# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL NO. 16-2738 (FLW) (LHG) |

*THIS DOCUMENT RELATES TO ALL CASES*

### PLAINTIFFS' FIRST AMENDED MASTER LONG FORM COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their counsel and pursuant to Case Management Order No. 1 ("CMO-1"), bring this First Amended Master Long Form Complaint against Defendants Johnson & Johnson ("J&J") and Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. ("J&J Consumer"), Imerys Talc America, Inc., f/k/a Luzenac America, Inc., f/k/a Rio Tinto Minerals, Inc. ("Imerys Talc") and Personal Care Products Council ("PCPC") (collectively referred to as "Defendants").

This First Amended Master Long Form Complaint sets forth questions of fact and law common to those claims subsumed within the context of this multidistrict proceeding. Plaintiffs seek compensatory and punitive damages, monetary restitution, equitable relief, and all other available remedies as a result of injuries incurred by Defendants' defective products. Plaintiffs make the following allegations based upon their personal knowledge and upon information and belief, as well as upon their attorneys' investigative efforts, regarding Defendants' talcum powder-containing products known as Johnson's Baby Powder and Shower to Shower (hereinafter together or individually, "the PRODUCTS").

This First Amended Master Long Form Complaint does not necessarily include all claims asserted in all of the transferred actions to this Court, nor is it intended to consolidate for any

purpose the separate claims of the Plaintiffs herein.  It is anticipated that individual plaintiffs may adopt this First Amended Master Long Form Complaint and the necessary causes of action herein through use of a separate short form complaint.  Any separate facts and additional claims of individual plaintiffs are set forth in those actions filed by the respective plaintiffs.  This First Amended Master Long Form Complaint does not constitute a waiver or dismissal of any actions or claims asserted in those individual actions, nor does any plaintiff relinquish the right to move to amend their individual claims to seek any additional claims as discovery proceeds.  As more particularly set forth herein, each plaintiff maintains that the PRODUCTS are defective, dangerous to human health, unfit and unsuitable to be advertised, marketed and sold in the United States, and lack proper warnings associated with their use.

## PARTIES

1.      Pursuant to CMO-1, this First Amended Master Long Form Complaint is filed for all Plaintiffs and, if applicable, Plaintiffs' spouses, children, decedents, Estates or wards represented by Plaintiffs' counsel who file a short form complaint.  By operation of CMO-1, all allegations pleaded herein are deemed pleaded in any short form complaint.

2.      Plaintiffs were diagnosed with various forms of cancer of the female reproductive system, including ovarian cancer, cancer of the fallopian tube, and primary peritoneal cancer, which were directly and proximately caused by their regular and prolonged exposure to talcum powder, contained in the PRODUCTS.

3.      Defendant, Johnson & Johnson, is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  Johnson & Johnson may be served with process by serving its registered agent at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

4.      At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS.   At all relevant times, Johnson & Johnson regularly transacted, solicited, and conducted business in all fifty States of the United States.

5.      Defendant Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. is a New Jersey corporation with its principal place of business in the State of New Jersey.  Johnson & Johnson Consumer Inc. may be served with process by serving its registered agent located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

6.      At all relevant times, upon information and belief, Johnson & Johnson Consumer Inc. was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS.  At all relevant times, Johnson & Johnson Consumer Inc. regularly transacted, solicited, and conducted business in all fifty States of the United States.

7.      At all relevant times, Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the PRODUCTS.

8.      Defendant Johnson & Johnson Consumer Inc. is and has been at all relevant times a wholly-owned subsidiary of Defendant Johnson & Johnson, under the complete dominion of and control of Defendant Johnson & Johnson.   Hereinafter, unless otherwise delineated, these two entities together shall be referred to as the "Johnson & Johnson Defendants."

9.      Defendant Imerys Talc America, Inc., f/k/a Luzenac America, Inc., f/k/a Rio Tinto Minerals, Inc. (hereinafter, "Imerys Talc"), is a Delaware corporation with its principal

place of business in the State of California, located at 1732 North First Street, Suite 450, San Jose, CA 95112.  At all relevant times, Imerys Talc has maintained a registered agent in the State of Delaware.  Imerys Talc may be served with process of this Court via service on its registered agent, Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

10.     At all relevant times, upon information and belief, Imerys Talc has been in the business of mining and distributing talc for use in talcum powder-based products, including the PRODUCTS.  Imerys Talc is the successor or continuation of Luzenac America, Inc. and Rio Tinto Minerals, Inc.  Imerys Talc is legally responsible for the conduct of Luzenac America, Inc. and Rio Tinto Minerals, Inc.

11.     Defendant Personal Care Products Council ("PCPC") f/k/a Cosmetic, Toiletry, and Fragrance Association ("CTFA"), is a corporation organized under the laws of the District of Columbia, with its principal place of business in the District of Columbia. At all relevant times, upon information and belief, Imerys Talc and Johnson & Johnson have been active members of PCPC.  PCPC may be served with process of this Court via service on its registered agent, Thomas Myers, at 1620 L Street, N.W., Suite 1200, Washington, District of Columbia 20036. PCPC is the successor or continuation of CTFA, and PCPC is legally responsible for CTFA's conduct.

12.     At all relevant times, upon information and belief, PCPC was a national trade association representing the personal care and cosmetics industry for the purposes of and, in fact, interacting with and influencing local, state and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc based body powders and the PRODUCTS.   The actions of Defendant PCPC in Washington DC has and have had repercussions throughout the talc industry, and in all states of the United States.

13.     Defendants John Does/Jane Does 1-30 are those persons, agents, employees, and/or representatives of Defendants whose conduct as described herein caused or contributed to the damages of Plaintiffs, all of whose names and legal identities are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

14.     Defendants Unknown Businesses and/or Corporations A-Z are unknown entities whose conduct as described herein caused or contributed to the damages of Plaintiffs, all of whose names and legal identities are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiffs and Defendants.

16.     The amount in controversy alleged by each of the respective individual Plaintiffs will exceed the sum or value of $75,000.

17.     Defendants have significant contacts with the federal judicial district identified in the short form complaint such that they are subject to the personal jurisdiction of the court in said district.

18.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the federal judicial district identified in the short form complaint.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

## FACTUAL ALLEGATIONS

**Overview of Talc**

19.     Talc is a magnesium trisilicate that is mined from the earth. Talc is an inorganic mineral.

20.     Talc is used in a wide array of industrial, commercial and cosmetic substances. It is the main substance in talcum powders, talc based body powders and the PRODUCTS.  The PRODUCTS are composed almost entirely of talc.

21.     At all relevant times, a feasible and safe alternative to talc has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness as talcum powders.

22.     At all relevant times, Defendant Imerys Talc[1] mined, refined, screened, tested and delivered the raw talc contained in the PRODUCTS.

23.     At relevant times, Imerys Talc continually advertised and marketed talc as safe for human use, and knew that its processed talc was intended for human use.

24.     Beginning in 2006 and until the present, Imerys Talc supplied its customers, including the Johnson & Johnson Defendants, with Material Safety Data Sheets ("MSDS") for talc, which conveyed health and warning information about talc.  *See* Ex. 1 (P-37 (IMERYS 049952)).[2]

25.     At relevant times, the Johnson & Johnson Defendants advertised and marketed their "Johnson's Baby Powder" product as a symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin feeling dry and comfortable, and "clinically proven gentle and mild."   The Johnson & Johnson Defendants induced women through advertisements to dust themselves with this product to mask odors.  The Johnson's Baby Powder bottle specifically targets women, stating: "For you, use every day to help feel soft,

---

[1]     All allegations regarding actions taken by Imerys Talc also include actions taken while that entity was known as Luzenac America, Inc.

[2]     All exhibits referenced in this Master Long Form Complaint are appended hereto and incorporated by reference.

fresh, and comfortable." *See* Ex. 2 (P-121 (excerpts from www.johnsonbaby.com and www.showertoshower.com); Ex. 3 (P-125 (JNJ 000058760)); and Ex. 4 (P-49 (picture of Johnson & Johnson's Baby Powder bottle)).

26.     At relevant times, the Johnson & Johnson Defendants advertised and marketed their "Shower to Shower" product as safe for use by women as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisements such as: "Your body perspires in more places than just under your arms.  Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body." The website included the suggested use of the product "Shower to Shower" in the genital area with the following: "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort." *See* Ex. 2; Ex. 4; and Ex. 5 (P-50 (picture of Johnson & Johnson's Shower to Shower bottle)).

27.     Although the labels on the bottles for the Johnson & Johnson Baby Powder and Johnson & Johnson Shower to Shower products have changed over time, the core message has been the same:  that women can safely use the products on their bodies including their genital areas.

**Strong Clinical Evidence Links Talc Use to Ovarian Cancer**

28.     In or about 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. W.J. Henderson and others in Cardiff, Wales.  *See* Ex. 6 (P-1 (Henderson, WJ, et al. Talc and carcinoma of the ovary and cervix.  Journal of Obstetrics and Gynaecology of the British Commonwealth. March 1971. Vol. 78. pp. 266-271)).

29.     In internal documents, Johnson & Johnson acknowledged over the course of decades, its recognition of and notice of the talc/ovarian cancer issue and that "if the results of

7

any scientific studies show any question of safety of talc" use, Johnson & Johnson would "not hesitate to take it off the market." *See* Ex. 7 (P-660 (JNJ000488208)); Ex. 8 (P-55 (JNJ000026241)); and Ex. 9 (P-115 (JNJ000024495)).

30.     Upon information and belief, in or about 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others. *See* Ex. 10 (P-3 (JNJ000020733)).  This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Upon information and belief, shortly after this study was published, Dr. Bruce Semple of Johnson & Johnson visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Johnson & Johnson should place a warning on its talcum powder products about the ovarian cancer risks so that women could make an informed decision about their health.

31.     A Johnson & Johnson Technology Forecast, dated 1986, acknowledged that safety of cosmetic powders was a concern and that health professionals had decided that powders provide no health benefit.  The document also acknowledged that "Retrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer." *See* Ex. 11 (P-9 (JNJ00000523)).

32.     Since publication of the Cramer study in 1982, there have been approximately twenty-seven (27) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women, including:

      a.   In 1983, a case-control study found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P., *et al.* Talc and Ovarian Cancer. *JAMA*. 1983; 250(14):1844.

b.  In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the genital area before their cancer diagnosis. The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their genital area and the relative risk for talc use between 1 and 9 years, relative to a shorter duration, was 1.6 (p = 0.05).  Whittemore AS, *et al.* Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol.* 1988 Dec; 128(6):1228-40.

c.  A 1989 study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls, and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once each week. Booth, M., *et al*. Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989 Oct; 60(4):592-8.

d.  In 1992, a case-control study found an 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. Harlow BL, *et al.* Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol.* 1992 Jul; 80(1):19-26.

e.  Another 1992 case-control study reported a 70% increased risk from genital talc use and a 379% significantly increased risk of ovarian cancer in women who used talc on sanitary napkins in their genital area. Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992 Apr; 45(1):20-5.

f.   Yet another 1992 case-control study by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months.  Yong Chen, *et al.*, Risk Factors for Epithelial Ovarian Cancer in Beijing, China, 21 *Int. J. Epidemiol.* 23-29 (1992).

g.   In 1995, the largest study of its kind to date found a 27% increased risk in ovarian cancer for women who regularly use talc in the abdominal or perineal area. Purdie, D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995 Sep 15; 62(6):678-84.

h.   In 1996, a case-control study found a statistically significant 97% increased risk of ovarian cancer in women who used what they described as a "moderate" or higher use of talc-based powders in their genital area. *See* Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8.

i.   In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women who performed any perineal dusting or used genital deodorant spray respectively had a statistically significant 60% to 90% higher risk of developing ovarian cancer. Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65.

j.   In 1997, a case-control study involving over 1,000 women found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc directly or via sanitary napkins to their perineal area. Chang, S, *et al*. Perineal talc exposure and risk of ovarian carcinoma. *Cancer*. 1997 Jun 15; 79(12):2396-401.

k.   In 1998, a case-control study found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. Godard, B., *et al*. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol*. 1998 Aug; 179(2):403-10.

l.   Dr. Daniel Cramer conducted another case-control study in 1999, observing 563 women newly diagnosed with epithelial ovarian cancer and 523 women in a control. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area and an 80% increase in risk for women with over 10,000 lifetime applications. Cramer, DW, *et al*. Genital talc exposure and risk of ovarian cancer. *Int J Cancer*. 1999 May 5; 81(3):351-56.

m.   In 2000, a case-control study including over 2,000 women found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. Ness, RB, *et al*. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology*. 2000 Mar; 11(2):111-7.

n.   In 2004, a case-control study of nearly 1,400 women from 22 counties in Central California found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use, and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. Importantly, this study

11

also examined women's use of cornstarch powders as an alternative to talc, and found no increased risk of ovarian cancer in women in the cornstarch group, supporting a safe alternative to talc for genital use. Mills, PK, *et al.* Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer.* 2004 Nov 10; 112(3):458-64.

o.  In a 2007 study by Buz'Zard, *et al.*, talc was found to increase proliferation, induce neoplastic transformation and increase reactive oxygen species (ROS) generation time-dependently in the ovarian cells.  The study concluded that talc may contribute to ovarian carcinogenesis in humans.  The data suggested that talc may contribute to ovarian neoplastic transformation and Pycnogenol reduced the talc-induced transformation. *Phytotherapy Research: PTR* 21, no. 6 (June 2007): 579–86.

p.  In 2008, a combined study of over 3,000 women from a New England-based case-control study found a 36% statistically significant increased risk for all types of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a highly significant dose-response relationship between the cumulative talc exposure and incidence of ovarian cancer (and all serous invasive ovarian cancer), adding further support to the causal relationship. Gates, MA, *et al.* Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemiol Biomarkers Prev.* 2008 Sep; 17(9):2436-44.

q.  A 2009 case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use, with an overall statistically significant 53% increased risk of ovarian cancer from

genital talc use. That increased risk rose dramatically, to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer.* 2009 Mar 15; 124(6):1409-15.

r.  In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011 May; 22(5):737-42.

s.  In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, KL, *et al.* Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila).* 2013 Aug; 6(8):811.

t.  In May 2015, Roberta Ness performed a meta-analysis of all accumulated epidemiologic evidence (23 case-control studies, 5 meta-analyses, and 3 analyses of a single cohohrt). Talc use was found to increase ovarian cancer by 30-60% in almost all well-designed studies. The results were published in the International Journal of Gynecological Cancer. Ness, R. Does talc exposure cause ovarian cancer? Intl. Jnl Gyn Cancer. 25 Suppl 1 (May 2015): 51.

u.  Also in 2015, Cramer, *et a*l. performed a retrospective case-control study. Overall, genital talc use was associated with an OR (95% CI) of 1.33 (1.16, 1.52), with a trend for increasing risk by talc-years. In addition, subtypes of

13

ovarian cancer more likely to be associated with talc included invasive serous and endometrioid tumors and borderline serous and mucinous tumors. Premenopausal women and postmenopausal HT users with these subtypes who had accumulated greater than 24 talc-years had ORs (95% CI) of 2.33 (1.32, 4.12) and 2.57 (1.51, 4.36), respectively. Epidemiology (Cambridge, Mass.), December 17, 2015.

v.  A 2016 study of African-American women found that body powder was significantly associated with Epithelial Ovarian Cancer.  Genital powder was associated with an increased risk of EOC (OR = 1.44; 95% CI, 1.11–1.86) and a dose–response relationship was found for duration of use and number of lifetime applications ($P < 0.05$).   The study concluded that body powder is a modifiable risk factor for epithelial ovarian cancer among African-American women. Schildkraut JM, et al. Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES). Cancer epidemiology, biomarkers & prevention: a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology. *Cancer Epidemiol Biomarkers Prev; 25(10); 1411–7.*[3]

w.  A 2016 study examined 2,041 cases with epithelial ovarian cancer and 2,100 age-and-residence-matched controls.  Genital use of talc was associated with a 1.33 OR with a trend for increasing risk by years of talc use.  Most women in the study reported using Johnson & Johnson's Baby Powder and Shower to Shower.

---

[3]     Johnson & Johnson was aware of the high rate of usage among African Americans (52%) and among Hispanics (37.6%). Ex. 12 (P-10 (JNJ000021093)).  Despite its knowledge of the increased risk of ovarian cancer, Johnson & Johnson targeted these populations in its marketing efforts. *Id.*

Among epidemiologic variables, no confounders for the association were identified. Cramer DW, et al. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. *Epidemiology*. 2016; 27, 334-46.

33.     In or about 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestos form talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. Ex. 13 (P-11 (JNJ000008945).

34.     Upon information and belief, in response to safety issues related to talc and talc based body powders, the Cosmetic Toiletry and Fragrance Association (CTFA), now known as Defendant PCPC, formed the Talc Interested Party Task Force (TIPTF). The TIPTF, which was originally formed in anticipation of litigation related safety issues, periodically convened, including in the 1980s to defend talc in response to epidemiologic studies that found an association between ovarian cancer and genital talc use. The task force once again convened in and around 1992 to combat the United States National Toxicology Program's study. Defendants Johnson & Johnson, Johnson & Johnson Consumer, Inc., and Luzenac – now known as Defendant Imerys Talc – were the primary actors and contributors to the TIPTF. *See* Ex. 14 (P-14 (JNJ000011704); and Ex. 15 (P-83 (LUZ011963)).

35.     The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend the use of talc and, specifically, talc based body powders at all costs, in anticipation of future litigation, ensure self-regulation, and to prevent local, state or federal regulation of any type over this industry. Imerys and the Johnson & Johnson Defendants wielded considerable influence on TIPTF. TIPTF hired scientists to perform biased research regarding the safety of talc. Members of TIPTF, including Johnson &

Johnson and Luzenac, edited reports of the scientists hired by this group before they were submitted to governmental agencies and/or released to the consuming public.  Members of TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on local, state and federal regulatory bodies regarding talc. These activities were conducted by these companies and organizations, including the Johnson & Johnson Defendants, PCPC, and Luzenac, over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to cancer.  *See* Ex. 14; Ex. 16 (P-13 (LUZ022044)); Ex. 17 (P-122 (JNJ000021035)); Ex. 18 (P-66 (LUZ006056)); Ex. 19 (P-90 (LUZ000566)); Ex. 20 (P-32 (LUZ001441); Ex. 21 (P-20 (JNJ000040596)); Ex. 22 (P-12 (IMERYS-A_0021921); Ex. 23 (P-27 (JNJ000000636)); and Ex. 24 (P-24 (LUZ006507)).

36.     At all times relevant, in anticipation of litigation and regulatory action, PCPC coordinated the defense of talc and talc based body powder and acted as a mouthpiece for the members of the TIPTF, including the Johnson & Johnson Defendants and Imerys.  PCPC, completely reliant on funding from cosmetic-industry companies, was motivated to defend talc and talc based body powders to retain its members involved with these products and retain their revenues. Upon information and belief, and at all times relevant, PCPC's revenue has been predominantly generated through a dues system based in part on its members' annual sales.  In addition, PCPC's salaries are nearly equivalent to the membership dues received, creating  a direct pecuniary interest in defending the safety of talc, talc based body powders and the PRODUCTS.

37.     In and around the mid-1970s, the Cosmetic Ingredient Review ("CIR") was formed to give PCPC and the cosmetic industry more credibility for self-regulation.  Since that time, CIR has reviewed the safety of ingredients used in the cosmetic and personal care products

16

industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC and its employees are paid by PCPC.

38.     Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry, but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1,800 ingredients to be "safe as used."  Additionally, the CIR Expert Panel annually holds two-day quarterly meetings to review substances.  Over the course of these annual meetings, the panel is able to review about 500 ingredients per year.  On average, only about 20 minutes is spent discussing the safety of each ingredient.

39.     Even though PCPC knew of the safety concerns surrounding talc and talc based body powders for almost three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, Defendants, including PCPC, influenced the CIR scientists writing and performing the review and, ultimately, edited the reviews in a biased manner.  Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

40.     Upon information and belief, in or about 1990, the U.S. Food and Drug Administration ("FDA") asked manufacturers to voluntarily stop putting talc on surgical gloves because mounting scientific evidence showed that it caused adhesions in surgical patients, an indication of a foreign body reaction.  On December 19, 2016, the FDA issued a ban on powdered surgical gloves, stating that "the risk of illness or injury posted by powdered gloves is unreasonable and substantial." *See* Ex. 25 (FDA, 21 CFR Parts 878, 880, and 895 [Docket No. FDA–2015–N–5017] RIN 0910–AH02 Banned Devices; Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove).

17

41.     On or about November 10, 1994, the Cancer Prevention Coalition mailed a letter to then Johnson & Johnson C.E.O., Ralph Larson, informing his company that studies as far back as 1960's ". . . show[ ] conclusively that the frequent use of talcum powder in the genital area pose[ ] a serious health risk of ovarian cancer." The letter cited a study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.  *See* Ex. 26 (P-18 (JNJ 000016645)).

42.     Upon information and belief, in or about 1996 and at the request of the FDA, the condom industry stopped dusting condoms with talc due to the growing health concerns.  *See* Ex. 27 (P-19 (LUZ011817)).

43.     On or about September 17, 1997, Johnson and Johnson's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by the Defendants regarding talc safety. Ex. 28 (P-73 (JNJ000024462)); and Ex. 21.

44.     In or about February of 2010, the International Association for the Research of Cancer (IARC), the specialized cancer agency of the World Health Organization, published a paper whereby it classified perineal use of talc based body powder as a "Group 2B" human carcinogen.  *See* Ex. 29 (P-29 (JNJ000381975)).  IARC, which is universally accepted as the international authority on determining the carcinogenicity of chemical substances and cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women who used talc in the perineal area.  IARC found that between 16-52%

of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%.  Despite the IARC listing of talc as a possible human carcinogen, documents show that industry, spearheaded by PCPC, continued to promote a national, state and local message about talc safety by recruiting scientists to publish articles that raised doubt about the link between perineal talc use and ovarian cancer. *See* Ex. 30 (P-78 (LUZ005090)); Ex. 31 (P-92 (LUZ003204)); Ex. 32 (P-348 (IMERYS 287251)); Ex. 33 (P-650 (IMERYS 288001)); and Ex. 20.

45.    In or about 2006, the Canadian government, under The Hazardous Products Act and associated Controlled Products Regulations, classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A."  *See* Ex. 34 (P-215 (IMERYS 255900)).

46.    In or about 2006, Imerys Talc began placing a warning on the Material Safety Data Sheets (MSDS) it provided to the Johnson & Johnson Defendants regarding the talc it sold to them to be used in the PRODUCTS. These MSDSs not only provided the warning information about the IARC classification, but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc. *See* Ex. 35 (P-37 (IMERYS 049952)).

47.    In 2008, the Cancer Prevention Coalition submitted a second "Petition Seeking a Cancer Warning on Cosmetic Talc Products" to the FDA.  The first Citizen Petition had been filed on November 17, 1994.  The second Petition requested that the FDA immediately require cosmetic talcum powder products to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer.  The FDA response to the two Citizen Petitions was filed on April 1, 2014. *See* Ex. 36 (P-47).

48.     In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their groin area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc products in that area.

49.     The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont publish a pamphlet entitled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

50.     Defendants knew of the adverse risks of using talc and talc based body powders in the perineal area and ovarian cancer and had a duty to warn about the potential hazards associated with the use of the PRODUCTS.  *See* Ex. 37 (P-341 (IMERYS 284935)).

51.     Defendants, though having knowledge of the increased risk of ovarian cancer associated with genital use of talc based body powder, nevertheless actively marketed the safety of the product to users and failed to inform customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of the PRODUCTS, particularly when used by women in the perineal area.  *See* Ex. 9; Ex. 38 (P-374 (JNJ000093556)); Ex. 39 (P-81 (LUZ001298)); and Ex. 12.

**52.**     In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc based body powders and the PRODUCTS to the public, and used influence over federal, state and local governmental and regulatory bodies regarding talc and talc based body powder.  *See* Ex. 21; Ex. 12; and Ex. 40 (P-26 (LUZ013095)).


**Federal Standards and Requirements**

53.     Talc as a cosmetic ingredient and talc based body powder as a cosmetic product is regulated by the FDA.  *See* Ex. 41 (P-324 (21 C.F.R. 740.1)).

54.     At all relevant times, Defendants had the obligation to comply with federal standards and regulations in the manufacture, design, marketing, branding, labeling, distribution, and sale of the PRODUCTS.

55.     Defendants, each individually, *in solido*, and/or jointly, violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq*., and regulations promulgated thereunder.

56.     Defendants have or may have failed to comply with federal standards and requirements governing the manufacture, design, marketing, branding and sale of the PRODUCTS including, but not limited to, the following violations of sections and subsections of the United States Code and the Code of Federal Regulations:

     a.  The PRODUCTS are adulterated pursuant in violation of 21 U.S.C. § 361 because, among other things, they contain a poisonous or deleterious substance which may render them injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual.

     b.  The PRODUCTS are misbranded in violation of 21 U.S.C. § 362 because, among other things, their labeling is false or misleading.

     c.  The PRODUCTS are misbranded in violation 21 U.S.C. § 362 because words, statements or other information required by or under authority of 21 U.S.C. § 362 are not prominently placed thereon with such conspicuousness and in such terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

d. The PRODUCTS are misbranded in violation of 21 C.F.R. § 701.1 because they contain false or misleading representations that they are safe for daily application to all parts of the female body.

e. The PRODUCTS do not bear a warning statement, in violation of 21 C.F.R. § 740.1, to prevent a health hazard that may be associated with the PRODUCTS, namely that the PRODUCTS may cause ovarian cancer or a heightened risk of ovarian cancer when applied to the perineal area.

f. The PRODUCTS do not prominently and conspicuously bear a warning statement, in violation of 21 C.F.R. § 740.2, as to the risk of ovarian cancer caused by use of the PRODUCTS when applied to the perineal area, in such terms and design that it is likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

g. The PRODUCTS, in violation of 21 C.F.R. § 740.10, do not conspicuously state on their principal display panel that the safety of the PRODUCTS have not been determined and/or that the safety of the PRODUCTS' principal ingredients have not been determined.

### COUNT I - STRICT LIABILITY-FAILURE TO WARN
### (Against Imerys Talc)

57.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

58.     Imerys Talc is liable under a theory of strict products liability as set forth in §402A of the Restatement of Torts (Second).

59. At all relevant times, Imerys Talc mined and sold talc to the Johnson & Johnson Defendants with full knowledge that the Johnson & Johnson Defendants were then packaging the talc and selling to consumers as the PRODUCTS and that consumers of the PRODUCTS were using it to powder their perineal regions.

60. At all relevant times, by mining, refining, screening and testing talc, and supplying that talc to the Johnson & Johnson Defendants for use in the PRODUCTS, Imerys Talc was knowingly an integral part of the overall manufacture, design and production of the PRODUCTS, and the PRODUCTS' introduction into the stream of interstate commerce.

61. At all relevant times, Imerys Talc knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when applied to a woman's perineal regions, and it knew or should have known that the Johnson & Johnson Defendants were not warning consumers of this danger.

62. At all relevant times, Imerys Talc knew or should have known that the use of the PRODUCTS significantly increases the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

63. At all relevant times, the PRODUCTS were defective and unreasonably dangerous when used in a reasonably foreseeable manner because, despite Imerys Talc's knowledge that the PRODUCTS were carcinogenic and could lead to an increased risk of ovarian cancer, Imerys Talc failed to provide adequate warning and/or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer associated with the use of the PRODUCTS when applied to the perineal area.

64.     Had Plaintiffs received warning or instruction regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

65.     Due to the absence of any warning or instruction by the Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

66.     As a direct and proximate result of Imerys Talc's failure to warn Plaintiffs of the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, despite its actual knowledge of this material fact, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT II - STRICT LIABILITY-FAILURE TO WARN
### (Against The Johnson & Johnson Defendants)

67.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

68.     The Johnson & Johnson Defendants are liable under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

69.     At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

70.     At all relevant times, the Johnson & Johnson Defendants knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

71.     At all relevant times, the PRODUCTS, manufactured and supplied by the Johnson & Johnson Defendants, were defective and unreasonably dangerous because, despite the Johnson & Johnson Defendants' knowledge that the PRODUCTS were carcinogenic and lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, the Johnson & Johnson Defendants failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

72.     At all relevant times, Plaintiffs used the PRODUCTS to powder their perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

73.     Had Plaintiffs received warning and/or instruction from the Johnson & Johnson Defendants regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

74.     Due to the absence of any warning or instruction by the Johnson & Johnson Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

75.     As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed and introduced into the stream of commerce by the Johnson & Johnson Defendants, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including

but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT III – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against Imerys Talc)

76.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

77.     Imerys Talc is liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

78.     At all relevant times, Defendant Imerys Talc was engaged in the business of mining and distributing talcum to the Johnson & Johnson Defendants for use in the PRODUCTS, and Imerys Talc was knowingly an integral part of the overall manufacture, design and production of the PRODUCTS, and their introduction into the stream of interstate commerce.

79.     At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in their condition.

80.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Imerys Talc in that, when Imerys Talc supplied its talc product to the Johnson & Johnson Defendants with full knowledge that the Johnson & Johnson Defendants would use the talc in formulating the PRODUCTS, and that the talc would be the primary ingredient in the PRODUCTS, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

81.     At all relevant times, the PRODUCTS were defectively manufactured and designed by Imerys Talc in that their design and formulation were more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

82.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

83.     As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT IV – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against The Johnson & Johnson Defendants)

84.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

85.     The Johnson & Johnson Defendants are liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

86.     At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

87.     At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in condition.

88.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by the Johnson & Johnson Defendants in that, when the PRODUCTS

left the hands of the Johnson & Johnson Defendants, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

89.     At all relevant times, the PRODUCTS were defectively manufactured and designed by the Johnson & Johnson Defendants in that their design and formulation was more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

90.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

91.     At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by the Johnson & Johnson Defendants to manufacture a product with the same therapeutic purpose as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, the Johnson & Johnson Defendants failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

92.     As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT V- BREACH OF EXPRESS WARRANTIES
#### (Against The Johnson & Johnson Defendants)

93.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

94.     The Johnson & Johnson Defendants, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. The Johnson & Johnson Defendants' express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

a.     The Johnson & Johnson Defendants advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

b.     The Johnson & Johnson Defendants advertised SHOWER to SHOWER to be applied around or on the perineal area.  For example, the Johnson & Johnson Defendants advertised that women should use SHOWER to SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

95.     The Johnson & Johnson Defendants, through the advertisements as listed above, made express warranties to Plaintiffs and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

96.     At all relevant times, the Johnson & Johnson Defendants breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS, when used in this manner for which the Johnson & Johnson Defendants advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

97.     At all relevant times, the Johnson & Johnson Defendants had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

98.     At all relevant times, the Johnson & Johnson Defendants willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiffs and the consuming public.

99.     At all relevant times, in reliance upon the express warranties made by the Johnson & Johnson Defendants as set forth above, Plaintiffs purchased and used the PRODUCTS in their perineal area, believing that the PRODUCTS were safe when used in this manner.

100.     As a direct and proximate result of the Johnson & Johnson Defendants' express warranties concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VI – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against The Johnson & Johnson Defendants)

101.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual plaintiffs' resident State.

102.     At the time the Johnson & Johnson Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the

PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

103.    Members of the consuming public, including consumers such as Plaintiffs, were intended third-party beneficiaries of the warranty.

104.    The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

105.    Plaintiffs reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and free of defects.

106.    The Johnson & Johnson Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

107.    The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous.   Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiffs and the general public.   The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform Plaintiffs or the unsuspecting consuming public.   The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

108.    As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VII – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

**(Against The Johnson & Johnson Defendants)**

109.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles including the law of the Plaintiffs' resident State.

110.     The Johnson & Johnson Defendants manufactured, supplied and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

111.     Members of the consuming public, including Plaintiffs, were the intended third-party beneficiaries of the warranty.

112.     The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

113.     Plaintiffs reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and effective for use by women in the perineal area.

114.     The Johnson & Johnson Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiffs' injuries.

115.     The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous. The Johnson & Johnson Defendants risked the lives of the consumers and users of their products, including Plaintiffs, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public.  The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or

inform the unsuspecting consuming public.  The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

116.    As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VIII - NEGLIGENCE
### (Against Imerys Talc)

117.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

118.    At all relevant times, Imerys Talc mined, refined, screened, tested and sold talc to the Johnson & Johnson Defendants, which it knew that the Johnson & Johnson Defendants were then packaging and selling to consumers as the PRODUCTS, and that consumers of the PRODUCTS were using it to powder their perineal regions.

119.    At all relevant times, Imerys Talc had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring and sale of the PRODUCTS.

120.    At all relevant times, Imerys Talc knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when used in a woman's perineal regions, and it knew or should have known that the Johnson & Johnson Defendants did not warn its consumers of that danger.

121.    At all relevant times, Imerys Talc was negligent in supplying talc to the Johnson & Johnson Defendants, when it knew or should have known that the talc would be used in the PRODUCTS, without adequately taking steps to ensure that consumers of the PRODUCTS, including Plaintiffs, received material information that Imerys Talc possessed on carcinogenic properties of talc, including its risk of causing ovarian cancer.

122.    At all relevant times, Imerys Talc breached its duty of reasonable care to Plaintiffs in that it negligently designed, developed, marketed, labeled, manufactured, formulated, tested, monitored and/or sold talc to the Johnson & Johnson Defendants.

123.    As a direct and proximate result of Imerys Talc's negligence, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT IX - NEGLIGENCE
### (Against the Johnson & Johnson Defendants)

124.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

125.    At all relevant times, the Johnson & Johnson Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

126.    At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and sale of the PRODUCTS.

127.     At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care and to warn Plaintiffs and the consuming public of the risk, dangers and adverse side effects of the PRODUCTS.

128.     At all relevant times, the Johnson & Johnson Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

129.     The Johnson & Johnson Defendants breached their duty to Plaintiffs and were otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and/or sale of the PRODUCTS utilized by Plaintiffs, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

130.     The Johnson & Johnson Defendants were further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonable foreseeable use.

131.     As a direct and proximate result of the Johnson & Johnson Defendants' negligence, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT X - NEGLIGENCE
### (Against PCPC)

132.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

133.    At all relevant times, PCPC was a national trade association representing the personal care and cosmetics industry of which the Johnson & Johnson Defendants and Imerys Talc were active members.

134.    At all relevant times, upon information and belief, the purpose and intent of PCPC was to interact with and influence local, state and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc based body powders and the PRODUCTS.

135.    At all relevant times, PCPC had actual knowledge of the significant risk of ovarian cancer caused by application of talc, talc based body powders and the PRODUCTS to the female perineal area.

136.    At all relevant times, PCPC voluntarily undertook a duty of care to Plaintiffs by self-regulating the cosmetics industry by promulgating federal, state and local standards, norms and/or bylaws that govern, control and/or inform the manufacturing, design, labeling, marketing, distribution and/or branding practices of its member companies, including but not limited to the Johnson & Johnson Defendants and Imerys Talc.

137.    At all relevant times, PCPC had the means and authority to control the federal, state and local safety standards of the Johnson & Johnson Defendants and Imerys Talc in the manufacturing, design, labeling, marketing, distribution and/or branding of talc, talc based body powder and the PRODUCTS.

138.    PCPC breached its duty of care to Plaintiffs and the consuming public by negligently failing to ensure that the Johnson & Johnson Defendants and Imerys Talc complied with and adhered to the PCPC standards, norms and/or bylaws concerning the safe manufacture, design, labeling, marketing, distribution and/or branding of talc, talc based body powders and the PRODUCTS, and subsequently allowing the talc, talc based body powders and PRODUCTS to

be introduced into the federal, state and local streams of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge.

139.     PCPC engaged in activities for the unlawful purpose of promoting its private and commercial interests, the interests of its member companies and talc, specifically, talc based body powder and the PRODUCTS.   PCPC's coordinated efforts, specifically designed to influence the regulation and marketing of talc, talc based body powder and the PRODUCTS on a local, state and national level, facilitated conduct which had no legitimate purpose.   PCPC's conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

140.     As a direct and proximate result of PCPC's negligence, the Johnson & Johnson Defendants and Imerys Talc manufactured, designed, labeled, marketed, distributed and branded talc, talc based body powders and the PRODUCTS on a federal, state and local level in a way that foreseeably caused a significant risk of ovarian cancer when the talc, talc based body powders and/or the PRODUCTS were applied to the female perineal area.

141.     As a further direct and proximate result of PCPC's negligence, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT XI – NEGLIGENT MISREPRESENTATION
### (Against the Johnson & Johnson Defendants)

142.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.   Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

143.     At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

144.     At all relevant times, the Johnson & Johnson Defendants had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

145.     Through their actions and omissions in advertising, promoting, labeling and otherwise, the Johnson & Johnson Defendants made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiffs concerning the character, safety and effectiveness of the PRODUCTS.

146.     At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

    a.  The Johnson & Johnson Defendants labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

    b.  The Johnson & Johnson Defendants advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

c.   The Johnson & Johnson Defendants, through the advertisements described above, among others, misrepresented to consumers, including Plaintiffs, that the PRODUCTS were safe for use all over the body, including the female perineal area.

d.   Despite actual knowledge of the health risks of the PRODUCTS, the Johnson & Johnson Defendants failed to disclose to the consumers and Plaintiffs, through adequate warnings, representations, labeling or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

e.   Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, the Johnson & Johnson Defendants failed to disclose to consumers, including Plaintiffs, through adequate warnings, representations, labeling or otherwise, that material fact.

147.   At all relevant times, the Johnson & Johnson Defendants failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiffs and/or concealed relevant facts that were known to them.

148.   At all relevant times, Plaintiffs were not aware of the falsity of the foregoing misrepresentations, nor were they aware that material facts concerning talc and the PRODUCTS had been concealed or omitted. In reasonable reliance upon the Johnson & Johnson Defendants' misrepresentations and/or omissions, Plaintiffs were induced to and did purchase the PRODUCTS and did use the PRODUCTS on their perineal areas. If the Johnson & Johnson

Defendants had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiffs would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

149.     Plaintiffs' reliance upon the Johnson & Johnson Defendants' misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiffs were not in a position to know these material facts, and because the Johnson & Johnson Defendants failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiffs to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, the Johnson & Johnson Defendants' corporate officers, directors and/or managing agents knew of and ratified the acts of the Johnson & Johnson Defendants, as alleged herein.

150.     As a direct and proximate result of the Johnson & Johnson Defendants' negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT XII - FRAUD
**(Against the Johnson & Johnson Defendants)**

151.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

152.    At all relevant times, the Johnson & Johnson Defendants intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiffs.

153.    At all relevant times, the Johnson & Johnson Defendants misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiffs, with knowledge of the falsity of their misrepresentations.

154.    At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by the Johnson & Johnson Defendants include, but are not limited to the following:

   a.   The Johnson & Johnson Defendants falsely labeled and advertised the
        PRODUCTS in the following ways, among others: "For you, use every day to
        help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away,"
        "your body perspires in more places than just under your arms," "Use SHOWER
        to SHOWER to feel dry, fresh, and comfortable throughout the day," and
        "SHOWER to SHOWER can be used all over your body."

   b.   The Johnson & Johnson Defendants falsely advertised SHOWER to SHOWER
        to be applied "all over," and in particular, urged women to use it to "Soothe Your
        Skin: Sprinkle on problem areas to soothe skin that has been irritated from
        friction. Apply after a bikini wax to help reduce irritation and discomfort."

   c.   The Johnson & Johnson Defendants, through the advertisements described
        above, knowingly misrepresented to Plaintiffs and the public that the

PRODUCTS were safe for use all over the body, including the perineal areas of women.

d.  The Johnson & Johnson Defendants intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e.  The Johnson & Johnson Defendants intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity and duration of any serious injuries resulting therefrom.

f.  Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

155.  At all relevant times, the Johnson & Johnson Defendants actively, knowingly and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use the PRODUCTS in the female perineal area.

156.  At all relevant times, the consuming public, including Plaintiffs, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

157.  At all relevant times, Plaintiffs relied on the Johnson & Johnson Defendants' misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS

and using the PRODUCTS on their perineal areas, and their reliance was reasonable and justified.

158.    As a direct and proximate result of the Johnson & Johnson Defendants' fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XIII - FRAUD
### (Against PCPC)

159.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

160.    At all relevant times, PCPC intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users of talc based body powders and the PRODUCTS, including Plaintiffs.

161.    At all relevant times, PCPC intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed materials facts to local, state and federal regulators in order to unduly influence the regulation and marketing of talc, talc based body powders and the PRODUCTS.  The actions of PCPC on a local, state and federal level impacted what material facts were or could be disclosed to consumers and users of talc based body powders and the PRODUCTS, including Plaintiffs.

162.    At all relevant times, PCPC, on a local, state and federal level, fraudulently misrepresented and/or concealed material facts to consumers and users of the PRODUCTS, including Plaintiffs, with knowledge of the falsity of their misrepresentations.

163.   At all relevant times, PCPC fraudulently misrepresented and/or concealed materials facts to local, state and federal regulators in order to unduly influence the regulation and marketing of talc, talc based body powders and the PRODUCTS.  The fraudulent actions of PCPC on a local, state and federal level impacted what material facts were or could be disclosed to consumers and users of talc based body powders and the PRODUCTS, including Plaintiffs.

164.   At all relevant times, upon information and belief, PCPC's conduct giving rise to fraud includes, but is not limited, to the following:

a.   PCPC formed the TIPTF, with the purpose of self-regulating the talc industry and to pool financial resources in an effort to prevent regulation of talc, including talc based body powders and the PRODUCTS.

b.   PCPC, through the TIPTF, hired and funded scientists to perform research regarding the safety of talc.  The TIPTF then edited the scientific reports in an effort to skew the data so that it demonstrated safety of talc and talc based body powder and suppressed data demonstrating these dangers.  The TIPTF then released and disseminated this biased and intentionally misleading data to local, state and federal governmental agencies, with the intent that the biased and intentionally misleading data would influence material facts that were or could be disclosed to consumers of talc, talc based body powders and the PRODUCTS, including Plaintiffs.

c.   PCPC, through the TIPTF, knowingly released false information about the safety of talc based body powder to the consuming public with the intent to induce consumers, including the Plaintiffs, to purchase talc based body powders.

d.   PCPC extensively lobbied and used political and economic influence on local, state and federal governmental bodies in order to prevent regulation of talc based

body powder, including the PRODUCTS.  These efforts were based knowingly

on false and misleading information about the safety of talc and talc based body

powder.

e.   PCPC caused to be released, published and disseminated, medical and scientific

data, literature and reports containing information and statements regarding the

risks of ovarian cancer which PCPC knew were incorrect, incomplete and

misleading.

f.   PCPC's action impacted the perceptions about the safety of talc and talc based

body powder in the public domain in a manner that falsely made it appear as

though the PRODUCTS were safe and that their use did not pose a risk for

women of contracting cancer of the reproductive system. PCPC's actions

contaminated and falsely influenced  the  risk /benefit  information available   in

the public domain to the detriment of consumers, including the Plaintiffs.

165.    At all relevant times, PCPC actively, knowingly and intentionally concealed and

misrepresented these material facts to consumers, including Plaintiffs, with the intent to deceive

the public and Plaintiffs, and with the intent that consumers would purchase and use talc based

body powder and the PRODUCTS in the female perineal area.

166.    At all relevant times, PCPC actively, knowingly and intentionally misrepresented

these material facts to local, state and federal governmental agencies with the intent to deceive

these agencies and influence material facts conveyed to consumers, including Plaintiffs, with the

intent that consumers would purchase and use talc based body powder and the PRODUCTS in

the female genital area.

167.    The consuming public, including Plaintiffs, would not have purchased talc based

body powders and/or the PRODUCTS and/or applied talc based body powders and/or the

PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in that manner.

168.    At all relevant times, Plaintiffs relied on PCPC's self-regulation of and misrepresentations concerning the safety of talc based body powders and the PRODUCTS and PCPC's fraudulent conduct when purchasing talc based body powders and/or the PRODUCTS and using them in their perineal areas, and their reliance was reasonable and justified.

169.    PCPC engaged in, coordinated or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

170.    As a direct and proximate result of PCPC's fraudulent conduct concerning talc based body powder and the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XIV – VIOLATION OF CONSUMER PROTECTION LAWS
### (Against The Johnson & Johnson Defendants)

171.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

172.    Plaintiffs purchased and used the PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of the Johnson & Johnson Defendants' actions in violation of the consumer protection laws applicable to the individual Plaintiffs' resident State.

173.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

a.   Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

b.   Advertising goods or services with the intent not to sell them as advertised;

c.   Over-promotion of the PRODUCTS, including but not limited to over-promotion of their safety and efficacy; and

d.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

174.   The Johnson & Johnson Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the PRODUCTS.

175.   The Johnson & Johnson Defendants uniformly communicated the purported benefits of the PRODUCTS while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of the PRODUCTS, especially use in the perineal area, and of the true state of the PRODUCTS' safety, efficacy and usefulness.  The Johnson & Johnson Defendants made these representations to consumers, including Plaintiffs, in the marketing and advertising described herein.   The Johnson & Johnson Defendants' conduct in connection with the PRODUCTS was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because the Johnson & Johnson Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy and advantages of the PRODUCTS.

176.   As a result of these violations of consumer protection laws, Plaintiffs have incurred damage and other expenses, for which the Johnson & Johnson Defendants are liable.

177.   As a direct and proximate result of the Johnson & Johnson Defendants' violation of consumer protection laws concerning the PRODUCTS, as described herein, Plaintiffs suffered

Case 3:16-md-02738-MAS-RLS   Document 128-1   Filed 03/14/17   Page 49 of 65 PageID: 1681

and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.


## COUNT XV – FRAUDULENT CONCEALMENT
### (Against Imerys Talc)

178.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

179.     Prior to Plaintiffs' use of the PRODUCTS and during the period in which plaintiffs actually used the PRODUCTS, Imerys Talc fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch based products for the same purposes.  Furthermore, Imerys Talc fraudulently concealed the safety information about the use of talc, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this First Amended Master Long Form Complaint were intentional so as to maintain the sales volume of its talc.

180.     Imerys Talc intentionally concealed safety issues with talc generally in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

181.     At the time Imerys Talc concealed the fact that the PRODUCTS were not safe as designed and marketed by the Johnson & Johnson Defendants, Imerys Talc was under a duty to

communicate this information to the general public in such a manner that the general public would appreciate the risks associated with using the PRODUCTS, generally.

182.     Plaintiffs relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

183.     As a direct and proximate result of Imerys Talc's malicious and intentional concealment of material and information, Defendants caused or significantly contributed to Plaintiffs' injuries.

184.     Imerys Talc furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

185.     Imerys Talc's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Imerys Talc must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

186.     As a direct and proximate result of Imerys Talc's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XVI – FRAUDULENT CONCEALMENT
### (Against The Johnson & Johnson Defendants)

187.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

188.     Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, the Johnson & Johnson Defendants fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the

49

availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch based products for the same purposes.  Furthermore, the Johnson & Johnson Defendants fraudulently concealed the safety information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this First Amended Master Long Form Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

189.    The Johnson & Johnson Defendants intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

190.    At the time the Johnson & Johnson Defendants concealed the fact that the PRODUCTS were not safe as designed and marketed, the Johnson & Johnson Defendants were under a duty to communicate this information to the general public in such a manner that the general public culd appreciate the risks associated with using the PRODUCTS, generally.

191.    Plaintiffs relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

192.    As a direct and proximate result of the Johnson & Johnson Defendants' malicious and intentional concealment of material and information, the Johnson & Johnson Defendants caused or significantly contributed to Plaintiffs' injuries.

193.    The Johnson & Johnson Defendants furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

194.    The Johnson & Johnson Defendants' acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

195.    The Johnson & Johnson Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which the Johnson & Johnson Defendants must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

196.    As a direct and proximate result of the Johnson & Johnson Defendants' fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XVII – FRAUDULENT CONCEALMENT
### (Against PCPC)

197.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

198.    Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, PCPC fraudulently suppressed material information regarding the safety and efficacy of talc based body powders and the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch based products for the same purposes.  Furthermore, PCPC fraudulently concealed the safety information about the use of talc, generally, and talc based body powder on the perineal area, specifically.  Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this First Amended Master Long Form Complaint was intentional so as to maintain the sales volume of talc, talc based body powders and the PRODUCTS.

199.     PCPC fraudulently suppressed material information from local, state and federal government agencies regarding the safety and efficacy of talc based body powders and the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch based products for the same purposes. Furthermore, PCPC fraudulently concealed the safety information about the use of talc, generally, and the application of talc based body powder to the female genital area, specifically.

200.     PCPC intentionally concealed safety issues with talc based body powders, generally, in order to induce consumers, including plaintiffs, to purchase the PRODUCTS.

201.     At the time PCPC concealed the fact that talc based body powders and the PRODUCTS were not safe as designed and marketed by the Johnson & Johnson Defendants, PCPC was under a duty to communicate this information to local, state and federal agencies, as well as the general public, in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

202.     Plaintiffs relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of talc based body powders and the PRODUCTS when used in the female genital area.

203.     PCPC engaged in, coordinated or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

204.     As a direct and proximate result of PCPC's malicious and intentional concealment of material and information, PCPC caused or significantly contributed to Plaintiffs' injuries.

205.    PCPC furthered this fraudulent concealment through a continued and systematic failure to disclose information to local, state and federal government agencies, Plaintiffs and the public.

206.    PCPC's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

207.    PCPC's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which PCPC must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

208.    As a direct and proximate result of PCPC's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XVIII – CIVIL CONSPIRACY
### (Against All Defendants)

209.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this First Amemded Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the individual Plaintiffs' resident State.

210.    At all relevant times, the Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, acted in concert, aided and abetted and/or conspired to cause Plaintiffs' injuries by exposing Plaintiffs to the PRODUCTS, which are harmful and dangerous.

211.   Further, at all relevant times, the Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted and/or conspired to defraud Plaintiffs and consumers of the PRODUCTS regarding the true nature of the PRODUCTS and their potential to cause ovarian cancer when used in a reasonably foreseeable manner.

212.   At all relevant times, the Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted and/or conspired to defraud Plaintiffs and consumers of the PRODUCTS with the purpose of maintaining the popularity and reputation of the PRODUCTS and, therefore, maintaining high sales of the PRODUCTS, at the expense of consumer safety.

213.   At all relevant times, pursuant to and in furtherance of said conspiracies, the Defendants performed the following overt and unlawful acts:

a.   For many decades, upon information and belief, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which indicate that, when applied to the perineal area, an ordinary and foreseeable use by women, talc based body powder and the PRODUCTS are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly;

b.   Upon information and belief, despite the medical and scientific data, literature and test reports possessed by and available to the Defendants, Defendants individually, jointly and in conspiracy with each other, fraudulently, willfully and maliciously:

i.   Withheld, concealed and suppressed said medical information regarding the increased risk of ovarian cancer from consumers, including Plaintiffs;

ii.   Through the TIPTF, Defendants instituted a "defense strategy" to defend talc based body powder at all costs. Admittedly, the Defendants, through

the TIPTF, used their influence over the NTP Subcommittee, and the

threat of litigation against the NTP, to prevent the NTP from classifying

talc as a carcinogen on its 10th RoC;

  iii. Defendants, through the TIPTF, used their influence over local, state and

federal agencies to control material facts disclosed to consumers,

including Plaintiffs; and

  iv. Caused to be released, published and disseminated medical and scientific

data, literature, and test reports containing information and statements

regarding the risks of ovarian cancer, which Defendants knew were

incorrect, incomplete and misleading.

 c. Upon information and belief, by these false and fraudulent representations,

omissions and concealments, Defendants intended to induce consumers,

including Plaintiffs, to rely upon said false and fraudulent representations,

omissions and concealments, and to continue to expose themselves to the dangers

inherent in the use of talc based body powders and the PRODUCTS.

214. Plaintiffs reasonably relied upon the aforementioned fraudulent representations, omissions and concealments made by the Defendants regarding the nature of talc based body powder and the PRODUCTS.

215. PCPC engaged in, coordinated or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

216. As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of talc based baby powder and the PRODUCTS which were made pursuant to and in

furtherance of a common scheme, and Plaintiffs' reliance thereon, Plaintiffs suffered and continues to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorney fees.

**COUNT XIX - LOSS OF CONSORTIUM**
**(Against All Defendants)**

217.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

218.    At all relevant times hereto, Plaintiffs had spouses (hereafter referred to as "Spouse Plaintiffs") and/or family members (hereafter referred to as "Family Member Plaintiffs") who have suffered injuries and losses as a result of the PRODUCTS and Plaintiffs' injuries.

219.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment, monitoring, medications and other expenditures, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

220.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love and affection.

221.    For all Spouse Plaintiffs, Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

222.    Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

223.    As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs, Family Member Plaintiffs and/or intimate partners of the aforesaid Plaintiffs, have sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial. Defendants are liable to Spouse Plaintiffs, Family Member Plaintiffs and intimate partners jointly and severally for all general, special and equitable relief to which Spouse Plaintiffs, Family Member Plaintiffs and intimate partners are entitled by law.

### COUNT XX - PUNITIVE DAMAGES
### (Against All Defendants)

224.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles including the law of the Plaintiffs' resident State.

225.     Defendants sold the PRODUCTS to Plaintiffs and other consumers throughout the United States without doing adequate testing to ensure that the PRODUCTS were reasonably safe for their intended use.

226.    Defendants sold the PRODUCTS to Plaintiffs and other consumers throughout the United States in spite of their knowledge that the PRODUCTS cause the problems heretofore set forth in this Master Long Form Complaint, thereby causing the severe and debilitating injuries suffered by the Plaintiffs.

227.     At all times relevant hereto, Defendants knew or should have known that the PRODUCTS were inherently dangerous with respect to the risk of ovarian cancer, loss of life's

enjoyment, an effort to cure the conditions proximately related to the use of the PRODUCTS, as well as other severe and personal injuries which are permanent and lasting in nature.

228.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the PRODUCTS, including but not limited to information regarding the increased risk of developing ovarian cancer when the PRODUCTS are used in the perineal area.

229.    Defendants' misrepresentations included knowingly withholding material information from the consumers, including Plaintiffs, concerning the safety and efficacy of the PRODUCTS.

230.    At all times material hereto, Defendants knew and intentionally and/or recklessly disregarded the fact that the PRODUCTS cause debilitating and potentially lethal side effects with greater frequency than safer alternative products.

231.    At all times material hereto, Defendants knew and intentionally and/or recklessly disregarded the fact that the PRODUCTS cause debilitating and potentially lethal side effects with greater frequency than safer alternative products and recklessly failed to advise the public of the same.

232.    At all times material hereto, Defendants intentionally misstated and misrepresented data, and continue to misrepresent data, so as to minimize the true and accurate risk of injuries and complications caused by the PRODUCTS.

233.    Notwithstanding the foregoing, Defendants continue to aggressively market the PRODUCTS to consumers, without disclosing the true risk of side effects.

234.    Defendants knew that the PRODUCTS were defective and of an unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute and sell the PRODUCTS so as to maximize sales and profits at the expense of the health and safety of the

Public, including Plaintiffs, in conscious and/or reckless disregard of the foreseeable harm caused by the PRODUCTS.

235.    Defendants continue to intentionally conceal and/or recklessly and/or grossly negligently fail to disclose to the public, including Plaintiffs, the serious side effects of the PRODUCTS in order to ensure continued and increased sales.

236.    Defendants' intentional, reckless and/or grossly negligent failure to disclose information deprived Plaintiffs of necessary information to enable them to weigh the true risks of using the PRODUCTS against their benefits.

237.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs have required and will require health care and services, and have incurred medical, health care, incidental and related expenses. Plaintiffs are informed and believe and further allege that Plaintiffs will in the future be required to obtain further medical care and/or hospital care and medical services.

238.    Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant to Common Law principles and the statutory provisions of the Plaintiffs' respective states.

239.    Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

### COUNT XXI - DISCOVERY RULE AND TOLLING
### (Against All Defendants)

240.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles including the law of the Plaintiffs' resident State.

241.     Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

242.     Plaintiffs plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

243.     Despite diligent investigation by Plaintiffs into the cause of their injuries, the nature of Plaintiffs' injuries and damages and their relationship to the PRODUCTS was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

244.     The running of the statute of limitations in this cause is tolled due to equitable tolling. Defendant(s) are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiffs and/or the consuming public, of the true risks associated with the PRODUCTS.  As a result of the Defendants' fraudulent concealment, Plaintiffs and/or Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendant(s).

## COUNT XXII - WRONGFUL DEATH
### (Against All Defendants)

245.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this First Amended Master

Lon Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles including the law of the Plaintiffs' resident State.

246.    Plaintiffs Decedents' spouses, beneficiaries and/or lawful representatives of Decedents' Estates bring this claim on behalf of themselves and as the Decedents' lawful beneficiaries.

247.    As a direct and proximate result of the conduct of the Defendants and the defective nature of the PRODUCTS as outlined above, Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

248.    As a direct and proximate cause of the conduct of Defendants, Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedents' deaths.  Plaintiffs, Administrators of Decedents' estates, bring this claim on behalf of Decedents' lawful beneficiaries for these damages and for all pecuniary losses sustained by said beneficiaries pursuant to any and all relevant statutes.

249.    As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of the PRODUCTS, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, damages for wrongful death, together with interest, costs of suit, attorneys' fees, punitive damages and such further relief as the Court deems equitable and just.

<u>**COUNT XXIII - SURVIVAL ACTION**</u>
<u>**(Against All Defendants)**</u>

250.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this First Amended Master

Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles including the law of the Plaintiffs' resident State.

251.   As a direct and proximate result of the conduct of Defendants, Decedents, prior to their deaths, were obligated to spend various sums of money to treat their injuries, which debts have been assumed by their estates. As a direct and proximate cause of the aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of their deaths and, as a direct and proximate result of the aforesaid, Decedents suffered a loss of earnings and earning capacity. Plaintiffs' spouses, as Administrators of the Estates of Decedents, bring this claim on behalf of the estates for damages under any and all applicable statute or common law.

252.   As a direct and proximate result of the conduct of Defendants, Decedents and their spouses, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder. This claim is brought on behalf of the Estates of the Decedents pursuant to any and all applicable statutes or common law.

253.   As a direct and proximate result of the conduct of Defendants, and including the observances of the suffering of the Decedents, until the date of their deaths, Plaintiffs suffered permanent and ongoing psychological damage.

254.   As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment.  Plaintiffs' spouses, as Administrators of the Estates of the Decedents, bring the claims on behalf of the Estates for damages any and all applicable statutes or common law and in their own right.

255.     Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of the Plaintiffs and the public.

256.     As a result of the Defendants' conduct, the Plaintiffs suffered the injuries and damages specified herein.

257.     Accordingly, the Plaintiffs seek and are entitled to compensatory and punitive damages in an amount to be determined at trial.

258.     As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of the PRODUCTS, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, damages for wrongful death, together with interest, costs of suit, attorneys' fees, punitive damages and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants on each of the above-referenced claims and causes of action, jointly and severally, as follows:

a.   Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, discomfort, physical impairment, emotional distress, loss of enjoyment of life, loss of consortium, wrongful death and other non-economic damages in an amount to be determined at trial of this action;

b.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

c.   Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless

indifference for the safety and welfare of the general public and Decedent in an amount sufficient to punish Defendants and deter future similar conduct;

d.   Prejudgment interest;

e.   Post-judgment interest;

f.   Awarding reasonable attorneys' fees;

g.   Awarding the costs of these proceedings; and

h.   Such other and further relief as this Court deems just and proper.

Dated:   March 14, 2017                    RESPECTFULLY SUBMITTED,

/s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ 07701
Tel: 732-747-9003
Fax: 732-747-9004
cplacitella@cprlaw.com

***Plaintiffs' Liaison Counsel***

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
Leigh.odell@beasleyallen.com

/s/ Michelle A. Parfitt
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
4900 Seminary Road, Suite 650
Alexandria, VA 22311
Tel: 703-931-5500
Fax: 703-820-1656
mparfitt@ashcraftlaw.com

***Plaintiffs' Co-Lead Counsel***

64