UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This document relates to: ALL CASES | MDL NO. 16-2378 (FLW) (LHG) |

CASE MANAGEMENT ORDER NO. 5
(Protocol For Production Of Documents and ESI)

THIS MATTER, having come before the Court during the Initial Conference held on Thursday, November 17, 2016, and the parties' subsequently filed joint submission,

IT IS ORDERED:

I.      GENERAL PROVISIONS

   A. Scope

This Order governs the production of documents and electronically stored information (ESI) in all cases during the pendency of their consolidation in this Multi-District Litigation (MDL 16-2378). The terms of this Order neither enhance, nor diminish, the scope of discovery as contemplated by the Rules. All parties reserve their rights with respect to the scope of the document production.

B. <u>Cooperation and Discovery Dispute Resolution by the Parties or the Court</u>

The Parties shall conduct discovery in a cooperative and collaborative manner. There is established a continuing duty to meet and confer in good faith on disputed issues that may arise during the conduct of discovery. When a request for conference and collaboration about an issue in dispute is made by one party to another, the conference and collaboration should occur without unreasonable delay. At the conclusion of any unsuccessful attempt to resolve a disputed discovery issue, and prior to its submission to the Court for resolution, the parties should have identified the scope of the issues as narrowly and accurately as possible, along with any factual premises which inform the basis of the dispute. The scope of discovery in these consolidated cases shall be governed by the proportionality factors set forth in Rule 26(b)(1). When a party relies on one or more of the proportionality factors set forth in Rule 26(b)(1) in a discovery dispute submitted to the Court for resolution, supporting materials should normally be presented.

C. <u>Interpretation to Avoid Waste and Unnecessary Expense</u>

The fundamental purpose served by this Order is to promote the exchange of discoverable information in an efficient and economical manner, employing methods that preserve, to the greatest practicable degree, the information's content, structure, functionality, and usefulness. When circumstances arise that are not contemplated by the terms of this order, or if uncertainty arises concerning the intended application of its terms, the parties should initiate the meet and confer process prior to expending material resources on a unilaterally conceived discovery protocol.

## II. DEFINITIONS

A. The term **"Electronically Stored Information,"** (hereinafter, "ESI") has the same meaning as contemplated by Rule 34 of the Federal Rules of Civil Procedure.

B. The term **"Document"** has the same meaning as contemplated by Rule 34 of the Federal Rules of Civil Procedure, and such meaning includes, in context, a discreet file of ESI that corresponds to such a writing in a reasonably usable format.

C. **"Hard Copy Document"** means a document that exists in the ordinary course of business in paper form.

D. **"Metadata"** means information about information, or data about data, and includes, without limitation, as it exists in the ordinary course of business: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system; or (iii) information about a file, whether created by a user or generated by the system itself. The parties agree to meet-and-confer concerning information about a record or document in a document management system, whether created by a user or generated by the system itself.

E. **"Native," "Native format,"** or **"Native data format"** means the format of ESI in which the ESI was originally created or the format used by the producing party in the usual course of the producing party's business activities.

F. **"Extracted Text"** means the textual content of an ESI native source exported into a separate electronic text file.

G. **"Optical Character Recognition"** or **"OCR"** means the process of recognizing the visible text contained within a hard copy document or contained within the digital image of a document, and rendering the recognized text into an electronic text file.

H. **"Searchable Text"** means extracted text or electronic text created by OCR.

I. **"Protected health information"** or **"PHI"** as used herein means any document or information supplied in any form, or any portion thereof, that identifies an individual or subscriber in any manner and relates to the past, present, or future care, services, or supplies relating to the physical or mental health or condition of such individual, the provision of health care to such individual, or the past, present, or future payment for the provision of health care to such individual. These terms specifically include "protected health information" as such term is defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164, promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 and applicable state laws. See, e.g., 45 C.F.R. § 164.501 ("protected health information") and 160.103 ("individually identifiable health information"). "Protected health information" includes, but is not limited to, medical bills, claims forms, charge sheets, medical records, medical charts, test results, notes, dictation, invoices, itemized billing statements, remittance advice forms, explanations of benefits, checks, notices, and requests. "Protected health information" also includes all notes, summaries, compilations, extracts, abstracts, or oral communications that contain, are based on, or are derived from confidential health information.

J. **"And"** and **"or"** shall be construed conjunctively or disjunctively as necessary to make their use inclusive rather than exclusive, e.g., "and" shall be construed to mean **"and/or."** **"Include"** and **"Including"** shall be construed to mean "include but not be limited to" and

"including, but not limited to." Reference to the singular shall also be deemed to refer to the plural, and vice-versa.

### III.   PROCESSING, CULLING, AND DE-DUPLICATION OF ESI

A. <u>Processing Protocols</u>

1. When processing ESI, Greenwich Mean Time (GMT) shall be selected as the time zone.

2. Files containing dynamic fields such as file names, dates, and times should be processed for production showing the field code (e.g. "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

3. Compressed file types (e.g. .CAB, .GZ, .TAR. .ZIP) shall be decompressed in a reiterative manner to ensure that a compressed file within a compressed file is decompressed into the lowest possible compression resulting in individual files. The parent/child relationship of these files shall be preserved and reflected in the applicable attachment metadata fields listed in *Appendix 2*.

4. Embedded files, including objects embedded in Microsoft Word and RTF documents that have been embedded with the "Display as Icon" feature, shall be extracted and produced as standalone files along with corresponding attachment Metadata to the parent document.

5. If a party cannot unencrypt discoverable electronically stored information that exists in encrypted format, the parties agree to meet and confer regarding how such information should be handled.

6. Documents that cannot be read because of processing, imaging, or formatting problems shall be promptly identified by the Receiving Party. The Producing Party and the Receiving Party shall meet and confer to attempt to resolve problem(s), to the extent the problem(s) are within the Parties' control.

B. <u>Culling of Identified Data Sets</u>

System Files may be culled by de-NISTing. An electronic file collection may be "de-NISTed" at the producing party's option, by removing commercially available, non-user created operating system and application files contained on the National Institute of Standards and Technology ("NIST") file list. Identification of NIST list matches will be through MD5 or SH-1 Hash values. When a producing party desires to cull an electronic file collection by categorically discarding specific file types not contained on the NIST list, it shall initiate a meet and confer conference with the requesting party to coordinate the use of the proposed file types.

C. <u>De-duplication</u>

1. ESI will be considered duplicative if it has matching MD5 or SHA-1 hash values. For this purpose, file contents only may be used for MD5 or SHA1 Hash value calculation and will not require inclusion of operating system metadata (e.g., filename, file dates) values. Messaging files associated with a discreet custodian may be de-duplicated based upon MD5 or SHA1 Hash values for the entire message family, including parent object and attachments.

2. Parties may de-duplicate stand-alone documents or entire document families vertically within each custodian or horizontally across custodians and data sources, including serial production sets. De-duplication procedures shall not break apart document families. The identity of other custodians of de-duplicated documents must be listed in the "Other Custodian(s)" field identified in Appendix 2. The "Other Custodians" field for a given document will be populated with any existing data at the time of the first production of that document. In instances where a newly collected document has been de-duplicated against a previously produced document, a separate DAT file will be provided upon request of the Requesting Party containing the "PRODBEG" number and an "Other Custodians" overlay field. The "Other Custodians" overlay

field will contain all previously provided duplicate custodial data as well as any additional duplicate custodians.

3. A producing party may employ electronic mail thread suppression in the manner specified in this protocol. As used in this protocol, email thread suppression means reducing duplicative production of email conversation threads by producing only the most recent or most complete email containing the prior thread of emails, as well as all attachments appended at any point within the history of the thread, and excluding email segments constituting exact duplicates of prior email text within the produced string.

4. To qualify as a single email conversation thread, all lesser included individual messages must have identical message conversation participants (including "bcc:" blind copy participants) and attachment history. The inclusion or deletion of a message participant shall terminate a conversation thread for this purpose, but such an occurrence ("conversation branching") may create the beginning of a separate and distinct conversation thread containing some or all of the lesser included messages.

## IV.     REVIEW PROTOCOL

The parties will cooperate in good faith regarding the use of electronic search methodologies. The Producing Party will provide keyword search terms and will consider reasonable requests for additional search terms proposed by the Requesting Party. A Producing Party will employ reasonable quality assurance measures to assess the completeness of its search and review methodologies.

## V. PRODUCTION FORMAT

A. <u>Presumptive Format of Production</u>

1. Document Images, with Metadata, and Text: Subject to the specifications or exceptions set forth below, the presumptive format for production of an ESI document is as a Group IV single page .TIFF image files accompanied by metadata, and a document level searchable text file.

2. Parties will produce ESI in native format for media files, spreadsheet files and presentation (e.g. PowerPoint) files. Parties will also produce ESI in native format for word processing files containing track changes or comments. When a producing party has applied permissible redactions to an image file, the underlying native file may be withheld. Files produced solely in native format will be produced with a .TIFF image slip sheet indicating the production number of the native file and the confidentiality designation, and stating "Produced in Native Format." The native file name nomenclature will correspond to the same Bates number nomenclature of the corresponding .TIFF image slip sheet, as more specifically described in Appendix 5.

3. Ancillary Content Disclosed: When TIFF images are produced for electronic documents, such images will be rendered, if possible, in such a way as to show, as may be applicable, all disclosable reviewer's comments, tracked changes, speaker's notes, and other similar content.

4. Parent-Child Relationships Preserved: The parent-child relationship between attachments, enclosures, embedded files, and/or exhibits to any parent document shall be preserved. The child-document should be consecutively produced immediately after the parent-document. If parent or child document is withheld on grounds of relevance or responsiveness, such withholding shall be noted with a slip sheet or indicated in a field. If the parent or child document is privileged, a slip sheet shall be inserted in the production. Child documents will be mapped to their parent document by attachment range within the applicable load file.

5. Color When Necessary: When a document that contains color content is produced without its native file because of applied redactions, and the absence of color in the document's TIFF rendering compromises the requesting party's ability to discern the remaining information it

contains, the producing party will honor reasonable requests to supplement the production with color images or native files.

B. Appendices

Additional technical specifications for production format are set forth in the attached appendices (Appendix 1: *TIFF Image File Specifications*; Appendix 2: *Data Load File Specifications*; Appendix 3: *Searchable Text File Specifications*, Appendix 4: *Image Load File Specifications*; Appendix 5: *Native File Specifications*.) A Producing Party may supplement the metadata fields set forth in Appendix 2 whenever the nature of the ESI file makes such supplementation appropriate for a complete production.

C. Presumptive Sources of Extracted Text

The presumptive source of extracted text shall be from the native file. Where a document image has been redacted and produced in a .TIFF format, OCR of the redacted image may be used to generate the source of searchable text. Similarly, where the native file does not contain a source of extractable text (*e.g.* a non-searchable PDF image file,) OCR may be used to generate the source of searchable text.

D. Production Format for Hard Copy Documents

In scanning and producing Hard Copy Documents that were Hard Copy Documents when this litigation was filed, such documents shall be unitized and organized as they are kept in the normal course of business. For Hard Copy Documents found in file folders and other containers that have labels or tabs or other identifying information, such labels and all sides of such file folders and tabs shall be scanned. In the case of an organized compilation of separate Hard Copy Documents – for example, a binder containing several separate Hard Copy Documents behind numbered tabs – the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the beginning and ending document and attachment fields. For Hard Copy Documents that contain fixed notes, the pages will be scanned both with and without the notes and those pages will be treated as part of the same document. Hard Copy Documents will be unitized at the lowest possible level and attachment

information preserved. For example, if a folder contains two Hard Copy Documents, the folder and each document will constitute a separate document, but they will have the same attachment start and end. If more than one level of parent-child relationship exists, documents will be kept in order, but all will be treated as children of the initial parent document.

### E. Redactions and Production of Redacted Documents

To the extent that a responsive document contains information that is Protected Health Information (PHI), information protected by the Health Insurance Portability and Accountability Act (HIPAA), privileged information, or is otherwise specifically protected against disclosure by the Federal Rules or separate order of the Court, the producing Party may apply redactions to the TIFF image file and produce the document in redacted form. Any redactions shall be clearly indicated on the face of the document and each page of the document from which information is redacted shall bear a designation that it has been redacted. The corresponding native file of the document may be withheld from production.

If a redaction is made because of Protected Health Information, and the basis of such redaction is annotated (e.g., "PHI" or "Protected Health Information") on the redaction itself, such redaction need not be included in a party's privilege log. Otherwise, the basis for any redaction applied to a document image shall be reflected in a multi-value field in a load file. The Parties may apply redactions to the native version of a document, with any such redactions made in a substantially similar manner as is applicable to TIFF images, described above.

### F. Evidentiary Use Native Files

Use of native files in an evidentiary proceeding or deposition shall be governed by a protocol to be entered separately.

### G. Enterprise Databases or Document Management Systems

If responsive information is identified in a party's enterprise or relational database (e.g. Oracle, SQL Server, DB2) or in a party's document management system, the parties shall first meet and confer in good faith regarding a protocol to achieve the purpose of the requested discovery.

VI.  CONVEYANCE AND DELIVERY

A. A producing party will send a small test load file at the onset of its first document production to test the parameters discussed within this protocol for production format.

B. ESI productions shall be conveyed on CD-ROM, DVD, external hard drive (with standard PC compatible interface), or readily accessible computer or electronic media as the parties may hereafter agree upon (the "Production Media"). Each item of Production Media should include: (1) the name of the producing party; (2) the production date; (3) a unique production volume name; (4) the Bates number range of the materials contained on such Production Media item; (5) the source of the documents for each Bates number range (i.e., custodian, information platform, etc.); (6) the name and contact information of a technical contact, preferably the person who generated the media item, so that in case of extraction issues the receiving party has a collaboration contact; and (7) any additional description of the items the producing party deems appropriate. The Production Media shall be accompanied by a transmittal letter identifying the above described information.

C. Producing parties shall maintain a running production log in spreadsheet format containing the above described information, plus any necessary encryption key associated with each Production Media. Upon the occasion of a physical conveyance of a production, an updated version of the production log shall be contemporaneously forwarded by electronic mail to persons designated by the requesting party. Encryption key information will not be contained in the physical conveyance of the Production Media.

VII.  PRIOR PRODUCTIONS

To the extent available, ESI already processed and produced from existing sources in other litigation may be produced to the Requesting Party in this Litigation using the production protocol applicable in the case in which such ESI was originally produced. When, by separate agreement, a party is producing a production set previously made in other litigation matters, all previously assigned production numbers ("PRODBEG" or its equivalent document-unique identification

number) shall be included in the "PRIORPRODBEG" field described in Appendix 2 to the extent available from the original production. When a prior production set cannot, without the occurrence of undue burden or expense, be made to conform to every production format specification contained in Section VI, above, the parties shall meet and confer to discuss proposed deviations from the production format.

## VIII. PROCESSING OF NON-PARTY DOCUMENTS

A. A Party that issues a non-Party subpoena ("Issuing Party") shall include a copy of this ESI Protocol with the subpoena and request that the non-Party produce documents in accordance with the specifications set forth herein.

B. The Issuing Party is responsible for producing to all other Parties any documents obtained pursuant to a subpoena to any non-Party in the form in which they were produced by the non-Party. To the extent practical given the data volume, productions by a non-Party should be produced by the Issuing Party to all other Parties within seven days of the non-Party's production to the Issuing Party.

C. Nothing in this ESI Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-Parties to object to a subpoena.

**IT IS SO ORDERED.**

Dated: 5/22/17

Hon. Lois H. Goodman, U.S.M.J.

**Appendix 1: TIFF Image File Specifications**

TIFF image files created for this litigation pursuant to this Order shall comport with the following specifications:

- The TIFF image file shall be a Group IV compression, black-and-white, single-page TIFF image file using a 300 x 300 dots-per-inch (DPI) optical scan resolution and an 8.5 x 11 inch page size, except for documents that in the producing party's reasonable judgment require a different resolution or page size.

- Original document orientation should be maintained (*i.e.* an original landscape document should be produced in landscape format).

- Each TIFF image file shall be branded with a legible, unique Bates number in the lower right corner, positioned so as not to interfere with reading the document. The Bates number shall: (1) be unique across the entire document production; (2) be a combination of an alphabetic prefix along with an 8-digit number (*e.g.* ABC00012345), wherein the numeric portion shall be zero-padded leftwards as needed to comprise 8 digits, (3) contain no special characters or embedded spaces, and (4) be numerically sequential within a given document. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be communicated to the receiving party.

- Confidentiality designations, if any, will be branded on the lower left corner of the applicable image, also positioned so as not to interfere with reading.

- The resulting TIFF image file shall be named according to the naming convention *number.TIF*, where "*number*" is the Bates number of the corresponding page. File names for these files shall not contain any special characters or embedded spaces.

- Image files shall be grouped in folders on the production media of no more than 1,000 TIFF files each unless necessary to prevent a file from splitting across folders. Files will not be split across folders, and separate folders will not be created for each file.

## Appendix 2: Data Load File Specifications

The data load file is a delimited text file containing data about each document needed for use with standard litigation support software.

The file name of the data load file should contain the volume name of the production media, although additional description information may be provided after the volume name. For example, both "ABC001.dat" and "ABC001_metadata.dat" would be acceptable names for a data load file having a production volume named "ABC001." File names shall not contain any special characters or embedded spaces.

Unless other delimiters are specified, the data in each field should be separated using Concordance default delimiters. A semicolon should be used as a multi-entry separator. A carriage-return line-feed should be used to indicate the start of the next record.

The first line of the data load file must contain each field name, separated by a delimiter, corresponding to the order in which the data appears in the file.

Load files should not span across media (*e.g.* CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

Data for documents shall be produced in only one data load file throughout the productions, unless that document is noted as being a replacement document in the Replacement field of the data load file.

Metadata Fields to be Included in the Data Load File

For all documents or electronic files produced, the following metadata fields for each document or electronic file, if available at the time of collection and processing and unless such metadata fields are protected from disclosure by attorney-client privilege or work-product immunity or otherwise prohibited from disclosure by law or regulation, including the European Data Privacy Regulation, will be provided in the data load file except to the extent that a document or electronic file has been produced with redactions.

The term "Scanned Docs" refers to documents that are in paper form at the time of collection and have been scanned into *.tif images (i.e., "Hard Copy Documents" as defined above.) The term "Email and E-Docs" refers to files that are in electronic form at the time of their collection.

The following fields are not exclusive and should be supplemented by a producing party with available metadata whenever appropriate or when otherwise consistent with this protocol, including data fields exported from a database or Document Management System.

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of parent in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| CUSTODIAN | Smith, John | Yes | Yes | Custodian(s) that possessed the document or electronic file |
| OTHERCUSTODIANS | Jones, David; Williams, Robert | N/A | Yes | Additional Custodian(s) that possessed de-duplicated document or electronic file—multiple custodians separated by semicolon |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record. |
| FOLDER | \My Documents\Document1.doc | N/A | Yes | Original source folder for the record produced. |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected. |
| DOCEXT | DOC | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document or electronic file. |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document. |
| DATECREATED | 10/09/2005 | N/A | Yes | Date that non-email file was created as extracted from file system metadata |

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| DATELASTMOD | 10/09/2005 | N/A | Yes | Date that non-email file was modified as extracted from file system metadata |
| SUBJECT | Changes to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |
| DATESENT | 10/10/2005 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 am | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/10/2005 | N/A | Yes | Received date of email message (mm/dd/yyyy format) |
| TIMERCVD | 10:33 am | N/A | Yes | Received time of email message, time zone set to GMT |
| CONFIDENTIALITY | CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| REDACTION | REDACTED | Yes | Yes | User-generated field indicating whether a document was redacted. |
| TEXTPATH | Text\001\001\ABC00000001.txt | Yes | Yes | Path to *.txt file containing extracted or OCR text |
| NATIVEPATH | Natives\001\001\ABC00000001.xlsx | N\A | Yes | Path to files supplied in native format. |

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| MD5 HASH | 30999747f4e6d7bef786e614ff2cf4b0 | N/A | Yes | MD5 Hash for electronic document |
| REPLACEMENT | REPLACEMENT | Yes | Yes | "Replacement" indicates the image is a replacement for a previously produced image; otherwise blank. |
| PRODVOL | VOL001 | Yes | Yes | Name of the Production Volume |
| PRIORPRODBEG | DEF00000001; RST00000463; XYZ00002136 | Yes | Yes | Other identifying production numbers that have been assigned to the record in previous productions; separated by a semi-colon. |

## Appendix 3: Searchable Text File Specifications

- The document level searchable text file will contain any text in the respective document, omitting any text redacted from the produced document.

- The file naming convention for the text file shall be in the form number.TXT, where "number" is the same Bates number as the Beginning Production Number for the first page of the respective document images. File names shall not contain any special characters or embedded spaces.

- The full path and file name of the text file must be provided in the data load file as specified in Appendix 2.

- OCR text for scanned images of paper documents should be generated by applying optical character recognition processes to the image of the document. The parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR shall be performed on a document level and provided in document-level text files. OCR text should not be delivered in the data load file or any other delimited file.

- For electronic files, searchable text shall be extracted from the native file and included in the text file. If the electronic file has no extractable text (*e.g.* a non-searchable PDF image file), the document will be OCR'd, and file-level OCR text will be provided in lieu of extracted text. Extracted text shall likewise be produced in document-level text files.

## Appendix 4: Image Load File Specifications

- The image load file should be a Standard Opticon formatted load file (.opt text file) with ANSI/Western European encoding that references the Control ID on a page level consistent with ingestion into the kCura Relativity® review platform. The name of the image load file should mirror the name of the delivery volume, and should have an .OPT extension (*e.g.* ABC001.OPT). File names shall not contain any special characters or embedded spaces.

- The volume names should be consecutive (*e.g.* ABC001, ABC002, etc.).

- Every image in the delivery volume should be contained in the image load file, one row in the load file per TIFF image. The total number of documents referenced in the image load file should match the total number of designated documents in the data load file for that production.

- Load files should not span across media (*e.g.* CDs, DVDs, Hard Drives, Etc.), *i.e.*, a separate volume should be created for each piece of media delivered.

## Appendix 5: Native File Specifications

- The file naming convention for the native file shall be in the form number.EXT, where "number" is the first page Bates number for the corresponding TIFF image and "EXT" is the original native file extension (i.e., *.doc, .xls, .ppt*, etc.) File names shall not contain any special characters or embedded spaces.

- The full path and file name of the native file must be provided in the data load file as specified in Appendix 2.