# Personal Care Products Council:
# An Animal Cruelty Analysis

Jennifer A. Hickman
Animal Rights Specialist, EdChange
http://www.EdChange.org
jenannh@gmail.com

April 2010

Founded in 1894, the Washington, DC-based Cosmetics, Toiletry and Fragrance Association (CTFA) is a not-for-profit trade organization representing more than 600 member companies that produce the vast majority of personal-care products sold in the U.S. today.  When Mark Pritchard, the President of Global Strategy at Procter & Gamble and the former chairman of CTFA, which was renamed Personal Care Products Council in 2007, was asked by Cosmetic-News Weekly why the organization changed its name, he said, "We're seeing a sea change in what the consumers desire in product-safety information.  Becoming the consumer's best resource is our motive." In 2008 they appointed a new President and CEO, Lezlee Westine, who was most recently President and CEO of TechNet, a political network of CEOs and executives from U.S. technology companies.

Indeed CTFA renamed themselves to Personal Care Products Council (PCPC) as a major consumer-outreach initiative.  Then-president of PCPC, Pamela Bailey, said about the name change, "We've amassed an incredible wealth of science-driven, peer-reviewed product safety information, which we're now putting into the hands of the consumer."  According to Bailey, the new name was determined by consumer focus groups who reacted favorably to the term 'personal care products' and 'council' was perceived to be a trustworthy body of independent experts.  The newly launched website was hailed by industry representatives as "great for the industry" (Adair Sampogna, VP of Global Consumer Communications for Estee Lauder), "...a huge help to the consumer" (Rochelle Bloom, Fragrance Foundation President), and "...a proactive step to address any consumer confusion regarding product labeling, such as in the area of naturals" (Allan Mottus, industry veteran)   (CosmeticNews Weekly, 2007).

Introducing PCPC

The PCPC represents a $250 billion global cosmetic and personal care products industry with members who manufacture, distribute, and supply most finished personal care products marketed in the U.S.  They self-describe as promoters of safety, advancers of science, public informers, and harmonizers of global standards.  In their 2008 Annual Report, they describe their goal of promoting safety as "the highest priority for personal care products companies is the safety and health of consumers of all ages who use and enjoy [their] products."  When describing their efforts to advance science, they explain, "The cornerstone of our safety initiatives is the Cosmetic Ingredient Review (CIR)."  As for informing the public, they say, "The Council is a trusted source of information for consumers about the global beauty and personal care products industry."  And for harmonizing global standards, they explain, "The Council is actively engaged in international efforts to align global regulatory standards for consumer products, to eliminate trade barriers, and to ensure a level playing field for member companies while at the same time reinforcing consumer confidence in product safety" (PCPC, 2008).

Services Offered to Members

PCPC offers services such as ingredient dictionaries, technical guidelines and database services, webinars, conferences, council on regulatory as well as ingredient safety and labeling matters, and certificates of free sales (CFS) (PCPC About Us, 2009). These CFSs are required by many countries before a foreign product can cross the border.  The PCPC provides governments'

© Jennifer A. Hickman, 2010

customs offices with this "certificate of assurance" that the products exported from the U.S. are the same as the products sold in the U.S., and that they satisfy state and federal requirements (PCPC FAQs, 2009).

In addition to the services listed above, PCPC offers its members events and products as well as information about trends and developments within the industry (PCPC Members Only, 2009). Events help disseminate information to members and provide networking opportunities. Some of the products offered to members include publications such as newsletters, special reports on industry issues, and the International Cosmetic Ingredient Dictionary and Handbook (PCPC Join us, 2009). Also listed as a service on the PCPC website is the Cosmetics Info website, which is a consumer information site ([www.cosmeticsinfo.org](www.cosmeticsinfo.org)) created to "provide information about cosmetic safety. The site provides consumers with information on safety about cosmetic ingredients and the science behind personal care products, as well as provide links to other authoritative bodies, and to research" (Cosmetics & Toiletries, 2008).

Membership in the PCPC

As stated above, the PCPC's membership enjoys more than $250 billion in annual retail sales. Membership in PCPC is available as an "Active Member Company" consisting of companies who manufacture and/or distribute finished products for retail and/or salon use in the U.S. with an annual fee based on salon and retail sales volume in incremental categories of $500,000 up to $2 billion plus. Fees range respectively from $640 to $407,000. In addition, companies pay an extra annual fee based on a percentage (again, respectively) of .56 percent to .0163 percent of their sales.

PCPC also offers an "Associate Member Company" membership for companies that supply goods and/or services to PCPC active member companies, such as ingredient and fragrance suppliers, packaging companies, research laboratories, advertising agencies, and magazines containing cosmetic advertising. Annual membership dues in this category are based on annual sales, ranging again in $500,000 increments to over $16 million. The additional extra sales-based fee is computed, respectively, from .18 percent to .037 percent with a maximum dues amount from this extra category being $28,725. Advertising firms and Independent Laboratory Consultant/Specialized Service pay a set rate of $3,440 and $2,200, respectively.

The above membership fees were taken from the membership applications found on the PCPC website in November, 2009. Because the PCPC is a not-for-profit trade association, companies are allowed to take tax deductions for all but the lobbying percentage of their dues. Since 2006, PCPC has estimated this non-deductible portion of services to be between 20 and 35 percent, depending on the year (PCPC Tax information, 2009).

PCPC and Animal Testing

Anti-Testing Movement

Although the issue of animal testing has been a major platform through which animal protection activists have demanded humane reform since the late 19th Century, it wasn't until the revitalization of the movement (post WWII) in the 1950's through the early 1970's that activists gained substantial ground in the fight to end the use of non-human animals for research, most notably through the passage of the Animal Welfare Act (AWA) of 1970 (Unti & Rowan, 2001).

The AWA prevented laboratories from using stolen animals (as had been standard procedure in the past), established the most minimum of humane standards for laboratory animals, required the USDA to register research facilities and license animal dealers, and expanded care standards for zoo, circus, carnival, exhibition, and wholesale pet business animals (Beers, 2006). The victory of the AWA propelled the anti-animal-testing campaign into the period Unti and Rowan (2001) describe as a period of mobilization and transformation for the animal welfare movement, the late 1970's through around 1990.

PCPC History on Animal Testing

Nearly all the companies who constitute PCPC's membership base have and/or still do test their products on animals. It is not surprising that on the PCPC website, under "The Animal Rights Movement," they see the animal testing issue as first emerging in the late 1970's, which would coincide with the swell of publicity the animal rights movement activists called to the issue, post-AWA passage.

On their website PCPC describes how the picketing of PCPC (then CTFA) and member companies in 1979 led to the organizational decision to have the industry (their member companies) fund a national center for the development of alternatives to animal testing. The funding was awarded to the Johns Hopkins School of Hygiene and Public Health as a $1 million three-year grant, with additional funding in subsequent years (PCPC history, 2009). The program administered by the Center for Alternatives to Animal Testing at Johns Hopkins University continues today, and cites the PCPC as the program founder in response to "a time when the scientific community in general and toxicologists in particular were under heavy attack for what was perceived to be excessive animal use for routine safety testing" (Johns Hopkins about page, 2009).

Frustrated that the animals rightists were not satisfied by this contribution made by PCPC towards minimizing the numbers of animals used in experimentation, and fed up with "continued offense" by the groups, the PCPC board instead concentrated resources on defeating legislation animal activists were trying to pass in order to ban animal testing altogether at the state level. In 1990 and 1991, after California became the first state to pass legislation banning animal testing, PCPC stepped in, launching a successful editorial campaign that effectively persuaded the public and lawmakers in their favor, resulting in gubernatorial vetoes both times (PCPC history, 2009).

Industry Regulations

Historically, the FDA has required no pre-market testing, so therefore cosmetics safety testing has been left up to manufacturers. The industry (PCPC) funded Cosmetic Ingredient Review (CIR), comprised of academic researchers and representatives from industry, consumer interests, and the FDA, which identifies "priority ingredients" each year for review and analyses to determine safety. From 1976 to 2006, the CIR declared only nine of the 1,286 ingredients reviewed to be unsafe for normal cosmetic use, but manufacturers are not obliged to eliminate any ingredients, even those deemed unsafe. This was until the first cosmetics regulatory act in a U.S. state, called The California Safe Cosmetics Act of 2005, took effect in January 2007. The PCPC once again enlisted their powerful lobbyists to fight this legislation.

The act requires manufacturers to report the use of potentially hazardous ingredients to the sate Department of Health Services (DHS), who will alert consumers. As the legislation was working its way through the California legislature, it drew fierce opposition from the CTFA, who opposed state-specific legislation that would lead to "state-by-state patchworks of rules... or un-

© Jennifer A. Hickman, 2010

justified, extreme requirements that are well beyond those placed on any other category of food, beverages, drugs, or consumer products" (Environmental Health Perspectives, 2006).

## Anti-Vivisection and the U.S. Government

The federal government has responded to the anti-vivisectionists' demands that have amassed massive public outcry over the 150 or so years since the inception of the animal rights movement. For example, it instituted the Animal Welfare Act in 1970 to require humane care for laboratory animals and to prevent the use of stolen animals for research (Beers, 2006). Unfortunately, they continue not only to allow nonhuman experimentation to be conducted on more than 115 million mice, rats, birds, primates, cats, dogs, rabbits, fish, horses, pigs, chickens, insects, etc., per year, but to require their use in numerous government-funded experiments.

The FDA, for example, requires companies marketing flouride products to swab the teeth of 200 rats for two weeks before killing them and baking their heads in an oven.  Government agencies requiring the use of animal testing include the FDA, the Environmental Protection Agency (which requires pesticides to be tested on dogs via "inhalation chambers," for example), the Department of Agriculture, the Consumer Product Safety Commission, the National Institute of Environmental Health Sciences, and the Department of Transportation (PETA US gov, 2009).

The most common animal test mandated by the U.S. government today is one in which animals are force-fed increasing doses of a chemical until they die. And government regulations require chemical manufacturers to squirt chemicals into the eyes of rabbits and onto their shaved skin.  Some of these government-mandated tests kill more than 2,000 animals every time they are conducted, though none of these tests have been proven formally to predict accurately human health implications (PETA US gov, 2009) of their respective substances.

## PCPC and Ties to the U.S. Government

### PCPC and the U.S. Government

The strong ties PCPC has to the U.S. government are made apparent throughout the organization's website as well as in their 2008 Annual Report, where they list as one of their main priority areas, "Supporting a Strong FDA."  In this section they talk about the millions of dollars their member companies have invested in initiatives to supplement FDA regulations, citing that a major focus of their 2008 lobbying efforts was to secure $1 million for FDA's Office of Cosmetics and Colors through an appropriations bill signed by President Obama.

Interestingly, the CIR (according to their website) was established in 1976 by the PCPC, with the support of the FDA and the Consumer Federation of America. Although the CIR is funded by the PCPC, they say that they and "the review process are independent from the [PCPC] and the cosmetics industry" (CIR, 2009).  Perhaps this "balance" is struck because of the inclusion of the Consumer Federation of America (CFA), a "liaison member" of the CIR.  According to the Consumer Federation of America's website, they represent some 300 nonprofit organizations throughout the U.S. (CFA, 2009).  But in addition to the CFA, the PCPC is a as "liaison member." On the CIR website, it appears as though the only "voting members" are representatives

from universities with the exception of one head of research from the Cleveland Clinic (CIR, 2009).

Although the CIR was funded and established by the PCPC, the PCPC describes the CIR as "an independent, nonprofit panel of world-renowned scientists and physicians...to assess the safety of ingredients used in the U.S. with the support of the FDA and the CFA..." (PCPC About Us, 2009). In the same area of their website, they also say that the "linchpin" of their self-regulatory programs is the CIR. In addition, according to the PCPC's Annual Report, the CIR supplements the FDA's oversight of cosmetic safety.

Unraveling The Connections

One could conclude, in essence, that the PCPC, via their own founded and funded "independent ingredient review" arm (CIR), is dictating to the U.S. government (via the FDA) safety review procedures, industry standards, determination of ingredient inclusion and exclusion, testing methodology choice, and points of consumer knowledge or lack thereof, and that they are using this pipeline, as well, to advocate restriction-free international trade. Yet they masterfully depict themselves as caring first and foremost about consumer safety by saying things like, "We are an active, vocal advocate for consumer safety and a trusted source of information about the industry and the products consumers rely on and enjoy every day" (PCPC Annual Report) or that they "enable [their] members to continue to develop and sell the safe, quality and innovative cosmetic and personal care products that help consumers live better, healthier lives" (PCPC Members Only, 2009).

Stated another way, by connecting the (initially) not-so-obvious dots, one sees that the cosmetics, toiletries, and fragrance industries have a trade association (PCPC) working intimately with the U.S. government to "be the voice on scientific, legal, regulatory, legislative and international issues for the personal care product industry" for more than 600 companies, meanwhile "self-regulating" via their own review process through the PCPC-founded and funded CIR.

### The U.S. Government Responding to the Anti-Vivisection Movement

For nearly 12 years, the Interagency Coordinating Committee on the Validation of Alternative Methods (ICCVAM), a federally-funded body working to promote regulatory acceptance of scientifically valid safety testing methods to replace, reduce, or refine the use of animals, has advanced national and international acceptance of alternatives for acute oral toxicity, skin corrosivity, and allergic contact dermatitis, three of the most common toxicity tests used.

The ICCVAM has been criticized by some if its original supporters, such as People for the Ethical Treatment of Animals (PETA), for relatively slow progress, especially when compared to European sister organizations. This difference in advancement of alternative testing methods is due, at least in part, to ICCVAM being limited in scope to the review of test methods applicable to regulatory testing: only those tests that the government funds and mandates. In addition, the ICCVAM is only a committee, not a research department with laboratories.

Perhaps this painstakingly slow process for bringing non-animal tests into industry light is why in 2008 the Executive VP for science at the PCPC, John Bailey, said, "ICCVAM is essential. It brings the science together, and allows a transparent assessment." Nevertheless, ICCVAM is currently underway with a five-year plan to establish priorities for future testing, identify and encourage appropriate research efforts, educate stakeholders on improved methods, and improve partnerships with industry (Weinhold, 2008).

© Jennifer A. Hickman, 2010

The Powerful Force Anti-Vivisectionists Face

While trying to decode the animal-testing industry's formula for success, I discovered that the PCPC lobbies extensively for personal care products companies to continue enjoying an absence of agency oversight and federal regulation that would hamper their billions in profits each year. It lobbies simultaneously for increased federal funding for one of their partners, the FDA. Meanwhile, the nonprofit self-funded and self-founded by PCPC, the CIR, is providing the FDA with the backing it needs for industry oversight.

If this wasn't enough of a incestuous relationship for anti-animal testing advocates, committees, and organizations to navigate, add to it the fact that the U.S. government-funded alternative testing methods committee, the ICCVAM, receives its administrative, operational, and scientific support from the National Toxicology Program Interagency Center for the Evaluation of Alternative Toxicological Methods, which is housed at the National Institute of Environmental Health Sciences (Weinhold, 2008), an agency which requires and conducts animal testing.

In other words, not only is the federal government backed by, and backing, the industry responsible for millions and millions of animal testing-related deaths each year, but also the government-sponsored agency created to work toward an end to the use of animal-testing is housed and administered by a federal government agency that conducts, and requires that animals be used for, testing.

Conclusion

Referring to the animal rights movement during the late 1960s, Beers (2006) explained, "Centrists bowed to the cultural ascendancy of scientific and medical research; unlike radicals, they would not level charges as suspect science or question benefits of research. Instead, proponents of the new campaign strove for yet another tenuous balance .... In doing so, they remodeled two time-honored antivivisection planks: pain alleviation and codified rights for experimental subjects. The goal was not to empty the laboratory cages but rather to ease pain and ensure the comfort of animals sacrificed to science." The movement has been divided throughout its history with regards to animal testing, with the more centrist groups campaigning for cooperation with the industry and government while more radical groups remain frustrated by the "selling out," as they see it, and demanding the end of the use of animals as research subjects altogether.

Given the entrenched government and industry connections and relations in place today, and the powerful and effective capabilities of the PCPC lobbying efforts to inform and sway legislation in their favor, the political opportunities are limited, and the legal opportunities given the lack of legislation may also be limited. After examining the intricate web of power, money, and corporate interest which is at the very heart of the animal testing issue, I conclude that the incredibly valuable life-saving victories for animals claimed over the past century and a half would be most effectively supplemented moving forward with continued and expanded use of more aggressive campaign strategies. Some that have proven most effective at producing relatively rapid change are pubic education efforts (including shock-tactics) and attempts to influence the most powerful voice of all on this issue: the consumer wallet. It is crucial for consumers to speak up loudly and clearly against the grossly outdated, ineffective, and inefficient use of animals for

testing consumer personal care products, and the best way to do so is to boycott spending on all products made by testing on animals, including those sold by PCPC organizations.

© Jennifer A. Hickman, 2010

References

Anonymous. (2007). CTFA gets personal and talks back. CosmeticNews Weekly, 329, 1.

Anonymous. (2008). CTFA makes major changes. Cosmetics & Toiletries, 123, 12.

Beers, D. (2006). For the prevention of cruelty. Athens, Ohio: Swallow Press.

Consumer Federation of America. (2009). About page. Accessed at http://www.consumerfed.org/about/default.asp on November 21, 2009.

Cosmetic Ingredient Review. (2009). Home page. Accessed at http://www.cir-safety.org/ on November 21, 2009.

Cosmetic Ingredient Review. (2009). Panel page. Accessed at http://www.cir-safety.org/panelandstaff.shtml on November 21, 2009.

Johns Hopkins University Center for Alternatives to Animal Testing. (2009). About page. Accessed at http://caat.jhsph.edu/about/history.htm on November 22, 2009.

Personal Care Products Council. (2009). About us. Accessed at http://www.personalcarecouncil.org/aboutus on November 21, 2009.

Personal Care Products Council. (2009). FAQs. Accessed at http://www.personalcarecouncil.org/FAQs on November 21, 2009.

Personal Care Products Council. (2009). History. Accessed at http://www.personalcarecouncil.org/About_Us/History/ on November 22, 2009.

Personal Care Products Council. (2009). Join us. Accessed at http://www.personalcarecouncil.org/join_pcpc on November 21, 2009.

Personal Care Products Council. (2009). Members only. Accessed at http://www.personalcarecouncil.org/membersonly on November 21, 2009.

Personal Care Products Council. (2009). Tax information. Accessed at http://www.personalcarecouncil.org/tax_information on November 21, 2009.

Personal Care Products Council. (2008). A dynamic industry at work. Washington, D.C.: Author.

People for the Ethical Treatment of Animals. (2009). Stop animal tests.com. Accessed at http://www.stopanimaltests.com/AnimalResearchInd.asp on November 21, 2009.

*Personal Care Products Council* 10

Unti, B. and Rowan, A. (2001). A social history of post war animal protection. In The State of Animals, ed. Deborah Salem and Andrew Rowan. Washington, D.C.: Human Society Press.

Washam, C. (2006). California enacts safe cosmetics act. Environmental Health Perspectives, 114, A402.

Weinhold, B. (2008). Toxicity testing takes stock. Environmental Health Perspectives, 116, A113.

EXHIBIT I

© Jennifer A. Hickman, 2010