# EXHIBIT  1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

The Honorable John Erlick
Trial Date: January 16, 2018
Hearing Date: June 2, 2017

SUPERIOR COURT FOR THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

JODY E RATCLIFF,

     Plaintiff,

     v.

AMERICAN HONDA MOTOR CO., INC., et al.,

     Defendants.

Case No. 16-2-18128-7 SEA

[PROPOSED] ORDER GRANTING DEFENDANT PERSONAL CARE PRODUCTS COUNCIL'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

15   THIS MATTER having come before the Court on Defendant Personal Care Products

16   Council's ("Defendant Council") Motion to Dismiss Plaintiff's Second Amended Complaint for

17   Lack of Personal Jurisdiction.

18   In adjudicating this Motion, the Court has considered the following:

19

20   1. Defendant Council's Motion to Dismiss Plaintiff's Second Amended Complaint for

     Lack of Personal Jurisdiction;

21

22   2. The Declaration of Shaun Morgan Defendant Council's Motion to Dismiss Plaintiff's

     Second Amended Complaint for Lack of Personal Jurisdiction and attached Exhibit A,

23

     the Declaration of Mark A. Pollak;

24

25   1 - [PROPOSED] ORDER GRANTING DEFENDANT PERSONAL CARE
     PRODUCTS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
     COMPLAINT FOR LACK OF PERSONAL JURISDICTION

ORIGINAL

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

1      3.  Plaintiff's Response to Defendant Council's Motion to Dismiss Plaintiff's Second

2           Amended Complaint for Lack of Personal Jurisdiction;

3      4.  The Declaration of Plaintiff's attorney Darron E. Berquist in Opposition to Defendant

4           Council's Motion to Dismiss Plaintiff's Second Amended Complaint for Lack of

5           Personal Jurisdiction and attached Exhibits 1 – 50;

6      5.  Defendant Council's Reply to Plaintiff's Response to its Motion to Dismiss Plaintiff's

7           Second Amended Complaint for Lack of Personal Jurisdiction;

8      6.  Defendant Council's Motion for Protective Order Quashing Plaintiff's Discovery

9           Requests;

10     7.  The Declaration of Shaun Morgan in Support of Defendant Council's Motion for

11          Protective Order Quashing Plaintiff's Discovery Requests and attached Exhibits 1-11;

12     8.  Plaintiff's Response to Defendant Council's Motion for Protective Order Quashing

13          Plaintiff's Discovery Requests;

14     9.  The Declaration of Darron E. Berquist in Response to Shaun Defendant Council's

15          Motion for Protective Order Quashing Plaintiff's Discovery Requests and attached

16          Exhibits 1-9;

17    10. Defendant Council's Reply in Support of Its Motion for Protective Order Quashing

18          Plaintiff's Discovery Requests;

19    11. The Declaration of Shaun Morgan in Support of Defendant Council's Motion for

20          Protective Order Quashing Plaintiff's Discovery Requests and attached Exhibits 1-11;

21    12. The Court's Order Granting Defendant Council's Motion for Protective Order, in part,

22          Quashing Plaintiff's Discovery Requests, in part, and Denying, in part;

23

24

25

2 - [PROPOSED] ORDER GRANTING DEFENDANT PERSONAL CARE
PRODUCTS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
COMPLAINT FOR LACK OF PERSONAL JURISDICTION

RIZZO MATTINGLY BOSWORTH PC

1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

1    13. Defendant Council's Supplemental Briefing on the Status of Discovery and the

2         Ripeness of its Motion to Dismiss Motion to Dismiss Plaintiff's Second Amended

3         Complaint for Lack of Personal Jurisdiction and attached Exhibit 1, Defendant

4         Council's Responses to Plaintiff's First Set of Interrogatories as Modified in

5         Accordance with Court's May 23, 2017 Order;

6

7    14. The Declaration of Shaun Morgan in Support of Defendant Council's Supplemental

8         Briefing on the Status of Discovery and the Ripeness of its Motion to Dismiss Motion

9         to Dismiss Plaintiff's Second Amended Complaint for Lack of Personal Jurisdiction

10        and attached Exhibit 1, Defendant Council's Responses to Plaintiff's First Set of

11        Interrogatories as Modified in Accordance with Court's May 23, 2017 Order;
          incorporates it
12   15. The Court's findings made on the record at the June 2, 2017 oral argument.

13   Now, having been fully advised in this matter:

14        IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant Council's

15   Motion to Dismiss Plaintiff's Second Amended Complaint for Lack of Personal Jurisdiction is

16   GRANTED and Plaintiff's claims against Defendant Council are dismissed with prejudice.

17        Done in Open Court this _2nd_ day of _June_ , 2017.

18

19

20                                                    _____

21                                                    HONORABLE JOHN P. ERLICK

22

23   Respectfully presented by:

24

     3 - [PROPOSED] ORDER GRANTING DEFENDANT PERSONAL CARE
25   PRODUCTS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
     COMPLAINT FOR LACK OF PERSONAL JURISDICTION

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

1    RIZZO MATTINGLY BOSWORTH PC

2    __s/*Shaun Morgan*__
       *Shaun Morgan, WSBA# 47203*
3    smorgan@rizzopc.com
       *Of Attorneys for Personal Care Products*
       *Council*
4

5    Approved as to Form and Content:

6    _____
       Thomas J. Owens WSBA #23868
7    Darron E. Berquist, *Pro hac vice*
       Of attorneys for Plaintiff
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    4 - [PROPOSED] ORDER GRANTING DEFENDANT PERSONAL CARE
25    PRODUCTS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
    COMPLAINT FOR LACK OF PERSONAL JURISDICTION

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

June 2, 2017

Page 1

1           SUPERIOR COURT OF THE STATE OF WASHINGTON

2              IN AND FOR THE COUNTY OF KING

3     -------------------------------------------------------

4     JODY E. RATCLIFF,           )

5           Plaintiff,        )

6      vs.                ) No. 16-2-18128-7 SEA

7     AMERICAN HONDA MOTOR CO.,    )

8     INC., et al,           )

9           Defendants.       )

10    -------------------------------------------------------

11          VERBATIM TRANSCRIPT OF PROCEEDINGS

12       HELD BEFORE THE HONORABLE JOHN P. ERLICK

13        TRANSCRIBED FROM FTR AUDIO RECORDING

14    -------------------------------------------------------

15                9:02 a.m.

16              June 2, 2017

17           King County Courthouse

18            Seattle, Washington

19

20

21

22

23     REPORTED VIA FTR RECORDING BY:

24     Brenda Steinman, CCR #2717

25     Court Reporter

June 2, 2017

```
                                                        Page 2
 1                   A P P E A R A N C E S
 2        FOR PLAINTIFF:
                  THOMAS OWENS, ESQ.
 3                Mendel Owens PS
                  1001 Fourth Avenue, Suite 4322
 4                Seattle, Washington 98154
                  206.395.6901
 5                tomowens@mendelowens.com
 6
                  DARRON E. BERQUIST, ESQ.
 7                NAHID A. SHAIKH, ESQ. - Pro Hac Vice
                  The Lanier Law Firm
 8                Tower 56, 126 East 56th Street, Sixth Floor
                  New York, New York 10022
 9                212.421.2800
                  darron.berquist@lanierlawfirm.com
10
11        FOR GENUINE PARTS; BARTELL DRUG; NATIONAL AUTOMOTIVE
          PARTS ASSOCIATION:
12                MEGAN E. UHLE, ESQ.
                  Bullivant Houser Bailey PC
13                888 Southwest Fifth Avenue, Suite 300
                  Portland, Oregon 97204
14                503.228.6351
                  megan.uhle@bullivant.com
15
16        FOR TARGET CORPORATION:
                  ROY A. UMLAUF, ESQ.
17                Forsberg & Umlauf, P.S.
                  901 Fifth Avenue, Suite 1400
18                Seattle, Washington 98164
                  206.689.8500
19                roy@foum.law
20
          FOR PERSONAL CARE PRODUCTS COUNCIL:
21                STEVEN V. RIZZO, ESQ.
                  SHAUN MORGAN, ESQ.
22                Rizzo Mattingly Bosworth PC
                  1300 Southwest Sixth Avenue, Suite 330
23                Portland, Oregon 97201
                  503.229.1819
24                srizzo@rizzopc.com
                  smorgan@rizzopc.com
25
```

June 2, 2017

Page 3

```
 1                    A P P E A R A N C E S

 2                         Continued

 3         FOR NORDSTROM:
                   MALIKA I. JOHNSON, ESQ.
 4                 Williams Kastner
                   601 Union Street, Suite 4100
 5                 Seattle, Washington 98101
                   206.233.2944
 6                 mjohnson@williamskastner.com

 7

           FOR CONTINENTAL AUTOMOTIVE SYSTEM:
 8                 ERICA FRASIER*, ESQ.

 9

           FOR PROCTER & GAMBLE CORPORATION:
10                 P. ARLEY HARREL, ESQ.
                   Williams Kastner
11                 601 Union Street, Suite 4100
                   Seattle, Washington 98101
12                 206.628.6625
                   aharrel@williamskastner.com

13

14         FOR JOHNSON & JOHNSON:
                   JENNIFER G. CRISERA, ESQ.
15                 Bennett Bigelow & Leedom, P.S.
                   601 Union Street, Suite 1500
16                 Seattle, Washington 98101
                   206.622.5511
17                 jcrisera@bbllaw.com

18

           FOR ESTEE LAUDER COMPANIES; BOBBI BROWN, CLINIQUE,
19         M.A.C:
                   NICOLE R. MacKENZIE, ESQ.
20                 Williams Kastner
                   601 Union Street, Suite 4100
21                 Seattle, Washington 98101
                   206.628.6614
22                 nmackenzie@williamskastner.com

23

24

25
```

June 2, 2017

Page 4

```
 1                    A P P E A R A N C E S

 2                       Continued

 3        FOR HENKEL CORPORATION:
               MARK CARLTON*, ESQ.
 4

 5        FOR REVLON:
               MICHAEL E. RICKETTS, ESQ.
 6             Gordon Thomas Honeywell
               600 University Street, Suite 2100
 7             Seattle, Washington 98101
               206.676.7599
 8             mricketts@gth-law.com

 9

10        ALSO PRESENT:
               MEGHAN McNABB
               Legal Intern; Forsberg & Umlauf
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236

June 2, 2017

Page 5

```
 1                        I N D E X

 2

 3         Genuine Parts Company Motion to Dismiss

 4    MS. UHLE; oral argument ........................ 11

 5    MR. BERQUIST; oral argument .................... 15

 6    MS. UHLE; oral argument ........................ 25

 7    MR. BERQUIST; oral argument .................... 26

 8    THE COURT; oral ruling ......................... 29

 9                        oo-OO-oo

10         Target and Bartell Summary Judgment Motion

11               Pursuant to Civil Rule 56(f)

12    MR. UMLAUF; oral argument ...................... 33

13    MR. BERQUIST; oral argument .................... 38

14    MR. UMLAUF; oral argument ...................... 49

15    MS. UHLE; oral argument ........................ 53

16    MR. BERQUIST; oral argument .................... 58

17    THE COURT; oral ruling ......................... 67

18                        oo-OO-oo

19         Personal Care Products Council Dismissal on

20               General and Specific Jurisdiction

21    MR. RIZZO; oral argument ....................... 77

22    MR. BERQUIST; oral argument .................... 86

23    THE COURT; oral ruling .........................112

24

25
```

June 2, 2017

Page 6

```
 1               SEATTLE, WASHINGTON; FRIDAY, JUNE 2, 2017
 2                          9:02 A.M.
 3                          oo-OO-oo
 4                  P R O C E E D I N G S
 5          THE COURT:  Morning.  Please be seated.
 6          Counsel, I was prepared to make some rulings
 7     on the summary judgment this morning, but I guess
 8     we'll submit the issues to the jury.
 9          UNIDENTIFIED SPEAKER:  Some of them might be
10     happy with that, your Honor.
11          THE COURT:  On the record, matter of
12     Ratcliff versus American Honda Motor Company, et al.
13     King County Cause No. 16-2-18128-7 Seattle.
14          And we have a crew here.  What I'm going to
15     do is have everyone identify themselves for the
16     record, and then I'll give the order on the motions to
17     be heard.  And I've entered the non-oral motion for
18     application of Nahid Shaikh to appear Pro Hac Vice.
19     So it has been entered.
20          All right.  And if I can counsel identify
21     themselves for the record, please.
22          MR. BERQUIST:  Good morning, your Honor.
23     Darron Berquist for the plaintiff.
24          THE COURT:  Mr. Berquist.
25          MR. OWENS:  Good morning, your Honor.
```

June 2, 2017

Page 112

```
 1                    THE COURT:  Or injury sustained in the forum
 2          state.
 3                    MR. BERQUIST:  Correct.
 4                    And as I mentioned, I think sort of closer
 5          to the beginning here, we allege in our complaint that
 6          the PCPC did commit intentional torts of fraud,
 7          intentional misrepresentation and conspiracy, with the
 8          knowledge that its effects would be felt throughout
 9          the United States, including Washington, when
10          consumers would purchase the talc containing products
11          and that the harm was ultimately experienced in
12          Washington.
13                    That -- I don't think whether the harm is
14          experienced in Washington is really an issue.  I
15          think -- I assume that the PCPC acknowledges that, but
16          I could be wrong.
17                    So it seems to me that we're focusing on
18          whether it was expressly aimed at the forum state.
19          And as I mentioned before, this was a, you know,
20          nationwide effort.  It was directed at all states and
21          consumers in all states.
22                    THE COURT:  With respect to PCPC's
23          CR 12(b)(2) motion, the Court would find that the case
24          law provides that the Court must -- this Court must
25          accept the allegations in the complaint as true.
```

June 2, 2017

Page 113

1                  With regard to the conspiracy theory, the

2         Court would find that under Silver Lake, and State v.

3         LG Electronics, and Hewitt v Hewitt, that Washington

4         does not recognize specific personal jurisdiction over

5         a foreign co-conspirator who allegedly conspires with

6         a Washington resident to assert personal jurisdiction

7         over that co-conspirator.

8                  So the conspiracy theory is not recognized

9         in Washington and is not a basis for asserting

10        personal jurisdiction over PCPC.

11                 With respect to PCPC's role as a lobbyist or

12        as a trade association, the question would be whether

13        PCPC's alleged intentional actions in misrepresenting

14        the safety or concealing evidence of the dangerousness

15        of the talc containing asbestos meets due process

16        requirements based on minimum contacts.

17                 There is a paucity of case law involving

18        trade associations, however, the defense did cite the

19        Ploense versus Electrolux Home Products case out of

20        Illinois Court of Appeals, 882 N.E.2d 653.

21                 That does seem to rely upon primarily the

22        conspiracy theory, which this Court finds cannot be a

23        basis for asserting claims against PCPC.

24                 So the question is whether the alleged

25        representations of PCPC are sufficient to invoke

June 2, 2017

Page 114

```
 1        jurisdiction over it by the plaintiff in this case.
 2              PCPC is not a manufacturer.  The
 3        manufacturers are the ones who put the product into
 4        the stream of commerce in the state of Washington.
 5              Absent the viability of a conspiracy theory,
 6        this Court would find that the allegations are --
 7        allegations against PCPC are too attenuated to find
 8        that it committed an intentional act specifically
 9        aimed at Washington State, which resulted in injuries
10        sustained by plaintiff Ratcliff.
11              Therefore, the Court finds that there is not
12        an independent basis for asserting a claim of personal
13        specific jurisdiction over PCPC in the state of
14        Washington.
15              Under plaintiff's theory PCPC, because of
16        its acts allegedly committed in Washington, D.C. and
17        elsewhere on the east coast, would expose PCPC to
18        litigation in each of the 50 states, which in this
19        Court's opinion would violate fundamental principles
20        of due process, as well as the tenets put out -- put
21        forth in International Shoe, World-Wide Volkswagen,
22        and a progeny of those cases.
23              The Court did consider the effects test, but
24        finds that even under the effects test under
25        Washington State's long-arm statute, the three
```

June 2, 2017

Page 115

1     elements, as set forth by this Court of an intentional

2     act aimed to the forum state and injury sustained in

3     this state as a result of that intentional act, have

4     not been met, and therefore the CR 12(b)(2) motion to

5     dismiss based on personal jurisdiction is granted.

6               MR. RIZZO:  I'll prepare the order, your

7     Honor, and submit it to Mr. Berquist.

8               THE COURT:  All right.  I would like that

9     entered today, otherwise we end up creating more time,

10    so if we could get that today.

11              MR. RIZZO:  Understood, your Honor.

12              THE COURT:  Mr. Umlauf, do we have the

13    order?

14              MR. UMLAUF:  Yes.

15              THE COURT:  Okay.

16              COURT CLERK:  Do you plan on using this

17    in --

18              MR. UMLAUF:  We have two, we have two.

19              COURT CLERK:  Okay.

20              MR. RIZZO:  Judge, thank you for the

21    opportunity to appear in your court.

22              THE COURT:  You're welcome, Mr. Rizzo.

23              Thank you.

24              Motion granting Target's summary judgment

25    and denying CR 56(f) request is entered.

June 2, 2017

Page 118

```
 1                    C E R T I F I C A T E

 2       STATE OF WASHINGTON  )

 3                            ) ss.

 4       COUNTY OF KING       )

 5              I, the Licensed Court Reporter in the state of

 6       Washington, do hereby certify that:

 7              I am not a relative or employee or counsel of

 8       any of the parties to said action, or a relative or

 9       employee of any such attorney or counsel, and that I

10       am not financially interested in the said action or

11       the outcome thereof;

12              The transcript attached hereto is a true

13       transcription of audio recording of the proceedings to

14       the best of my ability.

15              IN WITNESS WHEREOF, I have hereunto set my

16       hand:  June 12, 2017.

17                              Brenda Steinman

18                              ------------------------
                                Brenda Steinman
19                              CCR #2717
                                Certified Court Reporter
20                              State of Washington.

21

22

23

24

25
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110    FAX: 206.622.6236

1

2

HONORABLE TIMOTHY BRADSHAW

3

4

5

6

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

7 | **JODY E. RATCLIFF**,

No. 16-2-18128-7 SEA

8 |             Plaintiff,

9 |       v.

SECOND AMENDED COMPLAINT

10 | **AMERICAN HONDA MOTOR CO. INC.**;
**AVON PRODUCTS INC.**;
11 | **BOBBI BROWN PROFESSIONAL
     COSMETICS INC.**;
12 | **BORGWARNER MORSE TEC LLC**;
**BRENNTAG SPECIALTIES INC.** (f/k/a
13 |     MINERAL AND PIGMENT SOLUTIONS INC.
     and WHITTAKER, CLARK & DANIELS
14 |     INC.);
**BRITISH AMERICAN TOBACCO PLC** (d/b/a
15 |     Yardley and as successor to YARDLEY & CO.
     LTD.);
16 | **CLINIQUE LABORATORIES LLC**;
**COLGATE-PALMOLIVE CO.**;
17 | **CONTINENTAL AUTOMOTIVE SYSTEMS
     INC.** (f/k/a CONTINENTAL TEVES INC.);
18 | **CYPRUS AMAX MINERALS CO.**;
**ESTÉE LAUDER INC.**;
19 | **FORD MOTOR CO.**;
**GENUINE PARTS CO.**;
20 | **GEORGIA-PACIFIC LLC**;
**HENKEL CORP.** (d/b/a DIAL CORP., individually
21 |     and as successor to THE GILLETTE CO.);
**HENNESSY INDUSTRIES INC.**;
22 | **HONEYWELL INTERNATIONAL INC.** (f/k/a

23

SECOND AMENDED COMPLAINT - 1

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

ALLIED SIGNAL INC., as successor to the
BENDIX CORP.);
**IMERYS TALC AMERICA INC.** (f/k/a
LUZENAC AMERICA INC.);
**JOHNSON & JOHNSON**;
**JOHNSON & JOHNSON CONSUMER INC.**
(f/k/a JOHNSON & JOHNSON CONSUMER
COMPANIES INC.);
**LENTHERIC INC.** (f/k/a YARDLEY OF
LONDON INC.);
**L'OREAL SA** (individually and as successor to
THE MAYBELLINE CO. and MAYBELLINE
INC.);
**L'OREAL USA CREATIVE INC.** (d/b/a
Maybelline and f/k/a MAYBELLINE
COSMETICS CORP., individually and as
successor to THE MAYBELLINE CO. and
MAYBELLINE INC.);
**L'OREAL USA INC.** (f/k/a COSMAIR INC.);
**LORNAMEAD INC.**;
**MACY'S INC.** (f/k/a R. H. MACY & CO INC.);
**MAKE-UP ART COSMETICS INC.**;
**MAKE-UP ART COSMETICS (NEW YORK)
INC.**;
**MAKE-UP ART COSMETICS (U.S.) INC.**;
**MAREMONT CORP.**;
**MAYBELLINE LLC**;
**MERCK & CO. INC.** (as successor to
SCHERING-PLOUGH, THE MAYBELLINE
CO. and MAYBELLINE INC.);
**NATIONAL AUTOMOTIVE PARTS
ASSOCIATION INC.**;
**NAVISTAR INC.** (f/k/a INTERNATIONAL
TRUCK AND ENGINE CORP.);
**NISSAN NORTH AMERICA INC.**;
**NORDSTROM INC.**;
**PERSONAL CARE PRODUCTS COUNCIL**
(f/k/a COSMETICS, TOILETRIES, AND
FRAGRANCE ASSOCIATION);
**REVLON INC.**;
**SEPHORA USA INC.**;
**SMITHKLINE BEECHAM PLC** (successor to

SECOND AMENDED COMPLAINT - 2

YARDLEY OF LONDON);
**STANDARD MOTOR PRODUCTS INC.**;
**TARGET CORP.**;
**THE BARTELL DRUG CO.**;
**THE DIAL CORP.** (individually and as successor
    to THE GILLETTE CO.);
**THE ESTÉE LAUDER COMPANIES INC.**;
**THE PROCTER & GAMBLE CO.** (individually
    and as successor to YARDLEY OF LONDON
    and THE GILLETTE COMPANY);
**TOYOTA MOTOR SALES USA INC.**;
**UNION CARBIDE CORP.**;
**WALGREEN CO.**;
**WHITTAKER, CLARK & DANIELS INC.**;
**YARDLEY OF LONDON INC.**;
**YARDLEY OF LONDON (U.S.) LLC**;
**YARDLEY OF LONDON LTD**,

Defendants.

COMES NOW the Plaintiff and presents the following claims for relief:

## I.  PARTIES

Plaintiff resides in Seattle, Washington.

Defendants and/or their predecessors-in-interest (hereinafter collectively referred to as "Defendants"), other than the Personal Care Products Council, are corporations that, at all times relevant herein, manufactured, sold, distributed or supplied asbestos-containing products or products and equipment that were used in conjunction with asbestos[1]. The Personal Care Products Council is a trade organization that has represented and continues to represent— through lobbyists and otherwise—the interests of companies that sell cosmetic and personal care products, including many of the Defendants and/or their predecessors-in-interest.

//

//

_____

[1] As used throughout this Complaint, the term "asbestos" shall be interpreted broadly and include, among other things, both regulated and non-regulated forms of the mineral and transitional fibers.

SECOND AMENDED COMPLAINT - 3

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

## II. JURISDICTION

This Court has jurisdiction over this cause pursuant to RCW 4.12.025 and 4.28.185 because, at all times relevant herein, Defendants transacted business, committed tortious acts, and/or may be served with process in King County, Washington. Defendants Nordstrom Inc. and The Bartell Drug Co. are Washington corporations.

## III. FACTS

Plaintiff Jody E. Ratcliff was exposed to asbestos and asbestos-containing products mined, manufactured, produced, placed into the stream of commerce by, and/or used in conjunction with the products of the Defendants. As a direct and proximate result of this exposure, Ms. Ratcliff developed malignant mesothelioma. Plaintiff provides the following information:

| | | |
|---|---|---|
| A. | Specific Disease: | Malignant Mesothelioma |
| B. | Date of Diagnosis: | March 2014 |
| C. | Military: | N/A |
| D. | Occupation: | Registered Nurse; Certified Registered Nurse Anesthetist |
| E. | Places of Exposure[2]: | California; Colorado; Massachusetts; North Carolina; Tennessee; Texas; Washington; Washington, D.C. |
| F. | Dates of Exposure: | Approximately February 14, 1977, through approximately 2014 |
| G. | Current Address: | 334 Lakeside Avenue South Seattle, Washington 98144 |

---

[2] Ms. Ratcliff was exposed to Defendants' asbestos-containing products through her personal use of cosmetics and powders, as well as through her father's employment in the automotive repair industry (both direct as a bystander and secondary).

SECOND AMENDED COMPLAINT - 4

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

1

## IV. **LIABILITY**

2     Plaintiff claims liability based upon the theories of negligence; willful or wanton

3 misconduct; strict product liability under Section 402A of the Restatement (Second) of Torts and

4 under the Washington Product Liability Act ("WPLA")[3]; product misrepresentation; breach of

5 warranty; enterprise liability and concert of action; and/or market-share liability (alternative

market share liability). The liability-creating conduct of Defendants consisted, *inter alia*, of

6 negligent and unsafe design; failure to properly inspect, test, warn, instruct, monitor and/or

7 recall; failure to substitute safe products; marketing or installing unreasonably dangerous or

8 extra-hazardous and/or defective products, products not reasonably safe as designed, products

not reasonably safe for lack of adequate warning, and/or products with misrepresentations of

9 product safety; and suppressing the publication of information regarding the dangers of asbestos.

FURTHER ALLEGATIONS OF LIABILITY – TALC DEFENDANTS

10         *Negligence Per Se and/or Evidence of Negligence*

11     As against Defendants Avon Products Inc.; Bobbi Brown Professional Cosmetics Inc.;

12 British American Tobacco Co.; Clinique Laboratories LLC; Colgate-Palmolive Co.; Cyprus

13 Amax Minerals Co.; Estée Lauder Inc.; Henkel Corp.; Imerys Talc America Inc.; Johnson &

Johnson; Johnson & Johnson Consumer Inc.; Lentheric Inc.; L'Oreal SA; L'Oreal USA Creative

14 Inc.; L'Oreal USA Inc.; Lornamead Inc.; Macy's Inc.; Make-Up Art Cosmetics Inc.; Make-Up

15 Art Cosmetics (New York) Inc.; Make-Up Art Cosmetics (U.S.) Inc.; Maybelline LLC; Merck &

16 Co. Inc.; Nordstrom Inc.; Revlon Inc.; Sephora USA Inc.; Smithkline Beecham PLC; Target

Corp.; The Bartell Drug Co.; The Dial Corp.; The Estée Lauder Companies Inc.; The Procter &

17 Gamble Co.; Walgreen Co.; Whittaker, Clark & Daniels Inc.; Yardley of London Inc.; Yardley

18 of London (U.S.) LLC; and Yardley of London Ltd. (hereinafter "Talc Defendants"), Plaintiff

19 further alleges as follows (Plaintiff does not allege any cause of action under federal law):

20     The federal Food, Drug, and Cosmetic Act ("FDCA"), codified as 21 U.S.C. §§ 301-399,

governs the manufacture, sale, supply, distribution and marketing of cosmetic products in the

21

22 [3] RCW 7.72.010, *et seq*. Product seller Defendants are subject to strict liability pursuant to RCW 7.72.040(2)(a)-(e).

23

SECOND AMENDED COMPLAINT - 5

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

United States. 21 U.S.C. § 321(i) defines cosmetics by their intended use as "(1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any party thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles…" Talc Defendants' products and their ingredients are "cosmetic" products as defined by 21 U.S.C. § 321(i).

The FDCA was designed to protect consumers of "cosmetic" products. Plaintiff was a member of the class of persons the FDCA was intended to protect. The FDCA prohibits the manufacture, sale, supply, distribution and marketing of adulterated cosmetics in interstate commerce. 21 U.S.C. § 331. "Adulterations" refer to violations involving product composition— whether they result from ingredients, contaminants, processing, packaging, or shipping and handling—if the cosmetic "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual…" 21 U.S.C. § 361. The FDCA governs all persons and companies involved in cosmetics in interstate commerce—including manufacturers, packers, distributors and retailers—who are accordingly responsible for ensuring that they are not dealing in products that are adulterated or misbranded.

Talc Defendants manufactured, processed, sold, supplied, distributed and marketed talc and talc-containing cosmetic products throughout the United States. In violation of the FDCA, said products were contaminated with asbestos and/or asbestiform fibers, a poisonous and deleterious disease-causing mineral known by Talc Defendants to cause death and disease since the early 1900s. Under normal and customary use and application, Talc Defendants' talc-containing products and their ingredients released respirable asbestos and/or asbestiform fibers, and end users, including Plaintiff, were exposed to and consequently inhaled asbestos and/or asbestiform fibers. Talc Defendants knowingly manufactured, sold, supplied, distributed and marketed adulterated cosmetic products that were contaminated with asbestos and/or asbestiform fibers in clear violation of the FDCA. Talc Defendants' violation of the FDCA, which governs the sale of adulterated cosmetic products, including talcum powder and the ingredients therein,

SECOND AMENDED COMPLAINT - 6

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

Plaintiff's subsequent inhalation of asbestos and/or asbestiform fibers from the same were substantial factors in bringing about Plaintiff's mesothelioma and consequential damages. In violating the FDCA, which was enacted, among other things, to prevent the sale of asbestos-contaminated talc products, Talc Defendants were and are negligent *per se*.

Talc Defendants and their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of each of the acts set forth herein. Talc Defendants are liable for the oppressive and malicious acts of their predecessors and divisions, and each Talc Defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of, the acts of each of their predecessors and divisions.

Additionally, Talc Defendants were and are negligent *per se* for the aforementioned reasons pursuant to Wash. Rev. Code § 69.04.001, *et seq*.; California Sherman Food, Drug, and Cosmetic Law (California Health and Safety Code); Colo. Rev. Stat. § 25-1-101, *et seq.*; Mass. Gen. Laws ch. 94, § 186; N.C. Gen. Stat. § 106-120, *et seq*.; Tenn. Code Ann. § 53-1-101, *et seq*.; and Tex. Code Ann. § 431.001, *et seq.*

## Fraud

For decades, Talc Defendants have mined, processed, manufactured, distributed, marketed and supplied products composed of talc that were sold and marketed as safe for daily use by consumers on their bodies to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Talc Defendants' products were advertised as healthy for babies, children and adults to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

Talc Defendants, since the early 1900s, possessed medical and scientific data that raised concerns regarding the presence of asbestos in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. Talc is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food,

SECOND AMENDED COMPLAINT - 7

electric cable, ceramics, and cosmetics. In its loose form and as used in Talc Defendants' products, talc is known as "talcum powder."

Geologists and mining companies, including Talc Defendants and their suppliers, experts, agents and advisors, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

Talc Defendants and/or their affiliates, employees, agents or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

SECOND AMENDED COMPLAINT - 8

In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" stating that "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor, published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 AM. IND. HYG. ASSOC. J. 350-354 (1968).

A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The results of the Mount Sinai study were soon picked up and reported by both the *New York Times* and the *Washington Post* that same year.

In the early 1970s, the U.S. Food and Drug Administration ("FDA") began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Talc Defendants, including Colgate, Whittaker, Clark & Daniels ("WCD") and Cyprus Amax Minerals Co. ("Cyprus"), and the Cosmetic, Toiletry and Fragrance Association ("CTFA") (now the Personal Care Products Council), an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in

SECOND AMENDED COMPLAINT - 9

concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc Defendants' products.

Some Talc Defendants did not begin to test their products, if at all, to determine whether asbestos was present until the FDA inquiry began in the 1970s. Talc Defendants named herein and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" x-ray diffraction ("XRD") testing purportedly "routinely" on miniscule portions of the tens of thousands of pounds of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by transmission electron microscopy ("TEM"), which offers a more sensitive level of detection. This "voluntary" method that was developed collectively by and to which each Talc Defendant agreed was advocated to the FDA by Talc Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, despite Talc Defendants knowing that levels of asbestos contamination in talc commonly and demonstrably fell below the detection limit of XRD and despite knowing that contamination was not uniformly distributed such that the tiny amounts Talc Defendants tested would not adequately reveal the true level of contamination in the talc that reached consumers, such as Plaintiff.

Talc Defendants (and other entities in the talc industry and cosmetic industries), individually and collectively, failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both their finished products as well as talc shipments from Talc Defendants and other sources that were used to produce finished products.

Certain Talc Defendants, and even the outside laboratory McCrone Associates, further sent letters to the CTFA, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made. Certain Talc Defendants made and published such representations claiming that their testing method was adequate, claiming

SECOND AMENDED COMPLAINT - 10

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. Certain of the Talc Defendants intentionally and knowingly did so to avoid FDA regulations that may have required the Talc Defendants to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talcum powder products contained asbestos and were therefore dangerous.

After 1976, Talc Defendants herein continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in the talc being used to manufacture their products.

Talc Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain asbestos.

Talc Defendants collectively and through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-containing products.

Talc Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Plaintiff, of the serious bodily harm and/or death which may result from the inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

Talc Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Plaintiff was exposed.

SECOND AMENDED COMPLAINT - 11

Talc Defendants distorted the results of medical examinations conducted upon Plaintiff and/or individuals similarly situated who were exposed to asbestos fibers and dust by falsely stating and/or concealing the nature and extent of hazard to which Plaintiff' and those similarly situated had been subjected through the use or exposure to talc and talcum powder products.

Talc Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiff, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

Talc Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

> (a) to withhold from users of their products—and from persons who Talc Defendants knew and should have known would be exposed thereto—information regarding the health risks of inhaling or ingesting asbestos fibers and dust contained in their talc and talcum powder products;

> (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos fibers and dust in talc and talcum powder products;

> (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers; and

> (d) to falsely represent that their talc and talcum powder products were safe for use by consumers.

Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Talc Defendants regarding the hazards of their asbestos-containing talc and talcum powder products and was therefore deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

Talc Defendants, both acting individually and in concert with others, violated the common law duty of care owed to Plaintiff or otherwise engaged in intentionally culpable

SECOND AMENDED COMPLAINT - 12

activity that caused her to suffer severe injuries and damages.

The actions and inactions of Talc Defendants, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff.

By reason of the foregoing, Talc Defendants are jointly and severally liable to Plaintiff for the injuries and damages sustained by virtue of their fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

FURTHER ALLEGATIONS OF LIABILITY – TALC SUPPLIER DEFENDANTS

*Market-Share Alternate Liability*

As against Defendants Brenntag Specialties Inc.; Cyprus Amax Minerals Co.; Imerys Talc America Inc.; and Whittaker, Clark & Daniels Inc. (hereinafter "Talc Supplier Defendants"), Plaintiff further alleges as follows:

Talc Supplier Defendants, collectively or individually, mined, produced, processed, manufactured, marketed, supplied, distributed, imported, compounded, sold, promoted, inspected, tested, or otherwise placed into the stream of commerce asbestos products which were generically similar in nature. Plaintiff was exposed to asbestos dust and fibers from the Talc Supplier Defendants' products use or contact with other entities' products that incorporated Talc Supplier Defendants' Products as components thereof. Plaintiff has named as a defendant at least one of suppliers of asbestos-containing talc used in the products to which Plaintiff was exposed.

Talc Supplier Defendants engaged, individually or collectively, in identical, uniform and/or similar marketing activities to promote their products. Talc Supplier Defendants' conduct in mining, producing, processing, manufacturing, marketing, supplying, distributing, importing, converting, compounding, selling, promoting, inspecting, testing, and/or otherwise placing into the stream of commerce generic products with identical and/or similar qualities created an identical hazard and risk, namely asbestos-related disease. Plaintiff used Talc Supplier Defendants' products in an intended and foreseeable manner.

SECOND AMENDED COMPLAINT - 13

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

Conventional proof of product identification is impracticable and/or impossible due to the identical, concealed and/or undisclosed nature and/or identity of Talc Supplier Defendants' products. Talc Supplier Defendants' products did not contain a warning or other information about the health hazards associated therewith. Talc Supplier Defendants' products caused injuries to Plaintiff many years after she was exposed to asbestos dust and fibers from said products.

Talc Supplier Defendants' products represent a substantial share of the relevant market. Talc Supplier Defendants' products were dangerous when they left the Talc Supplier Defendants' control, and the Talc Supplier Defendants knew, and should have known, that said products would cause injuries to users, including Plaintiff. As a direct and proximate result of Talc Supplier Defendants' actions, Plaintiff was exposed to asbestos and sustained severe injuries and damages as a result thereof.

Talc Supplier Defendants' conduct in producing and marketing their talc constituted a breach of a legally recognized duty to the Plaintiff.

FURTHER ALLEGATIONS OF LIABILITY – PCPC

*Fraud*

Personal Care Products Council ("PCPC" or "CTFA"), as the entity is now known, was founded in 1894 as the Manufacturing Perfumers' Association ("MPA"). The MPA was established to coordinate industry opposition to Congressional legislation that would increase the tariff on imported raw materials, affecting the cost of producing toilet goods. In 1922, the MPA changed its name to the American Manufacturers of Toilet Articles ("AMTA"), extending its membership eligibility to companies beyond perfumers. By 1924, AMTA membership included 115 active members and 105 associate members, including many of the Talc Defendants and Talc Supplier Defendants named herein. In 1970, the AMTA changed its name to the CTFA. In 2007, the CTFA changed its name to PCPC. Many of the Talc Defendants and Talc Supplier Defendants were members of or otherwise contributed resources and/or financial support to the AMTA, CTFA and/or PCPC. PCPC's more than 600 member companies

SECOND AMENDED COMPLAINT - 14

manufacture, distribute, and supply "the vast majority of personal care products marketed in the United States."

In 1989, the CTFA formed a charitable organization, now known as the Personal Care Products Council Foundation, which developed the "Look Good Feel Better" program. Today, the PCPC, through collaboration with the American Cancer Society and the Professional Beauty Association, administers the "Look Good Feel Better" program, which is free, purports to help women suffering from cancer to maintain their confidence and self-esteem, and provides services, makeup and cosmetics, workshops, and events to women in Washington.

The PCPC has long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. One of the early indications of asbestos in cosmetic talc was reported by Schulz and Williams' 1942 paper on talcs in animal studies. In the Schulz and Williams 1942 paper, five "Talcum powder" samples are listed with serpentine concentrations (asbestos) ranging from 14 to 49%, with one sample containing trace of tremolite (asbestos). Cralley published a paper in 1968 in the American Industrial Hygiene Association Journal reporting the presence of mineral fibers in 22 over-the-counter talc products, ranging in concentration from 8% to 30%. X-ray diffraction ("XRD") analysis of the talcs revealed most fibers to be fibrous talc, but tremolite (asbestos), anthophyllite (asbestos), and chrysotile (asbestos) were also detected. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite and chrysotile (all asbestos) commonly among those minerals found within talc deposits.

"Asbestos" has become a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. XRD determines the crystalline structure of minerals by measuring the diffraction angles of an x-ray beam that has passed through the mineral. While XRD can identify amphibole minerals, it cannot determine if the mineral identified is fibrous or not, and thus it alone is not reliable for asbestos identification. Transmission electron microscopy

SECOND AMENDED COMPLAINT - 15

("TEM") is the most sensitive and reliable instrument for detection and identification of all asbestos types in all size ranges. Finally, an energy-dispersive x-ray detector ("EDX") interfaced with a TEM yields elemental composition, confirming the asbestos fiber's identity. Only TEM can detect and identify the very thin asbestos fibers that are the greatest health hazard. As such, it is the necessary final step to confirm an absence of asbestos contamination. By the 1970's, TEM was already established as a reliable method for asbestos identification. McCrone Associates, the laboratory selected by several cosmetic talc producers, including many of the Talc Defendants and Talc Supplier Defendants, to analyze their products, was already using TEM for definitive asbestos analysis. An article by McCrone and Stewart (1974) describes the advantages of TEM for asbestos analysis and states that the TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

Dr. Lewin of New York University disclosed twice in 1972 that asbestos contamination had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lwein reported that of 102 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both of these asbestiform minerals. XRD had been used as the first step in analysis and the presence of asbestiform mineral(s) and was verified by the use of optical microscopy to disclose the presence of significant numbers of fiber particles. Shortly thereafter, Dr. Lewin reported to Defendant Whittaker, Clark and Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that 1615 talc contained 1% chrysotile and that 4615 talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that four of fourteen

SECOND AMENDED COMPLAINT - 16

samples contained chrysotile believed to be part of the mineralogical system and another five had chrysotile content to be 1000 ppm or less. Only five samples did not have detectable chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile asbestos in many of the talc samples sent out by CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. The CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including many of the Talc Defendants and Talc Supplier Defendants herein, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc Defendants' and Talc Supplier Defendants' products. On September 3, 1973, the FDA sent the CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing x-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised the CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." The CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. The CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed promulgation. Minutes of the CTFA Talc Subcommittee meeting on March 15, 1976, at FDA reports that FDA's "Dr. Shaffner suggested the possibility

SECOND AMENDED COMPLAINT - 17

of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of the CTFA responded that "the subcommittee would give serious consideration to this suggestion."

CTFA Method J4-1, published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method is 0.5% and above." The CTFA met with and corresponded with the Talc Defendants and Talc Supplier Defendants named herein and third parties, as well as met with the FDA, to individually and collectively advocate for the use of inadequate XRD testing purportedly "routinely" on miniscule portions of the tens of thousands of pounds of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM, which offers a more sensitive level of detection. This "voluntary" method, that was published by the CTFA and known as the "J4-1" method, was collectively developed by and to which the CTFA and the Talc Defendants and Talc Supplier Defendants agreed was advocated to the FDA by the CTFA, Talc Defendants, and Talc Supplier Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though the CTFA, Talc Defendants, and Talc Supplier Defendants knew that the J4-1 method would not adequately reveal the true level of asbestos in the talc that reached consumers, such as Plaintiff. The first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," had 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that the CTFA ever shared this stunning failure with the FDA.

The CTFA did not disclose the failures of the CTFA J4-1 method in detecting asbestos in a sample known to contain tremolite asbestos to the FDA, nor did the CTFA disclose the inadequacies of its J4-1 methodology with the FDA. The CTFA, as well as Talc Defendants, Talc Supplier Defendants, and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both Talc Defendants' and other

SECOND AMENDED COMPLAINT - 18

CTFA members' finished products as well as talc shipments from Talc Supplier Defendants and other sources that were used to produce finished products. Instead, the CTFA sent letters to the FDA stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such intentionally false representations were made. The CTFA and certain Talc Defendants and Talc Supplier Defendants made and published such representations claiming that their testing method was adequate, claiming they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. The CTFA intentionally and knowingly did so to avoid FDA regulations that may have required the Talc Defendants, Talc Supplier Defendants and others to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talcum powder products contained asbestos and were therefore dangerous.

Minutes of the CTFA Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators. . ." When referring to the challenge of chrysotile detection, an article "Talc" in the January/March 1976 *CTFA Cosmetic Journal*, states that "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos … it was asked,  'Why should we test for chrysotile if there isn't any?'" The CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, represented that no fibrous amphibole, asbestiform tremolite, et al. were detected in cosmetic talc. Even after 1976, the CTFA, Talc Defendants, and Talc Supplier Defendants herein continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in the talc being used to manufacture cosmetic products. The CFTA continued to represent that no asbestos was detected in cosmetic talc. This material representation adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used

SECOND AMENDED COMPLAINT - 19

because the CTFA represented that its "ultra sensitivity could be a problem" and that it was expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater than 0.5%, a concentration that could allow more than a billion fibers per gram of talc to be passed off as containing no asbestos.

The FDA, and ultimately, the Plaintiff and her family members, directly and/or indirectly relied upon the CTFA's false representations regarding the presence of asbestos in cosmetic talc. The FDA's letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding the CTFA's misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, a July 11, 1986, FDA letter cites its cooperation with the talc industry such that an "analytical methodology was sufficiently developed" to assure that "such talc be free of fibrous amphibole…" The CTFA J4-1 method has continued to be cosmetic talc industry's method for assuring talc-free asbestos for the past four decades. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos analysis, continued to increase over the next decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc powder with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, four decades later, to use its antiquated and wholly inadequate J4-1 method.

The CTFA, Talc Defendants, and Talc Supplier Defendants collectively and through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff and her family members, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-containing products.

The CTFA, Talc Defendants, and Talc Supplier Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Plaintiff and her family members, of the serious bodily harm and/or death which may result from the

SECOND AMENDED COMPLAINT - 20

inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

The CTFA, Talc Defendants, and Talc Supplier Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Plaintiff was exposed.

The CTFA, Talc Defendants, and Talc Supplier Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive regulatory agencies and the public at large, including Plaintiff and her family members, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

The CTFA, Talc Defendants, and Talc Supplier Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

(a)    to withhold from users of their products—and from persons who the CTFA, Talc Defendants, and Talc Supplier Defendants knew and should have known would be exposed thereto—information regarding the health risks of inhaling or ingesting asbestos fibers and dust contained in their talc and talcum powder products;

(b)    to eliminate or prevent investigation into the health hazards of exposure to asbestos fibers and dust in talc and talcum powder products;

(c)    to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers; and

(d)    to falsely represent that their talc and talcum powder products were safe for use by consumers.

SECOND AMENDED COMPLAINT - 21

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

Plaintiff and her family members reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the CTFA, Talc Defendants, and Talc Supplier Defendants regarding the hazards of their asbestos-containing talc and talcum powder products and was therefore deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products. Plaintiff and her family members had a right to rely upon the CTFA's, Talc Defendants', and Talc Supplier Defendants' misrepresentations to the FDA and the public that cosmetic talc did not contain asbestos.

The CTFA, Talc Defendants, and Talc Supplier Defendants, both acting individually and in concert with others, violated the common law duty of care owed to Plaintiff or otherwise engaged in intentionally culpable activity that caused her to suffer severe injuries and damages.

The actions and inactions of the CTFA, Talc Defendants, and Talc Supplier Defendants, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff.

By reason of the foregoing, the CTFA (PCPC) is jointly and severally liable to Plaintiff for the injuries and damages sustained by virtue of its fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

## V. **DAMAGES**

As a proximate result of Defendants' negligence and/or product liability or other wrongful conduct as alleged above, Plaintiff Jody E. Ratcliff has sustained pain, suffering and disability in an amount not now known, but which will be proven at trial. Plaintiff Jody E. Ratcliff is entitled to damages for her physical pain and suffering, mental anguish, physical impairment and loss of enjoyment of life, disfigurement, and her reasonable and necessary medical and other expenses incurred as a result of her mesothelioma.

WHEREFORE, Plaintiff prays for judgment against the Defendants and each of them as follows:

1.      For general and special damages specified above, including pain, suffering, disability, and all other non-economic damages allowed by law;

SECOND AMENDED COMPLAINT - 22

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708

2.	For medical and related expenses and economic losses, all of which will be proven at the time of trial;

3.	For Plaintiff's costs and disbursements herein;

4.	For pre- and post-judgment interest in the maximum amounts allowed; and

5.	For such other relief as the Court deems just.

DATED this 5th day of December, 2016.

*s/Thomas J. Owens*
Thomas J. Owens, WSBA #23868
Darron E. Berquist, pro hac vice
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

On December 5, 2016, I served by email a copy of Plaintiff's Second Amended Complaint on all counsel of record for defendants who have appeared in the case.

*s/Thomas J. Owens*
Thomas J. Owens

SECOND AMENDED COMPLAINT - 23

THOMAS J. OWENS, ATTORNEY
1001 FOURTH AVENUE PLAZA, SUITE 4400
SEATTLE, WA 98154
TELEPHONE: 206.389.1541
FACSIMILE: 206.389.1708