1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO 16-MD-2738(FLW)(LHG)

_____ :
IN RE JOHNSON & JOHNSON      : TRANSCRIPT OF
POWDER PRODUCTS MARKETING,   : STATUS CONFERENCE
SALES PRACTICES.             :
-------------------------    : SEPTEMBER 6, 2017


CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ  08608


B E F O R E:  THE HONORABLE FREDA L. WOLFSON, USDJ
              THE HONORABLE LOIS H. GOODMAN, USMJ


A P P E A R A N C E S:

BEASLEY ALLEN, ESQUIRES
BY:  P. LEIGH O'DELL, ESQUIRE (ALABAMA)
        -and-
ASHCRAFT & GEREL, ESQUIRES
BY:  MICHELLE A. PARFITT, ESQUIRE (VIRGINIA)
      CHRIS TISI, ESQUIRE  (VIRGINIA)
        -and-
COHEN, PLACITELLA & ROTH, ESQUIRES
BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
On Behalf of the Plaintiffs Steering Committee

DRINKER, BIDDLE & REATH, ESQUIRES
BY:  SUSAN M. SHARKO, ESQUIRE
        -and-
SHOOK, HARDY & BACON, ESQUIRES
BY:  PATRICK L. OOT, ESQUIRE  (WASHINGTON, D.C.)
        -and-
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, ESQUIRES
BY:  JOHN H. BEISNER, ESQUIRE  (WASHINGTON, D.C.)
On behalf of Defendant Johnson & Johnson


* * * * *
**VINCENT RUSSONIELLO, RPR, CRR, CCR**
**OFFICIAL U.S. COURT REPORTER**
**(609) 588-9516**

2

A P P E A R A N C E S     C O N T I N U E D:


SEYFARRTH & SHAW, ESQUIRES
BY:  THOMAS L. LOCKE, ESQUIRE   (WASHINGTON D.C.)
        -and-
THE AXELROD FIRM, ESQUIRES
BY:  SHERYL L. AXELROD, ESQUIRE   (PENNSYLVANIA)
On Behalf of Defendant PCPC


COUGHLIN DUFFY, ESQUIRES
BY:  LORNA A. DOTRO, ESQUIRE
     MARK K. SILVER, ESQUIRE
        -and-
GORDON & REES, ESQUIRES
BY:  ANN THORNTON FIELD, ESQUIRE   (PENNSYLVANIA)
     NANCY M. ERFLE, ESQUIRE   (OREGON)
On behalf of Defendant Imerys Talc America

3

# C E R T I F I C A T E

        PURSUANT TO TITLE 28, U.S.C., SECTION 753, THE

FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE

TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE

ABOVE-ENTITLED MATTER.

                              S/Vincent Russoniello
                              VINCENT RUSSONIELLO, CCR
                              OFFICIAL U.S. COURT REPORTER

4

1          THE CLERK:  All rise.

2          JUDGE WOLFSON:  Thank you.

3          (Appearances are given.)

4                    * * * * *

5          JUDGE WOLFSON:  On the record.

6          I think instead of following through in the

7     order of your status letter, which is normally what I

8     do, I think it is better instead to go right to the

9     scope of discovery and what was my intent when I got

10    on the phone with you last week as to what the scope

11    is.

12         Let me start by saying, no, it was not limited

13    to asbestos.  So let me make that clear.  I'm sorry if

14    I gave some doubt to that.  Where I am is, and I can

15    certainly go through each of the ones that the

16    plaintiff has identified, but it is much broader.  It

17    includes information or knowledge of J&J as to a

18    number of these things.

19         I think all of this, and part of my reason for

20    broadening the discovery, and maybe I've had some

21    interest in doing so at the beginning as well and

22    perhaps it was being too narrowly construed, but I do

23    think also some of these matters could impact what

24    studies were being done at the time, if there was any

25    influence, who was involved.

5

1          For instance, if you have whether it's J&J or

2     the other entities somehow involved in other groups

3     that are performing the studies, I always said the

4     issue of bias in the studies is going to be an

5     important issue and I am going to allow these.

6          The only thing we're really not doing right

7     now is specific causation issues.  But I would like to

8     go through the topics to make sure what I've got on

9     really the relevance of each one of these.

10          "Cornstarch and/or cornstarch products."

11          What's that about, an alternative?

12          MS. O'DELL:  It's a safer alternative for talc

13     in the product.  We believe we have the right to

14     discover all of that and our experts need to know that

15     because in many states they will need to opine on what

16     would be a safer alternative design of the product.

17          JUDGE WOLFSON:  Okay.

18          "The closure of mines, mills, process,

19     facilities, et cetera."

20          Now, I was curious.  Did J&J actually have

21     some mines?

22          MS. O'DELL:  Yes, your Honor.  There is

23     information regarding decisions to close mines or to

24     not source talc for the talcum powder products because

25     of asbestos and other carcinogens within the ore body.

6

1          So we want to discover all that.  If a mine

2    was closed because of that, and that mine was used as

3    a source for the talcum powder products, we want to

4    discover that.

5          JUDGE WOLFSON:  How long ago were those

6    closures?

7          MS. O'DELL:  Some in the '70s, some earlier.

8    It depends on the specific mine.  But they would have

9    been within the zone of usage for many of the women.

10         JUDGE WOLFSON:  That's what my question was.

11         Let's go through all of these and then I'll

12    make some comments.

13         "Drill logs from mines and other documents."

14         These are again the J&J mines?

15         MS. O'DELL:  As well as Imerys mines.

16         JUDGE WOLFSON:  Okay.

17         Because I know this is under your J&J

18    defendant category.  But I'm assuming with regard to

19    Imerys, there is not going to be a dispute about this

20    anyway.  Correct?

21         MR. SILVER:  I'm sorry.  What was the

22    question?

23         JUDGE WOLFSON:  It says, "Drill logs from

24    mines and other documents."

25         You never had an issue about it.  Correct?

7

1          MR. SILVER:  No, your Honor.

2          JUDGE WOLFSON:  This is related to J&J mines.

3     So now it's getting the same kind of things from the

4     J&J mines. Okay.

5          "Meetings with advisory committees or

6     third-party consultants."

7          What does that mean?

8          MS. O'DELL:  It relates to consultants or

9     advisory boards that were considering the issue of

10    whether the products cause cancer, and we want to

11    discover those communications in documents.  That's

12    what the discovery request was specifically targeted

13    to those issues.

14         JUDGE WOLFSON:  Thank you.

15         And then I guess there was a sale of Shower To

16    Shower at some point to Valeant and you are saying if

17    there were documents that would reflect issues related

18    to the product in connection with the sale and how

19    that could impact the sale and if there were such

20    documents reflecting that.  Is that what that really

21    is?

22         MS. O'DELL:  Yes.

23         JUDGE WOLFSON:  Okay.

24         What are the "Board of Director

25    communications"?

8

1          MS. O'DELL:  Well, the specific request was

2     for "Communications of the Board of Directors or

3     subcommittees of the Board of Directors relating to

4     the safety of talcum powder products and specifically

5     the ovarian cancer risks."

6          JUDGE WOLFSON:  Okay.  I don't know why you

7     wouldn't get that.

8          "Communications with Mr. Zazenski at Imerys."

9          MS. O'DELL:  Mr. Zazenski, among other things,

10    wrote a document that suggested cornstarch was a safer

11    alternative for the design of the talcum powder

12    products.  And if cornstarch were not substituted for

13    talc, a warning should have been added to the bottle.

14    He is a person that is in a number of documents --

15         JUDGE WOLFSON:  Who was he?  What was his

16    position?

17         MS. O'DELL:  Product safety for Imerys.

18         JUDGE WOLFSON:  No longer employed?  Is he

19    deceased?

20         MS. O'DELL:  He's deceased.

21         MS. ERFLE:  He has been deceased since 2008.

22         JUDGE WOLFSON:  "The definition of pure talc."

23         MS. O'DELL:  It's our position, your Honor,

24    that there is no such thing as pure talc.  And to a

25    degree that there have been representations regarding

9

1   the talc is pure, we want to discover not only the

2   testing -- it would show that talc is not pure -- but

3   also to the degree there are documents that they

4   suggest evidence that talc is pure, we want to know

5   that.

6          On that particular issue, your Honor, let me

7   just make sure.

8          Mr. Tisi, do you have anything to add on that

9   point of pure talc?

10         MR. TISI:  I would add, your Honor, that the

11  issue in this case is whether or not the talcum powder

12  product -- and we've had some dispute about this with

13  the defense -- whether or not the talcum powder

14  product can cause cancer.

15         None of the products that they market are pure

16  talc from what we could see in the documents that

17  we've reviewed.  And so the issue in the case is their

18  product and not necessarily the talc.

19         JUDGE WOLFSON:  Okay.

20         "Contracts between defendants and any entity

21  concerning talc purchased for use in defendants'

22  products."

23         MS. O'DELL:  We would like to discover those

24  contracts and specifically are there indemnity clauses

25  that relate to those purchases, i.e., Johnson &

1   Johnson defendants purchasing talc from Imerys and

2   others?  Are there indemnity agreements that are a

3   part of that?  If there is liability for cases

4   involving ovarian cancer.

5            JUDGE WOLFSON:  Where I am at this point is,

6   the general subject matters can be discovered.  I'm

7   not going to deal with the exact parameters.  I'm

8   going to leave that to your disputes, your specific

9   requests that you can present to Judge Pisano.

10           I am allowing the general discovery requests.

11  I'm not making any ruling today on indemnity

12  agreements or anything of that nature.  I'll leave

13  that for the specifics to see what they look like.

14  I'm not so sure that's relevant to where we are today.

15  And certainly some of these things I think would be

16  limited, but the subject matters I'll permit.

17           So now with that you can tee-up up your

18  discovery issues.

19           MR. OOT:  Just a point of clarification.  So

20  for these subject matters, the general theory is

21  discoverable.  But we'll work with Judge Pisano to

22  narrow it?

23           JUDGE WOLFSON:  On the scope of it, right.  If

24  there are ones that are going beyond or if they're too

25  broad, right, exactly.

1          MS. O'DELL:  Your Honor, in relation to that,

2     so we don't get in a situation where we have to

3     relitigate all the specific issues, the direction that

4     you are giving us today is these matters are

5     discoverable --

6          JUDGE WOLFSON:  Yes.

7          MS. O'DELL?  -- if it relates to ovarian

8     cancer and the talcum powder products increasing the

9     risk of ovarian cancer, then we are allowed to

10    discover that.

11         JUDGE WOLFSON:  Yes.

12         MS. O'DELL:  And that should proceed.  So we

13    don't want to get in a posture today where we leave

14    this conference, we relitigate --

15         JUDGE WOLFSON:  That there is no issue about.

16         MS. O'DELL:  And so discovery in terms of

17    production documents should proceed.  Depositions

18    should proceed.

19         JUDGE WOLFSON:  I'm not so sure depositions

20    should proceed.  You don't want to depose someone more

21    than once.  So if you have disputes about areas that

22    that same person would be asked questions about, I

23    don't want to have that happen.  Depositions are a

24    separate question at the moment.

25         I'm trying to deal with the written discovery

1    first.  But I am going to give you some timelines

2    today for both written discovery and depositions.

3            MS. O'DELL:  Okay.  Thank you.

4            JUDGE WOLFSON:  Yes, Ms. Sharko.

5            MS. SHARKO:  I'm a little confused and I think

6    we need unfortunately a little more clarity.

7            JUDGE WOLFSON:  Sure.

8            MS. SHARKO:  The areas that you enunciated

9    are, in general, fair game for discovery as it relates

10   to ovarian cancer, and the parties need to work out

11   the parameters of that.  It's not everything, every

12   last piece of paper, every last whatever.

13           JUDGE WOLFSON:  Nothing is every last piece of

14   paper because as in any discovery we know there are

15   limits to it.  So, yes, that's why I'm not ruling on

16   any specifics today.

17           I'm saying the subject matters are

18   appropriate.  You have to review what the requests

19   are.  You decide if they are overbroad or not and we

20   go from there.

21           MS. SHARKO:  And apply the rules of

22   proportionality and all that.

23           JUDGE WOLFSON:  All the rules still apply to

24   this case.  The rules of civil procedure apply.  So

25   that's where we are.

1          Now, with that, let's go back to some of the

2     specific issues that you are raising.

3          Now, I understand you will be re-reviewing I

4     guess the written discovery requests, that some of the

5     prior objections may not apply, and I think you need

6     to do some more conferring.

7          Let me deal with all written discovery first

8     and then I'll talk about depositions with you.

9          Third-party subpoenas.  I guess there were

10    some issues about not who is being deposed but the

11    areas that you are identifying for those.  Is that

12    correct?

13          MS. O'DELL:  In terms of the request, your

14    Honor, I think the only outstanding issue relates to

15    -- there are two actually.  The foreign regulatory

16    agencies and what was happening with trade

17    associations in Europe.  That was briefed in the joint

18    letter.

19          So what the parties have done, we served

20    subpoenas without those requests that were subject to

21    objection to get things moving.  But there was an

22    issue in the joint letter that related to those

23    foreign regulatory and trade associations.  And if my

24    memory serves, there were some specific entities that

25    were included in the Colorado School of Mines

1   subpoena.

2         JUDGE WOLFSON:  At this point, having the

3   discover master, I'm not going to go into the

4   nitty-gritty of what those are.  That's an issue,

5   again, that should be teed-up for Judge Pisano.

6         You've reached agreement with regard to the

7   Bristol-Myers ruling and there is a stipulation I

8   understand that you want to enter with regard to all

9   these cases that are listed in Exhibit 1.  But I

10  understand there are a couple of cases for which you

11  still are pursuing the remand on.

12        MS. O'DELL:  There are three cases, your

13  Honor.  In each of those cases there is a state

14  defendant.  So the cases were filed in the resident

15  state of the plaintiff.  There is an in-state

16  defendant and --

17        JUDGE WOLFSON:  And I guess the argument is

18  going to be whether that's a real defendant or not or

19  simply joined to destroy diversity.  So those are

20  going forward.

21        MS. O'DELL:  Yes.  There are three of those

22  cases.

23        JUDGE WOLFSON:  Okay. So we can enter the

24  Exhibit 1.

25        Let me talk for a moment about the

1    Mehaffey-Weber memo.  I've read myself the papers that

2    were submitted in connection with this memo which

3    included the affidavit of Mr. Williams and fairly

4    limited briefing frankly on the issue.

5           I must tell you, my initial reaction is that

6    particularly some of the comments that were made on it

7    clearly seem that litigation is out there in some way.

8    I think just on its face, it seems to be a document

9    that could be protected by one of the privileges.  But

10   I really don't have quite enough.

11          Second of all, what does concern me, though,

12   there are a lot of other issues involved with it.  But

13   one is also I do not believe that the submissions by

14   J&J adequately tell me the protections that were taken

15   from not producing this because this was produced in

16   more than one place is my understanding.

17          MR. OOT:  Thank you, your Honor.

18          So our position related to waiver is first

19   prefaced by the violation of 26(b)(5)(B) and I think

20   it's very important.  I'm glad that your Honor said

21   the rules apply.

22          But here what's happened is they have

23   essentially taken our privileged document, filed it in

24   this case, and now we have an existing claw back and

25   they continue to violate the rule under 26(b)(5)(B).

16

1    And now exactly what's happening here, your Honor,

2    they want the Court to jump to whether or not the

3    document is privileged.

4         I would like to actually have a pause first

5    and really realize that 26(b)(5)(B) applies and we are

6    entitled to claw that back that until we have this

7    discussion of whether or not the document is

8    privileged.

9         MR. TISI:  Your Honors, Chris Tisi for the

10   plaintiffs.

11        I don't have the language of the order in

12   front of me.  It gives the plaintiffs certain

13   protections.  If a claw back has has been issued, as

14   was done in this case, we reserve the right to bring

15   the matter to the Court, which is exactly what we have

16   done.  In fact, it's been on the past three agendas

17   for the Court.

18        I think it's important to remember the reason

19   why this particular document among many was brought to

20   the Court's attention.  If you go back to the status

21   conference in February, the issue was whether or not

22   there has been an adequate document production in this

23   case.

24        Your Honor instructed the plaintiffs,

25   instructed me to go back to the defense and say to

17

1   them, Tell the defense with some particularity the

2   concerns you have with the productions that they've

3   made.

4           So we have this as an example, this 1998 memo

5   as an example of the reasons why we believe that

6   certain documents were not produced in this

7   litigation.  So we sent them this letter for that

8   purpose.

9           The reason why it becomes really important is

10  because this document is almost -- I've used the term

11  Rosetta Stone.  It really demonstrates, it gives us a

12  snapshot in time, as to what documents were collected,

13  what documents were there in 1998, and we still have

14  not been able to get our arms around it.

15          JUDGE WOLFSON:  Let me ask a question.  How

16  are you taking care of this issue with the documents

17  that existed in 1998?

18          MR. OOT:  So in a letter that -- a copy of a

19  letter that I sent to Mr. Tisi in response to his

20  Friday at 5:30 letter, I outlined all of the efforts

21  that we took to location the documents.

22          So what this issue is, your Honor, they're

23  talking about a cardboard box.  We're not necessarily

24  talking about missing documents.

25          JUDGE WOLFSON:  I understood what you said.

18

1    You said the boxes themselves don't exist anymore.

2    We've archived them.  We've done different things.

3         What my inquiry really is, is to make sure

4    that everything that was available back in '98 and

5    that's still available is being produced.  And if it

6    is not available, a description or explanation as to

7    what happened to it and what the chain of custody was.

8         And so my real issue is, what was done for you

9    to confirm what happened to those documents in this

10   time?  I don't know what's happened there.  I'm not

11   suggesting today that I'm going to go through this

12   because it's not my job to be the discovery master at

13   the moment.

14        I'm trying to get a feel to give you also some

15   views of what some of my concerns are.  So that if you

16   are going to present this to Judge Pisano for a report

17   and recommendation to me, you know the things I want

18   addressed.  I don't want this to go on for months.

19        MR. TISI:  Your Honor, there is one issue that

20   came up since we initially briefed this.  If you go

21   back and take a look at the notes from the last three

22   status conferences, one of the issues that came up,

23   apart from the privilege claims on this letter, was

24   whether or not the documents described in the memo

25   have been produced.

19

1        JUDGE GOODMAN:  Can I stop you?  Can you just

2   tell me, is it documents we are talking about or a

3   physical box we're talking about?

4        MR. TISI:  I don't care about the boxes.  The

5   boxes are irrelevant and candidly that's a bit of a

6   red herring.

7        What happened, if you look at the document,

8   the memo itself, what happened was over a year period

9   of time people went back into the record archives and

10   if you look at paragraph one of the memo it describes

11   this.

12        They went back into the archives, the

13   regulatory archives and the research archives, and

14   they retrieved not only boxes but notebooks, and

15   interviewed people who brought their own files to the

16   table.

17        Now, two things happened:  No. 1, is they

18   categorized and they described the boxes:

19        So for Bill Ashton there were something in the

20   range of 44 boxes.

21        For Ms. Galligher there were various notebooks

22   including bi-monthly testing of talc samples.

23        For Mr. Molinar there were his own personal

24   files and eight additional boxes.

25        So what this document does is categorize what

1    was collected.  And what was important about this was,

2    it was all related to the issue of whether talc causes

3    cancer, ovarian cancer back in 1997/1998.

4          This other thing that was done was that

5    counsel apparently pulled from the boxes -- and this

6    is in the first paragraph of that document -- pulled

7    from the boxes various documents that related to talc

8    and cancer and marked them.  And if you look at

9    footnote 1 of the memo, and I have a copy of it.

10         JUDGE WOLFSON:  I have the memo.

11         MR. TISI:  If you look at No. 1, if you look

12    at the memo on page 1, it says, "Each has" --

13         MR. OOT:  We're in open court and he's reading

14    a privileged document right now.  We're still entitled

15    to 26(b)(5)(B).

16         JUDGE WOLFSON:  I understand.  I have the

17    footnote, though.  So all it is, is just the coding

18    system for documents.  By the way, frankly, that

19    coding thing is really not protected.

20         MR. TISI:  But the point, your Honor, is even

21    if the boxes don't exist anymore as they were at the

22    time, candidly we have some concerns about it because

23    they had preservation requirements back in 1998.

24         JUDGE WOLFSON:  By the way, what was this

25    Coker litigation?  That's what Mr. Williams put in an

1   affidavit to say why this was done in anticipation of

2   litigation.  No one talked to him about his affidavit?

3        That's what you produced in this motion:

4   "Affidavit of Gene Williams.  I served as counsel in

5   the matter of Darlene Coker and spouse Ray Coker v.

6   Bill Thames Pharmacy, Inc., which at the time was

7   pending against a number of Johnson & Johnson

8   subsidiaries in the 136th Judicial District Court of

9   Jefferson County, Texas."

10       That's his whole position, that this was done

11  for Coker, and he calls them the "Coker coding

12  sheets."

13       MS. SHARKO:  We can find that out.  I think no

14  one anticipated actually arguing this motion today,

15  but we'll find that out.

16       MR. TISI:  Your Honor, the key point, and I

17  think it's important to bring this out, is that they

18  pulled documents from these files, made photocopies of

19  them.  Presumably those photocopies continue to exist.

20       So whether or not the boxes exist or not,

21  those documents that were pulled, we have no way of

22  knowing them until they produce them.

23       JUDGE WOLFSON:  My understanding is, they said

24  they are going to produce the documents.

25       MR. TISI:  Well, we don't know whether they

1    have or they haven't.  This is candidly why this has

2    been a little bit frustrating, because up until the

3    22nd of August, we had been under the impression they

4    provided us with a spreadsheet which was represented

5    to us and represented candidly to your Honor was an

6    accounting of where we could go to recreate the boxes

7    in the production that we already had.

8         So there is an eight or 16 page spreadsheet

9    that talks about Bates range of X to Y.  If you go to

10   the documents, this was part of the boxes.  And it was

11   keyed to the phrases in this 1998 document which gave

12   us the impression that all we had to do is simply go

13   back into our production, pull those documents, put

14   them in a stack and we would have what's referenced in

15   this 1998 document.

16        We went back.  You want to talk about time and

17   labor.  We went back.  Ms. O'Dell went back and her

18   office pulled a lot of these documents.  A lot of them

19   post-dated the memo.  A lot of them were things that

20   could not possibly have been in that file.

21        We were representing that to your Honor the

22   past three conferences.  We were representing to your

23   Honor that we were working this out.  All that was

24   really at issue at the end was the 1998 memo itself.

25   But the documents referenced in the memo, counsel was

1    working it out.

2            On at the 22nd of August, Ms. O'Dell and I got

3    on the phone with Mr. Oot and Ms. Frazier and it was

4    told to us for the very first time that these

5    documents, what was referenced in the spreadsheet was

6    not what was in the boxes.

7            What was referenced in the spreadsheet was,

8    these were the kinds of documents that would have been

9    in the boxes had we had them.  We didn't know until

10   about two weeks ago that the boxes did not exist.

11           In the meantime they have been litigating this

12   issue in state court and represented to the state

13   court Judge.  There is actually a state court order

14   ordering them to produce the boxes, the notebooks, the

15   files containing this memo.  At no point did J&J ever

16   represent to me -- and I went back and looked.  I'm

17   pretty careful about this stuff.  I went back and

18   looked and said, Could I have missed something?

19           I went back and looked at the status

20   conference reports, at the emails that were sent to

21   me, the spreadsheet, and in each and every instance --

22   and I have them with me if your Honor wants to look at

23   them -- in each and every instance what was

24   represented to me was that the spreadsheet that was

25   provided would allow plaintiffs to recreate what was

24

1    in those boxes.

2          Why is that important, your Honor?  No. 1 it's

3    a snapshot in time of what was known by the company.

4          No. 2, we're very -- and I'll say it

5    outright -- we're very concerned that documents that

6    existed at one time when the company was aware there

7    was an issue relating to talc and ovarian cancer no

8    longer exist.

9          We have asked them -- and I sent a letter last

10   week following up on our conference on the 22nd -- at

11   the very least you should produce to us those

12   documents that were pulled from the boxes and coded as

13   indicated in footnote 1.  I got a letter from Mr. Oot

14   this morning that I was reading on my phone as I was

15   coming to court.  There was no reference to that

16   request.

17         Your Honor, it's a real concern to us that

18   there was a collection of materials and documents

19   related to the very issues in this case almost

20   20 years ago.

21         JUDGE WOLFSON:  I have your argument.

22         MR. OOT:  Your Honor, that's just not true,

23   first of all.

24         JUDGE WOLFSON:  Tell me what the spreadsheet

25   was.

25

1      MR. OOT:  So when we originally met and

2  conferred, we agreed that we would go back into the

3  legacy archive, which is a very large volume of

4  documents, and we would have a human reviewer go and

5  location ranges where these documents would be located

6  and that's what the spreadsheet is.

7      JUDGE WOLFSON:  I don't understand.  Help me

8  out here.  First of all, if I take the way it's

9  described that the documents back in 1998 were

10  labeled, this coding system was set up for initials

11  that would reflect documents from different

12  individuals.  Correct?

13      MR. OOT:  Under the memo, yes, your Honor.

14      JUDGE WOLFSON:  Which they photocopied.  Does

15  that coding system appear anywhere on the documents or

16  in the archives?

17      MR. OOT:  No, your Honor.

18      JUDGE WOLFSON:  They don't.

19      MR. OOT:  No, because of the documents went

20  back into circulation.  The documents then get scanned

21  to a very large legacy archive where it's not

22  delineated by box number.  Again, we're talking, this

23  is back in 1998, much different than the litigation

24  technology that we are talking about now.

25      JUDGE WOLFSON:  I know what 1998 was like.  I

1   understand.

2           MR. OOT:  It's before I was a lawyer, your

3   Honor.

4           JUDGE WOLFSON:  I was a Magistrate Judge at

5   the time.  I know how it works.  I'm trying to figure

6   out how it was done here.  We're not talking the dark

7   ages.  So let's be clear about it.

8           I'm trying to figure out what was done to

9   preserve the documents and to label them in some way

10  and identify who they came from and where they were

11  maintained.

12          For instance, there are references here

13  whether documents were -- some individuals kept

14  personal files.  Others had them in a more general

15  fashion, and both kinds were being produced.

16          Again, I don't know what the Coker litigation

17  was.  We don't know if it was an ovarian cancer case

18  or not back in '98.  I have no idea.  Does anybody

19  know what the Coker litigation was?

20          MR. TISI:  We have not been able to find that

21  out, your Honor.

22          JUDGE WOLFSON:  Okay.  It would have been nice

23  if Mr. Williams had told us.

24          But we've got some litigation.  We're

25  obviously obtaining these documents and at least some

1    of the references would indicate that it was one of

2    the issues of concern.  There were discussions of

3    asbestos and other things.  Okay.  Whether it was one

4    litigation -- I guess you will have to identify at

5    some point when you are talking about the memo.  And

6    if it was also the threat of other litigation of why

7    this was being done if you want to have privileges

8    asserted.

9            But that there would be some reasoned way in

10   maintaining the documents particularly if any of these

11   individuals were going to be deposed or were deposed

12   in that litigation, which I don't know or not, what

13   documents they had in connection with their

14   depositions or discovery.

15           I find it hard to believe that everything just

16   went back into some photocopying of some general

17   archive without further description.  And I don't know

18   what custodian of records would know if they are still

19   around or not from '98 as to what was done or not.

20           I don't know if any of the individuals

21   continued to then, were given back or maintained their

22   files because it says photoscopies were made.  I don't

23   know if your archives are the photocopies or the

24   originals that were provided to you.  Do you know?

25           MR. OOT:  The legacy archive is the legacy

1    archive of all talc-related litigation that was

2    scanned in years before this case was filed.

3         JUDGE WOLFSON:  But I guess where I'm going

4    back to and I don't think I'm getting answers to and I

5    think you need to do a better job of is what's

6    reflected at least in the footnote is that they

7    photocopied documents that they received from each of

8    these individuals.

9         So I have two questions:  What did they do

10   with the photocopies?  What happened to the originals

11   that these individuals maintained?  Do you have an

12   answer to that?

13        MR. OOT:  It went back to the legacy archive,

14   which was scanned in.

15        JUDGE WOLFSON:  You said they went back.  The

16   originals went back?  You took them from each of the

17   individuals and took custody of them, J&J, instead of

18   maintaining them with the individuals?

19        MR. OOT:  From what I understand, the

20   information that was in those boxes was scanned into

21   this very large legacy archive that is searchable

22   and --

23        JUDGE WOLFSON:  And what happened to the

24   documents themselves?

25        MR. OOT:  I don't know, your Honor.

1          JUDGE WOLFSON:  You need an answer to that.

2     That's sufficient information here because that's part

3     of what I'm asking you, too.  What happened to them?

4     Were they returned to those individuals that they

5     could still keep their files?  Were they destroyed

6     once they were scanned and put in the archives?

7          I want those answers and you are going to give

8     them to them.  This is part of how the documents were

9     preserved or not and identifying then where they are.

10          And now what you are telling me is, the way

11     they went into these archives, not by identifying them

12     as coming from a particular individual.  Correct?

13          MR. OOT:  Correct.

14          JUDGE WOLFSON:  Do you have somebody who was

15     around in '98 who is telling you this stuff?

16          MR. OOT:  No, your Honor.  I'll see what I can

17     do.

18          JUDGE WOLFSON:  That's not helpful if you're

19     trying to figure it out today that you think this is

20     what they did, that's not a good answer for me.  Maybe

21     there is nobody around anymore that was there in '98.

22     Even Mr. Williams was still around in '98 and is still

23     doing it now.

24          MR. OOT:  I know what the endgame is, your

25     Honor.  I'm just not familiar with the process of how

1   they got there.

2          JUDGE WOLFSON:  From my perspective J&J has

3   not adequately addressed this issue on the documents.

4   The questions that I'm asking you that you don't have

5   answers to give me pause.

6          Now, what else do you want?

7          MR. TISI:  There's two things I just want to

8   clarify.  As I read the memo, they had boxes of

9   documents there.  The lawyers went in and photocopied

10  documents for whatever reason, criteria they used to

11  photocopy documents, and then labeled them in the

12  manner described in footnote 1.  Presumably, they

13  retained them.  What we originally sought was access

14  to the boxes themselves because we had understood --

15         JUDGE WOLFSON:  I know your questions.  Look,

16  we don't have to go around the block on this.  I've

17  already said it.  So everybody is clear, guess what,

18  we're on the record today, so that we're very clear,

19  is exactly what was done in '98.

20         I need somebody if they are still around, and

21  surely the lawyers are that could be helpful in this,

22  or whatever custodians because we know they had to

23  give them instructions.  I would assume they gave

24  instructions to some custodians as to what to do.

25  We're talking about two different things.

1          One is, I also don't know whether a decision

2     was made, and the lawyers would have to tell us that,

3     whether a decision was made to only photocopy some of

4     the documents.  Because all it says is, "Our coding

5     system for the source of the documents that we had

6     photocopied is as follows."

7          They may have made a selection of documents

8     they wanted to photocopy.  It may not have been the

9     entire universe of documents that they were given by

10    these individuals.  I need an answer to that.  Was it

11    a selective exercise?

12         Two, I understand you said the scanning.  But

13    what happened to the documents themselves?  Were they

14    returned to the various individuals who had maintained

15    them?  Were they destroyed?  Were they put somewhere

16    else?  We need answers to that.

17         And then, similarly, then what the

18    instructions were, what the custodians of these

19    records did and how they maintained them to either

20    isolate certain ones, identify certain ones, and if

21    that was done and if we can create that?

22         We do have issues here if there was any

23    destruction of documents or not and what exists and

24    that's what they are trying to figure out.  So we need

25    answers to those questions.

1          MR. OOT:  Yes, your Honor.

2          JUDGE WOLFSON:  Okay.  Next.

3          Now, again, I would consider that a discovery

4    issue which is something that would go to Judge Pisano

5    to resolve.  But I'm telling you, what I'm really

6    trying to do today is, as I said, I think that some of

7    these issues I'm addressing have not been adequately

8    looked at and addressed by counsel.

9          And before presenting them in a helter-skelter

10   way to Judge Pisano and delaying, I want to make sure

11   that I'm telling you the things that I would deem to

12   be relevant and pertinent so that this can be

13   presented to him in a reasoned fashion.

14         I understand I think you have a conference set

15   up in early October with him.  You have a month almost

16   to put this together and get it right and get them to

17   him so that he could start moving.

18         The reason for putting a master is expeditious

19   resolution, somebody who is going to give you the

20   time, which obviously Judge Goodman can't give you all

21   the time and that's why we're doing this and why I

22   went this route.

23         I want to save the time in this next month by

24   getting these issues ripe for him and not have him

25   have to go back and tell you I need this and this.

1    And also from my perspective because ultimately if one

2    of you wants to appeal his decision because they are R

3    and Rs, you know where I am coming from.

4           The memo itself is another issue.  That you

5    can present to him for an R and R.  As I said to you,

6    I think we need more information on that as well, both

7    in the creation of it, and I really wanted to know

8    what this Coker case was.  I thought you would come in

9    and tell me today.  Is it an ovarian cancer case or

10   was it something else that we were talking about?

11          I don't know what was going on in '98, if

12   there were other litigations being threatened and if

13   they were ovarian cancer cases being threatened or

14   not?  I don't know.  But that all goes to the idea of

15   the imminent litigation.  But on its face it appears

16   to be a document that could be protected.

17          But then I need to know how it was protected

18   and the measures that were undertaken.  Not I.  Let

19   Judge Pisano do it first.  He used to be a Magistrate

20   Judge, too.  So I think he will remember those days.

21          The museum artifacts.  Have you had some more

22   time to talk about this?

23          MS. SHARKO:  Yes.  Mr. Placitella and I have

24   been talking.  We'll continue to talk.  He has new

25   things he wants to build on to resolution of the

34

1    museum artifacts and make it a broader or more global

2    issue.

3              JUDGE WOLFSON:  This is with regard to the

4    other samples and things that you were discussing?

5              MS. SHARKO:  Yes.  I think I understand what

6    it is he wants and I told him I would hopefully get

7    back to him later this week.  I've been handicapped by

8    the hurricane and vacations and watching this issue

9    expand.  But I understand I think where he is and

10   hopefully we can resolve it and if we can't then we

11   know who can.

12             JUDGE WOLFSON:  Okay.

13             MR. PLACITELLA:  So just to give it some

14   background.  This is the offer that I made to try to

15   not have the Court deal with the All Writs Act and all

16   those complicated things.

17             This arose because there were lawyers in the

18   asbestos cases who made broad discovery requests not

19   just for what was in the museum but beyond that.  And

20   because I have two sides of my brain working here, one

21   that does asbestos cases because I am the co-chair of

22   the Asbestos Litigation Group for all the plaintiffs'

23   lawyers and then liaison counsel in the ovarian cases,

24   I have a universe of knowledge of what the issues are.

25             The issue is, I thought -- and remember I said

1    this on the phone -- I thought the issue was broader

2    than just artifacts because the original request by

3    the asbestos lawyers was more than that.

4          So what I said to Susan was, Look, I'll go to

5    the asbestos lawyers.  It will take me many, many

6    hours, probably 30 hours of phone calls to try to work

7    out a deal, so to speak, where all the samples will go

8    in one place and be under one custodian for the

9    plaintiffs in both sets of cases.

10         But don't make me do that twice.  Don't make

11   me do that for what's in the museum and then go back

12   and try to do that again, because when I call the

13   lawyer up in California and say, Would you agree to do

14   this, the first question they are going to ask me is,

15   Well, what about the other samples I asked for?  And

16   I'm not going to have an adequate response for that.

17         JUDGE WOLFSON:  I understand.  You are still

18   talking and she's now considering it.  Correct?

19         MR. PLACITELLA:  Right.

20         JUDGE WOLFSON:  So that you can try to come up

21   with some more global agreement to both the museum

22   artifacts as well as the other samples.

23         MR. PLACITELLA:  Right.

24         MS. SHARKO:  Yes.  The relation has been

25   evolving and I understand -- I think we shouldn't lay

1   this all out on the record at this point.  We should

2   just try and resolve it.

3          JUDGE WOLFSON:  I didn't want to hear all the

4   specifics.  You are talking, talk, talk, and then

5   we'll see where we are.

6          But I do understand that the idea is that you

7   are going to work something out that would include all

8   the lawyers so that we are not dealing with some of

9   these issues that are a little more problematic about

10  asking for injunctions with other courts, but instead

11  some cooperative effort among all the lawyers to work

12  this out.  So go for it.  That's what you should be

13  doing.

14         MR. PLACITELLA:  I'm trying.  The related

15  issue that I spoke to Susan about a number of times --

16  she didn't want me to bring it up, but I think I

17  should -- is the following.

18         JUDGE WOLFSON:  Remember, you want to be

19  friends.

20         MS. SHARKO:  I think we can resolve issues.

21  If we can't resolve them, then bring them to the

22  Court.  But coming in and giving you an update isn't

23  really productive in my view.

24         MR. PLACITELLA:  As part of this process, your

25  Honor, there are documents that have been produced in

1   the asbestos cases that we believe should have been

2   produced here.

3            JUDGE WOLFSON:  What are the asbestos cases?

4            MR. PLACITELLA:  They are people who are

5   claiming they have mesothelioma from applying and

6   using asbestos containing Johnson & Johnson talc and

7   Shower To Shower.  Those are the allegations.

8            JUDGE WOLFSON:  That is not an MDL.  Correct?

9            MR. PLACITELLA:  Correct.  They are individual

10  state court cases.  There is an MDL, but very few of

11  those are in the MDL which is in Philadelphia.

12           JUDGE WOLFSON:  Fine.  I've got it.  Have a

13  seat.

14           Imerys is working out its issue on samples?

15           MR. SILVER:  Judge, we just got the official

16  request on Friday.  We are doing investigations.  We

17  are meeting and conferring and we will continue to do

18  so.

19           JUDGE WOLFSON:  Okay.

20           Now, we can go off the record for a couple of

21  minutes.

22           (Discussion off the record.)

23                    * * * * *

24           JUDGE WOLFSON:  Let me go on the record.

25           While we were off the record, we discussed

1    some of the timing.  And what I've indicated is, at

2    this point I would like the document discovery

3    completed within 60 days and all written discovery

4    within 90 days.

5            I'm now going to identification of experts in

6    areas of expertise and, Ms. Parfitt, I'll hear from

7    you.

8            MS. PARFITT:  Thank you, your Honor.

9            Again, the difficulty the plaintiffs have at

10   this moment in providing you a specific date is the

11   issue with regard to the asbestos and the sampling.

12   There will obviously be some experts who that may be

13   an area and a topic that they will be addressing.

14           Again, the scope of where we are going, I

15   think we're going to know a little bit more in the

16   60 days that you are talking about as to which experts

17   that we have identified for certain purposes may be

18   able to go into that area as well.

19           So we wouldn't want to provide the Court with

20   a name and general areas of specialty and leave out a

21   topic, because that would be terribly helpful to the

22   Court.  So I think that's what we're trying to

23   identify, your Honor.

24           There has been this lapse of time where we

25   really haven't moved forward.  We've tried.  I'm not

1   saying there hasn't been effort on both sides.  But I

2   think we have a lot of clarity today.  I think what

3   your Honor has done last week and today has provided

4   both sides with tremendous clarity as to where we are

5   going, and a lot of the disputes which have prevented

6   us from going forward will be resolved.

7           We do in fact have a meeting with Judge Pisano

8   on October 4th.

9           JUDGE GOODMAN:  Don't we have a conference

10  October 5?

11          MS. PARFITT:  We do.  Judge Pisano could not

12  be available on the 5th.  So what we have agreed, we

13  were interested and he was interested in meeting the

14  parties.  So we've decided on October 4th and that was

15  confirmed this morning and all parties are available.

16          We will be well prepared to present to Judge

17  Pisano what our issues are.  We will all work in

18  earnest to identify where there are discovery disputes

19  remaining now that we have, again, some clarity from

20  the Court.

21          I guess what I would ask at this point is very

22  difficult to say to your Honor having not seen what

23  that additional discovery looks like, because frankly

24  and candidly while there have been efforts by all

25  parties to try to get to the place we are today, there

40

1    is still a lot that remains.

2         The Court has just given us 60 days, 90 days.

3    I think everybody understands what their marching

4    orders are.  We certainly understand the breadth of

5    that.  I think Judge Pisano on the 4th will identify

6    areas as well and make recommendations on how far we

7    can go.  We'll get that information to our experts.

8         I will advise the Court, we haven't been

9    sitting back and not working with experts.  We are.

10   We have in earnest as I represented to the Court a few

11   months ago.  We started that process because we are

12   identifying new experts as well.

13        And as your Honor indicated, there may be some

14   the Court is familiar with.  But for the most part

15   there will be new experts that the Court hasn't seen

16   reports or heard about.  So I think it will take a

17   little bit of time on our part to digest the new

18   documents that we are getting.

19        Some of the depositions that have not been

20   taken, and certainly with regard to the issue of

21   whether or not it's pure talc or not pure talc and

22   the parties dispute that, that's a contested issue and

23   will make a difference to these experts who have to

24   give opinions.  I don't know where we are on that.

25        So while I would like in this moment to be

41

1    able to give a date certain, I think even in another

2    30 days we'll probably be in a better position to

3    report to the Court as to when we might be able to

4    present that with the Court.  I don't think it's

5    helpful just to give you names.  I would like to be

6    able to give you identity and know myself how far,

7    what the breadth of those reports may be.

8            A lot of what's still in contest here are the

9    test samples of the asbestos and it's a big issue

10   because up to now we've had a talc and ovarian case.

11   The exploration of discovery has been with regard to

12   non-asbestos.  That's a big issue here.  We have to

13   get some clarity on that.  We're doing that.  We're

14   moving forward.  I'm optimistic that even in 30 days,

15   we're in a better place than where we are today.

16           JUDGE WOLFSON:  Okay.  Ms. Sharko.

17           MS. SHARKO:  I would ask that your Honor set a

18   deadline now.  We have been here for almost a year.

19   During that time the plaintiffs have continued to try

20   case after case in Missouri.  They've identified the

21   California case.  They prepared it.  They got experts.

22   They had a California version of a Daubert hearing and

23   tried the case.

24           The California coordinated proceedings started

25   about the same time as this MDL.  The same lawyers for

1   the plaintiffs are handling all this litigation.

2   There were asbestos allegations and expert theories in

3   the California case.  They have made those allegations

4   in the Missouri cases.

5        The witnesses they want to depose are not

6   people who are going to answer these questions

7   definitively if there are depositions.  There will be

8   more documents produced, but they have a lot of

9   documents.

10       And this new issue of sampling, the sampling

11   issue was as to other than the museum thing was raised

12   for the first time in the last week or two in my

13   discussions with Mr. Placitella.  And the discovery

14   plaintiffs are talking about identified every sample

15   ever known to human kind and what happened to it going

16   back to the flood.  Those requests were served Friday

17   night.

18       So I'm really, really concerned about the

19   delay here and not getting to the ultimate issue,

20   which is why at every hearing I've asked for a Daubert

21   hearing.  I know we need experts. Your Honor has set

22   some deadlines for discovery and we will try our best

23   to live up to them and to resolve the remaining issues

24   so we can get to Daubert.  But I do think it's fair

25   and appropriate and time for the plaintiffs to

43

1    identify their experts.

2         MS. PARFITT:  Your Honor, if I may be heard on

3    one point of clarification.

4         The California trial I was trial case there as

5    well.  The California case did not involve asbestos.

6    I did want there to be clarity there.  It did not

7    involve asbestos.

8         Your Honor, the point that Ms. Sharko -- Ms.

9    Sharko makes my argument.  With regard to the

10   discovery that your Honor has just discussed with us

11   with great clarity, the discovery issues that your

12   Honor has had with Judge Pisano will move us forward.

13   We are not interested in protracting.

14        Your Honors have not just one case in front of

15   them.  You have all of the federal cases that are

16   being filed across this country.  There will be some

17   with asbestos, some without.  And Your Honor I think

18   has approached this in the right way.  You don't want

19   redo.  You want depositions that are taken one time,

20   hopefully not twice.  You want experts that are taken

21   one time, hopefully not twice.

22        We will work in earnest to do that.  There is

23   no reason for us to delay.  Your Honor, we have

24   clients who are dying.  So if there is any party who

25   is interested in the reports we are and I don't want

44

1    our reluctance or my inability to state at this moment

2    when we will produce those experts.

3         JUDGE WOLFSON:  Remember, I'm not talking

4    about expert reports.  All I'm talking about was

5    identifying experts and the subjects on which they are

6    going to opine.  I'm not asking for their opinions.

7         So I would like to see those experts

8    identified and the subjects on which -- look, I

9    understand by the time they submit their report, there

10   may be additional things that they'll want to talk

11   about.

12        I'm not going to limit you in that first

13   identification you may not have identified an area and

14   now you've decided that person does want to talk about

15   this.  When you give the report, that's the final

16   notice of what they're saying.  So that's okay.  So

17   don't feel that you are going to be stuck and that's

18   what your concern is.  You're not.

19        I want to have those experts identified and

20   the general subjects within 60 days.

21        MS. PARFITT:  Your Honor, two questions.

22        JUDGE WOLFSON:  Yes.

23        MS. PARFITT:  The identity of the experts,

24   their specialty, and in general are you talking like a

25   paragraph of what they might be testifying to?

1           JUDGE WOLFSON:  I'm not even talking about a

2    real summary of their opinions here.  You are going to

3    talk about the areas of expertise, and if that

4    particular expert is going to talk about talc causing

5    ovarian cancer, whatever, if this one is going to talk

6    about asbestos fibers can cause ovarian cancer, if

7    this one is going to talk about an analysis of talc

8    and whether it's pure or not, whatever, so that we

9    understand those subjects they are discussing without

10   giving me their actual opinion.

11          MS. PARFITT:  Second question:  Are the

12   defendants in a position then to also identify simply

13   names?

14          JUDGE WOLFSON:  Not until they see yours

15   because they want to know what they have to respond

16   to.  It's always defendants are second.

17          MS. PARFITT:  I understand that.  But will

18   there be 30 days thereafter that the defendants --

19          JUDGE WOLFSON:  I'll give them a date once you

20   identify yours when they come in and they'll know they

21   have to be prepared for that.  To some extent they may

22   not even know until they see your reports, though.  So

23   we have to talk about that, how it works.  At least

24   they will know the areas.

25          MS. PARFITT:  The reason I say that, your

1   Honor, is the argument that counsel has that certainly

2   we should know who those people are, they know the

3   general areas and topics that have been presented in

4   these cases, too.  I understand we go first.  I

5   understand that completely.

6          JUDGE WOLFSON:  I think there may be some new

7   areas as you've identified.  So what's been tried in

8   Missouri or what's been tried in California may not

9   be.  It's only a subset of what you might be doing.

10  So we need to know what that is.

11         That's what I'm giving you.

12         We can go off the record.

13         (Discussion off the record.)

14                    *  *  *  *  *

15         JUDGE WOLFSON:  Let's go back on the record.

16  You want to discuss the special master order that you

17  have been conferring on.

18         MS. SHARKO:  Yes.  We had met and conferred --

19         JUDGE WOLFSON:  Do you have a copy for me?

20         MS. SHARKO:  Yes.

21         That's the defense version with the

22  plaintiffs' red lines from last night and we have

23  resolved everything except for two sets of red lines.

24  "Resolve" meaning either we accept their red lines or

25  we've agreed on compromised language.

1          The two areas at issue are on page 2 of the

2     draft.  The first one is in the second full paragraph.

3     The plaintiffs wants all hearings before Judge Pisano

4     to be stenographically recorded by a court reporter.

5     The defense feeling is that that's expensive and --

6          JUDGE WOLFSON:  Oh, please.  Look at the case

7     we're talking about.  On this one I think it makes

8     sense.  If there are certain things that Judge Pisano

9     prefers he wants to do informally, I'll leave that up

10    to him.

11         But anything that he thinks that he's either

12    formally ruling on or he wants to hear argument from

13    you on, then there should be a court reporter

14    available because also if there is ultimately to be a

15    review -- I don't know if you've identified Judge

16    Goodman or myself as the one -- we want to know what

17    happened.

18         So I think the way it should be written is, I

19    think it's subject to Judge Pisano, again, as I said,

20    because there are lots of things we do here even

21    informally that we want to resolve.

22         So modify language.  But I think if it's going

23    to be in the sense of a kind of motion practice or

24    whatever and you are looking for rulings and he may

25    make them orally, yes, definitely have a court

48

1    reporter.

2           MS. SHARKO:  Okay.  So, "May be

3    stenographically recorded by a court reporter subject

4    to the discretion of the special master"?

5           MS. O'DELL:  Or, your Honor, "at the request

6    of the parties."  If it's an issue that's hotly

7    contested and we believe it likely will be before you,

8    your Honor, we'll place you in the order and --

9           MS. SHARKO:  I'm okay with it.

10          JUDGE WOLFSON:  That's fine.

11          MS. O'DELL:  If we request it, we would like

12   it to be recorded because obviously sometimes we can

13   hear the same conversation --

14          MS. SHARKO:  I agreed to that.

15          JUDGE WOLFSON:  She agreed to that language as

16   requested by the parties.

17          MS. O'DELL:  Okay.

18          JUDGE WOLFSON:  Next.

19          MS. SHARKO:  The second issue is at the bottom

20   of the page.  Judge Pisano told us in our conference

21   with him that he wanted the ability to speak ex parte

22   to the parties.  The defendants consent to that.  We

23   put that in the order.  The plaintiffs want to

24   prohibit ex parte communications.

25          MS. O'DELL:  Your Honor, if Judge Pisano would

49

1  like to have an ex parte conversation, we would like

2  him to just let the parties know whether it's either

3  side and have an agreement of the parties in order to

4  do that.

5          JUDGE WOLFSON:  I'm in agreement with that.

6  Maybe you want to phrase it a little differently

7  because it makes it sound bad.  We do it the reverse

8  to say, "The special master may communicate ex parte

9  with any attorney with the agreement of the parties."

10          MS. O'DELL:  That's fine, your Honor.  Thank

11  you.

12          JUDGE WOLFSON:  Otherwise, it sounds like

13  they're really taking him to task, though.

14          MS. ERFLE:  Your Honor, does that mean then

15  one party has veto power over?  The way it's worded,

16  if I understand it, the Judge can make the request and

17  one party can say, No, we don't want you doing that?

18  I think if it's a heads-up, I understand that.  I

19  don't think we should control Judge Pisano that way.

20          JUDGE WOLFSON:  I understand.

21          JUDGE GOODMAN:  I think it's up to Judge

22  Pisano.  And if he gives notice he may be

23  communicating with the parties, I think that should be

24  enough.

25          MS. O'DELL:  Your Honor, we would just like if

50

1   it's an issue, the opportunity to have notice and to

2   object and --

3          JUDGE WOLFSON:  And let him decide.

4   Absolutely.  It doesn't simply mean, I'm telling you

5   I'm doing this and goodbye.  You have the right to

6   tell him why you think that it's not a good idea, then

7   it's up to him to decide weighing that.  So change

8   your language.

9          MS. SHARKO:  So I just want to understand  how

10  this works.  So if Judge Pisano decides he wants to

11  talk to Ms. O'Dell about some issue or get

12  clarification, before he can do that, he has to call

13  me and ask me if I have an objection to that?

14         JUDGE WOLFSON:  That's only for something

15  substantive.  If it's obviously like, I'm missing a

16  document, he can have his assistant call and say, I

17  didn't get this.  Can you send it to me again?  Or I

18  would like a courtesy copy.

19         No, no one needs notice on that.  If there is

20  a substantive discussion that he for some reason wants

21  to have ex parte, we all understand.  If it's not, if

22  it's basically ministerial, no, he doesn't have to

23  give notice.

24         By the way, I don't think he will be the one

25  making the phone call anyway at that point.  It will

51

1    probably be his assistant.  If there is any

2    substantive discussion, there should notice given so

3    that anyone could object if they think appropriate.

4            Next.  What else?

5            MS. O'DELL:  There is a few more changes we

6    agreed to before the conference that we have reached

7    agreement and we'll provide a revised version to the

8    Court.

9            JUDGE WOLFSON:  Okay.  Everything else is

10   good?

11           MS. SHARKO:  Yes.

12           JUDGE WOLFSON:  Wonderful.  So then if you can

13   do that and we can get it entered, then we know that

14   you're ready to go.  So we'll enter the order

15           We can go off the record.

16           (Discussion off the record.)

17           (Proceedings concluded.)

18                   *  *  *  *  *

19

20

21

22

23

24

25

52

**C E R T I F I C A T E**

   I, **Vincent Russoniello,** Official United States
Court Reporter and Certified Court Reporter of the
State of New Jersey, do hereby certify that the
foregoing is a true and accurate transcript of the
proceedings as taken stenographically by and before me
at the time, place and on the date hereinbefore set
forth.

   I do further certify that I am neither a relative
nor employee nor attorney nor counsel of any of the
parties to this action, and that I am neither a
relative nor employee of such attorney or counsel, and
that I am not financially interested in this action.

       S/Vincent Russoniello
       Vincent Russoniello, CCR
       Certificate No. 675

**'**

**'70s** [1] - 6:7
**'98** [8] - 18:4, 26:18, 27:19, 29:15, 29:21, 29:22, 30:19, 33:11

**0**

**08608** [1] - 1:8

**1**

**1** [9] - 14:9, 14:24, 19:17, 20:9, 20:11, 20:12, 24:2, 24:13, 30:12
**136th** [1] - 21:8
**16** [1] - 22:8
**16-MD-2738(FLW)(LHG** [1] - 1:2
**1997/1998** [1] - 20:3
**1998** [10] - 17:4, 17:13, 17:17, 20:23, 22:11, 22:15, 22:24, 25:9, 25:23, 25:25

**2**

**2** [2] - 24:4, 47:1
**20** [1] - 24:20
**2008** [1] - 8:21
**2017** [1] - 1:5
**22nd** [3] - 22:3, 23:2, 24:10
**26(b)(5)(B** [2] - 15:19, 16:5
**26(b)(5)(B)** [2] - 15:25, 20:15
**28** [1] - 3:8

**3**

**30** [4] - 35:6, 41:2, 41:14, 45:18

**4**

**402** [1] - 1:8
**44** [1] - 19:20
**4th** [3] - 39:8, 39:14, 40:5

**5**

**5** [1] - 39:10
**588-9516** [1] - 1:25
**5:30** [1] - 17:20
**5th** [1] - 39:12

**6**

**6** [1] - 1:5
**60** [4] - 38:3, 38:16, 40:2, 44:20
**609** [1] - 1:25
**675** [1] - 52:24

**7**

**753** [1] - 3:8

**9**

**90** [2] - 38:4, 40:2

**A**

**ability** [1] - 48:21
**able** [6] - 17:14, 26:20, 38:18, 41:1, 41:3, 41:6
**ABOVE** [1] - 3:11
**ABOVE-ENTITLED** [1] - 3:11
**absolutely** [1] - 50:4
**accept** [1] - 46:24
**access** [1] - 30:13
**accounting** [1] - 22:6
**accurate** [1] - 52:9
**ACCURATE** [1] - 3:9
**Act** [1] - 34:15
**ACTION** [1] - 1:2
**action** [2] - 52:15, 52:17
**actual** [1] - 45:10
**add** [2] - 9:8, 9:10
**added** [1] - 8:13
**additional** [3] - 19:24, 39:23, 44:10
**addressed** [3] - 18:18, 30:3, 32:8
**addressing** [2] - 32:7, 38:13
**adequate** [2] - 16:22, 35:16
**adequately** [3] - 15:14, 30:3, 32:7
**advise** [1] - 40:8
**advisory** [2] - 7:5, 7:9
**Affidavit** [1] - 21:4
**affidavit** [3] - 15:3, 21:1, 21:2
**agencies** [1] - 13:16
**agendas** [1] - 16:16
**ages** [1] - 26:7
**ago** [4] - 6:5, 23:10,

24:20, 40:11
**agree** [1] - 35:13
**agreed** [6] - 25:2, 39:12, 46:25, 48:14, 48:15, 51:6
**agreement** [6] - 14:6, 35:21, 49:3, 49:5, 49:9, 51:7
**agreements** [2] - 10:2, 10:12
**ALABAMA** [1] - 1:13
**allegations** [3] - 37:7, 42:2, 42:3
**ALLEN** [1] - 1:12
**allow** [2] - 5:5, 23:25
**allowed** [1] - 11:9
**allowing** [1] - 10:10
**almost** [4] - 17:10, 24:19, 32:15, 41:18
**alternative** [4] - 5:11, 5:12, 5:16, 8:11
**America** [1] - 2:13
**AN** [1] - 3:9
**analysis** [1] - 45:7
**ANN** [1] - 2:12
**answer** [5] - 28:12, 29:1, 29:20, 31:10, 42:6
**answers** [5] - 28:4, 29:7, 30:5, 31:16, 31:25
**anticipated** [1] - 21:14
**anticipation** [1] - 21:1
**anyway** [2] - 6:20, 50:25
**apart** [1] - 18:23
**appeal** [1] - 33:2
**appear** [1] - 25:15
**appearances** [1] - 4:3
**applies** [1] - 16:5
**apply** [5] - 12:21, 12:23, 12:24, 13:5, 15:21
**applying** [1] - 37:5
**approached** [1] - 43:18
**appropriate** [3] - 12:18, 42:25, 51:3
**archive** [7] - 25:3, 25:21, 27:17, 27:25, 28:1, 28:13, 28:21
**archived** [1] - 18:2
**archives** [8] - 19:9, 19:12, 19:13, 25:16, 27:23, 29:6, 29:11
**area** [3] - 38:13, 38:18, 44:13
**areas** [11] - 11:21, 12:8,

13:11, 38:6, 38:20, 40:6, 45:3, 45:24, 46:3, 46:7, 47:1
**arguing** [1] - 21:14
**argument** [5] - 14:17, 24:21, 43:9, 46:1, 47:12
**arms** [1] - 17:14
**arose** [1] - 34:17
**ARPS** [1] - 1:21
**artifacts** [4] - 33:21, 34:1, 35:2, 35:22
**asbestos** [18] - 4:13, 5:25, 27:3, 34:18, 34:21, 35:3, 35:5, 37:1, 37:3, 37:6, 38:11, 41:9, 41:12, 42:2, 43:5, 43:7, 43:17, 45:6
**Asbestos** [1] - 34:22
**ASHCRAFT** [1] - 1:14
**Ashton** [1] - 19:19
**asserted** [1] - 27:8
**assistant** [2] - 50:16, 51:1
**associations** [2] - 13:17, 13:23
**assume** [1] - 30:23
**assuming** [1] - 6:18
**attention** [1] - 16:20
**attorney** [3] - 49:9, 52:14, 52:16
**August** [2] - 22:3, 23:2
**available** [6] - 18:4, 18:5, 18:6, 39:12, 39:15, 47:14
**aware** [1] - 24:6
**AXELROD** [2] - 2:7, 2:7

**B**

**background** [1] - 34:14
**BACON** [1] - 1:19
**bad** [1] - 49:7
**Bates** [1] - 22:9
**BE** [1] - 3:9
**BEASLEY** [1] - 1:12
**becomes** [1] - 17:9
**beginning** [1] - 4:21
**Behalf** [2] - 1:17, 2:8
**behalf** [2] - 1:22, 2:13
**BEISNER** [1] - 1:21
**best** [1] - 42:22
**better** [4] - 4:8, 28:5, 41:2, 41:15

between [1] - 9:20
beyond [2] - 10:24, 34:19
bi [1] - 19:22
bi-monthly [1] - 19:22
bias [1] - 5:4
BIDDLE [1] - 1:18
big [2] - 41:9, 41:12
Bill [2] - 19:19, 21:6
bit [4] - 19:5, 22:2, 38:15, 40:17
block [1] - 30:16
Board [3] - 7:24, 8:2, 8:3
boards [1] - 7:9
body [1] - 5:25
bottle [1] - 8:13
bottom [1] - 48:19
box [3] - 17:23, 19:3, 25:22
boxes [22] - 18:1, 19:4, 19:5, 19:14, 19:18, 19:20, 19:24, 20:5, 20:7, 20:21, 21:20, 22:6, 22:10, 23:6, 23:9, 23:10, 23:14, 24:1, 24:12, 28:20, 30:8, 30:14
brain [1] - 34:20
breadth [2] - 40:4, 41:7
briefed [2] - 13:17, 18:20
briefing [1] - 15:4
bring [4] - 16:14, 21:17, 36:16, 36:21
Bristol [1] - 14:7
Bristol-Myers [1] - 14:7
broad [2] - 10:25, 34:18
broadening [1] - 4:20
broader [3] - 4:16, 34:1, 35:1
brought [2] - 16:19, 19:15
build [1] - 33:25
BY [10] - 1:13, 1:14, 1:16, 1:18, 1:20, 1:21, 2:6, 2:7, 2:10, 2:12

**C**

California [8] - 35:13, 41:21, 41:22, 41:24, 42:3, 43:4, 43:5, 46:8
cancer [16] - 7:10, 8:5, 9:14, 10:4, 11:8, 11:9, 12:10, 20:3, 20:8, 24:7, 26:17, 33:9, 33:13, 45:5,

45:6
candidly [5] - 19:5, 20:22, 22:1, 22:5, 39:24
carcinogens [1] - 5:25
cardboard [1] - 17:23
care [2] - 17:16, 19:4
careful [1] - 23:17
case [21] - 9:11, 9:17, 12:24, 15:24, 16:14, 16:23, 24:19, 26:17, 28:2, 33:8, 33:9, 41:10, 41:20, 41:21, 41:23, 42:3, 43:4, 43:5, 43:14, 47:6
cases [18] - 10:3, 14:9, 14:10, 14:12, 14:13, 14:14, 14:22, 33:13, 34:18, 34:21, 34:23, 35:9, 37:1, 37:3, 37:10, 42:4, 43:15, 46:4
categorize [1] - 19:25
categorized [1] - 19:18
category [1] - 6:18
causation [1] - 5:7
causes [1] - 20:2
causing [1] - 45:4
CCR [3] - 1:24, 3:16, 52:24
certain [7] - 16:12, 17:6, 31:20, 38:17, 41:1, 47:8
certainly [5] - 4:15, 10:15, 40:4, 40:20, 46:1
Certificate [1] - 52:24
Certified [1] - 52:7
CERTIFIED [1] - 3:9
certify [2] - 52:8, 52:13
cetera [1] - 5:19
chain [1] - 18:7
chair [1] - 34:21
change [1] - 50:7
changes [1] - 51:5
Chris [1] - 16:9
CHRIS [1] - 1:15
CHRISTOPHER [1] - 1:16
circulation [1] - 25:20
CIVIL [1] - 1:2
civil [1] - 12:24
claiming [1] - 37:5
claims [1] - 18:23
clarification [3] - 10:19, 43:3, 50:12
clarify [1] - 30:8

clarity [7] - 12:6, 39:2, 39:4, 39:19, 41:13, 43:6, 43:11
CLARKSON [1] - 1:7
clauses [1] - 9:24
claw [3] - 15:24, 16:6, 16:13
clear [4] - 4:13, 26:7, 30:17, 30:18
clearly [1] - 15:7
CLERK [1] - 4:1
clients [1] - 43:24
close [1] - 5:23
closed [1] - 6:2
closure [1] - 5:18
closures [1] - 6:6
co [1] - 34:21
co-chair [1] - 34:21
coded [1] - 24:12
coding [6] - 20:17, 20:19, 21:11, 25:10, 25:15, 31:4
COHEN [1] - 1:16
Coker [8] - 20:25, 21:5, 21:11, 26:16, 26:19, 33:8
collected [2] - 17:12, 20:1
collection [1] - 24:18
Colorado [1] - 13:25
coming [4] - 24:15, 29:12, 33:3, 36:22
comments [2] - 6:12, 15:6
Committee [1] - 1:17
committees [1] - 7:5
communicate [1] - 49:8
communicating [1] - 49:23
communications [4] - 7:11, 7:25, 8:8, 48:24
Communications [1] - 8:2
company [2] - 24:3, 24:6
completed [1] - 38:3
completely [1] - 46:5
complicated [1] - 34:16
compromised [1] - 46:25
concern [4] - 15:11, 24:17, 27:2, 44:18
concerned [2] - 24:5, 42:18
concerning [1] - 9:21

concerns [3] - 17:2, 18:15, 20:22
concluded [1] - 51:17
CONFERENCE [1] - 1:4
conference [8] - 11:14, 16:21, 23:20, 24:10, 32:14, 39:9, 48:20, 51:6
conferences [2] - 18:22, 22:22
conferred [2] - 25:2, 46:18
conferring [3] - 13:6, 37:17, 46:17
confirm [1] - 18:9
confirmed [1] - 39:15
confused [1] - 12:5
connection [3] - 7:18, 15:2, 27:13
consent [1] - 48:22
consider [1] - 32:3
considering [2] - 7:9, 35:18
construed [1] - 4:22
consultants [2] - 7:6, 7:8
containing [2] - 23:15, 37:6
contest [1] - 41:8
contested [2] - 40:22, 48:7
continue [4] - 15:25, 21:19, 33:24, 37:17
continued [2] - 27:21, 41:19
contracts [2] - 9:20, 9:24
control [1] - 49:19
conversation [2] - 48:13, 49:1
cooperative [1] - 36:11
coordinated [1] - 41:24
copy [4] - 17:18, 20:9, 46:19, 50:18
cornstarch [4] - 5:10, 8:10, 8:12
correct [9] - 6:20, 6:25, 13:12, 25:12, 29:12, 29:13, 35:18, 37:8, 37:9
COUGHLIN [1] - 2:9
counsel [8] - 20:5, 21:4, 22:25, 32:8, 34:23, 46:1, 52:14, 52:16
country [1] - 43:16
County [1] - 21:9
couple [2] - 14:10, 37:20

**COURT** [3] - 1:1, 1:25, 3:16
**Court** [19] - 16:2, 16:15, 16:17, 21:8, 34:15, 36:22, 38:19, 38:22, 39:20, 40:2, 40:8, 40:10, 40:14, 40:15, 41:3, 41:4, 51:8, 52:7
**court** [10] - 20:13, 23:12, 23:13, 24:15, 37:10, 47:4, 47:13, 47:25, 48:3
**Court's** [1] - 16:20
**courtesy** [1] - 50:18
**COURTHOUSE** [1] - 1:7
**courts** [1] - 36:10
**create** [1] - 31:21
**creation** [1] - 33:7
**criteria** [1] - 30:10
**CRR** [1] - 1:24
**curious** [1] - 5:20
**custodian** [2] - 27:18, 35:8
**custodians** [3] - 30:22, 30:24, 31:18
**custody** [2] - 18:7, 28:17

**D**

**D.C** [3] - 1:20, 1:21, 2:6
**dark** [1] - 26:6
**Darlene** [1] - 21:5
**date** [4] - 38:10, 41:1, 45:19, 52:11
**dated** [1] - 22:19
**Daubert** [3] - 41:22, 42:20, 42:24
**days** [10] - 33:20, 38:3, 38:4, 38:16, 40:2, 41:2, 41:14, 44:20, 45:18
**deadline** [1] - 41:18
**deadlines** [1] - 42:22
**deal** [5] - 10:7, 11:25, 13:7, 34:15, 35:7
**dealing** [1] - 36:8
**deceased** [3] - 8:19, 8:20, 8:21
**decide** [3] - 12:19, 50:3, 50:7
**decided** [2] - 39:14, 44:14
**decides** [1] - 50:10
**decision** [3] - 31:1, 31:3, 33:2

**decisions** [1] - 5:23
**deem** [1] - 32:11
**defendant** [4] - 6:18, 14:14, 14:16, 14:18
**Defendant** [3] - 1:22, 2:8, 2:13
**defendants** [6] - 9:20, 10:1, 45:12, 45:16, 45:18, 48:22
**defendants'** [1] - 9:21
**defense** [5] - 9:13, 16:25, 17:1, 46:21, 47:5
**definitely** [1] - 47:25
**definition** [1] - 8:22
**definitively** [1] - 42:7
**degree** [2] - 8:25, 9:3
**delay** [2] - 42:19, 43:23
**delaying** [1] - 32:10
**delineated** [1] - 25:22
**demonstrates** [1] - 17:11
**depose** [2] - 11:20, 42:5
**deposed** [3] - 13:10, 27:11
**depositions** [9] - 11:17, 11:19, 11:23, 12:2, 13:8, 27:14, 40:19, 42:7, 43:19
**described** [4] - 18:24, 19:18, 25:9, 30:12
**describes** [1] - 19:10
**description** [2] - 18:6, 27:17
**design** [2] - 5:16, 8:11
**destroy** [1] - 14:19
**destroyed** [2] - 29:5, 31:15
**destruction** [1] - 31:23
**difference** [1] - 40:23
**different** [4] - 18:2, 25:11, 25:23, 30:25
**differently** [1] - 49:6
**difficult** [1] - 39:22
**difficulty** [1] - 38:9
**digest** [1] - 40:17
**direction** [1] - 11:3
**Director** [1] - 7:24
**Directors** [2] - 8:2, 8:3
**discover** [8] - 5:14, 6:1, 6:4, 7:11, 9:1, 9:23, 11:10, 14:3
**discoverable** [2] - 10:21, 11:5
**discovered** [1] - 10:6

**discovery** [25] - 4:9, 4:20, 7:12, 10:10, 10:18, 11:16, 11:25, 12:2, 12:9, 13:14, 13:4, 13:7, 18:12, 27:14, 32:3, 34:18, 38:2, 38:3, 39:18, 39:23, 41:11, 42:13, 42:22, 43:10, 43:11
**discretion** [1] - 48:4
**discuss** [1] - 46:16
**discussed** [2] - 37:25, 43:10
**discussing** [2] - 34:4, 45:9
**discussion** [6] - 16:7, 37:22, 46:13, 50:20, 51:2, 51:16
**discussions** [2] - 27:2, 42:13
**dispute** [3] - 6:19, 9:12, 40:22
**disputes** [4] - 10:8, 11:21, 39:5, 39:18
**District** [1] - 21:8
**DISTRICT** [2] - 1:1, 1:1
**diversity** [1] - 14:19
**document** [17] - 8:10, 15:8, 15:23, 16:3, 16:7, 16:19, 16:22, 17:10, 19:7, 19:25, 20:6, 20:14, 22:11, 22:15, 33:16, 38:2, 50:16
**documents** [61] - 6:13, 6:24, 7:11, 7:17, 7:20, 8:14, 9:3, 9:16, 11:17, 17:6, 17:12, 17:13, 17:16, 17:21, 17:24, 18:9, 18:24, 19:2, 20:7, 20:18, 21:18, 21:21, 21:24, 22:10, 22:13, 22:18, 22:25, 23:5, 23:8, 24:5, 24:12, 24:18, 25:4, 25:5, 25:9, 25:11, 25:15, 25:19, 25:20, 26:9, 26:13, 26:25, 27:10, 27:13, 28:7, 28:24, 29:8, 30:3, 30:9, 30:10, 30:11, 31:4, 31:5, 31:7, 31:9, 31:13, 31:23, 36:25, 40:18, 42:8, 42:9
**done** [16] - 4:24, 13:19, 16:14, 16:16, 18:2, 18:8, 20:4, 21:1, 21:10, 26:6,

26:8, 27:7, 27:19, 30:19, 31:21, 39:3
**DOTRO** [1] - 2:10
**doubt** [1] - 4:14
**draft** [1] - 47:2
**drill** [1] - 6:13
**Drill** [1] - 6:23
**DRINKER** [1] - 1:18
**DUFFY** [1] - 2:9
**during** [1] - 41:19
**dying** [1] - 43:24

**E**

**early** [1] - 32:15
**earnest** [3] - 39:18, 40:10, 43:22
**EAST** [1] - 1:8
**effort** [2] - 36:11, 39:1
**efforts** [1] - 17:20, 39:24
**eight** [2] - 19:24, 22:8
**either** [4] - 31:19, 46:24, 47:11, 49:2
**emails** [1] - 23:20
**employed** [1] - 8:18
**employee** [2] - 52:14, 52:16
**end** [1] - 22:24
**endgame** [1] - 29:24
**enter** [3] - 14:8, 14:23, 51:14
**entered** [1] - 51:13
**entire** [1] - 31:9
**entities** [2] - 5:2, 13:24
**ENTITLED** [1] - 3:11
**entitled** [2] - 16:6, 20:14
**entity** [1] - 9:20
**enunciated** [1] - 12:8
**ERFLE** [3] - 2:12, 8:21, 49:14
**ESQUIRE** [13] - 1:13, 1:14, 1:15, 1:16, 1:18, 1:20, 1:21, 2:6, 2:7, 2:10, 2:10, 2:12, 2:12
**ESQUIRES** [10] - 1:12, 1:14, 1:16, 1:18, 1:19, 1:21, 2:5, 2:7, 2:9, 2:11
**essentially** [1] - 15:23
**et** [1] - 5:19
**Europe** [1] - 13:17
**evidence** [1] - 9:4
**evolving** [1] - 35:25
**ex** [5] - 48:21, 48:24,

49:1, 49:8, 50:21
**exact** [1] - 10:7
**exactly** [4] - 10:25, 16:1, 16:15, 30:19
**example** [2] - 17:4, 17:5
**except** [1] - 46:23
**exercise** [1] - 31:11
**Exhibit** [2] - 14:9, 14:24
**exist** [6] - 18:1, 20:21, 21:19, 21:20, 23:10, 24:8
**existed** [2] - 17:17, 24:6
**existing** [1] - 15:24
**exists** [1] - 31:23
**expand** [1] - 34:9
**expeditious** [1] - 32:18
**expensive** [1] - 47:5
**expert** [3] - 42:2, 44:4, 45:4
**expertise** [2] - 38:6, 45:3
**experts** [18] - 5:14, 38:5, 38:12, 38:16, 40:7, 40:9, 40:12, 40:15, 40:23, 41:21, 42:21, 43:1, 43:20, 44:2, 44:5, 44:7, 44:19, 44:23
**explanation** [1] - 18:6
**exploration** [1] - 41:11
**extent** [1] - 45:21

**F**

**face** [2] - 15:8, 33:15
**facilities** [1] - 5:19
**fact** [2] - 16:16, 39:7
**fair** [2] - 12:9, 42:24
**fairly** [1] - 15:3
**familiar** [2] - 29:25, 40:14
**far** [2] - 40:6, 41:6
**fashion** [2] - 26:15, 32:13
**February** [1] - 16:21
**federal** [1] - 43:15
**few** [3] - 37:10, 40:10, 51:5
**fibers** [1] - 45:6
**FIELD** [1] - 2:12
**figure** [4] - 26:5, 26:8, 29:19, 31:24
**file** [1] - 22:20
**filed** [4] - 14:14, 15:23, 28:2, 43:16
**files** [7] - 19:15, 19:24, 21:18, 23:15, 26:14,

27:22, 29:5
**final** [1] - 44:15
**financially** [1] - 52:17
**fine** [3] - 37:12, 48:10, 49:10
**FIRM** [1] - 2:7
**first** [14] - 12:1, 13:7, 15:18, 16:4, 20:6, 23:4, 24:23, 25:8, 33:19, 35:14, 42:12, 44:12, 46:4, 47:2
**FISHER** [1] - 1:7
**FLOM** [1] - 1:21
**flood** [1] - 42:16
**FOLLOWING** [1] - 3:9
**following** [3] - 4:6, 24:10, 36:17
**follows** [1] - 31:6
**footnote** [5] - 20:9, 20:17, 24:13, 28:6, 30:12
**FOR** [1] - 1:1
**foregoing** [1] - 52:9
**foreign** [2] - 13:15, 13:23
**formally** [1] - 47:12
**forth** [1] - 52:12
**forward** [5] - 14:20, 38:25, 39:6, 41:14, 43:12
**frankly** [3] - 15:4, 20:18, 39:23
**Frazier** [1] - 23:3
**FREDA** [1] - 1:9
**Friday** [3] - 17:20, 37:16, 42:16
**friends** [1] - 36:19
**front** [2] - 16:12, 43:14
**frustrating** [1] - 22:2
**full** [1] - 47:2

**G**

**Galligher** [1] - 19:21
**game** [1] - 12:9
**Gene** [1] - 21:4
**general** [10] - 10:6, 10:10, 10:20, 12:9, 26:14, 27:16, 38:20, 44:20, 44:24, 46:3
**GEREL** [1] - 1:14
**given** [5] - 4:3, 27:21, 31:9, 40:2, 51:2
**glad** [1] - 15:20

**global** [2] - 34:1, 35:21
**goodbye** [1] - 50:5
**Goodman** [2] - 32:20, 47:16
**GOODMAN** [4] - 1:10, 19:1, 39:9, 49:21
**GORDON** [1] - 2:11
**great** [1] - 43:11
**gritty** [1] - 14:4
**Group** [1] - 34:22
**groups** [1] - 5:2
**guess** [8] - 7:15, 13:4, 13:9, 14:17, 27:4, 28:3, 30:17, 39:21

**H**

**handicapped** [1] - 34:7
**handling** [1] - 42:1
**hard** [1] - 27:15
**HARDY** [1] - 1:19
**heads** [1] - 49:18
**heads-up** [1] - 49:18
**hear** [4] - 36:3, 38:6, 47:12, 48:13
**heard** [2] - 40:16, 43:2
**hearing** [3] - 41:22, 42:20, 42:21
**hearings** [1] - 47:3
**help** [1] - 25:7
**helpful** [4] - 29:18, 30:21, 38:21, 41:5
**helter** [1] - 32:9
**helter-skelter** [1] - 32:9
**hereby** [1] - 52:8
**hereinbefore** [1] - 52:11
**herring** [1] - 19:6
**Honor** [53] - 5:22, 7:1, 8:23, 9:6, 9:10, 11:1, 13:14, 14:13, 15:17, 15:20, 16:1, 16:24, 17:22, 18:19, 20:20, 21:16, 22:5, 22:21, 22:23, 23:22, 24:2, 24:17, 24:22, 25:13, 25:17, 26:3, 26:21, 28:25, 29:16, 29:25, 32:1, 36:25, 38:8, 38:23, 39:3, 39:22, 40:13, 41:17, 42:21, 43:2, 43:8, 43:10, 43:12, 43:17, 43:23, 44:21, 46:1, 48:5, 48:8, 48:25, 49:10, 49:14, 49:25

**HONORABLE** [2] - 1:9, 1:10
**Honors** [2] - 16:9, 43:14
**hopefully** [4] - 34:6, 34:10, 43:20, 43:21
**hotly** [1] - 48:6
**hours** [2] - 35:6
**human** [2] - 25:4, 42:15
**hurricane** [1] - 34:8

**I**

**i.e** [1] - 9:25
**idea** [4] - 26:18, 33:14, 36:6, 50:6
**identification** [2] - 38:5, 44:13
**identified** [9] - 4:16, 38:17, 41:20, 42:14, 44:8, 44:13, 44:19, 46:7, 47:15
**identify** [9] - 26:10, 27:4, 31:20, 38:23, 39:18, 40:5, 43:1, 45:12, 45:20
**identifying** [5] - 13:11, 29:9, 29:11, 40:12, 44:5
**identity** [2] - 41:6, 44:23
**Imerys** [7] - 2:13, 6:15, 6:19, 8:8, 8:17, 10:1, 37:14
**imminent** [1] - 33:15
**impact** [2] - 4:23, 7:19
**important** [7] - 5:5, 15:20, 16:18, 17:9, 20:1, 21:17, 24:2
**impression** [2] - 22:3, 22:12
**IN** [2] - 1:4, 3:10
**in-state** [1] - 14:15
**inability** [1] - 44:1
**Inc** [1] - 21:6
**include** [1] - 36:7
**included** [2] - 13:25, 15:3
**includes** [1] - 4:17
**including** [1] - 19:22
**increasing** [1] - 11:8
**indemnity** [3] - 9:24, 10:2, 10:11
**indicate** [1] - 27:1
**indicated** [3] - 24:13, 38:1, 40:13
**individual** [2] - 29:12,

37:9

**individuals** [11] - 25:12, 26:13, 27:11, 27:20, 28:8, 28:11, 28:17, 28:18, 29:4, 31:10, 31:14

**influence** [1] - 4:25

**informally** [2] - 47:9, 47:21

**information** [6] - 4:17, 5:23, 28:20, 29:2, 33:6, 40:7

**initial** [1] - 15:5

**initials** [1] - 25:10

**injunctions** [1] - 36:10

**inquiry** [1] - 18:3

**instance** [4] - 5:1, 23:21, 23:23, 26:12

**instead** [4] - 4:6, 4:8, 28:17, 36:10

**instructed** [2] - 16:24, 16:25

**instructions** [3] - 30:23, 30:24, 31:18

**intent** [1] - 4:9

**interest** [1] - 4:21

**interested** [5] - 39:13, 43:13, 43:25, 52:17

**interviewed** [1] - 19:15

**investigations** [1] - 37:16

**involve** [2] - 43:5, 43:7

**involved** [3] - 4:25, 5:2, 15:12

**involving** [1] - 10:4

**irrelevant** [1] - 19:5

**IS** [1] - 3:9

**isolate** [1] - 31:20

**issue** [43] - 5:4, 5:5, 6:25, 7:9, 9:6, 9:11, 9:17, 11:15, 13:14, 13:22, 14:4, 15:4, 16:21, 17:16, 17:22, 18:8, 18:19, 20:2, 22:24, 23:12, 24:7, 30:3, 32:4, 33:4, 34:2, 34:8, 34:25, 35:1, 36:15, 37:14, 38:11, 40:20, 40:22, 41:9, 41:12, 42:10, 42:11, 42:19, 47:1, 48:6, 48:19, 50:1, 50:11

**issued** [1] - 16:13

**issues** [20] - 5:7, 7:13,

7:17, 10:18, 11:3, 13:2, 13:10, 15:12, 18:22, 24:19, 27:2, 31:22, 32:7, 32:24, 34:24, 36:9, 36:20, 39:17, 42:23, 43:11

**itself** [3] - 19:8, 22:24, 33:4

**J**

**J&J** [11] - 4:17, 5:1, 5:20, 6:14, 6:17, 7:2, 7:4, 15:14, 23:15, 28:17, 30:2

**Jefferson** [1] - 21:9

**JERSEY** [1] - 1:1

**Jersey** [1] - 52:8

**job** [2] - 18:12, 28:5

**JOHN** [1] - 1:21

**JOHNSON** [2] - 1:4

**Johnson** [8] - 1:22, 9:25, 10:1, 21:7, 37:6

**joined** [1] - 14:19

**joint** [2] - 13:17, 13:22

**Judge** [26] - 10:9, 10:21, 14:5, 18:16, 23:13, 26:4, 32:4, 32:10, 32:20, 33:19, 33:20, 39:7, 39:11, 39:16, 40:5, 43:12, 47:3, 47:8, 47:15, 47:19, 48:20, 48:25, 49:16, 49:19, 49:21, 50:10

**JUDGE** [85] - 4:2, 4:5, 5:17, 6:5, 6:10, 6:16, 6:23, 7:2, 7:14, 7:23, 8:6, 8:15, 8:18, 8:22, 9:19, 10:5, 10:23, 11:6, 11:11, 11:15, 11:19, 12:4, 12:7, 12:13, 12:23, 14:2, 14:17, 14:23, 17:15, 17:25, 19:1, 20:10, 20:16, 20:24, 21:23, 24:21, 24:24, 25:7, 25:14, 25:18, 25:25, 26:4, 26:22, 28:3, 28:15, 28:23, 29:1, 29:14, 29:18, 30:2, 30:15, 32:2, 34:3, 34:12, 35:17, 35:20, 36:3, 36:18, 37:3, 37:8, 37:12, 37:19, 37:24, 39:9, 41:16, 44:3, 44:22, 45:1,

45:14, 45:19, 46:6, 46:15, 46:19, 47:6, 48:10, 48:15, 48:18, 49:5, 49:12, 49:20, 49:21, 50:3, 50:14, 51:9, 51:12

**judge** [1] - 37:15

**Judicial** [1] - 21:8

**jump** [1] - 16:2

**K**

**keep** [1] - 29:5

**kept** [1] - 26:13

**key** [1] - 21:16

**keyed** [1] - 22:11

**kind** [3] - 7:3, 42:15, 47:23

**kinds** [2] - 23:8, 26:15

**knowing** [1] - 21:22

**knowledge** [2] - 4:17, 34:24

**known** [2] - 24:3, 42:15

**L**

**label** [1] - 26:9

**labeled** [2] - 25:10, 30:11

**labor** [1] - 22:17

**language** [5] - 16:11, 46:25, 47:22, 48:15, 50:8

**lapse** [1] - 38:24

**large** [3] - 25:3, 25:21, 28:21

**last** [9] - 4:10, 12:12, 12:13, 18:21, 24:9, 39:3, 42:12, 46:22

**lawyer** [2] - 26:2, 35:13

**lawyers** [10] - 30:9, 30:21, 31:2, 34:17, 34:23, 35:3, 35:5, 36:8, 36:11, 41:25

**lay** [1] - 35:25

**least** [4] - 24:11, 26:25, 28:6, 45:23

**leave** [5] - 10:8, 10:12, 11:13, 38:20, 47:9

**legacy** [6] - 25:3, 25:21, 27:25, 28:13, 28:21

**LEIGH** [1] - 1:13

**letter** [10] - 4:7, 13:18, 13:22, 17:7, 17:18, 17:19, 17:20, 18:23,

24:9, 24:13

**liability** [1] - 10:3

**liaison** [1] - 34:23

**likely** [1] - 48:7

**limit** [1] - 44:12

**limited** [3] - 4:12, 10:16, 15:4

**limits** [1] - 12:15

**lines** [3] - 46:22, 46:23, 46:24

**listed** [1] - 14:9

**litigating** [1] - 23:11

**litigation** [14] - 15:7, 17:7, 20:25, 21:2, 25:23, 26:16, 26:19, 26:24, 27:4, 27:6, 27:12, 28:1, 33:15, 42:1

**Litigation** [1] - 34:22

**litigations** [1] - 33:12

**live** [1] - 42:23

**located** [1] - 25:5

**location** [2] - 17:21, 25:5

**LOCKE** [1] - 2:6

**logs** [2] - 6:13, 6:23

**LOIS** [1] - 1:10

**Look** [1] - 35:4

**look** [11] - 10:13, 18:21, 19:7, 19:10, 20:8, 20:11, 23:22, 30:15, 44:8, 47:6

**looked** [4] - 23:16, 23:18, 23:19, 32:8

**looking** [1] - 47:24

**looks** [1] - 39:23

**LORNA** [1] - 2:10

**M**

**Magistrate** [2] - 26:4, 33:19

**maintained** [5] - 26:11, 27:21, 28:11, 31:14, 31:19

**maintaining** [2] - 27:10, 28:18

**manner** [1] - 30:12

**marching** [1] - 40:3

**MARK** [1] - 2:10

**marked** [1] - 20:8

**market** [1] - 9:15

**MARKETING** [1] - 1:4

**master** [6] - 14:3, 18:12, 32:18, 46:16, 48:4, 49:8

**materials** [1] - 24:18

matter [2] - 16:15, 21:5
MATTER [1] - 3:11
matters [6] - 4:23, 10:6, 10:16, 10:20, 11:4, 12:17
MDL [4] - 37:8, 37:10, 37:11, 41:25
MEAGHER [1] - 1:21
mean [3] - 7:7, 49:14, 50:4
meaning [1] - 46:24
meantime [1] - 23:11
measures [1] - 33:18
meeting [3] - 37:17, 39:7, 39:13
meetings [1] - 7:5
Mehaffey [1] - 15:1
Mehaffey-Weber [1] - 15:1
memo [17] - 15:1, 15:2, 17:4, 18:24, 19:8, 19:10, 20:9, 20:10, 20:12, 22:19, 22:24, 22:25, 23:15, 25:13, 27:5, 30:8, 33:4
memory [1] - 13:24
mesothelioma [1] - 37:5
met [2] - 25:1, 46:18
MICHELLE [1] - 1:14
might [3] - 41:3, 44:25, 46:9
mills [1] - 5:18
mine [3] - 6:1, 6:2, 6:8
Mines [1] - 13:25
mines [9] - 5:18, 5:21, 5:23, 6:13, 6:14, 6:15, 6:24, 7:2, 7:4
ministerial [1] - 50:22
minutes [1] - 37:21
missed [1] - 23:18
missing [2] - 17:24, 50:15
Missouri [3] - 41:20, 42:4, 46:8
modify [1] - 47:22
Molinar [1] - 19:23
moment [6] - 11:24, 14:25, 18:13, 38:10, 40:25, 44:1
month [2] - 32:15, 32:23
monthly [1] - 19:22
months [2] - 18:18, 40:11

morning [2] - 24:14, 39:15
most [1] - 40:14
motion [3] - 21:3, 21:14, 47:23
move [1] - 43:12
moved [1] - 38:25
moving [3] - 13:21, 32:17, 41:14
MR [38] - 6:21, 7:1, 9:10, 10:19, 15:17, 16:9, 17:18, 18:19, 19:4, 20:11, 20:13, 20:20, 21:16, 21:25, 24:22, 25:1, 25:13, 25:17, 25:19, 26:2, 26:20, 27:25, 28:13, 28:19, 28:25, 29:13, 29:16, 29:24, 30:7, 32:1, 34:13, 35:19, 35:23, 36:14, 36:24, 37:4, 37:9, 37:15
MS [54] - 5:12, 5:22, 6:7, 6:15, 7:8, 7:22, 8:1, 8:9, 8:17, 8:20, 8:21, 8:23, 9:23, 11:1, 11:7, 11:12, 11:16, 12:3, 12:5, 12:8, 12:21, 13:13, 14:12, 14:21, 21:13, 33:23, 34:5, 35:24, 36:20, 38:8, 39:11, 41:17, 43:2, 44:21, 44:23, 45:11, 45:17, 45:25, 46:18, 46:20, 48:2, 48:5, 48:9, 48:11, 48:14, 48:17, 48:19, 48:25, 49:10, 49:14, 49:25, 50:9, 51:5, 51:11
museum [6] - 33:21, 34:1, 34:19, 35:11, 35:21, 42:11
must [1] - 15:5
MY [1] - 3:10
Myers [1] - 14:7

**N**

name [1] - 38:20
names [2] - 41:5, 45:13
NANCY [1] - 2:12
narrow [1] - 10:22
narrowly [1] - 4:22
nature [1] - 10:12
necessarily [2] - 9:18, 17:23

need [16] - 5:14, 5:15, 12:6, 12:10, 13:5, 28:5, 29:1, 30:20, 31:10, 31:16, 31:24, 32:25, 33:6, 33:17, 42:21, 46:10
needs [1] - 50:19
never [1] - 6:25
New [1] - 52:8
NEW [1] - 1:1
new [6] - 33:24, 40:12, 40:15, 40:17, 42:10, 46:6
next [4] - 32:2, 32:23, 48:18, 51:4
nice [1] - 26:22
night [2] - 42:17, 46:22
nitty [1] - 14:4
nitty-gritty [1] - 14:4
NJ [1] - 1:8
NO [1] - 1:2
nobody [1] - 29:21
non [1] - 41:12
non-asbestos [1] - 41:12
none [1] - 9:15
normally [1] - 4:7
notebooks [3] - 19:14, 19:21, 23:14
NOTES [1] - 3:10
notes [1] - 18:21
nothing [1] - 12:13
notice [6] - 44:16, 49:22, 50:1, 50:19, 50:23, 51:2
number [5] - 4:18, 8:14, 21:7, 25:22, 36:15

**O**

O'DELL [28] - 1:13, 5:12, 5:22, 6:7, 6:15, 7:8, 7:22, 8:1, 8:9, 8:17, 8:20, 8:23, 9:23, 11:1, 11:7, 11:12, 11:16, 12:3, 13:13, 14:12, 14:21, 48:5, 48:11, 48:17, 48:25, 49:10, 49:25, 51:5
O'Dell [3] - 22:17, 23:2, 50:11
object [2] - 50:2, 51:3
objection [2] - 13:21, 50:13
objections [1] - 13:5
obtaining [1] - 26:25

obviously [5] - 26:25, 32:20, 38:12, 48:12, 50:15
October [4] - 32:15, 39:8, 39:10, 39:14
OF [3] - 1:1, 1:4, 3:10
offer [1] - 34:14
office [1] - 22:18
OFFICIAL [2] - 1:25, 3:16
Official [1] - 52:6
official [1] - 37:15
once [3] - 11:21, 29:6, 45:19
one [30] - 5:9, 15:9, 15:13, 15:16, 18:19, 18:22, 19:10, 21:2, 21:14, 24:6, 27:1, 27:3, 31:1, 33:1, 34:20, 35:8, 43:3, 43:14, 43:19, 43:21, 45:5, 45:7, 47:2, 47:7, 47:16, 49:15, 49:17, 50:19, 50:24
ones [4] - 4:15, 10:24, 31:20
Oot [2] - 23:3, 24:13
OOT [19] - 1:20, 10:19, 15:17, 17:18, 20:13, 24:22, 25:1, 25:13, 25:17, 25:19, 26:2, 27:25, 28:13, 28:19, 28:25, 29:13, 29:16, 29:24, 32:1
open [1] - 20:13
opine [2] - 5:15, 44:6
opinion [1] - 45:10
opinions [3] - 40:24, 44:6, 45:2
opportunity [1] - 50:1
optimistic [1] - 41:14
orally [1] - 47:25
order [8] - 4:7, 16:11, 23:13, 46:16, 48:8, 48:23, 49:3, 51:14
ordering [1] - 23:14
orders [1] - 40:4
ore [1] - 5:25
OREGON [1] - 2:12
original [1] - 35:2
originally [2] - 25:1, 30:13
originals [3] - 27:24, 28:10, 28:16
otherwise [1] - 49:12

outlined [1] - 17:20
outright [1] - 24:5
outstanding [1] - 13:14
ovarian [14] - 8:5, 10:4, 11:7, 11:9, 12:10, 20:3, 24:7, 26:17, 33:9, 33:13, 34:23, 41:10, 45:5, 45:6
overbroad [1] - 12:19
own [2] - 19:15, 19:23

**P**

page [4] - 20:12, 22:8, 47:1, 48:20
paper [2] - 12:12, 12:14
papers [1] - 15:1
paragraph [4] - 19:10, 20:6, 44:25, 47:2
parameters [2] - 10:7, 12:11
Parfitt [1] - 38:6
PARFITT [9] - 1:14, 38:8, 39:11, 43:2, 44:21, 44:23, 45:11, 45:17, 45:25
part [8] - 4:19, 10:3, 22:10, 29:2, 29:8, 36:24, 40:14, 40:17
parte [5] - 48:21, 48:24, 49:1, 49:8, 50:21
particular [4] - 9:6, 16:19, 29:12, 45:4
particularity [1] - 17:1
particularly [2] - 15:6, 27:10
parties [14] - 12:10, 13:19, 39:14, 39:15, 39:25, 40:22, 48:6, 48:16, 48:22, 49:2, 49:3, 49:9, 49:23, 52:15
party [5] - 7:6, 13:9, 43:24, 49:15, 49:17
past [2] - 16:16, 22:22
PATRICK [1] - 1:20
pause [2] - 16:4, 30:5
PCPC [1] - 2:8
pending [1] - 21:7
PENNSYLVANIA [2] - 2:7, 2:12
people [5] - 19:9, 19:15, 37:4, 42:6, 46:2
performing [1] - 5:3
perhaps [1] - 4:22
period [1] - 19:8

permit [1] - 10:16
person [3] - 8:14, 11:22, 44:14
personal [2] - 19:23, 26:14
perspective [2] - 30:2, 33:1
pertinent [1] - 32:12
Pharmacy [1] - 21:6
Philadelphia [1] - 37:11
phone [6] - 4:10, 23:3, 24:14, 35:1, 35:6, 50:25
photocopied [4] - 25:14, 28:7, 30:9, 31:6
photocopies [4] - 21:18, 21:19, 27:23, 28:10
photocopy [3] - 30:11, 31:3, 31:8
photocopying [1] - 27:16
photoscopies [1] - 27:22
phrase [1] - 49:6
phrases [1] - 22:11
physical [1] - 19:3
piece [2] - 12:12, 12:13
Pisano [20] - 10:9, 10:21, 14:5, 18:16, 32:4, 32:10, 33:19, 39:7, 39:11, 39:17, 40:5, 43:12, 47:3, 47:8, 47:19, 48:20, 48:25, 49:19, 49:22, 50:10
place [6] - 15:16, 35:8, 39:25, 41:15, 48:8, 52:11
Placitella [2] - 33:23, 42:13
PLACITELLA [9] - 1:16, 1:16, 34:13, 35:19, 35:23, 36:14, 36:24, 37:4, 37:9
plaintiff [2] - 4:16, 14:15
Plaintiffs [1] - 1:17
plaintiffs [12] - 16:10, 16:12, 16:24, 23:25, 35:9, 38:9, 41:19, 42:1, 42:14, 42:25, 47:3, 48:23
plaintiffs' [2] - 34:22, 46:22
point [15] - 7:16, 9:9, 10:5, 10:19, 14:2, 20:20, 21:16, 23:15, 27:5, 36:1, 38:2, 39:21, 43:3, 43:8,

50:25
position [6] - 8:16, 8:23, 15:18, 21:10, 41:2, 45:12
possibly [1] - 22:20
post [1] - 22:19
post-dated [1] - 22:19
posture [1] - 11:13
POWDER [1] - 1:4
powder [7] - 5:24, 6:3, 8:4, 8:11, 9:11, 9:13, 11:8
power [1] - 49:15
practice [1] - 47:23
PRACTICES [1] - 1:5
prefaced [1] - 15:19
prefers [1] - 47:9
prepared [3] - 39:16, 41:21, 45:21
present [5] - 10:9, 18:16, 33:5, 39:16, 41:4
presented [2] - 32:13, 46:3
presenting [1] - 32:9
preservation [1] - 20:23
preserve [1] - 26:9
preserved [1] - 29:9
presumably [2] - 21:19, 30:12
pretty [1] - 23:17
prevented [1] - 39:5
privilege [1] - 18:23
privileged [4] - 15:23, 16:3, 16:8, 20:14
privileges [2] - 15:9, 27:7
problematic [1] - 36:9
procedure [1] - 12:24
proceed [4] - 4:11:12, 11:17, 11:18, 11:20
proceedings [3] - 41:24, 51:17, 52:10
process [4] - 5:18, 29:25, 36:24, 40:11
produce [5] - 21:22, 21:24, 23:14, 24:11, 44:2
produced [9] - 15:15, 17:6, 18:5, 18:25, 21:3, 26:15, 36:25, 37:2, 42:8
producing [1] - 15:15
product [7] - 5:13, 5:16, 7:18, 8:17, 9:12, 9:14, 9:18

production [4] - 11:17, 16:22, 22:7, 22:13
productions [1] - 17:2
productive [1] - 36:23
PRODUCTS [1] - 1:4
products [9] - 5:10, 5:24, 6:3, 7:10, 8:4, 8:12, 9:15, 9:22, 11:8
prohibit [1] - 48:24
proportionality [1] - 12:22
protected [4] - 15:9, 20:19, 33:16, 33:17
protections [2] - 15:14, 16:13
protracting [1] - 43:13
provide [2] - 38:19, 51:7
provided [4] - 22:4, 23:25, 27:24, 39:3
providing [1] - 38:10
pull [1] - 22:13
pulled [6] - 20:5, 20:6, 21:18, 21:21, 22:18, 24:12
purchased [1] - 9:21
purchases [1] - 9:25
purchasing [1] - 10:1
pure [10] - 8:22, 8:24, 9:1, 9:2, 9:4, 9:9, 9:15, 40:21, 45:8
purpose [1] - 17:8
purposes [1] - 38:17
PURSUANT [1] - 3:8
pursuing [1] - 14:11
put [6] - 20:25, 22:13, 29:6, 31:15, 32:16, 48:23
putting [1] - 32:18

**Q**

questions [7] - 11:22, 28:9, 30:4, 30:15, 31:25, 42:6, 44:21
quite [1] - 15:10

**R**

raised [1] - 42:11
raising [1] - 13:2
range [2] - 19:20, 22:9
ranges [1] - 25:5
Ray [1] - 21:5
RE [1] - 1:4

re [1] - 13:3
re-reviewing [1] - 13:3
reached [2] - 14:6, 51:6
reaction [1] - 15:5
read [2] - 15:1, 30:8
reading [2] - 20:13,
  24:14
ready [1] - 51:14
real [4] - 14:18, 18:8,
  24:17, 45:2
realize [1] - 16:5
really [17] - 5:6, 5:9,
  7:20, 15:10, 16:5, 17:9,
  17:11, 18:3, 20:19,
  22:24, 32:5, 33:7, 36:23,
  38:25, 42:18, 49:13
reason [8] - 4:19, 16:18,
  17:9, 30:10, 32:18,
  43:23, 45:25, 50:20
reasoned [2] - 27:9,
  32:13
reasons [1] - 17:5
REATH [1] - 1:18
received [1] - 28:7
recommendation [1] -
  18:17
recommendations [1] -
  40:6
record [13] - 4:5, 19:9,
  30:18, 36:1, 37:20,
  37:22, 37:24, 37:25,
  46:12, 46:13, 46:15,
  51:15, 51:16
recorded [3] - 47:4, 48:3,
  48:12
records [2] - 27:18,
  31:19
recreate [2] - 22:6, 23:25
red [4] - 19:6, 46:22,
  46:23, 46:24
redo [1] - 43:19
REES [1] - 2:11
reference [1] - 24:15
referenced [4] - 22:14,
  22:25, 23:5, 23:7
references [2] - 26:12,
  27:1
reflect [2] - 7:17, 25:11
reflected [1] - 28:6
reflecting [1] - 7:20
regard [8] - 6:18, 14:6,
  14:8, 34:3, 38:11, 40:20,
  41:11, 43:9

regarding [2] - 5:23, 8:25
regulatory [3] - 13:15,
  13:23, 19:13
relate [1] - 9:25
related [9] - 7:2, 7:17,
  13:22, 15:18, 20:2, 20:7,
  24:19, 28:1, 36:14
relates [4] - 7:8, 11:7,
  12:9, 13:14
relating [2] - 8:3, 24:7
relation [2] - 11:1, 35:24
relative [2] - 52:13, 52:16
relevance [1] - 5:9
relevant [2] - 10:14,
  32:12
relitigate [2] - 11:3,
  11:14
reluctance [1] - 44:1
remaining [2] - 39:19,
  42:23
remains [1] - 40:1
remand [1] - 14:11
remember [5] - 16:18,
  33:20, 34:25, 36:18,
  44:3
report [4] - 18:16, 41:3,
  44:9, 44:15
REPORTER [2] - 1:25,
  3:16
Reporter [2] - 52:7
reporter [4] - 47:4, 47:13,
  48:1, 48:3
reports [6] - 23:20,
  40:16, 41:7, 43:25, 44:4,
  45:22
represent [1] - 23:16
representations [1] -
  8:25
represented [5] - 22:4,
  22:5, 23:12, 23:24,
  40:10
representing [2] - 22:21,
  22:22
request [9] - 7:12, 8:1,
  13:13, 24:16, 35:2,
  37:16, 48:5, 48:11,
  49:16
requested [1] - 48:16
requests [7] - 10:9,
  10:10, 12:18, 13:4,
  13:20, 34:18, 42:16
requirements [1] - 20:23
research [1] - 19:13

reserve [1] - 16:14
resident [1] - 14:14
resolution [2] - 32:19,
  33:25
resolve [8] - 32:5, 34:10,
  36:2, 36:20, 36:21,
  42:23, 46:24, 47:21
resolved [2] - 39:6, 46:23
respond [1] - 45:15
response [2] - 17:19,
  35:16
retained [1] - 30:13
retrieved [1] - 19:14
returned [2] - 29:4, 31:14
reverse [1] - 49:7
review [2] - 12:18, 47:15
reviewed [1] - 9:17
reviewer [1] - 25:4
reviewing [1] - 13:3
revised [1] - 51:7
ripe [1] - 32:24
rise [1] - 4:1
risk [1] - 11:9
risks [1] - 8:5
Rosetta [1] - 17:11
ROTH [1] - 1:16
route [1] - 32:22
RPR [1] - 1:24
Rs [1] - 33:3
rule [1] - 15:25
rules [4] - 12:21, 12:23,
  12:24, 15:21
ruling [4] - 10:11, 12:15,
  14:7, 47:12
rulings [1] - 47:24
Russoniello [4] - 3:15,
  52:6, 52:23, 52:24
RUSSONIELLO [2] -
  1:24, 3:16

## S

S/Vincent [2] - 3:15,
  52:23
safer [3] - 5:12, 5:16,
  8:10
safety [2] - 8:4, 8:17
sale [3] - 7:15, 7:18, 7:19
SALES [1] - 1:5
sample [1] - 42:14
samples [7] - 19:22,
  34:4, 35:7, 35:15, 35:22,
  37:14, 41:9

sampling [3] - 38:11,
  42:10
save [1] - 32:23
scanned [5] - 25:20,
  28:2, 28:14, 28:20, 29:6
scanning [1] - 31:12
School [1] - 13:25
scope [4] - 4:9, 4:10,
  10:23, 38:14
searchable [1] - 28:21
seat [1] - 37:13
second [5] - 15:11,
  45:11, 45:16, 47:2,
  48:19
SECTION [1] - 3:8
see [7] - 9:16, 10:13,
  29:16, 36:5, 44:7, 45:14,
  45:22
seem [1] - 15:7
selection [1] - 31:7
selective [1] - 31:11
send [1] - 50:17
sense [2] - 47:8, 47:23
sent [4] - 17:7, 17:19,
  23:20, 24:9
separate [1] - 11:24
SEPTEMBER [1] - 1:5
served [3] - 13:19, 21:4,
  42:16
serves [1] - 13:24
set [5] - 25:10, 32:14,
  41:17, 42:21, 52:11
sets [2] - 35:9, 46:23
SEYFARRTH [1] - 2:5
Sharko [2] - 12:4, 41:16
sharko [2] - 43:8, 43:9
SHARKO [18] - 1:18,
  12:5, 12:8, 12:21, 21:13,
  33:23, 34:5, 35:24,
  36:20, 41:17, 46:18,
  46:20, 48:2, 48:9, 48:14,
  48:19, 50:9, 51:11
SHAW [1] - 2:5
sheets [1] - 21:12
SHERYL [1] - 2:7
SHOOK [1] - 1:19
show [1] - 9:2
Shower [4] - 7:15, 7:16,
  37:7
side [1] - 49:3
sides [3] - 34:20, 39:1,
  39:4
SILVER [4] - 2:10, 6:21,

7:1, 37:15
**similarly** [1] - 31:17
**simply** [4] - 14:19, 22:12, 45:12, 50:4
**sitting** [1] - 40:9
**situation** [1] - 11:2
**SKADDEN** [1] - 1:21
**skelter** [1] - 32:9
**SLATE** [1] - 1:21
**snapshot** [2] - 17:12, 24:3
**someone** [1] - 11:20
**sometimes** [1] - 48:12
**somewhere** [1] - 31:15
**sorry** [2] - 4:13, 6:21
**sought** [1] - 30:13
**sound** [1] - 49:7
**sounds** [1] - 49:12
**source** [3] - 5:24, 6:3, 31:5
**special** [3] - 46:16, 48:4, 49:8
**specialty** [2] - 38:20, 44:24
**specific** [8] - 5:7, 6:8, 8:1, 10:8, 11:3, 13:2, 13:24, 38:10
**specifically** [3] - 7:12, 8:4, 9:24
**specifics** [3] - 10:13, 12:16, 36:4
**spouse** [1] - 21:5
**spreadsheet** [8] - 22:4, 22:8, 23:5, 23:7, 23:21, 23:24, 24:24, 25:6
**stack** [1] - 22:14
**start** [2] - 4:12, 32:17
**started** [2] - 40:11, 41:24
**STATE** [1] - 1:8
**State** [1] - 52:8
**state** [8] - 14:13, 14:15, 23:12, 23:13, 37:10, 44:1
**states** [1] - 5:15
**STATES** [2] - 1:1, 1:7
**States** [1] - 52:6
**status** [4] - 4:7, 16:20, 18:22, 23:19
**STATUS** [1] - 1:4
**Steering** [1] - 1:17
**STENOGRAPHIC** [1] - 3:10
**stenographically** [3] -

47:4, 48:3, 52:10
**still** [13] - 12:23, 14:11, 17:13, 18:5, 20:14, 27:18, 29:5, 29:22, 30:20, 35:17, 40:1, 41:8
**stipulation** [1] - 14:7
**Stone** [1] - 17:11
**stop** [1] - 19:1
**STREET** [1] - 1:8
**stuck** [1] - 44:17
**studies** [3] - 4:24, 5:3, 5:4
**stuff** [2] - 23:17, 29:15
**subcommittees** [1] - 8:3
**subject** [7] - 10:6, 10:16, 10:20, 12:17, 13:20, 47:19, 48:3
**subjects** [4] - 44:5, 44:8, 44:20, 45:9
**submissions** [1] - 15:13
**submit** [1] - 44:9
**submitted** [1] - 15:2
**subpoena** [1] - 14:1
**subpoenas** [2] - 13:9, 13:20
**subset** [1] - 46:9
**subsidiaries** [1] - 21:8
**substantive** [3] - 50:15, 50:20, 51:2
**substituted** [1] - 8:12
**sufficient** [1] - 29:2
**suggest** [1] - 9:4
**suggested** [1] - 8:10
**suggesting** [1] - 18:11
**summary** [1] - 45:2
**surely** [1] - 30:21
**Susan** [2] - 35:4, 36:15
**SUSAN** [1] - 1:18
**system** [4] - 20:18, 25:10, 25:15, 31:5

**T**

**table** [1] - 19:16
**talc** [24] - 5:12, 5:24, 8:13, 8:22, 8:24, 9:1, 9:2, 9:4, 9:9, 9:16, 9:18, 9:21, 10:1, 19:22, 20:2, 20:7, 24:7, 28:1, 37:6, 40:21, 41:10, 45:4, 45:7
**Talc** [1] - 2:13
**talc-related** [1] - 28:1
**talcum** [7] - 5:24, 6:3,

8:4, 8:11, 9:11, 9:13, 11:8
**talks** [1] - 22:9
**targeted** [1] - 7:12
**task** [1] - 49:13
**technology** [1] - 25:24
**tee** [1] - 10:17
**tee-up** [1] - 10:17
**teed** [1] - 14:5
**teed-up** [1] - 14:5
**term** [1] - 17:10
**terms** [2] - 11:16, 13:13
**terribly** [1] - 38:21
**test** [1] - 41:9
**testifying** [1] - 44:25
**testing** [3] - 9:2, 19:22
**Texas** [1] - 21:9
**Thames** [1] - 21:6
**THE** [7] - 1:1, 1:9, 1:10, 2:7, 3:8, 3:10, 4:1
**themselves** [4] - 18:1, 28:24, 30:14, 31:13
**theories** [1] - 42:2
**theory** [1] - 10:20
**thereafter** [1] - 45:18
**they've** [2] - 17:2, 41:20
**thinks** [1] - 47:11
**third** [2] - 7:6, 13:9
**third-party** [2] - 7:6, 13:9
**THOMAS** [1] - 2:6
**THORNTON** [1] - 2:12
**threat** [1] - 27:6
**threatened** [2] - 33:12, 33:13
**three** [5] - 14:12, 14:21, 16:16, 18:21, 22:22
**timelines** [1] - 12:1
**timing** [1] - 38:1
**Tisi** [2] - 9:8, 16:9
**TISI** [11] - 1:15, 9:10, 16:9, 18:19, 19:4, 20:11, 20:20, 21:16, 21:25, 26:20, 30:7
**tisi** [1] - 17:19
**TITLE** [1] - 3:8
**TO** [2] - 3:8, 3:9
**today** [16] - 10:11, 10:14, 11:4, 11:13, 12:2, 12:16, 18:11, 21:14, 29:19, 30:18, 32:6, 33:9, 39:2, 39:3, 39:25, 41:15
**together** [1] - 32:16
**took** [3] - 17:21, 28:16,

28:17
**topic** [2] - 38:13, 38:21
**topics** [2] - 5:8, 46:3
**trade** [2] - 13:16, 13:23
**transcript** [1] - 52:9
**TRANSCRIPT** [2] - 1:4, 3:9
**TRANSCRIPTION** [1] - 3:10
**tremendous** [1] - 39:4
**TRENTON** [1] - 1:8
**trial** [2] - 43:4
**tried** [4] - 38:25, 41:23, 46:7, 46:8
**true** [2] - 24:22, 52:9
**try** [8] - 34:14, 35:6, 35:12, 35:20, 36:2, 39:25, 41:19, 42:22
**trying** [9] - 11:25, 18:14, 26:5, 26:8, 29:19, 31:24, 32:6, 36:14, 38:22
**twice** [3] - 35:10, 43:20, 43:21
**two** [12] - 13:15, 19:17, 23:10, 28:9, 30:7, 30:25, 31:12, 34:20, 42:12, 44:21, 46:23, 47:1

**U**

**U.S** [2] - 1:25, 3:16
**U.S.C** [1] - 3:8
**ultimate** [1] - 42:19
**ultimately** [2] - 33:1, 47:14
**under** [5] - 6:17, 15:25, 22:3, 25:13, 35:8
**understood** [2] - 17:25, 30:14
**undertaken** [1] - 33:18
**unfortunately** [1] - 12:6
**United** [1] - 52:6
**UNITED** [2] - 1:1, 1:7
**universe** [2] - 31:9, 34:24
**up** [18] - 10:17, 14:5, 18:20, 18:22, 22:2, 24:10, 25:10, 32:15, 35:13, 35:20, 36:16, 41:10, 42:23, 47:9, 49:18, 49:21, 50:7
**update** [1] - 36:22
**usage** [1] - 6:9
**USDJ** [1] - 1:9
**USMJ** [1] - 1:10

## V

**vacations** [1] - 34:8
**Valeant** [1] - 7:16
**various** [3] - 19:21, 20:7, 31:14
**version** [3] - 41:22, 46:21, 51:7
**veto** [1] - 49:15
**view** [1] - 36:23
**views** [1] - 18:15
**VINCENT** [2] - 1:24, 3:16
**Vincent** [2] - 52:6, 52:24
**violate** [1] - 15:25
**violation** [1] - 15:19
**VIRGINIA** [2] - 1:14, 1:15
**volume** [1] - 25:3

## W

**waiver** [1] - 15:18
**wants** [9] - 23:22, 33:2, 33:25, 34:6, 47:3, 47:9, 47:12, 50:10, 50:20
**warning** [1] - 8:13
**WASHINGTON** [3] - 1:20, 1:21, 2:6
**watching** [1] - 34:8
**Weber** [1] - 15:1
**week** [5] - 4:10, 24:10, 34:7, 39:3, 42:12
**weeks** [1] - 23:10
**weighing** [1] - 50:7
**whole** [1] - 21:10
**Williams** [5] - 15:3, 20:25, 21:4, 26:23, 29:22
**witnesses** [1] - 42:5
**WOLFSON** [83] - 1:9, 4:2, 4:5, 5:17, 6:5, 6:10, 6:16, 6:23, 7:2, 7:14, 7:23, 8:6, 8:15, 8:18, 8:22, 9:19, 10:5, 10:23, 11:6, 11:11, 11:15, 11:19, 12:4, 12:7, 12:13, 12:23, 14:2, 14:17, 14:23, 17:15, 17:25, 20:10, 20:16, 20:24, 21:23, 24:21, 24:24, 25:7, 25:14, 25:18, 25:25, 26:4, 26:22, 28:3, 28:15, 28:23, 29:1, 29:14, 29:18, 30:2, 30:15, 32:2, 34:3, 34:12, 35:17, 35:20, 36:3, 36:18, 37:3, 37:8, 37:12, 37:19, 37:24, 41:16, 44:3, 44:22, 45:1, 45:14, 45:19, 46:6, 46:15, 46:19, 47:6, 48:10, 48:15, 48:18, 49:5, 49:12, 49:20, 50:3, 50:14, 51:9, 51:12
**women** [1] - 6:9
**wonderful** [1] - 51:12
**worded** [1] - 49:15
**works** [3] - 26:5, 45:23, 50:10
**Writs** [1] - 34:15
**written** [6] - 11:25, 12:2, 13:4, 13:7, 38:3, 47:18
**wrote** [1] - 8:10

## Y

**year** [2] - 19:8, 41:18
**years** [2] - 24:20, 28:2

## Z

**Zazenski** [2] - 8:8, 8:9
**zone** [1] - 6:9