# EXHIBIT C

**DrinkerBiddle&Reath**
LLP

Susan M. Sharko
973-549-7350 Direct
susan.sharko@dbr.com

*Law Offices*

600 Campus Drive
Florham Park, NJ
07932-1047

(973) 549-7000
(973) 360-9831 fax
www.drinkerbiddle.com

*A Delaware Limited
Liability Partnership*

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
TEXAS
WASHINGTON D.C.

January 19, 2018

**VIA ELECTRONIC MAIL**

Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, New Jersey 07102

Re:   ***Johnson & Johnson Talcum Powder Products Marketing, Sales
Practices and Products Liability Litigation***
**Case No. 3:16-md-07238-FLW-LHG**

Dear Judge Pisano,

I am writing on behalf of defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. ("JJCI") (collectively, "defendants"), to respond to the PSC's January 5 letter, addressing defendants' document productions, and the PSC's January 15 agenda letter.

## I.   The Court Should Deny The Relief Sought In Plaintiffs' January 5 Letter.

In a nutshell, plaintiffs' January 5 letter seeks to use the supplemental production *they* requested as an excuse to delay the day of reckoning on fundamental science issues in this litigation. The Court should strongly rebuff this effort.

*First*, the PSC has not demonstrated any need for a three-month-plus extension to refine its list of deponents. As this Court made abundantly clear at each and every status conference, the focus of the proceeding at this stage should be on general causation. To the extent plaintiffs believe that fact witness depositions are necessary at this stage, such depositions are supposed to be limited to individuals who could provide testimony that is somehow relevant to general causation and necessary to plaintiffs' preparation of expert reports by some subset of the list of 37 potential experts they identified on November 6, 2017. But the PSC has failed to demonstrate any link between the document production or potential fact deponents and the question of general causation. As the Court put it, the PSC "know[s] what the studies are," and there has been no showing that this fact "is changed by any of the discovery." (12/7/17 Tr. 18:23-19:14, attached as Ex. A.)

*Second*, and for similar reasons, the PSC has not shown that there is any need for a "rolling depositions" schedule for fact witnesses. It is not plausible that a total of 60 depositions are needed before expert discovery on general causation can commence in earnest.

*Andrew B. Joseph
Partner responsible for
Florham Park Office*

*Established* 1849

91119473.1

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 2

*Third*, there is no reason to compel defendants to further de-duplicate documents. Defendants have complied with their obligations under Rule 34 and produced documents using the agreed upon methodology stated in the ESI protocol by de-duplicating the electronic documents produced and by providing de-duplication data for duplicative attachments. In addition, pursuant to the ESI protocol and at defendants' expense, all hard-copy documents underwent Optical Character Recognition ("OCR") to make them fully searchable. The ability to search hard-copy documents will minimize the burdens that plaintiffs claim are caused by the production of duplicate documents, as plaintiffs will undoubtedly use this functionality to cull out only the portion of recently produced documents that are of interest to them. Further, in the spirit of compromise, defendants are in the process of creating a spreadsheet that will enable the PSC to identify a significant number of documents from a portion of the recently produced documents that are duplicative of documents produced prior to October 2017. Plaintiffs want defendants to go even further and undertake highly expensive and burdensome manual efforts to de-duplicate hard-copy documents. Defendants are in no better a position to perform this additional de-duplication than is the PSC and should not be required to do so. Plaintiffs received the document production in the agreed upon (and ordered) reasonable usable form of the ESI Protocol – Rule 34(b)(2)(E)(iii) explicitly protects producing parties from costly reproductions, especially when the parties agreed to the production protocol.

*Finally*, there is no merit to the PSC's assertion that any other cost-shifting is in order. The PSC has insisted on additional discovery despite defendants' repeated objections that discovery proportional to the needs of the litigation has long been completed. Notably, Ms. O'Dell argued to the JPML more than a year ago that "much . . . has already been done" with respect to "general liability . . . and general causation" discovery. (9/29/16 JPML Hr'g 15:13-18, attached as Ex. B.) Nevertheless, the PSC has changed its tune in this Court, pressing for new discovery at every turn, in the apparent hopes of delaying a resolution of the general causation question. Defendants, in turn, have borne the brunt of the resulting expense – spending millions of dollars to turn around the latest supplement. The notion that defendants should now have to pay *more* to ease the PSC's burden in reviewing the documents would turn the Federal Rules of Civil Procedure on their head. After all, Rule 26 only contemplates cost-shifting in certain circumstances when requested by the *producing* party, to ease the burdens of responding to discovery (not to ease the burden of reviewing requested documents).

A.   **Background**

From its early stages, this proceeding has been focused on the threshold scientific question of general causation: can talc cause ovarian cancer when used perineally? Indeed, the Court held a day-long "science day" in January 2017, at which defendants expressed their hope that a plenary *Daubert* hearing could be held by summer 2017. (*See* 1/23/17 Tr. 165:18-22, attached as Ex. C.) And at the most recent status conference in December, the Court reiterated that general causation is the primary focus of the MDL

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 3

proceeding at this point: "I told you we're focusing on general causation first." (12/7/17 Tr. 18:25-19:1.)

Despite this instruction, the PSC's efforts have consistently focused on broader discovery issues – in particular, demands for production of documents, answers to interrogatories and schedules for depositions of fact witnesses. At the May 2017 status conference, for example, the PSC insisted that it needed to pursue discovery from third parties regarding *their* knowledge of the alleged risks of talc over time – subpoenas that Judge Goodman described as "incredibly broad" and implicating "a whole other avenue of litigation" that would cause "a real detour." (5/2/17 Tr. 23:6-18, attached as Ex. D.)

Similarly, in December, the PSC insisted that document discovery needed to be completed and depositions of fact witnesses needed to be taken before the PSC could whittle down its list of *37 experts* and provide expert reports so that the *Daubert* process could commence in earnest. The Court responded that the PSC "know[s] what the studies are," and in light of the "science focus, [the Court] d[id]n't see how this is changed by any of the discovery." (12/7/17 Tr. 18:23-19:14; *accord, e.g.*, 9/6/17 Tr. 44:3-20 (rejecting the idea that the PSC would need to analyze document discovery before identifying experts because it should already have enough information in hand to be able to "identify[] experts and the subjects on which they are going to opine"), attached as Ex. E.)

The Court responded similarly to the PSC's repeated insistence that it needs to take fact depositions before it could possibly streamline its expert list or generate expert reports. In September, for example, the Court responded to the PSC's reference to fact depositions that it was "not so sure depositions should proceed," particularly in light of the risk of piecemeal discovery posed by deposing fact witnesses before general causation is resolved. (9/6/2017 Tr. 11:16-12:2.) A few months later, when the PSC suggested that "the Court appreciates our experts will be relying on information from corporate depositions," the Court noted that "we're not writing on a blank slate"; that it was "a little confused" about the claimed need for depositions; and that, "for many of the science experts, I don't really understand why these corporate deps are necessary." (12/7/2017 Tr. 11:15-12:12, 17:21-18:1.) And when the PSC contended that the corporate depositions might yield relevant "admissions" on general causation, the Court responded, "But that does not go to what your own experts will be opining upon based upon their own review of what science was at the time . . . regardless of whether they admit it or not." (*Id.* 20:5-21:9.)

To be sure – and at the PSC's urging – the Court has permitted broad written discovery at this stage as long as it is general in nature and relevant and proportional to the issues and needs of the litigation. (*E.g.*, 9/6/17 Tr. 4:12-5:7, 10:5-16, 12:21-25.) Consistent with that direction – and despite their belief that sufficient documentary productions had already been made in connection with substantial state-court litigation–

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 4

defendants agreed to supplement their prior discovery and provide virtually all the discovery sought by plaintiffs in order to move past discovery issues.[1] Defendants' supplemental production (the "Supplemental Production") was produced on a rolling basis beginning in October 2017, and completed on December 20, 2017,[2] pursuant to agreement of the parties.[3]

The breadth, size and duplication of the Supplemental Production were driven by a number of factors beyond plaintiffs' document requests. For example, as the Court is aware, the PSC had raised a number of complaints with the Court concerning sources of documents identified in a privileged 1998 memorandum that was inadvertently produced. (*E.g.*, 9/6/17 Tr. 16:9-17:14, 37:1-11.) Although defendants insisted that these materials had already been produced to the extent that they were responsive, the PSC persisted, arguing that it had reason to "believe that certain documents were not produced in this litigation." (9/6/17 Tr. 17:4-9.) In an effort to resolve the dispute, defendants agreed to "go[] back and pull[] everything again and see[] if there's anything else in [a] warehouse anywhere that relates to talc that is potentially relevant" and to put "it in line for production." (*Id.* 35:24-36:4.)[4] This effort necessarily involved the production of duplicative materials, as the sources described in the 1998 memorandum were hard-copy documents and could not reasonably be de-duplicated without significant manual efforts. This fact was noted to plaintiffs' counsel a number of times, including, most recently at the December 2017 conference. As defense counsel explained, "we just redid the production" of the documents identified in that memorandum given the "number of the complaints" about it from the PSC – a fact that we had gone "over and over . . . with plaintiff." (12/7/17 Tr. 16:23-17:9.) As counsel further explained, while there would be "new documents" in the production, there would not be "double the number" of new documents. (*Id.*)[5]

---

[1]     In the interest of bringing the discovery to a close, defendants have endeavored to meet the PSC's requests even though they have in many cases been extremely broad or otherwise objectionable. Specifically, out of the PSC's 59 document requests and 67 interrogatories, defendants raised only one issue with respect to one request (regarding board of director materials).

[2]     Due to certain logistical issues, a small number of documents shipped on December 21.

[3]     In its letter, the PSC complains about the timing of the production and the fact that a significant number of documents were produced just prior to Christmas. However, plaintiffs disregard the fact that that date was agreed upon by plaintiffs. Moreover, as shown in the PSC's letter, defendants produced documents in installments, with a number of installments produced in advance of December 20. The fact that a significant portion of the production was produced in the last production is the result of the significant efforts that were required to comply with plaintiffs' demands, which could not reasonably have been accelerated.

[4]     Judge Pisano addressed the 1998 memorandum during the October 4 hearing and opined that it was "in [his] view, . . . privileged" because it was an "attorney-client communication" and "attorney work product . . . without any question." (10/4/17 Tr. 48:2-7, attached as Exhibit F.)

[5]     The PSC makes much of this passage in the letter, apparently contending that this statement was inaccurate because, in "a short period of time, J&J *more than doubled* the number of pages of documents

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 5

Also by way of example, another factor that led to the increased size and duplication of the Supplemental Production was the PSC's request that defendants produce in this litigation documents produced by defendants in asbestos personal injury actions involving Johnson's Baby Powder (the "Asbestos Track Litigation Production"). Most of these documents were already among the documents produced by defendants in this action prior to their Supplemental Production. Moreover, given the overlap of counsel in this MDL proceeding and in the asbestos actions, the contents of such documents would likely have been well known to plaintiffs' counsel prior to their formal production in the MDL.[6]

While the PSC's letter focuses largely on the number of pages and documents, it significantly overstates the production. The PSC repeatedly suggests that the productions encompassed more than 800,000 pages by asserting that the "production [has] balloon[ed] from less than 700,000 pages as of August 2017[] to well over 1,500,000 pages by December 22." (PSC Ltr. at 2; *id.* at 4 (similar figure).) Similarly, the PSC emphasizes that the latest production added "just under 200,000" documents to a collection that previously numbered "just over 110,000." (*Id.*)

These numbers obscure significant facts about the recent production in several respects:

- The PSC's starting point – "just under 200,000" – actually refers to approximately 180,000 produced documents.

- Approximately 40,000 documents – ***nearly a quarter of the post-September production*** – are non-party documents, which JJCI obtained from PTI Royston, LLC, a third-party contract manufacturer of JJCI talc products in Georgia, for purposes of making them available to plaintiffs.

- Approximately 40,000 documents are comprised of the "Asbestos Track Litigation Production" described above. All but approximately five thousand of these documents were previously produced. In addition,

---

produced to the PSC." (PSC Ltr. at 2.) But in context, the clear point of counsel's statement was that the forthcoming production would not "double the number" of documents because many of the documents it contained were duplicates of documents the PSC already had. (*See also id.* (explaining that even "an initial and cursory review" was sufficient to reveal to the PSC that the most recent productions "include documents previously produced").)

[6]      Notably, the PSC's injection of an asbestos theory of causation into the case represents a new development – a fact the PSC itself underscored at the most recent status conference in order to justify the very large number of experts it identified. (12/7/17 Tr. 8:22-9:2.) As a result of this development, defendants re-visited the list of filter terms used to screen electronic documents and expanded the scope of those terms to take into account these new allegations, which further contributed to the breadth and scope of the Supplemental Production.

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 6

plaintiffs should already be familiar with the Asbestos Track Litigation Production for the reasons discussed above.[7]

- Approximately 25,000 "documents" are placeholder pages (i.e., non-substantive documents that do not require review) that were included at the request of plaintiffs' counsel to account for nonresponsive attachments, privileged documents or documents with technical issues.

- Approximately 10,000 documents are easily identifiable duplicative attachments that are required to be produced pursuant to the ESI protocol. They can be readily de-duplicated using the data provided with the production.

The upshot is that while the PSC's letter could be read to suggest that it now has to sort old from new in a pile of 200,000 of defendants' documents, the actual number is approximately 65,000.

Moreover, while the most recent production does not identify all duplicates, it fully complies with the ESI protocol, which calls for de-duplication only with respect to electronic documents, since duplicates within that body of documents can reasonably be identified through computer software. (*See* Case Mgmt. Order No. 5, § 3.C, at 6-7, Dkt. No. 258 (May 22, 2017), attached as Ex. G.) The remaining documents are hard-copy documents rather than electronic documents, and accurate de-duplication would require significant manual efforts.

On January 5, 2018, the PSC submitted its letter, setting forth its "concerns" regarding the recent production, including that the production would somehow complicate the PSC's effort to identify possible fact witnesses by the Court's January 10, 2018 deadline. Nevertheless, on January 10, the PSC identified *29 witnesses* by name and several categories of potential 30(b)(6) witnesses connected with defendants. The PSC also listed an additional *17 witnesses* for Imerys; *five witnesses* for Personal Care Products Council; and *nine witnesses* who are not affiliated with any party – *60 witnesses in all*, not even counting potential 30(b)(6) witnesses, which are identified on behalf of all three defendant groups.

**B.     Why The PSC's Demands Should Be Rejected**

Against this backdrop – and especially because many of the supposed "burdens" identified by the PSC do not relate in any tangible way to the development of expert reports on the issue of general causation – the Court should reject the PSC's requests.

---

[7]     Nevertheless, in an effort to assist plaintiffs and in the spirit of compromise, defendants are in the process of creating a cross-reference table comparing the Asbestos Track Production to the documents previously produced to plaintiffs in this action.

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 7

*First*, the PSC's request for three more months to amend its potential list of deponents would effectively put the general causation question on ice, further delaying resolution of core scientific issues. As noted above, the Court expressed doubts that *any* fact witness deposition would be necessary to move ahead on general causation; certainly, plaintiffs do not need depositions of *29 fact witnesses* from the J&J defendants to prepare for *Daubert* hearings on that issue. (12/7/17 Tr. 18:23-19:14.) At this point, one year into the litigation, and in the stark absence of any legitimate reason why all of these people need to be deposed, the list of deponents should be stricken.

The fact that additional documents have been produced *at the request of the plaintiffs,* should not change this result. Plaintiffs do not even attempt to show how any of these documents could meaningfully alter the scientific backdrop to the general causation issue, further highlighting the illogic of their arguments.

*Second*, and for similar reasons, there is no need to adopt a schedule for "rolling depositions" at this stage. In December, the Court asked point blank: "What really is needed in the way of depositions to start getting expert reports rolling on the science?" (12/7/17 Tr. 18:23-25.) The PSC has never attempted to answer this question straightforwardly. At this point, it is clear that plaintiffs cannot make a credible showing on this issue.

*Third*, the Court should not compel defendants to undertake any further de-duplication efforts in connection with the recent production. As a threshold matter, and as detailed above, the relevant universe of potentially duplicative documents produced in the Supplemental Production is overstated.

Specifically, defendants should not be held responsible for the PTI documents, which comprise nearly a quarter of the production. In addition, the Asbestos Track Litigation Production contains another approximately 40,000 documents, and defendants are providing the PSC with a spreadsheet that identifies the approximately 35,000 of those documents that have been previously produced. Another approximately 35,000 documents are either slip sheets or are duplicate documents that can be identified with data that defendants have already produced, consistent with what the ESI protocol requires. Finally, approximately 25,000 documents in the remainder of the Supplemental Production are electronic documents that have already been subject to de-duplication pursuant to the ESI Protocol.

With respect to the remainder of the production (i.e., the approximately 40,000 hard-copy documents), there is no reason why the burden of de-duplication should fall on defendants rather that the PSC. Defendants have OCRed these documents as contemplated by the ESI protocol, but the protocol does not require defendants to de-duplicate those documents. And for good reason; accurate de-duplication of hard-copy

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 8

documents involves significant manual review, which defendants are in no better position to do than the PSC (which presumably knows better what it is looking for in any event).

Defendants discussed with their discovery vendor the possibility of conducting a manual de-duplication of hard-copy documents. The cost of such an undertaking was estimated to be between $500,000 and $1 million. This estimate reflects the fact that manual de-duplication would be a labor-intensive process that would involve additional coding, identification of potentially duplicative documents and manual review of those documents. To the extent that plaintiffs want this done, they should foot the bill.

Importantly, even without undertaking this expensive tasks, the PSC will be able to use the OCRed text provided with the hard-copy documents to substantially aid their analysis of those materials. For this reason too, plaintiffs have substantially overstated the need for undertaking a highly expensive de-duplication process.

**Fourth**, no other cost-shifting is justified either. The PSC's argument on this score largely repeats its complaint that it will now have to review documents that it likely had reviewed previously – and adds the assertion that defendants failed to "collaborat[e] with the PSC" to mitigate costs. These contentions are baseless.

As a threshold matter, the PSC cites no authority for shifting costs in this context. The fee-shifting provision in Fed. R. Civ. P. 26 permits a court, in exceptional cases, to protect *the producing party* from undue burden or expense. *See, e.g.*, *Juster Acquisition Co. v. N. Hudson Sewerage Auth.*, No. 12-3427, 2013 WL 541972, at *3 (D.N.J. Feb. 11, 2013) (attached as Ex. H); Fed. R. Civ. P. 26(c). The PSC cites no authority, and defendants are aware of none, allowing the Court to shift costs from the producing party to the requesting party merely to mitigate the expense of reviewing the documents produced.

If what the PSC means is that it should be entitled to request sanctions, that contention is equally without merit. Under Rule 37, sanctions can be imposed only for the violation of a court order, Fed. R. Civ. P. 37, which the PSC does not even attempt to allege here. And while a court has inherent authority to impose sanctions apart from Rule 37, it may do so only where there is "bad-faith conduct or willful disobedience." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991).

Nothing like that is alleged here. To the contrary, defendants have acted in good faith, repeatedly advising the PSC that prior productions were sufficient and that the re-productions the PSC was insisting on would result in substantial duplication. Notably, the PSC never objected to this possibility previously or suggested what measures could feasibly be undertaken to reduce the likelihood of duplication; instead, it repeatedly sought supplemental productions. In the interest of moving forward, and in an attempt to comply with the Court's orders regarding document production, defendants chose not to continue to press their objections and gave the PSC exactly what it asked for. Having

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 9

now received what it requested, the PSC should not be heard to complain that the production is too much, or that defendants are to blame for an alleged failure to mitigate costs.

"Cost shifting" as plaintiffs request here would be especially inappropriate because the PSC's argument ignores the fact that defendants themselves have already shouldered an incredible burden to provide supplemental productions that they have argued all along were unnecessary. Moreover, defendants have spent millions of dollars and undertaken substantial efforts to complete these productions on an accelerated timeframe. It would be grossly unfair to make defendants pay still more discovery costs based on the perverse justification that the PSC now agrees with defendants' position that the requested productions would result in duplicative discovery.

For all of these reasons, the Court should reject the PSC's requests. A schedule for expert reports and depositions leading up to a *Daubert* hearing should be established.

## II.     The Court Should Adopt Defendants' Proposed Deposition Protocol Order.

As the Court is aware, many multi-district litigation ("MDL") proceedings have adopted deposition protocol orders to promote a smoother and more efficient deposition process. *See, e.g., In re: Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, No. 3:08-cv-00008, Case Mgmt. Order No. 10 (D.N.J. May 2, 2012) (attached as Ex. I). As discussed at the last hearing before Your Honor, the parties agreed that a deposition protocol order should be adopted for this litigation as well.

To that end, defendants sent the PSC a proposed order on January 9, carefully tailored to this litigation. In response, plaintiffs plucked out of the cyber docket a random order from another MDL proceeding in another federal district) and requested that: (1) it be the starting point for any protocol; and (2) it be gutted and revised. In the interests of efficiency and fairness, defendants disagree and ask that either the January 9 version proposed by defendants be entered, or that plaintiffs forthwith provide redlined edits and specific objections to defendants' proposal so that the Court can resolve any outstanding issues at the January 22 hearing.

## III.    Plaintiffs' Request For Personnel Files And Compensation History Should Be Denied.

Plaintiffs have also raised, for the first time, a desire to obtain the personnel files and compensation history for all of the Company witnesses. This request should be soundly rejected because it is exceedingly overbroad and an invasion of privacy, as other courts have recognized in rejecting similar efforts (including efforts by the very same law firms as in this case). *See, e.g., In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 313 F.R.D. 32, 36, 38 (E.D. La. 2016) (denying across-the-board request for all "Xarelto-related" performance reviews and self-reviews of each corporate witness to be

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 10

deposed; a party seeking personnel records must demonstrate a "high degree of relevance and particularity . . . on a witness-by-witness basis").

A party seeking to discover personnel files must make an "individualized showing of relevancy, proportionality, and particularity." *Id.* at 32. This is so because an employee's personnel file typically contains "vast amounts of personal data," including "evaluations of his work performance." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 377 (1976); *see also Prof'l Recovery Servs., Inc. v. Gen. Elec. Capital Corp.*, 2009 WL 137326, at *4 (D.N.J. Jan. 15, 2009) (explaining that "special care must be taken before personnel files are turned over to an adverse party") (attached as Ex. J); *Closterman v. Liberty Mut. Ins. Co.*, 1995 WL 472105, at *1 (E.D. Pa. Aug. 9, 1995) ("There exists a strong public policy against the disclosure of personnel files.") (attached as Ex. K); *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 580 (E.D. Pa. 1989) (same), *aff'd, In re Sunrise Sec. Litig.*, 109 B.R. 658 (E.D. Pa. 1990) (granting the motion to clarify but denying the motion for reconsideration).[8]

Consistent with the strong policy against disclosure of personal data, a long line of courts have rejected requests for blanket discovery of personnel files. *See, e.g., In re: Invokana (Canagliflozin) Prods. Liab. Litig.*, No. 16-md-2750, slip op. at 1-2 (D.N.J. Nov. 9. 2017) (denying motion to compel personnel files for all company witnesses to the extent plaintiffs' "request seeks critiques of a witness's job performance," and requiring a "particularized witness-by-witness showing") (attached as Ex. M); *In re: Benicar (Olmesartan) Prods. Liab. Litig.*, No. 15-md-2606, slip op. at 1 (D.N.J. Jan. 29, 2016) (confirming that "the personnel files of Daiichi deponents are not required to be automatically produced") (attached as Ex. N); *In re: Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, No. 12-md-02342, slip op. at 2–3, 11–12 (E.D. Pa. Feb. 18, 2015) (denying motion to compel production of personnel files for every corporate employee to be deposed, and explaining that discoverability of personnel files "require[s] an individualized review of the circumstances related to the particular employees or ex-employees and of the issues to which the facts of their employment relate") (attached as Ex. O); *In re Sunrise Sec. Litig.*, 130 F.R.D. at 580 (denying motion to compel where plaintiff failed to "make specific allegations or some initial showing, based on deposition testimony or other evidence," that personnel files were sufficiently relevant); *see also Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2012 WL 1299379, at *9 (D.N.J. Apr. 16, 2012) (party must "articulate a particularized need" for discovery of custodial files "on a case-by-case basis") (attached as Ex. P).

---

[8]       *See also, e.g., Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1010 (7th Cir. 2009) ("[C]ourts have broad discretion to limit a request for the discovery of personnel files . . . ."); *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008) (affirming district court's denial of motion to compel production of personnel files); *Williams v. Roy O. Martin Lumber*, 51 F. App'x 483, at *6 (5th Cir. Sept. 30, 2002) (unpublished) (explaining that defendant "understandably wanted to protect its employees' privacy rights") (attached as Ex. L).

DrinkerBiddle&Reath
L L P

Hon. Joel A. Pisano (Ret.)
Page 11

      Plaintiffs' across-the-board request for a broad category of information from *every* corporate witness's personnel file should be rejected under these precedents because they have failed to make any individualized showing as to why any particular piece of information is needed from any individual witness's file. Judge Goodman's ruling in the *Invokana* MDL proceeding is instructive. There, plaintiffs originally sought the personnel files of deposition witnesses, including compensation data. After the plaintiffs narrowed their request to performance evaluations and self-evaluations contained in the witnesses' personnel files, the court found a "reasoned middle ground." *See In re: Invokana*, slip op. at 1. Specifically, the court held that "disclosing evaluations or assessments of [a] witness's performance, whether prepared by the witness or by the employer," would ***not*** be allowed absent a "particularized, witness-by-witness showing." *Id.* at 1-2. Accordingly, "[t]o the extent that Plaintiffs' request seeks critiques of a witness's job performance, that request is denied without prejudice to a renewed application upon a particularized, witness-by-witness showing." *Id.* at 2. The court did require production of "[p]ortions of a witness's personnel file that disclose the witness's goals, objectives, and responsibilities related to Invokana . . . without disclosing evaluations or assessments of that witness's performance," and instructed the parties "to meet and confer to achieve that production." *Id.*

      In short, a broad, "one-size-fits-all discovery request for" personnel files of deposition witness "is insufficient." *In re: Xarelto*, 313 F.R.D. at 38. Accordingly, plaintiffs' requests for personnel files and compensation history of the Company's current and former employees should be denied.[9]

      Thank you for your consideration of these matters.

                        Respectfully,

                        *s/Susan M. Sharko*

                        Susan M. Sharko

Enclosures
cc:    Hon. Freda L. Wolfson, U.S.D.J. (via Electronic Mail)
       Hon. Lois H. Goodman, U.S.M.J. (via Electronic Mail)
       Leigh O'Dell, Esq. (via Electronic Mail)
       Michelle Parfitt, Esq. (via Electronic Mail)
       Christopher Placitella, Esq. (via Electronic Mail)
       Lorna Dotro, Esq. (via Electronic Mail)
       Thomas Locke, Esq. (via Electronic Mail)

---

[9]    To the extent a former employee who is to be deposed is being compensated for his/her time, defendants will disclose that voluntarily.