# EXHIBIT D



**Montgomery**
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

**Atlanta**
4200 Northside Parkway
Building One, Suite 100
Atlanta, GA 30327

(800) 898-2034

BeasleyAllen.com

**P. Leigh O'Dell**
leigh.odell@beasleyallen.com

January 5, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

   Re: *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
      MDL No. 2738

Dear Judge Pisano:

  In anticipation of the Special Discovery Master Conference scheduled for January 22, 2018, and the discovery disclosure obligations imposed on the PSC by the Court at the December 7, 2017 Status Conference, the PSC writes to raise its concerns with J&J document productions recently made and the impact of those productions on the PSC's pending obligations.

  Specifically, J&J has, in the last three (3) months, produced documents that **more than double** the volume of documents that it had previously produced and previously had been characterized to both the PSC and the Court as being a "substantially complete" production. J&J's recent productions include primarily *new* documents that had never been produced to the PSC. J&J's rolling productions over the past 90-day period culminated in large productions received on December 20 and 22, 2017 – just prior to the Christmas Holiday weekend – consisting of more than four hundred thousand pages. J&J's 11th hour attempt to cure its year-long production failures has placed the PSC in an untenable position: To comply with the Court's Order that the PSC provide, by January 10, 2018 an initial list of witnesses it expects to depose, the PSC must review, *in a matter of weeks* what it has taken J&J a year to review and produce.

  J&J's recent document productions present four (4) issues that the PSC addresses, and which warrant granting the PSC some relief.  <u>First</u>, because of the volume, the lateness and the prior false representations that prior document productions were substantially complete, the PSC requests that the Special Master recommend that the PSC be allowed to supplement its January 10th anticipated list of deponents on or before April 30, 2018, in light of the volume of newly produced material that it must now review.  <u>Second</u>, the PSC desires that a discovery schedule be entered that will provide for rolling depositions, that will fairly permit the PSC to have adequate time to review the volume of documents recently produced so that the PSC will not be prejudiced

by being required to take depositions prior to having a fair opportunity to identify all documents relating to the deponent.  <u>Third</u>, since the J&J Defendants are in control of their own document productions, the PSC believes it proper to compel the J&J Defendants to identify which, if any, of the recently produced documents were previously produced by J&J.  Upon an initial and cursory review of the recently produced documents, the PSC has determined that J&J's most recent productions include documents previously produced, but with new Bates numbers; Defendants clearly did not attempt to de-duplicate the new productions.  <u>Fourth, and finally,</u> the PSC requests that the issue of cost-shifting be considered given the record on this issue.

## I.     FACTUAL BACKGROUND

**1.     The J&J Defendants Have *Doubled* Their Production Of Documents in the Past 90 Days**

For over a year, the J&J Defendants and the PSC have disagreed over the adequacy of J&J's MDL document production.  From the outset, J&J has insisted that providing its pre-MDL state court document production to the PSC would be both sufficient and adequate in this MDL, arguing that any additional requests in the MDL would be burdensome, dilatory and disproportionate to the needs of this case.  On the other hand, the PSC has been equally persistent in its claim that J&J's "off-the-shelf" state court production was wholly inadequate to the needs of this MDL, arguing that its own investigation strongly suggested that there were significant records which had not been produced.  Both sides have claimed that the other's position was an impediment to litigating the issues in this case, including general causation and liability.

Justifiably, the Court has repeatedly expressed its own frustration with the parties' inability to resolve the most basic of questions related to document production.  After months of dispute, and after the Court appointed a Special Discovery Master, the Court definitively addressed the J&J document discovery issue at the September 6, 2017 status conference.  At that conference, the Court ordered that J&J's document discovery on "general subject matters" be completed within 60 days. <u>See</u> Sept. 6, 2017 Hear. Tr. at pp. 4-5, 10 & 38.  This document discovery deadline was memorialized in CMO 9 and required J&J to "complete document production" by November 6. <u>See</u> CMO 9 (Doc. No. 673).

The entry of CMO 9 and the subsequent initial conference with the Special Discovery Master on October 4, 2017 had its desired effect.  It precipitated a flurry of J&J document productions that should have been produced a year ago.  In a short period of time, J&J ***more than doubled*** the number of pages of documents produced to the PSC. Indeed, the burden of re-collecting and re-reviewing and producing documents in accordance with CMO 9 deadlines was so significant that J&J was prompted to seek an emergency 45-day extension of time to produce its documents. <u>See</u> Amended CMO 9 (Doc. No. 2050); <u>see also</u> letter from S. Sharko, Esq. to Hon. F. Wolfson, Nov. 3, 2017 (Exhibit 1).

The PSC's challenges to the adequacy of J&J's "substantially complete" production has resulted in the production ballooning from less than 700,000 pages as of August 2017, to well over 1,500,000 pages by December 22, 2017.  J&J's post-September productions include approximately 249,000 pages produced in October and 400,000 pages produced in December 2017 alone, approximately 300,000 of which were produced just days before Christmas.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 3 of 9

The below chart outlines the history of J&J's document production in this MDL following its initial importation of its state court production of approximately 500,000 pages in April 2017. Not only does this chart illustrate how inadequate J&J's initial April 2017 state court production was to begin with, but it highlights the subsequent wave of J&J's unique post-CMO 9 MDL productions culminating with a crescendo of documents dumped on the PSC just before Christmas. Further, this chart illustrates the corresponding pressures now placed on the PSC because of that late production. Obviously, the PSC will now need to review and analyze this avalanche of materials while simultaneously having to identify deponents and preparing for and conducting depositions:[1]



With apparent awareness that its post-September 2017 MDL document production would be significant and new, J&J repeatedly attempted to belittle the importance of such productions to both the Special Master and the Court.

In October, for example, J&J casually suggested to the Special Master that any CMO 9 supplemental productions were, in fact, much ado about nothing. They were, in J&J's view, "clean-up" productions that would determine whether there was "anything else" beyond that which had already been produced which should be produced:

> MS. SHARKO: We've produced the documents. To try and put an end to this, we're now going back and pulling everything again and seeing if there's anything else in warehouse anywhere that relates to talc that is potentially relevant, and we're putting it in line for production and so.
>
> JUDGE PISANO: When?

---

[1] These pressures do not even account for the review of Imerys documents which are due to be produced to the PSC on January 5, 2018 pursuant to amended CMO 9.

> MS. SHARKO: The deadline that Judge Wolfson gave us is I want to say the end of November. It might take a little longer than that.
>
> JUDGE PISANO: So by that time period you will represent that they have the entire universe of documents that was produced from all of these people in Skillman, New Jersey in 1998?
>
> MS. SHARKO: *And more. We believe they have those documents now, but we're going back, and whether it's end of November...*

See Oct. 6, 2017 Conf. Tr. at pp. 36–37 (emphasis added).

This was reiterated by J&J when it sought to modify CMO 9 when it stated that "*in order to put an end to unnecessary discovery issues, defendants have decided to re-collect a number of previously collected document sources and produce responsive documents identified.*" See Exhibit 1. J&J's nonchalant description of its post-September 2017 document productions as nothing more than a "clean-up" productions was reiterated at the December 7, 2017 Status Conference:

> Ms. SHARKO: What we did, and we've been over this a number of times with the plaintiff, is a number of complaints *we just redid the production. Are there new document in there? Yes, but not double the number*."

Dec. 7, 2017 Hear. Tr. at 17 (emphasis added).

J&J's repeated assurance that it was simply doing a quality control exercise to satisfy the PSC's "unnecessary discovery issues" was misleading. Whether measured in pages or documents produced, the post-September 2017 productions are both quantitatively substantial and qualitatively important. The number of *pages* produced went from under 700,000 to over 1,500,000 while the number of *documents* went from just over 110,000 to just under 200,000 since September 2017.

The PSC's review, which was conducted between Christmas and New Year's Day, reveals three (3) troubling conclusions that, as set forth below, directly impacts the PSC's ability to fulfill its discovery responsibilities.

- The documents produced since September are primarily new documents that have not been produced before.

- To the extent that J&J has produced duplicative documents in its recent productions, which Defendants acknowledge has occurred, Defendants assigned these documents wholly different Bates numbers, rendering it impossible for the PSC to avoid a manual re-review and re-analysis of these previously reviewed documents.

- The number of pages of documents produced by J&J Defendants in the 90 days since the entry of CMO 9 has more than doubled.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 5 of 9

**2.      The Impact of J&J's Last-Minute Document Production on the PSC's Discovery and Anticipated Expert Obligations Is Significant**

At the December 7th Status Conference, in anticipation of J&J's final document production, the Court ordered that the PSC produce a preliminary list of potential J&J deponents by January 10, 2018. It is fair to say, however, in light of Defendants' repeated representations, that neither the Court nor the PSC anticipated that more than 400,000 pages of new documents would be produced on December 20 and 22.

While the PSC intends to comply with the Court's Order, its ability to do so has been significantly undercut by the avalanche of previously undisclosed documents, documents which should have been produced a year ago. Needless to say, it is impossible for the PSC to review in several weeks and over a holiday that which took J&J a year to review, produce, and then dump on the PSC, only days before the January 10, 2018 deponent disclosure deadline.

Apart from the sheer volume of documents produced, the manner in which the documents were produced has rendered the PSC's prior work product frustratingly irrelevant. As the PSC has begun to hurriedly review the recently produced documents, it has become apparent that the productions are a composite of new documents that have never before been produced, as well as previously produced documents that are now identified by new Bates numbers.

To the extent J&J has produced duplicative documents, the volume of which remains unclear, Defendants have assigned **new Bates numbers thereby eliminating the ability to identify or segregate them in order to avoid re-review**. To cure this, the PSC requested a "key" i.e., some index that would cross reference the different Bates numbers being used for the same document, that would lessen the burden on the PSC in reviewing duplicate documents. J&J indicated it would be too burdensome to provide such a key, a position which is wholly unreasonable. See email from P. Oot, Esq. to C. Tisi, Dec. 22, 2017 (Exhibit 2).

Finally, and even more troubling to the tasks at hand, the PSC has relied on J&J's prior assertions with respect to document production to identify potential deponents. That reliance has now been significantly undermined. To illustrate, in June 2017 the PSC requested the depositions of an initial group of four (4) J&J witnesses: Charles Wajsczuk, Homer Swei, Nancy Musco and Timothy McCarthy.

One of the primary reasons for choosing these four (4) J&J witnesses, witnesses who the PSC still desires to depose, was J&J's prior representation that all relevant and discoverable documents relating to these witnesses had been produced for the PSC to review. The PSC relied on J&J's representations about the completeness of the document productions relating to these witnesses. This reliance turned out to have been significantly misplaced. Thus, while the PSC still desires to depose these witnesses, the PSC requires additional time to fully review the newly produced documents relating to these witnesses prior to being required to proceed with the depositions. As illustrated by the chart below, for these four exemplar witnesses, each had a significant number of additional relevant documents produced just before Christmas:

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 6 of 9



## II.  ARGUMENT

**1. THE PSC REQUESTS THAT THE COURT ALLOW THE PSC TO SUPPLEMENT ITS JANUARY 10TH DEPOSITION DISCLOSURE LIST ON OR BEFORE APRIL 30, 2018**

At the December 7 Status Conference, the Court directed the PSC to produce a tentative list of potential deponents by January 10, 2018. In so doing, the Court acknowledged that the list could be amended. See Dec. 7, 2017 Hear. Tr. at p. 26. However, the Court's assumption that there could be "two more" added to that list was clearly premised on J&J's representation that its productions were substantially complete, that any further productions would only be a minor "clean-up" and that since nothing significantly new would be produced, the PSC should be able to identify most of the witnesses they would depose. As demonstrated above, the premises upon which both the Court and the PSC relied in discussing the PSC's obligation to identify witnesses by January 10, 2018 was not accurate.

Given the volume of documents that J&J produced in the last three (3) months, the PSC asks that the Special Master recommend that the PSC be allowed to supplement its January 10th anticipated deposition list on or before April 30, 2018.

**2. THE PSC REQUESTS THAT THE SPECIAL MASTER RECOMMEND A DISCOVERY SCHEDULE THAT ALLOWS THE PSC TO REVIEW THE DOCUMENTS THAT J&J HAS PRODUCED PRIOR TO THE COMMENCEMENT OF DEPOSITIONS**

As described above J&J sought a significant extension of the CMO 9 deadline to accommodate its production of documents. The PSC did not oppose J&J's extension request but

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 7 of 9

requested that the extension of time be considered in connection with an overall schedule so that the PSC would have adequate time to review and assimilate the new productions. In a letter to the Court dated November 3, 2017, the PSC stressed that:

> Extensions of this magnitude without the provision of sufficient time for Plaintiffs to review the documents produced, to take depositions, and to provide the resulting evidence to their experts for consideration would result in undue prejudice to Plaintiffs.

See Letter from L. O'Dell to Hon. F. Wolfson, Nov. 3, 2017 (Exhibit 3).

While the Court directed the PSC to provide its witness list, it did not address deadlines for discovery that would follow that disclosure. The PSC requests that the Special Master assist the parties in developing discovery schedule that would provide adequate time for the PSC to review the documents produced prior to the commencement of depositions.

**3.   THE PSC REQUESTS THAT J&J PROVIDE THE PSC WITH A KEY THAT WOULD ALLOW THE PSC TO IDENTIFY DUPLICATE DOCUMENTS IN THE PRODUCTION**

Immediately upon receipt of J&J's more than 400,000 page production on December 20th and 22nd, the PSC wrote to J&J to request that duplicate documents be identified or at least, that J&J provide a "key" identifying a document by both its "old" bates number and "new" bates number. Without a key of this type, the PSC's work reviewing previously produced documents would be rendered useless. See Exhibit 2.

J&J responded to the PSC's request on Friday December 22nd. *Id.* In that response, J&J conceded that there were not only duplicate documents to those previously produced but also that the duplicate documents have "new bates numbers." J&J claims that it would be too burdensome to have produced the documents without duplicates, but J&J also has not provided a key to enable cross-referencing the various bates numbers assigned to the same document.

In the context of modernized document production, J&J's claim of burden is plainly unreasonable. The documents in question are J&J's documents, originating from J&J employees' files. J&J is well aware of the documents that were previously produced and well aware of the documents it recently produced. J&J certainly logged each document it produced into its own database.

A production methodology that re-produces documents previously produced with different bates numbers is unjustifiable, and the problem has been compounded by J&J's refusal to provide a key or index to permit cross-referencing by the PSC. Because of the manner in which these documents were produced, an undue burden has been placed upon the PSC. Without relief, the PSC will be required to re-review documents because of the PSC's inability to quickly identify duplicates through the use of a key or index. Moreover, without relief, the PSC will be required to re-review documents in a fraction of the time J&J had to review and produce them. These problems would not have occurred had J&J taken its MDL document production in this MDL seriously as opposed to insisting that its "off the shelf" state court production be imported into this MDL.

The PSC respectfully requests that J&J be directed to either de-duplicate its recent productions or to provide a "key" that would allow the PSC to de-duplicate the production. Anything less would result in the PSC spending extraordinary amounts of time and resources re-reviewing documents that have previously been produced. The PSC should not be required to bear the burden of J&J's inadequate productions.

4.   **THE PSC REQUESTS THAT IT BE PERMITTED TO PRESENT A PETITION FOR COST-SHIFTING FOR THE EXTRAORDINARY WASTE CAUSED BY J&J'S DUPLICATIVE PRODUCTION**

Cost shifting in the course of first-party discovery is an extraordinary remedy. It is justified only when there has been manifest unreasonableness in a party's discovery conduct that visits unfair prejudice upon its adversary. By reproducing, at the eleventh hour, an enormous and randomized mix of old documents and new documents, with no way for the PSC to parse out the old from the new, J&J has visited extraordinary waste upon the PSC's resources.

Most of the hundreds and hundreds of hours the PSC has spent reviewing and analyzing J&J's document production must now be repeated. This extraordinary waste imposed upon the PSC is even more egregious in light of the fact that the PSC stridently opposed J&J's approach to simply recycle prior state-court productions with the hope they would prove adequate for the MDL.

As is now evident from the record, J&J's assessment was recklessly misplaced. Instead of acknowledging its miscalculation, and collaborating with the PSC to mitigate the miscalculation, it simply (and indifferently) reproduced most of its prior production with the new documents mixed in. New Bates numbers were then assigned to the production that should have occurred at the outset.

Most significantly, J&J did not preserve any way to cross-reference the Bates numbers of the previously produced documents with the new Bates numbers of the same documents produced a second time. If J&J had preserved that information, the PSC could efficiently re-associate all of their prior work product to the same documents in the second production. These two grievous miscalculations by J&J – first, that a prior state court production would be suitable for this MDL, and second, failing to preserve the identity of previously produced documents – were both entirely foreseeable.

It would be manifestly unfair for the economic burden of J&J's miscalculations to be visited entirely upon the Plaintiffs, and the Court has the inherent authority to provide a remedy. The extent of gratuitous waste imposed upon the PSC cannot yet be fully measured. Upon the completion of such an assessment, the PSC will seek leave of Court to submit a motion for equitable cost-shifting.

Thank you for your consideration of these matters.

Very truly yours,

*/s/ P. Leigh O'Dell*

P. Leigh O'Dell
Michelle A. Parfitt

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 9 of 9

cc:	Honorable Freda L. Wolfson, U.S.D.J.
	Honorable Lois H. Goodman, U.S.M.J.
	Susan Sharko, Esq. (via e-mail)
	Julie Tersigni, Esq. (via e-mail)
	Patrick L. Oot, Esq. (via e-mail)
	Lorna Dotro, Esq. (via e-mail)
	Mark Silver, Esq. (via e-mail)
	Nancy Erfle, Esq. (via e-mail)
	Tom Locke, Esq. (via e-mail)
	Sheryl Axelrod, Esq. (via e-mail)
	Chris Placitella, Esq. (via e-mail)
	Warren Burns, Esq. (via e-mail)
	Richard Golomb, Esq. (via e-mail)
	Richard Meadow, Esq. (via e-mail)
	Hunter Shkolnik, Esq. (via e-mail)
	Christopher V. Tisi, Esq. (via e-mail)
	Larry Berman, Esq. (via e-mail)
	Dan Lapinski, Esq. (via e-mail)

**ASHCRAFT & GEREL, LLP**

January 15, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

>   Re:   *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
>         MDL No. 2738

Dear Judge Pisano:

The Court has requested that the parties individually prepare a letter memorandum discussing the status of discovery and disputed matters. There are three (3) issues the PSC desires to raise before the Court that we believe should be on the Agenda for the upcoming meeting scheduled on January 22, 2018.

I.  **DISCOVERY SCHEDULE**: The matters contained in the PSC letter to your honor dated January 5, 2018 including a discovery schedule that addresses the recent document production by J&J and Imerys. (See Exhibit 1, PSC Letter to Hon. J. Pisano, Jan. 5, 2018). As indicated in that letter, the PSC was required to provide a list of proposed deponents on January 10, 2018, which the PSC timely provided. (See copy attached as Exhibit 2).

II. **DEPOSITION PROTOCOL**: J&J recently provided the PSC with a proposed deposition protocol that J&J seeks to apply to both fact and expert witnesses. The PSC has reviewed J&J's proposal and believes that a better approach for discovery is the approach taken by Chief Judge Lawrence Stengel in *In Re Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2436, Order, October 3, 2013 (See copy attached as Exhibit 3) with modifications that fit the needs of this case. The entry of an order similar to the one entered in Tylenol has the benefit of having been already reviewed by a distinguished Judge in the Third Circuit and the added benefit of involving J&J and one of its subsidiaries. We note that the Tylenol Order applies to fact witnesses only, as a supplemental order was entered in that case to address expert witnesses when that issue became ripe. In this Talc case, the PSC believes it is premature to address a deposition protocol for expert witnesses at this time in light of the status of discovery and expert disclosures.

# ASHCRAFT & GEREL, LLP

January 15, 2018
Page 2 of 4

The PSC also would suggest certain other modifications to the Tylenol Order as follows:

- First, in Tylenol, Judge Stengel entered a supplemental Order that required J&J to produce current or former corporate employees' personnel files and compensation history information. The PSC suggests that the Order to be entered in Talc include such a requirement as part of a composite order in lieu of the need to enter a separate order on this issue as occurred in Tylenol. The supplemental order entered by Judge Stengel is attached hereto. (See copy attached as Exhibit 4);

- Second, the PSC desires to make clear that were the Tylenol Order to be entered here, that the PSC has interpreted Section 4 (b) of the Tylenol Order to apply only to corporate representatives' depositions *noted pursuant to Rule 30(B)(6)* and that Section 4(b) does not impose an overall limit on the number of corporate depositions that the PSC may take in the case. The PSC believes this is already clear in the Tylenol Order because it contains a qualifier that Section 4(b) pertains to depositions "pursuant to Fed. R. Civ. P. 30(B)(6)" and because Section 4(a) of the Tylenol Order does not contain a limitation on depositions other than for the PSC in that case to act in good faith. Nevertheless, to avoid ambiguity and an issue at a later date, the PSC believes that were the Court to adopt the language in the Tylenol Order, that it be made clear that Section 4 (b) does not create an overall limitation on the number of depositions that the PSC will be permitted to take. Indeed, some of the counsel in this Talc case were also counsel in Tylenol, and they can represent to your Honor that in Tylenol the parties were not limited in the number of corporate witnesses they could depose except that "the PSC shall in good faith take only those depositions of defendants and their current employees deemed necessary under the circumstances of this case." See Section 4(a) of the Tylenol Order.

- Third, the PSC believes that a provision similar to Section 4(c) of the Tylenol Order need not be included at this time, since the Talc Court has not yet permitted case specific discovery.

- Fourth, in light of the size of this MDL and the fact that numerous state court litigations are pending (as compared to Tylenol, where the MDL consisted of only about 250 cases and there was only one coordinated state court litigation, in Atlantic County, New Jersey) that Section 11 of the Tylenol Order be amended to recognize that some depositions may exceed 7 hours because of the witness' involvement in this case over decades. In fact, in Tylenol, several corporate witnesses were deposed over several days because the product at issue has been on the market for many decades, thereby involving decades of information to discover that could not be discovered in some instances in only

**ASHCRAFT & GEREL, LLP**

January 15, 2018
Page 3 of 4

> 7 hours of deposition time. The same can be said here for the Talc case, which similarly spans decades on the market. The PSC will proceed in good faith but should not be subject to an artificial limitation on the amount of time they shall have to take a deposition.
>
> - Fifth, to the extent a defendant expects to conduct a "preservation" deposition of a current or former employee, that in addition to the requirements set forth in the Tylenol Order, that the PSC be afforded at least thirty (30) days' notice of the intent to take a preservation deposition, that the PSC be afforded an opportunity to take a discovery deposition prior to the preservation deposition, and that the PSC shall have equal time to do a cross examination of the witness in the preservation deposition.
>
> - Sixth, that the time spent on cross-noticed state court depositions not be "charged" against the MDL.  In this regard, again, considering the size of this MDL and the number of state court litigations pending, the PSC believes it is appropriate that it not be limited in the amount of time that it may have for deposing a witness because of coordination with state court litigants. The PSC intends to fully coordinate with state court litigants but not to the detriment of MDL litigants and the PSC's duties.
>
> The PSC makes a few other observations about the contents of the Tylenol Order that they believe should apply in this case as well:
>
> - First, the PSC notes that the Tylenol Order provides for the certification of the production of custodial files prior to the taking of a deposition with adequate time to review before the deposition commences. <u>See</u>, Sec. 16 of Tylenol Order. The PSC requires that for all deponents personnel files and relevant documents be produced with adequate time before the depositions;
>
> - Second, as noted above, the PSC fully intends to coordinate with state court litigants, but the PSC must be afforded adequate time for the PSC to conduct its examination which may involve multi-day depositions for legacy witnesses and witnesses whose involvement with the issues spans decades of time; and
>
> - Third, authenticity and foundational objections to exhibits must be addressed.
>
> The PSC will be prepared to discuss as the conference other contents of the Tylenol Order to be included in the deposition protocol order for this case.
>
> III. **PRIVILEGE ISSUES**:  The PSC anticipates providing defendants with their objections to the privilege logs.  We would also like to discuss with the Court the process for addressing privilege issues.

**Ashcraft & Gerel, LLP**

January 15, 2018
Page 4 of 4

    IV.    **Samples Protocol:**  The parties have had met and conferred on a protocol to address the chain of custody and division of various samples.  The parties expect to present an agreed upon protocol to Judge Wolfson before the next status conference.

Very truly yours,

/s/ Michelle A. Parfitt

Michelle A. Parfitt, Esq.
P. Leigh O'Dell, Esq.

cc:    Susan Sharko, Esq. (via e-mail)
        Julie Tersigni, Esq. (via e-mail)
        Kat Frazier, Esq. (via e-mail)
        Patrick Oot, Esq. (via e-mail)
        Lorna Dotro, Esq. (via e-mail)
        Mark Silver, Esq. (via e-mail)
        Tom Locke, Esq. (via e-mail)
        Sheryl Axelrod, Esq. (via e-mail)
        Warren Burns, Esq. (via e-mail)
        Richard Golomb, Esq. (via e-mail)
        Richard Meadow, Esq. (via e-mail)
        Hunter Shkolnik, Esq. (via e-mail)
        Chris Placitella, Esq. (via e-mail)
        Larry Berman, Esq. (via e-mail)
        Dan Lapinski, Esq. (via e-mail)
        Chris Tisi, Esq. (via e-mail)

# ASHCRAFT & GEREL, LLP

ATTORNEYS AND COUNSELLORS AT LAW

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VIRGINIA 22311
(703) 931-5500
FAX (703) 820-0630

**DISTRICT OF COLUMBIA**
ALLEN J. LOWE
CHRISTOPHER V. TISI
JERRY D. SPITZ
BENJAMIN E. DOUGLAS
DREW B. LaFRAMBOISE
JILLIAN M. PETRELLA
ADAM K. ROSEN
AVERY M. ADCOCK

**MARYLAND**
ROBERT G. SAMET
DAVID M. LAYTON
ROBERT A. FLACK
ALAN J. MENSH
NATHAN M. PEAK
STEPHEN M. GENSEMER
PATRICK K. LYONS
JENNIFER L. HUISMAN
DENISE J. GOTTRON

**SENIOR COUNSEL**
L. PALMER FORET

*ONLY ADMITTED IN NY

ROCKVILLE, MD 20852
SUITE 1002
11300 ROCKVILLE PIKE
(301) 770-3737

LANDOVER, MD 20785
SUITE 301
4301 GARDEN CITY DRIVE
(301) 459-8400

WASHINGTON, DC 20006
SUITE 700
1825 K STREET, N.W.
(202) 783-6400

BALTIMORE, MD 21202
SUITE 1212
10 EAST BALTIMORE STREET
(410) 539-1122

**VIRGINIA**
LAWRENCE J. PASCAL
JAMES F. GREEN
MICHELLE A. PARFITT
CRAIG A. BROWN
DAVID L. BAYNE, JR.
JOSEPH T. MUSSO
SARA E. ANDERSON
GERTRUDE N. KAMTCHOUM*

**OF COUNSEL**
WAYNE M. MANSULLA
WILLIAM F. MULRONEY

LEE C. ASHCRAFT
1908-1993

MARTIN E. GEREL
1918-2011

January 19, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

> Re:   *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
> MDL No. 2738

Dear Judge Pisano:

The PSC files this brief response to the various submissions filed by the defendants on Monday January 15, 2018. While the PSC will be prepared to respond more fully to the issues raised by defendants at the conference, the PSC wants to identify--and briefly address--four broad complaints that can be distilled from defendants' submissions:

1. **SCOPE OF DISCOVERY**: Defendants continue to insist that the scope of discovery is narrow and exclusively focused on "general causation." Not so. While the Court is clearly interested in discovery on the general causation question, and will discuss expert disclosures relating to these issues at the next status conference, it *also* recognized that the scope of discovery is to be much broader than "general causation" stating that the "only thing we're really not doing right now is specific causation issues." See September 6, 2017 Hearing Transcript at p. 5. Rather than attempt to characterize the Court's views on this matter any further, the PSC attaches the Court's comments on this topic contained on pages 1-14 of the September 6, 2017 status conference. [Attached as Exhibit 1]. They are quite clear.

2. **NUMBER OF POTENTIAL DEPONENTS IDENTIFIED**: Defendants further complain that the PSC has named an extraordinary, excessive and unprecedented number of potential deponents in this MDL in its January 10 disclosure. [Attached as Exhibit 2].

January 19, 2018
Page 2 of 3

> Exclusive of 30(b)(6) witnesses, the PSC has identified 29 J&J witnesses, 16 Imerys witnesses, 5 PCPC witnesses and 9 non-parties that it may wish to depose based on its document review to date. As the PSC points out in the chart on page 3, paragraph 3 of its January 10 disclosure, the PSC's proposed list is less than and certainly consistent with MDL's of this type which typically exceed the number of depositions identified here. Indeed, the numbers requested by the PSC here is less than in those cases since many of those cases involved fewer defendants than the 3 that are defendants here.

3. **TIMING OF DEPOSITIONS**: The PSC has been further accused of delay in starting depositions. This, too, is not true. As set forth more fully in the PSC's January 5 letter, the J&J defendants alone "dumped" 750,000 pages of documents on the PSC in the last couple months of 2017. See Letter to Hon. Joel Pisano, January 5, 2018. J&J made that massive production despite repeated representations that its prior state productions were both complete and sufficient. J&J's recent production would not have been made at all had the PSC not insisted that the prior productions were incomplete and insufficient—a claim that has now proven to be accurate. Given the J&J defendants' massive document production *which took a year to make*, the PSC should not be required to immediately begin depositions of J&J witnesses and instead should be afforded an opportunity to review the massive, recent document dump from J&J before being required to commence depositions of J&J witnesses.

   With respect to Imerys, however, its final production of January 5, 2018 was comparatively modest (about 75,000 pages). Therefore, the PSC can begin to take Imerys fact depositions in the immediate future. The PSC proposes that these start with the four (4) witnesses the PSC requested to depose last June (McCarthy, Pier, Turner and Ferret).

4. **DEPOSITION PROTCOL**: Defendants further complain that the PSC has refused to adopt or comment on their proposed deposition protocol. Defendants' proposal is quite restrictive and goes beyond the discovery depositions currently contemplated. And, its contents were not discussed in a meet and confer meeting with any PSC representative. In response, the PSC proposed a "clean" protocol modeled on one that was actually entered in this Circuit by Chief Judge Stengel in the Eastern District of Pennsylvania in *In Re Tylenol* with limited edits that apply to this MDL. The PSC provided this to the defendants in a word format for their consideration. [Attached as Exhibit 3]. The parties will meet and confer about the respective proposals. The PSC will be prepared to discuss the drafts to the extent the Court wishes to discuss a deposition protocol.

   Again, the PSC will be prepared to discuss all issues on Monday.

   Best regards,

   Michelle A. Parfitt, Esq.
   P. Leigh O'Dell, Esq

January 19, 2018
Page 3 of 3

cc:    Hon. Freda L. Wolfson, U.S.D.J. (via e-mail)
       Hon. Lois H. Goodman, U.S.M.J. (via e-mail)
       Susan Sharko, Esq. (via e-mail)
       Julie Tersigni, Esq. (via e-mail)
       Lorna Dotro, Esq. (via e-mail)
       Mark Silver, Esq. (via e-mail)
       Tom Locke, Esq. (via e-mail)
       Sheryl Axelrod, Esq. (via e-mail)
       Warren Burns, Esq. (via e-mail)
       Richard Golomb, Esq. (via e-mail)
       Richard Meadow, Esq. (via e-mail)
       Hunter Shkolnik, Esq. (via e-mail)
       Chris Placitella, Esq. (via e-mail)
       Larry Berman, Esq. (via e-mail)
       Dan Lapinski, Esq. (via e-mail)
       Chris Tisi, Esq. (via e-mail)



Montgomery
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

Atlanta
4200 Northside Parkway
Building One, Suite 100
Atlanta, GA 30327

(800) 898-2034

BeasleyAllen.com

**P. Leigh O'Dell**
leigh.odell@beasleyallen.com

January 30, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

    Re:    ***In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation***
           **MDL No. 2738**

Dear Judge Pisano:

    Ms. Sharko's letter of January 23, 2018 offering **one** 30(b)(6) deposition to address all of PSC's needs for deposition testimony is unhelpful and an example of the Johnson & Johnson Defendants' effort to thwart and obfuscate the need for relevant discovery in this case.

    As outlined in detail in the PSC's letter of January 5, 2018, the Johnson & Johnson Defendants have produced more than 800,000 pages since the September 7, 2017 status conference, more than 400,000 pages on December 20 and 21, 2017.  <u>These productions have doubled the number of documents produced in any previous state court litigation</u>.  Moreover, and despite prior assurances, a majority of the documents produced were new documents that should have been produced by the Johnson & Johnson Defendants more than a year ago. To further compound the problems, thousands of the documents that were duplicates were produced in a manner that is materially flawed and which will hinder the PSC's review of the materials. On January 5, 2018, Imerys produced more than 75,000 pages.

    Though trials involving defendants' talcum powder products and individual plaintiffs with ovarian cancer have taken place in federal and state court, there have been **only eight depositions** of corporate witnesses taken to date. **<u>All of these depositions were taken prior to the production of more than two-thirds of the documents produced in the MDL or 1,000,000 pages</u>**.  To properly represent the thousands of claimants before the MDL Court, the PSC must be afforded the opportunity to examine relevant witnesses under oath.

    These previously unproduced documents relate to the following topics among others: 1) documents described in the Mehaffey Weber memo; 2) documents produced by both Johnson & Johnson Defendants and Imerys in talcum powder/asbestos/cancer-related cases; 3) documents related to testing protocols and test results (particularly as related to asbestos, arsenic, nickel,

Honorable Joel A. Pisano (Ret.)
January 30, 2018
Page 2 of 3

chromium, cobalt and other carcinogens); 4) documents relating to the mines from which material used in Johnson's Baby Powder and Shower to Shower were/are sourced, the mining processes employed, and information about the talc deposits themselves; 5) the methodology used in the medical and scientific community for determining general causation including both analysis of and bias about epidemiologic and other scientific studies; 6) the biologically plausible mechanisms by which Johnson & Johnson's talcum powder products may cause ovarian and other cancers; and 7) the toxicology and pharmacology of the talc used. Plaintiffs need adequate time to review these documents in order to provide necessary data to the experts and to prepare for relevant depositions.

As noted during the January 22 hearing, there is no such thing as pure talc. Test results indicate that Johnson & Johnson's talcum powder products were/are composed of not only talc but also other carcinogens such as asbestos, arsenic, and nickel, among others. Evidence related to the composition of the products will affect the relevant epidemiologic and *in vitro* studies relied on by all experts, including epidemiologists, gynecologic oncologists, toxicologists, cell biologists, and regulatory experts.

In addition to results from internal scientific testing, evidence regarding the procedures used for sampling and the type of testing performed is important to determine if certain test results are valid and representative. Having access to documents related to standard operating procedures is not enough, however. Plaintiffs are entitled to examine relevant witnesses who were involved in the process of sampling and testing to determine how the testing was performed and the defendants' analysis of the results.

Moreover, as the Court has made clear, discovery related to issues of bias and influence of scientific literature and governmental agencies (such as the National Toxicology Program and IARC) are relevant to the *Daubert* process. Documents recently produced add to evidence that defendants actively influenced not only published studies but the reports of governmental and quasi-governmental bodies.

In short, the Court made clear[1] that the scope of discovery in this MDL is broad, encompassing what defendants knew and when they knew it. Plaintiffs should be allowed to depose witnesses relevant to these topic areas and for that reason, Plaintiffs seek the depositions of witnesses whose responsibilities include toxicology, safety surveillance, research, testing, mining, and talc processing.

Against this backdrop and despite the fact that Ms. Sharko on behalf of the Johnson & Johnson Defendants previously <u>agreed</u> to move forward with the depositions of Charles Wajszczuk (Product Safety), Homer Swei (Product Stewardship), Nancy Musco (Product Safety), and Timothy McCarthy (Safety and Toxicology),[2] Johnson & Johnson Defendants have now backtracked and asserted that a single 30(b)(6) deposition is sufficient.

Imerys objects to any and all depositions.

---

[1] Status Conference, Tr. 4-14 (Sept. 6, 2017).
[2] Hearing before Special Master Pisano, Tr. 57 (Oct. 4, 2017).

Honorable Joel A. Pisano (Ret.)
January 30, 2018
Page 3 of 3

  To prevent Plaintiffs from deposing relevant witnesses prior to the disclosure of expert reports would be tantamount to requiring defendants in a bellwether case to produce case-specific expert reports on the basis of medical records alone without the opportunity to depose the plaintiff or her treating physicians. The Federal Rules of Civil Procedure do not contemplate such a course of action.

  As stated during the September 6, 2017 status conference, the PSC's letter of November 6, 2017, during the December 7, 2017 status conference, in recent correspondence to Your Honor, and again during the January 22, 2018 hearing, the PSC respectfully requests adequate time to review the recently produced documents and to depose relevant witnesses prior to the disclosure of expert reports.

  Thank you for your consideration of these matters.

            Very truly yours,

            */s/ P. Leigh O'Dell*

            P. Leigh O'Dell
            Michelle A. Parfitt

cc: Honorable Freda L. Wolfson, U.S.D.J.
   Honorable Lois H. Goodman, U.S.M.J.
   Susan Sharko, Esq. (via e-mail)
   Julie Tersigni, Esq. (via e-mail)
   Patrick L. Oot, Esq. (via e-mail)
   Lorna Dotro, Esq. (via e-mail)
   Mark Silver, Esq. (via e-mail)
   Nancy Erfle, Esq. (via e-mail)
   Tom Locke, Esq. (via e-mail)
   Sheryl Axelrod, Esq. (via e-mail)
   Chris Placitella, Esq. (via e-mail)
   Warren Burns, Esq. (via e-mail)
   Richard Golomb, Esq. (via e-mail)
   Richard Meadow, Esq. (via e-mail)
   Hunter Shkolnik, Esq. (via e-mail)
   Christopher V. Tisi, Esq. (via e-mail)
   Larry Berman, Esq. (via e-mail)
   Dan Lapinski, Esq. (via e-mail)