Exhibit 2



**Montgomery**
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

**Atlanta**
4200 Northside Parkway
Building One, Suite 100
Atlanta, GA 30327

(800) 898-2034

BeasleyAllen.com

**P. Leigh O'Dell**
leigh.odell@beasleyallen.com

January 5, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

  Re: *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
    MDL No. 2738

Dear Judge Pisano:

  In anticipation of the Special Discovery Master Conference scheduled for January 22, 2018, and the discovery disclosure obligations imposed on the PSC by the Court at the December 7, 2017 Status Conference, the PSC writes to raise its concerns with J&J document productions recently made and the impact of those productions on the PSC's pending obligations.

  Specifically, J&J has, in the last three (3) months, produced documents that **more than double** the volume of documents that it had previously produced and previously had been characterized to both the PSC and the Court as being a "substantially complete" production. J&J's recent productions include primarily *new* documents that had never been produced to the PSC. J&J's rolling productions over the past 90-day period culminated in large productions received on December 20 and 22, 2017 – just prior to the Christmas Holiday weekend – consisting of more than four hundred thousand pages. J&J's 11th hour attempt to cure its year-long production failures has placed the PSC in an untenable position: To comply with the Court's Order that the PSC provide, by January 10, 2018 an initial list of witnesses it expects to depose, the PSC must review, *in a matter of weeks* what it has taken J&J a year to review and produce.

  J&J's recent document productions present four (4) issues that the PSC addresses, and which warrant granting the PSC some relief. <u>First</u>, because of the volume, the lateness and the prior false representations that prior document productions were substantially complete, the PSC requests that the Special Master recommend that the PSC be allowed to supplement its January 10th anticipated list of deponents on or before April 30, 2018, in light of the volume of newly produced material that it must now review. <u>Second</u>, the PSC desires that a discovery schedule be entered that will provide for rolling depositions, that will fairly permit the PSC to have adequate time to review the volume of documents recently produced so that the PSC will not be prejudiced

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 2 of 9

by being required to take depositions prior to having a fair opportunity to identify all documents relating to the deponent. Third, since the J&J Defendants are in control of their own document productions, the PSC believes it proper to compel the J&J Defendants to identify which, if any, of the recently produced documents were previously produced by J&J. Upon an initial and cursory review of the recently produced documents, the PSC has determined that J&J's most recent productions include documents previously produced, but with new Bates numbers; Defendants clearly did not attempt to de-duplicate the new productions. Fourth, and finally, the PSC requests that the issue of cost-shifting be considered given the record on this issue.

## I. FACTUAL BACKGROUND

**1. The J&J Defendants Have *Doubled* Their Production Of Documents in the Past 90 Days**

For over a year, the J&J Defendants and the PSC have disagreed over the adequacy of J&J's MDL document production. From the outset, J&J has insisted that providing its pre-MDL state court document production to the PSC would be both sufficient and adequate in this MDL, arguing that any additional requests in the MDL would be burdensome, dilatory and disproportionate to the needs of this case. On the other hand, the PSC has been equally persistent in its claim that J&J's "off-the-shelf" state court production was wholly inadequate to the needs of this MDL, arguing that its own investigation strongly suggested that there were significant records which had not been produced. Both sides have claimed that the other's position was an impediment to litigating the issues in this case, including general causation and liability.

Justifiably, the Court has repeatedly expressed its own frustration with the parties' inability to resolve the most basic of questions related to document production. After months of dispute, and after the Court appointed a Special Discovery Master, the Court definitively addressed the J&J document discovery issue at the September 6, 2017 status conference. At that conference, the Court ordered that J&J's document discovery on "general subject matters" be completed within 60 days. See Sept. 6, 2017 Hear. Tr. at pp. 4-5, 10 & 38. This document discovery deadline was memorialized in CMO 9 and required J&J to "complete document production" by November 6. See CMO 9 (Doc. No. 673).

The entry of CMO 9 and the subsequent initial conference with the Special Discovery Master on October 4, 2017 had its desired effect. It precipitated a flurry of J&J document productions that should have been produced a year ago. In a short period of time, J&J *more than doubled* the number of pages of documents produced to the PSC. Indeed, the burden of re-collecting and re-reviewing and producing documents in accordance with CMO 9 deadlines was so significant that J&J was prompted to seek an emergency 45-day extension of time to produce its documents. See Amended CMO 9 (Doc. No. 2050); see also letter from S. Sharko, Esq. to Hon. F. Wolfson, Nov. 3, 2017 (Exhibit 1).

The PSC's challenges to the adequacy of J&J's "substantially complete" production has resulted in the production ballooning from less than 700,000 pages as of August 2017, to well over 1,500,000 pages by December 22, 2017. J&J's post-September productions include approximately 249,000 pages produced in October and 400,000 pages produced in December 2017 alone, approximately 300,000 of which were produced just days before Christmas.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 3 of 9

    The below chart outlines the history of J&J's document production in this MDL following its initial importation of its state court production of approximately 500,000 pages in April 2017. Not only does this chart illustrate how inadequate J&J's initial April 2017 state court production was to begin with, but it highlights the subsequent wave of J&J's unique post-CMO 9 MDL productions culminating with a crescendo of documents dumped on the PSC just before Christmas. Further, this chart illustrates the corresponding pressures now placed on the PSC because of that late production. Obviously, the PSC will now need to review and analyze this avalanche of materials while simultaneously having to identify deponents and preparing for and conducting depositions:[1]



    With apparent awareness that its post-September 2017 MDL document production would be significant and new, J&J repeatedly attempted to belittle the importance of such productions to both the Special Master and the Court.

    In October, for example, J&J casually suggested to the Special Master that any CMO 9 supplemental productions were, in fact, much ado about nothing. They were, in J&J's view, "clean-up" productions that would determine whether there was "anything else" beyond that which had already been produced which should be produced:

> MS. SHARKO: We've produced the documents. To try and put an end to this, we're now going back and pulling everything again and seeing if there's anything else in warehouse anywhere that relates to talc that is potentially relevant, and we're putting it in line for production and so.
>
> JUDGE PISANO: When?

---

[1] These pressures do not even account for the review of Imerys documents which are due to be produced to the PSC on January 5, 2018 pursuant to amended CMO 9.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 4 of 9

> MS. SHARKO: The deadline that Judge Wolfson gave us is I want to say the end of November. It might take a little longer than that.
>
> JUDGE PISANO: So by that time period you will represent that they have the entire universe of documents that was produced from all of these people in Skillman, New Jersey in 1998?
>
> MS. SHARKO: *And more. We believe they have those documents now, but we're going back, and whether it's end of November...*

See Oct. 6, 2017 Conf. Tr. at pp. 36–37 (emphasis added).

This was reiterated by J&J when it sought to modify CMO 9 when it stated that "*in order to put an end to unnecessary discovery issues, defendants have decided to re-collect a number of previously collected document sources and produce responsive documents identified.*" See Exhibit 1. J&J's nonchalant description of its post-September 2017 document productions as nothing more than a "clean-up" productions was reiterated at the December 7, 2017 Status Conference:

> Ms. SHARKO: What we did, and we've been over this a number of times with the plaintiff, is a number of complaints *we just redid the production. Are there new document in there? Yes, but not double the number*."

Dec. 7, 2017 Hear. Tr. at 17 (emphasis added).

J&J's repeated assurance that it was simply doing a quality control exercise to satisfy the PSC's "unnecessary discovery issues" was misleading. Whether measured in pages or documents produced, the post-September 2017 productions are both quantitatively substantial and qualitatively important. The number of *pages* produced went from under 700,000 to over 1,500,000 while the number of *documents* went from just over 110,000 to just under 200,000 since September 2017.

The PSC's review, which was conducted between Christmas and New Year's Day, reveals three (3) troubling conclusions that, as set forth below, directly impacts the PSC's ability to fulfill its discovery responsibilities.

- The documents produced since September are primarily new documents that have not been produced before.

- To the extent that J&J has produced duplicative documents in its recent productions, which Defendants acknowledge has occurred, Defendants assigned these documents wholly different Bates numbers, rendering it impossible for the PSC to avoid a manual re-review and re-analysis of these previously reviewed documents.

- The number of pages of documents produced by J&J Defendants in the 90 days since the entry of CMO 9 has more than doubled.

**2. The Impact of J&J's Last-Minute Document Production on the PSC's Discovery and Anticipated Expert Obligations Is Significant**

At the December 7th Status Conference, in anticipation of J&J's final document production, the Court ordered that the PSC produce a preliminary list of potential J&J deponents by January 10, 2018. It is fair to say, however, in light of Defendants' repeated representations, that neither the Court nor the PSC anticipated that more than 400,000 pages of new documents would be produced on December 20 and 22.

While the PSC intends to comply with the Court's Order, its ability to do so has been significantly undercut by the avalanche of previously undisclosed documents, documents which should have been produced a year ago. Needless to say, it is impossible for the PSC to review in several weeks and over a holiday that which took J&J a year to review, produce, and then dump on the PSC, only days before the January 10, 2018 deponent disclosure deadline.

Apart from the sheer volume of documents produced, the manner in which the documents were produced has rendered the PSC's prior work product frustratingly irrelevant. As the PSC has begun to hurriedly review the recently produced documents, it has become apparent that the productions are a composite of new documents that have never before been produced, as well as previously produced documents that are now identified by new Bates numbers.

To the extent J&J has produced duplicative documents, the volume of which remains unclear, Defendants have assigned **new Bates numbers thereby eliminating the ability to identify or segregate them in order to avoid re-review**. To cure this, the PSC requested a "key" i.e., some index that would cross reference the different Bates numbers being used for the same document, that would lessen the burden on the PSC in reviewing duplicate documents. J&J indicated it would be too burdensome to provide such a key, a position which is wholly unreasonable. See email from P. Oot, Esq. to C. Tisi, Dec. 22, 2017 (Exhibit 2).

Finally, and even more troubling to the tasks at hand, the PSC has relied on J&J's prior assertions with respect to document production to identify potential deponents. That reliance has now been significantly undermined. To illustrate, in June 2017 the PSC requested the depositions of an initial group of four (4) J&J witnesses: Charles Wajsczuk, Homer Swei, Nancy Musco and Timothy McCarthy.

One of the primary reasons for choosing these four (4) J&J witnesses, witnesses who the PSC still desires to depose, was J&J's prior representation that all relevant and discoverable documents relating to these witnesses had been produced for the PSC to review. The PSC relied on J&J's representations about the completeness of the document productions relating to these witnesses. This reliance turned out to have been significantly misplaced. Thus, while the PSC still desires to depose these witnesses, the PSC requires additional time to fully review the newly produced documents relating to these witnesses prior to being required to proceed with the depositions. As illustrated by the chart below, for these four exemplar witnesses, each had a significant number of additional relevant documents produced just before Christmas:

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 6 of 9



## II.   ARGUMENT

1. **THE PSC REQUESTS THAT THE COURT ALLOW THE PSC TO SUPPLEMENT ITS JANUARY 10TH DEPOSITION DISCLOSURE LIST ON OR BEFORE APRIL 30, 2018**

At the December 7 Status Conference, the Court directed the PSC to produce a tentative list of potential deponents by January 10, 2018. In so doing, the Court acknowledged that the list could be amended. See Dec. 7, 2017 Hear. Tr. at p. 26. However, the Court's assumption that there could be "two more" added to that list was clearly premised on J&J's representation that its productions were substantially complete, that any further productions would only be a minor "clean-up" and that since nothing significantly new would be produced, the PSC should be able to identify most of the witnesses they would depose. As demonstrated above, the premises upon which both the Court and the PSC relied in discussing the PSC's obligation to identify witnesses by January 10, 2018 was not accurate.

Given the volume of documents that J&J produced in the last three (3) months, the PSC asks that the Special Master recommend that the PSC be allowed to supplement its January 10th anticipated deposition list on or before April 30, 2018.

2. **THE PSC REQUESTS THAT THE SPECIAL MASTER RECOMMEND A DISCOVERY SCHEDULE THAT ALLOWS THE PSC TO REVIEW THE DOCUMENTS THAT J&J HAS PRODUCED PRIOR TO THE COMMENCEMENT OF DEPOSITIONS**

As described above J&J sought a significant extension of the CMO 9 deadline to accommodate its production of documents. The PSC did not oppose J&J's extension request but

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 7 of 9

requested that the extension of time be considered in connection with an overall schedule so that the PSC would have adequate time to review and assimilate the new productions. In a letter to the Court dated November 3, 2017, the PSC stressed that:

> Extensions of this magnitude without the provision of sufficient time for Plaintiffs to review the documents produced, to take depositions, and to provide the resulting evidence to their experts for consideration would result in undue prejudice to Plaintiffs.

See Letter from L. O'Dell to Hon. F. Wolfson, Nov. 3, 2017 (Exhibit 3).

While the Court directed the PSC to provide its witness list, it did not address deadlines for discovery that would follow that disclosure. The PSC requests that the Special Master assist the parties in developing discovery schedule that would provide adequate time for the PSC to review the documents produced prior to the commencement of depositions.

**3. THE PSC REQUESTS THAT J&J PROVIDE THE PSC WITH A KEY THAT WOULD ALLOW THE PSC TO IDENTIFY DUPLICATE DOCUMENTS IN THE PRODUCTION**

Immediately upon receipt of J&J's more than 400,000 page production on December 20th and 22nd , the PSC wrote to J&J to request that duplicate documents be identified or at least, that J&J provide a "key" identifying a document by both its "old" bates number and "new" bates number. Without a key of this type, the PSC's work reviewing previously produced documents would be rendered useless. See Exhibit 2.

J&J responded to the PSC's request on Friday December 22nd. *Id.* In that response, J&J conceded that there were not only duplicate documents to those previously produced but also that the duplicate documents have "new bates numbers." J&J claims that it would be too burdensome to have produced the documents without duplicates, but J&J also has not provided a key to enable cross-referencing the various bates numbers assigned to the same document.

In the context of modernized document production, J&J's claim of burden is plainly unreasonable. The documents in question are J&J's documents, originating from J&J employees' files. J&J is well aware of the documents that were previously produced and well aware of the documents it recently produced. J&J certainly logged each document it produced into its own database.

A production methodology that re-produces documents previously produced with different bates numbers is unjustifiable, and the problem has been compounded by J&J's refusal to provide a key or index to permit cross-referencing by the PSC. Because of the manner in which these documents were produced, an undue burden has been placed upon the PSC. Without relief, the PSC will be required to re-review documents because of the PSC's inability to quickly identify duplicates through the use of a key or index. Moreover, without relief, the PSC will be required to re-review documents in a fraction of the time J&J had to review and produce them. These problems would not have occurred had J&J taken its MDL document production in this MDL seriously as opposed to insisting that its "off the shelf" state court production be imported into this MDL.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 8 of 9

      The PSC respectfully requests that J&J be directed to either de-duplicate its recent productions or to provide a "key" that would allow the PSC to de-duplicate the production. Anything less would result in the PSC spending extraordinary amounts of time and resources re-reviewing documents that have previously been produced. The PSC should not be required to bear the burden of J&J's inadequate productions.

4. **THE PSC REQUESTS THAT IT BE PERMITTED TO PRESENT A PETITION FOR COST-SHIFTING FOR THE EXTRAORDINARY WASTE CAUSED BY J&J'S DUPLICATIVE PRODUCTION**

      Cost shifting in the course of first-party discovery is an extraordinary remedy. It is justified only when there has been manifest unreasonableness in a party's discovery conduct that visits unfair prejudice upon its adversary. By reproducing, at the eleventh hour, an enormous and randomized mix of old documents and new documents, with no way for the PSC to parse out the old from the new, J&J has visited extraordinary waste upon the PSC's resources.

      Most of the hundreds and hundreds of hours the PSC has spent reviewing and analyzing J&J's document production must now be repeated. This extraordinary waste imposed upon the PSC is even more egregious in light of the fact that the PSC stridently opposed J&J's approach to simply recycle prior state-court productions with the hope they would prove adequate for the MDL.

      As is now evident from the record, J&J's assessment was recklessly misplaced. Instead of acknowledging its miscalculation, and collaborating with the PSC to mitigate the miscalculation, it simply (and indifferently) reproduced most of its prior production with the new documents mixed in. New Bates numbers were then assigned to the production that should have occurred at the outset.

      Most significantly, J&J did not preserve any way to cross-reference the Bates numbers of the previously produced documents with the new Bates numbers of the same documents produced a second time. If J&J had preserved that information, the PSC could efficiently re-associate all of their prior work product to the same documents in the second production. These two grievous miscalculations by J&J – first, that a prior state court production would be suitable for this MDL, and second, failing to preserve the identity of previously produced documents – were both entirely foreseeable.

      It would be manifestly unfair for the economic burden of J&J's miscalculations to be visited entirely upon the Plaintiffs, and the Court has the inherent authority to provide a remedy. The extent of gratuitous waste imposed upon the PSC cannot yet be fully measured. Upon the completion of such an assessment, the PSC will seek leave of Court to submit a motion for equitable cost-shifting.

      Thank you for your consideration of these matters.

      Very truly yours,

      */s/ P. Leigh O'Dell*

      P. Leigh O'Dell
      Michelle A. Parfitt

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 9 of 9

cc:   Honorable Freda L. Wolfson, U.S.D.J.
     Susan Sharko, Esq. (via e-mail)
     Julie Tersigni, Esq. (via e-mail)
     Lorna Dotro, Esq. (via e-mail)
     Mark Silver, Esq. (via e-mail)
     Tom Locke, Esq. (via e-mail)
     Sheryl Axelrod, Esq. (via e-mail)
     Chris Placitella, Esq. (via e-mail)
     Warren Burns, Esq. (via e-mail)
     Richard Golomb, Esq. (via e-mail)
     Richard Meadow, Esq. (via e-mail)
     Hunter Shkolnik, Esq. (via e-mail)
     Christopher V. Tisi, Esq. (via e-mail)
     Larry Berman, Esq. (via e-mail)
     Dan Lapinski, Esq. (via e-mail)

# EXHIBIT 1

**Drinker Biddle & Reath**
LLP

Susan M. Sharko
973-549-7350 Direct
973-360-9831 Fax
Susan.Sharko@dbr.com

Law Offices

600 Campus Drive
Florham Park, NJ
07932-1047

973-549-7000
973-360-9831 fax
www.drinkerbiddle.com

A Delaware Limited
Liability Partnership

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
TEXAS
WASHINGTON D.C.

Andrew B. Joseph
Partner responsible for
Florham Park Office

Established 1849

November 3, 2017

**BY ELECTRONIC MAIL**

Honorable Freda L. Wolfson
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

Re: In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation
MDL No. 2738

Dear Judge Wolfson:

On September 7, 2017, your Honor entered Case Management Order No. 9. The CMO provided dates for the November and December Case Management Conferences, and it set deadlines for (1) the completion of Johnson & Johnson Defendants' document production, (2) the completion of written discovery, and (3) Plaintiffs' identification of experts and delivery of expert testimony summaries.

As we discussed with Judge Pisano at the hearing last month, in order to put an end to unnecessary discovery issues, Defendants have decided to re-collect a number of previously collected document sources and produce the responsive documents identified. Defendants are also producing supplemental responses to Plaintiffs' First Set of Interrogatories and Document Demands in light of the expanded scope of discovery as defined by the Court. We advised Judge Pisano that we expected we would complete this effort by late November or December. We are working hard at this but based on current estimates, we believe that December 20 would be an appropriate completion date. Accordingly, we are submitting with this letter a proposed Amended Case Management Order 9, which extends the deadlines for document production and written discovery from November 6, 2017 and December 5, 2017, respectively, to December 20, 2017.

Co-Defendant, Imerys, has no objection. We have communicated with the Plaintiffs' Steering Committee and they want to tie this routine extension to an agreement on a complete scheduling order, whereas it is Defendants' position that this modest

Drinker Biddle & Reath LLP

Honorable Freda L. Wolfson
November 3, 2017
Page 2

requested adjustment to discovery deadlines should not impact the remainder of the current case schedule.

Respectfully submitted,

/s/ Susan M. Sharko

Susan M. Sharko

SMS:mdm

cc: Hon. Lois H. Goodman (via Electronic Mail)
Hon. Joel A. Pisano (Ret.) (via Electronic Mail)
Lorna Dotro, Esq. (via Electronic Mail)
Thomas Locke, Esq. (via Electronic Mail)
Leigh O'Dell, Esq. (via Electronic Mail)
Michelle Parfitt, Esq. (via Electronic Mail)
Christopher Placitella, Esq. (via Electronic Mail)

# EXHIBIT 2

**Tram Nguyen**

| | |
|---|---|
| **From:** | Oot, Patrick L. (SHB) <OOT@shb.com> |
| **Sent:** | Friday, December 22, 2017 10:05 AM |
| **To:** | Chris Tisi; Frazier, Kat (SHB) |
| **Cc:** | 'Leigh O'Dell'; Michelle Parfitt; Kristie Hightower (khightower@lundylawllp.com); Deanna Marquez (deanna.marquez@miscindiana.com); Tram Nguyen |
| **Subject:** | RE: TALC--J&J Defendant's recent document production |

Hi Chris.

Please see answers to your questions below.

I hope you and your family have a very nice holiday.

Best,

Patrick

**From:** Chris Tisi [mailto:ctisi@ashcraftlaw.com]
**Sent:** Wednesday, December 20, 2017 12:59 PM
**To:** Frazier, Kat (SHB) <KFRAZIER@shb.com>; Oot, Patrick L. (SHB) <OOT@shb.com>
**Cc:** 'Leigh O'Dell' <Leigh.ODell@BeasleyAllen.com>; Michelle Parfitt <mparfitt@ashcraftlaw.com>; Kristie Hightower (khightower@lundylawllp.com) <khightower@lundylawllp.com>; Deanna Marquez (deanna.marquez@miscindiana.com) <deanna.marquez@miscindiana.com>; Tram Nguyen <tnguyen@ashcraftlaw.com>
**Subject:** TALC--J&J Defendant's recent document production

Kat and Patrick:

I hope that you are well.

We have received the recent J&J production and would ask for a call with your team to clarify some questions that we have regarding this new production and its relationship to the old production. Among other things which may occur to us as we load the documents, we would like to understand the following:

- Given prior statements about reproducing documents that were previously produced, we would like further understand this production. In other words, are the documents in the 12/4 and 12/19 productions being reproduced under new bates numbers or are they are actually new documents. We want to understand the relationship/overlap between this production and prior productions.

All documents in the productions that you reference have new Bates numbers. We took appropriate steps to de-duplicate the recent production to avoid re-reviewing and re-producing documents where reasonably possible. However, as we have previously stated, a large percentage of these documents are hard copy and cannot reasonably be de-duplicated.

- If these new documents are reproductions of previously produced under new bates numbers, we want to understand why that was done that way and whether we can get this new production with the old bates numbers or at least a cross reference list that provides the old and new bates numbers so that we can determine what belongs together.

1

See above.  In addition, as agreed in CMO 5 Section VII, prior productions were produced under prior protocols.  As agree, the prior productions retained their Bates identifiers, metadata production format, redaction, etc.  Documents processed and produced after the entry of CMO 5 were produced using the PSC's requested protocol in Appendix 2 of the CMO.

- Additionally if they are reproductions under new bates numbers, are there differences in the metadata that was produced now versus what was originally produced.

See above.

- If the reproduced documents have redactions, are the redactions in the current set the same as redactions in previously produced documents (and vice versa)?

See above.

- For any reproduced documents, is there any changes to the privilege description  and will there be a new privilege log.

A privilege log pertaining to these documents will be provided in due course.

As you know, we have a compressed time to review these prior to identifying our preliminary list of deponents and would appreciate a call either today or tomorrow.

Please let us know your availability.

Best Regards,
Chris




CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, may contain confidential and privileged information, either as protected attorney work product or confidential client information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Mail Gate made the following annotations on Fri Dec 22 2017 09:04:45

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

# EXHIBIT 3



218 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103-4160
(334) 269-2343
(800) 898-2034
FAX: (334) 954-7555
BEASLEYALLEN.COM

November 3, 2017

**VIA ELECTRONIC MAIL**

Honorable Freda L. Wolfson, U.S.D.J.
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

  Re: *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
    **MDL No. 2738**

Dear Judge Wolfson:

  The Plaintiff's Steering Committee is in receipt of Defendants' Proposed Orders regarding the extension of time to produce documents and respond to written discovery. Prior to their submission, the parties met and conferred regarding Johnson & Johnson's request for an extension to December 20, 2017, and Imery's request for an extension to January 5, 2018. The PSC has endeavored to work cooperatively with Defendants. However, in this instance, Johnson & Johnson Defendants were unwilling to discuss the implications of an extension of time to the scheduling of future depositions and other discovery and to the disclosure of expert reports. Johnson & Johnson Defendants have repeatedly sought early disclosure of expert reports and the scheduling of a *Daubert* hearing. Johnson & Johnson Defendants have been both unwilling to discuss a broader scheduling order or to agree that they would not continue to seek an early *Daubert* proceeding.

  During the meet and confer process, Imerys was willing to engage in discussions about an overall scheduling order and to work cooperatively to address Imerys's need for additional time and Plaintiffs' need to ensure adequate time to prepare their experts.

  Extensions of this magnitude without the provision of sufficient time for Plaintiffs to review the documents produced, to take depositions, and to provide the resulting evidence to their experts for consideration would result in undue prejudice to Plaintiffs.

  Plaintiffs propose that the extensions of time be considered in light of a broader schedule that includes the following components:

- Date by which Plaintiffs shall disclose the names and qualifications and topics expected for experts;

Honorable Freda L. Wolfson, U.S.D.J.
November 3, 2017
Page 2 of 3

- Date by which the Defendants shall disclose the names and qualifications and topics expected for experts;
- Date by which Defendants shall complete document production;
- Date by which Defendants shall complete their written discovery;
- A Status Conference with Judge Pisano following certification that written and document production is substantially complete;
- Date on which depositions can commence;
- Date for completion of depositions;
- Date for Plaintiffs' expert reports;
- Date for Defense Expert reports;
- Date for rebuttal reports;
- Dates for expert depositions;
- Daubert and dispositive Motions briefing schedule; and
- Date for a Daubert conference to set hearings, if requested.

Plaintiffs propose a stay of the deadlines in CMO No. 9 for 7 days, including Plaintiffs' deadline for disclosure of the identities of their experts. This brief moratorium would allow the parties to meet and confer regarding a scheduling order. Should the parties not be able to reach an agreement, which appears unlikely, Plaintiffs request Judge Pisano's assistance in working out a proposed schedule that would be presented to the Court at least (7) days prior to the December 7th status conference.

Thank you for your consideration of these matters.

Respectfully submitted,

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell

*/s/ Michelle. A. Parfitt*
Michelle A. Parfitt

cc:   Hon. Lois H. Goodman
      Hon. Joel A. Pisano (ret.)
      Christopher M. Placitella, Esq.
      Susan Sharko, Esq.
      Patrick Oot, Esq.
      Gene Williams, Esq.
      Kat Frazier, Esq.
      Lorna Dotro, Esq.

Honorable Freda L. Wolfson, U.S.D.J.
November 3, 2017
Page 3 of 3

    Mark Silver, Esq.
    Nancy Erfle, Esq.
    John Beisner, Esq.
    Tom Locke, Esq.
    Sheryl Axelrod, Esq.