Exhibit 3

# ASHCRAFT & GEREL, LLP

January 15, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

> Re:    *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
> **MDL No. 2738**

Dear Judge Pisano:

The Court has requested that the parties individually prepare a letter memorandum discussing the status of discovery and disputed matters.  There are three (3) issues the PSC desires to raise before the Court that we believe should be on the Agenda for the upcoming meeting scheduled on January 22, 2018.

I.    **DISCOVERY SCHEDULE**:  The matters contained in the PSC letter to your honor dated January 5, 2018 including a discovery schedule that addresses the recent document production by J&J and Imerys. (See Exhibit 1, PSC Letter to Hon. J. Pisano, Jan. 5, 2018).  As indicated in that letter, the PSC was required to provide a list of proposed deponents on January 10, 2018, which the PSC timely provided. (See copy attached as Exhibit 2).

II.    **DEPOSITION PROTOCOL**:  J&J recently provided the PSC with a proposed deposition protocol that J&J seeks to apply to both fact and expert witnesses.  The PSC has reviewed J&J's proposal and believes that a better approach for discovery is the approach taken by Chief Judge Lawrence Stengel in *In Re Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2436, Order, October 3, 2013 (See copy attached as Exhibit 3) with modifications that fit the needs of this case.  The entry of an order similar to the one entered in Tylenol has the benefit of having been already reviewed by a distinguished Judge in the Third Circuit and the added benefit of involving J&J and one of its subsidiaries.  We note that the Tylenol Order applies to fact witnesses only, as a supplemental order was entered in that case to address expert witnesses when that issue became ripe.  In this Talc case, the PSC believes it is premature to address a deposition protocol for expert witnesses at this time in light of the status of discovery and expert disclosures.

# ASHCRAFT & GEREL, LLP

January 15, 2018
Page 2 of 4

The PSC also would suggest certain other modifications to the Tylenol Order as follows:

- First, in Tylenol, Judge Stengel entered a supplemental Order that required J&J to produce current or former corporate employees' personnel files and compensation history information. The PSC suggests that the Order to be entered in Talc include such a requirement as part of a composite order in lieu of the need to enter a separate order on this issue as occurred in Tylenol. The supplemental order entered by Judge Stengel is attached hereto. (See copy attached as Exhibit 4);

- Second, the PSC desires to make clear that were the Tylenol Order to be entered here, that the PSC has interpreted Section 4 (b) of the Tylenol Order to apply only to corporate representatives' depositions *noted pursuant to Rule 30(B)(6)* and that Section 4(b) does not impose an overall limit on the number of corporate depositions that the PSC may take in the case. The PSC believes this is already clear in the Tylenol Order because it contains a qualifier that Section 4(b) pertains to depositions "pursuant to Fed. R. Civ. P. 30(B)(6)" and because Section 4(a) of the Tylenol Order does not contain a limitation on depositions other than for the PSC in that case to act in good faith. Nevertheless, to avoid ambiguity and an issue at a later date, the PSC believes that were the Court to adopt the language in the Tylenol Order, that it be made clear that Section 4 (b) does not create an overall limitation on the number of depositions that the PSC will be permitted to take. Indeed, some of the counsel in this Talc case were also counsel in Tylenol, and they can represent to your Honor that in Tylenol the parties were not limited in the number of corporate witnesses they could depose except that "the PSC shall in good faith take only those depositions of defendants and their current employees deemed necessary under the circumstances of this case." See Section 4(a) of the Tylenol Order.

- Third, the PSC believes that a provision similar to Section 4(c) of the Tylenol Order need not be included at this time, since the Talc Court has not yet permitted case specific discovery.

- Fourth, in light of the size of this MDL and the fact that numerous state court litigations are pending (as compared to Tylenol, where the MDL consisted of only about 250 cases and there was only one coordinated state court litigation, in Atlantic County, New Jersey) that Section 11 of the Tylenol Order be amended to recognize that some depositions may exceed 7 hours because of the witness' involvement in this case over decades. In fact, in Tylenol, several corporate witnesses were deposed over several days because the product at issue has been on the market for many decades, thereby involving decades of information to discover that could not be discovered in some instances in only

# ASHCRAFT & GEREL, LLP

January 15, 2018
Page 3 of 4

> 7 hours of deposition time. The same can be said here for the Talc case, which similarly spans decades on the market. The PSC will proceed in good faith but should not be subject to an artificial limitation on the amount of time they shall have to take a deposition.

- Fifth, to the extent a defendant expects to conduct a "preservation" deposition of a current or former employee, that in addition to the requirements set forth in the Tylenol Order, that the PSC be afforded at least thirty (30) days' notice of the intent to take a preservation deposition, that the PSC be afforded an opportunity to take a discovery deposition prior to the preservation deposition, and that the PSC shall have equal time to do a cross examination of the witness in the preservation deposition.

- Sixth, that the time spent on cross-noticed state court depositions not be "charged" against the MDL.  In this regard, again, considering the size of this MDL and the number of state court litigations pending, the PSC believes it is appropriate that it not be limited in the amount of time that it may have for deposing a witness because of coordination with state court litigants. The PSC intends to fully coordinate with state court litigants but not to the detriment of MDL litigants and the PSC's duties.

The PSC makes a few other observations about the contents of the Tylenol Order that they believe should apply in this case as well:

- First, the PSC notes that the Tylenol Order provides for the certification of the production of custodial files prior to the taking of a deposition with adequate time to review before the deposition commences. See, Sec. 16 of Tylenol Order. The PSC requires that for all deponents  personnel files and relevant documents be produced with adequate time before the depositions;

- Second, as noted above, the PSC fully intends to coordinate with state court litigants, but the PSC must be afforded adequate time for the PSC to conduct its examination which may involve  multi-day depositions for legacy witnesses and witnesses whose involvement with the issues spans decades of time; and

- Third, authenticity and foundational objections to exhibits must be addressed.

The PSC will be prepared to discuss as the conference other contents of the Tylenol Order to be included in the deposition protocol order for this case.

III. **PRIVILEGE ISSUES**:  The PSC anticipates providing defendants with their objections to the privilege logs.  We would also like to discuss with the Court the process for addressing privilege issues.

4900 Seminary Road, Suite 650, Alexandria, Virginia 22311        (703) 931-5500

# ASHCRAFT & GEREL, LLP

January 15, 2018
Page 4 of 4

    IV.    **Samples Protocol:**  The parties have had met and conferred on a protocol to address the chain of custody and division of various samples.  The parties expect to present an agreed upon protocol to Judge Wolfson before the next status conference.

Very truly yours,

/s/ Michelle A. Parfitt

Michelle A. Parfitt, Esq.
P. Leigh O'Dell, Esq.

cc:    Susan Sharko, Esq. (via e-mail)
        Julie Tersigni, Esq. (via e-mail)
        Kat Frazier, Esq. (via e-mail)
        Patrick Oot, Esq. (via e-mail)
        Lorna Dotro, Esq. (via e-mail)
        Mark Silver, Esq. (via e-mail)
        Tom Locke, Esq. (via e-mail)
        Sheryl Axelrod, Esq. (via e-mail)
        Warren Burns, Esq. (via e-mail)
        Richard Golomb, Esq. (via e-mail)
        Richard Meadow, Esq. (via e-mail)
        Hunter Shkolnik, Esq. (via e-mail)
        Chris Placitella, Esq. (via e-mail)
        Larry Berman, Esq. (via e-mail)
        Dan Lapinski, Esq. (via e-mail)
        Chris Tisi, Esq. (via e-mail)

# EXHIBIT 1



**Montgomery**
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

**Atlanta**
4200 Northside Parkway
Building One, Suite 100
Atlanta, GA 30327

(800) 898-2034

BeasleyAllen.com

**P. Leigh O'Dell**
leigh.odell@beasleyallen.com

January 5, 2018

**VIA Electronic Mail**
Honorable Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

> Re:     *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales*
>           *Practices and Products Liability Litigation*
>           **MDL No. 2738**

Dear Judge Pisano:

In anticipation of the Special Discovery Master Conference scheduled for January 22, 2018, and the discovery disclosure obligations imposed on the PSC by the Court at the December 7, 2017 Status Conference, the PSC writes to raise its concerns with J&J document productions recently made and the impact of those productions on the PSC's pending obligations.

Specifically, J&J has, in the last three (3) months, produced documents that **more than double** the volume of documents that it had previously produced and previously had been characterized to both the PSC and the Court as being a "substantially complete" production. J&J's recent productions include primarily *new* documents that had never been produced to the PSC. J&J's rolling productions over the past 90-day period culminated in large productions received on December 20 and 22, 2017 – just prior to the Christmas Holiday weekend – consisting of more than four hundred thousand pages. J&J's 11th hour attempt to cure its year-long production failures has placed the PSC in an untenable position: To comply with the Court's Order that the PSC provide, by January 10, 2018 an initial list of witnesses it expects to depose, the PSC must review, *in a matter of weeks* what it has taken J&J a year to review and produce.

J&J's recent document productions present four (4) issues that the PSC addresses, and which warrant granting the PSC some relief.  First, because of the volume, the lateness and the prior false representations that prior document productions were substantially complete, the PSC requests that the Special Master recommend that the PSC be allowed to supplement its January 10th anticipated list of deponents on or before April 30, 2018, in light of the volume of newly produced material that it must now review.  Second, the PSC desires that a discovery schedule be entered that will provide for rolling depositions, that will fairly permit the PSC to have adequate time to review the volume of documents recently produced so that the PSC will not be prejudiced

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 2 of 9

by being required to take depositions prior to having a fair opportunity to identify all documents relating to the deponent. Third, since the J&J Defendants are in control of their own document productions, the PSC believes it proper to compel the J&J Defendants to identify which, if any, of the recently produced documents were previously produced by J&J. Upon an initial and cursory review of the recently produced documents, the PSC has determined that J&J's most recent productions include documents previously produced, but with new Bates numbers; Defendants clearly did not attempt to de-duplicate the new productions. Fourth, and finally, the PSC requests that the issue of cost-shifting be considered given the record on this issue.

## I.      FACTUAL BACKGROUND

**1.      The J&J Defendants Have *Doubled* Their Production Of Documents in the Past 90 Days**

For over a year, the J&J Defendants and the PSC have disagreed over the adequacy of J&J's MDL document production. From the outset, J&J has insisted that providing its pre-MDL state court document production to the PSC would be both sufficient and adequate in this MDL, arguing that any additional requests in the MDL would be burdensome, dilatory and disproportionate to the needs of this case. On the other hand, the PSC has been equally persistent in its claim that J&J's "off-the-shelf" state court production was wholly inadequate to the needs of this MDL, arguing that its own investigation strongly suggested that there were significant records which had not been produced. Both sides have claimed that the other's position was an impediment to litigating the issues in this case, including general causation and liability.

Justifiably, the Court has repeatedly expressed its own frustration with the parties' inability to resolve the most basic of questions related to document production. After months of dispute, and after the Court appointed a Special Discovery Master, the Court definitively addressed the J&J document discovery issue at the September 6, 2017 status conference. At that conference, the Court ordered that J&J's document discovery on "general subject matters" be completed within 60 days. See Sept. 6, 2017 Hear. Tr. at pp. 4-5, 10 & 38. This document discovery deadline was memorialized in CMO 9 and required J&J to "complete document production" by November 6. See CMO 9 (Doc. No. 673).

The entry of CMO 9 and the subsequent initial conference with the Special Discovery Master on October 4, 2017 had its desired effect. It precipitated a flurry of J&J document productions that should have been produced a year ago. In a short period of time, J&J *more than doubled* the number of pages of documents produced to the PSC. Indeed, the burden of re-collecting and re-reviewing and producing documents in accordance with CMO 9 deadlines was so significant that J&J was prompted to seek an emergency 45-day extension of time to produce its documents. See Amended CMO 9 (Doc. No. 2050); see also letter from S. Sharko, Esq. to Hon. F. Wolfson, Nov. 3, 2017 (Exhibit 1).

The PSC's challenges to the adequacy of J&J's "substantially complete" production has resulted in the production ballooning from less than 700,000 pages as of August 2017, to well over 1,500,000 pages by December 22, 2017. J&J's post-September productions include approximately 249,000 pages produced in October and 400,000 pages produced in December 2017 alone, approximately 300,000 of which were produced just days before Christmas.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 3 of 9

        The below chart outlines the history of J&J's document production in this MDL following its initial importation of its state court production of approximately 500,000 pages in April 2017. Not only does this chart illustrate how inadequate J&J's initial April 2017 state court production was to begin with, but it highlights the subsequent wave of J&J's unique post-CMO 9 MDL productions culminating with a crescendo of documents dumped on the PSC just before Christmas. Further, this chart illustrates the corresponding pressures now placed on the PSC because of that late production.   Obviously, the PSC will now need to review and analyze this avalanche of materials while simultaneously having to identify deponents and preparing for and conducting depositions:[1]



        With apparent awareness that its post-September 2017 MDL document production would be significant and new, J&J repeatedly attempted to belittle the importance of such productions to both the Special Master and the Court.

        In October, for example, J&J casually suggested to the Special Master that any CMO 9 supplemental productions were, in fact, much ado about nothing.  They were, in J&J's view, "clean-up" productions that would determine whether there was "anything else" beyond that which had already been produced which should be produced:

        MS. SHARKO: We've produced the documents. To try and put an end to this, we're now going back and pulling everything again and seeing if there's anything else in warehouse anywhere that relates to talc that is potentially relevant, and we're putting it in line for production and so.

        JUDGE PISANO: When?

---

[1] These pressures do not even account for the review of Imerys documents which are due to be produced to the PSC on January 5, 2018 pursuant to amended CMO 9.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 4 of 9

> MS. SHARKO: The deadline that Judge Wolfson gave us is I want to say the end of November. It might take a little longer than that.
>
> JUDGE PISANO: So by that time period you will represent that they have the entire universe of documents that was produced from all of these people in Skillman, New Jersey in 1998?
>
> MS. SHARKO: ***And more. We believe they have those documents now, but we're going back, and whether it's end of November...***

See Oct. 6, 2017 Conf. Tr. at pp. 36–37 (emphasis added).

This was reiterated by J&J when it sought to modify CMO 9 when it stated that "*in order to put an end to unnecessary discovery issues, defendants have decided to re-collect a number of previously collected document sources and produce responsive documents identified.*" See Exhibit 1. J&J's nonchalant description of its post-September 2017 document productions as nothing more than a "clean-up" productions was reiterated at the December 7, 2017 Status Conference:

> Ms. SHARKO: What we did, and we've been over this a number of times with the plaintiff, is a number of complaints ***we just redid the production. Are there new document in there? Yes, but not double the number***."

Dec. 7, 2017 Hear. Tr. at 17 (emphasis added).

J&J's repeated assurance that it was simply doing a quality control exercise to satisfy the PSC's "unnecessary discovery issues" was misleading. Whether measured in pages or documents produced, the post-September 2017 productions are both quantitatively substantial and qualitatively important. The number of *pages* produced went from under 700,000 to over 1,500,000 while the number of *documents* went from just over 110,000 to just under 200,000 since September 2017.

The PSC's review, which was conducted between Christmas and New Year's Day, reveals three (3) troubling conclusions that, as set forth below, directly impacts the PSC's ability to fulfill its discovery responsibilities.

- The documents produced since September are primarily new documents that have not been produced before.

- To the extent that J&J has produced duplicative documents in its recent productions, which Defendants acknowledge has occurred, Defendants assigned these documents wholly different Bates numbers, rendering it impossible for the PSC to avoid a manual re-review and re-analysis of these previously reviewed documents.

- The number of pages of documents produced by J&J Defendants in the 90 days since the entry of CMO 9 has more than doubled.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 5 of 9

**2.      The Impact of J&J's Last-Minute Document Production on the PSC's Discovery and Anticipated Expert Obligations Is Significant**

At the December 7th Status Conference, in anticipation of J&J's final document production, the Court ordered that the PSC produce a preliminary list of potential J&J deponents by January 10, 2018.  It is fair to say, however, in light of Defendants' repeated representations, that neither the Court nor the PSC anticipated that more than 400,000 pages of new documents would be produced on December 20 and 22.

While the PSC intends to comply with the Court's Order, its ability to do so has been significantly undercut by the avalanche of previously undisclosed documents, documents which should have been produced a year ago.  Needless to say, it is impossible for the PSC to review in several weeks and over a holiday that which took J&J a year to review, produce, and then dump on the PSC, only days before the January 10, 2018 deponent disclosure deadline.

Apart from the sheer volume of documents produced, the manner in which the documents were produced has rendered the PSC's prior work product frustratingly irrelevant.  As the PSC has begun to hurriedly review the recently produced documents, it has become apparent that the productions are a composite of new documents that have never before been produced, as well as previously produced documents that are now identified by new Bates numbers.

To the extent J&J has produced duplicative documents, the volume of which remains unclear, Defendants have assigned **new Bates numbers thereby eliminating the ability to identify or segregate them in order to avoid re-review**.  To cure this, the PSC requested a "key" i.e., some index that would cross reference the different Bates numbers being used for the same document, that would lessen the burden on the PSC in reviewing duplicate documents.  J&J indicated it would be too burdensome to provide such a key, a position which is wholly unreasonable. <u>See</u> email from P. Oot, Esq. to C. Tisi, Dec. 22, 2017 (Exhibit 2).

Finally, and even more troubling to the tasks at hand, the PSC has relied on J&J's prior assertions with respect to document production to identify potential deponents.  That reliance has now been significantly undermined.  To illustrate, in June 2017 the PSC requested the depositions of an initial group of four (4) J&J witnesses: Charles Wajsczuk, Homer Swei, Nancy Musco and Timothy McCarthy.

One of the primary reasons for choosing these four (4) J&J witnesses, witnesses who the PSC still desires to depose, was J&J's prior representation that all relevant and discoverable documents relating to these witnesses had been produced for the PSC to review.  The PSC relied on J&J's representations about the completeness of the document productions relating to these witnesses.  This reliance turned out to have been significantly misplaced.  Thus, while the PSC still desires to depose these witnesses, the PSC requires additional time to fully review the newly produced documents relating to these witnesses prior to being required to proceed with the depositions.  As illustrated by the chart below, for these four exemplar witnesses, each had a significant number of <u>additional</u> relevant documents produced just before Christmas:

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 6 of 9



## II.     ARGUMENT

**1.     THE PSC REQUESTS THAT THE COURT ALLOW THE PSC TO SUPPLEMENT ITS JANUARY 10TH DEPOSITION DISCLOSURE LIST ON OR BEFORE APRIL 30, 2018**

At the December 7 Status Conference, the Court directed the PSC to produce a tentative list of potential deponents by January 10, 2018.  In so doing, the Court acknowledged that the list could be amended. See Dec. 7, 2017 Hear. Tr. at p. 26.  However, the Court's assumption that there could be "two more" added to that list was clearly premised on J&J's representation that its productions were substantially complete, that any further productions would only be a minor "clean-up" and that since nothing significantly new would be produced, the PSC should be able to identify most of the witnesses they would depose.  As demonstrated above, the premises upon which both the Court and the PSC relied in discussing the PSC's obligation to identify witnesses by January 10, 2018 was not accurate.

Given the volume of documents that J&J produced in the last three (3) months, the PSC asks that the Special Master recommend that the PSC be allowed to supplement its January 10th anticipated deposition list on or before April 30, 2018.

**2.     THE PSC REQUESTS THAT THE SPECIAL MASTER RECOMMEND A DISCOVERY SCHEDULE THAT ALLOWS THE PSC TO REVIEW THE DOCUMENTS THAT J&J HAS PRODUCED PRIOR TO THE COMMENCEMENT OF DEPOSITIONS**

As described above J&J sought a significant extension of the CMO 9 deadline to accommodate its production of documents.  The PSC did not oppose J&J's extension request but

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 7 of 9

requested that the extension of time be considered in connection with an overall schedule so that the PSC would have adequate time to review and assimilate the new productions.  In a letter to the Court dated November 3, 2017, the PSC stressed that:

> Extensions of this magnitude without the provision of sufficient time for Plaintiffs to review the documents produced, to take depositions, and to provide the resulting evidence to their experts for consideration would result in undue prejudice to Plaintiffs.

See Letter from L. O'Dell to Hon. F. Wolfson, Nov. 3, 2017 (Exhibit 3).

While the Court directed the PSC to provide its witness list, it did not address deadlines for discovery that would follow that disclosure.  The PSC requests that the Special Master assist the parties in developing discovery schedule that would provide adequate time for the PSC to review the documents produced prior to the commencement of depositions.

3.    **THE PSC REQUESTS THAT J&J PROVIDE THE PSC WITH A KEY THAT WOULD ALLOW THE PSC TO IDENTIFY DUPLICATE DOCUMENTS IN THE PRODUCTION**

Immediately upon receipt of J&J's more than 400,000 page production on December 20th and 22nd , the PSC wrote to J&J to request that duplicate documents be identified or at least, that J&J provide a "key" identifying a document by both its "old" bates number and "new" bates number.  Without a key of this type, the PSC's work reviewing previously produced documents would be rendered useless. See Exhibit 2.

J&J responded to the PSC's request on Friday December 22nd. *Id.* In that response, J&J conceded that there were not only duplicate documents to those previously produced but also that the duplicate documents have "new bates numbers." J&J claims that it would be too burdensome to have produced the documents without duplicates, but J&J also has not provided a key to enable cross-referencing the various bates numbers assigned to the same document.

In the context of modernized document production, J&J's claim of burden is plainly unreasonable. The documents in question are J&J's documents, originating from J&J employees' files. J&J is well aware of the documents that were previously produced and well aware of the documents it recently produced. J&J certainly logged each document it produced into its own database.

A production methodology that re-produces documents previously produced with different bates numbers is unjustifiable, and the problem has been compounded by J&J's refusal to provide a key or index to permit cross-referencing by the PSC.  Because of the manner in which these documents were produced, an undue burden has been placed upon the PSC.  Without relief, the PSC will be required to re-review documents because of the PSC's inability to quickly identify duplicates through the use of a key or index.  Moreover, without relief, the PSC will be required to re-review documents in a fraction of the time J&J had to review and produce them. These problems would not have occurred had J&J taken its MDL document production in this MDL seriously as opposed to insisting that its "off the shelf" state court production be imported into this MDL.

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 8 of 9

    The PSC respectfully requests that J&J be directed to either de-duplicate its recent productions or to provide a "key" that would allow the PSC to de-duplicate the production. Anything less would result in the PSC spending extraordinary amounts of time and resources re-reviewing documents that have previously been produced. The PSC should not be required to bear the burden of J&J's inadequate productions.

## 4.   THE PSC REQUESTS THAT IT BE PERMITTED TO PRESENT A PETITION FOR COST-SHIFTING FOR THE EXTRAORDINARY WASTE CAUSED BY J&J'S DUPLICATIVE PRODUCTION

    Cost shifting in the course of first-party discovery is an extraordinary remedy. It is justified only when there has been manifest unreasonableness in a party's discovery conduct that visits unfair prejudice upon its adversary. By reproducing, at the eleventh hour, an enormous and randomized mix of old documents and new documents, with no way for the PSC to parse out the old from the new, J&J has visited extraordinary waste upon the PSC's resources.

    Most of the hundreds and hundreds of hours the PSC has spent reviewing and analyzing J&J's document production must now be repeated. This extraordinary waste imposed upon the PSC is even more egregious in light of the fact that the PSC stridently opposed J&J's approach to simply recycle prior state-court productions with the hope they would prove adequate for the MDL.

    As is now evident from the record, J&J's assessment was recklessly misplaced. Instead of acknowledging its miscalculation, and collaborating with the PSC to mitigate the miscalculation, it simply (and indifferently) reproduced most of its prior production with the new documents mixed in. New Bates numbers were then assigned to the production that should have occurred at the outset.

    Most significantly, J&J did not preserve any way to cross-reference the Bates numbers of the previously produced documents with the new Bates numbers of the same documents produced a second time. If J&J had preserved that information, the PSC could efficiently re-associate all of their prior work product to the same documents in the second production. These two grievous miscalculations by J&J – first, that a prior state court production would be suitable for this MDL, and second, failing to preserve the identity of previously produced documents – were both entirely foreseeable.

    It would be manifestly unfair for the economic burden of J&J's miscalculations to be visited entirely upon the Plaintiffs, and the Court has the inherent authority to provide a remedy. The extent of gratuitous waste imposed upon the PSC cannot yet be fully measured. Upon the completion of such an assessment, the PSC will seek leave of Court to submit a motion for equitable cost-shifting.

    Thank you for your consideration of these matters.

             Very truly yours,

             */s/ P. Leigh O'Dell*

             P. Leigh O'Dell
             Michelle A. Parfitt

Honorable Joel A. Pisano (Ret.)
January 5, 2018
Page 9 of 9


cc:     Honorable Freda L. Wolfson, U.S.D.J.
        Honorable Lois H. Goodman, U.S.M.J.
        Susan Sharko, Esq. (via e-mail)
        Julie Tersigni, Esq. (via e-mail)
        Patrick L. Oot, Esq. (via e-mail)
        Lorna Dotro, Esq. (via e-mail)
        Mark Silver, Esq. (via e-mail)
        Nancy Erfle, Esq. (via e-mail)
        Tom Locke, Esq. (via e-mail)
        Sheryl Axelrod, Esq. (via e-mail)
        Chris Placitella, Esq. (via e-mail)
        Warren Burns, Esq. (via e-mail)
        Richard Golomb, Esq. (via e-mail)
        Richard Meadow, Esq. (via e-mail)
        Hunter Shkolnik, Esq. (via e-mail)
        Christopher V. Tisi, Esq. (via e-mail)
        Larry Berman, Esq. (via e-mail)
        Dan Lapinski, Esq. (via e-mail)

# EXHIBIT 1

## DrinkerBiddle&Reath
L L P

Susan M. Sharko
973-549-7350 Direct
973-360-9831 Fax
Susan.Sharko@dbr.com

*Law Offices*

600 Campus Drive
Florham Park, NJ
07932-1047

973-549-7000
973-360-9831 fax
www.drinkerbiddle.com

*A Delaware Limited
Liability Partnership*

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
TEXAS
WASHINGTON D.C.

November 3, 2017

**BY ELECTRONIC MAIL**

Honorable Freda L. Wolfson
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

Re:     **In Re: Johnson & Johnson Talcum Powder Products Marketing,
Sales Practices and Products Liability Litigation
MDL No. 2738**

Dear Judge Wolfson:

On September 7, 2017, your Honor entered Case Management Order No. 9. The CMO provided dates for the November and December Case Management Conferences, and it set deadlines for (1) the completion of Johnson & Johnson Defendants' document production, (2) the completion of written discovery, and (3) Plaintiffs' identification of experts and delivery of expert testimony summaries.

As we discussed with Judge Pisano at the hearing last month, in order to put an end to unnecessary discovery issues, Defendants have decided to re-collect a number of previously collected document sources and produce the responsive documents identified. Defendants are also producing supplemental responses to Plaintiffs' First Set of Interrogatories and Document Demands in light of the expanded scope of discovery as defined by the Court. We advised Judge Pisano that we expected we would complete this effort by late November or December. We are working hard at this but based on current estimates, we believe that December 20 would be an appropriate completion date. Accordingly, we are submitting with this letter a proposed Amended Case Management Order 9, which extends the deadlines for document production and written discovery from November 6, 2017 and December 5, 2017, respectively, to December 20, 2017.

Co-Defendant, Imerys, has no objection. We have communicated with the Plaintiffs' Steering Committee and they want to tie this routine extension to an agreement on a complete scheduling order, whereas it is Defendants' position that this modest

*Andrew B. Joseph
Partner responsible for
Florham Park Office*

*Established* 1849

DrinkerBiddle&Reath
L L P

Honorable Freda L. Wolfson
November 3, 2017
Page 2

requested adjustment to discovery deadlines should not impact the remainder of the current case schedule.

Respectfully submitted,

*/s/ Susan M. Sharko*

Susan M. Sharko

SMS:mdm

cc:    Hon. Lois H. Goodman (via Electronic Mail)
       Hon. Joel A. Pisano (Ret.) (via Electronic Mail)
       Lorna Dotro, Esq. (via Electronic Mail)
       Thomas Locke, Esq. (via Electronic Mail)
       Leigh O'Dell, Esq. (via Electronic Mail)
       Michelle Parfitt, Esq. (via Electronic Mail)
       Christopher Placitella, Esq. (via Electronic Mail)

# EXHIBIT 2

## Tram Nguyen

| | |
|---|---|
| **From:** | Oot, Patrick L. (SHB) <OOT@shb.com> |
| **Sent:** | Friday, December 22, 2017 10:05 AM |
| **To:** | Chris Tisi; Frazier, Kat (SHB) |
| **Cc:** | 'Leigh O'Dell'; Michelle Parfitt; Kristie Hightower (khightower@lundylawllp.com); Deanna Marquez (deanna.marquez@miscindiana); Tram Nguyen |
| **Subject:** | RE: TALC--J&J Defendant's recent document production |

Hi Chris.

Please see answers to your questions below.

I hope you and your family have a very nice holiday.

Best,

Patrick

---

**From:** Chris Tisi [mailto:ctisi@ashcraftlaw.com]
**Sent:** Wednesday, December 20, 2017 12:59 PM
**To:** Frazier, Kat (SHB) <KFRAZIER@shb.com>; Oot, Patrick L. (SHB) <OOT@shb.com>
**Cc:** 'Leigh O'Dell' <Leigh.ODell@BeasleyAllen.com>; Michelle Parfitt <mparfitt@ashcraftlaw.com>; Kristie Hightower (khightower@lundylawllp.com) <khightower@lundylawllp.com>; Deanna Marquez (deanna.marquez@miscindiana.com) <deanna.marquez@miscindiana.com>; Tram Nguyen <tnguyen@ashcraftlaw.com>
**Subject:** TALC--J&J Defendant's recent document production

Kat and Patrick:

I hope that you are well.

We have received the recent J&J  production and would ask for a call with your team to clarify some questions that we have regarding this new production and its relationship to the old production.  Among other things which may occur to us as we load the documents, we would like to understand the following:

- Given prior statements about reproducing documents that were previously produced, we would like further understand this production.  In other words, are the documents in the 12/4 and 12/19 productions being reproduced under new bates numbers or are they are actually new documents.  We want to understand the relationship/overlap between this production and prior productions.

All documents in the productions that you reference have new Bates numbers.  We took appropriate steps to de-duplicate the recent production to avoid re-reviewing and re-producing documents where reasonably possible.  However, as we have previously stated, a large percentage of these documents are hard copy and cannot reasonably be de-duplicated.

- If these new documents  are reproductions of previously produced under new bates numbers, we want to understand why that was done that way and whether we can get this new production with the old bates numbers or at least a cross reference list that provides the old and new bates numbers so that we can determine what belongs together.

See above.  In addition, as agreed in CMO 5 Section VII, prior productions were produced under prior protocols.  As agree, the prior productions retained their Bates identifiers, metadata production format, redaction, etc.  Documents processed and produced after the entry of CMO 5 were produced using the PSC's requested protocol in Appendix 2 of the CMO.

- Additionally if they are reproductions under new bates numbers, are there differences in the metadata that was produced now versus what was originally produced.

See above.

- If the reproduced documents have redactions, are the redactions in the current set the same as redactions in previously produced documents (and vice versa)?

See above.

- For any reproduced documents, is there any changes to the privilege description  and will there be a new privilege log.

A privilege log pertaining to these documents will be provided in due course.

As you know, we have a compressed time to review these prior to identifying our preliminary list of deponents and would appreciate a call either today or tomorrow.

Please let us know your availability.

Best Regards,
Chris


CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, may contain confidential and privileged information, either as protected attorney work product or confidential client information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Mail Gate made the following annotations on Fri Dec 22 2017 09:04:45

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

# EXHIBIT 3



218 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103-4160
(334) 269-2343
(800) 898-2034
FAX: (334) 954-7555
BeasleyAllen.com

November 3, 2017

**VIA ELECTRONIC MAIL**

Honorable Freda L. Wolfson, U.S.D.J.
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

Re:   *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*
*MDL No. 2738*

Dear Judge Wolfson:

The Plaintiff's Steering Committee is in receipt of Defendants' Proposed Orders regarding the extension of time to produce documents and respond to written discovery. Prior to their submission, the parties met and conferred regarding Johnson & Johnson's request for an extension to December 20, 2017, and Imery's request for an extension to January 5, 2018. The PSC has endeavored to work cooperatively with Defendants. However, in this instance, Johnson & Johnson Defendants were unwilling to discuss the implications of an extension of time to the scheduling of future depositions and other discovery and to the disclosure of expert reports. Johnson & Johnson Defendants have repeatedly sought early disclosure of expert reports and the scheduling of a *Daubert* hearing. Johnson & Johnson Defendants have been both unwilling to discuss a broader scheduling order or to agree that they would not continue to seek an early *Daubert* proceeding.

During the meet and confer process, Imerys was willing to engage in discussions about an overall scheduling order and to work cooperatively to address Imerys's need for additional time and Plaintiffs' need to ensure adequate time to prepare their experts.

Extensions of this magnitude without the provision of sufficient time for Plaintiffs to review the documents produced, to take depositions, and to provide the resulting evidence to their experts for consideration would result in undue prejudice to Plaintiffs.

Plaintiffs propose that the extensions of time be considered in light of a broader schedule that includes the following components:

- Date by which Plaintiffs shall disclose the names and qualifications and topics expected for experts;

Honorable Freda L. Wolfson, U.S.D.J.
November 3, 2017
Page 2 of 3

- Date by which the Defendants shall disclose the names and qualifications and topics expected for experts;
- Date by which Defendants shall complete document production;
- Date by which Defendants shall complete their written discovery;
- A Status Conference with Judge Pisano following certification that written and document production is substantially complete;
- Date on which depositions can commence;
- Date for completion of depositions;
- Date for Plaintiffs' expert reports;
- Date for Defense Expert reports;
- Date for rebuttal reports;
- Dates for expert depositions;
- Daubert and dispositive Motions briefing schedule; and
- Date for a Daubert conference to set hearings, if requested.

Plaintiffs propose a stay of the deadlines in CMO No. 9 for 7 days, including Plaintiffs' deadline for disclosure of the identities of their experts. This brief moratorium would allow the parties to meet and confer regarding a scheduling order. Should the parties not be able to reach an agreement, which appears unlikely, Plaintiffs request Judge Pisano's assistance in working out a proposed schedule that would be presented to the Court at least (7) days prior to the December 7th status conference.

Thank you for your consideration of these matters.

Respectfully submitted,

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell

*/s/ Michelle. A. Parfitt*
Michelle A. Parfitt

cc:     Hon. Lois H. Goodman
        Hon. Joel A. Pisano (ret.)
        Christopher M. Placitella, Esq.
        Susan Sharko, Esq.
        Patrick Oot, Esq.
        Gene Williams, Esq.
        Kat Frazier, Esq.
        Lorna Dotro, Esq.

Honorable Freda L. Wolfson, U.S.D.J.
November 3, 2017
Page 3 of 3

      Mark Silver, Esq.
      Nancy Erfle, Esq.
      John Beisner, Esq.
      Tom Locke, Esq.
      Sheryl Axelrod, Esq.

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL NO. 16-2738 (FLW) (LHG) |

*THIS DOCUMENT RELATES TO ALL CASES*

### THE PLAINTIFFS' STEERING COMMITTEE'S
### INITIAL DISCLOSURE OF POTENTIAL DEPONENTS

In accordance with the Court's December 7, 2017 Order, the Plaintiffs' Steering Committee (PSC) provides the below list of witnesses who may be subject to deposition and states as follows:

1.     **The PSC's Initial Disclosure of its List of Potential Deponents:**  On September 7, 2017, the Court ordered Defendants to complete their document productions by November 6, 2017. That deadline was subsequently extended for the J&J Defendants until December 20, 2017, and for Defendant Imerys until January 5, 2018.  See CMO 9 (Doc. 673) and Amended CMO 9 (Doc. 2090).  The entry of these Orders precipitated voluminous productions of new documents in the final days of the formal discovery period, with the largest volume of documents being produced to the PSC in the last several weeks.  The specifics about these productions are described below:

A.  **J&J Defendants**: Prior to the entry of CMO 9 in September 2017, J&J had produced 678,777 pages of documents. Most of these documents (508,705 pages) were the earlier "state court production" and were produced in the MDL in late April 2017. While J&J initially insisted this first production fulfilled its MDL discovery obligations, that proved not to be the case.  Following the entry of CMO 9, the number of J&J documents requiring PSC review ballooned to over 1,500,000 pages, with over 400,000 pages being produced just days before Christmas.  J&J's productions subsequent to its earlier "state court production" are illustrated by the following table:[1]

---

[1] A detailed analysis of the J&J Defendants' flawed productions is set forth in the PSC's letter of January 5, 2018 to Special Master Pisano, incorporated by reference.  This letter also describes the relief that the PSC desires as a result of the J&J Defendants' defective productions.

1



B. **Imerys**:  Pursuant to the Amended CMO 9 discovery timetable, Defendant Imerys made its final MDL production on January 5, 2018. Imerys produced just over 75,000 pages of new documents in the past 5 days.

2.  **Supplementation and Amendment of this List**: Given the last-minute nature of defendants' productions, the PSC has not had adequate time to review this discovery. The list of deponents below is therefore initial and subject to change.  As noted the PSC's letter of January 5, 2018 to Special Master Pisano requests an extension until April 30, 2018 to supplement this list with additional potential deponents.

3.  **The Number of Potential Deponents:**  In preparing its initial list of proposed deponents, the PSC was guided by the number of fact witnesses deposed in MDL's of similar size, significance and complexity, including cases where J&J was a defendant:[2]

---

[2] Cases involving J&J as a defendant are noted with an "*".

| CASE | Fact/Corporate Depositions Taken or Permitted[3] | PSC Experts Identified | Defense Experts Identified | Total Plaintiffs |
|---|---|---|---|---|
| *In Re: Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL No. 2385 (S.D. Il.) | 47 (2-day limit) | 0[4] | | ~4,000 |
| *In Re: Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Relevant Products Liability Litigation*, MDL No. 2100 (S.D. Il.) | 57 | ~28 | | ~20,000 |
| *In Re: Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.) | 90 | 23 | | ~56,000 |
| *In Re: Xarelto* (Rivaroxaban) Products Liability Litigation*, MDL No. 2592 (E.D. La.) | 45 (2-day limit by Court Order) | 23 | 40 | 19,192 |
| *In Re: Gadolinium Based Contrast Agent Litigation*, MDL No. 1909 (N.D. Oh.) | 32 (20 were 2 days or longer) | 19 | 9 | ~1,000 |
| *In Re: Tylenol* (Acetaminophen) Marketing and Sales Practice and Products Liability Litigation*, MDL No. 2436 (E.D. Pa.) | 20 (by Court Order) | 12 | | 275 |
| *In Re: Testosterone Replacement Therapy Products Liability Litigation, et al.*, MDL No. 2545 (N.D. Il.) | 80 AbbVie - 43 Auxillium - 37 (by Court Order) | 21 | | |
| *In Re: Benicar (Olmesartan) Products Liability Litigation*, MDL No. 2606 (N.J.) | 50 general causation only (by Court Order) | 6 | | ~2,500 |
| *In Re: Actos (Pioglitazone) Products Liability Litigation*, MDL No. 2299 (W.D. La.) | ~50 | 17 | 16 | ~6,000 |
| *In Re: DePuy Orthopaedics, Inc.*, Pinnacle Hip Implant Products Liability Litigation*, MDL. No. 2244 (E.D. Tx.) | ~80 | ~12-15 | ~12-15 | ~9,500 |

---

[3] This number does not include third party non-party witnesses.
[4] Case settled before expert disclosures.

4. **Timing and Logistics of Depositions:**  The PSC requests depositions begin only after it has had a reasonable opportunity to review 800,000+ pages of documents newly produced by Defendants following the entry and amendment of CMO 9.  The PSC proposed in its January 5, 2018 letter that this issue would be an appropriate topic for the parties to cover with the Special Master at the upcoming January 22, 2018 conference.  See fn. 1.

5. **Scope of the List:**   The PSC limited its list of witnesses to those who it expects can shed light on the issues the Court has already deemed discoverable, including science-related issues and "what defendants knew".  See Hearing Transcript, Sept. 6, 2017, pp. 4-14.  The PSC did not include witnesses whose responsibilities appear to be primarily in the areas of marketing, sales and distribution, and reserves the right to request depositions of additional witnesses who have information in these areas and on these topics at a later date.

6. **30(B)(6) witnesses:**  The PSC has endeavored to identify 30(b)(6) witnesses on the substantive topics outlined below, but reserves the right to supplement those topics as appropriate and necessary.

## WITNESSES

The PSC submits the following individuals as potential deponents. For the Court's convenience, the PSC provides the witness's title, as best as the PSC could discern it.  Many of these witnesses, however, were employed for decades and may have held numerous positions and played different roles with respect to the issues in this case.

## I.   JOHNSON & JOHNSON DEFENDANTS

1. **Bruce Semple –** Director, Medical & Regulatory Affairs

2. **Charles Wajszczuk –** Director, Product Safety; Senior Director, Medical Safety Officer, Office Safety and Toxicology Consumer Health Care

3. **Donald "Don" Hicks –** Former Senior Director, Quality Assurance

4. **Jethro Ekurta –** Vice President, Global Head of Multiple Franchises and Regional Head of North America, Global Regulatory Affairs, J&J Consumer Inc.

5. **Erin McNabb –** Product Surveillance Scientist

6. **George Lee –** Director, Applied Research

7. **Helen Han Hsu –** Vice President, Head of Drug Safety Sciences

8. **Homer Swei –** Associate Director, Product Stewardship

9.      **James Molnar –** Director, Laboratory Services

10.     **Jane Cai –** Senior Director, Analytical Development

11.     **Jijo James –** Chief Medical Officer, JJCI

12.     **Joan Casalvieri –** Director, Toxicology

13.     **John Hopkins** – Former Director, Worldwide Category of Infant Care and Consultant

14.     **John Lemmo –** Principal Scientist; Research Manager, Fellow, Analytical SMP

15.     **Katharine Martin** – Senior Director, Research & Development

16.     **Kathleen Wille –** Senior Director, Scientific and External Regulatory Policy, Product Stewardship

17.     **Lorena Telofski –** Associate Director, Research and Development, Global Scientific Engagement

18.     **Michael Chudkowski –** Manager, Preclinical Toxicology

19.     **Nancy Musco –** Manager, Product Safety & Education

20.     **Regina Gallagher –** Principal Scientist

21.     **Santosh Jiwrajka –** Vice President, Quality Assurance

22.     **Simonette Cordero Soriano –** Safety Surveillance Physician

23.     **Steve Mann –** Former Director of Toxicology for J&J Consumer & Personal Products Worldwide (CPCUS)

24.     **Susan Nettesheim –** Vice President, Product Stewardship & Health Care Compliance

25.     **Susan Nicholson –** Vice President, Safety Surveillance and Risk Management, Consumer Products

26.     **Tara Glasgow –** Vice President, Research and Development, Baby and Scientific Engagement

27.    **Teresa Gonzalez Ruiz –** Product Director

28.    **Timothy McCarthy –** Director, Office of Safety and Toxicologist

29.    **William "Bill" J. Powers, Jr. –** Former Vice-President, Global Preclinical Development, Toxicologist

30.    **30(b)(6) Witness(es)**:
    i.    Relationship between J&J and JJCI, including historical relationships;
    ii.    Corporate structure;
    iii.    Manufacturing and testing of talc, including chain for custody for samples maintained;
    iv.    Safety assessment and monitoring to talcum powder products;
    v.    Relationship between J&J entities and other stakeholders including with co-defendants and FDA; and
    vi.    Evidentiary foundation for documents.


II.    **IMERYS TALC AMERICA, INC.**[5]

1.    **Craig Bernard –** Regulatory Affairs and Product Stewardship; Environmental and Health Scientist

2.    **Dave Matlock** – Operations Manager

3.    **Ed McCarthy –** Scientist

4.    **Eric Turner –** Vice President, Health and Safety Sustainability

5.    **Jim Kopp –** Manager

6.    **Jocelyn Ferret –** Project Stewardship and Analytical Lab Manager

7.    **John Poston –** Sr. Quality Manager

8.    **Julie Pier –** Global Laboratory Manager/Senior Scientist

9.    **Kent Cutler –** Vice President, Sales & Marketing

10.    **Maurizio Coggiola –** Commissioned Expert

---

[5] Includes all predecessor companies.

11. **Michele Refregier –** Chief Medical Officer

12. **R. Wayne Ball –** Environmental & Health Scientist

13. **Shripal Sharma –** Global Director, Product Stewardship

14. **Steve Jarvis –** Director, Health, Safety & Environment

15. **Phillippe Moreau** – Geologist

16. **Jon Godla** – Vice President Operations

17. **30(b)(6) Witness(es)**:
    i. Corporate structure and relationship to predecessor entities;
    ii. Relationship with co-Defendants and other entities like FDA;
    iii. Mining, manufacturing, testing, and safety and quality assessment of talc for talcum powder products; and
    iv. Evidentiary foundation for documents.

III. **Personal Care Products Council**

1. **Gerald "Jerry" McEwen –** Former Vice President, Science

2. **John Bailey –** Former Executive Vice President, Science

3. **Alan Andersen –** Former Director, Cosmetic Ingredient Review (CIR)

4. **Ivan Boyer –** Chief Toxicologist, Cosmetic Ingredient Review (CIR)

5. **Monice Fiume –** Senior Scientific Analyst/Writer, Cosmetic Ingredient Review (CIR)

6. **30(B)(6) Witness(es)**:
    i. Structure and relationship to predecessor entities;
    ii. Relationship with co-defendants and other entities like FDA and CIR; and
    iii. Evidentiary foundation for documents.

IV. **NON-PARTIES**

1. **William "Bill" Kelly, Jr. –** Consultant and Western Representative, Center for Regulatory Effectiveness (CRE)

2.  **Jim Tozzi –** Member, CRE Advisory Board; Director, Multinational Business Services, Inc.

3.  **Colorado School of Mines –** 30(b)(6) witnesses

4.  **Crowell and Moring –** Consultant on Regulatory Affairs, 30(b)(6) witnesses

5.  **Joshua Muscat –** Consulting Scientist

6.  **Michael Huncharek –** Consulting Physician and Scientist, founder of Meta-Analysis Research Group

7.  **IMA-North America –** Industrial Minerals Trade Association

8.  **McCrone Associates –** Asbestos Testing and Analysis Laboratory

9.  **RJ Lee –** Asbestos Testing and Analysis Laboratory


Date:  January 10, 2018                    Respectfully Submitted,


*s/Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
4900 Seminary Road, Suite 650
Alexandria, VA 22311
Telephone: 703-931-5500
Email: mparfitt@ashcraftlaw.com


*s/P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, PC
218 Commerce Street
Montgomery, AL 36104
Telephone: 334-269-2343
Email: leigh.odell@beasleyallen.com


*s/Christopher M. Placitella*
Christopher M. Placitella
COHEN PLACITELLA ROTH, PC
127 Maple Avenue

8

Red Bank, NJ 07701
Telephone 888-219-3599
Facsimile: 215-567-6019
Email: cplacitella@cprlaw.com

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: TYLENOL (ACETAMINOPHEN) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | § § § § | **MDL NO. 2436** **2:13-md-02436** |
| ***THIS DOCUMENT RELATES TO ALL CASES*** | § § § § | **HON. LAWRENCE F. STENGEL** |

**CASE MANAGEMENT ORDER NO. 14**
**(DEPOSITION PROTOCOL FOR NON-EXPERT WITNESSES)**

1. **<u>Purpose of this Order</u>** –   The purpose of this Order is to gain the highest degree of efficiencies and cooperation in the taking of depositions in Tylenol (Acetaminophen) related litigation.  While recognizing the benefits to the parties, their counsel, and the judicial system that result from coordination and cooperation, this court, counsel, and the parties also recognize that each state is an independent jurisdiction. Therefore, it is not the intention of the court or the parties that judges in any of the participating jurisdictions delegate their duties to any other judicial officer.

2. **<u>Applicable Rules</u>** – Unless otherwise agreed by all parties, when a deponent is questioned by an attorney that is a member of the PSC or a designee of the PSC, the depositions will proceed according to the Federal Rules of Civil Procedure and Local Rules.  However, if a deposition is crossed-noticed in a state court proceeding, the state court rules shall apply during the portion of the questioning by the state court attorneys. Any agreement to deviate from the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Order must be recorded on the transcript at the time the deposition commences.

3. **<u>Expert Depositions</u>** – This deposition protocol does not apply to expert witnesses which will be covered by a separate case management order that will be entered at a later time, if necessary.

4. **Number of Depositions**

   a. The PSC shall in good-faith take only those depositions of defendants and their current employees deemed reasonably necessary under the circumstances of this case.  Defendants shall make available, without requiring a subpoena, all current employees requested by the PSC for deposition, subject to the limits set on the number of depositions set forth within this Order and to defendants' right to object to the taking of any particular employee's deposition for good cause shown.  Defendants shall take reasonable steps to make available requested former employees, to the extent possible.

   b. The PSC collectively shall be limited to twenty (20) depositions of defendants' current employees and former employees, pursuant to Fed. R. Civ. P. 30(b)(6).

   c. The defendants shall in good faith take only those depositions of the plaintiffs' treating healthcare providers reasonably necessary under the circumstances of this case. The defendants shall not contact any of the plaintiffs' treating healthcare providers ex parte before the deposition.  All scheduling and communications with the plaintiffs' treating healthcare providers shall be through the plaintiffs' counsel. The defendants collectively shall be limited to the deposition of only:

      i. the plaintiff;

      ii. the plaintiff's spouse, if any (or parent if the injured party is a child, or representative of decedent); and

      iii. two (2) treating physicians and/or health care providers.

   d. Additional depositions may be allowed with leave of court upon good cause shown.

5. **Deposition Notices**

    a.   All depositions in 2:13-md-02436 will be noticed and conducted pursuant to Fed. R. Civ. P. 30.

    b.   Deposition Notices shall be in a form consistent with the Federal Rules of Civil Procedure and shall identify whether the deposition is to be videotaped.

    c.   Any Deposition Notice served pursuant to Fed. R. Civ. P. 45 will attach this Deposition Protocol.

6. **Cooperation in Scheduling**

    a.   The court will not set specific deadlines for beginning depositions or the amount of notice that will be given. The court expects the parties to use good judgment in scheduling depositions and in noticing depositions.

    b.   Individuals to be deposed should be given a reasonable amount of advance notice. All notices propounded pursuant to Fed. R. Civ. P. 30(b)(6) must give the witness to be deposed adequate time to prepare himself or herself on the subject matter of the deposition.

    c.   Absent extraordinary circumstances, counsel shall consult with opposing counsel and counsel for proposed deponents in an effort to schedule depositions at mutually convenient times and locations.

    d.   Counsel shall attempt in good-faith to cooperate in the scheduling of depositions considering the demands on the time and schedules of both the parties and their respective counsel.

    e.   More than one deposition may take place in 2:13-md-02436 at the same time, except that no more than two (2) depositions may be scheduled by any party for depositions on the same

day absent agreement by the parties or court order. Counsel shall act in good faith and endeavor, to the extent possible, to not schedule an unreasonable number of depositions on the same day or in disparate locations.

f.  Nothing in this CMO prevents the parties from seeking court intervention through a motion for a protective order, motion to quash, or other relief afforded by the Federal Rules of Civil Procedure. The parties shall attempt to address disputes related to depositions using the discovery dispute letter procedure contained in CMO-6, unless the timing of a forthcoming deposition or other event does not permit.

7.  **Cooperation at Deposition**

a.  <u>No smoking</u> – There shall be no smoking or use of other tobacco products in any room in which a deposition is being conducted at any time before, during, or after a deposition.

b.  Counsel are reminded that the courts consider depositions to be official court procedures and the conduct of all participants in depositions shall be in accordance with the customs and practices expected of lawyers and witnesses appearing before these courts, as if each was appearing personally before the court at the time of the depositions.

c.  Counsel shall not at any time conduct himself or herself in a manner not becoming an officer of the court and not in full compliance with the civil rules of practice and all other orders of the courts.  Neither counsel nor witnesses shall, at any time, engage in conduct that impedes, delays, or frustrates the examination of the witness. All counsel and the deponent must be treated with civility and respect.

4

8. **Location for Depositions**

   a. <u>Plaintiff Depositions</u> – Unless otherwise agreed by the parties' liaison counsel, depositions of plaintiffs (or representatives of the plaintiff) will take place in the plaintiff's locale or, by agreement of the parties, in the metropolitan city with a major airport closest to the deponent's residence.

   b. The location of the depositions shall be as consistent as feasible within each city, so that videotape equipment, if being used, can be left in place.

   c. <u>Defendants' Current and Former Employees</u> – To the extent reasonably possible, depositions of current and former employees of defendant shall take place at a mutually agreed-upon location in: Philadelphia, Pennsylvania; New Jersey; or the home federal district of the deponent.

9. **Attendance**

   a. <u>Who May be Present</u> – Unless otherwise agreed to by the PSC or Defense Lead or Liaison Counsel, depositions may be attended only by the parties, the deponent, the deponent's attorney, attorneys of record in 2:13-md-02436 or state Tylenol (Acetaminophen) cases (including any employee of such attorney who is assisting in the litigation and whose presence is reasonably required by the attorney), in-house counsel for defendants, the court reporter, and the videographer. For good cause shown, and upon prior notice to the PSC or Defense Lead or Liaison Counsel or request to the Court, attendance may be permitted for a person who does not fall within any of these categories.

b. <u>Use of Confidential Documents</u> – Use of confidential documents and/or confidential information shall be used in accordance with CMO-1 (Regarding Confidential Information) entered in 2:13-md-02436.

10. **<u>Conduct of the Deposition</u>**

a. Except by order of the court, the following provisions shall apply at all depositions of fact witnesses.

b. <u>Selection of Attorneys to Conduct Examination and Length of Deposition</u> –  One attorney will conduct the principal examination of the deponent on behalf of each of:

    i.  the PSC;

    ii.  plaintiffs in state court actions;

    iii.  Defendants J&J and McNeil; and

    iv.  each other named defendant(s).

c. The attorney so designated by the PSC will cooperate with other plaintiffs' counsel in advance of the date scheduled for the deposition regarding the areas of examination in order to conduct a thorough and non-duplicative examination.

d. <u>Sequence of Examination for Depositions</u>

    i.  Questioning at the depositions to be taken by the PSC will be conducted in the following sequence:

        1.  the primary examiner selected by the PSC—which may include a lawyer from the state court litigants;

        2.  other 2:13-md-02436 plaintiffs' attorneys on non-redundant matters;

3. the primary examiner selected by the state court litigants, if not the primary questioner in the deposition;

4. the primary examiner selected by Defendants J&J and McNeil or other defendants as applicable;

5. individual counsel for the deponent, if any; and

6. any recross or redirect by those mentioned above.

ii. Questioning at the depositions taken by Defense Lead or Liaison Counsel or designated counsel shall be conducted in the following sequence:

1. the primary examiner selected by J&J and McNeil;

2. any other 2:13-md-02436 counsel for defendants;

3. the primary examiner selected by the PSC—which may include a lawyer from the state court litigants;

4. any other 2:13-md-02436 plaintiffs' attorney on non-redundant matters;

5. the primary examiner selected by the state court litigants if not the primary questioner in the deposition;

6. individual counsel for the deponent, if any; and

7. any recross or redirect by those mentioned above.

11. **<u>Duration</u>**

a. The time limitations imposed by Fed. R. Civ. P. 30(d)(1)—one (1) day of seven (7) hours— shall apply in the MDL, unless the parties agree to a different time limitation or the court establishes a different time limitation.

b. In the event a party desires to take a witness's deposition for a greater period of time than the time set forth above, the parties shall meet and confer to negotiate the amount of additional time, if any. If the parties are unable to agree, the party requesting the additional time may move the court for an Order granting the additional time. The parties shall attempt to address disputes related to depositions using the discovery dispute letter procedure contained in CMO-6, unless the timing of a forthcoming deposition or other event does not permit.

12. **Objections and Directions Not to Answer**

a. <u>Objections preserved until time of trial</u> – All objections, except those as to form and privilege, are reserved until trial or other use of the depositions.

b. <u>Objection by one is for all</u> – Any objection made at a deposition shall be deemed to have been made on behalf of all other parties.

c. <u>No Speaking Objections</u> – Counsel shall refrain from engaging in colloquy during deposition. The phrase "objection as to form" or similar language shall be sufficient to preserve all objections as to form until the deposition is sought to be used. If requested, the objecting party shall provide a sufficient explanation for the objection to allow the deposing party to rephrase the question. No speaking objections are allowed and professionalism is to be maintained by all counsel at all times. Counsel shall not make objections or statements which might suggest an answer to a witness.

d. <u>Limited Instruction to not Answer</u> – Counsel shall not direct or request that a witness refuse to answer a question unless that counsel has objected to the question on the ground that the question seeks privileged information, information that the court has ordered may not be

8

discovered, or a deponent or his or her counsel intend to present a motion to the court for termination of the deposition on the ground that it is being conducted in bad faith or in such a manner as to unreasonably annoy, embarrass or oppress the party or deponent, or to discover evidence that the deponent's counsel believes is not discoverable.

e. <u>Consulting with Witness during Deposition</u> – Private consultations between deponents and their attorneys during the actual taking of the deposition are improper, except for the purpose of determining whether a privilege should be asserted. Any such conferences such conferences may be held during normal recesses, adjournments, or if there is a break in the normal course of interrogation and no questions are pending. However, counsel shall not seek to alter the substance of the testimony of the witness during the aforementioned conferences.

f. <u>Objections to Documents</u> – Objections to the admissibility of documents are not waived and are reserved for later ruling by the court or trial judge. A party need not "move" the admission of a document in a deposition to preserve its use at trial.

g. <u>Authenticity of Exhibits</u> – Any objection to the authenticity of an exhibit used in the deposition must be made by defendants within twenty (20) days of the deposition, or the exhibit will be deemed authentic. If defendant subsequently obtains information that an exhibit is not authentic, it will promptly notify the PSC. All parties shall cooperate as necessary so that the court may issue a ruling on any objection to a document prior to trial or prior to any remand of cases for trial in the transferor courts.

13. **Disputes during the deposition**

    a. Disputes between the parties arising during a deposition should be addressed to this court, or to a state court judge if the deposition is cross-noticed, rather than to the court in the district in which the deposition is being conducted.

    b. <u>If a dispute arises before or after a deposition</u> – Promptly upon filing a motion in the court in which her case is pending, the moving party will email a copy of the motion to Judge Stengel (Chambers_of_Judge_Lawrence_F_Stengel@paed.uscourts.gov) and his staff as follows: Melissa Mazur, Law Clerk (melissa_c_mazur@paed.uscourts.gov), and Pat Cardella, Deputy Clerk (pat_cardella@paed.uscourts.gov).  Copies of the request, together with the supporting documents, shall be e-mailed to the counsel involved in the immediate dispute and the leadership of defendants and of plaintiffs for each jurisdiction.  No supporting memorandum or brief will be necessary, unless requested by the court.  Exhibits attached to the motion are discouraged and, if used, should be kept to a minimum. To the extent the dispute relates to an action outside of the MDL proceedings, this court will endeavor to coordinate conferral among the courts for resolution of the issue, consistent with the law of the various jurisdictions.

    c. <u>If a dispute arises during a deposition that requires expedited consideration</u> – The party requesting the intervention of the court will send a short email to this court (as set forth above) stating as follows: *"The parties to the Tylenol MDL request your assistance resolving a dispute in connection with an ongoing deposition, and request a time to confer with the court by telephone at its earliest convenience."*  The party requesting assistance shall provide the court with a brief, non-argumentative description of the dispute that needs

10

resolution. The email shall be copied to lead counsel present at the deposition and to the designated lead and liaison counsel in the MDL. The email shall include the best telephone number(s) at which to reach the counsel involved in the deposition in which there is a dispute. After receipt of the email, the court will initiate a telephone conference between the court and counsel as soon as possible.

   d.  Nothing in this order should be read to prohibit any party from raising a dispute either before or after a deposition with any state court judge.

14. **Exhibits**

   a.  <u>Marking</u> – The first time a document is marked as a deposition exhibit, it shall be referred to by the Bates number appearing on the document. Documents that have not been previously produced shall be assigned a Bates number from a range of numbers reserved for this purpose. Thereafter, the exhibit shall be referred to by its deposition exhibit number. Counsel shall use reasonable efforts to mark exhibits sequentially and shall attempt to use the previously marked exhibit number in subsequent depositions rather than re-marking the same exhibit with different exhibit numbers.

   b.  <u>Copies</u> – A copy of any document about which examining counsel expects to question the deponent should ordinarily be provided to the reporter, the deponent, primary counsel for the parties, and deponent's counsel at the time it is presented to the deponent.

15. **Subpoenas and Documents**

   a.  <u>Subpoenas Pre-Notice</u> – Prior to serving a valid subpoena pursuant to Fed. R. Civ. P. 45, the party serving the subpoena shall provide pre-notice service to the opposing party of no less

than fifteen (15) days. If the opposing party fails to move to quash or seek other relief within the fifteen (15) day period, the serving party may serve the subpoena upon the witness.

b. <u>Document Request Within Subpoena or Deposition Notice</u> – A subpoena or notice upon a witness to testify and product documents (duces tecum) shall be noticed and served with the subpoena or deposition notice and document request at least thirty (30) days before the scheduled deposition. This provision shall not supersede any preexisting agreement or order governing which documents should be produced and/or when.

16. **<u>Custodial Files</u>**

a. <u>Supplementing</u> – Defendants shall supplement their custodial file of any employee, former employee or consultant within thirty (30) days of the date that the Notice of Deposition is served. The PSC shall not notice a deposition any sooner than thirty (30) days from the date the Notice of Deposition is served.

b. <u>Certification from defendants</u> – This supplementation, if any, of the custodial file shall be accompanied by a good-faith certification from defendant that they have, in good faith, produced all relevant documents pertaining to that witness to the PSC.  That certification shall also be accompanied by a privilege log relating to that witness so that the PSC may review and, if necessary, timely challenge any assertion of privilege relating to the deponent.

c. <u>Redactions and Privilege</u> – With respect to any document withheld or redacted, the producing party shall produce a privilege log at the time of within seven (7) days of producing the custodial file materials.

12

17. **Image Recorded Depositions** – Any deposition may be videotaped at the request of any party, provided that the deposition notice or subpoena contains or is accompanied by a notice that the deposition will be videotaped and the following conditions are met:

    a. <u>Simultaneous Stenographic Recording</u> – All videotaped depositions shall be simultaneously stenographically recorded.

    b. <u>Cost of the Deposition</u> – The party requesting videotaping of the deposition shall bear the expense of both the videotaping and the stenographic recording.

    c. <u>Access to Copies</u> – Subject to any restrictions contained within the Protective Order entered in this litigation, any party may at its own expense obtain a copy of the videotape and the stenographic transcript by contacting counsel that noticed the deposition or the court reporter.

    d. <u>Videotape Operator</u> – The operator(s) of the videotape recording equipment shall be subject to the applicable provisions of Fed. R. Civ. P. 28 and similar state court rules.

    e. <u>Swearing the Witness</u> – At the commencement of the deposition the operator(s) shall swear or affirm to record the proceedings fairly and accurately. The operator shall produce both video and DVD formats of each deposition.

    f. <u>Standards</u> – Unless physically incapacitated, the deponent shall be seated at a table except when reviewing or presenting demonstrative materials for which a change in position is needed. To the extent practicable, the deposition will be conducted in a neutral setting, against a solid background, with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as necessary to record accurately the natural body movements of the deponent or to portray

exhibits and materials used during the deposition. Sound levels will be altered only as necessary to record satisfactorily the voices of counsel and the deponent.

g. <u>Filing</u> – After the deposition is completed, the video operator shall certify on camera the correctness, completeness, and accuracy of the videotape recording in the same manner as a stenographic court reporter, and file a true copy of the videotape, the transcript, and certificate with Liaison Counsel for whomever noticed the deposition.

h. <u>Technical Data</u> – Technical data such as recording speeds and other information needed to replay or copy the tape shall be included on copies of the videotaped deposition.

18. **<u>Correction and Signing Depositions</u>** – Unless waived by the deponent, the transcript of a deposition shall be submitted to the deponent for correction and signature within thirty (30) days after the end of the deposition. The deposition may be signed by the deponent before any notary within thirty (30) days after the transcript is submitted to the deponent. If no corrections are made during this time, the transcript will be presumed accurate.

19. **<u>Coordination with State Court Actions/Cross-Noticing of Depositions</u>**

a. <u>Cross-Notices</u> – Any witness deposition in this litigation subject to this Order may be cross-noticed by any party in any Tylenol-related action pending in state court. There should be full participation by all jurisdictions in every deposition.

b. If a state court deposition has been cross-noticed in this MDL and state court plaintiffs wish to take a subsequent deposition of that witness, the state court plaintiffs shall raise that matter with the state court judge who is presiding over the state court litigation.

c. <u>Coordination of Depositions</u> – Plaintiffs' counsel from all jurisdictions shall coordinate the scheduling of depositions and the duties for examination of the deponent. In the interest of

14

efficiency, the fewest number of attorneys possible should be used at each deposition. Under no circumstance shall more than two plaintiffs' attorneys for each jurisdiction question a witness.

20. **Use of Depositions** – Depositions conducted in this MDL may be used in related cases in any state court to the extent permitted by that state's laws and rules. Depositions may, under the conditions prescribed in Fed. R. Civ. P. 32(a)(1)-(4) or as otherwise permitted by the Federal Rules of Evidence, be used by or against any party (including parties later added and parties in cases subsequently filed in, removed to, or transferred to this court as part of this litigation):

    a.  who is a party to this litigation;

    b.  who was present or represented at the deposition;

    c.  who was served with prior notice of the deposition or otherwise had reasonable notice thereof; or

    d.  who, within thirty (30) calendar days after the transcription of the deposition (or, if later, within sixty (60) calendar days after becoming a party in this Court in any action that is a part of this MDL proceeding), fails to show just cause why such deposition should not be useable against such party.

21. **Timing of Trial Preservation Deposition After Discovery Depositions** – To the extent defendants wish to conduct a "preservation" deposition for trial of a current or former employee or a consultant, the PSC shall be afforded at least thirty (30) days notice of the intent to take the preservation deposition and an opportunity to take a discovery deposition of that witness. In the event the PSC chooses to take a discovery deposition of the witness, the preservation deposition to

be taken by defendants shall not commence any sooner than seventy-two (72) hours after the completion of the discovery deposition.

22. **Supplemental Depositions** – The initial noticed deposition shall be presumed to be the complete deposition for discovery purposes barring exceptional circumstances. In the event a party seeks to re-depose a fact witness, the parties shall meet and confer regarding the request for a second deposition. If the parties are unable to reach an agreement, the party requesting the deposition may move the court for an order permitting the deposition. The parties shall attempt to address disputes related to depositions using the discovery dispute letter procedure contained in CMO-6, unless the timing of a forthcoming deposition or other event does not permit.

23. **Early Depositions** – If the parties become aware of persons who possess relevant information but who by reason of age or ill health may become unavailable for deposition, the deposition may be taken as soon as practicable.

24. **Court Reporting**

    a. Unless otherwise agreed to by the parties, Golkow Technologies will be used for court reporter and videographer services at depositions in the MDL proceedings.

    b. Golkow Technologies may also provide additional services to aid in the scheduling of and payment related to depositions on a case-by-case basis as agreed to in advance by the parties.

**SO ORDERED** this 3rd day of October, 2013.

BY THE COURT,

/s/Lawrence F. Stengel
LAWRENCE F. STENGEL, J.

16

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: TYLENOL (ACETAMINOPHEN) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | § § § § § § | MDL NO. 2436<br><br>2:13-md-02436<br><br>HON. LAWRENCE F. STENGEL |
| *THIS DOCUMENT RELATES TO ALL CASES* | § § § | |

# O R D E R

**AND NOW**, this 26th day of February, 2014, upon consideration of letter briefing

by the parties in accord with CMO 6 (Doc. No. 30) regarding plaintiffs' request for

**compensation information for witnesses** and after a telephone conference with the

court and counsel for the parties on February 24, 2014, it is hereby **ORDERED** that:

1)     The plaintiffs shall be permitted to discover information regarding the

    compensation of witnesses who are employees or former employees of Johnson &

    Johnson, McNeil, or a Johnson & Johnson subsidiary.[1]

---

[1] The defendants argue that the employment relationship alone is enough to show a witness's bias. They cite to Haynes v. Shoney, 1991 U.S. Dist. LEXIS 20612 (N.D. Fla. September 27, 1991), Morrow v. Greensouth, 2010 U.S. Dist. LEXIS 1336412, at *5 (N.D. Fla. December 7, 2010), and Porter v. Hamilton Beach/Proctor Silex Inc., 2003 U.S. Dist. LEXIS 8571, at *5 (W.D. Tenn. Aug. 27, 2003), to support this argument. I do not find this precedent to be persuasive or on point with the issues in this case. Haynes is very fact specific and relates to a motion for summary judgment in a less complex case. Morrow and Porter deal with employees who are serving as experts; the corporate witnesses in this case are not serving as experts but instead are testifying to the merits of the case. In addition, this case includes a claim for punitive damages. Thereby, the extent to which witnesses may have been biased by their compensation and performance incentives could affect this claim. The compensation paid or payable to the employees, or former employees, of Johnson & Johnson and/or McNeil is clearly relevant to credibility issues, at least.

2)      This compensation information shall be limited to salary, bonuses, stock options, deferred compensation, consultancy fees/agreements, and any other performance-based incentives.[2]

3)      Information about a witness's compensation shall be limited to periods when the individual has served as an executive for the defendants—that is, as an official with decision-making authority which could affect the Tylenol brand.[3]

4)      Witnesses will not be required to submit IRS Authorizations to the plaintiffs, as have been requested.[4]

5)      This compensation information may be obtained through the production of the witness's custodial file and/or through questioning during a witness's deposition.

---

[2] The plaintiffs have agreed to compromise on their initial compensation information requests and defer requests for information regarding employee 401k and pension benefits at this time. Discoverable compensation information also does not include healthcare benefits or other fringe benefits that may be available to employees of the defendants, which are not performance-based (i.e. discounts on products, access to corporate jet, etc.).

[3] This decision is consistent with my previous ruling in a telephone conference with counsel during the deposition of Ashley McEvoy, former President of McNeil. After hearing arguments from counsel, I determined that Ms. McEvoy's compensation was discoverable because "her financial stake or her interest in the company would be relevant and certainly it does go to bias." See MICHAEL GRAHAM, HANDBOOK OF FEDERAL EVIDENCE, § 607.7 (4th ed.1996)(explaining how examples of bias include "love, hate, fear, family relationship, sexual preference, *financial interest in outcome*, *business relationship,* membership in an organization, shared beliefs, payment by a party such as that made to an expert witness, and in criminal matters the fact that the witness has not been charged with a crime, been granted immunity or is currently awaiting sentence")(emphasis added).

My ruling was based on the fact that Ms. McEvoy, a former McNeil executive and current executive at Johnson & Johnson, is and was "a high-ranking executive," whose compensation package is generally tied to performance. As I explained in making my ruling, compensation structures for executives may be related to the sales of Tylenol and also may be used to show the witness's bias. In addition, a former employee's compensation package may go to bias; compensation packages that include stock options, deferred compensation, or consultancy agreements may allow an employee to still benefit from that compensation post-employment.

[4] This request seems extreme at this time. If the plaintiffs find that witnesses are not forthcoming with their compensation information, then this issue may be revisited.

6)     This compensation information shall be produced no less than **seven (7) days** before any corporate witness deposition.[5]

7)     Any testimony elicited or documents obtained by the plaintiffs, which relate to specific employee compensation and/or benefits, shall be deemed "Confidential" under the court's Amended Protective Order (Amended CMO 1)(Doc. No. 104), such that the testimony or documents are subject to confidentiality procedures.

BY THE COURT:


/s/Lawrence F. Stengel
LAWRENCE F. STENGEL, J.

---

[5] This provision applies to depositions scheduled more than seven (7) days after the date of this Order. For depositions scheduled within the week following the entry of this Order, this information shall be produced as soon as may be possible, but no less than one day before the deposition is to take place.