Exhibit A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

## District of New Jersey

| | | |
|---|---|---|
| In Re Johnson & Johnson Talcum Powder Product Marketing, Sales Practices, and Products Liability Litigation | ) ) ) ) ) ) | Civil Action No.   3:16-md-02738-FLW-LHG |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       Michael Huncharek, 1320 Main Street, Suite 302, Columbia, SC  29201

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attached Exhibit A for a List of documents to be produced.

| Place: Sheraton Columbia Downtown Hotel 1400 Main Street Columbia, SC  29201 | Date and Time: 30 Days from date of service of this subpoena |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:       09/25/2017

| CLERK OF COURT | |
|---|---|
| _____ | OR _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
The Plaintiff Steering Committee _____ , who issues or requests this subpoena, are:

Robert T. Dassow, Hovde Dassow & Deets, LLC, 10201 N. Illinois St., Suite 500, Indianpolis, IN 46290

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   3:16-md-02738-FLW-LHG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

MDL NO. 3:16-md-2738-LFW-LHG

### EXHIBIT A − SUBPOENA TO MICHAEL HUNCHAREK

TO:    Michael Huncharek
       1320 Main St.
       Suite 302
       Columbia, SC 29201

PLEASE TAKE NOTICE that pursuant to Rules 30, 34, 30(b)(6), and 45 of the Federal Rules of Civil Procedure, The Plaintiffs Steering Committee, by and through counsel, hereby commands Michael Huncharek (hereinafter "You") to produce any and all documents in their possession, custody, and control responsive to the requests in schedule a, *infra*, within 30 days of the date of service of this subpoena at the address below:

Sheraton Columbia Downtown Hotel
1400 Main Street
Columbia, SC  29201

Dated: September 25, 2017

RESPECTFULLY SUBMITTED,

Robert T. Dassow
Hovde Dassow & Deets, LLC
10201 N. Illinois St., Suite 500
Indianapolis, IN 46220
(317) 818-3100
rdassow@hovdelaw.com
beckhart@hovdelaw.com

Susanne N. Scovern
Scovern Law
201 Spear St., Suite 1105
San Francisco, CA 94105
Scovern@scovernlaw.com
Joseph_McPeak@scovernlaw.com

***On behalf of the Plaintiffs Steering
Committee***

## DEFINITIONS

The following definitions apply to the Notice of Deposition and are deemed to be incorporated into each subject matter and document requested and listed below. To the extent a term commonly in use in the cosmetic and/or personal care product industry or in use in the medical community is not defined herein, it shall be understood to be consistent with the meaning commonly ascribed to that term in the cosmetic and/or personal care product industry.

1.      "Defendants" refers to Defendants Johnson & Johnson, Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc., Imerys Talc America, Inc. f/k/a Luzenac America, Inc., and the Personal Care Products Council f/k/a the Cosmetic, Toiletry, and Fragrance Association (both collectively and individually) as well as all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including all corporations and entities affiliated with Defendants. The term "Defendant" shall also include all predecessor business entities, as well as any predecessor's partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives. The term "Defendant" shall also include all foreign subsidiaries or foreign parent companies, as well as any foreign subsidiaries' or parent companies' partners, directors, officers, employees, servants, agents, attorneys, joint venturers or other representatives.

2.      The term "Raw Talcum Powder" refers to any raw, processed, and/or packaged talc used in, or intended for use in, the Johnson's Baby Powder and/or Shower to Shower line of products, whether on a permanent, interim, or trial basis, and includes any talc derived from the same mine or ore body as talc used in or intended for use in the Johnson's Baby Powder and/or Shower to Shower line of products.

3.     The term "Heavy Metals" refers to any of the following: nickel, mercury, lead, manganese, copper, cobalt, chromium, magnesium, cadmium, aluminum, and arsenic.

4.     The term "Accessory Minerals" refers to any of the following free crystalline, silica, including quartz, cristobalite, and tridymite; and mica.

5.     The term "CRE" is used to refer to the Center for Regulatory Effectiveness and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with CRE.

6.     The term "PCPC" is used to refer to the Personal Care Products Council f/k/a the Cosmetic, Toiletry, and Fragrance Association and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with PCPC.

7.     The term "CTFA" is used to refer to the Cosmetic, Toiletry, and Fragrance Association and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with CTFA.

8.     The term "Imerys" or "Imerys Defendants" is used to refer to Imerys Talc America, Inc. f/k/a Luzenac America, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with Imerys and/or Luzenac.

9.     The term "Johnson & Johnson" or "Johnson & Johnson Defendants" is used to refer to Johnson & Johnson and/or Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. and all of their partners, directors, officers, employees, servants,

agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with Johnson & Johnson.

10.     The term "RTM" is used to refer to Rio Tinto Mineral and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with RTM.

11.     The term "TIPTF" is used to refer to Talc Interested Party Task Force and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with TIPTF.

12.     The term "CIR" is used to refer to the Cosmetic Ingredient Review and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the CIR.

13.     The term "NTP" is used to refer to the National Toxicology Program and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the NTP.

14.     The term "IARC" is used to refer to the International Agency for Research on Cancer and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives.

15.     The term "WHO" is used to refer to the World Health Organization and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives.

16.     The term "RoC" is used to refer to the "Report on Carcinogens," which is a congressionally mandated, science-based, public health document that the NTP prepares for the U.S. Department of Health and Human Services Secretary.

17.     The term "ISRTP" is used to refer to the International Society of Regulatory Toxicology and Pharmacology and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the ISRTP.

18.     The term "CTPA" is used to refer to the Cosmetic, Toiletry & Perfumery Association and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the CTPA.

19.     The term "MBS" is used to refer to Multinational Business Services, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with MBS.

20.     The term "MLS" is used to refer to Multinational Legal Services, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with MLS.

21.     The term "SFDA" is used to refer to the Chinese State Food and Drug Administration and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities, public or private, affiliated with it.

22.     The term "ACS" is used to refer to the American Cancer Society and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with it.

23.     The term "XRD" is used to refer to X-Ray Diffraction as a method for testing substances for the presence of asbestos and/or asbestiform materials, and/or amphibole materials.

24.     "Documents" and "Documentation" means paper and electronic writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained and translated through electronic means. If a document was prepared in several copies and if additional copies were thereafter made, and if any such copies were not identical or are no longer identical by reason of notation or modification of any kind whatsoever, including notations on the front or back of any pages thereof, then each such copy must be produced. Consistent with the above definition, the term document shall include, without limitation, any computer-generated, computer-stored, or otherwise maintained or reproduced communication or representation, any data compilation in any form, whether composed of letters, words, numbers, pictures, sounds, bytes, e-mails, electronic signals or impulses, electronic data, active files, deleted files, file fragments, or any combination thereof.

25.     "Scientific Study" shall mean, without limitation, all scientific studies, internal reports, scientific reporting to FDA, or any other government or regulatory entity, peer-reviewed literature, replicated studies, medical studies, medical research, epidemiological studies, toxicology studies, genetic studies, dosimetry studies, animal studies, radiation studies, journal articles, scholarly studies, internal investigations, scientific testing, pre-market testing, post-market surveillance, experiments, experimental results, raw data collected, and all other

scientific research and reporting conducted, funded, and/or sponsored by you and/or at your behest, in whole or in part.

26.     The term "Communication(s)" and/or "Correspondence" shall mean and include every manner or means of correspondence, disclosure, transfer, or exchange, and every correspondence, disclosure, transfer or exchange of information, whether orally, electronically or by documents, or whether face-to-face, by telephone, mail, email, text messaging, instant messaging, facsimile, personal delivery, overnight delivery, or otherwise.

27.     "Meeting" refers to, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned or scheduled in advance, including written exchanges through internet/web based chat, including AOL Instant Messenger$^{TM}$, or similar programs, electronic "bulletin board" programs, or internet/web based video chat, including Skype$^{TM}$, or similar programs.

28.     The term "Identify," when used in reference to a person, means to state that person's full name, name of his or her employer, job title or position, and that person's last known residence and/or business addresses, telephone numbers, and e-mail addresses.

29.     The term "Identify," when used in reference to a document, means to state the title of the document, its date, its author, its serial or identification number (if any), and its bates number (if previously produced in this lawsuit).

30.     The term "Identify", when used in reference to an object, means to state the generic and proprietary name of the object, its version or edition (if applicable), title of the document, its date, its author, its serial or identification number (if any), and the date it was created (if available) with sufficient specificity so that the object (or a reasonable facsimile of it) can be positively identified.

31.   The term "Date" means exact day, month and year, if ascertainable, or the best available approximations, including any relationship to other known events (designate whether exact or approximate).

32.   The term "Person" refers to, without limitation, any and every natural individual, each and every association, partnership, joint venture, corporation, Professional Corporation, trust and any and every other identifiable entity.

33.   The term "Employee" includes, without limitation, any current or former officer, director, executive, manager, secretary, staff member, messenger, agent, independent contractor, and/or other person who is or was employed by you or who provided services to you under an independent contractor arrangement.

34.   The use of the singular herein shall be deemed to include the plural and vice versa; and the use of one gender shall include the other, as appropriate in the context.  The past tense includes the present tense where the clear meaning is not distorted by change of tense.

35.   The term(s) "Disease" and/or "Diseases" shall mean and refer to health conditions including ovarian cancer, malignant and non-malignant tumors.

36.   The term "TIPTF" is used to refer to Talc Interested Party Task Force and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturs, third-party contractors or other representatives, including any corporations and entities affiliated with TIPTF.

37.   The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

38.     "Related to," or "regarding," mean, without limitation, discuss, describe, reflect, deal with, pertain to, analyze, evaluate, estimate, constitute, study, survey, project, assess, record, summarize, criticize, report, comment, or otherwise involve, in whole or in part.

39.     The term "Concerning" means referring to, relating to, describing, regarding, evidencing, or constituting; and each such term shall be deemed synonymous to the others where used herein.

40.     "Regulatory Agency" is used to refer to any domestic or foreign governmental body, entity, department, or division that oversees, monitors, or regulates cosmetic and/or personal care products, including but not limited to the Food and Drug Administration (FDA) and the Consumer Product Safety Commission (CPSC).

41.     The term "Asbestos" is used to refer to any matter, substance, material, product (or component thereof) containing asbestos, asbestiform materials (including non-regulated fibers such as winchite and richterite), transition fibers, cleavage fragments, and/or nonasbestiform asbestos materials, regardless of the fiber type, form, or percentage (including less than 1%), as well as chrysotile, amphiboles, amosite, crocidolite, tremolite, anthophyllite, and/or actinolite.

42.     Unless otherwise indicated, the "Relevant Period" for the information sought is 1982 to the present.

## **INSTRUCTIONS**

1.      In responding to this Request, you are required to produce all Documents known or reasonably available to you, regardless of whether such Documents are in your possession, custody, or control or in the possession, custody, or control of your agents, consignees,

representatives or investigators, including your attorneys or their agents, employees, representatives, or investigators.

2.      If any of the Documents or information Requested cannot be produced in full, you are required to specify, to the extent possible, the reasons for your inability to produce the remainder, and the approximate date when you expect to produce such Documents, if at all.

3.      If any Request is deemed to call for the production of privileged or otherwise protected information or materials, you must provide the following information in a written response, designating and identifying those Documents or information withheld from production on grounds of privilege:

    (a)    The reason for withholding the Document or information;

    (b)    A statement of the legal basis for the claim of privilege, work product or other ground for non-disclosure;

    (c)    A brief description of the Document, including:

        i.   The date of the Document;

        ii.   The number of pages, attachments, and appendices;

        iii.   The name(s) of its author(s) or preparer(s) and identification by employment and title of each such person;

        iv.   The name of each person who was sent, shown, or copied on the Document, or has had access to or custody of the Document, together with an identification of each such person;

        v.   The present custodian; and

        vi.   The subject matter of the Document, and in the case of any Document relating or referring to a meeting or conversation, identification of such meeting or conversation, in sufficient detail to enable the Court to determine the propriety of any claim of privilege.

4.      Failure to properly identify any withheld Documents may result in the waiver of any right to assert a privilege later.

5.      This Request imposes a continuing obligation upon you. If after producing Documents or information responsive to this Demand additional information or Documents become available to you, you are required to produce such additional Documents or information.

6.      With respect to each Document Requested that has been lost, destroyed, or otherwise disposed of since its preparation or receipt, you shall provide the following information separately as to each such Document:

(a)   A general description of the subject matter, author, recipient(s), date;
(b)   The identity of each person who has received a copy or had an opportunity to receive a copy thereof;
(c)   The last custodian of the Document or copies thereof; and
(d)   The full particulars or circumstances whereby the Document was disposed of, destroyed, or otherwise lost.

7.      All Documents produced in response to these Requests shall be either:

(a)   Organized and labeled to correspond with the number of the specific Request to which the Documents are responsive, or
(b)   Produced in the order and in the manner that they are kept in the usual course of business.

8.      All Documents requested shall include all Documents and information that relate in whole or in part to the relevant time period, or to events or circumstances during such relevant time period, even though dated, prepared or generated or received prior to relevant time period.

9.      All documents are to be produced in accordance with Case Management Order No. 5 (Protocol for Production of Document and ESI), attached hereto.

## SCHEDULE A – DOCUMENTS TO BE PRODUCED

1.   Please produce your current resume and/or *curriculum vitae*.

2.   Please produce any and all records of payments to you by any defendant or agent of any defendant.

3.   Please produce any and all communications you have had with any of the defendants regarding the potential risk of talc and ovarian cancer or the presence of asbestos or other heavy metals in raw talcum powder.

4. Please produce any and all communications you have had with any person (such as Robert Glenn, Ridgeway hall, William Kelly, Joshua Muscat, Gunter Obersorster and John Bailey) or entity (such as Crowell and Moring, Meta-Analysis Research Group, EUROTALC, GRE, The Weinberg Group) regarding the potential risk of talc and ovarian cancer or the presence of asbestos or other heavy metals in raw talcum powder

5. Please produce any and all Communications with any scientific journal or other publication regarding any article you have published, or sought to have published relating to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

6. Any and all Documents, including handwritten notes, typed notes, memoranda, or reports, which you created during, in anticipation of, or following the IARC review of talc

7. Please produce any and all papers or abstracts written by you on the subject of talc and ovarian cancer, whether published or unpublished, including any and all communications with any medical journal (including drafts, letters to/from journals, peer-review comments) about said paper or abstract.

8. Any and All Communications with any Regulatory Agency or representative thereof, including but not limited to the FDA, related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

9. Please produce, any and all Documents, including notes, drafts and communications, related to the report written in 2002 entitled "Assessing the epidemiologic literature on the carcinogenicity of talc.

10. To the extent not already produced in response to requests contained herein, please produce any and all Documents relating to your role as an industry observer in the IARC review of talc.

11. Please produce any and all documents, notes, memoranda, or meeting minutes related to any meeting between you and any Regulatory Agency, or representative of any Regulatory Agency, related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

12. Please produce any and all documents showing the nature and extent of your relationship with Meta-Analysis Research Group

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

**MDL NO. 16-2378 (FLW) (LHG)**

This document relates to: ALL CASES

## CASE MANAGEMENT ORDER NO. 5
## (Protocol For Production Of Documents and ESI)

**THIS MATTER,** having come before the Court during the Initial Conference held on Thursday, November 17, 2016, and the parties' subsequently filed joint submission,

**IT IS ORDERED:**

I.    **GENERAL PROVISIONS**

A. Scope

This Order governs the production of documents and electronically stored information (ESI) in all cases during the pendency of their consolidation in this Multi-District Litigation (MDL 16-2378). The terms of this Order neither enhance, nor diminish, the scope of discovery as contemplated by the Rules. All parties reserve their rights with respect to the scope of the document production.

B. <u>Cooperation and Discovery Dispute Resolution by the Parties or the Court</u>

The Parties shall conduct discovery in a cooperative and collaborative manner. There is established a continuing duty to meet and confer in good faith on disputed issues that may arise during the conduct of discovery. When a request for conference and collaboration about an issue in dispute is made by one party to another, the conference and collaboration should occur without unreasonable delay. At the conclusion of any unsuccessful attempt to resolve a disputed discovery issue, and prior to its submission to the Court for resolution, the parties should have identified the scope of the issues as narrowly and accurately as possible, along with any factual premises which inform the basis of the dispute. The scope of discovery in these consolidated cases shall be governed by the proportionality factors set forth in Rule 26(b)(1). When a party relies on one or more of the proportionality factors set forth in Rule 26(b)(1) in a discovery dispute submitted to the Court for resolution, supporting materials should normally be presented.

C. <u>Interpretation to Avoid Waste and Unnecessary Expense</u>

The fundamental purpose served by this Order is to promote the exchange of discoverable information in an efficient and economical manner, employing methods that preserve, to the greatest practicable degree, the information's content, structure, functionality, and usefulness. When circumstances arise that are not contemplated by the terms of this order, or if uncertainty arises concerning the intended application of its terms, the parties should initiate the meet and confer process prior to expending material resources on a unilaterally conceived discovery protocol.

## II.    DEFINITIONS

A. The term "**Electronically Stored Information**," (hereinafter, "**ESI**") has the same meaning as contemplated by Rule 34 of the Federal Rules of Civil Procedure.

B. The term "**Document**" has the same meaning as contemplated by Rule 34 of the Federal Rules of Civil Procedure, and such meaning includes, in context, a discreet file of ESI that corresponds to such a writing in a reasonably usable format.

C. "**Hard Copy Document**" means a document that exists in the ordinary course of business in paper form.

D. "**Metadata**" means information about information, or data about data, and includes, without limitation, as it exists in the ordinary course of business: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system; or (iii) information about a file, whether created by a user or generated by the system itself. The parties agree to meet-and-confer concerning information about a record or document in a document management system, whether created by a user or generated by the system itself.

E. "**Native**," "**Native format**," or "**Native data format**" means the format of ESI in which the ESI was originally created or the format used by the producing party in the usual course of the producing party's business activities.

F. "**Extracted Text**" means the textual content of an ESI native source exported into a separate electronic text file.

G. **"Optical Character Recognition"** or **"OCR"** means the process of recognizing the visible text contained within a hard copy document or contained within the digital image of a document, and rendering the recognized text into an electronic text file.

H. **"Searchable Text"** means extracted text or electronic text created by OCR.

I. **"Protected health information"** or **"PHI"** as used herein means any document or information supplied in any form, or any portion thereof, that identifies an individual or subscriber in any manner and relates to the past, present, or future care, services, or supplies relating to the physical or mental health or condition of such individual, the provision of health care to such individual, or the past, present, or future payment for the provision of health care to such individual. These terms specifically include "protected health information" as such term is defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164, promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 and applicable state laws. See, e.g., 45 C.F.R. § 164.501 ("protected health information") and 160.103 ("individually identifiable health information"). "Protected health information" includes, but is not limited to, medical bills, claims forms, charge sheets, medical records, medical charts, test results, notes, dictation, invoices, itemized billing statements, remittance advice forms, explanations of benefits, checks, notices, and requests. "Protected health information" also includes all notes, summaries, compilations, extracts, abstracts, or oral communications that contain, are based on, or are derived from confidential health information.

J. **"And"** and **"or"** shall be construed conjunctively or disjunctively as necessary to make their use inclusive rather than exclusive, e.g., "and" shall be construed to mean **"and/or."** **"Include"** and **"Including"** shall be construed to mean "include but not be limited to" and

"including, but not limited to." Reference to the singular shall also be deemed to refer to the plural, and vice-versa.

## III.   PROCESSING, CULLING, AND DE-DUPLICATION OF ESI

### A.   Processing Protocols

1.   When processing ESI, Greenwich Mean Time (GMT) shall be selected as the time zone.

2.   Files containing dynamic fields such as file names, dates, and times should be processed for production showing the field code (e.g. "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

3.   Compressed file types (e.g. .CAB, .GZ, .TAR. .ZIP) shall be decompressed in a reiterative manner to ensure that a compressed file within a compressed file is decompressed into the lowest possible compression resulting in individual files. The parent/child relationship of these files shall be preserved and reflected in the applicable attachment metadata fields listed in *Appendix 2*.

4.   Embedded files, including objects embedded in Microsoft Word and RTF documents that have been embedded with the "Display as Icon" feature, shall be extracted and produced as standalone files along with corresponding attachment Metadata to the parent document.

5.   If a party cannot unencrypt discoverable electronically stored information that exists in encrypted format, the parties agree to meet and confer regarding how such information should be handled.

6.   Documents that cannot be read because of processing, imaging, or formatting problems shall be promptly identified by the Receiving Party. The Producing Party and the Receiving Party shall meet and confer to attempt to resolve problem(s), to the extent the problem(s) are within the Parties' control.

B. Culling of Identified Data Sets

System Files may be culled by de-NISTing. An electronic file collection may be "de-NISTed" at the producing party's option, by removing commercially available, non-user created operating system and application files contained on the National Institute of Standards and Technology ("NIST") file list. Identification of NIST list matches will be through MD5 or SH-1 Hash values. When a producing party desires to cull an electronic file collection by categorically discarding specific file types not contained on the NIST list, it shall initiate a meet and confer conference with the requesting party to coordinate the use of the proposed file types.

C. De-duplication

1. ESI will be considered duplicative if it has matching MD5 or SHA-1 hash values. For this purpose, file contents only may be used for MD5 or SHA1 Hash value calculation and will not require inclusion of operating system metadata (e.g., filename, file dates) values. Messaging files associated with a discreet custodian may be de-duplicated based upon MD5 or SHA1 Hash values for the entire message family, including parent object and attachments.

2. Parties may de-duplicate stand-alone documents or entire document families vertically within each custodian or horizontally across custodians and data sources, including serial production sets. De-duplication procedures shall not break apart document families. The identity of other custodians of de-duplicated documents must be listed in the "Other Custodian(s)" field identified in Appendix 2. The "Other Custodians" field for a given document will be populated with any existing data at the time of the first production of that document. In instances where a newly collected document has been de-duplicated against a previously produced document, a separate DAT file will be provided upon request of the Requesting Party containing the "PRODBEG" number and an "Other Custodians" overlay field. The "Other Custodians" overlay

field will contain all previously provided duplicate custodial data as well as any additional duplicate custodians.

3.   A producing party may employ electronic mail thread suppression in the manner specified in this protocol. As used in this protocol, email thread suppression means reducing duplicative production of email conversation threads by producing only the most recent or most complete email containing the prior thread of emails, as well as all attachments appended at any point within the history of the thread, and excluding email segments constituting exact duplicates of prior email text within the produced string.

4.   To qualify as a single email conversation thread, all lesser included individual messages must have identical message conversation participants (including "bcc:" blind copy participants) and attachment history. The inclusion or deletion of a message participant shall terminate a conversation thread for this purpose, but such an occurrence ("conversation branching") may create the beginning of a separate and distinct conversation thread containing some or all of the lesser included messages.

## IV.    REVIEW PROTOCOL

The parties will cooperate in good faith regarding the use of electronic search methodologies. The Producing Party will provide keyword search terms and will consider reasonable requests for additional search terms proposed by the Requesting Party. A Producing Party will employ reasonable quality assurance measures to assess the completeness of its search and review methodologies.

## V.    PRODUCTION FORMAT

A.  <u>Presumptive Format of Production</u>

1.  Document Images, with Metadata, and Text: Subject to the specifications or exceptions set forth below, the presumptive format for production of an ESI document is as a Group IV single page .TIFF image files accompanied by metadata, and a document level searchable text file.

2.  Parties will produce ESI in native format for media files, spreadsheet files and presentation (e.g. PowerPoint) files.  Parties will also produce ESI in native format for word processing files containing track changes or comments.  When a producing party has applied permissible redactions to an image file, the underlying native file may be withheld.  Files produced solely in native format will be produced with a .TIFF image slip sheet indicating the production number of the native file and the confidentiality designation, and stating "Produced in Native Format."  The native file name nomenclature will correspond to the same Bates number nomenclature of the corresponding .TIFF image slip sheet, as more specifically described in Appendix 5.

3.  Ancillary Content Disclosed: When TIFF images are produced for electronic documents, such images will be rendered, if possible, in such a way as to show, as may be applicable, all disclosable reviewer's comments, tracked changes, speaker's notes, and other similar content.

4.  Parent-Child Relationships Preserved: The parent-child relationship between attachments, enclosures, embedded files, and/or exhibits to any parent document shall be preserved. The child-document should be consecutively produced immediately after the parent-document. If parent or child document is withheld on grounds of relevance or responsiveness, such withholding shall be noted with a slip sheet or indicated in a field. If the parent or child document is privileged, a slip sheet shall be inserted in the production. Child documents will be mapped to their parent document by attachment range within the applicable load file.

5.  Color When Necessary: When a document that contains color content is produced without its native file because of applied redactions, and the absence of color in the document's TIFF rendering compromises the requesting party's ability to discern the remaining information it

contains, the producing party will honor reasonable requests to supplement the production with color images or native files.

B. Appendices

Additional technical specifications for production format are set forth in the attached appendices (Appendix 1: *TIFF Image File Specifications*; Appendix 2: *Data Load File Specifications*; Appendix 3: *Searchable Text File Specifications*, Appendix 4: *Image Load File Specifications*; Appendix 5: *Native File Specifications*.) A Producing Party may supplement the metadata fields set forth in Appendix 2 whenever the nature of the ESI file makes such supplementation appropriate for a complete production.

C. Presumptive Sources of Extracted Text

The presumptive source of extracted text shall be from the native file. Where a document image has been redacted and produced in a .TIFF format, OCR of the redacted image may be used to generate the source of searchable text. Similarly, where the native file does not contain a source of extractable text (*e.g.* a non-searchable PDF image file,) OCR may be used to generate the source of searchable text.

D. Production Format for Hard Copy Documents

In scanning and producing Hard Copy Documents that were Hard Copy Documents when this litigation was filed, such documents shall be unitized and organized as they are kept in the normal course of business. For Hard Copy Documents found in file folders and other containers that have labels or tabs or other identifying information, such labels and all sides of such file folders and tabs shall be scanned. In the case of an organized compilation of separate Hard Copy Documents – for example, a binder containing several separate Hard Copy Documents behind numbered tabs – the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the beginning and ending document and attachment fields. For Hard Copy Documents that contain fixed notes, the pages will be scanned both with and without the notes and those pages will be treated as part of the same document. Hard Copy Documents will be unitized at the lowest possible level and attachment

information preserved. For example, if a folder contains two Hard Copy Documents, the folder and each document will constitute a separate document, but they will have the same attachment start and end. If more than one level of parent-child relationship exists, documents will be kept in order, but all will be treated as children of the initial parent document.

E.   Redactions and Production of Redacted Documents

To the extent that a responsive document contains information that is Protected Health Information (PHI), information protected by the Health Insurance Portability and Accountability Act (HIPAA), privileged information, or is otherwise specifically protected against disclosure by the Federal Rules or separate order of the Court, the producing Party may apply redactions to the TIFF image file and produce the document in redacted form. Any redactions shall be clearly indicated on the face of the document and each page of the document from which information is redacted shall bear a designation that it has been redacted. The corresponding native file of the document may be withheld from production.

If a redaction is made because of Protected Health Information, and the basis of such redaction is annotated (e.g., "PHI" or "Protected Health Information") on the redaction itself, such redaction need not be included in a party's privilege log. Otherwise, the basis for any redaction applied to a document image shall be reflected in a multi-value field in a load file. The Parties may apply redactions to the native version of a document, with any such redactions made in a substantially similar manner as is applicable to TIFF images, described above.

F.   Evidentiary Use Native Files

Use of native files in an evidentiary proceeding or deposition shall be governed by a protocol to be entered separately.

G.   Enterprise Databases or Document Management Systems

If responsive information is identified in a party's enterprise or relational database (e.g. Oracle, SQL Server, DB2) or in a party's document management system, the parties shall first meet and confer in good faith regarding a protocol to achieve the purpose of the requested discovery.

## VI.    CONVEYANCE AND DELIVERY

A.  A producing party will send a small test load file at the onset of its first document production to test the parameters discussed within this protocol for production format.

B.  ESI productions shall be conveyed on CD-ROM, DVD, external hard drive (with standard PC compatible interface), or readily accessible computer or electronic media as the parties may hereafter agree upon (the "Production Media"). Each item of Production Media should include: (1) the name of the producing party; (2) the production date; (3) a unique production volume name; (4) the Bates number range of the materials contained on such Production Media item; (5) the source of the documents for each Bates number range (i.e., custodian, information platform, etc.); (6) the name and contact information of a technical contact, preferably the person who generated the media item, so that in case of extraction issues the receiving party has a collaboration contact; and (7) any additional description of the items the producing party deems appropriate. The Production Media shall be accompanied by a transmittal letter identifying the above described information.

C.  Producing parties shall maintain a running production log in spreadsheet format containing the above described information, plus any necessary encryption key associated with each Production Media. Upon the occasion of a physical conveyance of a production, an updated version of the production log shall be contemporaneously forwarded by electronic mail to persons designated by the requesting party.  Encryption key information will not be contained in the physical conveyance of the Production Media.

## VII.   PRIOR PRODUCTIONS

To the extent available, ESI already processed and produced from existing sources in other litigation may be produced to the Requesting Party in this Litigation using the production protocol applicable in the case in which such ESI was originally produced. When, by separate agreement, a party is producing a production set previously made in other litigation matters, all previously assigned production numbers ("PRODBEG" or its equivalent document-unique identification

number) shall be included in the "PRIORPRODBEG" field described in Appendix 2 to the extent available from the original production. When a prior production set cannot, without the occurrence of undue burden or expense, be made to conform to every production format specification contained in Section VI, above, the parties shall meet and confer to discuss proposed deviations from the production format.

## VIII.   PROCESSING OF NON-PARTY DOCUMENTS

A.  A Party that issues a non-Party subpoena ("Issuing Party") shall include a copy of this ESI Protocol with the subpoena and request that the non-Party produce documents in accordance with the specifications set forth herein.

B.  The Issuing Party is responsible for producing to all other Parties any documents obtained pursuant to a subpoena to any non-Party in the form in which they were produced by the non-Party. To the extent practical given the data volume, productions by a non-Party should be produced by the Issuing Party to all other Parties within seven days of the non-Party's production to the Issuing Party.

C.  Nothing in this ESI Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-Parties to object to a subpoena.

**IT IS SO ORDERED.**

Dated:  5/22/17

Hon. Lois H. Goodman, U.S.M.J.

## Appendix 1: TIFF Image File Specifications

TIFF image files created for this litigation pursuant to this Order shall comport with the following specifications:

- The TIFF image file shall be a Group IV compression, black-and-white, single-page TIFF image file using a 300 x 300 dots-per-inch (DPI) optical scan resolution and an 8.5 x 11 inch page size, except for documents that in the producing party's reasonable judgment require a different resolution or page size.

- Original document orientation should be maintained (*i.e.* an original landscape document should be produced in landscape format).

- Each TIFF image file shall be branded with a legible, unique Bates number in the lower right corner, positioned so as not to interfere with reading the document. The Bates number shall: (1) be unique across the entire document production; (2) be a combination of an alphabetic prefix along with an 8-digit number (*e.g.* ABC00012345), wherein the numeric portion shall be zero-padded leftwards as needed to comprise 8 digits, (3) contain no special characters or embedded spaces, and (4) be numerically sequential within a given document. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be communicated to the receiving party.

- Confidentiality designations, if any, will be branded on the lower left corner of the applicable image, also positioned so as not to interfere with reading.

- The resulting TIFF image file shall be named according to the naming convention *number.TIF*, where "*number*" is the Bates number of the corresponding page. File names for these files shall not contain any special characters or embedded spaces.

- Image files shall be grouped in folders on the production media of no more than 1,000 TIFF files each unless necessary to prevent a file from splitting across folders. Files will not be split across folders, and separate folders will not be created for each file.

## Appendix 2: Data Load File Specifications

The data load file is a delimited text file containing data about each document needed for use with standard litigation support software.

The file name of the data load file should contain the volume name of the production media, although additional description information may be provided after the volume name. For example, both "ABC001.dat" and "ABC001_metadata.dat" would be acceptable names for a data load file having a production volume named "ABC001." File names shall not contain any special characters or embedded spaces.

Unless other delimiters are specified, the data in each field should be separated using Concordance default delimiters. A semicolon should be used as a multi-entry separator. A carriage-return line-feed should be used to indicate the start of the next record.

The first line of the data load file must contain each field name, separated by a delimiter, corresponding to the order in which the data appears in the file.

Load files should not span across media (e.g. CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

Data for documents shall be produced in only one data load file throughout the productions, unless that document is noted as being a replacement document in the Replacement field of the data load file.

Metadata Fields to be Included in the Data Load File

For all documents or electronic files produced, the following metadata fields for each document or electronic file, if available at the time of collection and processing and unless such metadata fields are protected from disclosure by attorney-client privilege or work-product immunity or otherwise prohibited from disclosure by law or regulation, including the European Data Privacy Regulation, will be provided in the data load file except to the extent that a document or electronic file has been produced with redactions.

The term "Scanned Docs" refers to documents that are in paper form at the time of collection and have been scanned into *.tif images (i.e., "Hard Copy Documents" as defined above.) The term "Email and E-Docs" refers to files that are in electronic form at the time of their collection.

The following fields are not exclusive and should be supplemented by a producing party with available metadata whenever appropriate or when otherwise consistent with this protocol, including data fields exported from a database or Document Management System.

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of parent in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| CUSTODIAN | Smith, John | Yes | Yes | Custodian(s) that possessed the document or electronic file |
| OTHERCUSTODIANS | Jones, David; Williams, Robert | N/A | Yes | Additional Custodian(s) that possessed de-duplicated document or electronic file—multiple custodians separated by semicolon |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record. |
| FOLDER | \My Documents\Document1.doc | N/A | Yes | Original source folder for the record produced. |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected. |
| DOCEXT | DOC | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document or electronic file. |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document. |
| DATECREATED | 10/09/2005 | N/A | Yes | Date that non-email file was created as extracted from file system metadata |

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| DATELASTMOD | 10/09/2005 | N/A | Yes | Date that non-email file was modified as extracted from file system metadata |
| SUBJECT | Changes to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |
| DATESENT | 10/10/2005 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 am | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/10/2005 | N/A | Yes | Received date of email message (mm/dd/yyyy format) |
| TIMERCVD | 10:33 am | N/A | Yes | Received time of email message, time zone set to GMT |
| CONFIDENTIALITY | CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| REDACTION | REDACTED | Yes | Yes | User-generated field indicating whether a document was redacted. |
| TEXTPATH | Text\001\001\ABC00000001.txt | Yes | Yes | Path to *.txt file containing extracted or OCR text |
| NATIVEPATH | Natives\001\001\ABC00000001.xlsx | N\A | Yes | Path to files supplied in native format. |

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| MD5 HASH | 30999747f4e6d7b ef786e614ff2cf4b0 | N/A | Yes | MD5 Hash for electronic document |
| REPLACEMENT | REPLACEMENT | Yes | Yes | "Replacement" indicates the image is a replacement for a previously produced image; otherwise blank. |
| PRODVOL | VOL001 | Yes | Yes | Name of the Production Volume |
| PRIORPRODBEG | DEF00000001; RST00000463; XYZ00002136 | Yes | Yes | Other identifying production numbers that have been assigned to the record in previous productions; separated by a semi-colon. |

### Appendix 3: Searchable Text File Specifications

- The document level searchable text file will contain any text in the respective document, omitting any text redacted from the produced document.

- The file naming convention for the text file shall be in the form number.TXT, where "number" is the same Bates number as the Beginning Production Number for the first page of the respective document images. File names shall not contain any special characters or embedded spaces.

- The full path and file name of the text file must be provided in the data load file as specified in Appendix 2.

- OCR text for scanned images of paper documents should be generated by applying optical character recognition processes to the image of the document. The parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR shall be performed on a document level and provided in document-level text files. OCR text should not be delivered in the data load file or any other delimited file.

- For electronic files, searchable text shall be extracted from the native file and included in the text file. If the electronic file has no extractable text (*e.g.* a non-searchable PDF image file), the document will be OCR'd, and file-level OCR text will be provided in lieu of extracted text. Extracted text shall likewise be produced in document-level text files.

### Appendix 4: Image Load File Specifications

- The image load file should be a Standard Opticon formatted load file (.opt text file) with ANSI/Western European encoding that references the Control ID on a page level consistent with ingestion into the kCura Relativity® review platform. The name of the image load file should mirror the name of the delivery volume, and should have an .OPT extension (*e.g.* ABC001.OPT). File names shall not contain any special characters or embedded spaces.

- The volume names should be consecutive (*e.g.* ABC001, ABC002, etc.).

- Every image in the delivery volume should be contained in the image load file, one row in the load file per TIFF image. The total number of documents referenced in the image load file should match the total number of designated documents in the data load file for that production.

- Load files should not span across media (*e.g.* CDs, DVDs, Hard Drives, Etc.), *i.e.*, a separate volume should be created for each piece of media delivered.

### Appendix 5: Native File Specifications

- The file naming convention for the native file shall be in the form number.EXT, where "number" is the first page Bates number for the corresponding TIFF image and "EXT" is the original native file extension (i.e., *.doc, .xls, .ppt*, etc.) File names shall not contain any special characters or embedded spaces.

- The full path and file name of the native file must be provided in the data load file as specified in Appendix 2.