# EXHIBIT 4

# ASHCRAFT&GEREL, LLP

May 11, 2018

**VIA ELECTRONIC MAIL**
Honorable Joel A. Pisano, U.S.D.J. (Ret.)
Walsh Pizzi O'Reilly Falanga, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ 07102

> **Re:**   *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation,* **MDL No. 2738**

Dear Judge Pisano:

We write to bring to your attention issues relating to the Plaintiffs' Steering Committee's ("PSC's") Amended Notices of Rule 30(b)(6) depositions served on Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc.[1]  As set forth below, the PSC and the Johnson & Johnson Defendants have been unable to reach agreement on the most fundamental issues with the Johnson & Johnson Defendants rewriting the PSC's notices to their own liking, refusing to produce witnesses on certain relevant topics, and refusing to produce any witnesses from Johnson & Johnson, which remains a separate defendant in this case.

In contrast to the Johnson & Johnson Defendants, the PSC has been able to resolve most, but not all, objections with the other Defendants: Imerys Talc America, Inc. and Personal Care Products Council (PCPC). Where the Defendants raise similar objections to those raised by the Johnson & Johnson Defendants, they will be noted. However, with the limited exceptions noted herein, those notices are either finalized or the parties are still in discussions with the hope that most (if not all) issues will be resolved.

The PSC seeks your guidance on the Johnson & Johnson Defendants' objections so that the depositions can be scheduled. As Your Honor is aware, the PSC wishes to complete these depositions so that the evidence gathered can be incorporated into the PSC's expert reports.

## BACKGROUND

On February 6th, Your Honor issued a Letter Order (Doc. No. 4173) (hereinafter "Letter Order") allowing the PSC to conduct discovery on four (4) distinct areas that bear upon the issue of general causation. That discovery was to occur through questioning Fed. R. Civ. P 30(b)(6) witnesses.

---

[1] At all times hereinafter, these two Defendants will be referred to as the "Johnson & Johnson Defendants" where there is no need to differentiate between the two.

The four (4) categories in which discovery is permitted are: 1) composition of the products; 2) testing of the products; 3) sampling of the products; and 4) influence on and bias in the science and literature. *See* Letter Order at 4.

Judge Wolfson has reviewed the scope of these four (4) categories on multiple occasions and has been quite clear: The four areas are "broad" and the defendants should be prepared to have their witnesses testify on all designated matters relating to these four topics. *See, e.g.* Tr. 11 (Feb. 7, 2018 Status Conf.) ("the areas that he has said that [defendants'] have to be prepared to testify about are broad and they are all the areas you've identified. I'll put that right on the record."). That concept has been continually emphasized by Judge Wolfson. *See id.* at 16 ("these are very broad topics and, frankly, Judge Pisano really gave you everything you wanted without having you select the people to be deposed because its very broad."); *id.* at 17 ("So where I am is, they are extremely broad."); *see also* Tr. 19-22 (March 6, 2018 Status Conf.) ("this is a little broader than you think it is… it could also reveal if someone was aware of something else in the science that doesn't make it into a document").

Your Honor was also clear that, in addition to being broad, in scope the PSC could take "one Rule 30(b)(6) witness **per defendant**, limited to the [4] subjects described above." Letter Order at 4 (emphasis added). As there are four defendants in the case – Johnson & Johnson, Johnson and Johnson Consumer, Inc., Imerys, and PCPC – the PSC issued four separate notices, one for each defendant, with topics subdivided into the four categories the Court permitted. Judge Wolfson has made clear, however, that this could mean that each of the four defendants may have to produce multiple witnesses on multiple days on different topics. *See, e.g.,* Status Conference Tr. at 20, Feb. 7, 2018 ("Look, these are broad topics and I don't see them being done in seven days.")

Judge Wolfson was also well aware that the parties would negotiate the scope of these broad notices and that Your Honor would be called upon to resolve disputes. The procedure established for the taking of Rule 30(b)(6) depositions in this case involves: 1) the PSC serving Notices of Rule 30(b)(6) depositions on each of the Defendants in this case; 2) Defendants serving written objections; 3) the PSC attempting to resolve the objections by amending the Notices; 4) the parties engaging in a further meet and confer; 5) presenting any remaining disputes for resolution by Your Honor and, if necessary, by Judge Wolfson; and 6) having the depositions commence.

The PSC served the original notices to the defendants on February 21, 2018. After hearing guidance from the Court during the March 6, 2018 status conference, the PSC served its first Amended 30(b)(6) Notices on the Johnson & Johnson Defendants on March 19, 2018. *See* Amended 30(b)(6) Notice of Johnson & Johnson, attached as **Exhibit A**. Rather than conferring with the PSC on issues concerning the Amended Notices (as the other Defendants did), counsel for the Johnson & Johnson Defendants served the PSC a single "Joint Response" to both notices on April 2, 2018.

The Johnson & Johnson Defendants' "Joint Response" contained not only boilerplate "general objections" but also objections or re-writes, or both, to virtually all of the PSC's categories for both Defendants. The Johnson & Johnson Defendants also stated that they would

not produce a witness from Johnson & Johnson at all, nor would they produce a witness from either defendant on some of the most basic questions, including the formulas of the products and lost or destroyed samples. *Id.*

Initially dodging the PSC's request to confer on the Amended Notices, on April 18, 2018, the Johnson & Johnson Defendants offered unspecified witnesses on unspecified topics on back-to-back dates starting on Memorial Day, May 28th, and going through and including a Saturday, June 2nd. The PSC indicated that it could not take these depositions on the dates offered for several reasons, including the fact there remained numerous areas of dispute as to critical topics contained in the notices and that the disputes should be resolved by Your Honor prior to the depositions commencing in order to ensure that the depositions proceed in an efficient and organized manner.

The parties subsequently engaged in an initial meet and confer on May 1, 2018. With one exception – where the PSC agreed to identify specific studies and literature that it would question Johnson & Johnson Defendants' witnesses about – the Johnson & Johnson Defendants refused to work with the PSC to resolve outstanding questions. The Johnson & Johnson Defendants subsequently served the PSC with a letter "to memorialize Defendants' position with respect to some of the parties remaining disputes." Letter from Susan Sharko, Esq., May 10, 2018, attached as **Exhibit B**.

The PSC believes it has reached an impasse with the Johnson & Johnson Defendants that requires guidance to resolve the areas of dispute, so that the anticipated Rule 30(b)(6) depositions can commence.[2]

## DISPUTES RIPE FOR RESOLUTION

### A.)  GENERAL OBJECTIONS

The Johnson & Johnson Defendants make the following two objections to all topics in the PSC's amended Notices:

### 1.  The Johnson & Johnson Defendants refuse to produce a witness on behalf of Johnson & Johnson, despite the Special Master's Order

Your Order allowing the PSC to conduct 30(b)(6) depositions was quite clear: The PSC is "entitled to one 30(b)(6) deposition **per defendant** limited to the subjects described above." *See* Letter Order at 5 (emphasis added). As permitted by the February 6th Order, the PSC served two

---

[2] The deposition schedule originally proposed by the Johnson Defendants is unworkable, not only because it includes a holiday and weekends (both of which are unnecessary), but also because since the notices were originally served the Johnson & Johnson Defendants have produced more than 27,000 documents with more than 87,000 pages, with 14,102 of those documents being produced at the end of April. The PSC is evaluating these documents on an expedited basis to determine whether they may have a bearing on the upcoming depositions. Thus, until the objections are resolved and the PSC has a fair opportunity to review the newly produced documents, the depositions should not commence.

separate 30(b)(6) notices on the Johnson & Johnson Defendants (one for Johnson & Johnson and one for Johnson & Johnson Consumer Inc.).

In response, the Johnson & Johnson Defendants filed a single "Joint Response" to the Amended Notices and made clear during the meet-and-confer process that Johnson & Johnson would not produce any witnesses with knowledge of the topics identified. As explained in the Johnson & Johnson Defendants' May 10th letter, Johnson & Johnson sees "no purpose" in complying with this Court's Letter Order to Produce a Johnson & Johnson employee since, according to it: "J&J agrees to be bound by the testimony of each of the witnesses presented on behalf of JJCI." *Id*. at 2.

While the PSC appreciates that Johnson & Johnson agrees to be "bound" by the testimony of Johnson & Johnson Consumer Inc., that is wholly beside the point. Johnson & Johnson has different employees, agents, and officers than Johnson & Johnson Consumer Inc., and separate witnesses should be produced for each Defendant. Furthermore, in response to the Notices, each Defendant should be required to produce witnesses as to each of the four categories of discovery permitted by the Court. If Johnson & Johnson knows nothing about each of the topics, as its counsel says, then it should simply produce a witness to say that under oath. The PSC is quite confident that this will not be the case.

This is not an academic or hypothetical concern. In previous trial cases involving ovarian cancer, Johnson & Johnson has **criticized** the plaintiffs for not recognizing and putting on evidence regarding the fact that Johnson & Johnson and Johnson & Johnson Consumer Inc. are different corporate entities. The PSC needs an opportunity to establish the factual basis for individual claims against Johnson & Johnson. For this reason, it is imperative that both entities be required to respond to the 30(b)(6) notices and to produce witnesses to speak on behalf of each of these corporations.

## 2. The Joint Response contains numerous "general objections" and the Johnson & Johnson Defendants refuse to clarify whether they refuse to produce documents or witnesses on a subject matter

The Joint Response of the Johnson & Johnson Defendants contains dozens of what they call "general objections." The Joint Response is unclear on whether the Johnson & Johnson Defendants will rely on these numerous general objections to refuse to produce witnesses and documents as requested or, as is customary, produce witnesses over those objections.

The Defendants have taken different approaches to this question. On one hand, Defendants Imerys and PCPC have informed the PSC that they are producing witnesses over their respective general objections. On the other hand, the Johnson & Johnson Defendants have indicated that they will unilaterally limit the PSC's Rule 30(b)(6) notice through the assertion of their general objections. Moreover, the Johnson & Johnson Defendants have refused to share with the PSC which general objection applies to which 30(b)(6) category, leaving the PSC to "figure it out."

The Johnson & Johnson Defendants' May 10th letter does little to clarify. It states that each of the dozens of objections "apply to each and every topic" and that while they will produce witnesses in many categories, they will not produce witnesses in others.

This issue must be clarified so that the PSC can move to compel on areas where the Johnson & Johnson Defendants are relying on their general objections to refuse to produce witnesses and documents.

## B.) OBJECTIONS TO TOPICS IN THE "COMPOSITION" SECTION OF THE AMENDED NOTICES

The Johnson & Johnson Defendants have made objections to Topics I.1, I.2, I.3, I.4, I.7 & I.8. Each is discussed below.

### 1. The Johnson & Johnson Defendants have objected to Schedule A, Topic I.1 (Relating to Identity of Talcum Powder Products)

Topic I.1 requires the Johnson & Johnson Defendants to each identify its talcum powder products marketed in the U.S.; the relationship that each Defendant had to the product and it's labeling; and any company who manufactured or bottled the talcum powder products, all for the time period between 1950 to the present. This subject matter involves the composition of talcum powder products of the Johnson & Johnson Defendants.

Unhappy with the question is drafted, the Johnson & Johnson Defendants state that in lieu of producing a witness or witnesses to discuss that topic, Johnson & Johnson Consumer Inc. (but **not** Johnson & Johnson) will produce a witness or witnesses to testify about a different subject matter of their own liking. Specifically, the Johnson & Johnson Defendants will not identify the products it manufactured but only the companies that manufactured them, i.e. "the identity of the companies that manufactured or bottled the talcum powder products or designed labels during the period 1950 to the present[.]"

In its May 10th letter, Johnson & Johnson, for the first time, offered to make a "chart, and stipulate to its accuracy, which identifies the J&J entity that had responsibility for . . . JBP and STS for each year." However, what defendants do **not** do is identify the many JBP and STS products that have been on the market, many of which may contain different formulas and have constituents that may be traced back to different talc sources. While the PSC is willing to discuss any stipulation that streamlines discovery, the PSC will need to be able to question a witness with its own investigation.

The PSC believes this objection seeks to prevent the PSC from asking Johnson & Johnson what products it produced and the relationship the Johnson & Johnson Defendants had with each product. The PSC believes inquiry into this issue is properly within the scope of discovery.

**2. The Johnson & Johnson Defendants' position on Schedule A, Topic I.2 (Relating to Formulas and Composition of Talcum Powder Products)**

Although the Johnson & Johnson Defendants did not object to this topic specifically in their Joint Response, the Johnson & Johnson Defendants nevertheless asserted during the May 1st meet-and-confer that the "general objections" apply to limit the questioning by the PSC and, subsequently, expressed concern about whether disclosure of formula information would be protected as confidential.

While the PSC agreed that production of such information would be protected by the Confidentiality Order, the Johnson & Johnson Defendants have not agreed to produce, without qualification, a witness on formulas, raising their "general objections." The Johnson & Johnson Defendants do not discuss this objection in their May 10th letter.

As Your Honor will recall, during the hearing on January 22, 2018, the PSC discussed the current formula (providing an electronic copy for the Special Master's review), explaining the critical importance of this information in relation to the composition of the products. The formulas of the talcum powder products from 1950 forward are well within the scope of discovery as outlined by the Court. Rule 30(b)(6) depositions of the Johnson & Johnson Defendants should not proceed until it is clear that the Johnson & Johnson Defendants will be producing witness(es) to testify and bind the respective companies on this critical area of inquiry.

**3. The Johnson & Johnson Defendants have objected to Schedule A, Topic I.3 (Relating to Talc Suppliers and Talc Mines)**

This topic seeks testimony about Talc Suppliers and Talc Mines that supplied the Talc. While the Johnson & Johnson Defendants initially refused to produce a witness on this topic, it has withdrawn that objection. *See* Ex. B at 2–3.

**4. The Johnson & Johnson Defendants have objected to Schedule A, Topic I.4 (Relating to Entities Responsible for Composition and Purity Testing and Standards)**

The Johnson & Johnson Defendants did not object to this category in their Joint Response and do not do so in the May 10th letter. However, during the meet and confer on May 1st, the Johnson & Johnson Defendants expressed an objection to the PSC's definition of "asbestos." The PSC believes a witness will be produced, subject to the objection, but include this issue in this letter so that there is no ambiguity.[3]

---

[3] Defendant Imerys also expressed an objection to the PSC's definition of "asbestos." In the meet and confer with Imerys, the Imerys Defendant has agreed to produce a witness on this issue, subject to its objection to the definition of "asbestos."

**5. The Johnson & Johnson Defendants have objected to Schedule A, Topics I.7 & I.8 (Relating to Allowable Amounts of Non-Talc Constituents in Talcum Powder Products and relating to Standards and Protocols)**

This topic seeks testimony about allowable amounts of certain constituents such as asbestos, arsenic, heavy metals, etc. in talcum powder products and the standards or protocols which establish the allowable amounts. The Joint Response states that Johnson & Johnson Consumer Inc. will produce a witness(s) only as to activities that occurred in the United States. However, the May 10th letter states that the Johnson & Johnson Defendants are willing to produce a witness "who can testify to foreign standards applicable to a product sold in the Unites States."

So long as this compromise includes both company policies and procedures and foreign regulatory standards applied to talc extracted from foreign mines that supplied talc for talcum powder products sold in the United States, this is agreeable.

**C.)   OBJECTIONS TO TOPICS IN THE "TESTING" SECTION TOPICS OF THE AMENDED NOTICES**

The Johnson & Johnson Defendants' previously sought to limit categories II.4 & II.5 as described below, but the Johnson & Johnson Defendants' May 10 letter proposes an agreement which the PSC accepts as outlined below:

**1. The Johnson & Johnson Defendants have objected to Schedule A, Topics II.4 & II.5 (Relating to Recommended Test Protocols (Topic 4) and Knowledge of Alternative Available Purity and Composition Testing (Topic 5))**

Topic 4 and 5 seeks testimony about testing protocols.  This topic relates to the testing methods or protocols considered by the Johnson & Johnson Defendants and the reasons the methods or protocols were either adopted or rejected. Initially, the Johnson & Johnson Defendants objected to these categories.  In the May 10th letter, it was agreed that the proffered witnesses would "be capable of testifying why Defendants used certain tests, and not others, in relationship to their talcum powder products."  The PSC will agree to this.

**D.)   OBJECTIONS TO TOPICS IN THE "SAMPLING" SECTION OF THE AMENDED NOTICES**

In their Joint Response and in the meet and confer on May 1, the Johnson & Johnson Defendants refused to produce any witness for categories III.1(d), III.2, III.3, III.4 and III.5.  In their May 10th letter, however, they withdrew their objection to Category III.4 (chain of custody for identified samples), but refuse to produce any witness for the remaining topics.

**1. The Johnson & Johnson Defendants have objected to Schedule A, Topics III. 1(d), 2, 3 & 5 (Relating to sampling issues)**

These topics seek testimony about, among other things, chain of custody, lost or misplaced samples, and other sampling related matters.

The Johnson & Johnson Defendants state Johnson & Johnson Consumer Inc. will only produce a witness(es) limited to discussing the issue of protocols for handling and processing of samples found and, most recently, for chain of custody for samples found.

However, they refused, and continue to refuse, to produce a witness on other subjects within this topic such lost or misplaced samples, the circumstances surrounding the destruction or loss of the samples, the location of the samples lost, and the location of other relevant talc samples. The production of samples by Defendants and the testing of those samples have been the focus of extensive time and effort by the parties and the Court. Moreover, the Special Master's Order establishing the due date for expert reports based on the completion of sample testing is suggestive of the importance of the samples produced in the litigation.

The Johnson & Johnson Defendants' identification of samples in this litigation is, to be charitable, spotty. For example, for the period after 2010, it produced approximately 476 samples. However, the number of samples produced for testing drops precipitously for the decades prior. For example, in the decade of the 2000's, the Johnson & Johnson Defendants produced a mere 11 samples. They similarly produced six samples from the 1990's and approximately 40 samples from the 1980's. Importantly, the 1980's through the 2000's were decades in which: 1) Johnson & Johnson Defendants both expected and prepared for litigation over its talcum products and their ability to cause ovarian cancer; and 2) the Johnson & Johnson Defendants were informed that its talcum powder products contained asbestos and other carcinogens and denied that allegation. As Judge Wolfson recognized with respect to studies, it is not only what the Johnson & Johnson Defendants had in their filing cabinets and produced in documents that matter but that which the Johnson & Johnson Defendants may have either ignored or even discarded that bear upon the science. *See* Status Conference Tr. at 20, March 6, 2018 ("I think they would be entitled to that…there were things being done and studies that were being done outside that never make their way to a full-blown study and do not end up in the documents…").

For the Johnson & Johnson Defendants to state that such important topics as the standard operating procedures for handling samples, and the location of samples lost or destroyed are not relevant—particularly when they have raised these as potential objections to the admissibility of any testing results—is gamesmanship pure and simple.

### E.) OBJECTIONS TO TOPICS IN THE "BIAS" SECTION OF THE AMENDED NOTICES[4]

### 1. The Johnson & Johnson Defendants have objected to Schedule A, Topic IV.9 (Relating to Foreign Regulatory Reviews)[5]

---

[4] On Topic IV.5 relating to the Johnson & Johnson Defendants relationship involving the "CRE" (Multinational Business Services, Inc., d/b/a/ Center for Regulatory Effectiveness and Multinational Legal Services), the PSC and the Johnson & Johnson Defendants have agreed that the scope of this area of inquiry will be limited to cosmetic products.

[5] The PSC understands that Defendant Imerys also objects to producing a witness on this topic.

This topic seeks testimony about foreign evidence. As noted above, the Johnson & Johnson Defendants objected to non-United States evidence relating to composition issues. *See* Topics I.7 & I.8.

It is artificial to limit the scope of evidence to matters only in the United States where the talc contained in the talcum powder products was sourced from mines outside the United States for much of the relevant time period. Talcum powder products and their constituents are of concern to not only regulatory agencies and scientists in the United States, but to those entities and individuals internationally.

2. **The Johnson & Johnson Defendants have objected to Schedule A, Topic IV.10 (Relating to *In Vivo, In Vitro,* or Bioassay Testing involving Testing and Safety)**

This topic seeks testimony about *in vivo*, *in vitro*, and bioassay studies relating to talc safety and composition that was funded or sponsored by the Johnson & Johnson Defendants, individually or through third parties. This and other topics are intended to include studies terminated, and any consultations with scientists regarding their studies or proposed studies.

The Johnson & Johnson Defendants desire to limit the scope of this discovery to studies formally conducted or sponsored by them. During the meet and confer, the Johnson & Johnson Defendants further asked the PSC to specify the studies that it was interested in questioning 30(b)(6) witnesses about.

Upon consideration of Defendants' request, the PSC will re-draft this topic, combine or collapse the topic with Topics IV.15 and IV.16, and specify the studies that the PSC anticipates it will inquire about. In the event the Johnson & Johnson Defendants object to this re-drafted topic, the issue will need to be presented to the Special Master for resolution. To facilitate this process, the PSC attached the redrafted category hereto as **Exhibit C**. It should be noted that the PSC and Imerys have reached an agreement using this redrafted category.

3. **The Johnson & Johnson Defendants have objected to Schedule A, Topic IV.13 (Relating to Professional Medical Organization Statements)**

On this topic, the PSC seeks to question witnesses about the Johnson & Johnson Defendants' communications with medical organizations, such as the Society of Gynecologic Oncologists, the National Cancer Institute, and the American College of Obstetrics and Gynecology, concerning the respective organization's position and statements regarding the use of talcum powder products and the risk of ovarian cancer and the payments made to these organizations.

This is a relevant and fair area of inquiry relating to influence of the Johnson & Johnson Defendants on the science and what bias may exist in the positions and statements of the professional organizations.

The Johnson & Johnson Defendants refuse to produce a witness on this topic.

**4.    The Johnson & Johnson Defendants have objected to Schedule A, Topic IV.16
       (Relating to Board of Directors Strategy and Discussions)**

This topic seeks testimony about the Boards of Directors of the Johnson & Johnson
Defendants, regarding discussions and communications involving strategies to address issues
concerning the safety of their talcum powder products. The Johnson & Johnson Defendants have
made a blanket boilerplate objection to this request on the ground that it is vague, ambiguous, not
relevant, etc. The May 10th letter makes clear that the Defendants believe that the production of
documents about the health and safety issues with respect to talcum powder products is sufficient
and that there is no need for testimony.

First, the involvement of Johnson & Johnson's Board of Directors in messaging the
science of ovarian cancer and talcum powder products undercuts Johnson & Johnson's bald
assertion that it was an innocent bystander to Johnson & Johnson Consumer, Inc. on scientific
issues (including exerting influence on the science) in this litigation. Second, policy, strategy,
protocols, etc. involving the safety of talcum powder products undoubtedly were set by the
Johnson & Johnson Defendants' Boards of Directors in conjunction with management. Judge
Wolfson ruled during the September 2017 status conference that documents relating to the safety
of talcum powder products and ovarian cancer risks were clearly discoverable. Status Conference
Tr. at 8:1-7, Sept. 6, 2017. Similarly, the PSC seeks now to obtain testimony from the Johnson &
Johnson Defendants regarding the Board of Directors input on the issue of the safety of talc. The
impact that these strategy decisions and efforts by the Board of Directors had the prospect of
influencing the science on the safety of their talcum powder products.

The PSC respectfully requests that the Special Master consider and resolve these issues
prior to the setting of any depositions of the Johnson & Johnson Defendants relating to these
30(B)(6) topics so that the parties have fair notice of the scope and content of these depositions.

Thank you for your consideration of these matters.

Very truly yours,

/s/ Michelle A. Parfitt
Michelle A. Parfitt, Esq.
P. Leigh O'Dell, Esq.

cc:    Honorable Freda L. Wolfson, U.S.D.J.
       Honorable Lois H. Goodman, U.S.M.J.
       Susan Sharko, Esq. (via e-mail)
       Julie Tersigni, Esq. (via e-mail)
       Lorna Dotro, Esq. (via e-mail)
       Mark Silver, Esq. (via e-mail)
       Nancy Erfle, Esq. (via e-mail)
       Tom Locke, Esq. (via e-mail)
       Chris Placitella, Esq. (via e-mail)
       Warren Burns, Esq. (via e-mail)

Hon. Joel A. Pisano, U.S.D.J. (Ret.)
May 11, 2018
Page 11 of 11

      Richard Golomb, Esq. (via e-mail)
      Richard Meadow, Esq. (via e-mail)
      Hunter Shkolnik, Esq. (via e-mail)
      Christopher V. Tisi, Esq. (via e-mail)
      Larry Berman, Esq. (via e-mail)
      Dan Lapinski, Esq. (via e-mail)

# EXHIBIT A

# Please see attached
# Exhibit 7 & 8 of this filing

# EXHIBIT B

# DrinkerBiddle&Reath
## L L P

Susan M. Sharko
973-549-7350
Susan.sharko@dbr.com

*Law Offices*

600 Campus Drive
Florham Park, NJ
07932-1047

973-549-7000
973-360-9831 fax
www.drinkerbiddle.com

*A Delaware Limited*
*Liability Partnership*

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
TEXAS
WASHINGTON D.C.

May 10, 2018

Leigh O'Dell, Esq.
Beasley Allen Law Firm
218 Commerce Street
Montgomery, AL 36104

Michelle Parfitt, Esq.
Ashcraft & Gerel, LLP
1825 K. Street, NW
Suite 700
Washington, DC 20006

Christopher V. Tisi, Esq.
Ashcraft & Gerel, LLP
2000 L. Street NW
Suite 400
Washington, DC 20036

Re:   *In re Johnson & Johnson Talcum Powder,* MDL NO. 16-2738 (FLW) (LHG)
      Amended Notices of 30(b)(6) Depositions of JJCI and J&J

Dear Counsel:

I write in furtherance of our ongoing meet and confer efforts regarding Plaintiffs' Steering Committee's Amended Notices of 30(b)(6) Depositions of Johnson & Johnson Consumer, Inc. ("JJCI") and Johnson & Johnson ("J&J") (collectively, "Defendants"), and to memorialize Defendants' position with respect to some of the parties' remaining disputes. In addition, as requested by you after rejecting the May dates we offered, I below provide June dates for each of Defendants' designated witnesses, together with the Topics to be covered by each witness.

*Andrew B. Joseph*
*Partner responsible for*
*Florham Park Office*

*Established* 1849

DrinkerBiddle&Reath
L L P

May 10, 2018
Page 2

## I. THE PARTIES' ONGOING DISPUTES

**General Objections:** You have asked Defendants to identify those Topics to which their general objections apply, and to state whether they intend to rely on their general objections in order to decline to produce a witness on any Topic.  As set forth in Defendants' Response to your Notices, the general objections apply to each and every Topic included within the Notices.  However, Defendants have agreed to and shall produce one or more witnesses as to each of the Topics in the Notice, subject to and consistent with the specific objections set forth in their Response.  There are just a few topics where we object to producing a witness at all:  Topics III.1(d), 3, and 5, and  IV.16

**Identification of a Witness for J&J:**  You have asked whether Defendants will produce a witness on behalf of J&J.  As represented at the March 6, 2018 status conference with Judge Wolfson, and again during our various meet and confers, J&J, a holding company, agrees to be bound by the testimony of each of the witnesses presented on behalf of JJCI.  J&J will not present any witness separate from or in addition to those witnesses produced by JJCI.  There is no need or purpose for that.

**Topic I.1:**  You seek further clarity with regards to Defendants' specific objections to Topic I.1, and take issue with Defendants' refusal to provide witness testimony on Defendants' "relationship" with any company that manufactured or bottled their talcum powder products, or designed labels, during the period 1950 to the present.  Defendants stand on their objection.  This testimony is simply not relevant.  As you are aware, the intention of the 30(b)(6) depositions is to provide sufficient additional discovery on science issues such that the parties can engage in *Daubert* hearings.  The requested information has no bearing on such a hearing.

You also have requested a witness to identify the talcum powder products on the market in the United States.  This too really has nothing to do with science issues.  However, despite their objections, Defendants are willing to create and produce a chart, and stipulate to its accuracy, which identifies the J&J entity that had responsibility for the manufacturing, packaging, labeling, marketing, and sale of JBP and STS for each year during the period identified in the Notice, to the extent such information is available.  Because any witness testifying as to the subject matter of Topic I.1 will provide no further information than that already contained in the chart, such production should alleviate the need for a witness on this Topic and streamline the deposition process.

**Topic I.3:**  You have asked whether Defendants intend to produce a witness as to Topic I.3, and also whether Defendants maintain copies of documents relating to the mines sold in 1989 and transferred to Cyprus Minerals at the time of sale.  Defendants will produce a

DrinkerBiddle&Reath
L L P

May 10, 2018
Page 3

witness as to Topic I.3.  As to the documents, Defendants already conducted reasonable searches for these materials and produced what was located in connection with these searches.

**Topics I.7 and I.8:** As we understand your current position, you want us in addition to produce a witness who can testify to foreign standards applicable to any product sold in the United States. In an effort of compromise, we will agree to do this, without waiver of all other objections.

**Topics II.4 and II.5:**  Defendants previously have agreed to provide a witness to give testimony on "[t]est protocols or methodologies regarding purity and composition of talc used in Defendants' talcum powder products – including with respect to the presence of asbestos, silica, heavy metals, arsenic, nickel, chromium, quartz, magnesium, accessory mineral or other non-talc constituent – that were considered by or recommended to Defendants."  In response, you have asked whether such witness also will testify to the reason that any particular test was used or not used.  Defendants can agree that the witness produced in response to Topics II.4 and II.5 will be capable of providing testimony regarding why Defendants used certain tests, and not others, in relation to their talcum powder products.

**Topics III.1(d), III.3, III.4 and III.5:**  Put simply, the parties continue to fundamentally disagree as to the relevance and burdensomeness of these topics.  Nevertheless, in an effort to reach agreement as to these issues, Defendants have considered your arguments and will agree to produce a witness to testify as to Topic III.4, the storage and chain of custody for the samples identified in Exhibit 1 to your Notices.  Defendants stand on their remaining objections to Topics III.1(d), III.3 and III.5.

**Topic IV.1:**  Defendants previously have agreed to produce a witness on this Topic, subject to any privilege objections.

**Topics IV.5 and IV.11:**  Defendants previously have agreed to produce a witness on these Topics, limited to Defendants' talc products.

**Topic IV.10:**  You have asked Defendants to provide a witness to testify as to the "identity and findings of *any* study" (emphasis added) which tested for a host of minerals.  In response, Defendants agreed to produce a witness to testify as to studies that were conducted or sponsored by Defendants.  In an effort to resolve this disagreement, I have requested that you provide me with a list of specific studies about which you wish to inquire so that Defendants can review the list and determine whether a compromise can be reached.  Please provide such a list.

DrinkerBiddle&Reath
L L P

May 10, 2018
Page 4

**Topic IV.16:**  You have asked Defendants to reconsider their objections to this Topic. Defendants decline your request and stand on their objections.  Of note, per a previous agreement with Plaintiffs, Defendants already have produced to you J&J Board and Committee materials that were identified that reference health and safety issues with respect to talc products generally and/or Johnson's Baby Powder and Johnson & Johnson Shower to Shower, in particular: JNJTALC000117116 – 7121 (July 14, 1975 Board meeting);   JNJTALC000117122 – 7129 (October 3, 1983 Board meeting); JNJTALC000117130 – 7137 (June 8 & 9, 2009 Board meeting); and JNJTALC000117138 – 7154 (November 30, 2016 Science, Technology & Sustainability Committee meeting).

## II. DEPOSITION DATES AND TOPICS

Per your request, below is the identity of each witness that will appear on behalf of Defendants, the Topics assigned to each witness and his/her dates of availability for deposition during the month of June:

**June 13 or 14,** Witness as to Topics I.1 (as to the warnings component of any label); II.10; IV.1-8, 10-15.

**June 21 and/or 22,** Witness as to Topics I.1; I.3a-j; I.4-7; I.9 (as to any industrial hygiene component of the Topic); II.1-8; II.11; III.6.

**June 25 or 26,** Witness as to Topics I.4 (post 2006); I.6 (post 2006), I.; I.9 (as to any quality assurance component of the Topic); II.6-8 (post 2006); II.9; II.11 (post 2006); III.1-2

**[                    ],** Witness as to :   Topic III.4

Please confirm that the above resolves the disputes so that the depositions may go forward, and if not, which points are still at issue so that any disputes may be promptly resolved by Judge Pisano.  Thank you.

Sincerely,

Susan Sharko

cc:     Mark Silver, Esq.
         Thomas Locke, Esq.

92590336.1

# EXHIBIT C

*The circumstances surrounding your involvement with, financial and scientific contributions relating to the following studies, related studies (like pilot studies) and proposed studies; including your non-privileged communications with J&J/JJCI, PCPC, Crowell and Moring, William Kelly, IMA NA and the authors and contributors to these studies:*

A.  Huncharek, M et al:  *Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer:  A Meta-Analysis of 11.933 Subjects from Sixteen Observational studies*, Anticancer Research 25:1955-1960 (2003);

B.  Muscat, J. et al, *"Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer; A Meta-Analysis of Nine Observational Studies"* Eur J. Cancer Prev. 2007: Vol 16, No.5 422-428;

C.  Muscat, J, et al, *"Peritoneal Talc Use And Ovarian Cancer: A Critical Review"* Eur. J. Cancer Prev. 2008 April: 17 (2)-19-146

D.  Huncharek M, et al, *"Perineal Talc Use and Ovarian Cancer Risk:  A Case Study of Scientific Standards in Environmental Epidemiology*, Eur. J. of Cancer Prev., 20:501-507 (2011)

E.  Studies, Potential Studies or Research Proposals described in the documents entitled: *"Overview of Potential New Projects In Talc/Ovarian Cancer Relationship"* by Huncharek, Muscat & Meta-Analysis Research Group [IMERYS 272247-272250] including the research proposals reflected in the following documents:

1.  *Perineal Talcum Use and Ovarian Cancer Risk: A Meta-Analytic Evaluation of the Dose Response Relationship.* [IMERYS 242353]
2.  *Smoking and a Risk Factor for Epithelial Ovarian Cancer; A Systematic Evaluation of the Epidemiologic Evidence*[IMERYS 280046]
3.  *Hysterectomy, Tubal Ligation and Ovarian cancer Risk: A meta-Analytic Evaluating of the Scientific Evidence.* [IMERYS 242340]
4.  *Cancer Risk among Talc Miners, Millers and related Industries: Results of a Systematic Review.* [IMERYS 280060]

F.  Studies described in document *Regulatory Science Project Proposals, IMERYS 242489496* including, but not limited to the following:

1.  Mossman Proposal entitled: *"A Study in Gene Expression Changes in Human Ovarian Epithelial (ISOE) Cells Exposed to Talc of Different Sources and Minerology* [Imerys 242489]:
2.  Muscat and Huncharek Proposal entitled: *Smoking and Body Mass Index (BMI) as a Risk factor for Epithelial Ovarian Cancer: A Systemic Evaluation of the Epidemiologic Evidence* [IMERYS 242495]
3.  Muscat and Huncharek Proposal entitled: *Perineal Talcum Use ad Ovarian cancer Risk: A Meta-Analytic Evaluation of the Dose-response Relationship* [IMERYS 242496]

G.  Mossman, B, *Assessment of Pathologic Potential of asbestiform vs Nonasbestaform particulates (cleavage fragments) in in vitro (sell of organ) models and bioassays*, Re. Tox. Pharm 52 (2008) S200-S203

H.  Shukla, Ari et. al., *Alterations in Gene Expression in Human Mesothelial Cells Correlate with Mineral Pathogenicity* Am. J Respiratory Cell & Molecular Biology, Vol 4, 115-123 (2009):

I.  Hilgass, J., et al *, Utilization of Gene Profiling and Proteomics to Determine Mineral Pathogenicity in a Human Mesothelial Cell Line  (LP9/TERT-1)* J. Toxicol. Environ Health A. 2010Jan.; 73 (5): 423-436

J.  Rohl, A & Langer, I, *Consumer Talcums and Powders: Minerals and Chemical Characterization,* J. Tox and Env. H. 2: 255-284 (1976)