# EXHIBIT 8

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>*THIS DOCUMENT RELATES TO ALL CASES* | MDL NO. 16-2738 (FLW) (LHG) |

## THE PLAINTIFFS' STEERING COMMITTEE'S AMENDED NOTICE OF THE 30(b)(6) DEPOSITION OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.

PLEASE TAKE NOTICE that pursuant to Rule 26 and Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Plaintiffs' Steering Committee (PSC) will take the videotaped deposition by oral examination of Defendant Johnson & Johnson Consumer Inc., through designated corporate representative(s), on the topics set forth in Schedule A, *infra*. The deposition, which shall be taken by stenographic means before a certified court reporter, or other person authorized to take oaths, shall be taken at a time and location to be agreed upon by the parties, and will continue from day to day until completed.

## DEFINITIONS

The following definitions apply to the Notice of Deposition and are deemed to be incorporated into each subject matter and document requested and listed below. To the extent a term commonly in use in the cosmetic and/or personal care product industry or in use in the medical community is not defined herein, it shall be understood to be consistent with the meaning commonly ascribed to that term in the cosmetic and/or personal care product industry.

1.      "Defendant", "you", "your", or "JJCI" refers to, without limitation, the interests of the Johnson & Johnson Consumer Inc, f/k/a Johnson & Johnson Consumer Companies, Inc.,

including relevant predecessors and its successors, subsidiaries, departments, divisions or affiliates, together with all current and former directors, officers, employees, agents, representatives, or persons acting, or purporting to act, on its behalf.

2.       Unless otherwise stated, JJCI does not refer to Johnson & Johnson (J&J).

3.       "Defendants" refer to all Defendants in this action, including J&J, Imerys Talc America ("Imerys"), and Personal Care Products Council ("PCPC") (both collectively and individually) as well as all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including all corporations and entities affiliated with Defendants.  The term "Defendant" shall also include all predecessor business entities, as well as any predecessor's partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives.  The term "Defendant" shall also include all foreign subsidiaries or foreign parent companies, as well as any foreign subsidiaries' or parent companies' partners, directors, officers, employees, servants, agents, attorneys, joint venturers or other representatives.

4.       The term "Talcum Powder Products" refers to Johnson's Baby Powder and Johnson & Johnson Shower to Shower line products.  This term is used interchangeably with the term "Relevant Products."

5.       The term "Talc," as distinguished from "Talcum Powder Products," refers to the talc that is mined, manufactured, or processed for the purposes of use in the Talcum Powder Products and their processing.

6.       The term "Composition" refers to the nature and chemical properties of something's ingredients or constituents, the identities and relative numbers of the elements and

compounds of which a thing is comprised, and chemical names and structural formulas of constituent compounds.

7.      The term "Raw Talcum Powder" refers to any raw, processed, and/or packaged talc used in, or intended for use in, the Johnson's Baby Powder and/or Shower to Shower line of products, whether on a permanent, interim, or trial basis, and includes any talc derived from the same mine or ore body as talc used in or intended for use in the Johnson's Baby Powder and/or Shower to Shower line of products.

8.      The term "Heavy Metals" refers to any of the following: nickel, mercury, lead, manganese, copper, cobalt, chromium, magnesium, cadmium, neodymium, aluminum, and arsenic.

9.      The term "Accessory Minerals" refers to any of the following: free crystalline silica, including quartz, cristobalite, and tridymite; and mica.

10.      The term "Asbestos" is used to refer to any matter, substance, material, product (or component thereof) containing asbestos, asbestiform materials (including non-regulated fibers such as winchite and richterite), transition fibers, cleavage fragments, and/or non-asbestiform asbestos materials, regardless of the fiber type, form, or percentage (including less than 1%), as well as chrysotile, amphiboles, amosite, crocidolite, tremolite, anthophyllite, and/or actinolite.

11.      The term "Documents" and "Documentation" as used in these discovery requests is coextensive with the meaning of the terms "Documents" and "tangible things" in Fed. R. Civ. P. 34, and shall have the broadest possible meaning and interpretation ascribed to the terms "Documents" and "tangible things" under Fed. R. Civ. P. 34, and the applicable Local Rules. Consistent with the above definition, the term Document shall include, without limitation, any

database, written, printed, typed, photostatic, photographed, recorded, computer-generated, computer-stored, or otherwise maintained or reproduced communication or representation, any data compilation in any form, whether comprised of letters, words, numbers, pictures, sounds, bytes, e-mails, electronic signals or impulses, electronic data, active files, deleted files, file fragments, or any combination thereof including, without limitation, all memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, projections, estimates, working papers, accounts, analytical records, reports and/or summaries of investigations, opinions or reports of consultants, opinions or reports of experts, opinions or reports of accountants, other reports, trade letters, press releases, comparisons, books, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, forecasts, drawings, diagrams, instructions, minutes of meetings, correspondence and communications (as defined below) of any type (including but not limited to video files, audio files, inter- and intra-office communications), questionnaires, surveys, charts, graphs, photographs, phonographs, films, tapes, discs, data cells, drums, printouts, all other compiled data which can be obtained (translated, if necessary, through intermediary or other devices into usable forms), Documents maintained on, stored in or generated on any electronic transfer or storage system, any preliminary versions, drafts or revisions of any of the foregoing, and other writings or Documents of whatever description or kind, whether produced or authorized by or on behalf of you or anyone else, and shall include all non-identical copies and drafts of any of the foregoing now in the possession, custody or control of you, or the former or present directors, officers, counsel, agents, employees, partners, consultants, principals, and/or persons acting on your behalf.

12.     "Scientific Study" shall mean, without limitation, all scientific studies, internal reports, scientific reporting to FDA, or any other government or regulatory entity, peer-reviewed literature, replicated studies, medical studies, medical research, epidemiological studies, toxicology studies, genetic studies, dosimetry studies, animal studies, radiation studies, journal articles, scholarly studies, internal investigations, scientific testing, pre-market testing, post-market surveillance, experiments, experimental results, raw data collected, and all other scientific research and reporting conducted, funded, and/or sponsored by you and/or at your behest, in whole or in part.

13.     The term "Communication(s)" and/or "Correspondence" shall mean and include every manner or means of correspondence, disclosure, transfer, or exchange of information, and every correspondence, disclosure, transfer or exchange of information, whether orally, electronically or by documents, or whether face-to-face, by telephone, mail, email, text messaging, instant messaging, facsimile, personal delivery, overnight delivery, or otherwise.

14.     "Meeting" refers to, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned or scheduled in advance, including written exchanges through internet/web based chat, including AOL Instant Messenger[TM], or similar programs, electronic "bulletin board" programs, or internet/web based video chat, including Skype[TM], or similar programs.

15.     The term "Identify" when used in reference to a person, means to state that person's full name, name of his or her employer, job title or position, and that person's last known residence and/or business addresses and telephone numbers.

16.     The term "Identify" when used in reference to a document, means to state the title of the document, its date, its author, its serial or identification number (if any), and its bates number (if previously produced in this lawsuit).

17.     The term "Identify" when used in reference to an object, means to state the generic and proprietary name of the object, its version or edition (if applicable), title of the document, its date, its author, its serial or identification number (if any), and the date it was created (if available) with sufficient specificity so that the object (or a reasonable facsimile of it) can be positively identified.

18.     The term "Date" means exact day, month and year, if ascertainable, or the best available approximations, including any relationship to other known events (designate whether exact or approximate).

19.     The term "Person" refers to, without limitation, any and every natural individual, each and every association, partnership, joint venture, corporation, professional corporation, trust and any and every other identifiable entity.

20.     The term "Employee" includes, without limitation, any current or former officer, director, executive, manager, secretary, staff member, messenger, agent, independent contractor, and/or other person who is or was employed by you or who provided services to you under an independent contractor arrangement.

21.     The use of the singular herein shall be deemed to include the plural and vice versa; and the use of one gender shall include the other, as appropriate in the context.  The past tense includes the present tense where the clear meaning is not distorted by change of tense.

22.     The term "PCPC" is used to refer to the Personal Care Products Council and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-

party contractors or other representatives, including any corporations and entities affiliated with PCPC, including its predecessor the Cosmetic, Toiletry and Fragrance Association (CFTA).

23.     The term "TIPTF" is used to refer to Talc Interested Party Task Force and all of its member companies, their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with TIPTF.

24.     The term "CIR" is used to refer to Cosmetic Ingredient Review and all of their partners, directors, officers, employees, servants, agents, attorneys, joint ventures, third-party contractors or other representatives, including all expert panel members of the CIR.

25.     The term "CRE" is used to refer to Multinational Business Services, Inc. d/b/a the Center for Regulatory Effectiveness and all of its partners, directors, officers, employees, servants, agents, attorneys, joint ventures, third-party contractors or other representatives, including any corporations and entities affiliated with CRE.

26.     The term "IARC" is used to refer to International Agency for Research on Cancer and all of their partners, members, staff, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with IARC.

27.     The term "ISTRP" is used to refer to International Society of Regulatory Toxicology and Pharmacology and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with ISTRP.

28.     The term "NTP" is used to refer to National Toxicology Program and all of their committees, review groups, partners, directors, officers, employees, servants, agents, attorneys,

joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with NTP.

29.    The term(s) "Disease" and/or "Diseases" shall mean and refer to health conditions including ovarian cancer, malignant and non-malignant tumors,

30.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

31.    "Related to" or "regarding," mean, without limitation, discuss, describe, reflect, deal with, pertain to, analyze, evaluate, estimate, constitute, study, survey, project, assess, record, summarize, criticize, report, comment, or otherwise involve, in whole or in part.

32.    The term "Concerning" means referring to, relating to, describing, regarding, evidencing, or constituting; and each such term shall be deemed synonymous to the others where used herein.

33.    "Regulatory Agency" is used to refer to any domestic or foreign governmental body, entity, department, or division that oversees, monitors, or regulates cosmetic and/or personal care products, including but not limited to the Food and Drug Administration (FDA) and the Consumer Product Safety Commission (CPSC).

34.    Unless otherwise indicated, the "Relevant Period" for the information sought is 1950 to the present.

## <u>INSTRUCTIONS</u>

1.      Defendant JJCI shall designate one or more officers, directors, managing agents, or other persons who consent to testify on Defendant JJCI's behalf who are most knowledgeable with respect to the deposition subject matter topics listed in Schedule A.

2.      Each deponent is instructed to produce at deposition: copies of any and all documents reviewed or read in preparation for the deposition; copies of any and all documents or tangible things related to or referring to the subjects listed in this notice contained in the deponent's files, papers, or other materials; and a copy of his or her resume or *Curriculum Vitae.*

3.      Each deponent should be prepared to discuss their competency to testify to subject matter the designee for which they were designated.  For example, they should be prepared to testify about the following:

   a.   The relationship between the designee and the Defendant, including any prior or continuing relationships with the Defendant. For any witness specially retained as a designee, the terms of any agreements specific to the witness' testimony.
   b.   The designee's occupational experience, familiarity, and proficiency with the subject matter.
   c.   The identity of any published writings, lectures, or presentations made by the witness concerning the same or similar subject matter.
   d.   The witness' understanding of his or her role as the Defendant's subject matter designee;
   e.   All activities undertaken by the designee to specifically prepare for the testimony about the subject matters, to include the identification of things examined, information reviewed, and the identity of any current or former employees interviewed.
   f.   Whether reviewed or not by the witness, the existence and identity of any prior testimony by the Defendant concerning the same or similar subject matter.
   g.   The identity of any prior instances of sworn testimony rendered by the witness in a judicial or administrative proceeding.

**SCHEDULE A - TOPICS**

## I.   THE COMPOSITION OF JJCI's TALCUM POWDER PRODUCTS

1.   IDENTITY OF JJCI's TALCUM POWDER PRODUCTS:  The identity of JJCI's Talcum Powder Products marketed in the United States, by year, and the relationship between J&J and JJCI with respect to the manufacture, testing, and purity of such products. The identity of and JJCI's business relationship with any companies who manufactured or bottled the talcum powder products or designed components of the products (i.e. labels) during this time period.

2.   FORMULAS AND COMPOSITION OF JJCI's TALCUM POWDER PRODUCTS:
   a.   The chemical names and chemical and structural formula(s) of constituent compounds and proportions of elements and constituents comprising talcum powder products manufactured, supplied, or sold by JJCI, by year.
   b.   The differences, if any, in the formula(s) or composition of the talcum powder products, including grade or purity of the talc used in each product, by year.
   c.   The types of materials used to manufacture the containers of the talcum powder products, by year.
   d.   The chemical names and chemical and structural formula(s) of constituent compounds and proportions of elements and constituents for all additives used in each talcum powder product, including fragrance, by year.

3.   TALC SUPPLIERS AND TALC MINES THAT SUPPLIED JJCI TALC:
   a.   The identities of all mining companies and/or suppliers of talc for JJCI's talcum powder products by product and by year.
   b.   The source mines for the talc used in these products, by year.
   c.   The methodology for differentiating the talc used in JJCI's talcum powder products by source and by year.
   d.   The blending proportions used for talc from various mined sources by year.
   e.   All drill core logs generated for each mine that supplied talc for use in JJCI's talcum powder products from inception of exploration to the present.
   f.   All mineralogic maps that contain the deposit site for each mine that produced talc for use in JJCI'S talcum powder products from inception of exploration to the present.
   g.   Any petrographic maps that contain the deposit site for each mine that produced talc for use in JJCI's talcum powder products from inception of exploration to the present.
   h.   The protocol, procedure, and frequency of exploration drilling and the results of any analyses.

    i.   For any mine which produced talc for use in JJCI's talcum powder products, mineralogic, petrographic, and/or chemical analyses for exploration drill cores, surface samples, and mine samples; the procedures for performing such analyses; the results of the analyses; and the procedures/protocol for conducting such analyses.

    j.   For each talc-producing mine (including the pre-mining exploration phase and development phase) that produced talc use in JJCI's talcum powder products, the data generated for quality control proposes, including whether you maintained this data, and, if so, its location.

4.    <u>ENTITIES RESPONSIBLE FOR COMPOSITION AND PURITY TESTING AND STANDARDS</u>:

    a.   The entities that are responsible for the purity and composition of talc used in JJCI's talcum powder products including their locations, by product and year.

    b.   The applicable purity standards by product and by year.

    c.   The sample preparation and testing protocols and procedures they used or were required to be used for the talc used in JJCI's talcum powder products, by product and by year.

5.    <u>LOCATION AND OWNER OF TALC MINES THAT SUPPLIED JJCI TALC</u>: The identity, location and owner(s) of any mine that was the source of talc for any talc used in JJCI's talcum powder products, and its relationship to JJCI and/or any other JJCI entity and any documentation or information about the composition of the talc from these mines including whether talc from said mine was ever known to contain asbestos, heavy metals, nickel, chromium, magnesium, arsenic, silica, quartz, or any other non-talc accessory mineral, and the percent composition of each.

6.    <u>TALC COMPOSITION AND PURITY TESTING AND PROCESSING ENTITIES</u>:  All entities who processed, sampled and tested the talc supplied for use in JJCI talcum powder products and the results of any such these testing, including the bates numbers for any such testing that are contained in defendants' MDL document production or their location if the testing results are not contained in the JJCI MDL document production.

7.    <u>ALLOWABLE AMOUNTS OF NON-TALC CONSTITUENTS IN JJCI TALCUM POWDER PRODUCTS</u>: The allowable amount of non-talc constituents permitted or allowable by protocol or standard operating procedure, by product and by year, including the amount of asbestos, silica, heavy metals, nickel, chrome, arsenic, cobalt, magnesium, accessory mineral, or any other non-talc constituent permitted pursuant to national standards, company standards, and/or federal regulations.

8.    <u>STANDARDS AND PROTOCOLS</u>: Any written standards or protocols used by you for the purity and/or composition of JJCI's talcum powder products, by product and by year.

9.    <u>RECORDATION OF NON–TALC CONSTITUENTS IN JJCI'S TALCUM POWDER PRODUCTS CONTAINED IN LAB BOOKS, NOTES, REPORTS, SUMMARIES, OR ANALYSES</u>: Any written summaries or analyses recording data regarding non-talc constituents contained in JJCI's talcum product products.

10.   <u>PROCESSING OF TALC</u>:  All information concerning the procedures or protocols related to the processing of talc intended for use for use in the talcum powder products, including mixing talc that originated from different sources, milling the talc, and the application of additives used in the cleaning of talc.

## II.    THE TESTING OF TALC INTENDED FOR USE IN JJCI'S TALCUM POWDER PRODUCTS

1.    <u>SENSITIVITY AND SPECIFICITY OF TESTING USED</u>: The sensitivity and specificity of any test used by you, specified by you, or used by others on your behalf for testing the purity of talc used in JJCI's talcum powder products per year, including testing for asbestos, silica, nickel, chrome, magnesium, quartz, heavy metals, or any other non-talc constituent.

2.    <u>PURPOSES FOR TESTING TALC FOR THE PRESENCE OF ASBESTOS, HEAVY METALS, ACCESSORY MINERALS, OR OTHER NON-TALC CONSTITUENTS</u>:  The reasons for testing talc for use in JJCI's talcum powder products for the presence of asbestos, silica, nickel, chrome, magnesium, or any other non-talc constituent, including the citation to any specific rules, regulations, and corporate parameters controlling these reasons with documented changes, by year.

3.    <u>IDENTITY OF TESTING METHODOLOGIES AVAILABLE BUT NOT USED</u>: All testing methodologies, including their sensitivity and specificity, available to JJCI by year to test for the purity of talc, including testing for the presence of asbestos, silica, heavy metals, nickel, chromium, magnesium, arsenic, quartz, accessory mineral, or any other non-talc constituent including the person or entity (such as the Colorado School of Mines) with whom you communicated concerning the pros and cons of such testing.

4.    <u>RECOMMENDED TEST PROTOCOLS</u>:  Any test recommended or considered with respect to purity and composition of talc, and whether and the reasons stated for any such test accepted or rejected, particularly with respect to the presence of asbestos, silica, heavy metals, arsenic, nickel, chromium, quartz, magnesium, accessory mineral or any other non-talc constituent.

5.  KNOWLEDGE OF ALTERNATIVE AVAILABLE PURITY AND COMPOSITION TESTING:  Knowledge of any other alternative tests or protocols for testing for the presence of asbestos, silica, heavy metals, nickel, quartz, chromium, arsenic, magnesium, accessory mineral or any other non-talc constituent, in talc than the ones actually used or specified by JJCI for the purity of talc used in the talcum powder products.

6.  TESTING PROTOCOLS, SPECIFICATIONS, PROCEDURES, AND LOCATIONS:
    a.  The testing protocols and specifications used on talc supplied for use in your talcum powder products by product and by year and their location in JJCI's MDL document production.
    b.  If applicable, any differences between the protocols and specifications used for different talc sources and their location in JJCI's MDL document production.

7.  TESTING PERFORMED BY NONPARTIES AT JJCI'S DIRECTION:
    a.  All entities that performed testing on talc used in JJCI's talcum powder products, whether the testing was conducted at the source (e.g., the mine) or at any point during the manufacturing process, by product and by year.
    b.  The protocol and/or procedures for providing samples to any nonparty entities performing testing of talc, including sample type, collection frequency, compositing, and chain of custody.
    c.  The specifications for testing of talc requested by JJCI, by product and by year.
    d.  The location of any remaining material from the samples tested by a nonparty, by product and by year.
    e.  For samples or remaining material from the samples tested that has been lost, discarded or destroyed, the circumstances surrounding their loss, disposition or destruction, and by whom.

8.  TESTING RESULTS INCLUDING LOCATION OF TESTING DOCUMENTS: All test results for the presence of asbestos, fibrous talc, silica, heavy metals, nickel, chromium, arsenic, magnesium, accessory mineral, or any other non-talc constituent in any sample of talc tested for purity, for any talc mine or talc supplied to you from any mine which supplied talc for use in any JJCI talc product including the location of any test results in JJCI's document production and the location of any such test results that are not in JJCI's MDL document production.

9.  QUALITY ASSURANCE PROCEDURES AND RESULTS FOR THE PURITY OF JJCI'S TALCUM POWDER PRODUCTS: Any quality assurance procedures for testing the composition or purity of talc intended for use in JJCI's talcum powder products and quality assurance results on talc tested for composition and purity including the location of any such test results in JJCI's MDL document

production and the location of any such test results that are not in JJCI's MDL document production.

10. *IN VIVO*, *IN VITRO*, OR BIOASSAY TESTING RELATING TO TALC SAFETY AND COMPOSITION: The identity and findings of any study, including but not limited to any animal or human study, which tested for the presence and composition of talc, asbestos, silica, heavy metals, nickel, chromium, magnesium, arsenic, accessory mineral or any other non-talc constituent from any JJCI talcum powder product.

11. LABORATORIES:  Knowledge of laboratories, both internal and external, methods and procedures used to test your talc intended for use in the talcum powder products.


III.    **THE SAMPLING OF TALC INTENDED FOR USE IN JJCI TALCUM POWDER PRODUCTS**

1. SAMPLING:
   a. The protocol and procedures used for the sampling of talc, either at the source (e.g., the mine) or at any point in the chain of production by product and by year.
   b. Any log books, records, notes, or other documents regarding the samples obtained either at the source (e.g., the mine) or at any point in the chain of custody by product and by year.
   c. Any summaries or analyses of samples obtained either at the source (e.g., the mine) or at any point in the chain of production by product and by year.
   d. For talc samples that have been lost, discarded or destroyed, the circumstances surrounding their loss, disposition or destruction and by whom.

2. PROCESSING OR HANDLING OF SAMPLES:  The protocol and/or procedures for handling or processing samples, whether obtained at the source (e.g., the mine) or at any point in the chain of production by product and by year, including all documents regarding the compliance with any such protocol or procedure.

3. LOCATION OF SAMPLES INCLUDING LOST OR DESTROYED SAMPLES: The location of any talc samples collected by you or other entities on your behalf in the normal course of business, including samples that have been discarded or destroyed. For talc samples that have been lost, discarded or destroyed, the circumstances surrounding their loss, disposition or destruction and by whom.

4. CHAIN OF CUSTODY FOR IDENTIFIED SAMPLES: The storage and chain of custody for any and all samples that have been identified as being in your possession. **Exhibit 1.**

5.     <u>LOCATION OF OTHER RELEVANT TALC SAMPLES</u>:  The location of any talc samples either from a source (e.g., the mine) which supplied talc for use in JJCI's talcum powder products or from any point in the chain of production, other than as identified in **Exhibits 1 and 2**, even if those samples are not in your custody and control.

6.     <u>PROTOCOLS OR RESTRICTIONS ON MINING TALC FOR USE IN TALCUM POWDER PRODUCTS</u>: Any restrictions, limitations or protocols regarding the source or the mining of talc intended for use in JJCI's talcum powder products.

## IV.    ISSUES RELATING TO INFLUENCE AND BIAS

1.     <u>PCPC</u>:
   a. JJCI's relationship with PCPC, including formal and informal JJCI representatives assigned to the Talc Interested Party Task Force, the Ad Hoc Talc Task Force, or any other formal or informal industry groups dealing with the issue of the safety of talc.
   b. JJCI's financial contributions to PCPC, including to committees and/or subcommittees, third party consultants, law firms, or scientists.
   c. JJCI's communications with PCPC and its members concerning talc and the science related to the relationship between talcum powder products (talc and any constituents) and ovarian cancer.
   d. JJCI's coordination with PCPC and other industry companies concerning the defense of talc at the FDA/CTFA/ISTRP meeting of January 31-February 1, 1994.
   e. JJCI's communications with staff and expert panel members of the Cosmetic Ingredient Review concerning the safety of talc and the CIR's safety assessment of talc, including communications made through consultants such as CRE.
   f. JJCI's participation in the communication of information about the science of talc and ovarian cancer between PCPC and other governmental and non-governmental organizations including FDA, ISRTP, NTP, CIR, CRE, IARC, and any other scientists who considered and published on the scientific evidence related to talcum powder products and ovarian cancer.
   g. JJCI's communications with PCPC and its members concerning funding studies and retaining scientists concerning talc and the science related to the relationship between talcum powder products (talc and any constituents) and ovarian cancer, including communications made through consultants such as CRE, the Weinberg Group, Crowell & Moring, and Nichols-Dezenhall.

2.     <u>IMERYS</u>:
   a. The communication and coordination between JJCI and Imerys on the scientific issues relating to ovarian cancer, including coordination with

respect to communication and influence on NTP, IARC and FDA, communications and conclusions with respect to the safety of talcum powder products, and the interpretation of the science relating to talcum powder products and ovarian cancer.

   b. JJCI's direct or indirect involvement and communications with Imerys' consultant, CRE, on issues related to the safety of talc.

3.   <u>NTP</u>: JJCI's direct and indirect communications with the National Toxicology Program (NTP) with respect to its consideration of talc as a carcinogen, including the following:

   a. JJCI's communication with respect to the 2000 NTP meeting on Talc.

   b. JJCI's efforts to address the NTP 13-2 vote to list non-asbestiform talc as carcinogenic in humans in 2000 in the NTP draft report on talc and cancer.

   c. JJCI's strategy (or consideration of a strategy) to "litigate" or support litigation designed to prevent NTP from listing talc as a carcinogen.

   d. JJCI's financial support for the efforts to prevent the listing of talc as a carcinogen by the NTP.

   e. JJCI's discussions of the "definition of talc" internally and with other entities involved in the NTP review process.

   f. JJCI's formal and informal coordination with other entities (including Imerys, CRE, Joshua Muscat, Crowell and Moring the Degge Group, and Judith Jones) to communicate with NTP in opposition to listing talc as a carcinogen in the 10th report on Carcinogens and efforts to prevent re-nomination of talc as a human Carcinogen in the 12th Report on carcinogens.

4.   <u>IARC</u>: JJCI's direct and indirect communications with IARC (through, for example, Imerys, PCPC, IMA-NA, CRE, Joshua Muscat, MD and Gunther Oberdorster, MD, Crowell and Moring and others retained to represent industry interests at the 2006 IARC meeting), including efforts to influence the IARC's review and consideration of the science of talc and ovarian cancer which ultimately was included in a report entitled "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 93, Carbon Black, Titanium Dioxide, and Talc, Lyon, France 2010.

5.   <u>CRE</u>: JJCI's relationship with Multinational Business Services, Inc. d/b/a Center for Regulatory Effectiveness and Multinational Legal Services (especially William Kelly, Jr., and Jim Tozzi), including communications between Imerys and CRE and payments made to CRE by JJCI.

6.   <u>FDA</u>: JJCI's communications with the FDA concerning the science of ovarian cancer and talc, including the purity of JJCI's talc.

7.    NATIONAL CANCER INSTITUTE (NCI):  JJCI's direct and indirect communication with the NCI, including members of the PDQ Adult Treatment Editorial Board or the Screening and Prevention Editorial Board, concerning its listing of Talc as a carcinogen, including financial support to NCI and the persons who make recommendations to NCI within and outside the organization.

8.    THE JJCI ESTABLISHED OVARIAN CANCER-TALC CAUSATION CRITERIA & CAUSATION ASSESSMENT CHANGES: JJCI physicians' assessment of talc's contribution to the cause of ovarian cancer "according to established criteria," what those criteria are, and the conclusion that a case of ovarian cancer was "determined to be of probable causality at the case level" by that criteria but was later assessed to of "unlikely" causality. [See, e.g., document entitled "Surveillance Review of Adverse Event reports of Ovarian Cancer and Use of Baby Powder" JNJ 000460665-73.]

9.    FOREIGN REGULATORY REVIEWS: JJCI's direct and indirect communications with any foreign regulatory bodies concerning the science of ovarian cancer and talc, including the purity and testing of talcum intended for use in JJJC's cosmetic products.

10.   IN VIVO, IN VITRO, OR BIOASSAY TESTING RELATING TO TALC SAFETY AND COMPOSITION: The identity and findings of any study, including but not limited to any animal or human study, which tested for the presence and composition of talc, asbestos, silica, heavy metals, nickel, chromium, magnesium, arsenic, accessory mineral or any other non-talc constituent, including any studies funded or sponsored individually or through third parties, any studies terminated, any consultations with scientists regarding their ongoing studies or proposed studies.

11.   CALIFORNIA SAFE COSMETIC ACT (CSCA): Communication you have had relating to or regarding the passage of the CSCA, including communications with Imerys, and PCPC relating to the CSCA.

12.   OTHER INDUSTRY ENTITIES: Communications between you and Industrial Minerals Association of North America (IMA-NA), EUROTALC, CCTFA, and CTPA concerning talc, talcum powder products and the science related to the relationship between talcum powder products (talc and any constituents) and ovarian cancer, including communications concerning regulatory and NGO reviews of talc, talcum powder products (talc and any constituents) and ovarian cancer.

13.   PROFESSIONAL MEDICAL ORGANIZATION STATEMENTS AND PUBLCIATION PLANS: JJCI's direct and indirect communications with professional medical organizations, including by not limited to, Society Gynecologic Oncologists (SGO), the National cancer Institute (NCI)  and American College of Obstetricians and Gynecologists (ACOG), concerning the

17

organization's position and/statements regarding genital use of talcum powder products (talc and any constituents) and ovarian cancer as well as payments to these organizations.

14. <u>CONTRACT RESEARCH ORGANIZATIONS AND NON-ATTRIBUTED RESEARCH</u>:  Any and all persons, entities, and organizations contracted or engaged by you or your agents to publish on the issue of talcum powder and ovarian cancer, including payments made for any publications and communications about any publications.

15. <u>PUBLICATION PLANS</u>: JJCI's publication plans, including both lay and scientific publications regarding talcum powder (talc and any constituents) and ovarian cancer.

## SCHEDULE B – DOCUMENT REQUEST

1.      Curriculum vitae(s) ("CVs") of the designated witness(es). Please produce the

requested CVs at least seven days prior to the deposition date.

Dated: March 19, 2018                    RESPECTFULLY SUBMITTED,

                                         /s/ *Michelle A. Parfitt*
                                         Michelle A. Parfitt
                                         ASHCRAFT & GEREL, LLP

                                         /s/ *P. Leigh O'Dell*
                                         P. Leigh O'Dell
                                         BEASLEY, ALLEN, CROW, METHVIN,
                                         PORTIS & MILES, P.C.

                                         ***Plaintiffs' Co-Lead Counsel***

                                         /s/ *Christopher M. Placitella*
                                         Christopher M. Placitella
                                         COHEN, PLACITELLA & ROTH, P.C.

                                         ***Plaintiffs' Liaison Counsel***

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on this 19th day of March, 2018, the Defendants identified below were served a true and correct copy of the Plaintiffs' Steering Committee's Notice of the 30(b)(6) Deposition of Defendant Johnson & Johnson Consumer Inc. by electronic mail:

Susan M. Sharko
Susan.sharko@dbr.com
DRINKER, BIDDLE & REATH, LLP
600 Campus Drive
Florham Park, NJ 07392-1047

Gene M. Williams
gmwilliams@shb.com
SHOOK, HARDY & BACON LLP
600 Travis St., Ste. 3400
Houston, TX 77002

John H. Beisner
John.beisner@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
*COUNSEL FOR DEFENDANTS JOHNSON & JOHNSON and*
*JOHNSON & JOHNSON CONSUMER INC.*

Lorna A. Dotro
ldotro@coughlinduffy.com
COUGHLIN DUFFY LLP
350 Mount Kemble Avenue
Morristown, NJ 07962

Mark Silver
msilver@coughlinduffy.com
COUGHLIN DUFFY LLP
350 Mount Kemble Avenue
Morristown, NJ 07962

Nancy M. Erfle
nerfle@grsm.com
GORDON & REES SCULLY MANSUKHANI
121 SW Morrison St., Ste. 1575
Portland, OR 97204
*COUNSEL FOR DEFENDANT IMERYS TALC AMERICA INC.*

Sheryl Lisa Axelrod
saxelrod@theaxelrodfirm.com
THE AXELROD FIRM PC
1125 Walnut Street
The Beasley Building
Philadelphia, PA 19107

Thomas Locke
tlocke@seyfarth.com
SEYFARTH SHAW LLP
975 F St., NW
Washington, DC 20004
*COUNSEL FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL*

Respectfully submitted,

/s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.

***Plaintiffs' Co-Lead Counsel***

/s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.

***Plaintiffs' Liaison Counsel***