# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL NO. 16-2738 (FLW) (LHG) |

**PLAINTIFFS' STEERING COMMITTEE'S REPLY TO DEFENDANTS JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER, INC., AND IMERYS TALC AMERICA, INC. F/K/A LUZENAC AMERICA, INC.'S RESPONSE TO PLAINTIFFS' STEERING COMMITTEE'S OBJECTION TO MAY 23, 2018 CASE MANAGEMENT ORDER OF THE SPECIAL MASTER RELATING TO 30(B)(6) DEPOSITIONS**

Just seven (7) days after receiving the Special Master's May 23 Order denying the PSC's request for discovery relating to missing talc samples as found by the Court to be "irrelevant" to the issues pending, Imerys disclosed the existence of 203 new talc samples. While Imerys has recently offered the PSC the opportunity to test these samples, to be clear, these additional samples were missing from its initial inventory disclosed to the PSC in February. Contrary to what defendants would have the Court believe, Imerys' recent disclosure was <u>not</u> cumulative of samples already produced. Rather, these samples were from the 1960's, 1970's, 1980's and 1990's— very relevant decades that were <u>not</u> represented in Imerys' February sample disclosure list which listed talc samples solely from the 2000's.

As if Imerys' May 30 disclosure of 203 pre-2000 samples was not bad enough, a day <u>after</u> the PSC filed the instant appeal, Imerys disclosed that it had found yet even more talc samples it had not previously disclosed. In that new disclosure, Imerys informed the PSC that it continues to inventory and investigate these samples, even as this appeal is being considered. Mindful of the Court's direction to complete testing so that the PSC may proffer its experts' reports, the PSC has asked for a full inventory of all of these known samples (and any others) before deciding which of these samples should be tested. *See* Exhibit 1 & Exhibit 2. The PSC must proceed in this manner so as to be comfortable that its experts will have access to full information and samples in order to address any <u>Daubert</u> issues that may be presented.

When Special Master Pisano declined to permit discovery of lost or missing samples, he obviously did not have this record. The record now illustrates even more precisely why discovery on this issue is necessary—the PSC must be able to identify and collect the most representative talc samples covering the greatest timeframe and from representative mines to test for the presence of asbestos, heavy metals and arsenic as part of its causation proof.

Individually and collectively, Defendants make three (3) arguments to forestall overturning the Special Master's Ruling. <u>First</u>, Imerys incredibly argues that the PSC's use of Imerys' recent missing samples disclosure to illustrate the need

for the missing samples discovery is an unfair "gotcha moment," a "red herring" and a "discovery sideshow." *See* Imerys' Opp. at 2. Second, both (Imerys and J&J) Defendants imply that any additional samples which might be identified through such discovery would be cumulative of what has already been produced. Third, they both argue that the testing of samples for the presence of carcinogens has nothing whatsoever to do with the question about whether Talcum Powder Products are capable of causing ovarian cancer.

The PSC writes this reply to briefly address these three arguments.

1. **Imerys' Ongoing Disclosure of New Samples, Particularly Relating to Different Decades, Illustrates Why the Special Master's Ruling on Discovery of Lost Samples Must Be Overturned**

Imerys bitterly complains that "the PSC is attempting to use its "not nefarious" supplemental sample disclosure as some sort of 'gotcha' moment." *Id*. at 3. It suggests that it was unfair for the PSC to use that disclosure to illustrate the need for missing samples discovery against it and presumably J&J. Changing the subject from the issues on this appeal, Imerys states that samples have already been offered to the PSC for splitting and testing. *Id*. Citing the PSC's June 4 letter asking for a full and complete inventory, Imerys posits that the PSC is creating a diversionary discovery sideshow by citing its innocent disclosure.

Nothing could be further from the truth and Imerys' argument is a diversion from the sole issue on this appeal—is it reasonable for the PSC to request discovery

3

from defendants related to lost samples? The Imerys supplemental disclosures illustrates precisely *why* the PSC has sought this discovery and *why* such discovery is necessary. As the PSC pointed out in its June 4 letter (Exhibit 1), the inventory which Imerys provided for inclusion in the Court's Stipulation and Order included 245 samples covering a 13 year period from 2001-2014. *See* Doc. 4767 (Agreed Order and Stipulation Regarding Production of Talc Samples from Imerys Talc America, Inc.). By contrast, the **203** newly discovered samples primarily cover ***an additional 34 year period, 1967-1998***.   The chart below illustrates this:

| Time Period | Imerys Order & Stipulation (Feb. 2018) | Supplemental Imerys Disclosure (May 30, 2018) |
|---|---|---|
| 1967-1987 | None | 20 |
| 1988 | None | 137 |
| 1998 | None | 12 |
| 2001-2009 | 129 | 14 |
| 2010-2014 | 57 | 20 |
| No date | 59 | None |
| Total | 245 | 203 |

Nor do the PSC's inquiries following this disclosure demonstrate that it is delaying and seeking unfair non-causation evidence as Defendants suggest. Following Imerys' recent disclosure, the PSC immediately sent Imerys a letter on June 4. *See* Exhibit 1. As a result of that immediate inquiry, the PSC held an additional meet-and-confer with Imerys on June 7. In that conference, Imerys surprisingly disclosed that <u>even more samples were located and were being</u>

4

<u>inventoried</u>. The PSC requested when that additional second supplemental inventory will be complete on June 8 so that the PSC could decide how to proceed.  *See* Exhibit 2, Email of C. Tisi.

When further pressed by Imerys to prematurely choose additional samples for testing on the spot and without complete information and inventory, the PSC further explained to Imerys' counsel:

> Mark, as of today, an additional 203 samples have been disclosed, nearly all from years for which no samples were previously made available.  The number of Imerys samples has nearly doubled. We are digesting this information as quickly as possible, but in order to make an informed decision about which samples to split, we need to know the universe we are dealing with.  What is your best estimate of when additional information will be provided to us?  Thanks.

*Id*. (Email of Leigh O'Dell).

Imerys' "moving target" disclosures—which are *still* incomplete and are *still* ongoing–illustrate in the most concrete way why the PSC must be able to take discovery to ensure that it has the most representative samples possible. Such discovery is also important so that the PSC can report to the Court as to how long it will take to complete its testing-a report that the Court asked for at the last status conference.

## 2. **Additional Samples Which Might Be Identified Through Such Discovery Is Not Cumulative Of What Has Already Been Produced**

Both Imerys and J&J further claim that "missing samples discovery" is unnecessary and time consuming in light of the sheer number of samples they have already produced. For example, Imerys complains that "plaintiffs have access to more samples than they will ever test," while J&J asserts that it produced "more than 1000 samples for plaintiffs to test, from which they selected 75." *See* Imerys' Opp. at 4; J&J Opp. at 1.

Defendants' "number of samples" argument is a strawman and a misdirection. As set forth above, prior to learning of Imerys' newly found samples (and after Judge Pisano ruled), the PSC had access to no Imerys' sample prior to 2001. Now, because these were found, presumably because the PSC pushed the issue, the PSC now has access to Imerys' samples from different mines going back decades to 1967. The same is true with J&J. As with Imerys, J&J's initial disclosure showed most of its samples were from after 2010. In that disclosure, J&J produced a mere 11 samples from the 2000's, a mere six (6) samples from the 1990's and approximately 45 samples from the 1980's. As with Imerys, the PSC should be able to explore whether J&J, has representative samples from relevant mines going back decades that have not been made available.

The record indicates that there are likely to be additional samples for relevant timeframes and the PSC should be able to explore this as part of the record supporting its causation experts.

### 3. The Testing Of Samples For The Presence Of Carcinogens Has Everything To Do With The Question About Whether Talcum Powder Products Are Capable Of Causing Ovarian Cancer

Defendants' finally assert that locating and testing available talc samples is ultimately irrelevant to the ultimate question of whether talcum powder products are capable of causing ovarian cancer. *See e.g.*, Imerys' Opp. at 4 ("pursuing isolated samples is not going to assist the Court in that ultimate issue."). They claim that the pursuit of sample testing that cuts across decades creates unnecessary delay in deciding whether sufficient evidence exists on that question. To the contrary, the identification of representative samples are important to that very inquiry.

Again, Defendants are wrong and want to shortcut the PSC's causation discovery. Defendants have been persistent in clamoring for Daubert hearings on the general causation question. While the PSC too wants to resolve that question--a question which the PSC believes will be resolved in its favor--it must balance the desire for swift resolution of that issue with the need for discovery of facts and evidence that it believes would support that claim. That evidence necessarily includes discovering whether Defendants' Talcum Powder Products have contained asbestos, heavy metals, arsenic, in addition to talc, all of which the PSC asserts

contribute to the products' cancer-causing propensities. The PSC should be able to discover whether additional evidence exists beyond that which Defendants have already identified.

## CONCLUSION

The PSC respectfully requests that its appeal of the Special Master's ruling related to undisclosed talc samples be reversed and that the defendants should be compelled to produce 30(B)(6) witnesses on this very important issue.

Date:  June 14, 2018                    Respectfully Submitted,

*s/ Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
4900 Seminary Road, Suite 650
Alexandria, VA 22311
Telephone: 703-931-5500
Email: mparfitt@ashcraftlaw.com

*s/ P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, PC
218 Commerce Street
Montgomery, AL 36104
Telephone: 334-269-2343
Email: leigh.odell@beasleyallen.com

*Plaintiffs' Co-Lead Counsel*

*s/ Christopher M. Placitella*
Christopher M. Placitella
COHEN PLACITELLA ROTH, PC
127 Maple Avenue

                Red Bank, NJ 07701
                Telephone 888-219-3599
                Facsimile: 215-567-6019
                Email: cplacitella@cprlaw.com

***Plaintiffs' Liaison Counsel***

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Dated:  June 14, 2018                             *s/ Michelle A. Parfitt*
                                                                    Michelle A. Parfitt