# EXHIBIT 5

**LEVY KONIGSBERG, LLP**
Moshe Maimon, Esq. (ID: 42691986)
Daniel LaTerra, Esq. (ID: 33702007)
800 Third Avenue, 11th Floor
New York, New York 10022
(212) 605-6200

**SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.**
101 Grovers Mill Road, Suite 200
Lawrence Township, New Jersey 08648
(609) 275-0400
*Attorneys for Plaintiffs*
Stephen Lanzo, III and Kendra Lanzo

| | |
|---|---|
| STEPHEN LANZO, III and KENDRA LANZO,<br><br>Plaintiffs,<br><br>v.<br><br>CYPRUS AMAX MINERALS COMPANY, et als.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY<br><br>DOCKET NO.: MID-L-7385-16AS<br><br>*Civil Action*<br><br>**MOTION *IN LIMINE* FOR ADVERSE PRESUMPTION INSTRUCTION DUE TO IMERYS' SPOLIATION AND CONCEALMENT OF TALC SAMPLES** |

## PRELIMINARY STATEMENT

The issue before this Court is how to remedy a clear-cut case of the destruction and concealment of critical evidence. During discovery, Plaintiffs requested that Imerys Talc America, Inc. (hereinafter "Imerys") produce all relevant talc samples in its possession. As is shown below, Imerys has been aware of potential litigation involving talc and asbestos disease since at least 1979, and therefore Imerys should have maintained the critical evidence consisting of the talc samples. Imerys' discovery responses stated that it had none – a claim that has been proven false during this trial.

As a result, Plaintiffs' Counsel were forced to find J&J talc products from other sources, and provide it to their testing expert, William Longo, Ph.D. The Defendants then used this fact — *e.g.* the Plaintiffs' procurement of J&J talc products for Dr. Longo — to (i) move to exclude Dr. Longo's tests as unreliable because he tested "tainted talc;" and then to (ii) cross-examine Dr. Longo at trial by suggesting that Plaintiffs' Counsel tampered and/or manipulated the J&J talc products provided to Dr. Longo, even showing a film clip to the jury demonstrating how this could be done.

This potentially case-determinative attack placed the credibility of Plaintiffs' witnesses (and Plaintiffs' Counsel) on grossly unequal footing with Defendants' witnesses, such as Julie Pier, who had the opportunity to test the actual talc samples at issue provided by Imerys to J&J. Then, over a month into trial, Imerys' corporate representative Julie Pier revealed that:

1. Imerys **destroyed** its samples of talc used Johnson & Johnson's baby powder, despite knowing there was actual and potential litigation over this talc involving asbestos disease;

2. Imerys **did possess** samples of its talc used in J&J baby powder, ranging in dates from 1966 to present; and

3. Imerys allowed its outside testing companies to destroy samples of talc sent to them, ignoring the outside test companies repeated admonitions that: "if you would like to have them returned, please notify us within 30 days. Otherwise, after 30 days, the samples will be discarded."[1]

When such discovery abuse reveals itself during trial, the law is well-settled that a spoliation is appropriate so that one Party will not benefit by recklessly depriving another Party of the evidence needed to present a claim or a defense. Rosenblit v. Zimmerman, 166 N.J. 391, 400-402 (2001).

If the Court does not act to cure this extraordinary prejudice by issuing a spoliation instruction, this will not only be contrary to New Jersey Supreme Court precedent, but will also

---

[1] ITA-Guild-001552-54, **Exhibit 3;** D. Ex. 6790 at JNJ-003730, 37377, 37395, 37390, 37371; ITA-Sabatelli-001697-99, **Exhibit 11**

have the perverse effect of encouraging talc Defendants to destroy or withhold the critical talc samples at issue. At the first day of trial, the Court stated: "Ultimately, though, any trial is a search for the truth, whatever the truth may be."[2] Here, Plaintiffs seek a remedy to make them whole as a result of Imerys' actions that prevented this search for the truth.

Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs' request for an adverse inference instruction as to Imerys, the text of which is proposed below, and for such other relief as to which Plaintiffs may be entitled.

## STATEMENT OF FACTS & PROCEDURAL HISTORY

### A. Plaintiffs requested talc samples during discovery, and Imerys stated it had none.

On February 21, 2017, Plaintiffs served discovery on Imerys requesting that Imerys produce the relevant talc samples in its possession, custody, or control[3]. ***Imerys responded that it had none[4]:***

> **REQUEST NO. 23:**
>
> Any talc, and/or products containing talc, of the type manufactured by defendant and which the defendant has in his possession, custody or control.
>
> **RESPONSE: In addition to the Preliminary Statement and General Objections incorporated by reference, Imerys objects to this requests on the grounds that it is not overly broad, unduly burdensome and not limited to the time period during which Plaintiff alleges that he was exposed to asbestos from Johnson & Johnson talc products. After a reasonable and diligent search, ➤ Imerys has been unable to locate any samples or exemplars of the cosmetic talc products sold to Johnson & Johnson during the relevant time period.**

As is set forth below, this statement was proven false by the testimony of Imerys' corporate representative Julie Pier.

---

[2] 1/22/18 Tr. at 23:23-24, **Exhibit 1**
[3] Plaintiffs' 2/21/2017 Supplemental Interrogatories and Document Requests, **Exhibit 4**
[4] Imerys' Amended Answers to Supplemental Interrogatories and Documents Requests, 12/14/17, at Request No. 23, **Exhibit 5**

### B. Imerys has been on notice of talc litigation since 1979.

How long has Imerys known that there is both potential and actual litigation over asbestos diseases arising from its talc samples?

As is shown by the below timeline, Cyprus knew since at least 1979 that Plaintiffs with mesothelioma were suing talc suppliers, including Windsor Minerals (the Vermont mines) for causing their asbestos cancer:

- **1979:** Imerys Corporate representative Patrick Downey admitted that when Cyprus acquired Metropolitan Talc in 1979, "Cyprus was aware of a lawsuit naming Metropolitan and another company called Whittaker, Clark & Daniels *alleging exposure to talc as the cause of mesothelioma*."[5] The lawsuit was entitled Westfall v. Whittaker, Clark & Daniels.[6] Indeed, Cyprus changed its purchase of Metropolitan Talc from a stock purchase agreement to merely an asset purchase because of the potential liabilities arising from this lawsuit: "A stock purchase agreement was negotiated; however, evidence of a substantial potential liability of Mathieu arose and it was determined to abandon the stock purchase format in favor of the purchase for cash of the plants, certain real property and inventories of each of the companies in the Mathieu family."[7]

- **1989**: When Cyprus bought Vermont Windsor mines from J&J, it negotiated that it would be indemnified by Johnson & Johnson for ongoing talc litigation, *including claims for asbestosis arising from talc exposure*.[8]

- **1992:** In 1992, when Cyrus sold its talc business to Imerys' predecessor, Cyprus agreed to keep the liabilities for its talc litigation.[9]

- **1994:** James R. Goay, Manager of Purchasing for Luzenac America, Inc. (Imerys' Predecessors) writes to J&J with respect to the talc litigation entitled Ritter v. Cyprus, et al, stating that samples of talc prior to 1984 are not available, because the samples are only retained by Luzenac for two years.[10]

- **2001:** The Luzenac Eastern Operations Manager Stephen S. Mauney and the Vermont Operations Quality Coordinator Martin P. Hayes write that testing records from the

---

[5] 1/30/2018 Tr. at 567:6-21, **Exhibit 12**
[6] ID. at ITA-Sabatelli-000082; **Exhibit 10**, Westfall Third Amended Complaint at 2 (Windsor Minerals sued for personal injuries for mesothelioma arising from "manufactured and/or distributed talc to Uniroyal, Inc. for usage in its plant in Providence, Rhode Island."). Affidavit of Frank A. Bolden, MSJ, **Exhibit 9**
[7] 1979 Acquisition of Assets of Charles Mathieu, P. Ex. IC-56 at ITA-Sabatelli-000003, **Exhibit 16**
[8] ITA-Sabatelli-000739; 000784-786; 000820-821, 000871-000877, **Exhibit 18**
[9] P. Ex. IC-11 at Greco-00544; 934-937, **Exhibit 17**
[10] P. Ex IC-309, **Exhibit 2**

Vermont mines were used by J&J to "defend against litigation:" "In 2000, Johnson and Johnson used these records to defend against litigation in a wrongful death suit."[11]

### C. Industrial talc and cosmetic talc come from the same mines, so litigation involving industrial talc put Imerys on notice of potential litigation involving cosmetic talc.

Imerys' argument that many of the lawsuits of which it was aware since 1979 involved industrial talcs, and therefore are distinguishable, does not withstand scrutiny. Mr. Downey testified that industrial talc and cosmetic talc are mined from the same talc ores:

> Q. You will agree that with regards to, for example, the Hamm mine, the other Vermont mines, that industrial talcs and cosmetic talcs are produced out of the same mine, correct?
> A. Generally there are mines that are, that provide the raw materials for the milling and beneficiation processes. So generally speaking, yes. But what defines the cosmetic talc grade is the—is the processing and beneficiation that occurs after mining.[12]

And as J&J's corporate representative Mr. Hopkins admitted, processing and beneficiation (froth flotation) do not remove asbestos from the talc. Mr. Hopkins conceded that there are "many reports which reflect that the attempts at flotation, not only flotation but different chemicals added to the flotation did not remove all the tremolite from the talc."[13] The reason for this, Mr. Hopkins testified, is that "[t]he purpose of flotation was to achieve high quality large platy talcs. Tremolite was not part of the end point."[14]

---

[11] D. Ex. 6764, **Exhibit 6**
[12] 2/6/2018 Tr. at 1407:2-11
[13] 2/8/18 Tr. at 1744:25-1645
[14] 2/8/18 Tr. 1744:13-16

Indeed, W. Nashed, Ph.D., Director of Science Information for J&J, wrote to the Department of Health, Education, and Welfare in 1972, and stated that it was an "incorrect" assumption that "[t]alc can be processed to remove asbestos-form particles."[15]

### D. Despite knowledge of litigation regarding the health effects of its talc, Imerys destroyed its talc samples after two years for over four decades.

Imerys testing corporate representative Julie Pier testified that Imerys has a policy of destroying all its talc samples after a period of two years, and that that this policy was "still in place."[16] Ms. Pier conceded that "as of 1993, it was the policy of the company Luzenac America to only retain samples for asbestos litigation for two years."[17] Further, Mr. Goay, Manager of Purchasing Imerys' predecessor Luzenac, wrote in an internal Luzenac memorandum that there were no samples prior to 1984: "Samples are not available for this time frame since retention is only two years."[18]

And all of this occurred while Imerys knew that there was ongoing litigation about the health effects of talc. ***Ms. Pier admitted that even though Imerys know that there was ongoing talc litigation, its policy was to destroy its talc samples[19]***:

```
15 outside lab.
16    Q.    No. My question was different,
17 Miss Pier.
18           You know, Luzenac Imerys knows that
19 even though there's ongoing litigation, you guys had
20 a policy to destroy the samples two years, and you
21 knew your outside lab had a policy to destroy
22 samples after 30 days, correct?
23    A.    For the samples, not the grids, yes.
24    Q.    And it's your testimony that you
25 maintain, Imerys Talc America maintains all the
```

---

[15] P. Ex. 2364, **Exhibit 20**
[16] 3/5/18 Tr. at 4672:8-24, **Exhibit 7**
[17] 3/5/18 Tr. at 4674:12-16, **Exhibit 7**
[18] P.Ex. 309 at 1-2, **Exhibit 2**
[19] 3/8/18 Tr. at 5015:18-23, **Exhibit 8**; 3/6/18 Tr. At 4937:1-4963:25, **Exhibit 15**

**E. The outside laboratories asked Imerys if they should destroy the samples, and Imerys did not respond.**

From at least 1996 to 2001, Imerys sent talc samples from the Windsor mines for testing to Bain Environmental.[20] Each time, Bain informed Imerys that "As we do not have the facilities to store the samples indefinitely, if you would like to have them returned, please notify us within 30 days. Otherwise, after 30 days, the samples will be discarded."[21] But despite this notice, Ms. Pier conceded that Imerys and its predecessor Luzenac did not stop its outside testing companies from destroying talc samples:

> Q. Luzenac did not do anything to stop its consultant, Bain Environmental, from destroying the sample that it had reported had chrysotile asbestos, correct?
> A. That's correct.[22]

**F. Contrary to Imerys' discovery response of "no talc samples," Ms. Pier testified that she maintains "several hundred" samples in storage.**

Ms. Pier admitted that she had not destroyed all samples. Since 2001, she had placed "several hundred" samples in offsite storage.[23] Further, Ms. Pier testified that Imerys has all of the grids containing portions of the samples that she has tested, but they have never turned them over in litigation:

> Q. And it's your testimony that you maintain, Imerys Talc America maintains all the grids for all the samples somewhere in your lab back in San Jose?
> A. That's correct.
> Q. Have you ever turned those over in litigation so other folks can looks at them, the grids?
> A. No, I haven't.[24]

---

[20] 3/8/18 Tr. at 5105:6-15, Exhibit 8
[21] ITA-Guild-001554; Exhibit 3; D. Ex. 6790 at JNJ-003730, 37377, 37395, 37390, 37371; ITA-Sabatelli-001697-99, Exhibit 11
[22] 3/8/18 Tr. at 5128:12-16, Exhibit 8
[23] 3/5/18 Tr. at 467:21-4679:3, Exhibit 7
[24] 3/8/18 Tr. at 5105:24-5106:7, Exhibit 8

*An internal Rio Tinto 2009 e-mail demonstrates that Imerys maintains Grade 66 talc samples from 1967 to 1984 (the very same talc used in J&J's talc products) in storage.*[25] Ms. Pier conceded that she received notification of these samples in 2009, but had not looked for them for purposes of this litigation.[26] Notably, Imerys did not produce this email[27] to Plaintiffs until February 5, 2018, several weeks into the trial in this case. And it was buried in a document dump of over 467,000 pages of documents – 63 Gigabytes of data.



Needless to say, it took Plaintiffs some time to find this needle in the haystack.

### G. Defendants made the reliability of the samples available for testing a central issue in this trial

There is no question but that Plaintiffs have been severely and perhaps irreparably prejudiced by Imerys' destruction of its talc samples, and its failure to turn over the "several hundred" talc samples that Ms. Pier personally stores and the all of the grid samples.

In order to prove that the talc in the J&J's talc products contained asbestos, Plaintiffs Counsel found bottles of J&J baby powder from sources other than Imerys, and gave them to Dr. Longo for testing.

---

[25] P. Ex. IC-242, **Exhibit 19**; 2/27/18 Tr. at 4024:5-4026:25, **Exhibit 14**
[26] 2/27/18 Tr. at 4026:22-25, Exhibit 14
[27] P. Ex. IC-242, Exhibit 19

Defense counsel used this as a potential case-determinative attack on Dr. Longo. The questions on cross-examination included:

- "And you were provided talc samples or J&J samples by the three plaintiffs' law firms"[28]

- "Now, you do not know the chain of custody for the Kazan containers from the point of sale to the time that you took possession, correct?"[29]

- "And you have no information about how these three samples were stored or handles before they came into your possession, correct?"[30]

- "But you actually have no information about where any of these containers have been, what state they were purchased in, whether they transferred hands, how they got into the collector's possession, unless it's in the affidavit. We don't have any of that information, correct?"[31]

Additionally, Defense Counsel questioned Dr. Longo extensively about the possibility that "someone" refilled the containers with asbestos-containing samples[32]. In a dramatic moment, Defendants even played to the jury a YouTube video demonstrating the replacement of talc in a baby powder bottle through use of a turkey baster.

Notably, this entire line of questioning, and this extremely (potentially case-determinative) prejudicial attack on Dr. Longo, could have been obviated if Imerys had not destroyed and hidden its talc samples from Plaintiffs.

## LEGAL ARGUMENT

**A. The New Jersey Supreme Court provides for the civil remedy of a spoliation inference where evidence has been destroyed or hidden.**

"Spoliation, as its name implies, is an act that spoils, impairs or taints the value or usefulness of a thing. Black's Law Dictionary 1409 (7th ed.1999). In law, it is the term that is used to describe ***the hiding or destroying of litigation evidence***, generally by an adverse party.

---

[28] 2/21/18 Tr. at 3124:11-23, **Exhibit 13**
[29] Id. at 3128:14-17
[30] Id. at 3129:4-6
[31] Id. at 3150 at 3-8
[32] Id. at 3161:18-3162:25

Bart S. Wilhoit, Comment, Spoliation of Evidence: The Viability of Four Emerging Torts, 46 UCLA L.Rev. 631, 633 (1998)." [Rosenblit v. Zimmerman, 166 N.J.391, 400-402 (2001)].

"When spoliation occurs, the law has developed a number of civil remedies, the purpose of which is to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct. Steffen Nolte, The Spoliation Tort: An Approach to Underlying Principles, 26 St. Mary's L.J. 351, 355–56 (1995)." [*Id.*].

"The best known civil remedy that has been developed is the so-called spoliation inference that comes into play where a litigant is made aware of the destruction or concealment of evidence during the underlying litigation. Since the seventeenth century, courts have followed the rule *"omnia praesumuntur contra spoliatorem,"* which means "all things are presumed against the destroyer."' [Id. (internal citations omitted)]. [*Id.*].

Thus, courts use the spoliation inference during the underlying litigation "as a method of evening the playing field where evidence has been hidden or destroyed." [*Id.*]. A spoliation instruction "allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her." [*Id.* (internal citations omitted)].

If the spoliation or concealment of evidence "is revealed in time for the underlying litigation, the spoliation inference may be invoked." [*Id.* at 407]

In Jerista v. Murray, 185 N.J. 175, 201-203 (2005), the New Jersey Supreme Court cited approvingly to "a number of jurisdictions" that "have crafted remedies in cases in which parties lost or destroyed critical trial evidence, ***even when the loss was not willful***." [*Id.*, citing Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 267-68 (2d Cir.1999) (holding that "[t]rial judges

should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing" and "that a finding of bad faith or intentional misconduct is not a sine qua non to sanctioning a spoliator with an adverse inference instruction"), cert. denied, 528 U.S. 1119 (2000); Sweet v. Sisters of Providence in Wash., 895 P.2d 484, 490–92 (Alaska 1995) (holding that defendant's negligent or intentional spoliation of evidence relevant to plaintiff's medical malpractice claim shifted burden of proof of legal causation and negligence away from plaintiffs); Velasco v. Commercial Bldg. Maint. Co., 169 Cal.App.3d 874 (1985) (concluding "that a cause of action may be stated for negligent destruction of evidence needed for prospective civil litigation"); Pub. Health Trust v. Valcin, 507 So.2d 596, 599–601 (Fla.1987) (adopting rebuttable presumption of negligence where defendant health care provider could not produce key records in malpractice action)].

Thus, "[i]f Plaintiffs can make a threshold showing that defendant's recklessness caused the loss or destruction of relevant evidence in the underlying personal injury lawsuit, the jury should be instructed that it may infer that the missing evidence would have been helpful to plaintiffs' case and inured to defendant's detriment. The jury is free to accept or reject that inference—just like the permissive inference of negligence that jurors may draw under the doctrine of res ipsa loquitur." Jerista v. Murray, 185 N.J. 175, 201-203 (2005).

### B. Imerys has destroyed and concealed critical evidence, thus the jury should be given an adverse inference instruction.

The Imerys corporate representative ***admitted*** that Imerys destroyed talc samples for years despite knowing about the talc personal injury litigation. Further, she testified, contrary to Imerys' discovery responses, that Imerys did maintain samples in storage of Imerys talc, including the very talc used in J&J talc products.

Applying the well-settled New Jersey Supreme Court precedent to the facts of this case, the remedy for making Plaintiffs whole as a result of Imerys' destruction and concealment of the Imerys talc samples is an adverse instruction.

Plaintiffs request the following instruction:

> For the talc in the baby powder used by Plaintiff Steven Lanzo from 1972 to 2016, you may infer, based upon Imerys Talc America's destruction of or withholding of samples of this product, that if these samples had been produced at trial, they would have been shown to have contained asbestos.

This instruction is necessary to "even the playing field" [Rosenblit, supra, 166 N.J. at 400-402] as a result of Imerys' destruction and concealment of critical evidence, especially in light of the fact that Plaintiffs' lack of this very evidence has been made into a central attack on Plaintiffs in this trial

### Conclusion

Plaintiffs respectfully request that the Court provide an adverse inference instruction to the jury as set forth above, and for such other relief as to which Plaintiffs may be entitled.

By: _____
MOSHE MAIMON, ESQ.
**Levy Konigsberg, LLP**
*Attorneys for Plaintiffs*
Stephen Lanzo, III and Kendra Lanzo

Dated: March 15, 2018

EXHIBIT 7

Page 4535

```
                SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION: MIDDLESEX COUNTY
                DOCKET NO. MID-7385-16AS


STEPHEN LANZO, III, AND KENDRA   )
LANZO,                           )
                                 )
                                 )
              Plaintiffs,        )
                                 ) TRIAL
      v.                         )
                                 ) (VOLUME XXII)
CYPRUS AMAX MINERALS COMPANY,    )
et al.,                          )
                                 )
              Defendants.        )
                                 )
```

---

                        Monday, March 5, 2018
                        9:30 a.m.
                        Middlesex County Courthouse
                        New Brunswick, New Jersey

B E F O R E:
H O N O R A B L E   A N A   C.   V I S C O M I, JSC




              REPORTED BY: ANDREA F. NOCKS, CCR, CRR

Job No. NJ2833217

Page 4672

1  AFTERNOON SESSION
2  COURT OFFICER: Jury entering.
3  (Jury enters.)
4  THE COURT: Please be seated. Make
5  sure cell phones are turned off.
6  Mr. Satterley, please continue.
7  BY MR. SATTERLEY:
8  Q. Miss Pier, Luzenac America, with
9  regards to transmission electron asbestos policy,
10 had a policy with regard to the sample, the samples
11 are to be maintained for only a period of two years,
12 correct?
13 A. I think that is, I think I've seen
14 that policy, yes.
15 Q. And that policy was after two years
16 the samples are to be disposed of, correct?
17 A. That's, I think, what it says, yes.
18 Q. And that policy existed in the 1990s
19 and into the 2000s, correct?
20 A. I'm not sure when it was first
21 instituted.
22 Q. Did it continue into the 2000s?
23 A. As far as I know, that policy is
24 still in place.
25 Q. So the policy of only maintaining

Page 4673

1  samples for asbestos analysis of two years is still
2  the policy of the company, correct?
3  A. It may be the policy. It's not what
4  we do, but...
5  Q. It's the policy, it's your
6  understanding it's been the policy for several
7  years, correct?
8  A. I think so.
9  Q. And you know that Luzenac America
10 instituted that policy and had that policy even
11 though they have been involved in litigation for
12 more than 20 some odd years, correct?
13 A. I really don't know the history of
14 litigation.
15 Q. Let me -- I have shown this to
16 counsel already. It should be 309.
17 THE COURT: Thank you.
18 BY MR. SATTERLEY:
19 Q. This, Miss Pier, is dated October the
20 17th, 1994, and this is from manager purchasing at
21 Luzenac America to Johnson & Johnson, and carbon
22 copies Mr. Zazenski, White, and Hasty.
23 Do you see that?
24 A. Yes.
25 Q. And attached to this letter is the

Page 4674

1  policy asbestos transmission electron microscopy
2  approved by Joe Johnson at Luzenac America, correct?
3  A. Yes, sir. It is.
4  Q. And it's procedure number QA-042,
5  correct?
6  A. Yes.
7  Q. And it says -- this would demonstrate
8  as of 1994, actually effective date says July 9,
9  1993.
10 Do you see that?
11 A. Yes, I do.
12 Q. So as of 1993, it was the policy of
13 the company Luzenac America to only retain samples
14 for asbestos for two years, for a period of two
15 years, correct?
16 A. Yes.
17 MR. SATTERLEY: And at this time,
18 your Honor, I move into evidence 309.
19 MR. ELDER: No objection.
20 THE COURT: Could I just see counsel
21 at sidebar, please.
22 (Sidebar.)
23 THE COURT: I just don't (inaudible)
24 reference to the other litigation.
25 MR. SATTERLEY: I'll black it out,

Page 4675

1  but I did want to demonstrate --
2  THE COURT: That was with regard to
3  another case.
4  MR. SATTERLEY: I can black it out.
5  MR. FROST: We had reached an
6  agreement to that.
7  MR. SATTERLEY: We reached an
8  agreement just to mark out Ritter, not Cyprus.
9  MR. FROST: Ritter, and there's a
10 phone number on page 3.
11 THE COURT: Okay.
12 MR. FROST: Also going to be
13 redacted.
14 MR. SATTERLEY: It's Mr. Zazenski's
15 number.
16 MR. FROST: It's an office number.
17 MR. SATTERLEY: I agree to redact
18 that, your Honor.
19 THE COURT: Okay. That is very kind
20 of you. All right.
21 (Sidebar ends.)
22 THE COURT: This document is now
23 admitted into evidence.
24 MR. SATTERLEY: Request permission to
25 publish, your Honor.

36 (Pages 4672 - 4675)

Page 4676

1  THE COURT: Yes.
2  BY MR. SATTERLEY:
3  Q.  And so on this document, 1994,
4  relative to transmission electron microscopy samples
5  and how long they're being maintained, there's a
6  specific reference to litigation that's ongoing in
7  1994 versus Cyprus, et al.
8       Do you see that?
9  A.  Yes, sir.
10 Q.  This is on Luzenac America letterhead
11 in Windsor, Vermont, correct?
12 A.  Yes, correct.
13 Q.  And it discusses, it talks about all
14 these various mines.
15      Do you see that?
16 A.  Yes, I do.
17 Q.  And it says, "Samples are not
18 available for this timeframe since retention is only
19 two years"; right?
20 A.  Yes, sir. That's what it says.
21 Q.  It says, "It is my understanding that
22 these records have since been turned over to Luzenac
23 America corporate headquarters with the sale of
24 Cyprus Windsor minerals in 1992"; right?
25 A.  Yes.

Page 4677

1  Q.  And the actual policy, QA-042,
2  asbestos transmission electron microscopy, that's
3  the actual policy itself, correct?
4  A.  I think so. This is a policy of
5  retention.
6  Q.  For the samples, correct?
7  A.  It seems so. Yes.
8  Q.  It's not just the retention. It also
9  gives direction on how they're to be sent to
10 McCrone, with a cover letter, coded, purchase order,
11 mailing label. It's specifically what to do with
12 regards to sending it to McCrone for testing?
13 A.  Okay. Yes.
14 Q.  And so it would be fair to say that
15 this policy, retaining it after two years, Luzenac
16 Rio Tinto Imerys doesn't have all the samples that
17 they had back in the '90s and the 2000s, correct?
18 A.  I think that's probably correct.
19 Q.  Because after two years they disposed
20 of them, destroyed them, correct?
21 A.  We -- I think, yes, we didn't keep
22 them. I have many of the samples historically,
23 though.
24 Q.  I'm sorry?
25 A.  I have samples.

Page 4678

1  Q.  You have some samples?
2  A.  I do.
3  Q.  But not every sample that was pulled
4  and reviewed and looked at has been maintained
5  because the policy says destroy them after two
6  years, correct?
7  A.  Correct.
8  Q.  And you say you personally maintain
9  samples now. Where do you maintain those?
10 A.  We have sent some of our samples to
11 off-site storage.
12 Q.  Where is that off-site storage for
13 these samples that you currently maintain?
14 A.  It's in Iron Mountain.
15 Q.  Where is that located?
16 A.  They have offices all over, but, I
17 mean, initially Denver.
18 Q.  How far do your samples that you
19 maintain that you have at Iron Mountain go back?
20 A.  I don't know exactly, maybe 2001.
21 Q.  And how many total samples do you
22 maintain in this Iron Mountain storage facility in
23 Colorado?
24 A.  How many samples? I don't know the
25 total. It's many.

Page 4679

1  Q.  Can you give me an estimate; ten, a
2  hundred, a thousand, one million?
3  A.  No. Several hundred maybe.
4  Q.  Now, with regards to samples that are
5  obtained, when a sample is pulled and you're looking
6  for chrysotile, you've got to use the transmission
7  electron microscope, correct?
8  A.  That's one of the techniques, yes.
9  Q.  Because earlier we went over --
10 A.  We did.
11 Q.  You couldn't find, with XRD you can't
12 find chrysotile, right?
13 A.  That's not necessarily true. At some
14 level you certainly can, and I have also seen it by
15 PLM.
16      MR. SATTERLEY: Your Honor, Exhibit
17 IC-239 has already been admitted into evidence.
18      May I publish?
19      THE COURT: Yes.
20 BY MR. SATTERLEY:
21 Q.  This is a document you created in
22 2007.
23      May I approach to give counsel a copy
24 of it?
25      THE COURT: You mean the witness.

37 (Pages 4676 - 4679)

Page 4780

1 Remember all the instructions I've
2 provided to you through the course of this trial:
3 No discussions with the testimony that you've just
4 heard, as well as any other testimonies or any of
5 the issues in this case, and no research of any kind
6 whatsoever.
7 We'll see you tomorrow morning at 9
8 a.m. Have a good night.
9 (Jury exits.)
10 THE COURT: Good night. We're off
11 the record.
12 (Proceedings adjourn at 4:30 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4781

1 CERTIFICATE OF OFFICER
2
3 I CERTIFY that the foregoing is a true
4 and accurate transcript of the testimony and
5 proceedings as reported stenographically by me at
6 the time, place and on the date as hereinbefore set
7 forth.
8 I DO FURTHER CERTIFY that I am neither
9 a relative nor employee nor attorney or counsel of
10 any of the parties to this action, and that I am
11 neither a relative nor employee of such attorney or
12 counsel, and that I am not financially interested in
13 the action.
14
15
16 ANDREA NUCKS, CCR, CRR
Certificate No. XI001573
17
18
19
20
21
22
23
24
25