

350 Mount Kemble Avenue
P.O. Box 1917
Morristown, New Jersey 07962
phone:  973-267-0058
fax:  973-267-6442
www.coughlinduffy.com

Wall Street Plaza
88 Pine Street, 28th Floor
New York, New York 10005
phone:  212-485-0105
fax: 212-480-3899

MARK K. SILVER, ESQ.
DIRECT DIAL: (973) 631-6045
EMAIL:  MSILVER@COUGHLINDUFFY.COM

August 13, 2018

***VIA ECF and Email***
The Honorable Freda L. Wolfson, U.S.D.J.
THE Honorable Lois H. Goodman, U.SM.J.
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

The Honorable Joel A. Pisano, USDJ (Ret.)
Walsh Pizzi O'Reilly Falanga
1037 Raymond Boulevard, 6th Floor
Newark, NJ 07102

Re:    *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2738

Dear Judges Wolfson, Goodman and Pisano:

As you are aware, this firm, together with Gordon & Rees, is counsel for Defendant Imerys Talc America, Inc. ("Imerys").   Imerys writes the Court seeking its assistance to preserve irreplaceable evidence that is the subject of discovery requests in several actions throughout the country, including actions pending before this Court.  Specifically, Imerys is in possession of approximately one hundred and one (101) Transmission Electron Microscopy Grids ("TEM Grids") that are one of a kind, fragile, and susceptible to damage and/or destruction upon handling and/or further testing.  As there are requests from Plaintiffs' counsel throughout the country to examine and potentially damage these TEM Grids, Imerys seeks a Protective Order from this Court until such time as an examination protocol can be negotiated with the PSC.  Such an order would ensure that Imerys can fulfill its discovery obligations in all pending cases without facing repercussions from individual courts.

Although a brief explanation of the issue is set forth below, Imerys respectfully requests a conference call with the Court to more fully explain the issue.  Imerys addresses this letter to all three judges simultaneously as it is unclear if the Special Master has the



authority to grant the relief requested by Imerys herein.  If Judge Wolfson would like Imerys to initially address this issue with Special Master Judge Pisano, it is happy to do so.

By way of background, Transmission Electron Microscopy ("TEM") is a microscopy technique in which a beam of electrons is transmitted through a specimen to form an image. The specimen is placed upon a grid.   In this case, the specimens in question are portions of historical talc samples that were placed on grids and examined by Imerys' employees in the normal course of business from 2001 – 2014.  TEM testing is one of the methods used to determine whether talc contains asbestos or other contaminants.  The testing results from those examinations have been produced in discovery and all results confirmed that asbestos was not present in any of the tested specimens.  Imerys has also produced the underlying samples.  Nonetheless, the PSC has requested that its experts be allowed to inspect and examine Imerys' TEM Grids.  It is Imerys' position that: 1) due to the age of the TEM grids in question, the simple act of transport and handling of the TEM Grids could lead to irreparable damage of the grids; and 2) examination of the TEM Grids is a form of "destructive testing" because the act of a TEM beam coming into contact with a TEM Grid during an examination of the grid could possibly lead to the grid breaking.   As a result, before any examination could occur, a protocol for examination of the grids would need to be negotiated between the parties similar to the type of protocol that was entered by this Court with respect to talcum powder samples.[1]

If this issue were simply between Imerys and the PSC, Imerys is confident that the parties would be able to negotiate a mutually agreeable resolution to this issue without the need for this Court's involvement.  However, this issue is not simply limited to this litigation. As Your Honors are aware, there are numerous mesothelioma and ovarian cancer litigations currently proceeding throughout the country.  There is currently a request pending to Imerys for the production of these exact same TEM Grids in the California state action entitled *Leavitt v. Johnson & Johnson, et. al.*, Alameda County Superior Court Case No. RG17882401.  The Plaintiffs in the *Leavitt* action are represented by Joseph Satterley, Esq. from the law firm of Kazan, McClain, Satterley & Greenwood.  The case is presided over by The Honorable Brad Seligman.  Plaintiffs in the *Leavitt* action have initiated steps to request that Judge Seligman issue an Order compelling Imerys to produce the TEM Grids in the California litigation.  (See Exhibit 1).

Simply stated, Imerys is caught between two masters and Imerys needs assistance from this Court.  Imerys believes this is the proper venue to raise this issue given the number of cases and plaintiffs' counsel involved here as compared to any individual state court action. Also, it will be important from the outset to make sure that any protocol reached here is enforced broadly.  Mr. Satterley's firm is identified as one of the firms that consented to be bound to the "Agreed Order and Stipulation Regarding Production of Talc Samples From

---

[1] The existing sample protocol entered by this Court cannot be used for the TEM Grids, as the TEM Grids raise a number of issues that are significantly different from those raised by the samples.



Imerys Talc America, Inc." issued by this Court (See Exhibit 2, Agreed Order and Stipulation, at Exhibit B). However, Mr. Satterley has stated on the record in several different jurisdiction that he is not bound by the Order. (See Exhibit 3, 7/18/18 Tr. at 30:12-13). As a result, he is attempting to re-litigate sampling issues in *Leavitt* and other cases. Imerys continues to meet and confer with Mr. Satterley on those issues without having to involve this Court at this time and only mentions this issue at this juncture to show why Court intervention is needed on the TEM Grid issue.

Similarly, while Imerys has the utmost respect for Judge Seligman, he has issued an order to Imerys that can be interpreted as ordering Imerys to disobey the orders of this Court. Specifically, Judge Seligman has ordered Imerys to not ship and/or send any more talc samples for testing pursuant to the MDL protocol until any issues before him are resolved. (See Exhibit 3, 7/18/18 Tr. at 42:4-10). Such an order puts Imerys in direct conflict with its obligations to this Court.

Based on Judge Seligman's comments during the last court conference, it is Imerys' impression that Judge Seligman is inclined to issue an Order compelling production of the TEM Grids in California. (See Exhibit 3, 7/18/18 Tr. at 27:19-28:19). Such an Order would prejudice Imerys' ability to defend itself in this litigation. Imerys represents to this Court that it is committed to work with all Plaintiffs' counsel throughout the country to come to mutually agreeable resolutions of all discovery disputes. However, it cannot do so when it is subject to competing Court Orders over evidence that is unique, irreplaceable, and subject to potential destruction. As a result, Imerys is asking this Court for an Order wherein this Court takes constructive possession of all TEM Grids in Imerys' possession until such time as an inspection protocol can be negotiated and/or until further involvement of this Court is required.

As stated above, given certain time constraints related to this issue, Imerys respectfully requests a telephonic conference with the Court at its earliest convenience.

We thank Your Honors for your time and attention to this matter.

> Respectfully submitted,
> COUGHLIN DUFFY LLP
> */s/ Mark K. Silver*
> Mark K. Silver
>
> Nancy M. Erfle, Esq.
> Ann Field, Esq.
> Gordon & Rees Scully Mansukhani
> 121 SW Morrison Street, Ste. 1575
> Portland, OR 97204



MKS/

Cc:    Plaintiffs' Steering Committee (via ECF and e-mail)
        Susan Sharko, Esq. (via ECF and e-mail)
        Thomas Locke, Esq. (via ECF and email)

# EXHIBIT 1

From: "Dept. 23, Superior Court" <dept23@alameda.courts.ca.gov<mailto:dept23@alameda.courts.ca.gov>>
Date: August 10, 2018 at 10:43:39 AM PDT
To: 'Andrea Huston' <ahuston@kazanlaw.com<mailto:ahuston@kazanlaw.com>>
Cc: "jennifer.lee@dentons.com<mailto:jennifer.lee@dentons.com>"
<jennifer.lee@dentons.com<mailto:jennifer.lee@dentons.com>>, "Joseph D. Satterley"
<JSatterley@kazanlaw.com<mailto:JSatterley@kazanlaw.com>>, Mark Swanson
<MSwanson@kazanlaw.com<mailto:MSwanson@kazanlaw.com>>, "Denyse F. Clancy"
<DClancy@kazanlaw.com<mailto:DClancy@kazanlaw.com>>, Jazmin Solorzano-Arroyo
<JSolorzano@kazanlaw.com<mailto:JSolorzano@kazanlaw.com>>, "Jubelirer, Samuel D.
(Samuel.Jubelirer@dentons.com<mailto:Samuel.Jubelirer@dentons.com>)"
<Samuel.Jubelirer@dentons.com<mailto:Samuel.Jubelirer@dentons.com>>
Subject: RE: Leavitt-ACSC Case No. RG17882401-Status of Meet and Confer with Imerys Talc America response RPD
Three and request for Reservation Number and Hearing Date

1

Counsel,

September 7, 2018, 9:30 a.m. has been reserved. Please reference the following reservation number on your motion, R-1991572 . Please have courtesy copies delivered to Department 23 upon filing of your motion.
The court will no longer be providing a court reporter. If you wish to have your proceedings transcribed you will need to make arrangements to have a court reporter present on the day of the hearing.
Please keep reset requests to a minimum, resources are limited.

Thank you,

Jhalisa A. Castaneda
Courtroom Clerk Floater| Dept. 23
Superior Court of California, Alameda County
1221 Oak Street
Oakland, California 94612
(510)-690-6074
jcastaneda@alameda.courts.ca.gov<mailto:jcastaneda@alameda.courts.ca.gov>


From: Andrea Huston [mailto:ahuston@kazanlaw.com]
Sent: Friday, August 10, 2018 10:19 AM
To: Dept. 23, Superior Court
Cc: jennifer.lee@dentons.com<mailto:jennifer.lee@dentons.com>; Joseph D. Satterley; Mark Swanson; Denyse F. Clancy; Jazmin Solorzano-Arroyo; Jubelirer, Samuel D. (Samuel.Jubelirer@dentons.com<mailto:Samuel.Jubelirer@dentons.com>)
Subject: Leavitt-ACSC Case No. RG17882401-Status of Meet and Confer with Imerys Talc America response RPD Three and request for Reservation Number and Hearing Date


Good morning,

Pursuant to the Court's direction on August 7, 2018, Plaintiffs' counsel and counsel for Defendant Imerys Talc America met and conferred concerning Imerys's responses to Plaintiffs' Requests for Production, Set Three.
As a result of this meet and confer:

1.    Imerys will not produce the testing grids without a court order.
2.    Imerys has agreed to produce a privilege log, identify and produce documents (non-confidential and non-confidential), and provide verified amended responses to the Requests that incorporate Imerys's inventories of grids and talc samples, but is unable to give Plaintiffs a reasonable time frame in which it will do so concerning this discovery served April 4.
3.    The parties are continuing to meet and confer regarding the production of talc samples, and will likely seek an Informal Discovery Conference with the Court on this specific issue next week.
4.    Plaintiffs are thus seeking a hearing date and Reservation Number for their Motion to Compel:  (a) production of a privilege log; (b) production of grids; (c) identification and production of documents in response to Request Nos. 24-27, 32, 35, 38, 41, 44, 47, 50, 53, 56, 59, 62, 65 and 68-69; and (d) verified amended responses that conform with C.C.P. Sections 2031.210-240 and .280.
5.    Plaintiffs seek a hearing date of September 7, 2018.
6.    Counsel for Imerys is copied on this email.

Thank you,

2

Andrea Huston

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

To reply to our email administrator directly, send an email to postmaster@kazanlaw.com<mailto:postmaster@kazanlaw.com>.
[cid:image001.jpg@01D43096.FF992040]

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE JOHNSON & JOHNSON<br><br>TALCUM POWDER PRODUCTS<br><br>MARKETING, SALES PRACTICES,<br><br>AND PRODUCTS LIABILITY<br><br>LITIGATION | MDL NO. 16-2738 (FLW)(LHG)<br><br>**AGREED ORDER AND<br>STIPULATION REGARDING<br>PRODUCTION<br>OF TALC SAMPLES FROM<br>IMERYS TALC AMERICA<br>INC.** |

WHEREAS, plaintiffs in the above captioned action as well as other actions in which plaintiffs have made personal injury claims regarding defendants' talcum powder ("Talcum Powder Litigation") have requested that Imerys Talc America, Inc. ("Imerys") produce historical[1] samples of talc provided to Johnson & Johnson for Johnson's® Baby Powder or Shower to Shower® (collectively "talc samples"") for testing;

WHEREAS, Imerys has represented that they have identified the talc samples available in an inventory provided to plaintiffs' counsel and which is attached hereto as Exhibit A;

---

[1] As used in this Agreed Order and Stipulation, "historical" refers to samples taken prior to 2014.

WHEREAS, there are thousands of plaintiffs involved in Talcum Powder Litigation against Imerys and a limited, finite supply of the talc samples;

WHEREAS, Imerys make no representations as to whether or not (i) the talc samples are comprised of marketed talcum powder, (ii) the recorded information about the talc samples is accurate, (iii) a chain of custody can be established for the talc samples and (iv) the talc samples were stored in a manner to avoid contamination by other particulates;

WHEREAS, the parties dispute whether testing regarding any talc sample or group of talc samples would result in any evidence relevant to any plaintiff or plaintiffs' claims;

WHEREAS, Imerys has represented that it has not opened or caused to be opened the talc sample containers to test or otherwise examine their contents since the talc samples were located in response to plaintiffs' production requests[2];

WHEREAS, plaintiffs' counsel who are signatories to this Agreed Order have represented that they have the authority to agree to this stipulation and select,

---

[2] The only exceptions to this are samples A02008, A03038, and A09309 as identified in Exhibit A.  In an effort to comply with instruction of the Court in the matter of Ratcliff v. Borgwarner Morse Tec LLC et, al, Superior Court of Washington for King County, Dkt. No 16-2-18128-7 SEA, and to ensure that Plaintiff and Defendants in that action have an opportunity to test a sample, if they choose, Imerys provided Plaintiff in the Ratcliff case (at the request of their counsel, the Lanier Firm) a portion of those samples prior to the entry of this Agreed Order. The remainder of samples A02008, A03038, and A09309 will be handled in accordance with the terms of this Agreed Order.

2

receive and test talc samples as described below on behalf of all plaintiffs[3] who are

now represented or who will in the future be represented by the law firms listed in

Exhibit B;

IT IS THEREFORE AGREED AND ORDERED THAT the parties will

comply with the provisions of this Agreed Order with respect to the division,

production, testing and testing results of the divided talc samples, as well as the

storage of the remaining portions of the talc samples that are not provided to the

parties and talc sample material that is not selected for division; and

IT IS FURTHER AGREED AND ORDERED THAT by complying with the

terms of this Agreed Order, the parties have acted reasonably in fulfilling their

discovery obligations with respect to the talc samples, and that the division,

production, and testing of talc samples pursuant to this Agreed Order does not

constitute spoliation of evidence.  Imerys will timely inform plaintiffs' counsel if it

discovers additional historical talc samples, and within a reasonable time

thereafter, the parties will meet and confer to discuss whether such additional talc

samples will become subject to this Agreed Order.  If the parties agree that such

additional talc samples shall become subject to this Agreed Order, they will

supplement this Agreed Order with an inventory of such additional samples.  If the

---

[3]     This Agreed Order does not affect any orders regarding the talc samples that
were previously entered by any other court.

parties disagree as to the inclusion of such additional samples, they shall raise the matter with the Honorable Joel A. Pisano (Ret.), the Special Master appointed in the above-referenced action, or any other Court that has previously issued an order to which such samples may be relevant.

IT IS FURTHER AGREED AND ORDERED AS FOLLOWS:

**Plaintiffs' Selection of Subset of Talc Samples**

1. Within thirty (30) business days of the entry of this Agreed Order, plaintiffs will select and identify to defendants in writing a reasonable number of talc samples from the inventories attached to this Agreed Order as Exhibit A. Imerys reserves the right to challenge the number of talc samples selected by plaintiffs as excessive or otherwise unreasonable, but must do so in writing within fourteen (14) days after plaintiffs provide their written selections to Imerys.  To the extent that Imerys objects to the number of talc samples, the parties shall meet and confer within fourteen (14) days of the objection in an effort to resolve the parties' dispute.  If the dispute cannot be resolved by agreement, plaintiffs' counsel shall present the dispute to Judge Pisano initially by letter, consistent with Local Civil Rule 37.1(a)(1), before filing a formal motion for an order.

2. To the extent that Imerys wishes to test material from talc samples other than those identified by plaintiffs, Imerys will provide advance written notice to the plaintiffs' counsel signing this Agreed Order and will comply with the provisions of this Agreed Order with respect to the division and testing of the additional talc samples for the Talcum Powder Litigation (Talc samples selected by plaintiffs and/or any additional talc samples selected by Imerys are hereinafter referred to as the "Selected Samples").

3. In the event a Selected Sample does not contain sufficient material to be divided as set forth below, resulting in amounts unsuitable for plaintiffs and defendants to test adequately, that Selected Sample will not be divided, but the party who originally selected that talc sample may select another talc sample in substitution.

**Laboratory to Divide Samples and Store Remaining Samples**

4. Within thirty (30) days of the entry of this Agreed Order, Imerys shall deliver, or cause to be delivered, all talc samples to Alliance Technologies LLC in Monmouth Junction, New Jersey, an independent testing laboratory that is DEA licensed, FDA registered, and which employs good laboratory practices ("the Laboratory").

5. Following agreement by the parties on the talc samples to be divided (or, to the extent there is a dispute, an order of either Judge Pisano or the Court),

5

the parties, in coordination with the Laboratory, shall agree on a date for the division of the Selected Samples pursuant to the terms of this Agreed Order. Such division shall take place no later than fourteen (14) days after the agreement or order described in the preceding sentence.

6. The Laboratory will divide the material of the Selected Samples over consecutive business days until the material of all Selected Samples has been divided pursuant to the terms of this Agreed Order, unless the plaintiff and defendant signatories to this Agreed Order and the Laboratory agree to a different schedule.

7. The Laboratory will not conduct any testing or analysis of the talc samples for either or both parties beyond the services set forth herein.  At Imerys' expense, the Laboratory will store all talc samples that were not selected for division and all remaining materials of the Selected Samples after providing portions to plaintiffs and defendants according to the process outlined below.

**Process for Dividing Selected Samples**

8. Plaintiffs will select two representatives and Imerys will select two representatives to observe the division of the materials comprising the Selected Samples (the "Observers") at the Laboratory in a manner and under such conditions as prescribed by the Laboratory.  The Observers may not interfere or interrupt the process, except by mutual consent.

6

9. Videotaping or visual recording of any kind is not permitted at the Laboratory. Any objection to the laboratory practices utilized in connection with the Laboratory's handling of the talc sample material, the Laboratory conditions, or the Laboratory's or parties' compliance with the terms of this Agreed Order as they relate to the handling of the talc sample materials at the Laboratory that could have been discovered by observation must be raised and addressed (including with Judge Pisano, if necessary) at the time of transfer, division or production of the talc sample material. To the extent no such objections are raised, they shall be waived and shall not be raised in connection with any proceeding.

10. The Laboratory also will prescribe the appropriate conditions (e.g., temperature and sterility), tools, and receptacles for dividing the Selected Samples, measure apportionments of the Selected Samples, and otherwise divide the Selected Samples among plaintiffs and Imerys, utilizing good laboratory practices.

11. For each Selected Sample, the Laboratory will prepare a label containing unique identifying information and sufficient information set forth on the original talc sample container to identify the source of each portion of a divided Selected Sample. The Laboratory will affix these labels to the receptacles holding the divided material from each Selected Sample, as well

7

as the original containers from which the divided material was obtained, before producing any divided material of a Selected Sample to plaintiffs or defendants. The division of talc samples shall be catalogued as set forth below in addition to any other standard recordkeeping of the Laboratory.

12. The material of each Selected Sample will be split into two approximately equal portions. One portion will be further divided into two approximately equal portions—one of which will be provided to plaintiffs and the other of which will be provided to Imerys. The portion provided to plaintiffs and the portion provided to Imerys (i.e., aliquots) will each be placed in a new receptacle chosen by the Laboratory for such purpose and labeled as set forth above. The remaining approximately one-half of the Selected Sample will be replaced in the original container of the Selected Sample if practicable in the judgment of the Laboratory technician responsible for dividing the Selected Samples. If not practicable to replace the remaining material of a Selected Sample back in its original container, the remaining material of the Selected Sample will be placed in a new receptacle, labeled as set forth above, and the Laboratory will retain the remaining Selected Sample material in the new receptacle as well as the original container of that Selected Sample.

**Cataloguing and Production of the Split Selected Samples**

8

13. The Laboratory shall produce one portion per party of material from each
Selected Sample to the Observers.  The Laboratory will catalogue the exact
receptacles it provides to each party's Observer, as well as any new
receptacles it uses to store Sample material, using the joint cataloging form
("Joint Catalogue"), which is attached hereto as Exhibit C.  Before removing
any receptacle from the Laboratory, an Observer for each party will sign the
Joint Catalogue evidencing receipt by him or her of each receptacle
containing a portion of material from the Selected Samples.  By signing the
Joint Catalogue, the signatory Observer for each party affirms that the Joint
Catalogue and receptacle labels are accurate, correct, and complete, and
acknowledges that the division of Selected Sample material were in
accordance with the provisions of this Agreed Order.

14. Each Observer will receive a copy of the signed Joint Catalogue, and the
Laboratory will retain a copy of the signed Joint Catalogue for its records.  It
is the responsibility of each party's Observers to deliver the signed Joint
Catalogue and the portions of the Selected Sample material to the party they
represent.

**Removal of Split Samples From Laboratory**

15. Following execution of the required documentation described above, each Observer will have authority to take possession, custody and control of the portions of Selected Sample material provided to the Observers by the Laboratory and remove them from the Laboratory on behalf party they represent.  Each party is thereafter responsible for the portions of the Selected Sample materials provided to its Observer.

**Handling and Testing of Split Samples**

16. Plaintiffs and Imerys are each permitted to have the portions of Selected Sample material provided to them at the Laboratory subjected to testing and analysis at another laboratory or laboratories of the party's choosing and at the party's expense, including destructive testing, provided any particular test or analysis of the Selected Sample material must be solely of the Selected Sample material contained in a single receptacle.  Materials from multiple receptacles cannot be commingled, nor may other materials to be subject to the testing be added to Selected Sample materials prior to, during or after any testing or analysis.  For clarity, a destructive test using hydrochloric acid is not precluded by the preceding sentence.

**Cost Sharing**

17. The parties will share equally in the expenses reasonably associated with dividing the Selected Samples, including the cost of transporting the talc samples to the Laboratory, renting space at the Laboratory for apportioning the Selected Samples, employing persons at the Laboratory, purchasing receptacles to hold the divided Selected Samples, and all other costs reasonably associated with dividing the Selected Samples.

**Compliance**

18. Plaintiffs and Imerys will use their best efforts to utilize the Selected Sample material initially apportioned to them under this Agreed Order so as to avoid the repeated division and production of Sample material.

19. Notwithstanding the foregoing, if plaintiffs' counsel signing this Agreed Order seek additional or different Samples than those initially chosen pursuant to this Agreed Order (other than any pursuant to any order regarding the Samples that was previously entered by any other court), whether in actions alleging damages for ovarian cancer, mesothelioma, or any other personal injury claimed to result from exposure to defendants' Talcum Powder Products, counsel must serve a written request upon

11

defendants explaining with particularity the reason for seeking additional material and why such materials could not have been requested through the initial division and production of Sample material pursuant to this Agreed Order. To the extent that Imerys objects to plaintiffs' request, the parties shall meet and confer within fourteen (14) days of the request in an effort to resolve the parties' dispute. If the dispute cannot be resolved by agreement, plaintiffs' counsel shall present the dispute to Judge Pisano initially by letter, consistent with Local Civil Rule 37.1(a)(1), before filing a formal motion for an order.

12

SO ORDERED, this ___21ˢᵗ___ day of ___February___ 2018.


_Freda L. Wolfson_
United States District Judge


**STIPULATED AND AGREED:**

 

_s/ Lorna A. Dotro_
Lorna A. Dotro
COUGHLIN DUFFY LLP
350 Mount Kemble Avenue
PO Box 1917
Morristown, NJ 07962
Telephone: (973) 267-0058
Facsimile: (973) 267-6442
Email: ldotro@coughlinduffy.com

_s/ Nancy M. Erfle_
Nancy M. Erfle
GORDON & REES LLP
121 SW Morrison Street
Suite 1575
Portland, Oregon 97204
Telephone: (503) 382-3852
Facsimile: (503) 616-3600
Email: nerfle@grsm.com

_s/Michelle A. Parfitt_
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
4900 Seminary Road, Suite 650
Alexandria, VA 22311
Telephone: 703-931-5500

13

Email: mparfitt@ashcraftlaw.com

*s/P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Email: leigh.odell@beasleyallen.com

*s/Christopher M. Placitella*
Christopher M. Placitella
COHEN PLACITELLA ROTH, PC
127 Maple Avenue
Red Bank, NJ 07701
Telephone: 888-219-3599
Facsimile: 215-567-6019
Email: cplacitella@cprlaw.com

Case 3:16-md-02738-MAS-RLS   Document 7057-1   Filed 08/13/18   Page 24 of 56 PageID: 19616
Case 3:16-md-02738-MAS-RLS   Document 4757-1   Filed 02/21/18   Page 1 of 1 PageID: 13629

EXHIBIT A

## VT Floated Product

| Project number | Description | Sample No. | Sample description |
|---|---|---|---|
| A02006 | TEM asbestos analysis of cosmetic grade talc for West Windsor | 1 | Grade 66 composite from Silo 4: 04 Dec - 07 Dec, 2001   (J&J priority sample) |
| A02007 | Grade 66 composite for J&J for quartz and amphibole testing | 1 | Silo 1: 30 Aug - 6 Sep & Silo 2: 18 Sep - 25 Sep, 2001 |
| A02007 | Grade 66 composite for J&J for quartz and amphibole testing | 2 | Silo 4: 9 Oct - 18 Oct, 2001 |
| A02008 | 4th quarter 2001 Grade 66 composite for TEM asbestos | 1 | Silo 4: 9 Oct - 18 Oct, 2001 |
| A02053 | XRD for quartz and amphiboles of Grade 66 composite for Johnson & Jo | 1 | Dec 4 - 7, 2001  Silo 4 & Jan 9 - 12, 2002   Silo 2 |
| A02223 | Quartz and Amphibole testing of Grade 96 USP composite for J&J | 1 | Mar 05-08, silo 1, batch 2892-2895, & Mar 20-26, silo 4, batch 2905-2910, 2002 composite |
| A02224 | TEM asbestos of Grade 96 USP 1st quarter composite for Johnson & Jo | 1 | Mar 05-08, Silo 1, batch 2892-2895 & Mar 20-26, silo 4, batch 2905-2910, 2002 composite |
| A02225 | 2002 Yearly composite of Grade 96 USP for AA testing for J&J | 1 | Year 2002 composite |
| A02399 | Quartz and Amphibole testing of Grade 96 USP 2nd Quarter 2002 comp | 1 | Apr 15-21, 2002 / Silo 2 / Batch 2928-2933 and May 1-4, 2002 / Silo 1 / Batch 2942-2945 |
| A02400 | TEM of Grade 96 USP, 2nd quarter 2002 composite for Johnson & John | 1 | Apr 15-21, 2002 / Silo 2 / Batch 2928-2933 and May 1-4, 2002 / Silo 1 / Batch 2942-2945 |
| A02401 | Quartz and Amphibole testing of Grade 96 USP 2nd qtr 2002 composite | 1 | May 14-19, 2002 / Silo 4 / Batch 2954-2959 and May 21-25, 2002 / Silo 2 / Batch 2961-2965 |
| A02523 | Quartz and Amphibole testing of Grade 96 composite for Johnson & Joh | 1 | June 13-16, 2002 Silo 1 and July 9-12, 2002 Silo 4 |
| A02523 | Quartz and Amphibole testing of Grade 96 composite for Johnson & Joh | 2 | Aug 3-9, 2002 Silo 2 and Aug 9-15, 2002 Silo 1 |
| A02524 | TEM of Grade 96 3rd quarter composite for Johnson & Johnson | 1 | 3rd quarter composite |
| A02594 | Quartz and Amphibole testing of Grade 96 USP for Johnson & Johnson | 1 | Sep 16 - 19, silo 4 and Oct 7 - 11, silo 1 |
| A03037 | Quartz and Amphibole analysis of 4th Quarter Grade 96 composite for J | 1 | Oct 29-Nov 1, 2002 Silo 2 and Dec 3-6, 2002 Silo 4 |
| A03038 | TEM of 4th qtr 2002 Grade 96 USP composite for J&J | 1 | 4th quarter composite |
| A03097 | Quartz and amphibole testing of Grade 96 USP composite for J&J | 1 | 2003: Jan 6-10, Silo 1 and Jan 23-29, Silo 2 |
| A03098 | TEM of 1st quarter 2003 Grade 96 USP composite for J&J | 1 | 1st quarter 2003 composite |
| A03194 | Grade 96 for Quartz and Amphibole Analysis for J&J | 1 | 24Feb-12Mar 03 Silo 4, 15Mar-19Mar 03, Silo 1 |
| A03371 | Quartz and Amphibole testing of Grade 96 USP composite for Johnson & | 1 | April 7-10, 2003 Silo 2 and May 13-16, 2003 Silo 4 |
| A03372 | TEM of 2nd qtr 2003 Grade 96 USP composite for Johnson & Johnson | 1 | Apr 7-10, 2003 Silo 2 and May 13-16, 2003 Silo 4 |
| A03416 | Quartz and Amphibole testing of Grade 96USP for Johnson & Johnson | 1 | June 3-10, 2003 Silo 1 and June 23-27, 2003 Silo 2 composite |
| A03498 | Quartz & Amphibole testing of 3rd quarter 2003 Grade 96 composite for | 1 | June 30-July 03, Silo 4 and Aug 03-Aug 06, Silo 1 |
| A03498 | Quartz & Amphibole testing of 3rd quarter 2003 Grade 96 composite for | 2 | Aug 11-Aug 14, Silo 4 and Sep 09-Sep 12, Silo 4 |
| A03499 | TEM of 3rd quarter 2003 Grade 96 composite for Johnson & Johnson | 1 | 3rd quarter Grade 96 composite |
| A03542 | Quartz and Amphibole testing of Grade 96USP for Johnson & Johnson | 1 | Sept 28-Oct 2, 2003: Silo 1 |
| A07002 | Archiving samples of discontinued products | 33 | GRADE 66, A99372-5 |
| A07002 | Archiving samples of discontinued products | 34 | GRADE 66, A99372-1 |
| A07002 | Archiving samples of discontinued products | 46 | Grade 66 Batch, 1667-1671 |

EXHIBIT A

## Houston Post-Shipment Ore

| Project number | Description | Sample No. | Sample description |
|---|---|---|---|
| A01653 | Characterization of Crude Ore Composite From Houston | 1 | Guangxi #2 RM, Nov 2001 |
| A01653 | Characterization of Crude Ore Composite From Houston | 2 | Guangxi #2 ACM, Nov 2001 |
| A01653 | Characterization of Crude Ore Composite From Houston | 3 | Guangxi #2 AFG, Nov 2001 |
| A01659 | Guangxi #2 composite (Nov. 2001) | 1 | Guangxi #2 RM, Nov 2001 |
| A02027 | Guangxi #2 crude, Nov '01 shipment to Mexico | 1 | Guangxi #2 crude from Nov '01 |
| A02328 | Guangxi #2 Composite for May 2002 | 1 | Guangxi #2  May 2002 |
| A02329 | Characterization of Guangxi #2 Crude Ore Composites | 1 | Roller Mill |
| A02329 | Characterization of Guangxi #2 Crude Ore Composites | 2 | ACM |
| A02329 | Characterization of Guangxi #2 Crude Ore Composites | 3 | AFG |
| A03026 | Dec 2002 Guangxi #2 crude composite from Houston | 1 | Guangxi #2 crude composite from Houston, Dec 2002 |
| A03027 | Characterization of Dec 2002 crude composites from Houston | 1 | Dec 2002 Guangxi #2 crude composite: RM |
| A03027 | Characterization of Dec 2002 crude composites from Houston | 2 | Dec 2002 Guangxi #2 crude composite: ACM |
| A03027 | Characterization of Dec 2002 crude composites from Houston | 3 | Dec 2002 Guangxi #2 crude composite: AFG |
| A03191 | Characterization of Guangxi #2 Crude Composite | 1 | Guangxi #2, Jan 03, RM |
| A03191 | Characterization of Guangxi #2 Crude Composite | 2 | Guangxi #2, Jan 03, ACM |
| A03191 | Characterization of Guangxi #2 Crude Composite | 3 | Guangxi #2, Jan 03, AFG |
| A03199 | Guangxi #2 Crude Composites-Jan 03 | 1 | Houston, Guangxi #2 Jan 03 |
| A03369 | Guangxi #2, June 2003, crude composite from Houston | 1 | Guangxi #2 crude composite: June 2003 |
| A03370 | Characterization of Guangxi #2 crude composites from Houston | 1 | A - Guangxi #2 crude composite from June 2003 |
| A03370 | Characterization of Guangxi #2 crude composites from Houston | 2 | B - Guangxi #2 crude composite from June 2003 |
| A03370 | Characterization of Guangxi #2 crude composites from Houston | 3 | C - Guangxi #2 crude composite from June 2003 |
| A03613 | TEM asbestos analysis of October 2003 Guangxi shipments to Houston | 2 | Guangxi #2A: Oct 2003 |
| A03614 | Characterization of crude ore composites from Houston | 4 | Guangxi #2A RM: Oct 2003 |
| A03614 | Characterization of crude ore composites from Houston | 5 | Guangxi #2A ACM: Oct 2003 |
| A03614 | Characterization of crude ore composites from Houston | 6 | Guangxi #2A AFG: Oct 2003 |
| A04033 | Characterization of Guangxi #1 and #2A pre-shipment from Houston | 2 | Guangxi #2A pre-shipment, MV Tequz, January 2004 |
| A04042 | CTFA testing on Gaungxi #2A ore for Johnson and Johnson | 1 | Guangxi #2a  - Oct 2003 composite  - A03613-2 |
| A04110 | TEM analysis of Guangxi 2A by J&J specs for Houston | 1 | Guangxi 2A: Feb 04, MV Tequi, ACM grind |
| A04111 | XRD amphibole and quartz of February 2004 shipment of Guangxi 2A fo | 1 | Guangxi 2A: Feb 04, MV Tequi, RM grind |
| A04112 | Characterization of Feb '04 Guangxi 2A crude composites | 1 | Guangxi 2A: Feb 04, MV Tequi, ACM grind |
| A04112 | Characterization of Feb '04 Guangxi 2A crude composites | 2 | Guangxi 2A: Feb 04, MV Tequi, RM grind |
| A04112 | Characterization of Feb '04 Guangxi 2A crude composites | 3 | Guangxi 2A: Feb 04, MV Tequi, AFG grind |
| A04315 | Characterization of Guangxi 2A pre-shipment from Houston | 1 | Guangxi 2A pre-shipment: May 2004 to M.V. Navios Galaxy |
| A04316 | Characterization of Guangxi #2 from Houston | 1 | RM: May 2004 composite for M.V. Great Bright |
| A04316 | Characterization of Guangxi #2 from Houston | 2 | ACM: May 2004 composite for M.V. Great Bright |
| A04316 | Characterization of Guangxi #2 from Houston | 3 | AFG: May 2004 composite for M.V. Great Bright |
| A04317 | Ore certification report for Guangxi #2A shipment for Johnson & Johnson | 1 | ACM-Guangxi #2: May 2004 composite, M.V. Great Bright |
| A04410 | Ore certification for Johnson & Johnson: Gaungxi #2 June 2004 shipmen | 1 | J&J - Houston, Guangxi 2A June 04, Navios Galaxy ACM |
| A04411 | Characterization of June 2004 Guangi 2A crude ore | 1 | Guangxi 2A;  June 2004;  Navios Galaxy RM |
| A04411 | Characterization of June 2004 Guangi 2A crude ore | 2 | Guangxi 2A;  June 2004;  Navios Galaxy ACM |
| A04550 | J&J characterization of Sep '04 Guangxi #2 | 1 | Sep '04 Guangxi #2: ACM from M.V. Danae |
| A04551 | Characterization of Sep '04 Guangxi #2 from Houston | 1 | Sep '04 Guangxi #2: RM from M.V. Danae |
| A04551 | Characterization of Sep '04 Guangxi #2 from Houston | 2 | Sep '04 Guangxi #2: ACM from M.V. Danae |
| A04551 | Characterization of Sep '04 Guangxi #2 from Houston | 3 | Sep '04 Guangxi #2: AFG from M.V. Danae |
| A04669 | Characterization of Guangxi 2A pre-shipment for Houston | 1 | Guangxi 2A pre-shipment - Nov 04 - M.V. Tai chang |
| A06292 | Analysis of Guangxi #2 and 2A shipments (MV Hebei Arrow) | 1 | Guangxi #2  RM (6/8/06) ship MV Hebei Arrow |
| A06292 | Analysis of Guangxi #2 and 2A shipments (MV Hebei Arrow) | 2 | Guangxi #2 ACM (6/8/06) ship MV Hebei Arrow |
| A06292 | Analysis of Guangxi #2 and 2A shipments (MV Hebei Arrow) | 3 | Guangxi #2 AFG (6/8/06) ship MV Hebei Arrow |
| A06292 | Analysis of Guangxi #2 and 2A shipments (MV Hebei Arrow) | 4 | Guangxi #2A  RM (6/8/06) ship MV Hebei Arrow |
| A06292 | Analysis of Guangxi #2 and 2A shipments (MV Hebei Arrow) | 5 | Guangxi #2A  ACM (6/8/06) ship MV Hebei Arrow |
| A06292 | Analysis of Guangxi #2 and 2A shipments (MV Hebei Arrow) | 6 | Guangxi #2A  AFG (6/8/06) ship MV Hebei Arrow |
| A06334 | TEM/Quartz  Analysis of Guangxi #2 and #2A for J&J | 1 | Guangxi #2, 1 Gallon jug, 06/06, Roller Mill |
| A06368 | Characterization of Guangxi #2 and #2A (M.V. Great Harvest) | 1 | Guangxi #2 - ship MV great Harvest - RM |
| A06368 | Characterization of Guangxi #2 and #2A (M.V. Great Harvest) | 2 | Guangxi #2 - ship MV great Harvest - ACM |
| A06368 | Characterization of Guangxi #2 and #2A (M.V. Great Harvest) | 3 | Guangxi #2 - ship MV great Harvest - AFG |
| A06368 | Characterization of Guangxi #2 and #2A (M.V. Great Harvest) | 4 | Guangxi #2A - ship MV great Harvest - RM |
| A06368 | Characterization of Guangxi #2 and #2A (M.V. Great Harvest) | 5 | Guangxi #2A - ship MV great Harvest - ACM |
| A06368 | Characterization of Guangxi #2 and #2A (M.V. Great Harvest) | 6 | Guangxi #2A - ship MV great Harvest - AFG |
| A06369 | TEM and Quartz analysis of Guangxi #2 and #2A samples for J&J | 1 | Guangxi #2 - ship MV great Harvest - RM |
| A06369 | TEM and Quartz analysis of Guangxi #2 and #2A samples for J&J | 2 | Guangxi #2 - ship MV great Harvest - RM |
| A07025 | TEM and Quartz analysis of Jan 2007 Guangxi 2A (RM) for Johnson and | 1 | Guangxi 2A - RM  ---  Jan 2007 MV Eastern Queen |
| A07136 | Characterization of Guangxi #2A Ore, June 2007, MV Makali | 1 | Guangxi #2, RM, May 2007, MV Makali |
| A07136 | Characterization of Guangxi #2A Ore, June 2007, MV Makali | 2 | Guangxi #2A, ACM, May 2007, MV Makali |
| A07136 | Characterization of Guangxi #2A Ore, June 2007, MV Makali | 3 | Guangxi #2A, AFG, May 2007, MV Makali |
| A07137 | Quartz and Amphibole Testing of Guangxi #2 and 2A Ore, June 2007 MV | 1 | Guangxi #2, RM, MV Makali |

EXHIBIT A

| A07137 | Quartz and Amphibole Testing of Guangxi #2 and 2A Ore, June 2007 MV | 2 | Guangxi #2A, RM |
|---|---|---|---|
| A07138 | Characterization of Guangxi #2 Ore, May 2007, MV Makali | 1 | Guangxi #2, RM, May 2007, MV Makali |
| A07138 | Characterization of Guangxi #2 Ore, May 2007, MV Makali | 2 | Guangxi #2, ACM, May 2007, MV Makali |
| A07138 | Characterization of Guangxi #2 Ore, May 2007, MV Makali | 3 | Guangxi #2, AFG, May 2007, MV Makali |
| A07358 | Characterization od Guangxi #2 Ore Samples | 1 | RM grind M.V. "Wina-1" |
| A07358 | Characterization od Guangxi #2 Ore Samples | 2 | ACM Grind M.V. "Wina-1" |
| A07358 | Characterization od Guangxi #2 Ore Samples | 3 | AFG Grind M.V. "Wina-1" |
| A07358 | Characterization od Guangxi #2 Ore Samples | 4 | RM Grind M.V. "Wina" |
| A07358 | Characterization od Guangxi #2 Ore Samples | 5 | ACM Grind M.V. "Wina" |
| A07358 | Characterization od Guangxi #2 Ore Samples | 6 | AFG Grind M.V. "Wina" |
| A07360 | TEM asbestos and quartz analysis for Guangxi roller mill samples | 1 | RM grind M.V. "wina-1" |
| A07360 | TEM asbestos and quartz analysis for Guangxi roller mill samples | 2 | RM grind M.V. "wina" |
| A07436 | Characterization of Guangxi #2 grinds, Nov 07 - MV Hellenic Sea | 1 | Guangxi #2 RM Nov 07 - MV Hellenic Sea |
| A07436 | Characterization of Guangxi #2 grinds, Nov 07 - MV Hellenic Sea | 2 | Guangxi #2 ACM Nov 07 - MV Hellenic Sea |
| A07436 | Characterization of Guangxi #2 grinds, Nov 07 - MV Hellenic Sea | 3 | Guangxi #2 AFG Nov 07 - MV Hellenic Sea |
| A07437 | TEM and Quartz Analysis of Guangxi #2 (MV Hellenic Sea) for Johnson | 1 | Guangxi #2 MV  Nov 07 - MV Hellenic Sea |
| A08027 | Characterization of Guangxi #2, Jan 2008, MV Iguana | 1 | Guangxi #2, RM, Jan 2008, MV Iguana |
| A08027 | Characterization of Guangxi #2, Jan 2008, MV Iguana | 2 | Guangxi #2, ACM,  Jan 2008,  MV Iguana |
| A08027 | Characterization of Guangxi #2, Jan 2008, MV Iguana | 3 | Guangxi #2, AFG,  Jan 2008, MV Iguana |
| A08028 | Quartz and Amphibole testing of Guangxi 2,  Jan 2008, MV Iguana for Jo | 1 | Guangxi 2 RM, Jan 2008, MV Iguana |
| A08073 | Characterization of February 2008 Guangxi 2 & 2A - MV "Wina" | 1 | February 2008  MV "Wina" Guangxi 2  RM |
| A08073 | Characterization of February 2008 Guangxi 2 & 2A - MV "Wina" | 2 | February 2008  MV "Wina" Guangxi 2  ACM |
| A08073 | Characterization of February 2008 Guangxi 2 & 2A - MV "Wina" | 3 | February 2008  MV "Wina" Guangxi 2  AFG |
| A08073 | Characterization of February 2008 Guangxi 2 & 2A - MV "Wina" | 4 | February 2008  MV "Wina" Guangxi 2A RM |
| A08073 | Characterization of February 2008 Guangxi 2 & 2A - MV "Wina" | 5 | February 2008  MV "Wina" Guangxi 2A  ACM |
| A08073 | Characterization of February 2008 Guangxi 2 & 2A - MV "Wina" | 6 | February 2008  MV "Wina" Guangxi 2A  AFG |
| A08074 | Quartz and TEM Analysis of February 2008 Guangxi 2 & 2A - a08540for | 1 | February 2008  MV "Wina" Guangxi 2  RM |
| A08074 | Quartz and TEM Analysis of February 2008 Guangxi 2 & 2A - a08540for | 2 | February 2008  MV "Wina" Guangxi 2A  RM |
| A08487 | Characterization of Guangxi #2 M.V. "Shi Dai" | 1 | RM  Guangxi #2 M.V. "Shi Dai" |
| A08487 | Characterization of Guangxi #2 M.V. "Shi Dai" | 2 | RM  Guangxi #2 M.V. "Shi Dai" |
| A08487 | Characterization of Guangxi #2 M.V. "Shi Dai" | 3 | AFG  Guangxi #2 M.V. "Shi Dai" |
| A08488 | TEM, Quartz, Amphibole Anaylsis of Guangxi #2 M.V. "Shi Dia" for Johns | 1 | RM  Guangxi #2 M.V. "Shi Dai" |
| A08540 | TEM, Quartz, & Amphibole Anaylsis of Guangxi #2 M.V. "Hellenic Sea" fc | 1 | RM Guangxi 2 "Hellenic Sea" |
| A09015 | Characterization of Guangxi 1&2 Nov 08 Shipment MV "Anna Smile" | 1 | RM Guangxi #2. MV "Anna Smile" |
| A09015 | Characterization of Guangxi 1&2 Nov 08 Shipment MV "Anna Smile" | 2 | ACM Guangxi 2, MV "Anna Smile" |
| A09015 | Characterization of Guangxi 1&2 Nov 08 Shipment MV "Anna Smile" | 3 | AFG Guangxi 2, MV "Anna Smile" |
| A09015 | Characterization of Guangxi 1&2 Nov 08 Shipment MV "Anna Smile" | 4 | RM Guangxi #1, MV "Anna Smile |
| A09015 | Characterization of Guangxi 1&2 Nov 08 Shipment MV "Anna Smile" | 5 | ACM Guangxi #1, MV "Anna Smile" |
| A09015 | Characterization of Guangxi 1&2 Nov 08 Shipment MV "Anna Smile" | 6 | AFG Guangxi #1, MV "Anna Smile" |
| A09020 | TEM & Quartz Analysis of Guangxi 2 for J & J | 1 | Guangxi 2 RM, Nov 08, MV "Anna Smile |
| A09479 | Guangxi #2 ore shipment to Houston - M.V. Beilun Dolphin, Oct 08 | 1 | Guangxi #2, RM, grind date ***, M.V. Beilun Dolphin, arrived 10/08 (sa |
| A09479 | Guangxi #2 ore shipment to Houston - M.V. Beilun Dolphin, Oct 08 | 2 | Guangxi #2, ACM, grind date 10/6/09, M.V. Beilun Dolphin, arrived 10/ |
| A09479 | Guangxi #2 ore shipment to Houston - M.V. Beilun Dolphin, Oct 08 | 3 | Guangxi #2, AFG, grind date 10/6/09, M.V. Beilun Dolphin, arrived 10/ |
| A10043 | Characterization of Guangxi 2 Shipment from M.V. Blunenau | 1 | Guangxi 2,  M.V. Blunenau, RM |
| A10043 | Characterization of Guangxi 2 Shipment from M.V. Blunenau | 2 | Guangxi 2,  M.V. Blunenau, ACM |
| A10043 | Characterization of Guangxi 2 Shipment from M.V. Blunenau | 3 | Guangxi 2,  M.V. Blunenau, AFG |
| A10044 | TEM and XRD Analysis of Guangxi 2 for Johnson & Johnson | 1 | Guangxi 2, M.V. Blunenau, RM |
| A10200 | Characterization Analysis of Guangxi #2 Shipment MV "Beilun Dolphin" | 1 | RM Guangxi #2; 4/28/10; MV "Beilun Dolphin" |
| A10200 | Characterization Analysis of Guangxi #2 Shipment MV "Beilun Dolphin" | 2 | ACM Guangxi #2; 4/28/10; MV "Beilun Dolphin" |
| A10200 | Characterization Analysis of Guangxi #2 Shipment MV "Beilun Dolphin" | 3 | AFG Guangxi #2; 4/28/10; MV "Beilun Dolphin" |
| A10201 | TEM Analysis of Guangxi #2 for Johnson and Johnson | 1 | RM Guangxi #2; 4/28/10; MV "Beilun Dolphin" |
| A10461 | Characterization Analysis of Sept. 2010 Guangxi #2 Shipment M.V. Sonj | 1 | RM, Guangxi 2, MV Sonja C |
| A10461 | Characterization Analysis of Sept. 2010 Guangxi #2 Shipment M.V. Sonj | 2 | ACM, Guangxi #2 MV Sonja C |
| A10461 | Characterization Analysis of Sept. 2010 Guangxi #2 Shipment M.V. Sonj | 3 | AFG, Guangxi #2 MV Sonja C |
| A10541 | TEM Analysis of Oct. 2010 Guangxi 2 MV Jiali Hai | 1 | RM Guangxi #2, MV Jiali Hai |
| A11076 | CTFA-USP XRD Analysis of January 2011 Houston Composites | 1 | 6x8 sample baggie |
| A11124 | Characterization of Chinese ore for Houston | 1 | Chinese 2 RM #2, Pregrind MV Hosanger |
| A11124 | Characterization of Chinese ore for Houston | 2 | Chinese 2 ACM #2, Stellar Ex MV Hosanger |
| A11124 | Characterization of Chinese ore for Houston | 3 | Chinese #2 AFG, Cimpact 710 MV Hosanger |
| A11128 | TEM Analysis of Guangxi 2 Shipment MV Hosanger for J&J | 1 | RM Guangxi #2 MV Hosanger |
| A11306 | Characterization of Chinese crude ore #2 from Houston | 1 | ACM Chinese 2 - MV Navios Star |
| A11306 | Characterization of Chinese crude ore #2 from Houston | 2 | AFG Chinese 2 - MV Navios Star |
| A11306 | Characterization of Chinese crude ore #2 from Houston | 3 | MISLABELED, RM Chinese 2 - MV Navios Star |
| A11306 | Characterization of Chinese crude ore #2 from Houston | 4 | Correctly Labeled RM Guangxi 2, Navio Star |
| A11307 | TEM analysis on Chinese #2 ore (MV Navios Star) for Johnson and John | 1 | RM Chinese 2 - MV Navios Star |
| A11307 | TEM analysis on Chinese #2 ore (MV Navios Star) for Johnson and John | 2 | Correctly Labeled RM Guangxi 2, Navio Star |
| A11510 | Characterization Analysis for Guangxi #2 | 1 | Guangxi #2 RM, Imp-200, 1 Gal Jug |

EXHIBIT A

| A11510 | Characterization Analysis for Guangxi #2 | 2 | Guangxi #2 ACM, St-Ex, 1 Gal Jug |
|---|---|---|---|
| A11510 | Characterization Analysis for Guangxi #2 | 3 | Guangxi #2 AFG, C-710, 1 Gal Jug |
| A11511 | TEM Analysis of Guangxi 2 from the MV Prabhu Puni | 1 | Guangxi 2 |
| A12069 | Characterization of Chinese #2 MV Silver Dragaon | 1 | RM - "A" - MV Silver Dragon - Chinese #2 ore composite sample |
| A12069 | Characterization of Chinese #2 MV Silver Dragaon | 2 | ACM - "A" - MV Silver Dragon - Chinese #2 ore composite sample |
| A12069 | Characterization of Chinese #2 MV Silver Dragaon | 3 | AFG - "A" - MV Silver Dragon - Chinese #2 ore composite sample |
| A12078 | Product Characterization of Silver Dragon Crude Ore Shipment | 4 | Chinese #2 Composite, RM |
| A12078 | Product Characterization of Silver Dragon Crude Ore Shipment | 5 | Chinese #2 Composite, ACM |
| A12078 | Product Characterization of Silver Dragon Crude Ore Shipment | 6 | Chinese #2 Composite AFG |

## Houston Product

| Project number | Description | Sample No. | Sample description |
|---|---|---|---|
| A09151 | TEM Analysis of Jan 2009 Samples from Houston | 2 | Jan 09, Grade 25 |
| A09152 | Quartz Analysis of Jan 2009 Samples from Houston | 2 | Jan 09, Grade 25 |
| A09153 | TEM Analysis of Feb. 2009 Houston Samples | 2 | Feb. 09, Grade 25 USP |
| A09154 | Quartz Analysis of Feb. 2009 Houston Samples | 2 | Feb 09, Grade 25 USP |
| A09173 | TEM Analysis of March 2009 Houston Samples | 2 | March 09, Grade 25 USP |
| A09174 | Quartz Analysis of March 2009 Houston Samples | 2 | March 09, Grade 25 USP |
| A09219 | TEM Analysis of April 2009 Houston Samples | 2 | April 09; Grade 25 USP |
| A09220 | Quartz Analysis of April 2009 Houston Samples | 2 | April 09; Grade 25 USP |
| A09231 | Heavy Metal Analysis of April 2009 Houston Composites | 2 | March 2009 Houston composite - Grade 25 USP |
| A09274 | TEM Analysis of May 2009 Houston Composites | 2 | May 2009 Houston composite - Grade 25 USP |
| A09276 | Heavy Metals Analysis of May 2009 Houston Composites | 2 | May 2009 Houston composite - Grade 25 USP |
| A09308 | TEM Analysis of June 2009 Houston Composites | 2 | June 2009 Houston composite - Grade 25 USP |
| A09309 | CTFA XRD Analysis of June 09 Houston Composites | 2 | June 2009 Houston composite - Grade 25 USP |
| A09310 | Heavy Metals Analysis of June 09 Houston Composites | 2 | June 2009 Houston composite - Grade 25 USP |
| A09370 | TEM Analysis of July 2009 Houston Composites | 2 | July 2009 Houston composite - Grade 25 USP |
| A09371 | CTFA XRD Analysis of July 2009 Houston Composites | 2 | July 2009 Houston composite - Grade 25 USP |
| A09372 | Heavy Metals Analysis of July 2009 Houston Composites | 2 | July 2009 Houston composite - Grade 25 USP |
| A09425 | TEM Analysis of August 2009 Houston Composites | 2 | Aug 2009 Houston composite - Grade 25 USP |
| A09426 | CTFA XRD Analysis of August 2009 Houston Composites | 2 | Aug 2009 Houston composite - Grade 25 USP |
| A09427 | Heavy Metal Analysis of August 2009 Houston Composites | 2 | Aug 2009 Houston composite - Grade 25 USP |
| A09470 | CTFA XRD Analysis of September 09 Houston Composites | 2 | Sept 09 Grade 25 USP |
| A09471 | TEM Analysis of September 09 Houston Composites | 2 | Sept 09 Grade 25 USP |
| A09560 | TEM Analysis of November 2009 Houston Composites | 3 | Grade 25 USP Houston fiber management sample November 2009 |
| A09561 | CTFA XRD Analysis of November 2009 Houston Composites | 3 | Grade 25 USP Houston fiber management sample November 2009 |
| A10016 | TEM Analysis of December 09 Houston Composites | 3 | Dec 2009 Houston composite - Grade 25 USP |
| A10017 | CTFA XRD Analysis of December 09 Houston Composites | 3 | Grade 25 USP, 6x8 sample baggie |
| A10123 | TEM Analysis of February 2010 Houston Composites | 3 | FEB 2010 Houston composite - Grade 25 USP |
| A10126 | CTFA XRD Analysis of February 2010 Houston Composites | 3 | 6x8 sample baggie, Grade 25 USP |
| A10178 | TEM Analysis of March 2010 Houston Composites | 3 | MAR 2010 Houston composite - Grade 25 USP |
| A10179 | CTFA XRD Analysis of March 2010 Houston Composites | 3 | Grade 25 USP |
| A10227 | TEM Analysis of April 2010 Houston Composites | 3 | April 2010 Houston composite - Grade 25 USP |
| A10228 | CTFA XRD Analysis of April 2010 Houston Composites | 3 | April 2010 Houston composite - Grade 25 Usp |
| A10268 | TEM Analysis of May 2010 Houston Composites | 3 | May 2010 Houston Composite - Grade 25 USP |
| A10269 | CTFA XRD Analysis of May 2010 Houston Composites | 3 | May 2010 Houston composite - Grade 25 USP |
| A10341 | TEM Analysis of June 2010 Houston Composites | 3 | June 2010 Houston composite - Grade 25 USP |
| A10342 | CTFA XRD Analysis of June 2010 Houston Composites | 3 | June 2010, Grade 25 USP |
| A10391 | TEM Analysis of July 2010 Houston Composites | 2 | JULY 2010 Houston composite - Grade 25 USP |
| A10392 | CTFA XRD Analysis of July 2010 Houston Composites | 2 | JULY 2010 Houston composite - Grade 25 USP |
| A10430 | TEM Analysis of August 2010 Houston Composites | 2 | Aug 2010 Houston composite - Grade 25 USP |
| A10431 | CTFA XRD Analysis of August 2010 Houston Composites | 2 | Aug 2010 Houston composite - Grade 25 USP |
| A10569 | TEM Analysis of October 2010 Houston Composites | 2 | OCT 2010 Houston composite - Grade 25 USP |
| A10570 | CTFA XRD Analysis of October 2010 Houston Composites | 2 | OCT 2010 Houston composite - Grade 25 USP |
| A10628 | TEM Analysis of November 2010 Houston Composites | 2 | Nov 2010, Grade 25 USP |
| A10629 | CTFA XRD Analysis of November 2010 Houston Composites | 2 | Nov 2010, Grade 25 USP |
| A10632 | TEM Analysis of September 2010 Houston Composites | 2 | Grade 25 USP Chinese #2 September 2010 sample |
| A10633 | CTFA XRD Analysis of September 2010 Houston Composites | 2 | Grade 25 USP Chinese #2 September 2010 sample |
| A11032 | CTFA XRD Analysis of December 2010 Houston Composites | 2 | 6x8 sample baggie, Grade 25 USP |
| A11033 | TEM Analysis of December 2010 Houston Composites | 2 | 6X8 SAMPLE BAGGIE, Grade 25 USP |
| A11075 | TEM Analysis of January 2010 Houston Composites | 2 | JAN 2011 Houston composite - Grade 25 USP |
| A11135 | TEM Analysis of February 2011 Houston composites | 2 | Feb 2011 Houston Composite - Grade 25 USP |
| A11136 | CTFA XRD Analysis of February 2011 Houston composites | 2 | Feb 2011 Houston Composite - Grade 25 USP |
| A11198 | Mar 2011 M4 Fibre Test samples from Houston | 2 | Mar 2011 Houston composite - Grade 25 USP |
| A11199 | Mar 2011 M4 Fibre Test samples from Houston | 2 | Mar 2011 Houston composite - Grade 25 USP |
| A11248 | TEM Analysis of April 2011 Houston Composites | 2 | Apr 2011 Houston Composite - Grade 25 USP |
| A11249 | April 2011 CTFA USP XRD analysis of Houston Composites | 2 | Apr 2011 Houston Composite - Grade 25 USP |
| A11304 | TEM Analysis of May 2011 Houston Composites | 2 | May 2011 Houston Composite - Grade 25 USP, Chinese #2 |
| A11305 | CTFA USP XRD Analysis of May 2011 Houston Composites | 2 | May 2011 Houston Composite - Grade 25 USP, Chinese #2 |
| A11361 | TEM analysis of JUN 2011 Houston composites | 2 | JUN 2011 Houston composite - Grade 25 USP |
| A11362 | CTFA USP XRD Analysis for JUN 2011 Houston composites | 2 | JUN 2011 Houston composite - Grade 25 USP |
| A11392 | TEM analysis of July 2011 Houston composites | 2 | JUL 2011 Houston Composite - Grade 25 USP |
| A11393 | CTFA USP analysis of July 2011 Houston composites | 2 | JUL 2011 Houston composite - Grade 25 USP |
| A11426 | TEM Analysis of August 2011 Houston Composites | 2 | Grade 25 USP Chinese #2 Aug '11 |
| A11427 | CFTA-USP XRD Analysis of August 2011 Houston Composites | 2 | Grade 25 USP Chinese #2 Aug '11 |
| A11459 | TEM analysis of Houston September 2011 composites | 2 | SEPT 2011 Houston composite - Grade 25 USP |
| A11460 | CTFA USP analysis on Houston September 2011 composites | 2 | SEPT 2011 Houston composite - Grade 25 USP |

EXHIBIT A

| A11508 | TEM Analysis of October 2011 Houston Composites | 2 | Oct 2011 Grade 25 USP Composite |
|--------|--------------------------------------------------|---|--------------------------------|
| A11509 | CTFA XRD Analysis of Oct 2011 Houston Composites | 2 | Oct 2011 Grade 25 USP Composite |
| A11547 | TEM Analysis of NOV 2011 Composites for Houston | 2 | NOV 2011 Houston composite - Grade 25 USP |
| A11548 | CTFA USP XRD Analysis of NOV 2011 Composites for Houston | 2 | NOV 2011 Houston composite - Grade 25 USP |
| A12009 | TEM Analysis of Houston Monthly Composites for December 2011 | 2 | DEC 2011 Houston Composite - Grade 25 USP |
| A12010 | CTFA USP XRD Analysis of Houston DEC 2011 monthly composites | 2 | DEC 2011 Houston Composite - Grade 25 USP |
| A12014 | 4th quarter 2011 heavy metal analysis | 1 | Grade 25 USP |
| A12083 | TEM Analysis of Feb 2012 Houston Composites | 3 | Chinese #2, Grade 25 USP |
| A12084 | CTFA XRD Analysis of Feb 2012 Houston Composites | 3 | Chinese #2, Grade 25 USP |

EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

# LIST OF PLAINTIFFS' LAW FIRMS[1]

| |
|---|
| Allan Berger and Associates |
| Allred, Brotherson & Harrington, P.C. |
| Anapol Weiss |
| Anastopoulo Law Firm |
| Andrews Thornton Higgins Razmara LLP |
| Andrus Wagstaff, P.C. |
| Ashby & Geddes |
| Ashcraft & Gerel |
| Aylstock, Witkin, Kreis & Overholtz, PLLC |
| Bachus & Schanker LLC |
| Bailey Peavy Bailey Cowan Heckaman, PLLC |
| Barnes Law Group, LLC |
| Baron & Budd, P.C. |
| Bathgate, Wegener & Wolf |
| Baum, Hedlund, Aristei & Goldman, P.C. |
| Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| Becker Law Group |
| Becnel Law Firm, LLC |
| Belluck & Fox L.L.P. |
| Bergstresser & Pollock PC |
| Berke Law Firm, PA |
| Bernstein Liebhard LLP |
| Bevan & Associates LPA, Inc. |
| Bisnar and Chase |
| Blasingame, Burch, Garrard & Ashley, P.C. |
| Blizzard & Nabers, LLP |
| Bohrer Law Firm, LLC |
| Boodell & Domanskis, LLC |
| Boucher LLP |
| Branch Law Firm |
| Brayton Purcell LLP |

---

[1]     Names based on complaints for talc personal injury actions against one or more of defendants.

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Brian E. Adorno Attorney at Law, LLC |
| Brookman, Rosenberg, Brown  Sandler |
| Brown Chiari LLP |
| Burg Simpson Eldredge Hersh & Jardine, P.C. |
| Burns Charest LLP |
| Buzin Law, P.C. |
| Campbell & Associates |
| Capretz & Associates |
| Cates Mahoney, LLC |
| Cellino & Barnes, P.C. |
| Chappell, Smith & Arden, P.A. |
| Cheeley Law Group |
| Childers, Schlueter & Smith, LLC |
| Clark, Robb, Mason, Coulombe Buschman & Charbonnet |
| Clayeo C. Arnold, APC |
| Clifford Law Offices, P.C. |
| Coady Law Firm |
| Cohen & Malad, LLP |
| Cohen, Placitella & Roth, P.C. |
| Colley Shroyer & Abraham Co. LLC |
| Cooney And Conway |
| Corrie Yackulic Law Firm, PLLC |
| Crumley Roberts, LLP |
| Cuneo Gilbert & LaDuca, LLP |
| D'Amato Law Firm, P.C. |
| Daniel & Associates, LLC |
| Danziger & De Llano, LLP |
| D'Arcy Johnson Day, P.C. |
| Davis & Crump |
| Dean Omar Branham |
| Deblase Brown Eyerly LLP |
| DeFeo & Kolker LLC |
| Delise & Hall |
| Dickson Kohan & Bablove LLP |
| Domengeaux Wright Roy & Edwards, LLC |
| Don Barrett P.A. |

Case 3:16-md-02738-MAS-LHG   Document 7917-2   Filed 08/13/18   Page 32 of 56 PageID: 19624
Case 3:16-md-02738-MAS-LHG   Document 4737-2   Filed 02/21/18   Page 3 of 10 PageID: 13631
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Dugan Law Firm, PLC |
| Dwyer Williams Potter |
| Early, Lucarelli, Sweeney & Meisenkothen |
| Eddie Foster |
| Eisenberg, Rothweiler, Winkler Eisenberg & Jeck, P.C. |
| Ely Law, LLC |
| Environmental Litigation Group, PC |
| Farris, Riley & Pitt, LLP |
| Farrise Firm PC |
| Fay Law Group PLLC |
| Fears Nachawati Law Firm |
| Feldman & Pinto |
| Ferraro Law Firm, P.A. |
| Fitzgerald Knaier, LLP |
| Fitzgerald Law Group, LLC |
| Fleming, Nolen & Jez, LLP |
| Flint Law Firm LLC |
| Fox and Farley |
| Frazer Law LLC |
| Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC |
| Galante & Bivalacqua LLC |
| Gary T. Mantkowski Co., L.P.A. |
| Geoffrey B. Gompers & Associates, P.C. |
| George & Farinas, LLP |
| Gibbs Law Group LLP |
| Girardi & Keese |
| Glenn LoeWenthal, PC |
| Goetz, Baldwin & Geddes, P.C. |
| Goldberg & Osborne LLP |
| Goldberg, Persky & White, P.C. |
| Goldenberg Heller Antognoli & Rowland, P.C. |
| Goldenberglaw, PLLC |
| Golomb & Honik, PC |
| Gori Julian & Associates, P.C. |
| Goza & Honnold, LLC |
| Greer, Russell, Dent & Leathers, P.A. |

Case 3:16-md-02738-MAS-LHG   Document 7917-2   Filed 08/13/18   Page 33 of 56 PageID: 19625
Case 3:16-md-02738-MAS-LHG   Document 4757-2   Filed 02/21/18   Page 4 of 10 PageID: 13632
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Grossman & Moore, PLLC |
| Gustafon Gluek |
| Habush Habush & Rottier S.C. |
| Hafeli Staran & Christ , P.C. |
| Haffner Law PC |
| Hagens Berman Sobol Shapiro LLP |
| Harrison Davis Steakley Morrison Jones, PC |
| Hart McLaughlin & Eldridge |
| Hatch, James & Dodge, P.C. |
| Hausfeld |
| Heard Robins Cloud LLP |
| Hedrick Law Firm |
| Helmsdale Law, LLP |
| Herman Gerel, LLP |
| Heygood, Orr & Pearson |
| Hillard Munoz Gonzales, LLP |
| Hobson & Bradley |
| Holland Law Firm |
| Holland, Groves, Schneller & Stolze, LLC |
| Hollis Law Firm P.A. |
| Hollis, Wright, Clay & Vail, P.C. |
| Horton Law Firm |
| Hovde, Dassow, & Deets, LLC |
| Huber, Slack, Thomas & Marcelle, LLP |
| Hughes Law Firm, PLLC |
| Hurley McKenna & Mertz |
| Hutton & Hutton |
| Jacobs & Crumpler, P.A. |
| Jamie A. Johnston, P.C. |
| Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C. |
| Jeansonne & Remondet |
| Jeffrey R. Lessin & Associates, P.C. |
| Joel E. Brown & Associates, P.C. |
| John B. Ostrow, P.A. |
| Johnson Becker, PLLC |
| Johnson Law Group |

Case 3:16-md-02738-MAS-RLS   Document 7017-2   Filed 08/13/18   Page 34 of 56 PageID: 19626
Case 3:16-md-02738-MAS-RLS   Document 4717-2   Filed 02/21/18   Page 5 of 10 PageID: 13633
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Jones Ward PLC |
| Karon LLC |
| Karsman, McKenzie & Hart |
| Karst & von Oiste LLP |
| Kassel McVey Attorneys At Law |
| Kazan, McClain, Satterley & Greenwood |
| Keefe Bartels LLC |
| Kelley Uustal, PLC |
| Kibbey and Wagner |
| Kiesel Law, LLP |
| King and Ballow |
| Kline & Specter, P.C. |
| Kuharski Levitz & Giovinazzo |
| Landry & Swarr, L.L.C. |
| Langdon & Emison |
| Lanier Law Firm, PLLC |
| Law Office of Eusi H. Phillips |
| Law Office of Grant D. Amey, LLC |
| Law Office of Haytham Faraj |
| Law Office of John D. Sileo, LLC |
| Law Office of Marion D. Floyd |
| Law Office of Roger "Rocky" Walton, P. C. |
| Law Office of Terence J. Sweeney |
| Law Offices of Eric H. Weinberg |
| Law offices of James S. Rogers |
| Law Offices of Kruskell |
| Law Offices of Lee W. Davis |
| Law Offices of Richard R. Barrett, PLLC |
| Law Offices of Wayne E. Ferrell, Jr., PLLC |
| Lenze Kamerrer Moss, PLC |
| Levin Simes LLP |
| Levy Baldante Finney & Rubenstein |
| Levy Konigsberg, LLP |
| Lewis Saul & Associates, P.C. |
| Lieff Cabraser Heimann & Bernstein, LLP |
| Lipsitz and Ponterio LLC |

EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Locks Law Firm, LLC |
| Lundy, Lundy, Soileau & South, LLP |
| Marlin & Saltzman LLP |
| Martinian & Associates, Inc. |
| Mary Alexander & Associates, P.C. |
| Massimo & Pawetta, P.C. |
| Maune Raichle Hartley French & Mudd, LLC |
| Mauro, Savo, Camerino, Grant & Schalk, P.A. |
| McDermott & Hickey, LLC |
| McEldrew Young |
| McGlynn, Glisson & Mouton |
| McGowan, Hood & Felder, LLC |
| McKoon, Williams, Atchley & Stanley, PLLC |
| McNulty Law Firm |
| Megargel & Eskridge Co., LPA |
| Meierhenry Sargent, LLP |
| Meirowitz & Wasserberg, LLP |
| Menges Law LLC |
| Merson Law PLLC |
| Messa & Associates, P.C. |
| Meyers & Flowers, LLC |
| Michael Hingle & Associates, LLC |
| Miller Legal, LLP |
| Milstein Adelman, LLP |
| Moll Law Group |
| Montrose Law LLP |
| Morelli Law Firm, PLLC |
| Morgan & Morgan, P.A. |
| Morris Bart, LLC |
| Morris Law Firm |
| Motley Rice LLC |
| Murray Law Firm |
| Napoli Bern Ripka Shkolnik & Associates, LLP |
| Napoli Shkolnik & Associates, LLP |
| Napoli Shkolnik LLC |
| Napoli Shkolnik, PLLC |

Case 3:16-md-02738-MAS-RLS   Document 7917-2   Filed 08/13/18   Page 36 of 56 PageID: 19628
Case 3:16-md-02738-FLW-LHG   Document 4757-2   Filed 02/21/18   Page 7 of 10 PageID: 13635
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Nass Cancelliere Brenner |
| Neal & Harwell, PLC |
| Neblett, Beard & Arsenault |
| Nix Patterson & Roach |
| O'Brien Law Firm |
| Oldfather Law Firm |
| Onder, Shelton, O'Leary & Peterson, LLC |
| Panish, Shea & Boyle |
| Parker Waichman, LLP |
| Patrick Miller, LLC |
| Paul LLP |
| Paul Reich & Myers PC |
| Pendley, Baudin & Coffin, LLP |
| Phillips & Paolicelli, LLP |
| Plymale Law Firm |
| Pogust Braslow & Millrood, LLC |
| Porter & Malouf, PA |
| Pourciau Law Firm, LLC |
| Powers Rogers & Smith LLP |
| Pratt & Associates |
| Pratt & Tobin, P.C. |
| Pribanic & Pribanic, LLC |
| Prim Law Firm, PLLC |
| Provost Umphrey Law Firm |
| Pulaski Law Firm |
| Remer & Georges-Pierre, PLLC |
| Rheingold Giuffra Ruffo & Plotkin |
| Rheingold Valet Rheingold McCartney & Giuffra |
| Richardson Richardson Boudreaux |
| Riley Williams & Piatt, LLC |
| Robbins Ross Alloy Belinfante |
| Robins Cloud LLP |
| Robinson, Calcagnie, Robinson, Shapiro, Davis, Inc. |
| Ross Feller Casey, LLP |
| Ross Law Offices, P.C. |
| Ruckdeschel Law Firm, LLC |

Case 3:16-md-02738-MAS-RLS Document 7917-2 Filed 08/18/18 Page 37 of 56 PageID: 19628
Case 3:16-md-02738-MAS-RLS Document 4737-2 Filed 02/21/18 Page 8 of 10 PageID: 13636
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Salkow Law, APC |
| Sanders Phillips Grossman, LLP |
| Sanders, Viener Grossman, LLP |
| Sangisetty Law Firm, LLC |
| Satterley & Kelley |
| Saunders & Walker, P.A. |
| Schlesinger Law Offices, P.A. |
| Schmidt & Sethi, PC |
| Schroeder Maundrell Barbiere & Powers |
| Scovern Law |
| Seeger Weiss LLP |
| Seidman Margulis & Fairman, LLP |
| Shaw Cowart, LLP |
| Shelby Lucado, LLC |
| Shrader & Associates, LLP |
| Sieben Polk P.A. |
| Sill Law Group, PLLC |
| Simmons Hanly Conroy LLC |
| Simon Greenstone Panatier Bartlett P.C. |
| Skikos, Crawford, Skikos & Joseph |
| Skikos, Crawford, Skikos, Joseph & Millican |
| Slack & Davis LLP |
| Southerland Law Firm, PLLC |
| Standly Hamilton, LLP |
| Stanley Law Group |
| Steve Merritt Law |
| Stewart & Stewart |
| Stone Granade & Crosby PC |
| Sugarman Law, LLC |
| Sullo & Sullo, LLP |
| Summers & Johnson, P.C. |
| Summers, Rufolo & Rodgers, P.C. |
| Sutter & Gillham, PLLC |
| Sutton, Alker & Rather, LLC |
| Szaferman, Lakind, Blumstein & Blader, P.C. |
| The Alarid Law Firm, P.C. |

Case 3:16-md-02738-MAS-LHG Document 7917-2 Filed 08/13/18 Page 38 of 56 PageID: 19630
Case 3:16-md-02738-MAS-LHG Document 4737-2 Filed 02/21/18 Page 9 of 10 PageID: 13637
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| The Brandi Law Firm |
| The Cheek Law Firm |
| The Cuffie Law Firm |
| The Deaton Law Firm |
| The Diaz Law Firm, PLLC |
| The Dugan Law Firm |
| The Dugan Law Firm, APLC |
| The Early Law Firm, LLC |
| The Hannon Law Firm, LLC |
| The Kruger Law Firm |
| The Law Firm of Joseph H. Low IV |
| The Law Offices of Peter G. Angelos |
| The Law Offices of Sean M. Cleary, P.A. |
| The Levensten Law Firm, P.C. |
| The Madalon Law Firm |
| The Miller Firm, LLC |
| The Pate Law Firm |
| The Penton Law Firm |
| The Pointe |
| The Potts Law Firm, LLP |
| The Reardon Law Firm, P.C. |
| The Ruth Law Team |
| The Simon Law Firm, PC |
| The Smith Law Firm, PLLC |
| The Whitehead Law Firm, LLC |
| The Zevan and Davidson Law Firm |
| Thornton Law Firm LLP |
| TorHoerman Law LLC |
| Tracey & Fox |
| Tracey Law Firm |
| Unglesby Law Firm |
| Usry, Weeks & Matthews, APLC |
| Ventura Law |
| Wagstaff & Cartmell, LLP |
| Wallace & Graham |
| Walton Telken Foster, LLC |

Case 2:16-md-02738-MAS-RLS Document 70175 Filed 08/13/18 Page 39 of 56 PageID: 19631
Case 3:16-md-02738-FLW-LHG Document 4757 Filed 02/21/18 Page 10 of 16 PageID: 13638
EXHIBIT B

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

| |
|---|
| Waters & Krause, LLP |
| Waters, Kraus & Paul |
| Watts Guerra LLP |
| Weinstein Courture PLLC |
| Weitz & Luxenberg, P.C |
| Wexler Wallace LLP |
| White & Weddle, P.C. |
| Wilentz, Goldman & Spitzer, P.A. |
| Will Davidson LLP |
| Will Ferguson & Associates |
| William G. Colvin, PLLC |
| Williams Declark Tuschman Co., L.P.A |
| Wilson Law PA |
| Worthington & Caron, P.C. |
| Wylder Corwin Kelly LLP |
| Yearout & Traylor, P.C. |

EXHIBIT C

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

## JOINT CATALOGUE

| Laboratory Control No. | Sample Identification No. | Label on Original Container | Date on Original Container | Quantity on Label of Original Container | Actual Quantity in Original Container | Quantity in Original Container or New Receptacle After Division |
|---|---|---|---|---|---|---|
| 2018_____-_____ | | | | | | |
| 2018_____-_____A | | | | | | |
| 2018_____-_____B | | | | | | |
| 2018_____-_____C | | | | | | |

Observer for plaintiffs hereby acknowledges receipt of 2018_____-_____A, _____ of original Sample 2018_____-_____.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(weight)

_____　　　　_____
Observer for Plaintiffs　　　　　　　　　　　　　　Date

Observer for defendants hereby acknowledges receipt of 2018_____-_____B, _____ of original Sample 2018_____-_____.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(weight)

_____　　　　_____
Observer for Defendants　　　　　　　　　　　　　　Date

Laboratory technician hereby acknowledges that all remaining material from Sample 2018_____-_____ was

(check one): ☐ replaced in its original container   ☐ transferred to a new receptacle (2018_____-_____C).

_____　　　　_____
Laboratory Technician　　　　　　　　　　　　　　Date

1

EXHIBIT C

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

## JOINT CATALOGUE

| LABORATORY CONTROL NO. | MUSEUM SAMPLE IDENTIFICATION NO. | LABEL ON ORIGINAL CONTAINER | DATE ON ORIGINAL CONTAINER | QUANTITY ON LABEL OF ORIGINAL CONTAINER | ACTUAL QUANTITY IN ORIGINAL CONTAINER | QUANTITY TRANSFERRED TO NEW RECEPTACLE |
|---|---|---|---|---|---|---|
| 2018_____-_____M | | | | | | |

Observer for plaintiffs hereby acknowledges that unselected Museum Sample _____, _____ was transferred to 2018_____-_____M.
(weight)

_____       _____
Observer for Plaintiffs                                    Date


Observer for defendants hereby acknowledges that unselected Museum Sample _____, _____ was transferred to 2018_____-_____M.
(weight)

_____       _____
Observer for Defendants                                   Date


Laboratory technician hereby acknowledges that unselected Museum Sample _____, _____ was transferred to 2018_____-_____M.
(weight)

_____       _____
Laboratory Technician                                     Date

EXHIBIT C

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
MDL NO. 16-2738 (FLW) (LHG)

## <u>JOINT CATALOGUE</u>

The parties hereby acknowledge that on this ___ day of _____, _____, the Samples selected for division were divided and produced fairly and pursuant to all terms of the Agreed Order.  That parties further acknowledge that the full contents of unselected Museum Samples were transferred to new receptacles fairly and pursuant to all terms of the Agreed Order.


_____        _____
Observer for Plaintiffs                                Date


_____        _____
Observer for Defendants                              Date


The Laboratory technician hereby acknowledges that he or she divided, transferred, labeled, catalogued and produced all Sample material fairly, using good laboratory practices and in accordance with all terms of the Agreed Order.


_____        _____
Laboratory Technician                              Date

1

# EXHIBIT 3

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

BEFORE HONORABLE BRAD SELIGMAN

DEPARTMENT 23

---oOo---

TERESA LEAVITT,

      Plaintiff,

vs.                                   No. RG17882401

JOHNSON & JOHNSON, et al.,

      Defendants.

_____/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Informal Discovery Conference)

July 18, 2018

Taken before ERIN F. ROBINSON

CSR No. 12199

Aiken Welch Court Reporters
One Kaiser Plaza, Suite 250
Oakland, California 94612
(510) 451-1580/(877) 451-1580
Fax:  (510) 451-3797
www.aikenwelch.com

Electronically signed by Erin  Robinson (001-123-202-0439)                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 2

```
 1      APPEARANCES OF COUNSEL:
 2      For the Plaintiff Teresa Leavitt:
 3          JOSEPH SATTERLEY, Esq.
            Kazan, McClain Satterley & Greenwood
 4          55 Harrison Street, Suite 400
            Oakland, California 94607
 5          (510)302-1000
            jsatterley@kazanlaw.com
 6
        For the Defendant Imerys USA:
 7
            JENNIFER LEE, Esq.
 8          Dentons LLP
            One Market Plaza, Spear Tower, 24th Floor
 9          San Francisco, California 94105
            (415)267-4000
10          jennifer.lee@dentons.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              P R O C E E D I N G S
 2           Wednesday, July 18, 2018 - 3:15 p.m.
 3                   ---oOo---
 4          THE COURT:  Good afternoon, everybody.
 5          MR. SATTERLEY:  Good afternoon, your Honor.
 6          MS. LEE:  I apologize for being late.  I had on
 7      my calendar 3:30.
 8          THE COURT:  No worries.  Let's have appearances.
 9          MR. SATTERLEY:  Good afternoon, your Honor, Joe
10      Satterley on behalf of the plaintiff.
11          MS. LEE:  Jennifer Lee on behalf of Imerys Talc
12      America.
13          THE COURT:  All right.  I received letter briefs
14      from each side.  Any additional developments I should
15      know about before we get started on this?
16          MR. SATTERLEY:  Not other than -- no, your
17      Honor, I can explain as we go along.
18          MS. LEE:  No other developments, your Honor.  We
19      are endeavoring to do some of the things that I think
20      plaintiffs have proposed in their briefing in particular
21      to get the weights of the samples that are being
22      collected now and being sent to the New Jersey
23      laboratory, and also going back and assessing the weights
24      of the samples that already have been provided to the MDL
25      in that context.
```

Page 4

```
 1      So that's one of the things that was requested.
 2      Essentially to get an inventory of the samples and give
 3      some kind of description of what that is so that the
 4      plaintiffs can decide which of those samples they would
 5      like to request, be split.
 6          THE COURT:  And what other than the weight of
 7      the samples, if anything --
 8          MS. LEE:  And photographs also, so we will
 9      endeavor to do both so we can get those to plaintiff's
10      counsel and identify hopefully the samples they would
11      like split.  So that is beginning.  We have not
12      previously done that in terms of weight and photographs,
13      so -- and unfortunately, it's a bit of a process.
14          So my understanding from speaking with my client
15      is that that would take somewhere between what we'd like
16      is something, it would take at least I think they said at
17      least 20 or so days, so more than two weeks, but if we
18      can get 30 days as an outside date to provide an
19      inventory with that information to plaintiffs, we can
20      accomplish that.
21          THE COURT:  Okay.  Let me actually start with
22      the TEM grids first because I think that's the more
23      serious issue here.  The record, as I understand it, is
24      the existence of these grids became clear in the recent
25      trial in New Jersey, I believe.
```

Page 5

```
 1          MR. SATTERLEY:  That's correct, your Honor.
 2          THE COURT:  What was the date of that?
 3          MR. SATTERLEY:  We start the trial January the
 4      3rd or 4th and verdict was April the 11th, so it was a
 5      three-month trial.
 6          THE COURT:  At this point what do we know in
 7      terms of how many grids, how big an inventory, what
 8      actually -- it's San Jose, right, that you have the
 9      stuff.
10          MS. LEE:  I believe most of it is there, your
11      Honor, if not -- I believe that's what Julie Pier
12      testified to.
13          THE COURT:  I saw San Jose referred to.
14          MS. LEE:  That is where the primary lab is, and
15      that's where it will be kept.  In terms of how many and
16      inventory and so forth, your Honor, we don't know much
17      more at this point other than what Julie, Ms. Pier
18      testified to in Lanzo, which she thinks it's several
19      hundred, I think that's what she said.
20          But we don't have an inventory of that, what she
21      says in Lanzo actually, which I believe is correct, is
22      that all of the TEM grids that we looked at are
23      available, they're always stored.  And as your Honor
24      knows from our letter brief as well, the issue isn't
25      about whether or not those are available, they are, we
```

2 (Pages 2 to 5)

Aiken Welch Court Reporters      Hearing (Leavitt v. Johnson) 07-18-18      7/18/2018

Electronically signed by Erin  Robinson (001-123-202-0439)                                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 6

1   have them, the question is whether or not they should be
2   produced, I think, is more of our position.
3        THE COURT: I'm get there. First I want to
4   understand what it is we've got. So several hundred. Is
5   there an actual inventory which identifies time period,
6   some other information for each grid?
7        MS. LEE: I don't know that information. I'm
8   sure there is some type of inventory. They keep track of
9   what those grids are. I just don't know the nature of
10  that at this point in time, and I don't know how
11  extensive that is.
12       THE COURT: And these grids, maybe you all can
13  help me on this, these are grids that were created in
14  examination of samples historically over time?
15       MS. LEE: Correct.
16       THE COURT: Going back how far, do you have any
17  idea?
18       MS. LEE: I don't know the exact year. Some of
19  them are very, very old, and I think Ms. Pier actually
20  refers to some of them being -- refers to some of them
21  being dated back in the early 2000s.
22       THE COURT: Do you know if they go earlier than
23  that?
24       MS. LEE: I can't imagine they would because,
25  well, they might. I don't know the answer.

Page 7

1        THE COURT: There's a lot you don't know about
2   these.
3        MS. LEE: Yes.
4        THE COURT: So leaving aside the question for
5   the moment of how delicate these grids are, I'm having a
6   lot of trouble seeing why these are discoverable.
7        MS. LEE: I don't know that the question -- in
8   theory, I would agree with you, frankly, likely they are,
9   if we can identify what they are, we can identify them as
10  relating to a mine that's at issue, et cetera, using
11  those parameters, I think for us, the bigger issue for us
12  on these TEM grids is that, well, you want to put it
13  aside, but the issue is --
14       THE COURT: That's really the issue.
15       MS. LEE: That's absolutely the issue, yes. And
16  I will say, your Honor, that from our perspective,
17  producing these TEM grids is tantamount to destructive
18  testing.
19       THE COURT: Not if I give you an order telling
20  you to do it. Let me back up. I'm jumping ahead.
21       You were worried about being accused in some
22  future theoretical case of tampering with evidence,
23  destroying evidence. If I give you an order to produce
24  it, that's not a real risk. Destructive testing is a
25  separate argument, you're worried about losing things out

Page 8

1   there. That's based on the assumption that examination
2   of a grid will destroy its utility in the future.
3        MS. LEE: Could possibly do that, yes. And
4   frankly would likely. With transport, with all the
5   things we laid out in our brief I know you read, with
6   transport, back and forth, with the actual testing
7   itself, reanalyzing it, and so forth, I think that really
8   we should be looking at the potential production of these
9   grids as a request for destructive testing.
10       And if that's the case, then what we're looking
11  at is, is there another source for this information. I
12  think that's really what we should be thinking about, is
13  there another source for the information that's sought by
14  looking at these grids, and I think the answer is, there
15  is. There are other sources.
16       THE COURT: Like what?
17       MS. LEE: Well, for example, the testing
18  results, and I know plaintiffs have a position about why
19  those testing results aren't sufficient, but there are
20  testing results documents that have already been produced
21  that they have with regard to these exact grids.
22       THE COURT: But this is secondary evidence that
23  you created.
24       MS. LEE: Correct.
25       THE COURT: Why should the plaintiff in any

Page 9

1   situation be required to accept secondary evidence?
2        MS. LEE: Well, I think they should when they
3   want as the primary evidence is tantamount to
4   destructive testing because when you're looking at it
5   from the perspective of we're talking about destructive
6   testing, I think you have to consider the prejudice that
7   could occur and the destruction of that evidence for
8   future cases that could occur.
9        THE COURT: Except you would say the same thing
10  of those cases, they shouldn't look at them, either.
11       MS. LEE: Agreed.
12       THE COURT: So basically your position is this
13  evidence nobody gets to look at and everybody should
14  accept your secondary evidence.
15       MS. LEE: Yes. And here's the other point on
16  that, though. The other point is that these are test
17  results from samples taken from presumably in this case
18  the mines that would be Vermont and Italy as well, those
19  are the two that are at issue for the product that's at
20  issue in this case.
21       MR. SATTERLEY: And China as well.
22       MS. LEE: And potentially China also, yes,
23  potentially China as well. And I guess the point is that
24  there is an abundance of evidence, not just ours but
25  independent evidence, plaintiff's own expert's evidence

3 (Pages 6 to 9)

Electronically signed by Erin Robinson (001-123-202-0439)                                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 10

1    and so forth of the same talc from those same mines.
2         So what we're talking about is producing the
3    physical grid that we use to test the talc out of these
4    mines that are the same mines that have been tested by
5    other experts, including plaintiff's own experts, by
6    independent sources, including RJ Lee, including McCrone,
7    there's lots of testing results of these mines talcs,
8    talc products that came out.
9         So it's not like these TEM grids are the only
10   source of evidence for looking at the presence of --
11   potential presence of asbestos in the talc that came from
12   Vermont, Italy and China is my point.  So it's not as
13   though, for example, in the case where the defendant
14   seeking destructive testing of a plaintiff's tissue in a
15   case like this, where there's no other source for that
16   physical evidence.
17        And it's not like we can take TEM grids or other
18   analyses that have been done of other people to make it
19   relevant to the case that's at issue.  This is a case
20   where there is an abundance of testing results, and even
21   Dr. Longo's own testing is of talc that came from the
22   same mines that these TEM grids represent.
23        So in context of that, and the fact that there
24   is this abundance of evidence regarding that talc
25   testing, when you look at it under the purview of

Page 11

1    destroying potential evidence, I think that weighs in
2    favor of not allowing this to occur because there is
3    abundant evidence of the same testing from the same mines
4    that are at issue here.
5         THE COURT:  Mr. Satterley?
6         MR. SATTERLEY:  Yes, your Honor, may it please
7    the court.  We tendered discovery to Imerys back in early
8    May requesting at least 15 different requests for the
9    various grids.  They have not provided a list.  They have
10   not provided any inventory.  They have not done anything
11   other than object and say we're going to potentially
12   destroy this evidence.
13        The fact of the matter is, grids are items, and
14   I have a videotape of their expert receiving our grids,
15   and so it's a minute and a half video of him unpackaging
16   the grids, looking at the grids, pulling out a package,
17   using tweezers, the exact same thing that they said will
18   destroy the grids, their expert did that analyzed it and
19   came into court and testified about his findings to try
20   to use that as a defense in a case.
21        Well, in that particular case, as we point out
22   in our letter brief, the court permitted yet a third
23   expert to look at the grids, he looked at the grids, came
24   and testified and was able to relocate many of the
25   asbestos fibers and also find more asbestos fibers.

Page 12

1         So my point is that while, yes, there is always
2    a risk of potential, something getting damaged or
3    something getting lost, that same risk applies to any
4    pathology that we have, any slides, because the way it
5    works is, yes, if an untrained analyst doesn't know what
6    they're doing, they can potentially damage the grid, a
7    grid.
8         For example, Dr. Sanchez, their expert, who
9    opened this package, I can show you the videotape of,
10   when he examined in that other case in New Jersey the
11   grids, he blew out a couple grid openings.  There's a
12   hundred grid openings in each grid.  And the fact that he
13   blew it out afterwards, we were able to point that out,
14   you put the electron beam too strong on that one little
15   spot, and you blew out that grid opening.
16        Yes, I did.  But we were able to look at many of
17   the other grid openings around it, and there was eight
18   grids at issue in the Lanzo case.  And you can see in the
19   video exactly how small they are, exactly what the
20   containers are held in, and that's the standard way in
21   which the grids are stored and maintained.
22        The very first issue that I'm troubled by is
23   that they won't even tell us how many grids there are,
24   what are the dates of the grids, because what occurred,
25   and we put it in our letter brief, originally they

Page 13

1    answered discovery saying they don't have anything,
2    samples, anything like that.
3         Only through vigorous cross-examination, I
4    cross-examined Ms. Pier, two and a half, three days did
5    she admit, and we got a spoliation instruction based upon
6    her testimony with regards to both the samples and to a
7    lesser extent the grid issue, but we established in that
8    trial that they started doing TEM testing way back in the
9    '90s and disposed of them for many, many years.
10        So the first issue is, we would like an
11   inventory of exactly what TEM grids exist, the date of
12   the grids, because right now they say there's reports out
13   there, we don't even know if these reports at all relate
14   to the grids in question.  The way they defend these
15   cases they put a bunch of negative reports in and say,
16   look, ladies and gentlemen, there's negative, no asbestos
17   in any of these reports.
18        We've got to have the right to challenge that,
19   to confront that because our testing of certain samples,
20   many of them there is asbestos present, not 100 percent
21   but I -- just, for example, in a different case turned
22   over yesterday a report where 11 of the 16 samples of the
23   J & J powder had asbestos in them.  Five didn't.
24        So it's really, really important for us to
25   understand exactly what grids they have, the dates of the

4 (Pages 10 to 13)

Electronically signed by Erin  Robinson (001-123-202-0439)                                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 14

1    grids, how many they are, do they relate to the testing
2    reports that they seek to put into evidence.  Secondly,
3    it's important because at some point I may ask the court
4    for some relief with regard to spoliation based upon
5    everything that we've established to exactly know what
6    exists today versus what doesn't exist.
7         Third, in their letter brief, they admit on page
8    4 that these are highly relevant.  They say they're
9    relevant and they have multi-case relevance is what they
10   say, including current and subsequently filed cases.  So
11   they have admitted in their letter brief that these grids
12   have relevance in this case and cases in the future.
13        It can't be -- and then the next-to-last
14   paragraph they say future plaintiffs will be deprived of
15   this evidence if it's turned over in this case.
16   Mrs. Leavitt will be deprived of this evidence if we go
17   the route in which Imerys wants to go and not let anybody
18   look at and challenge the grids.
19        What I would like with regards to the grids, I'd
20   like to show your Honor this video, and I apologize, I
21   just thought of it last night and I brought it over to
22   counsel, Imerys has given it to us, that's how I got it,
23   so you can see exactly what the grid packaging looks
24   like, you can see how their expert Dr. Sanchez handles
25   the grids in general, and because ultimately, any damage

Page 15

1    that occurs by my experts potentially could be used
2    against me if we damage it.
3         If we damage evidence, just like if they were to
4    lose pathology, if we sent over pathology to them and
5    they damage it or break the slides or lose it, then they
6    could potentially -- there could be some repercussions
7    about that.  Same as relates to us.  If we damage the
8    evidence to the point it's not useable, there's
9    repercussions under the law that we could be sanctioned
10   potentially.  We could be certain things could occur.
11        What occurred in Lanzo is, yeah, there's a
12   little bit of damage done by their expert, but we just
13   pointed that out and we didn't get any sanctions because
14   the beam of the electron microscope was too hot on one
15   particular opening.  And if you can just imagine, I think
16   we attached as an exhibit an example of the grid, the
17   entire grid.
18        And this is Exhibit 15.  This is a blown-up copy
19   of a grid.  And there's a hundred grid openings,
20   actually, their expert says, I'll wait until your Honor
21   gets to Exhibit 15.
22        THE COURT:  Got it.
23        MR. SATTERLEY:  So this is an enlarged version
24   of a photograph taken by Dr. Sanchez, Imerys's expert, in
25   which there are a hundred grid openings, A through J and

Page 16

1    1 through 10.  Dr. Sanchez actually counts the letters
2    and numbers, so he says there's 140 grid openings, but
3    what counsel is worried about is that one of these grid
4    openings will potentially be destroyed through an
5    electron beam when they're taking -- when they're trying
6    to take the chemistry of the fiber in question.
7         If they see something that looks like an
8    asbestos fiber, they have to characterize it.  The way
9    they characterize it is using an electron microscope with
10   a beam and if the beam is too hot, it could damage that
11   little opening.  Well, just because it damages that
12   little section right there doesn't mean the rest of the
13   grids are damaged.  There could be damage.
14        But our experts know how to do this, so they
15   don't damage the grids and certainly don't damage all the
16   grid openings.  So we understand and appreciate that this
17   is important evidence and delicate evidence, but it's
18   evidence that their analysts have looked at, so if we
19   don't get the ability to look at these grids and analyze
20   it, it's basically a one-sided presentation of evidence.
21        They have a stack of reports, TEM reports that
22   say, here, look, all these are negative, ladies and
23   gentlemen of the jury, and we never get a chance to
24   challenge it.  So there's only two remedies in my mind,
25   either all those reports are excluded completely because

Page 17

1    it's hearsay and it's not subject to any challenge at
2    all, or we get a chance to look at these grids and see if
3    what they say is accurate because there's a lot of unique
4    ways in which they characterize it as being no asbestos
5    there.
6         We put in our letter brief that there could be
7    five fibers, up to five fibers of each variety, five
8    tremolite, there has to be five tremolite, five
9    anthophyllite, five chrysotile before they say it's
10   there.  The bottom line, we request, first we get an
11   itemization, I would request an itemization as soon as
12   possible.
13        There's no reason why it's been two and a half
14   months since we started requesting this that somebody
15   hasn't itemized what's there.  Ms. Pier, when I
16   cross-examined her back in early March and told us for
17   the first time that everything is there, we still don't
18   have a definition of what's everything, so we would like
19   at first an itemization of what's there.
20        And then we can either meet and confer or
21   actually we probably have to come back to your Honor and
22   tell your Honor exactly which grids we'd like to look at.
23   If there's -- if everything is there since the last
24   20-some-odd years, there should literally be probably a
25   thousand or more grids, and there's no way I'm going to

5  (Pages 14 to 17)

Electronically signed by Erin Robinson (001-123-202-0439)                                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 18

1    spend the money to have somebody look through a
2    thousand-some-odd grids.
3        I just don't have the resources to do that.  So
4    we would make a reasonable approach on which grids we
5    would like our experts to look at.  We had two
6    alternatives in our brief on how that could go about.
7    One is the way it occurred in Lanzo, the grids were just
8    shipped to Dr. Sanchez, he opens them up, videotapes the
9    opening, we see the grids.
10       He looks at them.  He spent several days looking
11   at them.  Wraps them back up, ships them back over to us
12   and we have them back.  There's no problems with that
13   whatsoever other than, like I said, that one or two grid
14   opening criticism that we had.
15       The second way which is a much, much more
16   expensive way, would be for us to have our expert go to
17   their lab, I think it's in San Jose, and sit there and
18   work with these grids with their TEM.  That's much more
19   expensive for us because we'd have to pay somebody to
20   come out here, spend a lot of time out here, and it's not
21   just a day event.
22       Depending on how many grids there are, it could
23   be a few weeks or several weeks looking at these grids.
24   So that's the alternative relief if they're concerned
25   about damage, which we don't think will really occur.

Page 19

1        THE COURT:  I don't know if this is
2    incorporated, sounds like another alternative was to have
3    their experts come to Mr. Longo's lab and observe -- is
4    that a separate issue?
5        MR. SATTERLEY:  That could potentially occur if
6    their experts want to come and watch Dr. Longo, and he
7    has had that occur, and we put a declaration explaining
8    their situation.  In this litigation, talc litigation,
9    one expert sometimes questions the other experts, and so
10   there has been observations that have occurred.  So I
11   don't know necessarily that Dr. Longo will be the person
12   looking at these grids, there's a few --
13       THE COURT:  Whoever it is.
14       MR. SATTERLEY:  Whoever it is.  But there will
15   be safeguards in place because that's the last thing
16   plaintiffs want, any destruction of any evidence at all.
17   So I'm trying to think if there's anything else I want to
18   say about the grids.
19       The argument that this is destructive testing
20   and that these grids will be destroyed, there's no basis
21   in fact, and there's no case that I've ever seen that
22   says looking at grids under a microscope is tantamount to
23   destructive testing.  I've absolutely never seen a case
24   that says that.  It's actually not destructive testing.
25   You're taking a microscope and trying to identify

Page 20

1    something on there.
2        The criticism they cite to Dr. Longo in some
3    other case was that there could be fibers lost.  That
4    would benefit them and hurt us.  If there's asbestos
5    fibers on the grids and the movement of the grids caused
6    fibers to be dislodged or be removed from the grid, that
7    hurts us.  That doesn't help us.  We don't want that.
8        But at the same time, that doesn't justify a
9    complete denial of being able to take a look at these
10   grids.  So the ultimate -- the real reason why Imerys
11   doesn't want anybody to look at these grids is because if
12   we demonstrate that there's asbestos there, then their
13   testing protocol and their testing methods have been
14   demonstrated to be false, improper, wrong, and all their
15   testing goes out the window.
16       That's the real reason why they don't want us to
17   look at the grids.  So we'll do -- you know, hopefully
18   your Honor will find that the shipment is not a problem.
19   Can I show your Honor just this minute and a half video?
20       THE COURT:  Hold on.  I don't think I need to go
21   there yet.
22       MR. SATTERLEY:  And I do want to come back to
23   the samples whenever it is appropriate.
24       MS. LEE:  So your Honor, on the grid issue, I
25   strongly disagree.  We're not afraid of that because that

Page 21

1    already happens.  What Mr. Satterley just described about
2    how our testing protocols are wrong and we don't use the
3    right protocols, all of our testing results, therefore,
4    are wrong, that already happens with the documents at
5    issue, with the cross-examination of Ms. Pier.  She
6    admits that if there are less than five fibers or
7    suspected asbestos fibers on a grid it is not counted.
8    That's already there.
9        THE COURT:  But she doesn't admit there are
10   three fibers in a particular sample.
11       MS. LEE:  She couldn't do that anyway.  That
12   would require her to go back and look at every single
13   one.
14       THE COURT:  It would require her to look at the
15   grid.
16       MS. LEE:  But the point being that fear, it's
17   not a fear because it already happens.  So that's
18   incorrect.  But let me just make a couple of points.
19   First of all, Dr. Longo's testimony in the Von Salzen
20   matter, which we provided to you in the brief, indicates
21   to the court and I think to the parties as well how
22   sensitive these grids are and how sensitive the carbon
23   fiber on those grids are.
24       It's so sensitive that he says likely, likely he
25   says if two analysts look at the same grid one after the

6 (Pages 18 to 21)

Electronically signed by Erin Robinson (001-123-202-0439)                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 22

1    other, they're going to have different results, and
2    that's in the same time period right there.  No
3    difference.  We're talking about old grids, probably
4    closer to 20, 15 to 20 years, maybe even older grids that
5    we're talking about.
6        And the exchange that occurred that
7    Mr. Satterley is talking about or the observation that
8    occurred between RJ Lee group and MAS, Dr. Longo's
9    facility that was on Dr. Longo's grids that he created in
10   2017.  Those were one-year-old grids.
11        These grids that we're talking about are much
12   older, and with the passage of time, these grids become
13   more and more sensitive and more and more subject to
14   being destroyed or somehow affected so that they change
15   in their nature.  So in a sense, those are apples and
16   oranges.
17        Dr. Longo saying in his declaration, which by
18   the way, he does not say in his declaration that these
19   are not sensitive pieces of physical evidence, he does
20   not say that transporting them the way that Mr. Satterley
21   is proposing, in a Fed Ex package or whatever it is to
22   another expert and putting them under another TEM
23   analysis isn't going to destroy them.  He does not say
24   that in his declaration.
25        All he does is describe to the court what

Page 23

1    occurred with regard to his samples that were a-year-old
2    TEM grids, and that's very different than talking about
3    20 or even 20-plus-year-old grids that they now want us
4    to transport and have an expert just handle without any
5    type of protections around that.
6        So those are different things to me at least and
7    they should be to the court because those are very
8    distinct differences between what Dr. Longo did with the
9    RJ Lee group and what they are proposing now.  This is
10   not a case where, for example, there is a product or a
11   powder or something.
12        For example, if Ms. Leavitt had had a Johnson &
13   Johnson bottle that she had used previously and the
14   parties split those each side does their TEM testing and
15   then they exchange those grids to essentially check each
16   other's work, which is what also happens in the fiber
17   digestion arena when we do that, we have agreements where
18   we're going to have available all of the testing
19   materials so that we can see what the other expert saw.
20        That's not the situation here.  These are
21   historical pieces of physical evidence that are delicate
22   and we can put in depth declarations in the form of
23   opposing a formal motion on this or protective order
24   motion, if that's what this is going to come to, that
25   these grids are old, they are historic, and they are,

Page 24

1    therefore, even more sensitive.
2        And Dr. Longo knows TEM grids are sensitive
3    because this whole protocol of having RJ Lee come to his
4    facility, that was done presumably, and he doesn't say
5    this, but he went through all that trouble and expense to
6    make sure the TEMs did not leave his facility and if
7    people wanted to look at them, they came to his facility,
8    his people did the actual in and out of the microscope
9    and the observers observed what they were looking at.
10       So he took those precautions because these are
11   very sensitive pieces of equipment.  So I think that what
12   we're talking about here is, again, I'll go back to this
13   point, which is this, the plaintiff's issue and the
14   reason why they want these TEM grids is they want to put
15   up on the screen in front of the jury and say here's one
16   they looked at, here's a report that says no detectible
17   asbestos.
18       And their expert is going to say that's
19   asbestos, that's asbestos, that's asbestos, I see three
20   fibers, and that way they can show the jury again in
21   addition to the other documents and other questioning I'm
22   sure would happen with Ms. Pier that we missed asbestos
23   fibers when we were using the TEM protocol that we used.
24   That's what they want to do.
25       But they don't have to because, again, they have

Page 25

1    samples from the same mines, they have TEM grid results
2    from the same mines, that their experts have testified
3    they see asbestos.  They've shown those TEM grids to
4    juries and said this is a sample of talc from the Vermont
5    mine and it shows me asbestos, here is where it is.
6        They already have that information, they have
7    that ammunition, if you will, and they can make that
8    argument and present that evidence without having to
9    potentially destroy historical evidence, and it is
10   destructive.
11       Mr. Satterley himself just told you when
12   Mr. Sanchez received it in this first iteration of a
13   request that they have with regard to just sending them
14   the samples or the TEM grids so that they can open them,
15   he himself said Mr. Sanchez did, he punched out some of
16   those holes, that happens when you're looking at a grid.
17       And those grids that he's looking at, by the
18   way, are newer.  So if we're talking about even older
19   pieces of equipment or older pieces of carbon filters,
20   they're going to be even more subject to that type of
21   destruction.  And that's our primary concern.  So if we
22   are going to go forward with this any further, I don't
23   necessarily -- I don't have an opposition.
24       If they want to see or know what the inventory
25   of the grids are, that's probably discoverable and

7 (Pages 22 to 25)

Electronically signed by Erin Robinson (001-123-202-0439)    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 26

1    relevant so that they know what that is.
2         THE COURT: That's the first step.
3         MS. LEE: Yeah. And I don't know, frankly, I
4    don't have anything to say about that. If we put
5    together an inventory and can give them so that they can
6    see what's available, I think that's fine.
7         But I think the production of those has to be
8    subject to a formal motion, and so that we can address it
9    from the points of view of it being destructive and
10   making sure that the court has the evidence it needs from
11   the proper people that can explain what these grids are,
12   why it would be destructive, talk about the age of the
13   particular grids and so forth, if that's necessary.
14        THE COURT: Let me break down what I need to
15   know because I appreciate the letter briefs from the
16   parties, but there is not enough information to make an
17   ultimate decision yet. I think the defense counsel's
18   statement about the inventory is completely appropriate.
19        I think that the first step is to prepare or to
20   produce if it's already prepared an inventory which
21   indicates the volume, source and dates of any samples you
22   have. That's critical, No. 1. And what I'm going to --
23   I doubt you know, but how long is it going to take to
24   figure that out, we've got to get on the time schedule to
25   figure that one out. So that's No. 1.

Page 27

1         No. 2, I think the next step is taking at face
2    value Mr. Satterley's assertion that he's not likely to
3    want to test all of them, although he doesn't know how
4    many there are.
5         MR. SATTERLEY: I don't.
6         THE COURT: So it may be if he wants to test all
7    of them, maybe he wants to test one, I don't know. But
8    there's nothing to compel or protect until we know what
9    the volume is. And it makes a big difference, frankly,
10   in your destructive testing argument even if I were to
11   accept it if there's a thousand grids and he wants one.
12        That's a much easier question than if there's a
13   thousand grids and he wants a thousand. That's step
14   No. 2, identify what actually Mr. Satterley is asking
15   for. Step No. 3, which I will insist on before any
16   motion is filed, is the parties are to sit down meet and
17   confer and see if they can agree on a protocol for the
18   production and what kind of safeguards are there.
19        Now, I lay it out in that way because it seems
20   clear to me that putting aside for the moment the
21   argument that this is destructive testing, which I don't
22   think has been established so far, but there maybe is a
23   record that can be established, it seems to me this
24   material is clearly otherwise discoverable, clearly
25   otherwise highly relevant, it doesn't make any difference

Page 28

1    that there might be other ways defendant and plaintiff
2    might attempt to prove the same thing.
3         There's lots of different ways people prove
4    evidence, and there's no rule of discovery that says
5    you're required to accept only one form. It may well be
6    as defense counsel, as you pointed out yourself, who
7    knows what is on the screen might be the most compelling
8    way to bring that in. It's not the court's decision to
9    say you are only entitled to the less persuasive
10   evidence. That's plaintiff's choice. So I think this is
11   prima facie discoverable.
12        Now, whether a protective order of some sort is
13   necessary is going to have to wait until we know what the
14   volume is, what's actually requested, and what kind of
15   safeguards the parties will agree or the plaintiffs will
16   offer the parties don't agree. So I'd ask you to take
17   those steps, at which point if there's not an agreement,
18   I suspect there may not be, then we're going to need a
19   motion to create the record for this.
20        So I guess the first step is for you to figure
21   out how long it's going to take to get that inventory so
22   you can figure out the timing.
23        MS. LEE: I should at least be able to have an
24   answer to the question of when we can have that ready by
25   tomorrow. So I will pass that on to Mr. Satterley and

Page 29

1    let him know the timing of that, and I can copy the court
2    if that works, but I can't imagine it would take that
3    long. I can't imagine there's not already at least
4    something they can start from.
5         THE COURT: There ought to be something out
6    there, maybe you just need to copy it and change the
7    heading. And that would be an optimal situation. It's
8    work you both need to do. Let me turn to the sample
9    question.
10        MR. SATTERLEY: Your Honor, before we turn to
11   the sample, our deadline for filing motion to compel is
12   July 27th.
13        THE COURT: This will be stayed for the moment
14   while we're trying to work out the details.
15        MS. LEE: No objection.
16        MR. SATTERLEY: CCP section 2016.08OC2, your
17   Honor is tolling the filing of --
18        THE COURT: I am.
19        MR. SATTERLEY: Just wanted to make sure that's
20   on the record.
21        THE COURT: I always had that authority as a
22   complex judge. Since January 1st, all judges have that
23   authority, to toll at a discovery conference a discovery
24   deadline. It is tolled pending further decision of the
25   court. I'd rather we do this right rather than rush into

8 (Pages 26 to 29)

Electronically signed by Erin Robinson (001-123-202-0439)                                4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 30

1    it.
2         MR. SATTERLEY: I understand that. On the
3    sample issue counsel already addressed -- can I respond
4    to what counsel talked about?
5         THE COURT: One second. Go ahead.
6         MR. SATTERLEY: So the problem with the sample
7    issue is that unlike J & J, Imerys didn't do what they
8    said they were going to do apparently with MDL back in
9    February. Apparently, as I reviewed the filing and the
10   attachments on February 21st, there was the order entered
11   with Imerys and several other plaintiff's counsel.
12        I wasn't consulted or involved, although they
13   put my name on it. But what that required them to do is
14   to put into a repository all their samples at that time
15   within a short period of time thereafter, maybe 30 days,
16   according to the order. So what that also required them
17   to do is to properly quantify and label the containers.
18        And counsel in their letter brief accused me and
19   said, I will tell them exactly what I want, and we had a
20   detailed meet and confer, Ms. Lee wasn't -- I don't think
21   she may or may not been on the phone call, I dealt
22   mostly with Jubelirer, where I explained in detail why I
23   couldn't say, give me this sample, that sample because
24   unlike what J & J did, J & J photographed and I have for
25   the court and counsel two items, the photographs.

Page 31

1         And this is actually from the production in this
2    case. May I approach, your Honor?
3         THE COURT: Yes.
4         MR. SATTERLEY: J & J photographed each of the
5    samples, put numbers on them, and then cataloged the
6    exact quantity of material in each sample. So what I've
7    handed to your Honor is a package of photographs and also
8    an item called joint catalog.
9         What this joint catalog represents is last
10   Friday a representative working in my direction went to
11   the laboratory and obtained the ten samples that we
12   worked out with J & J. And I showed this to your Honor
13   because it has the date of the container, it has the
14   size, the number of ounces.
15        And at that time prior to receiving this, I
16   assumed I was going to get my half ounce because that's
17   what I asked for, and that the remaining half ounce would
18   go to defense counsel. And the remaining would be left
19   in the repository.
20        What is now obvious to me what happens is, I get
21   my half ounce and plaintiff's counsel for the MDL, and
22   defendant J & J split the remaining bottle. So I tell
23   your Honor that because this documents that we're able to
24   know exactly which packaging, which sample the amount of
25   the material, the date of the material, the label of the

Page 32

1    material, unlike J & J, Imerys has done none of this.
2         They haven't photographed anything, they haven't
3    labeled anything properly, they haven't weighed it out,
4    so that I can make a reasonable decision. And the
5    attachment to their letter brief has apparently -- they
6    made multiple submissions to this repository, and
7    apparently they may have made one sometime after February
8    21st, the initial, and they made one as recently as this
9    month.
10        And for the most part, other than some really
11   horrible black-and-white pictures that I can't make out
12   what's in there, there's no photographs of what these
13   products are. There's no organization, there's no
14   weight.
15        THE COURT: Well, I understand from Ms. Lee
16   they're going to give you that.
17        MR. SATTERLEY: So here's the problem is they
18   should have already done that, according to the order
19   they agreed to back in February. And so for them to now
20   have me wait another 20 or 30 days for them to weigh and
21   photograph something by order by agreement they were
22   supposed to do a while back is problematic.
23        I want to get this stuff tested because after
24   the testing occurs, and I turn it all over, there's going
25   to be -- they're going to be wanting to see what my

Page 33

1    results are and wanting to challenge it and things like
2    that. So I want to try to get this done quickly and not
3    have to wait many more months down the road or weeks down
4    the road.
5         So I think 20 days or 30 days is unreasonable.
6    Simply photograph what's in the repository. As a matter
7    of fact, their letter brief says that they are there this
8    week, all this week splitting these samples up with some
9    unidentified MDL counsel.
10        So they're there already this week and next
11   week, that's what their letter brief says, why aren't
12   they taking the photographs and measuring what's there so
13   that it can be done promptly? And so once they identify
14   the photograph and identify the weight and we have that
15   color evidence like that, then a meet and confer could
16   occur so that we can -- I can say, okay, I'd like to have
17   these samples.
18        The other thing that we put in the brief is with
19   regards to is the actual obtaining of the samples, I know
20   your Honor ruled against me on my videotaping request, I
21   think it's important that I at least be able to take some
22   photographic evidence or something because otherwise it's
23   one sided.
24        They get to go up and take pictures of all their
25   products and everything like that, and plaintiffs don't

9 (Pages 30 to 33)

Electronically signed by Erin Robinson (001-123-202-0439)                                        4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 34

1  get to likewise document what's there at all?  That's
2  just unfair.  Either a photograph or a videotape so that
3  we can have our photographs because I think they're going
4  to do it for themselves.
5        Every other case I've ever had all kinds of
6  products liability cases, defective cars, vehicle
7  inspections, I've never been denied the ability to take
8  photographs of the evidence.  I've never been denied the
9  ability to videotape an inspection.
10       So it's a shock and news to me that I can't at
11 least take photographs so that we have a documentation of
12 what's there and what's present.  And then I had one
13 other point.  It escapes me, I apologize.  I'll sit down
14 for the time being.  If it comes back --
15       THE COURT:  You'll be up again.  All right.
16 What about the timing?
17       MS. LEE:  The timing your Honor, so the samples
18 that are already with the New Jersey lab that's
19 designated by the MDL agreement, those we have to ask
20 that those lab folks actually do the weighing because
21 they already have the samples, that they do the weighing
22 and provide us with the photographs and that information.
23       That's going to cost approximately, and we've
24 already gotten this estimate, approximately $300 an hour,
25 and they estimate that they can do it, I can't remember

Page 35

1  now, I think it was approximately nine to ten hours, the
2  samples that are already with the New Jersey laboratory,
3  the neutral, essentially.  So that's that.
4        The additional samples, there is a process
5  happening now where they are going through the additional
6  216 samples that we mentioned in our letter brief that
7  are going to be produced shortly, and we have been
8  photographing and weighing those because of, frankly,
9  this case and the fact that it was requested.  So that is
10 underway.
11       Our estimate with regard to both of those things
12 happening our in-house preparation of these samples with
13 the photographs and the weights and so forth in addition
14 to the New Jersey lab doing the work on the samples they
15 already have is 30 days.  That's what they've asked me to
16 ask for.  That's what the lab people asked me to ask for,
17 and so that's what I'm asking for.
18       I don't know what's involved in all of that,
19 frankly.  I'm not a scientist.
20       THE COURT:  I thought you said 20.
21       MS. LEE:  20 to 30 days.  That's what they've
22 asked me to ask for.  So that's what I'm here to ask for.
23 I don't know, and I don't think Mr. Satterley knows,
24 either, what's involved with all of that, frankly, and
25 how that's done, et cetera, what the laborness is of it,

Page 36

1  if you will, but that's what the professional that is
2  doing this has asked me to ask for.
3        I don't have much more beyond that to address
4  the timing issue.  And with regard to Mr. Satterley's
5  point about not being able to see it happen, at least
6  with regard to the samples already within New Jersey,
7  that's a neutral entity, that is not us doing anything.
8        That is a lab that already has retention of the
9  samples for purposes of litigation that was chosen
10 collectively via the MDL process, so I don't know that
11 there's any issue there, and with regard to the ones that
12 we are producing, I don't really know, I mean, your Honor
13 has already looked at the issue of the videotaping
14 request which is essentially this issue, which I think is
15 just really not necessary.
16       THE COURT:  There's a separate question.  I'm
17 not revisiting videotape, but is there any objection once
18 the samples are identified that Mr. Satterley wants, when
19 he goes to pick them up, can he take a picture at the lab
20 right then and there so he can establish this is what it
21 looked like when I picked it up?  Any problem with that?
22       MS. LEE:  I don't think so, no.
23       THE COURT:  I wouldn't think so, either.
24       MS. LEE:  If the primary problem here is them
25 trying to combat some idea that we might assert some type

Page 37

1  of spoliation or whatever is laid out in their brief, I
2  agree with your Honor, there's other ways to address
3  that, which your Honor just gave one example.
4        Which I think, yeah, I have to confirm that
5  obviously with the lab and all of that, but I don't see
6  why that would be a problem where he could go and say,
7  here's a photo of when I showed to pick them up and
8  here's where they were, I don't see that as a problem.  I
9  can't see why it would be.
10       THE COURT:  I want you to use your best efforts
11 to produce this material this inventory in 20 days.  What
12 I'm going to ask on the whole thing is, I'm going to ask
13 for a report from you all in three weeks about where we
14 are on both issues.  The inventory of the TEM grids as
15 well as getting the inventory samples and the
16 photographs, et cetera.
17       At that point you may or may not have enough
18 information to meet and confer about the actual
19 production, and if so, tell me that and give me some
20 estimate about how much time you need to do that.  Once
21 you have -- are on the other end of that rainbow, we can
22 talk about further motions, IDCs or whatever.
23       So three weeks would put us to, if I'm correct,
24 that would be August 7th.  Any more we need to do today?
25       MR. SATTERLEY:  Your Honor, I thought of the two

10 (Pages 34 to 37)

Aiken Welch Court Reporters     Hearing (Leavitt v. Johnson) 07-18-18     7/18/2018

Electronically signed by Erin  Robinson (001-123-202-0439)                                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 38

1  things that I forgot about.
2      THE COURT:  I only had one before you forgot
3  about.
4      MR. SATTERLEY:  The whole issue of the cost,
5  with the J & J production they didn't charge us anything
6  because that was all set up with the MDL, the MDL and
7  defense counsel absorbed all the costs, and I received
8  absolutely no charge from J & J for simply going up there
9  and picking up the samples.
10      What Imerys is trying to do is, even though they
11  were supposed to have this all set up way back in
12  February with the MDL, they're trying to shift the cost
13  over to me, and I didn't negotiate this agreed order, I
14  wasn't -- counsel says this is a neutral entity and there
15  was a process involved.  They didn't invite me to be part
16  of that process.
17      I don't know if it's a neutral entity or not.  I
18  didn't choose that, $300 an hour.  I've never had a
19  situation where I had to pay that amount of money to get
20  something that's simply in their possession.  Can you
21  imagine if Mrs. Leavitt had a whole bunch of samples and
22  they wanted to look at them or examine them, instead of
23  just turning them over, I charge them a bunch of money
24  for that?
25      So I have an objection to them setting up a

Page 39

1  process not including me in the process and then trying
2  to shift the cost burden over to Mrs. Leavitt.
3      THE COURT:  I'm not going to address that today.
4  What I want is once you identify how many samples you
5  want, meet and confer, at that point if there's a cost
6  claim, that's one of the matters I'll resolve.  But I
7  want to do it on a concrete record so I know exactly what
8  we're talking about, both in terms of the dollar amounts
9  and the volume.
10      MR. SATTERLEY:  And the final issue with regards
11  to the meet and confer, Counsel told me that I would have
12  to get -- go talk to some other plaintiff's counsel to
13  get permission from some other plaintiff's counsel to --
14  and I told counsel, I'm not going to do that.
15      I don't engage some plaintiff's counsel because
16  I don't want to get in a dispute with another plaintiff's
17  counsel over some samples because the court has
18  jurisdiction over the parties here and not some
19  out-of-state plaintiff's counsel.
20      I just wanted to make clear that was an area of
21  dispute, and I'm going to request that we address
22  everything with your Honor and not counsel trying to
23  force me to get permission from some other plaintiff's
24  counsel with regards to any of these samples.
25      MS. LEE:  And here's the issue, samples that are

Page 40

1  already with the MDL are already with the MDL.  They were
2  produced pursuant to that order by Imerys, and the reason
3  why we've directed Mr. Satterley that way is that's the
4  only way to get those now.  I can't go back in there now
5  and say I need all my samples back because Mr. Satterley
6  in California wants that.
7      It doesn't work that way.  That's not how the
8  MDL order works.  So for those samples that are already
9  in the MDL, there's not much more I can do other than
10  say, you need to go to the PCS and talk to them about how
11  to get your portion of the samples there because there is
12  a provision for that to happen.
13      And Mr. Satterley has a problem with that order
14  or disputes his obligations under that order, that again
15  is not my fight.  I don't know how else to -- I don't
16  know how to remedy that for him, and I can't.  So the
17  fact of the matter is, there is an order, Mr. Satterley's
18  firm, both of his firms are listed on there as
19  represented by the plaintiff's counsel that negotiated
20  that order, that's what I know.
21      And so I am bound by that order, the samples
22  that are already with the MDL I cannot do anything about
23  other than direct Mr. Satterley to that person to call,
24  that's all I can do.
25      MR. SATTERLEY:  Your Honor, we requested these

Page 41

1  samples, I already told the court I wasn't involved in
2  that, I was never consulted.
3      THE COURT:  I don't know if that's relevant
4  whether you were part of that.  The question is if the
5  samples are subject to the control of an order issued by
6  another court, that's the problem.
7      MR. SATTERLEY:  They're not.  That's the
8  problem.  Our discovery was May the 4th, two months later
9  after we had our IDC, they then submit on July the 2nd a
10  whole bunch of samples, two months after I request it in
11  this case and after we have an IDC, they then submit it
12  and put stuff into the MDL.
13      So what really is occurring, they're using this
14  MDL order or this MDL process to deny my legitimate
15  request for materials.  Otherwise, they should have
16  responded timely to my request back on May the 4th that
17  they have -- the attachments to their letter, inventory
18  bags of talc in the Lanzo box, and then they have 20
19  items, and then it goes on for several pages, and there's
20  different materials that they're putting in for the very
21  first time on July the 2nd.
22      So they're using this MDL vehicle and saying
23  that MDL, they have the jurisdiction over this when, at
24  the time of my request, they had possession.  Imerys had
25  possession of these materials.  The MDL didn't have

Aiken Welch Court Reporters     Hearing (Leavitt v. Johnson) 07-18-18     7/18/2018

Electronically signed by Erin Robinson (001-123-202-0439)                                        4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 42

```
 1   possession of these materials.  Imerys did.  They're
 2   putting it in New Jersey when they had it here in
 3   San Jose.
 4          THE COURT:  Well, that may be true, but I still
 5   have the problem if they are currently under the control
 6   of that other court, there's an issue we have to look at.
 7   And let me say, I'm not going to resolve this matter
 8   today, but with regard to the samples that are not yet
 9   at the MDL that we're talking about, they don't go there
10   until you've had your meet and confer on this.
11          Don't ship it out there until we figure out
12   what's going on there because I can at least talk about
13   what's not there.  I will leave open for further briefing
14   or argument about authority I have over those MDL matters.
15   I'll tell you those federal judges seem to think they
16   have superior authority, but that's their problem, not
17   mine.
18          MR. SATTERLEY:  And your Honor, as I think I
19   said before, this is not a reason federal judge's opinion
20   on this.  This was an agreed order between Imerys
21   counsel --
22          THE COURT:  It was an order the judge signed.
23          MR. SATTERLEY:  An agreed order.
24          THE COURT:  But it's still an order, of course.
25   Doesn't matter if it's a stipulation order, it's an order
```

Page 43

```
 1   that's enforceable by all the contempt powers the court
 2   has.  So we have to walk a little bit more carefully.
 3          MR. SATTERLEY:  I understand.  It's just I think
 4   your Honor could imagine how frustrating it is when
 5   materials are here in California and after two months
 6   after I request them, they're transferred out of
 7   California to New Jersey, I think, in some parts to
 8   frustrate discovery of this case.
 9          MS. LEE:  Just so the record is clear, because
10   we do have a written order on this, I was discussing the
11   samples already with the MDL which is the 245 samples
12   that were submitted before May 4th.  I don't know the
13   exact date, but it was before May 4th.
14          There's a subsequent group of samples that is
15   currently being split that the MDL plaintiffs counsel
16   representative has identified that they want split, and
17   they want pieces of, for lack of a better term, but
18   there's already samples in the MDL that have been in the
19   MDL before May 4th.
20          So there's another group that is currently being
21   split and handled to be put into the MDL.  That's already
22   been identified by them.  They have identified 50, I
23   believe there was 216 additional samples identified, and
24   the PSE then stated they would like 58 of the samples
25   split.  That doesn't mean there's not going to be any of
```

Page 44

```
 1   that sampling.
 2          That just means a portion of those 216 samples,
 3   58 of them will go into the MDL, but there will still be
 4   samples we will be in possession of that per your Honor's
 5   order we will not submit to the MDL.  So there's no lack
 6   of samples here, I guess, is my point.  It's all there.
 7          But the problem is, the reason why and what I
 8   wanted to explain was that the reason we originally
 9   directed plaintiff's counsel to the MDL is because it
10   currently has possession of some of those samples that
11   we've already given them.  So and they're all subject to
12   order.  Anyways, okay.  That's all it was.  Thank you.
13          THE COURT:  That issue is for another day, if
14   there is an issue still, so I think that's it for now.
15          MR. SATTERLEY:  Your Honor, August the 7th at
16   what time, 3:00 o'clock.
17          THE COURT:  I'm just asking for a report August
18   7th, and you can tell me in that report whether you're
19   ready to come back, whether you need more time, whether
20   you need a briefing schedule.
21          MR. SATTERLEY:  And so just so -- if I can
22   summarize and understand, 20 days for the samples, and
23   tomorrow we're going to get information regarding the
24   inventory, volume, source and date of the grids, and then
25   we're to meet and confer regarding the quantity that we
```

Page 45

```
 1   want to -- is that accurate?
 2          THE COURT:  I think that's right.  They're going
 3   to tell you tomorrow when they get the inventory.
 4          MS. LEE:  Right.  By tomorrow I will get you how
 5   long it would take to produce an inventory of the grids
 6   that are in our possession.  And the 20 days is to
 7   produce an inventory that includes weights and
 8   photographs of the sample that are available, the actual
 9   talc samples as opposed to grids.  That was my
10   understanding.
11          MR. SATTERLEY:  And label identifying the
12   number.
13          MS. LEE:  Label identifying the number,
14   photographs and weights.
15          MR. SATTERLEY:  Your Honor, I think that's it.
16   Ms. Clancy asked that I advise the court that she would
17   like to have one day next week, maybe early next week an
18   IDC in this case, and this relates to the judicial
19   discovery, Ms. Clancy has been handling the Imerys USA
20   jurisdictional discovery, and she's had difficulty and
21   reached the end of her ability to meet and confer
22   regarding written discovery.
23          THE COURT:  Well, what I'd ask is an e-mail get
24   sent that's cc'd to the other side.  I'm not going to
25   deal with it on an ex parte basis.
```

Aiken Welch Court Reporters     Hearing (Leavitt v. Johnson) 07-18-18    7/18/2018

Electronically signed by Erin Robinson (001-123-202-0439)                    4ad8dbf5-0047-43b3-9234-90cc69762a39

Page 46

1      MR. SATTERLEY:  Okay.  We did an e-mail to the
2  court.  We e-mailed the other side and they ignored us.
3      THE COURT:  Send a cc to them.
4      MR. SATTERLEY:  Yes.  So I didn't get to show
5  the video.
6      THE COURT:  Maybe someday.
7      (Whereupon, proceedings were adjourned
8      at 4:17 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

1              REPORTER'S CERTIFICATE
2
3      I, ERIN F. ROBINSON, a Shorthand Reporter, State of
4  California, do hereby certify:
5      That said proceedings were taken before me at
6  said time and place, and were taken down in shorthand by
7  me, a Certified Shorthand Reporter of the State of
8  California, and were thereafter transcribed into
9  typewriting, and that the foregoing transcript
10  constitutes a full, true and correct report of said
11  proceedings that took place;
12      IN WITNESS WHEREOF, I have hereunder subscribed my
13  hand this 22nd day of July 2018.
14
15
16
17
18  
    _Erin F. Robinson_
    ERIN F. ROBINSON, CSR NO. _____
19  State of California
20
21
22
23
24
25

13 (Pages 46 to 47)

Electronically signed by Erin  Robinson (001-123-202-0439)                                    4ad8dbf5-0047-43b3-9234-90cc69762a39