350 Mount Kemble Avenue
P.O. Box 1917
Morristown, New Jersey 07962
phone:  973-267-0058
fax:  973-267-6442
www.coughlinduffy.com

Wall Street Plaza
88 Pine Street, 28th Floor
New York, New York 10005
phone:  212-485-0105
fax: 212-480-3899



MARK K. SILVER, ESQ.
DIRECT DIAL: (973) 631-6045
EMAIL:   MSILVER@COUGHLINDUFFY.COM

January 24, 2019

**VIA ECF and Email**
The Honorable Freda L. Wolfson, U.S.D.J.
The Honorable Lois H. Goodman, U.S.M.J.
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

>  Re:   *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, **MDL No. 2738**

Dear Judge Wolfson:

Imerys hereby submits, without argument, the following supplemental authority.  On January 22, 2019, in the trial of <u>Dianne Henson v. Colgate et al</u>, Superior Court of California, JCCP Case No. 3674, Case No. BC702253, The Honorable Armen Tamzarian evaluated the exact same issue currently before the Court with respect to applicability of Julie Pier's marital communications privilege and the documents at issue.  Judge Tamzarian found that the marital privilege applied.  A copy of the transcript is attached for Your Honor's consideration.  (See Pages 151-163).

> Respectfully submitted,
> COUGHLIN DUFFY LLP
>
> */s/ Mark K. Silver*
> Mark K. Silver
>
> Nancy M. Erfle, Esq.
> Ann Field, Esq.
> Gordon & Rees Scully Mansukhani
> 121 SW Morrison Street, Ste. 1575
> Portland, OR 97204

MKS/

cc: Plaintiffs' Steering Committee (via ECF and e-mail)
    Susan Sharko, Esq. (via ECF and e-mail)
    Thomas Locke, Esq. (via ECF and email)

**In the Matter Of:**

DIANNE HENSON vs COLGATE-PALMOLIVE COMPANY

**HENSON TRIAL - P.M.**

*January 22, 2019*

Court Reporters, Videography, Trial Preparation

Videoconference Center

Oakland • San Francisco • San Jose

Sacramento • Irvine • Los Angeles

877.451.1580

www.aikenwelch.com



Aiken Welch COURT REPORTERS

```
 1           SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                 FOR THE COUNTY OF LOS ANGELES
 3   DEPARTMENT 3              HON. ARMEN TAMZARIAN, JUDGE
 4
 5   LAOSD ASBESTOS CASES            ) JCCP Case No. 4674
     _____)
 6                                    )
     DIANNE HENSON,                   )
 7                                    ) Case No. BC702253
                 Plaintiff,           )
 8                                    )
          vs.                         )
 9                                    )
     COLGATE-PALMOLIVE COMPANY, A     )
10   DELAWARE CORPORATION WITH ITS    )
     PRINCIPAL PLACE OF BUSINESS IN THE )
11   STATE OF NEW YORK, ET AL.,       )
                                      )
12              Defendants.           )
     _____)
13
14                         P.M. SESSION
15              REPORTER'S TRANSCRIPT OF PROCEEDINGS
16                      JANUARY 22, 2019
17
18   APPEARANCES:
19   For the Plaintiff:     WATERS & KRAUS LLP
                            BY:  JONATHAN GEORGE, ESQ.
20                               BART SEEMEN, ESQ.
                            3141 HOOD STREET
21                          SUITE 700
                            DALLAS, TEXAS 75219
22                          (214) 357-6244
23                          IOLA GALERSTON, LLP
                            BY: SAMUEL I. IOLA, ESQ.
24                          3838 OAK LAWN AVENUE
                            SUITE 840
25                          DALLAS, TEXAS 75219
                            (469) 443-4898
26
              (Appearances Continued Next Page)
27
     REPORTED BY:     DEBORAH MORIN, CSR NO. 11558
28                    OFFICIAL REPORTER PRO TEMPORE
```

Page 151

```
 1  APPEARANCES OF COUNSEL:  (Continued)
 2
 3  For the Defendant          FOLEY & MANSFIELD
    COLGATE-PALMOLIVE:         BY:  GARY SHARP, ESQ.
 4                                  PETER M. MULARCZYK, ESQ.
                                    KIMBERLY L. RIVERA, ESQ.
 5                             300 SOUTH GRAND AVENUE
                               SUITE 2800
 6                             LOS ANGELES, CALIFORNIA 90071
                               (213) 283-2100
 7
 8  For the Defendant          SELMAN BREITMAN LLP
    IMERYS TALC                BY:  JERRY C. POPOVICH, ESQ.
 9  AMERICA, INC.:                  EDWARD MARTINOVICH, ESQ.
                               6 HUTTON CENTRE DRIVE
10                             SUITE 1100
                               SANTA ANA, CALIFORNIA 92707
11                             (714) 647-9700
```

```
 1  CASE NAME:              DIANNE HENSON VS.
 2                          COLGATE-PALMOLIVE COMPANY
 3  CASE NUMBER:            BC702253
 4  ALHAMBRA, CALIFORNIA    JANUARY 22, 2019
 5  DEPARTMENT 3            HON. ARMEN TAMZARIAN
 6  REPORTER:               DEBORAH MORIN, CSR NO. 11558
 7  APPEARANCES:            (AS HERETOFORE MENTIONED.)
 8  TIME:                   1:39 P.M.
 9
10       (THE FOLLOWING PROCEEDINGS HELD IN OPEN
11       COURT OUTSIDE THE PRESENCE OF THE JURY:)
12
13       THE COURT:  Okay.  I have a document in front
14  of me.  It seems to be an e-mail dated March 22, 2004,
15  from Julie Pier to Robert Pier.  Has this been marked as
16  one of the exhibits for trial or not?
17       MR. GEORGE:  It is a trial exhibit.  I don't
18  know exactly what exhibit number it is.
19       MR. POPOVICH:  I do.  It is Plaintiff's
20  Exhibit 1089.
21       THE COURT:  All right.  And I take it -- well,
22  first let me ask.  Is this going to be put in front of a
23  witness that is going to testify about this?
24       MR. GEORGE:  Julie Pier is the most
25  knowledgeable for Imerys.  And during the course of her
26  deposition, this document came up and she testified
27  about it.
28       THE COURT:  Okay.  So are you going to call
```

Page 152

```
 1           I N D E X
 2      JANUARY 22, 2019; P.M. SESSION
 3
 4     CHRONOLOGICAL INDEX OF WITNESSES
 5
 6  PLAINTIFF'S        DIRECT   CROSS   REDIRECT   RECROSS
 7  PIER, JULIE          188
    (VIDEO PLAYBACK, NOT REPORTED)
 8
 9
10  DEFENDANTS'        DIRECT   CROSS   REDIRECT   RECROSS
11  (NONE)
12
13              EXHIBITS
14  PLAINTIFF'S    MARKED      RECEIVED    WITHDRAWN
    EXHIBIT        FOR I.D.    IN EVD.     OR REJECTED
15
    (NONE)
16
17
18  DEFENDANTS'    MARKED      RECEIVED    WITHDRAWN
    EXHIBIT        FOR I.D.    IN EVD.     OR REJECTED
19
    (NONE)
20
21
22     (COURT EXHIBIT NO. 1 MARKED AT PAGE 184.)
```

```
 1  Julie Pier?
 2       MR. GEORGE:  She's our next witness by video.
 3  It's about an hour and 20 minutes.
 4       THE COURT:  I got it.  And there's an
 5  objection to this document by Imerys.  True?
 6       MR. POPOVICH:  Yes.
 7       THE COURT:  What is the objection?
 8       MR. POPOVICH:  Marital privilege.
 9       THE COURT:  Is that the only objection?
10       MR. POPOVICH:  352 as well, which I can
11  explain as part of the argument.
12       THE COURT:  Was the marital privilege
13  objection -- that was in front of Judge Byrdsong?
14       MR. GEORGE:  Yes.
15       MR. POPOVICH:  Yes.  And he denied it without
16  prejudice.
17       MR. GEORGE:  It was actually before him twice.
18  Once in an MIL and it was also -- the objection was made
19  when he did the page/lines.  And he overruled it for the
20  page/lines.
21       THE COURT:  There should be an Evidence Code.
22       MR. GEORGE:  Here we go.  980, confidential
23  spousal communications privilege.
24       MR. POPOVICH:  Sounds right, Your Honor.
25       THE COURT:  Let me hear from plaintiff first.
26  Why does the marital privilege not apply?
27       MR. GEORGE:  Because this was an e-mail that
28  was done on a business server and there was no
```

Page 153

1  expectation of privacy, which is an objective standard.
2  And that's what Judge Byrdsong -- his tentative ruling
3  was.
4         MR. POPOVICH: And I can explain why this case
5  is different.
6         THE COURT: You would agree with the general
7  premise that if two people work for a company and they
8  talk to each other about company business, the marital
9  privilege doesn't apply.
10        MR. POPOVICH: Well, first of all, her husband
11 does not work for the same company she does. The
12 husband does not work for us. He works out on oil
13 platforms out in the middle of the ocean.
14        But the answer to that, unfortunately Your
15 Honor hasn't had the benefit of the MIL. It was defense
16 MIL No. 7. And I believe there is case law that
17 indicates that even if they're talking about work,
18 there's still a privilege.
19        It is a privilege we want to protect that a
20 husband and wife can talk and vent, which is what she's
21 doing in that e-mail, but it comes down to whether she
22 had an expectation, I believe.
23        There's no question it was a communication
24 between a wife and her husband. The question is did she
25 have a reasonable expectation of privacy by using a work
26 computer on a work server to send the e-mail to her
27 husband, who was far away and they would be out of
28 communication for periods of time.

Page 154

1         So if I could address why this is different.
2  Why this is different is because of the nature of her
3  husband's work. Ms. Pier would often be out of contact
4  with her husband for days, even a week at a time. They
5  have children during this time. So it became difficult
6  for her when she got promoted to the position she was in
7  at the time of this e-mail to communicate with her
8  husband because of different time zones and his work
9  schedule, and when he would have access to communication
10 to her often came when she was at work.
11        She asked her company for a special system
12 through which she could communicate with her husband.
13 The company's policy was not to allow personal
14 communications like that on the company's equipment, but
15 she asked for special permission and got it because of
16 their unique situation. So because of that, we argue
17 that she did have an expectation of privacy.
18        Now, it came about in the sweep for documents
19 in response to discovery when literally tens of
20 thousands of documents were produced --
21        THE COURT: Let me back up on that point. So
22 before this communication on March 22, 2004, she
23 actually had a discussion with her company to see if she
24 could get an exception to the rule that she couldn't use
25 the company server for e-mails?
26        MR. POPOVICH: For personal, yes.
27        THE COURT: For personal. So this is before
28 this date. It wasn't afterwards.

Page 155

1         MR. POPOVICH: Correct. And I could read
2  directly from her declaration which was in support of
3  the MIL. Paragraph 4 of her declaration said:
4            "I called my employer's I.T.
5         department and was informed that corporate
6         policy discouraged personal communications
7         from work computers. I asked for a
8         special exception based upon Robert's" --
9         her husband -- "travel situation and how
10        complex our work schedules are,
11        emphasizing that we often cannot
12        communicate by phone and often can only
13        reach each other at odd hours. My request
14        to privately communicate with my husband
15        using my work computer was granted and the
16        I.T. department also installed the instant
17        messaging service.
18           "I thereafter communicated with my
19        husband on both instant messaging and
20        using my work e-mail address on my work
21        computer with the knowledge that those
22        communications would remain private."
23        We would argue that subjectively she believed
24 that she was having private communications. When
25 discovery happened and tens of thousands of documents
26 were produced, it got swept up in it, and it wasn't
27 realized until after it was disclosed and turned over to
28 plaintiff's counsel in another case.

Page 156

1         THE COURT: But isn't it an objective
2  standard, I would imagine.
3         MR. POPOVICH: My argument is that it is
4  subjective as to whether she has reasonable expectation
5  of privacy. I would argue that it is a subjective
6  standard. And there is a different code section, which
7  I have the original argument, that indicates that it is
8  her privilege to hold or waive.
9         Waiver must be knowing. That makes it a
10 subjective standard. She did not subjectively give a
11 knowing waiver.
12        THE COURT: Wait a minute. I agree the waiver
13 part is subjective, but when you have the reasonable
14 expectation of privacy, that means it's an objective
15 standard.
16        The first issue is does the privilege apply at
17 all. So if on an objective basis it does apply, then
18 she can only waive it subjectively. On an objective
19 basis, if it does not apply, well, then you don't even
20 get to an issue of waiver.
21        So I think the first step, if everybody agrees
22 it's a reasonable expectation of privacy, that means
23 objective. She could still waive it, even if the
24 privilege applies, and that would be subjective. Do you
25 disagree with that analysis?
26        MR. POPOVICH: I can't disagree with Court's
27 logic. But going back to 980, it doesn't really talk
28 about a reasonable expectation of privacy. It talks

Page 157

1  about it was during the marital or domestic partnership
2  relationship -- I don't think that is disputed -- that
3  it was a communication between a husband and wife, and
4  it was made in confidence between him or her and the
5  other spouse while they were spouses.
6           I think all of those conditions apply.  And
7  then as it says -- it refers back to section 912, which
8  is the waiver.
9           THE COURT:  Waiver is a second step of the
10 analysis.  It's not part of it.  Wouldn't you agree the
11 case law interprets this as an objective analysis?
12          Let me give you an example.  It isn't these
13 facts.  Okay.  And she says, let's say, at a meeting of
14 the company some statement and he's there.  Objectively,
15 she doesn't have any privacy.  Whether she thinks so in
16 her mind or not really doesn't matter.
17          On an objective level, if she's blurting this
18 stuff out in front of other people, there's no
19 expectation of privacy.  That's an objective analysis.
20 So you still have an argument, but I'm having trouble.
21          MR. POPOVICH:  I agree with the Court saying
22 that.  It comes down to under an objective standard, as
23 the Court has identified, it was reasonable for her to
24 have that expectation that her communications with her
25 husband were in confidence given that she took the extra
26 step she did in order to make that happen.
27          THE COURT:  Let me ask this.  So does this
28 guy, Robert Pier, have anything to do with company

Page 158

1  business or it's just her husband?
2           MR. POPOVICH:  Nothing to do with company
3  business.  She was venting to him about company issues,
4  as a wife would to a husband.
5           THE COURT:  Let me hear from plaintiff.  If
6  that's true and she got this special permission to use
7  company e-mail, wouldn't that be an exception to the
8  general rule that if you use the company e-mail you have
9  no expectation of privacy?
10          MR. GEORGE:  Well, one thing about her
11 declaration, she never says when they actually
12 instituted this process.  So if she did that -- all she
13 says is that I asked them in February of 2003, and at
14 some time -- there's nothing in the declaration that
15 says when -- they agreed with me, and then sometime
16 thereafter I communicated with my husband on both
17 instant messaging and the other e-mail.
18          So there's no -- at least in the declaration,
19 there's no support for her conclusion that she had an
20 expectation of privacy because all these special
21 procedures had been instituted.
22          THE COURT:  So maybe the procedures were
23 instituted after this date and she should have been
24 cautious?
25          MR. GEORGE:  Yes.  You don't have an objective
26 expectation of privacy here if you e-mail your spouse on
27 company time.
28          THE COURT:  I agree with that as a general

Page 159

1  proposition.  If you're using company equipment to
2  e-mail to yourself about something while you're working
3  at the company, you don't have a reasonable expectation
4  of privacy.  I would agree with that general
5  proposition.  I haven't researched it, but that sounds
6  right to me.
7           MR. GEORGE:  But under these facts, if in fact
8  she was given permission, don't they have the burden of
9  showing that since they're trying to establish a
10 protection?  Don't they have the burden of showing that
11 in fact these procedures were instituted and therefore
12 she had a basis for expectation of privacy?
13          THE COURT:  Let me hear from defendant on that
14 issue.
15          MR. POPOVICH:  Paragraph 4 of her declaration
16 starts, in February of 2003, I had these issues.  It
17 goes through the part that I've already read into the
18 record and it indicates that the I.T. department also
19 installed the instant messaging service in response to
20 her request.
21          "I thereafter communicated with my husband on
22 both instant messaging and using my work e-mail
23 address."
24          THE COURT:  Could you hand that declaration to
25 the clerk.
26          So you're saying the word "thereafter" implies
27 that it was after it was installed?
28          MR. POPOVICH:  Yes.

Page 160

1           MR. GEORGE:  Understood.  But there's no time
2  limit for either when they installed it or the
3  thereafter.
4           THE COURT:  What do you mean by there's no
5  time limit?
6           MR. GEORGE:  They said, okay, I asked my
7  company in 2003 to do this.  She never says that they
8  did it on December of 2003.  So we know it's prior to
9  this e-mail.  We don't know when they instituted.  It
10 could have taken them a year, for all we know.  It's not
11 in the declaration.
12          And I maintain it's their burden since they're
13 asserting the privilege to have the facts necessary to
14 assert it.
15          THE COURT:  All right.  I just want to read
16 this quickly and then I have to make a decision.
17          Where was the part you said that the company
18 installed something?  Do you remember?
19          MR. POPOVICH:  Paragraph 4.
20          THE COURT:  Okay.
21
22          [Brief pause.]
23
24          THE COURT:  I think a fair reading of
25 Paragraph 4 is that the sequence of events was these
26 communications happened after this system was installed.
27 I would agree with you.  We don't know precisely when,
28 but we do know the order and that's what matters.

Page 161

          If they installed a system for instant
messaging and also the permission was granted for the
private communications before this date -- I agree it's
not crystal clear, but the best interpretation of this,
from my perspective, is that the sequence of events is
that she asked for permission to use the server, they
granted it, and then she communicated. And one of those
communications was the communication we're talking
about.
          It's not crystal clear. But I think that's
the better interpretation of this. And if that's the
case, it seems reasonable for her to assume nobody is
going to be looking at these communications with her
husband, especially since her husband is not -- he's not
an employee. This isn't part of company business.
          Do you want to have one last argument about
that, sir?
          MR. GEORGE: I think I'll submit on the
papers.
          THE COURT: The 352 argument is something to
think about. I guess this seems to be three layers of
hearsay. So what would be the probative value against
these defendants?
          MR. GEORGE: Well, the probative value is that
she admits that she's three years behind in looking at
the samples to determine whether there's asbestos or
not. And that is a statement against interest as well
as an admission since she's a corporate representative.

Page 162

          THE COURT: I get it. So then it's to do with
the T.E.M. --
          MR. GEORGE: Correct.
          THE COURT: Not that an outside lab told
Johnson & Johnson, who then told her -- who then told
her husband that there was a problem. That's not what
you're trying to admit it for. You're trying to admit
it for her admission that they were three years behind.
          MR. GEORGE: Well, and also her admission that
she acknowledged that there was going to be an expose
about asbestos. She knew that somebody was going to
write about the fact that there was asbestos in the
talc.
          THE COURT: Can't you prove that they were
three years behind some other way?
          MR. GEORGE: Only through her testimony, and
that's what her testimony is.
          THE COURT: And she doesn't admit it?
          MR. GEORGE: She does in her testimony, but
that's what they were trying to exclude.
          THE COURT: Well, I thought they were trying
to exclude this document, not what she --
          MR. GEORGE: Well, the document -- in fairness
to them, the document is read to her and then she
explains what it all means. So they're, I guess,
objecting to the component of it that was read to her,
which it's very intertwined, so it's difficult to
extricate.

Page 163

          THE COURT: Was she separately asked were you
behind on the T.E.M.s?
          MR. POPOVICH: Not in this particular
transcript. Yes in other transcripts. And I would say
if the Court sustains this objection, keeps out the
e-mail and when it is quoted, I would not object to a
late designation of page/line by the plaintiffs in order
to bring that testimony without reference to the e-mail.
          THE COURT: Okay. All right. I'm going to --
I think the marital privilege applies. I will at a
break go back and look at the papers, but I have to make
a decision because we need to march forward. I think
that's the better of the argument.
          Can we bring in the jury.

          (The jury entered the courtroom.)

          THE COURT: Are we ready?
          MR. POPOVICH: Good afternoon. Thank you for
your patience. We had some things to iron out. But it
is now my opportunity to speak with you on behalf of
Imerys Talc America about what we envision the facts and
evidence in this case will show.
          You've heard it emphasized from the time of
jury selection, and I will emphasize it again now. It
is the evidence that should decide this case. That's
what's fair.
          You've now seen pictures of Ms. Henson. Nice

Page 164

lady. Fishing with her grandkids. It would be
understandable that you would feel sympathy for anybody
with cancer, including Ms. Henson. But we need to be
focused on the facts here.
          And what we'll talk through is about some of
the science that you're going to be hearing. And in
particular, we're going to focus on epidemiology. It's
a word you've already heard a couple times this morning.
          Epidemiology is a little different than a lot
of other scientific disciplines. Epidemiology looks
back. A lot of science looks at now and then projects
forward. It is epidemiology that we use to study and
determine with hindsight -- and the saying is hindsight
is 20/20 -- we hope so -- that we look backwards, look
at what has happened, look what has happened to people
exposed to various substances and determine whether a
substance caused a disease.
          So it is with that 20/20 hindsight that we're
going to be showing that exposure to raw talc from a
mine like those of Cyprus, those of us, and Imerys, us,
did not cause Ms. Henson's mesothelioma.
          What the evidence is going to show is that a
medical procedure in 2009 to deal with breast cancer was
part of the treatment that saved Ms. Henson's life at
that time, but unfortunately after nine years that she
gained from undergoing the procedure, it's now impacting
her future.
          So I've got four what I call signposts.

Page 165

1  That's each of these boxes here.  We're going to talk
2  about the evidence that Ms. Henson did not get
3  mesothelioma from the use of talc-based products.  We're
4  going to look at the testing under approved guidelines
5  and how that shows that cosmetic-grade talc does not
6  have asbestos fibers.
7       We're going to look at the epidemiology.  The
8  science that I'm talking about shows no link between
9  large exposures to raw talc and mesothelioma.  And then
10 we're going to talk about at the end, what did cause
11 Ms. Henson's mesothelioma.
12      The first signpost is that she did not get it
13 from exposure to talc-based products.  To the extent
14 that I end up repeating things that you've already
15 heard, I'm going to shortcut it.  There are some things
16 in my presentation in opening statement here that
17 hopefully you did not hear before, but I do not want to
18 waste a lot of time with repetition.
19      Obviously I don't know what the other
20 gentlemen here are going to say, so when I prepared
21 this, I anticipated talking about everything.  So if I
22 shortcut it, please understand.
23      Talc is a mineral.  It's in the earth.  It has
24 chemical properties, but it is not a manmade chemical.
25 Here's a talc mine that's representative in Vermont.
26 Open mining there.  There's a truck carrying out loads
27 of talc.
28      So let's talk a little bit about asbestos.

Page 166

1  Asbestos is found naturally in the earth, just like
2  talc.  It's a mineral.  It can be mined.  It can be
3  used.  It was literally used in thousands of products at
4  its maximum usage in the '50s and '60s.  And asbestos in
5  the earth, there can be outcroppings.  Wind, disturbance
6  can release fibers that can be in the air.
7       Products that used to be made with asbestos
8  like brakes and clutches and autos, just as an example,
9  when they wear can release asbestos fibers, so that in
10 an urban environment we all breathe asbestos.  And
11 you've heard the term that's going to be used for that.
12 When it's not a point source for release of asbestos, we
13 call it background or ambient asbestos.
14      Now, you've already heard this part.  People
15 because of breathing in this background or ambient
16 asbestos have millions of fibers in their lungs.  That's
17 normal.  That's not something to be concerned about.
18      Science shows that exposure to those levels do
19 not cause mesothelioma.  So there is an exposure or what
20 we call a dose that does not cause disease.
21      Ms. Henson would be breathing background or
22 ambient air 24/7, 365 days a year, 72 years of her life
23 up to this point.  And that is called a lifetime dose of
24 asbestos from background exposures.
25      I'm trying to give some terms here because
26 it's going come up during the trial.  And hopefully
27 you'll feel somewhat grounded in where we're at and what
28 we're talking about.

Page 167

1       If there were no level at which there's no
2  disease, there would be an epidemic of mesothelioma and
3  other asbestos-related cancers.  And we absolutely do
4  not hear that.
5       You saw earlier statistics of 3,000, 3,200
6  cases of mesothelioma in a year.  That's a lot of
7  people.  For each individual, that's a big deal.  But in
8  the grand scheme of statistics in the United States,
9  each doctor will say that it's a very rare cancer at
10 that number.
11      The federal government has through OSHA, the
12 Occupational Safety and Health Administration, set forth
13 permissible exposure limits to many substances, one of
14 which is asbestos.  Now, OSHA governs the workplace.
15 There's no claim that Ms. Henson was ever exposed to
16 talcum powder products in a workplace, but these
17 guidelines or standards set out by the federal
18 government do help understand the level of exposures
19 that can happen in a workplace.
20      Somebody working eight hours a day, 40 hours a
21 week over years, and there is a level since the 1980s
22 that is permissible.  Someone could be exposed to .1
23 fibers/c.c.
24      Now, the easiest way to think of a c.c., which
25 is a cubic centimeter, is a sugar cube.  Roughly a cubic
26 centimeter.  So if it's .1 per c.c., well, you can't
27 have .1 of a fiber.  You could have one fiber, and that
28 would be allowed in every ten c.c.s of air in an

Page 168

1  eight-hour day, 40-hour a week working condition.  So
2  there is a level at which people can work around
3  asbestos.
4       Dose does make a difference.  We've got some
5  common substances here.  The fact that you can drink
6  water and stay alive or you can drink too much water and
7  die.  Same with coffee.  Salt, you can consume too much.
8  Oh, Aspirin with the N kind of fell off its place there.
9       So the reason the dose makes the difference is
10 the body is capable of handling certain levels of normal
11 substances like we're talking about or things that
12 potentially could cause disease.
13      Now, this part on the left is my absolute
14 favorite slide.  You've already heard the term
15 mucociliary escalator.  "Muco" for mucus, "ciliary" --
16 it's the ciliary from the cilia, hairlike structures in
17 the body that literally beat rhythmically together in
18 unison.
19      And that little purple bad guy there is some
20 toxin or pollen or allergen that has gotten into the
21 body's airway and the body is removing it.  All day long
22 when you're healthy, you have mucus coming into the back
23 of your throat which you swallow and don't even think
24 about.  You could expectorate it.  That's the way the
25 body defeats some of these toxins.  And the body has the
26 ability to handle a certain amount before those defenses
27 are defeated.
28      Something else at the cellular level is called

Page 169

1  a macrophage.  For those of you old enough to remember
2  the Pac-Man game, one of the first really fun video
3  games, that waka, waka, waka.  Do you remember?
4          But macrophages will be triggered to go to
5  some kind of a toxin.  Again, it could be a piece of
6  pollen, a piece of a fiber.  It could be a metal shaving
7  or something that's so tiny that it's inhaled.  And it
8  has the ability to engulf and remove that from the cell.
9          When the macrophage has engulfed -- and the
10 way it gets removed is it will be taken into the
11 lymphatic system.  Kind of a crude description of the
12 lymphatic system is the gutter system of the body.  We
13 just had a ton of rain around here last week.  I was wet
14 often enough to remember.  And the gutter systems whisk
15 away the water and get it out of our streets so that we
16 can drive and not swim.
17         Same with the lymphatic system.  Toxins and
18 things like that get removed to the lymphatic system and
19 the lymphatic system takes it into the waste system and
20 out it goes.
21         So these are just some of the body's defenses
22 that when we're talking about very small doses the body
23 can handle it.
24         Now, you're going to hear names.  And there's
25 a lot of talk often about corporations ducking
26 responsibility.  The evidence will be that in 1979,
27 which as you heard from Mr. Iola's opening statement is
28 essentially the beginning of Imerys, Cyprus providing

Page 170

1  raw talc to Colgate for Cashmere Bouquet, it starts in
2  1979.  At the time we were a Cyprus entity.
3          It then moved from 1992 to Luzenac America.
4  It's actually a French company, but that was their
5  American subsidiary.  And then that in 2011 became
6  Imerys.
7          There's no ducking.  If you hear those names,
8  and you will as the evidence comes out, those are
9  Imerys, and we are responsible for them if you find that
10 we did anything wrong.
11         Second signpost.  So testing under the
12 approved guidelines shows that cosmetic-grade talc does
13 not have asbestos fibers.
14         Actually when I'm done talking, you will
15 likely see video testimony from Julie Pier.  She is a
16 representative of Imerys and has been asked to speak on
17 our behalf and she is a lead scientist for Imerys.  She
18 handles and oversees much of the testing of raw talc
19 that's being done, and then that is then sold to the
20 customers.  And she's tested thousands of samples.
21         Okay.  So she will talk about that process.
22         The testing is done and performed, interpreted
23 under the protocols of the government.  Their testing is
24 performed using the equipment that is approved, using
25 the standards that are approved, and then actually
26 Imerys goes on and does further testing on its own using
27 some of the latest equipment to see very small
28 particles.

Page 171

1          Just a quick look.  You've already heard some
2  of this about the talc testing.  There's the X-ray
3  diffraction.  Polarized light microscopy.  T.E.M., which
4  is transmission electron microscopy, which has the
5  ability to see the smallest of the small, literally
6  magnifying tens of thousands of times.  And then the
7  scanning electron microscope.  All were used in the
8  testing of the raw talc.
9          So in order to assure that the talc we're
10 selling is the purest that we can find in nature and
11 also before we sell it, there's a process that happens.
12 First you've got to find the mine and figure out whether
13 it's worthwhile to mine for a particular talc, so that
14 geologists look at the initial landscape.  They look at
15 whether the mineral composition in the region makes
16 sense for an area to even consider mining.
17         Next step.  They do some exploration testing.
18 Core samples are taken.  I was going to draw this, but
19 I'm a lousy artist.  I'll try to describe it.  So if you
20 have an area of land that you think has talc, talc is
21 not going to be everything under the dirt.  There's
22 going to be pockets of it or veins of it or however you
23 want to consider it.  And they have to define the scope
24 of that talc.
25         If it's just a ton, it's not going to be worth
26 mining.  You've got to determine the extent of it and is
27 it worthwhile to mine, and then also the nature of it.
28 They can drill cores down and through the layers of talc

Page 172

1  to determine how thick it is, what's above it, what's
2  below it.
3          If they determine that there are areas of
4  minerals other than talc there, and not necessarily
5  asbestos -- there are many other minerals that could be
6  there that would make it an inappropriate place to mine.
7  They can determine those things as best they can.  With
8  those corings, they can kind of get an idea of the body
9  of talc that they are considering mining.
10         Then there is a systematic investigation
11 called the infield testing.  That's in 60-foot
12 increments.  Tests are done, sent to labs and analyzed.
13 Again the analysis is still at this point is it even
14 worthwhile?  Is it going to provide us with the type of
15 product that we want?
16         The next step is bigger testing, blast
17 testing.  They do that about every ten feet.  That again
18 is sent to the laboratory or is collected, lab samples
19 done, and it's part of the assessment process.
20         Now, once the decision is made for the mining,
21 the next step is that when the mine is pulling out talc,
22 analysis occurs.  Once the mining and milling process is
23 underway, there are spot checks.  There are European
24 subsidiaries, and sometimes they will send theirs to the
25 United States labs; the United States will send it to
26 European labs to check and see if it's consistently
27 finding the same results to make sure that one lab is
28 not testing right and another lab testing wrong or there

Page 173

are discrepancies. And then finally the air in mines in the mills is routinely tested.

We anticipate that there will be some testimony about count sheets or lab sheets in which these tests that I just described were performed. On occasion there will be a lab sheet that might say that in the sample one chrysotile -- that's one type of asbestos -- one chrysotile fiber is found.

Finding one chrysotile fiber does not mean that the talc has contamination with asbestos. That was determined because the talc samples would be put in a filter. Because asbestos is all around us, there needs to be concern that there is contamination of the filters because of that. And indeed, when they tested filters without any talc sample at all, sometimes they find a chrysotile fiber. So finding one does not mean that there's contamination of the talc.

Now, there's going to be a lot of talk about long, thin fibers, whether it is asbestos or whether it's an amphibole -- that's the other family of asbestos fiber -- whether it's an amphibole that has been crushed, and as a result of the crushing, is in the shape, length, very narrow width, and looks like a fiber.

Is that causing disease? Is that even an asbestos fiber?

There is sometimes confusion about what is asbestos and what is even a talc fiber. You did not

Page 174

hear in plaintiff's opening statement this morning that talc fibers cause mesothelioma. I don't think you will because that's not the science.

So there needs to be through the evidence understanding of what exactly it is that we're talking about. We need to know where samples are from. We need to know how they were tested. And that will be provided through the evidence, but it needs to be very specific.

This was just to show again you have the amphibole family and the serpentine family. This is not all six types of asbestos. It's just the four that we anticipate you're going to hear the most about during this. And some, like the serpentine, chrysotile at the bottom there, when it is in asbestiform -- in other words, actually asbestos -- it's called chrysotile. When it is in the nonasbestiform, the rock without being the asbestos, it's called antigorite.

But -- and you've heard this from Mr. Sharp, when you're talking about anthophyllite, tremolite, and actinolite, they don't have a different name. That's why if you're hearing anthophyllite that may be nonasbestiform.

The evidence on the defense side will be that nonasbestiform does not cause mesothelioma. So we need to hear is it anthophyllite or is it anthophyllite asbestos, which is the asbestiform. This is getting deep into the science, but you'll learn more as we bring this out through the experts.

Page 175

Already talked about that. Now, you will hear testimony through Julie Pier, if not today, then at another time, that there was a time her lab was behind in testing, way behind, such that samples came in and product was actually sold to customers before the testing was done.

What the evidence will also show is that when they caught up and actually did the testing, no asbestos was found that would have been sold before they did the testing. It was fine, just like all other prior tests had been.

Third signpost. Science shows no link between large exposures to raw talc and mesothelioma. We focus on the large exposures because the testimony will be that Ms. Henson's exposure, even though it was daily, if there was asbestos contamination of her talc -- you heard Mr. Sharp say we're assuming that for purposes of answering this question -- does this rate as a large exposure?

The answer is no. It is quite small. But who has large exposures is the miners and the millers. So again, epidemiology. You're going to be very knowledgeable in epidemiology before this is all through, but this is the study of causes, distribution, and control of disease in populations.

Quick examples. It goes all the way back to the Black Plague that they found out when they detained visitors and didn't let them in amongst the population,

Page 176

the disease quit spreading. That was some of the earliest indications that examining a group that was getting sick can lead you to conclusions that helped stop the sickness.

It was in the 1700s that they found out that citrus juice, citrus fruits can stop scurvy. Probably the most easily identifiable example is smoking. People were getting lung cancers in droves. And they learned that almost all those people smoked. And so it was epidemiology looking back at what's going on that made that connection between smoking and lung cancer so that steps could be taken.

Well, when you look at the miners and millers, they're the ones who are going to be the most effective. You've got the miners -- it's a dirty job -- in there with the raw talc taking it out of the mines. You've got the millers, people dealing with the refining of the talc into talcum powder that can then be sold to customers and put into things like Cashmere Bouquet.

These are the people with the highest exposures. Mr. Sharp talked about the fact that they looked -- science looked back at the miners and millers of asbestos, and they were getting sick a lot. Why not go to the people who have the highest exposures if you're going to try to determine is that substance causing a particular disease?

And what the epidemiology has shown is that when they studied the miners and millers -- there were

Page 177

    1   over 1,722 miners and millers studied over 67 years --
    2   no mesothelioma.  When you compare that to asbestos
    3   miners and millers, the numbers were outrageously high.
    4           The data I just gave you comes from the
    5   studies.  And every one of the studies came up with a
    6   zero.
    7           Now, you saw the number on my last slide,
    8   1,722, I believe.  And if you look at the cohorts here,
    9   if you just add those up, a much bigger number, what you
   10   understand is that the cohort, the group of workers as a
   11   miner or miller was studied multiple times.
   12           Some of these studies are looking at the same
   13   people.  They're looking at them 30 years, 40 years, 60
   14   years after their exposures began by working with talc.
   15   So there's overlap.
   16           But when it comes down to it, these studies
   17   show with 20/20 hindsight that people exposed to
   18   cosmetic-grade talc do not get mesothelioma.
   19           Switching gears with you a little bit.  Going
   20   back to the medical side.  Pleural plaques.  Do you
   21   remember the pleura is that very thin lining around the
   22   lung?  There's one part of it that is adhering to the
   23   lung.  Another part of it that's adhering to the chest
   24   cavity.  And with those two layers of Saran wrap thin
   25   membrane and fluid between, when we breathe we don't
   26   have pain.
   27           You've heard of the disease pleurisy.  That's
   28   when there's inflammation in that pleura and breathing

Page 178

    1   is excruciating pain.  It is that process and part of
    2   the body that makes that possible.
    3           So one of the things that we can look at for
    4   someone that might have asbestos exposure is pleural
    5   plaques.  In that pleura, is there scarring that could
    6   have come from asbestos?
    7           Now, other things can cause scarring in the
    8   pleura, but one of them certainly is asbestos.  In
    9   Ms. Henson's spot, none.
   10           Pleural thickening can also be caused by many
   11   things, but one of them is asbestos exposure.  If you
   12   find it, you need more investigation, but in Ms. Henson,
   13   none.
   14           The objective signs of asbestos exposure are
   15   not in Ms. Henson.  The only thing that could arguably
   16   be a sign of asbestos exposure in her is mesothelioma.
   17   But we do have the ability to look at her condition and
   18   decide, find that there is another cause, which we're
   19   about to get to.
   20           So looking backwards, as I've been talking
   21   about, that science, the epidemiology is overwhelming in
   22   showing that use of talc, talcum powder is not going to
   23   cause the disease mesothelioma.
   24           Final signpost, what we believe really caused
   25   her mesothelioma.  In 2009 she has breast cancer on the
   26   right.  It's treated with chemo and radiation, and the
   27   radiation would have been the entire breast right up to
   28   the midline of the sternum.

Page 179

    1           Now, her mesothelioma is on the left pleura,
    2   but if -- and it's hard to get a visual on this unless
    3   you've actually had an anatomy class or something where
    4   you've worked with cadaver -- the lung is there's a top
    5   part of it, there's a bottom part of it.  And it comes
    6   all the way over to the midline.
    7           And that is where her mesothelioma started is
    8   under the sternum, right in the area where the radiation
    9   occurred, and it happened about nine years after the
   10   radiation.
   11           There's a term called latency, which is
   12   exposure to disease time period, and the doctors will
   13   indicate that when radiation is involved, nine years is
   14   plenty of latency.  Plenty of time for that radiation to
   15   have caused her mesothelioma.
   16           That's what the radiation machine looks like.
   17   We know from the medical records the model of the
   18   radiation machine.  And these are pictures of not the
   19   one that would have been used for her, but pictures of
   20   the same model.
   21           More education.  Radiation is measured in
   22   grays, G-R-A-Y-S.  Doses of radiation for treatment are
   23   given in centigrays.  One gray is a hundred centigrays.
   24   Ms. Henson received a standard dose of 5,040 centigrays
   25   of radiation and 20 fractions over 38 days.  That's
   26   where I stopped.
   27           Mr. Sharp had 5,940 centigrays, and that's
   28   because after this standard dose, which treats the

Page 180

    1   entire breast, there was a focus treatment for 900 more
    2   centigrays.
    3           Compare the dose she had to a dose that has
    4   been considered to cause cancer.  It's multiple times
    5   that level.  When you compare them to ordinary doses of
    6   radiation, you could actually get .01 centigrays by
    7   flying from New York to London.  You can .3 centigrays
    8   just for a standard mammogram.  So they're small
    9   compared to the treatment level of radiation.
   10           There will be no dispute among the doctors
   11   from any side that radiation causes secondary cancers.
   12   It's not just mesothelioma.  It can cause many different
   13   types of cancers depending on where in the body you're
   14   receiving the radiation.  It is an acknowledged by
   15   medical science cause of mesothelioma.
   16           So one of the experts we're going to bring in
   17   to talk to you is an expert in radiation oncology.  His
   18   name is Chris Kelsey.  He's going to talk to you about
   19   Ms. Henson's radiation treatment.  And he's going to
   20   talk about where the radiation was and where the
   21   mesothelioma started.  The plaintiffs will not bring you
   22   a radiation oncologist as far as providing testimony.
   23           I've already told you about where it was.  I
   24   want to focus on this last point here.  And Mr. Sharp
   25   showed you a picture of a wedge.  A breast is thicker in
   26   places and thinner in places.  The wedge helps
   27   distribute the radiation in a way so that the thicker
   28   part gets more, the thinner part gets less, so that the

Page 181

1  thinner part is not overradiated and the thicker part is
2  not underradiated.
3         One impact of using a wedge is something
4  called scatter.  They focus the radiation as much as
5  they can, but they want to make sure that they're
6  covering enough tissue to treat the cancer.
7         When you use the wedge, scatter happens, and
8  even would extend into the other side of the chest, so
9  that when there is talk about right breast cancer
10 treatment with radiation, left side of mesothelioma,
11 this scatter can also contribute to reaching the tissue
12 where she ultimately began her mesothelioma.
13        Dr. Kelsey will inform you that she received
14 enough radiation to cause her mesothelioma.  We're also
15 going to call Dr. Chirieac, who is an expert in
16 pathology.  In the United States arguably the best
17 person when it comes down to studying the impact of
18 radiation and what causes radiation-induced cancers.
19        And what he has learned through his studies is
20 that when you compare a mesothelioma caused by asbestos
21 to a mesothelioma caused by radiation, they don't follow
22 the same patterns.
23        Tumors caused by radiation grow more slowly.
24 You're going to hear in the testimony that based on the
25 latest medical information we have on Ms. Henson that
26 her tumor essentially is not growing right now.  She has
27 decided not to undergo treatment.  So we know treatment
28 isn't causing the tumor not to grow.

Page 182

1         We know that this is just a natural process.
2  And mesotheliomas caused by asbestos are some of the
3  most aggressive tumors known to science.  Hers is not
4  growing.
5         So it will be part of Dr. Chirieac's testimony
6  that her mesothelioma was caused by radiation as well.
7         Now, one last topic here.  And it may seem
8  quite cold to talk about this.  But for this jury to
9  understand Ms. Henson's condition, what she's going
10 through, you all need to understand through evidence
11 what her total medical picture is.
12        And we will be bringing a doctor -- and I'll
13 show you his picture in a moment -- who will talk about
14 her other conditions other than cancer.
15        Ms. Henson has C.O.P.D., which can be a couple
16 different diseases.  In her case it's emphysema.  And
17 she's a 58-pack-year smoker.  She smoked a pack a day
18 since she was young.  And at the time we took her
19 deposition last year, she was still smoking.
20        When there is discussion about her using
21 oxygen, it's not because of mesothelioma.  It's because
22 of C.O.P.D. and emphysema.
23        She has a history of strokes, so blood flow to
24 the brain is a problem for her.  She has been diagnosed
25 with dementia of a type that is related to lack of blood
26 flow up through the neck.  That's consistent with a
27 history of strokes as well.  She's got Type 2 diabetes.
28 She's been diagnosed with congestive heart failure.  And

Page 183

1  she's had a history of heart attacks as well.
2         All of these things impact what her life
3  expectancy would be if this cancer never happened.
4         And Dr. Brown is a cardiologist from central
5  California, and he'll be brought in to talk about these
6  other issues, the impact on her life expectancy,
7  irrespective of any cancer.  And it is his opinion that
8  she will pass away from something other than
9  mesothelioma.
10        Ladies and gentlemen, on behalf of Imerys, I
11 very much appreciate your attention following lunch.
12 It's a tough time often.  We look forward to presenting
13 this case.  And in the end, we will be arguing to you
14 that the evidence reflects that Imerys is being blamed
15 for something it did not do in this courtroom.  Okay.
16        Thank you so much.
17        THE COURT:  All right.  Thank you to all
18 counsel.  Let's start by calling your first witness.
19        MR. GEORGE:  Your Honor, can we have just a
20 few minutes to adjust the tape?
21        THE COURT:  Of course.  So we're going to
22 have -- the first witness is going to be by videotape
23 and we need a little bit of time to adjust it for you
24 folks.  So this would be a good time for a break.  So
25 why don't -- how much time are you going to need?
26        MR. GEORGE:  Like ten minutes.
27        THE COURT:  All right.  Why don't we take
28 approximately a ten-minute break.

Page 184

1         (Recess taken.)
2
3         (THE FOLLOWING PROCEEDINGS WERE HELD
4         OUTSIDE THE PRESENCE OF THE JURY:)
5
6         THE COURT:  So off the record the parties
7  agreed that in lieu of the court reporter trying to take
8  down what's on the videotape, we're going to accept a
9  transcript as what was said on the videotape.  Can we
10 mark that as an exhibit?
11        MR. GEORGE:  We can mark it as -- is this the
12 first court exhibit?
13        MR. MULARCZYK:  If you're separating out the
14 402 hearing, then yes.
15        THE COURT:  Yes.  We are separating out the
16 402 hearing.  Would this be the court exhibit?
17        MR. GEORGE:  This is marked for
18 identification.
19        THE CLERK:  Court Exhibit 1.
20        THE COURT:  Okay.  We'll call it court
21 Exhibit 1.
22
23        (COURT Exhibit 1 marked for
24        identification.)
25
26        THE COURT:  Let me just get a clear statement.
27        Do all three sides stipulate that that
28 transcript is a true transcript of what this witness is

Page 185

1  going to say in the videotape?
2      MR. GEORGE: Yes.
3      MR. POPOVICH: Yes. And if the video in any
4  way -- no offense to our technician, if there's any
5  discrepancy, we can point it out afterwards.
6      MR. GEORGE: We'll just mark it on the
7  transcript so the transcript will actually reflect what
8  was played.
9      THE COURT: Okay. Plaintiff agree to that?
10     MR. IOLA: Yes, Your Honor.
11     MR. SHARP: And, Your Honor, on behalf of
12 Colgate, Ms. Pier is not being offered as a witness
13 against Colgate, and as a result, we have not reviewed
14 the testimony. However, we agree for the purposes of
15 stipulation that the process that has been agreed on by
16 the other parties. So we would so stipulate.
17     THE COURT: All right. So you stipulate to
18 the transcript which will be Court's Exhibit 1. And
19 then I have a special instruction. I take it this is
20 the limiting instruction the parties are asking me to
21 read to the jury before the tape is played. True?
22     MR. SHARP: Yes, Your Honor.
23     THE COURT: And everybody stipulates to this
24 limiting instruction. Plaintiffs?
25     MR. IOLA: Yes.
26     MR. POPOVICH: Yes.
27     MR. MULARCZYK: Yes.
28     MR. GEORGE: Last thing, Your Honor. Just for

Page 186

1  your purposes for tonight, this testimony is an hour and
2  9 minutes, which will take around 4:00.
3      I've got a 20-minute, if you want to play it,
4  or I can save it for another time.
5      MR. IOLA: To be clear, an additional
6  20-minute video that we can play on the back of this if
7  we have time, or we can save it. I guess we'll know
8  when we get there.
9      THE COURT: We'll, that's a close call. Let's
10 see what time it actually is, and I'll look at how
11 agonized the jury is.
12     MR. GEORGE: I'm just giving you a heads up
13 that we have it.
14     MR. IOLA: Your Honor, can we just take one
15 second to lift the screen up?
16     THE COURT: Yes. Can we go off the record for
17 a moment.
18     MR. IOLA: Of course.
19
20     [Brief pause.]
21
22     (The jury entered the courtroom.)
23
24     THE COURT: All right. Welcome back,
25 everybody. Sorry for the delay. Just to let you know,
26 the delay occurs sometimes because we're talking about
27 ways to streamline the case, so we're not trying to
28 waste your time. We're trying to make the case go by

Page 187

1  more quickly.
2      All right. So the parties have agreed on a
3  certain instruction that I'm going to read to you before
4  a videotape deposition is played to you. Okay? Here's
5  the instruction.
6      You will now be presented testimony and
7  exhibits by deposition. A deposition is testimony by an
8  individual that is taken prior to trial. At a
9  deposition, the witness is sworn to tell the truth, the
10 same as in trial.
11     You must consider the deposition testimony and
12 any exhibits being presented to you in the same way as
13 you consider evidence given in court. The witness will
14 be testifying as a representative of Imerys Talc
15 America, Inc. As such, you may consider this evidence
16 only as to Imerys and not Colgate.
17     Okay. So this evidence is being submitted
18 against Imerys. It is not being submitted against
19 Colgate.
20     Are we ready?
21     MR. IOLA: Yes, Your Honor. At this time the
22 plaintiff calls by video deposition, Julie Pier, a
23 corporate representative for Imerys Talc America.
24     THE COURT: Okay. We're going to dim the
25 lights so you can see a little better.
26 ///
27 ///
28 ///

Page 188

1      (Excerpts from the video deposition of
2      JULIE PIER were played and not reported
3      pursuant to California Rules of Court
4      2.1040(d).)
5
6      THE COURT: All right. I think that's about
7  as much information as we're going to give you today.
8  We'll see you tomorrow at 9:00 A.M. Have a good night.
9
10     (The jurors exited the courtroom.)
11     (The following proceedings were held
12     outside the presence of the jury:)
13
14     THE COURT: Okay. I just want to make sure
15 there wasn't a mistake because I essentially read her --
16 almost the entire e-mail read into the record. So I
17 don't know what that motion was about.
18     MR. GEORGE: That was our agreement.
19     MR. POPOVICH: There was no reference to the
20 e-mail. There was reference to the facts referenced in
21 the e-mail. They took out -- other than one mistake,
22 yes. There was some reference to e-mail, but it was
23 generic. There's no way the jury would know that's an
24 e-mail to her husband.
25     I think that captured what I said at the end
26 of argument, which is they can get the facts in, not the
27 e-mail itself.
28     THE COURT: I just wanted to make sure there

Page 189

1  wasn't a mistake.
2        MR. GEORGE:  We protected her privacy.
3        THE COURT:  Anything we need to talk about
4  before we go off the record?
5        MR. GEORGE:  So for the exhibits, this
6  deposition -- if the defendant doesn't have any
7  objection, if he wants me to put the true exhibit
8  numbers on it, I'll do that this evening and we'll do
9  that in the morning and admit it.
10       THE COURT:  Great.  And perhaps the parties
11  can stipulate that certain exhibits were talked about in
12  the deposition.  I mean, I was trying to take notes.
13  Are you going to try to have them admitted into
14  evidence?
15       MR. GEORGE:  Yes.
16       THE COURT:  Okay.
17       MR. GEORGE:  We'll do it in the morning.
18  There's no objection from the defense.  I'll show them
19  what I'm going to admit before I admit it.
20       THE COURT:  All right.  Great.
21       MR. POPOVICH:  And we would need to give the
22  jury a reference point that Exhibit 4 in the deposition
23  equals exhibit -- trial exhibit whatever.
24       MR. GEORGE:  What I could do is I'll just put
25  the true exhibit number on the document, and then the
26  exhibit number that was in the deposition will be here
27  as well.
28       MR. POPOVICH:  As long as it's clear, that's

Page 190

1  fine.
2        THE COURT:  I think it is a good idea to maybe
3  come up with a stipulation.  For example, deposition
4  Exhibit 4 for Julie Pier is Exhibit 86 or whatever it is
5  here.  So that there's no confusion.
6        MR. GEORGE:  I can do that as I introduce them
7  so the jury will have an idea of how they match up.
8        THE COURT:  Okay.  Great.  Anything else we
9  need to talk about on the record?  Housekeeping?
10       MR. IOLA:  Yes.  Very briefly, Your Honor.  I
11  obviously have the court's ruling in regards to
12  Dr. Finkelstein.  I wanted to bring the court's
13  attention to one thing.
14       I understand the court's -- the court's ruling
15  about Dr. Finkelstein's ability to rely on the Gordon
16  paper and the samples.  That won't be allowed.  I did
17  want to bring the court's attention that at the hearing
18  with Judge Byrdsong, the plaintiffs had a motion in
19  limine No. 8, which was in regards to all the Italian
20  epidemiology studies.
21       And if I'm reading the tea leaves a little bit
22  on the court's order in regard to Dr. Finkelstein, I
23  think it's important that Your Honor understand that
24  Judge Byrdsong in the transcript of the hearing said
25  that for the Italian epidemiology studies, he was
26  inclined and actually did grant the motion excluding the
27  studies on chain of custody and authentication issues
28  that are very similar to what we're dealing with in the

Page 191

1  Gordon paper, and so ultimately the court ended up
2  saying instead of keeping them both out, I'm going to
3  let them both in.  And that's how we ended up with the
4  ruling that we did.
5        He ultimately overruled himself as to the
6  Rubino paper but only because he let in the Gordon
7  paper, and he saw them as very similar and having
8  similar issues.
9        If the court is going to ultimate -- and I'm
10  not saying that this is the court's directive, but if
11  the court was inclined to keep out the Gordon paper and
12  the samples, I think the court has to revisit
13  plaintiff's motion in limine No. 8 on the epidemiology
14  in all fairness and to be consistent with what happened
15  in front of Judge Byrdsong, and I think you'll see the
16  issues.  I know Your honor has not read this motion.
17  I'm talking in the abstract.  I would simply recommend
18  that we can provide a copy to the court if the court
19  does not have one.  Think on it, and then we can talk
20  about it a little bit later.
21       THE COURT:  I think you make a good point.  I
22  don't know if we necessarily need to go back to whatever
23  Judge Byrdsong said, but I think you make a good point
24  in that we want to make sure the rulings are consistent
25  in both directions.
26       So if there is -- if there is an objection to
27  some study because of chain of custody issues that are
28  similar -- no?  We've got a shaking of the head.  I'll

Page 192

1  keep an open mind to that.
2        So what is it I should be doing now?  Are you
3  seeking to exclude some study based on what you think
4  are similar arguments of chain of custody that you think
5  I should revisit?  Is that fair?
6        MR. IOLA:  Exactly, Your Honor.  I think if
7  you just read plaintiff's motion in limine No. 8 to
8  exclude the Rubino study and all the other Italian
9  epidemiology studies that come after it and you read the
10  defense's opposition, that will be plenty for the court
11  to understand the interaction between these motions,
12  especially considering that on Colgate's urging, the
13  court read the motions in limine No. 1 and No. 2 in
14  regards to Gordon, and I think this dovetails nicely
15  with that, and I would simply recommend the court read
16  it, and then we'll have the discussion at a later time.
17       THE COURT:  Is it fair to say you disagree
18  with their argument that it's a mirror image?  Is that
19  fair to say?
20       MR. MULARCZYK:  Absolutely.
21       THE COURT:  All right.  I don't know the
22  answer.
23       MR. MULARCZYK:  So to say that it deals with
24  samples and chain of custody, I guess the court will
25  find out when it reads the papers if it decides to do
26  so.
27       I don't think that anything the court learned
28  via Finkelstein about the samples is at all related to

Page 193
1  what the issue about epidemiological studies is.  It's
2  apples and oranges.  To be fair, in terms of how this is
3  being addressed right now, this seems to me this is an
4  argument that should have been made at the time we were
5  arguing this before openings took place, not to throw
6  this in now knowing what the circumstances are and the
7  openings hadn't taken place.
8           So the appropriate time to have raised this,
9  if we were bargaining, which is what Mr. Iola is doing
10 now based on the court's ruling, is that, well, hey
11 you've ruled this way, then let's go ahead and revisit
12 that other thing.
13          THE COURT:  To be clear, I don't think there's
14 any bargaining going on, and I think this could come up
15 in the sense that you're going to try to get in certain
16 evidence and they make an evidentiary objection, I
17 should be prepared for that evidentiary objection.
18          So I think it is worth looking at those
19 arguments and perhaps considering some kind of argument
20 outside the presence of the jury.  I don't think
21 anything I did with respect to Dr. Finkelstein
22 necessarily relates to this, but it's certainly worth
23 looking at.  I'm going to do my best to be
24 intellectually consistent.
25          MR. MULARCZYK:  I have no problem with that.
26 So does that mean that the court wants to be prepared to
27 talk about this tomorrow morning before we start with
28 witnesses or what does --

Page 194
1          THE COURT:  I don't think so.  This sounds
2  like this would come in when the defendants start their
3  case so we have a little bit of time to deal with this,
4  and I think plaintiff's counsel was just giving me the
5  heads up this is an argument we're going to be making,
6  so maybe you should prepare for it, Judge.
7          MR. IOLA:  That's exactly right, Your Honor.
8          And I just -- you know, the allusion that
9  Mr. Mularczyk made to me sitting on this intentionally
10 when I received the court's ruling minutes before I
11 opened.  I opened the entire morning, listened to the
12 other side, and then I finally got to read the decision
13 in its entirety at lunch -- I just have to say is wrong,
14 and it's not something that I would intentionally do.
15          I'm bringing it up to the court as soon as I
16 possibly can.  I just feel an obligation to say that,
17 Your Honor, and I apologize if it takes up your time.
18          THE COURT:  No, no.  I understand that.  I'm
19 going to decide any motions on the merits, not on what
20 we just talked about as far as timing of bringing up the
21 objection.  I'm going to look at each thing on the
22 merits.  Maybe it is the mirror image; maybe it isn't.
23 But it's worth looking at so that I'm prepared for an
24 argument that plaintiff says he's going to make.
25          MR. GEORGE:  You have copies of the MILs?
26          THE COURT:  I think so.
27          MR. MULARCZYK:  This will also come up in the
28 context of cross-examination as well.  So I don't know

Page 195
1  whether the court will read this and feels that this
2  can't be raised at all.  I don't know what the court
3  will do with this.  So it's just as much of an issue
4  during cross-examination as it is in the defense case,
5  so it's coming up sooner rather than later.
6          THE COURT:  All right.  Well, I haven't made
7  any rulings.  I'm just listening to what you're saying.
8          Anything else we need to say on the record, or
9  can we go off the record?
10         MR. IOLA:  No, not from the plaintiffs.
11         MR. POPOVICH:  Off the record is fine.
12
13         (At 4:22 P.M. the proceedings were
14         adjourned.)
15                        * * *

---

             SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   FOR THE COUNTY OF LOS ANGELES
DEPARTMENT 3                    HON. ARMEN TAMZARIAN, JUDGE

LAOSD ASBESTOS CASES              ) JCCP Case No. 4674
_____)
                                  )
DIANNE HENSON,                    )
                                  ) Case No. BC702253
          Plaintiff,              )
                                  )
     vs.                          )
                                  )
COLGATE-PALMOLIVE COMPANY, A      )
DELAWARE CORPORATION WITH ITS     )
PRINCIPAL PLACE OF BUSINESS IN THE)
STATE OF NEW YORK, ET AL.,        )
                                  )
          Defendants.             )
_____)


     I, DEBORAH MORIN, CSR NO. 11558, OFFICIAL REPORTER
PRO TEMPORE OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,
FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE
FOREGOING PAGES, 151 THROUGH 195, COMPRISE A FULL, TRUE AND
CORRECT TRANSCRIPT OF THE PROCEEDINGS AND TESTIMONY TAKEN IN
THE ABOVE-ENTITLED CAUSE ON JANUARY 22, 2019.
     DATED THIS 23RD DAY OF JANUARY, 2019.

     _____, CSR NO. 11558
     DEBORAH MORIN, OFFICIAL REPORTER