# EXHIBIT B1

Alan Campion, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:  JOHNSON & JOHNSON      )
TALCUM POWDER PRODUCTS         )
MARKETING, SALES PRACTICES     )
AND PRODUCTS LIABILITY         ) MDL NO:
LITIGATION                     ) 16-2738 (FLW) (LHG)
                               )
THIS DOCUMENT RELATES TO       )
ALL CASES                      )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF

ALAN CAMPION, Ph.D.

JANUARY 9, 2019

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Alan Campion, Ph.D.

## Page 2

1    ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF ALAN

2    CAMPION, PH.D., produced as a witness at the

3    instance of the Defendants Johnson & Johnson

4    entities, and duly sworn, was taken in the

5    above-styled and numbered cause on January 9, 2019,

6    from 9:16 a.m. to 2:58 p.m., before Karen L. D.

7    Schoeve, CSR, RDR, CRR, in and for the State of

8    Texas, reported by computerized machine shorthand,

9    at the Hilton Austin, 500 E 4th St, Austin, Texas,

10   pursuant to the Federal Rules of Civil Procedure and

11   the provisions stated on the record or attached

12   hereto.

13      It is further agreed that Rule 30(b)(5) is

14   waived by agreement of the parties.

15

16

17

18

19

20

21

22

23

24

## Page 3

1           A P P E A R A N C E S
2
3    FOR PLAINTIFFS' STEERING COMMITTEE:
4       DAVID P. DEARING, ESQUIRE
        P. LEIGH O'DELL, ESQUIRE
5       BEASLEY ALLEN, P.C.
        218 Commerce Street
6       P.O. Box 4160
        Montgomery, Alabama 36104
7       T: 334.269.2343
        F: 334.954.7555
8       david.beasley@beasleyallen.com
        leigh.odell@beasleyallen.com
9
        --AND--
10
        RICK YELTON, ESQUIRE
11      BURNS CHAREST LLP
        365 Canal Street, Suite 1170
12      New Orleans, Louisiana 70130
        D: 504.930.4746
13      T: 504.799.2845
        F: 504.881.1765
14      ryelton@burnscharest.com
15
16   FOR DEFENDANTS JOHNSON & JOHNSON ENTITIES:
17      ALEX V. CHACHKES, ESQUIRE
        ORRICK HERRINGTON & SUTCLIFFE LLP
18      51 West 52nd Street
        New York, New York 10019-6142
19      D: 212.506.3748
        T: 212.506.5000
20      achachkes@orrick.com
21      --AND--
22
23
24

## Page 4

1    A P P E A R A N C E S (Continued)
2
3    JACK N. FROST, JR., ESQUIRE
        DRINKER BIDDLE & REATH LLP
4       600 Campus Drive
        Florham Park, New Jersey 07932-1047
5       D: 973.549.7296
        T: 973.549.7000
6       F: 973.360.9831
        Jack.Frost@dbr.com
7
8
9    FOR DEFENDANT IMERYS TALC AMERICA, INC.
10      KENNETH J. FERGUSON, ESQUIRE
        JENNIFER FOSTER, ESQUIRE
11      GORDON REES SCULLY MANSUKHANI, LLP
        816 Congress Avenue, Suite 1510
        Austin, Texas 78701
12      D: 512.582.6472  (Mr. Ferguson)
        D: 512.582.6477  (Ms. Foster)
13      F: 512.391.0197
        F: 512.391.0183
14      kferguson@grsm.com
        jfoster@grsm.com
15
        --AND--
16
        MARK K. SILVER, ESQUIRE
17      COUGHLIN DUFFY LLP
        350 Mount Kemble Avenue
18      P.O. Box 1917
        Morristown, New Jersey 07962
19      D: 973.631.6045
        T: 973.267.0058
20      F: 973.267.6442
        msilver@coughlinduffy.com
21
22
23
24

## Page 5

1    A P P E A R A N C E S (Continued)
2
3    FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL:
4       RENEE B. APPEL, ESQUIRE
        SEYFARTH SHAW LLP
5       975 F Street, N.W.
        Washington, D.C. 20004
6       D: 202.828.5371
        T: 202.463.2400
7       F: 202.828.5393
        rappel@seyfarth.com
8
9
10   FOR DEFENDANTS PTI ROYSTON LLC AND PTI UNION LLC:
11      TARIQ M. NAEEM, ESQUIRE
        TUCKER ELLIS LLP
12      950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113-7213
13      D: 216.696.3675
        T: 216.592.5000
14      F: 216.592.5009
        tariq.naeem@tuckerellis.com
15
16   ALSO PRESENT:
17
        Shane Ramirez, Videographer
18
19
20   THE COURT REPORTER:
21      Karen L. D. Schoeve
        Certified Shorthand Reporter
22      Certified Realtime Reporter
        Registered Diplomate Reporter
        Realtime Systems Administrator
23
24

2 (Pages 2 to 5)

Alan Campion, Ph.D.

Page 6

1                    INDEX
2                              PAGE
3    Appearances                    3
4
5    ALAN CAMPION, Ph.D.
6        Examination By Mr. Chachkes        9
7    ****AFTERNOON SESSION****
8        Examination Continued By Mr. Chachkes    136
9        Examination By Mr. Ferguson        145
10       Examination By Mr. Dearing        177
11       Further Examination By Mr. Chachkes    200
12
13   Changes and Signature            203
14   Reporter's Certificate            205
15
16       REPORTER'S NOTE 1:  Please be advised that an
17   UNCERTIFIED ROUGH DRAFT version of this transcript
18   exists.  If you are in possession of said rough
19   draft, please replace it immediately with this
20   CERTIFIED FINAL TRANSCRIPT.
21
22       REPORTER'S NOTE 2:  Quotation marks are used for
23   clarity and do not necessarily reflect a direct
24   quote.

Page 7

1                  EXHIBIT INDEX
2    NO. DESCRIPTION                    PAGE
3    Exhibit 1            10
         Rule 26 Expert Report of Alan Campion,
4        Ph.D., dated 11/16/18
5    Exhibit 2            35
         Invoices, dated from 03/06/18
6        through 07/02/18
7    Exhibit 3            112
         Letter dated 06/23/18 to David Dearing
8        from John Godleski, M.D.
         Re:  Diane Bower
9
         Exhibit 4            122
10       Article from Human Pathology, Vol 15
         No. 11, dated 11/1984 entitled "Raman
11       Microspectroscopy in Human Pathology"
12   Exhibit 5            127
         Article from Applied Spectroscopy,
13       Volume 64, Number 6, 2010, entitled
         "Study of Inorganic Particles, Fibers,
14       and Asbestos Bodies by Variable Pressure
         Scanning Electron Microscopy with Annexed
15       Energy Dispersive Spectroscopy and
         Micro-Raman Spectroscopy in Thin
16       Sections of Lung and Pleural Plaque"
17   Exhibit 6            132
         Article from Elsevier, Vibrational
18       Spectroscopy, "The use of Raman spectroscopy
         to identify inorganic phases in iatrogenic
19       pathological lesions of patients with
         malignant pleural mesothelioma," by
20       M. Musa, A. Croce, M. Allegrina, C.
         Rinaudo, E. Belluso, D. Bellis, F.
21       Tofflalorio, G. Veronesi
22   Exhibit 7            149
         "Introductory Raman Spectroscopy,"
23       Second Edition, Elsevier 2003 by
         John R. Ferraro, Kazuo Nakamoto and
24       Chris W. Brown

Page 8

1              EXHIBIT INDEX (Continued)
2    NO. DESCRIPTION                    PAGE
3    Exhibit 8            150
         IR and Raman Spectroscopy, Principles
4        and Spectral Interpretations by
         Peter J. Larkin
5
         Exhibit 9            151
6        HHS Public Access, "Clinical
         instrumentation and application of
7        Raman spectroscopy" by Isaac Pence
         and Anita Mahadevan-Jansen
8
         Exhibit 10            152
9        Modern Raman Spectroscopy, A Practical
         Approach, by Ewan Smith and Geoffrey Dent
10
         Exhibit 11            152
11       Article from Journal of Raman Spectroscopy
         entitled "Understanding the Raman spectral
12       features of phyllosilicates" by
         Alian Wang, John Freeman and Bradley
13       Jolliff, published 04/14/15
14   Exhibit 12            154
         Cover page stating, "See Electronic Copy
15       of the Book Titled, 'Confocal Raman
         Microscopy'"
16
17
18
19
20
21
22
23
24

Page 9

1              P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Here begins the
3    deposition of Dr. Alan Campion.  Today's date is
4    January 8th, 2019.  The time is 9:16 a.m.
5          Will the court reporter please swear
6    in the witness.
7          ALAN CAMPION, Ph.D.,
8    having been first duly sworn to tell the truth, the
9    whole truth, and nothing but the truth, so help him
10   God, testified as follows:
11         MR. CHACHKES:  All set?
12         THE COURT REPORTER:  Yes.
13              EXAMINATION
14   BY MR. CHACHKES:
15       Q.  Good morning.
16       A.  Good morning.
17       Q.  Sir, my name is Alex Chachkes.  I'm with
18   the law firm of Orrick, Herrington.  I represent
19   J&J.
20          Have you ever had your deposition
21   taken before?
22       A.  No.
23       Q.  Okay.  This is your first one?
24       A.  Yes.

Alan Campion, Ph.D.

| Page 10 |
| --- |

1    Q.  Okay.  I'm sure you're familiar with the
2    ground rules.  I'm gonna ask you questions.  If you
3    could answer them consistent with your oath.
4        You could do that?
5    A.  Yes.
6    Q.  Any reason you can't answer fully and
7    truthfully today?
8    A.  No.
9    Q.  Okay.  If you would, when answering
10    questions, just wait for me to finish my questioning
11    and then answer orally because we have a transcript.
12        You can do that?
13    A.  Yes.
14    Q.  Okay.  No nodding, no "uh-huh."  Just
15    yeses, noes, or whatever is appropriate to the
16    question.
17    A.  Yes.
18    Q.  Okay.
19       (Deposition Exhibit 1 marked for
20       identification.)
21    Q.  (BY MR. CHACHKES)  Here before you is
22    Exhibit 1.  Do you recognize that as the report
23    from -- your report from this case?
24    A.  Yes.

| Page 11 |
| --- |

1    Q.  Okay.  And you're familiar with the phrase
2    "multidistrict litigation" or "MDL"?
3    A.  Yes.
4    Q.  Okay.  And this is your report in the MDL?
5    A.  Yes.
6    Q.  Tell me what your current employment is.
7    A.  I'm a professor of chemistry, University
8    of Texas at Austin.
9    Q.  Okay.  And do you have any other
10    employment or sources of income?
11    A.  I have an LLC for these consulting
12    activities.
13    Q.  Okay.  Anything else?
14    A.  No.
15    Q.  And was this LLC established for the
16    purposes of this particular litigation?
17    A.  Yes.
18    Q.  And this consulting?
19    A.  Yes.
20    Q.  Does it have any other members or
21    employees other than you?
22    A.  No.
23    Q.  And why did you establish the LLC?
24    A.  The University has very strict regulations

| Page 12 |
| --- |

1    about use of the University property and facilities
2    for outside activities.  It also has very strict
3    regulations about time spent by faculty pursuing
4    other outside activities.
5       And so I wanted to make a clear
6    distinction and separation between my
7    responsibilities to the University and any other
8    activities that I might be pursuing.
9    Q.  Okay.  And attached to your expert report
10    as Exhibit A is your CV; is that correct?
11    A.  Correct.
12    Q.  Are there any updates that you want to
13    make between when you published this and now?
14    A.  It's current.
15    Q.  When and how were you first contacted for
16    this case?
17    A.  I believe I was first contacted by Leigh
18    and Margaret Thompson who asked the question could I
19    identify talc using Raman spectroscopy.
20    Q.  Okay.  And "Leigh" is Leigh O'Dell who's
21    here at the deposition?
22    A.  Yes.  Correct.
23    Q.  And so the -- so attached to your report
24    is a publication on which you're a co-author

| Page 13 |
| --- |

1    relating to that subject, correct?
2    A.  Yes.
3    Q.  Was this contact after you wrote this
4    paper or before?  What's the sequence there?
5    A.  Before.
6    Q.  And was the inquiry from plaintiffs'
7    counsel what prompted you to write the report -- or
8    write the article?
9    A.  Yes.
10    Q.  Okay.  How did you come into contact with
11    the other co-authors of the paper?  How did you
12    collectively decide to write this?
13    A.  So I can't recall the exact sequence of
14    events, but I had a phone conversation with
15    Dr. Godleski, who, I believe, had independently
16    tried to do measurements at Renishaw.  It's also
17    possible that I called Renishaw directly, and they
18    said that they had already been contacted by
19    Dr. Godleski.
20    Q.  Okay.  So it's fair to say you were the
21    one who put the team together for the paper?
22    A.  It was a collaborative effort between me
23    and Dr. Godleski.  We work -- we worked together
24    very closely for a period of several years.

4  (Pages 10 to 13)

Alan Campion, Ph.D.

Page 14

```
 1      Q.  Okay.  Whose idea was it to contact
 2  Dr. Godleski for the purposes of this paper?
 3      A.  I can't recall.
 4      Q.  Could have been plaintiffs' counsel?
 5      A.  I can't recall.
 6      Q.  Did you know Dr. Godleski prior to contact
 7  from plaintiffs' counsel for the purposes of this
 8  case?
 9      A.  No.
10      Q.  Okay.  So is there any other way you
11  would've known about Dr. Godleski other than through
12  plaintiffs' counsel?
13      A.  No.
14      Q.  And what about the other co-authors?  How
15  did you come into communication with them for the
16  purposes of this paper that is Exhibit B to your
17  declaration?
18      A.  Those were long-time collaborators of
19  Dr. Godleski and he wanted to recognize their work
20  by including them as co-authors.
21      Q.  Okay.  So each of -- I'm just gonna name
22  their last names.
23          Each are Smith, Fedulov --
24      A.  Pardon me.  Smith is associated with
```

Page 15

```
 1  Renishaw Corporation.
 2      Q.  Okay.  All right.  So the collaborators or
 3  long-time collaborators with Godleski are Fedulov,
 4  Gregory, and Fan?
 5      A.  Correct.
 6      Q.  Okay.  And how did you come in contact or
 7  communication with Smith as a co-author of this
 8  paper?
 9      A.  So I have had a long-time relationship
10  with Renishaw, and he is a project specialist.  He
11  does demonstrations.  He consults with potential
12  customers.  I think his title is research scientist
13  or principal scientist, something like that.
14      Q.  And whose decision was it to bring him
15  into the team for this paper?
16      A.  It was either Tim Prusnick or Rich
17  Bormett, whom I've known for many years.  Their
18  responsibilities at Renishaw have changed over the
19  years.
20          So one of them is responsible for, I
21  think, marketing in the United States, and the other
22  one's responsible for North and South America, or
23  Canada and Mexico.  I just can't recall.
24      Q.  Okay.  Are they marketing people?
```

Page 16

```
 1      A.  They're technical people, but they're also
 2  responsible for marketing.  They're responsible for
 3  strategic planning.  They have lots of
 4  responsibilities.
 5      Q.  Do they do lab work?
 6      A.  Yes.
 7      Q.  And when you spoke to plaintiffs' counsel
 8  about the possibility of using Raman microscopy for
 9  the purposes of the talc litigation, what did they
10  say to you?
11          MR. DEARING:  First of all, I'm gonna
12  object to the content of our communications.  I
13  think you can ask him what his directive is, but any
14  specific conversations we had with our expert are
15  privileged.
16          MR. CHACHKES:  I'm going to disagree
17  with that.  I mean, if you -- if he wrote the paper,
18  as he testified, at the prompting of plaintiffs'
19  counsel, it's particularly relevant.  So I'll ask
20  you to make your objections --
21          MR. DEARING:  I don't believe that's
22  what he said.
23          MR. CHACHKES:  Yeah.
24          MR. DEARING:  He didn't write the
```

Page 17

```
 1  paper at our prompting.
 2          MR. CHACHKES:  Okay.  Can I have the
 3  question read back.
 4          (Last question was read.)
 5          MR. DEARING:  Yeah, we're objecting to
 6  that.  You said for the purpose of talc litigation.
 7  That's privileged communications.
 8      Q.  (BY MR. CHACHKES)  When you spoke to
 9  counsel about doing research into the applicability
10  of Raman spectroscopy to investigating the presence
11  of inorganic substances in pathology slides, what
12  did they say to you?
13          MR. DEARING:  Objection.  That's the
14  same objection -- that's the same question, okay.
15  You can't ask him about what specific conversations
16  we've had about the litigation.  That's privileged.
17          MR. CHACHKES:  Okay.  So you're --
18  this is -- you're saying this is attorney/client
19  privilege?
20          MR. DEARING:  Yes, absolutely.  You
21  can ask him about the research he did or whatever,
22  but the content of our communications is privileged.
23      Q.  (BY MR. CHACHKES)  So you had no inkling
24  or inclination to do the work that is in this paper
```

Alan Campion, Ph.D.

Page 18

1    prior to contact from counsel, correct?
2        A.  That's correct.
3        Q.  And you know that John Godleski does work
4    for plaintiffs in talc cases, correct?
5        A.  Correct.
6        Q.  All right.  And you know that Yuwei Fan
7    also does work for plaintiffs in talc cases,
8    correct?
9        A.  I did not know that.
10       Q.  Okay.  He works with Dr. Godleski.
11            Do you know that?
12       A.  Yes.
13       Q.  Okay.  Do you know why -- now, there's a
14   disclosure in the paper towards the end of -- let me
15   just read it to you -- that a potential conflict of
16   interest -- do you see -- you know -- do you recall
17   that?
18       A.  Yes.
19       Q.  Okay.  And it says that you and
20   Dr. Godleski have "served as consultants and
21   provided expert testimony in talc and other
22   environmental litigation," correct?
23       A.  That's what it says, yes.
24       Q.  Okay.  Is it accurate?

Page 19

1        A.  Certainly, he had at that point.  I had
2    not at that point, so perhaps what we meant was
3    there was the potential.  I really don't recall.  I
4    just wanted to make sure that we had disclosed
5    everything --
6        Q.  Okay.
7        A.  -- that was relevant.
8        Q.  Did you bill plaintiffs' counsel for your
9    work in underlying this paper?
10       A.  Yes.
11       Q.  Okay.  So all your work for the paper
12   that's attached to your expert report was billed to
13   plaintiffs' counsel?
14       A.  Yes.
15       Q.  And do you know why the conflict of
16   interest statement does not include Mr. Fan?
17       A.  No.
18       Q.  If he has taken plaintiffs' money for talc
19   litigation, he should have been in that disclosure,
20   shouldn't he have?
21            MR. DEARING:  Objection; form.
22   Speculation.
23       A.  I don't have an answer to that.
24       Q.  (BY MR. CHACHKES)  Well, what's the

Page 20

1    purpose of that statement?  Why is it in there?
2        A.  I don't know the extent of Dr. Fan's
3    involvement.  I don't know whether he was
4    compensated or not.  I simply don't know.
5        Q.  If you wouldn't mind just focusing on the
6    question I asked.
7            What's the purpose of this conflict of
8    interest statement in your paper?
9        A.  So it is to make it clear that -- let me
10   think about this.
11            It's required by journals, okay, to
12   declare any potential conflicts of interest, to make
13   sure the results reported therein are not influenced
14   by outside influences.
15       Q.  And the only reason you did this was
16   because it's required or do you think it was
17   actually a good thing?
18       A.  It's a good thing.  I think disclosure is
19   a good thing.
20       Q.  And in light of that policy and in light
21   of the fact that you believe it's a good thing, do
22   you think that the paper should also disclose
23   Mr. Fan under the conflict of interest statement if
24   he's taking plaintiffs' money for talc litigation?

Page 21

1            MR. DEARING:  Objection; form.
2    Speculation.
3        A.  I have no knowledge of whether he was
4    compensated or not.
5        Q.  (BY MR. CHACHKES)  So it's a hypothetical.
6    If he did take money from plaintiffs in talc
7    litigation, should he be in that conflict statement?
8            MR. DEARING:  Same objection.  That's
9    an inaccurate hypothetical.
10       A.  I'm not sure what you're asking me and
11   whether I'm obligated to give you an answer or not.
12       Q.  (BY MR. CHACHKES)  If somebody on the
13   paper is taking money from plaintiffs' lawyers in
14   talc litigation, shouldn't they be in -- listed in
15   the declaration of conflict of interests?  It's a
16   pretty straightforward question.
17            MR. DEARING:  Objection; form.
18   Speculation.
19       A.  I really can't speculate.  It's a
20   hypothetical question.
21       Q.  (BY MR. CHACHKES)  Okay.  So there are
22   instances when somebody is taking money from
23   plaintiffs' lawyers in talc litigation and you don't
24   think they should disclose that fact in the

Alan Campion, Ph.D.

Page 22

1    declaration of conflict of interests?
2        A.  I didn't say that.
3        Q.  What are you saying?
4        A.  I'm saying I don't know.
5        Q.  Okay.  Is this article published yet?
6        A.  Yes.
7        Q.  Okay.  Are you gonna take steps to see
8    that it's amended to disclose Mr. Yamm -- Mr. Fan in
9    the conflict of interest statements if indeed he's
10   taking money from plaintiffs' lawyers?
11              MR. DEARING:  Objection; form.
12   Speculation.  That's beyond the scope of this
13   witness' expertise.
14              And your hypothetical's wrong.  He's
15   not taking money from plaintiffs.
16              MR. CHACHKES:  If you can maybe rachet
17   back the speaking objections.
18              MR. DEARING:  Well, I'm talking to
19   you.
20       A.  I don't know that that's my
21   responsibility.
22       Q.  (BY MR. CHACHKES)  Okay.  It's your paper
23   though, right?
24       A.  Yes.

Page 23

1        Q.  You're the lead author, right?
2        A.  Correct.
3        Q.  Okay.  Do you know of anyone else who's an
4    author is taking the money from plaintiffs for talc
5    litigation?
6        A.  I'm not aware of any.
7        Q.  Okay.  To what degree did you communicate
8    with plaintiffs' lawyers while researching and
9    writing this publication?
10              MR. DEARING:  Objection; vague.
11              You don't have to disclose the content
12   of our communications.
13              I don't know "to what degree" means.
14       A.  I don't recall.
15       Q.  (BY MR. CHACHKES)  Did they get drafts?
16   Did plaintiffs' lawyers get drafts of your paper?
17       A.  Not that I recall, no.
18       Q.  Okay.  Did you -- was there more than one
19   phone call with the plaintiffs' counsel while you
20   were writing this paper?
21       A.  Not that I recall.
22       Q.  Okay.  So it's possible there were no
23   phone calls with plaintiffs' counsel during the
24   writing of this?

Page 24

1        A.  It's possible.
2        Q.  Okay.  You just don't recall?
3        A.  Yes.
4        Q.  Did plaintiffs' counsel make any
5    suggestions as to what should be in the paper?
6        A.  Absolutely not.
7        Q.  And why do you say "absolutely not"?
8        A.  Because I know that they didn't.
9        Q.  Okay.
10       A.  To the best of my recollection.
11       Q.  So when did you start writing your expert
12   report as opposed to the paper that we're talking
13   about?
14       A.  I believe that was in November of last
15   year.
16       Q.  So basically about three months ago?
17       A.  It's dated, so whatever the date was.
18       Q.  Okay.  And -- well, it's dated at the date
19   of when you finished it.
20              When did you start writing the expert
21   report?
22       A.  Probably a month before that.  It didn't
23   take very long to write.
24       Q.  Was your publication that we're talking

Page 25

1    about completely finished before you started working
2    on your expert report?
3        A.  Yes.
4        Q.  And prior to beginning your expert report
5    drafting, how many times had you met plaintiffs'
6    counsel -- any plaintiffs' counsel in person?
7        A.  Two or three.
8        Q.  Was it always Margaret and Leigh?
9        A.  Yes.
10       Q.  Okay.  And where did you meet?
11       A.  Sometimes at our house.
12       Q.  "Our" meaning?
13       A.  My wife and mine.
14       Q.  Okay.  How many times do you believe you
15   met with plaintiffs' counsel at your home?
16       A.  Two or three.
17       Q.  Did you meet anywhere else?  And, again,
18   I'm -- you know, just before you started writing
19   your expert report?
20       A.  I think we may have had lunch once at a
21   restaurant.
22       Q.  So it's possible you've had three or four
23   meetings with plaintiffs' counsel prior to starting
24   to write your expert report?

7 (Pages 22 to 25)

Alan Campion, Ph.D.

Page 26

1    A. Yes.
2    Q. And those three or four meetings were all
3  during the period of time when you were researching
4  and writing your publication?
5    A. Yes.
6    Q. And when you met, did you discuss the
7  progress of your research on what eventually became
8  your publication?
9    A. I may have reported some preliminary
10  results.
11    Q. Did plaintiffs' counsel have any comments
12  on those preliminary results?
13    A. Yes.
14    Q. What were those comments?
15        MR. DEARING: Objection. You're
16  getting into the content of our conversations.
17  There's not going to be much distinction between his
18  initial research and his ability to identify talc
19  articles. So I'm going to argue that those
20  conversations are privileged.
21        MR. CHACHKES: Okay. I just want to
22  ask a really clear question here and getting a clear
23  objection.
24    Q. (BY MR. CHACHKES) When you were working

Page 27

1  on your publication, the one that's the centerpiece
2  of your testimony here, you had communications with
3  plaintiffs' counsel, you talked about your paper
4  with plaintiffs' counsel, and they said stuff to you
5  about your research, but you're not gonna testify to
6  what they said to you?
7        MR. DEARING: Objection. I don't
8  think that's his testimony at all.
9        MR. CHACHKES: Okay.
10    Q. (BY MR. CHACHKES) You can answer the
11  question.
12    A. I don't recall extensive conversations
13  during --
14    Q. I'm not --
15    A. -- during the preparation of that
16  scientific paper.
17    Q. I'm not asking you whether it's extensive
18  or not. I'm just asking what the conversations
19  were.
20        Are you gonna testify to that?
21        MR. DEARING: I'm gonna object. Those
22  are privileged communications.
23    Q. (BY MR. CHACHKES) And you're gonna follow
24  the advice of your counsel?

Page 28

1    A. Yes.
2    Q. Okay. After you finished writing your
3  publication, how many times did you meet with
4  plaintiffs' counsel? Actually, strike that. Let me
5  just finish up the last line of questioning.
6        So there were three to four in-person
7  meetings up to the point where you finished writing
8  your publication.
9        Were there any phone calls in
10  addition?
11    A. I don't think so.
12    Q. Other than the first phone call which
13  contacted you about this, correct?
14    A. Correct.
15    Q. What about e-mails?
16    A. Some e-mail correspondence, yes.
17    Q. Okay. Did -- were there any -- was the
18  substance of the -- of those e-mails anything beyond
19  logistics?
20        MR. DEARING: We're gonna object to
21  the content of the e-mails under privileged
22  communications as well.
23    Q. (BY MR. CHACHKES) Okay. Are you gonna
24  follow the advice of counsel?

Page 29

1    A. Yes.
2    Q. Did any e-mails with counsel address the
3  subject matter of your publication?
4        MR. DEARING: Same objection. You're
5  asking for contents of e-mails.
6        MR. CHACHKES: So you're not gonna
7  permit him to testify about that?
8        MR. DEARING: He's not gonna testify
9  about any contents of communications between him and
10  his -- and the lawyers.
11        MR. CHACHKES: Okay.
12    Q. (BY MR. CHACHKES) What about after you
13  finished writing your paper and you picked up the
14  pen for your expert report, how many times -- how
15  many communications did you have with plaintiffs'
16  counsel?
17    A. A very small number. Four or five.
18    Q. Can you describe the nature of them?
19  Phone calls, meetings?
20        MR. DEARING: Objection; form.
21        I don't know what the nature of it is,
22  but you're not obligated to disclose any of the
23  contents of our communications.
24    A. I may have sought advice as to format

Alan Campion, Ph.D.

Page 30

1  because I've never written one of these before, but
2  nothing substantive.
3      Q.  (BY MR. CHACHKES)  Of the calls or contact
4  that you had with plaintiffs' counsel, how many --
5  well, after you started writing your report as
6  opposed to the publication, how many were in person,
7  if you can recall?
8      A.  None.
9      Q.  How many were by phone?
10     A.  None.
11     Q.  Okay.  So all communications with
12  plaintiffs' counsel during the period of time where
13  you picked up the pen to start writing your expert
14  report as opposed to your publication were by
15  e-mail?
16     A.  As far as I can recall, yes.
17     Q.  Okay.  What about in preparation for this
18  deposition, what'd you do to prepare?
19     A.  We had a conference call a couple of weeks
20  ago, and I met with David and with Rick last night
21  for a couple hours.
22     Q.  Any other preparation for this deposition?
23     A.  Well, I reviewed all the material in this
24  binder, but no other preparation involving the

Page 31

1  attorneys.
2      Q.  When you say "this binder," what are you
3  referring to?
4      A.  The binder on the table.
5      Q.  Okay.  Are there any other documents in
6  that binder other than your report and the documents
7  that are cited in your paper in your report?
8      A.  No.
9      Q.  Your wife is also an expert for plaintiffs
10 in this case?
11     A.  Correct.
12     Q.  And how did she get involved in this case?
13 Was it through you?
14     A.  No.
15     Q.  How?
16     A.  She was contacted by Margaret and Leigh.
17     Q.  Okay.  She was contacted first or after
18 you?
19     A.  First.
20     Q.  And when you got the call from Beasley
21 Allen law firm, were you already familiar with who
22 they were through your wife?
23     A.  No.
24     Q.  So you did not at the time of the first

Page 32

1  call from Beasley Allen make the connection that
2  these were lawyers working with your wife?
3      A.  Well, let me amend that.  I think they
4  mentioned Ellen.
5      Q.  Okay.  Ellen is your wife?
6      A.  Yep.
7      Q.  And it's Ellen Blair Smith?
8      A.  Correct.
9      Q.  And to the best of your knowledge, do you
10 know whether your wife recommended you as a
11 potential expert for this?
12     A.  Yes.
13     Q.  How so?
14     A.  Because -- because I think --
15         MR. DEARING:  I need to object here
16 because now we're crossing over into privileged
17 communications between the lawyers and Ms. Smith --
18 Dr. Smith.  So there may be a way you can ask him,
19 but you've asked him to divulge privileged
20 communications.
21         MR. CHACHKES:  So you're not gonna
22 permit that question?
23         MR. DEARING:  I'm not gonna permit him
24 to answer it in the way that it's posed because

Page 33

1  you're asking him to divulge privileged
2  communications.
3      Q.  (BY MR. CHACHKES)  Do you know what your
4  wife said to plaintiffs' counsel to prompt them to
5  call you as a potential expert?
6      A.  Yes.
7      Q.  What was that?
8         MR. DEARING:  Same objection.  You've
9  asked him to divulge what plaintiffs' counsel told
10 one of our experts.  That's a privileged
11 communication.
12     Q.  (BY MR. CHACHKES)  Do you know whether
13 plaintiffs' counsel got the idea to call you about
14 using Raman spectroscopy for the purposes of talc
15 litigation through your wife?
16     A.  Yes.
17     Q.  Okay.  Just to be clear, because I'm not
18 sure whether you were answering yes, do you know, or
19 yes, that's where they got the idea, is that where
20 they got the idea?
21     A.  Yes.
22     Q.  Is your wife -- is your wife familiar with
23 Raman spectroscopy as a scientist?
24     A.  No.

9  (Pages 30 to 33)

Alan Campion, Ph.D.

Page 34

```
1        Q.  How would she be aware of the
2    applicability of Raman spectroscopy to the purposes
3    of the plaintiffs' litigation?
4        A.  Would you rephrase that, please.
5        Q.  Okay.  How did she know that your work
6    might be relevant to the plaintiffs' litigation?
7        A.  I don't know the answer to that.
8        Q.  How did your wife become involved with
9    plaintiffs' counsel to the extent you know?
10       A.  I have no idea.
11       Q.  Could have been a cold call, could have
12   been something else?
13       A.  Yeah.
14       Q.  You and your wife don't discuss your
15   respective work for plaintiffs?
16       A.  Correct.
17       Q.  She knows you're in a deposition today,
18   right?
19       A.  Yes.
20       Q.  Your rate -- your -- is $600 an hour for
21   this work?
22       A.  Yes.
23       Q.  To date, how much have you billed?
24           MR. DEARING:  We have invoices if
```

Page 35

```
1    you'd like to see them.
2            MR. CHACHKES:  Oh, sure.  Yeah.  Can
3    we just -- this is one package?
4            MR. DEARING:  Yes.
5            MR. CHACHKES:  There's no copies?
6    Could we just mark this as Exhibit 2?  You don't
7    have any other copies?
8            MR. DEARING:  I don't.
9            MR. CHACHKES:  Okay.
10           MR. DEARING:  Sorry.
11           MR. CHACHKES:  All right.
12           (Deposition Exhibit 2 marked for
13           identification.)
14       Q.  (BY MR. CHACHKES)  So unfortunately,
15   there's not an extra copy.
16           Are you familiar with the invoices
17   that I'm holding here as Exhibit 2?
18       A.  Roughly.
19       Q.  Okay.  And I see that the first invoice is
20   January 3rd, 2017.
21           Is that about the time you took a call
22   from plaintiffs' counsel?
23       A.  I don't recall, but that invoice would
24   have represented my first visit to Renishaw, I
```

Page 36

```
1    believe.
2        Q.  Okay.  I -- I don't want to ambush you or
3    anything.  January 3rd, it says, "Background
4    reading."  So --
5        A.  Okay.
6        Q.  I'll tell you what.  I'll come back to
7    this after a break.  I'll absorb it and maybe I'll
8    have some other questions.
9            Is there any other compensation that
10   you received for the purpose of this litigation
11   other than what would be listed in Exhibit 2, which
12   was apparently the invoices -- your invoices in this
13   case?
14       A.  No.
15       Q.  And am I correct that all the invoice
16   billings through about October of 2018 are going to
17   be related to your publication rather than to your
18   expert report?
19       A.  Yes.
20       Q.  And the entire time you were doing the
21   underlying research for your publication and writing
22   your publication, you were aware that this was for
23   the purposes of plaintiffs?
24           MR. DEARING:  Objection; form.
```

Page 37

```
1            Are you asking him if the publication?
2            MR. CHACHKES:  I think the question's
3    clear.
4            MR. DEARING:  Well, it's not.
5            MR. CHACHKES:  Okay.
6        Q.  (BY MR. CHACHKES)  If you can answer it.
7            MR. DEARING:  Can you read back the
8    question, please?
9            (The last question was read.)
10           MR. DEARING:  Objection; vague.
11       A.  I used the work as purely scientific
12   research.  It looked -- it felt and looked to me and
13   I handled it like I would have handled any research
14   project.
15       Q.  (BY MR. CHACHKES)  Okay.  It's not a
16   question about bias.  It's really a question about
17   what you knew.
18           You knew the entire time you were
19   researching this publication that this was something
20   the plaintiffs wanted you to do.  They were paying
21   for it and they would use it for their purposes.
22           You knew that, right?
23           MR. DEARING:  Objection; form.
24   Misstates the evidence.
```

Alan Campion, Ph.D.

Page 38

1    A.  I can't speculate as to what purposes they
2  had in mind.
3    Q.  (BY MR. CHACHKES)  But they had a purpose
4  in mind.  Otherwise, they wouldn't have paid you,
5  right?
6    A.  I don't know that.
7    Q.  Okay.  Could have been pro bono.  They
8  could have been giving you money for no purpose
9  whatsoever, just -- just funding the research idly?
10    A.  Can you back -- go back to the previous
11  question as opposed to phrasing it the way you did
12  with the pro bono business?
13    Q.  No.
14    A.  Okay.  So I suppose they must have had
15  some purpose in mind.
16    Q.  What -- in 2017, what percentage of your
17  income was from plaintiffs' lawyers in this case?
18    A.  I don't have the answer to that.  Might
19  have been 50 percent.
20    Q.  Do you bill your travel time?
21    A.  No.
22    Q.  Did you keep lab notebooks relating to
23  your publication?
24    A.  Yes.

Page 39

1    Q.  Do you still have those?
2    A.  Yes.
3    Q.  Are you -- did you give them to
4  plaintiffs' lawyers?
5    A.  No.
6    Q.  So they wouldn't have been produced in
7  this case?
8    A.  What does that mean?
9    Q.  So "produced" means when you give a
10  document to your lawyers and the lawyers give them
11  to the other side.  That's what "produced" means.
12    A.  I have not given them my notebooks.
13    Q.  Okay.  Is there any other written material
14  that reflects the work you did underlying the
15  public- -- your publication?
16    A.  No.
17    Q.  Did you have e-mails with your
18  collaborators on the paper regarding the subject
19  matter of this?
20    A.  Yes.  The subject matter of my paper?
21    Q.  Of your paper, yes.
22    A.  Yes.
23    Q.  Okay.  Frequent e-mails?
24    A.  Reasonably frequent, yes.

Page 40

1    Q.  Did you hand those over to plaintiffs'
2  counsel?
3    A.  No.
4    Q.  Did you ever talk with Dr. Godleski about
5  his work for plaintiffs, what he did, how much he
6  made?
7    A.  No.
8    Q.  Have you ever done -- prior to your work
9  for plaintiffs' lawyers in this case, have you ever
10  done any consulting work?
11    A.  Not that I can recall.
12    Q.  So as a professor, your only source of
13  income has been from the University?
14    A.  So over the course of my entire career or
15  one-time events or --
16    Q.  Let's just say for the last 10 years.
17    A.  The only source of income over the last 10
18  years -- and it may not have been within the last 10
19  years -- was a one-day interview with a company as a
20  potential expert witness for which I was
21  compensated.  That never went anywhere.
22    Q.  Okay.  That had nothing to do with talc or
23  asbestos, right?
24    A.  (Nodded head.)

Page 41

1    Q.  You have to answer out loud.
2    A.  Sorry.  This is new to me.
3    Q.  Yes.
4    A.  No.  It had nothing to do with it.
5    Q.  Okay.  In the conflict of interest
6  disclosure --
7    A.  Oh.  Let me first say something that I had
8  forgotten about.  I am the co-author of a textbook,
9  so I was compensated for that.
10    Q.  Okay.  In the conflict of interest
11  statement in your publication, it says, "Served as
12  consultant and provided expert testimony in talc and
13  other environmental litigation."
14     Do you know what that phrase "and
15  other environmental litigation" refers to?
16    A.  That would be for Dr. Godleski.
17    Q.  Okay.  And regarding the textbook, that's
18  the one that's Principles of Modern Chemistry?
19    A.  Yes.
20    Q.  And the seventh edition was published in
21  2011?
22    A.  Correct.
23    Q.  Okay.  And there's a more recent edition,
24  correct?

Alan Campion, Ph.D.

Page 42

1    A. Correct.
2    Q. And you're not an author on that one?
3    A. That's correct.
4    Q. And why aren't you an author on the more
5  recent one?
6    A. Because I was not good at keeping up with
7  deadlines.
8    Q. Were you fired?
9    A. If you want to call it that.
10   Q. Well, what -- what do you call it?
11   A. I was fired.
12   Q. Okay. And did you write particular
13 chapters or did you write the whole thing?
14   A. This was a major revision of the fifth
15 edition, so I started with the sixth edition and
16 then continued with the seventh edition. It was a
17 complete restructuring of the order of the textbook.
18       My co-author, Pat Gillis, and I worked
19 together a lot. Professor Oxtoby is president of
20 Pomona College and does not have time to work on
21 that. He gave us an initial guidance, but Pat and I
22 worked on the textbook together. It's a lot of
23 work. I'll never do one again.
24   Q. Do you stand behind the scientific

Page 43

1  statements made in the textbook?
2    A. Absolutely.
3    Q. Okay. They're all pretty fundamental,
4  basic principles of science that are all beyond
5  dispute?
6    A. Yes.
7    Q. Okay. You've published over 130 articles?
8    A. Correct.
9    Q. Any of them -- what are the sources of
10 funding for those articles?
11   A. Oh, gosh. Primarily the National Science
12 Foundation, the Welch Foundation, Air Force grant,
13 Semiconductor Research Corporation. That's -- those
14 are -- those are the only ones I can recall.
15   Q. Okay. Do any of those -- any of your
16 published articles -- putting aside the one attached
17 to your report, do any of those address asbestos or
18 talc?
19   A. No.
20   Q. In any way whatsoever do they address
21 asbestos or talc?
22   A. None.
23   Q. If I'm reading your CV correctly, the last
24 publication prior to this publication past your

Page 44

1  report is 2009?
2    A. Correct.
3    Q. What explains the nine-year -- the last
4  nine years you've published only one paper?
5    A. I basically lost interest in doing
6  research. I've been doing it for a long time.
7    Q. Focusing exclusively on teaching?
8    A. Exclusively on teaching and also on
9  curriculum innovation. I spent three to five years
10 creating a new junior/senior level focal chemistry
11 laboratory which was revolutionary, and that's
12 something I'm very proud of.
13   Q. How would you describe your discipline?
14 Are you a physical chemist? Is that what you are?
15   A. My degree is actually in chemical physics.
16 There's a subtle distinction there. Chemical
17 physics grew out of quantum mechanics and
18 spectroscopy, and physical chemists -- chemistry
19 grew out of thermodynamics and electrochemistry, so
20 I think of myself as a molecular spectroscopist.
21   Q. Okay. Is it fair to say you won't be
22 offering an opinion on disease causation related to
23 the plaintiffs in these cases?
24   A. I'm not an expert in that area, so I don't

Page 45

1  know how I could.
2    Q. Okay. Do you plan on giving an opinion on
3  general causation?
4    A. I'm not an expert.
5    Q. Okay. You're not a medical doctor,
6  correct?
7    A. That's correct.
8    Q. Okay. And you're not qualified to testify
9  to potential sources of injuries of plaintiffs in
10 these actions?
11   A. No.
12       MR. DEARING: Objection; form.
13   Q. (BY MR. CHACHKES) You're not a
14 mineralogist?
15   A. No.
16   Q. For any bottle of J&J talc-based product,
17 you're not qualified to opine on whether it contains
18 asbestos or not?
19       MR. DEARING: Objection; form.
20   A. Would you repeat the question, please.
21   Q. (BY MR. CHACHKES) Sure. For any bottle
22 of J&J talc-based product, you're not qualified to
23 opine on whether or not it contains asbestos,
24 correct?

Alan Campion, Ph.D.

Page 46

1      A.  Not without having the opportunity to
2  study it, I suppose.
3      Q.  Okay.  And have you ever studied a bottle
4  of J&J talc-based products?
5      A.  We have taken spectrum.
6      Q.  Okay.  I'll come back to that.
7          Do you know, sitting here today,
8  whether any historical or current bottle of J&J
9  talc-based product contains asbestos?
10      A.  I have no personal knowledge of that.
11      Q.  Okay.  It's not your testimony today that
12  J&J talc-based products contain asbestos, is it?
13      A.  No.
14      Q.  You're not a geologist, are you?
15      A.  No.
16      Q.  Are you qualified to opine on whether a
17  min- -- a mineral is an asbestiform habit versus
18  nonasbestiform habit?
19      A.  No.
20      Q.  Do you even know what that means,
21  "asbestiform habit"?
22      A.  Just what I've read in the literature, per
23  se.
24      Q.  What you've read in the literature since

Page 47

1  you've been contacted by plaintiffs' lawyers?
2      A.  Yes.
3      Q.  You're not an industrial hygienist?
4      A.  No.
5      Q.  You're not a toxicologist?
6      A.  No.
7      Q.  Not an epidemiologist?
8      A.  No.
9      Q.  You're not a pathologist?
10      A.  No.
11      Q.  You're a person who does Raman
12  spectroscopy?
13      A.  Correct.
14      Q.  Okay.  Do you have other experience in
15  analy- -- analytical microscopy other than Raman
16  spectroscopy?
17      A.  Can you define analytical microscopy?
18      Q.  What other microscopes, beyond a Raman
19  spectro- -- spectrographic instrument, would you
20  feel you're an expert in?
21      A.  As part of the physical chemistry
22  laboratory, I feel like I'm pretty qualified in
23  fluorescence microscopy.
24      Q.  Any other device?

Page 48

1      A.  No.
2      Q.  Okay.  Do you consider yourself an expert
3  in any of the forms of electron microscopy?
4      A.  No.
5      Q.  What about XRD?
6      A.  No.
7      Q.  What about PLM?
8      A.  Polarized light microscopy?
9      Q.  Correct.
10      A.  I learned a great deal from Dr. Godleski.
11  I would not -- I would not say I'm an expert --
12      Q.  Okay.
13      A.  -- but I can recognize particles.
14      Q.  Okay.  That knowledge has come since the
15  plaintiffs contacted you for the purposes of this
16  case, correct?
17      A.  Partially correct.
18      Q.  Okay.  To what degree is that not correct?
19      A.  We -- we used polarized light microscopy
20  while I was a graduate student to orient single
21  crystals and identify particular crystal graphic
22  axes in organic crystals that we were studying.
23      Q.  Okay.  Have you ever used a PLM device to
24  look at inorganic material?

Page 49

1      A.  Well, that's how we identify the particles
2  before we do the Raman spectroscopy, sure.
3      Q.  Okay.  Other than work you did -- when you
4  say "we," did you do that work --
5      A.  Dr. Godleski and I together.
6      Q.  Okay.
7      A.  Side-by-side.
8      Q.  Okay.  So you worked side-by-side when the
9  PLM was being operated?
10      A.  Yes.  Most of the time.
11      Q.  Okay.  Did you fly to Boston to do that
12  work with him?
13      A.  I think I made two trips to Boston, and
14  then he's made several trips to Renishaw where we
15  worked together.
16      Q.  Okay.  And where is Renishaw physically
17  located?
18      A.  In Elgin, Illinois.
19      Q.  So you made several trips to Elgin,
20  Illinois, for the purposes of this case?
21      A.  Correct.
22      Q.  Do you have -- other than your work for
23  the purposes of this case and your work as a
24  graduate student, have you ever operated a PLM?

13  (Pages 46 to 49)

Alan Campion, Ph.D.

**Page 50**

1  A.  No.
2  Q.  Have you ever analyzed asbestos under any
3  scientific instrument?
4  A.  No.
5  Q.  So you would say you have zero experience
6  doing that?
7  A.  Correct.
8  Q.  Prior to this case, had you ever looked at
9  talc through Raman spectroscopy?
10  A.  No.
11  Q.  Prior to this case, had you ever looked at
12  any mineral through Raman spectroscopy?
13  A.  I'm trying to think of whether silicon
14  should be considered a mineral or not.  Silicon is
15  an element.  Most of my work with Raman microscopy
16  has been done on silicon and silicon germanium
17  alloys.
18  Q.  Okay.  Probably a metal, not a mineral?
19  A.  No, it's a semiconductor.
20  Q.  Okay.  But not a mineral?
21  A.  Not a mineral.
22  Q.  Okay.  Are you familiar with silicate
23  minerals?
24  A.  In general.

**Page 51**

1  Q.  What do you mean by "in general"?
2  A.  From the background reading that I've
3  done.  I would not consider myself an expert.
4  Q.  Okay.  When you say "the background
5  reading," you mean the background reading for the
6  purposes of this case?
7  A.  Correct.  For the purposes of the research
8  that we did --
9  Q.  Okay.
10  A.  -- for the publication.
11  Q.  Okay.  Can you give me an example of
12  silicate mineral?
13  A.  Talc.
14  Q.  Can you give me another example?
15  A.  There's so many.  Let's see, brucite.  I
16  just don't know off the top of my head.  I'd have to
17  look at the briefing book to refresh my memory.
18  Q.  Do you know the chemical formula for talc?
19  A.  Let's see, SI3 -- no MG3SI4010(OH)2.
20  Q.  Do you know whether the Raman spectra for
21  talc from different locations would differ?
22  A.  Yes.
23  Q.  And why is that?
24  A.  As far as I'm able to ascertain, there are

**Page 52**

1  different very small quantities of impurity metals
2  that may affect the exact positions.
3  Q.  Okay.  Are you aware there are different
4  grades of talc?
5  A.  No.
6  Q.  So if I ask you to tell me what the
7  different grades of talc are, you couldn't tell me?
8  A.  No.
9  Q.  Do you know whether the Raman spectra for
10  different grades of talc would be different?
11  A.  No.
12  Q.  Are you familiar with asbestiform
13  minerals?
14  A.  No.
15  Q.  Are you familiar with the criteria for
16  identifying what are asbestiform minerals versus
17  nonasbestiform?
18  A.  No.
19  Q.  Is talc an asbestiform mineral?
20  A.  If I'm not aware of their criteria, how
21  could I answer that question?
22  Q.  Are asbestiform minerals silicas?
23  A.  I don't know.
24  Q.  Do you know how many groups of asbestiform

**Page 53**

1  minerals there are?
2  A.  No.
3  Q.  Do you know the mineral morphology
4  categories for asbestos?
5  A.  No.
6  Q.  Do you know the difference between
7  serpentine and amphibole asbestos?
8  A.  No.
9  Q.  Have you heard of those distinctions
10  before?
11  A.  Yes.
12  Q.  Something you saw in -- for the purpose of
13  this case -- getting ready for this case?
14  A.  Yes.
15  Q.  Okay.  Can you tell me the challenges in
16  Raman spectroscopy that exist as between detecting
17  serpentine and amphibole minerals?
18  A.  I can't tell you in detail.
19  Q.  Okay.
20  A.  I could make some general comments about
21  the challenges of identifying minerals of these
22  classes.
23  Q.  Do you know what those classes are?
24  A.  No.  I mean, minerals in general, sorry.

14  (Pages 50 to 53)

Alan Campion, Ph.D.

Page 54

1      Q.  Okay.  So you couldn't tell me the
2  difference challenges specifically between detecting
3  serpentine and amphibole?
4      A.  No.
5      Q.  Have you done any tests to determine the
6  challenges of distinguishing serpentine and
7  amphibole minerals?
8      A.  No.
9      Q.  And you've -- you've never run a Raman
10  spectroscopy test on asbestos, correct?
11      A.  Correct.
12      Q.  Is it within your area of expertise to
13  testify as to the chemical formula of certain
14  asbestiform mineral species?
15      A.  No.
16      Q.  Do you know how many regulated asbestiform
17  mineral species there are?
18      A.  No.
19      Q.  And you don't know whether the Raman
20  spectr- -- spectrograph for these minerals would
21  differ?
22      A.  I mean, there are published Raman spectra
23  of asbestiform minerals, some of which I included in
24  these references.  So people have clearly identified

Page 55

1  them using Raman microscopy, I haven't.
2      Q.  Would you consider yourself an expert in
3  identifying asbestos using Raman spectroscopy?
4      A.  No.
5      Q.  Do you know whether the chemical formula
6  of a mineral is the same if the mineral is an
7  asbestiform versus nonasbestiform?
8      A.  No.
9      Q.  Do you know whether Raman spectroscopy can
10  tell the difference between an asbestiform and
11  nonasbestiform version of the same mineral?
12      A.  No.
13      Q.  Are you aware of any studies in that
14  regard?
15      A.  No.
16      Q.  And you certainly haven't done any?
17      A.  No.
18      Q.  Am I correct that there are a great number
19  of mineral species that have similar Raman
20  spectroscopy profiles?
21      A.  Could you phrase that question a little
22  more precisely, please?
23      Q.  Am I correct that there are different
24  minerals that have similar Raman spectroscopy

Page 56

1  profiles?
2      A.  Can you help me understand what you mean
3  by "similar"?
4      Q.  Meaning, you couldn't tell the difference
5  between two separate minerals because the Raman
6  spectroscopy profiles look the same.
7      A.  I would say that the Raman spectra of
8  minerals are as unique as fingerprints.
9      Q.  Okay.  Even if two different minerals have
10  the -- essentially the same chemical profile?
11      A.  Correct.
12      Q.  Okay.  Are you aware of any -- you -- but
13  you have never done research in that regard,
14  correct?
15      A.  Correct.
16      Q.  Are you aware of any research in that
17  regard?
18      A.  Well, there's one paper I included in this
19  packet, which shows how Raman spectra of these fiber
20  silicates differ and have unique signatures.
21      Q.  So if I were to show you two different
22  minerals that have nearly identical Raman
23  spectroscopy, you would doubt that that's real
24  science?

Page 57

1      A.  Say that again, please.
2      Q.  So if I were to show you that the Raman
3  spectr- -- spectroscopy profile of two separate
4  minerals look the same, you would doubt that.
5          That that's actual science?
6      A.  I would doubt that.
7      Q.  Okay.  You -- in your paper, you don't do
8  any identification of minerals using Raman
9  spectroscopy, right, of minerals other than talc?
10      A.  Only talc.
11      Q.  Okay.  Do you want to take a break or are
12  you good?  Are you okay?
13      MR. DEARING:  I'm good.
14      THE WITNESS:  I'm fine.
15      MR. CHACHKES:  Okay, great.
16      Q.  (BY MR. CHACHKES)  So you -- in your
17  expert report, you have a list of materials you
18  relied on, correct?
19      A.  Correct.
20      Q.  I'm looking at the last page and
21  there's 11 documents, correct?
22      A.  May I refer to them?
23      Q.  Oh, please.  Yes, you've got it actually
24  right there.

15 (Pages 54 to 57)

Alan Campion, Ph.D.

Page 58

1    A.  Oh, sorry.
2        (Examined exhibit.)  Yes.
3    Q.  Okay.  Which of these were provided to you
4  from plaintiffs' counsel, if any?
5    A.  Number 11.
6    Q.  Okay.  For Numbers 1 through 10, you
7  selected them, you found them for your purposes?
8    A.  Correct.
9    Q.  Okay.  Why were you provided Number 11,
10 which is the expert report of Dr. Godleski?
11   A.  I presume because he included some of our
12 Raman results in his report.
13   Q.  Okay.  So in that report, one would find
14 results that come straight out of the paper that's
15 attached to your expert report?
16   A.  I don't know.  He asked me to send him
17 some additional spectra, which I did.
18   Q.  Okay.  What did you send him?
19   A.  I can't remember what the particle names
20 or numbers were.
21   Q.  Were they talc?
22   A.  Oh, yeah.
23   Q.  Okay.  When you say particle names or
24 numbers, does different talc have different names

Page 59

1  and numbers?
2    A.  This is a complicated issue.
3    Q.  Okay.
4    A.  He has his numbering system.  I have my
5  numbering system.
6    Q.  Okay.  What's your numbering system?
7    A.  Particle 1.  Particle 2.  Slide X.
8    Q.  Okay.  How many different talc samples are
9  you in possession of?
10   A.  I'm not in possession of any.
11   Q.  Okay.  How is it you have a numbering
12 system for talc and you don't possess any?
13   A.  At -- at the time we took the data.
14   Q.  Okay.
15   A.  That's all.
16   Q.  So you had talc samples and then you got
17 rid of them?
18   A.  Gave them back to Dr. Godleski.  They were
19 his samples.
20   Q.  Okay.  All the talc that you looked at in
21 your laboratory came from Dr. Godleski?
22   A.  Yes.
23   Q.  And all the pathology samples, did those
24 also come from Dr. Godleski?

Page 60

1    A.  Yes.
2    Q.  Is it fair to say you've never had a talc
3  sample in your laboratory other than those provided
4  by Dr. Godleski?
5    A.  I believe that the Renishaw guys may have
6  taken some baby powder samples themselves and looked
7  at them.  I don't believe I was involved in that.
8    Q.  Okay.  But that was not in your
9  laboratory?
10   A.  Let's -- let me clarify this.  When you
11 say "my laboratory," okay, I don't have a
12 laboratory.  All of this work was done at the
13 rock -- at the Renishaw facility in Chicago.
14   Q.  Okay.  So is -- is all your Raman
15 spectroscopy equipment -- or to the extent you have
16 access to Raman spectroctros- -- spectroscopy
17 equipment, it's all in -- at Renishaw in Illinois?
18   A.  Correct.
19   Q.  Okay.  Have you ever had a Raman -- piece
20 of Raman spectroscopy equipment at the University?
21   A.  Oh, yes, many different types.  Some I
22 constructed myself for specialized purposes.
23       I had a commercial Renishaw instrument
24 which was, I believe, the first one of the new model

Page 61

1  that they currently manufacture.  It's probably
2  close to 20 years old.
3    Q.  Do you have a laboratory now at the
4  University?
5    A.  I do not.
6    Q.  Okay.  When was the last time you had a
7  laboratory at the University?
8    A.  Probably at the time of that last
9  publication that you cited, something like that.
10   Q.  Was there some sort of -- kind of official
11 closing of your laboratory?
12   A.  Yes.
13   Q.  And how -- how did that play out?
14   A.  Well, it was pretty easy.  We were
15 renovating the building and they said get all your
16 equipment out of here.
17   Q.  Okay.  The University didn't say, "Do you
18 want to establish a laboratory somewhere else or
19 reestablish it after the renovation?"
20   A.  We talked about it, but there was nothing
21 I was particularly passionate about doing.  So if
22 there were a problem that piqued my interest, I
23 would have likely kept the equipment and tried to
24 move in different directions, but there was simply

16 (Pages 58 to 61)

Alan Campion, Ph.D.

Page 62

1    nothing that was sufficiently interesting for me to
2    pursue at that time.
3        Q.  Okay.  So the decision to close your
4    laboratory and all the reasons to close your
5    laboratory are entirely things you've just
6    discussed, basically, your decision?
7        A.  Yes.
8        Q.  Okay.  So fair to say since 2009 you've
9    had no equipment related to Raman spectroscopy other
10   than what you had access to at Renishaw?
11       A.  We have a small Raman spectrometer in the
12   physical chemistry laboratory, but that's used for
13   teaching purposes.
14       Q.  Okay.  And so the equipment that you
15   talked about before that you had at the University,
16   that was all pre-2009?
17       A.  Yes.  That was purchased in 2002 and it
18   was part of my laboratory while I was doing the work
19   on the strains silicon.
20           And when that work ended and I didn't
21   have funding to continue to support that instrument,
22   I transferred it to a UT Center.  It's called the
23   Texas Materials Institute, and they have custody of
24   that instrument and they maintain it.

Page 63

1        Q.  Okay.  You did not attend -- there was an
2    international Raman spectroscopy conference last
3    year you didn't attend?
4        A.  No.
5        Q.  Okay.  When was the last time you attended
6    that conference, what year?
7        A.  Wow, maybe 2000.
8        Q.  Is the fact that you're not going to those
9    conferences anymore, is that tied up in your
10   decision not to do any more research?
11       A.  Yes.
12       Q.  Okay.  Do you want to elaborate?
13       A.  They're very big conferences.  I don't
14   generally like to go to very big conferences.
15       Q.  Okay.  Did you review any depositions
16   relating to this case?
17       A.  Pardon me?
18       Q.  Like deposition transcripts.  You know at
19   the end of this deposition there will be a
20   transcript of what you said and what I said.
21           You're aware of that, right?
22       A.  Yes.
23       Q.  Okay.  So that's a deposition transcript.
24           Have you reviewed any other deposition

Page 64

1    transcripts?
2        A.  Not that I recall.
3        Q.  Okay.  Have you ever met any plaintiffs in
4    the various talc litigation?
5        A.  No.
6        Q.  Could you name one?
7        A.  Well, I guess Brower.
8        Q.  And you're looking at?
9        A.  Number 11.
10       Q.  Okay.  Number 11, meaning you know the
11   name of Brower because it's in the expert report
12   that Dr. Godleski gave you?
13       A.  Correct.
14       Q.  Okay.  Can you name any other plaintiff?
15       A.  No.
16       Q.  Have you ever reviewed any medical records
17   relating to those cases?
18       A.  No.
19       Q.  It's fair to say that you have no current
20   intention to testify to specific plaintiffs in any
21   of these talc litigations?
22           MR. DEARING:  Objection; form.
23   Speculation.
24       A.  (No response.)

Page 65

1        Q.  (BY MR. CHACHKES) Can you answer that
2    question?
3        A.  Would you repeat the question.
4            MR. CHACHKES:  Would you mind
5    repeating the question.
6            (The last question was read.)
7        A.  Is it fair to say . . . I have no current
8    intention to testify.
9            I have to think about when you say "is
10   it fair to say," that's a tricky way of phrasing
11   that question for me.
12       Q.  (BY MR. CHACHKES) You have no intention
13   to testify to any particular plaintiff?
14       A.  Correct.
15       Q.  Okay.  Do you have any intention to
16   testify regarding any particular talc based product?
17       A.  No.
18       Q.  If you would turn to Exhibit 1, which is
19   your expert report, on page 6, you have a -- sort of
20   a summary in the last couple of paragraphs.
21           Do you see that?
22       A.  (Examined exhibit.)  Yes.
23       Q.  And in the second paragraph it reads,
24   "Raman spectro-" -- you wrote, "Raman spectroscopy

17 (Pages 62 to 65)

Alan Campion, Ph.D.

Page 66

1   is a reliable and unambiguous method for identifying
2   talc and asbestos bodies in human tissue as well as
3   inorganic materials," correct?
4       A.   Correct.
5       Q.   And that's your opinion in this case?
6       A.   Yes.
7       Q.   You opine that Raman spectroscopy is
8   reliable for identifying asbestos bodies yet you've
9   never done any work identifying asbestos bodies with
10  Raman spectroscopy?
11      A.   That's correct.
12      Q.   And you're not aware of the particular
13  challenges that may or may not exist in different --
14  identifying different kinds of asbestos or different
15  asbestiform versions of the same mineral?
16      A.   I'm not aware of specific challenges.
17      Q.   And that's because you did no research
18  whatsoever in that regard?
19      A.   Correct.
20      Q.   Do you have any intention to proffer an
21  opinion other than what's generally summarized in
22  those two paragraphs?
23      A.   Proffer an opinion to whom?
24      Q.   Well, an opinion in this case.

Page 67

1          So your expert report's an opinion,
2   right?  You realize that?
3       A.   Yes.
4       Q.   Okay.  On a high level, what you're
5   testifying to is summarized in those two paragraphs,
6   correct?
7       A.   Yes, on a high level.
8       Q.   Okay.  And then on a specific level, it's
9   really all about the research you've done in your
10  paper?
11      A.   Correct.
12      Q.   You don't have an opinion regarding the
13  potential causes of ovarian cancer, right?
14      A.   No.
15      Q.   And you don't have an opinion regarding
16  the potential causes of mesothelioma, correct?
17      A.   Correct.
18      Q.   In your publication, you identify talc in
19  three separate samples, correct?
20      A.   Correct.
21      Q.   One is something you doped, meaning, you
22  put the talc in yourself?
23      A.   Dr. Godleski put the talc in himself.
24      Q.   Okay.  One -- and the other two are

Page 68

1   pathology slides that Dr. Godleski got?
2       A.   Correct.
3       Q.   Other than those two human tissue samples
4   that I just mentioned, have you ever -- have you
5   ever looked at human tissue with Raman spectroscopy?
6       A.   No.
7       Q.   So what's listed in your paper is the
8   first time you ever looked at human tissue using
9   Raman spectroscopy?
10      A.   Correct.
11      Q.   And it's the first time you identified
12  talc using Raman spectroscopy?
13      A.   Correct.
14      Q.   And you've never identified asbestos using
15  Raman spectroscopy?
16      A.   Correct.
17      Q.   So the method for identifying talc in your
18  publication was something you and the co-authors
19  invented?
20      A.   What do you mean by "the method"?
21      Q.   So in your publication, there's a way to
22  identify -- it shows how to identify talc in human
23  tissue, correct?
24      A.   I'm still not sure what you're getting at.

Page 69

1       Q.   Okay.  What's confusing about my question?
2       A.   Could you rephrase it?
3       Q.   It would be helpful if you could tell me
4   what's confusing and then I could rephrase it
5   accordingly.
6       A.   I'm not quite sure what you mean by
7   "method."  I mean, we took the Raman spectrum.  We
8   compared the Raman spectrum with the Raman spectra
9   of known talc samples from multiple databases and
10  they matched.
11      Q.   Would you call that -- you wouldn't call
12  that "method."  Would you call it "methodology"?
13          Would you -- what would you -- what
14  word or phrase would you use to kind of summarize
15  the way of doing that that is in your paper?
16      A.   I would say we used Raman spectroscopy as
17  an analytical technique to identify talc.
18      Q.   Is this disclosure of a way of using Raman
19  spectroscopy to identify talc in tissue the first
20  such publication to do so?
21      A.   No.
22      Q.   Okay.  Is this way of identifying talc in
23  human tissue that's in your paper something that
24  anybody reasonably competent in Raman spectroscopy

18 (Pages 66 to 69)

Alan Campion, Ph.D.

Page 70

1    could do or use?
2        A.   Yes.
3        Q.   Who else, to the best of your knowledge,
4    has used Raman spectroscopy to identify talc in
5    human tissue?
6        A.   No one other than in the literature cited.
7        Q.   Okay.   And who is that?
8        A.   May I look at this?
9        Q.   Please.
10       A.   (Examined document.)   I'm still not used
11   to the organization of this.
12       Q.   So just -- just for the record, the binder
13   you have is basically the -- I guess is the
14   references that you list on the last page of your
15   expert report?
16       A.   Um-hum.
17       Q.   Does that include the Godleski expert
18   report?
19       A.   In here?
20       Q.   Yeah.
21       A.   Yes.
22       Q.   Okay.
23       A.   So References 3, 4, and 5 are the ones
24   that I know about that I could think of off the top

Page 71

1    of my head of people that look at talc.
2        Q.   Okay.   So your testimony is that the
3    Larkin paper, the Pence paper, and the Toporski
4    paper each disclose the identification of talc in
5    human tissue?
6        A.   I'm sorry.   I'm not sure that we're
7    looking at the same thing.
8        Q.   So -- oh, we may not be.   My -- my 3, 4,
9    and 5 are Larkin, Jansen and --
10       A.   Well --
11       Q.   I'm looking at your Materials Considered.
12       A.   I'm looking at the beginning of my expert
13   report, "Relevant Literature Review," on page 3.
14       Q.   My apologies.   Okay.   Let me rephrase
15   that.
16             So you're saying that in the de Mul
17   paper --
18       A.   Yes.
19       Q.   -- in the Rinaudo paper, and in the Musa
20   paper, each of those disclose the identification of
21   talc in human tissue?
22       A.   Correct.
23       Q.   Okay.   You're sure about it?
24       A.   Yes.   You have the papers if we need to

Page 72

1    look them up.
2        Q.   Okay.   Going to your paper -- just
3    returning to your paper, not your expert report, but
4    your paper -- can you just generally, going author
5    by author, tell me what each author contributed to
6    this paper?
7        A.   Well, we know what I did.
8             Ken Smith was the Raman microscopy
9    expert at Renishaw.
10            I believe Dr. Fan is the electron
11   microscopist.
12            And so I just don't recall.
13   Potentially, I may have been the one who developed
14   the cell line.
15            And I don't recall what Gregory did.
16            These were all long-time collaborators
17   of Dr. Godleski, and so he was the one that wanted
18   them to be co-authors.
19       Q.   By the way, the version of this paper
20   that's attached to your report is the just accepted
21   version, correct?
22       A.   Correct.
23       Q.   And now there's a published version,
24   correct?

Page 73

1        A.   Yes.
2        Q.   And is that identical to the just accepted
3    version I'm looking at?
4        A.   As far as I can tell.
5        Q.   And it's published in what journal?
6        A.   Analytical Chemistry.
7        Q.   And it's peer-reviewed?
8        A.   Oh, yes.   Absolutely.
9        Q.   Okay.   Are there any parts of your paper
10   that you cannot confirm its accuracy because one of
11   your co-authors was responsible for that piece?
12       A.   I certainly can't say anything about the
13   cell lines or that -- that sort of stuff.
14       Q.   When you say "about the cell lines,"
15   meaning what?
16       A.   Why that particular cell line of
17   RAW 264.7.   You know, I don't know anything about
18   that.
19       Q.   Any other part that you're --
20       A.   No.
21       Q.   So other than maybe the nature of in the
22   category of the cell lines, you stand behind every
23   sentence of your publication based on your personal
24   knowledge?

19 (Pages 70 to 73)

Alan Campion, Ph.D.

Page 74

1      A. So I don't have any personal knowledge of
2  model systems, cells, particles, assay. I wasn't
3  there when those things were prepared, so I can't
4  testify to that.
5          I also wasn't there when Godleski
6  prepared the particles and tissues, but I certainly
7  was there when we looked at the pathology slides.
8          Okay. So I would say everything from
9  Raman microscopy on down I'm quite confident in.
10     Q. When you say "Raman spectroscopy" --
11     A. Yeah. They did a funny formatting here.
12  So if you look at page 3, line 11 --
13     Q. Okay.
14     A. -- I think they cleaned that up in the
15  final version of the paper.
16     Q. Got it.
17         Okay. So you're personally familiar
18  with all the work and the conclusions and the
19  science in -- starting on page 3 where it says
20  "Raman microscopy" and everything after, correct?
21     A. Correct.
22     Q. And that was all worked on at Renishaw?
23     A. Correct.
24     Q. Why did Godleski come to Renishaw when the

Page 75

1  Raman spectroscopy was done?
2      A. Why was he there?
3      Q. Yeah, why was he there?
4      A. I think in part just to teach me. I mean,
5  I'm not a pathologist, right, so I didn't know what
6  to look for.
7      Q. So the RAW?
8  264.7 macrophage cell line, that's the li- -- that's
9  the cell line that was doped?
10     A. Correct.
11     Q. And that's not a human cell, correct?
12     A. I believe I looked it up and I believe
13  it's a mouse cell line; but beyond that, I can't
14  say.
15     Q. Okay. I have a note that it's a mouse,
16  Abelson murine leukemia virus-induced tumor cell.
17     A. I actually did take the time to look at
18  the TACC catalog, and they have 24,000 cell lines
19  developed since 1925, and that's the extent of my
20  knowledge.
21     Q. Okay. The talc used to dope that cell
22  line -- well, first of all, did you do the doping or
23  did Godleski?
24     A. Dr. Godleski did it.

Page 76

1      Q. Okay. The talc that Dr. Godleski put into
2  the cells, do you know what the source of that talc
3  was?
4      A. Yeah. It's identified in the paper. That
5  it was reagent grade talc from Aldrich CAS Registry
6  Number 14 on the box. It's on page 2 -- top of
7  page 2.
8      Q. Okay. And do you know what grade that
9  talc is?
10     A. I believe it was reagent grade, but I
11  don't know for sure.
12     Q. Okay. And that's because you're not
13  familiar with the grading of talc?
14     A. Yes.
15     Q. And the -- do you know what mines that J&J
16  used for its talc?
17     A. I have no idea.
18     Q. Do you know what mines the talc used to
19  dope the RAW cells in your paper came from?
20     A. I don't know that Sigma -- is it
21  Sigma-Aldrich? Yeah, I don't know that Sigma
22  identifies the source of their talc. In fact, it
23  could very well be synthetic.
24     Q. You're not offering an opinion in this

Page 77

1  case on the Raman spectra of J&J talc, are you?
2      A. No.
3      Q. You also looked at human tissue, correct?
4      A. Yes.
5      Q. One was from cystology slides of a patient
6  who had undergone talc pleurodesis, correct?
7      A. Correct.
8      Q. Okay. You -- do you understand what talc
9  pleurodesis is, generally?
10     A. Only in the vaguest possible way.
11     Q. Okay. Deliberately putting talc on a --
12     A. Right.
13     Q. -- into the tissue of a human being?
14     A. Right.
15     Q. Okay.
16         MR. DEARING: Can I interrupt you?
17         When you get to a pausing place, can
18  we take a break?
19         MR. CHACHKES: Yeah, we can pause
20  here. That's fine.
21         MR. DEARING: I didn't mean to
22  interrupt you.
23         MR. CHACHKES: Unless you think I'm on
24  a roll, I'm gonna --

20 (Pages 74 to 77)

Alan Campion, Ph.D.

Page 78

1    MR. DEARING:  I just had a really
2 large cup of coffee.
3    THE VIDEOGRAPHER:  Going off the
4 record.  The time is 10:37 a.m.
5    (A recess was taken from 10:37 a.m.
6    to 10:54 a.m.)
7    THE VIDEOGRAPHER:  This marks the
8 beginning of disk 2, back on the record.  The time
9 is 10:54 a.m.
10    Q.  (BY MR. CHACHKES)  Okay.  We were talking
11 about the doped mouse cells when we took a break.
12 Do you recall that?
13    A.  Yes.
14    Q.  Okay.  And for the purposes of the paper,
15 did you confirm the presence of talc using other
16 techniques other than Raman spectroscopy for those
17 mouse cells?
18    A.  No.
19    Q.  For the talc pleurodesis patient pathology
20 slide that originally came from Brigham and Young's
21 Women Hospital -- Women's Hospital [sic], correct?
22    A.  If that's what we said in the paper, yes.
23    Q.  Okay.  And that was procured by
24 Dr. Godleski?

Page 79

1    A.  Yes.
2    Q.  And then the remaining human tissue slide,
3 that third one came -- that was a patient who had
4 reported using perineal -- perineal talc, correct?
5    A.  Correct.
6    Q.  And it was ovarian tissue in that slide?
7    A.  Correct.
8    Q.  Do you know which cells in the ovary for
9 that slide?
10    A.  No.  That's outside my area of expertise.
11    Q.  Okay.  Do you know how the talc got into
12 that sample?
13    A.  Well, as we said in the paper, it was just
14 perineal use of talcum powder.
15    Q.  So you know that the talc that was in that
16 sample came through perineal use and not some other
17 method?
18    A.  That's what Dr. Godleski test --
19 specified --
20    Q.  Okay.
21    A.  -- or testified to.
22    Q.  Your only knowledge in this regard came
23 from Dr. Godleski?
24    A.  Oh, absolutely.  Yeah.

Page 80

1    Q.  Okay.  Do you know where Dr. Godleski's
2 knowledge came from?
3    A.  I don't have any personal knowledge other
4 than what's in this ex- -- expert report.
5    Q.  Okay.  Do you know whether that slide --
6 I'm gonna make a distinction between somebody who
7 uses talc -- uses perineal talc -- perineal talc and
8 because of it has talc in their cells or somebody
9 who uses perineal talc and happens to have talc in
10 their cells.
11    Do you understand that distinction?
12    A.  Correlation versus causality?
13    Q.  Well, so you would -- would you agree that
14 just because somebody uses talc doesn't mean that
15 the talc found in their cells got there through that
16 use?
17    MR. DEARING:  Objection to form.
18 Beyond the scope of his expertise.
19    A.  I can't comment on that.
20    Q.  (BY MR. CHACHKES)  Okay.  And you can't
21 comment on whether the perineal talc sample in your
22 paper reflects talc that was in the cells because of
23 the perineal use or somebody that was using perineal
24 talc and just happened to have talc in their cells?

Page 81

1    A.  That's outside my area of expertise.
2    Q.  Okay.  And do you have any knowledge of
3 what one would expect to find in terms of talc in
4 one's cells as a baseline, without the use of talc?
5    A.  I have absolutely no idea.
6    Q.  Okay.  And you don't know whether the talc
7 in those peri- -- ovarian cells that you looked at
8 was above the baseline or below the baseline?
9    MR. DEARING:  Objection to form.
10    A.  I -- I have no idea.
11    Q.  (BY MR. CHACHKES)  Okay.  And do you know
12 whether that talc -- those cells came from an area
13 of, for example, tumor in the ovaries?
14    A.  I was told by Dr. Godleski that that
15 sample was from tissue adjacent to tumor, but that's
16 the extent of my knowledge.  That's what he told me.
17    Q.  Do you know whether it came from an area
18 of consolidation?
19    A.  I don't know what that means.
20    Q.  Do you know whether it came from an area
21 of congestion?
22    A.  Don't know what that means.
23    Q.  Okay.  And the fact that the patient from
24 whom these cells came from had a history of perineal

21  (Pages 78 to 81)

Alan Campion, Ph.D.

Page 82

1  talc use, how does Dr. Godleski know that?
2      A.  I don't know.
3      Q.  And is there anything I can look at in
4  your report or in the paper that tells me the degree
5  of use for those -- for that patient that is the use
6  of perineal talc?
7      A.  That's certainly not something I would
8  know and I don't know if he put that in the front of
9  his report.
10     Q.  The -- was the presence of talc in the
11 human tissue that you looked at confirmed by other
12 techniques other than Raman spectroscopy?
13     A.  Yes.  I think in -- in his report he used
14 SEM/EDS.
15     Q.  When you say "his report," what do you
16 mean by that?
17     A.  This is the Brower report that's in -- in
18 the book here.
19     Q.  Okay.  So you're saying that the presence
20 of talc in the same slides you looked at in your
21 publication were the ones that Dr. Godleski had
22 looked at in that expert report that you referred to
23 in your materials considered?
24     A.  I don't know that they were the same

Page 83

1  slides.  I actually doubt that they were the same
2  slides because you have to prepare these slides
3  differently for microscopy than you do for SEM/EDS.
4      Q.  Okay.  In your paper, do you disclose
5  confirming the presence of talc in your -- the human
6  tissue slides through any other method other than
7  Raman spectroscopy?
8      A.  I don't believe so.
9      Q.  In this section on page 2 that begins
10 "Particles in tissues," it reads, "Histology slides
11 of a patient with known exposure to talc from a talc
12 pleurodesis procedure from Brigham and Women's
13 Hospital and from patients with exposure by way of
14 perineal use of talc from several other hospitals
15 was assessed" --
16     A.  Um-hum.
17     Q.  -- "by polarized light microscopy."
18         Do you see that?
19     A.  Yep.
20     Q.  Does that mean the two slides that you
21 looked at were assessed by PLM?
22     A.  Yes, we do PLM and Raman microscopy
23 simultaneously.  So we identify a particle using
24 polarized light microscopy, and then we shine the

Page 84

1  laser on to do a Raman spectrum --
2      Q.  Okay.
3      A.  -- of that particle.
4      Q.  So the PLM is necessary to hone in on the
5  particle you're gonna look at with Raman
6  spectroscopy?
7      A.  Correct.
8      Q.  And the PLM work was done by Dr. Godleski?
9      A.  The Renishaw microscope is equipped with
10 polarizing optics.
11     Q.  Okay.
12     A.  So we could do both the Raman and the PLM
13 in the same instrument.
14     Q.  Okay.  So the PLM aspect of the -- that
15 PLM work, was that done by you or was that done by
16 Dr. Godleski?
17     A.  Sometimes we did it together.  Sometimes I
18 did it on my own.
19     Q.  Okay.  Had you done this kind of PLM work
20 as a -- sort of a setup to doing the Raman work
21 before, prior to this paper?
22     A.  No.
23     Q.  Who taught you how to do the PLM aspect?
24     A.  Dr. Godleski.

Page 85

1      Q.  Do you know whether the human tissue that
2  you looked at in your publication was from
3  plaintiffs who were individuals in talc litigation?
4      A.  I don't know.
5      Q.  Do you -- and you don't know where -- what
6  mines the talc in those human tissue slides came
7  from, correct?
8      A.  Correct.
9      Q.  And you don't know the source, like
10 whether it came from J&J or Cal- -- or Colgate or
11 whether it's some industrial grade from a laboratory
12 supply?  You don't know the source of that talc
13 either, do you?
14     A.  No.
15     Q.  In that part of your paper that I pointed
16 you to, the particle in tissues, it suggests that
17 there were multiple perineal use tissue slides that
18 you looked at; is that correct?
19     A.  I believe we looked at two slides.
20     Q.  Okay.  And for the talc pleurodesis
21 slides, did you look at just one or is there more
22 than one?
23     A.  I can't recall.  We may have looked at
24 more than one.

22  (Pages 82 to 85)

Alan Campion, Ph.D.

| | |
|---|---|
| Page 86 | Page 88 |

Page 86

1    Q.  Okay.  But you only report on one of each
2  in your paper, correct?
3    A.  Yes, each of these figures was from one
4  slide.
5    Q.  Why don't you report on the other slides
6  that you looked at?
7    A.  So our purpose here was simply to
8  demonstrate that we could identify talc in tissue
9  unambiguously.  So we felt that if we demonstrated
10  that conclusively and unambiguously then that's all
11  we needed for this research project.
12        And there are also time and resource
13  constraints.  So Renishaw's demo instruments are not
14  available all the time, and we had sometimes one
15  day, sometimes two days.  So we did as much as we
16  could in the time available.
17    Q.  But the results you had on those
18  unreported-on slides were consistent with the
19  reported-on slides?
20    A.  I can't recall, but I -- I don't recall --
21  I don't recall any on anomalies.  Let's put it that
22  way.
23    Q.  The reference Raman spectrum that you
24  used, those came from an online laboratory from the

Page 87

1  online -- strike that.
2        The reference spectrum that you used
3  came from an online library at the Geology
4  Laboratory of Leon?
5    A.  Correct.
6    Q.  Have you used that online library before?
7    A.  Not before this project.
8    Q.  Okay.  That's because it's a mineral
9  database and you don't do minerals?
10    A.  Correct.
11    Q.  Did you search that database to see what
12  other minerals had Raman spectroscopy similar to
13  talc?
14    A.  Yes.  We pointed that out in the paper.
15    Q.  Okay.  And you found none?
16    A.  None.
17    Q.  Okay.  Did you -- what work did you do to
18  see whether there were any unreported-on minerals
19  that have similar Raman spectra to talc?
20    A.  What do you mean by "unreported-on"?
21    Q.  So, for example, minerals that have nearly
22  identical chemistries to talc might have similar
23  spectra, right?
24    A.  No.

Page 88

1    Q.  And you state that confidently?
2    A.  Um-hum.
3    Q.  Okay.  What is the percentage of amphibole
4  minerals that have been tested to find the Raman
5  spectrum?
6    A.  I don't -- I'm not sure that I know what
7  an amphibole is.
8    Q.  Okay.  What advantage does Raman
9  spectroscopy have over the other methods in the past
10  that people have used to identify minerals in human
11  tissue?
12    A.  Methods such as?
13    Q.  Do you know of any meth- -- what were
14  people doing before --
15    A.  Well, electron microscopy with energy-
16  dispersive spectroscopy I believe was the standard
17  method.
18    Q.  Okay.  What advantage --
19    A.  There --
20    Q.  Sorry.  I didn't mean to interrupt.
21    A.  No, that's all right.
22        There was -- there are, or is at least
23  one report of someone doing infrared spectroscopy,
24  but it's not widely used, as far as I can tell, for

Page 89

1  this purpose.
2    Q.  What advantage does electron microscopy
3  have over Raman spectroscopy for those purposes and
4  vice versa?
5    A.  So electron microscopy has higher spatial
6  resolution.  So if I remember correctly, a typical
7  electron microscopy can resolve objects to a size of
8  about 10 nanometers.
9        Raman microscopy being an optical
10  technique has a resolution limit roughly equivalent
11  to the wavelength of the light use, so about
12  1 micron.
13        So the advantages of electron
14  microscopy are greater spatial resolution.  The
15  advantages of Raman microscopy is much more
16  information about chemical composition and the
17  arrangement of the atoms in the mineral structure.
18    Q.  Any other respective advantages,
19  disadvantages?
20    A.  Not that I can think of.
21    Q.  Is one cheaper to use than the other?
22    A.  Oh, that's for sure.  Raman is much
23  cheaper.
24    Q.  Okay.

Alan Campion, Ph.D.

Page 90

1     A.  We're talking a couple hundred thousand
2  versus maybe a couple million.
3     Q.  Meaning, the instruments?
4     A.  Yeah, the instruments.
5     Q.  Okay.  What about actually running the
6  experiments, once you have the instrument as a sum
7  cost, or whether one is cheaper than the other?
8     A.  Since I haven't done electron microscopy
9  myself, I don't know how much time it takes.  Just
10 from talking to John and from reading this paper, I
11 think sample preparation is pretty elaborate for
12 electron microscopy, and sample preparation is
13 nonexistent for Raman microscopy.  You take the
14 slide, you put in the instrument, and you push a
15 button.
16    Q.  Any other respective advantages,
17 disadvantages in any way whatsoever?
18    A.  Not that I can think of.
19    Q.  Okay.  What about versus infrared?
20    A.  So in infrared spectroscopy, as I
21 mentioned, the -- sorry.
22         In spectroscopies involving
23 electromagnetic radiation, which include infrared
24 and visible light, the resolution is set by the

Page 91

1  wavelength of the radiation, and so the spot size
2  would be, let's say, a micron at 532, which is the
3  wavelength we used, and, let's see, if we went out
4  to 1064, which is in the near-infrared, you would
5  lose resolution by a factor of 2.
6         I'm trying to think of an infrared
7  frequency.  I could do a back of the envelope, if
8  you want.
9         But let's just say that for the
10 infrared technique spatial resolution is probably in
11 the order of 20 microns.
12    Q.  Okay.  So . . .
13    A.  So if you wanted to look at a particle,
14 for example, embedded in tissue, it would be very
15 difficult to discriminate the signature of the
16 particle from that of the surrounding tissue.  All
17 right.  I'm looking at a 5-micron particle in a
18 20-micron field of view.
19    Q.  Okay.  So roughly, when comparing
20 resolution, Raman spectroscopy is about 20 times
21 better than infrared and then EM --
22    A.  Let's say 10 times better.
23    Q.  In the range of 10 times better?
24    A.  Yeah.

Page 92

1     Q.  Okay.  And then elec- -- the EM is about
2  10 times better than --
3     A.  I think it's 100 times better.
4     Q.  Oh, 100 times better?
5     A.  Yeah.
6     Q.  Than Raman spectroscopy?
7     A.  Yeah.
8     Q.  Okay.  If I wanted to precisely
9  characterize the mineral I was looking at in human
10 tissue, electron microscopy would be better than
11 Raman spectroscopy because I have 100 times better
12 resolution, correct?
13    A.  I don't know what you mean by "precisely."
14    Q.  If my identification of the mineral
15 depended on seeing it really well, electron
16 microscopy would be better than Raman spectroscopy,
17 correct?
18         MR. DEARING:  Objection; form.
19    A.  If your interest was in examining the
20 morphology of the particle, yes.  If your interest
21 was in characterizing the chemical composition and
22 crystal structure, no.
23    Q.  (BY MR. CHACHKES)  If I wanted to know
24 more about the particle in human tissue beyond

Page 93

1  chemical composition and crystal structure, and that
2  was provided by electron microscopy, I would want to
3  use electron microscopy, right?
4         MR. DEARING:  Objection; form.
5     A.  If you wanted to learn something about
6  morphology, yes.
7     Q.  (BY MR. CHACHKES)  Why didn't you use
8  X-ray diffraction?
9     A.  Well, I'm not sure you can get an X-ray
10 diffraction pattern from a 5-micron particle.
11    Q.  Okay.  What about -- why isn't PLM alone
12 sufficient to characterize a mineral in the tissue
13 sample?
14    A.  It doesn't tell you anything about the
15 chemical composition or the arrangement of the atoms
16 in the lattice.
17    Q.  What about scanning electron microscopy?
18    A.  Scanning electron microscopy doesn't tell
19 you anything about the structure and arrangement of
20 the atoms in the particle.
21    Q.  In your article -- I could point you to
22 this, but you write, "The Raman signal intensity
23 depends upon the size and orientation of a talc
24 particle"; is that right?

Alan Campion, Ph.D.

Page 94

1    A.  Correct.
2    Q.  What do you mean by that?
3    A.  This is a little tricky.  So the Raman
4  signal depends upon the flexibility or the
5  polarizability or the ease with which electrons are
6  distorted in the presence of the electric field of
7  the laser.
8         And so if I can use a metaphor.
9  Imagine a crystal as a football and let's just
10 pretend that it's easier to slosh electrons back and
11 forth along the long axis as opposed to the short
12 axis.
13        So far so good?
14   Q.  So far so good.
15   A.  Okay.  So if the football was lying in the
16 plane of a microscope slide and the laser field
17 is -- the electric field of the laser is polarized
18 in that plane, then we would see a larger intensity
19 for that orientation than for that orientation
20 (demonstrating).
21   Q.  Okay.  Some orientations are more
22 conducive to inelastic electron scattering than
23 other orientations?
24   A.  I don't know what you mean by "more

Page 95

1  conducive to."
2    Q.  You get more of a signal?
3    A.  Correct.
4    Q.  Okay.  Is there a minimum size that's
5  required of the mineral to get an accurate Raman
6  spectrum reading for talc?
7    A.  That depends upon the specific conditions.
8  I'm trying to be precise here.
9         The issue is always the
10 signal-to-noise ratio.  In other words, what does
11 the signal look like relative to the background.  So
12 if you see -- well, I'll just draw it.
13 (Demonstrating.)
14        If you see something like that, okay,
15 you might say that that's a peak, right?
16   Q.  Okay.
17   A.  But if you see something like this, that's
18 pretty hard to say that there's a peak there.
19        And so it's always a question of the
20 signal and the background from the surrounding
21 medium from the detector, from all sorts of things.
22   Q.  Okay.  And when is -- when is the
23 signal-to-noise going to be an issue, and when is it
24 not going to be an issue?  And if you could relate

Page 96

1  that to the talc size to the talc particle.
2    A.  And that depends entirely on the
3  circumstances.  I can't generalize that, okay,
4  because the Raman intensity is proportional to the
5  volume of the particle.  Okay?  And so as the
6  particles get smaller, the intensity decreases, and
7  then it's just a question of how much the intensity
8  of the adjacent material compares to the adjacent --
9  to the talc particle that I'm interested in.
10   Q.  Okay.  Do you have -- and so you're saying
11 human tissue is such that you -- you can't sort of
12 generalize the noise created by the human tissue
13 surrounding a talc particle?
14   A.  That's correct.
15        And we pointed that out in the article
16 because even to the eye tissue structures are
17 inhomogeneous, right?  So you might have lymph, you
18 might have collagen, you might have all proteins.
19 You have all kinds of stuff there, and it varies
20 from location to location of the tissue sample.  So
21 it just matters where the talc is and what's around
22 the talc.
23   Q.  If you're looking at a Raman spectrum, how
24 do you know the signal-to-noise has become a problem

Page 97

1  versus, "Well, maybe I haven't found talc"?
2    A.  Can you rephrase that?  I'm not quite sure
3  what you're getting at there.
4    Q.  Well, if I'm looking at a sample and I
5  haven't already assumed there's talc in it, how do I
6  know the difference between the spectrum I'm looking
7  at, "Oh, I found that there is no talc," versus, "I
8  don't know because the signal-to-noise ratio is too
9  great" -- I mean, "too small"?
10   A.  Well, if I don't see a peak, right, then I
11 can't say anything about what's being sampled.
12   Q.  Is there a possibility that there is a
13 peak, it's just buried in noise?
14   A.  Sure.  That's what we're talking about
15 with signal-to-noise ratio.
16   Q.  Right.  And how do I know -- so how do I
17 know -- if I've got two Raman spectroscopy readouts,
18 how do I know whether, oh, well, this one is -- the
19 signal-to-noise is too great but maybe talc is in
20 there versus, oh, talc's not in there?
21   A.  Well, if the signal-to-noise ratio is
22 great, then you'll see it.
23        I think maybe what you meant was if
24 the signal-to-noise ratio is too small.

Alan Campion, Ph.D.

Page 98

1      Q.  Too small, correct.
2      A.  Yeah.
3      Q.  Yeah.
4      A.  Yeah.  Then you can't say anything.  If
5   you can't see signal above noise, then you can't say
6   anything.
7      Q.  Okay.  Is there a maximum size of the
8   mineral particle above which you might not get an
9   accurate Raman reading?
10     A.  I don't understand that question.
11     Q.  Is there a point where the mineral
12  particle is too big to use Raman spectroscopy?
13     A.  I am virtually certain that you could use
14  it to -- no, I'm certain that you could use it to
15  look up macroscopic, okay, crystals.  I mean,
16  millimeters, centimeters.  Right.
17     Q.  Okay.  Do you have any opinion regarding
18  the advantages of electron microscopes over Raman
19  spectroscopy when it comes to very small particles?
20     A.  If you're interested in morphology,
21  electron microscopy has the advantage.
22        If you're interested in chemical
23  composition and crystal structure or molecular
24  structure, then Raman microscopy has the advantage.

Page 99

1      Q.  Okay.  My question was more related to the
2   signal-to-noise issue.
3        Is there such -- would there be a case
4   in which you have a poor signal-to-noise under Raman
5   spectroscopy but you could resolve the question of
6   whether talc is there under electron microscopy?
7      A.  I am not an expert in signal-to-noise
8   considerations for electron microscopy, so I can't
9   comment to that.
10     Q.  I want to talk about the funding for this
11  paper.  If you -- I've looked at your invoice, which
12  is -- invoices, which is what's labeled as
13  Exhibit 2, and you see that it's billing from
14  January 3rd, 2017, through the end of June 2018.
15        Does that ring a bell?
16     A.  Yes.
17     Q.  Okay.  So am I correct that what's
18  Exhibit 2, the invoice, is -- from the very
19  beginning of 2017 to the end of June of 2018, is the
20  entirety of what you billed doing the work relating
21  to the paper?
22     A.  Yes.
23     Q.  And I've added it up and it's over
24  $190,000.

Page 100

1      Does that seem right?
2      A.  If you've added it up, that's correct.
3      Q.  Okay.  And do you have any idea why the
4   plaintiffs thought it was worth $190,000 to fund
5   this paper?
6        MR. DEARING:  Objection; form.
7   Speculation.
8      A.  I have no idea.
9      Q.  (BY MR. CHACHKES)  Do you have any idea
10  why plaintiffs think this could be a better method
11  for them than electron microscopy?
12        MR. DEARING:  Objection; form.
13  Speculation.
14     A.  I'm not sure what you mean by that
15  question.  I mean, that's -- that's for them to
16  decide, not for me to decide.
17     Q.  (BY MR. CHACHKES)  I'm not talking
18  about -- I'm talking about what you know.
19        What did they tell you?
20     A.  I've made the case that this is a
21  technique which is unambiguous.  That seems to be an
22  attractive feature of the technique to them.
23     Q.  And better than electron microscopy?
24        MR. DEARING:  Objection; form.

Page 101

1      You don't have to disclose any
2   contents of any conversations that we've had.
3        THE WITNESS:  Okay.
4      Q.  (BY MR. CHACHKES)  So did the plaintiffs
5   tell you whether they believe Raman spectroscopy for
6   the purposes of identifying minerals in tissue
7   samples is better than electron microscopy?
8        MR. DEARING:  Same objection.
9      A.  They would have no basis on which to make
10  that judgment.
11     Q.  (BY MR. CHACHKES)  Why do you say that?
12     A.  Because I'm the expert.
13     Q.  So it seems like a matter of common sense
14  if I'm paying $190,000 for something I want to get
15  something out of it.
16        What are the plaintiffs getting out of
17  it?
18        MR. DEARING:  Objection; speculation.
19     Q.  (BY MR. CHACHKES)  You can speculate.  If
20  you think that they're just sort of in a pro bono
21  way funding research, you can say that.  But if you
22  think there's another reason, I'd like to know.
23     A.  I would be guessing.
24     Q.  All right.  Guess.

26 (Pages 98 to 101)

Alan Campion, Ph.D.

Page 102

1    MR. DEARING:  If you know the answer,
2  you can say the answer.
3    A.  Okay.  So my guess is that they are
4  thinking that this technique might be more
5  unambiguous than other established techniques.
6    Q.  (BY MR. CHACHKES)  And at any time when
7  you were communicating with them, did you convey
8  that thought that this was going to be more
9  unambiguous than established techniques for using
10  for looking for minerals in tissue samples?
11    A.  I conveyed that in the paper and we've had
12  several conversations where I came to the conclusion
13  that this technique is unambiguous.
14    Q.  So more unambiguous than prior techniques?
15    A.  Unambiguous is superlative.  It can't be
16  more unambiguous.
17    Q.  Okay.  Well, there are other things to
18  know about particles other than structure and --
19  crystalline structure and -- what was the other
20  aspect?
21    A.  Chemical composition.
22    Q.  Yeah.  There's more to know about a
23  mineral than chemical composition and crystalline
24  structure, isn't there, or you don't know?

Page 103

1    A.  I'm not an expert in that area, but if --
2  if I may, I was tasked to identify talc.  That was
3  my task.  And the technique that we've developed
4  identifies talc unambiguously with complete
5  certainty.  I have no doubt whatsoever that this
6  method identifies talc, and that was the scope of
7  work.
8    Q.  And prior methods prior to your method did
9  not ambiguously identify talc?
10    MR. DEARING:  Objection; form.
11  Speculation.  He's already testified he's not an
12  expert in other methods.
13    Q.  (BY MR. CHACHKES)  You can answer.
14    A.  The answer I would give is that having
15  scanned Dr. Godleski's papers, for example, he
16  reports uncertainties.  He reports, I forgot,
17  5 percent uncertainty in the range of chemical
18  compositions, and that's more ambiguous than what
19  Raman spectroscopy can tell you.
20    Q.  What sources of funding were there for
21  this paper other than money from plaintiffs'
22  lawyers?
23    A.  None.
24    Q.  What did Renishaw get?

Page 104

1    A.  Renishaw did not bill me for instrument
2  time for much of the work.  We made an arrangement
3  for, I think, the last three days we were up there
4  to pay them, I think, $5,000 a day.
5    Q.  And that money came from plaintiffs'
6  lawyers?
7    A.  Yes.
8    Q.  Other than the $5,000 a day that you just
9  testified to, did the plaintiffs' lawyers pay
10  Renishaw anything?
11    A.  No.
12    Q.  What was Renishaw's interest in allowing
13  you to use their equipment prior to that free?
14    A.  So this will likely, or at least I hope,
15  turn out to be a collaboration for the future
16  because they independently have decided that putting
17  their instruments in pathology labs for particle
18  identification is a good business opportunity for
19  them.
20    And so this is a collaboration where I
21  could help them figure out parameters, test
22  hypotheses.  So we've had a good working
23  relationship for many years, and so we viewed this
24  as a collaboration initially.

Page 105

1    Q.  So in a nutshell, Renishaw's incentive was
2  that they saw the potential for greater use of their
3  instruments in a pathology context?
4    A.  Correct.
5    Q.  And what about Godleski?  Do you know
6  whether he was paid by plaintiffs' lawyers?
7    A.  I don't know that for a fact.
8    Q.  Does it seem a fair assumption that he was
9  paid just as you were?
10    MR. DEARING:  Objection; speculation.
11    A.  I don't know.  I simply don't know what
12  his financial arrangements were.
13    Q.  (BY MR. CHACHKES)  Okay.  Isn't the same
14  true of all of others, minus Kenna -- Kenneth Smith;
15  you don't know how all the other authors were
16  compensated, if at all?
17    A.  I have no reason to believe that they were
18  compensated for this work.  I believe that John
19  wanted them cited in recognition for their past
20  contributions.
21    Q.  When you say "past contributions,"
22  meaning, they've contributed nothing specific to
23  this article?
24    A.  They were responsible for the development

27 (Pages 102 to 105)

Alan Campion, Ph.D.

Page 106

1  of the cell lines and the electron microscopy and
2  that sort of stuff.  I don't know whether -- whether
3  Fan actually did an electron micrograph for any of
4  these samples or not.  I simply don't know.
5      Q.  Am I correct that in the invoices that are
6  marked as Exhibit 2 there are no billings for things
7  other than work related to the paper that we're
8  talking about?
9      A.  Correct.
10     Q.  So when I see things in this bill where
11 you bill for time talking to plaintiffs' attorneys,
12 that relates to this paper?
13     A.  Yes.
14     Q.  And you've had a long-standing
15 relationship with the Renishaw lab?
16     A.  Yes.
17     Q.  Going back to when?
18     A.  2002.
19     Q.  What --
20     A.  Actually, before that.  They had a more
21 primitive instrument that we used at Advanced Micro
22 Devices in the late -- 1997, 1998.  I was sort of an
23 informal consultant for AMD and my very first
24 experience with Raman microscopy was in their first

Page 107

1  generation instrument and the application was a
2  microelectronics application.  I believe we have a
3  publication in that area, but for sure I had a
4  student who did a master's thesis in which we
5  ident-- we were able to identify a impurity,
6  residual material, whatever you want to call it,
7  on -- on 12-inch silicon wafers that had been
8  mystifying to them.
9      Q.  Okay.  And something happened in 2002
10 where you kind of renewed this relationship?
11     A.  Yeah.  So what happened was -- and I'm
12 trying to remember the history here.  But about that
13 time, there was a great interest in the material
14 called strained silicon, and I believe it was
15 through Sematech that I first learned about strained
16 silicon.
17         And one of the ways you measure strain
18 in silicon is using Raman microscopy.  So when we
19 were on sabbatical in Paris in 2001, 2002, I wrote a
20 proposal and got about a million and a quarter or
21 million and a half, something like that, dollars
22 from the National Science Foundation under their
23 major research instrumentation program that funded
24 the purchase of a Renishaw microscope I had in my

Page 108

1  lab, as well as the equipment necessary to try to
2  develop a Raman near-field microscope to increase
3  the spatial resolution of Raman microscopy down to
4  the 10-nanometer range.  That project proved to be
5  overly ambitious and ultimately unsuccessful, but
6  the goal was to see if I could characterize strain
7  in silicon with high spatial resolution.
8      Q.  Have you ever received any compensation
9  from Renishaw?
10     A.  No.
11     Q.  Okay.  So since 2002, your relationship
12 with Renishaw has been sort of mutually
13 advantageous, is that correct, where you get to do
14 work with their instruments and they get sort of --
15 you know?
16     A.  No, no, no, no.  It's only this new
17 project is where I went to Renishaw and used their
18 instruments.
19         Prior to that, I had purchased an
20 instrument which was in my laboratory.
21     Q.  Okay.  Other than having purchased an
22 equipment with Renishaw, did you have any sort of
23 kind of relationship with them?
24     A.  If there were technical issues that arose

Page 109

1  from our instrument, I -- I would talk to them, send
2  a technician down, adjust it, that sort of stuff,
3  but that was it.
4      Q.  Okay.  In the acknowledgments of your
5  paper, I see it says -- and this is on page 8 --
6  "This study was supported in part by a pilot project
7  grant and the Particles Research Core of the Harvard
8  Center for Environmental Health supported by NIEHS,"
9  and there's a number.
10         Do see that?
11     A.  Yep.
12     Q.  What is that pilot project grant?
13     A.  I have absolutely no idea.  That was
14 Fedulov's and Godleski's.
15     Q.  Okay.  So this support from -- that is
16 listed in that first sentence, do you know whether
17 that was financial support or that was equipment
18 support or something else?
19     A.  I really don't know.
20     Q.  And it's possible that the only financial
21 support for this paper came from plaintiffs'
22 lawyers?
23     A.  It's possible.
24     Q.  Was Dr. Godleski responsible for whatever

28 (Pages 106 to 109)

Alan Campion, Ph.D.

Page 110

1  support was received and it's mentioned in the
2  acknowledgments?
3      A.  All I know is what the acknowledgment
4  says, and we never discussed it.
5      Q.  Okay.  He put that there, right?
6      A.  Yes.
7      Q.  Okay.  So it's possible Dr. Godleski was
8  responsible for that support?
9      A.  (Examined document.)
10     Q.  Who else would it be?
11     A.  Well, I mean, I can read this as well as
12 you can.  So Fedulov was a PI on one grant and the
13 particle research core was Dr. Godleski.
14         I have no information beyond what is
15 contained in that sentence.
16     Q.  Okay.  Who's Dr. Fedulov other than a
17 co-author?  I mean, he --
18     A.  I think -- I think he was the guy that did
19 the cell line developmental work, but I just don't
20 recall.
21     Q.  Do you know what the particle research
22 core of the Harvard Center for Environmental Health
23 is?
24     A.  No.

Page 111

1      Q.  You don't know what Dr. Godleski's
2  relationship to that center is?
3      A.  No.
4      Q.  To what degree -- you -- you cite in your
5  materials considered an expert report from
6  Dr. Godleski that's dated from June of 2018,
7  correct?
8      A.  Yes.
9      Q.  Okay.  To what degree did that impact the
10 opinions in your expert opinion that is your expert
11 report that is Exhibit 1?
12     A.  I'm not sure that I was even aware of that
13 report when I prepared my expert report.  I -- I
14 don't think I referred to it in my expert report and
15 I certainly didn't remember knowing what was in it.
16     Q.  Do you -- does the Godleski expert
17 report -- do they have any impact whatsoever on the
18 publication?
19     A.  No.  The publication was well before the
20 Godleski report.
21     Q.  Okay.
22         MR. CHACHKES:  Do you have any
23 objection to marking that report as an exhibit in
24 the deposition?

Page 112

1          MR. DEARING:  No.
2      Q.  (BY MR. CHACHKES)  Okay.  Can -- can -- do
3  you mind taking out the Godleski expert report that
4  is Number 11 in your materials considered?  We're
5  gonna just mark it as the next -- an exhibit.
6      A.  I will get it back?
7      Q.  In a way you will.
8          MR. CHACHKES:  Do you mind marking
9  that as Exhibit 3?  Okay.
10         (Deposition Exhibit 3 marked for
11         identification.)
12         MR. CHACHKES:  Okay.  I don't know if
13 anyone has a paperclip.
14     Q.  (BY MR. CHACHKES)  So I'll just confirm
15 that what is marked now as Exhibit 3 is the Godleski
16 report that you refer to in your materials
17 considered.
18     A.  Okay.  (Examined exhibit.)
19     Q.  Do you confirm --
20         MR. DEARING:  Can we leave it out?
21         MR. CHACHKES:  Yeah, leave it out.
22     Q.  (BY MR. CHACHKES)  You just -- do you
23 confirm that that is indeed the case, that this is
24 Number 11 on your materials considered?

Page 113

1      A.  Oh, yes.
2      Q.  In your invoices, I see that you've billed
3  for a meeting in St. Louis with Godleski.
4          What was going on in St. Louis?
5      A.  Oh, there was a microscopy conference that
6  he was attending.  Renishaw was going to be there
7  and they would roll out some new instrumentation,
8  and John thought it would be a good time to get
9  together and start thinking about drafting our
10 paper, if I remember correctly.
11     Q.  Okay.  I'm just gonna put this in the
12 stack of exhibits over here so it doesn't get lost.
13         Have the -- have the conclusions or
14 the work that's been done that's reflected in your
15 paper -- your publication been replicated or tested
16 by anybody other than what's reflected in the paper
17 itself?
18     A.  Not to my knowledge.
19     Q.  You state in your opinion that -- your
20 opinion in part is based on your review of
21 scientific literature; is that correct?
22     A.  In my expert report?
23     Q.  Yeah.
24     A.  If that's what I said, then it's correct.

29  (Pages 110 to 113)

Alan Campion, Ph.D.

Page 114

1    Q.  Okay.  And then I'm just gonna point you
2  to page 3.  You write that "There are dozens, if not
3  hundreds, of papers written that demonstrate the
4  application of Raman microscopy to a wide variety of
5  problems in biology and medicine."
6    A.  Um-hum.
7    Q.  Do you stand by that statement?
8    A.  Absolutely.
9    Q.  But the literature describing the use of
10  Raman microscopy to identify inorganic particles in
11  tissue is much more limited, correct?
12    A.  That's correct.
13    Q.  And you identified for me three
14  publications that relate to that, correct?
15    A.  That's correct.
16    Q.  And those are what -- remind me of those
17  numbers, 3, 4, and 5 --
18    A.  Yes.
19    Q.  -- in your expert report?
20    A.  Yes.
21    Q.  3, 4, and 5 are peer-reviewed?
22    A.  Oh, yes.
23    Q.  Are you -- so I see that your billing ends
24  in June.

Page 115

1        What have you billed in June?
2    A.  I haven't billed anything since June.
3    Q.  Okay.  You will, however, bill for the
4  work -- for the time preparing for this deposition
5  and this deposition, correct?
6    A.  Sure.
7    Q.  Anything else that you're planning to bill
8  for?
9    A.  You know, I think we had a couple of more
10  days of work up in Chicago.  I just -- I just don't
11  recall.  I just -- I haven't done the billing.  I
12  just haven't kept up with it.
13    Q.  The couple more days in Chicago, what was
14  that?
15    A.  I don't recall.  We just went to -- to --
16  I just don't recall.  Went up to do some -- some
17  experiment.
18    Q.  Is Chicago -- what was in Chicago?
19    A.  That's Renishaw.
20    Q.  Okay.  That was recent?
21    A.  I have to look at my schedule.  I just
22  really don't recall off the top of my head.
23    Q.  Past three months?
24    A.  It was at the end of last year.  Yeah.

Page 116

1    Q.  It had something to do with identifying
2  talc in human tissue?
3    A.  I think so.
4    Q.  You have no recollection whatsoever why
5  you went to Renishaw three months ago -- in the last
6  three months?
7    A.  I don't have a detailed recollection.  It
8  was to follow up on something.  I just don't
9  remember what it was.
10    Q.  Since your paper was already accepted for
11  publication at that point, what were you following
12  up on?
13    A.  I really don't -- I don't recall.
14    Q.  Do you have any plans to do additional
15  work in this area?
16    A.  If I'm asked to.  I don't have any current
17  plans.
18    Q.  Have you been asked to?
19    A.  No.
20    Q.  Has anybody from the plaintiffs' side said
21  to expect work to come?
22    A.  No.
23    Q.  So as far as you know, this may be the end
24  of your research into talc -- identifying talc in

Page 117

1  human tissue?
2    A.  As far as I know.
3    Q.  Are you aware of any activity whatsoever
4  to apply the technique you lay out in your
5  publication to actual slides from actual plaintiffs
6  in talc cases?
7    A.  Are you asking me if I'm going to be asked
8  to testify in cases?  Is that what you're asking me?
9    Q.  Well, something much more general.
10    A.  All right.
11    Q.  Which is:  Are you aware of any activity
12  whatsoever, whether it's you, Godleski, anybody else
13  who's going to take the techniques in your paper and
14  use it to identify talc in the context of a talc
15  litigation?
16    A.  I'm not currently aware of any plans like
17  that.
18    Q.  Okay.  Are you aware of any published
19  literature, anything that you saw while writing your
20  paper, or the process of preparing your expert
21  report, where the conclusions were, to any degree,
22  contrary to your conclusions?
23    A.  I haven't seen anything that's contrary to
24  our conclusions.

Alan Campion, Ph.D.

Page 118

```
 1       Q.  Or inconsistent?
 2       A.  Or inconsistent.
 3       Q.  All right.  I want to look at the Pence
 4   paper, if you can find --
 5           MR. CHACHKES:  I'm sorry.  Dave, do
 6   you mind helping?  Sorry.
 7           THE WITNESS:  I'm sorry to be using
 8   you in that regard.
 9           MR. CHACHKES:  It's the Pence paper,
10   yeah.
11       Q.  (BY MR. CHACHKES)  So let me -- so you --
12   you cite the --
13           MR. CHACHKES:  Thanks, that was quick.
14       Q.  (BY MR. CHACHKES)  -- you cite the Pence
15   paper as number -- let's see, as Number 1 in your
16   Relevant Literature Review in your expert report,
17   correct?
18       A.  Yes.
19       Q.  And of it on page 3 you say the Pence --
20   let me just go there.  You say, "Inhaled particles
21   (including talc, rutile, alpha-quartz, calcite, and
22   related compounds) were identified in human tissue
23   sections using Raman microscopy," correct?
24       A.  That was a mistake.
```

Page 119

```
 1       Q.  Ah.  Why was it a mistake?
 2       A.  It must have been referring to Paper
 3   Number 3 because I reread the Pence paper.  And so I
 4   don't know if that was a bad cut and paste or a bad
 5   proofreading job, but . . .
 6       Q.  Okay.
 7       A.  So that paper does not contain anything
 8   relevant to particles.
 9       Q.  Okay.  And did you read the paper prior to
10   writing this report?
11       A.  Yes.
12       Q.  Okay.  You alone wrote the words in this
13   paper, right?  In your --
14       A.  Yes.
15       Q.  -- opinion, right?
16       A.  Yes.
17       Q.  Did you share drafts with plaintiffs'
18   counsel when you were writing this?
19       A.  We may have exchanged one draft but just
20   for format sake.
21       Q.  Okay.  Are there any other mistakes in
22   your -- either your --
23       A.  Not that I've discovered.
24       Q.  Okay.  That's the only mistake that you
```

Page 120

```
 1   want to bring to my attention?
 2       A.  That's the only mistake I'm aware of.
 3       Q.  Okay.  In fact, the paper does not mention
 4   inhaled particles, correct?
 5       A.  That's correct.
 6       Q.  And it does not mention the -- the
 7   minerals that you list?
 8       A.  That's correct.
 9           MR. CHACHKES:  Do you mind giving me
10   the book?  It's probably the big thick one.
11       Q.  (BY MR. CHACHKES)  And then you cite a
12   book by Taporski and others, Confocal Raman
13   Microscopy, correct?
14       A.  Yes.  Um-hum.
15           MR. CHACHKES:  Yeah.  Thank you.
16       Q.  (BY MR. CHACHKES)  And you cite this book
17   because it describes recent developments in
18   applications of Raman spectroscopy, correct?
19       A.  Right.
20       Q.  This book doesn't discuss the use of Raman
21   spectroscopy to identify talc, does it?
22       A.  I've skimmed the book.  I have not read it
23   cover to cover.
24           My point in including it is to
```

Page 121

```
 1   demonstrate the myriad of applications of confocal
 2   Raman microscopy that are available to establish the
 3   widespread utility and the, sort of, high regard
 4   that the technique is held in the field -- in fact,
 5   in many fields.
 6       Q.  My -- my question is much more limited.
 7           The book doesn't discuss the use of
 8   Raman spectroscopy to identify talc, does it?
 9       A.  I don't know.  I didn't read it that
10   carefully.
11       Q.  Okay.
12       A.  I skimmed it.
13       Q.  And this book does not discuss the use of
14   Raman spectroscopy to identify asbestos, does it?
15       A.  I don't recall.  I can reread the book.
16       Q.  Sitting here today, you said you can't
17   tell me?
18       A.  Sitting here today, I can't tell you
19   definitively, that's right.
20       Q.  Okay.  You also list an article by de Mull
21   entitled "Raman misc- -- Microscopy in Human
22   Pathology"?
23       A.  Yep.
24       Q.  Okay.  And you say -- you say that this --
```

31 (Pages 118 to 121)

Alan Campion, Ph.D.

Page 122

1    actually, skip that.
2            This paper studied two individuals,
3    one with silicosis and one who cleaned rubber tanks,
4    correct?
5        A.  I don't recall.
6        Q.  All right.  Let me just mark it as an
7    exhibit.
8            MR. CHACHKES:  Are we on 4?  Okay.
9            (Deposition Exhibit 4 marked for
10           identification.)
11       Q.  (BY MR. CHACHKES)  Yeah.  So if you could
12   confirm what's been marked as Exhibit 4 is -- what
13   you have is --
14       A.  Yes.
15       Q.  -- Item Number 3 in your Relevant
16   Literature Review?
17       A.  Yes.
18       Q.  Okay.  And did you review any of the
19   papers cited by de Mull in this publication?
20       A.  I did not.
21       Q.  Then how do you know whether you are, in
22   fact, correct when you say, "This is the first
23   application of Raman microscopy in human pathology"?
24           MR. DEARING:  Actually, I believe he

Page 123

1    says, "that I'm aware of."
2        A.  It was the first one I could find doing a
3    literature search.
4        Q.  (BY MR. CHACHKES)  Okay.  You might be
5    wrong?
6        A.  Yes.
7        Q.  Okay.  You also write about this paper,
8    "The authors identified particles that include talc,
9    rutile, quartz, and related compounds in lung and
10   lymph node tissue."
11           Do you see that in your -- your
12   report?
13       A.  Yes.
14       Q.  And then you write that "The authors
15   concluded that the Raman technique could be used for
16   this nondestructive identification of inclusions in
17   human lung and lymph node tissue and that this
18   technique can be extended to other tissues."
19           Do you see that?  You wrote that.
20       A.  Okay.
21       Q.  Correct?
22       A.  If that's what I wrote, that's what I
23   wrote.
24       Q.  I'm not trying to trick you.  If you want

Page 124

1    to just read it.
2        A.  (Examined exhibit.)  Yes, that's what I
3    wrote.
4        Q.  Okay.  And the paper studied two
5    individuals, one with silicosis and one who cleaned
6    rubber tanks, correct?
7        A.  That's what it says.
8        Q.  And in the silicosis patient's lungs in
9    this paper that's marked as Exhibit 4, Raman spectra
10   were found that resembled a reference quartz
11   spectrum, correct?
12       A.  (Examined exhibit.)  Yeah.  That would be
13   Figure 4.
14       Q.  Well, you tell me.  I'm -- it's a
15   question.
16       A.  I'm looking at the paper and that's what
17   it says in Figure 4.
18       Q.  Okay.  In the other patient, Raman spectra
19   identified talc and rutile, correct?
20       A.  Yes.
21       Q.  In the case of the silicocious --
22   silicosis patient, the quartz was already known to
23   be present because the researcher had used polarized
24   light microscopy to identify the quartz, right?

Page 125

1        A.  Can I have a moment to refresh my memory
2    here?
3        Q.  Sure.
4        A.  (Examined exhibit.)  Yeah.  So Figure 4
5    compares a particle found in a lymph node to a
6    reference particle and the spectra look virtually
7    identical or close enough that you could identify
8    the particle as alpha-quartz.
9        Q.  Well, the question was different.  It was
10   about PLM.  Let me ask it again.
11           In the case of silicosis pat--
12   silicosis patient, the quartz was already known to
13   be present prior to the Raman spectroscopy because
14   the researchers had used polarized light microscopy
15   to identify the quartz; is that correct?
16       A.  (Examined exhibit.)  I mean, I don't see
17   that.  So are -- I mean, can you point me to where
18   you see that because I don't see it?
19       Q.  Okay.  So you don't see it?
20       A.  Huh-uh.
21       Q.  Okay.  Let's move on to the next paper.
22           Let's talk about -- you identify a
23   study by Rinaudo and that's Paper Number 4 in your
24   expert report, correct?

Alan Campion, Ph.D.

Page 126

1    A.  Yes.
2          MR. CHACHKES:  Thank you.
3    Q.  (BY MR. CHACHKES)  You say in your report
4  that "The authors identified asbestos bodies and
5  talc in lung and pleural plaque tissues.  They
6  describe the technique for study of inorganic
7  particles/fibers incorporated in the biological
8  system directly within the historog- -- histological
9  sections, without digestion of the tissue," correct?
10    A.  (Examined exhibit.)
11    Q.  I'm just quoting what you wrote.
12    A.  Yeah.  I'm just refreshing my memory.
13    Q.  Okay.  And that's -- you -- that's an
14  accurate representation of your summary of the -- of
15  the Rinaudo paper?
16    A.  That's what I gleaned from reading that
17  paper at that time, yes.
18    Q.  Okay.  Do you know if the method used by
19  Rinaudo has ever been repeated to identify asbestos
20  bodies in lung tissue?
21    A.  I -- no.
22    Q.  Do you know whether the method used by
23  Rinaudo has ever been repeated to identify talc
24  bodies in lung tissue?

Page 127

1    A.  So I believe that Paper Number 5 is an
2  extension of Paper Number 4.  So they may have
3  repeated their earlier measurements.
4    Q.  Do you know if that's the -- do you know
5  whether that's the same method in 5 that was used
6  in 4?
7    A.  It was just a refinement.
8    Q.  Okay.  Can we mark the Rinaudo paper as an
9  exhibit?
10          THE COURT REPORTER:  This would be
11  Exhibit 5.
12          MR. CHACHKES:  Thanks.
13          (Deposition Exhibit 5 marked for
14          identification.)
15    Q.  (BY MR. CHACHKES)  Can you confirm that
16  what's been marked as Exhibit 5 is the Rinaudo paper
17  that you list as Number 4 in your expert report?
18    A.  (Examined exhibit.)  Yes.
19    Q.  Okay.  You say in your report in the last
20  sentence that Raman that they identified two
21  minerals of interest, chrysotile and talc; is that
22  correct?
23          MR. DEARING:  Can I interrupt you for
24  a minute?

Page 128

1          MR. CHACHKES:  Sure.
2          MR. DEARING:  It appears that these
3  two studies or articles have different titles, so
4  are you sure they're the same?
5          MR. CHACHKES:  No, they don't.
6  Number 4.  Exhibit 5 is Number 4.
7          MR. DEARING:  Sorry.  I was looking
8  at 5.
9          MR. CHACHKES:  Okay.
10          MR. DEARING:  Sorry about that.
11    Q.  (BY MR. CHACHKES)  So -- where were we?
12  You said -- now you -- you state in your expert
13  report that the authors identified two minerals of
14  interest, chrysotile and talc, correct?
15    A.  Um-hum.
16    Q.  That a "yes"?
17    A.  Yes.
18    Q.  Okay.  And are you aware that chrysotile,
19  the word "chrysotile" doesn't appear in this paper?
20    A.  (Examined exhibit.)  I must have made a
21  mistake perhaps.  Maybe it was -- I can never say
22  these things -- chrysilodite [sic].
23    Q.  So what you're doing now is you're trying
24  to pronounce a kind of asbestos, correct?

Page 129

1    A.  Yes.
2    Q.  Okay.  It's pronounced crocidolite.
3    A.  Whatever you say.
4    Q.  Okay.
5    A.  I told you I couldn't pronounce it.
6    Q.  Okay.  Crocidolite is not the same thing
7  as chrysolite.
8          You understand that, don't you?
9    A.  Yes.
10    Q.  Okay.  How is it you made this typo when
11  you don't know anything about asbestos, replacing
12  one kind of asbestos for another?
13    A.  I don't know.
14          MR. DEARING:  Objection; form.
15    A.  I don't have a good explanation.
16    Q.  (BY MR. CHACHKES)  Could it be that
17  plaintiffs' lawyers did that correction for you?
18    A.  Absolutely not.
19          MR. DEARING:  Object; form.
20          Can you -- let me stop you for a
21  minute.  Can you read back two questions ago?  I'm
22  misunderstanding what you think he got confused.
23          MR. CHACHKES:  What?
24          MR. DEARING:  I misunderstood -- I

Alan Campion, Ph.D.

Page 130

1    don't understand what you're suggesting about what
2    he got confused on.
3            MR. CHACHKES:  You'll -- you have
4    redirect if you'd like.  That's a good
5    opportunity --
6            MR. DEARING:  I just want to hear the
7    question.
8            MR. CHACHKES:  It's on your screen.
9            (Mr. Dearing examined realtime
10            screen.)
11            MR. DEARING:  Okay.
12            MR. CHACHKES:  Okay.
13    Q.  (BY MR. CHACHKES)  Are you aware of what
14    asbestos group chrysotile belongs to?
15    A.  No.
16    Q.  Are you aware what asbestos group
17    crocidolite belongs to?
18    A.  No.
19    Q.  And indeed the paper doesn't say the paper
20    said that it found crocidolite and talc, in fact,
21    but it found spectra consistent with crocidolite and
22    talc?
23            MS. O'DELL:  Object to the form.  Feel
24    free to take a look at the paper, if you'd like.

Page 131

1            MR. DEARING:  You're misstating the
2    conclusion.
3            MR. CHACHKES:  If you -- if you guys
4    could limit the instructions to the witness, I don't
5    think he needs your help.
6            MR. DEARING:  Well, don't mislead him
7    because you're misstating what's in the paper.
8            MR. CHACHKES:  I -- he's a scientist.
9    He gets this.
10    A.  (Examined exhibit.)  Well, at the bottom
11    of page 575, it looks to me like they concluded, and
12    I quote, "We can therefore conclude that
13    'crocidolite' was the asbestos phase prev- --
14    prevalently breathed by the patient whose lungs thin
15    sections were studied."
16    Q.  (BY MR. CHACHKES)  And that's based on the
17    identification -- so did you note that your attorney
18    was pointing something out to you?
19    A.  Yes.
20    Q.  Yeah.  And he was pointing to a part of
21    the paper to help you find something in the paper,
22    correct?
23    A.  Yes.
24    Q.  Let's talk about another thing you cite.

Page 132

1            You cite the Musa paper as Number 5,
2    correct?
3    A.  Yes.
4            MR. CHACHKES:  Okay.  Let's mark that
5    as an exhibit.
6            THE COURT REPORTER:  This will be
7    Exhibit 6.
8            (Deposition Exhibit 6 marked for
9            identification.)
10    Q.  (BY MR. CHACHKES)  Can you confirm that
11    what's marked as Exhibit 6 is Paper Number 5, the
12    Musa paper, Paper Number 5 in your report?
13    A.  Yes.
14    Q.  Okay.  And of this paper you write that
15    the authors demonstrated that "Raman microscopy can
16    be applied directly to histo- -- histological
17    sections prepared for medical diagnosis," correct?
18    A.  Yes.
19    Q.  You also write that the paper represents
20    an extension of the previous paper and -- actually,
21    strike that.
22            So you were relying on this paper to
23    support your opinion that Raman spectroscopy can be
24    used to identify talc and asbestos in human tissue?

Page 133

1    A.  That's what they demonstrated.
2    Q.  Okay.  Are you aware that the Musa paper
3    reported a strong peak that is not present in talc
4    or crocidolite?
5    A.  (Examined exhibit.)
6    Q.  I'll direct your attention to page 70, the
7    text under Figure 10.
8    A.  So they assigned this band of 892 as due
9    to paraffin film.
10    Q.  Okay.  Does that impact your understanding
11    of whether the identification of crocidolite was
12    accurate?
13    A.  I'm not an expert in asbestos bodies.  I
14    was not asked to study them or be prepared to
15    comment on them.
16            So if you're asking me is the presence
17    of a band known to arise from paraffin or from
18    mounting medium or anything like that, confound
19    their assignment, I would say no.
20    Q.  Okay.  Do you feel your expertise is such
21    that you can confirm that their identification of
22    crocidolite was indeed correct?
23    A.  I haven't studied the Raman spectra of
24    crocidolite.

Alan Campion, Ph.D.

Page 134

1    Q.  Musa confirmed the Raman spectra with SEM
2  and EDS, correct?
3    A.  It appears so, yes.
4    Q.  And indeed, Musa used SEM/EDS to confirm
5  the kind of asbestos, correct?
6    A.  That's what -- let's see.
7       (Examined exhibit.)  So if you're
8  looking at Figure 5, Part B, they identify that as
9  clinocor- -- clinochlore.  I don't see any other.
10  And then 5A was the EDS spectrum of talc.
11       So I don't see any SEM work done for
12  crocidolite in this paper.
13    Q.  Okay.
14       MR. CHACHKES:  We can take a break
15  here.  I don't have an enormous amount after
16  lunch --
17       THE WITNESS:  Okay.
18       MR. CHACHKES:  -- so I don't know if
19  that impacts on how much of a lunch you want to
20  take.
21       THE WITNESS:  Okay.
22       MR. CHACHKES:  But I'm only one of --
23       MR. DEARING:  I'm sure Ken has quite a
24  bit.

Page 135

1       THE VIDEOGRAPHER:  Going off the
2  record.  The time is 12:07 p.m.
3
4       (A lunch recess taken from 12:07 p.m.
5       to 1:21 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 136

1       AFTERNOON SESSION
2       (Leigh O'Dell is not present.)
3       THE VIDEOGRAPHER:  Back on the record.
4  Time is 1:21 p.m.
5       EXAMINATION (CONTINUED)
6  BY MR. CHACHKES:
7    Q.  Dr. Campion, have you deleted or otherwise
8  destroyed or caused to be deleted any communications
9  regarding the funding of your research that we've
10  been talking to -- about today?
11    A.  No.
12    Q.  Okay.  I do ask in the future, and you can
13  consult your counsel about this, that you preserve
14  all such communications.  Okay?
15    A.  Yes.
16    Q.  That is, in any way relate to your article
17  and the funding of that article.
18       Can your -- the method you lay out for
19  detecting minerals in tissue, can that be used to
20  determine the abundance of a detected mineral in a
21  patient's body?
22    A.  So that's sort of a two-part answer,
23  right.  You would use polarized light microscopy to
24  determine the number of particles and then Raman to

Page 137

1  say that that is how many talc -- how many of those
2  particles were talc.
3    Q.  But can that be extrapolated in a
4  scientifically significant way to the amount of talc
5  in the body, generally?
6       MR. DEARING:  Objection; form.  Beyond
7  his areas of expertise.
8    A.  I don't know.
9    Q.  (BY MR. CHACHKES)  Do you know what
10  software those who use crystal -- those who use
11  Raman spectroscopy to identify minerals generally
12  use?  Strike that.  Let me make that a better
13  question.
14    A.  Okay.
15    Q.  For those folks who use Raman spectroscopy
16  to identify minerals, generally, do you know what
17  software they use to identify the spectra?
18    A.  These are databases, and there are
19  probably four or five databases.  I've come into --
20  discover's not quite the right word.  I looked into
21  two databases I hadn't looked into previously, but,
22  yes, there are a variety of these things.  They're
23  quite standard.  They're well recognized.  They're
24  used by geologists and mineralogists, planetary

35  (Pages 134 to 137)

Alan Campion, Ph.D.

Page 138

```
 1   scientists.
 2       Q.  Have you talked to any geologists or
 3   mineralogists or planetary scientists to ask what
 4   they do?
 5       A.  No.
 6       Q.  So you're just assuming that's what --
 7   they use these databases?
 8       A.  I'm not assuming that.  If you go to their
 9   website, that's what they say they do.
10       Q.  Give me an example of a website.
11       A.  RRUFF, R-R-U-F-F.  University of Arizona.
12       Q.  And do you know who has created that
13   database?
14       A.  I don't remember the name of the faculty
15   member in charge, but I did, in fact, send an e-mail
16   to the staff scientist just yesterday to see if they
17   had a search function, and they don't.
18       Q.  Okay.  But if I wanted to figure out
19   the -- what mineralogists do as a matter of course
20   or practice, one good person to talk to would be the
21   person who created the RRUFF database?
22       A.  Sure.
23       Q.  Have you heard of the CrystalSleuth
24   software?
```

Page 139

```
 1       A.  Yes, I've heard of it.
 2       Q.  Okay.  Do you know that it's known to be
 3   only 84 percent accurate?
 4       A.  No, I don't know that.
 5       Q.  Do you know why it might be less than
 6   100 percent accurate?
 7       A.  I'm not gonna speculate.  I have no idea.
 8       Q.  Okay.  Well, it does implicate your
 9   conclusions about the applicability of Raman
10   spectroscopy to identifying minerals, doesn't it?
11       A.  I respectfully disagree.
12       Q.  Why do you disagree?
13       A.  I look at multiple databases and I see the
14   same spectra in multiple databases for talc of
15   different origins and they look identical.  I have a
16   high degree of confidence that it's talc.
17       Q.  Now, you're assuming, aren't you, that the
18   minerals in a tissue sample would occur as a pure,
19   simple composition, correct?
20       A.  I'm not making any assumptions about that.
21       Q.  Are you aware that sometimes minerals
22   occur in nature and in tissue samples that are
23   composites of more than one mineral?
24       A.  I'm not -- outside of my expertise, I
```

Page 140

```
 1   don't know that but if you tell me that's true.
 2       Q.  And do you know that sometimes those
 3   composites don't have the precise chemical structure
 4   of the two individual compositions put together?
 5       A.  It would be helpful if you gave me a
 6   concrete example.
 7       Q.  Okay.  So you don't know one way or the
 8   other whether this is, in fact, the case?
 9       A.  Right.
10       Q.  And if, indeed, there are -- in nature,
11   minerals can form what's called a -- so let me just
12   strike that.
13           Have you ever heard of a solid
14   solution series?
15       A.  Yes.
16       Q.  What's a solid solution series?
17       A.  It is a compound of variable composition.
18       Q.  If in a tissue sample there's a solid
19   solution series of two or more minerals, would Raman
20   spectroscopy uniquely identify those minerals or
21   would you have to do additional investigation to
22   determine what you're looking at?
23       A.  I don't have direct experience in that
24   area, but I believe that I would be able to make
```

Page 141

```
 1   those identifications, as long as those composite
 2   materials existed in some database so that I could
 3   have some reference to look at.
 4       Q.  And if they didn't exist in a database,
 5   then you wouldn't be able to uniquely identify what
 6   you were looking at using Raman spectroscopy?
 7       A.  If that were the case, I would find some
 8   way to have someone prepare those, but this is all
 9   pretty hypothetical.
10       Q.  Hypothetical to you because you have no
11   experience with minerals --
12       A.  Right.
13       Q.  -- right?
14       A.  Yeah, so it's difficult for me to answer
15   that question.
16       Q.  Okay.  In your paper, if you would turn to
17   the end of page 5, you talk about probabilities.
18       A.  Yes.
19       Q.  Tell me when you're there.
20       A.  I know what you're referring to.
21       Q.  Yeah.  Just -- okay.  So in here you
22   say -- actually, why don't you summarize for me
23   what -- in lay terms what you're talking about when
24   you talk about --
```

36 (Pages 138 to 141)

Alan Campion, Ph.D.

| Page 142 |
|---|

1     A.  So I constructed these --
2     Q.  -- the --
3     A.  -- if I can use that term, a simple
4  statistical model asking myself the question, "What
5  are the odds that these three peaks appearing
6  simultaneously could come from something other than
7  talc?"
8         So joint probabilities are the
9  products of individual probabilities, assuming that
10  the individual probabilities are independent and
11  uncorrelated.
12         Then I said, "Let's use a standard of
13  an uncertainty of 5 percent," which is a --
14  typically used in medicine. It's typically called a
15  P test in medicine. In physics, that's a standard
16  for acceptance in the American Physical Society
17  Journal, right, published often.
18         So I said "Let's suppose it's
19  5 percent." Then the odds of those three peaks
20  coming from something other than talc is a product
21  of .05 to the third power. So that's an estimate in
22  my uncertainty as being less than a part in 10,000.
23     Q.  (BY MR. CHACHKES)  And what P tests do
24  mineralogists use when identifying minerals using

| Page 143 |
|---|

1  Raman spectroscopy?
2     A.  I don't know the answer to that.
3     Q.  And what probability would you calculate
4  for error, looking at a sample that you don't know
5  what mineral it is, considering talc versus the
6  other potential sheet silicates that you could be
7  looking at?
8     A.  I believe that's what I just answered. I
9  said:  What are the odds that these three peaks
10  could arise from three different substances
11  uncorrelated?
12     Q.  Is it possible that similarly structured
13  minerals, that is, similarly structured to talc,
14  have those three peaks?
15     A.  So we talked about that this morning. I
16  have searched multiple databases and I haven't seen
17  a single mineral that has those three peaks. Not
18  one.
19        MR. CHACHKES:  Okay. I have at this
20  time no further questions. I do want to state for
21  the record that we disagree with your privilege
22  objections.
23        We think you should have produced all
24  the communications among the authors of the paper.

| Page 144 |
|---|

1        We believe you should have produced
2  communications with the witness regarding the paper.
3        We believe you should have produced
4  all material regarding the funding of this paper
5  and -- budgeting, funding, anything along those
6  lines.
7        Any comments that counsel made
8  regarding the paper. This is something that is fair
9  game and that was specifically noticed by us in our
10  document requests.
11        In addition, you were required to tell
12  us what you were withholding before this deposition,
13  and you did not, and you would also produce a
14  privilege log, and you did not.
15        So I'm gonna leave the deposition open
16  and -- pending resolution of that and pass the
17  witness to the next defendant --
18        MR. DEARING:  Okay.
19        MR. CHACHKES:  -- the next
20  plaintiff -- plaintiff and --
21        MR. DEARING:  And we object to having
22  the deposition open, but we'll resolve these issues.
23        MR. FROST:  We join in Mr. Chachkes's
24  statements.

| Page 145 |
|---|

1        MR. CHACHKES:  So I'm gonna move from
2  this chair and someone else gets the honor of
3  sitting here.
4        Thank you for your time.
5        MR. FERGUSON:  David, can we go off
6  the record?
7        MR. DEARING:  Sure.
8        MR. FERGUSON:  Thank you.
9        MR. DEARING:  Sure.
10        THE VIDEOGRAPHER:  Going off the
11  record. The time is 1:32 p.m.
12        (A recess was taken from 1:32 p.m.
13        to 1:34 p.m.)
14        THE VIDEOGRAPHER:  Back on the record.
15  The time is 1:34 p.m.
16        EXAMINATION
17  BY MR. FERGUSON:
18     Q.  Dr. Campion, my name is Ken Ferguson and I
19  represent a company called Imerys.
20        Do you know who Imerys is?
21     A.  I've heard the name.
22     Q.  Okay. And I'm gonna ask you some
23  questions far less since Alex has covered most of
24  what needs to be covered.

37 (Pages 142 to 145)

Alan Campion, Ph.D.

Page 146

1      But as he told you, please make sure
2  that you understand my question before you answer.
3  If you don't understand what I'm asking, please let
4  me know.
5      A.  Thank you.
6      Q.  And I've noticed you're willing to do
7  that --
8      A.  Thank you.
9      Q.  -- if you don't understand.
10      First of all, what I want to do is
11  just make sure I know what's all in this notebook.
12  I don't think we've been through it yet.  So -- and
13  the notebook is -- is that something that you
14  brought or that counsel brought to the deposition
15  today?
16      A.  Counsel provided this to me, and he was
17  kind enough to let me leave it in his hotel room
18  last night so I didn't have to drag it back to my
19  house.
20      Q.  Okay.  And what I'm trying to figure out
21  is:  What is your understanding of what's in here?
22  Are all of the items that are on your Materials
23  Reviewed list in here?
24      A.  Yes.

Page 147

1      Q.  Or selected items?
2      A.  All of the items, as far as I'm aware, are
3  in there.  The last document, which is just a single
4  page, that I've referenced to an electronic book.
5      Q.  So the first thing that I come to when I
6  open the notebook is your Rule 26 Expert Report,
7  which I think has been previously marked as
8  Exhibit -- and I think you have it to your left.
9      A.  Okay.
10      Q.  What exhibit number is that?
11      A.  Exhibit 1.
12      Q.  Okay.  And may I take a look at that.  I
13  just want to make sure it corresponds to this, as
14  far as having this materials considered list as well
15  and it does.
16      Then the second tab is -- it says
17  "Campion (2018) Identification of Foreign" -- and
18  it's your . . .
19      A.  Publication.
20      Q.  Publication that has been discussed as
21  well that -- this copy was downloaded on July 1,
22  2018, correct?
23      A.  That's what it says.
24      Q.  Okay.  Then the next item is an article

Page 148

1  called "Raman Microspectroscopy in Human Pathology"
2  by F.F.M. de Mul; d-e, new word, M-u-l, correct?
3      A.  Yes.
4      Q.  And has that been listed as a --
5      A.  It's Exhibit 4.
6      Q.  Okay.  The next item is Dr. Godleski's
7  report, and that has been marked, correct?
8      A.  That's Exhibit 3.
9      Q.  Then the next item in the notebook is --
10  which I don't think has been marked, is -- looks
11  like perhaps a book chapter?
12      A.  It's a book.
13      Q.  It's a whole book.  From -- called
14  "Introductory Raman Spectroscopy, 2nd Edition,
15  2003," by John R. Ferraro and others, correct?
16      A.  Yes.
17      Q.  And is this something that you have relied
18  upon in the course of your research in this matter?
19      A.  No.  I included it as a reference to
20  illustrate the applicability of Raman spectroscopy.
21      Q.  And did you select this book in particular
22  because you thought that it described this issue
23  well or because it's one that you referred to or
24  what?

Page 149

1      A.  It's a classic.  It's been around forever.
2      Q.  And I think just to be complete I'm gonna
3  go ahead and mark that.
4      MR. FERGUSON:  Can I borrow some
5  exhibit stickers?  I hate to clog up the exhibit
6  section of the depo, but I'm gonna mark that as
7  Exhibit 7.
8      (Deposition Exhibit 7 marked for
9      identification.)
10      MR. FERGUSON:  And for the time being,
11  I think I'm just gonna leave this in here just
12  because it's kind of bulky and it's not tied
13  together.
14      So "Introductory Raman Spectroscopy"
15  is Exhibit Number 7.
16      Q.  (BY MR. FERGUSON)  The next item is
17  something entitled "IR" -- does that stand for
18  infrared?
19      A.  Yes.
20      Q.  -- "and Raman Spectroscopy: Principles and
21  Spectral Interpretation" by Peter J. Larkin.
22      And was that something that you
23  selected to be included in the --
24      A.  Yes.

Alan Campion, Ph.D.

Page 150

1      Q.  -- reference materials or that counsel
2    selected?
3      A.  I selected it.
4      Q.  And why did you select this particular --
5      A.  Just for balance, breadth.  Just to get
6    typical reference books, of which there are many --
7      Q.  Okay.  And --
8      A.  -- so I skimmed them electronically and
9    thought these would be good references in case any
10   one of you guys really wanted to be experts in Raman
11   spectroscopy.
12        MR. FERGUSON:  And I'm gonna mark the
13   Larkin --
14     Q.  (BY MR. FERGUSON)  Is it a whole book or a
15   chapter?
16     A.  It's a book.
17        MR. FERGUSON:  -- the Larkin book as
18   Exhibit 8.
19        (Deposition Exhibit 8 marked for
20          identification.)
21     Q.  (BY MR. FERGUSON)  And did you utilize
22   either Exhibit 7 or Exhibit 8 in your work prior to
23   being retained in this matter to work on the paper
24   that we've been discussing?

Page 151

1      A.  I can't recall.  There are a handful of
2    reference books that I've used over the years, and I
3    don't know whether I've referred to one of those or
4    not.
5      Q.  The next paper or item in the notebook --
6      A.  That's already marked.  That's 6, I
7    believe.
8      Q.  Okay.  The Musa article called "The use of
9    Raman spectroscopy to identify inorganic phases in
10   iatrogenic pathologic lesions of patients with
11   malignant pleural mesothelioma."
12     A.  It's marked Number 6.
13     Q.  It's Number 6.  Okay.  I won't remark it.
14        Then the Pence paper called "Clinical
15   instrumentation and applications of Raman
16   spectroscopy," is that previously marked?
17     A.  I don't believe so.
18        MR. FERGUSON:  I'm gonna mark Pence as
19   Exhibit 9 and leave it in the notebook as well.
20        (Deposition Exhibit 9 marked for
21          identification.)
22     Q.  (BY MR. FERGUSON)  The next item is the
23   Caterina Rinaudo -- Rinaudo, R-i-n-a-u-d-o, article
24   from 2010.

Page 152

1      A.  Yes.  That's Exhibit 5.
2      Q.  Okay.
3      A.  Should I wait for you to ask me a question
4    or can I just tell you it's Exhibit 5?
5      Q.  I think it works fine there.
6        And then there's a book, looks like,
7    called "Modern Raman Spectroscopy" by Smith and
8    Dent.  Has that been marked?
9      A.  No.
10     Q.  I didn't think so.
11        MR. FERGUSON:  And I'm gonna mark that
12   as Exhibit 10.
13        (Deposition Exhibit 10 was marked for
14          identification.)
15     Q.  (BY MR. FERGUSON)  Again, why is that
16   included here in this notebook?
17     A.  It's just for diversity.
18     Q.  Different reference that you might or
19   might not have referred to in the past?
20     A.  Correct.
21        (Deposition Exhibit 11 was marked for
22          identification.)
23     Q.  (BY MR. FERGUSON)  And then I don't think
24   I remember the Wang paper being discussed called

Page 153

1    "Understanding the Raman spectral features of
2    phyllosilicates" or phyllosilicates.
3      A.  I don't believe we discussed that paper.
4      Q.  And is the Wang paper one that you relied
5    on in developing your report in this matter or the
6    article that we've been discussing?
7      A.  I use that article to attempt to gain
8    familiarity with the properties of this class of
9    minerals, in part, but also to show how the Raman
10   spectra of this five classes, I think, of -- five
11   members of this class of minerals are distinctly
12   different.  So distinctly different that you can
13   tell the difference by eye.
14     Q.  And the Wang paper actually involved
15   results that they say were significant for planetary
16   surface exploration, espe-- -- especially Mars,
17   correct?
18     A.  I thought that was really interesting.
19     Q.  Okay.  A different situation than what
20   we're dealing with here?
21     A.  Yes.
22        Now, you skipped one.  There was just
23   that one page, or did you not want me to comment on
24   that?

Alan Campion, Ph.D.

Page 154

1   Q.  Well, thanks for reminding me.
2   Actually --
3       A.  It was a textbook that's a -- that's an
4   electronic resource and I included it because it's
5   the most recent book that I could find on the
6   subject.
7           And in particular, it addresses a
8   technique called confocal microscopy, which is a
9   specialized way of carrying out Raman microscopy to
10  achieve greater discrimination and spatial
11  resolution.
12      Q.  All right.  And what I'm going to mark is
13  a page that's in the notebook.  I'm marking it as
14  Exhibit 12 that says, "See Electronic Copy of the
15  Book Titled Confocal Raman Microscopy," correct?
16          (Deposition Exhibit 12 was marked for
17          identification.)
18      A.  Correct.
19      Q.  (BY MR. FERGUSON)  Okay.  Have we now
20  marked everything that is in the notebook that you
21  appeared with today?
22      A.  And if you're dying for a hard cover of
23  the electronic resource, I have one in my car.  Just
24  kidding.

Page 155

1   Q.  I think I'll pass on that for now.
2           Could you turn, first, to your report
3   in this matter?
4       A.  Yes.
5       Q.  Which is, again -- remind me of the
6   exhibit number?
7       A.  Number 1.
8       Q.  So if you look under the Qualification
9   section, there's a paragraph that's the third
10  paragraph --
11      A.  Yes.
12      Q.  -- that -- I'm -- I'm gonna just read and
13  ask you about the last sentence of that third
14  paragraph under Qualifications.
15          It says, "Although I use Raman
16  spectroscopy and microscopy to investigate a number
17  of different kinds of problems in science and
18  engineering, an important theme in my work has
19  always been developing novel experimental methods to
20  extract very weak signals in the presence of
21  significant background interference, expertise that
22  proved essential for the current project," correct?
23          Did I read that correctly?
24      A.  You read that correctly.

Page 156

1   Q.  Okay.  And that's what you're doing here
2   with this project; you're developing a novel
3   experimental method, correct?
4           MR. DEARING:  Objection; form.
5       A.  It's not novel.  It's a well-established
6   method, particularly since the advent of lasers in
7   the early 1960s.
8       Q.  (BY MR. FERGUSON)  You are attempting to
9   extract weak signals in the presence of significant
10  background interference, correct?
11      A.  That's correct.
12      Q.  At page 2 of your report, you cite a very
13  recent review --
14      A.  I believe that was the --
15          MR. DEARING:  Wait till he finishes
16  his question.
17      Q.  (BY MR. FERGUSON)  The very recent review
18  which is footnoted Number 4.  That's the Pence
19  paper.
20          Am I correct about that?
21      A.  So that may have been a typo as -- it
22  should have been the book -- the 2018 book that I
23  just referenced, so it's not the Pence paper --
24  well, let me read this again more carefully.  I'm

Page 157

1   sorry.
2       Q.  Sure.
3       A.  (Examined exhibit.)  Yes.  That -- that --
4   that's an error on my part.  I apologize.  That
5   should have been the 2018 Confocal Raman Microscopy
6   book.
7       Q.  So that footnote is footnoted wrong and it
8   should be the -- the electronic book that we don't
9   have?
10      A.  That's correct.
11      Q.  Okay.  Well, why don't we turn to the
12  Pence paper.
13      A.  Is the Pence paper still in the binder?
14      Q.  You're probably right.  Maybe you can find
15  it more quickly than I.
16      A.  Oh, yes.
17      Q.  Okay.  And that's entitled "Clinical
18  instrumentation and applications of Raman
19  spectroscopy," correct?
20      A.  Correct, yes.
21      Q.  Can you turn to the summary, which is --
22  again, I'd tell you the page number, but I have a
23  slightly different version.  I cut it off.
24      A.  Sure.  Summary, yes.

Alan Campion, Ph.D.

Page 158

1    Q.  Okay.  Just reading a couple of sentences
2    from that, it says in the first sentence of the
3    summary, "Despite the impressive work presented here
4    in a selection of clinical fields, there remain a
5    number of challenges that stand in the way of
6    clinical translation for Raman based technologies
7    for widespread human use," correct?
8        A.  That's what it says.
9        Q.  Okay.  And this is a 2016 article,
10   correct?
11       A.  That's correct.
12       Q.  Then if you go to about two-thirds of the
13   way down in the Summary paragraph --
14       A.  Okay.
15       Q.  -- you see where it says, "Preliminary
16   work" -- sentence starting "Preliminary work"?
17       A.  Yes.
18       Q.  And it says, "Preliminary work on many of
19   these aspects for clinical translation are ongoing,
20   but continued effort is needed to facilitate the
21   transition from benchtop to bedside," correct?
22       A.  Yes.
23       Q.  Okay.  You can put that aside.  I think
24   I'm going back to your report now.

Page 159

1            MR. DEARING:  I guess I'm going to
2    object to form to the last two questions about just
3    reading excerpt -- excerpt from a study without
4    asking the doctor any opinions about it.
5        Q.  (BY MR. FERGUSON)  Are you at your report?
6    Can you find your report for me?
7        A.  Sure.
8        Q.  Exhibit 1, as I recall.
9            Okay.  I think these questions have
10   been covered, but not all these sentences have been
11   read, so I'm gonna read it, then I'll ask you a
12   question about it.
13           Under Relevant Literature Review, you
14   say, "There are dozens, if not hundreds, of papers
15   written that demonstrate the application of Raman
16   microscopy to a wide variety of problems in biology
17   and medicine.  It is a well-established technique in
18   these fields.  The literature describing use of
19   Raman microscopy to identify inorganic particles in
20   tissues is more limited," correct?
21       A.  Correct.
22       Q.  Okay.  And that's the project that you're
23   doing here.
24           You're identifying inorganic particles

Page 160

1    and tissues, correct?
2        A.  Correct.
3        Q.  Okay.  And I think Mr. Chachkes may have
4    asked you a couple questions about this, but with
5    regard to the authors of the paper that you
6    published just last summer --
7        A.  Yes.
8        Q.  -- and I think you indicated you're
9    aware -- unaware that Dr. Fan had worked on
10   litigated matters with Dr. Godleski, correct?
11       A.  That's correct.
12       Q.  Assuming that Dr. Fan did, in fact, do
13   work with Dr. Godleski in the litigated matters,
14   then that would make three of the six authors of the
15   paper who had worked as paid experts for plaintiffs'
16   counsel in the case, correct?
17           MR. DEARING:  Objection; form,
18   inaccurate statement.
19       A.  I have no knowledge about it.
20       Q.  (BY MR. FERGUSON)  But we know that you've
21   worked as a paid expert, correct?
22       A.  Yes.
23       Q.  We know that Dr. Godleski has, correct?
24       A.  Correct.

Page 161

1        Q.  And if, in fact, Dr. Fan has, then that
2    would be three out of six, right, half?
3        A.  It seems to me you're asking me to
4    speculate about whether he was or was not paid and I
5    have no basis to speculate.
6        Q.  In your report, you indicated that the
7    ovarian tissue which was involved in your study,
8    quote, "followed long-term perineal talc exposure,"
9    unquote.
10       A.  Correct.
11       Q.  And how did you obtain the information
12   that it followed long-term perineal talc exposure?
13       A.  That's what Dr. Godleski told me.  These
14   were samples under his curation or whatever you guys
15   call it.
16       Q.  So -- so your only information with regard
17   to -- to the fact that the statement in your paper
18   that it followed long-term perineal talc exposure
19   was from Dr. Godleski, correct?
20       A.  Correct.
21       Q.  Well, you've made reference and there's
22   been some discussion about PLM or polarized light
23   microscopy, correct?
24       A.  Yes.

41 (Pages 158 to 161)

Alan Campion, Ph.D.

Page 162

1   Q.  You would agree that PLM cannot
2   specifically identify talc or any other particle,
3   correct?
4   A.  I don't know that I would make a statement
5   that boldly.  From my limited understanding of PLM,
6   it's possible it makes some inferences based on
7   color patterns and things like that, but I'm not an
8   expert in that field.
9   I would assert that it is not nearly
10  as definitive as Raman microscopy.
11  Q.  Is it your understanding that PLM can
12  simply indicate whether or not the particles in
13  question are birefringent?
14  A.  Yes.
15  Q.  Okay.  And birefringence is a
16  characteristic of many foreign particles, including
17  talc and many others, correct?
18  A.  Correct.
19  Q.  So birefringence itself doesn't tell you
20  what the particle is?
21  A.  It can.  So early on we happened to see a
22  particle of starch, I think it was, which shows a
23  characteristic Maltese cross pattern, which is
24  pretty easy to recognize, but I'm not a -- I'm not

Page 163

1   an expert in that area.
2   Ken Smith just said, "Oh, look at
3   this."
4   So in some cases -- what I'm saying is
5   in some cases it can identify particles.
6   Q.  You are not saying that you can identify
7   talc by birefringents alone, are you?
8   A.  Absolutely.  I'm not saying that.
9   Q.  There was a statement in your paper that
10  says, "Talc particles in ovarian tissue samples that
11  result from perineal talc use, in particular, are
12  known to fall in the lower size range."
13  Do you recall that statement?
14  A.  I recall that statement.
15  Q.  There's no citation to that statement.
16  What was your source for the statement
17  that talc particles from perineal talc use are known
18  to fall in the lower size range?
19  A.  That's what Dr. Godleski wrote.
20  Q.  Okay.  Again, the only thing you know
21  about that is that Dr. Godleski told you that was
22  the case --
23  A.  Correct.
24  Q.  -- correct?

Page 164

1   And in this scientific article that
2   was published without a citation, you just relied
3   upon that statement by Dr. Godleski?
4   A.  Correct.
5   Q.  And tell me how it works in publishing.
6   You were the first named author,
7   correct?
8   A.  Yes.
9   Q.  Does that mean you're the main au-- --
10  author, the one who's responsible for the contents?
11  A.  It differs by field.  So in my field,
12  physics or chemical physics, I tend to put my name
13  last.
14  In biologically related areas, it
15  seems to be customary to be the first author.
16  And when we, in fact, evaluate people
17  for promotion and tenure, we count first author
18  publications, I have no idea why they do that in
19  those fields, but it doesn't mean anything to me.
20  Q.  So how's that work in this case?
21  A.  I would say that John and I contributed
22  equally.
23  Q.  I know there's been some discussion about
24  the conflict of interest statement, and I don't want

Page 165

1   to be redundant or repetitive of that, but I just
2   have a question that I may have missed and I want to
3   make sure it's covered.
4   Under the Notes in the paper itself --
5   and feel free to refer to it, if you like -- it
6   says, "Declaration of Potential Conflicts of
7   Interest.  Alan Campion and John J. Godleski have
8   served as consultants and provided expert testimony
9   in talc and other environmental litigation,"
10  correct?
11  A.  Correct.
12  Q.  That statement, the "Declaration of
13  Potential Conflicts of Interest" doesn't say
14  anything about the people or entities that you
15  represented as part of your service as a consultant
16  in providing expert testimony, correct?
17  A.  I'm not sure what you mean by that.
18  Q.  Sure.  It doesn't say which side you're
19  on, does it?
20  A.  No.
21  Q.  Okay.  In order to inform the reader as to
22  the significance of a conflict of interest for why
23  there is a conflict of interest, would it not make
24  sense to you to disclose who had hired you and who

42 (Pages 162 to 165)

Alan Campion, Ph.D.

Page 166

1   was paying you to provide consulting service and
2   expert testimony?
3          MR. DEARING:  Objection; form.
4      A.  I don't think it is relevant.  This was a
5   scientific paper, and if I were approached by other
6   people it's possible that I would agree to conduct
7   similar research.
8          I haven't.  I don't necessarily
9   anticipate, but I have no bias one way or the other.
10     Q.  (BY MR. FERGUSON)  You've indicated you
11  have no bias, but the purpose of the conflict of
12  interest statement is so that the reader can make
13  the determination as to whether or not there's a
14  bias or not.
15     A.  Sure.  And, I mean, you guys are lawyers,
16  but the word "potential" seems to me to be pretty
17  telling.
18     Q.  Do you -- do you believe, based on your
19  experience in publishing papers before, that, in
20  fact, you should have disclosed that you were being
21  paid in conjunction with this paper by the Beasley
22  Allen law firm or other law firms involved in this
23  litigation?
24         MR. DEARING:  Objection; form.

Page 167

1   Misstates the evidence.
2      Q.  (BY MR. FERGUSON)  Did you answer?
3      A.  Would you repeat the question, please.
4      Q.  Sure.  Sure.  In terms of actually
5   disclosing a potential bias to readers of the
6   article, based on your experience in publishing in
7   the past, do you not believe that it would have been
8   appropriate for you to disclose that you were being
9   paid for your work in conjunction with this paper by
10  the Beasley Allen law firm?
11     A.  I mean --
12         MR. DEARING:  Objection; form.
13     A.  May I respond?
14     Q.  (BY MR. FERGUSON)  Please -- please do.  I
15  apologize.  I -- I was waiting for your response.  I
16  thought you were thinking about your response.
17     A.  Oh, I am thinking about it.
18     Q.  Good.
19     A.  So I think it's important to make a clear
20  distinction between the work that we were paid to
21  do, which was see if we could develop this technique
22  and the scientific publication that resulted.
23         The scientific publication that
24  resulted was spontaneous over the course of the two

Page 168

1   or three or four experiments where the three of us,
2   Godleski, Smith, and I, decided that this work was
3   of sufficient interests to a wide scientific
4   audience that it deserved publication on its own; in
5   other words, a contr-- -- a significant contribution
6   to the scientific literature.
7          So I think that being paid to produce
8   this paper is a mischaracterization of what
9   happened.
10     Q.  And that's your -- that's your position on
11  it, correct?
12     A.  It's my opinion.
13     Q.  Okay.  And that's your opinion.
14  But the reader didn't have an
15  opportunity to evaluate that potential bias that you
16  were being paid by a law firm at the time you were
17  writing this paper and for your work on that paper,
18  correct?
19     A.  Correct.
20     Q.  One of the exhibits -- and you can
21  probably tell me the number of it -- is the --
22  Dr. Godleski's report in the Brower case.
23     A.  Yes.
24     Q.  Correct?  And in that report he reported

Page 169

1   that he had found what he claimed to be 27 talc
2   particles, correct?
3      A.  Can you refer me to the page?
4      A.  Oh, at the bottom of page 3.
5      A.  (Examined exhibit.)  Okay.
6      Q.  Correct?
7      A.  Yep.
8      Q.  And he also found some, I believe, 184,
9   say, other foreign particles in the tissue that he
10  looked at, correct?
11     A.  Correct.
12     Q.  And he used SEM/EDS technology to make
13  that determination, right?
14     A.  Yes.
15     Q.  Okay.  Dr. Campion, do you have any
16  opinion whatsoe- -- whatsoever as to where those
17  particles, talc or not, in Miss Brower's tissue that
18  Dr. Godleski claims to have found -- where they came
19  from?
20     A.  Outside of my area -- not only is it
21  outside of my area of expertise, I don't unders- --
22  I have no -- I have no knowledge of the history of
23  the case.
24     Q.  You're certainly not an expert whether

43  (Pages 166 to 169)

Alan Campion, Ph.D.

Page 170

1    inert articles such as talc or aluminum silicates
2    can travel up the female reproductive tract to the
3    ovaries, correct, out of your field?
4        A.  Correct, out of my field.
5        Q.  Also, you're not an expert on whether such
6    particles would cause any disease, including ovarian
7    cancer, right?
8        A.  Not based on my own direct knowledge.
9            MR. FERGUSON:  Well, since we have two
10   minutes, why don't we go ahead and go off and . . .
11           THE VIDEOGRAPHER:  Going off the
12   record.  The time is 2:06 p.m.
13           (A recess was taken from 2:06 p.m.
14           to 2:15 p.m.)
15           THE VIDEOGRAPHER:  This marks the
16   beginning of disk 3.  Back on the record.  The time
17   is 2:15 p.m.
18       Q.  (BY MR. FERGUSON)  Dr. Campion, we've
19   taken a short break.  Are you ready to proceed?
20       A.  Sure.
21       Q.  A couple of things just to clean up and
22   then I'll -- then I should be done here within 15
23   minutes or so.
24           There was a discussion about work you

Page 171

1    had done since June up until the present and I was a
2    little confused about that, probably my fault, but
3    there was a meeting in Chicago for a few days; is
4    that right, at Renishaw?
5        A.  I honestly don't recall --
6        Q.  Okay.
7        A.  -- what I went up there for.
8        Q.  And do you have any estimate as to how
9    many hours you have spent working on this matter
10   since the last entry in the invoices that we have
11   that are marked Exhibit 2, which is June 30th, 2018?
12       A.  I would have to go back and check my
13   records.
14       Q.  And do you know how much -- what the total
15   is for all the invoices that are marked as
16   Exhibit 2?
17       A.  I believe earlier on I was asked --
18   someone told me it was something of the order
19   of $190,000 or something like that.
20       Q.  I actually tried to add them up and got
21   like 198,900.
22           Does that sound like it's in the
23   ballpark anyway?
24       A.  I'm a physical chemist.  198 and 190 are

Page 172

1    the same number.
2        Q.  Okay.  There may be some that might
3    disagree with that.
4        A.  I was teasing.
5        Q.  I know.
6            But, also, there was a discussion
7    about some changes in formatting that may have been
8    made, changes to the article that you authored along
9    with Dr. Godleski.
10           Who suggested the changes in
11   formatting?  The journal?
12       A.  The journal.  When it does it's just
13   accepted, right, it says, "The final version might
14   have minor changes in formatting."
15           And that final version is available.
16   There's a DOI.  Anybody can look it up.  I have a
17   copy, but I wasn't asked to bring it with me.
18       Q.  Would you go to the Rinaudo paper, which I
19   think we said was Number 5, Exhibit 5.
20       A.  You just handed it to me.  I've got it
21   right on top of my stack.  Yes, sir.
22       Q.  Okay, great.
23           And in this -- this is one of the
24   articles that you've cited as your -- as materials

Page 173

1    that you relied on or reviewed in preparation for
2    your -- your report, correct?
3        A.  (Examined exhibit.)  In the sense that I
4    wanted to demonstrate that other people were able to
5    detect talc in tissue.  That we were not the first
6    and that it was possible to detect other kinds of
7    minerals in tissue.
8            So it was a way of supporting the
9    viability of this technique as being a -- a
10   generally applicable technique.
11       Q.  And if you would take a look at page 572.
12       A.  (Complied.)  Yes.
13       Q.  Of Rinaudo paper in the upper right-hand
14   corner, there's a sentence that starts with
15   "Quantitative."
16           It says, "Quantitative microanalyses
17   are not possible because the studied
18   particles/fibers are very small, incorporated in an
19   unpolished matrix, and in a sample not perfectly
20   flat, as well as being carried out under variable
21   pressure conditions."
22           And my question to you is:  Do you
23   agree, generally, that quantitative analysis is not
24   possible with small particles in an unpolished, not

Alan Campion, Ph.D.

Page 174

1    flat, matrix?
2        A.  Well, if I'm reading that correctly,
3    they're referring to SEM, and I'm not sufficiently
4    expert in SEM to agree or disagree with that
5    statement.
6        Q.  And I believe they are referring to
7    SEM/EDS.
8            You just don't have an opinion on
9    that?
10       A.  No.  I mean -- and I know they're
11   referring to SEM/EDS because it says 20 kilovolts
12   electric, accelerating voltage, et cetera, beam
13   current, and stuff like that.
14       Q.  Well, you may not have an opinion on that.
15   Their opinion from the Rinaudo paper
16   is that you cannot do quantitative microanalysis
17   with an unpolished matrix that is not perfectly
18   flat, correct?
19           MR. DEARING:  Objection; form.  It's
20   beyond the scope of his expertise.
21       A.  If you're asking me if that's what they
22   said, yes, that's what they said.
23       Q.  (BY MR. FERGUSON)  Okay.  Thank you.
24           With regard to the paper you

Page 175

1    published -- and I'm -- I've been skipping back and
2    forth.
3        A.  Sure.
4        Q.  I want to make sure you -- I'm letting you
5    know which one I'm talking about.  Your paper,
6    published along with Dr. Godleski.
7        A.  Yes.
8        Q.  Would you agree with me that as far as
9    using Raman spectroscopy, this article was the first
10   one to appear that set out the use of Raman
11   microscopy or spectroscopy to analyze small
12   particles in tissue?
13       A.  No.  I believe I said in my report that
14   this 1984 article was the first one that I could
15   find.
16       Q.  Is that small tiss- -- small particles in
17   a tissue matrix?
18       A.  I believe they were small, yes.
19       Q.  So you -- if Dr. Godleski testified to
20   exactly that, that this was the first article to
21   appear that set out the use of Raman -- Raman
22   spectroscopy to analyze small particles in tissue,
23   you disagree with him?
24       A.  Is that something he wrote?

Page 176

1        Q.  No, sir.  It's something he said in a
2    deposition.
3        A.  Well, I guess.
4            MR. DEARING:  I'm just gonna object to
5    the form and the appropriateness of one expert
6    commenting on the veracity of another expert's
7    testimony.
8        A.  And there's also, I think some wiggle
9    room, depending on what you mean by small.  So --
10   its specific sizes aren't -- well, I can't comment
11   on what he said because I wasn't there.
12       Q.  (BY MR. FERGUSON)  Do you -- would you
13   agree that your article was the first in the history
14   of science to deal with the issue of foreign
15   particles in human tissues using Raman microscopy
16   that was published in a prominent journal?
17           MR. DEARING:  Same objection.
18       A.  That's a judgment call.  Who determines
19   what's prominent?
20       Q.  (BY MR. FERGUSON)  Apparently,
21   Dr. Godleski.
22       A.  Well, I don't remember the impact factor,
23   but I chose to journal in part because it has a high
24   impact factor.

Page 177

1        Q.  So you do agree that the -- the --
2        A.  I agree that this has perhaps the widest
3    possible audience for work of this type.  I think
4    that's a fair statement.
5        Q.  Okay.
6            MR. FERGUSON:  Okay.  I think that's
7    all I have, Dr. Campion.  Thank you for your time,
8    sir.
9            THE WITNESS:  Thank you.
10           MR. DEARING:  Anybody else?  No?
11   Doctor, I have a few questions for
12   you.
13           EXAMINATION
14   BY MR. DEARING:
15       Q.  You've been asked several questions about
16   your publication with Dr. Godleski.  Let me just ask
17   you point-blank.
18           Did the plaintiffs' attorneys in this
19   litigation ask you to publish an article on Raman
20   spectroscopy for your research?
21           MR. FERGUSON:  Objection; leading.
22       A.  No.
23           MR. CHACHKES:  Same objection.
24       A.  No.  The decision to publish arose

Alan Campion, Ph.D.

Page 178

1 spontaneously over the course of time as we became
2 serious collaborators.
3     Q.  (BY MR. DEARING)  Did the plaintiffs'
4 lawyers even suggest to you the idea of publishing
5 your results?
6         MR. CHACHKES:  Objection; leading.
7         MR. FERGUSON:  Same objection.
8     A.  No.
9     Q.  (BY MR. DEARING)  You have your CV in
10 front of you in this binder, if you need it, but
11 would you give me a summary of your education,
12 training, and experience with regard to Raman
13 spectroscopy and particle identification?
14     A.  Restricted to particle identification?
15     Q.  Well, let's start more general, with your
16 bachelor's degree and just your education and
17 training.
18     A.  So in my bachelor's degree, I did
19 undergraduate research at Oak Ridge National
20 Laboratory in the University of Tennessee in
21 radiation chemistry, and published three papers,
22 when I was 20 or 21 years old, something like that.
23         Then I moved to UCLA, where I studied
24 different kinds of molecular spectroscopy.  I did so

Page 179

1 many different topics that I wanted to call my
2 dissertation "A random walk through molecular
3 spectroscopy."
4         So we did microwave optical double
5 resonance, liquid helium temperatures.
6         The most relevant paper from my
7 graduate school days was the "Time-resolved
8 resonance Raman spectroscopy of bacterial
9 rhodopsin," and that was the first Raman spectrum
10 that I ever took.
11         This was a way of measuring the
12 confirmational change in a protein in realtime using
13 a pulse probe technique, and we were the first in
14 the world to report that in nature, so my interest
15 in Raman goes way back.
16     Q.  Let me stop you and --
17     A.  Yeah.
18     Q.  -- just talk about your education
19 specifically.
20     A.  Oh, I'm sorry.
21     Q.  Where did you get your bachelor's degree?
22     A.  I went to a little hippie college in
23 Florida called New College.
24     Q.  Okay.  What --

Page 180

1     A.  I started '68, graduated '72.
2     Q.  What was your degree in?
3     A.  My degree was in chemistry.
4     Q.  Okay.  And then you went on to get a
5 Ph.D.?
6     A.  At UCLA in chemical physics.
7     Q.  In looking at your CV, it looks like after
8 you obtained your Ph.D. you started a career in
9 research science; is that correct?
10     A.  I did a post-doctoral fellowship.  So it's
11 typical after you do a Ph.D. to do a post-doctoral
12 fellowship, which is analogous to doing a residency
13 after your M.D.  That was at UC Berkeley.
14     Q.  Was there a particular field of study?
15     A.  That's when I first went into the field of
16 surface physics, because at that time it seemed to
17 have great potential in helping us understand
18 catalytic processes, like your catalytic converter,
19 microelectronics, all sorts of stuff like that.  So
20 it was not only a new intellectual venue for me, it
21 had real-world applications that I thought would be
22 interesting.  So that's why I chose Berkeley.
23     Q.  Okay.  And would you walk us through your
24 other research and other professional experience?

Page 181

1     A.  Oh, okay.  So where is that?
2     Q.  I'm looking specifically on the second
3 page of your CV -- actually, it's still on the first
4 page of your CV.
5     A.  So my research interests had been surface
6 physics and chemistry.
7         And what do I mean by "surface
8 physics"?  I mean, how do molecules react with the
9 surfaces of solids under very well-controlled
10 conditions.
11         So I built a surface Raman
12 spectrometer.  So ultra high vacuum is defined to be
13 something like -- well, I have to do this in my
14 head.  Let's just call it 1 -- it's 10 to minus 13,
15 10 to minus 14-atmosphere, something like that,
16 okay.  There's nothing in the vacuum chamber that I
17 didn't put there.
18         And I designed and built that vacuum
19 chamber so we could do Raman spectrometry on
20 atomically flat, smooth surfaces.  We were the first
21 ones in the world to do that thereby disproving
22 about 50 perfectly reasonable theories of the nature
23 of the interaction of molecules and surfaces in
24 this -- using a Raman technique.

Alan Campion, Ph.D.

Page 182

1    That work was so successful that it
2  got me invited to be a plenary speaker at an
3  American Physical Society March meeting, which is
4  a -- the meeting of the solid state physics
5  community, and that single experiment is what got me
6  tenure. So I built that first Raman spectroscopy.
7  So . . .
8    Q.  Okay. And describe your career since
9  then.
10    A.  So I've just worked on a variety of
11  problems of interest. I -- I've enjoyed the extra
12  research part of my job as much as I've enjoyed the
13  research part of my job.
14    I was privileged enough to win a
15  number of prestigious teaching awards early on.
16  I've worked on curriculum development. Continue to
17  work on curriculum development.
18    I enjoy public policy work, and so I
19  was a member of the governing board for the Council
20  for Chemical Research, which represents the entire
21  chemical research industry in DC. Not supposed to
22  be a lobbying group, but we were supposed to inform,
23  I think was the buzz word.
24    Then I was also a member of the

Page 183

1  assessment committee for the National Institute of
2  Standards and Technology, which is one of only two
3  national labs that has to be reviewed annually, or
4  had to be reviewed annually. So I went four times a
5  year, looked at all of their programs and ended up
6  doing a report that ultimately went to Congress
7  through the Department of Commerce. So I enjoy
8  those kinds of interactions.
9    Q.  Tell us about your -- your current
10  teaching obligations.
11    A.  Yes. So since I have stopped doing
12  research, I teach two and sometimes three courses,
13  which I'm happy to do.
14    I teach the honors freshman chemistry
15  course using the book that I wrote. I'm teaching
16  that right now. I always try to teach courses as a
17  two-semester sequence so I can get to know my
18  students during the course of a year.
19    And then I'm also teaching the junior/
20  senior level physical chemistry course which is
21  classical thermodynamics, quantum mechanics. So I'm
22  an expert in quantum mechanics. Probably my
23  favorite subject to this day.
24    I'm going to teach the spring, for the

Page 184

1  first time, an advanced graduate level course in
2  molecular spectroscopy, which is my area of
3  long-term interest.
4    Q.  And that would include Raman spectroscopy?
5    A.  Yes, that would include Raman
6  spectroscopy. I can show you the syllabus. I even
7  put Raman spectroscopy in my freshman chemistry
8  book.
9    Q.  Okay.
10    A.  And probably the thing that's interested
11  me the most over the last four or five years was the
12  development of this upper division of physical
13  chemistry laboratory.
14    P chem labs, until I took this one
15  over, basically were designed to, quote, "show that
16  the stuff that's in the textbooks is actually real,"
17  which I thought was really boring, okay. They're
18  all classical experiments.
19    So I got a quarter of a million
20  dollars out of the Dean's office and I designed 12
21  different experiments that required students to
22  assemble, manipulate, design, interpret data. In
23  other words, they had to do things with their hands,
24  not just drop something into a machine and push a

Page 185

1  button, so the students learned electronics, optics,
2  microscopy. I mean, I can rattle off briefly the
3  experiments.
4    We measured lateral diffusion in model
5  cell membranes.
6    We used a scanning tunneling
7  microscope to image materials.
8    Used the SDM to learn about the
9  electronic properties of semiconductors and metals.
10    I have a Raman set of experiments
11  where they do surface-to-hand Raman spectroscopy and
12  also light scattering.
13    There's an NMR experiment where the
14  students learn the physical origins of NMR
15  relaxation processes, and it's a very simple
16  experiment, but the instrument's so sophisticated,
17  at the end, they can do -- and this is a three-week
18  experiment -- at the end, they can do a 3-D MRI of
19  anything you want. A pepper, which is pretty cool.
20    And then some more spectroscopy
21  experiments, and we wrap it up with a module on
22  computational quantum chemistry which is now
23  accurate enough that you can put it on your laptop
24  and do accurate quantum chemical calculations.

47 (Pages 182 to 185)

Alan Campion, Ph.D.

Page 186

1      Q.  In looking through your chemical
2  publication lists, it looks like you have 134 or so
3  publications.
4           With regard to the methodology that
5  you used in this case, as you articulate in your
6  report, have you ever published that methodology in
7  a peer-reviewed journal?
8      A.  What -- what methodology?
9      Q.  Well, the Raman spectroscopy techniques
10  that you used in this case that you describe in your
11  report and that you've been testifying about today,
12  have you published in that area?
13      A.  Well, we --
14           MR. CHACHKES:  Objection; leading.
15           MR. FERGUSON:  Same objection.
16      A.  So we have one article in which we
17  identified chemical nature of a defect on a
18  semiconductor manufacturing process.  Several papers
19  where we were able to quantify strain and strained
20  silicon, in collaboration with Sematech and with
21  Texas Instruments.  Those are the ones that I can
22  recall off the top of my head.
23      Q.  (BY MR. DEARING)  Okay.  Did you invent
24  the Raman spectroscopy technique to identify

Page 187

1  particles?
2      A.  No.
3           MR. FERGUSON:  Objection; leading.
4      A.  And I -- there are references.
5      Q.  (BY MR. DEARING)  To your knowledge, how
6  long has that methodology been in existence?
7      A.  I believe I said that the first article
8  that I read was dated back to 1984.
9      Q.  When was Raman spectroscopy invented?
10      A.  1928.
11      Q.  Is the technique used today substantially
12  similar to the technique used in 1928 when it was
13  developed?
14      A.  Well, that's a funny story, if you give me
15  30 seconds.
16           So Raman took a piece of blue glass
17  and a piece of yellow glass.
18      Q.  Okay.
19      A.  And if you take blue and yellow, which are
20  complementary colors, and you point them at the sun,
21  you get black, and if you put a liquid, any old
22  liquid in between them, then you see the yellow
23  light transmitted.
24           And so he concluded, with no molecular

Page 188

1  level of understanding whatsoever, that some sort of
2  inelastic light scattering had occurred, because
3  these were all colorless materials and therefore
4  could not be fluorescent.  That was what he did.
5      Q.  Okay.
6      A.  Never published a spectrum.  Two Russians
7  published the spectrum six weeks later, and he never
8  got any credit for it.
9      Q.  You also made reference to several
10  databases that you use as references or standards in
11  your work.
12           Can you describe what those databases
13  actually are in reference to Raman spectroscopy?
14      A.  Sure.  So these are curated, for lack of a
15  better word, by individuals interested in geology
16  and neurology, and scientists are invited to
17  contribute samples, and there must be some sort of
18  internal validation by the people who curate the
19  database.  But if you look at -- and I think I
20  could -- if you look at any of the databases, you
21  will see the origin of the sample, typically the
22  elemental composition, the experimental conditions,
23  the polarization of the laser, the color of the
24  laser, and that sort of thing.

Page 189

1      Q.  Okay.  So how do you apply those databases
2  to the work that you're doing with Raman?
3      A.  Well, the easiest ones for me to use are
4  the ones that have search functions built in.  We've
5  talked about that earlier.
6           So the Leon database has a
7  particularly easy-to-use search function.  The
8  Renishaw database is built into the instrument at
9  Renishaw.  I don't have that database independently.
10  I could get it, but I don't have it.
11           And so when you take a spectrum and
12  you click, it'll do a search of the database and
13  tell you what matches.  So I -- and then the other
14  databases are more cumbersome.  You have to sort of
15  manually look and see what the peak frequencies are,
16  you know, more or less by using a ruler and seeing
17  where the peak intersects the x-axis.
18      Q.  Based on your training and education and
19  experience, do you consider yourself an expert in
20  identifying materials and particles, whether mineral
21  or other, with Raman spectroscopy?
22      A.  Yes.
23      Q.  And I believe you testified that you
24  haven't done a lot of this, but could you identify

Alan Campion, Ph.D.

Page 190

1    asbestos fibers with Raman spectroscopy, if you were
2    asked to?
3        A.  Other people have --
4            MR. FERGUSON:  Objection; form.
5            MR. CHACHKES:  Objection; leading.
6        A.  -- so I can't imagine that I couldn't.
7        Q.  (BY MR. DEARING)  Okay.  You were also
8    asked several questions about some of the tissue
9    samples from Miss Brower.
10           And let me ask you.  If Miss Brower
11   testified that she used Johnson & Johnson Baby
12   Powder for feminine hygiene, and I'm talking about
13   perineal use, and if those particles migrated to the
14   ovaries, as Dr. Godleski has suggested, and that
15   Dr. Godleski found particles of talc in the ovaries,
16   do you believe that the talc particles you were
17   looking at in the Brower case were Johnson & Johnson
18   Baby Powder particles?
19           MR. FERGUSON:  Objection.
20           MR. CHACHKES:  Objection.
21           MR. FROST:  Objection.
22           MR. FERGUSON:  Objection; calls for
23   speculation.  Leading.
24           MR. CHACHKES:  Join.

Page 191

1        A.  One could answer that question in a
2    different way.  If you look at the last paragraph of
3    his expert testimony, whatever you call that, and
4    based on my extensive experience with him, he -- his
5    science is impeccable, okay.  He's a remarkable
6    scientist, great breadth and depth of knowledge.
7    And I've spent many, many hours with him talking
8    science over a wide range of subjects.  He knows his
9    stuff.  And so if an expert draws that conclusion,
10   I'm inclined to agree with it.
11           MR. SILVER:  Move to strike as
12   nonresponsive.
13           MR. FERGUSON:  Same objection.
14           MR. CHACHKES:  Also move to strike as
15   speculative.
16       Q.  (BY MR. DEARING)  So my question is a
17   little more specific; and that is:  If the talcum
18   powder used by Miss Brower was Johnson & Johnson
19   Baby Powder, used perineally, and that powder
20   migrated to the ovaries or other gynecologic tissues
21   that Dr. Godleski and you analyzed, do you believe
22   that the talc particles that you found were likely
23   Johnson & Johnson Baby Powder particles?
24           MR. FERGUSON:  Object to form.  Way

Page 192

1    out of his area of expertise.  Speculation.
2            MR. CHACHKES:  I'll join his
3    objections.  Also, it's leading.
4        A.  That seems to be a reasonable conclusion
5    to me.
6        Q.  (BY MR. DEARING)  Okay.  And the
7    techniques and methodologies that you used, as
8    described in your report, have those methodologies
9    and techniques been published in peer-reviewed
10   journals by other scientists?
11           MR. CHACHKES:  Objection; leading.
12           MR. FERGUSON:  Same objection.
13       A.  Well, we discussed two or three of the
14   other references cited extensively this morning.
15       Q.  (BY MR. DEARING)  Right.  Are there more
16   than two or three publications of Raman spectroscopy
17   and particle identification that you're aware of?
18       A.  I haven't found more than a handful.
19       Q.  You were asked some questions about the
20   Rinaudo paper, Exhibit Number 5.
21           Would you pull that out, please.
22       A.  Sure.  Yes.
23       Q.  And one of the questions that you were
24   asked was by Mr. Chachkes, and that was whether the

Page 193

1    Raman methodology used in the Rinaudo paper has been
2    duplicated or repeated, to your knowledge.
3            And my question to you is:  Did you
4    use essentially the same or substantially similar
5    technique and methodology with your Raman analysis
6    that Rinaudo and the other scientists used in this
7    paper?
8            MR. CHACHKES:  Objection; leading.
9            MR. FERGUSON:  Same objection.
10       A.  Yes, it was substantially the same.  I
11   mean, the designs of the spectrometer was different,
12   the laser frequency was different, but in principle,
13   all the components are the same.
14       Q.  (BY MR. DEARING)  Okay.  And Mr. Chachkes
15   also asked you a question implying that this paper
16   does not even mention the word "chrysotile";
17   although -- so I want to ask you.
18           Turn to page 576 of this paper, if you
19   would, in the Conclusion, and in particular, look
20   over in the right-hand column --
21       A.  Ah, yes.
22       Q.  -- at the top.
23           So would you just read that first
24   sentence, please, where it says, "The Raman

Alan Campion, Ph.D.

Page 194

1  spectra."
2  A.  "The Raman spectra of the two minerals,
3  talc and chrysotile, show bands at different
4  wavenumbers, allowing a rapid and certain
5  identification of the mineral phase."
6  Q.  And that's a summary finding of
7  Dr. Rinaudo and the other scientists, right?
8  A.  Correct.
9  Q.  So if Mr. Chachkes suggested to you that
10  this paper doesn't even mention chrysotile, he's
11  absolutely being dishonest with you, isn't he?
12         MR. FERGUSON:  Object to form.
13         MR. CHACHKES:  Objection; leading.
14  A.  Correct.
15  Q.  (BY MR. DEARING)  He wasn't being truthful
16  with his questions, was he?
17  A.  No.
18         MR. FERGUSON:  Object to form.
19         MR. CHACHKES:  Objection.
20  Q.  (BY MR. DEARING)  You think he was trying
21  to mislead you?
22         MR. CHACHKES:  Objection.
23         MR. FERGUSON:  Same objection.
24  A.  I have no idea what his intention was.

Page 195

1  Q.  (BY MR. DEARING)  You were also asked
2  several questions about the conflict of interest
3  statement in your publication with Dr. Godleski and
4  the others.
5         And if the publisher or the editor
6  felt that your statement of conflict of interest was
7  somehow inadequate or needed more information, based
8  on your experience and all the publications that
9  you've worked on in your career for peer-reviewed
10  journals, would that editor or publisher have asked
11  you to add information to that?
12         MR. CHACHKES:  Objection; leading.
13         MR. FERGUSON:  Same objection.
14  A.  Well, it's a pretty extensive
15  certification required, so . . .
16  Q.  (BY MR. DEARING)  So, in short, if the
17  publisher or editor felt that your statement of
18  conflict of interest was somehow inadequate or
19  needed more information, would --
20         (Speaking simultaneously.)
21  A.  The editor would've --
22  Q.  (BY MR. DEARING)  -- would you have been
23  asked to add --
24  A.  The editor --

Page 196

1  Q.  -- more information?
2  A.  -- would've asked me to add more
3  information, for sure.
4         MR. CHACHKES:  Same objection.
5         MR. FERGUSON:  Same objection.
6  Q.  (BY MR. DEARING)  You were also asked
7  several questions about your plans after this
8  deposition.
9         If the plaintiff attorneys were to
10  come to you and ask you to perform analysis on
11  specific plaintiff tissues to determine whether
12  there are particles of talc or perhaps asbestos, is
13  that something you feel qualified to do?
14  A.  Yes.
15         MR. FERGUSON:  Object to form.
16  Q.  (BY MR. DEARING)  Is that something you
17  would be willing to do?
18  A.  Yes.
19  Q.  Assuming we worked out all the details?
20  A.  Yes.
21  Q.  You were also asked early on about why you
22  analyzed the number of slides that you analyzed, and
23  I don't remember specifically what your answer was,
24  but my question is:  If you were to analyze a slide

Page 197

1  of tissue and identify talc particles human -- using
2  Raman spectroscopy, would it have been -- and you
3  reported on that in this article, would it have been
4  redundant for you to continue to report the same
5  findings of talc in other slides?
6         MR. CHACHKES:  Objection.
7         MR. FERGUSON:  Same objection.
8         MR. CHACHKES:  Leading.
9  A.  It might have been useful to establish
10  reproducibility of the technique, but to the extent
11  that we looked at other slides, reproducibility was
12  pretty solid.  It was really solid and that's in --
13  that's in our paper.
14  Q.  (BY MR. DEARING)  So you satisfied your
15  own necessity to prove that it was repeatable
16  without regard to whether you actually published it
17  in the paper, all of the different findings?
18  A.  Well, in the paper we referred to
19  reproducibility of the frequencies of a series of
20  particles in each of the three particular samples
21  that we looked at and the reproducibility was
22  remarkable.
23  Q.  How would you describe your level of
24  confidence when identifying a particle such as talc

Alan Campion, Ph.D.

Page 198

1    with Raman spectroscopy, even in tissue?
2         A.  I would say that it's unequivocal.
3              I would say I'm a hundred percent
4    confident.
5              I would say I'm completely confident.
6    I mean, there's millions of adjectives.
7              I have absolutely no doubt that when
8    we say it's talc, it's talc.
9         Q.  You were also asked several questions
10   about whether you knew about the different grades of
11   talc.
12             And if I were to tell you that grades
13   of talc typically describe the -- purity of the
14   talc or the presence of impurities with the talc,
15   does the grade of talc make any difference in your
16   determination as to whether the particle is, in
17   fact, talc?
18        A.  No.
19             MR. FERGUSON:  Object to form.
20             MR. CHACHKES:  Objection; leading.
21        Q.  (BY MR. DEARING)  Is there any significant
22   difference in Raman spectroscopy in the methodology
23   or technique in identifying minerals versus other
24   type of inert materials?

Page 199

1         A.  The experimental setup is the same.  There
2    might be some slight variations required to
3    accommodate samples of different sizes and
4    morphologies and that sort of thing, but the basic
5    idea is that you have a microscope with a laser and
6    something that measures the intensity of the emitted
7    radiation or the scattered radiation at different
8    frequencies.  So it's a perfectly general technique.
9         Q.  Is your level of confidence with regard to
10   particle identification the same whether you're
11   identifying minerals or nonmineral materials?
12        A.  Yes.
13        Q.  Does the fact that Dr. Godleski selected
14   the slides for Raman spectroscopy affect the
15   veracity or the accuracy of the Raman analysis
16   results?
17        A.  No.
18        Q.  And have all of your statements and -- has
19   all of your testimony today been offered to a
20   reasonable degree of scientific certainty?
21        A.  Yes.
22             MR. DEARING:  I think that's all I
23   have right now.
24             MR. CHACHKES:  Short redirect if

Page 200

1    that's okay.  It's only a few questions.
2              FURTHER EXAMINATION
3    BY MR. CHACHKES:
4         Q.  Did you disclose to the journal in which
5    you published your publication that your research
6    was funded by plaintiffs' lawyers?
7              MR. DEARING:  Objection; form.
8    Mischaracterizes his testimony.
9         A.  No.
10        Q.  (BY MR. CHACHKES)  Did you talk to any
11   Raman spectroscopy specialist who focuses on
12   minerals in -- at -- ever?
13        A.  No.
14        Q.  If a specialist in Raman spectroscopy for
15   identifying minerals were to tell you there are
16   unique problems and issues in using Raman
17   spectroscopy for minerals, do you believe you will
18   have the expertise to disagree with that expert?
19        A.  I would vigorously dispute that assertion.
20        Q.  Okay.  Yet you don't know, for example,
21   what special Raman issues are raised by solid
22   solution series?
23             MR. DEARING:  Objection; form.
24        A.  Correct.

Page 201

1         Q.  (BY MR. CHACHKES)  Okay.  And you don't
2    know whether or not Raman spectroscopy can identify
3    the difference between asbestiform and
4    nonasbestiform minerals?
5         A.  It has been reported in the literature,
6    but I'm not an expert.
7         Q.  Okay.  Whether the same mineral -- whether
8    it's an asbestiform or nonasbestiform habit, whether
9    Raman spectroscopy can determine that, you don't
10   know?
11        A.  Not firsthand.
12        Q.  Okay.  And you've never talked to any
13   Raman specialist about the special issues that arise
14   from mineral identification?
15        A.  No.
16             MR. CHACHKES:  Okay.  No further
17   questions.
18             MR. SILVER:  Can we go off the record
19   for a minute so we can switch places?
20             THE VIDEOGRAPHER:  Going off the
21   record.  The time is 2:53 p.m.
22             (A recess was taken from 2:53 p.m.
23             to 2:57 p.m.)
24             THE VIDEOGRAPHER:  Back on the record.

Alan Campion, Ph.D.

## Page 202

1  The time is 2:57 p.m.  This concludes the deposition
2  of Dr. Alan Campion.
3        Going off the record.  The time is
4  2:58 p.m.
5        (Discussion off the video record.)
6        MR. CHACHKES:  And then we maintain
7  our objections stated at the end of the direct
8  and --
9        MR. FERGUSON:  And we join in
10  Johnson & Johnson objections and continue those
11  objections as well.
12        MS. APPEL:  And PCPC also joins in the
13  objections to continue the deposition.
14        MR. DEARING:  We obviously object to
15  keeping the deposition open.
16
17        (Deposition concluded at 2:58 p.m.,
18        January 9, 2019.)
19
20
21
22
23
24

## Page 203

1        CHANGES AND SIGNATURE
2  WITNESS NAME:  ALAN CAMPION, Ph.D.
3  DATE:  JANUARY 9, 2019
4  PAGE/LINE    CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

## Page 204

1        I, ALAN CAMPION, Ph.D., have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted
4  above.
5        _____
6        ALAN CAMPION, Ph.D.
7
   THE STATE OF _____)
8
   COUNTY OF _____)
9
10       Before me, _____, on
11 this day personally appeared ALAN CAMPION, Ph.D.,
12 known to me (or proved to me under oath or through
13 _____) (description of
14 identity card or other document) to be the person
15 whose name is subscribed to the foregoing instrument
16 and acknowledged to me that they executed the same
17 for the purposes and consideration therein
18 expressed.
19       Given under my hand and seal of office this
20 _____ day of _____, 2019.
21
22       _____
23       NOTARY PUBLIC IN AND FOR
24       THE STATE OF _____

## Page 205

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NEW JERSEY
2
3
4  IN RE:  JOHNSON & JOHNSON   )
   TALCUM POWDER PRODUCTS      )
5  MARKETING, SALES PRACTICES  )
   AND PRODUCTS LIABILITY      )
6  LITIGATION         ) MDL NO:
               ) 16-2738 (FLW) (LHG)
7  THIS DOCUMENT RELATES TO    )
   ALL CASES          )
8
9
10      REPORTER'S CERTIFICATE
11 -----------------------------------------
12   DEPOSITION OF ALAN CAMPION, Ph.D.
13      TAKEN JANUARY 9, 2019
14 -----------------------------------------
15
16
17      I, Karen L. D. Schoeve, Registered Diplomate
18 Reporter, Certified Realtime Reporter, and Realtime
19 Systems Administrator, residing in the State of
20 Texas, do hereby certify that the foregoing
21 proceedings were reported by me and that the
22 foregoing transcript constitutes a full, true, and
23 correct transcription of my stenographic notes, to
24 the best of my ability and hereby certify to the

Alan Campion, Ph.D.

Page 206

```
 1    following:
 2          That the witness, ALAN CAMPION, Ph.D., was
 3    duly sworn by the officer and that the transcript of
 4    the oral deposition is a true record of the
 5    testimony given by the witness;
 6          That the original deposition was delivered to
 7    ALEX V. CHACHKES, custodial attorney;
 8          That a copy of this certificate was served on
 9    all parties and/or the witness shown herein on
10    _____.
11          I further certify that pursuant to FRCP No.
12    30(f)(i) that the signature of the deponent was
13    requested by the deponent or a party before the
14    completion of the deposition and the signature is to
15    be returned within 30 days from date of receipt of
16    the transcript.
17          If returned, the attached Changes and
18    Signature Page contains any changes and the reasons
19    therefor.
20          That pursuant to information given to the
21    deposition officer at the time said testimony was
22    taken, the following includes counsel for all
23    parties of record:
24
```

Page 208

```
 1    FOR DEFENDANT IMERYS TALC AMERICA, INC.
 2      KENNETH J. FERGUSON, ESQUIRE
        JENNIFER FOSTER, ESQUIRE
 3      GORDON REES SCULLY MANSUKHANI, LLP
        816 Congress Avenue, Suite 1510
 4      Austin, Texas 78701
        D: 512.582.6472 (Mr. Ferguson)
 5      D: 512.582.6477 (Ms. Foster)
        T: 512.391.0197
 6      F: 512.391.0183
        kferguson@grsm.com
 7      jfoster@grsm.com
 8           --AND--
 9      MARK K. SILVER, ESQUIRE
        COUGHLIN DUFFY LLP
10      350 Mount Kemble Avenue
        P.O. Box 1917
11      Morristown, New Jersey 07962
        D: 973.631.6045
12      T: 973.267.0058
        F: 973.267.6442
13      msilver@coughlinduffy.com
14
        FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL:
15
        RENEE B. APPEL, ESQUIRE
16      SEYFARTH SHAW LLP
        975 F Street, N.W.
17      Washington, D.C. 20004
        D: 202.828.5371
18      T: 202.463.2400
        F: 202.828.5393
19      rappel@seyfarth.com
20
21
22           (Continued on following page)
23
24
```

Page 207

```
 1    FOR PLAINTIFFS' STEERING COMMITTEE:
 2      DAVID P. DEARING, ESQUIRE
        P. LEIGH O'DELL, ESQUIRE
 3      BEASLEY ALLEN, P.C.
        218 Commerce Street
 4      P.O. Box 4160
        Montgomery, Alabama 36104
 5      T: 334.269.2343
        F: 334.954.7555
 6      david.beasley@beasleyallen.com
        leigh.odell@beasleyallen.com
 7
            --AND--
 8
 9      RICK YELTON, ESQUIRE
        BURNS CHAREST LLP
10      365 Canal Street, Suite 1170
        New Orleans, Louisiana 70130
11      D: 504.930.4746
        T: 504.799.2845
12      F: 504.881.1765
        ryelton@burnscharest.com
13
14    FOR DEFENDANTS JOHNSON & JOHNSON ENTITIES:
15      ALEX V. CHACHKES, ESQUIRE
        ORRICK HERRINGTON & SUTCLIFFE LLP
16      51 West 52nd Street
        New York, New York 10019-6142
17      D: 212.506.3748
        T: 212.506.5000
        achachkes@orrick.com
18
            --AND--
19
20      JACK N. FROST, JR., ESQUIRE
        DRINKER BIDDLE & REATH LLP
21      600 Campus Drive
        Florham Park, New Jersey 07932-1047
22      D: 973.549.7296
        T: 973.549.7000
23      F: 973.360.9831
        Jack.Frost@dbr.com
24
```

Page 209

```
 1    FOR DEFENDANTS PTI ROYSTON LLC AND PTI UNION LLC:
 2      TARIQ M. NAEEM, ESQUIRE
        TUCKER ELLIS | LLP
 3      950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113-7213
 4      D: 216.696.3675
        T: 216.592.5000
 5      F: 216.592.5009
        tariq.naeem@tuckerellis.com
 6
 7
 8          I further certify that I am neither counsel
 9    for, related to, nor employed by any of the parties
10    in the action in which this proceeding was taken,
11    and further that I am not financially or otherwise
12    interested in the outcome of the action.
13          Subscribed and sworn to on this the 9th
14    day of January, 2019.
15
16
17
18    _____
      Karen L.D. Schoeve, RDR, CRR
19    Realtime Systems Administrator
      NCRA Exp. Date: 09-30-21
20    Golkow Litigation Services
      Firm Registration No. 690
21    One Liberty Place
      1650 Market Street, Suite 5150
22    Philadelphia, Pennsylvania 19103
      T: 877.370.3377
23    F: 917.591.5672
      www.golkow.com
24
```

53 (Pages 206 to 209)