# EXHIBIT B2

Anne McTiernan, Ph.D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
|  | ) |
| IN RE: JOHNSON & JOHNSON TALCUM | ) |
| POWDER PRODUCTS MARKETING, SALES | ) |
| PRACTICES, AND PRODUCTS LIABILITY | ) MDL No. 2738 (FLW)(LHG) |
| LITIGATION | ) |
|  | ) |
|  | ) |

VIDEOTAPED DEPOSITION OF ANNE MCTIERNAN, PH.D.

January 28, 2019

Seattle, Washington

Anne McTiernan, Ph.D

## Page 2

```
 1          APPEARANCES
 2   For Johnson & Johnson:
 3       Bart H. Williams, Esquire
         Susan Gutierrez, Esquire
 4       Proskauer Rose LLP
         2029 Century Park East
 5       Suite 2400
         Los Angeles, CA  90067-3010
 6       310.284.4520
         310.557.2193 Fax
 7       Bwilliams@proskauer.com
         sgutierrez@proskauer.com
 8
         Benjamin S. Halperin, Esquire
 9       Skadden Arps Slate Meagher & Flom LLP
         4 Times Square
10       New York, NY  10036
         212.735.2453
11       917.777.2453 Fax
         Benjamin.halperin@skadden.com
12
     For Plaintiffs:
13
         Michelle A. Parfitt, Esquire
14       Ashcraft & Gerel, LLP
         1825 K Street NW
15       Suite 700
         Washington, D.C.  20006
16       202.803.7077
         Mparfitt@ashcraftlaw.com
17
         Cynthia L. Garber, Esquire
18       Robinson Calcagnie, Inc.
         19 Corporate Plaza Drive
19       Newport Beach, CA  92660
         949.720.1288
20       949.456.0037 Fax
         Cgarber@robinsonfirm.com
21
         Richard M. Golomb, Esquire
22       Golomb & Honik, PC
         1835 Market Street
23       Suite 2900
         Philadelphia, PA  19103
24       215.985.9177
         215.985.4169 Fax
25       rgolomb@golombhonik.com
```

## Page 3

```
 1   APPEARANCES (CONTINUED)
 2
     For Imerys:
 3
         Nancy M. Erfle, Esquire
 4       Gordon & Rees Scully Mansukhani, LLP
         121 SW Morrison Street
 5       Suite 1575
         Portland, OR  97204
 6       503.222.1075
         503.616.3600 Fax
 7       Nerfle@grsm.com
 8
     For PTI Union, LLC and PTI Royston:
 9
         Michael Anderton, Esquire
10       Tucker Ellis LLP
         950 Main Avenue
11       Suite 1100
         Cleveland, Ohio  44113-7213
12       216.696.4835
         216.592.5009 Fax
13       Michael.anderton@tuckerellis.com
14
     For Personal Care Products Council:
15
         Thomas T. Locke, Esquire
16       Seyfarth Shaw LLP
         975 F Street NW
17       Washington, D.C.  20004-1454
         202.828.5376
18       202.641.9276 Fax
         Tlocke@seyfarth.com
19
20
21
22   Also present:  Anthony Bocci, Videographer
23
24
25
```

## Page 4

```
 1              EXAMINATION INDEX
 2   EXAMINATION BY:              PAGE NO.
 3   MR. WILLIAMS                   10
 4   MS. ERFLE                     299
 5   MS. PARFITT                   305
 6
 7              EXHIBIT INDEX
 8   EXHIBIT NO.    DESCRIPTION      PAGE NO.
 9
10   Exhibit No. 1    Notice of oral and videotaped    15
                      deposition of Anne McTiernan
11                    and duces tecum.
12   Exhibit No. 1A   Plaintiff's steering             21
                      committee's response and
13                    objections to the notice of
                      oral and videotaped
14                    deposition of Anne McTiernan
                      and duces tecum.
15
     Exhibit No. 2    "Rule 26 expert report of        19
16                    Anne McTiernan, MD, PHD,"
                      dated 11/16/18.
17
     Exhibit No. 3    "Additional materials to         63
18                    Dr. Anne McTiernan."
19   Exhibit No. 4    World Cancer Research Fund        69
                      and American Institute for
20                    Cancer Research, "Ovarian
                      cancer 2014 report."
21
     Exhibit No. 5    World Cancer Research Fund        82
22                    and American Institute for
                      Cancer Research, "Diet,
23                    nutrition, physical activity
                      and ovarian cancer - Revised
24                    2018."
25
```

## Page 5

```
 1          EXHIBIT INDEX (CONTINUED)
 2
     Exhibit No. 6    World Cancer Research Fund        83
 3                    International, CUP panel web
                      page excerpt, "CUP expert
 4                    panel."
     Exhibit No. 7    World Cancer Research Fund        98
 5                    web page excerpt, "Myths and
                      controversies about what
 6                    causes cancer."
 7   Exhibit No. 8    American Institute for Cancer    103
                      Research, "GMOs and other hot
 8                    topics."
 9   Exhibit No. 9    Hutch News, "How to reduce       105
10                    the odds of getting cancer."
11   Exhibit No. 10   World Cancer Research Fund       110
                      and American Institute for
12                    Cancer Research, "Judging the
                      evidence."
13
     Exhibit No. 11   "Language from CUP judging       138
14                    the evidence report quoted
                      without citation in
15                    Dr. McTiernan's expert
                      report."
16
     Exhibit No. 12   Article, "Information bias in    164
17                    epidemiological studies with
                      a special focus on obstetrics
18                    and gynecology."
19   Exhibit No. 13   Article, "Prospective study      167
                      of talc use and ovarian
20                    cancer."
21   Exhibit No. 14   Article, "Genital talc           169
                      exposure and risk of ovarian
22                    cancer."
23   Exhibit No. 15   Article, "Perineal talc use      180
                      and ovarian cancer."
24
25
```

2 (Pages 2 to 5)

Anne McTiernan, Ph.D

## Page 6

1          EXHIBIT INDEX (CONTINUED)

2    Exhibit No. 16   Article, "Genital use of talc   192
3                      and risk of ovarian cancer: A
                        meta-analysis."
4
     Exhibit No. 16A  Article, "Genital use of talc   197
5                      and risk of ovarian cancer: A
                        meta-analysis."
6
     Exhibit No. 17   Study, "Systematic review and   203
7                      meta-analysis of the
                        association between perineal
8                      use of talc and risk of
                        ovarian cancer."
9
     Exhibit No. 18   Article, "The relationship      232
10                     between perineal cosmetic
                        talc usage and ovarian talc
11                     particle burden"
12   Exhibit No. 19   Collection of tests from        260
                        John Hopkins' deposition, his
13                     Exhibit No. 24.
14   Exhibit No. 20   Collection of tests from        263
                        John Hopkins' deposition, his
15                     Exhibit No. D-1, including
                        "The whole story."
16
     Exhibit No. 21   "IARC monographs on the         274
17                     evaluation of carcinogenic
                        risks to humans.  Volume 93 -
18                     Carbon black, titanium
                        dioxide, and talc," Lyon,
19                     France, 2010.
20   Exhibit No. 22   Article, "Perineal use of       279
                        talc and risk of ovarian
21                     cancer."
22   Exhibit No. 23   Testing document from           302
                        Ms. Pier's deposition, Pier
23                     Exhibit No. 47.
24   Exhibit No. 24   Copies of Dr. McTiernan's       303
                        invoices to Ms. Parfitt.
25

## Page 7

1          EXHIBIT INDEX (CONTINUED)
2
     Exhibit No. 25   Rule 26 expert report of Anne   304
3                      McTiernan, MD, PHD, dated
                        November 16, 2018.
4
     Exhibit No. 26   "Draft screening assessment,"   306
5                      dated December 2018.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 8

1          BE IT REMEMBERED that on Monday,
2    January 28, 2019, at 1301 Second Avenue, Suite 2000,
3    Seattle, Washington, at 9:11 a.m., before Terilynn
4    Simons, Certified Court Reporter, CCR, RMR, CRR, CLR,
5    appeared ANNE MCTIERNAN, PH.D., the witness herein;
6          WHEREUPON, the following proceedings
7    were had, to wit:
8
9               <<<<<< >>>>>>
10
11         VIDEOGRAPHER:  We are now on the
12   record.  My name is Anthony Bocci.  I am a videographer
13   for Golkow Litigation Services.  Today's date is
14   1/28/2019, and the time is 9:11 a.m.
15         This video deposition is being held at 1301 Second
16   Avenue, Suite 2000, Seattle, Washington 98101 in the
17   matter of In Re Johnson & Johnson Talcum Powder Products
18   Marketing Sales Practices and Products Liability
19   Litigation, for the United States District Court,
20   District of New Jersey.
21         The deponent is Dr. Anne McTiernan.
22         Will Counsel please identify themselves for the
23   record.
24         MS. PARFITT:  Good morning.  Michelle
25   Parfitt, counsel for the plaintiffs.

## Page 9

1          MS. GARBER:  Good morning.  Cynthia
2    Garber on behalf of the plaintiffs.
3          MR. GOLOMB:  Richard Golomb on behalf
4    of Plaintiffs.
5          MS. ERFLE:  Nancy Erfle on behalf of
6    Imerys Talc America.
7          MR. LOCKE:  Tom Locke from Personal
8    Care Products Council.
9          MR. ANDERTON:  Michael Anderton for
10   PTI Royston, LLC and PTI Union, LLC.
11         MR. HALPERIN:  Benjamin Halperin for
12   Johnson & Johnson.
13         MS. GUTIERREZ:  Susan Gutierrez for
14   Johnson & Johnson.
15         MR. WILLIAMS:  And Bart Williams for
16   Johnson & Johnson.
17         VIDEOGRAPHER:  Thank you.
18         Will the court reporter now please swear in the
19   witness.
20
21   ANNE MCTIERNAN, PH.D., having been first duly sworn
22              by the Certified Court Reporter,
23              testified as follows:
24   /////
25   /////

3 (Pages 6 to 9)

Anne McTiernan, Ph.D

1    EXAMINATION
2    BY MR. WILLIAMS:
3    Q  Good morning, Dr. McTiernan.
4    A  Good morning.
5    Q  We just met this morning.  My name is Bart Williams, and
6       I represent Johnson & Johnson in this matter, which is
7       pending in the District of New Jersey Federal Court.
8          Are you aware of that?
9    A  Yes.
10   Q  Have you ever had your deposition taken before?
11   A  Never.
12   Q  The way this will work is I'll ask you questions.
13      Counsel may interpose objections to my questions.  There
14      will be no judge here ruling on the objections, and after
15      the objections, if any, you are supposed to answer the
16      question.
17         Do you understand that?
18   A  Yes.
19   Q  My understanding is that you have provided us with a USB
20      drive; is that correct?
21   A  Michelle Parfitt provided you with that drive, yes.
22   Q  Are you aware of what's on that drive?
23   A  Yes.  It's all the documents that I've used in forming my
24      opinion.
25   Q  Are all of the files on the USB drive documents that you

1       considered in connection with your opinions in this case?
2    A  Yes.
3    Q  Are there any other files on the USB drive?
4    A  Not to my knowledge there are no other files.
5    Q  Can you be a little bit more particular about what types
6       of documents, categories of documents, are contained on
7       the drive?
8    A  So these will be scientific manuscripts published in
9       peer-reviewed journals.
10         They will be some expert testimony.
11         There was government reports, and I don't have the
12      full list right in front of me, so there are hundreds of
13      these things, but in general classifications, I think
14      that is-- that covers it generally.
15   Q  Those are all the things you recall at this time?
16   A  That's what I recall.
17         My report should be on there as well, my CV, and
18      government reports of-- other expert reports-- if I
19      mentioned that.
20   Q  Let me stop you there.
21   A  Yeah.
22   Q  Does the USB drive contain all of the materials that were
23      just recently produced to the defense in the case a few
24      days ago, which were entitled, "Additional materials"
25      that you had reviewed?

1          MS. PARFITT:  If I may, I am not sure
2    that Dr. McTiernan knows that.
3          The additional materials, they are not, to my
4    knowledge, on that thumb drive.
5          It was a list of some additional materials.  I'm not
6    sure that she's reviewed them all, and please feel free
7    to make that inquiry, if you will, but I don't believe,
8    Mr. Williams, they may be included on that thumb drive.
9          That thumb drive should include the report, the
10   references to the report.
11         MR. WILLIAMS:  Okay.
12   Q  (By Mr. Williams)  Dr. McTiernan, when were you first
13      approached about any involvement in talcum powder
14      litigation?
15   A  It should have been 2016.
16   Q  And by whom were you approached?
17   A  By Ms. Parfitt.
18   Q  Michelle Parfitt, counsel who is--
19   A  Yes.
20   Q  One thing I should have told you, in order for the court
21      reporter to take down everything that is said, you need
22      to wait until I'm completely finished--
23   A  Oh, sorry.
24   Q  --with my question.
25         You should take a pause and then answer the

1       question, okay?
2    A  Mm-hm, okay.
3    Q  Otherwise, she has to cut off part of the question, write
4       down your partial answer, and then the rest of my
5       question.
6          Do you understand that?
7    A  Okay, yes.
8    Q  So the first person who approached you was Michelle
9       Parfitt?
10   A  Yes.
11   Q  Do you remember--
12   A  For this-- yes, for this litigation, yes.
13   Q  When in 2016 did Ms. Parfitt approach you?
14   A  I don't have that in my head.
15         We should have a record of that first interaction.
16   Q  I will just get your memory for now.
17         Was it winter, spring, summer or fall?
18   A  It would be late summer.
19   Q  Did Ms. Parfitt contact you at your place of business?
20   A  She approached me first by an e-mail at my institutional
21      e-mail address, yes.
22   Q  And what is that e-mail address?
23   A  At that time it was probably still amctiern@fhcrc.
24         My institution has changed the middle part to
25      FredHutch, so I believe she did the first one.

Anne McTiernan, Ph.D

Page 14

1           Either one goes to the same place.
2    Q  Have you known Ms. Parfitt or any of the other
3       plaintiffs' lawyers prior to their contacting you?
4    A  No, I did not.
5    Q  How long after Ms. Parfitt first contacted you did you
6       agree to work with them in connection with the talcum
7       powder litigation?
8    A  It was approximately two months, and my institution
9       requires that I get permission for doing such consulting,
10      so the process took approximately two months before I
11      received approval.
12   Q  As of late summer 2016, when Ms. Parfitt first contacted
13      you, what institution are you talking about?
14   A  Oh, so Fred Hutch Cancer Research Center in Seattle.
15   Q  And if it took two months, that would mean that it was
16      late summer, early fall when you had received approval;
17      is that correct?
18   A  I believe, yes.
19   Q  And that's late summer, early fall of 2016, right?
20   A  I believe, yes.
21   Q  How much per hour are you billing for the literature
22      review and preparation for your report in this matter?
23   A  That was $450 an hour.
24   Q  At what rate are you charging for your time spent
25      providing deposition testimony?

Page 15

1    A  $650.
2    Q  Is that the same amount that you would charge for hearing
3       testimony if you were to testify at the Daubert, and
4       that's D-A-U-B-E-R-T, hearing in the summer of 2019?
5    A  Yes.
6    Q  Do you charge for travel related to your work as an
7       expert witness, separate and apart from any work that you
8       may do while traveling?
9    A  I have not previously been an expert witness, so I can't
10      give you an answer on what I usually do.
11   Q  So this is the very first time in your career where you
12      have served as an expert witness; is that correct?
13   A  That's right.
14                 (Exhibit No. 1 marked
15                   for identification.)
16
17   Q  (By Mr. Williams)  We have marked as Deposition Exhibit
18      No. 1 the deposition notice, and we will hand that out to
19      you through your counsel.
20               MS. PARFITT:  I believe you have that,
21      Anthony, the first notice.
22   Q  (By Mr. Williams)  Do you have Exhibit No. 1, the
23      deposition notice, in front of you?
24   A  Yes.
25   Q  Is this something you have seen before?

Page 16

1    A  Yes.
2    Q  When did you first see this?
3    A  Approximately a month ago.
4    Q  In response to this deposition notice, which lists
5       certain categories of documents, have you brought any
6       documents with you here today?
7    A  We have documents for reports that were available only
8       recently, so too recent to have them on the thumb drive,
9       so these include the Health Canada report, weight of
10      evidence, the screening-- the draft screening assessment,
11      risk management scope, information sheet, key messages,
12      and a "Draft systematic review of meta-analysis" by
13      Taher, so it's a signed manuscript.
14   Q  Anything else?
15   A  These others are all in my list of documents.  These are
16      just copies of them.
17   Q  So just let me clear that up.
18         You have just mentioned that there are some reports
19      in--
20   A  The Health Canada report.
21   Q  Let me just take them one at a time.
22   A  I'm sorry.
23   Q  You listed the Health Canada report, correct?
24   A  Yes.
25   Q  Something called the draft screening assessment?

Page 17

1    A  So these are all part of the Health Canada report.
2       These are the components of it.
3          A screening assessment document, weight of evidence
4       document, a document called "Risk management scope," one
5       called-- the title is, "Talc - potential risk of lung
6       effects and ovarian cancer."  I am calling it key
7       messages because that's the first title underneath that.
8          There's a talc information sheet.
9          And a government of Canada talc sheet.
10         It looks like it's a public messages sheet.
11         The last thing is a systematic review of
12      meta-analysis of the association between perineal use of
13      talc and risk of ovarian cancer by Taher, et al.
14   Q  And let me ask you to go a little bit more slowly when
15      you read today so that the court reporter can get it
16      down.
17         Is that okay with you?
18   A  Yes.
19   Q  Is it accurate to say that the items you have just listed
20      were not in your possession at the time that you prepared
21      your report that has been provided in this case?
22   A  That is correct.
23         They were published after that period.
24   Q  Is it accurate to say that none of the materials that you
25      have in front of you now were able to inform the opinions

5 (Pages 14 to 17)

Anne McTiernan, Ph.D

Page 18

1  that you expressed in the report, which predated your
2  receipt of those materials?
3  A  The Health Canada report, that is true for.
4     However, the other documents that I have here, one
5  is a paper that I cited from Blount.
6     One is information from the FDA website, which is--
7  I was able to access before doing my report.
8     Then the last thing is-- I'm sorry, it's a
9  deposition of Dr. Blount held last April, so I had access
10  to that earlier as well.
11  Q  Let's do this, we previously went through a list of
12  materials, most of which related to the Health Canada
13  report.
14     Do you remember that?
15  A  Yes.
16  Q  Other than that set of materials that you previously
17  described, is everything in the blue folder that's in
18  front of you, that you have brought with you today, a
19  duplicate of another report that has already been
20  produced to us?
21  A  Yes.
22     There was also one list here of additional
23  materials, so that should have been-- additional
24  materials to Dr. McTiernan, and that should be in your
25  list of what you have as well.

Page 19

1  Q  We are going to mark a copy of that additional materials
2  list in a moment, but for now, is it accurate that at the
3  time that you prepared your report in this case, which
4  was submitted to us in November of 2018, you had not
5  reviewed the additional materials list materials that you
6  have just pointed to?
7  A  That is correct.
8     Those were not available at that time.
9  Q  Let's mark as Exhibit No. 2 to the deposition a copy of
10  your expert report from November of 2018.
11     I think your counsel already has that.
12        (Exhibit No. 2 marked
13         for identification.)
14
15  Q  (By Mr. Williams)  Is the document marked Exhibit No. 2 a
16  copy of the expert report that you prepared in this case?
17  A  Yes, it is.
18  Q  It's dated November 16th, 2018?
19  A  Yes.
20  Q  You have a copy of that report in front of you that you
21  are holding right now; is that right?
22  A  Yes.
23  Q  Does the copy that you are holding right now have notes
24  on it?
25  A  Yes, it does.

Page 20

1  Q  We will take a look at that during a break and perhaps
2  get a copy of it.
3  A  Okay.
4  Q  When were the notes that you have written on your expert
5  report written on the report?
6  A  In the past week.
7     I realized, as I was reviewing and preparing, that I
8  had not used a program that would give the full name of
9  the references, so to aid in my review, I wrote in the
10  first author of the documents, the manuscripts that I was
11  referring to.
12     Everything listed here is-- that I've written is the
13  first author of an article, and then I've also underlined
14  a few places to jog my memory.
15  Q  Other than what you've just described, are there any
16  other notations that appear on the report document?
17  A  No, not to my knowledge, no.
18  Q  Did you bring with you today any invoices reflecting
19  statements that you have given to plaintiffs' counsel for
20  payment?
21  A  I did not bring them myself, but I believe you have them.
22        MS. PARFITT:  We did-- we have them.
23     If we can just take a look at them-- they were just
24  sent this morning to us, to my office, so if I could have
25  a chance to look through them, and maybe after the break

Page 21

1  we can get them marked.
2     Would that be appropriate?
3        MR. WILLIAMS:  That's fine.
4        MS. PARFITT:  The only other thing I
5  ask, Mr. Williams, could we perhaps note the Exhibit 1A,
6  the objection to the notice of depo?
7        MR. WILLIAMS:  Sure.
8        MS. PARFITT:  Thank you.
9        (Exhibit No. 1A marked
10         for identification.)
11
12  Q  (By Mr. Williams)  Your counsel-- we have premarked as
13  Exhibit No. 1A the objections that were served by
14  Plaintiffs' counsel to the deposition notice that we
15  provided.
16     Have you seen that before?
17     It's in front of you now.
18  A  This, no, I have not.
19  Q  So you have never seen the objections?
20  A  No, I have not.
21  Q  Did counsel consult with you at all at the time that was
22  prepared?
23  A  No.
24  Q  Let's go back to the point in time when you first spoke
25  with plaintiffs' counsel.

6 (Pages 18 to 21)

Anne McTiernan, Ph.D

Page 22

1      You said Ms. Parfitt reached out to you by e-mail at
2   your institution, which was the Fred Hutch Institution;
3   is that right?
4   A  Yes.
5   Q  Was anyone else on the phone?
6   A  No.
7   Q  How long was that call?
8   A  I don't remember.
9      I think it was brief, but I don't remember.
10  Q  And you said "I think" that it took a few months for the
11  process at your institution to be completed; is that
12  right?
13  A  Yes.
14  Q  How long after that first approach by Ms. Parfitt in the
15  summer, late summer, of 2016 did you decide that you
16  would in fact want to serve as an expert in this matter?
17  A  I decided within a week that I would be interested, but I
18  am required to do this process at my institution which
19  involves informing my division director and the senior
20  vice presidents of the institution as well as the
21  president, and in aiding that, our legal counsel reviews
22  all of these requests to do such consulting.
23     So that process happened to take a while.
24     This time, I'm not sure.  I think somebody was on
25  vacation, so that's why it took two months, so during--

Page 23

1   in order to start the process, I had to be interested in
2   doing this, so that's why I did it, but I couldn't firmly
3   say I could do it until they gave me approval.
4   Q  In that week's period of time, between the time
5   Ms. Parfitt first contacted you and the time that you
6   made the decision to participate in this litigation as an
7   expert, what, if any, documents relating to talcum powder
8   and ovarian cancer did you review?
9   A  I had already known some of the literature, some of the--
10  for example, the pooled analysis by Terry, et al., I had
11  already reviewed that in the past, and I think I did some
12  preliminary searches through Medline to see what the
13  available data were, but I did not do a systematic
14  review.
15     I was not able to share that with the counsel, who
16  was Ms. Parfitt at this point, because I wasn't able to
17  officially consult, but I was curious.  I wanted to know
18  what the data was looking like, what papers were
19  available.
20  Q  Other than the Terry 2013 article that you mentioned and
21  some preliminary searches that you did on Medline, is
22  there anything else you did in that week's period of
23  time?
24  A  In that week?  I don't recall anything else in that
25  period.

Page 24

1   Q  When you say you did preliminary searches on Medline, can
2   you recall any articles that you came up with?
3   A  I previously had already reviewed for the New York
4   Times-- when they contacted me about my scientific
5   opinion or my clinical opinion of this matter, I had been
6   given two of the cohort study papers, one by Gertig, et
7   al., and one by Houghton, et al., and so I briefly
8   reviewed those, and-- as well as the Terry case-control
9   study in order to talk with the New York Times, so I knew
10  about those papers.
11     In the epidemiology field, we often see things over
12  time.
13     This has been something that has been studied for
14  quite a few years, so I've been aware of the issue but
15  have not done a systematic review and not done a causal
16  analysis, was not a focus of my research at that point.
17  Q  At the time that you agreed to participate as an expert
18  in this litigation, is it accurate to say that the
19  studies that you had reviewed included the Terry 2013
20  analysis, the Gertig cohort study, the Houghton cohort
21  study, you had reviewed as all those things before you
22  decided to participate; is that true?
23  A  I had read those, yes.
24  Q  And you can't remember anything else, as you sit here
25  right now, that you had reviewed before you made that

Page 25

1   decision?
2   A  I can't remember others.
3   Q  Were there others or not?
4   A  I can't remember.
5      I believe that I only looked at those two cohort
6   studies and the Terry pooled analysis.
7   Q  Let me ask you to focus on Exhibit No. 2, your report.
8      Do you have that in front of you?
9   A  Yes.
10  Q  Does that report contain all of the opinions that you
11  intend to offer at any hearing on this matter?
12  A  Yes, unless-- so you are talking about any future-- any
13  future questioning I face in the court?
14     If there's more research that is published by that
15  time, I would want to know about it to see if it affects
16  my opinion or what the research is.
17     As a scientist I would want to keep up to date, but
18  for right now, this is my scientific opinion, what's in
19  this report.
20  Q  Today is my opportunity to ask you questions about your
21  opinions in this matter.
22     You understand that, right?
23  A  Yes.
24  Q  Have you modified your opinions in this litigation beyond
25  the opinions set forth in Exhibit No. 2?

Anne McTiernan, Ph.D

| Page 26 |
|---|

1    A   No, I have not.
2    Q   Are there any few or additional opinions that you expect
3        to testify to at any hearing in this matter, other than
4        what is contained in your report, Exhibit No. 2?
5    A   Nothing that I foresee, that I expect.
6    Q   Did you personally type the report that's marked as
7        Exhibit No. 2?
8    A   Yes, I did.
9    Q   Did anyone assist you in the preparation of your report?
10   A   The only assistance I had was occasionally if I couldn't
11       get a paper myself, through my own institutional library,
12       then we have an administrative assistant that I can ask
13       for that, and I believe I asked for a couple of papers
14       through that source.
15           There were a couple of times when I asked
16       Ms. Parfitt's firm if they had a paper.  This was quite a
17       few months after that period, perhaps half a year or
18       longer by the time I asked them.
19   Q   When did you start drafting the litigation report marked
20       as Exhibit No. 2?
21   A   That would have been winter of 2016 to spring of 2017.
22   Q   Since you typed the report yourself, am I right that you
23       have a file of it either at home or on your office
24       computer?
25   A   Yes, on my home computer.

| Page 27 |
|---|

1    Q   From start to finish did you work in the same file to
2        draft this report or did you have different files or
3        drafts?
4    A   I copied different drafts as a way of backing up.
5    Q   Have you maintained the drafts, the iterations, as it
6        went along?
7    A   Yes.
8    Q   How many hours would you say you have spent preparing the
9        litigation report since the winter of 2016 to the spring
10       of 2017 when you started writing it?
11   A   I would say approximately 240 hours.
12   Q   And on what do you base that estimate?
13   A   On invoices that I submitted through December 2018, plus
14       an additional 25 hours since that time.
15   Q   I take it from your last answer, that up through December
16       2018 you billed 240 hours total; is that accurate?
17   A   No.
18       As of December 2018 I believe it was 211 hours.
19   Q   And is that 211 hours the total amount of time that you
20       have spent grappling with the issues in this litigation
21       or is that just the time that you have spent writing the
22       report?
23           MS. PARFITT:  Objection; form.
24       You may answer.
25           THE WITNESS:  It was since the time I

| Page 28 |
|---|

1        was given approval to work on this, so anything I read
2        before that, I did not charge my time.
3    Q   (By Mr. Williams)  Is it accurate to say that the 240
4        hours reflects all of the hours, through today, that you
5        have spent on this matter?
6    A   Yes.
7    Q   And you broke it down to 211 hours through December 2018
8        and another 25 hours since that time, correct?
9    A   Approximately 25 since that time, yeah.
10   Q   Let me ask you to look at your report and refer you to
11       Pages 78 through 84.
12           You identify 127 documents or other materials as
13       references, correct?
14   A   Yes.
15   Q   Are those the materials that you are relying on to form
16       the basis of your opinions in this case?
17   A   Yes, although there are different materials that I was
18       able to review after the report was done, and they help
19       support my opinion.
20   Q   And are those additional materials, materials that we
21       have already discussed this morning?
22   A   Yes.
23   Q   Did the Plaintiffs' lawyers provide you with any of the
24       references that are contained in Nos. 1 through 127?
25   A   I believe some of them they provided if it was one that I

| Page 29 |
|---|

1        couldn't obtain on my own.
2            A few of the mechanistic studies, I believe.
3    Q   If you can identify them by number, that would be good.
4    A   Yeah.
5            Well, certainly some of the depositions I had no-- I
6        did not access myself, so No. 77, 78, 79.
7            The Longo reports, so 79 through 83.
8            84 as well they provided.
9    Q   Anything else?
10   A   I am trying to search.
11           They sent me some of the IARC monographs, but I had
12       access previously to them myself, so I'm not sure which
13       way you would want to count that, if I accessed the IARC
14       myself online, but that-- Ms. Parfitt also sent their
15       copy of it, so from two sources I had the same things.
16           These are the IARC monographs, "The evaluation of
17       carcinogenic effects," No. 40 and 42.
18           I think there was a third IARC report.
19   Q   Would that be No. 74?
20   A   Yes.
21   Q   Other than items 40, 42, 74, and 75 through 84, are there
22       any other materials that were provided to you by
23       plaintiffs' counsel?
24   A   I am searching here.
25           Some of the mechanistic studies they were able to

Anne McTiernan, Ph.D

## Page 30

1   provide when I couldn't get them myself, and some of
2   these journals were journals that were difficult to get,
3   so I believe 85 and 90.
4   Q   Had you identified Items 85 and 90 prior to the time they
5       were provided to you or did Counsel simply provide them
6       to you?
7   A   No, I don't think they-- no, they didn't simply provide
8       them to me.
9           At the time that I added these, these were added
10      toward the end of the time that I was preparing the
11      report.
12          I was able to see some other expert reports.  One
13      was a gynecologist -- I believe it was Plunkett -- who
14      mentioned that there were-- that-- the issue of
15      transporting had some additional references that I did
16      not have.
17          I had, originally, some mechanism-related papers
18      related to migration of talcum powder products through
19      the vaginal tract, and I didn't-- there were some
20      additional ones here that I had not known about.
21          I believe Egli and Sjosten were two-- sorry, 85 and
22      90.
23  Q   References 77 through 84 appear to be deposition
24      transcript exhibits and expert reports in litigation.
25          Do you see that?

## Page 31

1   A   Yes.
2   Q   Have you reviewed all of those transcripts?
3   A   I skimmed 77 and 78 and looked at some of the exhibits
4       that they had with them.
5           I skimmed Longo, but I read through the November
6       and-- this is another one-- these are not dated here-- of
7       February and November.
8   Q   Let's take them one at a time on Longo.
9           No. 79 says Longo, Rigler, April 2017.
10          Did you review that?
11  A   Only skimming that.
12          For all of these, I looked at the summary in the
13      beginning, which presented the numbers of samples that
14      were tested and the numbers that were considered to have
15      asbestos.
16  Q   So you only reviewed the summaries; is that accurate?
17  A   Summaries, yes.
18  Q   And that applies to 77 through 83?
19  A   Through 83, yes.
20  Q   Take a look at Page 84 of your litigation report.
21          Do you have that in front of you?
22  A   Yes.
23  Q   It lists here, "Additional materials and data
24      considered," and it lists thereafter 113 items.
25          Do you see that?

## Page 32

1   A   Yes.
2   Q   Have you read all of those items?
3   A   Not in full.
4           Do you want me to go through them one at a time?
5   Q   Let me just ask you generally, what's the difference
6       between the references to your report and the items
7       listed as additional materials and data considered?  Why
8       did you spread them out like that?
9   A   These up to 127 were available at the time that I was
10      actively writing my report.
11          Some of these other documents came along later and
12      were available to me, so the counsel did provide them.
13          Some of them were-- some of them were earlier, these
14      Fletcher papers on-- on some of the mechanistic work was
15      done earlier.
16          Many of these are-- to my knowledge they were
17      exhibits that were available from the case from the law
18      firm.
19          One of these is a repeat.  38 was listed originally.
20          I think there's a little bit of variability here.
21  Q   Let me stop you there for a moment.
22  A   Yes.
23  Q   Did you read each of the 113 items in their entirety?
24  A   No, I did not.
25  Q   In describing the difference between the additional

## Page 33

1   materials and data considered and the 127 references that
2   we've already gone over, is it accurate to say that the
3   additional materials were all provided by plaintiffs'
4   counsel?
5           MS. PARFITT:  Objection to form.
6           THE WITNESS:  It's not true.
7           Some of these I had myself--
8   Q   (By Mr. Williams)  Could you please identify all of the
9       items on here, of the 113 items, that you had yourself
10      prior to them being provided by plaintiffs' counsel?
11  A   Okay.  No. 2, American Cancer Society, I accessed their
12      website several times.
13          31 is a Hartge paper on talc and ovarian cancer, so
14      I accessed that myself.
15          This isn't a Hartge paper title, so that's one
16      problem, one reason I'm struggling here, so I assume that
17      this is another review that she has written, Hartge, but
18      I'm not sure if it's the same as the paper that I
19      referenced as one of my case-control studies that are
20      referenced.
21          The same issue with 33, 34 because I did reference
22      Henderson, these are migration papers, so I'm not sure
23      about that.
24          No. 37 I do consider.  It was a subset of the other
25      Huncharek review, so I did see this earlier.  I just did

Anne McTiernan, Ph.D

| Page 34 | Page 36 |
|---|---|

**Page 34**

1    not reference it for my report.
2        38 is the same IARC monograph paper-- work that is
3    referenced in the paper.
4        Institute of Medicine I was not able to review.
5        These other things look like they are Johnson &
6    Johnson or-- no-- other industry documents.
7    Q  Let me stop you there for a moment.
8        Remember, my question is simply:
9        Of the 113 items, please just list the numbers that
10    you had before they were provided by Plaintiffs' counsel.
11    That's all I need.
12    A  Okay.  Sorry.
13        67 I had previously, 79, 80, 87, 88, 89, 90, 91.
14        92 I believe I referenced earlier, so 92, 93, 94,
15        100-- can you remind me, is this for-- to distinguish
16        what was in my report or what I obtained on my own?
17    Q  What you obtained on your own.
18    A  Okay.  103 I obtained on my own.
19        That's it.
20    Q  All of the items, other than those that you just listed,
21        were provided to you by Plaintiffs' counsel, correct?
22    A  I believe so, yes.
23    Q  You did not read each and every page of the materials
24        that were provided to you by Plaintiffs' counsel; is that
25        true?

**Page 35**

1    A  I did not, that's true.
2    Q  Let me direct your attention to No. 47 through 65 on the
3        list that begin with the letters JNJ.
4        Do you see that?
5    A  Yes.
6    Q  Do you understand that these are internal Johnson &
7        Johnson documents?
8        Is that right?
9    A  I believe you.
10        I don't know what they are from looking at just the
11        numbers.  I would have to reference back to my documents.
12    Q  No. 40 through 46 all start with the word Imerys,
13        I-M-E-R-Y-S.
14        Do you see those?
15    A  Yes.
16    Q  Do you understand those to be internal Imerys documents?
17    A  Again, I would have to look and see what they look like.
18    Q  Did you ask Plaintiffs' counsel to provide you with the
19        Imerys and Johnson & Johnson documents?
20    A  No, I did not.
21    Q  So they just gave those to you?
22    A  I asked to see what available evidence there was, and
23        the-- the evidence that had been collected for the case
24        in general, so that was a very general question, and they
25        provided these.

**Page 36**

1    Q  Is that how you phrased it, "what available evidence
2        there was"?
3    A  As the questions came along of various-- of parts of
4        data-- so this came up with a question of what other
5        constituents are there in Johnson & Johnson Baby Powder
6        and Shower to Shower, and I relied first on published
7        data from Blount and Gordon, but I was interested in what
8        other testing had been done to see what are the
9        constituents, because otherwise there's no information,
10        but it was a very general question.  I didn't know what
11        was available.
12    Q  In response to that question that you just described, the
13        items that are listed here and the numbers that I just
14        gave you, 40 through 47 for Imerys-- excuse me, 40
15        through 46 for Imerys, and 47 through 65 for Johnson &
16        Johnson, are the only documents that were provided to
17        you?
18            MS. PARFITT:  Objection.
19            THE WITNESS:  For that, I would also
20        have received Longo, but one issue is I don't know-- from
21        looking at these numbers, I don't have them memorized
22        what they are.
23        I would have to look them up.
24        I do know that the Longo reports are the results of
25        testing of constituents of the products.

**Page 37**

1    Q  (By Mr. Williams)  And as you sit here today, you do not
2        know whether or not the documents that are listed in
3        References 40 through 65 are in fact authentic documents
4        of Johnson & Johnson or of Imerys, right, one way or the
5        other?
6            MS. PARFITT:  Objection; form.
7            THE WITNESS:  I don't have memorized
8        what these are.
9    Q  (By Mr. Williams)  Pardon me?
10    A  I don't have memorized what these are, what these numbers
11        refer to.
12    Q  With respect to any of the internal company documents
13        that you have reviewed from either Imerys or Johnson &
14        Johnson, as you sit here now, you do not know whether any
15        of those documents are in fact authentic Johnson &
16        Johnson or Imerys documents, correct?
17            MS. PARFITT:  Objection; form.
18            THE WITNESS:  When I looked at any of
19        these documents that were provided, they had stickers on
20        them, I noticed, like-- so exhibit numbers, so I assumed
21        this were exhibit numbers for some litigation.
22        That's all I know.
23    Q  (By Mr. Williams)  Are you relying on any of those
24        internal company documents to form the basis of your
25        opinions in this case?

10 (Pages 34 to 37)

Anne McTiernan, Ph.D

Page 38

1     MS. PARFITT: Objection; form, vague.
2     THE WITNESS: I looked through them.
3     I did not read them in enough detail to have them form
4     the primary basis of my opinion.
5  Q  (By Mr. Williams) Do they form something other than a
6     primary basis for your opinion?
7  A  They added to some-- to consideration of what might be
8     contained in these products.
9  Q  Do you have any idea what percentage of the entire
10    document production from Johnson & Johnson these 18
11    documents comprised?
12 A  I do not.
13 Q  When you asked Counsel to provide you with what some of
14    the evidence was with respect to the question you were
15    being asked to consider, did you ask for both evidence
16    that tends to show that, for example, Johnson's Baby
17    Powder contains asbestos, and for evidence that it does
18    not contain asbestos?
19 A  I asked about totality of evidence.
20    I didn't use the words, "Please show me where it
21    contains and where it doesn't."
22    One thing I'm interested in is if something contains
23    it, that's very concerning to me, so whether it's 50
24    samples out of 100 that have asbestos in it, I would be
25    concerned, but if it's only five, so even if more

Page 39

1     negative samples were provided, and there's only five
2     that are positive, that's still concerning.
3  Q  Were you provided any negative samples?
4  A  I did see evidence that some were negative, yes.
5  Q  Where did you see that?
6  A  I saw that in the Longo report, so there was-- each
7     report had a different percent that were positive.
8     Some were 50 percent positive, some 66 or 70 percent
9     positive, so that means the inverse, 30 to 50 percent
10    were negative, did not have asbestos.
11    Also, from my perusal of the Johnson & Johnson and
12    Imerys documents that seem to be exhibits, it looked like
13    there were some, but sometimes it was small amounts but
14    sometimes it was larger, but that some contamination or
15    inclusion of asbestos, but many times not.
16    There was also an FDA website that was able to look
17    at where they only tested, however, two products, two
18    bottles of Johnson & Johnson, and those were both
19    negative.
20 Q  In the normal course of your work outside of litigation,
21    do you review internal company documents for any reason?
22 A  No, not-- I would not have a reason to do that.
23 Q  When setting out to conduct research on a medical or
24    other scientific question, outside of litigation, have
25    you ever sought internal company documents related to the

Page 40

1     question at issue?
2     MS. PARFITT: Objection; form.
3     THE WITNESS: No, I don't-- well, it
4     depends how you define a company, because occasionally if
5     you're doing a full review of the scientific literature,
6     you may-- for example, if you are doing a meta-analysis,
7     they want to request data from other sources that aren't
8     yet in the public domain, and if that study happens to be
9     run through a company, then that could have happened.
10    I can't say it's common.
11    Typically we look at published data-- published
12    scientific data from scientific opinions.
13 Q  (By Mr. Williams) When drafting a publication on a
14    medical or a scientific question, have you ever sought
15    internal company documents related to the subject matter?
16    MS. PARFITT: Objection; asked and
17    answered.
18    THE WITNESS: So I'm curious, is that
19    the same question as before? Did you just ask that
20    question-- are you asking it again?
21 Q  (By Mr. Williams) I'll ask it another way.
22 A  Okay.
23 Q  Out of the multiple hundreds of publications that your
24    resume lists with you as an author, how many cite to
25    internal company documents?

Page 41

1     MS. PARFITT: Objection; form.
2     THE WITNESS: I believe that none do.
3     Most of my papers are with data from my own studies.
4  Q  (By Mr. Williams) Now, you were asked in this matter to
5     review the current state of scientific literature
6     regarding talcum powder products and to opine on whether
7     those products cause ovarian cancer.
8     Is that accurate?
9  A  Yes. I was asked to do a causal analysis and to form an
10    opinion on the association between use of talcum powder
11    products and risk of ovarian cancer.
12 Q  Were you given any other questions to answer or opine on?
13 A  So I'm just looking at your question. I'm sorry.
14    I think this summarizes the question I was asked to
15    answer.
16 Q  You were not retained to provide an opinion about whether
17    or not talc can cause pleural or peritoneal mesothelioma,
18    were you?
19 A  I was not, no.
20 Q  And you are not in fact providing an opinion on that
21    subject?
22 A  I am not.
23 Q  Did you in fact review what you believe to be the current
24    state of scientific literature regarding the question of
25    whether talc can cause ovarian cancer?

11 (Pages 38 to 41)

Anne McTiernan, Ph.D

| | Page 42 |
|---|---|

1    A  Yes, I believe I did.
2    Q  Did you consider literature and sources that refuted an
3       association or causal association between talc and
4       ovarian cancer?
5    A  Yes, I did.
6          I looked at the entirety of literature as I knew
7       it-- as I was able to find it.
8    Q  Did you consider literature and sources that have
9       concluded that the totality of the scientific evidence is
10      insufficient to find a causal association between talc
11      and ovarian cancer?
12              MS. PARFITT:  Objection; form.
13              THE WITNESS:  Yes.
14   Q  (By Mr. Williams)  When you wrote your report setting
15      forth your opinions in this case, did you identify the
16      sources that refuted the propositions that you were
17      making?
18   A  Those papers would have been part of my report, yes.
19   Q  So is it your testimony that the report that you have in
20      front of you, Exhibit No. 2, actually identifies the
21      sources that refuted the propositions that you were
22      making?
23   A  Yes.
24          If these were papers that included data-- so I use
25      data-- I reviewed the data from these studies, and

| | Page 43 |
|---|---|

1       regardless of what those studies concluded, I included
2       them in the report.
3    Q  Did you discuss in your report the part or parts within
4       those sources that refuted the propositions you were
5       making, including the data?
6    A  I believe that I discussed in general that-- whether
7       there is evidence of a causal relationship between talcum
8       powder product use and risk of ovarian cancer.
9          I did not, for each paper, reiterate what they
10      concluded.  I looked at their data.
11   Q  If there were parts of a study, for instance, that did
12      not support one of your opinions, did you make a note of
13      that in your report?
14              MS. PARFITT:  Objection; form.
15              THE WITNESS:  If the studies did not
16      show an association between talcum powder product use and
17      risk of ovarian cancer, I included those data, yes.
18          I included it both in the content of the report as
19      well as in the data table that I included at the end of
20      the report, and I included those data.
21   Q  (By Mr. Williams)  If those data did not, for instance,
22      show a dose response related to exposure to talcum powder
23      and the incidence of ovarian cancer, did you note in your
24      report where the data did not support dose response?
25   A  I did note that.

| | Page 44 |
|---|---|

1          It's in the table, and in the report I did note
2       where there was a dose response note-- I did note whether
3       there was a dose response seen in the paper.
4          I can't-- let me see, I can look through-- I'm not
5       sure if you want me to look through for each--
6    Q  We'll do that a little later.
7    A  Okay.
8    Q  Let me ask you now to turn to Page 68 of your report with
9       the heading that says, "Conclusion."
10   A  (Witness complies.)
11   Q  Do you have that in front of you?
12   A  Yes.
13   Q  Does that conclusion accurately summarize your opinion in
14      this case on the question of whether or not perineal use
15      of talcum powder products can cause ovarian cancer?
16   A  Yes.
17   Q  Now, your opinion is stated to a, quote, "medical and
18      scientific degree of certainty," closed quote.
19          Do you see that?
20   A  Yes.
21   Q  What do you mean by the use of the term "degree" in that
22      sentence?
23   A  I would say a high degree.
24          I don't put percentages on my opinion.  It's not
25      typical in my field to do that, but I would say with a

| | Page 45 |
|---|---|

1       high degree of certainty that based on the totality of
2       evidence, that use of talcum powder products can cause
3       ovarian cancer.
4    Q  Do you believe that perineal use of talcum powder
5       products manufactured today, in 2019, can cause ovarian
6       cancer?
7    A  So talcum powder products, yes.
8          There's no evidence that it would have changed.
9          The evidence from the epidemiologic studies were
10      from people's use decades previously, but then looking at
11      contents of talcum powder products over time it looks
12      like they continue to have constituents that could be
13      carcinogenic, as well as talcum powder by itself has been
14      shown to be carcinogenic, and so I believe that if
15      somebody was using them today, they could still have the
16      same potential for developing ovarian cancer as if they
17      used them 50 years ago.
18   Q  So the answer to my question is that you believe that
19      perineal use of talcum powder products manufactured
20      today, in 2019, can cause ovarian cancer, correct?
21   A  Yes-- yes.
22   Q  Did you reach the opinion, to a degree of medical and
23      scientific certainty, that perineal use of talcum powder
24      products can cause ovarian cancer before or after you
25      were hired by Plaintiffs' counsel?

12 (Pages 42 to 45)

Anne McTiernan, Ph.D

| Page 46 | Page 48 |
|---|---|

**Page 46**

1  A  After I had conducted a full systematic review of the
2     epidemiology data and mechanistic data, including
3     biologic evidence, and then done a causal analysis,
4     that's when I concluded that these products could
5     increase-- could cause ovarian cancer.
6  Q  So the answer is after you were hired by Plaintiffs'
7     counsel; is that correct?
8         MS. PARFITT:  Objection; misstates her
9     testimony, asked and answered.
10 Q  (By Mr. Williams)  I am looking for a temporal answer.
11    So my question is:
12    Did you reach your conclusions before or after you
13    were retained by Plaintiffs' counsel?
14         MS. PARFITT:  Objection; form, asked
15    and answered.
16         THE WITNESS:  It was after I had done
17    the causal analysis.
18 Q  (By Mr. Williams)  And that was after you were retained?
19         MS. PARFITT:  Objection.
20         THE WITNESS:  That was after I did the
21    causal analysis, which was after I began this project
22    with Counsel.
23 Q  (By Mr. Williams)  Did you consider whether some brands
24    of talcum powder products can cause ovarian cancer but
25    others may not?

**Page 47**

1  A  The epidemiology data were insufficient to determine
2     whether any particular brand was used by women, except
3     for one study, Cramer, in 2016.
4        It's my understanding that Johnson & Johnson
5     products had the vast proportion of the market share over
6     time, but I did not come to a conclusion that any
7     particular product was causing this.
8        All I know is that use of these products by these
9     women over time increased their risk for ovarian cancer
10    and that it can cause ovarian cancer.
11 Q  So it is your opinion that genital perineal use of
12    Johnson's Baby Powder specifically can cause ovarian
13    cancer, correct?
14 A  Yes, given that it's been shown to contain asbestos,
15    given that it contains talc, which has been shown to be
16    carcinogenic, then I would say yes, it could be-- it
17    could be a cause of ovarian cancer.
18 Q  Let me tease that out a little bit.
19       If the product did not contain asbestos, is it your
20    testimony that-- is it your opinion that genital perineal
21    use of Johnson's Baby Powder can cause ovarian cancer
22    without containing asbestos?
23 A  Yes, even without asbestos, my opinion is that talc can
24    increase risk of ovarian cancer, that there are
25    biological mechanisms, and so that these products could

**Page 48**

1     cause ovarian cancer.
2  Q  And that is true when it's Johnson's Baby Powder or
3     any other talcum powder product?
4         MS. PARFITT:  Objection; form.
5         THE WITNESS:  Yes.
6  Q  (By Mr. Williams)  Is it your opinion that genital
7     perineal use of Shower to Shower product specifically can
8     cause ovarian cancer?
9  A  To my knowledge it includes both talc, and some percent
10    may include asbestos and other constituents, and so that
11    would be my opinion, yes.
12 Q  And same question:
13       Even if Shower to Shower product did not contain
14    asbestos, it is your conclusion that because it contains
15    talc, it can cause ovarian cancer, correct?
16 A  Yes.
17 Q  And it's your testimony here today that it has been
18    established, to a degree of medical and scientific
19    certainty, that that is the case?
20 A  Yes.
21 Q  Is it your testimony today that it is accepted in the
22    medical and scientific field that talcum powder causes
23    ovarian cancer?
24         MS. PARFITT:  Objection; form.
25         THE WITNESS:  I would say that many

**Page 49**

1     scientists, many clinicians do believe that it can cause
2     ovarian cancer.
3  Q  (By Mr. Williams)  My question is different.
4        My question is whether or not, Dr. McTiernan, it is
5     accepted in the medical and scientific community today
6     that exposure to talcum powder causes ovarian cancer.
7  A  And I think I'm having trouble with the word "accepted,"
8     so I am not sure specifically what you mean that it was
9     "accepted."
10       Who it is accepted by, does somebody have
11    guidelines, is somebody giving advice to the public--
12    there are lots of different organizations that you could
13    call "the medical field," so I think that's why I'm
14    having some trouble there.
15       To me it's a question that's not specific enough for
16    me to figure out how to answer it.
17 Q  Well, it's one thing if there is a person in the medical
18    or scientific field who holds an opinion and quite
19    another to say that something is generally accepted in
20    the medical and scientific community that a substance
21    causes cancer; isn't that right?
22         MS. PARFITT:  Objection; form.
23         THE WITNESS:  Yeah, I still have a
24    problem with the word "accepted" because I work in many
25    other areas, and I have seen that there are so many

13  (Pages 46 to 49)

Anne McTiernan, Ph.D

## Page 50

1 different opinions by clinicians, by scientists about
2 associations, and then it comes to the point of policy
3 and coming up with guidelines.
4 That's why I am having a little problem answering a
5 question of whether it's accepted.
6 I think that for me what I can come up with is this
7 is my opinion from the research that I've done.
8 I can't speak for other medical groups of whatever
9 you are talking about.
10 I'm not sure which groups you are talking about.
11 Q (By Mr. Williams) Wouldn't it be accurate to say,
12 Dr. McTiernan, that it is, at best, inconsistent in terms
13 of the medical and scientific community as to whether or
14 not exposure to talcum powder in the perineal area causes
15 ovarian cancer?
16 MS. PARFITT: Objection; form.
17 THE WITNESS: Oh, I would say that any
18 exposure, any medical treatment, any medical prevention
19 method is going to be inconsistent, and I do know that
20 IARC has classified talc, even talc without asbestos, as
21 a possible carcinogen, and they have a pretty high bar
22 for whether they're going to consider something a
23 carcinogen, and they were talking about ovarian cancer
24 specifically.
25 Q (By Mr. Williams) We'll talk about that a little bit

## Page 51

1 later, but let me go back to my question.
2 My question is whether or not it is at best
3 inconsistent, in terms of looking across the available
4 medical and scientific information regarding an
5 association between talcum powder and causing ovarian
6 cancer, to conclude that in fact talcum powder exposure
7 in the perineal area causes ovarian cancer; isn't that
8 true?
9 MS. PARFITT: Objection; form.
10 THE WITNESS: So I think I would feel
11 a little better if you are talking now about across the
12 evidence or across all of this research, all of these
13 studies, and there were-- there have been 24 to 25
14 case-control cohort studies that have looked at this
15 information, and when you look at them in totality,
16 either meta-analysis or pooled analysis, you really see
17 clear evidence that ovarian cancer risk is higher in
18 people who have-- and statistically significantly higher
19 in people who have used these products.
20 Q (By Mr. Williams) Let me ask you, for purposes of my
21 question, to focus on the medical and scientific
22 community, okay, not your personal opinion of the data.
23 With respect to your survey of the medical and
24 scientific community and its analysis of whether or not
25 exposure to talcum powder in the perineal area actually

## Page 52

1 causes ovarian cancer, isn't it accurate to say that that
2 survey is at best inconsistent as to that conclusion?
3 MS. PARFITT: Objection; form,
4 misstates her testimony-- excuse me, it doesn't misstate
5 her testimony. It's been asked and answered, clearly.
6 THE WITNESS: I think-- I think from
7 what you're asking is I've surveyed the medical community
8 and scientific community, which I have not. I have not
9 surveyed them.
10 My job was to review studies to look at the
11 epidemiologic data. That was my primary purpose.
12 Then to look at biological mechanisms.
13 And then to do a causal analysis.
14 I did not contact and survey the medical community
15 in this field, which could be vast because we are talking
16 about gynecology, prevention, government bodies,
17 epidemiology-- I just did not-- I was not asked to do
18 that and I did not do that.
19 Q (By Mr. Williams) In forming your opinion that perineal
20 talc use can cause ovarian cancer, did you calculate how
21 much talc is needed to cause ovarian cancer?
22 A I looked at that. I was not able to determine because
23 there's no-- no study has been able to collect
24 information in enough depth to know how much the
25 individual woman used, exactly how much in a particular

## Page 53

1 day she used, and what was the content of the particular
2 bottle that she used or the bottle she used over time,
3 and many of the studies did not also even include enough
4 information to look at how frequently or how often they
5 did, but once they did, then you could see if you had
6 people that used it more often for a longer period of
7 time, that's when there was even a great increase in
8 risk, and that would be a dose response effect.
9 Q Is the answer to my question "no," you did not calculate
10 how much talc is needed to cause ovarian cancer?
11 MS. PARFITT: Objection; form, asked
12 and answered.
13 Q (By Mr. Williams) I am not asking for the reasons.
14 I am just asking for the bottom line.
15 The bottom line is that you did not calculate how
16 much talc is needed to cause ovarian cancer, correct?
17 MS. PARFITT: Objection; form.
18 THE WITNESS: It was not possible to
19 determine exactly how much talcum powder product was
20 used, so therefore it's not possible to determine how
21 much of each dose particular-- of a particular product
22 increases risk.
23 Q (By Mr. Williams) In your mind is there a dose of talc
24 that does not cause ovarian cancer when applied
25 perineally?

Anne McTiernan, Ph.D

## Page 54

1  A  There's no evidence that there's any lower threshold
2     than--
3  Q  I-- I'm sorry.  I didn't mean to cut you off.
4  A  So the question is there a dose of--
5  Q  Is there a dose of talc that does not cause ovarian
6     cancer when applied perineally?
7  A  There's no evidence that there's any lower limit to a
8     dose-- to use of these products that could increase risk.
9  Q  It is your testimony here today that a single dose from a
10    single perineal application of talc is enough to cause
11    ovarian cancer based upon your review of the studies?
12 A  The studies did not give that level of detail, of whether
13    somebody used one dose in terms of ovarian cancer risk.
14       However, if you think of the biology, if this one
15    dose was introduced perineal, then could move up through
16    the vagina, through the cervix and the uterus, and get to
17    just as far as the fallopian tubes, if it sits in there
18    and causes an inflammatory reaction, theoretically one
19    dose could be enough.
20       Typically in epidemiologic studies we look for dose
21    response, so if somebody is using something longer, more
22    time, more frequently, that increases the chance that
23    some of that content could get up into her perineal--
24    sorry, her peritoneal, fallopian tubes, ovaries, but
25    there's no reason that one dose couldn't do that.

## Page 55

1        We know from the biology that one dose of talc
2     injected either into the pleura or into the lungs can
3     cause an inflammatory response.
4  Q  When you say "theoretically one dose could be enough,"
5     you are speculating; are you not?
6        MS. PARFITT:  Objection; misstates her
7     testimony, form.
8        THE WITNESS:  I am saying that we know
9     from other evidence, the biology, that if one dose is
10    injected into the pleura, and I'm talking humans, or
11    inhaled into the lungs, one dose can cause an
12    inflammatory response, so that's why I believe one dose
13    could cause a response in the peritoneal area-- sorry, in
14    the fallopian tube or ovarian area.
15 Q  (By Mr. Williams)  You used the phrase "theoretically one
16    dose could be enough," did you not, in your answer a few
17    moments ago?
18 A  I said that because it would be unethical to introduce
19    one dose of this substance into the fallopian tubes or
20    ovary area, so you couldn't test that in a human
21    directly.
22 Q  My question is different, ma'am.
23       My question is that you are the person in the room
24    who used the phrase "theoretically one dose could be
25    enough" just a few moments ago, correct?

## Page 56

1        MS. PARFITT:  Objection; asked and
2     answered.
3        She has responded.
4        THE WITNESS:  I am saying I couldn't
5     find data from the studies about one dose, the effect of
6     one dose on ovarian cancer, but I am saying that one dose
7     could cause inflammation.
8  Q  (By Mr. Williams)  When you said "theoretically one dose
9     could be enough," you were speculating, correct?
10       MS. PARFITT:  Objection; asked and
11    answered, and she has given you the answer, Mr. Williams.
12       THE WITNESS:  I am saying I don't have
13    the data to say exactly.
14 Q  (By Mr. Williams)  You don't have the data to say one way
15    or the other?
16       MS. PARFITT:  Objection; misstates her
17    testimony.
18       THE WITNESS:  I don't have the data on
19    ovarian cancer and one dose.
20       MS. PARFITT:  Mr. Williams, without
21    breaking any train of thought, we have gone about an hour
22    and 15 minutes.  Maybe in an appropriate place, we could
23    take a minute, but I don't want to break your stride.
24       MR. WILLIAMS:  In a minute.  Thank
25    you.

## Page 57

1  Q  (By Mr. Williams)  When you said a few moments ago that
2     you believe that even one dose could cause inflammation,
3     based upon your review of the science, have you reviewed
4     scientific literature, any study that says talcum powder
5     causes inflammation, which inflammation causes ovarian
6     cancer?
7  A  The evidence that I was able to look at, because you can
8     not do-- ethically you cannot do a clinical trial where
9     you expose women to talcum powder products in one group
10    and a placebo in another and then follow them forward for
11    30 or 40 years to see if you develop ovarian cancer--
12    because that trial cannot be done, we have to look at
13    different lines of evidence, so we look at the
14    epidemiology, we look at whether materials can be
15    introduced into the peritoneal area and make their way up
16    through the vaginal tract and get to the fallopian tubes
17    or ovaries, and then we know that inflammation does
18    increase risk for ovarian cancer.
19       There have been many studies that show that
20    individuals with high levels of inflammatory markers in
21    their blood, for example, have increased risk for ovarian
22    cancer, and people with inflammatory conditions, again,
23    endometriosis, are at an increased risk for ovarian
24    cancer.
25 Q  Does all inflammation cause cancer, ma'am?

15  (Pages 54 to 57)

Anne McTiernan, Ph.D

Page 58

1    A  It's not clear that all does, but it certainly increases
2       risk.
3    Q  So the answer is "no," not all inflammation causes
4       cancer?
5             MS. PARFITT:  Objection; misstates her
6       testimony.
7             THE WITNESS:  I am saying that the
8       inflammation-- increased inflammation is associated with
9       increased risk for cancer.
10   Q  (By Mr. Williams)  What types of cancer?
11   A  For example, some inflammatory conditions like Crohn's
12      disease increases risk for colon cancer.
13           Individuals with rheumatoid arthritis have increased
14      risk for lymphoma.
15           Those inflammatory markers that I mentioned, like
16      C-reactive protein and to interleukin 6 or 8, if those
17      are increased, all those are can increase risk for breast
18      cancer, ovarian cancer, colon cancer, and other cancers.
19   Q  Now, you have a medical degree, correct?
20   A  Mm-hm.
21   Q  Is that a "yes"?
22   A  Yes.
23   Q  And you held a license to practice medicine in the state
24      of Washington from July of 1991 to February 18th of 2018;
25      is that right?

Page 59

1    A  I apologize, it's still active.  I still have a license.
2    Q  And you held what's known as a DEA license that allows
3       one to prescribe medicines?
4    A  Yes.
5    Q  Is that still active?
6    A  That's still active, yes.
7    Q  Is it accurate to say that you have never been a
8       gynecological oncologist?
9    A  That's accurate.
10   Q  Now, you have written two articles about how diet and
11      exercise affect women after they have been diagnosed with
12      gynecologic cancer, correct?
13   A  At least two, yeah.
14   Q  None of the articles that you've written on that topic
15      studied what causes or may cause gynecological cancers;
16      is that true?
17   A  That's correct.
18   Q  Can we agree that you have never written any
19      peer-reviewed, published article or study on the causes
20      of ovarian cancer?
21   A  If we're talking about an overall general article, that's
22      true.
23           However, we have a paper in press that is looking at
24      the association of physical activity with various
25      cancers, and ovarian cancer was one that was included

Page 60

1       there.
2           The work I do for the World Cancer Research Fund
3       looks at association of diet and physical activity and
4       obesity, and risk of cancer and ovarian cancer is one of
5       those.
6    Q  I didn't mean to include the work you have done on the
7       World Cancer Research Fund.  I meant separately published
8       articles of the sort that are referenced on your CV.
9           Did you understand that to be my question?
10   A  Yes.
11          So the first one is in press for 2019, for March of
12      2019, and ovarian was one of those cancers.
13   Q  And where is that to be published?
14   A  Medicine & Science in Sports & Exercise.
15   Q  Have you ever given any lectures regarding talcum powder
16      products and ovarian cancer?
17   A  No, I have not.
18   Q  Have you ever given any presentations regarding talcum
19      powder products and ovarian cancer?
20   A  No, I haven't.
21   Q  Have you ever posted on social media at all regarding
22      talcum powder products and ovarian cancer?
23   A  I don't believe so.
24   Q  Have you ever written any textbook chapters regarding
25      talcum powder products and ovarian cancer?

Page 61

1    A  No, I haven't.
2    Q  You are not and were not ever an oncologist of any kind?
3    A  No.
4    Q  You are not a pathologist, correct?
5    A  No.
6    Q  You are not a cancer biologist, right?
7    A  No.
8    Q  You are not a toxicologist?
9    A  No.
10   Q  You are not an industrial hygienist?
11   A  No.
12   Q  Prior to being hired by the Plaintiffs' lawyers in talc
13      litigation, you had not personally conducted research on
14      talcum powder product use and risk for ovarian cancer,
15      true?
16          MS. PARFITT:  Objection; misstates her
17      testimony, form.
18          THE WITNESS:  Let me look at the--
19      prior to being hired-- it depends on what you consider
20      research because I had read some articles, but I had not
21      produced a report in that area.
22   Q  (By Mr. Williams)  Let me put it this way:
23          You have published several manuscripts on
24      gynecologic cancers, including the prevention of ovarian
25      cancer in women at high genetic risk, correct?

Anne McTiernan, Ph.D

## Page 62

1    A  Yes.
2    Q  And you have published manuscripts regarding the effects
3       of weight and exercise on the risk for ovarian cancer,
4       correct?
5    A  Yes.
6    Q  But you have not personally conducted research on talcum
7       powder use and risk for ovarian cancer, correct?
8            MS. PARFITT:  Objection.
9            THE WITNESS:  The report that I've
10      just prepared I would say is research because it was a
11      systematic review.
12   Q  (By Mr. Williams)  Let me have you look at Exhibit No. 2,
13      your report, and then we'll take a break in a minute.
14   A  (Witness complies.)
15   Q  Could you turn to Page 6, please?
16          The first full paragraph on Page 6 begins by saying,
17      "Although I have not personally conducted research on
18      talcum powder product use and risk for ovarian cancer, I
19      have published several manuscripts," and it goes on.
20          Do you see that?
21   A  Yes.
22   Q  Is the first clause in that sentence true or not true?
23   A  Yes, that's true.
24   Q  Let's just mark, before we take a break, these other
25      items we said we were going to mark.

## Page 63

1            First is Exhibit No. 3, we would like to mark it,
2       "Additional materials to Dr. Anne McTiernan."
3                   (Exhibit No. 3 marked
4                   for identification.)
5
6    Q  (By Mr. Williams)  Now, I think you told us that the
7       additional materials that you brought here today support
8       your opinions; is that correct?
9    A  Yes.
10   Q  Other than believing that those materials you brought
11      today support your opinions with respect to the
12      association between perineal talcum powder use and
13      ovarian cancer, have your opinions changed at all since
14      you first prepared your report that we've marked as
15      Exhibit No. 2?
16   A  No, they have not.
17          MR. WILLIAMS:  Thanks.  Let's take a
18      quick break, about ten minutes.
19          VIDEOGRAPHER:  Going off the record,
20      the time is 10:28 a.m.
21              (Recess 10:28 to 10:40 a.m.)
22
23          VIDEOGRAPHER:  The time is 10:40 a.m.
24      We are back on the record.  This is the start of Media
25      Unit 2.

## Page 64

1    Q  (By Mr. Williams)  Dr. McTiernan, before you were ever
2       retained as a paid consultant for this litigation in the
3       fall of 2016, you had written literally hundreds of
4       articles for peer-reviewed journals.
5            Is that true?
6    A  Yes.
7    Q  You have worked on comprehensive written reports for the
8       U.S. government in your career?
9    A  Yes.
10   Q  Can you just describe very briefly, if you would, the
11      types?
12   A  The U.S. government, I did two reports on physical
13      activity and cancer risk and survival, 2008 and 2018, so
14      this was the-- it's called a physical activity guidelines
15      advisory committee, and for that we relied on
16      meta-analyses.  We did not do our own research.
17          I've also over the years done grant reviews for the
18      government.  I have reviewed their intramural program, so
19      that means their science, have reviewed their science,
20      and I have prepared reports years ago for National Cancer
21      Institute for-- I've done grant reviews for other
22      country's governments.
23          That's my governmental service.
24          I was on-- sorry, the United States government
25      still-- grant reviews for the Department of Defense and

## Page 65

1    the National Institute of Health.
2    Q  Let me ask you to look in your report, Exhibit No. 2, at
3       Page No. 7.
4            In the section of your report entitled, "Overall
5       approach," you write, in the second sentence, "I drew
6       upon my years of experience with synthesizing and
7       interpreting large numbers of epidemiologic studies for
8       comprehensive reports, including work for the U.S.
9       government," and we have gone through that, right?
10   A  Mm-hm.
11   Q  Is that a "yes"?
12   A  Yes.  Sorry.
13   Q  You go on to say, "the World Health Organization,
14      International Agency for Research on Cancer"-- IARC,
15      correct?
16   A  Yes.
17   Q  --"and the World Cancer Research Fund," correct?
18   A  Yes.
19   Q  And you have drawn upon your experience with all of those
20      organizations in setting forth your conclusions here?
21   A  Yes.
22   Q  And that's what you write in your report?
23   A  Yes.
24   Q  And you write that your opinions are based on the
25      published epidemiologic evidence, including original

Anne McTiernan, Ph.D

## Page 66

1    case-control and cohort studies, systematic reviews,
2    meta-analyses, and pooled analyses on the topic of talcum
3    powder products exposure and a risk of ovarian cancer,
4    correct?
5  A  Yes, that's what I wrote.
6  Q  Okay.  For the World Cancer Research Fund, you are a
7    member of the advisory panel of experts that guides
8    interpretation of meta-analyses and systematic reviews of
9    nutrition, physical activity, obesity, and risk for many
10   cancers, correct?
11 A  Yes, that's correct.
12 Q  On Page 5, if you flip one page earlier, you reference,
13   in the section of your report citing your credentials,
14   the work that you have done for the World Cancer Research
15   Fund, right?
16 A  Yes.
17 Q  In the middle of the page on Page 5 of Exhibit No. 2 you
18   say, "For the World Cancer Research Fund, I am a member
19   of the advisory panel of experts that guides
20   interpretation of meta-analyses and systematic reviews of
21   nutrition, physical activity, obesity, and risk for many
22   cancers, including ovarian cancer," right?
23 A  Yes.
24 Q  And you have a link there to an ovarian cancer 2014
25   report that you did, right?

## Page 67

1  A  Yes.
2  Q  And that--
3  A  Maybe I could correct that.
4       I'm on the advisory panel.  I don't prepare those
5    reports.
6       I help interpret them, but it's the World Cancer
7    Research Fund scientists-- sorry, Imperial College does
8    the meta-analyses and the systematic reviews, and then
9    the World Cancer Research Fund has scientists that write
10   the reports.
11      As an advisory committee member, I give opinions
12   on-- with the rest of the committee on-- and we summarize
13   what we think we are seeing in those-- in the data.
14 Q  So just to make sure that I understand the process, the--
15   you mentioned that there are staff members, I suppose,
16   from Imperial College who actually write the reports?
17 A  The staff members-- the scientists from Imperial College
18   do the meta-analyses.  They collect the data from all
19   available studies, and they prepare data tables, and
20   there are scientists at World Cancer Research Fund-- so
21   it's a funding organization and a scientific
22   organization, so their scientists write the reports.
23      For some of these cancers they also contract to
24   the-- to IARC, to scientists there who will write some of
25   the background epidemiology and the biology of particular

## Page 68

1    cancers.
2       I can't say who wrote them because I never quite
3    know who exactly did what-- what one person did the main
4    report drafting.
5  Q  As a panel member, you read the reports though, right?
6  A  Yes.
7  Q  As a panel member you make recommendations based on the
8    reports, don't you?
9  A  Say it again--
10 Q  As a panel member--
11 A  You make recommendations-- that means to them or to--
12 Q  To the public.
13      Let me rephrase the question.
14      As a panel member for the World Cancer Research
15   Fund, the WCRF, you read the reports that are prepared by
16   that organization and make recommendations to the public
17   based upon those reports, right?
18 A  I do read the reports.  I give input because I'm part of
19   a panel.  It doesn't mean I can drive exactly what gets
20   sent there.
21      When the public recommendations come out, we are
22   given a set of guidelines that if there are
23   recommendations that are developed, they will be
24   standardized, and we are asked to follow those standards.
25      I cannot develop my own standards for what

## Page 69

1    recommendations or what statements are made to the public
2    from that.
3                 (Exhibit No. 4 marked
4                  for identification.)
5
6  Q  (By Mr. Williams)  Let me have you take a look at what
7    we've marked as Exhibit No. 4, which is a copy of this
8    report that you provided a link to in your report at Page
9    5.
10      Page 5 of your report in this case, Exhibit No. 2--
11   Dr. McTiernan, can I have your attention?
12 A  Yes.
13 Q  In the report that you wrote for this case at Page No. 5,
14   you provided a link.
15      Do you see that?
16 A  Yes.
17 Q  That link is to a report that you are holding in your
18   hand, which is a 2014 ovarian cancer report, "Food,
19   nutrition, physical activity, and prevention of ovarian
20   cancer" that was prepared by the World Cancer Research
21   Fund, right?
22 A  Correct.
23 Q  In the bottom right-hand corner of the page do you see
24   there's a logo for something called the Continuous Update
25   Project?

Anne McTiernan, Ph.D

| Page 70 |
|---|

1  A  Yes.
2  Q  That is the "CUP" for short?
3  A  Yes.
4  Q  You helped to oversee the CUP as part of its expert
5     panel, true?
6  A  I'm on an advisory committee for this project.
7  Q  Take a look at Page 20 of Exhibit No. 4-- actually, Page
8     19, the acknowledgments section.
9        Do you have that in front of you?
10  A  Yes.
11  Q  And that lists the panel members, correct?
12  A  Correct.
13  Q  And amongst the ten panelists, you are listed, right?
14  A  Yes.
15  Q  And the chair is Alan Jackson from the University of
16     Southampton in Southampton, UK, right?
17  A  Correct.
18  Q  You are still on the CUP panel today, are you?
19  A  It's not clear.
20     I am advising on survivorship issues.
21     It's not clear if this panel will continue.
22     My term on it finished very recently, and we are
23  renegotiating who is going to be on it and what it's
24  going to look like for the future.
25  Q  In 2018--

| Page 71 |
|---|

1  A  I was a part of it, yes--
2  Q  You need to let me finish.
3     In 2018 you were a part of the panel, correct?
4  A  Correct.
5  Q  Let's take a look at Page 1 of Exhibit No. 4, which
6     describes the mission with reference to the World Cancer
7     Research Fund Global Network.
8        It says, "Our mission: Today the World Cancer
9     Research Fund Global Network continues," and it mentions
10     funding, interpreting the accumulated scientific
11     literature in the field, and educating people about
12     choices, correct?
13  A  Correct.
14  Q  And then at the bottom of Page 1 it references the World
15     Cancer Research Fund Global Network, and in that
16     paragraph it references, among others, the American
17     Institute for Cancer Research, which is the AICR, right?
18  A  Yes.
19  Q  And on the first-- the cover page of this document, you
20     see the AICR is referenced up at the top with the World
21     Cancer Research Fund, right?
22  A  Yes.
23  Q  As a member of the panel, you concluded that
24     developmental factors leading to greater linear growth,
25     which is marked by adult-attained height, are a

| Page 72 |
|---|

1     convincing cause of ovarian cancer; is that true?
2  A  Can you point to where you see this?
3  Q  Page 5.
4     I will direct your attention to the bottom of the
5     page.
6     It says, "The CUP panel judges as follows," right?
7  A  Yes.
8  Q  And it says the CUP panel-- that's the panel that you sit
9     on, right?
10  A  Yes.
11  Q  That isn't the people who write it and that isn't the
12     people who review the science.  That's you, right?
13  A  Correct.
14  Q  And it says that "The evidence that developmental factors
15     leading to greater linear growth (marked by adult
16     attained height) are a cause of ovarian cancer is
17     convincing."
18     That's what the panel wrote, correct, or
19     recommended?
20  A  That's correct.
21  Q  Strike that.
22     That's what the panel "judged," is the word that's
23     used, correct?
24  A  Correct.
25  Q  Is that another way of saying that factors that make some

| Page 73 |
|---|

1     people taller than others cause ovarian cancer?
2        MS. PARFITT:  Objection; form.
3        THE WITNESS:  This panel did not do a
4     full causal analysis.
5     It does-- its purpose is quite different from the
6     purpose of the report I prepared on talcum powder
7     products and ovarian cancer risk.
8        The purpose is not to establish causality but rather
9     to come up with guidelines for those variables that can
10     be interpreted into-- can be interpreted into guidelines.
11        There is a set of information on how these different
12     categories are formed, for convincing, probable
13     associations, and then later what can be done for that,
14     what kind of recommendations can be made to the public.
15        MR. WILLIAMS:  Move to strike that as
16     nonresponsive, Doctor, if we were in court, and I will do
17     that now for the record.
18  Q  (By Mr. Williams)  I would like to ask you to answer my
19     question.
20     My question is whether that first paragraph there,
21     under the "CUP panel judges as follows," is that
22     paragraph another way of saying that factors that make
23     some people taller than others cause ovarian cancer?
24        MS. PARFITT:  Objection; form, asked
25     and answered.

19 (Pages 70 to 73)

Anne McTiernan, Ph.D

| Page 74 |
|---|

1      THE WITNESS: So I still want to
2   under-- state that we didn't do a full causal analysis,
3   but there is a statement here that says these are
4   causes-- the panel considers the strength strong enough
5   that adult height and body fatness are causes of ovarian
6   cancer.
7   Q  (By Mr. Williams) Does "greater linear growth" mean
8      height?
9   A  It may not mean-- so this particular variable is never
10     measured.
11      You don't have the data in a population to look at
12   linear growth over time, and so they were looking at just
13   by adult height.
14      Because adult height can be-- have so many variables
15   associated with it -- genetic, nutrition -- they didn't
16   want to assume that it's only genetic association that is
17   driving the risk of cancer, so that's why they're talking
18   about growth, but it's a difficult variable because you
19   can't tell which cause the eventual adult height and
20   which of those parts are associated with ovarian cancer
21   or any cancer.
22   Q  You keep saying "they"-- saying "they" in your answers.
23      This is you. This is the CUP panel that made that
24   judgment that is set forth in Paragraph No. 1, true or
25   not true?

| Page 75 |
|---|

1   A  Correct, it was the panel.
2      MS. PARFITT: Objection.
3   Q  (By Mr. Williams) The second paragraph says, "Greater
4   body fatness, which the panel interprets to be marked by
5   the body mass index, is probably a cause of ovarian
6   cancer."
7      Do you see that?
8   A  Yes.
9   Q  That was a judgment made by the panel upon which you sit,
10   correct?
11   A  Correct.
12   Q  The third paragraph says, "The evidence suggesting that
13   lactation protects against ovarian cancer is limited."
14      That too was a panel judgment made by the panel upon
15   which you sit, right?
16   A  Correct.
17   Q  The panel that you were on, at least as of 2018, was
18   primarily looking at causes of ovarian cancer related to
19   diet and exercise; is that accurate?
20   A  The panel only looks at those related variables.
21   Lactation is included because it has some
22   nutritional components, but all of the variables that
23   this organization looks at and-- that's their mission.
24   The nutrition-related variables is what they look at.
25   Q  But the panel report that is in front of you, Exhibit

| Page 76 |
|---|

1   No. 4, was not exclusively related to diet and exercise,
2   was it?
3   A  I believe it was.
4   Q  Let me see if I can help you there.
5      You consider causes of ovarian cancer other than
6   those relating to diet and exercise, true?
7      MS. PARFITT: Objection; form.
8      THE WITNESS: From my knowledge the
9   meta-analysis work was focused on nutrition variables,
10   physical activity variables, and obesity-related
11   variables, all because they are related to nutrition, as
12   well as lactation because that's also a nutrition-related
13   variable.
14   Q  (By Mr. Williams) Your panel wrote about causes of
15   ovarian cancer other than those relating to diet and
16   exercise, true?
17      MS. PARFITT: Objection; form.
18      THE WITNESS: The panel did not-- I
19   will have to look and see what they said about other
20   causes, but the panel was focused on, in terms of the
21   meta-analysis, the new data that they are presenting, is
22   all related to nutrition, physical activity, and diet.
23   Q  (By Mr. Williams) Whether it's new data-- strike that.
24   First of all, Doctor, you said "they" again.
25      You mean you, you mean "our panel," correct?

| Page 77 |
|---|

1   A  When I say "they," the meta-analysis, I did not do the
2   meta-analysis.
3   the meta-analysis was done by Imperial College.
4   The meta-analysis was contracted by World Cancer
5   Research Fund to Imperial College to do those
6   meta-analysis.
7      What the panel did is-- we're a group of scientists.
8   We review those data once they're done.
9   Q  You review the data once it's done?
10   A  Once it's done.
11   Q  And you make recommendations as a panel member, correct?
12   A  We make judgments.
13      The recommendations are a combination of us and
14   WCRF.
15   Q  One of the judgments that is-- strike that.
16      On Page 7 of the document, Exhibit No. 4, there is a
17   listing entitled, "Other established causes."
18      Do you see that?
19   A  Yes.
20   Q  And those are established causes of ovarian cancer,
21   correct?
22   A  Correct.
23   Q  That paragraph--
24   A  Sorry, say that again.
25   Q  The other established causes that are being referred to

Anne McTiernan, Ph.D

Page 78

1    here are established causes of ovarian cancer, correct?
2         MS. PARFITT:  Objection; form.
3    Q  (By Mr. Williams)  Do you understand my question?
4    A  I do.
5         What I'm trying to say-- what I want to say here is
6    there was no systematic review done here.
7         This was information that was largely taken from the
8    second expert report and repeated here, so this was data
9    from 2007-- information from 2007, and there was no--
10   except for lactation, among all these variables there was
11   no new review done by the panel.
12        This was the knowledge at the time of the second
13   annual report, 2007, of variables that are-- that the
14   2007 expert panel thought were related to ovarian cancer.
15   Q  Hold on, Doctor.
16        In 2014, which is the date of this document, you
17   were sitting on the World Cancer Research Fund's panel,
18   correct?
19   A  Correct.
20   Q  The panel reviews the results of the epidemiological
21   analysis that is done by others, correct?
22   A  Reviews the data, the meta-analysis from the nutrition
23   variables, yes.
24   Q  And then it sets forth judgments and it writes the text
25   that appears in this document, correct?

Page 79

1    A  The panel did not write this text.
2         The panel-- the World Cancer Research Fund wrote
3    this text.
4    Q  Are you disavowing Page 7, third paragraph, "Other
5    established causes," that's set forth other established
6    causes for ovarian cancer?
7         MS. PARFITT:  Objection; form,
8    misstates her testimony.
9         THE WITNESS:  The question was am I
10   disavowing-- I am not disavowing.
11        I am saying it was not written by our panel.
12        We reviewed it.  We had opportunity to have input,
13   but we were not the final authors of this section.
14   Q  (By Mr. Williams)  When you read the section, did you
15   say, "Wait a minute, you haven't included anything in
16   here about talc causing ovarian cancer"?
17        Did you tell anybody that?
18   A  I don't recall doing that.
19        At the time I had not done a full analysis of
20   ovarian cancer risk factors.
21   Q  When you say that you don't recall doing it, are you
22   saying it might have happened, it might not have
23   happened, or are you saying that it did not happen?
24   A  It did not happen.
25   Q  This document does not include talc as a cause or

Page 80

1    probable cause of ovarian cancer, true?
2    A  If you're talking about this paragraph, I don't see it
3    there.
4    Q  And this paragraph does not describe talc as a risk
5    factor for ovarian cancer, such as hormone replacement
6    therapy, correct?
7    A  Talcum powder products are not mentioned there, correct.
8    Q  This 2004 CUP report-- strike that.
9         Did this 2014 CUP report come out before or after
10   Plaintiffs' counsel hired you as an expert in this case?
11   A  This came out before I was hired.
12        This was a 2014 report.
13        We may have downloaded this recently.
14        The way these reports work is the work for the
15   meta-analysis is done, and then the panel reviews the
16   data, and then a report is drafted and published online
17   at that time, so if it says, "2014," then it would have
18   been online in 2014, would have been public then.
19   Q  And there have been reports that have been prepared by
20   the World Cancer Research Fund and the American Institute
21   for Cancer Research since this 2014 report, right?
22        MS. PARFITT:  Objection to the form.
23        THE WITNESS:  Different cancers would
24   have been since then.
25        I don't have memorized exactly when the different

Page 81

1    years came out.
2         In-- last spring, and I think it was 2018, but it
3    could have been 2017, there was a final report of WCRF
4    that included all of these reports, but this was not
5    changed at that time.
6         The final report that came out was more of a global
7    summary and global nutrition recommendations, but these
8    all-- that's why it's called the Continuous Update
9    Project, because these things are updated at various
10   points and then they become part of that final report,
11   2017, 2018.
12        This is why I was-- I said that the panel may be
13   reconstituted, because we finished one set of cancers,
14   one set of reports.
15   Q  (By Mr. Williams)  The whole idea of the CUP reports is
16   that they get updated continuously, right?
17        MS. PARFITT:  Objection; form.
18        THE WITNESS:  The ovarian cancer was
19   not updated after 2014.
20        Is that your question?
21   Q  (By Mr. Williams)  Are you sure about that?
22   A  From my knowledge it was not updated.
23   Q  Take a look at Page 2 of Exhibit No. 4 that you have.
24        At the top of Page 2 it says, "Please cite the
25   report as follows," and it gives instructions about how

21  (Pages 78 to 81)

Anne McTiernan, Ph.D

<table>
<tr><td colspan="2">

Page 82

1    the report should be cited, correct?

2  A  Yes.

3  Q  It's accurate to say that the expectation of the

4    publication of this report is that it may be cited by

5    others, right?

6  A  Yes.

7  Q  That's why you have this at the top of Page No. 2,

8    correct?

9  A  Yes.

10  Q  Let me show you another document, which we'll mark as

11    Exhibit No. 5.

12            (Exhibit No. 5 marked

13            for identification.)

14

15  Q  (By Mr. Williams)  Exhibit No. 5, for the record, is a

16    multi-page document that says, "Diet, nutrition, physical

17    activity and ovarian cancer - revised 2018" on the cover

18    page.

19        Do you see that?

20  A  Yes.

21  Q  The CUP expert panel that you sat on through 2018 issued

22    this collection of reports entitled, "Diet, nutrition,

23    physical activity and cancer, a global perspective,"

24    right?

25  A  Yes.

</td><td colspan="2">

Page 84

1  A  Correct.

2  Q  The CUP expert panel that you sat on through last year is

3    in fact the body that issues these reports, like Exhibit

4    No. 5, correct?

5  A  Correct.

6  Q  Now let me have you look at Exhibit No. 5, which is the

7    2018 CUP report.

8        I will just quickly refer you to Page 4.

9        On Page 4 there's a heading that says, "Our

10    Continuous Update Project, CUP"-- do you see that?

11  A  Yes.

12        MS. PARFITT:  Give her just one

13    moment.

14  Q  (By Mr. Williams)  And then the second paragraph says,

15    "An independent panel of experts carries out ongoing

16    evaluations of this evidence, and their findings form the

17    basis of the WCRF network's cancer prevention

18    recommendations."

19        Do you see that?

20  A  Yes.

21  Q  That's referring to your panel, correct?

22  A  Yes.

23  Q  And if you look at the back of this document that's on

24    Page 21, in the acknowledgments section, it lists the

25    panel members.

</td></tr>
<tr><td colspan="2">

Page 83

1  Q  This is the most recent version of the Continuous Update

2    Project report that we were just looking at, right?

3  A  Yes.

4  Q  Let me show you another document, which is-- we'll mark

5    as Exhibit No. 6.

6            (Exhibit No. 6 marked

7            for identification.)

8

9  Q  (By Mr. Williams)  I will ask you to keep Exhibit No. 5

10    nearby.

11        Exhibit No. 6, I will represent to you, is the CUP

12    panel web page, which we printed out on January 7th,

13    2019.

14        Are you pictured in the picture there?

15  A  Yes.

16  Q  Is that you five people over from the right?

17  A  Yes.

18  Q  Above the photo that you appear in, do you see where it

19    says, "In 2018 the expert panel, chaired by Professor

20    Alan Jackson, issued our latest cancer prevention

21    recommendations as part of the World Cancer Research

22    Fund/American Institute for Cancer Research third expert

23    report, 'Diet, nutrition, physical activity and cancer: a

24    global perspective."

25        That's what it says, correct?

</td><td colspan="2">

Page 85

1        I've counted.  There are now nine panelists as of

2    2018, and you are listed as one, correct?

3  A  You are looking at-- sorry, which?

4  Q  Page 21 of Exhibit No. 5.

5        Do you see it listed there on Page 21?

6  A  Yes.

7  Q  Now, please go back to Page 6 of Exhibit No. 5, the 2018

8    report of the World Cancer Research Fund.

9        Under the box "Summary of panel judgments," do you

10    see there that the same conclusions that were set forth

11    in the 2014 report concerning the panel judgments are set

12    forth?

13  A  So are you talking about this table--

14  Q  If you look in the lower left-hand corner of the page, it

15    has Page No. 6.

16        Are you looking at the 2018--

17  A  It says, "Summary of panel judgments."

18  Q  Correct, and do you see the box that's underneath there

19    with subheadings?

20  A  Yeah.

21        One thing to point out is that this table, which is

22    the summary-- so you are in Exhibit No. 5 ?  It says,

23    "2014," so it's the exact same as this 2014 report.

24  Q  Ma'am, I am not even looking at that page.

25  A  Okay.

</td></tr>
</table>

22 (Pages 82 to 85)

Anne McTiernan, Ph.D

## Page 86

1  Q  I am asking you to look at Page 6.
2  A  Page 6.
3  Q  Which says, "The summary of the panel judgments."
4  A  Okay.
5  Q  In that summary of the panel judgments it sets forth the
6     same conclusions that were contained in the 2014 report
7     regarding linear growth, body fatness, and lactation,
8     correct?
9  A  That's correct.
10  Q  There's no reference to talcum powder here either,
11     correct?
12  A  That's correct.
13  Q  As of 2018 you had been retained as an expert by the
14     plaintiffs' lawyers in this litigation; is that correct?
15         MS. PARFITT:  Objection; form.
16         THE WITNESS:  The summaries are
17     regarding the data analyzed by WCRF on nutrition
18     variables.
19         They do not consider-- they do not do systematic
20     reviews for other ovarian cancer risk factors, only
21     nutrition variables.
22  Q  (By Mr. Williams)  Let me ask you to go to Page 3.
23         Again in your last answer you said "they."
24         You are a panelist for this organization, correct?
25  A  Yes, I am a panelist, but I don't-- I am not in a

## Page 87

1     position to choose what WCRF decides to contract out for
2     analyses.
3         They contract with the Imperial College of what the
4     focus is going to be: nutrition, physical activity, diet.
5         It's my-- I have the ability to refuse to be on the
6     panel, to decline if I don't want to be involved with
7     nutrition, physical activity, and obesity research
8     because that's the mission.  The mission are those
9     variables, not to do systematic reviews on other risk
10     factors.
11         We don't do anything on cigarette smoking or other
12     types of carcinogens, for example.
13         We only do nutrition, physical activity,
14     obesity-related variables.
15  Q  To be clear, this CUP update on ovarian cancer came out
16     in 2018, which is after you were retained by plaintiff
17     lawyers to opine on whether or not talc could cause
18     ovarian cancer.
19         Is that true or not true?
20         MS. PARFITT:  Objection; form, asked
21     and answered.
22  Q  (By Mr. Williams)  I am looking for a temporal answer.
23     This--
24         MS. PARFITT:  Same objection.
25  Q  (By Mr. Williams)  This update on ovarian cancer came out

## Page 88

1     in 2018, which is after you had been retained by
2     plaintiff lawyers to opine on whether or not talc could
3     cause ovarian cancer, true or not true?
4         MS. PARFITT:  Objection; form, asked
5     and answered.
6         THE WITNESS:  I want to be able to
7     answer this to try to make it more clear.
8         If you see on the cover, it says, "2014."
9         This is the 2014 report that was added to all of the
10     other reports.
11         Some were developed in 2011, some in 2017.
12         We did not redo the meta-analyses.  We did not redo
13     the entire report.
14         They were added together.
15         The World Cancer Research Fund for the first two
16     reports did all of the work at one time and came up with
17     books, so the most recent one was 2007.
18         This time they decided to do reports on a rolling
19     basis.  That's why Ovarian came out in 2014, but that
20     their final-- when they put it all together, they
21     celebrate, come out with big systematic-- sorry, summary
22     guidelines for the public for preventing cancer-related
23     nutrition, physical activity, things that people can do--
24     that was all added together in 2018, but this ovarian
25     report was from 2014.

## Page 89

1         MR. WILLIAMS:  I will move to strike
2     that as nonresponsive.
3  Q  (By Mr. Williams)  Dr. McTiernan, on the first page of
4     this document it says it was revised in 2018.
5         This document that's in front of you now was
6     published in 2018, wasn't it?
7         MS. PARFITT:  Objection; form.
8         She has been asked and answered it.
9         You have limited time, Mr. Williams, so I suggest
10     you listen to her answer.
11  Q  (By Mr. Williams)  This document was published in 2018,
12     yes or no?
13         MS. PARFITT:  Objection; form, asked
14     and answered.
15         THE WITNESS:  This document was
16     published along with all of the other documents, but the
17     document was prepared in 2014.
18         It's a report in 2014.
19  Q  (By Mr. Williams)  What year was this document published?
20         MS. PARFITT:  The document speaks for
21     itself.  Objection; form.
22         THE WITNESS:  It says, "Revised 2018."
23  Q  (By Mr. Williams)  2018 was after you were retained by
24     Plaintiffs' counsel, correct?
25         MS. PARFITT:  Objection; form,

23 (Pages 86 to 89)

Anne McTiernan, Ph.D

| Page 90 | Page 92 |
|---|---|

**Page 90**

1      mischaracterizes her testimony.
2   Q  (By Mr. Williams) You may answer, Doctor.
3          MS. PARFITT: Objection; form.
4      Answer as best you can.
5          THE WITNESS: Yes, 2018 is after I was
6      retained.
7   Q  (By Mr. Williams) It was a couple years after you had
8      been retained, right?
9   A  That's correct.
10   Q  Could you list for me all of the members of the panel who
11      served with you on the World Cancer Research Fund whom
12      you told, "We need to update this to state that talc,
13      which is something that people can use or not use, is
14      something that they should not use because it causes
15      ovarian cancer"?
16      List for me the people who are listed on Page 21, as
17      fellow panel members, all of the people that you have
18      told that.
19   A  I didn't talk with others about other risk factors for
20      ovarian cancer because we were using the same report
21      unchanged from 2014.
22   Q  Is the answer that there's no one?
23          MS. PARFITT: Objection; misstates her
24      testimony.
25   Q  (By Mr. Williams) Is the answer that there is no one

**Page 91**

1      there?
2          MS. PARFITT: Objection; form,
3      misstates her testimony.
4   Q  (By Mr. Williams) You may answer.
5   A  Correct.
6          MS. PARFITT: You may answer.
7   Q  (By Mr. Williams) Is the answer correct?
8   A  Correct.
9          MS. PARFITT: Objection.
10          MR. WILLIAMS: Counsel, I am entitled
11      to an answer to the question.
12          MS. PARFITT: You can, and I'm
13      entitled to object to the form.
14          MR. WILLIAMS: But you are objecting
15      over her answer.
16          MS. PARFITT: No, I am objecting-- she
17      is answering quite quickly. I am trying to object before
18      she answers, but after you.
19          MR. WILLIAMS: Fair enough.
20          MS. PARFITT: Thanks.
21   Q  (By Mr. Williams) Please turn to the second-to-last page
22      of this 2018 CUP report, which is entitled, "Our cancer
23      prevention recommendations."
24      It is a purple page. It is the inside cover of the
25      pamphlet.

**Page 92**

1      This says, "Our cancer prevention recommendations."
2      When it says "our" there, that refers to the panel
3      on which you sat in 2018, correct?
4   A  This is correct.
5      This is a separate document.
6      It must have been from the ovarian report because
7      this is-- there are separate recommendations based on all
8      of the cancers.
9   Q  The panel does not recommend limiting or stopping the use
10      of talcum powder, correct?
11   A  The panel did not look at all potential carcinogens.
12      The panel looked and developed recommendations based
13      on nutrition, physical activity, and obesity-related
14      variables.
15   Q  Is the answer that it does not list talc?
16          MS. PARFITT: Objection; form.
17          THE WITNESS: It does not list talc,
18      but it doesn't list other carcinogens as well.
19   Q  (By Mr. Williams) Please turn to Page 8.
20      I am referring to Page 8 of the 2018 CUP report.
21      I will direct your attention to Section 4 at the top
22      that says, "Other established causes."
23      Do you see that?
24   A  Yes.
25   Q  Not bearing children is listed as something that may be

**Page 93**

1      seen as a cause of ovarian cancer, correct?
2   A  Correct.
3   Q  Early menarche or age of first period is listed as
4      something that your panel concluded may be seen as a
5      cause of ovarian cancer, true?
6   A  It wasn't a panel conclusion. We weren't asked to judge
7      data.
8      This was written up as a background for other
9      potential causes.
10      There were no data that was reviewed by the panel.
11   Q  The heading is, "Other established causes," right?
12   A  Right.
13      WCRF prefers to use that language. I'm not sure I
14      would have used that.
15   Q  Talc is not listed as an established cause, correct?
16   A  It is not.
17      It looks like the paragraph was unchanged from 2014.
18      It was not updated.
19      This report, from my knowledge, is the same in 2014
20      as this-- as what's called "Revised," but I believe it's
21      the same report.
22   Q  Did you, as a member of this expert panel, conclude that
23      talc could be seen as a cause of ovarian cancer?
24   A  This expert panel didn't consider talc.
25   Q  Is the answer "no?"

24 (Pages 90 to 93)

Anne McTiernan, Ph.D

Page 94

1      MS. PARFITT:  Objection; form--
2      THE WITNESS:  All I can say is we
3   didn't consider-- we didn't review the literature.  We
4   didn't do-- review any of these other variables in
5   totality.
6   Q   (By Mr. Williams)  Is there any reason why you don't do
7      that?
8   A   We were tasked at looking at nutrition, physical
9      activity, and obesity-related variables.
10  Q   Tasked by whom?
11  A   By WCRF, World Cancer Research Fund.
12  Q   Did the World Cancer Research Fund say that you could not
13     look into talc?
14     MS. PARFITT:  Objection; form.
15     THE WITNESS:  They did-- in our
16  personal lives, that we could look into any variable you
17  wanted to, but for this purpose of this panel, we were
18  only looking at and evaluating the meta-analysis, which
19  was focused on physical activity, diet, and nutrition
20  variables.
21  Q   (By Mr. Williams)  Let me ask you to turn to Page 7 of
22     the CUP report.
23  A   Which one?
24  Q   Page 7 of the 2018 report, Exhibit No. 5.
25  A   Okay.

Page 95

1   Q   Do you see the heading that says, "Pathogenesis"?
2   A   Yes.
3   Q   Do you see where in the second paragraph the panel
4      concluded that the-- quote, "Most ovarian cancers occur
5      spontaneously, although five to ten percent of cases
6      develop due to a genetic disposition," Closed quote?
7      Do you see that?
8   A   I see that, and above that I see that "The epithelial
9      cells are subjected to a unique pro-inflammatory
10     microenvironment, which can increase the rate of DNA
11     damage, thus affecting cancer risk."
12        In this case the word "spontaneous" just means "as
13     opposed to genetics."
14        Spontaneous cancers mean they can be caused by
15     anything else, including environment, but not solely due
16     to an inherited genetic predisposition.
17  Q   Do you agree that most ovarian cancers occur
18     spontaneously?
19  A   I believe most are caused by environmental causes as for
20     many other cancers.
21        I am using the word "spontaneous."  I mean "non
22     solely genetic."
23        Cancer is a genetic disease, but the familial
24     genetic-inherited cancers account for only about five to
25     ten percent of ovarian cancers, similar to many other

Page 96

1   cancers.
2      "Spontaneous" means something else caused it.
3   Q   However you define "spontaneous," do you agree that most
4      ovarian cancers occur spontaneously?
5      MS. PARFITT:  Objection; form.
6      THE WITNESS:  I agree that most-- I
7   would not use that word myself because it can be
8   misconstrued by nonscientists.
9      "Spontaneous" means "nongenetically inherited," so I
10  would say environmental, that most cancers-- most ovarian
11  cancers are caused by something in the environment, some
12  exposure.
13  Q   (By Mr. Williams)  Did you tell someone to take out the
14     word "spontaneously"?
15  A   I don't recall.
16     We did have an opportunity in 2014 to edit these
17  various reports.
18     None of us had final say on exactly what came out of
19  the report.
20     We did go through a process of editing.
21  Q   When you had the opportunity to edit the report in 2014,
22     did you ask someone to take out the word "spontaneously"?
23  A   I don't recall.
24  Q   When you say you don't recall, are you saying it may have
25     happened, it may not have happened?

Page 97

1   A   It may have happened, it may not.
2      I apologize, I don't recall.
3   Q   And after you make such a recommendation as a panelist,
4      who decides what gets put in?
5   A   The World Cancer Research Fund.  The scientific officers
6      would decide.
7   Q   They would listen to the input and then decide one way or
8      the other?
9   A   Yes.
10  Q   In 2014 the Gertig 2000 and Terry 2013 studies on talc,
11     that you reviewed in 2016, had already been published,
12     correct?
13  A   I am hesitating because I don't remember when this exact
14     writing was.
15     If it's a 2014 report, that's when it came out.
16     It could have been being written within 2013, so at
17  the time I was not doing research on all of the variables
18  related to ovarian cancer, so I can't say what was
19  published at that time.
20  Q   2014 is after 2013, correct?
21  A   That's correct.
22  Q   If Gertig was published in 2000, Gertig would have been
23     published prior to the time that this exhibit, the 2014
24     version of this exhibit, was published, correct?
25  A   Published but perhaps not when it was prepared, that's

25 (Pages 94 to 97)

Anne McTiernan, Ph.D

Page 98

1    what I'm saying.
2  Q  If the Terry study was published in 2013, it would have
3     been published prior to the time that the 2014 version of
4     the World Cancer Research Fund would have been published,
5     correct?
6  A  It would have been published prior to publication, not
7     necessarily prior to report preparation.
8  Q  Have you ever been on the World Cancer Research Fund web
9     page?
10  A  Yes, I have.
11  Q  Let me show you what we've marked as Exhibit No. 7 or
12     what we will mark as Exhibit No. 7 to your deposition.
13              (Exhibit No. 7 marked
14                    for identification.)
15
16  Q  (By Mr. Williams)  Exhibit No. 7 is the World Cancer
17     Research Fund web page.
18        We printed this out as of January 8th, 2019.
19        It's a five-page document, and the portion that we
20     printed out is "Myths and controversies about what causes
21     cancer."
22        Do you see that?
23  A  Yes, I do.
24  Q  There is only one World Cancer Research Fund, to your
25     knowledge, correct?

Page 99

1  A  That's correct.
2  Q  The World Cancer Research Fund, the organization for whom
3     you have served as an advisory panel member for years,
4     tries to advise the public about potential causes for
5     cancer, correct?
6              MS. PARFITT:  Objection; form.
7              THE WITNESS:  Their focus is on
8     nutrition, physical activity, and obesity variables.
9        That's what they advise on.  That's what their
10     recommendations are.
11  Q  (By Mr. Williams)  The World Cancer Research Fund tries
12     to debunk myths about what has been established as a
13     cause of cancer, correct?
14              MS. PARFITT:  Objection; form.
15              THE WITNESS:  Before I answer that, I
16     would like to know if this is a Blount post.
17        If it's not-- it's not something that has come
18     before the World Cancer Research Fund.
19        We would never investigate or were never asked to
20     comment on these particular issues.
21  Q  (By Mr. Williams)  I will represent to you that the
22     address that is listed at the bottom of the page, which
23     includes
24     www.wcrf-uk.org/uk/preventing-cancer/cancer-risk-factors-
25     and it goes on, is, in fact, where you get-- where you go

Page 100

1     if you are trying to get to the World Cancer Research
2     Fund website.
3        Will you accept that representation, ma'am?
4  A  It looks like it comes from their website.
5        I am not clear on who developed this or-- it
6     certainly didn't have oversight by our committee.
7        Our committee was tasked at looking at the data from
8     the meta-analysis and systematic review.
9        None of these variables-- none of the variables
10     here, except perhaps coffee, were considered by my panel.
11        My panel does not oversee all World Cancer Research
12     Fund.  There are other groups that oversee them.
13        I do not.
14        I oversee-- sorry, I participate on one panel that
15     focuses on nutrition, physical activity, and diet
16     meta-analyses.
17  Q  Take a look at Page 2 of this document, which is Exhibit
18     No. 7.
19        At the top of the page it says, "Cosmetics and
20     toiletries."
21        Do you see that?
22  A  I do.
23  Q  It says, "Most studies have found no link between cancer
24     and the chemicals used in cosmetic and toiletry products,
25     such as moisturizers, shampoos, deodorants, and

Page 101

1     toothpastes.  The majority of countries have strict
2     regulations to ensure these products are safe."
3        Do you see that?
4  A  Yes.
5  Q  It goes on, second paragraph, "Some studies have found a
6     link between talcum powder, talc, and ovarian cancer, but
7     there is not enough evidence to be certain of this.  Even
8     if there were an increased risk, scientists estimate it
9     would be small.  Not smoking, followed by maintaining a
10     healthy weight through eating a healthy diet and keeping
11     active, are the most effective ways to reduce your cancer
12     risk."
13        Did I read that right?
14  A  Yes, you did.
15  Q  Do you disagree with that statement of the World Cancer
16     Research Fund?
17  A  I do.
18        I am surprised it's there.
19  Q  Is it accurate to say that your opinion in this case that
20     the state of known scientific evidence establishes that
21     perineal use of talc causes ovarian cancer conflicts with
22     the conclusion set forth on the website of the World
23     Cancer Research Fund that there is not enough evidence to
24     be certain that there is a link between talcum powder use
25     and ovarian cancer?

26  (Pages 98 to 101)

Anne McTiernan, Ph.D

---

Page 102

1      MS. PARFITT: Objection; form,
2   misstates the document.
3           THE WITNESS: I do disagree.
4   Q  (By Mr. Williams) Your opinion in this case conflicts
5      with the--
6   A  Yes, my opinion conflicts--
7   Q  You need to wait until I'm done, ma'am if you would.
8   A  Okay.
9   Q  Your opinion in this case, as set forth in your report,
10     conflicts with the conclusions set forth specifically
11     regarding talcum powder on the World Cancer Research Fund
12     website, correct?
13          MS. PARFITT: Objection to the form.
14          THE WITNESS: Yes, that's correct.
15  Q  (By Mr. Williams) The American Institute for Cancer
16     Research tries to advise the public regarding potential
17     causes of cancer; is that right?
18          MS. PARFITT: Objection; form,
19     misstates her testimony.
20          THE WITNESS: The American Institute
21     for Cancer Research is part of the World Cancer Research
22     Foundation, and they have the same mission, to focus on
23     nutrition, physical activity, and obesity in relation to
24     cancer risk and survival.
25  Q  (By Mr. Williams) Did you know that the American

---

Page 103

1      Institute for Cancer Research includes a page on its
2      website discussing whether different exposures can cause
3      cancer?
4   A  I would have to see it, but no, I do not follow whatever
5      page you're talking about.
6           I don't know what you're referring to.
7               (Exhibit No. 8 marked
8               for identification.)
9
10  Q  (By Mr. Williams) Let me show you what we've marked as
11     Exhibit No. 8.
12          Exhibit No. 8 is a three-page document, which is a
13     printout of the website of the AICR. The address is
14     listed at the bottom of Page 1 of Exhibit No. 8.
15          You are familiar with the American Institute for
16     Cancer Research?
17  A  Yes, I am.
18          It is a part of the World Cancer Research Fund.
19  Q  I would like you to look at the first page of Exhibit
20     No. 8.
21          There is a listing that says, "GMOs and other hot
22     topics," and then there are seven different topics that
23     are set forth, the fifth of which is cosmetics and
24     toiletries.
25          Do you see that?

---

Page 104

1   A  Yes.
2   Q  And the second paragraph that's listed there on Exhibit
3      No. 8 is identical to the paragraph that we just went
4      over in Exhibit No. 7 relating to talcum powder and
5      ovarian cancer; is that right?
6   A  Yes, I see that.
7   Q  Is it accurate to say that your opinion in this case,
8      that the state of known scientific evidence establishes
9      that perineal use of talc causes ovarian cancer,
10     conflicts with the conclusion of the American Institute
11     for Cancer Research, that there is not enough evidence to
12     be certain that there is a link between talc use and
13     ovarian cancer?
14          MS. PARFITT: Objection; form.
15          THE WITNESS: Yes, I disagree with
16     what they have written here.
17  Q  (By Mr. Williams) You have never told anyone from the
18     AICR, I take it, that you disagree?
19          MS. PARFITT: Objection; form.
20          THE WITNESS: I did not know that they
21     had this on their website.
22          I think I will talk to them now.
23  Q  (By Mr. Williams) Let me direct your attention to a new
24     document, which is an article from Hutch News that refers
25     to you.

---

Page 105

1      We'll mark it as Exhibit No. 9.
2               (Exhibit No. 9 marked
3               for identification.)
4
5   Q  (By Mr. Williams) This is an article that was published
6      on May 25th, 2018, correct?
7           It's a commentary written by you?
8   A  Yes. It was edited by-- our communications department
9      edited it, so I authored it, but they adjusted it.
10  Q  May 25, 2018 was at least a year and a half after you had
11     been retained by plaintiffs' counsel for this engagement,
12     correct?
13          MR. LOCKE: We haven't seen Exhibit
14     No.--
15  Q  (By Mr. Williams) Did you hear my question?
16  A  No-- yes.
17  Q  You're quoted in this article-- strike that.
18          The title of your article is, "How to reduce the
19     odds of getting cancer," right?
20  A  Yes.
21  Q  You are quoted in this article as saying there are steps
22     people can take to absolutely cut their risk of getting
23     cancer, true?
24  A  Yes.
25  Q  Directly under the title there's a quote that says,

---

27 (Pages 102 to 105)

Anne McTiernan, Ph.D

Page 106

1    "There are steps you can take that will absolutely cut
2    your risk, says Fred Hutch's doctor Anne McTiernan, who
3    contributed to a new report on diet, nutrition, physical
4    activity and cancer," did I read that right?
5    A  Yes.
6    Q  Now, at the time that you were writing this commentary, I
7       take it that you were not limited in any way in what you
8       could talk about as a way that someone could cut their
9       risk of getting cancer?
10         No one was editing your words, true?
11   A  That's not true.
12         The communications department has final say on what
13      goes out from our institution, so I don't have full
14      leeway of what went out.
15         They had asked me to write about something, with
16      their help, their editing, on the new report by the World
17      Cancer Research Fund, so it focused primarily on
18      nutrition, physical activity, and diet information.
19   Q  Are you suggesting that you could not have referenced
20      talcum powder or stopping the use of talcum powder as it
21      relates to your view of ovarian cancers, ma'am?
22   A  I am saying I was asked to focus on these variables in
23      this new report.
24         Fred Hutchinson is-- the communications department
25      is a news program-- sorry, a news service-- they call

Page 107

1    themselves a news service, and they wanted me to talk
2    about new results.
3       I added-- I did add to try to avoid other
4    carcinogens, and I specifically mentioned air pollution
5    and asbestos as some things that affect many different
6    cancers, but I was primarily tasked to talk about
7    nutrition, physical activity, and diet, and especially
8    since that was a new report.
9       That's why this article is focused on that.
10   Q  Did you identify talc use as an actual or probable
11      carcinogen of any kind of cancer in this article?
12   A  This was not focused on any particular risk factor, so I
13      was talking about very generic environmental causes of
14      cancer, and I can see that I did mention asbestos as an
15      example, but I did not list all of the cancer-causing
16      chemicals that can be encountered.
17   Q  In terms of your day-to-day research activities, those
18      are in the field of epidemiology, correct?
19   A  Epidemiology and clinical trials.
20         Some people consider that clinical research, and
21      some consider it epidemiology, but I'm an epidemiologist
22      and an internist.
23   Q  When it comes to assessing cause, epidemiology, your
24      field, is only one part of the causation analysis; is
25      that true?

Page 108

1          MS. PARFITT:  Objection; form.
2          THE WITNESS:  When we do a causation
3    analysis as epidemiologists, we primarily rely on results
4    in humans and especially epidemiology, but we also look
5    to see if there are plausible biologic mechanisms that
6    can link what we see in the human data, in terms of
7    exposure to risk of disease, so we do look at biological
8    mechanisms as well.
9    Q  (By Mr. Williams)  Much of epidemiologic observational
10      research in cancer focuses on determining the
11      associations between an exposure and an outcome, true or
12      not true?
13   A  Yes, that's true.
14   Q  The mere existence of an association does not itself
15      prove a cause and effect relationship between the
16      exposure and the disease, right?
17   A  The existence of an association is typically part of the
18      scientific data we would use in order to determine if
19      it's a cause and effect, and there could be some-- some
20      associations that would be so difficult to explain
21      otherwise, that you would understand that that has to be
22      a cause, but typically in the epidemiology of cancer, we
23      are looking at both the results in human, human
24      population studies, epidemiology studies, but we also
25      look at plausible biologic mechanisms.

Page 109

1    Q  Association is not synonymous with causation, is it,
2       ma'am?
3    A  Association, correct, it's not exactly the same as
4       causation.
5    Q  As you read the epidemiologic literature as part of your
6       work in this matter, you considered the Bradford Hill
7       aspects of causal inference, right?
8    A  That's correct.
9    Q  The continuous research project, for which you serve as a
10      panel member, also uses the Bradford Hill criteria as the
11      basis for its systematic review analyses, true?
12   A  The World Cancer Research Fund has a modified version of
13      Bradford Hill.
14         Most groups that are looking at these types of
15      variables, and are looking at developing public
16      recommendations, will use some kind of modification of
17      Bradford-Hill-like criteria, so the World Cancer Research
18      Fund has developed criteria that are very different in
19      some way from other epidemiology studies, and
20      particularly because they're focused on nutrition, and
21      nutrition is a variable different from other types of
22      exposures in terms of developing them.
23         They also have further developed those criteria for
24      survivorship, so it's not exactly a Bradford Hill
25      analysis.

28  (Pages 106 to 109)

Anne McTiernan, Ph.D

Page 110

1  Q  The Bradford Hill criteria are the basis for the
2     Continuous Update Project systematic review analyses and
3     the criteria for judging the evidence, true or not true?
4              MS. PARFITT:  Objection; form, asked
5     and answered.
6              THE WITNESS:  I would say Bradford
7     Hill criteria were considered in developing the
8     guidelines for the systematic review interpretation.
9              (Exhibit No. 10 marked
10                 for identification.)
11
12  Q  (By Mr. Williams)  Let me have you look at what we've
13     marked as Exhibit No. 10.
14       Exhibit No. 10 is a multi-page document from the
15     World Cancer Research Fund entitled, "Judging the
16     evidence," and dated 2018.
17       Do you recognize this document?
18  A  Yes, I do.
19  Q  This document was published at a time when you were
20     serving as a panelist for the World Cancer Research Fund?
21  A  It was developed before then, but it was published again
22     at that time, yes.
23  Q  Let me have you look at Page 4.
24       Page 4 sets forth how to cite the third expert
25     report ; does it not?

Page 111

1  A  How to cite the whole report, yes.
2  Q  It was contemplated at the time that this document,
3     "Judging the evidence," was published, that it could be
4     cited by experts, correct?
5              MS. PARFITT:  Objection; form.
6              THE WITNESS:  Yes.
7  Q  (By Mr. Williams)  Look at Page 5, if you would.
8  A  (Witness complies.)
9  Q  Page 5 under the title, "Introduction," the second full
10     paragraph, I will direct you to the last sentence.  It
11     says, "The Bradford Hill criteria are the basis for the
12     Continuous Update Project, CUP, systematic review
13     analyses and the criteria for judging evidence."
14       Do you see that?
15  A  Yes, I do.
16  Q  Is that an accurate statement?
17  A  I would say it's the beginning because they did change,
18     and it spanned quite a bit compared to Bradford Hill.
19       Bradford Hill's speech, when he developed it and
20     when the result was published in the World Society of
21     Medicine, was very basic, did not have the many criteria
22     that World Cancer Research Fund uses, and their criteria,
23     the way they developed it, beyond Bradford Hill, was
24     because of the nutrition-related variables.
25  Q  Is it an accurate statement or not, ma'am?

Page 112

1       That was my question.
2              MS. PARFITT:  Mr. Williams, if I could
3     just say, she is a doctor, if we could refer to her as
4     "Doctor."
5              MR. WILLIAMS:  I'm sorry.  Pardon me.
6  Q  (By Mr. Williams)  Dr. McTiernan, excuse me, is that last
7     sentence of the second paragraph on Page 5 accurate or
8     not?
9              MS. PARFITT:  Thank you.
10     Objection.
11              THE WITNESS:  When I said "basis," I
12     would say it's the beginning because it was revised quite
13     a bit.
14       I will add to that.
15       There are things in this document, in this
16     evidence-- "Judging the evidence" document that go much
17     beyond what Bradford Hill aspects considered and are much
18     more specific to these types of variables.
19  Q  (By Mr. Williams)  Let me have you turn to-- let's take a
20     look back at the exhibit that we marked as Exhibit No. 5.
21       Exhibit No. 5 is the 2018 revised report.
22       Do you have that in front of you?
23  A  Yes.
24  Q  This document at Page 9 sets forth the methodology for
25     the report.

Page 113

1       Do you see that on Page 9?
2  A  Yes.
3  Q  And it says, "Through this process," and this is the
4     third paragraph on that page.  "Through this process the
5     CUP ensures that everyone, including policy-makers,
6     health professionals, and members of the public, has
7     access to the most up-to-date information on how to
8     reduce the risk of developing cancer."
9       Do you see that?
10  A  No-- so you are on Page 9?
11       Which paragraph?
12  Q  I'm sorry, Page 4.  I misspoke.
13              MS. PARFITT:  Thank you.
14  Q  (By Mr. Williams)  Pardon me, ma'am-- Doctor.
15       Page 4, third paragraph, under "Our Continuous
16     Update Project."
17       Do you see that?
18  A  Yes.
19  Q  The whole purpose of the continuous update process is to
20     try to ensure that members of the public have access to
21     the most up-to-date information on how to reduce the risk
22     of developing cancer, correct?
23              MS. PARFITT:  Objection; misstates the
24     document.
25              THE WITNESS:  If you are looking at

29 (Pages 110 to 113)

Anne McTiernan, Ph.D

Page 114

```
 1    that sentence, you would also have to put it in context
 2    of what this report is.
 3        It's related to diet, nutrition, physical activity
 4    and cancer.
 5        It is not all potential causes of cancer that an
 6    individual could modify in order to reduce risk.
 7        We are talking only about diet, nutrition, and
 8    physical activity.
 9  Q (By Mr. Williams) Let's look at Page No. 9 of this
10    exhibit.
11        At the end of the first paragraph, under the
12    heading, "Methodology," it says, halfway down that
13    paragraph, "The literature search was restricted to
14    Medline and included only randomized controlled trials,
15    cohort and case-control studies. Due to their
16    methodological limitations, case-control studies were not
17    analyzed in the Ovarian Cancer SLR 2013."
18        Do you see that?
19  A Yes.
20  Q And "SLR" refers to "systematic literature review"?
21  A Yes, it does.
22  Q When you were considering the literature in your work for
23    the World Cancer Research Fund to determine what causes
24    cancer, it is accurate that your panel did not look at
25    any case-control studies?
```

Page 115

```
 1  A That's not true for the entire work that we did.
 2        For some of the cancers and some of the exposures we
 3    did include case-control studies; for example, arsenic
 4    and some other carcinogens.
 5        When I mentioned that the Bradford Hill aspects were
 6    extended for this analysis, it is particularly because of
 7    nutrition variables.
 8        Nutrition variables are very difficult to ascertain
 9    for exposure because as opposed to the use of talcum
10    powder products, which might be used once or twice a day,
11    nutrition variables are occurring sometimes 50 to 100
12    times a day.
13        The amount that people eat, what they're eating, how
14    often they're eating, the variables are so difficult to
15    collect, that the results from case-control studies are a
16    concern to some investigators.
17        Many epidemiologists disagree with this choice of
18    what World Cancer Research Fund decided to do.
19        When it says-- however, I should also mention when
20    it says, "analyzed," that's analyzed for the
21    meta-analysis.
22        The World Cancer Research Fund, when they do the
23    systematic reviews, also looks for pooled analyses and
24    meta-analyses, and they present them in the SLR, and
25    reports will have information from those other reports,
```

Page 116

```
 1    and those can have case-control studies in them.
 2        It's just that when they do their meta-analyses,
 3    which is actually looking at data from the various
 4    studies, they make the choice for nutrition variables to
 5    focus on cohort studies for some cancers and some
 6    exposures.
 7        As I mentioned, arsenic, there was some other
 8    exposures, like very hot teas that were studied in
 9    case-control studies, so that's not a complete sentence--
10    statement for all of the projects.
11            MR. WILLIAMS: I move to strike that
12    as nonresponsive.
13  Q (By Mr. Williams) My question to you is this:
14        The last sentence under "Methodology" on Page 9 of
15    this exhibit, Exhibit No. 5, says that "Due to their
16    methodological limitations, case-control studies were not
17    analyzed in the Ovarian Cancer SLR 2013."
18        That's what it says, right?
19  A And I was explaining what it means.
20  Q You would agree with me that each study design, cohort
21    study, case-control study, other types of studies, has
22    its advantages and limitations, correct?
23  A That's true.
24  Q And you would agree that the hierarchy of epidemiological
25    evidence places cohort studies above case-control
```

Page 117

```
 1    studies?
 2            MS. PARFITT: Objection; form.
 3            THE WITNESS: I would say the
 4    hierarchy of epidemiology evidence depends entirely on
 5    the question under review.
 6        If you have an exposure, which is very difficult to
 7    measure and which can change over time or which you are
 8    trying to determine lifetime exposure, then often it's
 9    more-- it's easier to do that in a case-control study.
10        The case-control studies that were reviewed for the
11    talcum powder product used and ovarian cancer risk
12    primarily used interview questionnaires, so an
13    interviewer spending time, sometimes several hours with a
14    patient in control, to determine lifetime exposures.
15        The cohort studies, however, typically, and
16    especially the three cohort studies that were included in
17    this review and that have been published on ovarian
18    cancer and talcum powder products, those studies were
19    designed to look at multiple diseases.
20        Nurses' Health Study was started to--
21  Q (By Mr. Williams) Ma'am, I am going to have to cut you
22    off because-- look, when I ask you questions, I need you
23    to answer the question that I've asked. Otherwise, you
24    could just talk for a half an hour, so if you would,
25    please, Doctor, just focus on the question that I'm
```

30 (Pages 114 to 117)

Anne McTiernan, Ph.D

Page 118

1  asking you.
2      The question that I'm asking you is:
3      As a matter of epidemiological practice in your line
4  of work, is it true or not true that case-- excuse me,
5  that cohort studies are placed higher in the hierarchy
6  than case-control studies?
7      If the answer is that's not true, please just say
8  it's not true.
9          MS. PARFITT:  Objection to form; asked
10  and answered.
11          THE WITNESS:  I think-- yeah, I did
12  try to answer that before.  I will try to do it better
13  this time.
14      For one thing, I am not sure what hierarchy you are
15  referring to, but what I'm saying is that depending on
16  the question, one type of study could be preferable to
17  another, but in general all of the studies provide
18  information, and we look at the totality of evidence.
19  Q  (By Mr. Williams)  So it is your view that there is no
20  generally accepted hierarchy of epidemiological evidence?
21          MS. PARFITT:  Objection; form,
22  misstates her testimony.
23          THE WITNESS:  I think it depends
24  entirely on what the question is.
25  Q  (By Mr. Williams)  Let's look at Exhibit No. 10, which is

Page 119

1  the "Judging the evidence" document from 2018 from the
2  World Cancer Research Fund, and I will direct your
3  attention to the seventh page.
4      At the bottom of Page 7 of this exhibit, Exhibit
5  No. 10, it has a section that says, "Study design," that
6  says, "Each study design has its advantages and
7  limitations.  The hierarchy of epidemiological evidence
8  places cohort studies above case-control studies, with
9  ecological studies and case reports at the bottom.
10      "There are merits in considering a number of
11  different study designs.  Cohort studies are likely to be
12  the main source of evidence owing to the long latent
13  period for cancer to develop and also to their
14  prospective design"--
15  A  I'm sorry, can you say where you're reading from?
16          MS. PARFITT:  7.  He's right here.
17          THE WITNESS:  Okay.
18  Q  (By Mr. Williams)  And I've read through that heading,
19  "Study design," through to the last sentence that says,
20  "However, in some circumstances case-control studies and
21  ecological studies may also make a useful contribution to
22  the evidence," and it refers to Section 7.
23      Do you see that?
24  A  Yes.
25  Q  Now, we are going to go to Section 7 in a minute, but my

Page 120

1  question to you now is:
2      Is it your testimony that there is in fact no
3  generally accepted hierarchy of epidemiological evidence
4  that places cohort studies above case-control studies?
5          MS. PARFITT:  Objection.
6          THE WITNESS:  And I would again say it
7  depends entirely on the question, the scientific
8  question.
9  Q  (By Mr. Williams)  Here this references that cohort
10  studies are likely to be the main source of evidence
11  owing to the long latent period for cancer and owing to
12  their prospective design.
13      Those are the two concepts that it mentions in that
14  sentence, correct?
15  A  That's what that mentions, yes.
16  Q  And the latent period for cancer refers to the fact that
17  exposure to a substance can sometimes take some time
18  before cancer is developed, right?
19  A  That's correct.
20  Q  That's the latency period?
21  A  Yes.
22  Q  And the idea of a prospective cohort study is that people
23  are asked about their-- what they do and put on and in
24  their bodies right now when they are healthy, and then
25  they are followed along, correct?

Page 121

1  A  That's correct.
2  Q  Okay.  And retrospective case-control studies are
3  backwards-looking where people are asked questions after
4  they have contracted a disease and they are asked to
5  recall what they put on and in their bodies, true?
6  A  So that is typical.
7      Cohort studies, by the way, could also ask
8  retrospectively what somebody had done over their
9  lifetime.
10      In this particular case, with talcum powder
11  products, they did, but I have seen many studies do that.
12      They can do a lifetime exposure, and then if-- the
13  better cohort studies focused on certain-- depending on
14  the question, they update their data so that then you
15  could have a lifetime exposure variable from a cohort
16  study.
17      For the-- in terms of long latent period for cancer,
18  case-control studies, if they're asking about lifetime
19  exposure and collecting that information, that would not
20  be an issue or a problem for case-control studies.
21  Q  Let me have you turn to Section No. 7, which is on Page
22  21.
23      That's the section that's referred to at the end of
24  the page we were just looking at, the study design
25  section referring to Section 7, so I want to go there.

31 (Pages 118 to 121)

Anne McTiernan, Ph.D

Page 122

1    Do you have Page 21 in front of you?
2  A  Yeah.
3  Q  In the left-hand column under Section 7, "Evidence
4    collated for the Continuous Update Project," at the very
5    bottom, it has the sentence that says, "The first stage
6    of the SLRs was a comprehensive search using a
7    standardized search strategy for the scientific
8    literature for randomized trials and cohort studies
9    published since 2006 using Medline.  Because case-control
10    studies are particularly prone to recall (and other)
11    bias, they were not routinely reviewed"--
12  A  Where are you again?  Okay.  Sorry.
13    MS. PARFITT:  Just give her a moment,
14    Mr. Williams, to catch up.
15  Q  (By Mr. Williams)  Do you see where I am?
16  A  Yes.
17  Q  In the right-hand column of Page 21 it says, "Because
18    case-control studies are particularly prone to recall
19    (and other) bias, they were not routinely reviewed.
20    "However, if there were no or very few RCTs or
21    cohort studies, they were included."
22    Do you see that?
23  A  Yes.
24  Q  In the case of talc and ovarian cancer, as of 2018, is it
25    accurate to say that there are five cohort studies that

Page 123

1    you have had the benefit of reviewing?
2  A  That is not correct.
3    In the three cohort studies, one of which had three
4    publications with different numbers of cases in them--
5    there are three cohort studies.
6  Q  So if we count the study that has three different cohort
7    studies within it, and then add the other two cohort
8    studies, we would get to five; would we not?
9    MS. PARFITT:  Objection; form.
10    THE WITNESS:  I repeat, the three
11    cohort studies, just that one of them has three
12    publications.
13  Q  (By Mr. Williams)  And do you consider three cohort
14    studies, one of which had three separate sets of data, to
15    be insufficient to do an analysis of whether talc causes
16    ovarian cancer?
17    MS. PARFITT:  Objection; form.
18    THE WITNESS:  I would consider those
19    three-- what I would do is look at the individual studies
20    of those three studies.  I would look at how the data
21    were collected and whether you can get the information
22    that you want to look at your question, before deciding
23    that they were sufficient on their own.
24  Q  (By Mr. Williams)  Every single cohort study that you
25    looked at in this case, for your work in this litigation,

Page 124

1    showed that there was no statistically significant
2    relationship between talc use and ovarian cancer,
3    correct?
4    MS. PARFITT:  Objection; form.
5    THE WITNESS:  One of those studies did
6    show a statistically significant association with use of
7    talcum powder products and risk of serous ovarian cancer,
8    and that was the Gertig study, but I also did an analysis
9    showing there was insufficient number of cases in all
10    three of those studies in order to find a statistically
11    significant result.
12    The driver of statistical significance is the number
13    of cases in a study, regardless of whether it's a cohort
14    study or case-control study.
15  Q  (By Mr. Williams)  We will get to the number of cases in
16    a moment, but with respect to the Gertig study, you are
17    aware and came across in your review, because you
18    referenced them in your report, that that Gertig study
19    was updated in 2008 and 2010 under the name "Gates,"
20    correct?
21    MS. PARFITT:  Objection; form.
22    THE WITNESS:  2008 I would not call an
23    update.
24    It only included 200 cases from the Nurses' Health
25    Study.  It also included other cases from the New England

Page 125

1    case-control study, so when you look at just the Nurses'
2    Health Study, part of it was only 200 cases, and it is
3    very difficult to determine which cases those were.
4    The second update wasn't an update, but at that time
5    they ended up looking at a different variable, a
6    different comparison.
7    The first study compared no use, never-users, to
8    users of different categories.
9    The second-- the third study compared-- combined
10    never-users with use of less than once a week, so you
11    have a very different comparison, so I think that was--
12    that was concerning.
13    It's not clear it's a real update-- the data aren't
14    really there.
15    That third study also didn't focus just on talc.
16    Talc was just one of the variables in the study.
17  Q  (By Mr. Williams)  To the extent that the 2010 study by
18    Gates, that update-- first of all, the 2010 update wasn't
19    an update.
20    You just said that yourself, correct, Doctor?
21    MS. PARFITT:  Objection.
22    THE WITNESS:  It was an update of
23    cases.
24    It is not clear it was an update of the data.
25  Q  (By Mr. Williams)  True or not true, the 2010 Gates

Anne McTiernan, Ph.D

Page 126

1    update did not show a statistically significant increased
2    risk of serous invasive ovarian cancer?
3            MS. PARFITT:  Objection.
4            THE WITNESS:  It did not show a
5    statistically significant association, correct.
6    Q  (By Mr. Williams)  Can you identify any cohort study that
7        concluded that there was a statistically significant
8        overall association between talc and ovarian cancer?
9            MS. PARFITT:  Objection; form.
10           THE WITNESS:  So you are talking about
11   for talc and any type of epithelial ovarian cancer?
12   Q  (By Mr. Williams)  Any statistically significant overall
13       association between talc and ovarian cancer?
14   A  That's correct, I didn't have sufficient sample size to
15       do it.
16   Q  The answer to my question is that you cannot identify any
17       cohort study concluding that there was a statistically
18       significant overall association between talc and ovarian
19       cancer, correct?
20           MS. PARFITT:  Objection to form; asked
21   and answered.
22   Q  (By Mr. Williams)  You may answer, Doctor.
23   A  So my answer is the same, that statistical significance
24       is not seen because the sample size is too small.
25   Q  Is there any other reason why statistical significance

Page 127

1    was not seen besides the sample size being too small?
2    A  Sample size is one of the major drivers.
3            The other thing is there is a lot of variability
4        around the point estimate, the relative risk.
5            When you see a sample size that's that small, that's
6        the major thing you start thinking about.
7    Q  Other than sample size and variability, is there any
8        other factor that you believe makes the cohort studies
9        unreliable?
10   A  I don't think I used the world "unreliable."  I used the
11       word "not statistically significant."
12           MS. PARFITT:  Objection.
13   Q  (By Mr. Williams)  Other than sample size and
14       variability, is there anything else that bears upon
15       statistical significance that is important?
16           MS. PARFITT:  Objection; form.
17       You are referring to the collective group of cohort
18   studies?
19           THE WITNESS:  The statistical
20   significance-- you are not talking about the effects.
21   You are talking about statistical significance.  Those
22   are the things that would drive it, in my opinion.
23           MR. WILLIAMS:  Counsel, I am going to
24   go to a different topic.
25       Do you want to take lunch now?  Do you want to go

Page 128

1    12:30?  What's your pleasure?
2            MS. PARFITT:  Can we go off the
3    record?
4            MR. WILLIAMS:  Let's go off the
5    record.
6            VIDEOGRAPHER:  Going off record, the
7    time is 12:07 p.m.
8            (Recess 12:07 to 12:0 p.m.)
9
10           VIDEOGRAPHER:  We are back on the
11   record.  The time is 12:09 p.m.
12   Q  (By Mr. Williams)  Dr. McTiernan, would you agree that if
13       you had only looked at the cohort studies in this case,
14       like it is suggested is appropriate in the World Cancer
15       Research Fund "Judging the evidence" document, Exhibit
16       No. 10, that you would not have been table to opine that
17       talcum powder causes ovarian cancer?
18           MS. PARFITT:  Objection; form.
19           THE WITNESS:  First I want to respond
20   by characterizing the World Cancer Research Fund
21   document, that they're referring to nutrition variables,
22   so that is why they consider case-control studies to be a
23   much lower hierarchy than cohort studies.
24       In terms of what was seen in the cohort studies, we
25   did see, with the Nurses' Health Study, elevated risk of

Page 129

1    serous cancer.
2        We also saw in the two cohort studies elevated risk
3    that was not statistically significant, and I-- my
4    opinion is that's because the sample size was small.
5        In answer, two of the three cohort studies did show
6    elevated risk of ovarian cancer, but they were not
7    statistically significant, with the exception to the
8    serous subtype in the Nurses' Health Study.
9    Q  (By Mr. Williams)  Have you completed your answer?
10   A  Yes.
11   Q  The only type of cancer for which there was a
12       statistically significant finding in one of the studies
13       related to serous invasive ovarian cancer, correct?
14   A  Only one type showing statistical significance around
15       that relative risk, yes.
16   Q  And that was the Gertig 2000 study?
17   A  Yes.
18       The--
19   Q  Ma'am, you have answered my question.
20       Was the Gertig 2000 study the only study where there
21   was a statistically significant finding that serous
22   invasive ovarian cancer was associated with talc use?
23           MS. PARFITT:  Objection; form.
24           THE WITNESS:  For the cohort studies,
25   yes, that's correct.

33 (Pages 126 to 129)

Anne McTiernan, Ph.D

Page 130

1    Q  (By Mr. Williams)  I take it you and I disagree as to
2    whether or not the Gates 2010 update showed that that
3    previously seen statistically significant increased risk
4    for serous invasive cancer went away?
5        You think it did not go away.  I represented to you
6    that the study says that it did go away, right?
7             MS. PARFITT:  Objection; form.
8             THE WITNESS:  My issue with them is
9    not-- is that different comparisons were made.
10       The first one looked at never-use versus ever-use--
11   Q  (By Mr. Williams)  You have already explained that,
12   ma'am--
13            MS. PARFITT:  Please allow her to
14   complete.
15            THE WITNESS:  I am just referring to
16   my answer.
17       The second study, the 2010 Gates study, was then
18   comparing never-user plus less than once a week use
19   versus greater use, so it's a different comparison.
20   That's going to dampen, going to lower the relative risk
21   by putting some of the users in with the nonusers.
22   Q  (By Mr. Williams)  The Gates 2010 study did not show a
23   statistically significant increased risk for serous
24   invasive ovarian cancer, true or not true?
25            MS. PARFITT:  Objection; form, asked

Page 131

1    and answered.
2             THE WITNESS:  It showed a six percent
3    increase in risk that was not statistically significant,
4    and it's not comparing nonusers to users.  It's comparing
5    nonusers plus less-than-once-a-week users to more-often
6    users.
7    Q  (By Mr. Williams)  Let me ask you to look, Doctor, at
8    Exhibit No. 10--
9    A  Which one?
10   Q  Exhibit No. 10, the "Judging the risk" document from
11   2018-- excuse me, "Judging the evidence."
12       I misspoke.
13       First, I haven't done this yet, but if you look at
14   Page 30, the acknowledgments section, it lists you as a
15   panel member for this review, correct?
16   A  Yes.
17   Q  It is true that you relied very heavily on this document,
18   that is Exhibit No. 10, in drafting your report for this
19   case?
20            MS. PARFITT:  Objection; misstates
21   testimony.
22            THE WITNESS:  I did not draft this
23   report.
24       Is that what you mean?
25       The World Cancer-- so you are talking about the

Page 132

1    World Cancer Research report or my report?
2    Q  (By Mr. Williams)  I am referring to--
3    A  For the talcum powder products--
4    Q  I'll restate the question.
5        For purposes of preparing your report, Exhibit No. 2
6    for this deposition, which is the report you prepared for
7    this litigation-- do you have that in mind?
8    A  Yes.
9    Q  It is true that you relied heavily on Exhibit No. 10, the
10   "Judging the evidence" document, in preparing your
11   report, which is Exhibit No. 2?
12            MS. PARFITT:  Objection; form.
13            THE WITNESS:  I didn't rely heavily.
14   I cited it as some of the methods of reviewing
15   meta-analyses.  I used some of the methods that I used
16   for that as well as what was used for the government
17   physical activity guidelines, but I did not use this
18   entirely.
19       In terms of determining causality, I used-- I went
20   back to the original Bradford Hill aspects, listed
21   aspects, to determine causality.  I did not use the
22   guidelines for the CUP analysis in determining whether
23   the association that's seen between talcum powder
24   products and risk of ovarian cancer meets criteria for
25   causal.

Page 133

1    Q  (By Mr. Williams)  Let me be very specific about what I
2    mean.
3        When you were typing up Exhibit No. 2, your report
4    for this case, you literally had this exhibit, Exhibit
5    No. 10, next to you as you typed?
6             MS. PARFITT:  Objection.
7    Q  (By Mr. Williams)  True or not true?
8             MS. PARFITT:  Objection; form.
9             THE WITNESS:  It's not true.
10   Q  (By Mr. Williams)  Is it your testimony that you prepared
11   your report without any reference at all to any part of
12   Exhibit No. 10?
13   A  I did reference it.  It's one of the references here.
14   Q  Show me that, if you would.
15   A  I think-- I used-- I included the website.
16   Q  You included the website for the 2014 report on Page 5 of
17   your report, but if you did refer to this document,
18   Exhibit No. 10, in your references or anywhere else,
19   please let me know where that is.
20   A  So I don't see it if I did.
21   Q  Have you completed your answer?
22   A  What was the question again?
23   Q  I was asking you to point out for me--
24   A  Did I refer to it or did I reference it?
25       I may not have referenced it.

Anne McTiernan, Ph.D

Page 134

1    I thought I had.
2    Yeah, I just have the website here.
3  Q  Let me refer you to your report in this case, Exhibit
4    No. 2, and ask you to turn to Page 10.
5    You have a heading that says, "The science of
6    epidemiology" at Page 10.
7    Do you see that?
8  A  Yes.
9  Q  And with the first paragraph there, starting about a
10    third of the way into the paragraph, you write,
11    "Epidemiological research describes and seeks to explain
12    the distribution of health and disease within human
13    populations."
14    Did I read that correctly?
15  A  Yes.
16  Q  And skipping a sentence, you write, "This type of
17    investigation is known as observational.  By relating
18    differences in circumstances and behavior to differences
19    in the incidence of disease, associations are identified
20    that may or may not be causal."
21    Is that what it says?
22  A  Yes.
23  Q  And then the first sentence of the next paragraph says,
24    "In epidemiological studies, an exposure is a factor or
25    condition that may or may not influence the risk of

Page 135

1    disease," right?
2  A  Yes.
3  Q  Throughout your report you included a lot of citations to
4    works that you relied upon, correct?
5  A  Yes.
6  Q  Your reference section includes, I think we said, 127
7    citations, right?
8  A  Yes.
9  Q  You did not provide a citation for any of the sentences
10    that we just read, right?
11  A  That is not here, no.
12  Q  And by that I mean there is no reference to a footnote,
13    there is no reference to any of the 127 items in the back
14    of your report, correct?
15  A  That's correct.
16  Q  Now, turn back to the "Judging the evidence" document,
17    which we marked as Exhibit No. 10, and I will ask you to
18    turn to Page 6 under the heading, "Epidemiological
19    evidence."
20    Right underneath that heading the "Judging the
21    evidence" document from the World Cancer Research Fund
22    says, and I'm quoting, "Epidemiological research
23    describes and seeks to explain the distribution of health
24    and disease within human populations," and I will stop
25    there.

Page 136

1    Is it accurate to say that the sentences that are
2    set forth under that heading, "Epidemiological evidence,"
3    are identical to sentences found in your report on Page
4    10, with one exception, that there is a sentence that
5    appears in your report that does not appear on Page 6 of
6    Exhibit No. 10?
7    MS. PARFITT:  Object to the form of
8    the question.
9    THE WITNESS:  I think you are talking
10    about the sentences up here.
11  Q  (By Mr. Williams)  I am actually talking about the three
12    sentences that I read from Page 10 of your report, two
13    sentences from the first paragraph, and one sentence, the
14    first sentence from the second paragraph.
15    Those three sentences are identical, word for word,
16    to the sentences that appear on Page 6 of Exhibit No. 10?
17    MS. PARFITT:  Objection; form.
18  Q  (By Mr. Williams)  Correct?
19  A  Yes.
20  Q  Now, just so we're clear, did you provide the people who
21    wrote the text of the World Cancer Research Fund a copy
22    of your expert report in this case when this document,
23    "Judging the evidence" was prepared?
24  A  No, they did not get a copy of this.
25    Nobody has seen it, other than Ms. Parfitt and her

Page 137

1    colleagues.
2  Q  So to this day there is nobody from the WCRF has seen
3    your expert report in this litigation, correct?
4  A  That's correct.
5  Q  So the way this work was, you had in front of you Exhibit
6    No. 10, and you prepared-- took out sentences from the
7    WCRF document and included them word for word in your
8    report, correct?
9    MS. PARFITT:  Objection; form.
10    THE WITNESS:  I can't recall where I
11    took this.
12    I have many different documents where I have
13    information about what epidemiology is.
14    If I took it from here, I should have cited it, but
15    I can't recall where exact sentences came from.
16  Q  (By Mr. Williams)  Wherever you took it from--
17  A  I should have cited it.
18  Q  Whether it was the "Judging the evidence" document or
19    someplace else, you didn't cite it?
20  A  I should have cited it, you're right.
21  Q  Now, we went through your expert report and the
22    Continuous Update Project's "Judging the evidence"
23    document, Exhibit No. 10, and we put the text side by
24    side for various sections for ease of reference, and I'm
25    going to pass those out to you, and we'll mark it as

35  (Pages 134 to 137)

Anne McTiernan, Ph.D

Page 138

1   Exhibit No. 11.
2       We will give it to Counsel.
3           (Exhibit No. 11 marked
4           for identification.)
5
6   Q  (By Mr. Williams)  Now, what we set forth here are a
7       total of 13 different places where the language from the
8       "Judging the evidence" report was used word for word,
9       with some exceptions, in your report.
10      Do you see that?
11      I am not asking you to agree or disagree, but let me
12      ask you to see that there are 13 different examples where
13      the language is either word for word or roughly word for
14      word used in your report, taking language that also
15      appears in the "Judging the evidence" report.
16      Do you see that?
17      Take your time to look through there.
18          MS. PARFITT:  Objection to form.
19          THE WITNESS:  I can see that some of
20      these are very common epidemiologic terms.
21  Q  (By Mr. Williams)  Let's look for a little-- why don't
22      you put that to one side for a moment and let me just ask
23      you some other questions, and then we'll take lunch.
24      I want to discuss a few places where it appears that
25      you copied from the "Judging the evidence" document and

Page 139

1       made some changes.
2           MS. PARFITT:  And I will object to the
3       form of that.
4       Please continue.
5   Q  (By Mr. Williams)  In describing what a pooled analysis
6       is in the Continuous Update Project report, and I will
7       refer you to Exhibit No. 10 at Page 11, in the right-hand
8       column--
9           MS. PARFITT:  Just give us a moment--
10          THE WITNESS:  Exhibit No. 10?
11  Q  (By Mr. Williams)  Right, Exhibit No. 10 at Page 11 on
12      the right-hand column.
13      There is a heading that says-- there's a paragraph
14      that begins, "Pooled analysis," last paragraph on the
15      page.
16      Do you see that?
17  A  Mm-hm.
18  Q  Is that a "yes"?
19  A  Yes.
20  Q  In Exhibit No. 10, which is the "Judging the evidence"
21      document, it says, "Pooled analysis is a type of
22      meta-analysis in which original individual-level data
23      from various published epidemiological studies of a
24      similar type - usually prospective cohort studies - are
25      combined and re-analyzed.

Page 140

1       "The combination of data from multiple studies
2       creates a larger data set and increased statistical
3       power."
4       Did I read that right from Exhibit No. 10?
5   A  Yes.
6   Q  Now, when you prepared your litigation report, you copied
7       a lot of the language verbatim into your litigation
8       report but made a few changes.
9       Have you noticed those?
10          MS. PARFITT:  Objection to that form.
11  Q  (By Mr. Williams)  Let me refer you to Exhibit No. 2,
12      Page 22 of your report.
13      Exhibit No. 2, Page 22.
14      I would ask you to keep Exhibit No. 2, Page 22 open
15      and keep Page 11 of Exhibit No. 10 open, and put them
16      side by side.
17      Referring you now to Page 22 of Exhibit No. 2, the
18      first full paragraph on that page says, "Pooled analysis
19      is a type of meta-analysis where original
20      individual-level data from various published and/or
21      unpublished epidemiological studies are combined and
22      re-analyzed.
23      Did I read that correctly from your report?
24  A  Yes.
25  Q  Now, when you wrote your report, the only difference

Page 141

1       between the language that's set forth in Exhibit No. 10,
2       in that first sentence, the only language that is added
3       is "and/or unpublished."
4       Do you see that?
5   A  Yes.
6   Q  So while the Exhibit No. 10, the "Judging the evidence"
7       document that was put out by the World Cancer Research
8       Fund, when they described a pooled analysis, they didn't
9       say anything about unpublished studies, true?
10  A  So again--
11  Q  Pardon me?
12      I am asking you to look at Exhibit No. 10, Page 11.
13  A  Right.
14  Q  Right-hand column.
15  A  Right.
16  Q  That sentence does not say anything about "and/or
17      unpublished," does it?
18  A  Right-- yes, it doesn't.
19  Q  And then in that sentence, if you go back to Page 22 of
20      your report, after you added "and/or unpublished
21      epidemiological studies," you took out some information,
22      did you not, some words?
23  A  What are you referring to that I took out?
24  Q  Well, the words that you took out were, dash, "Usually
25      prospective cohort studies," dash, right?

Anne McTiernan, Ph.D

Page 142

1    Actually, you also took out the words "of a similar
2    type," so let me restate the question.
3        In your report you took out the words "of a similar
4    type - usually prospective cohort studies"-- and I will
5    put a closed quote there.
6        You took those words out, right?
7    A  So, again, I can't remember every place-- because when I
8    write projects, I do take sections from things that I've
9    previously been involved with, since I'm considered on
10   this panel and it's considered as something I'm involved
11   with.  I should have cited it, but I would be citing
12   something that I'm part of.
13       This-- it's not true that pooled analyses is only
14   prospective cohort studies, and it is not even true that
15   it's usually.
16       Many pooled analyses of case-control studies-- there
17   are many pulled analyses of clinical trials, so when
18   they're saying, "usually prospective cohort studies,"
19   they're referring for what they usually-- for their data
20   or WCRF data, are usually prospective for the nutrition
21   variables, so that's what they specified there.
22   Q  The words "of a similar type - usually prospective cohort
23   studies," do not appear in your report.
24       Can we agree on that?
25       MS. PARFITT:  Objection; form.

Page 143

1        THE WITNESS:  It wouldn't be relevant
2    because I am talking generally about pooled analysis, and
3    it's individual data from-- it could be any type of
4    studies.
5        I mentioned it could be clinical trials.  There are
6    many pooled analyses of clinical trials.
7        It could be cohort studies, it could be case-control
8    studies.
9        And sometimes the cohorts and case-control studies
10   will be combined together where the cohort studies are
11   nested case-control studies, so it could be a combination
12   of two different types.
13       MR. WILLIAMS:  I move to strike that
14   as nonresponsive.
15   Q  (By Mr. Williams)  Doctor, my question is this:
16       The words "of a similar type - usually prospective
17   cohort studies," those words do not appear in your
18   report.
19       Can we agree on that?
20       MS. PARFITT:  Objection; form, asked
21   and answered.
22       THE WITNESS:  I agree they don't
23   appear in my report.
24   Q  (By Mr. Williams)  So the Continuous Update Project
25   document stated that you should only pool published

Page 144

1    studies, but you changed that language for your
2    litigation report to include "unpublished studies,"
3    right?
4        MS. PARFITT:  Objection; form.
5        THE WITNESS:  The Continuous Update
6    Project did make a decision to use only published data
7    because it did not have the personal power to get
8    unpublished.
9        It is typical in pooled analysis and sometimes in
10   meta-analyses to look for additional data if it's known
11   to exist, even if it's not published.
12       This is true for clinical trial pooled analyses,
13   case-control pooled analyses, and cohort pulled analyses.
14       It is not surprising at all that-- it was not
15   unusual to see that in the Terry pooled analysis there
16   were three studies that were previously unpublished that
17   were added to the published data for that pooled
18   analysis.
19       I've seen this for one of the pooled analyses we
20   relied on for the physical activity guidelines committee,
21   and so it's a common method.
22       As long as you use the same criteria to determine if
23   that study has valid data, then it's quite customary to
24   include it in a pooled analysis.
25   Q  (By Mr. Williams)  The only pooled analysis that you

Page 145

1    looked at for this litigation was Terry 2013, correct?
2        MS. PARFITT:  Objection; form.
3        THE WITNESS:  It's the only one that
4    characterizes a pooled analysis.
5        There were some of the case-control studies that
6    added together more than one study.
7        The second study of the Nurses' Health Study was a
8    pooled analysis of Nurses' Health cases and New England
9    case-control studies, so that was a pooled study that
10   involved just two sets of studies.
11   Q  (By Mr. Williams)  The only pooled analysis that you
12   cited in your paragraph on Page 22, referencing Item 39,
13   which I'll represent to you is the Terry 2013 study, the
14   only pooled analysis that you studied in your report on
15   Page 22 is the Terry study, correct?
16   A  I cited that singly because it was large enough.
17       My point is that it's large enough to be able to
18   look at some of these associations.
19   Q  And that Terry 2013 study pooled eight case-control
20   studies, correct?
21   A  That's correct.
22       It's a pooling project that has been done for many
23   other variables as well.
24   Q  Doctor, we will be here all day and it will go late into
25   the night.

37 (Pages 142 to 145)

Anne McTiernan, Ph.D

Page 146

```
 1          I would ask you to answer just the question that I
 2   ask.
 3          The question that I'm asking you now is:
 4          The Terry 2013 pooled eight case-control studies,
 5   correct?
 6          That's all I'm asking.
 7   A    That's correct.
 8   Q    You deviated from the Continuous Update Project's
 9   definition of a pooled analysis, which is on Page 11 of
10   Exhibit No. 10, in order to accommodate a study that you
11   found helpful for the plaintiffs in this case, correct?
12               MS. PARFITT:  Objection; form,
13   completely misstates her testimony and her opinions.
14          You may answer.
15               THE WITNESS:  The Continuous Update
16   Project definition was discussing studies related to
17   nutrition, and the Continuous Update Project decided to
18   only look at cohort studies for some of the relationships
19   they were addressing.
20          I believe this is why this sentence was written in
21   that way, but it is not true that pooled analyses are
22   usually prospective cohorts.
23          If you look at pooled analyses in general, many of
24   them are clinical trials, they are done in the treatment
25   area, many of them are case-control studies, and many can
```

Page 147

```
 1   be cohort studies.
 2   Q    (By Mr. Williams)  Let me ask my question this way:
 3          Doctor, could you point us to some learned treatise,
 4   study, summary of studies that uses the formulation for
 5   pooled analysis word for word that is set forth on Page
 6   22 of your report; that is, could you point us to some
 7   source that says that pooled analyses is a type of
 8   meta-analysis that includes published and unpublished
 9   studies and that simultaneously does not reference
10   prospective cohort studies?
11          Is there something that you can point us to that
12   uses the formulation for pooled analysis that you've set
13   forth?
14               MS. PARFITT:  Objection; form.
15               THE WITNESS:  I'm a little bit
16   confused by the question, but--
17   Q    (By Mr. Williams)  Let me stop you there because if
18   you're confused, it does me no good.
19          I will restate it.
20          Your paragraph here on Page 22 has one, and only
21   one, citation, and that's to 39, the Terry 2013 study,
22   correct?
23   A    That's correct.
24   Q    There are no other citations of any sort in that
25   paragraph, correct?
```

Page 148

```
 1   A    That's correct.
 2   Q    My question to you then is:
 3          Can you point us to any reference material anywhere
 4   that uses word for word the formulation for pooled
 5   analyses that you have set forth in the first two
 6   sentences of that paragraph?
 7   A    So I think you're asking about pooled analyses that
 8   include studies that are not published; is that correct?
 9   Q    I am asking the question that I asked.
10          I will restate it one more time.
11          Can you point us--
12               MR. WILLIAMS:  Counsel, I would as
13   that you not point to anything.
14               MS. PARFITT:  I am just trying-- there
15   is a monitor, for the Ladies and Gentlemen of the Jury,
16   in front of the doctor, and I am just reminding her to
17   look at the monitor, but you can--
18               MR. WILLIAMS:  I think that's
19   inappropriate.
20   Q    (By Mr. Williams)  But, Doctor, here is my question
21   again:
22          The first full paragraph on Page 22 describes pooled
23   analyses.  I'm referring you to the first two sentences
24   there-- are you with me so far?
25   A    Yes.
```

Page 149

```
 1   Q    Looking at those sentences word for word, and I mean
 2   every word in both of those two sentences-- are you still
 3   with me?
 4   A    Yes.
 5   Q    Okay.  Looking at those two sentences, can you point us
 6   to any reference material that you have reviewed anywhere
 7   that describes pooled analyses using the words, and I
 8   mean word for word, as you set it forth here in the first
 9   two sentences of Paragraph No. 22?
10               MS. PARFITT:  Objection; form.
11   Q    (By Mr. Williams)  You either can or you can't.
12          The answer is yes, the answer is no.
13          I just need to know--
14   A    Since I wrote that sentence, I am not sure where else it
15   would be.
16          If I was going to cite-- no, I can't.
17          I wrote that sentence.
18   Q    Okay.  What we do know is that the description of pooled
19   analysis in Exhibit No. 10, which is the World Cancer
20   Research Fund "Judging the evidence" document that has,
21   on Page 2, a description of how one is to cite to it,
22   what we do know is that that document describes pooled
23   analysis as including published epidemiological studies
24   of a similar type, usually prospective cohort studies,
25   right?
```

Anne McTiernan, Ph.D

## Page 150

1    MS. PARFITT:  Objection; form.
2        THE WITNESS:  And I disagree with that
3    characterization of pooled studies.
4        MR. WILLIAMS:  Why don't we take a
5    lunch break.
6        VIDEOGRAPHER:  Going off the record.
7    The time is 12:40 p.m.
8        (Lunch recess 12:40 to 1:21 p.m.)
9
10       VIDEOGRAPHER:  We are going on the
11   record at 1:21 p.m.
12       This is the start of Media Unit 3.
13   Q  (By Mr. Williams)  Good afternoon, Doctor.
14       This morning there have been several occasions when
15   I've used the word "ma'am," and I really apologize, and I
16   mean no disrespect.  I am going to try to use the word
17   "Doctor."
18       It's just how I was raised, and I apologize, but I
19   do understand that that can be disrespectful.  I don't
20   mean that at all.
21   A  No problem.  Thanks.
22   Q  In response to several of my questions earlier today
23   about the various World Cancer Research Fund and CUP
24   reports that we have marked as Exhibits 4, 5, and 10,
25   there have been several times when you have made

## Page 151

1    reference to your view that the focus of those reports
2    was on nutrition, physical activity, and diet.
3        Do you recall that that has happened occasionally?
4    A  Yes.
5    Q  If you could take out Exhibit No. 5, which is the 2018
6    report of the WCRF-- and I will ask you to turn to Page
7    8.
8        Section 4, "Other established causes," Page 8-- do
9    you have that in front of you, ma'am?
10   A  Yes.
11   Q  Section No. 4 is entitled, "Other established causes,"
12   and let me-- while you have that in front of you, let me
13   ask:
14       Not bearing children is listed as something that
15   this report says may be a cause of ovarian cancer,
16   correct?
17   A  It says, "May be seen as protective against ovarian
18   cancer," yes.
19   Q  Well, actually, it says-- I will just read it.  The
20   second sentence says, "Not bearing children increases the
21   risk of and may be seen as a cause of ovarian cancer,"
22   and it goes on to say, "The reverse also applies: Bearing
23   children reduces the risk of and may be seen as
24   protective against ovarian cancer."
25       Do you see that?

## Page 152

1    A  That's correct.
2    Q  Now, early menarche or age of first-- a woman first
3    having her period is also listed as something that may be
4    seen as a cause of ovarian cancer in this paragraph,
5    right?
6    A  Yes.
7    Q  Can we agree that early menarche, not bearing children,
8    and late natural menopause are not related to nutrition,
9    physical activity, or diet?
10   A  This paragraph is related to background, and it's talking
11   about menstrual cycles during a woman's lifetime.  That's
12   why it's talking about all of those variables related to
13   early menarche, late menopause.
14       I am not sure why whoever wrote this focused in on
15   that, on a woman's menstrual cycle.
16       They did not do a full systematic review of the risk
17   factors for ovarian cancer.
18       I can see from what was written here--
19   Q  Whether you consider it to be a full systematic review or
20   not, my question is:
21       Early menarche, not bearing children, and late
22   natural menopause are not, in and of themselves, related
23   to nutrition, physical activity, or diet, right?
24   A  And the whole report was not-- was to discuss and
25   interpret and summarize meta-analyses-- for all of the

## Page 153

1    cancers, different writers put in paragraphs about some
2    general factors about the cancers, and there was no
3    effort to do a systematic review, so these are not causal
4    analyses that were listed here.
5        I don't know why these particular ones were picked.
6    They're missing some.
7        They're missing endometriosis, for example, as well
8    as talcum powder.
9        They are missing public inflammatory disease, so it
10   is not a full review.
11       For some reason they picked just some
12   menstrual-related variables to mention here.
13   Q  Now, again, you said, "they."
14       Once this draft was prepared, you have testified
15   this morning that the panel, on which you are a member,
16   reviews and makes judgments based upon the draft that is
17   received, right?
18   A  In-- the 2014 draft.
19       To my knowledge it was not changed.
20       We did not see another update to review prior to the
21   2018 publication of everything together.
22       This was a 2014 document and it was on the website
23   in 2014.
24   Q  I want the record to be clear the document that I'm
25   referring you to right now, the Exhibit No. 5 to your

Anne McTiernan, Ph.D

## Page 154

1  deposition, is the revised document dated 2018.
2      We have that clear, right?
3  A  Yes, but it also says, "2014" on the label for ovarian
4  cancer.
5  Q  It does, but it also says that it was revised and
6  published in 2018, right?
7      I don't want to argue with you, but it does say that
8  was revised and published in 2018, true?
9          MS. PARFITT:  Objection; form.
10 Q  (By Mr. Williams)  Go ahead.
11 A  To my knowledge, the content was not changed.
12     I am not sure exactly why it was called "Revised,"
13 except that everything was put together and the
14 recommendations were added to this obviously, the overall
15 cancer recommendations, but to my knowledge the
16 meta-analysis for the nutrition variables and all were
17 not updated.
18     Clearly this review of other potential causes was
19 not updated, so in my mind it's the 2014 report.
20 Q  Now, let me focus you back on the lack of connection
21 between early menarche, nutrition, and physical activity,
22 and diet, okay?
23     Whether you believe this was a complete analysis or
24 not, the fact is that this report, which is marked as
25 Exhibit No. 5, does discuss menarche, not bearing

## Page 155

1  children, and late menopause, right?
2          MS. PARFITT:  Objection; form.
3          THE WITNESS:  It does include those,
4  and it's missing other risk factors for ovarian cancer.
5  Q  (By Mr. Williams)  So the statement "Epidemiological
6  principles" in this report, and those that we looked at
7  in other exhibits, Exhibit 4 and Exhibit No. 10, do apply
8  to your analysis of talc and ovarian cancer in this case,
9  right?
10     They do apply to things that are not limited to
11 nutrition, physical activity, and diet, correct?
12         MS. PARFITT:  Objection; form,
13 misstates her testimony.
14         THE WITNESS:  I am curious, what is
15 the statement "epidemiologic principles"?  Are you
16 referring to something in this ovarian cancer report?
17 Q  (By Mr. Williams)  Let me ask it this way:
18     Why is it that nutrition is a totally separate
19 context than talc?
20     Explain, if you would, to the Court, who is the
21 person who is going to review this-- describe to the
22 Court how nutrition is a separate context than talc, with
23 particular attention, Dr. McTiernan, to the notion that
24 nutrition, what someone eats and takes into their body,
25 is a modifiable behavior in the same manner that using

## Page 156

1  talc or not using talc is a modifiable behavior.
2      If you would, with your answer, as you describe how
3  you think these are unrelated and different contexts, how
4  is it that those contexts are different for purposes of
5  the analysis that you have done in this case?
6          MS. PARFITT:  Objection; form.
7          THE WITNESS:  So this is an issue
8  about measuring the exposure.
9      If you ask about talcum powder product use, you
10 typically are asking about something that is used once or
11 twice a day.
12     Somebody may just use one product.  Perhaps they use
13 more, but they're not going to be using as many variables
14 as in nutrition.
15     Assessing nutrition is extremely difficult.
16     Assessing nutrition for a lifetime is even more
17 difficult, and so this is why for case-control studies
18 nutrition analyses are very difficult to do if you are
19 trying to ask somebody retrospectively, "What did you eat
20 when you were in your 20s?"
21     You can ask somebody whether they used some products
22 in their 20s and expect their recall to be much better
23 than what they ate 30, 40 years ago because we are always
24 talking about decades of latency between exposure and
25 development of ovarian cancer.

## Page 157

1      Case-control studies can be done for numbers of
2  exposures, and they can be-- characterize exposure very
3  well, but nutrition is a special case.
4      Some epidemiologists still do case-control
5  studies of nutrition, but some, like-- because there are
6  so many cohort studies available in nutrition, some
7  epidemiologists prefer to look at that, especially when
8  you're looking at a cancer that has a long latency
9  period, and so you are looking for long integral between
10 when the exposure happened and when the cancer occurred.
11 Q  (By Mr. Williams)  Have you completed your answer?
12 A  Pardon me?
13 Q  Have you completed your answer?
14 A  Yes.
15 Q  Anything else that you want to add about the differences
16 between the context of nutritional and dietary concerns
17 versus the use of talcum powder?
18 A  I think that's it.
19 Q  Okay.  Why is it harder to remember-- strike that.
20     Why would it be harder for me or anyone else to
21 remember the types of foods I ate in my teens or my 20s
22 as compared to whether I used talcum powder during a
23 particular time in my life?
24 A  When you ask people about nutrition, you don't just ask
25 one question, "How often did you eat beef?"

Anne McTiernan, Ph.D

## Page 158

1    You are asking them for multiple types of foods, how
2    often they ate it, how much they ate it.
3        We often use food frequency questionnaires that can
4    be 12 pages long, each with about 20 to 30 items on them,
5    and to ask about-- somebody to recall that much
6    information retrospectively is more difficult than to ask
7    them to recall using one item.
8        Medications, we can often get information
9    retrospectively, like hormone therapy.  We can ask that
10   about that case-control studies and help the woman
11   remember, but because it was one pill that the woman had
12   to take per day, it is an easier thing to remember than
13   50 to 100 variables that you have to remember with a
14   dietary recall.
15  Q  Do you think it would be easier for a woman to recall
16   that she used talcum powder during her 20s than it would
17   be for her to recall that she ate red meat in her 20s?
18  A  I think it would be easier in the sense that people are
19   going to remember something that intimate, how often--
20   whether they used it or not, and we don't ask people just
21   one question, "Did you eat red meat?"
22       We ask them hundreds of questions of what they ate.
23  Q  Do you ask hundreds of questions about red meat?
24  A  We don't usually do studies with just red meat.
25       We do studies where we are asking about entire

## Page 159

1    dietary pattern.
2        I don't know of any study that asks just that one
3    question.
4   Q  These studies that relate to talcum powder refer often to
5    multiple products and substances that a person puts on or
6    in her body; do they not?
7        MS. PARFITT:  Objection; form.
8        THE WITNESS:  From the questionnaires
9    that I've looked at from these studies, when they're
10   available, they are much simpler questions, and often
11   they were assisted with remembering by in-person
12   interview or telephone interview with someone that is
13   helping them remember what they did during that period of
14   life.
15       That can be used for a simple question, simple
16   exposure.
17       For diet, it's much more difficult.
18  Q  (By Mr. Williams)  I understand that some questionnaires
19   may be longer than others, but with respect to an
20   individual question, that is whether someone ate red meat
21   in their 20s or someone used talcum powder in their 20s,
22   do you really see those questions as-- one of those
23   questions as more complicated than the other, taken
24   individually?
25       MS. PARFITT:  Objection to the form.

## Page 160

1        THE WITNESS:  I think if you wanted to
2    see if-- if you had just that one question, what somebody
3    ate, what meat they ate, a case-control study would be
4    just fine, you could ask somebody what they ate in the
5    past if it's just one variable.
6        If you're asking them to remember 50 to 100
7    variables, it's much more difficult.
8   Q  (By Mr. Williams)  Have we exhausted all of the reasons
9    why you believe that the context of this Exhibit No. 5,
10   this CUP update, is totally different, as you said, than
11   the context of the talc-related studies?
12       Is there anything else that you need to add to your
13   answer?
14  A  I can't think of anything.
15  Q  Pardon me?
16  A  I can't think of anything, no.
17  Q  Let me change topics slightly.
18       As an epidemiologist, you are familiar with a type
19   of bias called confounding, right?
20  A  Yes.
21  Q  Confounding is a type of bias that occurs when a third
22   variable interferes with a true relationship between an
23   exposure and an outcome, right?
24  A  Yes.
25  Q  Those are the words you used in your report, right?

## Page 161

1   A  Mm-hm.
2   Q  "Yes"?
3   A  Yes.
4   Q  A confounder is one that is related both to the risk
5    disease and to the exposure, correct?
6   A  That's correct.
7   Q  The classic example that you use in your report is people
8    who carry matches are more likely to develop lung cancer
9    than individuals who do not carry matches, right?
10  A  Correct.
11  Q  In that example, the cause and effect relationship, the
12   true one, is not between matches and lung cancer, but
13   rather between smoking and lung cancer, correct?
14  A  Correct.
15  Q  Correlation does not equal causation, correct?
16       The two do not equate?
17  A  I wouldn't go from one to the other, so-- this just means
18   that there's another variable explaining an association
19   in the first example, which is confounding.
20  Q  Do you believe that correlation and causation mean one in
21   the same thing when you are dealing with epidemiological
22   studies?
23  A  I don't usually use the word "correlation."
24       Association is one thing we look at when we're
25   trying to determine if there's a causal relationship.

Anne McTiernan, Ph.D

Page 162

1  Q  What I'm juxtaposing is correlation on the one hand and
2     causation on the other.
3        Do you have my question in mind?
4  A  I see it here, yes.
5  Q  Do you believe that correlation is identical to
6     causation?
7           MS. PARFITT:  Objection; asked and
8     answered.
9           THE WITNESS:  I think by "correlation"
10    you mean "association."
11 Q  (By Mr. Williams)  I mean a correlation between two
12    variables.
13          MS. PARFITT:  Objection; form.
14          THE WITNESS:  Yeah, I think
15    correlation is one way that two variables can be related,
16    and causation is a much more complicated analysis.
17 Q  (By Mr. Williams)  Same question with respect to
18    association.
19       Does association equate with causation?
20 A  I would say the same thing, association is part of causal
21    analysis.
22 Q  So in a paper studying the association between
23    match-carrying, for example, and lung cancer, you would
24    need to adjust for smoking before making any conclusions
25    about the risk estimates, true?

Page 163

1  A  I think usually we would want to look at it the other
2     way.
3        If you're looking at-- you wouldn't adjust for it
4     necessarily.  You might make sure to be aware that it's
5     part of the causal-- part of the pathway.
6        If you totally adjust for it, then it might make the
7     relationship disappear, so perhaps it's not the best
8     explanatory variable to use-- the best example, but the
9     premise is that there can be a second variable that can
10    be interfering with the relationship, which is why we
11    adjust for things that can potentially be related to both
12    the exposure and to the disease.
13 Q  And the second variable in the example that I used and
14    that you used in your report was that variable of whether
15    someone smokes?
16 A  Yes.
17 Q  In addition to the variable of their having matches
18    often, right?
19 A  Yes.
20 Q  And one of the studies that you gave us this morning is a
21    study written by Ulrik, U-L-R-I-K S. Kesmodel,
22    K-E-S-M-O-D-E-L.
23       Do you remember giving that one to us this morning?
24 A  Is this in the list?
25 Q  It was in the-- I'm sorry, it was identified on the list

Page 164

1     that Counsel gave you and produced to us on January 25th,
2     a few days ago.
3        Do you see that on the list?
4  A  No.
5     Which list is this?
6           MS. PARFITT:  If I may, Counsel, I
7     will hand her Exhibit No. 3.
8           THE WITNESS:  Oh, Kesmodel?
9           MR. WILLIAMS:  Yes.
10          THE WITNESS:  Yes.
11 Q  (By Mr. Williams)  So Kesmodel is one of the studies that
12    was provided to us, Defense counsel, by Plaintiffs'
13    counsel on January 25th, correct?
14 A  Is that the date?
15 Q  That's the date we received it.  I will represent that to
16    you.
17 A  Okay.
18 Q  Have you read that study?
19 A  Yes.
20 Q  We'll mark that as Exhibit No. 12.
21          (Exhibit No. 12 marked
22           for identification.)
23 /////
24 Q  (By Mr. Williams)  I will just refer you quickly to the
25    abstract on the first page of Exhibit No. 12, the

Page 165

1     Kesmodel study.
2        About three-quarters of the way down, the abstract
3     paragraph, it says, "Misclassification of confounders is
4     an issue that needs special attention by researchers, as
5     failure to measure accurately one or more strong
6     confounders may seriously bias the observed results."
7        Did I read that correctly from the abstract?
8  A  Yes.
9  Q  In the case of talcum powder use and the epidemiological
10    studies that you've reviewed, a confounder is one that is
11    related to ovarian cancer and perineal talc use, correct?
12 A  Correct, within that data set, yes.
13 Q  You agree that high body mass index, or BMI, is an
14    established risk factor for ovarian cancer, true?
15 A  It is a risk factor, yes.
16 Q  And the WCRF document that we looked at this morning,
17    that actually said that body mass index is probably a
18    cause of ovarian cancer.
19       Do you remember that this morning?
20          MS. PARFITT:  Objection.
21          THE WITNESS:  Yes.
22 Q  (By Mr. Williams)  Body mass index is a measure of weight
23    as compared to a measurement of height, right?
24 A  Yes.
25 Q  Now, the Continuous Update Project, for which you served

Anne McTiernan, Ph.D

Page 166

1    as a panel member, has actually concluded that body mass
2    index is a probable cause.
3        That was Exhibit No.-- I believe it was Exhibit
4    No. 5 from this morning.
5        Do you remember that?
6    A  I believe so.
7        Yes.
8    Q  In May 2018, after you were hired by Plaintiffs' lawyers
9    in the talc litigation, you wrote an article concluding
10   that there was strong evidence that being overweight or
11   obese increased the risk for cancers.
12       Do you remember that?
13       That was Exhibit No. 9 that we talked about this
14   morning.
15           MS. PARFITT:  Sorry, Exhibit No. 9?
16           MR. WILLIAMS:  Yes.
17           THE WITNESS:  The article--
18   Q  (By Mr. Williams)  The article that had your picture on
19   it this morning, Exhibit No. 9 that we showed you--
20   A  Oh, press--
21   Q  It's 9.
22       On the second page in the first paragraph it says
23   that the latest report found strong evidence that being
24   overweight or obese increased the risk for a number of
25   things, and one of the things that is mentioned is cancer

Page 167

1    of the ovary, right?
2            MS. PARFITT:  Objection.
3            THE WITNESS:  Yes.
4    Q  (By Mr. Williams)  Okay.  Talc use is associated with
5    higher body mass index, true?
6    A  I have not investigated that.
7        I did not do a review on body mass index and talc
8    use.
9    Q  The observation that talc use is associated with higher
10   body mass index is something that was noted in many of
11   the studies that you reviewed for purposes of your work,
12   right?
13           MS. PARFITT:  Objection.
14           THE WITNESS:  I didn't focus on body
15   mass index and talc use.
16   Q  (By Mr. Williams)  Let me ask--
17   A  If you have something to point to, we can look at it.
18   Q  Let's look at the Gertig 2000 study.  We have talked
19   about that one today.
20       This is going to be Exhibit No. 13.
21           (Exhibit No. 13 marked
22            for identification.)
23   /////
24   Q  (By Mr. Williams)  Do you have the Gertig study in front
25   of you, what we have marked as Exhibit No. 13?

Page 168

1    A  Yes.
2    Q  Let me direct you to Page 250, which should be the second
3    page of the copy that was handed to you, the left-hand
4    column, first paragraph, last sentence-- hold on.  I am
5    trying to find the citation.
6        Under the results section on that page, Page 250, do
7    you see that first paragraph?
8    A  Yes.
9    Q  The last sentence there says, "Talc use was associated
10   with higher body mass index and inversely associated with
11   current cigarette smoking."
12       Do you see that?
13   A  Yes.
14   Q  Talc use, this study found, was associated with higher
15   body mass index, true?
16       That's what it says?
17   A  It doesn't give us any statistics on it, but if you look
18   at the table, you can see a slight association, yes.
19   Q  Well, Table No. 1 does give us some information, correct?
20           MS. PARFITT:  Objection; form.
21           THE WITNESS:  It doesn't give us any P
22   values of how different it was.  It doesn't give us
23   percents, but-- yeah.
24   Q  (By Mr. Williams)  Okay.  And do you remember that in the
25   Cramer 1999 paper, that you rely upon, said that

Page 169

1    characteristics, such as body odor or excessive
2    perspiration, might predispose to both talc use and
3    ovarian cancer, but adjusting for BMI should control for
4    those effects.
5        Do you remember that?
6            MS. PARFITT:  Counsel, do you have a
7    copy of Cramer 1999 or could we get that?
8            MR. WILLIAMS:  I am just asking if she
9    remembers it now, and if she doesn't--
10           THE WITNESS:  I don't recall.  I would
11   have to look at it.
12           (Exhibit No. 14 marked
13            for identification.)
14
15   Q  (By Mr. Williams)  We will mark the Cramer 1999 study as
16   Exhibit No. 14.
17       I will direct your attention to the page that has in
18   the upper right-hand corner "355," the left-hand column,
19   second paragraph, the one that begins with, "Regarding
20   potential."
21       About midway down that paragraph it says,
22   "Characteristics such as body odor or excessive
23   perspiration might represent subtle constitutional
24   features that might predispose to both talc use and
25   ovarian cancer, but adjusting for BMI should control for

43 (Pages 166 to 169)

Anne McTiernan, Ph.D

| Page 170 |
|---|

1    these effects."
2         Do you see that?
3    A  Yes.
4    Q  Does it make sense to you, separate and apart from these
5        studies that I've shown you, that people who use talc on
6        their bodies, including people who use talc in their
7        perineal area, do so to absorb sweat and other moisture?
8    A  I didn't do a survey of why people use this.
9         It's not clear that only people who sweat and have
10       body odor are choosing to use body powders, so this isn't
11       a substantial sentence.
12        I'm not quite clear.
13        One statement it has about-- that it may predispose
14       to ovarian cancer, I don't know of any literature
15       associating body odor or perspiration for risk of or even
16       early diagnosis of ovarian cancer, so I'm confused by
17       that.
18   Q  Well, let me ask you to make an assumption then.
19        If you make an assumption for me that BMI increases
20       the risk for ovarian cancer, and you further make the
21       assumption that more talc users have high BMI than
22       nontalc users, do you believe that studies looking at
23       talc and ovarian cancer should adjust for BMI?
24            MS. PARFITT:  Objection; form,
25       misstates the evidence.

| Page 171 |
|---|

1             THE WITNESS:  So we see in one study--
2    I did not do a full review of all these studies, and I
3    don't believe the data was available in all of them the
4    way the Nurses' Health Study presented, which showed body
5    moss index-- in all of the studies, and I didn't do a
6    survey to look at the association between body mass index
7    and talc use.
8         I can see from these data in the Gertig study that
9    it wasn't a confounder.
10        They adjusted for it, but if you look at Table No. 2
11   in the Gertig paper, the age-adjusted relative risk is
12   very similar to the multivariate adjusted relative risk.
13        The multivariate adjusted relative risk included
14   body mass index, so this tells me that it's unlikely to
15   be any or extremely little confounding when you see such
16   a similar result for age-adjusted relative risk as you do
17   for multivariate relative risk.
18   Q  Just so we are clear, you are looking right now at
19   Exhibit No. 13, the Gertig study?
20   A  Sorry. Yes.
21   Q  Table No. 1 on Page 250, correct?
22   A  Table 1 and Table 2.
23        Table 1 shows the association of BMI versus talc
24   use.
25        Table 2 shows the relative risk, age adjusted and

| Page 172 |
|---|

1    multivariate adjusted.
2         If it was confounding from any of these variables
3    that they adjusted for, you would see very big
4    differences or much more marked than you see between
5    age-adjusted relative risk and multivariate adjusted
6    relative risk.
7    Q  Now, have you done the analysis to determine whether or
8        not BMI was associated with greater talc use or whether
9        BMI was associated as a confounder in terms of causing a
10       higher odds ratio or risk ratio in the Gertig study?
11   A  Did I personally do any statistics on these?  I didn't
12       have the data to do the statistics, but you can see that
13       its multivariate relative risk is so similar to
14       age-adjusted relative risk.  That means that it is not
15       confounding in the data.
16   Q  Did you do that analysis as part of your work?
17            MS. PARFITT:  Objection; asked and
18       answered.
19            THE WITNESS:  I am doing it right now.
20   Q  (By Mr. Williams)  Did you--
21   A  Since you pointed it out.
22   Q  Did you do that analysis as part of your work--
23   A  When I presented relative risk, I tended to present the
24       most adjusted relative risk I could find, I believe.
25        That's what I tried to do.

| Page 173 |
|---|

1    Q  You reviewed three cohort studies in connection with your
2        report, according to you, because you count Gates 2008
3        and Gates 2010 as part of Gertig, correct?  So that
4        counts as one, right?
5    A  I believe those cases-- those two other cases that were
6        in the second-- you are talking about the second Nurses'
7        Health Study, the Gates 2008?  I believe those 2010 were
8        in the first one, but they're never quite clear.
9    Q  Let me start over.
10   A  Sorry.
11   Q  I don't want to quibble with you.
12        You reviewed Gertig 2000, Houghton 2014, and
13   Gonzalez 2016, correct?
14   A  That's correct.
15   Q  You also reviewed Gates 2008 and Gates 2010, correct?
16   A  Correct.
17   Q  Each one of those studies found no overall statistically
18       significant association between perineal talc use and
19       ovarian cancer?
20            MS. PARFITT:  Objection.
21   Q  (By Mr. Williams)  I am not asking about serous invasive,
22       as you went to before.
23        I am talking about overall perineal task use.
24            MS. PARFITT:  Objection.
25   Q  (By Mr. Williams)  Correct?

Anne McTiernan, Ph.D

## Page 174

1    MS. PARFITT: Objection; form.
2    THE WITNESS: And the sample sizes
3 were too small to be able to determine statistical
4 significance with that level of relative risk.
5 Q  (By Mr. Williams) It was a consistent finding of those
6 cohort studies that there was not a statistically
7 significant association between perineal talc use overall
8 and ovarian cancer, right?
9    MS. PARFITT: Objection; form, asked
10 and answered.
11    THE WITNESS: The studies were not
12 large enough.
13    There were not enough cases to determine statistical
14 significance or to have a statistically significant
15 result.
16 Q  (By Mr. Williams) Is it your testimony that those
17 studies found a statistically significant association
18 overall between perineal talc use and ovarian cancer?
19    MS. PARFITT: Objection; form.
20    Counsel, that has been asked now about three or four
21 times.
22    I think she has given an answer.
23    I know you don't like it, but she has responded.
24 Q  (By Mr. Williams) Are you saying that those studies
25 found a statistically significant association between

## Page 175

1 perineal talc use and ovarian cancer?
2    MS. PARFITT: Objection, form.
3    Again, a fifth time asked and answered.
4    THE WITNESS: I am saying that they
5 did not have a large enough sample size to find a
6 statistically significant association.
7 Q  (By Mr. Williams) Identify for us on the record any
8 cohort study that concluded that there was a
9 statistically significant overall association between
10 talc and ovarian cancer.
11 A  I can't identify any.
12 Q  In forming your opinions in this litigation, did you take
13 note of the fact that each of those cohort studies
14 accounted for body mass index or BMI?
15 A  I believe I did not go through specific-- I am sure I
16 didn't go through specific confounding variables.
17    I just noted that they adjusted for potential
18 confounders and presented the most adjusted variable.
19 Q  Your written report does not take note of the fact that
20 each of the cohort studies you reviewed accounted for
21 body mass index, did it?
22    MS. PARFITT: Objection; form.
23    THE WITNESS: No, I didn't note one
24 particular variable for adjustment.
25 Q  (By Mr. Williams) Without reviewing the studies, are you

## Page 176

1 able to tell us, as you sit here, how many of the
2 case-control studies that you read and reviewed and are
3 relying on in this case do not adjust for body mass
4 index?
5    MS. PARFITT: Objection; form.
6    THE WITNESS: No, I did not count
7 that.
8 Q  (By Mr. Williams) Why not?
9    MS. PARFITT: I'm sorry, what was the
10 question?
11 Q  (By Mr. Williams) Why not?
12    MS. PARFITT: Objection.
13    THE WITNESS: I was tasked to look at
14 the overall association.
15    I did not look at specific confounders for each of
16 the studies.
17 Q  (By Mr. Williams) So if there were a confounder that
18 could impact the answer to the question of whether
19 perineal use of talcum powder causes cancer, you didn't
20 look at it?
21    MS. PARFITT: Objection; form,
22 misstates the testimony.
23    THE WITNESS: There could be
24 confounding variables in any type of research that may or
25 may not be available.

## Page 177

1    I noticed in the Gertig study, the data that we just
2 talked about, that body mass index was not a confounder,
3 so that gives me some-- at least in one data set, that it
4 wasn't an issue, nor would the other variables adjusted
5 for have been confounders because the multivariate
6 relative risk is so similar to the age-adjusted relative
7 risk.
8 Q  (By Mr. Williams) Did the Gertig study conclude what you
9 just said?
10 A  I think I just presented it.
11 Q  While you are reading, Doctor, I just want to be clear
12 with what my question is.
13    My question is:
14    Did-- strike that.
15    Where in the Gertig study did the Gertig study say
16 or conclude that BMI is not a confounder for talc use?
17 A  It's a general epidemiologic principle that if you see
18 similar results for the multivariate relative risk that
19 you see with just a-- either an unadjusted or in this
20 case age-adjusted relative risk, that the confounding
21 variables that were adjusted for in the multivariate are
22 unlikely to be confounders.
23    If they were, the data would look different.
24 Q  Have you completed your answer?
25 A  Yes.

45 (Pages 174 to 177)

Anne McTiernan, Ph.D

Page 178

1   Q  Did the Gertig study expressly state that BMI is not a
2       confounder for talc?
3              MS. PARFITT:  Objection; asked and
4       answered.
5              THE WITNESS:  I don't see that they
6       said that, but the data are showing it to me.
7   Q  (By Mr. Williams)  In forming your opinions in this
8       litigation, you did not do any analysis of whether the
9       studies that you relied upon adjusted for body mass
10      index, correct?
11  A  I didn't enumerate that, no.
12  Q  I would like to ask you about another type of study, the
13      meta and the pooled analyses.
14         You rely significantly on those study types,
15      correct?
16  A  That's correct.
17  Q  For the meta and the pooled analysis, the ones with the
18      combined data, you believe that the summary relative
19      risks for any talc use versus no talc use were
20      consistent, true?
21  A  Yes, I want to look at the--
22  Q  For reference, in your report, Exhibit No. 2 at Page 56.
23  A  I want to look at the papers too.
24  Q  I am just asking about your report, not the papers yet.
25         As far as your report is concerned, you believe that

Page 179

1       the summary of relative risks for any talc use versus no
2       talc use are consistent, right?
3   A  And where are you, Page 56?
4   Q  Page 56, the top paragraph, middle of the paragraph,
5       sentence starting with, "The summary relative risks,"
6       about four lines down.
7   A  "Were quite consistent," yes, I wrote that.
8   Q  Are there other ways in which the meta and the pooled
9       analyses are consistent, in your opinion?
10  A  I am not sure what you're asking.
11  Q  Well, in addition to the notion that the relative risks
12      were quite consistent, in your opinion, across the meta
13      and the pooled analyses, were there any other ways in
14      which those meta and pooled analyses were consistent, any
15      other hallmarks of a consistency, other than the relative
16      risk rates that you found notable?
17  A  I think if you could give some examples-- one--
18  Q  I am just asking you for your expert opinion.
19  A  One thing that is consistent is that for the two
20      meta-analyses that are most recent, which is why I put
21      most weight on them, they have all of the previous
22      studies included, is that they included the same study,
23      so that's similar between those two meta-analyses,
24      Penninkilampi and Berge.
25         The pooled analysis was a subset of those

Page 180

1       case-control studies, the eight case-control studies,
2       plus three previous and published studies.
3   Q  You did not perform your own meta-analysis, right?
4   A  No, I didn't.
5   Q  One of the reasons you did not perform your own
6       meta-analysis was because you believe that there were
7       two, in your words, excellent meta-analyses that had
8       recently been published, Penninkilampi and Berge,
9       correct?
10  A  Correct.
11  Q  "Penninkilampi" is spelled P-E-N-N-I-N-K-I-L-A-M-P-I.
12      That was from 2018, correct?
13  A  Yes.
14  Q  And the Berge analysis, B-E-R-G-E, was from 2017?
15  A  Yes.
16  Q  You believe that those two studies are consistent with
17      one another?
18  A  Yes, they have very similar results.
19  Q  Do you believe they support your opinion in the case that
20      perineal talcum powder can cause ovarian cancer?
21  A  Yes.
22  Q  Let me show you the Penninkilampi study.  We'll mark it
23      as Exhibit No. 15, I believe.
24              (Exhibit No. 15 marked
25                  for identification.)

Page 181

1
2   Q  (By Mr. Williams)  Do you recognize Exhibit No. 15,
3       Penninkilampi 2018, as one of the two studies that you
4       described as excellent and supportive of your opinions?
5   A  Yes.
6   Q  Do you know the source or sources of funding for this
7       paper?
8   A  No, I don't.
9   Q  Do you personally know who the author is?
10  A  No, I don't.
11  Q  Do you know what, if any, conflicts of interest any of
12      the authors may have?
13  A  I am just looking to see.
14         They claim no conflicts of interest.
15  Q  Do you know whether some of the authors are serving as
16      consultants to Plaintiffs' counsel in this litigation?
17  A  No, I don't.
18  Q  Do you have any criticisms of the Penninkilampi 2018
19      meta-analysis?
20              MS. PARFITT:  Objection; form.
21              THE WITNESS:  I think the only issue
22      that I see are based on all of the-- all of the
23      meta-analyses had this issue that depends on what results
24      were available from the source studies, so if there
25      weren't many studies that could do-- that could look at

Anne McTiernan, Ph.D

Page 182

1    subgroups, for example, or if there weren't enough--
2    wasn't enough information to do dose response-- but by
3    doing a meta-analysis, you have the best chance of being
4    able to look at these because in the individual study
5    those variables are-- the numbers of people within
6    particular subgroups is going to be too small to be able
7    to do an analysis.
8    Q   (By Mr. Williams)  Did you do an independent verification
9        of the data that the Penninkilampi study reports in--
10       strike that.
11           Did you do an independent verification that the data
12       that this study reports is indeed accurate?
13   A   Did I do a meta-analysis myself on statistics?  I did
14       not.
15   Q   No, just whether the data that is reported accurately
16       reflects what was reported in the study's records.
17   A   So there was a supplementary data table for this, I
18       assume.
19           I am pretty sure I looked at that and then compared
20       the relative risk that I abstracted onto my data table,
21       and I believe they were similar, but I don't see
22       supplementary data here.
23   Q   Take a look at Page 46 of the document in the lower
24       left-hand corner, Page 46 of Exhibit No. 15.
25           Do you see that the Penninkilampi study includes,

Page 183

1    for each study, a purported odds ratio, a lower limit and
2    an upper limit?
3    A   Yes.
4    Q   Did you go back to the individual studies to verify that
5        the numbers were recorded accurately?
6    A   I didn't compare the lower and upper limit of the
7        confidence interval.
8    Q   Would it be important to you, in determining that a study
9        is excellent, that the authors accurately report the odds
10       ratio and the confidence intervals?
11   A   I think that would be useful, but for a meta-analysis,
12       the data that goes into it, to my knowledge, are the odds
13       ratios and the sample size, so I am not sure what
14       variable-- which particular study you're talking about is
15       not reported correctly.
16   Q   I am asking you whether it's important, not just whether
17       it's notable.
18           Would it be important to you, in determining--
19       concluding that a study is excellent, that the authors
20       accurately report the odds ratios and the confidence
21       intervals; that is, if they get it wrong, that's not the
22       sign of an excellent study, right?
23           MS. PARFITT:  Objection; form.
24           THE WITNESS:  I think in many studies
25       there may be occasional data that are transformed not

Page 184

1    correctly that are implemented.
2        What I'm most intrigued by, all the cohort studies I
3    reviewed, all seven of them, come up with just about the
4    same overall relative risk of ever-use of talcum powder
5    products and risk of ovarian cancer.  It is consistently
6    1.25 to 1.3, and that tells me that this is a robust
7    finding because you see it in so many of these studies.
8    Q   (By Mr. Williams)  Would you expect the association for
9        long-term perineal talc use, say more than ten years, to
10       be greater than, the same, or less than the association
11       for any talc use, which could include a single use?
12   A   I would say it depends on what the individual study had
13       in terms of sample size within categories.
14           It really depends on sample size, and it depends on
15       what the data look like.
16           It's a difficult question to answer.
17   Q   Take a look at Page 46, Figure No. 2 of the Penninkilampi
18       study, Exhibit No. 15.
19           Do you see the explanation of the tables in Figure
20       No. 2?
21           Do you see that Table A refers to odds ratios for
22       any perineal talc use?
23   A   Yes.
24   Q   And the odds ratio for the combined data, the data for
25       any talc use in Table A, is 1.31?

Page 185

1        Do you see that?
2    A   Yes.
3    Q   Now look at Table B.
4        Do you see that this table refers to long-term
5        perineal talc use?
6    A   Yes.
7    Q   The odds ratio for that combined data, the data for
8        long-term use, is 1.25.
9        Do you see that?
10   A   Yes.
11   Q   So as between Penninkilampi's reported overall
12       association for any talc use, on the one hand, and its
13       reporting for long-term talc use on the other, which one
14       reflects a higher risk rate or odds ratio?
15   A   I would say they're very similar, 1.31 and 1.25, because
16       the confidence interval include both, so the confidence
17       interval in the top, 1.24 to 1.39, also includes the
18       bottom odds ratio of 1.25.  That tells me they're very
19       similar.
20   Q   Doctor, I am just asking you a simple question.
21           I asked you which one reflects a higher risk rate.
22           MS. PARFITT:  Objection; form, asked
23       and answered.
24           THE WITNESS:  I am answering as an
25       epidemiologist.

47 (Pages 182 to 185)

Anne McTiernan, Ph.D

Page 186

1      We would see those answers as quite similar.
2   Q  (By Mr. Williams)  So epidemiologists would say that 1.31
3      and 1.25, with the confidence intervals there, are the
4      same?
5   A  I wouldn't say they're the same.
6   Q  So which one--
7          MS. PARFITT:  Counsel, please let her
8      finish.
9      Thank you.
10         THE WITNESS:  We wouldn't say they're
11     the same, but we would state they could be similar.
12         1.31 is clearly larger than 1.25, but they could
13     be-- because of those confidence intervals, they could be
14     similar numbers.
15  Q  (By Mr. Williams)  When you evaluated the Penninkilampi
16     study, did you take note that the authors omitted certain
17     cohort data?
18         MS. PARFITT:  Objection; form.
19         THE WITNESS:  I noted that they
20     included one paper from each study, which is really
21     important.
22     If you include more than one paper from each study,
23     then you're over-counting or counting cases or noncases a
24     second time.
25     It's really important to only have one cohort

Page 187

1      represented in each of these meta-analyses.
2   Q  (By Mr. Williams)  But if there had been additional
3      cohorts after the first cohort, wouldn't it make sense to
4      use the last one rather than the first?
5          MS. PARFITT:  Objection; form.
6          THE WITNESS:  I think you are talking
7      about the Nurses' Health Study.
8   Q  (By Mr. Williams)  I am.
9   A  Whether they included the first one or the third one,
10     because the second one wouldn't do them any good.  There
11     are only 200 cases.  We don't know how they picked those.
12     The third one, as I mentioned earlier, the problem
13     with the third one is it used a different comparison to--
14     than the first one.
15     They are not comparing no-use versus ever-use.
16     They're comparing no-use plus less-than-once-a-week
17     versus higher levels, so you want to compare, as much as
18     possible, nonusers versus users, which is-- they are
19     trying to look at any ovarian-- sorry, any perineal talc
20     use in the Category A would be more accurate to use the
21     first Nurses' Health Study.
22  Q  Should I take your last answer to mean that you believe
23     it is a good thing that the Gates 2000 study was omitted
24     from the Penninkilampi analysis?
25         MS. PARFITT:  Objection; form.

Page 188

1      misstates her testimony.
2          THE WITNESS:  I would say because of
3      the variable used, it was reasonable that they picked the
4      Gonzalez, the first one.
5          If the data had been collected in an identical way,
6      then the third one would have been incorporated.
7   Q  (By Mr. Williams)  Did the study explain that that was
8      the reason why they omitted the Gates 2010 study?
9   A  I can't remember.
10     I think they had an appendix.
11     They talk about an appendix here with their
12     rationale.
13  Q  We can check it later, but as you sit here today, can you
14     remember any reference to--
15  A  I can't recall--
16  Q  Let me finish the question, if I could.
17     Doctor, can you remember any reference, as you sit
18     here, to the notion that they noted, in Penninkilampi,
19     that they were not using the data from Gates 2010?
20         MS. PARFITT:  If you need to consult
21     the document, please do.
22         MR. WILLIAMS:  My question is not
23     asking her to read it.
24  Q  (By Mr. Williams)  My question is whether you remember
25     it?

Page 189

1          MS. PARFITT:  Without reading the
2      document, do you recall?
3          THE WITNESS:  I don't recall.
4   Q  (By Mr. Williams)  Take a look at Figure No. 2, Table C
5      of Page 46 of that study.
6      Do you see that it describes the purported
7      association for increased risk of serous ovarian cancers?
8   A  Yes.
9   Q  And that's reporting the original Berge study from 2010,
10     right?
11  A  2000?  Berge 2000?
12  Q  Excuse me, not 2010.  Pardon me.
13     2000-- Berge 2000?
14  A  Yes.
15  Q  As you sit there, you don't know-- you don't recall any
16     explanation for the omission of the Gates 2010 data,
17     right?
18         MS. PARFITT:  Objection; form.
19         MR. WILLIAMS:  I'm sorry, did I get an
20     answer to that one?
21         MS. PARFITT:  No.  She-- I think she
22     is reading the document.
23         THE WITNESS:  Sorry.
24         MS. PARFITT:  Take your time.
25         MR. WILLIAMS:  My question-- well,

48  (Pages 186 to 189)

Anne McTiernan, Ph.D

Page 190

1  hold on.
2      Counsel, that just eats up the time.
3  Q  (By Mr. Williams)  I am asking-- Doctor--
4          MS. PARFITT:  Counsel, you asked--
5          MR. WILLIAMS:  Let me finish--
6          MS. PARFITT:  Let me finish.
7      You asked her in the middle of a question-- she
8  hasn't answered it.
9      Your question is right there.
10     She hadn't answered it.
11     She is reading the document.  That's reflected on
12  the camera.
13     Give her-- if you want an answer to the question,
14  give her an opportunity--
15  Q  (By Mr. Williams)  Here is the problem, Doctor--
16         MR. WILLIAMS:  Are you done, Counsel?
17         MS. PARFITT:  I am.
18  Q  (By Mr. Williams)  Here is the problem, Doctor:
19     If I ask a question that is separate and apart from
20  the document in front of you, and you choose to just read
21  the entire document, all of our time is lost, so when I
22  specifically ask you what you remember as you sit there,
23  I would ask you not to read the document because that's
24  not part of the question.
25     Is that okay with you?

Page 191

1          MS. PARFITT:  Counsel, that's actually
2  not okay as a question.
3      If the question is asking if this is a memory
4  contest-- when she has the document in front of her, why
5  aren't you allowing her to refer to the document?
6      It's not a memory contest.
7  Q  (By Mr. Williams)  Here is my question, Doctor:
8      As you sit here, do you remember, one way or the
9  other, whether the Penninkilampi study explains why it
10  omitted any reference to the data from the Gates 2010
11  report--
12         MS. PARFITT:  And I'm going to again
13  object.
14      Counsel, if she needs to look-- are you suggesting
15  she can't look at the document to refresh her
16  recollection?  Is that what you want the record to
17  reflect.
18  Q  (By Mr. Williams)  You may answer, Doctor.
19         MS. PARFITT:  Take your time, Doctor.
20         THE WITNESS:  Looking at the methods
21  here, I don't see that they've mentioned here why they
22  chose particular studies.
23      I do know that it's standard for meta-analysis to
24  only include one study from a cohort.
25      If you included more than one, it would be

Page 192

1  considered improper-- improper methodology.
2      Usually these meta-analyses, and I believe they had
3  it too, usually they will have supplementary data that's
4  available also that will give more of their methods and
5  the search terms, and I don't see that in what you've
6  provided here today.
7  Q  (By Mr. Williams)  Let me ask you to look at the Berge
8  study from 2017.  We will mark that as Exhibit No. 16.
9          (Exhibit No. 16 marked
10             for identification.)
11
12  Q  (By Mr. Williams)  Do you recognize Exhibit No. 16, which
13  is the Berge 2017 study, as the other of the two
14  meta-analyses that you described as excellent?
15  A  Yes.
16  Q  Please turn to Page 9 of the study.
17      I direct your attention to the left-hand column, the
18  last paragraph before "Acknowledgments."
19      Do you see that?
20  A  Yes.
21  Q  The Berge study says, "Several aspects of our results,
22  including the heterogeneity of results between
23  case-control and cohort studies and the lack of a dose
24  response with duration and frequency of use, however, do
25  not support a causal interpretation of the association."

Page 193

1      Do you see that conclusion?
2  A  Yes, I do.
3  Q  The author's conclusion that the reported association did
4  not support a causal interpretation, is the opposite of
5  the conclusion that you would come up with in this case,
6  correct?
7          MS. PARFITT:  Objection; form.
8          THE WITNESS:  That's correct.
9  Q  (By Mr. Williams)  If you would, keep the Berge 2017
10  paper out.
11      I will also ask you to refer for a moment to your
12  own report, which is Exhibit No. 2, and specifically Page
13  75.
14      There is a table, Table No. 3, of data that you
15  compiled about the various meta-analyses.
16      Do you see that table?
17  A  Yes.
18  Q  And Berge 2017 is the second one that is referenced?
19  A  Yes.
20  Q  The right-most column of your table is called, "Dose
21  response," correct?
22  A  Yes.
23  Q  And I'm going to talk a little more about dose response
24  later, but for now can we agree that under the "Dose
25  response" column for Berge 2017, you wrote, "Yes," for

Anne McTiernan, Ph.D

1    duration and frequency-- did you write that?
2  A  Yes.
3  Q  And then you wrote a colon, and you went on to reflect
4    that each ten-year increase in genital talc use was
5    associated with a 16 percent increase in relative risk,
6    and each increase of one application per week was
7    associated with a five percent increase in relative risk.
8      Do we have that right?
9  A  Yes.
10  Q  Now, if you would, please, turn back to the Berge study.
11    Can you just-- we couldn't find it.  Maybe you can,
12    and this one I do want you to look through it.
13      Would you please point out where the figures we just
14    discussed from your table are actually reflected in the
15    study?
16    I'm sure it's there.  We just couldn't find it.
17  A  I am not finding it.
18      MS. PARFITT:  Counsel, I can make it
19    quicker, so we can save on time.
20     Do you want me to show her where it is or have her
21    keep looking?
22      MR. WILLIAMS:  I actually prefer that
23    that not be what we do.
24      MS. PARFITT:  All right.  I am just
25    trying to move time along.

1  Q  (By Mr. Williams)  If you could turn to Page 6 of the
2    Berge meta-analysis, in the left-hand side, Table No. 3
3    there, it says there-- it has a table in Table No. 3 that
4    lists the duration of frequency, "Ever use of genital
5    talc - results of meta-analysis."
6      Do you see that?
7  A  Yes, Table No. 3?
8  Q  Right.
9      It says, "Duration, ten years," and then there's a
10    risk ratio of 0.97, with a confidence interval that drops
11    below 1.0.
12      Do you see that?
13  A  It looks like you have a different version than I have.
14  Q  Do I?
15  A  Yeah.
16      Yours is-- my table looks different.
17      That's odd.
18  Q  Are you looking at the-- I see, you are comparing-- just
19    for the record, you are comparing what we gave you as
20    Exhibit No. 16 with something in a notebook.
21    Which notebook are you looking in?
22  A  My data-- all the references that I used.
23  Q  Okay.
24  A  I am just wondering--
25  Q  Are there different versions of it?

1      MS. PARFITT:  Counsel, there are.
2    If I can help, there's two Berge papers.  One talks
3    about the dose response and one does not, and I think you
4    handed her the copy about-- that does not address the
5    dose response, and the one she has in her binder
6    addresses the dose response, both 2018 and very
7    confusing, but--
8      MR. WILLIAMS:  So they are two
9    different studies entirely?
10      MS. PARFITT:  No, they are actually
11    very, very close, but one addressed the dose response and
12    one did not.
13    One, Doctor-- just for clarify, the one that
14    Mr. McTiernan has in her notebook and that you all have
15    in your reference material is Exhibit No.-- Reference
16    No.-- what is that?
17    THE WITNESS:  35.
18      MS. PARFITT:  35 in the notebook,
19    which is the Berge study that deals with the dose
20    response.
21    The one you handed her is the Berge that does not
22    address the dose response or indicated there was no
23    trend.
24      MR. WILLIAMS:  Let's mark for the
25    record the one that Dr. McTiernan has in her hand as

1    Exhibit No. 16A.
2      MS. PARFITT:  Very good.
3      (Exhibit No. 16A marked
4      for identification.)
5
6      MR. WILLIAMS:  Do you happen to have
7    another copy of that one?
8      MS. PARFITT:  Yeah, I can check.
9      MR. WILLIAMS:  Thank you.
10  Q  (By Mr. Williams)  If you could look at Exhibit No. 16,
11    and turn to Page 7.
12  A  So we are back to the other one?
13  Q  The original--
14  A  That I did not reference?
15  Q  Exhibit No. 16.
16      Do you have that in front of you?
17  A  Page 7?
18  Q  Page 7, the right-hand column.
19    Do you see in the right-hand column it says, "The
20    presence or absence of a dose response is an important
21    aspect to consider in assessing the plausibility of the
22    causal nature of an association observed in a
23    meta-analysis"?
24      Did I read that right?
25  A  Yes, and the other version says the same thing.

50 (Pages 194 to 197)

Anne McTiernan, Ph.D

Page 198

1  Q  Okay.  It goes on to say, I believe in both versions,
2     "Although the numbers of studies included in the analysis
3     of duration and frequency of genital talc use was not
4     very large, and the exclusion of the reference category
5     from the dose response analysis might have reduced the
6     power of this analysis, the lack of a dose response --
7     irrespective on an analytical approach chosen to combine
8     categorical results across studies -- is a potentially
9     important and novel contribution of this meta-analysis."
10        Did I read that right?
11  A  Except the next version does not say, "lack of"-- if you
12     read the paragraph from 16A, it does not say "lack of
13     dose response."
14        You have that right there.
15        They have taken out that.
16        They must have replaced this table with a corrected
17     table, because that does show dose response in Table
18     No. 3.
19  Q  So Table No. 3 in the two different versions of the Berge
20     study are different?
21  A  Yes.
22        That's why I was so confused.
23        My data and my table was identical-- I abstracted
24     this.
25        MS. PARFITT:  "This" being 16A?

Page 199

1        THE WITNESS:  16A, the version I used,
2     and that's the version that was on the website and my
3     library.
4  Q  (By Mr. Williams)  Did you at any time read this study
5     that was marked as Exhibit No. 16?
6  A  No.
7  Q  And how did you access the version at 16A?
8  A  This one I would have gotten from my Fred Hutch library.
9  Q  Let me have you look at Exhibit No. 16A.
10        Do you have Page 9 in front of you?
11        Can you turn to that page, just before the
12     acknowledgments?
13  A  Okay.
14  Q  And this is the conclusion paragraph.
15        Do you see that it begins, "In conclusion"?
16  A  Yes.
17  Q  In the 16A version that you have in front of you they
18     wrote, "Several aspects of our results, including the
19     heterogeneity of results between case-control and cohort
20     studies, however, do not support a causal interpretation
21     of the association."
22        Do you see that?
23  A  Yes.
24  Q  And that was the conclusion of the Berge study from 2017
25     in both versions 16 and 16A, correct?

Page 200

1        MS. PARFITT:  Objection; form.
2        THE WITNESS:  And I tend to look at
3     data, not necessarily what somebody has written as their
4     conclusion.
5        The data to me show that there is an increased risk
6     of ovarian cancer with use of talcum powder products, and
7     I think their data show it very clearly, and they have
8     shown dose response relationships as well.
9  Q  (By Mr. Williams)  My question to you is a little bit
10     different.
11        My question is:
12        You disagree-- strike that.
13        You disagree with the conclusion reached by the
14     authors of the Berge study in that last sentence of their
15     report that finds heterogeneity between the results of
16     case-control and cohort studies, correct?
17        MS. PARFITT:  Objection; form,
18     misstates her testimony.
19        THE WITNESS:  So you are only asking
20     about the first part of that sentence not the causal
21     interpretation, but the first part; is that correct?
22  Q  (By Mr. Williams)  I am asking about the entirety of the
23     sentence.
24  A  The entirety of the sentence?
25        So yes, there was heterogeneity between the

Page 201

1     case-control and cohort studies, but no, I do not think
2     that that detracts from the causal association.
3  Q  What was the heterogeneity and the results between the
4     case-control and the cohort studies that you observed?
5  A  There was a smaller increase in risk with the
6     case-control studies.
7  Q  How much smaller?
8  A  Quite a bit.
9        The relative risk was 1.02 in the cohort studies,
10     1.26 in the case-control studies.
11  Q  And you conclude, based upon your own analysis, totally
12     separate from the Berge study-- you conclude, based on
13     your own analysis, that that disparity, 1.02 for the
14     cohorts, 1.26 for the case-control studies, constitutes
15     heterogeneity between those two types of studies?
16        MS. PARFITT:  Objection; misstates her
17     testimony.
18        She says she relied on the data.
19        MR. WILLIAMS:  Counsel, I would ask
20     you not to coach.
21        MS. PARFITT:  I am not coaching.
22        Let the record reflect I am not coaching.  I am
23     making it clear.
24        THE WITNESS:  I agreed that there's
25     heterogeneity between those two sets of results, but that

Anne McTiernan, Ph.D

Page 202

1   it does not subtract from the causal interpretation.
2        The other thing I note when I look at a figure like
3   this, Figure No. 2 in that Berge paper, that almost all
4   of the relative risks are to the right of the line; "the
5   line" being the line where the relative risk would be one
6   or no effect.
7        It's unusual to see so many studies with the
8   relative risk over on the right side.
9        I review a lot of meta-analyses, so this is unusual
10  to see that level of consistency.
11  Q   (By Mr. Williams)  So just so we're clear, you disagree
12      with the second half, the second clause of the final
13      sentence in the Berge study, but you agree with the first
14      portion, correct?
15            MS. PARFITT:  Objection; form,
16      misstates her testimony.
17            THE WITNESS:  I agree that the cohort
18      studies have lower relative risks than do the
19      case-control studies, yes.
20  Q   (By Mr. Williams)  And you agree that that makes them
21      heterogeneous, correct?
22            MS. PARFITT:  Objection; form.
23  Q   (By Mr. Williams)  Those two different types of studies?
24            MS. PARFITT:  Objection; form.
25            THE WITNESS:  That's part of the

Page 203

1   definition of "heterogeneity," is to see differences.
2   Q   (By Mr. Williams)  Let me ask you some questions about
3       the Taher 2018 study.
4       We will mark that study as Exhibit No. 17.
5            (Exhibit No. 17 marked
6             for identification.)
7
8   Q   (By Mr. Williams)  The Taher 2018 study is not one of the
9       articles that you originally included in your reference
10      list, right?
11  A   That's correct.
12      It was made public after my report was submitted.
13  Q   It is included in the additional materials to Dr. Anne
14      McTiernan, a listing that we marked earlier today?
15  A   Yes.
16  Q   Have you read the entire transcript?
17  A   Yes, I have.
18  Q   Did you have access to this article before it was
19      published?
20  A   It's not published.  It's a draft manuscript.
21  Q   Do you have access to the appendixes or supplemental
22      tables that are referenced in the publication?
23  A   Yes.
24      I don't have them with me, but I did have access.
25  Q   How did you have access to them?

Page 204

1   A   Ms. Parfitt sent them.
2   Q   Did she--
3   A   I am trying to remember if there was a website as well.
4   Q   Do you know how she obtained them?
5            MS. PARFITT:  Objection; form.
6            THE WITNESS:  I do not know.
7   Q   (By Mr. Williams)  Are you relying on the Taher 2018
8       study for your opinion in this litigation?
9   A   I am not relying on the study, but it did add to my-- it
10      does substantiate my opinion.
11      It's very similar results to what we saw in the
12      other meta-analyses.
13  Q   Is the Taher 2018 article peer-reviewed?
14  A   Not to my knowledge, but I don't know what process it
15      went through to get to this point.
16  Q   Do you know one way or the other whether it has been
17      accepted for publication?
18  A   I don't know.
19  Q   Do you know the source or sources of funding for the
20      Taher 2018 article?
21  A   I think it said Health Canada, but--
22  Q   Other than the reference to Health Canada-- it references
23      a contract with Health Canada.
24      Other than that, do you have any knowledge as to the
25      sources of funding?

Page 205

1            MS. PARFITT:  Objection; form.
2            THE WITNESS:  All I know is source of
3       funding is Health Canada, what it says in the paper.
4   Q   (By Mr. Williams)  Do you personally know any of the
5       authors who are listed on the first page?
6   A   No, I don't.
7   Q   Have you discussed your opinion on talc and ovarian
8       cancer with any of those authors?
9   A   No, I haven't.
10  Q   Do you know what conflicts of interest, if any, the
11      authors may have?
12            MS. PARFITT:  Objection; form.
13            THE WITNESS:  No, I don't.
14  Q   (By Mr. Williams)  Do you know whether some of the
15      authors are serving as consultants to the plaintiffs in
16      this litigation?
17  A   No, I don't.
18  Q   Were you asked to be a co-author of that paper?
19  A   No, I wasn't.
20  Q   Did you provide comments to it?
21  A   No, I didn't.
22  Q   Did the authors ever consult you in any way in connection
23      with their publication?
24  A   No, they didn't.
25  Q   Did you attend the National Cancer Institute directors'

Anne McTiernan, Ph.D

Page 206

1 meeting in Lyon, France on July 11, 2013 of last year,
2 2018?
3 A No, I didn't.
4 Q The Taher study contains a meta-analysis, right?
5 A That's correct.
6 Q If you turn to Page 28, Page 28 calculates or reports an
7 overall relative risk of 1.28 with a confidence interval
8 of 1.20 to 1.37, right?
9 A It's written there-- okay, yes.
10 Q If you turn to Page 49, under the heading, "Conclusion,"
11 the very last sentence says, in part, "The present
12 comprehensive evaluation of all currently available
13 relevant data indicates that perineal exposure to talc
14 powder is a possible cause of ovarian cancer in humans,"
15 right?
16 A Yes, I see that.
17 Q Do you agree that the 2018 paper represents a
18 comprehensive evaluation of all currently available
19 relative data?
20 A It appeared to be a relevant meta-analysis.
21     As you mentioned, it's not peer-reviewed.
22 I would like to see it be peer-reviewed, but it has
23 a remarkably similar relative risk of the other
24 meta-analyses that I've reviewed that were peer-reviewed,
25 so not only the most recent comprehensive ones but also

Page 207

1 the previous meta-analyses.
2 Q Do you agree with the conclusion of the authors in Taher
3 2018 that perineal exposure to talcum powder is a
4 possible cause of ovarian cancer in humans?
5 A I believe that it is a cause of ovarian cancer in humans.
6 Q My question is different.
7     My question is whether you agree with the conclusion
8 of the authors, what they wrote here, which is that
9 perineal exposure to talcum powder is a possible cause of
10 ovarian cancer in humans.
11 A And I am saying I would use a stronger statement than
12 that.
13     I would say these data support a causal association
14 with cancer, ovarian cancer.
15 Q So you disagree with them?
16 A Yes.
17 Q It would be faster if you just do that upfront.
18 A I like to be exact.  Sorry.
19 Q Just so we're clear, you disagree with the conclusion of
20 the authors in the Taher study, that talcum powder is a
21 possible cause of ovarian cancer in humans, right?
22 A I believe that talcum powder product use is the cause of
23 ovarian cancer in humans, based on my review.
24 Q The conclusion in this Taher 2018 article is the same as
25 that-- as the conclusion that was reached in the IARC,

Page 208

1 International Association for Research of Cancer, 2010
2 monograph with respect to perineal use of talc, right?
3     MS. PARFITT:  Objection; form.
4     THE WITNESS:  2010 monograph was from
5 data up until 2007, so they did not have the benefit of
6 the last ten years.
7     I believe IARC would have given a stronger
8 characterization of talcum powder applied to the perineum
9 if they were to review the data today, but they did
10 categorize talcum applied to the perineum as a possible
11 carcinogen Grade 2B.
12 Q (By Mr. Williams) I would move to strike that as
13 nonresponsive, Doctor, but my question is:
14     You are speculating when you say what IARC would or
15 would not have done; are you not?
16     MS. PARFITT:  Objection--
17     THE WITNESS:  Correct.
18 Q (By Mr. Williams) In fact, and point of fact, in 2010
19 IARC, in the 2010 monograph, reached a conclusion that
20 perineal exposure to talcum powder is a possible cause of
21 ovarian cancer, and they put it in Group 2B, right?
22     MS. PARFITT:  Objection; form.
23     THE WITNESS:  Using data that they had
24 available and through 2007, then yes, they classified it
25 that way in 2B.

Page 209

1 Q (By Mr. Williams) Do you have any criticisms of the
2 Taher 2018 meta-analysis?
3 A As I mentioned before, it has remarkable similar results
4 to the other meta-analyses, so that gave me some
5 confidence.
6     I was a little curious why they picked-- I think
7 it's some of the supplementary tables.
8     They picked relative risk for some of the-- a couple
9 of the studies that I would not have picked, and some of
10 the meta-analyses did not pick-- when many of the studies
11 have presented data, it's a little difficult to tell
12 which of the data are the most basic, meaning no use of
13 talcum powder products to the perineum versus any use,
14 and sometimes it's difficult to determine which is the
15 correct relative risk to pick, odds ratio, but I don't
16 have that here, don't have the supplemental data here.
17 Q Other than what you've just expressed, do you have any
18 other criticisms?
19 A I didn't see other concerns.
20     I think Table No. 2, the summary for the Bradford
21 Hill criteria of causation, they--
22 Q Could you give me the page?
23 A I'm sorry, Page 25, Table No. 2.
24 Q Thank you.
25 A The question I had there is when they looked at strengths

53 (Pages 206 to 209)

Anne McTiernan, Ph.D

Page 210

1    of association, they looked across individual studies and
2    didn't take into account the meta-analyses, so I think
3    they could have used their own data as well as the other
4    meta-analyses, and they could have mentioned that there
5    as part of strengths of association.
6    Q  Have you now listed all of your criticisms of the study?
7    A  Yes, I believe so.
8    Q  Do you believe it was improper of the authors of this
9    study to include both the Wu 2009 and the Wu 2015 studies
10   in the meta-analysis, as reflected on Page 29?
11   A  I would have to look back and see if those are the same--
12   if they include some of the same cases.
13   Q  If they included the same cases, then for the reasons you
14   described earlier today, you would criticize this study
15   because there would be double counting, right?
16          MS. PARFITT:  Objection.
17          THE WITNESS:  Yes.
18   Q  (By Mr. Williams)  Please turn to Page 3 on-- Figure
19   No. 3 on Page 39.
20          It says, underneath that table, "Figure No. 3:
21   Ovarian cancer risk estimates at increasing levels of
22   exposure to talc, as reported from multiple studies."
23          Do you see that?
24   A  Yes.
25   Q  Does Figure No. 3 provide evidence of a dose-response

Page 211

1    relationship, in your opinion?
2    A  I don't think I could evaluate that because I don't see
3    an explanation of where they get that data from.
4    Q  Let me ask you to look back on-- at Page 29-- actually,
5    Page 25.  Excuse me.
6          Do you see where it says, "Consistency:  15 out of
7    30 studies reported positive and significant associations
8    reported in:" and then there's a colon and four bullet
9    points?
10          Do you see that?
11   A  Yes.
12   Q  15 out of 30 is 50 percent of the case-control studies,
13   right-- 15 out of 30 is 50 percent of the total number of
14   studies reported, right?
15          MS. PARFITT:  Objection; form.
16          THE WITNESS:  Yes, that would be 50
17   percent.
18   Q  (By Mr. Williams)  And 50 percent of the studies did not
19   find a positive significant association that was
20   statistically significant, correct?
21          MS. PARFITT:  Objection; form,
22   misstates the data.
23          THE WITNESS:  You are asking me if
24   that's what it stated?
25          MR. WILLIAMS:  Yes.

Page 212

1          THE WITNESS:  That's what they stated,
2    yes.
3    Q  (By Mr. Williams)  And the importance of statistical
4    significance is-- strike that.
5          Statistical significance is evaluated in order for
6    epidemiologists and other researchers to try to rule out
7    chance, right?
8    A  Statistical significance depends largely on sample size,
9    and it's merely a probability, so if you have a P value
10   of 0.05, it means you have a five percent chance of
11   making an error.
12          There's nothing magical about 0.05.
13          0.06 could be a very relevant study as well.
14          Statistical significance is often determined-- it's
15   often thought to be statistically significant if the P
16   value is less than or equal to 0.05.
17          As I said, it's not magical.
18          It really depends on sample size, so when I look at
19   studies, I look at the totality of evidence, I look at
20   consistency, and I look at whether the relative risk is
21   above one consistently.
22   Q  What I'm trying to get at, Doctor, is whether-- is the
23   purpose of statistical significance.
24          Will you agree with me, and you can say "no," you
25   can say "yes," you can say "maybe," but do you agree with

Page 213

1    me or not that the purpose of evaluating statistical
2    significance is to try to rule out the possibility that
3    results are a result of chance?
4    A  I would modify that.
5          I would say you would look at a statistical test in
6    order to determine what is the likelihood that chance
7    explained your result.
8          I wouldn't say the word "rule out," because, as I
9    mentioned, a P value of 0.06 could be as relevant as a P
10   value of 0.05.
11          It really depends on the sample size.
12   Q  You are familiar with IARC ratings?
13          You mentioned them earlier today, right?
14   A  Yes.
15   Q  And you know that IARC ratings for Group 2B, which is
16   what IARC found for talc in 2006, I think, was that talc
17   should be listed as a possible cause of ovarian cancer,
18   correct?
19          MS. PARFITT:  Objection; misstates the
20   document.
21          THE WITNESS:  Maybe I should reframe
22   my answer.
23          My understanding is a classification 2B means a
24   possible carcinogen.
25   Q  (By Mr. Williams)  Okay.  And as you sit there, can you

Anne McTiernan, Ph.D

---

Page 214

1    tell us what the definition of a Group 2B substance is,
2    according to IARC?
3    A  I don't have that memorized.
4        I do know that there are different panels set up for
5    each carcinogen, and there is an overall group that helps
6    the scientists to decide what classification to put
7    something in, but that-- it's not a clear-cut,
8    necessarily.
9        The scientific panel has to look at the totality of
10   evidence as they decide what level of evidence they have.
11   Q  Does it sound familiar to you that in assigning a Group
12   2B status for talcum powder, that the IARC team concluded
13   that chance, bias, and confounding factors could not be
14   ruled out?
15   A  I don't have the document in front of me.
16      I would need to look at that.
17      Do we have it?
18   Q  We do, and I will get to it in a minute.
19      I am asking you, as you sit here, do you have any
20   memory that the way that IARC analyzes whether a
21   substance is in Group 2B or some other grouping, is that
22   if chance, bias, and confounding factors cannot be ruled
23   out, then the substance should be in Group 2B?
24          MS. PARFITT:  Objection; form.
25      Again, object to the memory aspect of this.

---

Page 215

1        If there's a document available, you should show it
2    to her.
3            THE WITNESS:  And I can't remember.
4    Q  (By Mr. Williams)  One reason that you have stated for
5    the lack of statistical significance in cohort studies is
6    the sample size in those studies, correct?
7    A  The number of cases, the sample size of cases, yes.
8    Q  Right.
9        So now in your last answer, you are distinguishing
10   between the total sample size on the one hand and the
11   number of cases of cancer on the other, correct?
12   A  Yes.
13   Q  What's important for your analysis, in terms of sample
14   size, is the number of cancer cases?
15   A  That's correct.
16   Q  You believe that the number of cases affects the
17   statistical power of the studies?
18   A  Yes.
19   Q  Doctor, let me ask you about your report though.
20      If you could look at Exhibit No. 2, Page 48, do you
21   see there in the middle of the page it says, "I interpret
22   the lack of statistical significance in some source
23   studies as being due to the small sample sizes of many of
24   these studies"?
25   A  Yes.

---

Page 216

1    Q  There you refer to sample size as opposed to the number
2    of cases, did you not, in that sentence that I just read
3    you?
4    A  The reason I'm hesitating is I do two sample size
5    calculations.
6        In here I am talking about calculation-- I was
7    talking about the sample sizes from case-control studies,
8    and after this link that I provide, the calculation
9    showed the minimum number of cases in controls need to be
10   931 each, and then there's another place where I
11   calculate the cohort sizes.
12   Q  Can we stay here for just one moment on Page 48?
13   A  Yes.
14   Q  First of all, you performed what is known as a power
15   calculation to determine the sample size that you
16   believed is required for a study?
17   A  That's correct.
18   Q  And you place particular importance, you told me a moment
19   ago, on the number of cancer cases total, correct?
20   A  That's correct.
21   Q  Based on your calculation, you concluded that the minimum
22   number of cases would need to be 931, correct?
23   A  That's correct, to have-- to have good power to detect
24   relative risk of 1.3 with statistical significance of
25   0.05.

---

Page 217

1    Q  You also concluded that the minimum number of controls
2    would need to be 931, correct?
3    A  That's the simplest model.
4        Different case-control studies will have different
5    numbers, and that can affect the power one way or the
6    other.
7        I just did a simple calculation, but you could have
8    power increased by having a small number more of controls
9    or a small number of more cases, so it depends on how--
10   how it ends up working out, but this is the simplest
11   model.
12   Q  The point you were making in performing your power
13   calculation was that meta-analyses, with their larger
14   combined sample sizes, can be used to overcome that lack
15   of statistical power; is that true?
16   A  Yes.
17   Q  One of the two meta-analyses that you called excellent
18   combine data from three of the cohort studies to arrive
19   at a single risk estimate.
20      Do you remember that?
21   A  No, I don't.
22      Which study?
23   Q  Let me ask you to look at the 2017 Berge analysis, and
24   let's use Exhibit No. 16A.
25          MS. PARFITT:  Not cutting you off

---

Anne McTiernan, Ph.D

---

Page 218

1    right now, but maybe when you get to a good place, we can
2    take a break.
3              MR. WILLIAMS:  Okay.  Sure.
4    Q  (By Mr. Williams)  Do you have Exhibit No. 16A in front
5    of you?
6    A  I do.
7    Q  And I would like to have you focus on Page-- I believe
8    it's 7, Figure No. 2.
9         Do you see where the authors list the three cohort
10   studies they analyzed?
11   A  Yes.
12   Q  Gates 2010, Houghton 2014, Gonzalez 2016?
13   A  Hold on a minute.
14   Q  And "Houghton" is--
15   A  Sorry.
16        (Phone interruption)  I was getting a call on this.
17   I am going to turn it off.
18   Q  Do you see in the middle of Page 7 the reference to
19   Gates, Houghton, and Gonzalez?
20        Do you see the reference in Figure No. 2, middle of
21   the page, that says, "Cohort studies," and it references
22   those three studies?
23   A  Yes.
24   Q  And "Houghton," for the record, is H-O-U-G-H-T-O-N.
25        Now, look back one page to Page 6 of Exhibit

---

Page 219

1    No. 16A, and take a look at the paragraph starting at the
2    top of the right column.
3         Do you see that one?
4    A  Yes.
5    Q  About halfway down that paragraph the authors state as
6    follows, "It should be noted that the cohort studies
7    included in the meta-analysis comprised a total of 429
8    cases of ovarian cases exposed to genital talc and 943
9    unexposed cases: the statistical power of the
10   meta-analysis of these cohort studies to detect a risk
11   ratio of 1.25, similar to the result of the meta-analysis
12   of case-control studies, was 0.99.  Thus, low power of
13   cohort studies cannot be invoked as explanation of the
14   heterogeneity of results."
15        Did I read that correctly?
16   A  Yes, you did.
17   Q  Now, they reference here in the Berge study-- strike
18   that.  Let me start over.
19        The Berge study is one of the two meta-analyses that
20   you said is an excellent study, correct?
21   A  Yes.
22   Q  And what they list here on Page No. 6 is 429 cases of
23   ovarian cancer and 943 unexposed cases.
24        Is that correct?
25   A  Yes.

---

Page 220

1    Q  If you add those two numbers together, what do you get?
2    A  I don't know exactly-- over 1300.
3    Q  1300 is more than 931, correct?
4    A  Yes.
5    Q  900 and 1300-- to be precise, it's 1372.  You add those
6    two numbers together.
7         1372 cancer cases is well above the 931 that you
8    calculated would be necessary to find statistical
9    significance, right?
10   A  Yes.
11   Q  And because of the nature of cohort studies, there were
12   also many times that the number of women who did not get
13   ovarian cancer-- right-- that's a separate number?
14   A  What did you say about the cohort studies?
15   Q  In addition to the cases where women ultimately,
16   unfortunately, were diagnosed with cancer, the 1372,
17   there are many times that number of women who were
18   followed along in their lives who did not get ovarian
19   cancer, correct?
20   A  Yes.
21   Q  So this meta-analysis is sufficient, under your power
22   calculation, to be able to find a statistically
23   significant association, true?
24   A  Yes, and that's why overall we see 1.22 is statistically
25   significant.

---

Page 221

1    Q  Please explain.
2    A  Pardon?
3    Q  Please explain your answer.
4    A  The overall relative risk of 1.22, the confidence
5    interval is 1.13 to 1.3-- you see the overall
6    statistically significant effect.
7    Q  That wasn't what they concluded for the cohort studies
8    though, correct?
9         The cohort studies had the following on page-- I am
10   looking at Page 7, Figure No. 2.
11        The cohort studies, for Gates it was 1.12, for
12   Gonzalez it was 0.73-- excuse me, I misspoke.
13        For Gates it was 1.06, for Houghton it was 1.12, and
14   for Gonzalez the relative risk is 0.73, correct?
15   A  0.73, yes.
16   Q  So if you look at the cohort studies, separate and apart
17   from the case-control studies that are listed above, we
18   can agree that the relative risk is nowhere near 1.22?
19        MS. PARFITT:  Objection; form.
20   Q  (By Mr. Williams)  Right?
21        MS. PARFITT:  Objection; form.
22        THE WITNESS:  Yeah, I think the-- the
23   way I look at the meta-analysis, is I look at all of the
24   studies together.
25        I don't just look at one particular type separate

Anne McTiernan, Ph.D

### Page 222

1    from others, but as an example, the Houghton study, which
2    had about 400 cases, I believe, the Women's Health
3    Initiative, with a relative risk of 1.12, if they had had
4    900 cases, that probably would have been a statistically
5    significant result, so that's what the power calculation
6    does.
7        In this case you have the Gonzalez-- the sister
8    study is what brings the relative risk down closer to one
9    because you do have one negative result there, but
10   overall, looking at all of the meta-analyses-- all of the
11   studies together, you see definitely a trend towards a
12   relative risk consistently above one.
13   Q  (By Mr. Williams)  Now-- have you completed your answer?
14   A  Yes.
15   Q  You just mentioned a moment ago that with a relative risk
16      of 1.12, if they had 900 cases, they probably would have
17      been a statistically significant-- that probably would
18      have been a statistically significant result.
19          When you say that that probably would have been the
20      case in the women's health study, you're speculating
21      there, aren't you?
22          MS. PARFITT:  Objection; form.
23          THE WITNESS:  I am speculating from my
24      previous experience with working with the Women's Health
25      Initiative, that with very large numbers of cases if you

### Page 223

1    have-- even with small relative risk you will have a
2    statistically significant result, an amount, that you
3    would correct on speculating what would be seen with this
4    particular data set.
5    Q  (By Mr. Williams)  Let me ask you to focus on Page 7 of
6       the exhibit and Figure No. 2, again, and the cohort
7       studies for Exhibit No. 16A, the Berge study.
8          You see there's a subtotal there for the cohort
9       studies at the bottom of the table, right?
10   A  Yes.
11   Q  The combined relative risk for the cohort studies is
12      1.02, no statistical significance, correct?
13   A  Correct.
14   Q  The confidence interval combined for those was 0.85 to
15      1.20, correct?
16   A  Correct.
17   Q  If you had been basing your analysis on the cohort
18      studies and not on an analysis of the case-control
19      studies, you would not have been able to reach your
20      conclusion that use of talc is a cause of ovarian cancer,
21      true?
22          MS. PARFITT:  Objection; form,
23      misstates the evidence.
24          THE WITNESS:  I looked at the totality
25      of evidence and looked at all of the epidemiologic data

### Page 224

1    that was available at the time, and in total that's what
2    I look at.
3        The issue with the cohort studies are that the
4    information on talcum powder product use was collected at
5    one point in time.  It was never updated, and it was not
6    retrospective, so we don't know what-- lifetime use in
7    those cohort studies.
8    Q  (By Mr. Williams)  We'll take a break in a moment, but my
9       question before the break is this:
10          I was asking, for purposes of my question, for you
11      to exclude case-control studies from your analysis.
12          My question was:
13          If you were doing an analysis that had been based on
14      the cohort studies, and not on your analysis of the
15      case-control study relative risks, you would not have
16      been able to conclude that perineal use of talc causes
17      ovarian cancer with a 1.02 relative risk that is not
18      statistically significant, right?
19          MS. PARFITT:  Objection; form,
20      misstates her testimony and her opinions.
21          THE WITNESS:  I think that's
22      speculative because I wouldn't have ignored the
23      significant amount of data from case-control studies.
24   Q  (By Mr. Williams)  On the question of whether or not the
25      difference between case-control and cohort studies may be

### Page 225

1    due to sample size and resulting low power, you come to
2    the opposite conclusion as the authors of the Berge 2017
3    study that you are relying upon, correct?
4        MS. PARFITT:  Objection; form,
5    misstates her testimony.
6        THE WITNESS:  I am not sure why you
7    come to that.
8    I have the opposite conclusion.
9    Q  (By Mr. Williams)  Well, the authors of the Berge study
10      concluded that-- the authors of the Berge study concluded
11      that low power of cohort studies cannot be invoked as an
12      explanation of the heterogeneity of results, right?
13      That's what they wrote?
14   A  That's what they wrote.
15   Q  On the question of whether or not the difference between
16      case-control and cohort studies may be due to sample size
17      and resulting low power, you come to the opposite
18      conclusion as the authors of the Berge study, correct?
19          MS. PARFITT:  Objection; form.
20          THE WITNESS:  I don't remember coming
21      to the opposite conclusion.
22      I have opposite-- I have alternative reason why I
23      think the cohort studies could have lower relative risk
24      than the case-control studies, and-- which I've just
25      stated about the way the exposures are collected.

Anne McTiernan, Ph.D

Page 226

1    Q   (By Mr. Williams)  In your report, Dr. McTiernan, you
2        dealt with the heterogeneity issue between the relative
3        risk findings for case-controls versus the relative risk
4        findings for cohorts.
5            You dealt with that disparity by doing a power
6        calculation and concluding that you needed 931 cases in
7        order to have sufficient power.
8            That's what you said, right?
9    A   A study-- I was talking about individual studies.
10           I wasn't talking about the combined group of cohort
11       studies.
12   Q   What the authors said on Page 6 of Exhibit No. 16A was,
13       "Thus, low power of cohort studies cannot be invoked as
14       an explanation of the heterogeneity of results."
15           They said that, right?
16   A   Yes, and I think they mean the cohort studies combined.
17   Q   I'm sorry?
18   A   They're talking about the cohort studies combined.
19       I'm talking about individual studies.
20   Q   And you disagree with that conclusion, true or not true?
21           MS. PARFITT:  Objection; form.
22           THE WITNESS:  I think that they're
23       correct in what they're saying, that they had sufficient
24       power to find a relative risk if it was there, if the
25       study was done directly when they added those three

Page 227

1        studies together, but I'm saying there were alternative
2        reasons why the relative risk is lower, so there's two
3        issues, the relative risk and the power and statistical
4        significance, and the relative risk for two of those
5        studies is over one.
6            They used Gates-- Gertig had a little bit different
7        level, but the data was collected in very different ways
8        for cohort studies than case-control studies.
9            Another problem with the cohort studies is that they
10       did not follow the women for very long, on average, which
11       was the case of 12 studies that have lifetime exposure,
12       so the cohort studies may have not had all of the cases
13       develop that were going to be developed, so there are
14       reasons-- but it's two different reasons: the effect
15       size, which is the relative risk, and the statistical
16       significance, which is the P value or the confidence
17       intervals.
18   Q   (By Mr. Williams)  With respect to the issue of power,
19       you said you needed to get to 931 cases, right?
20           MS. PARFITT:  Objection; form.
21           THE WITNESS:  I calculated 91-- 931
22       for an individual study.
23   Q   (By Mr. Williams)  And in these cases, if you combine the
24       cohort studies, the total number of cases, they are far
25       in excess of that number, right?

Page 228

1            MS. PARFITT:  Objection; form.
2            THE WITNESS:  You are talking about
3        this-- yes.
4    Q   (By Mr. Williams)  In your last answer or two answers
5        ago, you referenced the fact that two of the cohort
6        studies had relative risks above one.
7            Do you remember saying that?
8    A   Yes.
9    Q   You are referring to Gates, which was 1.06, and Houghton,
10       which is 1.12, correct?
11   A   Correct.
12   Q   The other relative risk was 0.73, correct?
13   A   Correct.
14   Q   If it had been statistically significant, that would show
15       a protective effect from the use of talc, correct?
16           MS. PARFITT:  Objection; form.
17           THE WITNESS:  Correct.
18   Q   (By Mr. Williams)  Do you think that relative risks of
19       1.06 and 1.12 are weak? strong? moderate?
20           How would you characterize those numbers?
21           MS. PARFITT:  Objection; form.
22           THE WITNESS:  I tend to look at the
23       number of what they are, rather than giving an adjective
24       to it.
25           I believe one possibility for these cohort studies

Page 229

1        to have lower relative risk is because of the less
2        accuracy in collecting the exposure.
3            It tends to reduce the point estimate, which is the
4        relative risk, if the exposure data is not collected with
5        as much refinement as you can see in-- as we've seen in
6        some of the other studies.
7    Q   (By Mr. Williams)  Why would it reduce the number rather
8        than raise the number?
9            Couldn't it do either?
10   A   I am not sure exactly why, but it tends to do that-- by
11       having incomplete information about an exposure, it tends
12       to lower the relative risk.
13   Q   Can you point us to any treatise, any study, any analysis
14       that makes that point?
15   A   Yes.
16   Q   That you just made?
17   A   Yes.
18   Q   Go ahead.
19   A   I have a reference.
20   Q   And then I promise we'll take a break.
21   A   Flegal, Brownie, and Haas, so Reference No. 45--
22   Q   And you are referring to Reference No. 45 from your
23       report?
24   A   Yes, Reference No. 45.
25           MS. PARFITT:  Counsel, with your

Anne McTiernan, Ph.D

Page 230

1    permission, I will hand her my--
2         MR. WILLIAMS:  Please.
3    Q   (By Mr. Williams)  For the record, are you looking,
4    Dr. McTiernan, to the portion of the Flegal, F-L-E-G-A-L,
5    study, Item No. 45 on your reference list, to try to find
6    something that supports your conclusion that a lack of--
7    I can't remember how you put it, but a lack of sufficient
8    questions in a cohort study leads to a lower risk ratio?
9    A   So I'll read from the abstract, the first two sentences,
10   "In epidemiologic studies individuals may be
11   misclassified with respect to exposure to a risk factor
12   for disease.
13        "Such misclassification causes the relative risk of
14   disease associated with exposure in the population to be
15   biassed toward the null value."
16   Q   And what is it that you believe caused people-- strike
17   that.
18        I take it you conclude here that the cohort studies
19   somehow misclassified some of the women who were
20   participating in the study?
21   A   In the Nurses' Health Study women were asked in 1982, at
22   one point, whether they used these products, and it was
23   never updated, and it did not ask about their lifetime
24   use before that.
25        The Women's Health Initiative asked if they had ever

Page 231

1    used it when they entered the study, so that was between
2    1992 and 1996.
3         It was not updated either.
4         It didn't have a full lifetime exposure collected,
5    so really you only have one point in time for those two.
6         One of them-- one of them asked about years of use
7    and one asked about frequency, but neither asked about
8    both.
9         This is a typical underestimate of exposure when
10   you're asking people just at one point in time and not
11   updating and not going back in time.
12   Q   Anything else you want to add?
13   A   No.
14        MR. WILLIAMS:  Let's take a break.
15        VIDEOGRAPHER:  Going off the record,
16   the time is 3:19 p.m.
17        (Recess 3:19 to 3:39 p.m.)
18
19        VIDEOGRAPHER:  We are back on the
20   record.  This is the start of Media 4.  The time is 3:39
21   p.m.
22   Q   (By Mr. Williams)  Dr. McTiernan, do you have Exhibit
23   No. 2 in front of you, your report?
24   A   Yes.
25   Q   Could you turn to Page 28.

Page 232

1         At the bottom of Page 28, the last sentence that
2    carries over, you wrote, "It should be noted that ovarian
3    talc particle burden may not be influenced by number of
4    applications of perineal talc usage, and therefore the
5    typical dose response relationship may not be necessary
6    for establishing causality between perineal talcum powder
7    product use and the risk for ovarian cancer."
8         What's the basis for that statement?
9    A   I think I addressed that a little bit this morning, that
10   if a woman is exposed to perineal talc and it moves up to
11   the fallopian tube or ovarian area, all she would need is
12   potentially one dose to then set up inflammation.
13        The more that she's exposed to, that suggests the
14   more likelihood of having the talc move up to that area,
15   so we do look at dose responses to help support this
16   association, but it still seems possible that a smaller
17   number of doses could still increase risk.
18        The reference that I used here, 64, Heller, do we
19   have that available?
20             (Exhibit No. 18 marked
21               for identification.)
22
23   Q   (By Mr. Williams)  And we will mark the Heller study as
24   Exhibit No. 18.
25        If you could, just point me to the page that you're

Page 233

1    referring to.
2    A   So, yes, if you look at-- just looking at Table No. 1,
3    this is 12 women who reported talc use.
4         You can see the talc counts weren't necessarily
5    correlated with the lifetime talc applications, and this
6    is estimated by a woman's report.
7         So even women that have a smaller number of
8    applications could have a very high talc count.
9    Q   Have you finished your answer?
10   A   Yes.
11   Q   Couldn't that very high talc count be as a result of the
12   fact that talc is all over the environment, not just from
13   talcum powder but from things we eat, places we go,
14   contamination?
15        Couldn't it be explained by that?
16        MS. PARFITT:  Objection; form.
17        THE WITNESS:  It seems like a likely
18   way for talc to be present in the ovaries is through
19   movement up through the genital tract.
20        There is some data suggesting that, yes, talc could
21   migrate through the lymph system, but there's much more
22   data showing that particles can move-- inert particles
23   can move through the genital tract up through the
24   fallopian tubes and to the ovaries in both animals and
25   humans.

59 (Pages 230 to 233)

Anne McTiernan, Ph.D

Page 234

1  Q  (By Mr. Williams)  Do you remember that the Heller study
2    looked at groups of women that both used talcum powder in
3    the perineal area and women who did not?
4  A  Yes.  It was about half and half, and--
5  Q  Hold on.  Let me ask the question.
6  A  Sorry.
7  Q  You do remember that it looked at both groups of women,
8    those who used talc and those who did not, correct?
9  A  Yes.
10 Q  And then it looked at their ovaries to determine which
11   ones had any evidence of talcum powder.
12     Do you remember that?
13 A  Yes.
14 Q  And do you remember that the Heller study concluded that
15   there were more women who had talcum powder in their
16   ovaries who had never used talcum powder in the perineal
17   area than there were women who had talc in their ovaries
18   who had reported use of talcum powder in the perineal
19   area?
20     Do you recall that?
21        MS. PARFITT:  Objection.
22        THE WITNESS:  What I see in the table
23   is a one point different, five versus six.
24     They were able then to contact the mothers of these
25   women to find out whether the women had been exposed as

Page 235

1    babies, if they had been diapered with talc, and you
2    could see quite a few-- three additional that did have
3    genital exposure from talc use as babies.
4  Q  (By Mr. Williams)  Dr. McTiernan, what is the latency
5    period for ovarian cancer?
6  A  It's decades, so it's thought to be-- it could be 30, 40
7    years.
8  Q  Isn't it 20 or 30 years?
9        MS. PARFITT:  Objection; form.
10        THE WITNESS:  It's not clear if it's
11   exactly that, but it could be much longer.
12 Q  (By Mr. Williams)  Well, take a look at the ages of the
13   women in Table No. 2.
14     Do you see those ages?
15     Wouldn't those women have had to have been diapered
16   in their 30s and 40s, by your analysis?
17 A  No, I see one woman is 59, so that would have been a long
18   period.
19     One is 40.
20     One is 64.
21 Q  If a woman were 59 and the latency period were 40 years,
22   that would mean that she would have had to have been
23   diapered when she was 19, right?
24 A  The latency could have been longer in some.
25     There's also a possibility of other exposure to

Page 236

1    their genital area that she didn't record, she didn't
2    recall.
3  Q  You're speculating now, aren't you?
4        MS. PARFITT:  Objection.
5  Q  (By Mr. Williams)  Are you not speculating right now?
6  A  I don't know.  They don't have data saying that the woman
7    misrepresented.
8  Q  What we do have data on is the ages of the women who had
9    talc in their ovaries, correct?
10 A  Yes.
11 Q  And who were part of this study, right?
12 A  Yes.
13 Q  The notion that the fact that they were diapered as
14   babies with talcum powder could be an explanation for how
15   they had talc in their ovaries doesn't hold up, does it,
16   if the ages of the women are, with two exceptions, people
17   who are in their 60s and 50s and 40s, right?
18        MS. PARFITT:  Objection; form,
19   misstates the data.
20        THE WITNESS:  I don't know if we have
21   data that can show that, but if talc has migrated up and
22   is in the peritoneal area, it sits there.  I don't know
23   how it would be removed.
24     It doesn't seem implausible to me that it could
25   remain there for years.

Page 237

1  Q  (By Mr. Williams)  Do you have any opinion on how long
2    talc particles stay in a woman's ovary, assuming it can
3    get to an ovary?
4  A  I have no data to show me one way or the other.
5  Q  What we do know from the Heller study though is in Table
6    No. 3 for those women who reported talc use, five of the
7    12 had talc in their ovary, correct?
8  A  That's correct.
9  Q  And six of the women, who reported no talc use, six of
10   the 12 had talc in their ovaries, correct?
11 A  That's correct.
12 Q  Now, you cited Heller as a basis for-- strike that.
13     You criticized the cohort studies earlier today for
14   asking only at one point in time whether women used
15   talcum powder.
16     Do you recall that testimony?
17 A  Yes, in the sense that it may underreport by asking about
18   one period in time.
19 Q  But you also just testified a few moments ago and you
20   testified earlier today that one-time exposure is
21   sufficient to support the conclusion that talc causes
22   ovarian cancer, right?
23 A  I don't recall saying that, and I did say that-- I
24   thought I just said that the women may not have
25   remembered using it.

60 (Pages 234 to 237)

Anne McTiernan, Ph.D

## Page 238

1    The ones that said they didn't, they may have not
2  remembered, and that is underreporting.
3  Q  But wouldn't asking the question whether-- one time
4  whether a woman ever used talcum powder be enough to give
5  the cohort studies the ability to analyze whether there
6  was an overall statistically significant association, if
7  in fact one existed, given your testimony that all it
8  takes is one exposure?
9  A  I think-- sorry, are you talking about my testimony of
10  one exposure in order to cause ovarian cancer?
11  Q  Yes.
12  A  There may be other reasons women could say it could not
13  report use of talc-- they may not remember it.
14    They may not feel comfortable reporting it.
15    In these cohort studies there were some subjects
16  that were not included because they didn't report use.
17    One of the cohort studies didn't include about 500
18  women because they didn't have information, they didn't
19  answer the question.
20  Q  You are speculating now, aren't you?
21    MS. PARFITT:  Objection; form.
22    THE WITNESS:  We can look at the
23  cohort studies to see what the numbers were that didn't
24  remember.
25  Q  (By Mr. Williams)  Is it your testimony that use of--

## Page 239

1  strike that.
2    Do you have an understanding, as you sit there, as
3  to whether or not use of talcum powder in the perineal
4  area is a habitual activity or something that is done
5  once and never again?
6  A  I don't think we have data showing one way or the other.
7  Q  Do you believe that there are no studies that talk at all
8  about whether or not this is a habit, the use-- and by
9  "this," I mean the use of talcum powder in the perineal
10  area?
11  A  I didn't review that.
12    The studies talked about what proportion of people
13  were using talc at the time that they were interviewed.
14    I noticed the Women's Health Initiative is 40
15  percent were using it.  I think Nurses' Health Study was
16  about 50 percent using it, whereas the sister study, a
17  very small percent, they were interviewed more recently
18  or they answered questions more recently.
19    I don't recall the studies determining whether
20  somebody had used it once versus several times or a
21  habitual use versus nonhabitual use.
22  Q  So the cohort studies that started in 1982, is it your
23  testimony that those women started using talcum powder in
24  1982?
25    MS. PARFITT:  Objection.

## Page 240

1    THE WITNESS:  I would have to look at
2  the question again, but they were asked at one point if
3  they were using, and--
4  Q  (By Mr. Williams)  Weren't they asked in some of the
5  cohort studies whether they ever used talcum powder?
6  A  One of them did and one didn't, so I would have to look
7  back.
8  Q  Regardless of which one is which, which one said, "Look
9  back" or which one side, "Are you currently using," isn't
10  the point that if talcum powder use in the perineal area
11  is a habitual thing that women did and do after
12  showering, after exercising-- after being out in the
13  world, if they hear, if it is something that is
14  habitually done, then is there any reason to believe that
15  when a woman reports that she has used talcum powder,
16  that she's only done it one time?
17    MS. PARFITT:  Objection; form.
18    THE WITNESS:  I don't know the answer
19  to that.  I haven't seen the data.
20  Q  (By Mr. Williams)  Earlier today you were asked questions
21  about cohort study methodology, and I believe you said
22  that one of the problems with the cohort studies is that
23  they ask about a lot of substances and not just talcum
24  powder.
25    Do you recall saying that?

## Page 241

1  A  Yes.
2  Q  And isn't it true-- strike that.
3    Isn't it true that a number of the cohort studies
4  ask about multiple substance-- strike that.
5    Isn't it true that a number of the case-control
6  studies ask about a number of substances?
7    MS. PARFITT:  Objection; form.
8    THE WITNESS:  Without having the
9  questionnaires for all of the case-control studies, I
10  can't answer about exactly what they asked about other
11  variables.
12    Certainly case-control studies, many of the ones
13  included, asked about several different chemical
14  exposures in relation to ovarian cancer.
15    They were designed to look at ovarian cancer.
16    The cohort studies, however, were designed to look
17  at exposures related to cardiovascular disease, various
18  cancers, osteoporosis, arthritis, cognition, so there are
19  many, many different forms that these women filled out,
20  and the Women's Health Initiative in the cohort study,
21  they were completing forms every year with different
22  types of information collected.
23    At baseline, which is the only time when talc was
24  collected, they had multiple forms that they had to
25  complete.

61 (Pages 238 to 241)

Anne McTiernan, Ph.D

## Page 242

1  Q  (By Mr. Williams)  What is it about asking about multiple
2     substances and not just talcum powder that makes that
3     practice in some cohort studies unreliable, in your view?
4  A  It could make it unreliable, but it certainly is fatigue,
5     how many questions can somebody answer accurately.
6        The cohort studies were self-administered forms, so
7     the woman had no prompting, no additional help with
8     remembering.
9        The two studies that I could find, the actual
10    questionnaire, the Nurses' Health Study and the Women's
11    Health Initiative, they're very short and simple
12    questions without going through any information about
13    what they might have been doing at different time points
14    in their life.
15       The Nurses' Health Study had one little question
16    about five categories to fill in, so something that's
17    that short can underestimate the level of exposure.
18 Q  Does being fatigued make a woman check the box saying
19    that she used talc or does it make her not check the box
20    saying that she used talc?
21 A  I don't know.
22 Q  Then what does fatigue have to do with it?
23 A  If it makes the result less accurate, whichever way it
24    goes, the misclassification, as we just talked about,
25    that then can drive the relative risk lower towards the

## Page 243

1     null.
2  Q  But it also can drive it higher, right, depending on
3     which way it goes?
4        MS. PARFITT:  Objection; form.
5        THE WITNESS:  Not usually from this
6     classification.  It usually drives it towards the null.
7  Q  (By Mr. Williams)  Your opinion that perineal talc use
8     can cause ovarian cancer is based on what you describe as
9     a statistically significant elevated risk, right?
10 A  That's correct, overall, looking at the meta-analysis and
11    the pooled analysis.
12 Q  And that statistically significant elevated risk estimate
13    is in combined data in the meta-analysis, correct?
14 A  Correct, adding the studies together.
15 Q  By combining the data, you are referring to meta-analyses
16    and pooled analyses, right?
17 A  Yes.
18 Q  Your opinion of that combined data is based upon
19    statistical significance, correct?
20 A  Partly.  It's based also on consistency across the
21    individual studies and also the effect size consistently
22    being elevated in most of the studies.
23 Q  You do agree that when you do not combine the data,
24    meaning when you look at the individual sourced studies
25    from which the meta-analyses are performed, the data is

## Page 244

1     not all statistically significant, right?
2        MS. PARFITT:  Objection; form,
3     misstates her testimony.
4        THE WITNESS:  When you look at studies
5     that were small, the smaller, older studies tended to be
6     less likely to have statistical significance, and the
7     newer, larger studies were more likely to be
8     statistically significant.
9  Q  (By Mr. Williams)  You agree that simply combining data
10    into meta or pooled analyses does not entirely eliminate
11    the underlying flaws of the individual studies, true?
12 A  Yes, when you combine data, then the individual study's
13    data still stand.
14       What you're doing by combining data is smoothing out
15    variability across studies and increasing sample size.
16 Q  Take a look at the Berge study, 16A, that we were looking
17    at earlier, and take a look at Figure No. 2.
18       That's the Forest plot, right?
19 A  Yes.
20 Q  This breaks out the case-control and the cohort studies
21    analyzed for the meta-analysis, right?
22 A  Yes.
23 Q  There's a combined relative risk for the case-controls
24    and the cohort combined, and that is the 1.22 indicated
25    at the bottom of the table, right?

## Page 245

1  A  That's correct.
2        MR. LOCKE:  Excuse me, can we just
3     take a quick break?
4        VIDEOGRAPHER:  Going off the record,
5     the time is 3:59 p.m.  Please stand by.
6        (Recess 3:59 to 4:00 p.m.)
7
8        VIDEOGRAPHER:  We are back on the
9     record.  The time is 4 p.m.
10 Q  (By Mr. Williams)  Dr. McTiernan, do you have the Berge
11    study, Exhibit No. 16A, in front of you?
12 A  Yes.
13 Q  And you are looking at the Forest plot?
14 A  Yes.
15 Q  I would like to focus you on the case-control studies.
16       I have counted the total number there.
17       I count 24 total.
18       Is that what you count?
19 A  Yes.
20 Q  If we look at those studies that have a confidence
21    interval that crosses over 1.0, there are 12 of them,
22    correct?
23 A  Yes, the earlier studies do.
24 Q  And that means that there are 12 that are not
25    statistically significant, correct?

**62 (Pages 242 to 245)**

Anne McTiernan, Ph.D

### Page 246

1    A  Yes.
2    Q  So as between just the case-control studies, the 24
3       listed here, at best only 50 percent of them or 12 of
4       them reflect a statistically significant association,
5       true?
6              MS. PARFITT:  Objection; form.
7              THE WITNESS:  And, again, that's
8       largely based on sample size.
9          The earlier studies tended to be smaller than the
10      older ones-- sorry, than the more recent ones, which the
11      sample size drives statistical significance.
12   Q  (By Mr. Williams)  It is accurate that 12 of the
13      case-control studies did not find a statistically
14      significant association, true or not true?
15             MS. PARFITT:  Objection; form, asked
16      and answered.
17             THE WITNESS:  The sample size drives
18      the statistical significance, and the larger, more recent
19      studies, were more likely to be statistically
20      significant.
21         The smaller, older studies, were more likely to be
22      not statistically significant.
23   Q  (By Mr. Williams)  The combined risk estimate for the 24
24      case-control studies came out to a statistically
25      significant number, correct?

### Page 247

1    A  That's correct.
2    Q  The combined risk estimate for the cohort studies, on the
3       other hand, did not come out to a statistically
4       significant number, right?
5    A  That's correct.
6    Q  Can we agree that on the question of statistical
7       significance, the combined risk estimate for the
8       case-control studies are not consistent with the combined
9       risk estimate for the cohort studies?
10             MS. PARFITT:  Objection; form, asked
11      and answered, misstates her prior testimony.
12         You may answer.
13             THE WITNESS:  The combined cohort
14      study not only was not significant, the relative risk was
15      1.02.
16   Q  (By Mr. Williams)  I don't believe you answered my
17      question.
18         My question is:
19         Can we agree that a question of statistical
20      significance, just that question, the combined risk
21      estimate for the case-control studies are not consistent
22      with the combined risk estimate for the cohort studies
23      because for the cohort studies the result was not
24      statistically significant, and for the case-control
25      studies the combined estimate was statistically

### Page 248

1       significant?
2              MS. PARFITT:  Objection; form, asked
3       and answered.
4    Q  (By Mr. Williams)  Am I right?
5    A  My response is that they showed different results, not
6       just the statistical significance being different, but
7       the point estimate is different.
8    Q  Let me put it this way:
9          On the question of statistical significance, yes or
10      no, are the results-- the combined results of the
11      case-controls consistent with the combined results on the
12      cohort studies or not, yes or no?
13             MS. PARFITT:  Objection; form, asked
14      and answered.
15             THE WITNESS:  So I think I answered
16      before, the statistical significance was different and
17      they showed different results.
18   Q  (By Mr. Williams)  And the different results that they
19      showed was that one, the cohorts, was not statistically
20      significant, and the case-controls, overall, were
21      statistically significant, correct?
22             MS. PARFITT:  Objection; form, asked
23      and answered multiple times.
24             THE WITNESS:  So I answered more
25      fully, I think, than just statistical significance.

### Page 249

1          I answered both about the relative risk, which is
2       the point estimate, and the statistical significance, so
3       the point estimate was 1.02 in the cohort studies, not
4       statistically significant.
5          It was 1.26 in the case-control studies, and that
6       was statistically significant.
7    Q  (By Mr. Williams)  Perhaps that's where the issue is.
8          For purposes of my question, I am asking you to
9       limit your analysis to the question of statistical
10      significance.
11         Are you with me so far?
12   A  I understand what you're saying.
13   Q  With respect to statistical significance, with respect to
14      that issue, is it your testimony that the case-control
15      studies, which find that there is a statistically
16      significant positive odds ratio or relative risk, and the
17      cohort studies, which do not collectively have a positive
18      relative risk, is it your testimony that those are
19      consistent with respect to the issue of statistical
20      significance?
21             MS. PARFITT:  Objection; form, asked
22      and answered, hopefully for the last time.
23             THE WITNESS:  And I think I don't look
24      at statistical significance in the same way for a
25      relative risk of 1.02 as I do for 1.26, but there is

Anne McTiernan, Ph.D

Page 250

1  something remarkable here, is that the upper limit of the
2  confidence interval for the cohort studies is almost up
3  to the relative risk for the case-control studies, so the
4  statistical significance test tells us the relative risk
5  could be as high as 1.2, so even though you call it
6  nonstatistically significant, it's still within 95
7  percent chance that it's up at 1.2.
8  Q  (By Mr. Williams)  Are they both statistically
9  significant or not, the case-controls or the-- and the
10  cohort studies?
11          MS. PARFITT:  Objection; form, asked
12  and answered.
13          Counsel, I do believe she is trying to answer the
14  question.
15          This is about the tenth time.
16  Q  (By Mr. Williams)  You may answer.
17          MS. PARFITT:  Give your response
18  again.
19          THE WITNESS:  I think I'm sorry, but I
20  don't think of something as just looking at the
21  statistical significance.
22          I always look at both the relative risk and the
23  statistical significance.
24          Repeating, the relative risk is only 1.2 for the
25  cohort studies.

Page 251

1          The confidence interval includes one, so that would
2  be considered not statistically significant, but it
3  ranges up to 1.2, which means the relative risk could be
4  as high as 1.2 for the cohort studies.
5  Q  (By Mr. Williams)  You're speculating; are you not?
6          MS. PARFITT:  Objection; form.
7          THE WITNESS:  I'm interpreting--
8          MS. PARFITT:  Misstates your
9  testimony.
10          THE WITNESS:  I am interpreting what
11  the 95 percent confidence intervals mean.
12          It's not a speculation.
13  Q  (By Mr. Williams)  Is the answer that you are not able to
14  answer my question as phrased when I limit the question
15  to an analysis of statistical significance?
16          MS. PARFITT:  Objection; form.
17          She has answered your question completely.
18          Let's move on, Mr. Williams.
19          You are not going to get a different answer.
20          You can use up the remaining of your time if you
21  would like, but she has answered the question.
22  Q  (By Mr. Williams)  You may answer, Doctor.
23          MS. PARFITT:  You are asking questions
24  10, 15 times--
25  Q  (By Mr. Williams)  You may answer.

Page 252

1          Just so we can remember, my question to you is:
2          Are you unable to answer my question because I am
3  limiting the question to talk about statistical
4  significance and whether those findings are consistent or
5  inconsistent?
6          MS. PARFITT:  Objection; form.
7          Answer his question.
8          You have answered multiple times.
9          THE WITNESS:  I think my answer is I
10  don't look at just statistical significance.  I look at
11  point estimate as well.
12  Q  (By Mr. Williams)  Are you an expert in asbestos?
13  A  No, I'm not an expert in asbestos.
14  Q  Are you an expert in geology?
15  A  No.
16  Q  Mineralogy?
17  A  No.
18  Q  Can you distinguish between an asbestiform fiber on the
19  one hand and a cleavage fragment on the other?
20  A  No.
21  Q  Can you distinguish between an asbestiform and a
22  nonasbestiform fiber?
23  A  No.
24  Q  Are you an expert in microscopy?
25  A  In which?

Page 253

1  Q  Microscopy.
2  A  No.
3  Q  Are you qualified to analyze bulk samples of baby powder
4  using different types of microscopes?
5  A  No, I'm not.
6  Q  Are you qualified to perform any of the following tests
7  for purposes of analyzing a talcum powder sample:
8          X-ray defraction?
9  A  Are you going to list them or do you want me to say
10  "no"--
11  Q  You can answer them one at a time.
12  A  No.
13  Q  Polarized light microscopy?
14  A  No.
15  Q  Transmission electron microscopy?
16  A  No.
17  Q  In your work do you review and analyze other people's
18  defraction patterns or readouts or images or other
19  results of microscopic testing for-- of talcum powder for
20  asbestos, the presence of asbestos?
21  A  Are you talking about looking at the details of their
22  sampling?
23  Q  Correct.
24  A  To determine the methods?  No, I would not do that.
25  Q  Regardless of the method, have you ever personally tested

64  (Pages 250 to 253)

Anne McTiernan, Ph.D

## Page 254

1    any talcum powder product for asbestos?
2    A  No.
3    Q  Have you ever been to a talc mine?
4    A  No.
5    Q  How about a talc mill?
6    A  No.
7    Q  Do you know how talc is selected from a mine, sorted,
8    sterilized, processed before it is ever put into a bottle
9    of Johnson's Baby Powder?
10   A  No, I don't.
11   Q  Do you know what methods are used to test the cosmetic
12   talc in Johnson's Baby Powder products for asbestos?
13   A  Are you talking about what your company methods are to
14   test?
15   Q  Whether it was the company's methods or someone else's--
16   A  No.
17   Q  Do you know how many methods were used over the years to
18   test cosmetic talc in Johnson's Baby Powder products for
19   asbestos?
20   A  In some of the documents I've reviewed, I have seen
21   mention of several types, but I couldn't-- I am not an
22   expert in them.
23   Q  Do you know how often cosmetic talc, in Johnson's Baby
24   Powder products, were tested for asbestos?
25   A  By anybody, I don't know.

## Page 255

1    Q  Is it your opinion that at one point in time or another,
2    Johnson's Baby Powder products contained asbestos?
3       I think you told us you believe that's true,
4    correct?
5    A  Yes, that is my opinion.
6    Q  I will rephrase.
7       Is it your opinion that Johnson's Baby Powder
8    products sold today contain asbestos?
9         MS. PARFITT:  Objection; form, asked
10   and answered.
11        THE WITNESS:  I believe from the
12   evidence I've seen, that there was asbestos as recently
13   as samples tested in the 2000s.
14      I don't know for 2019.
15      I haven't seen any reports on that.
16   Q  (By Mr. Williams)  And am I right-- if you take a look at
17   Page 57 of your report, Exhibit No. 2, and I'm referring
18   you to the bottom of the page, the last paragraph, does
19   that paragraph summarize your opinion that asbestos has
20   been found in Johnson's Baby Powder products
21   specifically?
22   A  So are you talking about the whole paragraph?
23   Q  Correct.
24      You mention Reference No. 75 and Reference No. 76 as
25   supporting the idea that published data as recently as

## Page 256

1    2014 have shown that present-day talcum powder products
2    include several types of asbestos, and you cite two
3    sources, right?
4    A  Yes.
5    Q  And those are Gordon 2014 and Blount 1991?
6    A  That's correct.
7    Q  You also cite to Exhibit No. 47 of the deposition of
8    Imerys witness Julie Pier, P-I-E-R.
9       Do you remember that?
10   A  Yes.
11   Q  And to Exhibit No. 24 to the deposition of Johnson &
12   Johnson witness John Hopkins, correct?
13   A  Yes.
14   Q  You also have cited to five litigation reports.  Those
15   are referenced as 79 to 83, which were prepared by
16   Dr. William Longo, right?
17   A  Yes.
18   Q  Are you in fact relying upon Gordon 2014, Blount 1991,
19   Pier Exhibit No. 47, Hopkins Exhibit No. 24, and the five
20   Longo reports for your opinion that asbestos has been
21   found specifically in Johnson's Baby Powder products?
22   A  I would have to look at Gordon again to see what that
23   said about Johnson & Johnson.
24      Blount did identify one of the components as baby
25   powder.

## Page 257

1       Pier and Hopkins were Johnson & Johnson products,
2    and Longo tested powder from-- my understanding from
3    the report, from Johnson & Johnson.
4    Q  Other than the materials that we just identified, are you
5    relying on anything else to support your opinion that
6    asbestos has been found specifically in Johnson's Baby
7    Powder products?
8    A  No.
9    Q  "No," you are not relying on anything else?
10   A  No, I'm not.
11   Q  Are you aware that at the time they authored the article
12   identified as Reference No. 75 -- that's the Gordon 2014
13   report -- that each of the three authors had been a paid
14   expert for the plaintiffs' lawyers in talcum powder
15   litigation?
16   A  I believe they said that in their disclosures.
17      Do we have 75 available?
18   Q  While they are looking for that, Doctor, do you recall
19   whether they identified in the Gordon 2014 article, and
20   by "they," I mean the authors, did they identify whether
21   they were plaintiff experts; that is, experts retained by
22   plaintiffs in litigation?
23   A  It says, "Attorneys for the litigation process."
24   Q  It does not say whether it's Plaintiff or Defendant,
25   correct?

Anne McTiernan, Ph.D

Page 258

1  A  I don't see it here--
2  Q  I'm sorry, what was--
3  A  It doesn't say for the plaintiff or the defense.  It
4     doesn't say which.
5  Q  Do you know, one way or the other, whether the product
6     tested in that article was Johnson's Baby Powder?
7  A  No, I can't recall if I saw it.
8        My paragraph didn't talk about Johnson & Johnson,
9     just talked about talcum powder products.
10 Q  Okay.  Let me ask you to assume, for purposes of my next
11    question, that the product that is referred to in the
12    Gordon article was not Johnson's Baby Powder.
13       Will you make that assumption for purposes only of
14    my question?
15 A  Okay.
16 Q  Okay.  How would an article about a different talcum
17    powder product than the ones that are at issue in this
18    case support your opinion that perineal use of Johnson's
19    Baby Powder products cause ovarian cancer?
20       MS. PARFITT:  Objection; form.
21       THE WITNESS:  My opinion was-- from my
22    report, my opinion was that talcum powder product use of
23    any source increases risk of ovarian cancer.
24 Q  (By Mr. Williams)  Okay.  With respect to the Blount
25    article, 1991, Reference No. 76 in your report is the

Page 259

1     article by author A.M. Blount.
2        Do you recall that?
3  A  Yes.
4  Q  What information from the Blount 1991 article are you
5     relying on for your opinion that the contaminated
6     products mentioned in that article refer to Johnson's
7     Baby Powder products?
8  A  So there was a table with unidentified samples labelled A
9     to O, and I is indicated as-- somewhere it's written as
10    baby powder, I believe.
11       Then from litigation there was some indication of
12    what these different samples were, and so that one was
13    identified as Johnson & Johnson Baby Powder.
14 Q  Did you review the entirety of Dr. Blount's deposition?
15 A  No.  I skimmed part of it.  I didn't review-- I skimmed
16    part of it.  I didn't read the total deposition.
17 Q  Did you read the part of the deposition where Dr. Blount
18    testified that the bottle of Johnson's Baby Powder that
19    she brought to the deposition could not possibly be the
20    bottle of talc that she identified as Sample No. 1 in her
21    1991 article?
22 A  You mean Sample 1 or Sample I?
23 Q  Sample I, thank you.
24       It's Roman I or I.
25 A  I didn't read that, no.

Page 260

1  Q  Let me ask you about John Hopkins.
2        You referenced having read some documents that bore
3     his name, correct?
4  A  Yes.
5  Q  Let's mark as Exhibit No. 19 a document that I believe
6     was Reference No. 78 in your report.
7              (Exhibit No. 19 marked
8                for identification.)
9
10 Q  (By Mr. Williams)  Do you recognize this as the document
11    in your report that you cited in support of your opinion
12    that talcum powder products contained asbestos?
13 A  Yes.
14 Q  It is Exhibit No. 24, you see there, with the little tab,
15    to John Hopkins' August 17, 2018 deposition, correct?
16 A  Okay.  Here it says "19."
17 Q  What says 19?
18 A  I have Exhibit No. 19 for this one, 24 for the--
19 Q  Correct.
20       Just so you know, for this deposition it's Exhibit
21    No. 19.
22       For Mr. Hopkins' deposition it was Exhibit No. 24.
23       Do you understand?
24 A  Yes.
25 Q  Is this one of the documents that Plaintiffs' counsel

Page 261

1     sent to you without your asking?
2        MS. PARFITT:  Objection; form.
3        THE WITNESS:  They did send it to me.
4     I don't recall if I asked for it or not.
5  Q  (By Mr. Williams)  Do you have any idea if the three
6     pages of testing contained in Mr. Hopkins' Exhibit No. 24
7     is representative of all the testing that was done on
8     Johnson & Johnson talcum powder products?
9  A  I don't, but I would be concerned about any bottles
10    having asbestos in them.
11 Q  Do you have a problem with the notion that the seller of
12    talcum powder products tests for asbestos?
13       MS. PARFITT:  Objection; form.
14       THE WITNESS:  Do I have a problem with
15    the notion that the seller tests--
16 Q  (By Mr. Williams)  I'll rephrase it.
17 A  No, I don't have a problem.
18 Q  And the reason you don't have a problem is that the
19    seller of a product could, in all good faith, seek to
20    determine whether or not a particular mine where they're
21    getting the product contains asbestos, right?
22       MS. PARFITT:  Objection; form.
23       THE WITNESS:  Okay.
24 Q  (By Mr. Williams)  So the mere fact-- what I'm getting at
25    is:

66 (Pages 258 to 261)

Anne McTiernan, Ph.D

---

Page 262

1       The mere fact that a company tests to determine
2  whether or not there is asbestos, for example, in a mine
3  where they are mining for talcum powder, that fact, in
4  and of itself, is not repugnant to you in any way,
5  correct?
6  A  No.
7         MS. PARFITT:  Objection; form.
8  Q  (By Mr. Williams)  It is not repugnant to you, for
9  example, for a car company to test whether cars of a
10  particular make and model have brakes that work, right?
11  A  Correct.
12  Q  The fact that they test for brakes does not mean that the
13  brakes do not work, right?
14  A  Correct.
15  Q  The fact that they test for brakes doesn't mean that the
16  product that is actually sold to people does not have
17  brakes that can stop a car, right?
18         MS. PARFITT:  Objection; form.
19         THE WITNESS:  There are a couple of
20  negatives there.  I'm just getting a little confused.
21  Q  (By Mr. Williams)  I will start over.
22       The mere fact that a car company tests its makes and
23  models to see whether the brakes work does not mean that
24  the cars that are ultimately sold have brakes that do not
25  work?

---

Page 263

1  A  Correct.
2  Q  Do you know whether this Exhibit No. 24 that's in front
3  of you, from Dr. Hopkins, represents final or preliminary
4  test results?
5         MS. PARFITT:  Objection; form.
6         THE WITNESS:  Final or preliminary?
7     Can you explain that, meaning-- what do you mean by
8  those two?
9  Q  (By Mr. Williams)  Do you know the difference between a
10  preliminary test and a final test?
11  A  I mean, in terms of what it means for the company, I
12  don't know what final or preliminary would mean in terms
13  of their testing procedures.
14  Q  Do you know, one way or the other, if any of the results
15  were updated or corrected?
16         MS. PARFITT:  Objection; form.
17         THE WITNESS:  Updated for a particular
18  sample or updated for all of their products?
19  Q  (By Mr. Williams)  Either.
20  A  I think I'm confused.
21     I see what was tested for this, and it says Shower
22  to Shower, medicated powder, baby powder, so I would
23  assume that that's an actual product.
24         (Exhibit No. 20 marked
25          for identification.)

---

Page 264

1
2  Q  (By Mr. Williams)  Let me show you what we've marked as
3  Exhibit No. D-1-- Exhibit No. 20.  Pardon me.
4         MS. PARFITT:  Counsel, I have not seen
5  this before.
6     Can you represent to us what this is?
7         MR. WILLIAMS:  I will in a second.
8  Q  (By Mr. Williams)  Have you ever seen this document,
9  Dr. McTiernan, what's been marked as Exhibit No. 20?
10  A  I don't think so-- well--
11  Q  Did Plaintiffs' counsel provide this to you?
12  A  I don't recall.
13  Q  Let me represent to you that this is Exhibit No. D-1,
14  D-1, to John Hopkins October 17, 2018 deposition.
15     Will you accept that representation?
16  A  Yes.
17  Q  You see the tab number that has-- it bears a deposition
18  tab number just like your deposition has exhibits with
19  tabs?
20  A  Yes.
21  Q  Do you see that Exhibit D-1 appears to contain the same
22  information as Hopkins' Exhibit No. 24, which you were
23  provided by Plaintiffs' counsel, except there's an
24  additional column that says "The whole story"?
25  A  I think there's an awful lot of information here.

---

Page 265

1  Q  Let's take a couple-- let's take the first one at the top
2  of the page.
3     Under "The whole story," it says, "Tremolite is not
4  asbestos."
5     Do you see that?
6  A  Yes.
7  Q  And you don't know, as you sit here, whether tremolite is
8  or is not asbestos, right?
9         MS. PARFITT:  Objection; misstates her
10  testimony.
11         THE WITNESS:  I am confused about that
12  because IARC states that tremolite is asbestos, so--
13  Q  (By Mr. Williams)  We'll get to that in a minute.
14     Is it your testimony that the IARC monograph does
15  not make any distinction between a mineral known as
16  tremolite and one known as tremolite asbestos?
17         MS. PARFITT:  Objection; form,
18  misstates her testimony.
19         THE WITNESS:  I don't recall.  We
20  would have to read it.
21  Q  (By Mr. Williams)  You don't remember one way or another?
22  A  No.
23  Q  Do you see the last line on the first page refers to, in
24  this same document, Exhibit No. 20 to your deposition,
25  D-1 to Dr. Hopkins' deposition, it refers to trace

---

Anne McTiernan, Ph.D

Page 266

1   amounts of fibrous minerals, but "The whole story" column
2   indicates that that does not mean asbestos?
3           MS. PARFITT:  Objection.
4       Is that what it says?
5       Is that the question?
6   Q  (By Mr. Williams)  Do you see that that's what it says?
7   A  It says, "Fibrous minerals does not mean asbestos," so--
8       is it fibrous talc?  That could be carcinogenic as well.
9       Is that correct?
10  Q  Do you know the difference between fibrous talc and
11      fibrous minerals?
12  A  I couldn't distinguish myself.  I'm not a mineralogist,
13      no.
14  Q  What's the basis for your testimony?
15      I think you were suggesting a moment ago that
16      fibrous talc is somehow carcinogenic.
17      Is that what you were suggesting?
18  A  I believe that IARC considers that it could be, so I
19      would have to look at the IARC report again to fully
20      report.
21  Q  So the basis for your testimony then is that you believe
22      that IARC states that fibrous talc is carcinogenic?
23  A  Yes, but I need to look at the report again.
24  Q  Okay.  You are relying on five litigation reports
25      authored or co-authored by Dr. Longo as part of his paid

Page 267

1       expert work for plaintiff lawyers in talcum powder
2       litigation, correct?
3           MS. PARFITT:  Objection; form.
4           THE WITNESS:  Correct.
5   Q  (By Mr. Williams)  Do you know-- do you think the chain
6       of custody is important when it comes to samples that are
7       being tested for asbestos?
8       Do you know what I mean when I say "chain of
9       custody"?
10  A  Why don't you explain it.
11  Q  Sure.
12      I will ask you to assume that "chain of custody"
13      refers to who has custody of a particular substance or
14      item that is going to be tested from the time that it
15      existed at its source to the time that it is tested.
16      Do you understand what I mean?
17  A  Yes.
18  Q  Do you know where Dr. Longo got the samples that he
19      tested?
20  A  I understood from the summaries in the beginnings of
21      these reports that he received the samples from Johnson &
22      Johnson.
23  Q  All of the samples?
24  A  I would have to look at the individual reports to
25      determine that.

Page 268

1   Q  Do you know one way or the other whether the samples that
2       Dr. Longo tested were open and unsealed when he received
3       them?
4   A  I don't recall reading that.
5       I would have to look at the report again.
6   Q  Do you know that Dr. Longo did not personally test any of
7       the samples he reports on in the litigation documents
8       that you relied on in the case?
9           MS. PARFITT:  Objection; misstates the
10      record.
11          THE WITNESS:  I just read the summary
12      report, which looked like his company did the testing.
13  Q  (By Mr. Williams)  Please turn to Page 57 of your report.
14      I want to focus your attention on the fourth
15      paragraph there that starts with the word "Asbestos."
16  A  Yes.
17  Q  Does that paragraph accurately summarize the bases of
18      your opinion that asbestos is established as a cause of
19      epithelial ovarian cancer?
20  A  Yes.
21  Q  You cite the 2011 Camargo, C-A-M-A-R-G-O, and the 2011
22      Reid, R-E-I-D, meta-analyses in support of your opinion
23      that asbestos is a cause of ovarian cancer, correct?
24  A  Yes.
25  Q  Those are References 71 and 72, right?

Page 269

1   A  Yes.
2   Q  You also cite Ferrante, F-E-R-R-A-N-T-E, a 2017 pooled
3       analysis, in support of your opinion that asbestos is a
4       cause of ovarian cancer, right?
5   A  Yes.
6   Q  You also cite to the IARC 2012 monograph on asbestos, an
7       article by members of the IARC working group, correct?
8   A  Yes.
9   Q  Other than those materials, are you relying on anything
10      else to support your opinion that asbestos is a cause of
11      ovarian cancer?
12  A  No, I don't believe so, and I did not do a full
13      systematic search with causal analysis for asbestos.
14      I only did that for talcum powder products.
15  Q  Why didn't you do one for asbestos?
16  A  I wasn't asked to.
17  Q  Were you asked to include a discussion of asbestos in
18      your report at all-- excuse me--
19  A  I was asked to respond about mechanisms-- sorry, to talk
20      about mechanisms that may be explaining the association
21      between talcum powder products and ovarian cancer risk,
22      and when I looked at mechanisms, I often would see the
23      potential for asbestos being included in talcum powder
24      products, so I wanted to include that as one possible
25      mechanism, especially given that asbestos is a known

68  (Pages 266 to 269)

Anne McTiernan, Ph.D

Page 270

1  carcinogen.
2  Q  Let me focus your attention on Page 57 of your report,
3      Exhibit No. 2, to the last sentence in that fourth
4      paragraph that says, "IARC concluded that asbestos,
5      fibrous talc, chromium, and nickel are Group 1 human
6      carcinogens.  IARC also classified cobalt as a 2B
7      'possible' carcinogen."
8      Do you see that?
9  A  Yes.
10  Q  Do you believe that Johnson's Baby Powder products
11     contained chromium, nickel, and cobalt?
12  A  I would have to review some of these documents that
13     talked about these--
14  Q  What are you relying on?
15          MS. PARFITT:  Please let her finish
16     the answer.
17          MR. WILLIAMS:  I'm sorry.
18          THE WITNESS:  I would need to review
19     the documents in the report responding to that.
20  Q  (By Mr. Williams)  Are those heavy metals, the three
21     metals I mentioned, the metals that you believe are or
22     have ever been present in Johnson's Baby Powder products?
23          MS. PARFITT:  Objection; form.
24          THE WITNESS:  Again, I would have to
25     review the documents.

Page 271

1  Q  (By Mr. Williams)  As you sit here today, you are not
2      able to tell us what the heavy metals are that are
3      supposedly contained in Johnson's Baby Powder?
4          MS. PARFITT:  Objection; misstates her
5      testimony, form.
6          THE WITNESS:  I would want to review
7      the documents.
8  Q  (By Mr. Williams)  Let me ask you this:
9      Is it your opinion today, Doctor, that Johnson's
10     Baby Powder products contain chromium, nickel, and
11     cobalt?
12  A  Again, I would need to look at the documents to see what
13     was found.
14  Q  So you can't state whether you have that opinion or not?
15          MS. PARFITT:  Objection.  She needs to
16     look at the document.
17     What documents do you need to see?
18          THE WITNESS:  I would want to see-- I
19     guess Longo-- whoever was looking at these to see what
20     was there, but my paragraph did not talk about Johnson &
21     Johnson.
22     My paragraph talked about talcum powder products
23     having these constituents.
24  Q  (By Mr. Williams)  That's my point.
25     So as you sit here today, based on your review, do

Page 272

1  you have evidence, do you believe that Johnson's Baby
2  Powder in particular contains chromium, nickel, and
3  cobalt?
4          MS. PARFITT:  Objection.
5          THE WITNESS:  I don't have evidence
6  one way or the other.
7     I did not look at that.
8     I looked only at the general comments that talcum
9  powder products could contain these metals.
10     I did not look at Johnson & Johnson.
11  Q  (By Mr. Williams)  Thank you.
12     Are any of your opinions dependent on the assumption
13     that the chemicals in the fragrance that goes into
14     Johnson's Baby Powder products are carcinogenic?
15  A  I read one review by Dr. Crowley (Phonetic) who indicated
16     that there were quite a few fragrances in these products
17     that fall into the classification of carcinogenicity.
18     Without that data, my opinion would still stand.
19  Q  Dr. Crowley is another expert Plaintiffs' witness that
20     Plaintiffs' counsel has paid in connection with talc
21     litigation, correct?
22          MS. PARFITT:  Objection; form.
23          THE WITNESS:  To my knowledge, yes.
24  Q  (By Mr. Williams)  Have you ever met or spoken with
25     Dr. Crowley?

Page 273

1  A  No, I have not.
2  Q  Are you relying on Dr. Crowley's litigation report for
3     your opinion that perineal use of Johnson's Baby Powder
4     products can cause ovarian cancer?
5  A  Yes, I have looked at his report.
6  Q  What chemicals did Dr. Crowley identify as fragrance
7     constituents contained in Johnson's Baby Powder products?
8  A  There were many.
9     I would have to see the report.
10     Do you have it?
11  Q  I don't want to take the time to do that.
12     Let me just ask you this:
13     Did you do anything to independently verify whether
14     those constituents are, in fact, contained in Johnson's
15     Baby Powder products?
16  A  No, I did not.
17  Q  We have talked a little bit about IARC today, and I want
18     to ask you some questions about that.
19     You are familiar with the International Agency for
20     Research on Cancer, right?
21  A  Yes, I am.
22  Q  You have done work with them?
23  A  Yes.
24  Q  IARC has five different categories it places substances
25     into with respect to whether they are or may be

Anne McTiernan, Ph.D

Page 274

1    carcinogenic, correct?
2    A  I can't respond to whether it's exactly five or not.
3       I have looked at these-- do we have a list of them?
4    Q  Sure.
5       It is-- we'll mark it as Exhibit No. 21.
6              (Exhibit No. 21 marked
7               for identification.)
8
9    Q  (By Mr. Williams)  This is the IARC monograph on talc.
10   2012?
11   A  This one is 2010.
12   Q  2010, okay.
13   Q  Let me refer you to Page 35 of the document.
14      Do you see "Group 2B" listed there?
15   A  Yes.
16   Q  That is where the agent is possibly carcinogenic to
17      humans, and then there is a fairly long description of
18      what that means.
19      Do you see that?
20   A  Yes.
21   Q  And it is your understanding that talc has been listed as
22      a Group 2B substance?
23   A  Yes.
24      You are using data up to 2006, yes.
25   Q  Of the almost 1000 substances that IARC has reviewed, do

Page 275

1    you know how many have been classified as Group 4, which
2    is on the next page, "The agent is probably not
3    carcinogenic to humans"?
4    A  No, I haven't.
5    Q  If I were to represent to you that there was one, and
6       only one, substance that they have reviewed that was put
7       into Group 4, would that surprise you?
8              MS. PARFITT:  Objection; form.
9              THE WITNESS:  It would not surprise me
10      because they probably are only looking at things that are
11      potentially carcinogenic.
12   Q  (By Mr. Williams)  You mentioned earlier today that IARC
13      sets a high bar for listing something as a Group 2B
14      possible substance.
15      Do you remember saying that?
16   A  I don't, but I believe you.
17   Q  What was the basis for your statement that IARC sets a
18      high bar as opposed to some other level bar for
19      determining whether a substance is a Group 2B substance?
20   A  From my understanding, they do a systematic review.  They
21      set up a panel of scientists, and then they do a
22      systematic review, including studies from humans and
23      animals, and they did this for-- for talcum powder
24      products-- for talc, they did it up to 2006, and they did
25      not do meta-analysis, but they did do a systematic

Page 276

1    review.
2    Q  Okay.  And let me refer you to Page 35 again, under Group
3       2B where that's the definition of the agent being
4       possibly carcinogenic to humans.
5       Do you see that?
6    A  Yes.
7    Q  It says, "This category is used for agents for which
8       there is limited evidence of carcinogenicity in humans
9       and less than sufficient evidence of carcinogenicity in
10      experimental animals."
11      Did I read that right?
12   A  Yes.
13   Q  Do you remember, as you sit there, the definition of
14      "limited evidence of carcinogenicity" under IARC's
15      definitions?
16   A  No, I don't.
17   Q  Take a look at Page 31.
18      On Page 31 of Exhibit No. 21, there is a definition
19      at the bottom of the page for "limited evidence of
20      carcinogenicity," right?
21   A  Yes.
22   Q  And it says, "A positive association has been observed
23      between exposure to the agent and cancer for which a
24      causal interpretation is considered by the working group
25      to be credible, but chance, bias, or confounding could

Page 277

1    not be ruled out with reasonable confidence."
2       Did I read that right?
3    A  Yes.
4    Q  Remember earlier today we were talking about chance,
5       bias, and confounding factors needing to be ruled out in
6       order to move something from a Group 2B designation to a
7       higher designation, and you said, "I would have to look
8       at the IARC monograph"?
9       Do you remember that?
10   A  Yes.
11   Q  Now that we are looking at the IARC monograph, and you
12      see the definition of "limited evidence of
13      carcinogenicity," will you agree with me now that in
14      order for something to move up from this Level 2B, where
15      there's limited evidence of carcinogenicity in humans, to
16      some higher level, one would need to rule out or
17      specifically the IARC group would need to rule out
18      chance, bias, and confounding?
19              MS. PARFITT:  Objection; form.
20              THE WITNESS:  Yes, because they state
21      that in the category above, "Sufficient."
22   Q  (By Mr. Williams)  And when you say "yes," "yes," they
23      would have to rule out all of those things, correct?
24   A  Yes, with reasonable confidence.
25   Q  Now, as we sit here today, IARC still lists talc as a 2B

70 (Pages 274 to 277)

Anne McTiernan, Ph.D

Page 278

1    substance, correct?
2              MS. PARFITT:  Objection; form.
3              THE WITNESS:  IARC has not updated
4    their 2006 data, correct.
5    Q  (By Mr. Williams)  Therefore the most recent update lists
6    talc as a Group 2B substance, correct?
7              MS. PARFITT:  Objection; form.
8              THE WITNESS:  Using data up to 2006,
9    yes.
10   Q  (By Mr. Williams)  You keep saying, "using data up to
11   2006."
12        Do you have any basis for-- strike that.
13        You testified earlier today that you believe that
14   IARC would set a higher designation if they had the
15   results of studies since 2006, correct?
16   A  I believe it would be reasonable to expect that, given
17   that there's more studies published since that time.
18   Q  And when you say that you believe it would be reasonable
19   to expect that, you expected it, right?
20             MS. PARFITT:  Objection.
21             THE WITNESS:  I can't say what a panel
22   of scientists would say if it was faced with reviewing
23   the literature.
24        All I can say is the literature-- all I can say is
25   the literature has been increased significantly in the

Page 279

1    last ten years.
2    Q  (By Mr. Williams)  And what study are you referring to or
3    studies are you referring to?
4    A  So some of the larger case-control studies that were
5    published in recent years, the two meta-analyses, and the
6    pooled analysis.
7    Q  Anything else?
8    A  In terms of epidemiology, that's it.
9    Q  Let me show you to one of the studies that has been done
10   since the IARC monograph was first drafted in 2006.
11        We'll mark it as Exhibit No. 22.
12             (Exhibit No. 22 marked
13             for identification.)
14
15   Q  (By Mr. Williams)  The Langseth study, which is Exhibit
16   No. 22, is one of the studies there you rely upon,
17   correct?
18   A  That's correct.
19   Q  Let me ask you to turn to Page 360, which is the-- I
20   believe the last page of the study.
21        Do you see that there are 34 publications cited as
22   references to the Langseth article?
23   A  Yes.
24   Q  For the record, "Langseth" is L-A-N-G-S-E-T-H.
25        The Langseth study was one of the meta-analyses that

Page 280

1    you relied upon in preparing your report, correct?
2    A  Yes.
3    Q  It was published in 2008?
4    A  Yes.
5    Q  That is two years after IARC met to discuss talc.
6    A  Yes.
7    Q  Three of the four authors of this meta-analysis were
8    participants in the IARC working group.
9        Do you remember that?
10   A  Yes.
11   Q  If you look at the last page of this exhibit, Exhibit
12   No. 22, there's an acknowledgments section on Page 360.
13        It says, "The work reported in this paper was
14   initiated while SH, JS, and EW were part of an IARC
15   monograph working group of the International Agency for
16   Research on Cancer, Lyon, France."
17        Do you see that?
18   A  Yes.
19   Q  So after the working group determined, and by that I mean
20   the IARC working group determined, that chance, bias, or
21   confounding could not be ruled out as an explanation for
22   the reported association between talc and ovarian cancer,
23   three of the members of that working group continued
24   their work in this article, correct?
25             MS. PARFITT:  Objection; form,

Page 281

1    misstates the substance of this article.
2             THE WITNESS:  Yes.
3    Q  (By Mr. Williams)  You may answer.
4    A  Yes.
5    Q  Does this paper report the perineal use of talc in fact
6    causes ovarian cancer?
7    A  I don't see that they did a full causal analysis in this
8    paper, but I see that they have a pooled odds ratio of
9    1.35, which is statistically significant.
10        Yeah, 1.35.
11   Q  You read this study, right?
12   A  Yes.
13   Q  Let's take a look at Page 359.
14        Under the heading "Proposal to research community,"
15   do you see that?
16   A  Yes.
17   Q  Right underneath that it says, "The current body of
18   experimental and epidemiological evidence is insufficient
19   to establish a causal association between perineal use of
20   talc and ovarian cancer risk."
21        Did I read that right?
22   A  Yes.
23   Q  Can you and I agree that that is the opposite of the
24   conclusion that you are intending to express in this
25   litigation?

71 (Pages 278 to 281)

Anne McTiernan, Ph.D

## Page 282

1 MS. PARFITT: Objection; form.
2 THE WITNESS: Using information
3 available to 2018, I do have a different opinion than
4 these investigators did in using their data up to 2006.
5 Q (By Mr. Williams) They-- strike that.
6 They would have information up until the time they
7 published this study, the Langseth study, right, which
8 was done in 2008?
9 MS. PARFITT: Objection.
10 THE WITNESS: Not necessarily up until
11 this date.
12 It takes a while to get-- it was accepted in 2007,
13 so their data are going to be studies probably only up to
14 2006, if the paper was already written and accepted in
15 2007, October.
16 Q (By Mr. Williams) After this Langseth paper was
17 published, there were large cohort studies, prospective
18 studies, that were published, true?
19 A They were small in terms of the number of cases.
20 They came from large cohorts, but the number of
21 cases were small.
22 Q Are you referring to the cohort studies that were
23 published in 2008, 2010, and 2014?
24 MS. PARFITT: Objection; form.
25 THE WITNESS: Two thousand-- yes-- how

## Page 283

1 many cases do we have?
2 I think we covered that earlier, the number of cases
3 that would be needed.
4 So Women's Health Initiative published in 2014 had
5 429 cases.
6 The sister study in 2016 had 154.
7 The Nurses' Health Study, which the problem with
8 that was they weren't-- they changed their categories
9 with exposure, but that one did have a larger number,
10 797.
11 Q (By Mr. Williams) You remember earlier today we went
12 through the whole discussion of whether or not there were
13 sufficient number of cases, right?
14 A And that was a different discussion that was about the
15 pooled analysis-- sorry, the meta-analysis of the cohort
16 studies.
17 It wasn't about these individual studies.
18 Q Let me talk to you now about the meta-analysis of those
19 studies that were conducted that are cohort studies.
20 Do you have those in mind?
21 A Yes.
22 Q Do you wish to change any of the testimony that you gave
23 earlier today concerning the-- whether or not there was a
24 sufficient number of cases, as part of the pooled
25 analysis, for the cohort studies to have power if

## Page 284

1 combined?
2 MS. PARFITT: Objection; form.
3 THE WITNESS: I don't think we had-- I
4 don't think we discussed that particular-- and we didn't
5 do a power analysis with the numbers that they had, but
6 together they had-- what was it, 900, so they probably
7 were powered with a relative risk of 1.3.
8 Q (By Mr. Williams) Well, whatever that testimony was, it
9 was.
10 Let me ask you this:
11 It is a fact that after the IARC monograph-- strike
12 that.
13 After-- it is a fact that after the data that
14 underlay the IARC monograph, after the Langseth study was
15 published in 2008, there were additional cohort studies
16 that were published, correct?
17 A As well as about eight case-control studies.
18 Quite a few studies were published after.
19 Q And based upon that, you speculate that if IARC were to
20 undertake an analysis of whether talc is causally
21 associated with ovarian cancer, that you believe that
22 they would change their mind?
23 MS. PARFITT: Objection; form.
24 THE WITNESS: I speculate it would be
25 reasonable for a scientific panel to come up with a

## Page 285

1 different classification after reviewing the new human
2 data that have been available the last ten years.
3 MR. WILLIAMS: Let's take one final
4 break, if we can.
5 VIDEOGRAPHER: Going off the record,
6 the time is 4:54 p.m.
7 (Recess 4:54 to 5:09 p.m.)
8
9 VIDEOGRAPHER: We are back on the
10 record. The time is 5:09 p.m.
11 Q (By Mr. Williams) Dr. McTiernan, just a few more minutes
12 from me, and then we have just a couple minutes of
13 questioning from Imerys counsel, but I have to do it. I
14 have to have you grab the Berge study one more time,
15 Exhibit No. 16A.
16 Earlier today, this afternoon actually, we had a
17 discussion about statistical significance, and I was
18 trying to focus you on statistical significance as it
19 relates to the cohort studies that are listed on page--
20 listed in Figure No. 2 on Page 7 of Exhibit No. 16A.
21 Do you have that in front of you?
22 A Yes.
23 Q And you'll recall that I focused you on the subtotal for
24 cohort studies with regard to what the relative risk was
25 and the confidence interval, and you noted that it was

Anne McTiernan, Ph.D

Page 286

1    1.02 as a relative risk with a confidence interval that
2    goes all the way up to 1.20.
3        Do you recall that?
4    A  Yes.
5    Q  And when I made the point that it was lacking statistical
6        significance, you said, "But the confidence interval
7        includes one, so that would not be statistically
8        significant, but it ranges up to 1.2, which means that
9        the relative risk could be as high as 1.2 for the cohort
10       study."
11       Do you recall saying that?
12   A  Correct.
13   Q  It is equally true, based on the confidence interval
14       reported on Page 7, that the relative risks could be as
15       low as 0.85, correct?
16   A  That's correct.
17   Q  And with respect to each of the case-control studies that
18       did not find statistical significance, first you see
19       Cramer in 1982, that one that had a 0.70 relative risk--
20       you see that one?
21   A  Yes.
22   Q  That one had a low--
23   A  That's Hartge.
24   Q  That's Hartge, pardon me.  I shouldn't have said
25       "Cramer."

Page 287

1        Let me start again.
2        The first case-control study that did not have a
3        statistically significant relative risk was Hartge 1983,
4        right?
5    A  Yes.
6    Q  And its lower confidence interval, the low side of that,
7        was 0.83, correct?
8    A  You're looking at Whittemore, but I think you're talking
9        about Hartge.
10   Q  Sorry, 0.40.
11   A  Yes.
12   Q  So the relative risk for Hartge could go as low as 0.40,
13       right?
14   A  Yes.
15   Q  The relative risk for Whittemore could go as low as 0.83,
16       right?
17   A  Yes.
18       What it means is a 95 percent chance that the risk
19       is within that range, 0.83 up to 1.74.
20   Q  So it could be as high as 1.74 for Whittemore or as low
21       as 0.83?
22   A  That's correct.
23   Q  And for Booth, the low point was 0.80, correct?
24   A  Yes.
25   Q  And for the next one, Harlow & Weiss, 1989, the low end

Page 288

1    of the confidence interval was 0.70, correct?
2    A  Yes.
3        One thing that all of these studies had in common is
4        they were very small, and you get a very wide confidence
5        interval with these small studies.
6        You notice the larger studies, the confidence
7        intervals, such as Cramer 2016, was 1.14 up to 1.5.
8        That's a much more narrow confidence interval, and that's
9        because it's a larger study.
10   Q  So let's focus now on what we were focused on this
11       afternoon with the cohort studies.
12       With respect to the cohort studies, in the aggregate
13       the low point was 0.85, correct?
14   A  That's correct.
15   Q  And those cohort studies, we established earlier today,
16       have a total number of cases that exceeded 1300, right?
17   A  Correct.
18   Q  That's all I need on that.
19       I wanted to ask you about one of the Bradford Hill
20       elements or factors, the one that has to do with
21       biological plausibility, okay?
22   A  Mm-hm.
23   Q  Is that a "yes"?
24   A  Yes.
25   Q  Okay.  So can you cite a single study, animal or human,

Page 289

1    that traces externally applied talc up through the
2    reproductive organs to the ovaries?
3        MS. PARFITT:  Objection; form.
4        THE WITNESS:  So the question is
5    externally applied talc?
6        MR. WILLIAMS:  Correct.
7        THE WITNESS:  So in humans that would
8    be unethical to do to see if that can move up to the
9    ovaries.
10       In terms of animals-- so in animals, talc was placed
11   in the vaginas, and it moved within four days up to the
12   ovaries.
13   Q  (By Mr. Williams)  And which study is that?
14   A  That's on Henderson 86.
15   Q  Okay.  Thank you.
16       Anything else?
17   A  Let me see.
18       In terms of humans, quite a few have been done with
19   particles of similar size to talc, which was thought to
20   be-- let me try to find where I have these.
21       So it wouldn't have the ethical issue, so inert
22   particles of carbon black were placed in women's vaginas
23   and were found to move in 30 minutes in two of three
24   patients, and that's the Egli study.
25   Q  Which one is that?

73 (Pages 286 to 289)

Anne McTiernan, Ph.D

Page 290

1   A  Egli, E-G-L-I.
2   Q  Anything else?
3   A  There was a surgical glove study with starch.
4        There was one radioactive tracer labelled human
5   albumin microspheres placed in-- there was--
6   radio-labelled albumin was placed in women's vaginas one
7   day before pelvic surgery, and of 14 women, nine showed
8   radioactivity in the fallopian tubes.
9   Q  Which study was that?
10  A  So that was the Venter, V-E-N-T-E-R.
11       One study on migration of talc-- sorry, no,
12  evaluated powder, so this was a starch powder on surgical
13  gloves that were used to perform pelvic exam in advance
14  of surgery, and they found statistically significant-- so
15  this is the Sjosten study.  It's S-J-O-S-T-E-N.
16  Q  Anything else?
17  A  And that's in terms of migration for humans and animals,
18  I believe.
19  Q  So is it accurate to say that not one of the studies that
20  you just mentioned -- Egli, Venter, Sjosten or Henderson
21  -- involves tracing externally applied talc in the
22  perineal area up through the reproductive organs through
23  the ovaries?
24  A  There are no such studies in humans, that's correct.
25       It would be unethical to apply it externally and

Page 291

1   follow it up through the pelvic organs.
2   Q  Same with the animals though, none of the animal studies
3   that you just mentioned, or the only animal study you
4   mentioned, does not deal with externally applied talc
5   moving up through the reproductive organs through the
6   ovaries, correct?
7        MS. PARFITT:  Object to form.
8        THE WITNESS:  They're vaginally
9   applied.
10  Q  (By Mr. Williams)  In the vagina, correct?
11  A  Into the vagina, yes.
12  Q  So you and I can agree that there is a difference between
13  the outer area and inside the vagina?
14       MS. PARFITT:  Objection.
15       THE WITNESS:  There are plenty of ways
16  for which anything on the external part of the peroneum
17  can move into the vagina.
18  Q  (By Mr. Williams)  There's not one study that you've
19  cited for humans that involved particles other than talc
20  or any known toxic substance.
21       There are articles that inject into the vagina the
22  particles and they see what happens, right?
23  A  Mm-hm.
24  Q  Is that "yes"?
25  A  Yes.

Page 292

1   Q  But none of the studies that you mentioned involve
2   reviewing perineal use external to the vagina and
3   followed the talc up through the reproductive organs,
4   true or not true?
5   A  That's correct.
6   Q  Can you cite any published study concluding that
7   particles on the outside of the vagina can migrate inside
8   and up the genital tract to the ovary?
9   A  I don't believe it was cited in my report.
10  Q  Assuming for a moment that talcum powder can reach the
11  ovaries, is it your opinion that talcum powder produces
12  chronic inflammation that somehow leads to ovarian
13  cancer?
14  A  Yes, it is my opinion that it can cause chronic
15  inflammation and it doesn't need to reach the ovaries.
16       Many cancers, especially serous cancers, are thought
17  to begin in the fallopian tubes, and they would need to
18  rise as high as that.
19  Q  So inflammation is the biological mechanism that you
20  believe is plausible for perineal talc use to cause
21  ovarian cancer, correct?
22  A  I believe it's one very plausible mechanism.
23  Q  There are no reports in the literature of externally
24  applied talcum powder products leading to inflammation,
25  granulomas, fibrosis, or adhesions anywhere along a

Page 293

1   woman's reproductive tract, correct?
2        MS. PARFITT:  Objection; form.
3        THE WITNESS:  Again, it's the ethics
4   of applying something that could potentially be
5   carcinogenic to see what would occur.
6   Q  (By Mr. Williams)  Can you identify any study that shows
7   inflammation, granulomas, fibrosis, or adhesions anywhere
8   along a woman's reproductive tract as a result of her
9   external genital talcum powder application?
10  A  I don't think I cited any such studies.
11  Q  Can you identify any published animal study where talcum
12  powder actually caused ovarian cancer in the animal?
13  A  There have been studies that showed that talc can lead to
14  cyst formation and epithelial changes in rats.
15  Q  Which study is that?
16  A  That is 122.
17       Hamilton.
18  Q  Any other studies?
19  A  Say that again?
20  Q  You said "Hamilton," right?
21  A  Hamilton, 1984.
22  Q  Any other studies?
23  A  Oh, and a mouse study, which is 123, Van Dyke.
24  Q  123?
25  A  123, yes, that talc can cause super NI generation and

Anne McTiernan, Ph.D

Page 294

1    release from mouth to macrophages (phonetic).
2  Q  Anything else?
3  A  I am just looking.
4      So you are talking about ovarian tumors.
5      The NTP, the National Toxicology Program, has also
6    done rat studies and found that exposure to talc cause--
7    it was an inhalation study, caused clear evidence of
8    carcinogenesis in females in terms of cancer of the
9    adrenal gland and the lung and possible carcinogenic
10    activity in males.
11  Q  What was the date of that NTP study?
12  A  NTP study?  That was No. 124.
13      1993.
14  Q  Are you familiar with the methodology of that study?
15  A  I have read the study, yes.
16  Q  And you know that the rats were subjected to talcum
17    powder pumped into a cage-- a closed cage, I think it
18    was, six hours a day, five days a week, for their entire
19    lives, right?
20  A  Yes.
21  Q  Do you think that that has applicability to human beings
22    using talcum powder in their homes?
23      MS. PARFITT:  Objection; form.
24      THE WITNESS:  Using talcum powder in--
25  Q  (By Mr. Williams)  In their homes.

Page 295

1  A  I think the correlation would be a larger concentrated
2    dose being introduced into the genital tract, and if the
3    talc is carcinogenic to animals and wasn't seen in the
4    control animals, then it's still concerning.
5  Q  Did the 1993 NTP study in fact report any ovarian cancer
6    in the female rats or mice?
7  A  I don't believe that these rats developed ovarian cancer.
8      They did not develop ovarian cancer.
9  Q  Not one of them did, correct?
10  A  No.
11      It may not be an ovarian cancer model.
12  Q  Did the 1993 NTP study report any neoplastic changes in
13    the ovaries of the female rats or mice?
14  A  Not to my knowledge.
15      Again, that's not a model for ovarian cancer.
16  Q  Can we agree that the NTP 1993 rat and mouse study does
17    not in fact show that talc causes inflammation, which
18    inflammation leads to neoplastic change or cancer in an
19    animal's ovaries?
20      MS. PARFITT:  Objection; form.
21      THE WITNESS:  I don't have the study
22    in front of me.
23      I don't recall that they did the full mechanistic
24    study.
25  Q  (By Mr. Williams)  Do you recall that the NTP expressly

Page 296

1    concluded that the 1993 rat study was not applicable or
2    appropriate for application to humans?
3      MS. PARFITT:  Objection; misstates the
4    evidence.
5  Q  (By Mr. Williams)  I'm sorry, I misspoke.
6      Are you aware that the FDA concluded that the 1993
7    NTP study was not applicable to human beings?
8      MS. PARFITT:  Objection; misstates the
9    evidence in the case.
10      THE WITNESS:  I would have to see both
11    the FDA statement and the NTP.
12  Q  (By Mr. Williams)  Can you identify-- strike that.
13      I want to distinguish between a study, an animal
14    study, where talcum powder caused inflammation on the one
15    hand, with an animal study that found that talcum powder
16    caused ovarian cancer.
17      Do you have that distinction that I'm making in
18    mind?
19      Do you have the distinction I'm making in mind?
20  A  I'm just reading through my report.
21  Q  Inflammation on the one hand, ovarian cancer on the
22    other.
23      I am trying to make that distinction.
24      Do you have that distinction in mind?
25      When you say "yes," I'll ask you a question.

Page 297

1  A  So in Genofre's, G-E-N-O-F-R-E, study, in animal models,
2    injection of talc into the pleura causes local and
3    systemic inflammatory response, so it includes elevated
4    levels of C-reactive protein and interleukin 6, and CEGF
5    and TGF beta, and several of these are associated with
6    increased risk of ovarian cancer in humans, including
7    C-reactive protein and interleukin 8.
8  Q  Did that study that you are referring to, the Genofre,
9    G-E-N-O-F-R-E, 2009 study, are you saying that that study
10    showed that talc caused inflammation that led to
11    neoplastic or cancerous changes in the animals?
12  A  This was a model looking at inflammation.
13  Q  And did that study show that talc application to the
14    animal caused inflammation that led to cancerous changes?
15  A  To my knowledge, it stopped at the inflammatory response.
16  Q  None of the studies that you are relying upon -- Genofre
17    -- compared C-reactive proteins, and that's C hyphen
18    reactive proteins, or IL 8 levels between perineal talc
19    users and nontalc users, correct?
20      MS. PARFITT:  Objection; form.
21      THE WITNESS:  I don't know about
22    research that has looked at that.
23      I do know that women with high levels of C-reactive
24    protein or interleukin 8 are at an increased risk of
25    developing ovarian cancer.

75 (Pages 294 to 297)

Anne McTiernan, Ph.D

Page 298

1  Q  (By Mr. Williams)  None of the studies that you rely on
2      concluded that C-reactive proteins or IL 8 levels can
3      cause a local inflammatory response in the ovary,
4      correct?
5           MS. PARFITT:  Objection; form.
6           THE WITNESS:  C-reactive protein and
7      interleukin 8 are the inflammatory response.
8           They are the products that are made during
9      inflammatory response, to my knowledge.
10  Q  (By Mr. Williams)  Was that an inflammatory response in
11      the ovary?
12  A  It was blood-- the epidemiologic studies you are talking
13      about was in blood.
14  Q  Can you identify any published study concluding that
15      increased C-reactive protein levels leads to ovarian
16      cancer in humans?
17  A  Yes, I have that.
18           I am looking for it.
19           I thought that I had reference to meta-analysis of
20      C-reactive protein and risk of ovarian cancer, but it's
21      not showing up.
22  Q  Can you identify any published study concluding that the
23      C-reactive protein levels are greater in perineal talc
24      users than nonperineal talc users?
25  A  I did not look at that.

Page 299

1  Q  Can you identify any published study concluding that the
2      interleukin, and that's I-N-T-E-R-L-E-U-K-I-N, dash 8
3      levels are greater in perineal talc users than
4      nonperineal talc users?
5  A  I did not look at that.
6           MR. WILLIAMS:  That's all the
7      questions I have, Doctor.  Thank you very much.
8           Let's go off the record.
9           VIDEOGRAPHER:  Going off the record,
10      the time is 5:33 p.m.  Please stand by.
11           (Recess 5:33 to 5:35 p.m.)
12
13           VIDEOGRAPHER:  We are back on the
14      record.  The time is 5:35 p.m.
15
16
17           EXAMINATION
18  BY MS. ERFLE:
19  Q  Dr. McTiernan, again, my name is Nancy Erfle.  I
20      represent Imerys Talc America, and you understand that's
21      a different defendant than Johnson & Johnson, correct?
22  A  Yes, I do.
23  Q  And do you understand the role in this litigation, what
24      their role is?
25  A  No.  You can explain it.

Page 300

1  Q  Okay.  That they, for a period of time, supplied the raw
2      material talc to Johnson & Johnson for the baby powder.
3           Are you aware of that?
4  A  I was aware that they did supply.
5           I don't know anything about when or how much, no.
6  Q  Okay.  So just a couple areas of questions:
7           There were some questions that Mr. Williams asked
8      you regarding chromium, nickel, and cobalt, and you said
9      you do not know if those were contained in the Johnson &
10      Johnson powder specifically.
11           Do you recall that?
12  A  I do recall saying that.
13  Q  Okay.  Same question as to Imerys.
14           You do not know if Imerys raw talc specifically
15      contained chromium, nickel, or cobalt, do you?
16  A  I would have to look.
17           I know that the Pier deposition had some information
18      at least about some of the talc.
19           Do we have that?
20           MS. PARFITT:  Give us one moment.
21           Do you want to have her identify--
22           MS. ERFLE:  Please do.
23           THE WITNESS:  So this is Exhibit
24      No. 47 of Pier testimony, 9/13/18.
25  Q  (By Ms. Erfle)  That's great.  Let's look at that.

Page 301

1           So you have that in front of you?
2  A  Yes.
3  Q  And what about that indicates that there is chromium,
4      nickel, or cobalt in the raw material specifically
5      provided to Johnson & Johnson?
6  A  So these samples are all from Imerys--
7  Q  Do you know that to be the case?
8  A  That was my understanding, that that was the case, and I
9      see Exhibit No. 38, chromium, cobalt, and nickel in a
10      Johnson & Johnson sample.
11  Q  Okay.  Do you know-- can you say-- how do you know that
12      that's a J&J sample?
13  A  This is what is stated by the expert witness, to my
14      understanding.
15  Q  So you've done no independent work yourself to confirm
16      what these are or what these samples are, correct?
17  A  That's correct.
18           I am relying on this testimony.
19  Q  So you don't know if these were actually samples that
20      went into a Johnson & Johnson bottle that reached a
21      consumer, correct?
22           MS. PARFITT:  Objection; form.
23  Q  (By Ms. Erfle)  You can answer.
24  A  Correct.
25  Q  And you don't know if any of these items listed in

76 (Pages 298 to 301)

Anne McTiernan, Ph.D

1  Exhibit No. 47 of Ms. Pier's exhibit-- Exhibit No. 47
2  from Ms. Pier's prior testimony, if any of that actually
3  went to a competitor or was a competitor's product not
4  Imerys, correct?
5       MS. PARFITT:  Objection; form.
6       THE WITNESS:  Correct, I don't know
7  from this data.
8  Q  (By Ms. Erfle)  And you don't know from Exhibit No. 47
9  from Ms. Pier's prior deposition, that you are looking at
10  now, if any of that talc came from mines that were never
11  actually used for Johnson & Johnson product, correct?
12       MS. PARFITT:  Objection; form.
13       THE WITNESS:  Well, this does state
14  "Johnson & Johnson company" on two of the samples that
15  have chromium, cobalt, and nickel.
16  Q  (By Ms. Erfle)  But, again, you don't know if that
17  actually ever reached into a product that became body
18  powder from Johnson & Johnson that went to a consumer,
19  correct?
20       MS. PARFITT:  Objection; form.
21       THE WITNESS:  Correct.
22       (Exhibit No. 23 marked
23       for identification.)
24  Q  (By Ms. Erfle)  And just to make the record clear, let's
25  put in as Exhibit No. 23 the Julie Pier document that you

1  are looking at, so we make sure it's a little clearer.
2       So all the questions I just asked you,
3  Dr. McTiernan, about the Julie Pier Exhibit No. 47, it's
4  also the same document as we've marked as Exhibit No. 23
5  to your deposition, correct?
6  A  I can't read the whole thing, but it looks the same--
7  it's the same number.
8  Q  I will represent to you that that's another copy of it,
9  but it's marked as Exhibit No. 23 to this deposition,
10  okay?
11  A  Okay.
12  Q  Are you okay with that?
13  A  Yes.
14       (Exhibit No. 24 marked
15       for identification.)
16
17  Q  (By Ms. Erfle)  Last thing I want to do is put in as
18  Exhibit No. 24-- Dr. McTiernan, can you please look at
19  that and identify that for the record, Exhibit No. 24?
20  A  These are invoices that I submitted to Ms. Parfitt's firm
21  for work up until December 2018.
22  Q  Okay.  So let's mark as Exhibit No.-- and are those a
23  complete copy of all invoices that you would have
24  incurred from the time you began your work on this
25  litigation up until December of 2018?

1  A  It should be, yes.
2       (Exhibit No. 25 marked
3       for identification.)
4
5  Q  (By Ms. Erfle)  Let's mark as Exhibit No. 25 this-- can
6  you identify that for the record?
7  A  This is a copy of my report with notes on it.
8       Yeah, it's a copy of my report, expert report, of
9  November 16th, 2018.
10  Q  And it's the one with your handwritten notes?
11  A  Yes.
12  Q  Okay.  One last question:
13       Do you have an invoice that you've generated from
14  December of 2018 through today, which is January 28th,
15  2019?
16  A  Not yet.
17  Q  Okay.  And once you generate that invoice, will you
18  please give it to your counsel and make sure that they
19  provide it to us?
20  A  Mm-hm.
21  Q  Is that a "yes"?
22  A  Yes.  Yes.
23       MS. ERFLE:  Okay.  That's all I have.
24       MR. GOLOMB:  How much time do you have
25  left--

1       MR. LOCKE:  I don't think there's any
2  more time.
3       MR. GOLOMB:  How much time is there on
4  that disc?
5       VIDEOGRAPHER:  I have another like 15
6  minutes.
7       MS. PARFITT:  Can we take a short
8  break, and we'll come back?
9       VIDEOGRAPHER:  Okay.  The time is 5:42
10  p.m.  We are going off the record.
11       (Recess 5:42 to 5:50 p.m.)
12
13       VIDEOGRAPHER:  We are back on the
14  record.  The time is 5:50 p.m.  This is Media Unit No. 5.
15
16
17       EXAMINATION
18  BY MS. PARFITT:
19  Q  Dr. McTiernan, good evening.  I just have a few questions
20  for you for the Ladies and Gentlemen of the Jury.
21       Dr. McTiernan, have you had an opportunity to review
22  the Canadian draft screening assessment by Health Canada?
23  A  I did, yes.
24  Q  And have you had an opportunity to review the entire
25  report?

Anne McTiernan, Ph.D

Page 306

1   A  Yes, I did.
2   Q  All right.  And who sponsored that study?
3   A  It was Health Canada.
4                    (Exhibit No. 26 marked
5                    for identification.)
6
7   Q  (By Ms. Parfitt)  All right.  I am going to have marked
8       as Exhibit No. 26, Dr. McTiernan, a copy of just the
9       draft screening assessment, dated December 2018, and,
10      again, ask if you will identify that.
11  A  Yes, Exhibit No. 26.
12  Q  That is one of the documents you have reviewed?
13  A  Yes.
14  Q  Have you reviewed any other documents that are part of
15      the Health Canada assessment of talc?
16  A  There were several other documents that were available.
17      These were drafted by the Health Canada for
18      information sheets for the public, and one that is called
19      "Talc: potential risk of lung effects and ovarian
20      cancer," another is a talc information sheet, a third is
21      on talc, and, again it's also information for the public
22      of how to minimize exposure, so they are already planning
23      what the public health messages will be.
24      One is a risk management scope, and this is to do
25      with the regulatory decisions, and also the Canadian

Page 307

1       weight of evidence general principles and current
2       applications at Health Canada.
3   Q  Now--
4                    MR. LOCKE:  Objection; nonresponsive,
5       move to strike.
6   Q  (By Ms. Parfitt)  Dr. McTiernan, the information from
7       Health Canada was made available to you, I believe you
8       testified, after your report was submitted in November
9       2018; is that correct?
10  A  That's correct.
11  Q  All right.  And the date, again, of the Health Canada
12      assessment was December 2018, correct?
13  A  Yes, correct.
14  Q  So at the time you submitted your report in the
15      multidistrict litigation, you did not have access to the
16      Health Canada report, correct?
17  A  Correct.
18  Q  All right.  Now, have you-- do you have an opinion, to a
19      reasonable degree of scientific certainty, as to whether
20      or not Health Canada has opined that talcum powder
21      products can cause ovarian cancer?
22                    MR. WILLIAMS:  Objection; lacks
23      foundation, calls for speculation.
24                    THE WITNESS:  Health Canada does, in
25      several places, firmly state that talcum powder-- that

Page 308

1       talc can cause ovarian cancer.
2   Q  (By Ms. Parfitt)  Specifically what are you referring to,
3       if you will?
4   A  So on-- are there page numbers on here-- on Page 21 of
5       the draft-- document called, "Draft screening
6       assessment," in the fourth paragraph down, the third
7       line, it says, "Further, available data are indicative of
8       a causal effect."
9       Another-- also, on Page 29, third paragraph down,
10      states that "On the basis of information presented in
11      this draft screening assessment, it is proposed to
12      conclude that talc meets the criteria under Paragraph
13      No. 64C of CEPA as it is entering or may enter the
14      environment in a quantity or concentrations or under
15      conditions that constitute or may constitute a danger in
16      Canada to human life or health."
17      Also in the beginning on Page Roman Numeral No. III,
18      it states in the fifth paragraph, "The meta-analyses of
19      the available human studies in the peer-reviewed
20      literature indicate a consistent and statistically
21      significant positive association between perineal
22      exposure to talc and ovarian cancer.  Further, available
23      data are indicative of a causal effect."
24  Q  Dr. McTiernan, from reviewing the draft screening
25      assessment performed by Health Canada, were you able to

Page 309

1       determine whether or not they did indeed perform a
2       causality assessment?
3                    MR. WILLIAMS:  Lacks foundation, calls
4       for speculation.
5                    THE WITNESS:  They did do a full
6       causal analysis that includes information from
7       toxicology, animal studies of the biologic information,
8       perineal exposure to talc, and then the human studies.
9       I am looking for where they did their full
10      causation.
11      So they then determined characteristic of risk to
12      human health, and then came up with their conclusions
13      about what-- that further available data are indicative
14      of a causal effect.
15  Q  (By Ms. Parfitt)  What methodology did they employ?
16  A  They did methodology that was similar to what I did for
17      my report.
18      They reviewed the epidemiologic data from a
19      meta-analysis.
20      They reviewed the data-- the literature on animal
21      studies.
22      They reviewed toxicology.
23      They reviewed information in how talc can be-- can
24      reach the ovary areas, and from that came up with their
25      conclusions.

78 (Pages 306 to 309)

Anne McTiernan, Ph.D

Page 310

1  Q  Was part of the Health Canada causality assessment a
2     study by the name of Tair (phonetic)?
3  A  Yes.  That was the meta-analysis that they reviewed.
4  Q  Okay.  And that was just one part--
5  A  That was the primary meta-analyses-- the most recent
6     meta-analysis that I reviewed.
7  Q  And that was just one part of the Health Canada
8     assessment; is that correct?
9  A  Exactly.
10 Q  Dr. McTiernan, you were asked by counsel for J&J whether
11    or not it would be repugnant for a company to test their
12    talcum powder products for asbestos.
13       Do you remember that question?
14 A  I believe the question was posed-- I would have to review
15    the question again.
16       I believe there was something about brakes and
17    another--
18 Q  Let me just--
19 A  I think the category was talcum testing for asbestos.
20 Q  I believe the question was whether-- first, whether it
21    was repugnant for a company to test for asbestos, whether
22    J&J would be repugnant for them to test-- to actually do
23    testing of their product.
24       Do you recall that?
25 A  Yes.

Page 311

1  Q  And he then asked you whether it was repugnant if a brake
2     company also tested to determine whether or not their
3     products' brakes failed.
4        Do you remember that?
5  A  Yes.
6  Q  In your opinion would it be repugnant for a company, if
7     they found that the brakes had failed, to not inform the
8     public?
9  A  Yes.
10       MR. WILLIAMS:  Incomplete
11    hypothetical.
12       MR. LOCKE:  Just note my objection.
13 Q  (By Ms. Parfitt)  Similarly, would it be repugnant of a
14    manufacturing company or a supplier who tested their
15    product and found asbestos to not warn or communicate
16    with the public and the medical and scientific field
17    about the fact that their product had asbestos?
18       MR. WILLIAMS:  Same objection.
19       MS. ERFLE:  Objection; also lacks
20    foundation.
21       THE WITNESS:  Yes.
22       MS. PARFITT:  I have no further
23    questions, Dr. McTiernan.  Thank you.
24       MR. WILLIAMS:  I think that's it--
25    actually-- that's fine.

Page 312

1        VIDEOGRAPHER:  This marks the end of
2  today's video deposition.  The time is 5:59 p.m.
3        (Deposition concluded at 5:59 p.m.)
4        (Signature reserved.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF WASHINGTON )   I, Terilynn Simons, CCR, RMR, CRR
                       ) ss a certified court reporter
2  County of Pierce    )   in the State of Washington, do
                           hereby certify:
3
4        That the foregoing deposition of ANNE MCTIERNAN, PH.D.
5  was taken before me and completed on January 28, 2019, and
   thereafter was transcribed under my direction; that the
6  deposition is a full, true and complete transcript of the
   testimony of said witness, including all questions, answers,
7  objections, motions and exceptions;
8        That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing but
9  the truth, and that the witness reserved the right of
   signature;
10
       That I am not a relative, employee, attorney or counsel
11 of any party to this action or relative or employee of any
   such attorney or counsel and that I am not financially
12 interested in the said action or the outcome thereof;
13       That I am herewith securely sealing the said deposition
   and promptly delivering the same to Bart H. Williams.
14
       IN WITNESS WHEREOF, I have hereunto set my signature on
15 the 30th day of January, 2019.
16
17
18
19
       _____
20     Terilynn Simons, CCR, RMR, CRR
       Certified Court Reporter No. 2047
21     (Certification expires 07/07/19.
22
23
24
25

79 (Pages 310 to 313)

Anne McTiernan, Ph.D

```
 1              - - - - - -
              E R R A T A
 2              - - - - - -
 3      PAGE  LINE  CHANGE
 4      ____  ____  _____
 5        REASON:  _____
 6        ____  ____  _____
 7        REASON:  _____
 8        ____  ____  _____
 9        REASON:  _____
10        ____  ____  _____
11        REASON:  _____
12        ____  ____  _____
13        REASON:  _____
14        ____  ____  _____
15        REASON:  _____
16        ____  ____  _____
17        REASON:  _____
18        ____  ____  _____
19        REASON:  _____
20        ____  ____  _____
21        REASON:  _____
22        ____  ____  _____
23        REASON:  _____
24        ____  ____  _____
25        REASON:  _____
```

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
            I,_____, do
 3      hereby certify that I have read the
        foregoing pages, and that the same
 4      is a correct transcription of the answers
        given by me to the questions therein
 5      propounded, except for the corrections or
        changes in form or substance, if any,
 6      noted in the attached Errata Sheet.
 7
 8      _____
        ANNE MCTIERNAN, PH.D.     DATE
 9
10
11
12
13
14
        Subscribed and sworn
15      to before me this
        _____ day of _____, 20____.
16
        My commission expires:_____
17
18      _____
        Notary Public
19
20
21
22
23
24
25
```