# EXHIBIT B3

April Zambelli-Weiner, Ph.D.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


----------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

----------------------------x


V O L U M E   I


VIDEOTAPED DEPOSITION OF

APRIL ZAMBELLI-WEINER, Ph.D.

WASHINGTON, D.C.

FRIDAY, JANUARY 11, 2019

8:59 A.M.



Pages: 1 - 209

Reported by: Leslie A. Todd

April Zambelli-Weiner, Ph.D.

| Page 2 | |
|---|---|
| 1 | Deposition of APRIL ZAMBELLI-WEINER, Ph.D., |
| 2 | held at the offices of: |
| 3 | |
| 4 | |
| 5 | ASHCRAFT & GEREL, LLP |
| 6 | 1825 K Street, N.W. |
| 7 | Washington, DC 20005 |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | Pursuant to notice, before Leslie Anne Todd, |
| 13 | Court Reporter and Notary Public in and for the |
| 14 | District of Columbia, who officiated in |
| 15 | administering the oath to the witness. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 4 | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS: |
| 4 | MARK HEGARTY, ESQUIRE |
| 5 | SHOOK, HARDY & BACON, LLP |
| 6 | 2555 Grand Boulevard |
| 7 | Kansas City, Missouri 64108 |
| 8 | (816) 474-6550 |
| 9 | |
| 10 | GEOFFREY M. WYATT, ESQUIRE |
| 11 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP |
| 12 | 1440 New York Avenue, N.W. |
| 13 | Washington, D.C. 20005 |
| 14 | (202) 371-7008 |
| 15 | |
| 16 | ON BEHALF OF THE PCPC: |
| 17 | THOMAS LOCKE, ESQUIRE |
| 18 | SEYFARTH SHAW LLP |
| 19 | 975 F Street, NW |
| 20 | Washington, D.C. 20004 |
| 21 | (202) 463-2400 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 3 | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | ON BEHALF OF THE PLAINTIFFS: |
| 3 | CHRISTOPHER V. TISI, ESQUIRE |
| 4 | WESIEY BOWDEN, ESQUIRE |
| 5 | LEVIN PAPANTONIO THOMAS |
| 6 | MITCHELL RAFFERTY PROCTOR, P.A. |
| 7 | 316 South Baylen Street |
| 8 | Pensacola, Florida 32502 |
| 9 | (850) 435-7184 |
| 10 | |
| 11 | MICHELLE A. PARFITT, ESQUIRE |
| 12 | ASHCRAFT & GEREL, LLP |
| 13 | 4900 Seminary Road, Suite 650 |
| 14 | Alexandria, Virginia 22311 |
| 15 | (703) 997-1774 |
| 16 | |
| 17 | DAVID J. STANOCH, ESQUIRE |
| 18 | GOLOMB & HONIK, PC |
| 19 | 1835 Market Street |
| 20 | Suite 2900 |
| 21 | Philadelphia, Pennsylvania 19103 |
| 22 | (215) 278-4449 |
| 23 | |
| 24 | |
| 25 | |

| Page 5 | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF THE IMERYS DEFENDANTS: |
| 4 | MARYAM M. MESEHA, ESQUIRE |
| 5 | COUGHLIN DUFFY, LLP |
| 6 | 350 Mount Kemble Avenue |
| 7 | Morristown, New Jersey 07962 |
| 8 | (973) 267-0058 |
| 9 | |
| 10 | MICHAEL R. KLATT, ESQUIRE |
| 11 | GORDON & REES SCULLY MANSUKHANI, LLP |
| 12 | 816 Congress Avenue |
| 13 | Suite 1510 |
| 14 | Austin, Texas 78701 |
| 15 | |
| 16 | ON BEHALF OF PTI: |
| 17 | MICHAEL ANDERTON, ESQUIRE |
| 18 | TUCKER ELLIS, LLP |
| 19 | 950 Main Avenue |
| 20 | Suite 1100 |
| 21 | Cleveland, Ohio 44113-7213 |
| 22 | (216) 696-4835 |
| 23 | |
| 24 | ALSO PRESENT: |
| 25 | DANIEL HOLMSTOCK (Videographer) |

2 (Pages 2 to 5)

April Zambelli-Weiner, Ph.D.

C O N T E N T S

1
2      EXAMINATION OF APRIL ZAMBELLI-WEINER, Ph.D.   PAGE
3      By Mr. Hegarty                9
4
5
6          E X H I B I T S
7      (Attached to transcript)
8      ZAMBELLI-WEINER DEPOSITION EXHIBITS       PAGE
9      No. 1   Invoices of TTi               13
10     No. 2   Notice of Oral and Videotaped
11         Deposition of April Zambelli-Weiner
12         and Duces Tecum                   36
13     No. 3   Curriculum Vitae, April Zambelli-
14         Weiner, Ph.D., M.P.H.             38
15     No. 4   Flash Drive                   38
16     No. 5   (Retained by witness.)        39
17     No. 6   E-mail string re Communication with
18         European Journal of Cancer Prevention  40
19     No. 7   E-mail string re Communications with
20         Anticancer Research               40
21     No. 8   (Retained by witness.)        42
22     No. 9   (Retained by witness.)        53
23     No. 10  Curriculum Vitae, April Zambelli-
24         Weiner, Ph.D., M.P.H.             54
25

E X H I B I T S

1
2      (Attached to transcript)
3      ZAMBELLI-WEINER DEPOSITION EXHIBITS       PAGE
4      No. 11  Article entitled "The role of
5          epidemiology in the law: A toxic
6          tort litigation case"             60
7      No. 12  Letter to Samuel S. Epstein from
8          Steven Musser (FDA), dated April 1,
9          2014                             173
10

P R O C E E D I N G S
-----------------

3          THE VIDEOGRAPHER:  We are now on the
4      record.  My name is Daniel Holmstock.  I'm the
5      legal videographer for Golkow Litigation Services.
6      Today's date is January 11, 2019, and the time is
7      8:59 a.m.
8          This deposition is being held at the law
9      offices of Ashcraft & Gerel, LLP, 1825 K Street,
10     Northwest, Suite 700, in Washington, D.C., for the
11     matter of In Re: Johnson & Johnson Talcum Powder
12     Products Marketing, Sales Practices, and Products
13     Liability Litigation, Cause No. 16-2738 and MDL
14     No. 2738.  It's pending before the United States
15     District Court for the Eastern District of New
16     Jersey.
17         The deponent is Dr. April
18     Zambelli-Weiner.
19         Counsel will be noted for appearances on
20     the stenographic record.
21         Our court reporter is Leslie Todd, who
22     will now administer the oath to the witness.
23         APRIL ZAMBELLI-WEINER, Ph.D.,
24     and having been first duly sworn,
25     was examined and testified as follows:

1              DIRECT EXAMINATION
2      BY MR. HEGARTY:
3          Q   Good morning, Doctor.
4          A   Good morning.
5          Q   My name is Mark Hegarty.  I represent
6      the Johnson & Johnson defendants in this case.
7              Would you please state your full name
8      for the record, please.
9          A   Sure.  April Zambelli-Weiner.
10         Q   And, Doctor, who is your current
11     employer?
12         A   My current employer is TTi Health
13     Research and Economics.
14         Q   Where's that located?
15         A   Westminster, Maryland.
16         Q   Do you have a separate consulting
17     business for litigation or is your litigation work
18     also through TTi?
19         A   No separate consulting business.
20         Q   Where do the fees go that you earn as an
21     expert witness?
22         A   They go to the company.
23         Q   Do any of those fees go directly to you?
24         A   No.
25         Q   Is your compensation at TTi in any way

April Zambelli-Weiner, Ph.D.

Page 10

1  enhanced by the money you get paid in your
2  litigation work or in testifying in a case like
3  this?
4      A   Well, I -- I am the owner of TTi. It's
5  actually owned by a holding company that I own.
6      Q   So going back to my question --
7      A   Sure.
8      Q   -- as the owner of TTi and so owner of
9  the holding company, is your compensation for --
10  for a year in any way affected by the amount of
11  litigation work that you do?
12      A   No.
13      Q   So whether you -- you bill zero in this
14  case or 100,000 in 2018, it would have no impact
15  on your compensation in 2018?
16      A   It would have no impact. It's also a
17  very small portion of what my company does, so in
18  that aspect it would also have no -- no tangible
19  impact.
20      Q   When you say it's a very small portion,
21  what do you mean?
22      A   Of our total revenue, litigation support
23  is under 10 percent.
24      Q   I had seen a reference in a prior
25  deposition that you had estimated that litigation

Page 11

1  work at TTi was 25 to 35 percent. Was that -- has
2  that changed or do you remember testifying to
3  that?
4      A   I don't remember testifying to that, but
5  it certainly has -- has changed and decreased.
6      Q   Approximately when did it start
7  decreasing?
8      A   It's hard to say. I haven't really done
9  any testifying work for several years, so it's a
10  very -- very small portion. I have some work that
11  is not testifying, but I would say it's been
12  substantially sort of steadily decreasing over
13  time.
14      Q   Do you have any other sources of income
15  except through your work at TTi?
16      A   No.
17      Q   What are you charging plaintiffs'
18  counsel in this case by the hour?
19      A   I believe it's 550 an hour. That's my
20  standard consulting rate.
21      Q   Did others help you that you charged
22  plaintiffs' counsel? In other words, did others
23  help you with your report or in any way assist you
24  in your work on this case that you event- -- you
25  ultimately charged the -- the attorneys who were

Page 12

1  paying for your time?
2      A   Yes.
3      Q   And who did you -- who assisted you in
4  any way in working on this litigation?
5      A   Some research assistants and
6  epidemiologists.
7      Q   What are their names?
8      A   Ashley Sier.
9      Q   Who else?
10      A   Carter Little.
11      Q   Anyone else?
12      A   Those are the main two.
13      Q   What is Ashley Sier's area of expertise?
14      A   She's an epidemiologist.
15      Q   Is she also at TTi?
16      A   Yes.
17      Q   How about Carter Little, what is -- what
18  is his area?
19      A   Oh, it's a she.
20      Q   I'm sorry. She.
21      A   And she is a research assistant, so she
22  works across a lot of areas doing research
23  support.
24      Q   What did Ashley Sier do in connection
25  with your work on the case we're here to talk

Page 13

1  about?
2      A   She would have, under my direction,
3  pulled papers, run calculations, that type of
4  support activity.
5      Q   What did Carter Little do?
6      A   Probably similar.
7      Q   Did either Ms. Sier or Ms. Little help
8  you write your expert report in this case?
9      A   No.
10      Q   Did anyone at TTi assist you in writing
11  your expert report?
12      A   No.
13      Q   I'm going to mark as Exhibit No. 1
14  copies of the invoices that have been provided to
15  us today.
16          (Zambelli-Weiner Exhibit No. 1 was
17          marked for identification.)
18  BY MR. HEGARTY:
19      Q   Would you look at Exhibit 1, Doctor, and
20  tell me what it is.
21      A   This looks like an invoice from
22  November.
23      Q   Well, let me ask you in more detail.
24      A   Mm-hmm.
25      Q   Are the invoices that are reflected in

4 (Pages 10 to 13)

April Zambelli-Weiner, Ph.D.

Page 14

1 Exhibit No. 1 all the invoices that TTi has
2 generated for your work on this case?
3         MR. TISI:  Well, I assume -- just, I
4 mean, I'm -- she spent some time recently -- I
5 don't know if her billing is up to date, but it is
6 accurate as of the last date of the last bill.
7         THE WITNESS:  I'm just looking at the
8 dates.  December, it looks like that covers --
9 right, so there might be December or January time
10 that hasn't been billed yet.
11 BY MR. HEGARTY:
12     Q   Do you have a sense for how much
13 additional time you have not billed that's not
14 reflected in Exhibit No. 1?
15     A   I couldn't say for sure, but based on
16 when my report was submitted, I would say probably
17 not very much, probably just to prepare for today.
18     Q   How much time did you spend preparing
19 for today?
20     A   I'm not sure.
21     Q   Can you give an estimate of less than 10
22 hours, less than 20 hours?
23     A   More than 10.  I don't know if it's more
24 than 20 or -- yeah.
25     Q   Your best estimate of the amount of time

Page 15

1 spent preparing for today is more than 10?
2     A   More than 10, yeah.
3     Q   Are you -- was it less than 30?
4     A   It was less than a full week, I would
5 say.  I'm just -- I'm just estimating, so I'm just
6 going to caveat that with I'm not certain.
7     Q   Will that preparation time be billed by
8 the hour?
9     A   Yes.
10     Q   Will that -- will that be billed at the
11 $550 per hour rate?
12     A   Correct.
13     Q   Are the -- strike that.
14         Is the work of Ms. Sier and Ms. Little
15 reflected in the invoices that we marked as
16 Exhibit No. 1?
17     A   It -- it should be, yes.
18     Q   How is it reflected?
19     A   In the other labor categories that
20 are -- that are listed.
21     Q   Were you paid a retainer to work on this
22 matter?
23     A   I -- it looks like it, but I don't do
24 the billing, so I'm -- I'm not certain.
25     Q   Have all the invoices set out in Exhibit

Page 16

1 No. 1 been paid?
2     A   We are current on payments, yes, to my
3 knowledge.
4     Q   Now, we're here today to take your
5 deposition in the case of In Re:  Johnson &
6 Johnson Talc Litigation MDL.  You're aware that
7 you've been designated as a testifying expert in
8 that case?
9     A   Correct.
10     Q   When were you first contacted about
11 serving as an expert witness in this case?
12     A   I'm not certain of that.
13     Q   Was it in 2018?
14     A   Yes, it was in 2018.
15     Q   Your invoice, if you want to refer to
16 it, indicates that you first started working on
17 this matter in October.  Does that look right?
18     A   That looks correct.
19     Q   Does that in any way refresh your memory
20 as to when you were first contacted about working
21 on this case?
22     A   It would have been sometime in proximity
23 to that date.  Yeah.
24     Q   So sometime in the proximity of October
25 2018, you were contacted about -- of working on

Page 17

1 this matter, correct?
2     A   Sometime --
3         MR. TISI:  As an expert, that's correct.
4 BY MR. HEGARTY:
5     Q   Who contacted you?
6     A   I believe it was Chris.
7     Q   Chris Tisi?
8     A   Chris Tisi, yes.
9     Q   Have you had any prior litigation work
10 with Ms. -- Mr. Tisi?
11     A   I've never been a testifying expert for
12 Chris before.
13     Q   Have you worked with him, though, in the
14 past?
15     A   Yes.
16     Q   In what matters have you worked with him
17 in the past?
18         MR. TISI:  Objection.
19         You can answer that question.
20         THE WITNESS:  GranuFlo.  And I'm not
21 sure if there were any others.
22 BY MR. HEGARTY:
23     Q   How long ago was the GranuFlo matter?
24     A   It's been a while.  Years.  I don't
25 remember.

5 (Pages 14 to 17)

April Zambelli-Weiner, Ph.D.

Page 18

1     Q   Between the time you worked with
2  Mr. Tisi on the GranuFlo litigation and the time
3  you were contacted around October of 2018, had you
4  had any other work with him where you were
5  designated as a consulting expert?
6         MR. TISI:  A consult -- when you say
7  "consulting expert," you --
8         MR. HEGARTY:  I'm sorry --
9         MR. TISI:  I just want to make sure
10  she's clear about the distinction between
11  consulting --
12         MR. HEGARTY:  Let me rephrase it.
13         MR. TISI:  -- and testifying expert.
14  BY MR. HEGARTY:
15     Q   Between the time you worked with
16  Mr. Tisi on the GranuFlo litigation and the time
17  that you were contacted about testifying in this
18  case, have you -- had you worked with Mr. Tisi
19  where you were designated as an expert witness in
20  the -- in a case?
21     A   No.
22     Q   Other than Mr. Tisi, had you worked in
23  the past on litigation matters with any of the
24  other lawyers you understand represent plaintiffs
25  in this litigation?

Page 19

1         MR. TISI:  Objection.  Overbroad.
2         THE WITNESS:  I will say I don't know
3  who all the lawyers are.  There's a lot.
4  BY MR. HEGARTY:
5     Q   Let me ask it this way:  Had you -- have
6  you worked with any of the other lawyers in this
7  room?
8     A   I've worked with Michelle before.
9     Q   That's Ms. Parfitt?
10     A   Yes.
11     Q   When have you worked --
12     A   Sorry.
13     Q   When have you worked with Ms. Parfitt?
14     A   Also on GranuFlo.
15     Q   Have you worked with her on any other
16  litigations?
17     A   Not that I can recall.
18         MR. TISI:  Well, I just -- I just want
19  to be clear.  When you say "worked with her on any
20  other litigations," are you talking about as a
21  testifying expert or as a consultant?
22         MR. HEGARTY:  I assume you'll object if
23  I just ask about consulting.
24         MR. TISI:  Yes, I will object on -- I
25  allowed that one question on GranuFlo because --

Page 20

1         MR. HEGARTY:  That's fair.
2         MR. TISI:  Okay.
3  BY MR. HEGARTY:
4     Q   Have you worked with Ms. Parfitt in any
5  other matter where you were designated as a
6  testifying expert besides the GranuFlo litigation?
7         MR. TISI:  Well, she was not a
8  testifying expert in the GranuFlo litigation.
9         THE WITNESS:  I don't -- I'm sorry, can
10  you repeat the question?
11  BY MR. HEGARTY:
12     Q   Sure.
13         Have you worked with Ms. Parfitt in any
14  other litigation where you were identified as a
15  witness or a testifying expert?
16     A   Not that I can recall.  I didn't work
17  with her directly.
18     Q   Have you worked with any other lawyers
19  in this room besides those we've talked about?
20     A   No, I don't believe so.
21     Q   What was your role in the GranuFlo
22  litigation?
23     A   Just to consult on broad scientific,
24  epidemiologic issues.
25         MR. TISI:  And that's all the questions

Page 21

1  I'll allow on that.  Thank you.
2  BY MR. HEGARTY:
3     Q   Was the contact that you had with
4  Mr. Tisi via telephone call --
5         MR. TISI:  On this case?
6  BY MR. HEGARTY:
7     Q   -- for purposes of working on this case?
8     A   Mostly by telephone.  I'm not sure if we
9  met -- I think we might have met once or twice at
10  a meeting.  Not -- I'm getting confused.
11         MR. TISI:  Yes.
12  BY MR. HEGARTY:
13     Q   As of the time of the first call that
14  you had with Mr. Tisi about working on this
15  matter, were you retained at that first call?
16         MR. TISI:  Well, I'm going to object.
17  When you say "on this matter," I assume you mean
18  as a testifying expert.
19         MR. HEGARTY:  Yes.
20         MR. TISI:  Thank you.
21         MR. HEGARTY:  We'll start there.
22         THE WITNESS:  No, I don't believe so,
23  no.
24  BY MR. HEGARTY:
25     Q   Was there a time period before the --

6 (Pages 18 to 21)

April Zambelli-Weiner, Ph.D.

Page 22

1  where you reviewed materials before you agreed to
2  serve as a testifying expert in this case?
3      A  Yes.
4      Q  During that time from your perspective,
5  were you retained as an expert in this case?
6          MR. TISI:  As a consulting -- as a
7  consultant at that point, not as a testifying
8  expert.  And so no further questions on that will
9  I permit.
10 BY MR. HEGARTY:
11     Q  At what point in time from the initial
12 phone call that you had with Mr. Tisi did you
13 understand you were retained as a consulting
14 expert?
15         MR. TISI:  Well, objection.  Assumes
16 facts not in evidence.
17         Go ahead.
18         THE WITNESS:  I was retained as a
19 consulting expert prior to having conversations
20 about being a litigation -- like testifying
21 expert.
22 BY MR. HEGARTY:
23     Q  Were you retained as a consulting expert
24 during the first call that you had with Mr. Tisi
25 about this litigation?

Page 23

1      A  I don't believe so.  I think we had --
2  we had conversations before I was retained at all.
3      Q  What were the conversations you had
4  before you were retained in any aspect about
5  serving as a consulting expert or testifying
6  expert in this matter?
7          MR. TISI:  Well, let me just object
8  because she has only been a consultant in -- to
9  the extent she's been -- she was a consultant on
10 issues, and then became a testifying expert,
11 that's the only context in which we have had
12 communications with her about talc -- the talc
13 litigation.  So there's no -- there was never a
14 time where we spoke to her when she was -- about
15 talc issues when she was not retained as a
16 consultant or a litigation expert.
17         MR. HEGARTY:  Okay.
18         MR. TISI:  I mean if that helps you --
19         MR. HEGARTY:  Well, the reason I had
20 followed up with that question was because she
21 said that there was a time period before she
22 understood she was a consulting expert between
23 when you had the first call and --
24         MR. TISI:  I understand.  I understand.
25 You and I understand.  I'm not so sure as a -- as

Page 24

1  an epidemiology, she -- epidemiologist, she
2  understands all of the nuances of the questions
3  you asked or -- so I figured I would make that
4  representation.
5  BY MR. HEGARTY:
6      Q  Before Mr. Tisi contacted you about
7  serving as a consulting expert in this litigation,
8  did you know anything about the talc litigation?
9          MR. TISI:  Objection.  I think you --
10 can we go off the record?  Because I think I may
11 be able to help you with this answer.  I -- I did
12 not --
13         THE REPORTER:  Are you off --
14         MR. TISI:  Yeah, we can go off the
15 record.
16         THE VIDEOGRAPHER:  The time is 9:15 a.m.
17 We're going off the record.
18         (A discussion was held off the record.)
19         THE VIDEOGRAPHER:  The time is 9:16
20 a.m., and we're back on the record.
21 BY MR. HEGARTY:
22     Q  Doctor, we had a short discussion off
23 the record about your initial contact about
24 serving as a consultant in the MDL litigation.
25         Who was -- who did you have that initial

Page 25

1  contact with?
2      A  So if I'm recalling correctly, because
3  it's been a little bit, I think it was Steve
4  Rotman at Hausfeld.
5      Q  Had you previously worked with him?
6      A  Yes.
7      Q  In what -- in what matters?
8      A  GranuFlo.
9      Q  Any others?
10     A  I don't believe so.
11     Q  So the first contact was with Steve
12 Rodman or Rotman.
13     A  Rot- -- Rotman.
14     Q  How do you spell that?
15     A  R-O-T-M-A-N, I think.
16     Q  Who else besides Mr. Rotman have you
17 spoken with as part of your work in this
18 litigation for the plaintiffs?
19     A  Testifying work?
20     Q  Let me -- let me ask it a different way.
21 Your -- your initial contact with was Mr. Rotman,
22 correct?
23     A  Correct.
24     Q  What other lawyers representing the
25 plaintiffs in the talc MDL litigation have you

7 (Pages 22 to 25)

April Zambelli-Weiner, Ph.D.

Page 26

1    spoken with about your work on this case?
2        A    "This case" being my report and
3    testifying today?
4        Q    Correct.
5        MR. TISI:  Well, when you say "this
6    case" -- Mark, I'm not trying to get in the way, I
7    promise you.  When you say "this case," that
8    implies the whole breadth of, you know,
9    consultant, expert.  She just answered the
10   question as a result of her report.  I think it's
11   important that you be clear as to what you're
12   talking about, a consultant versus testifying
13   expert.
14   BY MR. HEGARTY:
15       Q    Doctor, you've not been designated to
16   testify as an expert in any other talc case to
17   your knowledge; is that correct?
18       A    Can you repeat, please?
19       Q    Have you been -- to your knowledge, have
20   you been designated to testify as an expert or a
21   witness in any other talc case, besides the talc
22   MDL case?
23       A    No.
24       Q    What other lawyers besides Mr. Rotman
25   have you spoken with concerning your work on the

Page 27

1    talc MDL case?
2        MR. TISI:  Whether consultant or as --
3    as an expert, as in testifying.
4        MR. HEGARTY:  In any respect.
5        THE WITNESS:  In any respect.
6        MR. TISI:  I just want to make sure
7    you're clear on that.  Go ahead.
8        THE WITNESS:  I'm trying to remember.
9    There was one meeting with a lot of lawyers, so I
10   don't know who they all are.  But I -- I have
11   spoken to Leigh.  I have spoken to --
12   BY MR. HEGARTY:
13       Q    Leigh O'Dell?
14       A    Leigh O'Dell, yes.  Sorry.
15       Q    Who else, who you can recall?
16       A    John Restaino.  Maybe James Gotz.  I
17   don't remember the names of a lot of the other
18   people.
19       Q    Mr. Tisi certainly?
20       A    Yes.
21       MR. TISI:  And Ms. Parfitt.
22   BY MR. HEGARTY:
23       Q    Ms. Parfitt?
24       A    And, yes, Ms. Parfitt.
25       Q    When was this one meeting where you said

Page 28

1    there were a bunch of lawyers?
2        A    Yes.
3        Q    When was that?
4        MR. TISI:  I'm going to tell her not to
5    answer any further questions because that involves
6    the consulting that she did with us.  So you got
7    that she was a consultant and who she consulted
8    with, and no further questions.
9        MR. KLATT:  Chris, I think to clarify,
10   Rule 26 says for a consulting expert, what's not
11   discoverable is facts known or opinions held by
12   the consultant, but I don't think that's what Mark
13   is asking.
14       MR. HEGARTY:  My question was simply --
15       MR. TISI:  When it was?
16       MR. HEGARTY:  -- when was the meeting
17   that you mentioned with these lawyers.
18       MR. TISI:  If you can recall, you can
19   tell him what that is, but --
20       THE WITNESS:  Also I looked and saw Wes,
21   and I spoke to him.
22       MR. HEGARTY:  Okay.
23       THE WITNESS:  I'm not sure.  I just
24   really wouldn't want to speculate.
25   BY MR. HEGARTY:

Page 29

1        Q    Sometime between October 2018 and today,
2    correct?
3        A    It was before October.
4        Q    Before October 2018?
5        A    Correct.
6        Q    Where was the meeting?
7        A    At some law firm or -- somewhere in D.C.
8        Q    Okay.  Before being contacted by
9    Mr. Rotman about working on the talc MDL case,
10   what were you -- what did you know about the talc
11   litigation?
12       MR. TISI:  Objection.  Assumes facts not
13   in evidence.
14       THE WITNESS:  I -- based on my
15   recollection, I just knew of its existence.  And I
16   probably had read some literature and -- and seen
17   some -- some articles about it.
18   BY MR. HEGARTY:
19       Q    What literature had you read?
20       A    I don't know.  Just I generally peruse
21   the scientific literature and get alerts, so I may
22   have seen articles.
23       Q    Sitting here today, do you recall any
24   specific articles or literature that you reviewed
25   before being contacted about serving as an expert

8 (Pages 26 to 29)

April Zambelli-Weiner, Ph.D.

Page 30

1  in the talc MDL case?
2       MR. TISI:  Objection to the term
3  "expert."
4       THE WITNESS:  I don't recall any
5  specific articles, no.
6  BY MR. HEGARTY:
7       Q   Have you spoken to anyone -- to anyone
8  about the talc litigation before being contacted
9  by Mr. Rotman?
10      A   Anyone being just anyone?
11      Q   Correct.
12      MR. TISI:  I'm sorry, could you repeat
13  the question?  Oh, actually, I'll look.  Go ahead.
14      THE WITNESS:  I would actually
15  appreciate it if you could repeat the question.
16  BY MR. HEGARTY:
17      Q   The question was, had you -- have you --
18  had you spoken to anyone about the talc litigation
19  before being contacted by Mr. Rotman?
20      A   So I -- I probably spoke internally
21  maybe to some people about it at the company.  And
22  I also have a colleague, David Schwartz, who we
23  had some conversations about -- about it.
24      Q   What -- what prompted the conversation
25  with Mr. Schwartz about the talc litigation?

Page 31

1       A   He was interested in it, and he was
2  interested in my expertise in genetic
3  epidemiology.
4       MR. TISI:  I just -- I don't know who
5  Mr. Schwartz is.  Let me caution you if -- is
6  Mr. Schwartz a lawyer and was consulting you in
7  the context of --
8       THE WITNESS:  He's not a lawyer, no.
9       MR. TISI:  Okay.
10  BY MR. HEGARTY:
11      Q   Has Mr. Schwartz --
12      A   But I -- but I do need to be careful.  I
13  do have a confidentiality agreement with him.
14      Q   Is Mr. Schwartz with TTi?
15      A   No.
16      Q   Who is he with?
17      A   He is with ISS, Innovative Science
18  Solutions.
19      Q   Besides Mr. Schwartz, who else did you
20  speak with about the talc litigation before being
21  contacted by Mr. Rotman?
22      A   No one that I can think of.
23      Q   You said you spoke internally to folks
24  at TTi.  Who did you speak with internally?
25      A   I'm really just speculating that we may

Page 32

1  have spoken if there were articles or literature.
2       Q   Before being contacted by Mr. Rotman
3  about working on the talc MDL, were you aware of
4  any of the allegations where -- looked at any of
5  the pleadings, looked at any of the -- the other
6  other materials that might have been filed in any other
7  lawsuits?
8       A   Not that I can recall.
9       Q   But you were ultimately retained and
10  asked to give expert opinions in the talc MDL
11  case, correct?
12      A   Correct.
13      Q   The lawyers for the plaintiffs paid you
14  to review materials and offer opinions, correct?
15      A   Correct.
16      Q   Those opinions were ultimately set out
17  in your November 16, 2018 MDL report, correct?
18      A   Correct.
19      Q   How many hours did you spend reviewing
20  materials in connection with your work on your MDL
21  report?
22      A   I don't recall.  I guess that would
23  probably be reflected in the invoices.
24      Q   Can you look at the invoices and tell
25  how much time you spent working on your MDL

Page 33

1  report?
2       A   Not specifically working on the report,
3  from the invoices.
4       Q   Are you able to estimate in any way
5  today the amount of -- the number of hours you
6  spent working on your MDL report?
7       A   No.
8       Q   Was it more than a week's worth, more
9  than 40 hours?
10      A   I don't know.
11      Q   But whatever work you spent working on
12  your MDL report would be reflected in the invoices
13  we marked as Exhibit No. 1?
14      A   Correct, except for if there's -- I
15  don't think there would be any outstanding
16  invoices for that given the submission date, but
17  just noting there are still possibly outstanding
18  invoices.
19      Q   Are you able to estimate how many hours
20  you spent talking with plaintiffs' counsel in
21  connection with preparation of your report?
22      A   No.
23      Q   Are you able to estimate how many hours
24  you spent talking with plaintiffs' counsel about
25  your work on the MDL litigation in total, whether

9 (Pages 30 to 33)

April Zambelli-Weiner, Ph.D.

Page 34

1  it's your report or otherwise?
2      A  No.
3      Q  Did you meet with lawyers for the
4  plaintiffs yesterday?
5      A  Yes.
6      Q  How much time did you spend with them
7  yesterday?
8      A  Maybe six hours-ish.
9      Q  Other than the initial -- strike that.
10         Other than Mr. -- or Ms. Sier and
11  Ms. Little, did you speak with any of your other
12  colleagues at TTi about your work on the talc MDL
13  case?
14      A  Just my husband.
15      Q  Does he work there as well?
16      A  He does.
17      Q  Did he assist you in any way in
18  preparing your MDL report?
19      A  No.
20      Q  Has he assisted you in any way in the
21  work you've done in the talc MDL that we're here
22  to talk about today?
23      A  No.
24      Q  Have you discussed the MDL litigation
25  case or your report with any of the other experts

Page 35

1  that have been designated by the plaintiffs in the
2  MDL?
3      A  No, I haven't.
4         MR. TISI:  Objection.
5  BY MR. HEGARTY:
6      Q  Have you reviewed any of the other
7  plaintiffs -- plaintiff experts' MDL reports?
8         MR. TISI:  Objection.
9         THE WITNESS:  I am not certain, but I
10  don't think so.
11  BY MR. HEGARTY:
12      Q  Did you ever review any draft reports
13  from any of the plaintiffs' MDL experts?
14         MR. TISI:  Objection.
15         To the extent that was there anything --
16  he's asking for anything that came -- in the
17  context with any consulting that we did.  My -- I
18  instruct you not to answer that question.
19         THE WITNESS:  Okay.
20         MR. HEGARTY:  Well, I don't think if she
21  reviewed a draft MDL report from any of the other
22  experts, that would be covered by confidentiality.
23         MR. TISI:  I think -- I think it is --
24  it would be as a consult- -- it would be as a
25  consultant.  You're not entitled to consulting

Page 36

1  information that we would have gotten with respect
2  to a consulting witness.
3         MR. LOCKE:  Yeah, I disagree.
4         MR. TISI:  Okay.  Take --
5         MR. LOCKE:  And I object and want it
6  noted.
7         MR. TISI:  Take it up if you wish.
8         MR. LOCKE:  And reserve the right to
9  continue the deposition.
10         MR. TISI:  I would obviously object to
11  that, but as you wish.
12         (Zambelli-Weiner Exhibit No. 2 was
13         marked for identification.)
14  BY MR. HEGARTY:
15      Q  Doctor, I'm going to show you what I
16  marked as Exhibit No. 2.  This is a copy of your
17  notice of deposition for today.
18         Can you tell me whether you've seen
19  Exhibit No. 2 before right now?
20      A  Yes, I have.
21      Q  On page -- beginning on page 3 and
22  carrying over to pages -- page 8, there is a list
23  of documents that we asked to be produced.
24         Have you reviewed the paragraphs on
25  pages 3 through 8 before right now?

Page 37

1      A  Yes, I have.
2         MR. TISI:  And I assume you got our
3  objections as well, right, Mark?
4         MR. HEGARTY:  Yes.
5         MR. TISI:  Thank you.
6  BY MR. HEGARTY:
7      Q  Did you bring any materials with you
8  here today in response to your deposition notice
9  marked as Exhibit No. 2?
10      A  Excuse me.  Yes, I did.
11      Q  What did you bring?
12      A  I brought an updated CV.  I brought the
13  invoices.  I brought a USB drive with the articles
14  and documents that are listed in my report.  I
15  also have a binder that has my copy of my report
16  and some copies of other key documents and -- and
17  notes.
18      Q  Did you bring anything else besides the
19  materials you just mentioned?
20      A  Let me take a look and make sure I'm not
21  forgetting anything.  (Peruses document.)
22         I -- I think that's it.
23         MR. TISI:  Mark, as I mentioned, I think
24  this was outside the scope, but they were arguably
25  outside the scope, and I brought two documents

10 (Pages 34 to 37)

April Zambelli-Weiner, Ph.D.

1    that I can't seem to put my hand on, but I just --
2    I will give those to you.  Those are e-mails
3    related to -- yeah.  If you want them now or we'll
4    get them later, that's fine.
5    BY MR. HEGARTY:
6        Q   You mentioned that you brought the
7    invoices we marked as Exhibit No. 1, correct?
8        A   Mm-hmm.  Correct.
9        Q   I also was provided before the
10   deposition started with a copy of your CV, which
11   I'm marking as Exhibit No. 3.
12           (Zambelli-Weiner Exhibit No. 3 was
13           marked for identification.)
14   BY MR. HEGARTY:
15       Q   Would you look at Exhibit No. 3, and
16   tell me whether that is the updated CV that you
17   provided pursuant to your deposition notice.
18       A   Yes, I believe so.
19       Q   You also mentioned that you brought a
20   USB drive.  Do you have that with you?
21       A   I do.
22       Q   I'm marking as Exhibit 4 the USB drive
23   that you handed me.
24           (Zambelli-Weiner Exhibit No. 4 was
25           marked for identification.)

1    BY MR. HEGARTY:
2        Q   And, Doctor, again, tell me what's on
3    the USB drive that we marked as Exhibit No. 4.
4        A   The articles and documents that are
5    listed in my report.
6        Q   You also mentioned that you brought with
7    you a binder of copies of your report and what you
8    characterize as other key documents and notes.  Do
9    you have that with you?
10       A   I do.
11       Q   May I see it, please.
12       A   Mm-hmm, sure.
13       Q   Thank you.
14           I'm going to mark as Exhibit No. 5 a
15   copy of the notebook that you brought with you
16   here today.
17           (Zambelli-Weiner Exhibit No. 5 was
18           marked for identification.)
19   BY MR. HEGARTY:
20       Q   And how did you go about selecting the
21   key documents you mentioned outside of your
22   report?
23       A   Just what I felt was helpful for my
24   prep.
25           MR. HEGARTY:  May I have those e-mails?

1            MR. TISI:  Just let me make sure we're
2    not giving you two of the same -- wait a second.
3    Okay.  I got them both.
4            And just to be clear, she brought them,
5    but they were not -- we did not consider them
6    responsive, but we brought them anyway, because we
7    assumed you would be asking questions and then
8    say, We'd like to have a copy.
9            (Zambelli-Weiner Exhibit Nos. 6
10           and 7 were marked for
11           identification.)
12   BY MR. HEGARTY:
13       Q   Doctor, counsel provided me with copies
14   of what I've marked as Exhibit Nos. 6 and 7.
15           Would you please tell -- tell me what
16   Exhibit No. 6 and Exhibit No. 7 are.
17       A   Number -- Exhibit No. 6 is an e-mail on
18   behalf of my company to the European Journal of
19   Cancer Prevention regarding their process for
20   notifying them of issues with a paper that has
21   been published.
22       Q   What is Exhibit No. 7?
23       A   Exhibit No. 7 is the same for the
24   journal Anti-Cancer Research.
25       Q   Do you have any -- did you have any

1    other correspondence via e-mail or otherwise with
2    any other journals as part of your work on the
3    talc MDL case?
4        A   No.
5        Q   Did you communicate by e-mail or
6    otherwise with anyone else about your work on the
7    talc MDL besides attorneys for the plaintiff?
8        A   No.
9        Q   In the -- in your report, you did a
10   couple of fixed-effect analyses of the data from
11   the 2003 Huncharek paper and the 2007 Huncharek
12   and Muscat paper, correct?
13       A   Correct.
14       Q   There would have been calculations,
15   data, et cetera, generated or -- to prepare the
16   numbers that you put in the table, correct?
17       A   Not necessarily.
18       Q   Well, what did you do to prepare to put
19   the -- to provide the numbers in the fixed effects
20   -- for the fixed-effect models that you ran?
21       A   Sure.  We ran the calculations and just
22   transported the results into the table.
23       Q   Do those calculations still exist
24   somewhere?
25       A   No.

April Zambelli-Weiner, Ph.D.

Page 42

```
 1      Q   Were they run via some sort of computer
 2  program?
 3      A   Yes.
 4      Q   Is there a name for it?
 5      A   Stata.
 6      Q   Are there any written materials or
 7  documents that you prepared as part of running
 8  that fixed-effect -- fixed-effects analysis that
 9  still exists?
10      A   Not to my knowledge.
11      Q   Did you develop any kind of protocol
12  before you ran that fixed-effects model test for
13  the two papers?
14      A   It doesn't require a protocol.  It's
15  just a calculation, trying to replicate their
16  calculation.
17      Q   Did you do that calculation yourself or
18  did someone else do it?
19      A   I had Ashley do it, and I reviewed it.
20      Q   I'm going to mark as Exhibit No. 8 a
21  copy of the MDL report of yours that we've been
22  provided in this case.
23          (Zambelli-Weiner Exhibit No. 8 was
24          marked for identification.)
25  BY MR. HEGARTY:
```

Page 43

```
 1      Q   Would you look at Exhibit No. 8 and tell
 2  me whether that is your MDL report.
 3      A   I don't have a lot of room here.  Sorry.
 4          Yes, it is.  Appears to be.
 5      Q   Does the notebook that we marked contain
 6  an identical report to Exhibit No. 8?
 7      A   I believe it just has a different cover
 8  page, but, otherwise, it should be identical.
 9      Q   Why is the cover page different?
10      A   I'm guessing this is my version that I
11  submitted to the lawyers, and this is some legal
12  cover page that got put on it.
13      Q   Other than the cover page, from what you
14  can tell, is the report and the notebook the same
15  as the report we marked as Exhibit No. 8?
16      A   It should be.  Has the same date on it.
17      Q   The report we marked as Exhibit No. 8
18  defines the scope of your testimony in this
19  matter, correct?
20      A   That's correct.
21      Q   Is it correct that you prepared your
22  report with the same rigor and approach as you
23  would prepare an article for publication in a
24  journal?
25      A   Yes.
```

Page 44

```
 1      Q   Do you agree that you signed this
 2  report, correct?
 3      A   That's correct.
 4      Q   And you signed this report with the same
 5  intent as if signed under penalty of perjury,
 6  correct?
 7      A   Correct.
 8      Q   And it's entitled to the same weight,
 9  correct?
10      A   Same weight as?
11      Q   As if you signed that document under
12  penalty of perjury.
13      A   Sure.
14      Q   And it should be entitled to the same
15  weight as you would entitle a -- an article you
16  have had published in a journal, correct?
17          MR. TISI:  Let me just object to the
18  question about perjury.  I don't see where that
19  has any -- I'll just object.
20          Go ahead.
21          THE WITNESS:  Can you rephrase that
22  question?
23  BY MR. HEGARTY:
24      Q   Sure.
25          Your report should be entitled to the
```

Page 45

```
 1  same weight as you would entitle a -- an article
 2  you publish in a journal, correct?
 3          MR. TISI:  Objection.
 4          THE WITNESS:  I'm not sure what you mean
 5  by "weight."  Perhaps you could rephrase that.
 6  BY MR. HEGARTY:
 7      Q   Well, did you prepare the -- your report
 8  in any way different than you would prepare an
 9  article -- when you have prepared articles for
10  publication?
11      A   Well, certainly, the -- the end
12  deliverable is different, but in terms of the
13  methods, the rigor, there would be no difference.
14      Q   Your report is supposed to be your
15  testimony as if you're on the stand before a judge
16  and a jury.  Do you understand that?
17          MR. TISI:  Objection.
18          THE WITNESS:  Yes, I do.
19  BY MR. HEGARTY:
20      Q   Are there any necessary changes or
21  revisions to your report --
22      A   There is --
23      Q   -- as you -- that you know of sitting
24  here today?
25      A   That I know of sitting here today, there
```

12 (Pages 42 to 45)

April Zambelli-Weiner, Ph.D.

Page 46

1   is one.  Let me see if I can find it here.
2   (Peruses document.)
3          On page 30, there was a rounding error.
4      Q   Where on page 30?
5      A   So on -- at Booth, 1989, the lower limit
6   of the confidence interval under "Calculated OR"
7   should be 0.47.
8      Q   Was that an error on your part?
9      A   Yes.
10     Q   Any other necessary changes or revisions
11  to your report?
12     A   Not as I sit here today.
13     Q   How did you catch that error?
14     A   Just going back and rereviewing.
15     Q   The opinions that you intend to offer in
16  this case are set out in your report, correct?
17     A   Correct.
18     Q   Now, as your report shows, you don't
19  intend to offer the opinion that use of Johnson's
20  baby powder or Shower to Shower causes ovarian
21  cancer, correct?
22     A   That's correct.
23     Q   And as your report shows, you don't --
24  don't intent -- you did not do a risk assessment
25  or Bradford Hill analysis of all the literature

Page 47

1   looking at talcum powder products and ovarian
2   cancer, correct?
3      A   That's correct.
4      Q   Along these same lines, the materials on
5   which you intend to rely on for purposes of your
6   opinions are identified in your report, correct?
7      A   Correct.
8      Q   Your report focuses on some of the work
9   of Drs. Huncharek and Muscat.  Have you ever met
10  either of those doctors?
11     A   I have not.
12     Q   Have you ever spoken to either
13  Dr. Huncharek or Dr. Muscat?
14     A   I have not.
15     Q   Have you read any of their published
16  works besides those referenced in your report?
17     A   I couldn't say for certain.
18     Q   Sitting here today, do you know of any
19  other -- any other published works that you have
20  read besides those referenced in your report?
21     A   I couldn't point to a specific
22  publication, no.
23     Q   You just pointed out an error that you
24  made in your report.  I assume that you agree that
25  you had made errors or mistakes in written work

Page 48

1   before?
2      A   Sure.  Everyone does.
3      Q   You've made typographical errors,
4   correct?
5      A   Correct.
6      Q   You're misreported data or figures,
7   correct?
8      A   I don't know about --
9          MS. PARFITT:  Objection.
10         THE WITNESS:  -- the term "misreported,"
11  but I certainly can -- can, you know, agree that
12  there could be errors in reporting of -- of
13  numbers.
14  BY MR. HEGARTY:
15     Q   Have you miscited authorities in the
16  past?
17         MR. TISI:  Objection.
18         THE WITNESS:  Can you clarify that?
19  BY MR. HEGARTY:
20     Q   Sure.  Have you cited to authorities
21  that either were mixed up, in the wrong place, had
22  misspellings, had -- had wrong years of
23  publication?  Have you done things like that?
24     A   I'm sure, yes.
25         MR. TISI:  Objection.

Page 49

1   BY MR. HEGARTY:
2      Q   Have you ever failed to properly quote
3   material?
4          MR. TISI:  Objection.
5   BY MR. HEGARTY:
6      Q   And cite proper authorities for
7   quotations?
8      A   It's possible.
9      Q   Have you ever copied text from an
10  authority word for word and failed to properly
11  quote or cite the text?
12         MR. TISI:  Objection.
13         THE WITNESS:  Not to my knowledge, and
14  certainly not by intent.
15  BY MR. HEGARTY:
16     Q   It would be wrong to do so, correct?
17     A   Correct.
18         MR. TISI:  Objection.
19  BY MR. HEGARTY:
20     Q   And it would violate well-established
21  scientific guidelines for written work, correct?
22         MR. TISI:  Objection.
23         THE WITNESS:  What would?
24  BY MR. HEGARTY:
25     Q   If an author copied text from an

13  (Pages 46 to 49)

April Zambelli-Weiner, Ph.D.

Page 50

1    authority word for word and failed to properly
2    quote or cite the authority, that would violate
3    well-established scientific guidelines for written
4    work, correct?
5        MS. PARFITT:  Objection.
6        THE WITNESS:  I think that --
7        MR. LOCKE:  Can I -- can I just ask, are
8    you both representing the same people, right?
9        MS. PARFITT:  We are.
10       MR. LOCKE:  Do we need to have two
11   objections?
12       MR. TISI:  Yeah, I'll --
13       MS. PARFITT:  But just in case --
14       MR. TISI:  I'm objecting.
15       MS. PARFITT:  We're trying to keep the
16   stereo part of it down.
17       MR. HEGARTY:  Yeah, I would prefer that
18   we have one person.
19       MR. LOCKE:  Yeah, it just seems like if
20   we could have one counsel for plaintiffs.
21       MR. TISI:  Well, while we're at it, I
22   just want to make sure, I believe -- I'm looking
23   at her documents considered, and I believe she was
24   provided with Dr. Muscat's deposition, and I'm not
25   seeing it here.  I'm not saying it's not here, but

Page 51

1    I just want to make sure.  I believe that she was
2    provided with that.  You may want to double-check
3    that.
4    BY MR. HEGARTY:
5        Q   Let's go back to my question.
6        MR. TISI:  Actually, it's here.  Never
7    mind.  It's on there.
8    BY MR. HEGARTY:
9        Q   If an author copied text from an
10   authority word for word and failed to properly
11   quote or cite the authority, that would violate
12   well-established scientific guidelines for written
13   work, correct?
14       MR. TISI:  Objection.
15       THE WITNESS:  I think -- I think I would
16   generally agree with that.  I think it would be
17   contextually dependent to some extent.
18   BY MR. HEGARTY:
19       Q   If an author copied text from an
20   authority word for word and failed to properly
21   quote or cite the text, that would call into
22   question the scholarship of the author, correct?
23       MR. TISI:  Objection.
24       THE WITNESS:  Not necessarily.  I
25   would -- I would put that potentially in the realm

Page 52

1    of, you know, an error, an oversight.
2    BY MR. HEGARTY:
3        Q   Would it raise questions about the
4    quality of the author's work?
5        MR. TISI:  Objection.
6        THE WITNESS:  I would have to evaluate
7    that within the totality of the work itself.
8    BY MR. HEGARTY:
9        Q   It certainly would be something that you
10   would -- you would not agree with that that should
11   -- that that is okay to do, correct?
12       MR. TISI:  Objection.
13       THE WITNESS:  Sure.  I think everyone
14   seeks to have proper attribution, but I'm sure
15   errors and omissions happen.
16   BY MR. HEGARTY:
17       Q   But you -- I think you've said in the
18   past that the vast majority of publications
19   contain errors of some kind, correct?
20       A   I think I may have said that, but, sure,
21   errors happen.
22       Q   That's true, the vast majority of
23   publications contain errors of some kind, correct?
24       MR. TISI:  Objection.
25       THE WITNESS:  Again, I can't say that

Page 53

1    with certainty, but I would say that I could agree
2    that that's probably true.
3    BY MR. HEGARTY:
4        Q   Do you have your CV with you?
5        A   Yep.
6        Q   Now, I'm going to mark as Exhibit No. 9
7    the CV that you provided as part of your expert
8    report in pages 53 through 63 of your report.
9            (Zambelli-Weiner Exhibit No. 9 was
10           marked for identification.)
11   BY MR. HEGARTY:
12       Q   And can you tell me, what changes have
13   been made between Exhibit 9 and your updated CV?
14       A   I'm not certain.
15           Do you want me to sit here and look
16   through it?
17       Q   Not page for page, and I will -- I will
18   make sure on the record that I'm not asking you to
19   do that.
20           Just from what you understand, without
21   looking through it, are you able to identify any
22   changes that you made between when we were
23   provided your report back in November of 2016 and
24   the one you provided today?
25       A   I'm not sure what changes were made.

14  (Pages 50 to 53)

April Zambelli-Weiner, Ph.D.

1      Q   Are there any errors in your current CV
2  that we marked as exhibit -- what's that exhibit?
3      A   Oh, I'm sorry.  I don't know which one
4  is --
5          MR. TISI:  Exhibit --
6  BY MR. HEGARTY:
7      Q   Exhibit 3.
8      A   Is it -- this the new one?
9      Q   Are there any errors in Exhibit No. 3 of
10 which you are aware?
11     A   Is Exhibit No. 3 the new one?
12     Q   Correct.
13     A   Not as I sit here.
14         Do you want me to look through it?
15     Q   Well, let me ask you about a couple
16 parts of your CV.
17         I'm going to mark as Exhibit No. 10 a
18 copy of the CV that you included as part of the
19 report you prepared in the Accutane litigation.
20         (Zambelli-Weiner Exhibit No. 10
21              was marked for identification.)
22 BY MR. HEGARTY:
23     Q   I assume you've seen this before,
24 correct?
25         MR. TISI:  I'm sorry, which -- you're

1  going -- moving fast.  Is this Exhibit No. 10?
2          MR. HEGARTY:  Yes.
3          MR. TISI:  Do we have 9?  I have 8.
4          MR. HEGARTY:  Wasn't it 9 that --
5          MS. PARFITT:  It's the CV --
6          MR. WYATT:  It's the CV in her expert
7  report.
8          MR. TISI:  Oh, I didn't know we marked
9  it.  Okay.
10         THE WITNESS:  So 10 is from Accutane?
11 BY MR. HEGARTY:
12     Q   Yes.  You were -- you provided an expert
13 report in the Accutane litigation, correct?
14     A   I did.
15     Q   And Exhibit No. 10 is the copy of the CV
16 that you included as part of your expert report in
17 the Accutane litigation, correct?
18     A   Well, I'll have to take your word for
19 it.  There's no designation.
20     Q   Well, in the upper right-hand corner, it
21 says "Expert Report of Dr. April Zambelli-Weiner,"
22 correct?
23     A   Correct.  That doesn't necessarily tell
24 me it's from Accutane.
25     Q   Does it tell you it was from an expert

1  report that you prepared?
2      A   Yes.
3      Q   If you look under the "Positions Held"
4  part of the Accutane CV as compared to your
5  current CV, in the Accutane -- in the CV we marked
6  as No. 10, you say from 2003 to 2010 you were a
7  senior scientist and chief operating officer,
8  Epidemiology International Inc.
9          In your current CV, you say you were a
10 principal epidemiologist, correct?
11     A   Correct.
12     Q   Did your title change between the CV
13 that we marked Exhibit No. 10 and the CV that we
14 marked Exhibit No. 3?
15     A   They're all true.
16     Q   Well, which title did you have?
17     A   All of them.
18     Q   Why did you choose in Exhibit No. 10 to
19 list your title as senior scientist and chief
20 operating officer versus the title that you list
21 as principal epidemiologist now?
22     A   I don't know.  I have a lot of versions
23 of CVs.  CVs undergo revisions for various
24 reasons.
25     Q   So is it your testimony that you were a

1  senior scientist, chief operating officer and
2  principal epidemiologist at Epidemiology
3  International?
4      A   That's correct.
5      Q   And so you worked -- your CV says you
6  worked at Epidemiology International from 2003 to
7  2011.  Was that the title of the company the
8  entire time?
9      A   I believe, though, but -- it could have
10 changed.
11     Q   Was it ever known as RidgeCom?
12     A   I believe that was her old company.
13     Q   Did you ever work for RidgeCom?
14     A   I may have received paychecks from
15 RidgeCom.  I don't know what their structure was.
16     Q   Do you list RidgeCom anywhere on your
17 CV?
18     A   No.
19     Q   Did you ever work for a company called
20 Sterilex Corp.?
21     A   I did work for Sterilex.  Sterilex was
22 owned by the same person who owned EI, and so I
23 technically worked for EI but also did some work
24 for Sterilex.
25     Q   Do you list your work at Sterilex in

April Zambelli-Weiner, Ph.D.

Page 58

1  your CV?
2      MR. TISI:  Objection.
3      THE WITNESS:  No.
4  BY MR. HEGARTY:
5      Q   And why not?
6      A   To me it's the same place.
7      Q   In your current CV, you tell the world
8  that you were a research assistant at Wash U,
9  correct?
10      A   Correct.
11      Q   In the CV we marked as Exhibit No. 10,
12  you characterized your position as laboratory
13  technician, correct?
14      A   Correct.
15      Q   Did your, again, position or title
16  change between Exhibit No. 10 CV and your current
17  CV?
18      A   Again, same answer:  Both true.
19      Q   So your -- why the difference in title?
20      A   Again, I don't know.  Maybe the CV was
21  changed for a particular grant application or --
22  or something.  I'm just guessing.
23      Q   If you look over on page 57 of your CV,
24  that's 57 of 63, that's Exhibit No. 9, you list a
25  paper titled "Risk of neuroblastic associated

Page 59

1  with" -- "neuroblastoma associated with
2  carcinogens from a munitions factory:  A toxic
3  tort litigation case."  Do you see that?
4      A   I'm sorry, where are you?
5      Q   The bottom of page 57.
6      MR. TISI:  There's a 57 on both of the
7  exhibits, so I just want to make -- which one are
8  you talking about?
9      MR. HEGARTY:  Exhibit No. 9.
10      THE WITNESS:  "A persistent worldwide
11  environmental hazard," is that the one?
12  BY MR. HEGARTY:
13      Q   Let me see what you're looking at.
14      You're looking at Exhibit 10.  Exhibit
15  No. 9.
16      A   Oh, I'm sorry.  Okay.
17      Q   Do you see at the very bottom there's a
18  paper entitled "Risk of neuroblastoma associated
19  with carcinogens from munitions factory:  A toxic
20  tort litigation case"?
21      A   Yes, I do.
22      Q   There's no paper by that name at that --
23  published in that journal with that citation, is
24  there?
25      A   There should be.

Page 60

1      Q   I'm going to mark as Exhibit No. 11 a
2  copy of the paper whose citation is at the
3  reference you note "Law, Probability and Risk,
4  2008, 7, 15 to 34."
5      (Zambelli-Weiner Exhibit No. 11
6      was marked for identification.)
7  BY MR. HEGARTY:
8      Q   It's not the same title, is it?
9      A   I see that.  You're correct.
10      Q   That's a mistake in your CV, right?
11      A   That is.  Thank you for bringing it to
12  my attention.
13      Q   Is your -- with that mistake, is your CV
14  still reliable?
15      MS. PARFITT:  Objection.
16  BY MR. HEGARTY:
17      Q   Do you consider your CV still reliable?
18      A   I consider my CV representative of my
19  work, yes.
20      Q   Do you still consider it a reliable CV?
21      A   I don't -- I don't understand the
22  question.
23      Q   Well, is it -- is it a CV that we can
24  rely upon to properly tell us about your work
25  experience and the things that you've done in your

Page 61

1  career?
2      A   Yes.
3      Q   Now, your report defines what you
4  reviewed and relied on in the sense that on
5  page 46 of your report you list "Work cited."
6      A   I'm sorry, where are you?
7      Q   Let me start again.
8      On page 46 of your report, you list
9  "Work cited," correct?
10      A   Correct.
11      Q   On page 48, you list "Other documents
12  considered," correct?
13      A   Correct.
14      Q   Are the materials under "Other documents
15  considered" those that you reviewed that you
16  didn't rely on for purposes of your report?
17      A   These would be documents that I received
18  and reviewed.
19      Q   And what is the difference between
20  the -- what you call "work cited" and what you
21  call "other documents considered"?
22      A   What it should be is the "work cited"
23  would be referenced within the body of the -- of
24  the report.
25      Q   And "other documents considered," in

16 (Pages 58 to 61)

April Zambelli-Weiner, Ph.D.

Page 62

1    what way did you consider other documents for
2    purposes of your report, the other documents
3    listed?
4         A   I would just have reviewed them in some
5    capacity.
6         Q   What did it take for -- strike that.
7             For purposes of your opinions, did you
8    rely on the documents listed under "Other
9    documents considered"?
10        A   I would just say that I considered them.
11   They're not cited within the body of my report.
12        Q   With regard to the documents that you
13   included in the body of your report, did you rely
14   on any particular document more than others or
15   documents more than others?
16        A   I -- I'm not sure I understand the
17   question.
18        Q   Well, were there any particular
19   documents that you cited that you relied upon more
20   than others or were the principal documents you
21   relied upon, are you able to identify any of
22   those?
23        A   Well, I think obviously the focus of my
24   report is on the research products of
25   Dr. Huncharek and Muscat.  Hopefully I'm saying

Page 63

1    their names correctly.  So I guess in the way that
2    you're asking that, I would agree that perhaps I
3    relied on them more because they were the focus.
4         Q   Which of the studies that you list in
5    your report were provided to you by plaintiffs'
6    counsel?
7         A   That I cannot answer.
8         Q   Did -- were you -- did plaintiffs'
9    counsel provide you with a notebook or electronic
10   file of doc-- of medical literature or
11   documents?
12        MR. TISI:  Objection.
13        THE WITNESS:  They provided me with some
14   documents.  I don't recall what -- what came from
15   them and what came from me.
16   BY MR. HEGARTY:
17        Q   Did they provide those to you in a
18   notebook form, electronic form or some other form?
19        A   Electron -- electronic.  Sorry.
20        Q   Do you still have the electronic form in
21   which the documents were provided to you?
22        A   That's what I provided on the drive.
23        Q   So the drive that you provided to us
24   would have the documents that you received from
25   plaintiffs' counsel.

Page 64

1         A   Correct.
2         Q   And would it -- is it separated out into
3    a separate file where you can pull the drive and
4    see that these were the documents provided by
5    plaintiffs' counsel?
6         A   No.
7         Q   Is there any way to parse out from the
8    list of documents the documents you received from
9    plaintiffs' counsel?
10        A   Not as I sit here today.
11        Q   In the section of your report entitled
12   "Methodology" on page 9 -- I'll let you get there.
13        A   Thank you.  Mm-hmm.
14        Q   So I'll start over.  In the section
15   entitled "Methodology" on page 9, you state that
16   you had access to publicly available documents.
17            Do you see that, the second line under
18   "Methodology" section?
19        A   Oh, sorry.  Thank you.  Yes.
20        Q   But you make no mention in this section
21   or anywhere in your report of the details or
22   methods of any literature searches you performed.
23   Is that correct?
24        A   I didn't perform literature searches as
25   part of this report, in a systematic way that you

Page 65

1    do literature searches.
2         Q   Well, did you perform any type of
3    literature search yourself in connection with
4    preparing your report?
5         A   I'm sure I searched the literature, yes.
6         Q   Did you in any way set out in your
7    report the methodology by which you used to search
8    the literature?
9         A   No, because that wouldn't have been
10   appropriate.  It wasn't a literature review -- it
11   wasn't a report based on a literature review.
12        Q   Well, was searching the literature part
13   of your methodology for preparing your report?
14        A   No.  I wouldn't say so.
15        Q   Then why did you do it?
16        A   I may have done it to supplant my -- my
17   knowledge or I might have been curious about
18   something that I found, and I would look it up.
19        Q   But no part of the methodology for
20   preparing your report involved searching of the
21   medical literature; is that what you're saying?
22        A   Correct.  With -- I just want to
23   clarify, with the caveat that that wasn't part of
24   my -- my charge and what I was doing, so I
25   wouldn't have put a protocol in place.  The report

17 (Pages 62 to 65)

April Zambelli-Weiner, Ph.D.

Page 66

```
 1    doesn't contain a systematic or comprehensive
 2    literature review of any topic.
 3         Q   The literature review was not necessary
 4    for you to prepare your report; is that correct?
 5         A   You're -- you're -- I'm afraid I can't
 6    answer that correctly.  Well, I'm not
 7    understanding your question.
 8         Q   Sure.
 9         A   Because you're using "literature review'
10    in an ambiguous way.
11         Q   Well, was a literature search and the
12    review of the literature from that search
13    necessary for purposes of preparing your report?
14         A   I would say probably some literature
15    review was necessary.  I -- I probably in the
16    course of preparing my report needed or wanted to
17    pull a piece of literature to support the writing
18    of my report, but my report was not a literature
19    review.
20         Q   Is it your testimony that you -- that a
21    proper methodology for doing a report would only
22    that -- strike that.
23             Is it your testimony that a literature
24    review is only a methodology for preparing a
25    report if you're doing a review kind of analysis?
```

Page 67

```
 1         A   Well, sure.  There's lots -- there's
 2    lots of types of reviews.  If I want to go into
 3    PubMed and search for something, that doesn't
 4    require a protocol.  If I'm setting out to
 5    undertake a project that will involve literature
 6    review as part of that project, then that would be
 7    part of that protocol.
 8         Q   Okay.  Did you actually do the
 9    literature searches on publicly available
10    websites?
11         A   Yes.
12         Q   What publicly available websites did you
13    search?
14         A   Typically PubMed and Google Scholar.
15         Q   And you don't in your report describe
16    the literature searches you did in terms of what
17    words or phrases you looked for, correct?
18         A   No, because that wouldn't have been
19    appropriate.
20         Q   And you didn't describe in your report
21    the literature search engines or publicly
22    available resources that you searched, correct?
23         A   Correct, because, again, this wasn't a
24    literature review.
25         Q   Well, was it part of your methodology to
```

Page 68

```
 1    review all the documents that discuss or reference
 2    the 2003 or 2007 papers that you talk about in
 3    your report?
 4             MR. TISI:  Objection.
 5             THE WITNESS:  Can you repeat that,
 6    please?
 7    BY MR. HEGARTY:
 8         Q   Sure.
 9             Was it part of your methodology to
10    review all of the documents in the medical
11    literature that discuss or reference the 2003 and
12    2007 papers you talk about in your report?
13         A   No, that was not the focus of my report.
14         Q   With regard to the papers you did review
15    to prepare your report, we just looked at pages 46
16    and 48.  Is that the totality of the papers that
17    you reviewed in connection with preparing your
18    report?
19         A   You're referring to the -- to the "Work
20    Cited"?
21         Q   And the "Other Documents Considered"
22    sections.
23         A   I would say, again, these lists were
24    prepared to the best of my ability with the
25    references and sources that are cited in my report
```

Page 69

```
 1    and that I reviewed in preparation of my report.
 2         Q   Did you prepare these references as
 3    well?  Yourself, did you prepare the "Work Cited"
 4    and the "Other Documents Considered" part of your
 5    report?
 6         A   These -- the "Work Cited" part lives in
 7    a -- a database management software, so that's
 8    accessible by -- by everyone.  But, yes, it does
 9    get dropped in by me.
10         Q   How about the "Other Documents
11    Considered," did you prepare that?
12         A   I believe so, yes.
13         Q   Did you review the totality of -- of all
14    of the papers that are referenced in both
15    sections?  In other words, did you review the
16    entirety of every paper cited?
17         A   No, definitely not.
18         Q   Did you ever just read the abstracts?
19         A   I couldn't say for sure.
20         Q   But you can say for sure that you didn't
21    review every page of every document you cite in
22    this report.
23         A   That's correct.
24         Q   Had you read the papers by Dr. Huncharek
25    and Dr. Muscat referenced in your report before
```

April Zambelli-Weiner, Ph.D.

Page 70

1  being hired as an expert in this case?
2      A  Any -- can you clarify that question?
3      Q  Well, you talk about a 2003 and a 2007
4  paper and a 2011 paper in your report, correct?
5      A  Correct.
6      Q  You mentioned those were the focus of
7  your report, correct?
8      A  Correct.
9          MR. TISI:  Well, objection.  Misstates.
10  BY MR. HEGARTY:
11      Q  Had you read those papers before being
12  contacted by Mr. Rotman about working as an expert
13  on this litigation?
14      A  I can't recall.  They're old papers.
15      Q  You say you can't -- you don't know one
16  way or the other whether you had read them?
17      A  I -- I don't.  I really don't.
18      Q  So you think it's more likely than not
19  that you hadn't read them before being contacted
20  by Mr. Rotman?
21          MR. TISI:  Objection.  Calls for
22  speculation.
23          THE WITNESS:  I really don't -- I don't
24  recall.
25  BY MR. HEGARTY:

Page 71

1      Q  Well, when you read them for the first
2  time in connection with preparing your report, did
3  you recall seeing them in the past?
4      A  Not specifically.
5      Q  Was there anything about them that rang
6  a bell and -- or reminded you that you had seen
7  these before?
8      A  Not necessarily, but I read a lot of
9  literature.
10      Q  Before being contacted by Mr. Rotman,
11  had you ever heard of Dr. Huncharek?
12      A  I don't know.
13      Q  Had you ever heard of Dr. Muscat?
14      A  His name sounded familiar, so I may
15  have.
16      Q  Had -- you may have.  You can't say one
17  way or the other?
18      A  No.
19      Q  Had you read all the case-control
20  studies, population-based and hospital-based
21  studies regarding whether there's an association
22  between talc use and ovarian cancer before being
23  contacted by Mr. Rotman?
24      A  No, I'm sure I didn't.
25      Q  Had you read any of them?

Page 72

1      A  I -- I believe I had.
2      Q  Which ones had you read?
3      A  I don't recall.
4      Q  Are you able to recall any of the
5  case-control studies you had read before being
6  contacted by Mr. Rotman, the first names of the
7  authors or the last names of the authors, the
8  names, any of those?
9      A  No.
10      Q  Had you read all of the meta-analysis of
11  the case-control studies concerning talc and
12  ovarian cancer before being hired -- or before
13  being contacted by Mr. Rotman?
14      A  Can you repeat, please?
15      Q  Sure.
16          Had you read all of the meta-analysis of
17  the case-control studies concerning talc and
18  ovarian cancer before being contacted by
19  Mr. Rotman about working on this litigation?
20      A  No, I don't believe I would have read
21  all of them.
22      Q  Had you read any of them?
23      A  It's possible I had read some of them.
24      Q  Can you say under oath that you had read
25  any of them?

Page 73

1      A  I can't say for certain.
2      Q  As to those you may have read, can you
3  identify any of those today?
4      A  No.
5      Q  Had you read all of them through today?
6      A  No, probably not.
7      Q  Have you read all the case-control
8  studies concerning talc and ovarian cancer through
9  today?
10      A  I may have read -- I've at least --
11  well, I can't say I've -- I've read all of them
12  for sure, no.
13      Q  Had you read all of the prospective
14  cohort studies on talc and ovarian cancer before
15  being contacted by Mr. Rotman about working on
16  this litigation?
17      A  I can't say for sure.
18      Q  Are you able to testify whether you had
19  read any of them before being contacted by
20  Mr. Rotman?
21      A  I really can't say.  It's an old
22  literature.
23      Q  So what does that mean when you say,
24  "It's an old literature"?
25      A  It -- it goes back pretty far.

April Zambelli-Weiner, Ph.D.

Page 74

1    Q   Well, one of the cohort studies goes
2  back to 2014.  Are you aware of that?
3    A   Sure.  But I'm just saying as a
4  literature, it's an old literature.
5    Q   So you consider literature from 2014 to
6  be old literature?
7      MR. TISI:  Objection.
8      THE WITNESS:  I'm speaking of the body
9  of literature on the topic, the epi studies.
10 BY MR. HEGARTY:
11   Q   Had you read all the animal studies on
12 talc and ovarian cancer before being contacted by
13 Mr. Rotman?
14   A   No.
15   Q   Have you reviewed the animal studies
16 through today?
17   A   No.
18   Q   Have you read any of the cell studies on
19 talc and ovarian cancer by the time that you were
20 contacted by Mr. Rotman?
21   A   I -- I may have.
22   Q   Which cell studies had you read?
23   A   Your question is very broad.  So I did
24 work in the area of -- of cancer and inflammation
25 prior to becoming an epidemiologist, so -- and

Page 75

1  during my time as an epidemiologist.
2    Q   Well, can you cite for us here today any
3  of the -- any of the cell studies you had reviewed
4  looking at talc and ovarian cancer before being
5  contacted by Mr. Rotman?
6    A   I can't cite to any specifically.
7    Q   Had you read all of the cell studies
8  concerning talc and ovarian cancer that have been
9  published through today?
10   A   No, I have not read all of them.
11     MR. TISI:  We've been going -- when you
12 get a breaking point, we've been going a little
13 over an hour.
14     THE WITNESS:  I was just going to ask
15 for a break, please.
16     MR. HEGARTY:  Okay.  Let me ask -- let
17 me ask just a --
18     MR. TISI:  No problem.
19     MR. HEGARTY:  -- couple more questions,
20 and then we'll take a break.
21 BY MR. HEGARTY:
22   Q   You cited to Dr. Muscat's and Linda
23 Loretz's and Susan Nicholson's depositions in your
24 report.  Are you aware of that?
25   A   Yes.

Page 76

1    Q   Have you read every word of their
2  deposition testimony?
3    A   No, I haven't.
4    Q   Have you personally reviewed any parts
5  of their deposition testimony?
6    A   Yes.
7    Q   Did someone else review their deposition
8  testimony at TTi as well and help you with
9  understanding what they had testified to?
10   A   No, I don't believe so.
11   Q   But the testimony that you read from
12 those witnesses is just those depositions that you
13 list in your report, correct?
14   A   I -- I don't understand the question.
15   Q   Sure.  You list certain depositions in
16 your report from Dr. Muscat, from Ms. Loretz and
17 from Dr. Nicholson, correct?
18   A   Correct.
19   Q   That would be the totality of their
20 testimony that you have been provided for purposes
21 of your work on this case, correct?
22   A   To the best of my knowledge.
23   Q   That testimony came from counsel for
24 plaintiffs, correct?
25   A   That -- I don't -- what is "that

Page 77

1  testimony"?
2    Q   Well, the deposition transcripts you
3  reviewed were provided by plaintiffs' counsel,
4  correct?
5    A   Correct.
6    Q   Did you ask for any other deposition
7  testimony for purposes of your work on your
8  report?
9    A   I can't recall if I had asked for any.
10     MR. HEGARTY:  All right.  We can take a
11 break.  Go off the record.
12     THE VIDEOGRAPHER:  The time is 10:10
13 a.m., and we're going off the record.
14     (Recess.)
15     THE VIDEOGRAPHER:  The time is
16 10:28 a.m.  We're back on the record.
17 BY MR. HEGARTY:
18   Q   Doctor, we're back on the record.
19     Focusing on your report, which we've
20 marked as Exhibit No. 8, is it correct that all of
21 the opinions set out in your report concerning the
22 Huncharek, Muscat works, the PCP response, were
23 formed after being contacted by Mr. Rotman in this
24 case, correct?
25   A   Yes, that's correct.

20 (Pages 74 to 77)

April Zambelli-Weiner, Ph.D.

Page 78

1     Q   You had not done any comprehensive
2   analysis or developed any opinions about those
3   works before being contacted by Mr. Rotman,
4   correct?
5     A   Correct.
6     Q   Can you cite for us on any occasion in a
7   non-litigation situation when you have done the
8   exact same thing you have done here as to the
9   Huncharek and Huncharek and Muscat papers, that
10  is, where you listed as you do here in your report
11  what you contend are deficiencies in an
12  epidemiologic study or other study?
13    A   Can you repeat?  I lost the beginning of
14  that question.
15    Q   Sure.
16        Well, in a non-litigation situation,
17  have you ever done the same thing that you've done
18  here as to the Huncharek and Muscat papers?
19    A   Oh, absolutely, all the time.
20    Q   As to epidemio- -- published
21  epidemiology work looking at case-control
22  studies?
23        MR. TISI:  I --
24        THE WITNESS:  I don't understand the
25  question.

Page 79

1   BY MR. HEGARTY:
2     Q   Well, the Muscat and Huncharek studies
3   or papers that you referred to -- well, strike.
4         Let me be specific.  The Huncharek 2003
5   paper is a published meta-analysis, correct?
6     A   Correct.
7     Q   When outside of litigation have you ever
8   done what you do -- have done in your report as to
9   the Huncharek 2003 paper?
10    A   All the time in the daily course of my
11  work.
12    Q   Cite for me one published meta-analysis
13  where you have done the exact same thing that you
14  have done in your report.
15    A   Cite one published meta-analysis -- I
16  can't think of a specific paper, but in the course
17  of my work, I do evidence synthesis for nearly
18  every project that I work on.
19    Q   Well, I am asking -- so you -- sitting
20  here today, you can't cite a single published
21  paper in the medical literature of a meta-analysis
22  where you have done the exact same thing outside
23  of litigation as you have done for the 2003
24  Huncharek paper?
25        MR. TISI:  Objection.  Asked and

Page 80

1   answered.
2         THE WITNESS:  Not as I sit here, but I
3   can certainly get that to you.
4   BY MR. HEGARTY:
5     Q   Can you cite for me any published paper,
6   like the Huncharek and Muscat diaphragm study,
7   where you have done the exact same thing in --
8   outside of litigation that you have done in your
9   report?
10    A   Again, this is an evaluation of the
11  internal validity of an epi study, and that's
12  something that I do every day in the course of my
13  work.
14    Q   So every day in the course of your work,
15  you're looking at published epidemiologic studies
16  and doing the same thing that you have done in
17  your report?
18    A   Absolutely.
19    Q   And even though you do it every day, you
20  can't cite a single study sitting here today?
21    A   No, I can't.  I -- I have 20 to 30
22  active projects at a time.
23    Q   And did you do this -- did you do last
24  week what you did in your report for a published
25  epidemiologic study?

Page 81

1     A   I have ongoing projects where I'm doing
2   this exact same thing, yes.
3     Q   So even though you did it last week, you
4   can't cite for me any published paper that you're
5   working on or have worked on?
6     A   No.  As I said, I mean I can't recall a
7   specific title, a specific author, but I can
8   certainly get you examples.
9     Q   Cite for me any client or company that
10  you have -- have done this for.
11    A   Well, I can't cite proprietary
12  companies, but Centers for Disease Control and
13  Prevention.
14    Q   Cite for me one published article where
15  you have done the same thing as -- that you did
16  for the 2003 Huncharek paper for the CDC.
17    A   I can give you bodies of literature.
18  Would you -- would you like that?  I can't --
19  can't name a specific title and author.
20    Q   All right.  Tell me what --
21    A   I just read so much literature and work
22  on so many projects, that's just unreasonable.
23    Q   Tell me what body of literature.
24    A   Blood pressure thresholds --
25  effectiveness of blood -- blood pressure

21 (Pages 78 to 81)

April Zambelli-Weiner, Ph.D.

Page 82

1   thresholds.  Excuse me.
2       Q   And those -- that body of literature
3   concerns case-control studies, observational
4   studies?
5       A   Yes.
6       Q   And what was your -- was your work
7   product where you're critiquing the -- the way the
8   study was done, the -- whether each of the study
9   -- where the study reported data properly, that
10  was what you have done?
11      A   Correct.  It was an analysis of the
12  internal validity of a body of epi studies.
13      Q   And how many times have you done that?
14      A   I couldn't possibly say.
15      MR. TISI:  For that -- for the blood
16  pressure thing or overall?
17      MR. HEGARTY:  Overall.
18      THE WITNESS:  I don't know.  Accumulate
19  over 20 years of work, evaluation of epidemiologic
20  studies, thousands of times.
21  BY MR. HEGARTY:
22      Q   And you've done thousands of reports
23  like you've -- we've marked as Exhibit No. 8?
24      A   Well, I certainly haven't testified in
25  litigation thousands of times, so the answer would

Page 83

1   be no.
2       Q   Well, have you done in -- for any of the
3   work with the CDC or other clients where you
4   prepared a report like you prepared Exhibit No. 8?
5       A   I certainly have prepared work products
6   that have relied upon the analysis of the internal
7   validity of an epi study that I conducted.
8       Q   When did you first become aware of an
9   alleged link between ovarian cancer and talc use?
10      MR. TISI:  Objection.  Asked and
11  answered.
12      THE WITNESS:  I can't recall.
13  BY MR. HEGARTY:
14      Q   Well, previously I had asked you about
15  what you're aware of in the litigation.  Now I'm
16  broadening that.
17          When -- what knowledge did you have of
18  any alleged link between talc use and ovarian
19  cancer from any source?  Or strike that.
20          When did you have knowledge of any -- of
21  an alleged link between talc and ovarian cancer
22  from any source before being contacted by
23  Mr. Rotman?
24      A   I don't know.
25      Q   Do you know of any source of information

Page 84

1   that you have reviewed, again not considering
2   litigation but in the medical literature,
3   concerning talc and ovarian cancer before being
4   contacted by Mr. Rotman?
5       A   No, again, I couldn't recall.
6       Q   Had you formed any opinions about talc
7   and ovarian cancer before being contacted by
8   Mr. Rotman?
9       A   I can't recall.
10      Q   Can you identify any materials in the
11  published medical literature you had reviewed
12  concerning talc and ovarian cancer before being
13  contacted by Mr. Rotman?
14      A   No, I can't recall.
15      Q   Before being contacted by Mr. Rotman,
16  you had never written anything about talc,
17  correct?
18      A   I don't believe so.
19      Q   Before being contacted by Mr. Rotman,
20  you had never offered in writing any opinions
21  about talc, correct?
22      A   No, I'm going to say I -- I can't
23  recall.
24      Q   Sitting here today, can you cite for us
25  any written work that you have ever authored that

Page 85

1   talks about talc?
2       A   I can't.  I can't recall.  It's
3   possible.
4       Q   Well, can you cite for us any written
5   work that you have ever done concerning any
6   cosmetic product?
7       A   Not that's published to my knowledge,
8   but certainly I've done work products on cosmetic
9   products.
10      Q   What kind of cosmetic products?
11      A   Beauty, hygiene products.
12      Q   Give me an example.
13      A   Hair care products:  Shampoo,
14  conditioner.
15      Q   What kind of work?
16      A   Also facial cleansers.
17      Q   What kind of work?
18      A   Evidence synthesis, health hazard
19  assessments and evaluations.
20      Q   It's correct you've never offered any
21  opinions in writing about ovarian cancer, correct?
22      A   Not to my knowledge.
23      Q   You've never offered in writing any
24  opinions about talc and ovarian cancer, correct?
25      A   I believe that's correct.

22 (Pages 82 to 85)

April Zambelli-Weiner, Ph.D.

Page 86

1      Q   You've never offered in writing any -- a
2    discussion about the causes of ovarian cancer,
3    correct?
4      A   Wait.  Can you repeat the prior
5    question, please?
6      Q   You've never offered in writing any
7    opinions about talc and ovarian cancer before
8    being contacted by Mr. Rotman, correct?
9          MR. TISI:  Okay.
10         THE WITNESS:  Thank you.
11         MR. TISI:  With that caveat.
12         THE WITNESS:  Yes.
13         MR. TISI:  Thank you.
14         THE WITNESS:  Correct.
15   BY MR. HEGARTY:
16     Q   And before being contacted by
17   Mr. Rotman, you never offered in writing a
18   discussion about the causes of ovarian cancer,
19   correct?
20     A   Not that I can recall.
21     Q   And you've never published anywhere on
22   the risk factors for ovarian cancer, correct?
23     A   I don't believe so.
24     Q   You've never spoken to an audience about
25   the causes of ovarian cancer, correct?

Page 87

1      A   I don't believe so.  I'm really trying
2    to think back.
3      Q   And you certainly never set out the
4    opinions in your report in any peer-reviewed
5    publication, correct?
6      A   Correct.
7      Q   Your report is not peer reviewed, right?
8      A   Correct.
9      Q   You purport to comment on a
10   meta-analysis conducted by Dr. Huncharek and
11   others.  Have you ever taught on how to do a
12   meta-analysis?
13     A   Yes, I have.
14     Q   Where have you taught on how to do a
15   meta-analysis?
16     A   I've taught at Hopkins, and I have
17   taught internally.  I mentor a lot of
18   epidemiologists, so I've taught there as well.
19     Q   Who have you taught at Johns Hopkins
20   about how to do a meta-analysis?
21     A   I've -- doctoral students, graduate
22   students, and I'm -- I'm also in the process of
23   going to teach a class that will involve
24   discussion and teaching of meta-analysis.
25     Q   And when did you do these teaching

Page 88

1    courses?
2      A   I did them in the past when I was at
3    Hopkins, and I've currently been nominated for
4    adjunct status to -- to continue teaching there
5    again.
6      Q   Was that a formal course that you taught
7    on how to do meta-analysis?
8      A   No, it wasn't specifically on
9    meta-analysis.  It would have been embedded within
10   a larger curriculum.
11     Q   Well, was this a course over the
12   entirety of a semester?
13     A   I don't recall.
14     Q   Have you ever published on how to do a
15   meta-analysis?
16     A   I don't believe so.  I have published
17   meta-analyses, though.
18     Q   How many times have you published a
19   meta-analysis?
20     A   I'm not sure.  I've done hundreds of
21   meta-analyses, but not nearly that many
22   publications.
23     Q   Well, look at your CV and tell me what
24   publications you've done that are a meta-analysis.
25     A   (Peruses document.)

Page 89

1          So there's a 2018 paper in the Annals of
2    Surgical Oncology that's a meta-analysis.
3      Q   That is a --
4      A   It's --
5      Q   That's not a meta-analysis on a case --
6    on case-control studies, is it?
7      A   I don't recall what studies contributed
8    to that.
9      Q   Well, it's a -- it's a "Meta-Analysis of
10   Local Invasive Breast Cancer Recurrence After
11   Electron Intraoperative Radiotherapy," correct?
12     A   Correct.
13     Q   That looked at rates of recurrence using
14   a particular type of radiotherapy, correct?
15     A   That's correct.
16     Q   And that did not involve case-control
17   studies, correct?
18     A   As I said, I don't recall the nature of
19   the studies that were in that analysis.
20     Q   Well, the studies concern looking at
21   recurrence rates, correct?
22     A   Yes, that's correct.
23     Q   You did that for a company, right?
24     A   Correct.
25     Q   The company was decision -- was IntraOp

23 (Pages 86 to 89)

April Zambelli-Weiner, Ph.D.

Page 90

1    Medical, right?
2        A    That's correct.
3        Q    And they actually had a radiotherapy
4    that was included as part of this analysis, right?
5        A    Yeah, they have a product that related
6    to the analysis, yes, but it -- I don't believe
7    that was like a limited scope of the analysis.
8        Q    Your analysis came out with their
9    product was the best at limiting recurrence rate,
10    correct?
11        A    I don't know that that's correct.  We
12    could look at the paper if -- if you'd like.
13        Q    But the study was paid for by IntraOp
14    Medical?
15        A    That's correct.
16        Q    And you included that in your
17    acknowledgment, right?
18        A    Yes, I believe so.
19        Q    And was that -- did the fact that they
20    paid for that analysis influence the results?
21        A    No.
22        Q    Did you try to influence the results of
23    regulators by preparing that paper?
24        A    The paper was not submitted to
25    regulators.

Page 91

1        Q    Well, did you try to influence the
2    medical community with regard to the use of
3    electron intraoperative radiotherapy by preparing
4    this article?
5        MR. TISI:  Objection.
6        THE WITNESS:  I think we were submitting
7    evidence into the evidence base.  To what extent
8    that influences the medical community, I would
9    certainly hope that's the point of publishing
10    peer-reviewed literature.
11    BY MR. HEGARTY:
12        Q    Do you consider it okay to have a paper
13    funded by industry?
14        A    Absolutely.
15        Q    Can you cite for me any other
16    meta-analysis you've done in the published medical
17    literature?
18        A    I believe there is a presentation -- let
19    me look.  (Peruses document.)
20        There was a presentation on that same
21    topic, and let me look.  I believe there was an
22    Accutane presentation as well.
23        Q    I'm talking about meta-analysis that's
24    in the published medical literature.
25        A    Well, that was in the published medical

Page 92

1    literature.
2        Q    What was?
3        A    The Accutane presentation.
4        Q    That was actually an abstract, right?
5        A    Correct.
6        Q    You are -- was that abstract peer
7    reviewed?
8        A    Yes, it was.
9        Q    It was peer reviewed as part of what?
10        A    I'm looking.  (Peruses document.)  Where
11    is it?
12        American Public Health Association.
13        Q    That was part of -- at their annual
14    meeting, right?
15        A    Correct.
16        Q    It was not published beyond the book
17    that was prepared for that annual meeting, was it?
18        A    I don't recall.
19        Q    And you were -- at the time you gave
20    this public -- this presentation, you had been a
21    litigation expert for plaintiffs in the Accutane
22    litigation, correct?
23        A    That's correct.
24        Q    Did you disclose that in your abstract?
25        A    I believe so, yes.

Page 93

1        Q    And if you didn't, that would have been
2    improper, right?
3        A    Correct.
4        Q    Is it your opinion that meta-analysis
5    can amplify biases in -- in the individual
6    studies?
7        MR. TISI:  Objection.  Beyond the scope.
8        THE WITNESS:  I would say again it's
9    always hard with just a one-liner out of context,
10    but I would say, yes, I agree with that.
11    BY MR. HEGARTY:
12        Q    You agree that meta-analyses don't
13    correct bias and confounding in the underlying
14    studies, correct?
15        MR. TISI:  Objection.  Beyond the scope.
16        THE WITNESS:  Can you repeat, please?
17    BY MR. HEGARTY:
18        Q    Sure.  You agree that meta-analyses
19    don't correct bias and confounding in the
20    underlying studies.
21        MR. TISI:  Same objection.
22        THE WITNESS:  I don't -- I don't really
23    understand that statement.
24    BY MR. HEGARTY:
25        Q    Well, meta-analysis combines --

24 (Pages 90 to 93)

April Zambelli-Weiner, Ph.D.

1    A   Out of context, it's hard.
2    Q   Meta-analysis combines the work of other
3  published studies into one study, correct?
4    A   Correct.
5    Q   Doing that meta-analysis, if there are
6  biases and confounding in the underlying studies
7  don't correct those biases and confounding,
8  correct?
9         MR. TISI:  Objection.  Beyond the scope.
10        You can answer.
11        THE WITNESS:  I would say generally,
12  yes, I agree with that.
13  BY MR. HEGARTY:
14   Q   If the underlying studies are poor, the
15  meta-analysis will not improve them, correct?
16        MR. TISI:  Objection.  Beyond the scope.
17        THE WITNESS:  That's -- that's a very
18  ambiguous question.
19        Could you rephrase?
20  BY MR. HEGARTY:
21   Q   Sure.  If the underlying studies are
22  poor due to bias and confounding, the
23  meta-analysis will not improve those underlying
24  studies, correct?
25        MR. TISI:  Objection.  Beyond the scope.

1         THE WITNESS:  The meta-analysis is -- is
2  simply a synthesis of those studies, so whatever
3  strength and limitations existed within the
4  studies will still be there.
5  BY MR. HEGARTY:
6    Q   A proper meta-analysis must analyze
7  sources of heterogeneity across the studies,
8  correct?
9    A   That's correct.
10   Q   And a proper meta-analysis must examine
11  the methodology of each underlying individual
12  study.  You said that before, correct?
13   A   Correct.
14   Q   Did you do -- did you analyze the
15  individual -- the methodology of each individual
16  study in your reanalysis of the 2003 and 2007
17  papers?
18   A   Well, I wasn't doing an independent
19  meta-analysis.  I was simply attempting to
20  replicate one.  So I didn't go through that
21  process.
22   Q   So you did not do a -- meta-analysis
23  of the -- of the data in the 2003 or 2007 papers
24  in your report, correct?
25   A   I did not do an independent

1  meta-analysis.  I simply tried to replicate
2  numbers, which is a very different thing.
3    Q   Have you ever conducted a case study?
4    A   A case study?
5    Q   Sure.  You comment about the Huncharek
6  and Muscat 2011 case study.  Have you ever done
7  such a case study?
8    A   Can you clarify how you're using "case
9  study"?
10   Q   Well, let me ask it a different way.
11  Have you ever published in the medical literature
12  a review article?
13   A   I believe so, yes.
14   Q   Well, cite for me from your CV any
15  published review article you have written.
16   A   Perhaps I should back up.  How are you
17  defining "a review article"?
18   Q   Well, a review article is an article, as
19  I understand it, that looks at a body of medical
20  literature and talks about it and comments on it,
21  like Drs. Huncharek and Muscat did in the 2011
22  paper.
23   A   Well, there's lots of types of review
24  papers, so that's a very broad designation.
25   Q   Have you ever done a type of review

1  paper that the same -- along the same lines that
2  Dr. Huncharek and Dr. Muscat did in 2011 in the
3  published literature?
4    A   I'm not sure.  I'd have to go back and
5  look.
6    Q   Can you cite for me anything from your
7  CV where you have done a paper along the lines of
8  the 2011 Huncharek and Muscat paper?
9    A   Define "along the lines."
10   Q   Well, that is similar to what they did.
11   A   I can't answer that.  It's too -- that's
12  too vague.  I don't know what you're really asking
13  me.
14   Q   Well, cite for me any published medical
15  literature you've done where you've reviewed a
16  body of literature.
17   A   Sure.  A lot.
18   Q   Cite for me one example.
19   A   Okay.
20        (Interruption by cell phone.)
21   A   Oh, shoot, I'm sorry.  Excuse me.  It
22  won't turn off.  Sorry about that.
23        So just starting at the top --
24        MR. TISI:  Are you looking at the
25  current CV?  I just want to know what you're

April Zambelli-Weiner, Ph.D.

Page 98

1    looking at.  Are you looking at the current CV --
2         THE WITNESS:  Oh, I'm sorry.
3         MR. TISI:  There's three that are
4    marked, and I just want to make sure I'm looking
5    at the right one.
6    BY MR. HEGARTY:
7         Q    And you can just give me one example of
8    where you have published an article reviewing a
9    body of medical literature.
10        MR. TISI:  But she's looking at her CV,
11   and I just want to know which one she's looking at
12   because you marked three.
13        MR. HEGARTY:  I don't care whether she's
14   looking at the CV or not.
15        THE WITNESS:  I don't -- could you
16   repeat your prior question, please?
17   BY MR. HEGARTY:
18        Q    Sure.
19             I wanted you to cite for me one
20   published medical article where you have reviewed
21   the body of literature on a topic.
22        A    Sure.  The CD14 paper.
23        Q    Did you recently do an article on
24   Zofran?
25        A    Yes, I did.

Page 99

1         Q    Was that paid for by lawyers for the
2    plaintiffs in the Zofran litigation?
3         A    No, it wasn't.
4         Q    So they didn't provide any funding for
5    that paper.
6         A    They did not.
7         Q    Who provided the funding for the paper?
8         A    I did.
9         Q    You personally paid for it?
10        A    Yes, I did.
11        Q    Are you a retained expert for plaintiffs
12   in the Zofran litigation?
13        A    No, I'm not.
14        Q    You've received no money from
15   plaintiffs' lawyers as part of work on the Zofran
16   litigation.
17        A    That's correct.
18        Q    Why did you pay for yourself to do that
19   article?
20        A    I have a -- a longstanding interest in
21   birth defects, and we have a program within our
22   company to do work in this area and grow work in
23   this area.  We have a five-year, $4 million
24   contract with the National Center for Birth
25   Defects, and so this is a big area of focus for

Page 100

1    us.
2         Q    And how much did it cost to do that
3    article?
4         A    I don't know.  I'd have to quantify
5    that.
6         Q    Do you know what an h-index is?
7         A    H-index?
8         Q    An h-index.
9         A    I'm not sure.
10        Q    Do you have an h-index?
11        A    I don't -- I'm not sure as I sit here
12   what an h-index is.
13        Q    Are you a peer reviewer for any
14   journals?
15        A    I am.
16        Q    On page 55 of your CV, you list three
17   journals you say you've peer reviewed for; is that
18   correct?
19        A    Correct.
20        Q    And how many times have you peer
21   reviewed for those journals?
22        A    Maybe half a dozen.
23        Q    For each journal?
24        A    No, in total.
25        Q    You've never been a peer reviewer for

Page 101

1    the European Journal of Cancer Prevention,
2    correct?
3         A    I -- I don't believe so.
4         Q    You've never published in that journal,
5    right?
6         A    I don't believe so.
7         Q    What were its peer review procedures
8    back in 2011 or 2007, do you know?
9         A    I don't know.  I don't know.  I'm not
10   even sure what you're asking.
11        Q    Well, what were the peer review
12   procedures for any articles submitted to the
13   European Journal of Cancer Prevention back in
14   2007?
15        A    Typically they have instructions to
16   authors online.  I don't know as I sit here what
17   they are.
18        Q    Have you ever been a peer reviewer for
19   Anti-Cancer Research?
20        A    No, I don't believe so.
21        Q    Have you ever published in that journal?
22        A    No, I don't believe so.
23        Q    Do you know the peer review procedures
24   for that journal?
25        A    Not as I sit here.  Again, I'm sure

26 (Pages 98 to 101)

April Zambelli-Weiner, Ph.D.

Page 102

```
 1   they're readily available.
 2        Q   Have you ever been a reviewer for a NIH
 3   grant proposal?
 4        A   Yes, I have.
 5        Q   How many times?
 6        A   One -- one major time where I sat on a
 7   panel.  I'm not sure if I've reviewed grants
 8   outside of that.
 9        Q   Was it your testimony that if we go
10   online and look at the NIH website for those who
11   have submitted grants that your name will appear?
12        A   It should.  Although I don't know --
13        Q   What grant --
14        A   I don't know how long it goes back.
15        Q   What grant was that?
16        A   It was for the National Eye Institute.
17        Q   What year was that?
18        A   I don't recall.
19        Q   Have you ever been on an editorial board
20   for a journal?
21        A   No, I haven't.
22        Q   Have you ever been designated as an
23   expert witness for a defendant in a lawsuit?
24        A   I have not been designated as an expert
25   witness, no.
```

Page 103

```
 1        Q   Has your testimony ever been excluded by
 2   a court?
 3        A   Yes, I believe it has been excluded
 4   one -- one time.
 5        Q   It was excluded in the Accutane
 6   litigation, correct?
 7        A   That's correct.
 8        Q   It was also excluded in part in the
 9   Mirena litigation too, right?
10        A   Well, I believe the accurate
11   characterization of that is my -- my testimony was
12   limited to only the testimony I intended to give.
13   So...
14        Q   But your testimony was excluded in its
15   entirety in the Accutane litigation, right?
16        A   That's correct.  My understanding is
17   that's under appeal.
18        Q   Did you read the court's opinion
19   excluding your testimony?
20        A   I may have at one point in time.
21        Q   Doctor, you're not a medical doctor,
22   correct?
23        A   Correct.
24        Q   Dr. Huncharek is a medical doctor.  Are
25   you aware of that?
```

Page 104

```
 1        A   I don't recall what his background is.
 2        Q   You're not part of the medical
 3   community, right?
 4            MR. TISI:  Objection.
 5            THE WITNESS:  I wouldn't -- I wouldn't
 6   characterize it that way.  I would say I'm not an
 7   MD.  I'm not a physician.
 8   BY MR. HEGARTY:
 9        Q   Well, you're -- you don't consider
10   yourself to be a part of the medical community, do
11   you?
12        A   I consider -- that's a vague -- it
13   depends how you define "medical community."
14        Q   Well, are you a healthcare provider?
15        A   No, I'm not.
16        Q   Dr. Huncharek is a radiologist,
17   oncologist.  You're not an oncologist, right?
18        A   Correct.
19        Q   You're not a radiologist, right?
20        A   Correct.
21        Q   You have no training in oncology, right?
22        A   I have no training in clinical oncology.
23        Q   You have no training in radiology,
24   correct?
25        A   I have no training in radiology.  I'm
```

Page 105

```
 1   just clarifying.  That doesn't mean I don't have
 2   training in research related to these -- to these
 3   areas.
 4        Q   You've never diagnosed or treated a
 5   disease in a patient, including cancer, correct?
 6        A   That's correct, because I'm not a
 7   physician.
 8        Q   You have no expertise in treating
 9   patients with ovarian cancer, correct?
10        A   That's correct.
11        Q   You have no expertise in diagnosing
12   ovarian cancer, right?
13        A   I have no experience as a physician
14   diagnosing ovarian cancer.
15        Q   Have you ever diagnosed ovarian cancer
16   in a patient?
17        A   I haven't diagnosed ovarian cancer, but
18   it's sort of a slippery slope.  I'm just leaving
19   it open for -- as it relates to research.
20        Q   You're not a cell biologist, right?
21        A   I don't characterize myself as a -- as a
22   bench scientist, but I have done work in that
23   area.
24        Q   You've done cell studies?
25        A   Yes, I have.
```

27 (Pages 102 to 105)

April Zambelli-Weiner, Ph.D.

Page 106

1    Q   Using what kind of cells?
2    A   I don't recall.  It was at the National
3  Cancer Institute.  It's been a while now.
4    Q   You're not a pathologist, are you?
5    A   I'm not.
6    Q   Not a geneticist?
7    A   I'm not a clinical geneticist, but I do
8  have a Ph.D. in human genetics.
9    Q   You're not a mineralogist, correct?
10   A   That's correct.
11   Q   You're not an expert on talc, right?
12       MR. TISI:  Objection.
13       THE WITNESS:  I'm not a -- the mineral
14  talc?
15  BY MR. HEGARTY:
16   Q   Yes.
17   A   Can you clarify that question?
18   Q   Sure.
19   A   No, I'm not an expert on the mineral
20  talc.
21   Q   You're not an expert on asbestos,
22  correct?
23       MR. TISI:  Objection.
24       THE WITNESS:  I -- I would agree I'm not
25  an expert on asbestos as a -- as a mineral,

Page 107

1  correct.
2  BY MR. HEGARTY:
3    Q   Well, you're not an expert on talc and
4  its use in -- well, strike that.
5        You're not an expert on talc and any
6  potential medical effects of talc, correct?
7        MR. TISI:  Objection.
8        THE WITNESS:  I would consider myself an
9  expert in methodology as it might relate to that
10  kind of a question.
11  BY MR. HEGARTY:
12   Q   But how about specifically as it relates
13  to talc and any potential medical effects of talc,
14  you're not an expert on those, correct?
15       MR. TISI:  Objection.
16       THE WITNESS:  Could you rephrase the
17  question?
18  BY MR. HEGARTY:
19   Q   Sure.
20       You're not an expert on talc and ovarian
21  cancer, correct?
22       MR. TISI:  Objection.
23       THE WITNESS:  I wouldn't characterize
24  myself as an expert on talc and ovarian cancer,
25  but again, I certainly would consider myself an

Page 108

1  expert qualified to study that relationship if I
2  chose to do so.
3  BY MR. HEGARTY:
4    Q   You're not an expert on in vitro
5  testing, are you?
6    A   No.
7    Q   You're not an expert on in vivo testing?
8    A   Again, I would back up and clarify the
9  prior answer and say I wouldn't characterize
10  myself as an expert, but I have worked in those
11  areas --
12   Q   You've never done --
13   A   -- in the past.
14   Q   I'm sorry.  You've never done animal
15  studies, have you?
16   A   Yes, I have.
17   Q   Over what animal species?
18   A   I've worked with mice and rats.
19   Q   Doing what kind of experiments?
20   A   Doing studies of inflammation.
21   Q   Involving what exposure?
22       MR. TISI:  I'm sorry, she was not
23  finished.
24  BY MR. HEGARTY:
25   Q   Were you finished?

Page 109

1    A   No.
2    Q   Go ahead.
3    A   Studies of mechanisms of inflammation.
4    Q   Involving exposure to any substance?
5    A   No.
6    Q   You're not an industrial hygienist, are
7  you?
8    A   No.
9    Q   You're not an FDA expert, correct?
10       MR. TISI:  Objection.
11       THE WITNESS:  I am not -- correct, I'm
12  not a regulatory expert.
13  BY MR. HEGARTY:
14   Q   You're not an expert on the properties
15  of talc, correct?
16   A   Correct.
17   Q   With regard to ovarian cancer, what are
18  the subtypes of the disease?
19   A   Let's see.  I know there's -- I'll do my
20  best to recall.  I know there's epithelial and
21  nonepithelial.  Within epithelial, I know there is
22  mucinous and -- I'm blanking on -- on the other
23  subtypes at the moment.
24   Q   Do you know what the most common subtype
25  of ovarian cancer is?

April Zambelli-Weiner, Ph.D.

Page 110

1    A   Epithelial I believe makes up the
2  majority.
3    Q   How about -- that's not a subtype,
4  though.
5    A   Oh, you said type.
6    Q   It's a type of ovarian cancer.
7    A   Right. I don't recall at the moment.
8    Q   Dr. Muscat is a full professor at Penn
9  State. Dr. Huncharek was an adjunct assistant
10  professor at the University of South Carolina
11  School of Medicine.
12    Do you currently hold any faculty
13  positions?
14    A   I don't currently hold, but as I said,
15  I'm -- my -- I've been nominated for adjunct
16  status at Hopkins, and that's currently in
17  process.
18    Q   Have you ever held a faculty position at
19  a university?
20    A   No, I haven't. Other than during my
21  time at Hopkins.
22    Q   That was not a faculty position.
23    A   I wouldn't call that faculty, no.
24  That's correct.
25    Q   If you look at the qualifications

Page 111

1  section of your report that starts on page --
2    A   Actually, sorry, can I just clarify?
3  Because I was on staff at Hopkins, so I don't know
4  what -- I don't know what definition of "faculty"
5  you're using, but I'm just going to clarify that.
6    Q   You've never been a professor at any
7  university, correct?
8    A   Correct.
9    Q   Or an assistant professor?
10    A   That's correct.
11    Q   Or an adjunct professor?
12    A   Correct.
13    Q   If you look at the "Qualifications"
14  section of yours on page 5 of your report.
15    A   I'm really sorry, but after this
16  question I need another break. Sorry.
17    Q   How much longer can you go?
18    MR. TISI: I don't think she should have
19  to -- if she needs to take a break --
20    MR. HEGARTY: No, no, I'm saying my --
21  the next several questions might take five
22  minutes. I don't have just question, but other --
23  otherwise, it's a break point.
24    THE WITNESS: If it's that, I'll power
25  through.

Page 112

1    MR. HEGARTY: Okay. Well, I mean I can
2  take a break now or we can wait until I move
3  through this section.
4    MR. TISI: It's up to her.
5    MR. HEGARTY: Which should be five or
6  ten minutes. It's up to you.
7    THE WITNESS: I'll give it a whirl. Go
8  ahead.
9  BY MR. HEGARTY:
10    Q   Okay. If you look at the
11  "Qualifications" section, in the second paragraph
12  you say that you're a methodological expert. Do
13  you see that?
14    A   Yes.
15    Q   That's a self-proclaimed title, correct?
16    MR. TISI: Objection.
17    THE WITNESS: Well, I wouldn't agree
18  with that characterization of it. This is what
19  clients hire me and my company to do, so I think
20  the expertise is recognized.
21  BY MR. HEGARTY:
22    Q   Well, has any group, entity or person
23  recognized you in any published setting as a
24  methodological expert?
25    A   It's possible. I don't know what you

Page 113

1  mean by "a published setting."
2    Q   Well, have you ever been characterized
3  in any published work as a methodological expert?
4    A   I don't know about that.
5    Q   Have you ever been given this title by
6  anyone but yourself?
7    A   Sure. Yeah, absolutely.
8    Q   Name somebody who has called you a
9  methodological expert.
10    A   The faculty at Johns Hopkins who want me
11  to come teach.
12    Q   Give me a name.
13    A   They're in the Center for Biomedical
14  Engineering. I can tell you that. I'm just
15  blanking on the name at the minute because it's a
16  difficult one. I can get it for you, especially
17  on a break.
18    Q   So sitting here today, you can't name
19  anyone who has ever called you a methodological
20  expert?
21    A   Not at the moment. Again, I don't know
22  what you mean by called me. I think expertise is
23  recognized in a multitude of ways.
24    Q   Well, I -- I'm sorry.
25    A   And building a business on -- on

29 (Pages 110 to 113)

April Zambelli-Weiner, Ph.D.

Page 114

1    epidemiology and methodology I think is a
2    recognition of the expertise.
3        Q   Well, I'm being specific to the phase
4    you use in your report, "methodological expert."
5    Who has ever called you a methodological expert in
6    epidemiology and public health?
7        A   I'm sure my clients have.
8        Q   Can you name for me any person that's
9    ever called you that?
10       A   Some of the lawyers sitting here today.
11       Q   Okay.  Anybody else?  Can you name any
12   specific person from a client, not a lawyer.
13       A   Well, I can't name client names.
14       Q   Why can't you name client names?
15       A   Confidentiality.
16       Q   So the name of a person you work with
17   you consider to be confidential?
18       A   Sure.  Well, I mean I'm -- I'm bound by
19   confidentiality agreements, and what I do for them
20   is -- is often confidential.
21       Q   So you're -- you think those
22   confidentiality agreements extend to simply
23   identifying the person with whom you have
24   communicated with?
25       A   Sure.

Page 115

1        Q   When in any written -- strike that.
2            This -- this claim of a methodological
3    expert, is that on your website anywhere?
4        A   I don't know.
5        Q   When in any written work have you called
6    yourself a methodological expert?  Can you cite
7    for me any written work where you've used that
8    phrase?
9        A   I'm not sure.
10       Q   Have you ever taught courses on this
11   methodological expertise?
12       A   I think we -- I think we talked about
13   that a little bit already.
14       Q   How long ago was that?
15       A   That's been a while.  During my time at
16   Hopkins.  Because, of course, I'm in the
17   commercial sector, so my day-to-day livelihood
18   does not involve teaching, but it does involve
19   mentoring.
20       Q   Are you -- you're --
21       A   And as I --
22       Q   Sorry, I thought you were finished.
23       A   No, I just wanted to -- to reiterate
24   that -- that I am going to be teaching.
25       Q   Well, you're -- when is the last time

Page 116

1    that you were at Johns Hopkins?
2        A   2003 or '4.
3        Q   Okay.  And have you ever taught any
4    courses on methodological expertise of
5    epidemiology and public health since working at
6    Hopkins?
7        A   I have not taught any academic courses,
8    no.
9        Q   And have you written any articles
10   setting out in detail this methodological
11   expertise that you have?
12       A   Could you be more specific?
13       Q   Sure.  You say you're a methodological
14   expert.  In any written publication, have you ever
15   explained in what way you're a methodological
16   expert?
17       A   I don't know.  I don't know how or why
18   that would happen, but -- I don't think so.
19       Q   What special training have you had to
20   become a methodological expert beyond any other
21   person who is a trained epidemiologist?
22       A   All of my training and years of
23   experience.  Ph.D. and post-doc at Johns Hopkins,
24   20 years of experience working in the field, and
25   building a multimillion dollar consulting firm

Page 117

1    from nothing based on my skills, expertise and
2    reputation as well as my -- my larger team.
3        Q   And again, going back to what special
4    training do you have besides -- beyond what an
5    epidemiologist would have at -- at Johns Hopkins?
6            MR. TISI:  Objection.  Calls for
7    speculation.
8    BY MR. HEGARTY:
9        Q   Do you consider yourself a
10   methodological expert who has had training beyond
11   an epidemiologist at Johns Hopkins?
12           MR. TISI:  Objection.  Asked and --
13           THE WITNESS:  I don't understand the
14   question.
15           MR. TISI:  Asked and answered.
16   BY MR. HEGARTY:
17       Q   Well, what -- what training allows you
18   to say you're a methodological expert?
19       A   What -- what allows anyone to say
20   they -- they're an expert?  That you are
21   accomplished, that you are recognized and -- and
22   valued for those services, which I clearly am.  I
23   have 20 years of experience working in the field
24   of epidemiology, beyond my Ph.D. and post-doc from
25   Johns Hopkins and the program that accepts three

30 (Pages 114 to 117)

April Zambelli-Weiner, Ph.D.

Page 118

1  people a year.  So, yes, I consider myself an
2  expert, and I think that's established.
3       Q    But can you cite for us anybody out --
4  besides in this room who considers yourself to be
5  a methodological expert?
6            MR. TISI:  Objection.  Asked and
7  answered --
8            THE WITNESS:  Yes.
9            MR. TISI:  -- now about four times.
10 BY MR. HEGARTY:
11      Q    Can you give us a name?
12      A    The CDC that awarded my -- my company a
13 five-year contract for the National Center for
14 Chronic Disease.
15      Q    At the top of page 6 of your report, you
16 claim that much of your work is focused on
17 diseases of inflammation.  What published articles
18 of yours in your CV focuses on diseases of
19 inflammation?
20      A    I have several publications on asthma,
21 several publications on cancer, diabetes,
22 cardiovascular disease.
23      Q    And all of those publications concern
24 inflammation?
25      A    Sure, at some level mechanisms of

Page 119

1  inflammation, yes.
2       Q    And those publications would be set out
3  in your CV, correct?
4       A    Correct.
5            MR. HEGARTY:  Okay.  We can take that
6  break if you want to.
7            THE WITNESS:  Thanks.
8            THE VIDEOGRAPHER:  The time is 11:06
9  a.m., and we're going off the record.
10           (Recess.)
11           THE VIDEOGRAPHER:  The time is 11:21
12 a.m., and we're back on the record.
13 BY MR. HEGARTY:
14      Q    Doctor, the opinions in your report are
15 based on your review of materials, your training
16 and your experience, correct?
17      A    Correct.
18      Q    You were not personally involved in any
19 of the studies that you cite in your report,
20 correct?
21      A    That's correct.
22      Q    You were not an author on any of the
23 studies you've cited or read and referenced in
24 your report, correct?
25      A    That's correct.

Page 120

1       Q    You're not relying on any publication of
2  yours or a study you were involved in for purposes
3  of your opinions, correct?
4       A    That's correct.
5       Q    You had not seen any of the company
6  documents of J&J and Imerys before being hired by
7  the lawyers in this case, correct?
8       A    I believe that's correct.
9       Q    As to the company documents, you don't
10 personally know any of the -- of the individuals
11 who are referenced in those documents, do you?
12      A    No, I don't.
13      Q    You have not been involved in any group
14 that has examined the safety of talc, correct?
15      A    Correct.
16      Q    You've never worked for J&J, right?
17      A    That's correct.
18      Q    Never worked for Imerys?
19      A    Correct.
20      Q    You've never talked with anyone at J&J
21 or Imerys regarding talc, correct?
22      A    Correct.
23      Q    You've never talked with any other
24 company who makes talc about a talc product,
25 correct?

Page 121

1       A    That's correct.  I -- yes, I believe so.
2       Q    You've had no involvement in the
3  development of any talc product, correct?
4       A    Although -- well, can you repeat the
5  prior question?
6       Q    Sure.  You've never talked with any
7  company with which you have worked regarding a
8  talc product of theirs, correct?
9       A    That's correct.
10      Q    You've had no involvement in the
11 development of any talc product, correct?
12      A    Correct.  Well, I -- I -- not to my
13 knowledge.
14      Q    You've never worked for FDA, right?
15      A    That's correct.
16      Q    You've never worked for any health
17 agency or authority, correct?
18      A    I have worked for them as a contractor
19 but not as an employee.
20      Q    You've never been part of a health
21 agency's health or safety assessment of any
22 product, correct?
23           MR. TISI:  Objection.
24           THE WITNESS:  I wouldn't say that's
25 entirely correct.

31 (Pages 118 to 121)

April Zambelli-Weiner, Ph.D.

Page 122

```
1    BY MR. HEGARTY:
2        Q   What part is not correct?
3        A   I have worked with a health agency that
4    evaluates the safety of chemicals and chemical
5    ingredients.
6        Q   Well, have you been involved in that
7    agency's health assessment?  In other words, are
8    you -- were you part of your team doing a health
9    assessment or a safety assessment of a product?
10       A   No, I wasn't.
11       MR. TISI:  Objection.
12   BY MR. HEGARTY:
13       Q   You've never been involved in responding
14   to a citizen petition, correct?
15       A   That's correct.
16       Q   You've never been part of FDA's review
17   of a citizen petition, correct?
18       A   Correct.
19       Q   Have you ever submitted a response to a
20   citizen petition?
21       A   I don't believe so.
22       Q   Have you ever worked with anyone in
23   preparing a response to a citizen petition?
24       A   I don't believe so.
25       Q   Have you ever read -- had you ever read
```

Page 123

```
1    the rules and regulations regarding citizen
2    petitions before being contacted by Mr. Rotman in
3    this case?
4        A   That I don't know.  I don't recall.
5        Q   As to the FDA's review of the 1994 and
6    2008 citizen petitions on talc and ovarian cancer,
7    can you name those at FDA who were involved in the
8    analysis of those citizen petitions?
9        A   I believe -- let's see.  I know I have
10   it here, but if this is a memory test -- I -- Kapp
11   maybe.  I think he's the chair or deputy chair of
12   the --
13       MR. TISI:  You're allowed to look at --
14       THE WITNESS:  Okay.
15   BY MR. HEGARTY:
16       Q   Let me ask a different question.
17       A   Yeah.
18       Q   Is the information you have as far as
19   who was involved from the FDA's denial letter?
20       A   Correct.
21       Q   Do you have any information beyond
22   what's in the FDA's denial letter in terms of
23   names as far as who was involved in FDA in looking
24   at the citizen petition?
25       A   No, I don't.
```

Page 124

```
1        Q   Do you know what -- do you know what
2    role each person at FDA played in terms of
3    responding to the citizen petition?
4        A   No, I don't know what they did or
5    exactly what their process was.
6        Q   Can you describe the expertise of any of
7    the individuals at FDA who reviewed or were
8    involved in reviewing the citizen petition?
9        A   Not as I sit here right now, no.
10       Q   Have you ever spoken to anyone at FDA
11   about their review of the citizen petition?
12       A   No.
13       Q   Have you ever tried to speak to anybody
14   at FDA about their review?
15       A   Could you be more specific?
16       Q   Sure.  Have you ever tried to speak with
17   anyone at FDA about their review of the 1994 and
18   2008 citizen petitions regarding talc and ovarian
19   cancer?
20       A   No.
21       Q   How much time did FDA spend in its
22   review of the citizen petitions?
23       A   I don't know.
24       Q   Over what period of time did FDA do its
25   review of the citizen petitions?
```

Page 125

```
1        A   All I know from the docket is that there
2    were years that transpired, but I don't know how
3    much time they spent on the review.
4        Q   Did FDA consult with any outside experts
5    as part of this process of reviewing the citizen
6    petitions in -- from 2008 and 1994?
7        A   I don't know.
8        Q   You had no involvement in FDA's review
9    of the 2000 -- of the 1994 and 2008 citizen
10   petitions, correct?
11       A   Correct.
12       Q   You have no personal knowledge of FDA's
13   work in responding to the citizen petitions,
14   correct?
15       A   Only what's publicly available.
16       Q   You've had no involvement in anything
17   that FDA has done as to talc, correct?
18       MR. TISI:  Objection.
19       THE WITNESS:  I've had no involvement
20   with FDA regarding talc.
21   BY MR. HEGARTY:
22       Q   Neither FDA nor any regulatory,
23   scientific or other body has ever sought out your
24   opinion on the scientific literature as to talc
25   and ovarian cancer, correct?
```

32  (Pages 122 to 125)

April Zambelli-Weiner, Ph.D.

Page 126

1    MR. TISI:  Objection.
2    THE WITNESS:  Can you repeat that,
3  please?
4  BY MR. HEGARTY:
5    Q   Sure.  Neither FDA nor any other
6  regulatory, scientific or other body has ever
7  sought out your opinions on the scientific
8  literature as to talc and ovarian cancer, correct?
9    MR. TISI:  Objection.
10    THE WITNESS:  I believe that's correct,
11  yes.
12  BY MR. HEGARTY:
13    Q   You've never submitted anything to FDA
14  or any other agency or group regarding talc,
15  correct?
16    A   I believe that's correct.
17    Q   Or ovarian cancer, correct?
18    A   Can you repeat the question?
19    Q   Sure.  You've never submitted anything
20  to FDA or any other agency or group regarding
21  ovarian cancer, correct?
22    A   I wouldn't say that's correct, no.
23    Q   What -- what part is incorrect?
24    A   Well, I've certainly been involved --
25  you just said the word "submitted."  I've

Page 127

1  certainly submitted things to agencies related to
2  ovarian cancer.
3    Q   Okay.  What have you submitted to
4  agencies regarding ovarian cancer?
5    A   Proposals.
6    Q   Proposals as to what?
7    A   For studies.
8    Q   Studies on what?
9    A   Ovarian cancer.
10    Q   Ovarian cancer and what?
11    A   Surveys, survivorship issues.
12    Q   Have you published in those areas?
13    A   No.
14    Q   If you look at the "Methodology" section
15  of your report on pages 9 and 10.
16    A   (Peruses document.)
17    Q   And in that last paragraph on page 9,
18  you state that your analysis and -- and in
19  formulating opinions, you employed methods that
20  are generally accepted by the scientific
21  community.
22    Do you see that?
23    A   Yes, I do.
24    Q   Is there a name for the method that you
25  employ, a formal name?

Page 128

1    A   I would call it critical review,
2  critical epidemiological review.
3    Q   What is your definition of "general
4  acceptance" of the medic -- of the scientific
5  community?
6    A   That the methods are taught, conducted,
7  published in textbooks.  I mean I think anyone
8  could come up with a range of -- of definitions
9  for -- for "generally accepted," but certainly as
10  a Ph.D. epidemiologist with 20 years of
11  experience, I know what's generally accepted in
12  the field of epidemiology.
13    Q   What did you do to confirm that the
14  methods you employed are generally accepted?
15    A   I don't need to confirm them.
16  They're -- they're just standard, fundamental
17  epidemiologic methods that you can find in the
18  Rothman textbook.
19    Q   Did you go and confirm that what you did
20  was what is set out in, for example, the Rothman
21  textbook?
22    A   I don't -- I don't need to do that.  No.
23    Q   Did you survey scientists as far as what
24  your method -- as far as the methodology you
25  proposed -- you did to see if it was generally

Page 129

1  accepted by those scientists?
2    A   No.  And I would certainly hope I -- I
3  didn't have to do that or I would be in a lot of
4  trouble.
5    Q   Where are the methods you employed
6  published in the medical literature?  You
7  mentioned Rothman.  Is -- is that one source?
8    A   Sure.  I mean this is essentially an
9  analysis of the internal validity of epidemiologic
10  studies.  So you can look up "internal validity"
11  in any epi textbook.
12    Q   Have you ever published your methodology
13  in any medical journal?
14    A   Can you be more specific?
15    Q   Well, you say that you employed
16  methodologies that are generally accepted by the
17  scientific community.  Have you ever laid out in
18  any medic- -- published medical article the
19  methodology that is to be employed when you do
20  what you do in this report, the steps?
21    A   Well, an assessment of the internal
22  validity of a study is a component of any review
23  of a study.  So it's not a methodology per se as
24  much as a process.  It's, again, textbook
25  epidemiology.

33 (Pages 126 to 129)

Golkow Litigation Services - 877.370.DEPS

April Zambelli-Weiner, Ph.D.

Page 130

1    Q   Have you ever published a chapter in a
2  textbook laying out the methods for analyzing
3  medical literature?
4    A   No, I haven't.
5    Q   Have you ever published in any medical
6  article the methods for analyzing a medical
7  journal, step-by-step methods?
8      MR. TISI:  Medical --
9      MR. HEGARTY:  I'm sorry.
10     MR. TISI:  Analyzing a medical journal?
11     MR. HEGARTY:  Yeah, let me repeat that.
12 Should have just let my bad question go.
13 BY MR. HEGARTY:
14   Q   Have you ever published in a medical
15 article the methods for analyzing the reliability,
16 the validity, the accuracy of a medical article?
17   A   I don't know to what extent that might
18 be in anything I published.
19   Q   Can you cite for me anything like that
20 today?
21   A   No, not at the moment.
22   Q   Have you ever tested the accuracy of the
23 results that you get from employing the methods
24 that you used for purposes of your report?
25     MR. TISI:  Objection.

Page 131

1      THE WITNESS:  Well, I think the validity
2  of -- of -- I'm sorry, repeat the question.
3  BY MR. HEGARTY:
4    Q   Sure.  Have you ever tested the accuracy
5  of the methodological approach that you -- you
6  used for purposes of preparing your report?
7      MR. TISI:  Objection.  Assumes --
8      THE WITNESS:  Can you define "accuracy"?
9  That's not really a term I would apply to this.
10 BY MR. HEGARTY:
11   Q   Have you ever developed a rate of error
12 in applying the methodology that you imply -- you
13 used for purposes of your report?
14   A   That isn't something that -- that we
15 would do in epidemiology.
16   Q   If you look at Section 5.1 of your
17 report on page 10, you refer to ethics guidelines
18 by the American College of Epidemiologists.  Do
19 you see that?
20   A   I do.
21   Q   Do you intend to testify in this case
22 that either Dr. Huncharek or Dr. Muscat were
23 unethical in connection with any of their work?
24   A   No, I don't think that's what I'm
25 testifying to.

Page 132

1    Q   Do you intend to testify that either
2  intended their work to improperly influence
3  anyone?
4    A   I'm not testifying to intent.  I'm --
5  I'm testifying to fact.
6    Q   Do you intend to testify that the
7  statements and conclusions that they made were
8  intended to not reflect their honest review of
9  the data but instead made to benefit J&J or Imerys?
10   A   No.  As I said, I'm not testifying to
11 their intent.
12   Q   Do you intend to testify that they were
13 intentionally misleading in their work?
14   A   Again, no.
15   Q   Do you intend to testify that any errors
16 or discrepancies cited in their report were done
17 intentionally?
18   A   No.
19   Q   Have you ever filed or gave notice of
20 any ethical complaint about an author of a
21 publication?
22   A   I don't believe so.
23   Q   Have you filed or gave notice of any
24 ethical complaints about Dr. Huncharek or
25 Dr. Muscat?

Page 133

1    A   No.
2    Q   Have you ever been on a review board or
3  panel involved in looking at claims of ethical
4  violations in published literature?
5    A   No, I haven't.
6    Q   Do you intend to testify that either J&J
7  or Imerys had any involvement in the works you
8  discuss with the intent to influence anyone?
9    A   Again, I'm -- that's a compound
10 question, but I'm just going to repeat, I'm not
11 testifying to intent.
12   Q   Do you intend to testify that either J&J
13 or Imerys were aware of the issues with the
14 studies you cite in your report?
15     MR. TISI:  Objection.
16     THE WITNESS:  I'm sorry, can you repeat?
17 BY MR. HEGARTY:
18   Q   Sure.  Do you intend to testify that
19 either J&J or Imerys were -- were aware of the
20 issues that you cite in your report with regard to
21 any of the works you analyzed?
22   A   I don't know if they were aware of the
23 issues.
24   Q   Do you intend to testify that the
25 statements and conclusions made in -- I'm sorry.

34 (Pages 130 to 133)

April Zambelli-Weiner, Ph.D.

Page 134

1    A   Just give me one second.  Sorry.  Sorry,
2   excuse me.
3        Go ahead.
4    Q   Do you intend to testify that the
5   statements and conclusions made in PCPC's 2009
6   response to the citizen petition were intended to
7   not reflect their honest review of the data but
8   instead made to benefit J&J or Imerys?
9        MR. TISI:  Objection.
10        THE WITNESS:  I can't --
11        MR. TISI:  Compound question.
12        THE WITNESS:  I can't -- can you repeat?
13   BY MR. HEGARTY:
14    Q   Sure.  Do you intend to testify that the
15   statements and conclusions made in PCPC's response
16   to the citizen petition, the 2009 response, were
17   intended to not reflect their honest review of the
18   data but instead made to benefit J&J or Imerys in
19   the process?
20        MR. TISI:  Objection.  Compound
21   question.
22        THE WITNESS:  I'm not testifying to
23   intent.
24   BY MR. HEGARTY:
25    Q   Do you intend to testify that either J&J

Page 135

1   Imerys or PCPC were aware of the issues you cite
2   in your report as to the Huncharek and Muscat
3   analysis submitted in 2009?
4        MR. TISI:  Objection.
5        THE WITNESS:  That's a long question.
6   I'm sorry, can you repeat?
7   BY MR. HEGARTY:
8    Q   Sure.  Do you intend to testify that
9   either J&J, Imerys or PCPC were aware of the
10   issues you cite in your report about the Muscat
11   and Huncharek analysis that they submitted to FDA
12   in 2009?
13    A   No, I don't know what they were aware
14   of, so no.
15    Q   Do you intend to testify that PCPC, J&J
16   or Imerys were misleading in their interactions
17   with FDA?
18    A   No.
19    Q   Do you intend to testify that either
20   PCPC, J&J or Imerys acted with an improper motive
21   in communicating with FDA about talc and ovarian
22   cancer?
23    A   Again, no, not testifying to intent.
24    Q   Do you intend to testify that either of
25   these companies interacted with Drs. Huncharek and

Page 136

1   Muscat on these papers, what you cite in your
2   report, with an improper motive or intent to
3   influence or mislead anyone, including FDA?
4        MR. TISI:  Objection.  Compound.
5        THE WITNESS:  No.
6   BY MR. HEGARTY:
7    Q   In the middle of page 10 of your report,
8   you say the reliability -- that reliability is the
9   concept that results must be repeatable.  Is that
10   statement correct?
11    A   That's correct, in general, in
12   scientific research, yes.
13    Q   So the word "reliability" is the concept
14   that results must be repeatable.  Is that the
15   right phrase?  It's not repeatable -- or
16   replica -- or it's not replicability?
17    A   You could probably interchange --
18   interchange that, but reliability is the concept
19   that given the same protocol and the same set of
20   circumstances, you would get the same results.
21    Q   In this section under "Transparency and
22   Reproducibility," you also state that:  "The
23   reliability of scientific findings cannot be
24   evaluated if research is not reported in a
25   transparent and reproducible manner."

Page 137

1        Correct?
2    A   Correct.
3    Q   So according to you, the reliability of
4   any work that is not reported in a completely
5   transparent and reproducible manner cannot be
6   evaluated, correct?
7        MR. TISI:  Objection.
8        THE WITNESS:  I think that's a poorly
9   written sentence, which is what you're probably
10   driving at.  I think the point is you can't do,
11   you know, a full evaluation of the rigor of a
12   study if there aren't transparent methods and
13   reporting of results, which is why it took so much
14   effort to undertake the analysis that I did.
15   BY MR. HEGARTY:
16    Q   Well, is it your opinion that the 2003
17   study by Dr. Huncharek was not reported in a
18   completely transparent and reproducible manner?
19    A   Yes, it is.
20    Q   How about the 2007 paper?
21    A   Yes.
22    Q   How about the 2009 response to the
23   citizen petition?
24    A   Can you --
25    Q   Sure.  Was the --

35 (Pages 134 to 137)

Page 138

1    A   I lost the chain of the question there.
2    Q   Was the Huncharek and Muscat response to
3  the citizens petition done in a completely
4  transparent and reproducible manner?
5    A   I wouldn't talk about reproducibility in
6  terms of a review paper, a weight of evidence type
7  analysis. I'm talking about studies, statistical
8  analyses, which would be the 2003 and 2007 papers.
9    Q   So we focused on the 2003 and 2007
10  paper. By the definition you report here, you
11  cannot even evaluate whether the papers were
12  reliable, correct?
13    A   Well, that's your -- that's your
14  interpretation of what I wrote, but I just
15  explained what I meant.
16    Q   Well, according to your statement, you
17  can't say one way or another whether these works
18  are valid because, according to you, they're not
19  trans- -- they're not done in a transparent or
20  reproducible manner. I'm just using your words.
21    A   Right. And you're -- you're assigning
22  your meaning to it, and I'm telling you my
23  meaning.
24    Q   Again, what is your meaning besides what
25  you write in your report?

Page 139

1    A   My meaning is I can't fully evaluate the
2  rigor of the results, and in a particular study,
3  if there's not full transparent reporting of the
4  methods and the results. So I can attempt -- I
5  can do an analysis, I can attempt to replicate,
6  but ultimately it remains unknown if you're unable
7  to replicate what was done. So that leaves
8  something unknown that should not be unknown.
9    Q   Okay. So you can't fully evaluate the
10  rigor of the 2003 and 2007 papers, correct?
11    MR. TISI: Objection.
12    THE WITNESS: I did -- I did -- I did a
13  full evaluation of those papers.
14  BY MR. HEGARTY:
15    Q   Well, you just said you can't fully
16  evaluate the rigor of a -- of the results of a
17  study unless they're reported in a transparent and
18  reproducible manner, correct?
19    A   Correct. So there's still some -- there
20  are still some unknowns that -- that should not be
21  unknown. That's -- that's the point being made.
22    Q   So you can't evaluate all -- all the
23  rigors or knowns about the 2003 or 2007 papers
24  because, according to you, they weren't done in a
25  completely transparent and reproducible manner,

Page 140

1  correct?
2    MR. TISI: Objection.
3    THE WITNESS: No, I don't agree with how
4  you said that.
5  BY MR. HEGARTY:
6    Q   Okay. Well, I guess we will let the
7  record reflect your definition.
8    Is it your opinion that unless
9  everything an author does is spelled out in a
10  study such that the exact same materials can be
11  reviewed and the exact same analysis be done, the
12  study is invalid and unreliable?
13    A   In general, I would not agree with that
14  statement. I think that it's very contextually
15  dependent. Certain types of studies, certain
16  types of analyses require certain types of
17  specification of the methods and reporting. So it
18  really is quite a spectrum. It's very
19  contextually dependent. Meta-analysis in
20  particular has a lot of standards and best
21  practices around it in terms of methods in
22  reporting.
23    Q   And where are those standards and best
24  practices laid out in the published literature?
25    A   You can look at the Cochrane

Page 141

1  Collaboration. You can look at the PRISMA
2  guidelines. You can look at PICOs.
3    Q   Is your opinion that errors in
4  abstracting data render a report invalid or
5  unreliable?
6    A   Again, it's the context of the errors.
7  So errors in and of themselves and in the
8  abstract, you can't really take them out of
9  context. So it depends on the nature and the
10  magnitude of the errors.
11    Q   Is that also true for misquoting of
12  authorities?
13    A   I think I --
14    MR. TISI: Objection.
15    THE WITNESS: I think I did actually
16  testify before to that exact thing. I think I
17  said I would have to look at the totality of -- of
18  the piece of work and the context.
19  BY MR. HEGARTY:
20    Q   Is not following an author's methods
21  that they lay out at the beginning of a
22  publication and not following them as they said
23  they would, does that -- does that make a study
24  invalid or unreliable?
25    MR. TISI: Objection.

36 (Pages 138 to 141)

April Zambelli-Weiner, Ph.D.

Page 142

1          THE WITNESS: I don't understand your
2    question.
3    BY MR. HEGARTY:
4          Q    Well, if an author lays out what they're
5    going to do in a paper, and then doesn't do that
6    in a paper, that's something different, does that
7    make the paper invalid or unreliable?
8          MR. TISI: Objection.
9          THE WITNESS: Yes, I would say that it
10   does. It certainly -- it certainly is a threat to
11   validity.
12   BY MR. HEGARTY:
13         Q    Does cherry-picking the science make a
14   report invalid and unreliable?
15         A    I don't know what you mean by -- by
16   cherry-picking the science.
17         Q    Well, you know what "cherry-picking"
18   means.
19         A    Well, I think different people have
20   different meanings of it.
21         Q    What's your definition of
22   "cherry-picking"?
23         A    I don't -- I don't usually use that
24   word. If you want to give me your definition,
25   I'll respond to it.

Page 143

1          Q    You've never heard that phrase before?
2          A    I have heard the phrase.
3          Q    And what is your understanding when you
4    hear that phrase?
5          A    Selective examination of certain pieces
6    of evidence, I suppose is a reasonable definition.
7          Q    Does doing that in a report or article
8    make a report -- that report or article invalid
9    and -- and unreliable?
10         MR. TISI: Objection.
11         THE WITNESS: Well, it depends on what
12   the goals and objectives -- stated goals and
13   objectives of the study analysis or report are.
14   BY MR. HEGARTY:
15         Q    Well, in what -- when can you ever have
16   a goal or objective that would allow you to
17   cherry-pick the science?
18         A    When you have reasons to focus on
19   particular studies, like studies that are
20   submitted by sponsors to regulatory agencies.
21         Q    How about in a review article --
22         A    And I call that cherry-picking, by the
23   way.
24         Q    How about in a review article of all the
25   literature, is it appropriate to cherry-pick in

Page 144

1    that situation?
2          A    It depends on the -- the nature of the
3    review. Some reviews -- there's a gradient of
4    rigor in reviews. Some reviews are not meant to
5    be systematic or comprehensive. They're meant to
6    be representative. And in that case, yes, you may
7    select what you think is the best literature.
8          Q    How about in a systematic and
9    comprehensive review, is it appropriate to
10   cherry-pick in that situation?
11         MR. TISI: Objection.
12         THE WITNESS: I would say by definition
13   not in a systematic review. A comprehensive
14   review, you know, again, depends upon the nature
15   of the review. I would say across the board it
16   really depends on what the stated goal is and what
17   the claim of cherry-picking is. I just really
18   can't evaluate something in -- in abstract.
19   BY MR. HEGARTY:
20         Q    Well, if an author is trying to do a
21   systematic and comprehensive review, is it your
22   opinion that it would be improper to cherry-pick
23   in that situation?
24         MR. TISI: Objection.
25         THE WITNESS: Again, it depends on the

Page 145

1    nature of the review. Reviews aren't -- they're
2    not black and white like that. You might have
3    certain pieces of evidence that you need as
4    supporting lines of evidence. In that case it
5    might be appropriate to choose representative
6    pieces of evidence.
7          Certainly in -- in my work for CDC, we
8    are often in the situation of having to choose the
9    best available evidence as part of an evidence
10   synthesis, and so that does involve choosing
11   certain studies over other studies.
12   BY MR. HEGARTY:
13         Q    How about -- but I'm talking about a
14   systematic and comprehensive review of the entire
15   body of literature. Is it appropriate in that
16   situation to cherry-pick?
17         MR. TISI: Objection. Asked and
18   answered.
19         THE WITNESS: I think I did answer that
20   question. I think it depends on -- on the
21   context, the stated objective of the review, the
22   topic of the review, the methods for the review,
23   and the context of what you're accusing
24   cherry-picking.
25   BY MR. HEGARTY:

37 (Pages 142 to 145)

April Zambelli-Weiner, Ph.D.

Page 146

1      Q   So it's your opinion then in some
2  situations it's okay to cherry-pick --
3          MR. TISI:  Objection.
4  BY MR. HEGARTY:
5      Q   -- a systematic or comprehensive review?
6          MR. TISI:  Objection.
7          THE WITNESS:  No.  Those aren't my
8  words.
9  BY MR. HEGARTY:
10     Q   You just said that --
11     A   That's not what I said.
12     Q   You just said that are instances -- you
13  can't make the -- the -- a general statement that
14  it's improper to cherry-pick in doing a systematic
15  and comprehensive review.
16         MR. TISI:  Objection.  "Cherry-picking"
17  is your word, Counsel.  It's not been hers, and
18  she's been clear about that.
19         MR. HEGARTY:  Do you want to get into
20  whether that's a proper objection, Chris?
21         MR. TISI:  It is -- it is a totally
22  proper objection.  She --
23         MR. HEGARTY:  You're to object --
24         MR. TISI:  She -- she --
25         MR. HEGARTY:  You're to object to form

Page 147

1  from the court's rules.
2          MR. TISI:  You don't need to tell me --
3  you don't need to tell me how to -- how to defend
4  a deposition.  You asked her about a definition.
5  She disagreed with your concept, asked you to
6  define it, and now you're -- now you're
7  force-feeding her a word.  So I'm objecting to
8  your use of a word that she had a concern with.
9  BY MR. HEGARTY:
10     Q   Well, let me ask it this way:  Is it
11  ever proper in a systematic and comprehensive
12  review to only focus on one side of a particular
13  issue where there -- there's data on the other
14  side and not mention the data on the other side?
15         MR. TISI:  Objection.
16         THE WITNESS:  If -- it depends on the --
17  again, it depends on the objective of the review.
18  I don't know what you mean by one side or the
19  other.  Again, that would be contextually
20  dependent.  Is there even a one side or another
21  depending on the research question?
22  BY MR. HEGARTY:
23     Q   Well, we'll get -- we'll get to this in
24  a moment.
25         You criticized Drs. Huncharek and Muscat

Page 148

1  for only talking about one part of a body of
2  literature and not talking on the body of
3  literature that shows something different, don't
4  you?
5      A   Can you be more specific?
6      Q   Do you ever accuse Drs. Huncharek and
7  Muscat in your meta- -- your report of
8  cherry-picking -- not using that term, but of
9  cherry-picking?
10     A   I believe I --
11         MR. TISI:  Objection.
12         THE WITNESS:  -- do provide examples
13  where I feel like they haven't represented a
14  balanced discussion of certain issues.  I don't
15  know if that's what you're referring to.
16  BY MR. HEGARTY:
17     Q   Would you call that cherry-picking?
18     A   I said I don't use that word.  I -- I
19  just --
20     Q   Well, what do you call it?
21     A   An imbalanced or -- imbalanced
22  discussion.  Yeah.
23     Q   If an author in a publication has an
24  imbalanced discussion, does that threaten the
25  validity of the work?

Page 149

1      A   It depends on what the stated objective
2  study designs are.
3      Q   What if the intent of the study is to
4  present a balanced review of the literature, but
5  the author doesn't do a balanced review of the
6  literature, does that threaten the validity of the
7  work?
8      A   I think it depends on the nature of the
9  imbalance within the context of that particular
10  study.  I mean a certain imbalance may not be a
11  big threat to validity or a big risk of bias, so
12  that may not carry as much weight as an imbalanced
13  discussion of something that's a very prominent or
14  central issue in that particular research
15  question.
16     Q   All the things that you criticized the
17  2003, 2007 and 2009 papers, according to you,
18  render those works invalid and unreliable.  Is
19  that your opinion?
20     A   My opinion is that there are serious
21  substantive errors and methodologic deficiencies
22  in these papers that make them very unreliable or
23  limit the validity of the studies.
24     Q   And those same standards should be
25  applied to all the work done by the plaintiffs'

38 (Pages 146 to 149)

April Zambelli-Weiner, Ph.D.

Page 150

1    experts in this litigation, correct?
2         MR. TISI:  Objection.
3         THE WITNESS:  Can you repeat the
4    question?
5    BY MR. HEGARTY:
6         Q   Sure.  The standards that you apply in
7    your report about doing proper analysis and
8    studies and publications should be applied to all
9    the plaintiffs' experts' reports in this case,
10   correct?
11        MR. TISI:  Objection.
12        THE WITNESS:  Well, again, I don't think
13   I specified any particular standards.  I think
14   that I said it's contextually dependent upon what
15   the objected -- objective is, what the study
16   design is, what the questions are, and so on.
17   BY MR. HEGARTY:
18        Q   So you don't cite in your report any
19   objective standards for evaluating a published
20   work, correct?
21        A   I -- I don't recall what I cited.
22        Q   Can you cite for me any objective
23   standards for evaluating the validity and
24   reliability of a work?
25        A   Again, I think I did talk about textbook

Page 151

1    epidemiology in terms of internal validity.  The
2    evaluation of internal validity.  Right.  That
3    gets to the reliability, the validity of the
4    measurement, the risk of bias, the extent to which
5    it's being controlled for, all textbook
6    epidemiology.
7         Q   And those standards should be applied to
8    the plaintiffs' experts' reports in the MDL
9    cases -- the MDL case, correct?
10        MR. TISI:  Objection.
11        THE WITNESS:  I don't know what the
12   plaintiffs' experts' reports were or what they
13   were charged with, so I can't -- I can't answer
14   that.
15   BY MR. HEGARTY:
16        Q   It should be applied to the work you did
17   in your report, though, correct?
18        A   Well, my report was a critical review of
19   a very specific body of evidence.
20        Q   And the objective standards that are in
21   the published literature should be applied to your
22   work, correct?
23        A   Again, just to make sure we're talking
24   about the same thing, we're talking about an
25   assessment of the internal validity.  I feel like

Page 152

1    we're bouncing between concepts.  If you're
2    talking about an assessment of the internal
3    validity of an epidemiologic study, then I just
4    described what that entails.
5         Q   Well, we'll come back to it.
6         Now, you state it calls -- in your
7    report that you found superficial and substantive
8    errors, methodological concerns, and lack of
9    transparency that you say call into question the
10   accuracy, validity and reliability of the works
11   you looked at from Drs. Huncharek and Muscat.
12        And does that mean that, according to
13   your standards, work that has superficial and
14   substantive errors calls into question the
15   accuracy, validity and reliability of the work?
16        A   Again, it's going to be the same answer.
17   It's dependent upon what the stated objective of a
18   study was, what the intended use is, what the
19   conclusions were.  You can't take an evaluation
20   out of context.
21        Q   Well, how many superficial errors in a
22   published work is okay?
23        A   I think that depends on the nature of
24   the errors and how significant they are, what the
25   impact of those errors are.

Page 153

1         Q   And how many substantive errors are
2    okay?
3         A   Again, that's a critical evaluation
4    that's contextually dependent.
5         Q   And where are all of these contextually
6    dependent standards set out in the published
7    literature?
8         A   This is expert, right, review and
9    textbook epidemiology.  This is scientific
10   standards.
11        Q   Well, just cite for me the text or
12   authority that says that the number of superficial
13   errors, the number of substantive errors is all
14   contextual and depends on the -- the stated
15   objectives, et cetera.  Cite for me a work that
16   says that.
17        A   I can't as I sit here.  That doesn't
18   mean it doesn't exist.  I think it's -- I think I
19   did cite some of the references to scientific
20   integrity that get at what you're talking about.
21        Q   Well, in the end, your report is your
22   subjective take on these studies, correct?
23        A   My report represents my expert review of
24   these studies.  Correct.
25        Q   Well, you don't employ any type of

39 (Pages 150 to 153)

April Zambelli-Weiner, Ph.D.

Page 154

1    objective published scoring system, correct?
2        MR. TISI:  Objection.
3        THE WITNESS:  That -- that's correct.
4    I -- I wouldn't do that.
5    BY MR. HEGARTY:
6        Q   You don't speak for any --
7        A   That would be --
8        Q   I'm sorry.
9        A   No, that's okay.
10       THE REPORTER:  I'm sorry --
11   BY MR. HEGARTY:
12       Q   You don't speak for any scientific
13   group, correct?
14       MR. TISI:  Objection.
15       THE WITNESS:  Correct.
16   BY MR. HEGARTY:
17       Q   You don't speak for any -- epidemiologic
18   group or entity for purposes of your report, do
19   you?
20       A   Correct.
21       Q   Or any journal, correct?
22       A   Correct.
23       Q   You haven't provided your critique to
24   any of the journals that have published these
25   papers, correct?

Page 155

1        A   Well, I -- I have initiated that
2    process.  I have not done it yet.
3        Q   Okay.  You haven't communicated with
4    these journals and advised them of the critiques
5    that you have set out in your report, correct?
6        A   I have generally advised them of -- of
7    the issues.
8        Q   And those are set out in the e-mails
9    that we marked earlier.
10       A   Correct.
11       Q   You haven't provided your critique of
12   these studies to FDA, correct?
13       A   Correct.
14       Q   No journal or entity has said the things
15   you have stated in your report, correct?
16       A   I don't -- I don't know whether that's
17   true or not.
18       Q   Can you cite anyone outside of this
19   litigation who has said the things you are saying
20   about these publications in your report?
21       A   I don't know.
22       Q   Can you cite anyone outside of the
23   litigation that has said the things you are saying
24   about the 2009 response to the citizen petition?
25       A   I don't know if that exists or not.

Page 156

1        Q   In the end, you're speaking only for
2    yourself as part of your report, correct?
3        A   I am speaking for myself as a scientist
4    and a public health researcher, that's correct.
5        Q   And -- and as an expert paid by the
6    plaintiffs in this case, correct?
7        A   That is correct.
8        Q   That's also a title of yours, right?
9    You're a paid plaintiffs' expert in this
10   litigation, right?
11       MR. TISI:  Objection.
12       THE WITNESS:  If you want to -- if you
13   want to give me that title, that's fine.  I
14   don't -- that's not a title I walk around using.
15   BY MR. HEGARTY:
16       Q   But you're being paid to testify and to
17   write your report, correct?
18       A   I am a consultant.  I do get paid by
19   people.  75 percent is industry.
20       Q   I'm talking about for purposes of
21   litigation, you were paid -- you've been paid for
22   your work, correct?
23       A   Sure.  Absolutely, yes.
24       Q   And you're testifying for the plaintiffs
25   in this case, correct?

Page 157

1        A   That is correct.
2        Q   The 2003, 2007 articles were peer
3    reviewed, correct?
4        A   That's correct.
5        Q   Your report has not been peer reviewed,
6    right?
7        A   Not yet.
8        Q   The 2003 and 2007 papers were published
9    in journals, correct?
10       A   That's correct.
11       Q   Your report has never been published in
12   a journal, correct?
13       A   Correct.
14       Q   In the "Assignment" section in your
15   report on page 6, at the bottom before the
16   "Summary of Opinions," you say that you were asked
17   to address the methodology of the 2009 Huncharek
18   and Muscat, H&M reports, reports submitted to the
19   FDA in a subsequent 2011 publication, correct?
20       A   Yes, that's correct.
21       Q   Who gave you this assignment?
22       A   The plaintiff lawyers.
23       Q   Did they give you an assignment that you
24   didn't do or didn't have time to do?
25       A   No.

40 (Pages 154 to 157)

April Zambelli-Weiner, Ph.D.

Page 158

1      Q   In that same paragraph, you state that
2    the 2011 publications -- you say that the report
3    in the 2011 publication were on behalf of the
4    talcum powder industry to FDA.
5      A   Correct.
6      Q   What is the authority you have for
7    saying that the authors published the 2011 article
8    on behalf of the talcum powder industry?
9      A   My understanding is that they were
10   consultants of the industry at the time and also
11   litigation experts.
12     Q   And is that the only basis you have for
13   saying that that article was published on behalf
14   of the talcum powder industry?
15     A   Well, are you speaking about the 2011
16   paper?
17     Q   Yes.
18     A   So my understanding is that over time,
19   there was a chain of -- of relationship between
20   the authors and the work that originated in 2000,
21   and then showed up periodically over time in these
22   various publications.  So the data in the orig- --
23   in the 2011 paper actually originated in -- in a
24   2000 report.
25     Q   And what is the source of that

Page 159

1    understanding?
2      A   The documents, the proposal to J&J and
3    the preliminary data report.
4      Q   In the section "Summary of Opinions"
5    at the bottom of page 6, carrying over to the top
6    of page 7, you say:  "The 2003 and 2007 papers
7    did not utilize generally accepted methodologies
8    and best practices in epidemiology and
9    meta-analysis."
10     A   Correct.
11     Q   Where are these methodologies and best
12   practices published?
13     A   So again, I would refer you to the
14   Cochrane Collaboration.  They have a handbook on
15   meta-analysis.  There are other resources as well.
16   There's textbooks on meta-analysis.  Borenstein is
17   one.
18     Q   Okay.  You have never published a paper
19   on methodologies and best practices in
20   epidemiology, correct?
21     A   I don't -- no, I haven't had a published
22   paper that was specifically aimed at that
23   objective.
24     Q   Going back to something you mentioned a
25   moment ago, you said that your MDL report has not

Page 160

1    been peer reviewed.  Have you submitted it for
2    publication?
3      A   No, I have not.
4      Q   Why did you say not yet?
5      A   Because I intend to -- to submit the
6    contents of it in some form.
7      Q   Okay.  You intend to submit to who?
8      A   I'm -- a journal.  I'm not sure yet.
9      Q   In what form?
10     A   I'm not sure yet.
11        THE WITNESS:  I really hate to do this.
12   I have to run to the bathroom.
13        MR. HEGARTY:  Okay.
14        THE WITNESS:  But, I mean, I can
15   literally be like three minutes.
16        MR. HEGARTY:  Okay.  Go off the record.
17        THE VIDEOGRAPHER:  The time is 11:59
18   a.m.  We're going off the record.
19        (Recess.)
20        THE VIDEOGRAPHER:  The time is
21   12:04 p.m.  We're back on the record.
22   BY MR. HEGARTY:
23     Q   Okay, Doctor, we left off talking about
24   the "Summary of Opinions" section on pages 6 and
25   7.  In this section you state that -- at the top

Page 161

1    of page 7, you state that these studies were
2    heavily relied on by the talc industry in the
3    2000 -- in its 2009 submission.
4        Do you see where I'm reading?
5      A   I do.
6      Q   You also state at the bottom of page 8
7    that these studies were a primary focus of the
8    arguments advanced by the talc industry in
9    opposition to a mandatory cancer warning on talcum
10   powder products.
11        Do you see that?
12     A   I do.
13     Q   What is your basis for saying that the
14   talc industry heavily relied on the 2003 and 2007
15   studies?
16     A   The basis is the -- the PCPC report in
17   which Huncharek and Muscat elevate their studies
18   and emphasize their studies, sometimes not
19   discussing the fullness of the literature on the
20   topic, but raising their studies as important
21   pieces of evidence on important lines of evidence
22   related to causation.
23     Q   And did you -- is there some objective
24   standard that you applied to come up with the
25   phrase "heavily relied on"?

41 (Pages 158 to 161)

April Zambelli-Weiner, Ph.D.

Page 162

1      A   Well, I did note that they cited their
2  own studies over 25 times.
3      Q   Do you say that in your report?
4      A   No, it's not in my report.  It's just
5  something I noted during my review.
6      Q   Is there a published objective
7  standard that defines objective -- that assigns
8  heavily reliance based on the number of times --
9          MR. TISI:  Objection.
10  BY MR. HEGARTY:
11      Q   -- a paper is cited in a journal or a
12  publication?
13          MR. TISI:  Objection.
14          THE WITNESS:  I'm not aware that
15  something like that would exist.  Certainly this
16  falls under my purview in terms of my critical
17  analysis of these papers.
18  BY MR. HEGARTY:
19      Q   Well, what is the basis for your saying
20  that the -- these studies were the primary
21  focus -- what's the objective standard for
22  defining "primary focus"?
23          MR. TISI:  Objection.
24          THE WITNESS:  I think I just answered
25  the question.  The emphasis on the studies,

Page 163

1  sometimes at the cost of other studies, and the
2  fullness of the literature and data that's
3  available on a particular topic.
4  BY MR. HEGARTY:
5      Q   What published standards did you apply
6  that defines "heavy reliance"?
7          MR. TISI:  Objection.  Asked and
8  answered.
9          THE WITNESS:  I think I answered that
10  question.
11  BY MR. HEGARTY:
12      Q   Well, it's your subjective take on
13  the -- the --
14      A   Well, it's -- sure.
15          MR. TISI:  Objection.
16          THE WITNESS:  It's my expert review,
17  yes.  Correct.
18  BY MR. HEGARTY:
19      Q   And I'm asking you, can you cite for me
20  any published authorities that -- that sets forth
21  the standard for looking at a publication and
22  defining what you have to show to say there's
23  heavy reliance and there's primary focus on these
24  studies?
25          MR. TISI:  Objection.

Page 164

1          THE WITNESS:  That's not a thing, to my
2  knowledge.  So I don't know that that would exist.
3  Again, I think this just falls within the purview
4  of a critical review.
5  BY MR. HEGARTY:
6      Q   When have you ever before in a published
7  article used the phrase "primary focus" or "heavy
8  reliance"?
9      A   I -- I don't know.  I don't recall every
10  word of everything I've ever written.
11      Q   On -- also on page 7 at the very last
12  line, you say that:  "Any scientific, regulatory
13  or policy deliberation or decisions, including but
14  not limited to those undertaken and issued by FDA
15  that relied upon the data and analysis put forward
16  by Drs. Huncharek and Muscat, in whole or in part,
17  are based on flawed data, calculations and
18  conclusions."
19          Do you see where I'm reading?
20      A   I do.
21      Q   First of all, are you saying that
22  everything in the 2009 submission was flawed?
23          MR. TISI:  Objection.
24          THE WITNESS:  I'm not saying that
25  everything in the 2009 submission was flawed.  I

Page 165

1  think I'm saying just what I wrote in my report.
2  BY MR. HEGARTY:
3      Q   Are you saying that every discussion of
4  the studies that are set out in the response
5  are -- is flawed?
6          MR. TISI:  Objection.
7          THE WITNESS:  I'm not sure what you're
8  asking me.
9  BY MR. HEGARTY:
10      Q   Well, there are a number of discussions
11  in the beginning of the response to publications,
12  and many of which you don't refer to.
13          Are all the discussions about the
14  publications that were cited in the citizen
15  petition flawed by Drs. Huncharek and Muscat?
16          MR. TISI:  Objection.
17          THE WITNESS:  I'm not saying that.  That
18  wasn't the focus of -- of my review.
19  BY MR. HEGARTY:
20      Q   Is it your opinion that none of the
21  statements in the response were supported by the
22  studies and data referenced?
23      A   That is not my opinion.  That's not what
24  I'm saying.
25      Q   Your report in the end is limited to the

42 (Pages 162 to 165)

April Zambelli-Weiner, Ph.D.

1  data and conclusions you list from the 2003, the
2  2007 and 2009 response, correct?
3       A   Can you repeat that, please?
4       Q   Sure.
5           Your report about the problems you found
6  with the 2003, 2007, 2009 documents are those that
7  you set out in your report, correct?
8       MR. TISI:  Objection.  Asked and
9  answered.
10          THE WITNESS:  I think -- I think in
11  general, yes, I've laid that out.  I think as I've
12  explained it, it's data that began and was
13  originated in 2000, and was propagated and
14  disseminated over a period of time in -- in these
15  various -- various publications.
16  BY MR. HEGARTY:
17      Q   You agree that not everything in the
18  2003, the 2007 and 2009 papers is inaccurate.
19          MR. TISI:  Objection.
20          THE WITNESS:  I certainly -- I certainly
21  agree with regard to -- I don't know what -- can
22  you rephrase, please?  I don't know what --
23  BY MR. HEGARTY:
24      Q   Sure.
25          Do you agree that not everything in the

1  2003, 2007 and 2009 documents you discuss in your
2  report is inaccurate?
3       MR. TISI:  Are you talking about the
4  data, or what are you talking about?
5  BY MR. HEGARTY:
6       Q   Can you answer the question?
7       MR. TISI:  Well, objection.  Vague.
8       THE WITNESS:  I don't know what
9  "everything" means.
10  BY MR. HEGARTY:
11      Q   Well, is every sentence, every data
12  cite -- or strike that.
13          Do you agree that not every sentence,
14  not every data cite, not every reference to data
15  is inaccurate in the 2003, 2007, and 2009 papers,
16  right?
17          MR. TISI:  Objection.  Beyond the scope.
18          THE WITNESS:  Sure, there are words that
19  are spelled correctly.  There are proper cites.
20  There are proper numbers.
21  BY MR. HEGARTY:
22      Q   There are statements that are not
23  inaccurate?
24      A   I'm sure that there are.  I didn't -- I
25  didn't do just a blanket analysis of every

1  statement in the paper.  I was focused on the
2  critical scientific and epidemiological issues.
3       Q   Do you intend to testify that PCPC and
4  J&J or Imerys intended to present flawed data to
5  the FDA?
6       MR. TISI:  Objection.  Asked and
7  answered.
8       THE WITNESS:  I'm not testifying to
9  intent.
10  BY MR. HEGARTY:
11      Q   Is it your contention that the FDA
12  relied on the 2003 and 2007 papers in making
13  decisions about talc and ovarian cancer for the
14  citizen petitions?
15      A   It -- it is my -- I'm sorry, what word
16  did you use?
17      Q   Yeah, is it your contention that FDA
18  relied on the 2003 and 2007 papers in making
19  decisions about talc and ovarian cancer for the
20  citizen petitions?
21      A   So I would say, yes, on the basis of FDA
22  citing that they -- in their denial letter, excuse
23  me, that they reviewed and considered all of the
24  data that was submitted in support of the work --
25  surrounding, I should say, the citizen petitions.

1       Q   Well, what data do you have that FDA
2  actually relied on the 2003 and 2007 papers in
3  responding to the citizen petitions?
4       A   The denial letter that that data was
5  part of their review.
6       Q   Did they refer to the 2003 and 2007
7  papers in the denial letter?
8       A   I don't recall.  But I think -- the
9  language I'm recalling is that we have -- well, we
10  could pull it up actually.  That might be better.
11      Q   Well, I will.  We'll get to that.
12          But -- okay.  Who at FDA relied on the
13  2003 and 2007 papers --
14          MR. TISI:  Objection.
15  BY MR. HEGARTY:
16      Q   -- as to the citizen petition?
17          MR. TISI:  I'm sorry.
18          THE WITNESS:  I can't answer that kind
19  of question.
20          MR. TISI:  I'm sorry.  I need to place
21  an objection.  Asked and answered.
22          THE WITNESS:  Sorry.
23  BY MR. HEGARTY:
24      Q   Well, what person or persons relied on
25  the 2003 and 2007 papers --

43 (Pages 166 to 169)

April Zambelli-Weiner, Ph.D.

Page 170

1     MR. TISI:  Objection.
2  BY MR. HEGARTY:
3     Q   -- at FDA?
4        MR. TISI:  Objection.  Asked and
5  answered.
6        THE WITNESS:  I can't answer that
7  because I don't know the inner workings of who
8  reviewed what as part of that.
9  BY MR. HEGARTY:
10     Q   Well, at what point in time during the
11  review process did they rely on the 2003 and 2007
12  papers?
13     A   I don't know.  You would have to ask
14  them.
15     Q   On which part of the papers did they
16  rely upon for purposes of the -- the review of the
17  2008 and 2000 -- 1994 citizen petitions?
18     A   I -- I can't answer specifically what --
19  what specific parts they relied on per se.  What
20  I -- what I can say, however, is that a lot of the
21  language and arguments and positions that were
22  proffered in the PCPC reports are echoed in FDA's
23  denial letter.  So it does -- it does seem to me
24  eerily similar and indicative to me in my opinion
25  that they considered that data.

Page 171

1     Q   Well, what weight did individuals at FDA
2  in reviewing the 2003 and 2007 petition -- strike
3  that.
4        What weight did the FDA give to the 2003
5  and 2007 papers in their review of the citizen
6  petitions?
7     A   I can't answer that.
8     Q   What was the extent or nature of the
9  reliance that they -- that they -- that they gave
10  to those papers?
11     A   Again, they're not very detailed in the
12  denial letter about what their process was
13  exactly, so I can't answer that.
14     Q   What else did they rely on outside of
15  what's reported in the denial letter?
16     A   I -- I can't be certain of -- again,
17  because of -- of lack of detail in their methods
18  and process, I can't be sure of what they relied
19  on.
20     Q   Do you have any basis to say that FDA
21  relied on the 2003 and 2007 papers besides the
22  2014 denial letter?
23     A   No, I don't.
24     Q   Do you have any personal knowledge of
25  how FDA evaluated the 1994 and 2008 citizen

Page 172

1  petitions?
2     A   Actually, can you go back and repeat the
3  prior question?  I'm sorry.
4     Q   Well, the question was, do you have any
5  other basis for saying that FDA relied on the 2003
6  and 2007 papers in making decisions about talc and
7  ovarian cancer other than the 2014 citizen --
8  denial and citizen petition?
9     A   Other than knowing that that was part of
10  what they considered in their analysis, I can't
11  say for sure how much weight they gave -- gave to
12  those.
13     Q   Do you even know if they reviewed the
14  2003 and 2007 papers?
15     A   I would assume so.  I would hope so
16  based on their statements that they considered all
17  of the data submitted.  And I think actually they
18  do cite to one of the studies on the docket
19  online.  I do believe that they list one -- at
20  least one of the studies there.
21     Q   Do you know -- do you know if the
22  totality of the 2003 and 2007 papers, all the
23  papers themselves were submitted as part of the --
24  the papers submitted as part of the review
25  process?

Page 173

1     A   Well, there's -- certainly the data is
2  reviewed and referenced within the PCPC report.
3     Q   Do you know if FDA read, actually read,
4  the 2003 and 2007 papers you reference in your
5  report?
6     A   Again, I -- I -- no, I can't know that.
7     Q   You did review, as we just talked about,
8  the FDA's April 2014 denial letter of the citizen
9  petitions, correct?
10     A   Correct.
11        MR. HEGARTY:  I'll mark as Exhibit
12  No. 12 that denial letter.
13        (Zambelli-Weiner Exhibit No. 12
14        was marked for identification.)
15  BY MR. HEGARTY:
16     Q   You've seen the denial letter, correct?
17     A   Yes.
18     Q   You agree that nowhere FDA cited in its
19  analysis to either the 2003 or 2007 studies,
20  correct?
21     A   Again, can you just give me a minute to
22  look at this?
23     Q   How much time do you need?
24     A   Just a few minutes.
25        MR. HEGARTY:  Let's go off the record.

44  (Pages 170 to 173)

April Zambelli-Weiner, Ph.D.

Page 174

1      MR. TISI:  No, we're not going to go off
2  the record.  She's just -- she's just looking at
3  the document.
4      MR. HEGARTY:  If she needs a few
5  minutes, we're going to go off the record.
6      THE VIDEOGRAPHER:  Off --
7      MR. HEGARTY:  Yeah, go -- well, yeah, go
8  off the record.
9      THE VIDEOGRAPHER:  The time is
10  12:17 p.m.  We're going off the record.
11      (Pause.)
12      THE VIDEOGRAPHER:  The time is
13  12:17 p.m.  We're back on the record.
14  BY MR. HEGARTY:
15      Q   Going back to my question, Doctor,
16  nowhere in the 2014 letter did FDA cite to either
17  the 2003 or 2007 studies, correct?
18      A   So they don't cite directly to the two
19  studies, but they do say that they have reviewed
20  the comments received in response to the
21  petitions, which are obviously inclusive of the
22  2003 and 2007 data contained within that report.
23  And as I also said, there may -- it may be listed
24  as a reference on the docket as well.
25      Q   Let me see if I can get an answer to my

Page 175

1  question.
2      Did the FDA --
3      MR. TISI:  She answered.
4  BY MR. HEGARTY:
5      Q   -- anywhere in its letter cite to the
6  2003 or 2007 studies you reference in your report?
7      A   I answered you.  I led with that answer.
8  I said they do not directly cite to the 2003 and
9  2007 papers.
10      Q   Nowhere did FDA cite to the 2009
11  submission by PCPC, correct?  They don't refer to
12  it by name, do they?
13      A   Well --
14      MR. TISI:  Objection, Counsel.
15      THE WITNESS:  -- as the only comment
16  submitted in response to the citizen petition,
17  it's implied.
18  BY MR. HEGARTY:
19      Q   But do they actually include a cite
20  anywhere to the 2009 submission by PCPC?
21      A   They don't directly call out the
22  2009 PCPC report, at least as far as I recall, but
23  we can look at this more if you want.
24      Q   If you turn to page 3 of the FDA's
25  letter, FDA cites on that page its testing of talc

Page 176

1  for asbestos.  Do you see that, at the top of the
2  page?
3      A   Just the first paragraph, is that
4  what you're --
5      Q   The first two paragraphs.
6      A   First two paragraphs.  Okay.
7      Q   Do you see where FDA cites to testing
8  for -- of talc for asbestos?
9      A   They conducted an exploratory survey, is
10  that what you're referring to?
11      Q   Yes.
12      A   Yes.
13      Q   That was not in the 2009 submission,
14  correct?
15      A   Are you referring to the 2009 PCPC
16  report?
17      Q   Yes.
18      A   I wouldn't think so.  That was a PCPC
19  report, and this is an FDA-sponsored survey.
20      Q   The FDA's survey looking at asbestos in
21  talc was not in the 2003 or 2007 papers, correct?
22      A   That's correct.
23      Q   FDA also cited on page 3 under
24  "Toxicological Findings" to the 1993 NTP study.
25  That was not in the PCPC submission, was it?

Page 177

1      A   I don't know if -- if the PCPC report
2  cites NTP.
3      Q   Do you have that PCPC report with you?
4      A   I do.
5      Q   Can you cite -- can you find anywhere
6  where the PCP response -- PCPC response by
7  Drs. Huncharek and Muscat cite to the 1993 NTP
8  study?
9      A   It's a little lengthy.  You want me to
10  look?
11      Q   Well, sitting here today, do you recall
12  it was cited?
13      A   I don't recall if it was cited or not.
14      Q   Okay.
15      A   But, I mean, FDA does say on the first
16  page that they considered other scientific
17  information as well.  So...
18      Q   If you turn over to page 4, in the
19  paragraph before "Epidemiology and Etiology
20  Findings," the FDA states that it reviewed 15
21  articles from 1980 to 2008 not cited in the
22  petition.  None of these would have been in the
23  2003 and 2007 articles by Drs. Huncharek and or
24  Dr. Huncharek and Muscat, correct?
25      A   I don't know.  Their language is cited

45 (Pages 174 to 177)

April Zambelli-Weiner, Ph.D.

| Page 178 | Page 180 |
|---|---|

Page 178

1  in your petitions. So I don't know what that
2  implies.
3      Q   Did the 2009 submission by the PCPC have
4  15 articles from 1980 to 2008 on toxicology?
5      A   I don't recall.
6      Q   FDA stated also on page 4 that it
7  considered the scientific literature submitted in
8  support of both citizen petitions. That would
9  include Huncharek's 2003 study, as well as 11
10 other pieces of literature not authored by
11 Dr. Huncharek or Dr. Muscat. Correct?
12     A   Can you repeat that? That was long.
13     Q   Sure.
14         The FDA says on that page that it
15 reviewed the literature submitted in support of
16 both citizen petitions, correct? That's at the
17 bottom -- I'm sorry, in the middle of the page.
18     A   Under "Epidemiology and Etiology" --
19     Q   Yes, second paragraph.
20     A   After consideration of the scientific
21 literature, yes.
22     Q   So they did submit the literature the
23 citizen -- the citizen petition provided, correct?
24     A   Correct.
25     Q   Do you agree that FDA reviewed far more

Page 179

1  material than the 2003 and 2007 studies than
2  what's cited in the 2009 response, correct?
3         MR. TISI: Objection to the term "far
4  more."
5         THE WITNESS: Again, I -- I can't say
6  what exactly they reviewed and what weight they
7  gave to any particular piece of evidence, because
8  of the lack of detail in -- in the letter.
9  BY MR. HEGARTY:
10     Q   Can you cite for me any other -- strike
11 that.
12         Besides the FDA, can you cite for me any
13 scientific, regulatory or policy decision or
14 deliberation that as part of it reviewed and
15 relied on the 2003 and 2007 studies?
16     A   I mean, certainly I know there are
17 others. I would have to go back and review to --
18 to recall whether they cited these studies or not.
19     Q   Well, can you cite for me any regulatory
20 body who reviewed the 2003 and 2007 studies as
21 part of any decision concerning talc and ovarian
22 cancer?
23     A   That sounds like the same question to
24 me. Again, not as I sit here, but I don't know
25 that they didn't.

Page 180

1      Q   Is it your contention that any decision
2  by FDA with regard to talc and ovarian cancer as
3  to the citizen petitions would have been different
4  if not for what you call is flawed data,
5  calculations and conclusions in the 2003 and 2007
6  study and 2009 submission?
7      A   Excuse me. Sorry. I apologize. Please
8  repeat the question.
9      Q   Sure.
10         Is it your contention that any decision
11 by FDA with regard to talc and ovarian cancer in
12 response to the citizen petitions would have been
13 different if not for what you call the flawed
14 data, calculations and conclusions in the 2003 and
15 2007 studies and 2009 submission?
16     A   I can't say that any particular outcome
17 would have been different, especially for FDA,
18 because I don't know exactly what they did and how
19 they weighed the evidence.
20         That said, what I'm saying is if an
21 analysis utilized the data and weighed it
22 significantly, particularly for particular pieces
23 of data, then that process is relying on flawed
24 data.
25     Q   What has FDA reviewed about talc and

Page 181

1  ovarian cancer since 2014?
2      A   I'm not sure as I sit here.
3      Q   Can you cite any other regulatory or
4  policy decision maker who relied on the 2003 to
5  2007 or the 2009 submission with regard to
6  decisions or deliberations as to talc and ovarian
7  cancer?
8      A   Again, I know Health Canada just came
9  out with a draft assessment. I don't know if they
10 cited these studies. I can't speak to what other
11 agencies have cited these studies, and to what
12 extent they've weighed them or relied on them --
13     Q   Can you --
14     A   -- as I sit here right now.
15     Q   I'm sorry.
16         Can you even cite to any regulatory or
17 policy decision maker who even reviewed the 2003
18 or 2007 or 2011 papers or the 2009 submission?
19     A   Again, that was really beyond my
20 purview, so I -- I don't know as I sit here. I
21 mean, certainly we could find out if we wanted to.
22     Q   Can you cite any person who was
23 influenced by the 2003 or 2007 papers?
24         MR. TISI: Objection.
25         THE WITNESS: I can't cite a specific

46 (Pages 178 to 181)

April Zambelli-Weiner, Ph.D.

Page 182

1  person, no.
2  BY MR. HEGARTY:
3        Q   Can you cite any specific person who was
4  influenced by the 2009 submission?
5        A   No, I can't cite a specific person.  No.
6        Q   On page 9 of your report, second
7  paragraph, you make the statement that the 2003
8  and 2009 studies influenced important regulatory
9  and policy decisions.
10       Do you see that?
11       A   I'm sorry, where are you?
12       Q   Second paragraph, page 9, first
13  sentence.  You say that -- you make reference to
14  the 2003 and 2007 studies, and you say that they
15  influenced important regulatory and policy
16  decisions.
17       Do you see that?
18       A   You talk fast, and I'm having trouble --
19       MR. TISI:  Where are you?
20       THE WITNESS:  -- catching up.
21       MR. TISI:  I'm sorry.  I don't see --
22  BY MR. HEGARTY:
23       Q   Well, on page -- the second paragraph,
24  page 9, first sentence, you refer to the 2003 and
25  2007 studies, and then you say they influence

Page 183

1  important regulatory and policy decisions.
2        Do you see that?
3        A   Correct.
4        Q   What regulatory and policy decisions
5  were influenced?
6        I think as part of the evidence base
7  on -- on talc and ovarian cancer, they are
8  influencing the policy decisions that come out of
9  that analysis.
10       Q   Okay.
11       A   To the extent that they are -- are
12  relied upon.
13       Q   Who did they influence, what persons?
14       A   I can't name specific people.
15       Q   What bodies were influenced?
16       A   Again, I've already answered that.  I --
17  I don't know -- I know that they were submitted in
18  support of a regulatory submission, the citizens
19  petition.  So they were submitted to a regulatory
20  agency -- the data was submitted by industry to
21  the regulatory agency with the intent to influence
22  the decision-making.
23       Q   So you are going to testify that the
24  materials were intent -- were submitted with the
25  intent to influence the regulatory agencies.

Page 184

1        A   I -- I'm using "intent" in the way that
2  all scientists, researchers, anyone producing data
3  has the intent to influence decision-making.
4  That's why we do what we do.  I assume they also
5  had that intent or why would they have submitted
6  it.
7        Q   So you intend to testify to that; is
8  that correct?
9        A   No, I'm not -- I'm not testifying to
10  that.  I'm saying --
11       Q   You used the word "intent."
12       MR. TISI:  Objection, Counsel.
13       MR. HEGARTY:  So --
14       MR. TISI:  I think "intent" is very
15  different than what you're using it now.
16       Go ahead and answer if there's a pending
17  question.
18  BY MR. HEGARTY:
19       Q   Do you intend to testify that J&J,
20  Imerys or PCPC submitted the 2009 submission or
21  referenced the 2003 or 2007 papers with the intent
22  to influence the FDA's decision as to the citizen
23  petitions?
24       A   I would -- again, I want to clarify that
25  I'm not offering an opinion on intent.  I'm taking

Page 185

1  the process at its -- at its face value, that by
2  nature of submitting a comment, you want to
3  contribute something to the process just by the
4  nature of doing that.  Otherwise, there's no
5  reason to do it.
6        Q   When did this influence, if at all -- if
7  it happened, happen?  What point in time?
8        A   Again, I'm using the word "contribute,"
9  "weigh in."  We could substitute any number of
10  verbs.  But, again, by submitting the comment,
11  they are contributing to the process.
12       Q   How much time did FDA spend reviewing
13  the 2009 submission?
14       A   I can't answer that.
15       Q   Did FDA find the errors and issues you
16  set out in your report when they reviewed the 2003
17  or 2007 papers or the 2009 response?
18       A   I don't know if they did or didn't.
19       Q   What would have been the result of
20  the -- of the citizen petition process without the
21  issues you raise in your report?
22       A   I -- I can't answer that.  Again, I
23  think we've been over this about the lack of
24  detail in terms of their process and how much
25  weight was given to particular pieces of evidence.

47 (Pages 182 to 185)

April Zambelli-Weiner, Ph.D.

Page 186

1   You'd have to ask them.
2       Q   Can you cite -- strike that.
3           On page 9, before the "Methodology"
4   section, you state that, in the last paragraph:
5   "Because the articles were given prominence in
6   regulatory proceedings and in a publication by the
7   talc industry, I have been asked to review and
8   assess the validity of data in claims put forward
9   by Dr. Michael Huncharek and Dr. Joshua Muscat."
10          Do you see that?
11      A   I do.
12      Q   You were asked to do this review by
13  plaintiffs' lawyers, right?
14      A   Correct.
15      Q   So they were the ones telling you that
16  these articles were given added prominence,
17  correct?
18      A   No.  That was my own assessment.
19  Because industry obviously has an obligation to
20  ensure the safety of their products and -- and
21  submit data to FDA that's reliable and valid.  And
22  so when that data is the only data that's
23  submitted in response to the citizen petitions, it
24  clearly has a special place there in that -- in
25  that review process.

Page 187

1       Q   What is the stand- -- a published
2   standard for what constitutes added prominence?
3       A   That question doesn't make sense to me.
4       Q   Well, that's your subjective opinion,
5   correct?
6       A   That -- that is my expert analysis, yes,
7   that's correct.
8       Q   But there's no publication that defines
9   what constitutes added prominence of a publication
10  or article in regulatory proceedings, is there?
11      A   Not to my knowledge.  I'm sure we could
12  debate, and it is my opinion that as the only
13  comment, it had added prominence, and that being
14  repeatedly cited within the report gives it added
15  prominence as well.
16      Q   You state in the second paragraph on
17  page 9 that the 2003 and 2007 articles assumed --
18      A   I'm sorry, where are you?
19      Q   Second paragraph, page 9.
20      A   Okay.
21      Q   You say that: "The 2003 and 2007
22  articles assumed added importance from a
23  regulatory and policy perspective due to the
24  authors attributing weight to them."
25          Do you see where I'm reading?

Page 188

1       A   Correct.
2           MR. TISI:  Well, let's finish the
3   sentence.  I just want it for the record, finish
4   the sentence, please, Counsel.
5           MR. HEGARTY:  Well, you can finish it if
6   you want.
7           MR. TISI:  No, I --
8   BY MR. HEGARTY:
9       Q   What do you mean by --
10          MR. TISI:  Then I will finish it right
11  now because you're asking your question --
12          MR. HEGARTY:  No, you will not.
13          MR. TISI:  Well, you -- well, you can't
14  just -- you can't just ask half a sentence.  I
15  want the record to be clear.
16          MR. HEGARTY:  It's part of the question.
17  I'm -- it's part of the question.
18          MR. TISI:  It's not part -- it's not
19  part of the -- well, but the sentence is a full
20  sentence, Counsel.
21  BY MR. HEGARTY:
22      Q   What, Doctor, do you mean --
23          MR. TISI:  It's one thing to cherry-pick
24  sentences.  It's another thing to cherry-pick
25  phrases within a sentence.

Page 189

1           MR. HEGARTY:  Well, lawyers can
2   cherry-pick; authors can't.
3   BY MR. HEGARTY:
4       Q   Doctor, what do you mean --
5           MR. TISI:  Are you telling me you're
6   cherry-picking?
7   BY MR. HEGARTY:
8       Q   What do you mean by added -- "assumed
9   added importance"?  What does that mean?
10      A   Just by -- by nature of what was being
11  submitted.  Again, by the industry advocating for
12  their interpretation of the data, their
13  recommendations, the obligation of industry to
14  ensure the safety of their products and to submit
15  reliable data to the FDA, that by nature makes
16  this data special in this process.
17      Q   Cite --
18      A   That is --
19      Q   I'm sorry.
20      A   That is what I mean by "added
21  importance, weight, prominence."  You can
22  substitute adjectives.
23      Q   By what objective standard did you apply
24  in terms of saying that the authors attributed
25  weight to them?  Was there some objective scoring

48 (Pages 186 to 189)

April Zambelli-Weiner, Ph.D.

Page 190

1    system that you used?
2          MR. TISI:  Objection.  Assumes --
3          THE WITNESS:  I'm sorry, can you --
4    BY MR. HEGARTY:
5          Q    Did you use some objective scoring
6    system in defining the weight that was -- that the
7    authors attributed to these studies?
8          MR. TISI:  Objection.
9          THE WITNESS:  No.  In fact, the authors
10   in their -- let me back up.
11   I assume you're referring to the 2009
12   PCPC report?
13   BY MR. HEGARTY:
14         Q    Yes, that's what you're referring to
15   there, right?
16         MR. TISI:  That's why I asked you to
17   read her entire sentence.
18         Go ahead.
19   BY MR. HEGARTY:
20         Q    Let me go -- let me strike that and let
21   me ask a different question.
22         Can you cite all of -- what authority do
23   you have to say that FDA or any other regulatory
24   or policy entity gave importance, added or
25   otherwise, to the 2003 or 2007 studies?

Page 191

1          A    The -- the basis -- I think I've already
2    answered this question.  The basis is that the
3    data was submitted in response to the citizens
4    petition.  The FDA clearly cites in their denial
5    letter that they considered the data submitted in
6    response to the petition.  That gives, as the only
7    comment submitted in response to the -- to the
8    submission and the nature of the report therein,
9    added weight and -- and prominence.
10         Q    Is it your contention that all FDA
11   considered was the 2009 submission?
12         A    No.  Again, I've answered that question.
13   I -- because of the lack of detail of -- of their
14   process and how they weighed the evidence, I can't
15   answer specifically what they did and how much
16   weight they gave to these studies.
17         Q    Cite all support from -- that you have
18   to say that FDA gave the 2003 and 2007 articles
19   added importance over any other materials they
20   reviewed.
21         A    I think you missed -- misstated what was
22   in my report.  I didn't say FDA gave them.
23         Q    Okay.
24         A    You should read back probably what you
25   said.

Page 192

1          Q    So it's not your testimony that FDA gave
2    the 2003 and 2007 articles added importance over
3    anything else they reviewed; is that correct?
4          A    I think I already answered that and said
5    we don't know exactly how they weighed these
6    articles.  I think you're misstating what I --
7    what I wrote.
8          Q    You don't know what -- how FDA weighed
9    the 2009 submission either, correct?
10         A    Correct.  Just that they reviewed it.
11         Q    Is it your claim that it was not within
12   PCP's right to submit material to FDA regarding
13   the citizen petition?
14         A    No, not at all.
15         Q    FDA regulations expressly allow this,
16   right?
17         A    Correct.
18         Q    Was any group, entity or person
19   precluded from submitting materials to FDA?
20         A    Not that I'm aware of.
21         Q    Is it your opinion that PCPC should be
22   incriminated because no one else chose to file a
23   submission?
24         A    No, not at all.
25         Q    Is it your testimony that PCPC, J&J or

Page 193

1    Imerys intended to give improper weight to these
2    studies to influence FDA?
3          A    Again, I'm not -- I'm not -- well,
4    repeat the question.  Sorry.
5          Q    Is it your opinion -- or strike that.
6          Do you intend to testify that PCPC, J&J
7    or Imerys intended to give improper weight to
8    these studies to influence FDA?
9          A    No, that's not my opinion.  I'm not
10   testifying to that.
11         Q    Is it your opinion that Drs. Huncharek
12   and Muscat intended to give improper weight to
13   their studies to influence FDA as part of their
14   submission in 2009?
15         A    I'm not opining on intent.  I'm opining
16   on the facts, and the facts are that they did do
17   that.  So that's a fact.
18         Q    You claim in the second paragraph on
19   page 9 that the 2003 and 2007 articles were
20   advocated to the medical and scientific community.
21         How were these articles advocated?
22         MR. TISI:  Where is that, Counsel?
23         MR. HEGARTY:  Last line of the second
24   paragraph on page 9.
25         MR. TISI:  You said attribute -- oh,

49 (Pages 190 to 193)

April Zambelli-Weiner, Ph.D.

Page 194

```
 1    advocated.  I see.
 2         THE WITNESS:  Sorry, let me read the
 3    whole sentence, please.
 4         (Peruses document.)
 5         MR. TISI:  Could you open the door a
 6    little bit, Mark.  Honestly, it's -- it's really
 7    hot in here.
 8         THE WITNESS:  Sure, I think -- I think
 9    this comes back to the -- some previous points
10    that we discussed in -- in terms of how the
11    authors elevated their own studies within the 2009
12    report, how data that was generated in 2000 was
13    then repeatedly replicated and disseminated to the
14    scientific and medical community over the course
15    of almost a decade.
16    BY MR. HEGARTY:
17         Q   Who advocated the data from the 2003 and
18    2007 studies to the medical and scientific
19    community?
20         A   The authors and whoever funded the
21    papers.
22         Q   Okay.  And how were they advocated?
23         A   By repeating and replicating the same --
24    the same data, the same messages over and over
25    again.
```

Page 195

```
 1         Q   Identify any person from the scientific
 2    or medical community who read the 2003, the 2007
 3    or 2011 articles.
 4         A   Myself.
 5         Q   Okay.  Anybody else?
 6         A   I -- I'm sure there are.
 7         Q   Well, my question is, can you identify
 8    for me anybody besides yourself who even read the
 9    2003, 2007 or 2011 articles you reference in your
10    paper?
11         A   I can't name anyone by name, but we
12    could probably get hard data on how often they've
13    been read or cited.
14         Q   Did you do anything in terms of talking
15    to scientists or doctors or looking up citations
16    to try to determine or support your claim that
17    these papers were advocated to the medical or
18    scientific community?
19         A   No, I -- I didn't feel the need to do
20    that.  Again, I think when this same dose-response
21    table shows up three, four times over -- over the
22    course of 10 years in multiple publications, I
23    would say that's advocating for that data.
24         Q   Can you cite for me anyone in the
25    medical and scientific community who changed what
```

Page 196

```
 1    they were doing or going to do based on any of the
 2    articles you reference in your paper or your
 3    report?
 4         A   I can't speak to that, no --
 5         Q   Can you cite --
 6         A   -- as I sit here.
 7         Q   Can you cite for me anyone in the
 8    scientific or medical community who relied in any
 9    way on the 2003, 2007 or 2011 articles?
10         A   Again, I would say maybe not as I sit
11    here, but certainly that could be done.
12         Q   You've not done that.
13         A   No.
14         Q   Can you cite any medical or scientific
15    person or group who ever relied on these articles
16    in making any decisions as to talc or talc and
17    ovarian cancer?
18         A   Again, I'm not aware of who has cited or
19    reviewed -- you know, the full extent of who has
20    cited and reviewed these studies.  So I can't
21    answer that right now.
22         Q   Is it your testimony that J&J or Imerys
23    advocated these articles to the medical and
24    scientific community?
25         A   To the extent -- I think going back to
```

Page 197

```
 1    my prior answer, to the extent that the authors
 2    and whoever funded the work to repeatedly
 3    disseminate the same data over the course of 10
 4    years, I would say yes.
 5         Q   Well, who at J&J and Imerys advocated
 6    these articles to the medical and scientific
 7    community?
 8         A   I don't know the -- I don't know the
 9    details of who funded what and specific names of
10    people.
11         Q   Well, what was the method that they
12    advocated these articles to the medical and
13    scientific community?
14         A   I think I answered that.
15         Q   Well, what was the answer?
16         A   Could we read it back?
17         Q   Well, let me -- let me -- what was --
18    what did Imerys and J&J advocate as to these
19    articles to the medical and scientific community?
20         A   I think you're mischaracterizing.  The
21    data has been advocated through the various
22    publications.  So the same data being repeated,
23    the same assessment of the data being repeated,
24    the same error-prone data being repeated and
25    disseminated over the course of 10 years.
```

50 (Pages 194 to 197)

April Zambelli-Weiner, Ph.D.

Page 198

1    Q   So who did J&J and Imerys advocate this
2  data to?
3    A   Oh, I can't answer that.
4    Q   And when did they --
5    A   Other than --
6    Q   -- advocate the data?
7    A   Other than to the extent that
8  disseminating findings to the medical and
9  scientific community is advocating in the sense
10 that you are putting something out there to help
11 influence and change decision-making.
12   Q   Okay.  When did they disseminate this --
13 these findings to the medical and scientific
14 community?
15   A   Whenever the -- the papers were
16 published.
17   Q   And how did J&J and Imerys go about
18 disseminating the medic- -- the findings to the
19 medical and scientific community?
20   A   I -- I think I answered that.
21   Q   Well, what was the means by which they
22 disseminated the findings to the medical and
23 scientific community?
24   A   Through publications.
25   Q   So you're saying that Imerys and J&J

Page 199

1  published the materials to the medical -- the 2003
2  and 2007 articles?
3    A   That's not what I said.  That's not what
4  I said.
5        What I said was to the extent that
6  someone is funding a study or participating in a
7  study and then publishing that study, you are
8  disseminating that data to the medical and
9  scientific community.
10   Q   Is it your testimony that J&J and Imerys
11 published the 2003 and 2007 studies?
12   A   No, that's not what I said.
13   Q   Okay.  Tell me the involvement that J&J
14 and Imerys had in the 2003 and 2007 studies.
15   A   Well, again --
16   Q   Besides funding, if any.
17   A   I have seen e-mails related to some of
18 the papers in which employees provided feedback
19 related to the papers.
20   Q   Okay.  Where is that written in your
21 report?
22   A   I think there's a footnote actually that
23 speaks to that.  Let me see.
24       (Peruses document.)  Page 14.
25   Q   What footnote?

Page 200

1    A   Number 6.
2    Q   And you're saying number 6 demonstrates
3  that J&J and Imerys were involved in the
4  preparation of the 2003 and 2007 reports -- or
5  articles?
6    A   Yes, that's my understanding, that
7  the preliminary data was shared.  The same
8  dose-response data --
9        THE REPORTER:  I'm sorry.  What was
10 that?
11       THE WITNESS:  Preliminary data was
12 shared.
13       There was a little -- actually a little
14 bit that changed between the 2000 and the 2003
15 paper, but overall, the dose-response data was
16 shared in the 2000 preliminary data.  And then
17 related to a publication, there was an e-mail from
18 Johns Hopkins and others providing feedback on --
19 on the paper.
20 BY MR. HEGARTY:
21   Q   The reference you make there was to a
22 meta-analysis done to submit to NTP, correct?
23   A   I don't know specifically what was
24 submitted to NTP, but this is my understanding of
25 at least demonstrating that there was sharing of

Page 201

1  the data and involvement in -- in the data.
2    Q   So is it your testimony that the
3  meta-analysis you reference in footnote 6 was the
4  article that was published in 2003?
5    A   It's certainly parts of this.  The data
6  from the 2000 preliminary report shows up again in
7  the 2003 paper, so they are connected in that way.
8    Q   So the -- it's your testimony that J&J
9  and Imerys published the 2003 paper?
10       MR. TISI:  Objection.
11       THE WITNESS:  No, that's not what I
12 said.
13 BY MR. HEGARTY:
14   Q   Who published the paper?
15   A   Well, the authors presumably published
16 the paper, but I think if you go back to my prior
17 response about funders involved --
18   Q   Well, what is your definition of
19 "advocating"?
20   A   I also already answered that, but
21 I'll -- I'll answer again.
22       Anytime someone publishes results and
23 puts them out into the medical and scientific
24 community, it's to inform policy, program,
25 healthcare and public health decision-making.  So

51 (Pages 198 to 201)

April Zambelli-Weiner, Ph.D.

Page 202

1  you are advocating for that data as part of that
2  process.
3        MR. HEGARTY:  Do you want to -- I'm
4  about to go on to another section.  You want to
5  take the lunch break now or --
6        MR. TISI:  It's totally -- it's totally
7  okay.  The lunch is here.  I was told --
8        MR. HEGARTY:  It's up to you.
9        MR. TISI:  I'm reading it, and it said
10  take lunch available at 12:30.  So that's what I'm
11  assuming, that lunch is available at 12:30.
12        MR. HEGARTY:  Okay.  Why don't -- it's a
13  good breaking --
14        MR. TISI:  I haven't seen anybody walk
15  by.
16        MR. HEGARTY:  It's a good break point if
17  you want to do it now because the next section
18  will go for a while.
19        MR. TISI:  I don't care.  Okay.
20        MR. HEGARTY:  You will not be
21  disappointed.
22        THE VIDEOGRAPHER:  Let's go off the
23  record.  The time is 12:46 p.m.  We're going off
24  the record.
25        (Lunch recess.)

Page 203

1        MR. HEGARTY:  We're back on the record,
2  not on the video record, and we've talked with
3  counsel and understand that the doctor is not
4  feeling well and is not feeling confident in her
5  ability to go forward and complete the deposition
6  which could go on for the next few hours.  So
7  we're in agreement to adjourn the deposition to
8  another day.
9        But I did want to ask you, Doctor, if
10  you can, to confirm that with regard to the point
11  in time when we took a break for lunch, that you
12  felt well enough and that you understood the
13  questions that I asked, and that your answers were
14  appropriate from your standpoint and not -- they
15  weren't influenced by how you are feeling today.
16  Would that be a true statement?
17        THE WITNESS:  Yes.  I was able to focus
18  and understand your questions this morning.  But
19  after profuse vomiting, I'm feeling significantly
20  worse.
21        MR. HEGARTY:  I'm sorry to hear that.
22        And you were not on any medication such
23  that it affected your ability to understand my
24  questions or give responses this morning, were
25  you?

Page 204

1        THE WITNESS:  No.  That's correct.
2        MR. HEGARTY:  Do you have anything else
3  you want to add?
4        MR. TISI:  The only thing I want to add
5  is, and I think she clarified it, but you're not
6  feeling confident in her ability to go forward
7  because you've been very ill since lunch, right?
8        THE WITNESS:  Yes.  And I want to be
9  able to do my best.
10        MR. HEGARTY:  Yes, we want you to do
11  your best.
12        MR. TISI:  So we got about I guess three
13  hours and 50 minutes or so, whatever the number
14  is --
15        THE VIDEOGRAPHER:  3 hours, 52 minutes.
16        MR. TISI:  -- and we will reschedule it
17  at a time we can get this done.  And I personally
18  apologize.
19        THE WITNESS:  I apologize as well.
20        MR. TISI:  We did the best we could.
21  This was not my intent.
22        MR. HEGARTY:  There's no disagreement on
23  that.
24        THE WITNESS:  Nor mine.
25        MR. TISI:  Not that we're testifying to

Page 205

1  intent or anything like that.
2        MR. HEGARTY:  That's a good one.  Let's
3  go off the record.
4        (Whereupon, the deposition
5        of APRIL ZAMBELLI-WEINER, Ph.D.
6        was adjourned at 2:12 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

52 (Pages 202 to 205)

April Zambelli-Weiner, Ph.D.

## Page 206

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2       The undersigned Certified Shorthand Reporter

3    does hereby certify:

4       That the foregoing proceeding was taken before

5    me at the time and place therein set forth, at

6    which time the witness was duly sworn; That the

7    testimony of the witness and all objections made

8    at the time of the examination were recorded

9    stenographically by me and were thereafter

10   transcribed, said transcript being a true and

11   correct copy of my shorthand notes thereof; That

12   the dismantling of the original transcript will

13   void the reporter's certificate.

14      In witness thereof, I have subscribed my name

15   this date:  January 12, 2019.

16

17        _____

18       LESLIE A. TODD, CSR, RPR

19       Certificate No. 5129

20

21   (The foregoing certification of

22   this transcript does not apply to any

23   reproduction of the same by any means,

24   unless under the direct control and/or

25   supervision of the certifying reporter.)

## Page 207

1       INSTRUCTIONS TO WITNESS

2      Please read your deposition over carefully and

3    make any necessary corrections. You should state

4    the reason in the appropriate space on the errata

5    sheet for any corrections that are made.

6    After doing so, please sign the errata sheet

7    and date it.

8      You are signing same subject to the changes

9    you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you. If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

## Page 208

1       ------

2      E R R A T A

3       ------

4   PAGE LINE CHANGE

5   ____ ____ _____

6   REASON: _____

7   ____ ____ _____

8   REASON: _____

9   ____ ____ _____

10  REASON: _____

11  ____ ____ _____

12  REASON: _____

13  ____ ____ _____

14  REASON: _____

15  ____ ____ _____

16  REASON: _____

17  ____ ____ _____

18  REASON: _____

19  ____ ____ _____

20  REASON: _____

21  ____ ____ _____

22  REASON: _____

23  ____ ____ _____

24  REASON: _____

25

## Page 209

1     ACKNOWLEDGMENT OF DEPONENT

2     I,_____, do hereby

3    certify that I have read the foregoing pages, and

4    that the same is a correct transcription of the

5    answers given by me to the questions therein

6    propounded, except for the corrections or changes

7    in form or substance, if any, noted in the

8    attached Errata Sheet.

9

10  _____

11  APRIL ZAMBELLI-WEINER, Ph.D.     DATE

12

13

14  Subscribed and sworn to

15  before me this

16  _____day of_____,20___.

17  My commission expires:_____

18  _____

19  Notary Public