# EXHIBIT B4

April Zambelli-Weiner, Ph.D.

Page 210

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


----------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

----------------------------x


V O L U M E   I I


VIDEOTAPED DEPOSITION OF

APRIL ZAMBELLI-WEINER, Ph.D.

WASHINGTON, D.C.

THURSDAY, FEBRUARY 7, 2019

9:54 A.M.


Pages: 210 - 455

Reported by: Leslie A. Todd

April Zambelli-Weiner, Ph.D.

| Page 211 | Page 213 |
|---|---|
| 1     Deposition of APRIL ZAMBELLI-WEINER, Ph.D.,<br>2   held at the offices of:<br>3<br>4<br>5        ASHCRAFT & GEREL, LLP<br>6        1825 K Street, N.W.<br>7        Washington, DC 20005<br>8<br>9<br>10<br>11<br>12     Pursuant to notice, before Leslie Anne Todd,<br>13   Court Reporter and Notary Public in and for the<br>14   District of Columbia, who officiated in<br>15   administering the oath to the witness.<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1   APPEARANCES (Continued):<br>2<br>3     GEOFFREY M. WYATT, ESQUIRE<br>4     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP<br>5     1440 New York Avenue, N.W.<br>6     Washington, D.C. 20005<br>7     (202) 371-7008<br>8<br>9   ON BEHALF OF THE PCPC:<br>10     THOMAS LOCKE, ESQUIRE<br>11     SEYFARTH SHAW LLP<br>12     975 F Street, NW<br>13     Washington, D.C. 20004<br>14     (202) 463-2400<br>15<br>16   ON BEHALF OF THE IMERYS DEFENDANTS:<br>17     MICHAEL R. KLATT, ESQUIRE<br>18     GORDON & REES SCULLY MANSUKHANI, LLP<br>19     816 Congress Avenue<br>20     Suite 1510<br>21     Austin, Texas 78701<br>22     (512) 582-6485<br>23<br>24<br>25 |

| Page 212 | Page 214 |
|---|---|
| 1     A P P E A R A N C E S<br>2<br>3   ON BEHALF OF THE PLAINTIFFS:<br>4     CHRISTOPHER V. TISI, ESQUIRE<br>5     LEVIN PAPANTONIO, LLP<br>6     316 South Baylen Street<br>7     Pensacola, Florida 32502<br>8     (850) 435-7184<br>9<br>10     MICHELLE A. PARFITT, ESQUIRE<br>11     ASHCRAFT & GEREL, LLP<br>12     4900 Seminary Road, Suite 650<br>13     Alexandria, Virginia 22311<br>14     (703) 997-1774<br>15<br>16   ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:<br>17     MARK HEGARTY, ESQUIRE<br>18     SHOOK, HARDY & BACON, LLP<br>19     2555 Grand Boulevard<br>20     Kansas City, Missouri 64108<br>21     (816) 474-6550<br>22<br>23<br>24<br>25 | 1   APPEARANCES (Continued):<br>2<br>3   ON BEHALF OF PTI:<br>4     MICHAEL ANDERTON, ESQUIRE<br>5     TUCKER ELLIS, LLP<br>6     950 Main Avenue<br>7     Suite 1100<br>8     Cleveland, Ohio 44113-7213<br>9     (216) 696-4835<br>10<br>11   ALSO PRESENT:<br>12     DANIEL HOLMSTOCK (Videographer)<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |

2 (Pages 211 to 214)

April Zambelli-Weiner, Ph.D.

1    C O N T E N T S
2   EXAMINATION OF APRIL ZAMBELLI-WEINER, Ph.D.    PAGE
3     By Mr. Hegarty              218, 441
4     By Mr. Klatt                418, 449
5     By Mr. Locke                426
6     By Mr. Tisi                 438, 446
7
8         E X H I B I T S
9       (Attached to transcript)
10   ZAMBELLI-WEINER DEPOSITION EXHIBITS        PAGE
11   No. 13   Cancer Prevention Coalition paper:
12       Petition Seeking a Cancer Warning
13       on Cosmetic Talc Products        221
14   No. 14   Excerpt from deposition of Linda
15       Loretz, Ph.D            230
16   No. 15   Article entitled "Perineal talc use
17       and ovarian cancer risk: A case
18       study of scientific standards in
19       environmental epidemiology"      234
20   No. 16   Article entitled "Perineal
21       Application of Cosmetic Talc and
22       Risk of Invasive Epithelial
23       Ovarian Cancer: A Meta-analysis of
24       11,933 Subjects from Sixteen
25       Observational Studies"       237

1        E X H I B I T S (Continued)
2        (Attached to transcript)
3    ZAMBELLI-WEINER DEPOSITION EXHIBITS        PAGE
4   No. 17   Article entitled "Factors Related
5       to Inflammation of the Ovarian
6       Epithelium and Risk of Ovarian
7       Cancer"                277
8   No. 18   Article entitled "Use of cosmetic
9       talc on contraceptive diaphragms
10       and risk of ovarian cancer: a
11       meta-analysis of nine observational
12       studies"               325
13   No. 19   Article entitled "Perineal Talc
14       Use and Ovarian Cancer, A
15       Systematic Review and Meta-Analysis" 334
16   No. 20   Power-Point slides            336
17   No. 21   Letter from PCPC to FDA, dated
18       July 21, 2009          344
19   No. 22   Article entitled "Perineal Talc
20       Exposure and Risk of Ovarian
21       Carcinoma"              345
22   No. 23   Article entitled "Characteristics of
23       Women Who Use Perineal Powders"      369
24   No. 24   Binder (retained by witness)     441
25

1        E X H I B I T S (Continued)
2        (Attached to transcript)
3    ZAMBELLI-WEINER DEPOSITION EXHIBITS        PAGE
4   No. 25   Article entitled "Perineal use of
5       talc and risk of ovarian cancer"      443
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        P R O C E E D I N G S
2        --------------------
3        THE VIDEOGRAPHER:  The time is 9:54
4   a.m., February 7, 2019.  We are on the record with
5   video 1 of Volume II.
6        Unless you want the witness resworn.
7        MR. HEGARTY:  No, we're fine.
8        RESUMED DIRECT EXAMINATION
9   BY MR. HEGARTY:
10    Q   Good morning, Doctor.
11    A   Good morning.
12    Q   We're here for the continuation of your
13   January 11th deposition.  What did you do to
14   prepare for this continued deposition?
15    A   Sure.  I went back over my report.  I
16   went back over some of the underlying studies that
17   I reference in my report.  I read my depo
18   transcript from the first session.  And I may have
19   looked at a few other documents.  Like I recall
20   looking at the IARC report on -- on talc.
21    Q   Do you recall any other specific
22   documents besides those you mentioned?
23    A   No, not that I recall.
24    Q   Did you meet with any attorneys for
25   plaintiffs to prepare for the deposition?

April Zambelli-Weiner, Ph.D.

Page 219

1      A   I met with Chris yesterday.
2      Q   How long did you meet with Chris?
3      A   Maybe like an hour and a half.
4      Q   Was that the extent of the meetings you
5   had with counsel for plaintiffs since your last
6   deposition on the 11th?
7      A   Yes.  I believe so.
8      Q   Have you communicated since your last
9   deposition with anyone outside of the litigation
10   regarding your report or your opinions in your
11   report?
12      A   No, I don't think so.
13      Q   Have you prepared any additional
14   invoices from those we marked when we were here
15   the last time for -- that -- that recorded your
16   work in this case?
17      A   I don't believe so.
18      Q   Do you recall -- or are you able to
19   estimate how much additional work you have done in
20   this matter since January 11th by hours?
21      A   I can estimate for you.  Maybe 16 hours,
22   20 hours.  Something in that range.
23      Q   Do you have your report in this case
24   that we had previously marked as Exhibit No. 8?
25      A   Yes, I do.

Page 220

1      Q   We're going to be working from that
2   report really for the rest of the deposition.
3      A   Okay.
4         MR. TISI:  And, Counsel, I just want to
5   remind you that I -- that we did prepare that
6   binder that you -- a copy of the binder from --
7   that we marked last time, and then another binder
8   with the studies that -- for ease of reference
9   that would correspond with the -- the charts that
10   she developed in her report.  So I just wanted to
11   make sure you knew that we had a copy of what we
12   previously produced and a -- and a new binder --
13         MR. HEGARTY:  Okay.
14         MR. TISI:  -- to make things easy.
15         MR. HEGARTY:  Thank you.
16         MR. TISI:  Mm-hmm.
17   BY MR. HEGARTY:
18      Q   Doctor, if you would turn to page 7 of
19   your report.
20         Are you there?
21      A   Yes.
22      Q   If you would look under the section
23   "Background:  Underlying Opinions," Part 4, do you
24   see that part?
25      A   Yes.

Page 221

1      Q   You -- the first heading you have under
2   there is the 2008 Citizens Petition to the FDA.
3         First of all, do you understand that
4   it's "Citizen Petition" and not "Citizens
5   Petition"?
6      A   I don't know for certain, but I'll take
7   your -- I'll take your word for it.
8      Q   You talk about the Citizen Petitions
9   that were filed and you make reference to Samuel
10   Epstein.  Did you do any research into who Samuel
11   Epstein is?
12      A   I don't recall doing any research other
13   than perhaps looking him up at the time in terms
14   of his position with the organization that
15   submitted the petition.
16      Q   Did you do any research about his
17   organization, the Cancer Prevention Coalition?
18      A   No, I didn't.  Not that I recall.
19      Q   I'm going to hand you what I'm marking
20   as Exhibit 13, which is the 2008 Citizen Petition.
21         (Exhibit No. 13 was marked for
22         identification.)
23   BY MR. HEGARTY:
24      Q   And you're familiar with this document,
25   correct?

Page 222

1      A   Yes.
2      Q   You say on page 7 of your report that
3   the grounds for this request from that Citizen
4   Petition included then the paragraphs you have
5   under -- under that part of your report.
6         Do you see where I'm referring to,
7   beginning with "Twelve publications"?
8      A   Yes, I do.
9      Q   And you say in your report:  "Twelve
10   publications since 1995 confirming the causal
11   relationship between genital application of talc
12   and ovarian cancer and the protective effect of
13   tubal ligation or hysterectomy preventing the
14   translocation of talc to the ovary."
15         First of all, did you review the 12
16   publications that are at the back of Exhibit 13?
17      A   I'm not -- I don't believe so, but I was
18   just summarizing the petition -- basis for their
19   petition.
20      Q   Well, in your report, are you -- when
21   you refer to 12 publications, are you referring to
22   the 12 references that are at the back of
23   Exhibit 13?
24      A   I'm simply summarizing what the petition
25   said.  So they cited 12 studies, and I was just

April Zambelli-Weiner, Ph.D.

1  paraphrasing their basis for their petition.
2      Q   Well, where in the -- can you tell me
3  where in the petition they make reference to 12
4  publications since 1995 confirming the causal
5  relationship between genital application of talc
6  and ovarian cancer?
7      A   Sure.  I believe that's paraphrased
8  from -- let's see -- the second full paragraph on
9  page 3.
10     Q   The paragraph beginning "The scientific
11  basis"?  Oh, I'm sorry, page 3.
12     A   Page 3.
13     Q   The paragraph beginning --
14     A   "Evidence" --
15     Q   -- "Evidence for the May 2008 petition."
16     A   Yes.
17     Q   So from that paragraph you made
18  reference -- you -- you said that those 12
19  publications in your report confirm the causal
20  relationship between genital application of talc
21  and ovarian cancer; is that correct?
22         MR. TISI:  Objection.
23         THE WITNESS:  Again, that's -- that's
24  not my opinion.  I'm simply paraphrasing the
25  petition's basis.

1  BY MR. HEGARTY:
2      Q   But going back again to what I asked a
3  moment ago, you did not go and confirm whether the
4  12 publications they referenced actually do
5  confirm a causal relationship between talc use and
6  ovarian cancer?
7      A   No, that --
8         MR. TISI:  Objection.
9         THE WITNESS:  That wasn't my charge.
10        MR. TISI:  Objection.  Outside the
11  scope.
12        Give me a moment to object.
13        THE WITNESS:  Sure.  Sorry.
14  BY MR. HEGARTY:
15     Q   With regard to the next paragraph
16  concerning the -- or that begins with the
17  statement "Strength of epidemiological evidence,"
18  do you see that?
19     A   Yes.
20     Q   Again, did you review the references
21  that you make in that paragraph to see if they did
22  confirm the association between perineal talc use
23  and the risk of ovarian cancer?
24        MR. TISI:  Objection.  Outside the
25  scope.

1         THE WITNESS:  Again, I would say that
2  wasn't my -- my task or my charge, so, no, I did
3  not do that.
4  BY MR. HEGARTY:
5      Q   The next paragraph says:  "An analysis
6  of 16 pooled studies confirming a statistical --
7  statistically significant 33 percent increased
8  risk of ovarian cancer associated with perineal
9  talc use."
10        Did you make ref-- did you review the
11  reference they cited for that proposition?
12     A   That's a different question.  Let me see
13  what they cite.
14     Q   And I -- I can tell you they cite the
15  Huncharek 2003 study.
16     A   I -- yes.  I wanted to be sure.  Well,
17  then, yes, I did review that.
18     Q   So the Citizen Petition is using the
19  Huncharek paper to advocate that there should be a
20  warning for ovarian cancer with talcum powder use,
21  correct?
22     A   I would say that's correct, they include
23  that in their -- in their -- in their petition.
24     Q   So do you agree that they are using this
25  paper to influence FDA to agree with their

1  position?
2         MR. TISI:  Objection.
3         THE WITNESS:  I would agree that it is
4  part of their submission to FDA.  So to the extent
5  that they're advocating for that position, it
6  is -- it's part of that package, yes.
7  BY MR. HEGARTY:
8      Q   Was it improper in your opinion for them
9  to use the Huncharek paper to advocate for a
10  warning of ovarian cancer with talcum powder
11  product use?
12        MR. TISI:  Objection.
13        THE WITNESS:  I don't think I can really
14  answer.  I wasn't tasked with doing what they did,
15  so I don't think I can really answer that question
16  as to whether it was proper for them to do it or
17  not to do it.
18  BY MR. HEGARTY:
19     Q   Do you know what influence, if any, the
20  2003 Huncharek paper had as part -- in connection
21  with FDA's analysis of the Citizen Petition as
22  submitted by Samuel Epstein?
23     A   I'm sorry.  Can you repeat the question?
24     Q   Sure.
25     A   Thank you.

April Zambelli-Weiner, Ph.D.

1      Q   Do you know -- do you happen to know
2  what influence, if any, the 2003 Huncharek paper
3  had in connection with FDA's analysis of the
4  Citizen Petition as submitted by Mr. Epstein?
5      A   I couldn't say specifically how much
6  weight they might have given it -- given to it,
7  other than that I would presume they reviewed it.
8      Q   You next cite a report by 19 scientists
9  in eight nations worldwide under IARC confirming a
10  30 to 60 percent increased risk of ovarian cancer
11  following the perineal application of talc.
12          Is that a reference to the 2010 IARC
13  monograph, to your knowledge?
14      A   Again, I was just trying to paraphrase
15  their basis. So I'm not sure what -- it looks
16  like it is IARC, but they also cite a Lancet
17  paper.
18      Q   You did as part of your review, as you
19  mentioned, go back and review the 2010 IARC
20  monograph; is that correct?
21      A   I reviewed parts of it. I didn't --
22  didn't read the whole thing.
23      Q   Now, IARC did not conclude that talc is
24  a carcinogen, correct?
25          MR. TISI: Objection.

1          THE WITNESS: I believe -- I mean, I'm
2  relying on recall here, but I believe they
3  concluded it was a 2B, possible human carcinogen.
4  BY MR. HEGARTY:
5      Q   You're aware that they have categories
6  above that of probably carcinogenic and
7  carcinogenic?
8      A   Yes, I do.
9      Q   They did not characterize talc as
10  carcinogenic, correct?
11          MR. TISI: Objection. Outside the
12  scope.
13          THE WITNESS: Well, again, I would just
14  reiterate the 2B, possibly carcinogenic,
15  categorization.
16  BY MR. HEGARTY:
17      Q   Which again, as you mentioned, is
18  possibly carcinogenic, correct?
19      A   That's their rubric, correct.
20      Q   IARC did not confirm that there was an
21  increased risk of ovarian cancer with application
22  of talc, correct?
23          MR. TISI: Objection. Outside the
24  scope.
25          THE WITNESS: I don't think I can really

1  answer that because I wasn't really tasked with
2  reviewing the IARC report in detail and sort of
3  the basis for their conclusion. So I wouldn't
4  feel comfortable really answering that.
5  BY MR. HEGARTY:
6      Q   In fact, as to IARC, you're aware that
7  it concluded that there was limited evidence of
8  carcinogenicity, but chance bias or confounding
9  could not be ruled out with reasonable confidence.
10          MR. TISI: Objection.
11  BY MR. HEGARTY:
12      Q   Do you recall reading that?
13          MR. TISI: Objection.
14          THE WITNESS: I don't recall reading
15  that specifically.
16  BY MR. HEGARTY:
17      Q   At the top of page 8 of your report, you
18  make reference to the testimony of Ms. Loretz in
19  the first paragraph.
20          Do you see that?
21      A   I'm looking.
22      Q   The middle of the paragraph.
23      A   Thank you.
24          Yes, I see that.
25      Q   You say that, according to Ms. Loretz

1  that --
2          MR. TISI: I think it's Dr. Loretz.
3          MR. HEGARTY: Dr. Loretz. Okay.
4  BY MR. HEGARTY:
5      Q   You say, according to Dr. Loretz, she
6  said that the PCP response was edited in meetings
7  with J&J and Imerys, and then you cite her
8  deposition at page 425.
9          Do you see that?
10      A   Yeah, I'm just reading that sentence
11  again, please. (Peruses document.)
12          Yes, I see that.
13          MR. HEGARTY: I'm going to mark as
14  Exhibit 14 that page of Ms. Loretz's deposition.
15          MR. TISI: Do you have the whole
16  deposition?
17          MR. HEGARTY: I do, if you want to look
18  at it.
19          MR. TISI: Would you mind, yeah.
20          (Exhibit No. 14 was marked for
21          identification.)
22  BY MR. HEGARTY:
23      Q   You cited pages 4 -- 425/21, to 426/1.
24  Do you see where you made that reference, Doctor?
25      A   425/21. Yes, I'm looking.

April Zambelli-Weiner, Ph.D.

Page 231

1    Q   Where does -- and my question is, where
2  does Ms. Loretz say in that portion of her -- her
3  deposition that you cited that the PCP response
4  was edited by J&J and Imerys?
5    A   So it doesn't say that, and I'm not sure
6  that's what I was conveying in that -- in that
7  sentence.
8        It says, question: "This report was
9  written with Johnson & Johnson and Imerys's input,
10 correct?"
11       And she says: "We probably had all of
12 our members who were interested, you know, review
13 it. That doesn't mean we changed the conclusions
14 at all."
15   Q   Right.
16   A   So I think I was simply referencing
17 that -- that it -- it was reviewed in consultation
18 with them.
19   Q   What is your support for saying that the
20 PCP response was prepared after edits and meetings
21 with J&J and Imerys?
22       The only reference you make to support
23 that is this page from her deposition, and you
24 agree that there's no -- that this portion of the
25 deposition does not say that J&J and Imerys were

Page 232

1  involved in editing the PCP response, does it?
2        MR. TISI:  Objection.  You -- it
3  misstates her testimony.  You know that -- you
4  know what her testimony was.
5  BY MR. HEGARTY:
6    Q   You can go ahead and respond.
7    A   Again, I -- this is just one section,
8  and I know I cite other sections, so I'm a little
9  uncomfortable responding fully in the absence of
10 the full document.  But I can simply say that I
11 think my intention was to cite that -- that there
12 was collaboration with J&J or Imerys or at least
13 the opportunity to review.
14   Q   Well, then, where did you get the
15 information from on which you base the statement
16 "after edits and meetings with J&J and Imerys"?
17   A   Do you have the rest of the -- the other
18 cites for the Loretz dep?
19   Q   Well, you think that it might be in
20 those other cites?
21   A   It just would give me a fuller picture
22 of -- of what I was trying to convey in this
23 paragraph.
24   Q   Well, we'll come back to that.
25       If you look at the next section -- next

Page 233

1  sentence, you say:  "According to Dr. Linda
2  Loretz, director of Safety and Regulatory
3  Toxicology at PCPC, this document would have been
4  sent to the PCPC members for approval before
5  submission."
6        Again, citing this same part of
7  Ms. Loretz's -- Ms. Loretz's testimony -- or
8  Dr. Loretz's testimony, where in the portion of
9  testimony that you cite does she say that it's
10 going to be sent to PCPC members for approval
11 before submission?
12   A   Again, I would say the same answer.
13 It's possible that it's a mistake in how the --
14 how the deposition transcript is -- is cited, but
15 without seeing the rest of it, it's hard for me to
16 know.
17   Q   You say next on page 8 that:  "The 2011
18 paper disclosed that the authors were consultants
19 for Johnson & Johnson and Imerys."
20       Do you see in the second paragraph of
21 page 8 where you say that the 2011 article right
22 in the middle, that you -- you refer to the title,
23 and then you say, "... and discloses that the
24 authors were consultants to Johnson & Johnson and
25 Imerys at the time the initial drafts of this

Page 234

1  manuscript was produced."
2        Do you see where I'm reading?
3    A   I do.
4    Q   I'm going to mark as Exhibit 15 the 2011
5  paper.
6        (Exhibit No. 15 was marked for
7        identification.)
8        MR. TISI:  Thank you.
9  BY MR. HEGARTY:
10   Q   If you turn to the very last page -- I'm
11 sorry, if you turn to page 506, do you see the
12 "Acknowledgments," "Conflicts of Interest"
13 section?
14   A   I do, yes.
15   Q   The authors don't cite that they were
16 consultants of Johnson & Johnson and Imerys at the
17 time the initial drafts of the manuscript were
18 produced, do they?
19   A   That's correct.  It just says "Johnson &
20 Johnson Consumer Product Worldwide."
21   Q   So your reference to Imerys is a
22 mistake, correct?
23   A   It may be.  With regard to this specific
24 COI and the exact wording, yes, I would say that's
25 correct.

7 (Pages 231 to 234)

April Zambelli-Weiner, Ph.D.

Page 235

1    Q   Thank you.
2        Now, throughout your paper -- I'm sorry,
3    throughout your report, you do not distinguish
4    between citations to footnotes and citations to
5    the references to the work cited.  For example, if
6    you go to page 11 of your report, at the very top
7    you make reference to a footnote 5 that refers to
8    the PRISMA statement, but then in the following
9    paragraph, in the same format as a footnote, you
10   make reference to 16.
11       Do you see that?
12       MR. TISI:  I'm sorry, where are you,
13   Counsel?  I --
14   BY MR. HEGARTY:
15       Q   The top of page 11, there's a footnote 5
16   that appears to refer to a PRISMA statement.  Then
17   the -- next line after that footnote beginning
18   "The 2009 paper" ends with a reference to 16.
19       Is 16 a footnote as well?
20       A   No.  If it was a footnote, it would be
21   on that page.
22       Q   So what is the reference to -- 16?
23       A   It should be in the back.  Let's take a
24   look.  (Peruses document.)
25       So it is a reference 16 in the work

Page 236

1    cited.
2        Q   So is it proper format to make reference
3    to footnotes and make references to the work cited
4    using the same format?
5        MS. PARFITT:  Objection to form.
6        MR. TISI:  Objection.
7        THE WITNESS:  I think it is.  I mean, I
8    think, could it have been clearer, sure, but I
9    don't think there's -- there's anything wrong with
10   doing that.
11   BY MR. HEGARTY:
12       Q   Have you ever done -- used that kind of
13   format in any published work of yours?
14       MR. TISI:  Objection.
15       THE WITNESS:  I don't recall.
16   BY MR. HEGARTY:
17       Q   You do agree that it can be confusing.
18       A   Sure.  I mean, generally footnotes are
19   on the same page, and, you know, I think you can
20   follow the pattern there, but you certainly could
21   use another format to make it a little bit
22   clearer.
23       Q   I'm going to mark as Exhibit 16 the 2003
24   Huncharek paper, which I'm sure you have a copy of
25   as well.

Page 237

1        (Exhibit No. 16 was marked for
2        identification.)
3    BY MR. HEGARTY:
4        Q   This is obviously one of the papers that
5    was a focus of your report, correct?
6        A   Correct.
7        Q   If you look on page 14, of your report
8    under the section "Analysis" beginning at "6.1
9    Huncharek, et al., 2003."  Do you see where I'm
10   referring you to?
11       A   Yes.
12       Q   In the first line you say:  "In 2003, a
13   meta-analysis study by Huncharek, Geschwind and
14   Kupelnick -- Kupelnick."  Do you see where I'm
15   reading?
16       A   Yes, I do.
17       Q   If you look at the first page of the --
18   of the Exhibit 16, you misspelled Geschwind, did
19   you not?
20       A   Yes, it appears I did.
21       Q   If you look over on page 18 of your
22   report under the section "Lack of replication,
23   2003 Huncharek Meta-analysis," do you see where
24   I'm referring you to?
25       A   Yes, I do.

Page 238

1        Q   You begin that section by saying:  "In
2    their 2003 paper, Drs. Huncharek and Muscat
3    claim."  Do you see where I'm reading?
4        A   Yes.
5        Q   Dr. Muscat was not an author on the 2003
6    paper, was he?
7        MR. TISI:  Objection.
8        THE WITNESS:  He was not an author, but
9    I believe I'm referencing my understanding that he
10   worked on the paper in some capacity.
11   BY MR. HEGARTY:
12       Q   Well, from -- what is your basis for
13   saying that he in some way worked on this paper?
14       A   If I'm recalling correctly, I'm thinking
15   about his deposition.
16       Q   But if you read his deposition, you know
17   that he said that he had no involvement in this
18   paper, correct?
19       MR. TISI:  Objection.
20       THE WITNESS:  I don't -- I don't recall
21   his deposition word for word.
22   BY MR. HEGARTY:
23       Q   Well, throughout your report when you
24   refer to the 2003 study, you continually refer to
25   this study as by Huncharek and Muscat, don't you?

8 (Pages 235 to 238)

April Zambelli-Weiner, Ph.D.

Page 239

1      A   I do.  And, you know, I'm also
2   recalling, hopefully correctly, that they were
3   both named on the proposal.  Again, I don't have
4   the documents in front of me, but my recollection
5   is that they may have both been named on the
6   proposal and the preliminary report from which
7   some of the data in the 2003 paper derived from.
8      Q   But, Doctor, in the section I'm pointing
9   to and throughout your report, you are referring
10  to and critiquing the 2003 article we marked as
11  Exhibit No. 16, correct?
12     A   That's correct.
13     Q   So it would be a mistake to -- when
14  you're talking about this article, to say that
15  Dr. Muscat was an author of this article, correct?
16         MR. TISI:  Objection.  She already
17  answered that question.  Asked and answered.
18         You can go ahead and answer.
19  BY MR. HEGARTY:
20     Q   You can answer.
21     A   Again --
22         MR. TISI:  You can answer again.
23         THE WITNESS:  Okay.  Yeah, I believe I'm
24  referencing his involvement in -- in the data in
25  the paper.

Page 240

1   BY MR. HEGARTY:
2      Q   So you don't think it's a mistake when
3   you're talking about the 2003 paper with lead
4   author Huncharek to continually talk about
5   Dr. Muscat as an author of that paper.
6          MR. TISI:  Objection.
7          THE WITNESS:  Again, I think my
8   characterization of it is -- you know, as you can
9   see in the title above it, "2003 Huncharek
10  Meta-analysis," and then below citing his
11  involvement in the paper --
12  BY MR. HEGARTY:
13     Q   But you --
14     A   -- and the data.
15     Q   But you are saying that in the first
16  sentence:  Drs. Huncharek and Muscat claim that
17  their calculations suggest an inverse
18  dose-response relationship."
19         There you're referring to what they're
20  claiming in the 2003 paper, correct?
21         MR. TISI:  Objection.  Asked and
22  answered.
23         THE WITNESS:  Again, the dose-response
24  data actually appears prior in a 2000 report.  So,
25  again, I would stay by my statement, sir, from

Page 241

1   before.
2   BY MR. HEGARTY:
3      Q   So you don't consider that to be a
4   mistake in your report?
5      A   I don't, no.
6      Q   If you would turn over to Table 1 on
7   page 15 of your report.  Tell me when you're
8   there.
9      A   Okay.
10     Q   First, in footnote 8, you note that
11  typographical and grammatical errors can and do
12  occur in research, correct?
13     A   Correct.
14     Q   These can include transcription errors
15  where data is inadvertently transferred
16  incorrectly, correct?
17     A   I don't believe that's what I said.
18     Q   But do you agree that typographical and
19  grammatical errors in a publication can include
20  transcription errors where data is inadvertently
21  transferred incorrectly?
22         MR. TISI:  Objection to the term
23  "transcription errors."
24         THE WITNESS:  Well, again, I don't know
25  how -- I don't know exactly how you're using

Page 242

1   "transcription."  Perhaps you can clarify.
2   BY MR. HEGARTY:
3      Q   Well, can errors in -- do errors in the
4   transfer of data sometimes occur in publications?
5      A   Sure.  Yes.
6      Q   Do citation errors sometimes occur in
7   publications?
8      A   Yes.
9      Q   Is it your methodology for purposes of
10  your report that any article or study with
11  typographical, grammatical or citation errors
12  renders that study invalid?
13     A   No, I don't think --
14         MR. TISI:  Let me just place an
15  objection.
16         THE WITNESS:  Sorry.
17         MR. TISI:  Thank you.
18         THE WITNESS:  I'm sorry.
19  BY MR. HEGARTY:
20     Q   You can answer.
21     A   Could you repeat the question.  Thank
22  you.
23     Q   Is it your methodology for purposes of
24  your report that any article or study with
25  typographical and grammatical or citation errors

9 (Pages 239 to 242)

April Zambelli-Weiner, Ph.D.

---

Page 243

1  renders that study invalid?
2      A   No, I don't think that's what I'm saying
3  at all. I think that I'm talking about an
4  analysis of internal validity of a study for which
5  there are, you know, numerous components to that.
6      Q   But you state in that footnote that:
7  "The number of errors identified in this paper
8  raise concerns about the rigor of the authors'
9  quality control procedures and the editorial
10 review process for this journal."
11     Do you see where I'm reading?
12     A   I do.
13     Q   Can you identify for me any written
14 standard for the number and type of errors that
15 are recognized to raise concern about the rigor of
16 the authors' quality control procedures?  Is there
17 any objective standard published?
18        MR. TISI:  Objection.
19        THE WITNESS:  That was a long question.
20 I'm going to do my best to answer it. It was
21 compound.
22        So there are certainly standards about
23 the types of errors, and I believe that was one of
24 the components of what you said. And I would
25 refer you to IARC actually for a good example of

---

Page 244

1  that in terms of when there is lack of clarity or
2  lack of transparency or these types of issues,
3  that it does call into question the quality of the
4  paper, and therefore could impact the weight that
5  such a paper is given in a weight-of-evidence
6  analysis or a causation analysis.
7        So I think that, you know, when we're
8  talking about something like this that is a
9  meta-analysis, you know, there absolutely are --
10 are guidances and standards around the kinds of
11 errors and the importance of precise abstraction
12 of data from the original studies.
13 BY MR. HEGARTY:
14     Q   Can you point to me to any such
15 published guidance and standards?
16     A   I think I just mentioned one. I think
17 when we met last time --
18     Q   I'm sorry, when you say IARC, are you
19 talking about the monograph?
20     A   Sure. Because they -- they discuss
21 methodology--
22     Q   Okay.
23     A   -- in part of the IARC monograph.
24     I think I mentioned before the Cochran
25 collaboration. I think I mentioned the Bornstein

---

Page 245

1  textbook. And I -- I'm sure there are many others
2  related to specifically substantive errors which
3  are really critical in a meta-analysis. Because a
4  meta-analysis, by definition, is an analysis of
5  other people's studies and other people's data.
6  And so when you're assessing a question of
7  validity, the question is, are you measuring what
8  you say you're measuring, are you either
9  measuring the data from the prior studies
10 accurately or you're not. So that drives directly
11 at validity.
12     Q   Have you ever published in any article
13 or journal the number of errors in a paper that
14 raise concerns that -- the number of errors that
15 are necessary to raise concerns about the rigor of
16 the authors' quality control procedures and
17 editorial review process?
18     A   Can you repeat that question, please?
19     Q   Sure.
20        Have you ever published in a journal or
21 any -- or in any format the number of errors it
22 takes before you have concerns about the rigors of
23 the authors' quality control or the editorial
24 review process? Is there an objective number?
25 Five errors? Ten errors?

---

Page 246

1      A   I have not published on that. I don't
2  know that anyone has. And I'm not even sure that
3  would be appropriate because it's really, again,
4  about a wholistic analysis of the internal
5  validity of a study, and -- and that you can't
6  take really individual errors out of that -- out
7  of that larger context, or just not all errors are
8  also created equally.
9      Q   What does it take for an error in a
10 publication to be a substantive error in your
11 opinion?
12     A   Well, in my opinion, it would depend
13 on --
14        MR. TISI:  Let me just object to the
15 vagueness of the question.
16        Go ahead.
17        THE WITNESS:  Sure.
18        In my opinion, it would depend on the
19 nature of the study or the nature of the
20 publication. I think in meta-analysis, I would
21 definitely consider misabstraction or
22 misrepresentation of the data from the original
23 studies, particularly under the premise of a -- of
24 a protocol that involves double abstraction, a --
25 a concerning and substantive error.

---

10 (Pages 243 to 246)

April Zambelli-Weiner, Ph.D.

Page 247

BY MR. HEGARTY:
1
2      Q   Can you identify for me any other types
3  of errors in a publication that you consider
4  substantive errors besides what you just provided?
5      A   Well, I -- I think I detail a lot of
6  them, you know, in -- in my report.
7      Q   Well, let us talk about those then.
8      MR. TISI:  I'm sorry, she wasn't
9  finished with her answer, Counsel.  You asked her
10  a question, unless you are withdrawing the
11  question.
12      MR. HEGARTY:  No, I'm not withdrawing.
13  BY MR. HEGARTY:
14      Q   Did you finish?
15      A   Can you repeat the question, please?
16      Q   Well, yeah, I had asked you about,
17  can you identify for me any other types of errors in
18  a publication that you consider substantive errors
19  besides what you provided, and I was going to then
20  allow you to make reference to what you include in
21  your report, but if you want to go ahead and give a
22  separate response, that's fine.
23      A   I lost my train of thought.  I -- I
24  think I was -- I was going to say that obviously I
25  detailed, you know, some of these in my report,

Page 248

1  and I think that -- again, I would just reiterate,
2  it really depends upon the nature of the error and
3  the paper and the study.
4      Q   So if we look at the sentence just
5  before Table 1, you say:  "A list of substantive
6  errors is provided in Table 1 of this report
7  (below)."
8      Do you see where I'm reading?
9      A   I do.
10      Q   So in your opinion, the errors -- the
11  references that you cite in Table 1 are those you
12  consider to be substantive errors, correct?
13      A   I would say, correct, within the context
14  of my footnote, which is, you know, trying to
15  distinguish between, you know, more typographical
16  and grammatical errors versus errors that drive at
17  the -- the methods or the results of the study.
18      Q   Well, let's go through them one by one.
19  Let's look at the first one.  You quote the 2003
20  article as saying, "Literature retrieval was
21  performed by previously described methods,"
22  quoting 8.  Correct?
23      A   Correct.
24      Q   You say, though, that Citation 8 is not
25  correct, so there was no method provided to

Page 249

1  substantiate it.  It can't be replicated.  That's
2  what you say, correct?
3      A   Correct.
4      Q   That's not true, is it?
5      A   Well, that is my analysis of -- of that
6  particular statement.
7      Q   Well, do you have the paper in front of
8  you, Exhibit 16?
9      A   Yes, I do.
10      Q   If you turn to the references, do you
11  see there's a reference there to 3, Cooper &
12  Hedges, L.V., The Handbook of Research Synthesis,
13  New York, Russell Sage Foundation, 1994?
14      Do you see that reference?
15      A   I see that reference, but I just --
16      Q   Do you --
17      A   Excuse me, I want to --
18      MR. TISI:  Give her a moment.
19      THE WITNESS:  I want to find the section
20  of the paper where that particular statement comes
21  from.  (Peruses document.)
22  BY MR. HEGARTY:
23      Q   You list it as page 1956, paragraph 2.
24      A   Thank you.
25      MR. TISI:  And if you have -- on your

Page 250

1  note, if you have your report with --
2      THE WITNESS:  Yes.  Thank you for that
3  reminder, yeah.
4      MR. TISI:  Sure.
5      THE WITNESS:  I'll have to keep -- maybe
6  I'll -- maybe I'll switch to that report, that
7  version of the report.
8  BY MR. HEGARTY:
9      Q   We're on page 15.
10      MR. TISI:  I think you said you had the
11  references pulled out of the report with the --
12      THE WITNESS:  Right.  Yeah.
13      MR. TISI:  Okay.
14      THE WITNESS:  Right.  So in the paper
15  they cite to that statement with -- with -- let me
16  see, I'm trying to find it -- with -- with
17  reference 8.  So you're referring to reference 3?
18  BY MR. HEGARTY:
19      Q   Correct.  Did you read reference 3?
20      A   Which -- which, by the way, my
21  understanding is an entire textbook.  Just let me
22  confirm.
23      Right.  So in my opinion, it -- it's
24  really not appropriate to cite an entire
25  textbook -- or let's just say it's -- it's not

April Zambelli-Weiner, Ph.D.

Page 251

1 informative to cite an entire textbook for
2 literature retrieval methods.
3       Typically the way that's handled in
4 research is, if you've published a prior study
5 where you've provided a lot of detail on your
6 protocol, because papers are like -- word count is
7 prime real estate in a -- in a peer-reviewed
8 paper, you take advantage of that and you go ahead
9 and reference the prior paper so you don't have to
10 go through that again.  So that's really standard.
11       I find this to be not informative about
12 the literature retrieval method to cite an entire
13 textbook.
14    Q   So do -- would you find it it to be a
15 substantive error if they meant to make reference
16 to -- to number 3 instead of number 8, if that --
17       THE REPORTER: I couldn't hear you.  You
18 have got -- I need you to finish your question.  I
19 didn't hear it with the cough.  Sorry.
20       MR. HEGARTY:  Okay.
21 BY MR. HEGARTY:
22    Q   All right.  Would you consider a -- a
23 typographical error where they meant to refer to 3
24 but they said 8 as a substantive error?
25       MR. TISI:  Objection.

Page 252

1       THE WITNESS:  Well, I think I'm going to
2 stand by what I put in my table, which is
3 methods -- references are important, and if
4 they're relying on another reference for their
5 method, then it should be informative as to the
6 method in a way that someone could replicate their
7 meta-analysis if they -- if they so desired.
8 BY MR. HEGARTY:
9    Q   But -- in that very same section that
10 you reference, in 1956, the authors go on and
11 describe in quite -- in a quite detailed way the
12 way they did their literature search, didn't they?
13    A   Well, I'm going to take a quick look
14 just to refresh my memory.  (Peruses document.)
15       I -- I don't think I would agree with
16 your characterization of that.
17    Q   Well, they -- they reference the
18 databases that they searched, correct?
19    A   They do, but it's very -- it's a very
20 odd and very strange reference that leaves me with
21 a lot of questions.  Because the MEDLARS
22 reference -- MEDLARS is a several iterations ago
23 version of PubMed.  So MEDLARS hasn't been MEDLARS
24 since, I don't know, a long time ago.
25       So I found it very strange for them to

Page 253

1 be -- the way they described the databases that
2 they've searched definitely left me with questions
3 as -- excuse me -- as well as the search terms.
4 That's not really a very detailed way of -- of
5 laying out your search terms.  So I disagree with
6 your assessment.
7    Q   Well, it would be -- it would be
8 incorrect to say that they made no description at
9 all of how they did their literature retrieval,
10 correct?
11    A   I'm sorry.  Repeat, please.
12    Q   Sure.  It would be incorrect to say that
13 the authors made -- provided no description of how
14 they went about doing their literature retrieval,
15 correct?
16    A   I think I would agree.  Obviously, they
17 provide some description, but whether that's
18 adequate and informative, I think that's a
19 different question.
20    Q   Was it your contention that their -- the
21 way they provided the information as to the
22 literature retrieval method was a substantive
23 error in their report?
24    A   Well, again, I think -- yes, I think
25 I -- I think I've said that in Table 1, just that

Page 254

1 it's -- it drives directly at the methods of the
2 meta-analysis.  So in that way, I consider it a
3 substantive error.
4    Q   Well, what would have changed in the
5 report if they had provided a different
6 description of the -- their literature retrieval
7 methods?
8    A   I -- I can't answer that.  I would've
9 had to see what they changed.
10    Q   Is there a written authority that --
11 that tells authors on how they're to describe
12 in -- in their articles how they do their
13 literature search and how to cite it?
14    A   I -- there very well may be.  I think
15 there's certainly convention for anyone who is
16 well versed in -- in the field.
17    Q   Can you cite for me any published
18 authority that tells authors how they're to
19 describe their literature searches?
20       MR. TISI:  Objection.
21       THE WITNESS:  Not off the top of my head
22 as I sit here, but that doesn't mean it doesn't
23 exist.
24 BY MR. HEGARTY:
25    Q   Your second point in that table --

12 (Pages 251 to 254)

Golkow Litigation Services - 1.877.370.DEPS

April Zambelli-Weiner, Ph.D.

1          MR. TISI:  Table 1 from --
2          MR. HEGARTY:  Table 1.  We're going to
3   stick with Table 1 for the next 30 or 40 minutes
4   at least.
5          MR. TISI:  Okay.
6   BY MR. HEGARTY:
7      Q   -- refers to text, noting that the
8   Hankinson data was subsequently used in Gertig so
9   that Gertig would only be included, but then you
10   note that they went on to cite 12, or Hankinson,
11   instead, correct?
12      A   Right.  So I believe -- just to make
13   sure I'm understanding your characterization
14   correctly, in the text they say Hankinson was
15   included and Gertig was removed, but in Table 1
16   where they list the studies that were included,
17   Hankinson is not there and Gertig is there.
18      Q   Correct.  So the table is correct,
19   right?
20      A   Well, I think it -- it leaves -- it
21   leaves an open question.  I mean we -- we can take
22   that at face value and assume that that's --
23   that's what happened, but, you know, certainly
24   that's a question.
25      Q   Well, they say that the Hankinson data

1   was included in Gertig, so they would use Gertig.
2   And the mistake you're pointing out is that in the
3   text they actually say we're taking -- we're going
4   to refer to Hankinson, correct?
5      A   I'm having a hard time reading it.  Let
6   me look here.  One second.  (Peruses document.)
7      Q   In other words, they say that --
8      A   Right.
9      Q   -- they're going to go with Gertig, but
10   then they say they're go -- then they make
11   reference to 12, which is Hankinson, instead of
12   10, correct?
13      A   Correct.  So they say 12 was included,
14   and therefore only 12, which is Hankinson was
15   included in the meta-analysis.  But in Table 2, it
16   looks like it was Gertig and -- and not Hankinson,
17   although --
18      Q   So any -- I'm sorry.
19      A   -- we can't be sure what actually
20   happened.
21      Q   But anyone reading this paper when they
22   looked at Table 1 would know that that's a
23   typographical error, that they meant to say
24   citation 10, Gertig, correct?
25          MR. TISI:  Objection.

1          THE WITNESS:  Not necessarily, and I'll
2   tell you why.  Because usually there is a graph --
3   a graphical depiction of, you know, a forest plot
4   of the results of the meta-analysis.  That's a
5   very standard reporting out of your results.
6          And in that graph, you get really
7   important information about the meta-analysis.
8   You know which studies were actually used, you get
9   the point estimates, the confidence intervals, you
10   often gets the weights that were applied to those
11   studies.  And so that would have been confirmatory
12   of which study was in fact actually used.  So
13   since that doesn't appear here, it's an open
14   question.
15   BY MR. HEGARTY:
16      Q   Well, if they had said only reference 10
17   was included in the meta-analysis, would you have
18   said that that's a -- a problem or an issue?
19          MR. TISI:  Objection.
20          THE WITNESS:  I'm sorry.  Can you repeat
21   that, please?
22   BY MR. HEGARTY:
23      Q   Sure.  If they had said therefore only
24   reference 10 was included in the meta-analysis,
25   instead of saying reference 12, would you have

1   also called that a substantive error?
2          MR. TISI:  Objection.
3          THE WITNESS:  Well, I think -- I think
4   certainly that would have improved the situation.
5   I mean it doesn't -- you know, it wouldn't have
6   drawn this direct contradiction that leaves an
7   open question that's not answered by the lack
8   of -- of reporting out on the meta-analysis
9   results.  So -- but obviously having the graphical
10   report out of the meta-analysis results would have
11   resolved that question.
12   BY MR. HEGARTY:
13      Q   Anyone looking at Table 2 would see that
14   Gertig was included and not Hankinson, correct?
15      A   Again, you know, there are other errors
16   in Table 1.  So, you know, again, it's an open
17   question.  I'm not going to agree that you can
18   assume that that's what happened because, you
19   know, there's other errors.
20      Q   And I said Table 1, I meant -- Table 2,
21   I said.  I meant to say Table 1.  Well --
22          MR. TISI:  Table 1 -- I guess where I'm
23   confused here, are you talking about Table 1 from
24   the report or the table from the -- from the
25   article?

April Zambelli-Weiner, Ph.D.

Page 259

1    MR. HEGARTY:  Well, please, Chris, I
2  understand --
3    MR. TISI:  Well --
4    MR. HEGARTY:  If I make an error -- an
5  issue with the clarity of the -- of the
6  transcript, I'd just rather you not take my time
7  with asking questions.
8    MR. TISI:  I -- I'll give you an extra
9  20 seconds.
10    Can you tell me which chart -- which
11  chart you're referring to?
12    MR. HEGARTY:  My question was, as it
13  relates to Table 1, anyone in the article, the
14  2003 article would know that they included Gertig
15  and not Hankinson.
16  BY MR. HEGARTY:
17    Q  Correct, Doctor?
18    A  Oh, I'm sorry.  I didn't realize you
19  were asking me --
20    Q  Sure.
21    A  -- a question again.  Go ahead.
22    Q  In Table 1 of the -- of the 2003
23  article, they don't reference Hankinson, correct?
24    A  That is correct.
25    Q  And in fact, it was proper to include --

Page 260

1  include Gertig and not Hankinson because Gertig
2  had used the same data, correct?
3    A  Well, I -- I didn't do that analysis.  I
4  mean, I assume that's -- that's their judgment or
5  what they're trying to convey, but, you know, I
6  sort of stand by the position that that's an open
7  question as to what was actually done.
8    Q  Well, how did this excerpt with errors,
9  as you say it, in Table 1 of your report have any
10  substantive impact on the article?
11    A  Oh, I mean I think what studies were
12  included in the meta-analysis absolutely is -- you
13  know, drives at the core of this -- of the paper
14  and the -- substance of this paper.
15    Q  Well, Doctor, at the top of Table 1 in
16  the 2003 paper, they say "Overview of included
17  studies."  That means these are the studies they
18  included in the meta-analysis, correct?
19    A  That is what it says, correct.
20    Q  So how did a misreference to Hankinson
21  in that paragraph when Hankinson is not included
22  here have any substantive effect on the paper?
23    A  I think I answered your question, but
24  I'll go ahead -- I'll go ahead and say it again.
25    Those types of contradictory errors or

Page 261

1  contradictions in the context of other errors
2  within this paper, including in Table 1, coupled
3  with the lack of reporting out on the results of
4  the meta-analysis, which would resolve the
5  contradiction, leave it as an open question.
6    Q  Your third point in Table 1 of your
7  report on page 15 refers to the authors reporting
8  on the lowest dose and how Booth had a lowest dose
9  of rarely or less-than-one-time dose that's not
10  reported, correct?
11    A  Correct.  That's correct.
12    Q  And you know that this was not included
13  because a rarely or less-than-one-month --
14  one-per-month-dose could not be combined with the
15  other study data.  You know that's why the authors
16  didn't list that, correct?
17    MR. TISI:  Objection.  Calls for
18  speculation.
19    THE WITNESS:  I -- I don't know that,
20  and I think that that -- that's exactly the point.
21    If you look at the study, and I'm just
22  trying to flip to the section in the study, I
23  believe there was like a one-line description of
24  the dose-response analysis.
25    But I think it's important to find it.

Page 262

1  Because the authors basically state that the
2  lowest recorded exposure category -- a comparison
3  was made across these studies comparing the lowest
4  recorded exposure category with the highest
5  exposure level.  That is the extent of their
6  methods description related to their dose-response
7  analysis.
8    So, if you take them at face value that
9  what they're saying is true, you go back to the
10  original studies and you look for the lowest
11  recorded exposure category, and that is not what
12  they did.
13  BY MR. HEGARTY:
14    Q  Would you have any problem if this
15  article -- the 2003 article had recorded that
16  we're not including the rarely or
17  less-than-one-month from Booth because we couldn't
18  combine it with the other studies data?
19    A  Well, I think certainly what I can agree
20  to is that a more -- a more detailed transparent
21  methods description of what actually was done
22  would have been very appreciated and welcomed, and
23  I think at that point, you know, I evaluate
24  that on -- on its merits.  But that's not what
25  happened, so it leaves us with a lot of questions.

14 (Pages 259 to 262)

April Zambelli-Weiner, Ph.D.

Page 263

1        And I also -- I also think, excuse me,
2   just to add, that it's misleading.  Because if
3   someone comes in -- comes in to this paper and is
4   not familiar with this body of literature and with
5   these studies, then it looks like these are the --
6   the exposure categories that are reported out for
7   each of these studies, when in fact that's not
8   accurate.  That's not a full and accurate
9   characterization of the data in these underlying
10  studies.
11       Q   You figured it out.  You -- you aren't
12  contending that others couldn't pull the Booth
13  paper and figure it out, are you?
14       A   Again, it's about standards of
15  methods -- no one should have to, right?  It
16  should be very clearly spelled out exactly what
17  they are doing.  Methods have to be spelled out;
18  decisions have to be justified.
19          That's -- you know, what you're alleging
20  is -- presuming that is what happened, is -- is a
21  methodologic choice that the authors are making
22  that they're obligated to describe and justify to
23  a certain extent, and that did not happen.
24       Q   As a general proposition, though, it's
25  not improper in a meta-analysis if you have some

Page 264

1   parts of data you can't combine with other -- with
2   data from other studies to just include the data
3   across the studies that you can combine, correct?
4       A   I'm sorry.  Can you read that back or
5   rephrase?
6       Q   Sure.  As a general proposition, it's
7   not improper in a meta-analysis if you have some
8   parts of data you can't combine with other studies
9   to then just include the data across the studies
10  that you can combine, correct?
11          MR. TISI:  Object.
12  BY MR. HEGARTY:
13      Q   That you're matching like with like or
14  combining like with like.
15      A   Again, that's a very sort of amorphous,
16  abstract question, but I'll -- I'll do my best to
17  answer it.
18          I mean, I think, you know, that when
19  you're doing a meta-analysis, you should set out
20  the research questions, set out the objective, set
21  out the inclusion/exclusion criteria, make that
22  very clear, and describe the methods, describe
23  your justification for your choices, and then
24  allow the reader to evaluate those.
25          Again, I don't know what they did, and

Page 265

1   we shouldn't be in that position of having to
2   guess and wonder what they did or make
3   assumptions, and I think that that's the point,
4   and that's really the -- the most I can say about
5   that.
6       Q   So did you actually go back and read the
7   Booth paper?
8       A   I did, yes.
9       Q   And from reading the Booth paper, you
10  did not conclude that they excluded that rarely or
11  less-than-one-time per dose because it -- no -- no
12  such similar data was collected across the other
13  studies?  Did you not make note of that?
14          MR. TISI:  Objection.
15          THE WITNESS:  I simply made note of what
16  they did.  What I can say is, first of all, I
17  don't prescribe to the premise that -- that this
18  dose-response analysis is valid at face value.
19  Just the methodologic choices made by the author.
20  So let's just establish that, put that aside.
21          There are lots of different ways to do
22  this, to do -- to do a dose-response analysis, to
23  do a meta-analysis, and so I can't really
24  speculate on what they thought they were doing or
25  what they actually did.  I think all I can say is

Page 266

1   they had an obligation to lay that out and allow
2   people to evaluate it and were -- were unable to
3   do that.
4   BY MR. HEGARTY:
5       Q   How did this present or how did this --
6   strike that.
7          How was this a substantive error that
8   affected the results or conclusions of the 2003
9   paper?
10      A   Again, it drives directly to the methods
11  and the results of the study.  If you say you are
12  taking the lowest recorded exposure category from
13  each study, then that should be an accurate
14  statement, and it's not an accurate statement.  If
15  you did something else, then you should describe
16  that something else, and you should justify that
17  something else so that people can evaluate the
18  validity of that, the risk of bias of that and so
19  on.  That did not happen.  That drives directly to
20  the substance of the paper, methods and results.
21      Q   Well, did you run the meta-analysis,
22  leaving Booth out, to check whether it had any
23  effect on the results?
24      A   No.  I wasn't -- I wasn't tasked with
25  trying to figure out how to do this the right way.

15 (Pages 263 to 266)

April Zambelli-Weiner, Ph.D.

1    That wasn't my job.
2         Q   Well, did you run the analysis with
3    including the -- the lowest dose from Booth to see
4    if it had any effect on the results?
5         A   Again, not my charge.  Simply defending
6    the facts, as you asked me originally, that this
7    is a -- a substantive error.
8         Q   If you look at the next point you make
9    over at the top of page 16, that's looking at the
10   Cook data.  Do you see that?
11        A   Yes.
12        Q   And what they -- the authors did there
13   was to convert the --
14            THE REPORTER:  Was to what?
15            THE WITNESS:  I'm sorry.
16   BY MR. HEGARTY:
17        Q   And what the authors did there was to
18   convert the days reported to years, correct,
19   from -- from the Cook study?
20        A   That -- that's what they attempted to
21   do, correct.
22        Q   And your issue is with the fact that the
23   intervals overlap, correct?
24        A   Correct.  And also that the -- the
25   categories are rounded incorrectly if you -- if

1    this, you know, figure out how -- what the right
2    way to do it was.
3         Q   Well, if the authors had used the
4    numbers you said they should have used, would it
5    have made -- had any effect on the risk numbers
6    that they reported or the conclusions from the
7    study?
8         A   Can you repeat the question?
9         Q   Sure.
10            If the authors had used the numbers from
11   Cook that you say they should have used, would it
12   have had any effect on the risk numbers they
13   reported or the conclusions from the study?
14        A   Well, I think -- I think in this
15   particular case I'm -- I'm simply calling out the
16   misrepresentation of the -- of the exposure
17   categories.  There may be other Cook-related
18   errors.  But, again, standing -- standing by my --
19   my position that it's paramount that the data be
20   accurately represented from the underlying
21   studies.
22        Q   Well, what would the risk number have
23   been if they had used what you say is the accurate
24   data from Cook?
25        A   I -- I can't answer that.

1    you extrapolate that.
2         Q   Well, did you tell the reader of your
3    report what the numbers should have been listed
4    as?
5         A   I don't know.  I don't believe so.
6         Q   Well, what was the substantive effect on
7    the results from the way they characterized the
8    data from Cook in terms of lifetime days?
9         A   Again, anything that drives at the
10   methods and the results of the meta-analysis is a
11   substantive error.  And I'm just going to bring it
12   right back to the foundation of a valid
13   meta-analysis, which is an analysis of someone
14   else's data, of someone else's study, and proper
15   representation of that data is paramount to the
16   foundation of a valid meta-analysis.
17            So, you know, inaccurately representing
18   the data from another study to me is a substantive
19   error.  It drives directly at the analysis, the
20   methods and the results.
21        Q   Well, did you run the meta-analysis
22   using what you believed were the proper numbers
23   from Cook?
24        A   Again, I -- I was not charged with that.
25   It wasn't my -- wasn't my task or my job to rerun

1         Q   Well, what would the conclusions have
2    been if they had used the accurate numbers from
3    Cook as you say they should have?
4         A   Again, you know, this -- this is just
5    about the, you know, inaccurate, incorrect
6    representation of the data from the original
7    studies, and another example of this in the
8    context of a lot of other issues.
9             So I'm also -- also not entirely
10   comfortable -- I know -- I know you want to walk
11   through these one at a time, but they do each
12   exist within -- within a broader context of -- of
13   a lot of other issues.
14        Q   The next point you make refers to the
15   data that they used from the Gertig study, in
16   particular leaving out the "never and less than
17   one week."  Do you see where I'm referencing?
18        A   Yes, I do.
19        Q   Again, as with Booth, a never and
20   less-than-one-week level of exposure could not be
21   combined with the other data that they were
22   looking at for purposes of the meta-analysis,
23   correct?
24        A   Well, again, that's your assertion and
25   your supposition about what the authors did.  I --

April Zambelli-Weiner, Ph.D.

Page 271

1  they don't tell us what they did.  And -- well,
2  they do tell us what they did, and they didn't do
3  that, so they did something different than that,
4  which we don't know exactly what they did.
5      So, again, same answer as before:  This
6  is just another example of, you know,
7  misrepresenting the data from the original
8  studies, leaving out exposure categories, without
9  proper explanation of exactly what they did and
10  exactly why they did it.
11      Q   Well, do you intend to testify that the
12  authors intentionally misrepresented the data from
13  the original studies?
14          MR. TISI:  Objection.
15          THE WITNESS:  I can't speak to what
16  their intent was.  But you can mislead -- it's
17  misleading, period.  I don't know what their
18  intent was, but it's misleading.
19  BY MR. HEGARTY:
20      Q   Well, is it your -- is it your testimony
21  that they tried to be misleading or they tried to
22  misrepresent the data?
23      A   Again, I -- I can't say what their
24  intent was.  I can simply say that there is
25  misleading data, there's misleading statements

Page 272

1  throughout their works.  That's just a fact.
2      Q   Well, what would have been the numbers
3  reported from the study if they had included the
4  lowest dosage category from Gertig?
5      A   I can't answer that, because a whole
6  dose-response methodology should be laid out.
7  It -- there's many different ways to come at this.
8  They didn't do that, so I can't evaluate that.
9  It's really a hypothetical.
10      Q   If you look at the next point you make,
11  it's the third cell in the carryover table on
12  page 16, it concerns the odds ratio and confidence
13  interval reported from the Chang study, correct?
14      A   I'm sorry, are you third from the
15  bottom?
16      Q   No, the third cell down from the top.
17      A   Okay.  Same.
18      Q   Same.
19      A   Okay.
20      Q   You're talking there about the odds
21  ratio in one instance and the confidence interval
22  in another instance from the Chang study, correct?
23      A   Correct.
24      Q   Those are likely typographical errors,
25  correct?

Page 273

1          MR. TISI:  Objection.
2          THE WITNESS:  Well, I wouldn't agree
3  with that.  Again, I'm going to come back to the
4  foundation of what a meta-analysis is.  And I do
5  believe, again, the authors state somewhere in
6  their paper -- hopefully I'm again recalling
7  correctly -- yes, two researchers performed the
8  data abstraction.
9          So this raises a lot of questions for me
10  as a researcher when I see these kinds of errors,
11  because you have to understand in a meta-analysis,
12  you're really talking about, like, copy and paste.
13  I mean this is just -- you're not running
14  calculations with regard to the abstraction of the
15  data.  You're literally copying and pasting from
16  another person's study to, you know, your data
17  abstraction form.
18          So, to have these kinds of errors under
19  the assertion that there was a double abstraction
20  process raises a lot of questions for me, and I
21  would think for any researcher, because how is it
22  that two people independently abstract the same
23  error incorrectly?
24  BY MR. HEGARTY:
25      Q   Well, what would have been the effect on

Page 274

1  the risk numbers reported if they had used the
2  proper odds ratio and confidence interval, as you
3  say they should have?
4      A   Again, that -- that wasn't my charge.
5  That wasn't my task.  I'm simply laying out that
6  they did not abstract the data from the underlying
7  studies correctly.
8          And in some cases -- you know, you have
9  to understand how meta-analysis works.  These
10  errors are substantive to the results of the
11  meta-analysis.  I can't speak to what the direct
12  specific impact of these would be because I wasn't
13  tasked with designing this meta-analysis, and --
14  and making those methodologic judgments myself and
15  going through that process.
16          But I can tell you that a valid
17  meta-analysis is based on the foundation of
18  accurate and meticulous abstraction of the data
19  from the original studies.  And so if that is not
20  done, that is in fact a substantive error.
21      Q   Well, what was the substantive impact of
22  having a confidence interval of 1.09 to 2.68
23  versus 1.09 to 2.64?
24      A   Again, I can't tell you specifically.
25  All I can tell you is that even small errors can

17 (Pages 271 to 274)

April Zambelli-Weiner, Ph.D.

Page 275

1   become amplified in a meta-analysis. So I can
2   just talk qualitatively about what can happen.
3   Rounding errors, these kinds of errors, they can
4   have impact on the results because you are
5   weighting these studies, and so depending upon how
6   the studies get weighted, errors get -- can become
7   amplified. It is absolutely core to the substance
8   of a meta-analysis.
9        Q   Is it your testimony that a 2.68 versus
10   a 2.64 higher confidence interval in that one cite
11   would have caused substantive error in the risk
12   numbers that were calculated?
13        A   Again, I'm going to stand by my prior
14   testimony that I'm not -- I'm not -- first of all,
15   I wasn't charged with doing that.
16        Second of all, do I think that that one
17   little like 0.04 is going to have by itself a
18   major impact on the results? Probably not. Is it
19   still a substantive error? Yes, it is. And does
20   it exist within the context of a lot of other
21   errors that compounded and together can have a
22   substantive impact on the results? Yes, it
23   absolutely does.
24        Q   In the next cell, you again cite a
25   confidence interval that was cited as 0.6 to 3.4

Page 276

1   when it should have been 0.6 to 2.4. Do you see
2   where I'm reading?
3        A   I do, yes.
4        Q   What was the substantive impact to the
5   results of this paper by having a confidence
6   interval of -- of 0.6 to 3.4 instead of 0.6 to
7   2.4?
8        A   I would say, again, it's -- it's the
9   same answer. And, you know, we didn't really talk
10   about the one above it either, which is -- which
11   is pretty substantive to misrepresent the point
12   estimate in Chang, so just bringing that to -- to
13   the forefront as well.
14        So, I mean, you know, again, it's --
15   it's -- one, it's a substantive error; and, two,
16   they exist within the context of -- of a lot of
17   errors. And so I can't answer what the specific
18   impact would be of the accumulation of these -- of
19   these substantive errors.
20        Q   Well, going back to the -- the Chang
21   reference, what would have been the numbers
22   reported if they had used 0.865 instead of 0.96?
23        A   I can't answer that, and quite frankly,
24   we shouldn't have to wonder.
25        Q   Well, what would have been the numbers

Page 277

1   if they had used in the -- the next part 2.4
2   instead of 3.4?
3        A   I would say it's -- it's again the same
4   answer. It just shouldn't happen.
5        Q   The next point you make is that the Ness
6   reference included use on feet, correct?
7        A   Correct.
8        Q   The number listed, though, was from the
9   Ness paper, and those -- that number are for
10   genital and rectal use and feet, correct?
11        A   Can we pull up the paper?
12        Q   Sure. You have it in front of you,
13   right?
14        A   Yeah.
15        Q   And for the record, I will mark that
16   paper as Exhibit 17.
17          (Exhibit No. 17 was marked for
18          identification.)
19   BY MR. HEGARTY:
20        Q   In particular, if you turn over to
21   Table 2 of Exhibit 17, on page 114 -- are you
22   there with me, Doctor?
23        A   I am. I'm sorry. Yes, I'm there.
24        Q   And you see that the numbers that the
25   2003 article reported were for talc use,

Page 278

1   genital/rectal and feet, correct?
2        A   That is correct.
3        Q   So it wasn't just limited to feet, as
4   you say in your report, correct?
5        A   Well, it does include feet, and if you
6   look at the section above on talc use, you can see
7   that a large proportion of the talc exposure is
8   feet. And I think that this is really important
9   as it relates to the author's stated objectives of
10   this paper, which if I'm recalling correctly, are
11   perineal cosmetic talc use.
12        And so I think that that is an important
13   limitation or aspect of this data that is
14   questionable in terms of whether this should
15   have -- would have even met the inclusion/
16   exclusion criteria if that had been clearly
17   specified. Whether that drives at the -- at the
18   research question, which is -- which really gets
19   to validity.
20        I mean validity is, are you measuring
21   what you say you're measuring. So if you're
22   measuring perineal talc -- if you're saying you're
23   measuring perineal talc, but you're actually
24   measuring feet also, that's an issue.
25        Q   Doctor, the category they used are for

April Zambelli-Weiner, Ph.D.

1   genital/rectal use, and feet.  So every person in
2   the list -- every person from the dataset that
3   they used used talc on the genitals and rectal
4   area, correct?
5        A   It says "genital/rectal and feet."
6   That's what it says, correct.
7        Q   So it did not include just users on
8   their feet, correct?
9        MR. TISI:  Objection.
10       THE WITNESS:  I don't -- I don't know
11  that I necessarily agree with that.  I mean if you
12  look above, you know, the genital/rectal use is
13  161 cases.  There's clearly more than 161 cases
14  represented in -- in that section.
15       So, you know, regardless, it's very
16  possible that it includes people who only had foot
17  exposure, and at a minimum, I think this is an
18  important substantive issue.
19  BY MR. HEGARTY:
20       Q   You say it's very possible that the
21  category that Dr. Ness reported on in Table 2
22  included cases and controls who only used it on --
23  on feet?  Is that what you're saying?
24       A   Well, I need to look a little more
25  closely.

1        MR. TISI:  Excuse me.  Could we go off
2   the record?  I'm so sorry.
3        MR. HEGARTY:  Okay.  Let's go off the
4   record.
5        THE VIDEOGRAPHER:  The time is
6   11:01 a.m., and we're going off the record.
7        (Recess.)
8        THE VIDEOGRAPHER:  The time is
9   11:11 a.m., and we're back on the record.
10  BY MR. HEGARTY:
11       Q   Doctor, when we broke we were talking
12  about the reference to the Ness paper and
13  including the category of genital/rectal and feet,
14  and I asked you to let me know whether you thought
15  that that category did -- did or would have
16  included individuals who did not also use talc on
17  the genital/rectal area.
18       A   Correct.
19       Q   Is that still your testimony?
20       A   Yes.  After reviewing the paper -- well,
21  let's just say after reviewing Table 2 but not
22  rereviewing the entire paper --
23       MR. TISI:  Table 2 of the Ness paper.
24       THE WITNESS:  I'm sorry.  Table 2 of the
25  Ness paper, it is my interpretation of that, that

1   that can include people with feet exposure, not
2   genital/rectal.
3   BY MR. HEGARTY:
4        Q   Okay.  Your next point as we were
5   walking through Table 1 on pages 15, 16, 17 of
6   your report, we're looking at the top of page 17,
7   you make reference to misstating the year of a
8   publication.
9        How is that a substantive error?
10       A   Again, this -- this I cite here because
11  it's an important methods reference.  So, again,
12  my definition of "substantive," anything that
13  drives at the methods or the -- you know, the
14  results of the -- of the study.
15       Q   Misciting the year would not have had
16  any substantive effect on the numbers that the
17  authors ran, would -- would it?
18       MR. TISI:  Objection.
19       THE WITNESS:  No, I think -- sorry.
20       MR. TISI:  I'm sorry.
21       Objection.  Misstates, asked and
22  answered.
23  BY MR. HEGARTY:
24       Q   You -- you can answer.
25       A   Okay, sure.  Yeah, I think this -- this

1   would drive more at the methods of the study.
2        Q   Also, the next point you make about the
3   text referring to seven studies but the -- the
4   table including only six studies, how would that
5   have had an effect on the numbers that the study
6   reported?
7        A   I think this goes back to what we were
8   talking about before in that the dose-response
9   analysis leaves a lot of -- of questions as to
10  what was actually done.  And so I think with all
11  of that in mind, again, the contradiction is open,
12  but -- because we don't have an adequate
13  description of the methods, we have
14  contradictions, and we don't have the reporting
15  out of the meta-analysis showing us, you know,
16  exactly what went into the meta-analysis.
17       Q   Your last point refers to the rounding
18  of numbers.  Rounding of numbers in doing a
19  meta-analysis is not, per se, improper, correct?
20       A   I would say I don't necessarily agree
21  with you, with a caveat.  You know, meta-analysis
22  really is about representing the data from the
23  original studies.  If there's a reason to round
24  numbers, if that's a methodologic choice that was
25  made by the investigators, then I would hope that,

19 (Pages 279 to 282)

April Zambelli-Weiner, Ph.D.

1    one, they would describe that choice; and, two,
2    justify that choice; and, three, apply it
3    uniformly.
4         So this -- and this does speak to the
5    point that I made before, which is, you know,
6    those types of rounding errors can have a
7    substantive impact on the results, particularly as
8    it relates to the weights and how much weight a
9    particular study gets.  So I think that is
10   absolutely a substantive error.
11        Q   Did you do an analysis comparing what
12   the results would have been if they had not
13   rounded versus the results because they did round?
14        A   Again, same answer as -- as before, no,
15   that wasn't my -- my charge.
16        Q   The results from this meta-analysis,
17   that is, the 2003, the relative risk -- or I
18   should say the odds number reported of 1.23 is
19   comparable to the other meta-analysis that had
20   been done, correct?
21        A   I'm sorry.  Are we -- are we -- so we're
22   back on the main meta-analysis?
23        Q   We're on the 2003 meta-analysis.
24        MR. TISI: He shifted from the -- the
25   dose-response.

1         THE WITNESS:  Okay.
2    BY MR. HEGARTY:
3         Q   The numbers they report for the relative
4    risks of their meta-analysis of 1.23 are
5    comparable to all of the other meta-analysis that
6    had been conducted at that point in time and that
7    have been conducted since, correct?
8         A   I can't really answer that.  I wasn't
9    charged with doing that analysis, so I -- it
10   wouldn't be fair for me to speculate.
11        Q   But you had not -- you did not go back
12   and look at the other meta-analysis to see if the
13   numbers that the 2003 paper reported are
14   consistent with what other meta-analyses have
15   reported?
16        A   Again, no, I didn't do an exhaustive
17   review of all the meta-analyses.  No.
18        Q   So can you testify that the -- the
19   numbers they reported from this study are
20   different than all the other meta-analysis that
21   have been done in a substantive way?
22        MR. TISI:  Objection.
23        THE WITNESS:  Again, not -- not my
24   charge.  Didn't do that analysis, so wouldn't want
25   to comment on it.

1    BY MR. HEGARTY:
2         Q   If you look at the section on page 18
3    entitled "Lack of replication, 2003 Huncharek
4    meta-analysis."  Do you see where I am?
5         A   Yes.
6         Q   Your first sentence says:  "In their
7    2003 paper, Drs. Huncharek and Muscat claim that
8    their calculations suggest an inverse dose
9    repose."
10        That's wrong, isn't it?
11        A   There's a missing S, correct.
12        Q   That's a mistake in your report, right?
13        A   That's a -- that's a typo, yes, correct.
14        Q   Does that make your report
15   substantively -- should be questioned
16   substantively?
17        A   Well, I think I did, one, further make
18   that distinction, but, two, also reiterate that
19   it's the totality of the errors in any particular
20   piece of work.
21        Q   But your quality control did not pick up
22   that error, correct?
23        A   That is correct, yes.
24        Q   Is it your contention that as of 2003,
25   it was wrong to say that the dose-response numbers

1    available suggested an inverse dose-response
2    relationship?
3         A   I'm not sure I understand your question.
4    Can you rephrase or be specific?
5         Q   Was it your contention that as of 2003,
6    it was wrong to say that the dose-response data
7    from the talc ovarian cancer studies argued
8    against a causal relationship?
9         MR. TISI:  Can you see -- you don't have
10   a -- let me give this to you because that may be
11   easier if you want to --
12        THE WITNESS:  So if I'm understanding
13   you correctly, you're asking me to make an
14   assessment about the body of evidence as a whole
15   related to dose-response?
16   BY MR. HEGARTY:
17        Q   Well, let me ask it differently.
18        Are you contending that it was wrong for
19   the 2003 paper to -- to say that the dose-response
20   data available suggested an inverse dose-response?
21        A   I think that what I'm saying is that
22   there are validity issues with the dose-response
23   analysis as presented in that paper that, yes,
24   bring me to the conclusion that that is not a
25   valid analysis, and that therefore is not a valid

April Zambelli-Weiner, Ph.D.

Page 287

1    conclusion from that analysis.
2        Q   Well, the authors actually note in their
3    paper that they had limitations on what they could
4    do in terms of calculating dose-response, over on
5    page 1958, correct?
6        A   Do you want to point me to --
7        Q   Yeah, in the third -- the paragraph in
8    the middle, they say -- after saying, "These data
9    suggest an inverse relationship between talc
10   exposure and ovarian cancer risk.  Unfortunately,
11   only limited data were available."  Do you see
12   that section?
13       A   Yes.
14       Q   So they describe the limitations that
15   they had in terms of analyzing dose-response,
16   correct?
17           MR. TISI:  Objection.
18           THE WITNESS:  They do discuss some
19   limitations of -- of the analysis.  That doesn't
20   necessarily mean they address all of the issues
21   that I brought up.
22   BY MR. HEGARTY:
23       Q   Well, it's not improper to include
24   limitations in terms of what's available for an
25   analysis in an article, correct?

Page 288

1            MR. TISI:  Objection.
2            THE WITNESS:  No, I -- it's not
3    improper.  I mean, I think it's -- it's something
4    that's expected to discuss limitations, but I
5    think now we're shifting from one thing, which is
6    the validity of the analysis, to what the authors
7    discuss in their Discussion section.
8    BY MR. HEGARTY:
9        Q   Well, did you do an independent analysis
10   of the dose-response data available as of 2003 to
11   determine whether it did suggest an inverse
12   dose-response?
13       A   Well, what I did, which is in my report,
14   is try to replicate their dose-response analysis.
15   I did not do necessarily a broader evaluation of
16   the entire evidence base with regard to
17   dose-response.  That was not -- that was not my
18   charge.
19       Q   Well, if we turn over to page 20 of your
20   report, where you do what you say you just did of
21   trying to replicate what the authors did, you
22   report that -- the data that you generated in
23   Table 2, correct?
24       A   Correct.
25       Q   One of the categories that you use is a

Page 289

1    mixed exposure category.  Correct?
2        A   Correct.
3        Q   You note that the studies included nine
4    studies, correct?
5        A   Correct.
6        Q   But nowhere in your report do you list
7    what those nine studies were, correct?
8        A   I don't know if that's true, but I do
9    believe I reference Table 2, which is where the
10   nine studies are.  Table 2 in the 2003 Huncharek
11   paper.
12       Q   So the nine studies you're making
13   reference to in that part of your report refers to
14   Table 2 in the 2003 study.
15       A   Yes, I believe so, and that's what's in
16   the methods summary below.
17       Q   As to your calculations, again, you're
18   reporting here what was done in the 2003 paper
19   we've been looking at, correct?
20       A   Well, what I'm reporting here is my
21   attempt to replicate the two summary risk
22   estimates that are reported for the,
23   quote/unquote, lowest exposure cat- -- reported
24   exposure category and the highest exposure
25   category in the 2003 paper.

Page 290

1            Again, because we don't -- we have lots
2    of questions about what actually was done, we have
3    a lack of description of the methods, and we don't
4    have the reporting out of the results, as we
5    discussed previously.  So there's a question as to
6    what was actually done and how they actually
7    arrived at those particular sum- -- summary risk
8    estimates.
9            So what I'm doing here is trying to
10   figure that out, given all of those gaps, and
11   trying to take what they said they did, the
12   references they cited, and a standard generally
13   accepted approach to meta-analysis to see if we
14   can arrive at the same answers.
15       Q   Well, the first column, you report on
16   the Huncharek and Muscat method, correct?
17       A   Correct.
18       Q   Again, Dr. Muscat was not an author on
19   the 2003 paper, correct?
20           MR. TISI:  Objection.  Asked and
21   answered.
22           THE WITNESS:  I think we -- I think we
23   talked about that, you know, my -- excuse me, my
24   reference to him in terms of his involvement and
25   the fact that this dose-response data actually

April Zambelli-Weiner, Ph.D.

Page 291

1    derives from a much earlier report.
2    BY MR. HEGARTY:
3        Q   Well, can you cite for me any authority
4    to say that Dr. Muscat was in any way involved in
5    the publication of the 2003 meta-analysis?
6        A   Again, I think -- I think I answered
7    that.  I'm -- I'm referring back to the original
8    proposal, preliminary data reports, and possibly
9    his -- his deposition, with the caveat that I
10   obviously don't remember every word of his
11   deposition.
12       Q   Okay.  The authors in the 2003 paper did
13   identify the methods they used to do the
14   meta-analysis, correct, in the methods -- in the
15   materials and methods section, correct?
16           MR. TISI:  Dose-response or the overall,
17   Counsel?
18           MR. HEGARTY:  I'm referring to this
19   table.
20           MR. TISI:  Okay.
21   BY MR. HEGARTY:
22       Q   In the materials section, they described
23   the methods they used as a general, variance-based
24   method employing confidence intervals, correct?
25       A   Correct.  So they -- they do two things.

Page 292

1    They say the data analysis was performed according
2    to Greenland, and they cite Greenland, and then
3    they also list a series of equations there.  And
4    so there is some discrepancy between the equations
5    listed here and what is in Greenland.
6            And so, again, not knowing what exactly
7    was done, we ran it -- you know, I ran it both
8    with the formulas as reported and then with the
9    formulas from Greenland.
10       Q   As for -- excuse me -- as for your
11   calculations, which are the Greenland method and
12   the fixed -- actually, you did all three, correct?
13       A   Correct.
14       Q   As to all three calculations that you
15   did by every method, the odds ratio for the
16   adjusted lowest category of dose is higher than
17   the odds ratio for the highest category of dose,
18   correct?
19       A   I'm sorry.  Let me read that back.
20   (Reading monitor.)
21           Okay.  So if I'm understanding you
22   correctly, you're asking if the reported point
23   estimates are higher for -- across the board for
24   the adjusted lowest exposure category compared to
25   the highest exposure category.

Page 293

1        Q   Correct.
2        A   Okay.  And I'm looking.
3            I would say that appears to be correct
4    with -- you know, with the context of, first of
5    all, none of these match exactly to what's
6    reported in the paper.  And, two, it should be
7    noted that there's significant overlap of the
8    confidence intervals across this table, which is
9    an important methodologic -- or result, I should
10   say, in terms of how you interpret these findings.
11       Q   But the adjusted numbers you're
12   reporting show an inverted dose-response, correct?
13           MR. TISI:  Objection.
14           THE WITNESS:  I would not characterize
15   it that way.  I would not characterize it -- I
16   certainly would not put this data forward as
17   strong evidence of an inverse dose-response.  That
18   is not something I would do.
19   BY MR. HEGARTY:
20       Q   You do agree, though, that the higher --
21   the lowest exposures in all cases had a higher
22   point estimate than the higher exposures for the
23   adjusted numbers, correct?
24           MR. TISI:  Objection.
25           THE WITNESS:  Again, and -- so that --

Page 294

1    that is correct, you are reading the table
2    correctly.
3            But again, to go back, I think we need
4    to just revisit the premise of there's incorrect
5    data here.  I don't agree with the premise of the
6    -- the methodologic choice of the authors related
7    to the dose-response analysis.  So taking the
8    authors' data in Table 2 at face value, we are
9    unable to replicate the numbers in their study.
10           But, you know, to bring it back to
11   answer your question, yes, you are -- you are
12   reading that correctly.
13   BY MR. HEGARTY:
14       Q   But you're replicating their commentary
15   that the data suggests an inverse dose-response,
16   correct?
17           MR. TISI:  Objection.
18           THE WITNESS:  Again, I would not
19   interpret this data in that way.  There's
20   significant overlap of the confidence intervals.
21   This in no way -- and again, this is based on
22   incorrect data and in a -- in a flawed analysis.
23   So just stopping at those first two points, I
24   would never do this analysis.  This is not an
25   analysis I would do.  And so I can't validate it.

22 (Pages 291 to 294)

April Zambelli-Weiner, Ph.D.

Page 295

1    I wouldn't put it forward in that way.
2          But just taking the fact that they did
3    do that and there are errors in the data, that
4    even with these results, I would not put this
5    forward as strong evidence of -- of an inverse
6    dose-response.  I would not use this to support
7    that point.
8    BY MR. HEGARTY:
9        Q   Doctor, if you look over on page 19 of
10   your report, in the last paragraph marked 3, you
11   actually say that the data you ran suggests a
12   positive dose-response.  So you're taking your
13   data and saying it suggests a positive
14   dose-response, correct?
15       A   I'm not -- no.  I -- I make a
16   distinction here.  I'm simply reporting on the
17   finding, just as I just conceded to you that in
18   fact that's what the data says.
19          What I'm saying is in fact when you run
20   it with -- with standard generally accepted
21   statistical packages, you actually see a different
22   trend.  That's very different than putting this
23   data forward and advocating it in -- in support of
24   a very important, you know, aspect regarding a
25   causal -- a causal question.

Page 296

1          So I will agree with you that I'm making
2    that observation that in certain cases it does
3    flip, the trend flips, and that's an interesting
4    finding.  But I'm not putting -- I'm not now
5    taking this result and disseminating it to FDA or
6    to the -- to the medical and scientific community
7    and saying, Look, this is proof of a positive
8    dose-response.  That's an important distinction.
9        Q   Well, what data points suggest a
10   positive dose-response?
11       A   Again, there are certain instances where
12   the point estimates increase.  Just as you
13   indicated there are situations where they
14   decrease, there are scenarios in this table where
15   the point estimate increases from the lowest to
16   the highest exposure at that point.
17       Q   Just tell me which point estimates
18   suggest a positive dose-response.
19       A   The unadjusted applications per month.
20   Again, with the caveat of the description that
21   I've just provided.
22       Q   So it's your testimony that it's proper
23   to look at unadjusted numbers rather than adjusted
24   numbers to say that there's a suggestion of a
25   dose-response?

Page 297

1        A   Well, that's a very -- that's a
2    different question.  That's a very broad question.
3    I mean, it depends on -- you know, I wasn't
4    designing this analysis.  That's very different.
5    If I'm going to design an analysis, I'm going to
6    go through the process of evaluating confounding
7    and deciding whether unadjusted or adjusted
8    numbers are the right way to go.
9          This was done in response to
10   Dr. Muscat's deposition in which he alluded to the
11   fact that unadjusted numbers may have been used in
12   the meta-analysis.  So just to cover all possible
13   permutations, that's why unadjusted values are
14   included here.
15       Q   Well, you say in that paragraph that
16   with the adjusted data for the number of talc
17   applications per month actually showing a data --
18   showing data suggesting a positive dose-response.
19          What adjusted data from the number of
20   application -- talc applications per month --
21          MR. TISI:  Show her where she says --
22   BY MR. HEGARTY:
23       Q    -- suggest a positive dose-response?
24          MR. TISI:  Where is -- where are you
25   referring to, Counsel?

Page 298

1          MR. HEGARTY:  If you follow along, I was
2    at the page -- bottom of page 9.
3          MR. TISI:  Well, she is looking for it
4    too.  Bottom of page -- you're not going to tell
5    me?
6          MR. HEGARTY:  19.
7          MR. TISI:  Thank you.
8          THE WITNESS:  Oh, I see what you're
9    saying.  I see what you're saying.  I think that
10   should say unadjusted.
11   BY MR. HEGARTY:
12       Q   So that's another mistake in your
13   report?
14       A   I'm just checking.  (Peruses document.)
15   I think that's correct, I think it
16   should say "unadjusted."
17       Q   Okay.  Over on page 21 of your report,
18   in the third paragraph beginning "In his
19   deposition" -- do you see where I'm reading?
20       A   Yes.
21       Q   You again note that:  "The results for
22   frequency per month" -- this is at the end of the
23   paragraph -- "measure change appreciably,
24   including demonstrating increasing risk with
25   increasing exposure for the analysis using talc

April Zambelli-Weiner, Ph.D.

applications per month."

So is it your testimony that the numbers you generated demonstrate increasing risk with increasing exposure for talc applications per month?

A   I think I just -- I think I just answered that before.  Again, juxtaposing to the -- the data -- first of all, the data that they report in their -- in their study, which, by the way, is again not resemble indicated here.  I'm simply making the observation that there is a reversing of that trend.  And, you know, it's an interesting finding that using standard accepted statistical packages for meta-analysis, which one must wonder why they weren't used in the first place, that that does result in a different trend in terms of dose-response.  So if someone was going to take these data and use them in that way, that that trend is in fact reversed.

Q   The adjusted numbers don't show that, do they?

A   I think we just -- I think we just covered that.  I believe it's the unadjusted, yes.

Q   So are you saying it's proper in a paper to choose an unadjusted number to say it

demonstrates increasing risk with dose versus the adjusted number which doesn't?

A   Again, I think you're asking me an abstract question.  I explained why I included unadjusted here in this analysis.  If I was going to go about doing an analysis that I was going to put forward and -- and advocate for or publish, I would go through that process of deciding.

That was not my charge here.  That was not the process, and I've only -- you know, I've included unadjusted, as I said, because Dr. Muscat offered that perhaps that -- that describes or explains some of the discrepancies that we were seeing.

Q   Well, in an article of yours, have you -- when you've had both an adjusted and an unadjusted number, have you ever gone with the unadjusted number versus the adjusted number?

A   Sure.  Yes.

Q   So you -- it's proper methodology when you have an adjusted number and an unadjusted number to go with the unadjusted number?

A   Well, it's a contextual question that involves that research question and that data.  I mean, it's a question of is confounding an issue.

Is there a risk of bias due to residual confounding?  So that has to be -- that's a methodologic decision that involves, you know, expert analysis, expert judgment, and in some cases confounding is not a concern, and therefore the unadjusted may in fact be the appropriate number to use.

Q   Is that the appropriate number to use here?

MR. TISI:  Objection.

THE WITNESS:  Again, that wasn't my charge or my process.  So I'm -- I -- I can't answer that.  I told you why I was including that, and that's all I can say about it.

BY MR. HEGARTY:

Q   Did you do a trend analysis to try to show dose-response?

A   No.  Again, I was simply trying to replicate.  I was not doing an independent dose-response analysis.

Q   When you're doing a fixed effects analysis, is it proper to combine relative risk with odd ratio -- odds ratios?

A   Sure.  I mean, there are certain times where that would -- that would be appropriate.  I

mean, when the outcome is rare, the odds ratio approximates the relative risk.

Q   How about if the outcome is not rare. Is it proper to combine relative risk numbers with odds ratio numbers in doing a fixed effect analysis?

A   I think I'd have to review the question and review the studies, and -- and make that judgment.

Q   Over on page 21 under -- before Part 3, do you see the paragraph before -- before Part 3?

A   Yes.

Q   You make reference again to this data was asserted to the FDA in 2009.  Do you see where I'm reading?

A   Yes.

Q   The FDA did not report in their 2014 denial letter that there was an inverse dose-response, did they?

A   I don't recall exactly what they -- what they say.

MR. TISI:  Here you go.  Don't worry about that.

THE WITNESS:  Okay.

BY MR. HEGARTY:

April Zambelli-Weiner, Ph.D.

1      Q   Do you have Exhibit 12 there?
2          MR. TISI:  Oh, this is --
3          MR. HEGARTY:  Did you find it?
4          MR. TISI:  I'm looking for it.
5          MR. HEGARTY:  It wouldn't be the last
6   exhibit.
7          MR. TISI:  Yeah, it wasn't.  That's why
8   I'm looking for it.
9          THE WITNESS:  Can I just take a quick
10  break after -- after this question?
11         MR. HEGARTY:  Well, let's take a quick
12  break now so you can -- let's go off the record.
13         THE WITNESS:  Okay.  Thanks.
14         THE VIDEOGRAPHER:  The time is 11:36
15  a.m.  We're going off the record.
16         (Recess.)
17         THE VIDEOGRAPHER:  The time is 11:40
18  a.m., and we're back on the record.
19  BY MR. HEGARTY:
20      Q   Doctor, when we left off, I was going to
21  ask you about the -- the 2014 letter, but I want
22  to move on, so I'm not going to ask you questions
23  about that.
24      A   Okay.
25      Q   I want to next move to page 22 of your

1   report, the section entitled "Unsupported Claims
2   of Bias from Uncontrolled Confounding."
3          Do you see that page?
4      A   Page 22.  Yes.
5      Q   The first italicized paragraph says:
6   "Uncontrolled confounding may result in a spurious
7   positive association between talc and ovarian
8   cancer."
9          That's a true statement, correct?
10     A   It depends if you're asking me like
11  hypothetically or if you're asking me
12  specifically.
13     Q   Just as a general proposition.
14     A   I would say, as a general proposition,
15  uncontrolled confounding is a risk of bias to any
16  epidemiologic study.
17         With regard to the talc and ovarian
18  literature, I wasn't tasked with doing that
19  analysis, so I really can't offer an opinion as to
20  whether I think uncontrolled confounding is an
21  issue.
22     Q   Fair enough.
23         At the bottom of page 22, you make
24  reference to the study and say:  "The authors
25  provided no substantive evidence or discussion of

1   the plausible role of uncontrolled confounding in
2   their analysis or the larger evidence base."
3   Correct?
4      A   Correct.  You read that correctly.
5      Q   But if you look at pages 956 -- I'm
6   sorry, 958 and 959 of the study, the 2003 study --
7      A   958 -- 1958.
8      Q   At the very bottom of 958, carrying over
9   to 959, there they are analyzing whether weight,
10  body mass index is a potential confounding factor,
11  correct?
12     A   So, I'm sorry, just let me take a moment
13  to look at this.  (Peruses document.)
14         So I think -- I think that this
15  definitely is a very general discussion of some of
16  the -- you know, they say a number of factors are
17  known to influence ovarian cancer risk either
18  positively or negatively.
19         I'm just looking to see if this is part
20  of the discussion section, but -- no, it looks
21  like it's part of -- part of the results.
22         But that is not to me a substantive
23  discussion of -- or a substantive dealing of
24  confounding as it relates to, you know, this
25  particular research question.

1      Q   But they do -- and they are assessing
2   there whether there's an effect of confounding on
3   their result -- correct? -- in particular, on --
4   with regard to weight and body mass index,
5   correct?
6      A   If you want me to read this section,
7   I'll read it.
8      Q   Well, I guess the -- you make the next
9   statement in your report that says:  "Based upon
10  their description of their methods, it appears
11  they do not evaluate and/or discuss what the
12  important confounders are to the talc ovarian
13  cancer research question."
14         But in the part of the study I'm
15  referring to, they do talk about weight, body mass
16  index as a confounder, correct?
17     A   Well, again, I'm going to make a
18  distinction between -- you know, with the caveat
19  that I haven't read this -- this section and all
20  the context around it, yeah.
21         But what I can say is when you're doing
22  a meta-analysis or when you're doing an epi study,
23  the consideration of confounding really happens up
24  front.  And the point that I'm making here is
25  there's no consideration of -- in a detailed way

25 (Pages 303 to 306)

April Zambelli-Weiner, Ph.D.

1    that informs the methods of what they consider to
2    be the important confounders to this relationship
3    because -- to this particular research question,
4    because that would obviously inform the methods of
5    the meta-analysis.
6          They don't make any distinction in the
7    meta-analysis methods that we're aware of saying,
8    Well, you know, studies must have adjusted for
9    these factors, because these are strong, important
10   confounders in the relationship.  In fact, they
11   don't address it directly at all.
12         And when you actually get into the
13   tables of their paper, you actually see that there
14   are misrepresentations and sort of selective
15   choosing of risk estimates, some of which are only
16   age adjusted, when there are more fully adjusted
17   risk estimates.  So it really begs a lot of
18   questions, again, as to what the authors' position
19   on confounding really was at the beginning of
20   this -- of this study and analysis, and it appears
21   to not have informed the analysis in any direct
22   way that -- that is clear to us.  And that's the
23   point that I'm making.
24         Whether they happen to mention a few
25   risk factors for ovarian cancer in the tech --

1    excuse me, text of their paper, that doesn't meet
2    the bar.
3          Q    At the very bottom of page 22, the
4    carryover sentence, you say:  "They do not assess
5    the adequacy of control for confounding at the
6    individual study level."
7          Do you see where I'm reading?
8          A    Yes.
9          Q    So is it your testimony that if a
10   meta-analysis doesn't assess the adequacy of
11   control for confounding at the individual study
12   level for each of the studies in the
13   meta-analysis, the meta-analysis is invalid?
14         A    Well, again, I'm going to -- I'm going
15   to caveat this with, you know, when you are
16   evaluating something, you are eval-- a study, a
17   meta-analysis, you are evaluating the totality of
18   it.
19         And in this case, I'm -- it's even taken
20   to another level because the authors continually
21   rely upon this position and advocate for this
22   particular position that uncontrolled confounding
23   may explain this positive association.
24         So to try to answer your question, I'm
25   going to say, you know, it depends on the research

1    question, it depends on the study.  But I would
2    say generally that a meta-analysis should include
3    a qualitative review of the individual studies,
4    and that as part of that, if there are
5    epidemiologic studies, that would include a risk
6    of bias assessment, of which confounding is -- is
7    one risk of bias.
8          Q    And if in a given meta-analysis the
9    authors don't include a qualitative review of the
10   individual studies, as a general proposition, that
11   would render their study potentially invalid or --
12         MR. TISI:  Objection.
13   BY MR. HEGARTY:
14         Q    -- unreliable, correct?
15         MR. TISI:  Objection.
16         THE WITNESS:  I think again you're
17   asking me in the abstract, and I'm just going to
18   respond in the abstract that that is a general
19   process of a meta-analysis.  I mean to what extent
20   any particular -- your interpretation of
21   qualitative, my interpretation of qualitative, a
22   particular author's description of what they did
23   or did not do, I would have to evaluate that on
24   a -- on a case-by-case basis.
25         But I -- I am willing to say, and I

1    agree, that a review of the individual studies is
2    part -- one of the first parts of a meta-analysis.
3    BY MR. HEGARTY:
4          Q    Again, as a general proposition, would
5    you consider an error in a meta-analysis if the
6    authors did not do that?
7          MR. TISI:  Objection.
8          MS. PARFITT:  Objection.
9          THE WITNESS:  I would consider it a
10   concern, yes.  It would -- it would raise concern.
11   But, again, within -- I would have to see it --
12   how that's being presented.  How do I know that?
13   What are the methods?  You know, how has
14   confounding been addressed?  I think it's so
15   contextually specific that it's really hard to
16   answer that in the abstract.
17   BY MR. HEGARTY:
18         Q    Over on -- at the top of page 23, you
19   say in the bolded part that:  "The authors do not
20   provide any empirical evidence to support their
21   assertion that uncontrolled confounding may
22   explain the observed positive association between
23   talc exposure and ovarian cancer."
24         Do you see where I'm reading?
25         A    I do.

April Zambelli-Weiner, Ph.D.

Page 311

1      Q   When you say "empirical evidence," what
2   do you mean?
3      A   Oh, I'm sorry, I just coughed over your
4   question.
5      Q   When you say "empirical evidence," what
6   do you mean?
7      A   So empirical data, data from other
8   studies, data from their own sensitivity analyses,
9   demonstrating that, you know, there either is or
10  is not concern for a residual confounding.
11     Q   So as a general proposition, is it your
12  testimony that if a meta-analysis fails to include
13  empirical data with regard to uncontrolled
14  confounding, the paper is invalid and unreliable?
15         MR. TISI:  Objection.
16         THE WITNESS:  No.  I'm not going to
17  agree to that in the abstract.  I think again you
18  can't take this analysis out of context, and the
19  fact that the authors repeatedly assert to the
20  FDA, to the medical and scientific community, that
21  uncontrolled confounding may explain this positive
22  association.  I mean, it literally becomes a
23  mantra that almost takes on the feeling of -- of
24  fact, so this is repeatedly asserted.
25         And the point that I'm making is -- and

Page 312

1   we're still talking about the 2003 paper, as far
2   as from my understanding, is this mantra that is
3   repeated throughout the paper without any actual
4   data to support that notion.
5   BY MR. HEGARTY:
6      Q   So with regard to authors presenting
7   hypothesis, you would fault any author of a report
8   if they set forth a hypothesis that didn't -- that
9   wasn't supported by data, correct?
10         MR. TISI:  Objection.
11         THE WITNESS:  Not necessarily.  It
12  depends how it's couched.  It depends how it's
13  presented.  Again, that's why I said you can't
14  really take this out of the context of -- of this
15  analysis of why this is so important.
16         And, you know, I can't recall their
17  specific comments off the top of my head.  I'm
18  sure we could find them in their various --
19  various papers, but they're very definitive, very
20  assertive about this as an explanation for the --
21  the positive association that's observed.
22  BY MR. HEGARTY:
23     Q   Can you cite for me any authority that
24  says it's improper for authors in an article like
25  this to hypothesize the reasons of the results

Page 313

1   without providing data?
2      A   Well, what I can say to you as -- as a
3   peer reviewer, as someone who's been on both sides
4   of the peer review process, it is -- it's
5   certainly not improper to hypothesize.  Again, it
6   depends on how it's couched.
7         But what I will say is, as a general
8   rule, the conclusions must be supported with data.
9   So it's one thing to say something may cause
10  something or something may explain something or
11  this is a limitation that we weren't able to
12  explore fully.  You know, it depends on how that's
13  being presented.
14         But I think that I can say, again having
15  been on both sides of that process, that if you're
16  going to come out strong on a position about
17  confounding, if you're going to say, This is
18  explained by uncontrolled confounding, or we are
19  confident that uncontrolled confounding is not a
20  strong risk of bias, you're going to be asked to
21  back that up with real data.
22     Q   And what kind of real data would you
23  need to back that up?
24     A   I think, as I said, data from other
25  studies, or the authors could do their own

Page 314

1   sensitivity analyses around -- around that
2   particular issue.
3      Q   If you look at the next section at the
4   bottom of page 23, "Unsubstantiated Claims of
5   Selection Bias."  Do you see that section?
6      A   Yes.
7      Q   You make reference there to Section
8   860.7.  Correct?
9      A   Yes, that's correct.
10     Q   That section applies only to approval of
11  Class III medical devices, correct?
12     A   Yes.  That -- that is a section out of
13  the Medical Device Code, and I think I was simply
14  using that as an example of -- of guidance that's
15  out there for the scientific and regulatory
16  community.  And I think that above that, I also
17  cite some other -- other examples for the point
18  I'm trying to make, which is the conclusions need
19  to be substantiated with data -- by the data or
20  with data.  And I think that's the point I just
21  made --
22     Q   Well, can you cite --
23     A   -- previously.
24     Q   I'm sorry.
25         Can you cite for me any text or

April Zambelli-Weiner, Ph.D.

1 authority by any author that says the section you
2 quoted there applies to epidemiologic studies like
3 the 2003 study by Huncharek?
4       A   Again, I don't know that -- that's kind
5 of a strange question to me, but I think I just
6 explained why I -- why I cited that there.
7       Q   Well, that section doesn't apply to
8 cosmetics, correct?
9       A   Well, again, it's a general principle,
10 which I've supported with other cites.  So it was
11 just another example.
12      Q   Can you cite for me any epidemiologic
13 text or other authority that says anything similar
14 to this as related to epidemiologic studies?
15      A   It's entirely possible.  I can't quote,
16 you know, textbooks as I sit here right -- right
17 at this moment.
18      Q   If you stay on page 24, at the very top,
19 you criticize the 2003 paper for proposing an
20 explanation for the spurious association between
21 talc use and ovarian cancer, saying that the
22 authors provided no substantive evidence or
23 discussion to support this supposition.
24          Do you see where I'm reading?
25      A   I do.  One second, please.

1          One second.
2       Q   Do you see where I'm reading?
3       A   So you're at the top of page 24?
4       Q   Yes.
5       A   Yes.
6       Q   You later say that Huncharek went on to
7 admit in the 2009 response that there was no basis
8 for such an effect in the literature, correct?
9       A   Yes, I believe that's -- that's correct.
10      Q   So were they correct -- was Huncharek
11 correct in the 2009 response to FDA?
12      A   I -- I didn't evaluate the -- you know,
13 his -- his statement later.  So I think the point
14 that I'm making is -- again, we're in the 2003
15 paper, so within that context, they're offering up
16 this bias as an explanation for the positive
17 association, and within the context of that paper,
18 they don't provide any data to really support
19 that.
20      Q   In the paragraph beginning "The authors
21 also single out" -- do you see that paragraph?
22      A   Yes.
23      Q   You refer to the authors omitting
24 discussion about the treatment effect in the
25 hospital-based case-control studies, correct?

1       A   I'm just -- I'm rereading your question.
2 I think this is the section -- let me
3 just look at it quickly.
4          Right.  Right.  So this is -- this is I
5 think the section where I'm talking about the
6 imbalanced discussion around -- around this
7 particular issue.
8       Q   Well, are you aware of the possibility
9 of vaginal irritation and discharge post-ovarian
10 cancer surgery and treatment?
11      A   I would say generally, yes.
12      Q   And both of those conditions could
13 prompt talc use, correct?
14      A   Both of what conditions?
15      Q   Vaginal irritation and vaginal
16 discharge.
17      A   I'm sorry.  What was your question
18 again?
19      Q   Both of those conditions, vaginal
20 irritation and vaginal discharge, could prompt
21 talc use, correct?
22          MR. TISI:  Objection.
23          THE WITNESS:  Sure.  I mean, so could a
24 lot of other conditions as well.
25 BY MR. HEGARTY:

1       Q   Well, you're aware that Dr. Huncharek is
2 a radiation oncologist, correct?
3       A   I think you -- I think you mentioned
4 that before.  I'm not aware of his -- you know,
5 his specific background.
6       Q   So is there anything wrong with someone
7 with direct personal knowledge of a condition
8 post-treatment with making references to that
9 knowledge in an article like this?
10      A   I don't think that's the issue that I'm
11 making at all.  I think the issue that I'm making
12 is, you know, they raise this as a -- as a
13 possibility.  Nothing wrong with raising that as a
14 possibility as a hypothesis.  The point is they
15 don't substantiate it with any data.
16          They further then don't go on to discuss
17 the flip side of this issue, which is that the
18 hospital-based case-control studies, which, by the
19 way, are historically known to be at higher risk
20 of bias than population-based case-control
21 studies, may also be at risk of treatment bias
22 because of the nature of the controls in those
23 studies.
24          And when we're talking about
25 misrepresentations, you know, in the studies, in

April Zambelli-Weiner, Ph.D.

1  the two -- in the 2003 paper, the authors, if I'm
2  recalling correctly, make an assertion that the
3  rate of exposure in the control groups is actually
4  comparable between the population and
5  hospital-based case-control studies.  And my
6  inspection of those -- of some of those studies is
7  that that is not in fact true.  So in fact, there
8  is a possibility that the hospital-based
9  case-control studies may be at higher risk of bias
10  due to this issue than the population-based
11  case-control studies.
12         So what I'm detailing in this paragraph
13  is their imbalanced discussion of this issue,
14  which really drives at the results and the
15  interpretation of the population- versus
16  hospital-based case-control studies.
17    Q   Well, you say in this paragraph that the
18  controls with gastrointestinal cancers and skin
19  cancer, as well as other diseases -- you cite
20  hemorrhoids, urinary disease, skin disease --
21  could prompt short-term talc use.
22         You cite no substantiation for those
23  statements, do you?
24    A   Correct.  Here, I believe that's
25  correct.  But, again, I'm not proffering this out

1  as an example of this -- this explains the
2  positive association.  I'm not putting this
3  forward to the FDA and to the medical and
4  scientific community and saying, You know, this is
5  proof that this positive association is noncausal.
6         I'm simply raising here the issue, the
7  methodologic issue that the authors have failed to
8  have an imbalance -- or a balanced, excuse me,
9  discussion of this particular issue.
10    Q   Well, can you substantiate in any way by
11  citing to any authority that any of the conditions
12  you cite would prompt talc use?
13    A   I -- I don't know.  It might -- might be
14  possible.
15    Q   You say in the last paragraph before the
16  Conclusion section that -- again, the section
17  we're talking about that you're -- and you just
18  mentioned it before, that the authors failed to
19  present a balance -- or I think you said the
20  authors present an imbalanced discussion of the
21  potential impact with regard to hospital- versus
22  population-based studies, correct?
23    A   Correct.
24    Q   And what you're saying is that if an
25  author doesn't give equal time to both sides in a

1  publication, then their analysis is invalid and
2  unreliable?
3         MR. TISI:  Objection.
4         THE WITNESS:  No, that's -- that's not
5  what I'm saying.  I wouldn't characterize it that
6  way.
7         I think, you know, what I'm saying again
8  is that if you are going to put forward this --
9  this concept or this idea that this type of bias
10  is at play and can explain the observed positive
11  associations, that that requires support and that
12  requires a fulsome discussion.  I mean, it's well
13  known in the field of epidemiology that
14  hospital-based case-control studies are at a
15  higher risk of bias.
16         And by the way, going back to my
17  previous question whether that can be
18  substantiated or not, what I wrote there, the data
19  are the data, and the data in some of the studies
20  actually show that the control groups do have a
21  higher prevalence of talc exposure, the
22  hospital-based case-control studies, than some of
23  the population-based case-control studies.  So the
24  data actually bear out regardless of whether that
25  particular statement can be substantiated.

1  BY MR. HEGARTY:
2    Q   Cite for me any -- cite for me the
3  authority that says that hospital-based
4  case-control studies are at higher risk of bias.
5    A   Epi -- any epi textbook.
6    Q   Cite for me an epi textbook.
7    A   Rothman.
8    Q   Okay.  You said a moment ago that if you
9  are going to put forward this concept or this idea
10  that this type of bias is at play, it can explain
11  the observed positive associations that that
12  requires support.
13         The same would be true in any
14  publications or report where you're putting forth
15  any kind of concept, whether it's bias or anything
16  else from the epidemiologic studies, you have to
17  in that situation require support for what you're
18  saying, correct?
19         MR. TISI:  Objection.
20         THE WITNESS:  Again, I'm going to go
21  back to what I -- what I said previously and try
22  to repeat it accurately.  It really depends on the
23  context of which -- of what you're saying and how
24  you're saying it.
25         So, I mean, certainly in a peer-reviewed

April Zambelli-Weiner, Ph.D.

Page 323

1    publication, as I said before, it's kind of prime
2    real estate.  You can't address every possible
3    thing under the sun.  And so it depends on how
4    it's being proffered.  It's one thing to say, You
5    know what, this is a limitation of our study.  We
6    were unable to address this, or, you know, this is
7    a strength of our study.  Certainly those kinds of
8    qualitative discussions exist, and you can't
9    possibly provide data to support all of those.
10          But this is a very different situation.
11   These are two concepts that are being repeatedly
12   offered up over the period of a decade to a
13   regulatory agency, to the medical and scientific
14   community, as the reason -- some of the prime
15   reasons why this is not a causal association.
16   That's a very different situation.
17   BY MR. HEGARTY:
18       Q   What -- strike that.
19           Is it your contention that -- strike
20   that.
21           Is it improper in any analysis, whether
22   it's published or in a report, to include an
23   imbalanced discussion of a particular issue?
24           MR. TISI:  Objection.  Beyond the scope.
25           THE WITNESS:  Can you repeat that,

Page 324

1    please?
2    BY MR. HEGARTY:
3        Q   Sure.  Is it improper in any analysis,
4    whether it's published or in a report, to include
5    an imbalanced discussion of a particular issue,
6    only focusing on literature going a certain way
7    and not talking about literature going the other
8    way?
9            MR. TISI:  Objection.
10           THE WITNESS:  Well, I -- again, that's a
11   very broad question.  So I think it would depend
12   upon the nature of -- of the report, of the paper,
13   of the question, of the particular issue.  You
14   just can't kind of answer that in a vacuum.
15   That -- that's very difficult.
16   BY MR. HEGARTY:
17       Q   If you turn over to Section 6.2 of your
18   report, this section starts discussing the 2007
19   diaphragm paper, correct?
20       A   Correct.
21       Q   Do you have a copy of that in front of
22   you?
23       A   Yes, I do.
24       Q   And for purposes of the record, I'm
25   going to mark that paper as Exhibit 18.

Page 325

1            (Exhibit No. 18 was marked for
2    identification.)
3    BY MR. HEGARTY:
4        Q   If you turn over to page 26 in your
5    report, Table 3, please.
6        A   Yes.
7            MR. TISI:  You're -- the copy you're
8    marking has handwritten notes on it.  Is this --
9            MR. HEGARTY:  Let me see it.  Did I give
10   you one that -- it might have been one of mine.
11   Oh, it's on the -- I'll take it back.
12           MR. TISI:  It's on this one too.
13           MR. HEGARTY:  Oh, it's handwritten
14   notes?
15           MR. TISI:  It just says -- I mean, I
16   haven't gone through the paper, but right here
17   where the --
18           MR. HEGARTY:  Oh, okay.  Fine.
19           MR. TISI:  No, I just don't know if that
20   was intentional or not.
21   BY MR. HEGARTY:
22       Q   So we're focusing on your Table III on
23   page 26.
24       A   Okay.
25       Q   You claim that the -- strike that.

Page 326

1            How did the misreference to Richardson
2    affect the substantive results of this paper?
3        A   I'm just rereviewing for a moment.
4    (Peruses document.)
5            I think this is the -- you know, again,
6    the same answer for -- for this table as it was
7    for Table I in my report.  Which would be, you
8    know, anything that drives at the -- you know, a
9    clear articulation of the methods and a clear
10   understanding of what was done and the results, to
11   me is a substantive error.  Again, with the caveat
12   that these all exist on a backdrop of -- of other
13   errors.  You know, you can't really take a single
14   error in isolation.  It's -- it's a review of the
15   totality of the paper.
16       Q   Your next point in the table refers to
17   the difference between the text -- what the text
18   is reporting and what the table shows, correct?
19       A   Right.  Correct.  So -- I just want to
20   pull up the paper -- or the table real fast just
21   to make -- make the comment clear.
22           So this is a little bit of a compound
23   issue.  So, I mean, in the text they cite an odds
24   ratio of 0.6 for Booth.  The first issue is that
25   0.6 is associated with a different study, Ness.

April Zambelli-Weiner, Ph.D.

Page 327

1      But the second issue, which may be in
2 another row, but I -- I don't recall, is that then
3 in Table I, the adjusted odds ratio for Booth that
4 is reported, which is 0.75, actually does not
5 exist in Booth. So that --
6      Q   Well -- okay. Are you finished?
7      A   Sure.
8      Q   Well, your -- you say in your report
9 that in Table I, the lowest adjusted OR is 0.6,
10 correct? That's what you say in your report.
11     A   Correct. Right.
12     Q   That's not right, is it? The lowest
13 adjusted risk is from Harlow and Weiss, and that's
14 0.5, correct?
15     A   That's correct. So I guess -- I guess I
16 was referencing their statement, but their
17 statement is also incorrect in that aspect as
18 well. So, yes.
19     Q   Well, actually, in your report, you're
20 saying -- you drew out the number and said the
21 lowest number was 0.6, didn't you?
22     A   Again, referencing their range, so, you
23 know, in theory, they're both -- they're both
24 incorrect, yes.
25     Q   But your report is not correct, right?

Page 328

1      MR. TISI: Objection.
2      THE WITNESS: I think I just answered
3 that.
4 BY MR. HEGARTY:
5      Q   Well, is the -- is the lowest adjusted
6 OR, as you report in your report, 0.6?
7      MR. TISI: Objection.
8      THE WITNESS: No, I agree with you that
9 the lowest adjusted OR is 0.5, and just explained
10 that, you know, I was referencing their comment on
11 the range of -- of odds ratios, which is also
12 incorrect.
13 BY MR. HEGARTY:
14     Q   If you turn over to the next page,
15 page 27, the second cell down, how is the -- the
16 reversing of the descriptions of the Hartge and
17 Ness studies a substantive error in this paper?
18     A   Again, I'm sort of standing by my -- my
19 statements I've been giving you all morning, which
20 is, you know, an accurate description of the
21 methods is -- is paramount to a meta-analysis.
22 And I think for someone who's, you know, not
23 familiar with the literature, someone may apprise
24 these types of studies differently. And I -- it
25 is a substantive error as it relates to my

Page 329

1 definition of -- of a "substantive error."
2      Q   The next reference includes reporting --
3 or strike that.
4      The next reference refers to the
5 inclusion of Booth in the paper. Do you see where
6 I'm reading?
7      A   Are you in the third one down?
8      Q   The third one down.
9      A   Yes.
10     Q   Is it your -- your statement in your
11 report is that Booth should have never been
12 included in the analysis, correct?
13     MR. TISI: Objection.
14     THE WITNESS: I think that's one of the
15 comments that I'm making, and I think that we
16 could talk about that, because that's obviously
17 something that the authors bring up as well and
18 do -- do an analysis dropping -- dropping Booth.
19     But I think the other point which is
20 perhaps, you know, equally important is that this
21 particular adjusted odds ratio is not, you know,
22 what is in the original study. This is not
23 reported in the original study.
24 BY MR. HEGARTY:
25     Q   Did you do the analysis excluding Booth?

Page 330

1      A   No, I don't believe I did.
2      Q   Well, what would have been the effect of
3 the results if Booth had not been included?
4      A   Again, you know, same answer as -- as
5 we've been doing all morning. I didn't do that,
6 it wasn't my charge, and really we shouldn't be in
7 a position to have to -- to wonder and ask that
8 question.
9      Q   Well, you're the one, Doctor, who
10 claim -- has been claiming that this had an
11 improper -- or that this influenced regulators and
12 other authorities in an improper way.
13     What would the numbers have been if they
14 had done the proper way?
15     A   It's -- it's not my job. I mean, that's
16 not -- that's a whole project unto itself. I
17 mean, you would have to strip it back and go all
18 the way back to the beginning, and that just
19 wasn't what I was tasked with doing. I mean, I
20 think the issue is -- is exactly what these papers
21 are and how they were -- how they were put
22 forward, as you just said.
23     Q   The next reference again to Harlow and
24 Weiss, did you run the analysis excluding Harlow
25 and Weiss?

April Zambelli-Weiner, Ph.D.

Page 331

1          MR. TISI:  Well, the next reference is
2  Harlow and the next --
3          MR. HEGARTY:  I'm sorry.
4          MR. TISI:  Are you skipping two cells
5  down?
6          MR. HEGARTY:  Yeah.  Let me go back.
7  BY MR. HEGARTY:
8      Q   The next reference is to Harlow.  Did
9  you run the analysis without including Harlow?
10     A   The same answer.
11     Q   No?
12     A   No, for the reasons I just -- I just
13  described.
14     Q   Well, what effect did it have on the
15  numbers reported in the study by including Harlow?
16     A   Same answer.  Same answer as before.
17     Q   Which is?
18     A   Which is, again, not my charge, didn't
19  do it, and same answer as before.
20     Q   The next point as to Harlow and Weiss,
21  did you run the analysis without including Harlow
22  and Weiss?
23     A   No.  Same answer as before.
24     Q   What would have been the effect on the
25  numbers reported or the conclusions drawn if

Page 332

1  Harlow and Weiss had not been included?
2      A   I can't answer that because I didn't do
3  that.
4      Q   Over on page 29, Table IV, you report on
5  your attempted -- attempt at replication of the
6  numbers from the 2007 paper, correct?
7      A   Correct.
8      Q   In all your efforts, all the analyses
9  you did, you calculated an odds ratio each time
10  less than 1, correct?
11     A   That is correct.
12     Q   Using the fixed effect model, you showed
13  a statistically significant odds ratio of 0.74,
14  which would be a protective effect against ovarian
15  cancer, correct?
16         MR. TISI:  Objection.
17         THE WITNESS:  Well, you're -- so I'm
18  going to answer that to the best of my ability, by
19  saying we haven't established the validity of this
20  analysis at face value.  So I'm not agreeing with
21  that finding that I would draw that conclusion
22  from it.
23         But I can simply tell you that based on
24  my attempted replication of their analysis, that
25  is the result.  So I can -- I can definitely agree

Page 333

1  to that.
2  BY MR. HEGARTY:
3      Q   Well, your odds ratios are actually
4  lower than the 2007 article reported, correct?
5      A   Again, the point -- the point of this
6  table, I'm not endorsing this analysis.  I'm not
7  endorsing this study.  So I wouldn't interpret it
8  that way.  The only conclusion that I would draw
9  from this table is that their main pooled analysis
10  cannot be replicated.
11     Q   Going back to my question, though, your
12  odds ratios were actually lower than what the 2007
13  article reported, correct?
14     A   That's correct.
15     Q   And your odds ratios support the
16  conclusions reached in the 2007 article, correct?
17         MR. TISI:  Objection.  Misstates.
18         THE WITNESS:  No, I -- I wouldn't -- I
19  wouldn't agree with that.  Again, I -- I'm not
20  endorsing this analysis.  I think there's a lot of
21  issues with this paper.  You're sort of picking
22  out one, and I -- I wouldn't agree to that, no.
23  BY MR. HEGARTY:
24     Q   Well, an odds ratio of 0.74 would
25  suggest no association between talc-dusted

Page 334

1  diaphragms and ovarian cancer, correct?
2      A   Well, in a vacuum, if you're just -- if
3  you're just taking an odds ratio and a confidence
4  interval and saying how do you interpret this,
5  that is true.  But I think it's important to
6  remember that there are errors in this data, and
7  in fact, you know, if I'm recalling correctly, one
8  really important error where, you know, the
9  confidence interval and the point estimate didn't
10  even make sense.  So you're -- you're -- this is
11  based on a flat analysis.  This was just an
12  attempt to replicate.
13     Q   Did you review the Penninkilampi study?
14     A   I -- I don't recall if I reviewed that
15  study at some point.
16         MR. HEGARTY:  I'm going to mark as
17  Exhibit 19 the Penninkilampi study.
18         (Exhibit No. 19 was marked for
19  identification.)
20         MR. TISI:  Just object.  Outside --
21         THE WITNESS:  Would this --
22         MR. TISI:  Object.  Outside the scope.
23         THE WITNESS:  Would this be another good
24  time to -- if we're taking a shift, just to take a
25  quick bathroom break?

32 (Pages 331 to 334)

April Zambelli-Weiner, Ph.D.

Page 335

1      MR. HEGARTY: Sure.
2      THE WITNESS: Okay. Thanks.
3      MR. HEGARTY: Go off the record.
4      THE VIDEOGRAPHER: The time is 12:16
5   p.m. We're going off the record.
6      (Lunch recess.)
7      THE VIDEOGRAPHER: The time is 1:07 p.m.
8   and we're back on the record.
9   BY MR. HEGARTY:
10     Q   Doctor, when I left off, we were going
11  to look at the Penninkilampi study, but before I
12  get there, I wanted to take a step back real
13  quick.
14        With regard to the 2003 and 2007 studies
15  you talk about in your report, those studies are
16  meta-analyses of case-control studies, correct?
17     A   I don't believe they're limited to
18  case-control studies. I --
19     Q   Well, the --
20     A   I'd have to go back and look.
21     Q   Well, the 2007 diaphragm study looked at
22  case-control studies, correct?
23     A   Could we look at it?
24     Q   Well, what other kind of study could
25  they look at?

Page 336

1      A   Cohort study.
2      Q   Okay. Well, they -- they didn't -- you
3   do agree they did look at case-control studies,
4   correct?
5      A   Correct.
6      Q   And case-control studies are subject to
7   many biases, correct?
8      A   I don't think I'd agree with your
9   characterization of that just in the abstract. I
10  think I would agree that all study designs have
11  strengths and limitations.
12        MR. HEGARTY: I'll mark this as Exhibit
13  20.
14        (Exhibit No. 20 was marked for
15        identification.)
16        MR. HEGARTY: I'm sorry. You need the
17  copy.
18        MR. TISI: Thanks.
19  BY MR. HEGARTY:
20     Q   This is a copy of a PowerPoint that you
21  prepared; isn't that correct, Doctor?
22     A   I participated in this. I don't recall
23  who prepared the PowerPoint.
24     Q   Well, if you look over several pages in,
25  you see your picture, correct?

Page 337

1      A   That's correct, yes.
2      Q   And you presented this with --
3      A   This was a presentation to --
4      Q   -- John Clark?
5      A   -- to defense firms with a panel. Yes,
6   correct.
7      Q   You presented this with John Clark,
8   correct?
9      A   He was one of the presenters, yes.
10     Q   And over on several pages into it, if
11  you find the page that says "Strengths and
12  Limitations of Observational Studies."
13     A   I'm sorry. Where are you?
14     Q   Let me see your copy.
15        Do you see where I'm pointing now that
16  says, "Strengths and Limitations of Observational
17  Studies"?
18     A   Yes.
19        MR. TISI: I'm sorry, what page number
20  are you on here?
21        MR. HEGARTY: There's not a page number.
22  BY MR. HEGARTY:
23     Q   One of the limitations is, is subject to
24  many biases. Do you agree with that statement?
25     A   I would say generally again that

Page 338

1   observational studies juxtaposed to RCTs are at
2   risk of bias, and that's what an analysis of
3   internal validity is.
4      Q   But did you prepare this slide?
5      A   I don't recall who prepared the slide.
6      Q   You prepared -- you were part of this
7   presentation, though, correct?
8      A   I was, correct.
9      Q   And you participated in the preparation
10  of this slide deck, correct?
11     A   I don't recall.
12     Q   So is it your testimony that you can't
13  say that observational studies are subject to many
14  biases?
15     A   I think I just answered your question
16  about that.
17     Q   It's a true statement, though, correct?
18     A   I think I just answered it.
19     Q   What is the answer?
20     A   I think I said observational studies
21  juxtaposed to RCTs are at risk of bias.
22     Q   You don't make that limitation, though,
23  in this slide, do you?
24     A   I don't remember --
25     Q   There's no reference to RTC studies, is

33 (Pages 335 to 338)

April Zambelli-Weiner, Ph.D.

Page 339

1    there?
2         MR. TISI:  You're going to have to let
3    her finish, Mark.
4         MR. HEGARTY:  I wasn't finished with my
5    question.
6         MR. TISI:  Okay.  Well, then --
7         THE WITNESS:  My apologies.  Go ahead.
8         MR. TISI:  -- go ahead.
9    BY MR. HEGARTY:
10        Q    There is no reference to RCT studies in
11   this slide, correct?
12        A    Again, I'm just going to say I haven't
13   seen this in a long time.  I don't remember the
14   context of these slides.  On this particular
15   slide, you're correct, there's no -- there's no
16   mention of RCTs.
17        Q    Case-control studies or observational
18   studies, correct?
19        A    They are one type of observational
20   study.
21        Q    And you also say:  "Observational
22   studies are -- have limited control over
23   composition of the control groups."
24             That's correct, isn't it?
25        A    I would say, again, having not looked at

Page 340

1    this in a long time -- well, actually, now looking
2    up above two slides and seeing clinical trials, I
3    can say for certain that this is really being
4    juxtaposed to RCTs, so discussing the differences
5    between RCTs and observational studies.
6         Q    Doctor, is it a true statement that
7    observational studies have limited control over
8    composition of the control groups?
9         A    I would say that I would agree with that
10   as a limitation juxtaposed to RCTs.
11        Q    Is it true that observational studies
12   have a limitation of standardization of exposures
13   and outcome varies?
14             Let me restate it that the -- for
15   observational studies, standardization of exposure
16   and outcomes vary, correct?
17             MR. TISI:  Let me place an objection.
18             And if you need to kind of refresh
19   yourself, you haven't seen this for a while, to
20   realize the context, feel free to look at the
21   document.
22             THE WITNESS:  Sure.  I'm sorry, can you
23   repeat --
24   BY MR. HEGARTY:
25        Q    Do you agree with that third bullet

Page 341

1    point?
2         A    Again, I think without -- without
3    refreshing on this, I'm going to agree that you
4    read that correctly, and I'm going to agree that
5    it appears that what we're doing is juxtaposing
6    clinical trials with observational studies.  But I
7    haven't looked at this in a very long time.
8         Q    And observational studies, as you say,
9    data more likely -- is more likely to be
10   incomplete and poorer quality, correct?
11        A    That's -- that's what's on the slide.
12        Q    That's a true statement, though,
13   correct?
14        A    I would say again generally, not looking
15   at the whole context of this, juxtaposed to RCTs,
16   that is -- that is probably an accurate statement.
17        Q    If you'd turn to the Penninkilampi study
18   that we had marked as Exhibit 19.
19             First of all, have you ever read this
20   study?
21        A    I don't recall.
22        Q    Are you able to say one way or the
23   other?
24        A    No.
25        Q    If you look over on page -- on page 44

Page 342

1    of this study.
2         MR. TISI:  Well, if you need to review
3    it, and this is -- you've never read it before or
4    you have -- feel free to do it.  I'm going to
5    object to any questions about Penninkilampi as
6    being beyond the scope.
7             THE WITNESS:  (Perusing document.)
8    BY MR. HEGARTY:
9         Q    Do you see in Table 1 --
10            MR. TISI:  Well, no.  She's reading it.
11   She's looking at it.
12            MR. HEGARTY:  Well, I haven't asked a
13   question.  I just --
14            MR. TISI:  Well, but you're about to ask
15   a question about the study --
16            MR. HEGARTY:  Then we're going to go off
17   the record.
18            MR. TISI:  No, we're not going to go off
19   the record.  It's not within the scope of her
20   report.  It's not cited, nothing.  So if you're
21   going to ask her questions about something --
22   questions that are outside the scope of her
23   report, and you give her a study and she's never
24   read it before, she's going to read it.
25            MR. HEGARTY:  Well, we're not going to

34 (Pages 339 to 342)

April Zambelli-Weiner, Ph.D.

---

Page 343

1  sit here while she reads it.
2          MR. TISI:  Well, then, don't ask her --
3          MR. HEGARTY:  Let's go off the record.
4          MR. TISI:  No, we're not going to go off
5  the record.  We will not go off the record, and
6  we'll call the judge -- Judge Walsh if you want
7  to.
8          MR. HEGARTY:  Okay.  Well, let's call
9  him.
10         MR. TISI:  Let's go.
11         MR. HEGARTY:  Off the record.
12         MR. LOCKE:  Yeah, let's go off the
13 record while we get that set up.
14         THE VIDEOGRAPHER:  The time is 1:13 p.m.
15 We're going off the record.
16         (A discussion was held off the record.)
17         THE VIDEOGRAPHER:  The time is
18 1:22 p.m., and we're back on the record.
19 BY MR. HEGARTY:
20     Q   Doctor, we -- we were going to talk
21 about Penninkilampi.  I'm going to table that
22 exhibit for right now, and I'm going to move on to
23 another part of your report.
24         If you would turn to page 36 of your
25 report, the section "PCPC 2009 Response."  Do you

---

Page 344

1  see that section?
2      A   Yes, I do.
3      Q   This is your analysis of the 2009
4  response to the Citizen Petition, correct?
5      A   Yes, that's correct.
6      Q   I'm going to mark as Exhibit 21 a copy
7  of that response.
8          MR. TISI:  Thank you.
9          (Exhibit No. 21 was marked for
10         identification.)
11 BY MR. HEGARTY:
12     Q   Do you see the -- see what I marked as
13 Exhibit 21?
14     A   Yes.
15     Q   And is that the document you reviewed
16 for purposes of this part of your report?
17     A   Yes, I believe so.
18     Q   Over on page 37 of your report, in the
19 table included there, Table VI, you make reference
20 to statements that the authors of the response
21 made about the Chang 1997 study, correct?
22     A   Correct.
23         MR. HEGARTY:  I'm going to mark as
24 Exhibit 22 the Chang study that is referenced in
25 your table.

---

Page 345

1          (Exhibit No. 22 was marked for
2          identification.)
3  BY MR. HEGARTY:
4      Q   Is that the Chang study that's
5  referenced in your table?
6      A   Yes, I believe so.  Let me just check.
7  (Peruses document.)
8          Yes.
9      Q   If you look over on Table 2 of the Chang
10 study, Exhibit 22, that is the dose-response data
11 reported in the study, correct?
12     A   Can I just have a minute to look at
13 this?  (Peruses document.)
14         So I would say there is dose-response
15 data reported in Table 2 of the Chang study, but
16 I'm not certain that's the only dose-response data
17 that's in the paper.
18     Q   Well, I -- I'm focusing on the dose-
19 response data in Table number 2.
20     A   Okay.
21     Q   The data for after-bath use shows
22 decreasing odds ratios as dose increases, correct?
23     A   I'm sorry, after bath talc use, is that
24 what you said?
25     Q   Yes.

---

Page 346

1      A   That -- that's correct, yes.
2      Q   The authors then say in the response as
3  you note that that data suggests an inverse
4  dose-response.
5          How is that statement wrong based on the
6  data from Table 2 in the Chang study?
7      A   Well, again, you know, I think this is
8  a -- a broader issue of the discussion of
9  dose-response.  As I indicated, this is not the
10 only dose-response data in -- in the Chang study.
11 And I think that this really drives at the lack of
12 a fulsome discussion of the reasons why one might
13 not observe a dose-response.  I think that's an
14 incomplete representation of the authors' study
15 and the authors' data, and really drives at one of
16 the very important issues in dose-response
17 analyses, which is taking a quantitative variable
18 and reducing it into arbitrary categories.
19         And so a very important piece of data
20 from the Chang study was ignored, which is the
21 fact that when they looked at these variables
22 quantitatively, they did see a dose-response
23 increasing risk with increasing years of -- now
24 that's years of talc exposure.  So just to be --
25 just to be accurate, I want to be sure that I'm

---

April Zambelli-Weiner, Ph.D.

1    being accurate with -- with what I have in my
2    report.
3        Q   So how is it wrong to say as the
4    response does that the data suggests an inverse
5    dose-response?  What's inaccurate about that
6    statement?
7        A   It's misleading.  It's a mis- -- it's a
8    -- misleading and non-wholistic, and in my -- and
9    in my opinion, not a responsible, fulsome
10   discussion of dose-response, both of dose-response
11   at large.
12       And if you're going to advocate in the
13   way that these authors and PCPC advocated for lack
14   of dose-response as a key reason there's not a
15   causal relationship, then I feel there's a
16   scientific obligation to provide a fulsome
17   discussion of that, which the authors do not do.
18   They ignore the data that does not line up with
19   their -- with their opinion, and they don't talk
20   about the reasons why one might not observe a
21   dose-response, and the reasons why one might
22   observe an inverse dose-response.  Because there
23   are actually scientifically defensible reasons why
24   you might observe an inverse dose-response in a
25   causal relationship.

1        Q   Did you do that analysis for the Chang
2    study?
3        A   I was not charged with doing that
4    analysis.  So, again, I am critically reviewing
5    the Huncharek and Muscat papers, you know, as they
6    were presented and evolved over time, and
7    advocated to FDA and to the medical and scientific
8    community.
9        Q   They say in that -- you say in that
10   table that Huncharek and Muscat say they
11   acknowledge that the lack of dose-response needs
12   clarification.
13       That's a true statement from the Chang
14   study, correct?
15       A   Well, I -- I'd have to read --
16       Q   Well, look at the conclusion in the very
17   first -- on the very first page of the Chang
18   study.  And I'll read it for purposes of the
19   record.
20       The conclusion says --
21       A   Can you tell me where you are?  I'm
22   sorry, excuse me.
23       Q   The very first page.  The conclusion
24   says: "This investigation supports previous
25   contentions that exposure to talc may increase

1    risk of ovarian carcinoma.  Questionable trends in
2    duration and frequency of exposure suggest that
3    further studies may be needed to clarify the role
4    of talc and the etiology of this disease."
5        So how is it wrong to say they
6    acknowledge that a lack of a dose-response needs
7    clarification?
8        A   I think I just explained my -- my issue
9    with their treatment of this paper.
10       Q   But how is it wrong?
11       A   What's wrong is the incomplete and
12   unacknowledged -- the title of the -- of the table
13   is "Unacknowledged Positive Dose-Response Data."
14   That's the title of the table.  So that's the
15   point that I'm illustrating and calling out here
16   is that they did not acknowledge the positive
17   dose-response data that was observed in the study.
18       Q   Was it your testimony that scientists
19   are not allowed in studies to look at other papers
20   and state any disagreements that they have with
21   the authors?
22       A   Can you repeat that, please?
23       Q   Is it your testimony that in reviewing
24   another author's paper that it's improper to draw
25   your own conclusions and report those own

1    conclusions in your paper?
2        A   I'm certainly not saying that it's wrong
3    for people to disagree, but I -- as -- as someone
4    who is in the business of designing and
5    implementing studies that get submitted to FDA, I
6    can say that that warrants a fulsome and complete
7    and accurate discussion of the issue if you are
8    going to put forward this lack of dose-response as
9    a primary reason why you believe there's not a
10   causal association.  I feel very strongly about
11   that.
12       Q   And if somebody takes the opposite view
13   that there is a dose-response, you would also take
14   issue if they failed to support that contention
15   with a fulsome and complete and accurate
16   discussion, correct?
17       MR. TISI:  Objection.
18       THE WITNESS:  Again, you're taking --
19   you're sort of taking my statement a little bit
20   out of context, because what happens in a
21   particular manuscript depends on the context, what
22   happens in a particular manuscript or whatever the
23   forum is for that discussion.
24       The point here is, and I think we're in
25   the section -- yeah, we are -- we're in the

April Zambelli-Weiner, Ph.D.

Page 351

1    section on the PCPC report -- this was not a
2    manuscript that was restricted in word count.
3    This is a report in which they had the opportunity
4    to provide as much detail, as much of a fulsome
5    discussion as was necessary to shed light on
6    these very important issues, and they did not do
7    that.
8    BY MR. HEGARTY:
9        Q   So in any report where you're not
10   limited by space or word count, if you fail to
11   provide that fulsome discussion in order to
12   support a proposition that you're making, then you
13   would take issue with that, correct?
14       MR. TISI:  Objection.
15       THE WITNESS:  Again, I'm going to
16   disagree with your blanket characterization, and
17   say, you know, I can comment on this particular --
18   these particular studies, this particular context,
19   and the submission of this data and the posturing
20   of the data to the FDA.  That's what I'm
21   commenting on.
22       There's all kinds of contexts and
23   reasons and reports that get written for various
24   purposes.  So that's just an overly broad question
25   that I really can't answer.  I -- I provided you

Page 352

1    with my opinion and basis for this table.
2    BY MR. HEGARTY:
3        Q   The next comment you make in that table
4    is as to Harlow 1992, correct?
5        A   Yes.
6        Q   And you say that Huncharek and Muscat
7    provided no discussion of Harlow 1992, correct?
8        A   As far as I can recall, that's -- that's
9    correct.
10       Q   Did you read their response?
11       A   I'm sorry?
12       Q   The two thousand -- did you read the
13   2009 response?
14       A   Yes, I did.
15       Q   Did you see that in the first part of
16   the 2009 response, that they addressed each of the
17   12 references that were included in the PCPC
18   response?  Do you understand that?
19       I'm sorry, that were in the --
20       A   Would you like to point to where --
21       Q   -- that were in the Citizen Petition.
22       Do you understand that the first part of
23   the response was to address the 12 studies that
24   were included in the Citizen Petition?  Do you
25   understand that?

Page 353

1        A   I do.
2        Q   Okay.
3        A   Would you like to point me to a
4    particular area?
5        Q   Then if you turn over to page -- first
6    of all, Harlow wasn't included in those 12 studies
7    that the Citizen Petition included in its
8    submission to FDA, was it?
9        A   I -- I don't recall specifically.
10       Q   Well, you had -- do you have the exhibit
11   for the Citizen Petition in front of you?
12       A   Let me find it.
13       Q   That's Exhibit 13.
14       A   Yes.
15       Q   Is Harlow listed as one of the
16   authorities?
17       A   Does not appear to be, no.
18       Q   So it would not be proper to include a
19   discussion about Harlow in the first part where
20   they say they're only going to address the 12
21   studies cited in the Citizen Petition, correct?
22       MR. TISI:  Objection.
23       THE WITNESS:  I don't necessarily agree
24   with that, no.
25   BY MR. HEGARTY:

Page 354

1        Q   So you think it's -- where they're
2    saying their defining their analysis to the 12
3    authorities cited in the Citizen Petition, that
4    they should ignore that and then just start adding
5    other studies.  Is that what you're saying?
6        A   Well, if they're specifically stating,
7    In this section we're only going to do those 12
8    studies, okay, fine.  I'm not necessarily
9    commenting on that.  I'm commenting on the -- on
10   the submission as a whole, and particularly how
11   dose-response is dealt with in their response.
12       Q   Well, turn the -- turn to page 21 of
13   your -- of the response.  In the section Part 4,
14   "Talc and Ovarian Cancer Risk," do you see that
15   section?
16       A   Yes, I do.
17       Q   The next section, "Introduction," it
18   says:  "Above we reviewed the literature citations
19   including the" --
20       THE REPORTER:  Excuse me.  Can you
21   please start over.
22   BY MR. HEGARTY:
23       Q   "Above we reviewed the literature
24   citations, including the petition of the FDA by
25   I. Epstein, et al."

37 (Pages 351 to 354)

April Zambelli-Weiner, Ph.D.

Page 355

```
1           Do you see where I'm reading?
2       A   Yes.
3       Q   That did not include Harlow, did it?
4       A   Well, I'm taking your word for it. I
5   haven't gone back and looked at this, so I'll --
6   I'll assume your -- your premise.
7       Q   Well, you just looked at the Citizen
8   Petition. It didn't include Harlow, did it?
9       A   Right, but now we're looking at the PCPC
10  report.
11      Q   The next sentence says: "The petition
12  cites similar relevant literature published since
13  1995."
14          Do you see that?
15      A   Yes.
16      Q   So they're limiting their database
17  search to post-1995 studies thereafter, right?
18          MR. TISI: Well, why don't you read the
19  paragraph.
20          THE WITNESS: Let me just take a moment
21  (Peruses document.)
22          Okay. So --
23  BY MR. HEGARTY:
24      Q   So if they did limit their search
25  thereafter to post-1995 literature, that would not
```

Page 356

```
1   include the 1992 Harlow study, correct?
2       A   Well, I'm not certain. I mean they say:
3   "We searched electronic databases in order to
4   determine if other citations exist that were not
5   cited by Epstein or Huncharek." So they don't
6   really time limit that.
7       Q   Well, but Huncharek did cite to the 1992
8   Harlow study, didn't it?
9       A   I believe so. You're bouncing around a
10  lot, so I'm just trying to keep up here.
11      Q   Well, Doctor, you wrote the report and
12  you should be an expert on your report.
13          MR. TISI: Oh, come on, Counsel, that's
14  unfair. You're peppering her with questions, and
15  she needs to go back and see what she's got.
16          MR. HEGARTY: Well, the objection --
17          MR. TISI: I mean, well, that was a
18  snarky comment, so just ask her questions.
19          MR. HEGARTY: Well, I think what's being
20  done here is running out my time.
21          MR. TISI: She's not running out the
22  time. You're asking her silly questions.
23          MR. HEGARTY: Yes, she is.
24          MR. TISI: Go ahead.
25  BY MR. HEGARTY:
```

Page 357

```
1       Q   Didn't the --
2       A   It did.
3       Q   -- 2003 meta-analysis include the Harlow
4   study?
5       A   Yes, it did.
6       Q   So what is wrong with the way they laid
7   this out in not including the Harlow study from
8   what they said they did?
9       A   Again, this is my expert opinion. I
10  am -- I am standing by it, that if you are
11  representing a review of a body of evidence to
12  FDA, you should be fulsome in that -- in that
13  representation. And I think that Harlow should
14  have been included.
15      Q   You say: "Huncharek and Muscat provided
16  no discussion of Harlow 1992."
17          Here they're incorporating what they
18  included in their Huncharek paper. How is that no
19  discussion?
20          MR. TISI: Objection.
21          THE WITNESS: Again, I'm just going to
22  refer you back and -- you know, I'm trying to
23  answer your questions, but refer you back to the
24  table that, to my knowledge, whether in the PCPC
25  report or otherwise, there is no discussion of the
```

Page 358

```
1   positive dose-response data that exists within
2   this evidence base, and there are two examples of
3   that.
4   BY MR. HEGARTY:
5       Q   Well, that's not true either because
6   they incorporated into their paper the 2003
7   meta-analysis, correct?
8       A   They incorporate the Harlow paper, but
9   that's different than what I'm saying.
10      Q   Well, they do make reference to papers
11  that you contend show a positive dose-response by
12  referring to the 2003 meta-analysis, correct?
13          MR. TISI: Objection.
14          THE WITNESS: We're talking apples and
15  oranges. That's not what I'm referring to.
16  BY MR. HEGARTY:
17      Q   Now, in page -- again, on page 37 under
18  your table, you make statements about what they
19  should have included about dose-response,
20  including positive dose-response data described in
21  individual studies. You say that, correct?
22      A   I'm sorry, where are you?
23      Q   In the paragraph below the table,
24  Table VI.
25      A   Okay.
```

April Zambelli-Weiner, Ph.D.

Page 359

1      Q   You say: "The authors do not report the
2   positive dose-response data described in the
3   individual epidemiologic studies." Correct?
4      A   Correct.
5      Q   And you take issue with that?
6      A   That's correct.
7      Q   You say that it's wrong for them not to
8   do that, correct?
9          MR. TISI:  Objection.
10         THE WITNESS:  Well, I think I'll repeat
11  again what -- what I said in prior answers, which
12  is in advocating such a strong position to FDA on
13  dose-response, dose-response as a key tenet of a
14  causal assessment, there's not a fulsome
15  discussion of dose-response.
16  BY MR. HEGARTY:
17     Q   Where is it defined in the medical
18  literature what constitutes a strong position in a
19  paper?  That's your subjective take, correct?
20         MR. TISI:  Objection.
21         THE WITNESS:  Again, as an
22  epidemiologist doing this kind of work in the
23  business of submitting -- you know, helping
24  clients submit things to FDA, I would not do this.
25  I would not consider this an appropriate and

Page 360

1   fulsome discussion of an important issue in a
2   causation analysis.  That's my opinion.
3   BY MR. HEGARTY:
4      Q   Cite me a published authority that --
5   that supports that opinion.
6          MR. TISI:  Objection.
7          THE WITNESS:  I'm not even sure what
8   you're asking me.
9   BY MR. HEGARTY:
10     Q   Cite me a published authority that
11  defines what it -- what it takes in a paper to be
12  a strong position.  That's your subjective view,
13  correct?
14     A   Well, I --
15         MR. TISI:  Objection.
16         THE WITNESS:  I think the repeated
17  statements, and we could -- we could certainly,
18  you know, if you wanted to spend the time, go
19  through all of them and pull them out where they
20  complete -- sorry, repeatedly rely upon the
21  assertion that there's no evidence of a
22  dose-response, that an inverse dose-response is
23  evidence against a causal assessment.  They're
24  clearly arguing for that position.  That's clearly
25  the position that they're taking and advocating.

Page 361

1   BY MR. HEGARTY:
2      Q   So you would fault an author of a report
3   if they reported on positive dose-response data
4   but did not give equal time to those studies that
5   didn't find a dose-response, correct?
6          MR. TISI:  Objection.
7          THE WITNESS:  Again, it's -- I would say
8   it's contextually dependent.
9   BY MR. HEGARTY:
10     Q   Well --
11     A   You're asking a very just general
12  broad question.
13     Q   You're -- you're supposedly the expert.
14  If somebody in a report is advocating that, based
15  on the data in the ovarian cancer case-control
16  studies, there is a dose-response, you would fault
17  that author if they didn't give equal time to the
18  data that didn't show a dose-response, correct?
19         MR. TISI:  Objection.
20         THE WITNESS:  No.  Not -- I'm sorry.
21         MR. TISI:  Objection.
22         THE WITNESS:  No, not necessarily, and I
23  think you're -- you're mischaracterizing or
24  misunderstanding my -- my position.
25  BY MR. HEGARTY:

Page 362

1      Q   So you would think in some instances if
2   an author advocates that there is a dose-response,
3   and they ignored data that didn't show a
4   dose-response, that's okay?
5          MR. TISI:  Objection.
6          THE WITNESS:  Again, I think I said it's
7   contextually dependent.  It's dependent upon the
8   body of literature.  It's dependent upon what --
9   you know, there's a tenet in epidemiology that you
10  can't prove the null hypothesis.  So even the
11  concept of data against a dose-response is sort of
12  erroneous.
13         So, again, I'm just going to say
14  generally that it would be contextually dependent
15  on what that data was and how it was treated, and
16  I would have to make that evaluation on a case-by-
17  case basis.
18  BY MR. HEGARTY:
19     Q   Is there data in the ovarian cancer
20  literature against a dose-response?
21     A   That's a very vague question, and, you
22  know, I probably should have started with this way
23  back when we started talking about dose-response
24  that I'm just taking the assumption that you're
25  talking about a linear dose-response because there

April Zambelli-Weiner, Ph.D.

Page 363

1    are a lot of different types of dose-response --
2    dose responses.  So it's a very complex question.
3    I'm not really sure exactly.
4        Q   Well, did -- did you analyze all the
5    dose-response data from the case-control studies
6    and the cohort studies in the ovarian cancer
7    literature?
8        A   No.  That wasn't -- that wasn't my
9    charge.
10       Q   Well, then, how can you say that the
11   authors did not report on positive dose-response
12   data if you didn't analyze all the studies?
13       A   Because I became aware of that data.  So
14   certainly I'm aware that that data exists in my
15   review of the --
16       THE REPORTER:  Aware that that data?
17   BY MR. HEGARTY:
18       Q   Okay.  You don't --
19       THE REPORTER:  I couldn't hear -- excuse
20   me.  I need -- I could not hear.  There was a
21   cough and I couldn't hear.
22       MR. TISI:  I think she said --
23       THE REPORTER:  "So certainly I'm aware
24   that that data" --
25       MR. TISI:  I think she said "exists,"

Page 364

1    and then I -- went off the record.
2    BY MR. HEGARTY:
3        Q   You made no reference in that section to
4    what data -- to the data to which you're referring
5    to, correct?  In other words, you make no
6    response -- no citation to any literature that
7    shows a positive dose-response data in that
8    paragraph, correct?
9        MR. TISI:  Objection.  She cites Harlow.
10       MR. HEGARTY:  Chris, do you want to take
11   the microphone and answer for her?
12       MR. TISI:  I -- I'd love -- I'd love to,
13   but you've got to ask the question.  She just
14   testified to Harlow.
15       MR. HEGARTY:  Chris, please stick to the
16   obligations that you committed to under the
17   court's order --
18       MR. TISI:  I got it, but, you know,
19   you --
20       MR. HEGARTY:  -- and stick to the form
21   objections.
22       MR. TISI:  You're peppering questions
23   and not allowing her to answer, and then running
24   over -- running over things.
25       MR. HEGARTY:  Well, we'll let the record

Page 365

1    reflect as to the propriety of that response.
2    BY MR. HEGARTY:
3        Q   My question is, in that paragraph, do
4    you cite any studies that report a positive
5    dose-response from the data?
6        A   I don't know what paragraph you're
7    referring to.
8        Q   It's the paragraph we've been talking
9    about, the paragraph under the table.
10       A   Well, I think the table cites to two
11   studies.  So I'm not really sure what you're
12   asking me.
13       Q   Doctor, please listen to my question.
14       My question is, in the paragraph I'm
15   looking at under the table --
16       A   Mm-hmm.
17       Q   -- do you cite to any study reporting a
18   positive dose-response from the data?
19       A   There's no citations in that paragraph,
20   but that doesn't mean I'm not citing studies that
21   have positive dose-response data.
22       Q   Okay.
23       A   So I'm not really sure why you're asking
24   me that.
25       Q   What study on that -- on that page has a

Page 366

1    positive -- has positive dose-response data?
2        A   Chang and Harlow.
3        Q   Okay.  And you've analyzed that data,
4    and it's your opinion that that data shows a dose-
5    response; is that correct?
6        A   It's my opinion that the authors report
7    positive dose-response data, yes.
8        Q   Now, that's not my question.  My
9    question is, in your opinion, does the data show a
10   positive dose-response from your own independent
11   analysis?
12       A   I do not -- I did not do an, excuse me,
13   independent analysis of dose-response.  That
14   wasn't my charge.  It was a critical review of
15   these works, and that's what my review is focused
16   on.
17       Q   Over on page 37 under the section
18   "Contradictory unsupported claims of uncontrolled
19   confounding," you make the statement that -- over
20   on -- turning to page 38 of that section.  The
21   paragraph which begins "On page 4."  Do you see
22   that paragraph?
23       A   Yes, I do.
24       Q   "They further discuss this on
25   page 23" -- this is the second line -- "where they

40 (Pages 363 to 366)

April Zambelli-Weiner, Ph.D.

Page 367

1  cite an article by Rosenblatt and colleagues as
2  empirical data supporting their assertion that
3  smoking is an important confounder."
4        Do you see where I'm reading?
5     A  Yes, I do.
6     Q  Nowhere in this response do they ever
7  say that smoking is an important confounder, do
8  they?
9     A  Well, I would have to go back and look
10 at the specific language they use.
11    Q  Well, go over to page 23 of the
12 response. Second paragraph. This is where they
13 talk about Rosenblatt. Nowhere in that
14 paragraph -- and you read the response -- or
15 anywhere in this report do they ever say that
16 smoking is an important confounder, do they?
17    A  Well, again, without rereading this
18 entire report, which I know we -- none of us want
19 to do, I'll say in that paragraph they -- they
20 say: "An example of a factor that could confound
21 the weak effect shown for perineal talc is
22 smoking." So they're -- they're calling out
23 smoking as a confounder. "It's now recognized,"
24 and they go on to talk about -- about that.
25    Q  The word "important" is your word,

Page 368

1  correct?
2     A  I'm sorry. We're back on --
3     Q  The word in the report that I read to
4  you, the word "important" is your word. It's not
5  the word in their response, is it?
6     A  I'm just trying to find it.
7        I don't know. The answer is I'm not
8  sure if they've ever used the word "important" to
9  describe smoking as a confounder.
10    Q  Okay. You also cite in that part of the
11 report, this is the paragraph on page 38 beginning
12 on page 4, that they -- they referred to a finding
13 of in Rosenblatt of 1.2. Do you see where I'm
14 reading?
15    A  Yes.
16    Q  Nowhere in this paper do they ever make
17 reference to the 1.2 odds ratio that Rosenblatt
18 reports, do they?
19    A  Well, they -- they don't cite the 1.2,
20 but they -- they do refer to Rosenblatt, that
21 smokers are more likely to engage in talc dusting.
22 So, I mean, obviously you can go back to the paper
23 and -- and pull that data.
24    Q  Well, that -- that's a true statement
25 from Rosenblatt, isn't it?

Page 369

1     A  I don't know what your question is.
2     Q  Well, the statement that they make there
3  that says that "Rosenblatt reported that smokers
4  are more likely to engage in perineal talc dusting
5  compared with nonsmokers" is a true statement,
6  isn't it?
7     A  I don't know. We can go back and look
8  at Rosenblatt.
9        (Exhibit No. 23 was marked for
10       identification.)
11 BY MR. HEGARTY:
12    Q  Here is Exhibit 23, which is the
13 Rosenblatt studies. If you look in the Abstract
14 section on the first page, the Results section in
15 the middle, they say that smokers -- they say
16 that: "Women who smoke cigarettes or were in
17 highest BMI were more likely to engage in perineal
18 use of powder." Correct?
19    A  I'm sorry, I'm just looking (reading to
20 herself) -- yes.
21    Q  So what is wrong -- what is wrong with
22 their statement in the second paragraph on page 23
23 about what they say concerning the Rosenblatt
24 study?
25    A  You're back on the PCPC report?

Page 370

1     Q  Yes.
2     A  Okay. I'm going to go back to my report
3  for a minute. (Peruses document.)
4        So I -- I think the point that I'm
5  making is I'm not necessarily disagreeing with the
6  characterization of -- of the odds ratio. I think
7  that I'm making a different point here.
8     Q  And you're making a point that they
9  don't make in their response, do you -- or do
10 they?
11    A  I'm losing your -- your train of -- the
12 line of questioning.
13    Q  Well, you're making a point about how
14 they're making reference to Rosenblatt that they
15 don't do in their response. Do they?
16    A  Can we -- could we just slow it down for
17 a minute? Because you have me bouncing between
18 things and I'm getting confused. So if it's okay,
19 I would just like to take a minute and reorient
20 myself to my report.
21    Q  How much time do you need?
22    A  I don't know. A minute. I mean --
23    Q  Well, I'm not -- we'll take --
24       MR. TISI: We can do that for the
25 record.

41 (Pages 367 to 370)

April Zambelli-Weiner, Ph.D.

1      MR. HEGARTY:  Go off the record, please.
2      MR. TISI:  Just for a minute is fine.
3      THE VIDEOGRAPHER:  The time is
4  1:49 p.m., and we're going off the record.
5      (Pause in the proceedings.)
6      THE VIDEOGRAPHER:  The time is 1:51
7  p.m., and we're back on the record.
8  BY MR. HEGARTY:
9      Q   Doctor, we went off the record for a
10 moment to allow you to look at the Rosenblatt
11 study and compare it to your study, and let me go
12 back to -- I think the point I was trying to make
13 is that you make the assertion in your report that
14 Huncharek and Muscat claim a positive significant
15 association from the Rosenblatt data for a
16 relative risk of 1.2 that is not statistically
17 significant.
18          Nowhere in the response do they make
19 that point, do they?
20      A   They don't specifically call out that
21 point, but I'm citing the data in Rosenblatt that
22 supports the point.  So I think, you know, I'm
23 trying to make two points.  I'm making the point
24 that they're relying on data that is not
25 statistically significant here in this regard, and

1  relying on what they would call modest risk
2  estimates that, you know, or weak -- weak effects
3  to support the notion that smoking may be
4  confounding the association between talc and
5  ovarian cancer, wherein other parts of their
6  report and of their papers they dismiss similar --
7  similar odds ratios, both in magnitude but also
8  with regard to statistical significance.
9      Q   If you turn over to page 39 of your
10 report.  In the second paragraph on that page
11 beginning "A similar position" -- do you see where
12 I'm reading?
13      A   Yes.
14      Q   About two-thirds of the way down, you
15 state that:  "As example on page 20" -- do you see
16 where I'm reading?
17      A   Yes.
18      Q   "As example on page 20 of the 2009 H&M
19 report, the authors claim the findings of their
20 subgroup meta-analysis of hospital-based controls
21 showed no increased risk, when it actually showed
22 a 19 percent increase of ovarian cancer for
23 talc exposed patients."
24          Do you see where I'm reading?
25      A   Yes, I do.

1      Q   That's -- that's a misstatement, isn't
2  it?
3      A   We could look at -- look it up.
4      Q   Well, is it your testimony that the --
5  that the meta-analysis of hospital-based controls
6  showed a 19 percent increased risk of ovarian
7  cancer for talc-exposed patients?
8      A   I would have to go back and review that.
9      Q   Well, where did that 19 percent number
10 come from?
11      A   Again, I'd have to go back and look just
12 to make sure that that's -- that that's accurate.
13 But...
14      Q   You've got to go back to where?
15      A   The subgroup analysis.
16      Q   Well, if you look at Exhibit 16, that's
17 the 2003 paper, the Huncharek meta-analysis.  Do
18 you have that document?
19      A   Yes.
20      Q   If you look over at page 1959, the
21 paragraph beginning "Table 1 on the left-hand
22 column" -- do you see that paragraph?
23      A   Yes.  "As seen in Table 1" or "Table 1"?
24      Q   The paragraph beginning "Table 1 shows."
25      A   Mm-hmm, yes.

1      Q   Do you see where I'm reading?
2      A   Yes.
3      Q   About two-thirds of the way down it
4  says:  "Interestingly, pooling all hospital-based
5  studies" -- do you see where I'm reading?
6      A   I do.
7      Q   -- "yielded a relative risk of 1.19,
8  0.99 to 1.4."  Do you see where I'm reading?
9      A   Yes, I do.
10      Q   Is that where you got the 19 percent
11 number from?
12      A   Yes, I believe so.
13      Q   That number is not statistically
14 significant, is it?
15      A   It is not statistically significant,
16 that's correct.
17      Q   And includes -- it includes the null
18 value, correct?
19      A   Correct, but that is not interpret --
20 that is not appropriate to interpret that as no
21 association or no increased risk.
22      Q   Doctor, listen to my question.  Does the
23 confidence interval I read to you include the null
24 value?
25      A   Yes, it does.

April Zambelli-Weiner, Ph.D.

---

Page 375

1    Q   Including the null value means you
2  cannot rules that that number is not due to
3  chance, correct?
4            ^ Ck MS. PARFITT:  Objection.
5            THE WITNESS:  It's a loose -- a loose
6  interpretation of it.  But, again, I'm making the
7  distinction -- this entire section is actually --
8  and there's another section in my report -- making
9  the distinction between statistical significance
10  and the magnitude of the risk estimate.
11  BY MR. HEGARTY:
12    Q   Please listen --
13    A   They're not the same thing.
14    Q   Please listen to my question.  I just
15  want an answer to this question:  Including the
16  null value in a confidence interval means that you
17  cannot conclude that that number is not due to
18  chance, correct?
19            MR. TISI:  Objection.
20            THE WITNESS:  I -- I don't agree with
21  your -- with your characterization.
22  BY MR. HEGARTY:
23    Q   Okay.  Including the null value in a
24  confidence interval means that the study shows no
25  association between the exposure and the disease

---

Page 376

1  that's being studied, correct?
2            MR. TISI:  Objection.
3            THE WITNESS:  No, I don't agree with
4  that.
5  BY MR. HEGARTY:
6    Q   So you would -- and you -- strike that.
7            And is it your testimony that in this
8  instance, the 19 percent number that is -- that I
9  referenced from the 2003 paper with the confidence
10  interval that includes 1.0, shows a 19 percent
11  increased risk of ovarian cancer for talc-exposed
12  patients?
13    A   Absolutely.  Textbook epidemiology.
14    Q   Okay.  Even though it's not
15  statistically significant.
16    A   Absolutely.  Those are two entirely
17  different concepts.
18    Q   Certainly to say it shows a 19 percent
19  increased risk without saying it's not
20  statistically significant is misleading, isn't it?
21    A   Not necessarily, if you report the
22  confidence intervals.
23    Q   Did you report the confidence intervals?
24    A   Yes.
25    Q   And what did you report them as?

---

Page 377

1    A   0.99 to 1.41.
2    Q   And you think that it's okay if you
3  report the confidence intervals to -- to say that
4  if it's not statistically significant, that study
5  does show an increased risk of 19 percent.
6            MR. TISI:  Objection.
7            THE WITNESS:  Absolutely.  The
8  definition of a positive association is a risk
9  estimate greater than 1.0.  Moise Desvarieux,
10  Epidemiology 101.  Look it up.
11  BY MR. HEGARTY:
12    Q   What is the reference?
13    A   Desvarieux.
14    Q   If a confidence interval includes 1.0,
15  that is compatible with no difference being a
16  likely explanation, correct?
17    A   It's within the range of likely values.
18    Q   Doctor, you have actually testified in
19  the past that if a confidence interval includes
20  1.0, that is compatible with no difference being a
21  likely explanation.  Correct?
22    A   I think I just -- I think I just said
23  that.  I said it's within the range of likely
24  values.  But what -- but important caveat, they're
25  not all as likely.  They're not equally likely.

---

Page 378

1    Q   Meaning that it is compatible with no
2  difference between cases and controls.  That's
3  what that means, correct?
4    A   I would not characterize it that way.
5    Q   So you disagree with the way I
6  characterize it; is that correct?
7    A   Can you read back your question?
8    Q   Sure.  A confidence interval that
9  includes 1.0 is compatible with no difference
10  between cases and controls, correct?
11            MR. TISI:  Objection.
12            THE WITNESS:  I think that that is a
13  likely value.  It is within the range of likely
14  values.  Again, with the caveat that they are
15  not -- all the -- all the values within a
16  confidence interval are not equally likely.
17            But, yes, I mean it is compatible with
18  no association as a likely value based on the
19  underlying data.  But, again, an important caveat,
20  just to be accurate, if, for example, in this case
21  when you have a confidence interval that goes
22  to .99, that's the limit of the confidence
23  interval, and that is actually the least likely
24  value.  So it's really important to understand
25  that not all values within a confidence interval

---

April Zambelli-Weiner, Ph.D.

## Page 379

1    are equally likely.
2    BY MR. HEGARTY:
3        Q   Nor is it proper to say that the point
4    estimate in a nonstatistically significant finding
5    is the most likely value, as you say on page 41.
6    That's not right, is it?
7        A   That is correct actually.  The point
8    estimate is always the most likely estimate of the
9    true population parameter given the data.
10       Q   Cite for me an authority that supports
11   that statement.
12       A   I -- I would refer you to epidemiology
13   biostatistics textbooks again.
14       Q   Which textbook?
15       A   I don't know specifically.  I've given
16   you Rothman.  It may be in there.
17       Q   Well, cite for me an authority that you
18   are aware of that says that the point estimate in
19   a nonstatistically significant finding is the most
20   likely value.
21       MR. TISI:  Objection.
22       THE WITNESS:  I think I answered your
23   question.
24   BY MR. HEGARTY:
25       Q   What is the authority?

## Page 380

1        A   I think I said -- again, I'm not citing
2    a specific authority, but I've given you numerous
3    textbook authorities to support my expertise as an
4    epidemiologist.
5        Q   Cite for me anything besides the Rothman
6    text.
7        A   I'm not sure.  I'm sure I could find
8    something for you if you're really interested.
9        Q   When you have a nonstatistically
10   significant finding, the null hypothesis has not
11   been disproved, correct?
12       MR. TISI:  Objection.
13       THE WITNESS:  I'm sorry, that's a
14   convoluted question.  Can you repeat, please?
15   BY MR. HEGARTY:
16       Q   Sure.  When you have a nonstatistically
17   (sic) finding between an exposure and a disease,
18   then the null hypothesis has not been disproved,
19   correct?
20       A   I'm not sure -- your wording is throwing
21   me off.  Do you want to reword that or --
22       Q   No.  Can you not answer my question?
23       A   Let me take a look.  (Peruses monitor.)
24       Right, you cannot -- if -- if the 95
25   percent confidence interval includes the null

## Page 381

1    value of 1.0, based on an alpha value of 0.05, you
2    can't reject the null hypothesis of that
3    difference, that's correct.
4        THE WITNESS:  Could I take a quick
5    break?
6        MR. HEGARTY:  Sure.
7        THE WITNESS:  Thank you.
8        MR. HEGARTY:  Let's go off the record.
9        THE VIDEOGRAPHER:  The time is 2:01 p.m.
10   We're going off the record.
11       (Recess.)
12       THE VIDEOGRAPHER:  The time is 2:05 p.m.
13   We're back on the record.
14   BY MR. HEGARTY:
15       Q   Doctor, we're on page 39 of your report.
16       A   Okay.
17       Q   Are you there?
18       A   Yes.
19       Q   If you look towards the bottom, the
20   paragraph beginning with the word "Further."  Do
21   you see that?
22       A   Yes.
23       Q   About three lines down from the
24   beginning of that paragraph, over to the
25   right-hand column, you say:  "Unfortunately, the

## Page 382

1    authors unevenly discuss the evidence base only
2    citing studies that support the case for a
3    noncausal relationship and utilizing the observed
4    differences -- difference in risk estimates
5    between population and hospital-based case-control
6    studies as evidence undermining the causal
7    association, et cetera."
8        Do you see where I'm reading?
9        A   I do.
10       Q   Is it your testimony or your opinion by
11   that statement that in the response that they --
12   that the authors only cited to studies that
13   support the case for a noncausal relationship?  Is
14   that what you're saying there?
15       A   No, I don't think that that accurately
16   characterizes what I'm saying there.
17       Q   Well, tell me how my reading is not
18   accurate.
19       A   Well, the section is specifically around
20   the selection bias issue and the issue related to
21   hospital- versus -- versus population-based
22   controls.  So I think this gets to something we
23   discussed earlier, which is the lack of a fulsome
24   discussion around this issue, and reasons why you
25   might observe the differences that were -- were in

44 (Pages 379 to 382)

April Zambelli-Weiner, Ph.D.

Page 383

1    observed the meta-analysis.
2       Q   So is it your testimony that the
3    sentence I read only concerns the issue of
4    selection bias as it relates to the hospital- and
5    population-based case-control studies?  It's not
6    an issue generally as to the causal relationship
7    across the studies?
8          MR. TISI:  Objection.
9          THE WITNESS:  Well, I think I -- I'm
10   citing it here in that section specifically.  So,
11   yeah, here it is there to reference that
12   particular issue in that -- that section.
13   BY MR. HEGARTY:
14      Q   So you're not saying that the authors of
15   the 2009 response only cited studies that support
16   the case for a noncausal relationship between talc
17   and ovarian cancer.  That's not what you're
18   saying, correct?
19         MR. TISI:  Objection.
20         THE WITNESS:  Let me read back your
21   question.  (Peruses monitor.)
22         That's -- that's not what I'm saying in
23   this section.  I mean I'm not really commenting on
24   that in terms of the breadth of their causation
25   analysis, but this statement relates to the issue

Page 384

1    of selection bias.
2    BY MR. HEGARTY:
3       Q   At the beginning of the deposition we
4    talked about what you're -- you were doing in this
5    paper, and there -- in this -- in your analysis,
6    and on page 9, you -- you said that you were asked
7    to review and assess the validity of the data in
8    claims put forward by Dr. Huncharek and
9    Dr. Muscat.
10         Where in your report do you discuss any
11   valid data that they included in their response or
12   their 2003 paper or their 2007 paper?
13         MR. TISI:  Objection.
14         THE WITNESS:  I'm sorry, can you repeat
15   the question?
16   BY MR. HEGARTY:
17      Q   Where in your report do you identify any
18   valid data or assessment of the data that were put
19   forth in the 2003 and 2007 articles and the 2009
20   response?
21      A   That's kind of a confusing question, but
22   I'll do my best to answer it.
23         So, again, you asked me initially back
24   in the first session, you know, what my
25   methodology was, and I described it as a critical

Page 385

1    appraisal of -- of these studies.  And so
2    particularly related to the dose-response data and
3    the -- you know, uncontrolled confounding and
4    other issues that are then proffered in the 2009
5    report as evidence against a causal association.
6          So I think that, again, I'm trying to
7    answer your question.  I mean I think certainly
8    there is -- well, you know, I'm just -- I'm not
9    even sure I can answer that question.  Do you want
10   to try rephrasing it?  I'm -- it's confusing.
11      Q   What part -- I'm not sure what part is
12   confusing.  Where in your paper do you put forth
13   any valid data and analysis from the two papers or
14   the response?  Do you do that anywhere?
15      A   Well, certainly there's citations in
16   here.  If this is what you're asking -- again, I'm
17   not -- I'm not sure what you're asking.  If you're
18   asking if I'm citing to studies that have valid
19   data in them, sure.
20      Q   No, I'm citing to what you said you were
21   going to do.  Where in your report do you identify
22   the valid data and analysis that the authors set
23   out in the 2003 and 2007 studies and the 2009
24   response?
25      A   Again, as part of -- so let's back up to

Page 386

1    what the methodology is to -- I'm trying to answer
2    your question fully.
3          It's an assessment of the internal
4    validity of these studies.  So my analysis of
5    these studies is that they have very low validity
6    overall, both of these studies.  So that's the --
7    that's the focus of my report and that's what I'm
8    describing in my report is my analysis of the
9    internal validity of these studies, which is very
10   low.
11         If I was asked to do a causation
12   analysis or weight of evidence analysis or submit
13   something to FDA, I would give these studies very
14   little, if any, weight whatsoever, and would not
15   trot them into FDA ever.  So that's the focus
16   of -- that's the focus of my -- of my report.
17      Q   You're not answering my question.
18         My question was, point to me in your
19   report where you set out the valid analysis and
20   the valid data that the -- the articles reported
21   and the response reported?
22         MR. TISI:  Objection.  Asked and
23   answered.
24         THE WITNESS:  Again, I feel like I
25   answered your question.  That was not my task.  My

April Zambelli-Weiner, Ph.D.

1  task was to assess the internal validity of these
2  studies.  I did that, and I reported out on that
3  in my report.
4  BY MR. HEGARTY:
5      Q   If you look over on page 40 of your
6  report, you say in the middle of that page, the
7  paragraph beginning "On page 19" -- do you see
8  that?
9      A   "On page 19," yes.
10     Q   You report what the Huncharek and Muscat
11 articles say, and then you say that statement is
12 incorrect, and the statement of fact by the
13 Epstein authors is correct.
14         Do you see where I'm reading?
15     A   Well, yeah, I'm just taking a look at
16 it.  (Peruses document.)
17     Q   How is the statement by Huncharek and
18 Muscat -- by Huncharek -- first of all, let me
19 back up.
20         You say that Huncharek and Muscat make
21 that statement.  Muscat again was not an author of
22 that paper, did he -- was he?
23         MR. TISI:  Objection.  Asked and
24 answered.  About ten times.
25         THE WITNESS:  Again, I believe we're

1  talking here about the PCPC report, which he is an
2  author on.  But I've also addressed previously his
3  association with the data that shows up in the
4  2003 paper.
5  BY MR. HEGARTY:
6      Q   Okay.  You note that what Epstein
7  reports, he -- the -- the part of the report
8  they're referring to there is Epstein claiming
9  that the Huncharek study supports an association
10 between perineal talc dusting and ovarian cancer
11 risk.  That's what you're saying there, right?
12     A   Let me -- let me -- let me tell you what
13 I'm saying.  Hopefully that will answer your
14 question.
15         When a -- when the PCPC report says that
16 the petitioners erroneously indicate that the
17 meta-analysis supports an association, that's the
18 part that I'm objecting to.  The meta-analysis as
19 reported shows a 1.33 pooled risk estimate.  So
20 that is by definition a positive association.
21     Q   But you're aware, Doctor, that the
22 authors from the 2003 paper did more than just
23 report the odds ratios.  They, in essence, did a
24 Bradford Hill analysis.
25         MR. TISI:  Objection.

1  BY MR. HEGARTY:
2      Q   Correct?
3         MR. TISI:  Objection.
4         THE WITNESS:  Are you -- are you
5  referring to the 2003 paper?
6  BY MR. HEGARTY:
7      Q   Yes.
8      A   I don't recall exactly if they laid it
9  out that way, but I -- it is my understanding that
10 they did a causation analysis, yes.
11     Q   And they concluded after that analysis
12 that the available observational data do not
13 support the existence of a causal relationship
14 between perineal talc exposure and an increased
15 risk of epithelial ovarian cancer.  That was their
16 conclusion, correct?
17     A   Well, I think in a way you're exactly
18 illustrating my point, which is sort of the point
19 of this section, is the conflation of
20 epidemiologic concepts.  Because a meta-analysis
21 is simply a statistical analysis.  By itself, it
22 cannot prove or disprove causation.  So to make
23 the leap from a statistical finding to causation
24 is -- is inappropriate.
25     Q   Well, it's -- you can do that if you do

1  a Bradford Hill analysis, can't you?
2      A   But that's not what we're talking about.
3  Right now we're talking about the results of the
4  meta-analysis.
5      Q   We're talking about what their analysis
6  was in their paper and their conclusions that they
7  drew from that paper, correct?
8      A   Well, we started this line of
9  questioning with you pointing me to this
10 statement, which says:  "The petitioners
11 erroneously indicate that the meta-analysis
12 supports an association."
13         So I'm responding to that specific
14 comment and saying that is an inappropriate
15 characterization of the results of meta-analysis.
16     Q   All the response is doing is reporting
17 what the authors said from the 2003 paper.
18 Isn't -- aren't they?
19     A   I -- I don't know what you're asking me.
20 I'm sorry.
21     Q   Well, they reported what the authors
22 said, which from their review of the data, it did
23 not support a causal relationship.  That's what
24 the 2009 response says, correct?
25     A   Are -- are we still here or are we

April Zambelli-Weiner, Ph.D.

Page 391

1 somewhere else now?
2 Q We're still here.
3 A So we're talking about the
4 meta-analysis. We're talking about the statement
5 being incorrect.
6 Q The statement --
7 A Are we talking about something
8 different?
9 Q They didn't report an inaccurate
10 statement from the 2003 meta-analysis, correct?
11 A Who is "they"?
12 Q Drs. Muscat and Huncharek.
13 A Okay. Hopefully you understand why this
14 is confusing. We're starting with a comment made
15 by Epstein. We have Huncharek and Muscat in the
16 PCPC report responding to their comment, calling
17 their comment inappropriate. And I'm responding
18 to their comment, to Huncharek and Muscat's
19 comment.
20 Q That's not my question. My question is
21 simply, in the 2009 response, they accurately
22 reported what the authors concluded from the 2003
23 study, correct?
24 A I -- I can't just blanketly agree with
25 that. I'm not even sure what you're asking.

Page 392

1 Q Well, they reported that the 2003 study
2 did not support the existence of a causal
3 relationship, and that's what the authors said,
4 correct?
5 A Well, that's an incorrect statement.
6 That's an incorrect -- that is not a
7 scientifically defensible assertion. You cannot
8 make the leap from the results of a statistical
9 analysis to causation. You can't say that a
10 meta-analysis does not support causation. That's
11 not appropriate.
12 Q Okay. Cite for me authority that says
13 that.
14 A Any authority that talks about Bradford
15 Hill, that talks about causation -- I mean we all
16 know what a causation analysis is, hopefully, but
17 we can go through that. I mean it's the
18 evaluation of different lines of evidence to
19 address a question. One single data point cannot
20 address causation. A single meta-analysis cannot
21 address causation.
22 Q So in your opinion, it would be improper
23 in any meta-analysis to draw a causal conclusion
24 from the results, correct?
25 MR. TISI: Objection.

Page 393

1 MS. PARFITT: Objection.
2 MR. HEGARTY: Can -- can we limit it to
3 one person objecting?
4 MS. PARFITT: Sure. But I get excited
5 every now and then. I just want to join in.
6 MR. HEGARTY: I got it.
7 BY MR. HEGARTY:
8 Q Okay. Can you answer my question?
9 A Can you repeat it, please?
10 Q So it would be -- so in your opinion, it
11 would be improper in any meta-analysis to draw a
12 causal conclusion from the results, correct?
13 MR. TISI: I got it. Objection.
14 THE WITNESS: I think it's a very broad
15 question. I would have to -- I'd have to see the
16 context. I don't know if you're asking me if
17 within the context of a meta-analysis you can do a
18 causal assessment, but I'm sure that that could
19 be -- that could be done.
20 I think what I'm saying is that to infer
21 that a single data point or a single study proves
22 or disproves causation is not -- is not
23 appropriate.
24 BY MR. HEGARTY:
25 Q You just testified, and I rolled back to

Page 394

1 your -- your testimony, that you can't say that a
2 meta-analysis does not support causation. The
3 reverse would be true as well: You can't say that
4 a meta-analysis supports causation, correct?
5 MR. TISI: Objection.
6 THE WITNESS: Let me read -- let me read
7 your question, please. (Peruses monitor.)
8 So maybe there's a misunderstanding.
9 Let me -- let me try restating just to be clear.
10 You can't draw a causal conclusion from
11 a single data point from a statistical analysis.
12 That's not to say that a meta-analysis can't
13 support a causal assessment. That can happen.
14 BY MR. HEGARTY:
15 Q But in the meta-analysis itself where
16 the authors draw from the data -- a single data
17 point, it would be improper, according to you, to
18 draw the conclusion that it either supports or it
19 doesn't support a causal relationship, correct?
20 MR. TISI: Objection.
21 THE WITNESS: Again, with the caveat --
22 I would say, yes, with the caveat that it depends
23 on how that's said. It depends if you're saying
24 the meta-analysis is, you know, one line of
25 evidence in support of a causation or if you're

47 (Pages 391 to 394)

April Zambelli-Weiner, Ph.D.

Page 395

1  saying from this meta-analysis, we cannot infer
2  causation.  Those are actually two different
3  things.
4  BY MR. HEGARTY:
5     Q   And the latter would be improper,
6  according to you, correct?
7        MR. TISI:  Objection.
8        THE WITNESS:  Again, yes, I would say --
9  I just want to be clear because this has been like
10  a very confusing line of questioning -- that it
11  would be inappropriate in my opinion to draw a
12  causal assessment based on the results of a single
13  statistical analysis like a meta-analysis.  That's
14  not to say that it can't contribute.  That's not
15  to say that a meta-analysis paper doesn't do a
16  broader causal assessment.  So there's -- there's
17  a lot of context to that question.
18  BY MR. HEGARTY:
19     Q   If you'd turn over to page 41 of your
20  report, please.
21        You cite a portion of the PCPC report on
22  that page beginning with "Two meta-analyses" -- do
23  you see that?
24     A   Yes.
25     Q   And you say that:  "The report says that

Page 396

1  both showed significant differences in summary
2  odds ratios between population-based and
3  hospital-based case-control studies, with the
4  latter showing generally no results."  You then go
5  and say:  "That statement is false."
6        What is false about that statement?
7     A   I think again I'm -- if you will read
8  further down, I'm referring to the subgroup
9  analysis of the 1.19 odds ratio, and that that is
10  not a null finding.
11     Q   Okay, so I want to make it clear.
12        It's your testimony that the odds
13  ratio -- an odds ratio of 1.19 with a confidence
14  interval of 0.99 to 1.4 is not a null result?
15     A   That's correct.  That is a positive
16  association by textbook epidemiology.
17     Q   Okay.  Cite for me a textbook that says
18  that.
19     A   I did.  Moise Desvarieux.
20     Q   Cite for me where it's been generally
21  accepted that you can conclude with a
22  nonstatistically significant finding that there's
23  a causal association from the -- between the
24  exposure and the disease.
25     A   I think I just testified that -- that

Page 397

1  that's what I wouldn't do.  That that's not
2  something that I would do.
3     Q   What's not something that you would do?
4     A   Jump from a nonstatistically significant
5  finding to a causal assessment.  Those are two
6  entirely different things.
7     Q   But you're saying that an odds ratio as
8  reported here does show an association.  That is,
9  a 0.99 to 1.4 with an odds ratio of 1.99 does show
10  an association.
11     A   Absolutely correct, that's a positive
12  association.
13     Q   Is it your opinion that the -- that the
14  finding of 1.19 with a confidence interval of 0.99
15  to 1.4 shows an association between talc use and
16  ovarian cancer in the hospital-based studies?
17     A   Yes, I would interpret that odds ratio
18  as a 19 percent increased risk.
19     Q   And is it your contention that such a
20  conclusion has been generally accepted in the
21  epidemiologic community?
22     A   Sure.  Absolutely.  I mean, I think
23  there's a lot of -- a lot that's been written
24  about certainly the difference between the
25  magnitude of an estimate and statistical

Page 398

1  significance and hypothesis testing.
2        And, you know, even the American
3  Statistical Association recently came out with a
4  whole diatribe on how, you know, we need to get
5  away from the overreliance on -- on statistical
6  significance.  So, I think absolutely.  These are
7  two entirely different concepts, and, by
8  definition, that's a positive association.
9     Q   And you say that the textbook you cite
10  supports that statement.
11     A   Yes, it does.
12     Q   At the top of page 43 of your report,
13  you say:  "The authors assert that weak
14  associations are intrinsically susceptible to
15  bias."
16        That's a true statement, isn't it?
17     A   No, I don't -- I don't agree with that.
18  I mean, I think that you have to do an analysis of
19  the study that produced that particular risk
20  estimate.  You can have a very modest association
21  that's highly valid and highly reliable and very
22  low risk of bias, and you can have a very elevated
23  risk estimate that's very -- very susceptible to
24  bias or high risk of bias.  So I don't think you
25  can just make those kinds of blanket

48 (Pages 395 to 398)

April Zambelli-Weiner, Ph.D.

| Page 399 | Page 401 |
|---|---|

**Page 399**

1  characterizations.
2      Q   Tell me if you agree with the following
3  statement: "Although lower risks -- lower
4  relative risks can reflect causality, the
5  epidemiologists will scrutinize such associations
6  more closely because there is a greater chance
7  that they are the result of uncontrolled
8  confounding or biases."
9          MR. TISI:  Objection.
10         THE WITNESS:  I'm just going to read it
11  back, if that's okay.  (Peruses monitor.)
12         You know, I -- I think that that's one
13  of those quotes or -- or statements that I
14  think -- I think could be true.  I personally take
15  the position that I'm evaling -- evaluating every
16  study with the same methodology and the same
17  rigor, regardless of what the magnitude of the
18  point estimate is.
19         So I think that, you know, that
20  undertaking of an analysis of internal validity
21  and risk of bias should happen in -- irrespective
22  of what the magnitude of the risk estimate is.
23  BY MR. HEGARTY:
24      Q   Tell me if you agree with the following
25  statement:  "When considering bias and

**Page 400**

1  confounders, the weaker the association, the
2  greater the concern that bias or confounding could
3  be the reason for the association."
4          MR. TISI:  Objection.
5          THE WITNESS:  I'm sure I've seen -- I've
6  seen that written, and I'm sure I can understand
7  why someone would write that.  But, again, you
8  know, it really depends upon the question being
9  asked.
10         If we're looking at a body of literature
11  where we have really very little concern about
12  confounding, then I wouldn't be scrutinizing a low
13  or modest relative risk and having extra concern
14  about confounding.  So it's very -- it's very
15  contextually dependent.
16         I think the intent there is to say that
17  not knowing anything, you know, and just in a
18  vacuum, if we don't know anything about a
19  particular research question, and we have a more
20  modest relative risk, we want to be sure that we
21  adequately address the risks of bias.  But again,
22  I take the position that we should be doing that
23  no matter what.
24  BY MR. HEGARTY:
25      Q   So do you agree that the weaker the

**Page 401**

1  association in a study, the greater there is
2  for concern -- the greater the concern there is
3  that bias or confounding could be the reason for
4  the association?
5          MR. TISI:  Objection.
6          THE WITNESS:  Again, I would say -- I
7  think I've said that's contextually dependent.  I
8  mean, I would need to look at the body of
9  literature and understand what the risks of bias
10  are.
11  BY MR. HEGARTY:
12      Q   Well, bias can explain a finding of a
13  relative risk or an odds ratio of 1.2, correct?
14         MR. TISI:  Objection.
15         THE WITNESS:  Bias can explain -- I
16  mean, depending upon the nature of the bias, you
17  can have all kinds of effects to -- on the point
18  estimate.  So bias can explain a finding of 1.2,
19  of 1.5, of 4.0.  You know, it depends again on the
20  specific -- specific study and the specific risks
21  of bias that are -- are at play.
22  BY MR. HEGARTY:
23      Q   If you turn over to the Conclusion
24  section on page 45, in the second to last
25  statement -- or the second to last sentence

**Page 402**

1  makes the statement that:  "Any conclusion" --
2  make sure I read this right.
3          You say:  "Any conclusion reached on
4  dose-response, uncontrolled confounding or
5  selection bias that relied upon or were influenced
6  by data analysis, opinions or conclusions
7  presented within these studies and report, are at
8  a high risk of bias."
9          Did I read that correctly?
10      A   You did.
11      Q   First identify any such conclusions that
12  relied on or were influenced by either the 2003 or
13  2007 papers or the 2009 submission.
14      A   Again, I think we went through this
15  before.  We know that these data were presented to
16  FDA, advocated to FDA at different times, so we
17  know that FDA reviewed these data.  So I think
18  that certainly we can say FDA considered these
19  data as part of their decision-making.
20      Q   That's not my question, Doctor.
21         My question is, identify any conclusions
22  that relied on or were influenced by either the
23  2003 or 2007 papers or the 2009 submission.
24      A   Again, I would presume that FDA's
25  conclusions relied upon this data because they --

49 (Pages 399 to 402)

April Zambelli-Weiner, Ph.D.

Page 403

1  they stated their intent to review it carefully,
2  they posted it to the docket.  They obviously
3  considered this as part of their decision-making
4  process.
5      Q   Who at FDA relied on either of these
6  documents?
7      A   Again, I think we went through this
8  before, that I, you know, certainly can't pinpoint
9  who specifically did the review.  You know, we can
10  talk about who was on the denial letter, but we
11  don't have a lot of detail about how FDA conducted
12  their review, who reviewed what, how much weight
13  they gave to things specifically.  You know, we --
14  we went through that before.
15      Q   What was the extension -- extent of
16  their reliance?
17      A   Again, I -- I have no personal knowledge
18  of exactly how much weight they gave to any pieces
19  of evidence.  But again, you know, my supposition
20  based on -- it's my opinion that they did rely on
21  these data in a meaningful way based on the
22  language in their -- the language in their denial
23  letter.  The fact that we don't see a lot of other
24  citations -- I mean, again presumably, FDA would
25  in making their decision-making publish and

Page 404

1  produce other pieces of -- of evidence that they
2  relied upon.  So the prominence that this data has
3  on the docket, you know, and any other documents
4  leads me to believe that they did rely upon it.
5      Q   Well, why don't you cite for us your
6  extensive experience in dealing with FDA when
7  they're considering a Citizen Petition.
8      A   Again, I think I've been very honest
9  about my opinion about this and my experience with
10  this.  I don't have any direct experience.  I'm
11  basing it on my review of -- of the docket, of the
12  denial letter.  That's --
13      Q   Cite for me all your experience in
14  communicating with FDA about any product.
15      A   Again, I am in the business of helping
16  clients submit data to FDA.  So from that
17  perspective, I do have expertise.  I understand
18  the kinds of things that FDA looks for.  I don't
19  have any specific communication with FDA over a
20  Citizen Petition, if that's what you're asking me.
21      Q   You have never had any direct
22  communication with anyone at FDA ever, have you?
23      A   That is not accurate.
24      Q   Tell me when -- cite for me any instance
25  when you've had direct communication with FDA with

Page 405

1  regard to a safety issue with any product.
2      A   I definitely have.  I -- you know, I'm
3  not sure I can name names at the moment.  But I --
4  I absolutely have.
5      Q   Well, name a product.
6      A   I can't -- I'm not sure I can name a
7  product either based on confidentiality.
8      Q   Can you name a product without
9  confidentiality?
10      A   Well, I can name product categories.  I
11  can talk about cardiac rhythm technologies.  I can
12  talk about lung imaging technologies.
13      Q   Doctor --
14          MR. TISI:  She's trying -- she's not
15  finished.
16          THE WITNESS:  I'm trying to answer your
17  question.
18          MR. HEGARTY:  Well, she's not answering
19  my question.
20          MR. TISI:  Well, but you -- but you --
21  but she said -- Counsel --
22  BY MR. HEGARTY:
23      Q   If you're --
24          MR. TISI:  -- you asked her a question
25  about communications with the FDA under any

Page 406

1  circumstances and you asked her categories, and
2  she's answering.  You got to let her answer.
3  BY MR. HEGARTY:
4      Q   If you're communicating with FDA, that
5  communication is not confidential or protected.
6  Is that what you're -- is that the position you're
7  taking?
8          MR. TISI:  Actually, that's not true,
9  Counsel, and you know that.  In many instances
10  it's protected from -- from competitors.
11  Absolutely it is.  Absolutely it is.
12          MR. HEGARTY:  I don't agree, and we're
13  not -- that's not --
14          MR. TISI:  Absolutely.  Well --
15  BY MR. HEGARTY:
16      Q   I'm just asking if that's your opinion.
17      A   My opinion is that any work that I do on
18  behalf of my clients working with -- with
19  regulatory agencies or with regulatory consultants
20  or in any capacity is -- is confidential, yes.
21      Q   You have never communicated with the FDA
22  about a Citizen Petition, correct?
23      A   I believe that is correct.
24      Q   You have no personal knowledge of
25  anything the FDA did with regard to evaluating the

50 (Pages 403 to 406)

April Zambelli-Weiner, Ph.D.

Page 407

1  2008 and 1994 Citizen Petition, do you?
2      A  I believe I have answered that
3  repeatedly, yes.
4      Q  And what is your opinion based on that
5  you said -- where you said that they did rely on
6  the 2003 and 2007 papers and the 2009 submission?
7      A  Again, I think I've already answered
8  that repeatedly.
9      Q  It's only -- it's only what's in the
10 2014 denial letter, correct?
11     A  That's not correct.  I believe I cited
12 the meeting that the PCP -- PCPC and J&J had with
13 FDA, and the docket as well.
14     Q  And where do you cite those?
15     A  In here, in my report.
16     Q  Show me.
17     A  Let's see.  (Peruses document.)
18        So, in "Other documents considered,"
19 number 1 is the e-mail from John Bailey regarding
20 the meeting with FDA.
21        And I believe the docket is -- is cited
22 in here as well.
23     Q  Where is it cited?
24     A  You want me to look for it?
25     Q  Yes.

Page 408

1      A  It's either in a footnote or it's cited.
2  I'm trying to think of where.  (Peruses document.)
3      Q  How much time do you need, Doctor?
4      A  I think it's -- I'm not certain, but
5  I -- I think it's footnote 3 on page 8.
6         MR. TISI:  Correct.
7         MR. HEGARTY:  Are you saying "correct"
8  for her?
9         MR. TISI:  What?  I'm sorry.
10        MR. HEGARTY:  Did you say "correct"?
11        MR. TISI:  I -- I just answered the --
12 I'm sorry.
13        MR. HEGARTY:  And when I said, Did you
14 just say "correct," I was referring to counsel for
15 the plaintiff.
16        MR. TISI:  No, she -- she said,
17 "Correct."  She said, "Correct."
18 BY MR. HEGARTY:
19     Q  Where on page 3?
20     A  I'm sorry, I said page 8, footnote 3.
21     Q  Your -- your contention is that's where
22 that cite is to?
23     A  I believe so.
24     Q  And how does being on -- being on the
25 docketing statement in the letter from John Bailey

Page 409

1  support an opinion that FDA was influenced by the
2  2009 and -- response and the 2003 and 2007 papers?
3      A  Well, again, I think it supports -- it
4  supports that they reviewed that and considered
5  that as part of their decision-making.
6      Q  Okay.  Can you list for me everything
7  they reviewed and considered?
8      A  Again, we went -- we went through this
9  before.  But, no, because there's really a lack of
10 detail in the denial letter about what their
11 process was and -- and what specifically they
12 reviewed.
13        But, again, you know, in my opinion as
14 an expert, I would have expected them to -- to
15 provide detail on -- on the things that they
16 reviewed, and they don't provide a lot of -- a lot
17 of other documents, but they do specifically refer
18 to -- refer to this, and this exists on the
19 docket.
20     Q  How many responses to citizen petitions
21 have you read?
22     A  I'm not certain.
23     Q  Can you cite for me any other response
24 to a Citizen Petition you've read by FDA?
25     A  I believe I've read some around tobacco

Page 410

1  products.
2      Q  Okay.  Cite for me one product.
3         MR. TISI:  Objection.
4         THE WITNESS:  I -- I can't recall
5  specific products.
6  BY MR. HEGARTY:
7      Q  If you would turn to page 6 -- I'm
8  sorry, return to Exhibit 6.
9         MR. HEGARTY:  Would you hand her
10 Exhibits 6 and 7, please.
11        MR. TISI:  I've got it here, 6.  Here
12 is 6.  And I don't -- I don't see 7.
13 BY MR. HEGARTY:
14     Q  First, as to page 6 --
15        MR. TISI:  I don't -- I don't have 7.
16 I'm sorry.  Hold on.  Do you need both --
17        MR. HEGARTY:  Well, we'll start with
18 page -- we'll start with Exhibit 6.
19 BY MR. HEGARTY:
20     Q  First is Exhibit 6.
21        Can you cite for me any other occasion
22 when you've written to a journal who published an
23 article asking for the procedure for reporting on
24 concerns that you identified in that article?
25     A  I may have.  I don't recall.

51 (Pages 407 to 410)

April Zambelli-Weiner, Ph.D.

Page 411

1    Q   You have never written a Letter to the
2  Editor identifying concerns that you have
3  identified with regard to any article, have you?
4    A   Well, I'm recalling one, but I just want
5  to be accurate. I'm going to just flip to my CV
6  real fast. I want to make sure I accurately
7  characterize it. (Peruses document.)
8       So I'm just recalling the chondrolysis
9  article, and I -- I'm just not sure if it was a
10  Letter to the Editor or not. So...
11    Q   And what page are you looking at?
12    A   Page 58.
13    Q   Which reference?
14    A   The Hasan paper, the chondrolysis paper.
15  It's at the very top, it's the first one.
16    Q   Do you think that's a Letter to the
17  Editor commenting on the -- on concerns you've had
18  with another article?
19    A   I don't recall. I'm just saying I don't
20  recall the format of that article. It may be.
21  It's been a while. I'm trying to -- to recollect.
22    Q   Other than that possible article, can
23  you cite for me any other occasion you've written
24  a Letter to the Editor criticizing or commenting
25  on what another author or authors wrote in a

Page 412

1  paper?
2    A   Not that I can recall.
3    Q   The last communication with the
4  publication listed in Exhibit No. 6 is dated
5  December 4, 2018.
6       Has there been any further communication
7  or activity with regard to this journal?
8    A   I don't believe so.
9    Q   Have you drafted a response to the
10  article, the 2000 -- first of all, does this
11  concern the 2003 or the 2007 article?
12    A   Well, it would concern both, but I'm not
13  sure. This one looks like it's to the European
14  Journal of Cancer Prevention.
15    Q   And that's the 2007 article?
16    A   Right, but I think it's also the 2011
17  article, if I recall correctly.
18    Q   Have you written or has anybody at your
19  office written a Letter to the Editor or other
20  proposed submission to either of these journals
21  with regard to the 2003 or 2007 papers?
22    A   I have not done anything yet. I've
23  been -- been a little busy.
24    Q   Has anybody in your office done that?
25    A   No.

Page 413

1    Q   Are there any plans to do it going
2  forward?
3    A   There are plans to do it going forward.
4    Q   When?
5    A   I can't answer that.
6    Q   Well, there's -- is there anything --
7  any timetable set up?
8    A   No, because I'm just doing it on my own
9  time, so it has to be worked in.
10    Q   Also, with regard to Exhibit No. 7,
11  which is the one we can't find but I'll hand you
12  my copy, that's another correspondence that you
13  had with regard to either the 2003 or 2007 paper.
14       Has there been any further
15  correspondence with that journal since the last
16  dated e-mail there?
17    A   No. I would say same answers.
18    Q   You also mentioned earlier that when you
19  were asked if you were going to submit your report
20  to be peer reviewed, you said, "Not yet."
21       Do you have any plans to do that?
22    A   Well, again, I think a lot of what's in
23  my report could potentially fall within the
24  purview of a Letter to the Editor, but I'm still
25  evaluating what format I'll -- I'll do that.

Page 414

1    Q   Well, have you written your report in a
2  different format?
3    A   No, I haven't.
4    Q   Have you -- do you have any timetable
5  for submitting your report in its current or a
6  different format?
7    A   Not yet.
8    Q   You reviewed for purposes of your report
9  three documents: The 2003, the 2007 articles, and
10  the 2009 response. Correct?
11    A   Correct.
12    Q   In those documents there are references
13  to multiple other articles including case-control
14  studies, correct?
15    A   I would presume that would be correct.
16    Q   Did you review any of those other
17  articles or any other articles with the same
18  critical eye that you reviewed the 2003 and 2007
19  articles or the 2009 response?
20    A   Again, that wasn't my -- that wasn't my
21  task. That wasn't my charge to do, you know, a
22  broad evaluation of the entire evidence base.
23       So I think we talked about previously
24  that, you know, my focus was really a critical
25  appraisal of these studies that industry put

April Zambelli-Weiner, Ph.D.

Page 415

1  forward to FDA, to the medical and scientific
2  community, around the causal or lack -- their
3  position of the lack of causal association between
4  talc and ovarian cancer.  So that was my focus.
5  It was not a broader focus than that.
6      Q   Well, did any -- anything prevent you
7  from looking at the Cramer 1999 study and doing
8  the same thing with that study as you did with the
9  2003 Huncharek study?
10     A   Well, again, I mean certainly that could
11 be done, but that was not -- that was not my task,
12 that was not my charge.
13     Q   Did you ask to be able to do that?
14         MR. TISI:  Objection.  Communications
15 with counsel.
16         THE WITNESS:  No.
17         MR. TISI:  I'm sorry.  Communications
18 with counsel.
19 BY MR. HEGARTY:
20     Q   Could you have done that?
21     A   Well, certainly that could be done as
22 part of a larger weight of evidence or a causation
23 analysis or, you know, any paper could be -- could
24 be critically reviewed, but this had a very
25 specific focus.

Page 416

1      Q   And that very specific focus was what
2  plaintiffs' counsel gave to you, correct?
3      A   That's not how I characterized it.
4  Again, I characterized it as the key literature
5  that industry put forward to FDA, which is very
6  important to support very important points around
7  a causal analysis related to this question.
8      Q   Well, you made reference in your report
9  to the Chang study.  Did you go to the Chang study
10 and see if they did that study properly?
11     A   Again, no.  But had you put forward
12 Chang, I would have done the same review.
13     Q   How long would that have taken?
14     A   I don't know.
15     Q   You referenced the Harlow study and said
16 they didn't talk about the Harlow study.  Did you
17 do an analysis of the Harlow study to see if it
18 was valid and reliable?
19     A   Again, same answer:  Not my charge, not
20 my task.  Had -- had you put that forward as
21 their key evidence, I would have done the same
22 review as I did here.
23     Q   So if I ask you to do those reviews, you
24 will do it?
25         MR. TISI:  Objection.

Page 417

1  BY MR. HEGARTY:
2      Q   Is that correct?
3          MR. TISI:  Objection, Counsel.  Improper
4  question.
5          MR. HEGARTY:  No, it's not --
6          MR. TISI:  It is.  She's --
7          MR. HEGARTY:  It's not improper.
8          MR. TISI:  She's not here to -- to --
9  BY MR. HEGARTY:
10     Q   No, I'm going to put on the record, I'm
11 asking you to do the analys- -- same analysis you
12 did on the --
13         MR. TISI:  And I'm going to object as an
14 improper question.
15 BY MR. HEGARTY:
16     Q   Well, if you say to me that I have the
17 ability to give it to you to do the analysis, I'm
18 going to give those studies to you and expect the
19 analysis.
20         MR. TISI:  Well, and then I'm going to
21 ask you to have your experts be available to me so
22 that I can speak to them about an analysis that
23 they've done.  Improper question.
24         You don't have to --
25         MR. HEGARTY:  My expert --

Page 418

1          MR. TISI:  You don't have to answer that
2  question.
3          MR. HEGARTY:  My expert didn't offer to
4  do the analysis.
5          MR. TISI:  You don't have to answer that
6  question because -- because you're not being
7  retained by Mr. -- Mr. Hegarty's client to do the
8  analysis that -- that he's asking you to do on the
9  spot here.
10         MR. HEGARTY:  Let's go off the record.
11 I need to coordinate with transferring the -- the
12 witness for the remaining time.  Off the record.
13         THE VIDEOGRAPHER:  The time is 2:48
14 p.m., and we're going off the record.
15         (Recess.)
16         THE VIDEOGRAPHER:  The time is 2:55
17 p.m., and we're back on the record.
18         DIRECT EXAMINATION
19 BY MR. KLATT:
20     Q   Good afternoon, Doctor.  My name is Mike
21 Klatt, and I represent Imerys Talc America in this
22 matter.
23         By your own testimony back on
24 January 11th, 2019 -- which was the first session
25 of the deposition, right?

53 (Pages 415 to 418)

April Zambelli-Weiner, Ph.D.

Page 419

1    A   Correct.
2    Q   -- and today, you said you performed
3  what you described as a critical analysis of three
4  Huncharek or Muscat articles and one submission by
5  them to the FDA; is that correct?
6    A   Correct.
7    Q   Now, to date, as we sit here in February
8  2019, you'd agree with me that there's been well
9  over two dozen studies published, whether they're
10 prospective studies, retrospective studies, cohort
11 studies, case-control studies, meta-analyses, on
12 genital use of talc and ovarian cancer?
13      MR. TISI:  Objection.
14      THE WITNESS:  I would say that, first of
15 all, I wasn't tasked with a broader review of the
16 literature, so I -- I'm sure I can agree that
17 there's a broader literature out there, but I
18 can't speak to specifically what exists.
19 BY MR. KLATT:
20    Q   Well, Doctor, you cite over 24 of those
21 studies in your report, in your references or
22 materials considered, right?
23    A   Again, I'm going to rely on you for the
24 number, but certainly, you know, to the extent
25 that studies were cited within these articles,

Page 420

1  yes, that's correct.
2    Q   I mean on page 46 through 50 of your
3  report, I can just read them out.  Purdie, 1995;
4  Chang, 1997; Cramer, 1995; Green, 1997; Wong,
5  1999; Booth, 1989; Harlow, 1992; Cook, 1997;
6  Cramer, 1982; Harlow, 1989; Ness, 2000;
7  Rosenblatt, 1992; Whittemore, 1998; Chen, 1992;
8  Cramer, 1999; Gertig, 2000; Godard 1998; Tzonou,
9  1993; Hartge 1983; Gates, 2010; Gates, 2008; Gross
10 and Berg, 1995; Langseth, 2004; Langseth, 2008;
11 Mills, 2004; Terry, 2013.
12      These are all studies regarding talc and
13 ovarian cancer that you cited on pages 46 to 50 of
14 your report, correct?
15    A   I -- I'm going to agree that, you know,
16 without looking at it, that you read that
17 correctly.  I mean certainly again any studies
18 that relate to my analysis of these particular
19 articles, sure, would absolutely be in my work
20 cited.
21    Q   And you said in response to
22 Mr. Hegarty's questions a short time ago that
23 you've not done the same sort of fly specking
24 critical analysis of any of these other papers or
25 studies of talc and ovarian cancer that you've

Page 421

1  done for the Huncharek and Muscat articles and
2  submission, correct?
3    A   Well, I'm not sure about your -- your
4  terminology, but what I will agree to is that I
5  wasn't tasked with doing that, and therefore,
6  you're correct, I did not -- I did not do a
7  critical appraisal of the broader evidence base on
8  talc and ovarian cancer.
9    Q   Now, have you or any of your employees
10 at TTi or anyone else acting at your direction
11 sent e-mails or otherwise communicated with the
12 editors of any of the journals that have published
13 these over two dozen studies relating to talc and
14 ovarian cancer?
15    A   I'm sorry.  Are you asking specifically
16 related to these studies?
17    Q   Correct.
18    A   Not to my knowledge.
19    Q   In Exhibits 6 and 7, you communicated
20 with two journals specifically requesting
21 corrections or retractions of Huncharek and Muscat
22 articles on talc and ovarian cancer, correct?
23    A   Well, again, I haven't looked at those
24 in a long time, so just to your language, I'm not
25 sure that we were calling for the retraction as

Page 422

1  much as we were requesting the process, to
2  understand their process.
3    Q   Doctor, I'm looking at Exhibit 6, and
4  the subject is "Re:  Inquiry about European
5  Journal of Cancer Prevention Retraction."
6      And Exhibit 7, the e-mail is "Inquiry
7  About Retraction, Any Cancer Research Feedback
8  Form."  Correct?
9    A   Sorry, I'm trying to put my hands on --
10      MR. HEGARTY:  We have 6.  We don't have
11 7.
12      MR. TISI:  I thought you gave her your
13 copy of 7.
14      MR. HEGARTY:  I gave that back to --
15 here is Exhibit 7.  He just put Exhibit 6 to your
16 left.
17      THE WITNESS:  Thank you.
18      Right.  So I think you read the title of
19 one of the e-mails, and then later in the e-mail,
20 you know, the body of the e-mail it says,
21 you know, what are -- what are the possible steps to
22 report these findings to the scientific community?
23 You know, is there a way to request a retraction?
24 Are there any other methods that you would
25 suggest?

54 (Pages 419 to 422)

April Zambelli-Weiner, Ph.D.

Page 423

1    So my characterization of the e-mails
2  would be to inquire to the journals as to what
3  their process is for handling these kinds of
4  issues.
5  BY MR. KLATT:
6    Q   And you've not attempted and no one
7  acting on your behalf has attempted in any way to
8  insert themselves, to tamper, monkey, meddle with
9  any of the other published literature on talc and
10  ovarian cancer other than these specific Huncharek
11  and Muscat articles, correct?
12    MR. TISI: Objection to your -- to your
13  question.
14    THE WITNESS:  Again, I'm not agreeing
15  with your characterization of -- of the work that
16  I did.
17    But, again, my task was very focused on
18  these specific studies, and so I did not do that
19  broader analysis, nor would I have the basis at
20  this point in time to do that.  So the answer to
21  your question is no.  Again, not agreeing with
22  your characterization.
23  BY MR. KLATT:
24    Q   You've had no other communication and no
25  one acting on your behalf has had any other

Page 424

1  communication with any of the editors of the
2  journals publishing the articles on talc and
3  ovarian cancer, whether prospective studies,
4  retrospective case-control studies or
5  meta-analyses, requesting any sort of retraction
6  or correction of any of those articles, right?
7    MR. TISI: Objection, other than these
8  two.
9  BY MR. KLATT:
10    Q   Other than the two Huncharek and Muscat
11  articles that you have --
12    MR. TISI: Well, there's actually four
13  Muscat and Huncharek articles.
14  BY MR. KLATT:
15    Q   Other than the Huncharek and Muscat --
16    THE VIDEOGRAPHER:  Counsel, your
17  microphone fell off.
18  BY MR. KLATT:
19    Q   Other than the three Huncharek and
20  Muscat articles and the submission, you and no one
21  acting on your behalf has attempted to contact any
22  of the editors of any of the journals that have
23  published the prospective cohort studies, the
24  retrospective case-control studies or the other
25  meta-analyses of talc and ovarian cancer, correct?

Page 425

1    A   So just to make sure I understand your
2  question, I assume you're asking that question
3  specifically related to those studies.
4    Q   And the communications that you or those
5  acting at your direction have had with the editors
6  of the journals that have published the Huncharek
7  and/or Muscat articles.
8    MR. TISI: Objection.
9    THE WITNESS: I'm sorry, I lost that --
10  I lost that line.
11  BY MR. KLATT:
12    Q   Let me start over.
13    A   Thank you.
14    Q   You've communicated or people acting at
15  your behalf have communicated with the editors of
16  journals that have published Huncharek and/or
17  Muscat studies requesting the procedures to
18  request corrections or retractions of those
19  specific articles, correct?
20    A   Correct.
21    Q   Neither you nor anyone else acting at
22  your direction has had any communication with the
23  over two dozen other prospective cohort studies,
24  retrospective case-control studies or other
25  meta-analyses dealing with talc and ovarian cancer

Page 426

1  to request any sort of corrections or retractions
2  of those articles, right?
3    A   That's correct.  We -- we -- it feels
4  like the same question as before, but, yes, that's
5  correct.
6    MR. KLATT:  Thank you.
7    MR. LOCKE:  Let me -- oh, I was just
8  going to try to shoot between the two of you.  But
9  thanks.  Thanks.
10    DIRECT EXAMINATION
11  BY MR. LOCKE:
12    Q   Doctor, my name is Tom Locke.  I
13  represent the Personal Care Products Council.  I
14  have relatively few questions for you.
15    A   Okay.
16    Q   Epidemiology is a field that takes years
17  of academic training to learn; is that correct?
18    A   I would say that's true, yes.
19    Q   How long did it take you to earn your
20  doctorate in epidemiology?
21    A   Four years.
22    Q   And you had a master's degree that was
23  related prior to that; is that correct?
24    A   That's correct.
25    Q   And you conducted postdoctoral

55 (Pages 423 to 426)

April Zambelli-Weiner, Ph.D.

Page 427

1    epidemiology training after you obtained your
2    doctorate?
3         A   That's correct.  I had a post-doc at
4    Johns Hopkins.
5         Q   Only a person with epidemiological
6    training would be able to determine an error -- an
7    epidemiologic error in an epidemiologic study; is
8    that correct?
9              MR. TISI:  Objection.  Calls for
10   speculation.
11             THE WITNESS:  I don't know that I would
12   necessarily agree with that.  I mean, I think
13   people have different levels of training and
14   different levels of experience working in the
15   field.  So I think that's probably not exactly
16   true.
17   BY MR. LOCKE:
18        Q   Well, when you say "working in the
19   field," let me just ask you -- well, let's break
20   it down.
21             Could an ordinary high school graduate
22   read a study or paper like Dr. Huncharek and
23   Dr. Muscat's 2009 submission to the FDA and
24   identify the errors that you claim to have found?
25             MR. TISI:  Objection.

Page 428

1              THE WITNESS:  Well, I would say some of
2    them, probably yes.  I would think probably just
3    about anyone could do like a crosscheck between
4    the data reported in the study and the data
5    reported in the original studies.  So I think
6    certain errors, it's possible.
7    BY MR. LOCKE:
8         Q   Are you talking about typographic
9    errors?
10        A   No, I was talking about the number of
11   errors, the abstraction errors.
12        Q   So in your opinion, it does not take an
13   expert in epidemiology to be able to look at
14   relative risks, ORs, all the other types of
15   terminology and -- to identify the errors that
16   exist -- that you contend exist in Dr. Huncharek
17   and Dr. Muscat's report?
18             MR. TISI:  Objection.
19             THE WITNESS:  Well, no, I don't think
20   that's exactly what I was saying.  I think you
21   asked me could someone with a high school
22   education pick out any of the errors, and I was
23   simply pointing out that I think there's some of
24   the errors that they could probably identify.
25             But, you know, with regard to the

Page 429

1    larger -- the concepts that you're talking about,
2    I think those are more epi -- epidemiological,
3    methodological -- sorry, it's been a long day --
4    concepts.
5    BY MR. LOCKE:
6         Q   So it takes someone with epidemiological
7    training to analyze a report or study like what
8    Drs. Huncharek and Muscat did in 2009 and identify
9    if there are problems with that study.
10             MR. TISI:  Objection.
11             THE WITNESS:  Again, I'm going to kind
12   of -- it's kind of an amorphous question, right?
13   I mean there's people with a lot of epidemiologic
14   training.  There's people who practice
15   epidemiology who are clinicians who have learned
16   on the job.  So your specific question was about
17   training, and I would say there's probably some
18   exceptions to that.
19   BY MR. LOCKE:
20        Q   Well, people are going to have to
21   understand epidemiology pretty well in order to
22   identify the errors that you've identified; is
23   that correct?
24        A   I would say that's certainly true of
25   some of the errors, yes.

Page 430

1         Q   Well, referring specifically to the
2    epidemiologic errors, is that true with respect to
3    the epidemiologic errors?  I'm not talking about
4    typos or misspellings or those kinds of things.
5         A   I'm sorry, can you repeat your question
6    or rephrase?
7         Q   Sure.
8              I'm asking you, you know, it's not a --
9    you're going to have to have epidemiological
10   experience or training in order to identify the
11   types of epidemiologic errors that you contend are
12   contained in the 2009 submission drafted by
13   Drs. Huncharek and Muscat?
14        A   So I would agree with -- I -- I will
15   sort of agree with your statement because, again,
16   I'm thinking of the exceptions.  You know, I have
17   people who work for me who have bachelor's
18   degrees, and they wouldn't necessarily have
19   specific training in epidemiology, but I sure am
20   impressed with what they're able to pick out from
21   these studies.
22             So I'm just saying, you know, I might
23   generally agree with you, but I don't think that
24   holds true all of the time.
25        Q   And the people that work for you,

56 (Pages 427 to 430)

April Zambelli-Weiner, Ph.D.

Page 431

1  they're working for a post -- a person with
2  postdoctorate training in epidemiology. That's
3  their job is to work in and on epidemiologic
4  matters, correct?
5      A  That is true, correct.
6      Q  Do you know whether PCPC in 2009
7  employed persons with epidemiological training
8  like yourself?
9      A  No, I couldn't say.
10     Q  Earlier today you stated that
11 Drs. Huncharek -- or that Dr. Huncharek and
12 Dr. Muscat's material was misleading. Let me just
13 stop there.
14        Is that an accurate characterization of
15 what you had said about their work?
16     A  Yes, I think that there are aspects of
17 their -- of their reports that are misleading,
18 that's correct.
19     Q  Let me ask you -- but you also testified
20 that you had no idea what their intent was; is
21 that correct?
22     A  That's correct. I mean, I can't know,
23 you know, did they intend to mislead or was there
24 just, you know, not good quality control, massive
25 errors. I mean, I can't know what their intent

Page 432

1  was. I can simply state what I'm able to discern
2  as -- as an expert reviewing -- reviewing these
3  papers.
4      Q  So would it be better to use the word --
5  or strike that.
6        Rather than using the word "misleading,"
7  would it be more appropriate to state that
8  Dr. Huncharek and Dr. Muscat in your view made
9  errors?
10        MR. TISI:  Objection.
11        THE WITNESS:  Not -- not necessarily. I
12 think they did make errors. I think that's
13 obvious. I think that their data is misleading.
14 I think that, you know, there are decisions that
15 are made, again for whatever reason, to
16 characterize a particular study in a particular
17 way that is misleading or inaccurate. So I think
18 those are both true. I would -- I would stick
19 with both of those.
20 BY MR. LOCKE:
21     Q  Are you offering an opinion that
22 Dr. Huncharek and Dr. Muscat acted in an unethical
23 manner?
24        MR. TISI:  Objection.
25        THE WITNESS:  I think again I'm -- I

Page 433

1  would say, no, because to me that gets to intent,
2  but I think that taking the facts of the
3  studies -- I'm definitely speaking to the facts as
4  they exist with regard to scientific standards.
5  BY MR. LOCKE:
6      Q  Are you a medical ethicist?
7      A  No.
8      Q  Are you a scientific ethicist?
9      A  No, I wouldn't characterize myself that
10 way.
11     Q  Are you a legal ethicist?
12     A  No.
13     Q  You're not offering an opinion regarding
14 whether a person or entity may submit materials to
15 the FDA; is that correct?
16        MR. TISI:  Objection.
17        THE WITNESS:  I'm not sure I understand
18 the question.
19 BY MR. LOCKE:
20     Q  Well, are you offering an opinion
21 regarding whether it's appropriate for a person or
22 entity to submit materials to the FDA?
23     A  No, I'm not.
24     Q  When did you first work on talc and
25 ovarian cancer epidemiology issues in any

Page 434

1  capacity?
2      A  I think I previously stated that I can't
3  be certain that I never read any of these papers
4  before, just having worked in the area of cancer
5  for a good bit of my career. So I really can't
6  pinpoint that time. If you're asking me a more
7  specific question around my engagement, I'll try
8  to answer that to the best of my ability.
9      Q  Well, let me ask you a more specific
10 question.
11        When did you first begin analyzing
12 Dr. Huncharek and Dr. Muscat's materials on talc/
13 ovarian cancer epidemiology?
14     A  Hmm. I -- I don't recall specifically.
15     Q  Well, was it before or after you were
16 contacted by any of plaintiffs' counsel in this
17 litigation?
18     A  In any capacity?
19     Q  In any capacity.
20     A  I would say it was after.
21        MR. TISI:  I think we're done.
22        THE WITNESS:  Again, to the best of my
23 recollection.
24        MR. LOCKE:  No, I don't think we're
25 done. I don't think we've hit our time.

57 (Pages 431 to 434)

April Zambelli-Weiner, Ph.D.

Page 435

1      MR. TISI:  I think you have.
2    How much time is left?
3      THE VIDEOGRAPHER:  18 minutes and 52
4  seconds.
5      MR. TISI:  So you're a minute over, but
6  if you have a last question, I will --
7      MR. LOCKE:  Sure.
8  BY MR. LOCKE:
9    Q   When was the first time you began
10  working as a testifying expert on talc and ovarian
11  cancer issues?
12    A   I don't recall.  I would rely on a
13  letter agreement or invoices to -- to verify that
14  because I'm just not sure.
15    Q   Well, I want to get this cleared up.
16      MR. TISI:  No, we're done.
17      MR. LOCKE:  No, I --
18      MR. TISI:  No, we're done.
19      MR. LOCKE:  Well, put it on the record
20  because I want to be crystal clear that you're
21  cutting me off and I can't follow up with this
22  last question.
23      MR. TISI:  You're a couple of minutes --
24  couple of minutes over.  I've given you some
25  latitude here, Tom.

Page 436

1      MR. LOCKE:  Okay.
2      MR. TISI:  It's your job to divide --
3  divide it up amongst yourselves --
4      MR. LOCKE:  Okay.
5      MR. TISI:  -- and if you find yourself
6  without time, it's not my problem.
7      MR. LOCKE:  Well, it actually is, but I
8  might -- we might go to the judge about it.  Let's
9  just --
10      MR. TISI:  If you -- if you -- how
11  much -- how many more questions do you think you
12  have on this area?
13      MR. LOCKE:  Well, it kind of depends on
14  the answer, but basically what I'm trying to find
15  out is was there --
16      MR. TISI:  Tom, I am going to --
17      MR. LOCKE:  One more question.
18      MR. TISI:  One more question.  Then --
19  then have at it.
20  BY MR. LOCKE:
21    Q   Was there a period of time between when
22  you became a testifying expert and when you --
23  before which you were working on Dr. Huncharek and
24  Muscat's -- or analyzing their materials?
25    A   Am I -- I'm not sure I'm allowed to

Page 437

1  answer that.
2      MR. TISI:  Yeah, you may be infringing
3  on -- to the extent that she's been consulting
4  with us.  So it's a different -- it may be a
5  different question.
6      MR. LOCKE:  Well, no, what I'm trying to
7  find out was, was there a period of time when she
8  was a consulting expert and then became a
9  testifying expert.
10      MR. TISI:  You can ask her that
11  question.
12  BY MR. LOCKE:
13    Q   Was there a period of time when you were
14  consulting expert before you became a testifying
15  expert?
16    A   Yes.
17      MR. TISI:  No more questions.  We're
18  done.  I do have like two questions.
19      THE VIDEOGRAPHER:  Counsel, your
20  microphone.
21      MR. TISI:  Okay.
22    Let's go off the record.  I just want
23  to --
24      THE VIDEOGRAPHER:  The time is
25  3:15 p.m., and we are going off the record.

Page 438

1    (Recess.)
2      THE VIDEOGRAPHER:  The time is
3  3:19 p.m., and we are back on the record.
4      CROSS-EXAMINATION
5  BY MR. TISI:
6    Q   Doctor, I just want to ask you just a
7  very brief couple of questions.
8    First of all, you were asked in the
9  first part of your deposition whether or not there
10  was information that you wanted and that you
11  requested that you did not have.
12    Do you remember that question?
13    A   Correct.  Yes, I do.
14    Q   Okay.  Would you turn to your report,
15  footnote 4 on page 9.
16    A   Okay.
17    Q   I'm going to read it into the record.
18  It says:  "I requested additional documents
19  relating to the 2003 and 2007 studies by Huncharek
20  and Muscat that might have been in the possession
21  of Dr. Huncharek, who I understood did the primary
22  analysis.  I was informed that Dr. Huncharek has
23  not been made available for deposition, and that
24  he claims the documents relating to his work on
25  talc were destroyed by a fire."

58 (Pages 435 to 438)

Golkow Litigation Services - 1.877.370.DEPS

April Zambelli-Weiner, Ph.D.

Page 439

1        Do you -- do you see that?
2        A   Yes.
3        Q   Okay.  Why would it have been helpful to
4   you to see the background documents, including
5   drafts and communications and analyses, that would
6   have been in the possession on the 2003, 2007, and
7   for that matter, the 2009 and 2011 report and --
8   and study?
9            MR. HEGARTY:  Objection.  Form.
10           THE WITNESS:  Sure.  I think I testified
11   earlier today to the fact that there's a paucity
12   in the methods, a lack of transparency, a lack of
13   clarity in terms of what was done, and certainly,
14   you know, any data that might have shed some --
15   some light on that would have been very helpful in
16   trying to evaluate the studies.
17   BY MR. TISI:
18       Q   And have you been made aware that the
19   plaintiffs' steering committee has attempted to
20   subpoena Dr. -- Dr. Huncharek, and that the court
21   actually ordered his deposition to -- to occur
22   and -- or his documents to be produced, and that
23   he has not made himself available?
24           MR. HEGARTY:  Objection.  Form.
25           THE WITNESS:  Yes, I've been made aware

Page 440

1   of that.
2   BY MR. TISI:
3        Q   The second question, you were referred
4   to -- by Mr. Hegarty to Exhibit No. 22, the Chang
5   article.  Would you pull that up, please.
6        A   Sure.
7        Q   And I'm specifically going to turn your
8   attention to page 2400.
9        A   I'm sorry.  Chang.  Okay.
10       Q   And this is a case-control study, 1997,
11   correct?
12       A   That's correct.
13       Q   And this would have been -- this is one
14   of the studies that Dr. Huncharek and Muscat told
15   the FDA was part of the dataset that did not
16   support a causal inference?
17           MR. HEGARTY:  Objection.  Form.
18           THE WITNESS:  I believe that's correct.
19   BY MR. TISI:
20       Q   Okay.  Could you turn to the page 2400,
21   the last paragraph, the concluding paragraph, and
22   read the first sentence into the record, please.
23       A   Is it the one that starts "Differences"?
24       Q   No, it says "The results of this study."
25       A   Oh, sorry.  Okay.

Page 441

1        Q   Do you see that?
2        A   Yes.
3        Q   Would you read the first sentence into
4   the record, please.
5        A   Sure.  "The results of this study appear
6   to support the contention that talc exposure
7   increases risk of ovarian carcinoma."
8        Q   Did Dr. Huncharek and Muscat, did they
9   communicate that to the FDA, if you can recall?
10           MR. HEGARTY:  Objection.  Form.
11           THE WITNESS:  Not that I recall.
12           MR. TISI:  No further questions.
13           MR. HEGARTY:  Can we go off the record
14   for a second.
15           THE VIDEOGRAPHER:  The time is 3:23 p.m.
16   We're going off the record.
17           (Pause in the proceedings.)
18           THE VIDEOGRAPHER:  The time is 3:25 p.m.
19   We're back on the record.
20           (Exhibit No. 24 was marked for
21           identification.)
22           REDIRECT EXAMINATION
23   BY MR. HEGARTY:
24       Q   Doctor, for purposes of the record, I've
25   marked as Exhibit 24 the binder you brought of

Page 442

1   studies with you today; is that correct?
2        A   Correct.
3        Q   In talking about the 2009 response to
4   the Citizen Petition, you have testified in the
5   past that it is always appropriate to challenge
6   the opinions of others, and this is the foundation
7   of science.  Correct?
8        A   Well, I'm not certain about the
9   testimony.  Certainly I don't recall all of my
10   testimony, so I guess my answer would be I don't
11   recall.
12       Q   Well, do you agree that it's always
13   appropriate to challenge the opinions of others,
14   and this is a foundation of science?
15       A   I think that I could agree that
16   scientific debate is part of science and the
17   scientific process.
18       Q   You were asked questions about being
19   informed with regard to Dr. Huncharek's status.
20   Who informed you of his status?
21       A   Plaintiff lawyers.
22       Q   And what additional documents did you
23   request?  You said, "I requested additional
24   documents."  What additional documents did you
25   request?

Golkow Litigation Services - 1.877.370.DEPS

April Zambelli-Weiner, Ph.D.

1  A   Any, you know, analyses, protocols, any
2  supporting documentation related to the studies.
3  Q   Did you report to FDA any problems that
4  you have had -- that you -- strike that.
5      Did you report to FDA the problems you
6  noted with regard to the 2009 response to the
7  Citizen Petition?
8  A   No, I have not.
9      MR. HEGARTY:  I'm going to mark as
10 Exhibit 25 the Langseth study.
11     (Exhibit No. 25 was marked for
12      identification.)
13 BY MR. HEGARTY:
14 Q   You did review that study, did you not?
15 A   Yes, I believe so at some point.
16 Q   Can you turn over to the -- turn to the
17 last -- turn to page -- second page under the
18 "Proposal to Research Community."  Do you see
19 that?
20 A   Yes.
21 Q   First of all, this is a meta-analysis,
22 correct?
23 A   That's correct.
24 Q   And it includes the forest plot that you
25 thought you would expect from the Huncharek study?

1  A   That's correct.
2  Q   And under the Proposal to Research
3  Community, the authors say:  "The current body of
4  experimental and epidemiologic evidence is
5  insufficient to establish a causal association
6  between perineal use of talc and ovarian cancer
7  risk."
8      Did I read that correctly?
9  A   You did read that correctly.
10 Q   How is that a different conclusion than
11 what Drs. Huncharek and his other authors reached
12 in the 2003 meta-analysis?
13     MR. TISI:  Objection.
14     THE WITNESS:  Well, I think that's what
15 I was trying to describe earlier.  This sounds
16 like they're making an assessment of the body of
17 literature at large.  I haven't reread this paper.
18 My point earlier was it's inappropriate to infer
19 causation solely from the meta-analysis.
20 BY MR. HEGARTY:
21 Q   How is this conclusion different than
22 what the 2009 response to FDA says -- I'm sorry,
23 the -- how is this different than the 2009
24 response that Drs. Huncharek and Muscat provided
25 to the FDA?

1      MR. TISI:  Objection.
2      THE WITNESS:  Again, not recalling their
3  specific language, they state the current body of
4  experimental and epidemiologic evidence, so
5  they're talking about a broader evidence base.
6  That's my interpretation of that particular
7  comment, but then having not read the paper
8  recently and having the full context.
9  BY MR. HEGARTY:
10 Q   When you read the Langseth paper, did
11 you take issue with anything in it?
12 A   Again, I wasn't charged with doing a
13 critical review of this paper, so it wasn't --
14 wasn't the same task.
15     MR. HEGARTY:  And that's probably -- is
16 that my time?
17     MR. TISI:  He's done, although I have a
18 follow-up question to that, so I might as well
19 ask.
20     MR. HEGARTY:  Okay.  Was that my three
21 and a half, whatever?
22     THE VIDEOGRAPHER:  3 minutes and 29
23 seconds.
24     MR. HEGARTY:  Okay.  All right.  Thank
25 you.

1      RECROSS-EXAMINATION
2  BY MR. TISI:
3  Q   Doctor, I'd like to ask you two things
4  since counsel brought up the Langseth paper.
5      Could you please go to the "What this
6  study adds" section, the gray box in the very end,
7  and read the two bullet points, please.
8      First of all, you've seen these kinds of
9  boxes before --
10 A   Yes.
11 Q   -- in these studies?
12     Why do they put them there?
13     MR. HEGARTY:  Objection.  Form.
14     THE WITNESS:  They're emphasis just to
15 help people translate and distill the information
16 in the article.
17 BY MR. TISI:
18 Q   Okay.  Could you please identify -- read
19 the two bullet points into the record, please.
20 A   Sure.  "Epidemiological evidence
21 suggests that use of cosmetic talc in the perineal
22 area may be associated with ovarian cancer risk.
23 The IARC has classified this use of talc as
24 possibly carcinogenic to human beings," in
25 parentheses, "Group 2B."

April Zambelli-Weiner, Ph.D.

1       "The mechanism of carcinogenicity may be
2  related to inflammation.  This paper focused on
3  the high degree of consistently in the studies
4  accomplished so far and what should be the focus
5  in future studies."
6       Q   And this was -- what was the date of
7  this article?
8       A   It looks like 2007.
9       Q   Okay.  And this was one of the articles
10 that was put forth by Dr. Huncharek and Muscat?
11      A   That's correct, they do -- they do
12 discuss this paper.
13      Q   Did they -- did they tell the FDA that
14 the study suggested the use of cosmetic talc in
15 the perineal area may be associated with ovarian
16 cancer risk?
17          MR. HEGARTY:  Objection.  Form.
18          THE WITNESS:  No.  In fact, this is an
19 example of one of the data points they
20 mischaracterized and misrepresent.
21 BY MR. TISI:
22      Q   One more question.
23          MR. HEGARTY:  Objection.  Form.
24 BY MR. TISI:
25      Q   Go to the abstract in the very front of

1  the paper, and do you see the -- could you please
2  read the second to last -- excuse me, the last
3  sentence of the abstract, please.
4       A   Beginning "Some"?
5       Q   Yes, please.
6       A   "Some environmental exposures, notably
7  talc and asbestos, have been suspected as ovarian
8  carcinogens."
9       Q   Having read Dr. Muscat and Hunchark's
10 statement to the FDA, what, if anything, did they
11 tell the FDA about the presence of asbestos in
12 talc?
13          MR. HEGARTY:  Objection.  Form.
14          THE WITNESS:  My recollection is that
15 they repeatedly assert that talc has been free of
16 asbestos for a very long time.
17          MR. TISI:  Thank you very much.
18          MR. HEGARTY:  Off the record for a
19 second.
20          MR. TISI:  Do you want to ask a
21 follow-up with our two minutes?
22          THE VIDEOGRAPHER:  The time is 3:31 p.m.
23 We're going off the record.
24          (A discussion was held off the record.)
25          THE VIDEOGRAPHER:  The time is

1  3:33 p.m., and we're back on the record.
2          RECROSS-EXAMINATION
3  BY MR. KLATT:
4       Q   Doctor, I'm asking you about the
5  Langseth article that Mr. Tisi just asked you
6  about.
7          Do you see on the first page the four
8  authors' names:  H. Langseth, S. Hankinson,
9  J. Siemiatycki, and E. Weiderpass?
10      A   Yes, I do.
11      Q   If you turn to the last page of the
12 article down under "Acknowledgments," do you see
13 the acknowledgements say:  "The work reported in
14 this paper was initiated while SH," Sue Hankinson,
15 "JS," Jack Siemiatycki, "and EW," Elaine
16 Weiderpass, "were part of an IARC monographs
17 working group of the International Agency for
18 Research on Cancer"?
19          Were you aware of that?
20      A   I don't recall that specifically.
21      Q   So in 2008, in this meta-analysis, they
22 said:  "The epidemiologic evidence suggests the
23 use of cosmetic talc in the perineal area may be
24 associated with ovarian cancer risk."
25          Correct?

1       A   Correct, that's what it says.
2       Q   They don't say "causes," correct?
3       A   In that statement -- in that sentence,
4  that's correct, they don't say "cause."
5       Q   And in contrast, instead of saying
6  "suggests" or "may be," back over on the second
7  page of the article, "These IARC epidemiologists
8  say the current body of experimental and
9  epidemiologic evidence is insufficient to
10 establish a causal association."  Correct?
11      A   You did read that correctly.
12      Q   And that's in 2008, correct?
13      A   I think it's 2007.
14      Q   2007.
15          And the FDA's perfectly capable of
16 reading this paper from start to finish
17 themselves, correct?
18          MR. TISI:  Objection.
19          THE WITNESS:  I would hope so.
20          MR. KLATT:  Thank you.
21          MR. TISI:  We're done.
22          THE VIDEOGRAPHER:  The time is 3:35
23 p.m., February 7, 2019.
24          Going off the record, concluding the
25 videotaped deposition.

61 (Pages 447 to 450)

April Zambelli-Weiner, Ph.D.

|  | Page 451 |
|---|---|
| 1 | (Whereupon, the deposition |
| 2 | of APRIL ZAMBELLI-WEINER, Ph.D. |
| 3 | was concluded at 3:35 p.m.) |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 452

1 CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2     The undersigned Certified Shorthand Reporter
3 does hereby certify:
4     That the foregoing proceeding was taken before
5 me at the time and place therein set forth, at
6 which time the witness was duly sworn; That the
7 testimony of the witness and all objections made
8 at the time of the examination were recorded
9 stenographically by me and were thereafter
10 transcribed, said transcript being a true and
11 correct copy of my shorthand notes thereof; That
12 the dismantling of the original transcript will
13 void the reporter's certificate.
14     In witness thereof, I have subscribed my name
15 this date:  February 10, 2019.
16
17     _____
18     LESLIE A. TODD, CSR, RPR
19     Certificate No. 5129
20
21 (The foregoing certification of
22 this transcript does not apply to any
23 reproduction of the same by any means,
24 unless under the direct control and/or
25 supervision of the certifying reporter.)

Page 453

1     INSTRUCTIONS TO WITNESS
2     Please read your deposition over carefully and
3 make any necessary corrections. You should state
4 the reason in the appropriate space on the errata
5 sheet for any corrections that are made.
6 After doing so, please sign the errata sheet
7 and date it.
8     You are signing same subject to the changes
9 you have noted on the errata sheet, which will be
10 attached to your deposition.  It is imperative
11 that you return the original errata sheet to the
12 deposing attorney within thirty (30) days of
13 receipt of the deposition transcript by you. If
14 you fail to do so, the deposition transcript may
15 be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

Page 454

1     - - - - - -
2     E R R A T A
3     - - - - - -
4 PAGE LINE CHANGE
5 ___ ___ _____
6 REASON: _____
7 ___ ___ _____
8 REASON: _____
9 ___ ___ _____
10 REASON: _____
11 ___ ___ _____
12 REASON: _____
13 ___ ___ _____
14 REASON: _____
15 ___ ___ _____
16 REASON: _____
17 ___ ___ _____
18 REASON: _____
19 ___ ___ _____
20 REASON: _____
21 ___ ___ _____
22 REASON: _____
23 ___ ___ _____
24 REASON: _____
25

April Zambelli-Weiner, Ph.D.

Page 455

```
 1           ACKNOWLEDGMENT OF DEPONENT
 2      I,_____, do hereby
 3   certify that I have read the foregoing pages, and
 4   that the same is a correct transcription of the
 5   answers given by me to the questions therein
 6   propounded, except for the corrections or changes
 7   in form or substance, if any, noted in the
 8   attached Errata Sheet.
 9
10   _____
11   APRIL ZAMBELLI-WEINER, Ph.D.        DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
25
```

Golkow Litigation Services - 1.877.370.DEPS