# EXHIBIT B5

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NEW JERSEY
 2
 3    ------------------------ )
      IN RE JOHNSON & JOHNSON  )
 4    TALCUM POWDER PRODUCTS    )
      MARKETING, SALES          )   MDL NO.
 5    PRACTICES, AND PRODUCTS   )   16-2738 (FLW) (LHG)
      LIABILITY LITIGATION      )
 6                              )
      ------------------------ )
 7                              )
      THIS DOCUMENT RELATES TO )
 8    ALL CASES                 )
                               )
 9    ------------------------
10                  ─── ─── ───
11           Saturday, January 19, 2019
                    ─── ─── ───
12
13          Videotaped Deposition of ARCH I. "CHIP"
14     CARSON, M.D., Ph.D., held at the Marriott
15     Houston Medical Center, 6580 Fannin Street,
16     Houston, Texas, commencing at 9:02 a.m., on
17     the above date, before Michael E. Miller,
18     Fellow of the Academy of Professional
19     Reporters, Certified Court Reporter,
20     Registered Diplomate Reporter, Certified
21     Realtime Reporter and Notary Public.
22                  ─── ─── ───
23           GOLKOW LITIGATION SERVICES
           877.370.DEPS | fax 917.591.5672
24                 deps@golkow.com
```

Arch I. "Chip" Carson, M.D., Ph.D.

---

Page 2

```
 1   A P P E A R A N C E S :
 2   BEASLEY ALLEN, PC
       BY: P. LEIGH ODELL, ESQUIRE
 3       leigh.odell@beasleyallen.com
         MARGARET M. THOMPSON, ESQUIRE
 4       margaret.thompson@beasleyallen.com
         234 Commerce Street
 5       Montgomery, Alabama 36103-4160
         (334) 269-2343
 6       Counsel for Plaintiffs' Steering
         Committee
 7
 8   BURNS CHAREST LLP
       BY: AMANDA KLEVORN, ESQUIRE
 9       aklevorn@burnscharest.com
         365 Canal Street
10       Suite 1170
         New Orleans, Louisiana 70130
11       (504) 799-2845
         Counsel for Plaintiffs
12
13   TUCKER ELLIS LLP
       BY: MICHAEL C. ZELLERS, ESQUIRE
14       michael.zellers@tuckerellis.com
         515 South Flower Street
15       42nd Floor
         Los Angeles, California 90071
16       (213) 430-3400
         Counsel for Johnson & Johnson
17       Defendants
18
19   DRINKER BIDDLE & REATH, LLP
       BY: KATHERINE MCBETH, ESQUIRE
20       katherine.mcbeth@dbr.com
         One Logan Square, Suite 2000
21       Philadelphia, Pennsylvania 19103
         (215) 988-2706
22       Counsel for Johnson & Johnson
         Defendants
23
24
```

Page 3

```
 1   A P P E A R A N C E S :
 2   DYKEMA GOSSETT PLLC
       BY: JANE E. BOCKUS, ESQUIRE
 3       jbockus@dykema.com
         112 East Pecan Street
 4       Suite 1800
         San Antonio, Texas 78205
 5       (210) 554-5500
         Counsel for Imerys Talc America
 6
 7   COUGHLIN DUFFY LLP
       BY: JONATHAN F. DONATH, ESQUIRE
 8       jdonath@coughlinduffy.com
         350 Mount Kemble Avenue
 9       Morristown, New Jersey 07962
         (973) 267-0058
10       Counsel for Imerys Talc America
11
12   TUCKER ELLIS LLP
       BY: CAROLINE M. TINSLEY, ESQUIRE
13       caroline.tinsley@tuckerellis.com
         100 South Fourth Street, Suite 600
14       St. Louis, MO 63102
         (216) 696-3675
15       Counsel for PTI Royston LLC and PTI
         Union LLC
16
17   SEYFARTH SHAW, LLP
       BY: RENEE B. APPEL, ESQUIRE
18       rappel@seyfarth.com
         975 F Street, N.W.
19       Washington, D.C. 20004-1454
         (202) 463-2400
20       Counsel for Personal Care Products
21
22   VIDEOGRAPHER:
23       DOUG OVERSTREET,
         Golkow Litigation Services
24
```

---

Page 4

```
 1              INDEX
 2
     APPEARANCES                    2
 3
     PROCEEDINGS                    8
 4
 5
     EXAMINATION OF ARCH I. "CHIP" CARSON, M.D., Ph.D.:
 6
       BY MR. ZELLERS               9
 7
       BY MS. BOCKUS              284
 8
       BY MS. APPEL               343
 9
10
     CERTIFICATE                  364
11
     ERRATA                       366
12
     ACKNOWLEDGMENT OF DEPONENT        367
13
     LAWYER'S NOTES               368
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1          DEPOSITION EXHIBITS
              ARCH I. "CHIP" CARSON, M.D., Ph.D.
 2               January 19, 2019
 3   NUMBER        DESCRIPTION        PAGE
 4   Exhibit 1   Notice of Deposition     10
 5   Exhibit 2   11/16/18 Carson Expert   15
                 Report
 6
     Exhibit 3   Carson Curriculum Vitae  21
 7
     Exhibit 4   Listing of Literature    21
 8               Reviewed
 9   Exhibit 5   2019 Longo et al         26
                 Publication
10
     Exhibit 6   2019 Fletcher et al      26
11               Publication
12   Exhibit 7   Undated Taher et al      26
                 Publication
13
     Exhibit 8   1952 Graham et al        29
14               Publication
15   Exhibit 9   12/18 Health Canada Draft  30
                 Screening Assessment
16
     Exhibit 10  1/1/14 FDA Letter to     31
17               Epstein
18   Exhibit 11  1991 Blount et al        32
                 Publication
19
     Exhibit 12  1974 Parmley et al       32
20               Publication
21   Exhibit 13  USB Drive Containing     36
                 Materials Reviewed
22
     Exhibit 14  8/1/00 Health Canada     98
23               Decision-Making Framework
24
```

2 (Pages 2 to 5)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 6

DEPOSITION EXHIBITS

1
2
Exhibit 15  Handwritten List of          124
3          Materials Reviewed by
          Dr. Carson
4
Exhibit 16  1979 Chappell et al          130
5          Publication
6  Exhibit 17  2011 Reid et al Publication   159
7  Exhibit 18  2011 Camargo et al          163
          Publication
8
Exhibit 19  2013 Terry et al             192
9          Publication
10  Exhibit 20  2016 Cramer et al          195
          Publication
11
Exhibit 21  IARC Classification Groups   225
12          Document
13  Exhibit 22  2017 Berge et al           243
          Publication
14
Exhibit 23  2007 Langseth et al          247
15          Publication
16  Exhibit 24  2016 Schildkraut et al     271
          Publication
17
Exhibit 25  Excerpt from IARC            289
18          Monograph 93
19
20
21
22
23
24

Page 7

REFERENCED EXHIBITS

1
2
NUMBER                          PAGE
3
Exhibit          ......................   148
4  Hopkins-28
5  Exhibit          ......................   148
   Pier-47
6
Exhibit          ......................   28
7  P-346
8
9          --o0o--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1          PROCEEDINGS
2          (January 19, 2019 at 9:02 a.m.)
3          THE VIDEOGRAPHER:  We are now
4  on the record.  My name is Doug
5  Overstreet.  I'm the videographer for
6  Golkow Litigation Services.  Today is
7  January 19th, 2019.  The time is
8  9:02 a.m.
9          This video deposition is being
10  held in Houston, Texas in the matter
11  of Talcum Powder Litigation MDL
12  No. 2738.
13          The deponent is Dr. Chip
14  Carson.
15          Will counsel please identify
16  themselves for the record.
17          MS. O'DELL:  Leigh O'Dell,
18  Beasley Allen, for the plaintiffs.
19          DR. THOMPSON:  Margaret
20  Thompson, Beasley Allen, for the
21  plaintiffs.
22          MS. KLEVORN:  Amanda Klevorn,
23  Burns Charest, for the plaintiffs.
24          MR. ZELLERS:  Michael Zellers

Page 9

1  for the Johnson & Johnson defendants.
2          MS. McBETH:  Katherine McBeth,
3  Drinker Biddle & Reath, for the
4  Johnson & Johnson defendants as well.
5          MS. BOCKUS:  Jane Bockus for
6  Imerys.
7          MR. DONATH:  Jonathan Donath
8  from Coughlin Duffy for Imerys.
9          MS. APPEL:  Renée Appel from
10  Seyfarth Shaw for Personal Care
11  Products.
12          MS. TINSLEY:  Caroline Tinsley,
13  Tucker Ellis, for PTI Union, LLC and
14  PTI Royston, LLC.
15          THE VIDEOGRAPHER:  The court
16  reporter today is Mr. Mike Miller, and
17  he will now swear in the witness.
18  ARCH I. "CHIP" CARSON, M.D., Ph.D.,
19          having been duly sworn,
20          testified as follows:
21          EXAMINATION
22  BY MR. ZELLERS:
23      Q.     Can you state your name,
24  please.

Arch I. "Chip" Carson, M.D., Ph.D.

Page 10

1      A.    Arch Carson.
2      Q.    You are a physician; is that
3   right?
4      A.    I am.
5      Q.    A medical toxicologist?
6      A.    Yes.
7      Q.    We are here today to take your
8   deposition in the talc MDL litigation
9   proceedings; is that right?
10     A.    As far as I know, yes.
11     Q.    You are an expert witness for
12   the plaintiffs in that litigation; is that
13   right?
14     A.    Yes.
15     Q.    Did you receive a notice of
16   deposition, which we'll mark as Exhibit 1, to
17   appear here today?
18          (Carson Deposition Exhibit 1
19     marked.)
20     A.    Yes, I received a copy of this
21   document.
22          MS. O'DELL:  And, Michael, just
23     for the record, we just reassert all
24     our previously served objections to

Page 11

1   the notice.
2          MR. ZELLERS:  Thank you.
3   BY MR. ZELLERS:
4      Q.    You have given deposition
5   testimony in the past; is that right?
6      A.    I have.
7      Q.    On how many occasions?
8      A.    Probably 30, 35.
9      Q.    You are familiar with the
10   procedures we're going to follow today?
11     A.    More or less, I think.
12     Q.    If at any time I ask you a
13   question and you don't understand it, tell me
14   you don't understand it and I'll repeat it or
15   rephrase it to try to make it clear to you.
16          Can you do that?
17     A.    Yes.
18     Q.    If you answer a question that I
19   ask or that any of the counsel ask, we're
20   going to assume that you understood it; is
21   that fair?
22          MS. O'DELL:  Object to form.
23     A.    That's fair.
24          ///

Page 12

1   BY MR. ZELLERS:
2      Q.    As best we can, let me finish
3   my question before you start to give your
4   answer.  I'll do the same and allow you to
5   finish your answer before I ask you another
6   question so our court reporter can take down
7   what each of us say.
8          Can you do that?
9      A.    Yes.
10     Q.    In response to the notice of
11   deposition, which we've marked as Exhibit 1,
12   have you brought with you certain documents
13   here today?
14     A.    I have a collection of
15   documents that in part respond to these
16   requests, yes.
17     Q.    Do you have any documents in
18   your possession that are responsive to the
19   notice of deposition, Exhibit 1, that you
20   have not brought here today?
21     A.    I would have to go through
22   these things one by one, but --
23     Q.    You didn't do that before we
24   came here today?

Page 13

1      A.    I did, but the plaintiffs'
2   attorneys --
3          MS. O'DELL:  Let me just stop
4   you, Dr. Carson, just because
5   discussing what we've discussed is not
6   within the purview of this deposition.
7   That's privileged.  Let me just say --
8          THE WITNESS:  All right.
9          MS. O'DELL:  -- Dr. Carson, in
10   response to the notice, has brought
11   with him copies of the cited materials
12   in his report, and that's in the
13   binder that is to his left.
14          He's brought with him copies of
15   certain documents that were listed on
16   his materials considered list.  He
17   doesn't have a physical copy of
18   everything on his materials considered
19   list.
20          I brought today a thumb drive
21   that has a copy of all the items on
22   his materials considered list.  If you
23   would like access to that, it's
24   available to you.

Arch I. "Chip" Carson, M.D., Ph.D.

Page 14

1   And then in addition, he has
2 brought some additional materials that
3 he has reviewed since the service of
4 his report.
5   The only other item, as I
6 recall, on the notice of deposition
7 request for documents that has not
8 been brought to the deposition is
9 copies of invoices and Dr. Carson has
10 not sent us an invoice. That's why we
11 don't have a copy.
12   So to try to short-circuit
13 this, just to make sure since we made
14 decisions about what's produced and
15 what's not, I'll just say all that for
16 the record. And if you'd like that,
17 you're welcome to it.
18 BY MR. ZELLERS:
19   Q.   Dr. Carson, you heard
20 Ms. O'Dell describe what you brought here
21 today. Is all of that accurate?
22   A.   It is.
23   Q.   Are you aware of there being
24 any documents or materials that are

Page 15

1 responsive to the deposition notice that you
2 have not brought with you here today?
3   A.   No.
4   Q.   I'm trying to understand what
5 counsel for plaintiffs, Ms. O'Dell, has said,
6 so let me ask you some questions.
7   You have brought with you today
8 in a binder some of the cited materials in
9 your report; is that right?
10   A.   Yes. This is intended to be a
11 complete set of the cited references, with
12 one exception.
13   Q.   When you say cited
14 references --
15   A.   From my report.
16   Q.   Your expert report, we will
17 mark as Exhibit 2.
18   (Carson Deposition Exhibit 2
19 marked.)
20 BY MR. ZELLERS:
21   Q.   Is Deposition Exhibit 2 your
22 report in this matter?
23   A.   It is. It also has
24 attachments.

Page 16

1   Q.   I'll ask you about the
2 attachments in a moment.
3   Does this report,
4 Deposition Exhibit 2, contain all of the
5 opinions that you intend to offer at any
6 trial or hearing of this matter?
7   A.   In general, it contains all of
8 my opinions. I expect to expand on those
9 opinions possibly in this deposition or in
10 the future.
11   Q.   Today's my opportunity to ask
12 you what your opinions are in this matter.
13   As of today, are the opinions
14 that you expressed to us set forth at any
15 trial or hearing in this matter, are they
16 contained in your report, Exhibit 2?
17   A.   I have seen information that
18 has become available recently that I did not
19 have at that time this report was finalized,
20 and I have modified my opinions very slightly
21 as a result of that information.
22   Q.   How have you modified your
23 opinions?
24   A.   My opinions have essentially

Page 17

1 been strengthened as they relate to the
2 causation question between perineal talcum
3 powder use and the occurrence of ovarian
4 cancers.
5   Q.   Other than you believing that
6 your opinions are strengthened with respect
7 to the association between perineal talcum
8 powder use and ovarian cancer, have your
9 opinions changed at all since you prepared
10 your report, Exhibit 2?
11   A.   No.
12   Q.   Are there any new or additional
13 opinions as of today that you expect to
14 testify to at trial or any hearing of this
15 matter other than your report, Exhibit 2, and
16 as you have qualified that report by stating
17 that your opinions on association are
18 stronger today?
19   A.   No.
20   MS. O'DELL: Object to the
21 form.
22 BY MR. ZELLERS:
23   Q.   Okay. Your report has a list
24 of references that begin on page 11.

5 (Pages 14 to 17)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 18

1    Do you see that?
2    A.    Yes.
3    Q.    What are the references?  What
4  do they relate to?  And by that, I mean --
5  I'm just trying to understand what this list
6  is.
7    A.    This is a list of references
8  from which I gleaned information that were
9  important to my forming opinions regarding
10  the question that was given to me, and they
11  contribute to pieces of the report in various
12  ways.
13    They don't represent a complete
14  review that I made in preparing my report,
15  but all are important in some way in terms of
16  coming to my conclusions.
17    Q.    Are the references that you
18  list in your report from page 11 up and
19  through page 16, are those the materials that
20  you are relying on in terms of your opinions
21  that you're expressing in your report?
22    MS. O'DELL:  Objection to form.
23    A.    Yes.
24    ///

Page 19

1  BY MR. ZELLERS:
2    Q.    What, then, is the difference
3  between the references to your report and
4  Exhibit B, which has a caption, Literature?
5    A.    The Exhibit B represents a
6  larger set of documents, including scientific
7  literature, technical reports, and so forth
8  that I reviewed in preparation of my report
9  and the formation of my opinions; but they
10  did not contain information that I felt
11  necessary to cite in my report.
12    Q.    The literature that you cite to
13  as Appendix B of your report are materials
14  that you reviewed but are not the materials
15  that you're specifically relying on.  The
16  materials that you're specifically relying on
17  are set forth in your references list; is
18  that right?
19    MS. O'DELL:  Excuse me.  Object
20    to the form, misstates his testimony.
21    A.    My opinions are based on my
22  total review of the literature as well as my
23  training, my professional experience and many
24  other factors.

Page 20

1    I produced a report that I
2  thought was responsive to the question that
3  was given to me by the plaintiffs' attorneys,
4  and within that report I felt it necessary to
5  cite specific key references that contributed
6  to items in that report.
7  BY MR. ZELLERS:
8    Q.    And those are --
9    MS. O'DELL:  Excuse me, sir.
10  Are you finished, Dr. Carson?
11    THE WITNESS:  Yes.
12    MS. O'DELL:  Okay.  Sorry.
13  BY MR. ZELLERS:
14    Q.    Those are the items that you've
15  listed under References; is that right?
16    A.    Yes.
17    Q.    Literature are other materials
18  that you have reviewed but didn't rise to the
19  level of you citing them as a reference for
20  your report, correct?
21    A.    That is correct, but they do
22  contribute information that I utilize in
23  terms of the whole to formulate my opinions.
24    Q.    Let me mark several of the

Page 21

1  attachments to your report as separate
2  exhibits.
3    (Carson Deposition Exhibit 3
4    marked.)
5  BY MR. ZELLERS:
6    Q.    Exhibit 3 is your curriculum
7  vitae that was attached to your report; is
8  that right?
9    A.    Yes.
10    (Carson Deposition Exhibit 4
11    marked.)
12  BY MR. ZELLERS:
13    Q.    Exhibit 4 is a copy of your
14  literature list that we just discussed that
15  is in your report; is that right?
16    A.    Yes.
17    MS. O'DELL:  Thank you.
18  BY MR. ZELLERS:
19    Q.    The one difference with
20  Exhibit 4, your literature list that's
21  attached to your report as Appendix B is not
22  numbered.  I've gone ahead and numbered the
23  pages on Exhibit 4, your literature list, in
24  case we want to refer to a specific page.

6 (Pages 18 to 21)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 22

1    Today, when I refer to
2  products, talc products, baby powder or
3  Shower to Shower, I'm referring to the baby
4  powder product manufactured by Johnson &
5  Johnson Consumer Products Inc. and the Shower
6  to Shower product formerly manufactured by
7  Johnson & Johnson Consumer Products Inc.
8    Do you understand that?
9    A.    Yes.
10   Q.    Is your report, Exhibit 2,
11 accurate?
12   A.    I believe so.
13   Q.    Do you believe it's complete?
14   A.    In terms of its focus, yes.
15   Q.    What do you mean in terms of
16 its focus?
17   A.    It covers specific aspects of a
18 larger question, and regarding those specific
19 aspects, I believe it is complete.
20   Q.    It covers the aspects of the
21 question that you intend to offer opinions
22 on, correct?
23   A.    That is correct.
24   Q.    What is the question that was

Page 23

1  given to you by counsel for plaintiffs in
2  this litigation?
3    A.    The question is do the -- does
4  the habitual use of talcum powder products
5  cause ovarian cancer.
6    Q.    Were you given any other
7  questions to answer or opine on in this
8  litigation?
9    A.    Not specifically.
10   Q.    What do you understand habitual
11 use of talcum powder to refer to?
12   A.    It means routine use, periodic
13 use.
14   Q.    Over any period of time?
15   A.    Over an extended period of
16 time.
17   Q.    What is an extended period of
18 time?
19   A.    Months or years.
20   Q.    Any other definition that you
21 have of habitual use?
22   A.    No.
23   Q.    Today, in response to the
24 notice of deposition, you did bring the

Page 24

1  binder of materials; is that right?
2    A.    Yes.
3    Q.    The binder of materials, did
4  you prepare that, or was it prepared for you?
5    A.    Well, I uploaded documents to a
6  share file, and the plaintiffs' attorneys
7  were kind enough to print those for me and
8  assemble them in the binder.
9    Q.    In addition, you have brought
10 with you a stack of eight or so additional
11 references that you have on the table in
12 front of you; is that right?
13   A.    Yes.
14   Q.    Are those materials that were
15 cited either as references in your report or
16 in the literature section of your report?
17   A.    I think they're all included in
18 one or the other of those lists.
19   Q.    Your testimony under oath is
20 that all of the additional materials you
21 brought here today are referred to either in
22 your reference list, which is -- begins at
23 page 11 of your report, or your literature
24 list, which we've marked as Exhibit 4 and is

Page 25

1  Exhibit B to your report; is that right?
2    MS. O'DELL:  Objection to the
3    form.
4    Go ahead.
5    A.    There are a couple of new
6  articles here that were not available at the
7  time that I submitted my report, and I
8  believe the literature list was also created.
9  BY MR. ZELLERS:
10   Q.    Were those new materials
11 provided to you by plaintiffs' counsel or are
12 those materials that you did some type of
13 literature search and found?
14   A.    One of them was provided to me
15 by plaintiffs' counsel, but I was aware that
16 it was coming.  And -- actually, two of them
17 were provided by plaintiffs' counsel.
18   Q.    All right.  The two additional
19 documents that were provided to you by
20 plaintiffs' counsel, can you show those to
21 me?
22   A.    Okay.  One is the Longo report.
23   Q.    We will mark as
24 Deposition Exhibit 5 the Longo report dated

Arch I. "Chip" Carson, M.D., Ph.D.

Page 26

1    January 15th of 2009 [sic].
2        (Carson Deposition Exhibit 5
3        marked.)
4        A.    The other is the recent
5    Fletcher, et al article.
6        (Carson Deposition Exhibit 6
7        marked.)
8    BY MR. ZELLERS:
9        Q.    The Fletcher article dated
10   January 3rd of 2019 we'll mark as Exhibit 6.
11   This is an article from Reproductive
12   Sciences; is that right?
13       A.    Yes.  And I actually have a
14   third.
15       Q.    All right.  You have a third
16   article that was provided to you by
17   plaintiffs' counsel?
18       A.    Yes.
19       (Carson Deposition Exhibit 7
20       marked.)
21   BY MR. ZELLERS:
22       Q.    Let's mark that as
23   Deposition Exhibit 7.  Can you tell us what
24   article that is?

Page 27

1        A.    This is a meta-analysis.
2    It's -- the title is Systematic Review and
3    Meta-Analysis of the Association Between
4    Perineal Use of Talc and Risk of Ovarian
5    Cancer.  The lead author is Mohamed Taher.
6        Q.    The Taher paper we have marked
7    as Exhibit 7; is that right?
8        A.    Yes.
9        Q.    This is something that you were
10   provided by plaintiffs' counsel; is that
11   right?
12       A.    Yes.
13       Q.    Exhibit 6, Reproductive
14   Sciences, are you familiar with that journal?
15       A.    I'm aware that it exists.
16       Q.    Do you review that journal on a
17   regular basis as a part of your clinical and
18   research activities?
19       A.    No, I don't.
20       Q.    Is Reproductive Sciences a
21   peer-reviewed journal?
22       A.    I believe it is.
23       Q.    The Exhibit 6 has as a
24   corresponding author, Dr. Saed, S-A-E-D, a

Page 28

1    Ph.D.; is that right?
2        A.    Yes.
3        Q.    What additional articles have
4    you brought here with you today separate and
5    apart from your binder of materials?
6        A.    There's a copy of the IARC
7    monographs preamble.
8        Q.    For what purpose did you bring
9    that article?
10       A.    This discusses the general
11   process that IARC uses in approaching a
12   putative carcinogenic material.
13       Q.    That has previously been marked
14   as Plaintiff Exhibit P-346 in another
15   proceeding; is that right?
16       A.    I don't know.
17       Q.    Well, the document we're
18   looking at has that exhibit sticker on it; is
19   that right?
20       A.    It does.
21       Q.    What else have you brought here
22   with you today?
23       A.    This is an article from
24   The Lancet from 1952 titled Value of Modified

Page 29

1    Starch as a Substitute for Talc, and the
2    first author is J.D.P. Graham.
3        Q.    Why did you bring that article?
4        A.    This is an older article that
5    discusses the suitability of substituting
6    cornstarch materials for talc due to
7    perceived issues with talc.
8        Q.    Is this an article that you had
9    cited previously, either in your references
10   or your list of literature?
11       A.    I did not cite it in my report.
12   I don't know -- I don't recall if it's in the
13   literature list or not.
14       (Carson Deposition Exhibit 8
15       marked.)
16   BY MR. ZELLERS:
17       Q.    Why did you decide to bring
18   that with you here today?
19       A.    It is in the literature list.
20       I ran across it last night, and
21   I thought I might need to refer to it during
22   the deposition.
23       Q.    What other documents or
24   materials have you brought other than your

Arch I. "Chip" Carson, M.D., Ph.D.

Page 30

1    binder of materials?
2        A.    I have here a copy of the
3    recent Canadian position on the safety of
4    talcum powder and its relationship to ovarian
5    cancer.
6        Q.    When did you review that
7    document?
8        A.    A couple weeks ago, I think.
9        Q.    Is that a document that you
10   were provided by plaintiffs' counsel?
11       A.    It was.
12       Q.    Can I see the document, please?
13   We'll mark the draft screening assessment
14   from Health Canada dated December 18th of
15   2018 as Exhibit 9.
16           (Carson Deposition Exhibit 9
17       marked.)
18   BY MR. ZELLERS:
19       Q.    Any other documents?
20       A.    I have a copy of the letter
21   from the FDA from April 1st, 2014 responding
22   to positions -- petitions for labeling.
23       Q.    This is a letter that has a
24   stamp on it on the first page, April 1st,

Page 31

1    2014, from -- or strike that -- to
2    Dr. Epstein from the FDA; is that right?
3        A.    Yes.
4        Q.    Let's mark that as Exhibit 10.
5           (Carson Deposition Exhibit 10
6        marked.)
7    BY MR. ZELLERS:
8        Q.    What else?
9        A.    I have an article authored by
10   A.M. Blount which is titled Amphibole Content
11   of Cosmetic and Pharmaceutical Talcs that was
12   published in Environmental Health
13   Perspectives in 1991.
14       Q.    Is that a journal that you
15   review on a regular basis as part of either
16   your clinical practice or your research
17   activities?
18       A.    That one I do look at pretty
19   much.
20       Q.    Is this an article you were
21   aware of back in 1991?
22       A.    No.  At least I don't recall.
23       Q.    Is it fair that your review of
24   this literature, the literature relating to

Page 32

1    talcum powder and ovarian cancer, is
2    something that you undertook when you were
3    retained by plaintiffs' counsel and asked to
4    address the question they gave to you?
5        A.    Yes, it is.
6        Q.    We will mark the article by
7    Blount as Exhibit 11.
8           (Carson Deposition Exhibit 11
9        marked.)
10   BY MR. ZELLERS:
11       Q.    And you have one more; is that
12   right?
13       A.    Yes, one more, which is -- this
14   is an article from the American Journal of
15   Obstetrics and Gynecology from 1974 titled
16   The Ovarian Mesothelioma.  It's authored by
17   Parmley and Woodruff.
18       Q.    We'll mark that as Exhibit 12.
19           (Carson Deposition Exhibit 12
20       marked.)
21   BY MR. ZELLERS:
22       Q.    Exhibit 12, is this an article
23   that was cited previously by you in either
24   your references or your literature list?

Page 33

1        A.    Yes.
2        Q.    For what -- strike that.
3           Is this a document that you
4    chose to bring today or were you provided it
5    by plaintiffs' counsel?
6        A.    This is another one I ran
7    across last night and decided to bring along
8    to the depo.
9        Q.    Same questions with respect to
10   the Blount article, Exhibit 11:  Is this an
11   article you cite in your references or
12   literature?
13       A.    In the literature, yes.
14       Q.    For what purpose have you
15   brought this with you today?
16       A.    I thought I want to refer
17   to it in response to questions here.
18       Q.    Exhibit 10, the letter from the
19   FDA to Dr. Epstein, April of 2014, for what
20   purpose have you brought that here with you
21   today?
22       A.    I thought I might want to refer
23   to it in response to questioning.
24       Q.    The documents that you have

Arch I. "Chip" Carson, M.D., Ph.D.

Page 34

1 brought here with you today are documents
2 that you wanted to have available to try to
3 respond to the questions that I may ask you?
4     A.    Yes.
5     Q.    These documents you all
6 believe -- strike that.
7         The documents that you've
8 identified and you've brought with you --
9 have brought with you today, you believe
10 those are supportive of the opinions that you
11 are rendering in this matter; is that right?
12    A.    Yes.
13    Q.    The documents on your
14 literature list, what we have marked as
15 Exhibit 4, are those documents that were
16 provided to you by plaintiffs' counsel?
17    A.    Some were.
18    Q.    The documents on this list that
19 were not provided by plaintiffs' counsel, did
20 you find those through a literature search?
21    A.    Yes.
22    Q.    Are you able to distinguish for
23 us which documents on your literature list,
24 Exhibit 4, came from plaintiffs' counsel and

Page 35

1 which items on the literature list you came
2 up with?
3     A.    To some extent.
4     Q.    So if we went through item by
5 item, you believe you could distinguish
6 between what was provided to you by
7 plaintiffs and what you found on your own?
8     A.    For some, but not all of them.
9     Q.    Have you reviewed all of the
10 materials that are listed on your literature
11 list?
12    A.    I have reviewed all of them,
13 yes.
14    Q.    Have you reviewed all of the
15 materials that are on your reference list?
16    A.    Yes.
17    Q.    The materials on your reference
18 list, is it the same that some were provided
19 to you by plaintiffs' counsel and some you
20 found on your own?
21    A.    I think there may be one or two
22 references that I didn't have before I saw
23 them in the share file that may have been
24 provided by plaintiffs' counsel, but I

Page 36

1 wouldn't be able to tell you for sure.  I'm
2 sure I ran across these in my own literature
3 search.
4     Q.    Deposition Exhibit 13, we will
5 mark the thumb drive that plaintiffs' counsel
6 has brought here today.
7         (Carson Deposition Exhibit 13
8     marked.)
9 BY MR. ZELLERS:
10    Q.    Do you, Dr. Carson, have an
11 understanding of what's on the thumb drive
12 we've marked as Exhibit 13?
13    A.    My understanding is this is
14 copies of the documents on the literature
15 list.
16    Q.    When were you first retained by
17 anyone regarding the talc/ovarian cancer
18 litigation?
19    A.    In October of 2018.
20    Q.    Who contacted you?
21    A.    I was contacted by an attorney
22 named Russ Abney.
23    Q.    Who is Mr. Abney, if you know?
24    A.    Mr. Abney is a lawyer who used

Page 37

1 to work in the Houston area and with whom I
2 had some dealings years ago; and since that
3 time he has become involved in this talc
4 litigation in some way, was aware of me as a
5 potential expert witness, and contacted me
6 regarding my interest and availability.
7     Q.    What matters have you worked on
8 with Mr. Abney in the past?
9     A.    I think it would have been back
10 in the 1990s, and I frankly don't recall what
11 cases we worked on, but there were one or
12 maybe two cases.
13    Q.    When in October of 2018 were
14 you contacted by Mr. Abney?
15        MS. O'DELL:  Object to the
16    form.
17    A.    I believe it was either the
18 14th or 15th of October.
19 BY MR. ZELLERS:
20    Q.    How do you remember with that
21 precision?
22    A.    I have an e-mail that relates
23 to a phone call which was our initial
24 contact.

10 (Pages 34 to 37)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 38

1    Q.    Mr. Abney at some point asked
2   you to address the question that you told us
3   before:  Does the habitual use of talcum
4   powder cause ovarian cancer?
5        Is that right?
6        MS. O'DELL:  Object to the
7   form.
8    A.    Well, he talked to me generally
9   about the case that was proceeding, and I
10  discussed with him what my understanding of
11  those things was and what the kind of
12  opinions I would be able to render would be.
13  And he suggested that he set up a meeting
14  between me and members of plaintiffs'
15  counsel.
16  BY MR. ZELLERS:
17   Q.    When Mr. Abney called you
18  middle of October of 2018, talcum powder and
19  any relationship or association that it may
20  have to ovarian cancer had not been a focus
21  of your research or study; is that right?
22   A.    That's right.
23   Q.    It had not been a part of your
24  clinical practice, right?

Page 39

1    A.    That's correct.
2    Q.    When did you meet with the
3   larger group of plaintiffs' counsel?
4    A.    I believe we had a telephone
5   meeting on the 16th of October.  I'm not
6   sure.  I have to --
7    Q.    That's -- right now I just want
8   estimates.
9    A.    Okay.
10   Q.    And so I don't -- as long as
11  you're reasonably comfortable that it was in
12  that time frame.
13   A.    It was mid October.
14   Q.    That's fine.
15       When were you asked the
16  question that the plaintiffs' lawyers wanted
17  you to try to answer in this litigation?
18   A.    Well, after the meeting we
19  parted ways and then made contact again a few
20  days later, and I was told that they were
21  interested in me going ahead and doing a
22  review and starting to establish opinions.
23   Q.    What do you mean by they
24  authorized you or were comfortable with you

Page 40

1   doing a review?  What does that mean?
2    A.    Well, I felt that I was hired
3   as a witness at that point and that's when I
4   would begin my billable hours on this case.
5    Q.    When was that?  Sometime in
6   later October of -- late October of 2018?
7    A.    It was within a few days after
8   our first meeting, still in October.
9    Q.    What did you do to answer the
10  question?  What was your methodology?
11   A.    Well, initially I decided to do
12  a general literature search on the question
13  to see what research had been performed, what
14  reports had been written, what the quality of
15  that research was.
16   Q.    When did you start that?
17   A.    Immediately.  I was curious.
18       I began to assemble the
19  available literature and review it on a
20  piecemeal basis through the subsequent time
21  period; the next couple of weeks I reviewed a
22  lot of it.
23   Q.    What did you search for when
24  you did this general literature search?

Page 41

1    A.    I searched under various search
2   terms, including "talc," including "ovarian
3   cancer," the relationship between the two.
4   As I became more familiar with the
5   literature, I expanded that search into other
6   topics.
7        As I became -- I was already
8   aware of issues related to the inclusion of
9   asbestos in talc deposits, and so I expanded
10  my search into that part of the literature
11  that relates to asbestos in talc or asbestos
12  in ovarian cancer.
13       As I felt my opinions would
14  need to extend into cancer and carcinogenesis
15  in general, I did some search into ovarian
16  cancer specifically and general
17  carcinogenesis to see what the current state
18  of the art was regarding that in the
19  literature.
20       I looked at some issues of
21  mining practices.
22       I looked at the Johnson &
23  Johnson website.  There's a webpage regarding
24  talc and ovarian cancer that I looked at.

11 (Pages 38 to 41)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 42

1    I looked through old notes and
2  lecture files that I had for information that
3  I've used or accessed previously in my
4  professional capacity for information that
5  was pertinent.
6         Just a very dendritic kind of
7  extensive search.
8    Q.    You reviewed these materials
9  that you have told us about and then did you
10 prepare your report?
11   A.    At that point I -- well, the
12 literature review took several stages.
13 Typically when you perform a review like
14 this, you end up with a -- I do a very
15 general sort of approach to a review, so I
16 get much more than will be pertinent to my
17 review eventually.
18        I find that a valuable approach
19 because it allows me to find things I
20 wouldn't otherwise find or look for or know
21 to look for.
22        And then I'm able to cull
23 through that information and discard pieces
24 of the search materials that are not relevant

Page 43

1  or interesting to me and then refine my
2  search and redo it, extending it into
3  different areas that have now become
4  pertinent in my opinion, until I satisfy
5  myself that I have pretty much covered the
6  waterfront so to speak in terms of a
7  literature review.
8    Q.    You did your literature review.
9  You reviewed the Johnson & Johnson website
10 and the other materials that you have told us
11 about.
12        Did you then formulate your
13 opinions and set them down in your report
14 which we marked as Exhibit 2?
15   A.    I did.  I began writing as I
16 reviewed the literature and continued to take
17 notes which, through a continuous editing
18 process, eventually became my report.
19   Q.    Did you prepare your report?
20   A.    I did.
21   Q.    Did anyone assist you in the
22 preparation of your report?
23   A.    No one assisted me in the
24 preparation of my report.  I did receive

Page 44

1  review of draft versions of my report and
2  comments, in particular --
3    Q.    Don't tell me about the
4  comments.
5    A.    Okay.
6    Q.    I don't want to know what the
7  lawyers may have told you.
8         Did the comments come from the
9  lawyers for plaintiffs or did they come from
10 other people?
11   A.    They came from the lawyers.
12 They also came from a few of my colleagues.
13   Q.    Did you share your report with
14 some of your colleagues?
15   A.    I let a few people read it and
16 I talked to them about it.
17   Q.    Are the opinions your opinions?
18   A.    Yes, they are.
19   Q.    Have you told me, you know,
20 generally what you have done to formulate
21 your opinions in this matter?
22   A.    Yes, I think so.
23   Q.    You did all of this over a
24 30-day period; is that right?

Page 45

1    A.    Yes.
2    Q.    All right.  You have no
3  invoices, correct?
4    A.    That's correct.
5    Q.    Is it typical that you'll work
6  on a matter for some number of months and not
7  generate any invoices?
8    A.    Yes.
9    Q.    You are billing your time at
10 what rate?
11   A.    $450 per hour.
12   Q.    Can you estimate for us the
13 number of hours that you have spent doing
14 your literature review, formulating your
15 opinions, and writing your report?
16   A.    There's still some tallying I
17 need to do from my calendar, but it's between
18 150 and 180 hours.
19   Q.    Does that include your meetings
20 and communications with plaintiffs' counsel?
21   A.    Yes, that's up until today.
22   Q.    Other than meeting with
23 Mr. Abney or talking with Mr. Abney -- did
24 you ever meet with Mr. Abney face-to-face?

12 (Pages 42 to 45)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 46

1      A.   No.
2      Q.   What other plaintiff lawyers
3  have you met with or talked with as part of
4  your formulating your opinions and doing your
5  literature review?
6      A.   We've had a number of
7  conference calls where there were several of
8  these attorneys' colleagues on the line, but
9  in terms of in-person meetings, those have
10  been with Ms. O'Dell and Ms. Thompson,
11  Dr. Thompson.
12      Q.   How many meetings have you had
13  with Ms. O'Dell?
14      A.   Three.
15      Q.   How many meetings have you had
16  with Dr. Thompson?
17      A.   Three.
18      Q.   Did you know Dr. Thompson
19  before you were retained in this matter?
20      A.   I did not.
21      Q.   Any other plaintiff lawyers in
22  this litigation that you are aware of --
23  strike that.
24           Any other plaintiff lawyers in

Page 47

1  this matter that you've had communications
2  with other than what you have told us?
3      A.   No.
4      Q.   Do you have any social
5  relationship with any of the plaintiffs'
6  counsel?
7      A.   No.
8      Q.   Your relationship with
9  Dr. Thompson is just the three meetings that
10  you have been involved in with her?
11      A.   Well, we've exchanged e-mail
12  communications, but other than that, no.
13      Q.   Have you met with or talked
14  with any other expert witness for plaintiffs?
15      A.   No, I have not.
16      Q.   Do you know who Thomas Dydek
17  is?
18      A.   Yes.
19      Q.   Who is Thomas Dydek?
20      A.   He is a toxicologist.
21      Q.   Where does he practice?
22      A.   I don't recall.
23      Q.   Have you had any discussions
24  with Dr. Dydek?

Page 48

1      A.   I have not had any discussions
2  with Dr. Dydek.  We may have met previously,
3  but I don't recall.
4      Q.   Any previous meeting with
5  Dr. Dydek, did it relate to this litigation?
6      A.   No.
7      Q.   Did it relate to expert witness
8  work that you were doing?
9      A.   No.
10      Q.   Do you know what the
11  relationship is, if any, between Dr. Thompson
12  and Dr. Dydek?
13      A.   I don't know of any
14  relationship outside of his work as an expert
15  witness in related litigation.
16      Q.   Dr. Crowley, do you know
17  Michael Crowley?
18      A.   I know of Dr. Crowley.
19      Q.   Did you know of Dr. Crowley
20  before you were retained in the talcum powder
21  litigation?
22      A.   No.
23      Q.   Have you ever met with
24  Dr. Crowley?

Page 49

1      A.   I have not.
2      Q.   Ever talked with Dr. Crowley?
3      A.   I have not.
4      Q.   You reviewed his report as part
5  of your review in this matter; is that right?
6      A.   That's correct.
7      Q.   Do you know who any of the
8  other experts are in this litigation for
9  plaintiffs?
10      A.   Well, I know there are a number
11  of people who have generated reports that I
12  have also reviewed.
13      Q.   What reports have you reviewed
14  from plaintiffs' other experts?
15      A.   Well, I've reviewed several
16  reports from Dr. Longo, who's done work on
17  the presence of asbestos in talc products and
18  related things.  I think he's the only other
19  expert that I'm aware of at this point.
20      Q.   Well, you're aware of
21  Dr. Crowley?
22      A.   Well, Dr. Crowley, Dr. Longo,
23  and Dr. Dydek that you mentioned before.
24      Q.   Have you reviewed any reports

Arch I. "Chip" Carson, M.D., Ph.D.

Page 50

1    or transcripts from Dr. Dydek?
2         A.    Yes, I reviewed an expert
3    report that he provided before I got involved
4    in this case.
5         Q.    Did you review that report
6    before you prepared your report?
7         A.    Yes.
8         Q.    Did you review Dr. Crowley's
9    report before you prepared your report?
10        A.    Yes.
11        Q.    And you reviewed Dr. Longo's
12   report before you prepared your report; is
13   that right?
14        A.    I've reviewed one report.
15   There was another one that became available
16   after.
17        Q.    The second report is what you
18   brought here today and we marked as
19   Exhibit 5; is that right?
20        A.    Yes.
21        Q.    Any other plaintiff experts
22   that you're aware of?
23        A.    Not that I can think of, no.
24        Q.    Any other reports from

Page 51

1    plaintiffs' experts that you have reviewed?
2         A.    Well, there's a -- there is an
3    article that's been submitted for publication
4    which I consider a piece of the scientific
5    literature.  You mentioned Dr. Saed earlier,
6    and I know that he has a relationship with
7    this case as well.
8         Q.    What is his relationship with
9    this case, Dr. Saed?
10        A.    He's provided some work at the
11   request of the attorneys here.
12        Q.    Have you reviewed that work?
13        A.    That's the subject of several
14   articles he's published previously, he and
15   his colleagues, as well as the additional one
16   that I brought today.
17        Q.    Other than the articles that
18   you have listed on your reference and
19   literature list and the Saed article that you
20   brought with you today, are you aware of any
21   other work that Dr. Saed has done in this
22   matter?
23        A.    No.
24        Q.    Any other plaintiff experts

Page 52

1    that you're aware of?
2         A.    No.
3         Q.    Are you aware of any of the
4    experts for defendants in the talcum powder
5    litigation?
6         A.    No.
7         Q.    Have you reviewed any reports
8    from any of the experts in the talcum powder
9    litigation?
10        A.    I have not.
11        Q.    Have you reviewed any of the
12   transcripts of defense experts in the talcum
13   powder litigation?
14        A.    I've reviewed some deposition
15   transcripts of various witnesses.
16        Q.    Those witnesses are all listed
17   in either your references or your literature;
18   is that right?
19        A.    Yes.
20        Q.    Did you review the entire
21   transcripts of the witnesses that you've
22   identified?
23        A.    I think for the most part I
24   would say yes.

Page 53

1         Q.    Did you review the exhibits to
2    those depositions?
3         A.    Yes.  If they were provided to
4    me, I did, yes.
5         Q.    Did you believe that it was
6    your job to do an independent assessment as
7    to whether or not the habitual use of talcum
8    powder causes or can cause ovarian cancer?
9              MS. O'DELL:  Object to the
10        form.
11        A.    Could you repeat the question,
12   please.
13   BY MR. ZELLERS:
14        Q.    Sure.
15              Plaintiffs asked you to --
16   strike that.
17              Plaintiffs' counsel asked you
18   to answer that question; is that right?
19        A.    Yes.
20        Q.    You understood that they were
21   looking to develop an association or a causal
22   relationship between the habitual use of
23   talcum powder and ovarian cancer, correct?
24        A.    Yes.

14 (Pages 50 to 53)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 54

1     MS. O'DELL:  Object to the
2  form.
3         Excuse me, I'm sorry,
4  gentlemen.  Give me just one second to
5  object if I need to.
6     THE WITNESS:  Sure.
7     MS. O'DELL:  Thank you.
8  BY MR. ZELLERS:
9     Q.    Did you consider the literature
10  and the sources that refuted that association
11  or causal relationship?
12     A.    I tried to consider all the
13  available literature.
14     Q.    When you wrote your report
15  setting forth your opinions, did you set
16  forth the sources that refuted the
17  propositions you were making?
18     A.    I cited several sources that on
19  the surface might seem to refute my opinions.
20     Q.    And you believe that is
21  contained in your report which we marked as
22  Exhibit 2; is that right?
23     A.    Yes.
24     Q.    Have you been involved in any

Page 55

1  other talcum powder litigation other than
2  this talc MDL matter that Mr. Abney talked to
3  you about?
4     A.    No, I haven't.
5     Q.    In the 30 to 35 occasions that
6  you've testified in the past, have any of
7  those been on issues relating to talcum
8  powder and any association between talcum
9  powder and ovarian cancer?
10     A.    No.
11     Q.    You are not an expert in
12  asbestos, correct?
13     MS. O'DELL:  Object to the
14  form.
15     A.    I'm an occupational medicine
16  physician, and I have a significant amount of
17  awareness and training regarding asbestos as
18  it relates to occupational exposures and
19  general environmental exposures, but I don't
20  consider myself an asbestos expert.
21  BY MR. ZELLERS:
22     Q.    What percentage of your time do
23  you spend working as a consultant?  And I'm
24  talking about your professional time.

Page 56

1     A.    Probably 5%.
2     Q.    What percent of your income
3  comes from the work that you do as a
4  consultant?
5     A.    Of course it varies quite a bit
6  from moment to moment, but it would be less
7  than 10%.
8     Q.    Have you ever testified at
9  trial?
10     A.    Yes.
11     Q.    On how many occasions?
12     A.    Probably ten.
13     Q.    The 30 to 35 depositions that
14  you've given previously, those have been in
15  the context of you providing litigation
16  consulting services; is that right?
17     A.    In terms of expert testimony,
18  yes.
19     Q.    The trial appearances that
20  you've made, are those also in your capacity
21  as an expert witness?
22     A.    Yes.
23     Q.    Have you been involved in other
24  litigations?

Page 57

1     A.    Yes.
2     Q.    What other litigations have you
3  been involved in as an expert?
4     A.    Well, I've been asked to
5  provide opinions and testify in a number of
6  cases, most of which involved personal injury
7  in the occupational setting or environmental
8  exposures.
9     Q.    Has the majority of your expert
10  work in the occupational setting and for
11  environmental exposures been on behalf of
12  plaintiffs?
13     A.    No, it's been split about
14  50/50, plaintiff and defense.
15     Q.    Have you ever been retained in
16  a case involving cosmetic products?
17     A.    No.
18     Q.    Your curriculum vitae that we
19  marked as Exhibit 3, is it correct and up to
20  date?
21     A.    It was up to date at the time
22  of submission of my report in the end of
23  2018.
24     Q.    What additions need to be made

15 (Pages 54 to 57)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 58

1  or corrections need to be made to your CV,
2  Exhibit 3, to bring it up to date?
3       A.    Well, I've terminated a
4  relationship with the University of Texas
5  Medical Branch in Galveston where I was
6  their -- the medical director of their
7  Employee Health Services Clinic.  I continue
8  to be -- serve as an assistant clinical
9  professor of preventive medicine and family
10 medicine at that institution.
11          I have terminated my
12 relationship with the Enbridge Corporation as
13 their medical director.
14          The Spectra Energy entry, which
15 is about the seventh on the list of
16 professional activities, is also terminated
17 as that was a company that was merged and
18 became Enbridge.
19      Q.    Any other corrections or
20 updates to your curriculum vitae that we've
21 marked as Exhibit 3?
22      A.    No.
23      Q.    Why are you no longer serving
24 as medical director, Employee Health Services

Page 59

1  with the University of Texas?
2       MS. O'DELL:  Objection to form.
3       A.    That was a contract that I had
4  through the University of Texas Houston
5  College of Nursing that provided those
6  services to UTMB, and UTMB decided to make a
7  change and go with another contractor.
8  BY MR. ZELLERS:
9       Q.    Why are you no longer serving
10 as medical director for Spectra Energy
11 Corporation and Enbridge Corporation?
12      A.    Well, Spectra Energy no longer
13 exists; it became Enbridge Corporation.  And
14 in October of 2018, I determined that I did
15 not -- I no longer had sufficient time to
16 provide that service.
17      Q.    Your undergraduate degree was
18 in biologic sciences with a concentration in
19 engineering; is that right?
20      A.    Yes.
21      Q.    You received a Ph.D. in
22 toxicology; is that right?
23      A.    Yes.
24      Q.    And then later an M.D. degree;

Page 60

1  is that right?
2       A.    Yes.
3       Q.    What percentage of your time is
4  spent in the clinical practice of medicine?
5       A.    Currently I see patients
6  one-half day a week and work as a supervisor
7  of the occupational medicine residents for
8  additional time during the week, so clinical
9  activities would be about probably 12 hours a
10 week.
11      Q.    Do you see or treat women for
12 gynecologic cancer?
13      A.    I do not.
14      Q.    You have never worked for a
15 company that manufactures cosmetic products,
16 correct?
17      A.    That's correct.
18      Q.    You're not a gynecologist or an
19 oncologist, correct?
20      A.    That's correct.
21      Q.    You're not a cancer biologist?
22       MS. O'DELL:  Object to the
23 form.
24      A.    That's correct.

Page 61

1  BY MR. ZELLERS:
2       Q.    You are not a geologist,
3  mineralogist or microscopist?
4       A.    That's correct.
5       Q.    You're not an epidemiologist?
6       A.    Well, I may be considered an
7  epidemiologist simply by my appointment as an
8  associate professor in the Department of
9  Epidemiology at the School of Public Health
10 here in Houston.
11      Q.    Do you have any professional
12 education in the field -- well, strike that.
13          Have you ever published or
14 conducted a meta-analysis?
15      A.    I have conducted meta-analyses.
16 I've not published them.
17      Q.    You did not do any type of
18 fellowship in epidemiology, correct?
19      A.    That's correct.
20      Q.    You're not board certified in
21 epidemiology; is that right?
22      A.    I don't believe there is a
23 board certification in epidemiology.
24      Q.    You're not a biostatistician or

Arch I. "Chip" Carson, M.D., Ph.D.

Page 62

1 a pulmonologist?
2      A.    That's correct.
3      Q.    You're not a material
4 scientist?
5      A.    That's correct.
6      Q.    Nor are you a pathologist?
7      A.    Correct.
8      Q.    You've never been involved in
9 any pathological exam or research relating to
10 ovarian cancer; is that right?
11           MS. O'DELL:  Object to the
12 form.
13      A.    I'm not sure exactly what you
14 mean by your question.
15 BY MR. ZELLERS:
16      Q.    Sure.  Let me withdraw that.
17           You've never been involved in
18 terms of the research relating to ovarian
19 cancer, correct?
20      A.    Not specifically, no.
21      Q.    You've never authored any
22 literature or publications relating to talcum
23 powder?
24      A.    No.

Page 63

1      Q.    Or relating to ovarian cancer,
2 correct?
3      A.    No.
4      Q.    Okay.  What journals -- well,
5 strike that.
6           You have never published on
7 fragrance chemicals; is that right?
8           MS. O'DELL:  Object to the
9 form.
10      A.    That's correct.
11 BY MR. ZELLERS:
12      Q.    Never done any research on
13 fragrance chemicals, correct?
14      A.    I've done some work with
15 fragrance chemicals and health effects that
16 are associated with them, but I have not -- I
17 would not classify that as research or
18 publication.
19      Q.    You had no opinions regarding
20 talcum powder or any of its constituent
21 components before getting involved in this
22 litigation; is that right?
23           MS. O'DELL:  Object to the
24 form.

Page 64

1      A.    I think I had opinions about
2 talcum powder and its constituents, but if
3 you could be more specific, I might be able
4 to give you a more specific answer.
5 BY MR. ZELLERS:
6      Q.    Did you ever, before getting
7 involved in this litigation in October of
8 2018, do research -- strike that.
9           You've never published on
10 talcum powder, correct?
11      A.    That's correct.
12      Q.    You have never published on the
13 constituent components of talcum powder,
14 correct?
15      A.    That may not be the case.  I've
16 done work in some other minerals which have
17 resulted in publications, for example,
18 vermiculite, which have touched on the issues
19 of asbestos, association with talc,
20 association with other minerals, but never
21 specifically regarding talc.
22      Q.    Are those publications on your
23 CV?
24      A.    They are.

Page 65

1      Q.    That we marked as Exhibit 3?
2      A.    Yes.
3      Q.    Okay.  Have you ever
4 communicated with the FDA regarding talcum
5 powder?
6      A.    I've not.
7      Q.    Have you ever communicated with
8 Health Canada regarding talcum powder?
9      A.    No.
10      Q.    When did you first start
11 preparing your report which we've marked as
12 Exhibit 2?
13      A.    Well, I began a literature
14 review immediately after talking to
15 Mr. Abney.
16      Q.    My question, I guess, is:  When
17 did you start writing your report?
18      A.    Well, technically I started
19 writing my report after I was retained by
20 plaintiffs' counsel.
21      Q.    Late October, early
22 November 2018?
23           MS. O'DELL:  Object to the
24 form, misstates his prior testimony.

17 (Pages 62 to 65)

Page 66

1      A.    In October of 2018.
2  BY MR. ZELLERS:
3      Q.    Have you reviewed any of the
4  deposition transcripts of any of the experts
5  that have been deposed in this litigation?
6      A.    Yes.
7      Q.    What deposition transcripts of
8  experts have you reviewed?
9      A.    Oh, of experts?  No, I have not
10  reviewed -- well, I've reviewed -- I've
11  reviewed expert depositions, but I don't know
12  what case they were deposed in, but it
13  relates to talcum powder and ovarian cancer
14  issue.
15      Q.    What expert depositions have
16  you reviewed?
17      A.    They're all cited in the
18  literature exhibit.
19      Q.    All of the deposition
20  transcripts that you've reviewed are cited in
21  Exhibit 4?
22      A.    I think any of the transcripts
23  that I review are -- reviewed are probably
24  included in here.

Page 67

1      Q.    Are you aware of reviewing any
2  transcripts that you did not include in your
3  literature statement?
4      A.    I'm not aware, but I can't tell
5  you as I'm sitting here right now whether all
6  of those are included in this literature
7  statement or not.
8      Q.    You -- looking at page --
9      MS. O'DELL:  I'm sorry.  Go
10  ahead.
11  BY MR. ZELLERS:
12      Q.    Are there any that you believe
13  you have reviewed that are not included in
14  the literature statement?
15      A.    Well, let me just see here.
16  There are --
17      MS. O'DELL:  I think they're at
18  the end, Dr. Carson.
19      THE WITNESS:  At the very end.
20      A.    Beginning on page 27 is a list
21  of the depositions, transcripts and reports
22  that I've reviewed, which include some of the
23  expert witnesses, but again, I would have to
24  say I'm -- I'm sort of unaware of the nuts

Page 68

1  and bolts of what goes on legally in this
2  case.  I know there are multiple lawsuits,
3  and I'm not sure which ones those -- these
4  are pertinent to.
5  BY MR. ZELLERS:
6      Q.    My question is a little
7  different and I hope pretty simple:  In
8  addition to the depositions, transcripts and
9  reports that you have listed on pages 27 and
10  28 of Exhibit 4, your literature list, are
11  there any additional depositions or
12  transcripts that you've reviewed?
13      A.    Pardon me for a moment while I
14  review this.
15      (Document review.)
16      A.    No, I'm not aware that there
17  are.
18  BY MR. ZELLERS:
19      Q.    Your testimony earlier was that
20  you have reviewed each of those depositions
21  in their entirety; is that right?
22      A.    Yes.
23      Q.    You have also reviewed the
24  exhibits to those depositions; is that right?

Page 69

1      A.    If they were made available to
2  me, I've looked at all those exhibits as
3  well.
4      Q.    On page 27 of Exhibit 4, who is
5  Annie Yessaian?
6      A.    On page 24?
7      Q.    Strike that.  I'm sorry.  On
8  page 27 of Exhibit 4 --
9      A.    I see.
10      Q.    -- at the bottom, who is Annie
11  Yessaian?
12      A.    I don't recall.
13      Q.    You reviewed her entire
14  transcript and you don't recall who she is?
15      A.    I don't.
16      Q.    Well, go to the next page.  Who
17  is Pat Downey?
18      A.    I believe Pat Downey is an
19  operative of the Imerys company.
20      Q.    Do you know what Mr. Downey's
21  position is?
22      A.    It's a supervisory position
23  regarding -- regarding quality of the talc
24  product.

18 (Pages 66 to 69)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 70

1      Q.    Who is John Hopkins?
2      A.    John Hopkins is an official, I
3  believe, of -- I'm not sure -- of Johnson &
4  Johnson, I believe, who has some oversight of
5  talc quality as well.
6      Q.    Susan Nicholson, who is she?
7      A.    I don't recall.
8      Q.    Who is Julie Pier?
9      A.    Julie Pier is another scientist
10  who works for Imerys, who is responsible for
11  testing and quality.
12      Q.    In your clinical and academic
13  practice, do you typically rely upon
14  depositions of company witnesses or experts?
15          MS. O'DELL:  Object to the
16      form.
17      A.    If there's pertinent
18  information in there that leads me to other
19  areas or helps me formulate my opinions, then
20  yes.
21  BY MR. ZELLERS:
22      Q.    In the papers and publications
23  that you have identified in your curriculum
24  vitae, Exhibit 3, do you ever recall citing

Page 71

1  to company witness deposition testimony?
2      A.    I don't typically cite
3  deposition testimonies in published papers.
4      Q.    You cite to various company
5  documents.  This is on pages 29 to 30 of
6  Exhibit 4, your list of literature; is that
7  right?
8      A.    Yes.
9      Q.    Did you rely on these documents
10  in formulating your opinions?
11      A.    Yes.
12      Q.    Were these documents selected
13  for you by plaintiffs' counsel?
14      A.    Yes, they were.
15      Q.    Are you able to identify what
16  each of the documents are?
17          MS. O'DELL:  Based on the Bates
18      number?
19          MR. ZELLERS:  Based on the
20      Bates numbers.
21      A.    No, I am not.  I would have to
22  look at each individual document to refresh
23  my memory as to what it contains.
24          ///

Page 72

1  BY MR. ZELLERS:
2      Q.    Once you looked at these
3  documents, the Imerys documents and the
4  documents produced by the Johnson & Johnson
5  companies, did you ask plaintiffs' counsel
6  for any additional documents?
7      A.    I did not.  My understanding is
8  that most of these are reports, testing
9  reports, and most of them are positive
10  results regarding the presence of asbestos or
11  fibers in the product.  And I know that there
12  were many others that may not have shown
13  positive results that I did not look at.
14      Q.    Did you ask the plaintiff
15  attorneys to show you or provide you with the
16  testing documentation that showed an absence
17  of asbestos or asbestos fibers in the talcum
18  powder?
19      A.    Regarding the test results that
20  are equivalent to these that were negative,
21  no, I did not request those.
22      Q.    Did you review documents
23  relating to any fragrance chemicals that are
24  contained in or that you believe are

Page 73

1  contained in the talcum powder?
2      A.    Yes.  I did review some lists
3  and, of course, Dr. Crowley's report.
4      Q.    Do you have any idea or
5  understanding as to the amount or amounts of
6  the fragrance chemicals that are contained in
7  the talcum powder in either the Johnson &
8  Johnson Consumer company talcum powder that's
9  involved in this litigation?
10          MS. O'DELL:  Object to the
11      form.
12          MR. ZELLERS:  Let me withdraw
13      that.
14  BY MR. ZELLERS:
15      Q.    Do you know or have any
16  understanding as to the amounts of fragrance
17  chemicals that are in the talcum powder?
18      A.    I do not have the specific
19  formulation or quantities of those substances
20  that contributed to the products.
21      Q.    Do --
22          MS. O'DELL:  Excuse me.
23          MR. ZELLERS:  Ms. O'Dell,
24      please, I'm going to let the doctor

19 (Pages 70 to 73)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 74

1  finish.
2      MS. O'DELL:  In that instance,
3  I don't know that he was, and so if he
4  was, my apologies.
5      MR. ZELLERS:  It's okay.
6      MS. O'DELL:  I've been on my
7  best behavior today, as you know,
8  so -- but I don't want the witness to
9  feel as if they're being cut off, and
10  because Dr. Carson is a very polite
11  gentlemen, he would let you interrupt
12  him.
13      MR. ZELLERS:  Of course.
14      MS. O'DELL:  And I don't think
15  that's fair.
16      So, Dr. Carson, if you're
17  finished, great.  If you're not, you
18  may continue.
19      A.    Well, I was going to say that
20  my opinion is that there are very small
21  quantities of those substances that
22  contribute to the fragrance component.
23  BY MR. ZELLERS:
24      Q.    Do you know how those

Page 75

1  quantities of fragrance chemicals may have
2  changed over the years?
3      A.    My understanding is they have
4  not changed dramatically, but there have been
5  certain substitutions over time.
6      Q.    Do you agree that to the extent
7  that you have reviewed internal documents,
8  either of Imerys or from Johnson & Johnson
9  companies, that you have only reviewed the
10  documents that were hand-selected by the
11  plaintiff lawyers for you to review?
12      MS. O'DELL:  Object to the
13  form.
14      A.    I agree that the only documents
15  that I've reviewed regarding the internal
16  products of Johnson & Johnson or Imerys are
17  the ones that were provided by the
18  plaintiffs' attorneys.
19  BY MR. ZELLERS:
20      Q.    Do you know what percentage of
21  the documents that have been produced in this
22  litigation by the Johnson & Johnson companies
23  and by Imerys you have reviewed?
24      A.    Well, based on my general

Page 76

1  understanding of business practices and these
2  types of industries, I've reviewed an
3  extremely small percentage of those.
4      Q.    Is it your practice in your
5  academic work or your clinical research work
6  to rely on internal company documents?
7      A.    Yes, it is.
8      Q.    Do you rely on internal company
9  documents when you publish papers?
10      A.    In some cases.
11      Q.    Can you tell me in what cases
12  or instances you have relied on internal
13  company documents in your publications?
14      A.    Well, for example, I did -- I
15  was involved in some research work in
16  conjunction with NIOSH at the O.M. Scott
17  Company at Marysville, Ohio, where we did
18  a -- we performed a research in the company
19  and relied on some internal documents in
20  terms of gauging concentrations, industrial
21  hygiene records and so forth, in order to
22  draw conclusions that were pertinent to those
23  publications.
24      Q.    Was that data or were those

Page 77

1  internal communications that you relied on?
2      A.    They were both.
3      Q.    What is the publication on your
4  CV where you relied on those materials?
5      A.    Well, let me see here.  I think
6  the first author -- looking back here -- the
7  first author would be Jim Lockey.
8      Q.    Looking at page 6?
9      A.    It's on page 6, and the --
10  there are two publications there.  One is
11  Pulmonary Changes After Exposure to
12  Vermiculite Contaminated With Fibrous
13  Tremolite that appeared in the American
14  Review of Respiratory Disease in 1984.
15      There's another publication
16  which is a book chapter called Pulmonary
17  Hazards From Vermiculite that appeared in a
18  book titled Health Issues Related to Metal
19  and Nonmetallic Mining.
20      Q.    Do you agree that when you have
21  been provided only a small subset of the
22  documents of a company relating to a
23  particular product, that those documents can
24  potentially be misleading?

20 (Pages 74 to 77)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 78

1      MS. O'DELL:  Object to the
2  form.
3      A.    I don't agree that that's the
4  case because I am capable of understanding
5  that it's a subset of available information,
6  and I can make a reliable determination on
7  the pertinence of that material regardless.
8  BY MR. ZELLERS:
9      Q.    Without looking at any other
10  documents or any documents that may put the
11  documents you were provided in context?
12      MS. O'DELL:  Object to the
13  form.
14      A.    It depends on the specific
15  case, but I would say in most cases, yes.
16  BY MR. ZELLERS:
17      Q.    In this case, it was not
18  necessary for you to look at any documents
19  other than those specific documents the
20  plaintiffs provided to you; is that your
21  testimony?
22      MS. O'DELL:  Object to the
23  form.
24      A.    Regarding the contribution to

Page 79

1  my opinions, I would say, yes, it was not
2  necessary.
3  BY MR. ZELLERS:
4      Q.    Did you do any independent
5  investigation to reach your opinions, other
6  than the literature search and review of
7  websites that you told us about earlier?
8      A.    Other than just general
9  discussion with colleagues, no.
10      Q.    Did any of the colleagues that
11  you spoke with provide you with any
12  substantive support for your opinions?
13      A.    Not that I can recall.  It was
14  mostly just helpful feedback.
15      Q.    The colleagues that you spoke
16  with were who?
17      A.    Various colleagues in my
18  department or in the School of Public Health.
19      Q.    Who?
20      A.    Well, Dr. George Delclos, who
21  is a pulmonologist; Dr. Brett Perkison, who
22  is an occupational medicine physician;
23  Roberta Ness, who is an epidemiologist.
24      Q.    Roberta Ness is in your

Page 80

1  department?
2      A.    She's in my department, yes.
3      Q.    You understand she's a
4  lawyer -- strike that.
5      You understand she's an expert
6  for the plaintiffs in this litigation?
7      A.    I didn't know that.
8      Q.    Dr. Ness never told you that
9  she was an expert witness for plaintiffs in
10  this matter?
11      A.    No, we didn't discuss this
12  case.  We only discussed the issue.
13      Q.    Any other colleagues that you
14  discussed your report and opinions with?
15      MS. O'DELL:  Object to the
16  form.
17      A.    I think I shared some of my
18  thinking with the occupational medicine
19  residents as a group and asked them to
20  consider certain issues in the case.
21  BY MR. ZELLERS:
22      Q.    Did they contribute to your
23  review and analysis and opinions?
24      A.    We had an interesting

Page 81

1  discussion, but I don't think that changed my
2  opinions in any way.
3      Q.    The opinions that you're
4  expressing in this case are your opinions; is
5  that right?
6      A.    That's correct.
7      Q.    Your opinions you set forth in
8  your report beginning on page 7; is that
9  right?
10      A.    Let me refer to my report, if
11  you don't mind.
12      MS. O'DELL:  Object to the
13  form.
14      A.    I would say -- I would say in
15  answer to that question that, yes, my
16  opinions do begin on page 7 of the report.
17  BY MR. ZELLERS:
18      Q.    Your first opinion set forth on
19  page 7 is that talcum powder is immunogenic
20  and carcinogenic; is that right?
21      A.    Yes.
22      MS. O'DELL:  Excuse me.
23  BY MR. ZELLERS:
24      Q.    Your second opinion is that

Arch I. "Chip" Carson, M.D., Ph.D.

Page 82

1   perineal use of talcum powder results in
2   direct exposure to the ovaries either via
3   inhalation or migration through the female
4   reproductive tract, correct?
5        A.   I would not phrase the opinion
6   in that way, but in general, that is my
7   opinion, yes.
8        Q.   How would you phrase your
9   second opinion?
10       A.   I think my second opinion
11  relates mostly to the direct exposure to the
12  reproductive tract that perineal use of
13  talcum powder produces.
14       Q.   Are you opining as to
15  inhalation as an exposure of talcum powder to
16  women's ovaries?
17           MS. O'DELL:  Object to the
18       form.
19       A.   Only as a secondary route of
20  exposure.
21  BY MR. ZELLERS:
22       Q.   Is it part of your opinions or
23  do you defer to other experts on inhalation?
24       A.   I would include that as my

Page 83

1   opinion.
2        Q.   So you're testifying here today
3   that the perineal use of talcum powder
4   results in direct exposure to the ovaries
5   through migration through the female
6   reproductive tract and that inhalation also
7   results in exposure of talcum powder to the
8   ovaries; is that right?
9        A.   That is correct, but my basic
10  opinion is that perineal use of talcum powder
11  exposes the entire reproductive tract,
12  including the pelvic cavity.  So it's a bit
13  more extensive than your phrasing.
14       Q.   Your third opinion is very
15  similar to your first opinion, except that
16  here you add that it's your opinion that the
17  ovaries are particularly susceptible to the
18  carcinogenicity of talcum powder because they
19  have, in your words, "no intrinsic
20  elimination system"; is that right?
21       A.   That's correct.
22       Q.   Is that something you came up
23  with on your own, no intrinsic elimination
24  system?

Page 84

1           MS. O'DELL:  Object to the
2       form.
3        A.   It's an anatomical fact.  The
4   physiology of the reproductive system does
5   not provide the ovaries with the kind of
6   clearance system that, for example, the lungs
7   would have for inhaled exposures.
8   BY MR. ZELLERS:
9        Q.   The words "no intrinsic
10  elimination system," are those your words or
11  are those words that you've seen reported in
12  another study or another paper?
13       A.   I think that's a fairly generic
14  description, that those are my words.
15       Q.   Your fourth opinion is that you
16  believe that the epidemiological studies on
17  talcum powder and ovarian cancer show about a
18  30% increased risk; is that right?
19       A.   Correct.
20           MS. O'DELL:  Object to the
21       form.
22  BY MR. ZELLERS:
23       Q.   As you told us at the outset,
24  those are all still your opinions, although

Page 85

1   you do believe even stronger that there is a
2   causal association between talcum powder and
3   ovarian cancer; is that right?
4        A.   That's correct.
5        Q.   Have you published on your
6   theory that baby powder causes ovarian
7   cancer?
8        A.   No.
9        Q.   Do you have plans to do that?
10       A.   Not presently.
11       Q.   Have you conducted any tests or
12  experiments to confirm your theory that talc
13  migrates to the ovaries?
14           MS. O'DELL:  Object to the
15       form.
16       A.   These are conclusions that I
17  have drawn based on published literature.  I
18  wouldn't characterize them as a theory.  I
19  think they're pretty much established fact.
20  BY MR. ZELLERS:
21       Q.   I'm going to ask you about all
22  these opinions, and so we'll go through the
23  literature and determine -- or at least I'll
24  ask you questions about why you think that

Arch I. "Chip" Carson, M.D., Ph.D.

Page 86

1 some of these matters are established fact.
2        My question is:  Did you do any
3 tests or experiments as part of your review
4 and analysis in this matter?
5        A.    I did not.
6        Q.    Did you do any tests or
7 experiments relating to your opinion that
8 talc causes cancer via inflammation?
9        A.    I did not.
10       Q.    Can you identify any article
11 that identifies inflammation anywhere in a
12 woman's reproductive tract that results from
13 external genital talc application?
14          MS. O'DELL:  Object to the
15       form.
16       A.    I think there are a number of
17 published articles that allude to that
18 relationship and draw a fairly strong
19 conclusion that it exists.
20          MS. O'DELL:  Mike, excuse me,
21       and I'm sorry to interrupt.  We've
22       been going over an hour and a half.
23       Are you at a point where we can take
24       just a short break for...

Page 87

1          MR. ZELLERS:  Sure, we can.
2       Let me just ask these couple of
3       questions, and then we'll take a
4       break.
5          MS. O'DELL:  Sure.
6 BY MR. ZELLERS:
7       Q.    So please identify for me any
8 articles that you have reviewed that identify
9 inflammation anywhere in a woman's
10 reproductive tract resulting from external
11 genital talc application.
12          MS. O'DELL:  Objection to form.
13       A.    I think -- I think the research
14 evidence that includes the epidemiology
15 piece, which is limited to external
16 application of talcum powder, has significant
17 enough correspondence with the biological
18 experimentation literature that it allows us
19 to draw those conclusions.
20 BY MR. ZELLERS:
21       Q.    I understand you've drawn some
22 conclusions here, and I'm going to ask you
23 about these conclusions.
24          But what my question is:  Are

Page 88

1 you aware of any article that identifies
2 inflammation in a woman's reproductive tract
3 resulting from external genital talc
4 application?
5          MS. O'DELL:  Object to the
6       form.
7       A.    I would say that the studies
8 which have looked at that have relied on the
9 result of internal application to show
10 migration.  There have been studies that have
11 shown inflammation as the result of talc, and
12 in my opinion, external application is the
13 same as internal application in the
14 reproductive tract.
15 BY MR. ZELLERS:
16       Q.    I don't mean to be
17 argumentative, and I don't want to be, but
18 can you name me an article that identifies
19 inflammation in a woman's reproductive tract
20 resulting from external genital talc
21 application?
22          MS. O'DELL:  Objection, asked
23       and answered.
24       A.    I can't specifically.

Page 89

1          MR. ZELLERS:  Let's take a
2       break.
3          THE VIDEOGRAPHER:  We're off
4       the record, 10:37, end of Tape 1.
5          (Recess taken, 10:37 a.m. to
6       10:55 a.m.)
7          THE VIDEOGRAPHER:  We're on the
8       record at 10:55, beginning of Tape 2.
9 BY MR. ZELLERS:
10       Q.    Dr. Carson, two of the things
11 that you have reviewed since authoring your
12 report in November of 2018 that you believe
13 support your conclusions in this matter and
14 your opinions in this matter are the draft
15 screening assessment from Health Canada,
16 which we marked as Exhibit 9, and the Taher
17 paper, which has been marked as Exhibit 7; is
18 that right?
19       A.    Yes.
20       Q.    Have you looked into what other
21 public health authorities, other than
22 Health Canada, have had to say about talc and
23 ovarian cancer?
24       A.    Yes, I have.

23 (Pages 86 to 89)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 90

```
1        Q.    Did you -- strike that.
2        Are you familiar with the
3   Center for Disease Control in the United
4   States?
5        A.    Yes.
6        Q.    Did you review the CDC and its
7   position on any relationship between talcum
8   powder and ovarian cancer?
9        A.    That may have been part of my
10  review, but I don't specifically recall now
11  what the CDC has on that issue.
12       Q.    CDC does not list talc or
13  talcum powder as a risk factor for ovarian
14  cancer, correct?
15       A.    It's quite possible.
16       Q.    Mayo Clinic and a number of
17  medical centers do not list talc as a risk
18  factor for ovarian cancer, correct?
19       A.    That may be true.
20       Q.    Did you consider, or are you
21  familiar with the National Cancer Institute?
22       A.    I am.
23       Q.    National Cancer Institute is a
24  leading health authority in the United
```

Page 91

```
1   States; is that right?
2        A.    Yes.
3        Q.    Particularly in the area of
4   cancer and materials that may or may not be
5   carcinogenic; is that right?
6        A.    Well, the National Cancer
7   Institute is responsible for guiding national
8   research policies as it relates to cancers,
9   and that's one of their considerations is
10  substances that may be related to cancer.
11       Q.    When you reviewed what the
12  National Cancer Institute has determined with
13  respect to talcum powder and whether or not
14  it is a risk factor for ovarian cancer, what
15  did you find?
16       A.    The most recent publication
17  that I viewed discounts the relationship.
18       Q.    In fact, the National Cancer
19  Institute has concluded that the weight of
20  the evidence does not support an association
21  between perineal talc exposure and increased
22  risk of ovarian cancer; is that right?
23       MS. O'DELL:  Are you reading a
24       quote from the document?
```

Page 92

```
1        MR. ZELLERS:  I'm asking the
2   doctor a question.
3        MS. O'DELL:  Okay.
4        MR. ZELLERS:  So --
5        MS. O'DELL:  That's specific
6   language, and if you have specific
7   language that you're reading from the
8   report or you've taken from the
9   report, I would just ask that you show
10  the doctor.
11       MR. ZELLERS:  Ms. O'Dell, I
12  have my question.  I'm asking my
13  question.  The doctor can either
14  answer my question or not answer my
15  question.  I'm not reading from a
16  document.  I'm reading from my notes.
17       MS. O'DELL:  I object to the
18  form of the question.  I think it's
19  unfair.
20       MR. ZELLERS:  Can you answer
21  that question, Doctor?
22       A.    I would agree that that
23  restates the general opinion of the NCI as
24  published, but in order to verify the
```

Page 93

```
1   specific wording, I would need to look at the
2   document.
3   BY MR. ZELLERS:
4        Q.    Why would you rely on
5   Health Canada but not these other public
6   health organizations, including Center for
7   Disease Control and the National Cancer
8   Institute?
9        A.    Well, there are a number of
10  reasons.  There are lots of public health
11  organizations.  Many of them have different
12  interests and different approaches in the way
13  that they address problems.  For example,
14  discussing the National Cancer Institute, its
15  primary focus is on research and treatments
16  regarding cancers, not necessarily causes,
17  but it is a funder of basic research in the
18  United States.
19       Health Canada is an
20  organization whose charge is to -- is to
21  synthesize public health-related positions
22  based on evidence and disseminate those to
23  public -- the public through various
24  healthcare organizations or agencies.  And
```

24 (Pages 90 to 93)

Page 94

1  for that reason, I think it's important to
2  look at the different focus.
3          Also, the Health Canada report
4  is a more contemporaneous report, which has
5  been based on more recent science than has
6  been considered either by the NCI or some of
7  the other public health organizations.
8     Q.    The NCI's most recent update to
9  its publication was January of 2019; is that
10 right?
11         MS. O'DELL:  Object to the
12 form.
13    A.    It's current in terms of its
14 publication.  I don't know that it's January
15 of '19; it may be.  But it's still not based
16 on the most recently available literature.
17 BY MR. ZELLERS:
18    Q.    But Health Canada is; is that
19 right?
20    A.    Health Canada is based on more
21 recent literature than the NCI position.
22    Q.    Health Canada and its
23 assessment is based upon the meta-analysis by
24 Taher that we've marked as Exhibit 7; is that

Page 95

1  right?
2     A.    It is.
3          MS. O'DELL:  Object to the
4  form.
5  BY MR. ZELLERS:
6     Q.    You have reviewed that paper
7  and you believe it supports and strengthens
8  your opinions in this case; is that right?
9     A.    Yes.
10    Q.    Does the National Cancer
11 Institute review the peer-reviewed literature
12 as it relates to risk factors for ovarian
13 cancer?
14    A.    They have a number of
15 committees that are set up for that purpose,
16 and it is -- it's a committee approach which
17 is handled by a committee chairperson.  The
18 National Cancer Institute itself has some
19 oversight of that process, but they defer to
20 the committee chairs.
21    Q.    You understand that the Health
22 Canada assessment is a draft; is that right?
23    A.    Yes.
24    Q.    You understand that it's at the

Page 96

1  very beginning of the public comment period,
2  correct?
3     A.    Yes.
4     Q.    You agree that Health Canada
5  can take up to two years to either take
6  action or no action at all; is that right?
7     A.    I don't know that to be the
8  case, but it very well could be.
9     Q.    How did you come to learn of
10 the Health Canada risk assessment?
11    A.    I believe the attorneys let me
12 know about it.
13    Q.    The attorneys for plaintiffs in
14 this matter that retained you?
15    A.    Yes.
16    Q.    Were you involved in the Health
17 Canada risk assessment prior to its
18 publication?
19    A.    No.
20    Q.    Have you submitted any comments
21 to Health Canada?
22    A.    Not yet.
23    Q.    Do you intend to submit
24 comments to Health Canada?

Page 97

1     A.    I might.
2     Q.    What comments do you intend to
3  submit to Health Canada?
4     A.    I haven't formulated them yet.
5     Q.    Outside of litigation, do you
6  generally rely on draft assessments by
7  regulatory agencies?
8          MS. O'DELL:  Object to the
9  form.
10    A.    Yes.
11 BY MR. ZELLERS:
12    Q.    Are you familiar with the
13 precautionary principle?
14    A.    I am.
15    Q.    What is the precautionary
16 principle?
17    A.    The precautionary principle
18 states that changes should take place in the
19 face of a potential hazard until that hazard
20 is proved not to exist.  It's a general
21 precept that's used in the EU, for example,
22 and very different from the one that operates
23 in this country.
24    Q.    The principle in this country

25 (Pages 94 to 97)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 98

1  is that there needs to be scientific evidence
2  in order to take action; is that right?
3          MS. O'DELL:  Object to the
4      form.
5      A.   Yes, that's correct.
6  BY MR. ZELLERS:
7      Q.   The precautionary principle
8  says even before there's full or complete
9  scientific demonstration of cause and effect,
10 it is appropriate to take a precautionary
11 approach; is that right?
12     A.   That's right.
13     Q.   The Health Canada follows --
14 strike that.
15         Health Canada follows and has
16 adopted a precautionary approach; is that
17 right?
18     A.   Yes.
19     Q.   Please review
20 Deposition Exhibit 14.
21         (Carson Deposition Exhibit 14
22     marked.)
23 BY MR. ZELLERS:
24     Q.   Deposition Exhibit 14 is the

Page 99

1  Health Canada Decision-Making Framework for
2  Identifying, Assessing and Managing Health
3  Risk.
4          Do you see that?
5      A.   Yes.
6      Q.   If you go to page 5 of
7  Exhibit 14 --
8          MS. O'DELL:  Feel free to
9      take -- review the document if you're
10     not familiar with it, Dr. Carson.
11 BY MR. ZELLERS:
12     Q.   One of the underlying
13 principles in the Health Canada
14 decision-making framework is use a
15 precautionary approach; is that right?
16     A.   That's right.
17     Q.   If we go to page 8, Health
18 Canada defines the use of a precautionary
19 approach, and looking at the second sentence:
20 A precautionary approach to decision-making
21 emphasizes the need to take timely and
22 appropriate preventative action, even in the
23 absence of a full scientific demonstration of
24 cause and effect.

Page 100

1          Did I read that correctly?
2      A.   You did.
3      Q.   Is that your understanding of
4  what a precautionary approach is?
5      A.   Yes.  In general, the
6  precautionary principle can be restated that
7  an ounce of prevention is worth a pound of
8  cure.
9      Q.   Health Canada does not require
10 a finding of causation such as required in
11 litigation matters in this country, the
12 United States; is that right?
13     A.   In order to adopt a document
14 that has a significant effect on general
15 public health practices, no, it does not.
16     Q.   The Taher paper, that's another
17 paper that you have reviewed since you
18 published your report; is that right?
19     A.   Which paper?  I'm sorry.
20     Q.   This is what we've marked as
21 Exhibit 7.  You brought it with you here
22 today?
23     A.   Okay.  Yes.
24     Q.   You've read the Taher 2018

Page 101

1  manuscript; is that right?
2      A.   Yes.
3      Q.   Where did you obtain that
4  manuscript from?
5      A.   This was obtained directly from
6  one of the coauthors on this study to the
7  plaintiffs' attorneys, who passed it along to
8  me.
9      Q.   So one of the coauthors on this
10 study gave it to the plaintiffs' counsel, who
11 then gave it to you; is that right?
12     A.   That's correct.
13     Q.   Who was the author of this
14 publication, Exhibit 7, that provided the
15 paper to plaintiffs' counsel, if you know?
16     A.   I don't recall.
17     Q.   But one of these authors; is
18 that right?
19     A.   It would -- yes.
20     Q.   Why did you not include this
21 paper on either your reliance list or your
22 literature list?
23     A.   I didn't have it at the time
24 that those were formulated.

26 (Pages 98 to 101)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 102

1    Q.    Did you have access to the
2 appendices and supplemental tables that are
3 referred to in the Taher 2018 publication
4 which we've marked as Exhibit 7?
5    A.    The ones that are not in
6 this -- in this document or --
7    Q.    Yes.
8    A.    Those -- I have not thoroughly
9 examined those, but I do have access to them.
10   Q.    How do you have access to those
11 appendices and supplemental tables?
12   A.    They were also provided to me
13 by plaintiffs' counsel.
14   Q.    Has the Taher publication,
15 which we've marked as Exhibit 7, been peer
16 reviewed?
17   A.    It's in the process.  This is a
18 manuscript that's just been accepted for
19 publication, so it has gone through peer
20 review.
21   Q.    It has gone through peer
22 review --
23   A.    That's my understanding.
24   Q.    -- and Exhibit 7 is the article

Page 103

1 that you believe will be published; is that
2 right?
3    A.    This is a -- this is a working
4 manuscript which has gone through at least
5 part of the peer-review process.  There may
6 be minor edits that occur to this, but this
7 is substantially the final article.
8    Q.    How do you know that?
9    A.    That's the general process of
10 submitting publications to peer-reviewed
11 article -- journals.
12   Q.    How do you know -- I'm sorry,
13 did you finish?
14   A.    I'm finished.
15   Q.    How did you know the status of
16 the peer-review process with respect to
17 Exhibit 7?
18   A.    Because it's been accepted for
19 publication.
20   Q.    How do you know that?
21   A.    That, I was told by the
22 plaintiffs' attorneys.
23   Q.    And you've accepted that; is
24 that right?

Page 104

1    A.    Yes, I have.
2    Q.    Do you know any of the authors
3 of this paper, Exhibit 7?
4    A.    No, I don't.
5    Q.    Do you know the source of
6 funding for this paper?
7    A.    I -- I think the sources of
8 funding are mentioned in here.
9    Q.    Other than what's mentioned in
10 the paper, Exhibit 7, do you have any
11 knowledge as to the sources of funding?
12   A.    There's a combination of
13 sources.  In part, this work is funded
14 through the plaintiffs' attorneys.
15   Q.    Have you communicated with any
16 of the authors of this paper?
17   A.    No.
18   Q.    Do you know the credentials of
19 any of the authors of this paper?
20   A.    I haven't investigated that.
21   Q.    In your epidemiological work
22 outside of litigation, do you rely on
23 articles that are funded at least in part by
24 plaintiffs' counsel in litigation?

Page 105

1    A.    If the articles represent good
2 science, I don't really pay much attention or
3 worry about the funding source.
4    Q.    Do you know what conflicts of
5 interest any of the authors have?
6    A.    I don't know specifically.  I
7 can't recall if they're outlined in here.
8 But the -- those are also evaluated based on
9 the peer-review process.
10   Q.    Do you know whether some of the
11 authors are serving as consultants to
12 plaintiffs' counsel in this litigation?
13   A.    I know that -- no, I don't know
14 that.  Excuse me, I gave an incorrect answer.
15   Q.    Sure.  Correct it, please.
16   A.    I mentioned that part of the
17 funding for this research came from
18 plaintiffs' counsel, and I'm not -- I don't
19 know that that's the case.  I was thinking of
20 another research report when I said that.
21   Q.    Do you know whether or not, at
22 least in part, funding for this paper, the
23 Taher paper, came from plaintiffs' counsel?
24   A.    No, I don't.

27 (Pages 102 to 105)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 106

1    Q.    Taher, this paper, Exhibit 7,
2  concludes that asbestos contamination does
3  not explain ovarian cancer, correct?
4    A.    It does come to that general
5  conclusion.
6    Q.    That's a different conclusion
7  than you have formulated in this matter; is
8  that right?
9    A.    No, it's not.
10    Q.    You agree that asbestos
11  contamination does not explain ovarian
12  cancer; is that right?
13    A.    It doesn't completely explain
14  ovarian cancer.
15    Q.    Does it explain ovarian cancer?
16      MS. O'DELL:  Objection, asked
17    and answered.
18    A.    I -- I don't believe it
19  completely explains ovarian cancer, no.
20  BY MR. ZELLERS:
21    Q.    Turn to page 41 of Exhibit 7.
22  Look at the last three lines of the paper.
23  The authors of the Taher publication state:
24  The similarity of findings between studies

Page 107

1  published prior to and after this point
2  suggest asbestos contamination does not
3  explain the positive association between
4  perineal use of talc powder and the risk of
5  ovarian cancer.
6      Did I correctly state their
7  conclusion?
8    A.    Well, there was a final clause
9  of the sentence, but yes, you correctly read
10  that.
11    Q.    The Taher authors also
12  discussed the lack of consistency among the
13  various talcum powder studies; is that right?
14      MS. O'DELL:  Object to the
15    form.
16    A.    I'm sorry, could you repeat
17  that question?
18  BY MR. ZELLERS:
19    Q.    Sure.
20      You looked at the Bradford Hill
21  factors in formulating your opinion; is that
22  right?
23    A.    Yes.
24    Q.    One of the Bradford Hill

Page 108

1  factors is consistency; is that right?
2    A.    Yes.
3    Q.    You, in fact, are opining in
4  this case that there is consistency among the
5  talcum powder ovarian cancer studies and
6  publications; is that right?
7    A.    Yes.
8    Q.    The authors of the Taher paper
9  disagree with that conclusion; is that right?
10      MS. O'DELL:  Object to the
11    form.
12    A.    I don't think they disagree
13  with that.
14  BY MR. ZELLERS:
15    Q.    Turn to page 25, Table 2.  This
16  is, again, something that you have reviewed
17  in preparation for your deposition; is that
18  right?
19    A.    Well, I didn't review it in
20  preparation for the deposition, but I've
21  reviewed it recently.
22    Q.    At the request of plaintiffs'
23  counsel, correct?
24    A.    Yes.

Page 109

1    Q.    Table 2 is a summary of
2  evidence for each of the Hill criteria of
3  causation as applied to perineal application
4  of talc and ovarian cancer.
5      Do you see that?
6    A.    Yes.
7    Q.    Under Consistency, they state
8  that 15 out of 30 studies reported positive
9  and significant associations; is that right?
10    A.    Yes.
11    Q.    15 out of 30, that's 50%,
12  right?
13    A.    Yes.
14    Q.    50% is no better than a coin
15  toss; is that right?
16      MS. O'DELL:  Object to the
17    form.
18    A.    Well, I would have to also
19  mention that the majority of those 30 studies
20  found positive associations.  These are the
21  ones that showed positive associations that
22  rose to the level of statistical
23  significance.
24      ///

28 (Pages 106 to 109)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 110

1  BY MR. ZELLERS:
2      Q.    If an association is not
3  statistically significant, then it can be due
4  to chance; is that right?
5      A.    But if it's due to chance over
6  and over and over again, and you keep getting
7  a positive association, that argues very
8  strongly against the chance as being the only
9  factor.
10      Q.    Can you answer my question:  A
11  lack of a statistically significant
12  association is consistent with or can be
13  consistent with no risk, correct?
14          MS. O'DELL:  Objection to form,
15      asked and answered.
16      A.    If you're referring to an
17  individual study, that might be the case;
18  however, when considering the Bradford Hill
19  criterion of consistency, you look at the
20  overall body of the literature and what it
21  tells you.
22          There's an obvious statistical
23  trend toward positive connection between
24  talcum powder perineal application and the

Page 111

1  occurrence of ovarian cancer, and the more
2  evidence that mounts, the more strongly that
3  association is proven.
4  BY MR. ZELLERS:
5      Q.    Would you say that 15 out of 30
6  means there are consistent results across
7  studies?
8      A.    I think I've just explained to
9  you how I believe there are consistent
10  results across studies.
11      Q.    The authors of the Taher paper
12  also conclude that they do not find a
13  consistent dose-response in the papers that
14  look at perineal application of talc and
15  ovarian cancer; is that right?
16          MS. O'DELL:  Object to the
17      form.
18      A.    Well, what they actually say is
19  that about half of the epidemiological
20  studies assess only one level of talc
21  exposure, ever versus never.  So it's not
22  possible from those studies to establish a
23  biological gradient.
24          However, there are a number of

Page 112

1  studies that have shown a biological gradient
2  at -- especially in relation to some of the
3  subtypes of ovarian cancer.
4  BY MR. ZELLERS:
5      Q.    And I'm going to ask you about
6  those questions, but right now I'm just
7  asking you about the Taher paper.
8      A.    Well, I'm trying to just
9  completely answer your question.
10      Q.    I'm asking you about the Taher
11  paper.  You understand?
12      A.    Yes.  This is all from the
13  Taher paper that I read you.
14      Q.    Section 3.3.1 talks about
15  evidence from human studies.  That's on
16  page 20; is that right?
17      A.    Yes.
18      Q.    This section talks about
19  whether or not there is a consistent
20  dose-response found in those studies; is that
21  right?
22          MS. O'DELL:  What sentence are
23      you pointing to?
24          MR. ZELLERS:  I'm asking the

Page 113

1  doctor questions based upon his review
2  of the paper, Ms. O'Dell.
3          MS. O'DELL:  Okay.  Feel free
4  to review it, Doctor, if you need to.
5          THE WITNESS:  I'm just taking a
6  look at this section.
7  BY MR. ZELLERS:
8      Q.    And if it helps you, look on
9  page 21, lines 174 through 177.
10          (Document review.)
11  BY MR. ZELLERS:
12      Q.    I only want to ask you about
13  two sentences.  Are you ready for me to ask
14  you my question?
15      A.    Just one moment, please.
16      Q.    Sure.
17          (Document review.)
18          THE WITNESS:  All right, I'm
19  ready for your question.
20  BY MR. ZELLERS:
21      Q.    The Taher paper states that
22  many of the studies only reported on the
23  ovarian cancer risk assessing one exposure
24  category and that exposure response analyses

29 (Pages 110 to 113)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 114

1  were not done in all studies; is that right?
2      A.   Yes.
3      Q.   When conducted, findings from
4  trend analyses were not consistent; is that
5  correct?
6          MS. O'DELL:  Object to the
7      form.
8      A.   Yes.
9  BY MR. ZELLERS:
10     Q.   All right.  With respect -- I'm
11 done with that paper.
12         You discuss your opinion
13 number 1 on page 7 of your report; is that
14 right?
15     A.   Yes.
16     Q.   You first state on page 7 that
17 you believe talcum powder is immunogenic and
18 produces chronic inflammation in the tissues;
19 is that right?
20     A.   Yes.
21     Q.   You state that other components
22 in talcum powder, including mineral fibers,
23 asbestos, fibrous talc, carcinogenic metals
24 and other chemicals intensify the

Page 115

1  inflammatory response and stimulate cell
2  growth and proliferation; is that right?
3      A.   Yes.
4      Q.   Other than asbestos, what
5  mineral fibers in talc intensify the
6  inflammatory response?
7      A.   Well, the endogenous fibrous
8  talc fibers also intensify the response.
9      Q.   Other than asbestos and fibrous
10 talc fibers, what mineral fibers in talc do
11 you believe intensify the inflammatory
12 response?
13     A.   I'm not really able to answer
14 that question because I don't have a specific
15 opinion about it.  I'm not a geologist.
16     Q.   Are the other chemicals that
17 you refer to in this section fragrance
18 chemicals?
19     A.   Yes.
20     Q.   Any others?
21     A.   None that are intentionally
22 added.
23     Q.   You claim, again on page 7,
24 that talcum powder produces chronic

Page 116

1  inflammation in the tissues in which it
2  sequesters; is that right?
3      A.   Yes.
4      Q.   Assuming for the moment that
5  talc can reach the ovaries, is it your
6  opinion that talc produces chronic
7  inflammation in the ovaries and that this
8  somehow leads to ovarian cancer?
9      A.   It is my opinion that talc
10 produces chronic inflammation in the
11 epithelial tissues of the ovaries and
12 surrounding epithelial tissues and leads to
13 both carcinogenesis initiation and promotion.
14     Q.   There are no reports in the
15 literature of externally applied talc leading
16 to inflammation, granulomas, fibrosis or
17 adhesions anywhere along a woman's
18 reproductive tract, correct?
19         MS. O'DELL:  Object to the
20     form, asked and answered.
21     A.   Well, that's similar to the
22 question that you asked earlier, and although
23 I'm not aware of experimental reports that
24 specifically jive with that condition,

Page 117

1  certainly there are a lot of theoretical
2  reports that have been published.
3          For example, Dr. Ness' article
4  from '99 lays out the theory of inflammation
5  and relates that to talc exposure from
6  perineal application.
7  BY MR. ZELLERS:
8      Q.   This is your colleague,
9  Dr. Ness; is that right?
10     A.   Ness, and Coussens, when she
11 was at Pittsburgh.
12     Q.   Dr. Ness, you showed her your
13 report and asked for her comments; is that
14 right?
15     A.   I didn't show her the report.
16     Q.   Well, you talked to her about
17 and showed her your conclusions and your
18 opinions; is that right?
19     A.   No, I talked to her about the
20 paper.
21     Q.   Her paper?
22     A.   Yes.
23     Q.   Did you share with her that you
24 were going to be an expert for the plaintiffs

30 (Pages 114 to 117)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 118

1  in this litigation?
2      A.    No, I didn't.
3      Q.    Did she wonder or ask why it
4  was that you were researching or looking into
5  this issue?
6      A.    She -- I think she may have,
7  yeah.
8      Q.    And what did you tell her?
9      A.    I told her I had been recently
10 asked to look into it.
11     Q.    Did you tell her that you'd
12 been asked to look into it by counsel for
13 plaintiffs in the talc litigation?
14     A.    No, I didn't.
15     Q.    And that never came up; is that
16 right?
17     A.    It didn't.
18     Q.    And she never talked to you or
19 told you about her experience and her work as
20 counsel -- strike that, as an expert for
21 plaintiffs; is that your testimony?
22     A.    Yes.  It was a very brief
23 conversation.
24     Q.    If up to 50% of all U.S. women

Page 119

1  have used genital talc, shouldn't there be
2  studies which have shown inflammation,
3  granulomas, fibrosis or adhesions in a
4  woman's reproductive tract?
5          MS. O'DELL:  Object to the
6      form.
7      A.    Well, there are studies that
8  show those things.
9  BY MR. ZELLERS:
10     Q.    Please, tell me the published
11 studies that demonstrate inflammation,
12 granulomas, fibrosis or adhesions in a
13 woman's reproductive tract from externally
14 applied talc?
15     A.    Well, you're adding a new
16 condition now.
17     Q.    I'm sorry if I didn't add that
18 before.
19     A.    There are multiple studies that
20 show inflammation and other inflammatory
21 reactions in connection with the occurrence
22 of ovarian cancer.
23          The piece that you're now
24 asking for is the external application of

Page 120

1  talc relating to that, and to my knowledge,
2  there are no experimental reports or case
3  reports that can document that at the current
4  time.
5      Q.    Granulomas, fibrosis and
6  adhesions do not cause ovarian cancer,
7  correct?
8          MS. O'DELL:  Object to the
9      form.
10     A.    The inflammatory process that
11 is intimately connected with granuloma
12 formation may well be the same process that
13 results in mutation and promotion of ovarian
14 cancer.  So I -- I could not agree completely
15 with your statement.
16 BY MR. ZELLERS:
17     Q.    Is there a good scientific
18 basis today to opine that granulomas,
19 fibrosis or adhesions cause ovarian cancer?
20         MS. O'DELL:  Object to the
21     form.
22     A.    No, I don't think they cause
23 ovarian cancer.
24         ///

Page 121

1  BY MR. ZELLERS:
2      Q.    Would you agree that not all
3  inflammatory conditions lead to cancer?
4      A.    Yes.
5      Q.    It's true that all of us
6  experience inflammatory reactions of one sort
7  or another, including chronic conditions,
8  that do not lead to cancer, correct?
9      A.    That's correct.  Although there
10 is a strong relationship between inflammatory
11 processes and the occurrence of cancers, and
12 some of those inflammatory diseases that
13 you're referring to also have associations
14 with increased rates of cancers.
15         MR. ZELLERS:  Move to strike as
16     nonresponsive.
17 BY MR. ZELLERS:
18     Q.    Rheumatoid arthritis is an
19 inflammatory condition; is that right?
20     A.    Yes, it is.
21     Q.    Does it increase the risk of
22 ovarian cancer?
23     A.    I think I -- it does -- it's
24 not associated with ovarian cancer, but I

31 (Pages 118 to 121)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 122

1 think it may be associated with other
2 cancers.
3      Q.   Does -- strike that.
4           Is psoriasis an inflammatory
5 condition?
6      A.   Generally, it is.
7      Q.   Is it associated with an
8 increased risk of ovarian cancer?
9      A.   Not that I'm aware.
10      Q.   In your report you state that
11 inflammation is a normal body process that
12 leads to the thwarting of infection and rapid
13 healing; is that right?
14      A.   That's correct.
15      Q.   If your inflammation theory is
16 correct, why doesn't inflammation generally,
17 such as in pelvic inflammatory disease, cause
18 ovarian cancer?
19      A.   It may do so.
20      Q.   You are opining under oath here
21 that pelvic inflammatory disease causes
22 ovarian cancer?
23      A.   I think there are experts who
24 have concluded that.

Page 123

1      Q.   What study are you relying on
2 for that opinion or statement?
3      A.   That's not part of the opinions
4 that I've been asked to consider in this --
5 in this case.
6      Q.   As you sit here, can you cite
7 me a publication or a study that finds that
8 pelvic inflammatory disease causes ovarian
9 cancer?
10      MS. O'DELL:  Object to the
11 form.
12      A.   Well, I have -- I have a list
13 of studies that relate inflammation to
14 ovarian cancer and other cancers.
15 BY MR. ZELLERS:
16      Q.   Can you name me a study or a
17 publication?
18      A.   Okay.  I think I have my list
19 here.
20      Q.   You brought other materials
21 with you?
22      A.   I brought this list.
23      Q.   All right.  Well, what list are
24 you pulling out of your pocket?

Page 124

1      A.   This is a list that I've put
2 together of some of the studies I've
3 considered and how they relate to things I
4 might testify to today.
5      Q.   Why did you not tell me about
6 your list that you brought with you today
7 before now?
8      A.   Well, I'm telling you about it
9 now.
10      Q.   My question is why did you not,
11 when I asked you what you brought to the
12 deposition today, not take the list out and
13 show us the list?
14      A.   I didn't think of it.
15      Q.   Okay.  We'll mark your list as
16 Deposition Exhibit 15.
17           (Carson Deposition Exhibit 15
18 marked.)
19 BY MR. ZELLERS:
20      Q.   These are a number of notes,
21 four pages of notes.  Are these all your
22 notes?
23      A.   Yes.
24      Q.   First page has got a section of

Page 125

1 articles on asbestos and ovarian cancer; is
2 that right?
3      A.   Yes.
4      Q.   It also has inflammation and
5 cancer and a number of studies; is that
6 right?
7      A.   Yes.
8      Q.   Second page has got cohort,
9 where you've listed out the four cohort
10 studies; is that right?
11      A.   Yes.
12      Q.   Beneath that are the
13 meta-analyses where you've listed those out
14 and made some notes on those, correct?
15      A.   Yes.
16      Q.   The back page of the second
17 page has got a listing of a number of the
18 case-control studies, correct?
19      A.   Yes.  Those are duplicated on
20 another page.
21      Q.   The third page has got a
22 section on migration and studies that you're
23 looking at for that proposition, correct?
24      A.   Correct.

Arch I. "Chip" Carson, M.D., Ph.D.

Page 126

1    Q.    Underneath that, ovarian cancer
2  risk; is that right?
3    A.    Yes.
4    Q.    Underneath that, talc and other
5  cancer; is that right?
6    A.    Yes.
7    Q.    And then on the last page,
8  page 4, is a listing of the case-control
9  studies with the odds ratios and confidence
10 intervals; is that right?
11   A.    For the most part, yes.
12   Q.    All right.  So looking now at
13 your list of studies that you have prepared,
14 which study demonstrates or supports the
15 proposition that pelvic inflammatory disease
16 causes ovarian cancer?
17   A.    Looking through here, I don't
18 have that item specifically in my notes, but
19 I'm just using my notes to refresh my memory
20 about the individual research report.  I
21 think the Coussens and Werb paper from 2010
22 talks about general mechanisms of
23 inflammation in relation to the occurrence of
24 ovarian cancer.

Page 127

1        And there's the Ness and
2  Cottreau paper from '99.
3        Okada has discussed it in the
4  2007 paper.  And there's a paper from 2001
5  which is Balkwill and Mantovani which
6  discusses the relationship between talc and
7  ovarian cancer and also discusses the
8  relationship to other sources of
9  inflammation.
10   Q.    Each of those papers that
11 you've identified you believe state that
12 pelvic inflammatory disease is a cause of
13 ovarian cancer, correct?
14        MS. O'DELL:  Object to the
15   form.
16   A.    Well, I don't think they state
17 that in so many words, but if you read the
18 paper and you understand that -- what pelvic
19 inflammatory disease is and its relationship
20 to inflammatory processes in general, yes,
21 that's what they're saying.
22 BY MR. ZELLERS:
23   Q.    Doctor, my question to you was:
24 Are you aware of any papers in which the

Page 128

1  authors conclude that pelvic inflammatory
2  disease causes ovarian cancer?  Do you
3  believe each of the authors in the studies
4  that you've identified, that their studies
5  stand for that proposition?
6        MS. O'DELL:  Object to form,
7    asked and answered.
8    A.    I think all of the studies that
9  I've identified for this question do allude
10 to that, yes.
11 BY MR. ZELLERS:
12   Q.    That pelvic inflammatory
13 disease causes ovarian cancer, correct?
14   A.    That it is a -- it's a factor,
15 yes.
16   Q.    It's a cause.  That's what they
17 state in those papers, right?
18        MS. O'DELL:  Object to the
19   form.
20 BY MR. ZELLERS:
21   Q.    That's your testimony?
22        MS. O'DELL:  Excuse me,
23   misstates his testimony.  Object to
24   the form.

Page 129

1    A.    I would say it's a factor and
2  leave it at that.
3  BY MR. ZELLERS:
4    Q.    All right.  Are you familiar
5  with pleurodesis?
6    A.    I am.
7    Q.    Does a pleurodesis cause
8  cancer?
9    A.    It is not known to, although it
10 might.
11   Q.    Are you familiar with the
12 study, 1979, A survey of the long-term
13 effects of talc and kaolin pleurodesis?
14   A.    Can tell me who the author of
15 that was?
16   Q.    Sure.  The author is -- this is
17 from the Research Committee of the British
18 Thoracic Association.  The members of the
19 subcommittee were Chappell, Johnson, Charles,
20 Wagner, Seal, Berry and Nicholson.
21        Are you familiar with that
22 paper?
23   A.    I'm not familiar with the
24 paper.  I may have looked at it in the past.

33 (Pages 126 to 129)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 130

1    Q.    We'll take a look at it.  We'll
2  mark it as Deposition Exhibit 16.
3            (Carson Deposition Exhibit 16
4    marked.)
5    A.    Thank you.
6    MS. O'DELL:  Thank you.
7  BY MR. ZELLERS:
8    Q.    This was a study that looked at
9  the association between pleurodesis and lung
10 cancer; is that right?
11   A.    Yes.
12   Q.    It's a study that you cite on
13 page 1 of your literature list; is that
14 right?
15   A.    Okay.  Yes.
16   Q.    So you've read it; is that
17 right?
18   A.    I have.
19   Q.    You've considered it; is that
20 right?
21   A.    Yes.
22   Q.    They looked at 210 patients
23 that underwent a pleurodesis with talc or
24 kaolin 14 to 40 years before; is that right?

Page 131

1    A.    That's correct.
2    Q.    And they found that there was
3  no increased incidence of lung cancer and no
4  cases of mesothelioma; is that right?
5    A.    That's correct.
6    Q.    Why don't -- well, strike that.
7            You're aware of the studies
8  that have looked at antiinflammatory drugs
9  and aspirin use with respect to whether or
10 not they're associated with -- let me
11 withdraw that.
12           Are you familiar with the NSAID
13 and aspirin use studies relating to the
14 incidence of ovarian cancer in chronic users?
15   A.    I'm familiar with some of
16 those, yes.
17   Q.    If your theory is correct that
18 inflammation causes ovarian cancer, then you
19 would expect that the studies of NSAIDs and
20 aspirin use, antiinflammatory drugs that
21 reduce inflammation, would consistently
22 reduce the incidence of ovarian cancer,
23 correct?
24           MS. O'DELL:  Object to the

Page 132

1    form.
2    A.    I think that was the hypothesis
3  of those research reports.
4  BY MR. ZELLERS:
5    Q.    And, in fact, the NSAID studies
6  do not find a consistent causal reduction in
7  the risk of ovarian cancer; is that right?
8    A.    I think that's correct.
9    Q.    In your report you also state
10 that studies show that use of cornstarch
11 instead of talcum powder reduces the risk of
12 ovarian cancer; is that right?
13   A.    Yes.
14   Q.    If inflammation causes cancer,
15 why would cornstarch be a superior
16 alternative to talc?
17   A.    The reason is that cornstarch,
18 being a biological product, is much -- it
19 does have a rapid clearance from the body,
20 even when sequestered, in comparison with a
21 mineral substance like talc.
22   Q.    Well, in fact, cornstarch
23 causes or increases the risk of inflammation,
24 granulomas, fibrosis and adhesions, correct?

Page 133

1    A.    It may, yes.
2    Q.    Just like you claim talcum
3  powder increases the risk of inflammation,
4  granulomas, fibrosis and adhesions; is that
5  right?
6            MS. O'DELL:  Object to the
7    form.
8    A.    I think you are -- you're
9  parsing terms here.  That list of things were
10 your words.  I was agreeing with the
11 relationship between talc and inflammation in
12 ovarian epithelial tissue and the production
13 or granulomas.  I did not discuss the
14 relationship between talc and adhesions or
15 fibrosis.  There was one other thing on your
16 list.
17 BY MR. ZELLERS:
18   Q.    Well, in fact, the FDA has
19 banned the use of cornstarch as a powder for
20 lubricating surgical gloves; is that right?
21   A.    It has, but that's not the
22 reason.
23   Q.    Well, the reason that they
24 banned the use of cornstarch is because it

34 (Pages 130 to 133)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 134

1  presented an unreasonable and substantial
2  risk of illness or injury and that that risk
3  cannot be corrected or eliminated by
4  labeling, correct?
5      A.   I don't know the specific
6  language.  It looks like you're reading from
7  a Federal Register document.
8          The main reason that cornstarch
9  has been banned as a lubricant in gloves is
10 because of the potential for transmission of
11 primarily respiratory problems through
12 inhalation, mostly by co-workers, not by
13 patients.
14     Q.   You do agree that cornstarch
15 has been banned by the FDA for use in
16 surgical gloves; is that right?
17     A.   All powdered gloves have been
18 essentially banned from hospitals and
19 operating rooms now.
20     Q.   You also talk about
21 inflammation and oxidative stress; is that
22 right?
23     A.   Yes.
24     Q.   Does the presence of oxidative

Page 135

1  stress in a tissue indicate that cancer will
2  develop in that tissue?
3      A.   No.
4      Q.   If exposure to a substance
5  causes oxidative stress in certain tissue,
6  does that mean exposure of all other tissues
7  to that substance will cause oxidative stress
8  in those tissues?
9      A.   Not necessarily.
10     Q.   Does the body have protective
11 mechanisms that can limit tissue damage from
12 oxidative stress?
13     A.   Yes.
14     Q.   Do all substances that cause
15 oxidative stress also cause cancer?
16     A.   I'm not sure the answer to that
17 question is known.
18     Q.   Are there any studies or
19 publications that indicate that oxidative
20 stress is involved in the development of
21 ovarian cancer?
22     A.   If I can define the term
23 "oxidative stress," I could give you an
24 answer to that, that question.

Page 136

1      Q.   Why do you have to have a
2  special definition of "oxidative stress"?
3  I'm asking simply:  Is there a publication or
4  a study which documents that oxidative stress
5  is involved in the development of ovarian
6  cancer?
7          MS. O'DELL:  Object to the
8      form.
9      A.   Sure.
10 BY MR. ZELLERS:
11     Q.   And what paper are you going to
12 point me to?
13     A.   Well, I'll point you to the
14 Ness paper to begin with, because it was one
15 of the earlier papers that related oxidative
16 stress from talc to the occurrence of ovarian
17 cancer.  But the relationship between
18 inflammation, which essentially is the source
19 of the oxidative stress, and cancer goes all
20 the way back into the 19th Century in terms
21 of its proposal as a rationale.
22     Q.   Is oxidative stress a variation
23 of inflammation as you're using that term
24 relating to a potential cause of ovarian

Page 137

1  cancer?
2      A.   It's a component of
3  inflammation.
4      Q.   As a toxicologist, how would
5  you define fibrous talc?
6      A.   Fibrous talc is a form of talc
7  that is conformed into elongated structures
8  that have an aspect ratio of length greater
9  than width that is different from the
10 majority of talc which is the platy form.
11     Q.   Do you consider yourself to be
12 an expert on fibrous talc?
13     A.   No, I don't.
14     Q.   Do you consider yourself to be
15 an expert on oxidative stress?
16     A.   I have dealt a lot with issues
17 of oxidative stress and health effects
18 resulting from it.
19     Q.   Do you consider yourself to be
20 an expert in oxidative stress?
21         MS. O'DELL:  Objection, asked
22     and answered.
23     A.   I'm not a specific expert in
24 oxidative stress, but I can -- I can opine

Arch I. "Chip" Carson, M.D., Ph.D.

Page 138

1  regarding my professional understanding and
2  training.
3  BY MR. ZELLERS:
4      Q.    You've never been involved in
5  terms of any research or publication on the
6  subject of oxidative stress and any
7  association with ovarian cancer, correct?
8      A.    Not in terms of ovarian cancer,
9  no.
10      Q.    You have not been involved in
11  any research or publication relating to the
12  subject of inflammation and its association
13  with ovarian cancer, correct?
14      A.    No.  All right.  Yes, correct.
15      Q.    Yes, it is correct?  Okay.
16          You claim that the presence of
17  asbestos and fibrous talc further intensifies
18  the carcinogenic effect of talc; is that
19  right?
20      A.    Yes.
21      Q.    Is that statement different
22  from the statement directly above where you
23  allege that asbestos and mineral fibers
24  intensify the inflammatory response and

Page 139

1  stimulate the cell growth and proliferation?
2      A.    It's not different, no.
3      Q.    Are your opinions dependent on
4  talc containing carcinogenic asbestos and/or
5  fibrous talc?
6      A.    No.
7      Q.    Do you believe that talcum
8  powder without asbestos causes ovarian
9  cancer?
10      A.    I believe talcum powder causes
11  ovarian cancer.  I have not seen any research
12  done on talcum powder that has been shown not
13  to contain asbestos.
14      Q.    Your assumption that you have
15  made in formulating your opinions here is
16  that talcum powder contains asbestos; is that
17  right?
18      A.    No.
19      Q.    What assumption have you made
20  as to whether or not talcum powder contains
21  either asbestos or fibrous talc?
22          MS. O'DELL:  Object to the
23      form.
24      A.    Looking at the research

Page 140

1  reports, the epidemiology first, is looking
2  at the relationship between perineal use of
3  dusting powders, talcum powders and ovarian
4  cancer.
5          Although there have been
6  efforts in some of those studies to
7  characterize the proportion or the
8  ingredients that would be either asbestos or
9  fibers, that's not done in all cases, and
10  it's not ruled out in any cases.
11          The -- also, the research
12  studies that have been performed, the
13  testing, for example, of the products
14  themselves are replete with reports of
15  components of these powders that are fibrous
16  in nature.
17          MR. ZELLERS:  Move to strike as
18      nonresponsive.
19  BY MR. ZELLERS:
20      Q.    Do you believe that all talcum
21  powder products that are on the market
22  contain asbestos?
23          MS. O'DELL:  Object to the
24      form.

Page 141

1      A.    I don't know.
2  BY MR. ZELLERS:
3      Q.    Does it matter to your opinion
4  as to whether or not the talcum powder
5  products, and particularly the talcum powder
6  products involved in this case, contain
7  asbestos?
8      A.    I wouldn't have a way to be
9  able to answer that yes or no.
10      Q.    Do you -- strike that.
11          Have you reached a conclusion
12  as to whether or not the talcum powder
13  products involved in this case contain
14  fibrous talc?
15      A.    I think that most of them do.
16      Q.    Does all of the talcum powder
17  contain fibrous talc or just some of it?
18      A.    Certainly a lot of it does.
19      Q.    The basis for your conclusion
20  that the talcum powder at issue in this case
21  contains fibrous talc is the testing reports
22  that plaintiffs' attorneys gave you?
23          MS. O'DELL:  Object to the
24      form.

36 (Pages 138 to 141)

Page 142

1   A.   Yes.  Also Longo's publications
2 and reports.
3 BY MR. ZELLERS:
4   Q.   You have reviewed the Longo
5 reports; is that right?
6   A.   Yes.
7   Q.   Have you ever met with him?
8   A.   No.
9   Q.   Do you know his qualifications?
10   A.   I looked at his qualifications
11 at one point, but I don't recall exactly what
12 it is at this stage.
13   Q.   Ever hear of him before this
14 lawsuit, your getting involved in the talc
15 litigation back in October of 2018?
16   A.   No.
17   Q.   Have you reviewed any of
18 Longo's testing where he did not find
19 asbestos?
20   A.   I -- the only thing I've
21 reviewed are what's present in those reports
22 that I cited.
23   Q.   Were you provided by counsel
24 for plaintiffs with any testing reports from

Page 143

1 Longo where he did not find asbestos?
2   A.   There are some of those listed
3 in his reports.
4   Q.   Have you reviewed the FDA's
5 testing of talcum powder products?
6   A.   The FDA didn't really do much
7 testing of talcum powder products.
8   Q.   Have you reviewed the FDA's
9 testing of talcum powder products?
10   MS. O'DELL:  Objection, vague.
11   A.   The only FDA testing that I
12 looked at was the -- I have it referenced in
13 my list, but the FDA, based on a
14 recommendation, requested samples from
15 various companies, I think nine different
16 sources of talc.  They received four and
17 tested those.  And based on their test method
18 determined that there was not a -- not
19 evidence of a significant hazard.
20 BY MR. ZELLERS:
21   Q.   Have you made any effort to
22 quantify the amount of any alleged
23 contaminant in the Johnson & Johnson Consumer
24 talcum powder?

Page 144

1   MS. O'DELL:  Object to the
2 form.
3   A.   That wasn't my charge.  I defer
4 to the other experts in this case.
5 BY MR. ZELLERS:
6   Q.   Do you have an opinion on what
7 type of asbestos you believe is in the talcum
8 powder products at issue in this case?
9   A.   Well, there have been various
10 types shown, but I think for the most part
11 it's tremolite and anthophyllite.
12   Q.   Are you familiar with
13 crocidolite?
14   A.   Yes.
15   Q.   Is crocidolite found in talcum
16 powder or baby powder?
17   A.   It's not commonly found in it.
18   Q.   You believe that the
19 asbestos -- types of asbestos that may be in
20 the talcum powder at issue in this case is
21 tremolite and acidolite [sic]?
22   MS. O'DELL:  Objection.
23   A.   Anthophyllite.  There are
24 others found, but you asked for most common.

Page 145

1 BY MR. ZELLERS:
2   Q.   Most common you believe are
3 tremolite and anthophyllite?
4   A.   Anthophyllite.
5   Q.   Anthophyllite.  Those two; is
6 that right?
7   A.   Yes.
8   Q.   What types of asbestos are
9 associated with ovarian cancer?
10   A.   Well, I'll go back to my list
11 again.  Crocidolite is associated with
12 ovarian cancer in the Acheson report from
13 1982, which was from female gas mask
14 manufacturers in England who made gas masks
15 during the period of the Second World War,
16 and crocidolite is associated with that with
17 a fairly high relative risk of 2.96.
18 Chrysotile asbestos had also a positive
19 relative risk of 1.74.
20   There was a study of factory
21 workers and pipe laggers in east London,
22 which is the Berry report from 2000, that
23 showed a relative risk of 2.53, and those
24 workers were exposed to primarily asbestos

37 (Pages 142 to 145)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 146

1  cement products and plasters, so the --
2      Q.    What type of asbestos, if you
3  know?
4      A.    That would have been primarily
5  amphibole asbestos types, which would include
6  crocidolite and tremolite and anthophyllite,
7  amosite is in that category.
8          Bertolotti in 2008 published a
9  report -- actually, there were several
10 reports that resulted from the Eternit
11 factory studies in Casale Monferrato in
12 Italy, which was a plant that manufactured
13 cement sheet and corrugated tubing, and there
14 were a number of studies that showed elevated
15 relative risks in persons exposed to asbestos
16 in that work, and that would also have been
17 amphibole asbestos types.
18     Q.    The studies that you've recited
19 for us, those are all occupational studies;
20 is that right?
21     A.    Yes.  I've got a lot more.
22     Q.    Well, and it's on your list,
23 which we marked as Exhibit 15; is that right?
24     A.    That's correct.

Page 147

1      Q.    All right.  Those studies did
2  not involve the perineal application of
3  talcum powder products; is that right?
4          MS. O'DELL:  Object to the
5      form.
6      A.    It was not a factor in the
7  study.
8  BY MR. ZELLERS:
9      Q.    Crocidolite and chrysotile
10 asbestos has generally not been found in
11 talcum powder products, correct?
12     A.    In general, that's the case.
13     Q.    Was there ever a point in time
14 where you believe that the talcum powder
15 products involved in this case were not
16 contaminated with asbestos?
17         MS. O'DELL:  Objection to form,
18     vague as to time.
19     A.    My understanding is that Imerys
20 and their predecessors and Johnson & Johnson
21 made significant efforts to reduce components
22 of asbestos in their talc products over a
23 number of years and made step-wise progress
24 in doing that.

Page 148

1          But based on my current
2  understanding, I don't believe they've ever
3  been totally successful in doing so.
4          So in answer to your question,
5  which I think was, was there ever a point in
6  time where you believe the talcum powder
7  products involved in this case were not
8  contaminated with asbestos, no.
9  BY MR. ZELLERS:
10     Q.    You cite in your report,
11 page 5, to two exhibits to the depositions of
12 John Hopkins and Julie Pier in support of
13 your opinion that talcum powder products
14 contain asbestos; is that right?
15     A.    That's correct.
16     Q.    Looking at page 5, footnote 1,
17 you cite to Exhibit Hopkins-28 in the Hopkins
18 deposition and Exhibit Pier-47 in the Pier
19 deposition; is that right?
20     A.    That's correct.
21     Q.    Are you aware that those
22 exhibits were created by plaintiffs' counsel?
23         MS. O'DELL:  Objection to form.
24     A.    I didn't -- I -- I don't know

Page 149

1  that and doesn't matter to me.
2  BY MR. ZELLERS:
3      Q.    Do you know where the data in
4  those exhibits come from?
5      A.    Well, they come from the two
6  persons who are testifying who have produced
7  them from their -- mostly from their business
8  records.
9      Q.    Okay.  So you believe that
10 Exhibit Hopkins-28 to the Hopkins deposition
11 and Exhibit Pier-47 to the Pier deposition
12 come from the business records of the
13 Johnson & Johnson Company and Imerys?
14     A.    From the most part, there was
15 a -- there was a table that was constructed
16 during the deposition which was sort of a
17 piece of summary information.  I don't know
18 if it's an exhibit to the deposition or if
19 it's something separate from that, but it
20 would not have been from business records,
21 but occurred at the deposition itself.
22         MS. O'DELL:  Excuse me,
23     Dr. Carson, would you like to see a
24     copy of exhibit -- of the Hopkins

38 (Pages 146 to 149)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 150

1  Exhibit Hopkins-28 and Pier
2  Exhibit Pier-47 in answering these
3  questions?
4           THE WITNESS:  If that's easy to
5  do, yes.
6           MS. O'DELL:  It's very easy to
7  do.  This is a copy of
8  Exhibit Hopkins-28 of the Hopkins
9  deposition and Exhibit Pier-47 of the
10  Pier deposition.
11          THE WITNESS:  Okay.
12  BY MR. ZELLERS:
13      Q.    Dr. Carson?
14      A.    Yes, sir.
15      Q.    Did you make any effort to
16  investigate the alternative explanations for
17  the data that's contained in those two
18  exhibits, Exhibit Hopkins-28 and
19  Exhibit Pier-47?
20      A.    Alternative explanations, I'm
21  not sure what you mean by that.
22      Q.    If the Johnson & Johnson
23  company -- companies' scientists and Imerys'
24  scientists opined that those tests don't

Page 151

1  actually show asbestos, you have no expertise
2  to dispute that, do you?
3           MS. O'DELL:  Object to the
4  form.
5      A.    No, I don't have any personal
6  expertise to dispute that.
7  BY MR. ZELLERS:
8      Q.    Do you know whether or not any
9  of the talc product that is identified on
10  Exhibit Hopkins-28 and Exhibit Pier-47 was
11  actually used in the talcum powder products
12  that were sold by the Johnson & Johnson
13  Consumer Products company?
14          MS. O'DELL:  Objection to form.
15      A.    I -- it's my understanding that
16  some of these results, at least -- in
17  particular from the Pier deposition, that
18  some of these results were from testing that
19  was done on material that had already been
20  shipped and probably incorporated into
21  products.
22  BY MR. ZELLERS:
23      Q.    Do you know whether or not any
24  of the talc that is referred to on the two

Page 152

1  exhibits you're looking at,
2  Exhibit Hopkins-28 and Exhibit Pier-47, were
3  included in talcum powder product sold by J&J
4  Consumer Products?
5           MS. O'DELL:  Objection to the
6  form, asked and answered.
7      A.    No, I don't.
8  BY MR. ZELLERS:
9      Q.    Have you confirmed -- strike
10  that.
11          What amount of asbestos
12  exposure is associated with ovarian cancer?
13      A.    Any.
14      Q.    Your testimony under oath is
15  that any asbestos exposure is associated with
16  ovarian cancer?
17      A.    Any asbestos exposure and any
18  perineal application of talcum powder is
19  associated with an increased risk for ovarian
20  cancer.
21      Q.    The amount of asbestos
22  contained -- or allegedly contained within
23  the baby powder is of no consequence,
24  correct?

Page 153

1           MS. O'DELL:  Object to the
2  form.
3      A.    No, it is of consequence, and a
4  larger dose would be a greater hazard.  But
5  that doesn't mean that a low dose is not a
6  hazard.
7  BY MR. ZELLERS:
8      Q.    My question is:  Do you know
9  the amount of alleged asbestos exposure
10  that's associated with ovarian cancer?
11      A.    No.
12      Q.    Do you know the type of ovarian
13  cancer that asbestos is associated with?
14          MS. O'DELL:  Object to the
15  form.
16      A.    It's associated mostly with the
17  collection of epithelial ovarian cancers --
18  BY MR. ZELLERS:
19      Q.    What --
20      A.    -- primarily serous.
21      Q.    Does the type of ovarian cancer
22  vary based upon the type of asbestos?
23      A.    Not that I'm aware of.
24      Q.    You believe that all types of

39 (Pages 150 to 153)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 154

1    asbestos can produce all types of ovarian
2    cancer; is that correct?
3           MS. O'DELL:  Object to the
4       form.
5       A.    I suspect that some forms of
6    asbestos are much more carcinogenic than
7    others, and that would be true for the
8    ovaries as well as other structures in the
9    body.
10   BY MR. ZELLERS:
11      Q.    Are you able to distinguish for
12   us what types of asbestos cause or are
13   associated with what types of ovarian cancer?
14      A.    I don't think I'm able to make
15   those distinctions, but the studies I just
16   read to you regarding the relationship
17   between asbestos and ovarian cancer and the
18   others on my list do indicate that there are,
19   for example, in the Acheson study, there
20   were -- there was a positive relationship
21   between both crocidolite and chrysotile
22   exposure, and the crocidolite had a greater
23   effect on ovarian cancer than the chrysotile,
24   but did not have -- they were both positive.

Page 155

1       Q.    What type of ovarian cancer?
2       A.    That, I don't know at the
3    moment.  I could look in the paper and see if
4    it's listed.
5       Q.    There are a number of different
6    types of ovarian cancer; is that right?
7       A.    That's correct.
8       Q.    You are not familiar with J&J
9    Consumer Products' procedures for milling or
10   mining; is that right?
11          MS. O'DELL:  Object to the
12      form.
13      A.    I'm familiar with some of their
14   procedures, yes.
15   BY MR. ZELLERS:
16      Q.    Are you familiar with their
17   testing of source mines?
18      A.    To some extent.
19          MS. O'DELL:  Object to the
20      form.
21   BY MR. ZELLERS:
22      Q.    Is it set forth in your report,
23   or is that just background information that
24   you looked at?

Page 156

1       A.    That's background information
2    and my personal knowledge.
3       Q.    You are not going to give an
4    opinion on mines, mining or milling in this
5    case; is that right?
6       A.    Depends on the questions.
7       Q.    Well, as you sit here today, do
8    you intend to give opinions on talc mining,
9    mines or milling?
10      A.    It wasn't my intention, but if
11   asked a question that I think I'm qualified
12   to answer, I'll try to do it.
13      Q.    Are you an expert on talc
14   mining and milling?
15      A.    I'm an expert on industrial
16   processes in general, and if -- I have some
17   personal understanding of talc mining and
18   milling.
19      Q.    Have you been personally
20   involved in talc mining and milling?
21      A.    I haven't been involved in it;
22   I've observed it.
23      Q.    Do you consider yourself to be
24   an expert in talc mining and milling?

Page 157

1           MS. O'DELL:  Objection, asked
2       and answered.
3       A.    No, I don't.
4    BY MR. ZELLERS:
5       Q.    You have no independent basis
6    to say that cosmetic talc contains asbestos,
7    correct?
8           MS. O'DELL:  Object to the
9       form.
10      A.    What do you mean by independent
11   basis?
12   BY MR. ZELLERS:
13      Q.    You have not done any testing
14   of talcum powder to determine whether it
15   contains asbestos or not; is that right?
16      A.    No.  All of my understanding is
17   based on other sources.
18      Q.    And those other sources would
19   be, in part, the testing that was done by
20   Longo; is that right?
21      A.    Yes, as well as the testing
22   that's reported in the -- in the literature
23   section as the Imerys test results and
24   quality control materials.

40 (Pages 154 to 157)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 158

1    Q.    You're looking now back at the
2  Pier Exhibit Pier-47 and the Hopkins
3  Exhibit Hopkins-28; is that right?
4    A.    I was actually referring to the
5  Imerys documents that are referenced toward
6  the end of the literature exhibit to my
7  report, but certainly the Exhibit Pier-47
8  would be included there.
9    Q.    You have no independent basis
10  to say that cosmetic talcum powder contains
11  fibrous talc, correct?
12        MS. O'DELL:  Object to the
13    form.
14    A.    I have no independent basis,
15  no.
16  BY MR. ZELLERS:
17    Q.    You're familiar with the
18  limitations of the research on a potential
19  link between asbestos and ovarian cancer; is
20  that right?
21        MS. O'DELL:  Object to the
22    form.
23    A.    I'm familiar with some research
24  limitations in that question, yes.

Page 159

1  BY MR. ZELLERS:
2    Q.    You agree that research on the
3  potential relationship between asbestos and
4  ovarian cancer has only considered a small
5  number of cases; is that right?
6        MS. O'DELL:  Object to the
7    form.
8    A.    Well, it's considered thousands
9  of cases.  Certainly in terms of the number
10  of women who have experienced ovarian cancer
11  it's small, but it's significant, and that's
12  where we get research from that answers
13  important questions.
14  BY MR. ZELLERS:
15    Q.    Are you familiar with the Reid
16  paper, 2011?
17    A.    Yes, but it's been a while
18  since I've looked at it.
19    Q.    Well, I'll hand you a copy.
20  We'll mark it as Exhibit 17.
21        (Carson Deposition Exhibit 17
22    marked.)
23        MS. O'DELL:  Thank you.
24        ///

Page 160

1  BY MR. ZELLERS:
2    Q.    The Reid paper that I've handed
3  you, what we've marked as Exhibit 17, looks
4  at the issue:  Does exposure to asbestos
5  cause ovarian cancer.
6        Is that right?
7    A.    Yes.
8    Q.    They talk about in terms of
9  limitations on the first page, right-hand
10  column, they say:  Studies that have examined
11  this issue have been limited for two major
12  reasons.
13        Is that right?
14    A.    Yes.
15    Q.    Number one, small number of
16  cases, much fewer women than men have been
17  exposed to asbestos, particularly in more
18  heavily exposed occupational settings where
19  relative risks are higher; is that right?
20    A.    Yes.
21    Q.    How many of these studies --
22  well, strike that.
23        Would you agree that the
24  studies in this area have been primarily

Page 161

1  related to occupational exposure?
2    A.    Primarily, yes.
3    Q.    How many total women have been
4  studied?
5        MS. O'DELL:  Object to the
6    form.  In this study, in this paper,
7    or are you talking about in general?
8        MR. ZELLERS:  In general.
9    A.    I don't know the answer to
10  that.
11  BY MR. ZELLERS:
12    Q.    How many women have been
13  studied in nonoccupational studies?
14    A.    Well, very few in comparison to
15  the occupational studies.
16    Q.    Are you aware of the
17  difficulties that have existed over time in
18  distinguishing between peritoneal
19  mesothelioma and ovarian cancer?
20    A.    Yes.
21    Q.    What are those difficulties?
22    A.    There is a potential
23  misclassification of one as the other because
24  they have very common habits.  They look very

Page 162

1 similar under light microscopy, and they're
2 often difficult to distinguish, even by a
3 pathologist, unless special tests are used.
4           Often these cases occur in
5 places where they don't have the access to
6 special test equipment that can definitively
7 distinguish, and so they are classified and
8 we move on.
9       Q.    Another limitation of any
10 studies in this area relate to the inability
11 to account for nonoccupational risk factors
12 for ovarian cancer other than age; is that
13 right?
14           MS. O'DELL:  Object to the
15 form.
16       A.    Are you reading also from this
17 paper or --
18 BY MR. ZELLERS:
19       Q.    I was looking now at the
20 Camargo paper.  Are you familiar with the
21 Camargo paper?
22       A.    If you have a copy of that, I'd
23 like to look at it, if I'm going to answer
24 questions about it.

Page 163

1       Q.    All right.  This is a paper in
2 2011.  We'll mark it as Exhibit 18.
3           (Carson Deposition Exhibit 18
4 marked.)
5 BY MR. ZELLERS:
6       Q.    Here the authors also looked at
7 the issue of occupational exposure to
8 asbestos and ovarian cancer; is that right?
9       A.    Yes.
10       Q.    If you turn to page 216 -- I'm
11 sorry, 1216, second-to-last paragraph before
12 the conclusion:  A further limitation of our
13 analysis was its inability to account for
14 nonoccupational risk factors for ovarian
15 cancer other than age.
16           Is that identified by the
17 authors as a limitation?
18       A.    Yes, it is.
19       Q.    Under -- if you go a page back,
20 1215, under Discussion, in the second
21 paragraph, the authors talk about other
22 studies that have been done in this area,
23 including Edelman; is that right?
24           MS. O'DELL:  If you need to

Page 164

1 take a minute to refresh yourself on
2 the page --
3           MR. ZELLERS:  I'm looking under
4 Discussion.
5           MS. O'DELL:  -- please feel
6 free to do that.
7           Excuse me, sir, I was talking.
8 If you need to review the paper,
9 Dr. Carson, please feel free to do
10 that.
11           MR. ZELLERS:  This doctor has
12 given 35 depositions.  He is perfectly
13 capable of handling himself.  He does
14 not need your advice as we go along.
15           MS. O'DELL:  Nor do I, Michael.
16 So I'm going to deal with this witness
17 in the way I choose, which is
18 perfectly appropriate.  If Dr. Carson
19 needs to review the paper, he's going
20 to review the paper.  You may ask him
21 questions, he'll be happy to respond.
22           MR. ZELLERS:  Your job is not
23 to coach the witness; your job is to
24 make objections as to form or

Page 165

1 foundation, not to make speaking
2 objections and coaching of the
3 witness.
4           MS. O'DELL:  If you have a
5 question, I'm sure Dr. Carson would be
6 happy to address it.
7           MR. ZELLERS:  I've asked him
8 the question.
9           MS. O'DELL:  Would you mind
10 repeating the question, please?
11           MR. ZELLERS:  Sure.
12           THE WITNESS:  I don't remember
13 the question.
14           MR. ZELLERS:  Okay.  I'll be
15 happy to repeat it.
16 BY MR. ZELLERS:
17       Q.    Dr. Carson, you've looked at
18 this Camargo paper; is that right?
19       A.    Yes.
20       Q.    In their discussion, they talk
21 about other research, including research done
22 by Edelman; is that right?
23       A.    Are you at the top of the
24 middle column on --

42 (Pages 162 to 165)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 166

1    Q.    I'm looking under Discussion.
2    A.    Yes.
3    Q.    The first -- well, the second
4 paragraph.
5    A.    Second paragraph, yes.
6    Q.    The magnitude of the pooled
7 estimate is similar to that reported by
8 Edelman; is that right?
9    A.    Correct.  Correct.
10    Q.    Then they state:  They
11 concluded, however, that despite the positive
12 and significant association, there was
13 insufficient information to infer that
14 ovarian cancers were caused by occupational
15 exposure to asbestos because of concerns
16 about tumor misclassification, inappropriate
17 comparison populations and the failure to
18 take into account for known risk factors.
19        Did I read that --
20    A.    You read that correctly.
21    Q.    All right.  Are women who use
22 talc perineally at greater risk of
23 mesothelioma?
24    A.    I can't say that they are, but

Page 167

1 they may be.
2    Q.    Wouldn't you expect to find
3 higher rates of other cancers in women using
4 talc like mesothelioma if they are being
5 exposed to substantial amounts of asbestos?
6    A.    Well, we may -- we may be
7 seeing some mesotheliomas that are
8 misclassified as ovarian cancers, or we may
9 be seeing mesotheliomas and not relating talc
10 application as a pertinent contributor to
11 that case.
12    Q.    You told us earlier that you
13 thought that there may have been more
14 asbestos in talcum powders in the 1970s; is
15 that right?
16        MS. O'DELL:  Objection to form.
17    A.    I think I said there have been
18 step-wise improvements, and I -- but I agree
19 with that statement.
20 BY MR. ZELLERS:
21    Q.    Shouldn't we have seen higher
22 rates of ovarian cancer in the earlier
23 studies --
24        MS. O'DELL:  Object --

Page 168

1 BY MR. ZELLERS:
2    Q.    -- if your theory is correct?
3        MS. O'DELL:  Object to the
4 form.
5    A.    There may have been higher
6 rates of ovarian cancers, but you have to
7 also understand that the latency period for
8 ovarian cancer is pretty long.  It's greater
9 than 20 years, often as long as 40 years.
10 And so we're still dealing with cancers that
11 may have started back in the '70s.
12 BY MR. ZELLERS:
13    Q.    Would you agree that exposure
14 to asbestos through a perineal cosmetic talc
15 use is different from the heavy occupational
16 exposure that has primarily been researched?
17        MS. O'DELL:  Objection to form.
18    A.    Yes.  I agree with that.
19 BY MR. ZELLERS:
20    Q.    Are you an expert and
21 knowledgeable about cleavage fragments?
22    A.    I'm not.
23    Q.    If I went through a series of
24 questions and asked you to differentiate

Page 169

1 between cleavage fragments and asbestos
2 fibers, you would defer that to other
3 experts?
4    A.    I would.
5    Q.    You also claim that the
6 presence of carcinogenic metals, including
7 chromium, cobalt and nickel in talc, adds to
8 its carcinogenicity; is that right?
9    A.    That is right.
10    Q.    Do you have an opinion or
11 knowledge as to the amounts of chromium,
12 cobalt and nickel, if any, in talc?
13    A.    Those metal elements are
14 included as -- usually as impurities or in
15 very small quantities in some deposits and
16 are present in small amounts.
17    Q.    Do you have any idea how much
18 of these metals, if any, reaches a woman's
19 ovaries each time they use talc?
20    A.    I can't tell you how much, but
21 I can tell you that some does, and it is --
22 it remains in the talc until long after it
23 reaches the ovaries.
24    Q.    Chromium, cobalt and nickel are

Arch I. "Chip" Carson, M.D., Ph.D.

Page 170

1  natural elements; is that right?
2      A.   Yes.
3      Q.   They are naturally in our
4  bodies; is that right?
5      A.   That's correct.
6      Q.   They are present in food,
7  drinking water, bottled water, vitamins; is
8  that right?
9      A.   To some extent.
10     Q.   Do you have any evidence that
11 the blood or tissue levels of any trace heavy
12 metals are higher in genital talc users
13 compared to nonusers?
14         MS. O'DELL:  Object to the
15     form.
16     A.   I do not.
17 BY MR. ZELLERS:
18     Q.   As we discussed when we talked
19 about asbestos, you cannot evaluate the
20 potential effects of exposure to a substance
21 without factoring in the amount of exposure;
22 is that right?
23         MS. O'DELL:  Object to the
24     form.

Page 171

1      A.   It's useful to factor in the
2  amount if the amount is known.  If the amount
3  is not known, it's not necessarily required
4  to draw conclusions.
5  BY MR. ZELLERS:
6      Q.   In this case, you do not know
7  the amount, be it chromium, cobalt and/or
8  nickel; is that right?
9          MS. O'DELL:  Objection to the
10     form.
11         Excuse me.  Dr. Carson, as you
12     know, is not being offered as a
13     case-specific expert, so that question
14     sounds like a specific patient, and so
15     I would -- that's my objection.
16     A.   I do not know the amount, but
17 my opinion is that any within the
18 microenvironment of the inflammatory process
19 that is occurring due to talc sequestration
20 is contributing to the carcinogenic
21 potential.
22 BY MR. ZELLERS:
23     Q.   But you don't know for any
24 individual plaintiff their level of exposure

Page 172

1  to chromium, cobalt or nickel or any other
2  heavy metal; is that right?
3      A.   That is correct.
4      Q.   That answer to that question
5  would be true if I asked you about the
6  different fragrance chemicals, correct?
7          MS. O'DELL:  Object to the
8      form.
9      A.   Also true.
10 BY MR. ZELLERS:
11     Q.   You did a risk assessment in
12 this matter; is that right?
13     A.   Yes.
14     Q.   Do you agree that a complete
15 and proper risk assessment involves four
16 elements?
17         MS. O'DELL:  Object to the
18     form.
19     A.   Not necessarily.
20 BY MR. ZELLERS:
21     Q.   Well, you have to identify a
22 potential hazard; is that right?
23     A.   Yes.
24     Q.   You've got to do some type of

Page 173

1  dose-response assessment; is that right?
2      A.   Not necessarily.
3      Q.   You --
4          MS. O'DELL:  Excuse me.  If you
5      finished -- if you need to,
6      Dr. Carson, if you're not finished.
7      If you're finished, fine.  Sorry.
8      A.   A qualitative risk assessment
9  does not necessarily require a dose-response
10 in order to reach valid conclusions.
11 BY MR. ZELLERS:
12     Q.   It is not necessary to do a
13 dose-response assessment as part of a risk
14 assessment.  Is that your testimony under
15 oath?
16     A.   It's not always necessary.
17     Q.   Was it necessary in this case?
18     A.   Well, I think there is an
19 aspect of dose-response that was performed in
20 the risk assessment process here.
21     Q.   What dose-response assessment
22 did you make with respect to chromium, cobalt
23 and nickel and any other heavy metal?
24     A.   There's no information

44 (Pages 170 to 173)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 174

1  available to do a dose-response estimate for
2  those metals.
3      Q.    What information did you rely
4  or use, if any, to make a dose-response
5  assessment with respect to any fragrance
6  chemicals?
7          MS. O'DELL:  Objection, form.
8      A.    There is no information
9  available to do a dose-response estimate for
10 the fragrances.
11 BY MR. ZELLERS:
12     Q.    Did you do any type of exposure
13 assessment in this case?
14         MS. O'DELL:  Object to the
15 form, vague.
16     A.    I'm not sure exactly what
17 you're -- what you're asking by exposure
18 assessment.
19 BY MR. ZELLERS:
20     Q.    Well, an exposure assessment is
21 also part of a risk assessment; is that
22 right?
23     A.    In this risk assessment, I
24 considered studies that are reported in the

Page 175

1  scientific and medical literature which have
2  reported the assessment of exposure in these
3  cases in various forms, and I considered
4  those exposure assessments as being valid as
5  reported and considered them as a whole.
6      Q.    Did you look at any exposure
7  assessment specific to the alleged heavy
8  metals contained in talcum powder?
9          MS. O'DELL:  Object to the
10 form.
11     A.    No, I did not.
12 BY MR. ZELLERS:
13     Q.    Did you look at any exposure
14 assessment with respect to any fragrance
15 chemicals contained within talcum powder?
16         MS. O'DELL:  Object to the
17 form.
18     A.    With respect to the fragrance
19 chemicals and the heavy metals, the only
20 exposure assessment that I was able to do was
21 verify that these things were present in
22 materials.
23         The fragrances are always
24 present in whatever form they were added in,

Page 176

1  and the metals were there as the baseline
2  component of the talc formation that they
3  came from.
4  BY MR. ZELLERS:
5      Q.    You do not know the amounts of
6  either the heavy metals or the fragrance
7  chemicals in the talcum powder at issue in
8  this case, correct?
9      A.    That's -- that's correct, I
10 don't.
11     Q.    You do not know -- well, strike
12 that.  I'll withdraw that.
13         You brought with you an IARC
14 monograph; is that right?
15     A.    I have a couple of them.
16     Q.    All right.
17         MS. O'DELL:  Are we going to --
18 are you going to move to --
19         MR. ZELLERS:  We can take a
20 break if you'd like.
21         MS. O'DELL:  Yeah, it's been
22 about an hour and a half.
23         MR. ZELLERS:  Sure.
24         THE VIDEOGRAPHER:  We're off

Page 177

1  the record 12:32, end of Tape 2.
2          (Recess taken, 12:32 p.m. to
3  1:38 p.m.)
4          THE VIDEOGRAPHER:  We're on the
5  record, 1:38, beginning of Tape 3.
6  BY MR. ZELLERS:
7      Q.    Dr. Carson, when we left, we
8  were talking about the trace metals and
9  fragrance chemicals in talcum powder,
10 correct?
11     A.    Yes.
12     Q.    You do not know how much of
13 these trace metals or fragrance chemicals
14 reach the ovaries, correct?
15     A.    I don't know specifically how
16 much reaches it, but if I know it's a
17 component of the talc, and if I know the talc
18 reaches it, then I know some of the metals
19 and the fragrances reach it.
20     Q.    You don't know the component or
21 the amount of either the trace metals or the
22 fragrance chemicals in the baby powder,
23 correct?
24     A.    That's correct.

45 (Pages 174 to 177)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 178

1    Q.    You do not know the exposure of
2  any of the women who are plaintiffs in this
3  litigation to the talcum powder, correct?
4        MS. O'DELL:  Individual women?
5        MR. ZELLERS:  Yes, individual
6  women.
7    A.    I don't, no.
8  BY MR. ZELLERS:
9    Q.    You brought with you an IARC
10  monograph, and I think you've got several
11  monographs that are on your literature list;
12  is that right?
13    A.    That's correct.
14    Q.    Generally, IARC classifies
15  chemicals and agents from Group 1,
16  carcinogenic to humans, down to Group 4,
17  probably not carcinogenic to humans; is that
18  right?
19    A.    That's correct.
20    Q.    Does the classification of a
21  substance as a known probable or possible
22  carcinogen by IARC, and IARC is International
23  Agency for Research on Cancer, or by the
24  National Toxicology Program or the U.S.

Page 179

1  Environmental Protection Agency, mean that
2  the substance can cause all types of cancers
3  in humans by any exposure route?
4        MS. O'DELL:  Object to the
5  form.
6    A.    No.
7  BY MR. ZELLERS:
8    Q.    There are different cancers
9  that may be associated with different
10  chemicals or agents; is that right?
11    A.    And different routes of
12  exposure.
13    Q.    You can have an agent that is a
14  carcinogen or a probable or possible
15  carcinogen for one type of cancer, but not
16  for another type of cancer, correct?
17    A.    That's correct.
18    Q.    You can have an agent or a
19  chemical that's a carcinogen for one route of
20  exposure for a chemical or agent but is not
21  carcinogenic for a different route of
22  exposure, correct?
23        MS. O'DELL:  Objection to form.
24    A.    Yes.

Page 180

1  BY MR. ZELLERS:
2    Q.    What -- would you agree that,
3  in general, metals can differ in their
4  toxicity and potential carcinogenicity based
5  on their form?
6    A.    Yes.
7    Q.    Do you know the forms of
8  chromium, nickel and cobalt detected in
9  cosmetic talc?
10    A.    There's -- metal ions are
11  usually incorporated in the mineral lattice,
12  and so they are part of the magnesium
13  silicate crystal.
14    Q.    I'm not sure if that answers my
15  question, and if it does, I don't understand,
16  so let me ask again.
17         Do you know the forms, and by
18  that I mean valence state, of chromium or
19  nickel or cobalt that have been detected in
20  cosmetic talc?
21    A.    Oh, the valence state?
22    Q.    Yes, sir.
23    A.    I don't know specifically, but
24  that's dependent on the surrounding structure

Page 181

1  that the metals are contained in, and metals
2  can assume a different valence state
3  depending on the redox environment.
4    Q.    You are not, at least in this
5  litigation today, expressing any opinion as
6  to the valence state of chromium that may be
7  found in cosmetic talc, correct?
8        MS. O'DELL:  Object to the
9  form.
10    A.    No, I'm not.
11  BY MR. ZELLERS:
12    Q.    Your second opinion is that the
13  perineal use of talcum powder results in
14  direct exposure to the ovaries either via
15  inhalation or migration through the female
16  reproductive tract; is that right?
17    A.    Well, it's primarily through
18  the female reproductive tract.  The
19  inhalation exposure would be a secondary
20  route.
21    Q.    Let me ask you a couple of
22  questions about inhalation exposure.
23         You do not cite any studies in
24  the body of your report evidencing that

46 (Pages 178 to 181)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 182

1  talcum powder can reach the ovaries through
2  inhalation, correct?
3          MS. O'DELL:  Object to the
4      form.
5      A.    That is correct, although
6  there -- yes, that's correct.
7  BY MR. ZELLERS:
8      Q.    You have never performed any
9  study yourself pertaining to whether inhaled
10 talc can migrate to the ovaries; is that
11 right?
12     A.    I have not, although it has
13 been used as an explanation of how talc
14 particles might have reached the ovaries in
15 persons who did not have another form of
16 exposure.
17     Q.    If inhalation is the exposure
18 path for talc, shouldn't the lungs bear more
19 of a burden?
20     A.    Yes.
21     Q.    Why, then, isn't there an
22 epidemic of mesothelioma in women who use
23 talcum powder?
24     A.    Because the primary route is

Page 183

1  perineal via the reproductive tract.
2      Q.    You discuss that on page 7 of
3  your report; is that right?
4      A.    Yes.
5      Q.    You cite a number of studies
6  for the proposition that talc can be
7  transported from the perineum to the upper
8  reproductive tract and body cavity; is that
9  right?
10     A.    That's correct.
11     Q.    None of the articles that you
12 cite actually looked at whether talc can
13 migrate from perineal application through the
14 fallopian tubes to the ovaries, did they?
15     A.    Let me just refresh my memory
16 for a moment here.  Egli was carbon black.
17 Venter was radioactive technetium labeled
18 albumin.  Let me see.  Blumenkrantz -- I have
19 my notes here.
20         Yeah, I can't remember what the
21 substance was in Blumenkrantz.  Sjösten,
22 starch -- yeah, Blumenkrantz was retrograde
23 menstruation.  Halme was talc.
24     Q.    Which study was talc?

Page 184

1      A.    The -- I'm sorry.  The Heller
2  study was talc, which I didn't cite here.
3  Halme was a retrograde menstruation study via
4  the fallopian tubes, and Sjösten was starch
5  particles.
6      Q.    The only study -- and this is
7  not one that you cited, but you've now
8  referred to that involved talc, was Heller;
9  is that right?
10     A.    Well, it looked at -- it didn't
11 look at transport inasmuch as it looked at
12 the presence of talc particles in the ovaries
13 and found them with or without the history of
14 talc powder use.
15     Q.    Heller looked at 24 patients;
16 is that right?
17     A.    I don't know, but that sounds
18 about right.
19     Q.    Half of them had a history of
20 using talc products, half did not?
21         MS. O'DELL:  Object to form.
22     A.    That's correct.
23 BY MR. ZELLERS:
24     Q.    Heller found talc in the

Page 185

1  tissues of all 24 patients; is that right?
2      A.    That is correct.
3      Q.    I believe we covered this
4  before, but just to confirm:  There are no
5  published articles that you're aware of that
6  show granulomas, fibrosis or adhesions
7  anywhere in the reproductive tract of a woman
8  as a result of external genital talc
9  application, correct?
10         MS. O'DELL:  Object to the
11     form.
12     A.    I believe that's the case,
13 although there have been granulomas found in
14 some cases of cancer where they reported
15 having used talc.
16 BY MR. ZELLERS:
17     Q.    Of the cases or the studies you
18 cited here, Egli, that involved just three
19 women, correct?
20     A.    That was just -- that was an
21 experimental study of the transport of carbon
22 particles.
23     Q.    The women were in a lithotomy
24 position; is that right?

47 (Pages 182 to 185)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 186

1    A.    That's correct.
2    Q.    And that means that they had
3  their legs up in the air, correct?
4    A.    Correct.
5    Q.    Those conditions -- well,
6  strike that.
7         They were injected with
8  oxytocin; is that right?
9    A.    It is.
10    Q.    That was to aid in the
11  transport of the particles, correct?
12         MS. O'DELL:  Object to the
13    form.
14    A.    I believe that was the author's
15  theory.
16  BY MR. ZELLERS:
17    Q.    Those are different
18  circumstances or conditions from a woman who
19  would apply a talc to her genital area
20  standing up, correct?
21    A.    Well, they are, but I'm not
22  sure that that position is really pertinent
23  to the migration of particles through the
24  reproductive tract.

Page 187

1    Q.    Is it your pos- -- is it your
2  testimony that if a woman is in a lithotomy
3  position with their legs up into the air,
4  that that is comparable with respect to the
5  migration of talc to a woman who's standing
6  up and using it in her perineal region?
7    A.    It may be.
8    Q.    Are you an expert on that?
9    A.    I'm not.
10    Q.    The authors in Egli, they
11  stated it was possible that the study
12  observed false positives due to sample
13  contamination because they failed to use
14  liquid or filter blanks as negative controls,
15  correct?
16    A.    I don't recall that, but that
17  may be the case.
18    Q.    You refer to a study by Venter.
19  That involved a radioactive particulate
20  matter, correct?
21    A.    Yes.
22    Q.    Did not involve talc particles,
23  correct?
24    A.    The point of the study was --

Page 188

1  of all these studies -- that they were using
2  various particles that could be detected at
3  the other end, and so this was an attempt to
4  do an experimental study which would cause no
5  harm that would give them an answer regarding
6  transport through the reproductive tract.
7    Q.    In this study, particles were
8  introduced into the reproductive tract, not
9  externally; is that right?
10         MS. O'DELL:  Object to the
11    form.
12    A.    That is correct.
13  BY MR. ZELLERS:
14    Q.    Women were given Pitocin to
15  stimulate uterine contractions; is that
16  right?
17    A.    That's the same as oxytocin.
18    Q.    And that's a yes, correct?
19    A.    Yes.
20    Q.    Again, as with the Egli study,
21  the women were inverted in the Trendelenburg
22  position with their head down, legs up when
23  the particles were administered; is that
24  right?

Page 189

1    A.    I believe so.
2    Q.    Is it possible that the
3  radionuclides can leach from the particles?
4    A.    I don't know the answer to
5  that, but it was radioactive technetium that
6  was bound to albumin.
7    Q.    The Sjösten study that you
8  cite, that did not use -- involve the
9  perineal use of talc, but an exam with a
10  force to the cervix; is that right?
11    A.    Excuse me.  An exam with what?
12    Q.    So it involved an exam with
13  force to the cervix?
14         MS. O'DELL:  Object to the
15    form.
16    A.    Well, this was -- this was done
17  as an experimental study on women who were
18  scheduled to get hysterectomies and they did
19  it on some women one day prior to the
20  hysterectomy and another group of women four
21  days prior to the hysterectomy, and they used
22  gloves that were powdered with starch and
23  gloves that were not powdered with starch.
24         And so they had what's called a

Arch I. "Chip" Carson, M.D., Ph.D.

Page 190

1    Latin square design, and they were able at
2    the point of the hysterectomy of taking
3    samples of the fallopian tubes and washing
4    them to determine whether or not particles
5    were found in the tubes.
6    BY MR. ZELLERS:
7        Q.    What they actually found was
8    that, whether the women were examined with
9    gloves with the starch particles or not, they
10   found starch particles in both, both groups,
11   correct?
12       A.    It is true.
13       Q.    Tubal ligation, you refer to
14   tubal ligation and use that or purport to say
15   that that supports your migration theory,
16   correct?
17       A.    It does.
18       Q.    Your testimony is that for
19   patients who have had a tubal ligation, that
20   they are at a lesser risk of the talc -- let
21   me withdraw that.
22            Explain to us very briefly why
23   you believe that tubal ligation supports your
24   migration theory.

Page 191

1        A.    If the pathway of exposure of
2    the ovaries that results in ovarian cancer is
3    via the reproductive tract, then tubal
4    ligation, which closes off the fallopian
5    tubes, would interrupt that pathway and
6    result in reduced exposure; therefore, you
7    would expect a reduced incidence of cancer in
8    those women.
9        Q.    In fact, though, that is not
10   what has been reported or at least that has
11   not been consistently reported in the
12   studies; is that right?
13       A.    Well, it actually has been a
14   positive factor in a number of the
15   epidemiologic studies that have looked at the
16   ovarian cancer incidence and have been able
17   to include tubal ligation as a historical
18   factor in their analysis.
19       Q.    Did you look at the Terry 2013
20   meta-analysis?
21       A.    Yes.
22       Q.    You cite that in support of
23   your positions in this case; is that right?
24       A.    I did.

Page 192

1        Q.    In fact, in Terry -- well, and
2    let me mark it for you so you've got it in
3    front of you.
4            THE WITNESS:  Okay.  I'm going
5    to move this binder for the time
6    being, if you don't mind.
7            MR. ZELLERS:  Oh, yes, I'll
8    hand you the articles that I refer to,
9    but if you need it, just pull it out.
10           THE WITNESS:  Thank you.
11           (Carson Deposition Exhibit 19
12   marked.)
13   BY MR. ZELLERS:
14       Q.    Deposition Exhibit 19 is the
15   2013 Terry meta-analysis that you referred to
16   in your report; is that right?
17       A.    Yes.
18       Q.    That's a pooled analysis of
19   eight studies; is that right?
20       A.    Yes.
21       Q.    Okay.  This pooled analysis of
22   eight studies relating to genital powder use
23   and the risk of ovarian cancer shows no
24   variation in the risk in talc users based on

Page 193

1    whether they had a tubal ligation or
2    hysterectomy; is that right?
3        A.    I think that's the conclusion
4    of the authors here, but it's not the
5    conclusion of the individual authors of the
6    studies who did the original investigations.
7        Q.    Well, it is the conclusion of
8    the authors based upon their meta-analysis of
9    eight studies; is that right?
10           MS. O'DELL:  Object to the
11   form.
12       A.    Let me just check that.
13           (Document review.)
14       A.    Yes.
15   BY MR. ZELLERS:
16       Q.    If you look at pages 819,
17   carried over to 820, I'm reading:  Our
18   finding of slightly attenuated associations
19   following exclusion of women with powder
20   exposure after tubal ligation or hysterectomy
21   are not supportive of this hypothesis, but
22   risk estimates in this subgroup analysis may
23   have randomly differed from those including
24   all women because of the reduction in sample

49 (Pages 190 to 193)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 194

1    size.
2            Is that right?
3        A.   Yes.
4        Q.   Essentially, looking at these
5    eight studies in this meta-analysis, Terry
6    did not find that exposure to genital powder
7    applications that occurred before tubal
8    ligation or hysterectomy made any substantive
9    difference in the results; is that right?
10       A.   Yes, but the point is that the
11   authors didn't find that it did not make a
12   difference either.  They -- they ended up
13   with a study with reduced numbers that they
14   couldn't make determinations about.
15       Q.   If, though, the migration
16   theory is correct, you would expect that
17   there would be a reduction in the incidence
18   of ovarian cancer for women who have had a
19   tubal ligation or hysterectomy; is that
20   right?
21           MS. O'DELL:  Object to the
22       form.
23       A.   Yes, that is correct.
24           ///

Page 195

1    BY MR. ZELLERS:
2        Q.   And that was not found in the
3    Terry meta-analysis that you cite; is that
4    right?
5            MS. O'DELL:  Object to the
6        form.
7        A.   That is correct, but it was
8    found in the baseline studies that were, in
9    part, included in this meta-analysis.
10   BY MR. ZELLERS:
11       Q.   Are you -- you also cite the
12   Cramer study, 2016; is that right?
13       A.   Yes.
14       Q.   I've got a few questions for
15   you on the Cramer study, but let me just ask,
16   since we're at this part right now.
17           Do you have the Cramer study?
18   I'll hand it to you.
19       A.   If you have a copy, I'd
20   appreciate it.
21           MR. ZELLERS:  Sure.  We'll mark
22       the Cramer study as Exhibit 20.
23           (Carson Deposition Exhibit 20
24       marked.)

Page 196

1            THE WITNESS:  Thank you.
2            MS. O'DELL:  Thank you.
3    BY MR. ZELLERS:
4        Q.   This is also a study,
5    Exhibit 20, Cramer 2016, that you cite as
6    supportive of your opinions in this case,
7    correct?
8        A.   Correct.
9        Q.   Cramer actually looked at
10   whether or not there was any greater
11   association of talc use and ovarian cancer
12   and whether or not women who had a tubal
13   ligation or hysterectomy had a reduced
14   incidence of the disease; is that correct?
15       A.   Yes.
16       Q.   Turn to page 337, and then it
17   carries over to 339.  They're talking --
18   they, being the authors -- of their results,
19   and I'm reading just at the very bottom of
20   337, carried over to 339:  By test for
21   interaction, column 3, the association was
22   significantly greater for women who were
23   African-American, had no personal history of
24   breast cancer, had a tubal ligation or

Page 197

1    hysterectomy.
2            Is that right?
3            MS. O'DELL:  Object to the
4        form.
5        A.   Beginning on page 337?
6    BY MR. ZELLERS:
7        Q.   Yes.
8        A.   I'm sorry, if you could --
9        Q.   Sure.  At the very end of 337.
10       A.   Okay.
11       Q.   So they're looking at --
12       A.   Oh, by tests for interaction.
13       Q.   Yes.
14       A.   Yeah.
15       Q.   So if your migration theory is
16   correct, you would expect there to be a lower
17   incidence of ovarian cancer in women who have
18   had a tubal ligation or hysterectomy,
19   correct?
20           MS. O'DELL:  Object to the
21       form.
22       A.   That is correct.
23   BY MR. ZELLERS:
24       Q.   All right.  Cramer finds by

50 (Pages 194 to 197)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 198

1  test for interaction the association was
2  significantly greater for women who -- and
3  then I'm skipping African-American, but I'm
4  coming down to -- have a tubal ligation or
5  hysterectomy.
6      Is that correct?
7      A.   Yes.
8      Q.   All right.  If talcum powder
9  migrates from the perineal region to the
10 ovaries, shouldn't exposure to -- exposure to
11 talc be far greater in concentration in the
12 rectal, vulvar, vaginal, cervical and uterine
13 tissues which are closer to the area of
14 initial exposure?
15     MS. O'DELL:  Objection to form.
16     A.   Well, the acute exposure would
17 be greater.
18 BY MR. ZELLERS:
19     Q.   You would expect because the
20 acute exposure is greater, that there should
21 be inflammation caused in these organs and
22 areas, correct?
23     A.   No.  The inflammation and
24 oxidative stress is an ongoing process that

Page 199

1  has to develop over time, and it occurs on a
2  chronic basis in areas where foreign bodies
3  locate and reside.  And talc and talcum
4  powder are examples of foreign bodies that
5  have the right characteristics to cause
6  chemotaxis in reactive oxygen species and
7  oxidative status.
8      Q.   Well, in fact, there would be
9  chronic exposure, so if we're dealing with,
10 as you described in the very beginning, which
11 you were asked, to look at the habitual use
12 of talcum powder, that would create exposure
13 on a chronic basis to the rectal area and
14 tissues, vulvar, vaginal, cervical and
15 uterine tissues; is that right?
16     MS. O'DELL:  Object to the
17     form.
18     A.   I suspect if one doesn't bathe,
19 that would be more of an issue, but most
20 people bathe regularly as well.
21 BY MR. ZELLERS:
22     Q.   And bathing regularly
23 eliminates any exposure in the rectal,
24 vulvar, vaginal, cervical and uterine tissues

Page 200

1  to talcum powder?
2      MS. O'DELL:  Object to the
3      form.
4      A.   It doesn't -- it doesn't
5  eliminate exposure, but it does remove
6  residual exposure, as does sweating, other
7  body secretions and so forth.
8  BY MR. ZELLERS:
9      Q.   Are you aware of any studies
10 that show inflammation or oxidative stress as
11 a result of genital talc use in the rectal,
12 vulvar, vaginal, cervical and uterine
13 tissues?
14     A.   No, I'm not.
15     Q.   Under your theory or belief
16 that talcum powder travels from the perineal
17 region to the ovaries through the woman's
18 reproductive tract, talcum powder must travel
19 past the labia, through the vagina, through
20 the cervix, and then to the uterus; is that
21 right?
22     A.   That's correct.
23     Q.   And then the powder travels
24 through the uterus and into the fallopian

Page 201

1  tubes to reach the ovaries; is that right?
2      A.   Yes.
3      Q.   On what studies are you relying
4  to say that talcum powder affects the body
5  differently when it's applied to the perineal
6  region and travels to the cervix compared to
7  when it is applied directly to the cervix?
8      A.   I don't think --
9      MS. O'DELL:  Object to the
10     form.
11     A.   -- there is much of a
12 difference.
13 BY MR. ZELLERS:
14     Q.   You would expect there to be a
15 comparable similar result whether talcum
16 powder is applied directly to the cervix
17 through the use of dusting of a diaphragm as
18 there is to the use of talcum powder in the
19 genital areas; is that right?
20     A.   That is correct.  I think the
21 two differ probably in terms of quantity very
22 significantly.  But other than that, they
23 would be the same.
24     Q.   When applied to the perineal

51 (Pages 198 to 201)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 202

1   region, talcum powder would also be in close
2   contact with a woman's urethra; is that
3   right?
4        A.    Yes.
5        Q.    Substances, and in your view,
6   talcum powder, are capable of traveling up
7   the urethra; is that right?
8             MS. O'DELL:  Object to the
9   form.
10       A.    The urethra has a sphincter
11  which prevents transport beyond that point.
12  BY MR. ZELLERS:
13       Q.    Women get urinary tract
14  infections when bacteria travels up the
15  urethra; is that right?
16       A.    That's correct.
17       Q.    Studies, though, do not show an
18  increase in bladder cancer with talcum powder
19  use; is that right?
20       A.    I don't believe that talcum
21  powder transports in any appreciable amount
22  up the urethra into the bladder.
23       Q.    Studies do not show an increase
24  in rectal cancer with talcum powder use, do

Page 203

1   they?
2        A.    No.
3        Q.    Are you aware that that IARC --
4   and you're familiar with IARC, right?
5        A.    Yes.
6        Q.    Are you aware that IARC rejects
7   this migration theory and calls the evidence
8   weak?
9             MS. O'DELL:  Object to the
10  form.
11       A.    The IARC has made that
12  statement in their -- I think the 2006 review
13  that resulted in their recent monograph, but
14  I think they're about to reconsider that.
15  BY MR. ZELLERS:
16       Q.    Well, they also have stated
17  that in 2010; is that right?
18       A.    Well, that's the --
19            MS. O'DELL:  Object to the
20  form.
21       A.    That's the monograph from the
22  2006 review.
23  BY MR. ZELLERS:
24       Q.    Why do you believe that they're

Page 204

1   about to reconsider that?
2        A.    Because the chatter is that
3   this is something that's on their radar
4   screen currently.
5        Q.    What chatter are you aware of?
6   And what is chatter?
7        A.    It's discussion among -- within
8   the scientific and healthcare community of
9   things that are on the drawing board for
10  IARC.
11       Q.    Do you know whether or not
12  IARC -- well, strike that.
13            IARC has not changed its
14  position that the migration theory and
15  evidence for the migration theory is weak; is
16  that right?
17            MS. O'DELL:  Object to the
18  form.
19       A.    They have not changed their
20  position that was published in the 2010
21  monograph.
22  BY MR. ZELLERS:
23       Q.    All right.  You have heard
24  chatter that they may look at it again; is

Page 205

1   that right?
2        A.    Yes.
3        Q.    Other than this chatter, you're
4   unaware of any other -- well, strike that.
5             You're unaware of any change in
6   IARC's position with respect to migration,
7   correct?
8        A.    Well, an example of what I'm
9   talking about is the Health Canada report,
10  which has contradicted what is found in the
11  IARC monograph and is more current and
12  considers information that will probably go
13  into the next IARC review.
14            MR. ZELLERS:  Move to strike as
15  nonresponsive.
16  BY MR. ZELLERS:
17       Q.    Does IARC review and rely on
18  draft assessments in formulating their
19  positions?
20       A.    IARC relies on primary studies.
21       Q.    Not draft assessments, correct?
22       A.    Well, the draft assessment that
23  I guess you're referring to, the Health
24  Canada draft assessment, is derived from

Arch I. "Chip" Carson, M.D., Ph.D.

Page 206

1  primary studies, the same ones that will be
2  considered by IARC.
3      Q.   All right.  As of today, IARC's
4  published position is that evidence of a
5  migration theory of talcum powder migrating
6  to the ovaries is weak, correct?
7      A.   Yes.
8      Q.   Have you conducted any tests or
9  experiments with respect to your theory or
10  position that talc migrates to the ovaries
11  through the reproductive tract?
12      A.   No, I haven't.
13      Q.   How much talc actually reaches
14  the ovaries in your opinion?
15      A.   I can't answer that question
16  because the dose has not been quantified.
17      Q.   Does it only reach the ovaries
18  during certain times?
19      A.   I don't believe so.  I think
20  there are many circumstances whereby that
21  migration pathway is functional, and in my
22  belief, the pathway from the perineum to the
23  cervix is pretty much an open channel, and
24  then it continues to be open pretty much all

Page 207

1  the way into the pelvic cavity.
2      Q.   You are not a specialist in
3  women's health issues, correct?
4          MS. O'DELL:  Object to the
5  form.
6      A.   Well, I'm a doctor.  I've
7  examined a lot of women.
8  BY MR. ZELLERS:
9      Q.   Are you --
10          MS. O'DELL:  Excuse me.  Are
11  you finished, sir?
12          THE WITNESS:  Yes, I'm
13  finished.
14          MS. O'DELL:  Okay.
15  BY MR. ZELLERS:
16      Q.   Are you an expert in the
17  women's reproductive tract?
18      A.   I've taken it apart and put it
19  back together again in medical school, and in
20  other settings I've done OB/GYN rotations.
21  I've participated in pelvic surgeries.  I
22  understand the anatomy.
23      Q.   There are physicians who are
24  specialists in the female reproductive tract;

Page 208

1  is that right?
2      A.   That is correct.
3      Q.   You are not one of those
4  physicians, correct?
5      A.   I don't claim to be a
6  specialist in gynecology.
7      Q.   Your third opinion is that the
8  ovaries lack an intrinsic elimination system;
9  is that right?
10      A.   That's correct.
11      Q.   Is "intrinsic elimination
12  system" a recognized term of art that's used
13  by gynecologists?
14      A.   I don't think so.  It was just
15  the term I used to describe the situation.
16      Q.   Is "intrinsic elimination
17  system" a term of art used by oncologists?
18      A.   The same answer.
19      Q.   Have you seen published studies
20  that use that term?
21      A.   I don't know.  I suspect I
22  could have.  It's apparently a small number
23  of ways to describe that in a few words.
24      Q.   You do not cite to any studies

Page 209

1  in the body of your report to support your
2  theory that the ovaries do not have an
3  intrinsic elimination system, correct?
4      A.   That's correct.
5      Q.   You have not conducted any
6  tests to show that exposure to the ovaries to
7  particulate matter, if any, is longer than
8  exposure to other parts of the female
9  anatomy; is that right?
10          MS. O'DELL:  Object to the
11  form.
12      A.   I have not conducted any such
13  tests.
14  BY MR. ZELLERS:
15      Q.   Is the cervix more or less
16  sensitive to the impact of foreign particles
17  than the ovaries?
18          MS. O'DELL:  Object to the
19  form.
20      A.   I think that the important
21  point is the residence time that exists, and
22  the cervix is not presented with things for
23  an extended time like the ovaries are in
24  relation to things like talc.  But it is

Arch I. "Chip" Carson, M.D., Ph.D.

Page 210

1  sensitive.
2  BY MR. ZELLERS:
3      Q.    All right.  Your fourth
4  theory -- or strike that.
5          Your fourth opinion is that the
6  epidemiological studies show a positive
7  relationship between regular perineal
8  application of talcum powder and ovarian
9  cancer; is that right?
10     A.    That's correct.
11     Q.    The studies that you reference
12 in this opinion are referred to on pages 6
13 and 7 of your report; is that right?
14         MS. O'DELL:  Object to the
15     form.
16     A.    Most of them, yes.
17 BY MR. ZELLERS:
18     Q.    You conclude that when
19 confounding and bias are exhaustively
20 considered -- and do you believe you've done
21 that here?
22     A.    I am restating what authors of
23 the primary studies have done.  I'm
24 evaluating the consistency of the evidence,

Page 211

1  not the basic evidence itself.
2      Q.    The apparent cause and effect
3  relationship between perineal talcum powder
4  use and ovarian cancer amounts to about a 30%
5  increased risk of ovarian cancer in talcum
6  powder users.
7          Is that your opinion in this
8  case?
9      A.    It is.
10     Q.    And that is your opinion from
11 reviewing the epidemiologic studies that you
12 cite in your report?
13     A.    Yes.
14     Q.    When epidemiologists refer to
15 the statistical power of a study, what are
16 they referring to?
17     A.    Statistical power refers to the
18 ability of a study design, if carried out, to
19 detect a signal in the data of a particular
20 magnitude.
21     Q.    In plain English, statistical
22 power is the likelihood that a study will
23 detect an effect when there is an effect to
24 be detected; is that fair?

Page 212

1      A.    Yes.
2          MS. O'DELL:  Object to the
3      form.
4  BY MR. ZELLERS:
5      Q.    Are you familiar with the term
6  "person-years" as it relates to
7  epidemiological study?
8      A.    Yes, I am.
9      Q.    What is -- strike that.
10         How are person-years
11 calculated?
12     A.    They are calculated by -- in
13 relation to an exposure or to an existing
14 treatment, they're calculated by multiplying
15 the duration of the treatment or exposure in
16 years by the number of people being studied.
17 And that -- the result is person-years.
18     Q.    Can you explain the difference
19 between high-grade serous and low-grade
20 serous cancer?
21     A.    High-grade serous cancer has
22 a -- is less differentiated and has a greater
23 propensity for metastasis and invasion.
24     Q.    Are you aware that the

Page 213

1  epidemiological literature shows that these
2  are very different cancers?
3      A.    They behave quite differently,
4  yes.
5      Q.    Do you know what publication
6  bias is?
7      A.    Yes.
8      Q.    What is publication bias?
9      A.    Publication bias is the
10 tendency to -- to spin a certain argument
11 in -- in order to influence acceptance of
12 publications.
13     Q.    Is that a recognized issue in
14 the field of epidemiology, at least as you've
15 observed?
16     A.    It's a -- it's not necessarily
17 recognized in the field of epidemiology.  It
18 exists in all scientific endeavors.
19     Q.    Is it something that you and
20 other physicians and experts and scientists
21 need to be aware of?
22     A.    Yes.  I think we're all exposed
23 to the effects of that and warned about it as
24 we go through our careers.

54 (Pages 210 to 213)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 214

1    Q.    When I asked you early on what
2  your methodology was, you looked at the
3  published literature, you looked at some
4  websites I think that you told us about
5  earlier, and then you performed a risk
6  assessment and considered whether perineal
7  use of talc products poses a safety risk to
8  consumers; is that right?
9          MS. O'DELL:  Object to the
10   form.
11   A.    Well, that's a gross
12 oversimplification of the risk assessment
13 process that I performed.
14         The review of the literature,
15 which was based on the question that I was
16 asked to address, was a fairly exhaustive one
17 which incorporated a search for every
18 pertinent publication that was available and
19 included multiple languages.
20         It then was -- proceeded into a
21 distillation of the facts that were -- that
22 were claimed based on those individual
23 studies and investigations, and a comparison
24 of those, one with another, eventually

Page 215

1  considering them all as a whole to arrive at
2  conclusions that addressed the question.
3  BY MR. ZELLERS:
4    Q.    That was your methodology; is
5  that right?
6    A.    That is the methodology, yes.
7    Q.    Did you consider the Bradford
8  Hill criteria or factors in reaching your
9  conclusions and opinions in this matter?
10   A.    That's part of the methodology
11 which is outlined in my report.
12   Q.    In analyzing the Bradford Hill
13 criteria, did you conduct a meta-analysis of
14 the available data to reach a conclusion
15 about the relative risk?
16   A.    No, I did not.
17   Q.    Why didn't you conduct a
18 meta-analysis for this case?
19   A.    I did not have the time to do a
20 meta-analysis in this case, first of all.
21 Secondly, there have been a number of other
22 meta-analyses performed, and I had those
23 results available to me in addition to
24 various reviews of the literature that have

Page 216

1  been published as well.  And I felt that was
2  sufficient to be able to produce this report
3  that addressed the question I was asked.
4    Q.    As you told us earlier, you
5  have never published a meta-analysis on any
6  topic; is that right?
7    A.    That's correct.
8    Q.    You cite to some of the
9  available studies on talcum powder use in
10 ovarian cancer, but not to all of the
11 studies, correct?
12         MS. O'DELL:  Object to the
13   form.
14   A.    That's true.
15 BY MR. ZELLERS:
16   Q.    What was your reasoning for
17 focusing on certain studies and excluding
18 other studies?
19   A.    The studies that I referenced
20 were those that had specific aspects that
21 directly influenced my report or my
22 conclusions or that I felt were illustrative
23 of comments I was making in the report, and
24 that's why they were referenced.

Page 217

1          All of the studies may not have
2  risen to that -- the level of requiring being
3  referenced, but pretty much all the studies
4  are included in the literature that I
5  reviewed.
6    Q.    You cite in the report the
7  studies that were favorable or supportive of
8  your opinions, correct?
9    A.    Well, I cited a number of
10 studies, not all of which were favorable to
11 my overall opinions, at least not on the
12 surface.
13   Q.    Did you cite all of the studies
14 that you believe in one way or another
15 support your opinions in this case?
16   A.    I don't think so.
17   Q.    You believe there are
18 additional studies that support your opinions
19 that you did not cite?
20   A.    They're in the literature list.
21   Q.    Did you cite the opinions that
22 refuted -- strike that.
23         Did you cite the studies that
24 refuted your opinions in this matter?

Page 218

1      A.    I cited some studies that had
2   opinions that -- or that had conclusions that
3   did not necessarily agree with mine, but I
4   don't think they refuted my conclusions.
5      Q.    Do you believe the standard for
6   proving causation in the scientific
7   literature is the same one that applies in
8   this litigation?
9           MS. O'DELL:  Object to the
10   form.
11      A.    I don't know that.
12   BY MR. ZELLERS:
13      Q.    A document you brought here
14   today was an FDA letter?
15      A.    Yeah, I think you marked it.
16      Q.    I did mark it.  Why don't you
17   see if you could find it so I can ask you a
18   couple of questions about it.
19      A.    There it is.  That one?
20      Q.    Yes.  Exhibit 10 is an FDA
21   letter dated April 1st of 2014 to a
22   Dr. Epstein; is that right?
23      A.    Yes.
24      Q.    That is a document that you

Page 219

1   reviewed and considered as part of your
2   analysis of this case; is that right?
3      A.    Yes.
4      Q.    Do you believe that that
5   exhibit, Exhibit 10, is supportive of your
6   opinions in this matter?
7      A.    I don't think it's very
8   supportive.  It's -- it's in response to a
9   proposal from a citizens voluntary agency to
10   provide more stringent labeling on talcum
11   powder products, and the agency rejected
12   the -- that petition.
13      Q.    The FDA is the regulatory body
14   in the United States that oversees food, drug
15   and cosmetics; is that right?
16           MS. O'DELL:  Object to the
17   form.
18      A.    Yes.
19   BY MR. ZELLERS:
20      Q.    This letter -- strike that.
21           In this letter the FDA goes
22   through and analyzes some of the Bradford
23   Hill factors; is that right?
24      A.    I'd have to look at this in

Page 220

1   more detail to be able to answer that
2   specifically.
3      Q.    Well, essentially, based upon
4   its analysis as of 2014, the FDA concluded
5   that causation had not been established as
6   between genital talcum powder use and ovarian
7   cancer or an increased risk of ovarian
8   cancer, correct?
9      A.    Well, it said that an updated
10   review failed to identify any new compelling
11   literature data or new scientific evidence.
12   I don't think they indicate here that they
13   actually did a standard review of that
14   literature.
15      Q.    Well, take a look, if you will,
16   at page 4.  The FDA sets forth its
17   epidemiology and etiology findings; is that
18   right?
19      A.    Yes.
20      Q.    The FDA has a number of very
21   capable physicians, scientists,
22   toxicologists, pharmacologists and medical
23   professionals; is that right?
24           MS. O'DELL:  Object to the

Page 221

1   form.
2      A.    I don't know if they're still
3   working, but they have good people on staff.
4   BY MR. ZELLERS:
5      Q.    And just so, a year or two or
6   three, if this transcript is ever reviewed,
7   we are in the midst of a shutdown of at least
8   portions of the government; is that right?
9      A.    That's correct.
10      Q.    And that is what your comment
11   was directed to, correct?
12      A.    That is correct.
13      Q.    On page 4 the FDA states:
14   After consideration of the scientific
15   literature submitted in support of both
16   citizens' petitions, FDA found.
17           And then, number 2, that
18   several of the studies acknowledge biases in
19   the study design and no single study has
20   considered all the factors that potentially
21   contribute to ovarian cancer, including
22   selection bias and/or uncontrolled
23   confounding that result in spurious positive
24   associations between talc use and ovarian

Arch I. "Chip" Carson, M.D., Ph.D.

Page 222

1  cancer risk.
2       Did I read that correctly?
3       A.    You did read it correctly.
4       Q.    Does that appear to be at least
5  one of the conclusions of the FDA after
6  considering the scientific literature as of
7  early 2014?
8       MS. O'DELL:  Object to the
9       form.
10      A.    Yes, that is listed as an FDI
11 finding -- FDA finding.
12 BY MR. ZELLERS:
13      Q.    The FDA noted that a
14 dose-response -- strike that.
15      The FDA noted that
16 dose-response evidence is lacking; is that
17 right?
18      A.    A dose-response --
19      Q.    Two things.  The FDA notes that
20 there's a lack of consistency in the study
21 results, correct?
22      MS. O'DELL:  Where are you
23      reading?  I'm sorry.
24      MR. ZELLERS:  I'm looking at

Page 223

1  Conclusion 3.
2       THE WITNESS:  Point 3.
3       A.    They found that the
4  case-control studies did not demonstrate a
5  consistent positive association across
6  studies; although some studies have found
7  small positive associations between talc and
8  ovarian cancer, but lower confidence limits
9  are often close to 1, and dose-response
10 evidence is lacking.
11 BY MR. ZELLERS:
12      Q.    That was FDA's conclusion
13 number 3 based upon its review of the
14 scientific literature; is that right?
15      MS. O'DELL:  Object to the
16      form.
17      A.    It's correct.  It's not a valid
18 interpretation of the statistical results,
19 but that was one of their findings.
20 BY MR. ZELLERS:
21      Q.    Well, that was their finding.
22 You disagree at least in part with their
23 finding; is that right?
24      MS. O'DELL:  Object to the

Page 224

1  form.
2       A.    That is correct.
3  BY MR. ZELLERS:
4       Q.    You are a paid expert for the
5  plaintiffs in this litigation; is that right?
6       A.    That is correct.
7       Q.    To your knowledge, the FDA is
8  not paid -- well, let me withdraw that.
9       A.    I wouldn't go out on a limb
10 there.
11      Q.    Number 4, Conclusion 4, a
12 cogent biological mechanism by which talc
13 might lead to ovarian cancer is lacking.
14 Exposure to talc does not account for all
15 cases of ovarian cancer and there was no
16 scientific consensus on the proportion of
17 ovarian cancer cases that may be caused by
18 talc exposure.
19      Was that a conclusion of the
20 FDA based upon its review of the
21 epidemiologic literature?
22      MS. O'DELL:  Object to the
23      form.
24      A.    Yes, it was, and it's one that

Page 225

1  I also disagree with.
2  BY MR. ZELLERS:
3       Q.    IARC also considered the
4  Bradford Hill considerations; is that right?
5       A.    Yes, it did.
6       Q.    IARC rejected classification of
7  talc as a carcinogenic, instead assigning it
8  to the classification of possibly
9  carcinogenic to humans; is that correct?
10      A.    That's correct.
11      Q.    We've already discussed the
12 IARC categories briefly, but let's mark a
13 document from the IARC website as to the
14 classifications, Exhibit 21.
15      (Carson Deposition Exhibit 21
16      marked.)
17 BY MR. ZELLERS:
18      Q.    Tell me if you recognize that.
19      A.    Yes.
20      Q.    Exhibit 21 is from the IARC
21 website, and it goes through the
22 classifications of different agents that have
23 been made by the International Agency for
24 Research on Cancer; is that right?

57 (Pages 222 to 225)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 226

1      A.    Yes, that's correct.
2      Q.    It has studied and included 120
3  agents in the Group 1 category, which is
4  carcinogenic to humans, correct?
5      A.    That's correct.
6      Q.    That's the only category in
7  which IARC finds sufficient evidence in
8  humans, correct?
9          MS. O'DELL:  Object to the
10      form.
11     A.    That's the category that
12 represents substances for which there is
13 sufficient and irrefutable evidence of human
14 carcinogenesis.
15 BY MR. ZELLERS:
16     Q.    It lists 82 agents in Group 2A
17 as being probably carcinogenic to humans; is
18 that right?
19     A.    That's correct.
20     Q.    IARC is certainly willing to
21 declare agents as either a known or probable
22 carcinogen; is that right?
23     A.    That's correct.
24     Q.    There is only one agent in

Page 227

1  Group 4, probably not carcinogenic to humans,
2  correct?
3      A.    Yes.  I thought that number had
4  gone up recently, but the date here is
5  November 2018, so some may have been moved
6  back into Group 3.
7      Q.    So out of the over 1,000 agents
8  that IARC has reviewed, it's only placed one
9  agent in the Group 4 category, probably not
10 carcinogenic; is that right?
11     A.    That's correct.
12     Q.    There is no Group 5, not
13 carcinogenic; is that right?
14     A.    That's correct.
15     Q.    With genital talc, IARC
16 Group 2B designation -- well, strike that.
17          Genital talc is listed as an
18 IARC Group 2B designated substance; is that
19 right?
20     A.    That's correct.
21     Q.    That's based on limited
22 evidence in humans, which means that IARC
23 cannot rule out chance, bias or confounding
24 with reasonable confidence, correct?

Page 228

1          MS. O'DELL:  Object to the
2      form.
3      A.    I think limited evidence also
4  refers to just the number of studies that
5  have been performed as well as the quality of
6  the studies.
7  BY MR. ZELLERS:
8      Q.    Well, based upon the evidence
9  that is available, the studies that are
10 available, a 2B designation by IARC means
11 that IARC cannot rule out chance, bias or
12 confounding with reasonable confidence,
13 correct?
14          MS. O'DELL:  Objection, asked
15      and answered.
16     A.    Not always the case.
17 BY MR. ZELLERS:
18     Q.    That's part of the definition,
19 isn't it?
20     A.    I don't believe it applies to
21 every agent or every evaluation.
22     Q.    Well, I'll not take the time to
23 go through the IARC definitions; if we at the
24 end of the day have extra time, we'll go back

Page 229

1  and we'll take a look.
2          What else is in the Class 2B,
3  possibly carcinogenic.  Ginkgo biloba, is
4  that something you're aware of that's in that
5  category?
6          MS. O'DELL:  Object to the
7      form.
8      A.    That's a biological material.
9  BY MR. ZELLERS:
10     Q.    Pickled vegetables?
11     A.    That may be in Group 2B.
12     Q.    Occupational carpentry and
13 joinery?
14          MS. O'DELL:  Objection to form.
15     A.    That's wood dust exposure.
16 BY MR. ZELLERS:
17     Q.    Also 2B; is that right?
18     A.    Wood dust itself is Group 1.
19 The occupation is Group 2B.
20     Q.    Let me ask you about some
21 individual Bradford Hill criteria.  On
22 page 10 of your report, you state that you
23 gave the most weight to strength of
24 association, consistency and biologic

58 (Pages 226 to 229)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 230

1  plausibility; is that right?
2      A.    That's correct.
3      Q.    How much weight did you give to
4  the other six factors?
5      A.    Sufficient.
6      Q.    Why did you put less weight on
7  those?
8      A.    Because the strength of
9  association, the consistency of the evidence
10 and the biological plausibility of perineal
11 talc, talcum powder application as
12 responsible for the occurrence of ovarian
13 cancer was compelling.
14     Q.    FDA focused on dose, correct?
15     A.    Yes.
16     Q.    You did not; is that right?
17     A.    That's right.
18     Q.    The first Bradford Hill factor
19 that you focused on was strength of
20 association.
21          What association does the
22 literature report between talc use and
23 ovarian cancer?
24     A.    Overall, evaluating the

Page 231

1  universe of research, epidemiologic research
2  that's been done on this, it shows an average
3  30% increase in ovarian cancer risk for those
4  who regularly apply talcum powder to the
5  perineum.
6      Q.    Regular application of talcum
7  powder means what?
8      A.    It -- I believe that it means
9  daily or thereabouts.
10     Q.    In what form of application?
11     A.    Talcum powder.
12     Q.    In what amount?
13     A.    Whatever is necessary or
14 desired by the user.
15     Q.    Does that vary from woman to
16 woman?
17     A.    It does.
18     Q.    Did you make any attempt to
19 assess what regular use of talcum powder was?
20     MS. O'DELL:  Object to the
21 form.
22     A.    There have been a couple of
23 attempts to try to quantify what -- what that
24 means.  I think for the most part they've

Page 232

1  been failed attempts, but they have been
2  attempts to estimate the quantity of powder
3  that you start with and the amount that
4  results in the application to the perineum by
5  using models and actually doing some
6  measurements and recording activities.
7  BY MR. ZELLERS:
8      Q.    You did not do any modeling or
9  any assessment of the quantity of baby powder
10 that was involved with daily use; is that
11 right?
12     A.    No, I relied on those others.
13     Q.    When you say 30% increased
14 risk, that's a 1.3 odds ratio; is that right?
15     A.    That's correct.
16     Q.    And that comes largely from the
17 case-control studies, correct?
18     MS. O'DELL:  Object to the
19 form.
20     A.    Yes, but it's also consistent
21 with some of the information from the cohort
22 studies.
23 BY MR. ZELLERS:
24     Q.    Epidemiologists consider a 1.3

Page 233

1  odds ratio in a case-control study to be a
2  weak or modest association; is that right?
3      MS. O'DELL:  Object to the
4  form.
5      A.    That's correct.
6  BY MR. ZELLERS:
7      Q.    Where here we're talking only
8  about statistical associations, not
9  causation, correct?
10     MS. O'DELL:  Object to the
11 form.
12     A.    Well, association eventually
13 becomes causation when the -- when the
14 evidence mounts to a point where it becomes
15 recognized by all of the players that this is
16 what's going on.
17          A 30% increase may be
18 classified by epidemiologists as weak or
19 modest, but if you look at the number of
20 women in this country who die each year from
21 this fatal disease, that represents about
22 3,000 lives that could potentially be saved
23 through prevention.
24     Q.    There is not a --

Arch I. "Chip" Carson, M.D., Ph.D.

Page 234

1         MS. BOCKUS:  Excuse me, I need
2    to object as nonresponsive.
3         MR. ZELLERS:  Yes, join.
4    BY MR. ZELLERS:
5         Q.    There is not a consensus at
6    this time with respect to any causation
7    relating to genital talc and ovarian cancer,
8    is there?
9         MS. O'DELL:  Objection to the
10   form.
11        A.    I believe that that consensus
12   is building.
13   BY MR. ZELLERS:
14        Q.    FDA -- that's not FDA's
15   position, correct?
16        MS. O'DELL:  Object to the
17   form.
18        A.    Not at the moment.
19   BY MR. ZELLERS:
20        Q.    That's not the position of the
21   National Cancer Institute; is that right?
22        A.    That's correct.
23        Q.    That's not the position of the
24   CDC; is that correct?

Page 235

1         A.    That's correct.
2         Q.    IARC does not refer to any
3    association between perineal talc use and
4    ovarian cancer as a strong association, does
5    it?
6         MS. O'DELL:  Object to the
7    form.
8         A.    It calls it a Group 2B
9    carcinogen, which is fairly significant.
10   BY MR. ZELLERS:
11        Q.    Well, we discussed a few
12   minutes ago that if an agent is a Group 2B
13   carcinogen, that is based on limited evidence
14   in humans; is that right?
15        A.    That's correct.
16        Q.    All right.  Your opinions on
17   strength of association, do they apply
18   equally to all forms of ovarian cancer?
19        A.    No, they don't.  These apply to
20   the epithelial ovarian cancer spectrum.
21        Q.    Your opinions in terms of there
22   being a -- well, let me withdraw that.
23        We've agreed that 1.3 is not a
24   strong association, at least insofar as

Page 236

1    epidemiologists are concerned, correct?
2         MS. O'DELL:  Object to --
3    object to the form.
4         A.    It's an increased risk that
5    translates into human lives, so it depends on
6    your point of view.
7         MS. BOCKUS:  Object to form --
8    I mean, sorry, nonresponsive, move to
9    strike.
10        MR. ZELLERS:  Join.
11        MS. O'DELL:  Oppose.
12        DR. THOMPSON:  Agreed.
13   BY MR. ZELLERS:
14        Q.    The 1.3 relative risk that you
15   believe generally applies, that would relate
16   to epithelial cancers; is that right?
17        A.    Yes.
18        Q.    That's what you're limiting
19   your opinions to in this case, correct?
20        MS. O'DELL:  Object to the
21   form.
22        A.    Well, these opinions relate to
23   several of the cancers that have shown
24   increases in these background epidemiologic

Page 237

1    studies, which include the epithelial ovarian
2    cancers, including the serous; the borderline
3    cancers are also showing increases in some of
4    the studies.  So it's the group of those
5    cancers, yes.
6    BY MR. ZELLERS:
7         Q.    The cohort studies, prospective
8    cohort studies, have not shown an association
9    between talc and ovarian cancer, correct?
10        MS. O'DELL:  Object to the
11   form.
12        A.    They have in some subtypes.
13   BY MR. ZELLERS:
14        Q.    There was an initial
15   description with respect to the first Nurses'
16   study that was not supported in the update of
17   that study; is that correct?
18        A.    The Nurses' Health Study?
19        Q.    Yes.
20        A.    Yes, that's correct.
21        Q.    Let's look at a different
22   criteria, consistency.  The literature does
23   not show a consistent association between
24   talc use and ovarian cancer, correct?

60 (Pages 234 to 237)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 238

1          MS. O'DELL:  Object to the
2     form.
3          A.    I believe that, in fact,
4     research shows -- does show a consistent
5     pattern.
6     BY MR. ZELLERS:
7          Q.    The cohort studies do not show
8     an association between talc use and ovarian
9     cancer as we just discussed, correct?
10          A.    The basic cohort studies that
11     look at all of the subjects and all of the
12     cancers together typically do not rise to the
13     level of significance.
14          Q.    The hospital-based case-control
15     studies collectively do not show an
16     association between talc use and ovarian
17     cancer, correct?
18          A.    I sort of discount the
19     distinction between the hospital-based
20     studies and the community-based studies.  I'm
21     not sure whether there are valid reasons to
22     consider those differently.
23          Q.    We've discussed earlier that
24     you are not an epidemiologist; is that right?

Page 239

1          MS. O'DELL:  Object to the
2     form, misstates his testimony.
3          A.    I don't think I necessarily
4     agreed to that characterization because I
5     deal a lot with epidemiologic work.  I'm a
6     faculty member in the Department of
7     Epidemiology at the University of Texas
8     School of Public Health, and some may
9     consider me an epidemiologist.
10     BY MR. ZELLERS:
11          Q.    Do you consider yourself an
12     expert in epidemiology?
13          A.    No.
14          Q.    Do you agree -- well, do you
15     agree that hospital-based case-control
16     studies are less susceptible to selection
17     bias than population-based case-control
18     studies?
19          A.    It depends on the methodology
20     that's used to recruit the study subjects.
21          Q.    With hospital-based
22     case-controlled studies, you're more likely
23     to be comparing hospitalized patients to
24     hospitalized patients rather than comparing

Page 240

1     ill patients in the community to healthy
2     people in the community, correct?
3          A.    In some cases that might be
4     correct, but I'm not sure that's any -- in
5     any sort of world an advantage.
6          Q.    Well, shouldn't there be
7     consistency if the Bradford Hill criteria is
8     to be -- well, strike that.
9               In applying the Bradford Hill
10     criteria of consistency, there should be
11     consistency across different types of
12     studies, cohort studies, hospital-based
13     case-control studies, and population-based
14     case-control studies, correct?
15          MS. O'DELL:  Object to the
16     form.
17          A.    That's correct.
18     BY MR. ZELLERS:
19          Q.    Isn't the absence of an
20     association in the cohort studies especially
21     significant in that the study design for the
22     cohort studies reduces the likelihood of
23     recall bias?
24          A.    There are many forms of bias

Page 241

1     that study designers need to consider in the
2     process of designing a study, and there are
3     even more types of bias that are discovered
4     after a study has begun.
5               You can fault case-control
6     studies for being particularly sensitive to
7     recall bias, but many of these authors who
8     perform these studies indicated that they
9     were well aware of that bias potential and
10     took measures to avoid it.
11               The same thing can be said
12     about cohort studies.  They suffer from other
13     forms of bias, misclassification in
14     particular.  They may also suffer from the
15     fact that they are extremely expensive, have
16     long duration, and require very large numbers
17     of subjects in order to carry them out and
18     are frequently underpowered and unable to
19     arrive at the conclusions that they seek for
20     that reason.
21          MR. ZELLERS:  Move to strike as
22     nonresponsive.
23     BY MR. ZELLERS:
24          Q.    Is it possible that recall bias

Page 242

1 explains the difference between the cohort
2 studies and the retrospective case-control
3 studies?
4          MS. O'DELL:  Object to form,
5      asked and answered.
6      A.    I don't believe that that is
7 the case.
8 BY MR. ZELLERS:
9      Q.    Is it possible?
10          MS. O'DELL:  Objection.
11      A.    Theoretically it would be
12 possible.
13 BY MR. ZELLERS:
14      Q.    Are you familiar with the
15 Berge -- Berge 2017 study?
16      A.    Yes.
17      Q.    Is that a study that you cite
18 and reviewed and rely on?
19      A.    It was a meta-analysis.
20      Q.    Is that a meta-analysis that
21 you cite, review and have relied upon?
22      A.    Yes.
23      Q.    Take a look, if you will, at
24 Exhibit 22.

Page 243

1          (Carson Deposition Exhibit 22
2      marked.)
3          THE WITNESS:  Thank you.
4          MS. O'DELL:  Thank you.
5 BY MR. ZELLERS:
6      Q.    You're familiar with this
7 meta-analysis; is that right?
8      A.    Yes.
9      Q.    The authors conclude that
10 information bias from retrospective
11 self-report of talc use is a possible
12 explanation for the association detected in
13 case-control studies; is that right?
14          MS. O'DELL:  I'm sorry, are you
15      reading from a certain page?
16          MR. ZELLERS:  I am.
17          MS. O'DELL:  Can you direct it
18      to us, please?
19          THE WITNESS:  Could you tell us
20      where that is?
21          MR. ZELLERS:  Sure.
22 BY MR. ZELLERS:
23      Q.    Take a look if you will on
24 page 6, the right-hand column, third

Page 244

1 paragraph.  Reading from the second full
2 paragraph, the authors discuss the fact that
3 the association between genital talc use and
4 risk of ovarian cancer is present in
5 case-control but not in cohort studies, can
6 be attributed to bias in the former type of
7 studies; is that right?
8          MS. O'DELL:  Object to the
9      form.
10      A.    That's what it says.
11 BY MR. ZELLERS:
12      Q.    Then continuing down:
13 Information bias from retrospective
14 self-report of talc use is a possible
15 explanation for the association detected in
16 case-control studies.
17          Is that right?
18      A.    That's what it says.
19      Q.    What was your methodology for
20 discounting the effect of recall bias in the
21 population-based case-control studies?
22      A.    The fact that several authors
23 discussed the possibility of recall bias and
24 incorporated methodology for avoiding recall

Page 245

1 bias, for example, placing parallel questions
2 that should be affected in the same way, and
3 still showed a positive result for talc and
4 ovarian cancer is one reason.
5          The other has to do with
6 consistency of the results, and although
7 you've stated that from these various
8 documents, including this quotation, that the
9 case-control studies showed positive
10 associations but the cohort studies did not,
11 I would -- I would refute that by saying that
12 all of the -- the vast majority of all of the
13 studies show a positive odds ratio or
14 relative risk, even if they don't rise to the
15 level of significance.
16          If these results were obtained
17 simply by chance, you would expect an equal
18 number of positive results and negative
19 results, but we don't have that here.  We
20 have practically all positive results with
21 three or four outliers.
22          And so --
23      Q.    We looked at the Taher paper
24 early on in this deposition where Taher

Arch I. "Chip" Carson, M.D., Ph.D.

Page 246

1  concluded that 15 out of the 30 case-control
2  studies reported a statistically significant
3  association between genital talc use and
4  ovarian cancer, correct?
5       A.    That's correct, but you're
6  not -- you're not talking about the other 15.
7       Q.    The hospital-based case-control
8  studies collectively do not show a
9  statistically significant association between
10 talc use and ovarian cancer, correct?
11           MS. O'DELL:  Object to the
12      form.
13      A.    I don't know that that is the
14 case.
15 BY MR. ZELLERS:
16      Q.    You don't know that it's not
17 the case; you'd have to go back and relook at
18 the studies, fair?
19      A.    I'd have to look through here,
20 which I'm happy to do if you want me to, but
21 I don't believe that that's the case.
22      Q.    In fact, the author, you cite
23 the Langseth paper, a 2008 paper, as
24 supportive of your position; is that right?

Page 247

1       A.    Yes.
2       Q.    I'll mark that
3  Deposition Exhibit 23.
4       A.    I think it was 2004, was it
5  not?
6       Q.    Well, I'm going to hand it to
7  you and we can look at it together.
8           (Carson Deposition Exhibit 23
9      marked.)
10      A.    Okay.
11 BY MR. ZELLERS:
12      Q.    You're familiar with the
13 Langseth paper; is that right?
14      A.    Yes.
15          (Comments off the stenographic
16      record.)
17 BY MR. ZELLERS:
18      Q.    Langseth and the authors
19 concluded that the current body of
20 experimental and epidemiological evidence is
21 insufficient to establish a causal
22 association between perineal use of talc and
23 ovarian cancer risk; is that right?
24          And I'm looking at the second

Page 248

1  page.
2           MS. O'DELL:  Object to the
3      form.
4  BY MR. ZELLERS:
5       Q.    Is that the conclusion of the
6  authors?
7       A.    What I'm reading here is on
8  balance, the epidemiological evidence
9  suggests that the use of cosmetic talc in the
10 perineal area may be associated with ovarian
11 cancer risk.  The mechanism of
12 carcinogenicity may be related to
13 inflammation.
14      Q.    Take a look at the paragraph on
15 the right-hand side under Proposal to
16 Research Community.  I'm looking at the
17 second page of the Langseth article.
18          Are you there?
19      A.    Yes, I am.
20      Q.    The authors state:  The current
21 body of experimental and epidemiological
22 evidence is insufficient to establish a
23 causal association between perineal use of
24 talc and ovarian cancer risk.

Page 249

1           Is that right?
2           MS. O'DELL:  Object to the
3      form.
4       A.    That's what it says.
5  BY MR. ZELLERS:
6       Q.    Experimental research is needed
7  to better characterize deposition, retention
8  and clearance of talc to evaluate the ovarian
9  carcinogenicity of talc.
10          Is that what the authors state?
11      A.    Well, that's what it says, but
12 it says much more.  In fact, the editors of
13 the journal, in the section on the next page
14 that is titled What This Study Adds, say:
15 Epidemiological evidence suggests that the
16 use of cosmetic talc in the perineal area may
17 be associated with ovarian cancer risk.  The
18 IARC has classified this use of talc as
19 possibly carcinogenic to human beings,
20 Group 2B.  The mechanism of carcinogenicity
21 may be related to inflammation.  This paper
22 focused on the high degree of consistency in
23 the studies accomplished so far and what
24 should be the focus in future studies.

63 (Pages 246 to 249)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 250

1      So I --
2      Q.    And then the conclusion is what
3  I read, that:  The current body of
4  experimental and epidemiological evidence is
5  insufficient to establish a causal
6  association between perineal use of talc and
7  ovarian cancer risk.
8      Correct?
9      MS. O'DELL:  Object to the
10  form.
11      A.    That is what it says, but this
12  was accepted in 2007, which was now 12 years
13  ago.
14  BY MR. ZELLERS:
15      Q.    Let me ask you about the cohort
16  studies.  They involved a much greater number
17  of women than the case-controlled studies; is
18  that right?
19      MS. O'DELL:  Object to the
20  form.
21      A.    Well, they did not involve more
22  cases, but they involved more women because
23  in order to do a cohort study, you have to
24  start with a huge group of people and wait

Page 251

1  for them to develop cancers, and then count
2  those cancers.
3  BY MR. ZELLERS:
4      Q.    What was your methodology for
5  weighing the power of the cohort studies
6  versus the case-control studies?
7      A.    The cohort studies, it wasn't
8  apparent in every research report exactly how
9  they had done their sample size calculations
10  and power determinations, but in many cases
11  the lack of arriving at conclusions was
12  simply due to an inability to detect an
13  effect in the cohort studies, not that they
14  detected that there was not an effect.  And
15  that's unfortunately a disadvantage of an
16  underpowered study.
17      Q.    Is it your testimony that the
18  cohort studies are underpowered?
19      A.    I think by and large most
20  cohort studies are underpowered and --
21  because power calculations are based on
22  chance.  Investigators are sort of spinning
23  the roulette wheel and hoping that the number
24  that they want comes up.  In some cases that

Page 252

1  doesn't happen.
2      Q.    Is it your testimony that the
3  cohort studies relating to genital talc use
4  and ovarian cancer are spinning the roulette
5  wheel?
6      MS. O'DELL:  Object to the
7  form.
8      A.    In terms of the power of the
9  studies to detect a meaningful difference
10  among the subjects, yes.
11  BY MR. ZELLERS:
12      Q.    That's your testimony as an
13  expert in this case; is that right?
14      A.    It is my testimony that cohort
15  studies, including these, are chronic -- or
16  quite often underpowered simply because of
17  the expense associated with performing these
18  studies.
19      Q.    What analysis did you do to
20  conclude that the cohort studies in this
21  area, the four cohort studies, are
22  underpowered?
23      A.    Like I just mentioned to you, I
24  read the studies and looked at their

Page 253

1  conclusions, and their conclusions were not
2  that the effect didn't exist, but they
3  couldn't detect it.
4      MR. ZELLERS:  Let's go off the
5  record because we need to change our
6  tape.
7      THE VIDEOGRAPHER:  We're off
8  the record at 3:06, end of Tape 3.
9      (Recess taken, 3:06 p.m. to
10  3:19 p.m.)
11      THE VIDEOGRAPHER:  We're on the
12  record at 3:19, beginning of Tape 4.
13  BY MR. ZELLERS:
14      Q.    Dr. Carson, you are not a
15  statistician, correct?
16      A.    That's correct.
17      Q.    You are not a biostatistician;
18  is that right?
19      A.    That's right.
20      Q.    Do you agree that some of the
21  case-control studies have shown statistically
22  significant findings and others have not?
23      A.    I do agree that.
24      Q.    If a study does not show a

Arch I. "Chip" Carson, M.D., Ph.D.

Page 254

1   statistically significant association, it
2   could mean that no risk exists, as we've
3   discussed; is that right?
4       A.   That's correct.
5       Q.   What methodology did you use to
6   weigh the lack of statistical significance
7   across studies?
8           MS. O'DELL:  Object to the
9       form.
10      A.   Across all of the case-control
11  studies?
12  BY MR. ZELLERS:
13      Q.   Yes.
14      A.   I simply treated them as
15  isolated research designs that were done on
16  different populations in different places
17  with different considerations.  They were not
18  necessarily comparable, like apples to apples
19  or oranges to oranges; they were very
20  different studies in most cases, and so I
21  felt it was important to allow their findings
22  to stand on their own.
23      Q.   I want to talk to you about
24  dose-response.  That's another of the

Page 255

1   Bradford Hill criteria; is that right?
2       A.   That's correct.
3       Q.   Which studies show a
4   dose-response, talc exposure and ovarian
5   cancer?
6       A.   Let me see here.  I'm looking
7   at my notes.  The Harlow study from 1992
8   showed a dose-response, and the Cramer 2016
9   study showed a dose trend with strong odds
10  ratios for premenopausal women and hormone
11  therapy-treated women with greater than
12  24 years of exposure.
13          The Schildkraut study, also a
14  case-controlled study of 2016, showed a
15  dose-response.
16      Q.   There are a number of studies
17  that did not show a dose-response; is that
18  right?
19      A.   It's correct.  They did not
20  necessarily show there was not a
21  dose-response.  They just, as I was
22  mentioning before, were unable to detect a
23  dose-response.
24      Q.   Do you have your report in

Page 256

1   front of you?
2       A.   I do.
3           I would also add that the
4   Penninkilampi meta-analysis also found a
5   dose-response.
6       Q.   Do you mention Penninkilampi at
7   all in your report?
8       A.   It's cited.
9       Q.   In the body of your report?
10      A.   I think it's in there
11  somewhere.
12      Q.   You believe it is; is that
13  right?
14      A.   I do.
15      Q.   Well, I'll ask you a couple of
16  questions about it then.
17          Before I do, let's talk a
18  little bit more about your report.  So go to
19  page 7.  You state at the very top of that
20  page that it has been difficult to estimate
21  dose in order to evaluate the dose-response
22  relationship for ovarian cancer; is that
23  right?
24      A.   That's correct.

Page 257

1       Q.   You state that it also has been
2   difficult to exactly estimate the quantity of
3   talcum powder administration during personal
4   hygiene activities; is that right?
5       A.   That's correct.
6       Q.   Let's look at a couple of the
7   studies that you believe do, in fact, show a
8   dose-response.  The Penninkilampi, that's a
9   meta-analysis, 2018; is that right?
10      A.   That's correct.
11      Q.   That study does not consider or
12  include the Gertic 2010 cohort study; is that
13  right?
14      A.   I -- I'd have to look at the
15  table, but yes, that one may be left out.
16      Q.   Well, that's a significant
17  study to leave out of an analysis, isn't it?
18          MS. O'DELL:  Object to the
19      form.
20          THE WITNESS:  I'm getting
21      there.
22          (Document review.)
23          THE WITNESS:  Apologies, I have
24      binder block here.

65 (Pages 254 to 257)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 258

1         MS. O'DELL:  You need help?
2         THE WITNESS:  Okay.
3    BY MR. ZELLERS:
4         Q.    And I misspoke.  I meant to
5    refer to Gates, the updated Nurses' study.
6    So Gates 2010.
7         A.    Yes, it appears that Gates is
8    not included in the -- in the spectrum of
9    studies considering; the Gertic study does
10   appear.
11        Q.    Gates 2010 is an important
12   cohort study in this area, would you agree?
13        MS. O'DELL:  Object to the
14        form.
15        A.    It's important, but I think it
16   may be considered one of the ones that
17   suffered from power issues.  It wasn't able
18   to determine a relative risk in the
19   population that it assessed.
20   BY MR. ZELLERS:
21        Q.    There are a number of the
22   case-control studies that did not determine a
23   relative risk, at least of statistical
24   significance, correct?

Page 259

1         A.    Well, they determined odds
2    ratios, which is the equivalent of relative
3    risk for a case-control study.
4         Q.    And in a number of those
5    case-control studies, at least 15 out of the
6    30 relative risk was not -- or strike that --
7    statistical significance was not achieved in
8    the study; is that right?
9         MS. O'DELL:  Object to the
10        form.
11        A.    That's correct.
12   BY MR. ZELLERS:
13        Q.    Let's look at the Cramer paper.
14   We've talked about this earlier.
15        A.    Which one, the 2016?
16        Q.    Exhibit 20, yes, 2016.
17        A.    Okay.
18        Q.    This is another study that you
19   cite as being supportive of your
20   dose-response opinion; is that right?
21        A.    Yes.
22        Q.    Tell me when you have it.
23        A.    I think you may have picked up
24   my copy or the copy that I was looking at.

Page 260

1         Q.    This is my highlighted copy, so
2    I'm sure it wasn't yours.
3         A.    I'm sorry.
4         Q.    That's all right.  We'll --
5    take your time.
6         A.    Here we are.
7         Q.    Got it, Exhibit 20?
8         A.    I think so.
9         Q.    Do you have the Cramer study in
10   front of you?
11        A.    I do.
12        Q.    It's a retrospective
13   case-control study published in 2016; is that
14   right?
15        A.    That's correct.
16        Q.    If we look at the table of
17   results on page 337, Table 1.
18        Do you see that?
19        A.    Yes.
20        Q.    This table shows the risk of
21   ovarian cancer for women who use talc, talcum
22   powder, daily; is that right?
23        MS. O'DELL:  Object to the
24        form.

Page 261

1         A.    It does.
2    BY MR. ZELLERS:
3         Q.    And it's four different periods
4    of time; one year, one to five years, five to
5    20 years and more than 20 years; is that
6    right?
7         A.    That's correct.
8         Q.    There was only statistical
9    significance found for the time period of one
10   to five years of use and more than 20 years
11   of use; is that right?
12        A.    For the first group, the -- for
13   those who reported months year of use --
14   months per year of use.
15        Q.    Well, for the first group,
16   which was equivalent to one year of daily
17   use, there was no statistical significance;
18   is that right?
19        MS. O'DELL:  Object to the
20        form.
21        A.    That -- well, the -- there was
22   a positive odds ratio with a nonsignificant
23   95% confidence interval.
24        ///

66 (Pages 258 to 261)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 262

1  BY MR. ZELLERS:
2      Q.    Meaning that if you look at
3  this study, that it is certainly possible
4  that because there is not statistical
5  significance, there could be a finding of no
6  risk, correct, no increased risk?
7      A.    That's a possibility.
8      Q.    Then if we go to the next
9  period, we do show a dose-response for talcum
10  powder use in the year -- years one to five;
11  is that right?
12      A.    Well, one to five years of
13  daily use, yes.
14      Q.    But then when we look at five
15  to 20 years of daily use, there is not a
16  statistically significant association; is
17  that right?
18      A.    That's correct.
19      Q.    But then when we go to greater
20  than 20 years, we do find a statistical
21  association; is that right?
22      A.    That's correct.
23      Q.    If, in fact, there was a true
24  dose-response relationship, you would expect

Page 263

1  to see that dose-response relationship in
2  each of these groups; is that right?
3          MS. O'DELL:  Object to the
4      form.
5      A.    It's more like we see in the
6  group directly below that, where you start
7  out with an odds ratio which is not
8  significant but positive, and then reach a
9  significant odds ratio at one to five years
10  of daily use and a higher amount of
11  significance with five to 20 years of daily
12  use, and still a significant odds ratio,
13  which is about the same level, at greater
14  than 20 years of daily use.
15  BY MR. ZELLERS:
16      Q.    Is that a yes to my question,
17  that if you do have a true dose-response
18  relationship, you would expect to see that
19  dose-response continue throughout each of the
20  periods?
21          MS. O'DELL:  Object to the
22      form.
23      A.    Well, it would be nice if you
24  did that, but epidemiologic data is very

Page 264

1  dirty, and it doesn't always work out quite
2  that cleanly.
3  BY MR. ZELLERS:
4      Q.    All right.  Do you -- well, let
5  me withdraw that.
6          Confounding.  You considered
7  and talk about confounding as another one of
8  the Bradford Hill criteria; is that right?
9          MS. O'DELL:  Object to the
10      form.
11      A.    Confounding, by that you mean
12  specificity?
13  BY MR. ZELLERS:
14      Q.    Well, I thought your -- I
15  thought you said in your methodology that you
16  applied the Bradford Hill criteria.
17      A.    That's correct.
18      Q.    Is confound -- strike that.
19          Is confounding an issue in
20  interpreting epidemiologic studies?
21      A.    Yes.
22      Q.    Do you agree that there is
23  confounding in these studies?
24      A.    I'm sure there's confounding in

Page 265

1  these studies.
2      Q.    You're familiar with that term,
3  right?
4      A.    Yes.
5      Q.    That's where the presence of
6  another association confuses the relationship
7  between the exposure and the disease being
8  studied; is that right?
9      A.    That's correct.
10      Q.    For example, if you're studying
11  the association between coffee and pancreatic
12  cancer, you need to be mindful of whether
13  cigarette smoking is more common in coffee
14  drinkers than the rest of the population,
15  fair?
16      A.    Yes.
17      Q.    Coffee -- or strike that.
18          Cigarette smoking could be a
19  confounder in that situation?
20      A.    Possible.
21      Q.    Because if more coffee drinkers
22  are smokers than non-coffee drinkers, an
23  association between coffee drinking and
24  pancreatic cancer might be due to the

67 (Pages 262 to 265)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 266

1   smoking, not the coffee drinking; fair?
2       A.    That would be a good
3   description of confounding.
4       Q.    Confounding can distort results
5   in epidemiological studies; is that right?
6       A.    It can.
7       Q.    Do you agree that residual
8   confounding is possible in every
9   observational study?
10      A.    Yes, I think there's some form
11  of confounding that's present in every
12  observational study.
13      Q.    It's possible that unmeasured
14  confounders may be present in every
15  observational study; is that right?
16      A.    That's correct.  Not just
17  unmeasured confounders, but unrecognized
18  confounders.
19      Q.    It's impossible to say that all
20  known and unknown confounding factors have
21  been controlled for in any given study; is
22  that right?
23      A.    I also agree with that.
24      Q.    Many new factors possibly

Page 267

1   involved in ovarian cancer risk are just
2   being published in the literature, correct?
3       MS. O'DELL:  Object to the
4   form.
5       A.    I believe that is true.
6   BY MR. ZELLERS:
7       Q.    For example, history of
8   chlamydia infection, have you read about that
9   possibly being involved in ovarian cancer
10  risk?
11      A.    I haven't read that
12  specifically.  I was thinking more about the
13  new information regarding genetic
14  susceptibilities.
15      Q.    Also, weight gain during
16  adolescence, is that another relatively new
17  possible ovarian cancer risk factor?
18      MS. O'DELL:  Object to the
19  form.
20      A.    It is, but obesity has been
21  recognized as a cofactor for many years.
22  BY MR. ZELLERS:
23      Q.    History of chlamydia infection,
24  weight gain during adolescence, those were

Page 268

1   not controlled for in any of the talc/ovarian
2   cancer studies, were they?
3       A.    Not that I'm aware of.
4       Q.    Are you aware that studies that
5   show a relationship between talc and ovarian
6   cancer did not account for confounders?
7       A.    I think it's possible that many
8   of those studies did not account for all
9   potential confounders, but they made attempts
10  to.
11      Q.    For example, Terry 2013, we
12  talked about that earlier; is that right?
13      A.    Yes.
14      Q.    Terry 2013, that meta-analysis
15  did not adjust for hormone replacement
16  therapy usage, correct?
17      A.    Yes.
18      Q.    If hormone replacement therapy
19  is a risk factor for ovarian cancer, then the
20  Terry 2013 meta-analysis did not account for
21  that potential confounding factor, correct?
22      MS. O'DELL:  Object to the
23  form.
24      A.    Correct.

Page 269

1   BY MR. ZELLERS:
2       Q.    You cannot say whether the odds
3   ratio of the Terry 2013 study would have been
4   lower if the authors had adjusted for hormone
5   replacement therapy usage, correct?
6       A.    I cannot say that.  Yes.
7       Q.    Recall bias.  You're familiar
8   with recall bias?
9       A.    I am.
10      Q.    That is also a concern in every
11  retrospective study, correct?
12      A.    Yes.
13      Q.    Recall bias can distort a
14  scientific evaluation of whether an exposure
15  is actually related to a disease; is that
16  right?
17      A.    Yes, it can.
18      Q.    For example, recall bias could
19  distort results if women with ovarian cancer
20  were more likely to remember their exposure
21  to talc than women without ovarian cancer; is
22  that right?
23      MS. O'DELL:  Object to the
24  form.

68 (Pages 266 to 269)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 270

1       A.    That's correct.
2    BY MR. ZELLERS:
3       Q.    The effects of recall bias can
4    be very real; is that right?
5             MS. O'DELL:  Object to the
6    form.
7       A.    I'm not sure what you mean by
8    very real.
9    BY MR. ZELLERS:
10      Q.    Well, let's look at one of the
11   studies that you cite.  You cited the
12   Schildkraut study in your report and you
13   referred to it a bit earlier as supporting
14   dose-response; is that right?
15      A.    Yes.
16      Q.    That's a study by Schildkraut
17   and others titled Association Between Body
18   Powder Use and Ovarian Cancer, the
19   African-American Cancer Epidemiologic -- or
20   Epidemiology Study.
21            Is that right?
22      A.    Yes.
23      Q.    I've got it here for you.
24      A.    Okay.

Page 271

1             (Carson Deposition Exhibit 24
2       marked.)
3    BY MR. ZELLERS:
4       Q.    Deposition Exhibit 24 is the
5    Schildkraut study, 2016, correct?
6             (Pause.)
7    BY MR. ZELLERS:
8       Q.    Did you say correct?
9       A.    I think I did.  I'm sorry.
10      Q.    That's all right.  I may have
11   missed it.
12            Exhibit 24 is the Schildkraut
13   2016 study; is that right?
14      A.    Yes.
15      Q.    This is one of the studies that
16   you cite to and that you relied on in forming
17   your opinions; is that right?
18      A.    Yes.
19      Q.    The study looked at, among
20   other things, what impact, if any, lawsuit
21   filings in 2014 had on whether women recalled
22   using talc in the past, correct?
23      A.    I believe so.
24      Q.    The authors thought that the

Page 272

1    publicity from lawsuits might influence the
2    participants' recall of prior body powder
3    use; is that right?
4       A.    This was a recent study, so
5    that was more likely.
6       Q.    If you look on page 2,
7    right-hand side, last paragraph that starts
8    "Covariates include."
9             Do you see that?
10      A.    Yes.
11      Q.    And I'm reading about
12   two-thirds of the way down:  Two class action
13   lawsuits were filed in 2014 concerning
14   possible carcinogenic effects of body powder
15   which may have influenced recall of use;
16   therefore, year of interview 2014 or later,
17   yes/no, was concluded as a covariate in the
18   logistic regression models.
19            Is that correct?
20      A.    That's correct.
21      Q.    So go to page 4, Table 2.  This
22   is the adjusted odds ratio for the
23   associations between mode, frequency and
24   duration of body powder use in ovarian

Page 273

1    cancer; is that right?
2       A.    Yes.
3       Q.    The second column shows the
4    number of cases, and that would be women with
5    ovarian cancer; is that right?
6       A.    That's correct.
7       Q.    The third column shows the
8    controls; that's the women who do not have
9    ovarian cancer, correct?
10      A.    Yes.
11      Q.    Looking at this data before
12   2014, before the lawsuits, the percentage of
13   controls, meaning women without ovarian
14   cancer, said they used talc on their genitals
15   was 34%; is that right?
16            So those are women who were
17   interviewed before 2014.
18      A.    Yes.  Any genital use controls,
19   34%.
20      Q.    And the controls, again, are
21   women without ovarian cancer.
22      A.    That's correct.
23      Q.    The percentage of cases,
24   meaning women with ovarian cancer, that were

Page 274

1  interviewed before 2014 that said they used
2  talc on their genitals was 36.5%; is that
3  right?
4      A.    That's correct.
5      Q.    So roughly the same reporting
6  of genital talc use between women with and
7  without ovarian cancer occurred for those
8  women interviewed before the lawsuits were
9  filed; is that right?
10     A.    That's correct.
11     Q.    Then look at what happened
12 after the lawsuits were filed in 2014.  For
13 women interviewed after 2014, the percent of
14 women without ovarian cancer that said they
15 used talc on their genitals was 34.4%; is
16 that right?
17     A.    That's correct.
18     Q.    So based on this data, the
19 lawsuits had essentially no effect on how
20 many of the women without ovarian cancer, the
21 controls, remembered or recalled using baby
22 powder; is that right?
23     A.    Well, the percentage is the
24 same in both cases.

Page 275

1      Q.    It went from 34% to 34.4%; is
2  that right?
3      A.    That's correct.
4      Q.    For women with ovarian cancer,
5  before the lawsuits were filed, 36.5% of them
6  said they recalled using baby powder; is that
7  right?
8      A.    That's right.
9      Q.    But after the lawsuits were
10 filed, the percent of women with ovarian
11 cancer who said they used baby powder went up
12 to 51.5%; is that right?
13     A.    That is also correct.
14     Q.    Is that a significant increase
15 from 36.5%?
16     A.    I don't know, but it seems like
17 it might be.
18     Q.    So after the lawsuits were
19 filed, the percent of women with ovarian
20 cancer who said they used baby powder jumped
21 significantly; is that right?
22         MS. O'DELL:  Object to the
23     form.
24     A.    Well, that's -- that is true.

Page 276

1  BY MR. ZELLERS:
2      Q.    In this study, lawsuit filings
3  appears to have affected how many women with
4  ovarian cancer remembered using talc on their
5  genitals but basically had no effect on the
6  memory of women without ovarian cancer; is
7  that right?
8          MS. O'DELL:  Object to the
9      form.
10     A.    You can't say that this is --
11 this demonstrates recall bias.  It could.
12 BY MR. ZELLERS:
13     Q.    These findings could be an
14 example of the potential effect of recall
15 bias; is that right?
16         MS. O'DELL:  Object to the
17     form.
18     A.    That is correct.
19 BY MR. ZELLERS:
20     Q.    So pre-2014 there was an odds
21 ratio of 1.19 with the confidence interval
22 ranging from .87 to -- strike that --
23 from .87 to 1.63, so there is not statistical
24 significance pre-2014; is that right?

Page 277

1      A.    Probably not.
2      Q.    If the study had been
3  terminated as of 2014, prior to the lawsuits
4  being filed, then the results of the study
5  would have been that genital talc use was not
6  statistically significantly associated with
7  an increased risk of ovarian cancer; is that
8  right?
9          MS. O'DELL:  Object to the
10     form.
11     A.    Yes.
12 BY MR. ZELLERS:
13     Q.    Did you make an attempt to
14 account for this potential recall bias in
15 weighing the Schildkraut study?
16     A.    The authors did that for me by
17 including the period of the interview as a
18 cofactor in the logistic regression models.
19 It accounts for this difference that you see
20 on the table.
21     Q.    You do agree there was no
22 statistically significant finding of an odds
23 ratio prior to 2014, the data collected
24 through that time; is that right?

Arch I. "Chip" Carson, M.D., Ph.D.

Page 278

1    A.    In the -- in the data collected
2  on those -- let me see here.  In the data
3  collected on those 351 cases and
4  corresponding controls, there was not a
5  significant odds ratio.
6    Q.    I want to go back and ask you a
7  few questions about some of the things I had
8  talked to you before about.
9          In terms of this chatter about
10 IARC, who has told you this?
11   A.    There are a number of
12 environmental websites and -- that also
13 operate on social media that discuss this
14 kind of thing.
15   Q.    So there's social media
16 websites that have talked about at least the
17 possibility of IARC revisiting the issue?
18   A.    Yes, among many other things.
19   Q.    I asked you earlier about
20 cornstarch, and you believe that cornstarch
21 is rapidly cleared from the body, including
22 the ovaries; is that right?
23         MS. O'DELL:  Object to the
24   form.

Page 279

1    A.    Yes.
2  BY MR. ZELLERS:
3    Q.    What is the mechanism by which
4  you believe that cornstarch is rapidly
5  cleared from the body, including the ovaries?
6    A.    It's primarily composed of
7  carbohydrate with a small amount of
8  structural material, probably cellulose, and
9  those materials are broken down in body
10 fluids fairly rapidly and dissolved and
11 become part of the general milieu of the
12 body.
13   Q.    Does cornstarch create
14 inflammation in the body?
15   A.    Yes.
16   Q.    You testified that the latency
17 period for ovarian cancer is between 20 and
18 40 years; is that right?
19   A.    Roughly, yes.
20   Q.    What is the basis for you
21 saying that?
22   A.    There are a number of factors
23 that influence that, but there are
24 organizations that have determined latency

Page 280

1  factors -- or latency periods for a number of
2  different types of cancers and tumors based
3  on the incidence data and what is known about
4  the natural progression of those tumors over
5  time.
6          I can't recall at the moment
7  exactly where I determined the latency period
8  for ovarian cancer to be between 20 and
9  40 years.
10         We do have a paper that's
11 referenced here that discusses the
12 determination of latency periods and includes
13 ovarian cancer as one of the tumors that it
14 determines a latency period for, and it uses
15 a mathematical formula with various factors
16 plugged into it to calculate that.
17         In that particular article, the
18 latency factor -- period was very long.  I
19 think it was 44 years on the average.
20   Q.    You do not have personal
21 expertise in terms of the latency period for
22 ovarian cancer, correct?
23   A.    I have -- I've calculated
24 latency periods as an exercise when I was in

Page 281

1  graduate school, but that's not something I
2  normally do.  I usually defer to the -- those
3  who have published latency periods for that
4  information.
5    Q.    You are recalling that at least
6  in some of the study or studies that you've
7  reviewed that the latency period for ovarian
8  cancer is 20 to 40 years, correct?
9    A.    Yes.
10   Q.    Are you able to tell us which
11 study or studies you're relying on for that
12 information?
13   A.    I'd have to go through my list
14 to find it.  Do you mind if I take a moment
15 to do that?
16   Q.    Define "a moment."
17   A.    Well, however long it takes me
18 to find it in that list, but --
19   Q.    Let me see if I can shortcut
20 it.
21         Do you believe that the latency
22 period for ovarian cancer is something you've
23 written out in one of your handwritten notes?
24   A.    I don't believe so.

71 (Pages 278 to 281)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 282

1    Q.    It would be -- where would it
2    be?
3            MS. O'DELL:  If you need a
4    moment to review either your report or
5    your materials list, you know --
6            THE WITNESS:  I don't believe
7    that particular piece of information
8    is in my report, but it's -- I think I
9    could come up with it fairly quickly
10   if I --
11   BY MR. ZELLERS:
12   Q.    All right.  Go ahead.  Find for
13   us the study or studies you're relying on for
14   the latency period of ovarian cancer.
15   A.    Okay.  If I'm lucky, I may hit
16   on it here.
17          (Document review.)
18   A.    It's the Diana Nadler and Igor
19   Zurbenko paper Estimating Cancer Latency
20   Times Using the Weibull Model.
21   BY MR. ZELLERS:
22   Q.    You're looking at Exhibit 4,
23   your literature list; is that right?
24   A.    Yes.

Page 283

1    Q.    What page of Exhibit 4 are you
2    looking at?
3    A.    Page 17 in the Ns.
4    Q.    Are you finished?
5    A.    There may be others in the
6    list, but you asked me to cite one.  You want
7    me to continue looking?
8    Q.    No, I -- that is sufficient for
9    my purposes.  Thank you.
10   Dr. Carson, there have been
11   some studies where talc particles had been
12   observed or reported in the ovaries of women
13   who have had perineal talc use; is that
14   right?
15   A.    Yes.
16   Q.    Heller was one of the studies
17   that we talked about, correct?
18   A.    Correct.
19   Q.    In those studies, there has not
20   been inflammation noted; is that right?
21   A.    No, there -- that's not been an
22   important finding.
23          MR. ZELLERS:  I have no further
24   questions for you.

Page 284

1            MS. BOCKUS:  If you want to
2    pass me your microphone, I think I can
3    stay here.  I'm not going to pass him
4    that many exhibits.
5            MR. ZELLERS:  I'm happy to help
6    you.
7            MS. BOCKUS:  Thank you.
8            EXAMINATION
9    BY MS. BOCKUS:
10   Q.    Dr. Carson, my name is Jane
11   Bockus.  I'm not certain I actually
12   introduced myself to you this morning, but I
13   represent Imerys in this litigation.
14          Do you understand that?
15   A.    I do.
16   Q.    Before Mr. Abney contacted you
17   about preparing a report that would explain
18   the relationship between regular perineal use
19   of talc based on personal hygiene products
20   and subsequent development of ovarian cancer,
21   is that anything that you had researched
22   before that date?
23          MS. O'DELL:  Object to the
24   form.

Page 285

1    A.    I don't think Mr. Abney --
2    well, he may have been that detailed in our
3    discussion.  But in response to your
4    question, that's not a specific question I
5    had researched in the past, although I had
6    researched related kinds of issues.
7    BY MS. BOCKUS:
8    Q.    So would it be fair to say that
9    the opinions contained in your report are all
10   opinions that you have come to as a result of
11   doing the research at the request of
12   Mr. Abney and others in the plaintiffs'
13   lawyer group?
14          MS. O'DELL:  Object to the
15   form.
16   A.    Yes.
17   BY MS. BOCKUS:
18   Q.    Okay.  And I'm going to
19   apologize right now.  I'll be jumping around
20   because most of my outline has already been
21   covered, so let me just get you to look at
22   your report, if I could, and I'm going to ask
23   you some questions about it.
24          Turn to page 4, and

72 (Pages 282 to 285)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 286

1  paragraph (b), the first sentence reads:
2  Numerous studies have examined the
3  cancer-causing characteristics of talc.
4        Do you see that?
5     A.   Yes.
6     Q.   And you identified Wilde as
7  your source for that statement, correct?
8     A.   That is correct.
9     Q.   Isn't it correct that the Wild
10  study actually exonerated talc as having
11  cancer-causing characteristics?
12     A.   That was a conclusion of the
13  author, but the reason it's cited there is
14  because that's an example of the
15  investigation of the relationship.
16     Q.   Okay.  But in that study,
17  they -- he concluded that talc alone did not
18  cause cancer, correct?
19     A.   As I recall, that was the
20  general conclusion, yes.
21     Q.   Okay.  Then in the next couple
22  of sentences, you say that talc has caused
23  cancer when implanted in various tissues and
24  under the skin in laboratory animals.  It

Page 287

1  causes inflammation and fibrotic reaction,
2  including the chemotaxis of inflammatory
3  immune cells and accelerated growth and
4  division of cells in the involved tissue.
5        And you cite Okada 2007 for
6  that proposition; is that correct?
7     A.   That's correct.
8     Q.   But Okada wasn't even looking
9  at talc, was it?
10     A.   Let me see here.  Okada was
11  looking at inflammation as -- as the endpoint
12  in the various components of inflammation
13  which I talked about here, the chemotaxis of
14  inflammatory immune cells, accelerated growth
15  division in the involved tissues.
16     Q.   But what you say is that talc
17  causes.  When you say "it," you're referring
18  to talc, correct?  It causes inflammation and
19  fibrotic reaction; isn't that what you're
20  saying in this sentence?
21     A.   It is talc, yes.
22     Q.   Okay.  And yet, Okada, the
23  study that you cite for that proposition,
24  doesn't look at talc at all, does it?

Page 288

1     A.   No.
2     Q.   And then going on, you talk
3  about the fact that there in that same
4  paragraph, if you go down, you talk about
5  IARC and the fact that IARC concluded that
6  talcum powder use by women for feminine
7  hygiene is a possible human carcinogen;
8  that's not a classification of talc as a
9  carcinogen, correct?
10        MS. O'DELL:  Object to the
11     form.
12     A.   It is within the spectrum of
13  carcinogens.
14  BY MS. BOCKUS:
15     Q.   It's possible.
16     A.   That's correct.
17     Q.   And then you say that --
18  meaning that there is insufficient evidence
19  of carcinogenesis in humans, but strong
20  evidence in other mammalian species.
21        Can you tell me where in IARC
22  it says that there is strong evidence that
23  talc causes ovarian cancer in other mammalian
24  species?

Page 289

1     A.   I think the issue is not
2  specifically ovarian cancer; the issue is
3  cancer.  And that's the point of view of
4  IARC, and that's what's alluded to here.
5     Q.   So this is the one exhibit I'm
6  going to hand you, if I can get that one
7  marked by my assistant.
8        MR. ZELLERS:  Exhibit 25.
9        (Carson Deposition Exhibit 25
10     marked.)
11        MS. O'DELL:  This is a page out
12     of the monograph?
13        MS. BOCKUS:  Yes.
14        MS. O'DELL:  Are you going to
15     identify it?
16        MS. BOCKUS:  And he can look it
17     up in his whole monograph.  I just
18     pulled the page for simplicity.
19        MS. O'DELL:  So feel free to do
20     that, Doctor.
21        MS. BOCKUS:  Yes, page 412.
22  BY MS. BOCKUS:
23     Q.   So looking at Exhibit 25, this
24  is a page from the IARC monograph where it

73 (Pages 286 to 289)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 290

1   talks about the data -- the evidence that
2   they have and the evidence that they
3   reviewed.
4          Do you see that?
5      A.   That's correct.
6      Q.   And what they actually state
7   with regard to experimental evidence is that
8   there is limited evidence in experimental
9   animals for the carcinogenicity of talc not
10  containing asbestos or asbestiform fibers.
11         Correct?
12         MS. O'DELL:  Object to the
13     form.
14  BY MS. BOCKUS:
15     Q.   Did I read it incorrectly?
16     A.   No, I just lost you for a
17  moment.
18     Q.   It's one sentence.  Go ahead
19  and take your time and read it.
20     A.   Yes, I agree with that.  They
21  found that inhaled talc, which does not
22  contain asbestos or asbestiform fibers, is
23  Group 3.
24     Q.   That wasn't my question.  I'm

Page 291

1   talking about experimental animals because
2   that's what -- you state in your report that
3   IARC found strong evidence in animals, and
4   yet the part of IARC that I know of where
5   they're addressing the animal data with
6   regard to talc is what I handed you in
7   Section 6.2, and it states there's limited
8   evidence, correct?
9          MS. O'DELL:  Objection.
10     A.   It states that there's limited
11  evidence -- I need to find this section in
12  the monograph.  Just bear with me for a
13  moment.  It's page 412?
14         (Document review.)
15     A.   Okay.  I seem to be missing
16  that part of the monograph.
17         MS. O'DELL:  Do you have the 93
18     monograph?
19         THE WITNESS:  Where's the --
20     this is 100C, and this is 93.  Okay.
21     Here it is.  All right.  Okay.
22     A.   Okay.  The entire monograph is
23  designed to evaluate carcinogenic risk, and
24  it looks at three different species, carbon

Page 292

1   black, titanium dioxide and talc.
2          So regarding talc, the overall
3   point of view here is whether or not it
4   produces cancer, not just ovarian cancer, not
5   just lung cancer, but any cancer.
6          And so I'm not sure that that
7   responds to your question.
8   BY MS. BOCKUS:
9      Q.   No.  My question was:  You
10  state in your report that IARC found strong
11  evidence in animals, and I want to know where
12  you believe that statement occurs in the IARC
13  monograph, or do you know?
14         MS. O'DELL:  And if you need a
15     minute to look, feel free to do that.
16     A.   Well, I can say that it might
17  take me a while to look for it, but I can say
18  that that's the basic definition of Group 2B,
19  is limited evidence in humans and compelling
20  evidence in animals or other --
21  BY MS. BOCKUS:
22     Q.   Tell me where you're looking at
23  that definition of 2B.
24     A.   Let me see here.

Page 293

1      Q.   We earlier marked the...
2          Exhibit 21, I think.
3      A.   Well, I have this other
4   exhibit, which is the preamble from another
5   situation; it's Exhibit P-346, and...
6      Q.   Well, let me just ask a
7   different question, rather than looking at
8   the preamble.
9      A.   All right.
10     Q.   Because that's kind of
11  overarching.
12     A.   It is.
13     Q.   To know what IARC found with
14  regard to talc and the evidence in animal
15  models, wouldn't it be more appropriate to
16  look at what they actually said about talc in
17  the animal studies?
18     A.   Yes.
19         MS. O'DELL:  Objection, form.
20     A.   I would agree that that's the
21  case.
22  BY MS. BOCKUS:
23     Q.   And to your knowledge, nowhere
24  did they find strong evidence of

74 (Pages 290 to 293)

Page 294

1  cancer-causing potential of talc in animal
2  studies, correct?
3          MS. O'DELL: Objection to form.
4      A.  Well -- well, it says on that
5  page there's limited evidence in experimental
6  animals, so I'll agree that at least in this
7  location it does not say strong evidence.
8  BY MS. BOCKUS:
9      Q.  And without going through the
10  entire monograph, you don't know where that
11  language came from, is that fair, that you
12  used in your report?
13         MS. O'DELL: Object. Excuse
14  me. Object to the form. I think he
15  was pointing -- directing you to the
16  preamble and you withdrew your
17  question, but --
18         MS. BOCKUS: Well, let me just
19  ask a qualifying question.
20  BY MS. BOCKUS:
21     Q.  Does the preamble in any way
22  address their findings with regards to talc?
23     A.  No, the preamble addresses the
24  methodology that's used by the IARC agency in

Page 295

1  addressing all the substances that they
2  evaluate.
3      Q.  Okay.
4      A.  And that's usually where I pull
5  things like that.
6          MS. O'DELL: Are you finished,
7  Doctor?
8          THE WITNESS: Unless I'm going
9  to continue to search for this.
10  BY MS. BOCKUS:
11     Q.  I don't need for you to look in
12  the preamble, because I'm really only
13  interested in their findings as to talc, not
14  their overarching methodology, that sort of
15  thing.
16     A.  Okay. But it's important to
17  point out that this particular monograph is
18  an evaluation of the carcinogenicity of talc
19  that does not contain asbestos or asbestiform
20  fibers, so --
21     Q.  Correct. Which was, from their
22  view, the talc that was included in all of
23  the studies that they reviewed, correct?
24         MS. O'DELL: Objection,

Page 296

1  misstates the evidence.
2      A.  I believe that was their
3  assumption.
4  BY MS. BOCKUS:
5      Q.  Okay. The studies that you
6  reference in support of the notion that
7  asbestos in -- that may or may not exist in
8  body powder contributes to cause ovarian
9  cancer, none of the studies that you cite to
10  have referenced an application of a product
11  to the perineum of the women and girls study,
12  correct?
13         MS. O'DELL: Object to the
14  form.
15         THE WITNESS: I have a -- I
16  apologize greatly, but I lost the
17  track. Could you repeat that
18  question.
19         MS. BOCKUS: That's totally
20  understandable because it was a little
21  bit convoluted.
22         MS. O'DELL: Do you mind if we
23  get the realtime running again? We're
24  just off track here.

Page 297

1          MS. BOCKUS: That's okay.
2  BY MS. BOCKUS:
3      Q.  I'm looking on page 5. Do you
4  see on page 5 of your report, sir,
5  paragraph (c)?
6      A.  Yes.
7      Q.  And there you cite one, two,
8  three, four, five, six, seven, eight, nine,
9  10, 11, 12 studies, correct?
10     A.  Yes.
11     Q.  Do you speak Italian?
12     A.  I can read it pretty well.
13     Q.  Is that what you did for the
14  Bertolotti study?
15     A.  The Bertolotti study. Yes, I
16  read most of it. I may have kibitzed with
17  some of my colleagues about the meaning of a
18  few words.
19     Q.  At any rate, all of these
20  studies have to do with heavy occupational
21  exposure to asbestos, correct?
22         MS. O'DELL: Object to the
23  form.
24     A.  Yes.

Arch I. "Chip" Carson, M.D., Ph.D.

Page 298

1  BY MS. BOCKUS:
2      Q.    And you don't have any
3  information how the dose of asbestos to which
4  these women were exposed during their heavy
5  occupational exposure compares to any
6  exposure to asbestos from the use of body
7  powder, correct?
8      A.    Well, I think these were not
9  all occupational exposures, but I do not have
10 information regarding things like the route
11 of exposure, no.
12     Q.    Do you have any information
13 regarding the dose?
14     A.    No, I don't.
15     Q.    Do you have any information
16 that would compare the dose of asbestos to
17 which the women in these studies were
18 exposed --
19     A.    Well, in some of the studies --
20     Q.    Wait, I haven't finished my
21 question.
22     A.    Sorry.
23     Q.    -- to any alleged dose of
24 asbestos in body powder?

Page 299

1          Can you make any comparison
2  whatsoever to the amount of asbestos to which
3  these women were exposed to any exposure by
4  any woman who has used a Johnson & Johnson
5  body powder?
6          MS. O'DELL:  Object to the
7      form.
8      A.    I don't think I'm able to make
9  that kind of comparison.
10 BY MS. BOCKUS:
11     Q.    Okay.  There are ways to study
12 whether two toxins combined increase a risk
13 more than exposure to a single toxin, whether
14 it -- whether one offsets the risk of one of
15 the toxins or whether you add them together,
16 even multiply them together, right?
17     A.    Yes.
18     Q.    Has any such study ever been
19 done with regard to talc and the heavy metals
20 that you identify in your report?
21     A.    Not specifically a study to
22 look at the combined contribution, but we
23 know a lot about the mechanism of action of
24 the metals in particular in the

Page 300

1  microenvironment, and based on what we know
2  about the mechanism of action of talc as well
3  and even asbestos, they're all similar, and
4  for that reason would be expected to be
5  additive.
6      Q.    But the study hasn't been done
7  even in a petri dish, has it?
8          MS. O'DELL:  Object to the
9      form.
10     A.    I don't know if there's
11 something in progress or not, but that's the
12 kind of study that is currently being looked
13 at.  Combined exposures is the -- sort of the
14 hallmark of research these days in
15 toxicology.
16 BY MS. BOCKUS:
17     Q.    Do you know of anyone who's
18 looking at that question?
19     A.    I don't.
20     Q.    Okay.  Have any of the heavy
21 metals that you have identified been
22 identified as carcinogenic to the ovary by
23 IARC?
24     A.    No.

Page 301

1      Q.    I want you to turn to page 7
2  now, if you would, please, on other evidence.
3  And you've talked about this paragraph a fair
4  amount already, and I don't want to repeat
5  any of the prior questions.
6          But I want to ask you about the
7  statement in that first sentence, where you
8  say that transport of talc-containing
9  materials from the perineum to the upper
10 reproductive tract and body cavities has been
11 shown to occur with startling regularity.
12 And I want to stop right there.
13         If I recall your testimony
14 correctly, none of these studies even look at
15 the transport of talc-containing materials
16 from the perineum to the upper reproductive
17 tract; isn't that correct?
18         MS. O'DELL:  Object to the
19     form.
20     A.    Well, it is true that most of
21 the research that's been done in this area
22 has been done on materials that have been
23 instilled into the vagina or the posterior
24 fornix, but I think and it's my opinion that

76 (Pages 298 to 301)

Page 302

1  application to the perineum is equivalent to
2  that.
3      Q.    Do you have an opinion as to
4  what percentage of the talcum powder applied
5  in a daily dusting to the perineum makes its
6  way to the vagina?
7      A.    No, I don't know.
8      Q.    Do you have an opinion as to
9  what percentage of the talc that, in your
10  opinion, would make its way to the vagina
11  would actually make its way to the cervix?
12      A.    I don't know that either.
13      Q.    And out of the talc that makes
14  its way to the cervix, what percentage makes
15  it past the cervix into the uterus?
16      A.    That, I don't know either.
17      Q.    Do you have any reason to
18  believe that talc would migrate with more
19  frequency or rapidity than sperm?
20          MS. O'DELL:  Objection to form.
21      A.    No, I don't have reason to
22  believe that would be the case.
23  BY MS. BOCKUS:
24      Q.    Would you agree, in fact, that

Page 303

1  it is unlikely that talc, an inert particle,
2  would travel as quickly or in the same
3  percentages as sperm through the reproductive
4  tract?
5          MS. O'DELL:  Object to the
6      form.
7      A.    I think the transport time is
8  roughly the same for any particulate matter,
9  including sperm.
10  BY MS. BOCKUS:
11      Q.    Do you have any studies to
12  support that opinion?
13      A.    Well, we know -- we know the --
14  we know the velocity of motile sperm; it's
15  very slow.  And we have studies that have
16  shown the progression of particles through
17  the fallopian tubes at at least that fast a
18  rate, possibly faster.
19          And so the motility of sperm is
20  slower than the rate at which it passes
21  through the female reproductive system, so
22  there are obviously other mechanisms at play
23  other than sperm motility.
24      Q.    To your knowledge, were any of

Page 304

1  those studies that you list here done in
2  women who were standing up?
3      A.    The studies that I list in
4  other evidence?
5      Q.    Yes.
6      A.    I think not.
7      Q.    In fact, were any of them done
8  in women who were inclined with their head
9  elevated over their hips?
10      A.    No.
11      Q.    So my question is:  Where do
12  you get the term "startling regularity" with
13  regard to the transport of talc from outside
14  a woman's body to the upper reproductive
15  tract?
16          MS. O'DELL:  Object to the
17      form.
18      A.    The propensity of evidence of
19  rapid transport of particulate material
20  regarding -- regardless of its composition.
21  BY MS. BOCKUS:
22      Q.    Particulate material inserted
23  well into a woman's vagina whose hips are
24  above her head, correct?

Page 305

1          MS. O'DELL:  Objection to form.
2      A.    Well, we have other studies
3  too.  We have the powdered glove examination
4  studies, things of that nature, that are a
5  little bit different.
6  BY MS. BOCKUS:
7      Q.    And you believe they support
8  your conclusion that talc is transported from
9  the perineum to the upper reproductive tract
10  with startling regularity?
11      A.    I think that's a valid
12  conclusion supported by the evidence, yes.
13      Q.    I'm turning to page 8 now, and
14  the number that you have here -- and you've
15  repeated it a couple of times today -- about
16  your opinion that the elimination of talc as
17  a risk could result in over 3,000 lives saved
18  in the U.S. each year.
19          How did you come to that
20  conclusion?
21      A.    Well, I'm referring to talcum
22  powder here --
23      Q.    Okay.  Sure.
24      A.    -- which is the complete

77 (Pages 302 to 305)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 306

1    product.
2              I came to that conclusion based
3    on the number of new cases of ovarian cancer
4    that are diagnosed in the United States each
5    year and the number of ovarian cancer deaths
6    that occur each year.
7              And essentially, of 21,000 or
8    so cases of -- new cases of ovarian cancer,
9    there are corresponding 14,000 or more deaths
10   each year, so that's a two-thirds fatality
11   rate if you look over time.
12             The -- at 30% increase in the
13   risk of -- or a 30% increase in the risk of
14   cancer applied in reverse, that is reducing
15   those -- that 30% increased risk from the use
16   of perineal application of talcum powder
17   could result in the prevention of as many as
18   3,000 lives, depending on the prevalence of
19   use.
20       Q.    Would that calculation require
21   that 100% of the women in the U.S. be using
22   talcum powder on a daily basis?
23       A.    It would require a hundred
24   percent of the women in the U.S. to stop

Page 307

1    using talcum powder on a daily basis.
2        Q.    That wasn't my question.
3              In order to attribute --
4        A.    Well, my answer to your
5    question then is no.
6        Q.    In order to attribute 30% of
7    all ovarian cancer deaths to the use of
8    talcum powder -- let me back up.
9              The data that you have that
10   you've cited is talking about the percentage
11   of women -- the percentage of women who use
12   talcum powder who are diagnosed with ovarian
13   cancer, correct?
14             MS. O'DELL:  Object to the
15       form.
16       A.    It is the total number of new
17   diagnoses per year.
18   BY MS. BOCKUS:
19       Q.    Okay.
20       A.    I think last year was
21   22,000-something.
22       Q.    But that number, 22,000, 100%
23   of those women did not use talcum powder,
24   correct?

Page 308

1        A.    There may not have been use of
2    talcum powder in all those women, that's
3    correct.
4        Q.    Do you have any notion as to
5    what percent of those women may have used
6    talcum powder?
7        A.    Based on these various studies,
8    it seems to vary between 30 and 60%.  It's
9    more so in the U.S., Australia and the U.K.
10       Q.    Do you have an opinion as to
11   how regularly a women needs to use talcum
12   powder before her risk of ovarian cancer is
13   increased by 30%?
14       A.    Well, based on the epidemiology
15   studies, that risk occurs in the population
16   in general from ever use as opposed to never
17   use, and so it would depend on the individual
18   woman.
19             Each person has an individual
20   susceptibility and individual characteristics
21   and would probably have an individual use
22   pattern.  So I couldn't say for any
23   individual woman.
24       Q.    And that's not what I'm asking

Page 309

1    for.  I'm really asking for in general,
2    because that's what epidemiology is, correct?
3    It's not talking about an individual woman,
4    right?
5        A.    That's correct, it's describing
6    it in the population.
7        Q.    So in the population, in the
8    studies that you've reviewed, what is the
9    minimum number of days per month, or however
10   you want to describe it, that a woman would
11   need to use talcum powder before she would be
12   included in the group that you believe have a
13   30% increased risk of ovarian cancer?
14             MS. O'DELL:  Object to the
15       form.
16       A.    The only qualifier that I've
17   been able to come up with and that I've used
18   in this report is the regular use of talcum
19   powder.
20   BY MS. BOCKUS:
21       Q.    Okay.
22       A.    And that is going to vary over
23   a broad range.  It would be periodically
24   daily to several times a week would be

Arch I. "Chip" Carson, M.D., Ph.D.

Page 310

1 regular use.
2     Q.    And over how many years must a
3 woman use talcum powder on a regular basis
4 before her risk of ovarian cancer is
5 increased to 30% --
6         MS. O'DELL:  Object to the
7     form.
8 BY MS. BOCKUS:
9     Q.    -- in your opinion?
10         MS. BOCKUS:  Sorry.
11     A.    Some of the studies have
12 focused on usage periods as short as one
13 year, but most have studied longer periods of
14 use and separated use into things like
15 decades or accumulated total person-years
16 based on reports of the women, multiplying
17 frequency by time.
18         So again, it would depend on
19 the individual, but the research reports
20 hover around five to ten years of regular
21 use, resulting in significant odds ratios.
22 BY MS. BOCKUS:
23     Q.    As I understand it in
24 toxicology, one of the basic tenets is that

Page 311

1 it's the dose that makes the poison, correct?
2     A.    That's correct.
3     Q.    That water can kill you if you
4 drink too much of it, right?
5     A.    Theoretically.
6     Q.    In a short period of time.
7         And so I'm trying to find out
8 what you have determined is the threshold of
9 risk is -- for talcum powder use by women.
10 Do you have an opinion as to at what point a
11 threshold has been reached where the use of
12 talcum powder by women in their perineal
13 region increases their risk?
14     A.    I think any use of carcinogenic
15 materials or any exposure to carcinogenic
16 materials increases the risk somewhat.  A
17 greater exposure, based on the
18 "dose makes the poison" principle, would
19 result in a greater risk.
20         And we know from toxicologic
21 studies that intense exposures can sometimes
22 accelerate the process and even shorten the
23 latency period of a carcinogenic event.
24         So my opinion is that there is

Page 312

1 no threshold of exposure for risk; that we
2 are -- we are right to use a zero threshold
3 approach until we know more about the
4 possibility of a threshold below which
5 exposure would be safe.  At the current time
6 we don't have that information.
7     Q.    Do you believe that there
8 probably is a threshold below which use is
9 safe?
10     A.    In the carcinogenic process,
11 which we haven't really talked about in this
12 session today, there is an insult to a cell
13 which affects the genetic material, the DNA.
14 And there are built-in repair mechanisms that
15 the cell has for fixing that problem that
16 occurred, a mutation, for example.
17         These kinds of insults are
18 happening to cells all the time, not just
19 from carcinogens in our environment, but just
20 from natural occurrences, even endogenous
21 biochemical reactions cause these problems.
22         The question is:  Is the repair
23 process sufficient to undo what's been done?
24 And an exposure to environmental carcinogens,

Page 313

1 that repair process is often overwhelmed so
2 that it cannot catch up with the damage
3 that's being created, and a tumor is born,
4 basically.
5         That is where the concept of
6 threshold comes from.  Have we overwhelmed
7 the repair or not, and we don't have enough
8 research evidence or scientific evidence to
9 be able to define that line at this point.
10     Q.    Has there ever been a study
11 that showed that talcum powder caused DNA
12 damage in normal ovarian epithelial tissue?
13     A.    Well, we do have the studies
14 that have recently been produced by Fletcher
15 and Saed that show the inflammatory process
16 is influenced by talc, and this is nonfibrous
17 talc, that result in mutagenic events that
18 are available for promotion, and there are
19 biomarkers that have also been established
20 for that.
21     Q.    The studies by Saed did not
22 demonstrate DNA mutation, did they?
23         MS. O'DELL:  Object to the
24     form.

79 (Pages 310 to 313)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 314

1    A.    I think they actually did.
2  BY MS. BOCKUS:
3    Q.    That's your reading of them?
4    A.    Yes.
5    Q.    What Saed did is he placed talc
6  on cultured ovarian cancer cells, correct?
7    A.    Yes.
8    Q.    And that actually -- what he
9  recorded was an elevation in the CA-125?
10    A.    That's one of the things he
11  did.  He also measured -- he did a number of
12  genetic studies.  He did transcribed RNA.  He
13  located individual SNPs, which are single
14  nucleotide polymorphisms, in the genetic
15  material.
16        And he found that as a result
17  of that treatment, those mutations altered
18  the effectiveness of antioxidant enzymes that
19  are part of the protection mechanism and
20  shield the repair process of the cell from
21  further damage.
22    Q.    Let's go back to the CA-125.
23        MS. O'DELL:  If you need to
24    pull the paper out, Doctor, just, if

Page 315

1  you want to take a moment and do that.
2  I know you were searching for it while
3  you were talking.
4        THE WITNESS:  Yes, I think I
5  have it right here.
6        MS. BOCKUS:  These are just
7    general questions that I'm going to
8    ask you.
9        MS. O'DELL:  You still may get
10    the paper out.
11        MS. BOCKUS:  Do whatever you
12    want to do.
13        THE WITNESS:  You can go ahead.
14    I'm...
15  BY MS. BOCKUS:
16    Q.    What controls did Saed use?
17  Did he use any controls?  In other words, did
18  he place a known foreign object that was
19  not -- that was known not to be a carcinogen
20  on the cultured ovarian cells to see if there
21  was a difference?
22        MS. O'DELL:  Can you just pause
23    just for a minute, let the doctor pull
24    out the exhibit?

Page 316

1        THE WITNESS:  I'm sorry, it
2    appears that I do need to get the
3    original paper here.  There it is.
4    Okay.  Thank you.
5        (Document review.)
6  BY MS. BOCKUS:
7    Q.    Can you answer the question:
8  Did Saed have any either positive or negative
9  controls that he used in his experiments?
10        MS. O'DELL:  Object to the
11    form.
12    A.    I think he did, but I'd like to
13  actually find it in here so I can give you
14  the specifics.
15        Well, he used normal cells and
16  epithelial ovarian cancer cells, and one was
17  the control for the other.  He treated them
18  in the same way.
19  BY MS. BOCKUS:
20    Q.    Let me ask a different
21  question.
22        What I'm asking is:  Did he
23  use, say, glass beads to see if -- as a
24  control to the talc?  Did he have anything

Page 317

1  that he was controlling the cells' reaction
2  to against the talc?
3    A.    I don't believe so.
4    Q.    That would be important in an
5  experiment of this nature, would you not
6  agree with that?
7        MS. O'DELL:  Object to the
8    form.
9    A.    Well, he did utilize normal and
10  cancerous cells, which would theoretically
11  act as a control in that experiment.
12  BY MS. BOCKUS:
13    Q.    That's not my question.  I'm
14  really asking about another element that he
15  is exposing the cells to, both the normal and
16  the cancerous cells.
17        MS. O'DELL:  Objection to form.
18  BY MS. BOCKUS:
19    Q.    To see if the reaction was just
20  a reaction to a foreign body versus talc
21  specifically.
22        Did he do that?
23        MS. O'DELL:  Object to the
24    form.

80 (Pages 314 to 317)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 318

1    A.    I don't believe that he
2  provided a control exposure as part of this
3  experiment.
4  BY MS. BOCKUS:
5    Q.    And you would agree that there
6  are many things that will increase a CA-125,
7  correct?
8         MS. O'DELL:  Object to the
9    form.
10   A.    Yes, it's an acute-phase
11 reactant.
12 BY MS. BOCKUS:
13   Q.    Pregnancy can increase
14 somebody's CA-125?
15   A.    That's correct.
16   Q.    And with regard to the SNPs,
17 that is not the same thing as a test showing
18 mutation, correct?
19        MS. O'DELL:  Object to the
20   form.
21 BY MS. BOCKUS:
22   Q.    It's a surrogate.
23   A.    Well, it's because there was
24 transcribed RNA that was used to determine

Page 319

1  their presence, and the -- it's just part of
2  their procedure, but it identifies genetic
3  alterations.  And those genetic alterations
4  transformed into differential enzyme
5  activities.
6    Q.    Do you know whether there are
7  standard tests for genotoxicity and
8  mutagenicity?
9    A.    There are lots of standard
10 tests, yes.
11   Q.    And Saed didn't use any of
12 those, did he?
13        MS. O'DELL:  Object to the
14   form.
15   A.    Well, he went directly to cells
16 in culture to see what happened when they
17 were treated with talc.
18 BY MS. BOCKUS:
19   Q.    Does the amount of talc that
20 Saed used compare in any way to the amount of
21 talc that may reach a woman's ovary from
22 perineal application?
23        MS. O'DELL:  Object to the
24   form.

Page 320

1    A.    I don't specifically know.
2  BY MS. BOCKUS:
3    Q.    There's no way to know that, is
4  there?
5    A.    No, there's not.
6    Q.    Let me find my -- there we go.
7         The Saed paper that you were
8  looking at just a minute ago, it has
9  something printed across it.  What does that
10 say?
11   A.    In blue here?
12   Q.    Uh-huh.
13   A.    "For Peer Review."
14   Q.    Okay.  So it hasn't yet been
15 peer reviewed; is that correct?
16        MS. O'DELL:  Object to the
17   form.
18   A.    It's been submitted.
19 BY MS. BOCKUS:
20   Q.    So does that mean it has not
21 yet been peer reviewed?
22        MS. O'DELL:  Object to the
23   form.
24   A.    I think it's been accepted for

Page 321

1  publication.
2  BY MS. BOCKUS:
3    Q.    But the copy you have says on
4  it "For Peer Review," correct?
5    A.    That's correct.
6    Q.    In the paragraph that we were
7  looking at earlier, where you were talking
8  about the startling regularity, later on in
9  the paragraph you state that there
10 is clearly -- sufficient particulate
11 materials applied routinely to the perineum
12 have ready access and in sufficient
13 quantities to produce biologic responses in
14 internal tissues.
15        What internal tissues have you
16 seen any study recording a biologic response
17 to talc from?
18        That was such a bad question,
19 I'm going to ask it again.
20        What internal tissues are you
21 referring to there?
22   A.    Well, it says including --
23 including ovaries and surrounding structures.
24 By surrounding structures, I'm referring to

81 (Pages 318 to 321)

Page 322

1  the fallopian fimbriae and the epithelium of
2  the cavity.
3       Q.   So -- and I know we've been
4  through this already, but to your knowledge,
5  there are no studies reporting biologic
6  responses to talc in the vagina, correct?
7       A.   Not that I'm aware.
8       Q.   You're not aware of any studies
9  reporting biologic responses to talc in the
10  cervix, correct?
11       A.   Correct.
12       Q.   Are you aware of any studies
13  reporting biologic response to the uterus?
14       A.   No.
15       Q.   Are you aware of any studies
16  reporting a biologic response in the
17  fallopian tubes?
18       MS. O'DELL:  Object to the
19       form.
20       A.   Well, I don't -- I'm not aware
21  of studies that draws a direct correlation
22  between exposure to talc and reaction in the
23  fallopian tubes.
24            ///

Page 323

1  BY MS. BOCKUS:
2       Q.   Okay.  Is the ovary attached to
3  the fallopian tube?
4       A.   It is -- it's in the proximity.
5  It's not directly attached.
6       Q.   And what surrounds the ovary?
7       A.   There's a structure that -- the
8  ovary itself?
9       Q.   Yes.
10       A.   There's an epithelial membrane
11  around the ovary, and --
12       Q.   And then what touches the
13  epithelial membrane?
14       A.   Well, the fimbriae of the
15  fallopian tubes surround that and the rest of
16  it is just sort of space.
17       Q.   Space.  Is the space filled
18  with fluid?
19       A.   It is.
20       Q.   And is that fluid kind of
21  moving around?
22       A.   All the time.
23       Q.   All the time.
24            So things that come through the

Page 324

1  fallopian tube goes into that fluid and just
2  gets moved around all the time; is that
3  correct?
4       MS. O'DELL:  Objection.  Excuse
5       me.  Objection, form.
6       A.   Well, there's a fairly direct
7  presentation of the ovary, so there's not a
8  large space there, but there is a space.  And
9  whatever goes into that space remains there.
10  Some of it may come back out.
11  BY MS. BOCKUS:
12       Q.   Does the fallopian tube move
13  around during the month?
14       MS. O'DELL:  Object to the
15       form.
16       A.   I don't know.
17       MS. BOCKUS:  I'm almost
18       finished.  I'm going through all the
19       things that I've crossed off.
20  BY MS. BOCKUS:
21       Q.   So I understand you correctly,
22  you have not identified a nonthreshold dose
23  of talc; is that correct?
24       MS. O'DELL:  Object to the

Page 325

1       form.
2       A.   You mean a dose that is below a
3  safe threshold?
4  BY MS. BOCKUS:
5       Q.   Correct.
6       A.   No, I have not.
7       Q.   Did you make any attempt to
8  extrapolate a de minimis risk level?
9       MS. O'DELL:  Object to the
10       form.
11       A.   I did not.  It would be nice to
12  be able to do that, considering that most of
13  us have had talcum powder exposures of one
14  sort or another during our lives.  And it's
15  something that seems to have been felt to be
16  very useful.
17            So it would be nice to be able
18  to do that exercise, but I haven't -- I have
19  not been prevented -- presented with the
20  information to approach that, nor am I aware
21  of anyone else who's been able to do it.
22  BY MS. BOCKUS:
23       Q.   What information would you need
24  that you don't have?

Arch I. "Chip" Carson, M.D., Ph.D.

Page 326

1    A.    Well, we'd need -- we'd need
2  dose information, first of all, which we
3  don't have, to combine with the epidemiologic
4  results.
5          We need to define the
6  mechanistic issues better than they are
7  currently, and at that point I think we would
8  be able to make some strong conclusions
9  regarding potential thresholds of hazardous
10  doses.
11    Q.    You would agree that the great
12  majority of women who use talcum powder on a
13  regular basis are never diagnosed with
14  ovarian cancer, correct?
15    A.    I think that's true.
16    Q.    And it's also true that the
17  majority of women diagnosed with ovarian
18  cancer have never used talcum powder on a
19  regular basis, correct?
20        MS. O'DELL:  Object to the
21  form.
22    A.    I think it's a majority, but
23  there's a significant number who have.
24        ///

Page 327

1  BY MS. BOCKUS:
2    Q.    But the majority have not,
3  correct?
4    A.    I would say more than 50% have
5  not.
6    Q.    And would you agree that -- let
7  me back up.
8          When is the last time you
9  conducted a pelvic exam?
10    A.    I haven't done one in a couple
11  of years.
12    Q.    Under what circumstances did
13  you do it two years ago?
14    A.    I see patients regularly, and
15  in some cases, pelvic exams are either
16  requested or indicated by the issue.
17    Q.    It's not something you do on a
18  regular basis, correct?
19    A.    It's not.
20    Q.    And you do not -- what
21  percentage of your patients are women?
22    A.    Probably half, maybe a little
23  less than half.
24    Q.    How do patients come to see

Page 328

1  you?  In other words, are they referred by
2  other people?
3    A.    I have primarily a referral
4  practice in toxicology.
5    Q.    In toxicology?  And so what
6  types of patients are referred to you?
7    A.    I have patients who are either
8  workplace-related patients who have had
9  chemical or other substance exposures.  I
10  also have a number of environmental exposure
11  patients that I see.
12          And I also have a number of --
13  I also see a number of patients for general
14  routine surveillance activities or required
15  exams by regulation, either for licensure or
16  certification.
17    Q.    Are you sent patients where the
18  patient is trying to figure out why they got
19  some disease?
20    A.    Sometimes.  Usually the patient
21  comes and tells me why they got the disease,
22  and I go -- I talk to them about the
23  possibilities, and we look at ways of
24  confirming that or refuting it, or in many

Page 329

1  cases, altering to a correct path of
2  diagnostic investigation.
3    Q.    So sometimes a patient comes to
4  you and says:  I was exposed to this chemical
5  and that's why I can't breathe?
6    A.    Yes.
7    Q.    And you do an investigation,
8  and sometimes you say:  You know what, that
9  chemical has nothing to do with why you can't
10  breathe?
11    A.    Sometimes that's the case.
12        MS. O'DELL:  Are you finished,
13  sir?  Are you finished?
14    A.    Well, I just wanted to add --
15  BY MS. BOCKUS:
16    Q.    Sure.
17    A.    -- that although many times it
18  is the case, and often the patient does
19  understand that connection quite well,
20  usually from a very closely connected cause
21  and effect kind of relationship.  It's when
22  things are stretched out much more in time,
23  and there is a likely suspect that may be an
24  innocent bystander, that they may get

83 (Pages 326 to 329)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 330

1  confused.
2     Q.    Have you ever been referred a
3  patient to determine why they have ovarian
4  cancer?
5     A.    No.
6     Q.    Do you know of any methodology
7  accepted in the medical community for
8  determining why an individual woman has
9  developed ovarian cancer?
10          MS. O'DELL:  Object to the
11     form.
12     A.    Other than genetic testing that
13  identifies specific risks and history taking
14  that might identify other known risk factors
15  for that woman, there is -- I don't believe
16  that there is any good or prescribed
17  procedure for making that determination, and
18  there is no reasonable screening test that
19  can find that cancer when it is at an early
20  stage.
21  BY MS. BOCKUS:
22     Q.    Do you believe that obesity
23  causes ovarian cancer?
24     A.    It certainly seems to be

Page 331

1  related to the occurrence of ovarian cancer
2  from a statistical point of view.
3     Q.    What is the increase in a
4  woman's risk of ovarian cancer if she's obese
5  compared to a nonobese woman?
6     A.    In terms of numbers?
7     Q.    Yes, sir.
8     A.    I don't know the -- I don't
9  know the numbers.
10     Q.    What other risk factors are you
11  familiar with for ovarian cancer?
12     A.    Well, certainly work with
13  asbestos is a risk factor, and we have a
14  number of studies that have shown women
15  working in the asbestos industry or women who
16  are married to asbestos workers and have
17  secondary exposure presumably from that are
18  at risk for ovarian cancer.
19          There are --
20     Q.    Let me stop you just one
21  second.
22     A.    Yes.
23     Q.    What percentage -- what is
24  their relative risk or what is the odds ratio

Page 332

1  for that population of women?
2     A.    Well, it varies depending on
3  the research study that has been done, but
4  I've seen odds ratios or relative risks all
5  the way from 1 or even below to very high
6  numbers, like 20 to 50.
7     Q.    20.0, is that what you're
8  saying?
9     A.    Yes, 20.0.
10     Q.    Not 1.2, but 20.0?
11     A.    Correct.
12     Q.    Okay.
13     A.    Which is a -- which would be 20
14  times the normal risk without the exposure.
15     Q.    Okay.  So we've got obesity and
16  heavy exposure to asbestos.  Any other risk
17  factors that you're familiar with?
18          MS. O'DELL:  Objection --
19     excuse me.  Objection, misstates the
20     doctor's testimony.
21          You may answer.
22          THE WITNESS:  Okay.
23     A.    Other risk factors for ovarian
24  cancer would include things like early

Page 333

1  menarche, late menopause, never being
2  pregnant.  These are some of the more common
3  risk factors that are identified.
4          There are genetic risk factors
5  that are known, like the BRCA mutations,
6  which confer an increased risk.  Family
7  history.
8  BY MS. BOCKUS:
9     Q.    Do you know the odds ratios of
10  any of the risk factors that you just
11  identified of never having children, having
12  early menarche or late menopause?
13     A.    Right offhand, I don't know
14  what those odds ratios -- the range of those
15  are.
16     Q.    Do you know if any of those
17  odds ratios exceed 1.3?
18     A.    I think they do.
19     Q.    Does that lead you to conclude
20  that those things cause ovarian cancer?
21     A.    It certainly argues for that.
22  The -- there's a risk factor that derives
23  from something.  You need a mechanism to fill
24  in the blank.

Arch I. "Chip" Carson, M.D., Ph.D.

Page 334

1       But also, some of these risk
2   factors are so common in the population that
3   we can concoct large cohort studies that will
4   have -- can have very low relative risks,
5   like on the order of 1.3 or even lower, and
6   still a significant result.
7       So the more common a factor is,
8   the easier it is to do the research and the
9   more likely you'll get a finding that's
10  relevant to interpretation.
11      Q.   What pushes a talc particle
12  from the perineum into the vagina?
13      A.   Probably mostly the law of mass
14  action.  It simply goes of its own volition.
15  These small particles are always in motion
16  through molecular forces, and they simply
17  move in all directions, and some of them move
18  in that direction.
19      Q.   Would that be true for any
20  small particles applied to a woman's
21  perineum?
22      A.   Yes.
23      Q.   Are you board certified in
24  medical toxicology?

Page 335

1       A.   I'm not.  I started practicing
2   medical toxicology before there was a board
3   in the specialty, and I've been grandfathered
4   into the profession as a member of the
5   American College of Medical Toxicology.
6       Q.   How long did you talk to
7   Dr. Ness about her paper?
8       A.   About her paper, probably a
9   minute and a half.  About all kinds of other
10  things, for a while.
11      Q.   What other kinds of things?
12      A.   Mostly personal things that had
13  nothing to do with talc or this case.
14      Q.   How long do you think that
15  conversation was?
16      A.   Well, with Dr. Ness, nothing
17  lasts very long, so I would say ten minutes
18  at the most.
19      Q.   Okay.  Did you call her?
20      A.   No.  She's -- she comes and
21  goes in the same building where I office, and
22  my office is just on the opposite side of the
23  floor of hers, and I see her sometimes in
24  passing or in the elevator.

Page 336

1       Q.   So you think you just ran into
2   her?
3       A.   Yeah.
4       Q.   The other people that you
5   identified that you discussed your report
6   with, did you ask them to read your report?
7       A.   I asked them to look at parts
8   of it, early drafts of it to let me know if
9   they thought I was making sense.
10      Q.   And did they offer you comments
11  and suggestions for changes in your paper?
12      A.   Not really.  Mostly they gave
13  me a pat on the back and said:  I think
14  you're doing a good job, just sort of beef
15  this part up, and what do you mean by this,
16  maybe I could rephrase that.  That sort of
17  thing.
18      Q.   Did they give you written
19  suggestions?
20      A.   No, these were all verbal
21  comments.
22      Q.   Had you given them a hard copy
23  of the portions of your report that you
24  wanted them to comment on?

Page 337

1       A.   Yes.
2       Q.   And they didn't redline it or
3   make -- draw arrows or anything like that for
4   you?
5       A.   I think actually George Delclos
6   did draw some -- or make some notes on there
7   and hand it back to me, and I incorporated
8   those into my electronic version.
9       Q.   Do you still have George's
10  notes to you?
11      A.   No, I don't.
12      Q.   Is he the only one out of the
13  people that you asked to look at it who gave
14  you handwritten notes?
15      A.   Yes, I think so.
16      Q.   Have you seen the term
17  "intrinsic elimination system" regarding the
18  ovary in any of the publications that you've
19  read?
20      A.   I don't know, I may have.
21      Q.   Can you think of one in
22  particular that discusses that characteristic
23  of -- that you believe relates to the ovary?
24      A.   Well, the migration papers

85 (Pages 334 to 337)

Arch I. "Chip" Carson, M.D., Ph.D.

| | Page 338 |
|---|---|
| 1 | discuss migration to the ovary. It would |
| 2 | probably be a talc paper, though. I don't |
| 3 | recall seeing it anywhere. |
| 4 | Q.    Did you consult any gynecologic |
| 5 | textbooks? |
| 6 | A.    No, I didn't. I may have |
| 7 | looked at some diagrams on the Internet. |
| 8 | Q.    Okay. Did you consult any |
| 9 | gynecologic oncology textbooks? |
| 10 | A.    Not textbooks, no. |
| 11 | Q.    Do you know the position of the |
| 12 | Society of Gynecologic Oncologists on the |
| 13 | question of whether does talc increase a |
| 14 | woman's risk for ovarian cancer? |
| 15 | A.    No, I don't. |
| 16 | Q.    Would that be important to you |
| 17 | to know their position? |
| 18 | A.    No, I don't think so. |
| 19 | Q.    Do you know the position of |
| 20 | ACOG on whether the use of -- perineal use of |
| 21 | talc increases a woman's risk of ovarian |
| 22 | cancer? |
| 23 | A.    I don't know that either. |
| 24 | That's not something I've looked at. |

| | Page 339 |
|---|---|
| 1 | Q.    Would that be important to you? |
| 2 | A.    No. |
| 3 | Q.    Do you have any scientific text |
| 4 | that suggests that an inert particle resides |
| 5 | on the ovary longer than it does in the |
| 6 | cervix? |
| 7 | A.    Well, I have -- I have a paper |
| 8 | that relates to the time for dissolution of a |
| 9 | particle in biological fluids, which would go |
| 10 | to the length of time a particle of talc |
| 11 | remains in the ovary once it gets there. |
| 12 | But I don't have -- I don't |
| 13 | know that I have a scientific paper that |
| 14 | specifically says that it stays in the ovary |
| 15 | longer than it stays in the cervix. |
| 16 | Q.    You testified that you |
| 17 | understand there have been some attempts to |
| 18 | quantify the amount of talc, I guess from a |
| 19 | single use, that ends up on the perineum. |
| 20 | Did I understand that |
| 21 | correctly? |
| 22 | A.    Yes. |
| 23 | Q.    Can you tell me what those |
| 24 | attempts are, who did them, where did you see |

| | Page 340 |
|---|---|
| 1 | that? |
| 2 | A.    Well, I saw this actually when |
| 3 | I first started this process, and I think |
| 4 | Dr. Longo was involved in that activity, |
| 5 | where they modeled the -- the application of |
| 6 | talcum powder and did some calculations based |
| 7 | on the amount of substance that was used, and |
| 8 | they measured it in things like shakes and -- |
| 9 | and then quantified the amount that was lost |
| 10 | from the container to determine what an |
| 11 | application amount was. |
| 12 | I don't think they were able to |
| 13 | go beyond that point in the modeling process. |
| 14 | Q.    You didn't see anything that |
| 15 | Dr. Longo did that attempted to quantify the |
| 16 | amount of talcum powder from a single shake |
| 17 | that ended up on a woman's perineum, did you? |
| 18 | MS. O'DELL: Object to the |
| 19 | form. |
| 20 | A.    I -- you know, I don't know the |
| 21 | answer to that, simply because I don't |
| 22 | recall, but I wouldn't be surprised that |
| 23 | there was an attempt made to do that. But |
| 24 | beyond that, I don't think anything would be |

| | Page 341 |
|---|---|
| 1 | successful. |
| 2 | These were clothed subjects, so |
| 3 | that adds another factor to the calculation. |
| 4 | BY MS. BOCKUS: |
| 5 | Q.    Is that the only experiment |
| 6 | that you're familiar with that you've seen |
| 7 | anywhere that attempts to quantify the amount |
| 8 | of talcum powder from a single use that ends |
| 9 | up actually on a woman's perineum? |
| 10 | A.    There was another part of that |
| 11 | study where they applied it to underwear with |
| 12 | the same sort of calculation process. It was |
| 13 | all part of the same modeling process. |
| 14 | Q.    And do you recall what |
| 15 | percentage of the talc applied to the |
| 16 | underwear ended up adhered to the woman's |
| 17 | perineum? |
| 18 | MS. O'DELL: Object to the |
| 19 | form. |
| 20 | A.    I don't think -- I don't think |
| 21 | they measured the amount that adhered to the |
| 22 | perineum. I think what they were interested |
| 23 | in was proximity. |
| 24 | /// |

Arch I. "Chip" Carson, M.D., Ph.D.

Page 342

1  BY MS. BOCKUS:
2      Q.    Okay.  Can you tell me the
3  names of the environmental websites that have
4  been talking about IARC revisiting their
5  classification of talc?
6      A.    There are -- there are a number
7  of Twitter feeds and websites that carry on
8  this kind of discussion.  Science Interest is
9  one of them.  I think IARC Watch is another
10  one.  I have -- I get e-mails about some of
11  these and end up going into them for a period
12  of time and seeing if they have anything
13  interesting going on.  Some of them are
14  searchable.
15          And then I get e-mails from the
16  ones that I visit about other ones.  So I
17  spend as much of my time deleting these
18  e-mails without reading them as I do actually
19  viewing the material.
20      Q.    So fair to say this is just
21  chatter you've seen on the Internet in these
22  different chat rooms or Twitter accounts that
23  you visit from time to time?
24      A.    It's all Internet based, yes.

Page 343

1          MS. BOCKUS:  Okay.  I think
2  that's all I have.  Thank you.
3          MS. O'DELL:  Why don't we take
4  a short break.  We've been going about
5  two hours.
6          MR. ZELLERS:  Do you have
7  questions?
8          MS. APPEL: I do, but --
9          MS. O'DELL:  Yeah, do you
10  have --
11          MS. APPEL: I don't have a lot.
12          MS. O'DELL:  Okay.  Sure.  Why
13  don't you go ahead, and then we'll
14  take a break.  We have been going
15  about two hours, but, Renée, please.
16          If you're okay, Doctor.
17          THE WITNESS:  I'm fine.
18              EXAMINATION
19  BY MS. APPEL:
20      Q.    It's been a while since we did
21  introductions, so just as a reminder, my name
22  is Renée Appel and I'm here on behalf of
23  Seyfarth Shaw and I represent Personal Care
24  Products, counsel.

Page 344

1      A.    Uh-huh.
2      Q.    And echoing what my colleagues
3  have said today, if there's at any point I
4  ask a question that you do not understand,
5  just stop me and ask me to rephrase it or let
6  me know otherwise, okay?
7      A.    I will.
8      Q.    Thanks.
9          So going back shortly to your
10  scope of work, do you teach any coursework on
11  talc or ovarian cancer?
12      A.    I teach some general courses.
13  Up until last spring I taught a general
14  environmental health course for graduate
15  students in the Master of Public Health
16  program at the School of Public Health, and
17  in that course we did touch on things like
18  environmental exposures that would include
19  minerals of various varieties, but it was
20  very cursory.
21      Q.    And was that curriculum
22  specific to environmental and industrial
23  products or minerals as opposed to consumer
24  products?

Page 345

1      A.    We actually did touch on other
2  consumer products as well in terms of the
3  significant environmental problem that we
4  have currently, but -- regarding the huge
5  volume of personal care products that goes
6  into our aqueous waste stream and how that's
7  affecting the aquatic environment as well as
8  groundwater and so forth.
9          As a matter of fact, in that
10  course, as part of the culmination of the
11  course, there are student workgroups that
12  develop presentations on a particular topic,
13  and the topic of personal care products has
14  been a favorite choice for the last several
15  years.
16      Q.    But your curriculum did not
17  include talc among those products?
18          MS. O'DELL:  Object to the
19  form.
20      A.    I think talc may have been
21  represented as an individual mineral on a
22  slide that listed many minerals.
23  BY MS. APPEL:
24      Q.    Earlier today you had mentioned

87 (Pages 342 to 345)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 346

```
 1   a shared file.  Is that shared file something
 2   that you created or plaintiffs' counsel
 3   created?
 4       A.    It's something that I think
 5   plaintiffs' counsel created for me to be able
 6   to send them documents and receive documents,
 7   and it's a Dropbox share file.  It's -- at
 8   this point I think it might be mine.  I'm not
 9   sure just exactly who's in charge of that or
10   runs it, but it comes directly into my
11   Dropbox file.
12           I know I had to boost my
13   subscription to Dropbox in order to hold the
14   2 gigabytes of data from -- that we were
15   putting into there.
16       Q.    Is there anything from that
17   Dropbox file that you relied upon in forming
18   your opinion in your report that you have not
19   already provided to defense counsel?
20       A.    No, everything that was in that
21   Dropbox that I've relied upon has been
22   identified here.
23       Q.    Who prepared Exhibit B to your
24   report?
```

Page 347

```
 1       A.    Exhibit B was a list of
 2   articles from the research literature
 3   included in the Dropbox that -- that I think
 4   does not -- I don't know whether it includes
 5   the referenced articles from my report or
 6   not, but they were all part of the same
 7   collection of research articles and
 8   supplemental documents.
 9       Q.    And my question, Dr. Carson,
10   was: Who prepared that exhibit?
11       A.    The exhibit was prepared by the
12   plaintiffs' attorneys.
13       Q.    You testified earlier that you
14   have spent approximately 150 to 180 hours in
15   your expert retention work; is that correct?
16       A.    Correct.
17       Q.    Can you estimate what portion
18   of that time was spent researching versus
19   what portion of time was spent actually
20   drafting your expert report?
21       A.    Those two things are in some
22   ways difficult to separate because I would --
23   I was writing my report the entire time that
24   I was reviewing the research materials and
```

Page 348

```
 1   accumulating information in the draft as a
 2   result of my review of the literature.
 3           So if I had to separate things
 4   out, I would say that, by far, the -- most of
 5   the time has been spent in reading articles
 6   and reviewing them and comparing them with
 7   other articles, and a comparatively small
 8   amount of time has been spent in drafting the
 9   report.
10           Although there were some
11   strings of activity which was all report
12   drafting basically, I would say probably 85
13   to 90% was research, seeking articles,
14   reading them, reviewing them, and comparing
15   them.
16       Q.    And you also testified earlier
17   today that you discarded information not
18   relevant or interesting to you.
19           How did you make that
20   determination?
21           MS. O'DELL:  Objection to the
22   form.
23       A.    The things that I discarded did
24   not seem to fit into my gestalt of the
```

Page 349

```
 1   understanding of this question and the
 2   opinions that I wanted to express.  They may
 3   have been interesting information and useful
 4   for some purposes, but not for this
 5   particular report.
 6   BY MS. APPEL:
 7       Q.    Was some of that information
 8   that you discarded based on relevancy or that
 9   you determined was not of interest
10   information that may have been different than
11   your opinions?
12       A.    No.  I didn't discard any
13   research because the opinions provided
14   differed from my own.  These were things that
15   really were irrelevant to the question.
16           I remember finding an awful lot
17   of geological research stuff that just didn't
18   have any relevance to the question.
19           Because I used such broad
20   search terms, I ended up pulling in a whole
21   lot of things that were not necessary or
22   useful, and those just went in the trash.
23       Q.    You testified earlier that you
24   have not treated any patients with ovarian
```

Arch I. "Chip" Carson, M.D., Ph.D.

Page 350

1 cancer; is that correct?
2      A.    Not knowingly, not because of
3 ovarian cancer.
4      Q.    Have you ever diagnosed any
5 patients with ovarian cancer?
6      A.    I think when I was in medical
7 school or residency, I probably participated
8 in that on several patients.
9      Q.    Have you ever instructed a
10 patient not to use talcum powder products?
11      A.    I hadn't up until a month or
12 two ago, but I've been asking people about --
13 about their talcum powder use just as sort of
14 a curiosity in mentioning that there might be
15 a risk.
16      Q.    Do you ask that of all your
17 patients?
18      A.    I would say no, I don't usually
19 ask the men that, but I probably should.
20      Q.    And have the responses to those
21 inquiries of your female patients and their
22 talcum product use, has that been used at all
23 to inform your opinions in this case?
24      A.    I don't think so.  There have

Page 351

1 been very few that I have asked that question
2 in the last month or so.  I've had a limited
3 clinic schedule during this period of time.
4 We had the holidays and other things, so I
5 haven't seen that many patients.
6           And of those I've asked about
7 it, it seems about half of the women have had
8 a history of using talcum powder.
9      Q.    And of those women that are
10 using -- have told you that they have used
11 talcum powder, are those women diagnosed with
12 ovarian cancer?
13      A.    No.
14      Q.    So suffice to say the inquiry
15 that you've asked of your female patients
16 concerning their talcum use has nothing to do
17 with the question that you've been posed in
18 this particular litigation?
19           MS. O'DELL:  Object to the
20 form.
21      A.    Actually, that's the only
22 reason I've been asking them.  It's not
23 something that came to mind earlier.  I have
24 an environmental exposure survey that I

Page 352

1 usually administer to my patients, and I have
2 plans to add that as a question in my
3 environmental exposure survey.  Which I
4 haven't done already, but will as soon as I
5 get the opportunity.
6 BY MS. APPEL:
7      Q.    You testified earlier today
8 that you do not believe there was ever a
9 point where talcum powder did not contain
10 asbestos, correct?
11      A.    Yes.
12      Q.    So in forming your opinion in
13 your report, you've assumed that the talcum
14 powder does contain asbestos, correct?
15           MS. O'DELL:  Object to the
16 form.
17      A.    Well, I think the asbestos
18 contribution to this whole issue is important
19 and significant.  I think there's good
20 evidence that whatever we call talcum powder
21 is carcinogenic and responsible for ovarian
22 cancer -- as a cause of ovarian cancer, but I
23 can't say -- I can't say based on looking at
24 a can of talcum powder whether or not it has

Page 353

1 asbestos in it or how much.
2 BY MS. APPEL:
3      Q.    Have you formed an opinion,
4 Dr. Carson, on whether there's a relationship
5 between pure talc and ovarian cancer?
6           MS. O'DELL:  Objection to form.
7      A.    My opinion is there is, but
8 that's based on the research reports that
9 have been done using so-called pure talc,
10 talcum powder, and I am -- I -- my opinion is
11 that it's unlikely that those test substances
12 actually are pure talc.
13 BY MS. APPEL:
14      Q.    So again, Dr. Carson, in
15 forming your opinions, you have done so on
16 the belief that all the talc powder products
17 or just pure talc do, in fact, contain
18 asbestos?
19           MS. O'DELL:  Objection to form.
20      A.    It is my opinion that all
21 talcum powder products do contain a certain
22 amount of asbestos, even if it's extremely
23 small.
24           My opinions have been formed

89 (Pages 350 to 353)

Page 354

1  based on research that has been done on
2  available talcum powder products, so I guess
3  the research would have been done using some
4  small quantity of asbestos in all of those
5  studies.
6  BY MS. APPEL:
7      Q.    You also testified today,
8  Dr. Carson, that you have found in your
9  research that there is a dose-response
10  relationship between talcum powder products
11  and ovarian cancer, correct?
12      A.    Well, a number of the research
13  studies, the epidemiology studies have shown
14  positive and statistically significant
15  trends.
16      Q.    And those trends that you're
17  relying on, Dr. Carson, actually only relate
18  to duration and frequency, correct?
19          MS. O'DELL: Objection to form.
20      A.    Yes, they do relate to duration
21  and frequency, which is the only surrogate we
22  have for dose.
23  BY MS. APPEL:
24      Q.    So in forming your opinion,

Page 355

1  Dr. Carson, you have not determined a level
2  of harmful exposure to talcum powder products
3  that causes ovarian cancer?
4      A.    That's correct.
5      Q.    And you did not conduct a dose
6  assessment between talcum powder products and
7  ovarian cancer, correct?
8          MS. O'DELL: Objection to form.
9      A.    Well, I did not conduct a
10  dose-response, but I am of the opinion that
11  there's no safe threshold for exposure to a
12  carcinogen until such a threshold is
13  identified.
14  BY MS. APPEL:
15      Q.    And does that include
16  Category 2B particles as well --
17          MS. O'DELL: Objection.
18  BY MS. APPEL:
19      Q.    -- that it's a possible
20  carcinogen?
21          MS. O'DELL: Objection to form.
22      A.    It includes the talc that was
23  discussed in the IARC report. Those
24  conclusions have nothing to do with how it's

Page 356

1  classified by IARC.
2  BY MS. APPEL:
3      Q.    But it's your opinion that a
4  possible carcinogen -- strike that.
5          It's your opinion that any dose
6  of a possible carcinogen can cause cancer?
7          MS. O'DELL: Objection to form.
8      A.    Yes, I think there is a
9  potential for any dose of a carcinogen to
10  cause a cancer. There's also the principle
11  that the lower the dose, the less likely it
12  is, the lower the risk is for developing a
13  cancer.
14  BY MS. APPEL:
15      Q.    And your opinion extends to
16  those particles that have not been identified
17  as carcinogens, but may just be possible
18  carcinogens?
19      A.    I think talc has been
20  identified as a carcinogen.
21      Q.    So you disagree with the IARC
22  classification?
23      A.    The IARC 2B classification is a
24  carcinogenic classification.

Page 357

1      Q.    But you recognize and -- that
2  there are different types of categories that
3  IARC has?
4      A.    Yes.
5      Q.    And that -- it's that talc that
6  does not contain asbestos was not, in fact,
7  categorized as a Group 1, correct?
8      A.    That's correct.
9      Q.    So is it your opinion, then,
10  looking at other 2B-classified particles by
11  IARC, that any exposure to pickled vegetables
12  would cause cancer?
13      A.    We know that there are a number
14  of carcinogens that are regularly present in
15  things like the food that we eat. We have a
16  rule that says that those things should not
17  be included in food items unless they have
18  passed a particular exemption process.
19          Pickled vegetables are
20  something that people have been familiar with
21  and have been using for hundreds of years,
22  and things like talcum powder are things that
23  have been used for -- well, at least a
24  hundred years, but probably considerably

Arch I. "Chip" Carson, M.D., Ph.D.

Page 358

1 longer.
2 And whether or not those things
3 are carcinogens, there are people who still
4 find enough value to offset that factor in
5 their own lives and they can make their own
6 decisions regarding their exposure.
7 It's a similar concept to
8 people who choose to smoke. Although smoking
9 is an addictive behavior, people are aware
10 that it causes disease, including cancer, and
11 yet they continue to smoke.
12 We continue to eat grilled
13 meats, even -- most of us know now that
14 grilled meats contain polycyclic aromatic
15 hydrocarbons that are known carcinogens, some
16 of them Group 1 carcinogens, and yet, we
17 continue that practice and revel in it even.
18 That's just part of what we do as human
19 beings.
20 The issue with talc is a
21 complicated question in my mind. I think I'm
22 straying a bit from your -- from your
23 question, but baby powder, for example, is
24 something that has a very -- very dear sort

Page 359

1 of relationship to many people.
2 The experience with that from
3 the time you were a baby until you grow up
4 and have your own children involves a lot of
5 the use of baby powder in many, many
6 households. That's a difficult relationship
7 to break. It's psychological as much as it
8 is knowledge based.
9 So as we go through the
10 decades, we get a little safer and safer as
11 we begin to peel these habits, these
12 dangerous habits away from our lives and
13 accept better lifestyles.
14 MR. ZELLERS: Move to strike as
15 nonresponsive.
16 MS. APPEL: Respectfully --
17 MS. BOCKUS: Is he finished?
18 MR. ZELLERS: I don't think so.
19 THE WITNESS: I can go on.
20 BY MS. APPEL:
21 Q. Yeah. My question was more
22 narrow, and I was analogizing your opinion as
23 to talcum powder and was asking about other
24 2B classifications, and my example --

Page 360

1 A. Pickled vegetables.
2 Q. -- I had was pickled
3 vegetables, and the question was whether or
4 not is your opinion that any consumption of
5 pickled vegetables causes cancer?
6 MS. O'DELL: Objection to form.
7 A. I believe the primary form of
8 cancer that's potentially related with
9 pickled vegetables is stomach cancer, and
10 there is a slight increase in risk with
11 consumption of pickled vegetables for
12 everybody who does it.
13 BY MS. APPEL:
14 Q. Okay. And what about gasoline
15 or exhaust?
16 A. Gasoline meaning the fuel?
17 Q. Yes.
18 A. Well, gasoline used to contain
19 a significant amount of benzene, which was
20 a -- determined to be a carcinogenic
21 substance. In recent years, most of the
22 benzene has been removed from gasoline, so
23 now there's very little benzene in vapors
24 that are expressed.

Page 361

1 But there's a small amount. So
2 when you inhale gasoline vapors, you are also
3 exposing yourself to a very small amount of a
4 carcinogenic substance.
5 As far as exhaust is concerned,
6 diesel exhaust in particular has -- contains
7 particles that have been identified through
8 various bioassays to be carcinogenic. So
9 diesel exhaust is regulated as a carcinogenic
10 material, even though we continue to be
11 exposed.
12 Q. And it's your opinion that any
13 exposure that we all incur related to exhaust
14 will cause us cancer?
15 MS. O'DELL: Objection to form.
16 A. It will cause an increase in
17 risk of cancer. Doesn't necessarily cause
18 cancer in everybody.
19 BY MS. APPEL:
20 Q. Okay. Are you aware that Saed
21 has been hired by plaintiffs' counsel in this
22 litigation?
23 A. I am. And when I misspoke
24 earlier today regarding the Taher paper, I

91 (Pages 358 to 361)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 362

1  was thinking of the Saed paper.
2      Q.    Okay.  Last question:  Counsel
3  was asking you about the migration process,
4  and you mentioned that in the course of
5  particles moving up the track, that some of
6  it may come back out even after it reaches
7  the fluid surrounding the ovaries, correct?
8      A.    Yes.
9      Q.    So if particles have the
10 ability to come back out, that means that
11 there is, in fact, some form of an intrinsic
12 elimination system.
13     A.    Well, if this is all based on
14 mass action, it would not necessarily be an
15 intrinsic elimination system, and I believe
16 that talc particles, once they produce an
17 inflammatory response, they become
18 sequestered within that inflammatory milieu
19 and no longer are available for movement back
20 out into the fluid.
21         I'm sure there's some small
22 percentage of them that are an exception to
23 that, but for the majority, that would be the
24 case.

Page 363

1          MS. APPEL:  Okay.  That's all I
2  have.  Thank you, Dr. Carson.
3          MS. TINSLEY:  I don't have any
4  questions.
5          MS. O'DELL:  Okay.  Why don't
6  we take a short break.
7          THE VIDEOGRAPHER:  Off the
8  record at 5:37, end of Tape 4.
9          (Recess taken, 5:37 p.m. to
10 5:44 p.m.)
11         THE VIDEOGRAPHER:  We're on the
12 record at 5:44, beginning of Tape 5.
13         MS. O'DELL:  Dr. Carson, I
14 don't have any questions, so this will
15 conclude your deposition.
16         MR. ZELLERS:  Thank you,
17 Doctor.
18         THE VIDEOGRAPHER:  Going off
19 the record, 5:44.  End of deposition,
20 end of Tape 5.
21         (Proceedings recessed at
22 5:45 p.m.)
23           --o0o--
24

Page 364

1              CERTIFICATE
2      I, MICHAEL E. MILLER, Fellow of
   the Academy of Professional Reporters,
3  Registered Diplomate Reporter, Certified
   Realtime Reporter, Certified Court Reporter
4  and Notary Public, do hereby certify that
   prior to the commencement of the examination,
5  ARCH I. "CHIP" CARSON, M.D., Ph.D. was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
       I DO FURTHER CERTIFY that pursuant
11 to FRCP Rule 30, signature of the witness was
   not requested by the witness or other party
12 before the conclusion of the deposition.
13     I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15 employee of such attorney or counsel, and
   that I am not financially interested in the
16 action.
17
18
   MICHAEL E. MILLER, FAPR, RDR, CRR
19 Fellow of the Academy of Professional Reporters
   NCRA Registered Diplomate Reporter
20 NCRA Certified Realtime Reporter
   Certified Court Reporter
21
   Notary Public in and for the
22 State of Texas
   My Commission Expires:  7/9/2020
23
   Dated: January 22, 2019
24

Page 365

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11 the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14         It is imperative that you return
15 the original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24

|  | Page 366 |
|---|---|

```
            ERRATA
 1
 2    PAGE  LINE  CHANGE
 3    ____ ____ _____
 4        REASON: _____
 5    ____ ____ _____
 6        REASON: _____
 7    ____ ____ _____
 8        REASON: _____
 9    ____ ____ _____
10        REASON: _____
11    ____ ____ _____
12        REASON: _____
13    ____ ____ _____
14        REASON: _____
15    ____ ____ _____
16        REASON: _____
17    ____ ____ _____
18        REASON: _____
19    ____ ____ _____
20        REASON: _____
21    ____ ____ _____
22        REASON: _____
23    ____ ____ _____
24        REASON: _____
```

Page 368

```
            LAWYER'S NOTES
 1
 2
 3    PAGE   LINE
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```

Page 367

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4       I, ARCH I. "CHIP" CARSON, M.D.,
      Ph.D., do hereby certify that I have read the
 5    foregoing pages and that the same is a
      correct transcription of the answers given by
 6    me to the questions therein propounded,
      except for the corrections or changes in form
 7    or substance, if any, noted in the attached
      Errata Sheet.
 8
 9
10
11
12    _____
      ARCH I. "CHIP" CARSON, M.D., Ph.D.   DATE
13
14
15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18
19    _____
20    Notary Public
21
22
23
24
```