# EXHIBIT B9

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


IN RE: JOHNSON &              )
JOHNSON TALCUM POWDER  )
PRODUCTS MARKETING      )
SALES PRACTICES AND     )   MDL 16-2738
PRODUCT LIABILITY       )   (FLW)(LHG)
LITIGATION              )
_____  )
THIS DOCUMENT           )
PERTAINS TO ALL CASES   )


THURSDAY, APRIL 18, 2019


- - -


        Videotaped deposition of Christian

Merlo, M.D., MPH, held at the offices of

VENABLE LLP, 750 East Pratt Street, Suite

900, Baltimore, Maryland, commencing at 9:06

a.m., on the above date, before Carrie A.

Campbell, Registered Diplomate Reporter

and Certified Realtime Reporter.


- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Christian Merlo, M.D., MPH

## Page 2

```
 1
 2    A P P E A R A N C E S :
 3    LEVIN, PAPANTONIO, THOMAS, MITCHELL,
      RAFFERTY & PROCTOR, P.A.
      BY: CHRISTOPHER V. TISI
 4       ctisi@levinlaw.com
      316 South Baylen Street, Suite 600
 5    Pensacola, Florida  32502
      (850) 435-7000
 6
 7
      RESTAINO LAW LLC
 8    BY: JOHN M. RESTAINO, JR., DPM, JD, MPH
         JRestaino@RestainoLLC.com
 9    130 Forest Street
      Denver, Colorado  80220
10    (303) 839-8000
11
      ASHCRAFT & GEREL, LLP
12    BY: MICHELLE A. PARFITT
13       mparfitt@ashcraftlaw.com
      4900 Seminary Road, Suite 650
14    Alexandria, Virginia  22311
      (703) 931-5500
15
16
      ROBINSON CALCAGNIE, INC.
17    BY: CYNTHIA L. GARBER
         cgarber@robinsonfirm.com
18    19 Corporate Plaza Drive
      Newport Beach, California  92660
19    (949) 720-1288
20
21    WAGNER REESE LLP
      BY: JEFF S. GIBSON
22       JGibson@WagnerReese.com
      11939 North Meridian Street
23    Carmel, Indiana  46032
      Counsel for Plaintiffs
24
25
```

## Page 3

```
 1    DRINKER BIDDLE & REATH LLP
      BY: SUSAN M. SHARKO
 2       Susan.Sharko@dbr.com
      600 Campus Drive
 3    Florham Park, New Jersey 07932-1047
      (973) 549-7000
 4
 5    DRINKER BIDDLE & REATH LLP
      BY: KATHERINE MCBETH
 6       katherine.mcbeth@dbr.com
      One Logan Square, Suite 2000
 7    Philadelphia, Pennsylvania  19103
      (215) 988-2700
 8
      and
 9
      SKADDEN ARPS SLATE MEAGHER & FLOM LLP
10    BY: JESSICA D. MILLER
         jessica.miller@skadden.com
11    1440 New York Avenue N.W.
      Washington, DC  20005
12    (202) 371-7000
      Counsel for Defendant Johnson &
13    Johnson
14
15    SEYFARTH SHAW LLP
      BY: THOMAS T. LOCKE
16       tlocke@seyfarth.com
      975 F Street, N.W.
17    Washington, DC 20004
      (202) 463-2400
18    Counsel for Defendant Personal Care
      Products Council
19
20
21    TUCKER ELLIS, LLP
      BY: MICHAEL ANDERTON
         michael.anderton@tuckerellis.com
22    950 Main Avenue, Suite 1100
      Cleveland, Ohio 44113
23    (216) 592-5000
      Counsel for PTI Union, LLC and PTI
24    Royston, LLC
25
```

## Page 4

```
 1    V I D E O G R A P H E R :
      DANIEL HOLMSTOCK, Golkow Litigation
 2    Services
 3          – – –
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                INDEX
 2                              PAGE
 3    APPEARANCES.................................  2
 4    EXAMINATIONS
 5      BY MR. TISI............................  11
 6      BY MS. MILLER..........................  479
 7      BY MR. TISI............................  483
 8
 9              EXHIBITS
10    No.   Description                 Page
11    Merlo 1   Curriculum Vitae of Christian A.   11
                Merlo, MD, MPH
12
      Merlo 2   Pulmonary & Critical Care        13
13              Medicine printout
14    Merlo 3   Expert Report of Christian       32
                Merlo, MD, MPH, for General
15              Causation Daubert Hearing
16    Merlo 3A  Expert Report of Christian       33
                Merlo, MD, MPH, Supplemental
17              Materials Reviewed and
                Considered
18
      Merlo 3B  March 13, 2019 letter from Susan  78
19              Sharko to Michelle Parfitt
20    Merlo 4   Christian Merlo, MD, MPH         54
                biography printout from Johns
21              Hopkins website
22    Merlo 5   Johns Hopkins web page printout  57
                of Christian Merlo, MD, MPH,
23              Adult Clinic for the Cystic
                Fibrosis Center
24
25
```

2  (Pages 2 to 5)

Christian Merlo, M.D., MPH

### Page 6

| | | |
|---|---|---|
| 1 | Merlo 6   Faculty directory printout of the epidemiology department at Johns Hopkins Bloomberg School of Public Health | 65 |
| 3 | Merlo 7   Printout of the web page from the Johns Hopkins department of epidemiology | 70 |
| 5 | Merlo 8   VeraMedica Institute invoices | 83 |
| 6 | Merlo 9   Excerpt from Expert Report Of Christian Merlo, MD, MPH; Page 46 | 110 |
| 8 | Merlo 10   "Merlo Allegations of Plaintiffs Experts Methodologic Flaws" | 118 |
| 10 | Merlo 12   "Ovarian Cancer and Talc," Cramer, et al. | 151 |
| 11 | Merlo 13   Draft Screening Assessment Talc, Chemical Abstracts Service Registry Number 14807-96-6, Environment and Climate Change Canada, Health Canada, December 2018 | 165 |
| 15 | Merlo 14   "The Environment and Disease: Association of Causation?" Sir Bradford Hill | 170 |
| 17 | Merlo 21   "Perineal Talc Use and Ovarian Cancer A Systematic Review and Meta-Analysis," Penninkilampi, et al. | 418 |
| 19 | Merlo 22   "Epidemiology, Concepts and Methods," Oleckno | 200 |
| 21 | Merlo 23   Chapter 14: "From Association to Causation: Deriving Inferences from Epidemiologic Studies" | 206 |
| 23 | Merlo 24   CDC Lesson 1:  Introduction to Epidemiology | 217 |

### Page 7

| | | |
|---|---|---|
| 1 | Merlo 25   "Appetite-Suppressant Drugs and The Risk of Primary Pulmonary Hypertension," Abenhaim, et al. | 232 |
| 3 | Merlo 26   NHMRC levels of evidence and grades for recommendations for developers of guidelines, December 2009 | 251 |
| 5 | Merlo 27   Chapter 8: Case-Control Studies, Rothman, et al. | 268 |
| 7 | Merlo 28   "Six Persistent Research Misconceptions," Rothman | 270 |
| 8 | Merlo 29   Interpretation of Epidemiologic Studies on Talc and Ovarian Cancer by Kenneth Rothman, et al., IMERYS 209695 - IMERYS 209705 | 272 |
| 11 | Merlo 30   Systematic Review and Meta-Analysis of the Association between Perineal Use of Talc and Risk of Ovarian Cancer, Taher, et al. | 438 |
| 14 | Merlo 31   "Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ)- Health Professional Version," NIH | 309 |
| 17 | Merlo 32   Modern Epidemiology, Kenneth Rothman, et al. | 314 |
| 18 | Merlo 33   Rule 26 Expert Report of Jack Siemiatycki, MSc, PhD | 324 |
| 20 | Merlo 34   Excerpts from Jack Siemiatycki, PhD, deposition | 330 |
| 21 | Merlo 35   Rule 26 Expert Report of Patricia G. Moorman, MSPH, PhD | 331 |
| 23 | Merlo 36   Excerpts from Patricia G. Moorman, MSPH, PhD, deposition on January 25, 2019 | 334 |

### Page 8

| | | |
|---|---|---|
| 1 | Merlo 37   Excerpt From Expert Report of Christian Merlo, MD, MPH, for General Causation Daubert Hearing | 344 |
| 3 | Merlo 38   Statement from Christian Merlo Expert Report, February 25, 2019, Page 44-55 | 351 |
| 5 | Merlo 39   Statement from Christian Merlo Expert Report, February 25, 2019, Page 45 | 353 |
| 7 | Merlo 40   "Mineral Fiber Exposure and the Development of Ovarian Cancer," Rosenblatt, et al. | 359 |
| 9 | Merlo 41   "Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer," Tzonou, et al. | 374 |
| 11 | Merlo 42   Excerpt From Expert Report of Christian Merlo, MD, MPH, for General Causation Daubert Hearing | 396 |
| 14 | Merlo 43   Epidemiology Concepts and Methods, William A. Oleckno | 404 |
| 16 | Merlo 44   "Scientists rise up against statistical significance," Amrhein | 410 |
| 18 | Merlo 46   Exhibit of a compilation of studies titled "Dose Response" | 446 |
| 19 | Merlo 47   Pro Publica Christian Merlo printout | 88 |
| 21 | Merlo 48   "Genital use of talc and risk of ovarian cancer: A meta-analysis," Berge, et al. | 378 |
| 23 | (Exhibits attached to the deposition.) | |

### Page 9

| | | |
|---|---|---|
| 1 | CERTIFICATE.................................487 | |
| 2 | ACKNOWLEDGMENT OF DEPONENT..................489 | |
| 3 | ERRATA......................................490 | |
| 4 | LAWYER'S NOTES..............................491 | |

Christian Merlo, M.D., MPH

## Page 10

1      VIDEOGRAPHER:  We are now on
2  the record.
3      My name is Daniel Holmstock.
4  I'm the videographer for Golkow
5  Litigation Services.
6      Today's date is April 18, 2019,
7  and the time on the video screen is
8  9:06 a.m.
9      This deposition is being held
10  at the law offices of Venable LLP, 750
11  East Pratt Street, Suite 900,
12  Baltimore, Maryland, for the matter of
13  In Re: Johnson & Johnson Talcum Powder
14  Products Marketing, Sales Practices
15  and Products Liability Litigation, MDL
16  Number 2738, pending before the United
17  States District Court for the Eastern
18  District of New Jersey.
19      Our deponent today is
20  Dr. Christian Merlo.
21      Counsel for the record will be
22  noted on the stenographic record for
23  appearances.
24      Our court reporter is Carrie
25  Campbell, who will now administer the

## Page 11

1  oath to the witness.
2
3      CHRISTIAN MERLO, M.D., MPH,
4  of lawful age, having been first duly sworn
5  to tell the truth, the whole truth and
6  nothing but the truth, deposes and says on
7  behalf of the Plaintiffs, as follows:
8
9      (Merlo Exhibit 1 marked for
10  identification.)
11
12      DIRECT EXAMINATION
13  QUESTIONS BY MR. TISI:
14      Q.   Please state your name.
15      A.   My name is Christian Merlo.
16      Q.   And I've placed before you,
17  Dr. Merlo, a copy of your CV as Exhibit 1.
18  Do you see that?
19      A.   I do.
20      Q.   Is this your current CV?
21      This was produced to us in
22  connection with this litigation.
23      A.   Seems about right.
24      Q.   Okay.  Is there anything that
25  needs to be added to it since February of

## Page 12

1  this year that would make it more current?
2      A.   There are probably a couple of
3  articles that I need to put in there.
4      Q.   Do any of them deal with
5  ovarian cancer?
6      A.   They do not.
7      Q.   Do any of them deal with talc?
8      A.   They do not.
9      Q.   Okay.  Get back to your CV in a
10  moment.
11      You're a medical doctor?
12      A.   I am.
13      Q.   And you're board certified in
14  internal medicine?
15      A.   Internal medicine, pulmonary
16  medicine and critical care medicine.
17      Q.   Okay.  And you are also an
18  associate professor of medicine in the
19  Department of Pulmonary and Critical Care
20  Medicine at Johns Hopkins University?
21      A.   In the department of medicine
22  and also in the department of epidemiology at
23  the School of Public Health.
24      Q.   I'll ask you about the second
25  later, but my specific question is that you

## Page 13

1  are associate professor of medicine in the
2  Department of Pulmonary and Critical Care
3  Medicine at Johns Hopkins University?
4      A.   But my official title is an
5  associate professor of medicine in
6  epidemiology.
7      (Merlo Exhibit 2 marked for
8  identification.)
9  QUESTIONS BY MR. TISI:
10      Q.   Okay.  I would like you show
11  you what I would like to have marked as
12  Exhibit Number 2.
13      This is the --
14      MR. TISI:  I'm sorry, did you
15  put an exhibit sticker on it?
16  QUESTIONS BY MR. TISI:
17      Q.   This is the web page to the
18  Johns Hopkins Division of Pulmonary and
19  Critical Care Medicine.
20      Do you see that?
21      A.   I see the exhibit, yes.
22      Q.   Okay.  And who is Nadia Hansel?
23      A.   Nadia Hansel is our current
24  division director of the pulmonary and
25  critical care division.

4 (Pages 10 to 13)

Christian Merlo, M.D., MPH

Page 14

1      Q.    She basically runs your
2  division?
3      A.    Well, she's part of the crew
4  that runs the division, but she's our
5  division director.
6      Q.    Okay.  And did you see where it
7  describes -- on the second paragraph it
8  describes the scope of conditions treated in
9  the department, Division of Pulmonary and
10  Critical Care Medicine?
11      A.    I see that paragraph, yes.
12      Q.    Let me read it for the record.
13            It says, "We hold clinical and
14  research expertise in a broad range of
15  diseases, including asthma, COPD, critical
16  care, cystic fibrosis, interstitial lung
17  disease, lung cancer, lung transplantation,
18  neuromuscular disease, pulmonary
19  hypertension, sarcoidosis and sleep
20  medicine."
21            Do you see that?
22      A.    I do.
23      Q.    Does the Johns Hopkins Division
24  of Pulmonary and Critical Care Medicine
25  provide primary care treatment for

Page 15

1  gynecologic cancers?
2      A.    I think you'd have to define
3  primary care treatment.
4      Q.    Yes.
5      A.    We do have an oncologic center
6  where we take care of many patients who are
7  very, very sick with cancers, and some of
8  those involve gynecologic cancers, and we are
9  the primary caregiver in our onc ICU.
10      Q.    Okay.  But is that in the
11  Division of Pulmonary and Critical Care --
12      A.    Yes.
13      Q.    -- Medicine?
14            Okay.  But the treatment of
15  people who actually are diagnosed, until the
16  very end of their treatment, is not in your
17  division; is that correct?
18      A.    Again, I think you'd have to
19  define what the treatment is --
20      Q.    Okay.
21      A.    -- because sometimes the
22  treatment involved in gynecologic cancers
23  involves therapies that give side effects,
24  and those side effects land those patients in
25  some intensive care units where we do take

Page 16

1  care of patients like that.
2      Q.    Okay.  So -- I'm sorry.  I
3  didn't mean to interrupt you.
4            So other than treating the side
5  effects that perhaps might occur in the
6  context of a patient who has gynecologic
7  cancers, people with ovarian cancer typically
8  are treated by oncologists; is that true?
9  Primarily?
10      A.    Again, if we're talking about
11  oncologic therapy, yes, they would be
12  traditionally treated by oncologists.
13      Q.    You're what's called an
14  associate professor?
15      A.    I am an associate professor.
16      Q.    Okay.  And just to follow up on
17  the last question, you're not board certified
18  in oncology, are you?
19      A.    I'm not.
20      Q.    Do you have tenure?
21      A.    Tenure is a tricky thing at
22  Hopkins.  There's not really a full
23  definition of it.
24            The usual definition is if
25  you're asked to stay after an instructor, the

Page 17

1  institution is committed to keeping you here.
2      Q.    Okay.
3      A.    But there's no contract that
4  one signs or that one gets saying "you can
5  stay here forever."
6      Q.    You're not a full professor?
7      A.    I am not a full professor.
8      Q.    And your expertise is critical
9  care -- is in the care -- critical care --
10  I'm sorry.
11            Your expertise has been
12  described as in critical care and cystic
13  fibrosis, and those with lung transplants as
14  well as patients who have other lung
15  diseases, as well as those who require
16  critical care therapy.
17            Is that true?
18      MS. MILLER:  Objection.
19            Are you looking at this?
20      MR. TISI:  I'm not -- you can
21  object.
22      THE WITNESS:  No, you'd have to
23  show me where you're getting that.  I
24  mean, I have lots of expertise.  I
25  have expertise in internal medicine

5 (Pages 14 to 17)

Christian Merlo, M.D., MPH

Page 18

1    and a broad range of pulmonary
2    medicine, a broad range of critical
3    care medicine as well as lung
4    transplantation.
5         So I'm not sure where you got
6    that from, but if you show me
7    something I can --
8    QUESTIONS BY MR. TISI:
9         Q.   We'll do that.
10        I think you mentioned you don't
11   hold yourself out as an expert in oncology,
12   correct?
13        MS. MILLER:  Objection.
14        THE WITNESS:  I think what I
15   said before is I do have a broad range
16   of experience in taking care of
17   oncologic patients in our oncology
18   ICU, so I do consider myself an expert
19   in the intensive care unit care for
20   patients with oncologic disease.
21   QUESTIONS BY MR. TISI:
22        Q.   Okay.  Different question,
23   however.
24        Do you hold yourself out to
25   your colleagues as an expert -- as a cancer

Page 19

1    expert?
2         MS. MILLER:  Objection.
3         THE WITNESS:  I'm going to have
4    to say the same thing, because part of
5    cancer does deal with patients who get
6    very, very, very sick.  And as a
7    group, we have several in our group
8    who attend in our oncology ICU, and
9    I'm one of them, and I do have
10   specific expertise in that aspect of
11   oncology.
12   QUESTIONS BY MR. TISI:
13        Q.   And you are not board certified
14   in oncology, however?
15        A.   I believe I said I wasn't.
16        Q.   And you're not a gynecologist?
17        A.   I'm not a gynecologist.
18        Q.   You're not a toxicologist?
19        A.   I am not a toxicologist.
20        Q.   You're not a mineralogist?
21        A.   I'm not a mineralogist.
22        Q.   Turning back to your CV,
23   Exhibit 1, page 2, you have a section
24   entitled "Peer Review, Original Science
25   Publications."

Page 20

1         Do you see that?
2         A.   I do.
3         Q.   And you identify, if I'm
4    reading correctly, 79 peer-reviewed papers?
5         A.   Seems about right.
6         Q.   Do any of your peer-reviewed
7    papers deal with gynecologic cancers?
8         A.   There's one paper where we look
9    at the risk of malignancy after lung
10   transplantation, and I believe we looked at
11   certain -- I have to go back and look at the
12   paper, but I believe we looked at all sorts
13   of cancers, and gynecologic cancers may have
14   been in there as well.
15        Q.   But the focus of the paper was
16   the consequences of lung transplantation,
17   correct?
18        A.   The risk of malignancy after
19   lung transplantation.
20        Q.   Do any of them deal
21   specifically with ovarian cancer and its
22   causes?
23        A.   No.
24        Q.   Do any of them deal with talcum
25   powder products?

Page 21

1         A.   Excuse me.  No.
2         Q.   Do any of them deal with
3    asbestos?
4         A.   No.
5         Q.   In fact, you understand in this
6    case that there is a claim that there is
7    asbestos contamination or asbestos included
8    in talcum powder products, correct?
9         MS. MILLER:  Objection.
10        THE WITNESS:  I wasn't asked to
11   give an opinion on asbestos in this
12   case.
13   QUESTIONS BY MR. TISI:
14        Q.   Okay.  And I understand that,
15   and that was going to be my question.  So I'm
16   going to ask you that you -- so we don't run
17   into problems here, I'm going to ask that you
18   listen to my question.  Okay?
19        Do you understand that there is
20   an allegation in this case -- and if you
21   don't have an understanding, that's fine --
22   that there is asbestos in talc -- Johnson &
23   Johnson's talcum powder products?
24        MS. MILLER:  Objection.
25        MR. LOCKE:  Objection.

6 (Pages 18 to 21)

Christian Merlo, M.D., MPH

Page 22

1    THE WITNESS:  Again, I wasn't
2  asked to give an opinion about
3  asbestos.
4  QUESTIONS BY MR. TISI:
5    Q.    I didn't ask whether you were
6  asked to give opinions.
7    Do you have any understanding
8  if that's part of the record in this case?
9    MS. MILLER:  Same objections.
10    MR. LOCKE:  Objection.
11  QUESTIONS BY MR. TISI:
12    Q.    Okay.  That's fine.
13    So again, I'm going to ask you
14  to listen to my question.
15    So you're not offering an
16  opinion as to whether or not talc -- the
17  presence or -- the presence of asbestos
18  provides a biologically plausible mechanism
19  for talcum powder product causing ovarian
20  cancer?
21    A.    So I have not reviewed the
22  literature specifically about asbestos.  I
23  was not asked to provide an opinion about
24  asbestos.
25    Q.    Okay.

Page 23

1    A.    However, if asbestos was
2  present at all in a sufficient dose within
3  talcum powder products, that would have come
4  out in the epidemiologic literature, which it
5  didn't.
6    Q.    Okay.
7    A.    Because the epidemiology shows
8  that there is not a causal association
9  between talcum powder and ovarian cancer.
10    MR. TISI:  I'm going to move to
11  strike the answer as nonresponsive.
12  QUESTIONS BY MR. TISI:
13    Q.    My question was:  Were you
14  asked to offer a -- by the way, I'm not
15  getting any -- I said -- my question was:
16  Did you -- were you asked whether or not the
17  presence of asbestos would provide a
18  biologically plausible mechanism for talcum
19  powder products causing ovarian cancer?
20    The question is either yes or
21  no.
22    MR. LOCKE:  Objection.
23    THE WITNESS:  Can you ask that
24  question again?
25

Page 24

1  QUESTIONS BY MR. TISI:
2    Q.    Yes.
3    Were you asked to provide an
4  opinion as to whether or not the presence of
5  asbestos in talcum powder products is a
6  biologically plausible mechanism for causing
7  ovarian cancer?
8    MS. MILLER:  Objection.
9    MR. LOCKE:  Objection.
10    THE WITNESS:  I was asked to
11  provide an opinion on talcum powder
12  products.  And my opinion, based on
13  the epidemiologic literature, is that
14  there is no causal association.
15    So whatever is in talcum powder
16  products would have come out in the
17  literature.
18  QUESTIONS BY MR. TISI:
19    Q.    Okay.  Would it be fair to say
20  you've never published any commentary or
21  review of the literature on ovarian cancer
22  and its causes generally?  I apologize.
23    A.    I have never published a review
24  on ovarian cancer.
25    Q.    Have you published a review on

Page 25

1  any cancer?
2    A.    We have a review in press --
3  sorry, in submission on malignancies after
4  lung transplantation.
5    Q.    Does it focus on whether or not
6  talcum powder products is a risk factor for
7  ovarian cancer?
8    A.    It does not.
9    Q.    Have you ever published a
10  commentary or review on the causes of ovarian
11  cancer?
12    A.    I have not.
13    Q.    Have you published a commentary
14  or review on talcum powder products and its
15  safety?
16    A.    I have not.
17    Q.    Have you published any
18  commentary or review that deal with lifestyle
19  or environmental cause of disease?
20    MS. MILLER:  Objection.
21    THE WITNESS:  That's a pretty
22  broad question.
23  QUESTIONS BY MR. TISI:
24    Q.    It is.
25    A.    I mean, you have my CV here,

7 (Pages 22 to 25)

Christian Merlo, M.D., MPH

Page 26

1  and my clinical and research experience has
2  dealt with epidemiology. And the
3  epidemiology -- epidemiology usually is the
4  study of an exposure and how it relates to an
5  outcome, and most of my papers and research
6  has focused on exposures and how they lead to
7  outcomes.
8      Q.   So what exposures,
9  environmental or lifestyle exposures, have
10 you investigated as related to what diseases?
11     MS. MILLER: Objection.
12     THE WITNESS: Well, you'd have
13 to get a little more specific about
14 what diseases we're talking about.
15 QUESTIONS BY MR. TISI:
16     Q.   So my question was a broad one,
17 because I don't see anything in your
18 published literature that falls in this
19 category, but it may just be that I missed
20 it.
21     Do you have any articles which
22 deal with the relationship between lifestyle
23 and environmental factors and any kind of
24 cancer?
25     A.   That's a different question.

Page 27

1      Q.   Okay. So the answer would be?
2      A.   Well, I would have to say that
3  the risk of malignancy after lung
4  transplantation does deal with that.
5      Q.   Is lung transplantation an
6  environmental or lifestyle?
7      MS. MILLER: Objection.
8      THE WITNESS: So again, that's
9  a pretty broad question. It can be --
10 QUESTIONS BY MR. TISI:
11     Q.   Okay.
12     A.   -- and it depends, because a
13 lung transplant could be done for someone who
14 is born with a disease, say like cystic
15 fibrosis, a genetic disease, or a lung
16 transplantation could be performed because
17 someone has emphysema because they smoked all
18 their life.
19     And so the environmental
20 exposure and the personal health exposure is
21 very, very different in those two
22 populations.
23     Someone who's smoking may
24 smoke -- continue to smoke after their lung
25 transplant. It's not advised, but they may

Page 28

1  continue. So that environmental exposure can
2  lead to an outcome over time.
3      Q.   But did you study the
4  relationship between the exposure and the
5  outcome, or was it primarily focused on lung
6  transplant?
7      A.   Well, I --
8      MS. MILLER: Objection.
9  QUESTIONS BY MR. TISI:
10     Q.   Let me rephrase the question.
11 Let me withdraw and rephrase the question.
12     Did you do any causation
13 analysis, including applying the Bradford
14 Hill factors, to any exposure and any cancer
15 in any of your publications?
16     A.   So in general, when a study is
17 performed, we try to do either a Bradford
18 Hill or different aspects of Bradford Hill to
19 look at strength of associations or look at
20 specificity, to look at consistency, to look
21 at dose response. Sometimes it's available;
22 sometimes it's not.
23     I think it's a -- it's a --
24 it's a framework that is often used in these
25 papers and in these studies, but it's not

Page 29

1  necessarily the only thing that's done in
2  them.
3      Q.   I understand.
4      But if I looked at -- and I
5  appreciate that. These may touch on aspects
6  of Brad Hill -- the Bradford Hill guidelines.
7      My question is: Did you ever,
8  in any of these papers, synthesize all of the
9  medical and scientific information available
10 in order to do a Bradford Hill, complete
11 Bradford Hill, analysis of the relationship
12 between an exposure and a disease?
13     MS. MILLER: Objection.
14     THE WITNESS: Well, that's a
15 very, very, very broad question.
16 QUESTIONS BY MR. TISI:
17     Q.   Uh-huh.
18     A.   I think that there are certain
19 papers in my CV that -- studies that we've
20 done. It's the only study available that we
21 did.
22     Q.   Okay.
23     A.   So, you know, it's impossible
24 to synthesize everything that's in the
25 medical literature if it's the only study

8 (Pages 26 to 29)

Christian Merlo, M.D., MPH

Page 30

1    that's done.
2        Q.   Okay.  So if I -- it wouldn't
3    be surprising if I looked at all these papers
4    and the word "Bradford Hill" does not appear
5    in any of them?
6        A.   That wouldn't be something that
7    would appear --
8        Q.   Okay.
9        A.   -- normally in a paper like
10   this.
11       Q.   Do any of these 78, 79 papers
12   purport to provide any guidance or discussion
13   of the definition or how to apply the
14   Bradford Hill criteria, a theoretic paper,
15   for example?
16           MS. MILLER:  Objection.
17           THE WITNESS:  I don't have any
18       theoretical papers describing a
19       Bradford Hill analysis.
20   QUESTIONS BY MR. TISI:
21       Q.   Okay.  So just -- this is a
22   slightly different question than before.
23           Have you ever published
24   research aimed at elucidating a possible
25   causation between a putative risk factor and

Page 31

1    disease?
2        A.   Well, I think that -- can you
3    ask that again?
4        Q.   Yes.
5            Have you ever published
6    research aimed at elucidating a possible
7    causation between a putative risk factor and
8    a disease?
9            MS. MILLER:  I'm objecting.
10       Objection.
11           THE WITNESS:  So it's not -- we
12       don't really approach epidemiologic
13       studies trying to show causation with
14       risk factors.
15           Sometimes there are studies
16       that are -- that we do just to
17       identify risk factors.  And then once
18       risk factors are identified, then we
19       could do follow-up studies to see if
20       they are actual factors or exposures
21       that lead to a certain outcome.
22           Sometimes that takes multiple
23       studies to do that.
24   QUESTIONS BY MR. TISI:
25       Q.   Can you identify an article

Page 32

1    where you identified a risk factor for a
2    disease?
3        A.   I can.
4            I mean, one of the first
5    studies that we did was to look at the risk
6    factors for developing resistant bacteria in
7    patients with cystic fibrosis.
8        Q.   Okay.  In that context, did you
9    apply the Bradford Hill guidelines?
10           MS. MILLER:  Objection.
11           THE WITNESS:  Again, that's not
12       really something that would have been
13       done in that study.
14   QUESTIONS BY MR. TISI:
15       Q.   Okay.
16       A.   There's a -- there's a large
17   epidemiologic data set that the Cystic
18   Fibrosis Foundation has, and we utilized that
19   to identify factors that we thought might be
20   important in seeing if those factors led to
21   this resistant organism in that population.
22           (Merlo Exhibit 3 marked for
23       identification.)
24   QUESTIONS BY MR. TISI:
25       Q.   I'm going to mark your report

Page 33

1    in this case.
2            You issued a report in the
3    talcum powder products litigation?
4        A.   I wrote a report.
5        Q.   Yes.
6        A.   Yes, I did.
7        Q.   Marked as Exhibit Number 3.
8        A.   Thank you.
9        Q.   Uh-huh.
10           I think we've also been
11   provided a supplemental materials reviewed
12   and considered paper which I'll mark as 3A,
13   which I assume is a supplement to your
14   report.
15           (Merlo Exhibit 3A marked for
16       identification.)
17   QUESTIONS BY MR. TISI:
18       Q.   Is this your report in this
19   case, and are these the supplemental
20   materials you reviewed as of today?
21       A.   This looks about correct.
22       Q.   Okay.  Does this contain all
23   the opinions you're prepared to offer in this
24   case?
25           MS. MILLER:  Objection.

9 (Pages 30 to 33)

Christian Merlo, M.D., MPH

Page 34

1    THE WITNESS: From the -- from
2 the items that I've reviewed thus far.
3 There may be other things that come up
4 in the literature, there may be other
5 reports that are out, and I would like
6 to review those and...
7 QUESTIONS BY MR. TISI:
8    Q.   But as of today, as of today,
9 this is -- these are your opinions and these
10 are the bases of your opinions, correct?
11    A.   They are.
12    Q.   Okay.  Go to page 30 of your
13 report, if you would.  The second sentence of
14 your report says, "While there is no single
15 method for undertaking a causal assessment
16 based on epidemiology, the criteria
17 formulated by Austin Bradford Hill are often
18 used and are considered the gold standard for
19 evaluating causation once an association has
20 been identified."
21    Do you see that?
22    A.   I do.
23    Q.   Can you point to any articles
24 on your CV where you applied the gold
25 standard articulated on page 30 of your

Page 35

1 report?
2    MS. MILLER:  Objection.
3    THE WITNESS:  Well, again, most
4 of these articles are epidemiologic
5 studies looking at an exposure and an
6 outcome.
7    Sometimes there are Bradford
8 Hill considerations that are
9 available, and sometimes there are
10 not.
11 QUESTIONS BY MR. TISI:
12    Q.   But whether they are -- I'm
13 sorry, go ahead.
14    A.   And in every study, we apply
15 what we can --
16    Q.   Right.
17    A.   -- based on these suggestions
18 put forth by Bradford Hill.
19    Q.   Is there any study in which you
20 say, "We are undertaking" -- and I'm not
21 using these words specifically.
22    "We are, in this article,
23 undertaking a causal assessment of putative
24 factor X and disease Y, and here is my
25 analysis"?

Page 36

1    MS. MILLER:  Objection.
2    THE WITNESS:  I wouldn't say it
3 that way.
4 QUESTIONS BY MR. TISI:
5    Q.   I understand you wouldn't say
6 it that way, but in concept.
7    A.   In concept.
8    That's the concept of all of
9 those articles, or at least the majority of
10 them, that we're looking for -- we're looking
11 at an outcome, and we're looking for an
12 exposure to see if that exposure leads to an
13 outcome.
14    And there are considerations
15 that we consciously or subconsciously -- "we"
16 meaning my research team and myself
17 consciously and subconsciously --
18 considerations that Bradford Hill put forth
19 that we apply in there.
20    Now, is it stated?  No, but it
21 wouldn't be stated in the papers.  The
22 medical literature is not written that like
23 that.
24    Q.   Okay.  You mentioned -- and you
25 give an example in your report; we're going

Page 37

1 to talk about it later -- primary pulmonary
2 hypertension and anorexigens.
3    Do you remember the IPPHS
4 study?
5    A.   I do.
6    Q.   Does, in your opinion, exposure
7 to anorexigens cause pulmonary hypertension,
8 primary pulmonary hypertension?
9    A.   The opinion of the medical
10 community -- and part of that is that a
11 significant exposure over a significant
12 amount of time with certain specific
13 anorexigens is associated with pulmonary
14 hypertension.
15    Q.   That's a different -- that's a
16 different question than I'm asking, Doctor.
17    So I asked you -- I asked you
18 whether or not in your opinion exposure to
19 anorexigens, in particular dexfenfluramine
20 and fenfluramine, cause pulmonary
21 hypertension?
22    MS. MILLER:  Objection.
23    THE WITNESS:  So I'm going to
24 answer it very similarly, because
25 you --

10 (Pages 34 to 37)

Christian Merlo, M.D., MPH

1    QUESTIONS BY MR. TISI:
2        Q.    But I'm using the word "cause,"
3    so --
4        A.    And based on the medical
5    literature and based on clinical experience,
6    if we're talking about those two anorexigens,
7    the opinion of the medical community is that
8    those cause primary pulmonary hypertension.
9        Q.    Okay.  Is that your opinion?
10       A.    Yes.
11       Q.    Okay.  And we'll talk about it
12   again, but there was only one study,
13   epidemiologic study, the IPPHS study,
14   correct?
15       A.    You'd have to show me what
16   you're referring to so we can look at it.
17       Q.    Yeah, it's the study by
18   Abenhaim.  I believe it's footnote 77 of your
19   report.
20             You know that study, don't you?
21       A.    I referenced it, but if you'd
22   like to discuss it --
23       Q.    I'm not going to discuss --
24       A.    -- I'd like to see it in front
25   of me to discuss it.

1        Q.    I will discuss it later and
2    I'll -- I will discuss it later, but I'm
3    asking you:  Do you know that there was only
4    one study, epidemiologic study, performed?
5             MS. MILLER:  Objection.
6             THE WITNESS:  I'm not aware of
7        that, but if we're going to talk about
8        studies, then I would have like to
9        have that in front of me.
10   QUESTIONS BY MR. TISI:
11       Q.    I'm going to give it to you.
12             I'm asking you whether there
13   are any other studies, epidemiologic studies,
14   that you're aware of other than that study,
15   which I will give you.
16             MR. LOCKE:  Objection.
17             MS. MILLER:  Objection.
18             THE WITNESS:  You know, I'm not
19       really here to give my opinion on
20       whether or not there was one or ten
21       epidemiologic studies looking at
22       anorexigens in pulmonary hypertension.
23   QUESTIONS BY MR. TISI:
24       Q.    I understand.
25       A.    I'm not a pulmonary

1    hypertension expert, so if you'd like to
2    discuss that, I would need to review the
3    medical literature.
4        Q.    Okay.
5        A.    I can't agree or disagree with
6    you.
7        Q.    Well, you're not an ovarian
8    cancer expert, are you?
9             MR. LOCKE:  Objection.
10            THE WITNESS:  I think I
11       answered that before.
12   QUESTIONS BY MR. TISI:
13       Q.    If you're not a primary
14   pulmonary hypertension expert, and that's a
15   lung disease, are you a -- do you consider
16   yourself an ovarian cancer expert?
17            MR. LOCKE:  Objection.
18            THE WITNESS:  And what I said
19       before is that there are certain
20       aspects of cancer that I do consider
21       myself an expert, and that is the care
22       of patients who have cancer in the
23       intensive care unit.
24   QUESTIONS BY MR. TISI:
25       Q.    Okay.  Do you hold yourself out

1    to your colleagues as an expert in ovarian
2    cancer?
3             MS. MILLER:  Objection.
4             MR. LOCKE:  Objection.
5             THE WITNESS:  I'm going to have
6        to answer that very similarly because
7        there are certain aspects of
8        malignancies where I have taken care
9        of patients with ovarian cancer in the
10       intensive care unit, who are very,
11       very sick, who have been given
12       specific therapies for their ovarian
13       cancer, that I do consider myself an
14       expert in taking care of.
15   QUESTIONS BY MR. TISI:
16       Q.    I understand that.
17             But ovarian cancer is a -- let
18   me just -- if I was, you know, a doctor at
19   Hopkins, and we're not sitting here in a
20   deposition, and I came to you and said,
21   "Doctor, what is your area of expertise?"
22   would you say "ovarian cancer"?
23            MS. MILLER:  Objection.
24            MR. LOCKE:  Objection.  Asked
25       and answered four times.

11 (Pages 38 to 41)

Christian Merlo, M.D., MPH

Page 42

```
 1          THE WITNESS:  I would say
 2    internal medicine.  I would say
 3    pulmonary medicine.  I would say
 4    critical care medicine.  And all of
 5    those -- well, maybe -- no, actually
 6    all of them encompass taking care of
 7    patients who can become or do become
 8    very, very sick with ovarian cancer
 9    and with specific -- and having
10    specific expertise in taking care of
11    some of the medicines that they get
12    that give them very, very specific
13    side effects.
14    QUESTIONS BY MR. TISI:
15      Q.    Have you also cared for
16    patients with primary pulmonary hypertension?
17      A.    I have.
18      Q.    Okay.  So does that also make
19    you an expert in the area of primary
20    pulmonary hypertension?
21      A.    So there are certain aspects of
22    primary pulmonary hypertension that I do
23    consider myself an expert in.  I do take care
24    of patients in the hospital who have primary
25    pulmonary hypertension and also secondary
```

Page 43

```
 1    pulmonary hypertension.
 2          But -- I'll just stop there.
 3      Q.    Do you put -- when you're
 4    taking care of a patient with primary
 5    pulmonary hypertension and they're exposed to
 6    anorexigens, or they're exposed to
 7    fenfluramine, dexfenfluramine, although those
 8    are off the market, and would you note that
 9    on the list of potential differential causes
10    of the pulmonary hypertension?
11          MS. MILLER:  Objection.
12          THE WITNESS:  Can you ask that
13    again?
14    QUESTIONS BY MR. TISI:
15      Q.    Yes.
16          If you have a patient who has
17    primary pulmonary hypertension with a history
18    of use of the anorexigens fenfluramine and
19    dexfenfluramine, do you put them on the list
20    of potential causes in your -- do you make
21    note of that in your record?
22          MS. MILLER:  Objection.
23          MR. LOCKE:  Objection.
24          THE WITNESS:  Well, you're
25    right, these medicines have been off
```

Page 44

```
 1    the market for quite some time, so it
 2    would be very rare to see somebody who
 3    had a new diagnosis of pulmonary
 4    hypertension and an exposure to one of
 5    those medicines.
 6          When I'm evaluating someone
 7    with pulmonary hypertension, I
 8    typically do ask them about the
 9    potential exposures to anorexigens.
10    It's just on the list of things to do.
11    QUESTIONS BY MR. TISI:
12      Q.    Okay.
13      A.    And it should be part of the
14    differential diagnosis.
15      Q.    So you're treating -- is it
16    fair to say that with ovarian cancer you're
17    treating the sequela of the disease, not
18    making the diagnosis of the disease?
19      A.    No, I mean, I've probably made
20    the diagnosis of disease one or two times in
21    my career.
22      Q.    Okay.  And how long -- when you
23    say your career, how long is that?
24      A.    I graduated medical school in
25    1996, so that's when I became a doctor.
```

Page 45

```
 1      Q.    Okay.  So can you -- you list
 2    the factors on page 30 of your report, the
 3    Bradford Hill factors:  strength of
 4    association, consistency, specificity,
 5    temporality, biologic gradient, plausibility,
 6    coherence, experimentation, analogy.
 7          You list them all, correct?
 8      A.    One, two, three, four, five,
 9    six, seven, eight, nine.  Yes, correct.
10      Q.    Okay.  From the time that
11    Bradford Hill, Sir Bradford Hill, wrote his
12    article -- and you agree that's a seminal
13    paper on the topic of how you evaluate cause?
14      A.    It's an article, and it's an
15    important article historically.  We learn
16    about it in epidemiology classes.  I teach
17    about it.
18          Seminal article, I mean, there
19    are lots of articles that are written about
20    causation.  This is an article that I've
21    learned about in class and I've taught about
22    in class.
23      Q.    Well, I think you used the word
24    "seminal" in your report, didn't you?
25      A.    I may have.
```

12 (Pages 42 to 45)

Christian Merlo, M.D., MPH

Page 46

1     Q.   Okay.
2     A.   If you can show me that, I --
3     Q.   So, well, do you agree that
4   it's --
5     A.   I don't know where.
6     Q.   -- it's a seminal article on
7   the issue?
8     A.   But can you show me where I
9   said that?
10    Q.   I'm asking what your opinion
11  is as to whether or not you agree that's the
12  seminal article -- that's a seminal article
13  on causation.
14    A.   But you said I --
15    Q.   I'm not asking you whether you
16  said it in the report.
17    A.   You just did.
18       MS. MILLER:  Objection.
19  QUESTIONS BY MR. TISI:
20    Q.   I'm asking you -- I'm asking
21  you whether it is a seminal article.
22    A.   And I'll say, it's -- it is an
23  article about -- written about causation.
24    Q.   Okay.  Has the medical
25  community, over the past 60 years, changed

Page 47

1   the definitions of any of the Bradford Hill
2   factors as described by Bradford Hill in his
3   1965 article?
4        MS. MILLER:  Objection.
5        THE WITNESS:  That is a very
6    general question, and I would have to
7    say that it depends.  It depends on
8    who you're defining as the medical
9    community, who you're defining as --
10   yeah, I mean, that's a -- too general
11   a question to answer.
12  QUESTIONS BY MR. TISI:
13    Q.   Well, are there different --
14  do -- does the medical community define these
15  factors differently depending upon who's
16  applying them?
17       MS. MILLER:  Objection.
18       THE WITNESS:  Again, I don't
19   know who you're referring to as far as
20   the medical community.  You'd have to
21   be much more specific about that.
22  QUESTIONS BY MR. TISI:
23    Q.   Well, you used the term,
24  Doctor.  I'm just kind of jumping off of what
25  you said.

Page 48

1    I'm asking you:  In your
2   view -- let me -- in terms of you, Dr. Merlo,
3   do you apply the same -- is your definitions
4   of the Bradford Hill factors the same in 2019
5   as described by Bradford Hill in 1965?
6     A.   I would say that it's very
7   similar --
8     Q.   Okay.
9     A.   -- to what's described.
10    Q.   Is there any that are different
11  in your view?
12       Can you look at it and say, for
13  example, "My view of the coherence factor is
14  different than as described by Dr. -- by
15  Bradford Hill"?
16       MS. MILLER:  Objection.
17       For the record, I'll just state
18  that the -- Dr. Merlo brought Bradford
19  Hill with him.
20       MR. TISI:  I'm going to mark it
21  as well.
22       MS. MILLER:  Do you want to
23  mark this one?
24       MR. TISI:  I will not.  I'll
25  mark them when I get --

Page 49

1        MS. MILLER:  But he's looking
2    at it now.
3        MR. TISI:  He can look at it.
4    I think you're limited to "objection,"
5    and if we start with this, we're going
6    to go to the judge.
7        MS. SHARKO:  Mr. Tisi --
8        MR. TISI:  And that's another
9    thing.  We're only having one
10   objection.
11       MS. SHARKO:  You don't need to
12   point your finger.
13       MR. TISI:  I pointed up.  I
14   pointed up, Counsel, and the record
15   will reflect that I did.  There's a
16   camera right on me, as you assured me.
17       And you're laughing, let the
18   record reflect that, as you do in
19   every deposition.
20       MS. SHARKO:  Please, behave
21   yourself.
22       MR. TISI:  Agreed.
23       THE WITNESS:  So did you have a
24   specific question about coherence?
25

13 (Pages 46 to 49)

Christian Merlo, M.D., MPH

Page 50

1    QUESTIONS BY MR. TISI:
2        Q.    No.
3              My question is -- I want to be
4    able to say -- I want to know whether or not
5    your 2009 {sic} definitions of the Bradford
6    Hill factors -- no, let me phrase it a
7    different way.
8              Do you take any issue with any
9    of the factors as described in the 1965
10   articles and say, you know, "This concept is
11   outdated, I would define it differently," or
12   can we look at the 1965 factors as being the
13   ones you actually apply, the definitions you
14   use?
15       A.    So I usually look at them as
16   considerations and not factors.
17       Q.    Okay.
18       A.    And in general, the way it's
19   written is how I interpret and move through
20   when I evaluate evidence.
21       Q.    Okay.  Now, almost every one of
22   your 79 peer-reviewed papers going back to
23   your CV have to do with lung disease of one
24   kind or another, correct?
25       A.    There are a few that deal with

Page 51

1    certain conditions that may not involve lung
2    disease.
3        Q.    The vast majority are, correct?
4        A.    I mean, I haven't tallied up.
5    I don't know percentages, but there are
6    articles in there that involve other disease
7    states.
8        Q.    The vast -- would you agree
9    that the vast majority of your published
10   literature deals with lung disease of one
11   kind or another, whether it be transplants,
12   cystic fibrosis, COPD, et cetera?
13             MS. MILLER:  Objection.  Asked
14       and answered.
15             THE WITNESS:  I didn't tally it
16       up, and I don't have the percentages,
17       but I do know that there are many
18       articles in there that are written
19       about diseases that may not involve
20       the lungs.
21   QUESTIONS BY MR. TISI:
22       Q.    I don't think you have to tally
23   them up to look at them and see that the vast
24   majority of them deal with lung diseases,
25   true?

Page 52

1             MS. MILLER:  Objection.
2             MR. LOCKE:  Objection.
3             MS. MILLER:  Asked and answered
4        again.
5             THE WITNESS:  I mean, I don't
6        even know what vast majority means,
7        but --
8    QUESTIONS BY MR. TISI:
9        Q.    I would say -- let's say more
10   than 50 percent.
11            MS. MILLER:  Objection to the
12       definition of "vast majority" as more
13       than 50 percent.
14            THE WITNESS:  So, again, I
15       don't know the numbers.  We can go
16       through them if you'd like --
17   QUESTIONS BY MR. TISI:
18       Q.    Okay.
19       A.    -- and get a percentage, but --
20       Q.    I think -- I think -- fine.
21             On your CV at the bottom of
22   page 8 you've written several book chapters,
23   correct?
24       A.    Book chapters, sure.
25       Q.    Do any deal with cancer?

Page 53

1        A.    I don't specifically recall,
2    but in this First Aid for Internal Medicine
3    Boards there may have been -- there may have
4    been some -- some cancer topics in there.
5        Q.    Do any deal with the
6    methodology for assessing causation?
7        A.    Book chapters on the
8    methodology assessing causation?  Not that
9    I'm aware of.
10       Q.    Any deal with talcum powder or
11   ovarian cancer?
12       A.    You know, other than the
13   potential for there being talk about
14   malignancies or cancer in First Aid for
15   Internal Medicine Boards, which I don't
16   specifically recall.
17       Q.    Do you think that that
18   references talcum powder?
19       A.    Do I think that what references
20   talcum powder?
21       Q.    That first chapter.
22       A.    Which one?  I'm --
23             MS. MILLER:  Objection.
24   QUESTIONS BY MR. TISI:
25       Q.    The one you just mentioned.

14 (Pages 50 to 53)

Christian Merlo, M.D., MPH

Page 54

1    Do any of your book chapters
2 deal in any way with talcum powder?
3    A.   No, they don't.
4    Q.   Okay.  Prior to finalizing your
5 report in February of 2019, two months ago,
6 had you ever publicly expressed your opinion
7 about talcum powder and ovarian cancer?
8    A.   No.
9    Q.   Now, we talked about the fact
10 that you were an associate professor at Johns
11 Hopkins critical care.
12        You've been associate professor
13 for how many years?
14    A.   I'd have to look back at my CV.
15 It looks like I was promoted to associate
16 professor in 2015.
17    Q.   So you've been associate
18 professor for four years?
19    A.   That's correct.
20        (Merlo Exhibit 4 marked for
21    identification.)
22 QUESTIONS BY MR. TISI:
23    Q.   Okay.  I want to show you
24 Exhibit Number 4, which is the -- your bio on
25 your web page for the critical care division

Page 55

1 of Hopkins.
2        That's your picture, correct?
3    A.   That is my picture.
4    Q.   Does it list your expertise as
5 cystic fibrosis, lung transplant, pulmonary
6 and critical care medicine?
7    A.   Are you referring to up top --
8    Q.   Yes.
9    A.   -- to the right?
10        Expertise:  cystic fibrosis,
11 lung transplant, pulmonary and critical care
12 medicine --
13    Q.   Yes.
14    A.   -- pulmonary?
15    Q.   Yeah.
16    A.   That's what it says.
17    Q.   Does it also say your research
18 interests are HIV-related pulmonary disease,
19 outcomes after lung transplantation, clinics
20 and -- clinical cystic fibrosis?
21    A.   That's what it says.
22    Q.   Okay.  Any mention of ovarian
23 cancer?
24    A.   There is no mention of ovarian
25 cancer.

Page 56

1    Q.   Any mention of cancer of any
2 kind?
3    A.   There is not.
4    Q.   Okay.  Now, your CV also
5 mentions that you currently run the adult
6 clinic for a cystic fibrosis center for the
7 past four years, since 2015?
8    A.   So I'm the associate program
9 director for our adult cystic fibrosis
10 program at Johns Hopkins.
11    Q.   I'm sorry, I promoted you.
12    A.   Thank you.  It's very difficult
13 to get promoted at Hopkins, so --
14    Q.   Maybe someday.
15        You've held that position since
16 2015?
17    A.   Where are you referring --
18 where are we looking now?
19    Q.   Page 2.
20    A.   Page 2.
21    Q.   I'm sorry, the first page.
22    A.   First page.
23    Q.   It says, "2015 to present,
24 associate program director, Adult Cystic
25 Fibrosis Center."

Page 57

1    A.   2015, yes, that's correct.
2    Q.   So for four years you've been
3 an associate professor.  For four years
4 you've been an associate program director for
5 the Cystic Fibrosis Clinic.
6        What is cystic fibrosis?
7    A.   Cystic fibrosis is a genetic
8 disease that -- some people are born with it,
9 and it leads to an abnormal chloride channel
10 in epithelial-lined cells -- in
11 epithelial-lined organs in the body.  In the
12 lungs it leads to a buildup of secretions and
13 progressive lung disease that oftentimes
14 leads to death or lung transplantation.
15        It leads to sinus disease.  It
16 leads to liver disease.  It leads to problems
17 in the gastrointestinal tract.  It leads to
18 infertility in men.  It leads to women
19 oftentimes having difficulties getting
20 pregnant.
21        And, unfortunately, there is no
22 cure for it.
23    Q.   Is it cancer?
24    A.   No.
25        (Merlo Exhibit 5 marked for

15 (Pages 54 to 57)

Christian Merlo, M.D., MPH

Page 58

1     identification.)
2     QUESTIONS BY MR. TISI:
3         Q.    Okay.  If I could show you
4     Exhibit Number 5, which is the web page from
5     the Adult Clinic for the Cystic Fibrosis
6     Center.
7         A.    I look much younger there.
8         Q.    We all look younger, Doctor, at
9     different times.
10        This is your web page from the
11    Johns Hopkins Adult Clinic for Cystic
12    Fibrosis?
13        A.    It's a web page from Hopkins.
14    I don't know whose web page it is.  I didn't
15    make it.
16        Q.    And it lists you and it -- an
17    associate professor of medicine and
18    epidemiology, correct?  Right under your
19    name?
20        A.    Where are you referring to?
21        Q.    Right under your name.
22        A.    I see.
23        Associate professor of medicine
24    and epidemiology, yes.
25        Q.    And I will talk about the

Page 59

1     epidemiology portion of it, but right now let
2     me ask you this:  The research interests
3     listed here are outcomes of adults with
4     cystic fibrosis infected with multiple
5     antibiotic-resistant pneumonias -- and I
6     don't even know how to pronounce that last
7     word.
8         Could you tell me?
9         A.    Pseudomonas aeruginosa.
10        Q.    Okay.  Diagnosis of management
11    of pulmonary arterial venous malformations,
12    correct?
13        A.    I do see that.
14        Q.    Are there areas of your
15    research interests?
16        A.    Those are things that I've been
17    interested in in research, among other
18    things.  I don't know who put this together
19    or where they got those things, so -- but
20    that's part of my research interests, sure.
21        Q.    Your clinical interests, at
22    least as described by your colleagues at
23    Johns Hopkins, are cystic fibrosis and lung
24    transplantation, correct?
25        MS. MILLER:  Objection.

Page 60

1         THE WITNESS:  On this website,
2     it's listed that my clinical interests
3     are cystic fibrosis and lung
4     transplantation.
5         But again, I have no idea who
6     put this together.  I don't know if
7     they were my colleagues or they're --
8     some random person at Hopkins did
9     this.
10    QUESTIONS BY MR. TISI:
11        Q.    Okay.  Did you ever ask to take
12    it down?
13        A.    No.
14        Q.    Okay.  Would you ever tell
15    somebody, "let's put in my clinical interests
16    here treatment of ovarian cancer"?
17        MS. MILLER:  Objection.
18        THE WITNESS:  You know, there
19    are lots of websites out there, and if
20    I spent my time just looking at
21    websites, I wouldn't be able to get
22    anything done.
23        So Hopkins has a lot of web
24    presence, and we oftentimes don't know
25    what goes up there.

Page 61

1     QUESTIONS BY MR. TISI:
2         Q.    I'll just start:  Now that
3     you've seen it, would you go back to your
4     colleagues and say, "You know something, I'm
5     an expert in ovarian cancer; you need to list
6     that"?
7         MS. MILLER:  Objection.
8         MR. LOCKE:  Objection.
9         THE WITNESS:  No.
10    QUESTIONS BY MR. TISI:
11        Q.    Okay.
12        A.    Not on a website.
13        Q.    Now let's talk a bit about your
14    appointment as associate professor of
15    medicine and epidemiology at the Johns
16    Hopkins School of Public Health.
17        You held that position as well,
18    right?
19        A.    Can you say that one more time?
20        Q.    Yeah.
21        Do you hold -- are you -- have
22    you been appointed as associate professor of
23    medicine and epidemiology at the Johns
24    Hopkins School of Public Health?
25        A.    So I'm appointed an associate

16 (Pages 58 to 61)

Christian Merlo, M.D., MPH

Page 62

1  professor of epidemiology at the Johns
2  Hopkins Bloomberg School of Public Health.
3      Q.   Now, would you agree that your
4  primary appointment, in terms of the time you
5  spend, is in the pulmonary and critical care
6  area as opposed to the School of Public
7  Health?
8          MS. MILLER:  Objection.
9          THE WITNESS:  So it depends.
10  It depends on the time of year.  It
11  depends on year to year.  There may be
12  more -- there may be some years where
13  I spend much more time over at the
14  School of Public Health in
15  collaborating with the epidemiologists
16  over there.  There may be years or
17  months where I spend more time in the
18  hospital.  There's no way for me to
19  really parse it out.
20  QUESTIONS BY MR. TISI:
21      Q.   If you were to -- if you were
22  to -- let's take a year, but we could take
23  four years you've been associate professor.
24  Let's do the big picture first.
25          Over the four years you have

Page 63

1  been at Hopkins, and you had to give me an
2  estimate of the time you spend over at the
3  Bloomberg School of Public Health as opposed
4  to at the pulmonary and critical care
5  medicine or the cystic fibrosis clinic,
6  basically the Bloomberg School of Public
7  Health and everything else, how would you
8  divide the time over the past four years?
9          MR. LOCKE:  Objection.
10         THE WITNESS:  I think it's
11  impossible to divide it because I may
12  go to clinic on, say, Wednesday --
13  Thursday and see transplant patients
14  and see cystic fibrosis patients, but
15  then Friday I'll spend working on a
16  research project with one of my
17  fellows where we have some of the
18  epidemiologists and analysts helping
19  us with our analysis and study
20  designs.
21          There may be times when I'm
22  seeing a patient in clinic, and then I
23  call one of my colleagues over at the
24  School of Public Health because I'm
25  going to say I'm going to get a sample

Page 64

1  for you, this and that.
2          So there's no way for me to
3  parse out whether it's 20/80, 80/20,
4  50/50.  It's all related.
5  QUESTIONS BY MR. TISI:
6      Q.   Do you have an office over at
7  the School of Public Health?
8      A.   I don't have a physical space
9  over at the School of Public Health.
10     Q.   Okay.
11     A.   I do have -- I do have lab
12  meetings that are located over at the School
13  of Public Health or in other epidemiologic
14  areas that are outside the School of
15  Medicine.
16     Q.   Now, there are professors and
17  assistant professors who work only in the
18  Bloomberg School of Public Health, correct?
19     A.   There are faculty that are only
20  appointed -- their only appointment is within
21  the School of Public Health, that is correct.
22     Q.   And they spend all their
23  professional time in that school -- in the
24  School of Public Health?
25     A.   Not necessarily.

Page 65

1      Q.   Okay.
2      A.   Because Hopkins is a very
3  collaborative place, and even though a
4  faculty member may not have a primary
5  appointment within a school, that doesn't
6  necessarily mean that that person would spend
7  his or her time only in one specific
8  building.
9      Q.   Now --
10     A.   It's a very fluid place.
11     Q.   Okay.  But there are full
12  professors at the Bloomberg School of Public
13  Health, correct?
14     A.   There are full professors at
15  the Johns Hopkins Bloomberg School of Public
16  Health.
17     Q.   And there are full associate
18  professors at -- full-time associate
19  professors at the Bloomberg School of Public
20  Health?
21     A.   There are full-time associate
22  professors at the Bloomberg School of Public
23  Health.
24          (Merlo Exhibit 6 marked for
25  identification.)

17 (Pages 62 to 65)

Christian Merlo, M.D., MPH

Page 66

1  QUESTIONS BY MR. TISI:
2      Q.   I'm going to provide you as
3  Exhibit Number 6 the faculty directory at the
4  Bloomberg School of -- the epidemiology
5  department at the Bloomberg School of Public
6  Health.
7          MS. MILLER:  Are you providing
8  it to the rest of us or just to him?
9          MR. TISI:  I apologize,
10  Counsel.  I didn't do it quick enough
11  for you.
12          MS. MILLER:  Thank you.
13          MR. TISI:  Actually, may I have
14  one copy back?
15          MS. MILLER:  Totally.
16          MR. TISI:  Thank you.
17          MS. MILLER:  Susan and I can
18  share.
19  QUESTIONS BY MR. TISI:
20      Q.   I'll represent to you, Doctor,
21  that this is the faculty directory of the
22  epidemiology department, Bloomberg School of
23  Public Health.  It was taken off the website
24  before your deposition was moved last week,
25  so April 3rd of 2019.

Page 67

1          Do you see that?
2      A.   I do.
3          MR. LOCKE:  Objection.
4  QUESTIONS BY MR. TISI:
5      Q.   And it lists full-time faculty.
6          Do you see that?
7      A.   I don't --
8      Q.   See on the top -- top right
9  here, full time?
10      A.   I do see that.
11      Q.   And if you look through here --
12  first of all, actually on the front page is a
13  gentleman by the name of Leon Gordis.
14          Who is Dr. Gordis?
15      A.   Leon Gordis was an
16  epidemiologist who -- when I took
17  Epidemiology I at the School of Public
18  Health, he taught the course.
19      Q.   And he is -- he wrote a
20  textbook on epidemiology, correct?
21          MS. MILLER:  Objection.
22          THE WITNESS:  I know of a
23  textbook that he wrote.  He may have
24  written multiple, but I know of one.
25

Page 68

1  QUESTIONS BY MR. TISI:
2      Q.   And it's used at Hopkins,
3  right?
4      A.   Dr. Gordis' textbook, when I
5  took the course, was used at Hopkins.
6          I'm not sure what textbook is
7  used for that specific class today.
8      Q.   And do you know a Dr. -- and I
9  can't pronounce his name -- Moyses Szklo?
10      A.   Yeah, and I -- I'm not sure how
11  to pronounce his last -- his last name
12  either.
13      Q.   He's a full professor -- he's a
14  full professor of epidemiology, correct?
15      A.   Moyses Szklo.
16          Do I know him?  No.  I know of
17  him.
18      Q.   Do you know that he took over
19  the editing of the book when -- on
20  epidemiology when Dr. Gordis passed?
21      A.   I don't know that.
22      Q.   Okay.  Both of those
23  epidemiologists I mentioned, Dr. Szklo and
24  Dr. Gordis, were full-time professors at
25  the -- or in Dr. Szklo's case still is a

Page 69

1  full-time professor at the Bloomberg School
2  of Public Health, correct?
3      A.   It says right here that he's a
4  full-time professor.
5      Q.   Have you spoke to Dr. Szklo?
6          MS. MILLER:  Objection.
7          THE WITNESS:  This Dr. Szklo?
8  Yeah.
9  QUESTIONS BY MR. TISI:
10      Q.   Szklo, is that how you
11  pronounce it?
12      A.   I think so.
13      Q.   Okay.
14      A.   I'm not sure.  Again, I know of
15  him, and I don't think I've ever met him.
16          Hopkins is a big place.
17      Q.   Now, I've -- it's also
18  collaborative, right?
19      A.   It is.
20      Q.   You told me it's very
21  collaborative.
22      A.   It is.  But it's a very big
23  place.
24      Q.   Understood.
25          But that's a department that

18 (Pages 66 to 69)

Christian Merlo, M.D., MPH

Page 70

1   you've -- I mean, is there anything that
2   would prevent you from speaking to Dr. Szklo?
3        MS. MILLER:  Objection.
4        THE WITNESS:  If I had a reason
5   to.  But there are many people on here
6   that I actually have collaborated
7   with, so --
8   QUESTIONS BY MR. TISI:
9        Q.   Okay.
10       A.   In particular, Dr. Kirk right
11  here, I think he's on many of my articles.
12  So, you know, it just depends.
13       If there was something specific
14  that I thought that we could work on or I had
15  a question, I'd just e-mail or call him right
16  up and go over there.
17       Q.   Good to know.  We'll talk about
18  that.
19       (Merlo Exhibit 7 marked for
20  identification.)
21  QUESTIONS BY MR. TISI:
22       Q.   I showed you Exhibit 4, which
23  was your personal web page from Johns Hopkins
24  pulmonary critical care department.
25       Now let me show you the web

Page 71

1   page from the Johns Hopkins department of
2   epidemiology, which I'd like to have marked
3   as Exhibit Number 7.
4        Do you see that?
5        A.   I see a faculty directory for
6   Johns Hopkins Bloomberg School of Public
7   Health.
8        Q.   All right.  And underneath it
9   says, "department affiliation."  It says,
10  "school of medicine, primary" and
11  "epidemiology, joint."
12       Do you see that?
13       A.   I do.
14       Q.   What does it mean to be
15  primary, and what does it mean to be joint?
16       A.   I actually have no idea.  I
17  know that my first appointment at Johns
18  Hopkins was with the School of Medicine, and
19  then because I was teaching courses over at
20  the School of Public Health and collaborating
21  with some of the investigators over there, we
22  talked about another appointment, which I
23  guess would be called a joint appointment.
24       Q.   Okay.  It says here, "View
25  current courses."

Page 72

1        Do you see that?
2        A.   I do.
3        Q.   And if you click on that, on
4   the computer, you get the second page of this
5   document, which is a course catalog.
6        Do you see that?
7        A.   I do.
8        Q.   And it says, "No results."
9        A.   Okay.
10       Q.   Okay.  Do you teach any courses
11  in epidemiology?
12       A.   I do.  I teach two.
13       Q.   Which ones do you teach?
14       A.   I teach a course called the
15  Science of Clinical Investigation and --
16       Q.   And what is -- I'm sorry.
17       A.   And that -- and the specific
18  aspect of that is the design of clinical
19  studies.  We have both an in-person class and
20  an online course.
21       Q.   Okay.  And is any part of that
22  course the discussion of the application of
23  the Bradford Hill framework to answering a
24  question of causation?
25       MS. MILLER:  Objection.

Page 73

1        THE WITNESS:  I don't know that
2        I have a specific slide that would say
3        Bradford -- there may be.  I'd have to
4        look back.  But we certainly do talk
5        about causality.
6   QUESTIONS BY MR. TISI:
7        Q.   And one of the things -- do you
8   have slides that you use in that course?
9        A.   I have slides, and other
10  instructors have slides.
11       Q.   Do you have any objection to
12  producing it to us?
13       MS. MILLER:  I don't think
14       that's his decision whether to object
15       or not.  I think that would be our
16       objection.
17       MR. TISI:  I'm asking whether
18       he has any objection.
19       MS. MILLER:  That's not an
20       appropriate question for the witness.
21       MR. TISI:  I understand.
22       Objection.
23       MS. MILLER:  But if it is
24       appropriate or not --
25       MR. TISI:  Objection.

19 (Pages 70 to 73)

Christian Merlo, M.D., MPH

Page 74

1  Objection.
2        MS. MILLER:  No, I'm going to
3  speak.
4        MR. TISI:  No, you're not.
5        MS. MILLER:  You're talking --
6  Yes, I am.
7        MR. TISI:  No, you're not.
8        MS. MILLER:  Really?  You want
9  to watch?
10        MR. TISI:  Let's call the
11  judge.  Let's go off the record and
12  call the judge.
13        MS. MILLER:  We're going to off
14  the record and call the judge and tell
15  her that you asked the witness if he
16  has any objection to producing a
17  document --
18        MR. TISI:  Yes, does he have
19  personal --
20        MS. MILLER:  -- and won't let
21  me talk about the objection.  That is
22  not an appropriate question.
23        MR. TISI:  Does he have -- does
24  he have any -- do you have any
25  objection --

Page 75

1        MS. MILLER:  That is not an
2  appropriate question.  I'm instructing
3  you not to answer.
4        THE WITNESS:  You can take the
5  course.
6  QUESTIONS BY MR. TISI:
7    Q.   I'd love to take the course,
8  Doctor.
9    A.   Great.
10    Q.   I'd love to learn about the
11  levels of evidence.  But let's --
12        MS. SHARKO:  Should we agree?
13        MS. MILLER:  Yeah.
14  QUESTIONS BY MR. TISI:
15    Q.   Let's -- we're going -- on a
16  break, we're going to call the judge on that
17  question.
18        You said you taught a second
19  course.  What is the second course?
20    A.   So there's an online version
21  and there's an in-person version, and
22  sometimes they're a little bit different;
23  sometimes they're the same.
24    Q.   Okay.  In any of these courses
25  have you ever discussed your opinions on

Page 76

1  talcum powder?
2    A.   No, although I think it would
3  be a very fun exercise during that class.
4    Q.   Okay.  When is the next time
5  you give the class?
6    A.   We give the in-person version
7  in the fall, and we give the online version
8  usually in the wintertime.
9    Q.   Have you ever taught strategies
10  for investigating the causes of cancer?
11    A.   Can you ask that again?
12        MS. MILLER:  Objection.
13  QUESTIONS BY MR. TISI:
14    Q.   Yes.
15        Have you ever taught any
16  strategies for investigating the causes of
17  cancer?
18        MS. MILLER:  Same objection.
19        THE WITNESS:  So I would have
20  to say that in certain -- now, for
21  instance, in this -- in this
22  investigation looking at malignancies
23  after a transplant that we did, yeah,
24  certainly we talked about aspects of
25  how to evaluate the potential

Page 77

1  exposure/outcome relationship.
2  QUESTIONS BY MR. TISI:
3    Q.   What article is that, so I can
4  look it up?
5    A.   I'm trying to find the number
6  here.  65.
7    Q.   Thank you.
8        What is the title of the
9  article?  I'm sorry.
10    A.   "Risk Factors for De Novo
11  Malignancy Following Lung Transplantation."
12    Q.   Okay.  Do you know whether or
13  not ovarian cancer -- there's an association
14  between lung transplantation and ovarian
15  cancer?
16        MS. MILLER:  Objection.
17        MS. SHARKO:  Could you keep
18  your voice up, please, Mr. Tisi?
19        MR. TISI:  Sure.  You know, I'd
20  have to -- that's the first time I've
21  ever heard you say that.
22        MS. SHARKO:  I know.  I'm --
23        MR. TISI:  Well, this witness
24  is actually pretty good in answering
25  questions, so I appreciate that so

Christian Merlo, M.D., MPH

Page 78

1  far.
2      THE WITNESS:  I would have to
3  specifically look back at that
4  article.  I don't specifically recall.
5  QUESTIONS BY MR. TISI:
6      Q.   Okay.  Now, could you go to
7  Appendice C of your report?  Your report
8  which I believe is Exhibit Number 3.
9      It's the list of cases that you
10 have testified to over the past four years.
11     A.   Okay.
12     Q.   And that's exhibit -- and
13 that's Exhibit 3 -- and that's Exhibit 3,
14 correct?
15     A.   Yes, correct.
16     Q.   I want to have -- I believe
17 counsel provided us with a supplemental
18 exhibit to that.  I'll make it 3B because I
19 think we have a 3.
20         (Merlo Exhibit 3B marked for
21 identification.)
22         MS. MILLER:  You're talking
23 about the fact that we didn't know
24 what court one of the cases was in or
25 something.

Page 79

1          MR. TISI:  Honestly, I don't
2  know.  I don't have any idea.
3          MS. MILLER:  He's talking about
4  this.
5          MR. TISI:  Okay.  This is just
6  a clerical thing, Doctor.
7          Here's -- provided to us.  It
8  was a supplement.  I'm not even going
9  to spend any time with it.  It's just
10 a housekeeping thing.
11         MS. MILLER:  Yeah, I don't
12 think Dr. Merlo was involved in that.
13         MR. TISI:  Okay.
14 QUESTIONS BY MR. TISI:
15     Q.   Okay.  So you've given
16 testimony in the past four years 20 times?
17     A.   That seems about -- I mean, I
18 don't know if it's exactly 20, but --
19 whatever --
20     Q.   Well, I've counted them up.
21 Five times in 2015; three times in 2016; five
22 times in 2017, six times in 2018.
23     Does that -- does that look
24 about right to you?
25     A.   It looks about right.

Page 80

1      Q.   Okay.  Are there times that
2  you've consulted on legal cases but not been
3  an expert?
4          MS. MILLER:  Objection.
5          THE WITNESS:  Well, being asked
6  to consult on a case, I've been
7  considered an expert.  There have been
8  cases that I've turned down because I
9  felt like my opinion -- or I felt like
10 there wasn't -- there wasn't something
11 that I could support or there wasn't
12 something that was -- something that I
13 could provide an opinion about.
14 QUESTIONS BY MR. TISI:
15     Q.   Could you give me an estimate,
16 if you would -- I'll talk about your work on
17 behalf of Johnson & Johnson in this case, but
18 putting that aside for a moment, on the legal
19 matters in which you have been either
20 identified as an expert or consulted,
21 approximately how much have you made the past
22 year, money?
23     A.   Well, first off, I would like
24 to clarify that I'm not working on behalf of
25 Johnson & Johnson.

Page 81

1          And I would have to look at my
2  tax statement because I don't recall.
3      Q.   Was it more than $10,000?
4      A.   Probably.
5      Q.   More than 20?
6      A.   Probably.
7      Q.   More than 30?
8      A.   Probably was more than 30.
9      Q.   More than 40?
10     A.   Probably.
11     Q.   More than 50?
12     A.   Probably.
13     Q.   More than 60?
14     A.   In the last year, probably,
15 yes.
16     Q.   More than 70?
17     A.   Maybe.
18     Q.   Okay.  What about the year
19 prior?
20     A.   I don't recall.
21     Q.   Okay.  The prior -- last year
22 you had six times in 2018.  2017 you had five
23 times.
24     Would it be approximately the
25 same?

21 (Pages 78 to 81)

Christian Merlo, M.D., MPH

Page 82

1          MS. MILLER: Objection. He
2     said he doesn't remember.
3          MR. TISI: I can -- I can ask
4     these questions.
5          THE WITNESS: Again, I'd
6     probably have to look at my tax
7     records. I'd be just guessing.
8     QUESTIONS BY MR. TISI:
9          Q.    Would it be more than 10?
10         A.    I'd be guessing.
11         Q.    Okay. Over the past four
12    years, have you been provided -- have you
13    provided expert work in litigation fairly
14    consistently? Is that something that you do?
15         MS. MILLER: Objection.
16         THE WITNESS: It's not
17         something I keep track of. I have
18         been -- I have offered opinions as an
19         expert witness, but I don't keep track
20         of how much or how little.
21    QUESTIONS BY MR. TISI:
22         Q.    Now in this case, in 2019, have
23    you -- in 2019, have you given any
24    depositions -- we're now in April. Have you
25    been identified as an expert or given any

Page 83

1     opinions in 2019 other than in this case?
2          A.    I'd have to look back through
3     my records. I don't remember.
4          Q.    You don't remember giving any
5     depositions or signing any reports over the
6     past three, four months?
7          A.    Again, I'd have to look at my
8     records.
9          Q.    Okay. In this case we have
10    your records, which I'll mark in a minute.
11    Actually, I'll do it right now. Exhibit
12    Number 8, which are the records of --
13    provided to us.
14         (Merlo Exhibit 8 marked for
15         identification.)
16    QUESTIONS BY MR. TISI:
17         Q.    And it shows that you have made
18    in the Johnson & Johnson litigation about
19    $150,000 so far this year?
20         A.    This looks like a bill or an
21    invoice.
22         Q.    One is dated -- one is dated
23    March 1, 2019, and it's -- first date is
24    December 3, 2018, through March 17th, and
25    it's for $116,000?

Page 84

1          A.    I see that, yes.
2          Q.    Is that accurate?
3          A.    This is an invoice. I haven't
4     seen it yet, but --
5          Q.    Did you do any work for
6     Johnson & Johnson before December of 2018?
7          A.    Again, I just would like to
8     clarify. I'm not working for Johnson &
9     Johnson.
10         Q.    Okay. Have you been paid by
11    Johnson & Johnson for your time prior to
12    December of 2018?
13         A.    Not that I recall.
14         Q.    Okay.
15         MS. MILLER: Let us know when
16         it's a good time for a break.
17    QUESTIONS BY MR. TISI:
18         Q.    The next document is an invoice
19    showing that you made an additional $28,995
20    through April 7, 2019; is that correct?
21         MS. MILLER: I'm sorry?
22         THE WITNESS: I'm sorry, could
23         you ask that one more time?
24         MR. TISI: I'm sorry. I'm
25         sorry.

Page 85

1     QUESTIONS BY MR. TISI:
2          Q.    It shows just $5 short of 30 --
3     $29,000 as of March 7, 2019?
4          A.    That's what the invoice shows,
5     yes.
6          Q.    It has a company or LLC here
7     called VeraMedica.
8               What is VeraMedica?
9          A.    VeraMedica is an organization.
10    I'm not sure about the -- any of the
11    specifics there, but it's an organization
12    that I used for administrative purposes to
13    put binders together, to make photocopies, to
14    make -- to schedule meetings, those sort of
15    things.
16         Q.    Are they a scientific
17    consulting company?
18         A.    I have no idea.
19         Q.    Do they provide -- did they
20    provide you any support for the reports that
21    you prepare -- the report you prepared in
22    this case?
23         A.    Other than making a photocopy
24    or scheduling meetings or helping to give me
25    kind of an office away from an office, that's

22 (Pages 82 to 85)

Christian Merlo, M.D., MPH

Page 86

1    the support that they give me.
2        Q.    And if you give me about five,
3    ten minutes, I think we can finish this.
4        MR. TISI:  Is that okay with
5    you, Counsel?
6        MS. MILLER:  Sure.
7        MR. TISI:  Okay.
8    QUESTIONS BY MR. TISI:
9        Q.    Your expert work you charge
10   $530 an hour, and $720 an hour for your
11   testimony?
12       A.    That's correct.
13       Q.    Okay.  Those are -- those are
14   numbers that are -- is there anything built
15   into that number?
16           We had Dr. Diette the other day
17   where a certain portion of his bill went to
18   somebody other than himself, so I'm asking
19   you that question.
20       A.    You know, and I'd have -- I
21   don't actually know, but I'd have to look
22   back or I'd have to talk -- the
23   administrative services for -- that were
24   supported to me by VeraMedica may be built
25   into that.

Page 87

1        MS. MILLER:  I would note that
2    the -- it says 540 on the --
3        MR. TISI:  Okay.
4        MS. MILLER:  -- on here and it
5    says 530 on here, so...
6        THE WITNESS:  And again, I'm
7    not sure of the specifics.
8    QUESTIONS BY MR. TISI:
9        Q.    Okay.  Now, in addition to
10   consulting for litigation purposes like you
11   are here, have you also worked directly for
12   pharmaceutical companies over the past four,
13   five years?
14       A.    I have not worked directly for
15   pharmaceutical companies --
16       Q.    Well, I'm sorry.
17       A.    -- over the past four or five
18   years.
19       Q.    That's a bad question.
20           Have you been provided funding
21   by pharmaceuticals companies like Novartis,
22   for example?
23       A.    So it depends.  And that's a
24   very general question, so you'd have to be
25   very -- even more specific about that.

Page 88

1        Q.    Well, let me show you -- and
2    I'm taking this out of order a little bit.
3    There's a website that I go to sometimes to
4    find this information out.
5           It identifies -- and I'm going
6    to show you...
7        MS. MILLER:  We're up to what
8    number exhibit?
9        MR. TISI:  This is 47.  It's
10   taken out of order because everything
11   is marked.
12       (Merlo Exhibit 47 marked for
13   identification.)
14   QUESTIONS BY MR. TISI:
15       Q.    It lists payments made by
16   pharmaceutical companies to doctors, and I'm
17   just curious as to whether this is accurate
18   or not.
19           Were you paid approximately
20   $44,000 in 2016 --
21       MS. MILLER:  Objection.
22   QUESTIONS BY MR. TISI:
23       Q.    -- by --
24       MS. MILLER:  Sorry, I thought
25   you were done.

Page 89

1    QUESTIONS BY MR. TISI:
2        Q.    -- by, among others, Novartis?
3        MS. MILLER:  Objection.
4        THE WITNESS:  So I'm not really
5    sure what this website is.
6           I do -- I have been involved in
7    think tanks for -- involving other
8    doctors and folks to talk about
9    aspects of disease, and there have
10   been honorariums involved with that.
11          I also give speeches to groups,
12   mainly groups of doctors and nurses
13   and teams that take care of patients
14   with cystic fibrosis.  And those
15   speeches are sometimes sponsored by
16   pharmaceutical companies, so -- and
17   I'm provided an honorarium to give
18   that.
19          So this doesn't surprise me.
20   QUESTIONS BY MR. TISI:
21       Q.    Okay.  So -- and that's what
22   I'm trying to get at here, Doctor.
23          You can call them honorarium.
24   You can call them whatever you want.  You
25   get -- you get a check from the

23 (Pages 86 to 89)

Christian Merlo, M.D., MPH

Page 90

1    pharmaceutical companies for outside -- work
2    outside of your official duties at Johns
3    Hopkins.
4                And this goes from 2013 to
5    2016, correct?
6                MR. LOCKE:  Objection.
7                THE WITNESS:  And I am going to
8         say that they're honorarium because
9         that's what they're called.
10   QUESTIONS BY MR. TISI:
11        Q.   Okay.
12        A.   And I'm asked by sometimes
13   other centers to come, and that -- and
14   that -- to give a speech or a talk to the
15   group, and that talk or speech might be
16   sponsored by a pharmaceutical industry, and
17   that's what this reflects.
18        Q.   Okay.  And so without getting
19   down to the minutiae, this has 44,000,
20   approximately, in 2016, 31,000 in 2015,
21   79,000 in 2014, and 42,000, approximately,
22   more or less, in 2013.
23             Is that about -- is that
24   accurate or in that ballpark?
25        A.   I mean, I'd have to look

Page 91

1    through my records, but that's what the
2    website says.
3         Q.   Okay.  And is that money that
4    you get as an honorarium yours?
5         A.   It is mine, yes.
6         Q.   And did you do it in 2017,
7    2018, and continue into 2019?
8              MS. MILLER:  Objection.  Vague.
9              THE WITNESS:  I'd have to look
10        through my records.  I have done --
11        I've given much less talks in the last
12        few years.
13   QUESTIONS BY MR. TISI:
14        Q.   And on all the products that
15   you speak about or all the companies that
16   you -- they -- would it be fair to say that
17   they are all focused in the pulmonary area;
18   in other words, either involved treatments
19   for pulmonary disease or descriptions of
20   pulmonary disease?  Correct?
21        A.   So there's a lot to that
22   question because you mentioned products, you
23   mentioned descriptions, and I probably should
24   break it down a little bit.
25             The talks are usually given to

Page 92

1    a group that's taking care of patients with
2    advanced lung disease due to cystic fibrosis.
3              And most times the talks are a
4    description about the disease, either to
5    educate the teams or describe how the process
6    of when a kid grows up to be an adult with
7    cystic fibrosis, how do you take care of the
8    transition process.
9              Most of them don't involve a
10   specific therapy for cystic fibrosis.
11   Oftentimes specific therapies are talked
12   about after the talk with the group, but most
13   times it's done for education purposes.
14        Q.   But most of the companies that
15   pay these honorariums actually do produce
16   products used to treat cystic fibrosis and
17   pulmonary disease, correct?
18        A.   Which companies are you
19   referring to?
20        Q.   Gilead, Novartis.
21        A.   Gilead, Novartis do have --
22   well, Novartis not anymore, but --
23        Q.   They did at the time?
24        A.   -- Gilead and Novartis did have
25   products that were used to treat patients

Page 93

1    with cystic fibrosis.
2         Q.   Okay.  So just to wrap this up,
3    and I -- we'll move on to the next topic and
4    take our break.
5              MS. MILLER:  Take our break.
6    QUESTIONS BY MR. TISI:
7         Q.   You have done work in
8    litigation, which we've talked about earlier,
9    and you did speeches and talks for which you
10   received honorarium from pharmaceutical
11   companies.
12             Do you also -- have you also
13   provided consulting services to
14   pharmaceutical companies or the like that are
15   not giving speeches and all that?
16        A.   I mean, I've helped design some
17   of these talks, put together the slides for
18   them, and I have been provided honorariums
19   for that as well.
20             MR. TISI:  Let's take our
21        break.
22             VIDEOGRAPHER:  The time is
23        10:23 a.m., and we're going off the
24        record.
25             (Off the record at 10:23 a.m.)

24 (Pages 90 to 93)

Christian Merlo, M.D., MPH

1          VIDEOGRAPHER:  The time is
2    10:42 a.m., and we are back on the
3    record.
4    QUESTIONS BY MR. TISI:
5          Q.    Just a couple of questions real
6    briefly before I move on to your report.
7                You received your master's in
8    public health from Johns Hopkins School of
9    Public Health in 2003?
10         A.    Yes, I believe so.
11         Q.    And who was your advisor?
12         A.    My advisor in the School of
13   Public Health, or the School of Medicine at
14   that time?
15         Q.    School of Public Health.
16         A.    I believe my advisor may have
17   been Marie Diener Smith, but I don't
18   specifically recall.
19         Q.    Did you do a Capstone?
20         A.    At the time the Capstone
21   project was not part of the master's in
22   public health.
23         Q.    Okay.  Did you have to do any
24   kind of final project to get your MPH?
25         A.    We had a final project

1    assignment with Biostatistics IV where we had
2    to design a clinical study, do the analysis
3    and write up a manuscript, which was
4    eventually published, but that was my final
5    project.
6          Q.    And was it a pulmonary study?
7          A.    It was a study looking at risk
8    factors for resistant organisms in cystic
9    fibrosis.
10         Q.    Okay.  So it was a pulmonary
11   cystic fibrosis study?
12         A.    It was a cystic fibrosis study.
13         Q.    Okay.
14         A.    An epidemiologic cystic
15   fibrosis study.
16         Q.    Are you a Capstone advisor for
17   any students in the School of Public Health?
18         A.    I have been in the past.  I'm
19   not this year.
20         Q.    Okay.  How does the School of
21   Public Health assign students to advisors for
22   their Capstone project?
23                I mean, do they look at
24   qualifications, et cetera, areas of interest,
25   research?

1          A.    I don't know specifically.  I
2    don't know if advisors are assigned or
3    advisors are recommended and then the student
4    decides.  I just don't know.
5          Q.    Have you ever had a student who
6    did a Capstone project with you that was not
7    pulmonary in nature?
8          A.    I've had students who have
9    worked with me that have been outside of
10   pulmonary and critical care medicine.
11         Q.    Okay.
12         A.    Two have been surgeons who have
13   worked on -- that we wound up working on many
14   projects together.
15         Q.    Okay.  All right.  So when was
16   the first time you met with -- who was your
17   primary contact for the ovarian cancer report
18   that we've marked as Exhibit 3?  Which of the
19   lawyers?
20                Who first contacted you for
21   this project?
22         A.    Ms. Miller.
23         Q.    Okay.  And when was that done?
24   When was the first contact you had with
25   Ms. Miller?

1          A.    2018.
2          Q.    Okay.  When?
3          A.    Late 2018.  I don't
4    specifically recall.
5          Q.    The first billing record that
6    we had when we looked at that exhibit, I
7    think Exhibit 8, had a December 2018 date.
8                Is that about right?
9          A.    It would have been before that.
10         Q.    Okay.  Was December 2018 the
11   first actual work you did on the project?
12         A.    What do you mean by "work"?
13         Q.    It's the first time you billed,
14   so why would that be the -- I mean, did you
15   do work for which you did not bill?
16         A.    It -- just if you could be a
17   little bit more specific about what you mean
18   by "work."
19         Q.    I can't go by anything any --
20   for more than what you billed.
21                How long between the first
22   contact and the first work you did on the
23   case that would start the process of
24   resulting in the report that was issued in
25   February?

25  (Pages 94 to 97)

Christian Merlo, M.D., MPH

Page 98

1      MS. MILLER: Objection.
2      THE WITNESS: I don't
3  specifically recall.
4  QUESTIONS BY MR. TISI:
5      Q.   Okay.
6      MS. MILLER: Don't forget to
7  give me ten seconds before you answer.
8      THE WITNESS: I'm sorry.
9  QUESTIONS BY MR. TISI:
10     Q.   Prior to -- now, we had
11 indicated that you did some litigation work.
12 You did some consulting work for which you
13 received honoraria.
14     Had you ever worked -- had you
15 ever had -- done litigation work for
16 Johnson & Johnson previously?
17     A.   Well, again, I'd have to
18 clarify. I'm not doing litigation work for
19 Johnson & Johnson.
20     Q.   How would you -- so we don't
21 have to dance around that issue, how would
22 you --
23     A.   But you keep asking it, so --
24     MR. LOCKE: Objection.
25

Page 99

1  QUESTIONS BY MR. TISI:
2      Q.   Well, okay. So you tell me --
3  you tell me how I would phrase it so we don't
4  have to keep going back and forth on that.
5      MS. MILLER: Objection.
6  QUESTIONS BY MR. TISI:
7      Q.   What makes you more
8  comfortable?
9      Have you ever done consulting
10 work for Johnson & Johnson in a litigation
11 context before?
12     A.   Again, the premise there is
13 that I'm doing something for someone, and I'm
14 not doing something for anyone.
15     Q.   Are you being paid by them?
16     A.   I don't know who I'm being paid
17 by.
18     Q.   You don't know who -- you don't
19 know that the lawyers here are paying you for
20 your time here today?
21     A.   Again, I don't know who is
22 paying me. I know I'm getting paid, but I
23 don't know who is paying me.
24     Q.   Okay. You're being paid in
25 this litigation. You're not being paid by

Page 100

1  me, right?
2      So you're being paid by the
3  folks sitting next to you, and where it comes
4  from, we'll leave that -- we'll leave that to
5  other people to decide.
6      The question is: You are being
7  paid to be here today?
8      A.   I will submit a bill, and I
9  will be paid for being here today.
10     Q.   Have you ever had any similar
11 circumstances in cases involving Johnson &
12 Johnson before?
13     A.   I don't believe that I have --
14 I don't believe so.
15     Q.   Okay. Has Johnson & Johnson,
16 putting litigation aside, ever hired you or
17 paid you honoraria to actually speak on a
18 topic?
19     A.   I've never been paid an
20 honorarium or have been hired by Johnson &
21 Johnson.
22     Q.   Okay. Have they ever consulted
23 you in any way for any scientific reason
24 outside of litigation?
25     A.   Johnson & Johnson has not

Page 101

1  consulted me outside of this litigation.
2      Q.   Now, Merlo -- you know that
3  this report was filed in the context of
4  litigation, correct, Exhibit 3? It's got a
5  legal caption on it.
6      A.   Exhibit 3, yes.
7      Q.   Okay. And it was requested as
8  a result -- it was -- I'm sorry, it was
9  generated as a result of a request from the
10 lawyers for J&J?
11     A.   I was asked -- I'll just read
12 this right here. I was asked to address
13 fundamental tenets of epidemiology, to review
14 epidemiology related to the potential
15 association between perineal talc use and
16 ovarian cancer, to review plaintiffs'
17 epidemiologic expert reports, and to offer my
18 opinions on their methodologies.
19     Q.   Who asked you to do that?
20     A.   I was asked by Ms. Miller.
21     Q.   Okay. And when you drafted --
22 when you did that, you understood that your
23 report was being submitted in the context of
24 this litigation, correct?
25     A.   I understood that I would put

26 (Pages 98 to 101)

Christian Merlo, M.D., MPH

Page 102

1  together a report and that would likely be
2  submitted.
3      Q.   In litigation?
4      A.   In litigation.
5      Q.   Okay.  So this report that you
6  have in front of you, Exhibit Number 6, was
7  not generated in your normal course of your
8  professional work as a professor or -- excuse
9  me, as an assistant professor at Johns
10  Hopkins, either in the School of Public
11  Health or the department of medicine?
12          MS. MILLER:  Objection.
13          THE WITNESS:  Can you ask that
14      again?
15  QUESTIONS BY MR. TISI:
16      Q.   Yes.
17          So the report that you have in
18  front of you, Exhibit Number 3, was
19  generated -- was not generated in the normal
20  course of your professional work as a
21  professor or researcher at either the School
22  of Medicine or the School of Public Health at
23  Johns Hopkins?
24          MS. MILLER:  Objection.
25          THE WITNESS:  So I'd say it

Page 103

1  depends.  Because if we look at it as
2  a report in itself and how I approach
3  this subject, that would be very
4  similar to how I approach a lot of
5  things in my -- in my career.  So --
6  and in my professional duties within
7  the School of Medicine and
8  epidemiology.
9          So is this any different?  No.
10  QUESTIONS BY MR. TISI:
11      Q.   I didn't ask you that question,
12  Doctor.  With all due respect, I think you
13  need to listen to my question.
14          My question is:  Was this
15  particular report on talcum powder product
16  and ovarian cancer done in connection with
17  your duties and responsibilities at Johns
18  Hopkins?
19          MS. MILLER:  That wasn't your
20      question.
21          MR. LOCKE:  Objection.
22          MS. MILLER:  That's a different
23      question.  I just want to make that
24      clear.  And I'm objecting to this
25      question as well.

Page 104

1          THE WITNESS:  Can you ask that
2      again?
3  QUESTIONS BY MR. TISI:
4      Q.   Yes.
5          Would you have done this report
6  had Ms. Miller not asked you to do it?
7      A.   I would not have specifically
8  put this together.
9      Q.   Okay.
10      A.   Had not been asked to provide
11  my opinions on this topic.
12      Q.   Right.
13          And before Ms. Miller reached
14  out to you in December of 2018, some five
15  months ago, you had never expressed an
16  opinion one way or another about the risk of
17  ovarian cancer associated with talcum powder
18  products, have you?
19          MR. LOCKE:  Objection.
20          MS. MILLER:  Objection.
21          THE WITNESS:  Can you ask that
22      one more time?
23  QUESTIONS BY MR. TISI:
24      Q.   Yes.
25      A.   I'm sorry, I'm just getting --

Page 105

1  when I hear objections, I just --
2      Q.   Yeah, they're intended to be
3  that way.
4      A.   No, but it's -- so I need to
5  think about the question.
6          MS. MILLER:  They're not
7      intended to be that way.  That was not
8      a necessary comment.
9  QUESTIONS BY MR. TISI:
10      Q.   Let me ask you this question.
11          Before your report in February,
12  Exhibit Number 3, had you ever expressed the
13  opinion on page 46 of your report that says,
14  "When analyzed in a methodologic manner, the
15  body of medical literature simply does not
16  support the conclusion that perineal exposure
17  to talc causes ovarian cancer"?
18          Have you ever said that
19  statement or any statement similar to that
20  prior to your report being filed on
21  February 25, 2019?
22      A.   I had not said that prior to
23  this because I had not reviewed all of this
24  literature prior to that.
25      Q.   Okay.  So all the literature

27 (Pages 102 to 105)

Christian Merlo, M.D., MPH

Page 106

1   review that you did in this case was as a
2   result of being retained in this case?
3        A.   The literature review that I
4   did in this case was because I was asked to
5   provide an opinion on that.
6        Q.   Prior to Ms. Miller contacting
7   you, had you ever read any of the articles
8   that you read in connection with this report
9   on talc and ovarian cancer?
10       A.   Likely no.
11       Q.   Okay.  Now, you mentioned, if
12  you go to page 1 of your report, the scope of
13  your report -- as I count it, you have -- you
14  did three things.
15            You were asked to address
16  fundamental tenets of epidemiology, correct?
17       A.   Address fundamental tenets of
18  epidemiology.
19       Q.   Okay.  Number 2, review the
20  epidemiology of the potential association
21  between perineal talc use and ovarian cancer,
22  correct?
23       A.   To review the epidemiology
24  related to the potential association between
25  perineal talc use and ovarian cancer,

Page 107

1   correct.
2        Q.   And the third assignment was to
3   review plaintiffs' reports and
4   offer your opinion on their methodologies?
5        A.   So those are two different
6   things.  To review plaintiffs' epidemiology
7   expert reports and then to offer my opinions
8   on their methodologies would be a separate
9   thing.
10       Q.   Okay.  All right.  And to be
11  clear, the scope -- the things that you did
12  for this report as indicated on page 1, the
13  four items we've talked about, are things you
14  never did before December of 2019 {sic}?
15            MS. MILLER:  Objection.
16  QUESTIONS BY MR. TISI:
17       Q.   2018?
18            MS. MILLER:  Objection.
19            THE WITNESS:  Well, not
20       necessarily.
21       I think if we --
22  QUESTIONS BY MR. TISI:
23       Q.   Actually, let me rephrase the
24  question.
25            You have --

Page 108

1            MS. MILLER:  I think if you let
2   him finish --
3            MR. TISI:  I said I'm
4       withdrawing the question.  Okay?
5   QUESTIONS BY MR. TISI:
6        Q.   I assume that you have reviewed
7   fundamental tenets of epidemiology prior to
8   December of 2018?
9            MS. MILLER:  Objection.
10           THE WITNESS:  I have reviewed
11      and I teach fundamental tenets of
12      epidemiology.
13  QUESTIONS BY MR. TISI:
14       Q.   Okay.  Putting that aside,
15  prior to December of 2018, have you ever
16  reviewed the epidemiology related to the
17  potential exposure between perineal talc use
18  and ovarian cancer?
19       A.   The potential exposure?
20       Q.   Association.
21       A.   I had not reviewed epidemiology
22  related to the potential association between
23  perineal talc use and ovarian cancer.
24       Q.   Before December of 2018?
25       A.   Specifically, it may have been

Page 109

1   November.  I don't remember when we first
2   talked, but --
3        Q.   Let's say the last quarter.
4        A.   -- late 2018.
5        Q.   Okay.  So within the past eight
6   or nine months?
7        A.   Before late 2018?  No, I did --
8   had not reviewed the epidemiology --
9        Q.   Okay.
10       A.   -- related to the potential
11  association between perineal talc exposure
12  and ovarian cancer.
13       Q.   Okay.  And if you go to
14  page 46 -- and we touched on this.  You said
15  your opinion on Issue Number 2, which would
16  be the results of your analysis of the
17  epidemiology related to the potential
18  association between perineal use and ovarian
19  cancer, your opinion was:  When analyzed in a
20  methodologic manner, the body of medical
21  literature simply does not support the
22  conclusion that perineal talc exposure causes
23  ovarian cancer.
24       A.   And we're referring to page 46
25  of --

28 (Pages 106 to 109)

Christian Merlo, M.D., MPH

Page 110

1    Q.   Correct.
2    A.   -- this report?
3         And which line was that?
4    Q.   The last paragraph.
5    A.   "When analyzed in a
6  methodologic manner, the body of medical
7  literature simply does not support the
8  conclusion that perineal exposure to talc
9  causes ovarian cancer," yes.
10        (Merlo Exhibit 9 marked for
11 identification.)
12 QUESTIONS BY MR. TISI:
13   Q.   And I have that conclusion
14 marked as Exhibit Number 9.  Read it and tell
15 me if it's correct.
16   A.   That's correct.
17   Q.   And that's your professional
18 opinion on the issue of causation, correct?
19   A.   That is my professional and
20 epidemiologic opinion on causation.
21   Q.   Okay.
22   A.   Correct.
23   Q.   Did you -- in addition to
24 providing basic epidemiologic principles, did
25 you apply your professional and epidemiologic

Page 111

1  judgment to answer that question?
2    A.   I don't know what you mean by
3  "epidemiologic judgment."
4    Q.   Well, this -- epidemiology
5  isn't the kind science where you just plug
6  numbers in and you come out with an answer,
7  right?
8         MS. MILLER:  Objection.
9         THE WITNESS:  Well,
10   epidemiology can be very objective and
11   not subjective, and oftentimes there
12   are numbers involved in epidemiology.
13 QUESTIONS BY MR. TISI:
14   Q.   Clearly there are numbers --
15 clearly there are numbers involved.
16        But an expert in epidemiology
17 also has to use their professional judgment
18 interpreting the numbers, correct?
19        MS. MILLER:  Objection.
20        THE WITNESS:  I don't know what
21   you mean by "interpreting the
22   numbers."
23 QUESTIONS BY MR. TISI:
24   Q.   Well, oftentimes experts
25 disagree about what an epidemiology study or

Page 112

1  a group of epidemiology studies mean, true?
2    A.   Can you say that again?
3    Q.   Yeah.
4         Oftentimes experts in
5  epidemiology disagree about what an
6  epidemiology study actually means or a group
7  of epidemiology studies actually means?
8    A.   There may be instances where
9  epidemiologists may disagree on methodologies
10 and how a study was performed.
11        The interpretation of results
12 is usually something that is not disagreed
13 upon.  It's usually the methodology that
14 leads to the disagreement.
15   Q.   Well, for an individual study,
16 the results are what the results are, true?
17   A.   For an individual study, the
18 results are usually what the results are
19 based on -- but those are -- with the caveat
20 that there are a lot of aspects that go into
21 those results:  the study design, the study
22 type, whether or not bias and confounding was
23 accounted for before or after the analysis,
24 was the analysis appropriate.
25        So those results can't just be

Page 113

1  taken out of context without looking at all
2  the other aspects of the study.
3    Q.   Okay.  And when -- now, putting
4  aside looking at the results of an individual
5  study, when you're looking at a body of
6  literature, all right, multiple epidemiology
7  studies, multiple biologic studies, and
8  trying to interpret a body of literature, do
9  you use professional judgment?
10        MS. MILLER:  Objection.
11        THE WITNESS:  Again, I don't --
12   I don't know what "professional
13   judgment" means.  I don't understand
14   what you mean by that, so --
15 QUESTIONS BY MR. TISI:
16   Q.   Do you know if that's a phrase
17 that's used in textbooks that are used at
18 Johns Hopkins, that you teach students?
19        MS. MILLER:  Objection.
20        THE WITNESS:  I mean, I have no
21   idea.  There's lots of textbooks.  You
22   would have to point me to one that
23   you're referring to.
24 QUESTIONS BY MR. TISI:
25   Q.   We will do that.

29 (Pages 110 to 113)

Christian Merlo, M.D., MPH

Page 114

1    Now, apart from your own
2  causation opinion, which we've marked as
3  Exhibit Number 9, I think, right there -- is
4  that number 9?
5      A.   That's number 9.
6      Q.   You also, as part of your
7  assignment, offered opinions on the
8  plaintiffs' experts' reports, true?
9      A.   That's correct.
10     Q.   Okay.  And in fact, if you go
11  to page 46 of your report, you devoted the
12  vast majority of your conclusion paragraphs
13  to discussing the methodologies that are used
14  by plaintiffs' experts in reaching their
15  conclusions.
16         Do you see that?
17     A.   Yes.
18     Q.   Okay.  For example, you say in
19  paragraph 2, "The methodologies used by
20  plaintiffs' experts ignore fundamental
21  principles of epidemiology.  In particular,
22  plaintiffs' experts ignore the hierarchy of
23  evidence evaluating studies and rely on study
24  designs that are inherently susceptible to
25  bias.  Specifically plaintiffs' experts pay

Page 115

1  particular attention to criticizing cohort
2  studies, with little acknowledgement to the
3  limitations of case-control studies that find
4  weak associations."
5         Did I read that correctly?
6      A.   That's correct.
7      Q.   Okay.  So you think that there
8  is a hierarchy of evidence that is generally
9  accepted?
10         MS. MILLER:  Objection.
11         THE WITNESS:  It's not what I
12  think.  There is a general hierarchy
13  of evidence --
14  QUESTIONS BY MR. TISI:
15     Q.   Okay.
16     A.   -- in the epidemiologic
17  community --
18     Q.   Okay.
19     A.   -- and so there are different
20  levels of evidence based on a study design.
21     Q.   Okay.  And on that -- under
22  that design hierarchy, cohort studies are
23  more reliable than case-control studies, as a
24  general matter?
25         MS. MILLER:  Objection.

Page 116

1         THE WITNESS:  So in --
2         MS. MILLER:  Ten seconds.
3         THE WITNESS:  So in general,
4  the hierarchy of evidence does put
5  certain study designs above others.
6  Meta-analyses are usually put above
7  randomized controlled trials.
8  Randomized controlled trials are
9  usually put above cohort studies.
10  Cohort studies are usually put above
11  case-control studies.  Case-control
12  studies are usually put above case
13  series or cross-sectional studies.
14         But it depends.  It depends on
15  many, many -- it depends on many, many
16  factors, and you can't just take that
17  in itself.
18         A poorly designed randomized
19  controlled trial may be much less
20  informative than a very, very good
21  cohort study.
22  QUESTIONS BY MR. TISI:
23     Q.   Okay.  Then you say -- a
24  separate criticism.  You say, "Plaintiffs'
25  experts generally agree that even if the

Page 117

1  studies do show an association between talc
2  use and ovarian cancer, have found a relative
3  risk in the range of 1.2 to 1.6, this, by
4  definition, is a weak association."
5         Do you see that?
6      A.   I do, yes.
7      Q.   Okay.  And you're critical of
8  their description of the strength of the
9  association?
10     A.   Relative risk in the range of
11  1.2 to 1.6 is, by definition, a weak
12  association.
13     Q.   Whose definition?
14     A.   I think I have a reference in
15  here.
16     Q.   Yeah, you have a reference to
17  an Australian white paper.
18     A.   And in the epidemiology --
19  epidemiologic community, a relative risk or
20  an odds ratio of less than 2 would be
21  considered a weak association --
22     Q.   Okay.
23     A.   -- and very, very easy --
24  easily -- with the susceptibility to be
25  easily explained away by bias or confounding,

30 (Pages 114 to 117)

Christian Merlo, M.D., MPH

Page 118

1  and that's why it's considered a weak
2  association.
3      Q.    The next thing you say is,
4  "Likewise, plaintiffs' experts demonstrate a
5  dose-response relationship in relying on
6  methodologically flawed studies and
7  statistically insignificant trend lines."
8      A.    That's correct.
9      Q.    Okay.  And then another thing
10  is you say, "They see consistency where the
11  studies are inherently inconsistent."
12      A.    That's correct.
13      Q.    Okay.  So those are the four
14  main criticisms that you have?
15          MS. MILLER:  Objection.
16          THE WITNESS:  That's what it
17  says here, yeah.
18          (Merlo Exhibit 10 marked for
19  identification.)
20  QUESTIONS BY MR. TISI:
21      Q.    Okay.  So I have pulled
22  together -- so it will help us frame our
23  discussion today, I pulled those four, put
24  them on a slide, and I'm going to ask you to
25  look at it and tell me whether you agree that

Page 119

1  those -- I'm sorry.  Can I have that one
2  back?  That's my copy.
3          MS. MILLER:  Yeah.
4          I'm going to object to this
5  exhibit.  I think this pulls four
6  sentences out of a 46-page report.  It
7  says "Merlo allegations," and Merlo's
8  not making allegations.  He's --
9          MR. TISI:  Oh, he's making
10  plenty of allegations, and your
11  expert --
12          MS. SHARKO:  Don't interrupt.
13          MS. MILLER:  Excuse me.
14          MR. TISI:  I'm going to tell
15  you the -- Jessica, we're not going to
16  get into this.  You've been --
17          MS. MILLER:  I'm going to
18  object to this exhibit --
19          MR. TISI:  So just say
20  "objection."
21          MS. MILLER:  -- and I'm going
22  to explain -- no.
23          MR. TISI:  No.  You're not
24  going to.  Objection.
25          MS. MILLER:  I'm going to

Page 120

1  explain on the record my objections to
2  this exhibit.
3          MR. TISI:  Objection to form is
4  the question {sic}.
5          MS. MILLER:  That's -- you
6  can't object to the form of an
7  exhibit.
8          MR. TISI:  Fine.  Objection.
9          MS. MILLER:  Excuse me.  Please
10  let me finish --
11          MR. TISI:  Objection.
12          MS. MILLER:  -- my sentence.
13  You're being really rude to me.
14          MR. TISI:  I'm being -- you
15  know, honestly, you have been so
16  unprofessional with every one of these
17  witnesses, and I have today pulled
18  together all of your objections over
19  the past couple of depositions, I've
20  put them on a spreadsheet, and I will
21  send them to judge -- to Judge Pisano
22  and have him look at whether or not
23  your objections comply with the CMO.
24          MS. SHARKO:  Calm down.
25          MR. TISI:  Okay.  So if we're

Page 121

1  going to -- if we're going to go down
2  this today as we did in the Shih
3  deposition, the Ballman deposition and
4  every other deposition in this case,
5  I'm going to pull them, I'm going to
6  send them to Judge Pisano, and we're
7  going to have a hearing.
8          MS. MILLER:  I'm not going to
9  be intimidated by your threats.
10          MR. TISI:  So let's just --
11  let's just comply with the CMO and say
12  "objection."
13          MS. MILLER:  This is an
14  inappropriate exhibit.
15          MR. TISI:  Fine.  Objection.
16          MR. LOCKE:  I object as well.
17  QUESTIONS BY MR. TISI:
18      Q.    Doctor, are those four
19  criticisms --
20          MS. MILLER:  Excuse me.  Do you
21  have something to say?
22          MR. LOCKE:  Yeah, I object as
23  well for the same bases.
24          MR. TISI:  Okay.
25          MR. LOCKE:  It doesn't even

31 (Pages 118 to 121)

Christian Merlo, M.D., MPH

Page 122

1      quote --
2          MR. TISI:  Tom --
3          MR. LOCKE:  -- what's there.
4          MR. TISI:  Tom, I'm asking
5      him -- I haven't asked a question yet.
6          MS. MILLER:  It doesn't matter
7      whether you've asked the question.
8      We're objecting to the exhibit itself.
9          MR. TISI:  Fine.
10         MS. MILLER:  It's an
11     inappropriate exhibit.
12         MR. TISI:  So just say
13     objection.
14         MS. SHARKO:  I don't think we
15     have to do that.  If you're concerned
16     about the witness hearing what we're
17     saying, he can leave the room.
18         MR. TISI:  I'm happy to leave
19     the room --
20         MS. SHARKO:  This is totally
21     inappropriate, Mr. Tisi, and you know
22     it.
23         MR. TISI:  I can provide him
24     with a plate of spaghetti and ask him
25     questions about it if I want to.

Page 123

1      Okay?  It's not inappropriate.
2          MR. LOCKE:  And it would be a
3      complete waste of time.
4      QUESTIONS BY MR. TISI:
5          Q.   Doctor, let me ask you:  Are
6      these four criticisms that are on that
7      exhibit criticisms that you have of
8      plaintiffs' experts?
9          MS. MILLER:  Objection.
10         MR. LOCKE:  Objection.
11         MR. TISI:  Can I have the
12     spreadsheet that you made copies of
13     today?  Because I'm going to mark that
14     as an exhibit.
15         THE WITNESS:  I didn't say
16     these things.
17     QUESTIONS BY MR. TISI:
18         Q.   Okay.  So you disagree.
19         Is there anything that I would
20     need to make those things -- to make them
21     accurate?
22         A.   It's all in my report.
23         Q.   Okay.  So let's do this.  You
24     make serious charges against plaintiffs'
25     experts in your report, do you not?

Page 124

1          MR. LOCKE:  Objection.
2          MS. MILLER:  Objection.
3          THE WITNESS:  I don't know what
4      you mean by "serious charges."
5      QUESTIONS BY MR. TISI:
6          Q.   Well, you say that each of
7      plaintiffs' experts used Bradford Hill in a
8      manner that was irregular and suggest
9      results-driven approach.
10         Do you remember that?
11         MS. MILLER:  Objection.
12         THE WITNESS:  Where are you
13     referring to?
14     QUESTIONS BY MR. TISI:
15         Q.   Well, go to page 40, if you
16     could, of your report.
17         On your report, you use the
18     phrase that "they jumped to causation without
19     sufficiently determining association."
20         That's a word that you use.  That's
21     the -- that's Section C.
22         Do you see that?
23         A.   It says, "Jumping to causation
24     without sufficiently determining
25     association."

Page 125

1          Q.   Okay.  So they jumped to
2      causation.
3          Is that a word that you used or
4      is it a word that was provided to you by
5      defense lawyers in this case?
6          MS. MILLER:  Objection.
7          MR. LOCKE:  Objection.
8          THE WITNESS:  Again, I didn't
9      say "they."  It just says, "C, jumping
10     to causation without sufficiently
11     determining association."
12     QUESTIONS BY MR. TISI:
13         Q.   And then you describe what the
14     plaintiffs' experts allegedly did, correct?
15         A.   It's all -- it's all in my
16     report.
17         Q.   Okay.  And on page 35 of your
18     report, you say that they "ignored and
19     disregarded well-established hierarchy."
20         A.   Which page?  I'm sorry.
21         Q.   Page 35.
22         And this is under the title of
23     Methodologic Flaws in Plaintiffs' Experts'
24     Epidemiology-Based Opinions, correct?
25         A.   Where are you referring to?

32 (Pages 122 to 125)

Christian Merlo, M.D., MPH

Page 126

1    Q.    Right there.
2    A.    I know, but what -- I see that,
3  Methodologic Flaws in Plaintiffs' Experts.
4    Q.    Right.
5         And Section A is, "disregard
6  for the hierarchy of evidence."
7    A.    Section A does say "disregard
8  for the hierarchy of evidence."
9    Q.    And the third paragraph starts
10  with, "A number of plaintiffs'
11  epidemiologists ignore well-established
12  hierarchy of evidence," correct?
13    A.    In my report it says, "A number
14  of plaintiffs' epidemiologists ignore the
15  well-established hierarchy of evidence."
16    Q.    And under the section that says
17  Methodologic Flaws of Plaintiffs' Experts'
18  Epidemiology-Based Opinions, you also say
19  that they "fabricated consistency by ignoring
20  studies that did not support their
21  conclusion" on page 44, correct?
22    A.    And where is that on page 44?
23    Q.    Well, Section 2 says,
24  "Plaintiffs' experts fabricate consistency by
25  ignoring inconsistent studies."

Page 127

1    A.    It says Section 2, "Plaintiffs'
2  experts fabricate consistency by ignoring
3  inconsistent studies."
4    Q.    That is a very -- to charge
5  another scientist with fabrication is a
6  pretty serious charge, is it not?
7         MR. LOCKE:  Objection.
8         MS. MILLER:  Objection.
9  QUESTIONS BY MR. TISI:
10    Q.    It's not one that scientists
11  make lightly, is it?
12    A.    I'm not fabri -- I'm not -- I'm
13  not charging anyone with anything.
14    Q.    Well, you're saying that that's
15  what they did, correct?
16         You're saying that "plaintiffs'
17  experts fabricated consistency by ignoring
18  inconsistent results."
19    A.    The studies were inconsistent.
20    Q.    Okay.
21    A.    So to say that they're
22  consistent is --
23    Q.    A fabrication?
24    A.    -- inconsistent.
25    Q.    And you're saying that's a

Page 128

1  fabrication?
2         MS. MILLER:  Objection.
3         THE WITNESS:  It says,
4    "Plaintiffs' experts fabricate
5    consistency by ignoring inconsistent
6    studies."
7  QUESTIONS BY MR. TISI:
8    Q.    And that is a pretty serious
9  thing to say about another scientist, is it
10  not?
11         MS. MILLER:  Objection.
12         THE WITNESS:  Not if it's not
13    true.
14  QUESTIONS BY MR. TISI:
15    Q.    Okay.  And so your opinion is
16  that these experts fabricated opinions?
17    A.    What this is saying is that
18  plaintiffs' expert fabricate consistency, not
19  fabricating an opinion; fabricate consistency
20  when consistency does not exist.
21    Q.    Well, one of their opinions is
22  that there is consistency, correct?
23         MS. MILLER:  Objection.
24         THE WITNESS:  There is
25    opinions -- well, you'd have to show

Page 129

1    me who you're talking about and --
2  QUESTIONS BY MR. TISI:
3    Q.    Well, you wrote this, Doctor.
4  You wrote this, Doctor.  You wrote this,
5  Doctor.  Okay?
6         You said that "plaintiffs'
7  experts fabricate consistency by ignoring
8  inconsistent studies."
9         That was your words, correct?
10    A.    That's correct.
11    Q.    All right.  Now, my question to
12  you is:  You are -- you know that plaintiffs'
13  experts, using your words here, said that the
14  studies were consistent.
15    A.    We'd have to go through each
16  expert and look --
17    Q.    You've done that before today,
18  right?
19    A.    But we'd have to do it today.
20    Q.    You've done that in preparation
21  of this report?
22    A.    I've read all the reports.
23    Q.    Okay.  And so you wouldn't say
24  that "plaintiffs' experts fabricated
25  consistency by ignoring inconsistent results"

Christian Merlo, M.D., MPH

Page 130

1  had you not actually done the work to make
2  that conclusion, correct?
3      A.   I have read the expert --
4      Q.   Okay.
5      A.   -- reports, but for the purpose
6  of today, we would have to --
7      Q.   I'm going to ask you that. I'm
8  going to ask you that, Doctor.
9           My question is: That's a
10 pretty serious thing for one scientist to say
11 about another.
12          MS. MILLER: Objection.
13 QUESTIONS BY MR. TISI:
14     Q.   How would you -- how would you
15 react if somebody said you -- that you
16 fabricated your opinion in this case?
17          MS. MILLER: Objection.
18          THE WITNESS: I didn't say that
19     there's fabrication of opinion. I
20     said that's fabricating consistency,
21     and that's a very different thing.
22 QUESTIONS BY MR. TISI:
23     Q.   Okay. And you don't think that
24 the experts in this case testified that they
25 thought the studies were consistent?

Page 131

1      A.   We'd have to look at each
2  expert and go through. It's a very general
3  question.
4      Q.   So you didn't do that before
5  today?
6          MS. MILLER: Objection.
7  QUESTIONS BY MR. TISI:
8      Q.   You actually cite Moorman's
9  report, Siemiatycki's report, Singh's report,
10 McTiernan's report. You cited all these --
11 all these here. And we can go through them,
12 and I'm happy to go through them.
13          But I'm asking you about your
14 report. And this report says that it is --
15 that it is your review -- they said it was
16 consistent; you said that was fabricated.
17 Right?
18          MS. MILLER: Objection.
19          THE WITNESS: What I say is,
20     "plaintiffs' experts fabricate
21     consistency by ignoring inconsistent
22     studies."
23 QUESTIONS BY MR. TISI:
24     Q.   Okay.
25     A.   And when we look at the body of

Page 132

1  medical evidence and the literature, there's
2  tremendous inconsistency between study
3  designs, cohort studies and case controls,
4  and even within study designs.
5      Q.   Okay. And then --
6      A.   In looking at the difference
7  between hospital-based case controls and
8  population-based controls, there's
9  inconsistency.
10     Q.   Okay. And we're going to talk
11 about that. Okay. I promise you we're going
12 to talk about that.
13          But the question is: When you
14 use a word like "fabrication," you would
15 agree that that is a word that is -- has a
16 particular understanding in science as being
17 a very bad thing?
18          MS. MILLER: Objection.
19          THE WITNESS: I would neither
20     agree nor disagree with that. I don't
21     know even what you mean by "that's a
22     very bad thing."
23 QUESTIONS BY MR. TISI:
24     Q.   So if somebody said to you,
25 "Doctor, your report contains fabricated

Page 133

1  conclusions or fabricated methodologies,"
2  would you not take that seriously?
3          MS. MILLER: Objection.
4          THE WITNESS: I don't know what
5     a fabricated conclusion is or a
6     fabricated methodology, sir.
7  QUESTIONS BY MR. TISI:
8      Q.   You don't know what that is.
9          But you used the word -- what
10 did you mean by "fabrication"? The word
11 "fabrication."
12          What does the word
13 "fabrication" mean to you?
14     A.   What I mean is plaintiffs'
15 experts are making a case for consistency
16 when consistency does not exist.
17     Q.   Okay. Well, you go on to say,
18 Doctor, at the very last page, you say -- or
19 the paragraph says, "As a professor of
20 medicine and public health, I have focused my
21 career using science of epidemiology as a
22 scientific tool to help improve the
23 understanding of health and disease. The
24 distortion of epidemiologic science for
25 purposes of litigation does not achieve those

34 (Pages 130 to 133)

Christian Merlo, M.D., MPH

| | Page 134 |
|---|---|

1  goals; instead, it undermines scientific
2  efforts to better understand the etiology of
3  disease."
4          Is it your opinion that
5  plaintiffs' experts distorted the
6  epidemiologic science for purposes of
7  litigation?
8          MR. LOCKE: Objection.
9          THE WITNESS: That's what I
10  wrote in my report.
11  QUESTIONS BY MR. TISI:
12      Q.   Did you mean to refer to
13  plaintiffs' experts here?
14      A.   In any epidemiologic study --
15      Q.   I'm asking you this question.
16          MS. MILLER: Please let him
17  answer.
18          THE WITNESS: In any
19  epidemiologic study, if science is
20  distorted for the purpose of
21  litigation, it goes against --
22  QUESTIONS BY MR. TISI:
23      Q.   Right.
24      A.   -- what I've done in my --
25      Q.   And you're claiming that's what

| | Page 135 |
|---|---|

1  defendants -- that's what plaintiffs'
2  experts did in this case.
3      A.   Can you say that again?
4      Q.   Yes.
5          You say you don't do that,
6  right?
7          You don't distort the
8  scientific evidence for the purposes of
9  litigation, right?
10          MS. MILLER: Objection.
11          THE WITNESS: Can you ask that
12  question --
13  QUESTIONS BY MR. TISI:
14      Q.   Yes.
15      A.   -- just a little slower?
16  You're speaking very fast.
17      Q.   You say that -- you say, as a
18  professor of medicine in public health, it's
19  a bad thing to distort the epidemiologic
20  evidence for litigation, true?
21      A.   What I say is, "As a professor
22  of medicine in public health, I have focused
23  my career on using the science of
24  epidemiology as a scientific tool to help
25  improve our understanding of health and

| | Page 136 |
|---|---|

1  disease."
2      Q.   Right.
3      A.   "The distortion of
4  epidemiologic science for purposes of
5  litigation does not achieve this goal."
6      Q.   Okay.
7      A.   "Instead, it undermines
8  scientific efforts to better understand the
9  etiology of disease."
10      Q.   We read that. Now I'm asking
11  you a question about that.
12          My question is: Is it your
13  opinion that that's what the plaintiffs'
14  experts did in this case?
15          MS. MILLER: Objection.
16          THE WITNESS: I don't know what
17  the experts did in this case as far as
18  with regards to that.
19          What I can say is that the
20  distortion of epidemiologic science
21  for purposes of litigation does not
22  achieve those goals.
23  QUESTIONS BY MR. TISI:
24      Q.   Okay. I'm asking you this
25  question. You have to answer this question.

| | Page 137 |
|---|---|

1  Okay?
2          Is it your opinion, to a
3  reasonable degree of medical and scientific
4  certainty, that plaintiffs' experts distorted
5  the epidemiologic science for the purposes of
6  litigation?
7          MR. LOCKE: Objection.
8          THE WITNESS: So I believe I
9  answered that already.
10          I -- the methodology that was
11  performed by plaintiffs' experts is
12  flawed, and, therefore, my opinions in
13  relation to the potential causal
14  association between talcum powder and
15  ovarian cancer -- when I think of --
16  when I -- based on the body of medical
17  evidence, there is no causal
18  association between perineal talc
19  usage and ovarian cancer.
20          And the critique I have against
21  plaintiffs' opinions relate to their
22  methodology.
23  QUESTIONS BY MR. TISI:
24      Q.   Right.
25          And is it your opinion -- I

35 (Pages 134 to 137)

Christian Merlo, M.D., MPH

Page 138

1  understand you have a difference of opinion
2  on their methodology.  But you take it one
3  step further, right?
4        You say it was their
5  methodology -- at least the implication is,
6  and I'm asking you the question:  Are you
7  suggesting that they fabricated in a
8  methodology for the purposes of litigation?
9        MR. LOCKE:  Objection.
10        MS. MILLER:  Objection.  Asked,
11  answered, mischaracterizes his
12  opinions and his testimony.
13        THE WITNESS:  I believe I
14  answered that.
15  QUESTIONS BY MR. TISI:
16     Q.   Okay.  I want to hear about
17  your litigation -- I want to hear about what
18  your opinion is as the motivation for doing
19  what they did.
20        Is it your opinion that their
21  motive in drafting their reports and using
22  the methodology that they use was to assist
23  in litigation?
24        MS. MILLER:  Objection.
25        THE WITNESS:  I have no idea

Page 139

1     what their motivation was.
2  QUESTIONS BY MR. TISI:
3     Q.   So then why is it in here?  Why
4  is anything about litigation even in your
5  report, Doctor?
6        MR. LOCKE:  Objection.
7        MS. MILLER:  Objection.
8        THE WITNESS:  Because if
9     epidemiologic science is distorted for
10     the purposes of litigation, it does
11     not achieve those goals.
12  QUESTIONS BY MR. TISI:
13     Q.   And do you think that that's
14  what they did?
15        MS. MILLER:  Objection.
16        THE WITNESS:  I have no idea
17     what they did.
18  QUESTIONS BY MR. TISI:
19     Q.   Okay.  So you'd take that out
20  of this report?
21        MR. LOCKE:  Objection.
22        MS. MILLER:  Objection.
23        THE WITNESS:  My report is my
24     report.  It stands.
25

Page 140

1  QUESTIONS BY MR. TISI:
2     Q.   So you have no idea what the
3  motive and intent of plaintiffs' experts were
4  in drafting their opinions, right?
5     A.   I have no idea.
6     Q.   Okay.  Are you saying that the
7  methodology that they used was fraudulent?
8        MS. MILLER:  Objection.
9        THE WITNESS:  I don't think
10     that there's -- are you referring to
11     any part of my report that says
12     fraudulent?
13  QUESTIONS BY MR. TISI:
14     Q.   I'm asking your opinion --
15  I'm asking your opinion right now, under
16  oath.
17        Are you saying that the
18  opinions that they offered was fraudulent?
19        MS. MILLER:  Objection.
20  QUESTIONS BY MR. TISI:
21     Q.   The methodology they used was
22  fraudulent?
23     A.   Probably have to be a little
24  bit more specific.
25     Q.   Tell me what your views are on

Page 141

1  that.
2     A.   Which expert are we talking
3  about?  Which part of the methodology?
4  Which --
5     Q.   Okay.  Do you think that
6  Dr. Siemiatycki applied a fraud -- a
7  professor of epidemiology applied -- who has
8  sat on IARC and looked at cancer and exposure
9  to disease applied a fraudulent methodology?
10        MR. LOCKE:  Objection.
11        MS. MILLER:  Objection.
12        THE WITNESS:  No.  I don't even
13     know what a fraudulent methodology is.
14  QUESTIONS BY MR. TISI:
15     Q.   Okay.  Do you think he applied
16  a litigation or results-driven methodology?
17     A.   I don't -- I don't know what a
18  litigation -- I don't know what a litigation
19  methodology would be.
20     Q.   Well, it says -- do you believe
21  that he distorted the epidemiologic
22  sciences -- science for the purpose of
23  litigation?
24     A.   I never said that
25  Dr. Siemiatycki distorted epidemiologic

Page 142

1    science.
2         Q.    Okay.  Do you think that
3    Dr. McTiernan did?
4              MS. MILLER:  Objection.
5              THE WITNESS:  Can you ask that
6    one more time?
7    QUESTIONS BY MR. TISI:
8         Q.    Yes.
9              Do you think that Dr. McTiernan
10   distorted epidemiologic science?
11             MS. MILLER:  Objection.
12             THE WITNESS:  I have no idea.
13   QUESTIONS BY MR. TISI:
14        Q.    Okay.  Do you think that
15   Dr. Smith-Bindman distorted science?
16             MS. MILLER:  Objection.
17             THE WITNESS:  I don't know.
18   QUESTIONS BY MR. TISI:
19        Q.    Do you think that Dr. Singh
20   distorted science?
21        A.    The same answer stands.
22        Q.    Dr. Moorman, do you think she
23   distorted science?
24             MS. MILLER:  Objection.
25             THE WITNESS:  I think -- I

Page 143

1    can't -- I can't speak to the
2    motivations of someone else.
3    QUESTIONS BY MR. TISI:
4         Q.    Do you believe that the same
5    standards you would apply to plaintiffs'
6    experts should apply to your opinions:  You
7    shouldn't fabricate; you shouldn't distort;
8    you shouldn't ignore?
9              MS. MILLER:  Objection.
10   That's --
11             MR. TISI:  Let the record
12   reflect you're once again laughing.
13             MS. MILLER:  -- four questions.
14             MS. SHARKO:  I'm smiling.
15             MR. TISI:  You're laughing.
16             MS. SHARKO:  No.  I think --
17             MR. TISI:  I don't ask -- I'm
18   not asking her anything.  The record
19   will reflect is you were laughing.
20             MS. SHARKO:  The record will
21   reflect that you are not asking him a
22   single question like you're supposed
23   to.
24             You're barking things.  You're
25   raising your voice.  Your hands are

Page 144

1    shaking --
2              MR. TISI:  Okay.  That's fine.
3              MS. SHARKO:  -- and I ask that
4    you calm down.
5              MR. TISI:  I think it's -- I
6    think -- you can ask if I'd calm down,
7    but when this gentleman comes in here
8    and says our experts fabricated,
9    ignored, I take it personally.
10   QUESTIONS BY MR. TISI:
11        Q.    I want to hear -- I want to
12   ask -- I want to ask you this question,
13   Doctor.
14             MS. SHARKO:  Well, I think
15   you're misrepresenting his report, and
16   he's told that you.
17             MR. TISI:  Well, if you are,
18   then maybe -- maybe he ought to back
19   down on some of the adjectives he
20   uses.
21   QUESTIONS BY MR. TISI:
22        Q.    Doctor, do you believe --
23             MS. SHARKO:  Do you need a
24   break, Mr. Tisi?
25             MR. TISI:  No, I don't, Susan,

Page 145

1    but maybe you do.
2    QUESTIONS BY MR. TISI:
3         Q.    Let me ask you this question,
4    Doctor.
5              Do you believe that the same
6    standards that you apply to reviewing
7    plaintiffs' experts in this report should
8    apply to your report as well?
9              MS. MILLER:  Objection.
10             THE WITNESS:  I believe that my
11   opinion is made based on the body of
12   medical evidence.  And for someone to
13   say that there is consistency when
14   consistency doesn't exist, or strength
15   of association when strength of
16   association doesn't exist, or there is
17   a dose response when dose response
18   doesn't exist, that's ignoring the
19   body of evidence.
20   QUESTIONS BY MR. TISI:
21        Q.    Okay.  And you would take issue
22   if you ignored evidence of the strength of
23   association, correct?
24             MS. MILLER:  Objection.
25

Christian Merlo, M.D., MPH

Page 146

1  QUESTIONS BY MR. TISI:
2      Q.   If you ignored evidence of
3  consistency, if you ignored evidence of dose
4  response, you would be subject to the same
5  criticism.  You would hold yourself up to no
6  different scrutiny than you would imply --
7  you would impose on plaintiffs' experts,
8  agreed?
9          MS. MILLER:  Objection.  There
10     was a question, and before he could
11     answer it, you asked another question.
12         MR. LOCKE:  Objection.
13 QUESTIONS BY MR. TISI:
14     Q.   Would you agree that you should
15 not fabricate inconsistency when there is
16 consistency?
17         MS. MILLER:  Objection.
18         THE WITNESS:  If we just go
19     back to the medical evidence in this
20     specific case, the fact that there is
21     no strength of association or --
22 QUESTIONS BY MR. TISI:
23     Q.   I'm not asking you that
24 question.  Doctor, I'm going to move to
25 strike it.  And honestly, we're going to

Page 147

1  need -- we may need to take a break on this
2  because you need to listen to my question.
3          My question is:  Would you hold
4  yourself to the same standards that you have
5  criticized the plaintiffs' experts for?
6          I'm not asking about the
7  evidence in this case.
8          Scientifically, would you agree
9  that you should not -- you should not ignore
10 consistency when it exists?
11         MS. MILLER:  Objection.
12         THE WITNESS:  Can you ask that
13     one more time?
14 QUESTIONS BY MR. TISI:
15     Q.   Yes.
16         Do you agree that you should
17 not fabricate an opinion?
18         MS. MILLER:  Objection.
19         THE WITNESS:  I don't know what
20     that means.
21 QUESTIONS BY MR. TISI:
22     Q.   You don't know -- well, you
23 used the word "fabrication."  It's your word.
24     A.   Well, fabricate an opinion.
25     Q.   Yes.

Page 148

1      A.   I don't know what that means.
2      Q.   Okay.  Do you think you should
3  not fabricate a methodology for the purposes
4  of litigation?
5          MS. MILLER:  Objection.
6          THE WITNESS:  I never said
7      fabricating methodology.
8  QUESTIONS BY MR. TISI:
9      Q.   Okay.  Do you think that you
10 should not -- you should not ignore evidence
11 and well-established principles?
12         MS. MILLER:  Objection.
13         THE WITNESS:  Can you ask that
14     one more time?
15         MR. TISI:  Yeah.
16         THE WITNESS:  I'm not sure I
17     understood what that --
18 QUESTIONS BY MR. TISI:
19     Q.   Do you think you should not
20 ignore evidence?
21         Should you ignore evidence?
22         MS. MILLER:  Objection.
23         THE WITNESS:  I mean, in
24     looking at the causal association
25     between exposure and outcome, we try

Page 149

1      to look at all the evidence.
2  QUESTIONS BY MR. TISI:
3      Q.   Do you know Sonal Singh?
4      A.   No.
5      Q.   He previously worked at
6  Hopkins.
7          Did he distort science?
8          MS. MILLER:  Objection.
9          THE WITNESS:  I have no idea.
10 QUESTIONS BY MR. TISI:
11     Q.   Okay.  Now, let me see if I
12 can...
13         As you know, I represent women
14 who claim to have developed ovarian cancer as
15 a result of using talcum powder products.
16         You understand that, correct?
17         MR. LOCKE:  Objection.
18         THE WITNESS:  If you're telling
19     me that, that's fine.
20 QUESTIONS BY MR. TISI:
21     Q.   Okay.  You were first consulted
22 in this case in December of 2019 {sic},
23 correct?
24         MS. MILLER:  Objection.  Asked
25     and answered multiple times.

Christian Merlo, M.D., MPH

Page 150

1    THE WITNESS:  Somewhere around
2  there.  I don't remember the specific
3  time.
4        MS. MILLER:  Please let me
5  finish my objections.
6  QUESTIONS BY MR. TISI:
7    Q.    Prior to being contacted by the
8  lawyers --
9        MS. SHARKO:  I assume you mean
10  December 2018.
11        MR. TISI:  2018.
12  QUESTIONS BY MR. TISI:
13    Q.    Prior to being contacted by the
14  lawyers representing Johnson & Johnson to
15  defend them in lawsuits, you had never
16  expressed the causation opinions, any of the
17  information in Exhibit Number 3, correct,
18  other than the general principles of
19  epidemiology?  Any -- let me rephrase the
20  question.
21        Prior to December of 2018, you
22  had never expressed opinions about talc and
23  ovarian cancer, true?
24    A.    That's about right.
25    Q.    Okay.  And you do know that the

Page 151

1  epidemiologic -- the first epidemiologic
2  study was published by researchers at Harvard
3  University in 1982, correct?
4        MS. MILLER:  Objection.
5        THE WITNESS:  I would have to
6  look back through the -- through my
7  report and see where those researchers
8  are from.
9        (Merlo Exhibit 12 marked for
10  identification.)
11  QUESTIONS BY MR. TISI:
12    Q.    Well, let me provide you with a
13  copy of an article by Cramer, et al.
14        You've seen this study before,
15  correct?
16    A.    Cramer, yes, 1982.
17    Q.    Okay.  And you were just
18  looking at your chart on page 34 and 35 of
19  the various studies, correct?
20    A.    That's correct.
21    Q.    Okay.  There are over 30
22  studies that you identified here,
23  hospital-based, population-based,
24  case-control studies, pooled case-control
25  studies and cohort studies, correct?

Page 152

1    A.    There are hospital-based
2  case-control studies.  There are
3  population-based case-control studies, pool
4  case-control studies, cohort studies.
5    Q.    They go from the 1980s, 1990s,
6  2000s and 2010s.  Four decades, correct?
7    A.    Spanning 1982 through 2016 for
8  these studies that we're talking about right
9  here.
10    Q.    Were you involved in any of
11  these studies in any way even peripherally?
12    A.    I was not.
13    Q.    Okay.  Had anybody in this
14  period of time ever contacted you and said,
15  "You know, we have this issue out there about
16  whether or not talcum powder products are
17  associated with ovarian cancer; could you
18  consult with us on that question?"
19        MS. MILLER:  Objection.
20        THE WITNESS:  What period of
21  time are we talking about?
22  QUESTIONS BY MR. TISI:
23    Q.    1982 till today.
24        Other than the lawyers.
25    A.    Can you ask me that question

Page 153

1  again then?
2    Q.    Yeah.
3        From 1982 until today, has
4  anybody, other than the lawyers for Johnson &
5  Johnson, ever asked you your opinions about
6  ovarian cancer and talcum powder products?
7        MS. MILLER:  Objection.
8        THE WITNESS:  Well, I believe I
9  answered that already, because I told
10  you when I was first approached to see
11  if I could offer an opinion.
12  QUESTIONS BY MR. TISI:
13    Q.    That's a different question.
14        My question is:  Outside of
15  lawyers, outside of lawyers in litigation,
16  has any scientist ever come up to you and
17  said, "Dr. Merlo, you are a epidemiologist
18  and a pulmonary and critical care professor
19  at Johns Hopkins.  I'd like you to give me
20  your thoughts on the relationship between
21  ovarian cancer and talcum powder products."
22        MS. MILLER:  Objection.
23        THE WITNESS:  No one has asked
24  me to give an opinion in that time
25  period from 1982 to 2016.

39 (Pages 150 to 153)

Christian Merlo, M.D., MPH

Page 154

1  QUESTIONS BY MR. TISI:
2      Q.   Has anyone ever consulted you
3  and said, "What do you think about these
4  studies?"
5      A.   No.
6      Q.   Has anyone ever said to you,
7  "Doctor, you know, the evidence is really
8  unclear; can you help us design a study?"
9          MS. MILLER:  Objection.
10         THE WITNESS:  No.
11 QUESTIONS BY MR. TISI:
12     Q.   Has anybody ever come to you
13 from Johnson & Johnson and say, "You know, we
14 have these different regulatory bodies
15 looking at the issue, NTP, the National
16 Toxicology Project, IARC, the FDA, Health
17 Canada, looking at this issue; would you come
18 help us explain to these various regulatory
19 bodies what the science is about talc and
20 ovarian cancer?"
21         MS. MILLER:  Objection.
22         THE WITNESS:  No, but I would
23 have been excited to do it.
24 QUESTIONS BY MR. TISI:
25     Q.   You know that Congress just

Page 155

1  held a hearing on the issue of ovarian cancer
2  and talcum powder products, correct?
3      A.   I have no idea.
4      Q.   You know Dr. McTiernan appeared
5  before -- appeared before the House of
6  Representatives to express her opinions in a
7  public forum, correct?
8          MS. MILLER:  Objection.
9          THE WITNESS:  Again, I have no
10 idea.
11 QUESTIONS BY MR. TISI:
12     Q.   Do you know that -- did Johnson
13 & Johnson ever ask you, "You know, Dr. Merlo,
14 we need somebody to present our point of view
15 on what the science says.  Would you go
16 testify before Congress?"
17         Did they tell you that?
18         MS. MILLER:  Objection.
19         THE WITNESS:  Did they tell me
20 what?
21 QUESTIONS BY MR. TISI:
22     Q.   Did they ask you to do that?
23         MS. MILLER:  Objection.  Vague.
24 QUESTIONS BY MR. TISI:
25     Q.   Did Johnson & Johnson ask you

Page 156

1  to express your opinions to the United States
2  Congress about the relationship between
3  ovarian cancer and talcum powder products?
4          MS. MILLER:  Objection.
5          THE WITNESS:  No.  No.  But
6  again, I would have been excited to do
7  something like that.
8  QUESTIONS BY MR. TISI:
9      Q.   Did any scientist at Johnson &
10 Johnson ever come to you and say, "You know,
11 we have" -- you understand Health Canada has
12 reviewed the evidence, correct?
13     A.   I don't have -- I don't know
14 anything about Health Canada.
15     Q.   Okay.  Health Canada, you know,
16 is the Canadian equivalent to the United
17 States FDA?
18         MR. LOCKE:  Objection.
19         MS. MILLER:  Objection.
20         THE WITNESS:  I have no idea
21 what Health Canada is.
22 QUESTIONS BY MR. TISI:
23     Q.   Okay.  And have you ever been
24 asked by the scientists, as opposed to the
25 lawyers at Johnson & Johnson, to express your

Page 157

1  opinion before any regulatory or professional
2  body on the relationship between ovarian
3  cancer and talcum powder products?
4          MS. MILLER:  Objection.
5          THE WITNESS:  No, and I believe
6  I've answered this before, but I would
7  have been -- having reviewed the
8  literature, I would be really excited
9  to do that.
10 QUESTIONS BY MR. TISI:
11     Q.   Uh-huh.  Let me ask you this,
12 Doctor -- maybe Ms. Sharko will ask you to do
13 it after this deposition.  We'll find out.
14         Has Johnson & Johnson ever come
15 to you and asked you, we have -- to do a
16 causation analysis on any issue, on any
17 product it markets?
18     A.   They have not.
19     Q.   And you know Johnson &
20 Johnson's a big company.  They produce --
21 they produce pharmaceutical drugs.  They
22 produce cosmetics.  They produce
23 over-the-counter drugs.  They produce all
24 kinds of drugs, right?
25         MS. MILLER:  Objection.

Christian Merlo, M.D., MPH

Page 158

1        THE WITNESS:  I have no idea.
2    I mean, I know of Johnson & Johnson,
3    but I don't have an opinion on what
4    they do or have really any knowledge
5    on what they do.
6    QUESTIONS BY MR. TISI:
7        Q.    And other than the litigation,
8    they never came to you to ask your advice on
9    anything, true?
10        MS. MILLER:  Objection.
11        THE WITNESS:  I think we've
12    talked about that.  They didn't ask me
13    to do anything.
14    QUESTIONS BY MR. TISI:
15        Q.    Now, in this case, literally
16    millions of documents have been produced --
17    millions of pages of documents have been
18    produced to us.
19        Would it surprise you that the
20    name Christian Merlo doesn't appear in any of
21    them?
22        MS. MILLER:  Objection.
23        THE WITNESS:  I don't know what
24    you're referring to.
25

Page 159

1    QUESTIONS BY MR. TISI:
2        Q.    Millions of pages of documents
3    relating to research and marketing and
4    evidence and -- about ovarian cancer and its
5    relationship to talcum powder products, the
6    composition of talcum powder, all kinds of
7    issues, have been produced to us in this
8    case.
9        Would it surprise you that your
10    name doesn't appear even once over the past
11    40 or 50 years of documents that we've
12    received?
13        MR. LOCKE:  Objection.
14        THE WITNESS:  No, it wouldn't
15    surprise me, but my opinion on this
16    and the potential association --
17    potential causal association between
18    talcum powder and ovarian cancer is
19    based on the medical literature.
20    QUESTIONS BY MR. TISI:
21        Q.    Okay.  Have the scientists at
22    Johnson & Johnson ever reached out to you and
23    said -- even as of today, even as of the day
24    you wrote this report criticizing the various
25    studies that have been done in this case,

Page 160

1    done on this issue, have you ever either been
2    approached or approached Johnson & Johnson
3    and said, "You know something, I'm an expert
4    in design of studies.  Let me help you design
5    a study that would -- that would answer this
6    question once and for all"?
7        MS. MILLER:  Objection.
8    QUESTIONS BY MR. TISI:
9        Q.    Has that ever happened?
10        MS. MILLER:  Objection.
11        THE WITNESS:  Excuse me.  That
12    has not happened.
13    QUESTIONS BY MR. TISI:
14        Q.    Okay.
15        A.    However, I would gladly like to
16    be involved in something like that.
17        Q.    Okay.
18        A.    I think the key issue here in
19    designing a clinical study like that is there
20    are a lot of difficulties.
21        Q.    Well, you can't do a clinical
22    trial on this issue, can you?
23        A.    Well, it depends what you mean
24    by a clinical trial, because clinical trials
25    can be cohort studies; they can be

Page 161

1    case-control studies.
2        Q.    Understood.
3        You can't randomize patients
4    to receiving talcum powder products, and it
5    would be unethical and unfeasible to study
6    this question using a randomized, controlled,
7    placebo-controlled trial?
8        A.    It would be very difficult to
9    perform a randomized controlled trial.
10        Q.    It would also be -- it would
11    not only be difficult, it would be unethical
12    if the hypothesis was to assess whether or
13    not talcum powder products cause ovarian
14    cancer?
15        A.    Usually when randomized
16    controlled trials are designed, by
17    definition, if there is a -- if you're
18    testing a hypothesis that something is
19    causing something, usually you wouldn't
20    perform a randomized controlled trial.
21        Q.    It would be unethical.  There
22    are rules against that, correct?
23        MS. MILLER:  Objection.
24        THE WITNESS:  There are rules
25    against randomized controlled trials

41 (Pages 158 to 161)

Christian Merlo, M.D., MPH

Page 162

1    when the hypothesis is that you're
2    going to cause -- there is the
3    potential to cause harm.
4    QUESTIONS BY MR. TISI:
5        Q.   Right.
6            So it's not -- it's not -- you
7    would not expect to see clinical trials in a
8    setting like this?
9        A.   Again, these are -- there are
10   clinical trials that have been done, but we
11   wouldn't expect to see a randomized
12   controlled trial performed here.
13       Q.   Okay.  And you would agree with
14   me that in circumstances like this, what
15   typically experts have are epidemiology
16   studies, observational studies.
17           MS. MILLER:  Can you just ask
18   that again?
19   QUESTIONS BY MR. TISI:
20       Q.   You want me to answer {sic}
21   again?
22       A.   If you could ask me again, yes,
23   please.
24       Q.   Do you -- where the question is
25   whether or not an environmental factor or a

Page 163

1    substance causes harm, what science typically
2    relies on are observational studies and
3    biologic studies because you can't do
4    controlled trials?
5            MS. MILLER:  Objection.
6            THE WITNESS:  Okay.  Again, we
7    have to just separate clinical trials.
8    That involves everything.
9    QUESTIONS BY MR. TISI:
10       Q.   Right.
11       A.   So if we're talking about an
12   observational study, for instance, if I'm
13   looking at a -- how a certain infectious
14   agent might affect an outcome in a patient
15   with cystic fibrosis, I wouldn't necessarily
16   do a randomized control trial where I give
17   someone an infection and I don't give
18   somebody else -- give another group an
19   infection and I look at an outcome
20   afterwards.
21       Q.   Right.
22       A.   So when there is a potential
23   for harm, a randomized control trial is
24   usually not done, so we rely on observational
25   studies, cohort and case-control studies, to

Page 164

1    provide us with potential evidence when
2    looking at the association between exposure
3    and outcome.
4        Q.   Okay.  Has the FDA ever reached
5    out to you and asked your opinions on the
6    question of whether or not talc causes
7    ovarian cancer?
8        A.   The FDA has not.
9        Q.   Okay.  You know IARC?
10       A.   I know what IARC stands for,
11   but I don't know IARC.
12       Q.   Okay.  Do you -- have you --
13   has the International Agency for Research on
14   Cancer, IARC, ever contacted you for any
15   reason to ask you to be involved in any
16   assessment of any exposure and cancer?
17       A.   They have not.
18       Q.   Have you written Health Canada
19   to express your opinions that you've given in
20   your report?
21           MS. MILLER:  Objection.
22           THE WITNESS:  Again, I don't
23   really know who Health Canada is.
24   QUESTIONS BY MR. TISI:
25       Q.   Have you been provided with

Page 165

1    Health Canada's draft report on talcum powder
2    and ovarian cancer?
3            MS. MILLER:  Objection.  I
4    don't know what that means.
5            MR. TISI:  You don't have to,
6    Counsel.
7            THE WITNESS:  Is there
8    something that you want to show me?
9    QUESTIONS BY MR. TISI:
10       Q.   Yeah.  Sure.
11       A.   We can look at it.
12           (Merlo Exhibit 13 marked for
13   identification.)
14   QUESTIONS BY MR. TISI:
15       Q.   Showing you what I have marked
16   as Exhibit Number 13.
17           Have you seen this document
18   before?
19       A.   I don't know.
20       Q.   Is it of interest to you --
21           MS. MILLER:  Do you need some
22   time to flip through it?
23           THE WITNESS:  I think so.
24           MR. TISI:  No, I'm not -- I'm
25   not asking -- I'm asking if he ever

Christian Merlo, M.D., MPH

Page 166

1    saw it -- Counsel, you know, honestly,
2    you really need to stop.  You are
3    among the most unprofessional people I
4    have ever seen objecting in a case.
5    You inject yourself into almost every
6    question.
7         MR. LOCKE:  Objection.
8         MS. SHARKO:  Your ad hominem
9    and personal attacks --
10        MR. TISI:  Counsel, I was
11   called at the last deposition --
12        MS. SHARKO:  -- and venomous
13   comments, Mr. Tisi, are inappropriate.
14        MR. TISI:  I was called --
15        MS. SHARKO:  Stop it
16   immediately.
17        MR. TISI:  I was called at the
18   last deposition I was kicking her
19   under the table.  I was called that I
20   speak to her as a -- you know, that I
21   speak to women this way.
22        Please don't talk to me about
23   ad hominem attacks.
24        MS. SHARKO:  Well, those other
25   things you said are true.  You were

Page 167

1    kicking her.
2         MR. TISI:  Oh, okay.  I was not
3    kicking her under the table, and you
4    know that that's true -- not true.
5         MR. LOCKE:  The witness is
6    entitled to read --
7         MR. TISI:  I'm not asking him a
8    question about the document.  I'm
9    asking whether he ever saw the
10   document.
11        MS. MILLER:  He needs to review
12   it to know if he ever saw it.
13        MR. TISI:  No.  I'm asking him
14   the questions.
15        MS. MILLER:  Okay.
16        THE WITNESS:  I'm looking to
17   see if I've seen this before.
18        I don't know.
19   QUESTIONS BY MR. TISI:
20        Q.   Okay.  Is it of interest to you
21   how other people outside of litigation, other
22   scientists, have evaluated the question of
23   whether or not talcum powder products cause
24   ovarian cancer?
25        MS. MILLER:  Objection.

Page 168

1         THE WITNESS:  Can you ask that
2    one more time?
3    QUESTIONS BY MR. TISI:
4         Q.   Yeah.
5         Is it of interest to you what
6    other scientists and regulators have said
7    about the question you were asked to address
8    outside of litigation?
9         A.   I'm curious about what others
10   say; however, in my review of the body of
11   medical literature that is out there today in
12   the published, peer-review literature, my
13   opinions are based on that.
14        Q.   Okay.
15        A.   I'm curious about other things,
16   but my opinions are based on what is peer
17   reviewed and published.
18        Q.   Have you looked to see what
19   others have said about the body of evidence?
20        A.   I don't know what you mean by
21   "others."
22        Q.   Other scientists?  Other
23   regulatory bodies?
24        A.   You'd have to be more specific.
25        Q.   Example, Health Canada?

Page 169

1         A.   Health Canada?  And again, I
2    have no idea who Health Canada is, whether or
3    not -- who is involved in Health Canada,
4    whether or not there are scientists involved,
5    whether or not -- who's there.  I have no
6    idea.
7         Q.   How about IARC?  Did you review
8    the IARC 2010 report?
9         You were reviewing evidence
10   through 2006.  Did you look at that?
11        A.   Can you say that again?  You
12   said two dates.
13        Q.   Yes.
14        There was a 2010 report looking
15   at evidence up to 2006.
16        Did you look at that report?
17        A.   I believe I did review that.
18        Q.   And did you look any other
19   place to see what other scientists and
20   doctors have said about the issue?
21        A.   Again, my job is not to have
22   opinions about other doctors or scientists.
23   My job is to give an opinion based on the
24   body of medical evidence, and that's what I
25   did.

43 (Pages 166 to 169)

Christian Merlo, M.D., MPH

Page 170

1    Q.    Did you seek epidemio -- input
2  from your epidemiologic colleagues at Johns
3  Hopkins?
4    A.    I seek -- I seek help from
5  epidemiologists all the time.
6    Q.    For this report?
7    A.    No.
8    Q.    Okay. Did you speak to
9  Dr. Diette about your opinions in this case?
10   A.    No.
11   Q.    Did you speak to Dr. Szklo? Is
12 that his name?
13   A.    Yeah. No.
14   Q.    Did you speak to him?
15   A.    No. No.
16   Q.    Did you get permission of
17 approval from Johns Hopkins to participate in
18 this litigation?
19        MS. MILLER: Objection.
20        THE WITNESS: That's not
21     something that I would need approval
22     through Johns Hopkins for.
23        (Merlo Exhibit 14 marked for
24     identification.)
25

Page 171

1  QUESTIONS BY MR. TISI:
2    Q.    Going back to your opinions
3  about talc, I'd like to attach as Exhibit 14
4  the Bradford Hill article I think you had in
5  front of you, but I'm going to attach it as
6  Exhibit Number 14.
7    A.    Thank you.
8    Q.    Is this the Bradford Hill
9  article that you have been referring to?
10   A.    This is one of many of Bradford
11 Hill's articles.
12   Q.    Okay.
13   A.    This is his discussion of
14 the -- what we call nowadays the Bradford
15 Hill analysis.
16   Q.    This is what you called the
17 seminal article, right?
18        MR. LOCKE: Objection.
19        MS. MILLER: Objection.
20        THE WITNESS: Did I say that?
21 QUESTIONS BY MR. TISI:
22   Q.    Yes, you did.
23        I don't know why that's a hard
24 question to answer, Doctor. Either you agree
25 to that or you don't, but it is in your

Page 172

1  report.
2    A.    I see it there on page 30.
3    Q.    Yeah. So now can we agree it's
4  a seminal article?
5        MS. MILLER: Objection.
6        THE WITNESS: Well, it says,
7     "As Hill noted his seminal article."
8  QUESTIONS BY MR. TISI:
9    Q.    So why was that such a hard
10 question to ask when -- answer when I asked
11 you what your opinion was?
12        MR. LOCKE: Objection.
13        MS. MILLER: Objection.
14 QUESTIONS BY MR. TISI:
15   Q.    Did you need to see it in your
16 report in order to say what it says?
17        MS. MILLER: Objection.
18        THE WITNESS: I didn't
19     specifically remember saying that.
20 QUESTIONS BY MR. TISI:
21   Q.    Okay. It doesn't matter
22 because my question was, is it a seminal
23 article? I didn't ask you whether you said
24 it in your report.
25        Why is it so hard to answer a

Page 173

1  simple question as whether or not this is a
2  seminal article?
3        MS. MILLER: Objection.
4        Is that actually a question
5     you're asking?
6        MR. TISI: Yes. Absolutely.
7  QUESTIONS BY MR. TISI:
8    Q.    Why is it so hard to answer
9  that question?
10        MS. MILLER: Objection.
11        MR. LOCKE: Objection.
12 QUESTIONS BY MR. TISI:
13   Q.    Without seeing it in your
14 report?
15        MS. MILLER: Objection.
16        Now that the question has been
17     amended, still objection.
18        THE WITNESS: I thought you had
19     asked me if I said it, and I couldn't
20     remember --
21 QUESTIONS BY MR. TISI:
22   Q.    No.
23   A.    -- if I actually said it.
24   Q.    Actually, I asked you about ten
25 times: Is this a seminal article?

44 (Pages 170 to 173)

Page 174

```
 1          And why is that such a hard
 2 question to answer?
 3          MS. MILLER: Objection.
 4          MR. LOCKE: Objection.
 5          THE WITNESS: It's probably one
 6 of his seminal articles.
 7 QUESTIONS BY MR. TISI:
 8    Q.   Okay. You didn't address the
 9 question of biologic plausibility in your
10 report, did you?
11    A.   So I did not speak about
12 biologic plausibility in my report.
13    Q.   Okay. Did you -- I'm sorry.
14    A.   And -- you can go ahead.
15    Q.   Did you address the question of
16 specificity?
17    A.   There are several aspects of
18 the Bradford Hill considerations that are
19 inherently irrelevant in the analysis.
20          And the reason for that is if
21 we -- if we just back up a little bit, first
22 of all, Bradford Hill said that you need to
23 have a clearcut association before even going
24 into that and --
25    Q.   Aren't there plenty of examples
```

Page 175

```
 1 of cases where a exposure -- there is no
 2 epidemiology studies where there is a
 3 clearcut association?
 4          I'll give you an example:
 5 Acetaminophen and liver disease, do you know
 6 of any epidemiology study which establishes
 7 that risk?
 8          MS. MILLER: Objection.
 9          THE WITNESS: I'm not here to
10 give an opinion on --
11 QUESTIONS BY MR. TISI:
12    Q.   I know. But I want to know --
13    A.   -- acetaminophen and liver
14 disease. I'd have to review the literature.
15    Q.   Well, where is your assessment?
16          Where is the statement that
17 before you apply the Bradford Hill factors
18 that there must be a clearcut association?
19          MS. MILLER: Objection.
20          THE WITNESS: It's actually
21 said right in his article.
22 QUESTIONS BY MR. TISI:
23    Q.   Actually, let's talk about that
24 because you quoted part of the sentence
25 there. You didn't quote the whole thing, did
```

Page 176

```
 1 you?
 2          It's the second paragraph.
 3    A.   I see that.
 4    Q.   Right.
 5          What does the first paragraph
 6 say?
 7    A.   We can read it if you'd like.
 8    Q.   Why don't you.
 9    A.   "I have no wish, nor the skill,
10 to embark upon a philosophical discussion of
11 the meaning of causation. The cause of
12 illness may be immediate, indirect, it may be
13 remote and indirect, underlying the observed
14 association, but with the aims of
15 occupational and almost synonymously
16 preventive medicine in mind, the decisive
17 question is whether the frequency of the
18 undesirable event, B, will be influenced by a
19 change in the environmental factor, A. How
20 such a change exerts that influence may call
21 for a great deal of research. However,
22 before deducing causation and taking action,
23 we shall not have invariably have to sit
24 around awaiting the results of that research.
25 The whole chain may have to be unraveled or a
```

Page 177

```
 1 few links may suffice. It will depend on
 2 circumstances."
 3    Q.   Okay. So and circumstances
 4 are, there are sometimes we have a lot of
 5 evidence on one factor and a lot of evidence
 6 on another factor, right?
 7          MS. MILLER: Objection.
 8 QUESTIONS BY MR. TISI:
 9    Q.   These are considerations. No
10 one is more important than the other. And
11 that was Dr. -- Sir Bradford Hill's point,
12 right? These are considerations?
13          MS. MILLER: Objection.
14          THE WITNESS: Once there is a
15 clearcut association. And without
16 that clearcut association, one could
17 make the case of not even performing a
18 Bradford Hill analysis.
19 QUESTIONS BY MR. TISI:
20    Q.   Okay. One can make the case;
21 is that what he says?
22    A.   What he says is that in -- "in
23 looking at causation, our observations reveal
24 an association between two variables,
25 perfectly clearcut and beyond what we would
```

45 (Pages 174 to 177)

Christian Merlo, M.D., MPH

Page 178

1   care to attribute the play of chance."
2       Q.   Now, before we discuss your
3   experience any further, I want to ask you to
4   go back to the front page of your report.
5           The front page of your report,
6   Exhibit 3, says -- actually, let me just go
7   back and ask this question.
8           On the Bradford Hill, you said
9   you didn't discuss the biologic evidence with
10  respect to talc and ovarian cancer, and it's
11  not in your report, correct?
12          MS. MILLER: Objection.
13          THE WITNESS: I did not.
14  QUESTIONS BY MR. TISI:
15      Q.   Okay. Did you -- I'm sorry, I
16  thought you were finished.
17      A.   No, I did not discuss biologic
18  plausibility, and the reason is -- I said
19  before one could make the case of not even
20  performing a Bradford Hill analysis, but for
21  the sake of what other experts did, I went
22  through strength of association, consistency
23  and dose response.
24          And with a lack of strength of
25  association, with a lack of consistency

Page 179

1   between studies and with a lack of dose
2   response, biologic plausibility doesn't
3   matter because there's no causal association
4   between talcum powder and ovarian cancer
5   based on the medical literature.
6       Q.   So let me ask you this: Is the
7   issue of specificity important?
8           For example, wouldn't it be
9   important to consider whether or not the
10  studies that did show an association were
11  specific to a particular type of cancer and
12  not others? Because that would -- that
13  question would argue against the issue of
14  recall bias, for example.
15      A.   You asked several questions
16  there, so if you could just break that down,
17  it would be helpful.
18      Q.   I'll break it down.
19          Wouldn't it be important to
20  consider the issue of specificity?
21          You know that many of these
22  studies broke down their analysis -- tried to
23  break down their analysis by subtype of
24  ovarian cancer, correct?
25      A.   There were several

Page 180

1   epidemiologic studies that looked at
2   different subtypes.
3       Q.   And serous cancers were more
4   associated at a higher rate than other
5   ovarian cancers, correct?
6       A.   It depends on which study we're
7   looking at. We'd have to go through all of
8   them.
9       Q.   Okay. But would it -- you
10  didn't do that for the purposes of -- you
11  didn't look at whether or not the evidence --
12  there was evidence of specificity to -- for
13  example, epithelial ovarian cancer as opposed
14  to other kinds of cancers?
15      A.   That's not --
16          MS. MILLER: Objection.
17          THE WITNESS: That's not
18      exactly what Bradford Hill is talking
19      about when talking about specificity.
20  QUESTIONS BY MR. TISI:
21      Q.   Okay.
22      A.   The term "specificity" is
23  referred -- the term "specificity" is talking
24  about a specific exposure causing a certain
25  disease, and there are certain diseases that

Page 181

1   have lots of things that can cause them.
2           But if there is one disease
3   that only one exposure causes, then that's
4   what specificity means. Not specificity in
5   the different type of ovarian cancer.
6       Q.   So you don't think it's
7   relevant to look at whether or not a
8   association is correlated more specifically
9   with the type of ovarian cancer as opposed to
10  ovarian cancer generally for the purposes of
11  trying to figure out whether or not there
12  really was bias in these studies?
13          MS. MILLER: Objection.
14          THE WITNESS: I don't even
15      understand what you just asked me.
16  QUESTIONS BY MR. TISI:
17      Q.   Okay. You didn't look at --
18  you didn't look at analogy, did you?
19          MS. MILLER: Objection.
20          THE WITNESS: Analogy, again,
21      is -- you'd have to look at something
22      exactly similar to talc, and there's
23      nothing analogous there that --
24  QUESTIONS BY MR. TISI:
25      Q.   But you didn't address it in

46 (Pages 178 to 181)

Christian Merlo, M.D., MPH

Page 182

1    your report is my question.
2         A.   I did not address it.
3         Q.   And you didn't address the
4    specificity factor, correct?
5         A.   Again, specificity in this
6    case, as in cases of other diseases where
7    there are a number of potential risk factors,
8    it's not appropriate to look at specificity.
9         Q.   Doctor, my question is:  You
10   didn't address it in your report at all?
11        MS. MILLER:  Please don't
12   interrupt him.
13        THE WITNESS:  It's inherent in
14   there.
15   QUESTIONS BY MR. TISI:
16        Q.   Okay.  It's not addressed
17   specifically in your report, is it?
18        MS. MILLER:  Objection.
19   QUESTIONS BY MR. TISI:
20        Q.   You didn't say, "I address the
21   specificity factor, and it doesn't apply or
22   it does apply" for the following reasons?
23        MS. MILLER:  Objection.
24        THE WITNESS:  Again, there is
25   not a line item that says specificity,

Page 183

1    and because of -- and the reason for
2    that is because there's no strength of
3    association, there's no consistency
4    within studies, and there's no dose
5    response to -- within the studies.
6         And so without those things --
7    QUESTIONS BY MR. TISI:
8         Q.   Okay.
9         A.   Without those things, the other
10   considerations are -- are -- you can't get
11   there.
12        Q.   Okay.  Let me go to page 30 of
13   your report.  There's a paragraph here that
14   deals with the issue -- it's the seminal --
15   the seminal article paragraph.
16        A.   Sure.
17        Q.   All right?  It says, "Before
18   evaluating causation, study must reveal an
19   association between two variables, preferably
20   clearcut and beyond that -- beyond what we
21   would care to attribute the play of chance.
22   As I discuss further below, the requirement
23   is likely not satisfied here because we are
24   not presented with a clearcut association."
25        How do you define clearcut?

Page 184

1         A.   So, first of all, it says
2    "perfectly clearcut."
3         Q.   I understand you quoted him,
4    and I'm asking you -- I'm not asking you what
5    he meant because I think it's -- article is
6    pretty clear when he meant.
7         I'm asking you:  In the next
8    sentence where you pulled out the word
9    "clearcut," what do you mean?
10        MS. MILLER:  Objection.
11        THE WITNESS:  One that is
12   beyond that we would attribute to the
13   play of chance.
14        And based on the body of
15   medical evidence and the inconsistency
16   within certain study designs and
17   between certain study designs, the
18   association is not clearcut.
19   QUESTIONS BY MR. TISI:
20        Q.   How do you define "clearcut"?
21        In other words, when you say
22   "play of chance," that's a statistical
23   concept.
24        Chance is defined typically by
25   P value, correct, of .05?

Page 185

1         A.   Chance is defined as a -- about
2    a 1 and 20 chance.
3         Q.   Right.  A .05 P value, right?
4         A.   Statistically, yes.
5         Q.   Okay.  And so is that what you
6    mean when you say "a clearcut association"?
7         You're talking a statistically
8    significant association, correct?
9         A.   I'm not.  No, I'm not.
10        MS. MILLER:  Objection.
11   QUESTIONS BY MR. TISI:
12        Q.   Okay.  So what do you mean
13   by -- when you say --
14        A.   I wasn't finished.
15        Q.   Okay.
16        A.   Well, I'm trying to get at what
17   you mean by clearcut association.
18        MS. MILLER:  Okay.  Objection.
19   Asked and answered.
20        THE WITNESS:  One where there
21   is consistency between -- and in this
22   instance, in this specific instance,
23   one where there's consistency between
24   different types of studies and
25   different types of --

47 (Pages 182 to 185)

Christian Merlo, M.D., MPH

Page 186

1    QUESTIONS BY MR. TISI:
2        Q.    I'm not asking you in this
3    case.
4        I'm asking you, generally
5    speaking, when you say the requirement is not
6    satisfied here -- okay, because it's not
7    presented with a clearcut association.
8        I'm asking you, generally
9    speaking, if you're -- if I'm a student at
10   Johns Hopkins and I see this sentence and I
11   ask you -- raise my hand and say, "Doctor,
12   can you tell me what is meant by a clearcut
13   association?  What is meant by that?" how
14   would you -- what would you tell me?
15       Without reference to any
16   specific case, what is meant by clearcut
17   association?
18       MS. MILLER:  Objection.
19       THE WITNESS:  I would say it
20   depends.  It depends on what we're
21   looking at, what exposure and outcome
22   relationship we're looking at.  It
23   depends what's available in the
24   medical evidence.  It depends on how
25   the study or the initial work was set

Page 187

1    up.  It depends on whether or not bias
2    and confounding were taken care of.
3        It depends on so many factors
4    that it makes it impossible to even
5    answer that question.
6    QUESTIONS BY MR. TISI:
7        Q.    Would it matter whether or not
8    the study was replicated, in other words,
9    that there was more than one study?
10       A.    So sometimes replication can
11   help with --
12       Q.    Is it necessary?
13       A.    So I was -- wasn't done.
14       Q.    Okay.
15       A.    So sometimes replication can be
16   helpful.
17       Is it necessary?  Not
18   necessarily, because you could have one very,
19   very, very good initial study where you've
20   taken care of lots of things like bias and
21   confounding and random error and the analysis
22   is fine, and so you do come up with, "Hey, we
23   think this association is real.  Let's do
24   further studies."
25       But when you look at different

Page 188

1    study types over a period of time that
2    show -- some show something and some show
3    another, that's inconsistent, and that --
4        Q.    What do they show here that
5    makes them inconsistent?
6        MS. MILLER:  Objection.  He's
7    really -- please let him finish his
8    sentences.
9        THE WITNESS:  Can you be more
10   specific?
11   QUESTIONS BY MR. TISI:
12       Q.    Yeah.  You just made --
13       MS. MILLER:  You were in the
14   middle of a sentence.
15   QUESTIONS BY MR. TISI:
16       Q.    You just made the statement,
17   "Some show something and some show another,
18   that's inconsistent."
19       My question is, what:  Here --
20   what is the "something" you're referring to?
21       A.    Well, if we're specifically
22   talking about the potential causal
23   association between talcum powder and ovarian
24   cancer, there are hospital-based case-control
25   studies that are all not statistically

Page 189

1    significant.
2        There are population-based
3    case-control studies; some are statistically
4    significant, some are not.
5        There are cohort studies, four
6    of them, all not statistically significant.
7        And so when you break down this
8    association in trying to look at causality,
9    when you break down things -- when you break
10   down this by study design, there's a
11   difference.  There's an inconsistency between
12   cohort studies and cases controls.  There's
13   an inconsistency between population-based
14   case controls and hospital-based case
15   controls.
16       Q.    Okay.  So if I understand you
17   correctly --
18       A.    And so the association is not
19   clearcut.
20       Q.    Okay.  So if I can go to
21   page 45 of your report -- I was going to
22   discuss this later, but this seems to be a
23   perfect time.
24       On page 45 you state, "It is
25   important to remember, contrary to the

48 (Pages 186 to 189)

Christian Merlo, M.D., MPH

Page 190

1  suggestion of plaintiffs' experts, in
2  parentheses, that this criterion" -- and the
3  criterion we're talking about is
4  consistency -- "to weigh in favor finding
5  causal association must be consistency in
6  statistically significant associations."
7          And you have that in bold,
8  correct?
9      A.    Are we reading the first
10  sentence?
11     Q.    Correct.
12     A.    Okay.  Can I read it?
13     Q.    Sure.
14     A.    You want me to read it out
15  loud?
16     Q.    No, I just read it.
17     A.    I was flipping through, trying
18  to --
19     Q.    That's okay.  Let me read it
20  again.
21          You state, "It is important to
22  remember, contrary to the suggestion of
23  several of plaintiffs' experts, that for this
24  criterion to weigh in favor of finding a
25  causal relationship, there must be

Page 191

1  consistency in statistically significant
2  associations."
3          And you have that in bold,
4  correct?
5      A.    That's correct.
6      Q.    Okay.  And the report that you
7  cite there is -- I'm sorry, you don't cite
8  anything for that.
9          Can you tell me your basis for
10  that --
11         MS. MILLER:  Objection.
12 QUESTIONS BY MR. TISI:
13     Q.    -- statement?
14         MS. MILLER:  Objection.
15         THE WITNESS:  As an
16  epidemiologist, if we are -- if I'm
17  asked to weigh the body of evidence
18  and there is inconsistency in
19  statistical significance, it makes it
20  impossible to conclude a causal
21  relationship between exposure and
22  outcome.
23          Because if you're not showing
24  consistent statistical significance,
25  then that association becomes very

Page 192

1      difficult to prove causality.
2  QUESTIONS BY MR. TISI:
3      Q.    So is an underlying
4  principle -- you say it's important to
5  remember here -- that a statistically
6  significant result is inconsistent with a
7  statistically insignificant result?
8          MR. LOCKE:  Objection.
9          MS. MILLER:  Objection.
10         THE WITNESS:  Can you say that
11  again?
12 QUESTIONS BY MR. TISI:
13     Q.    Yes.
14          If one study shows a
15  statistically significant result and one a
16  statistically insignificant result, are they
17  by definition inconsistent?
18         MS. MILLER:  Objection.
19         THE WITNESS:  I think it
20  depends.  If you get 20 studies, and
21  10 of them are statistically
22  significant and 10 are not
23  statistically significant, that's
24  inconsistent.
25

Page 193

1  QUESTIONS BY MR. TISI:
2      Q.    Okay.  Have you done a
3  meta-analysis?
4      A.    I have.
5      Q.    Okay.  Have you ever published
6  a meta-analysis?
7      A.    I have not.
8      Q.    Are you a biostatistician?
9      A.    I've taken courses in
10  biostatistics.  I don't consider myself a
11  biostatistician, but oftentimes there is a
12  link between epidemiology and biostatistics.
13  So I do a lot of my statistical analysis
14  myself.  I don't consider myself a
15  biostatistician, though.
16     Q.    Okay.  Do you hold yourself out
17  to colleagues as a biostatistician or a
18  statistician?
19         MS. MILLER:  Objection.  Asked
20  and answered.
21         THE WITNESS:  Again, I consider
22  myself an epidemiologist, and we do
23  have training in biostatistics, and
24  they're not -- they're oftentimes
25  very, very linked.  I don't call

Christian Merlo, M.D., MPH

Page 194

1          myself a biostatistician.
2          QUESTIONS BY MR. TISI:
3          Q.    Okay.  By virtue of being --
4      would you agree with me that though there is
5      overlap between the two professions -- you
6      guys need each other, right? -- it is not
7      necessarily the case that a biostatistician
8      is an epidemiologist and an epidemiologist is
9      a biostatistician?
10              MS. MILLER:  Objection.
11              MR. LOCKE:  Objection.
12              THE WITNESS:  That's pretty
13          general.  I mean, there are probably
14          people out there that are both.
15          QUESTIONS BY MR. TISI:
16          Q.    And there are some that are one
17      and not the other, correct?
18          A.    I have no idea.  It's not
19      something I think about.
20          Q.    Okay.  What is the latency of
21      ovarian cancer between something that may
22      cause it and something that -- and the onset
23      of disease?
24              MS. MILLER:  Objection.
25              THE WITNESS:  I don't think

Page 195

1      anybody knows the latency of ovarian
2      cancer and -- first of all, you'd have
3      to not just say something, you'd have
4      to say what risk factor you're talking
5      about.  Is it risk factor X, and do we
6      know that, has that been studied?
7          So talking about the latency of
8      ovarian cancer with such generalities,
9      I don't think anybody can answer that.
10     QUESTIONS BY MR. TISI:
11          Q.    Well, is that important to
12     consider when looking at cohort studies and
13     to see whether or not they're long enough?
14              MS. MILLER:  Objection.
15              THE WITNESS:  So that depends.
16          It depends on whether -- certainly it
17          does depend on how long you follow
18          someone in a cohort study, yeah, but
19          also depends on when potentially the
20          exposure could have started.
21              For instance, in cohort studies
22          that I have performed in patients with
23          cystic fibrosis who have had lung
24          transplants, some are born with
25          conditions.  Some are -- some acquire

Page 196

1      an infection at age 1, and we follow
2      them for 20 years.
3          Sometimes we ask about things
4      and we follow people for an
5      appropriate amount of time, but they
6      may have been exposed to that prior to
7      that.  So it really depends.
8      QUESTIONS BY MR. TISI:
9          Q.    Now, I asked you a couple of
10     questions before about the role of
11     professional judgment in looking at the
12     Bradford Hill guidelines.
13          Do you remember those
14     questions?
15          A.    Not specifically, no.
16          Q.    Okay.  Well, I'm going to turn
17     to that question now.  I told you I'd come
18     back to it, and I'm going to come back to it
19     now.
20          Did you use -- when looking at
21     all of this evidence that you looked at, did
22     you use any degree of professional judgment
23     in analyzing the question of whether or not
24     talcum powder products cause ovarian cancer?
25          A.    I don't know what you mean by

Page 197

1      "professional judgment."
2          What I did is I reviewed the
3      literature.  I read the articles.  I looked
4      at how the studies were designed, whether or
5      not they controlled for bias or adjusted for
6      potential confounding, sample size in
7      studies, the differences in population
8      between the case-control studies, the number
9      of people in cohort studies, how long people
10     were followed.
11          So I don't know what you mean
12     by professional judgment, but that's what I
13     did.
14          Q.    Well, I mean, you provided a
15     list of people -- you provided a list of
16     things that you did.
17          Is there anything on that list
18     that you think that any of plaintiffs'
19     experts did not do?
20          A.    You'd have to get way more
21     specific about that.
22          Q.    I'm asking you.  Did you -- you
23     reviewed their reports.
24          Is there anything -- any part
25     of you -- did they look at bias, study

Christian Merlo, M.D., MPH

Page 198

1    design, number of patients enrolled, all
2    those things that you just mentioned?  You
3    listed a bunch of them.
4               Can you think of any gap in
5    their report where they didn't consider the
6    things you considered?
7               MS. MILLER:  Objection.
8               THE WITNESS:  You'd have to
9        show where what we're -- what you're
10       asking me about.
11   QUESTIONS BY MR. TISI:
12       Q.   No, I'm not going to do that,
13   Doctor.
14            I'm asking can you think of any
15   as you sit here right now?
16            MS. MILLER:  Objection.  Asked
17   and answered.
18            THE WITNESS:  Without us going
19       through the specifics, I can't answer
20       that general question.
21   QUESTIONS BY MR. TISI:
22       Q.   So do you agree that it is
23   well-understood that Hill's postulates are
24   ones in which experts will always apply
25   professional judgment?

Page 199

1        A.   I don't -- what are you
2    referring to?
3        Q.   Well, let me ask you this:  In
4    your report you refer oftentimes to a
5    textbook by William Oleckno.
6             Do you know that --
7        A.   The textbook?
8        Q.   Yeah.
9        A.   I do know that textbook.
10       Q.   Okay.
11            MS. MILLER:  If we're going to
12       move on to a new subject, lunch has
13       been waiting for a while, so maybe --
14            MR. TISI:  Well, I just opened
15       up a can of worms here, so I'm going
16       to just -- give me about five, ten
17       minutes, and we'll get done with this
18       section.
19   QUESTIONS BY MR. TISI:
20       Q.   You cited it several times
21   because you find that that is an
22   authoritative textbook in the area of
23   epidemiology?
24            MS. MILLER:  Objection.
25            THE WITNESS:  I cited it

Page 200

1    because it's one of my textbooks.  I'm
2    not here to provide opinions on
3    whether or not I think a textbook is
4    authoritative.  I'm here to give you
5    my opinion on the medical evidence.
6             (Merlo Exhibit 22 marked for
7    identification.)
8    QUESTIONS BY MR. TISI:
9        Q.   Well, you cited a textbook --
10   okay.  Let me ask you this.  Let me look at
11   Exhibit 22.
12            Here is a -- it's called
13   Epidemiology, Concepts and Methods.
14            Do you see that, Doctor?  I
15   just included the cover page.
16            MS. MILLER:  I'm going to
17       object to this exhibit.  It is two
18       pages pulled from a book, and the
19       second page ends in the middle of a
20       sentence.
21            MR. TISI:  I'm not asking that
22       question.  Why don't you --
23            MS. MILLER:  I just don't think
24       it's a proper exhibit.
25            MR. TISI:  I know you don't

Page 201

1    think so.  You don't think anything is
2    proper.
3             But I'm going to ask -- why
4    don't you wait until I ask my
5    question, and then we can figure out
6    whether or not I'm doing something
7    improper or not.
8             MS. MILLER:  I'm objecting to
9        the exhibit, not to the question.
10            MR. TISI:  Okay.  That's fine.
11   I'm objecting to your objections
12   because I think they're ridiculous.
13            MS. SHARKO:  Please be
14   professional.
15            MR. TISI:  Oh, I'm very
16   professional, Counsel, except when
17   somebody is an intrusive as Ms. Miller
18   has been in any deposition I've been
19   involved with.
20            MS. SHARKO:  That's so
21   inappropriate.
22            MR. TISI:  I know you think it
23   is inappropriate.
24            MR. LOCKE:  Objection.  I'm
25   objecting to the exhibit as well.

51 (Pages 198 to 201)

Christian Merlo, M.D., MPH

Page 202

1  QUESTIONS BY MR. TISI:
2      Q.    So there is a paragraph here on
3  page 188, and I'm going to ask you whether
4  you agree with it or not, and I'm going to
5  ask you to read it.
6          It says --
7      A.    So what am I looking at here?
8      Q.    On page 188, Chapter 7.
9      A.    No, what is this exhibit?
10     Q.    It is a -- it is a -- it is a
11  page of Chapter 7, Association, Causation in
12  Epidemiology.
13          There's a chapter from
14  Dr. Oleckno's book.
15     A.    Okay.  So I see a photocopy of
16  what appears to be the cover of the book.
17     Q.    The first chapter -- the first
18  page of the chapter.
19     A.    Of Chapter 7.
20     Q.    And there's a paragraph on
21  Bradford Hill.  Okay?
22          And I'm going to ask you about
23  the paragraph that he writes on Bradford
24  Hill.  It's the only paragraph that he talks
25  about Bradford Hill.

Page 203

1          MS. MILLER:  Objection.  We --
2          MR. TISI:  That's fine.
3  QUESTIONS BY MR. TISI:
4      Q.    "On 1965, Sir Bradford Hill,
5  professor emeritus at the medical statistics
6  with the University of London, delivered a
7  landmark address where he outlined nine
8  criteria that could be used to determine if
9  statistical associations were likely to
10  represent causal associations.  His reasoning
11  built on the earlier work of others such as
12  John Stuart Mill, who in 1856 had defined
13  several canons from which causal
14  relationships could be deduced.  Over the
15  years, many authors have articulated or
16  modified Hill's basic criteria which have
17  become known as Hill's postulates.  Using
18  these as a focal point, the following six
19  guidelines should be helpful in deciding
20  whether or not statistical associations are
21  likely to represent causal associations.  In
22  the end, the process of determining causation
23  is largely subjective except for the first
24  guideline, which is actually a requirement."
25          And that's temporal

Page 204

1  association, correct?  Temporal sequence,
2  temporality?
3      A.    We're talking about that last
4  sentence there?
5      Q.    Yes, correct.
6      A.    "In the end, the process of
7  determining causation is largely subjective
8  except for the first guideline, which is
9  actually a requirement."
10     Q.    And the first guideline is
11  correct temporal sequence?
12     A.    I'm not sure what it's
13  referring to, but I see "correct temporal
14  sequence" right below that.
15     Q.    All right.  Do you disagree
16  that the determination of causation is
17  largely subjective, if using Hill's
18  postulates?
19     A.    Can you ask that again?
20     Q.    Yeah.
21          Do you believe that the
22  ultimate decision on causation requires -- is
23  a subjective look at the evidence?
24          MS. MILLER:  Objection.
25          THE WITNESS:  I'm not -- I'm

Page 205

1  sorry, I'm just not understanding what
2  you're asking.
3  QUESTIONS BY MR. TISI:
4      Q.    Okay.  Do you agree with the
5  sentence that -- the last sentence.  "In the
6  end, the process of determining causation is
7  largely subjective except for the first
8  guideline, which is actually a requirement"?
9          MS. MILLER:  Objection.
10          THE WITNESS:  I see that
11  sentence there, and I see that it
12  says, "In the end, the process of
13  determining causation is largely
14  subjective except for the first
15  guideline, which is actually a
16  requirement."
17          What is the question?
18  QUESTIONS BY MR. TISI:
19     Q.    My question:  Do you agree with
20  that sentence?
21     A.    It's written there.
22     Q.    Do you agree with it?
23     A.    I think it depends.  I think
24  it -- it depends on what we're looking at.
25  It depends on the exposure outcome

52 (Pages 202 to 205)

Christian Merlo, M.D., MPH

Page 206

1  relationship.  It's a very, very general
2  question --
3       Q.   Okay.
4       A.    -- and a photocopy of one page
5  in a textbook that I don't have memorized.
6           (Merlo Exhibit 23 marked for
7       identification.)
8  QUESTIONS BY MR. TISI:
9       Q.   Well, let's look at exhibit
10  number -- let's look at Exhibit Number 23,
11  which is the textbook by Dr. Gordis.  And I
12  do have the whole chapter here, so feel free
13  to thumb through it.
14           MS. MILLER:  Is this a good
15  time for lunch?  You said it was just
16  five minutes.  It's been five minutes.
17           MR. TISI:  Okay.
18           MS. MILLER:  Do you want to do
19  that after lunch?
20           MR. TISI:  I would prefer to
21  finish it now, but if you feel like
22  you're -- you absolutely need to have
23  lunch right now, if the witness does,
24  I'm absolutely okay with that.
25           MS. MILLER:  We've been going

Page 207

1  an hour and 40 minutes.  That's a long
2  time.
3          What do you think, Susan?
4           MS. SHARKO:  Yeah.
5           MR. TISI:  It's up to you.  I
6  said I'm okay with it.
7           MS. SHARKO:  Thank you.
8           VIDEOGRAPHER:  All right.  The
9  time is 12:18 p.m.  We're going off
10  the record.
11          (Off the record at 12:17 p.m.)
12           VIDEOGRAPHER:  The time is
13  12:57 p.m., and we're back on the
14  record.
15  QUESTIONS BY MR. TISI:
16       Q.   Doctor, before the break I was
17  about to hand you Exhibit Number 23.  And
18  these are -- just for the record, I had these
19  kind of preorganized, so we're going to skip
20  exhibits.  So you may see me bouncing around
21  a little bit.  There's not necessarily a
22  rhyme or reason to that.
23          So this is Exhibit Number 23.
24  This is Chapter 14 from the Gordis textbook.
25       A.   Sure.

Page 208

1       Q.   And Dr. Gordis, again, is
2  the -- was the head of the department for
3  epidemiology at Johns Hopkins, correct?
4       A.   You know, I don't remember.  I
5  know he taught one of my courses.
6       Q.   He's a big deal, isn't he?
7       A.   I can't remember if he was the
8  head of the department of epidemiology.
9       Q.   He's a big deal.  He was well
10  known, a well-known epidemiologist?
11       A.   I took his course, I mean, but
12  I don't know what you mean by "big deal."  I
13  don't --
14       Q.   You don't think he's -- okay.
15  Do you -- you don't understand what his
16  reputation was in the community?
17       A.   Again --
18           MR. LOCKE:  Objection.
19           MS. MILLER:  Objection.
20  QUESTIONS BY MR. TISI:
21       Q.   Let me ask you -- what you
22  think you're here for, candidly, is not as
23  important to me as you answering my
24  questions.  Because what I may think
25  important or you may think important and what

Page 209

1  Ms. Miller may think important are different.
2          So I'm going to ask this
3  question:  Do you have an understanding of
4  the reputation of Dr. Gordis?
5           MS. MILLER:  Objection.
6           MR. LOCKE:  Objection.
7           THE WITNESS:  And I'll state
8  that I took a course by Dr. Gordis in
9  epidemiology.  It was Epidemiology I.
10          And I will state again that I'm
11  not here to give an opinion on whether
12  or not I think Dr. Gordis or anyone
13  has a reputation or a good reputation
14  or a great reputation or whatever.
15  QUESTIONS BY MR. TISI:
16       Q.   So you have -- you're agnostic
17  to who Dr. -- Dr. Gordis' qualifications?
18       A.   What I can say --
19           MS. MILLER:  Objection.
20           THE WITNESS:  I didn't say
21  that.
22  QUESTIONS BY MR. TISI:
23       Q.   Okay.  So what is your
24  assessment?
25           MS. MILLER:  Objection.

53 (Pages 206 to 209)

Christian Merlo, M.D., MPH

Page 210

1  QUESTIONS BY MR. TISI:
2      Q.   What is your assessment then?
3          MS. MILLER:  Same objection.
4          THE WITNESS:  What I can say --
5      what I can say is that he was a
6      professor of mine.  I learned a great
7      deal from the class that I took that
8      he taught, and he was a member of the
9      faculty at Johns Hopkins Bloomberg
10     School of Public Health.
11         But as far as reputation and
12     those things, that's -- I don't have
13     an opinion about it.
14 QUESTIONS BY MR. TISI:
15     Q.   Do you consider him an
16 authority?
17         MS. MILLER:  Objection.
18 QUESTIONS BY MR. TISI:
19     Q.   You personally consider him an
20 authority?
21         MS. MILLER:  Objection.
22         THE WITNESS:  I consider
23     Dr. Gordis a professor of mine.
24 QUESTIONS BY MR. TISI:
25     Q.   Well, he was a professor of

Page 211

1  yours, and so I'm asking you:  Do you
2  consider him to be an authority in the field
3  of epidemiology?
4          MS. MILLER:  Objection.
5          THE WITNESS:  Dr. Gordis was an
6      epidemiologist.  He's since passed.
7      And he taught a course that I took,
8      and that's that.
9  QUESTIONS BY MR. TISI:
10     Q.   So you don't have any feelings
11 about his qualifications one way or the
12 other?
13     A.   It's not something I consider.
14 It's not something that I -- he taught me a
15 class, and I learned a lot from it.
16         Now, whether or not he's an
17 authority is -- that's -- I don't have an
18 opinion -- I'm not here to give an opinion
19 about --
20     Q.   I didn't ask you whether you
21 think you're here to give an opinion about
22 that.  I'm here to ask you questions, and I'm
23 entitled to ask you questions.  Okay?
24         And so if you -- if you don't
25 have an opinion, that's one thing.  But if

Page 212

1  you have an opinion, I'm entitled to ask it.
2  Unless counsel tells you that you can't
3  answer it, you have to answer it.
4          So my question is:  Do you have
5      an opinion as to whether or not Dr. -- from
6      your perspective, he is an authority in the
7      field of epidemiology?
8          MS. MILLER:  Objection.
9          MR. LOCKE:  Objection.
10         MS. MILLER:  I'm going to
11     object on multiple grounds, one of
12     which is asked and answered.
13         THE WITNESS:  He was a
14     professor of mine who taught a course
15     in Epidemiology I, we used his
16     textbook as one of the references
17     during the class, and I had good
18     interactions with him during the
19     class.  That's what I have to say
20     about Dr. Gordis.
21 QUESTIONS BY MR. TISI:
22     Q.   So let's look at Chapter 14,
23 Association to Causation:  Deriving
24 Inferences From Epidemiologic Studies.
25         That's what we're doing here

Page 213

1  today, right?  We're deriving -- we're seeing
2  whether or not there's an inference from the
3  epidemiologic studies?
4          MS. MILLER:  Objection.
5          THE WITNESS:  Can you ask me
6      that question --
7  QUESTIONS BY MR. TISI:
8      Q.   Actually, I don't even need to.
9  Let's move on.
10         Can you look at the page --
11 it's 260, please.  Actually, go to page 251.
12     A.   251.  Got it.
13     Q.   Do you see on page 251 -- and
14 I'm not going to ask you to read it.
15 Actually, if you go to page 250 --
16         MS. MILLER:  I'm sorry, Chris,
17     I don't think we got a copy.
18         MR. TISI:  Oh, I'm sorry.
19     That's my bad.  Here you go.
20         MS. MILLER:  Thank you so much.
21 QUESTIONS BY MR. TISI:
22     Q.   There's a section called
23 Evidence for Causal Relationship, and then it
24 has guidelines for judging whether an
25 observed association is causal.  On page 250.

Christian Merlo, M.D., MPH

Page 214

1    A.    250 now.
2    Q.    Yeah.
3    A.    250.  Okay.  I got it.
4    Q.    And see Table 14.1 in those
5  lists, the five aspects -- excuse me -- the
6  nine aspects of Bradford Hill?
7    A.    Yeah, let me just look at them
8  because there are nine there.  I just want to
9  make sure that those are the nine Bradford
10 Hill criteria.
11      MR. LOCKE:  Objection to the
12    use of this exhibit.
13      THE WITNESS:  So I see these
14    nine -- I see Table 14.1 stating
15    "guidelines for judging whether an
16    observed association is causal," and I
17    see nine lines there.
18      But there are some lines that
19    are not necessarily those that are --
20    those that Bradford Hill spoke about
21    in his article.
22 QUESTIONS BY MR. TISI:
23    Q.    Okay.  So if you go to the
24  last -- after discussing the nine that he
25  discusses, at the very end it has a

Page 215

1  conclusion.
2    A.    Who are you referring to,
3  Dr. Gordis or --
4    Q.    Dr. Gordis.
5    A.    -- Bradford Hill?
6    Q.    Dr. Gordis.  At the conclusion
7  on page 260.
8    A.    So we're going to 260 now?
9    Q.    Uh-huh.
10    A.    Okay.  260.
11    Q.    Right.
12      There's a conclusion there,
13  right?
14    A.    I see "conclusion," the word,
15  yes.
16    Q.    Okay.  And I'm going to read
17  it -- the paragraph in the conclusion and see
18  whether you agree with it.
19      "Although causal guidelines
20  discussed in this chapter are often referred
21  to as criteria, the term does not seem
22  entirely appropriate.  Although it may be a
23  desirable goal to place causal inferences on
24  a firm quantitative and structural
25  foundation, at present we do not have all the

Page 216

1  information needed for doing so.  The
2  preceding list should therefore be
3  considered -- should therefore be considered
4  to be only guidelines that can be of most
5  value when coupled with reasoned judgment
6  about the entire body of available evidence
7  in making decisions about causation."
8      Did I read that correctly?
9    A.    Yes, you did.
10    Q.    Okay.  Do you agree with that
11 statement?
12      MS. MILLER:  Objection.
13      MR. LOCKE:  Objection.
14      THE WITNESS:  I mean, there are
15    so many statements in there, you'd
16    have to ask me specifically if I agree
17    or disagree with --
18 QUESTIONS BY MR. TISI:
19    Q.    Well, do you agree with the
20  statement that reasoned judgment is important
21  when interpreting epidemiologic evidence?
22      MS. MILLER:  Objection.
23      THE WITNESS:  I didn't write
24    this, and I don't know exactly what
25    the definition of reasoned judgment

Page 217

1  in -- that's a very vague term.
2  QUESTIONS BY MR. TISI:
3    Q.    Okay.
4    A.    And it's going to be impossible
5  to answer that, because I don't know what the
6  definition of reasoned judgment is.
7      (Merlo Exhibit 24 marked for
8    identification.)
9  QUESTIONS BY MR. TISI:
10    Q.    Okay.  That's fine.
11      Go to page -- we'll discuss
12  this real quickly.
13      Oh.  On page 2 of your report,
14  footnote 1, you refer to a lesson from the
15  CDC publication.  I'd like to mark that as
16  Exhibit Number 24.
17    A.    Where are we now?
18    Q.    Page 2 of your report, footnote
19  1.
20    A.    Correct.  Yes.  I have it.
21    Q.    It refers to a CDC publication?
22    A.    That's correct.
23    Q.    Okay?  I marked that as Exhibit
24  Number 24.
25      I assume that this is something

55 (Pages 214 to 217)

Christian Merlo, M.D., MPH

Page 218

1  that you read before you cited it in your
2  report?
3           MR. LOCKE: Objection.
4           THE WITNESS: So this --
5  this --
6  QUESTIONS BY MR. TISI:
7       Q.   Actually, it's a very simple
8  question: I assume you read it before citing
9  it?
10      A.   I did look at this website from
11 the CDC. This definition actually comes out
12 of several textbooks, and the reference from
13 those --
14      Q.   Doctor, I didn't ask you that
15 question. I asked you whether you --
16      A.   I'm giving you an answer.
17      Q.   I just asked you whether you
18 read it.
19      A.   And so I'm giving you an
20 answer.
21           Where I found this definition
22 was in several textbooks. When I looked back
23 to the reference, it referenced this lesson.
24           Did I read this entire thing?
25 I don't recall. I know that I did look this

Page 219

1  up on the CD's website -- CDC's website and
2  did take this definition from one or the
3  entirety of those -- of those references, and
4  I don't specifically remember where.
5       Q.   Okay. You cited it, and so
6  let's go through it. Okay?
7           On page 1 it says,
8  "Epidemiology is just -- is not just a
9  research activity but an integral component
10 of public health providing the foundation for
11 directing practical and appropriate public
12 health action based upon this science and
13 causal reasoning."
14           MS. MILLER: Do you know where
15 he is?
16           THE WITNESS: I'm sorry, where
17 are you?
18 QUESTIONS BY MR. TISI:
19      Q.   The last sentence on the first
20 page.
21           I'll read it again.
22 "Epidemiology is not just a research activity
23 but an integral component of public health
24 providing the foundation for directing
25 practical and appropriate public health

Page 220

1  action based on this science and causal
2  reasoning."
3           Do you see that?
4       A.   I do see that.
5       Q.   Okay.
6       A.   And that's why I put this
7  definition in --
8       Q.   Okay.
9       A.   -- when I was defining
10 epidemiology, because I said that it's "the
11 study of the distribution and determinants of
12 health-related states or events in specific
13 populations and the application of this study
14 to control health problems."
15      Q.   Right.
16      A.   And that's what I was looking
17 for, is a definition --
18      Q.   And it also -- and it also uses
19 the word "causal reasoning."
20      A.   If I could just finish --
21      Q.   Well, I understand, but --
22      A.   -- because I'm giving you an
23 answer.
24      Q.   You're not -- I asked you about
25 a particular sentence. Okay? I didn't ask

Page 221

1  you why you used it. I didn't ask you -- you
2  need to -- I'm perfectly happy to let you
3  answer the question, but I'm also -- it's
4  also important that you listen to my
5  question. Okay?
6           My question is: Do you agree
7  with the statement that I just read?
8           I didn't ask you why. I didn't
9  ask how. I didn't ask you what you did to do
10 get there. I simply asked you whether you
11 agree with it.
12           MR. LOCKE: Objection.
13           MS. MILLER: Objection.
14           Assuming that was a question
15 and not a speech. I'm --
16           MR. TISI: It was a speech,
17 actually.
18           MS. MILLER: Oh. I'm objecting
19 to it as a speech.
20           MR. TISI: Fine.
21 QUESTIONS BY MR. TISI:
22      Q.   So now I'm going to ask you the
23 question.
24           Do you agree with the sentence
25 that is in the article that you cited?

Christian Merlo, M.D., MPH

Page 222

1          MS. MILLER: Objection.
2          THE WITNESS: I would like to
3    preface this by saying I am listening
4    to your questions.
5    QUESTIONS BY MR. TISI:
6          Q.   Okay. So I'm going to ask you
7    to listen closer because the answers are not
8    answering my question.
9          So now let me ask you this
10   question --
11         MR. LOCKE: Objection.
12   QUESTIONS BY MR. TISI:
13         Q.   -- again, and it's a very
14   simple one.
15         Do you agree with the following
16   statement, quote, "Epidemiology is not just a
17   research activity but an integral component
18   of public health, providing the foundation
19   for directing practical and appropriate
20   public health action based on this science
21   and causal reasoning, close quote."
22         Do you agree with that?
23         A.   It's a statement that's in
24   this -- off the website.
25         Q.   And do you agree with it?

Page 223

1          A.   I mean, there's so many aspects
2    to that statement --
3          Q.   I understand.
4          A.   -- that make it difficult to
5    agree or disagree with. It depends. It --
6          Q.   Okay.
7          A.   I didn't write it, so I --
8          Q.   Now let's go to the end where
9    it says, "Application" on the last page
10   before the summary.
11         Application. Do you see the
12   paragraph? Let's see if we can read it
13   together.
14         "Epidemiology is not just the
15   study of," in quotes, "public health in a
16   population. It also involves applying the
17   knowledge gained by the studies to
18   community-based practice. Like the practice
19   of medicine, the practice of epidemiology is
20   both a science and an art. To make a proper
21   diagnosis and to prescribe appropriate
22   treatment for a patient, the clinician
23   combines medical, scientific knowledge with
24   experience, clinical judgment and
25   understanding of the patient. Similarly, the

Page 224

1    epidemiologist uses the scientific methods of
2    descriptive and analytic epidemiology as well
3    as experience, epidemiologic judgment and
4    understanding of local conditions in
5    diagnosing the health of a community and
6    proposing appropriate practical and
7    acceptable public health interventions to
8    control and prevent disease in a community."
9          First of all, did I read that
10   right?
11         A.   You did read that correctly off
12   the page.
13         Q.   Does it use the word -- does it
14   make the statement that it -- that
15   epidemiologists use scientific methods of
16   descriptive and analytic epidemiology as well
17   as experience and epidemiologic judgment?
18         Does it not say that?
19         MS. MILLER: Objection.
20         THE WITNESS: It says,
21   "Similarly, the epidemiologist uses
22   the scientific methods of descriptive
23   and analytic epidemiology as well as
24   experience, epidemiologic judgment and
25   understanding of local conditions in

Page 225

1    diagnosing the health of a community
2    and proposing appropriate practical
3    and acceptable public health
4    interventions to control and prevent
5    disease in the community."
6    QUESTIONS BY MR. TISI:
7          Q.   Do you agree with it?
8          A.   I mean, in general, that seems
9    like a statement that -- that's why we use
10   epidemiology.
11         Q.   Okay.
12         A.   I didn't write this. There's
13   no reference there. There's -- this is a
14   very, very general statement.
15         Q.   Okay. I agree.
16         But you cited this particular
17   document in your report, and I'm asking you
18   about it.
19         In fact, you make a lot of
20   statements in your report that aren't cited
21   either, right?
22         MS. MILLER: Objection.
23         THE WITNESS: You asked several
24   questions there.
25

Christian Merlo, M.D., MPH

Page 226

```
1    QUESTIONS BY MR. TISI:
2        Q.   Well, okay.  You make a lot of
3    statements in your report that aren't cited
4    either, don't you?
5            We just talked about the
6    statistical significance paragraph, the one
7    that's important to note.  There was not a
8    citation there either, right?
9            MR. LOCKE:  Objection.
10           MS. MILLER:  Objection.
11           THE WITNESS:  In that instance
12       there was not a citation.
13   QUESTIONS BY MR. TISI:
14       Q.   Okay.  So the fact that there's
15   no citation, does that make your -- the
16   opinion you express in your report invalid?
17       A.   Not necessarily.
18       Q.   Okay.  So --
19       A.   But --
20       Q.   I want to ask you about this
21   statement.
22       A.   I --
23       Q.   Well, I want to ask you about
24   this statement.  You answered my question,
25   saying that there's no --
```

Page 227

```
1        A.   No, I didn't.  No, I didn't.  I
2    didn't finish.  And --
3        Q.   Doctor --
4        A.   And --
5        Q.   Do you agree or disagree --
6            MS. MILLER:  He's literally in
7        the middle of a word --
8            THE WITNESS:  And I would
9        appreciate it if you would stop
10       interrupting.  Just let me finish.
11       It's fine.
12   QUESTIONS BY MR. TISI:
13       Q.   Fine.  I would appreciate if
14   you answer my question.
15           Do you agree or disagree with
16   the application paragraph in this document?
17           MR. LOCKE:  Objection.
18           THE WITNESS:  It's not
19       something to agree or disagree with.
20       It's from a website that is online.
21           I cited this to give a
22       definition of what epidemiology is.
23       It doesn't mean I agree or disagree
24       with the entire thing.  I used this as
25       a way to get a definition for
```

Page 228

```
1    epidemiology.
2    QUESTIONS BY MR. TISI:
3        Q.   Understood.  I get it.  I get
4    it.
5            Now I'm asking you:  In the
6    document that you cited is another statement.
7    Do you agree with it or not agree with it?
8            MS. MILLER:  Objection.
9    QUESTIONS BY MR. TISI:
10       Q.   And if you don't agree with it,
11   I want to know why.  And if you do agree with
12   it, I'm fine with it.
13           MS. MILLER:  Okay.  So what's
14       the question?  Because I --
15   QUESTIONS BY MR. TISI:
16       Q.   Do you agree with it, or do you
17   don't agree with it?
18           MS. MILLER:  Objection.  Asked
19       and answered.
20           THE WITNESS:  I think in
21       general -- it's such a general
22       statement that it depends.  It depends
23       on what we're talking about.  It
24       depends on what the study is doing.
25           It's so general that there's no
```

Page 229

```
1    way to agree or disagree with it.
2    QUESTIONS BY MR. TISI:
3        Q.   Okay.  Well, I guess the CDC
4    would be happy to know that.
5            MR. LOCKE:  Objection.
6    QUESTIONS BY MR. TISI:
7        Q.   Let's move on to the discussion
8    on paragraph -- page 33, footnote 75.  And we
9    talked about this very briefly, the IPPHS
10   study on the primary pulmonary hypertension?
11       A.   Are you referring to my report?
12       Q.   Yes.
13       A.   Okay.
14       Q.   Page 33?
15       A.   33.
16       Q.   Footnote 75.
17           In the footnote you cite a
18   study by Abenhaim, appetite suppressants and
19   the risk of primary pulmonary hypertension in
20   1996, for the proposition for -- where you're
21   discussing strength of association, correct?
22       A.   That's correct.
23       Q.   All right.  And I thought that
24   was an interesting example that you took, and
25   I want to ask you some questions about that.
```

Christian Merlo, M.D., MPH

Page 230

1        You mentioned before that you
2    believe that anorexigens, fenfluramine and
3    dexfenfluramine, can cause primary pulmonary
4    hypertension, correct?
5        You remember that testimony?
6        MR. LOCKE:  Objection.
7        MS. MILLER:  Objection.  I
8        don't think that characterizes his
9        testimony accurately.
10       THE WITNESS:  As a clinician,
11       when I see patients who have been
12       diagnosed with pulmonary hypertension,
13       asking about anorexigens is part of my
14       clinical evaluation because of studies
15       that have looked into the association.
16   QUESTIONS BY MR. TISI:
17       Q.   Okay.  So and I think you
18   testified before, and the record will reflect
19   what you testified to, but I think you did
20   testify before that you believed on balance
21   that there is cause and effect there.  But
22   the record will be what the record is.
23       Let me ask you this:  Are you
24   aware -- first of all, this is a case-control
25   study, correct?

Page 231

1        A.   It is a case-control study.
2        Q.   Subject to all the same biases
3    that you discussed with respect to the
4    case-control studies in this case, correct?
5        MS. MILLER:  Objection.
6        THE WITNESS:  So some of the
7        biases.  But we have to remember that
8        this is a medication study, and so the
9        medications can be looked at in the
10       record, they can be looked as whether
11       or not someone's been prescribed them.
12       So it is a little bit different
13       there in that this is not just
14       recalling back, this is -- you can
15       look to see whether or not people were
16       on medications.
17   QUESTIONS BY MR. TISI:
18       Q.   Do you know whether they did
19   that?
20       A.   I'd have to read the article
21   again.
22       Q.   Okay.  Well, you're just
23   speculating right now as you're talking?
24       MR. LOCKE:  Objection.
25       MS. MILLER:  Objection.

Page 232

1        THE WITNESS:  No, we'd have to
2    look back through the records.
3        (Merlo Exhibit 25 marked for
4        identification.)
5    QUESTIONS BY MR. TISI:
6        Q.   My question to you is this:
7    Did you do the same kind of rigorous analysis
8    of this study that you did of the studies
9    involving talc?
10       MS. MILLER:  Objection.
11       THE WITNESS:  My -- the reason
12       that I included this study in my
13       report was because -- was to -- was to
14       highlight a strength of association.
15   QUESTIONS BY MR. TISI:
16       Q.   I understand.
17       A.   And an odds ratio of 6.3 that
18   actually increases to -- well, I could look
19   here -- to 23.1 when the drugs were used for
20   more than three months is a high strength of
21   association.
22       Q.   Okay.
23       A.   So the reason that I included
24   it was to make the point that it is very,
25   very, very difficult, almost impossible, to

Page 233

1    explain away an odds ratio of 23.1 by some
2    other factor, bias or confounding.
3        Q.   It's funny because I was
4    involved in the litigation involving that,
5    and that's exactly what experts like you
6    said.
7        But we'll go back -- let me go
8    back and ask you this question, Doctor.
9        MS. MILLER:  Objection.
10       MR. LOCKE:  Objection.
11   QUESTIONS BY MR. TISI:
12       Q.   Do you know --
13       MS. MILLER:  Enough with the
14       speeches.  "Experts like you"?  What
15       does that even mean?
16       MR. TISI:  Experts like you,
17       hired by the companies.  Experts like
18       you.
19   QUESTIONS BY MR. TISI:
20       Q.   Let me ask you --
21       MR. LOCKE:  Objection.
22   QUESTIONS BY MR. TISI:
23       Q.   Let me ask you --
24       MS. SHARKO:  Please behave the
25       way you would in court.

59 (Pages 230 to 233)

Christian Merlo, M.D., MPH

|  | Page 234 |
|---|---|
| 1 | THE WITNESS: So I've never |
| 2 | been hired by a company -- |
| 3 | QUESTIONS BY MR. TISI: |
| 4 | Q. Okay. |
| 5 | A. -- to evaluate primary |
| 6 | pulmonary hypertension drugs. So I would |
| 7 | appreciate you not labeling me as something |
| 8 | that I am not. |
| 9 | Q. Okay. So let me ask you this, |
| 10 | Doctor: Are you aware that there was no -- |
| 11 | first of all, are you aware there's no cohort |
| 12 | studies involving primary pulmonary |
| 13 | hypertension anorexigen use? |
| 14 | A. So I'm aware of cohort studies |
| 15 | that have followed patients with pulmonary |
| 16 | hypertension, but I'm not aware that they |
| 17 | looked at exposures over time in cohort |
| 18 | studies. |
| 19 | Q. Were you aware that there are |
| 20 | no other case-control studies; in fact, this |
| 21 | is the only one? |
| 22 | MR. LOCKE: Objection. |
| 23 | THE WITNESS: Again, I would |
| 24 | have to review the medical literature |
| 25 | to -- |

|  | Page 235 |
|---|---|
| 1 | QUESTIONS BY MR. TISI: |
| 2 | Q. Would it surprise you? |
| 3 | A. I'm sorry? |
| 4 | Q. Would it surprise you to know |
| 5 | that this is not the -- that this is the only |
| 6 | one? |
| 7 | MS. MILLER: Objection. |
| 8 | THE WITNESS: Not necessarily, |
| 9 | and I'll tell you why. Because if you |
| 10 | have a study that suggests -- that has |
| 11 | an odds ratio of 6.3 that goes up to |
| 12 | 23, as a researcher, I'm not sure |
| 13 | another study would need to be done. |
| 14 | QUESTIONS BY MR. TISI: |
| 15 | Q. Okay. At what point -- what |
| 16 | would the odds ratio have to be before you |
| 17 | say, we don't need to do a second one? |
| 18 | MS. MILLER: Objection. |
| 19 | THE WITNESS: It depends. It |
| 20 | depends on the study design. It |
| 21 | depends on the -- |
| 22 | QUESTIONS BY MR. TISI: |
| 23 | Q. Say a case-control study, what |
| 24 | level would a case-control study have to be |
| 25 | in terms of a statistically significant odds |

|  | Page 236 |
|---|---|
| 1 | ratio for you, Dr. Merlo, to say you don't |
| 2 | need a second one, it's enough? |
| 3 | MS. MILLER: Objection. |
| 4 | MR. LOCKE: Objection. |
| 5 | THE WITNESS: So, again, I'm |
| 6 | going to say it depends. It depends |
| 7 | on not only the study design, but I |
| 8 | was going to finish with how the study |
| 9 | was conducted. But what plans were |
| 10 | taken to try to limit bias, what plans |
| 11 | were taken in the analysis to try to |
| 12 | adjust for potential confounding, and |
| 13 | what was done in the analysis. And |
| 14 | that -- it depends. It depends on all |
| 15 | those things. |
| 16 | QUESTIONS BY MR. TISI: |
| 17 | Q. Let's go to your report at the |
| 18 | end -- the summary paragraph, and we'll go |
| 19 | elsewhere. I want to address your opinions |
| 20 | about the so-called hierarchy of evidence. |
| 21 | A. Sure. |
| 22 | Q. On page 46. |
| 23 | A. 46, I got it. |
| 24 | MS. MILLER: I'm going to |
| 25 | object to that speech. |

|  | Page 237 |
|---|---|
| 1 | QUESTIONS BY MR. TISI: |
| 2 | Q. You say -- |
| 3 | MR. TISI: No speech. |
| 4 | |
| 5 | QUESTIONS BY MR. TISI: |
| 6 | Q. You call it the hierarchy of |
| 7 | evidence, right? |
| 8 | A. What are you referring to? |
| 9 | Q. Okay. "In particular, |
| 10 | plaintiffs' experts ignored the hierarchy of |
| 11 | evidence in evaluating studies." |
| 12 | Do you see that? |
| 13 | A. I do see that sentence. |
| 14 | Q. Okay. |
| 15 | A. Or that partial sentence. |
| 16 | Q. I want to talk about that. |
| 17 | I take it that you believe that |
| 18 | there is a recognized hierarchy of evidence |
| 19 | with cohort studies having higher evidentiary |
| 20 | values and reliability than case-control |
| 21 | studies? |
| 22 | MS. MILLER: Objection. Asked |
| 23 | and answered before lunch. |
| 24 | THE WITNESS: So that's not my |
| 25 | belief. It's a belief in epidemiology |

Christian Merlo, M.D., MPH

Page 238

1    that there is a hierarchy of evidence.
2    QUESTIONS BY MR. TISI:
3       Q.   Okay.  And you also believe
4    that within case-control studies that
5    hospital-based studies are more reliable than
6    population-control studies?
7          MS. MILLER:  Objection.
8          THE WITNESS:  What are you
9    referring to?
10   QUESTIONS BY MR. TISI:
11      Q.   I'm asking -- you say here --
12         MS. MILLER:  Can you tell us
13   what page you're on?
14         MR. TISI:  46.
15         MS. MILLER:  Thanks.
16         Do you have your report?
17   QUESTIONS BY MR. TISI:
18      Q.   In your report you talk about
19   the merits of hospital-based studies
20   versus -- which in your view showed no
21   association, and the case-control studies,
22   some of which showed an association, the
23   population-based ones?
24         MS. MILLER:  Is that a
25   question?

Page 239

1          MR. TISI:  Yes.
2          MS. MILLER:  Objection.
3          THE WITNESS:  Can you -- can
4    you ask that again?  Because I didn't
5    understand that was a question.
6    QUESTIONS BY MR. TISI:
7       Q.   Let me ask you directly.
8          In terms of reliability, do you
9    think that hospital-based studies are more
10   reliable than population-based case-control
11   studies?
12         MS. MILLER:  Objection.
13         THE WITNESS:  I don't know if
14   more reliable -- I don't know if
15   "reliable" is the right term.  It's
16   not a term we use in evaluating the
17   literature.
18         But there is some suggestion
19   that hospital-based case-control
20   studies might be less susceptible to
21   recall bias, and recall bias is a
22   tremendous limitation in case-control
23   studies of all kinds.
24   QUESTIONS BY MR. TISI:
25      Q.   Okay.

Page 240

1       A.   And the reason for that is that
2    there's thought that when a hospital-based
3    case-control study is done, cases and
4    controls think about the past in the same
5    amount; whereas when we have population-based
6    case-control studies, there may be
7    difference -- differences in recall between
8    cases and controls.  And that's the
9    definition of recall bias.
10         MR. TISI:  Okay.  I'm going to
11   move to strike.
12   QUESTIONS BY MR. TISI:
13      Q.   My question was in terms of
14   evidentiary value.  Do you place
15   hospital-based studies having more -- give
16   them more weight as a study design than
17   population-based case-control study designs?
18         MR. LOCKE:  Objection.
19   QUESTIONS BY MR. TISI:
20      Q.   For whatever reason.  I don't
21   care what the reason is now.
22         MS. MILLER:  Objection.
23         THE WITNESS:  So I'll say it
24   depends.
25   QUESTIONS BY MR. TISI:

Page 241

1       Q.   Okay.
2       A.   And it depends on the -- how
3    the study is put together.  It depends on
4    what the study investigators used to tried to
5    limit bias and what the study investigators
6    tried to use to limit confounding.
7          If -- a poorly designed
8    hospital-based study may not be as good as a
9    very well-designed population-based study and
10   vice versa.
11      Q.   In terms of -- I'm sorry.
12      A.   But if we're talking about
13   serious limitations in case-control studies,
14   recall bias is one of them.
15         And it's an accepted thought
16   that recall bias is less in hospital-based
17   case-control studies when compared to
18   population-based studies.
19      Q.   What's your citation for that?
20      A.   I would have to look through.
21   I know I talked about it in my report, but I
22   have to -- if you give me a couple seconds,
23   I'll look through that.
24         MS. MILLER:  Do you know what
25   page it's on, Counsel?

Christian Merlo, M.D., MPH

Page 242

1      MR. TISI:  Nope.
2      MS. MILLER:  I do.
3      MR. TISI:  Good for you.
4      MS. MILLER:  May I say that to
5  cut to the chase?
6      MR. TISI:  No, I don't want --
7      MS. MILLER:  You want him to
8  read through every page?  Okay.
9      MR. TISI:  I don't want him to
10  read every page, but I don't want you
11  to coach your witness.  Because I
12  noticed before that you were circling
13  things while he was looking at it, so
14  I don't want to do it anymore.
15      MR. LOCKE:  Objection.
16      MS. SHARKO:  That's really
17  inappropriate --
18      MR. TISI:  I understand it's --
19      MS. SHARKO:  -- Mr. Tisi, and
20  it's not true.
21      MR. TISI:  The video will
22  demonstrate that it is true.
23      MR. LOCKE:  It's false.  She
24  was circling something on the left
25  side away from the witness.

Page 243

1      MR. TISI:  Okay.
2      MS. MILLER:  To show to Susan.
3      MS. SHARKO:  With her computer
4  open between Ms. Miller and the
5  witness.
6      MR. TISI:  Well, I was accused
7  before of kicking under the table,
8  which I thought was absolutely
9  inappropriate.
10      MS. SHARKO:  We understand
11  that.
12      MR. TISI:  And incorrect.
13      MS. SHARKO:  You've mentioned
14  that a number of times.
15      MR. TISI:  And incorrect.  And
16  incorrect and wrong and
17  unprofessional.  We're sitting at a
18  conference table.
19      MS. SHARKO:  All right.  So
20  let's have a truce on the personal
21  attacks and just take your deposition.
22      MR. TISI:  Perfect.  Perfect.
23      THE WITNESS:  So on page 6, the
24  last paragraph I say, "Recall bias is
25  often less likely to occur when both

Page 244

1  cases and controls are patients, for
2  example, in hospitalized patients."
3  QUESTIONS BY MR. TISI:
4      Q.   Is there a citation to it?
5      A.   There is, Schultz and Grimes.
6      Q.   Okay.
7      A.   "Where the degree of thinking
8  about a possible exposure outcome is likely
9  to be at similar levels."
10      Q.   Okay.  All right.  So going
11  back to the hierarchy of evidence concept --
12  because you mentioned that several times
13  throughout your report, true?
14      A.   You've asked me several times
15  about it, and I have talked about the
16  hierarchy evidence in my report.
17      Q.   Okay.  Well, let's talk about
18  the places where you do talk about it.
19      You mentioned it in your
20  conclusion.  We talked about that.
21      Can you go to page 27 of your
22  report?
23      A.   Sure.
24      Q.   At the very bottom of the page
25  it says, "While cohort studies have their own

Page 245

1  limitations like any other study design, the
2  focused criticism of cohort studies by
3  plaintiffs' epidemiologists, even though they
4  generally are considered more reliable than
5  case-control studies, suggesting a biased
6  approach to their analysis."
7      Do you see that?
8      A.   I do.
9      Q.   Okay.  First of all, that's
10  another example where you accused our experts
11  of being biased, correct?
12      MR. LOCKE:  Objection.
13      MS. MILLER:  Objection.
14      THE WITNESS:  I didn't accuse
15  anything.  I'm suggesting.
16  QUESTIONS BY MR. TISI:
17      Q.   Okay.  You're suggesting.
18      Do you believe that they used a
19  biased methodology?
20      A.   I'm sorry.
21      Q.   Did you believe that they used
22  a biased methodology?
23      MS. MILLER:  Objection.
24      THE WITNESS:  What I say here
25  is "even though they're generally

62 (Pages 242 to 245)

Christian Merlo, M.D., MPH

Page 246

1    considered more reliable than
2    case-control studies suggests a biased
3    approach to their analysis."
4    QUESTIONS BY MR. TISI:
5        Q.   Do you believe that they did?
6            MS. MILLER:  Objection.
7            THE WITNESS:  I'm just going to
8    read what I said.
9            MS. MILLER:  Asked and
10   answered.
11   QUESTIONS BY MR. TISI:
12       Q.   I understand you read what you
13   said.  This is my opportunity to ask you
14   questions about what you wrote.  I can read
15   what you said, too.
16           Okay.  So my question to you
17   is:  Do you believe that they used a biased
18   approach --
19           MS. MILLER:  Objection.
20   QUESTIONS BY MR. TISI:
21       Q.   -- to their analysis?
22       A.   What I'm saying is that --
23       Q.   I'm not asking what you said.
24   I'm asking what your opinion is now, Doctor.
25           Is your opinion, if I close

Page 247

1    this book and we don't read what you said,
2    I'm asking you, do you think that they used a
3    biased approach in looking at the
4    case-control studies and the cohort studies?
5            MS. MILLER:  He was in the
6            middle of answering, and you
7            interrupted him to ask the question --
8            MR. TISI:  No, he was about to
9    read me what -- this is what I said.
10   QUESTIONS BY MR. TISI:
11       Q.   I'm asking you what your
12   opinion is.
13       A.   And my opinion is what I said.
14       Q.   Okay.
15       A.   And I'll say again.
16       Q.   No, you don't need read it
17   again.  If your opinion is limited to what it
18   says here, then that's fine.
19           Do you believe -- do you have
20   any reason to know that they used -- well,
21   strike that.  Strike that.  We'll let it
22   stand.
23           Before you discussed the state
24   of mind of our experts and their sloppiness,
25   their bias approach, you state, "It is

Page 248

1    generally accepted that they are more
2    reliable than case-control studies," meaning
3    cohort studies, true?
4            MR. LOCKE:  Objection.
5            THE WITNESS:  Can you state
6    that as a question?
7    QUESTIONS BY MR. TISI:
8        Q.   Yes.
9            Do you state that cohort
10   studies here are more reliable than
11   case-control studies?
12           MS. MILLER:  Objection.
13           THE WITNESS:  So it depends.
14   In general, cohort studies, as I
15   talked about earlier, when performed
16   appropriate -- when designed
17   appropriately, when performed
18   appropriately, when analyzed
19   appropriately, do fall higher up on
20   the hierarchy of evidence when
21   compared to case-control studies.
22   QUESTIONS BY MR. TISI:
23       Q.   On page 35, you have a whole
24   section about the disregard of hierarchy of
25   evidence.

Page 249

1            Do you see that?
2        A.   I do see the disregard for
3    hierarchy of evidence.
4        Q.   And you're referring, again, to
5    the methodologic flaw of plaintiffs' experts,
6    which is the main Section 8 above, correct?
7        A.   Can you show me what you're
8    referring to?
9        Q.   Yeah.
10           Roman Numeral VIII is
11   Methodologic Flaws of Plaintiffs' Experts'
12   Epidemiology-Based Opinions.  That's the
13   title of this section?
14       A.   That's correct.
15       Q.   And the first criticism you
16   have here is disregard for hierarchy of
17   evidence, correct?
18       A.   I see that, disregard for
19   hierarchy of evidence.
20       Q.   Are you saying that the
21   plaintiffs' experts disregarded the hierarchy
22   of evidence?
23           MS. MILLER:  Objection.
24           THE WITNESS:  In general, in
25   comparing cohort studies to

63 (Pages 246 to 249)

Christian Merlo, M.D., MPH

Page 250

1      case-control studies, they're just not
2   equal.  I mean, cohort studies are
3   following subjects --
4   QUESTIONS BY MR. TISI:
5      Q.   Wasn't what I asked.  So,
6   Doctor, sorry.  I wasn't asking your opinion
7   about case control and cohort.
8           I'm asking you:  Did the
9   plaintiffs' experts -- not what your views
10  are.  Did, in your opinion, plaintiffs'
11  experts disregard the hierarchy of evidence?
12          MR. LOCKE:  Objection.
13          MS. MILLER:  Objection.
14          THE WITNESS:  So -- and I'll
15      say that in general the hierarchy of
16      evidence does place cohort studies
17      above the case-control studies.  And
18      to treat those studies equally in
19      looking at the body of evidence would
20      be disregarding the hierarchy of
21      evidence.
22  QUESTIONS BY MR. TISI:
23      Q.   Okay.  And you say, "The
24  hierarchy of evidence is well-established in
25  the scientific community."  And that's where

Page 251

1   you cite the National Health and Research
2   Council.
3           And that's that Australian
4   white paper that we talked about before,
5   right?
6           MS. MILLER:  Objection.
7           THE WITNESS:  I'd have to look
8       at it.
9           (Merlo Exhibit 26 marked for
10      identification.)
11  QUESTIONS BY MR. TISI:
12      Q.   Okay.  We'll find it.
13          I'll attach this as Exhibit
14  Number 26.  This is the paper to which you
15  were referring.
16      A.   Yeah, I don't have this
17  memorized, the entirety.
18      Q.   I'm not asking you about it.
19  I'm just asking if this is the document you
20  referenced to in your footnote.
21      A.   This looks like it.
22      Q.   Okay.  Before when I asked you
23  about Health Canada, you said you didn't even
24  know who they were.
25          Do you know who the Australian

Page 252

1   National Health Medical Research Council is?
2           MR. LOCKE:  Objection.
3           THE WITNESS:  I do not know who
4       the National Health and Medical
5       Research Council are.
6   QUESTIONS BY MR. TISI:
7       Q.   Did you get this document from
8   the defense lawyers or did you find it on
9   your own?
10      A.   I found this myself.
11      Q.   Okay.  Without -- but you don't
12  know who these people are?
13      A.   I don't know who a lot of
14  people are that publish things.
15      Q.   Well, you don't know what this
16  organization is, do you?
17      A.   No, I don't.
18      Q.   Okay.  So -- but you say
19  here -- the only thing you cite for that is
20  this Australian document.
21          Can you tell me why you didn't
22  go to any of the textbooks that you use at
23  Hopkins to cite this well-established
24  principle?
25      A.   No.

Page 253

1           MR. LOCKE:  Objection.
2           THE WITNESS:  I mean, I could
3       have gone to textbooks, but I didn't.
4   QUESTIONS BY MR. TISI:
5       Q.   Well, we will.
6       A.   I looked things up.
7       Q.   You call this a fundamental
8   principle of epidemiology, if you go to
9   page 46.  First sentence, second paragraph of
10  your conclusions.
11      A.   The first sentence of the
12  second paragraph?
13      Q.   Uh-huh.
14      A.   And what was the question?
15      Q.   You call it a fundamental
16  principle of epidemiology, right?
17      A.   The first sentence of the
18  second paragraph says, "The methodologies
19  used by plaintiffs' experts ignore
20  fundamental principles of epidemiology."
21      Q.   In particular, plaintiffs'
22  experts ignore the hierarchy of evidence.
23      A.   Yes.
24      Q.   That's what you're referring
25  to?

64 (Pages 250 to 253)

Christian Merlo, M.D., MPH

Page 254

1      A.   Yes.
2      Q.   Okay.  So in your whole report,
3  the only thing you cited was this Australian
4  document, which we've marked as Exhibit
5  Number 26, on this fundamental principle,
6  right?
7           MR. LOCKE:  Objection.
8           MS. MILLER:  Objection.
9  QUESTIONS BY MR. TISI:
10     Q.   Because I don't see any other
11 citation in any other place other than this
12 Australian document from the organization you
13 know who they are.
14     A.   That's the citation I used.  I
15 teach about this in class.  I've been taught
16 about it in class.
17     Q.   Okay.
18     A.   You're welcome to take my class
19 and see the slides.
20     Q.   I think I'm gonna.
21          Putting aside your concern
22 about how the experts weighed the talc
23 studies, you believe that the cohort design
24 is the best for measuring ovarian cancer?
25          MS. MILLER:  Objection.

Page 255

1           THE WITNESS:  Again, it
2  depends.  It depends on the -- how the
3  study is set up.  It depends on
4  what -- it depends on how long someone
5  is followed.  It depends on the study
6  population being looked at.  It
7  depends on what potential bias was --
8  tried to -- it depends on the
9  investigators planning to try to limit
10 bias.  It depends on the plan to
11 adjust for potential confounders.
12          So it depends.  It's too
13 general to answer.
14 QUESTIONS BY MR. TISI:
15     Q.   Do you know whether or not any
16 of the cohort studies had, as one of its
17 primary focuses at the initiation of this
18 study, assessing whether or not talc causes
19 ovarian cancer?
20     A.   Can you ask that again?
21     Q.   Yes.
22          Do you know whether or not one
23 of the hypotheses that was considered at the
24 inception of any of these cohort studies was
25 that talc could cause ovarian cancer?

Page 256

1      A.   So I wasn't -- I wasn't
2  involved in any of the design of the cohort
3  studies, but one of the beauties of a cohort
4  study is you actually don't need that.
5      Q.   Okay.
6      A.   And what you do is you follow
7  patients over time, and sometimes things come
8  up.  And you might add a questionnaire in and
9  then follow because you have a large group of
10 people that you're following over time.  You
11 have a time zero with some measurement, and
12 then an outcome that develops.  And that's --
13 that's the purpose of a cohort study --
14     Q.   How long --
15     A.   -- that you don't need to have
16 one hypothesis.
17     Q.   How large would a study -- have
18 you done any power calculations to determine
19 how large a study would have to be in order
20 to accurately collect information that would
21 be useful in determining where there's
22 association?
23          MR. LOCKE:  Objection.
24          THE WITNESS:  I don't
25 understand your question.  It doesn't

Page 257

1  make sense.
2  QUESTIONS BY MR. TISI:
3      Q.   How large?  How large would a
4  study have to be?
5           How many patients would have to
6  be enrolled in a cohort study in order to get
7  good information about whether or not talc is
8  associated with ovarian cancer?
9           MR. LOCKE:  Objection.
10          THE WITNESS:  So it depends.
11 It depends on the study.  It depends
12 on the study population.
13          If you're looking at younger
14 women, it may take -- there may be --
15 you may need a larger study
16 population.  If you're looking at
17 women, say, in their 50s, you need a
18 smaller population.
19          It's all going to depend on
20 the -- on the incidence of disease in
21 the study population.
22 QUESTIONS BY MR. TISI:
23     Q.   Did you look at that?
24     A.   I did.
25     Q.   Okay.  How long would the study

65 (Pages 254 to 257)

Christian Merlo, M.D., MPH

Page 258

1  have to be?
2       A.    It depends.  It depends on
3  the -- it depends on the population.  It
4  depends on what the incidence of disease in
5  that population is.
6       Q.    And how long -- how long do you
7  think it would have to be for a cohort study
8  to detect ovarian cancer in women?
9            MS. MILLER:  Objection.
10            THE WITNESS:  Well, then I'm
11  going to have to say it depends.
12  Because in all women, that will --
13  you'd need a very different number
14  than in looking at, say, women who are
15  55 to 65, because the incidence of
16  disease is very different among
17  different age populations.
18  QUESTIONS BY MR. TISI:
19       Q.    Okay.  So in women 55 to 65,
20  did you independently assess how large a
21  study would have to be?
22            MS. MILLER:  Objection.
23            THE WITNESS:  I looked at power
24  and sample size calculation under
25  various assumptions, and those

Page 259

1  assumptions utilized the incidence of
2  disease and the time to follow someone
3  with varying times and varying
4  incidence of disease.
5  QUESTIONS BY MR. TISI:
6       Q.    So how large would a study have
7  to be in women age 50 to 55 to detect an
8  association between talc and ovarian cancer?
9       A.    So I used 55 to 65 as an
10  example just talking right here.  I don't
11  specifically remember right now the incidence
12  of ovarian cancer in someone who is 55 to 60.
13            I know that there are ranges,
14  and those ranges are available on the
15  Internet to look at incidence of disease
16  based on age, and I used some of those ranges
17  and some of those incidences.
18       Q.    Did you do calculations?
19       A.    I did calculations.
20       Q.    Where are they?
21       A.    They're in my report.
22       Q.    Where are they?
23            MR. LOCKE:  Objection.
24            THE WITNESS:  Give me a couple
25  of seconds to find it.

Page 260

1  QUESTIONS BY MR. TISI:
2       Q.    I'm not saying anything.
3            What page are you looking at,
4  Doctor?
5       A.    Well, this might not be -- 38.
6  So 38, page 38, paragraph 1, where it says,
7  "She relies on commentary by Narod, who
8  states that the lack of significant overall
9  association between ever talc use and ovarian
10  cancer in the cohort studies may be due to
11  the fact that despite the large size of the
12  cohorts, the studies were not adequately
13  powered to detect a relative risk of
14  approximately 1.2."
15       Q.    Right.
16       A.    "But this commentary rests on
17  sample size calculations with certain
18  assumptions regarding the risk of ovarian
19  cancer, including the same incidence rate
20  issue that undermines Dr. McTiernan's
21  critique.  When the actual incidence rate of
22  ovarian cancer in the cohort studies is taken
23  into account, it decreases the study sample
24  size needed to the sample size reported in
25  the relevant cohort studies."

Page 261

1       Q.    I understood.  I read that.
2            Where is your calculation for
3  that?
4            Did you -- it says when -- the
5  last sentence says, "When the actual
6  incidence rates of ovarian cancer in the
7  cohort studies is taken into account, it
8  decreases the study sample size."
9            You did the calculation to make
10  that conclusion, and I don't see it in your
11  report.
12            Can you tell me where it is?
13       A.    I did it on a computer, and it
14  gave me a sample size that was similar to
15  what was reported in the relevant cohort
16  studies when you use an incidence of ovarian
17  cancer that's similar to the incidence rates
18  of the population that was being studied.
19       Q.    You did it on a computer?  It's
20  not in your report.
21            MS. MILLER:  Yes, it is.
22  QUESTIONS BY MR. TISI:
23       Q.    Well, tell me where it is.
24            MR. TISI:  I'm not asking
25  counsel; I'm asking the witness.

66 (Pages 258 to 261)

Christian Merlo, M.D., MPH

Page 262

1    MS. MILLER:  Well, we can sit
2    and he can look for it, or I can tell
3    you where it is.
4        MR. TISI:  It's funny how that
5    happens.  When I ask him about a
6    specific sentence, you want him to
7    read the whole report.
8        MS. MILLER:  No, that's not --
9    no, that's exactly the opposite of
10   what I was saying.  I said if you want
11   him to read the whole report, you can.
12   I also know where it is.
13       MR. TISI:  No, that's -- it
14   depends on the question.
15       MS. SHARKO:  Well, being nice
16   doesn't work, unfortunately.
17       MS. MILLER:  Yeah, I'm trying
18   to be nice.  That's the irony.
19       MR. TISI:  You don't -- fine.
20       MS. MILLER:  Do you want to
21   finish that sentence?
22       MR. TISI:  Yes.
23       MS. MILLER:  Go ahead.
24       MR. TISI:  Your conduct during
25   the course of these depositions has

Page 263

1    been anything but nice.
2        MR. LOCKE:  Objection.
3        MR. TISI:  If you really want
4    it to be put on the record, that's
5    what I was going to say.
6        To honor Susan's request, I was
7    going to forebear from that, but you
8    asked.
9        MS. SHARKO:  Mr. Tisi, really.
10       THE WITNESS:  So just give me a
11   couple seconds.  I'll find it.
12       Okay.  So I think I found
13   another instance where I described
14   that sample size would be adequate.
15   QUESTIONS BY MR. TISI:
16   Q.   Okay.  Where is that?
17   A.   It's at page 37.
18   Q.   Which paragraph?
19   A.   Third paragraph.
20   Q.   Okay.
21   A.   And then halfway down that
22   paragraph it says, "Specifically using the
23   Berge study meta-analysis of cohort studies,
24   which concluded that combined cohort studies
25   yielded no risk of ovarian cancer when

Page 264

1    comparing participants exposed to talc to
2    participants not exposed to talc, I
3    calculated that the incidence of ovarian
4    cancer in the overall number of study
5    participants was sufficient to detect the
6    true risk of ovarian cancer of 1.25 with a
7    power of 99, 99 percent."
8    Q.   So what would the number have
9    to be in order to be -- what was your number?
10   That's what I wanted to know.
11   A.   I would have to look at my
12   computer again.  I just know it's sufficient.
13   Q.   Okay.  But you didn't put in
14   your report what the number would have to be
15   to -- so I can't ask you that question, and
16   you don't know it here right now, do you?
17       MR. LOCKE:  Objection.
18       THE WITNESS:  The number is
19   over the number of participants
20   included in those studies.
21   QUESTIONS BY MR. TISI:
22   Q.   Okay.
23   A.   And that means that there's
24   only a 1 percent chance of being incorrect --
25   Q.   Okay.

Page 265

1    A.   -- if, in fact, there is no
2    difference in folks who haven't been
3    exposed -- or unexposed to talcum powder.
4    Q.   Now, getting back to the --
5    this fundamental principle of epidemiology
6    that there's this hierarchy of evidence, you
7    know that the current view in epidemiology,
8    in fact, a view that's been for a while, has
9    been that case control and epidemiologic case
10   control and cohort studies are looked at
11   together --
12       MR. LOCKE:  Objection.
13   QUESTIONS BY MR. TISI:
14   Q.   -- if they exist together,
15   right?
16       MS. MILLER:  Objection.
17       THE WITNESS:  I don't
18   understand the question.  You have to
19   ask it again.
20   QUESTIONS BY MR. TISI:
21   Q.   Well, let's look at the Gordis
22   textbook again.  Exhibit Number 23.
23       Can you look at Exhibit 23
24   again, Doctor?
25       MS. MILLER:  Is that the

67 (Pages 262 to 265)

Christian Merlo, M.D., MPH

Page 266

1    Chapter 14?
2        MR. TISI:  Yeah.
3    QUESTIONS BY MR. TISI:
4        Q.   Can you go to page 256?  You
5    use it as an example -- 255, excuse me.  Oh,
6    I'm sorry.  257, please.
7            He uses as an exam -- and feel
8    free to look at if you wish.  He uses an
9    example, the process for using evidence in
10   developing recommendations, effectiveness of
11   prenatal interventions.  He's giving a
12   causation approach here.
13           The top here is categorizing
14   the evidence by quality and source, and
15   stage 2 is using the guidelines of evidence
16   of causal relationship, and those would be
17   the Bradford Hill criteria.
18           Do you see that?
19       A.   I see this table and I see a --
20   something that says, stage 1, categorizing
21   the evidence by the quality of its source.
22           I see stage 2, guidelines with
23   some -- what Dr. Gordis calls criteria, some
24   of which are some Bradford Hill
25   considerations.

Page 267

1        Q.   Okay.  Now, let's look at the
2    quality of evidence, because that's what
3    we're talking about here, right?
4            Number 1 is trials, and we
5    talked about those before.  Those would be
6    kind of the human experimental trials, the
7    placebo-control kind of trials, right?
8        A.   Usually trials are either
9    randomized, double-blinded, placebo-control
10   trials, or randomized, not blinded, or
11   nonrandomized but clinical trials where an
12   intervention is done.
13       Q.   Okay.  And the second category
14   he has here is cohort or case-control
15   studies.
16           Do you see that?
17       A.   I do see that line that says
18   "cohort or case-control studies."
19       Q.   He doesn't say cohort and then
20   case-control studies, does he?
21       A.   He doesn't.
22       Q.   Okay.
23       A.   They're both observational
24   studies.
25       Q.   Do you know who Kenneth Rothman

Page 268

1    is?
2        A.   No.
3        Q.   You don't know who he is?
4        A.   I have no idea.
5        Q.   Okay.  Do you know he's written
6    a textbook on epidemiology?
7        A.   I don't know his textbook, no.
8            (Merlo Exhibit 27 marked for
9    identification.)
10   QUESTIONS BY MR. TISI:
11       Q.   Okay.  So I'm going to show you
12   and ask whether you agree with it.  It's a
13   textbook on case-control studies.
14           Chapter 8.  Did you read -- by
15   the way, did you read Dr. Ballman's
16   testimony?
17       A.   I did.
18       Q.   You did.
19           So you saw a discussion of
20   Dr. Rothman, right?
21       A.   Yes, but I don't know who
22   Dr. Rothman is.
23       Q.   Okay.  Spent a lot of time
24   talking about Dr. Rothman.
25           Let me ask you this --

Page 269

1            MS. MILLER:  I'm sorry,
2    Mr. Tisi, can we have copies as well?
3            MR. TISI:  Oh, I'm sorry.  That
4    was an error.  Here you go.
5            MS. MILLER:  Thank you so much.
6            MR. TISI:  You're welcome.
7    QUESTIONS BY MR. TISI:
8        Q.   Second sentence in the
9    textbook -- second paragraph.  It's on --
10   this is on -- this chapter is entitled
11   "Case-Control Studies," right?
12       A.   This chapter, Chapter 8, called
13   "Case-Control Studies."
14       Q.   The second paragraph begins
15   with the sentence, "Conventional wisdom about
16   case-control studies is that they do not
17   yield estimates of effect that are valid
18   measures obtained from cohort studies.  This
19   thinking may reflect common misunderstandings
20   in the conceptualizing of case-control
21   studies, which will be clarified later."
22           Do you see that?
23       A.   I do see that.
24       Q.   Do you agree with that?
25           MS. MILLER:  Objection.

68 (Pages 266 to 269)

Christian Merlo, M.D., MPH

1      THE WITNESS:  This is a very,
2  very, very vague statement.
3  QUESTIONS BY MR. TISI:
4      Q.    Okay.
5      A.    And I'm going to have to say it
6  depends.  It depends on who's thinking about
7  it.  It depends on the quality of the
8  case-control study.  It depends on the
9  quality of the cohort study.  It depends on
10  so many things that I can't even agree nor
11  disagree with it.
12      (Merlo Exhibit 28 marked for
13      identification.)
14  QUESTIONS BY MR. TISI:
15      Q.    Okay.  Let me show you another
16  article by Dr. Rothman, Exhibit Number 28.
17      This is a review article
18  entitled "Six Persistent Misconceptions."
19      Do you see that?
20      A.    I do.
21      Q.    Have you seen this before?
22      A.    Yes.
23      Q.    Okay.  Can you read
24  misconception number 1?
25      MS. MILLER:  Objection.

1      THE WITNESS:  Misconception 1,
2  "There is a hierarchy of study
3  designs.  Randomized trials provide
4  the greatest validity, followed by
5  cohort studies, with case-control
6  studies being least reliable."
7  QUESTIONS BY MR. TISI:
8      Q.    You are -- studying for your
9  support of this general -- this general
10  proposition, you're citing that Australian --
11  that Australian white paper, right?
12      MR. LOCKE:  Objection.
13  QUESTIONS BY MR. TISI:
14      Q.    You didn't study any published
15  literature.  You didn't cite textbooks,
16  published literature, nothing?
17      MR. LOCKE:  Objection.
18      MS. MILLER:  Objection.
19      THE WITNESS:  I'm citing -- I'm
20  citing that article, but I'm also
21  referencing my experience in
22  epidemiology as well as the general
23  sense among epidemiologists today.
24  QUESTIONS BY MR. TISI:
25      Q.    The general -- how do I check

1  that, Doctor?  I mean, honestly, I'm pulling
2  up book chapters, published articles.  You
3  pulled up a white paper from Australia.
4      How do I check and ask you,
5  other than your say-so, as to what the
6  general acceptance is in the -- in the
7  epidemiologic community, other than you just
8  saying it?
9      MS. MILLER:  Objection.
10      MR. LOCKE:  Objection.
11      THE WITNESS:  You can take a
12  class in epidemiology.
13  QUESTIONS BY MR. TISI:
14      Q.    I don't think I'm going to take
15  your class.
16      A.    Well, I didn't say my class.
17  You can take any class.
18      Q.    I'm reading the textbooks, and
19  they don't say what you say.
20      MS. MILLER:  Objection.
21      MR. LOCKE:  Objection.
22      (Merlo Exhibit 29 marked for
23      identification.)
24  QUESTIONS BY MR. TISI:
25      Q.    I'm going to show you another

1  one.  This is Dr. Rothman who actually was,
2  unlike you, consulted to look at the talc
3  question back in 2000.
4      Almost 20 years ago, right?
5      I'm going to show you that
6  Exhibit Number 29.
7      MS. SHARKO:  Can we please just
8      have questions instead of accusatory
9      speeches?
10      MR. TISI:  I thought there was
11      only one objector here.
12  QUESTIONS BY MR. TISI:
13      Q.    Doctor, I show you Exhibit
14  Number 28, which is entitled "Interpretation
15  of Epidemiologic Studies on Talc and Ovarian
16  Cancer."
17      Have you seen this before?
18      A.    Yes.
19      Q.    Okay.  Have you been shown or
20  have you seen the section on exposure
21  misclassification on page 3?
22      A.    I see the -- I see the
23  paragraph underneath exposure
24  misclassification.
25      Q.    Now, just to put things in

Page 274

1   context, this is November of 2000, this date
2   of this report, correct?
3       A.   That's correct.
4       Q.   Okay.  This is some -- this is
5   like halfway, if that, in the timeline of all
6   the studies that have been conducted in this
7   case from 1982 to 2016?
8           MR. LOCKE:  Objection.
9           MS. MILLER:  Objection.
10          THE WITNESS:  It's November
11   of 2000 --
12   QUESTIONS BY MR. TISI:
13      Q.   Right.
14      A.   -- and that's when it was
15   published.
16      Q.   So what he's saying here, and
17   I'm going to read it for the record, not all
18   the study -- "nearly all the studies were
19   case-control studies.  It is commonly
20   believed that the validity of case-control
21   studies is worse than cohort studies, but
22   this view is mistaken.  The validity of the
23   study depends on the specifics of the study
24   design, the nature of the data and the nature
25   of the hypothesis that the study addresses."

Page 275

1           Do you see that?
2       A.   I do see that.
3       Q.   Do you agree with it or not?
4       A.   Well, I think I said earlier,
5   and I've said it in my report, that the
6   hierarchy of evidence is in general.  And I
7   said that a poorly designed or a poorly
8   executed or a poorly analyzed cohort study
9   may be less evident than a very, very
10   well-designed case control.
11      Q.   So when -- I'm sorry.
12      A.   And the same thing for
13   randomized control trials.
14          But when looking at the
15   different study designs, if properly
16   designed, if properly conducted, if properly
17   analyzed and if properly interpreted, a
18   randomized control trial gives you higher
19   evidence than a cohort, which gives you
20   higher evidence than a case-control, which
21   gives you higher evidence than a case series.
22      Q.   And you --
23      A.   In general.
24      Q.   And you saw that plaintiffs'
25   experts, each one of them, talked about study

Page 276

1   design, talked about the methodology used in
2   the studies and the conclusions reached in
3   the study, right?  They went through every
4   one of them.
5           MS. MILLER:  Objection.
6           MR. LOCKE:  Objection.
7           MR. TISI:  True?
8           MS. MILLER:  Objection.
9           THE WITNESS:  You'd have to be
10   more specific --
11   QUESTIONS BY MR. TISI:
12      Q.   Well, you reviewed them and you
13   made the criticisms.
14          So can you tell me one expert
15   who -- both plaintiffs' experts who did not
16   look at the study design for the
17   case-controls and cohorts, who did not look
18   at the methodology and who did not look at
19   the results?
20          MS. MILLER:  Objection.
21          MR. LOCKE:  Objection.
22          THE WITNESS:  You'd have to be
23   more specific.  If we look at the --
24   QUESTIONS BY MR. TISI:
25      Q.   No, you'll have to be more

Page 277

1   specific because you made some bald
2   accusations here, and I really need you to be
3   specific.  I need you to tell me:  Did
4   plaintiffs' experts -- did plaintiffs'
5   experts -- did they do or not do an analysis
6   of each study?
7           MS. MILLER:  Objection.
8           MR. LOCKE:  Objection.
9           THE WITNESS:  There were
10   summaries of studies, but we'd have to
11   go through each expert and go through
12   the reports of each one of them to get
13   specific about it.
14   QUESTIONS BY MR. TISI:
15      Q.   Okay.  You disagree with the
16   way in which they characterize them, but they
17   just didn't simply list the studies, did
18   they?
19          MS. MILLER:  Objection.
20          MR. LOCKE:  Objection.
21          THE WITNESS:  I never said I
22   disagreed.
23   QUESTIONS BY MR. TISI:
24      Q.   Okay.
25      A.   With whatever you're saying.

70  (Pages 274 to 277)

Christian Merlo, M.D., MPH

Page 278

```
 1    Q.   Okay.  All four studies --
 2         MS. MILLER:  Do you want a
 3    break?
 4         MR. TISI:  If -- he can tell me
 5    if he wants a break.
 6         THE WITNESS:  I'm okay.
 7         MR. TISI:  He just said he's
 8    okay.
 9         MS. MILLER:  Do we have a new
10    rule in depositions where lawyers
11    can't ask for a break?
12         MR. TISI:  If you want to ask
13    for a break, that's fine.  If he's --
14    you asked him whether he wants a
15    break.
16         MS. MILLER:  This is just
17    getting surreal, Susan.
18         MR. TISI:  It is totally
19    getting surreal.  You asked him
20    whether he wants a break.
21         Can you read that back?  Can
22    you read that back?
23         MS. SHARKO:  I thought -- are
24    we really going to have this kind of
25    meltdown over a break, Mr. Tisi?
```

Page 279

```
 1         MR. TISI:  I am totally okay
 2    with her taking a break if she says "I
 3    would like to take a break."  But
 4    don't ask the witness whether he wants
 5    to take a break, because that suggests
 6    that he should take a break.
 7         MS. SHARKO:  Seriously?
 8         MR. TISI:  That's coaching.
 9         MS. SHARKO:  That's not
10    coaching, Mr. Tisi.
11         MS. MILLER:  Was there a
12    question?  Was there a question
13    pending?
14         MR. TISI:  It's totally
15    coaching.
16         Did you need to take a break,
17    or do you want to go forward?
18         Do you want to take a break?
19         MS. MILLER:  I would like to
20    take a break.
21         MS. SHARKO:  I want to take a
22    break.
23         MR. TISI:  Perfect.  All you
24    have to do is ask.
25         VIDEOGRAPHER:  The time is
```

Page 280

```
 1    2:00 p.m.  We're going off the record.
 2         (Off the record at 2:00 p.m.)
 3         VIDEOGRAPHER:  Okay.  The time
 4    is 2:11 p.m., and we're back on the
 5    record.
 6    QUESTIONS BY MR. TISI:
 7         Q.   Was the talc/ovarian cancer
 8    hypothesis prespecified in any of the cohort
 9    studies?
10         MS. MILLER:  Objection.
11         THE WITNESS:  I don't know.
12    The cohort studies involving the
13    Nurses' Health Study, for instance,
14    added a questionnaire in 1982.
15         And so if one added a
16    questionnaire in 1982 asking about
17    talc, at that point in the cohort
18    study there may have been a hypothesis
19    about that.  That's why they added
20    that -- that's why one might think
21    that they added a questionnaire.
22    QUESTIONS BY MR. TISI:
23         Q.   You don't know that because the
24    study doesn't say that, does it?
25         MS. MILLER:  Objection.
```

Page 281

```
 1         THE WITNESS:  I'd have to
 2    review the study back -- to look at
 3    it.  I don't have it memorized.
 4    QUESTIONS BY MR. TISI:
 5         Q.   How many times in each of these
 6    cohort studies -- what is the concept of
 7    exposure classification?
 8         A.   Can you be more specific?
 9         Q.   Yeah.
10         What is exposure mis -- is that
11    a term of art in epidemiology?
12         A.   Well, misclassification is a
13    term.  And you can have misclassification in
14    both exposure and both in outcome if --
15         Q.   I'm asking you about exposure
16    misclassification.  Actually, I'm using the
17    term that Dr. Rothman used.
18         By the way, you know, Doctor,
19    the journal American Epidemiologists?
20         A.   I don't.
21         Q.   Okay.  Do you know -- have you
22    ever heard of the Ken Rothman Award in
23    epidemiology?
24         A.   I've never heard of that.
25         Q.   Okay.  All right.  So
```

71 (Pages 278 to 281)

Christian Merlo, M.D., MPH

Page 282

1  Dr. Rothman and his colleagues talk about
2  exposure misclassification in Exhibit
3  Number 29.
4          Do you know what that concept
5  is?
6      A.   And what page is that on again?
7      Q.   I'm just asking you what it is.
8  I mean, it's in Exhibit 29 he uses the term.
9          Do you know what it is?
10     A.   Well, you're referring to this.
11 I haven't read this paragraph yet, but I do
12 know what exposure misclassification is.
13     Q.   Then that's what I want.  What
14 is exposure misclassification?
15     A.   Misclassification involving an
16 exposure is when either a study subject is
17 classified as being exposed when they're not
18 exposed or being classified as not exposed
19 when they're exposed.
20     Q.   And exposure misclassification,
21 generally speaking, will bias the results
22 towards the null, correct?
23     A.   Not necessarily.
24     Q.   I didn't say necessarily.  I
25 said generally speaking.

Page 283

1          Wouldn't that be the case?
2      A.   No, absolutely not.
3      Q.   Okay.
4      A.   And I'll tell you why.
5      Q.   Please.
6      A.   Because there are two different
7  types of misclassification.  One is
8  traditionally referred to as differential
9  misclassification, and one is traditionally
10 referred to as nondifferential
11 misclassification.
12         Nondifferential
13 misclassification can bias the study results
14 to the null.  Differential misclassification,
15 such as that occurs with recall bias, can
16 actually bias the result away from the
17 null --
18     Q.   Okay.
19     A.   -- and give you an overinflated
20 estimate of risk.
21     Q.   Is recall bias an aspect of
22 exposure misclassification; do you think?
23     A.   Absolutely.
24     Q.   Okay.  So exposure
25 misclassification that is differential -- I

Page 284

1  think you said it's the one that biases
2  toward the null -- is that a problem with
3  cohort studies?
4      A.   Nondifferential --
5      Q.   Nondifferential?
6      A.   -- misclassification --
7      Q.   Yes.
8      A.   -- biases toward the null.
9      Q.   Right.
10         Is that a recognized concern
11 with cohort studies?
12     A.   So it depends.  It depends if
13 there's some reason to believe that those who
14 are exposed actually are unexposed, and those
15 that are unexposed are being labeled as
16 exposed.
17     Q.   And in the cohort studies on
18 talc, would it -- isn't it generally true
19 across the cohort studies that women were
20 asked about that talc exposure only once?
21     A.   I would have to review the
22 articles again.  I don't know that I
23 specifically have that memorized.
24     Q.   Okay.  If that were true, would
25 there be a danger of exposure

Page 285

1  misclassification?
2      A.   Again, I think it depends.  It
3  depends on -- it depends on the
4  questionnaire.  It depends on the time
5  between questionnaire and measurement of
6  outcome.  It depends on whether or not
7  there's any aspect of asking about potential
8  exposure in the past, and it depends a lot --
9  it depends on a lot of things.
10     Q.   Did you review the Taher draft
11 article meta-analysis?
12     A.   I did review Taher.
13     Q.   Do you know whether or not
14 exposure misclassification was identified as
15 a shortcoming in the cohort studies dealing
16 with talc?
17     A.   I would have to look at the
18 draft and see what you're referring to.
19     Q.   No, I'm not asking about the
20 draft.  I'm asking in the cohort studies
21 themselves.
22     A.   I'm sorry?
23     Q.   Didn't the authors of the
24 cohort studies identify weaknesses in their
25 studies?

72 (Pages 282 to 285)

Christian Merlo, M.D., MPH

Page 286

1          MS. MILLER:  Objection.
2          THE WITNESS:  You'd have to be
3    more specific and see which -- what
4    study are we talking about?
5    QUESTIONS BY MR. TISI:
6          Q.    Did they identify a concern
7    about a limitation being that there might be
8    recall -- excuse me, might be exposure
9    misclassification, nondifferential
10   misclassification?
11         MS. MILLER:  Objection.
12         THE WITNESS:  You'd have to
13   point me to the specific article that
14   you're referring to.
15   QUESTIONS BY MR. TISI:
16         Q.    You don't know whether or not
17   the authors in any of those studies discussed
18   it?
19         A.    There are so many articles
20   here, so many reports, a lot of paper, I
21   don't have things memorized.
22         Q.    You --
23         A.    If there's certain -- something
24   that you want to ask me about the cohort
25   studies --

Page 287

1          Q.    You put them in your report.
2          Did you address -- did you
3    address in your report, in your discussion of
4    the cohort studies, the concern about a
5    nondifferential misclassification of
6    exposure?
7          A.    Can you ask that again?
8          Q.    Yes.
9          In your report on your
10   discussion of the -- what you call the four
11   cohort studies, did you discuss the issue of
12   nondifferential misclassification of
13   exposure?
14         MS. MILLER:  Objection.
15         THE WITNESS:  I would have to
16   look through my report because I don't
17   have that memorized as well.
18   QUESTIONS BY MR. TISI:
19         Q.    Well, your discussion of the
20   individual studies are on --
21         A.    Be happy to look at that.
22         Q.    Yeah.  On Houghton page 24 and
23   25.
24         I mean, I assume you read this
25   before you came in here today, right?

Page 288

1          MS. MILLER:  Objection.
2          MR. LOCKE:  Objection.
3          THE WITNESS:  I'm sorry?
4    QUESTIONS BY MR. TISI:
5          Q.    When's the last time you read
6    your report before you came in here today?
7          A.    I read it last night.
8          Q.    Okay.
9          A.    But again, there's a lot of
10   information here, and I don't have things
11   memorized.
12         Q.    I agree.  I agree.
13         So on page 24 and 25 you
14   discuss -- and 26 you discuss Gates,
15   Houghton, Gonzales and Gertig.  I don't see
16   any discussion about the concern of
17   nondifferential misclassification bias.
18         A.    Okay.
19         Q.    Do you agree?
20         A.    Do I agree with what?
21         Q.    Did you discuss nondifferential
22   misclassification bias in your discussion of
23   the four cohort studies?
24         A.    I discussed the potential for
25   nondifferential misclassification in

Page 289

1    observational studies in my report.
2          Q.    Did you discuss them in the
3    context of the talc studies?
4          A.    I didn't.
5          Q.    You know that that's a concern
6    that the plaintiffs' experts had when they
7    looked at the case -- excuse me, the cohort
8    studies, that women were asked only one time
9    whether they were exposed to talc and that
10   there was a potential for nondifferential
11   misclassification bias?
12         MR. LOCKE:  Objection.
13         MS. MILLER:  Objection.
14   QUESTIONS BY MR. TISI:
15         Q.    Do you remember that?
16         A.    You'd have to show me
17   specifically what you're referring to.
18         Q.    You don't remember that that
19   was -- that was a primary focus of each one
20   of these experts?
21         MR. LOCKE:  Objection.
22         MS. MILLER:  Objection.
23         THE WITNESS:  Again, you'd have
24   to show me the specifics because --
25

73 (Pages 286 to 289)

Christian Merlo, M.D., MPH

Page 290

1    QUESTIONS BY MR. TISI:
2        Q.    Okay.  But you don't address
3    that in your report?
4            MS. MILLER:  Objection.
5            THE WITNESS:  I'm sorry?
6    QUESTIONS BY MR. TISI:
7        Q.    You don't address that in your
8    report with respect to the individual case --
9    the individual cohort studies, do you?
10           MR. LOCKE:  Objection.
11           THE WITNESS:  Nondifferential
12       misclassification is a potential
13       limitation of any observational study.
14   QUESTIONS BY MR. TISI:
15       Q.    Okay.  I asked you whether you
16   discussed it in the context of the cohort
17   studies.
18           MS. MILLER:  Objection.
19   QUESTIONS BY MR. TISI:
20       Q.    The four cohort studies on
21   talc, did you discuss -- did you even discuss
22   that bias?
23           I mean, you're sitting here
24   telling our -- telling -- under oath telling
25   our -- saying that our experts were, you

Page 291

1    know, litigation-driven opinions, that they
2    did all kinds of -- did all kinds of things
3    that in your view were inappropriate for the
4    purposes of litigation.
5            I'm asking you:  Did you look
6    at the issue of recall -- excuse me, of
7    nondifferential exposure misclassification
8    with respect to the four cohort studies?
9            MS. MILLER:  Objection.
10           MR. LOCKE:  Objection.
11           THE WITNESS:  So I don't know
12       what the first part of what you said
13       was, whether or not that was a
14       question.
15   QUESTIONS BY MR. TISI:
16       Q.    Well, you are sitting here
17   saying that they applied -- you are sitting
18   here, and you've been -- made some very --
19   used some very strong words in your report
20   about the conduct of the plaintiffs' experts.
21   Agreed?
22           MS. MILLER:  Objection.
23           THE WITNESS:  I mean, that's a
24       general -- a very general statement,
25       the conduct --

Page 292

1    QUESTIONS BY MR. TISI:
2        Q.    It is a general statement, and
3    I suspect that -- I suspect that the judge
4    might look at some of the words used in here
5    and agree with me here.
6            Pretty strong terms to say that
7    somebody was using a -- conducting an
8    analysis for the purpose of litigation and
9    all the things that you've said.  So -- but
10   let's put that aside.
11           MS. MILLER:  Objection.
12   QUESTIONS BY MR. TISI:
13       Q.    Let's put it aside.  Put it
14   aside.
15           MS. MILLER:  If that's a
16       speech, I'm objecting to it.  It
17       mischaracterizes --
18           MR. TISI:  Put it aside.
19           MS. MILLER:  It
20       mischaracterizes his report.  If
21       you're going to say it, then you're
22       going to have to let me object to it.
23       If you didn't want to say it --
24           MR. TISI:  Put it aside.
25           MS. MILLER:  -- then you

Page 293

1    shouldn't have said it.
2            MR. TISI:  Put it aside.
3    QUESTIONS BY MR. TISI:
4        Q.    You didn't discuss -- one of
5    your real criticisms is they did not
6    account -- our experts did not account for
7    recall bias in each of the case-control
8    studies, true?
9        A.    I'm not saying that it wasn't
10   accounted for.  It's just a known limitation
11   of case-control studies, absolutely.
12       Q.    Okay.  Did our experts consider
13   recall bias as part of looking at the
14   talc-related case-control studies?  Did they
15   address the issue?
16           MS. MILLER:  Objection.
17           THE WITNESS:  Again, I think
18       we'd have to look at each specific --
19       each specific expert, and if there's a
20       part in the expert report that you'd
21       like to discuss, I'd like to have it
22       in front of me.  I don't have these --
23       I don't have these --
24           MR. TISI:  You --
25           THE WITNESS:  I don't have

74 (Pages 290 to 293)

Christian Merlo, M.D., MPH

| Page 294 |
|---|

1      these memorized.
2      QUESTIONS BY MR. TISI:
3        Q.    Okay. You had an opportunity
4   to write your report. There was no page
5   limit on it. You could have written a
6   thousand-page report if you'd wanted to.
7        My question here is: You don't
8   really -- you have criticisms of plaintiffs'
9   experts generally, but you don't really
10   address what they said about each individual
11   study, do you?
12        MR. LOCKE: Objection.
13        MS. MILLER: Objection.
14        THE WITNESS: Again, we'd have
15    to go through each report --
16   QUESTIONS BY MR. TISI:
17        Q.   You don't address. I'm not
18   asking what they did. I'm asking: In your
19   report, you do not address what each expert
20   of the plaintiff said about each study, do
21   you?
22        MS. MILLER: Objection.
23        MR. LOCKE: Objection.
24        THE WITNESS: I'm not sure what
25    you're asking me.

| Page 295 |
|---|

1   QUESTIONS BY MR. TISI:
2        Q.    Okay. Did each of the
3   plaintiffs' experts address the issue of
4   recall bias? Was that issue discussed in
5   each and every one of their reports?
6        MS. MILLER: Objection.
7        THE WITNESS: Again, I'd have
8    to go through them and --
9   QUESTIONS BY MR. TISI:
10        Q.    Well, I assume you did that
11   before today.
12        A.    And I don't have them
13   memorized.
14        Q.    Okay.
15        A.    So if you'd like to go through
16   them, I'm happy to sit here and we can go
17   through each of them.
18        Q.    You know that's impossible,
19   don't you? In seven hours, you know that's
20   impossible, which is exactly why you're
21   saying that.
22        MR. LOCKE: Objection.
23   QUESTIONS BY MR. TISI:
24        Q.    Let me ask you this, Doctor:
25   You are going -- you are asking -- you are --

| Page 296 |
|---|

1   exposure misclassification. You identified
2   it as a potential weakness generally.
3        Did you discuss that issue in
4   connection with any one of the four cohort
5   studies for talc?
6        MS. MILLER: Objection.
7        THE WITNESS: Misclassification
8    is inherently a limitation in any
9    study --
10   QUESTIONS BY MR. TISI:
11        Q.    And did you --
12        A.    -- case control or cohort
13   studies. There are limitations inherent in
14   the case-control studies that are in the
15   literature. There are inherent limitations
16   in the cohort studies that are out there.
17        Q.    Right.
18        And just testified before that
19   because of these things, you have to look at
20   the design of each study individually, right?
21        A better -- I think you said a
22   well-designed cohort study is better than a
23   well-designed case-control study, right?
24        And a poorly-designed cohort
25   study may be less valuable than a

| Page 297 |
|---|

1   well-designed case-control study, right?
2        MR. LOCKE: Objection.
3        MS. MILLER: Objection.
4        THE WITNESS: It depends.
5    Potentially.
6   QUESTIONS BY MR. TISI:
7        Q.    Of course it depends.
8        So the question is: Having
9   been dependent upon that, it's incumbent upon
10   you as a scientist to look at each study for
11   the purpose of design, to see whether one is
12   well-designed and one isn't, right?
13        MS. MILLER: Objection.
14        THE WITNESS: Can you ask that
15    again?
16   QUESTIONS BY MR. TISI:
17        Q.    Yes.
18        Since epidemiology -- we went
19   through the different examples -- requires
20   you to not strictly adhere to a hierarchy but
21   look at the particular designs of the
22   studies, did you do that with respect to each
23   one of these studies?
24        A.    I did.
25        Q.    Okay. So with regard to the

75 (Pages 294 to 297)

Christian Merlo, M.D., MPH

Page 298

1    cohort studies, okay, did you look at
2    individually whether there was a particular
3    concern with these studies on
4    misclassification bias?
5        A.    There's always a concern for
6    misclassification.
7        Q.    Understood.  Theoretically
8    that's true with every one of these cohort
9    studies.
10        But you know each of these
11    studies only asked these women in decades,
12    most cases decades -- I think the Nurses'
13    Health Study was six and a half years -- but
14    one -- only once about talc usage at the
15    beginning -- at or near the beginning of the
16    study, right?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  We'd have to
19    break -- that's a very generalized
20    question.
21    QUESTIONS BY MR. TISI:
22        Q.    Where is it in your report?
23    Where is it in your report?
24        A.    I'm sorry.
25        MS. MILLER:  Objection.

Page 300

1        A.    The analysis was done during
2    the follow-up period.
3        Q.    Which was when?
4        How many decades after they
5    were initially asked?
6        A.    Well, it depends on when the
7    patient -- when the study subject was
8    enrolled.
9        I can say that the Gertig
10    study, it was assessed -- the exposure
11    questionnaire was added in 1982, and they
12    were followed for 14 years on average.
13        Q.    Right.
14        And in 14 years, isn't it
15    conceivable that somebody could have started
16    using talc, or somebody that who said they
17    were using talc stopped using talc?
18        A.    That's certainly possible, but
19    for four studies to show the same
20    nondifferential misclassification, that would
21    be very, very unlikely.
22        Q.    Right.
23        And four studies which asked --
24    asked the question once at the beginning of
25    the study, right?

Page 299

1    QUESTIONS BY MR. TISI:
2        Q.    Where is your discussion in the
3    report about when they were asked about their
4    talc usage in the cohort studies?
5        A.    Well, we can go through my
6    report if you'd like to.
7        Q.    You just did that, Doctor, and
8    you said it wasn't here.
9        On page 24 and 25, you have a
10    discussion, the Gertig, Gates, Houghton and
11    Gonzalez studies.  There is no discussion in
12    here about when they were asked about the
13    talc and how often they were asked.
14        MR. LOCKE:  Objection.
15        THE WITNESS:  I would have to
16    look back through my report because I
17    do know that in the Gertig study and
18    the Gates study, the questionnaire
19    that asked women about talc exposure
20    was in 1982.
21    QUESTIONS BY MR. TISI:
22        Q.    Correct.
23        A.    And so that is when they were
24    asked.
25        Q.    And when was the analysis done?

Page 301

1        MS. MILLER:  Objection.
2    QUESTIONS BY MR. TISI:
3        Q.    They all had the same flaw.
4    You had four flawed studies, didn't you?
5        MS. MILLER:  Can we stick with
6    one question at a time?
7    QUESTIONS BY MR. TISI:
8        Q.    You had four flawed studies
9    with respect to misclassification bias.  They
10    all asked one time at the beginning of the
11    study; true or not true?
12        MR. LOCKE:  Objection.
13        MS. MILLER:  Objection.
14        THE WITNESS:  The Gates and
15    Gertig study did ask women questions
16    about talc in 1982.  That was the only
17    time that they were asked about talc
18    usage in those two studies.
19    QUESTIONS BY MR. TISI:
20        Q.    What about Houghton?
21        A.    In Gertig -- sorry, in -- let
22    me just do Gonzalez first.
23        Gonzalez were asked if they
24    used talc within 12 months prior to
25    enrollment into the study, and so that's

Christian Merlo, M.D., MPH

Page 302

1  going to depend on when they enrolled in the
2  study in between 2003 to 2009. And they were
3  followed for six years afterwards.
4      Q.   And they were never -- just
5  while we're talking about that, were they
6  ever asked after enrollment, again, whether
7  or not they switched to using talc, or people
8  who said they were using talc stopped?
9          MS. MILLER: Objection.
10         THE WITNESS: They were not
11     asked again.
12 QUESTIONS BY MR. TISI:
13     Q.   Okay. Houghton?
14     A.   In Houghton, participants
15 were -- completed an annual questionnaire at
16 enrollment. And I don't know if I have the
17 specific year that the questionnaire was
18 asked, because study subject enrolled from
19 1993 to 1998 and then were followed --
20     Q.   How many years?
21     A.   An average of 12 years.
22     Q.   Okay. Were they ever asked in
23 that 12 years whether some who had been on
24 talc went off, or some who were off talc went
25 on in those 12 years?

Page 303

1      A.   They weren't.
2      Q.   Okay. So those were
3  limitations on the cohort studies, correct?
4      A.   They're potential limitations
5  of a cohort study.
6      Q.   And you don't address those in
7  your report, do you?
8      A.   Again, it's inherent in a
9  cohort study that there are potential --
10 there's potential exposure misclassification.
11     Q.   I understand.
12         Did you address those -- well,
13 in cohort studies they can be asked every
14 year about their exposures, right? Some do
15 that.
16     A.   And there's still potential for
17 misclassification.
18     Q.   Understood.
19         But these particular studies
20 were particularly vulnerable to that bias
21 because they asked only once at the beginning
22 of the studies, true?
23     A.   Not necessarily, no.
24     Q.   Okay. But you don't address it
25 at all in the context of each individual

Page 304

1  study, do you?
2          MS. MILLER: Objection. Asked
3      and answered like ten times.
4          THE WITNESS: I addressed it in
5      the context of my report, and inherent
6      in any observational study is the
7      potential for misclassification.
8  QUESTIONS BY MR. TISI:
9      Q.   You didn't analyze in your
10 report whether the cohort studies in talc
11 were flawed or limited in reliability by
12 misclassification studies, did you?
13         MS. MILLER: Objection.
14         THE WITNESS: Can you ask that
15     again?
16 QUESTIONS BY MR. TISI:
17     Q.   Yes.
18         Other than making the general
19 observation, did you analyze in your report
20 whether the cohort talc studies were flawed
21 or limited in reliability by
22 misclassification bias?
23     A.   So other than saying what I
24 said before, that inherent in all
25 observational studies, which I talked about

Page 305

1  in my report, misclassification, other than
2  that -- that's what I talked about in my
3  report.
4      Q.   Other than that, the answer is
5  no, you didn't discuss them in the context of
6  the individual studies?
7          MS. MILLER: Objection.
8          MR. LOCKE: Objection.
9          THE WITNESS: But I discussed
10     it within my report, which is within
11     the context of the individual studies.
12 QUESTIONS BY MR. TISI:
13     Q.   Let's talk about strength of
14 the association. We talked about methodology
15 generally. Let's talk about strength.
16         On page 32 of your report, you
17 say -- you have a section called "Lack of
18 Strength of Associations."
19         Page 32, bottom, Section D.
20     A.   Lack of Strength of
21 Association.
22     Q.   Do you see that?
23     A.   Yes.
24     Q.   On page 33, you say, "The
25 heart -- the higher the relative risk, the

Christian Merlo, M.D., MPH

Page 306

1  greater the likelihood that the relationship
2  is causal."
3      A.   I see that.
4      Q.   You use the term "weak" or
5  "relatively weak" association seen in the
6  talc and ovarian cancer relationship,
7  correct?  You call them weak.
8      A.   Where are you?
9      Q.   For example, the very -- the
10  very last -- the second full paragraph, last
11  three lines up you say, "Relatively weak
12  associations."
13      A.   I'm not seeing where you're
14  referring to.
15      Q.   Right there.
16          MS. MILLER:  It's hard to see
17  upside down.
18          MR. TISI:  Well, I can't do it
19  any other way unless you want me to
20  reach over and point at the witness.
21          I said three sentences up from
22  the second paragraph.
23          MS. MILLER:  Three second up --
24  from the bottom of the second
25  paragraph?

Page 307

1          MR. TISI:  Yeah.
2          MS. MILLER:  Oh, okay.  I see
3  it now.  I misunderstood you.
4          THE WITNESS:  I see that.
5  QUESTIONS BY MR. TISI:
6      Q.   And on page 42, you say, "It is
7  generally accepted that risk ratios -- that
8  ratios of risk measures between 1.1 and 2.0
9  represent a weak association between exposure
10  and outcome."
11      A.   What page is that on?
12      Q.   42.
13      A.   And where is that?
14      Q.   I'm sorry.  I'm sorry, page 43,
15  second paragraph.  "Although there is no
16  universe numeric definition of a strong
17  association between exposure and risk, it is
18  generally accepted that risk -- that ratios
19  of risk measures between 1.1 and 2.0
20  represent a weak association between exposure
21  and outcome."
22          Is that right?
23          Did you say that?
24      A.   Did I --
25      Q.   Yes.

Page 308

1      A.   I wrote that in my report.
2      Q.   Okay.  And you cite a 1982
3  article by Widner.
4      A.   That's correct.
5      Q.   And on page 46, you state that
6  "Risk ratios between 1.2 and 1.6 are by
7  definition weak associations."
8          That's your conclusion
9  sentence.  First sentence, third paragraph
10  down.
11          "This is by definition a weak
12  association."
13      A.   That's correct.
14      Q.   Okay.  Where is that definition
15  written?
16          MS. MILLER:  Objection.
17          THE WITNESS:  Well, I would
18  have to go back and look at the
19  article that I referenced.
20  QUESTIONS BY MR. TISI:
21      Q.   Is that the only -- is that the
22  only article that you can think of?
23      A.   It's the only article that
24  comes to mind that I could find, but it's a
25  generally accepted -- generally accepted in

Page 309

1  the epidemiologic community that anything
2  less than 2 is a weak association.
3      Q.   Anything less than 2 is weak?
4      A.   So, again, it depends, because
5  there are certain studies that may show, that
6  have been designed properly, that bias and
7  confounding aren't a problem, that analysis
8  is great and interpretation is fine where
9  that association, that relative risk, even
10  though it's less than 2 considered weak, that
11  may be -- that may point towards causality
12  between an exposure and an outcome.
13          However, when bias and
14  confounding are potential to be present --
15  for instance, if we're going to talk about
16  confounding, which I think I should --
17      Q.   I'm asking you about the
18  definition, where, by definition, something
19  less than 2.0 is weak.
20      A.   It's a generally accepted --
21      Q.   Generally accepted?
22      A.   It's generally accepted in the
23  epidemiology community.
24          (Merlo Exhibit 31 marked for
25  identification.)

Christian Merlo, M.D., MPH

Page 310

1    QUESTIONS BY MR. TISI:
2        Q.    I'm going to show you
3    Exhibit Number 31, which is the National
4    Cancer Institute statements on ovarian
5    cancer.
6            Have you seen this before?
7        A.    No.
8            MR. LOCKE:  Objection.
9    QUESTIONS BY MR. TISI:
10        Q.    Okay.  If you look at the
11    second page, it talks about factors within --
12    "with adequate evidence of increased risk of
13    ovarian, fallopian tube and primary
14    peritoneal cancers."
15            Do you see that?
16        A.    I see that.
17        Q.    You see they talk about
18    endometriosis.
19            MS. MILLER:  Can you point me
20    to that?
21            MR. TISI:  Yeah.  You see where
22    endometriosis is?
23            MS. MILLER:  No, that's why I'm
24    asking you to point --
25            MR. TISI:  It's on page 3 of

Page 311

1    18.
2            MS. MILLER:  Oh, sorry, I was
3    on page 4.  I thought you said
4    factors.
5    QUESTIONS BY MR. TISI:
6        Q.    See endometriosis?
7            Do you see that?
8        A.    I do see that.
9        Q.    See it talks about this is an
10    established risk of ovarian cancer?  The
11    magnitude of the effect is described as
12    modest with 1.8 to 2.4.
13            MS. MILLER:  Objection.
14    Mischaracterizes the document.
15    QUESTIONS BY MR. TISI:
16        Q.    Do you see that?
17        A.    I see a statement that says,
18    magnitude of effect --
19        Q.    Okay.
20        A.    -- modest with observed
21    relative risks of 1.8 to 2.4.
22        Q.    Do you see magnitude of effect
23    for hormone replacement therapy, modest with
24    observed relative risk, 1.20 to 1.8?
25        A.    I do see the statement

Page 312

1    magnitude of effect modest with observed
2    relative risks of 1.2 to 1.8.
3        Q.    Do you think the National
4    Cancer Institute doesn't understand the --
5    doesn't understand the concept of strength of
6    association and this generally accepted
7    principle that anything under 2.0 is weak?
8            MS. MILLER:  Objection.
9            MR. LOCKE:  Objection.
10            THE WITNESS:  So again, I'm not
11    here to give an opinion on the
12    National Cancer Institute.  I don't
13    know who put this document together,
14    and I did say that it depends.  It
15    depends on the study.
16    QUESTIONS BY MR. TISI:
17        Q.    Okay.
18        A.    But in general, a relative risk
19    of -- or an odds ratio of less than 2 is a
20    weak association.
21        Q.    What about obesity and height,
22    the next one?  It says, based on fair
23    evidence -- not even great evidence but fair
24    evidence -- obesity and height are associated
25    with a modest increased risk of ovarian

Page 313

1    cancer, and they defined it as a 1.1.
2            Do you see that?
3        A.    I see, based on fair evidence,
4    increases in height and body mass indexes are
5    associated with a modest increase in risk of
6    ovarian cancer.
7            And then where are you seeing
8    the 1.1?
9        Q.    The next paragraph.
10        A.    I do see that.
11        Q.    So the National Cancer
12    Institute, at least with respect to ovarian
13    cancer, has classified modest increases from
14    anywhere between 1.1 all the way up to 2.0 as
15    modest, correct?
16            MS. MILLER:  Objection.
17            MR. LOCKE:  Objection.
18            THE WITNESS:  Again, I'm not
19    sure who put this all together, but if
20    I were to give a presentation and
21    say -- in a classroom or in a lecture
22    or in my research progress and said
23    that a risk ratio of 1.1 was modest,
24    I'd get laughed out of the room.
25    QUESTIONS BY MR. TISI:

Christian Merlo, M.D., MPH

Page 314

1    Q.    So this is a laughable
2    document, huh?
3         MR. LOCKE:  Objection.
4         THE WITNESS:  I'm not saying
5    I'm laughing at this, but I'm just
6    telling you that if Dr. Gordis came
7    into the room and I tried to explain
8    to him that a relative risk of 1.1 is
9    modest, he'd laugh me out of the room.
10   QUESTIONS BY MR. TISI:
11   Q.    Now he's an expert?
12   A.    I'm not saying he's an expert.
13   Q.    Okay.
14   A.    He was my teacher.
15   Q.    Okay.
16   A.    And I wouldn't do that in front
17   of him.
18        (Merlo Exhibit 32 marked for
19        identification.)
20   QUESTIONS BY MR. TISI:
21   Q.    Okay.  Let's look at Exhibit
22   Number 32, which is another chapter out of
23   the textbook Modern Epidemiology by
24   Dr. Rothman, which I have marked as Exhibit
25   Number 32.  And on page 25 of 30, it talks

Page 315

1    about the strength criteria.
2         He says -- and I want to ask
3    you whether you agree with it or not -- under
4    the strength of association, second -- two
5    sentences from the bottom of the first
6    paragraph, "Of special importance, Cornfield,
7    et al., acknowledged that having only a weak
8    association does not rule out causal
9    association.  Today, some associations, such
10   as those between smoking and cardiovascular
11   disease or between environmental tobacco
12   smoke and lung cancer are accepted by most as
13   causal, even though the associations are
14   considered weak."
15        Do you agree with that?
16   A.    So I'm going to -- if you just
17   give me a second to read it over again.
18   Q.    Uh-huh.
19   A.    Because I'm seeing this for the
20   first time.
21        So again, we're talking about
22   generalizations here, and there are -- there
23   may be instances where a relative risk or an
24   odds ratio is less than 2, and it's
25   considered a weak association.

Page 316

1    But because of other factors,
2    maybe factors, considerations that Bradford
3    Hill has, such as consistency or dose
4    response, do lead one to conclude that
5    there's a causal association between exposure
6    and outcome.
7         And if we're talking about
8    environmental tobacco smoke and lung cancer,
9    studies are consistent, and there's a
10   consistent dose response.
11   Q.    They all show -- they all
12   show -- they all show statistically
13   significant associations.  Every cohort and
14   case-control study shows consistent
15   association in secondhand smoke; is that what
16   you're testifying to?
17        MS. MILLER:  Objection.
18        MR. LOCKE:  Objection.
19        THE WITNESS:  I didn't say
20        that.
21   QUESTIONS BY MR. TISI:
22   Q.    Okay.
23   A.    I said that there's
24   consistency.  And there's consistency in the
25   literature that secondhand smoke in

Page 317

1    sufficient dose over sufficient time -- so a
2    dose response plus consistency -- can lead
3    one to conclude that there is a causal
4    association between secondhand smoke and,
5    say, lung cancer.
6    Q.    So where is the statement that
7    you have to -- in the absence of a high risk
8    ratio or in the presence of a weak risk ratio
9    that you need to have dose response and
10   consistency?
11   A.    Because --
12   Q.    Or is that -- is that your
13   postulate?
14   A.    No, that is not my postulate.
15   That's -- those things oftentimes go
16   hand in hand.  And the reason I say this, if
17   there's a relative risk of 200, it's going to
18   be very difficult to explain that away.
19        Say we used the pulmonary
20   hypertension example.  The odds ratio is 23
21   for patients that use that medication for
22   more than three months.  So -- and that gets
23   at the dose response and gets at the factors
24   that may -- the other considerations that
25   Bradford Hill brought out, namely, namely,

80 (Pages 314 to 317)

Christian Merlo, M.D., MPH

Page 318

1    the dose response.
2         So secondhand smoke over a
3    sufficient amount of time, given a sufficient
4    amount of exposure, even though there may be
5    a weak relative risk, that potentially could
6    be a causal -- could -- one could conclude
7    causality because of the other considerations
8    that are present.
9    Q.   On the next page -- I'm going
10   to ask you about secondhand smoke.  Before I
11   do, let's go to the next page.  It says,
12   "These examples remind us that a strong
13   association is neither necessary nor
14   sufficient for causality and that weakness
15   isn't even necessary nor sufficient for the
16   absence of causality."
17        Do you see that?
18   A.   Is that the second sentence on
19   the top?
20   Q.   Yes.  "These examples remind us
21   that a strong association is neither
22   necessary nor sufficient for causality and
23   that weakness is neither necessary nor
24   sufficient for absence of causality."
25        Do you agree with that?

Page 319

1    A.   So I think that this is one of
2    the -- one of the things that Bradford Hill
3    in his article said, that these are
4    considerations, and that if there is a risk
5    ratio, whether it's a relative risk or a odds
6    ratio of 200, it's difficult to explain that
7    away.
8         Could it be explained away?
9    Sure, if we didn't measure some factor that
10   is associated with the exposure and the
11   outcome and is not in between the causal
12   pathway.  But it -- it's a reason to use
13   these as considerations.
14        And further, if we're talking
15   about a weak association, say a weak relative
16   risk or odds ratio, that less than 2, if
17   there are other considerations that add to
18   it, say dose response or consistency among
19   studies, then that supports causality.
20   Q.   Let me go to the Oleckno
21   article -- the Oleckno textbook again, and
22   let me ask you this.  He also -- it's the
23   same one we talked about before.  So we can
24   go to Exhibit Number 22.
25        MS. MILLER:  I have the same

Page 320

1    objection that this is an excerpt that
2    was cut off at the end, and it's not a
3    complete chapter or a complete
4    anything.
5         MR. TISI:  Okay.  Well, it's a
6    complete paragraph that talks about
7    the strength of association, so
8    let's...
9         MR. LOCKE:  Objection.
10        THE WITNESS:  I'm sorry, I just
11   need a little bit of time to find it.
12   QUESTIONS BY MR. TISI:
13   Q.   That's fine.
14   A.   Okay.  So I have three pages
15   photocopied here.
16   Q.   Correct.
17        So if you go to the last page,
18   it has a paragraph with a bullet point that
19   says, "Strength of Association."
20        Do you see that?
21        And if you read it and tell me
22   where Dr. Oleckno talks about strong,
23   moderate and weak associations.
24        MS. MILLER:  Objection.
25        MR. LOCKE:  Objection.

Page 321

1         THE WITNESS:  I think the
2    Oleckno textbook says in general, the
3    stronger an association between a
4    given exposure and outcome, the more
5    likely association is causal.
6         It's also referencing a table,
7    6.3, which is not here, so I'm not
8    sure how I can even answer that.
9    QUESTIONS BY MR. TISI:
10   Q.   Yeah, but you said -- but,
11   Doctor, you said here -- you said here at the
12   end "by definition."  You use the phrase "by
13   definition," "a 1.2 to 1.6 by definition is
14   weak."
15        And I don't see that
16   definition, so you need to tell me where that
17   definition is.
18   A.   It's an accepted definition in
19   epidemiology.
20        MS. MILLER:  Objection.
21   QUESTIONS BY MR. TISI:
22   Q.   By whom?
23   A.   Epidemiologists.
24   Q.   Where?
25        I've gone through every

81 (Pages 318 to 321)

Christian Merlo, M.D., MPH

Page 322

1    textbook and I've never seen a definition,
2    and you don't provide it.  So I want to know
3    where you find it --
4              MR. LOCKE:  Objection.
5              MS. MILLER:  Objection.
6    QUESTIONS BY MR. TISI:
7        Q.    -- other than the Australian
8    thing that we talked about before.  Where?
9              MS. MILLER:  Objection.
10             MR. LOCKE:  Objection.
11             THE WITNESS:  It's in my
12        reference.  We can pull that and look
13        at it, if you'd like.
14   QUESTIONS BY MR. TISI:
15       Q.    Okay.  I'm going to find it in
16   your references?
17       A.    It's that reference.
18       Q.    Okay.  That Australian white
19   paper?
20             MS. MILLER:  Objection.
21             THE WITNESS:  Let me look
22        through.  I'll look through my report
23        again.
24   QUESTIONS BY MR. TISI:
25       Q.    Actually, Doctor, I think

Page 323

1    that's where it is.  I'm not going to ask you
2    to move on.
3              But you criticize plaintiffs'
4    experts because they say -- they call this
5    strong, this 1.2 to 1.6 as strong.
6              Do you see that?  Page 43 of
7    your report?
8        A.    I do see that.  Plaintiffs'
9    epidemiologists find a strong association.
10       Q.    Did you actually read their
11   reports?
12       A.    I did.
13             MR. LOCKE:  Objection.
14   QUESTIONS BY MR. TISI:
15       Q.    Did you read their depositions?
16       A.    I did.
17       Q.    Did you read -- did you read
18   where they explained what they were talking
19   about in terms of strength of association?
20             MS. MILLER:  Objection.
21             THE WITNESS:  So you would have
22        to --
23   QUESTIONS BY MR. TISI:
24       Q.    I mean, you're cherry-picking
25   what they said, aren't you?

Page 324

1              MR. LOCKE:  Objection.
2              MS. MILLER:  Objection.
3    QUESTIONS BY MR. TISI:
4        Q.    You're cherry-picking.
5              I'm going to show you what
6    Dr. Siemiatycki says.  Actually, let me just
7    choose actually -- I'm going to choose
8    Dr. Siemiatycki.  Here's his report.  I'm
9    going to attach it as Exhibit Number 33, his
10   discussion of that issue.
11             (Merlo Exhibit 33 marked for
12        identification.)
13   QUESTIONS BY MR. TISI:
14       Q.    He's one of the people you
15   criticize, right?
16       A.    I critiqued plaintiffs'
17   reports.
18       Q.    Right.
19             And you say, "Dr. Siemiatycki
20   states," and you have a quote, which indeed I
21   will tell you appears in the report, but it's
22   not the whole thing of what he says.  Does
23   it -- would you agree?
24             MS. MILLER:  Objection.
25             THE WITNESS:  Can you ask that

Page 325

1    again?  I'm not sure what you're
2    asking me.
3    QUESTIONS BY MR. TISI:
4        Q.    Yes.  I'm going to read his
5    section that talks about strength of
6    association.
7              MS. MILLER:  I'm going to
8        object to this --
9              MR. TISI:  Of course you're
10       going to object because it's --
11             MS. MILLER:  -- specific
12       because it's page 19 and then it's
13       page 62, 63, 87, 88, 82.
14             MR. TISI:  Yes.  These are the
15       two -- this is every place in his
16       report where he talks about strength
17       of association.  Absolutely.
18             MS. MILLER:  Well, I don't have
19       a need to know that.
20             MR. TISI:  Including --
21       actually, it has -- it has the -- it
22       has the very quote that this doctor
23       put in his report, and I'll put it
24       there.  It's page 63.  "Such a high
25       and significant meta-analysis research

82 (Pages 322 to 325)

Christian Merlo, M.D., MPH

Page 326

1    risk ratio could not have occurred by
2    chance."
3    QUESTIONS BY MR. TISI:
4        Q.    Do you see that?
5        MR. LOCKE:  Objection.
6    QUESTIONS BY MR. TISI:
7        Q.    It's on page 63, and that's the
8    quote you had.
9        MS. MILLER:  You objected to
10   cherry-picking.  These are seven
11   cherry-picked pages from an expert
12   report.
13       MR. TISI:  They're not
14   cherry-picked pages.  Every part that
15   talks about --
16       MS. MILLER:  I don't know what
17   cherry-picked means to you, but --
18       MR. TISI:  Well, Counsel, then
19   keep your objections to yourself.
20       MR. LOCKE:  Objection.
21       MR. TISI:  "Objection, form,"
22   is fine.
23   QUESTIONS BY MR. TISI:
24       Q.    Doctor, this is the paragraph
25   that you quote in your report, correct?  It's

Page 327

1    the last sentence of a full paragraph.
2        A.    I'd have to look at his full
3    report to know if that's the one I'm quoting.
4    Said that again somewhere.
5        Q.    Okay.  Doctor, it says, "Such a
6    high" -- you look at your report on page 43.
7    It says, "Such a high and significant," in
8    parentheses, "relative risk could not have
9    occurred by chance."  And that's the sentence
10   on page 63.
11       A.    So we're looking at page 63
12   of --
13       Q.    Correct.
14       A.    -- Dr. Siemiatycki's report.
15       Q.    Right.
16       And that's at the end of a
17   paragraph, right?
18       A.    That's at the end of a
19   paragraph.
20       Q.    Okay.  So let's look at what he
21   says before that.
22       "Strength of association.  This
23   can embody both the magnitude of the relative
24   risk and its statistical significance.  The
25   meta-analysis risk ratio estimate is 1.28.

Page 328

1    That means the best estimate from an ep --
2    from the epidemiologic literature is that
3    women who regularly used talcum powder
4    products in the genital area had a 28 percent
5    higher risk of ovarian cancer than a woman
6    who did not use such powder.  As I illustrate
7    in Table 11, which I attach" -- because it
8    refers to there, if you take a look on
9    page -- at the -- on page 87, it has a
10   Table 11.  He lists numerous kinds of --
11   urban air pollution, trichloroethylene,
12   diesel engine emissions, benzene, domestic
13   radon gas, secondhand cigarette smoke,
14   intermittent, intense sun exposure, et
15   cetera.  He lists a lot of them, all within a
16   relative risk of 1.09, with the highest being
17   1.64.
18       Do you see that table?
19       A.    I do.
20       Q.    "As I illustrate in Table 11
21   with a few examples, this relative risk is in
22   line with well-recognized risk factors for
23   cancer and other diseases.  For example, it
24   is well-accepted now that people living in an
25   urban neighborhood in which there is -- in

Page 329

1    which the air is highly polluted with
2    particulate matter have a 5 to 10 percent
3    excess risk of lung cancer compared to people
4    living in a less polluted urban neighborhood.
5    Also is well-accepted that workers exposed to
6    a solvent called trichloroethylene had about
7    a 40 percent higher chance of kidney cancer
8    compared to workers not exposed to
9    trichloroethylene.  Thus, the 28 percent
10   increase in ovarian cancer for women who used
11   talcum powder products is in line with many
12   risk factors.  This increased risk is
13   manifested by a meta research -- meta risk
14   ratio that is statistically significant."
15   And then it has the sentence you quoted.
16       He's very clear about the range
17   of relative risks and compares it to a number
18   of other well-accepted carcinogens, does he
19   not?
20       MS. MILLER:  Objection.
21       MR. LOCKE:  Objection.
22       THE WITNESS:  I see that there
23   is a comparison to other agents and
24   potential risk for disease in those
25   agents.

83 (Pages 326 to 329)

Christian Merlo, M.D., MPH

Page 330

1   QUESTIONS BY MR. TISI:
2       Q.   And you --
3       A.   However, this says nothing
4   about the strength of association.  It just
5   says that there's an association between
6   these agents and this disease with this
7   relative risk.
8           These are all under 2.  That
9   doesn't -- that says nothing about the
10  strength.  It's a weak association of all of
11  them.
12      Q.   Okay.  Then he goes on and he's
13  asked about that in his deposition, and I'm
14  going to attach that.  And I'm not going to
15  spend a lot of time on it, but for the
16  record, that will be on the record, Exhibit
17  Number 34.
18          (Merlo Exhibit 34 marked for
19          identification.)
20  QUESTIONS BY MR. TISI:
21      Q.   And did you cite anything from
22  his deposition?
23          MS. MILLER:  Objection.
24          THE WITNESS:  I'd have to look
25      through my report.

Page 331

1   QUESTIONS BY MR. TISI:
2       Q.   Let me show you another
3   example: Dr. Moorman.  Dr. Moorman, who you
4   also criticize as saying, "Taken as a whole,
5   the overwhelming statistical strength of
6   these studies" -- sorry, "by the strength of
7   the studies, whose results are replicated
8   over decades and over a wide variety of
9   populations and investigators, further
10  supported by consistent meta-analysis, weigh
11  heavily in favor of a causal inference."
12          That was what you said that
13  Dr. Moorman said, correct?
14      A.   You'd have to refer to me where
15  I said that.
16      Q.   On page 43 and 44 of your
17  report.
18      A.   And I apologize.  I don't have
19  these -- this memorized.  So, you know,
20  you're reading stuff --
21      Q.   Well, I do, and I didn't write
22  it.  Here you go.
23          MS. MILLER:  Objection.
24          (Merlo Exhibit 35 marked for
25          identification.)

Page 332

1           MS. MILLER:  Again, I'm going
2   to have to have the same objection.  I
3   don't know why you didn't just provide
4   the entire expert report.
5           This is pages 11, 12, 13, 14,
6   15, 16.  We don't have pages 1 to 10.
7   We don't have --
8           MR. TISI:  Counsel, I got your --
9       objection.  I got your --
10          MS. MILLER:  -- pages after 16,
11  and page 16 ends in the middle of a
12  sentence.
13          MR. TISI:  I got your -- I got
14  your objection, Counsel.
15          MR. LOCKE:  Same objection.
16  QUESTIONS BY MR. TISI:
17      Q.   Doctor, can you turn to page 15
18  of Dr. Moorman's report, which I have put
19  here, which I will represent to you is a
20  whole section on strength of association.
21          She has a paragraph, "The
22  overall association seen in talc/ovarian
23  cancer meta-analyses, as well as many other
24  individual studies, are statistically
25  significant, indicating an increased risk of

Page 333

1   approximately 25 to 30 percent.  While not as
2   high as other relationship, like smoking and
3   lung cancer, these relative risks are in line
4   with other generally accepted causal
5   relationships.  Example, secondhand smoke and
6   lung cancer:  I consider the strength of
7   association as seen in the ovarian cancer
8   epidemiologic studies to be an important
9   factor in favor of a causal relationship
10  between talc and ovarian cancer, particularly
11  when considered along with the consistency
12  and association seen across these studies."
13          Dr. Moorman is not -- has
14  characterized what the studies show.  The
15  numbers are the numbers, correct?
16          MS. MILLER:  Objection.
17          MR. LOCKE:  Objection.
18          THE WITNESS:  You'd have to
19      show me what you're referring to.  The
20      numbers are the numbers.
21  QUESTIONS BY MR. TISI:
22      Q.   All right.  Well, let's do
23  that.  Dr. Moorman --
24          MS. MILLER:  This is only part
25  of her report, and it's not the part

84 (Pages 330 to 333)

Christian Merlo, M.D., MPH

Page 334

1  of her report that he cites.  Is that
2  correct?
3       (Merlo Exhibit 36 marked for
4  identification.)
5  QUESTIONS BY MR. TISI:
6     Q.   Here's your -- here's Exhibit
7  Number 36, please.
8       She's asked the questions on
9  page 249 of her report -- of her deposition.
10  "I think you're conflating or
11  misunderstanding my question."  This is the
12  Johnson & Johnson lawyer asking the question.
13       "I think you're conflating or
14  you're misunderstanding my question because
15  you're answering the question" --
16     A.   I'm sorry, where are we?
17     Q.   Page 249, starting on line 3.
18       Okay?  "And I think you're
19  conflating or you're misunderstanding my
20  question because you're answering the
21  question about whether the association is
22  real or not real, and my question for you is
23  whether the association is weak, modest or
24  strong.  How would you characterize it?" to
25  Dr. Moorman.

Page 335

1       Her answer:  "Answer, as I
2  would -- as I have said, there is no absolute
3  terminology that would say what is a weak
4  association, what is modest and what is
5  strong.  So I think it is more accurate just
6  to describe it as it is, a 25 to 30 percent
7  increased risk of ovarian cancer."
8       Do you see that?
9     A.   I see that.
10     Q.   Okay.  She didn't characterize
11  it as strong, did she?
12       MS. MILLER:  Objection.
13       MR. LOCKE:  Objection.
14  QUESTIONS BY MR. TISI:
15     Q.   She characterized it by the
16  number, correct?
17       MS. MILLER:  Objection.
18       MR. LOCKE:  Objection.
19       MS. MILLER:  Are you asking
20  ever or here or --
21       MR. TISI:  I'm asking -- I'm
22  asking when she was asked the question
23  at deposition.
24       MR. LOCKE:  Objection.
25       THE WITNESS:  Dr. Moorman is

Page 336

1  saying that I think it's more accurate
2  just to describe it as it is, a 25 to
3  30 percent increase of risk of ovarian
4  cancer, but I don't know what she's
5  referring to there --
6  QUESTIONS BY MR. TISI:
7     Q.   Okay.
8     A.   -- whether that's one study,
9  all studies, a meta-analysis, anything.
10     Q.   Okay.
11     A.   One could also say that a
12  relative risk of 1.25 or 1.30 is a weak
13  association.
14     Q.   Okay.  But you are
15  characterizing what they testified to, and
16  you were cherry-picking statements from their
17  report, were you not?
18       MS. MILLER:  Objection.
19       MR. LOCKE:  Objection.
20       THE WITNESS:  I don't know what
21  you mean by "cherry-picking."
22  QUESTIONS BY MR. TISI:
23     Q.   Meaning taking --
24     A.   I read their depositions --
25  sorry, I read their reports and I critiqued

Page 337

1  their reports.  And by saying that a relative
2  risk of 1.2 is a strong association is so far
3  out of line of the epidemiologic community
4  that that is my critique.
5       MR. TISI:  Okay.  We're about
6  ready to go into a new area, so if you
7  want to take a break, this is a good
8  time unless you want me to just plow
9  forward.
10       MS. MILLER:  How long is the
11  next area?
12       MR. TISI:  I have no idea.  It
13  depends on whether he says "it
14  depends" all the time.
15       MR. LOCKE:  Objection.
16       THE WITNESS:  I can take a
17  break.
18       MR. TISI:  Perfect.
19       THE WITNESS:  Get some coffee.
20       MR. TISI:  Perfect.
21       VIDEOGRAPHER:  The time is
22  3:01 p.m.  We're going off the record.
23       (Off the record at 3:01 p.m.)
24       VIDEOGRAPHER:  The time is
25  3:16 p.m., and we're back on the

85 (Pages 334 to 337)

Christian Merlo, M.D., MPH

Page 338

1    record.
2    QUESTIONS BY MR. TISI:
3        Q.    Doctor, could you go to page 31
4    of your report?  I'm going to talk about
5    consistency and statistical significance.
6        A.    Sure.
7        Q.    We've spent a lot of time
8    talking about consistency and your opinion
9    that there is no consistency, so I think
10   we'll be able to go through this pretty
11   quickly.
12           But if you go to page 31, you
13   criticize plaintiffs' experts -- well, you
14   say, "Lack of consistency between studies.
15   One of the most striking aspects of their
16   studies is their inconsistency."
17           Do you see that?
18       A.    No.
19           Where am I saying that?
20       Q.    First sentence of your
21   Section A on page 31.
22       A.    Okay.
23       Q.    Okay.  And you note, and I'm
24   summarizing here, that there are seven
25   hospital-based studies, four cohort studies

Page 339

1    and some population studies that have
2    statistically insignificant results.
3            And we talked about that
4    before; do you recall?
5        A.    We talked about cohort studies.
6    We talked about hospital-based studies.  We
7    talked about population-based studies.  We
8    talked about statistical significance in
9    population-based studies as well as
10   statistical insignificance in
11   population-based studies as well as
12   statistical insignificance in hospital-based
13   and statistical insignificance within cohort
14   studies.
15       Q.    Right.
16           And on page 34 of your report,
17   you have a chart that you put in summarizing
18   the studies, correct?
19       A.    Page 34 is a chart that
20   summarizes case-control studies as well as
21   cohort studies, and the case controls are
22   broken down into hospital-based and
23   population-based.
24       Q.    And the first column is
25   actually the study name.  The second column

Page 340

1    are the risk ratios, correct?
2        A.    Yes, the first column's the
3    study authors and the dates.  The second
4    column is either the odds ratio, relative
5    risk or hazard ratio.
6        Q.    Can we call them risk ratios
7    generally?
8            Can we call them -- is there a
9    general -- I thought we could call them risk
10   ratios, but --
11       A.    Sure.  It's just that in an --
12   an odds ratio is something that's determined
13   in a case-control study and a relative risk,
14   which in a hazard ratio deal with time, and
15   those are involved in cohort studies.
16       Q.    I understand.  I understand.
17           But the second column are the
18   risk ratios generally?
19       A.    Estimates of risk, yes.
20       Q.    Estimates of risk.
21           And the third column are the
22   confidence interval.
23           And tell me what a confidence
24   interval is.
25       A.    A confidence interval is when

Page 341

1    you do an analysis and you get a -- some
2    estimate of risk, some point estimate, which
3    would be that second column.  Then you're
4    given -- then you obtain what's called a
5    95 percent confidence interval, which is sort
6    of the range within statistical significance
7    where that point estimate might fall.
8        Q.    Right.
9        A.    And in general, when the
10   95 percent confidence interval overlies 1,
11   that signifies a nonstatistically significant
12   point -- estimate of risk.
13       Q.    But the confidence interval
14   encompasses the range of likely -- where the
15   likely results are likely to be to a
16   95 percent certainty?
17       A.    The -- I don't know that I
18   would say certainty.  I think it's the --
19   it's the range of the -- it's the range of
20   the point estimate above which or below which
21   there would be a 2.5 percent chance of that
22   point estimate falling.
23       Q.    Okay.
24       A.    And the confidence interval can
25   either be wide or narrow.  The wider it is,

Christian Merlo, M.D., MPH

Page 342

1    that usually relates to heterogeneity within
2    the study, a small study population, problems
3    in collecting appropriate information.
4           If the confidence interval is
5    narrow, usually that reflects a larger study
6    population.
7       Q.    And the last column is your
8    assessment of the strength of the
9    association, if there is one, right?
10          You say, "Is it a statistically
11   significant association?"
12          And that's your interpretations
13   here, correct?
14      A.    It says, "If there's a
15   statistically significant association."
16   That's what's reported in the journal.
17      Q.    Okay.  And then the "no" in the
18   last column stands for not statistically
19   significant?
20      A.    The "no" stands for not
21   statistically significant, that's correct.
22      Q.    And the "weak" stands for
23   statistically significant and with your
24   characterization of the strength of the
25   association?

Page 343

1       A.    The "weak" stands for a weak
2    statistically significant association.
3       Q.    But that's your
4    characterization; that's not the authors'?
5       A.    That is what is -- they're all
6    below 2, statistically significant --
7       Q.    Okay.
8       A.    Which -- suggests a weak
9    association, yes.
10      Q.    Okay.  And just to be clear,
11   you can't point to me any textbook in
12   epidemiology where it is universally accepted
13   that a risk ratio of 1.17, which is one of
14   the things -- to 1.92 is weak.  That's just
15   your view of what the scientific community
16   says?
17          MS. MILLER:  Objection.
18          MR. LOCKE:  Objection.
19          THE WITNESS:  It's not my view
20      of what the scientific community says.
21      It's what the scientific community
22      says.
23   QUESTIONS BY MR. TISI:
24      Q.    Okay.  And you -- okay.  I'd
25   like to make this chart a separate chart -- a

Page 344

1    separate exhibit.
2           (Merlo Exhibit 37 marked for
3           identification.)
4    QUESTIONS BY MR. TISI:
5       Q.    And I'm going to do it Exhibit
6    Number 37.
7       A.    Thank you.
8       Q.    I'm going to come back to it,
9    and I don't want to keep flipping back and
10   forth to the pages.
11      A.    Okay.
12      Q.    And this is your -- this chart
13   summarizes the -- the last column here
14   summarizes your view of the inconsistency of
15   these studies.  The now are inconsistence
16   with the weaks?
17          MS. MILLER:  Objection.
18          THE WITNESS:  So what -- not
19      only that, I mean, what this does
20      summarize, inconsistency within
21      population-based case-control studies
22      where some studies show a weak
23      statistically significant association
24      while some studies do not show any
25      statistically significant association.

Page 345

1           But there's also differences
2    in -- within study -- the same study
3    design.  Say, within case controls,
4    hospital-based case controls, there
5    are seven of them, and none of them
6    have a statistically significant
7    association, and therefore case con --
8    sorry, four cohort studies which do
9    not show any statistically
10   significant.
11          So it's not just summarizing
12   the differences in that column, it's
13   summarizing the differences between
14   study types and the differences within
15   a similar study.
16   QUESTIONS BY MR. TISI:
17      Q.    Understood.  And I hear you.
18          And what I'm trying to say is,
19   it's your view that a weak statistically
20   significant result is inconsistent with a
21   non -- and I think you agreed to this before,
22   but I want to make sure.
23          MS. MILLER:  No.
24   QUESTIONS BY MR. TISI:
25      Q.    That a weak statistically

Christian Merlo, M.D., MPH

Page 346

1    significant result is inconsistent with a --
2    for example, let's go back down here. Let's
3    take -- see the Rosenblatt study, which was
4    one that was done at your institution. That
5    has -- was nonstatistically significant, in
6    your view, and that is inconsistent with
7    Cramer, which is -- shows a weak -- a weak
8    statistically significant results.
9            MS. MILLER: Objection. That
10           mischaracterizes either his report or
11           his testimony, whichever it is that
12           you're characterizing.
13   QUESTIONS BY MR. TISI:
14       Q.   Doctor, is it your view that,
15   using the example I just took, Cramer is
16   inconsistent with Rosenblatt?
17       A.   Which Cramer?
18       Q.   Cramer 1982 and Rosenblatt
19   1992.
20       A.   So Cramer 1982 shows a point
21   estimate of 1.92, and the 95 percent
22   confidence interval is 1.27 to 2.89.
23           Rosenblatt, 1.27 --
24       Q.   No, Rosenblatt -- Rosenblatt
25   1992, which is a hospital-based study.

Page 347

1        A.   Rosenblatt '92. Okay.
2        Q.   A hospital-based study.
3        A.   So that's a 1.7, with the
4    95 percent confidence interval .7 to 3.9.
5            Now, Cramer 1982 is
6    statistically significant. Rosenblatt '92 --
7    Cramer '82, statistically significant;
8    Rosenblatt '92, not statistically
9    significance.
10       Q.   And are those inconsistent?
11           MS. MILLER: Objection.
12           THE WITNESS: One is
13           statistically significant, and one is
14           not statistically significant. They
15           are inconsistent with each other.
16   QUESTIONS BY MR. TISI:
17       Q.   Okay. So and on page 44 and 45
18   of your report, you criticize plaintiffs'
19   experts. You say, "I would agree" -- you
20   see, this is the part where you accuse them
21   of fabrication. Page 44. "Plaintiffs'
22   experts fabricate consistency by ignoring
23   inconsistent studies," that heading.
24           Do you see that?
25           MS. MILLER: Objection. That

Page 348

1    was such a loaded question.
2            MR. TISI: Oh, it is. It's a
3    loaded -- it's a loaded headnote.
4            THE WITNESS: So I'm not
5    accusing anybody of anything.
6            MS. MILLER: Objection.
7            THE WITNESS: I'm just
8    reporting what the medical evidence
9    shows. And the medical evidence shows
10           that there is inconsistency among
11           similar study designs, inconsistency
12           between hospital-based and
13           population-based case controls,
14           inconsistency among population
15           case-controls, and inconsistency
16           between cohort studies and case
17           controls, all leading to
18           inconsistency.
19           I'm not accusing anyone of
20           anything. I'm just reporting what's
21           in the medical literature.
22   QUESTIONS BY MR. TISI:
23       Q.   Okay. So but you didn't just
24   say they're inconsistent result. You say
25   plaintiffs' experts fabricate consistency

Page 349

1    when there is none. Right?
2            So that's -- I mean, maybe I'm
3    splitting hairs, but that's a little bit more
4    inflammatory than just simply saying, I find
5    the studies inconsistent. Right?
6            MS. MILLER: Objection.
7            MR. LOCKE: Objection.
8            THE WITNESS: I don't know. I
9            don't know what your definition of
10           inflammatory is.
11   QUESTIONS BY MR. TISI:
12       Q.   Okay. I think if somebody
13   accused you of fabrication, you might be
14   thinking that that might be inflammatory, but
15   we'll see.
16           MR. LOCKE: Objection.
17   QUESTIONS BY MR. TISI:
18       Q.   Let's move on.
19           You say plaintiffs' experts
20   uniformly assert -- I'm sorry, uniformly
21   assert consistent criterion has been
22   satisfied, and then you go on to say, "I
23   would agree with plaintiffs' experts that
24   there's some consistencies among the study,
25   but those consistencies are among the

88 (Pages 346 to 349)

Christian Merlo, M.D., MPH

Page 350

1  hospital-based case-control studies and among
2  the large cohort studies showing no
3  statistically significant inconsistencies" --
4  I'm sorry, "showing no association between
5  talc exposure and ovarian cancer.  By
6  contrast, the inconsistencies between
7  hospital-based and population-based
8  case-control and within population-based
9  case-control studies."
10       Did I read that right?
11       Actually, let me -- I didn't
12  read it right.  Let me read it again.
13       "I would agree with plaintiffs'
14  experts that there are some consistencies
15  between studies, but those consistencies are
16  among hospital-based case-control studies and
17  among large cohort studies showing no
18  statistically significant association between
19  talc exposure and ovarian cancer.  By
20  contrast, there are inconsistencies between
21  hospital-based and population-based
22  case-control studies and within
23  population-based case-control studies."
24       Did I read that right?
25       A.   Yes, sir.

Page 351

1       Q.   Okay.  And then you go on to
2  say -- and this is the statement that we
3  talked about before, the kind of the general
4  rule that you set out.  It says, "It is
5  important to remember, contrary to the
6  suggestion of several of plaintiffs' experts
7  on page 45, that for this criteria to weigh
8  in favor of finding a causal relationship,
9  there must be consistency and statistically
10  significant associations.  Consistency is --
11  in relative risks that are not statistically
12  significant is not meaningful because that
13  sort of consistency does not provide any
14  degree of confidence that the claim of
15  association made by the study is more than
16  random chance."
17       Did I read that right?
18       A.   That's correct.
19       (Merlo Exhibit 38 marked for
20  identification.)
21  QUESTIONS BY MR. TISI:
22       Q.   Okay.  Now, I'm going to have
23  that statement marked here as Exhibit
24  Number 38.  But I'm going to do this, Doctor,
25  because I have to say that I made a mistake

Page 352

1  here on -- in retyping this.
2       I did not highlight
3  statistically significant.  So if you would
4  just do me a favor and take this pen and
5  circle "statistically significant" in the
6  middle of that paragraph, I'd appreciate
7  that.
8       MS. MILLER:  Objection.
9  QUESTIONS BY MR. TISI:
10       Q.   Go ahead, if you don't mind.
11       A.   What do you want me to do?
12       Q.   Just take statistically in --
13  because in your document, you actually
14  highlight and italicize "statistically
15  significant" in your -- correct?
16       MS. MILLER:  Huh?
17  QUESTIONS BY MR. TISI:
18       Q.   In your -- on page 45, top
19  paragraph.
20       A.   But that's not -- that's not
21  from page 45.  This is page 44 from that
22  paragraph.
23       Q.   Let me see.  Maybe I gave you
24  the wrong one.
25       MS. MILLER:  This is the

Page 353

1  paragraph --
2       MR. TISI:  I apologize.  I'm
3  sorry, you're correct.  It's
4  Exhibit 39.
5       (Merlo Exhibit 39 marked for
6  identification.)
7       MS. MILLER:  So are we done
8  with this one?
9       MR. TISI:  I'm just mark it.
10  It's the early part.  We'll leave it
11  there.
12  QUESTIONS BY MR. TISI:
13       Q.   This is 39.  I'm sorry, Doctor.
14       A.   That's okay.
15       Q.   This is the paragraph on the
16  top of page 45.  And I did not emphasize what
17  you emphasized, and I apologize for that.
18       You emphasized statistically
19  significant, and I didn't when I retyped
20  this.  So if you would do me a favor and just
21  circle the words "statistically significant,"
22  I'd appreciate it.
23       MS. MILLER:  I'm going to
24  object to that.  I think you should
25  circle it if you want it circled.

89 (Pages 350 to 353)

Christian Merlo, M.D., MPH

Page 354

1          THE WITNESS: It's mentioned
2     twice, so --
3     QUESTIONS BY MR. TISI:
4          Q.   Well, the one that you
5     highlighted in your report.
6          A.   Looks like -- consistency and
7     statistically significant.  This and this.
8          Q.   And this is your rule that you
9     set out.  It says, "Important to remember,"
10    and this is a -- we talked about this earlier
11    in your deposition.  Although there is no
12    citation for this, you agree that this is
13    your -- you believe that this is a generally
14    accepted principle in epidemiology?
15         A.   It's a generally accepted
16    principle in epidemiology.
17         Q.   Okay.  Doctor, have you seen
18    references to the fact that statistical
19    significance is not the test of consistency?
20         A.   You'd have to show me a
21    reference.
22         Q.   Okay, let's do that.  Could you
23    go -- can you pull out Exhibit 23, which is
24    the "From Association to Causation" chapter
25    that Johns Hopkins uses in courses there?

Page 355

1     It's the Gordis text.
2          Do you see that?
3          Do you have it in front of you?
4          A.   I have Chapter 14, yes,
5     Exhibit 23.
6          Q.   Can you go to page 251.  On
7     page -- it talks about Replications of
8     Findings, which is the consistency issue,
9     right?
10         MS. MILLER: Objection.
11         THE WITNESS: I see where it
12    says "Replication of Findings."
13    QUESTIONS BY MR. TISI:
14         Q.   And it says, "If the
15    relationship is causal, we would expect to
16    find consistency in different studies and in
17    different populations.  Replication of
18    findings is particularly important in
19    epidemiology.  If an association as observed,
20    we can also -- we would also expect it to be
21    seen consistently within subgroups of the
22    population and in different populations and
23    unless there is a clear reason to expect
24    different results."
25         Do you see that?

Page 356

1          A.   I do see that.
2          Q.   Is there any mention of
3     statistical significance in this?
4          MS. MILLER: Objection.
5          THE WITNESS: There is not.
6     QUESTIONS BY MR. TISI:
7          Q.   Okay.
8          A.   But there's not a reference
9     saying that -- that if it's not there, the
10    opposite.
11         Q.   Okay.  Does it also talk about
12    there needs to be consistency among study
13    designs?
14         MS. MILLER: Objection.
15    QUESTIONS BY MR. TISI:
16         Q.   This talks about among studies
17    but not study design, does it?
18         MS. MILLER: Objection.
19         THE WITNESS: It says, "If an
20    association observed, we would expect
21    it to be seen consistently within
22    subgroups of the population and in
23    different populations," which may
24    involve different studies and
25    different study designs.

Page 357

1     QUESTIONS BY MR. TISI:
2          Q.   But it doesn't say study
3     designs, does it?
4          MS. MILLER: Objection.
5          THE WITNESS: I don't think it
6     has to.  That's inherent in the
7     statement.
8     QUESTIONS BY MR. TISI:
9          Q.   Okay.  Now, I previously asked
10    you whether you had done any independent
11    research on studies of talc and ovarian
12    cancer, and you said you had not.
13         Do you recall that?
14         MS. MILLER: Objection.
15    QUESTIONS BY MR. TISI:
16         Q.   That was very early in the day.
17         MS. MILLER: Objection.
18         THE WITNESS: I don't recall.
19    I'm going to have to see it.
20    QUESTIONS BY MR. TISI:
21         Q.   Okay.  Have you done any
22    studies in talc and ovarian cancer?
23         A.   What do you mean by "studies"?
24         Q.   Have you done any observational
25    studies on talc and ovarian cancer?

90 (Pages 354 to 357)

Christian Merlo, M.D., MPH

Page 358

1      A.   I've reviewed the literature --
2      Q.   Have you done any studies?
3      A.   -- on the potential causal
4  association between talcum powder and ovarian
5  cancer.  I've reviewed the literature.
6      Q.   Have you authored any studies
7  on talc and ovarian cancer or designed any
8  studies on talc and ovarian cancer?
9      A.   And I believe I told you no
10 earlier on.
11     Q.   That was my question.
12          Now, you mentioned in your
13 report that there are seven hospital-based
14 case-control studies examining the
15 association between talc and ovarian cancer.
16     A.   Where did I say that?
17     Q.   It's in your chart, and you
18 mentioned it several times today.
19          MS. MILLER:  You just said,
20 this is in your report.
21          THE WITNESS:  You just said I
22 wrote it in my report, so I just
23 wanted to see where I said it.
24 QUESTIONS BY MR. TISI:
25     Q.   Are there not seven

Page 359

1  observational -- seven hospital-based
2  studies, Doctor?
3      A.   I have a chart here that has
4  seven hospital-based case-control studies.
5      Q.   Okay.  And one of them we just
6  talked about, it was Rosenblatt, it was
7  done here at Johns Hopkins, was it not?
8      A.   I don't specifically recall.
9      Q.   Well, actually, you mention
10 that on page 14 of your report.  Go to
11 page 14 of your report.
12          You say, "Rosenblatt is a 1992
13 reported hospital-based study evaluating
14 fiber exposure generally with fiber defined
15 as asbestos talc or fiberglass, et cetera,
16 done in Johns Hopkins Hospital."
17          Do you see that?
18     A.   A little bit before my time,
19 1981 to 1985 --
20     Q.   Right.
21     A.   -- at Johns Hopkins.
22          (Merlo Exhibit 40 marked for
23 identification.)
24 QUESTIONS BY MR. TISI:
25     Q.   All right.  I'm like to attach

Page 360

1  the Rosenblatt study, Exhibit Number 40.
2          Did you actually read this
3  study?
4      A.   I did.
5      Q.   Good.
6          Let's go, so we don't have to
7  spend a lot of time rereading it.
8      A.   I haven't memorized it, though.
9      Q.   Okay.  One of the authors of
10 this study, if you'll notice, is a guy we
11 mentioned a couple times today, Dr. Szklo.
12 He's the second author.
13     A.   Szklo, yes.
14     Q.   Szklo.
15          He's at the school.  He's a
16 full professor there.
17          Have you ever said, you know,
18 "Doctor, there's a study done at our school.
19 What do you think about this relationship?
20 You've published on it."
21          Have you gone and talked to
22 him?
23     A.   I have not.
24          MS. MILLER:  Objection.
25          MR. LOCKE:  Objection.

Page 361

1          MS. MILLER:  Give us time to
2  object, Doctor.
3          THE WITNESS:  Okay.  Sorry.
4          I did my own independent
5  search, and I evaluated the body of
6  medical evidence.
7  QUESTIONS BY MR. TISI:
8      Q.   Now, if you go to -- I'm sorry.
9      A.   I did read this article, and I
10 did see that -- recall now that I did see his
11 name on there, but it did not interfere or
12 cause me reflection to go talk to him about
13 it because I was going to perform my own
14 independent review.
15     Q.   Right.
16          So you had on the chart -- on
17 your chart, exhibit number -- do you have
18 your chart in front of you?  Exhibit 37?
19     A.   I have Exhibit 37, yes.
20     Q.   And I asked you before whether
21 or not Rosenblatt was inconsistent with
22 Cramer.
23          Do you remember that?
24          And you said yes?
25     A.   So if we're still -- which

Christian Merlo, M.D., MPH

Page 362

1  Rosenblatt, again, are we talking about?
2  Because there are two Rosenblatts.
3      Q.   1992.
4      A.   Rosenblatt '92.  I got it.
5      Q.   And Cramer 1982.
6      A.   Got it.
7      Q.   And I asked you the question,
8  and you said that they were inconsistent.
9           Well, let's see what Dr. Szklo
10 says about this.
11          Now, just to be clear,
12 Rosenblatt is a hospital-based case-control
13 study?
14     A.   Rosenblatt was a hospital-based
15 case-control study, yes, that's correct.
16     Q.   And Cramer was a
17 population-based case-control study?
18     A.   Cramer 1982 was a
19 population-based case-control study.
20     Q.   Now, first, if you go to the
21 study itself, if you go to the third page,
22 page 22.
23     A.   Page 22, yes.
24     Q.   It says -- actually, the second
25 column it says, "We found an increased

Page 363

1  relative risk, 4.8, for talc use on sanitary
2  napkins, with a smaller effect on genital
3  bath talc exposure, relative risk 1.7."
4           Do you see that?
5      A.   I do see that.
6      Q.   Can you tell me why it is you
7  didn't refer to the talc on sanitary napkins'
8  relative risk of 4.8, which was statistically
9  significant?
10     A.   The point estimate that I took
11 out of that was for genital talc exposure,
12 which is a relative risk of 1.70.
13     Q.   All right.  But genital talc
14 exposure was defined as asbestos --
15 asbestos -- I'm sorry, it was actually fiber
16 exposure.
17          In your report on page 15, you
18 talk about it as being -- it's defined --
19     A.   Well, if you actually look at
20 Table 3, the genital fiber use, yes/no, has
21 an odds ratio of 1.0, and the 95 percent
22 confidence interval is 0.2 to 4.0.
23          So if we're just talking about
24 genital fiber use, there's --
25     Q.   Okay.

Page 364

1      A.   -- an odds ratio of 1 --
2      Q.   Okay.
3      A.   -- which is null.
4      Q.   And when you have talc, it's
5  1.7, and when you have it directly applied to
6  sanitary napkins, it was 4.8 -- do you see
7  that? -- which was statistically significant.
8      A.   Statistically significant with
9  a confidence interval of 1.3 to 17.8, a very,
10 very wide range, and with also a proportion
11 of missing -- of cases and controls with
12 missing exposure.
13     Q.   But then he says something that
14 addresses your point directly.  It says,
15 "This is" -- and I'm going to read the whole
16 paragraph.
17          MS. MILLER:  Tell us where you
18 are.
19          MR. TISI:  Yeah.  Second
20 column.  It's beginning with "we
21 found" on page 22.
22 QUESTIONS BY MR. TISI:
23     Q.   "We found an increased relative
24 risk, 4.8 for talc use on sanitary napkins,
25 with a smaller effect for genital bath

Page 365

1  exposure, 1.7."
2           And that 1.7 was not
3  statistically significant, correct?
4      A.   The 1.7 was not statistically
5  significant.
6      Q.   Okay.  He then says, "This is
7  in accordance with the original finding of a
8  significant increased risk for perineal talc
9  exposure, relative risk 1.9, 95 percent
10 confidence interval, 1.3 to 2.9, by Cramer,
11 et al."
12          And that's the Cramer article
13 from 1982, correct?
14     A.   That's what it says.
15     Q.   Okay.  And so he's saying his
16 results are actually consistent with what
17 Cramer found.
18     A.   But they're not.
19     Q.   Okay.  But Dr. Szklo says that
20 they are?
21          MR. LOCKE:  Objection.
22          THE WITNESS:  If we're talking
23 about consistency here between two
24 studies and talking about statistical
25 significance and consistency within

Christian Merlo, M.D., MPH

Page 366

1    statistical significance, they're not
2    consistent.
3    QUESTIONS BY MR. TISI:
4        Q.   Okay.  Because statistical
5    significance is never the test for
6    consistency, is it, Doctor?
7            And everybody from the
8    epidemiology textbooks to the American
9    Statistical Association says, don't do what
10   you did in this report, true?
11           MS. MILLER:  Objection.
12           MR. LOCKE:  Objection.
13           THE WITNESS:  I don't even know
14   what that means, and I --
15   QUESTIONS BY MR. TISI:
16       Q.   Okay.
17       A.   -- don't know what you mean by
18   everyone and --
19       Q.   Well, we're going to talk --
20       A.   -- who those different groups
21   are, so you'd have be very specific.
22       Q.   We're going to be --
23       A.   It's a very big generalization.
24       Q.   Well, you made a lot of
25   generalizations about what the epidemiology

Page 367

1    community thinks.
2            MR. LOCKE:  Objection.
3    QUESTIONS BY MR. TISI:
4        Q.   So I'm talking to you about
5    epidemiology textbooks.  The American
6    Statistical Association says, you don't do
7    what you did here.
8            MS. MILLER:  Objection.
9            MR. LOCKE:  Objection.
10   QUESTIONS BY MR. TISI:
11       Q.   Let me ask you this.  He says
12   below, "The results of our study suggest that
13   genital talc fiber exposure may be associated
14   with an adverse event, but further study is
15   needed to determine if this relationship is
16   causal in nature from 1990 -- this 1992
17   study."
18           Correct?
19       A.   Where are you reading that?
20       Q.   The paragraph below.  It says,
21   "The results of our study."  Two paragraphs
22   down.
23       A.   Okay.
24       Q.   Okay.  It says, "The results of
25   our study and others suggest that genital

Page 368

1    talc fiber exposure may be associated with an
2    adverse event, but further study is needed."
3            Do you see that?
4        A.   I do, and that's a very, very
5    general statement.  There's a "suggest,"
6    there's a "may," there's an "associated,"
7    there's an "adverse effect."  I don't even
8    know what that means.
9        Q.   He never said it was
10   inconsistent, did he?  He said, in fact, his
11   study -- this study is in accordance with the
12   original study.
13           MS. MILLER:  Objection.
14           THE WITNESS:  This statement
15   right here is not talking about -- is
16   not talking about consistency, this
17   results of our study.  I don't know
18   why that has anything to do with
19   consistency.
20   QUESTIONS BY MR. TISI:
21       Q.   Okay.  Well, let's go to the
22   paragraph that does.
23           It says above, "We found an
24   increased, 4.8 for talc use on sanitary
25   napkins, with a smaller effect for genital

Page 369

1    bath talc exposure, relative risk, 1.7.  This
2    is in accordance with the original finding of
3    a significant increased risk for perineal
4    talc exposure by Cramer, et al.  Preliminary
5    findings from a Chinese talc study also
6    suggest the application of talc-containing
7    dusting powder and the risk of epithelial
8    ovarian cancer relative risk to be 1.9, with
9    a confidence interval of 1.1 to 13.8," which
10   is the Chen study on your list.  "A
11   nonsignificant effect for genital talc
12   exposure on genital sanitary napkins or
13   underwear was detected in a study by Hartge,
14   relative risk 2.5, which was not
15   statistically significant.  Whittemore, et
16   al., detected an increased relative risk 1.4,
17   P value greater than .05, for perineal
18   exposure.  In a study of borderline ovarian
19   tumors, the increased risk was also observed
20   with talc exposure use on sanitary napkins,
21   relative risk 1.9 with a confidence interval
22   of .9 to 6.9."
23           This paragraph says all these
24   studies show an increased risk, true?
25   Including the last one that says an increased

93 (Pages 366 to 369)

Christian Merlo, M.D., MPH

Page 370

1    risk was observed in a nonstatistically
2    significant study.
3            MS. MILLER:  Objection.
4            MR. LOCKE:  Objection.
5            THE WITNESS:  This paragraph
6        does not say that there's an increased
7        risk in all these studies.
8            This paragraph says -- this
9        paragraph highlights that some studies
10       are statistically significant and
11       others are nonstatistically
12       significant.  And that is not
13       consistent.
14   QUESTIONS BY MR. TISI:
15       Q.    They say these are -- these
16   studies are in accordance, and you're saying
17   that that's inconsistent?
18           MS. MILLER:  Objection.
19           THE WITNESS:  That's not what
20       it says.
21   QUESTIONS BY MR. TISI:
22       Q.    It says this study is in
23   accordance with the original finding of a
24   significant -- a significant increased risk
25   for perineal talc exposure, true?  Does it

Page 371

1    not say that?
2        A.    And what that sentence is
3    referring to is the sentence before that,
4    which is talking about an increased relative
5    risk for talc use on sanitary napkins, and
6    that's it.  It's not in accordance --
7        Q.    No, that's not true.
8        A.    It is.
9        Q.    It says with a smaller effect
10   for genital bath talc exposure, relative risk
11   1.7.  It includes both, does it not?
12       A.    That relative risk is not
13   statistically significant.  If they're
14   talking about the point estimate being over
15   1, that may be true, but this paragraph does
16   not say anything about consistency within
17   these studies.  In fact, this highlights
18   inconsistency between all of these studies.
19       Q.    Okay.  Well, and so
20   Dr. Moyses -- Dr. Szklo is wrong when he says
21   this: "The results of our study and others
22   suggest that genital fiber exposure may be
23   associated with an adverse effect."
24           He's wrong when he says that?
25       A.    That is such a general

Page 372

1    statement.  It says "suggests," "may,"
2    "associated adverse effect."  I don't even
3    know what the adverse effect he's talking
4    about is.
5        Q.    Well, how about the last --
6    let's talk about the last paragraph.
7            "In summary" --
8            MS. MILLER:  The last paragraph
9        of what --
10           MR. TISI:  Of the study.
11           MS. MILLER:  Oh, okay.
12   QUESTIONS BY MR. TISI:
13       Q.    "In summary, our study shows
14   that the development of ovarian cancer may
15   be -- may be associated with genital fiber
16   exposure, especially talc on sanitary
17   napkins."
18           Do you see that?
19       A.    I do.
20           And then it says, "Given its
21   small sample size and the potential selection
22   bias stemming from including patients in only
23   one hospital, further research needs to be
24   performed in order to confirm our findings."
25           And that is the importance of

Page 373

1    consistency.  And that first paragraph that
2    you highlighted demonstrates the lack of
3    consistency.
4        Q.    Doctor, he's saying that this
5    study is further support of the hypothesis,
6    additional study needs to be done, but that
7    this shows that the development of ovarian
8    cancer may be associated with genital fiber
9    exposure.  That's what he says.  I'm reading
10   directly from the report.
11           MR. LOCKE:  Objection.
12           THE WITNESS:  And where are you
13       reading that?
14   QUESTIONS BY MR. TISI:
15       Q.    "In summary, our study shows
16   that the development of ovarian cancer may be
17   associated with genital fiber exposure,
18   especially talc on sanitary napkins and
19   exposure to fibers in relatives."
20           He does say that, correct?
21           MS. MILLER:  Objection.
22           THE WITNESS:  He says, "Our
23       study shows that the development of
24       ovarian cancer may be associated."
25       "May be associated."

94 (Pages 370 to 373)

Christian Merlo, M.D., MPH

Page 374

1        And then he also says -- and
2    I'll say this again -- "Given its
3    small sample size and the potential
4    for selection bias" --
5    QUESTIONS BY MR. TISI:
6        Q.    And he doesn't say this is
7    inconsistent, does he?  He doesn't say, our
8    studies are opposite to.  He doesn't say, our
9    studies are inconsistent with, does he?
10       MR. LOCKE:  Objection.
11       MS. MILLER:  Objection.
12       THE WITNESS:  He doesn't say
13   they're inconsistent.  He doesn't say
14   either.  But they are inconsistent
15   with each other, because some are
16   showing a statistical significance and
17   some are not.
18       (Merlo Exhibit 41 marked for
19   identification.)
20   QUESTIONS BY MR. TISI:
21       Q.    Let's go to another one.
22       A.    They're inconsistent.
23       Q.    Let's go to another one.
24   There's another one that you refer to.  It's
25   the Tzonou study from Greece, the Tzonou

Page 375

1    study.  I'm going to show you this one.  This
2    is one you also read.
3        And this is another
4    hospital-based study, correct?
5        And this is the one on your
6    chart --
7        MS. MILLER:  I'm sorry, I took
8    yours.
9        MR. TISI:  I'm sorry.
10   QUESTIONS BY MR. TISI:
11       Q.    This is the one on your chart
12   that has a 1.05 with a confidence interval of
13   .28 to 3.98.
14       Do you see that?
15       A.    I see on my chart 1.05, with a
16   95 confidence interval of .28 to 3.98.
17       Q.    Let's look at what these
18   doctors say about this relationship.  If you
19   go to page 409, second column, it says, "The
20   results of the present study do not support
21   an association between talc and ovarian
22   cancer but given the overlapping range in the
23   confidence intervals, they are not
24   incompatible with it."
25       True?

Page 376

1        A.    Can you just show me?  I'm
2    sorry, I just didn't know where that was.
3        Okay.
4        Q.    Does it not say, "The result of
5    the present study do not support the
6    association between talc and ovarian cancer
7    but given the overlapping range of the
8    confidence intervals, they are not
9    incompatible"?
10       MR. LOCKE:  Objection.
11       THE WITNESS:  I do see that
12   sentence, but I'm just trying to
13   figure out where that -- that that is
14   reference to.
15   QUESTIONS BY MR. TISI:
16       Q.    Okay.  Was it important to you
17   to figure out what that doctor meant by that?
18   The overlapping confidence intervals is
19   consistency, is it not?
20       MR. LOCKE:  Objection.
21       THE WITNESS:  I don't know what
22   you mean by overlapping confidence
23   intervals.
24   QUESTIONS BY MR. TISI:
25       Q.    If confidence intervals overlap

Page 377

1    between studies and -- let's say at 1.2,
2    those are consistent.  The confidence
3    intervals are consistent, correct?
4        MS. MILLER:  Objection.
5        THE WITNESS:  It depends.  It
6    depends if you have three, eight,
7    ten studies that show 1.2, 1.3, their
8    confidence intervals overlap and those
9    are all statistically significant,
10   then those would be consistent.
11       However, if you have a point
12   estimate -- if you have several
13   studies that have point estimates of
14   1.2, 1.3, those are statistically
15   significant, and you have several
16   studies that have similar point
17   estimates but they're not
18   statistically significant, no, they
19   would be inconsistent with each other.
20   QUESTIONS BY MR. TISI:
21       Q.    Even though the confidence
22   intervals overlap?
23       A.    That's not really how you
24   approach consistency, in just looking at the
25   confidence intervals and seeing if they

Christian Merlo, M.D., MPH

Page 378

1    overlap.
2          Because the two studies, if
3    we're talking about a consistent set, the
4    studies would be statistically significant,
5    and that would point towards consistency.
6          Q.   I'm going to like to show
7    you -- have you seen a meta-analysis of the
8    hospital-based studies at all?
9          A.   I did review some
10   meta-analyses.
11         Q.   Did you review the
12   meta-analyses of the hospital-based studies?
13         A.   I would have to look back at my
14   report and see --
15         Q.   Let me see if I can show you
16   the Berge study.
17         A.   -- which -- which had the
18   hospital-based studies.
19         Q.   Let me show you the Berge
20   study, which you've actually seen, correct?
21         MS. MILLER:  Can you show us,
22   too?
23         THE WITNESS:  Okay.
24         (Merlo Exhibit 48 marked for
25   identification.)

Page 379

1    QUESTIONS BY MR. TISI:
2          Q.   If you go to the table on
3    page 6 of 15.
4          Do you see they have
5    case-control studies and they have
6    hospital-based control studies?
7          Do you see that?
8          A.   I do see that.
9          Q.   Okay.  See the relative risk of
10   1.34?
11         A.   I do see 1.34.
12         Q.   See the confidence interval
13   greater than 1, 1.16 to 1.51?
14         A.   I see 1.16 to 1.51.
15         Q.   What does that tell you,
16   Doctor?
17         MR. LOCKE:  Objection.
18         THE WITNESS:  Well, it tells me
19   that looking at these six case-control
20   studies, the relative risk in however
21   they lump these together was a 1.34,
22   with a 95 percent confidence interval
23   of 1.16 to 1.5 -- sorry, 1.51.
24   QUESTIONS BY MR. TISI:
25         Q.   And that's statistically

Page 380

1    significant for the hospital-based studies,
2    correct?
3          A.   For -- that's what that
4    suggests for those six studies.
5          Q.   Now, Doctor, just while we're
6    at it here, and we're going to talk about
7    the -- by the way, you didn't reference that
8    in your report, did you, that there was a
9    meta-analysis of the hospital-based studies
10   that showed a statistically significant
11   increased risk?
12         MR. LOCKE:  Objection.
13         THE WITNESS:  Can you ask that
14   one more time?
15   QUESTIONS BY MR. TISI:
16         Q.   Yes.
17         You didn't note that there was
18   a meta-analysis of the hospital-based studies
19   in the Berge study that showed a
20   statistically significant increased risk, did
21   you?
22         MR. LOCKE:  Objection.
23         THE WITNESS:  In the
24   meta-analysis done by Berge, I did not
25   reference that hospital-based

Page 381

1    case-control study table right there.
2    QUESTIONS BY MR. TISI:
3          Q.   And that showed an increased
4    risk?
5          A.   I would have to go through and
6    look at the papers that were pulled for that
7    because I have seven on my list, and there's
8    six there.
9          Q.   Okay.  But, of course, this
10   study was published and yours wasn't.  Your
11   report has not been?
12         MR. LOCKE:  Objection.
13         MS. MILLER:  Objection.
14         THE WITNESS:  I didn't do a
15   meta-analysis.  I just gave a summary
16   statement of the available
17   hospital-based case controls, and
18   they're all not statistically
19   significant.
20   QUESTIONS BY MR. TISI:
21         Q.   Right.
22         And -- but when you combine
23   them, because they were not powered to do it,
24   they were small studies, because the
25   confidence intervals were large -- you

96 (Pages 378 to 381)

Christian Merlo, M.D., MPH

Page 382

1    indicated that before.  When you combine
2    them, you increase the power, right?
3            MR. LOCKE:  Objection.
4            MS. MILLER:  Objection.
5            THE WITNESS:  You can --
6    QUESTIONS BY MR. TISI:
7        Q.    Okay.
8        A.    -- if the studies looked at the
9    same thing.
10       Q.    Right.
11       A.    If they looked at the same
12   measure of exposure.
13       Q.    So when they combine them, it
14   increased the power.  They show a
15   statistically significant results in the
16   Berge study, correct?
17           MS. MILLER:  Objection.  He
18   specifically said something different.
19           MR. TISI:  You get to cross.
20           THE WITNESS:  If, in fact, the
21   studies are measuring the same aspect
22   of the exposure, which there are
23   varying measures of exposure with --
24   in all of the case-control studies, if
25   they're measuring the same thing, then

Page 383

1        it does add -- it does add more study
2        subjects, which increases -- it does
3        add more study subjects.
4    QUESTIONS BY MR. TISI:
5        Q.    And it does increase the power?
6            MR. LOCKE:  Objection.
7    QUESTIONS BY MR. TISI:
8        Q.    To detect an association,
9    correct?
10           MR. LOCKE:  Objection.
11           MS. MILLER:  Objection.
12           THE WITNESS:  That's not really
13       what power is for.  Power is to say
14       that if you don't detect a certain
15       association, that you're not wrong
16       about that.  That's what power's for.
17   QUESTIONS BY MR. TISI:
18       Q.    Well, the original studies did
19   not detect a statistically significant
20   result, but when you combine them, they did,
21   true?
22           MS. MILLER:  Objection.
23           MR. LOCKE:  Objection.
24           MS. MILLER:  No, that's not
25       what he said.

Page 384

1            THE WITNESS:  And I would have
2    to go through and see why there's only
3    six there and see what the measure of
4    risk was and whether or not that was
5    appropriate to even combine those.
6    QUESTIONS BY MR. TISI:
7        Q.    Okay.  But you didn't do that,
8    and you didn't address this in your report?
9            MR. LOCKE:  Objection.
10           THE WITNESS:  So in looking at
11   this table now, I'm looking at the
12   hospital-based case-control studies,
13   and there's six of them, and the
14   relative risk is as you say.  But
15   there is significant heterogeneity
16   within the studies, and so it may not
17   be appropriate to lump all of those
18   together.
19           And I believe that the authors
20   concluded that because of
21   heterogeneity, it did not support a
22   causal interpretation of the
23   association.
24   QUESTIONS BY MR. TISI:
25       Q.    Doctor, let me ask you this:

Page 385

1    It also says at the top -- and if you look at
2    the abstract -- actually, the -- and I'll
3    represent to you that this study was actually
4    amended.  The original study was amended a
5    year later, so this is the amended study.
6            It says, "This meta-analysis
7    resulted in a weak" -- second to the last
8    sentence -- "weak but statistically
9    significant association between genital talc
10   use and ovarian cancer, which appears to be
11   limited to serous carcinoma with the
12   suggestion of a dose response."
13           Do you see that?
14           MR. LOCKE:  Objection.
15           THE WITNESS:  That's in the
16   abstract?
17   QUESTIONS BY MR. TISI:
18       Q.    Yes.
19       A.    Can you read that again?
20       Q.    Yeah.
21           Second to the last sentence.
22   It says, "The meta-analysis results in a weak
23   but statistically significant association
24   between genital talc -- genital use of talc
25   and ovarian cancer, which appears to be

97 (Pages 382 to 385)

Christian Merlo, M.D., MPH

Page 386

1    limited to serous carcinoma and suggests --
2    with the suggestion of dose response."
3           Did I read that correctly?
4       A.   You read that correctly.
5       Q.   You don't note that in your
6    report, do you?
7           MR. LOCKE:  Objection.
8           THE WITNESS:  But the authors
9        also say in their concluding sentence,
10       "Several aspects of our study,
11       including heterogeneity of results
12       between case-control and cohort
13       studies, however, do not support a
14       causal interpretation of the
15       association."
16   QUESTIONS BY MR. TISI:
17      Q.   I understand, Doctor.
18           I asked you whether I read the
19   prior sentence correctly about a dose
20   response, and you didn't address that in your
21   report, did you not?
22           MR. LOCKE:  Objection.
23           MS. MILLER:  Objection.
24           THE WITNESS:  Well, let's look
25        at dose response then.

Page 387

1    QUESTIONS BY MR. TISI:
2       Q.   Let's look at -- yeah.  You
3    didn't address it.  I looked for it.  I
4    didn't find it.
5       A.   The only reason I'm looking at
6    this is because I did address dose response,
7    and I looked at all of the dose response
8    within all of the studies available.  And in
9    order for Berge to talk about dose response,
10   the studies that involve a dose response have
11   to go in there.
12           And aside from one study, which
13   is Wu 2015, there is no dose response.
14   There's random curves, there's convex curves,
15   convey curves, in Booth, Wong, Cook, Mills,
16   Merritt, Gertig, Cramer, in all of those.  So
17   actually I did.
18      Q.   Okay.  My question is --
19      A.   And there's no dose response.
20      Q.   Did you address Berge's
21   analysis of that issue?
22           MS. MILLER:  Objection.
23           THE WITNESS:  There's no need
24        to because --
25

Page 388

1    QUESTIONS BY MR. TISI:
2       Q.   The question is whether you did
3    or you didn't.
4           MS. MILLER:  Please don't
5        interrupt the witness.
6           MR. TISI:  No, he needs to
7        answer my questions.
8           MS. MILLER:  He's answering
9        your questions as fully as he can --
10          MR. TISI:  My question is, I
11       know you --
12          MS. MILLER:  And now you're
13       interrupting me.
14          MR. TISI:  I know you -- well,
15       because you're coaching.
16   QUESTIONS BY MR. TISI:
17      Q.   Doctor, I know you discussed
18   the --
19          MR. TISI:  Your laughing is
20       really, really overwhelming.
21          MS. MILLER:  You just accused
22       me of coaching the witness for saying
23       "please don't interrupt him."
24          MR. TISI:  You are totally
25       coaching the witness.  Don't interrupt

Page 389

1    him.  He was saying X, Y and Z.  It's
2    coaching.
3           MS. MILLER:  Excuse me?  I
4        said, "Please don't interrupt the
5        witness."
6           Where did I say he was saying
7        X, Y and Z?
8    QUESTIONS BY MR. TISI:
9       Q.   Doctor --
10          MS. MILLER:  What are you even
11       talking about?
12   QUESTIONS BY MR. TISI:
13      Q.   Doctor, did you address the
14   analysis done by Berge on the dose response
15   issue in your report?
16          You may have done the
17   underlying studies, but did you discuss
18   Berge's?
19          MR. LOCKE:  Objection.
20          THE WITNESS:  I actually am
21       trying to find where the -- where the
22       dose response is even discussed in
23       Berge.
24   QUESTIONS BY MR. TISI:
25      Q.   Okay.  I can help you with

98 (Pages 386 to 389)

Christian Merlo, M.D., MPH

Page 390

1    that.
2           Have you actually seen this?
3    This -- because there are two Berge
4    publications. There was the original and
5    there was an amended one. This is the
6    amended one.
7           Did counsel provide you with
8    the amended one?
9       A.   Counsel didn't provide me with
10   any articles.
11      Q.   Okay.
12      A.   I looked them up myself.
13      Q.   Did you find this one?
14      A.   Again, I don't have these
15   memorized, so I don't know which is the first
16   one or which is the second one.
17      Q.   This is the second one.
18           MS. MILLER: Is there a
19   question pending? I'm so sorry, I
20   lost it.
21           MR. TISI: Yes.
22   QUESTIONS BY MR. TISI:
23      Q.   Did you see this -- have you --
24   will you see the second -- the second Berge
25   study?

Page 391

1       A.   I may have had the second one
2    or the first one. I don't know.
3       Q.   Okay.
4       A.   Because it's not --
5           MS. MILLER: Can we check his
6    references?
7           MR. TISI: Well, no, I think
8    the record will be -- the record will
9    be that he didn't, so we'll just go
10   on.
11          THE WITNESS: No, I'm not
12   saying that, because I --
13          MR. TISI: No, I think the
14   record will be that the study that you
15   looked at was the original Berge study
16   but not the amended one.
17          THE WITNESS: Why do you say
18   that?
19          MR. TISI: Because you have a
20   citation to it with a year and the
21   publication.
22          MS. MILLER: And the citation
23   is to 2018, and this year is this?
24          THE WITNESS: And this is 2018.
25          MR. TISI: Okay. It'll be what

Page 392

1    it'll be.
2           THE WITNESS: I don't know how
3    you can say that this -- that I
4    didn't -- that I looked at this one or
5    the other one.
6           MR. TISI: It'll be what it'll
7    be. I will compare the citation, and
8    it'll either be the one you looked at
9    or not. Let's move on.
10          THE WITNESS: Well, we can
11   compare it right now.
12   QUESTIONS BY MR. TISI:
13      Q.   I want to go -- Doctor --
14      A.   I'm going to look to compare it
15   right now.
16      Q.   Well, then you can do it off
17   the record. I'm not doing it on the record.
18      A.   Well, then you can't say
19   that -- that you can just assume that --
20      Q.   I'm not --
21      A.   -- I saw the first one and
22   didn't see the second one.
23      Q.   Doctor, I'll look it up. You
24   have the citation in the back of your
25   references. I'll just look it up.

Page 393

1           If you go to your chart here,
2    exhibit -- that we marked as Exhibit
3    Number 37 -- it's right in front of you,
4    sir -- would you agree with me that of all
5    the studies of whatever design, other than
6    Hartge 1983, Hartge and Stewart 1994, and
7    Gonzalez 2016, all -- every single one of
8    these risk ratios or relative risks or hazard
9    ratios is greater than 1?
10          MS. MILLER: Objection.
11          THE WITNESS: The point
12   estimates in this -- in this chart,
13   Hartge 1983, Hartge Stewart '94, and
14   Gonzales are all below 1. The others
15   are -- the point estimates are above
16   1.
17   QUESTIONS BY MR. TISI:
18      Q.   Okay. And so of the
19   30-some-odd studies, all of them have -- all
20   of these studies, 30 of 33 or whatever the
21   number happens to be, other than three have a
22   risk ratio, relative risk or hazard ratio,
23   greater than 1?
24      A.   A point estimate greater than
25   1.

99 (Pages 390 to 393)

Christian Merlo, M.D., MPH

Page 394

1      Q.    Greater than 1.
2            Would you look at the
3    confidence interval of the ones that have a
4    greater -- a point estimate greater than 1?
5            Would you agree that the
6    confidence intervals overlap for every one of
7    those studies at 1.2?
8            MS. MILLER:  Objection.
9            THE WITNESS:  I would have to
10           use a calculator to do that.
11   QUESTIONS BY MR. TISI:
12     Q.    Well, all you have to do is
13   look at the -- all you have to look at is the
14   confidence interval, right?  The confidence
15   interval?  If it overlaps 1.2, then it's --
16   then they're overlapping, right?
17     A.    It's not how we use a
18   confidence interval, but if that's what -- if
19   that's the number that you want to say, but
20   that's not how --
21     Q.    They're all -- every single one
22   of these confidence intervals, with the
23   exception of the three that I just talked
24   about, overlap at 1.2.
25     A.    For the purpose of this

Page 395

1    exercise, looking down that column,
2    95 percent confidence interval, and you want
3    me to say whether or not there's overlap at
4    1.2?
5      Q.    Uh-huh.
6      A.    And what was the other
7    qualification?
8      Q.    None.
9            The vast majority of these
10   confidence intervals overlap at 1.2, true?
11     A.    1.2 is included in many of
12   these.
13     Q.    The vast majority -- in fact
14   every one, with the exception of three that I
15   just mentioned?
16     A.    Well, Cramer 1982 is 1.27.  Wu
17   2015 is 1.27.
18     Q.    Right.
19     A.    That doesn't include 1.2.
20     Q.    Okay.  Okay.  1.2 or above.
21     A.    Okay.
22     Q.    Is that true?
23     A.    That is true for that column.
24     Q.    Okay.  And in fact, most of
25   them have -- overlap at 1.25, correct?  Not

Page 396

1    every one, but they -- most of them do.
2            In fact, even if you look at
3    the cohort studies, with the exception of
4    Gonzalez, they include 1.25.
5      A.    Okay.
6      Q.    Is that true?
7      A.    It looks like it, based on this
8    chart.
9      Q.    Now, I provided Dr. Ballman --
10   have you seen Dr. Ballman's exhibits?
11     A.    Yes.
12     Q.    Okay.  I provided her with a
13   copy of your chart, which I will have marked
14   as Exhibit 42.  Since you had time to look at
15   it, I'm going to ask you whether you agree
16   with her or not.
17           (Merlo Exhibit 42 marked for
18           identification.)
19   QUESTIONS BY MR. TISI:
20     Q.    I asked her to highlight, to
21   circle, every -- I asked her to highlight
22   every -- in red, in pink, every result that
23   was greater than 1.0, and she did.
24           Do you see that?
25           MS. MILLER:  Objection.

Page 397

1            MR. LOCKE:  Objection.
2            THE WITNESS:  What -- you're --
3            what did she highlight?
4    QUESTIONS BY MR. TISI:
5      Q.    Every result that had a risk
6    ratio greater than 1.0, and she highlighted
7    that in pink.
8      A.    And you're talking about the
9    point estimate?
10     Q.    The point estimate, correct.
11           MR. LOCKE:  I'm going to object
12           for the same reasons we did during her
13           deposition.
14           MR. TISI:  Okay.
15   QUESTIONS BY MR. TISI:
16     Q.    Do you see that?
17     A.    That's what it looks like.
18     Q.    Okay.  And she circled every
19   point estimate -- she circled every
20   confidence interval that included 1.2, which
21   is a 20 percent increase, correct?
22           MR. LOCKE:  Same objection.
23           MS. MILLER:  Objection.
24   QUESTIONS BY MR. TISI:
25     Q.    Do you see that, and do you

Page 398

1    disagree with that?
2        MS. MILLER: I'm going to
3    object. I don't understand how you
4    disagree with circling, and also --
5    QUESTIONS BY MR. TISI:
6        Q.    Do you --
7        MS. MILLER: -- this is kind of
8    illegible.
9    QUESTIONS BY MR. TISI:
10       Q.    Do you agree --
11       MR. TISI: It's very legible to
12   me, Counsel, but you can coach your
13   witness if you'd like. I can read it
14   very carefully. Very well.
15       THE WITNESS: I see circles in
16   the 95 percent confidence interval,
17   and if you're asking if those circles
18   include a range that includes 1.2 in
19   that 95 percent confidence interval,
20   that's what it appears to show.
21   QUESTIONS BY MR. TISI:
22       Q.    And then I asked her to
23   highlight in blue those that included 1.25,
24   and she did that as well.
25       Do you see that?

Page 399

1        MR. LOCKE: Objection.
2        MS. MILLER: Objection.
3        THE WITNESS: The blue is a
4    little bit difficult to make out.
5    There's purple.
6    QUESTIONS BY MR. TISI:
7        Q.    Well, purple is the -- it's
8    blue and red. We didn't use a purple marker.
9        A.    And so what was the question?
10       Q.    Those were the ones that
11   included 1.25 in the confidence interval.
12       A.    So it looks like this exercise
13   does have a blue mark to those values that
14   would include a 1.25 within the confidence
15   interval.
16       Q.    And so in terms of we can
17   disagree with the significance of that, you
18   agree that with the interpretation that she
19   had about risk ratios greater than 1, the
20   ones that are greater than 1.2 -- or they
21   included 1.2 and the ones that included 1.25?
22       MS. MILLER: Objection.
23       MR. LOCKE: Objection.
24       THE WITNESS: For the purposes
25   of you asking her what to highlight,

Page 400

1    she appears to have done what you've
2    asked her to do --
3    QUESTIONS BY MR. TISI:
4        Q.    Okay.
5        A.    -- and circled.
6        Q.    And if asked to do the same
7    thing, you would have done the same circling
8    and the same highlighting?
9        MR. LOCKE: Objection.
10       THE WITNESS: If you asked me
11   the same questions, it appears that
12   she followed your directions
13   appropriately.
14   QUESTIONS BY MR. TISI:
15       Q.    Okay. Now, I'm going to show
16   you what -- a textbook. It's already been
17   marked as Exhibit Number 32.
18       Can you pull that out, please?
19   That's the Rothman textbook.
20       A.    32?
21       Q.    Uh-huh. I have another copy in
22   case anybody wants it because I don't really
23   need paper. You can have it if you'd like.
24       MS. MILLER: Okay. Instead of
25   making us go through our pile.

Page 401

1        Thanks.
2        MR. TISI: Yeah.
3    QUESTIONS BY MR. TISI:
4        Q.    Do you have it in front of you?
5        A.    I have Modern Epidemiology.
6        Q.    Okay. If you look at the
7    consistency prong -- we've looked at the
8    strength prong before -- and it's on page 26
9    of 30.
10       A.    Okay.
11       Q.    Okay. And I'm going to read
12   the paragraph and see whether you agree with
13   it or not.
14       In this textbook Dr. Rothman
15   says --
16       A.    I'm sorry, where are you
17   reading from?
18       Q.    The second paragraph under
19   Consistency. This is the consistency prong.
20       "One mistake in implementing
21   the consistency" --
22       A.    But where is this in the paper?
23   I'm not seeing it. I see the second
24   paragraph.
25       Q.    "One mistake." It says -- it

Christian Merlo, M.D., MPH

Page 402

1    starts with "one mistake."
2          Do you see it?
3      A.   I see it now.
4      Q.   Okay.  "One mistake in
5    implementing the consistency criterion is so
6    common it deserves special mention.  It is
7    sometimes claimed that a literature or set of
8    results is inconsistent simply because some
9    results are statistically significant and
10   some are not.  This sort of evaluation is
11   completely fallacious, even if one accepts
12   the use of statistical -- the use of
13   significance testing methods."
14         Did I read that correctly?
15         MR. LOCKE:  Objection.
16         MS. MILLER:  Objection.
17         MR. LOCKE:  And to the
18         characterization of this as a
19         textbook.
20         THE WITNESS:  I see that
21         statement on this page.
22   QUESTIONS BY MR. TISI:
23     Q.   You can pull the textbook out
24   so I don't have to, like, deal with that kind
25   of objection.

Page 403

1          MR. LOCKE:  Well, it's a
2          portion of a book.
3          MR. TISI:  Okay.  Okay, Tom.
4    QUESTIONS BY MR. TISI:
5      Q.   The chapter in a textbook.
6    That's exactly what you did, right?
7      A.   I'm sorry?
8      Q.   Do you agree with that
9    statement?
10     A.   Do I agree with the statement?
11     Q.   "One mistake in implementing
12   the consistency criterion is so common that
13   it deserves special attention.  It is
14   sometimes claimed that a literature or set of
15   results is inconsistent simply because some
16   results are statistically significant and
17   some are not.  That sort of evaluation is
18   completely fallacious, even if one accepts
19   the use of significance testing methods."
20         Did I read that correctly?
21     A.   Yes, you did.
22     Q.   Do you agree with that?
23     A.   I would say it depends, and
24   I'll tell you why.  Because it's a very
25   general statement.  And if we're talking in

Page 404

1    this instance where there are several
2    different kinds of study designs -- there's
3    consistency within study results.  There's
4    consistency within hospital-based
5    case-controls.  There's consistency in
6    nonsignificant -- nonsignificant results.
7          There's inconsistency in
8    population-based case-control studies where
9    some showed statistical significance, some
10   don't.  There's also consistency within
11   cohort studies where there's a consistent
12   nonstatistically significance.
13         So there's consistency and
14   there's inconsistency.  And just to divide it
15   up simply the way that Dr. Rothman says here
16   is too general because there are very
17   specific instances that need to be considered
18   before just agreeing or disagreeing to that
19   statement.
20         (Merlo Exhibit 43 marked for
21         identification.)
22   QUESTIONS BY MR. TISI:
23     Q.   Okay.  Let me look at Dr. --
24   what Dr. Oleckno says about it.  Here's
25   Exhibit Number 43, which is also from the

Page 405

1    Oleckno textbook that you referred to in your
2    report.
3          And in the chapter --
4          MS. MILLER:  This appears to be
5    pages 131, 173 and 174 --
6          MR. TISI:  Correct.
7          MS. MILLER:  -- so I'm going to
8    have the same objection.
9          MR. TISI:  Fine.
10         MS. MILLER:  This just pulls
11   things out of context rather than
12   including an inherent thing.  I don't
13   know --
14         MR. TISI:  I know you don't
15   know.
16         MS. MILLER:  -- what's between
17   pages 131 --
18         MR. TISI:  I know you don't
19   know, Counsel.
20         MS. MILLER:  -- and 173 --
21         MR. TISI:  Objection.
22         MS. MILLER:  -- and what occurs
23   after page 175.
24         MR. TISI:  "Objection" is fine.
25         THE WITNESS:  Can I take a

102 (Pages 402 to 405)

Christian Merlo, M.D., MPH

Page 406

1    favor?
2        MR. TISI: Yeah.
3        THE WITNESS: Can we take a
4    little -- I just need to use the
5    restroom.
6        MR. TISI: Absolutely.
7        THE WITNESS: Would that be
8    okay?
9        MR. TISI: Absolutely.
10       THE WITNESS: All right.
11   Thanks.
12       VIDEOGRAPHER: The time is
13   4:20 p.m., and we're going off the
14   record.
15    (Off the record at 4:20 p.m.)
16       VIDEOGRAPHER: The time is
17   4:32 p.m., and we are back on the
18   record.
19   QUESTIONS BY MR. TISI:
20       Q.   If you go to page 174 of
21   Exhibit 43, the Oleckno textbook, there's a
22   bullet point talking about statistical
23   significance.  I gave it to you as the last
24   document we gave you.
25       A.   Sorry, it was not in front of

Page 407

1    me.  I got it.
2        Q.   Okay.  Go to page 174.
3        A.   This is a four-page summary of
4    the textbook?
5        Q.   No, it's not a four-page
6    summary of the textbook, Doctor.  It is a
7    page out of the textbook where he bullet
8    points, and this is the point where he talks
9    about statistical significance and
10   significance testing.
11       It says here, "Measures of
12   association may be tested for statistical
13   significance, i.e., if they significantly
14   different {sic} from 1.0 for measures based
15   on relative comparisons or significantly
16   different from .0 for measures based on
17   absolute comparisons.  Statistical
18   significance is rooted in hypothesis testing
19   and is measured by the P value.  Generally, P
20   .05 indicates that an observed measure of
21   association is unlikely to be due to chance
22   alone based upon the assumption that there is
23   no real association.  Thus, it is considered
24   statistically significant."
25       You with me so far?

Page 408

1        A.   I do see where that's said.
2        Q.   And that's correct, right?
3        A.   That's correct.
4        Q.   All right.  "Conversely, P
5    greater than .05 indicates that the observed
6    measure of association is probably due to
7    chance alone and hence not statistically
8    significant."
9        Correct?  Do you see that?
10       A.   I do see that, correct.
11       Q.   Okay.  "Statistical
12   significance does not indicate the strength
13   of an association, nor does it reveal its
14   practical significance.  For a number of
15   reasons, most epidemiologists prefer to use
16   confidence intervals rather than
17   significant -- significance testing.  For one
18   thing, these provide more information than
19   significance testing."
20       Do you see that?
21       A.   I do.
22       Q.   And do you agree with that?
23       A.   So there's a lot of statements
24   there.
25       Q.   The last sentence, the last two

Page 409

1    sentences I'm talking about.
2        A.   "For a number of reasons, most
3    epidemiologists prefer to use confidence
4    intervals rather than significance testing.
5    For one thing, these provide more information
6    than statistic -- significance testing."
7        So it's an -- that's an
8    important thing to consider, and I think we
9    have to remember that statistical
10   significance, a P value of less than .05,
11   will give a confidence interval that does
12   not -- that -- so if you have a statistically
13   significant result, meaning that the P value
14   is less than .05, then if you're looking at a
15   measure of risk, then your confidence
16   interval will not include 1.
17       So they're not saying the
18   same -- they're not saying different things.
19   If your -- if your confidence interval does
20   not include 1, then you're going to have a
21   statistically significant result.
22       The reason for looking at the
23   confidence interval is because that gives you
24   more information about the study.  If the
25   confidence interval is really, really tight,

103 (Pages 406 to 409)

Christian Merlo, M.D., MPH

Page 410

1 that means your measurement is really good or
2 your study sample is really, really big.
3        But you're not going to have a
4 statistically significant result if the
5 confidence interval crosses 1. It will be
6 statistically insignificant.
7        So dividing these things up is
8 not how this is meant to mean. What this
9 means is that the confidence interval just
10 gives you a little bit more information, but
11 they're not any different than each other.
12 It's the same thing.
13        (Merlo Exhibit 44 marked for
14        identification.)
15 QUESTIONS BY MR. TISI:
16     Q.    All right. Doctor, I'm going
17 to show you what the American Statistical
18 Association says about this issue. I'm
19 attaching this as Exhibit Number 44.
20     I assume you've seen if you
21 read Dr. Ballman's testimony, because I think
22 it came out a couple of days before her
23 testimony.
24     A.    Okay.
25     Q.    I assume you've read this, sir?

Page 411

1     A.    I have looked this over, yes.
2     Q.    It says -- under the section it
3 says, "Retire Statistical Significance."
4 That's the title of the -- of the article.
5        Retire?
6     A.    I don't have that, actually. I
7 have "Sciences Rise Up Against Statistical
8 Significance."
9     Q.    All right. Well, okay. I have
10 a different version.
11        MS. MILLER: Retire is nature.
12        THE WITNESS: And then I have
13 "Comment." So this is a comment.
14 QUESTIONS BY MR. TISI:
15     Q.    Right. Correct.
16     A.    Not a study.
17     Q.    Right. I understand.
18        Your report is a comment,
19 right?
20        MR. LOCKE: Objection.
21        MS. MILLER: Objection.
22        THE WITNESS: My report is a
23 conglomeration of my opinions based on
24 the medical evidence.
25

Page 412

1 QUESTIONS BY MR. TISI:
2     Q.    So underneath -- on page 2, it
3 says, "Pervasive problem." And you
4 understand the American Statistical
5 Association published 42 articles in one
6 journal relating to this issue?
7     A.    I have no idea what the
8 American association -- what was it called?
9     Q.    Statistical association?
10     A.    The American Statistical
11 Association, that's not something I follow,
12 so it's not -- I would have no idea whether
13 they published 42 articles or --
14     Q.    That's a good point.
15        What epidemiology journals do
16 you actually get? You mentioned the American
17 Epidemiology -- the American Epidemiology.
18        Any others that you get?
19     A.    So I don't subscribe to
20 journals because we all -- we get them
21 through our Welch Library. We have access to
22 pretty much every journal available. And so
23 there are a number of epidemiologic journals
24 within the Welch Library that I have access
25 to.

Page 413

1     Q.    Which ones do you get? Which
2 one do you look at?
3     A.    It would depend on the
4 situation. It would depend on the
5 investigation that I'm undertaking.
6     Q.    Okay. Do you know who Sander
7 Greenland is?
8     A.    I do not.
9     Q.    Okay. So on page 2 of this
10 document, it says, "Let's be clear about what
11 must stop. We should never conclude that
12 there is no difference or no association just
13 because a P value is larger than the
14 threshold, such as P .05 or equivalent,
15 because confidence interval includes zero.
16 Neither should we conclude that two studies
17 conflict because one had a statistically
18 significant result and the other did not.
19 These errors waste research efforts and
20 misinform policy decisions."
21        Do you see that?
22     A.    I do.
23     Q.    Okay. I assume you disagree
24 with that given what you said before?
25     A.    Again, I think it's going to

Christian Merlo, M.D., MPH

Page 414

1  depend, and the reason why I say it's going
2  to depend is because two studies may be
3  inherently different.  One study may have a
4  very good study design and one study may have
5  a poor design.  One study may adjust for bias
6  and confounding; one study may not.
7       And this is a very, very
8  generalized statement that can either be
9  agreed or disagreed with because of those.
10      Q.   Okay.  Doctor, I'm going to
11  show you a -- can you please take out the
12  article about misconceptions again, the
13  Rothman review which I -- you -- Exhibit
14  Number 28?
15      A.   Exhibit 28?
16      Q.   Uh-huh.
17      A.   Okay.  I have it.
18      Q.   Misconception number 6, 1063.
19  Can you read it for the record, please?
20      A.   Misconception -- which one?
21      Q.   6.
22      A.   6.  Okay.
23      "Misconception 6.  Significant
24  testing is useful and important for the
25  interpretation of data."

Page 415

1       Q.   And does it also say that -- on
2  the second column, second paragraph,
3  "Significant tests are a poor classification
4  scheme for study results.  Strong effects may
5  be incorrectly interpreted as null findings
6  because the author" --
7       A.   I'm sorry to interrupt.  Where
8  are you?
9       Q.   Second paragraph.
10      A.   Thank you.
11      Q.   On the right-hand side.
12      A.   I see it.
13      Q.   "Significant tests are a poor
14  classification scheme for study results.
15  Strong effects may be incorrectly interpreted
16  as null findings because the authors
17  fallaciously interpret lack of statistical
18  significance or imply lack of effect or weak
19  effects may be incorrectly interpreted as
20  important because they are statistically
21  significant."
22      Do you see that?
23      A.   I do see that.
24      Q.   Do you agree with that?
25      A.   So again, I'm just going to say

Page 416

1  it depends, because it depends on the study
2  design.  It depends on whether the
3  researchers decided to set up their study
4  well and properly control for bias, properly
5  adjust for potential for confounding, analyze
6  the results correctly.  So all of those
7  factors have to -- have to come into balance.
8       And the interesting thing about
9  this paper is it's published in the Journal
10  of General Internal Medicine.  And if he's an
11  epidemiologist and has these very important
12  misconceptions that he's trying to bring
13  forward in the epidemiology community, I'm
14  not sure why this wasn't published in an
15  epidemiology journal.
16      Q.   Actually, in all fairness,
17  Doctor, I could have chosen dozens of
18  articles where Dr. Rothman makes the same,
19  including in his textbook.  He has been very
20  adamant about this.  So, I mean, you may not
21  understand it, but he has written about this
22  a lot.
23      So let me -- you made a
24  comment --
25      MS. MILLER:  We're going to

Page 417

1  have to object to that speech and move
2  to strike that speech for the record.
3  QUESTIONS BY MR. TISI:
4       Q.   You made a comment, and I
5  really have to push back on it.
6       Let's go to the conclusion --
7       A.   Are you asking me if I don't
8  understand it?
9       Q.   Do you not -- do you not -- do
10  you understand it?
11      A.   Understand what?
12      MS. MILLER:  Objection.
13  QUESTIONS BY MR. TISI:
14      Q.   I don't understand what your
15  question is.
16      MS. SHARKO:  You don't have to
17  respond to the speeches, Doctor.
18      MS. MILLER:  Yeah, just let it
19  go.
20  QUESTIONS BY MR. TISI:
21      Q.   Doctor, if you go to the
22  conclusion in this thing, he says -- he makes
23  the following statement:  "It is easy to
24  declare that the result is not statistically
25  significant, falsely implying that there is

Christian Merlo, M.D., MPH

Page 418

```
 1    no indication of an association, rather than
 2    considering it the quantitative --
 3    quantitatively the range of associations that
 4    the data actually support."
 5        Do you see that?
 6    A.   I do see that sentence.
 7    Q.   Okay.  And what he's talking
 8    about, the range of associations, is
 9    expressed by the confidence interval; is that
10    correct?
11    A.   I don't know what he's
12    referring to there.
13    Q.   Okay.
14    A.   But if he's talking about a
15    nonstatistically significant result, then the
16    confidence interval will include 1.
17        (Merlo Exhibit 21 marked for
18        identification.)
19    QUESTIONS BY MR. TISI:
20    Q.   Okay.  Doctor, I want to go
21    back for a moment to the -- we were talking
22    about the hospital-based studies and the
23    heterogeneity, and we talked about Berge, and
24    I want to talk about Penninkilampi for a
25    moment.
```

Page 419

```
 1        I'll show the Penninkilampi
 2    study which you reviewed in your report.
 3    A.   Thank you.
 4    Q.   And that's exhibit number --
 5    Exhibit Number 21.
 6        You've seen this study before?
 7    A.   Yes, I have.
 8    Q.   First of all, I'm going like
 9    you to go to page 200 -- to page 44, please.
10    It's the one with the table on it.
11    A.   44, yes.
12    Q.   Now, it showed -- on the
13    Table 1 it shows serous invasive and serous
14    borderline tumors having a statistically
15    significant elevated risk of 1.32 and 1.39
16    respectively, correct?
17    A.   Serous invasive, serous
18    borderline, 1.32, 1.39.
19    Q.   Okay.  And this is a
20    meta-analysis, true?
21    A.   This is a meta-analysis.
22    Q.   Okay.  Now it does not show the
23    same for mucinous, mucinous invasive, et
24    cetera, right?  It shows that they're not
25    statistically significant?
```

Page 420

```
 1    A.   Mucinous.  Which ones?
 2    Mucinous, invasive mucinous, borderline?
 3    Q.   Uh-huh.
 4    A.   Yeah, with much -- a much lower
 5    number of studies that looked at that.
 6    Q.   Would any bias or recall bias
 7    or confounding have -- what would that --
 8    what would explain that there would be a
 9    difference between serous tumors and
10    nonserous tumors?
11        Because I assume there would be
12    no reason for a woman to recall exposure to
13    one and not the other.
14    MS. MILLER:  Objection.
15        Mischaracterizes this table, among
16        other problems.
17    THE WITNESS:  I'm not sure what
18        you're asking.
19    QUESTIONS BY MR. TISI:
20    Q.   Okay.  Let's go on.
21        On the qualitative data
22    synthesis on page -- on the right-hand
23    column, at the bottom of the second paragraph
24    it says, "The only outcome" -- it talks about
25    the three cohort studies.
```

Page 421

```
 1        "The only outcome reported in
 2    all three studies was any perineal talc use,
 3    hence the available data from prospective
 4    studies was limited."
 5        Do you see that?
 6    A.   Can you point me to where
 7    you're reading?
 8    Q.   (Indicating.)
 9    MS. MILLER:  So it's the third
10    to the last paragraph, the last
11    sentence?  Is that where you are?
12    MR. TISI:  It's the second
13    paragraph on the right-hand side.
14    THE WITNESS:  The last sentence
15    of the second paragraph?
16    QUESTIONS BY MR. TISI:
17    Q.   The last sentence.
18        "The only outcome reported in
19    all three core studies was any perineal talc
20    use."  And that would be irrespective of
21    duration, frequency, et cetera, right?
22    A.   That would refer to any
23    perineal talc use if they're combined
24    together.
25    Q.   Right.
```

106 (Pages 418 to 421)

Golkow Litigation Services - 877.370.DEPS

Christian Merlo, M.D., MPH

Page 422

1    And there -- so he indicated
2  that the available data from the prospective
3  studies, meaning the cohort studies, was
4  limited, true?  It's what he says?
5    A.    In combining them it's limited,
6  because the cohort studies may have not
7  collected the same data about talc exposure.
8    Q.    Okay.  It also says, "A
9  subgroup analysis related to study population
10  setting, i.e., hospitals or general
11  population, was performed for any perineal
12  use application."
13    Do you see that?
14    A.    Yes, I do.
15    Q.    And the conclusion was, "There
16  was no difference between the pooled results
17  for hospital-based and population studies,
18  OR, 1.22 versus 1.33 respectively."
19    Do you see that?
20    A.    I do see that sentence, but I
21  need see what that's referring to, what table
22  and where that's coming from.
23    Q.    Well, have you reviewed this
24  before?
25    A.    I have.  I just haven't

Page 423

1  memorized it.  There's a lot of papers out
2  there.
3    Q.    Okay.
4    A.    And I don't know what that
5  sentence is referring to.
6    Q.    Okay.  Then it goes on to say,
7  "There was heterogeneity in the analysis for
8  non-perineal applications of talc.  There was
9  no heterogeneity for any other outcome
10  measures in either the meta-analysis for all
11  available studies or subgroup analysis."
12    Do you see that?
13    A.    I do see that.
14    Q.    Okay.  Do you agree with that?
15    MS. MILLER:  Objection.
16    THE WITNESS:  I would just need
17    to see the table where it says that.
18  QUESTIONS BY MR. TISI:
19    Q.    Well, haven't you seen it
20  before?
21    A.    I have.  I just haven't
22  memorized it.
23    Q.    Okay.  Well, if you go to
24  Table 2, it talks about the type of cancers.
25  Serous invasive has a 1.25 with a confidence

Page 424

1  interval of 1.01 to 1.55, heterogeneity, .33.
2    Do you see that?
3    A.    Which line is that?
4    Q.    Under Types of Ovarian Cancer,
5  Doctor.  Right here.
6    A.    I see that.
7    Q.    Let's read what he says in
8  conclusion.  The conclusion that
9  Dr. Penninkilampi reaches when he did his
10  meta-analysis says -- and this is
11  January 2018.  "The results of this review
12  indicate that perineal talc is associated
13  with a 24 to 39 percent increased risk of
14  ovarian cancer.  While the case-control
15  studies are prone to recall bias, especially
16  with intense media attention following the
17  commencement of a litigation in 2014, the
18  confirmation of an association in cohort
19  studies between perineal talc use and serous
20  ovarian cancer is suggestive of a causal
21  association."
22    Do you see that?
23    A.    I do see that; however,
24  Penninkilampi --
25    Q.    I didn't ask you a question.  I

Page 425

1  just asked --
2    A.    Well, I need to qualify this
3  because Penninkilampi left out the -- left
4  out Gates, and in Gates there was no
5  association between serous.
6    Q.    I just asked you if you saw it.
7  I'm going to ask you a follow-up question.
8  Okay?
9    Did you see it?
10    Did I read it correctly?
11    A.    You read it correctly.
12    Q.    I assume you disagree with it.
13    MS. MILLER:  Objection.
14    MR. LOCKE:  Objection.
15    THE WITNESS:  I neither
16  disagree -- I'm not disagreeing with
17  it.  It's just the -- what I do have
18  an issue with is the methodology, and
19  the methodology in this -- in this
20  meta-analysis did not include the
21  Gates study.  And the Gates study is
22  one that was a follow-up to Gertig
23  using the same cohort, and that
24  association was not in the Gates study
25  when found in Gertig with bigger

107 (Pages 422 to 425)

Christian Merlo, M.D., MPH

Page 426

```
1     numbers.
2          So I'm not agreeing or
3     disagreeing with the statement.  I'm
4     disagreeing with the methodology that
5     led to that statement.
6   QUESTIONS BY MR. TISI:
7     Q.   Now, you would agree with me
8   that this article was peer-reviewed and
9   published, right?
10    A.   I don't know.  I don't know --
11  I'm not -- I don't serve on the review
12  committee for Epidemiology.  I don't know
13  what their practices are.  I can only speak
14  to the journals that I review for and whether
15  or not those are peer-reviewed.
16    Q.   Doctor, isn't it true that
17  every meta-analysis done in this case shows
18  between a 25 and 40 percent increased --
19  statistically significant increased risk of
20  ovarian cancer?
21        MS. MILLER:  Objection.
22  QUESTIONS BY MR. TISI:
23    Q.   Every published and even
24  unpublished meta-analysis shows that risk?
25        MR. LOCKE:  Objection.
```

Page 427

```
1         MS. MILLER:  Objection.
2         THE WITNESS:  We'd have to go
3     through each specific one if you want
4     me to --
5   QUESTIONS BY MR. TISI:
6     Q.   Can you think of one that
7   doesn't have a statistically significant
8   increased risk?
9         MS. MILLER:  Objection.
10        THE WITNESS:  Again, we'd have
11    to go through each -- each one
12    individually.
13  QUESTIONS BY MR. TISI:
14    Q.   I'm not asking -- I'm not
15  asking you that.
16        I'm asking, can you think of
17  any meta-analysis that was published or not
18  published that shows a nonstatistically
19  significant result?
20    A.   Well --
21        MS. MILLER:  That's a different
22  question.
23        MR. TISI:  I'm changing the
24  question.
25        MS. MILLER:  Okay.  Great.  I
```

Page 428

```
1     just wanted to make sure we were on
2     the same page.
3         MR. TISI:  I don't know why you
4     need to confirm that, but, okay, fine,
5     I changed the question.
6         THE WITNESS:  So there are six
7     meta-analyses that I reviewed, and
8     again, it depends on what we're
9     looking at here.
10        There's a meta-analysis from
11    1995 which -- done by Gross which may
12    not have the same quality that
13    meta-analyses done later because we
14    learned how to do meta-analyses over
15    time.
16        But also have to remember that
17    some of these meta-analyses broke
18    things down by type of study, design,
19    case-control versus cohort study, and
20    even broke it down even further,
21    breaking down the case-control studies
22    into hospital-based versus
23    population-based.
24        And it's inappropriate to lump
25    them all together, because they're
```

Page 429

```
1     different study designs.
2   QUESTIONS BY MR. TISI:
3     Q.   But, Doctor, every one of these
4   passed peer review, every single one, right?
5         MS. MILLER:  Objection.
6         MR. LOCKE:  Objection.
7         THE WITNESS:  And when you
8     break things down further, for
9     instance --
10  QUESTIONS BY MR. TISI:
11    Q.   Well, my --
12    A.   -- in the Penninkilampi --
13    Q.   But that wasn't my question,
14  Doctor, honestly.
15        Every one of these studies
16  passed peer review, did they not?
17    A.   Again, I'm not a -- I'm not a
18  reviewer for these -- for these articles.
19    Q.   I didn't ask you whether you're
20  a reviewer.  I didn't ask you whether you
21  reviewed them.  I didn't ask whether you knew
22  the process of review.  I didn't ask whether
23  you reviewed the reviewer comments.  I didn't
24  ask you anything.
25        I asked you:  They were all
```

108 (Pages 426 to 429)

Christian Merlo, M.D., MPH

Page 430

```
1   published in peer-reviewed journals, right?
2        MR. LOCKE: Objection.
3        THE WITNESS: I don't know.
4
5   QUESTIONS BY MR. TISI:
6        Q.   You don't know --
7        A.   I don't know if these are all
8   peer-reviewed journals.
9        Q.   All right. Let's talk about
10  dose response. That's the -- one of the Hill
11  aspects, and you spent some time talking
12  about that. And you discuss it on page 32 of
13  your report.
14       Do you see that, sir?
15       A.   I do see where I talk about
16  dose response in my report.
17       Q.   And you claim on page 45 when
18  you're criticizing plaintiffs' experts that
19  plaintiffs' experts claim there was dose
20  response when none exists, right?
21       MR. LOCKE: Objection.
22  QUESTIONS BY MR. TISI:
23       Q.   It's on page 45.
24       A.   I thought we were on page 32.
25       Q.   I said, you talk about your
```

Page 431

```
1   opinions on lack of dose response, and you
2   criticize plaintiffs' experts who claim there
3   is dose response when none exist.
4        A.   So on page 32, they're not my
5   opinions; that's what's found in the medical
6   literature.
7        Q.   I got it. I hear you, Doctor.
8        I'm saying your two parts of
9   your discussion, you point out dose response
10  on page 32, and that's your interpretation of
11  the studies, and your criticisms of the
12  plaintiffs' experts appear on page 45.
13       MS. MILLER: Objection.
14       THE WITNESS: On page 45, I
15  talk about where there is no dose
16  response, and that would be my
17  opinion.
18  QUESTIONS BY MR. TISI:
19       Q.   Right. And that plaintiffs are
20  just flat out wrong, plaintiffs' experts?
21       MR. LOCKE: Objection.
22       THE WITNESS: I didn't say --
23  I'm not saying plain out, flat out
24  wrong. What I'm saying is, my
25  opinion, based on the medical
```

Page 432

```
1   literature out there and based on the
2   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,
3   13, 14, 15, 16, 17 articles that may
4   have -- sorry -- yeah, about that. I
5   mean, I haven't tallied them up, but a
6   bunch have attempted to look at dose
7   response, and that dose response is
8   just not there.
9   QUESTIONS BY MR. TISI:
10       Q.   First of all, is dose response
11  required for Bradford Hill?
12       MS. MILLER: Objection.
13       THE WITNESS: Again, if we --
14       if we go back to Bradford Hill,
15       Bradford Hill has considerations, and
16       those nine considerations oftentimes
17       run into each other.
18       Does one or another outweigh
19       the other? They're usually used in
20       combination.
21  QUESTIONS BY MR. TISI:
22       Q.   Okay.
23       A.   Is one of them required and an
24  absolute? They're considerations that in --
25  used in combination can help provide
```

Page 433

```
1   information on the causal pathway.
2        Q.   And it is often true with
3   exposures as opposed to drugs that it is
4   difficult to measure exposure, true?
5        We talked about smoking. We
6   talked about asbestos. We've talked about
7   pollution. We've talked about benzene.
8   We've talked about all different kinds of
9   exposure.
10       It is often difficult to know
11  exactly how much a person gets, true?
12       MS. MILLER: Objection.
13       THE WITNESS: It depends. I
14       mean, that's a very general statement.
15       I think if we're -- if you have an
16       accurate way of measuring something,
17       then it's easier. If you don't,
18       then --
19  QUESTIONS BY MR. TISI:
20       Q.   Let's take cigarettes.
21       A.   -- it's more difficult.
22       Q.   Let's take cigarettes. We use
23  pack years, right?
24       A.   Cigarettes? Pack years would
25  be one estimate of the frequency and
```

109 (Pages 430 to 433)

Christian Merlo, M.D., MPH

Page 434

1    duration --
2        Q.    But you don't know how much --
3        A.    -- of exposure.
4        Q.    You don't know how much a
5    person actually gets, how much they actually
6    take into their lungs, whether they complete
7    the whole cigarette, whether they go halfway
8    and then put it out, whether they just puff
9    on it.  You don't really know how much they
10   actually get, right?
11           MS. MILLER:  Objection.
12           MR. LOCKE:  Objection.
13           THE WITNESS:  Actually, I
14       haven't reviewed the literature on
15       this, and there may be studies out
16       there that I'm just not aware of.  And
17       there may be studies that have looked
18       at how much deposition goes into the
19       lungs.
20           We have studies looking at
21       inhalational antibiotics, and we've
22       studied actually how much gets into
23       the lungs.  I'd have to read
24       literature on --
25

Page 435

1    QUESTIONS BY MR. TISI:
2        Q.    Well, those would be clinical
3    trials, would they not be?  Because you could
4    measure that because you're in a controlled
5    environment, right?
6        A.    I'm not sure what you're
7    asking.
8        Q.    What I'm saying is, when you're
9    doing an occupational exposure like this, it
10   is oftentimes difficult to measure dose --
11           MS. MILLER:  Objection.
12   QUESTIONS BY MR. TISI:
13       Q.    -- as a general matter?
14           MS. MILLER:  Objection.
15   QUESTIONS BY MR. TISI:
16       Q.    I mean, I think it's a point
17   Dr. Diette made.  We sat with Dr. Diette last
18   week.  He said it's very difficult to measure
19   dose.
20           MS. MILLER:  Objection.
21           MR. LOCKE:  Objection.
22           THE WITNESS:  Can you ask me
23       that question again?
24   QUESTIONS BY MR. TISI:
25       Q.    Yes.

Page 436

1            Is it difficult to measure dose
2    with exposures like this that are not drugs,
3    for example?
4            MS. MILLER:  Objection.
5            THE WITNESS:  And I'll say it
6        depends.  If there is a reliable
7        measure of -- if there's a reliable
8        method of measuring something --
9        because we're talking in generalities.
10       If there's a reliable measure, then
11       it's easier.
12   QUESTIONS BY MR. TISI:
13       Q.    What's the best way to measure
14   talc exposure?
15           MS. MILLER:  Objection.
16           THE WITNESS:  Measuring talc
17       exposure is -- would be very difficult
18       to measure because of many, many
19       factors.
20   QUESTIONS BY MR. TISI:
21       Q.    Okay.  And have you seen where
22   articles attempted to figure out a way to do
23   that?
24           MS. MILLER:  Objection.
25           THE WITNESS:  What kind of

Page 437

1    articles are you referring to?
2    QUESTIONS BY MR. TISI:
3        Q.    The epidemiology studies, never
4    versus ever, breaking it down by weeks, days,
5    months, years, et cetera.
6            Have you seen those kinds of --
7    those kinds of attempts?
8            MR. LOCKE:  Objection.
9            THE WITNESS:  So there are --
10       there have been articles that have
11       attempted to look at frequency of
12       duration and those sorts of things,
13       but I think we need to step back a
14       little bit because what I'm talking
15       about is it's -- it's not a
16       medication.  There are no pharmacy
17       records.  There's no dosing.  I have
18       no idea -- and I don't think anyone
19       can tell what -- how much comes out if
20       someone's pouring talc on a sanitary
21       napkin or underwear or placing talc in
22       the perineal area.  There's no way to
23       know.  And there's no article in the
24       medical literature that looks at that
25       as a measure of exposure.

110 (Pages 434 to 437)

Christian Merlo, M.D., MPH

Page 438

1     And that's actually more
2 important than frequency and duration
3 because we have no idea what even goes
4 into that frequency and duration.
5     (Merlo Exhibit 30 marked for
6 identification.)
7 QUESTIONS BY MR. TISI:
8     Q.  I'm going to show you what I
9 have marked as Exhibit Number 30, which is an
10 meta-analysis by Taher. It's not been
11 published yet, but it is the draft that we
12 have that's been commissioned by Health
13 Canada.
14     You've seen this before, right?
15     A.  I've seen Taher. I'm not aware
16 that it's commissioned by Health Canada.
17     Q.  I'll represent to you that it
18 is.
19     When did you see this study for
20 the first time?
21     A.  I don't recall. Sometime after
22 December.
23     Q.  So if you look at -- if you
24 look at the conclusion on the one that says
25 page 49 on the bottom, P2.00344.9, it says,

Page 439

1 source of funding. "This work was supported
2 by Health Canada."
3     Do you see that?
4     A.  I do. "This work was supported
5 by Health Canada."
6     Q.  Do you think Health Canada is
7 involved with this litigation?
8     MR. LOCKE:  Objection.
9     THE WITNESS:  Again, I told you
10 I don't know anything about Health
11 Canada.
12 QUESTIONS BY MR. TISI:
13     Q.  Do you think that this --
14     MR. TISI:  You want to talk
15 about inappropriate, that was totally
16 inappropriate, that laughter.
17     MS. SHARKO:  Given this --
18 given the way your experts are having
19 this big ex parte communication with
20 Health Canada, I don't think so,
21 Mr. Tisi.
22     MR. TISI:  Given the way --
23 given the way -- given the way -- wait
24 a second.
25     MS. PARFITT:  Chris, let's go

Page 440

1 off the record for this.
2     MR. TISI:  Given the way your
3 experts have filed things with Health
4 Canada, with Dr. Nicholson, not
5 identifying who she was when she was
6 writing for the Cosmetic Association
7 of Canada, I don't think you get to
8 talk.
9     MS. SHARKO:  I think your
10 comments are totally off base. You
11 asked me why we laughed.
12     MR. TISI:  It's not even
13 appropriate to laugh. Even if you
14 thought it was funny, it's not
15 appropriate.
16 QUESTIONS BY MR. TISI:
17     Q.  Doctor --
18     MS. SHARKO:  Well, then don't
19 make the obnoxious comments.
20     MR. TISI:  You don't think
21 laughing is obnoxious?
22 QUESTIONS BY MR. TISI:
23     Q.  On page 26, the summary of
24 evidence on biologic gradient exposure
25 response.

Page 441

1     A.  26?
2     Q.  There's a chart.
3     A.  I see it.
4     Q.  Okay? It discusses -- it
5 summarizes the evidence on biologic gradient.
6 It says, "About half of the epidemiologic
7 studies assessed only one level of talc
8 exposure, ever versus never usage."
9     Is that correct?
10     MR. LOCKE:  Objection.
11     MS. MILLER:  Objection.
12     Are you asking --
13     MR. TISI:  I'm asking what I'm
14 asking.
15     MS. MILLER:  -- whether you
16 read it correctly?
17     MR. TISI:  No. I'm asking is
18 that correct.
19 QUESTIONS BY MR. TISI:
20     Q.  "About half of the epidemiology
21 studies assessed only one level of talc
22 usage, ever versus never."
23     MR. LOCKE:  Objection.
24     THE WITNESS:  You know, I would
25 have -- I don't have these things

Christian Merlo, M.D., MPH

Page 442

1    memorized. I'm going to have to go
2    back to each individual article and
3    look to see if it's about half.
4    That's not something that I have
5    memorized.
6           I know that I did look into the
7    different exposure categories or the
8    different levels of exposure in each
9    study, but I didn't lump those into
10   that kind of broad category.
11   QUESTIONS BY MR. TISI:
12      Q.   The next one says, "Of the 12
13   studies reporting a positive association, six
14   studies found a significant exposure response
15   trend, particularly with medium and high
16   frequency usage groups. Regarding duration
17   of use, exposure to talc, several studies
18   reported the greatest risk in 20-plus years
19   of exposure group followed by 10 to 20 years
20   group, then less than 10 years group."
21          Do you see that?
22      A.   I do see that statement.
23      Q.   Now, Bradford Hill doesn't
24   require proof of dose response. It just says
25   if there is evidence of it, that's supportive

Page 443

1    of causation, correct?
2           MR. LOCKE:  Objection.
3           THE WITNESS:  Well, I'm going
4    to have to --
5    QUESTIONS BY MR. TISI:
6       Q.   Let's get it.
7       A.   -- refer back to Bradford Hill
8    and see what he says.
9       Q.   Let's see what he says.
10   Exhibit Number 14.
11          It's on page 10.
12      A.   Okay.
13      Q.   It says, "If" -- "Fifthly, if
14   the association is one which can reveal a
15   biologic gradient or a dose-response curve,
16   then we should look most carefully for such
17   evidence."
18          Do you see that?
19      A.   I do see that.
20      Q.   It doesn't say statistically
21   significant evidence, it doesn't say studies
22   which demonstrate it, does it?
23          MR. LOCKE:  Objection.
24          THE WITNESS:  It says that if
25   the association is one that can reveal

Page 444

1    a biologic gradient, then we should
2    look for it.
3    QUESTIONS BY MR. TISI:
4       Q.   Right.
5           And should look for evidence of
6    it?
7       A.   Look for such evidence.
8       Q.   Right.
9           And it goes -- down at the
10   bottom it says, "Often the difficulty is to
11   secure some satisfactory quantitative measure
12   of environment which will permit us to
13   explore dose response, but we should
14   invariably seek it."
15          Do you agree with that?
16          MS. MILLER:  Objection.
17          THE WITNESS:  Can you ask me
18   that again? I'm sorry.
19   QUESTIONS BY MR. TISI:
20      Q.   Yes.
21          It says, "Often the difficulty
22   in to secure some satisfactory quantitative
23   measure of environment which would permit us
24   to explore this dose response, but we should
25   invariably seek it."

Page 445

1       A.   That's correct.
2       Q.   All right. And so in trying to
3    seek the evidence, these authors, not
4    involved in litigation, found that there was
5    at least evidence of a dose response,
6    correct?
7           MR. LOCKE:  Objection.
8           THE WITNESS:  I'm going to have
9    to turn back to that page again and
10   look at it because I don't know the
11   exact words.
12          What page is that on again?
13   26?
14   QUESTIONS BY MR. TISI:
15      Q.   Yes. And I'll read it again,
16   Doctor.
17          "Of the 12 studies reporting a
18   positive association, six studies found
19   significant exposure response trends,
20   particularly with medium and high frequency
21   usage groups. Regarding duration of use,
22   exposure to talc, several studies reported
23   the greatest risk in the 20-plus years of
24   exposure group, followed by 10 to 20, then
25   less than 10 years."

112 (Pages 442 to 445)

Christian Merlo, M.D., MPH

Page 446

1    A.  So...
2        MR. LOCKE:  Is there a
3    question?
4        MR. TISI:  Yes.  That's the
5    section I was referring to.
6    QUESTIONS BY MR. TISI:
7    Q.   Isn't that what they found?
8    A.   That's what they say.
9        (Merlo Exhibit 46 marked for
10   identification.)
11   QUESTIONS BY MR. TISI:
12   Q.   Okay.  Let me show you Exhibit
13   Number 46, which is a compilation exhibit
14   that I pulled together, and I tabbed it for
15   you with the actual articles.  And you can
16   check my quotations from it.
17       MS. MILLER:  I'm going to
18   object to this exhibit, of course.
19       MR. TISI:  Of course you are.
20       MS. MILLER:  Because you once
21   again just pulled random sentences out
22   of studies --
23       MR. TISI:  Okay.
24       MS. MILLER:  -- that do not
25   account for the entire body of

Page 447

1    statements within the studies.
2        MR. TISI:  Okay.
3    QUESTIONS BY MR. TISI:
4    Q.   Now, Doctor, if you look, I
5    have the Berge studies we talked about
6    before.  And you saw the statement, "The
7    meta-analysis results in a weak but
8    statistically significant association between
9    genital use of talc and ovarian cancer which
10   appears to be limited to serous with a
11   suggestion of dose response."
12       Is that correct?
13       MR. LOCKE:  Objection.
14   QUESTIONS BY MR. TISI:
15   Q.   Is that there in?  Can you
16   confirm that that's there?
17       MS. MILLER:  You just said --
18       MR. LOCKE:  Objection.
19       MS. MILLER:  That was so fast.
20       THE WITNESS:  Confirm where
21   what is where?
22   QUESTIONS BY MR. TISI:
23   Q.   Okay.  Number one says, "The
24   meta-analysis resulted in a weak but
25   statistically significant association between

Page 448

1    genital talc use and ovarian cancer, which
2    appears to be limited to serous carcinoma
3    with suggestion of dose response."
4        Is that --
5        MS. MILLER:  So you've got the
6    ellipses leaving out the "which
7    appears to be limited to serous
8    carcinoma"?
9        MR. TISI:  I'm reading it from
10   the study, Doctor.
11   QUESTIONS BY MR. TISI:
12   Q.   Am I reading that correctly, if
13   you look at it?
14       MR. LOCKE:  Objection.  Asked
15   and answered.
16       THE WITNESS:  You're reading
17   the abstract.
18   QUESTIONS BY MR. TISI:
19   Q.   Yes.  Is that correct.
20       I'm just asking you, Doctor,
21   whether it says that.
22   A.   And I said that's what it says
23   in the abstract, and I'm looking for where
24   that is actually represented in the -- in the
25   article.

Page 449

1    Q.   And in number 2 it says -- on
2    the Schildkraut study it has a quote, and
3    let's turn to the Schildkraut study.  And
4    that's number 2.  And if you go to page --
5    A.   But if I could just say,
6    because I did find this Table 3 right now,
7    looks at duration and frequency.
8    Q.   Uh-huh.
9    A.   And the number of risk
10   estimates are 12 and the relative risk 1.16,
11   with a 95 percent confidence interval, 1.07
12   to 1.26.  This is just dichotomized duration,
13   ten years.  This isn't -- that's not a dose
14   response.  That's yes or no.
15   Q.   Okay.
16   A.   Less than ten years or more
17   than ten years.
18   Q.   Okay.  Now --
19   A.   Frequency, one time a week.
20   That's not -- that's not a frequency.
21   That's -- that's a yes/no, and that's a
22   dichotomized -- so that's not a dose
23   response.
24   Q.   Okay.  Doctor, in the
25   Schildkraut study on number 2, does the

Christian Merlo, M.D., MPH

Page 450

1    Schildkraut author say on page -- and then if
2    you look at number 2, which is the second
3    article attached on page 1416, the second --
4    left-hand side, second to last paragraph,
5    second sentence, it says, "The dose response
6    observed for duration of genital powder use
7    provides further evidence of the relationship
8    between genital powder and overall EOC risk."
9            Do you see that?
10           MR. LOCKE:  Objection.
11   QUESTIONS BY MR. TISI:
12       Q.   I highlighted it for you to
13   make it easy.
14       A.   That's what is said in the --
15   in the paper; however, when you look at
16   Table 2, duration of use, again, it's
17   dichotomized into less than 20 years or
18   greater than 20 years.  So there's no full --
19   never use and genital use.
20           And then it's looked at
21   lifetime body powder applications.  Again,
22   dichotomized in above median, 3,600, or
23   below -- or above 3,600.
24           That's not a dose response.  A
25   dose response is multiple categories.  This

Page 451

1    is a dichotomy.  This is a yes or no.  Is it
2    more or less.  That's not a dose response.
3        Q.   Okay.  Doctor, that's what the
4    authors say that's in the published
5    peer-reviewed literature, correct?
6            MR. LOCKE:  Objection.
7            MS. MILLER:  Objection.
8            THE WITNESS:  I said that
9        that's what it said, but that's not
10       what dose --
11   QUESTIONS BY MR. TISI:
12       Q.   Okay.  So why are you going any
13   further than what I asked you?
14           MR. LOCKE:  Objection.
15           THE WITNESS:  Because that's
16       not what a dose response represents.
17   QUESTIONS BY MR. TISI:
18       Q.   All right.  Let's go to the
19   next one.  Let's go to the Cramer study,
20   which is number 3 and 4.  There's two
21   statements here.  One is on page 335, and
22   I've highlighted it.
23           Does it say an odds ratio of
24   1.49 was associated with more than 20 talc
25   years, greater than 7,200 applications, in a

Page 452

1    dose response?
2        Q.   Do you see that?
3            MR. LOCKE:  Objection.
4    QUESTIONS BY MR. TISI:
5        Q.   Does it not say that, Doctor?
6            Do you see where I'm at,
7    Doctor?
8        A.   I do.
9        Q.   Okay.  Does in not say that?
10       A.   It says, "An odds ratio of 1.49
11   was associated with more" -- and I'm sorry, I
12   had to skip a couple pages -- "than 20 talc
13   years, greater than 7,200 applications" --
14       Q.   And --
15       A.   -- "in a dose response."
16       Q.   And if you go to page --
17       A.   However, I would like to just
18   look at --
19       Q.   Your lawyer can ask you
20   questions.  I asked whether that's in the
21   published article.
22           The next is on page 345, in
23   summary.
24           Do you see that?
25           It says, "Overall, there's an

Page 453

1    association between genital talc use and EOC
2    in a significant trend with increasing talc
3    years' use."
4            MR. LOCKE:  Is there a
5        question?
6            MR. TISI:  Yes.  I said, is
7        that correct?
8            MS. MILLER:  Is what correct?
9            MR. LOCKE:  Objection.
10   QUESTIONS BY MR. TISI:
11       Q.   I said do you see it.  On
12   page 345, number 1 in the Cramer study, the
13   authors report in the peer-review literature:
14   "Overall, there is an association between
15   genital talc use and epithelial ovarian
16   cancer in a significant trend with increasing
17   talc years' use."
18           Did you read that right?
19       A.   I see that written there.
20       Q.   And does it appear in the
21   peer-reviewed literature?
22           MS. MILLER:  Objection.
23           THE WITNESS:  Again, this is --
24       it's in the literature.
25

114 (Pages 450 to 453)

Christian Merlo, M.D., MPH

Page 454

1    QUESTIONS BY MR. TISI:
2        Q.    Okay.
3        A.    I can't comment on whether it
4    was peer-reviewed or not.
5        Q.    Okay.  And the next study,
6    which is the Terry study -- you've seen that
7    study before as well, Doctor?  That's
8    number 5?
9        A.    I have.
10       Q.    Okay.  All right.  Do you see
11   where -- the statement where it says -- I
12   highlighted it for you.  "The association
13   between genital powder exposure and ovarian
14   cancer may not be linear, and a modest
15   exposure may be sufficient to increase the
16   cancer risk."
17            Do you see that?
18       A.    I do see that.
19       Q.    Okay.  Next one is Wu.  That's
20   the one where I think you agree there was
21   evidence of dose response, correct?
22       A.    Well, the statement in the
23   Terry where it just says, "Alternatively, the
24   associate" -- that's not saying that there's
25   a dose response.  That's just stating

Page 455

1    something.
2        Q.    Okay.
3        A.    It says nothing about dose
4    response.
5        Q.    Next one is Wu, number 5.  I'm
6    sorry, number 6.
7        A.    Number 6.
8        Q.    Okay.  In the abstract, does it
9    not say, "Risk of ovarian cancer increased
10   significantly with increasing frequency and
11   duration of talc use"?
12       A.    So in Wu -- just trying to flip
13   through these.
14            Where'd you read that?
15       Q.    In the abstract.  It's
16   highlighted for you, Doctor.
17       A.    There's a lot going on here
18   really quickly, so I'm just trying my hardest
19   to read everything.
20            So in the abstract it says,
21   "Risk of ovarian cancer increased
22   significantly with increasing frequency and
23   duration of talc use."
24       Q.    And does it also say -- and I
25   highlighted it for you as well in the back --

Page 456

1    "However, only about half the studies
2    examined exposure response relationships, and
3    the evidence for this is less consistent.
4    Our study adds to the small group of studies
5    that have investigated a combination of
6    frequency and duration of use of ovarian
7    cancer -- on ovarian cancer."
8        A.    So I think -- I think in my
9    report I actually said that Wu, there's a
10   suggestion of a dose response, as well as
11   Cramer 2016, there is a suggestion of dose
12   response.
13            But all the cutoffs were not
14   statistically significant, so, you know --
15       Q.    But, of course -- but, of
16   course, we just agreed that Bradford Hill
17   doesn't require a statistically significant
18   result on dose response.  Just says it's good
19   if you have evidence of it.
20            MS. MILLER:  Objection.
21            MR. LOCKE:  Objection.
22            THE WITNESS:  I didn't agree to
23       that.  I think that I have to take
24       what this table tells me, and if there
25       is evidence of a dose response based

Page 457

1    on what the numbers look like and is
2    there a consistent increase in risk
3    with increasing duration and
4    frequency, and those numbers are
5    statistically significant, then that
6    would suggest a dose response.
7            However, if we look at the risk
8    estimates in Wu here, looking at
9    Table 2, looking at total number of
10   times, yeah, there is a -- there is a
11   suggestion that there is an increase
12   in risk estimate with increasing
13   number of talc uses, but those numbers
14   are not statistically significant.  So
15   they could all be the same or be
16   solely due to chance.
17            MR. TISI:  I'm going to take --
18            THE WITNESS:  So it depends.
19            MR. TISI:  Okay.  I want to
20       take a break.
21            VIDEOGRAPHER:  The time is
22       5:22 p.m.  We're going off the record.
23       (Off the record at 5:22 p.m.)
24            VIDEOGRAPHER:  The time is
25       5:36 p.m.  We're back on the record.

Christian Merlo, M.D., MPH

Page 458

1    QUESTIONS BY MR. TISI:
2        Q.   Doctor, can you go back to
3    Exhibit 32, which was the -- Chapter 2 out of
4    the Rothman textbook.
5        A.   I have it here.
6        Q.   If you can go to the section on
7    biologic gradient.
8        MS. MILLER:  Can you point us
9    to a page?
10        MR. TISI:  Yeah.  It's 28.
11        THE WITNESS:  28.
12        MS. MILLER:  Like where it says
13    out of 30?
14        MR. TISI:  You know, I don't
15    have my copy right there.  I'm just
16    using the book.
17        MS. MILLER:  Sorry.  There's
18    like different page numbers.
19        MR. TISI:  Yeah, if you just
20    give me -- it's the one that -- maybe
21    I will look at yours.  Thank you.
22        MS. MILLER:  Sure.
23    QUESTIONS BY MR. TISI:
24        Q.   It's page -- it's page 27 out
25    of 30.

Page 459

1        A.   I see it.
2        Q.   Okay.  Do you agree that not
3    all bio -- all dose-response relationships
4    are linear?
5        MS. MILLER:  Objection.
6        THE WITNESS:  There may be
7    dose-response relationships that could
8    be linear, there may be dose-response
9    relationships that may be exponential,
10    but in general, a dose response has an
11    increasing risk with increasing dose.
12    QUESTIONS BY MR. TISI:
13        Q.   Right.
14        But they could be like U-shaped
15    curves; they can be J-shaped curves; they
16    could be monotonic associations; they could
17    be all kinds of associations, right?
18        MS. MILLER:  Objection.
19        THE WITNESS:  So if we're
20    talking about curves, a curve can look
21    like anything.  It can be a straight
22    line.  It can be something that -- J
23    goes like a J shape, like you're
24    saying.  There could be a convex
25    curve.  There could be a concave

Page 460

1    curve.  But that -- but that's just
2    describing the curve.
3    QUESTIONS BY MR. TISI:
4        Q.   The last sentence of this says,
5    "The issues imply that a -- existence of a
6    monotonic association is neither necessary
7    nor sufficient for causal relation."
8        Is that true or not true?
9        A.   And I would just have to look
10    up to see what monotonic is being defined as.
11        Q.   So you don't have any
12    understanding what the word "monotonic"
13    means?
14        MS. MILLER:  Objection.
15        THE WITNESS:  Well, I have an
16    understanding, but I need to know what
17    monotonic is being referred to as
18    here.
19    QUESTIONS BY MR. TISI:
20        Q.   Well, what do you -- how do you
21    define monotonic?
22        MS. MILLER:  Objection.
23        THE WITNESS:  Usually monotonic
24    means that there is an increasing risk
25    with increasing dose, or a decreasing

Page 461

1    risk with decreasing dose.
2    QUESTIONS BY MR. TISI:
3        Q.   Okay.  Let's just use your
4    definition.
5        Is the monotonic association
6    either necessary or sufficient for causal
7    relationship?
8        A.   Can you ask that again?
9        Q.   Yeah.
10        I'm referring to the sentence
11    that -- and Dr. Rothman says, "These issues
12    imply that the existence of a monotonic
13    association is neither necessary nor
14    sufficient for causal relation."
15        Is that true or not true using
16    your definition of monotonic?
17        A.   Well, if we go back to the
18    original Bradford Hill considerations,
19    biologic gradient is only one of the
20    considerations.  And if we're talking about a
21    causal relationship, we need to consider the
22    other considerations as well.
23        Q.   But, Doctor, that's not my
24    question.  Okay?
25        So my question is -- I'm

116 (Pages 458 to 461)

Christian Merlo, M.D., MPH

Page 462

1  focused now on biologic gradient or dose
2  response.
3          Would you agree with
4  Dr. Rothman that a monotonic association,
5  meaning increasing dose with increasing
6  duration -- with increasing risk, is neither
7  necessary nor sufficient for causal relation?
8          MS. MILLER: Objection.
9          THE WITNESS: And again, I'm
10  going to have to go back to what I
11  just said because I'm not sure what
12  Dr. Rothman is referring to here.
13          Is it just specifically for
14  biologic gradient --
15  QUESTIONS BY MR. TISI:
16      Q.  Yeah.
17      A.  -- or is it -- well --
18      Q.  Let's assume that's what he's
19  saying, because I want to know if, on its
20  own, a -- on its own, is it necessary to have
21  a increasing risk with increasing dose --
22          MS. MILLER: Objection.
23  QUESTIONS BY MR. TISI:
24      Q.  -- to show causation?
25          MS. MILLER: Objection.

Page 463

1          THE WITNESS: Again, I will go
2  back to the Bradford Hill
3  considerations, and that of the nine
4  considerations, none of them or all of
5  them could support causation.
6  QUESTIONS BY MR. TISI:
7      Q.  Okay.
8      A.  I'm not going to say none of
9  them, but all of them could support
10  causation.
11          Does one factor -- does one
12  factor weigh in more than another factor?
13  Not necessarily.
14          And this sentence can't be
15  taken out of context in the -- from the
16  Bradford Hill considerations.
17      Q.  I hear you, Doctor, but I'm
18  going to ask you to listen to my question.
19          Is it necessary to have a dose
20  response to find causation?
21          You said before that it was
22  necessary to have a consistent association, I
23  think a clear association -- that was your
24  testimony before -- to even get to Bradford
25  Hill.

Page 464

1          Remember that?
2          MR. LOCKE: Objection.
3          THE WITNESS: We would have to
4  refer back to what -- what I said.
5  QUESTIONS BY MR. TISI:
6      Q.  Okay.
7      A.  I don't recall specifically my
8  language.
9      Q.  Is it necessary to have a
10  dose-response relationship in order to show
11  causation? Is that a required element?
12      A.  I think what I said earlier is
13  that of the nine Bradford Hill
14  considerations, none of them are required.
15      Q.  Okay.
16      A.  They're helpful in making an --
17  in making -- in putting together an
18  evaluation looking at causality.
19      Q.  Is Dr. Rothman's statement here
20  wrong?
21          MS. MILLER: Objection.
22  QUESTIONS BY MR. TISI:
23      Q.  Is the existence of a monotonic
24  association -- he says, "The existence of a
25  monotonic association is neither necessary

Page 465

1  nor sufficient for causal relations."
2          Is that wrong?
3          MS. MILLER: Objection.
4          THE WITNESS: I'm going to say
5  it depends. If you have nine other --
6  or eight other factors that suggest
7  causation and there's -- and a
8  biologic gradient doesn't exist
9  because you haven't tested for it or
10  it's just isn't showing that, you have
11  to consider the other factors.
12          If biologic gradient is the
13  only thing, and we're not seeing
14  strength of association and
15  consistency, then it becomes difficult
16  to rely on that -- just the biologic
17  gradient. So I'm just going to say it
18  depends.
19  QUESTIONS BY MR. TISI:
20      Q.  Okay. So if you go to the
21  Penninkilampi study back -- I forget which
22  exhibit it was. But if you can pull that out
23  if you can find it, sir.
24      A.  Sure.
25          MR. TISI: Do you know what

117 (Pages 462 to 465)

Christian Merlo, M.D., MPH

Page 466

1      exhibit it was?
2      QUESTIONS BY MR. TISI:
3          Q.   21, please.
4          A.   21.  Got it.
5          Q.   You were critical of that study
6      because Penninkilampi included Gertig but not
7      Gates.
8          Do you recall that?
9          MS. MILLER:  Objection.
10         THE WITNESS:  I did make
11         reference that Gertig was included in
12         this meta-analysis and Gates was not,
13         which is a more recent publication
14         with greater numbers.
15     QUESTIONS BY MR. TISI:
16         Q.   Which Gates did you mean?
17     Which Gates study did you mean should have
18     been included that wasn't?
19         A.   I'll just need to look up the
20     specific one in my report.  Gates 2010.
21         Q.   Okay.  What was the talc
22     exposure metric in Gates 2010?
23         A.   If I could see the article, I
24     could...
25         Q.   Is it in your report?

Page 467

1          A.   I could point to it.
2          Q.   Is it in your report?
3          A.   No, but I know that it was --
4      but I would have to see the article because I
5      don't specifically remember what the
6      actual -- I don't want to be mistaken right
7      now.
8          Q.   Well, Penninkilampi used an
9      ever use of talc, correct, as its metric?
10         A.   I mean, Table 1 in
11     Penninkilampi summarizes the different
12     outcomes in the methods of talc use.
13         Q.   Right.
14         A.   There's any perineal, there's
15     non-perineal, there's diaphragm, and there's
16     sanitary napkins.
17         Q.   Well, if you look at
18     Penninkilampi under Figure 2 -- on the study
19     name.  Under Figure 2 it says "any perineal
20     talc use."
21         Do you see?
22         A.   I do see that.
23         Q.   Okay.  Do you know what the
24     metric was in Gates?
25         MS. MILLER:  I believe you

Page 468

1      asked that question.
2      QUESTIONS BY MR. TISI:
3          Q.   Could that have been --
4          MR. TISI:  Counsel, I'm not
5      even done, okay?
6          MS. MILLER:  It sounded like a
7      question.
8          MR. TISI:  I'm not done.
9          MS. MILLER:  Apologies.
10     QUESTIONS BY MR. TISI:
11         Q.   In the Gates -- in the Gates
12     study, do you know that talc use metric was
13     great or equal to one week versus less --
14     versus less than one time a week?
15         MS. MILLER:  Objection.
16         THE WITNESS:  I'd love to look
17         at it.
18     QUESTIONS BY MR. TISI:
19         Q.   I'm happy to show it.  I'm
20     happy to show it to you.  It's my copy, so
21     you can't have it.  But it's in Table 4, and
22     this is Gates 2010.
23         A.   So Table 4 says, talc use,
24     greater than once a week versus less than
25     once a week.

Page 469

1          Q.   Right.
2          So it's a different metric, is
3      it not?
4          A.   It may or may not be a
5      different metric because there is a previous
6      publication where the authors felt that this
7      was a more reliable measure of exposure of
8      ever versus never.
9          Q.   The point is, Doctor, you were
10     critical of Penninkilampi as to why they
11     didn't include Gates 2010.  And I'm asking
12     you:  Would that be good reason not to
13     include Gates 2010, because it used a
14     different metric of exposure?
15         MS. MILLER:  Objection.  Calls
16         for speculation.
17         THE WITNESS:  No, not
18         necessarily, because the authors felt
19         that this -- that this metric was
20         actually a more reliable metric of
21         ever versus never.
22     QUESTIONS BY MR. TISI:
23         Q.   Okay.  In the Gertig study,
24     they use ever versus ever talc use.  You
25         MS. MILLER:  Objection.  You

118 (Pages 466 to 469)

Christian Merlo, M.D., MPH

Page 470

1          said ever versus ever.
2     QUESTIONS BY MR. TISI:
3          Q.    They used ever use.
4               Gates -- Gertig used ever
5     versus never, correct?
6          A.    Gertig?  Again, I don't have
7     these memorized, so I'm going to have to look
8     at it to see what we're referring to.
9          Q.    But the big question is you
10    don't -- you can't sit here today and tell me
11    why it is that Penninkilampi did not use
12    Gates 2010, can you?
13              It's not in your report, and
14    you can't tell me that?
15         MS. MILLER:  Objection.  Asked
16    and answered.
17         THE WITNESS:  The description
18    of the -- of the pulling of articles
19    for the meta-analysis is described.
20    The replication of that would have to
21    be performed to answer that question.
22    QUESTIONS BY MR. TISI:
23         Q.    And you didn't do that, did
24    you?
25         A.    For me to -- for me to perform

Page 471

1     my own meta-analysis by myself would be out
2     of the scope of even performing an analysis
3     per -- a meta-analysis correctly.
4          Q.    Doctor --
5          A.    I'm going to need a team to do
6     that.
7          Q.    Okay.  We started our day today
8     talking about publication and, you know,
9     opinions inside and outside litigation and
10    all those questions.
11              Let me ask you this:  You spent
12    seven hours with me today.  You wrote your
13    report.  You've been through this process.
14              Do you intend to publish your
15    views on ovarian cancer and talc?
16         A.    I have no idea what I'm going
17    to do in the future.  I -- I am a -- I have
18    an active research career in cystic fibrosis
19    and lung transplantation.
20              If the opportunity arose where
21    there was something to publish and seemed
22    interesting, fine, but I can't predict that.
23         Q.    Well, you're also pretty busy
24    in litigation.  You do four, five cases a
25    year.  You do speakers bureaus.  You do all

Page 472

1     kinds of stuff.  You find time for those.
2               My question to you is:  Would
3     you find time do this, to submit your point
4     of view to peer review?
5          MS. MILLER:  Objection.
6          THE WITNESS:  Again, I'm going
7     to have to answer it the same -- the
8     same way, that if an opportunity arose
9     and it seemed like an interesting
10    investigation --
11    QUESTIONS BY MR. TISI:
12         Q.    Is it an interesting
13    investigation to you, or is this just
14    something you did for this case?
15         MS. MILLER:  Objection.
16         THE WITNESS:  This has -- this
17    has been a very interesting exercise
18    in evaluating epidemiology.
19    QUESTIONS BY MR. TISI:
20         Q.    And so now having been through
21    the process, do you intend to subject your
22    opinions, particularly the ones where you
23    were very strong in your criticism of those
24    who have published and have put themselves
25    out there, subject your opinions to peer

Page 473

1     review?
2          MR. LOCKE:  Objection.
3          THE WITNESS:  Well --
4     QUESTIONS BY MR. TISI:
5          Q.    Dr. Siemiatycki has put himself
6     out there and submitted himself --
7          MS. MILLER:  He started
8     answering the question --
9     QUESTIONS BY MR. TISI:
10         Q.    Well, let me ask you this.
11         MS. MILLER:  -- and you
12    interrupted him.  Can we just end the
13    day with question, answer, question,
14    answer?
15    QUESTIONS BY MR. TISI:
16         Q.    Okay.  Dr. Siemiatycki
17    published in this, correct?
18         MS. MILLER:  Objection.
19         THE WITNESS:  I'm going to have
20    to look through what's been published
21    by Dr. Siemiatycki.
22    QUESTIONS BY MR. TISI:
23         Q.    Okay.  Dr. McTiernan went
24    before Congress and gave her testimony,
25    correct?

119 (Pages 470 to 473)

Christian Merlo, M.D., MPH

Page 474

1     MR. LOCKE: Objection.
2     THE WITNESS: Again, I told you
3  I didn't know about that.
4  QUESTIONS BY MR. TISI:
5     Q.  Dr. Smith-Bindman said she's
6  going to submit her meta-analysis to
7  publication.
8     Do you remember seeing that?
9     A.  You'd have to show me where she
10 said that.
11    Q.  Dr. Moorman was a coauthor on
12 the Schildkraut study, correct?
13    A.  I'd have to look back through
14 the list of authors to confirm or not
15 confirm.
16    Q.  Some of them wrote Health
17 Canada, as counsel pointed out, to express
18 their point of views on this in the comment
19 period, correct?
20    A.  I have no idea.
21    Q.  Do you have any intention, now
22 having been through this process, as you sit
23 here today, to submit your criticisms and
24 your opinions to the criticisms of your
25 fellow peers?

Page 475

1     MS. MILLER: Objection.
2     THE WITNESS: Submit where?
3  QUESTIONS BY MR. TISI:
4     Q.  Anywhere. Congress, medical
5  meetings, regulatory authorities,
6  publications, peer review, your colleagues,
7  anywhere.
8     MS. MILLER: Objection.
9     THE WITNESS: And I'll just
10 have to say I have no idea.
11 QUESTIONS BY MR. TISI:
12    Q.  Okay.
13    A.  There's a possibility that
14 something may arise in the future and I may
15 take up that opportunity. And I don't know
16 today.
17    Q.  Have you gone -- have you gone
18 to your oncology department here -- you have
19 an oncology department here at -- or a
20 gynecology department here at Hopkins?
21    A.  We do have a --
22    Q.  Gynecology?
23    A.  -- a gynecology department.
24    Q.  Okay. If a gynecology
25 department asked you, do you think we should

Page 476

1  tell our patients to stop using talcum
2  powder, what would you tell them?
3     MS. MILLER: Objection.
4     THE WITNESS: Again, I -- I'd
5  say it depends. If you're talking
6  about based on the medical evidence
7  out there, there's no evidence to
8  suggest that -- and if we're
9  specifically talking about risk of
10 ovarian cancer --
11 QUESTIONS BY MR. TISI:
12    Q.  Yes.
13    A.  -- there's no evidence to
14 suggest a causal relationship between talcum
15 powder and ovarian cancer.
16    Q.  No evidence whatsoever?
17    A.  Based on the body of medical
18 literature, no, there is not evidence --
19    Q.  And so you would --
20    A.  -- but there is a --
21    Q.  You would tell them --
22    MS. MILLER: He's in a middle
23 of a sentence.
24    THE WITNESS: So what I said is
25 it would depend. If we're talking

Page 477

1  about the medical literature, that
2  would be my response, that -- that
3  that causal relationship does not
4  exist based on the evidence.
5     But if a doctor is asking -- if
6  a gynecologist is asking me whether or
7  not talcum powder should be used for a
8  specific patient, it's going to be
9  dependent on that specific patient.
10 There might be a wound in there.
11 There might be some other reason --
12 QUESTIONS BY MR. TISI:
13    Q.  I'm not asking that.
14    A.  Well, that's --
15    Q.  I'm not asking that. I'm
16 asking --
17    A.  But that's what I'm saying.
18 You asked me if I would recommend, and so
19 I'll telling you that it depends. It
20 depends.
21    Q.  If a gynecologist came to you
22 and said, "Doctor, you're an epidemiologist,
23 I have women who are asking me whether or not
24 I should -- they hear what's on the radio,
25 they hear what's on television. They're

Christian Merlo, M.D., MPH

Page 478

1 aware of a potential link that's been
2 discussed out there. Should I tell my women
3 to stop or should I tell them to continue
4 using it?" what would you tell them?
5 Continue using it?
6            MS. MILLER: Objection, vague,
7       and objection, asked and answered.
8            THE WITNESS: So I would ask
9       why, and it would be dependent on the
10      answer to why.
11 QUESTIONS BY MR. TISI:
12      Q.   If they said because there's a
13 concern that they might put myself at
14 increased risk of ovarian cancer?
15           MS. MILLER: Objection. This
16      was asked and answered.
17 QUESTIONS BY MR. TISI:
18      Q.   If they said -- if they said
19 that was the reason why, what would you
20 answer -- would you respond to them?
21      A.   I would say, based on the body
22 of medical evidence, there is no causal
23 association between talcum powder and ovarian
24 cancer.
25      Q.   Okay. So you'd tell them, keep

Page 479

1 dusting?
2            MS. MILLER: Objection.
3            THE WITNESS: I didn't say
4       that. I said based on the body of
5       medical evidence, there is no
6       association, causal association,
7       between talcum powder and ovarian
8       cancer.
9            There may be other reasons that
10      that gynecologist would or would not
11      recommend using talcum powder.
12           MR. TISI: Doctor, I appreciate
13      your time today. I have no further
14      questions.
15           Anything else? Do you have any
16      questions?
17           MS. MILLER: We're discussing
18      it. I just have two questions.
19           CROSS-EXAMINATION
20 QUESTIONS BY MS. MILLER:
21      Q.   Can you go back to Exhibit 31?
22      A.   31.
23      Q.   Okay. Can you turn to --
24           MR. TISI: Can you wait until I
25      get my copy, Counsel?

Page 480

1            MS. MILLER: Of course.
2            MR. TISI: Can you find --
3       would you pull them over...
4 QUESTIONS BY MS. MILLER:
5      Q.   We're going to be looking at
6 page 11.
7            MR. TISI: I'm sorry, he just
8       started putting them away.
9            MS. MILLER: It's
10      understandable. I think everybody
11      wants to get home for the weekend.
12 QUESTIONS BY MS. MILLER:
13      Q.   I'm looking at the bottom of
14 page -- of page 11 in Exhibit 31.
15           Do you recall Exhibit 31 was
16 shown to you earlier today?
17      A.   I do.
18      Q.   And this is a document from the
19 National Cancer Institute; is that correct?
20      A.   That's what it appears to be.
21      Q.   The title is "Ovarian,
22 Fallopian Tube and Primary Peritoneal Cancer
23 Prevention," correct?
24      A.   Correct.
25      Q.   There's a section on page 11

Page 481

1 titled "Perineal Talc Exposure."
2            Do you see that?
3            MR. TISI: It's on page 11? I
4       don't see it on page 11.
5            MS. MILLER: Page 11 of 17.
6 QUESTIONS BY MS. MILLER:
7      Q.   Do you see that section?
8            MR. TISI: No, I don't,
9       actually. Can you show me?
10           THE WITNESS: I do.
11           MR. TISI: I see oophorectomy
12      on page 11.
13           MS. MILLER: You've got --
14      you've got a different version than
15      the one you used as an exhibit. It's
16      on page 11 of the one you used as an
17      exhibit.
18           MR. TISI: Okay. I'll have to
19      argue this when we're done.
20 QUESTIONS BY MS. MILLER:
21      Q.   Did counsel direct you to this
22 section of the exhibit when he was
23 questioning you about it?
24           MR. TISI: Objection to form.
25           THE WITNESS: Not that I

121 (Pages 478 to 481)

Christian Merlo, M.D., MPH

Page 482

1     recall.
2     QUESTIONS BY MS. MILLER:
3         Q.    Did you see this section when
4     you were asked questions about this document?
5             MR. TISI:  Objection to form.
6             THE WITNESS:  Not that I
7     recall.
8     QUESTIONS BY MS. MILLER:
9         Q.    Can you read the first sentence
10     under Perineal Talc Exposure?
11         A.    Sure.
12             "The weight of evidence does
13     not support an association between perineal
14     talc exposure and an increased risk of
15     ovarian cancer."
16         Q.    Can you read the second
17     sentence?
18         A.    "Results from case control and
19     cohort studies are inconsistent."
20             MS. MILLER:  I have no further
21     questions at this time.
22             MR. TISI:  May have it, please?
23             MS. MILLER:  Well, don't take
24     his because --
25             MR. TISI:  Well, okay, can I

Page 483

1     have -- may I have yours then?
2             MS. MILLER:  Well, mine is
3     marked.
4             MR. TISI:  Okay.  Well, I --
5             MS. MILLER:  You don't have it?
6             MR. TISI:  I don't.  I have the
7     different copy.
8             MS. MILLER:  If you give it to
9     me, I'll show you what page it is.
10             REDIRECT EXAMINATION
11     QUESTIONS BY MR. TISI:
12         Q.    All right.  So, Doctor, first
13     of all, you testified earlier you don't even
14     know who these authors are who did this,
15     correct?
16             MR. LOCKE:  Objection.
17     QUESTIONS BY MR. TISI:
18         Q.    Earlier?
19             MS. MILLER:  Objection.
20             THE WITNESS:  It looks like
21     this is from the National Cancer
22     Institute, but I don't know who put
23     this all together.
24     QUESTIONS BY MR. TISI:
25         Q.    So now in the perineal talc

Page 484

1     exposure it has footnotes 43, 44, 45 and 46.
2         Do you see that?
3         A.    Okay.
4         Q.    Do you see that?
5         A.    Yeah, I see 42 through 45, yes.
6         Q.    And if you go to the back of
7     the thing where they -- the back of this --
8     they only looked at four studies.
9         Do you see that?
10         A.    What are you referring to?
11         Q.    Well, the footnotes, they look
12     at 43, 44, 45 and 46.  They have four
13     references:  Huncharek, Terry, Gertig and
14     Houghton.
15         One is the Huncharek study
16     which in your footnote in your report you
17     indicated you agree that there are mistakes
18     in those, right?
19             MS. MILLER:  Objection.
20     QUESTIONS BY MR. TISI:
21         Q.    You looked at the report of
22     April Zambelli-Weiner, correct?
23         A.    I did look at that, yes.
24         Q.    Okay.  And you agree that there
25     were mistakes in that?

Page 485

1             MS. MILLER:  Objection.
2             THE WITNESS:  The numbers may
3     have been off, but the general gist of
4     the trend was still the same, meaning
5     the numbers didn't affect statistical
6     significance, as I recall.
7     QUESTIONS BY MR. TISI:
8         Q.    And this is not -- this
9     study -- studies four -- it has four
10     references.  You have some 30 --
11             MS. MILLER:  We're out of time.
12     QUESTIONS BY MR. TISI:
13         Q.    You have some 30 references.
14         Are you going to tell me that
15     they did a full causation analysis that you
16     did?
17             MS. MILLER:  Objection.  And
18     we're out of time.
19             MR. TISI:  You're not going to
20     let him answer that question?
21             MS. SHARKO:  He can answer that
22     one question.
23             MR. TISI:  Thank you.
24             THE WITNESS:  I don't know what
25     they did here.

122 (Pages 482 to 485)

Christian Merlo, M.D., MPH

Page 486

1          MR. TISI:  Thank you very much.
2     I appreciate it.
3          VIDEOGRAPHER:  Okay.  That's
4     it.
5          MS. MILLER:  Thank you.
6          VIDEOGRAPHER:  The time is
7     6:01 p.m., April 18, 2019.  Going off
8     the record, completing the videotaped
9     deposition.
10    (Deposition concluded at 6:01 p.m.)
11          _ _ _ _ _ _ _
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 487

1               CERTIFICATE
2
3          I, CARRIE A. CAMPBELL, Registered
       Diplomate Reporter, Certified Realtime
4      Reporter and Certified Shorthand Reporter, do
       hereby certify that prior to the commencement
5      of the examination, Christian Merlo, MD, MPH
       was duly sworn by me to testify to the truth,
6      the whole truth and nothing but the truth.
7          I DO FURTHER CERTIFY that the
       foregoing is a verbatim transcript of the
8      testimony as taken stenographically by and
       before me at the time, place and on the date
9      hereinbefore set forth, to the best of my
       ability.
10
           I DO FURTHER CERTIFY that I am
11     neither a relative nor employee nor attorney
       nor counsel of any of the parties to this
12     action, and that I am neither a relative nor
       employee of such attorney or counsel, and
13     that I am not financially interested in the
       action.
14
15
16
       _____
17     CARRIE A. CAMPBELL,
       NCRA Registered Diplomate Reporter
18     Certified Realtime Reporter
       Notary Public
19     Dated:  April 19, 2019
20
21
22
23
24
25

Page 488

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4     carefully and make any necessary corrections.
5     You should state the reason in the
6     appropriate space on the errata sheet for any
7     corrections that are made.
8          After doing so, please sign the
9     errata sheet and date it.  You are signing
10    same subject to the changes you have noted on
11    the errata sheet, which will be attached to
12    your deposition.
13          It is imperative that you return
14    the original errata sheet to the deposing
15    attorney within thirty (30) days of receipt
16    of the deposition transcript by you.  If you
17    fail to do so, the deposition transcript may
18    be deemed to be accurate and may be used in
19    court.
20
21
22
23
24
25

Page 489

1          ACKNOWLEDGMENT OF DEPONENT
2
3
4          I,_____, do
5     hereby certify that I have read the foregoing
      pages and that the same is a correct
6     transcription of the answers given by me to
      the questions therein propounded, except for
7     the corrections or changes in form or
      substance, if any, noted in the attached
8     Errata Sheet.
9
10
11
12    _____
      Christian Merlo, M.D., MPH          DATE
13
14
15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18
19    Notary Public
20
21
22
23
24
25

123 (Pages 486 to 489)

Christian Merlo, M.D., MPH

Page 490

```
 1            - - - - - - -
               ERRATA
 2            - - - - - - -
 3   PAGE  LINE  CHANGE/REASON
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```

Page 491

```
 1            - - - - - - -
             LAWYER'S NOTES
 2            - - - - - - -
 3   PAGE  LINE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```

124 (Pages 490 to 491)