# EXHIBIT B11

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


IN RE:  JOHNSON & JOHNSON      )
TALCUM POWDER PRODUCTS         )
MARKETING, SALES               )
PRACTICES, AND PRODUCTS        ) MDL NO:
LIABILITY LITIGATION           ) 16-2738 (FLW)(LHG)
                               )
THIS DOCUMENT RELATES TO       )
ALL CASES                      )




********************************************

ORAL VIDEOTAPED/REALTIMED DEPOSITION OF

ELLEN BLAIR SMITH, M.D.

JANUARY 9, 2019

VOLUME 1 OF 1

********************************************

Ellen Blair Smith, M.D.

Page 2

1      ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF

2  ELLEN BLAIR SMITH, M.D., produced as a witness at

3  the instance of the Defendants Johnson & Johnson

4  entities, and duly sworn, was taken in the

5  above-styled and numbered cause on January 9, 2019,

6  from 9:24 a.m. to 9:23 p.m., before Karen L. D.

7  Schoeve, CSR, RDR, CRR, in and for the State of

8  Texas, reported by computerized machine shorthand,

9  at the Hilton Austin, 500 E 4th Street, Austin,

10 Texas, pursuant to the Federal Rules of Civil

11 Procedure and the provisions stated on the record or

12 attached hereto.

13      It is further agreed that Rule 30(b)(5) is

14 waived by agreement of the parties.

Page 3

1      A P P E A R A N C E S
2
3  FOR PLAINTIFFS' STEERING COMMITTEE:
4      P. LEIGH O'DELL, ESQUIRE
       DR. MARGARET M. THOMPSON, ESQUIRE
5      BEASLEY ALLEN, P.C.
       218 Commerce Street
6      P.O. Box 4160
       Montgomery, Alabama 36104
7      T: 334.269.2343  (Ms. O'Dell)
       F: 334.954.7555  (Ms. O'Dell)
8      C: 512.695.1708  (Ms. Thompson)
       T: 800.898.2034  (Ms. Thompson)
9      F: 855.674.1818  (Ms. Thompson)
       leigh.odell@beasleyallen.com
10     margaret.thompson@beasleyallen.com
11     --AND--
12     CYNTHIA L. GARBER, ESQUIRE
       ROBINSON CALCAGNIE, INC.
13     19 Corporate Plaza Drive
       Newport Beach, California 92660
14     C:  949.456.0037
       T:  949.720.1288
15     F:  949.720.1292
       cgarber@robinsonfirm.com
16
       --AND--
17
       PAULA R. BROWN, ESQUIRE
18     BLOOD HURST & O'REARDON, LLP
       501 West Broadway, Suite 1490
19     San Diego, California 92101
       T:  619.338.1100
20     F:  619.338.1101
       pbrown@bholaw.com
21
22
23
24

Page 4

1      A P P E A R A N C E S (Continued)
2
3  FOR DEFENDANTS JOHNSON & JOHNSON ENTITIES:
4      SCOTT A. JAMES, ESQUIRE
       SHOOK, HARDY & BACON L.L.P.
5      JPMorgan Chase Tower
       600 Travis Street, Suite 2450
6      Houston, Texas 77002-2926
       D:  713.546.5644
7      T:  713.227.8008
       F:  713.227.9508
8      sjames@shb.com
       --AND--
9
10     KATHERINE McBETH, ESQUIRE
       DRINKER BIDDLE & REATH LLP
11     One Logan Square, Suite 2000
       Philadelphia, Pennsylvania 19103-6996
12     D:  215.988.2706
       T:  215.988.2700
13     F:  215.988.2757
       katherine.mcbeth@dbr.com
14
15 FOR DEFENDANT IMERYS TALC AMERICA, INC.
16     MICHAEL R. KLATT, ESQUIRE
       GORDON REES SCULLY MANSUKHANI, LLP
17     816 Congress Avenue, Suite 1510
       Austin, Texas 78701
18     D:  512.582.6485
       T:  512.391.0197
19     F:  512.391.0183
       mklatt@grsm.com
20
       --AND--
21
22
23
24

Page 5

1      A P P E A R A N C E S (Continued)
2
3      MARK K. SILVER, ESQUIRE
       COUGHLIN DUFFY LLP
4      350 Mount Kemble Avenue
       P.O. Box 1917
5      Morristown, New Jersey 07962
       D:  973.631.6045
6      T:  973.267.0058
       F:  973.267.6442
7      msilver@coughlinduffy.com
8
9  FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL:
10     RENEE B. APPEL, ESQUIRE
       SEYFARTH SHAW LLP
11     975 F Street, N.W.
       Washington, D.C. 20004
12     D:  202.828.5371
       T:  202.463.2400
13     F:  202.828.5393
       rappel@seyfarth.com
14
15 FOR DEFENDANTS PTI ROYSTON LLC AND PTI UNION LLC:
16     TARIQ M. NAEEM, ESQUIRE
       TUCKER ELLIS | LLP
17     950 Main Avenue, Suite 1100
       Cleveland, Ohio 44113-7213
18     D:  216.696.3675
       T:  216.592.5000
19     F:  216.592.5009
       tariq.naeem@tuckerellis.com
20
21 ALSO PRESENT:
       Shane Ramirez, Videographer
22
23 THE COURT REPORTER:
24     Karen L. D. Schoeve, CRR, RDR, RSA

2  (Pages 2 to 5)

Ellen Blair Smith, M.D.

Page 6

INDEX

PAGE

1
2
3  Appearances                                      3
4  Stipulation:  Objection by one is good          15
      for all
5
6  ELLEN BLAIR SMITH, M.D.
7      Examination By Mr. James            11
8      Afternoon Session
9      Examination Continued By Mr. James     162
10     Examination By Mr. Klatt            297
11     Examination By Ms. O'Dell           308
12     Further Examination By Mr. James    343
13     Further Examination By Mr. Klatt    352
14     Further Examination By Ms. O'Dell   378
15     Further Examination By Mr. Klatt    379
16
17  Changes and Signature                   381
18  Reporter's Certificate                  383
19
20     REPORTER'S NOTE 1:  Please be advised that an
   UNCERTIFIED ROUGH DRAFT version of this transcript
21  exists.  If you are in possession of said rough
   draft, please replace it immediately with this
22  CERTIFIED FINAL TRANSCRIPT.
23     REPORTER'S NOTE 2:  Quotation marks are used for
   clarity and do not necessarily reflect a direct
24  quote.

Page 7

EXHIBIT INDEX

NO. DESCRIPTION                         PAGE

1
2
3  Exhibit 1              20
      Invoices dated 02/09/17 through 09/04/18
4
5  Exhibit 2              38
      Notice of Oral and Videotaped Deposition
      of Ellen Blair Smith and Duces Tecum
6
   Exhibit 3              40
7      Materials considered
      (2.5 reams)
8  Exhibit 4              41
9      Rule 26 Expert Report of Ellen Blair
      Smith, M.D., dated 11/16/18
10
   Exhibit 5              44
11     Rule 26 Expert Report of Judith Wolf,
      M.D., dated 11/16/18
12
   Exhibit 6              53
13     Curriculum Vitae of Ellen Blair Smith, M.D.
14  Exhibit 7              99
15     Article entitled "Talc" from
      www.fda.gov, dated 01/07/19
16  Exhibit 8              106
      Letter dated 04/01/14 to Samuel Epstein,
17     M.D., from Steven M. Musser, Ph.D.
18  Exhibit 9              113
      AACR article entitled "Does Exposure to
19     Asbestos Cause Ovarian Cancer?
      A Systematic Literature Review and
20     Meta-analysis," dated 05/24/11
21  Exhibit 10             124
      IARC Monographs - 100C, "Fig 2.4.6
22     Cancer of the ovary"
23
24

Page 8

EXHIBIT INDEX (Continued)

NO. DESCRIPTION                         PAGE

1
2
3  Exhibit 11             154
      ACOG, Women's Health Care Physicians
4      article entitled "Talc Use and
      Ovarian Cancer"
5
   Exhibit 12             157
6      Ovarian Cancer:  Risk Factors, SGO,
      article entitled "Ovarian Cancer"
7
   Exhibit 13             160
8      ACOG, Women's Health Care Physicians,
      FAQ096, July 2017, FAQ entitled
9      "Ovarian Cancer"
10  Exhibit 14             163
      NIH, National Cancer Institute article
11     entitled "Ovarian, Fallopian Tube, and
      Primary Peritoneal Cancer Prevention
12     (PDQ)-Health Professional Version"
13  Exhibit 15             169
      American College of Obstetricians
14     and Gynecologists, article entitled
      "Assessing Ovarian Cancer Risk When
15     Considering Elective Oophorectomy at
      the Time of Hysterectomy" by Allison
16     F. Vitonis, Linda Titus-Ernstoff
      and Daniel Cramer, dated 05-2011
17
   Exhibit 16             176
18     Obstetrics & Gynecology, article
      entitled "Perineal Exposure to Talc
19     and Ovarian Cancer Risk" by Bernard
      Harlow, Daniel Cramer, Debra Bell
20     and William Welch, dated 07-1992
21  Exhibit 17             184
      International Union Against Cancer,
22     article entitled "Genital Talc
      Exposure and Risk of Ovarian Cancer"
23     by Daniel Cramer, et al., dated
      11/19/98
24

Page 9

EXHIBIT INDEX (Continued)

NO. DESCRIPTION                         PAGE

1
2
3  Exhibit 18             189
      Anticancer Research 23 (2003), article
4      entitled "Perineal Application of osmetic
      Talc and Risk of Invasive Epithelial
5      Ovarian Cancer:  A Meta-analysis of
      11,933 subjects from Sixteen Observational
6      Studies" by Michael Huncharek,
      J. F. Gerschwind and Bruce Kupelnick
7
8  Exhibit 19             197
      Article entitled "Perineal use of
9      talc and risk of ovarian cancer" by
      H. Langseth, S. E. Hankinson,
10     J. Siematycki, E. Weiderpass,
      dated 10/15/07
11
   Exhibit 20             203
12     AACR, article entitled "Genital Powder
      Use and Risk of Ovarian Cancer:  A
13     Pooled Analysis of 8,525 Cass and
      9,859 Controls," by Kathryn Terry,
14     et al., dated 06/12/13
15  Exhibit 21             207
      Epidemiology, article entitled
16     "Perineal Talc Use and Ovarian
      Cancer, A Systematic Review and
17     Meta-Analysis" by Ross Penninkilampi
      and Guy Eslick, dated 01/2018
18
   Exhibit 22             216
19     American Journal of Epidemiology,
      article entitled "Risk Factors for
20     Epithelial Ovarian Cancer by Histologic
      Subtype" by Margaret Gates, et al.,
21     dated 09/11/09
22  Exhibit 23             216
      Journal of the National Cancer
23     Institute Report, "Prospective Study
      of Talc Use and Ovarian Cancer" by
24     Dorota Gertig, et al.

3  (Pages 6 to 9)

Ellen Blair Smith, M.D.

Page 10

EXHIBIT INDEX (Continued)

NO. DESCRIPTION                                    PAGE

Exhibit 24                              226
    Wolters Kluwer Health, Inc., article
    entitled "Genital use of talc and risk
    of ovarian cancer: a meta-analysis"
    by Wera Berge, et al.

Exhibit 25                              238
    Oxford University Press article entitled
    "Perineal Powder Use and Risk of
    Ovarian Cancer" by Serena Houghton,
    et al., dated 06/05/14

Exhibit 26                              254
    Gynecologic Oncology, article
    entitled "Talc and ovarian cancer"
    by Steven A. Narod, dated 2016

Exhibit 27                              300
    List of Tests from 08/22/1985 - 10/1/2002

Exhibit 28                              300
    List of Tests (large blue chart)

Exhibit 29                              309
    MAS, article entitled "The Analysis
    of Johnson & Johnson's Historical
    Baby Powder & Shower to Shower
    Products from the 1960's to the
    Early 1990's for Amphibole Asbestos"
    by William Longo and Mark Rigler,
    dated 11/14/18

Exhibit 30                              333
    European Journal of Cancer Prevention,
    article entitled "Genital use of talc
    and risk of ovarian cancer: a meta-analysis"
    by Wera Berge, et al., dated 05/2018

Exhibit 31                              352
    IARC Monographs, Arsenic, Metals,
    Fibres, and Dusts, Volume 100C,
    A Review of Human Carcinogens

Page 12

1    Q.  Where are you currently employed,
2 Dr. Smith?
3    A.  I am a hospice medical director for
4 Halcyon Home, LLC.
5    Q.  And do you have a separate consulting
6 business?
7    A.  No.
8    Q.  We're here to take your deposition today
9 in the talc MDL.
10       Do you understand that?
11    A.  I do.
12    Q.  When were you first contacted about
13 serving as an expert witness in the talc MDL?
14    A.  I was contacted to look at the scientific
15 data in January of 2017.
16    Q.  When did you first agree to serve as an
17 expert in the litigation?
18    A.  In about August or September in 2017.
19    Q.  Who contacted you?
20    A.  Margaret Thompson.
21    Q.  How many contacts have you had with
22 Margaret Thompson between the first contact and
23 today?
24    A.  Enumerable.

Page 11

1         PROCEEDINGS
2         THE VIDEOGRAPHER:  Here begins the
3 deposition of Ellen Blair Smith, Ph.D.
4         THE WITNESS:  No, M.D.
5         THE VIDEOGRAPHER:  M.D.  Excuse me.
6         Today's date is January 9th, 2019.
7         The time is 9:24 a.m.
8         Will the court reporter please swear
9 in the witness.
10         ELLEN BLAIR SMITH, M.D.,
11 having been first duly sworn to tell the truth, the
12 whole truth, and nothing but the truth, so help her
13 God, testified as follows:
14         EXAMINATION
15 BY MR. JAMES:
16    Q.  Good morning, Dr. Smith.
17    A.  Good morning.
18    Q.  Is Dr. Smith the appropriate way to refer
19 to you?
20    A.  Sure.
21    Q.  Okay.  My name is Scott James.  I'm
22 counsel for J&J, and we met briefly before the
23 deposition, correct?
24    A.  Yes.

Page 13

1    Q.  More than ten?
2    A.  Yes.
3    Q.  More than 20?
4    A.  I would think so.
5    Q.  All pertaining to this litigation?
6    A.  No.
7    Q.  Okay.  How do you know Ms. Thompson?
8    A.  I've known Dr. Thompson for almost 40
9 years.
10    Q.  And how did you first meet Ms. Thompson?
11    A.  I was a fellow in gynecologic oncology at
12 Duke, and she was a senior resident at Duke.  She's
13 one year behind me in training.
14    Q.  How many meetings have you had with
15 Mrs. Thompson pertaining to this litigation?
16    A.  I don't know.  A lot.
17    Q.  Same series of questions.  More than ten?
18    A.  Yes.
19    Q.  Okay.  More than 20?
20    A.  Yes.
21    Q.  And have those meetings occurred between
22 the first contact about the litigation, which was
23 January 2017, and today?
24    A.  Yes.

Ellen Blair Smith, M.D.

Page 14

1    Q.   More than 30 meetings?
2    A.   Probably not that many.
3    Q.   Can you estimate the amount of time that
4  you have spent with Mrs. Thompson pertaining to the
5  issues in this litigation?
6    A.   No, I cannot.
7    Q.   Have you met with any other counsel for
8  plaintiffs in this litigation?
9    A.   Leigh O'Dell and Cynthia Garber.
10        THE WITNESS:  And Paula, I don't know
11  your last name.
12        MS. BROWN:  Brown.
13    Q.   (BY MR. JAMES)  Any other counsel besides
14  the ones you just mentioned?
15    A.   No.
16    Q.   How much time would you -- have all the
17  meetings with Mrs. O'Dell and Ms. Garber -- and I --
18  my apologies, Mrs. Brown, have any of those meetings
19  been without the presence of Mrs. Thompson?
20    A.   No.
21    Q.   Has Ms. Thompson been present at all of
22  your meetings pertaining to this litigation?
23    A.   Yes.
24    Q.   Dr. Smith, have you given a deposition

Page 15

1  before?
2    A.   Yes.
3    Q.   So you understand the ground rules, but
4  I'll repeat just a couple of them to help us along
5  the way today, okay?
6    A.   Okay.
7    Q.   So my questions will be verbal, and I ask
8  that your answers be verbal as well so they can be
9  recorded.
10    A.   Yes.
11    Q.   If you need a break at any time today,
12  please just let me know, and we'll be happy to
13  accommodate you.
14    A.   Thank you.
15    Q.   And if you don't understand one of my
16  questions, please ask me to rephrase, or oftentimes,
17  your counsel will ask that I rephrase as well.
18  Okay?
19    A.   Thank you.
20        MR. KLATT:  And can I add that we have
21  an agreement that an objection for one is good for
22  all?
23        MS. O'DELL:  Yes.
24        MR. KLATT:  Okay.  Fine.

Page 16

1        MR. JAMES:  Thank you, Mr. Klatt.
2    Q.   (BY MR. JAMES)  Have you ever worked as an
3  expert -- a paid expert in litigation before?
4    A.   Yes.
5    Q.   What -- what matters?
6    A.   It was expert testimony as an expert on
7  cervical cancer, in between 1996 and 1998, for a
8  local obstetrician gynecologist here in Houston, and
9  the case pertained to appropriate treatment of
10  carcinoma in situ of the cervix, and the patient's
11  informed consent for a hysterectomy.
12    Q.   Were you serving as an expert for the
13  physician?
14    A.   I was on the defense side, yes, sir.
15    Q.   Have you served as an expert in any other
16  litigation other than the one you just mentioned and
17  the talc MDL?
18    A.   No.
19    Q.   How many prior depositions have you given?
20    A.   Maybe five.  I was -- I've been treating
21  physician in several litigations, not an expert,
22  just fact.
23    Q.   Were you deposed in the -- as an expert in
24  the litigation that you just discussed with us?

Page 17

1    A.   The -- I was was --
2        MS. O'DELL:  Object to the form.
3        MR. JAMES:  Sure.
4        MS. O'DELL:  Just make sure . . .
5    Q.   (BY MR. JAMES)  So you mentioned that you
6  served as an expert one time in one --
7    A.   Right.
8    Q.   -- prior case, correct?
9    A.   Correct.
10    Q.   Were you deposed in that case?
11    A.   Yes.
12    Q.   Were the other -- all of the other
13  depositions taken in your capacity as a treating
14  physician?
15    A.   Yes.
16    Q.   Have you been a defendant in any of those
17  cases?
18    A.   No.
19    Q.   Are there any other depositions, other
20  than the ones that we've just discussed, that you
21  have given during your lifetime?
22    A.   I gave a deposition -- oh, I gave a
23  testimony and a deposition once as -- I don't
24  exactly know what I was.  I'm -- fact, and as a

5 (Pages 14 to 17)

Ellen Blair Smith, M.D.

Page 18

1    patient at a hospital.
2        Q.  Were you a defendant in that case?
3        A.  No.
4        Q.  For this case, for the talc MDL, turning
5    back to the talc MDL, where do the fees that you
6    receive in this litigation, where do those fees go
7    to?
8        A.  You mean come from?
9        Q.  Do you take -- do you receive those fees
10   personally?
11       A.  Yes, I receive them personally.
12       Q.  You are currently employed, as we
13   discussed, correct?
14       A.  Yes.
15       Q.  Do you have any other sources of income
16   besides the expert work that you're engaged in now
17   and your current role for the hospice facility?
18       A.  I have several personal annuities.
19       Q.  Any other sources of income --
20       A.  No.
21       Q.  -- besides personal investments?
22       A.  No.
23       Q.  And you're charging $600 per hour in this
24   litigation, correct?

Page 19

1        A.  I am.
2        Q.  Is that a standard rate regardless of the
3    sort of work you're performing?
4        A.  In this MDL?
5        Q.  Yes.
6        A.  Yes.
7        Q.  Yes, Doctor.
8        A.  Yes.
9        Q.  Can you quantify for us the number of
10   hours you have spent working as an expert in this
11   litigation?
12       A.  I -- I don't have it off the top of my
13   head, but I know they have very clear time records.
14       Q.  Have you to date invoiced -- have you
15   invoiced for all of the time that you've spent in
16   the litigation to date?
17       A.  No.
18       Q.  Where do your invoices carry you through?
19       A.  December 31st.  I have -- there is an
20   invoice that I submitted December 31st that's not
21   been paid yet.  But I'm through the end of 2018.
22       Q.  And you'll be submitting an additional
23   invoice for the time that you've spent in January,
24   correct?

Page 20

1        A.  Correct.
2            MR. JAMES:  And counsel mentioned
3    before the deposition that they have brought with
4    them copies of the invoices in litigation.
5            Could I have those, please.
6            MS. O'DELL:  Sure.
7            MR. JAMES:  Thank you.
8            MS. O'DELL:  I'm missing a last
9    invoice.  I'll get it to you on the break.
10           MR. JAMES:  Okay.
11           And I'm gonna hand what counsel has --
12   I'm gonna mark what counsel has handed me, the set
13   of invoices, as Exhibit Number 1.
14           (Deposition Exhibit 1 marked for
15           identification.)
16       Q.  (BY MR. JAMES)  And, again, Dr. Smith,
17   these set of invoices that I was just handed will
18   reflect the time that you've spent in this
19   litigation through the end of December 2018,
20   correct?
21       A.  When you get the last one, yes, it will.
22       Q.  Understood.
23           And then we get an additional invoice
24   for January, correct?

Page 21

1        A.  Correct.
2        Q.  How much time have you spent in January on
3    this litigation?
4            MS. O'DELL:  Just give your best
5    estimate, if you don't . . .
6        A.  20.  15 to 20.
7        Q.  (BY MR. JAMES)  Can you break that time
8    down for me, as far as what you've been doing during
9    the month of January?
10           Has it been preparing for the
11   deposition, reviewing --
12       A.  Yes.
13       Q.  -- articles?
14           I'm sorry.  I --
15       A.  Sorry.
16       Q.  -- didn't finish the question --
17       A.  I'm sorry.
18       Q.  -- so let me rephrase it.
19           Has all the time that you've spent in
20   January been preparing for the deposition?
21       A.  Yes.
22       Q.  For the total time that you've spent as
23   work for -- strike that.
24           For the total time you've spent

6 (Pages 18 to 21)

Ellen Blair Smith, M.D.

Page 22

1  working in this litigation as an expert, can you
2  give me a rough breakdown about the amount of time
3  you've spent reviewing literature, reviewing company
4  documents, and meeting with plaintiffs' counsel?
5      A.  The vast majority of time has -- can I do
6  it in percentages?
7      Q.  That'd -- that would be fine.
8      A.  Okay.  I would say 75 percent is reviewing
9  medical literature, 20 percent is meeting with --
10  maybe less than that.  15 percent is -- no.
11  20 percent is meeting with plaintiffs' attorneys,
12  and the remainder is reviewing other documents.
13      Q.  When you say "other documents," are you
14  referring to company docket -- company documents and
15  litigation materials you've been provided?
16      A.  Yes.
17      Q.  Have you discussed your involvement in
18  this litigation with any of the other experts for
19  the plaintiffs in the talc MDL?
20      A.  No.
21      Q.  And let me ask specifically about a few of
22  the experts, if I may.
23          Have you discussed this litigation at
24  all with Alan Campion?

Page 23

1      A.  In terms of, "What are you doing?"
2          "I'm reading articles," that kind of
3  discussion.
4          In terms of when he was going to --
5  certainly in terms of when he was going out of town
6  to do experiments, that kind of discussion.
7          But I did give him an article once
8  that I didn't understand some of the technology in
9  it.  And I asked him if he understood it, to read it
10  and see if he could explain to me, and he couldn't.
11  So I guess that's talking about too.
12      Q.  Do you recall the article in question?
13      A.  It was a lab study.  I think it was Lee.
14      Q.  Did you discuss any other studies with
15  Alan Campion?
16      A.  I don't believe so.
17      Q.  Have you discussed the substance of
18  Campion's opinions with him?
19      A.  No.
20      Q.  What is your relationship with Alan
21  Campion?
22      A.  He's my husband.
23      Q.  I understand.
24          Did Ms. Thompson first contact you or

Page 24

1  Mr. Campion about the litigation?
2      A.  Me.
3      Q.  And before you were retained as a
4  litigation, did Ms. -- Ms. Thompson share with you
5  any information about the litigation?
6          MS. O'DELL:  Object to the form.
7      A.  I'm not sure I understand that question.
8      Q.  (BY MR. JAMES)  What were the nature of
9  the discussions before you were retained in this
10  litigation with Ms. Thompson?
11      A.  She informed me that she was involved
12  in --
13          MS. O'DELL:  Let's stop you right
14  there.  Dr. Smith, in terms of -- should have been
15  quicker on my objection.
16          In terms of discussions with kind of
17  like Dr. Thompson, those are -- those discussions
18  are protected by the work prod- -- product
19  privilege, so I'm gonna instruct you not to answer
20  about any discussions that you had with the lawyers
21  for the plaintiffs.
22          MR. JAMES:  And that's -- just so I'm
23  clear, that's regardless of whether the discussions
24  were before she was retained or after she was

Page 25

1  retained?
2          MS. O'DELL:  I think, in terms of the
3  litigation when she billed for the time regarding
4  those discussions, those are privileged.  And -- and
5  I believe if you'll look at the invoices, Dr. Smith
6  has billed for all the time during which she's
7  discussed the litigation.
8      Q.  (BY MR. JAMES)  Did -- did you recommend
9  to Mrs. Thompson that she also reach out to your
10  husband?
11      A.  Yes.
12      Q.  And why did you do that?
13      A.  Leigh O'Dell said that --
14          THE WITNESS:  Oh, is that work
15  product?
16          MS. O'DELL:  It is, but you can --
17  just to the degree I -- I made a suggestion to you,
18  but don't go any further than that.  Go ahead.
19      A.  Yeah.  Leigh O'Dell told me that the
20  defense had recommended evaluation of particles by
21  Raman spectroscopy.
22          And I said, "Too bad we don't know
23  anybody who does that."
24          And Leigh and Dr. Thompson both said,

Ellen Blair Smith, M.D.

Page 26

1    "Yeah, it's too bad."
2          And I said, "My husband does that." I
3    thought they knew.
4          MS. O'DELL:  That's the extent of any
5    disclosure, again, of communications with counsel.
6          THE WITNESS:  Okay.
7    Q.  (BY MR. JAMES)  Did you refer Ms. Thompson
8    to any of the other experts who were working on the
9    MDL?
10   A.  I did not.
11   Q.  Do you understand that there are a number
12   of experts that are working on the MDL for the
13   plaintiffs that are located in Austin?
14   A.  I know of one -- oh, I guess two.  My
15   husband is one of them.
16   Q.  Other than your husband --
17   A.  Yeah.
18   Q.  -- do you know of any other experts who
19   are located in Austin?
20   A.  One, yes.
21   Q.  And who is that?
22   A.  Judy Wolf.
23   Q.  And do you know Dr. Wolf?
24   A.  Yes, I do.

Page 27

1    Q.  Do you know here -- did you know her
2    before this litigation?
3    A.  Oh, yes.
4    Q.  Did you refer Ms. Thompson to her for this
5    litigation?
6    A.  I did not.
7    Q.  Do you know if Ms. Thompson contacted you
8    or -- or Dr. Wolf first?
9    A.  I believe I was contacted first.
10   Q.  Have you had any discussions with Dr. Wolf
11   about this litigation?
12   A.  No.
13   Q.  Have you had discussions with any of the
14   other plaintiffs' experts about this litigation
15   besides Alan Campion?
16   A.  No.
17   Q.  Are you familiar with a
18   Dr. Clarke-Pearson?
19   A.  Very well.
20   Q.  Have you had any discussions with
21   Dr. Clarke-Pearson about the litigation?
22   A.  No.
23   Q.  Have you exchanged any e-mails with any of
24   the experts, including your husband about this

Page 28

1    litigation?
2    A.  No.
3    Q.  Have you exchanged any other writings or
4    written materials about this litigation with any of
5    the other experts in this litigation?
6    A.  No.
7    Q.  How long have you known Dr. Wolf, did you
8    say?
9    A.  Maybe 20 years.
10   Q.  Did you reach out to her and encourage her
11   involvement in litigation?
12   A.  I did not.
13   Q.  Did she reach out to you to encourage your
14   involvement --
15   A.  She did not.
16   Q.  -- in litigation?
17         THE COURT REPORTER:  Doctor, let him
18   finish his whole question, please.
19         THE WITNESS:  Yes, ma'am.  I'm sorry.
20   Q.  (BY MR. JAMES)  Have you ever authored any
21   publications concerning talc?
22   A.  No, sir.
23   Q.  Have you ever authored any publications
24   concerning talc and ovarian cancer?

Page 29

1    A.  No, sir.
2    Q.  Have you ever authored any publications
3    concerning asbestos?
4    A.  No, sir.
5    Q.  Have you ever published a talc or asbestos
6    or risk factors for ovarian cancer?
7    A.  No.
8    Q.  Have you ever conducted any studies that
9    pertain to the issues addressed in your report?
10         MS. O'DELL:  Object to the form.
11   A.  I am --
12         THE WITNESS:  Can I answer it?
13         MS. O'DELL:  Yes.
14   A.  I am --
15   Q.  (BY MR. JAMES)  May I just rephrase?
16   A.  Sure.
17   Q.  Have you ever conducted any studies
18   pertaining to the allegation that talc causes
19   ovarian cancer?
20   A.  No.
21   Q.  Do you -- are you working on any articles
22   that pertain to the issues in this litigation that
23   you consider works in progress?
24   A.  No.

8  (Pages 26 to 29)

Ellen Blair Smith, M.D.

Page 30

1    Q.  Do you have any plans to author or
2  contribute to any articles that pertain to the
3  issues in this litigation?
4    A.  No.
5    Q.  Have you submitted the substance or any --
6  any substance in your report to a journal for peer
7  review?
8    A.  No.
9    Q.  Have you made any internet postings, blog
10  postings, or other social media postings about the
11  issues in this litigation?
12    A.  No.
13    Q.  Have you ever given any presentations,
14  speeches, or lectures concerning talc and ovarian
15  cancer?
16    A.  No.
17    Q.  The same question for asbestos and ovarian
18  cancer.
19    A.  No.
20    Q.  Have you ever given any interviews or made
21  any public statements concerning talc?
22    A.  No.
23    Q.  Concerning talc or ovarian cancer?
24    A.  No.

Page 31

1    Q.  And concerning asbestos and ovarian
2  cancer?
3    A.  No.
4    Q.  Have you ever counseled patients on risk
5  factors for ovarian cancer?
6    A.  Yes.
7    Q.  What risk factors have you counseled your
8  patients on?
9    A.  Predominantly BRCA, Fanconi anemia pathway
10  risk factors.
11    Q.  And when you say "predominantly," are
12  there any other risk factors for ovarian cancer that
13  you've counseled your patients on?
14
15    Q.  Have you ever told a patient that talcum
16  powder products was the cause or were the cause of
17  their ovarian cancers?
18    A.  No.
19    Q.  Have you ever told a patient that talcum
20  powder products was likely the cause of their
21  ovarian cancer?
22    A.  No.
23    Q.  Have you ever asked any of your patients
24  about their usage of talcum powder products?

Page 32

1    A.  Not to my recall.
2    Q.  Have you ever asked your patients about
3  their usage of talcum powder products in taking
4  their medical histories?
5    A.  No.
6    Q.  And same question:  Have you asked -- it's
7  not the same question.  Let me strike that.
8      Have you ever asked your patients
9  about their exposure to asbestos in the course of
10  taking their medical histories?
11    A.  No.
12    Q.  Have you discussed the opinions that
13  you've rendered in your report concerning talc and
14  ovarian cancer with any of your patients?
15    A.  No.
16    Q.  And have you discussed with any of your
17  patients the opinions that you've rendered in your
18  report concerning asbestos or other alleged
19  constituents of talcum powder products?
20    A.  No.
21    Q.  Have you ever told any of your patients to
22  stop using talcum powder products?
23    A.  No.
24    Q.  Have you ever cautioned any of your

Page 33

1  patients about using talcum powder products?
2    A.  No.
3    Q.  Have you ever evaluated the personal risk
4  of a patient for developing ovarian cancer based
5  upon their history of usage of talcum powder
6  products?
7    A.  No.
8    Q.  Have you ever recommended risk-reducing
9  surgery on the basis of any of your patients' prior
10  usage of talcum powder products?
11    A.  No.
12    Q.  Are you aware of any physicians who
13  recommend risk-reducing surgery for patients with a
14  history of usage of talcum powder products?
15    A.  There is a published paper using use of
16  talcum powder as one of the risk factors for doing
17  oophorectomy and benign disease, but I didn't write
18  that paper.
19    Q.  Let me ask the question again.  Just make
20  sure I said it correctly.
21    A.  Okay.
22    Q.  Are you aware of any physicians that you
23  know that recommend risk-reducing surgery to
24  patients who have prior -- a history of usage of

Golkow Litigation Services - 877.370.DEPS

Ellen Blair Smith, M.D.

Page 34

1    talcum powder products?
2       A.  No.
3              MS. O'DELL:  Object to the form.  I
4    think the question, Mr. James, is just a little
5    unclear.  When you say "you know," are you talking
6    about know of, know personally --
7              MR. JAMES:  Sure.
8              MS. O'DELL:  -- in the community?  I
9    mean --
10             MR. JAMES:  Sure.  I'll rephrase.
11      Q.  (BY MR. JAMES)  Do you know any physicians
12   with whom you have a professional relationship who
13   recommend risk-reducing surgery for patients who
14   have a prior history of usage of talcum powder
15   products?
16      A.  No.
17      Q.  You mentioned a paper in the course of --
18   of this line of questioning.
19             Do you recall the name of the paper
20   that you're referring to?
21      A.  The first author, it starts with a V,
22   V-i-t.  And the third author is Cramer.  And it's
23   some --
24      Q.  Did you say V-i-d, Doctor?  I'm sorry.

Page 35

1       A.  V as in Valentine.  V- -- I can't spell
2    the name.  I can't remember the first name.
3              The third author is Daniel Cramer, and
4    it was published in 2011 or 2013, and it's -- it's a
5    paper about a risk scoring system to recommend
6    oophorectomy in women who are undergoing
7    hysterectomy, trying to establish their risk of
8    ovarian cancer.  One of such factors is talcum
9    powder use.
10      Q.  And do you recall if that paper recommends
11   that physicians recommend to their patients
12   risk-reducing surgery if they have prior history of
13   talcum powder product usage?
14      A.  That is not an exclusive factor in that
15   risk assessment system.
16      Q.  Are you aware of any medical or scientific
17   organization that has recommended risk-reducing
18   surgery for patients who report prior usage of
19   talcum powder products?
20             MS. O'DELL:  Object to the form.
21      A.  I am not.
22      Q.  (BY MR. JAMES)  Do you understand that
23   Dr. Cramer is a paid litigation expert for the
24   plaintiffs?

Page 36

1       A.  I understand that.
2       Q.  And Dr. Cramer is one of the authors that
3    you identified as an author on the paper that you
4    were just discussing, correct?
5       A.  Correct.
6       Q.  Have you ever recommended increased
7    screening or monitoring for your patients for
8    ovarian cancer based on their prior usage of talcum
9    powder products?
10      A.  No, I have not.
11      Q.  Are you aware of any physicians with whom
12   you have a professional relationship who do this?
13      A.  No.
14      Q.  Have you ever recommended to any doctors
15   that you know professionally to tell their patients
16   to stop using talcum powder products?
17      A.  Yes.
18      Q.  Okay.  Who is that?
19      A.  Which doctors I've recommended that to?
20      Q.  Yes, Doctor.
21      A.  Well, I didn't tell them to do it.  I told
22   them my concerns about talc, but I thought it was
23   implicit in expressing my concerns that they would
24   counsel their patients.  I didn't tell -- I didn't

Page 37

1    tell the doctors to do a lot of things.
2       Q.  Understood.
3       A.  Okay.
4       Q.  And can you identify any of the doctors
5    with whom you've had those conversations?
6       A.  Yes.
7       Q.  And please identify them.
8       A.  Karen Swenson, Michael Breen, Anna Lozano.
9       Q.  And are those physicians that you know
10   here in the Austin community?
11      A.  Yes.
12      Q.  Are there any other physicians with whom
13   you've discussed your concerns of talcum powder
14   products?
15      A.  Mark Crozier is a GYN, gynecologist, but
16   he's no longer practicing.  He's retired.
17      Q.  And do you know if the three physicians
18   that you've just identified do now indeed counsel
19   their patients about talcum powder products?
20      A.  I do not know.
21      Q.  Did you have those conversations with
22   those three physicians before your retention in the
23   litigation or after?
24      A.  After.

10 (Pages 34 to 37)

Ellen Blair Smith, M.D.

Page 38

1    Q.  Have you recommended to those three
2  physicians or any other physicians that they
3  recommend to their patients risk-reducing surgery if
4  they have prior usage of talcum powder products?
5    A.  No.
6    Q.  Have you suggested to those three
7  physicians or any other physicians that they follow
8  some sort of increased monitoring or screening of
9  patients based upon prior usage of talcum powder
10 products?
11   A.  No.
12   Q.  I'm going to hand you a copy of the
13 deposition notice, which is why we're all here
14 today.  And I'm gonna mark that as Exhibit Number 2.
15      (Deposition Exhibit 2 marked for
16       identification.)
17      MS. O'DELL:  Thanks, Scott.
18      MR. JAMES:  Yeah.
19      BY MS. O'DELL:  We previously served
20 objections, and I'll just -- to certain document
21 requests that are contained in the notice, and I
22 would just reassert those now for the record.
23      MR. JAMES:  Understood.
24   Q.  (BY MR. JAMES)  Dr. Smith, have you seen a

Page 39

1  copy of this deposition notice before?
2    A.  Yes.
3    Q.  And when were you pro- -- when were you
4  provided a copy?
5    A.  Saturday or Sunday -- this past Saturday
6  or Sunday.
7    Q.  And I understand that you and your counsel
8  have brought with you to today's deposition a number
9  of materials, correct?
10   A.  Correct.
11   Q.  And we've discussed and marked the
12 invoices already.  And so Ms. O'Dell is looking
13 toward a table with other materials that I'll
14 describe.
15      Are those the materials that you've
16 brought with you that respond to the deposition
17 notice?
18   A.  Yes, sir.
19   Q.  And Ms. O'Dell and I discussed prior to
20 the deposition, but the materials that you've
21 brought with your -- with you today to today's
22 deposition are your materials considered in your
23 references, correct?
24   A.  Correct.

Page 40

1    Q.  And you've also brought with you a
2  separate pile of -- a smaller set of studies or
3  literature that you have included some notes on,
4  correct?
5    A.  Correct.
6    Q.  And without getting up and moving around
7  right now, I would like to mark the subset pile as
8  Exhibit Number 3.
9      MR. JAMES:  Okay, Leigh?
10      MS. O'DELL:  Yeah.
11      (Deposition Exhibit 3 marked for
12       identification.)
13   Q.  (BY MR. JAMES)  And we'll apply the
14 sticker at the break.  Okay?
15      Dr. Smith, are there any other
16 materials that -- that you've brought with you today
17 that we have not discussed?
18   A.  No.
19   Q.  Are there any other materials that -- that
20 having looked back at this deposition notice today,
21 that you can think of that are responsive that you
22 have not brought with you?
23   A.  No.
24      MS. O'DELL:  I say that subject to the

Page 41

1  objections.
2      MR. JAMES:  Understood.
3    Q.  (BY MR. JAMES)  Okay.  I'm going to hand
4  you, Dr. Smith, what you have in front of you
5  already, and I'm going to mark as Exhibit Number 4 a
6  copy of the report that you authored in this
7  litigation.
8      (Deposition Exhibit 4 marked for
9       identification.)
10   Q.  (BY MR. JAMES)  And, Dr. Smith, I'm gonna
11 hand you the -- the stickered copy, but I understand
12 that you have an identical copy in front of you,
13 correct?
14   A.  Correct.
15   Q.  And if throughout the deposition today you
16 prefer to flip it in the loose-leaf binder, that's
17 fine as well.  Okay?
18   A.  Okay.  May I --
19      MS. O'DELL:  Just leave it there.
20   A.  May I point out a couple of corrections
21 for that, because I've only recently --
22      MS. O'DELL:  Dr. Smith, you certainly
23 may, but let him ask you the questions.
24   Q.  (BY MR. JAMES)  Yeah.  I'm actually going

11 (Pages 38 to 41)

Ellen Blair Smith, M.D.

Page 42

1    to ask you that question, so you'll have a chance
2    to.
3        A.  Okay.
4            MR. JAMES:  And if counsel, down the
5    line throughout the day, has any requests of copies
6    of anything I'm handing out, just let me know.  I
7    have some.
8        Q.  (BY MR. JAMES)  Okay.  Dr. Smith, you
9    would agree that the report that I've handed you and
10   marked as Exhibit Number 4 defines the scope of your
11   opinions in this litigation --
12       A.  Yes.
13       Q.  -- correct?
14           MS. O'DELL:  Object to the form.
15   Excuse me.  I was a little off the mark.
16           MR. JAMES:  Okay.
17       Q.  (BY MR. JAMES)  Dr. Smith, do you have any
18   changes to this report that you'd like to make
19   today?
20       A.  Yes.
21       Q.  And what are those changes?
22       A.  There is deficient of second parenthesis,
23   and I'm trying to figure out where it is in here.
24   Let me go to more substantive things.

Page 43

1            On page 7 where it says, "A Cancer
2    Genome," second paragraph.  Do you know where I am,
3    page 7, second paragraph?
4        Q.  Yes.  Yes, Doctor.
5        A.  It should be "The Cancer Genome Atlas,"
6    not "A Cancer Genome Atlas."
7            Do you want me to mark it on here?
8        Q.  It's fine.
9        A.  Okay.  And then on the chart labeled on
10   Exhibit B the single gene studies, on the second
11   page, the back page under Wu, 2015, the fourth
12   column, 1.56.
13           Are you with me?
14       Q.  Yes, Doctor.
15       A.  That 1.56 and 1.77 are inverted.  The 1.77
16   should go with Hispanics as is the confidence
17   intervals.  The 1.56 should go with
18   African-Americans, as does that conference
19   intervals, just a transposition.
20       Q.  Are there any other changes to the report
21   that you'd like to make today?
22       A.  Well, I haven't found the parentheses yet,
23   but you'll figure it out when you see it.
24       Q.  Okay.  Dr. Smith, did you write this

Page 44

1    report?
2        A.  I did.
3        Q.  Is all of the wording in this report your
4    wording?
5        A.  Yes.
6        Q.  Did you consult with Dr. Wolf in writing
7    your report?
8        A.  I did not.
9        Q.  Did you meet with Dr. Wolf in writing your
10   report?
11       A.  I did not.
12       Q.  I'm gonna mark as Exhibit Number 5 a copy
13   of Dr. Wolf's report in this litigation.
14           (Deposition Exhibit 5 marked for
15           identification.)
16       Q.  (BY MR. JAMES)  Dr. Smith, have you seen
17   this report before?
18       A.  No.
19           MR. JAMES:  I apologize to -- to
20   counsel and to you, Dr. Smith.  I have a bad back
21   which prevents me from leaning too --
22       A.  That's okay.
23       Q.  -- further -- too far forward.
24           Dr. Smith, at first I'd like you to

Page 45

1    pull out your report.
2        A.  Um-hum.
3        Q.  And I'd like you to turn to page 16 of
4    your report, please.
5        A.  (Complied.)  Um-hum.
6        Q.  And if you look down at the one, two,
7    three, fourth full paragraph.
8        A.  Um-hum.
9        Q.  Actually, it's the -- when I say "full,"
10   it's the third full paragraph.  It's the paragraph
11   that starts with "In my opinion."
12       A.  Um-hum.
13       Q.  Do you see that paragraph?
14       A.  Um-hum.
15       Q.  If you look at that last sentence of that
16   paragraph -- I'm gonna read and make sure I read it
17   correctly.
18           It says, quote, "All of the cohort
19   studies are limited by failure to obtain complete
20   information, lack of power, selection bias, and
21   short follow-up," close quotes.
22           Did I read that correctly?
23       A.  Yes.
24       Q.  And if you could turn, then, to Dr. Wolf's

12 (Pages 42 to 45)

Ellen Blair Smith, M.D.

Page 46

1   report, please.
2       A.  What page?
3       Q.  And I'm looking at page 8 of Dr. Wolf's
4   report.  And it's second full paragraph, so it's the
5   second section on that page.  I'm gonna quote a page
6   of Dr. Wolf's report here.
7       A.  (Complied.)  Um-hum.
8       Q.  Okay.  It's the sentence that starts with
9   the word "All."
10          Do you see where I am?
11      A.  Um-hum.
12      Q.  Okay.  It says, quote, "All of the cohort
13  study are limited by lack of power, failure to make
14  the appropriate queries, selection bias, and short
15  follow-up," close quote.
16      A.  Um-hum.
17      Q.  Do you see that section that I read?
18      A.  I do.
19      Q.  And did I read that correctly?
20      A.  You did.
21      Q.  Do you agree that those two sentences are
22  remarkably similar?
23      A.  They are similar.
24      Q.  And is your testimony that the wording in

Page 47

1   your report is purely your wording?
2       A.  It is.
3       Q.  All right.  If you could turn back to your
4   report, please, Dr. Smith, on page 16.
5       A.  (Complied.)  I'm on 16.  Okay.
6       Q.  Okay.  And if we look down, it's the --
7   it's the paragraph below the paragraph that we just
8   read.  It starts with the "When looking" phrase.
9          Do you see --
10      A.  Um-hum.
11      Q.  -- where I am?
12      A.  Um-hum.
13      Q.  Okay.  And if you look at that paragraph,
14  Dr. Smith, on page 16, that full paragraph.
15      A.  Um-hum.
16      Q.  If you could read that to yourself right
17  now, please.
18      A.  Okay.  (Examined exhibit.)
19      Q.  And it's the paragraph that starts with
20  the phrase "When looking at epidemiological
21  studies."
22      A.  Um-hum.
23      Q.  And have you had a chance to read that?
24      A.  I have.

Page 48

1       Q.  Okay.  And if you look at page -- if you
2   can turn to Dr. Wolf's report, please.
3       A.  Um-hum.
4       Q.  Okay.  If you turn to Dr. Wolf's report on
5   page 8 --
6       A.  Um-hum.
7       Q.  -- it's the bottom paragraph.
8       A.  (Complied.)
9       Q.  And Dr. Wolf starts a paragraph with the
10  same phraseology.  She says, quote, "When looking at
11  epidemiological studies."
12          Do you see where I'm reading?
13      A.  Um-hum.
14      Q.  And have you had a chance to review her
15  paragraph there?
16          MS. O'DELL:  Object to the form.
17      A.  (Examined exhibit.)  I do.
18      Q.  (BY MR. JAMES)  Okay.  Would you agree
19  that those two paragraphs are remarkably similar?
20      A.  I'm not --
21          MS. O'DELL:  Object to the form.
22      A.  -- quite through that.
23      Q.  (BY MR. JAMES)  Please take your time.
24  I'm sorry.

Page 49

1       A.  (Examined exhibit.)  They're similar.  I
2   think it's because we looked at the same data.
3       Q.  And, Dr. Smith, within that paragraph, I'm
4   gonna call your attention to two specific sentences.
5          So I'm looking back at your report,
6   Dr. Smith, and you say, quote -- in your report,
7   quote, "Recall and confounding bias in case-control
8   studies appear to have minimal impact."
9       A.  Um-hum.
10      Q.  "(Penninkilampi and Eslick 2018;" --
11      A.  Um-hum.
12      Q.  -- "Langseth 2008)."
13      A.  Um-hum.
14      Q.  "There appears to be no significant
15  publication bias."
16      A.  Um-hum.
17      Q.  "(Berge, 2017;" --
18      A.  Um-hum.
19      Q.  -- "Penninkilampi 2018)," close --
20      A.  Um-hum.
21      Q.  -- quote.
22          Did I read that correctly?
23      A.  You did.
24      Q.  And do you see that in Dr. Wolf's report

13 (Pages 46 to 49)

Ellen Blair Smith, M.D.

Page 50

1    she has those exact same sentences verbatim?
2        A.  Yes.
3        Q.  And, again, is your testimony that the
4    wording in this report is your wording?
5        A.  It is my wording.
6        Q.  Okay.  Dr. Smith, if you could look at
7    page 7 of your report.  If you look at the bottom
8    paragraph, about halfway down through that
9    paragraph, Dr. Smith, you state the following --
10       A.  Page 7?
11       Q.  Yes, Dr. Smith.
12       A.  Okay.
13       Q.  It's the last paragraph on that page,
14   right above the visuals.
15       A.  (Complied.)  Um-hum.
16       Q.  Do you see the sentence that starts with
17   the word "binding"?  "Binding of BCDX2 or CX3," it's
18   a Holliday Junction.
19            Do you see where I'm reading?
20       A.  Um-hum.
21       Q.  And if I kept rea- -- if I keep reading,
22   that sentence ends with a citation to the Compton
23   2010 study.
24            Do you see that?

Page 51

1        A.  Um-hum.
2        Q.  Is that wording in that sentence your
3    wording or is that quoted from the article?
4        A.  It's quoted from the article, I believe.
5    By -- that's why it's referenced.
6        Q.  Oh, understood.  Is that what you were
7    referring to earlier as something that was missing a
8    quote?
9        A.  No.  No, it's not a quo- -- I -- what I
10   was referring to is there's missing a back half of a
11   parenthesis in the text.
12       Q.  Do you agree that if you're quoting
13   verbatim from one of the sources that you cite that
14   you should include quotations in your report?
15            MS. O'DELL:  Object to the form.
16       A.  I'm not sure that's necessary in a
17   scientific paper.  I think the importance is it's
18   cited.
19       Q.  (BY MR. JAMES)  You submitted articles to
20   peer-reviewed journals before, correct?
21       A.  I have.
22       Q.  And your understanding is that if -- if
23   something is cited without quotes that's standard?
24            MS. O'DELL:  Object to the form.

Page 52

1        A.  I think it's allowable.
2        Q.  (BY MR. JAMES)  Are there any other
3    passages in your report that you can recall that you
4    would have written verbatim but not quoted?  Excuse
5    me, strike that.
6            Are there any other passages in your
7    report that you have cited to a source and included
8    text verbatim from that source --
9            MS. O'DELL:  Object to the form.
10       Q.  (BY MR. JAMES) -- that you did not put in
11   quotations?
12            MS. O'DELL:  Excuse me.  Object to the
13   form.
14       A.  I don't remember any.
15       Q.  (BY MR. JAMES)  Okay.  Dr. Smith, with
16   your expert report you produced a copy of your CV.
17       A.  Yes.
18       Q.  Correct?
19       A.  Yes.
20       Q.  Since providing your counsel with a copy
21   of the CV that was then provided to me, have there
22   been any changes to your CV?
23       A.  No.
24       Q.  I'm gonna mark the CV, then, that was

Page 53

1    produced to the defendants as Exhibit Number 6.
2            (Deposition Exhibit 6 marked for
3            identification.)
4        Q.  (BY MR. JAMES)  I'm gonna hand you a copy,
5    Dr. Smith.  Sorry again for the --
6        A.  That's okay.
7        Q.  -- throwing.
8            MS. O'DELL:  If you just hand them to
9    me, I'll be glad to hand them over.
10           MR. JAMES:  Thank you so much.
11       Q.  (BY MR. JAMES)  And, again, Dr. Smith,
12   this is your current CV that you're looking at, is
13   Exhibit Number 6?
14       A.  (Examined exhibit.)  Yes, it is.
15       Q.  Thank you.  Okay.
16           In your report, Dr. Smith, you
17   describe the methodology that you've conducted to
18   collect the materials that you reviewed, correct?
19       A.  Correct.
20       Q.  And I see you're still looking at your CV,
21   so I don't intend to rush you.
22       A.  That's okay.  It's fine.
23       Q.  And so I am -- I'm not gonna ask you any
24   further questions about the CV if you want to set

14  (Pages 50 to 53)

Ellen Blair Smith, M.D.

Page 54

1    that aside.
2        A. Oh, okay. (Complied.) Okay.
3        Q. I'm gonna turn to your report now.
4        A. Okay.
5            MS. O'DELL: Yeah, just -- we can
6    maybe stack -- thank you.
7        Q. (BY MR. JAMES) The searches that you ran
8    to capture the materials that you reviewed for
9    purposes of forming your litigation opinions, had
10   you run those searches before being retained as an
11   expert in this litigation?
12       A. No.
13       Q. Had you read any of the studies that you
14   cite in your report before being retained in the
15   litigation?
16       A. Yes.
17       Q. Is there a way for you to delineate which
18   studies that you reviewed before your retention and
19   which studies you reviewed after?
20       A. I know I'd seen Cramer 82.
21           Do you want me to go through my
22   references list and try to identify which one I've
23   seen before?
24       Q. Well, we understand that the reference

Page 55

1    list is -- is lengthy, correct?
2        A. It is.
3        Q. Do you think that you're looking for a
4    handful of articles or a larger set of articles that
5    you saw before your retention?
6        A. I would say it's larger than that on these
7    references, yes.
8        Q. Okay. And so rather than us take the time
9    to do that now, Dr. Smith, sitting here today, is
10   there any way for you to delineate or define which
11   ones you reviewed before being retained?
12       A. Do I --
13           MS. O'DELL: Object to the -- excuse
14   me. Object to the form.
15           I think she just -- she's willing to
16   do that, if you want her to go through the list,
17   but --
18       A. Or I can put a check on them, if you want.
19       Q. (BY MR. JAMES) Let's not do that right
20   now. How about that?
21       A. Okay.
22       Q. And then we'll think about how we approach
23   that.
24           Did plaintiffs' counsel provide you

Page 56

1    any of the studies that are listed in your
2    references or materials considered lists?
3        A. Yes.
4        Q. Is there any way for you to delineate
5    which studies were provided to you by plaintiffs'
6    counsel and which ones that you found on your own?
7        A. Frequently I would provide them an
8    abstract asking for full text, so that happened a
9    lot. There were some that they sent to me as these
10   studies were coming out in e-Pubs, e-publication,
11   prior to print publication. I could go through,
12   and, again, try to mark those.
13       Q. Would you have in your possession records
14   that would help you come up with a list of what was
15   provided to you versus what you found on your own?
16       A. No, but, like, I know that things that
17   came out in '17 and '18 usually they got before I
18   did.
19       Q. And those are the prepub versions you were
20   just mentioning?
21       A. Right. They usually weren't
22   prepublication. They were usually peer --
23       Q. You said e-Pub?
24       A. Yeah. e-Pub.

Page 57

1        Q. My apologies.
2        A. Yeah, that didn't have a citation, right.
3        Q. In your report under the Methodology
4    section, Dr. Smith, you say that you, "Began with a
5    comprehensive review of the medical literature," and
6    then you use the phraseology, "ON many topics."
7            Is that -- do you recall using that
8    phraseology? It's at page 2.
9            MS. O'DELL: Object to the form.
10       A. (Examined exhibit.) I'm looking for -- it
11   says --
12       Q. (BY MR. JAMES) It's the first sentence,
13   Doctor -- it's the second sentence, Dr. Smith.
14       A. Then I read many of the references of the
15   articles cited in those papers. I didn't see many
16   topics.
17       Q. Sure. So in the second sentence -- and
18   I -- my questioning is probably unnecessarily
19   confusing.
20           But in the second sentence under
21   Methodology, you say that you relied on PubMed
22   searches on many topics.
23           Do you see that?
24       A. Oh, that. Okay. Oh, that was the second

Ellen Blair Smith, M.D.

Page 58

1  sentence. Sorry, I was off by one. Yes.
2      Q.  And -- and then later on you just
3  mentioned, Dr. Smith, you note in this paragraph
4  that you also looked at the references of the
5  articles --
6      A.  Right.
7      Q.  -- and conducted some additional Google
8  searching, correct?
9      A.  Correct.
10         MS. O'DELL:  Object to the form.
11     Q.  (BY MR. JAMES)  When you refer to the
12  "many topics" there, can you define what many topics
13  you are referring to?
14     A.  Sometimes you find different -- when
15  you're using a search engine, even in PubMed, if you
16  put in -- put it in one way and it looks like talc
17  and ovarian cancer, then you put it in ovarian
18  cancer, and talc you may get differences on how you
19  go back.  Inflammation in carcinogenesis.  Then you
20  look at inflammation and ovarian cancer.
21         So just, if you word it differently,
22  you can pick up different references, and they come
23  out in different order sometimes.  So it's -- when
24  you're looking for everything, you need to, kind of,

Page 59

1  mix it up and say it different ways to try to find
2  all the articles.
3      Q.  For every topic that you looked at, did
4  you conduct a comprehensive review for the
5  underlying scientific and medical literature?
6      A.  Yes.
7      Q.  So every topic that you've addressed in
8  your paper was a critical component of your meth- --
9  methodology to conduct a comprehensive review and
10  capture all of the relevant and scientific -- the
11  relevant scientific and medical literature?
12     A.  That --
13         MS. O'DELL:  Object to the form.  Give
14  me --
15     A.  That was --
16         MS. O'DELL:  Excuse me.  Just give me
17  just a second, and I'll get my obj- -- object to
18  the form.  Thank you.
19     A.  That was my attempt.
20     Q.  (BY MR. JAMES)  Do you agree that prior to
21  offering expert opinions on particular topics an
22  expert should be expected to conduct a con- --
23  comprehensive review of the scientific and medical
24  literature on that topic?

Page 60

1         MS. O'DELL:  Object to the form.
2      A.  I would agree with that.
3      Q.  (BY MR. JAMES)  You agree that --
4         THE WITNESS:  Am I supposed to wait,
5  Laurel [sic]?
6         MS. O'DELL:  Just give me just a --
7  just a second.
8         THE WITNESS:  Okay.
9         MS. O'DELL:  I'll try to be quicker on
10  the draw.
11         THE WITNESS:  Okay.
12     Q.  (BY MR. JAMES)  Do you agree that doing
13  that is a fundamental first step to your
14  methodology?
15     A.  I do.
16     Q.  Would you agree that any opinion formed on
17  an incomplete review of the relevant scientific and
18  medical literature on a particular topic would be
19  unreliable?
20         MS. O'DELL:  Object to the form.
21     A.  Not necessarily.  Not necessarily.
22     Q.  (BY MR. JAMES)  And why do you say that?
23     A.  I mean, if you miss -- if a person misses
24  one article but has a substantial amount of the

Page 61

1  information required, they can reach the right
2  conclusion and have not read one article.
3      Q.  Then do you -- again, do you agree that
4  the methodology to opine on a particular topic
5  should start with the intent to capture the relevant
6  scientific and medical literature on that topic?
7         MS. O'DELL:  Object to the form.
8      A.  I agree.
9      Q.  (BY MR. JAMES)  Do you believe that you
10  conducted a comprehensive review in the manner that
11  we just described on the topic of heavy metals and
12  ovarian cancer?
13         MS. O'DELL:  Object to the form.
14     A.  No.
15     Q.  (BY MR. JAMES)  Do you believe that you
16  followed the methodology that we just described on
17  the topic of fragrances and ovarian cancer?
18         MS. O'DELL:  Object to the form.
19     A.  I read a limited amount of material on
20  fragrances.
21     Q.  (BY MR. JAMES)  And so my question
22  remains.
23         Do you agree -- or do you believe that
24  you followed the methodology that we just described

16 (Pages 58 to 61)

Ellen Blair Smith, M.D.

Page 62

1    in forming your opinions on fragrances and ovarian
2    cancer?
3        A.  No.
4            MS. O'DELL:  Object to the form.
5        Q.  (BY MR. JAMES)  Do you believe that you
6    followed the methodology that we just described in
7    forming your opinions on asbestos and ovarian
8    cancer?
9            MS. O'DELL:  Object to the form.
10       A.  Yes.
11       Q.  (BY MR. JAMES)  Do you believe that you
12   followed the methodology that we just described on
13   the issue of, quote, "fibrous talc," close quote,
14   and ovarian cancer?
15       A.  Yes.
16           MS. O'DELL:  Object to the form.
17           Give me just a second, Doctor.  Thank
18   you.
19       Q.  (BY MR. JAMES)  Dr. Smith, can you explain
20   to me the difference between the reference list
21   attached to your report and the -- what I refer to
22   as the materials considered list attached to your
23   report as part of Exhibit C?
24           Do you understand that there are two

Page 63

1    different lists?
2        A.  Yes, I do.
3        Q.  Okay.  Can you explain to me the
4    difference between those two lists, the significance
5    of why they're placed on one list versus the other?
6        A.  If I used a reference in my paper, it is
7    on my reference list.
8            The larger reference list, I believe,
9    is what's called a reliance list that aggregates all
10   the references that all the experts that are
11   involved in this litigation had as one master list
12   of reference for the whole litigation.
13           Does that make sense?
14       Q.  Was that a list that you created, the
15   materials considered list?
16       A.  The reliance list, the last one?
17       Q.  Yes, Doctor.
18       A.  I did not create that.
19       Q.  Did you review all of the sources listed
20   on that list?
21       A.  There are sources on there that I have not
22   reviewed.
23       Q.  Is there any way for you to delineate
24   which sources you reviewed on the -- what you're

Page 64

1    referring to as the reliance list and which sources
2    you did not review?
3        A.  I'd have to go through it one by one.  I'd
4    be glad to.
5        Q.  Yeah.  I think that we're time limited
6    today, so I ask that we not do that at this time.
7        A.  Okay.
8        Q.  Are there materials that you reviewed and
9    that you concluded were not relevant to your opinion
10   cited on the reliance list but not on the reference
11   list?
12           MS. O'DELL:  Objection to form.
13       A.  I think that -- so are we calling the
14   Exhibit C a reliance list --
15       Q.  (BY MR. JAMES)  I think, Doctor --
16       A.  -- and my --
17       Q.  I was trying to use your terminology, but
18   it's -- I'll just --
19       A.  Okay.
20       Q.  -- to be clearer, I'll ask the question
21   with Exhibit C.
22       A.  Okay.
23       Q.  Are there materials contained on Exhibit C
24   that you reviewed but did not cite to or discuss in

Page 65

1    the text of your report?
2            MS. O'DELL:  If you understand the
3    question, Doctor.  If you're confused about the
4    question, then I'm sure counsel will be glad to
5    rephrase it.  Because with the terminology, this is
6    getting -- it is a little confusing.
7        A.  Could you clarify that --
8        Q.  (BY MR. JAMES)  Sure.  I'll try to.
9        A.  -- because I am a little confused.
10       Q.  I'll try.
11       A.  I'm sorry.
12       Q.  That's okay.
13           Did you review materials cited on the
14   Exhibit C that you concluded were not relevant to
15   your opinions?
16       A.  I can't recall anything.
17       Q.  In your report, you make reference to
18   looking at company documents, correct?
19       A.  Correct.
20       Q.  Did you affirmatively request those
21   company documents or were those provided to you by
22   counsel without you requesting those?
23       A.  Those were provided to me without request.
24       Q.  Did counsel -- sitting here today, do you

17 (Pages 62 to 65)

Ellen Blair Smith, M.D.

| Page 66 | Page 68 |

Page 66

1  recall the information or subject matter of the
2  company documents that you reviewed?
3       A.  Ummm . . .
4           MS. O'DELL:  Object to the form.
5           If there's any confusion in the
6  question, Doctor, just ask him to rephrase it.  But
7  if you understand the question, feel free to answer.
8       A.  I believe that the -- there was a
9  newspaper article about condoms and exclusion of
10 talc products with condoms, that was a company
11 document that I saw.
12      Q.  (BY MR. JAMES)  Did the company documents
13 that you were provided by counsel inform your
14 opinions in this case?
15      A.  No -- well . . .  No.
16      Q.  When counsel provided you the company
17 documents to review, did you ask for any additional
18 company documents?
19      A.  No.
20      Q.  Did you ask for context to those company
21 documents?
22          MS. O'DELL:  Object- -- objection to
23 form of the question.
24          You -- don't reveal any communications

Page 67

1  you've had with counsel about company documents, or
2  any other thing, for that matter --
3          THE WITNESS:  Okay.
4          MS. O'DELL:  -- but in regard to this
5  topic.
6          MR. JAMES:  Well, I'm just asking what
7  she's asked to see.  So --
8          THE WITNESS:  I haven't asked to --
9          MR. JAMES:  -- I'm asking --
10         THE WITNESS:  -- see anything.
11         MR. JAMES:  Well, I'm sorry,
12 Dr. Smith.
13         THE WITNESS:  Sorry.
14         MR. JAMES:  So if you feel like
15 there's a way to rephrase my question, that's what
16 I'm trying to get at.
17         MS. O'DELL:  I think you asked -- I
18 heard you ask a different question than asked --
19         MR. JAMES:  Okay.  Let me try again.
20         MS. O'DELL:  -- than that.  So just --
21 if you don't mind, rephrase it.
22         MR. JAMES:  Understood.
23      Q.  (BY MR. JAMES)  After you were provided
24 the company documents, did you ask if there were any

Page 68

1  additional documents that would provide context to
2  the documents that you were initially provided?
3       A.  I --
4           MS. O'DELL:  Object to the form.
5       A.  I don't believe so.
6       Q.  (BY MR. JAMES)  Did you ask if any defense
7  witness had ever authored any testimony about the
8  company documents you were provided?
9           MS. O'DELL:  Excuse me, Doctor.  Don't
10 testify to any communications with counsel.
11          So if you -- you can ask her, did she
12 ask a question.  She can say yes.  But in terms of
13 the subject matter of the question, the content of
14 that conversation, I'm gonna object and just
15 instruct the witness not to answer.
16          Is that -- is that a
17 fair distinction --
18          MR. JAMES:  But you're allowing the
19 witness to answer whether she asked for it, correct?
20          MS. O'DELL:  I think I -- you asked
21 that question and I allowed it.
22          MR. JAMES:  Got it.
23          MS. O'DELL:  But to the degree you've
24 asked for what her questions were, what the

Page 69

1  discussion was, I think that is protected.
2           MR. JAMES:  Got it.
3       Q.  (BY MR. JAMES)  So did you ask for any --
4  once you were provided the company documents that
5  you were provided by counsel, did you ask whether
6  the defense had ever offered any testimony or
7  witnesses about the contents of those documents?
8           MS. O'DELL:  Excuse me, Doctor.  Don't
9  answer that question.
10          That's the subject matter of the
11 communication, and I'm not gonna allow her to answer
12 those questions.
13          So don't answer the question.
14      Q.  (BY MR. JAMES)  Do you know if any defense
15 witness has ever addressed the content of the
16 company documents that you were provided by counsel?
17          MS. O'DELL:  Object to the form.
18      A.  I don't know that.
19      Q.  (BY MR. JAMES)  You would agree with me
20 that if you were attempting as a scientist to form
21 opinions on a particular topic you would want to be
22 sure that you were provided both sides of the story,
23 correct?
24          MS. O'DELL:  Object to the form.

18 (Pages 66 to 69)

Ellen Blair Smith, M.D.

Page 70

1      You may answer the question if you
2   understand it, Doctor.
3      A.  I think the scientific literature presents
4   both sides of the story.  That's how you factor it
5   in, right?  You usually don't call up individuals
6   and ask them their opinion.  Their published,
7   peer-reviewed opinions are available in the
8   literature.
9      Q.  (BY MR. JAMES)  Dr. Smith, in your report
10  in discussing asbestos, you mentioned litigation
11  reports authored by a Dr. Longo, correct?
12     A.  Yes.
13     Q.  Okay.  So we were just talking about
14  company documents --
15     A.  But now --
16     Q.  -- in the -- prior to the questioning, and
17  I want to just make sure you know where I'm going.
18     You testified that the company
19  documents did not inform your opinions, correct?
20     MS. O'DELL:  Object to the form.
21     A.  Yes.  Perhaps you and I are talking about
22  different things between company documents and
23  litigation documents.
24     Q.  (BY MR. JAMES)  Sure.  And I think -- fair

Page 71

1   enough.
2      Let's just move on to the Longo
3   requesting.
4      A.  Okay.
5      Q.  And with respect to asbestos, you looked
6   at Longo litigation reports, correct?
7      A.  I did.
8      Q.  You understand those to be litigation
9   materials, correct?
10     A.  Yes.
11     MS. O'DELL:  Object to the form.
12     Q.  (BY MR. JAMES)  Do you understand Longo --
13  Dr. Longo is a paid litigation expert, correct?
14     A.  Yes.
15     Q.  And you understand his reports are not
16  peer-reviewed, correct?
17     MS. O'DELL:  Object to the form.
18     A.  Yes.
19     Q.  (BY MR. JAMES)  You understand that
20  they're not published, correct?
21     A.  Yes.
22     Q.  Do you know if anyone on the defense side
23  has addressed or responded to Dr. Longo's litigation
24  reports?

Page 72

1      A.  I do not know that.
2      Q.  And wouldn't you want to know that as a
3   scientist before forming opinions upon Dr. Longo's
4   reports?
5      MS. O'DELL:  Object to the form.
6      A.  I would be interested in that.
7      Q.  (BY MR. JAMES)  And counsel didn't provide
8   that information to you, did they?
9      A.  They did not.
10     MS. O'DELL:  I would just object to
11  the statement that somehow that question assumes,
12  Counsel, that defense -- defendants in this case
13  have served expert reports, which they have not.
14  It's a little misleading, but . . .
15     Q.  (BY MR. JAMES)  You were looking at
16  Dr. Longo's litigation reports from other cases.
17     Did you know that?
18     MS. O'DELL:  Dr. Smith is not involved
19  in other cases, so I'm not sure she would have
20  information to know what's another case or what the
21  present case.  So to be fair --
22     MR. JAMES:  Leigh, I've asked a fair
23  question, and I think Dr. Smith is capable of
24  answering it.

Page 73

1      MS. O'DELL:  I'm not sure that that's
2   a fair question.
3      If you understand it --
4      MR. JAMES:  Well, why don't you please
5   state your objection and then let Dr. Smith answer,
6   if you can.
7      MS. O'DELL:  Object to the form.
8      MR. JAMES:  Thank you.
9      A.  Could you say it again?  I got lost.
10     Q.  (BY MR. JAMES)  Sure.  You've already
11  agreed with me that the Longo reports that you've
12  reviewed are litigation reports, correct?
13     A.  Right.
14     Q.  Okay.  And your counsel just stated that
15  the Longo litigation reports were not part of the
16  MDL litigation.
17     MS. O'DELL:  That's not what I said.
18     MR. JAMES:  Okay.
19     Q.  (BY MR. JAMES)  Nevertheless, you have
20  reviewed litigation reports from plaintiffs -- an
21  expert that's paid by plaintiffs in this litigation,
22  correct?
23     A.  I have.
24     Q.  You have also reviewed a litigation report

19 (Pages 70 to 73)

Ellen Blair Smith, M.D.

Page 74

1  prepared by a Dr. Crowley, correct?
2      A.  Correct.
3      Q.  And that pertains to fragrances, correct?
4      A.  Correct.
5      Q.  You understand Dr. Crowley's report is not
6  peer-reviewed, correct?
7      A.  Correct.
8      Q.  You understand his report is not published
9  in the medical literature, correct?
10     A.  Correct.
11     Q.  Did you review any of the other expert
12 reports besides Dr. Crowley's report in this MDL?
13         MS. O'DELL:  In addition to Dr. Longo.
14         MR. JAMES:  Thank you.
15     Q.  (BY MR. JAMES)  In addition to Dr. Longo?
16     A.  I don't think so.
17         MS. O'DELL:  Hey, Scott, we've been
18 going about an hour and 15 minutes or something
19 close to that, hour and 10 minutes.  Whenever it's a
20 good place --
21         MR. JAMES:  Another 5 to finish this
22 line.
23         Is that good, Doctor?
24         THE WITNESS:  Sure.

Page 75

1          MR. JAMES:  Okay.
2      Q.  (BY MR. JAMES)  Dr. Smith, you also looked
3  at -- or at least you listed, in your lists, you
4  looked at the deposition of a Dr. Alice Blount,
5  correct?
6      A.  Oh, yes.
7      Q.  Okay.  Does that ring a bell?
8      A.  Yes.  But is she involved in this
9  litigation?
10     Q.  That was gonna be my question to you.
11         Did you know that Dr. Blount has
12 testified as an expert for plaintiffs in the talc
13 litigation?
14     A.  In --
15         MS. O'DELL:  Excuse me.  Object to the
16 form.
17     A.  In this MDL?
18     Q.  (BY MR. JAMES)  In the talc litigation --
19     A.  Oh, in the talc litigation, yes.
20         MS. O'DELL:  Object to the form.  I
21 think it's a mischaracterization to say she's an
22 expert, to my knowledge.
23         So you want to restate your question.
24     Q.  (BY MR. JAMES)  Do you know that

Page 76

1  Dr. Blount has been listed by plaintiffs in talc
2  litigation as an expert for plaintiffs?
3          MS. O'DELL:  Object to the form;
4  misstates the testimony, as I understand it.
5      A.  I know she's been deposed.
6      Q.  (BY MR. JAMES)  Did you review her
7  testimony in full?
8      A.  I -- I reviewed her paper, and I read her
9  testimony fairly superficially.
10     Q.  Do you know if the defense in the talc
11 litigation has responded to or addressed
12 Dr. Blount's testimony and article?
13     A.  I do not know that.
14     Q.  Wouldn't you like to know that?
15         MS. O'DELL:  Object to the form.
16     A.  Sure.
17     Q.  (BY MR. JAMES)  Is there a reason that you
18 didn't consider the defenses' response to
19 Dr. Blount's testimony and article?
20         MS. O'DELL:  Object to the form of the
21 question.
22         There have been no expert reports
23 in -- by -- served by defendants in the MDL.  That's
24 an unfair question.

Page 77

1      A.  I'm lost again.  I'm sorry.
2      Q.  (BY MR. JAMES)  Sure.  I understand.
3          You read Dr. Blount's testimony
4  superficially is what you just testified to,
5  correct?
6      A.  Yes.
7      Q.  You understand Dr. Blount testified in
8  another case in the talc litigation, correct?
9      A.  Yes.
10     Q.  Do you know if the defendants responded to
11 Dr. Blount's testimony and report in that case?
12     A.  I do not know that.
13     Q.  You've cited in your report a deposition
14 exhibit from a Dr. John Hopkins.
15         Does that ring a bell?
16     A.  It does.
17     Q.  Okay.  And you also cited a deposition
18 exhibit from a Julie Pier.
19         Does that ring a bell?
20     A.  It does.
21     Q.  And why did you look at those two
22 exhibits?
23     A.  I looked at the identification in Pier on
24 minerals and quantities, parts per million.

20  (Pages 74 to 77)

Ellen Blair Smith, M.D.

Page 78

1    I looked at the Hopkins', the
2    identification of asbestos and asbestiform species
3    in various ore and talcum powder products.
4        Q.   Did you consider both of those exhibits
5    relevant to the opinions that you formed concerning
6    asbestos and ovarian cancer?
7        A.   Yes.
8        Q.   Did you -- do you know if the defense has
9    addressed or responded to the information contained
10   in those two deposition exhibits?
11       A.   I --
12           MS. O'DELL:  Object to the form.
13       A.   I do not know.
14       Q.   (BY MR. JAMES)  Did you ask if the
15   defendants have responded to the information
16   contained in those exhibits?
17           MS. O'DELL:  Object to the form.
18       A.   I did --
19           MS. O'DELL:  And I -- excuse me.  And
20   I would instruct you just-- he's asking you about
21   what you talked about with your lawyers for the
22   plaintiffs, and I would just instruct you not to
23   answer that question, as I've instructed you on
24   every other line of inquiry to that extent.

Page 79

1            I instructed her not to answer that.
2        A.   I'm --
3            MR. JAMES:  Understood.
4        A.   -- not responding.
5        Q.   (BY MR. JAMES)  Yeah, understood.
6            Would you like to know if the
7    defendants have responded to the information
8    contained in the two deposition exhibits that you
9    cited?
10       A.   Yes, I would.
11           MR. JAMES:  Is now good for a break?
12           MS. O'DELL:  Sure.
13           MR. JAMES:  Okay.
14           Thank you, Doctor.
15           THE VIDEOGRAPHER:  Going off the
16   record.  The time is 10:34 a.m.
17           (A recess was taken from 10:34 a.m.
18           to 10:53 a.m.)
19           THE VIDEOGRAPHER:  Back on the record.
20   The time is 10:53 a.m.
21       Q.   (BY MR. JAMES)  Okay.  Dr. Smith, are we
22   ready to proceed?
23       A.   I am.
24       Q.   Great.

Page 80

1        Dr. Smith, did you do any independent
2    testing to support your opinions in this case?
3        A.   I did not.
4        Q.   Did you do any independent analysis or
5    reanalysis of raw data to support your opinions?
6        A.   I did not.
7        Q.   On page 2 of your report, Dr. Smith, you
8    conclude with a passage where you state that you
9    have applied in this litigation, quote, "The same
10   methodology and scientific rigor that I have used
11   regularly in my professional career and clinical
12   practice," closed quote.
13           Do you see that passage that I read?
14       A.   Oh, yes.  In the -- under Methodology?
15       Q.   Yes, Doctor.
16       A.   Yes.
17       Q.   Did you see where I read?
18       A.   Yes.
19       Q.   Okay.
20       A.   Yes.
21       Q.   In your professional practice and your
22   clinical practice, do you rely on litigation reports
23   by paid experts?
24           MS. O'DELL:  Object to the form.

Page 81

1        A.   No.
2        Q.   (BY MR. JAMES)  Do you rely on unpublished
3    data or unpublished testing as a clinician?
4            MS. O'DELL:  Object to the form.
5        A.   Occasionally, there is unpublished data
6    that you may cite information from an author for the
7    things that weren't in publication material.
8    That -- that happens commonly with a lot of
9    scientific reports.
10       Q.   (BY MR. JAMES)  As a clinician, have you
11   ever relied on the type of litigation materials that
12   you have reviewed in your capacity as an expert in
13   this case?
14           MS. O'DELL:  Object to the form;
15   vague.
16       A.   I don't think so.
17       Q.   (BY MR. JAMES)  As a clinician, in your
18   daily practice or your professional practice, have
19   you ever relied on deposition testimony of paid
20   experts to form your opinions?
21           MS. O'DELL:  Object to the form.
22       A.   No.
23       Q.   (BY MR. JAMES)  Before being contacted by
24   counsel in this case, had you formed an opinion as

21 (Pages 78 to 81)

Ellen Blair Smith, M.D.

Page 82

1    to any cause of ovarian cancer?
2        A.   (No response.)
3        Q.   And let me rephrase that --
4        A.   Yes.
5        Q.   -- because it's prob- -- it's phrased
6    poorly.
7             Before being contacted about work in
8    this litigation, had you reached the conclusion that
9    there were any causes of ovarian cancer?
10       A.   Yes.
11       Q.   And what had you concluded before being
12   contacted in the litigation about causes of ovarian
13   cancer?
14       A.   Well, I'm not sure that I
15   understand how -- what do you mean "cause"?
16       Q.   You understand that in the epidemiologic
17   literature, the word "association" is used, correct?
18       A.   Yes.
19       Q.   And the word "cause" is used, correct?
20       A.   Correct.
21       Q.   In your clinical practice, if someone
22   asked you what caused their ovarian cancer, would
23   you know what they were asking you?
24       A.   Yes.

Page 83

1        Q.   By the word "cause"?
2        A.   Yes.
3        Q.   And so I don't mean for my question to be
4    confusing.  I'm -- what I'm asking you is if --
5    certainly in this litigation, you have offered the
6    opinion in your report that in your opinion talc
7    causes ovarian cancer, correct?
8        A.   Correct.
9        Q.   Did you form that opinion, that causation
10   opinion, after being retained in this litigation?
11       A.   After reviewing the literature.
12       Q.   And after being retained; is that right?
13       A.   Correct.
14       Q.   And so my question to you, which I hope is
15   simple, is that before you were contacted about work
16   in this litigation, had you concluded that there was
17   anything else out there that could be categorized as
18   a cause of ovarian cancer?
19       A.   Are you -- causation such as genetic
20   predisposition?
21       Q.   That would be one of them.
22       A.   Okay.  Yeah.  Then we're on the same page.
23       Q.   Okay.  And so had -- had you concluded
24   before your work in this litigation that genetics,

Page 84

1    loosely, could -- could be categorized as a cause of
2    ovarian cancer?
3        A.   Yes.
4        Q.   Is there anything else that you had
5    concluded before your work in this litigation that
6    could be categorized as a cause of ovarian cancer?
7        A.   Yes.
8        Q.   What else?
9        A.   Endometriosis.
10           Do you want more?
11       Q.   Yes.  If you could list any others.
12       A.   Nulliparity, some data on obesity, mixed
13   data on pelvic inflammatory disease, mixed data on
14   smoking.  That's what has come to the top of my
15   head.
16       Q.   And just to make sure that we're on the
17   same page, my question at this point is still
18   confined to the issue of cause.
19           And so of the items that you just
20   mentioned before being retained in this litigation,
21   had you concluded that obesity is a cause of ovarian
22   cancer?
23           MS. O'DELL:  Object to the form.
24       A.   Mixed data on that.  More pertaining to

Page 85

1    endometrioid cancers.
2        Q.   (BY MR. JAMES)  So you would -- did you
3    hold the opinion before your work in this litigation
4    that obesity was a cause of ovarian cancer?
5            MS. O'DELL:  Object to the form.
6        A.   Partially.
7        Q.   (BY MR. JAMES)  And when you say
8    "partially," are you referring to the subtype?
9        A.   Yes.
10       Q.   And so of the i- -- the items that you did
11   just mention to me, then, you do consider those to
12   be -- you did consider those to be causes of ovarian
13   cancer before your work in this litigation; is that
14   correct?
15       A.   Correct.
16       Q.   When you reached those causation
17   conclusions, did you do so based upon the body of
18   scientific and medical literature?
19       A.   Yes.
20           MS. O'DELL:  Object to the form.
21       Q.   (BY MR. JAMES)  Did you reach those
22   conclusions in the context of litigation?
23       A.   No.
24       Q.   Did you reach those causation conclusions

22 (Pages 82 to 85)

Ellen Blair Smith, M.D.

Page 86

1    after talking with plaintiffs' counsel?
2              MS. O'DELL:  Object to the form.
3        A.  No.
4        Q.  (BY MR. JAMES)  Did you reach those
5    causation conclusions after being provided materials
6    selected for your review by counsel?
7              MS. O'DELL:  Object to the form.
8        A.  (Examined realtime screen.)  No.
9        Q.  (BY MR. JAMES)  Did you reach those
10   causation conclusions by reviewing unpublished
11   litigation reports?
12             MS. O'DELL:  Object to the form.
13       A.  No.
14       Q.  (BY MR. JAMES)  Did you reach those
15   causation conclusions by reviewing company
16   documents?
17             MS. O'DELL:  Object to the form.
18       A.  No.
19       Q.  (BY MR. JAMES)  What conclusions did you
20   have, if any, before your work in this litigation on
21   the talc ovarian cancer hypothesis?
22             MS. O'DELL:  Object to the form.
23             Would you -- would you -- could you
24   just -- I was just reading your question, Scott.

Page 87

1        Is that right?
2              MR. JAMES:  What conclusions.
3              MS. O'DELL:  Okay.  Sorry.
4        A.  I was concerned about talc products being
5    transported through the female genital tract because
6    of findings in the '70s of talc deeply embedded in
7    ovarian tissue.
8              J. Don Woodruff was one of my mentors,
9    and he shared this information with me in 1979; and
10   I found it concerning.  He went on or was in the
11   position at that time of postulating talc -- talcum
12   powder as an etiologic factor in the development of
13   ovarian cancer.  This is well before the publication
14   of the epidemiologic studies, and I registered his
15   concerns in my brain.
16       Q.  (BY MR. JAMES)  And with that statement,
17   then, are you indicating that those concerns -- you
18   did not express those concerns to anyone else,
19   correct?
20             MS. O'DELL:  Object to the form.
21   Misstates her testimony, but go ahead.
22             MR. JAMES:  I don't want to do that,
23   so let me start over.
24       A.  Okay.

Page 88

1        Q.  (BY MR. JAMES)  When you said you
2    registered those concerns in your brain, what do you
3    mean by that?
4        A.  I never used talcum powder products on my
5    female children, and I don't have any male children,
6    so that's pretty much -- and I didn't use talcum
7    powder products on myself, and I felt strongly about
8    that.
9        Q.  And what time frame was that?
10       A.  Well, I heard from him in 1979 in my first
11   trial, and I didn't use talcum powder from 1979 to
12   1992 when my first daughter was born, nor did I use
13   it in 1994 for diapering my second daughter; and we
14   just didn't have powder in my home.
15       Q.  Did you express those concerns in writing
16   anywhere?
17       A.  No.
18       Q.  We discussed this already this morning,
19   but did you express those concerns to any of the
20   patients that you treated?
21       A.  No.
22       Q.  Same line of questions but with respect to
23   asbestos.  Okay?
24             Did you conclude before -- what --

Page 89

1    what conclusions had you come to, if any, before
2    your work in this litigation about a relationship
3    between asbestos and ovarian cancer?
4        A.  Prior to my work in this litigation, I did
5    not have an awareness of the relationship of
6    asbestos to ovarian cancer.
7        Q.  Is that an opinion, then, that you've
8    formed in the context of litigation?
9              MS. O'DELL:  Object to the form.
10       A.  After my review of the scientific data,
11   yes.
12       Q.  (BY MR. JAMES)  And to be clear and to
13   respond to the objection, the question I'm asking
14   is:  Did you reach the opinion about the
15   relationship between asbestos and ovarian cancer in
16   the context of this litigation?
17       A.  I think it's unfair to say "context of
18   litigation."  I would have -- had I reviewed all
19   that literature, I would have reached that
20   conclusion whether or not this litigation was
21   ongoing or not.
22       Q.  If you don't like the word "context," I
23   can rephrase.
24             Did you reach the asbestos conclusions

23 (Pages 86 to 89)

Ellen Blair Smith, M.D.

Page 90

1    that you've rendered in your report after being
2    retained in this litigation?
3        A.  Yes, correct.
4        Q.  On that note, Dr. Smith, let's look at
5    page 21 of your report, please.
6        A.  (Complied.) Excuse me.
7        Q.  And you see at the bottom of page 21,
8    Dr. Smith, you have a section that's labeled
9    "Summary of my opinions."
10           Do you see where I am?
11       A.  Yes, sir.
12       Q.  And Item Number 1 is the opinion that you
13   hold today that talc causes ovarian cancer, correct?
14       A.  Correct.
15       Q.  And we've discussed this already, but that
16   is an opinion that you've formed after being
17   retained in the litigation, correct?
18       A.  Correct.
19       Q.  With respect to Item Number 2, you have
20   opined that "There is credible evidence that
21   Johnson and Johnson baby powder products contain
22   asbestos."
23           Do you see where I read?
24       A.  I do.

Page 91

1        Q.  Is that an opinion that you formed after
2    your retention in this litigation?
3        A.  Correct.
4        Q.  Then you have the opinion that asbestos
5    and fibrous talc cause ovarian cancer.
6           Again, those are opinions that you've
7    formed after being retained in the litigation,
8    correct?
9        A.  Correct.
10       Q.  And then continuing on to Number 2, the
11   opinion that you've formed concerning heavy metals,
12   is that an opinion that you formed after being
13   retained in this litigation?
14       A.  Correct.
15       Q.  With respect to -- and the same is true
16   with fragrances, is that an opinion that you formed
17   after being retained in the litigation?
18       A.  Correct.
19       Q.  And Item Number 3, you express opinions
20   concerning inflammation.
21           Is that a fair paraphrasing of
22   Number 3?
23       MS. O'DELL:  Objection to form.
24       A.  I don't think those are opinions.  I think

Page 92

1    those are facts.  Those are scientific facts.
2    They've been demonstrated in the laboratory.
3        Q.  (BY MR. JAMES)  You understand that you
4    have been retained to offer your scientific opinions
5    in this litigation, right?
6        A.  Yes.  Yes.
7        Q.  And so Number 3, do you hold the opinion
8    that you've expressed in Number 3?
9        A.  Yes.
10       Q.  Is that an opinion that you've formed
11   after being retained in the litigation?
12       A.  Yes.
13       Q.  And Number 4, do you see where I am still?
14       A.  I do.
15       Q.  Okay.  And Number 4 is an opinion
16   concerning migration and also an opinion concerning
17   inhalation, correct?
18       A.  Yes.
19       Q.  Are those opinions that you've formed
20   after being retained in this litigation?
21       A.  Correct.
22       Q.  Turning to the opinion that you have
23   expressed that there is, quote, "credible evidence,"
24   close quote, that Johnson's Baby Powder products

Page 93

1    contain asbestos, what is the credible evidence that
2    you rely upon?
3        A.  The paper of Blount in 1991 and the report
4    of Dr. Longo and the other doctor with him whose
5    name I forgot.  It starts with an R, I think.
6        MS. O'DELL:  I think you mean Rigler.
7        THE WITNESS:  That's it.  Starts with
8    an R.
9        Q.  (BY MR. JAMES)  Are those the litigation
10   reports in litigation testimony that we previously
11   discussed?
12       A.  Yes, sir.
13       Q.  Is there any other evidence that you
14   consider -- that you have considered that supports
15   your opinion that there's, quote, "credible
16   evidence" of asbestos in those products?
17       MS. O'DELL:  Object to the form.
18       A.  I can't remember any other evidence or
19   references.
20       Q.  (BY MR. JAMES)  You cite some articles on
21   page 18 of your report?
22       A.  Oh, yes.
23       Q.  Do you see where I am, Doctor?
24       A.  Yes.

24 (Pages 90 to 93)

Ellen Blair Smith, M.D.

Page 94

1    Q. And you cite a number of articles there.
2        Do you see where I'm looking in the
3    first paragraph?
4    A. (Examined exhibit.) Yes.
5    Q. Okay. In that -- the first paragraph in
6    that section?
7    A. Yes.
8        MS. O'DELL: And we're -- just for
9    purposes, we're at page 18?
10        MR. JAMES: Correct.
11        THE WITNESS: Yeah. We're talking
12    about the first sentence.
13        MS. O'DELL: Okay.
14    Q. (BY MR. JAMES) How did you obtain those
15    articles?
16    A. Those articles were provided for me as
17    reference materials by the plaintiffs' attorneys.
18    Q. Do any of those articles pertain to
19    Johnson & Johnson products?
20    A. Blount disclosed in her deposition that it
21    was Johnson & Johnson Baby Powder.
22    Q. And I'm -- just to be clear, I'm asking
23    about the articles that you've cited in the first
24    paragraph in the asbestos section on page 18.

Page 95

1    A. Blount's one of those articles -- well,
2    her article -- the deposition is not the paper.
3    You're right. No, that's fine.
4    Q. No, that's fine.
5    A. I don't know that any of those were
6    Johnson & Johnson Baby Powder.
7        MS. O'DELL: Just to be -- if you're
8    referring to -- when you say "those," it's not clear
9    on the record, so if there's something specific --
10    you don't have to go back, but just be -- be
11    cognizant of that.
12    Q. (BY MR. JAMES) What level of review did
13    you undertake to collect literature on the topic of
14    the alleged presence of asbestos in talcum powder
15    products?
16        MS. O'DELL: Object to the form.
17    A. (Examined exhibit.)
18        MS. O'DELL: If you understand the
19    question.
20        THE WITNESS: I understand the
21    question.
22    A. I mean, I remember Googling that question
23    and getting into a lot of craziness on the internet
24    that I didn't want to be in. I relied on the

Page 96

1    reports provided to review.
2    Q. (BY MR. JAMES) And those were the reports
3    provided to you by plaintiffs' counsel?
4    A. Yes.
5    Q. And you also cited a number of articles
6    that you just testified were provided to you by
7    plaintiffs' counsel?
8        MS. O'DELL: Object to the form.
9    A. Yes.
10    Q. (BY MR. JAMES) Did you find any articles
11    through your searches that contradicted the
12    information provided to you by plaintiffs' counsel?
13        MS. O'DELL: Object to the form.
14    A. Yes.
15    Q. (BY MR. JAMES) Where are those articles
16    cited in your report?
17    A. I don't think I have cited them in my
18    report.
19    Q. You found articles that contradict the
20    allegation that asbestos is a contaminant in talcum
21    powder products, correct?
22        MS. O'DELL: Object to the form.
23    A. It's not a contradiction. The absence of
24    something does not contradict the presence of

Page 97

1    something.
2        Do you understand?
3        Like in Longo's report, he found
4    asbestos in 63 percent of his samples. He did not
5    find asbestos in 34 percent of his samples. The
6    fact that he didn't find it in 34 percent does not
7    mean he didn't find it in 66.
8        Asbestos is a carcinogen and its
9    significance in risk to life is when you find it.
10        In the FDA report that did not find
11    asbestos in Johnson's Baby Powder, Shower to Shower,
12    and in multiple samples from suppliers of ore -- I
13    mean, that's great that they didn't find it, but it
14    doesn't mean it's not detectable. And I can't
15    explain in terms of being an expert in technique to
16    understand why some people found it and some people
17    didn't find it.
18        Does that make sense to you?
19    Q. (BY MR. JAMES) I think you answered a
20    question that I didn't ask, so let me rephrase.
21    A. I'm sorry.
22    Q. In searching for literature about the
23    alleged presence of asbestos in cosmetic talc, did
24    you find any articles -- published articles that

Ellen Blair Smith, M.D.

Page 98

1 reach the conclusion that there was no such
2 contamination?
3         MS. O'DELL:  Object to the form.
4     A.  I can't remember any.
5     Q.  (BY MR. JAMES)  If you had found those,
6 would you have discussed those in your report?
7     A.  Probably.  I mean, I want to be
8 comprehensive.
9     Q.  And so if there is a body of literature
10 out there that you didn't discuss in your report,
11 then you would agree that your analysis of the issue
12 was not comprehensive, correct?
13         MS. O'DELL:  Excuse me.  Object to the
14 form; misstates her testimony.
15     A.  If I missed it, I shouldn't have.
16     Q.  (BY MR. JAMES)  And, Dr. Smith, you did
17 just mention the FDA testing of talc for the
18 presence of asbestos, correct?
19     A.  Yes.
20     Q.  And have you reviewed that testing?
21     A.  I've reviewed that report.
22     Q.  The FDA's report?
23     A.  Yes.
24     Q.  Did you discuss it at all in your

Page 99

1 litigation report?
2     A.  No.
3     Q.  And why is that?
4     A.  I explained that.  Negative isn't as
5 significant as positive.
6     Q.  Is that because the positive testing
7 results supports your litigation opinion; the
8 negative testing results do not?
9         MS. O'DELL:  Object to the form.
10     A.  No.  It's because the positive testing is
11 a threat to human life.
12     Q.  (BY MR. JAMES)  So you have seen -- I'm
13 gonna mark as Exhibit Number 7 the 2007 -- excuse
14 me, the 2010 FDA testing on cosmetic talc.
15     A.  Yes.
16         (Deposition Exhibit 7 marked for
17          identification.)
18     Q.  (BY MR. JAMES)  Is that a printout of the
19 testing information you have reviewed, Dr. Smith?
20     A.  That is identical to what I have reviewed.
21     Q.  Okay.  Do you have any reason to disagree
22 with the FDA's findings here in this Exhibit 7?
23         MS. O'DELL:  Object to the form to the
24 degree -- what findings are you referring to in your

Page 100

1 question?
2         MR. JAMES:  The findings in Exhibit
3 Number 7.
4         MS. O'DELL:  Object to the form.
5     A.  Their -- I -- they said, "No asbestos
6 detected."
7         I can -- I don't know enough about
8 testing to disagree with them, but I don't know
9 what -- I mean, does "none" mean zero or does "none"
10 mean below some level?
11         I do know that their technique -- I
12 know enough to know that it's a good means of
13 finding asbestos by, you know, polarized light
14 microscopy followed by TEM, that that's a good
15 technique.
16         I don't understand why theirs are so
17 different from the other, and I don't have the
18 expertise to go any further than that.
19     Q.  (BY MR. JAMES)  With respect to whether
20 there is asbestos in the cosmetic talc products or
21 there isn't, is it fair to say that you would defer
22 to others?
23     A.  Yes.
24         MS. O'DELL:  Object to the form.

Page 101

1     Q.  (BY MR. JAMES)  And do you consider
2 yourself to be an expert in mineral classification?
3     A.  Absolutely not.
4     Q.  What about an expert in mineralogy?
5     A.  Absolutely not.
6     Q.  But you understand the FDA's testing was
7 performed by an independent lab?
8     A.  Yes, they said that.
9     Q.  And that's contrasted, which you
10 understand that Longo's testing is done by a paid
11 litigation expert, correct?
12         MS. O'DELL:  Object to the form.
13     A.  I'm kind of thinking they probably paid
14 the lab they sent it too.  I mean, shouldn't
15 they?
16     Q.  (BY MR. JAMES)  And who's -- who is
17 "they"?
18     A.  The FDA paid the AMA Analytical Services.
19     Q.  Okay.  Do you have any understanding of
20 how the lab results by the FDA were obtained or paid
21 for?
22     A.  No.
23     Q.  Do you have an understanding of -- did you
24 know that the FDA's testing was performed outside

26 (Pages 98 to 101)

Ellen Blair Smith, M.D.

Page 102

1  the context of litigation?
2      MS. O'DELL: Object to the form.
3      A.  I hadn't thought of it, but I would not
4  think it's about litigation.
5      Q.  (BY MR. JAMES)  And if we looked at the
6  front page of Exhibit Number 7, which I've handed
7  you, have you reviewed the text of this exhibit
8  before today?
9      A.  This whole -- yes.
10     Q.  Okay.
11         MS. O'DELL: And if you need to
12  look --
13     Q.  (BY MR. JAMES)  And do you understand that
14  this exhibit --
15         MS. O'DELL: Excuse me.  Excuse me.
16         If you -- and if you need to refresh
17  yourself on any part of the text, Doctor, feel free
18  to do that as he's asking you questions.
19         THE WITNESS: Okay.
20         MR. JAMES: Absolutely.  Certainly.
21     Q.  (BY MR. JAMES)  If you turn to the second
22  page of the exhibit, do you see the section that's
23  titled "How FDA followed up on the latest reports"?
24     A.  Yes.

Page 103

1      Q.  Okay.  And you see it says, quote,
2  "Because safety questions about the possible
3  presence of asbestos in talc are raised
4  periodically, the FDA decided to conduct an
5  exploratory survey of currently marketed
6  cosmetic-grade raw material talc," closed quote.
7          Do you see where I read?
8      A.  Yes.
9      Q.  And there's no discussion there that the
10  testing was done at the behest of litigation, is
11  there?
12     A.  No.
13     Q.  And did you know that the talcum products
14  tested by the FDA in this document were Johnson &
15  Johnson products?
16         MS. O'DELL: Object to the form.
17     A.  I think it says Johnson's Baby Powder and
18  Shower to Shower on there, and I know those are J&J
19  products.
20     Q.  (BY MR. JAMES)  Do you have any personal
21  knowledge concerning the specifications that are
22  used by Johnson & Johnson with respect to its
23  cosmetic talcum powder products?
24     A.  I do not know them.

Page 104

1      Q.  Have you looked at those?
2      A.  No, I have not.
3      Q.  Are you aware that Johnson & Johnson
4  manufacturers its products in accordance with United
5  States Pharmacopeia Convention?
6          MS. O'DELL: Objection to form.
7      A.  I did not know that specifically.
8      Q.  (BY MR. JAMES)  Have heard of that
9  organization before?
10     A.  Yes, I have.
11     Q.  Do you consider that to be a respected
12  organization?
13         MS. O'DELL: Object to the form.
14     A.  Yes.
15     Q.  (BY MR. JAMES)  Did you know that there
16  have been thousands upon thousands of testing
17  documents produced in this litigation?
18         MS. O'DELL: Object to the form.
19     A.  I --
20         MS. O'DELL: Don't speculate.  If
21  you -- if you --
22         THE WITNESS: I --
23         MR. JAMES: I'm asking her if she
24  knew.

Page 105

1          THE WITNESS: -- was going to say I
2  didn't know.
3          MS. O'DELL: Okay.  Good.  I didn't
4  hear what your answer was.  Sorry.
5          THE WITNESS: Okay.
6          MS. O'DELL: I didn't -- I talked over
7  you.  I apologize.
8          THE WITNESS: That's okay.
9      Q.  (BY MR. JAMES)  So the -- just so that the
10  exchange is clear, Doctor, did you know that there
11  have been thousands upon thousands of testing
12  documents produced in this litigation?
13     A.  I did not.
14     Q.  Did you know that those testing documents
15  include testing documents performed by third-party
16  labs?
17         MS. O'DELL: Object to the form.
18     A.  I did not.
19     Q.  (BY MR. JAMES)  Did you review a 2014
20  letter by the FDA in the course of forming your
21  opinions in this case?
22     A.  Could you show me that letter?
23     Q.  Absolutely.
24     A.  See if I recognize it.

27 (Pages 102 to 105)

Ellen Blair Smith, M.D.

Page 106

```
 1              MR. JAMES:  I'm gonna mark as Exhibit
 2    Number 8 -- it's the 2014 FDA letter denying the
 3    Citizen Petitions.
 4              (Deposition Exhibit 8 marked for
 5              identification.)
 6         A.  (Examined exhibit.)  Yes, sir, I have seen
 7    this letter.
 8         Q.  (BY MR. JAMES)  Did you consider this
 9    letter informative -- to be informative of your
10    opinions?
11              MS. O'DELL:  Object to the form.
12         A.  I read this report, and it went into a
13    total database.
14         Q.  (BY MR. JAMES)  And does that mean your
15    total set of materials that you considered?
16         A.  Yes, it's my brain.
17         Q.  Do you understand that in this letter the
18    FDA also commented on the allegation that asbestos
19    contaminates cosmetic talc products?
20         A.  Yes.
21         Q.  And did you -- do you recall seeing the
22    FDA's conclusion in this letter about that
23    allegation?
24              MS. O'DELL:  Feel free to refresh
```

Page 107

```
 1    yourself about the document, Dr. Smith.
 2         A.  (Examined exhibit.)  My understanding was
 3    their conclusions was that they were not going to
 4    issue a warning on products, nor were they going to
 5    allow a hearing for further discussion.
 6         Q.  (BY MR. JAMES)  And you understand that in
 7    this 2014 letter the FDA referred back to its 2010
 8    testing for presence of asbestos, correct?
 9         A.  Correct.
10         Q.  Do you have any reason to disagree with
11    the FDA's statements in this letter about the
12    allegation that asbestos contaminates talc products?
13              MS. O'DELL:  Objection to the form.
14              I think Dr. Smith misunderstood your
15    prior question.  Counsel, I think you sort of missed
16    each other.
17              But your context of this question is
18    asbestos, not the overall finding of the letter, but
19    asbestos itself?
20         Q.  (BY MR. JAMES)  Dr. Smith, can you answer
21    my question?
22         A.  I may have to read it again.
23              (Examined realtime screen.)  Yes, they
24    did refer back to the 2010 testing for presence of
```

Page 108

```
 1    asbestos.
 2         Q.  (BY MR. JAMES)  And my -- the question
 3    that I posed before Ms. O'Dell made her speaking
 4    objection was that do you have any reason to
 5    disagree with the FDA's statements in this letter
 6    about the allegation that asbestos contaminates talc
 7    products?
 8              MS. O'DELL:  Object to the form;
 9    misstates the document.
10         A.  (Examined realtime screen.)
11              I share the FDA's concern that they
12    make a blanket statement with testing only some of
13    the suppliers and a limited number of products and a
14    limited number of samples of those products, so I --
15    I understand they -- how they base their conclusion.
16    I might have or would have suggested additional
17    studies.
18         Q.  (BY MR. JAMES)  And you understand --
19    again, we've discussed this already, but of the
20    products tested, those products included Johnson &
21    Johnson products.
22              Did you know that?
23         A.  Yes.  I -- they had a single sample of
24    Johnson & Johnson powder from the DC area.
```

Page 109

```
 1         Q.  Do you understand that the supplier of the
 2    talc that's used in Johnson & Johnson products also
 3    submitted samples?
 4         A.  Yes, I did.
 5         Q.  Do you have any opinions about the amount
 6    of exposure to asbestos that you believe would be
 7    imparted upon a user of Johnson & Johnson talc
 8    products?
 9              MS. O'DELL:  Object to the form; vague
10    as to time and duration.
11         A.  No.
12         Q.  (BY MR. JAMES)  And do you have any
13    opinions about the alleged contamination on a
14    fiber-per-bottle basis?
15              MS. O'DELL:  Object to the form.
16         A.  No.
17         Q.  (BY MR. JAMES)  Do you have an opinion as
18    to when you believe J&J talc powder products were
19    contaminated with asbestos and on the market?
20              MS. O'DELL:  Object to the form.
21         A.  Yes.
22         Q.  (BY MR. JAMES)  What is that opinion?
23         A.  My opinion is that contamination occurs at
24    the mine and persists through the processing all the
```

Ellen Blair Smith, M.D.

Page 110

1  way to market.
2      Q.  Okay.  I think you misunderstood my
3  question or maybe I asked a bad question.
4          But do you have any opinion about
5  when, for what duration or period of years,
6  Johnson & Johnson talc products were on the market
7  and were allegedly contaminated with asbestos?
8          MS. O'DELL:  Object to the form.
9      A.  Dr. Longo has tested samples from the '70s
10  to 2000 with the presence of a -- presence of
11  asbestos.
12      Q.  (BY MR JAMES)  And, again, you're
13  referring back to the Longo litigation testing that
14  we've talked about at length --
15      A.  Yes.
16      Q.  -- this morning, correct?
17      A.  Yes.
18          MS. O'DELL:  Objection to form.
19  Excuse me.  Object to the form.
20      Q.  (BY MR. JAMES)  Do you have any opinion
21  about -- well, strike that.
22          With respect to your opinion that
23  asbestos is a cause of ovarian cancer, how did you
24  go about searching for the materials that you

Page 111

1  reviewed to inform that opinion?
2      A.  I reviewed articles that were listed in
3  IARC 100C and --
4      Q.  And the -- oh, I'm sorry, Doctor.
5      A.  -- then PubMed research as well.
6          THE COURT REPORTER:  What did you say?
7          THE WITNESS:  PubMed, P-u-b-M-e-d
8      Q.  And on page 18 through 19, Doctor, is,
9  again, your section on asbestos, correct?
10      A.  Um-hum.  Um-hum.
11      Q.  And in that section, Doctor, you refer to
12  the IARC, which you just mentioned, correct?
13      A.  Correct.
14      Q.  And then you cite five, what you refer to
15  as, quote, "heavy occupational exposure," close
16  quote, studies, correct?
17      A.  Correct.
18      Q.  And below that you also discuss the
19  Camargo study; is that right?
20      A.  Correct.
21      Q.  And then if you turn the page, you refer
22  in a single sentence to a Reid study, correct?
23      A.  Correct.
24      Q.  Did you review all of those studies?

Page 112

1      A.  Yes.
2      Q.  Okay.  Did you review any other studies
3  examining the purported relationship between
4  asbestos and ovarian cancer?
5      A.  Not that I remember.
6      Q.  Does this report reflect your complete
7  analysis of those studies?
8          MS. O'DELL:  Object to the form.
9      Q.  (BY MR. JAMES)  And how they relate to
10  your opinions in this case?
11          MS. O'DELL:  Objection to form.
12      A.  Yes.  I believe so.
13      Q.  (BY MR. JAMES)  Do you recall looking at
14  the Reid study?  Do you -- sitting here today, do
15  you recall the Reid study?
16      A.  That's my favorite one.  May I see it.
17      Q.  Sure.
18          MS. O'DELL:  Yes.  Please.
19      Q.  (BY MR. JAMES)  Did you say -- I'm sorry.
20          Did you say the Reid study was your
21  favorite study?
22      A.  Yes.
23          MS. O'DELL:  On this topic, Doctor.
24          THE WITNESS:  In my life, no.  It is

Page 113

1  not my favorite study in my life, but . . .
2          MR. JAMES:  Okay.  I'm gonna mark the
3  Reid study as Exhibit Number 9.
4          (Deposition Exhibit 9 marked for
5          identification.)
6      A.  (Examined exhibit.)
7          MR. JAMES:  Oh, thank you.
8      Q.  (BY MR. JAMES)  Have you had a chance to
9  refresh your recollection of the study, Doctor?
10      A.  Um-hum.  Um-hum.
11      Q.  And why is this your favorite study?
12      A.  As a pathology review discriminating
13  mesothelioma from epithelial ovarian cancer.
14      Q.  And you don't have any -- strike that.
15          The discussion that you've included in
16  your report as to Reid is that single sentence,
17  correct?
18      A.  Yes.
19      Q.  Do you --
20      A.  And it's a meta-analysis.
21      Q.  Do you agree with the statements in the
22  Reid study about misclassification?
23      A.  Exactly what statements, please?
24      Q.  Sure.

Ellen Blair Smith, M.D.

Page 114

1    So if you look towards the Conclusion
2  section that's on the second to last page of the
3  article.
4    A. (Complied.) Thank you.
5    Q. And if you look at the Conclusion section,
6  I'll just read the first couple sentences.
7    The article says, quote, "Taken
8  without further analysis, women thought to have
9  ovarian cancer had an increased rate in the
10  meta-analysis if reporting having been exposed to
11  asbestos, compared with reference populations."
12  (Paraphrasing.) However, this finding may result
13  from the methods used to identify the ovarian cancer
14  cases, close quote.
15    A. Yes.
16    Q. Do you agree with the concern expressed in
17  Reid about the disease misclassification?
18    A. I do.
19    Q. And then if you scan further down in that
20  paragraph of the article, Doctor, you see, you know,
21  about halfway to three-quarters of the way down,
22  there's a sentence that starts with the word
23  "However."
24    It says, quote, "However, the authors

Page 115

1  of this article suggest that the IARC decision to
2  determine asbestos exposure as a cause of ovarian
3  cancer was premature and not wholly supported by the
4  evidence" --
5    A. Are you on the back page?
6    Q. -- close quote.
7    Yes. On the same paragraph that I was
8  reading with you earlier. It's the Conclusion
9  paragraph.
10    A. Where it says "Discussions"? Oh, no.
11    Q. I'm on page --
12    A. Oh, I'm --
13    Q. -- 1294.
14    A. Okay. I've caught up with you now.
15  Sorry. (Examined exhibit.)
16    Q. And I was reading a sent- -- a sentence
17  that started with the word "However."
18    A. All right. Um-hum. (Examined exhibit.)
19    Q. Do you agree with the Reid authors that
20  the determination of IARC was premature?
21    A. No, I do not.
22    Q. Do you agree with the authors of the Reid
23  paper that the IARC conclusion was not wholly
24  supported by the evidence?

Page 116

1    A. I think the weight of the evidence falls
2  with the IARC even though they're meta-analysis
3  crossed -- their -- no, their meta-analysis didn't.
4    The overall -- I mean, their findings
5  have a risk of 1.75 with confidence intervals of
6  1.45 to 2.10.
7    So, again, she has a positive study
8  with pathology review, and then she says the IARC is
9  premature. I don't understand her conclusion.
10    Q. Do you understand that, again, her --
11  her -- the cautions expressed in this last
12  paragraph, some of those cautions arise from the
13  concerns about disease in this classification.
14    Do you understand that?
15    MS. O'DELL: Object to the form.
16    A. Yes.
17    Q. (BY MR. JAMES) And do you agree with
18  those concerns?
19    MS. O'DELL: Object to the form.
20    A. I think it is very difficult to
21  discriminate mesothelioma from epithelial ovarian
22  cancer sometimes.
23    Q. (BY MR. JAMES) And I received word that
24  the tape needs to be changed so --

Page 117

1    A. Okay.
2    Q. -- we'll take a short break.
3    A. Okay.
4    THE VIDEOGRAPHER: Going off the
5  record. The time is 11:39 a.m.
6    (A recess was taken from 11:39 a.m.
7    to 11:55 a.m.)
8    THE VIDEOGRAPHER: This marks the
9  beginning of Disk 2. Back on the record. The time
10  is 11:55 a.m.
11    Q. (BY MR. JAMES) Dr. Smith, we are
12  continuing our discussion of your opinion on
13  asbestos as causes of ovarian cancer. Okay?
14    A. Correct.
15    Q. Did you consider any weaknesses or
16  limitations in the body of the literature that you
17  reviewed concerning the link between asbestos and
18  ovarian cancer?
19    A. Could you be more specific?
20    Q. Certainly in evaluating medical literature
21  you would agree that one thing for you to consider
22  is whether the study has any limitations, correct?
23    A. Correct.
24    Q. And so my question, which is open-ended,

30 (Pages 114 to 117)

Ellen Blair Smith, M.D.

Page 118

1    is whether, in looking at the set of literature that
2    you looked at on asbestos and ovarian cancer, if you
3    found any limitations to that set of literature?
4          MS. O'DELL:  Objection; vague.
5          A.  I've considered whether they're single
6    site studies, occupational sposure -- exposure
7    versus people who wash the clothes of workers or
8    nonenvironmental exposure as opposed to
9    occupational, those things.
10         Q.  (BY MR. JAMES)  And --
11         A.  And --
12         Q.  -- so let's start --
13         MS. O'DELL:  I'm sorry.  Were you
14   finished, Dr. Smith?  If you --
15         THE WITNESS:  I have.
16         MS. O'DELL:  Okay.
17         Q.  (BY MR. JAMES)  Let's -- so you just
18   identified one limitation as -- let me -- let me
19   rephrase that.
20         Would you agree that one limitation of
21   the set of literature that you reviewed was that --
22         (Phone interruption.)
23         THE WITNESS:  What is that?
24         MR. JAMES:  Just a second.  Let's go

Page 119

1    off.
2          THE VIDEOGRAPHER:  Going off the
3    record.  The time is 11:57.
4          (A recess was taken from 11:57 a.m.
5          to 11:58 a.m.)
6          THE VIDEOGRAPHER:  Back on the record.
7    The time is 11:58 a.m.
8          Q.  (BY MR. JAMES)  Dr. Smith, would you agree
9    that one limitation to this set of literature that
10   you reviewed is that the literature pertains to
11   occupational exposures?
12         MS. O'DELL:  Object to the form.
13         A.  It contains occupational exposure and, I
14   mean, the meta-analysis of Reid, for example.  It
15   contains both.
16         Q.  (BY MR. JAMES)  Do you -- would you agree
17   that for the studies that pertain to occupational
18   exposure that you've reviewed that's one limitation
19   to those studies in applying them to the --
20         A.  Nonoccupational people, yes.
21         Q.  Thank you.  And the doctor finished my
22   question.
23         A.  Sorry.
24         Q.  And I -- we understood each other, so

Page 120

1    that's okay.  I'll try to talk quicker, and you can
2    try to anticipate my questions less.
3          MS. O'DELL:  Well, and if you would --
4    yes, and give me a moment just to respond --
5          THE WITNESS:  Sorry.
6          MS. O'DELL:  -- respond with an
7    objection if I need to.
8          THE WITNESS:  I'll get better.
9          MS. O'DELL:  Thank you.  You're doing
10   great.
11         Q.  (BY MR. JAMES)  You agree that long-term
12   exposure to asbestos in an indust- -- in an
13   industrial environment is different than the
14   allegation that a person's exposed to
15   asbestos-contaminated talc products --
16         MS. O'DELL:  Object --
17         Q.  (BY MR. JAMES)  -- correct?
18         MS. O'DELL:  Object to the form.
19         A.  If you are talking about difference in
20   terms of dosage and -- and amount of exposure, then
21   I would say there's probably a difference.
22         If you would suggest that the
23   mechanism of carcinogenesis is different, then I
24   would say no, it's probably the same.

Page 121

1          Q.  (BY MR. JAMES)  And you agree that some of
2    the studies that the IARC looked at were in the
3    occupational context, correct?
4          A.  Correct.
5          Q.  And, in fact, the IARC's conclusion on
6    causation was heavily weighted on the occupational
7    studies, correct?
8          MS. O'DELL:  Object to the form.
9          A.  I'd have to look at the IARC study again
10   to see how they stated it.  And I could do that, if
11   you want me to.
12         Q.  (BY MR. JAMES)  Do you recall that when
13   the IARC looked at the nonoccupational studies the
14   association that they found there was not
15   statistically significant?
16         MS. O'DELL:  Objection to the form.
17         A.  I don't recall that.
18         Q.  (BY MR. JAMES)  If that's the case, do you
19   believe that's important?
20         MS. O'DELL:  Object to the form.
21         A.  I'd like to look at the paper if you'd
22   let -- if you'd let me.
23         Q.  (BY MR. JAMES)  Sure.
24         THE WITNESS:  Am I allowed to see it?

31 (Pages 118 to 121)

Ellen Blair Smith, M.D.

Page 122

1    Q.  (BY MR. JAMES)  That's fine.  That's fine.
2         Let's talk about -- talk about --
3    we'll talk about the paper more -- more specifically
4    in just a second.
5    A.  Okay.
6    Q.  If I can continue the line of questions on
7    the limitations.
8    A.  Okay.
9    Q.  So we've talked about occupational --
10        MS. O'DELL:  Excuse me.
11   Q.  (BY MR. JAMES)  -- being one limitation,
12   correct?
13        MS. O'DELL:  Excuse me.  Doctor --
14        MR. JAMES:  Leigh, there's not a
15   question pending.
16        MS. O'DELL:  She's asked to look at
17   IARC 100C, and if the witness has asked to look at
18   the document, I'm going to put it in front of her.
19   Give me just a second.
20        THE WITNESS:  It's the second IA.
21   It's the first thing in the second IA.
22        MS. O'DELL:  (Handed binder to
23   witness.)
24        THE WITNESS:  Thank you.

Page 123

1    A.  (Examined binder.)
2    Q.  (BY MR. JAMES)  Okay.  Dr. Smith, your
3    counsel has handed you a copy of the IARC talc
4    monograph, correct?
5    A.  Correct.
6    Q.  Okay.  And I'm gonna mark as Exhibit
7    Number 10 --
8         MS. O'DELL:  I'm sorry.  You said the
9    talc monograph.  I handed her 100C.  Not --
10        MR. JAMES:  Oh.  Thank you.
11        BY MS. O'DELL:  Not monograph.
12        MR. JAMES:  You're right.
13        BY MS. O'DELL:  193.
14        MR. JAMES:  You're right.  You're
15   right.  Thank you.
16   Q.  (BY MR. JAMES)  So I am going to -- I'll
17   refer to it commonly as the asbestos monograph
18   for -- for a simple shorthand.
19        So your counsel has handed you a copy
20   of the asbestos monograph 100C and --
21        MS. O'DELL:  Which -- which discusses
22   talc, so I don't want to be misleading.
23        THE WITNESS:  No, 193 discusses talc.
24   100C discusses asbestos.

Page 124

1    Q.  (BY MR. JAMES)  So I'm going to hand
2    you -- I think we're all on the same page now.  I'm
3    gonna hand you also a copy with some excerpts from
4    100C.  Okay?
5    A.  Okay.
6    Q.  And I'm gonna mark it as Exhibit
7    Number 10.
8         (Deposition Exhibit 10 marked for
9         identification.)
10        MS. O'DELL:  Thank you.  Feel free to
11   refer to the whole monograph if you'd like,
12   Doctor -- Dr. Smith.
13        THE WITNESS:  Okay.
14   A.  I turned right to it.
15   Q.  (BY MR. JAMES)  Okay.  Doctor, if you can
16   look at page 256 --
17   A.  Yeah.
18   Q.  -- of either the exhibit that I handed you
19   with the excerpts or you're welcome to look at the
20   larger monograph as well.
21   A.  I'm there.
22   Q.  And if you look at the right-hand column,
23   it's the first full paragraph in that column.  It
24   starts with "The Working Group."

Page 125

1         Do you see where I'm reading?
2    A.  Um-hum.  Um-hum.  Yes.
3    Q.  And if you look down at the bottom half of
4    that paragraph, the IARC Monograph states, quote,
5    "The conclusion received additional support from
6    studies showing that women and girls with
7    environmental, but not occupational exposure to
8    asbestos had positive, though non-significant,
9    increases in both ovarian cancer incidence and
10   mortality," close quote.
11        Do you see where I read that?
12   A.  Yes.
13   Q.  And did I read that correctly?
14   A.  Yes.
15   Q.  So here the IARC is commenting that in the
16   nonoccupational studies the association is not
17   statistically significant, correct?
18        MS. O'DELL:  Object to the form.
19   A.  In the articles, they cited, IARC -- this
20   started in 2009 and was published in 2012, and I do
21   not believe they had the 2011 meta-analysis by Reid
22   in this.  They cite Reid 2008 and 2009, but not the
23   meta-analysis.  So what they have, they're making
24   their conclusions there.

32 (Pages 122 to 125)

Ellen Blair Smith, M.D.

Page 126

1    Q.  (BY MR. JAMES)  Right.
2    A.  I think this adds to it.
3    Q.  The Reid paper?
4    A.  The 2011 Reid paper.
5    Q.  And the 2011 Reid paper, again, is the
6  paper where the authors conclude that the IARC's
7  finding with respect to asbestos and ovarian cancer
8  is -- may be premature, correct?
9    A.  I disa- --
10       MS. O'DELL:  Object to the form.
11    A.  Yes.  You are correct that that is their
12  conclusion.  I disagree with their conclusion.  It
13  is your Exhibit 9.
14    Q.  (BY MR. JAMES)  And so you disagree with
15  the conclusions of -- of the paper that you qual- --
16  that you categorized as one of your favorites,
17  correct?
18       MS. O'DELL:  Object to the form.
19    A.  Yes.
20    Q.  (BY MR. JAMES)  And if you look up on the
21  same paragraph, Dr. Smith --
22    A.  Um-hum.
23    Q.  -- the first sentence of that paragraph
24  reads, quote:  (Paraphrasing.)  The Working Group

Page 127

1  noted that a causal association between exposure to
2  asbestos and cancer of the ovary was clearly
3  established, based on five strongly positive
4  mort- -- mortality studies of women with heavy
5  occupational exposure to asbestos, close quote.
6       Do you see that?
7    A.  Correct.
8    Q.  So, again, the IARC here is emphasizing
9  that the body of literature that supports the IARC's
10  finding is the occupational body of literature,
11  correct?
12       MS. O'DELL:  Objection to the form.
13    A.  Correct.
14    Q.  (BY MR. JAMES)  Are there any other
15  limitations that -- that you can think of with
16  respect to this set of literature?
17       And when I say "set," I refer to the
18  literature exploring the relationship between
19  asbestos and ovarian cancer.
20    A.  In IARC --
21       MS. O'DELL:  Object to the form;
22  vague.
23    A.  -- 100C.
24    Q.  (BY MR. JAMES)  The -- yes.  My question

Page 128

1  posed is about the body of literature that you
2  reviewed to inform your opinions about asbestos and
3  ovarian cancer.
4       Are there any other limitations that
5  you can identify for us today?
6       MS. O'DELL:  Objection to form; vague.
7    A.  I think the IARC -- I forgot how to speak
8  English.  Sorry.
9       The IARC conclusion that asbestos is
10  causative in ovarian cancer is expanded by two
11  meta-analyses as opposed to these single studies,
12  EPI studies, even though they're cohort studies of
13  Camargo and Reid.
14       Reid doesn't agree with her own
15  statistical findings.  I don't know why she did
16  that.
17    Q.  (BY MR. JAMES)  Well, the Reid authors
18  considered the limitations of the body of
19  literature, correct?
20       MS. O'DELL:  Object to the form.
21    A.  Everyone considers the limitations of the
22  body of literature when they write a paper.
23    Q.  (BY MR. JAMES)  Right.  So do you -- do
24  you think Reid did anything incorrectly in

Page 129

1  evaluating the limitations of the body of
2  literature?
3    A.  I think she made an incorrect conclusion.
4  I don't think that necessarily has to do with the
5  limitations of the body.
6       She has statistically significant
7  meta-analytic study even though the strength is low,
8  but she -- and then she says -- I disagree with it.
9  I don't think it's significant.
10       I mean, it's 1.75.  What -- I don't --
11  I don't understand how she reached her conclusion.
12    Q.  But you understand she -- the paper notes
13  the concern for misclassification, which we've
14  already discussed, correct?
15    A.  Right.  But she accounted for that in her
16  studies, so I --
17    Q.  What do you mean by that?
18    A.  She had a patholo- -- she had pathologic
19  review accounted for within here too.
20       MS. O'DELL:  When you say "here,"
21  you're referring to Exhibit 9, the Reid paper?
22       THE WITNESS:  Yes.
23       MS. O'DELL:  Okay.
24       THE WITNESS:  Sorry.  I wasn't clear,

Ellen Blair Smith, M.D.

Page 130

1    and the camera probably can't see it too.
2        Q.  (BY MR. JAMES)  So the authors of the Reid
3    paper conclude that disease misclassification may be
4    such a problem such that the IARC's conclusion may
5    be premature?
6        MS. O'DELL:  Objection to --
7        Q.  (BY MR. JAMES)  And you're saying that the
8    authors --
9        MS. O'DELL:  Excuse me.  Have you
10   finished your question?  Sorry.
11       MR. JAMES:  No.
12       MS. O'DELL:  Okay.
13       Q.  (BY MR. JAMES)  You're saying the author's
14   just got it -- got it wrong?
15       MS. O'DELL:  Object to the form.
16       A.  I disagree with their conclusion.
17       Q.  (BY MR. JAMES)  So with mis- -- with this
18   set of literature we've talked about two limitations
19   so far:  Misclassification and occupational versus
20   nonoccupational, correct?
21       A.  We've talked about those two things, yes.
22       Q.  Are there any other limitations to the
23   body of literature that you reviewed that can
24   identify today?

Page 131

1        MS. O'DELL:  Object to the form;
2    vague.
3        A.  No.
4        MS. O'DELL:  Are you limiting that to
5    asbestos and ovarian cancer or are you limit -- I
6    mean --
7        MR. JAMES:  Yes.  We're talking about
8    the subset of literature, which I've said several
9    times, pertaining to the allegation that asbestos is
10   causative of ovarian cancer.  That's what we're
11   talking about right now.
12       MS. O'DELL:  That makes it clear.  I
13   don't want something taken out of the record later
14   and it's not -- it's not clear.
15       MR. JAMES:  Fair enough.
16       A.  We've talked about those things.  At this
17   time, I can think of nothing else.
18       Q.  (BY MR. JAMES)  Do you consider the small
19   number of cases to be a limitation to that body of
20   literature pertaining to the allegation that
21   asbestos is -- is a cause of ovarian cancer?
22       MS. O'DELL:  Object to the form.
23       A.  (Examined exhibit.)  I'm looking at the
24   numbers in the Reid study, and I'm sorry, it's

Page 132

1    taking me a minute here, Table 2.
2        Small number of cases.  When they are
3    talking about all cases combining, studying 5,240
4    cases, is that a small number?
5        Q.  (BY MR. JAMES)  Do you believe there's --
6    one of the limitations to this body of literature is
7    the small number of cases?
8        A.  No.  No.
9        Q.  Do you believe that there are any
10   limitations to this literature associated with the
11   type of asbestos involved in these studies?
12       A.  No.
13       Q.  Are you familiar with the type of asbestos
14   involved in these occupational studies?
15       A.  Each of the studies list types, at least
16   some of them do.
17       Q.  Does that matter to you at all?
18       A.  Big picture, probably not.
19       Q.  Okay.  So does the type of asbestos at
20   issue in the studies looked at by the IARC matter to
21   you at all in your opinion that asbestos
22   contamination in talc is causative of ovarian
23   cancer?
24       MS. O'DELL:  Objection to form.

Page 133

1        A.  I don't remember a breakdown by type in
2    the IARC by tremolite or actinolite or -- you know,
3    I don't remember that breakdown.
4        Q.  (BY MR. JAMES)  And it's not addressed in
5    your report, correct?
6        A.  It is not addressed in my report.
7        Q.  To reach your opinion that asbestos is a
8    cause of ovarian cancer, what methodology did you
9    apply?
10       A.  The same methodology I applied -- I apply
11   every time.  I read all the literature that I could
12   find.  I read it critically.  Went through the
13   tables, read the footnotes, and made a conclusion,
14   as did IARC 100C.
15       Q.  Is your causation opinion based on IARC?
16       A.  I think we reached the same conclusion.  I
17   certainly got a bunch of references from IARC.
18       But as I told you, I make my own
19   conclusions, even when they disagree with an author
20   of a paper.  So I'm certainly influenced by their
21   conclusion, but I made my conclusion, and I felt
22   freedom to disagree if I did.
23       Q.  Did you read all the studies that IARC
24   discussed?

34 (Pages 130 to 133)

Ellen Blair Smith, M.D.

Page 134

1    A.  Yes.
2    Q.  Did you read the nonoccupational studies?
3    A.  I read all of these studies.  They are --
4  I would have to look at them individually or go to
5  details of them.
6    Q.  Is there a reason why you didn't discuss
7  the nonoccupational studies but you did discuss the
8  occupational studies?
9        MS. O'DELL:  Object to the form.
10   A.  I discussed two meta-analyses that include
11  occupational and nonoccupational exposure because,
12  as I stated other places in my report, I give
13  strength to a meta-analysis above a single either
14  occupational or nonoccupational exposure.
15   Q.  (BY MR. JAMES)  And in that section, you
16  did cite to the five occupational studies, but you
17  actually don't cite to the nonoccupational studies
18  in the text of your report.
19        And so that's the genesis of my
20  question is:  Did you actually look at the
21  nonoccupational studies?
22        MS. O'DELL:  Objection to form; asked
23  and answered.
24   A.  If -- if there's a study that's -- that I

Page 135

1  didn't cite, I -- I don't believe I -- I don't
2  remember it.
3    Q.  (BY MR. JAMES)  Later on in your analysis
4  with respect to talc and ovarian cancer you talk
5  about the importance of strength, correct?
6    A.  Part of the Bradford Hill criteria, yes.
7    Q.  And did you consider strength with respect
8  to asbestos and ovarian cancer?
9    A.  I thought it was interesting that the
10  strength of the relative risk or overall risk was
11  similar between talc and asbestos.
12        For Reid, it was 1.75.
13        For Camargo, it was pretty close to
14  that.  I don't remember the exact number.  I don't
15  think -- I mean, do you want to know the exact
16  number?  Wait, wait.  I may have said it in my
17  report.
18        (Examined exhibit.)  Yeah, 1.77.
19  Yeah, that's almost exactly the same thing and
20  almost exactly the same confidence intervals, 1.45,
21  2.1, 1.37, 2.28.  So they're, you know, so those two
22  meta-analyses.  Now I forgot -- oh, yes.  Strength.
23        I thought -- I thought it was
24  interesting, yes.

Page 136

1    Q.  Is the odds ratio that you just cited, the
2  odds ratio, applicable to the occupational studies
3  or the nonoccupational studies?
4    A.  Well, there's an occupational one.
5  There's a little bit lower.  There tend to be in
6  the -- the statistically significant ones tend to be
7  a 2.27s, 2.53s, not like -- not like asbestos and
8  mesothelioma where the relative risk is 70, you
9  know.  I mean, we're talking about a much lower
10  thing.
11   Q.  And, again, we've talked already about the
12  fact of the IARC noted in its analysis that the
13  nonoccupational studies provide a not statistically
14  significant association.
15   A.  Yes.
16        MS. O'DELL:  Excuse me.
17   Q.  (BY MR. JAMES)  Correct?
18        MS. O'DELL:  Objection to form.
19        You may answer.
20   A.  I agree with you, but that's why we have
21  meta-analyses.
22   Q.  (BY MR. JAMES)  Do you consider a
23  limitation to the body of literature looking at
24  asbestos and ovarian cancer to include confounding?

Page 137

1    A.  Tell me what you mean by "confounding."
2    Q.  What does "confounding" mean to you?
3    A.  No, no.  You asked -- I asked first.
4    Q.  I know, but I get to ask the questions.
5  That's the way it works.
6        MS. O'DELL:  Object to the form to the
7  extent it's vague and there may be some confusion.
8    A.  For example, I would consider a
9  confounding factor that every one of your asbestos
10  workers are heavy cigarette smokers.
11   Q.  (BY MR. JAMES)  And I'll ask a more
12  precise question now.
13        Did you -- do you recall, in reviewing
14  the body of literature in asbestos and ovarian
15  cancer, that the literature notes an inability to
16  account for confounding factors?
17   A.  Yes.  In these studies, they -- they
18  don't -- they have not accounted for factors.
19  Certainly --
20   Q.  And --
21   A.  Yeah.
22   Q.  I'm sorry.
23        MS. O'DELL:  Finish your answer if
24  you'd like to, Dr. Smith.

35 (Pages 134 to 137)

Ellen Blair Smith, M.D.

Page 138

1    A.  Like genetic.  Smoking, genetics, you
2    know, all those things, yes.
3    Q.  (BY MR. JAMES)  And you would agree that
4    is a limitation to the set of literature, correct?
5    A.  Yes.
6    Q.  Have you heard of a body of literature
7    referred to as the Miners and Millers studies.
8         Does that ring a bell to you?
9    A.  It rings a bell.
10    Q.  Do you know if you reviewed those studies
11    in the course of forming your opinions in this case?
12    A.  I'd have to hear an author, but I remember
13    reading about the Miners and Mills [sic] studies.
14    Q.  Did you know that there's a body of
15    literature out there studying cancer rates in miners
16    and millers of cosmetic talc?
17         MS. O'DELL:  Object to the form.  It's
18    vague, asked and answered.
19    A.  Without an author, I -- I remember studies
20    by author or perhaps by the first initial of the
21    author's last name, but I don't remember reading
22    something called Miners and Mills studies.
23    Q.  (BY MR. JAMES)  If there is a body of
24    literature out there that looks at the cancer rates

Page 139

1    of talc miners and millers and that body of
2    literature is not cited in your report, then that
3    means you didn't consider that body of literature,
4    correct?
5         MS. O'DELL:  Objection to form;
6    misstates the record.
7    A.  I don't remember reading that paper.  I
8    hope I did.
9    Q.  (BY MR. JAMES)  Okay.  Can you cite to
10    me -- I'm sorry, Doctor.
11    A.  I would hope I did read the paper, but I
12    didn't.  I don't remember it.
13    Q.  Can you point to me anywhere in your
14    report where you would address studies looking at
15    cancer rates in miners and millers of talc?
16    A.  There is not --
17         MS. O'DELL:  Objection to the form.
18    A.  There is not in my report.
19    Q.  (BY MR. JAMES)  Within your report, you
20    include some opinions on a phrase that I'll put into
21    quotes, "fibrous talc," close quote.
22    A.  Yes.
23    Q.  You state in your report that "Asbestos
24    and fibrous talc cause epithelial ovarian cancer,"

Page 140

1    correct?
2    A.  I do.
3    Q.  Do you equate fibrous talc to be -- to be
4    also talc-containing asbestiform fibers?
5    A.  Fibrous talc is an abest- -- asbestiform
6    habit of talcum powder.  So in that -- in that
7    equivalence, they're needlelike particles.
8    Q.  Do you know if the term "fibrous talc" is
9    used in the IARC Monograph?
10    A.  I believe it is.
11    Q.  Do you understand if there is a
12    distinction between fibrous talc and talc-containing
13    asbestiform fibers?
14         MS. O'DELL:  Objection to form.
15    A.  I believe -- wait.
16         (Examined realtime screen.)  I believe
17    there is a distinction.  I would really like to find
18    that part because I know it's in here.
19         (Examined exhibit.)  Talcum-containing
20    asbestiform fibers.  Talc may also form true mineral
21    fibers that are asbestiform in habit.  I used the
22    right word.
23         "Talc-containing asbestiform fibres is
24    a term that's been used inconsistently in the

Page 141

1    literature.  In some contexts, it applies to talc
2    containing asbestiform fibres of talc or talc
3    intergrown on a nanoscale with other minerals,
4    including [sic] anthophyllite."
5         So I think they make distinction
6    between whether it's asbestos or asbestiform habit
7    of talc.
8         Am I answering your question?
9    Q.  (BY MR. JAMES)  I think so.
10    A.  Okay.
11    Q.  Let me ask you this.
12    A.  Okay.
13    Q.  Would you defer to other experts on
14    distinctions or characterat- -- characterizations of
15    fibrous talc versus talc-containing asbestiform
16    fibers?
17         MS. O'DELL:  Objection; form.  She
18    just answered your question about that.
19    A.  I believe many mineralogists know more
20    about the forms of talc and minerals than I do.
21    I...
22    Q.  (BY MR. JAMES)  Have you cited any
23    epidemiologic or medical literature that supports
24    your opinion that fibrous talc is causative of

Ellen Blair Smith, M.D.

Page 142

1  ovarian cancer?
2      A.  I have never seen a study that looks
3  specifically with pure fibrous talc and ovarian
4  cancer.
5      Q.  What is the significance of your opinions
6  on asbestos to your opinions on talc and ovarian
7  cancer?
8          MS. O'DELL:  Objection to the form.
9      A.  (Examined realtime screen.)  I think the
10  presence of asbestos in talcum powder products
11  causes ovarian cancer.
12      Q.  (BY MR. JAMES)  Is the alleged presence of
13  asbestos in cosmetic talc powders critical to your
14  causation opinion that talc powders cause ovarian
15  cancer?
16      A.  No.
17          MS. O'DELL:  Objection to form.
18      Q.  (BY MR. JAMES)  Do you believe that talc
19  powders not contaminated with asbestos would also be
20  a cause of ovarian cancer?
21      A.  I'm not sure there is such a thing as a
22  pure, platy talc powder, but I believe such powder
23  use, did it exist, would cause ovarian cancer.
24      Q.  Would your answer hold true if I asked the

Page 143

1  same question about fibrous talc?
2          MS. O'DELL:  Just to be clear --
3          MR. JAMES:  And if you'd like -- I'll
4  just go through it again, which is no problem.
5      Q.  (BY MR. JAMES)  Is the alleged presence of
6  fibrous talc critical to your causation opinion that
7  talcum powders cause ovarian cancer?
8          MS. O'DELL:  Object to the word
9  "alleged."
10          You may answer.
11      A.  I believe that fibr-- -- fibrous talc -- a
12  poor preparation of fibrous talc applied repeatedly
13  and consistently to the perineum would cause ovarian
14  cancer.
15      Q.  (BY MR. JAMES)  And let me ask a question,
16  maybe, that's more precise, similar to the question
17  I asked you about asbestos.
18          Do you believe that talc that does not
19  contain fibrous talc is a cause of ovarian cancer?
20      A.  I already answered that.
21          MS. O'DELL:  Object to the form.
22      A.  But I -- but --
23      Q.  (BY MR. JAMES)  I think maybe we missed
24  each other.

Page 144

1      A.  Okay.  You gave me a --
2          MS. O'DELL:  Let him -- excuse me.
3  Let him ask the question and then you respond.
4          THE WITNESS:  Okay.
5      Q.  (BY MR. JAMES)  (Examined realtime
6  screen.)  So the question that I asked was:  Do you
7  believe that talc that does not contain fibrous talc
8  is a cause of ovarian cancer?
9          MS. O'DELL:  Object to the form.
10      A.  Yes.
11      Q.  (BY MR. JAMES)  If talc powders did not
12  contain asbestos or fibrous talc, would your
13  opinions about mechanism change?
14      A.  This is kind of a double negative, doesn't
15  it?
16          MS. O'DELL:  Object to the form.
17      Q.  (BY MR. JAMES)  I don't think it's a
18  double negative.
19      A.  Okay.
20          (Examined realtime screen.)  My
21  opinion about mechanisms unchanged by concerns of
22  asbestos in fibrous talc.
23          MR. JAMES:  It's 12:32.  I can
24  continue a little longer if you'd like or -- it's up

Page 145

1  to you Leigh and Dr. Smith.
2          MS. O'DELL:  Dr. Smith, would you like
3  to take a break for lunch now or --
4          THE WITNESS:  Have you got a 10-minute
5  block?
6          MR. JAMES:  I can always go for 10
7  more minutes.
8          THE WITNESS:  Let's do it.
9          MR. JAMES:  Okay.
10          THE WITNESS:  Is that -- is everybody
11  else comfortable?  Yeah, I don't want to --
12          MS. O'DELL:  Yeah.  10 minutes and
13  let's --
14          THE WITNESS:  -- make somebody --
15          BY MS. O'DELL:  -- take a break.
16          THE WITNESS:  -- endure hunger pains.
17      Q.  (BY MR. JAMES)  All right.  Dr. Smith,
18  we're gonna wade back into your report --
19      A.  Oh, good.
20      Q.  -- and I'm looking at page 3.
21          And on page 3, Dr. Smith, you list
22  what you consider to be, quote, "generally
23  accepted," close quote, risk factors for ovarian
24  cancer, correct?

37 (Pages 142 to 145)

Ellen Blair Smith, M.D.

Page 146

1     A.  I see that.
2     Q.  What is your definition of a generally
3  accepted risk factor?
4     A.  Something that the vast majority of
5  trained physicians in that specialty would accept as
6  truth.
7     Q.  And how did you compile this list?
8     A.  Working in the field for 40 years, viewing
9  lots of risk articles and tabulating them, like
10  listing them and reviewing the literature regarding
11  specific things.
12        For example, a comprehensive view of
13  the literature regarding tubal sterilization and its
14  risk of ovarian cancer.
15        Throughout my career, numerous times,
16  I've done ovarian contraceptive use and ovarian
17  cancer of use as formulations of oral contraceptives
18  have changed and different progestins, different
19  levels of estrogen, do we still have a suppressive
20  effect on ovarian cancer?  So this is kind of my
21  life.
22     Q.  Do you believe all of the factors that
23  you've listed here in this first paragraph are
24  mentioned in the articles here that you've cited?

Page 147

1     A.  I'm not -- without going to each
2  individual article, I can't checklist which thing is
3  listed in each article.
4     Q.  Was it -- when you created this list, was
5  it your intention to cite to an authority that
6  supported each one of these things that you listed
7  at least once?
8     A.  I think -- I don't think everyone -- I
9  can't promise you, without looking at each of these
10  papers, that everybody listed every single one of
11  the things I said, but somebody in this group
12  mentioned these things, and I had other information
13  that maybe want to put on the list.
14     Q.  Is it possible that at least some of these
15  things that you've listed are not identified in the
16  sources that you've cited and instead come from the
17  information that you just referred to that -- that
18  you possessed through your practice?
19     A.  It's possible.
20        MS. O'DELL:  Object to form.
21     A.  It's possible.
22     Q.  (BY MR. JAMES)  For -- for example, IUDs
23  that you listed here, do you believe that's a
24  general accepted risk factor for ovarian cancer?

Page 148

1     A.  What's -- oh, intrauterine devices.  I
2  don't think that's generally -- it's been -- it's
3  been studied in some studies.  Pelvic inflammatory
4  disease, it's been plus or minus in some studies.
5     Q.  So --
6     A.  But --
7     Q.  I'm sorry.
8     A.  -- somebody mentioned it somewhere in
9  my -- in my life.
10     Q.  And so the way you've characterized this
11  paragraph is that you have attempted to list, quote,
12  "generally accepted," close quote, risk factors.
13        And what I'm asking you is whether all
14  these things that you've listed here are, in your
15  opinion, generally accepted by the medical
16  community?
17     A.  I will give you that intrauterine devices
18  may not be generally accepted by the majority of --
19  I lost my mike.  I'm sorry -- obstetrician
20  gynecologists.
21     Q.  And how about PID?  Do you believe that's
22  a generally accepted risk factor with the
23  terminology you've used?
24     A.  There -- there are a whole bunch of papers

Page 149

1  about pelvic inflammatory disease and its impact on
2  ovarian cancer and epidemiologic studies and they
3  vary in value.
4        I would -- it is not as strong a risk
5  factor as inherited gene mutations, family history,
6  nulliparity, and endometriosis.
7     Q.  When creating this list of generally
8  accepted risk factors, did you consult a list of
9  risk factors published by any medical or scientific
10  organization?
11        MS. O'DELL:  Object to the form.
12        But you . . .
13     A.  I didn't go on any websites to get my
14  references.
15     Q.  (BY MR. JAMES)  Would you have consulted
16  the list of risk factors published by ACOG?
17     A.  I didn't get the -- even the committee
18  opinion or the postgraduate, all those different
19  letters, I didn't use that as one of my resources.
20     Q.  And did you consider a list of risk
21  factors published by the SGL?
22     A.  I did not use that as one of my risk
23  factors.
24     Q.  Do you recognize both of those

38 (Pages 146 to 149)

Ellen Blair Smith, M.D.

Page 150

1     organizations as respected scientific organizations?
2         A.  I do.
3         Q.  And you're members of both, correct?
4         A.  I am.
5         Q.  And you have been active in both, correct?
6         A.  Very.
7         Q.  In crafting a list of generally accepted
8     risk factors, why wouldn't you have been interested
9     in what those two organizations have to say about
10    what is, quote, "generally accepted"?
11        A.  I'm not disinterested.  I, again,
12    assembled my own sources out of medical databases
13    and read the articles and did my own work.
14            It's not that I disagree with them.
15    It's just I don't want a copy of their stuff, you
16    know.  I want to do my own work.
17        Q.  Earlier you defined "generally
18    accepted" -- and I'll see if I can find it on my
19    realtime.
20            While I'm looking for it, and you can
21    correct me if I've misstated it, Dr. Smith, but my
22    recall is that you defined "generally accepted" as
23    something that is believed by the majority of
24    practitioners in the field.

Page 151

1             Is that a fair summary?
2         A.  Yes.
3         Q.  Wouldn't it be logical that statements by
4     medic- -- respected medical and scientific
5     organizations with regard to risk factors would be
6     reflective of what the medical community believes --
7         A.  Yes.
8         Q.  -- as a whole?
9             MS. O'DELL:  Object to the form.
10        Q.  (BY MR. JAMES)  Among that list in the
11    same paragraph, you have listed all of the risk
12    factors.
13            You also list talc and asbestos,
14    correct?
15        A.  Yes.
16        Q.  And the way you phrase it, I want to be
17    sure that I understand your testimony, but are you
18    testifying here that talcum powder and asbestos are
19    generally accepted risk factors for ovarian cancer?
20            MS. O'DELL:  Object to the form.
21        A.  They are not on the SGO list.  They are
22    not -- I mean, on the ACOG list.  They are listed in
23    some review articles and the literature about them
24    in risk factors.  They are not listed in others.

Page 152

1             I can't give you a percentage, like
2     have a vote in ACOG of who calls it a risk factor
3     and who doesn't.  So I don't know what proportion of
4     OB/GYNs believe that's a risk factor or not, but
5     certainly some do, and I can't quantitate it
6     further.
7         Q.  (BY MR. JAMES)  And to say something is
8     generally accepted, you'd have to quantify it,
9     wouldn't you?
10            MS. O'DELL:  Object to the form.
11        A.  Yeah.  I think generally it would be at
12    51 percent, and I don't know where the count is.
13        Q.  (BY MR. JAMES)  And do you know that the
14    ACOG has actually issued a statement on the
15    talc/ovarian cancer hypothesis?
16            MS. O'DELL:  Object to the form.
17        A.  I have read a very brief statement on the
18    ACOG website about talc.
19        Q.  (BY MR. JAMES)  And, again, is -- so
20    because you consider it to be a well-respected
21    organization, you would be interested in what that
22    organization has to say about the hypothesis,
23    correct?
24        A.  That's why I looked it up.

Page 153

1         Q.  And do you -- did you -- do you recall, if
2     you've looked at that statement, that they say that
3     there is, quote, "No medical consensus that talcum
4     powder causes ovarian cancer," closed quote?
5         A.  That was the final line, I think, a first
6     line -- first part of what I read was "Don't use it"
7     because of the -- I can't -- I can't quote it out of
8     my brain.  But just the "Don't use talc."  We
9     haven't got medical consistent is the very short
10    statement I remember reading some time ago.
11        Q.  Okay.  I'm gonna mark that, the ACOG
12    statement that I'm discussing --
13        A.  Oh.  Well, good.
14        Q.  -- with you, Dr. Smith, as Exhibit
15    Number 11.
16        A.  Don't make me dig so far back.
17            MS. O'DELL:  Exhibit 11?
18            MR. JAMES:  Yes.
19            BY MS. O'DELL:  Thank you.
20            MR. JAMES:  That's where we are.
21            BY MS. O'DELL:  Is this the . . .
22            MR. JAMES:  And I'm sorry for the
23    small print.
24            (Line intentionally left blank.)

39 (Pages 150 to 153)

Ellen Blair Smith, M.D.

Page 154

1    (Deposition Exhibit 11 marked for
2    identification.)
3    A. (Examined exhibit.) Okay. "Obstetrician
4 gynecologists do not remend -- recommend use of
5 vaginal treatment such as douche, vaginal sprays or
6 talcum powder and the use of talcum powder has
7 declined over the years. There is no medical
8 consensus that talcum powder causes ovarian cancer."
9    Q. (BY MR. JAMES) Right. And so we've
10 talked about that last sentence already, correct,
11 where they -- ACOG has published a statement saying
12 there's not a medical consensus, correct?
13    A. Yes.
14    Q. Okay. And the first portion of the
15 statement that you've read into the record about the
16 gynecologists not recommending the use --
17    A. Um-hum.
18    Q. -- can you read the first part of that
19 sentence for me?
20    A. "Because of concerns regarding potential
21 discomfort or pain."
22    Q. And so the recommendation to not use the
23 talcum powder products there is predicated on
24 concern for discomfort or pain, correct?

Page 155

1    MS. O'DELL: Object to the form.
2    A. That's what it says, but -- so -- and the
3 number of references they cite here are puny
4 compared to a number of studies that I reviewed
5 in-depth. I --
6    Q. (BY MR. JAMES) Do you believe the ACOG --
7    MS. O'DELL: Excuse me, sir. Let her
8 finish the --
9    Q. (BY MR. JAMES) Oh, I'm sorry. I thought
10 you were.
11    MS. O'DELL: Yeah.
12    You may finish, Dr. Smith, if you'd
13 like.
14    A. Reading between the lines and knowing some
15 of the people involved, they don't want to incur
16 criticism for saying, "Because of our concerns about
17 a potential for the development of ovarian cancer,
18 obstetrician gynecologists do not recommend the use
19 of vaginal treatments," so they threw in "potential
20 discomfort or pain."
21    Now, women frequently use douches,
22 sprays, or powder because they're uncomfortable.
23 It's not because they cause discomfort.
24    So the people behind the statement

Page 156

1 don't want women to use talcum powder products and
2 aren't willing to call its relation to ovarian
3 cancer.
4    Q. (BY MR. JAMES) Do you know Dr. Hal
5 Lawrence?
6    A. I do. Blue-eyed boy.
7    Q. Have you reached out to him with any
8 concerns about the statement and how --
9    A. No, I have not.
10    Q. -- it's phrased?
11    MS. O'DELL: Dr. Smith, let him
12 finish, please, with his question --
13    THE WITNESS: Oh, I'm sorry.
14    MS. O'DELL: -- just so it's clear on
15 the record.
16    MR. JAMES: Okay. I'm about to the
17 breaking point, I believe. I'm gonna mark as the
18 next two exhibits, Exhibit 12.
19    THE WITNESS: I'm out of order.
20    MS. O'DELL: That's okay. We'll do it
21 a --
22    THE WITNESS: I don't want to lose
23 any. I don't.
24    MS. O'DELL: They're all there.

Page 157

1    THE WITNESS: Here. I got some over
2 here. Sorry.
3    (Deposition Exhibit 12 marked for
4    identification.)
5    Q. (BY MR. JAMES) All right. Dr. Smith,
6 what I've handed you is the publication of risk
7 factors for ovarian cancer published by the SGA --
8 SGO.
9    A. Yes.
10    Q. Just for the record, Dr. Smith, is this
11 the list that you consulted in forming your opinions
12 in this case?
13    MS. O'DELL: Object to the form;
14 misstates her testimony. I think she said she
15 didn't consult the list.
16    A. Yeah, I didn't read this for writing my
17 report.
18    Q. (BY MR. JAMES) Okay. I thought earlier
19 you testified --
20    A. I've looked them up.
21    Q. -- that you -- I'm sorry. Well, we're so
22 close.
23    A. I interrupted you. I'm sorry.
24    Q. No. We're both doing it now, but we're

Ellen Blair Smith, M.D.

Page 158

1    close.
2           I'm sorry.  I thought you acknowledged
3    earlier that you were aware that talc was not listed
4    as a risk factor on -- on the SGO's list.
5           MS. O'DELL:  That's a different
6    question, Counsel, but --
7           A.  Yes, sir, I was aware of that.
8           Q.  (BY MR. JAMES)  Okay.  So at some point
9    you've read the list, correct?
10          A.  Yes.
11          Q.  Did you -- have -- when is the last time
12   you've read the list?
13          A.  I -- the last time I read the list was
14   probably in the past two weeks.  I did not use this
15   list in the preparation of my report.  I didn't use
16   this as a source.
17          Q.  And you didn't cite to it?
18          A.  And I didn't cite it.
19          Q.  And you didn't discuss it at all?
20          A.  And I didn't discuss it at all.
21          Q.  You agree it's relevant when opining on
22   what risk factors are generally accepted, correct?
23          MS. O'DELL:  Object to the form.
24          A.  (Examined exhibit.)  I'm sorry.  I was

Page 159

1    reading it.
2           MS. O'DELL:  Take a moment if you need
3    to, Doctor, to read it.
4           A.  (Examined exhibit.)  I see something here
5    that I can say is not permanent -- is not -- I
6    disagree with.  Let's put it that way.  I disagree
7    with.
8           Yes, women who -- yes.  I mean, age
9    is -- you know, when -- when you read all these
10   papers on risk factors, aging is a risk factor for
11   the development of ovarian cancer, and this is one
12   of the few places that I say -- that I see actually
13   say, "Yeah, the older you get, the higher your
14   risk," because that's just the way it is.
15          They say women who have had
16   gynecologic surgery makes them at increased risk for
17   ovarian cancer, and I have never seen that before.
18   I -- I can't remember seeing that anywhere.
19          And I've certainly seen hysterectomy
20   decreases value and tubal ligation decreases value,
21   but having that in the increase, that is not
22   something I've ever seen.  I'd like to see the
23   studies that show that.
24          Okay.  So my comments are done.

Page 160

1           Q.  And before we break, Doctor, just for
2    purposes of the record, I also want to confirm:  At
3    some point, you have looked at a list of risk
4    factors for ovarian cancer published by ACOG,
5    correct?
6           A.  Yes.
7           Q.  And earlier you acknowledged that talc was
8    not listed on that --
9           A.  Yes.
10          Q.  -- list, correct?
11          A.  Yes.
12          Q.  And so I'm -- it's -- and, again, it's
13   something that you have not cited or discussed in
14   your report, correct?
15          A.  (Nodded head.)
16          Q.  So I'm going to hand you what I'm marking
17   as Exhibit Number 13 to confirm that this is, in
18   fact, what you've looked at.  Okay?
19          (Deposition Exhibit 13 marked for
20           identification.)
21          A.  (Examined exhibit.)  Okay.
22          Q.  (BY MR. JAMES)  Does that list -- does
23   that publication that I've handed you look familiar
24   to you?

Page 161

1           A.  Yes.
2           Q.  Is that what you reviewed before,
3    Dr. Smith --
4           A.  I've seen it before.
5           Q.  -- with respect to ACOG?
6           A.  I've seen it before.
7           Q.  Do you consider it relevant to the
8    opinions that you're offering in this case?
9           A.  It is relevant to the conversation.
10          Q.  Is it relevant to an opinion about whether
11   something is generally accepted or not?
12          MS. O'DELL:  Object to the form.
13          A.  It's accepted by the members of -- or at
14   least the steering committee of ACOG, and I -- this
15   is pretty bland.  It's -- I think most people would
16   agree with these risk -- risk factors.
17          MR. JAMES:  Is now time for a break
18   everyone?
19          THE WITNESS:  I'm up for it.
20          THE VIDEOGRAPHER:  Going off the
21   record.  The time is 12:54 p.m.
22
23          (A lunch recess taken from 12:54 p.m.
24           to 2:03 p.m.)

41 (Pages 158 to 161)

Ellen Blair Smith, M.D.

Page 162

1    AFTERNOON SESSION
2         THE VIDEOGRAPHER:  Back on the record.
3    The time is 2:03 p.m.
4         EXAMINATION (CONTINUED)
5    BY MR. JAMES:
6    Q.  Dr. Smith, are we ready to proceed?
7    A.  We are.
8    Q.  Great.
9         In compiling your list of generally
10   accepted risk factors, did you consult the NCI's
11   list of risk factors for ovarian cancer?
12   A.  I did not.
13   Q.  Okay.  Are you aware that the NCI has
14   listed risk factors in the publication referred to
15   as the PDQ?
16   A.  I know they have PDQs.  I have not read
17   that PDQ.
18   Q.  You recognize the NCI, the National Cancer
19   Institute, as a respected scientific organization?
20        MS. O'DELL:  Object to the form.
21   A.  Yes.
22   Q.  (BY MR. JAMES)  And I've seen references
23   to the NC-- -- NCI in your report, correct?
24   A.  Yes.

Page 163

1    Q.  And they're a frequent sponsor of studies
2    and --
3    A.  Yes.
4    Q.  -- cancer research, correct?
5    A.  Yes.
6    Q.  I'm gonna mark as Exhibit Number 14 the
7    NCI PDQ on Ovarian Cancer Prevention, Health
8    Professional Version.
9         (Deposition Exhibit 14 marked for
10        identification.)
11   Q.  (BY MR. JAMES)  And, Dr. Smith, is this
12   the first time that you've seen this document?
13   A.  I believe so.
14   Q.  Okay.  If you turn to -- unfortunately,
15   it's not paginated.  I'll do a manual count for you.
16        If you flip seven pages and look on
17   the backside of this double-sided copy.
18   A.  (Complied.)  Okay.
19   Q.  Okay.  At the top of that page there's a
20   section titled, "Factors With Inadequate Evidence of
21   an Association Risk of -- of Ovarian, Fallopian
22   Tube, and Primary Peritoneal Cancer."
23        Do you see where I'm reading?
24   A.  Yes.  And do you know what, I recognize

Page 164

1    this page.  I have seen it before.
2    Q.  So you've seen this PDQ document?
3    A.  Yes, I have.
4    Q.  And this document is not cited or
5    discussed in your report, correct?
6    A.  It is not.
7    Q.  Why is that?
8    A.  I prefer to use peer-reviewed references
9    rather than organizational websites or PDQs.
10   Q.  And you reference other organizations in
11   your report, correct?
12   A.  Give me an example.
13   Q.  For example, do you reference IARC in your
14   report?
15   A.  Oh, yes.
16   Q.  Okay.  But here you decided not to
17   recognize the NCI PDQ, correct?
18        MS. O'DELL:  Object to the form.
19   A.  I think they're a different level of -- of
20   standard between IARC and the PDQ.
21   Q.  (BY MR. JAMES)  Are you familiar with the
22   process employed to prepare the PDQ that's in front
23   of you right now?
24   A.  I do not know what method that is.

Page 165

1    Q.  We see here on this PDQ on the page that I
2    referred you to --
3    A.  Um-hum.
4    Q.  -- that below the category of "Factors
5    With Inadequate Evidence," you see there that
6    "Perineal talc exposure" is listed, correct?
7    A.  Yes.
8    Q.  Okay.  And can you read that first
9    sentence for me in the section right there?
10   A.  "The weight of evidence does not support
11   an association between perineal talc exposure and an
12   increased risk of ovarian cancer."
13   Q.  And your litigation opinion offered here
14   today is different than what the NCI states here,
15   correct?
16   A.  Yes, it is.
17   Q.  In determining whether something is
18   generally accepted, do you believe it would be
19   appropriate to consult what the National Cancer
20   Institute says with respect to the association
21   between ovarian cancer and talc?
22        MS. O'DELL:  Object to the form.
23   A.  I have told you that I have seen this and
24   I looked at the references they cited, which is a

42 (Pages 162 to 165)

Ellen Blair Smith, M.D.

Page 166

1    very limited portion of the medical literature.
2         This is not an exhausted list of
3    references.  Certainly it lacks the most recent
4    meta-analyses, so I think they didn't look at enough
5    stuff.
6         Q.  (BY MR. JAMES)  Do you think the recent
7    meta-analyses are the -- are pieces of literature
8    that are critical to the causation opinion --
9    opinion you're reaching here today?
10        MS. O'DELL:  Object to the form.
11        A.  I believe they are more comprehensive and
12   highly supportive.
13        Q.  (BY MR. JAMES)  And the question that I
14   asked earlier, I think that maybe I didn't get an
15   answer to.
16        Do you believe when opining about
17   whether something is generally accepted it would be
18   appropriate to consult what the National Cancer
19   Institute has to say about the topic?
20        MS. O'DELL:  Object to the form.
21        A.  I've read it.  It's not worthy of
22   citation.
23        Q.  (BY MR. JAMES)  Do you believe the opinion
24   published by the NCI with respect to risk factors

Page 167

1    and ovarian cancer is informative to your opinion
2    about what is generally accepted as a risk factor
3    for ovarian cancer?
4         MS. O'DELL:  Object to the form.
5         A.  I sought other references in peer-reviewed
6    journals to compile my risk factor list.
7         Q.  (BY MR. JAMES)  Do you believe the NCI PDQ
8    paper is relevant to forming an opinion about what
9    is generally accepted by the medical community?
10        MS. O'DELL:  Objection --
11        A.  It is not relevant --
12        MS. O'DELL:  Excuse me.  Objection;
13   asked and answered.
14        A.  It is not relevant to my opinion because
15   it is not comprehensive.
16        Q.  (BY MR. JAMES)  And when you say it's not
17   relevant to your opinion, are you speaking about
18   your opinion on causation?
19        A.  Yes.
20        MS. O'DELL:  Object to the form.
21        Q.  (BY MR. JAMES)  And --
22        A.  Well, and risk factor.  Yes, all of it.
23        Q.  But in your report you've -- in addition
24   to opine -- opining that talc is causative of

Page 168

1    ovarian cancer, you have also opined that talc is a
2    generally accepted risk factor for ovarian cancer.
3         Do you understand the distinction
4    between those two opinions?
5         MS. O'DELL:  Objection to form.
6         A.  I understand the difference in -- of those
7    opinions.
8         Q.  (BY MR. JAMES)  And with respect to the
9    latter opinion, the opinion about what is generally
10   accepted by the medical community, would you agree
11   that the statement provided by the NCI in its PDQ is
12   relevant to determining what is generally accepted
13   as a risk factor?
14        MS. O'DELL:  Object to the form.
15        A.  I don't -- I don't think that physicians
16   go to the PDQ and say, "If that's what the NCI says,
17   that's what I believe."
18        To find out the number of, for
19   example, obstetricians/gynecologists who believe
20   talcum powder products are a significant contributor
21   to ovarian cancer, I believe to answer that
22   question, we'd have to survey those people.
23        Q.  (BY MR. JAMES)  I think I've asked my
24   question enough times there.

Page 169

1         What risk factors for ovarian cancer
2    do you believe have been scientifically demonstrated
3    to be synergistic or additive?
4         MS. O'DELL:  Object to the form.
5         You may answer.
6         A.  BRCA and -- BRCA 1 and 2 status in oral
7    contraceptive use has been demonstrated to be
8    additive.
9         Tubal ligation with nulliparity and
10   other higher risk factors.
11        The -- I'm looking up the name of the
12   author again.
13        MS. O'DELL:  What are you referring
14   to, Dr. Smith?
15        (Deposition Exhibit 15 referenced.)
16        A.  The multiple risk factor studies of
17   Vitonis, Titus-Ernstoff, and Cramer, 2011 and their
18   five risk factors, one of which was talc, were
19   cumulative in increasing your risk for -- as a
20   scoring system for increasing your risk of ovarian
21   cancer, so that's clearly an additive study.  It
22   doesn't look at synergy.
23        Q.  (BY MR. JAMES)  So the Vitonis study that
24   you mentioned you're saying looks at cumulativeness,

Ellen Blair Smith, M.D.

Page 170

1  but not synergy, correct?
2      A.  Synergy to me means you put two things
3  together and they're bigger than their sum.  And I
4  haven't seen that in ovarian cancer risk factors.
5      Q.  As a whole or with respect to talc?
6          MS. O'DELL:  Object to form.
7      A.  As a whole.
8      Q.  (BY MR. JAMES)  So you don't have an
9  opinion that -- let me start over.
10          Are there any ovarian cancer risk
11  factors that you believe have been scientifically
12  demonstrated to be synergistic?
13      A.  I can't think of any at this time.
14      Q.  Are there any risk factors for ovarian
15  cancer that you believe have been scientifically
16  demonstrated to be additive?
17      A.  Yes.
18      Q.  And what are those?
19          MS. O'DELL:  Objection; asked and
20  answered.
21      A.  I just answered that question.
22          THE WITNESS:  May I see the Vitonis
23  paper, please?
24          MS. O'DELL:  Sure.

Page 171

1          MR. JAMES:  I'm gonna mark the Vitonis
2  paper as Exhibit 15.
3          (Deposition Exhibit 15 marked for
4          identification.)
5          (Discussion off the record.)
6      Q.  (BY MR. JAMES)  Before we dig into the
7  paper, Dr. Smith, and this may help move us along,
8  in your report, you used the terminology
9  "cumulative," "additive," and "synergistic."
10      A.  I do.
11      Q.  So synergistic we have discussed already,
12  correct?
13      A.  Correct.
14      Q.  Do you believe "cumulative" and "additive"
15  mean the same thing?
16      A.  Not necessarily.
17      Q.  Do you believe that it has been
18  scientifically demonstrated that talc is cumulative
19  with other risk factors?
20      A.  I'm not aware of such a paper.
21      Q.  Do you believe it has been scientifically
22  demonstrated that talc is additive with other risk
23  factors?
24      A.  I believe this paper suggests it's

Page 172

1  additive.
2      Q.  And so this paper is discussing a
3  hypothesis, correct?
4          MS. O'DELL:  Object to the form.
5      A.  That this paper has attempted to develop a
6  risk factor score that may estimate patients who do
7  not have documented genetic predisposition to
8  ovarian cancer, so eliminating that possibility.
9          And now -- or they're trying to
10  develop a risk factor based score system to advise
11  physicians on when to include oophorectomy with
12  hysterectomy and salpingectomy.
13      Q.  (BY MR. JAMES)  If you look with me at the
14  first page in the Conclusion section of the
15  abstract, Dr. Smith --
16      A.  Um-hum.
17      Q.  -- do you see where it says that "We
18  developed a risk-assessment tool that can quantify
19  women's risk for ovarian cancer and should be
20  validated in other data sets."
21          Do you see that language?
22      A.  Yes.
23      Q.  Okay.  Do you acknowledge that this paper
24  represents a hypothesis?

Page 173

1          MS. O'DELL:  Object to the form.
2      A.  I -- it has not been validated by other
3  studies that I am aware of.
4      Q.  (BY MR. JAMES)  Okay.  Dr. Smith, on
5  page 9 you begin your review of the epidemiologic
6  literature, correct?
7      A.  Yes, sir.
8      Q.  Okay.  And I'm referring you there because
9  we'll spend a little bit of the time walking through
10  it together.  Okay?
11      A.  Okay.
12      Q.  You start your analysis with a discussion
13  of meta-analyses in the pooled study, correct?
14      A.  Correct.
15      Q.  What limitations do you believe there are
16  with meta-analyses in general?
17      A.  Meta-analyses are statistical studies of
18  single -- single site epidemiologic studies, but
19  they are still retrospective in the tiers of level
20  of evidence in medicine, case control, and cohort
21  studies.
22          All epidemiologic studies are all
23  listed at Level 4, which is obviously not the
24  highest level of evidence.  So that's a big

44 (Pages 170 to 173)

Ellen Blair Smith, M.D.

Page 174

1  limitation to start with.
2       Q.  Any other limitations that you can
3  identify, sitting here today, with respect to
4  meta-analyses?
5       A.  I am not an expert on statistical methods,
6  but I know there are multiple different statistical
7  tools to perform meta-analyses, and I'm sure a
8  biostatistician could give you a better discussion
9  of that.
10      Q.  So on page 9, you start with your
11  discussion of the 1992 Harlow meta-analysis,
12  correct?
13      A.  Correct.
14      Q.  How would you characterize the odds ratio
15  reported in that meta-analysis?
16          MS. O'DELL:  Object to the form.
17      A.  It's -- the authors conclude there's
18  associated, albeit modest, between ovarian cancer
19  and peritoneal talc use.
20          In their study, their meta-analysis
21  was 1.5, 0.9; but in all studies involved for 1100
22  patients, which is still a really small number,
23  it's 1.3, confidence intervals 1.1 to 1.6.
24      Q.  (BY MR. JAMES)  And just to be clear,

Page 175

1  Dr. Smith, the meta-analysis odds ratio for this
2  paper is -- the crude odds ratio is 1.3, correct?
3          MS. O'DELL:  Objection to form.
4       A.  Yes, but it says "all studies."
5          THE WITNESS:  Do you want to pull this
6  out --
7          MS. O'DELL:  Um-hum.
8          THE WITNESS:  -- so I can --
9          MS. O'DELL:  Sure.
10         THE WITNESS:  -- look at it?
11         MR. JAMES:  Leigh, I probably have it
12  as well.
13         Did you beat me to it?
14         THE WITNESS:  Yep.  Well, she did.  I
15  didn't.
16         MS. O'DELL:  I was trying to redeem
17  myself from not alphabetizing correctly before.
18         Do you want to mark it, and I'll --
19         MR. JAMES:  Sure.
20         BY MS. O'DELL:  -- have to hand it to
21  her.
22         MR. JAMES:  I'm gonna mark the
23  Harlow '92 study as Exhibit 16.
24      A.  Let me go to this one.  Easier for --

Page 176

1          (Deposition Exhibit 16 marked for
2          identification.)
3       Q.  (BY MR. JAMES)  And, Dr. Smith, just --
4  just to make sure we're framed correctly here, my
5  question to you is:  How you would -- how would you
6  characterize an odds ratio of 1.3?
7          MS. O'DELL:  Objection to form.
8       A.  Depends on what the confidence intervals
9  are, but it's -- it reflects a 30 percent increase
10  in whatever you're measuring.
11      Q.  (BY MR. JAMES)  Would you characterize the
12  association as weak?
13         MS. O'DELL:  Object to the form.
14      A.  30 percent.  It's relative.  30 percent
15  more ovarian cancer is not weak.  It's fatal.
16      Q.  (BY MR. JAMES)  That's not the question
17  that I asked.
18         The question I asked is --
19      A.  I wouldn't call it weak.
20         MS. O'DELL:  Excuse me.  Sorry.
21         THE WITNESS:  Sorry.
22         MS. O'DELL:  Let him finish and let me
23  object.  Go ahead.
24      Q.  (BY MR. JAMES)  How would you characterize

Page 177

1  the 1.3, please?
2       A.  30 percent.
3       Q.  Would you characterize it as a strong
4  association?
5       A.  I would characterize it as statistically
6  significant number.
7       Q.  Would you characterize it as a modest
8  association?
9       A.  Modest, weak suggests unimportant, and I
10  would not call it unimportant.
11      Q.  Do you understand that the authors of this
12  paper use the terminology "modest"?
13      A.  Yes, they did.
14      Q.  Okay.  Do you think that when they use
15  that terminology they were calling it unimportant?
16      A.  I think that they suggested that it was
17  small in size.  Small increase, modest increase,
18  that's what they were meaning.
19      Q.  And you understand one of the factors that
20  experts use in evaluating an epidemiological body of
21  literature is the strength of an association,
22  correct?
23      A.  Yes.
24      Q.  And you discuss that later in your report,

45 (Pages 174 to 177)

Ellen Blair Smith, M.D.

Page 178

1 correct?
2 A. I do.
3 Q. And so my question here is whether, in
4 your expert opinion, a 1.3 odds ratio can be
5 characterized as strong, modest, weak, or another
6 adjective?
7 MS. O'DELL: Object to the form.
8 A. I will use the authors term as modest.
9 I'll accept that word.
10 Q. (BY MR. JAMES) Would you also accept the
11 terminology "weak," if the authors use that term?
12 A. Did they use that term? Can you show me
13 where they use the word "weak"?
14 Q. You can turn to the last page. Usually
15 I'm asking questions, but I'm happy to try to point
16 you out to what I'm discussing. Page 26 of the
17 Harlow paper.
18 A. Um-hum.
19 Q. Okay. Do you see the last paragraph
20 there?
21 A. Yes.
22 Q. That first sentence?
23 A. Oh, did they use the word "weak." If the
24 authors use it, I will quote them.

Page 179

1 Q. Will you accept that terminology to
2 describe the 1.3?
3 MS. O'DELL: Object to the form.
4 A. I -- in light of the larger body that's
5 coming up, I will not accept that.
6 Q. (BY MR. JAMES) You --
7 A. That's my personal opinion.
8 Q. Is your personal opinion guided by
9 principles of epidemiology?
10 MS. O'DELL: Objection to form.
11 A. Yeah, I think so.
12 Q. (BY MR. JAMES) You disagree with the
13 characterization of the association by the authors
14 of the study that you cite, correct?
15 MS. O'DELL: Objection; asked and
16 answered.
17 A. Happens, yes.
18 Q. (BY MR. JAMES) Okay. Dr. Smith, looking
19 at your report, returning to the second study that
20 you cite, you cite the Gross and Berg study; is that
21 correct?
22 A. I do.
23 Q. That's from 1995, correct?
24 A. It is.

Page 180

1 Q. Okay. And here you note in the report, if
2 you turn the page, Dr. Smith, you have copied in a
3 table from the article, correct?
4 A. Correct.
5 Q. In here, we see that according to your
6 report the odds ratio is a 1.29, correct?
7 A. It is.
8 Q. And, again, how would you characterize a
9 1.29 odds ratio?
10 A. A 29 percent increase in ovarian cancer
11 after talc exposure.
12 Q. And would you characterize that
13 association as strong, modest, weak, or another
14 adjective?
15 MS. O'DELL: Object to the form.
16 A. Are those my only choices?
17 Q. (BY MR. JAMES) No, I gave you another
18 adjective choice at the end of my question.
19 MS. O'DELL: Objection.
20 A. You gave me strong, modest, weak.
21 Q. (BY MR. JAMES) I'm sorry if I -- maybe I
22 misspoke, but I'm just asking you if you'd
23 characterize a 1.29 as strong, modest, weak, or
24 choose another adjective if you'd like.

Page 181

1 MS. O'DELL: Object -- excuse me.
2 Object to form.
3 A. Statistically significant.
4 Q. (BY MR. JAMES) Would you acknowledge that
5 there are statistically significant associations
6 that in epidemiological community would be referred
7 to as weak?
8 MS. O'DELL: Object to the form.
9 A. The rate of dissolution of an aspirin
10 tablet in the stomach, coated or noncoated, in terms
11 of time to analgesia may be statistically
12 significantly different if there's a 30 second
13 difference between coated and noncoated.
14 But that is a statistical significant
15 difference that I find is not clinically
16 significant. Whether your headache goes away
17 30 seconds sooner or later isn't clinically
18 significant to me; whereas, a 29 percent increase
19 risk of ovarian cancer is very clinically
20 significant to me.
21 Q. (BY MR. JAMES) Do you understand that
22 epidemiologists judge odds ratios based upon their
23 strength?
24 MS. O'DELL: Object to the form.

Ellen Blair Smith, M.D.

Page 182

1      A.  They may use adjectives to quantitate the
2  amount of difference in terms of size or strength
3  and they may use words "modest."  I understand they
4  do that.
5      Q.  Do you understand --
6         MS. O'DELL:  Excuse me.
7         Are -- I'm sorry.  Are you finished,
8  Dr. Smith?
9         THE WITNESS:  Yes.
10      Q.  (BY MR. JAMES)  Do you understand that in
11  judging associations, epidemiologists -- do you have
12  expertise in epidemiology, Dr. Smith?
13      A.  I do not.
14      Q.  You do not?
15      A.  Just reading them; not doing them.
16      Q.  Do you understand that the weaker an odds
17  ratio for an epidemiologist, that that bears some
18  significance to an epidemiologist in making a causal
19  conclusion?
20         MS. O'DELL:  Object to the form.
21      A.  It is one of Bradford Hill's nine factors
22  or pos-- he did -- didn't want to call them
23  postulates.
24         One of Bradford Hill -- I forget the

Page 183

1  word he used -- nine factors in assessing causation
2  and significance of epidemiologic findings.
3      Q.  (BY MR. JAMES)  Do you agree that when an
4  association is lower, weaker, smaller, or more
5  modest, that the smaller, weaker, or more modest
6  that it gets, even if it's statistically
7  significant, the lower the odds ratio becomes the
8  more concerned you become as an epidemiologist or as
9  an expert with whether that association is due to
10  chance, bias, confounding?
11         MS. O'DELL:  Obj --
12      Q.  (BY MR. JAMES)  Do you accept that?
13         MS. O'DELL:  Excuse me.  Objection to
14  the form.
15      A.  It depends.  It depends on if this is a
16  single study, a small-numbered study, or whether
17  that small result is consistent, reproducible over a
18  wide number of studies.
19      Q.  (BY MR. JAMES)  Would you agree that the
20  smaller the association the more concern there is --
21  there -- there is with confounding, chance, or bias?
22         MS. O'DELL:  Excuse me.  Objection;
23  asked and answered.
24      A.  Not necessarily.

Page 184

1      Q.  (BY MR. JAMES)  All right.  The next study
2  you discuss.  And we're still on page 10, Dr. Smith,
3  is the Cramer 1999 study.
4      A.  Yes.
5      Q.  And, I believe, just like with the prior,
6  you have copied in a table from that study, right?
7      A.  Once you learn it on the computer, you
8  just keep doing it.
9      Q.  Sure.  And do you see there with the table
10  that you've inputted into your report the odds
11  ratio, a summary odds ratio of 1.4; is that right?
12      A.  I do.
13      Q.  Again, if the authors referred to that
14  association in the paper as a relatively weak odds
15  ratio, would you accept their terminology?
16         MS. O'DELL:  Do you happen to have
17  that paper handy?
18         THE WITNESS:  You seem to be getting
19  there faster than we are.
20         I'm missing 14.  Where did 14 go?
21      Q.  (BY MR. JAMES)  I'll mark it as Exhibit --
22  I think we're at 17?
23         (Deposition Exhibit 17 marked for
24          identification.)

Page 185

1         THE WITNESS:  Are you get -- are you
2  going -- I'm missing some of your exhibits.
3         MS. O'DELL:  We'll -- we'll straighten
4  it out.
5         THE WITNESS:  Okay.  I'm not
6  responsible for that?
7         MS. O'DELL:  You are not responsible.
8         THE WITNESS:  Okay.  I will quit
9  worrying about it.
10         And I dropped my mike.  I'm sorry.
11  Can you still hear me, sir?
12         THE VIDEOGRAPHER:  I can hear you.
13         THE WITNESS:  Okay.
14      A.  Yes, he does use "the relatively weak odds
15  ratio observed."
16      Q.  (BY MR. JAMES)  Would you agree with that
17  conclusion in the study that you cite?
18      A.  As an epidemiologist, I think he's using
19  epidemiologist speak.  It's not my word choice.
20      Q.  You are here evaluating a body of
21  epidemiologic literature, correct?
22      A.  I am.  As a clinician and expert on
23  ovarian cancer.
24      Q.  And do you see here where the authors of

Ellen Blair Smith, M.D.

Page 186

1    this article that you cited say in that same
2    paragraph, quote, "Despite the consistency noted
3    above, the relatively weak odds ratio observed could
4    reflect potential biases, especially recall and
5    confounding"?
6        A.  Yes.  And then they go on to say:
7    (Paraphrasing.)  Recall bias seems more likely to
8    affect exposures that occurred over a short period
9    of time than those occurred long ago.  The average
10   duration of talc exceeded 20 years in both cases,
11   genital talc exposure may be less likely to be
12   subject to recall bias.
13           And I cite that exact thing in
14   quotations in my report.  It is restated on
15   page 356, I believe.
16       Q.  So that you cite the portion of the
17   statement that you read, correct?
18       A.  Correct.
19       Q.  Okay.  But you didn't cite the statement
20   that I read into the record, correct?
21           MS. O'DELL:  Object to the form.
22       A.  Correct.
23       Q.  (BY MR. JAMES)  Did you cite the portion
24   of this -- of the article that supports your

Page 187

1    opinion?
2            MS. O'DELL:  Objection to the form.
3        A.  I sub- -- quoted the part of the paper
4    where the author specifically addressed concerns
5    about recall, bias, and found them unlikely.  I
6    think it's important that he thought of it.  I think
7    it's real important that he thought of it.
8            But I think he, and every author, in
9    every study should go through his or her study with
10   a fine-tune comb that says "What -- "Why should I
11   believe these results?
12           "What could I -- how -- what could I
13   have made a mistake?
14           "What are confounding factors?
15           "Where is the bias that could've been
16   introduced?
17           "Did I draw my conclusion from the
18   data in my study?"
19           That's what every good author does,
20   and so he did that.  And then he answered his own
21   question, "No, I don't think that's a confounding
22   factor."
23       Q.  (BY MR. JAMES)  In discussing this study,
24   do you discuss Dr. Cramer's findings on dose

Page 188

1    response in your report?
2        A.  (Examined exhibit.)  He -- I do not
3    discuss it in my report.  He himself called
4    dose-response relationship, quote, "weak," unquote.
5        Q.  And you would agree that's an important
6    finding of the study, correct?
7        A.  I think you ought to look at every study
8    to see if it has a dose-response relationship.
9        Q.  Including this one, correct?
10       A.  Every study.  Yes, including this one.
11       Q.  All right.  Next, Dr. Smith, you discuss
12   the Huncharek study, correct?
13       A.  Correct.
14       Q.  And in the text --
15           THE WITNESS:  Are you just going to
16   supply that to us?
17           MR. JAMES:  I can or the --
18           THE WITNESS:  I'd like to have the
19   studies as we discuss them, if you wouldn't mind.
20           MR. JAMES:  Absolutely.  And --
21   absolutely.
22           And right now, I'm looking at your
23   report with you as well, so . . .
24           THE WITNESS:  Sure.  Sure.  But they

Page 189

1    have -- I -- mine is a summary.  You got the real
2    thing.
3            MR. JAMES:  Sure.  As do you.  But I'm
4    happy to give you my copy.
5            THE WITNESS:  Well, Ms. O'Dell does
6    not mind getting every study for us.  She's . . .
7            MR. JAMES:  All right.  So I'm going
8    to mark the Huncharek study as Exhibit Number 18.
9            (Deposition Exhibit 18 marked for
10           identification.)
11       A.  Thank you.  (Examined exhibit.)
12       Q.  (BY MR. JAMES)  And you note in your
13   report an odds ratio of 1.33, correct?
14       A.  Yes.  Ever versus never exposure,
15   "Relative risk of 1.33 with a 95% confidence
16   interval of 1.16 to 1.45, a statistically
17   significant result suggesting a 33% increased risk
18   of ovarian cancer."  That is a quote from the study.
19       Q.  Dr. Smith, would -- how would you
20   characterize a 1.33 odds ratio?
21       A.  33 percent --
22       Q.  Okay.  And would --
23       A.  -- clinically significant, statistically
24   significant.

48 (Pages 186 to 189)

Ellen Blair Smith, M.D.

Page 190

1    Q.  You recognize that all statistically
2  significant associations cannot be described as
3  strong, correct?
4    A.  No.  We've been through this.
5      MS. O'DELL:  Objection to form.
6    A.  Not all statistical significant -- you
7  used the word "strong."  I used the word "clinically
8  significant."  Those are different things.
9    Q.  (BY MR. JAMES)  I agree with you.  And I'm
10  asking you about strength.
11      MS. O'DELL:  Could you repeat your
12  question, please?
13      MR. JAMES:  I'd be happy to.
14    Q.  (BY MR. JAMES)  Would you characterize the
15  odds ratio in this paper as strong, modest, weak or
16  another adjective that you prefer?
17      MS. O'DELL:  Object to the form; asked
18  and answered.
19      MR. JAMES:  It hasn't been asked.
20    A.  Clinically, statistically significant.
21  That's the word I'm gonna use.
22    Q.  (BY MR. JAMES)  Is there a reason why
23  you're uncomfortable characterizing the odds ratio
24  with one of the adjectives strong --

Page 191

1    A.  That, yeah --
2    Q.  -- modest or weak?
3    A.  -- epidemiologists use because weak in --
4  I'm not an epidemiologist.  Perhaps I don't have the
5  epidemiologic --
6      (Counsel conferring off the record.)
7    A.  Do you want me to wait while y'all talk?
8    Q.  (BY MR. JAMES)  No, ma'am.
9    A.  I don't know the connotations of what
10  "weak" means in epidemiologic circles.  If it just
11  means a small number, less than 2.0, weak, in my
12  medical clinical brain implies unimportant, trivial.
13  And I think that kind of difference, when you talk
14  about ovarian cancer, is not trivial and it's not
15  unimportant.
16      So maybe that's my hang-up, and maybe
17  it's because I'm not an epidemiologist.  I'm a -- I
18  am person who takes care -- or took care of patients
19  with ovarian -- continues to take care of people
20  with ovarian cancer.
21    Q.  You include the statement in your report
22  that "The study" -- and I'm looking at your report
23  now -- "did not collect the necessary data to permit
24  this determination," in what you're referring to

Page 192

1  there as dose response in the above sentence.
2      Do you see where I've --
3    A.  Yes.
4    Q.  -- read that?
5    A.  Yes.
6    Q.  Okay.  And what's your basis for that
7  statement?
8    A.  This is -- I believe this is an ever/never
9  study.  Now, have you -- so if it's ever/never, you
10  didn't use it or you ever used it.  And so you --
11  implicitly, you can't get dose response if you don't
12  look at frequency and duration.  And a lot of these
13  talc studies are ever/nevers.
14    Q.  And this is not an attempt for a gotcha or
15  anything like that, but I want to make sure we're
16  looking at the same paper.
17      So can you turn with me to page 1958?
18    A.  (Complied.)
19    Q.  And you see Table 2.  There's a table
20  there with dose response data.
21    A.  (Examined exhibit.)  Well . . .
22    Q.  Do you see here that the --
23    A.  Yeah, I see --
24    Q.  I'm sorry.

Page 193

1    A.  -- I see your table.
2    Q.  Thank you.
3    A.  I see your table.  Here it's used.  And I
4  see what I wrote, and I haven't reread this
5  immediately prior to my deposition.
6      MS. O'DELL:  And if you need a few
7  minutes to refresh yourself, Dr. Smith, feel free to
8  do that.
9      THE WITNESS:  I hate to waste your
10  time, but I'd like to do that.
11      MS. O'DELL:  Yes, please.
12      MR. JAMES:  Yeah.  Can we go off the
13  record while the Doctor reviews the paper?
14      THE WITNESS:  Sure.
15      MR. JAMES:  Leigh, Margaret, is that
16  fine?
17      MS. O'DELL:  You know, if it's gonna
18  take you a few minutes, I think --
19      THE WITNESS:  Yeah.
20      MS. O'DELL:  -- we'll go off.  If it's
21  gonna take you a minute or so, let's just give the
22  Doctor a moment and we'll keep going.
23      THE VIDEOGRAPHER:  Going off the
24  record.  The time is 2:44 p.m.

49 (Pages 190 to 193)

Ellen Blair Smith, M.D.

Page 194

```
1           (A recess was taken from 2:44 p.m.
2       to 2:56 p.m.)
3           THE VIDEOGRAPHER:  This marks the
4   beginning of Disk 3.  Back on the record.  The time
5   is 2:56 p.m.
6       Q.  (BY MR. JAMES)  Dr. Smith, you've had a
7   chance to look at the Huncharek paper, correct?
8       A.  I have.
9       Q.  And does that paper include data to permit
10  a conclusion as to dose response?
11      A.  It does not.
12      Q.  And what's your basis for that statement?
13      A.  They only had dose response information
14  on 9 of the 16 studies, and the authors themselves
15  said only a small minority of studies contain dose
16  responses.
17          This is on page 1958, the left side
18  column, second paragraph that starts there about
19  halfway -- between one-third and one-half way down.
20          "Unfortunately, only limited data were
21  available and only a small minority of" -- oh, I
22  lost my place -- "only a small minority" --
23          UNIDENTIFIED SPEAKER:  (Inaudible.)
24          THE WITNESS:  Okay.
```

Page 195

```
1       A.  -- "only a small minority of studies
2   contain dose-response information of any type
3   and (2), substantial differences existed in dose
4   stratification levels among the studies reporting
5   such information.  It is therefore not possible to
6   perform more sophisticated modeling of dose response
7   data."
8           Final -- far- -- farther down on that,
9   "The lowest half exposure category in this Cramer
10  study was 'less than 30' applications, which is not
11  consistent with other 'low.'"
12          "Taken together, these" -- last
13  sentence, "Taken together, these data show a lack of
14  clear dose-response relationship."  Okay.
15      Q.  (BY MR. JAMES)  So you concluded your
16  answer to my question with a sentence in the paper
17  that says, quote, "Taken together, these data show a
18  lack of a clear dose-response relationship," close
19  quote, correct?
20      A.  Correct.
21          MS. O'DELL:  Object to the form.
22      Q.  (BY MR. JAMES)  So the authors have made
23  conclusions about dose response, correct?
24      A.  They can't.  They said they couldn't.  I
```

Page 196

```
1   must not be understanding you.
2       Q.  Are you misunderstanding the paper?
3           MS. O'DELL:  Objection to form.
4       A.  No.
5           MS. O'DELL:  She said she was
6   misunderstanding your question.
7           MR. JAMES:  I'm posing the questions,
8   Leigh.  Thank you.
9       Q.  (BY MR. JAMES)  Dr. Smith, you've stated
10  in your report that, quote, "The study did not
11  collect the necessary data to permit this
12  determination," close quote.
13          Do you see that?
14      A.  Yes.
15      Q.  And your position is that the
16  dose-response findings in this paper are a nullity?
17  Is that your position?
18          MS. O'DELL:  Object to the form.
19      A.  I don't know what you mean by "nullity,"
20  but they didn't have sufficient data to determine a
21  clear dose response.
22      Q.  (BY MR. JAMES)  Okay.  And yet we do see
23  here that the authors have made a conclusion about
24  dose response, correct?
```

Page 197

```
1           MS. O'DELL:  Object to the form.
2       A.  "Despite the findings, the data showed a
3   lack of clear dose-response relationship, making the
4   relative risk of questionable validity."  That's in
5   their abstract.
6           So I don't see where they say they
7   have made a clear dose-response relationship.
8       Q.  (BY MR. JAMES)  Okay.  Let's just let the
9   language of the paper speak for itself and we can
10  move on.
11          MS. O'DELL:  Object to the form.
12      Q.  (BY MR. JAMES)  Next you discuss the
13  Langseth study, correct?
14      A.  Yes, sir.
15      Q.  And on page 12 of your report, you quote
16  the statement in the paper, and I'm gonna mark it as
17  Exhibit Number 19.
18          (Deposition Exhibit 19 marked for
19          identification.)
20      Q.  (BY MR. JAMES)  Okay.  I'm handing you a
21  clean copy of Exhibit Number 19 of Langseth.
22      A.  Thank you.
23      Q.  Okay.  In your report you quote the
24  article for the proposition --
```

50 (Pages 194 to 197)

Ellen Blair Smith, M.D.

Page 198

1     A.  You gave me two copies.

2          THE WITNESS:  Does somebody else need

3  another one?

4     Q.  (BY MR. JAMES)  -- for the proposition

5  that the epide- -- "epidemiological evidence

6  suggests that the use of cosmetic talc in the

7  perineal area may be associated with ovarian cancer

8  risk."

9          That's what you quote in your report,

10  correct?

11     A.  Correct.

12     Q.  If you look at the second page of the

13  article in the section titled "Proposal: To Research

14  Community," do you see where I am?

15     A.  I do.

16     Q.  Okay.  The authors there state, quote,

17  "The current body of experimental and

18  epidemiological evidence is insufficient to

19  establish a causal association between perineal use

20  of talc and ovarian cancer risk," close quote.

21          Do you see where I read that?

22     A.  I do.

23     Q.  And that conclusion of the author -- or

24  the authors is not included in your report, is it?

Page 199

1          MS. O'DELL:  Object to the form.

2     A.  It is not.  I don't agree with that

3  conclusion.

4     Q.  (BY MR. JAMES)  So this is another paper

5  that you've cited where you disagree with the

6  authors' conclusions, correct?

7     A.  Correct.  They have a statistically

8  significant overall risk of 1.35 -- between 1.26

9  to 1.46, so that is -- and then it says on research

10  report what this study shows, "Epidemiologic [sic]

11  evidence suggests the use of cosmetic talc in the

12  perineal area may be associated with ovarian cancer

13  risk."

14     Q.  That's the portion that you've cited in

15  your report, correct?

16     A.  Yes, that is exactly what I quoted.

17     Q.  But you didn't quote the sentence that I

18  read that specifically disclaims a causal

19  association, correct?

20          MS. O'DELL:  Object to the form.

21     Q.  (BY MR. JAMES)  Or --

22     A.  I --

23     Q.  Well, let me --

24     A.  I did not --

Page 200

1     Q.  Sorry.

2     A.  -- cite that.

3     Q.  And, again, you -- in your report, you

4  concluded that meta-analyses are -- I think you used

5  the terminology "most valid" way to look at this

6  issue; is that right?

7     A.  Okay.  I think they're the best we have,

8  and I think they are the best we are going to have.

9          The best studies to determine

10  causation are randomized, controlled, prospective

11  trials, and more than one of them.  That's what's

12  called Level 1 evidence.

13          There is no ethical way we can apply

14  any possible carcinogen, suspected carcinogen,

15  proven carcinogen to the perineum of any woman and

16  have that be ethically acceptable.  That study

17  cannot be done.

18          We are going to have to validate the

19  epidemiologic data in the laboratory, because that's

20  the only ethical place.

21     Q.  And you understand the length of study is

22  authored by the IARC Working Group, correct?

23     A.  Yes.

24     Q.  And do you understand that IARC has

Page 201

1  classifi- -- classified perineal talc application as

2  a 2B?

3          MS. O'DELL:  Objection to --

4     Q.  (BY MR. JAMES)  Do you understand that?

5          MS. O'DELL:  Excuse me.  Object to the

6  characteration -- characterization regarding the

7  working group.

8     A.  IARC 93 classified talc as a 2B possible

9  carcinogen.

10     Q.  (BY MR. JAMES)  Do you understand IARC has

11  not classified talc as a carcinogen, correct?

12          MS. O'DELL:  Object to the form.

13     A.  Correct.

14     Q.  (BY MR. JAMES)  And IARC has not

15  classified talc as a probable carcinogen, correct?

16     A.  Correct.

17     Q.  The conclusion that you're offering -- the

18  opinion that you're offering here today conflicts

19  with the IARC 2B finding, correct?

20          MS. O'DELL:  Objection to form.

21     A.  I told you that a study can't apply

22  anything that's a possible, and I didn't say talc in

23  any study.

24          I said the model for a randomized

Ellen Blair Smith, M.D.

Page 202

1  controlled trial would be apply whatever substance
2  you want to women and see if they result in this
3  disease.
4          But if you start with a possible,
5  probable, or absolutely carcinogen, you're never
6  gonna -- you can't -- you can't even write that down
7  on the paper.  That's not going anywhere.
8          That study will -- multiple studies we
9  need -- we needed to have to have Level 1 evidence
10 will never be done.
11     Q.  (BY MR. JAMES)  And I think that your
12 answer maybe wasn't responsive to my question.
13         And so my question is whether the
14 causation opinion you're offering in this litigation
15 is different than the conclusion reached by IARC?
16     A.  IARC in -- based on data up to 2006,
17 declared talc a 2B possible carcinogen.
18         I believe that since 2006, in the past
19 12 years, we have a plethora of data that leads me
20 to the conclusion that talc is a Class 1 carcinogen.
21     Q.  You know IARC has not, to date, made that
22 classification, correct?
23     A.  That's right.
24     Q.  Okay.  Next in your report you discuss a

Page 203

1  Terry pooled analysis, correct?
2      A.  Yes.
3      Q.  And, again, here in your report -- and we
4  can mark Terry if that -- I'll hand you a copy of
5  that.
6          In your report you note the overall
7  odds ratio in Terry is a 1.24, correct?
8      A.  Yes.
9      Q.  Okay.  And I'm gonna mark Terry as Exhibit
10 Number 20.
11         (Deposition Exhibit 20 marked for
12         identification.)
13     Q.  (BY MR. JAMES)  You see here that the
14 Terry odds ratio of 1.24 is lower than some of the
15 odds ratios reported in the prior meta-analyses,
16 correct?
17         MS. O'DELL:  Object to the form.
18     A.  Slightly.  Well, let's see.
19         (Examined exhibit.)  1.33.  1.24 is
20 smaller.  Yes, I agree with -- that 1.24 is lower
21 than 1.33.
22     Q.  (BY MR. JAMES)  Would you agree with the
23 authors of this paper when they describe the odds
24 ratio as a modest odds ratio?

Page 204

1      A.  We've had this discussion before.
2      Q.  Okay.  Fair enough.
3          And your answers prior hold here as
4  well?
5      A.  They hold.
6      Q.  Understood.
7          In your report, I didn't see any
8  discussion in the -- when you're mentioning the
9  Terry paper of the paper's findings on dose
10 response.
11         Are you familiar with the
12 dose-response findings in the Terry paper?
13     A.  Once more, I'll need a moment to look.
14         (Examined exhibit.)  They did -- there
15 is no significant trend for increasing number of
16 lifetime applications.
17     Q.  And if you see on page -- I think you're
18 reading on page 817; is that right, Dr. Smith?
19     A.  I was reading from the abstracts.
20     Q.  Oh, yes, Doctor.
21         If we also look at the page 812.
22     A.  (Complied.)
23     Q.  Do you see there where they say "Evidence
24 for a dose-response relationship has been

Page 205

1  inconsistent" or are you on another page?
2      A.  Did you say 812?
3      Q.  Yes, Doctor.
4      A.  The top?
5      Q.  Yes, The top.
6      A.  Yes.  "Evidence of dose-response
7  relationship has been inconsistent."
8      Q.  And is there a reason why you don't
9  discuss the dose-response findings of Terry in your
10 report?
11     A.  Because they didn't use -- they didn't
12 observe the trend of increased risk applications.  I
13 mean, I -- it wasn't a pointed omission.
14         MS. O'DELL:  If you want to re- --
15 need to review the paper.
16     Q.  (BY MR. JAMES)  Dr. Smith, are you
17 reviewing or may I continue with another question?
18     A.  Hold on one second.  (Examined exhibit.)
19     Q.  Sure.
20     A.  (Paraphrasing.)  No trend in cumulative
21 use was evident in analyses restricted to ever-users
22 of genital powder.  Taken together, these
23 observations suggest that the significant trend test
24 largely reflects ever/never.

52 (Pages 202 to 205)

Ellen Blair Smith, M.D.

Page 206

1          I would -- I would suggest that I
2    didn't mention a negative.  I mean, it isn't there.
3          Q.  So that if a paper finds that there's no
4    dose response, that's the basis for you not to
5    report that finding?
6          MS. O'DELL:  Object to the form.
7          A.  I think it didn't add anything to the body
8    of this report.
9          Q.  (BY MR. JAMES)  You acknowledge later in
10   your report that whether or not the literature
11   reports a dose response, one way or the other, is
12   important to the causative analysis, correct?
13         A.  I accept that it -- I could have improved
14   my report by including that negative information.
15         Q.  And if you look at the page 820 of the
16   Terry article -- it's at the very end of the
17   article.  We see in the language at the top of the
18   right column that the authors conclude, quote, "More
19   work is needed to understand how genital powders may
20   exert a carcinogenic effect, and which constituents
21   (e.g., talc) may be involved."
22         MS. O'DELL:  Object to form.
23         A.  I would agree with that wholeheartedly.
24         Q.  (BY MR. JAMES)  So as of 2013, Dr. Smith,

Page 207

1    the Terry authors are concluding that the --
2    concluding that whether or not talc exerts a
3    carcinogenic effect is undetermined, correct?
4          MS. O'DELL:  Object to the form;
5    misstates the record.
6          A.  That's what they stated, exactly.  And I
7    would agree more work needs to be done.
8          Q.  (BY MR. JAMES)  All right.  Finally,
9    Dr. Smith, you discuss the Penninkilampi --
10         A.  Yes.
11         Q.  -- study, correct?
12         A.  Yes.
13         Q.  I'm gonna mark the Penninkilampi study as
14   Exhibit Number 21.
15         (Deposition Exhibit 21 marked for
16   identification.)
17         Q.  (BY MR. JAMES)  In your report, Dr. Smith,
18   you refer to the odds ratio with -- associated with
19   long-term powder use as a 1.25, correct?
20         A.  Correct.
21         Q.  And if we look at Figure 2 of the study --
22   or it's Table 2 --
23         A.  (Complied.)
24         Q.  -- you see that the long-term use odds

Page 208

1    ratio of the 1.25 is less than the overall odds
2    ratio reported of the 1.31, correct?
3          A.  I --
4          Q.  And another -- maybe an easier place to
5    reference, Dr. Smith, would be the abstract in the
6    results section.
7          A.  No.  I believe I used the serous invasion
8    rather than all.  And that -- that's just -- I
9    should've put "serous carcinoma" there, not "all."
10   That's just a flat out mistake.
11         Q.  And if we see in the Results section,
12   Dr. Smith, we see -- and this is in the abstract
13   portion of the paper, they report that the odds
14   ratio with any perineal talc use associated with
15   ovarian cancer --
16         MS. O'DELL:  Where -- where are you
17   reading from?
18         MR. JAMES:  I'm in the abstract in the
19   Results section.
20         MS. O'DELL:  Okay.
21         MR. JAMES:  This is 1.31.
22         A.  Yeah.  That's just a typo.  Yeah, 1.31 --
23         Q.  (BY MR. JAMES)  And then --
24         MS. O'DELL:  Excuse me.

Page 209

1          Q.  (BY MR. JAMES)  Let me finish.
2          MS. O'DELL:  Let him finish, please.
3          A.  I'm sorry.
4          Q.  (BY MR. JAMES)  So the abstract reports
5    that the overall odds ratio was a 1.31.  But if you
6    continue on reading in the abstract, you see that
7    the long-term talc use odds ratio is a 1.25.
8          Do you see that?
9          MS. O'DELL:  Object to the form.
10         A.  Okay.  How far down did you go?  I see
11   "any," then "more than 3600 lifetime applications"
12   is 1.42.
13         And ever use is 1.35, 1.27, 1.43 in
14   case control, but not cohort studies.
15         Q.  (BY MR. JAMES)  Okay.  And my apol- --
16         A.  "However" --
17         Q.  Oh, sorry, Doctor.
18         A.  -- is that where -- is that where you are?
19   Is that the right sentence now?
20         Q.  If -- if I may.  If I may refer you back
21   to Figure 2 and not Table 2, I think that will get
22   us there quicker.
23         MS. O'DELL:  I'm sorry, Scott.  I'm
24   sort of confused.

53 (Pages 206 to 209)

Ellen Blair Smith, M.D.

Page 210

1          MR. JAMES: Sure. And I'm gonna --
2     I'm straightening this up right now.
3          THE WITNESS: Okay. Okay.
4     Q. (BY MR. JAMES) So we're looking at
5     Figure 2, which is where I initially --
6     A. Okay.
7     Q. -- tried to get us.
8     A. Okay. So -- okay. So the -- yes.
9          MS. O'DELL: Okay. Excuse me. Let
10    him --
11         THE WITNESS: I'm sorry.
12         MS. O'DELL: -- ask a question.
13    Q. (BY MR. JAMES) So on page -- on
14    Figure 2 --
15         MS. O'DELL: Excuse me. Dr. Smith, if
16    you'll let him ask the question.
17         This is very -- gonna be very
18    confusing on the record, so if we could just start
19    over and make it clear.
20         MR. JAMES: Sure. Sure.
21         MS. O'DELL: Thank you.
22    Q. (BY MR. JAMES) So we're looking at the
23    Penninkilampi study, Figure 2, page 46, correct?
24    A. Correct.

Page 211

1     Q. Okay. And do we see here, which is where
2     I was trying to go, that the "Any perineal talc use"
3     odds ratio reported here is a 1.31, correct?
4     A. Correct.
5     Q. And then they go on in Figure 2 to state
6     that the "Long-Term perineal talc use" odds ratio is
7     a 1.25, correct?
8     A. Correct.
9     Q. And the authors also note that it's a
10    lower magnitude odds ratio, correct?
11    A. Correct.
12    Q. Does that lower magnitude odds ratio for
13    long-term perineal talc use comport with your
14    litigation opinions?
15         MS. O'DELL: Object to the form.
16    A. It's not inconsistent.
17    Q. (BY MR. JAMES) It's not inconsistent with
18    your opinions that a long-term talc user has a lower
19    odds ratio?
20         MS. O'DELL: Object to the form.
21    A. It is not unusual to have a -- a single
22    inconsistent finding within one study. It doesn't
23    change the whole picture of -- I mean, I note it. I
24    acknowledge it.

Page 212

1     Q. (BY MR. JAMES) Uh-huh.
2     A. Cramer's got a paper. I think it's Cramer
3     has a paper that tubal ligation increases ovarian
4     cancer risks in one of his forms. I mean, it's --
5     you know, you have the outliers. But the body of
6     literature doesn't support this single decrease from
7     1.31 to 1.25. But, you know, okay, but I see it. I
8     know it.
9     Q. And in your report you discuss
10    Penninkilampi as politically -- excuse me,
11    particularly important to your analysis, correct?
12         MS. O'DELL: Object to the form.
13    A. I really like this study. I -- I like the
14    scope of it. I like inclusion of the cohorts. It
15    has a huge number of cases. Bigger is better. When
16    you get away from small numbers and into the really
17    large numbers, you have a much higher chance of
18    finding truth if you -- so I like this study.
19    Q. (BY MR. JAMES) Do you see on page 42 of
20    the study, it's the left-hand column, top paragraph,
21    bottom sentence, the authors state, "Hence, while
22    perineal talc use has not been shown to be safe, in
23    a similar regard, a certain causal link between talc
24    use and ovarian cancer has not yet been

Page 213

1     established," close quote?
2     A. They do say that.
3     Q. Okay. Do you agree with that finding or
4     statement?
5     A. My conclusions are based on the totality
6     of all the evidence that I have reviewed, not just
7     the epidemiologic. Certainly, they have not reached
8     that conclusion.
9          MR. KLATT: Objection; nonresponsive.
10    Q. (BY MR. JAMES) And the Penninkilampi
11    authors did not reach a causation conclusion,
12    correct?
13         MS. O'DELL: Object to form.
14    A. Well, in their introduction, they said a
15    causal link has not been used.
16         And their discussion is that they said
17    that a (paraphrasing) talc use appears to be
18    associated with an increased risk of serous ovarian
19    cancer, both invasive and borderline, and not with
20    mucinous and with endometrial -- endometrioid
21    ovarian cancer with perineal use.
22    Q. (BY MR. JAMES) The question remains,
23    Dr. Smith: The Penninkilampi study that you cite as
24    particularly important in your report, the authors

Ellen Blair Smith, M.D.

Page 214

1    there do not render the conclusion that talc is a
2    demonstrated cause of ovarian cancer, do they?
3         MS. O'DELL: Objection to form; asked
4    and answered.
5         A. They ask for a sustained need for further
6    research on the potential mechanism by which ovarian
7    cancer may be caused by talc.
8         So they -- they do not allow a causal
9    relationship, nor do they allow rejecting that
10   causal relationship.
11        Q. (BY MR. JAMES) And here, we do know that
12   you have rendered the causation opinion, and so your
13   causation opinion is different than the opinion
14   reached by the authors of the Penninkilampi study,
15   isn't it?
16        A. Yes.
17        Q. When evaluating the Penninkilampi study,
18   did you note that the Penninkilampi authors omitted
19   certain cohort data?
20        A. They use Gertig rather than Gates.
21        Q. Okay. And the Gates paper is the
22   follow-up paper, correct?
23        A. The Gates paper is the -- do you want to
24   do the -- the prospective studies now or do you want

Page 215

1    to do it as part of this?
2         Q. I -- right now, I'd just like to continue
3    with the questioning.
4         A. Okay. Okay.
5         Q. And if there is a --
6         A. Okay.
7         Q. -- point where you'd like the papers,
8    we'll get them for you.
9         A. Thank you.
10        Q. Okay.
11        A. I always love the papers.
12        The Gates study is the first half of
13   the Nurses' study.
14        MS. O'DELL: Scott, if you're gonna
15   mark the papers, why don't we go ahead and mark
16   Gates and --
17        THE WITNESS: Gertig?
18        MS. O'DELL: -- if you're going to --
19   Yes.
20        If you're going to -- I think we've
21   marked them --
22        MR. JAMES: Sure. That sounds fine.
23        MS. O'DELL: That way the Doctor can
24   have it in front of her while she's answering the

Page 216

1    questions.
2         MR. JAMES: Okay. So I'm marking the
3    Gates 2010 paper as Exhibit 22.
4         (Deposition Exhibit 22 marked for
5         identification.)
6         Q. (BY MR. JAMES) And so the question --
7    I'll rephrase.
8         MS. O'DELL: Oh. I thought you were
9    gonna hand me something else. Okay.
10        Q. (BY MR. JAMES) The Gates paper is the --
11   is a paper produced on the Nurses' Health cohort,
12   correct, Dr. Smith?
13        A. Did you say the Gates' paper?
14        Q. Yes.
15        A. Yes.
16        MS. O'DELL: Are you gonna mark
17   Gertig, if you're gonna compare the two?
18        MR. JAMES: I'll mark Gertig as
19   Exhibit 23.
20        (Deposition Exhibit 23 marked for
21        identification.)
22        Q. (BY MR. JAMES) And Dr. Smith, Gertig is
23   also a Nurses' Health paper, correct?
24        A. It's the first one.

Page 217

1         Q. Thank you.
2         A. Thank you.
3         Q. All right. And so to reframe the
4    question, Dr. Smith, the Penninkilampi study omits
5    the data from the Gates 2010 study, correct?
6         MS. O'DELL: Object to the form.
7    Excuse me. I'm sorry.
8         A. It used Gertig and not Gates.
9         Q. (BY MR. JAMES) Okay. Is there --
10        A. I -- I don't think he -- I don't know why
11   he -- that is what it is.
12        Q. And, again, you understand the Gates 2010
13   paper has data on additional years of follow-up,
14   correct?
15        A. And additional patients.
16        MS. O'DELL: Objection to form.
17        Q. (BY MR. JAMES) And you understand that
18   the Gates 2010 paper includes an analysis of the
19   odds ratios associated with talc and ovarian cancer,
20   correct?
21        A. Correct.
22        Q. Do you believe the Penninkilampi study
23   should have included the data from the Gates 2010
24   paper?

55 (Pages 214 to 217)

Ellen Blair Smith, M.D.

Page 218

1      A. I --
2          MS. O'DELL: Object to the form.
3      A. I believe it doesn't matter.
4      Q. (BY MR. JAMES) Why doesn't it matter?
5      A. Because we have the Berge study that did
6   include it, and that -- for some reason, it's not
7   included in my report, and if you don't call it a
8   flaw, I will. I -- I think in multiple drafts and
9   cut and pasting it went to the great cyber void.
10     Q. Okay. And that's -- the discussion that
11  you just had was concerning the Berge paper,
12  correct?
13     A. Right.
14     Q. But returning back to the Penninkilampi
15  study, do you believe it was a flaw for the authors
16  not to include data from Gates 2010?
17         MS. O'DELL: Objection to form.
18     A. No, I don't.
19     Q. (BY MR. JAMES) Why is that?
20     A. Because it doesn't make any difference.
21  Because Berge did, and it didn't make any difference
22  in the results.
23     Q. Okay. So I'm asking about the
24  Penninkilampi study. And my question is whether

Page 219

1   Penninkilampi should have included the data from the
2   Gates 2010.
3          MS. O'DELL: Object to the form.
4      A. Well, if you use the most recent available
5   data, maybe he should have, yes, you're right.
6      Q. (BY MR. JAMES) And, in fact, that's one
7   of the points that you make in your report, correct?
8          You -- one of the things you note in
9   your report is follow-up is a good thing, right?
10     A. Correct.
11     Q. And the Penninkilampi authors make certain
12  conclusions about the cohort data, don't they?
13     A. You're gonna have to tell me what those
14  conclusions are before I'll agree with or not agree
15  with that.
16     Q. Okay. Dr. Smith, if you -- do you have
17  the Penninkilampi paper in front of you?
18     A. I do.
19     Q. Okay. And you see on page 47 in the
20  Conclusions section --
21     A. Um-hum.
22     Q. -- you see that, quote -- and this is the
23  second sentence down --
24     A. Um-hum.

Page 220

1      Q. -- "While the results of case-control
2   studies are prone to recall bias, especially with
3   intense media attention following the commencement
4   of litigation in 2014, the confirmation of an
5   association in cohort studies between perineal talc
6   use and serous invasive ovarian cancer is suggestive
7   of a causal association," closed quote.
8          Do you see that?
9      A. Yes.
10     Q. And so Penninkilampi is hinging its
11  conclusions on what it believes to be the results
12  of, quote, "cohort studies," closed quote, correct?
13         MS. O'DELL: Object to the form.
14     A. I don't believe that they hinge their
15  whole findings on cohort studies. Their statistical
16  and significant include- -- significance included
17  those cohort studies, but it's only a component of
18  theirs.
19     Q. (BY MR. JAMES) And certainly in the
20  Conclusions section, the Penninkilampi authors
21  acknowledge the bias limitations associated with
22  case control studies, correct?
23     A. They say case control studies are prone to
24  recall bias. I think a better choice of words would

Page 221

1   be may be prone to recall bias.
2          But, yes, cohort studies obviate
3   recall bias. They don't have it.
4      Q. And we know again here that Penninkilampi
5   did not include the Nurses' Health cohort data from
6   2010 Gates, correct?
7          MS. O'DELL: Object to the form.
8      A. Correct.
9      Q. (BY MR. JAMES) Okay. And are -- do you
10  know that in the Gates 2010 paper the reported
11  association with the serous ovarian cancer washed
12  out?
13     A. I know that.
14         MS. O'DELL: Object to the form.
15     Q. (BY MR. JAMES) And Penninkilampi
16  apparently doesn't know that, correct?
17         MS. O'DELL: Object to the form.
18     A. I haven't talked to him.
19     Q. (BY MR. JAMES) Okay. Well, Penninkilampi
20  is referring to a confirmation of an association and
21  cohort studies.
22         Do you see that?
23     A. Right.
24     Q. So he must be referring to --

Ellen Blair Smith, M.D.

Page 222

1    A. The Gertig study.
2    Q. -- Gertig study, correct?
3       MS. O'DELL: Excuse me.
4    A. Right.
5       MS. O'DELL: Object to the form.
6       Hey, Doctor, give me just a minute
7    to --
8       THE WITNESS: Okay. I'm sorry.
9       MS. O'DELL: -- get my objection in.
10   Q. (BY MR. JAMES) And we know that's true
11   because we know none of the cohorts performed today
12   have found an association, correct?
13      MS. O'DELL: Object to the form.
14   A. That is true.
15   Q. (BY MR. JAMES) We know the Women's Health
16   Initiative study did not find an association between
17   perineal talc use and ovarian cancer, correct?
18      MS. O'DELL: Object to the form.
19   A. That is true.
20   Q. (BY MR. JAMES) We know the Gonzalez
21   Sister Study -- the prospective Gonzalez Sister
22   Study did not find an association between perineal
23   talc use and ovarian cancer, correct?
24   A. That is true.

Page 223

1    Q. So we can deduce here that the only study
2    that he can be referring to is the Gertig 2000
3    study, correct?
4    A. He lists Gertig in his reference -- in
5    his -- see. He lists Gertig --
6    Q. So there's no dispute --
7    A. -- right there.
8    Q. I'm sorry, Doctor.
9    A. In Gertig, there's no dispute. He's
10   not trying to hide anything. It's listed,
11   "Gertig 2000."
12   Q. Right. So there's no dispute in our
13   discussion here either than what he's referring to
14   there is the Gertig 2000 study, correct?
15      MS. O'DELL: Object to the form.
16   A. He is referring to the Gertig.
17   Q. (BY MR. JAMES) And he just forgot to look
18   at the Gates 2010 data, correct?
19   A. I don't know why --
20      MS. O'DELL: Object to the form.
21   A. -- he didn't look at the Gates study.
22      MS. O'DELL: Excuse me, Doctor.
23      Object to the form.
24      You may answer.

Page 224

1    Q. (BY MR. JAMES) If you had looked at
2    the Gates --
3       MS. O'DELL: Hey, let -- finish -- if
4    you've got an answer --
5       Did you finish your answer?
6       THE WITNESS: I did finish my answer.
7       MS. O'DELL: Okay. Give me a moment.
8    Thank you.
9       THE WITNESS: I know. I'm not
10   supposed to talk so fast.
11   Q. (BY MR. JAMES) If you had looked at the
12   Gates 2010 data, he wouldn't have been able to make
13   that statement, correct?
14      MS. O'DELL: Object to the form.
15   A. Do you mean the statement that the
16   confirmation of an association in cohort studies
17   between perineal talc use and serous invasive cancer
18   is suggested of a causal association?
19      Well, his -- the Gates study did not
20   have statistically significant increase incidence of
21   serous ovarian cancer.
22   Q. (BY MR. JAMES) Another reason that you'd
23   want to look at the most recent data available from
24   a cohort is because of concerns about latency, which

Page 225

1    you also cite in your report, correct?
2       MS. O'DELL: Objection to form.
3    A. That's not the only reason to just look at
4    most up-to-date studies.
5    Q. (BY MR. JAMES) Is it one of the reasons?
6       MS. O'DELL: Object to the form.
7    A. I have never con- --- thought about latency
8    in terms of looking at the most recent study and the
9    most up-to-date studies.
10   Q. (BY MR. JAMES) Okay. In your report, do
11   you recall critiquing the cohort studies on the
12   basis that, in your opinion, they have short
13   follow-up and don't account for latency?
14      Do you recall that critique?
15   A. Particularly -- particularly the Gonzalez
16   study, yes.
17   Q. Okay. But the -- the question that I'm
18   posing here is more general in nature.
19      Is that one of the reasons that you
20   would want to include the most recent data from a
21   cohort is to, in part, address the concern of
22   latency that you --
23   A. The longest follow-up possible.
24   Q. Okay. We will turn to the Berge study,

Ellen Blair Smith, M.D.

Page 226

1 which you previewed for us, Dr. Smith, and I will
2 hand you a copy, if I haven't already.
3         MR. JAMES: I'm gonna mark Berge,
4 B-e-r-g-e, as Exhibit 24.
5         (Deposition Exhibit 24 marked for
6         identification.)
7 Q.  (BY MR. JAMES) Dr. Smith, I've handed you
8 the Berge paper.
9         And this is a paper you have seen
10 before, correct?
11 A.  It is.
12 Q.  And as you just discussed, you acknowledge
13 it's not discussed in your report, correct?
14         MS. O'DELL: Objection to form.
15 Q.  (BY MR. JAMES) Or I'll -- I'm going to
16 rephrase. I know -- I --
17 A.  I have cited it --
18 Q.  -- I can correct that.
19         You cited it for a publication bias
20 point, correct?
21 A.  I don't -- I'd have to look where I cited
22 it.
23 Q.  Okay.
24 A.  I -- it's missing from here.  Yeah.

Page 227

1 Q.  Do you agree that you haven't discussed
2 the Berge study in-depth in your report?
3 A.  Correct.
4 Q.  And that was a -- what you were alluding
5 to earlier as a mistake and omission.  Fair?
6         MS. O'DELL: Objection to form.
7 A.  Correct.
8 Q.  (BY MR. JAMES) What are your thoughts on
9 the Berge study?
10 A.  Again, it -- it -- it uses Gates instead
11 of Gertig.  It has very similar findings to
12 Penninkilampi.  If you look at his forest plot, he
13 looks at the cohort studies:  Gates, Houghton,
14 Gonzalez, nurses, women, sisters.  Again, they are
15 not statistically significant on their relative risk
16 and confidence intervals.
17         And yet in inclusion with the entire
18 population, his numbers are very similar to
19 Penninkilampi with an overall relative risk slightly
20 lower of 1.22 versus Penninkilampi is 1.31;
21 confidence intervals 1.13 to 1.30 for Berg remains
22 statistically significant as Penninkilampi 1.24 to
23 1.39.
24 Q.  Do you -- Doctor, are you finished?

Page 228

1 A.  I was looking for something, but go ahead
2 and talk.
3         MS. O'DELL: Excuse me.  I think --
4 let me get -- I think maybe -- do you have part of
5 the table missing from your version?
6         THE WITNESS: There's -- yeah, there's
7 a table that I'm used to around here.
8         MR. JAMES: Do you have a better copy,
9 Leigh?
10         THE WITNESS: Let me see.
11         MS. O'DELL: Is it an eTable?
12         THE WITNESS: No, I think it's just
13 the copy . . .
14         MR. JAMES: That's all I have.
15         THE WITNESS: Oh, yeah.  No.  I don't
16 know.  Yeah, this is my copy.
17         MR. JAMES: Okay.  Let me see.
18         And Mr. Klatt has handed me some
19 better copies as well, if anybody needs a better one
20 as well.
21         MS. O'DELL: Thank you.
22         MR. JAMES: And at the break, I will
23 resticker.
24         THE WITNESS: Yeah, it's Table 2 on --

Page 229

1 here it is.
2 A.  Table 2 on page 6 where Penninkilampi -- I
3 am becoming buried -- found invasive serous.
4         So first, I'm gonna give you
5 Penninkilampi's statistically significant increase
6 rate invasive serous cancer with genital talc use.
7 Penninkilampi's numbers are overall risk 1.25,
8 confidence interval 1.01 to 1.55.
9         Berg -- Berge is 1.24, confident
10 intervals 1.15 to 1.34.
11         So this is why I told you from
12 comparing these two papers that Gertig versus Gates,
13 when you look at all the same body, it's six of one
14 half-a-dozen of the other, the inclusion of which of
15 those two post -- his studies in meta-analyses.
16 Q.  (BY MR. JAMES) But you have already
17 agreed with me that it would have been better for
18 Penninkilampi to included the Gates 2010 data,
19 correct?
20         MS. O'DELL: Objection to form.
21 A.  I like using the most recent study.
22 Q.  (BY MR. JAMES) And that's EPI 101, isn't
23 it?
24         MS. O'DELL: Objection; form.

58 (Pages 226 to 229)

Ellen Blair Smith, M.D.

Page 230

1    A. That's everything 101.
2    Q. (BY MR. JAMES) And we see here in the
3  Berge paper if we look at the conclusions in the
4  abstract, the very last sentence of the paper, the
5  authors conclude, quote -- and I'm at the very first
6  page of the paper in the abstract -- they conclude,
7  quote, "The heterogeneity of results by study
8  design . . . however, detracts from a causal
9  interpretation of the association."
10   A. I think I'm in the wrong place.
11       MS. O'DELL: What page are you on?
12       MR. JAMES: The abstract.
13   A. The heterogeneity.
14   Q. (BY MR. JAMES) Dr. Smith, I think your
15  scarf is covering your mike.
16   A. I'm sorry. Nope. I broke it.
17       THE VIDEOGRAPHER: Okay. We need to
18  go off the record.
19       MR. JAMES: Okay. Off the record.
20       THE VIDEOGRAPHER: Okay. Off the
21  record. The time is 3:41 p.m.
22       (A recess was taken from 3:41 p.m.
23       to 4:13 p.m.)
24       THE VIDEOGRAPHER: Back on the record.

Page 231

1  The time is 4:13 p.m.
2    Q. (BY MR. JAMES) And, Dr. Smith, when we
3  broke, we were discussing the Berge study, correct?
4    A. Yes.
5    Q. And so I'm gonna -- I think that when we
6  broke I was pointing you toward the abstract portion
7  of the patient -- paper.
8    A. Correct.
9    Q. Okay. And do you see there at the bottom
10  of the abstract the authors there conclude, quote,
11  "The heterogeneity of results by study design and
12  the lack of a trend for duration and frequency of
13  use, however, detract from a causal interpretation
14  of this association," close quotes?
15   A. That --
16       MS. O'DELL: Object to form.
17   A. That was their assessment.
18   Q. (BY MR. JAMES) Okay. And your litigation
19  opinion differs from the causal conclusions reached
20  by these authors, correct?
21       MS. O'DELL: Object to the form.
22   A. My causal interpretation is built on the
23  totality of all of these studies and the
24  biochemistry and all the literature I reviewed. So

Page 232

1  it does differ from this individual one paper.
2    Q. (BY MR. JAMES) And, again, the individual
3  one paper you're here is a meta-analysis that -- it
4  is a meta-analysis, correct?
5    A. Yes. I have -- I have great respect for
6  this paper.
7    Q. And we see the -- in the conclusion that
8  we just read, one of the points the authors here
9  make concerns the heterogeneity results by study
10  design, correct?
11   A. Correct.
12   Q. And there the authors are noting that the
13  association that appears in a subset of the case
14  control studies is not being replicated in the
15  cohorts prospective studies, correct?
16       MS. O'DELL: Object to the form.
17   A. Case control studies are entirely
18  different from cohort studies.
19   Q. (BY MR. JAMES) All right. Let me ask my
20  question again.
21   A. Okay.
22   Q. Here when the authors are referring to the
23  difference in the results of the types of studies,
24  right, in this conclusion, that's what they're

Page 233

1  referring to, aren't they, when they say
2  "heterogeneity"?
3    A. I can't -- I can't define their
4  heterogeneity.
5    Q. Let me try again. So here the authors
6  refer to the -- quote, "The heterogeneity of results
7  by study design," close quote.
8       Does that phrase -- do you understand
9  what they mean by that phrase?
10   A. Do they define it further in the text? I
11  don't remember that.
12   Q. Let's look to page 253 of the article.
13   A. Mine has single-digit page numbers.
14   Q. Hum.
15   A. Starts on page 1 and goes to page 9 --
16  oop. Because mine's an e-Pub. This is an e-Pub.
17       MS. O'DELL: This is the copy I think
18  you gave.
19       MR. JAMES: Can I see that real quick?
20       MS. O'DELL: Yeah.
21       MR. JAMES: Is that an e-Pub as well,
22  Leigh, on the front?
23       BY MS. O'DELL: It --
24       THE WITNESS: It says, "Cancer --

59 (Pages 230 to 233)

Ellen Blair Smith, M.D.

Page 234

1  General Cancer Position 00000."
2          MS. O'DELL:  Is that the same one
3  you're looking at?  It's just different page
4  numbers.
5          MR. JAMES:  Um-hum.
6          MS. O'DELL:  That may be the copy
7  that -- I think that's the copy that -- that Mike
8  gave us.
9          MR. JAMES:  Um-hum.
10          THE WITNESS:  Because on my copy, I
11  had to write down the final publication information
12  beside it.
13          MR. JAMES:  Okay.  I think on the next
14  break I'm gonna take a peek closer at these Berge
15  articles.  I think we may still have a disconnect.
16          MS. O'DELL:  Okay.
17          MR. JAMES:  I'm not sure why we're
18  looking at two different versions on the same paper.
19  Here you go.
20          THE WITNESS:  I have written here that
21  the final publication pages were 248 through 257 of
22  Volume 27.
23          Does that help you?
24          MR. JAMES:  Sort of.  So let's --

Page 235

1  let's just keep moving.  Okay?
2          THE WITNESS:  Okay.
3          MR. JAMES:  Let's keep plowing.
4          Q.  (BY MR. JAMES)  The Berge authors made a
5  conclusion that the evidence was insufficient to
6  support causation, correct?
7          MS. O'DELL:  Object to the form.
8          A.  They say it detracts from causal
9  interpretation of this association.
10          Q.  (BY MR. JAMES)  And one of the items they
11  consider is the fact that the cohort data does not
12  report a statistically significant association
13  between ovarian cancer and talc use, correct?
14          A.  Because they use Gates.
15          Q.  Understood.
16          Would you agree that all of the
17  meta-analyses that we have looked at today and that
18  you addressed in your report are relying on a -- on
19  a similar set of data?
20          MS. O'DELL:  Object to the form.
21          A.  I will certainly tell you the past three
22  studies -- two to three studies we've looked at work
23  on a similar data.  This is a growing body of
24  epidemiologic evidence, so each study grows in the

Page 236

1  number of studies they include.
2          Q.  (BY MR. JAMES)  So as time goes on and
3  more studies are performed testing the hypothesis of
4  ovarian cancer in talc, that body of literature can
5  be included in the next meta-analysis that's
6  completed, correct?
7          MS. O'DELL:  Object to the form.
8          A.  Correct.
9          Q.  (BY MR. JAMES)  You agree that the
10  meta-analyses of all of the underlying studies
11  cannot eliminate the recall bias in the underlying
12  studies?
13          MS. O'DELL:  Object to the form.
14          A.  In any case control study, there exists
15  the possibility of any recall bias.
16          Q.  (BY MR. JAMES)  And putting these studies
17  together in a meta doesn't eliminate that, correct?
18          MS. O'DELL:  Object to the form.
19          A.  No, it does not.
20          Q.  (BY MR. JAMES)  And you may recall this,
21  but the Penninkilampi study concedes that point,
22  correct?
23          MS. O'DELL:  Object -- object to the
24  form.

Page 237

1          A.  (No response.)
2          Q.  (BY MR. JAMES)  And Dr. Smith, referring
3  to page 47, the Conclusions section of the paper.
4          A.  Yes.
5          Q.  And we see here that the -- if you look
6  down to --
7          A.  Yes.
8          Q.  -- the last sentence in that column, they
9  say, "Additional epi evidence from prospective
10  studies with attention to effects of ovarian cancer
11  subtype is warranted."
12          Do you see that?
13          A.  I see that.
14          Q.  And so the authors here in the
15  Penninkilampi study are expressing a need for
16  additional prospective data, correct?
17          MS. O'DELL:  Objection.
18          A.  Correct.
19          Q.  (BY MR. JAMES)  We've talked already, in
20  some fashion, about the cohort studies.
21          You agree with me that the litigation
22  opinions you're offering in your report conflict
23  with the cohort studies, correct?
24          MS. O'DELL:  Object to the form.

Ellen Blair Smith, M.D.

Page 238

1      A.  The cohort studies, with the exception of
2  Gertig and serous, showed no statistically
3  significant increase hazard ratio or relative risk
4  or standardized mortality ratio, depending on the
5  statistics they chose, hazard ratios for ovarian
6  cancer.  That is a fact.
7      Q.  (BY MR. JAMES)  You discuss the Houghton
8  study, the Women's Health Initiative study on
9  page 15 of your report.
10     A.  Yes.
11     Q.  And you include the note that -- on
12  page 15, that "No histologic information was
13  obtained."
14         Do you see that phrase in your report?
15     A.  I do.
16     Q.  Do you believe that to be correct?
17     A.  May I see the paper.
18     Q.  Yes, Doctor.
19         MR. JAMES:  I'm gonna mark the Women's
20  Health Initiative Houghton study as Exhibit
21  Number 25.
22         (Deposition Exhibit 25 marked for
23          identification.)
24         THE WITNESS:  Thank you.

Page 239

1      Q.  (BY MR. JAMES)  If we look at the study on
2  page 3, Dr. Smith.
3      A.  (Examined exhibit.)  Yes.  Table 1?
4      Q.  You're ahead of -- you're ahead of me.
5         MS. O'DELL:  Please wait for the
6  question, Dr. Smith.
7         THE WITNESS:  He said, "If we look at
8  the study on page 3."  That was a question.
9      Q.  (BY MR. JAMES)  Yes.  Yes.  Yes, page 3.
10  Page 3.  I'm getting there.
11         (Examined exhibit.)  And the study
12  states that "Associations by ovarian cancer
13  histological subtype were evaluated."
14     A.  I'm sorry.  Where are you on page 3?
15     Q.  Give me one second.  I lost it.  I'm on
16  the wrong page here.  Give me one second.
17         Dr. Smith, if we turn to page 5
18  of 6 --
19     A.  Um-hum.
20     Q.  -- we see here that there is information
21  in the Table 4 pertaining to Histology, correct?
22     A.  I see that.
23     Q.  Okay.  And do you know if this study found
24  any variation in risk by subtype?

Page 240

1      A.  They did not find any variation of risk by
2  subtype.
3      Q.  Okay.  So would you agree with me, then,
4  that that statement in your report is erroneous?
5      A.  I believe --
6         MS. O'DELL:  Object to the form.
7      A.  I believe I -- it would have been better
8  stated "No difference in risks by histologic
9  information was demonstrated."
10     Q.  (BY MR. JAMES)  Okay.
11     A.  What it stated here is wrong.
12     Q.  Are your opinions that you're offering
13  today on general causation between talc and ovarian
14  cancer histologic specific?
15     A.  With regards to mucinous ovarian cancer, I
16  have seen no -- strike that.
17         I learned how to say that.
18     Q.  That's fine.
19     A.  With a totality of the information I've
20  looked at, I do not believe talcum powder is a risk
21  factor for the development of mucinous ovarian
22  cancer.
23     Q.  Do you believe it is a risk factor for the
24  other subtypes of epithelial ovarian cancer?

Page 241

1      A.  I am certain that it's a risk factor for
2  the risk factor of serous invasive ovarian and
3  endometrioid invasive --
4         Did I say endometrial?
5      Q.  You did.
6      A.  Oh, I meant -- okay.  Let me start again.
7         I believe it is.  It -- talcum powder
8  products cause invasive serous ovarian cancer and
9  invasive endometrioid ovarian cancer.
10         I am less clear on its relation to
11  clear cell carcinoma, and I believe it is not a
12  causative agent in the development of mucinous
13  ovarian cancer.
14     Q.  And when you say you're less clear with
15  respect to clear cell, sitting here today, do you
16  offer the opinion that talc is causative of clear
17  cell ovarian cancer?
18     A.  It is -- yes, I will say that.  Because of
19  the inflammation, yes, I can say that.
20     Q.  So you're -- you say that you're less
21  clear about it, but you still feel --
22     A.  I think there's less dat- --
23         MS. O'DELL:  Let him finish his
24  question.

61 (Pages 238 to 241)

Ellen Blair Smith, M.D.

Page 242

1      Q.  (BY MR. JAMES)  So you --
2          THE WITNESS:  Let him finish his
3  question.
4      Q.  (BY MR. JAMES)  So you say that you're
5  less clear about clear cell, but you were still
6  comfortable stating that the evidence is sufficient
7  to conclude that talc causes clear cell carcinoma?
8          MS. O'DELL:  Objection; form.
9      A.  I can say it better.  Clear cell carcinoma
10  is a less frequent histologic type, but inflammation
11  still contributes heavily to its development.  I
12  think we have fewer cases; therefore, fewer data,
13  but I think talc contributes to its development.
14      Q.  (BY MR. JAMES)  And when you say
15  "contributes to its development" --
16      A.  Causes.
17      Q.  -- I think you --
18      A.  In a legal term.
19      Q.  -- are you asking -- are you saying that
20  it causes?
21      A.  Causes.
22      Q.  So your opinion here today is that talc is
23  causative of serous?
24      A.  Serous.

Page 243

1      Q.  Serous endometrioid --
2      A.  Yes.
3      Q.  -- and clear cell; is that correct?
4      A.  Yes.
5      Q.  Do you consider those three subtypes of
6  ovarian cancer to be separate diseases?
7          MS. O'DELL:  Object to the form.
8      A.  If they're -- if they're poorly
9  differentiated, they are in the same type 2 ovarian
10  cancer that we talk about aggressive, metastasized
11  widely, fatal, yes.
12      Q.  (BY MR. JAMES)  Do you believe that the
13  risk factor profiles for serous, endometrioid, and
14  clear cell are different or the same?
15          MS. O'DELL:  Object to the form.
16      A.  They're certainly overlapping.
17  Endometriosis is generally associated more with
18  endometrioid and clear cell carcinomas, less so with
19  serous carcinomas.
20      Q.  (BY MR. JAMES)  If other experts have
21  reached the conclusion that the association between
22  talc and ovarian cancer is causative -- proven
23  causative by the science only with serous and talc,
24  then you would disagree with those experts?

Page 244

1          MS. O'DELL:  Object to the form; lack
2  of foundation.
3      A.  I'd love to discuss it with them.
4      Q.  (BY MR. JAMES)  Do you have any quarrels
5  with the analysis on the Houghton paper?
6      A.  Could you be more specific?
7      Q.  Do you have any critiques, just sitting
8  here today, of the Houghton paper?
9          MS. O'DELL:  Object to the form;
10  vague.
11      A.  Well, in evaluating it, I looked at
12  that it was small and -- well, it's 61,000
13  postmenopausal women.  It had a relatively short
14  follow-up of only 12.4 years.  The number of cases
15  is low, about 429, so -- I mean, it's a small, short
16  study.
17      Q.  (BY MR. JAMES)  (Short pause.)
18          And do you understand that the Women's
19  Health Initiative included a question on duration?
20      A.  Yes.
21      Q.  Okay.  Did you factor that into
22  considering your comment on follow-up?
23          MS. O'DELL:  Object to the form.
24      A.  The follow-up's still 12.4 years.  It

Page 245

1  doesn't change it.
2      Q.  (BY MR. JAMES)  Does the fact that they
3  asked about duration factor into your analysis at
4  all?
5      A.  It's better to ask about duration, but --
6      Q.  And -- I'm sorry.
7      A.  -- but it doesn't change how long the
8  study went on with the small numbers.
9      Q.  And so the study, if -- by asking about
10  duration is increasing data on the -- on the time
11  period for which it's evaluating talc users,
12  correct?
13      A.  Correct.
14          MS. O'DELL:  So off the mark.  I
15  object to that question.
16      Q.  (BY MR. JAMES)  On page 16 of your report,
17  you state that, quote, "In my opinion, meta-analyses
18  is the most valid and reliable way to study an issue
19  like ovarian cancer," closed quote.
20          Did you see where I read that?
21      A.  I see "In my opinion meta-analyses
22  provides most reliable evidence in this situation."
23          Is there another place?  That's the
24  third -- second full paragraph.

Ellen Blair Smith, M.D.

Page 246

1    I heard you say "valid," and I
2  don't -- I'm not seeing that word.
3        MS. O'DELL: I think you need to look
4  a bit further down the page.
5        THE WITNESS: Sorry.
6        MR. JAMES: Yeah.
7    Q. (BY MR. JAMES) It's the next paragraph.
8        Do you see that? It's the
9  lead sentence --
10   A. Yeah, okay. I'm -- okay. I'm with you
11 now.
12   Q. Okay. Is that statement confined to talc
13 or to ovarian cancer in general?
14       MS. O'DELL: Object to the form.
15   A. No. I mean, if we're looking at treatment
16 studies, we have the opportunity to do prospective
17 randomized controls trials, like the Armstrong trial
18 that's cited in here. Those are always the best
19 forms we have for treatment. We just can't do it
20 for exposure.
21   Q. (BY MR. JAMES) Here you say that you
22 consider meta-analyses to be the most valid and
23 reliable way to study an issue like ovarian cancer,
24 correct?

Page 247

1        MS. O'DELL: Object to the form; asked
2  and answered.
3    A. I think meta-analysis is most valid and
4  reliable way to study risk in ovarian cancer.
5  Perhaps the word "issue" was not the best word
6  choice.
7    Q. (BY MR. JAMES) So you believe that
8  meta-analysis is the best way to study risk factors
9  for ovarian cancer?
10       MS. O'DELL: Object to the form.
11   A. Yes.
12   Q. (BY MR. JAMES) Do you understand that the
13 literature that we have discussed today, prospective
14 cohort studies, meta-analyses, case control studies
15 commonly make the comment about the advantages
16 over -- excuse me -- the advantages of prospective
17 studies over retrospective studies?
18   A. Absolutely.
19   Q. And those studies that make those comments
20 are the studies that look at the issue of talc and
21 ovarian cancer.
22       MS. O'DELL: Excuse me. Make --
23   Q. (BY MR. JAMES) Correct?
24   A. Are you talking about --

Page 248

1        MS. O'DELL: Excuse me. Let me object
2  to form of that question and the question before.
3        MR. JAMES: A retrospective objection.
4        MS. O'DELL: Yes, that's right.
5    A. Prospective what type studies, please?
6    Q. (BY MR. JAMES) Okay.
7    A. Cohort versus randomized? Double-blind?
8    Q. So the meta-analyses, for example, that
9  you have described as the most valid and reliable
10 way to study the issue have commented in the studies
11 themselves that prospective data is a higher level
12 of evidence.
13       Did you know that?
14   A. Are you talking about cohort studies that
15 are prospective?
16   Q. Correct, prospective cohort studies.
17   A. Okay.
18       MS. O'DELL: Object to the form.
19   A. Which can be analyzed by meta-analysis as
20 well.
21   Q. (BY MR. JAMES) But the meta-analyses
22 themselves that you have cited have discussed --
23   A. Contain retrospective studies.
24   Q. Excuse me. Just one second.

Page 249

1        The meta-analyses that you have cited
2  and relied upon have discussed the fact that
3  prospective cohort studies are higher level
4  evidence.
5        Did you know that?
6        MS. O'DELL: Object to the form.
7    A. In general, I know that.
8    Q. (BY MR. JAMES) The cohorts themselves in
9  their methodology sections and discussion sections
10 talk about the fact that they are being studied
11 prospectively for the purpose of eliminating recall
12 bias.
13       Do you understand that?
14       MS. O'DELL: Object to the form.
15   A. That is one bias that can be eliminated in
16 a prospective cohort study, but they're both Level 4
17 evident epidemiologic studies which comes fourth
18 down the scale on the validity of scientific papers.
19   Q. (BY MR. JAMES) For example, the Houghton
20 study that we've looked at today says that "The
21 prospective nature of our study would eliminate the
22 potential for recall bias."
23       Would you agree with that statement?
24   A. Yes.

Ellen Blair Smith, M.D.

Page 250

1    Q.  The Gertig study that we've discussed
2   today says that they have prospectively examined the
3   relationship in a large cohort of U.S. women given
4   the concerns for recall and selection bias.
5          Do you understand that?
6          MS. O'DELL:  Objection to form.
7    A.  I understand that.
8    Q.  (BY MR. JAMES)  So these studies are
9   performed to address the flaws in the case control
10  studies, correct?
11          MS. O'DELL:  Object to the form.
12   A.  They are a different type of study and
13  they do account for recall bias, but they have their
14  own weakness and limitations.
15   Q.  (BY MR. JAMES)  And we've already talked
16  about today that, even in the Penninkilampi study
17  that you've discussed in your report, they conclude
18  with a note that prospective studies are warranted,
19  correct?
20          MS. O'DELL:  Object to the form;
21  misrepresents the document.
22   A.  They conclude with a note that prospective
23  studies are warranted.
24   Q.  (BY MR. JAMES)  If we look back at the

Page 251

1   Langseth study.
2          MS. O'DELL:  19.
3    Q.  (BY MR. JAMES)  Did you locate it before I
4   did?
5    A.  I got it.
6    Q.  Okay.  I'm coming behind you here.  You
7   see on page 3 --
8    A.  My -- it's not paginated, but I'm on the
9   third page.
10   Q.  Oh, thank you.  And it's actually -- it
11  should be on page 2 because there's only three
12  pages.
13   A.  Okay.
14          MS. O'DELL:  Is there a specific place
15  you want her to read?
16          MR. JAMES:  I'm still looking.
17  (Examined exhibit.)
18   Q.  (BY MR. JAMES)  Do you see in the bottom
19  paragraph where the authors there call for the --
20   A.  "Proposal; To Research Community?
21   Q.  Yes.  They call for the performance of
22  prospective studies.
23          MS. O'DELL:  Is there a specific place
24  you're pointing her to?

Page 252

1          MR. JAMES:  In that section.
2    A.  I have read this three times, and I'm not
3   seeing it.  Proposal:  To Research Community.
4    Q.  (BY MR. JAMES)  Huh.
5    A.  Are you looking at the next page, the next
6   to the last paragraph?
7    Q.  Oh.  Yes.  Thank you.
8    A.  Okay.
9    Q.  Page 3.
10   A.  Page --
11   Q.  It's the second to the last paragraph.
12   A.  I gotcha.  "While it would not be
13  reasonable"?
14   Q.  Yes, Doctor.
15   A.  Okay.  Yes, I see that.
16   Q.  Okay.  Again, they're calling there for
17  cohort studies, cohort prospective studies, correct?
18          MS. O'DELL:  Object to the
19  mischaracterization.
20   A.  Correct.
21   Q.  (BY MR. JAMES)  And we know that after the
22  Langseth 2008 paper, we did have additional cohort
23  data published, correct?
24   A.  The Gates follow-up, you mean?

Page 253

1    Q.  We had the Gates 2010 paper, correct?  The
2   Houghton WHI 2014 paper, correct?
3          Can you verbally answer, please?
4    A.  Yes.  I'm sorry.
5    Q.  And the Gonzalez 2016 prospective paper,
6   correct?
7    A.  Correct.
8    Q.  On page 16, you also remark that "The
9   cohort studies were not designed specifically to
10  look at talcum powder."
11          Do you remember making that remark?
12          MS. O'DELL:  Where are you?
13          MR. JAMES:  On page 16 of Dr. Smith's
14  report.
15          BY MS. O'DELL:  Oh, 16.
16   Q.  (BY MR. JAMES)  It's the third par- --
17  third full paragraph down.  "In my opinion"
18  paragraph.
19   A.  "In my opinion, meta-analysis is the most
20  valid and reliable way to study an issue like
21  ovarian cancer, which is relatively rare and
22  requires a long study period to detect.  The cohort
23  studies were not designed specifically to look at
24  talcum powder.  Instead, the use of talcum powder is

64 (Pages 250 to 253)

Ellen Blair Smith, M.D.

Page 254

1    only one of many queries."
2        Q.  And that's the question I'm asking you
3    right now.
4            So there you make the remark that
5    cohort studies were not designed specifically to
6    look at talc.
7            Is that a criticism you have of the
8    cohort studies?
9        MS. O'DELL:  Objection to the --
10   object to the form; misstates what's in Dr. --
11           Go ahead, Doctor.
12       A.  I don't find it particularly critical.  I
13   mean, that -- they're studying lots of things.
14       Q.  (BY MR. JAMES)  So you do not include a
15   criticism against the cohort studies for the fact
16   that talcum powder is only one of many queries?
17       A.  That is not a criticism.
18       Q.  You also make the claim, and if you
19   continue on reading, Doctor, that there's a lack of
20   power in the cohort studies?
21       A.  Yes.
22       Q.  Okay.  And what is that based on?
23           (Deposition Exhibit 26 referenced.)
24       A.  The numbers.  "Power" is the numbers.

Page 255

1            Steven Narod, who is a medical
2    oncologist and epidemiologist, suggests that in
3    cohort studies the critical threshold for finding --
4    because of the rarity of ovarian cancer, the
5    critical number base is 200,000.
6            Only did one cohort study, which is
7    Gates, reach 200,000.
8            Houghton -- Houghton had 61,576 women.
9            Gonzalez had only 41,654 sisters.
10           Kind of tiny and underpowered or lack
11   of power, and those are epidemiologic terms.
12       Q.  Did you consider the statements in Berge
13   about the power of the cohorts?
14       A.  I'd have to look at Berge again to see
15   what that was.  I found it.
16           Where do you see that?
17       Q.  If you look at the right column, the first
18   full paragraph.
19       A.  What page, please?
20       Q.  Oh, thank you.
21       A.  Oh, do you have a prob- --
22       Q.  It's page --
23       A.  Is this your bad problem?
24       Q.  Yes.  We're gonna --

Page 256

1        A.  Which table does it have on it?  Does it
2    have Table 2 on it?
3        Q.  Yeah.  We're looking at page 6 --
4        A.  Okay.
5        Q.  -- of Table 2.
6        A.  Table 2 page.
7        Q.  Yes.  Thanks, Doctor.
8        A.  All right.  Now, okay, so right-hand or
9    left-hand column?
10       Q.  It's the right-hand column.
11       A.  Okay.  Paragraph number?
12       Q.  It's the first full paragraph --
13       A.  Okay, great.
14       Q.  -- in the right-hand column.
15       A.  Got it.
16       Q.  And are you reading that paragraph?
17       A.  Yes.
18       Q.  Thank you.
19       A.  (Examined exhibit.)  He's talking about
20   heterogeneity.  I don't think he's . . .
21       Q.  So that -- Doctor, may I ask you a
22   question?
23       A.  Certainly.
24       Q.  All right.

Page 257

1            So that paragraph concludes with the
2    statement that, quote, "Low power of cohort studies
3    cannot be invoked as explanation of the
4    heterogeneity results," closed quote, correct?
5        A.  I am -- I agree with you that that is what
6    it says.
7        Q.  Okay.
8        A.  I cannot agree to that interpretation.
9        Q.  Have you performed your own power
10   calculations in this case?
11       A.  I have not.
12       Q.  Okay.  Do you have any reason to disagree
13   with the power calculations set forth in the Berge
14   paper?
15       MS. O'DELL:  Object to the form.
16       A.  The data from the Narod paper.
17       Q.  (BY MR. JAMES)  Do you have any other
18   basis upon which you would disagree with the Berge
19   power calculations?
20       A.  No.
21       Q.  On page 16 of your report, you discuss a
22   range by which you believe the risk of ovarian
23   cancer is increased by way of talc use, and you
24   conclude that it is a 20 to 50 percent range.

Ellen Blair Smith, M.D.

Page 258

1      Do you see where I am?
2      A. I know I wrote that, but -- yes, I found
3   it.
4      Q. Super.
5         It's in the paragraph --
6      A. Right.
7      Q. -- above Mechanisms?
8      A. Right.
9      Q. Where do you get that range from?
10     A. Smith-Bindman. I don't think I -- I --
11  okay. So over all the studies, the meta-analyses,
12  they ran from a 1.2 to a serous subtype 1.5.
13        In that range, it -- that would be a
14  50 -- 20 to 50 percent increase in ovarian cancer.
15     Q. In the course of answering that question,
16  did you reference Smith-Bindman?
17     A. Yeah, at the time I wrote this report, I
18  hadn't seen her individual analysis, so I couldn't
19  have had that information when I wrote this. I have
20  seen it subsequently.
21     Q. When you did look at that report?
22     A. Her deposition. Probably, I don't know, a
23  week-and-a-half ago, week ago. The days are running
24  together. Maybe as much as two weeks ago. I don't

Page 259

1   remember it in relation to Christmas.
2         MS. O'DELL: Do you remember -- do --
3   are you referring to her report?
4      A. Is that her report? Oh, yes, it's not her
5   deposition. It's her report.
6      Q. (BY MR. JAMES) Did you look at any other
7   expert reports in this litigation that we haven't
8   discussed today?
9      A. I have seen Plunkett.
10     Q. Okay. Any others?
11        MS. O'DELL: Other than the ones we've
12  talked about previously.
13     A. Crowley, Longo. None of the GYN
14  oncologists. I can't think of any other.
15     Q. (BY MR. JAMES) Do you know why you were
16  provided the Smith-Bindman report?
17     A. Can I tell you why I enjoyed it?
18     Q. No.
19        Do you know why you were provided it?
20     A. I suppose the lawyers wanted me to read
21  it.
22     Q. Did you ask for it?
23     A. No.
24     Q. Did you ask for the report from

Page 260

1   Dr. Plunkett?
2      A. No.
3      Q. Those reports that you are provided in
4   this case were selected for you by plaintiffs'
5   counsel, correct?
6         MS. O'DELL: Object to the form.
7      A. Those two reports.
8      Q. (BY MR. JAMES) So to opine that there's a
9   20 to 50 percent increased risk for ovarian cancer
10  by way of talc use, you said that you -- how did you
11  get to the 50 percent again?
12     A. That was a high limit in serous in
13  Gerrig --
14     Q. In Gertig?
15     A. -- Gertig. In Gertig.
16        The low range was 1 point. I think
17  it's 22 or 21. So I put that range.
18     Q. And do you have any opinion about where
19  the risk actually falls in that range?
20        MS. O'DELL: Object to the form.
21     A. Let's say it's 20 percent. Let's look at
22  the lowest possible increase in risk. And let's
23  look at the percentage of women who use talc.
24        We -- when you use various parameters

Page 261

1   such as Narod did, you're going to come up with
2   hundreds of lives interrupted by ovarian cancer. So
3   even a 20 percent increase is amazingly clinically
4   significant and severe.
5      Q. (BY MR. JAMES) Dr. Smith, with due
6   respect, that wasn't the question that I asked you.
7      A. Okay.
8      Q. My question to you is: You've cited in
9   your report a range of a 20 to 50 percent increased
10  risk of ovarian cancer, correct?
11     A. Yes.
12     Q. And my question is: Do you have an
13  opinion about where -- a more precise opinion about
14  where the risk actually falls in that range?
15        MS. O'DELL: Object -- object to
16  the --
17     A. I --
18        MS. O'DELL: -- form. The report
19  speaks for itself.
20     A. I think that range encompassed what the
21  truth is. I don't know an exact number that I can
22  give you.
23     Q. (BY MR. JAMES) And when you answered my
24  question in discussion about the 20 percent

66 (Pages 258 to 261)

Ellen Blair Smith, M.D.

Page 262

1    increased risk . . .
2        A.  I was giving you the lowest number.
3        Q.  And you answered my question -- in the
4    manner that you answered my question, that's with
5    the assumption that it is a real increased risk,
6    correct?
7            MS. O'DELL:  Object to the form.
8        A.  Correct.
9        Q.  (BY MR. JAMES)  On page 16 and 17 of your
10   report, you include a discussion of migration?
11       A.  Yes.
12       Q.  And you include the phrase that it is,
13   quote, "universally accepted," close quote, by the
14   gynecological community --
15       A.  Correct.
16       Q.  -- that "the female genital tract
17   functions as a conduit for foreign material to enter
18   the peritoneal cavity."
19           Do you see where I was reading?
20       A.  I see exactly where it's reading.
21       Q.  On what basis do you support your claim
22   that it is universally accepted?
23       A.  It's what we teach medical students and
24   residents.  We have the data of Egli and Sjösten

Page 263

1    and -- starts with a K -- uterine peristalsis, and
2    the Alba tubal transport dysfunction literature
3    through infermil- -- infertility.  Looking at
4    nonflagellated particles that go through from the
5    outside world to the peritoneal cancer -- peritoneal
6    cavity via the vagina, cervix, uterus, fallopian
7    tube, peritoneal cavity.
8            We certainly have all the
9    bacteriologic information from chlamydia.  Looking
10   at the shot we have all the information --
11   consistent information on decreasing incidence of
12   ovarian cancer with tubal ligation, with
13   hysterectomy that blocks that open channel.
14           This is -- this is universally
15   accepted in my gynecologic/obstetric population.
16   I've seen it cited in the FDA without footnote.
17   It's kind of like the sun's gonna rise tomorrow and
18   things get from the outside world to the peritoneal
19   cavity through the patent genital tract of a woman.
20       Q.  Do you believe it's universally accepted
21   that talc is one of the foreign materials that can
22   migrate through the genital tract?
23       A.  I believe it is.  It's a particulate.
24   It's in the range of all the particles that -- that

Page 264

1    have gone from outside to inside.
2        Q.  We've talked about the IARC today,
3    correct?
4        A.  Yes.
5        Q.  Do you know that the IARC has called the
6    evidence concerning migration to be relatively weak?
7        A.  May I see that statement?
8        Q.  I'm asking you if you're familiar with it?
9        A.  I don't remember that statement.
10       Q.  You referenced the FDA statement on
11   migration.
12           What are you referring to there?
13       A.  I think they say it's something like
14   universally accepted or everybody acknowledges.  I
15   don't remember the exact words, but they -- they say
16   that it's what happens.
17       Q.  Do you know if the FDA statement you're
18   referring to pertains specifically to talc?
19       A.  No, it doesn't particularly -- it --
20   it . . .
21           MS. O'DELL:  If you need to see the
22   statement again, Doctor --
23           THE WITNESS:  Okay.  It should --
24           BY MS. O'DELL:  -- please take a look.

Page 265

1            THE WITNESS:  -- be on the bottom down
2    here.
3            You want to pull IARC while you're
4    there?
5            I know it's here.  It's one of the
6    early, early -- nope.  We're getting there.
7            BY MS. O'DELL:  Here you go.
8            THE WITNESS:  We're getting close to
9    it.
10           BY MS. O'DELL:  (Inaudible.)
11           THE WITNESS:  I got it.  And that's --
12   that's the petition.  Here's the FDA.
13           BY MS. O'DELL:  No, no.  That's --
14       Q.  (BY MR. JAMES)  Here, I'll see if I can
15   find somewhere.
16       A.  8?
17       Q.  Did we find the FDA letter?
18           MS. O'DELL:  Exhibit 8.
19           MR. JAMES:  Okay.  Super.
20       A.  (Examined exhibit.)  I am not finding what
21   I'm looking for.
22       Q.  (BY MR. JAMES)  You want to look on page 5
23   of the letter, Dr. Smith?  I think that's where
24   you're looking.

67 (Pages 262 to 265)

Ellen Blair Smith, M.D.

Page 266

```
 1      A. Oh, okay.
 2      Q. And it's the third full paragraph down.
 3      A. Here we go. Here we go.
 4         (Examined exhibit.) Right. "The
 5  potential for particulates to migrate from the
 6  perineum and vagina to the peritoneal cavity is
 7  indisputable."
 8      Q. So that statement is not a direct
 9  statement about talc, correct?
10      A. Correct.
11         MS. O'DELL: Object to the form.
12      Q. (BY MR. JAMES) You say in the section of
13  your report that you reviewed the small number of
14  articles that dispute talcum powder's ability to
15  reach the tubes and ovaries, but that you, quote,
16  "rejected those claims."
17         Do you see that passage of your
18  report?
19      A. Yes.
20      Q. What studies did you review and reject?
21      A. The one with the cynomolgus monkeys -- I
22  can't say that right, cynologus monkeys. I know the
23  name of the author.
24      Q. Are there any other studies that --
```

Page 267

```
 1      A. There's two of them.
 2      Q. Sorry, Doctor.
 3      A. I'm sorry. There's one with -- there's
 4  one with two monkeys, and there's one with six
 5  monkeys or five monkeys, about like that.
 6         Anyhow, they didn't -- they put
 7  particulate in the vagina. It did not transport
 8  into the peritoneal cavity of these sacrifice
 9  monkeys. And I apologize for spacing out on the
10  name of the author. Um --
11      Q. Are -- sorry, Doctor.
12         MS. O'DELL: Yes, go ahead. Sorry.
13      A. There's a rodent study by Wiener, Weiner
14  that did not get -- well, everything went through,
15  including the controls for black carbon and then
16  nothing went through. Let me think of the author of
17  those monkeys. Nothing went through in the next set
18  of experiments.
19         The absence of evidence is not
20  evidence of absence. The fact that it doesn't go
21  through in somebody's study is not as significant as
22  it does go through in somebody else's.
23      Q. (BY MR. JAMES) In somebody else's study?
24      A. Right. Like even the Sjösten person with
```

Page 268

```
 1  talc -- I mean, not talc -- corn starch on gloves,
 2  seeing those pelvic exam under anesthesia and then
 3  looking for starch in the peritoneum when the ladies
 4  get a subsequent hysterectomy, some of the patients
 5  did not have starch particles go through, but the
 6  majority did. So it doesn't have to go through
 7  every time to prove a point.
 8      Q. Do you believe you conducted a
 9  comprehensive review of the literature relevant to
10  the issue of migration?
11      A. I do.
12      Q. Did you review all of the relevant animal
13  studies pertaining to the issue of migration?
14      A. I tried to. I know more about rat and
15  rabbit ovaries than I want to.
16         MS. O'DELL: There's no question
17  pending, Doctor. Thank you.
18      Q. (BY MR. JAMES) You discussed the tubal
19  ligation data earlier --
20      A. Yes.
21      Q. -- correct?
22      A. Yes.
23      Q. Okay. What is your view on the tubal
24  ligation data? Do you find the data there
```

Page 269

```
 1  consistent or inconsistent?
 2         MS. O'DELL: Object to the form.
 3      A. I find it consistent.
 4         MS. O'DELL: Excuse me. Sorry. Keep
 5  going.
 6      Q. (BY MR. JAMES) And earlier today, we
 7  discussed the Terry 2013 study, correct?
 8      A. Yes.
 9      Q. Okay. Do you know what the Terry study
10  had to say about the tu- -- tubal ligation
11  hypothesis?
12      A. Not without looking at it. Uh-oh. I've
13  got that bad copy that's missing part of a page.
14      Q. That's a different copy, Doctor.
15      A. That's Katherine Terry.
16      Q. Oh, is it?
17      A. The first study. It's got a badly copied
18  page, so we had to go to the originals. I don't
19  know if it's on that page, but . . .
20         MS. O'DELL: I've got it here.
21      A. Oh, here. I found the -- the tubal
22  ligation paper -- chart is on a different page.
23  It's not the bad page.
24      Q. (BY MR. JAMES) And are you looking at
```

68 (Pages 266 to 269)

Ellen Blair Smith, M.D.

Page 270

1    page 819, Doctor?
2        A.  Yes.
3        Q.  Okay.
4        A.  This has in the cases with ovarian cancer
5    there was a lower incidence of tubal ligation than
6    in the controls in this study.
7        Q.  You'd agree the data of the Terry paper is
8    not supportive of the tubal ligation hypothesis,
9    correct?
10        MS. O'DELL:  Objection; form.
11        A.  In this study, the cases had a lower
12    instance of ligation than the patients with ovarian
13    cancer.  So this is not a data point in the whole
14    literature of tubal ligation and its protective
15    effects.
16        Q.  (BY MR. JAMES)  Did you discuss this
17    finding of the Terry paper in your report?
18        A.  I don't think I did.
19        Q.  Why not?
20        A.  Because I think I made a -- very broad
21    statement about tubal ligation.
22        Do you know exactly where that is?
23        Q.  Are we looking at the report or the paper,
24    Doctor?

Page 271

1        A.  I'm looking at the report on tubal
2    ligation.
3        MS. O'DELL:  I think you're looking
4    for page 3, Doctor.
5        THE WITNESS:  About what?
6        MS. O'DELL:  Page 3.
7        THE WITNESS:  Back to page 3?
8        A.  Oh, the risk?  There it is.  "Additionally
9    there are factors that are recognized as protective
10    that include tubal ligation, oral contraceptive use,
11    salpingectomy, salpingo-oophorectomy, hysterectomy,
12    and breastfeeding."
13        Yes, I did not cite the Terry study.
14        Q.  (BY MR. JAMES)  And then on page 14 of
15    your report is where you include a more detailed
16    discussion of Terry, correct?
17        A.  Yes.
18        Q.  Do you include any discussion there of the
19    tubal ligation data in that setting?
20        A.  I do not.
21        Q.  In fact, you do say here that -- just for
22    all candor here, Doctor, if we look on page 14 of
23    your paper, you say that "There was no association
24    with parity, OC use, tubal ligation status, or

Page 272

1    menopausal status."
2        Do you see where I'm reading?  I'm on
3    page 14 of your report.
4        A.  I don't think -- I think it came out to be
5    not statistically significant.
6        Q.  Correct.
7        So you do have this report in here,
8    correct?
9        A.  Yeah.
10        Q.  Okay.  So the data, according to your
11    report on tubal ligation, is inconsistent, isn't it?
12        MS. O'DELL:  Object to the form.
13        A.  This single study does not support my
14    earlier station.  But again, the totality of the
15    literature on tubal ligation supports it as
16    decreasing risk factor for ovarian carcinoma and
17    even your -- some of the other things cited tubal
18    ligation.
19        MS. O'DELL:  What are you looking for,
20    Doctor?
21        THE WITNESS:  SGO and the PDQ risk
22    factors.
23        MS. O'DELL:  Uh-huh.
24        THE WITNESS:  Yeah.

Page 273

1        A.  "If a patient has her tubes tied, a tubal
2    ligation, her risk is deeply reduced."
3        "Tubal ligation benefits based on
4    solid evidence, tubal ligation is associated with a
5    decreased risk of ovarian cancer."
6        Q.  (BY MR. JAMES)  Do you find those SGO and
7    ACOG statements that you just referred to be
8    informative about risk factors for ovarian cancer?
9        MS. O'DELL:  Object to the form.
10        A.  No.  What I found to be informative of my
11    assessment of tubal ligation is a comprehensive view
12    of all the literature on tubal ligation through
13    numerous papers and a full report that ultimately
14    was cut out of this in one of my reports in the
15    early drafts.
16        MS. O'DELL:  Don't discuss drafts.
17        THE WITNESS:  I'm sorry.
18        MS. O'DELL:  Thank you.
19        THE WITNESS:  I'm sorry.  I dropped it
20    again.
21        A.  I have completely reviewed the literature.
22    I know all the literature on tubal ligation.  You
23    have -- I mentioned earlier the -- the Cramer study
24    that shows tubal ligation increased ovarian cancer;

69 (Pages 270 to 273)

Ellen Blair Smith, M.D.

Page 274

1  whereas, Terry's not statistically significant, but
2  that's beta error, finding difference where none
3  exist.
4         The -- the totality of the literature,
5  not just a couple of funky websites, tell me that
6  tubal ligation decreases the incidence of ovarian
7  cancer, and that is because it interrupts the
8  conduit from the outer world to the peritoneal
9  cavity.
10      Q.  (BY MR. JAMES)  Do you have the Terry
11 paper in front of you still, Dr. Smith?
12      A.  Yes.
13      Q.  Okay.  If we look at page 819, in the
14 right-hand column, the bottom first --
15      MS. O'DELL:  Excuse me, Scott.  Can
16 you give me just a minute to get there?  I can't
17 find it.
18      MR. JAMES:  Sure.
19      MS. O'DELL:  Yeah.  Thank you.
20      What page?
21      MR. JAMES:  819, the bottom first full
22 paragraph that leads with the words, "The biological
23 plausibility."
24      A.  Um-hum.  I'm there.

Page 275

1      Q.  (BY MR. JAMES)  Do you see where I am?
2      A.  Yes, I am.
3      Q.  Okay.  If you drop down about halfway
4  through that paragraph --
5      A.  Uh-huh.
6      Q.  -- the article states, quote,
7  "Talc-containing powders are hypothesized to promote
8  cancer development by ascending the female genital
9  tract and interacting directly with the ovarian
10 surface epithelium leading to local inflammation."
11      A.  Correct.
12      Q.  Do you agree with the Terry
13 characterization of that?
14      MS. O'DELL:  Would you mind reading
15 the full sentence, please?
16      A.  "Talc" --
17      MS. O'DELL:  Excuse me.  Not you.
18      THE WITNESS:  Oh, sorry.
19      MR. JAMES:  Sure.  Where did I leave
20 off, Leigh?
21      MS. O'DELL:  You left off "leading to
22 local inflammation," and then you stopped.
23      Q.  (BY MR. JAMES)  Okay.  "Characterized by
24 increased rates of cell division, DNA repair,

Page 276

1  oxidative stress, and elevated and inflammatory
2  cytokines."
3         Do you see that per- -- that sentence
4  that I read?
5      A.  I do.
6      Q.  Okay.
7      A.  Yes.
8      Q.  Do you agree with the Terry authors that
9  that is a hypothesis?
10      MS. O'DELL:  Objection to form.
11      A.  Yes.  I think at the time this was
12 written . . .
13      Yes, I think that is a hypothesis that
14 many people have drawn and is drawn in this paper.
15      Q.  (BY MR. JAMES)  Dr. Smith, with respect to
16 your report section that discusses NSAIDs.  So I'm
17 moving on.
18      A.  Yes.
19      MS. O'DELL:  Hey, Scott, if you're
20 moving on to another topic, can we take a short
21 break?
22      MR. JAMES:  Absolutely.
23      MS. O'DELL:  Thank you.
24      THE VIDEOGRAPHER:  Going off the

Page 277

1  record.  The time is 5:17 p.m.
2         (A recess was taken from 5:17 p.m.
3         to 5:37 p.m.)
4         THE VIDEOGRAPHER:  This marks the
5  beginning of Disk 3 -- excuse me, Disk 4.  Back on
6  the record.  The time is 5:37 p.m.
7      Q.  (BY MR. JAMES)  Dr. Smith, are you aware
8  that the cohort studies that we've discussed today
9  have also considered the migration hypothesis by
10 considering the data on tubal ligation and ovarian
11 cancer?
12      MS. O'DELL:  Object to the form.
13      A.  I need to look at those studies for the
14 specific information.  May I retrieve them?
15      Q.  (BY MR. JAMES)  Sure.  If I --
16      A.  Nope.
17      Q.  If I can refer you first to the Houghton
18 WHI study.
19      A.  Sure.  Okay, Gates.
20      I need Gertig and I -- have you given
21 me Gonzalez?
22      Q.  We have not marked Gonzalez.
23      A.  Okay.  Then I will not look for it.
24      (Examined exhibit.)  Yes.

Ellen Blair Smith, M.D.

Page 278

1      Q.  Okay.  So are you aware that the cohorts
2  also included data on that hypothesis?
3          MS. O'DELL:  Object to the form.
4      A.  Now I am, yes.
5      Q.  (BY MR. JAMES)  Did you cite that data in
6  your report?
7      A.  I did not.
8      Q.  Earlier you discussed that in
9  acknowledging the Terry finding on tubal ligation
10  that you had considered the entire body of
11  literature, correct?
12          MS. O'DELL:  Object to the form.
13      A.  Yes.
14      Q.  (BY MR. JAMES)  And that's one of the
15  reasons that you discounted the Terry finding on the
16  tubal ligation migration issue, correct?
17          MS. O'DELL:  Object to the form.
18      A.  I didn't discount it.  I think the
19  preponderance of all the literature on tubal
20  ligation overpowers a single or two or three reports
21  that do not find tubal ligation important, either
22  not statistically significant or impair prognosis --
23  increase risk of ovarian cancer.
24      Q.  (BY MR. JAMES)  Would you weigh the cohort

Page 279

1  data on this issue more heavily than the case
2  controlled data on this issue?
3          MS. O'DELL:  Object to the form.
4      A.  No.
5      Q.  (BY MR. JAMES)  Would you consider the
6  data on equal footing?
7          MS. O'DELL:  Object to the form.
8      A.  I con- -- I can consider all of these
9  individual studies equally.
10          Yes.  I consider the case control
11  if -- just because it's a case control study about
12  effects of tubal ligation compared to a cohort
13  study, I don't think that weight is about pa- --
14  recall of tubal ligation.
15          There -- there are studies on women
16  recalling whether they've had a surgical procedure
17  to end their fertility and they're pretty accurate
18  because it's pretty important to every woman.
19      Q.  (BY MR. JAMES)  Are you aware of any
20  prospective cohort data that supports the tubal
21  ligation migration hypothesis?
22          MS. O'DELL:  Object to the form.
23      A.  I cannot give you one off the top of my
24  head.

Page 280

1      Q.  (BY MR. JAMES)  And you didn't discuss any
2  of that data in your report, correct?
3      A.  I did not.
4      Q.  Discussing now where we left off,
5  Dr. Smith, the data on NSAIDs.
6      A.  Yes.
7      Q.  In your report, you acknowledge the
8  literature on NSAIDs and ovarian cancer risk as
9  inconsistent, correct?
10      A.  Yes.  And in its totality.
11      Q.  And earlier in your report when you list
12  what you considered to be generally accepted
13  protective factors, you do not list NSAIDs, correct?
14      A.  Correct.
15      Q.  Is that because you believe that it's not
16  generally accepted that NSAIDs apply a protective
17  effect for ovarian cancer?
18          MS. O'DELL:  Object to form.
19      A.  I don't think we have found the right
20  anti-inflammatories because I don't think we, as a
21  scientific community, do not understand the critical
22  points in inflammation and carcinogenesis and
23  disease progression.
24          So I believe in the future -- and I

Page 281

1  think this is critical -- in the future in
2  laboratory studies when we discern the actual
3  mechanisms of carcinogenesis, enzyme changes,
4  reactive oxygen species, DNA damage, aneuploidy,
5  malignancy, that we will be able to affect
6  inflammation and interrupt it in a -- in a very
7  progressive, protective way.  I think that's coming,
8  and it's gonna come out of the lab.
9      Q.  (BY MR. JAMES)  Is it fair to say that
10  we're not there yet?
11      A.  We're not there yet.
12      Q.  Are you aware, as of today, with
13  doctors -- a doctor following a standard of care to
14  prescribe NSAIDs to decrease ovarian cancer risk?
15      A.  Not in ovarian cancer.
16      Q.  Would you agree that some types of
17  inflammation don't increase cancer risk?
18          MS. O'DELL:  Object to the form.
19      A.  I can think of examples of an acute single
20  inflammation episode that's been studied and not had
21  long-term cancer effects, but I think what we know
22  about cancer is that it is chronic inflammation,
23  repeated insult, the snowballing of the inflammatory
24  cascade inducing enzyme, changes reactive oxygen

71 (Pages 278 to 281)

Ellen Blair Smith, M.D.

Page 282

1    species, reactive nitrogen species and ultimately
2    DNA alteration, inducing driver mutations and
3    starting this thing going and then causing it to
4    progress.
5         Q.  (BY MR. JAMES)  Do you believe rheumatoid
6    arthritis is associated with cancer?
7         A.  I have not reviewed that literature, and I
8    cannot comment on that.
9         Q.  Can you think of any inflammatory
10   conditions, as you sit here today, that are not
11   associated with cancer?
12        A.  That are not associated with cancer?
13        Q.  Correct.  Correct.
14            MS. O'DELL:  Object to the form.
15        A.  I haven't studied all inflammatory
16   conditions.
17        Q.  (BY MR. JAMES)  Did you look for
18   genotoxicity studies in conducting your review in
19   this case?
20        A.  Yes.
21        Q.  Okay.  Did you review any?
22        A.  Yes.
23        Q.  Which ones?
24        A.  There is an article on nanoparticles and

Page 283

1    talc.  There is -- and I cannot remember the name of
2    the author for the life of me.  I can see the
3    heading and there is a growing body of evidence on
4    the role inflammation plays in the development of
5    ovarian cancer.
6            And their initial papers are more
7    about oxidative stress in the pathogenesis of
8    ovarian cancer.  A group at Wayne State University
9    have been looking at this for several years.
10        Q.  Do you know Dr. Saed?
11        A.  I have never met him.  I've just read his
12   stuff.
13        Q.  Had you read his papers before you were
14   retained as an expert in this litigation?
15        A.  Yes.
16        Q.  You had read his papers?
17        A.  Yes.
18        Q.  When did you read his papers?
19        A.  Just in the course of -- he's presented at
20   SGO before.
21        Q.  Do you know when?
22        A.  I know he -- oh, I know he had an abstract
23   in '17.  I think he's been there before that.  And
24   then I went deep diving into his paper after I was

Page 284

1    asked to review his literature.
2         Q.  Do you know anything about his connection
3    to this litigation?
4         A.  Yes, I do.
5         Q.  What do you know?
6         A.  I know that I suggested to Dr. Thompson
7    that she get in touch with him and start reading his
8    literature.
9         Q.  So were you the first point of contact
10   between plaintiffs' counsel and Dr. Saed?
11        A.  I was the name.  I was the person that
12   gave them his name.
13        Q.  And how did you know Dr. Saed again?
14        A.  I don't know him.  I just read his papers.
15        Q.  How did you become --
16        A.  I think they're good.
17        Q.  How did you become familiar with him or
18   aware of him, just through his papers?
19        A.  Through his papers and looking at
20   inflammation in ovarian cancer and reading GY --
21   he's published in GY Oncology before.  I just knew
22   his paper.  Maura Fletcher [sic, Nicole] who's in
23   his lab, I think I saw her papers first.
24        Q.  Do you know Fletcher?

Page 285

1         A.  I don't know any of them.  I don't know
2    anybody in -- I don't know where Wayne State is.
3    It's in Michigan somewhere.  I don't know anybody
4    there.
5         Q.  Do you know if plaintiffs' counsel had a
6    litigation relationship with Dr. Saed before you
7    identified Dr. Saed as someone they should contact?
8         A.  I don't know if they did, but they may
9    have.  I don't know that.
10        Q.  Do you know anything about the funding of
11   his studies?
12        A.  I do not.
13        Q.  And when were you retained in this
14   litigation, it was 2017?
15        A.  January of 2017 was the first time that
16   they asked me to look at the literature.
17        Q.  I looked at your references in your
18   materials considered list.  I didn't see reference
19   to an Endo-Capron study.
20            Does that title ring any bells with
21   you, Endo-Capron?
22        A.  I don't -- it does not ring any bells.
23        Q.  If that study and a body of other studies
24   on genotoxicity are not listed in your references

Ellen Blair Smith, M.D.

Page 286

1  list or your materials considered list, may I
2  assume, then, that you didn't review those studies?
3      MS. O'DELL: Excuse me. I object to
4  the question. I think it's vague. If there's a
5  specific study you want to ask her about, then you
6  know she's happy to review it and comment if you ask
7  her questions, but to the degree you've referenced,
8  quote, "a body of literature," that may not be the
9  way Dr. Smith is aware of it.
10      I object to the question.
11      MR. JAMES: Speaking objection is
12  noted. You can answer the question.
13      MS. O'DELL: Objection is noted.
14      MR. JAMES: Your speaking objection is
15  noted. That you've been speaking all day. So thank
16  you.
17      A. Could you ask the question again? I'm so
18  lost.
19      Q. (BY MR. JAMES) Okay. Let's start with
20  the Endo-Capron study.
21      If the Endo-Capron study is not listed
22  in your materials considered or reference list, then
23  may I safely presume that you did not review that
24  study?

Page 287

1      MS. O'DELL: Objection. It goes to --
2      A. Do you know who the author is?
3      MS. O'DELL: Excuse me. Excuse me.
4  Object to the form.
5      A. I mean, do I know -- would I know it by an
6  authors' name or another name of Endo-Capron?
7      Does it stand for something?
8      Q. (BY MR. JAMES) If you have not listed the
9  study in your references or materials considered
10  list, then may I assume or presume that you did not
11  review that study?
12      MS. O'DELL: Object to the form.
13      A. I don't recognize that study. I --
14  with -- I can't give you more information.
15      MS. O'DELL: It's --
16      Q. (BY MR. JAMES) If you have reviewed --
17      MR. JAMES: This is a very simple
18  question, Leigh.
19      Q. (BY MR. JAMES) If you have reviewed a
20  piece of literature, whether you've cited it,
21  considered it, or referred to it, it would be listed
22  somewhere in your references list or your materials
23  considered list, correct?
24      MS. O'DELL: Objection to form.

Page 288

1      A. I would presume so.
2      Q. (BY MR. JAMES) Are you aware of any
3  studies that have reported inflammation, granulomas,
4  or foreign body reactions in the ovarian tissue of a
5  woman following her usage of talcum powder products?
6      MS. O'DELL: Object- --
7      A. I --
8      THE WITNESS: Sorry, were you saying
9  something?
10      MS. O'DELL: Give me just a moment
11  here.
12      A. I know of -- I do not know of a human
13  study with talc related granuloma.
14      Q. (BY MR. JAMES) With respect to your
15  Bradford Hill analysis, Dr. Smith, we have covered a
16  lot of that along the way today, and so I'm going to
17  jump around just a little bit in hopes of moving us
18  along. Okay?
19      A. Okay.
20      Q. So with regard to specificity, which is
21  one of the factors you've analyzed in your report,
22  correct?
23      A. Yes.
24      Q. Do you believe that factor was met here on

Page 289

1  this body of literature?
2      A. I . . . I think the --
3      Q. And I believe -- sorry, Doctor.
4      A. -- body of all the work cited here
5  supports that criteria. I don't think that's as
6  important as the consistency and the strength.
7      Q. We have discussed strength earlier today,
8  and I don't want to replow ground that we have
9  plowed, but, in your opinion, is the criteria of
10  strength met on this body of literature?
11      A. I believe that.
12      Q. Can you cite any study or scientific
13  literature that characterizes the association at
14  issue as an association that is strong?
15      MS. O'DELL: Object to the form.
16      A. The numbers are what they are and
17  statistically significant and clinically
18  significant.
19      Q. (BY MR. JAMES) Can you cite to a single
20  study that characterizes the odds ratio or
21  association as strong?
22      MS. O'DELL: Object to the form.
23      Q. (BY MR. JAMES) That's a "yes" or "no"
24  question.

73 (Pages 286 to 289)

Page 290

1          MS. O'DELL:  Object to the form.
2     A.  I haven't read the word "strong" in those
3   studies.
4     Q.  (BY MR. JAMES)  Do you believe the
5   criteria consistency is met?
6     A.  Oh, yes.
7     Q.  Do you acknowledge that there is an
8   inconsistency with respect to the results based upon
9   the design study -- correct?
10          MS. O'DELL:  Objection to the form.
11     A.  You mean the cohort studies?
12     Q.  (BY MR. JAMES)  Yes.  Do you acknowledge
13   that there is an inconsistency between the results
14   produced by the cohort studies as compared to the
15   results produced by the case control studies?
16     A.  Individually, but not in the meta -- not
17   with their inclusion in the meta-analyses.
18          So you're looking at individual
19   studies, but when they go into the whole stew pot it
20   becomes statistically significant and consistent.
21     Q.  And that brings us back to the word of
22   heterogeneity that we discussed a bit earlier in the
23   Berge study.
24          But do you understand that in the

Page 291

1   Berge study one of the detractors from the causal
2   interpretation was the heterogeneity between study
3   and design?
4          Do you understand that?
5          MS. O'DELL:  Object to the form.
6     A.  They didn't quantitate heterogeneity like
7   they did in the Penninkilampi study which actually
8   quantitated heterogeneity on the Newhouse Ottawa
9   Scale [sic, Newcastle], so I think it's better to
10   look at that.  And none -- none of the studies in
11   Penninkilampi had an NOS score less than 5, which
12   meant they didn't have to get rid of anything for
13   lack of -- for -- because of heterogeneity, and the
14   cohort studies were in there.  So I think we have a
15   better idea of assessment of heterogeneity in
16   that -- in that study.
17     Q.  (BY MR. JAMES)  Okay.  And my question is:
18   Do you acknowledge that in the Berge study, one of
19   the reasons the authors of that study concluded that
20   the caus- -- causal interpretation was not
21   appropriate was because of the lack of consistency
22   between study design?
23          MS. O'DELL:  Object to form.
24     A.  I agree with you that is a quote from that

Page 292

1   study.
2     Q.  (BY MR. JAMES)  We discussed already that
3   in the Penninkilampi study the finding that they
4   included in that study based upon cohort studies
5   omitted the data from the Gates 2010 study, correct?
6          MS. O'DELL:  Object to the form.
7     A.  Correct.  We have discussed that.
8     Q.  (BY MR. JAMES)  Would you agree that a
9   lack of data on dose response, in a hypothetical
10   situation, would counter against a causal
11   interpretation?
12          MS. O'DELL:  Object to the form.
13     A.  That is one of the factors that one
14   considers in determining causality.
15     Q.  (BY MR. JAMES)  Do you believe dose
16   response is met on the body of literature here?
17     A.  On the epidemiologic da- -- data, it --
18   their dose response is equivocal.  Penninkilampi
19   found dose response in the -- in the meta-analysis,
20   whereas Berge didn't.
21     Q.  Let me finish, Doctor.  I'm sorry.
22     A.  I think it's -- as I said in my report, it
23   is very difficult, even if you look at -- so many
24   studies did not look at frequency and duration.

Page 293

1          For example, Gertig, one of the cohort
2   studies is ever/never in 1982.  But many of the
3   other studies didn't look at dose, duration,
4   frequency, and how do you -- how do you establish
5   dose in pouring powder on your bottom.
6          So I -- I am not surprised that it's
7   been in the epidemiologic literature very difficult
8   to establish clear dose response curves.
9     Q.  You mentioned the Gertig study in your
10   answer, Dr. Smith.
11          And do you understand that the Gertig
12   study did look at frequency?
13     A.  I thought the Gertig study was the Nurses'
14   study, and they asked in 1982 ever/never, single
15   time, and they never queried again.
16     Q.  So you're unaware of the fact that the
17   Nurses' Health study included information on
18   frequency?
19          MS. O'DELL:  Objection; form.
20   Misstates.
21     A.  Let me look at it.  It's right on top.
22          (Examined exhibit.)  They were given
23   one assessment, no daily, one to six times a week,
24   less than once a week, on sanitary napkins, yes, no,

Ellen Blair Smith, M.D.

Page 294

1  one time.
2          That's not -- that's not a decent
3  frequency and duration.  I'm sorry.  You don't know
4  how long.  You ask it one time.  You don't account
5  for changes in practices.  That's not valid.
6      Q.  (BY MR. JAMES)  Do you acknowledge that
7  frequency is a valid measure of dose response?
8          MS. O'DELL:  Object to the form.
9      A.  It's a measure of assessing dose response.
10     Q.  (BY MR. JAMES)  Do you acknowledge
11  duration is a measure of assessing dose response?
12         MS. O'DELL:  Object to the form.
13     A.  Yes.
14     Q.  (BY MR. JAMES)  Are you aware that there
15  are case control studies that have looked at
16  duration and frequency and found no dose response?
17         MS. O'DELL:  Object to the form.
18     A.  Yes.
19     Q.  (BY MR. JAMES)  And, in fact, the studies
20  that -- those studies are cited in your Exhibit B,
21  correct?
22     A.  These are only single case control studies
23  in Exhibit B, and I looked at dose responses.  I
24  read through the studies, and they attempted to do

Page 295

1  that.
2      Q.  You acknowledged that some of the dose --
3  excuse me, some of the case control studies that you
4  cited do not show dose response, correct?
5      A.  I would say the majority do not show dose
6  response with a single epi case control studies.
7      Q.  Did you consider the findings in the
8  studies that you cited and in other literature
9  pertaining to the use of talcum powder on condoms,
10  diaphragms, or sanitary napkins?
11     A.  No.
12     Q.  Why not?
13     A.  Well, the good people that make condoms
14  eliminated talc exposure on condoms in the 1990s.
15  That's a very smart move.
16         And then you start breaking down sales
17  of these populations into small enough groups that
18  you lose the ability to have statistical
19  significance.
20     Q.  Do you understand the number of articles
21  that you've cited and discussed in your report do
22  include -- include finding on odds ratios associated
23  with sanitary napkins, diaphragms, and condoms?
24     A.  Right.  And I -- and I put some of those

Page 296

1  on my Exhibit B chart in the Comments section.
2      Q.  And so my question that I think I
3  originally posed is:  Do you consider those findings
4  relevant to your opinions today?
5      A.  They are a component of my -- of genital
6  talc use, so, yes, they are a component of my
7  opinion.
8      Q.  Do you understand the data in those
9  studies does not show an association between the use
10  of talcum powder on condoms, diaphragms, and
11  sanitary napkins in ovarian cancer?
12         MS. O'DELL:  Object to the form.
13     A.  Most -- most studies, when you broke them
14  down, they lost -- they did not have statistical
15  significance.  Your statement is correct.
16         (Discussion off the record.)
17         MR. SILVER:  Could we go off the
18  record?
19         THE VIDEOGRAPHER:  Going off the
20  record.  The time is 6:05 p.m.
21         (A recess was taken from 6:05 p.m.
22         to 6:16 p.m.)
23         THE VIDEOGRAPHER:  Back on the record.
24  The time is 6:16 p.m.

Page 297

1          MR. JAMES:  Dr. Smith, thank you for
2  your time.  That's all the questions I have for now.
3          THE WITNESS:  Thank you.
4              EXAMINATION
5  BY MR. KLATT:
6      Q.  Dr. Smith, my name is Mike Klatt --
7      A.  Hi.
8      Q.  -- and I represent Imerys Talc America.
9          Do you know what Imerys Talc America
10  is?
11     A.  Yes.
12     Q.  What are they?
13     A.  They are -- own the mines from which the
14  talc is mined.
15     Q.  Do you know what years they owned the
16  mines from which the talc is mined and used in the
17  Johnson & Johnson talc-based body powder product?
18     A.  I know it's more recent, but I don't know
19  the exact dates.
20     Q.  Do you know who owned the mines before
21  Imerys owned them?
22     A.  Lusignac, which I think was J&J.
23     Q.  No, Lusignac is Imerys, my client.
24     A.  Oh, is Imerys.  Okay.

75 (Pages 294 to 297)

Ellen Blair Smith, M.D.

Page 298

1    Q.  So who owned it before Lusignac and
2  Imerys?  Do you know?
3    A.  J&J, I believe.
4    Q.  Okay.  I'm gonna skip around because a lot
5  of ground's been covered today --
6    A.  Okay.
7    Q.  -- and I just have follow-ups on a bunch
8  of different areas, so --
9    A.  Okay.
10   Q.  -- I'll be skipping from subject to
11  subject, and it's pretty random here.
12       You said earlier today that you knew
13  Dr. Hal Lawrence with ACOG?
14   A.  Yes.
15   Q.  If you communicate with Dr. Hal Lawrence,
16  or anybody else outside of this litigation, on the
17  subject of talc and ovarian cancer, are you gonna
18  disclose to them that you're a paid expert for
19  plaintiffs in the litigation?
20       BY MS. O'DELL:  Object to the --
21   A.  No.
22       MS. O'DELL:  Object to the form.
23   A.  No.  And I haven't talked to Dr. Lough- --
24  Lawrence in 40 years.

Page 299

1    Q.  (BY MR. KLATT)  Okay.  But I'm just asking
2  in the future.
3    Q.  (BY MR. KLATT)  You understand that Imerys
4  tests talc of competitors.  It tests talc from mines
5  that are never used for body powder.  It tests talc
6  from portions of mines that are never used for any
7  purpose.
8       You can't tell me that any of these
9  samples ended up in Johnson & Johnson Body Powder,
10  can you?
11       MS. O'DELL:  Objection to the form;
12  misstates the evidence, misleading, mischaracterizes
13  the document.
14   A.  (Examined document.)  9-9-1975, Johnson's
15  Baby Powder anthophyllite and tremolite on the 28.
16   Q.  (BY MR. KLATT)  And do you have any proof
17  that Imerys owned the mines that that sample came
18  from at the time it was tested?
19       MS. O'DELL:  Objection.
20   A.  I don't.
21   Q.  (BY MR. KLATT)  I'm sorry?
22       MS. O'DELL:  Objection.
23   A.  I don't know when Imerys bought the mine.
24   Q.  (BY MR. KLATT)  And let's mark what you're

Page 300

1  looking at as the next exhibit, 28.  If you can
2  please, Dr. Smith, put this sticker on here.
3       (Deposition Exhibit 27 and 28 marked
4        for identification.)
5    Q.  (BY MR. KLATT)  Have you read Dr. Hopkins
6  multiday deposition where he was questioned about
7  what you're looking at right now, Exhibit 28?
8    A.  I have not read it in detail.
9    Q.  Have you read Ms. Pier's deposition where
10  she was questioned about Exhibit 27?
11   A.  I have not read it in detail.
12   Q.  Do you know that Exhibit 27 and 28 that
13  you're looking at are attorney created charts?
14       MS. O'DELL:  Objection; misrepresents
15  the record.
16       MR. KLATT:  Not at all.  It's exactly
17  what happened.
18       MS. O'DELL:  Objection.
19   A.  I have another J&J sample here from
20  3-3-87.  You want to just --
21       MR. JAMES:  Objection; nonresponsive.
22   Q.  (BY MR. KLATT)  Have you read Dr. Hopkins
23  multiday deposition that resulted in the creation of
24  Exhibit 28 --

Page 301

1       (Speaking simultaneously.)
2    A.  No.
3    Q.  (BY MR. KLATT)  -- or Ms. --
4    A.  Not in detail --
5    Q.  -- or Ms. Pier's --
6    A.  -- no.
7    Q.  -- deposition --
8       MS. O'DELL:  Let him finish.
9    Q.  (BY MR. KLATT)  -- that resulted in the
10  creation of Exhibit 27 to your deposition?
11   A.  Not in detail.
12   Q.  Do you understand that they had
13  explanations why each of those items that you're
14  looking at had nothing to do with any asbestos in
15  Johnson & Johnson Baby Powder?
16       MS. O'DELL:  Objection.
17   A.  I did not know that.
18   Q.  (BY MR. KLATT)  And if you were being
19  objective, you would weigh their explanations in
20  contrast to Dr. Longo's testimony that you're just
21  accepting at face value, correct?
22       MS. O'DELL:  Objection; misstates the
23  record.
24   A.  I think there are three different

Ellen Blair Smith, M.D.

Page 302

1  determinations.
2      Q.  (BY MR. KLATT)  Well, you're just assuming
3  what Dr. Longo found was valid, correct?
4          MS. O'DELL:  Objection.  An expert is
5  allowed to rely on another expert.
6          You may answer the question if you
7  understand.
8          THE WITNESS:  An expert is allowed to
9  what?
10         MS. O'DELL:  To rely on the findings
11 of another expert as counsel knows.
12     A.  I have no reason to doubt Dr. Longo's
13 technique.
14     Q.  (BY MR. KLATT)  Do you know anything about
15 his technique?
16     A.  I have read it in his report, but I don't
17 remember off the top of my head.
18     Q.  Have you -- do you have any expertise
19 yourself in how to test a product to see whether
20 there's asbestos in it?
21     A.  Only in the broadest general TEM, SEM, XRD
22 case.  I don't know how to perform any of those.
23     Q.  But let's -- you would agree with me
24 that you accept -- you don't know Dr. Longo

Page 303

1  personally, correct?
2      A.  Not at all.
3      Q.  And you know nothing about his background
4  or qualifications, correct?
5      A.  I have not --
6          MS. O'DELL:  Objection.
7      A.  -- studied his CV.
8      Q.  (BY MR. KLATT)  But you were willing to
9  accept his conclusions about asbestos being in body
10 powder at face value, but you didn't even bother to
11 look at the explanations that Dr. Hopkins from
12 Johnson & Johnson or Ms. Pier from Imerys gave that
13 asbestos isn't in body powder --
14         MS. O'DELL:  Objection --
15     Q.  (BY MR. KLATT)  -- correct?
16         MS. O'DELL:  Objection to the form.
17 Misstates the record.
18     A.  I have not read their depositions.
19     Q.  (BY MR. KLATT)  If this court were to
20 determine when it examines the evidence that
21 Dr. Longo's testing does not show asbestos in
22 Johnson & Johnson Body Powder, you would have no
23 basis -- other basis to say that there is asbestos
24 in Johnson & Johnson --

Page 304

1          MS. O'DELL:  Objection.  Incomplete --
2      Q.  (BY MR. KLATT)  -- body powders, correct?
3          MS. O'DELL:  Excuse me.  Objection;
4  incomplete hypothetical.  The Court will not make
5  findings of fact.  That's a jury's job and counsel
6  knows that.
7          MR. KLATT:  Absolutely not.  This
8  court can exclude that evidence under Daubert, and
9  you know it.
10         MS. O'DELL:  That's not a finding of
11 fact, and you know that.  End of story.
12         MR. KLATT:  But they can find that the
13 methodology used is inadequate to show that there's
14 asbestos in this product.
15         MS. O'DELL:  Which is not what you
16 just said, and you know that, so it misstates the
17 process.
18         (Speaking simultaneously.)
19         MR. JAMES:  Ms. O'Dell --
20     Q.  (BY MR. KLATT)  Well, let me ask you
21 this --
22         MR. JAMES:  -- make your objections
23 and let the record proceed.
24     Q.  (BY MR. KLATT)  If the judge in this

Page 305

1  case --
2          MS. O'DELL:  The record --
3          MR. JAMES:  That's the way it's
4  supposed to work.
5      Q.  (BY MR. KLATT)  If the judge in this case
6  concludes that Dr. Longo's methodology is inadequate
7  to show that asbestos is in Johnson & Johnson Body
8  Powder, then you have no basis to say that it is,
9  correct?
10         MS. O'DELL:  Objection to the form.
11 Misstates the record.
12     A.  I'd have to think about that.
13     Q.  (BY MR. KLATT)  Are Exhibit 27 and 28 and
14 Dr. Longo's testing the only documents you're
15 relying on regarding asbestos being in Johnson &
16 Johnson Body Powder products?
17         MS. O'DELL:  Objection to form.
18     A.  No.  There is the Blount deposition
19 that --
20     Q.  (BY MR. KLATT)  Do you know whether that
21 has anything to --
22         MS. O'DELL:  Let her finish, please,
23 sir.
24     Q.  (BY MR. KLATT)  I'm sorry.  Go ahead.

Ellen Blair Smith, M.D.

Page 306

1          MS. O'DELL:  Let her finish.
2      Go ahead.
3          A.  -- that identified asbestos in Baby
4   Powder, Johnson's -- the -- that she identified as
5   Johnson's Baby Powder.
6          Q.  (BY MR. KLATT)  Do you know whether that
7   Baby Powder --
8          MS. O'DELL:  Let her -- I don't think
9   she's done.
10         Q.  (BY MR. KLATT)  -- was supplied by Imerys?
11         MS. O'DELL:  I don't think she --
12  she's done.
13         A.  I haven't finished thinking.  I cannot
14  think of another example at the top of -- off my
15  head at this hour.
16         Q.  (BY MR. KLATT)  Do you know whether
17  Dr. Blount's finding of asbestos that you just
18  referred to involved talc supplied by Imerys?
19         A.  As I answered previously, I do not know
20  when Imerys assumed ownership of those mines.
21         Q.  So you can't tell the Court whether
22  Dr. Blount's testing was testing talc from Imerys or
23  not, correct?
24         MS. O'DELL:  Objection to form.

Page 307

1          A.  I cannot.
2          MS. O'DELL:  Misstates the record.
3          Q.  (BY MR. KLATT)  You're charging $600 an
4   hour; is that correct?
5          A.  I am.
6          Q.  Is that for all work you're doing in the
7   case, including testimony, whether it's in a
8   deposition or in a court of law?
9          A.  I believe there's a flat daily rate.  I'm
10  not sure about this, but I believe that a flat daily
11  rate of 800 hours in one day is only $5,000.  That
12  was an exaggeration.  I'm trying to show that I've
13  retained my sense of humor.
14         Q.  I think what you were saying is that if
15  testimony lasted all day there would be a flat rate
16  of $5,000 --
17         A.  Correct.
18         Q.  -- is that correct?
19         But if it's broken down by an hourly
20  basis, whether you're doing reading or testifying,
21  it's all $600 an hour?
22         A.  That -- I agree with that.
23         Q.  Okay.
24         MR. KLATT:  Can we go off the record

Page 308

1   for a second.  I think I'm done.  I just need to
2   look back over my notes.
3          THE VIDEOGRAPHER:  Going off the
4   record.  The time is 7:06 p.m.
5          (Ms. Brown left the room.)
6          (A recess was taken from 7:06 p.m.
7   to 7:39 p.m.)
8          THE VIDEOGRAPHER:  Back on the record.
9   The time is 7:39 p.m.
10         MR. KLATT:  I'm done with my
11  questioning, subject to any follow-up, so . . .
12              EXAMINATION
13  BY MS. O'DELL:
14         Q.  Dr. Smith, I've got a few questions for
15  you.
16         A.  Okey-doke.
17         Q.  I know it's been a long day so I'll be
18  brief.
19         You were asked a series of questions
20  about the presence of asbestos in Johnson's Baby
21  Powder and Shower to Shower.
22         Do you remember those questions?
23         A.  I remember I was asked them.
24         Q.  Good answer to not a very specific

Page 309

1   question.
2          Don't remember the specific questions,
3   but you were asked about those topics?
4          A.  Yes.
5          Q.  And let me show you what I'm marking as
6   Exhibit 29, which is Dr. Longo's report.
7          (Deposition Exhibit 29 marked for
8              identification.)
9          Q.  (BY MS. O'DELL)  Are you, in part, relying
10  on Dr. Longo's testing and his findings of the
11  presence of asbestos in historical samples of
12  Johnson's Baby Powder and Shower to Shower?
13         A.  Yes.
14         Q.  And from your review of Dr. Longo's
15  report, he found -- did he find asbestos in a number
16  of samples?
17         A.  He found --
18         MR. JAMES:  Objection; leading.
19         A.  He found asbestos in 66 percent of the
20  samples he tested.
21         Q.  (BY MS. O'DELL)  And did he test samples
22  from a time period of the 1960s into the 1990s?
23         MR. JAMES:  Objection; leading.
24         MR. KLATT:  Object to form.

78 (Pages 306 to 309)

Ellen Blair Smith, M.D.

Page 310

1    A.  Yes.  And memory serves the last date on
2    his report was 2000, but there was a chart that I
3    saw.
4        Q.  (BY MS. O'DELL)  Is -- is -- what other --
5    and you would defer to Dr. Longo on the testing
6    methodology that's appropriate for identifying
7    asbestos in Johnson's Baby Powder and Shower to
8    Shower?
9        MR. JAMES:  Objection; form.
10    A.  Yes.
11        Q.  (BY MS. O'DELL)  Would you also -- well,
12    strike that.
13        Did Dr. Longo also test for the
14    presence of fibrous talc?
15    A.  He did.
16        MR. JAMES:  Objection; form.
17        Q.  (BY MS. O'DELL)  Did he -- were there --
18    what do you recall about Dr. Longo's findings
19    regarding fibrous talc?
20    A.  I believe the vast majority of his samples
21    had fibrous talc.  If memory serves, there's only
22    one sample in which he could not demonstrate fibrous
23    talc.
24        Q.  And -- and you -- would you defer to

Page 311

1    Dr. Longo on the methodology that's appropriate for
2    testing Johnson's Baby Powder and Shower to Shower
3    for the presence of fibrous talc?
4        MR. JAMES:  Object to the form.
5    A.  I would.
6        Q.  (BY MS. O'DELL)  Is there other evidence
7    that you relied on in considering the question of --
8    of whether there is asbestos present in Johnson's
9    Baby Powder and Shower to Shower?
10    A.  Yes.
11        Q.  And -- and what is that evidence?
12    A.  Blount found asbestos in Johnson &
13    Johnson's Baby Powder.  Her report is in 1991.  Her
14    deposition specified that it wasn't just any talcum
15    powder; it was Johnson & Johnson's.
16        Exhibits formerly known as 28, but now
17    known as -- no.  Are you kidding?  It's 28 again --
18    showed tremolite, actinolite, and chrysotile --
19    chryso- -- in Shower to Shower.
20        Do you want me to go through every one
21    of them, or just --
22    Q.  Not every one, but --
23    A.  Okay.  But Johnson & Johnson sent -- some
24    Johnson & Johnson samples had identifiable asbestos

Page 312

1    fibers.
2        And the now labeled Exhibit 27 by Pier
3    from -- deposition of Pier had Johnson & Johnson
4    sample demonstrating chrysotile and tremolite.
5        Q.  And is there also published literature
6    that -- in addition to Dr. Blount that reports
7    finding asbestos in cosmetic powders?
8    A.  Yes.  Those references are listed in the
9    very first sentence of my section on asbestos in my
10    report on page 18.
11        Q.  And are you referring to --
12    A.  Cralley.
13        Q.  Is that -- would you spell that for the
14    record?
15    A.  C-r-a-l-l-e-y is the first author.  68.
16        Do you want me to pull all these
17    studies and go through here for you?
18        Q.  No.
19        Would it be fair to say that in
20    addition to Dr. Longo's testing and the evidence
21    that you've referenced in regard to the -- to the
22    Hopkins chart and the Pier chart that there's
23    evidence in the published literature regarding the
24    presence of asbestos in talcum powder?

Page 313

1    A.  Yes.
2        MR. JAMES:  Object to form.
3        Q.  (BY MS. O'DELL)  You were also asked
4    earlier today about your review of the literature
5    regarding the causal connection between exposure to
6    asbestos and ovarian cancer.
7        Do you recall those questions?
8    A.  I do recall those questions.
9        Q.  Was your review of the asbestos and
10    ovarian cancer literature comprehensive?
11    A.  To the best of my ability.
12        Q.  And you spoke earlier about the IARC
13    monogram regarding asbestos and fibrous talc in a
14    talcum asbestiform habit 100C -- you called that?
15    A.  Yes.
16    Q.  Do you --
17        MR. JAMES:  Objection; form.
18        Sorry, Leigh.
19        MS. O'DELL:  Excuse me.
20        Q.  (BY MS. O'DELL)  Did you review all of the
21    monograph?  Let me start there.
22    A.  Yes.
23        Q.  Did you review all of the articles that
24    are referenced in IARC's comprehensive review of

Ellen Blair Smith, M.D.

| | |
|---|---|
| Page 314 | Page 316 |

**Page 314**

1  asbestos?
2      A.  I read them.
3      Q.  Did --
4      A.  And other studies that have come out
5  subsequent to IARC.
6      Q.  Did you attempt to review all the relevant
7  literature regarding asbestos and ovarian cancer?
8      A.  I did.
9      Q.  Is that literature included on the
10  materials considered list that I think is Exhibit C
11  of your expert report?
12      A.  I believe all those references are in
13  there.
14      Q.  Has IARC concluded that fibrous talc or
15  talc in an asbestiform habit is a known human
16  carcinogen?
17          MR. JAMES:  Object to form.
18      A.  Yes.
19      Q.  (BY MS. O'DELL)  Now, I asked you just a
20  moment ago about Exhibit C, the materials considered
21  list, the -- the bigger list of literature that's --
22      A.  This (indicating)?
23      Q.  Yes -- included in your report.
24          And did you review the materials that

**Page 315**

1  are listed on Exhibit C?
2      A.  I can't promise you that I've read every
3  single word on every single study, but I have read
4  the vast majority of them.
5      Q.  Let me --
6      A.  Greater than 90 percent.
7      Q.  Okay.  Let me switch gears for a moment.
8  You were asked a series of questions today about the
9  FDA's response to the civil service petition.  That
10  was one topic.
11          Do you recall that?
12      A.  Yes.
13      Q.  If you don't mind finding that and pulling
14  it out.  I think it's right here.  It was Exhibit 8.
15      A.  Yes.
16      Q.  Do you recall that?
17      A.  Yes.
18      Q.  And if you will turn to page 5 of
19  Exhibit 8.  Just let me know --
20      A.  This is the FEC letter.
21      Q.  Yes.
22      A.  Yes.
23      Q.  And so if you'll look about a little more
24  than halfway down the page, the paragraph beginning

**Page 316**

1  "While there exists."
2          Do you see that?
3      A.  Yes, I do.
4      Q.  And I think you and counsel for Johnson &
5  Johnson discussed this a little earlier.  It says,
6  "The potential for particulates to migrate from the
7  perineum and vagina through the peritoneal cavity is
8  indisputable."
9          Did I read that correctly?
10      A.  You did.
11      Q.  Is that your opinion?
12      A.  Absolutely.
13      Q.  And counsel for Johnson & Johnson
14  suggested that that statement in this letter that's
15  written by the FDA did not apply to talc and talc
16  migrating through the upper genital tract.
17          Do you recall that?
18          MR. JAMES:  Object to form and object
19  to the mischaracterization.
20      A.  I recall that.
21          MS. O'DELL:  It was not a
22  mischaracterization.
23      Q.  (BY MS. O'DELL)  What does the next
24  sentence say regarding the migration of perineal

**Page 317**

1  talc?
2      A.  I was just getting ready to say it's the
3  very next statement that they said:  (Paraphrasing.)
4  It is, therefore, plausible that perineal talc --
5  other -- any -- they say (other particulate) can
6  reach the endometrial cavity, fallopian tubes,
7  ovaries, and peritoneum and may elicit a foreign
8  body reaction, inflammatory response, but in some
9  exposed women may progress to epithelial cancers.
10      Q.  And in terms of -- of -- of migration, let
11  me also ask you -- just keep that in front of you,
12  but I'm gonna pull out what's marked as Exhibit 19,
13  the Langseth paper.  If you see it, maybe you can
14  help me.
15      A.  Yeah.  I told you they're all messed up.
16      Q.  They -- they are.
17      A.  Here it is.
18      Q.  Okay.  Great.
19          And the -- in reference to Exhibit 19,
20  earlier, counsel for J&J suggested that the -- the
21  IARC Working Group authored this paper.
22          Do you recall that?
23      A.  I remember he -- this is from the Cancer
24  Registry of Norway and Harvard and Montreal and

Ellen Blair Smith, M.D.

Page 318

1    Stockholm and Finland.
2         Q.   So this is not an official publication
3    of -- of IARC.  Fair?
4         A.   No, it is not.
5         Q.   And if you'll -- but the authors in this
6    study, if you'll . . .
7         A.   Yeah.  I see here where they mention the
8    working group.
9         Q.   Yes.  And, in fact, the authors of the --
10   of the study, to be fair, are part of the working
11   group.  Is that . . .
12        A.   Correct.
13        Q.   And if you'll look at page 1 of Exhibit 19
14   and if you'll -- the left-hand column, the -- it's
15   the next to the last paragraph toward the end of the
16   page, does the authors of the Langseth conclude that
17   talc particles can migrate to the vagina to the
18   peritoneal cavity and ovaries?
19        A.   They document asbestos fibers -- well,
20   first they say:  (Paraphrasing.)  It's known that
21   particles and fibres that enter the body can migrate
22   to distant organs.  Asbestos fibres that are found
23   in the ovaries exposed to asbestos, analogously
24   following perineal application, talc part- --

Page 319

1    particles can migrate from the vagina to the
2    peritoneal cavity and ovaries.  A majority of women
3    experience retrograde menstruation.  And this
4    also -- this suggests a mechanism by which talc
5    particles can travel through the female reproductive
6    tract to the ovaries.
7         Q.   Is this part of the evidence that you
8    relied on in supporting your opinion that talc
9    particles applied to the -- to the perineal area can
10   migrate to the upper genital tract, including the
11   ovaries?
12        A.   Yes, and the research that these
13   statements are based on.
14        Q.   Yes.  And what other evidence do you rely
15   on to support your opinion that talc can migrate to
16   the ovaries?
17        A.   I have a section called "Migration" in --
18   in my report.  While I'm finding it, I'll start with
19   the multiple human studies, which I weight more
20   heavily -- or influenced me more strongly than
21   studies in rodents that have shown particulate
22   matter passing from the perineum into the peritoneal
23   cavity.
24             And -- and as I'm looking through all

Page 320

1    the studies, I will cite S-j-ö-r-s-e-n, et al., Egli
2    and Newton, et al., Hunes, Zerm- -- a Greek study
3    with the e-r.
4         Q.   Why don't you spell it for us?
5         A.   Why don't I look at my bibliography.  It's
6    gotta be the last one --
7             THE VIDEOGRAPHER:  We need to
8    change --
9         A.   -- if they're in alphabetical order.
10            THE VIDEOGRAPHER:  -- the disk, like
11   now, so if we can go off the record.
12            MS. O'DELL:  I'm sorry.  I didn't hear
13   you.
14            THE VIDEOGRAPHER:  The disk, I need to
15   change it out.  It finished a little earlier, so let
16   me swap it out.
17            MS. O'DELL:  Can she finish her answer
18   or . . .
19            THE VIDEOGRAPHER:  No because I have
20   to switch it out.  Sorry.
21            (A recess was taken from 7:56 p.m.
22             to 8:00 p.m.)
23            THE VIDEOGRAPHER:  This marks the
24   beginning of disk 5.  Back on the record.  The time

Page 321

1    is 8:00 p.m.
2         Q.   (BY MS. O'DELL)  Dr. Smith, before we had
3    to change the videographic tape, I had asked you
4    what evidence you rely on to support your opinion
5    that talc migrates from the perineum to the ovaries,
6    and you were walking us through that.
7             So why don't you just take a step back
8    and --
9         A.   Did you get the reading from Langseth on
10   the tape?
11        Q.   I think we got that.  Assume we got that
12   and then go from there.
13        A.   Okay.  So there are a number of papers
14   that look at migration of particulates.
15            First, talc was identified deeply
16   embedded in the ovaries, 1971 by Henderson.
17            Egli and Newton had flushed carbon
18   particles from the vaginal vault and that came out
19   in the peritoneal cavity.  These patients generally
20   who were coming to abdominal surgery in some period
21   of time, same day, next day, up to four days in
22   these studies.
23            And so this -- particulates would be
24   placed in the vagina, not propelled, but placed in

Ellen Blair Smith, M.D.

Page 322

1  the vagina, and then the peritoneal cavity was
2  entered, washed to see if those particulates are
3  there.  So Egli and Newton did carbon particles.
4         Sjösten did glove powder.
5         There are studies from K-u-n-z, looks
6  at micronized albumin particles placed in the vagina
7  that are transported.
8         There's a recent study by Zermanitokis
9  [sic] -- you have the spelling -- that looks at
10  tubal transport.  And the great thing about that
11  study is that you can pass particles and demonstrate
12  them by ultrasonography and actually live-action
13  watch them go through the tube and study tubal
14  motal- -- motility as they go towards the dominant
15  ovarian part -- particle.
16         All these particles, a wide range of
17  studies from very small particles to larger
18  particles, the majority of them were approximating
19  sperm size, which is, in length, 5 microns.
20         So I looked at all these studies and
21  conclude that migration is real.  There's -- a
22  female genital tract is the path to the peritoneal
23  cavity.
24         Dr. Woodruff gave his presidential

Page 323

1  address in 1979 talking about ovarian cancer
2  resulting from unknown agents transversing the
3  vagina, cervix, endometrium, fallopian tube, into
4  the peritoneal cavity, surrounding the uterus and
5  inciting ovarian cancer.
6         I think we're seeing in in vitro
7  studies in the lab, as we study inflammation in
8  ovarian cancers, we are seeing -- able to generate
9  these studies at a molecular level without hurting
10  women, but seeing what the effect of exposure to
11  talc is on normal epithelial cells, fallopian
12  tubes . . .
13    Q.  Before you get so far into that -- I'm
14  gonna ask you about that in just a moment, but let
15  me just ask one question before we leave migration.
16  It is the ability of talc applied to the perineum to
17  migrate through the -- the genital tract to the
18  ovaries.
19         Is that a hypothesis?
20         MR. JAMES:  Object to form.
21    A.  I think it is something that happens.  It
22  is -- it has been -- while I have not seen a paper
23  that demonstrates talc, per se, has been transported
24  through the internal genitalia and to peritoneal

Page 324

1  cavity, particulates of similar size, larger and
2  smaller, have been demonstrated to do that.  These
3  are not motile; they're not flagellated.  A particle
4  can go from outside to inside.
5         There's no reason why talc shouldn't
6  do it, and certainly we've seen talc deeply embedded
7  in the ovary suggesting that that's how it got
8  there.
9    Q.  (BY MS. O'DELL)  In fact, the evidence is
10  so strong the FDA has concluded it's indisputable.
11         MR. KLATT:  Objection to form.
12    Q.  (BY MS. O'DELL)  Has the FDA concluded
13  that it's indisputable that talc can migrate from
14  the perineum to the upper genital tract?
15         MR. JAMES:  Object to form.
16  Mischaracterizes the letter.
17         MR. KLATT:  Misstates the testimony.
18    A.  I think indisputable is the word that --
19  that Dr. Musser, deputy director for scientific
20  operations, Center for Food Safety and Applied
21  Nutrition, used in his letter to Dr. Epstein.
22         "The potential for particulates to
23  migrate from the peritoneum [sic] and vagina to the
24  peritoneal cavity is indisputable."  That's the word

Page 325

1  he used.
2    Q.  (BY MS. O'DELL)  Okay.  Let me ask you to
3  go back to the topic you were -- had moved on to.  I
4  just wanted to finish migration, and you were
5  talking about inflammation.
6    A.  Yes.
7    Q.  What evidence is there that talcum powder
8  causes inflammation?
9    A.  Well, when you go into -- when you go into
10  the laboratory, you don't have to use the broad
11  brush of inflammation.  You can look at specific
12  biochemical production or responses of molecules
13  involved in that inflammatory cascade.
14         So Kahn showed that nanopart --
15  nanotalc particles stabilized TNF-alpha, which is a
16  tumor necrosis factor alpha in human macrophages,
17  which is one of the steps in the inflammatory
18  cascade.
19         In fact, he found that the smaller --
20  the smaller of the pol- -- particle, the more the
21  production of unstabilization of TNF-alpha as
22  opposed to larger pol- -- particles.
23         Saed has, through the 2000s, looked at
24  ovarian cancer cell lines upregulation of

Ellen Blair Smith, M.D.

Page 326

1    anti-inflammatory and pro-inflammatory enzymes in
2    products.  And then -- and he's written -- has a new
3    book chapter on it with Nicole Fletcher and all the
4    people in his lab.
5            And then has recently had a paper
6    accepted that looks at the response of controls,
7    normal ovarian epithelium, fallopian tube
8    epithelium, normal, and three different cell lines
9    of ovarian epithelial cancer cells in response to
10   three different levels of -- of talc.
11           And looked at the production of
12   pro-inflammatory enzymes, decrease in
13   anti-inflammatory enzymes, increase in cell
14   proliferation, decrease in apoptosis, and induction
15   of single-nucleotide polymorphisms that are
16   associated with carcinogenesis.
17           Before we had one paper where a
18   researcher named Buzard had taken a memorialized
19   normal ovarian cell line, exposed it to 5 milligrams
20   per -- micrograms, I'm sorry, per milliliter to --
21   of talc, talcum powder, and this is scientific grade
22   talc, this was not Johnson's Baby Powder -- and
23   induced malignancy, as measured by the criteria of
24   lack of adherence in semi-solid auger, which is a

Page 327

1    standard of maligat -- malignancy and; yet, she
2    didn't do anything with it.  She didn't
3    cytologically evaluate it.  She didn't -- she just
4    said, "I made it a malignant."
5            So we have an example of malignant
6    transformation that is documented by a pretty
7    reliable basis if you query -- I can't say that, but
8    she really didn't go far with it.
9            Saed is starting to really break it
10   down, and he had a really remarkable dose response
11   in vitro to 5, 50, or 100-microgram per mil talc in
12   his changes.
13           MR. KLATT:  Object to the narrative
14   answer.
15       Q.  (BY MS. O'DELL)  Has -- in addition to the
16   Buzard paper you mentioned and Dr. Saed's work over
17   the last decade, have there been others that looked
18   at talc and -- in cell cult -- culture and found
19   evidence that talc produced inflammation?
20           MR. KLATT:  Objection;
21   mischaracterization.
22           MR. JAMES:  Join.
23       A.  Oh, Shulka.  I forgot that study.  That's
24   a big one.  Shulka -- Shulka, S-h-u-l-k-a, looked

Page 328

1    at -- at exposed normal mesothelial cells and then
2    normal ovarian epithelial ovarian cells to both
3    asbestos and nonfibrous talc and found induction of
4    pro-inflammatory genes have -- with exposure to
5    these 2 carcinogens.
6            Here's another Saed.
7            I think that covers it pretty much.
8        Q.  (BY MS. O'DELL)  You asked earlier today
9    about I think the question was -- well, let me just
10   ask it this way:  Is there a regulatory body that
11   shares your view that talcum powder can cause
12   ovarian cancer?
13           MR. JAMES:  Object to form.
14       A.  The Canadian EPA, CEPA, came out with
15   Health Canada, which is publishing -- is in
16   it's discussion period where they cite the
17   literature and base -- and their conclusion is that
18   talcum powders -- I can paraphrase it.
19           Do you have a copy that I can read?
20           But they say that talcum powder is a
21   significant public health risk to women from
22   perineal exposure, but I -- off the top of my head,
23   I can't remember their conclusion to read to you.
24       Q.  (BY MS. O'DELL)  You also asked some

Page 329

1    questions today about the -- about ACOG.
2            Do you remember those questions about
3    ACOG and the societies --
4        A.  Um-hum.
5        Q.  -- of which you're a member?
6        A.  Um-hum.
7        Q.  What's referred to as "The Green Journal,"
8    I believe?
9        A.  It's obstetrics and gynecology.  It's the
10   journal of ACOG.
11       Q.  And has -- recently have papers been
12   published regarding ovarian cancer and its -- excuse
13   me, and talcum powder causing -- well, let me strike
14   that and start over.
15           Have recently, in The Green Journal,
16   there have been a publication dealing with talcum
17   powder products causing a significant increase in
18   ovarian cancer?
19       A.  I think what --
20           MR. JAMES:  Object to form.
21       A.  I think what you're referring to is, you
22   know, the end of every year they -- they review a
23   lot of topics and it's, you know, top five articles
24   in preeclampsia and top five articles in

Ellen Blair Smith, M.D.

Page 330

1  endometriosis and there's Jason Wright wrote the top
2  five articles in ovarian cancer.
3          And I think -- I don't remember
4  whether they were ranked, but I know Number 4 on the
5  list was the Penninkilampi study, but that's -- I
6  don't know who decides that. I don't remember
7  reading how that was decided, but I know Jason
8  Wright wrote it.
9      Q. (BY MS. O'DELL) And is that something
10 that suggests that the -- the causal connection
11 between the use of genital talc and ovarian cancer
12 is becoming more well-known in the medical
13 community?
14         MR. JAMES: Objection to form.
15         MR. KLATT: Objection; leading.
16 Speculation.
17     A. I think both Canada Health and the flurry
18 of two publications in '18. There are other studies
19 that are ongoing and in various stage of analysis,
20 preparation, proof, shows that we're getting a lot
21 more interest in talc and its relationship to
22 ovarian cancer. And there is increasing concern in
23 the -- all over the world, but the studies I know of
24 are largely in the United States and Canada.

Page 331

1      Q. (BY MS. O'DELL) Let me change topics just
2  for a minute.
3          You were asked questions throughout
4  the day, different points about the fragrance
5  chemicals that comprise the fragrance for --
6  fragrances for Baby Powder and Shower to Shower.
7          Do you recall that?
8      A. I do recall that.
9      Q. Do you -- did you -- excuse me.
10         Do you defer to Dr. Crowley on his
11 examination of the specific characteristics of those
12 fragrance chemicals?
13     A. I was getting ready to say I defer --
14 before you could finish your sentence. I defer to
15 Dr. Crowley on everything about fragrances.
16     Q. And do you -- I mean, your -- do you rely
17 on his opinions regarding the inflammatory, toxic,
18 and potential carcinogenic effect of the chemicals
19 in the fragrances for Baby Powder and Shower to
20 Shower?
21     A. Yes. I don't know anything about those
22 substances.
23     Q. You were also asked questions about the
24 heavy metals that had been demonstrated to be

Page 332

1  present in talcum powder in certain periods.
2          MR. JAMES: Object to form.
3      Q. (BY MS. O'DELL) Do you rely on IARC's
4  comprehensive review of the literature regarding the
5  carcinogenicity of chromium?
6      A. Yes.
7      Q. Did you review IARC's analysis of --
8      A. Yes. I read that. That is the way I made
9  my assessment of whether or not they are toxic.
10     Q. And did you -- in the same way, did you
11 review IARC's Monograph in relation to nickel?
12     A. Yes.
13     Q. And do you rely on IARC's comprehensive
14 review of both the epidemiological literature, the
15 animal studies, and other evidence regarding the
16 carcinogenicity of nickel?
17     A. Yes.
18     Q. And --
19     A. I didn't individually pull every one of
20 their papers. I just read IARC.
21     Q. And you relied on IARC's review of those
22 materials?
23     A. Yes. I have trusted them. If they say
24 nickel is a carcinogen at specific levels, then I

Page 333

1  have no intention of pulling all those papers and
2  studying them myself.
3      Q. And would the same be true of Cobalt?
4      A. Yes.
5      Q. I want to show you what I'm going to mark
6  as Exhibit 30, and this is a copy of the Berge
7  paper. It's the most up-to-date copy.
8          (Deposition Exhibit 30 marked for
9          identification.)
10     Q. (BY MS. O'DELL) So I've handed you
11 Exhibit 30. It's a copy --
12     A. Um-hum.
13     Q. It's the most up-to-date copy of the Berge
14 paper. We had discussions today at different times.
15 I think that we had different Berge publications,
16 and so I want to mark the one that has been
17 published most recently.
18     A. Okay. This is -- we have previously
19 marked the e-Pub. This is the print.
20     Q. All right. And if you'll -- I have just
21 one question.
22         You were asked today or the suggestion
23 was made to you today that in Berge the study did
24 not demonstrate a dose response.

84 (Pages 330 to 333)

Ellen Blair Smith, M.D.

Page 334

1        Do you recall those questions?
2    A.  Yes.
3    Q.  And if you'll take a look at the next to
4  last sentence of the abstract --
5    A.  Yes.
6    Q.  -- of Berge.
7        Do you see that?
8    A.  Yes.
9    Q.  And, in fact, did Berge demonstrate a --
10  dose response?
11    A.  He says it's a -- which appears to be
12  limited, that -- okay.
13        "Statistically significant association
14  between general use of talc in ovarian cancer, which
15  appears to be limited to serous carcinoma was
16  suggestion of dose-response."
17    Q.  The . . .
18    A.  And he has a table of the duration
19  frequency.
20    Q.  And is that table supportive of the fact
21  that the studies show the -- a dose response or at
22  least the trending of a dose response?
23    A.  Their -- the --
24        MR. KLATT:  Objection.

Page 335

1        MR. JAMES:  Object to form.
2    A.  His results -- his relative risks are 1.16
3  for a duration. 1.05 for frequency.  They are
4  statistically significant with 1.07 to 1.26 for a
5  duration. 1.04 to 1.07 confidence intervals.  But
6  his number of risk estimates are small, 12 and 7.
7    Q.  Okay.  You . . .
8        MR. JAMES:  Leigh, if you're done with
9  Exhibit 30, may I have a look at it, please.
10        MS. O'DELL:  Sure.
11    A.  I think -- from what I've seen, it looks
12  pretty much the same.
13        MR. JAMES:  Thank you.
14    Q.  (BY MS. O'DELL)  Let me ask you to --
15    A.  Except that chart is -- oh, yeah.  It's in
16  the other one.  Down here.  I think they're the same
17  thing.
18        Go ahead.
19    Q.  Doctor, you were asked a series of
20  questions about individual patients and whether
21  talcum powder can cause ovarian cancer in an
22  individual patient.
23        Do you remember those questions?
24    A.  Generally.

Page 336

1    Q.  Yeah.  Have you been asked to look at any
2  individual patients in order to render what's
3  ter- -- referred to as a case specific opinion?
4    A.  No.
5    Q.  And is it -- would you be willing to do
6  that if asked?
7    A.  No.  I haven't thought about it.
8    Q.  Okay.
9    A.  I'd like to think about it before I accept
10  any more responsibility.
11    Q.  Yeah.
12        Does that in any way --
13    A.  At this hour -- at this hour of the
14  deposition.
15    Q.  Does that in any way undermine or change
16  your opinion that talcum powder products, Baby
17  Powder and Shower to Shower cause ovarian cancer?
18    A.  No.
19        MR. KLATT:  Objection; leading.
20    A.  It doesn't change my mind.
21    Q.  (BY MS. O'DELL)  And is that opinion based
22  on your review of the totality of the literature as
23  you've described in your report and in the materials
24  that are cited not only within the report but also

Page 337

1  Exhibit C?
2        MR. JAMES:  Object to form.
3    A.  Yes.  I -- I find the epidemiologic data
4  and the consistency is so significant, and then the
5  biochemical stuff, the skin would be coming out like
6  gangbusters.  Speaks to plausibility,
7  experimentation, mechanism, and that's just very
8  compelling.
9    Q.  (BY MS. O'DELL)  And in terms of the
10  opinions that you've expressed in your report, are
11  those opinions based on the published literature and
12  other data that you have referenced and relied on in
13  your report?
14    A.  Yes.
15    Q.  Okay.
16    A.  All of that has been published and
17  peer-reviewed.
18    Q.  Right.
19        So the degree that there's new data
20  coming out, you're not relying on sort of the hope
21  of new data in the future to reach your opinions?
22    A.  No, I think I'm willing to commit and make
23  my opinion.  I -- I feel very excited that we
24  have -- we will have opportunities as we understand

85 (Pages 334 to 337)

Ellen Blair Smith, M.D.

Page 338

1 this process, the therapeutic interventions at some
2 time.
3     Q.  You were asked questions earlier today
4 about what you had done prior to litigation and what
5 you've done post litigation in terms of informing
6 your opinions in this case.
7         Did you know that talc and asbestos
8 are inflammatory prior to becoming involved in the
9 litigation?
10     A.  Yes.
11         MR. JAMES:  Object to form.
12     Q.  (BY MS. O'DELL)  Prior to the litigation,
13 did you know, based on your understanding of the
14 medical and scientific literature, that inflammation
15 creates a pro-carcinogenesis -- excuse me,
16 carcinogenic environment?
17         MR. JAMES:  Object to form.
18     A.  Yes.
19     Q.  (BY MS. O'DELL)  Prior to the litigation,
20 did you know, based on your review of the scientific
21 and medical literature, that inflammation was a
22 mechanism for epithelial ovarian cancer development
23 and progression?
24         MR. JAMES:  Object to form.

Page 339

1     A.  Certainly the recent data is more
2 compelling, that has been postulated, and various
3 little snippets of data like some of Saed's stuff
4 and enzyme induction, stuff like that, has been
5 leading there.  It's been growing.
6     Q.  (BY MS. O'DELL)  But you were aware of
7 that --
8     A.  Yeah, prior to --
9     Q.  -- in -- excuse me.  You were aware of --
10     A.  -- prior to January of 2017.
11     Q.  Okay.
12         MR. JAMES:  Object to the form.
13     Q.  (BY MS. O'DELL)  Prior to litigation, did
14 you know that particles such as talc and asbestos
15 could migrate or be transported to the fallopian
16 tube and ovary from the perineum?
17         MR. JAMES:  Object to the form.
18     A.  Oh, yes.
19     Q.  (BY MS. O'DELL)  Prior to the litigation,
20 were you aware of scientific data and medical
21 literature demonstrating that talc as well as
22 asbestos could be exposed to the body through
23 inhalation?
24     A.  Oh, yes.

Page 340

1     Q.  Are your opinions in this case outlined in
2 your deposition today as well as the report that
3 you've provided in this case?
4     A.  Yes.
5     Q.  And every time today when you have
6 referred to talcum powder products, have you been
7 referring to Johnson's Baby Powder and Shower to
8 Shower?
9         MR. JAMES:  Object to form.
10     A.  Except when specified otherwise.
11     Q.  (BY MS. O'DELL)  Okay.  And then last
12 question.  You were asked a series of -- or maybe
13 the last question.
14         You were asked a --
15     A.  I got so excited.
16     Q.  We've got a series of questions about what
17 you tell your patients, and you --
18     A.  Um-hum.
19     Q.  -- testified that you do not tell your
20 patients presently about the increased risk of
21 ovarian cancer with perineal talc use.
22         Do you recall that?
23     A.  I do.
24     Q.  Do you treat patients with ovarian cancer

Page 341

1 at this time?
2     A.  At the end of their life.
3     Q.  Why do you not tell them about talc as
4 a -- as a cause of ovarian cancer?
5     A.  It's too late.
6     Q.  Why?
7     A.  They're dying.
8     Q.  And --
9     A.  There's nothing -- they failed all
10 therapy.  If there was adequate therapy --
11     Q.  And it would be --
12     A.  -- to reverse it, then they wouldn't be my
13 patient.
14     Q.  And it would be insensitive and wrong to
15 counsel a patient at that junction in their life --
16     A.  Um-hum.
17     Q.  -- about a risk factor that they will have
18 no effect on their --
19     A.  They can't do anything about it.  I don't
20 want to induce guilt.  The horse is out of the barn.
21         They need pain control.
22         They need nausea control.
23         They need love, support.  They need
24 their family, you know, their priest or spiritual

Ellen Blair Smith, M.D.

Page 342

1  leader. They need a lot of care, but they don't
2  need to be told "This happened because you used
3  powder" or, "Boy, if you hadn't" -- I don't know.
4  That'd be just dumb.
5          MS. O'DELL: I don't have any further
6  questions, Dr. Smith. Thank you.
7          I'm sure these -- one of these
8  gentlemen will have some questions.
9          MR. JAMES: We will.
10         Are we taking five, Mike?
11         MR. KLATT: Five minutes.
12         MR. JAMES: Okay.
13         MR. KLATT: We'll just need a time
14  from the videographer.
15         MR. JAMES: Okay.
16         THE VIDEOGRAPHER: So let's -- are we
17  going off?
18         MR. KLATT: We don't need to go off.
19  Just what's the time?
20         THE VIDEOGRAPHER: 32 plus 16 prior,
21  so it should be 48.
22         MS. O'DELL: So I'm not sure what
23  the -- I'm not sure what the calculation's being
24  made.

Page 343

1          MR. SILVER: Let's go off the record
2  so we can figure out the calculation because I think
3  it's different that he . . .
4          THE VIDEOGRAPHER: Going off the
5  record. The time is 8:32 p.m.
6          (A recess was taken from 8:32 p.m.
7          to 8:43 p.m.)
8          THE VIDEOGRAPHER: Back on the record.
9  The time is 8:43 p.m.
10         FURTHER EXAMINATION
11  BY MR. JAMES:
12     Q.  Dr. Smith, good evening.
13     A.  Hi.
14     Q.  I have a few more questions for you.
15  Okay?
16     A.  Okey-doke.
17     Q.  Are you aware of any studies or literature
18  showing that the presence of heavy metals in
19  cosmetic talc powders increases the risk of ovarian
20  cancer?
21         MS. O'DELL: Object to the form.
22     A.  I know that IARC calls those Class 1 --
23  two of them Class 1 carcinogens. I don't know how
24  much they influence the carcinogenicity of talcum

Page 344

1  powder.
2     Q.  (BY MR. JAMES) Are you aware of any
3  scientific literature or studies that address
4  whether the chemicals and the fragrances of talc
5  powder cause ovarian cancer?
6     A.  I do not. I defer to Dr. Crowley.
7     Q.  Did you consider the body of literature,
8  looking at whether talc is associated with other
9  types of gynecological cancers?
10    A.  I did not --
11         MS. O'DELL: Object to the form.
12    A.  I did not even search endometrial cancer,
13  cervical cancer, vulvar cancer.
14    Q.  (BY MR. JAMES) Do you believe that body
15  of literature would be relevant to the opinions
16  you're offering today?
17    A.  It would be confirmatory, were it to
18  exist.
19    Q.  Confirm --
20    A.  I don't know if it exists.
21    Q.  Sorry.
22         Confirmatory to the extent that it
23  revealed an association, correct?
24         MS. O'DELL: Object to the form.

Page 345

1     A.  To the extent that it revealed an
2  association if such literature exists.
3     Q.  (BY MR. JAMES) If the literature, looking
4  at the association between talc and other
5  gynecological cancers, did not support an
6  association, would that impact the opinions you're
7  offering today?
8          MS. O'DELL: Object to the form.
9     A.  Probably not.
10    Q.  (BY MR. JAMES) Why is that?
11    A.  Because -- because of the lethality of
12  ovarian cancer, we do much better curing endometrial
13  and cervix cancer. Ovarian cancer is a real killer.
14  Not that I want anybody to get cancer.
15    Q.  And I'm not sure that I understood your
16  answer.
17    A.  Okay.
18    Q.  So -- and it may -- and it's probably on
19  my part.
20         But you said because of the?
21    A.  Lethality. Lethal.
22    Q.  Lethality? Lethality. Okay.
23    A.  Yeah, of ovarian cancer. It is unusual
24  to -- it's unusual to find ovarian cancer at an

87 (Pages 342 to 345)

Ellen Blair Smith, M.D.

Page 346

1    early stage.  It is unusual to cure ovarian cancer.
2    We have a pretty darn good -- well, it could be
3    better.  We don't cure everybody.  But we have a
4    pretty good track record with curing endometrial and
5    cervical cancer.  Not that I want anybody to get
6    cancer, but we need to do everything to decrease the
7    incidence of ovarian cancer.
8         Q.  If your opinion is that talc causes
9    ovarian cancer, would you believe that talc would
10   also cause cervical cancer?
11        A.  I don't know that information.
12             MS. O'DELL:  Objection; form.
13        A.  Cervical cancer -- cervical cancer, in
14   all, except extremely rare incidents such as DES
15   exposure, which thank God we've gotten rid of, is --
16   a component of cervical cancer is human papilloma
17   virus, which is a necessary but insufficient
18   carcinogen.  That is, this is your cumulative -- one
19   of your cumulative examples where you've got to have
20   the one of HPV, but then you need another punch.
21   You need another factor.  You can't just have HPV to
22   cause cervical cancer.
23             I -- I can't think of any research
24   that -- in influence of talc usage in cervical

Page 347

1    cancer.  I don't think I've ever seen that paper.
2         Q.  (BY MR. JAMES)  Would you expect talc to
3    be associated with uterine cancer?
4         A.  I've never seen that paper either.  Taking
5    us back to Mr. -- is it Klatt?  Menstruation
6    association -- I'm just -- I'm thinking, and I
7    shouldn't be thinking.  I should -- I've never seen
8    that paper.
9         Q.  Or body of papers, if such a body exists,
10   correct?
11        A.  Or if such a body --
12             MS. O'DELL:  Object to the form.
13        A.  -- exists.
14        Q.  (BY MR. JAMES)  You would agree that if
15   talc migrates to the genital tract, that talc would
16   be exposed to tissues and organs along the way,
17   correct?
18        A.  Yes.
19        Q.  Okay.  You discussed with your counsel
20   Exhibit Number 30, which is the most recent version
21   of the Berge paper, correct?
22        A.  Yes.  I have the -- I have the 24, but I
23   think this is good enough.
24        Q.  And I'm gonna hand you back Exhibit 30.

Page 348

1         A.  Okay.  I haven't found any differences
2    between the two, except the page numbers.
3         Q.  And Dr. Smith, if you could just look at
4    that abstract for me on the first page, please.
5         A.  Yes.
6         Q.  And you see at the bottom of the abstract
7    that -- the sentence that I asked you about earlier,
8    and discussed with you at some length, about the
9    heterogeneity issue.
10             Do you see that?
11        A.  Yes.
12        Q.  Okay.  And you see there that the authors
13   of the Berge paper still conclude on Exhibit
14   Number 30 that a causal interpretation is not
15   warranted, correct?
16             MS. O'DELL:  Objection; form.
17        A.  It says, "The heterogeneity" -- they
18   didn't say it's not causal.  They say the
19   heterogeneity results detract from a causal
20   interpretation, so that lowers the chance that
21   they're willing to make in a causal association.  It
22   doesn't strike it out entirely.
23        Q.  (BY MR. JAMES)  And that language is
24   consistent with the language that we discussed

Page 349

1    earlier today, correct?
2         A.  It is.
3             MS. O'DELL:  Objection; form.
4         Q.  (BY MR. JAMES)  During counsel's
5    questions, you made references to literature or
6    studies that I think you characterized as "would be
7    coming out."
8             Is that terminology that I heard
9    correctly?
10        A.  Yes.
11        Q.  Okay.  Are you aware of studies on the
12   talc ovarian cancer hypothesis that are works in
13   progress?
14        A.  Yes.
15        Q.  Okay.  What are those studies?
16        A.  Well, there's another epidemiologic study
17   cited in Health Canada by Traher -- Taher,
18   T-a-h-e-r, Mohamed Taher, and a whole bunch of other
19   people.  That is another epidemiologic
20   meta-analysis.
21        Q.  Are there any other studies that you're
22   aware of that pertain to the issues in this
23   litigation that are works in progress?
24        A.  I think people all over are still actively

88  (Pages 346 to 349)

Ellen Blair Smith, M.D.

Page 350

1  looking at inflammation in all cancers at various
2  molecular levels. Gosh. Their group's called the
3  Cancer Genome Analysis, that's working on --
4  continues to work on ovarian cancer. Sambucetti
5  looks on ovarian cancer with BRCA mutations.
6  Looking -- there are new papers coming out all the
7  time on other risk factors.
8      Q.  And if I may ask a very precise question
9  in hopes of moving us along.
10     A.  Okay. Sorry.
11     Q.  That's fine.
12     A.  No worries.
13     Q.  Are you aware of any other papers that are
14  works in progress that specifically look at the
15  issue of talc and ovarian cancer?
16     A.  I have not read --
17         MS. O'DELL: Besides the one she
18  mentioned?
19     A.  Besides the one I mentioned, I have not
20  read any other data or prepublication drafts.
21         MR. JAMES: Okay. That's all the
22  questions I have for now.
23         MR. KLATT: Oh.
24         THE WITNESS: What are we on? 10s?

Page 351

1  14, 13. It may be down here. 11, 10.
2         MR. KLATT: Do you -- I don't -- I'm
3  looking for the IR Asbestos Monograph.
4         THE WITNESS: This is not it?
5         MR. KLATT: No, I don't believe so.
6         THE WITNESS: I mean, it's like --
7         MS. O'DELL: I don't believe we
8  entered that yet.
9         THE WITNESS: It's got -- this is from
10  the IR Monograph, but it is not the --
11         MR. KLATT: Do you have the entire
12  monograph --
13         THE WITNESS: Yes, we do.
14         MR. KLATT: -- in one of those books?
15         THE WITNESS: Yes, we do.
16         MR. KLATT: Can you pull it?
17         THE WITNESS: Second IA.
18         MS. O'DELL: Which monograph?
19         THE WITNESS: The --
20         MR. KLATT: The 2012 Asbestos
21  Monograph.
22         THE WITNESS: MC. It's the second
23  one. It's not that one. It's the second IA. Yep,
24  that's it.

Page 352

1         MR. KLATT: Let me do this.
2         Let's just mark this, the full
3  Asbestos Monograph --
4         THE WITNESS: Okay.
5         MR. KLATT: -- Doctor, instead of some
6  pages. Let's mark it as the next exhibit.
7         THE COURT REPORTER: It should be 31.
8         (Deposition Exhibit 31 marked for
9         identification.)
10         FURTHER EXAMINATION
11  BY MR. KLATT:
12     Q.  Doctor, I'm handing you, and just verify
13  it's what you're looking at. But this -- I'm
14  representing to you this is a copy of the 2012 IARC
15  Asbestos Monograph that's referred to your
16  report and also --
17     A.  Exactly.
18     Q.  -- referred to in your testimony multiple
19  times today, correct?
20     A.  Correct.
21     Q.  And if you would, turn to page 256,
22  please.
23     A.  (Complied.) Getting close.
24     Q.  Are you at page 256?

Page 353

1     A.  I am.
2     Q.  Of the IARC 2012 Asbestos Monograph?
3     A.  I am.
4     Q.  I'm looking in the right-hand column, and
5  I think you looked at this language earlier today.
6         The right-hand column, the middle
7  paragraph says, "The IARC Working Group noted that a
8  causal association between exposure to asbestos and
9  cancer of the ovary was clearly established based on
10  five strongly positive cohort mortality studies of
11  women with heavy occupational exposure to asbestos,"
12  correct?
13     A.  Correct.
14     Q.  And then it cites five studies that you've
15  reviewed, correct?
16     A.  Right.
17     Q.  None of those studies involve the type of
18  asbestos that's alleged to be in Johnson & Johnson's
19  body powder products, correct?
20         MS. O'DELL: Object to the form.
21     A.  I'd have to look at them back to look at
22  the types. I -- I'm sorry. I don't remember the
23  details in these studies --
24     Q.  (BY MR. KLATT) If, in fact --

89 (Pages 350 to 353)

Ellen Blair Smith, M.D.

Page 354

1    A. -- at the time.
2    Q. -- those five studies involve a type of
3  asbestos that hasn't been alleged to be in Johnson &
4  Johnson's Baby Powder, then you wouldn't be reliant
5  on those, correct?
6        MS. O'DELL: Object to the form.
7  Misstates the record.
8    A. These studies are not about Johnson's Baby
9  Powder.
10    Q. (BY MR. KLATT) Exactly.
11    A. These studies are about asbestos.
12    Q. Right. And they're not even done in the
13  U.S., are they?
14    A. Some of them for sure were in the UK. I
15  can look them all up if you want.
16    Q. And they were studies of women who had
17  heavy occupational exposure to asbestos, correct?
18  That's what the IARC Monograph says?
19    A. I can -- I can look at that in more detail
20  if I find Reid or --
21    Q. No, I'm just asking you what the IARC
22  Monograph says.
23        MS. O'DELL: You're welcome to refer
24  to Reid if you'd like.

Page 355

1    A. I'd like to refer to Reid if I can find
2  it, because it's up here as evidence. Early,
3  early --
4    Q. (BY MR. KLATT) But I'm not asking you
5  about Reid. I'm asking you about the IARC
6  Monograph.
7    A. The Reid includes those studies in a
8  meta-analysis and has details on those studies that
9  will allow me to refresh my memory --
10    Q. All right. I'll withdraw --
11    A. -- about them.
12    Q. -- the question.
13        I want to focus on what IARC's saying
14  because you said earlier today you relied on IARC.
15        IARC says in Exhibit 31, Doctor --
16  IARC says in Exhibit 31 that the link to ovarian
17  cancer and asbestos is based on the studies with
18  women with heavy occupational exposure, correct?
19  That's --
20    A. Predominance, it says that. And the
21  predominoc-- the predominant exposure in these
22  studies, to my memory, was occupational. But I
23  believe some -- some studies were spouses and --
24  of people who were nonoccupationally exposed, and I

Page 356

1  can't remember which studies are that.
2    Q. I'm talking about the studies IARC is
3  relying on for its conclusion that ovarian cancer --
4    A. I'd like to --
5    Q. -- is related to --
6        THE WITNESS: Get me Reid, will you?
7  What is that saying on there?
8    Q. (BY MR. KLATT) The studies are cited
9  right there, Doctor.
10    A. I know. I just --
11        MS. O'DELL: She's just reading.
12    A. -- was verifying the information before I
13  give this to you.
14        (Examined exhibit.) Okay. My -- the
15  next sentence takes us where we want to go.
16        (Paraphrasing.) The conclusion
17  received these initial support from studies showing
18  women and girls with environmental but not
19  occupational exposure. I will give you that now.
20    Q. Okay. But it says the link is clearly
21  established based on the heavy occupational
22  exposure, correct?
23        MS. O'DELL: Objection to the form.
24    A. That was their initial establishment of

Page 357

1  the link.
2    Q. (BY MR. KLATT) Now, that very same IARC
3  Monograph, turn over to page 280, if you would. It
4  says there in the right-hand column about three
5  paragraphs down -- do you see where I'm reading?
6    A. Yeah.
7    Q. This very same IARC Working Group that
8  looked at asbestos says, "The association between
9  exposure to talc, potential retrograde translocation
10  to the ovarian epithelium, and the development of
11  ovarian cancer is controversial," correct?
12        MS. O'DELL: Objection.
13    A. That was their assessment based on
14  IARC 2010, which --
15    Q. (BY MR. KLATT) And this --
16        MS. O'DELL: Excuse me.
17    Q. (BY MR. KLATT) I'm sorry. Go ahead.
18    A. -- and this volume.
19        MS. O'DELL: She was not finished.
20    Q. (BY MR. KLATT) And this volume is --
21        MS. O'DELL: Excuse me.
22    A. And this volume.
23        MS. O'DELL: Let her finish, please,
24  sir.

90 (Pages 354 to 357)

Ellen Blair Smith, M.D.

Page 358

```
1        Q. (BY MR. KLATT) Are you finished?
2        A. I am now.
3             MS. O'DELL: She was not finished, and
4    it's not gonna be clear on the record.
5             Dr. Smith, if you need to finish your
6    answer, please go ahead and do that.
7        Q. (BY MR. KLATT) I apologize. I thought
8    you were finished, and so I didn't mean to interrupt
9    you.
10            So IARC, on the one hand --
11            THE WITNESS: I said it.
12       Q. (BY MR. KLATT) -- is saying --
13            THE WITNESS: She's got it down.
14            MS. O'DELL: Okay.
15       Q. (BY MR. KLATT) I'm sorry?
16       A. The transcriptionist has what I said.
17   This -- 20 -- 93 and 100C, 2010 and 2012.
18       Q. Are what IARC cites for stating that the
19   association between exposure to talc, potential
20   retrograde translocation to the ovarian epithelium,
21   and the development of ovarian cancer is
22   controversial, correct?
23            MS. O'DELL: Object to the form.
24       A. That's what they say in probably 2011.
```

Page 359

```
1        Q. (BY MR. KLATT) So on the one hand,
2    they're saying in this monograph that the link to
3    ovarian cancer they ascertain is based on every
4    occupational exposure, but when they describe the
5    association with talc, retrograde translocation to
6    the ovaries and ovarian cancer, they don't say it's
7    clearly established at all. They say it's
8    controversial, correct?
9             MS. O'DELL: Object to the form.
10       A. I know what they say. I can read their
11   words. I would, again, disagree that retrograde
12   translocation of particulates to the ovarian
13   epithelium is not controversial based on the data
14   that I've been talking about for about half the day.
15       Q. (BY MR. KLATT) Which IARC also summarizes
16   in its 2010 talc monograph and in this monograph?
17       A. In 2010 --
18            MS. O'DELL: Objection -- excuse me.
19   Excuse me.
20            Objection. That is -- misstates her
21   prior testimony, and you know that.
22            So to the degree you understand the --
23   the question, Dr. Smith, please go ahead.
24       A. I know what they say. I know what I have
```

Page 360

```
1    facts to substantiate. They are not the same thing,
2    so I disagree with their assessment that retrograde
3    translocation to the ovarian epithelium is at all
4    controversial for any particulate.
5             I have talked about the both
6    epidemiologic and biochemical by different
7    investigators of exposure to talc in vitro and a
8    strong epidemiologic history relating talc and
9    ovarian cancer.
10            So based on what I've been talking
11   about for the past 12 hours, I disagree with this.
12       Q. (BY MR. KLATT) Okay. Well, that's what I
13   wanted to establish.
14            On the one hand, when IARC in the
15   asbestos monograph in 2012 is talking about exposure
16   to talc, translocation to the ovaries, and the
17   development of ovarian cancer, they don't say it's
18   clearly established at all.
19            They -- they, IARC, says it's
20   controversial, correct?
21            MS. O'DELL: Objection; asked and
22   answered.
23       A. They're flat wrong.
24       Q. (BY MR. KLATT) I'm asking what IARC says.
```

Page 361

```
1        A. I -- okay. We have read this sentence 14
2    times.
3        Q. Do you agree with it?
4        A. I do not agree with the statement. I
5    agree those words are printed on the paper.
6        Q. Do you agree that's IARC's position?
7        A. IARC printed those things --
8             MS. O'DELL: Objection; asked and
9    answered.
10       A. -- and said that.
11       Q. (BY MR. KLATT) Okay. Thank you.
12            And they cite their own talc monograph
13   in 2010, and they cite their asbestos monograph --
14       A. Asked and answered.
15       Q. -- and they ask -- you're not the lawyer
16   here.
17       A. I know it, but I'm getting it.
18       Q. IARC, for the statement that the exposure
19   to talc translocation to the ovaries and development
20   of ovarian cancer is controversial, what IARC
21   cites -- listen to me, Doctor -- what IARC cites --
22       A. I'm listening. I have my eyes closed, but
23   I'm listening.
24       Q. -- is their own 2010 talc monograph and
```

91 (Pages 358 to 361)

Ellen Blair Smith, M.D.

Page 362

1 this very 2012 asbestos monograph, correct?
2      MS. O'DELL: Excuse me. Asked and
3 answered 10 times.
4      Q. (BY MR. KLATT) Is that correct?
5      MS. O'DELL: Excuse me. Asked and
6 answered.
7      A. The words are printed on the paper. That
8 is what they wrote.
9      Q. (BY MR. KLATT) So my statement's correct?
10      MS. O'DELL: Objection.
11      A. They wrote that, yes.
12      Q. (BY MR. KLATT) Not that hard.
13      I think we established earlier that
14 there's not a single study showing talc applied to
15 the external genital area has been shown to migrate
16 into the ovaries?
17      A. I know of no talc translocation migration
18 studies.
19      Q. And the Egli study and the Sjösten study
20 and the Zervomanoklakis study --
21      (Speaking simultaneously.)
22      A. I'm not (unintelligible).
23      Q. -- that you cited, none of those involve
24 talc?

Page 363

1      A. None of --
2      MS. O'DELL: Object to the form.
3      A. -- them did.
4      Q. (BY MR. KLATT) And they all involve those
5 particles being injected into the reproductive
6 tract?
7      MS. O'DELL: Object to the form.
8      A. Absolutely not.
9      Q. (BY MR. KLATT) They say poster- --
10      A. Sjösten did not inject anything. He had
11 corn starch on gloves.
12      Q. And was that applied externally or was the
13 corn starch --
14      A. It's a pelvic examination.
15      Q. Let me finish.
16      And a pelvic examination involves
17 introduction of corn starch on surgical gloves into
18 the reproductive tract. It's not specific --
19      A. I don't think you'll get any --
20      MS. O'DELL: Excuse me. Excuse me.
21      Q. (BY MR. KLATT) It's not external
22 application, correct?
23      MS. O'DELL: Object to the form.
24      A. You said "injected."

Page 364

1      Q. (BY MR. KLATT) Okay. Well, let's talk --
2 Egli and Zervomanoklaskis involved injections of
3 particles into something called the vaginal
4 posterior fornix, correct?
5      A. Um-hum.
6      Q. I'm sorry?
7      A. Yes.
8      Q. And that's not the external genital area,
9 is it?
10      A. Hum. That is part of the lower genital
11 tract.
12      Q. The posterior vaginal fornix is the area
13 of the vagina right next to the cervix, correct?
14      A. Uh-huh.
15      Q. So the very top of the vagina, correct?
16      A. It's sort of at the very back.
17      Q. And so it's not at the external genital
18 area, correct?
19      A. I didn't say it was external. I said it
20 was part of the lower genital tract.
21      Q. It's about halfway to the ovaries,
22 correct?
23      MS. O'DELL: Objection to form.
24      A. Yes.

Page 365

1      Q. (BY MR. KLATT) And those animals in those
2 studies --
3      A. They're humans.
4      Q. Well, no. You said -- Egli, I thought you
5 said was in animals.
6      MS. O'DELL: Object to form.
7      A. No, Egli's in humans.
8      Q. (BY MR. KLATT) Well --
9      A. Egli's --
10      Q. -- the humans were --
11      A. -- in humans.
12      Q. The hum- --
13      A. Zervomanoklaskis is in humans. Sjösten is
14 in humans. Hunts is in humans.
15      Q. And these humans, then, were given Pitocin
16 to stimulate uterine contractions, weren't they?
17      A. Some of them in some of the studies.
18      Q. Well, that doesn't have anything to do
19 with women applying talc externally, does it?
20      MS. O'DELL: Object to the form.
21      A. No, but it is part of the transport
22 mech- -- the contractions of the uterus and the
23 fallopian tube are part of the mechanisms of
24 transport.

92 (Pages 362 to 365)

Ellen Blair Smith, M.D.

Page 366

1    Q.  (BY MR. KLATT) And, in fact, in Egli,
2  the -- the study subjects were tilted head down at a
3  15-degree angle, correct?
4          MS. O'DELL:  Objection to form.
5    A.  Yes.
6    Q.  (BY MR. KLATT) And in Sjösten, it was
7  corn starch, not talc, correct?
8    A.  Yes.
9    Q.  And you said these were a part of
10  gynecologic examinations in which the physician was
11  introducing the corn starch into the reproductive
12  tract, correct?
13          MS. O'DELL:  Objection to form.
14    A.  On his or her gloves.  Not injecting it.
15    Q.  (BY MR. KLATT) Health Canada that you've
16  referred to, they just announced a preliminary
17  evaluation and opened it up to public comment,
18  right?
19    A.  They are in the 90-day discussion window.
20    Q.  And -- well, the discussion window means
21  the public comments can be submitted for the next 90
22  days, correct?
23    A.  Correct.
24    Q.  And then they have up to two years to make

Page 367

1  a decision whether they're gonna do anything at all
2  or nothing, correct?
3          MS. O'DELL:  Object to the form.
4    A.  Correct.
5    Q.  (BY MR. KLATT) So they haven't made any
6  final conclusions at all, have they?
7    A.  They've drawn their conclusions.  They
8  will entertain comments.  I think their conclusions
9  are compelling.
10    Q.  Well, at the end of nine -- at the end of
11  two years, they may decide to do nothing at all
12  based on the evidence they receive, correct?
13    A.  It might, but may still be here.
14    Q.  The Shukla study that you talked about --
15    A.  Yes.
16    Q.  -- that didn't look at any sort of genetic
17  mutations, did it?
18    A.  It looked at gene activation.
19          THE WITNESS:  Can you get the Shukla?
20    Q.  (BY MR. KLATT) Gene expression, correct?
21    A.  Gene expression.
22          THE WITNESS:  Sorry.  Thank you.
23    Q.  (BY MR. KLATT) Gene expression is a part
24  of daily living, isn't it?

Page 368

1          MS. O'DELL:  Object to the form.
2    A.  Gene expression is part of everything.
3    Q.  (BY MR. KLATT) Exactly.  It's how we
4  live.
5          If we didn't have gene expression,
6  we'd die, right?
7    A.  Right.
8    Q.  So the mere fact that they measured gene
9  expression doesn't say anything about causing
10  cancer, does it?
11    A.  It's what genes --
12          MS. O'DELL:  Object to the form.
13    A.  -- they looked at.
14    Q.  (BY MR. KLATT) And Shukla didn't conclude
15  that their findings showed that talc causes
16  ovarian --
17          MS. O'DELL:  Give her a moment to --
18    Q.  (BY MR. KLATT) -- cancer --
19          MS. O'DELL:  -- and just --
20    Q.  (BY MR. KLATT) -- correct?
21          MS. O'DELL:  You may look at the study
22  before you answer the question.
23    Q.  (BY MR. KLATT) Well, you testified to
24  Shukla study in response to Ms. O'Dell's question

Page 369

1  without looking at it.
2          MS. O'DELL:  Let me rephrase my
3  objection.
4          If you need to look at a study, you
5  may.  If you don't, please feel free to answer Mr.
6  Klatt's questions.
7    Q.  (BY MR. KLATT) Doctor, when you were
8  answering Ms. O'Dell's questions about Shukla, you
9  didn't need to look at the study, did you?
10          MS. O'DELL:  Objection.
11    A.  I want to know -- I want to see the
12  descriptions of --
13    Q.  (BY MR. KLATT) Did they conclude their
14  results of their study showed that talc caused
15  ovarian cancer?
16    A.  (Examined exhibit.)  So they looked at --
17  this is the mesothelioma, so we're not -- they
18  looked at subalteration, cell activation, cell
19  motility, immune response, protein metabolic
20  processes, signal transection, changes in
21  extracellular matrix.
22          All of these are pathways looking at
23  MRA levels that are activated in the carcinogenic
24  process in . . .

Ellen Blair Smith, M.D.

Page 370

1      Q.   Doctor, my question is:  Shukla nowhere
2   concludes that the results of their experiments
3   showed that talc or even asbestos caused ovarian
4   cancer, correct?
5      A.   No, they did not cause ovarian cancer,
6   yes.
7          They upregulated enzymes active in
8   some part of the carcinogenic process.  They didn't
9   induce any demonstrated genetic abnormalities.
10     Q.   Correct.
11         And if you would turn your attention
12  to page 2000 -- I'm sorry.  Page -- do you have a
13  page 121?
14     A.   No -- oh, wait.  I have a -- this is
15  crazy.  I have a 199 and then it goes to 2009 -- oh,
16  wait.  That may be the year.
17     Q.   I think that's the year.
18     A.   Yeah, I think that's the year.
19         Ah.  I have a 121, yes.
20     Q.   Okay.  Do you see a paragraph in the
21  Shukla study on page 121 beginning with, "Several
22  other genes"?
23     A.   Yes.
24     Q.   "Several other genes uprate -- upregulated

Page 371

1   by talc at 8 hours are affected by asbestos at both
2   8 and 24 hours may be important in repair from
3   mineral-induced responses," correct?
4      A.   Correct.
5          MS. O'DELL:  Object to the form.
6      Q.   (BY MR. KLATT)  For example, SOD2 is an
7   antioxidant protein, correct?
8      A.   Correct.
9      Q.   Antioxidant has anticancer properties,
10  right?
11         MS. O'DELL:  Object to the form.
12     A.   In general.
13     Q.   (BY MR. KLATT)  And you see that the next
14  thing they talk about, PTGS2?
15     A.   Yes.
16     Q.   It's a key enzyme in pros- -- prostanoid
17  bio- -- biosynthesis associated with modulation of
18  mitogenesis and inflammation, correct?
19         MS. O'DELL:  Object to the form.
20     A.   Correct.
21     Q.   (BY MR. KLATT)  That's an anticancer
22  property?
23     A.   Not necessarily.
24     Q.   Well --

Page 372

1      A.   You can modulate up and you can modulate
2   down.
3      Q.   And what they found is that it modulated
4   down, correct?
5          MS. O'DELL:  Object to the form.
6      A.   I don't see the figure.
7      Q.   (BY MR. KLATT)  Do you see the next thing
8   they talk about?  Upregulation of angiopoietin-4.
9      A.   Um-hum.
10     Q.   Do you see that?
11     A.   Uh-huh.
12     Q.   Is thought to play a key role -- or excuse
13  me, play a role in inhibition of tumor cell motility
14  and metastasis.
15         So if you're inhibiting tumor cell
16  motility and metastasis, that's an anticancer
17  property, correct?
18         MS. O'DELL:  Objection to the form.
19     A.   Yes.
20     Q.   (BY MR. KLATT)  And then KLF4,
21  Kruppel-like factor 4, is a negative regulator of
22  cell proliferation, correct?
23     A.   And can be a positive or negative
24  modulator of DNA transcription.

Page 373

1      Q.   Well, cancer is uncontrolled cell
2   proliferation, correct?
3      A.   You can't -- it can go either way.
4      Q.   Well, it says --
5          MS. O'DELL:  Excuse me.  She's
6   finished?
7      Q.   (BY MR. KLATT)  -- it's a negative
8   regulator of cell proliferation.
9          Does it say that?
10     A.   Which is different from transcription.  It
11  says "positive or negative transcription."
12     Q.   But if you're a negative regulator of cell
13  proliferation, that's an anticancer property,
14  correct?
15         MS. O'DELL:  Objection to form.
16     A.   I think --
17         MS. O'DELL:  She's answered the
18  question.
19     A.   -- that's oversimplified.
20     Q.   (BY MR. KLATT)  What a negative regulator
21  of cell proliferation means it down-regulates
22  self-proliferation, correct?
23     A.   Yes.
24     Q.   That's anticancer property?

94 (Pages 370 to 373)

Ellen Blair Smith, M.D.

Page 374

```
1        A.  I think when you make that big jump, there
2    are a whole lot of little steps in there to get to
3    that.
4            I can't make that conclusion, and I
5    don't think you can either.
6        Q.  I'm just reading what they're saying
7    there.
8            MS. O'DELL:  Object to the form.
9        A.  No, you're interpreting what they're
10   saying because they didn't say it's an anticancer
11   drug.
12       Q.  (BY MR. KLATT)  They say it's a negative
13   regulator of cell proliferation, correct?
14       A.  And nowhere in this sentence does it say
15   it's anticancer.
16       Q.  Well, do you want something that increases
17   cell proliferation or decreases cell proliferation?
18       A.  Certainly in repair --
19           MS. O'DELL:  Objection to form.
20       A.  -- process.  If it's normal epithelium, I
21   want -- you don't know enough about this and neither
22   do I.
23           Can we just keep going?
24       Q.  (BY MR. KLATT)  Sure.  That's fine.
```

Page 375

```
1            You're not aware of any evidence that
2    genital talc use increases vulvar cancer in women --
3        A.  No.
4        Q.  -- who use it, correct?  Correct?
5        A.  I said "no."  Correct.
6        Q.  You're not aware of any evidence that
7    women who use external genital talc have increased
8    risk of vaginal cancer, correct?
9        A.  I do not.
10       Q.  And I believe with Mr. --
11       A.  James.
12       Q.  -- Mr. Scott James you talked about no --
13   awareness of no increase in cervical cancer or
14   uterine cancer in talc users, correct?
15       A.  You are correct.
16       Q.  And also, talc applied to the external
17   genital area would come into contact with the rectal
18   area, correct?
19           MS. O'DELL:  Objection.
20       A.  It -- yes.
21       Q.  (BY MR. KLATT)  Are you aware of any
22   evidence that women who use talc in the genital area
23   have an increased risk of rectal cancer?
24       A.  I do not have any evidence to that effect.
```

Page 376

```
1        Q.  You're aware that Dr. Saed has just
2    started writing about talc in relation to ovarian
3    cancer since he's become a retained litigation
4    expert by the plaintiffs, right?
5            MS. O'DELL:  Objection to form.
6        A.  I can't tell you the exact first time he
7    did an experiment or published a result with that.
8    I can't -- I . . .
9        Q.  (BY MR. KLATT)  You're not aware of
10   Dr. Saed making any sort of connection between talc
11   and ovarian cancer before you got involved in this
12   litigation, correct?
13       A.  I -- I'm not aware of that.
14       Q.  IARC has not said that any of the heavy
15   metals you cite in your report increase the risk of
16   ovarian cancer, correct?
17       A.  They have called them Class 1 carcinogens,
18   and there's been no association with ovarian cancer
19   made in their report.
20       Q.  And you're not aware of any evidence that
21   women who use talc-based body powder products have
22   increased blood or tissue levels of cadmium, cobalt,
23   chromium, or nickel, compared to women who never use
24   those products --
```

Page 377

```
1        A.  I know no evidence --
2        Q.  -- correct --
3            MS. O'DELL:  Objection; form.
4        A.  -- to that effect.
5            MS. O'DELL:  Excuse me.  Objection to
6    form.
7        Q.  (BY MR. KLATT)  Is that correct?
8        A.  I know no evidence to that effect.
9        Q.  And finally, Doctor, and I think it's very
10   admirable what you're currently doing with the women
11   who are in hospice care for ovarian cancer.
12           When you interact with these women,
13   you interact not only with the women but with their
14   family and friends as well, correct?
15       A.  Absolutely.
16       Q.  Now, have you ever told any of their
17   family or friends that they shouldn't use talc --
18           MS. O'DELL:  Objection to form.
19       Q.  (BY MR. KLATT)  -- in the genital area?
20       A.  I think it would be quite inappropriate to
21   have that conversation at that time.
22       Q.  Well, these are women -- these are
23   mothers, sisters, daughters, and female friends of
24   these women who are dying with ovarian cancer,
```

95  (Pages 374 to 377)

Ellen Blair Smith, M.D.

Page 378

1  correct?
2       MS. O'DELL:  Objection to form.
3       A.  I have never told them -- counseled a
4  family member or a friend or a child of a dying
5  ovarian cancer patient about genital talc use.
6       Q.  (BY MR. KLATT)  You haven't said a word
7  about it right up until as we sit here today; is
8  that correct?
9       MS. O'DELL:  Objection to form.
10      A.  Correct.
11          MR. KLATT:  Thank you.  That's all I
12  have.
13          MR. JAMES:  I don't have any further
14  questions.
15          MS. O'DELL:  Okay.
16          FURTHER EXAMINATION
17  BY MS. O'DELL:
18      Q.  I have -- have -- let me just ask one
19  question.
20          In the situation when you're
21  counseling a family of a dying patient, would it be
22  inappropriate to have a discussion that Mr. Klatt
23  suggested?
24      A.  I feel it would be.

Page 379

1       MS. O'DELL:  Okay.  I have no further
2  questions.
3          FURTHER EXAMINATION
4  BY MR. KLATT:
5       Q.  Well, let me ask one more question about
6  that.
7          Do you ever care for women who are
8  dying from ovarian cancer due to BRCA1 or BRCA2
9  mutations?
10          MS. O'DELL:  Object to the form.
11      A.  I -- in my life?  Yes.
12      Q.  (BY MR. KLATT)  And you would certainly
13  counsel those women to have their female mothers,
14  sisters, daughters, and friends -- well, mothers,
15  sisters, and daughters tested for those mutations,
16  correct, because you'd want them to take steps to
17  potentially avoid the risk of ovarian cancer.
18      A.  Correct.
19          MS. O'DELL:  Objection.
20          MR. KLATT:  Thank you.
21          MS. O'DELL:  I have nothing further.
22          THE VIDEOGRAPHER:  This concludes the
23  deposition of Ellen Blair Smith, M.D.  Going off the
24  record.  The time is 9:22 p.m.

Page 380

1       MR. JAMES:  Thank you, Dr. Smith.
2       (Discussion off the record.)
3          THE COURT REPORTER:  Leigh, would you
4  like the witness to read and sign?
5          MS. O'DELL:  Yes, I would.
6          THE COURT REPORTER:  Would you like it
7  to go to you or directly to the witness?
8          MS. O'DELL:  To me.
9
10      (Deposition concluded at 9:23 p.m.,
11      January 9, 2019.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 381

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  ELLEN BLAIR SMITH, M.D.
3  DATE:  JANUARY 9, 2019
4  PAGE/LINE   CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

96 (Pages 378 to 381)

Page 382

```
 1        I, ELLEN BLAIR SMITH, M.D., have read the
 2   foregoing deposition and hereby affix my signature
 3   that same is true and correct, except as noted
 4   above.
 5        _____
 6            ELLEN BLAIR SMITH, M.D.
 7
     THE STATE OF _____)
 8
     COUNTY OF _____)
 9
10        Before me, _____, on
11   this day personally appeared ELLEN BLAIR SMITH,
12   M.D., known to me (or proved to me under oath or
13   through _____) (description of
14   identity card or other document) to be the person
15   whose name is subscribed to the foregoing instrument
16   and acknowledged to me that they executed the same
17   for the purposes and consideration therein
18   expressed.
19        Given under my hand and seal of office
20   this _____ day of _____,
21   2019.
22
         _____
23
             NOTARY PUBLIC IN AND FOR
24           THE STATE OF _____
```

Page 383

```
 1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2
 3   IN RE:  JOHNSON & JOHNSON    )
     TALCUM POWDER PRODUCTS       )
 4   MARKETING, SALES             )
     PRACTICES, AND PRODUCTS      ) MDL NO:
 5   LIABILITY LITIGATION         ) 16-2738 (FLW)(LHG)
                                  )
 6   THIS DOCUMENT RELATES TO     )
     ALL CASES                    )
 7
 8
 9
10         REPORTER'S CERTIFICATE
11   --------------------------------------------
12   DEPOSITION OF ELLEN BLAIR SMITH, M.D.
13        TAKEN JANUARY 9, 2019
14   --------------------------------------------
15
16
17       I, Karen L. D. Schoeve, Registered
18   Diplomate Reporter, Certified Realtime Reporter, and
19   Realtime Systems Administrator, residing in the
20   State of Texas, do hereby certify that the foregoing
21   proceedings were reported by me and that the
22   foregoing transcript constitutes a full, true, and
23   correct transcription of my stenographic notes, to
24   the best of my ability and hereby certify to the
```

Page 384

```
 1   following:
 2        That the witness, ELLEN BLAIR SMITH, M.D.,
 3   was duly sworn by the officer and that the
 4   transcript of the oral deposition is a true record
 5   of the testimony given by the witness;
 6        That the original deposition was delivered
 7   to SCOTT A. JAMES, custodial attorney;
 8        That a copy of this certificate
 9   was served on all parties and/or the witness shown
10   herein on _____.
11        I further certify that pursuant to FRCP
12   No. 30(f)(i) that the signature of the deponent was
13   requested by the deponent or a party before the
14   completion of the deposition and the signature is to
15   be returned within 30 days from date of receipt of
16   the transcript.
17        If returned, the attached Changes
18   and Signature Page contains any changes and the
19   reasons therefor.
20        That pursuant to information given to the
21   deposition officer at the time said testimony was
22   taken, the following includes counsel for all
23   parties of record:
24
```

Page 385

```
 1   FOR PLAINTIFFS' STEERING COMMITTEE:
 2      P. LEIGH O'DELL, ESQUIRE
        DR. MARGARET M. THOMPSON, ESQUIRE
 3      BEASLEY ALLEN, P.C.
        218 Commerce Street
 4      P.O. Box 4160
        Montgomery, Alabama 36104
 5      T: 334.269.2343  (Ms. O'Dell)
        F: 334.954.7555  (Ms. O'Dell)
 6      C: 512.695.1708  (Ms. Thompson)
        T: 800.898.2034  (Ms. Thompson)
 7      F: 855.674.1818  (Ms. Thompson)
        leigh.odell@beasleyallen.com
 8      margaret.thompson@beasleyallen.com
 9      --AND--
10      CYNTHIA L. GARBER, ESQUIRE
        ROBINSON CALCAGNIE, INC.
11      19 Corporate Plaza Drive
        Newport Beach, California 92660
12      C:  949.456.0037
        T:  949.720.1288
13      F:  949.720.1292
        cgarber@robinsonfirm.com
14
        --AND--
15
        PAULA R. BROWN, ESQUIRE
16      BLOOD HURST & O'REARDON, LLP
        501 West Broadway, Suite 1490
17      San Diego, California 92101
        T: 619.338.1100
18      F: 619.338.1101
        pbrown@bholaw.com
19
20
21        (Continued on following page)
22
23
24
```

97 (Pages 382 to 385)

Ellen Blair Smith, M.D.

| Page 386 | Page 388 |
|---|---|

**Page 386**

1  FOR DEFENDANTS JOHNSON & JOHNSON ENTITIES:
   SCOTT A. JAMES, ESQUIRE
2  SHOOK, HARDY & BACON L.L.P.
3  JPMorgan Chase Tower
   600 Travis Street, Suite 2450
4  Houston, Texas 77002-2926
   D: 713.546.5644
5  T: 713.227.8008
   F: 713.227.9508
6  sjames@shb.com
7    --AND--
   KATHERINE McBETH, ESQUIRE
8  DRINKER BIDDLE & REATH LLP
9  One Logan Square, Suite 2000
   Philadelphia, Pennsylvania 19103-6996
10  T: 215.988.2706
   T: 215.988.2700
11  F: 215.988.2757
   katherine.mcbeth@dbr.com
12
13  FOR DEFENDANT IMERYS TALC AMERICA, INC.
   MICHAEL R. KLATT, ESQUIRE
14  GORDON REES SCULLY MANSUKHANI, LLP
15  816 Congress Avenue, Suite 1510
   Austin, Texas 78701
16  D: 512.582.6485
   T: 512.391.0197
17  F: 512.391.0183
   mklatt@grsm.com
18
   --AND--
19
   MARK K. SILVER, ESQUIRE
20  COUGHLIN DUFFY LLP
   350 Mount Kemble Avenue
21  P.O. Box 1917
   Morristown, New Jersey 07962
22  D: 973.631.6045
   T: 973.267.0058
23  F: 973.267.6442
   msilver@coughlinduffy.com
24

**Page 387**

1  FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL:
2  RENEE B. APPEL, ESQUIRE
   SEYFARTH SHAW LLP
3  975 F Street, N.W.
   Washington, D.C. 20004
4  D: 202.828.5371
   T: 202.463.2400
5  F: 202.828.5393
   rappel@seyfarth.com
6
7  FOR DEFENDANTS PTI ROYSTON LLC AND PTI UNION LLC:
8  TARIQ M. NAEEM, ESQUIRE
   TUCKER ELLIS | LLP
9  950 Main Avenue, Suite 1100
   Cleveland, Ohio 44113-7213
10  D: 216.696.3675
   T: 216.592.5000
11  F: 216.592.5009
   tariq.naeem@tuckerellis.com
12
13
14      I further certify that I am neither
15  counsel for, related to, nor employed by any of the
16  parties in the action in which this proceeding was
17  taken, and further that I am not financially or
18  otherwise interested in the outcome of the action.
19
20
21      (Continued on following page)
22
23
24

**Page 388**

1      Subscribed and sworn to on this the 11th
2  day of January, 2019.
3
4
5
6  _____
   Karen L.D. Schoeve, RDR, CRR
7  Realtime Systems Administrator
   NCRA Exp. Date:  09-30-21
8  Golkow Litigation Services
   Firm Registration No. 690
9  One Liberty Place
   1650 Market Street, Suite 5150
10  Philadelphia, Pennsylvania 19103
   T: 877.370.3377
11  F: 917.591.5672
   www.golkow.com
12
13
14
15
16
17
18
19
20
21
22
23
24

98 (Pages 386 to 388)