# EXHIBIT B19

Ghassan Saed, Ph.D.

Page 346

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW JERSEY

3

4    IN RE:  JOHNSON & JOHNSON TALCUM

5    POWDER PRODUCTS MARKETING, SALES

6    PRACTICES, AND PRODUCTS LIABILITY

7    LITIGATION

8                                MDL NO. 16-2738(FLW)(LGH)

9

10   _____/

11   THIS DOCUMENT RELATES TO

12   ALL CASES                    VOLUME II

13   _____/

14

15

16

17        The Videotaped Deposition of GHASSAN SAED, Ph.D.,

18        Taken at 1 Park Avenue,

19        2nd Floor Conference Room,

20        Detroit, Michigan,

21        Commencing at 8:30 a.m.,

22        Thursday, February 14, 2019,

23        Before Jennifer L. Ward, CSR-3717.

24

25

Ghassan Saed, Ph.D.

Page 347

1  APPEARANCES:
2
3  P. LEIGH O'DELL, ESQ. and
4  MARGARET M. THOMPSON, M.D., J.D.
5  Beasley Allen Law Firm
6  218 Commerce Street
7  Montgomery, Alabama 36103
8  (334) 269-2343
9  leigh.odell@beasleyallen.com
10  Margaret.Thompson@BeasleyAllen.com
11      Appearing on behalf of Plaintiffs.
12
13  DANIEL R. LAPINSKI, ESQ.
14  Wilentz, Goldman & Spitzer, P.A.
15  90 Woodbridge Center Drive
16  Suite 900
17  Woodbridge, New Jersey 07095
18  (732) 855-6066
19  dlapinski@wilentz.com
20      Appearing on behalf of Plaintiffs.
21
22
23  (Appearances continued on Page 346.)
24
25

Page 348

1  APPEARANCES:  (Continued)
2
3  MARK C. HEGARTY, ESQ.
4  Shook, Hardy & Bacon, LLP
5  2555 Grand Boulevard
6  Kansas City, Missouri 64108
7  (816) 474-6550
8  mhegarty@shb.com
9      Appearing on behalf of Defendant Johnson &
10      Johnson.
11
12  GEOFFREY M. WYATT, ESQ.
13  Skadden, Arps, Slate, Meagher & Flom, LLP
14  1440 New York Avenue N.W.
15  Washington, D.C. 20005
16  (202) 371-7008
17  geoffrey.wyatt@skadden.com
18      Appearing on behalf of Defendant Johnson &
19      Johnson.
20
21
22
23  (Appearances continued on Page 347.)
24
25

Page 349

1  APPEARANCES:  (Continued)
2
3  JAMES W. MIZGALA, ESQ.
4  Tucker Ellis
5  233 South Wacker Drive
6  Chicago, Illinois 60606
7  (312) 624-6300
8  James.mizgala@tuckerellis.com
9      Appearing on behalf of Defendant PTI.
10
11  THOMAS T. LOCKE, ESQ.
12  Seyfarth Shaw, LLP
13  975 F Street, N.W.
14  Washington, D.C. 20004
15  (202) 463-2400
16  tlocke@seyfarth.com
17      Appearing on behalf of Defendant PCPC.
18
19  ALSO PRESENT:
20      Jeff Gudme, Videographer
21
22
23
24
25

Page 350

1           INDEX TO EXAMINATIONS
2
3  WITNESS                          PAGE
4  GHASSAN SAED, Ph.D.
5
6  EXAMINATION BY MR. HEGARTY (Continuing)     359
7  EXAMINATION BY MS. O'DELL            549
8  REEXAMINATION BY MR. HEGARTY              557
9  EXAMINATION BY MR. LOCKE             564
10
11
12           INDEX TO EXHIBITS
13
14  EXHIBIT                          PAGE
15
16  EXHIBIT 22
17  Invoice                    361
18
19  EXHIBIT 23
20  Copy of Pages From Lab Notebook          362
21
22  EXHIBIT 24
23  Lab Notebook                 396
24
25  (Index to Exhibits continued on Page 349.)

2 (Pages 347 to 350)

Ghassan Saed, Ph.D.

Page 351

INDEX TO EXHIBITS

1
2
3  EXHIBIT                              PAGE
4
5  EXHIBIT 25
6  Abstract for March 2018 SRI Meeting        408
7
8  EXHIBIT 26
9  F-098 Abstract                       415
10
11 EXHIBIT 27
12 Manuscript Submission to Journal of
13 Gynecologic Oncology                 428
14
15 EXHIBIT 28
16 Correspondence From the FTO          477
17
18 EXHIBIT 29
19 Correspondence Regarding SGO Meeting     479
20
21 EXHIBIT 30
22 Correspondence Regarding the 50th
23 Annual SGO Meeting                   481
24
25 (Index to Exhibits continued on Page 350.)

Page 353

INDEX TO EXHIBITS

1
2
3  EXHIBIT                              PAGE
4
5  EXHIBIT 36
6  Manuscript to Reproductive Sciences,
7  Submission Date of January 3, 2019       490
8
9  EXHIBIT 37
10 Reproductive Sciences,
11 Submission Date of January 3, 2019       490
12
13 EXHIBIT 38
14 Manuscript with Submission Date
15 of October 10, 2018                  491
16
17 EXHIBIT 39
18 Correspondence with Reproductive Sciences
19 Regarding Manuscript                 493
20
21 EXHIBIT 40
22 Response to Reviewer Comments        494
23
24
25 (Index to Exhibits continued on Page 352.)

Page 352

INDEX TO EXHIBITS

1
2
3  EXHIBIT                              PAGE
4
5  EXHIBIT 31
6  Correspondence to Ms. Thompson at
7  Beasley Allen Regarding an SGO Abstract      481
8
9  EXHIBIT 32
10 Abstract Submission to the 66th Annual
11 Scientific Meeting For the Society of
12 Reproductive Investigation in Paris March
13 2019                                 482
14
15 EXHIBIT 33
16 Notification of Submission to
17 Gynecologic Oncology                 488
18
19 EXHIBIT 34
20 Notification From Gynecologic Oncology   488
21
22 EXHIBIT 35
23 Final Decision, Rejection of Manuscript      489
24
25 (Index to Exhibits continued on Page 351.)

Page 354

INDEX TO EXHIBITS

1
2
3  EXHIBIT                              PAGE
4
5  EXHIBIT 41
6  Correspondence with Reproductive Sciences
7  Regarding Manuscript                 495
8
9  EXHIBIT 42
10 Chart of SNP Data                    495
11
12 EXHIBIT 43
13 E-Mail from Sharon Pepe              496
14
15 EXHIBIT 44
16 The Role of Talc Powder Exposure in Ovarian
17 Cancer, Mechanistic Approach         496
18
19 EXHIBIT 45
20 Form B                               514
21
22 EXHIBIT 46
23 E-Mail with Advice Regarding Form B      518
24
25 (Index to Exhibits continued on Page 353.)

Ghassan Saed, Ph.D.

Page 355

INDEX TO EXHIBITS

1
2
3  EXHIBIT                              PAGE
4
5  EXHIBIT 47
6  Form B for Calendar Year 2017          519
7
8  EXHIBIT 48
9  E-Mail Dated February 7, 2019          522
10
11  EXHIBIT 49
12  E-Mail Forwarded by Amy Harper on
13  February 11, 2019                     523
14
15  EXHIBIT 50
16  GWAS Catalog Search                   528
17
18  EXHIBIT 7
19  Original Manuscript        (Previously Marked)
20
21  EXHIBIT 16
22  Report                  (Previously Marked)
23
24
25  (Index to Exhibits continued on Page 354.)

Page 356

INDEX TO EXHIBITS

1
2
3  EXHIBIT                              PAGE
4
5  EXHIBIT 24
6  Preliminary Study        (Previously Marked)
7
8  EXHIBIT 1
9  Lab Notebook for the Data Reported
10  in Manuscript
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 357

1   Detroit, Michigan
2   Thursday, February 14, 2019
3   About 8:43 a.m.
4            THE VIDEOGRAPHER:  On the record.
5   This is the continued video deposition of Ghassan Saed,
6   being taken in Detroit, Michigan.  Today is
7   February 14th, 2019.  The time on the record is
8   approximately 8:43 a.m. Eastern time.
9            At this time will the attorneys
10   please identify themselves and affiliations, and then
11   our court reporter will swear in the witness.
12            MS. O'DELL:  Leigh O'Dell,
13   Beasley Allen, for the Plaintiffs.
14            MS. THOMPSON:  Margaret Thompson,
15   Beasley Allen, Plaintiffs.
16            MR. LAPINSKI:  Daniel Lapinski, the
17   Wilentz Law Firm, the Plaintiffs.
18            MR. HEGARTY:  Mark Hegarty for the
19   Johnson & Johnson Defendants.
20            MR. WYATT:  Geoffrey Wyatt from
21   Skadden for the J & J Defendants.
22            MR. LOCKE:  Tom Locke from
23   Seyfarth Shaw for the Personal Care Products Council.
24            MR. MIZGALA:  James Mizgala for PTI.
25            MS. O'DELL:  Before we begin, let me

Page 358

1   just put a statement on the record.  Today's date is
2   February the 14th, 2019.
3            Yesterday, Imerys Talc America filed
4   bankruptcy.  Imerys Talc America has been a principal
5   Defendant in this litigation, and their interests are
6   inextricably intertwined with Johnson & Johnson
7   Defendants and others.  There's a stay on all matters,
8   as we understand it, for matters related to Imerys.
9            We were here in Detroit yesterday
10   preparing, were ready to proceed.  We were ready
11   yesterday to proceed with Dr. Saed.  We alerted to the
12   court to the stay and asked the court's guidance as to
13   whether the deposition should proceed, in light of the
14   fact that Imerys is not present today and not
15   represented.  The court directed us to proceed.
16            Former counsel for Imerys,
17   Mark Silver, represented to the court that he could
18   weigh Imerys' rights as to the continuation of the
19   deposition.  So in light of the court's order, and in
20   light of Mark's Silver's representation, we'll proceed
21   today, but any possibility the deposition will be
22   reopened as to Imerys, we believe is now foreclosed.
23            MR. HEGARTY:  On behalf of
24   Johnson & Johnson Defendants, we refer to the
25   correspondence by Ms. Sharko of yesterday,

Ghassan Saed, Ph.D.

Page 359

1  February 13th, for Johnson & Johnson's position with
2  regard to the Imerys filing in today's deposition.
3          MR. LOCKE:  We join in that.
4          MR. HEGARTY:  Okay.  Ready?  I don't
5  know if you need to reswear in the witness.  Okay.
6          GHASSAN SAED, Ph.D.,
7  having first been duly sworn, was examined and
8  testified on his oath as follows:
9  EXAMINATION BY MR. HEGARTY:
10     Q.   Good morning, Dr. Saed.
11     A.   Good morning.
12     Q.   Did you review any documents to prepare to
13  testify here today?
14     A.   Maybe my report.
15     Q.   Did you review any other documents besides
16  your report to prepare to testify today?
17     A.   Anything specific, no.
18     Q.   Did you talk to anyone outside of
19  Plaintiffs' counsel to prepare to testify today?
20     A.   No.
21     Q.   Did you talk with any of the -- of the -- of
22  your co-authors on your manuscript or who were involved
23  in preparing the lab notebooks about either your
24  deposition last month or your deposition today?
25     A.   Anything specific?  Like talk about what?

Page 360

1      Q.   Talk about what was discussed at your
2  deposition --
3      A.   No.
4      Q.   -- the subject of your deposition?
5      A.   With my lab worker, yes.  I was telling them
6  about the whiteout in the notebook.
7      Q.   What lab worker?
8      A.   My research assistant.
9      Q.   What's their name?
10     A.   Rong.  We call her Florie, so --
11     Q.   Did you talk with anyone else outside of
12  Plaintiffs' counsel about your deposition last month or
13  your deposition today besides Flora?
14     A.   No.
15     Q.   Since your last deposition, have you spoken
16  with anyone outside of Plaintiffs' counsel about your
17  talc testing or your manuscripts, other than your lab
18  personnel?  In other words, anyone outside of
19  Wayne State or outside of our lab personnel, have you
20  talked with them about the testing that you did or your
21  manuscript?
22     A.   The testing that I did, I didn't.  About the
23  manuscript, I talked to SRI.
24     Q.   Anyone else?
25     A.   And I talked to regarding the abstracts that

Page 361

1  we submitted to SGO.
2      Q.   Anyone else?
3      A.   No.
4      Q.   Have you prepared any additional invoices of
5  your work -- and let me back up.  We were provided with
6  a copy of an additional invoice of your work late last
7  night.  I'm going to mark as Exhibit Number 22 a copy
8  of that invoice.
9          DEPOSITION EXHIBIT 22
10         Invoice
11         WAS MARKED BY THE REPORTER
12         FOR IDENTIFICATION
13  BY MR. HEGARTY:
14     Q.   Is that the -- the most recent invoice that
15  you prepared for purposes of your work on this
16  litigation?
17     A.   Yes.
18     Q.   Has that invoice been paid?
19     A.   Yes.
20     Q.   You mentioned when we were together last
21  month that you were asked to write an editorial to an
22  open access journal on talc and oxidative stress.  Have
23  you started writing that editorial?
24     A.   Not yet.
25     Q.   Did you or anyone else add to or change

Page 362

1  anything in the lab notebooks produced at your last
2  deposition, Exhibits 2 and 3?
3      A.   No.
4      Q.   We received prior to your deposition a
5  number of additional documents that you provided to
6  counsel for Plaintiffs that I'd like to walk through.
7  The first document we received I'm going to mark as
8  Exhibit 23, which is a copy of pages from one of your
9  lab notebooks that were produced last month.
10         DEPOSITION EXHIBIT 23
11         Copy of Pages From Lab Notebook
12         WAS MARKED BY THE REPORTER
13         FOR IDENTIFICATION
14  BY MR. HEGARTY:
15     Q.   Is that correct?
16     A.   This is -- which one is this?
17     Q.   I believe this would be the pilot study of
18  the preliminary trial that you did, as you said,
19  tune up the technique for your testing for your
20  manuscript.
21     A.   Exhibit 3?
22         MS. O'DELL:  Object to the form.
23  BY MR. HEGARTY:
24     Q.   It should be -- it's the first --
25         MS. O'DELL:  Dr. Saed --

5 (Pages 359 to 362)

Ghassan Saed, Ph.D.

Page 363

1  BY MR. HEGARTY:
2      Q.   -- 30 pages or so of Exhibit 3, correct?
3              MS. O'DELL:  Object to the form.  I
4  think you're referring to Exhibit 2.
5              MR. HEGARTY:  Exhibit 2, yes.
6  BY MR. HEGARTY:
7      Q.   You should be at Exhibit 2.
8      A.   Exhibit 2?
9      Q.   Yes.
10     A.   The first 29 pages.
11     Q.   The first 29 pages; is that correct?
12     A.   Oh, this one here?
13     Q.   Of Exhibit 2.
14     A.   Okay.
15     Q.   Is that right?
16     A.   Yes.  Yes.  I know now.
17     Q.   As you said last month, those pages
18  represent a preliminary trial or a pilot study for the
19  testing that you ultimately did that's described in
20  your manuscript and your expert report, correct?
21     A.   This was an attempt to -- yes.
22     Q.   Okay.  And again, those pages, Exhibit 23,
23  are from original notebook number two, correct,
24  Exhibit Number 2?
25     A.   Yes.

Page 364

1      Q.   If you look in Exhibit 23 at page two.
2      A.   Yes.  This page?
3      Q.   Yes.  There are 500 microliter and 1,000
4  microliter treatments?
5      A.   Micrograms.
6      Q.   Micrograms, I'm sorry.  There -- there are
7  500 -- let me start over.  There are 500 and 1,000
8  micrograms per milliliter of treatments shown on that
9  page.  Where is the data for the 500 microgram per
10  milliliter tests?
11     A.   So this experiment, we started to treat
12  cells with two doses, 500 and a thousand.  And this
13  experiment here we did not continue because the RNA was
14  degraded, and we couldn't do any further testing with
15  it.  So that's why we stopped here, and we started a
16  new one on -- on -- on page -- the actual manuscript
17  work.
18              So those doses were not -- the
19  cells were not good, they were not healthy, and they
20  didn't tolerate this treatment, and this is why we
21  think we lost them, because they didn't tolerate this
22  treatment.  We're not sure why.
23     Q.   That was going to be my follow-up question.
24  Why, from your standpoint, was the RNA degraded?
25     A.   Oh, RNA could degrade for many reasons.

Page 365

1      Q.   Did you --
2      A.   It's very --
3      Q.   I'm sorry.
4      A.   It's a very labile molecule.
5      Q.   Did you conclude that the 500 microgram per
6  milliliter and the thousand microgram per liter dosages
7  were toxic to the cells?
8      A.   Not necessarily.  We just lost the RNA.
9  From our practice working with RNA, this is a common
10  problem working with RNA.  RNA is a very labile
11  molecule, and it's susceptible to degradation, and so
12  the RNA degraded, and we did not continue, and we
13  started this other experiment.
14     Q.   If you turn over to page 24 --
15     A.   24.
16     Q.   -- of that part of the notebook.
17     A.   Um-hum.
18     Q.   You have tables --
19     A.   Yes.
20     Q.   -- that report data for a thousand.
21     A.   Correct.
22     Q.   How is that possible?
23     A.   Okay.  So this experiment is from part one.
24  This is the poster that we submitted, which is this.
25  Exhibit 3, this data belonged to the first -- first

Page 366

1  trial experiment that we did.  It's misplaced here.
2  That's not the right place for it.  It's right here.
3              MS. O'DELL:  Dr. Saed, you're
4  pointing to a page in Exhibit 3?
5              THE WITNESS:  This is Exhibit --
6  Exhibit 3.  That's the poster we submitted at SRI, it's
7  right here, and this data exactly is there.  It's not
8  supposed to be here.
9              MS. O'DELL:  What -- what page in
10  Exhibit 3 is the poster?
11             THE WITNESS:  It's 62 and 63.  This
12  here, right here.
13  BY MR. HEGARTY:
14     Q.   Okay.  We'll come back to that.
15     A.   Exact same data.
16     Q.   Okay.
17     A.   So yes, we tried -- we tried a thousand, and
18  we tried the 500, that was our initial work, because we
19  always -- when we do treatment like this, we always
20  start with the high dose, and then we titrate it down
21  to lower dose.
22     Q.   If we stay on page two of Exhibit 23, or
23  your notebook two --
24     A.   Can you just show me the page, please?
25     Q.   Same page we were looking at.

Ghassan Saed, Ph.D.

Page 367

1    A.   Okay.
2    Q.   You show on this page using baby powder and
3  talc.  Do you see that?
4    A.   Where?
5    Q.   If you look in the experiments, you list
6  500 micrograms per milliliter of talc.  You also list
7  500 micrograms per milliliter of baby powder that you
8  designate as BP.  Do you see that?
9    A.   Yes.
10   Q.   So in this experiment, did you use Johnson
11  baby powder and another manufacturer's talc?
12   A.   Yes, Fisher.
13   Q.   I'm sorry?
14   A.   Fisher.
15   Q.   In fact, you show pictures of both --
16   A.   Correct.
17   Q.   -- on the page before?
18   A.   Correct.
19   Q.   Is there a breakdown of data in this
20  notebook between the baby powder and the talc?
21   A.   We did not continue this experiment because
22  we didn't get RNA, so that's why the first part of
23  the -- of the experiment was done with Fisher, and the
24  manuscript was done with baby powder.  We did not
25  continue that because we didn't get RNA.  And this is

Page 368

1  very common.
2    Q.   On pages six and seven, you show RNA
3  extraction data?
4    A.   Yes.
5    Q.   Did you not generate any RNA extraction data
6  for the 500 and the thousand milliliter per microgram
7  tests?
8    A.   Okay.  So see the ID number?
9    Q.   Yes.
10   A.   All the ID number, and then the ID number
11  here?  It says exactly which one we isolated RNA from,
12  so they should correspond.  If we isolated RNA, it will
13  be from here.  But the problem is, the RNA we isolated
14  was not -- the quality was not good, so we had to redo
15  it.
16   Q.   And none of the numbers that you list for
17  the 500 and the thousand --
18   A.   Um-hum.
19   Q.   -- are listed on the RNA data on six and
20  seven?
21   A.   Yes.
22          MS. O'DELL:  Object.
23  BY MR. HEGARTY:
24   Q.   So did you actually generate RNA data for
25  the 500 and --

Page 369

1    A.   No.
2    Q.   -- 1,000 microgram per milliliters doses?
3    A.   Okay.
4          MS. O'DELL:  Just object to form.
5  Let him finish.
6          THE WITNESS:  Okay.
7          MS. O'DELL:  And then as you're
8  going back and forth, Dr. Saed, in talking about
9  specific pages, just make sure you're really clear --
10          THE WITNESS:  Yeah.
11          MS. O'DELL:  -- what you're
12  referring to so it will -- it will come through on the
13  transcript.
14          THE WITNESS:  Okay.  So again, I
15  forgot, what was the question?
16  BY MR. HEGARTY:
17   Q.   Did you generate RNA extraction data for the
18  500 and a thousand microgram per milliliter samples?
19   A.   No, nothing -- not from this study.
20   Q.   In looking at pages six and seven, for what
21  samples was this RNA extraction data created?  What do
22  they correspond to?
23   A.   Here.  The ID is right here.
24          MS. O'DELL:  What page, sir?
25          THE WITNESS:  Page two.

Page 370

1  BY MR. HEGARTY:
2    Q.   Well, you said --
3    A.   Page seven, you have 267, 269, 273, yes?
4    Q.   Yes.
5    A.   And then on the next page, you have -- it
6  has -- everything has a code next to it.  So they're
7  all labeled.  See that?
8    Q.   Yes.  But if you look, Doctor, there is --
9  for example, 278, on page two, a sample for 278 --
10   A.   Um-hum.
11   Q.   -- and I don't see RNA extraction data for
12  278 on six or seven.
13   A.   278.  I just want to make sure before I
14  answer you.  Okay.
15   Q.   Why is that?
16   A.   We -- probably we lost it.
17   Q.   Do you know?
18   A.   I don't know.  What I know from this
19  experiment, the RNA extraction did not work as well as
20  we would like to.
21   Q.   But the data on six and seven do correspond
22  with some of the samples on page two, correct?
23   A.   Some worked, some didn't.
24   Q.   Did you run any enzyme tests, any PCR or
25  ELISA tests on the 500 or 1,000 samples?

7 (Pages 367 to 370)

Ghassan Saed, Ph.D.

Page 371

1    A.   From these data?
2    Q.   Yes.
3    A.   No.
4    Q.   Do you still have somewhere, though -- or
5    strike that.  With regard to the sample 278 we talked
6    about, did you even run the RNA extraction data?
7         MS. O'DELL:  Objection, form.  I'm
8    not sure I understood.  Do you mind repeating your
9    question?
10   BY MR. HEGARTY:
11   Q.   Well, you how a sample.  We looked at 278,
12   correct?
13   A.   (Nodding).
14   Q.   And you're nodding your head.  And on six
15   and seven there is no RNA extraction data for 278.  Did
16   you even try to run the 278 sample?
17   A.   I need to clarify something.  There is
18   something missing here, okay.  So these are the samples
19   the treatment of cells, okay.  You treat the cells, and
20   then after the treatment, as indicated here, 24 hours,
21   48 hours, 72 hours with the different doses, 500,
22   1,000, with the -- with the -- with the powder, then
23   you -- after that, you extract RNA.
24   Q.   Right.
25   A.   What I said is some of the extraction

Page 372

1    worked, some didn't, and even the one that they worked,
2    the RNA was degraded.
3    Q.   How do you know if an extraction works or it
4    doesn't?
5    A.   Because when you look at the -- you're
6    trying to -- how do I know if it worked or not?  If you
7    look at the ratio of 260 to 280, that's very low, and
8    the yield was very low.
9    Q.   You're looking at the ratio of 260 to 280?
10   A.   Yes.  And the -- the yield, how much we got
11   out of the cells was very low to do anything with it.
12   Q.   But why didn't you -- why don't you have a
13   line for 278?
14   A.   278?  I don't know.  Maybe we -- maybe we --
15   we lost it completely.  I don't know.  I don't
16   remember.
17   Q.   If you turn over to page 20 of this same
18   part of the notebook we're looking at, there you report
19   treatments with 5, 20 and 100 micrograms per
20   milliliter, correct?
21   A.   Correct.
22   Q.   Where is the enzyme data for these tests?
23   In other words, you show --
24   A.   Oh, okay.
25   Q.   -- RNA data on the next couple pages, 22 and

Page 373

1    23.  Did you run data for SOD-3, CAT, GST, etcetera?
2    A.   Okay.  Let me answer this, please.  So this
3    part here, you see how it's scribbled a lot and
4    scratched and all that stuff?
5         MR. LAPINSKI:  What page are you
6    referring to, Doctor?
7         THE WITNESS:  20.  20 you have the
8    same page, right?
9    BY MR. HEGARTY:
10   Q.   20, yes.
11   A.   Okay.  This part here, we just started a
12   fresh one here.  It's exactly the same one.  We started
13   to explain everything in details.
14   Q.   You're jumping over to the main tests?
15   A.   Yes, which this is exactly the same.  It's
16   just different -- the way we organized it here better,
17   okay.  We didn't cross anything, we didn't do anything,
18   I just scrambled this, and then we started the whole
19   new book from here, explaining everything in details
20   with the sample ID.  Let me tell you --
21        MS. O'DELL:  At what page --
22        THE WITNESS:  Let me answer the
23   question.
24        MS. O'DELL:  At what page is that?
25        THE WITNESS:  Oh.  From here on,

Page 374

1    from --
2         MS. O'DELL:  Page?
3         THE WITNESS:  From page 30 on.
4         MS. O'DELL:  Okay.
5         THE WITNESS:  Let me explain.  Let
6    me answer your question about the enzymes.  So now we
7    did -- these are the cells.  We treated the cells,
8    okay, with the 5, 20 and a hundred, okay.  And then we
9    took some of the media, we took some of the cells for
10   RNA extraction to do PCR, we took some from the cells
11   for -- to isolate protein to do ELISA, and some for DNA
12   to do the genetic testing.
13   BY MR. HEGARTY:
14   Q.   Okay.
15   A.   So it's the same exact sample ID, same exact
16   lot, because that's the way -- the proper way to do
17   these kind of experiments.  You have to start from one
18   cell line -- from one lot of cells, sorry, and then go
19   from there.  So same cells, we isolate RNA, isolate for
20   PCR, protein for enzyme testing we call it, it's ELISA,
21   and DNA for genetic testing.
22   Q.   If you look at page 21 of the same part of
23   the notebook we've been talking about --
24   A.   Yes.
25   Q.   -- there are tests at the bottom dated

Ghassan Saed, Ph.D.

Page 375

1  February 26th, 2018 with 5, 20 and a hundred and zero
2  that are numbered 3 -- 383, 384, 385 and 386.  Do you
3  see that?
4      A.   Um-hum.
5      Q.   If you turn to the next two pages --
6      A.   383.
7      Q.   -- those pages are dated 2-15 -- 2-5 and
8  2-16 and list data -- RNA extraction data for 383,
9  384, 385 and 386, but you're showing the seeding
10  of cells on the 26th.  How can you have data
11  generated on the 5th and 16th for cells you seeded on
12  the 26th?
13      A.   This is 2-26.  That's 283, 284, 260, yeah.
14  This could be from a different lot.  So because we --
15  we get -- we always treat cells and get more cells if
16  we need RNA.  So this could be from a different lot.
17  So this is normal ovarian epithelial cells, but they're
18  very hard to grow.  You need to grow more of them to
19  get the same amount of RNA.
20      Q.   So where are then the treatments of 383,
21  384, 385 and 386 that are reported on 22 and 23?
22      A.   This one here?
23      Q.   Yes.  You report data on 2-5 and 2-16 on
24  pages 22 and 23 for samples 383 through 386, but where
25  are the --

Page 376

1      A.   Yeah.
2      Q.   -- seeding -- where is the seeding data and
3  the data for those four samples?
4      A.   There is no seeding data.  This is just to
5  get more of it.  We have retreated the same time with
6  the other cells, but this is an additional treatment to
7  get more cells --
8      Q.   Understood.
9      A.   -- more RNA.  But we didn't use this for
10  isolating the RNA from here.
11      Q.   But where did 383 to 386 come from?
12      A.   They were treated with the same cells.
13      Q.   But you --
14          MS. O'DELL:  On what page?
15  BY MR. HEGARTY:
16      Q.   The page you're pointing to, page 20, has
17  crossed out 383 to 386, and it covers different cells
18  on that page --
19      A.   No --
20      Q.   Let me finish -- SKOV A2780.
21      A.   Can I answer?
22      Q.   Sure.
23      A.   Okay.  If you look at page 20, see normal
24  ovarian?
25      Q.   Yes.

Page 377

1      A.   383, 384, 385, that answers your question,
2  right?  They are treated with the same.  This is just
3  additional, extra --
4      Q.   Okay.
5      A.   -- to get more cells.
6      Q.   So where -- where are the tests for the ones
7  that are reported on 2-26?
8      A.   We didn't need to do it.  We have -- we have
9  done here.  We did it.  We're done.
10      Q.   Well, why did you do it again on 2-26?
11      A.   We need more.  We always need more.
12      Q.   But did you test those?
13      A.   The new ones that we did?
14      Q.   Correct.
15      A.   No.
16      Q.   Why not?
17      A.   We didn't need to.  We had -- we had enough
18  RNA, and we proceeded.
19      Q.   Well, you had enough RNA as reported on 2-5
20  and 2-16.  Why then did you decide on 2-26 to do the
21  cells again?
22      A.   Hold on one second, please.
23          MS. O'DELL:  Object to form.
24          THE WITNESS:  I'm not understanding
25  what you're really asking me now.

Page 378

1  BY MR. HEGARTY:
2      Q.   Well, you --
3      A.   Where are you looking?
4      Q.   Let me finish my question.  You said you ran
5  the tests for normal epithelial cells, as you pointed
6  to on page 20, 383 to 386, that you say correspond to
7  the data on those two pages, on pages 22 and 23,
8  correct?
9      A.   Yes.
10      Q.   Those pages are -- have dates on them of the
11  data runs of 2-5 and 2-16, correct?
12      A.   Correct.
13      Q.   So you've got data that you can use?
14      A.   Um-hum.
15      Q.   Then why did you need to run additional
16  cells on 2-26, if you already had data that you could
17  use?
18      A.   I answered.
19          MS. O'DELL:  Object to the form.
20  BY MR. HEGARTY:
21      Q.   Tell me again.
22      A.   Okay.  Normal ovarian epithelial cells, they
23  are very slow-growing cells, and every time we work
24  with them, we -- because cancer cells grow so fast,
25  these grow very slow, so every time we do experiments

Ghassan Saed, Ph.D.

Page 379

1   with normal epithelial cells, we back up.  We have --
2   we wake up some more cells just in case something
3   happens, so we can use them.  Does that make sense?
4       Q.   Yes.  And going back to page 20, why,
5   though, do you have numbers 383 through 386, but then
6   you also have crossed through data with regard to the
7   5, 20 and a hundred?  Doesn't that appear that these
8   test results weren't done --
9           MS. O'DELL:  Object to the form.
10  BY MR. HEGARTY:
11      Q.   -- or these tests weren't done?
12      A.   I answered you.
13      Q.   Why do you have lines through the 5, 20 and
14  100?
15      A.   Here?
16      Q.   Here.
17      A.   Okay.
18          MR. LAPINSKI:  When you say here,
19  you're referring to page 20?
20          THE WITNESS:  On page 20.  So they
21  were missed, -- they were -- see the numbers are
22  different?  We crossed them.  We give them the right --
23  the corresponding correct numbers.
24  BY MR. HEGARTY:
25      Q.   Okay.

Page 380

1       A.   And this is my handwriting.  I crossed that.
2       Q.   So you do have -- do you have other
3   handwriting in this part of the notebook of yours?
4       A.   This is Nicole, and this is me.
5       Q.   You're on the right side of page 20?
6       A.   Right side, this is me.  I crossed this, and
7   I put the numbers.
8       Q.   And you're pointing on the -- to the ride
9   side of page 20?
10      A.   Correct.  The 383, 384, 385, 386 where it
11  says okay, that's me.  Yeah.  So my answer about these
12  cells, that the -- because they're slow growing,
13  they're very, very slow growing, everybody knows this,
14  we -- we always -- when we do experiments with them, we
15  back up.  So we add -- we seed more just in case, so we
16  don't have to wait another three, four weeks.
17      Q.   Would you look at page 13 of that same part
18  of the notebook, please?
19      A.   Show me, please.
20      Q.   Dated 1-12-18 at the top.
21      A.   Yeah.
22      Q.   It says at the top, protein levels for
23  CA-125 assay, correct?
24      A.   Yes.
25      Q.   At the very bottom of that notebook, it says

Page 381

1   that other proteins and media may be interfering
2   tri-lysate.  What does that mean?
3       A.   This is an ELISA assay to determine CA-125
4   levels.  So when you determine -- CA-125 is a protein
5   that is made by the cell inside the cells, and also
6   secreted outside the cells.
7           So when -- we try to do to determine
8   in the media first how much we have there in the media,
9   and if -- also we wanted to determine how much they are
10  in the lysate inside the cell.  That's what I meant by
11  this.  Lysate means inside the cell.  Media means
12  outside the cell.
13      Q.   When it says other proteins and media
14  may be interfering, what is that referring to?
15      A.   May be interfering, maybe.  We don't know.
16  So we're just assuming that, so that's why we run both.
17      Q.   You report on this same page using a
18  thousand micrograms per milliliter of talc in this
19  experiment --
20      A.   Correct.
21      Q.   -- is that correct?
22      A.   Correct.
23      Q.   But again, you reported, again, we noted a
24  moment ago that a thousand was killing the cells,
25  correct?

Page 382

1       A.   No.
2           MS. O'DELL:  Object to the form.
3           THE WITNESS:  No.
4           MS. O'DELL:  That's not what he
5   said.
6           THE WITNESS:  That's not what I
7   said.  Thank you.
8   BY MR. HEGARTY:
9       Q.   What did you say?
10      A.   I said we could not get RNA from the
11  treatment of the thousand.  We got media in cells, the
12  lysate.  There's something -- I need to explain this.
13  Do you want me to?
14      Q.   Which part do you want to explain?
15      A.   The mixup between the lysate, the media, RNA
16  versus protein versus enzymes.  There's like really a
17  mixup here.
18      Q.   Really a what?
19      A.   Mixup.  Mixup.  We're mixing it.
20      Q.   When you say mixup, what do you mean?
21      A.   It means you refer to treatment with a
22  thousand, with -- for RNA to the same treatment with a
23  thousand for the media collected from cells.
24      Q.   Okay.  We'll -- we'll come back --
25      A.   Okay.

10 (Pages 379 to 382)

Ghassan Saed, Ph.D.

Page 383

1    Q.    -- to your explanation if we need to.
2    A.    If you need to.
3    Q.    If you look over on page 19 of this same
4  part of the notebook. Tell me when you're there,
5  page 19.
6    A.    Oh.
7    Q.    I think you're on page 20.
8    A.    Sorry. Dated January 29?
9    Q.    At the top.
10   A.    Yes, thank you.
11   Q.    At the bottom, there's a date of January 31,
12 2018. It says, the presence of 1,000 micrograms per
13 milliliter is physically killing the cells. We need to
14 decrease dose. First of all, whose handwriting is
15 that?
16   A.    That's Nicole.
17   Q.    So I just asked you a moment ago about your
18 use of a thousand micrograms per milliliter for the
19 CA-125 test results. So how can you get valid test
20 results for CA-125 when -- for a thousand micrograms
21 per milliliters of -- of dose, when the dose is
22 physically killing the cells?
23   A.    Yes. So it's physically killing the
24 cells. It doesn't mean it's killing all cells in the
25 media. It's killing part of the cells, not the whole

Page 384

1  cells. So we still got media, we still got protein out
2  of it.
3    Q.    But how do you know that the -- results
4  of the tests are not affected by the toxicity of the
5  dose to the cells?
6    A.    Good question.
7        MS. O'DELL: Object to the form.
8        THE WITNESS: Good question. That's
9  why we repeated this in here.
10       MS. O'DELL: Refer to the page.
11       THE WITNESS: So we -- we -- this
12 was just a pilot experiment, as I indicated, and that's
13 why we repeated it in detail here. If you go to ELISA
14 section here, and you can here under the ELISA section
15 there's a CA-125 with the new doses, 5, 20 and a
16 hundred. It's right here.
17       MS. O'DELL: What pages are you
18 referring to?
19       THE WITNESS: I will tell you in one
20 second. It is page 63. It's called CA-125 ELISA.
21 BY MR. HEGARTY:
22   Q.    I understand that you -- why did you go
23 from -- why did you go from a thousand to a hundred?
24   A.    Because, as I told you, physically it was
25 affecting the cells. So we don't want to stress the

Page 385

1  cells, so that's we went and titrated down to the
2  lowest dose, which is 5, 20 and a hundred. And for
3  CA-125, I believe we did that.
4    Q.    Nicole wrote on 1-31-18 on that page 19 that
5  we need to decrease dose. Why did she say we need to
6  decrease dose, if you know?
7    A.    Because it is physically killing some of the
8  cells or most of the cells.
9    Q.    Is it your testimony that the data for
10 CA-125 run with a thousand micrograms per milliliter is
11 still valid data?
12   A.    Yes.
13       MS. O'DELL: Object to form.
14       THE WITNESS: Yes.
15 BY MR. HEGARTY:
16   Q.    Even though the data came from tests where
17 the dose was physically killing the cells?
18   A.    Yes, part of the cells.
19   Q.    How are you able to know that it was only
20 part of the cells and not all of the cells?
21   A.    We can see it under the microscope. This is
22 the exact same reason how she determined physically
23 killing the cells. So you look at them.
24   Q.    If you look at the --
25   A.    And also, if I may add, we confirmed it with

Page 386

1  the lower dose, and we got similar effects. So that's
2  why we believe it is a valid data.
3    Q.    If you turn over to page 15 of that same
4  part of the notebook, at the very bottom there's a
5  statement that says, lysate protein measurements may be
6  affected by talc. Whose handwriting is that?
7    A.    Nicole.
8    Q.    What does that mean?
9    A.    It means the yield of the protein, how much
10 protein you get from cells isolated from talc. So when
11 you treat cells with talc, the protein yield that you
12 get, that's why we do a normalization, is affected
13 because there is a differential expression of genes.
14 Something is going on.
15   Q.    If you look at the very end of that first
16 exhibit. It's page 24 of that -- of the part of the
17 notebook we've been looking at, page 24.
18   A.    This is here. This belongs -- this is not
19 right. This is here.
20   Q.    No, this is a -- we're look at something
21 different.
22   A.    Oh, sorry.
23   Q.    Go to page 24 of the part of the notebook
24 we've been looking at?
25   A.    24. This here?

11 (Pages 383 to 386)

Ghassan Saed, Ph.D.

Page 387

1    Q.   Correct.
2    A.   Yeah, this is here.
3    Q.   Okay.  You're saying the data that you're
4  pointing to on 24 is in the --
5    A.   This --
6    Q.   -- poster?
7    A.   -- this mistakenly put here.  It should be
8  here.  This is in the poster.  It's exact identical
9  data.
10        MS. O'DELL:  Just what you're saying
11 that the data --
12        THE WITNESS:  24 page here is 62, 63
13 here.
14        MS. O'DELL:  Of Exhibit 3?
15        THE WITNESS:  Of Exhibit 3.
16        MS. O'DELL:  Okay.
17        THE WITNESS:  It's mistakenly put
18 here.
19 BY MR. HEGARTY:
20    Q.   Where is the data for the 20, 100 and a
21 thousand for all of the charts that you have on the
22 back?
23    A.   It's here.  It's all here.
24    Q.   In which notebook?
25    A.   It's -- this is 3, and it starts from page

Page 388

1  38 all the way down.
2    Q.   Why is the 5 microgram per milliliter data
3  not reported?
4    A.   Oh.  Okay, sorry.  This is the first
5  experiment we did long time ago.  We did it with a
6  hundred -- with 20, and a hundred, and a thousand.
7  This is for the first experiment that we did, and we
8  were actually surprised to see the effect.  So that's
9  the whole idea of this experiment.  That's why we
10 reported this.
11         We didn't even look what goes up,
12 what goes down.  We -- we just -- the fact that there
13 was a biological effect upon talc treatment was very
14 intriguing to us.  This was done September through
15 October of 2017.
16    Q.   If we go -- if you look again, page 22
17 and 23 from that same part of the notebook we've been
18 looking at.
19         MS. O'DELL:  Exhibit 23.
20         THE WITNESS:  Here?
21         MR. HEGARTY:  Yes.
22 BY MR. HEGARTY:
23    Q.   There you list RNA data and CDNA data,
24 correct?
25    A.   CDNA data?

Page 389

1    Q.   Well, it says CDNA at the top of page 23.
2    A.   That's -- that's -- yeah, that's not -- CDNA
3  was not done for this one.
4    Q.   That was going to be my next question.  What
5  data was -- what other tests were done with the samples
6  that we talked through on page 20 of the 5, 20 and a
7  hundred?
8    A.   Okay.  PCR data, no PCR data.  We haven't
9  done anything PCR here from these data.
10    Q.   Did you do anything with those data?
11    A.   Those data, let's see.  Those data are the
12 same.  I'm sorry.  Sorry.  I take that back.  I
13 misunderstood the question.  Okay.
14         MS. O'DELL:  Why don't you repeat
15 the question?
16         THE WITNESS:  Yeah, please, please,
17 because I'm confused going back and forth, so sorry.
18 BY MR. HEGARTY:
19    Q.   Well, I'm looking for --
20    A.   Sorry.
21    Q.   -- any other tests that you ran with these
22 samples.
23    A.   What samples?
24    Q.   Samples --
25    A.   356?

Page 390

1    Q.   5 through 20 -- 5, 20 and a hundred on page
2  20.
3    A.   356, 357, all that?
4    Q.   Correct.
5    A.   The whole manuscript is all about that.  I
6  was thinking of the other one, I'm sorry.
7    Q.   So the samples that you list in the first
8  part of the notebook were carried over to the next part
9  of the notebook?
10    A.   This is exactly the same as here.  We just
11 rewrote it to make it clear.  That's -- I said that
12 already.  It's exact same treatment, exact same thing.
13         MS. O'DELL:  And you refer -- excuse
14 me, I'm sorry.  If he refers to the pages, so --
15         THE WITNESS:  On 20, page 20, the
16 cell treatment and the ID number is carried over here,
17 and clearly written in -- on page 32 for the record.
18 BY MR. HEGARTY:
19    Q.   In that poster, though, you don't report on
20 any 5 microgram data, correct?
21    A.   Correct.
22    Q.   Why not?
23    A.   Because I told you, this was -- okay, one
24 more time.  This work was the initial experiment that
25 we did to see if there is an effect of talcum powder on

12 (Pages 387 to 390)

Ghassan Saed, Ph.D.

Page 391

1  cells.
2        MS. O'DELL:  And you referred to
3  Exhibit 3, page --
4        THE WITNESS:  Yes.  I don't know.
5  MS. O'DELL:  Yeah.  This --
6  MR. HEGARTY:  Okay.
7        THE WITNESS:  You keep mixing me up,
8  so --
9  BY MR. HEGARTY:
10   Q.   All right.  I think I'm following you now,
11  okay.
12   A.   Okay.
13   Q.   On --
14        MS. O'DELL:  Excuse me.  I'm sorry,
15  Mark.  Were you finished?  So you were referring to
16  exhibit --
17        THE WITNESS:  Yeah.  So this -- this
18  poster was done from the initial observation on this,
19  all that's in Exhibit 3.
20  BY MR. HEGARTY:
21   Q.   Okay.
22   A.   Okay.  And this is data dated from September
23  to October, okay?
24        MS. O'DELL:  2017.
25        THE WITNESS:  2017, okay.  At that

Page 392

1  time, we did 20, a hundred, and a thousand, at that
2  time.  And so now we repeated this in February of '18.
3        MS. O'DELL:  2018?
4        THE WITNESS:  This is when -- 2018.
5  And this is when we did the 5, the 20, and a hundred.
6  BY MR. HEGARTY:
7   Q.   You list in this poster results for a
8  thousand micrograms per milliliter?
9   A.   Correct.
10   Q.   Again, how are you able to verify that
11  that's valid data, when you reported in your study
12  lab book that a thousand micrograms per milliliter was
13  killing the cells?
14        MS. O'DELL:  Object to form.
15        THE WITNESS:  Okay.  I just answered
16  this.
17        MS. O'DELL:  Repeat your answer --
18        THE WITNESS:  Physically killing
19  some cells, that doesn't mean you cannot get RNA, you
20  cannot get to do the assay.  That doesn't -- it's not
21  the optimal condition, but you still can do the
22  experiment, okay.  And to confirm that, when we did it
23  with the lower dose, we got the results.
24  BY MR. HEGARTY:
25   Q.   In the same chart we're looking at, you do

Page 393

1  something called supernatant?
2   A.   Supernatant.
3   Q.   Supernatant.  What is that?
4   A.   It's the media of the cells.
5   Q.   Why do you run tests on be the media?
6   A.   Because you want to see if there is an
7  effect on -- which one is this?  Oh, I'm sorry.  Hold
8  on one second.  Supernatant.
9        MS. O'DELL:  I'm sorry.  Just to
10  clarify, Dr. Saed, you're looking at the 2017 poster?
11        THE WITNESS:  I'm sorry.  Yeah,
12  thank you for reminding me.
13        MS. O'DELL:  Are you asking -- I
14  understood the question to correspond to the 2018
15  experiments, but --
16        THE WITNESS:  Okay.  Let me answer
17  this.  So supernatant is when you dissolve the talc
18  powder with DMSO, the solvent, you have two phases,
19  media, like soluble phase, and the talcum particles,
20  correct.  So we wanted to see if there is -- if there
21  is an effect from the supernatant without the
22  particles.  That's all.
23  BY MR. HEGARTY:
24   Q.   Did you see any effect?
25   A.   There is some effect.

Page 394

1   Q.   What was the -- what was the reason for the
2  effect?
3   A.   Because we could not fully isolate the
4  particles from the supernatant.  So that's why we
5  believe the effect comes from the particles.
6   Q.   When you say the effect comes from the
7  particles, what do you mean?
8   A.   The -- the talcum particles.
9   Q.   And what effect are you talking about?
10   A.   The effect we see here, the changing -- the
11  changing oxidative stress markers, the effect that we
12  observe in the -- that we report in the poster?
13        MS. O'DELL:  Just for the record,
14  the poster as contained in Exhibit 3 at pages 60 --
15  what are the pages in the notebook that are at issue?
16        THE WITNESS:  38 to 68.
17        MS. O'DELL:  Okay.  Thank you.
18  BY MR. HEGARTY:
19   Q.   If you look at the very first page, the
20  index of the part of the notebook we've been looking
21  at?
22   A.   This?
23   Q.   Exhibit 2.
24   A.   Yep.
25   Q.   Do you see in the middle of that page a date

13 (Pages 391 to 394)

Ghassan Saed, Ph.D.

1  of January 7, 2018 for protein extraction samples?
2      A.  Um-hum.
3      Q.  Do you see that?
4      A.  Yes.
5      Q.  Then if you turn over to page 20 of that
6  same part of the notebook --
7      A.  Um-hum.
8      Q.  -- this shows that you're seeding the cells
9  and treating the cells on February 1st, 2018.  How can
10  you do protein extraction on January 1st when you're
11  not doing the tests until February 1st?
12          MS. O'DELL:  Exhibit 1.
13          THE WITNESS:  Let's see.  53.  Where
14  is 53.  Okay.  Yeah.  Good question.  So if you go to
15  page -- it says here go to page 53, okay.
16  BY MR. HEGARTY:
17      Q.  Right.
18      A.  And again, we're mixing up between two
19  things, okay.  I'm sorry, can I say it again?
20          MS. O'DELL:  Explain it in detail --
21          THE WITNESS:  Yeah, yeah.
22          MS. O'DELL:  -- so the record is
23  clear, please.
24          THE WITNESS:  This -- this -- go to
25  page 53, please.

1  BY MR. HEGARTY:
2      Q.  Okay, I'm there.
3      A.  Okay.  This is for ELISA for protein
4  extraction.  That for MRNA.  That's why we have -- the
5  book is not in chronological order, and we label each
6  section, and we left pages so we can write it, fill it
7  in.  That's why.  You see different two assays.  This
8  is protein, ELISA enzymes, and this is RNA.
9      Q.  Okay.
10  DEPOSITION EXHIBIT 24
11  Lab Notebook
12  WAS MARKED BY THE REPORTER
13  FOR IDENTIFICATION
14  BY MR. HEGARTY:
15      Q.  We're going to look at the second -- next
16  notebook for a bit, Doctor.  I'm marking as Exhibit 24
17  a copy of the other notebook that we were provided,
18  Number 3.
19          MS. O'DELL:  Exhibit 3?
20          MR. HEGARTY:  Exhibit 3, yeah.
21          MS. O'DELL:  What number did you
22  mark the -- the new exhibit?  Exhibit 24?
23          THE WITNESS:  24.
24          MS. O'DELL:  Okay.
25          THE WITNESS:  This one.

1  BY MR. HEGARTY:
2      Q.  This was the notebook that you brought to
3  the deposition the last time, correct?
4      A.  Correct.
5      Q.  You said this was your first study involving
6  Fisher talc where you exposed three ovarian cell lines
7  and macrophages of epithelial cells and presented the
8  work for the poster to the SRI, correct?
9      A.  Yes.  Just to clarify, macrophages and
10  ovarian epithelial.
11      Q.  Do you see pages -- the first few pages of
12  this part -- this part of the notebook, there are
13  several dates that are whited out and written over.  Do
14  you see those dates?
15      A.  Where?
16      Q.  For example, on 9-26, the very first date,
17  9-26-2017, there's whiteout there in the left-hand
18  corner?
19      A.  Yeah.
20      Q.  Look over on the next -- the page before.
21      A.  (Gesturing).
22      Q.  Correct.  You're pointing to -- what -- what
23  page number is that at the bottom?
24      A.  38.
25      Q.  There is a whiting out, and written over the

1  whiteout is 26-2017.  Do you see that?
2      A.  Yes.
3      Q.  Why is that?
4      A.  No idea.
5      Q.  Then if you look down, there's also a
6  whiteout over 9 -- whiteout in 9-29-2017 is written
7  over.  Do you see that?
8          MS. O'DELL:  What page are you on
9  there?
10          THE WITNESS:  Yes.
11          MR. HEGARTY:  We're on page 38.
12  BY MR. HEGARTY:
13      Q.  Do you know, why is that whited out?
14      A.  No idea.  A mistake.
15          MS. O'DELL:  And Doctor, if you can
16  identify the wording under the whiteout, don't guess,
17  but --
18          THE WITNESS:  Sometimes you can,
19  sometimes you cannot.  It says, for example, page 38,
20  the whiteout says biologic.
21  BY MR. HEGARTY:
22      Q.  Can you --
23      A.  This is like procedure.  It's like methods.
24  It's not even data, nothing to do with data.
25      Q.  On the dates that we just talked about, can

Ghassan Saed, Ph.D.

Page 399

1  you tell from the original notebook what -- what the
2  date was that or the dates were that were whited out?
3      A.   I can't tell.
4           MS. O'DELL:  Object to the form.
5           THE WITNESS:  I cannot tell.
6  BY MR. HEGARTY:
7      Q.   Okay.  Turn over to page 51, please.
8      A.   iNOS.
9      Q.   Are you there, Doctor?
10     A.   iNOS, yes.
11          MS. O'DELL:  When you say iNOS --
12          THE WITNESS:  iNOS, the molecule.
13          MS. O'DELL:  How do you spell that?
14          THE WITNESS:  I, and then NOS,
15  N-O-S.
16          MS. O'DELL:  Okay.
17  BY MR. HEGARTY:
18     Q.   If you look under the -- in the table where
19  it says SKOV dash 3 cells?
20     A.   Yes, SKOV.
21     Q.   You're on the wrong page.
22     A.   Oh, sorry.  Yes.  SKOV control.
23     Q.   Yeah, there's a control for 20 micrograms
24  per milliliter talc, and then also a listed control for
25  100 microgram per milliliter talc.  Do you see that?

Page 400

1      A.   Yes.
2      Q.   Wasn't there only one control for each cell
3  line?
4      A.   For this experiment?
5      Q.   Yes.
6      A.   No, there wasn't.
7      Q.   You had one set of control cells for each
8  dose?
9      A.   Correct.
10     Q.   Does the notebook report the treating of the
11  controls for each of the cell lines?
12     A.   What notebook?
13     Q.   The notebook we're looking at.
14     A.   Yeah.  It says right there, 20 microgram
15  control, hundred microgram control, 20 microgram
16  treatment, hundred microgram treatment.
17     Q.   Does it report the treatment of controls
18  anywhere besides in the -- in the chart?  In other
19  words, is it reported elsewhere in the notebook?
20     A.   I don't remember.
21          MS. O'DELL:  For which finding?
22          THE WITNESS:  I don't remember for
23  what month are you referring to.
24  BY MR. HEGARTY:
25     Q.   I'm referring to the SKOV dash 3 cells.

Page 401

1      A.   For iNOS?
2      Q.   Yes.
3      A.   Yes, whatever is written here.  It is
4  reported 20 control and a hundred control for this, and
5  you want to see if it's done for another molecule, like
6  GPX1, for example?
7      Q.   No, not right now.
8      A.   Okay.
9      Q.   Not right now.  You did not do the -- a
10  5 microgram per milliliter sample here?
11     A.   Oh, my God.  Okay.  No, I did not.
12     Q.   Okay.  You're still doing a thousand
13  micrograms per milliliter test with this part -- this
14  test, correct?
15     A.   I did 20, a hundred, and a thousand.
16     Q.   Please go to page 53.
17     A.   GPX?
18     Q.   I'm sorry, go to page 52 first.
19     A.   Still GPX.
20     Q.   Are you at page 52?
21     A.   Um-hum.
22     Q.   It says, in the chart that has data at the
23  top, normal ovarian OV epithelial control for 20, then
24  it says 100.  What does that mean?
25     A.   So this is normal ovarian for a thousand,

Page 402

1  normal -- oh.  Yes, I think she did the control for 20
2  and a hundred at one time.
3      Q.   How can you do a control for 20 and a
4  hundred at the same time?
5      A.   Because they're very close doses, so we
6  don't -- as you just said to me, you really didn't need
7  to do more than one control, but because the doses are
8  big, there's a huge difference in the dose, like
9  between 20, a hundred, and a thousand, there's a huge
10  difference, that's why we have control for both.  But
11  for 20 and a hundred, we found from here, from the
12  other previous studies that they -- we didn't need to
13  do it, so she didn't do it.
14     Q.   But isn't there -- okay, I see.  So you
15  think that for purposes of this test, that the control
16  for the 20 and the 100 was the same control, one
17  control for both of those?
18     A.   Correct.  Will serve for both, yes.
19     Q.   Do you know which dose she applied to the
20  control?  Was it 20 or a hundred?
21     A.   No, the control, you don't apply those.
22     Q.   Well, do you apply the DMSO?
23     A.   Yes.
24     Q.   At what volume?
25     A.   Same volume like you use for treatment.

Ghassan Saed, Ph.D.

Page 403

```
1     Q.   I gotcha.
2     A.   Thank you.
3     Q.   Go to page 53 now, please.
4     A.   Okay.
5     Q.   If you go down to the table where you're
6  reporting on A2780 cells --
7     A.   Yes.
8     Q.   -- particularly the 1,000 microgram per
9  milliliter talc, do you see that part of the table?
10    A.   I do.
11    Q.   The p-value noted there is .291, correct?
12    A.   Yes, correct.
13    Q.   That's not statistically significant,
14 correct?
15    A.   Correct.
16    Q.   That's for GPX1, right?
17    A.   Correct.
18    Q.   Go back to the -- then, your poster --
19    A.   Okay.
20    Q.   -- for this experiment.
21    A.   Okay.  GP -- GPX1.
22    Q.   If you look at the GPX1 --
23    A.   A2780.
24    Q.   -- it's in the right hand -- on the
25 right-hand side, the middle graph, correct?
```

Page 404

```
1     A.   Yes.
2     Q.   For the 1,000 dose average for the A2780,
3  don't you list that as being statistically significant?
4     A.   Let me look.  So this -- which color would
5  be this?  That's the purple color.  That's comparing --
6  comparing to this purple color.  Okay.  So this is
7  comparing it to the 20 dose.  Yeah, you see -- okay.
8  So this -- this --
9          MS. O'DELL:  What are you referring
10 to?
11 BY MR. HEGARTY:
12    Q.   The p-value?
13    A.   The p-value here is comparing the thousand
14 to its control.  The p-value here, if you see the
15 asterisk, it's comparing it to the treatment, to the
16 20 microgram treatment, I believe.  I'm not sure.
17    Q.   But doesn't the --
18    A.   Yes.
19    Q.   -- description -- doesn't the description
20 under the -- the graph say it's comparing to --
21    A.   Let me see.
22    Q.   -- to controls?
23    A.   Versus control, you're right, so yeah,
24 that's statistically significant.  That wasn't -- okay.
25    Q.   Why do you list in that -- in that graph
```

Page 405

```
1  that it is statistically significant, when the p-value
2  from the data we're looking at is .291?
3          A.   So maybe the asterisk -- again, this -- this
4  is PowerPoint, and the asterisk can be shifted easily,
5  so if -- we're not hiding it.  This is the data, .29.
6  Anybody knows it's not statistically significant, and
7  so maybe these asterisks were shifted or something.  I
8  cannot tell you, but the data is right here.  The data
9  is in front of you.
10    Q.   But the data is not included in your poster,
11 correct?
12    A.   Correct.
13    Q.   So anyone looking at the poster would not
14 have access to the data we're looking at on page 53,
15 correct?
16         MS. O'DELL:  Object to the form.
17         THE WITNESS:  They don't have the
18 data, yes, but they can ask.
19 BY MR. HEGARTY:
20    Q.   Turn over to page 55 of that part of the
21 notebook, please.
22    A.   55.
23    Q.   We're again looking at the data for SOD3,
24 and in particular the A2780 cells.  Do you see for the
25 100 microgram and 1,000 microgram treatments that your
```

Page 406

```
1  p-values are above .05?  They're .1692 and .1029?  Do
2  you see that, Doctor?
3     A.   Yes.
4     Q.   And if you turn back to the poster and look
5  at SOD3 on the left-hand side, the third graph down,
6  for the 2780 for the hundred and the thousand -- I'm
7  sorry, it's the fourth -- fourth graph down, for the
8  hundred and the thousand, you're reporting those to be
9  statistically significant at a p-value of less than
10 .05, correct?
11         MS. O'DELL:  Do you need -- if you
12 need to see that -- the poster in larger, if it's
13 difficult to read, i -- f you can read it, fine, great.
14         THE WITNESS:  Yeah.
15         MS. O'DELL:  If you cannot, then
16 I'll provide it to you electronically.
17         THE WITNESS:  What I am concerned
18 about -- I have a concern here.  So what I'm concerned
19 about, that these asterisks were shifted, so -- but the
20 data is what we go with.  I'm not -- I'm not really
21 sure.  I mean, I wouldn't say significant if the data
22 say it's not significant, okay.
23 BY MR. HEGARTY:
24    Q.   At least the -- on 55, page 55, it shows the
25 data are not statistically significant, correct?
```

Ghassan Saed, Ph.D.

Page 407

1      A.   Not correct.  Not all of them.
2      Q.   Well, I'm sorry.  Fair point.
3      A.   Yeah.
4      Q.   The ones we looked at --
5      A.   Yes.
6      Q.   -- the 2780 for a hundred and the 2780 for a
7   thousand are not statistically significant?
8      A.   For this specific mark, yes.
9      Q.   Correct, okay.
10     A.   Yeah.  So I'm concerned about this maybe
11  shifted or something.  I don't know what the answer is.
12     Q.   The poster that we've been looking at, was
13  this a poster that you presented at SRI?
14     A.   SRI.
15     Q.   The SRI meeting in March?
16     A.   March --
17          MS. O'DELL:  2017?
18          THE WITNESS:  -- 2017?
19  BY MR. HEGARTY:
20     Q.   Yes.
21     A.   No.
22     Q.   March 2018?
23     A.   2018.
24          MS. O'DELL:  2018, excuse me.
25          THE WITNESS:  March 2018.

Page 408

1   BY MR. HEGARTY:
2      Q.   Was there an abstract that went along with
3   that?
4      A.   I don't understand your question.
5      Q.   Well, you have a poster there, correct?
6      A.   Yes.
7      Q.   Was there an abstract that was published for
8   the meeting that went along with the poster?
9      A.   Yeah.  You submit an abstract first to the
10  meeting, and then they accept it, and then they publish
11  it, yes.
12       DEPOSITION EXHIBIT 25
13       Abstract for March 2018 SRI Meeting
14       WAS MARKED BY THE REPORTER
15       FOR IDENTIFICATION
16  BY MR. HEGARTY:
17     Q.   I'm marking Exhibit 25, which was what we
18  also looked at last time.  Is Exhibit 25 the abstract
19  for the March 2018 SRI meeting?
20     A.   Yeah, but that's for a different.  That's
21  for CA-125.
22     Q.   Exactly.
23     A.   Oh, you're done with this?
24     Q.   NO.  I'm trying to find the -- I'm trying to
25  find where the abstract is that you prepared for the

Page 409

1   poster that we're looking at right now, and I don't
2   know where it is.
3      A.   Okay.
4      Q.   The only abstract I could find for
5   March 2018 to SRI was 25.
6      A.   That was the breaking -- late-breaking
7   abstract, CA-125, but there is an abstract for this.
8      Q.   And -- okay.  We'll come back once we look
9   through your documents to see if we can find the
10  abstract that corresponds to that.
11     A.   So when you say you didn't find it, you
12  didn't find it online?
13     Q.   I did not find it in the documents that have
14  been produced, or at least I -- I overlooked it.  And
15  we'll go through all the abstracts to make sure that
16  I'm --
17          MS. O'DELL:  I think you --
18  BY MR. HEGARTY:
19     Q.   -- incorrect or correct.
20          MS. O'DELL:  It was produced in the
21  documents that were provided to you.
22          MR. HEGARTY:  Which one are you
23  referring to that you think corresponds with that?
24          MS. O'DELL:  Let me ask Dr. Saed, is
25  that the abstract that corresponds with the poster?

Page 410

1   You might not --
2          THE WITNESS:  Talcum powder enhanced
3   oxidase -- yes.
4          MS. O'DELL:  And it's the -- it was
5   labeled Saed Lecture 2018A, Oxidative Stress.
6   BY MR. HEGARTY:
7      Q.   And I'll tell you the reason that I didn't
8   connect this abstract with that poster is because this
9   abstract describes cells treated for -- with 0, 200 and
10  500.
11     A.   This abstract is from 0, 200 and 500.  And
12  this is 0, 200, 500.  I don't remember.  I don't
13  remember this.
14          MS. O'DELL:  I'll take it back,
15  Doctor, if it's not the same.
16          THE WITNESS:  Yeah, I don't -- I
17  don't remember.  It's different maybe.  I don't know
18  what it is.
19  BY MR. HEGARTY:
20     Q.   When we're finished walking through your
21  documents --
22     A.   Yes.
23     Q.   -- we'll see if we came across an abstract
24  that corresponds to that poster.
25     A.   Yeah.

17 (Pages 407 to 410)

Ghassan Saed, Ph.D.

Page 411

1  Q.  Stay with this poster for a little bit
2  longer.
3  A.  Oh.
4  Q.  Go back to it, please.  Would you look at
5  the Results section, please, Doctor?
6  A.  Of the abstract?
7  Q.  Of the poster.
8  A.  Sorry.
9  Q.  Do you see the results in the lower
10  left-hand corner?
11  A.  The conclusion you're talking about?
12  Q.  No, the Results section?
13  A.  Oh, I'm sorry, yes, here.
14  Q.  The Results section says there was a marked
15  increase in MRNA levels of the pro-oxidant enzymes iNOS
16  and MPO in talc-treated ovarian cancer cell line
17  macrophages in normal ovarian epithelial cells, all as
18  compared to their controls.  Then it cites the figure.
19  A.  Um-hum.
20  Q.  Additionally, there was a marked increase in
21  the MRNA levels of the anti-oxidant enzymes CAT, SOD3,
22  GSR, GPX1 and GS1P1, in talc-treated ovarian cancer
23  treated cells in normal ovarian epithelial cells, as
24  all compared to their controls, correct?
25  A.  That's what it says.

Page 412

1  Q.  So in this experiment, you show that both
2  pro and anti-oxidants had a marked increase, correct?
3  A.  Let me check this.  Hold on one second.  So
4  iNOS increased, MPO increased, GPX goes down, SOD3 goes
5  up, GSR goes up.  Some goes up.  Catalase goes up.
6  Yes.
7  Q.  But in your manuscript, you reported an
8  increase in pro-oxidant enzymes and a decrease in the
9  anti-oxidant enzymes.  It seems that at least some of
10  your results from your -- in your later manuscript and
11  your report are different than what you're reporting
12  here.
13        MS. O'DELL:  Object to form.
14  BY MR. HEGARTY:
15  Q.  Is that correct?
16  A.  Okay.  So this is done only with PCR.  The
17  manuscript was done extensively with PCR, and usually
18  PCR data has to be complemented with the enzyme data,
19  okay.  In science, this is a common practice.  PCR data
20  is preliminary.  It's an indication.
21        If you don't complement it with
22  protein and MRNA and protein ELISA activity, it is not
23  very accurate.  So we here objective, this was -- the
24  intriguing results from this poster was to see whether
25  or not there is any biological effect in use by the

Page 413

1  talcum powder.  And we only did PCR here.  This is very
2  preliminary.
3  Q.  Okay.
4  A.  That's why we repeated -- this is why we
5  repeated the whole study with the tri-purses (ph), and
6  we extensively did the enzymes, the ELISAs, everything.
7  Q.  Do you have a copy of your manuscript there,
8  Doctor, the one for Reproductive Sciences?
9  A.  Do I have a copy of that?
10  Q.  I'll show you.  It's been marked previously
11  as Exhibit 7.  That's your manuscript to Reproductive
12  Sciences, correct?
13        MS. O'DELL:  What's the date on it?
14        THE WITNESS:  January 3rd, yes.
15        MS. O'DELL:  Okay.
16  BY MR. HEGARTY:
17  Q.  Turn over to page seven of Exhibit 7,
18  please.
19  A.  Exhibit 7, page seven.  Okay.
20  Q.  About three-fourths of the way down, you're
21  reporting on anti-oxidant enzymes GPX and GSR for both
22  PCR and ELISA assays, correct?
23  A.  Correct.
24  Q.  You report there that GPX and GSR were
25  significantly decreased in response to talc treatment

Page 414

1  under both PCR and ELISA assays, correct?
2  A.  Correct.
3  Q.  That's opposite of what you reported in your
4  abstract, correct?
5  A.  Not correct.
6  Q.  Well, your abstract said that you reported a
7  marked increase in the MRNA levels of anti-oxidant
8  enzymes that include GSR and GPX1.  How is that not the
9  exact opposite?
10        MS. O'DELL:  You're referring to the
11  poster, not an abstract?
12        MR. HEGARTY:  Yes, the poster.
13        THE WITNESS:  Let me explain,
14  please.  So this is done, number one --
15  BY MR. HEGARTY:
16  Q.  Here.  You're referring to the poster?
17  A.  The poster is done with the Fisher powder.
18  That's number one.  This is done with a different dose.
19  Here, this is done with -- this is a very preliminary,
20  just to see if there is a biological effect.
21        After we saw there is a biological
22  effect, we did a comprehensive design of a study where
23  we do 5, 20, a hundred doses for the right time,
24  complemented with protein assays, ELISAs and etceteras.
25  So that's my response.

Ghassan Saed, Ph.D.

Page 415

1        MS. O'DELL:  And you're referring to
2  the manuscript?
3        THE WITNESS:  The manuscript.
4  BY MR. HEGARTY:
5     Q.   Do you remember me -- strike that.  Do you
6  remember us just looking at an abstract that talked
7  about results from dosages of talc of 0, 200 and 500?
8  Do you remember looking at that abstract?
9        MS. O'DELL:  What are you referring
10 to?
11       MR. HEGARTY:  Well, the abstract you
12 handed him.  I'll show it to you.  I'll mark it as --
13       MS. O'DELL:  Are you referring him
14 back to his deposition previously?
15       MR. HEGARTY:  No, the one we just --
16       THE WITNESS:  Yeah.  This --
17       MR. HEGARTY:  Let me ask a question.
18       MS. O'DELL:  I'm sorry.
19    DEPOSITION EXHIBIT 26
20    F-098 Abstract
21    WAS MARKED BY THE REPORTER
22    FOR IDENTIFICATION
23 BY MR. HEGARTY:
24    Q.   I'm marking for purposes of the deposition
25 Exhibit 26, which was that F dash 098 abstract that

Page 416

1  counsel for Plaintiffs --
2        MS. O'DELL:  Which one was marked?
3        MR. HEGARTY:  It's the same one that
4  you just had.
5        MS. O'DELL:  Thank you.
6  BY MR. HEGARTY:
7     Q.   Do you see Exhibit 26, Doctor?
8     A.   Yes.
9     Q.   Where in the note -- in any of the notebooks
10 we've looked at are there tests -- test results for
11 0, 200 and 500 micrograms per milliliter of talc?
12    A.   This is this.
13    Q.   Where --
14    A.   It's a typo.
15    Q.   What's a typo?
16    A.   The 200, 500.  It's a hundred -- it's 20 and
17 a hundred and a thousand.  This abstract is this
18 poster.
19    Q.   You're saying that it should read --
20    A.   Yes.
21    Q.   -- 0, 20, and a hundred?
22    A.   It should read -- it should read 0, 20, a
23 hundred, and a thousand.
24    Q.   0, 20, a hundred, and a thousand --
25    A.   Yeah.

Page 417

1     Q.   -- and instead it reads 0, 200 and 500
2  micrograms per milliliter?
3     A.   Per mil.  This -- this is a -- this --
4  this abstract is this poster.  So -- and I will -- I
5  will double-check it, but I think it's a typo.  This
6  abstract is for the March meeting?  Yes, so it is.
7  It's gotta be a typo.
8     Q.   Who does the proofreading of your abstracts,
9  Doctor?
10    A.   I do.
11    Q.   And it's your testimony that you just missed
12 the dosages?  Instead of having 0, 20 and a hundred,
13 and a thousand, you missed and listed it 0, 200 and
14 500?
15    A.   Is that possible?  It could be.  I don't
16 know.
17    Q.   Is it your testimony that you did not run
18 the same tests that you reported in your abstract and
19 generated data for dosages at 200 and 500?
20       MS. O'DELL:  Object to the form.
21       THE WITNESS:  This is what I did.
22 It's detailed here in the lab notebook, it's published
23 in the poster.  We are not hiding anything.  The poster
24 was viewed by everybody at SRI meeting, so there's
25 nothing to hide here.

Page 418

1  BY MR. HEGARTY:
2     Q.   And you're pointing to your poster?
3     A.   The poster, yes.  This is the final outcome
4  of abstract.
5        MS. O'DELL:  He was pointing -- he
6  was pointing to the lab notebook and the data there.
7        THE WITNESS:  Yeah.  This is what
8  displayed in the meeting, so people will see this with
9  the abstract.  They will find out it's a mistake.
10 BY MR. HEGARTY:
11    Q.   Doctor, I want to ask you about Exhibit
12 Number 1, which was the --
13    A.   Go back here?
14    Q.   -- the lab notebook, which is Exhibit
15 Number 2.  This is the portion of the notebook starting
16 at page 30 going forward.
17    A.   The manuscript?
18    Q.   For the manuscript.
19    A.   Yes.
20    Q.   Although you did indicate that some of the
21 tests were in the first 30 pages that were then carried
22 forward, correct?
23    A.   Just this part here, the 20.
24    Q.   You're pointing to page 20?
25    A.   Yes.

Ghassan Saed, Ph.D.

Page 419

1    Q.   Can you identify in looking through the
2  first several pages of this notebook, or throughout,
3  whether there is any of your handwriting in this part
4  of the notebook?
5    A.   Any of my handwriting?
6    Q.   Correct.
7    A.   I don't remember, but I'm sure, if I see it.
8  Particularly I don't do it, but -- I don't see in here
9  anything here in my handwriting.
10   Q.   Keep going.
11   A.   Keep going.  I can't say yet.  What page you
12  are looking for?
13   Q.   I'm not looking at any particular page.
14   A.   You want me to keep going?
15   Q.   For example, if you look over at page 63.
16   A.   63?
17   Q.   None of that is your handwriting on that
18  page?
19   A.   63.
20        MS. O'DELL:  And you're referring
21  to --
22        THE WITNESS:  This?
23        MS. O'DELL:  -- page 63 as it was
24  indicated in the lab notebook --
25        THE WITNESS:  Show me, please.

Page 420

1        MR. HEGARTY:  Correct, yeah.
2        THE WITNESS:  Can you show me the
3  page?
4        MS. O'DELL:  -- Bates 35.
5        THE WITNESS:  Yes, this, no,
6  nothing -- I don't -- I don't have anything here.
7  BY MR. HEGARTY:
8    Q.   Do you know whose handwriting that is?
9    A.   That is either Florie or Ira.
10   Q.   I'll come back if I --
11   A.   I don't know.  I don't know.
12   Q.   I'll come back if I want you to look at it
13  further.
14   A.   Okay.
15   Q.   If you go to Bates number SAED 5.
16   A.   What page?  What page?
17   Q.   Okay.  If you want to look at the original,
18  but we're going to have to work from the handwritten
19  notes.
20   A.   Yeah, I like to look at the original,
21  please.
22   Q.   Okay.  Go to -- it looks like 33, page 33.
23   A.   Okay.  The methodology.
24   Q.   It should look like this.
25   A.   The methodology, yeah.  No.  Hold on.

Page 421

1    Q.   Yes, that page.
2    A.   This?  Okay.
3    Q.   There looks to be some odd handwriting on
4  that page.  Do you know what that is?  It looks like
5  almost Chinese characters.
6    A.   Yeah.  This is a methodology.  We just copy
7  it.
8    Q.   I'm talking about the characters that look
9  like they're Chinese on that page.
10   A.   Yeah.
11   Q.   Do you see that?
12   A.   Yeah.  I don't read Chinese.
13   Q.   Is that Chinese?
14   A.   I don't know.  I really don't know.  But let
15  me explain something, please, so I make you comfortable
16  with this.  This is a methodology page.  This just
17  describing the method.  We copy it from -- you know,
18  once we do RNA extraction, this is indicate what kit we
19  use, what number, and, you know, the most important
20  things.
21   Q.   Understood.
22   A.   But I don't know what that means.
23   Q.   My question only was -- only concerned if
24  you could interpret that dark writing on that page.
25   A.   I do not read Chinese.  I can't read it.

Page 422

1    Q.   Where in this part of the notebook are there
2  totals for confluency?
3    A.   One more time, please.
4    Q.   Where in this notebook are there totals for
5  confluency with regard to your cell tests?
6    A.   Can you please explain the word total?
7    Q.   Well, what does confluence mean?
8    A.   Yeah, thank you.
9    Q.   What does that mean?
10   A.   Confluence, when cells reach their double
11  timing of division.  Like we always start with -- if we
12  want to start with one million cells for an experiment,
13  we go half, and then we leave it for couple of days
14  when they double so we can do the experiment.  So they
15  confluence when they reach 90 percent filling the
16  plates.
==17   Q.   Go over to page 31 of your notebook, please.==
==18  At the bottom there a --==
==19   A.   What --==
==20   Q.   -- there's an entry dated 1-29-18.==
==21   A.   Can you just show me where?  31?==
==22   Q.   31.  It says 31 in the lower left-hand==
==23  corner.==
==24   A.   This one?==
==25   Q.   Yes.==

20 (Pages 419 to 422)

Ghassan Saed, Ph.D.

Page 423

1    A.    Yeah.
2    Q.    At the very bottom you say, 2 mil cells plus
3  8 mils medium 100, and then dish.  Do you see that?
4    A.    Um-hum.
5    Q.    And then underneath that it says, cells
6  doubled in one day.
7    A.    Um-hum.
8    Q.    Do you see that?
9    A.    Um-hum.
10    Q.    How long does it normally take for
11  epithelial cells to double?
12    A.    That's not a clear question.  Are you
13  talking about epithelial ovarian cancer cells?
14    Q.    Well, let's talk about cancer cells first,
15  and then normal cells.
16    A.    Cancer cells, they double quick.
17    Q.    How quick?
18    A.    Very quickly, like next day.
19    Q.    How about noncancerous, normal ovarian
20  epithelial cell?
21    A.    Normal ovarian epithelial take longer time.
22    Q.    Approximately how much longer?
23    A.    It depends on the lot.  I think it's like a
24  week to grow.  They're very slow-growing cells.  Like,
25  for example, normal macrophages, they double quickly.

Page 424

1    Q.    In your cell tests, did all of the cells
2  that you tested double in one day?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  I just told you.
5  BY MR. HEGARTY:
6    Q.    Where is the data in the lab notebook that
7  reports on the length of time it took for the cells to
8  double?
9    A.    That's from our past experience with these
10  cells.  We worked with these cells for 20 years.
11    Q.    Why did someone then report, though, here
12  that certain cells doubled in one day?
13    A.    She wants to be extra good.
14    Q.    Can you tell what cells she's talking about
15  here?
16    A.    The cancer cells, usually.
17    Q.    Are the cells identified in this part of the
18  notebook?
19    A.    Except for the normal, yes.
20    Q.    Well, I'm talking about the entry on 1-29-18
21  we've been looking at on page 31.
22    A.    Here.
23    Q.    Can you tell from the entry itself --
24    A.    Oh.
25    Q.    -- what cells she's referring to?

Page 425

1        MS. O'DELL:  Object to the form.
2        THE WITNESS:  She is referring to
3  some of these cells here.
4  BY MR. HEGARTY:
5    Q.    What are you pointing to?
6    A.    On the top.
7    Q.    How do you know she's -- you're talking
8  about the top of the next page, page 32?
9    A.    No, same page --
10    Q.    Okay.
11    A.    -- same page.  Same page goal, total cells,
12  macrophages KOV (ph), TOV, A2780, those cells.  Now,
13  what I'm saying is, this statement refers to the cancer
14  cells, because cancer cells double in one day.  We
15  already know that.
16    Q.    So you're assuming that's what she's talking
17  about?
18        MS. O'DELL:  Object to the form.
19  BY MR. HEGARTY:
20    Q.    Correct?
21    A.    I know what she's talking about.
22    Q.    And whose handwriting is this?
23    A.    That's Florie probably.
24    Q.    Under the date 1-29-18 it says subculture
25  cells.  What does that mean?

Page 426

1    A.    It means you split them.
2    Q.    How do you measure cell doubling?
3    A.    You start -- you count them.  You start with
4  half a million, next day you get one million, you use a
5  hemocytometer, you measure them.
6    Q.    What is the instrument you use?
7    A.    Hemocytometer.
8        MS. O'DELL:  Would you spell that,
9  please?
10        THE WITNESS:  I can't.
11        MS. O'DELL:  Okay.
12  BY MR. HEGARTY:
13    Q.    Do you record --
14    A.    I can't, I can't.
15    Q.    Do you record the readings you get from a
16  hemocytometer?
17    A.    You don't get reading.  Okay.  Here's what
18  we do.  We look at the cells.  When you put half a
19  million tells in 10 millimeter dish, they're like half
20  full.  You can look under the microscope, and you see
21  half full.
22        We got experience because we --
23  we've worked with these cells for a very long time.
24  And then the next day when you look at the same culture
25  dish under the microscope, you'll see it all over the

21 (Pages 423 to 426)

Ghassan Saed, Ph.D.

Page 427

1  dish, so we -- we reach confluency, we can work with
2  them.
3             You don't want to work with cells
4  when they are spaced out because they don't like to be
5  spaced out.  They like to be simulate body where they
6  attach, touch each other.
7             MR. HEGARTY:  Let's take a short
8  break, please.  Thank you.
9             THE VIDEOGRAPHER:  We're going off
10  the record, the time is 10:00.
11             (There was a recess taken.)
12             THE VIDEOGRAPHER:  We're back on the
13  record at 10:23.
14  BY MR. HEGARTY:
15      Q.   Dr. Saed, we're going to continue looking at
16  what we marked as Exhibit Number 1, which is your
17  notebook, Exhibit Number 2.  If you turn to page 114 of
18  that notebook, please.
19      A.   Statistical section?
20      Q.   Correct.  That section is dated October 6th,
21  2018, correct?
22      A.   Correct.
23      Q.   Who was the statistician for your test
24  results?
25      A.   Steven.  I forgot his last name.  He

Page 428

1  works -- he works with us in the department.
2      Q.   Is he listed as one of the authors of your
3  manuscript?
4      A.   No.
5      Q.   You don't know his last name?
6      A.   I can find out, but I don't know his last
7  name.  Steven Kolisky or something.
8      Q.   Was the data sent to him in a blinded
9  fashion?
10      A.   This is how the data was sent to him.
11      Q.   You're pointing to pages 115 through 124?
12      A.   115 -- yes, this is how -- this is how the
13  data were.
14             MS. O'DELL:  And just to be clear,
15  what data are you referring to?  What pages?
16             THE WITNESS:  The data from PCR data
17  115 and 116, and then ELISA data 117, 118.
18  DEPOSITION EXHIBIT 27
19  Manuscript Submission to Journal of
20  Gynecologic Oncology
21  WAS MARKED BY THE REPORTER
22  FOR IDENTIFICATION
23  BY MR. HEGARTY:
24      Q.   Doctor, we received as part of the
25  materials produced to us last week what I'm marking as

Page 429

1  Exhibit Number 27, which was the -- which is the
2  manuscript submission to the Journal of Gynecologic
3  Oncology; is that correct?
4      A.   Correct.
5      Q.   That shows a submission date of August 22nd,
6  2018.  There's a cover letter on about the second page
7  or third page.  Do you see that?
8      A.   I do.
9      Q.   That letter is dated August 26th, 2018; is
10  that correct?
11      A.   Yes.  22nd.
12      Q.   August 22nd, 2018?
13      A.   Yes.
14      Q.   The statistical analysis we just looked at
15  is dated October 6th, 2018, so how could you submit a
16  manuscript on August 22nd, 2018 when the statistical
17  analysis was not done until October 6th, 2018?
18      A.   Good question.  So for the Gynecology
19  Oncology submission, we did not use the statistics from
20  here.  We just did it our -- the p-value, like what you
21  noticed.  We didn't -- we didn't submit a
22  statistical -- professional statistician in the -- in
23  the manuscript.  Just -- it says here, if you look at
24  the materials and method, we just did the simple
25  p-value comparison test.  That's all.

Page 430

1      Q.   Do you describe the Finkel p-value
2  comparison test in the manuscript?
3      A.   I'm trying to look for it, if we did.  It
4  says -- oh, okay.  No, I take that back, I'm sorry.  I
5  misspoke.  Okay.  So this -- this -- this date here
6  when we put it in the notebook, that's not when the
7  statistics were performed.  I can't give you the exact
8  date when the statistics were performed.  I have
9  to go back.  I'm sorry, I misspoke.  I have to go back
10  and tell you exactly when we did the statistics.  But
11  here we describe the statistics that's done by this
12  method from Steven.
13      Q.   What page are you pointing to?
14      A.   It's page seven.  Yeah, this is done by
15  statistician, so this is done by him.
16      Q.   Right.  The --
17      A.   The data was done by him.
18      Q.   Your statistical description in the
19  manuscript submitted to the Gynecologic -- the Journal
20  of Gynecologic Oncology is the same as in your
21  manuscript?
22      A.   Correct.
23      Q.   So --
24      A.   That's the date where we entered it in the
25  book.

Ghassan Saed, Ph.D.

Page 431

```
 1      Q.    10-6-18 is the date it was entered into the
 2   book?
 3      A.    Correct.  I remember it now.
 4      Q.    What was the date the statistical analysis
 5   was done?
 6      A.    I can find out.  I don't remember.
 7      Q.    Is there any way --
 8      A.    It's definitely different.
 9      Q.    -- or how can you find out?
10      A.    I can go back and ask Steven.  But it's
11   definitely -- if we -- if we listed it in the OB/GYN
12   Oncology submission, so it's definitely before that,
13   but I cannot remember the exact date.
14      Q.    Whose handwriting is -- is describing the
15   statistical analysis?
16      A.    This is --
17            MS. O'DELL:  What page are you
18   referring to, please?
19            THE WITNESS:  This is page 114.
20            MR. HEGARTY:  114.
21            THE WITNESS:  This is Florie.
22   BY MR. HEGARTY:
23      Q.    Do you know when this --
24      A.    This was --
25      Q.    -- was added to the notebook?  Was it added
```

Page 432

```
 1   on 10-6-18, or added at another time and dated 10-6-18?
 2            MS. O'DELL:  Object to the form.
 3            THE WITNESS:  I'm not sure when
 4   we -- when we added this, but that was the last thing
 5   we added, I think.
 6   BY MR. HEGARTY:
 7      Q.    And how were the p-values determined?  By
 8   what comparison?
 9      A.    It states very clearly here in the
10   statistical section, if you read it.  It's very
11   complicated statistical methods, because they are not
12   normally distributed, so they had to use this method
13   to -- there are a lot of comparison to do that,
14   comparison between treated versus untreated, comparison
15   between different doses, comparison between normal
16   versus cancer.  It's a lot of that.
17      Q.    That was my question, is to what -- what
18   different samples are you doing the comparisons across?
19      A.    So all comparisons were statistically
20   significant.  We were particularly interested between
21   control and treatment.
22      Q.    So it's your understanding that the p-values
23   compared talc untreated -- compared the untreated
24   controls to the treated controls?
25      A.    Okay.
```

Page 433

```
 1            MS. O'DELL:  Objection to the form.
 2            THE WITNESS:  Okay.  If you read
 3   here, if you go to the Results section of the
 4   manuscript, now, each -- each section of the results
 5   shows what the comparison were and what the actual
 6   p-value is for that comparison.
 7   BY MR. HEGARTY:
 8      Q.    Okay.  Why was DMSO selected as a dilutant
 9   for talc?  Why that particular material?
10            MS. O'DELL:  Object to the form.
11            THE WITNESS:  Yeah, the question is
12   not clear.  I don't understand what you mean by --
13   BY MR. HEGARTY:
14      Q.    Well, were there -- were there alternatives
15   to DMSO?
16      A.    Were they -- to dissolve talc?
17      Q.    Correct.
18      A.    We got this from the other papers where they
19   used the -- let me -- let me try to remember.  I don't
20   know if they were alternatives, but we used this DMSO
21   always in our lab to dissolve organic things, nonporous
22   stuff.
23      Q.    Some of your assays rely on optical density
24   measurements, correct?
25      A.    Correct.
```

Page 434

```
 1      Q.    That includes PCR and ELISA, correct?
 2      A.    ELISA you mean?
 3      Q.    ELISA.
 4      A.    I'm not sure about PCR, what are you
 5   referring to, colorimetric?
 6      Q.    Well, do you understand --
 7      A.    I'm confused now.
 8      Q.    Do you know whether PCR testing relies on
 9   optical density measurements?
10      A.    Absolutely not.
11      Q.    How about ELISA?
12      A.    Correct, some of the ELISA are colorimetric,
13   is that what you're asking?
14      Q.    Well, I'm talking about optical density
15   measurements.
16      A.    Yeah, it's colorimetric.
17      Q.    What is the principle behind optical density
18   assays; that is, what do they measure?
19      A.    They measure change in color that sometimes
20   you cannot see if you add a substance to it.
21      Q.    Don't they measure the ability of the sample
22   to absorb or block light?
23      A.    They could.  I don't know.
24      Q.    Do they?
25      A.    It depends on the assay.  What assay are you
```

23 (Pages 431 to 434)

Ghassan Saed, Ph.D.

Page 435

1   referring to in particular?
2       Q.   Well, we just agreed that -- do you know one
3   way or the other whether any of the assays that you ran
4   rely on optical density measurements?
5       A.   Yes.
6           MS. O'DELL:  Object to the form.
7           THE WITNESS:  We -- some of the
8   assays that we did for ELISA or, for example, protein
9   assays to determine how much protein you have, it
10  depends on change in wavelength and change in color in
11  response to wavelength.
12  BY MR. HEGARTY:
13      Q.   But they --
14      A.   It's called colorimetric.
15      Q.   But it also -- but it measures the ability
16  of the sample to absorb or block light, right?
17          MS. O'DELL:  Object to the form.
18          THE WITNESS:  I'm not sure about
19  absorb light.  I'm not sure about that.  It changes
20  color based on the reaction.  For example, with a
21  protein assay, if you oxidize copper one to copper two,
22  reduce it, that is accompanied by change in color.  So
23  the colorimetric assay at this specific wavelength will
24  determine that.  The change, the degree, how much color
25  is changed, which is proportional to how much protein

Page 436

1   you have.
2   BY MR. HEGARTY:
3       Q.   Can the presence of particulate matter in
4   the solution analyzed in these optical assays affect
5   the results?
6           MS. O'DELL:  Object to the form.
7           THE WITNESS:  Again, there is a
8   misunderstanding of what's going on here.
9   BY MR. HEGARTY:
10      Q.   Well, I'm not talking about --
11          MS. O'DELL:  Excuse me.
12  BY MR. HEGARTY:
13      Q.   -- what you specifically --
14      A.   Let me finish, please.
15          MS. O'DELL:  No, no.  Excuse me.
16          MR. HEGARTY:  I'll withdraw the
17  question.
18          MS. O'DELL:  Let him finish his
19  answer.
20          MR. HEGARTY:  I just withdrew the
21  question.
22          MS. O'DELL:  No.  He was --
23          MR. HEGARTY:  If you want to ask him
24  the question, you can ask him.
25          MS. O'DELL:  No.

Page 437

1           MR. HEGARTY:  I withdrew the
2   question.
3           MS. O'DELL:  No.  If he has started
4   to answer the question that's on the table, he's
5   entitled to finish his answer.
6           MR. HEGARTY:  I don't agree with
7   that.
8           MS. O'DELL:  Otherwise, the record is
9   not clear, and the doctor's trying to explain his
10  answer.
11          MR. HEGARTY:  The record is clear.
12  I withdrew the question.
13          MS. O'DELL:  No.  The record is
14  not --
15  BY MR. HEGARTY:
16      Q.   Doctor, listen to my question.
17          MS. O'DELL:  You may finish your
18  answer, Doctor.  Please continue.
19          MR. HEGARTY:  No, you may not finish
20  your answer, because there's no question pending.
21  There's nothing to answer.
22          MS. O'DELL:  That is --
23          MR. HEGARTY:  I withdrew the
24  question.
25          MS. O'DELL:  Well, the answer --

Page 438

1           THE WITNESS:  You asked me a
2   question.
3           MS. O'DELL:  If the question
4   is --
5           MR. HEGARTY:  You are not answering
6   my question.
7           MS. O'DELL:  Excuse me.  Excuse me.
8   Let him finish, but if you're not going to let him
9   finish, the question is struck and the answer is
10  struck, so it can't be used against him --
11          MR. HEGARTY:  I agree.
12          MS. O'DELL:  -- if you're not going
13  to let him finish his answer.
14          MR. HEGARTY:  I agree.
15  BY MR. HEGARTY:
16      Q.   Let me ask a different question.  Generally,
17  without regard to the tests that you ran, can the
18  presence of particulate matter in solutions analyzed by
19  optical density assays affect the results?
20          MS. O'DELL:  Object to the form of
21  the question.  Excuse me.  This is also an area that
22  was covered last time, which representation by
23  Ms. Sharko was that topics previously covered would not
24  be reviewed again.
25          So Doctor, if you understand the

24 (Pages 435 to 438)

Page 439

```
 1   question, I'll let this question be answered, but we're
 2   not going to revisit every topic.
 3              MR. HEGARTY:  That was not the
 4   representation --
 5              MS. O'DELL:  Yes, it was.
 6              MR. HEGARTY:  -- and that was a
 7   different question, and we said that -- I'm not going
 8   to get into this debate because it's been debated
 9   again.  If you want to instruct him not to answer it,
10   you can do so at your peril.
11   BY MR. HEGARTY:
12       Q.   Would you answer my question, please?
13              MS. O'DELL:  Yeah, don't -- don't --
14   don't say anything like that to me.
15              If you understand the question, you
16   may answer, Doctor.  If you need the question repeated,
17   we can do that.
18              THE WITNESS:  Okay.  So just for the
19   record, can you please repeat the question?
20   BY MR. HEGARTY:
21       Q.   Generally, without regard to the testing
22   that you ran, can the presence of particulate matter in
23   solutions analyzed by optical density assays affect the
24   results?
25              MS. O'DELL:  Objection to the form.
```

Page 440

```
 1   You may answer any way you choose.  You're not limited
 2   to not talking about your own data.
 3              THE WITNESS:  The answer is -- I
 4   mean, there's no answer yes or no here.  This is very
 5   complicated answer.  You want me to explain, I can
 6   explain.  There is no yes or no.  The question is
 7   wrong.
 8   BY MR. HEGARTY:
 9       Q.   Why is the question wrong?
10       A.   Because it doesn't work like that.
11       Q.   Okay.  Tell me why it doesn't work like
12   that.
13       A.   I'm tell you.  I'll tell you.  So when we --
14   when we measure colorimetric assay for proteins, these
15   were proteins extracted from cells.  They have no --
16   nothing from outside, no talc, no powders, nothing
17   else.  This is total protein extracted from lysate of
18   cells, so whatever is in the cells can interfere with
19   the assay, you can ask that question, that's fair, but
20   outside, no, because there is no outside source.  You
21   know what I mean?
22       Q.   What did you do in your tests to insure that
23   through your test procedures you didn't carry along any
24   talc particles?
25       A.   You can't carry talc particles because it
```

Page 441

```
 1   carries proteins.
 2       Q.   How is that?
 3              MS. O'DELL:  I'm sorry.
 4              THE WITNESS:  The methodology --
 5              MS. O'DELL:  You did not let him
 6   finish, Mark.  Please finish, sir.
 7              THE WITNESS:  Okay.  This is really
 8   easy.  I can explain.  This is very easy, Mark.  The
 9   methodology that you use, you treat, you wash the
10   cells, the cells are alive, you wash them, and then you
11   lyse them, and then you extract proteins.  Hopefully,
12   the method that you extract proteins that you use does
13   not bring anything else, because we have been
14   establishing this from 1960.
15              It only carries proteins, and you go
16   through different phases of purification until you
17   extract total proteins.  And this is very standard
18   method, and whatever you get there is only protein that
19   comes from cells.
20   BY MR. HEGARTY:
21       Q.   How are you able to rule out that talc
22   particles did not enter the cell and were picked up
23   until the lyse and the extraction of proteins?
24       A.   You have --
25              MS. O'DELL:  Objection to form.
```

Page 442

```
 1              THE WITNESS:  That's why you have a
 2   control.  We have a control, treated versus untreated,
 3   we extracted proteins from both cells, and then you
 4   only extract purified proteins.  We have purified
 5   proteins there.
 6              We just determine -- we use the
 7   colorimetric assay, the BSA-based colorimetric assay to
 8   determine how much protein we have there so we can
 9   compare the same amount of protein between treated and
10   untreated.  That's the idea.
11   BY MR. HEGARTY:
12       Q.   But how does comparing untreated to treated
13   rule out that you didn't pick up talc particles that
14   had entered the cell and were then extracted with the
15   protein?
16              MS. O'DELL:  Object to the form.
17              THE WITNESS:  I already answered
18   you.  Do you want me to repeat it and waste your time?
19   It's fine.  It's up to you.
20              I already told you, there is -- we
21   extract -- the methodology that we use to extract -- to
22   purify -- how about that -- purify proteins from cells,
23   okay, is what you get there, your final product that
24   you get is proteins.
25   BY MR. HEGARTY:
```

Ghassan Saed, Ph.D.

Page 443

```
1       Q.    Okay.  If you turn to page 32 of your lab
2    notebook.
3       A.    I am not mad, I'm just -- sorry.  Which
4    one?
5           MS. O'DELL:  Exhibit 2.
6    BY MR. HEGARTY:
7       Q.    Page 32.
8       A.    Okay.
9           MS. O'DELL:  Exhibit 2.
10          THE WITNESS:  This one?
11   BY MR. HEGARTY:
12      Q.    There's handwriting -- it's dated 2-1-2018,
13   correct?
14      A.    Yes.
15      Q.    There's a handwritten reference to UNT,
16   both -- and then there's is a typed UNT.  What does UNT
17   mean?
18      A.    Untreated.
19      Q.    Was there only one control for each cell
20   type?
21      A.    One dish, yes.
22      Q.    So there could be only one volume of DMSO
23   added per cell line, correct?
24          MS. O'DELL:  Objection to form.
25          THE WITNESS:  The question is not
```

Page 444

```
1    clear really.
2    BY MR. HEGARTY:
3       Q.    Well, you had -- said you had one control
4    dish for each cell line tested, correct?
5       A.    Yes.
6       Q.    And in that control dish, you would add an
7    amount of DMSO, correct?
8       A.    Correct.
9       Q.    So how much DMSO did you add to that one
10   control dish for each of the cell lines tested?
11      A.    Okay.
12          MS. O'DELL:  Object to form.
13          THE WITNESS:  So let me answer this.
14   So we have DMSO alone, and DMSO dissolved in a DMSO
15   talc.  So whatever treatment volume we use here, we use
16   the same here.  So if we used 50 microliters here to
17   treat the cells from the treated, from the DMSO talc,
18   we used 50 microliters again for DMSO control.  Same
19   volume.
20   BY MR. HEGARTY:
21      Q.    So you had -- so you had three control
22   dishes so that you would have to control dish for each
23   dose of talc?
24          MS. O'DELL:  Object to the form.
25          THE WITNESS:  Three control dishes?
```

Page 445

```
1    BY MR. HEGARTY:
2       Q.    Well, you said you added DMSO to the
3    controls that corresponded with the amount of talc in
4    DMSO to the various cell lines, correct?
5           MS. O'DELL:  Object to form.
6           THE WITNESS:  Okay, let me answer
7    you.  So you have, for example, EL1, which is
8    macrophages, okay.  You have one, two, three, four
9    plates, cells.  You call them plates, right.  So plate
10   one is untreated.  You add -- we -- we make the
11   concentrations 5, 10, 20, a hundred in a fixed volume
12   of DMSO.  Let's say it's 50 microliters, okay.
13              So we add 50 microliters of DMSO to
14   untreated, 50 microliters to -- that contain
15   5 micrograms to this one, 50 microliters DMSO that
16   contains 20 micrograms to the next one, 50 microliters
17   of DMSO that contains a hundred microgram of talc to
18   the next one.  So they all have the same volume.  But
19   one with -- without the powder, and one with the
20   various concentration of powder.
21   BY MR. HEGARTY:
22      Q.    I gotcha.  Would you turn to page 67 of your
23   lab notebook, Exhibit 2?  Are you there?
24      A.    Yes.
25      Q.    You list there your calculations for CA-125,
```

Page 446

```
1    correct, in the table at the bottom?
2       A.    Yes.
3       Q.    What test methods or what testing was done
4    to get those levels, get those values?
5       A.    I don't understand the question.
6       Q.    Well, what -- what tests -- what -- how do
7    you test the -- the samples for CA-125?  What is the --
8    what is the process for doing that, that generates
9    these numbers?
10      A.    ELISA.
11      Q.    And physically how does it -- how is it
12   done?  Do you put it in a machine and it generates
13   the -- the data?
14      A.    Physically you -- you are provided with a
15   standard curve, I mean CA-125 protein with different
16   concentration, yes, and then you can use the different
17   concentration to create the standard curve, and then
18   you can run the standard curve with your samples as
19   indicated by the 96 full plate here, and then ELISA
20   read it, right, and then you get the results.
21      Q.    What is the date of the plate setup for this
22   test?  It says plate setup, but I don't see a date for
23   it.
24      A.    It's -- it is -- yes, I see the date.  It's
25   right here.  It says January 17.  See it?
```

26 (Pages 443 to 446)

Ghassan Saed, Ph.D.

| Page 447 | Page 449 |
|---|---|
| 1     Q.   That is the date of the plate setup? | 1   dose only. |
| 2     A.   If it says inside here, yes. | 2   BY MR. HEGARTY: |
| 3     Q.   What was the date that the test results were | 3     Q.   For how long of exposure? |
| 4   generated? When were the samples tested? Is there a | 4     A.   That's -- here it says 48 hours, but it is |
| 5   date next to -- | 5   72 hours. |
| 6     A.   No, no. They're all together. You can't | 6     Q.   Where then is the data in your notebook |
| 7   run standard and stop and leave and go home. They're | 7   showing treatment of the cells for the CA-125 test, and |
| 8   all run at the same time because you need to compare to | 8   then 72 hours later you're running the test results? |
| 9   a standard. | 9     A.   I can't see it here. I cannot see it in my |
| 10     Q.   When were the cells treated for the CA-125 | 10   notebook. |
| 11   test? | 11     Q.   Okay. Let's -- |
| 12     A.   When were the cells treated for -- this | 12     A.   But I have some cells from January 10, |
| 13   is -- I think it's in the beginning of the ELISA. | 13   CA-125 ELISA with the trial, for the trial from -- |
| 14   So -- yes. So this -- I don't know when we treated | 14     Q.   But for 72 hours, they would have been |
| 15   this. It must be the same date. I don't have a note | 15   treated 72 hours before January 17th, correct? |
| 16   of that. | 16     A.   Yes, 72 hours it says. |
| 17     Q.   Well, you report in your manuscript -- | 17     Q.   What page are you pointing to? |
| 18     A.   January 17. | 18     A.   This is page 13. This is the trial |
| 19     Q.   -- that you tested for CA-125 up to | 19   experiment that we did. |
| 20   72 hours -- | 20     Q.   Right now I'm talking about the -- not the |
| 21     A.   Yes. | 21   trial experiment, the manuscript experiment. |
| 22     Q.   -- of exposure, correct? | 22     A.   They would have been done the same date |
| 23     A.   Yes. | 23   almost. This is January 10, that's January 17. So we |
| 24     Q.   Where is that reflected in your notebook? | 24   were treating the cells probably at the same time. I'm |
| 25     A.   It's here. | 25   not sure. It's not written here. |

| Page 448 | Page 450 |
|---|---|
| 1     MS. O'DELL: What page are you | 1     Q.   You do agree that you would have had to |
| 2   referring to? | 2   treat the cells three days before January 17th, |
| 3   BY MR. HEGARTY: | 3   correct? |
| 4     Q.   Yeah, what page are you referring to? | 4     A.   Correct. So this is why the trial |
| 5     A.   January -- 63. Where is the cell treatment | 5   experiment started on January 10th. |
| 6   for this. Yeah. I only have the date for the assay on | 6     Q.   You can't find in the notebook on -- |
| 7   here. But the treatment, these are the 12, 12 plus | 7   notebook Exhibit Number 2, treatment for the CA-125 |
| 8   100. Let me check the manuscript which one we did | 8   test on January 14th, 2018? |
| 9   here. CA-125. Let's see. So for this one, we used a | 9     MS. O'DELL: Object to the form. |
| 10   hundred microgram per mil, one dose to do the assay. | 10     THE WITNESS: I only -- I found |
| 11     Q.   And in your manuscript you say activity | 11   the trial experiment that I did, which is dated |
| 12   assay was utilized to determine apoptosis of all cell | 12   January 10. |
| 13   lines -- I'm sorry, that's apoptosis. Let me back up | 13   BY MR. HEGARTY: |
| 14   to -- | 14     Q.   That couldn't be the same cell line, right? |
| 15     A.   If you go to here, you can see the -- the | 15     A.   I'm not sure. |
| 16   legend. If you go to legend for CA-125, and it tells | 16     Q.   If you go to your -- your page 50 in your |
| 17   you that we used a hundred micrograms per mil dose, and | 17   notebook, please. |
| 18   in this time, we only did one dose, the highest dose. | 18     A.   Okay. That's 33? |
| 19     MS. O'DELL: What -- what figure are | 19     Q.   I'm sorry. Go to page 49 of your notebook. |
| 20   you referring to? | 20     A.   49, which is GPX. |
| 21     THE WITNESS: It is figure four | 21     Q.   Correct. If you would look at sample ID |
| 22   legend. It says increase CA-125, and this one is | 22   358. Do you see that sample ID to the left? |
| 23   about treatment, and these are the cell lines that we | 23     A.   358, macrophages, 20 micrograms per mil. |
| 24   used, they are here, and the table, and this is | 24     Q.   And if you go over to the normalized data to |
| 25   referred to a hundred micrograms per mil. It's one | 25   the far right, do you see that normalized data of 2.17, |

27 (Pages 447 to 450)

Ghassan Saed, Ph.D.

Page 451

1  2.46 and 2.39?
2     A.   Yes.
3     Q.   And do you see the average of 2.47?
4     A.   Yes.
5     Q.   How can you have an average of 2.47 when
6  none of the normalized data is above 2.46?
7     A.   2 point -- hold on one second.  2.17, 2.46,
8  2 point -- actually, it would be lower.  That's even
9  better.
10    Q.   That's not my question, Doctor.
11    A.   I know.  I understand.  I'm just looking why
12  we -- probably this happened.  The answer is, probably
13  it's a typo, it's a mistake.  But if you add it, then
14  you will get a lower value.
15    Q.   Understood.  But if you -- when I did the
16  average, I came up with 2.34.
17    A.   Yes.
18    Q.   Why is this reporting 2.47?
19    A.   These are formulas already linked to the --
20  each section, so maybe sometimes by mistake you -- you
21  link to the wrong cell number.
22    Q.   Can you explain why the number is wrong?
23        MS. O'DELL:  Object to the form.
24        THE WITNESS:  I can't explain.  Just
25  a mistake.

Page 452

1  BY MR. HEGARTY:
2    Q.   If you go over to --
3    A.   If the -- for the record, if they were
4  averaged correctly, you will get the lower number --
5    Q.   If you would --
6    A.   -- which is -- which is better.
7    Q.   When you say better, better in what way?
8    A.   I mean it's more consistent with the -- with
9  the data.
10    Q.   Go over to page 61, please.
11    A.   ELISA?
12    Q.   It's just a table of data.
13    A.   This?  61?  Yes.
14    Q.   Okay.
15    A.   Let me see what's this first.
16    Q.   It should be a table dated January 11, 2018.
17    A.   This is for catalase.
18    Q.   Okay.
19    A.   January 11?
20    Q.   Yes.
21    A.   Yes, I got that.
22    Q.   If you look at the very first line over
23  A2780 dash C, do you see that line?
24    A.   Um-hum.
25    Q.   Yes?

Page 453

1    A.   Yes.
2    Q.   You go over and you see the 9.98 number, the
3  11.63 number and 10.50 number?
4    A.   Yes.
5    Q.   When I took -- added those numbers and
6  divided by three, I got 10.7 instead of 11.07.  Do you
7  know why that is the case?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  What did you get?
10  BY MR. HEGARTY:
11    Q.   Well, if you add those three numbers and you
12  divide by three, you get 10.7, not 11.07, and my
13  question to you is, do you know why that's the case?
14    A.   Can I add them?
15    Q.   Yes.
16        MS. O'DELL:  Do you need a piece of
17  paper?
18  BY MR. HEGARTY:
19    Q.   Do you have a --
20    A.   Yeah.
21    Q.   -- phone?
22    A.   Yeah.  9.98 plus -- 10.7.  This is 11.07.  I
23  don't know.  It's a very small difference, nothing
24  significant.
25    Q.   Would you turn over to page 105 of your

Page 454

1  notebook, please?
2    A.   105.
3    Q.   In the chart on that page, you list the
4  results for the HOSEpic control and for talc, correct?
5        MS. O'DELL:  What page are you on?
6  BY MR. HEGARTY:
7    Q.   That cell line?
8    A.   H --
9    Q.   H-O-S-E --
10    A.   HOSEpic, yeah.
11    Q.   HOSEpic?
12    A.   Um-hum.
13    Q.   For the control and for talc, the results
14  are listed, correct?
15        MS. O'DELL:  I'm sorry, what page
16  are you on?
17        THE WITNESS:  I don't understand
18  what you're saying.
19  BY MR. HEGARTY:
20    Q.   Well, you list results for the cell line
21  HOSEpic control and talc, correct?
22    A.   Correct.
23        MS. O'DELL:  You're on page 105?
24        THE WITNESS:  105?
25        MS. O'DELL:  Give me just a moment,

28 (Pages 451 to 454)

Ghassan Saed, Ph.D.

Page 455

1  'cause I don't think I'm on the same page.  This is
2  what I have for -- what page are the Bates number,
3  Mark, just to make sure?
4          MR. HEGARTY:  85.  He's working off
5  the other number.
6          MS. O'DELL:  I know that.  But I'm
7  just trying to make sure --
8          THE WITNESS:  105.  Thank you for
9  your help.
10 BY MR. HEGARTY:
11     Q.    In your manuscript, you don't report the
12 results for the HOSEpic cell line.  Why is that?
13     A.    Because this is a normal ovarian, epithelial
14 ovarian, and we actually did another normal epithelial
15 ovarian, so -- and we had the same results.  The
16 HOSEpic is normal.
17     Q.    Would you go a couple pages over to 107,
18 please?
19     A.    MTT?
20     Q.    MTT Cell Proliferation.
21     A.    Um-hum.
22     Q.    Do you see that page?
23     A.    I do.
24     Q.    In the table above the graph, it says
25 Cytotoxicity Percent.  Do you see that table?

Page 456

1      A.    Yes.
2      Q.    Then in the graph below it says, cell
3  proliferation above baseline percentage.  Why does the
4  table report cytotoxicity and the graph report cell
5  proliferation above baseline?
6      A.    I need to explain.
7      Q.    Okay.
8      A.    Okay.  So MTT measures cell proliferation
9  that is proportional to cell death.  So the cells that
10 proliferate, there are cells that die.  So you can here
11 the percentage of cell proliferation above the baseline
12 is the cells that proliferated, here is the toxicity,
13 the cells that died.  So it's two different ways of
14 interpreting it.
15     Q.    Go back one page to 106, please.
16     A.    106.
17     Q.    At the top it says, MTT Cell Proliferation
18 Assay, correct?
19     A.    Correct.
20     Q.    You report on that page the seeding of cells
21 on 9-4-2018, correct?
22     A.    Correct.
23     Q.    And then below on 9-6-28 (sic) it says after
24 24 hours treatment, correct?
25     A.    9-5.

Page 457

1      Q.    Well, 9-6.
2      A.    9-6?
3      Q.    Do you see where it says, the first line
4  after 9-6, after 24 hours treatment?
5      A.    Um-hum.
6      Q.    Yes?
7      A.    Yes.
8      Q.    And turn to the next page, the raw data is
9  reported on 9-6-2018; is that correct?
10     A.    Yes.
11     Q.    In your manuscript, though, you report cell
12 proliferation data for 72 hours.  So here you're
13 seeding cells on 9-4, and then you're taking tests
14 after 24 hours.  Where does the 72 hours come from?
15 Where did the 72 hours come from?
16     A.    So 9-4, treat cells with talc.  9-5, 9-6 is
17 24.  Oh, yeah.  So this one -- this one is 24 hours
18 only.  What does it say here?
19     Q.    Well --
20     A.    I want to see it.
21     Q.    Yes.  It's over on -- if you look at
22 page six, you report cell proliferation and apoptosis
23 using MTT cell proliferation assays with talc,
24 100 micrograms per milliliter for 72 hours.
25     A.    Yes, this is -- this is 24 hours.

Page 458

1      Q.    But you -- that same table -- I'm sorry, the
2  same graph you have there is the same graph you have in
3  your manuscript.
4      A.    Yes.
5      Q.    So where is this data for 72 hours?
6      A.    There is no data.  This is the data.  It's
7  24 hours.
8      Q.    So why did you report in your manuscript
9  that it's for 72 hours?
10     A.    It's a typo, a mistake.  Because we've
11 done -- everything else is 72 hours, that's why.
12     Q.    So it's your testimony that in your
13 manuscripts where you report cell proliferation from
14 100 micrograms per milliliter of talc for 72 hours,
15 that should be 24 hours?
16     A.    What we did here is clearly explained in the
17 notebook.  It says when we seeded the cells and when we
18 treated the cells and when we did the assay, and that's
19 24 hours.  It says after 24 hours treatment.
20     Q.    Understood.  Why does your manuscript say
21 72 hours?
22     A.    It's a mistake.  I told you, okay.  But it
23 says clearly in my notebook, it says after 24 hours of
24 treatment, and this is the dose, 100 microgram per mil
25 of talc.

29 (Pages 455 to 458)

Ghassan Saed, Ph.D.

Page 459

1    Q.   Do you intend to correct that mistake,
2  Doctor?
3    A.   Of course.  But this -- this manuscript is
4  not rejected.
5    Q.   I understand that.  But the manuscript has
6  been accepted with you reporting your data for cell
7  proliferation for 72 hours, correct?
8    A.   This is a normal practice.  When we get the
9  proof, we go over the manuscript, we make sure
10  everything is correct, and we -- we edit it.  It's not
11  the first time.  It's very basic.
12    Q.   Did you find this mistake before right now?
13    A.   The 24 hours?
14    Q.   Yes.
15    A.   I'm sure we will find it when we read it.
16    Q.   That's not my question.  My question is, is
17  this the first time you're appreciating that you made a
18  mistake in your manuscript, that it should be 24 hours
19  instead of 72 hours?
20    A.   I answered.
21    Q.   What's your answer?
22    A.   I would have picked it up on the reproof.
23    Q.   Had you picked it up before right now?
24    A.   I didn't get the reproof yet.
25    Q.   But had you picked up the error before right

Page 460

1  this moment?
2    A.   You want me to say something?  Okay.  I
3  already said, when I get the proof -- this is a
4  mechanism in our lab.  When I read the proof, we sit
5  down, and we make sure that everything is accurate
6  according to our notebook, what we did, and then we
7  have the opportunity to fix it.
8    Q.   Had you --
9    A.   And how do you count the cells so I will look
10  for it, and when it comes, I will fix whatever needs to
11  be fixed.
12    Q.   But were you aware of this mistake before
13  right now?
14    A.   I didn't look specifically for this one.
15    Q.   When you say the proof, you're talking about
16  the proof from the publisher?
17    A.   Yes, the proof.
18    Q.   You don't -- you don't do that comparison
19  before you send it to the publisher?
20         MS. O'DELL:  Object to the form.
21         THE WITNESS:  We do, we do, but
22  sometimes with too many data, too much information, you
23  know, you do mistakes.
24  BY MR. HEGARTY:
25    Q.   Now, MTT doesn't measure cell proliferation

Page 461

1  directly, correct?
2    A.   I don't understand your question.
3    Q.   Well, it's not a direct measure of cell
4  proliferation, is it?
5         MS. O'DELL:  Object to form.
6         THE WITNESS:  I don't understand
7  your question.
8  BY MR. HEGARTY:
9    Q.   What don't you understand?
10    A.   The question is scientifically wrong.
11    Q.   Why is it scientifically wrong?
12    A.   What you mean by direct?
13    Q.   Well, it's an indirect measure of cell
14  proliferation?
15    A.   I'm asking you, what do you mean by -- you
16  said -- you asked me if it's direct measurement, right?
17    Q.   You're not --
18    A.   I'm asking you, what do you mean by direct?
19    Q.   You're not counting the number of cells that
20  are proliferating?
21    A.   Of course you are.
22         MS. O'DELL:  Excuse me.  Object to
23  the form.
24  BY MR. HEGARTY:
25    Q.   In what way?

Page 462

1         MS. O'DELL:  Object to the form.
2         THE WITNESS:  Okay.  The -- okay.
3  So the basis of the -- of the MTT that cells that
4  absorb the dye are the cells that are proliferating,
5  and cells that do not absorb the dye, cells are dying,
6  so you can take that, it's a direct measure of
7  proliferation.
8  BY MR. HEGARTY:
9    Q.   And how do you count the cells?
10    A.   The dye, the ELISA.  You do the
11  measurements, you do the quantitation, how much dye was
12  absorbed for cells.  So when you say direct, that's one
13  of the best techniques that we have.  And by the way,
14  this is very standard technique to measure cell
15  proliferation.
16    Q.   Go over, please, to what would be page 104
17  of your notebook, Exhibit 2, 104.  It should look like
18  this.
19    A.   Yes.
20    Q.   These are the --
21    A.   SNPs.
22    Q.   The talc matter results?
23    A.   Correct, the SNP analysis.
24    Q.   These show color dots that are very close
25  together, correct?

Ghassan Saed, Ph.D.

Page 463

1    A.   Yes.
2    Q.   Who read the charts and recorded the data?
3    A.   I need to explain this.
4    Q.   Okay.
5    A.   So this is done by a Core Facility at
6  Wayne State University.  We sent them the DNA from the
7  treated cells, and they run the SNP assay, and they
8  give us the data exactly as you see it here.
9    Q.   Do you know how they generate that data?
10    A.   I don't.
11    Q.   Do you know who generated the data, who at
12  Core?
13    A.   By name?
14    Q.   Yes.
15    A.   No.  We submit it online.  There's a
16  form that you fill out, and which -- it goes to
17  them, and you send them the samples.  I can't remember
18  names.
19    Q.   Do you know what the two colored dots
20  represent?
21    A.   I'm not sure, but probably for alleles,
22  different alleles.
23    Q.   Well, you have green dots and you have red
24  dots.  What do those mean?
25    A.   Alleles, C versus T, A versus G.  I'm not

Page 464

1  sure exactly how they --
2    Q.   None of your tests showed development of
3  neoplastic cells, correct?
4    A.   Proliferation does.
5    Q.   Are you equating cell proliferation with
6  neoplastic development?
7    A.   It's an indirect --
8          MS. O'DELL:  Object to form.
9          THE WITNESS:  It's an indirect
10  proliferation.  It is an indirect measure of -- of the
11  beginning of a transformation.
12  BY MR. HEGARTY:
13    Q.   Well, you showed no transformation of normal
14  ovarian cells to cancerous cells, correct?
15          MS. O'DELL:  Object to form.
16          THE WITNESS:  No.  These are
17  immortalized normal.  They do not transform.
18  BY MR. HEGARTY:
19    Q.   Well, there are tests -- are there not tests
20  to measure whether normal cells have undergone
21  neoplastic changes?
22    A.   Again, the question is not clear, because
23  the normal that we used are immortalized cell lines.
24  That means they do not change unless you really beat
25  them up.

Page 465

1    Q.   Have you ever done in any -- strike that.
2  Have you ever done any tests to look for neoplastic
3  changes in cells directly?
4    A.   No.
5    Q.   Have you ever taken results like you
6  had with your tests and applied them in an invitro
7  model?
8    A.   I'm sorry?
9          MS. O'DELL:  Object to the form.
10          THE WITNESS:  I'm not clear.
11  BY MR. HEGARTY:
12    Q.   Have you ever taken results of any testing
13  you've done like this and taken them and applied them
14  in an animal model?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  Can you explain what
17  "like this" means?  Like transformed?
18  BY MR. HEGARTY:
19    Q.   Well, the tests that you did for your
20  manuscript, have you ever done tests like those and
21  applied those in an invivo model?
22    A.   What tests?
23          MS. O'DELL:  Object to form.
24          THE WITNESS:  What tests you're
25  talking about?

Page 466

1  BY MR. HEGARTY:
2    Q.   The tests in your manuscript, the tests in
3  your notebook.
4    A.   I have done one million tests.  Which one?
5    Q.   Any one.  Have you ever applied in any -- in
6  any of your work, have you ever taken any of your work
7  and applied it in an invivo model?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  Not related to this
10  project?
11  BY MR. HEGARTY:
12    Q.   Yes, in any sense.
13    A.   I don't remember.  I really didn't
14  understand the question, to be honest with you.
15          MS. O'DELL:  Well, don't answer a
16  question if you don't understand it.
17          THE WITNESS:  I really did not
18  understand it.
19          MS. O'DELL:  If you don't --
20  BY MR. HEGARTY:
21    Q.   If you can --
22          MS. O'DELL:  If you don't understand
23  the question, please don't --
24          THE WITNESS:  It's a very confusing
25  question.  It's made of two components that contradict

31 (Pages 463 to 466)

Ghassan Saed, Ph.D.

Page 467

1  each other.
2  BY MR. HEGARTY:
3      Q.   You can treat cells and then inject those
4  cells into an animal model, correct?
5      A.   What do you mean by animal model?
6      Q.   Like a rat or a mouse?
7      A.   Why would you do that?
8      Q.   To do an invivo test for your results?
9      A.   That's the wrong way to do invivo test.
10     Q.   How do you do an invivo test?
11     A.   You create from -- invivo from within, not
12 inject the cells.
13     Q.   Okay.  Have you ever taken cells that you
14 created --
15     A.   I didn't -- you don't take cells for invivo.
16 You create the environment invivo for the animal and
17 watch for the response of the animal.
18     Q.   Have you ever done that?
19     A.   No.
20          MR. HEGARTY:  Okay.  We need to
21 change tapes.  Let's go off the record.
22          THE VIDEOGRAPHER:  We're going to go
23 off the record.  The time is now 11:09.
24          (There was a recess taken.)
25          THE VIDEOGRAPHER:  We're back on the

Page 468

1  record, the time is 11:19.
2  BY MR. HEGARTY:
3      Q.   Doctor, please turn to page 35 of your lab
4  notebook, Exhibit 2.  At the top it should read
5  RNA Concentration.  Is that correct?
6      A.   Correct.
7      Q.   Yes?
8      A.   Yes.
9      Q.   If you look over to the right-hand column
10 where it lists at the top 260 slash 230, do you see
11 that?
12     A.   The ratio?  Yes.
13     Q.   Yes, the ratio.  The normal ranges for the
14 260 to 230 ratio is 2.0 to 2.2, correct?
15     A.   Not correct.
16     Q.   What is the normal ratio?
17     A.   We don't look at 260, 230.  We look at 260,
18 280.
19     Q.   Understood.  But I'm focusing on 260 and
20 230.
21     A.   I don't know.
22     Q.   What's the normal ratio?
23     A.   I don't know.  It doesn't mean anything.
24     Q.   What doesn't mean anything?
25     A.   The 230.  What we look at is the 260, 280

Page 469

1  ratio.
2      Q.   What's the normal ratio for 260 to 280?
3      A.   Around 2.
4      Q.   When you say around 2, what is the range?
5      A.   1.7, 1.8, 1.9, 2.
6      Q.   How about -- strike that.  Many are above
7  that range.  You have numbers is at 2.31, 2.25, 2.24.
8  Do you see that?
9      A.   I do.
10     Q.   Could that indicate -- could those values
11 indicate the presence of contaminants?
12     A.   No.
13     Q.   Why not?
14     A.   This is just indicate the -- the percentage
15 of degradation of RNA.  Nothing to do with
16 contamination.  The quality of the RNA and whether
17 there is DNA in there.
18     Q.   If you look back at Exhibit 26, that's the
19 abstract that we marked F dash 098.
20     A.   Um-hum.
21     Q.   I'm sorry.
22          MS. O'DELL:  Exhibit 26?
23 BY MR. HEGARTY:
24     Q.   I'm sorry.  We're looking at --
25     A.   The manuscript?

Page 470

1      Q.   Just a second.  We're looking -- I think I
2  gave you the SRI previously, the SRI abstract.  You
3  have that over there?
4      A.   CA-125?
5      Q.   Yes.  What's that marked as?
6      A.   CA-125, that's 25.
7      Q.   Okay.  If you look at Number 25, you report
8  there in the Method section that you treated for
9  purposes of your CA-125 cells with a thousand
10 micrograms per milliliter of talc for 72 hours; is that
11 correct?
12          MS. O'DELL:  Give me just a minute,
13 because you didn't give me a copy of that exhibit, so I
14 need to pull it up.  Would you repeat the question,
15 please?
16 BY MR. HEGARTY:
17     Q.   Do you need the question repeated, Doctor?
18     A.   Please.
19          MS. O'DELL:  I need the question
20 repeated.
21 BY MR. HEGARTY:
22     Q.   Doctor, in the Method section --
23          MS. O'DELL:  I don't have access to
24 it real time, so if you'll give me a moment to hear the
25 question.

Ghassan Saed, Ph.D.

Page 471

1     MR. LAPINSKI:  Miss Court Reporter,
2 could you repeat the question back, please?
3     MR. HEGARTY:  Let me -- let me
4 restate it.
5 BY MR. HEGARTY:
6     Q.   Doctor, in the Method section for this
7 abstract, you report on treating primary normal
8 epithelial cells with or without a thousand micrograms
9 per milliliter of talc for 72 hours.  Is that what you
10 did?
11     MS. O'DELL:  Object to the form.
12     THE WITNESS:  Yes.
13 BY MR. HEGARTY:
14     Q.   Where is the data that you reported treating
15 for a thousand micrograms per milliliter of talc for
16 72 hours for the CA-125 test?
17     A.   Page 12 and 13.
18     Q.   Of which book?
19     A.   Two.
20     MS. O'DELL:  And that's
21 Exhibit 24.  Excuse me.  I apologize.  It's not
22 Exhibit 24.  It's --
23 BY MR. HEGARTY:
24     Q.   Can you show me that page, please?
25     A.   (The witness complies).

Page 472

1     MS. O'DELL:  It's Exhibit 25 -- 3,
2 excuse me.
3     THE WITNESS:  Thank you.
4 BY MR. HEGARTY:
5     Q.   You report that you used talc from
6 Sigma-Aldrich; is that correct?
7     A.   No.
8     Q.   Where did your talc come from?
9     A.   Fisher.  This is Fisher.  Sigma-Aldrich is
10 from the south cell line.
11     Q.   So that's a mistake, correct?
12     MS. O'DELL:  Object to the form.
13 BY MR. HEGARTY:
14     Q.   Is it a mistake?
15     A.   I think this was trying to refer to ATCC
16 cells, where we got them from, the cell lines that we
17 used.
18     Q.   In the Conclusion section, you say that this
19 will provide a molecular basis to previous reports that
20 linked genital use of talcum powder to increased risk
21 of epithelial ovarian cancer.  Do you see where I'm
22 reading?
23     A.   Yes.
24     Q.   How will those results -- or how did those
25 results provide a molecular basis to previous reports

Page 473

1 that linked genital use of talcum powder to increased
2 risk of epithelial ovarian cancer?
3     A.   So when a substance induces CA-125, CA-125
4 is a marker for inflammation.  If a substance is able
5 to induce a marker of inflammation, and we know that
6 inflammation in this specific marker is a marker for
7 ovarian cancer, then we conclude that it is a molecular
8 basis to that.
9     Q.   Can you cite for me any studies correlating
10 elevations in CA-125 levels in patients who do not have
11 ovarian cancer to ovarian cancer risk?
12     MS. O'DELL:  Object to the form.
13     THE WITNESS:  Say that again,
14 please.
15 BY MR. HEGARTY:
16     Q.   Sure.  Can you cite for me any published
17 studies correlating elevations in CA-125 levels in
18 women who do not have ovarian cancer to ovarian
19 cancer -- to risk of ovarian cancer?
20     MS. O'DELL:  Object to the form.
21 BY MR. HEGARTY:
22     Q.   In other words, showing an association
23 between elevated CA-125 levels and the risk of ovarian
24 cancer?
25     A.   Yeah, yeah.

Page 474

1     MS. O'DELL:  Object to the form.
2     THE WITNESS:  I'm not -- I'm not --
3 this is not my specialty.  I would defer this to an
4 OB/GYN oncologist.  But what I know, my interest here,
5 anything that induces inflammation is what I'm
6 interested in.  In my mind, anything that induces
7 inflammation is associated with increased risk based on
8 the data that we've shown.
9 BY MR. HEGARTY:
10     Q.   Can you cite for me any published studies
11 correlating increased levels of CA-125 with ovarian
12 cancer risk?
13     MS. O'DELL:  Objection, asked and
14 answered.
15     THE WITNESS:  It is correlated
16 with -- with inflammation, it's correlated with the
17 pathogenesis of ovarian cancer.
18 BY MR. HEGARTY:
19     Q.   Can you cite for me any studies that say
20 that?
21     A.   Pathogenesis?
22     Q.   No, that it's correlated with inflammation?
23     MS. O'DELL:  Object to form.
24     THE WITNESS:  I'm talking about
25 inflammation --

33 (Pages 471 to 474)

Ghassan Saed, Ph.D.

Page 475

1  BY MR. HEGARTY:
2      Q.   Correct.
3      A.   -- not CA-125.  As I told you, CA-125 I'm
4  not an expert in.  This for a -- I defer this to an
5  oncologist -- OB/GYN oncologist.  But what I'm saying
6  is very clear.  Anything that induces inflammation, and
7  specifically inflammation that is linked to pathogens
8  is ovarian cancer.
9      Q.   For this abstract, did you include any
10 conflict of interest disclosure?
11     A.   What abstract is this?
12     Q.   The abstract Number 25, Exhibit Number 25.
13     A.   You don't need to include any conflict of
14 interest for any SRI abstract.
15     Q.   Okay.  Next, would you find Exhibit 26,
16 which we previously marked as -- which is the F-098
17 abstract?  It was previously marked as 26.
18     A.   I don't have it.
19     Q.   I just saw it there I think.
20     A.   Where?
21     Q.   Right there.
22     A.   Sorry.
23     Q.   In the Method section of that abstract, you
24 again report using talc from Sigma-Aldrich; is that
25 correct?

Page 476

1      A.   Again --
2          MS. O'DELL:  Object to form.
3          THE WITNESS:  -- this refers to the
4  cell lines.  The talc we used for this abstract was
5  from Fisher.
6  BY MR. HEGARTY:
7      Q.   There's a reference from using a cell line
8  MDAH dash 2774.  Do you see that?
9      A.   Using MDAH-2774.
10     Q.   Yes.
11     A.   Yes.
12     Q.   Why did you not use that cell line for your
13 manuscript?
14     A.   Which one we used for the manuscript, let me
15 see.  Oh, we used A2780 instead.  I think that was not
16 available when we did the manuscript.  This is 2017
17 work.
18     Q.   Did you include a -- a conflict of interest
19 disclosure with this manuscript, F dash 098?
20         MS. O'DELL:  Object to form.
21         THE WITNESS:  That's not a
22 manuscript.
23 BY MR. HEGARTY:
24     Q.   I'm sorry.
25     A.   That's an abstract.

Page 477

1      Q.   Fair point.  Did you include a conflict of
2  interest disclosure with this abstract?
3      A.   This is SRI?
4      Q.   Correct.
5      A.   They do not require that.
6      Q.   I'm sorry.  This is Reproductive Sciences.
7      A.   SRI.
8  DEPOSITION EXHIBIT 28
9  Correspondence From the FTO
10 WAS MARKED BY THE REPORTER
11 FOR IDENTIFICATION
12 BY MR. HEGARTY:
13     Q.   I'm going to next mark as Exhibit 28
14 correspondence from the FTO regarding the 50th Annual
15 Meeting on Women's Cancer in March 2019.  Do you see
16 that?
17     A.   This is -- this is the -- the poster work we
18 are going to present in Honolulu, yes.
19         MS. O'DELL:  I think you said 2019.
20         THE WITNESS:  Yeah.
21         MS. O'DELL:  But I want to be clear
22 on what the question is.
23 BY MR. HEGARTY:
24     Q.   Have you prepared that poster?
25     A.   It's a March 16, 2019.

Page 478

1      Q.   Right.  Have you prepared that poster?
2      A.   Yes.
3      Q.   Do you have a copy of it?
4      A.   No.
5      Q.   Well, I asked you if you prepared it, and
6  you said yes.
7      A.   Yeah, Amy prepared it, Dr. Harper.
8      Q.   Did -- did Amy prepare a poster for this
9  meeting?
10     A.   I said yes.
11     Q.   And do you have a copy of it in your office?
12     A.   Here now?
13     Q.   Here now.
14     A.   Here now, no.
15     Q.   Do you have a copy in your office?
16     A.   Do I have a copy in my office?  Yes.
17     Q.   This presentation is to be about --
18     A.   It's not -- for the record, the copy is not
19 complete yet.
20     Q.   This presentation is for your manuscript; is
21 that correct?
22         MS. O'DELL:  Object to the form.
23         THE WITNESS:  Not correct.
24 BY MR. HEGARTY:
25     Q.   What is it for?

34 (Pages 475 to 478)

Ghassan Saed, Ph.D.

Page 479

1    A.   It's -- this is only for the -- if I
2  remember correctly, this is only for the -- the SNP
3  analysis.
4    Q.   The SNP analysis that's reported in your
5  manuscript?
6    A.   Correct.  Part of the manuscript.
7    Q.   And Dr. Harper is planning to present at
8  this meeting?
9    A.   Correct.
10   DEPOSITION EXHIBIT 29
11   Correspondence Regarding SGO Meeting
12   WAS MARKED BY THE REPORTER
13   FOR IDENTIFICATION
14 BY MR. HEGARTY:
15   Q.   I'm going to next mark as Exhibit 29 another
16  document we've been provided, which is correspondence
17  regarding the same SGO meeting; is that correct?
18   A.   For submission for the abstract, yes.
19   Q.   This is an e-mail from Lynette Kelley dated
20  January 29, 2019?
21   A.   Correct.
22   Q.   This e-mail refers to your inquiry
23  on the completed disclosure.  Do you see that first
24  line?
25   A.   I do.

Page 480

1    Q.   Where is the disclosure that you provided?
2    A.   Where is the disclosure?
3    Q.   Well, this indicates you provided to SGO a
4  disclosure; is that correct?
5    A.   It is online.
6    Q.   The e-mail says, notes since you have no
7  financial ties with the commercial entity, there is
8  nothing for you to disclose.  Do you see where I'm
9  reading?
10   A.   I do.
11   Q.   Do you know what she means by that
12  statement?
13   A.   Yes.  Because in the disclosure form it says
14  if you have a conflict of interest, yes or no, and it
15  indicates specifically that -- that what they like to
16  see in the conflict of interest is a commercial --
17  financial interest from commercial companies that they
18  are working with you to develop drugs or to develop
19  products.  I told them about Beasley Allen
20  specifically, and they said no, you don't have to,
21  that's not a conflict of interest.
22   Q.   When you -- when you say you told them, you
23  talked about you told Lynette Kelly?
24   A.   Yeah, yes, I talked to her.
25   Q.   This is what she's referring to when she

Page 481

1  says regarding your inquiry?
2    A.   Correct.  I picked up the phone and I called
3  her to confirm it.
4    DEPOSITION EXHIBIT 30
5    Correspondence Regarding the 50th
6    Annual SGO Meeting
7    WAS MARKED BY THE REPORTER
8    FOR IDENTIFICATION
9  BY MR. HEGARTY:
10   Q.   I'm next marking as Exhibit 30 --
11   A.   I'm sorry.
12   Q.   -- further correspondence regarding the
13  50th Annual HGO meeting -- SGO meeting.  Do you see
14  that, Doctor?
15   A.   Yes.  That's to Amy, yes.
16   Q.   This correspondence dates back to
17  September 12th, 2018, correct?
18   A.   It says so, yes.
19   Q.   Are you a member of SGO?
20   A.   Yes.
21   DEPOSITION EXHIBIT 31
22   Correspondence to Ms. Thompson at
23   Beasley Allen Regarding an SGO Abstract
24   WAS MARKED BY THE REPORTER
25   FOR IDENTIFICATION

Page 482

1  BY MR. HEGARTY:
2    Q.   I've next marked as Exhibit 31
3  correspondence from you to Ms. Thompson at
4  Beasley Allen regarding an SGO abstract, correct?
5    A.   What is this?
6    Q.   At the very top it says, Subject, SGO
7  Abstract.
8    A.   SGO Abstract.  I see it written, but
9  I'm trying to remember what -- which one is
10  this.
11   Q.   Well, is this the abstract for the SGO
12  meeting?
13   A.   Is it?  I don't know.  I can't remember.
14  Let's see.  Do you have the abstract for the SGO
15  meeting?
16   Q.   This is all we have, Doctor.
17   A.   We have an abstract.  This is missing.  Do
18  we -- oh, oh, sorry.  It's right here.  Okay.  What
19  about this?
20   Q.   Why did you communicate with Ms. Thompson
21  regarding this abstract?
22   A.   Why not?  I work for them.  They -- they pay
23  for my time.
24      MS. O'DELL:  Excuse me, wait a
25  minute.

35 (Pages 479 to 482)

Ghassan Saed, Ph.D.

Page 483

1      THE WITNESS:  What's wrong?
2      MS. O'DELL:  Object to any inquiry
3  that relates to communications with counsel, so I
4  instruct you not to divulge communications with
5  counsel.
6      MR. LAPINSKI:  Let me see that.
7  BY MR. HEGARTY:
8      Q.   At the very end of the abstract,
9  Doctor --
10     A.   Here?
11     Q.   -- Exhibit 31, where it talks about the
12 first presenting author, it says, will not be
13 published.  What does that mean?
14     A.   I don't know.
15     Q.   Okay.  You do intend to publish part of this
16 data, correct?
17     A.   This is already accepted and published.
18     Q.   So why is she saying that --
19     A.   Who is "she"?  I don't know where this is
20 coming from.
21     Q.   Let me finish my question.  Why does it say
22 will not be published?
23     A.   Hold on one second.  Abstract -- this is
24 from me -- I have no idea why it says that, because we
25 submitted it and it's accepted.  It's published.  When

Page 484

1  it's accepted, it's published.
2      Q.   Dr. Harper is a fellow; is that correct?
3      A.   Oh, now I remember.  Yes, yes.
4      Q.   Okay.  You said you remember?
5      A.   Yeah, yeah.  You know where they -- I think,
6  I'm not quite sure, but I think when they have the
7  e-mail where they say confidential, whatever, whatever,
8  I think that's part of it.
9           You know, some e-mails they have
10 everything in this e-mail is confidential, and it's
11 like -- it reads like that, but maybe this is part of
12 it.  I don't know what the answer is.  But it is going
13 to be published.  It is already accepted, and it's
14 going to be presented.
15      DEPOSITION EXHIBIT 32
16      Abstract Submission to the 66th Annual
17      Scientific Meeting For the Society of
18      Reproductive Investigation in Paris March
19      2019
20      WAS MARKED BY THE REPORTER
21      FOR IDENTIFICATION
22 BY MR. HEGARTY:
23      Q.   Next I've marked as Exhibit 32 an abstract
24 submission to the 66th Annual Scientific Meeting for
25 the Society of Reproductive Investigation in Paris in

Page 485

1  March 2019, correct?
2      A.   Correct.
3      Q.   For what study does this relate to?
4      A.   This -- this particular one, Talcum Powder
5  Enhances Key Mechanism of Ovarian Cancer, Development
6  and Progression.
7      Q.   Is this the same subject as your
8  manuscript?
9      A.   Part of it, yes.
10     Q.   Has this been accepted?
11     A.   Yes, and I'm going to present it.
12     Q.   Has there been any further communication
13 with this group about this presentation, beyond what we
14 look at here?
15     A.   This group who?  SRI?
16     Q.   The SRI?
17     A.   No.  We just get an acceptance letter.
18     Q.   Have you prepared the abstract yet?
19     A.   Not yet.  You mean the poster?
20     Q.   Well, the poster or the abstract?
21     A.   That's already been submitted.
22     Q.   Do you have a copy of the abstract?
23     A.   You should have it somewhere.  It's an
24 abstract.
25     Q.   Well, I don't think we do, but you think

Page 486

1  there is a copy of the abstract?
2      A.   What we submitted to SRI, I think you should
3  have a copy.  You should have a copy, yeah.  But it's
4  accepted.
5      Q.   Next I want to ask you about this -- this
6  document we initially -- we already marked, which is
7  the submission of a manuscript to Gynecologic Oncology.
8  Can you find that, please?
9           MS. O'DELL:  Exhibit 27?
10          MR. HEGARTY:  Exhibit 27.
11          THE WITNESS:  Okay.
12 BY MR. HEGARTY:
13     Q.   This submission includes at the bottom,
14 suggested reviewers.  Do you see that?
15     A.   Yes.
16     Q.   Were -- are these reviewers you suggested?
17     A.   Yes.  They ask you to.
18     Q.   Have you communicated with these reviewers
19 about your manuscript?
20     A.   No.
21     Q.   If you turn to the -- turn to page 13 of
22 this -- of the manuscript, please.
23     A.   References?
24     Q.   No, at the top, conflict of interest.  You
25 reported that you have no conflict of interest to

36 (Pages 483 to 486)

Ghassan Saed, Ph.D.

Page 487

1  disclose -- to declare; is that correct?
2      A.   Correct.
3      Q.   So there you made no reference to your
4  serving as a consulting expert for Plaintiffs in the
5  talc litigation, correct?
6      A.   We didn't think we needed to do it.
7      Q.   Why did you think you didn't need to?
8      A.   I -- because we don't think that this is a
9  commercial conflict of interest because I did the
10  work in my lab, and I paid for it from my discretion
11  fund, and everything from that, it's another paper for
12  me, and I'm not gaining any special financial interest
13  from it, other than it looks like any other paper I
14  have.
15      Q.   This manuscript reported results for
16  48 hours.  Why did you change from 48 hours to
17  reporting 72 hours?
18      A.   Yeah.  You asked me this question
19  previously, and I told you every 48 hours will be
20  corrected to 72 hours.
21      Q.   So in the manuscript -- so in this
22  manuscript submission, the reference to 48 should be
23  to 72?
24      A.   We fixed it in the SRI manuscript to
25  72 hours.  All the work was done at 72 hours.

Page 488

1      DEPOSITION EXHIBIT 33
2      Notification of Submission to
3      Gynecologic Oncology
4      WAS MARKED BY THE REPORTER
5      FOR IDENTIFICATION
6          MS. O'DELL:  Did you put a number on
7  that?
8          MR. HEGARTY:  Yes.
9  BY MR. HEGARTY:
10      Q.   I've next marked as Exhibit 33 the
11  notification of your submission to Gynecologic
12  Oncology, correct?
13      A.   Correct.
14      DEPOSITION EXHIBIT 34
15      Notification From Gynecologic Oncology
16      WAS MARKED BY THE REPORTER
17      FOR IDENTIFICATION
18          MS. O'DELL:  Did you just mark
19  another exhibit?
20          MR. HEGARTY:  Yes.
21  BY MR. HEGARTY:
22      Q.   I've next marked as Exhibit Number 34 a
23  notification you received from Gynecologic Oncology
24  where you get your -- your paper was assigned a
25  manuscript number; is that correct?

Page 489

1      A.   Which one are you talking about?
2      Q.   34.
3      A.   Yes.  It's an automated e-mail.  Yes, what
4  about it?
5      Q.   This is just an -- this is an e-mail
6  advising you that your manuscript has got a number,
7  correct?
8      A.   That's the same e-mail like this one.  I got
9  a number, yes.  Number --
10      DEPOSITION EXHIBIT 35
11      Final Decision, Rejection of Manuscript
12      WAS MARKED BY THE REPORTER
13      FOR IDENTIFICATION
14  BY MR. HEGARTY:
15      Q.   I've next marked as Exhibit Number 35 what's
16  entitled at the top Final Decision.  This is the
17  rejection of your manuscript by Gynecologic Oncology;
18  is that correct?
19      A.   This is the review results of my, yeah,
20  Gynecologic Oncology manuscript.
21      Q.   Included within this document are the
22  reviewer comments, correct?
23      A.   Correct.
24      Q.   Did you provide any response to the reviewer
25  comments?

Page 490

1      A.   No.  Response to this manuscript -- to this
2  journal?
3      Q.   Correct.
4      A.   No.
5      Q.   Was this the last communication you had with
6  Gynecologic Oncology regarding your manuscript?
7      A.   This is --
8      Q.   35?
9      A.   Yes.
10      DEPOSITION EXHIBIT 36
11      Manuscript to Reproductive Sciences,
12      Submission Date of January 3, 2019
13      WAS MARKED BY THE REPORTER
14      FOR IDENTIFICATION
15  BY MR. HEGARTY:
16      Q.   I've next marked as 36 a copy of your
17  manuscript we received from Plaintiffs' counsel last
18  week.  This is the manuscript to Reproductive Sciences
19  with a submission date at the very first page of
20  January 3, 2019, correct?
21      A.   Correct.
22      DEPOSITION EXHIBIT 37
23      Reproductive Sciences,
24      Submission Date of January 3, 2019
25      WAS MARKED BY THE REPORTER

Ghassan Saed, Ph.D.

Page 491

1      FOR IDENTIFICATION
2  BY MR. HEGARTY:
3      Q.  I've next marked as Exhibit 37 another
4  document we received from Plaintiffs' counsel last
5  week, which appears to be another copy of the same
6  document?
7      A.  Yes, it's the same.  They look the same.
8      DEPOSITION EXHIBIT 38
9      Manuscript with Submission Date
10     of October 10, 2018
11     WAS MARKED BY THE REPORTER
12     FOR IDENTIFICATION
13 BY MR. HEGARTY:
14     Q.  I'm marking next as Exhibit 38 a copy of a
15 document received late last night from Plaintiffs'
16 counsel, which appears to be a manuscript with a
17 submission date on the very first page of October 10,
18 2018.  Do you see that, Doctor?
19     A.  Yes, I do.
20     Q.  Does this -- does Exhibit 38 represent the
21 initial submission of your manuscript to Reproductive
22 Sciences?
23     A.  Correct.
24     Q.  Did you submit this manuscript with any type
25 of cover letter?

Page 492

1      A.  I think so, yes.  You should have it.
2      Q.  You think there is a cover letter?
3      A.  Yes.
4      Q.  I've not seen that cover letter, so I don't
5  think we have it.
6          MS. O'DELL:  I don't have it.
7          THE WITNESS:  No?  This is --
8  BY MR. HEGARTY:
9      Q.  If you would turn over to page 13 of this
10 document.
11     A.  Can you give me one minute -- one second,
12 please?
13     Q.  Sure, go ahead.
14     A.  I just want to see.  I'm not sure.  I can't
15 remember.  Actually, Dr. Harper submitted this, so I
16 don't remember.  I'll take my answer.
17     Q.  How can you tell that Dr. Harper submitted
18 this?
19     A.  Because I instructed her -- I instructed her
20 to do so.
21     Q.  Do you know whether she included a cover
22 letter?
23     A.  That's what I'm saying, I'm not sure.
24     Q.  If you turn over to page 13 of Exhibit 38,
25 please.

Page 493

1      A.  Page 13?
2      Q.  Correct.
3      A.  Okay.
4      Q.  If you look at the conflict of interest
5  section, you state, the authors declare that there is
6  no conflicts of interest, correct?
7      A.  That's what it says, yes.
8      Q.  But in your current manuscript, you do
9  disclose a conflict of interest.  Why did you change
10 between your initial submission and your current
11 version?
12     A.  Yeah.  This was submitted by Dr. Harper, and
13 when this -- the manuscript came back with -- with the
14 revisions, I revised it according to the reviewer
15 comments, and I noticed that there is a mistake in the
16 conflict of interest, I added it, because we really
17 don't believe that we have a conflict of interest.
18 That's the idea.
19     Q.  When you say we, who are you talking about?
20     A.  The lab, our lab.  We don't believe, because
21 we -- this is lab work from our lab, financed by our
22 lab.
23     DEPOSITION EXHIBIT 39
24     Correspondence with Reproductive Sciences
25     Regarding Manuscript

Page 494

1      WAS MARKED BY THE REPORTER
2      FOR IDENTIFICATION
3  BY MR. HEGARTY:
4      Q.  I'm next marking as Exhibit 39 --
5          MS. O'DELL:  I'm sorry, could you
6  pass one this way?  These are --
7  BY MR. HEGARTY:
8      Q.  -- a copy of correspondence with
9  Reproductive Sciences regarding your manuscript,
10 correct?
11     A.  Yes.
12     DEPOSITION EXHIBIT 40
13     Response to Reviewer Comments
14     WAS MARKED BY THE REPORTER
15     FOR IDENTIFICATION
16 BY MR. HEGARTY:
17     Q.  I'm going to next mark as Exhibit 40 a copy
18 of another document received late last night.  Would
19 you tell me what Exhibit 40 is?
20         MR. HEGARTY:  I'm not going to give
21 you a copy, since you gave it to us late last night,
22 and I only have two copies.
23         THE WITNESS:  So this is the --
24         MS. O'DELL:  Why don't you let me
25 see it first so --

38 (Pages 491 to 494)

Ghassan Saed, Ph.D.

Page 495

1    THE WITNESS:  Yeah, this is my
2  response.
3  BY MR. HEGARTY:
4    Q.   Your response to their comments?
5    A.   To the -- to the reviewer comments.
6    Q.   Is this the only response that you prepared
7  to the reviewer comments?
8    A.   Correct.
9    MS. O'DELL:  Other than the
10  resubmitted manuscript, which he's testified to?
11    THE WITNESS:  Yeah, that's the
12  response, yes.
13    DEPOSITION EXHIBIT 41
14    Correspondence with Reproductive Sciences
15    Regarding Manuscript
16    WAS MARKED BY THE REPORTER
17    FOR IDENTIFICATION
18  BY MR. HEGARTY:
19    Q.   I've marked next as Exhibit 41 additional
20  correspondence you had with Reproductive Sciences
21  regarding your manuscript, correct?
22    A.   They sent me this e-mail, yes.  This is an
23  automated e-mail sent to everybody.
24    DEPOSITION EXHIBIT 42
25    Chart of SNP Data

Page 496

1    WAS MARKED BY THE REPORTER
2    FOR IDENTIFICATION
3  BY MR. HEGARTY:
4    Q.   I'm marking next as Exhibit 42 a chart we
5  were provided by counsel for Plaintiffs.  What is this
6  chart?
7    A.   This is the SNP data.
8    Q.   The SNP data for your manuscript?
9    A.   For my -- for my manuscript, and for the
10  poster that we're going to submit, to -- to present.
11    DEPOSITION EXHIBIT 43
12    E-Mail from Sharon Pepe
13    WAS MARKED BY THE REPORTER
14    FOR IDENTIFICATION
15  BY MR. HEGARTY:
16    Q.   I've marked -- marking next as Exhibit 43 a
17  copy we received last time at your deposition, which is
18  an e-mail from Sharon Pepe regarding the cost of your
19  testing, your experiments, correct?
20    A.   Correct.
21    DEPOSITION EXHIBIT 44
22    The Role of Talc Powder Exposure in Ovarian
23    Cancer, Mechanistic Approach
24    WAS MARKED BY THE REPORTER
25    FOR IDENTIFICATION

Page 497

1  BY MR. HEGARTY:
2    Q.   I've marked next as Exhibit 44 a document
3  titled, The Role of Talc Powder Exposure in Ovarian
4  Cancer, Mechanistic Approach.  Do you see that?
5    A.   Yes.
6    Q.   Is this the budget document you mentioned at
7  your last deposition?
8    A.   Yes.
9    Q.   Who prepared this?
10    A.   I did.
11    Q.   When was it prepared?
12    A.   September.  Middle of September.
13    Q.   Of 2018?
14    A.   '17.
15    Q.   Of 2017.  Why did you prepare this?
16    A.   To see how much this project would cost me
17  if I want to do it.
18    Q.   Was this document requested by someone?
19    A.   No.
20    Q.   Did someone ask you to prepare it?
21    A.   No.
22    Q.   Who did you prepare this for?
23    A.   For me, for my lab.
24    Q.   Did you give this document to anybody?
25    A.   This document, I gave it to Beasley Allen.

Page 498

1    Q.   Would you turn to the second page of this
2  document, please?  With regard to Aim I, did you
3  perform the tests described in Aim I?
4    A.   It was just a proposal.
5    Q.   Did you actually perform the tests?
6    A.   No.  My -- that was my plan, my thinking.
7    Q.   Your initial thinking said you -- strike
8  that.  You noted with regard to Aim I that you intended
9  to expose cells to increasing doses of talc of 100, 200
10  and 500, correct?
11    A.   That's what it says.
12    Q.   You also noted that you intended to test a
13  number of markers.  When you ultimately did your
14  manuscript, you did not test NADPH, Nox2 and Nox4, GST
15  and 8-OHdG.  Why did you not do those tests --
16    MS. O'DELL:  Object to form.
17    THE WITNESS:  I think the
18  activity --
19  BY MR. HEGARTY:
20    Q.   Other than GST?
21    A.   Yeah.
22    Q.   Why did you not do the others?
23    A.   Financial.  I mean, they're all the same.
24  If you do one, so maybe enough to do -- you don't have
25  to do all the oxidated stress marker.  You can pick the

Ghassan Saed, Ph.D.

Page 499

1  most key one, and it's financial basically.
2      Q.   What was your methodology for picking the
3  markers that you did?
4      A.   The one we published most with, the
5  technology available.
6      Q.   Have you not published on any -- on NA --
7  NADPH, Nox2 and Nox4 and 8-OHdG?
8          MS. O'DELL:  Object to form.
9          THE WITNESS:  We -- we did publish
10  some paper with NADPH oxidase, yes.
11  BY MR. HEGARTY:
12     Q.   Why did you not include that marker?
13     A.   As I said, financial.
14     Q.   When you say financial, what do you mean?
15     A.   Money, cost.
16     Q.   It costs more to include it?
17     A.   It costs more to include it.
18     Q.   Is there some publication where you can go
19  to, to determine what the key markers are to do in a
20  test like this?
21          MS. O'DELL:  Object to the form.
22          THE WITNESS:  It's a practice in our
23  lab that we use pro-oxidant as myeloperoxidase, iNOS,
24  nitrite, nitrate, and anti-oxidant as SOD, catalase,
25  and glutathiones.  So just a normal -- it's a -- it's

Page 500

1  a -- a practice that we use in the lab.
2  BY MR. HEGARTY:
3      Q.   If you look at the very end of part -- end
4  of the part of Aim I, it says, we hope to accomplish
5  this aim by October 10th in order to submit our
6  findings to our premier society, Society of
7  Reproductive Investigation, SRI.  Do you see that?
8      A.   Yes.
9      Q.   You did ultimately submit some findings to
10  SRI, correct?
11     A.   Correct.
12     Q.   The -- the description below the text says
13  the estimated time to execute this aim is four weeks.
14  Do you see that?
15     A.   Where do you see that?
16     Q.   (Gesturing).
17     A.   Yes.
18     Q.   You did do some of the tests that are
19  described in Aim I, correct?
20     A.   When?
21     Q.   You did some of the tests described with
22  different dosages that you talk about in Aim I,
23  correct?
24     A.   Right, but when?  When are you referring to?
25     Q.   At any point in time?

Page 501

1      A.   After this?
2      Q.   After this.
3      A.   Yes.
4          MS. O'DELL:  Object to the form.
5          THE WITNESS:  That's what we
6  submitted to SRI.
7  BY MR. HEGARTY:
8      Q.   And how much time -- total time did it take
9  to execute what you eventually did do?
10     A.   I cannot remember.
11          MS. O'DELL:  Object to the form.
12          THE WITNESS:  I cannot remember.
13  BY MR. HEGARTY:
14     Q.   If you look at Aim II, do you see that?
15     A.   Yes.
16     Q.   If you turn over to the next page over, the
17  carryover paragraph on the next page at the top --
18     A.   Yes.
19     Q.   -- you report the intent to look at a number
20  of SNPs, and then you list those that include SNPs for
21  BRCA1 and BRCA2.  Do you see that?
22     A.   I do, correct.
23     Q.   You did not do those tests, correct?
24     A.   Correct.
25     Q.   Why not?

Page 502

1      A.   Expenses.
2      Q.   When you say expenses, were you told not to
3  do them by somebody?
4      A.   Told, no.  This is just more money to do it.
5  And -- and unnecessary to do it.
6      Q.   Why did you propose to do it in the first
7  place?
8      A.   Because if you have -- if I have to choose
9  between oxidative -- BRCA1 and BRCA2 are not oxidative
10  stress markers.  They're just -- they can have clinical
11  value when you interpret the data using patient with
12  BRCA1 mutation versus patient without BRCA1 mutation.
13     Q.   Why did you propose to do it in the first
14  place then?
15     A.   I just told you.
16     Q.   Why is that?
17     A.   Because when you interpret the data, okay,
18  some data -- some response of patients with
19  BRCA1 negative versus BRCA1 positive, they're
20  different outcome.  So this will help in interpret the
21  data.
22     Q.   The reason you didn't test those SNPs was
23  because of expense, correct?
24     A.   Yes.
25          MS. O'DELL:  Object to the form.

Ghassan Saed, Ph.D.

Page 503

1  BY MR. HEGARTY:
2      Q.   If you look at Aim III --
3      A.   You're talking about BRCA1?
4      Q.   I'm talking about BRCA1 and BRCA2.
5      A.   Yes.
6      Q.   If you look at Aim III, none of those
7  tests -- strike that.  Under Aim III, you have done
8  none of those tests, correct?
9      A.   Not correct.
10     Q.   Well, the Aim III includes looking
11 at normal ovarian epithelial cell lines treated
12 with talc that will be washed and suspended in agar
13 at 500 cells per well and layered on a top of a base of
14 20 percent agar in a 96 well plate.  Did you do that
15 test?
16     A.   No.
17     Q.   Why did you not do that test?
18     A.   What's the right word.  Expense.  Is that
19 the word.
20     Q.   Did you do any of the tests described in
21 Aim III?
22     A.   Yes, I did.
23     Q.   For purpose of your manuscript?
24     A.   Yes, I did.
25     Q.   Which one?

Page 504

1      A.   Apoptosis and proliferation.
2      Q.   Where is that described?
3      A.   Apoptosis, all the way down.
4          MR. LAPINSKI:  Dr. Saed, just make
5  sure you keep your voice up.
6          THE WITNESS:  Oh, sorry.  All the
7  way down.
8  BY MR. HEGARTY:
9      Q.   Show me where.
10     A.   In bold, you see it, apoptosis.
11     Q.   But isn't -- but aren't the -- isn't the
12 analysis of apoptosis to be taken from the cells
13 suspended in agar?
14     A.   No.
15         MS. O'DELL:  Object to form.
16 BY MR. HEGARTY:
17     Q.   Where do you describe in Aim III the testing
18 that you said you did for apoptosis?
19         MS. O'DELL:  Object to form.
20         THE WITNESS:  We're -- yes.  We're
21 really confusing the questions.  Okay.  One at a time.
22 Which one you want me to answer first?
23 BY MR. HEGARTY:
24     Q.   Well, let me --
25     A.   Yes, please.

Page 505

1      Q.   -- let me make sure that I'm clear.  You're
2  describing here evaluating apoptosis using cells in
3  agar, correct?
4          MS. O'DELL:  Object to the form.
5          THE WITNESS:  This is a proposal.  I
6  don't have to do everything I said in the proposal,
7  okay.  I -- I propose to do transformation assays, and
8  then after I do the transformation assays, I will do
9  apoptosis.  That's what I propose to do.
10 BY MR. HEGARTY:
11     Q.   You did --
12     A.   But I did --
13     Q.   I'm sorry.  Go ahead.
14     A.   But I did -- I did apoptosis because I don't
15 want to go through all the expenses doing all this
16 experiment, and the normal ovarian primary -- primary
17 normal ovarian cells are very, very limited, very hard
18 to grow, so it takes more money, more time, more effort
19 to grow them and to do them, and you cannot do this
20 test with immortalized.
21     Q.   You did not evaluate in your manuscript
22 apoptosis using the method described in Aim III,
23 correct?
24         MS. O'DELL:  Object to the form.
25         THE WITNESS:  One question again,

Page 506

1  I'm sorry.
2  BY MR. HEGARTY:
3      Q.   Doctor --
4      A.   I don't understand what you're saying.
5      Q.   You describe in Aim III a method using cells
6  suspended in agar that -- from which you're going to
7  test for apoptosis, correct?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  Not correct.
10 BY MR. HEGARTY:
11     Q.   How is that not correct?
12     A.   This is a proposal.  Again, this is a
13 proposal to do.  My proposal was to take normal
14 epithelial cells primary to that assay and look for
15 transformation and then check for apoptosis in --
16 period.  In my manuscript, I chose to do apoptosis on
17 the immortalized cells treated with the talc powder.
18 Does that make sense?
19     Q.   You chose to do a different method to
20 evaluate apoptosis?
21     A.   No, I did not say that.
22     Q.   Well, this method says you were going to
23 extract samples from the cells suspended in agar and
24 test those for apoptosis, correct?
25     A.   I didn't do this in my manuscript.  Is that

Ghassan Saed, Ph.D.

Page 507

1    what you're saying?
2        Q.    Yes.
3        A.    No, I did not.
4        Q.    Okay.  That was my question.
5        A.    I did apoptosis part of it.
6        Q.    Understood.
7        A.    In a different cell line.
8        Q.    Correct.
9        A.    Yes, thank you.  I like that.
10       Q.    Now, this -- the test you described in
11   Aim I -- I'm sorry.  The test you described in Aim III
12   is a test to look for neoplastic transformation,
13   correct?
14              MS. O'DELL:  Object to the form.
15              THE WITNESS:  All of it, or just the
16   part of the agar and growing up the --
17   BY MR. HEGARTY:
18       Q.    Well, if you look at the aim, it says
19   exposure to talc results in neoplastic transformation
20   of normal ovarian surface epithelial cells.  Do you see
21   that in bold?
22       A.    I do.
23       Q.    That was the aim of this test, correct?
24       A.    Correct.
25       Q.    You were going to do this test and look to

Page 508

1    see whether there was neoplastic transformation of
2    normal ovarian surface epithelial cells, correct?
3              MS. O'DELL:  Object to the form.
4    There are multiple tests described in this paragraph.
5              THE WITNESS:  I don't -- we are
6    talking about something I didn't do.
7    BY MR. HEGARTY:
8        Q.    Understood.
9        A.    I proposed to do, but I didn't do.  It's
10   just a proposal.
11       Q.    Right.  You did not do any test to directly
12   look at neoplastic transformation of normal epithelial
13   cells, correct?
14       A.    Not correct.
15       Q.    How is that not correct?
16       A.    Because I did apoptosis and proliferation.
17       Q.    That's a -- those are different tests than
18   you describe here?
19              MS. O'DELL:  Object to the form.
20   BY MR. HEGARTY:
21       Q.    Correct?
22              MS. O'DELL:  Object to the form.
23              THE WITNESS:  Okay.  Let's make this
24   easy.  What test you are referring to?  Name me -- name
25   one test, please.

Page 509

1    BY MR. HEGARTY:
2        Q.    You purported to do this test --
3        A.    What's this test?
4        Q.    -- using the cells suspended in agar,
5    correct --
6              MS. O'DELL:  Object to form.
7    BY MR. HEGARTY:
8        Q.    -- in this proposal?
9        A.    That's not a test.  A test is something you
10   test.  This is growing cells.
11       Q.    You proposed to do tests from cells growing
12   in agar?
13       A.    What tests?
14              MS. O'DELL:  Object.
15              THE WITNESS:  I'm asking you what
16   tests you're asking me?
17   BY MR. HEGARTY:
18       Q.    The tests you described in this --
19       A.    What tests?  Tell me, what tests?
20       Q.    Doctor, can you read this piece of paper?
21       A.    I read it.  I am the one who wrote it.  I
22   know exactly what I wrote.
23       Q.    And you wanted to do these tests --
24       A.    What these tests?
25       Q.    -- because, as you say at the end, we expect

Page 510

1    that exposure of normal ovarian surface epithelial
2    cells to talc will result in neoplastic transformation
3    of these cells over time, which is critical in
4    establishing a cause-and-effect relationship.  You
5    wrote that, correct?
6              MS. O'DELL:  Object.  Object to the
7    form.
8              THE WITNESS:  What you read is from
9    here.  That is what I wrote.
10   BY MR. HEGARTY:
11       Q.    And you did not do the tests in Aim III?
12              MS. O'DELL:  Object to the form,
13   misrepresents what he just said.
14   BY MR. HEGARTY:
15       Q.    Correct?
16       A.    I just said, if you want -- okay.  If you
17   want, we can --
18              MS. O'DELL:  No, just be clear.
19              THE WITNESS:  -- spend more time.
20   I'm very clear.  I'm very clear.
21              MS. O'DELL:  Be clear in your
22   testimony.  Excuse me, Doctor.  He's asked you a very
23   confusing question.  I've objected to the form.  Be
24   clear on what --
25              THE WITNESS:  Okay.

42 (Pages 507 to 510)

Ghassan Saed, Ph.D.

Page 511

```
 1              MS. O'DELL:  -- your tests are that
 2   you performed.
 3              MR. HEGARTY:  Well, it's not very
 4   confusing.  It's only very confusing to the doctor
 5   because he obviously doesn't want to answer.
 6              THE WITNESS:  No, no, not at all.
 7   Not at all.
 8              MS. O'DELL:  That's -- that's really
 9   improper, and --
10              THE WITNESS:  I -- I would really
11   answer any question you want me to answer.
12              MS. O'DELL:  Fine.
13              THE WITNESS:  Ask me, please, any
14   questions you want.  What I'm trying to say, I don't
15   want to answer something I don't understand.  I'm
16   trying to ask you simple question, can you clarify your
17   question, say what tests you are referring to.  So that
18   is very simple question.  You're asking me what
19   tests --
20   BY MR. HEGARTY:
21        Q.   I agree.
22        A.   -- I wanted to do.  I'm asking you what you
23   are the tests you are looking -- you are talking about.
24        Q.   I agree, my questions have been very simple.
25   Doctor, did you did not perform the tests described in
```

Page 512

```
 1   Aim III, correct?  That was the question.
 2              MS. O'DELL:  Object to the form.
 3              THE WITNESS:  I did not perform all
 4   the tests here.  I performed part of it, which is
 5   apoptosis part.
 6   BY MR. HEGARTY:
 7        Q.   Using the test method you describe in
 8   Aim III?
 9              MS. O'DELL:  Object to the form.
10              THE WITNESS:  What test method?  You
11   see, that's where my concern is, what test method
12   you're talking about.
13   BY MR. HEGARTY:
14        Q.   The test method involving suspending cells
15   in agar.
16        A.   That's not a test method.
17        Q.   What is it?
18        A.   That's a culture.  We treat -- that's not a
19   treatment.  This is where you put cells this culture.
20        Q.   Did you do that for purposes of your
21   manuscript?
22        A.   No.
23        Q.   There's a reference at the -- in the third
24   line down to utilizing a neoplastic transformation
25   assay.
```

Page 513

```
 1        A.   What page is that?
 2        Q.   Same Aim III we've been long at.
 3        A.   27?  Are you talking about 27?
 4        Q.   Yes.
 5        A.   Reference 27.  Okay.
 6        Q.   Did you perform a neoplastic transformation
 7   assay for purpose of your manuscript?
 8        A.   Where is 27.  One more time, please.
 9        Q.   You described in this aim utilizing a
10   neoplastic transformation assay, correct?
11        A.   Yes.
12        Q.   Did you perform that assay for purposes of
13   your manuscript?
14        A.   No.
15        Q.   Turn over to the last page -- or second to
16   last page, which is Phase II.  Do you see that?
17        A.   Phase II.  General Methods.
18        Q.   Phase II.  Phase II will be the
19   S-nitrosylation of caspase-3 assay/apoptosis.  Do you
20   see that?
21        A.   I do.
22        Q.   Did you do that test?
23        A.   I did the S -- the caspase-3
24   assay/apoptosis, yes.
25        Q.   Did you do the -- did you do the
```

Page 514

```
 1   S-nitrosylation?
 2              MS. O'DELL:  Objection.
 3   BY MR. HEGARTY:
 4        Q.   Did you do the S-nitrosylation of caspase-3?
 5        A.   No.  We did the caspase-3 activity.
 6        Q.   Why did you not do the S-nitrosylation of
 7   caspase-3?
 8        A.   You want to do the S-nitrosylation of
 9   caspase-3 if you want to know the mechanism by
10   which caspase-3 is nitrosylated, and since we are not
11   doing the transformation, we're just doing it with
12   immortalized cell lines to figure out if talc has an
13   effect or not, then we just did the activity of
14   caspase-3.  S-nitrosylation of caspase-3 affect
15   caspase-3 activity, so it's an incorrect method.
16              MR. HEGARTY:  Let's take a quick
17   break.
18              THE VIDEOGRAPHER:  We're going off
19   the record, the time is 12:08.
20              (There was a recess taken.)
21              THE VIDEOGRAPHER:  We're back on the
22   record at 12:26.
23        DEPOSITION EXHIBIT 45
24        Form B
25        WAS MARKED BY THE REPORTER
```

43 (Pages 511 to 514)

Ghassan Saed, Ph.D.

Page 515

1    FOR IDENTIFICATION
2  BY MR. HEGARTY:
3     Q.   I've marked next as Exhibit 45 a copy of
4  a document we were provided by Plaintiffs' counsel
5  last week that has Form B at the top.  Doctor, what is
6  Form B?
7     A.   This is the disclosure of consulting for
8  Wayne State University for faculty.
9     Q.   This is a form you prepared?
10    A.   This is the form they give us to fill out.
11    Q.   You filled out Exhibit 45?
12    A.   I did.
13    Q.   You reported in Exhibit 45 for 2018 your
14 consultation work at four hours every Friday; is that
15 correct?
16    A.   Correct.
17    Q.   Does that accurately describe the amount of
18 time and when you spent that time consulting in 2018?
19         MS. O'DELL:  Object to the form.
20         THE WITNESS:  No.  So this is only
21 included the consultation we have half a day a week,
22 from 9:00 to 5:00 during business hours, 9:00 to
23 5:00 --
24         MS. O'DELL:  Excuse me.
25         THE WITNESS:  -- Monday through

Page 516

1  Friday.  After hours, after 5:00, weekends are not
2  included here.  This is just the official time of the
3  university.
4  BY MR. HEGARTY:
5     Q.   So what you list here is every Friday
6  between 9:00 and 5:00 you've averaged four hours of
7  consultation?
8     A.   I have --
9         MS. O'DELL:  Object to the form.
10        THE WITNESS:  I have half a day
11 deducted from my 9:00 to 5:00 obligation to the
12 university, and then --
13 BY MR. HEGARTY:
14    Q.   And as -- I'm sorry.
15    A.   -- I can work extra.
16    Q.   You don't have to report that working extra?
17    A.   To the university?
18    Q.   To the university?
19    A.   No.
20    Q.   When you say description of consulting
21 owner, what does that mean?
22    A.   The owner of the DS Biotech.
23    Q.   Does the agency, though, refer to who you're
24 consulting for?
25        MS. O'DELL:  Object to the form.

Page 517

1         THE WITNESS:  I don't understand the
2  question.
3  BY MR. HEGARTY:
4     Q.   Well, shouldn't you describe under Agency
5  the entity for whom you're consulting?
6     A.   Not necessarily.
7     Q.   Well, you're not -- you're -- in this -- for
8  this litigation, you're consulting with Beasley Allen,
9  correct?
10    A.   Correct.
11    Q.   Why didn't you identify Beasley Allen under
12 Agency?
13    A.   Unnecessary to do because the consultation
14 with Beasley Allen were done -- was done under the
15 DS Biotech.
16    Q.   Some of the consulting that you did for
17 Beasley Allen was during the week, though, correct,
18 during that half day a week?
19    A.   Friday, yes.  I'm allowed to do half a day
20 week.
21    Q.   Your interpretation of the word agency would
22 be to identify your company that you consult with as
23 opposed to who you're consulting with?
24    A.   That's what I was advised to do by Faculty
25 Affair.

Page 518

1     Q.   Who advised you to do that?
2     A.   Faculty Affair.
3     Q.   Who is that?
4     A.   You have the e-mail right there.
5     Q.   Okay.  We'll jump to that e-mail.
6  DEPOSITION EXHIBIT 46
7  E-Mail with Advice Regarding Form B
8  WAS MARKED BY THE REPORTER
9  FOR IDENTIFICATION
10 BY MR. HEGARTY:
11    Q.   I've marked as Exhibit 46 the e-mail the
12 doctor pointed in follow-up to -- or in connection with
13 an answer he gave to a question as far as how he was
14 advised to fill out Form B.  Can you tell me about that
15 advice as -- as it pertains to Exhibit 46?
16    A.   Yes.  That's what I consulted with them,
17 that I -- I did not need to itemize what companies
18 under the DS Biotech I consulted with.  They don't
19 care.  They just want DS Biotech.
20    Q.   The person you spoke with was the person who
21 sent you this e-mail, Kate Laimbeer?
22    A.   Correct.
23    Q.   This notes that you had this phone call --
24 or strike that.  This e-mail, as reflected in
25 Exhibit 46, is dated February 8, 2019; is that correct?

44 (Pages 515 to 518)

Ghassan Saed, Ph.D.

Page 519

1    A.    It says so, yes.
2    Q.    Did you have such a discussion with anyone
3  before the February 2019 time period about how to fill
4  out this form?
5    A.    No.  It's after my previous deposition that
6  we were talking about conflict of interest, I wanted to
7  make sure that I'm doing the right thing.  I called
8  them again, and I discussed with them, and they said I
9  was -- what I was doing is perfectly all right.
10      DEPOSITION EXHIBIT 47
11      Form B for Calendar Year 2017
12      WAS MARKED BY THE REPORTER
13      FOR IDENTIFICATION
14  BY MR. HEGARTY:
15    Q.    I've next marked as Exhibit 47 --
16      MS. O'DELL:  Thank you.
17  BY MR. HEGARTY:
18    Q.    -- the Form B for calendar year 2017; is
19  that correct?
20    A.    Correct.
21    Q.    This again was a form that you filled out,
22  right?
23    A.    Correct.
24    Q.    On this form, you describe under the heading
25  Date, two hours Saturday, and under hours you list

Page 520

1  10:00 a.m. to 12 noon.  Do you see that?
2    A.    I do.
3    Q.    We just talked about a form, the Form B
4  before where you said that you needed to only list
5  consulting activity that you were doing during the
6  week.  Did that -- did the process or procedure
7  change?
8    A.    No.  This is 2017, and it's supposed to be a
9  Friday.
10    Q.    The date is supposed to be a Friday?
11    A.    Friday.  That's my consultation time.
12    Q.    I'm going to show you from your last
13  deposition Exhibit Number 4, which were your invoices
14  that were provided at your deposition, and this exhibit
15  shows that you started consulting with Beasley Allen
16  for which you were invoicing them beginning in the
17  October/September time frame through the end of the
18  year.  Do you see that?
19    A.    I do.
20    Q.    If you look at those invoices for the 2017
21  time frame and -- and you do the math, at least the
22  math I did, it comes out to be about a hundred hours of
23  work.
24    A.    Okay.
25    Q.    But on your form that we marked as

Page 521

1  Exhibit 47, you listed --
2      MS. O'DELL:  I'm sorry, Mark.  When
3  you say a hundred hours of work, which two invoices did
4  you -- or which invoices --
5      MR. HEGARTY:  I'm adding up
6  invoice -- the first one, the second one, and the third
7  one in --
8      MS. O'DELL:  What are the dates on
9  them, or the invoice numbers?
10      THE WITNESS:  The third one is
11  January.
12      MR. HEGARTY:  They are --
13      THE WITNESS:  22 and 17.
14      MR. HEGARTY:  I don't see invoice
15  numbers on them.
16      THE WITNESS:  64.
17      MR. HEGARTY:  I think they're in the
18  right corner invoice number, and it's -- you said a
19  hundred hours.
20      MR. HEGARTY:  Invoice number, right.
21      MS. O'DELL:  You said a hundred
22  hours, and they're not a hundred hours that were billed
23  for in 2017.
24      THE WITNESS:  64 hours was billed on
25  2017.

Page 522

1  BY MR. HEGARTY:
2    Q.    You have for an invoice dated 1-25-2018,
3  58 hours?
4    A.    What date is that?
5    Q.    That is invoice 10 -- 10025.
6    A.    That's January.
7    Q.    January.  So did you bill --
8    A.    That's the following year.
9    Q.    So your invoice in January of 2018 was
10  60 hours for that month?
11    A.    That's 25 days in January, yes.
12    Q.    That was -- that would be more than four
13  hours a week, right?
14    A.    Again -- okay.  The consultation time is
15  four hours from 9:00 to 5:00 my work, but I can work
16  from 5:00 to 9:00 every day, I can work with weekends.
17  I can work, work, work.
18      DEPOSITION EXHIBIT 48
19      E-Mail Dated February 7, 2019
20      WAS MARKED BY THE REPORTER
21      FOR IDENTIFICATION
22  BY MR. HEGARTY:
23    Q.    I've marked next as Exhibit 48 an e-mail
24  dated February 7, 2019 regarding publishing of your
25  manuscript; is that correct?

45 (Pages 519 to 522)

Ghassan Saed, Ph.D.

Page 523

1    A.   The SRI?
2    Q.   From SRI; is that right?
3         MS. O'DELL:  Object to the form.
4         THE WITNESS:  This is from SAGE, the
5    proof -- the proofreading.
6    BY MR. HEGARTY:
7    Q.   This is in connection with your manuscript
8    being published, correct?
9    A.   Yes, the SRI manuscript.
10   Q.   Have you had any further communications with
11   Reproductive Sciences or SAGE about your manuscript
12   since February 7, 2019?
13   A.   No.
14   DEPOSITION EXHIBIT 49
15   E-Mail Forwarded by Amy Harper on
16   February 11, 2019
17   WAS MARKED BY THE REPORTER
18   FOR IDENTIFICATION
19   BY MR. HEGARTY:
20   Q.   I've next marked as Exhibit 49 an e-mail
21   that was forwarded to you by Amy Harper on February 11,
22   2019.
23   A.   Correct.
24   Q.   She's forwarding you that e-mail, an e-mail
25   from Reproductive Sciences dated October 10, 2018; is

Page 524

1    that correct?
2    A.   Correct.
3    Q.   How did the -- how did the forwarding of
4    this e-mail come about?
5    A.   I asked her to forward me the -- this
6    letter?
7    Q.   Why did you ask her to forward you this
8    letter?
9    A.   She has access to the submission online, and
10   we needed this letter because you guys asked us for all
11   the communications, so I asked her to provide it.
12   Q.   Did you ask her to provide all
13   communications that she has in her possession with
14   RSI (sic) regarding your manuscript?
15   A.   Correct.
16   Q.   Did she provide any communications to you
17   besides this one?
18   A.   (Gesturing).
19   Q.   That's the same one.
20   A.   Oh.  She may.  Everything she gave me, I
21   gave you.  It's pretty simple.
22   Q.   Dr. Saed, do you know what the GWAS catalog
23   is?
24   A.   Yes, I do.
25   Q.   What is it?

Page 525

1    A.   The Genome-Wide Association Study.
2    Q.   Have you ever gone to the website and used
3    the search tool for the catalog?
4    A.   I did.
5    Q.   Have you done it in the last four or five
6    weeks?
7    A.   I did it yesterday.
8    Q.   Why did you do it yesterday?
9    A.   Because I wanted to look for new information
10   about the risk of ovarian cancer with our markers, if
11   there is any updates.
12   Q.   So what searches did you do on the GWAS
13   catalog?
14   A.   If you go to NCBI website -- what search,
15   ovarian -- ovarian oxidative stress and increased
16   ovarian cancer risk.
17   Q.   And I asked you what search because it
18   actually gives you a box you can type search terms
19   into, correct?
20   A.   They do, yes.
21   Q.   And what you just listed were the search
22   terms you typed in?
23   A.   Oxidative stress, risk of ovarian cancer.
24   Q.   Did you print off the results?
25   A.   No.

Page 526

1    Q.   Did you also do a search for any of the SNPs
2    that you reported on in your manuscript?
3    A.   In the GWAS?
4    Q.   Correct, in the GWAS catalog.
5         MS. O'DELL:  Doctor, before you
6    answer the question, I would just object to the
7    question to the extent that Ms. Sharko conveyed in a
8    February 6th e-mail, we aren't going to plow old
9    ground, and -- and that was conveyed to Judge Pisano.
10   So you covered this -- this -- this area in detail last
11   time.
12        MR. HEGARTY:  I'm not -- one, I'm
13   not replowing old ground, and two, she represented that
14   because documents were produced late, that it precluded
15   us from covering areas that we would have otherwise
16   been able to cover if we had had more time, and this is
17   one such area that we were not able to cover because we
18   had to spend our time going through documents that
19   should have been produced.
20        MS. O'DELL:  That's what -- what was
21   represented to Judge Pisano by Ms. Sharko in a
22   February 6th e-mail was not what you just said.  She
23   said, we aren't going to replow old ground, end quote.
24        MR. HEGARTY:  And I'm not replowing
25   old ground.

46 (Pages 523 to 526)

Ghassan Saed, Ph.D.

Page 527

1    MS. O'DELL:  I think you are.  I'm
2  just putting you on notice that that was the
3  representation.
4          MR. HEGARTY:  I don't disagree
5  that's the representation, but I do disagree with your
6  contention that I'm replowing old ground.
7          MS. O'DELL:  I think you are, but --
8          MR. HEGARTY:  You can do what you
9  want to do then.
10  BY MR. HEGARTY:
11     Q.   Doctor, my question was, did you put into
12  the GWAS catalog search any of the SNPs you looked at,
13  catalase, MPO, GSR?  Did you do those searches?
14     A.   Not recently.
15          MS. O'DELL:  Object to form.
16  BY MR. HEGARTY:
17     Q.   You didn't do that yesterday?
18     A.   No.
19     Q.   Did you do any other searches yesterday
20  using the GWAS catalog besides those you talked about?
21     A.   No.
22     Q.   Did you do any other searches -- strike
23  that.  Did you do that search in preparation for
24  today's deposition?
25     A.   No.

Page 528

1    Q.   Okay.  Why did you --
2    A.   Most of the times I do this.  Frequently.
3    Q.   So that's a catalog you frequently search?
4    A.   Yes, I do.
5    Q.   Is it an authoritative source for -- for
6  you?
7    A.   Not necessarily, no.
8          MS. O'DELL:  Object to the form.
9  DEPOSITION EXHIBIT 50
10  GWAS Catalog Search
11  WAS MARKED BY THE REPORTER
12  FOR IDENTIFICATION
13  BY MR. HEGARTY:
14     Q.   I'm going to show you what I've marked as
15  Exhibit Number 50.  This is a GWAS catalog search for
16  MPO.  MPO is one of the SNPs you looked at, correct,
17  Doctor?
18     A.   Correct.
19     Q.   If you looks at results from that search,
20  none of those results report any association with that
21  MPO with ovarian cancer risk, correct?
22          MS. O'DELL:  Object to the form.
23          THE WITNESS:  Here?
24  BY MR. HEGARTY:
25     Q.   Correct.

Page 529

1    A.   Maybe.
2    Q.   Well, do you read it any differently than I
3  did, I just described?
4    A.   No.  What I'm saying is it doesn't have to
5  be reported here.  So the SNP is already known, and
6  it's been reported, published.  It's not in the GWAS.
7    Q.   This catalog, though, lists -- lists those
8  SNPs that have achieved genome-wide significance for
9  whatever particular risk they're -- you're looking at,
10  correct?
11     A.   What risk you're looking at here.
12          MS. O'DELL:  Object -- excuse me.
13  Object to the form.
14  BY MR. HEGARTY:
15     Q.   This printout is just of a search of MPO and
16  what significance it is achieved in terms of the
17  studies, correct?
18     A.   No.
19          MS. O'DELL:  Object to the form.
20          THE WITNESS:  Not correct.
21  BY MR. HEGARTY:
22     Q.   What did I say that was not correct?
23     A.   So what you need to do, the GWAS -- do you
24  want me to explain how it works?
25     Q.   Sure.

Page 530

1    A.   'Cause that's not how you do it.
2    Q.   All right.  Explain it to me.
3    A.   Okay.  GWAS, they compare -- they take DNA
4  from normal patients, DNA from -- let's say I want to
5  look at risk of ovarian cancer, from ovarian cancer
6  patients, okay, and then they sequence the genome from
7  group, the normal group and the patient group, and then
8  they see which variance in these SNP in this genome
9  that can be associated with this disease.
10          So when you do the search, you have
11  to put both parameters, not just one.  If you put just
12  MPO, it's going to tell you everything that related to
13  what, in relation to what disease.  You need to put
14  something next to it.
15     Q.   So according to you, to determine whether
16  MPO has reached genome-wide significance using the GWAS
17  catalog, you have to put in MPO and ovarian cancer?
18          MS. O'DELL:  Object to the form.
19          THE WITNESS:  I didn't say that.  I
20  said the MPO that we use, the SNP that we use, okay, it
21  is listed in GWAS, and the -- it is minus four,
22  if I can recall correctly, 63 --
23          MS. O'DELL:  Feel free to look at
24  your manuscript if you need to.
25          THE WITNESS:  Something like that,

Ghassan Saed, Ph.D.

Page 531

1  and this has been --
2          MS. O'DELL:  Don't -- don't -- be
3  precise.
4          THE WITNESS:  Minus -- where do I
5  find it now, in my manuscript.  Do you want to know
6  which one exactly?  Okay, where is the table?
7  BY MR. HEGARTY:
8      Q.   Finish your answer.
9      A.   Yeah, I'm trying to determine the exact.
10         MS. O'DELL:  If you need the table
11  to finish your answer, Doctor --
12         THE WITNESS:  Yeah, the exact --
13  yeah.  Okay.  So here we go.  So --
14  BY MR. HEGARTY:
15     Q.   What are you look at?  What exhibit?
16     A.   I'm look at Exhibit 42.  Where -- where is
17  that.  Where is my manuscript.  I need my manuscript.
18  Hold on one second.
19         I'm just trying to remember what
20  SNP number is going here, and it's not listed in -- in
21  the genome wide.  But it has been published about,
22  that's what I'm trying to tell you.  But it's not -- I
23  don't find it here.  It's minus 463, I believe.  But I
24  can't find it.
25         But what I'm trying to say is that

Page 532

1  there are SNPs that are reported in the GWAS for
2  myeloperoxidase, like for example, this SNP that we --
3  minus 463 that has been published upon that has been
4  associated with ovarian cancer.  That's what I'm trying
5  to say.
6      Q.   Has that SNP achieved genome-wide
7  significance?
8      A.   I don't know.
9      Q.   If you would find Exhibit 40, please.
10     A.   40?
11     Q.   Four-oh.
12     A.   40.  That's 50.  Where is 40.  44, 43.  Yes.
13     Q.   Exhibit 40 is a correspondence from you to
14  Dr. Layman, correct?
15     A.   Correct.
16     Q.   Who is Dr. Layman?
17     A.   He is the Chief Editor for Reproductive
18  Science.
19     Q.   Do you personally know Dr. Layman?
20     A.   Do I personally know him, no.
21     Q.   Have you ever met him?
22     A.   I met him once.  He comes to the society
23  meeting.
24     Q.   You only met him once then, though?
25     A.   No.  I met him during the society meetings,

Page 533

1  maybe once or twice, I don't know.  I can't remember.
2      Q.   Have you had conversations with him beyond
3  more than those -- more than those once or twice
4  meetings?
5      A.   The last time I met him was two years ago,
6  over two years ago.
7      Q.   Have you ever had any manuscripts rejected
8  by Reproductive Sciences?
9      A.   Yes.
10     Q.   In the last -- when was the last time you
11  had a manuscript rejected?
12         MS. O'DELL:  Object to the form.
13         THE WITNESS:  When was the last time
14  I had -- I can't remember.  I really can't.
15  BY MR. HEGARTY:
16     Q.   Since your deposition last month, have you
17  given any presentations to anyone at your university or
18  anyone in your profession regarding the results of your
19  tests?
20     A.   Individuals?
21     Q.   Individuals or groups.
22     A.   Agencies?
23     Q.   Or agencies, anybody, since your last
24  deposition?
25     A.   Yeah, Health Canada.  I sent them an e-mail.

Page 534

1      Q.   What are you --
2      A.   Telling them about my results.  I have a
3  paper in press that deals with the effect of talcum
4  powder on the induction of oxidative stress.
5      Q.   When did you send an e-mail to Health
6  Canada?
7      A.   Ten days ago maybe, a week.  I can't
8  remember exactly.
9      Q.   Who did you send it to?
10     A.   I went to the website, there was an e-mail
11  that they ask you if you want to report something,
12  clicked on the e-mail, and sent it.
13     Q.   What did you send?
14     A.   I just told you, I sent that I have paper,
15  manuscript in press that shows the effect of talcum
16  powder on oxidative stress markers.
17     Q.   Do you still have a copy of what you sent to
18  Health Canada?
19     A.   E-mail, you mean?
20     Q.   Yes.
21     A.   I'm sure I can find my e-mail.
22     Q.   Did you get a response?
23     A.   I got a response saying that I will be
24  contacted later.
25     Q.   Have you been contacted since you got that

Ghassan Saed, Ph.D.

Page 535

1  e-mail response?
2      A.   Not yet.
3      Q.   Did you provide Health Canada with a copy of
4  your manuscript?
5      A.   No.
6      Q.   What prompted you to contact that particular
7  agency with regard to your manuscript?
8      A.   Because that particular agency announced
9  talcum powder as a risk factor for ovarian cancer.
10     Q.   How did you become aware of that?
11     A.   The media.  It's everywhere.
12     Q.   When did you become aware of what
13 Health Canada had announced with regard to talc and
14 ovarian cancer?
15     A.   I can't remember exactly.
16     Q.   Did you become aware of it before your
17 deposition last month?
18     A.   Before.
19     Q.   And what prompted you ten days ago, at that
20 point in time, to actually go on the website and then
21 send an e-mail?
22     A.   The manuscript -- I was waiting for the
23 manuscript to get in press.
24     Q.   And what -- what document told you that the
25 manuscript was in press?

Page 536

1      A.   This reproof that I got.
2      Q.   You're talking -- you're pointing to
3  Exhibit 40?
4      A.   February -- no.  February -- from SAGE.  The
5  reproof that I just got, February 7.
6      Q.   So your e-mail correspondence --
7      A.   48.
8      Q.   I'm sorry, Exhibit 48?
9      A.   (Nodding head).
10     Q.   So your e-mail correspondence with Health
11 Canada would have come after February 7th?
12          MS. O'DELL:  Object to form.
13          THE WITNESS:  I can't remember.  I
14 really can't remember.
15 BY MR. HEGARTY:
16     Q.   Other than communicating with Health Canada
17 regarding your manuscript or your test results, since
18 your last deposition -- I think it was on the 23rd
19 or --
20     A.   22nd.
21     Q.   22nd of January --
22          MS. O'DELL:  January 23rd.
23          THE WITNESS:  23rd.
24 BY MR. HEGARTY:
25     Q.   -- have you reached out, spoken with, gave a

Page 537

1  presentation to anyone else about your test results or
2  your manuscript?
3      A.   No.
4      Q.   Have you sent -- strike that.  Have you
5  communicated with FDA with regard to the findings in
6  your manuscript?
7      A.   No.
8      Q.   Have you communicated with anyone at the
9  medical school for Wayne State regarding your
10 manuscript or your test results?
11     A.   No.
12          MS. O'DELL:  Object to the form.
13          THE WITNESS:  But no.
14          MS. O'DELL:  Other than the author.
15 BY MR. HEGARTY:
16     Q.   Have you ever prepared --
17     A.   Yes, thank you.  Other than the authors.
18          MR. HEGARTY:  Do you want to take a
19 microphone and answer for him?
20          MS. O'DELL:  No.  I'll just object.
21          MR. HEGARTY:  Do you think that was
22 proper to add the name to get the doctor --
23          MS. O'DELL:  I think the question
24 was confusing, and -- and he testified to the other
25 co-authors and their positions at the university, one

Page 538

1  of which is -- is a professor at the medical school.
2  BY MR. HEGARTY:
3      Q.   Have you ever prepared a PowerPoint
4  presentation where you lay out the results of your
5  tests or talk about your manuscript?
6      A.   To whom?
7      Q.   To anybody.
8      A.   Posters is a PowerPoint presentation?
9      Q.   Well, besides the poster.
10     A.   Is that considered a --
11     Q.   Well, you know what a PowerPoint
12 presentation is?
13     A.   That's a PowerPoint presentation.
14     Q.   Just your poster?
15     A.   Yeah.
16     Q.   Okay.  Have you -- other than that poster,
17 have you ever prepared a multi --
18     A.   Like an oral talk?
19     Q.   Like an oral talk?
20     A.   Yeah, no.
21     Q.   Do you have any current plans to give any
22 kind of presentation beyond what we've talked about
23 already in terms of the abstract presentation?  Is
24 there anything planned for you to speak about your
25 results or your manuscript that we have not talked

49 (Pages 535 to 538)

Ghassan Saed, Ph.D.

Page 539

1  about in this deposition?
2      A.   I'm going to SRI conference in Paris next
3  month, and I'm going to present this work that you see,
4  these abstracts, and Dr. Harper will go to SU and
5  present that in March, all of March.
6      Q.   Is that SRI presentation different than the
7  other Paris presentation that we talked about?
8      A.   SRI is in Paris, SU is in Honolulu, and
9  they're back to back.  That's why I can't be in both.
10     Q.   Any other planned presentations --
11     A.   Not yet.
12     Q.   -- regarding your tests or your manuscript
13  that you have not talked about?
14     A.   Well, no.
15     Q.   Is there anything in the works you have not
16  talked about?
17     A.   The works, no.
18     Q.   Dr. Saed, you agree that not all
19  inflammation is the same, correct?
20     A.   I don't understand the question.
21     Q.   Well, is all inflammation, regardless of the
22  type, identical?
23     A.   It says information --
24          MS. O'DELL:  Object to form.
25          THE WITNESS:  -- in front of me

Page 540

1  here.
2  BY MR. HEGARTY:
3      Q.   Inflammation.
4      A.   Oh, it says inflammation.  It says
5  information.
6      Q.   Is all inflammation the same?
7      A.   In what term you are trying to get me to
8  answer?
9      Q.   Well, are there various types of
10  inflammation?
11     A.   Yes, of course.
12     Q.   Do you agree that inflammation doesn't
13  mean -- strike that.  Do you mean that -- do you agree
14  that inflammation of tissue doesn't mean that that
15  tissue isn't doing something in the body.
16          MS. O'DELL:  Object to the form.
17          THE WITNESS:  Okay.  Can I explain
18  this?
19  BY MR. HEGARTY:
20     Q.   Yes.
21     A.   Okay.  So there are two types of
22  inflammation, okay.  Acute inflammation that spike and
23  come back, and that is not commonly linked with cancer
24  development.  And chronic inflammation that stays for a
25  long time, and it is lower in magnitude, and that is

Page 541

1  linked to cancer, cause of cancer.
2          There is also an inflammation --
3  inflammatory response, which is a normal response of
4  the body, okay, like for example, during ovulation
5  there is an oxidative stress and inflammation
6  associated with, but that's a normal physiological
7  process that is required for ovulation that will
8  completely correct it when that process is done.
9      Q.   I'm going to jump around a little bit, and
10  I'm going to come back to that.  But in your
11  manuscript, you report in the Treatment of Cells
12  section on page five --
13     A.   Which exhibit do you have so we can --
14     Q.   Well, in here, it's Exhibit 7 was the
15  original manuscript.
16     A.   Yes, this one?
17     Q.   Yes.
18     A.   Okay.  What page?
19     Q.   If you go to page five.
20     A.   Okay.
21     Q.   You list under -- in the section Treatment
22  of Cells as treated with Fisher Scientific or baby
23  powder.  Do you see where I'm reading?
24     A.   Yes, I do.
25     Q.   What of your data reported in your

Page 542

1  manuscript is of Fisher talc?
2      A.   None.
3      Q.   Why did you then list in the Treatment of
4  Cells that the treatment was Fisher talc or baby
5  powder?
6      A.   That's a typo, because we've done both, so
7  it's a typo.  When we get the proof, we will correct
8  that.  And I'm aware of that.  We discussed that last
9  time.
10     Q.   And how do the results of your tests show
11  that talc can cause chronic inflammation to ovarian
12  cells?
13     A.   The fact that it induces inflammation.
14  That's -- that's -- that's -- that's a great indication
15  that it is doing something in the body.
16     Q.   How long must inflammation last to be
17  considered chronic?
18          MS. O'DELL:  Object to the form.
19          THE WITNESS:  Okay, yes.  So this is
20  invitro studies in cell lines, so to simulate that with
21  what's going invivo, you have to do animal studies.
22  Which by the way, you asked me, but I misunderstood the
23  question about if I have -- have I done invivo studies
24  in animals, and I have done many, but not related to
25  talc.  I just want to correct this on the record.

Ghassan Saed, Ph.D.

Page 543

1  BY MR. HEGARTY:
2      Q.    You have done many invivo studies --
3      A.    Yes.
4      Q.    -- in animals?
5      A.    Yes, because I was not understanding your
6  invitro cells going to the animals.  I have done real
7  invivo studies where I operated on animals and create
8  postoperative adhesions and studied many, many animal
9  models, and I have published all that.
10            MR. HEGARTY:  Could we go off the
11  record real quick?
12            THE VIDEOGRAPHER:  We're going to go
13  off the record, the time is 12:56.
14            (There was a recess taken.)
15            THE VIDEOGRAPHER:  We're back on the
16  record at 1:22.
17  BY MR. HEGARTY:
18      Q.    Dr. Saed, you previously worked with your
19  consulting firm, UD Biotech, with Michael Diamond; is
20  that correct?
21      A.    No, that's not correct.
22      Q.    Who is Michael Diamond?
23      A.    Michael Diamond was our reproductive
24  endocrinology chief at Wayne State, and when he was
25  here, we created the company together, but we never did

Page 544

1  anything.  So years later he moved to University of
2  Augusta, and when he moved there, he asked to separate
3  from the company.  We never did anything together at
4  the company.
5      Q.    Have you had any discussions with
6  Dr. Diamond about your tests with talc or your
7  manuscript?
8      A.    No.
9      Q.    You mentioned your report for this case,
10  which is Exhibit 16.  I'm not sure if I've given it
11  back to you, and I think we have a --
12      A.    Thank you.
13      Q.    -- different number of exhibits here.  You
14  found your report?
15      A.    That's the report I think.
16      Q.    If you can go to page 20, please.
17      A.    Page 20.  Sorry, I'm losing my voice.  20,
18  yes.
19      Q.    In the section Summary of Opinions, do you
20  see that section?
21      A.    I do.
22      Q.    You say, these opinions are made to a
23  reasonable degree of scientific certainty.  What does
24  that mean to you?
25      A.    Where do you read, please?

Page 545

1      Q.    These opinions are made to a reasonable
2  degree of scientific certainty, and my question is,
3  what does that part of the sentence mean to you?  What
4  does it mean when you say your opinions are to a
5  reasonable degree of scientific certainty?
6      A.    They are based on my expertise, training,
7  experience, knowledge of the literature, all that
8  stuff.
9      Q.    Well, I understand that that's what
10  follows, but I mean when you say -- what is the
11  meaning of a reasonable degree of scientific
12  certainty?
13      A.    That's what I explained.  That's what I
14  meant.  That's how I explained it.
15      Q.    You meant that your opinions are based on my
16  experience, training and expertise, etcetera?
17            MS. O'DELL:  Object to the form.
18            THE WITNESS:  My -- my opinion is
19  based on my expertise, training, experience, and
20  knowledge of literature.
21  BY MR. HEGARTY:
22      Q.    And that's what a reasonable degree of
23  scientific certainty means to you?
24      A.    Yes.
25            MS. O'DELL:  Object to the form.

Page 546

1  BY MR. HEGARTY:
2      Q.    If you look at the end of that first
3  paragraph, you say, knowledge of the relevant
4  literature and my previous and ongoing research.  Do
5  you see that?
6      A.    I do.
7      Q.    Do you have any ongoing research with regard
8  to this subject area?
9      A.    The talc and the inflammation?
10      Q.    Correct.
11      A.    Or the inflammation and cancer, yes, I do.
12      Q.    What is ongoing?
13      A.    We are planning to do more work in this.
14      Q.    What work are you planning to do?
15      A.    More biological work.
16      Q.    What type of work?
17      A.    Maybe look at animal studies, maybe looking
18  at sequencing of some genes.
19      Q.    How far has that --
20      A.    I'm not sure yet.
21      Q.    I'm sorry.  How far has that progressed?
22      A.    Not yet.
23      Q.    When you say not yet --
24      A.    We -- the ongoing part is just the cell
25  line, the cell culture part.

Ghassan Saed, Ph.D.

Page 547

1    Q.   Do you have plans to do any other -- strike
2    that.  Do you have any current plans, sitting here
3    today, for other cell studies or tests like you did in
4    your manuscript involving talc?
5         MS. O'DELL:  Object to the form.
6    Would you -- would you mind repeating the question, or
7    read it back, please?
8         THE WITNESS:  What was the question?
9    BY MR. HEGARTY:
10   Q.   Do you have plans to do -- do you have any
11   current plans, sitting here today, for other cell
12   studies or tests like you did in your manuscript
13   involving talc?
14   A.   Do I have current right now going on in my
15   lab right now?
16   Q.   Either going on in your lab, or that you
17   plan to do or give thought to do?
18   A.   Yes, I am.
19   Q.   What are those?
20   A.   I'm planning to do more cell lines, and I'm
21   planning to do the transformation assay.
22   Q.   What's a transformation assay?
23   A.   The one we spent three hours discussing.
24   Q.   The Aim III?
25   A.   Yes.

Page 548

1    Q.   And how far along are those plans?
2    A.   Planning.  I don't know.
3    Q.   Do you have a timetable for any of those --
4    A.   Not yet.
5    Q.   -- those -- those proposed tests?
6    A.   Not yet.
7    Q.   Have you gone -- strike that.  Do you have
8    plans beyond the thinking stage for any tests involving
9    cell lines or invivo studies that involve talc?
10   A.   Other than what I just mentioned?
11   Q.   Other than what you talked about?
12   A.   Not -- not -- I don't think of anything
13   right now.  I may.
14   Q.   Have you prepared any written proposals --
15   A.   No.
16   Q.   -- for additional testing?
17   A.   None.
18        MS. O'DELL:  I think we're at five,
19   Mark.
20        MR. HEGARTY:  Okay.  All right.
21   Thank you.
22        THE WITNESS:  Thank you.
23        MR. HEGARTY:  Give me a second.
24        MS. O'DELL:  I'm going to take a
25   short break.

Page 549

1         MR. HEGARTY:  All right.
2         THE VIDEOGRAPHER:  We're going off
3    the record, the time is 1:28.
4         (There was a recess taken.)
5         THE VIDEOGRAPHER:  We're back on the
6    record at 1:31.
7    EXAMINATION BY MS. O'DELL:
8    Q.   Dr. Saed, I have a few questions for you.  I
9    think in front of you I put Exhibit 24, which was a
10   copy of your preliminary study that counsel for J & J
11   marked previously.
12   A.   Yes.
13   Q.   And if you'll turn to the last page of 24.
14   It should be near the top, 'cause I pulled it out
15   previously.  Yeah.  Is that it?  Okay.
16        If you'll turn to the last page of
17   the exhibit.  Just turn it over, I think, because it's
18   front and back.  It's a copy of your poster that
19   counsel asked you about earlier.
20   A.   Correct.
21   Q.   And in the results as written on the
22   left-hand side of the poster, is there a
23   suggestion that the results are statistically
24   significant?
25        MR. HEGARTY:  Objection, form.

Page 550

1    BY MS. O'DELL:
2    Q.   Do you report the results as statistically
3    significant?
4    A.   Not as written in the results section,
5    because it says marked increase.  Marked doesn't mean
6    they are statistically significant necessarily.
7    Q.   You also were asked some questions early on
8    in your continued deposition this morning, and -- and
9    in regard to the series of questions, you expressed
10   confusion by the question.  I think at one point you
11   said there was a mixup.  What did you mean by that?
12   A.   A mixup in the question, because the
13   question was a compound question.  Each part contradict
14   the other.
15   Q.   Did you --
16   A.   That's my understanding.
17   Q.   Was your -- was your reference to mixup
18   related to data in the lab notebook?
19   A.   No --
20        MR. HEGARTY:  Objection.
21        THE WITNESS:  -- not at all.
22   BY MS. O'DELL:
23   Q.   Let me ask you to turn to what was marked as
24   Exhibit 1.  You can turn to it in your -- in the actual
25   lab notebook if you'd like, but it's the lab notebook

Ghassan Saed, Ph.D.

Page 551

1  for the data that's reported in your manuscript. Let
2  me ask you to turn to page -- I believe it is 39.
3      A.  Yes.
4      Q.  And it says -- I think it's Calculation Data
5  is written in at the top.
6      A.  Yes.
7      Q.  Do you see that? And you were asked a
8  number of questions about the column that's marked
9  Average. Do you recall those questions?
10     A.  Yes.
11     Q.  And Dr. Saed, who calculates the average and
12  the normalized average in -- in a table like this in
13  the lab notebook?
14     A.  So all these data were submitted to our
15  biostatistician, and he analyzed all the statistics.
16     Q.  Do you rely on the biostatistician in terms
17  of the type of data analysis that is performed?
18     A.  I do.
19     Q.  And is he or she, the biostatistician, the
20  person that decides the type of calculation that's
21  going to be done and how it is formulated into a
22  spreadsheet?
23     A.  Correct.
24     Q.  And do you defer to the biostatistician for
25  that type of contribution?

Page 552

1      A.  Correct.
2      Q.  Do you have any information that would
3  suggest that the information contained in the columns
4  calculated by the biostatistician are incorrect?
5      A.  No.
6      Q.  You've been asked a number of questions
7  today about documents that have been provided over
8  the -- prior to your initial deposition and -- and
9  since that time. Are you aware of any documents in
10 your possession that have not been produced?
11     A.  I'm not aware.
12     Q.  You were asked questions about a budget that
13 you prepared in September of 2017 that was marked as
14 Exhibit 44.
15     A.  Yes.
16     Q.  And it should be near the top.
17     A.  I remember it.
18     Q.  And if you'll -- when you have that in front
19 of you, Doctor, if you'll turn to page three of the
20 budget. And it -- particularly, you were asked --
21 strike that. Let me start again.
22         You were asked a series of questions
23 about Aim III of the budget, and there were some
24 questions asked regarding a particular test that was
25 performed in relation to Aim III. Do you recall that

Page 553

1  question?
2      A.  I do.
3      Q.  There was actually a series of questions.
4  In fact, Aim III -- does Aim III compose a number of
5  different types of tests?
6          MR. HEGARTY: Objection, form.
7          THE WITNESS: It does.
8  BY MS. O'DELL:
9      Q.  And which of the tests listed in Aim III
10 have you completed?
11     A.  We did -- we did them with our cell lines.
12 We did myeloperoxidase, we did iNOS, and we did -- we
13 did caspase-3, activity for apoptosis.
14     Q.  Okay. And when you say MPO, what --
15     A.  Myeloperoxidase, and inducible nitric oxide
16 synthase, and then caspase-3, activity for apoptosis.
17 Apoptosis.
18     Q.  And -- and any suggestion that Johnson &
19 Johnson counsel made that these tests were not
20 performed would be incorrect?
21         MR. HEGARTY: Objection, form.
22         THE WITNESS: They were performed in
23 our cell lines that we report in the manuscript, yes.
24 BY MS. O'DELL:
25     Q.  Okay. You were asked about a submission to

Page 554

1  Health Canada. Did you submit the comments, to the
2  best of your knowledge, prior to the deadline for doing
3  so?
4      A.  Yes.
5      Q.  Was your -- when was your manuscript
6  accepted for publication by SRI approximately?
7      A.  I believe January, around that time.
8      Q.  Lastly, you were -- maybe not lastly, but
9  you were asked a series of questions regarding your
10 report, and specifically, the basis for your opinions.
11 Are your opinions in this case based on the research
12 that you conducted and that you have -- the data for
13 which you've included in your report and manuscript?
14     A.  Yes.
15     Q.  And are your opinions in this case also
16 supported by the scientific and medical literature?
17         MR. HEGARTY: Objection, form.
18         THE WITNESS: Yes.
19 BY MS. O'DELL:
20     Q.  You mentioned that you anticipate doing
21 continued research in the future. Do you need
22 additional research to support the opinions that you've
23 provided in this case?
24     A.  No. The opinion based on the data so far
25 collected, which is based on cell lines, is sufficient

53 (Pages 551 to 554)

Ghassan Saed, Ph.D.

Page 555

1  to draw this conclusion --
2      Q.   And -- and --
3      A.   -- and we are -- go ahead.
4      Q.   No, please, go ahead.
5      A.   And we are planning to do some more work.
6      Q.   Okay.  What level of confidence do you have
7  in the opinions that you've offered in this case?
8      A.   Great confidence.
9      Q.   Would it be fair to say that you hold --
10  that in your opinion it is far more than, quote, more
11  likely than not that your opinions are supported by
12  your data and research?
13          MR. HEGARTY:  Objection, form.
14          THE WITNESS:  My conclusion and
15  opinion is based on data from my work here, and they
16  are supported by it, yes.
17  BY MS. O'DELL:
18      Q.   Last question, Doctor.  You were asked a
19  number of questions about invitro models and their
20  usefulness in cancer research.  Do invitro models
21  reliably predict the pathogenicity of harmful
22  particulates or other carcinogens in humans?
23          MR. HEGARTY:  Objection, form.
24          THE WITNESS:  Yes.
25          MS. O'DELL:  I've got nothing

Page 556

1  further.
2          MR. HEGARTY:  Just a few follow-up
3  questions.  First, I just want to put on the record we
4  want to -- want to request documents that the doctor
5  apparently has not provided.  There were abstracts
6  mentioned today, there was correspondence mentioned
7  today that -- that we hadn't seen.
8          In particular, there's a cover
9  letter to Reproductive Sciences, an abstract for Paris,
10  an abstract for I think the other outlet --
11          MR. WYATT:  Honolulu.
12          MR. HEGARTY:  I'm sorry, the
13  Honolulu -- the Honolulu presentation, and then there's
14  the e-mail to Health Canada, so I just want to put on
15  the record that --
16          MS. O'DELL:  Let me --
17          MR. HEGARTY:  -- we'll be making
18  those requests.
19          MS. O'DELL:  Let me state two
20  things, that the abstract from SRI -- SRI has been
21  provided.  The abstract to the SGO meeting in March was
22  provided to Susan Sharko in December by e-mail, as well
23  as the table that was provided, so those have been
24  provided --
25          THE WITNESS:  We did.

Page 557

1          MS. O'DELL:  -- to you previously.
2  So I don't want the record to be unclear on that.
3  There may be some other things, but -- but what the
4  doctor has testified to is he has provided everything
5  in his possession.
6  REEXAMINATION BY MR. HEGARTY:
7      Q.   Doctor, if you look at the abstract -- I'm
8  sorry, look at the poster that you had -- we have been
9  talked about today -- talking about today.
10      A.   Yes.
11      Q.   Do you have that in front of you?
12      A.   I have to find it.  Yes.
13      Q.   You reported in this poster that treatment
14  of 20 micrograms per milliliter of the cells with talc
15  showed a marked increase in the anti-oxidant enzymes
16  CAT, SOD-3, GSR, GPX1 and GSTP1, correct, at the
17  20 microgram per milliliter level?
18      A.   I don't see where you're reading.
19      Q.   Well, I'm not necessarily reading a
20  particular part, but this poster shows a marked
21  increase in the enzymes CAT, SOD-3, GST, GPX1 and GSTP1
22  at the 20 microgram level, correct?
23          MS. O'DELL:  Object to the form.
24  Where are you reading?  Which table are you referring
25  to?

Page 558

1          MR. HEGARTY:  I'm reading the
2  Results section.
3          THE WITNESS:  In the Results
4  section, where does it say 20 microgram?
5  BY MR. HEGARTY:
6      Q.   Well, you say that -- you show increases in
7  talc-treated ovarian cancer cell lines and in normal
8  ovarian cancer cell lines, all compared to their
9  controls -- their control.
10      A.   Yeah, but there's nothing about
11  20 microgram.
12      Q.   So is it -- that's why I asked you.  Does --
13  do the results you report in the Results section apply
14  to 20 microgram per milliliter dose?
15      A.   I can't -- I have to go and look through
16  them.  I can't remember right now.
17      Q.   You don't know if that's what you're
18  reporting in this --
19      A.   No, no.
20          MS. O'DELL:  Objection.
21  BY MR. HEGARTY:
22      Q.   -- Results section?
23      A.   No, no.  That's not what I said.  I said
24  overall results, as I told you, this is preliminary
25  results to show that whether there is a biological

54 (Pages 555 to 558)

Ghassan Saed, Ph.D.

Page 559

1  effect of the exposure of talc to the cells, and that
2  by itself is intriguing.  That's the whole objective of
3  this whole work.  And if you want details of which one
4  increased how much, I can't tell you from here.  I have
5  to go back to the data.
6      Q.   So you would have to look at the data?  You
7  couldn't look at the individual graphs?
8      A.   Very hard to see this.  Very small.  Barely
9  I can see it.
10     Q.   So you can't tell by looking at the
11 20 microgram per milliliter data, for example, SOD-3,
12 and see if there was a marked increase in the
13 anti-oxidant SOD-3?
14          MS. O'DELL:  Objection.
15          THE WITNESS:  As compared to
16 control.
17 BY MR. HEGARTY:
18     Q.   Yes.
19     A.   So yeah, it's hard for me to do.
20     Q.   Okay.  Do you remember your
21 biostatistician's name?  You were not able to recall
22 it.
23     A.   Steven Goyski something.  I can find it.
24     Q.   Going back to your Aim III in Exhibit 44,
25 which counsel asked you about.  You were asked whether

Page 560

1  you had done those tests and -- some of those tests,
2  and you said you had done those in your cell lines,
3  correct?
4      A.   Yes.
5      Q.   You did not do those tests in cells
6  suspended in agar at 500 cells per well, and then
7  incubated in a humidified incubator for 14 to 21 days,
8  correct?
9      A.   There is need to do that.
10         MS. O'DELL:  Object.  Object to the
11 form.
12 BY MR. HEGARTY:
13     Q.   Did you -- you did not do those tests in
14 those --
15     A.   Specific environment?
16     Q.   -- involved in agar?
17     A.   In this specific environment, no.  There was
18 no need to do that.
19     Q.   You mentioned you submitted your comments
20 to Health Canada in advance of the deadline.  How
21 did you know what the deadline was to submit your
22 comment?
23     A.   I went -- I went to the website, and I can't
24 really remember when I did that.  That's the whole
25 idea.

Page 561

1      Q.   Do you have the galley pages yet for your --
2  your Reproductive Sciences manuscript?
3      A.   Galley?  The proof?
4      Q.   The proof.
5      A.   Not yet.
6      Q.   Are you -- do you have currently
7  ongoing -- strike that.  Do you have any ongoing
8  inflammatory studies?  In other words, are you doing
9  any cell line treatments testing for inflammation
10 currently?
11         MS. O'DELL:  Object to form.
12 BY MR. HEGARTY:
13     Q.   Let me strike that.  That's a bad example --
14 question.  Do you have any current studies looking at
15 inflammation in ovarian cancer?
16         MS. O'DELL:  Object to form.
17         THE WITNESS:  This is the core of
18 our lab.  That's what we do.
19 BY MR. HEGARTY:
20     Q.   Right.  But do you have any current studies
21 ongoing?
22     A.   Related to talc?
23     Q.   No.  Related to inflammation in ovarian
24 cancer?
25     A.   Of course.

Page 562

1      Q.   Okay.  How many such studies do you have
2  going on?
3      A.   I don't know.  I can't remember.
4      Q.   Can you remember one of them?
5      A.   Yeah.
6      Q.   Which one can you remember?
7      A.   We have identified a new role
8  myeloperoxidase, which is a key inflammatory marker,
9  and we found that we were the first to report that it
10 is expressed in ovarian cancer cells, which it's not
11 supposed to be there, and then people after us
12 confirmed that.
13         We found that the form that is
14 expressed in epithelial ovarian cancer is the monomer
15 form not the dimer form that is found in macrophages.
16 We -- interestingly, we found that ovarian cancer
17 patients, they have higher levels of oxidated stress in
18 their plasma.
19         And we ran plasma assay and
20 looked at the form of MPO, and we found that it's
21 a monomer form.  Monomer means it is reduced
22 because of oxidation, high level of oxidation.  So
23 that's ongoing now in our lab.  And we just submitted a
24 grant.
25     Q.   You were asked by counsel if you have plans

55 (Pages 559 to 562)

Ghassan Saed, Ph.D.

Page 563

1  to do other studies, which I had asked you about,
2  involving talc in cell lines, and you said we are
3  planning to do these.  Who is "we"?
4      A.   We, our lab.
5      Q.   Okay.  When you say your lab, who are you --
6  who are you including in that?
7      A.   My lab, my research assistants, my
8  collaborators, my fellows.
9      Q.   And who are those individuals?
10     A.   Dr. Harper, my -- Dr. Rong, Florie,
11  Dr. Morris, myself, and -- who else can I remember.
12  And we have some -- a guy from Pathology doing some
13  work for us, yes.
14     Q.   And do you know who the guy from Pathology
15  is?
16     A.   Yes.  His name -- I'm really bad with names.
17  Do you want his name?
18     Q.   If you can remember it.
19     A.   I can't remember his name, but he -- he does
20  the immunofluorescent staining for us.  We have several
21  projects ongoing right now in our lab.
22          MR. HEGARTY:  That's all questions I
23  have.
24          MR. LOCKE:  Can I just ask one
25  really quick question?

Page 564

1  EXAMINATION BY MR. LOCKE:
2      Q.   This relates to your Health Canada contact
3  that you had recently.  When you contacted
4  Health Canada, did you inform Health Canada that you
5  are a litigation consultant?
6      A.   No.
7          MS. O'DELL:  Object to form.
8          THE WITNESS:  No, I did not.
9          MR. LOCKE:  Thank you, Doctor.
10         THE WITNESS:  Thank you.
11         MR. HEGARTY:  Thank you.
12         THE VIDEOGRAPHER:  We're going to go
13  off the record, the time is 1:48.
14          (The deposition was concluded
15          at 1:48 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 565

1              CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN   )
3                      ) SS
4  COUNTY OF OAKLAND   )
5      I, Jennifer L. Ward, Certified Shorthand Reporter,
6  a Notary Public in and for the above county and state,
7  do hereby certify that the above deposition was taken
8  before me at the time and place hereinbefore set forth;
9  that the witness was by me first duly sworn to testify
10  to the truth, and nothing but the truth, that the
11  foregoing questions and answers made by the
12  witness were duly recorded by me stenographically and
13  reduced to computer transcription; that this is a true,
14  full and correct transcript of my stenographic notes so
15  taken; and that I am not related to, nor of counsel to
16  either party nor interested in the event of this cause.
17
18
19      _____
20      Jennifer L. Ward, CSR-3717
21      Notary Public,
22      Oakland County, Michigan
23
24  My Commission expires:  10-27-2019
25

Page 566

1              STATEMENT OF DEPONENT
2
3
4
5
6          I have reviewed the above transcript
7  and have listed corrections, if any, on the attached
8  errata sheet,
9
10  this_____ day of_____, 20____.
11
12
13
14      _____
15      SIGNATURE OF THE WITNESS
16
17  SUBSCRIBED AND SWORN to before me this _____ day of
18  _____, 20_____.
19
20
21      _____
22      NOTARY PUBLIC
23
24  My Commission expires: _____.
25

56 (Pages 563 to 566)

Ghassan Saed, Ph.D.

Page 567

```
 1         - - - - - -
             E R R A T A
 2         - - - - - -
 3    PAGE  LINE  CHANGE
 4    ____  ____ _____
 5      REASON: _____
 6    ____  ____ _____
 7      REASON: _____
 8    ____  ____ _____
 9      REASON: _____
10    ____  ____ _____
11      REASON: _____
12    ____  ____ _____
13      REASON: _____
14    ____  ____ _____
15      REASON: _____
16    ____  ____ _____
17      REASON: _____
18    ____  ____ _____
19      REASON: _____
20    ____  ____ _____
21      REASON: _____
22    ____  ____ _____
23      REASON: _____
24    ____  ____ _____
25      REASON: _____
```

Golkow Litigation Services - 1.877.370.DEPS