# EXHIBIT B26

Gregory B. Diette, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

-----------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

-----------------------------x


VIDEOTAPED DEPOSITION OF

GREGORY B. DIETTE, M.D.

TOWSON, MARYLAND

TUESDAY, APRIL 9, 2019

8:58 A.M.


Reported by: Leslie A. Todd

Gregory B. Diette, M.D.

Page 2

1    Deposition of GREGORY B. DIETTE, M.D., held at
2    the:
3
4
5       SHERATON BALTIMORE NORTH HOTEL
6       903 Dulaney Valley Road
7       Towson, Maryland 21204
8
9
10
11
12
13
14
15
16    Pursuant to notice, before Leslie Anne Todd,
17    Court Reporter and Notary Public of the State of
18    Maryland, who officiated in administering the oath
19    to the witness.
20
21
22
23
24
25

Page 4

1    APPEARANCES (Continued):
2
3       CYNTHIA L. GARBER, ESQUIRE
4       ROBINSON CALCAGNIE, INC.
5       19 Corporate Plaza Drive
6       Newport Beach, California 92660
7       (949) 720-1288
8
9       NATHAN D. FINCH, ESQUIRE
10      MOTLEY RICE LLC
11      401 9th Street, NW
12      Suite 1001
13      Washington, D.C. 20004
14      (202) 232-5507
15
16   ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:
17      ALLISON M. BROWN, ESQUIRE
18      RICHARD M. HEASLIP, ESQUIRE
19      WEIL, GOTSHAL & MANGES LLP
20      17 Hutfish Street, Suite 201
21      Princeton, New Jersey 08542-3792
22      (609) 986-1104
23
24
25

Page 3

A P P E A R A N C E S

1
2
3    ON BEHALF OF THE PLAINTIFFS:
4       MICHELLE PARFITT, ESQUIRE
5       ADAM K. ROSEN, ESQUIRE
6       ASHCRAFT & GEREL, LLP
7       1825 K Street, N.W.
8       Suite 700
9       Washington, D.C. 20006
10      (202) 783-6400
11
12      CHRISTOPHER V. TISI, ESQUIRE
13      LEVIN PAPANTONIO THOMAS MITCHELL
14       RAFFERTY PROCTOR, P.A.
15      316 South Baylen Street
16      Pensacola, Florida 32502
17      (850) 435-7000
18
19      DENNIS M. GEIER, ESQUIRE
20      COHEN PLACITELLA ROTH, PC
21      127 Maple Avenue
22      Red Bank, New Jersey 07701
23      (732) 747-9003
24
25

Page 5

1    APPEARANCES (Continued):
2
3       KATHERINE MCBETH, ESQUIRE
4       DRINKER BIDDLE & REATH, LLP
5       One Logan Square, Suite 2000
6       Philadelphia, Pennsylvania 19103-69896
7       (215) 988-2706
8
9       JESSICA D. MILLER, ESQUIRE
10      SKADDEN, ARPS, MEAGHER & FLOM, LLP
11      1440 New York Avenue, N.W.
12      Washington, D.C. 20005
13      (202) 371-7000
14
15   ON BEHALF OF THE PCPC:
16      THOMAS T. LOCKE, ESQUIRE
17      SEYFARTH SHAW LLP
18      975 F Street, N.W.
19      Washington, D.C. 20004-1454
20      (202) 463-2400
21
22   ALSO PRESENT:
23      DANIEL HOLMSTOCK, Videographer
24
25

2 (Pages 2 to 5)

Gregory B. Diette, M.D.

Page 6

```
 1          C O N T E N T S
 2   EXAMINATION OF GREGORY B. DIETTE, M.D.     PAGE
 3      By Ms. Parfitt              14
 4      By Mr. Finch                465
 5      By Ms. Brown                467
 6
 7
 8            E X H I B I T S
 9         (Attached to transcript)
10   DIETTE DEPOSITION EXHIBITS           PAGE
11   No. 1   Notice of Oral and Videotaped
12           Deposition of Gregory Diette, MD,
13           MHS, and Duces Tecum          16
14   No. 2   Defendants' Response to Plaintiffs'
15           Document Requests Contained in Notice
16           of Oral and Videotaped Deposition of
17           Gregory Diette, M.D., MHS and Duces
18           Tecum                         17
19   No. 3   Expert Report of Gregory Diette, MD,
20           MHS for General Causation Daubert
21           Hearing, Supplemental Materials
22           Reviewed and Considered       18
23   No. 4   Article entitled "Ovulation and Risk
24           of Epithelial Ovarian Cancer"  44
25
```

Page 8

```
 1          E X H I B I T S (Continued)
 2         (Attached to transcript)
 3   DIETTE DEPOSITION EXHIBITS           PAGE
 4   No. 13   Document headed "Statement of Dr.
 5            Anne Mc Tiernan prepared for the
 6            Subcommittee on Economic and
 7            Consumer Policy Hearing on Examining
 8            the Public Health Risk on
 9            Carcinogens and Consumer Products,
10            March 12, 2019"              235
11   No. 14   Draft Screening Assessment, Talc,
12            Chemical Abstracts Service Registry
13            Number 14807-96-6, Environment and
14            Climate Change Canada, Health Canada,
15            December 2018                267
16   No. 15   Article entitled "Asbestos Exposure
17            and Ovarian Fiber Burden," Bates
18            JNJ 000004999 to 000005003   281
19   No. 16   Excerpt from "Modern Epidemiology,"
20            Third Edition, by Rothman, Greenland
21            and Lash                     289
22   No. 17   Taylor and Francis Group article,
23            "Moving to a World Beyond "p < 0.05" 297
24
25
```

Page 7

```
 1          E X H I B I T S (Continued)
 2         (Attached to transcript)
 3   DIETTE DEPOSITION EXHIBITS           PAGE
 4   No. 5   Bottle of Johnson's Baby Powder
 5           (Retained by Plaintiffs' Counsel)  52
 6   No. 6   Excerpt of Deposition of Susan
 7           Nicholson, M.D.               82
 8   No. 7   Document entitled "Appendix C"
 9           Curriculum Vitae of Gregory B.
10           Diette, MD, MHS               91
11   No. 8   Document from Johns Hopkins Medicine
12           website, entitled "Find an Expert,"
13           Gregory Bruce Diette, M.D.    95
14   No. 9   Gregory B. Diette, MD, Associate
15           Professor, Departmental Affiliations 98
16   No. 10   Expert Report of Gregory Diette, MD,
17            MHS for General Causation Daubert
18            Hearing                      133
19   No. 11   Document entitled "Appendix E,"
20            Expert Testimony of Gregory B.
21            Diette, MD, MHS              138
22   No. 12   Document from the Sidney Kimmel
23            Comprehensive Cancer Center, Risk
24            Factors & Symptoms           213
25
```

Page 9

```
 1          E X H I B I T S (Continued)
 2         (Attached to transcript)
 3   DIETTE DEPOSITION EXHIBITS           PAGE
 4   No. 18   Article entitled "Retire statistical
 5            Significance," by Amrhein, Greenland,
 6            McShane                      299
 7   No. 19   Article from Johns Hopkins Institute
 8            for Clinical & Translational Research,
 9            "The American Statistician Special
10            Issue: Moving to a World Beyond 'P
11            < 0.05'"                     308
12   No. 20   Supplementary information to: Retire
13            Statistical significance, Valentin
14            Amrhein et al.               312
15   No. 21   Document entitled "Gregory Diette,
16            MD, MHS: Talc/Ovarian Cancer Disease
17            Control Studies (Hospital Studies
18            Below Line)                  324
19   No. 22   Chart showing Estimated Relative
20            Risk of Ovarian Cancer, According
21            to Reported Use of Talc, Bates
22            JNJ 000013131               327
23
24
25
```

Gregory B. Diette, M.D.

Page 10

1          E X H I B I T S (Continued)
2          (Attached to transcript)
3     DIETTE DEPOSITION EXHIBITS              PAGE
4     No. 23   Article entitled "Exposure to
5          Secondhand Smoke and Risk of Cancer
6          in Never Smokers: A Meta-Analysis of
7          Epidemiologic Studies"          366
8     No. 24   International Journal of Cardiology
9          article, "Risk of all-cause mortality
10         and cardiovascular disease associated
11         with secondhand smoke exposure: A
12         systematic review and meta-analysis" 369
13    No. 25   NIH Public Access Author Manuscript,
14         "Common Household Activities are
15         Associated with Elevated Particulate
16         Matter Concentrations in Bedrooms of
17         Inner-City Baltimore Pre-School
18         Children"              377
19    No. 26   "The Health Consequences of
20         Involuntary Exposure to Tobacco
21         Smoke," A Report of the Surgeon
22         General          377
23    No. 27   IARC Monograph entitled "Arsenic,
24         Metals, Fibres and Dusts," Volume
25         100 C, A review of Human Carcinogens 392

Page 11

1          E X H I B I T S (Continued)
2          (Attached to transcript)
3     DIETTE DEPOSITION EXHIBITS              PAGE
4     No. 28   Table 2.8 Epidemiologic studies of
5          asbestos exposure and ovarian cancer
6          (and, for comparison, lung cancer
7          and mesothelioma)          396
8     No. 29   Article entitled "Association between
9          Body Powder Use and Ovarian Cancer:
10         The African American Cancer
11         Epidemiology Study (AACES)"      413
12    No. 30   Article entitled "Perineal Talc Use
13         and Ovarian Cancer, A Systematic
14         Review and Meta-Analysis"      416
15    No. 31   Ultrastructural Pathology article,
16         "Correlative polarizing light and
17         scanning electron microscopy for
18         the assessment of talc in pelvic
19         region lymph nodes"          427
20    No. 32   Letter to Samuel Epstein from the
21         Department of Health and Human
22         Services, dated April 1, 2014      431
23    No. 33   Facsimile dated September 30,
24         2004 to Luzenac America from
25         Richard Zazenski to Bill Ashton      437

Page 12

1          E X H I B I T S (Continued)
2          (Attached to transcript)
3     DIETTE DEPOSITION EXHIBITS              PAGE
4     No. 34   Article entitled "Possible Role of
5          Epithelial Inflammation in Ovarian
6          Cancer"              442
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 13

1          P R O C E E D I N G S
2          ------------------
3          THE VIDEOGRAPHER:  We are now on the
4     record, and my name is Daniel Holmstock.  I am the
5     videographer for Golkow Litigation Services.
6     Today's date is April 9th, 2019, and the time on
7     the video screen is 8:58 a.m.
8          This video deposition is being held at
9     the Sheraton Baltimore North Hotel, at 903 Dulaney
10    Valley Road in Towson, Maryland, in the matter of
11    Johnson & Johnson Talcum Powder Products
12    Marketing, Sales Practices and Products Liability
13    Litigation, MDL No. 2738, and is pending before
14    the United States District Court for the Eastern
15    District of New Jersey.
16          Our deponent today is Dr. Gregory
17    Diette.
18          Counsel for appearances will be noted on
19    the stenographic record.  And our court reporter
20    today is Leslie A. Todd, who will now administer
21    the oath.
22          GREGORY B. DIETTE, M.D.,
23          and having been first duly sworn,
24          was examined and testified as follows:
25          DIRECT EXAMINATION

4 (Pages 10 to 13)

Gregory B. Diette, M.D.

Page 14

```
 1    BY MS. PARFITT:
 2       Q   Good morning, Dr. Diette.  How are you?
 3       A   Good morning.  Fine, thanks.
 4       Q   Good.  We will dispense with the usual
 5    comments with regard to a deposition.  I
 6    understand you've had --
 7           THE VIDEOGRAPHER:  Microphone.
 8    BY MS. PARFITT:
 9       Q   All right.  Now we're back on the mic.
10       Dr. Diette, we'll dispense with the
11    usual comments with regard to what a deposition is
12    about.  I understand you've probably had your
13    deposition taken more than a hundred times.  Is
14    that fair?
15       A   I don't know if it's a hundred, but --
16    but plenty enough that I think that I -- I
17    understand the process.
18       Q   All right.  The only one that I will ask
19    you to pay some attention to is the fact that if
20    you don't understand my question, please let me
21    know.  Otherwise, I'm going to assume you
22    understand every question that I ask, and the
23    answers that you're giving are truthful and
24    accurate.  Fair enough?
25       A   It is.
```

Page 15

```
 1       Q   All right.  Now, you're sitting here
 2    today in Towson, Maryland, in a Sheraton Hotel; is
 3    that correct?
 4       A   That is.
 5       Q   All right.  You are normally, I believe,
 6    over at Johns Hopkins University Medical Center,
 7    correct?
 8       A   That's right.
 9       Q   All right.  Is your department aware of
10    the fact that you're sitting over here having a
11    deposition taken?
12       A   I don't know if anybody knows about this
13    today, but they wouldn't be surprised, I mean, to
14    hear it if I told them.
15       Q   All right.  They know that you
16    frequently give depositions so they would not be
17    surprised; is that correct?
18           MS. BROWN:  Objection to form.
19           THE WITNESS:  They -- I don't know about
20    frequently, but they know that -- that I do give
21    depositions.
22    BY MS. PARFITT:
23       Q   All right.  Very good.
24           Would you please introduce your formal
25    God-given name for the ladies and gentlemen of the
```

Page 16

```
 1    jury.
 2       A   Sure.  It's Gregory --
 3           MS. BROWN:  Objection.  There's no jury
 4    here.
 5           MS. PARFITT:  There may be.
 6           MS. BROWN:  Go ahead, Dr. Diette.
 7           THE WITNESS:  My parents gave it to me,
 8    for what it's worth, but it's Gregory Bruce
 9    Diette.
10    BY MS. PARFITT:
11       Q   Okay.  Very good.
12           Dr. Diette, what I'd like to do is mark
13    as Exhibit 1 a notice of the deposition.
14           (Diette Exhibit No. 1 was marked
15            for identification.)
16    BY MS. PARFITT:
17       Q   Dr. Diette, if I may, Exhibit 1 is the
18    notice of deposition.  Have you seen that document
19    before?
20       A   Yeah, I've certainly seen -- seen
21    something just like this.
22       Q   All right.  Do you see at the back of
23    the deposition, there is a notice that -- there is
24    a request for you to bring certain information to
25    your deposition?  Do you see that?
```

Page 17

```
 1       A   Yes.
 2       Q   All right.  Have you had a chance to
 3    review that?
 4       A   I have.
 5       Q   All right.  How recently?
 6       A   Last week sometime.
 7       Q   All right.  Was it provided to you by
 8    counsel?
 9       A   I think that's the only way I could get
10    it.
11       Q   Okay.  Very good.
12           Now, yesterday, perhaps early in the
13    morning, I was also provided a copy of the
14    Defendants' Response to the Plaintiffs' Document
15    Requests Contained in the Notice of Oral and
16    Videotaped Deposition.
17           Let me show you what we will have marked
18    as Exhibit No. 2.
19           (Diette Exhibit No. 2 was marked
20            for identification.)
21    BY MS. PARFITT:
22       Q   Dr. Diette, let me present you with a
23    copy of Exhibit No. 2.
24           All right.  Dr. Diette, my understanding
25    is that this document, Exhibit No. 2, represents
```

5 (Pages 14 to 17)

Gregory B. Diette, M.D.

Page 18

1   your responses to the requests that were
2   propounded upon you to -- for documents and other
3   materials prior to your deposition, correct?
4           MS. BROWN: Objection to the form. It
5   represents the lawyer's objections to the document
6   requests you served.
7           MS. PARFITT: Fair.
8           THE WITNESS: I -- I think Ms. Brown's
9   got it right.
10  BY MS. PARFITT:
11      Q   All right. Did you -- well, let's have
12  marked the attachment to the response to
13  plaintiffs' document, which was prepared by your
14  lawyers. And let's separately mark as Exhibit
15  No. 3 the attachments, if you will.
16      A   Should I pull this apart or -- or you
17  want to do that?
18      Q   And for purposes of the record,
19  Exhibit 2 will represent the entire document, the
20  response to plaintiffs' request, and No. 3 will
21  represent just the attachments to the request,
22  which would be material that you, Dr. Diette, were
23  to provide.
24          (Diette Exhibit No. 3 was marked
25          for identification.)

Page 19

1   BY MS. PARFITT:
2       Q   And we'll briefly just review what's
3   here, so we can move on to other areas.
4           The first page of that document
5   indicates supplemental materials reviewed and
6   considered.
7           MS. BROWN: Counsel, can we go off the
8   record for a second?
9           MS. PARFITT: Yes.
10          THE VIDEOGRAPHER: The time is 9:03.
11  We're going off the record.
12          (Pause in the proceedings.)
13          THE VIDEOGRAPHER: The time is 9:04 a.m.
14  We're back on the record.
15          MS. BROWN: Good morning. This is Ali
16  Brown for J&J. We're back on the record, having
17  taken a short break to put the cameras on both the
18  questioner and myself, and we'll proceed, of
19  course, with the camera on Dr. Diette. Thank you.
20          MS. PARFITT: Thank you. And I should
21  have asked, there's no one on the phone, is there,
22  today?
23          THE VIDEOGRAPHER: There is no phone
24  present here today.
25          MS. PARFITT: Perfect. Thank you very

Page 20

1   much.
2   BY MS. PARFITT:
3       Q   All right. Dr. Diette, number -- or
4   Exhibit No. 3, the first document, Supplemental
5   Materials Reviewed and Considered, did you prepare
6   this Supplemental Materials Reviewed and
7   Considered?
8       A   I contributed to it, but I didn't do the
9   typing.
10      Q   Okay. What does that mean when you say
11  you contributed to it?
12      A   I helped to clarify what other --
13  because this -- this looks like it's all
14  reports -- I just want to make sure what's here --
15  reports, a couple of papers probably, and I -- I
16  helped to verify that these were also things that
17  I had -- had received and had a chance to look at.
18      Q   All right. So would it be fair to say
19  that the 23 items listed on this were materials
20  that somebody typed on a list and asked that you
21  review it; is that correct?
22          MS. BROWN: Objection to the form.
23  Misstates his testimony.
24          THE WITNESS: So I think, just in terms
25  of the sequence, I mean I've gotten materials in

Page 21

1   this matter over a period of time, right. So they
2   come in dribs and drabs. And a lot of this looks
3   like some of the more recent things that came, you
4   know, because you guys have been doing
5   depositions, and some of the reports came in later
6   and so forth. So it's really -- that's how I got
7   the materials, and then this is just to make sure
8   that I had a complete list of everything that I've
9   gotten.
10  BY MS. PARFITT:
11      Q   All right. And the reason I asked is
12  because you submitted your report on
13  February 25th, 2019. So may I assume that
14  everything on the list, Exhibit No. 3, the first
15  page, supplemental, represents documents you
16  received after February 25th, 2019, correct?
17          MS. BROWN: Objection to the form.
18          THE WITNESS: I wouldn't assume that. I
19  mean, so certainly some things here, right. So
20  the expert reports that are dated 2/25, I didn't
21  have, you know, even on the day that I submitted
22  mine, so those came after. Something like the
23  Barnard study, I may well have had that. I mean,
24  my -- my goal here was to -- just to make sure
25  that we hadn't left anything off.

Gregory B. Diette, M.D.

Page 22

BY MS. PARFITT:

Q   All right.  Is it fair to say that the items that are listed on Exhibit No. 2 -- 3 were not items that you considered for purposes of the opinions you've expressed in your report of February 25th, 2019?

MS. BROWN:  Objection to the form.

THE WITNESS:  So I -- it's very possible that the Barnard study I did consider.  Trabert, I can't remember.  But definitely, right, the expert reports that are dated on 2/25, I couldn't have considered.  And anything that's a deposition transcript that happened after 2/25, obviously I couldn't have considered that either.

BY MS. PARFITT:

Q   All right.  Very good.

The information thereafter, I believe we have -- one, two, three -- four invoices.  They begin with the date of 12/14/2018, and end with a date of 3/15/19.

Are there any other invoices that you would like to share with me today?

A   I don't have any others that I'm aware of.

Q   Are you preparing any invoices for your

Page 23

time post the very last invoice which is dated 3/15/2019?

A   I will be.

Q   All right.  How many hours have you spent since your submitting the invoice of 3/15/2019?

A   Let's see, three -- I would estimate about -- about 20 hours or maybe 25 hours, give or take.

Q   All right.  And what is your hourly rate?

A   So to clarify, so when on here it says it's 485, my -- my rate itself is actually $400 an hour, and that's the amount that was charged.

Q   Okay.  Now, is the amount that was charged, 400, because you worked with someone else who assists you with preparing the materials?

A   It's not --

MS. BROWN:  Objection to the form of the question.

THE WITNESS:  Sorry.

MS. BROWN:  Go ahead.  You can answer.

THE WITNESS:  No, it's because that's how much I've asked to be paid is $400 per hour.

BY MS. PARFITT:

Page 24

Q   All right.  Let me get this straight.  Your hourly rate is 485.

A   Well, sort of.  I'll describe it if you'd like here.

Q   Well, I -- you can understand my confusion.  If your hourly rate is 485, I want to know you're -- why I'm getting --

A   You don't need to be confused for very long, though.

MS. BROWN:  Hold on.  Hold on.

Counsel, you've got to let him answer the question.

MS. PARFITT:  Sure.

MS. BROWN:  He is endeavoring to set that straight.

MS. PARFITT:  Please.

MS. BROWN:  So go ahead.

THE WITNESS:  I think it's pretty easy.  I charge $400 an hour, and Medical Science Affiliates prepares this invoice, and part of their business model is to add an hourly rate to -- to my rate.

BY MS. PARFITT:

Q   Okay.  And I want to talk a little bit about that in a moment, but that's exactly one of

Page 25

the issues I need some clarification on.  But let's finish up the bills.

A   Mm-hmm.

Q   We have a bill for 12/14/2018 for $17,103.75.  Correct?

A   Correct.

Q   And we have a bill for 1/15/2018 for $5,068.02, correct?

A   That's correct.

Q   We have a bill for 2/12/2019 for $35,375.  Is that correct?

A   It is.

Q   And we have a bill for $20,973.75; is that correct?

A   It is.

Q   And then we have an additional 20, maybe 25 hours that you will charge at the rate of $400, although Medical Science Affiliates gets $85 of that, correct?

A   That's correct, although I think -- I don't know if you're following -- well, that's correct.  Go ahead.

Q   Okay.  And we'll explore that in a minute.

A   Okay.

7 (Pages 22 to 25)

Gregory B. Diette, M.D.

1     Q   Now, attached to that is -- it has an
2   exhibit on it, Plaintiffs' Exhibit No. 7, and it
3   appears to be several pages of notes.
4         Do you see that?
5     A   I do.
6     Q   All right.  What are these notes?
7     A   Well, these -- I haven't looked to see
8   for sure what's --
9         MS. BROWN:  And, Counsel, just to make
10   sure the record is clear, this was produced in
11   response per your request for his notes that were
12   marked at the Ingham deposition.  So this exhibit
13   number is the marking from the Ingham deposition,
14   and these were the notes that he produced there
15   that I'm frankly sure you have access to, but in
16   the effort of cooperation, we reproduced them here
17   per your request.
18   BY MS. PARFITT:
19     Q   So, Doctor --
20     A   It's -- oh, go ahead.  I'm sorry.
21     Q   Go ahead.  You were going to tell me
22   what they are.
23     A   Yeah, and I didn't know if that was
24   the -- the sufficient answer, because that's
25   literally, I guess, what they are right there.

1   These are -- they're an exhibit.  But did you mean
2   something else, like --
3     Q   Well, now that I've had clarification by
4   your attorney, that does help a bit, but I do have
5   a couple of questions.
6         MS. MILLER:  For the record, she's not
7   his attorney.  She's J&J's attorney.
8         MS. PARFITT:  We're going to have one
9   examiner today.  So you and Ali decide who that's
10   going to be.
11         MS. BROWN:  Okay.  Counsel, let's keep
12   going with the questions for Dr. Diette so we
13   don't waste the doctor's time.
14         MS. PARFITT:  Believe me, I don't want
15   to waste my time.  So let's -- okay.  I realize
16   every now and again it happens.
17   BY MS. PARFITT:
18     Q   So, Dr. Diette, these are notes that you
19   prepared back at the time of the Ingham
20   deposition, correct?
21     A   So not literally.  Right, there are -- I
22   was asked, and I don't remember exactly what --
23   what was on the notice, but I was asked to bring
24   any notes that I had made.  So they're not
25   necessarily for the Ingham matter.  They're notes

1   that I just made as I was reading through
2   different articles.
3     Q   Okay.  Would --
4     A   No, I'm sorry.
5     Q   Are you finished?
6     A   No, that's just what I was going to say,
7   so these are -- it just represents just notes that
8   I was making at certain times when I was looking
9   at some of the articles.
10     Q   Okay.  When did you first start looking
11   at any of the articles?
12     A   Sometime in -- by -- if we're talking
13   about the articles, meaning articles pertaining to
14   ovarian cancer and talcum powder, is it?
15     Q   Well, it's a good question, because you
16   just said when you started looking at any of the
17   articles, are you talk- -- do these represent any
18   articles or do these represent articles of ovarian
19   cancer and talcum powder?
20     A   Yeah, yeah.
21         MS. BROWN:  And hold on, I think the
22   record is going to be unclear.  When you say
23   "these," are you referring to what has been marked
24   as Plaintiffs' Exhibit 7 in response to your --
25         MS. PARFITT:  Correct.

1         MS. BROWN:  -- notice of deposition?
2   Okay.
3         THE WITNESS:  So this would have been
4   sometime in 2017 that -- that I started.  I don't
5   know if these notes were made in 2017, but I
6   just mean that that's the answer to when I started
7   to look at those article -- articles.
8   BY MS. PARFITT:
9     Q   And we'll get to that timeline in a
10   moment.
11         Are there any additional notes that you
12   have prepared post Plaintiffs' Exhibit No. 7,
13   which I understand you presented at the Ingham
14   deposition?
15     A   I don't think so.  I'll give you an
16   example of something that I don't know whether you
17   consider it a note or not.
18     Q   Okay.
19     A   Like as I was preparing my report, I
20   would put like a -- like a little sticker on a
21   paper where I wanted to pull a quote into the --
22   into the paper, and then I would tear that off and
23   throw it away because it wasn't, you know, useful
24   anymore.  But nothing else that kind of -- that
25   looks like this.

Gregory B. Diette, M.D.

Page 30

1      Q   All right.  So you would put a sticker
2  on a paper like when I wanted to put a quote in,
3  and then I tore it off.
4          Are these medical records that -- or
5  excuse me, medical articles that you were
6  reviewing?
7      A   These are scientific articles, yeah, the
8  ones that informed my report.
9      Q   All right.  So do you have a stack of
10 scientific and medical articles that informed your
11 report at your office, at your home?
12     A   I've got -- I've got little piles of
13 stuff everywhere you can look.
14     Q   Okay.  Do any of them have markings on
15 them or any stickies?
16     A   I don't think there's any stickies
17 anymore.  If they have markings, there could be
18 some that have yellow highlights.
19     Q   All right.
20     A   But I don't think any that have like
21 writing on them per se.
22     Q   Okay.  But there might be yellow
23 highlights on them, correct?
24     A   There sure could be, yeah.  Not on all
25 of them, but could be on some.

Page 31

1      Q   All right.
2          MS. PARFITT:  I'll address this with
3  counsel later, but I would request copies of all
4  those highlighted articles that you may have
5  somewhere.  But we can talk about that --
6          MS. BROWN:  We can talk about that off
7  the record.
8          THE WITNESS:  Okay.
9  BY MS. PARFITT:
10     Q   All right.  So other than notations on
11 some medical and scientific articles, there would
12 be no additional notes like that which forms part
13 of the part of Plaintiffs' Exhibit 7, correct?
14     A   Correct.
15     Q   All right.  In the request to appear
16 here at your deposition, there was an inquiry with
17 regard to, I believe you called it, Medical
18 Science Affiliates.
19     A   Correct.
20     Q   All right.  Do you have a retainer
21 agreement with Medical Science Affiliates?
22         MS. BROWN:  And I'm just going to
23 interject here, Counsel.  To the extent you've
24 made a request for any documentation regarding
25 Medical Science Affiliates, you have our

Page 32

1  objections to those document requests, and
2  Dr. Diette's testimony will be consistent with
3  that.
4          MS. PARFITT:  My question -- are you
5  objecting to providing me with a copy of
6  Dr. Diette's agreement with Medical Science
7  Affiliates?
8          MS. BROWN:  Well, we haven't even
9  established that there is such a thing.  I
10 understand you to be getting into questions
11 regarding Medical Sciences.
12         MS. PARFITT:  I will, yeah.
13         MS. BROWN:  I understand you've asked a
14 number of document requests regarding Medical
15 Sciences, and I just want to make sure that the
16 record is clear that we have endeavored to respond
17 to those and object accordingly.
18         MS. PARFITT:  Okay.  And we're going to
19 try and reduce the number of narrative objections
20 if we can so we can get through this --
21         THE WITNESS:  I remember your question
22 if you want me to answer it.
23 BY MS. PARFITT:
24     Q   I do.
25         I wanted to know in response to request

Page 33

1  number 14, whether or not you have any contracts,
2  agreements, writings conveying mutual
3  understandings between you and Medical Science
4  Affiliates or any entity of or related to Medical
5  Science Affiliates for the past ten years?
6          MS. BROWN:  And, Counsel, I'm going to
7  object to the extent that any of those requests or
8  documentation involve work product that we have
9  asserted privilege over, he will not be answering
10 that question under the work-product privilege.
11         MS. PARFITT:  Okay, Counsel, you can
12 assert work product.  Got it.  Is that what you're
13 asserting right now?
14         MS. BROWN:  Yes.  He's not going to
15 answer that question.  We're asserting work
16 product.
17         MS. PARFITT:  So he is not going to
18 answer my question with regard to any agreement or
19 writing or contracts that he has with Medical
20 Science Affiliates under the guidance of counsel
21 that is objecting and refusing to have you answer
22 that question.  Is that correct -- record correct?
23         MS. BROWN:  That's correct, Counsel.
24         MS. PARFITT:  Okay.
25 BY MS. PARFITT:

9 (Pages 30 to 33)

Gregory B. Diette, M.D.

Page 34

1      Q   And we're going to talk about Medical
2   Science in just -- just a moment.
3           Anything else other than the documents
4   that I have in front of you, Exhibit 7, the
5   invoice and your supplemental reliance, that you
6   have brought to your deposition today?
7      A   So I didn't bring this today.
8      Q   Okay.  Fair enough.
9      A   I mean I -- I didn't bring anything -- I
10  mean I didn't bring any materials to the
11  deposition.
12     Q   Okay.
13          All right.  Dr. Diette, what is your
14  profession?
15     A   Well, I'm a physician, epidemiologist,
16  researcher.
17     Q   Okay.  You're actually a professor of
18  medicine at the Department of Pulmonary and
19  Critical Care, is that correct, at Johns Hopkins?
20     A   Literally it's the Department of
21  Internal Medicine, and it's the Division of
22  Pulmonary, Critical Care, and Sleep Medicine.
23     Q   Okay.  Dr. Diette, do you agree that
24  ovarian cancer ranks as the fifth cause of
25  neoplastic death among women?

Page 35

1      A   I've seen -- I've seen it listed on --
2   you know, on lists of causes of death.  I don't
3   know what you mean by "agree with," but I mean --
4      Q   Do you have a difference of opinion as
5   to whether or not ovarian cancer ranks fifth with
6   regard to causes of neoplastic death among women?
7          MS. BROWN:  Objection.  Asked and
8   answered.
9          THE WITNESS:  It doesn't seem to be
10  something that there's an opinion on.  That's what
11  I mean.  I mean it's like an objective fact.  I
12  mean if there's a list that's put out by, you
13  know, government stats, and it's number 5 on that
14  list, that's -- that's an objective fact.
15  BY MS. PARFITT:
16     Q   Do you object to that?
17          MS. BROWN:  Let him answer, Counsel.
18          MS. PARFITT:  I have.  Thank you.
19          Are you objecting as --
20  BY MS. PARFITT:
21     Q   Let me ask you this, Doctor.
22     A   Okay.
23     Q   Have you seen that in any published
24  scientific literature?
25          MS. BROWN:  Objection to the form.

Page 36

1          THE WITNESS:  I've seen -- I've seen it
2   ranked highly.  I don't remember if it was fifth,
3   but I've seen it ranked highly.
4   BY MS. PARFITT:
5      Q   All right.  Are you aware of the fact
6   that ovarian cancer accounts for more deaths than
7   any other cancer in the female reproductive
8   system?
9      A   Ovarian cancer.  Is that -- is that a
10  statement from a -- like a document or something?
11     Q   It's a question.
12     A   It's a question that --
13     Q   Do you know whether or not ovarian
14  cancer accounts for more deaths than any other
15  cancer of the female reproductive system?
16     A   I know it's a highly ranked one.  I
17  wouldn't be able to say whether it's more than all
18  others.
19     Q   All right.  Do you know whether
20  approximately 22,000 new cases of ovarian cancer
21  identified each year and 14,000 women
22  approximately will die in the United States alone
23  from ovarian cancer?
24          MS. BROWN:  Objection to the form.
25          THE WITNESS:  I haven't memorized

Page 37

1   anything with exact numbers like that.  I mean I'm
2   not saying it's far off from the truth, and if you
3   have, you know, some document that supports that,
4   I'd be glad to look at it and see if it looks
5   right, but -- but I haven't memorized the exact
6   number.
7   BY MS. PARFITT:
8      Q   All right.  And you know, Dr. Diette,
9   this won't be a memory test, but I do understand
10  that you have spent almost $100,000 in this case
11  alone reviewing medical and scientific articles,
12  so all I'm simply asking is that you provide me
13  with your best answers.  Fair?
14          MS. BROWN:  I object to the --
15          MS. PARFITT:  That's all, Counsel.
16  That's all --
17          MS. BROWN:  -- speech by counsel.  He's
18  here to answer your questions.
19          MS. PARFITT:  Counsel --
20          MS. BROWN:  That is a highly
21  objectionable statement, Counsel, and you know it.
22  If you have a question to ask him, he is here to
23  answer it.  We're not going to be here to have you
24  give speeches on the record about the fees that he
25  has charged for the work that he has done.

10  (Pages 34 to 37)

Gregory B. Diette, M.D.

Page 38

1      MS. PARFITT: Ms. Brown, your objection,
2  according to the CMO in the MDL case, perhaps
3  you're doing other state depositions, is that you
4  say, "Objection. Form."
5      And I'll try and do my best, if you'd do
6  the same. And I'm not admonishing you, and I hope
7  you're not admonishing me. That's not how I roll.
8      MS. BROWN:  Well, the record is going to
9  be very clear --
10     MS. PARFITT:  It will be.
11     MS. BROWN:  -- about the statement that
12 you just made about the other work that I'm doing.
13     MS. PARFITT:  I said --
14     MS. BROWN:  I am well aware of the
15 CMO --
16     MS. PARFITT:  Perfect.  Okay.
17 Counsel --
18     MS. BROWN:  -- and the deposition
19 protocol in this case.
20     MS. PARFITT:  -- that's fine.
21     MS. BROWN:  And I --
22     MS. PARFITT:  Counsel --
23     MS. BROWN:  -- expect that you will
24 abide by it --
25     MS. PARFITT:  -- let me ask questions.

Page 39

1      MS. BROWN:  -- and not interrupt me.
2  Thank you.
3      MS. PARFITT:  I am not going to, but I
4  would ask the same courtesy.  And, listen, we have
5  a long day to go, and it will be longer --
6      MS. BROWN:  Just ask the doctor a
7  question and move on.
8      MS. PARFITT:  -- if we go back and
9  forth.  "Objection, form" is the appropriate way,
10 or we will have to call the judge.
11     MS. BROWN:  Happy to do it.
12     MS. PARFITT:  Very good.  So will I.
13 BY MS. PARFITT:
14     Q   All right.  Dr. Diette, do you have an
15 understanding from your review of the scientific
16 and medical literature that ovarian cancer cases
17 are detected and diagnosed at a late stage and
18 there are limited prospects for cure?
19     MS. BROWN:  Objection to the form of the
20 question.
21     THE WITNESS:  I didn't listen to what
22 you said because --
23 BY MS. PARFITT:
24     Q   Sure.
25     A   But just for the reason that I'm still

Page 40

1  thinking about your question before, I just wanted
2  to clarify that I -- because when you said that I
3  billed $100,000, I think what you might be doing
4  is adding up all of those MSA invoices, which that
5  doesn't all go to me.  I mean there's a way to
6  figure out how much that I've billed, but -- but
7  you wouldn't be correct if you're saying that
8  those four invoices represent the amount that I've
9  charged.
10     Q   Okay.  And we'll talk about that, but I
11 appreciate the clarification.
12     So, the other question is, do you have
13 an understanding that most ovarian cancer cases
14 are detected and diagnosed at a late stage and
15 there are limited prospects for cure?
16     MS. BROWN:  Same objection.
17     THE WITNESS:  I have that general
18 understanding.
19 BY MS. PARFITT:
20     Q   Okay.  Do you have any knowledge as to
21 what the mortality and morbidity of ovarian cancer
22 is?
23     A   Well, the morbidity is not a number,
24 right.  I mean you're talking about what are the
25 consequences?

Page 41

1      Q   You're right.
2      A   And then the mortality would be
3  something that's an objective fact that there's a
4  percentage of people with the disease that die.
5      Q   Right.
6      A   I don't know the number.  I didn't
7  memorize that.  If it's important, we can look it
8  up, but it's a high -- it's a high proportion that
9  die from it.
10     Q   Fair.  Do you know what the latency is
11 for ovarian cancer?
12     A   Between what and what?
13     Q   The latency period between -- let's take
14 some examples -- asbestos and ovarian cancer.
15     MS. BROWN:  Objection to the form of the
16 question.
17     You can answer if you understand.
18     THE WITNESS:  So the -- that's a tricky
19 issue, I think in a way, because I'm not sure that
20 it's been fully established that asbestos causes
21 ovarian cancer.  I mean I'm aware of what the IARC
22 has put out on it, but I'm not sure that that's a
23 fact.  But I don't recall seeing in there where
24 the latency, if it was even true, whether that
25 was -- whether that was established.

Gregory B. Diette, M.D.

Page 42

1   BY MS. PARFITT:
2       Q   All right.  Have you in the course of --
3   strike that.
4           All right.  From a review of the
5   materials you reviewed attached to your expert
6   report, Doctor, I see that you reviewed the Purdie
7   case --
8           MS. BROWN:  Counsel -- Counsel, is there
9   a page you want to point him to so we can follow
10  along?
11          MS. PARFITT:  I'm still asking the
12  question, Counsel.
13  BY MS. PARFITT:
14      Q   Dr. Diette, attached to your report is a
15  materials reviewed.  And on page 7, it lists that
16  you have read the Purdie case, which is a 1995
17  case study -- excuse me, not case study, but a
18  scientific article.
19          MS. BROWN:  Objection to the form.
20          Take your time to get to that page,
21  Doctor.
22          THE WITNESS:  It's 7 in my report?
23  BY MS. PARFITT:
24      Q   It is on page 7 of your report.
25          MS. BROWN:  And, Counsel, I think we

Page 43

1   have a disconnect here.  Are you referring to the
2   7 of the reliance list?
3           MS. PARFITT:  I am.  I'm sorry about
4   that.
5           THE WITNESS:  Oh.  Is it 7 of the -- the
6   exhibit you gave me or is it part of what's my
7   reliance list that's attached to my report?
8   BY MS. PARFITT:
9       Q   What I have is your reliance list, and
10  it's page 7 of your reliance list.
11      A   I got you.
12          MS. BROWN:  Got that.  Okay.
13  BY MS. PARFITT:
14      Q   And I believe you have three Purdie --
15  excuse me, two Purdie cites, one 2003 and one
16  1995.  Correct?
17      A   That's correct.
18      Q   Okay.  Did you indeed review the Purdie
19  article for purposes of your testimony here today?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  I don't think I reviewed
22  it for the purpose of my testimony, but I -- I
23  included it because it's something I reviewed at
24  some point prior to preparing the report.
25  BY MS. PARFITT:

Page 44

1       Q   Okay.  All right.  And we're going to
2   talk about that in conjunction with -- just hold
3   tight.  I'm going to set that aside, and let me
4   ask you this --
5       A   Can I ask just real quick?
6       Q   Sure.
7       A   There's like a cold breeze blowing down
8   here, and I know we will regret making it warmer
9   in here at some point.
10      Q   Sure.
11          MS. PARFITT:  Well, let's take a moment
12  and let's see if we can --
13          MS. BROWN:  Why don't we go off the
14  record for one second.
15          THE VIDEOGRAPHER:  The time is 9:25 a.m.
16  We're going off the record.
17          (Pause in the proceedings.)
18          THE VIDEOGRAPHER:  The time is 9:27 a.m.
19  and we are back on the record.
20          (Diette Exhibit No. 4 was marked
21          for identification.)
22          MS. PARFITT:  Ready?
23          THE VIDEOGRAPHER:  Oh, yeah, we're on.
24          MS. PARFITT:  Okay.  Thank you.
25  BY MS. PARFITT:

Page 45

1       Q   Dr. Diette, let me show you what's been
2   marked as Plaintiffs' Exhibit No. 4 to the Diette
3   deposition, and I'll represent to you -- sorry --
4   I'll represent to you that this is the --
5           MS. BROWN:  Thank you.
6   BY MS. PARFITT:
7       Q   -- an article by Dr. Purdie entitled
8   "Ovulation and Risk of Epithelial Ovarian Cancer"
9   published in the International Journal of Cancer
10  in 2003.  Do you see that?
11      A   I do.
12      Q   All right.  If I can direct your
13  attention to page 231 of that article.
14          MS. PARFITT:  Let's put it on the ELMO.
15  BY MS. PARFITT:
16      Q   Okay.  And, Dr. Diette, I'll put it up
17  on the overhead as well.  About halfway down --
18  there you go -- left-hand column, Dr. Purdie and
19  authors state:  "Thus, the latency period of more
20  advanced malignant epithelial ovarian cancer could
21  be estimated to be approximately 30 to 40 years."
22          Did I read that correctly?
23      A   You read it fine.
24      Q   All right.  Do you agree or disagree
25  that the latency period of more advanced malignant

12 (Pages 42 to 45)

Gregory B. Diette, M.D.

Page 46

1  epithelial ovarian cancer can be estimated to be
2  approximately 30 to 40 years?
3      A   Well, I think, you know -- so there's no
4  way for me to know for sure, right, but could
5  be -- it seems like a pretty safe statement
6  because it could be more, it could be less.
7          It's also an incomplete sentence, right,
8  in the sense that when you talk about the latency,
9  you talk about the latency between a particular
10 kind of exposure.  I mean, in this context, right,
11 there may have other -- there may be other ways
12 people use that word, but in this context it's the
13 time from the exposure to the development of the
14 disease.  So there's no exposure mentioned in that
15 sentence, so it's a little -- a little loose, you
16 know.
17         MS. PARFITT:  All right.  Move to strike
18 that last part of your statement.
19 BY MS. PARFITT:
20     Q   Okay.  Dr. Diette, do you agree that
21 it's imperative to develop public health programs
22 that either reduce the incidence or detect ovarian
23 cancer at an earlier stage?
24     A   It's an agreeable statement.
25     Q   Okay.  In developing public health

Page 47

1  programs, does -- in order to set up preventive
2  programs, detection programs, does that include
3  getting information about whatever the putative
4  exposure may be to individuals who may be
5  susceptible to them?
6          MS. BROWN:  Objection to the form of the
7  question.
8          MS. PARFITT:  Let me strike that
9  question completely.  It was a lousy question.
10 All right.
11         THE WITNESS:  It was --
12         MS. PARFITT:  And I'm going to agree
13 with counsel on that.  How about that?
14         THE WITNESS:  It was below average.  It
15 wasn't lousy.
16 BY MS. PARFITT:
17     Q   Sure.  Okay.
18         When one develops a public health
19 program in order to alert individuals about a
20 public health issue, what is the manner, let's
21 say, in your department to do that?
22         MS. BROWN:  Objection to the form of the
23 question.
24         THE WITNESS:  I'm not sure what we're
25 talking about.  I mean --

Page 48

1  BY MS. PARFITT:
2      Q   Sure.  And, you know, that might be --
3  that might be fair.  So let me go for a third try.
4  Okay?
5      A   Okay.
6      Q   Do you develop public health programs
7  for Johns Hopkins?
8      A   I'm trying to think -- I would say
9  generally, no.  I mean --
10     Q   It's not part of your role.
11         MS. BROWN:  Well, let him finish.  I'm
12 sorry.
13         THE WITNESS:  But I don't know -- I
14 mean, I don't know what -- I mean that's a pretty
15 broad topic, which is what's a public health
16 program.  So I'm just thinking like, for example,
17 you know, I've done work with asthma in -- in the
18 inner city nearby.
19 BY MS. PARFITT:
20     Q   Correct.
21     A   And we certainly have a program, you
22 know, that deals with -- with that.  I wouldn't
23 say I've developed it as a public health program
24 per se but as a -- as a research program.  But,
25 you know, where public health starts and stops,

Page 49

1  I'm not exactly sure.
2      Q   Fair enough.
3          All right.  Talcum powder products are
4  widely available, correct?
5          MS. BROWN:  Objection to the form of the
6  question.
7          THE WITNESS:  You know, they -- I
8  guess -- so anyway, I'm an epidemiologist, so when
9  somebody says something like that, like when you
10 say it, like I'm thinking like to whom or for whom
11 or where or when or something.  I mean there's
12 sort of like a time and place and something else
13 more to that.  I think it's a common product, but
14 I don't -- I don't know what it means to be widely
15 available.
16 BY MS. PARFITT:
17     Q   All right.  Did you ever ask Johnson &
18 Johnson or their attorneys a question with regard
19 to how many bottles of Johnson & Johnson's Baby
20 Powder they distribute each year in America?
21         MS. BROWN:  Objection to the form of the
22 question.
23         THE WITNESS:  I have not asked that.
24 BY MS. PARFITT:
25     Q   Okay.  Similarly, have you ever asked

13 (Pages 46 to 49)

Gregory B. Diette, M.D.

1  Johnson & Johnson how many bottles of their Shower
2  to Shower they distributed?
3      A.  No.
4      MS. BROWN:  Same objection.
5  BY MS. PARFITT:
6      Q.  All right.  Have you ever purchased
7  talcum powder products?
8      A.  I -- I don't do the shopping.  You know,
9  and so it -- like, I don't -- I don't buy anything
10  at the store.
11     Q.  Okay.  Fair enough.
12         Are you aware of the fact that Johnson &
13  Johnson continues to sell their talcum powder
14  products?
15     A.  I wasn't aware that they weren't.  I
16  mean, I don't know where I would get that from,
17  but as best as I can tell.
18     Q.  All right.  Have you ever looked at the
19  back of a Johnson & Johnson's Baby Powder product
20  to see what it says about its usage --
21     MS. BROWN:  Objection.
22  BY MS. PARFITT:
23     Q.  -- and direction?
24     MS. BROWN:  Excuse me.  Objection to the
25  form of the question.

1  BY MS. PARFITT:
2      Q.  Okay.  Let me show you what I'll have
3  marked as Exhibit --
4      MS. PARFITT:  Where are we?
5      MR. ROSEN:  Five.
6  BY MS. PARFITT:
7      Q.  -- 5.  And I'll represent to you,
8  Dr. Diette, that this is a bottle of Johnson's
9  Baby Powder, and we'll have it marked as Exhibit
10  No. 5.
11     (Diette Exhibit No. 5 was marked
12     for identification.)
13  BY MS. PARFITT:
14     Q.  Now, my understanding is that you are
15  trained, skilled, and have expertise in pulmonary
16  medicine, correct?
17     A.  Among other things.
18     Q.  And I didn't mean to limit your
19  expertise.  Okay.
20         If you will, let me show -- pass to you
21  the Exhibit No. 5, and ask that you turn it to the
22  back.  Look at the bottle.
23     MS. BROWN:  Counsel, before he does
24  that, will you put -- represent on the record
25  where this bottle that you've marked as Exhibit 5

1      THE WITNESS:  It's possible that I have
2  years ago, but not -- not recently.
3  BY MS. PARFITT:
4      Q.  Nothing recent.
5         How about since you were retained by
6  Johnson & Johnson as an expert, have you ever
7  looked at a bottle of Johnson & Johnson's Baby
8  Powder or Shower to Shower?
9      MS. BROWN:  Same objection.
10     THE WITNESS:  No.  I've seen pictures,
11  you know, in different settings, but I haven't --
12  I haven't seen a bottle of it or looked at it.
13  BY MS. PARFITT:
14     Q.  Okay.  Do you have an understanding as
15  to whether or not Johnson & Johnson's Baby Powder
16  or the Shower to Shower contains a warning on its
17  product against use in the genital area to avoid
18  ovarian cancer?
19     MS. BROWN:  Objection to the form.
20     THE WITNESS:  I don't know whether they
21  do or don't.  But I'm also not, you know, skilled
22  in warnings.  So I wouldn't -- I mean, I -- even
23  if it said something, I wouldn't necessarily be
24  the person to tell you whether that's a warning or
25  not.

1  came from and when it was purchased and by whom?
2      MS. PARFITT:  Counsel, I'm asking the
3  questions.  I just represent that it is a bottle
4  of Johnson & Johnson's Baby Powder purchased from
5  a store.
6      MS. MILLER:  Michelle, I'm trying
7  really, really hard not to say a word today.
8      MS. PARFITT:  Sure.
9      MS. MILLER:  I know that I'll annoy
10  you --
11     MS. PARFITT:  Oh, no, you're not.
12     MS. MILLER:  -- but it's not Johnson &
13  Johnson's Baby Powder.  It's Johnson's Baby
14  Powder, and you keep saying it wrong.
15     MS. PARFITT:  That's fine.  That's fine.
16     MS. MILLER:  And I think for the record,
17  it's important.  It's a product by JJCI, as you
18  know.
19     MS. PARFITT:  That's fine.
20     MS. MILLER:  So we just need
21  Johnson's --
22     MS. PARFITT:  Okay.  And why don't we --
23  whenever I -- since I'm sure I won't remember all
24  that, why don't we just reflect for the record
25  that when I say Johnson & Johnson's Baby Powder,

14 (Pages 50 to 53)

Gregory B. Diette, M.D.

Page 54

1    that it's Johnson's Baby Powder. Okay?
2          MS. BROWN: And just to get my -- my
3    objection on the record to what you marked as
4    Exhibit 5, we have no representation of when this
5    was bought, by whom it was bought.
6          With that, Dr. Diette, here is
7    Exhibit 5.
8          MS. PARFITT: Thank you.
9    BY MS. PARFITT:
10         Q   All right, Dr. Diette, look at the back
11   of that. Do you see that there's a little picture
12   that looks like a little baby with an X on it?
13         A   I do.
14         MS. BROWN: Objection to the form.
15   BY MS. PARFITT:
16         Q   Okay. Okay. What does that say on the
17   back of the product?
18         A   It says: "Warning: Keep powder away
19   from child's face to avoid inhalation, which can
20   cause breathing problems. Avoid contact with the
21   eyes. For external use only."
22         Q   Okay. And at the bottom of that
23   product, does it happen to say what's contained in
24   it?
25         MS. BROWN: Objection to the form of the

Page 55

1    question.
2          THE WITNESS: It has a line called
3    "Ingredients," which says "Talc, fragrance."
4    BY MS. PARFITT:
5          Q   Okay. Dr. Diette, you've been retained
6    by Johnson & Johnson since when, for purposes of
7    the ovarian cancer cases?
8          MS. BROWN: Objection. Form. Do you
9    mean the Ingham case or do you mean the MDL?
10   BY MS. PARFITT:
11         Q   Well, let me clarify.
12         When were you first -- it's a fair
13   question -- when were you first retained by
14   Johnson & Johnson to represent them in either
15   mesothelioma cases or ovarian cancer cases?
16         MS. BROWN: Objection to the form. He
17   is an expert witness on behalf of Johnson &
18   Johnson. He is not here representing anyone.
19         THE WITNESS: That honestly sounds like
20   Ms. Brown's job, I mean, but -- but I guess to try
21   to answer your question, the -- I was first asked
22   to review the epidemiology in 2017.
23   BY MS. PARFITT:
24         Q   Okay. And was that the first time that
25   Johnson & Johnson had asked you to provide any

Page 56

1    expert work for them?
2          MS. BROWN: Objection to the form.
3          THE WITNESS: I believe so, yeah.
4    BY MS. PARFITT:
5          Q   Okay. Had you ever worked for Johnson &
6    Johnson or any of their entities prior to 2017 in
7    any type of litigation?
8          MS. BROWN: Same objection.
9          THE WITNESS: I -- I don't think so. I
10   would say almost certainly no.
11   BY MS. PARFITT:
12         Q   Okay. Since your retention in 2017, did
13   Johnson & Johnson, their medical department, their
14   regulatory department, science department, ever
15   ask that you take a look at the back of the
16   product, Johnson's Baby Powder, for purposes of
17   giving an opinion as to what scientific and
18   medical information should be on that product?
19         MS. BROWN: Objection to the form of the
20   question.
21         THE WITNESS: I would be the wrong kind
22   of expert for that. I mean I'm not a warnings
23   expert, so it wouldn't -- wouldn't make any sense
24   for anybody to ask me that question.
25   BY MS. PARFITT:

Page 57

1          Q   I'm not asking you about the adequacy of
2    the warning. I'm asking you about your expertise
3    as a pulmonary medicine expert with regard to
4    inhalation issues as contained on the back of that
5    product.
6          A   It still wouldn't make any sense. I
7    wouldn't be the person to ask that to.
8          Q   Dr. Diette, whether or not it makes
9    sense to you or not, my question is simply this:
10   Yes or no, has Johnson & Johnson asked your
11   opinion at any point in time with regard to what
12   kind of scientific and medical information should
13   be on the back of their powder?
14         MS. BROWN: Objection. Answered three
15   times.
16         THE WITNESS: They and everybody else in
17   the world has not asked me to do anything like
18   that ever.
19   BY MS. PARFITT:
20         Q   Okay. And they, Johnson & Johnson, has
21   never asked you to -- your opinion with regard to
22   the inhalation warning; is that correct?
23         MS. BROWN: Objection. Counsel, we've
24   been through this like six times.
25         THE WITNESS: I think it's the same

15 (Pages 54 to 57)

Gregory B. Diette, M.D.

Page 58

1    warning we're talking about, right?
2    BY MS. PARFITT:
3        Q    The one that's on the back, yeah.
4        A    So it's still -- still the same.
5        Q    Okay.  And just for the record, we're
6    going to put on the ELMO -- thank you.  Just go
7    ahead and see if we can get that on there.  Okay.
8            (Counsel conferring.)
9    BY MS. PARFITT:
10       Q    And again, for clarity of the record,
11   what we've been talking about is on -- the child
12   with the X over the nose and mouth and the warning
13   that is to the far right, correct?
14           MS. BROWN:  Objection to the form.
15           THE WITNESS:  I was with you until you
16   said "to the far right."  I don't know --
17   BY MS. PARFITT:
18       Q    To the right of the baby.
19       A    Oh, I see.  I'm sorry.
20       Q    Yeah, no problem.
21       A    Yeah.  No, that's --
22       Q    That's what we're talking about.
23       A    It's to the right of the baby, yeah.
24       Q    Okay.  Very good.  All right.
25           Dr. Diette, as a scientist and a

Page 59

1    clinician, do you have a belief or opinion that
2    women should be informed of even a potential risk
3    of using talcum powder products on their genital
4    area?
5            MS. BROWN:  Objection.
6            THE WITNESS:  Not based on what I've
7    reviewed.
8    BY MS. PARFITT:
9        Q    Okay.  Is it your opinion that there is
10   no risk of ovarian cancer from the long-term use
11   of talcum powder products?
12           MS. BROWN:  Objection.  Form.
13           THE WITNESS:  I -- I don't see evidence
14   that there's a -- so I'm an epidemiologist, so the
15   way I talk about things might be a little
16   different than the way you're asking it.  But
17   there's not sufficient evidence to say that it's a
18   cause of ovarian cancer.
19   BY MS. PARFITT:
20       Q    Okay.  And we'll talk about that in a
21   little bit.
22           Do you have an understanding as to
23   whether there are other scientists and
24   epidemiologists who have reviewed the same
25   scientific and epidemiological information that

Page 60

1    you have who have a different opinion with regard
2    to the causality of talcum powder products and
3    ovarian cancer?
4            MS. BROWN:  Objection to the form.
5            THE WITNESS:  Well, I've seen like, for
6    example, the expert reports that are -- that are
7    part of this matter and some of the deposition
8    transcripts.  So -- so, yes, I mean I've seen what
9    they've said.
10   BY MS. PARFITT:
11       Q    Okay.  And from your review of those
12   expert reports, do you understand that many of
13   those scientists and epidemiologists are
14   individuals who treat women who have been
15   diagnosed for ovarian cancer?  Do you understand
16   that?
17           MS. BROWN:  Objection.  Lacks
18   foundation, calls for speculation.
19           THE WITNESS:  So I saw that there were
20   some GYN oncologists involved.  I don't remember
21   the count of them, but I saw there were GYN
22   oncologists, both on the defense and the
23   plaintiffs' side.
24   BY MS. PARFITT:
25       Q    Okay.  And the GYN oncologists would be

Page 61

1    the practice of medicine that treats women for
2    reproductive diseases and cancers like ovarian
3    cancer, correct?
4            MS. BROWN:  Objection.
5            THE WITNESS:  They -- they would be the
6    ones that provide treatment for the GYN cancers.
7    BY MS. PARFITT:
8        Q    Okay.  You're a pulmonologist, correct?
9        A    I am.
10       Q    All right.
11       A    And again, among other things.
12       Q    Understood.
13           MS. BROWN:  Let him finish, Counsel, he
14   wasn't done.
15   BY MS. PARFITT:
16       Q    My -- it's a simple question, are you a
17   pulmonologist?
18           MS. BROWN:  Wait, but he was still
19   answering.  You cut him off.  Let him finish.
20           MS. PARFITT:  Doc -- I withdraw that
21   question.
22   BY MS. PARFITT:
23       Q    Are you a pulmonologist?
24       A    I am a pulmonologist.
25       Q    All right.  As a pulmonologist, do you

16  (Pages 58 to 61)

Gregory B. Diette, M.D.

Page 62

1    treat and care for women -- treat and care and
2    provide gynecological and oncological care to
3    women who have been diagnosed with ovarian cancer?
4        MS. BROWN: Objection to the form.
5        THE WITNESS: Mostly, no, although
6    I'll just -- there was a lot in your question,
7    right, so that --
8    BY MS. PARFITT:
9        Q   You want me to break it down?
10       MS. BROWN: Let him finish first, and
11   then you can follow up.  He has to be allowed to
12   answer your question.
13       MS. PARFITT: Oh, absolutely, but if
14   it's unclear -- that was one of the --
15       THE WITNESS: I didn't say it was
16   unclear.  I just said it -- it's complicated, so
17   there's more than -- it's not just a simple
18   answer.
19       MS. PARFITT: Let me withdraw the
20   question.
21       MS. BROWN: Wait, Counsel, he's not
22   done.
23       Dr. Diette, you finish your answer, and
24   then counsel, of course, will follow up.
25   BY MS. PARFITT:

Page 63

1        Q   Okay.  Go ahead.
2        A   Thank you.
3        Q   Sure.
4        A   So, you know, I wouldn't be the person
5    who prescribes chemotherapy or provides the
6    surgery.  Part of my work is as an intensive care
7    doc in the oncology center, and so I'll see people
8    with every kind of cancer possible and provide
9    some of the care to them.
10       I see people in my clinic that have, you
11   know, pulmonary consequences of some of their
12   treatment for ovarian cancer.  And so it's -- it's
13   not a straightforward yes or no that I do or don't
14   participate, but I don't do the -- the GYN onc
15   part of that care.
16       Q   All right.  Have you in your practice of
17   pulmonary medicine ever diagnosed a woman with
18   ovarian cancer?
19       A   I can't remember ever doing that.
20       Q   All right.  Now, Dr. Diette, are you
21   aware of whether or not -- strike that.
22       Are you aware that Johnson & Johnson has
23   tested their talcum powder products?
24       MS. BROWN: Objection to the form.
25       THE WITNESS: I have some awareness of

Page 64

1    that.
2    BY MS. PARFITT:
3        Q   Okay.  What is your understanding of the
4    testing that's been performed by Johnson & Johnson
5    on their talcum powder products?
6        MS. BROWN: Objection.  That's overly
7    broad.
8        THE WITNESS: Well, like the type --
9        MS. BROWN: You mean internal, external,
10   third party, FDA?
11   BY MS. PARFITT:
12       Q   Do you understand the question?
13       A   I was actually going to say something
14   similar to what Ms. Brown said but less
15   sophisticated.
16       I mean what I meant was, were you asking
17   about like the kinds of tests that were done or --
18   or things of that sort?  I just -- I just know,
19   generally speaking, that there has been testing
20   done.
21       Q   Sure.  Let me make it very simple.
22       Are you aware of studies -- strike that.
23       Have you seen studies done by Johnson &
24   Johnson that tested and evaluated their talcum
25   powder products for the presence of asbestos?

Page 65

1        MS. BROWN: Same objection.
2        THE WITNESS: I don't think I've seen
3    anything from Johnson & Johnson, per se.
4        Is that what -- is that what you're
5    referring to?
6    BY MS. PARFITT:
7        Q   That is, yes.
8        A   Okay.  Then not -- not that I'm aware
9    of.
10       Q   All right.  I saw where you looked at
11   the depositions of Drs. Longo and Rigler.
12       MS. BROWN: Objection to the form.
13       THE WITNESS: Is that in a different
14   case?
15   BY MS. PARFITT:
16       Q   Good question.  You have their
17   depositions listed as part of the materials
18   reviewed and relied upon.  Have you read those?
19       MS. BROWN: Objection.
20       If you want to refresh yourself on your
21   reliance list, I'm sure counsel will point you to
22   the page.
23       MS. PARFITT: Absolutely.
24   BY MS. PARFITT:
25       Q   Let me direct you to -- just bear with

17 (Pages 62 to 65)

Gregory B. Diette, M.D.

Page 66

1    me one second.  I apologize here.
2           Okay.  It's -- your reference materials
3    reviewed and considered start on -- or in
4    Appendix B of your report.
5           Do you see that?
6        A   I don't see Longo and Rigler.
7        Q   Okay.  At the very top, it has
8    "Materials Reviewed and Considered by Gregory
9    Diette," and the second item under "Expert
10   References" says "Expert report of William Longo
11   and Mark Rigler."
12          Do you see that?
13       A   Oh, I do, yeah.  So I see Longo, and I'm
14   just --
15       Q   Do you see Rigler?  He's right after
16   that.  It says William --
17       A   Oh, got you.
18          MS. BROWN:  Counsel, these are reports.
19   I thought your question was about a deposition.
20          MS. PARFITT:  That's a -- that's a fair
21   objection.
22   BY MS. PARFITT:
23       Q   Have you read the expert report of
24   William Longo and Mark Rigler?
25       A   So, because I see there's a date on it

Page 67

1    of November 14th, 2018 --
2        Q   Correct.
3        A   -- I know I've seen at least a few of
4    Dr. Longo's reports, and I -- I think they're the
5    same over and over again.  So I -- if I -- if I'm
6    not mistaken, I don't think I would have reread it
7    like, you know, specifically for this matter if it
8    looked the same as others.  I think I probably
9    just like flipped through it to see what it was --
10   was there generally.
11       Q   All right.  So I understand your answer,
12   is your testimony that you don't recall
13   specifically reviewing the November 14th, 2018
14   expert report of Dr. Longo's and Rigler?
15          MS. BROWN:  Objection to the form,
16   misstates his testimony.
17          MS. MILLER:  So can I say something?
18   Because I was involved in that, I think that every
19   item with respect to litigation that we sent to
20   Dr. Diette, which would have been depositions or
21   expert reports, was put on the list because it was
22   sent to him.  I --
23          MS. PARFITT:  Oh, and I understand.  I
24   appreciate that.
25   BY MS. PARFITT:

Page 68

1        Q   But my question --
2           MS. PARFITT:  And noted.
3    BY MS. PARFITT:
4        Q   My question to you is, sitting here
5    today, what I need to know -- and if it's no,
6    that's a fine answer.  If it's yes, that's a fine
7    answer.
8           Have you read the expert report of
9    Drs. Longo and Rigler dated November 14, 2018?
10          If you did, I'm not -- I'm not --
11          MS. BROWN:  Objection to the form.  I
12   think he answered that.
13          Counsel, I think what you're really
14   after is, is he relying on that to form his
15   opinion.
16          MS. PARFITT:  Actually, I'm not.  That's
17   a good question, but I'm not asking that.
18   BY MS. PARFITT:
19       Q   Did you read the report?
20       A   So I -- I'm not sure if I read this one
21   with this particular date.
22       Q   That's fine.
23       A   But wait, wait, wait.  But, you know, if
24   it's on here, because that's what it reminds me
25   of, I don't have a specific memory for this matter

Page 69

1    because I've been reading some of these things for
2    other matters as well.  So I -- you know, I don't
3    remember whether -- whether I read that particular
4    one, but if it looked like other ones that I had,
5    I would have, you know, touched it, opened it,
6    looked to see what was in there, and then not read
7    every word of it.  But I don't remember which way
8    it worked.
9        Q   Sitting here today, are you able to tell
10   me the results of Dr. Longo and Rigler's testing
11   of Johnson & Johnson's talcum powder products as
12   reflected in their expert reports of November 14,
13   2018?
14          MS. BROWN:  Objection to the form.
15          THE WITNESS:  I don't remember the
16   details, but I could -- I could look that up and
17   pull -- pull out what I saw.
18   BY MS. PARFITT:
19       Q   Did you mark it?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  Oh, you mean like with
22   highlights?
23   BY MS. PARFITT:
24       Q   Mm-hmm.  Yes, with highlights.
25       A   Sorry.  I thought you were talking about

18  (Pages 66 to 69)

Gregory B. Diette, M.D.

Page 70

1    marking exhibits, I'm thinking like that's not
2    what I do.  So, no -- so I don't know.
3        Q   All right.
4        A   This particular one, I might have
5    highlighted an earlier one or -- or even not.  And
6    the only reason I say that is because his reports
7    tend to have an awful lot of like sort of like
8    testing data in the -- in the back of it, and
9    there's not a lot of like words, you know, to
10   read.  So there's not a lot to really highlight
11   for me.  I mean, you know what I mean?  It's kind
12   of succinct in terms of like the opinion part, and
13   then there's a whole bunch of scientific stuff
14   that's somebody else's field.
15       Q   Understood.  And I think what I'm
16   getting at is for purposes of the opinions you are
17   presenting to the jury in this case, are you
18   relying on the test results of Dr. Longo's and
19   Rigler's that are contained in not only their
20   November 14th -- contained in their November 14th,
21   2018 report?
22       MS. BROWN:  And objection.
23       Counsel, you said "jury."  I assume you
24   mean for purposes of this Daubert hearing, is he
25   relying on the Rigler and Longo report of

Page 71

1    November 14th, 2018.
2    BY MS. PARFITT:
3        Q   For purposes of the opinions that you
4    have provided in your expert report and I assume
5    will present to Judge Wolfson sometime in July,
6    are you relying on the information that's
7    contained in the expert report of Dr. Longo and
8    Rigler, November 14, 2018?
9        A   I wouldn't use the word "rely."  I would
10   say aware of, but not -- I'm not relying on it.
11       Q   And let me explore that, because this is
12   the only time I will have a chance to talk to you
13   before that Daubert hearing.
14       A   Sure.
15       Q   Are you, for purposes of your opinion
16   that you're sharing -- will share with me today
17   and will share with the court in July, relying on
18   any of the test results of Drs. Longo and Rigler
19   contained in their reports of November 14, 2018?
20       A   Yeah, I think the way I said it is
21   exactly right, because to me "rely on" has some --
22   there's some legal connotation for that, right.
23       And so it doesn't -- it doesn't inform
24   my opinion, but I'm aware of what his general
25   position has been.  And so -- but I don't -- I

Page 72

1    wouldn't say I rely on it in the sense that it's
2    an underpinning of an opinion or something like
3    that.
4        Q   All right.  Do you have an understanding
5    then that Drs. Longo and Rigler found the presence
6    of asbestos in the talcum powder products they
7    tested?
8        MS. BROWN:  Objection to the form of the
9    question.
10       THE WITNESS:  My -- my understanding is
11   they say they found it, but I don't -- I don't
12   know the fact of whether they found it or not.
13   BY MS. PARFITT:
14       Q   Okay.  Did -- from your read or not read
15   of Drs. Longo and Rigler -- strike that.
16       Did Drs. Longo and Rigler find
17   asbestiform fibers in the tests done of Johnson &
18   Johnson's product, talcum powder products?
19       MS. BROWN:  Objection to the form.
20       THE WITNESS:  I guess I need to know
21   what we're talking about if you say "asbestiform
22   fibers," because I thought your question before
23   was asbestos.
24   BY MS. PARFITT:
25       Q   It was.

Page 73

1        A   And are you expecting me to -- to say
2    that that's two different things, or is it just
3    another way of you trying to ask the same
4    question?
5        Q   How do you define "asbestiform fibers"?
6        MR. LOCKE:  Objection.
7        MS. BROWN:  Objection to the form of the
8    question.
9        THE WITNESS:  Well, I -- I understand
10   some the terminology, but I'm not a mineralogist.
11   Right.  So I -- I can tell you -- I think I have
12   to diverge a little bit to answer your question,
13   if I can, just to say that -- unless you don't
14   want me to.  Feel free to --
15       MS. BROWN:  No, you should answer the
16   question --
17       THE WITNESS:  Okay.
18       MS. BROWN:  -- as honestly and
19   truthfully and accurately as you can.
20       THE WITNESS:  Because asbestos -- I
21   mean, asbestos in terms of at least its
22   commercial, you know, forms is something that's
23   in -- that's in asbestiform fiber, right.  It's in
24   asbestiform habit.  And so I think, you know, for
25   me to understand the minerals, when we're talking

19 (Pages 70 to 73)

Gregory B. Diette, M.D.

Page 74

1    about asbestos, we're talking about a particular
2    kind of mineral that's in a particular form or
3    habit.
4            And so I -- I think when you're talking
5    about an asbestiform fiber, there's some
6    redundancy there in a way, right, which is that
7    that's a description that you could apply to
8    something that other people would call asbestos.
9    BY MS. PARFITT:
10       Q   All right. Fine. Thank you.
11           Has Johnson & Johnson provided you with
12   any testing that they performed on their product?
13           MS. BROWN: Objection.
14   BY MS. PARFITT:
15       Q   Shower to Shower or Johnson's Baby
16   Powder.
17           MS. BROWN: Objection.
18           THE WITNESS: I don't think I have seen
19   anything.
20   BY MS. PARFITT:
21       Q   Did you ever ask Johnson & Johnson to
22   see any of the testing that they performed on
23   their own talcum powder products?
24           MS. BROWN: Objection. Asked and
25   answered.

Page 75

1            THE WITNESS: I have not.
2    BY MS. PARFITT:
3        Q   Okay. Dr. Diette, are you aware that
4    there are generic talcum powder products being
5    sold in the marketplace today that contain an
6    ovarian cancer warning for individuals who use it
7    in their genital area?
8            MS. BROWN: Objection to the form --
9            THE WITNESS: I don't --
10           MS. BROWN: -- lacks foundation, calls
11   for speculation.
12           THE WITNESS: I don't know one way or
13   the other.
14   BY MS. PARFITT:
15       Q   Okay. Has Johnson & Johnson shared that
16   information with you?
17           MS. BROWN: Same objections.
18           THE WITNESS: Well, if they had, I'd be
19   aware of it, right? I mean --
20   BY MS. PARFITT:
21       Q   I would think.
22       A   Yeah. So it has to be no. Yeah.
23       Q   Okay. You state in your -- you state in
24   your expert report that the presence of asbestos
25   as an accessory mineral present in cosmetic talc

Page 76

1    would not alter your analysis, and I assume
2    opinions, with regard to talcum powder products
3    causing ovarian cancer.
4        A   That's in my report?
5        Q   Yes.
6        A   Can we flip to that?
7        Q   Sure. Why don't you go to page 3.
8            And if I may, it's at the bottom,
9    paragraph 6.
10       A   I'm with you, yeah.
11       Q   Okay. And it says: "To the extent
12   plaintiffs' expert opined that asbestos is an
13   accessory mineral present in cosmetic talc that
14   causes ovarian cancer, this theory would not alter
15   the analysis because the existing epidemiological
16   literature regarding talc use would
17   necessarily" --
18           MS. BROWN: You're reading it --
19           MS. PARFITT: Beg your pardon?
20           MS. BROWN: You read it wrong. Perineal
21   talc use.
22           MS. PARFITT: Oh, I'm sorry. Perineal.
23   Thank you.
24   BY MS. PARFITT:
25       Q   -- "perineal talc use would necessarily

Page 77

1    account for the presence of any asbestos in the
2    products used in both studies."
3            Did I now read that correctly, with
4    counsel's correction?
5        A   Yeah, you're -- you've got it right now.
6        Q   Okay. What do you mean by that
7    statement?
8        A   So what I -- what I mean generally is
9    that I've reviewed the -- what I think is the
10   whole epidemiology on the -- on the topic, and the
11   studies themselves don't break down or don't do
12   analyses of what the talcum powder is or what it
13   consists of. So to the extent that they've
14   studied talcum powder, to me whatever is in talcum
15   powder is baked into the epidemiology. And so
16   whether asbestos is a fact that it's in there or
17   it's a fact that it's not doesn't really change
18   how to interpret those studies.
19           Is that what you're asking?
20       Q   Mm-hmm.
21       A   Okay.
22       Q   Mm-hmm. Is asbestos a carcinogen?
23       A   It is.
24       Q   We're going to come back to that.
25           Let me just get on a little bit further

20  (Pages 74 to 77)

Gregory B. Diette, M.D.

Page 78

1  on here.
2          Are you going to be giving an opinion in
3  this case that Johnson & Johnson's talcum powder
4  products contain asbestos?
5     A   No.
6     Q   You will not?
7     A   I will not.
8     Q   Have you made an assumption then for
9  purposes of your opinion that Johnson's -- that
10  Johnson & Johnson's talcum powder products do not
11  contain asbestos?
12     A   I -- no, I haven't made that assumption.
13  I -- I recognize that there's a debate about that,
14  and I don't have the expertise to sort through
15  what's right about that debate.
16     Q   All right.  Assume that Johnson &
17  Johnson's talcum powder products contain asbestos,
18  would that place consumers that use the product in
19  needless danger?
20          MS. BROWN:  Objection.  Counsel, that's
21  an incomplete hypothetical.  Is that the same talc
22  that's in the epi?
23  BY MS. PARFITT:
24     Q   Can you answer the question?
25          MS. PARFITT:  And please don't coach the

Page 79

1  witness.
2          MS. BROWN:  Objection to the incomplete
3  hypothetical.
4          THE WITNESS:  So, anyway, so the
5  needless part, I think -- I'm not sure if you need
6  that in your question or whether it changes how I
7  would answer it.  I think the general issue is
8  whether or not there's a risk or whether there's a
9  danger.  And from what I can tell from reading the
10  literature, that there's not a risk of -- did you
11  say "ovarian cancer" in your question?
12  BY MS. PARFITT:
13     Q   Correct.
14     A   Yeah, I don't see that there's a -- a
15  risk of ovarian cancer from the literature.
16     Q   Assume for purposes of my question that
17  Johnson & Johnson's talcum powder products has
18  asbestos in it, would it be imprudent and not
19  reasonable for Johnson & Johnson to sell that
20  product to its customers, yes or no?
21          MS. BROWN:  Objection to the incomplete
22  hypothetical.
23          THE WITNESS:  So I think, you know, it
24  isn't a yes or no, right?  I mean, because it's --
25  if you're talking about asbestos, there's asbestos

Page 80

1  all over the world, right.  And so everything
2  comes down to dose in any case, right.  So for me
3  to be concerned about it, you'd have to show me
4  that there's a sufficient dose that a person gets
5  in order to raise the risk of whatever it is that
6  you're talking about.
7  BY MS. PARFITT:
8     Q   Let me ask you this:  Assume Johnson &
9  Johnson's talcum powder products has asbestos in
10  it.  Are you with me?
11     A   I am, yeah.
12     Q   All right.  Would it be imprudent for
13  Johnson & Johnson to sell its talcum powder
14  products to consumers to use it in their
15  genital -- on their genital areas?
16          MS. BROWN:  I object to this line of
17  question, Counsel.  Are you divorcing your
18  hypothetical from the epidemiology he has reviewed
19  and is here to talk about?
20          MS. PARFITT:  He didn't answer the
21  question, Counsel.  Counsel, if he understands --
22  he understood the last question, it's the same.
23  Thank you.
24          MS. BROWN:  I object to the entire line
25  of questioning.

Page 81

1  BY MS. PARFITT:
2     Q   Please.
3     A   If we're talking about what exists in
4  the world right now, I -- I don't see any issue
5  with it.
6     Q   All right.  Do you know who
7  Dr. Nicholson is?
8     A   Which -- which Nicholson?
9     Q   Susan Nicholson.
10     A   I'm not sure.  Is she an expert in --
11     Q   She's not.  She's actually the -- and
12  I'll represent to you, the chief medical officer
13  for Johnson & Johnson.
14     A   Oh, I don't know her.
15     Q   Okay.  Let me represent to you that
16  Dr. Nicholson, who is a medical officer for
17  Johnson & Johnson, was deposed in this case, this
18  same case that we're in together, you and I.  Are
19  you aware of that?
20     A   Only because you said so.
21     Q   Okay.  And the deposition that was taken
22  of Dr. Nicholson was a deposition that was taken
23  wherein she -- we call it a 30(b)(6).  That means
24  she represents the voice of the company that she
25  works for.  Understand?

21 (Pages 78 to 81)

Gregory B. Diette, M.D.

Page 82

1        MS. BROWN:  Objection to the form of the
2    question.
3        THE WITNESS:  I understand what you
4    said.  I don't know what I -- if I understand what
5    that means.
6        MS. PARFITT:  Okay.  All right.  Let me
7    have marked as Exhibit -- I believe it's
8    Exhibit No. 6 that we're on.
9        (Diette Exhibit No. 6 was marked
10       for identification.)
11       MS. BROWN:  And, Counsel, if you're
12    going to ask him questions about Dr. Nicholson's
13    deposition that he has not reviewed, we need to at
14    least have a full copy of the deposition here.
15    Thanks.
16       MS. PARFITT:  I believe you have --
17       MS. BROWN:  And you should take as long
18    as you need to review it to answer any questions
19    counsel might have.
20       MS. PARFITT:  Okay.  And, Counsel, I'll
21    get you that -- I don't have a copy --
22       MS. BROWN:  We have -- I mean your
23    colleague just --
24       MS. PARFITT:  We have just one.  I'm
25    just saying we just have one.  I don't have one

Page 83

1    for you.
2        MS. BROWN:  As long as the doctor has
3    time to review it -- you know he hasn't seen this
4    before.  If you're going to ask him questions
5    about it, he needs to read it.
6        MS. PARFITT:  Just one.
7    BY MS. PARFITT:
8        Q    Dr. Nich- -- or Dr. Diette, let me
9    direct your attention to page 37.
10       A    Okay.
11       Q    And specifically line 2, and let me read
12    it.  We'll put it up on the ELMO.
13       MS. BROWN:  Counsel, while you're doing
14    that, I'm going to object to taking one page out
15    of Dr. Nicholson's deposition that the doctor has
16    not reviewed and asking questions out of context.
17    And if he needs to read the whole deposition to
18    answer your question, he will need to do that.
19       MS. PARFITT:  Counsel, please not --
20    let's not coach.
21       MS. BROWN:  And I'm objecting on the
22    record to the improper questioning with snippets
23    of somebody else's deposition.
24       MS. PARFITT:  Okay.
25    BY MS. PARFITT:

Page 84

1        Q    Okay.  At the top, if I may, it says --
2    line 2:  "Well" -- and I'll represent to you that
3    I was one of the attorneys that took
4    Dr. Nicholson's deposition.
5        The question is:  "Well, if your
6    products contain asbestos, would you agree with me
7    that that impacts the safety of the product?"
8        Answer:  "Absolutely, yes."
9        Next question:  "Would you agree that
10    Johnson & Johnson has a zero tolerance policy with
11    regard to having asbestos in their talcum powder
12    products?"
13       The answer:  "Yeah, that is correct."
14       Next question:  "In fact, as a
15    representative of the company, it's your position
16    that your Johnson & Johnson's talcum powder
17    products should not contain asbestos; is that
18    correct?"
19       "That's correct -- that is correct."
20       Next question:  "And you would agree
21    with me that if your talcum powder products had
22    asbestos in them, it would place the consumers
23    that use your product in needless danger,
24    correct?"
25       "It could, yes."

Page 85

1        Next question on page 48 of that same
2    deposition --
3        MS. BROWN:  Counsel, I'm sorry, but your
4    pages are not matching up to what we've been
5    handed.  Can you just direct us -- and we're -- in
6    the snippet you gave us, I can't find this.
7        THE WITNESS:  I don't have 48.  Mine
8    goes to 41.
9        MS. BROWN:  Yeah, mine says 37, 37, 37.
10       THE WITNESS:  Maybe here in the whole
11    thing?
12       MR. HEASLIP:  And mine is 46 through 53.
13       MS. PARFITT:  Okay.
14       MS. BROWN:  This is not what you're
15    reading, so it's impossible to follow.
16       Were you able to follow that, Doctor?
17       MS. PARFITT:  We have it on the
18    overhead.  I think --
19       MR. ROSEN:  I go to -- I go to 41.
20       MS. BROWN:  Yeah, well, he needs to have
21    it in front of him.  We don't have a copy.
22       MS. PARFITT:  Well, let's do this.  I
23    have an overhead and an ELMO.  So let's keep
24    going.  Why don't you read the screen.
25       Do you need me to go back over those

                                    22 (Pages 82 to 85)

Gregory B. Diette, M.D.

Page 86

1  questions?
2        MS. BROWN: But, Counsel, that's not
3  even a transcript. What is that?
4        MS. PARFITT: It's --
5        MS. MILLER: How are you going to mark
6  that as an exhibit?
7        MS. PARFITT: I'm going to put an
8  exhibit sticker on it, and I'm going to put it in
9  as representative pages from the Nicholson
10  deposition.
11        MS. BROWN: Can he find it in the large
12  copy?
13        MR. ROSEN: Would you mind passing
14  back Exhibit 6 that we handed --
15        THE WITNESS: Oh. This is all of your
16  36's. That's a whole bundle of the same thing.
17        But I would like to get the 36-page
18  back --
19        MS. PARFITT: Sure.
20        THE WITNESS: -- if we're going to talk
21  about it.
22        MS. PARFITT: Absolutely. I want you to
23  have actually 37, and you need -- here we go.
24        MS. BROWN: This is the complete set?
25        MS. PARFITT: Yes, I'm assuming.

Page 87

1        MS. BROWN: You have that in front of
2  you?
3        THE WITNESS: I do.
4  BY MS. PARFITT:
5     Q    And, Dr. Diette, if you have any trouble
6  reading any of that -- or you can also look up on
7  the ELMO that's being displayed.
8        MS. BROWN: Thank you.
9        MS. PARFITT: Okay. Yeah, sorry.
10  BY MS. PARFITT:
11     Q    Again, page 48, line 14.
12        Do you have that there, Doctor, in front
13  of you?
14     A    I do.
15     Q    Okay.
16        "Q. You would agree, Dr. Nicholson, if
17  Johnson & Johnson's Baby Powder indeed had
18  asbestos in it, it would be imprudent and not
19  reasonable for Johnson & Johnson to sell it to its
20  consumers?"
21        "A. I would agree with that.
22        "Q. Thank you.
23        "A. I would not support Johnson &
24  Johnson selling a product that contained
25  asbestos."

Page 88

1        Did I read all that correctly?
2     A    You did.
3     Q    All right. Do you -- so you disagree
4  with Dr. Nicholson; is that correct?
5        MS. BROWN: Objection to the form.
6        MR. LOCKE: Objection.
7        MS. BROWN: Misstates his testimony.
8        THE WITNESS: I don't -- I don't agree
9  or disagree. I mean, I -- I honestly don't know
10  who she is other than what you just said. But --
11  but it sounds like she's articulating a policy for
12  the company, which I think is her right -- her
13  right to do that and to express those opinions.
14  BY MS. PARFITT:
15     Q    Okay. All right.
16        Okay. Now, counsel provided for us in
17  advance of this deposition a copy of your CV. So
18  let me --
19        THE WITNESS: Would it -- would it be a
20  good time just to refill coffee? Is that okay?
21        MS. PARFITT: Sure. And I should have
22  said that. Any time you need a break --
23        THE WITNESS: No, I know.
24        MS. PARFITT: -- you holler.
25        THE WITNESS: Thank you. I appreciate

Page 89

1  that.
2        MS. PARFITT: You're very welcome.
3        THE VIDEOGRAPHER: The time is 10:07
4  p.m. We're going off the record.
5        (Recess.)
6        THE VIDEOGRAPHER: The time is
7  10:20 a.m., and we're back on the record.
8  BY MS. PARFITT:
9     Q    Dr. Diette, are you still --
10        THE VIDEOGRAPHER: Microphone, Counsel.
11  BY MS. PARFITT:
12     Q    Are you good?
13     A    All set. Thank you.
14     Q    All right. Dr. Diette, if asbestos was
15  found to be in talcum powder products -- strike
16  that.
17        Would the presence of asbestos in talcum
18  powder products provide evidence to support the
19  hypothesis that talcum powder products -- strike
20  that.
21        Would the presence of asbestos in talcum
22  powder products provide biologically plausible
23  evidence to support the hypothesis that talcum
24  powder products can cause ovarian cancer?
25        MR. LOCKE: Objection.

23 (Pages 86 to 89)

Gregory B. Diette, M.D.

Page 90

1          MS. BROWN:  Objection to the form of the
2     question.
3          THE WITNESS:  You would have to qualify
4     it, right, because I -- if you're talking about
5     like -- even like, you know, one fiber or
6     something would be quite different than if there's
7     a sufficient amount in order to -- to cause a
8     disease, right.  So it -- it always comes down to
9     dose in terms of what you're talking about.
10         So it's -- all by itself, I don't think
11    that that question is answerable.
12    BY MS. PARFITT:
13         Q    Can one fiber of asbestos alone cause
14    cancer?
15         MS. BROWN:  Objection to the form.
16         THE WITNESS:  It's -- it's so impossible
17    to think that it would, because we all have
18    asbestos in our lungs, and there's a background
19    amount of asbestos in the world that if one fiber
20    could do it, I think we would all have cancer.  So
21    I -- I think somebody could say that, but I don't
22    think it would be true.
23    BY MS. PARFITT:
24         Q    You certainly don't think it's true; is
25    that correct?

Page 91

1          A    Oh, for sure, yeah.
2          Q    Okay.  Let me mark at this time a
3     copy -- a copy of your curriculum vitae, and we'll
4     have it marked as exhibit -- Exhibit 7.
5          (Diette Exhibit No. 7 was marked
6          for identification.)
7     BY MS. PARFITT:
8          Q    Do you have that in front of you?
9          A    I do.
10         Q    Okay.  Who prepared that curriculum
11    vitae?
12         A    Well, not one person.  This is an
13    iterative exercise over time.  So it's -- I mean,
14    me in the sense, although not as the person, you
15    know, typing the words, but it's -- you know, it's
16    my -- my information on here.  And I've had
17    different administrative assistants who have --
18    who have helped to sort of shape it.
19         Q    Is it current?
20         A    No.
21         Q    It's not?
22         A    It's not.
23         Q    All right.  What additions or deletions
24    would you make to your curriculum vitae?
25         A    For the most part, I'd add a bunch of

Page 92

1     papers that have been either accepted or published
2     since then.  There's probably some talks and
3     things.  The -- the grant award section I'm sure
4     needs updating.
5          Q    Okay.  It looks, on the far right of
6     that CV, that it's got a June 2017 date; is that
7     correct?
8          A    It is.
9          Q    All right.  Has there been a curriculum
10    vitae prepared by you since June of 2017?
11         A    No.
12         Q    All right.  Where would I get these
13    additional articles and speeches?  Do you have
14    them in a -- contained in one particular place?
15         A    No.  Where -- where you could get the
16    articles would be on PubMed, and if you just did a
17    PubMed search with my name, you would find them
18    all.
19         For speeches, I don't actually have a
20    repository, so it's going to take me some work to
21    actually sort of populate that part of the CV.
22         Q    Are you -- do you have any intention of
23    updating your CV?
24         A    Yes.  Can I give you an extra sentence
25    or two?

Page 93

1          Q    Sure.
2          A    Okay.  So I sure want to.  The stakes
3     are low for me at this point.  This is our
4     Department of Medicine format CV, which we use for
5     promotion purposes, for the most part.  I've been
6     promoted to professor, which there's no other rank
7     to get promoted to.  And so it's not really that
8     urgent for me to -- to change that.
9          Then on top of that, my administrative
10    assistant went out on maternity leave, and then I
11    didn't want to swamp her with this when she came
12    back.
13         Q    That was nice.
14         A    And literally just last week, she took a
15    new job, a better job but in a different place.
16         So long answer, yeah, I want to, but
17    it's not going to happen really soon.
18         Q    Okay.  So your current academic
19    appointment at Johns Hopkins University, is that a
20    professor of medicine, is that correct, Division
21    of Pulmonary and Critical Care?
22         A    Yeah, and I think it's called Pulmonary,
23    Criteria Care and Sleep Medicine now.  We just --
24    we just changed the name recently.
25         Q    And sleep medicine?

24 (Pages 90 to 93)

Gregory B. Diette, M.D.

Page 94

1    A    And sleep, yeah.
2    Q    All right.  Are you still within the
3  Department of Epidemiology?
4    A    Yes.
5    Q    All right.  Are you still an associate
6  professor of medicine in epi and environmental
7  health?
8    A    No, that's a typo somewhere.  I don't
9  know where you saw that, but -- oh, probably in my
10  report.  But, no, I'm -- the professor label
11  carries across all the -- different entities.
12    Q    So you're no longer an associate
13  professor.
14    A    Right.  Professor of whatever it is that
15  I'm a professor of.
16    Q    All right.  Your board certification is
17  in pulmonary and critical care?
18    A    It's in internal medicine and pulmonary
19  medicine.
20    Q    You're not a member of the American
21  College of Epidemiology, correct?
22    A    No.
23    Q    Your undergraduate degree was in
24  English?
25    A    English and economics.

Page 95

1    Q    Okay.  And then post-medical school, you
2  received a MHS in public health; is that correct?
3    A    Well, it was in epidemiology.
4    Q    Okay.
5    A    I only just say that because there is a
6  degree in public health, and that's not what mine
7  was called.
8    Q    Okay.  Let me show you what we'll have
9  marked as the Johns Hopkins Medicine website as --
10    MS. PARFITT:  What exhibit?
11    MS. BROWN:  8.
12  BY MS. PARFITT:
13    Q    -- Exhibit 8?
14    (Diette Exhibit No. 8 was marked
15    for identification.)
16  BY MS. PARFITT:
17    Q    All right.  Do you have that in front of
18  you?
19    A    I do.
20    Q    All right.  Now, this is for the Johns
21  Hopkins Medical School; is that correct, or
22  medical center?
23    A    So I don't know.  You know, the top says
24  "Johns Hopkins Medicine," which is a broader label
25  that includes the medical school and probably the

Page 96

1  hospital as well.
2    Q    All right.  So if someone were going on
3  the website to look at the hospital, the medical
4  school, medical center, this is what they would
5  see.  And look over to the far right, and it has
6  "Expertise."  Do you see that?
7    A    I do.
8    Q    All right.  Is -- it reads: "Expertise:
9  Asthma, chronic obstructive pulmonary disease
10  (COPD), pulmonary" -- excuse me -- "pulmonary
11  disease, and critical care medicine, pulmonary
12  medicine."
13    Is that correct?
14    A    It is correct.
15    Q    All right.  Is there anything you want
16  to add with regard to your expertise?
17    MS. BROWN:  Objection to the form of the
18  question.
19    THE WITNESS:  So I honestly don't know
20  what this is.  I mean, I don't doubt that it comes
21  from Hopkins, but it's not something I look at.
22  BY MS. PARFITT:
23    Q    Okay.
24    A    If you -- well, no, just one second.
25  Because if you look at the bottom, it says

Page 97

1  "Request an appointment."  So this looks like some
2  kind of place that somebody could go and find a
3  call-in number to get an appointment for -- for a
4  doctor.
5    Q    Okay.
6    A    So I think it's -- I don't know.  I
7  could add all kinds of things, but I don't -- I
8  don't know what the format is for this.  Like I
9  don't know if there is a word limit.
10    Q    Sorry.
11    A    I don't know -- I don't know what the
12  purpose of this is.
13    Q    All right.  The second line says:
14  "Research interests," and it states:
15  "Environmental impacts on lung disease,
16  epidemiology of airway disease and chronic
17  obstructive pulmonary disease, asthma."
18    Did I read that correctly?
19    A    You did.
20    Q    Does that accurately reflect your
21  current research interests?
22    MS. BROWN:  Objection.  Form.
23    THE WITNESS:  Well, it's some, but it's
24  so incomplete.  You know, it's obviously just a
25  couple of snippets that somebody chose to put on

25 (Pages 94 to 97)

Gregory B. Diette, M.D.

Page 98

```
 1    this -- on this page.
 2    BY MS. PARFITT:
 3        Q   Okay.  Well, I will represent to you
 4    that if one chose to go on the Johns Hopkins
 5    Medicine website, this is how they hold you out to
 6    the -- to the world, so to speak.
 7            MS. BROWN:  Objection to the speech.  Is
 8    there a question?
 9            THE WITNESS:  So --
10            MS. PARFITT:  Counsel --
11            MS. BROWN:  There's no question.
12            MS. PARFITT:  -- please.
13            MS. BROWN:  Is there a question?
14            MS. PARFITT:  Yes.
15            MS. BROWN:  What is it?
16    BY MS. PARFITT:
17        Q   Is this how -- is this information
18    correct, Dr. Diette?
19        A   Oh, the information is correct.
20        Q   Okay.
21        A   It's very incomplete.
22        Q   Okay.  Let me show you now what we'll
23    have marked as Exhibit 9.
24            (Diette Exhibit No. 9 was marked
25            for identification.)
```

Page 99

```
 1            THE WITNESS:  Can I just -- just
 2    clarify?
 3    BY MS. PARFITT:
 4        Q   There's no question pending right now.
 5        A   I want to clarify my last --
 6            MS. BROWN:  But if you want --
 7    BY MS. PARFITT:
 8        Q   Your counsel will have a chance to -- to
 9    talk with you.
10            MS. BROWN:  Whoa, Counsel.  Are you
11    going to take the position on the record that the
12    witness can't clarify any --
13            MS. PARFITT:  No, I'm not doing that
14    all.
15            MS. BROWN:  Well, that was his request,
16    and he wanted to --
17    BY MS. PARFITT:
18        Q   What do you need to do, Doctor?  I'm
19    sorry.
20        A   Oh, well, I just -- because we were
21    talking about this front page, and I didn't
22    realize there were other pages here.  This still
23    isn't complete, but there's a whole lot here more
24    about me than just what was on that front page.  I
25    just wanted to point to all that.  I haven't read
```

Page 100

```
 1    it to see if it's accurate or not, but there's --
 2    there's certainly more about me than just those
 3    couple of --
 4        Q   Okay.  Well, you know, that's a good
 5    point, and I missed that.  So thank you for
 6    bringing that to our attention.
 7            Let's look at that sec- -- second page
 8    of the website for Johns Hopkins Medical Center.
 9            MR. TISI:  Counsel, that is Exhibit 8.
10            MS. PARFITT:  And it is Exhibit 8.
11    Thank you.
12            Okay.  Let's put that up there.
13    BY MS. PARFITT:
14        Q   And there's a category that says
15    "Background"; is that correct?
16        A   It is.
17        Q   All right.  Now, it states:
18    "Dr. Gregory Diette is a professor of medicine at
19    the Johns Hopkins University School of Medicine.
20    He holds a joint appointment in the Department of
21    Epidemiology in the Johns Hopkins Bloomberg School
22    of Public Health."  Hashtag, "His areas of
23    clinical expertise include asthma and obstructive
24    lung disease."
25            Did I read that correctly?
```

Page 101

```
 1        A   You did.
 2        Q   Okay.  Is that correct?
 3        A   That -- that it includes those two
 4    diseases?
 5        Q   Yes.
 6        A   It does include that.
 7        Q   Okay.  And the third paragraph reads:
 8    "His research interests include environmental
 9    impacts on lung disease, epidemiology of airway
10    disease, and chronic obstructive pulmonary
11    disease."
12            Did I read that correctly?
13        A   You did.
14        Q   All right.  And does that reflect some
15    of your research interests?
16        A   It does.
17        Q   All right.  Now, let's move over -- and
18    thank you for correcting me on that.
19            Now, I will represent to you that
20    Exhibit 9 is from the website from the Bloomberg
21    School of Public Health.
22            Do you have that in front of you?
23        A   I do.
24        Q   All right.  Now, if one was to go onto
25    the website for the Bloomberg School of Public
```

26 (Pages 98 to 101)

Gregory B. Diette, M.D.

Page 102

1  Health, this is the type of information they would
2  receive, Dr. Diette.
3         Look down at the "Overview." Do you see
4  that?
5     A   I do.
6     Q   Okay. It says --
7         MS. PARFITT: Let's get that up on the
8  ELMO.
9  BY MS. PARFITT:
10    Q   All right. Do you see under "Overview,"
11 it says: "My research focuses on identifying
12 factors that cause or provoke asthma. We have
13 been interested especially in air pollutants,"
14 parens, "particulate matter, NO2, secondhand
15 smoke," close parens, "and allergens," parens,
16 "including mouse," close parens, "that are
17 especially problematic in inner city homes. We
18 are studying the effects of these pollutants and
19 allergens on inflammation and oxidative stress.
20 More recently, we have begun examining how dietary
21 patterns, especially a Western diet style -- a
22 Western-style diet, may increase susceptibility to
23 inhalable pollutants and allergens."
24        Did I read that correctly?
25    A   You did.

Page 103

1     Q   Okay. And then again, under your
2  "Research Interests, it states: "Epidemiology of
3  lung diseases, asthma, COPD" --
4         And what's COPD?
5     A   Chronic obstructive pulmonary disease.
6     Q   "-- outcomes, environmental," and then
7  it says, "Particulate matter, allergens and health
8  disparities."
9         Did I read that correctly?
10    A   You did.
11    Q   All right. Does that represent some of
12 your research interests?
13    A   It does represent some.
14    Q   Okay. You are a clinician?
15    A   True.
16    Q   All right. What is the profile of the
17 types of patients that you see in your practice?
18        MS. BROWN: Form.
19        THE WITNESS: You want me to just take a
20 stab at it? Because I'm not sure -- is profile --
21        MS. BROWN: If you don't understand the
22 question, I'm sure counsel will clarify it.
23        MS. PARFITT: I will, sure.
24 BY MS. PARFITT:
25    Q   What is the nature of the diseases that

Page 104

1  patients who come to you are experiencing?
2         MS. BROWN: Objection to the form.
3         THE WITNESS: And I'll do my best, and
4  then if it's not what you're looking for, please
5  just ask me to clarify.
6         I -- I see probably, you know, almost
7  every single kind of medical problem there is
8  because I -- I attend in so many different
9  locations within the Hopkins system. So meaning
10 that I do work in the intensive care unit where
11 it's every kind of medical problem you could
12 imagine, it just happens to be the sickest of the
13 sick. So it could be any -- any organ system, or
14 not even an organ system, but all sorts of
15 illnesses.
16        In the pulmonary clinic, I see -- I
17 certainly see people with asthma and COPD, but I
18 see pretty much any kind of pulmonary disease and
19 get referrals for things that aren't pulmonary
20 diseases. They -- they may be somebody who's got
21 a -- a symptom that turns out to be a
22 pulmonary disease.
23        In the oncology center, when I attend
24 there, I see every kind of cancer patient that at
25 least that Hopkins sees.

Page 105

1         And then I'm also lucky enough to attend
2  on the general internal medicine service, and so
3  there it's really everything, it's all comers.
4  And so it ranges from basically head-to-toe kind
5  of medicine.
6  BY MS. PARFITT:
7     Q   Okay. Now, if I arrived at -- for in --
8  I guess you said the intensive care clinic, and I
9  had a gynecological problem, would I see you?
10        MS. BROWN: Objection to the form.
11        THE WITNESS: So there's no intensive
12 care clinic, just to be clear. Like a clinic is
13 an outpatient setting. So our intensive care unit
14 is an inpatient setting for critically ill people.
15 BY MS. PARFITT:
16    Q   Okay.
17    A   So you might or might not end up seeing
18 me, because if we're -- the way that the program
19 works is that -- so, for example, if somebody is
20 pregnant, just giving an example, if it's an early
21 pregnancy, then those patients would end up in our
22 medical ICU. If it's a later pregnancy, then they
23 would go to the -- the obstetrics unit to their --
24 their own particular unit. And then you might see
25 me if I was consulted into that unit, whether or

27 (Pages 102 to 105)

Gregory B. Diette, M.D.

Page 106

1    not you were in our -- our unit or not.
2        Q   So if I came in with a gynecological
3    problem, they might call you -- you, who are a
4    pulmonologist, they might call you in to consult
5    with me?
6            MS. BROWN:  Objection to the form of the
7    question and the tone.
8            THE WITNESS:  Well, I am picking up the
9    tone, which I -- which I think -- I mean, I know
10   you're trying to make a point here.  And the
11   question as you asked it is -- the answer is, of
12   course.  But I think what you're trying to get at
13   is would they have asked me to come deal with
14   their pregnancy, for example, and I wouldn't be
15   the person dealing with their pregnancy.  I would
16   be dealing with something else.
17   BY MS. PARFITT:
18       Q   Okay.  All right.  Is it fair to say
19   that your practice primarily deals with
20   individuals who have pulmonary and lung disease
21   conditions?
22           MS. BROWN:  Objection.
23           THE WITNESS:  I think if you dial back
24   and listen to what I said for those other answers,
25   you would be pretty clear that it isn't just that.

Page 107

1    BY MS. PARFITT:
2        Q   Okay.  Well, I would include asthma in
3    that as well.
4            MS. BROWN:  Same objection.
5            THE WITNESS:  Well, include it, but I
6    mean -- but, you know, when I'm on the general
7    internal medicine service, I'm not seeing mostly
8    asthma.  I might be seeing somebody with diabetes
9    or a heart attack or pelvic inflammatory disease,
10   you know, to name a GYN problem.  I mean it's the
11   whole gamut from head to toe.
12   BY MS. PARFITT:
13       Q   Is it fair to say your research in
14   public health focuses on factors that cause and
15   provoke asthma?
16           MS. BROWN:  Objection to the form of the
17   question.
18           THE WITNESS:  It's a focus.
19   BY MS. PARFITT:
20       Q   Is it fair to say that you have a
21   particular interest in air pollutants, and that
22   includes secondhand smoke and mouse allergens?
23       A   I agree with most of what you said, but
24   not literally the way you said it, because I don't
25   think mouse allergen's a pollutant.  So I'm

Page 108

1    certainly interested in pollutants.
2        Q   Okay.  And more recently, you've
3    expressed a research interest in dietary patterns
4    particularly, and especially a Western diet and
5    how that might increase susceptibility to
6    inhalable pollutants; is that correct?
7        A   True.
8            MS. BROWN:  Form.
9    BY MS. PARFITT:
10       Q   Are you -- have you published recently
11   on that?
12       A   I'm sure there's stuff that's come out.
13       Q   Well, I only have your CV from 2017, so
14   I'll represent that I'm not seeing something on
15   that CV.
16           Is there something you've done recently?
17       A   Yeah, it's a couple of years ago.
18       Q   Okay.
19       A   I mean the best way to find stuff would
20   be on PubMed.
21       Q   All right.  You've been retained to
22   serve as an expert for Johnson & Johnson, correct?
23           MS. BROWN:  Form.
24           THE WITNESS:  That's correct.
25   BY MS. PARFITT:

Page 109

1        Q   Okay.  Do you know what the -- do you
2    have an understanding of what the allegations are
3    against Johnson & Johnson?
4            MS. BROWN:  Objection to the form.
5            THE WITNESS:  Which -- which ones?
6    BY MS. PARFITT:
7        Q   Do you know why you're -- Johnson &
8    Johnson is being sued?
9            MS. BROWN:  Objection.
10           Counsel, are you asking a legal
11   question?
12           MS. PARFITT:  No.
13   BY MS. PARFITT:
14       Q   Do you have any understanding of the
15   allegations or the nature of the lawsuit against
16   Johnson & Johnson, the company that's retained you
17   to provide expert legal testimony?
18           MS. BROWN:  Same objection.
19           THE WITNESS:  I think, generally
20   speaking, what I understand is that there's an
21   allegation that talcum powder causes ovarian
22   cancer.
23   BY MS. PARFITT:
24       Q   Okay.  Do you have an understanding of
25   the allegations against Imerys?

28 (Pages 106 to 109)

Gregory B. Diette, M.D.

Page 110

1           MS. BROWN:  Objection.
2           THE WITNESS:  I don't have any separate
3    understanding.
4    BY MS. PARFITT:
5       Q    Okay.  Do you know who Imerys are -- is
6    or are?
7       A    I'm aware that it's a supply company of
8    some sort, but I don't know much more about them.
9       Q    All right.  And do you have an
10   understanding of the allegations against the
11   Personal Care Products Corporation --
12          MS. BROWN:  Objection.
13   BY MS. PARFITT:
14      Q    -- otherwise known as the PCPC?
15          MS. BROWN:  Objection.  Calls for
16   speculation.
17          THE WITNESS:  I don't --
18          MR. LOCKE:  Objection.
19   BY MS. PARFITT:
20      Q    You don't.
21      A    I don't know who that is.
22      Q    All right.  Have you ever seen a
23   complaint in this case?
24          MS. BROWN:  Objection.
25   BY MS. PARFITT:

Page 111

1       Q    And when I say "this case," I'm talking
2    about this case of talcum powder products and
3    ovarian cancer, be it in an MDL context or a state
4    context.
5           MS. BROWN:  Same objection.
6           MS. MILLER:  With any complaint, any
7    talcum --
8           MS. PARFITT:  Any -- yeah, has he ever
9    seen a complaint in any talcum powder product and
10   ovarian cancer case.
11          MS. BROWN:  Objection to the form.
12          THE WITNESS:  I'm sure I must have.
13   BY MS. PARFITT:
14      Q    You're sure you must have.
15          Is it in the materials that you have
16   reviewed for purposes of your -- your deposition
17   today or for purposes of the report you prepared?
18      A    No.
19          MS. BROWN:  Objection.
20   BY MS. PARFITT:
21      Q    Okay.  If you have seen it, what have
22   you done with it?
23          MS. BROWN:  Objection.  Vague.
24          THE WITNESS:  Well, the same thing I do
25   with any complaint, which is just to try to read

Page 112

1    through it quickly and just get a sense of what
2    the case is about.
3    BY MS. PARFITT:
4       Q    And then what do you do with it?
5           MS. BROWN:  Form.
6    BY MS. PARFITT:
7       Q    Do you keep it?
8       A    Oh, not forever.  I mean if the case is
9    over, then I destroy it with all the other
10   materials.
11      Q    Well, this case is far from over.
12          Have -- do you still have --
13          MS. BROWN:  Counsel, just ask the
14   question.
15   BY MS. PARFITT:
16      Q    -- a copy of the complaint?
17          MS. MILLER:  You asked about a state
18   court case.
19          MS. PARFITT:  No.  I said was there --
20   hey -- again, hey, ladies, I'm sorry, I think the
21   two of you are going to have to agree who is going
22   to com-- -- who's going to complain -- who's going
23   to object.  One of you can object.
24          MS. BROWN:  Well, if you're going to
25   complain, I'm going to object.

Page 113

1           MS. PARFITT:  Okay.
2           MS. BROWN:  Please just ask the
3    question.  No speeches.
4           MS. PARFITT:  Then, please, and I --
5    listen, I think that we're getting at a crossroads
6    here.  One person gets to object.  And let me
7    remind you what the CMO says, because I know you
8    know that --
9           MS. BROWN:  Counsel --
10          MS. PARFITT:  And I'm not admonishing.
11   Let me finish, Counsel --
12          MS. BROWN:  Don't yell at me.
13          MS. PARFITT:  -- and then you can speak.
14          MS. BROWN:  You're raising your tone at
15   me.
16          MS. PARFITT:  Well, the camera will --
17   oh, please, don't be so condescending.
18          MS. BROWN:  Sure, it's going to reflect
19   that you're raising your tone.
20          MS. PARFITT:  I hope -- I hope that the
21   Judge sees this because we're probably --
22          MS. BROWN:  We are well aware of the
23   CMO.
24          MS. PARFITT:  -- going to have to call
25   him soon.

29 (Pages 110 to 113)

Gregory B. Diette, M.D.

Page 114

1        MS. BROWN:  We are complying with it.
2   We're happy to call the Judge.
3        MS. PARFITT:  So the CMO says that you
4   get to say, "Objection.  Form."  That's what you
5   get to say.
6        You have a wonderful opportunity at the
7   end of this deposition to ask him as many
8   questions as you like, but for right now, my time,
9   my deposition.  It's, "Objection.  Form."  And I
10  really would appreciate that courtesy.  I will
11  give it to you, but I would appreciate getting it
12  back.  So --
13       MS. BROWN:  And to be clear --
14       MS. PARFITT:  No, Counsel, no more
15  speeches.  No more speeches.
16       MS. BROWN:  You just made a speech, and
17  I'm going to respond --
18       MS. PARFITT:  No more speeches, Counsel.
19  My deposition.
20       MS. BROWN:  No, Counsel.
21       MS. PARFITT:  Not your deposition.
22  BY MS. PARFITT:
23       Q   Next question I have --
24       MS. PARFITT:  No more questions,
25  Counsel.  You want me to depose you?

Page 115

1        MS. BROWN:  Counsel, no.  You are
2   raising your tone.
3        MS. PARFITT:  Counsel --
4        MS. BROWN:  You are yelling at me.
5        MS. PARFITT:  -- you know what, I was
6   told a little bit earlier nobody could hear me.
7   So I have lifted my voice, and now I'm using my
8   stage voice.  So now everyone can hear me, and now
9   I'm speaking too loud to you.
10       So I'm going to try -- you know, you
11  can't have it both ways.  One speaker, one
12  objectioner.  Next question.
13       MS. BROWN:  The record will reflect that
14  you are making incessant speeches.  Please --
15  BY MS. PARFITT:
16       Q   Are you an oncologist, Dr. Diette?
17       A   I am not an oncologist.
18       Q   Are you a radiation oncologist?
19       A   No.
20       Q   Are you a gynecologist?
21       A   No.
22       Q   Okay.  Have you ever provided
23  gynecological care or treatment for a woman who
24  has been diagnosed with ovarian cancer?
25       MS. BROWN:  Objection.  Form.

Page 116

1        THE WITNESS:  Can you say it again?
2   BY MS. PARFITT:
3        Q   Sure.
4        A   Yeah.
5        Q   Have you ever been provided
6   gynecological care or treatment for a woman who
7   has been diagnosed with ovarian cancer?
8        A   So there's just a couple of things
9   there, and I think maybe I heard it wrong.
10       Did you say been provided care?
11       Q   Have you ever provided --
12       A   Provided.  Okay.  I'm sorry.  I thought
13  you said "been provided."
14       Q   No, no, no, no.
15       MS. MILLER:  You did say that.
16       THE WITNESS:  I thought it sounded like
17  did I get care.  I was like --
18       MS. MILLER:  You did --
19  BY MS. PARFITT:
20       Q   No, I -- I don't think you did.
21       A   Yeah, right.
22       Q   I know, that would have been a very
23  awkward question, wouldn't it?
24       Have you ever provided gynecological
25  care or treatment for a woman who has been

Page 117

1   diagnosed with ovarian cancer?
2        A   Sure.  And I think it goes back to some
3   of the things I said before where I see people in
4   the hospital who have ovarian cancer, and through
5   my training, you know, for medical school and
6   residency, that was part of our training also,
7   which was to rotate on services where people
8   had every -- every imaginable illness.
9        Q   Okay.  Well, your residency was how long
10  ago?
11       MS. BROWN:  Objection.
12       THE WITNESS:  My residency was 1990 to
13  1993.
14  BY MS. PARFITT:
15       Q   Okay.  So I'm not talking about what you
16  did in 1993, back in that period of time.
17       What I'm talking about is whether or not
18  you have actually provided gynecological care to a
19  woman who presented to you with ovarian cancer?
20       MS. BROWN:  Objection to the form.
21  Asked and answered five times.
22       You can answer, Dr. Diette.
23  BY MS. PARFITT:
24       Q   And by that, primary care.  Not in a
25  consulting role but primary care.

30 (Pages 114 to 117)

Gregory B. Diette, M.D.

Page 118

1          MS. BROWN:  Same objection.
2          THE WITNESS:  I think I know your
3  question, but could you be specific like --
4  BY MS. PARFITT:
5      Q   Sure.
6      A   -- like just an example, and then I'll
7  know that we're talking about the same thing.
8      Q   Okay.  Have you ever provided primary
9  care, gynecological care or treatment for a woman
10  who has been diagnosed with ovarian cancer?
11     A   So --
12         MR. LOCKE:  Objection.
13         THE WITNESS:  -- I'm not trying to
14  criticize the question, but primary care sounds
15  like something that a -- like a family
16  practitioner or an internist would do.  I think
17  you mean something else, so --
18  BY MS. PARFITT:
19     Q   I do.  Okay.  What I'm talking about is
20  if I called up Johns Hopkins and said, I have been
21  diagnosed with ovarian cancer, I need to see a
22  physician, would I be referred to the pulmonology
23  department, your department, or would I be
24  referred to a different department?
25         MS. BROWN:  Objection to the form.

Page 119

1          THE WITNESS:  Different department,
2  assuming it's literally for the care of the
3  ovarian cancer.
4  BY MS. PARFITT:
5      Q   Okay.  Fair.  Thank you.
6          Have you ever researched the life
7  expectancy of a woman who has ovarian cancer?
8      A   No.
9          MS. BROWN:  Objection to the form.
10  BY MS. PARFITT:
11     Q   Are you a pathologist?
12     A   I am not.
13     Q   All right.  And are you a radiologist?
14     A   I am not.
15     Q   Okay.  Are you a mineralogist?
16     A   No.
17     Q   Are you a toxicologist?
18     A   No.
19     Q   Are you a pharmacologist?
20     A   No.
21     Q   Okay.  Are you a regulatory expert?
22     A   I don't know what that means, but I
23  don't -- I don't use those words to describe
24  myself.
25     Q   Okay.  Are you a certified industrial

Page 120

1  hygienist?
2      A   No.
3      Q   Okay.  Are you what's referred to as a
4  mineralogist or a mineral scientist specialist?
5      A   Neither one.
6      Q   Are you a geologist?
7      A   No.
8      Q   Okay.  Is it fair to say that you do not
9  hold yourself out in the scientific and medical
10  community as an expert with regard to testing
11  standards of particulate matter, toxins or
12  carcinogens?
13     A   I think that sounds right.
14     Q   And that would include testing of
15  minerals -- or, excuse me, that would include
16  testing of asbestos?
17         MS. BROWN:  Objection to the form.
18         THE WITNESS:  Correct.
19  BY MS. PARFITT:
20     Q   And that would include testing of talcum
21  powder products?
22     A   That I -- I don't do that, is that
23  right?
24     Q   Right.
25     A   Yeah, that's correct.

Page 121

1      Q   All right.  Let's talk a little bit
2  about your publications and your research.
3          Let me direct your attention to -- I
4  believe this is Appendix C of your CV, which I
5  believe is Exhibit 7.
6          Do you have that in front of you?
7      A   I do.
8      Q   Okay.  I understand, now that I have a
9  CV that's dated June of 2017, and the CV I have,
10  it says that you've published approximately 167
11  publications in peer-reviewed literature.
12         Is that correct or incorrect?
13     A   It was probably true as of June 2017.
14     Q   All right.  So sitting here today in
15  April of 2019, approximately how many publications
16  in peer-reviewed journals have you published?
17     A   I think if you look on PubMed, you will
18  see more than 200.
19     Q   Okay.  Is it fair to say that you've
20  published no papers or studies in the peer-
21  reviewed literature about asbestos or asbestos-
22  related diseases?
23     A   Correct.
24         Well, can you ask that as two different
25  questions?

Gregory B. Diette, M.D.

Page 122

1    Q   Sure.
2    A   I can help you just clarify what I --
3  what I'm trying to answer.
4    Q   Please.
5    A   So nothing about asbestos, but if you --
6  if you consider asbestos-related diseases to
7  include lung cancer, for example, that there are
8  publications that bear on lung cancer, and there's
9  at least one article, maybe more, on interstitial
10  lung diseases, and asbestosis would be an
11  interstitial lung disease.
12    Q   Okay.  Can you tell me what those
13  articles are?
14    A   Let's see.  Would the -- how do you want
15  me to do it, like the number?
16    Q   If you give me the number, that would be
17  fine.
18    A   Yeah.  So number 5 has to do with lung
19  cancer.
20    Q   Now, does that have to do with lung
21  cancer and asbestos exposure?
22    A   No, not specifically.
23    Q   All right.  So that has -- that is not
24  lung cancer and asbestos.
25        All right.  Is there another one?

Page 123

1    A   Yeah, so if you look at number 6, this
2  is, you know, a study about evaluating lung masses
3  and large lymph nodes.
4    Q   Yes.
5    A   So that would include, you know, lung
6  cancer in that as well.
7    Q   Does that include asbestos and lung
8  cancer?
9    A   Not specifically.
10    Q   All right.  Any others?
11    A   I would say any of the ones where you
12  see the word "bronchoscopy," it has something to
13  do with lung cancer for the most part, though not
14  literally lung cancer and asbestos.
15        So, for example, like 21, number 2,
16  number 3, you know, all sort of have some bearing
17  on at least the -- you know, the care or
18  management of people with suspected lung cancer or
19  who actually have lung cancer.
20    Q   Dr. Diette, my question is very specific
21  to publications in the peer-reviewed journal that
22  deal with the topic of asbestos or asbestos-
23  related diseases like lung cancer where the word
24  "asbestos" appears in your publication.
25        MS. BROWN:  Objection to the form.

Page 124

1        THE WITNESS:  So that's a different
2  question.  So the answer to that is no.
3  BY MS. PARFITT:
4    Q   All right.  Have you published any
5  papers in the peer-reviewed literature on
6  mesothelioma?
7    A   No.
8    Q   All right.  So nowhere in the 200
9  publications that you have prepared would I see
10  the word "mesothelioma"?
11    A   I can't promise that you won't see that
12  word in some paper, but there's not a paper whose
13  primary topic is about mesothelioma.
14    Q   All right.  Very good.
15        Having reviewed your 200 or so
16  publications, is it fair to say that there are no
17  peer-reviewed publications regarding the subject
18  matter of ovarian cancer?
19    A   That's correct.
20    Q   Is it fair to say that none of your
21  peer-reviewed papers address a diagnosis of
22  ovarian cancer?
23        MS. BROWN:  Objection.  Form.  I don't
24  understand that.
25        THE WITNESS:  Well, I think -- I think

Page 125

1  the answer to the one before encompasses, you
2  know, something else with the word "ovarian
3  cancer" in the question.
4  BY MS. PARFITT:
5    Q   Okay.  All right.  Have you published
6  any peer-reviewed publications that talk about the
7  causes of ovarian cancer?
8        MS. BROWN:  Objection.
9        THE WITNESS:  No.
10  BY MS. PARFITT:
11    Q   Have you published any peer-reviewed
12  papers that talk about risk factors for ovarian
13  cancer?
14        MS. BROWN:  Same objection.
15        THE WITNESS:  No.
16  BY MS. PARFITT:
17    Q   Have you published any publications in
18  the peer-reviewed journal on risk factors for
19  mesothelioma?
20    A   No.
21    Q   What causes mesothelioma?
22    A   A few things.  You know, asbestos in
23  sufficient dose can do it.  Radiation can do it.
24  There's some other minerals that aren't asbestos
25  that are suspected to do it.  It can arise on its

Gregory B. Diette, M.D.

Page 126

1  own spontaneously.  And, you know, there's
2  thoughts of, at least in the peritoneum, about
3  certain kinds of chronic inflammation that may
4  lead to that as well.
5      Q  Okay.  Can asbestos cause lung cancer?
6      A  Yes.  In a sufficient dose.
7      Q  Okay.  Is it fair to say that you have
8  not published in the peer-reviewed literature any
9  studies on talcum powder products as a causative
10  factor for ovarian cancer?
11      A  That is correct.
12      Q  Is it fair to say that you have not
13  published in the peer-reviewed journal any studies
14  with regard to talcum powder products as a risk
15  factor for ovarian cancer?
16      A  That's correct.
17      Q  Is it fair to say that there are
18  no publications in your peer-reviewed literature
19  on the subject of talcum -- of talc as a source of
20  asbestos fibers?
21      MS. BROWN:  Objection.  Counsel, I think
22  you just misspoke.  Do you mean on his CV?
23      MS. PARFITT:  I'm sorry?  I did.
24  BY MS. PARFITT:
25      Q  Is it fair to say --

Page 127

1      MS. PARFITT:  Thank you.
2  BY MS. PARFITT:
3      Q  Is it fair to say that there are no
4  peer-reviewed publications in your CV that discuss
5  the subject as -- of talc as a source of asbestos
6  fibers?
7      A  Correct.
8      Q  Is it fair to say there are no
9  publications in a peer-reviewed journal contained
10  in your curriculum vitae regarding the association
11  or relationship between talcum powder products and
12  ovarian cancer?
13      MS. BROWN:  Objection to the form of the
14  question.
15      THE WITNESS:  Correct.
16  BY MS. PARFITT:
17      Q  Are there any publications in --
18  peer-reviewed publications on your curriculum
19  vitae regarding the association or relationship
20  between asbestos and ovarian cancer?
21      MS. BROWN:  Objection.  Asked and
22  answered.
23      THE WITNESS:  You said are there any --
24  BY MS. PARFITT:
25      Q  Asbestos.

Page 128

1      A  Right, are there -- no.
2      Q  Okay.  I noted in your CV or in some of
3  the readings that you are currently involved in
4  some clinical trials.
5      Did I -- did I get that correct?
6      A  I have been involved in trials.
7      Q  Something recent?
8      A  Oh, all the time.
9      Q  Okay.  Are you currently involved in any
10  clinical trial --
11      A  Yeah.
12      Q  -- trials?
13      Okay.  Do any of them deal with the
14  subject of asbestos?
15      A  No.
16      Q  Do any of your trials or research deal
17  with the subject of talcum powder products?
18      A  No.
19      Q  All right.  Do you currently have
20  ongoing any research work in the area of asbestos?
21      MS. BROWN:  Objection to the form.
22      THE WITNESS:  No.
23  BY MS. PARFITT:
24      Q  Do you currently have ongoing in any of
25  your research work on the topic of mesothelioma?

Page 129

1      A  No.
2      Q  Do you currently have any research work
3  ongoing on the topic of talcum powder products?
4      A  No.
5      Q  Do you currently have any research in
6  the works with regard to work on -- work on
7  ovarian cancer?
8      A  No.
9      MS. BROWN:  Objection to the form.
10  BY MS. PARFITT:
11      Q  Okay.  Would it be fair to say that the
12  only report that you have prepared on the topic of
13  talcum powder products and ovarian cancer would be
14  your litigation report --
15      MS. BROWN:  Object --
16  BY MS. PARFITT:
17      Q  -- in the multidistrict litigation?
18      MS. BROWN:  Objection to the form,
19  misstates his testimony.
20      THE WITNESS:  I doubt it's the only
21  report.  But I certainly did prepare a report for
22  this.
23  BY MS. PARFITT:
24      Q  Okay.  How many reports have you
25  prepared on the issue of talcum powder products

33 (Pages 126 to 129)

Gregory B. Diette, M.D.

Page 130

1   and ovarian cancer?
2          MS. BROWN:  Objection to the form.
3   Litigation?
4          MS. PARFITT:  Litigation reports.
5          THE WITNESS:  Like less than ten, and --
6   and I may be getting the terminology wrong.  I
7   think there's like a couple of affidavits that I
8   think to me are like a report.  So I don't know --
9   BY MS. PARFITT:
10      Q   That's a good clarification.
11         MS. BROWN:  Well, let him finish.  Let
12  him finish.
13  BY MS. PARFITT:
14      Q   I was trying to clarify for you, Doctor.
15         MS. BROWN:  Right, but just let him
16  finish and then you can clarify.
17         MS. PARFITT:  Counsel, I will.  Please.
18         THE WITNESS:  But -- but that's what I
19  meant, so there's -- there's other things that
20  I've sort of written in the litigation work that
21  are other than just this report that we're looking
22  at here today.
23  BY MS. PARFITT:
24      Q   Okay.  So your understanding of what you
25  have prepared in written form on talcum powder

Page 131

1   products and ovarian cancer would be, one,
2   affidavits.  Correct?
3       A   Correct.
4       Q   And two, a legal expert report or more?
5          MS. BROWN:  Form.
6          THE WITNESS:  Correct.
7   BY MS. PARFITT:
8       Q   Okay.  Do you know whether or not you
9   have prepared any legal expert reports like the
10  one you prepared here in the MDL?
11         MS. BROWN:  Objection to the form.
12         THE WITNESS:  Well, on any topic?
13  BY MS. PARFITT:
14      Q   Affidavits -- no, on ovarian cancer and
15  talcum powder products.
16      A   I don't think I --
17         MS. BROWN:  I object.
18         THE WITNESS:  I'm sorry.
19         Yeah, I don't know if I've completed
20  another -- another report, although I'm just
21  trying to think if there was like -- like a case-
22  specific report that might have had something in
23  it.  I mean not a report like this one, meaning
24  where -- where the whole topic is just about
25  the -- the epidemiology and so forth.

Page 132

1   BY MS. PARFITT:
2       Q   Okay.  So the record is clear and I'm
3   clear --
4       A   Yeah.
5       Q   -- the only report that you have
6   prepared dealing with the -- your evaluation of
7   the epidemiology on talcum powder products and
8   ovarian cancer is the report that we have marked
9   as exhibit -- I guess we haven't had it marked
10  yet, but is the report that you filed in this
11  case; is that right?
12         MS. BROWN:  Objection.  Misstates his
13  testimony.
14         MS. MILLER:  When you say "report," do
15  you mean depositions?
16         MS. PARFITT:  Counsel, I -- I know --
17  we'll get to it.  You'll get a -- you'll get a
18  question.
19         MS. MILLER:  It's not about us having a
20  question.  It's about you asking fair questions.
21         MR. TISI:  Well, it's not -- her job --
22  I'm going to jump in here because --
23         MS. PARFITT:  Okay.  Right.
24         MR. TISI:  -- now you're double teaming.
25  I assume you have competent counsel defending this

Page 133

1   deposition.  Honestly, you did this last week, and
2   you've done it in every deposition, and you in
3   particular, and you have a real problem with
4   obstructing depositions.  You need to stop.
5   BY MS. PARFITT:
6       Q   Okay.  Dr. Diette, I'll try and break it
7   down, and I'm just trying to -- this isn't a trick
8   question.  So you let me know if you don't
9   understand my question.
10         MS. BROWN:  And, Counsel, in all
11  seriousness, in an effort to help, are you meaning
12  to include or exclude the Ingham affidavit, which
13  I think is the --
14         MS. PARFITT:  I haven't gotten to it.  I
15  really haven't gotten to it.  That's -- that's --
16  I'm hoping that the doctor knows what he -- what
17  he's filed.
18         Let's have marked as Plaintiffs' Exhibit
19  No. 10.
20         (Diette Exhibit No. 10 was marked
21         for identification.)
22  BY MS. PARFITT:
23      Q   Okay.  Dr. Diette, let me present you
24  with an "Expert Report of Gregory Diette for
25  General Causation Daubert Hearing."  Okay.

34 (Pages 130 to 133)

Gregory B. Diette, M.D.

Page 134

1    A   That's this --
2    Q   Do you see that?
3    A   That's this one for here?
4    Q   Correct.
5    A   Yes.
6    Q   All right.  Now, you've identified on
7   the record that the report I have handed you,
8   which is Exhibit No. 10, is a copy of your federal
9   court expert report in the matter of -- dealing
10  with the issues of talc and ovarian cancer,
11  correct?
12   A   Exactly right.
13   Q   And in addition to that report, you have
14  prepared some affidavits in the past also
15  addressing the topic of talcum powder products and
16  ovarian cancer, correct?
17   A   That's correct.
18   Q   Okay.  Have you prepared any reports on
19  talcum powder products and ovarian cancer outside
20  of the legal context?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  No.
23  BY MS. PARFITT:
24   Q   Okay.  And have you provided any other
25  type of written report in a legal context, aside

Page 135

1   from affidavits and the MDL report that you have
2   in front of you?
3        MS. BROWN:  Form.
4   BY MS. PARFITT:
5    Q   On talcum powder products and ovarian
6   cancer.  I'm just trying to find out your world.
7    A   No, I understand.  And I'm not sure if
8   there could be like a work in progress.  But
9   you're talking about completed, completed like
10  products like this, right?
11   Q   Correct.
12   A   I -- I can't think of another one.
13   Q   Okay.  Do you have another report and/or
14  affidavit in progress in the talcum powder
15  products cases and ovarian cancer?
16       MS. BROWN:  Dr. Diette, I'm going to
17  instruct you to the extent you're doing any work
18  on this issue that is in a consulting nature and
19  has not been disclosed, you should not disclose
20  that here.
21       I assume counsel is only asking for
22  situations in which you have been disclosed as an
23  expert, and with that, you can answer the
24  question.
25       THE WITNESS:  Is that right?

Page 136

1   BY MS. PARFITT:
2    Q   That's correct.
3    A   Oh, yeah, so then, no, nothing --
4   nothing for which I've been disclosed.
5    Q   Okay.  But I take it that you have been
6   retained -- you're currently retained to work on
7   some other cases other than talcum powder products
8   and ovarian cancer, is that correct, by Johnson &
9   Johnson?
10       MS. BROWN:  Counsel, I'm going to -- to
11  the extent you're asking about consulting
12  engagements, I'm going to instruct him not to
13  answer.
14  BY MS. PARFITT:
15   Q   No, I'm asking this:  Are you an expert
16  on behalf of Johnson & Johnson and asbestos and --
17  and ovarian cancer cases?
18   A   So there's a subtlety there, right,
19  because -- I mean you may call this an asbestos
20  and ovarian cancer case.  I think it's a talcum
21  powder and ovarian cancer case.
22   Q   Okay.
23   A   There's nothing that's about asbestos
24  separately from what we're talking about here.
25   Q   Fair enough.  Have you been retained by

Page 137

1   Johnson & Johnson to testify as a legal expert in
2   any talcum powder product cases and meso- --
3   mesothelioma?
4    A   Yes.
5    Q   Okay.  Are you currently an expert in
6   any of those cases?
7    A   Yes.
8    Q   How many?
9        MS. BROWN:  And again, Doctor, to the
10  extent you've been disclosed, you can answer the
11  question.
12       THE WITNESS:  So I don't -- I don't know
13  the count then.  I would estimate ten, but I could
14  be off by a couple.
15  BY MS. PARFITT:
16   Q   Have you given depositions in those
17  cases yet?
18   A   In some cases I have.
19   Q   Okay.  Is this the first deposition that
20  you have given in talcum powder products and
21  ovarian cancer?
22       MS. BROWN:  Objection.
23       THE WITNESS:  I don't think so.
24  BY MS. PARFITT:
25   Q   Okay.  Did you give testimony in the

35 (Pages 134 to 137)

Gregory B. Diette, M.D.

Page 138

1    Ingham case?
2        A   I did.
3        Q   Okay.  Did you testify at trial at the
4    Ingham case?
5        A   I did not.
6        Q   Okay.  Is there any other case other
7    than the Ingham case where you have given
8    deposition in an ovarian cancer and a talcum
9    powder case?
10       A   I think there's at least one other one.
11       Q   Do you remember the name of it?
12       A   I don't.  I could look at my testimony
13   list and see if I can figure it out.
14       Q   Okay.  And we'll have that marked as
15   well.  Why don't we have that marked as Diette
16   Exhibit -- it's part of your exhibit number --
17   it's part of your report, but we'll have it marked
18   as a separate exhibit.
19           (Counsel conferring.)
20   BY MS. PARFITT:
21       Q   Let me show you what's -- we'll have
22   marked as Exhibit No. 11.
23           (Diette Exhibit No. 11 was marked
24           for identification.)
25   BY MS. PARFITT:

Page 139

1        Q   All right.  Let me show you what's
2    Exhibit 11.
3        MS. PARFITT:  We have a copy for
4    counsel.
5        MS. BROWN:  Thank you.
6        MR. ROSEN:  I think there's --
7        THE WITNESS:  Oh, there's two.
8        MS. PARFITT:  Oh, okay, we'll take one
9    back.  Thank you.  Okay.  Very good.
10   BY MS. PARFITT:
11       Q   Dr. Diette, does this represent an
12   accurate list of cases in which you have been
13   retained as an expert since I believe 2014?
14       A   It is.
15       Q   All right.  Are there any additions to
16   this list of cases --
17       A   I'm sorry.
18       Q   -- where you've given testimony?
19       A   I'm sorry.  I think I -- I wasn't paying
20   attention to your last question.
21       Q   That's all right.
22       A   Did you say is this a list of cases that
23   I provided depositions?
24       Q   Expert testimony.
25       A   Expert testimony.  Then the answer is

Page 140

1    yes.
2        Q   Okay.  The last date I have here is
3    September 28, '18.
4        A   No.  It should go further.
5        MS. BROWN:  We have another page,
6    Counsel.
7        MS. PARFITT:  Okay.
8        THE WITNESS:  I think it's two-sided, so
9    it's the back of that page.
10       MS. PARFITT:  Okay.  Well --
11       MS. BROWN:  Do you want my copy?
12       MS. PARFITT:  That would be great.  I
13   appreciate that.  I will give it right back to
14   you.
15   BY MS. PARFITT:
16       Q   Okay.  All right.  So the last date is
17   February 22nd, 2019; is that correct?
18       A   That is.
19       Q   All right.  Are you able to circle for
20   me which cases are cases in which you have been
21   retained as an expert in the -- on the topic of
22   talcum powder products and ovarian cancer?
23       MS. BROWN:  Objection to the form.
24       You can answer to the extent you know,
25   Doctor.

Page 141

1        THE WITNESS:  I actually don't.  I'd
2    have to look it up to figure out if I'm right that
3    there is one on here, but I don't know -- and
4    other than Ingham, right?
5    BY MS. PARFITT:
6        Q   Yes, sir.
7        A   Other than Ingham, yeah, so I -- I'm not
8    sure.  I can't tell.
9        Q   All right.  Have you -- we talked about
10   your peer-reviewed publications.  Are any of your
11   public -- peer-reviewed publications discussing
12   cohort studies?
13       MS. BROWN:  Objection to the form.
14       THE WITNESS:  So some of them are cohort
15   studies.
16   BY MS. PARFITT:
17       Q   But you have performed --
18       MS. BROWN:  Let him answer, please.
19       MS. PARFITT:  Sure.
20       THE WITNESS:  That I performed, yes.
21   BY MS. PARFITT:
22       Q   All right.  So in your carrier as a
23   medical doctor, you have published cohort studies?
24       A   I have.
25       Q   What have been the general topics of

Gregory B. Diette, M.D.

Page 142

1 those cohort studies?
2     A   Generally speaking, things related to
3 respiratory diseases and -- and things people
4 inhale.
5     Q   All right.  Have you published case-
6 control studies?
7     A   I don't know.  I can't think of one.  It
8 doesn't mean that there isn't one, but I'm -- I
9 can't think of a case-control study.
10    Q   All right.  Is it fair to say that none
11 of the published cohort studies address the issue
12 of talcum powder products and ovarian cancer?
13    A   Correct.
14    Q   And is it fair to say that none of the
15 cohort studies that you published address the
16 issue of talcum powder products and mesothelioma?
17    A   Correct.
18    Q   Is it fair to say that none of the
19 cohort studies that you have published address the
20 issue of asbestos and mesothelioma?
21    A   Correct.
22    Q   Is it fair to say that -- that the
23 majority of your publications in your -- listed in
24 your curriculum CV and those that you said you
25 have published since 2017 deal primarily in the

Page 143

1 research interests of lung disease, COPD,
2 asthma --
3         MS. BROWN:  Objection --
4 BY MS. PARFITT:
5     Q   -- pulmonary medicine, lung diseases?
6         MS. BROWN:  Objection to the form.
7         THE WITNESS:  There's certainly plenty
8 there.  You know, I get different feedback from
9 different people who look at my CV to tell whether
10 or not it's, you know, all that or whether there's
11 other things.  I think people read into it what
12 they -- what they see.  Because there's -- you
13 know, there's ICU research topics, there's
14 procedure-related topics, there's radiology
15 topics.  I mean there's all -- all sorts of
16 different things besides those.
17 BY MS. PARFITT:
18    Q   Okay.  Do you publish on methods and
19 methodology?
20        MS. BROWN:  Form.
21        THE WITNESS:  So I think there's a
22 couple of methods -- methods related papers.
23 BY MS. PARFITT:
24    Q   Papers that deal primarily with
25 epidemiological methodology?

Page 144

1         MS. BROWN:  Wait.  Hold on.  Is that a
2 question?
3         MS. PARFITT:  Mm-hmm.
4         MS. BROWN:  I didn't understand that.
5 If you understood it, you can answer.
6         THE WITNESS:  Well, the papers I was
7 thinking about had to do with methods and
8 quality -- quality assessment in terms of
9 healthcare.
10 BY MS. PARFITT:
11    Q   Okay.
12    A   I don't know if I've published anything
13 on epi methods, meaning like, you know, the topic
14 of a case-control study or --
15    Q   Right.
16    A   -- cohort studies, things of that sort.
17    Q   So it would be fair to say that you have
18 not published in a peer-reviewed journal a paper
19 on study designs, correct?
20        MS. BROWN:  Objection to the form.
21        THE WITNESS:  I would have to look back
22 and see.  I mean it's -- it's possible I've been
23 involved in something that -- that -- I mean it's
24 just hard to remember.  It's 200 plus papers,
25 so --

Page 145

1 BY MS. PARFITT:
2     Q   Right.  So nothing you can remember
3 today.
4     A   Correct.
5     Q   Okay.  And have you published on the
6 Bradford Hill factors?
7         MS. BROWN:  Form.
8         MR. LOCKE:  Objection.
9         THE WITNESS:  So I've not written a
10 paper about Bradford Hill.
11 BY MS. PARFITT:
12    Q   All right.  In any of the 200 papers
13 that you have published in a peer-reviewed
14 journal, do you set forth in those papers the
15 Bradford Hill framework?
16        MS. BROWN:  Objection to the form of the
17 question.
18        THE WITNESS:  You couldn't do it.
19 Right.  I mean, it's -- the papers that I write
20 are primary research papers, and that framework
21 doesn't belong in those papers, but we articulate
22 the -- the issues that are -- that are relevant
23 for a Bradford Hill analysis.
24 BY MS. PARFITT:
25    Q   Okay.  Well, in this expert report that

37 (Pages 142 to 145)

Gregory B. Diette, M.D.

Page 146

1    you did file in the federal court, you stated
2    specifically that you followed the Bradford Hill
3    framework.  Do you recall saying that?
4        A   I -- I do.  There was more to it, but it
5    included that.
6        Q   Okay.  So what I'm asking you, in any of
7    the papers, whether they be cohort study, case
8    control, other research and scientific
9    publications that you've listed on your curriculum
10   vitae, have you stated in those papers that you
11   are following or are guided by the Bradford Hill
12   framework?
13       MS. BROWN:  Objection.  He just answered
14   that.
15       THE WITNESS:  Yeah, it's sort of baked
16   into what we do.  So it's like in -- I mean the
17   answer is no, generally, but -- but we include
18   things in a way that they fit with what Bradford
19   Hill considerations are.  But there's not one that
20   was called like the Bradford Hill approach or
21   something.
22   BY MS. PARFITT:
23       Q   Okay.  And by --
24       MS. BROWN:  Let him finish.
25       Were you finished, Doctor?

Page 147

1        THE WITNESS:  I'm okay.  Thank you.
2        MS. PARFITT:  Thank you.
3    BY MS. PARFITT:
4        Q   Assume I did a search of the word
5    "Bradford Hill" in the 167 papers that you have
6    published in the peer-reviewed journal, would it
7    surprise you if those words did not appear?
8        MS. BROWN:  Objection to the form.
9        THE WITNESS:  It wouldn't surprise me,
10   but I -- I don't know that it's not there
11   somewhere.  And I would search more broadly than
12   just those 167.  I would look at the more recent
13   ones too.  I mean I can't say that it's not there,
14   but there's not a paper about Bradford Hill.
15   BY MS. PARFITT:
16       Q   Okay.  Have you been involved in any
17   original research on asbestos in general?
18       MS. BROWN:  Objection to the form.
19       THE WITNESS:  I have not.
20   BY MS. PARFITT:
21       Q   Have you -- have you conducted any
22   original research on ovarian cancer?
23       MS. BROWN:  Objection to the form, asked
24   and answered.
25       THE WITNESS:  I guess, I mean -- is it

Page 148

1    different than what you asked?  Because I'm
2    just --
3    BY MS. PARFITT:
4        Q   It is.
5        This would be some original research
6    that you might be -- got a funding or a grant or
7    something.
8        A   I see.  Nothing like that.
9        Q   Okay.  Have you received any funds --
10   any funding or any grants to study mesothelioma?
11       A   No.
12       Q   Have you received any funding or grants
13   to study asbestos?
14       A   No.
15       Q   Have you received any funding or grants
16   to study talcum powder products and their
17   association with ovarian cancer?
18       MS. BROWN:  Objection to the form.
19       THE WITNESS:  No.
20   BY MS. PARFITT:
21       Q   Have you ever published in peer-reviewed
22   literature a causation analysis or a review
23   article asking whether an exposure causes a
24   disease?
25       MS. BROWN:  Objection to the form of the

Page 149

1    question.
2        THE WITNESS:  I don't know.  I would
3    have to look back over.  I don't -- like I don't
4    know if I would use those words "causation
5    analysis," but we certainly write -- did you say
6    review article?
7    BY MS. PARFITT:
8        Q   Yes.
9        A   So I don't write many review articles.
10   They're really -- they're really low quality
11   academic products for the most part, and so I try
12   to focus more on original research.
13       Q   All right.  Well, same question applied
14   to original research.
15       MS. BROWN:  Objection to the form.
16       THE WITNESS:  Well, it wouldn't be -- I
17   mean that wouldn't be an original research
18   article.
19   BY MS. PARFITT:
20       Q   Okay.  Have you ever performed any
21   research on the environmental impacts of talcum
22   powder products and ovarian cancer?
23       MS. BROWN:  Objection to the form,
24   vague.
25       THE WITNESS:  No.

38 (Pages 146 to 149)

Gregory B. Diette, M.D.

Page 150

1    BY MS. PARFITT:
2        Q   Environmental impacts of diseases is
3    something -- is a topic that you are interesting
4    in, correct?
5        A   I am.
6        Q   You've studied the impact of
7    environmental effects on lung diseases, correct?
8        A   I have.
9        Q   In fact, that's something you continue
10   to be interested in, correct?
11       A   I am.
12       Q   But you've not studied any environmental
13   impacts on ovarian cancer, correct?
14       A   Correct.
15           MS. BROWN:  Asked and answered.
16   BY MS. PARFITT:
17       Q   Would it be fair to say that prior to
18   being retained by Johnson & Johnson sometime in
19   2017, you had done no research on the issue of
20   talcum powder products and ovarian cancer?
21           MS. BROWN:  Objection to the form,
22   misstates his testimony.
23           THE WITNESS:  I think it's the same as
24   before.  Right.  I mean you went through each --
25   each item, and my answer was no.

Page 151

1    BY MS. PARFITT:
2        Q   So it was not until you were retained by
3    Johnson & Johnson that you conducted any research
4    on the topic of ovarian cancer and talcum powder
5    products, correct?
6            MS. BROWN:  Objection to the form,
7    misstates his testimony.
8            THE WITNESS:  That is right.
9            MS. PARFITT:  Okay.  And is now a good
10   time for a bio break or is it --
11           MS. PARFITT:  Sure.
12           THE WITNESS:  If you're in the middle of
13   something, I --
14           MS. PARFITT:  No, no, this is fine.
15   We'll just move into another area quickly, yeah.
16           THE VIDEOGRAPHER:  The time is
17   11:14 a.m., and we're going off the record.
18           (Recess.)
19           THE VIDEOGRAPHER:  The time is
20   11:24 a.m., and we are back on the record.
21   BY MS. PARFITT:
22       Q   All right.  Dr. Diette, I want to talk
23   for a moment about Medical Science Affiliates.
24   All right?
25       A   Okay.

Page 152

1        Q   And to give you some -- a reference,
2    we'll spend a little time on that before we get
3    into your report.  All right?  Fair?
4        A   Sounds good.
5        Q   Okay.  What is Medical Science
6    Affiliates?
7        A   I think they -- they call themselves an
8    environmental consulting company.
9        Q   How long have you been involved with
10   Medical Science Affiliates?
11           MS. BROWN:  Form.
12           THE WITNESS:  So involved, I guess we'll
13   have to sort, but I -- I've known about them and
14   done some work with them for about ten years.
15   BY MS. PARFITT:
16       Q   Okay.  And I too want to sort, so let me
17   ask you this:  When were you first introduced to
18   Medical Science Affiliates?
19       A   Well, I guess if it's ten years, it
20   would have been about ten years ago.
21       Q   And what were -- how did it come about
22   that you learned of a group called Medical Science
23   Affiliates?
24       A   There was a woman who worked there
25   then -- I don't remember what her name is, she's

Page 153

1    not there anymore -- and she knew a colleague of
2    mine, and they were I think at the time looking
3    for somebody to take on an epidemiology project, a
4    review.  And so he -- he sent around like a note
5    or talked to us, I don't remember how he did it,
6    but to see if anybody was interested in -- in
7    doing an epidemiology project.
8        Q   Who was that colleague?
9        A   I think it was Hank Fessler, but I could
10   be wrong.  That's a while ago.
11       Q   And what is his position within the
12   university?
13       A   He works in pulmonary.
14       Q   Okay.  So you were -- you were then
15   engaged by Medical Science Affiliates to do an
16   epidemiological report for them?
17           MS. BROWN:  Objection.  Misstates
18   testimony.
19           THE WITNESS:  I don't know about
20   engaged.  I mean my -- my relationship is as an
21   independent contractor.  So it's like -- it's not
22   like I have an agreement to do anything with them
23   or for them.  But that's -- that's the place
24   where, you know, they organize the materials for
25   me to look over and to -- and to do the

Gregory B. Diette, M.D.

Page 154

1   epidemiological review.
2   BY MS. PARFITT:
3        Q   Okay.  Your counsel has objected, as you
4   heard, to me obtaining a copy of your agreement,
5   so I'm going to have to ask you a few more
6   questions about this.
7            What is your arrangement with Medical
8   Science Affiliates?  Independent contractor?
9        A   That's exactly right.
10           MS. BROWN:  He just said it.
11           MS. PARFITT:  Okay.  I understand.  You
12   can take your own deposition, Counsel.  It's going
13   to show up on the record too, you're rubbing your
14   head.
15   BY MS. PARFITT:
16       Q   Medical Science, you have an independent
17   contract relationship, to do what?
18       A   I think what it establishes is that I
19   can use their administrative services as kind of
20   like an outside office for me to do work.
21       Q   Okay.  So that's one role, they're an
22   outside office.  You mentioned, though, that they
23   contracted you to also write an epidemiology
24   report.  Correct?
25       A   It's --

Page 155

1            MS. BROWN:  Objection to the form.
2            THE WITNESS:  It's incorrect.
3   BY MS. PARFITT:
4        Q   Okay.  Straighten it out for me.
5        A   Well, they didn't contract me to do
6   anything.  They asked if I was interested in doing
7   this epidemiologic project for a client that they
8   knew of.
9        Q   Okay.  That helps me.
10           So Medical Science Affiliates reached
11   out -- requested that you do an epidemiological
12   report for one of their clients.
13       A   Exactly right.
14       Q   Okay.  Over the course of ten years that
15   you've been affiliated as an independent
16   contractor with Medical Science Affiliates, how
17   many times have you prepared a report for one of
18   Medical Science Affiliates' clients?
19       A   I don't know.
20       Q   More than ten?
21       A   Sure.
22       Q   More than a hundred?
23       A   A hundred would be pushing it.  So
24   something in the tens, I would say.  But not ten.
25   I mean something higher up in --

Page 156

1        Q   More 50?
2        A   At least 50.
3        Q   Okay.  And what has been the topic of
4   those reports that you have prepared for Medical
5   Science Affiliates' clients?
6            MS. BROWN:  And I'm going to jump in
7   here.  To the extent that those projects are
8   governed by confidentiality agreements, I would
9   ask Dr. Diette that you only disclose that which
10   has been disclosed publicly, for example, in court
11   or at a deposition.
12           MS. PARFITT:  Please stop coaching the
13   witness.
14   BY MS. PARFITT:
15       Q   Can you answer?
16           MS. BROWN:  We're trying to protect
17   confidentiality.
18           MS. PARFITT:  I get --
19           MS. BROWN:  I'm instructing him on
20   privilege.
21           MS. PARFITT:  That's fine.  I
22   understood.  He can talk now.
23           THE WITNESS:  So I would say that most
24   of the work is in the context of what Ms. Brown
25   said, which is that it wasn't for me to share with

Page 157

1   other people.
2   BY MS. PARFITT:
3        Q   All right.  Is J&J a client of Medical
4   Science Affiliates?
5        A   I don't know what their relationship is,
6   like I don't know if you would call them a client
7   or not.
8        Q   Okay.  Does Medical Science Affiliates
9   do some work for Johnson & Johnson?
10           MS. BROWN:  Objection.  Speculation.
11           THE WITNESS:  So I can tell you about
12   what they do for me with regard to Johnson &
13   Johnson.  I don't know about anything else.
14   BY MS. PARFITT:
15       Q   All right.  Tell me what you know.
16       A   Well, like, for example, like in the
17   cases that we've discussed that involve Johnson &
18   Johnson, they've provided a service by collecting
19   the materials, right.  So, for example, like when
20   you see that list of materials that -- that I
21   provided that I reviewed, they will collect those
22   and -- and organize them for me.
23           If there's a need to have a meeting or a
24   phone call, they'll help to set that up, right, so
25   that -- so, for example, for the deposition today,

Gregory B. Diette, M.D.

Page 158

1    they were able to help sort my -- through my
2    schedule, you know, with me, and figure out a day
3    or days, I don't remember what we offered, things
4    of that sort.  They'll prepare invoices on my
5    behalf.  They'll help edit a report.  You know,
6    administrative type things.
7         Q   Okay.  Let's break that down a little
8    bit.
9         Is it your understanding that Medical
10   Science Affiliates bills Johnson & Johnson --
11        MS. BROWN:  Object --
12   BY MS. PARFITT:
13        Q   -- and invoices them for work?
14        MS. BROWN:  Objection to the form, calls
15   for speculation.
16   BY MS. PARFITT:
17        Q   If you know.
18        A   I don't know where the bill goes because
19   I don't know if it goes to the law firm.  Like if
20   it matters to you whether it's directly to Johnson
21   & Johnson or -- I mean I can only guess that, you
22   know, the law firm is not going to pay the bill
23   out of their own pocket.  They're probably going
24   to then invoice Johnson & Johnson, but I don't
25   know whether the bill goes directly to Johnson &

Page 159

1    Johnson or whether it goes to the law firm.
2         Q   All right.
3         MS. BROWN:  And, Doctor, counsel doesn't
4    want you to guess, so just answer the question the
5    best --
6    BY MS. PARFITT:
7         Q   Dr. Diette, if they -- Medical Science
8    Affiliates collects material for you -- as you say
9    they did, correct?
10        A   That's correct.
11        Q   -- do they bill you or do they bill
12   someone else?
13        MS. BROWN:  Objection to the form.
14        THE WITNESS:  They bill someone else.
15   BY MS. PARFITT:
16        Q   Okay.  So when you testified that J&J --
17   excuse me, when you testified that you had
18   assistance with regard to the preparation of some
19   of the materials that accompany your report, that
20   was work that you contracted with Medical Service
21   Affiliates to do, and they didn't bill you, they
22   billed somebody else, correct?
23        MS. BROWN:  Objection to the form.
24        THE WITNESS:  I don't know if
25   "contracted" is right, but -- but they did what

Page 160

1    you said, which is that they billed somebody else
2    for the work that they did.
3    BY MS. PARFITT:
4         Q   Do you know who that somebody else is?
5    And I want to remind you you're under oath,
6    Dr. Diette.
7         MS. BROWN:  What --
8         THE WITNESS:  What's --
9         MS. BROWN:  Whoa, whoa, whoa.  I'm
10   objecting to the implication there.  Dr. Diette
11   has done nothing but testify truthfully today.
12        MS. PARFITT:  Counsel, objection, form.
13   I'm telling you.
14   BY MS. PARFITT:
15        Q   Please go on, Dr. Diette.
16        MS. BROWN:  No, but what you just said
17   is inappropriate --
18        MS. PARFITT:  It was not --
19        MS. BROWN:  -- and it violates both the
20   federal rules --
21        MS. PARFITT:  -- violative of anything,
22   Counsel.
23        MS. BROWN:  -- as well as deposition
24   protocol.  He of course is testifying under oath,
25   and if you're suggesting something otherwise,

Page 161

1    that's wildly inappropriate.
2         MS. PARFITT:  Counsel, let the Court
3    decide if it's -- I think the Court might decide
4    that your objections and your manner today are
5    wildly inappropriate.
6    BY MS. PARFITT:
7         Q   So, Dr. Diette, so we can move forward,
8    do you remember the question?
9         A   I remember it, but I think I already
10   answered it.  It's -- I don't have a better answer
11   than what I gave you before.
12        Q   You don't know who Medical Science
13   billed for the services they rendered to you?
14        A   Well, let's look at the invoice if we
15   want to.  If it's on the top of that, then I
16   might --
17        Q   It's been blacked out, Dr. Diette.
18        A   So it's either a law firm or it's
19   Johnson & Johnson.  I don't know whether it's one
20   or the other.
21        MS. BROWN:  Counsel, you're
22   misrepresenting the documents.  It's very clear
23   who they sent the bill to on the face of the
24   invoice, and it has not been redacted for
25   work-product privilege.

41 (Pages 158 to 161)

Gregory B. Diette, M.D.

Page 162

BY MS. PARFITT:

Q   What I want to understand, for purpose of the expert report you prepared in this litigation, I want you to tell me, if you will, every service that Medical Science Affiliates performed for you.

A   I don't think I can give you a full list.  I think that the -- go ahead.

Q   No, no, please, go ahead.

A   All right.  So I think the category of things that I told you about before are the kinds of things that they -- that they did in this case.  I don't know if I mentioned like arranging like a phone call.  Like if I was going to have a phone call, they would arrange that.  Help with -- I already talked about editing -- editing reports and -- I can't think of another service they did, but that's what I can think of right now.

Q   Okay.  Did Medical Science Affiliates research the scientific literature for you in preparation for some of the information contained in your expert report?

A   I don't -- I don't think they did any of that.  I mean, they've -- they've done searches in the past on other -- other topics, but I don't

Page 163

think they did any for this.

Q   All right.  So it's your testimony that in the talcum powder/ovarian cancer case, they did not do any research of the peer-reviewed literature; is that correct?

A   Well, let me be clear, when you talk about talcum powder and ovarian cancer -- because I have to think back with each -- you know, each case or whatever, but we're talking about this particular matter as you're asking these questions or --

Q   Well, that's a -- that's a great point.  You got involved in talcum powder and ovarian cancer cases sometime in 2017.  That's your testimony.

A   It is.

Q   All right.  So at that point in time when you became engaged to work on talcum powder products and ovarian cancer, what I'm interested in knowing is whether or not, whether it was for this report, another report, has Medical Science Affiliates done any research work of the literature on this topic?

A   And by "research work," does that -- do you mean like finding papers or does it mean doing

Page 164

something else with the papers?

Q   I'll break it down.  Did they do a literature search for you?

A   Yeah, and that's what I don't remember.  So I'm just saying that they've done that at my request in the past.  But not -- not too much.  I mean it's actually not that helpful, because I -- I find it easier to do it myself.

Q   Whether it was helpful or not, my question is, did Medical Science Affiliates do any literature research for you in -- on the topic of talcum powder products and ovarian cancer?

A   I can't give you a better answer.  I mean I -- I think it sounds to me like you keep asking the same thing, and it -- my answer is I'm not -- I'm not sure.  Like they may have gathered a couple of papers, I don't remember if they did or not.  They certainly didn't do the search, like I didn't commission anybody to do like -- like the search.

Q   Okay.  And how would they deliver that information to you?  Do they e-mail it to you?  Do they send it to you?  What happens?

A   It depends upon how I ask.  So it can come as a binder, like the binder you have in

Page 165

front of you, it could like that, and be hard copies.  It could be through, you know, an electronic mechanism, if there were something to share that way.

Q   All right.  Did Medical Science Affiliates summarize any of those depositions that you have listed in your report?

A   I don't -- do I have -- I don't think -- do I have deposition summaries?

Q   No.

A   Oh, then no.

Q   You have depositions.

A   Then the answer is no.

Q   Okay.  Now, what you've provided me are reports and depositions of various experts either for Johnson & Johnson or for the plaintiff that you've indicated you've -- you've put them on your reliance list.

And what I'm questioning is whether or not you've had any summaries done of those reports by Medical Science Affiliates.

A   No.

Q   Okay.  Have they done any summaries of any type of information for you in the talcum powder products and ovarian cancer?

42 (Pages 162 to 165)

Gregory B. Diette, M.D.

Page 166

```
 1          MS. BROWN:  And, Counsel, here I'm going
 2  to interject, and to the extent your question --
 3          MS. PARFITT:  Objection.  Form.
 4          MS. BROWN:  -- seeks to -- I'm
 5  instructing on privilege, which I'm allowed to do
 6  under the federal rules and under the --
 7          MS. PARFITT:  If it's a privilege
 8  issue --
 9          MS. BROWN:  -- let me do that.
10          MS. PARFITT:  -- it's certainly fine.
11          MS. BROWN:  Thanks.  So my instruction
12  here will be that, Doctor, you are not under the
13  work-product privilege to disclose any
14  correspondence you've had with MSA, unless it is
15  something on which you rely for your opinions
16  here, and then of course, counsel is entitled to
17  have that information.
18  BY MS. PARFITT:
19      Q   With that understanding, how do you
20  answer the question?
21      A   Can you say it again because I think I
22  lost it?
23      Q   Sure.  Let me just have it read back to
24  you here.
25          Has Medical Science Affiliates done any
```

Page 167

```
 1  summaries of any type of information for you -- or
 2  provided any information for you on the talcum
 3  powder products and ovarian cancer cases?
 4          MS. BROWN:  Same instruction.  If you're
 5  relying on anything they've done, of course,
 6  please answer the question.
 7          THE WITNESS:  So if we're talking about
 8  cases -- because that's why I clarified before,
 9  we're not talking about this matter.  We're
10  talking about ever in any -- in any case?
11  BY MS. PARFITT:
12      Q   Ovarian cancer and talcum powder
13  products.
14      A   Oh, yeah.  No, I understand the words.
15  I'm just trying to make sure whether we're talking
16  about like this -- this matter that we're talking
17  about only or -- or beyond that.
18      Q   Has -- has -- beyond that.
19      A   So I'm going to say probably they have.
20  That if there are cases where there were like
21  medical records, for example, although I don't
22  think I've gotten any medical records, but they
23  would have provided a summary.  If there were
24  deposition transcripts in those other cases, they
25  might well have -- have done that.
```

Page 168

```
 1      Q   Did you use for purposes of your expert
 2  report any of the summaries that were -- that were
 3  conducted by Medical Science Affiliates that you
 4  just spoke about?
 5      A   See, this is where I -- I don't know if
 6  you're trying to confuse me or what, but --
 7      Q   No, I'm not.
 8      A   Okay.  So I just want to be clear,
 9  because there aren't any summaries for this,
10  right.
11      Q   Okay.
12      A   So -- and that's why I keep trying to --
13  I just -- because there's a different answer for
14  what -- what people have done in other matters and
15  what they've done in this matter.  There aren't
16  any summaries that I'm aware of to -- to look at.
17      Q   All right.  Did Medical Science
18  Affiliates help you write your expert report?
19          MS. BROWN:  Objection to the form of the
20  question.
21          THE WITNESS:  You know, "write" is a --
22  is a word that can mean a lot of things.  They
23  helped me to -- to shape it, like to create the --
24  the format for it and like edit out typos and
25  things of that sort.
```

Page 169

```
 1  BY MS. PARFITT:
 2      Q   Okay.  Well, that has -- it means a lot
 3  of things as well.  So let me ask you --
 4          MS. BROWN:  Counsel, just ask the
 5  question.
 6          MS. PARFITT:  Counsel, I'm -- please.
 7          MS. BROWN:  You can't editorialize like
 8  that.  It's a question and an answer.
 9  BY MS. PARFITT:
10      Q   Dr. Diette, what I would like to ask you
11  is, when you say they helped shape your report,
12  what do you mean they helped shape your report?
13          MS. BROWN:  Objection.
14          THE WITNESS:  What I just said -- I mean
15  what I said after -- after that before.
16  BY MS. PARFITT:
17      Q   Is every word in your expert report that
18  you have there in front of you a word that you put
19  in it?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  Well, I don't know.  I
22  mean, there's -- there's quotes from people,
23  right, so that those aren't my words, for example.
24  BY MS. PARFITT:
25      Q   Well, you know, I'm glad you brought
```

43 (Pages 166 to 169)

Gregory B. Diette, M.D.

Page 170

1    that up. That's a good question.
2         A   Yeah.
3         Q   Are the opinions and the writings
4    contained in that report words that you selected?
5         A   Oh, for sure. I mean like the opinions
6    and my -- my summaries of things and -- is that
7    what we're talking about?
8         Q   No. No.
9         A   We're not? All right.
10        Q   The report is about -- let's see how
11   many pages -- it's about 51 pages long, and the
12   question I have, with the exception of quotes from
13   other people, Dr. Diette, is every word in this
14   report a word you chose to put in the report?
15            MS. BROWN: Objection to the form.
16            THE WITNESS: For sure, yes. Although
17   like some of the words, for example, I think might
18   come from one of those affidavits that we were
19   talking about, right. So it may be like, you
20   know, words that I created in a different context
21   and then pulled into this.
22   BY MS. PARFITT:
23        Q   Okay. Well, then when you say "Medical
24   Science Affiliates helped shape," I'm trying to
25   get an understanding, what do you mean "shape"?

Page 171

1         A   It would look like a disaster if I did
2    this myself. So the fact that there are headings,
3    that, you know, things don't spill over from one
4    page to another. I don't remember if there's a
5    table in here, but to not have the table split
6    across, to have, you know, references look okay.
7    That I'm not good at. So the fact that this, in
8    my view, looks like a professional product, that's
9    what they -- that's what they've done for me is to
10   make it look like that.
11        Q   Okay. There are multiple footnotes in
12   your report to testimony of various experts that
13   were retained by the plaintiff.
14        A   Yeah.
15        Q   Who prepared those footnotes?
16            MS. BROWN: Objection to the form.
17            THE WITNESS: Staff somewhere, but --
18   BY MS. PARFITT:
19        Q   I'm sorry.
20        A   Staff.
21        Q   Staff?
22        A   Yes.
23        Q   What staff?
24        A   I don't know which staff did it, but I
25   mean like the -- if you say who prepared the

Page 172

1    footnotes, like the information that comes from it
2    was information that I pulled from the --
3         Q   Not my question. Who prepared the
4    actual footnotes that appear at the bottom of your
5    expert report of 58 -- or, excuse me, 51 pages?
6         A   So like actually put like -- like 110
7    and then put like "Siemiatycki dep, 149"?
8         Q   Or how about put "226, Singh depo, don't
9    consistently reduce," and there's a summary, I
10   mean who provided that information, what staff?
11            MS. BROWN: Objection to the form.
12   Misstates his testimony about how the report was
13   prepared.
14            THE WITNESS: I'm sorry. We're looking
15   at number 226.
16   BY MS. PARFITT:
17        Q   By way of example, Dr. Diette.
18        A   No, no, I'm just -- I'm just trying to
19   help because an example helps.
20            So I don't know. I mean some -- some
21   staff person put that particular -- literally that
22   segment in, but like it came from me identifying
23   that NSAIDS don't consistently reduce the risk of
24   ovarian cancer and wanting to link it there to my
25   statement.

Page 173

1         Q   Who's the staff? Staff for MSA?
2         A   It could be MSA; it could be the law
3    firm. I'm not sure which.
4         Q   Did you dictate to MSA or anyone else
5    portions of your expert report, and someone else
6    then did the recordation?
7         A   Somebody else did the --
8         Q   Did the -- did --
9         A   The --
10        Q   Did you dictate any portions of your
11   report to anyone?
12        A   I don't -- I don't do that.
13        Q   You don't dictate. Okay.
14        A   No.
15        Q   Did you spend time on the phone with
16   anyone at MSA and discuss what your -- your report
17   should look like?
18            MS. BROWN: And again, I'm going to
19   instruct on work product, that you not reveal the
20   substance of any discussions you had regarding
21   drafts of this report. Whether or not there was a
22   conversation is an appropriate question to answer.
23            THE WITNESS: Sure.
24   BY MS. PARFITT:
25        Q   You did?

Gregory B. Diette, M.D.

Page 174

1    A   Yes.
2    Q   So you had a conversation --
3    A   Yes.
4    Q   -- about the substance of your report,
5  correct?
6        MS. BROWN:  Objection to the form.
7        THE WITNESS:  Oh, no, you just -- you
8  said something else before that.  What was the
9  question before?
10       MS. BROWN:  Discuss what your report
11  should look like.
12       THE WITNESS:  Yeah, that's different.
13  BY MS. PARFITT:
14   Q   Okay.
15   A   You changed it to "substance."  But I
16  mean what it should look like is what I'm talking
17  about.  It was -- it should look good, right?  And
18  so there should be like, you know, bold headings
19  and there should be spaces where they belong.
20   Q   What's the name of the contact person
21  you interfaced with at MSA?
22   A   My main one is Maddie Petta --
23  Pettenati.
24   Q   Okay.  And how long have you worked with
25  Maddie Pettenati?

Page 175

1    A   A couple of years.
2    Q   Okay.  Do you work with anyone else over
3  at MSA to help you with your reports?
4    A   Oh, sure.
5        MS. BROWN:  Objection to the form.
6        THE WITNESS:  Yeah.
7  BY MS. PARFITT:
8    Q   Who?
9    A   There's a woman named April, Shannon.
10  I'm sure there's others too.
11   Q   What are their backgrounds?
12       MS. BROWN:  Objection to the form.
13       THE WITNESS:  Everybody has a -- a
14  science background of some sort, like biology
15  degrees, things of that sort.
16  BY MS. PARFITT:
17   Q   Okay.  How much time did you spend with
18  the folks at -- the team at MSA for purposes of
19  getting your report put together?
20   A   I don't know.  I mean, what do you mean
21  by "with"?
22   Q   Well, we know you've had conversations.
23  We know that you have received information with
24  regard to shaping your report, and what I want to
25  know is, how much time did you spend with the team

Page 176

1  at MSA to help you get your report in order?
2        MS. BROWN:  Objection to the form,
3  misstates the testimony.
4        THE WITNESS:  I don't recall the amount
5  of time.  I mean whatever it took.  Like some of
6  it might be like a two-minute conversation to say
7  like, you know, I want to move a section down or
8  something.  Or, you know, Can you proofread that
9  particular paragraph and look for typos?  And
10  things of that sort.
11  BY MS. PARFITT:
12   Q   Did any of the folks at MSA make any
13  suggestions with regard to the scientific or
14  medical content of your report?
15       MS. BROWN:  Objection.  Instruct not to
16  answer on work product.  You can discuss -- you
17  can answer the question of whether you had any
18  conversations, the substance of which is
19  privileged, and I'll instruct you not to answer.
20       MS. PARFITT:  MSA is a third-party
21  contractor from what I'm understanding.
22       MS. BROWN:  No different than if he was
23  working with a secretary to format this.
24  Conversations about drafts of the report are
25  privileged and will not be discussed.

Page 177

1  BY MS. PARFITT:
2    Q   Doctor, if you can answer the question.
3    Can you say it again?  I'm sorry.
4    Q   Sure.  No worries.  I'm just getting it
5  here.
6        Did any of the folks at MSA make any
7  suggestions with regard to the scientific or
8  medical content of your report?
9        MS. BROWN:  I'm instructing you not to
10  answer that question under the work-product
11  privilege.
12  BY MS. PARFITT:
13   Q   Do you keep time records of the time you
14  spend with MSA?
15   A   No.
16   Q   Okay.  Well, I believe you testified at
17  the beginning of your deposition that your charge
18  per hour is $485, correct?
19   A   Well, I was trying -- I was trying to
20  make you understand that differently, and you said
21  we would talk about it, so maybe we can.  My
22  charge is $400 an hour.
23   Q   All right.  Where does the 485 come
24  from?
25   A   It's what I said before, right.  They

45 (Pages 174 to 177)

Gregory B. Diette, M.D.

Page 178

1   add $85 when they bill somebody for my time.
2        Q   Who "they"?
3        A   MSA.
4        Q   "They," MSA?
5        A   Yeah.
6        Q   All right.  So that I get it straight,
7   you charge 400 -- $400 for your time, correct?
8        A   Correct.
9        Q   And then your understanding is MSA
10  charges an additional $85 to someone for their
11  assistance for you, correct?
12       MS. BROWN:  Objection to the form, calls
13  for speculation.
14       THE WITNESS:  So it's -- I don't know --
15  I don't know how they break it down, because they
16  bill for different things, like they bill for
17  photocopying, they bill for some administrative
18  tasks separately.  Whatever it is, it's their
19  business model, and they -- they add that amount
20  to the hourly rate.
21  BY MS. PARFITT:
22       Q   How much did Medical Science bill for
23  their work, do you know?
24       MS. BROWN:  Objection.  Calls for
25  speculation.

Page 179

1        THE WITNESS:  You can tell if we look at
2   the -- the invoices.
3   BY MS. PARFITT:
4        Q   Okay.  They would bill the same number
5   of -- well, let me ask for a clarification.  Not
6   all your work was done in conjunction with the
7   assistance of Medical Science Affiliates, correct?
8        MS. BROWN:  Objection to the form.
9        THE WITNESS:  I mostly sat by myself.
10  Yeah.
11       Q   Okay.  So the invoices that I have for
12  you would not necessarily reflect all of the work
13  that Medical Science Affiliates afforded you,
14  correct?
15       A   That's incorrect.
16       MS. BROWN:  Objection to the form.
17  BY MS. PARFITT:
18       Q   Okay.
19       A   I mean that's what I was trying to offer
20  you earlier is to try to understand the -- the
21  bills.  Because also when you add that comment
22  about the amount of money in total, it wasn't all
23  money that goes to me.
24       Q   Yeah.  The bills that I have have a date

Page 180

1   and basically an amount.  I don't have --
2        A   Like it --
3        Q   -- it's been blacked out.
4        A   It doesn't matter.  I can still --
5        MS. BROWN:  It's been redacted for work
6   product.
7        THE WITNESS:  I mean I can help you
8   understand it if you want.
9   BY MS. PARFITT:
10       Q   All I really want to understand and get
11  a better understanding, Dr. Diette, is the types
12  of services that MSA provided you in order to
13  file this -- prepare this report.
14       A   Yeah, I -- I listed those.
15       Q   Okay.  Do they help you with all of your
16  expert reports?
17       A   In what?
18       Q   Does MSA provide any type of service in
19  any and all expert reports that you prepare in the
20  context of litigation?
21       A   No.
22       Q   Okay.  Do you have another go-to service
23  to help you with the preparation of your expert
24  services?
25       MS. BROWN:  Objection to form.

Page 181

1        THE WITNESS:  No.  I do stuff on my own
2   as well.
3   BY MS. PARFITT:
4        Q   All right.  So there are cases where
5   you've done the work by yourself, and there are
6   cases like this particular case where you engage
7   the services of MSA, correct?
8        A   That is --
9        MS. BROWN:  Objection to the form.
10       THE WITNESS:  -- correct.
11  BY MS. PARFITT:
12       Q   Okay.  And did MSA edit any of your --
13  any of your -- did MSA edit your expert report?
14       A   Yeah.
15       Q   Okay.  What kind of edits did they make?
16       A   Well, all sorts.  Like I asked them to
17  look for typos, for example.
18       Q   Right.
19       A   I just happen to be open to page 30 and
20  31, and where you see that the -- there's like
21  bulleted sections, when I wrote that, it was just
22  one long impenetrable paragraph, and so they were
23  nice enough to sort of break it into some chunks
24  so it would be easier to read.
25       Q   Okay.  Bear with me if I asked this

46 (Pages 178 to 181)

Gregory B. Diette, M.D.

Page 182

1    before, but did MSA ever suggest any new sentences
2    or study that you didn't previously insert in your
3    paper?
4        A   I doubt a new study.  It could be -- I
5    mean we worked -- we worked pretty hard to make
6    sure that I have the full list of studies, you
7    know, acknowledged, and so if there was something
8    I left off -- I mean I don't remember this
9    specifically for this, but that would be a normal
10   practice, right, like which is to say, you know,
11   Oh, I saw in your list of papers that there's a
12   Smith paper, should that be on here?  Not them
13   going out and saying, Oh, I found a Smith paper,
14   would you like that on there?
15       Q   But they might looked at yours and say,
16   You -- you missed a study.  Fair?
17       A   Oh, sure.
18           MS. BROWN:  Objection to the form.
19           THE WITNESS:  Yeah.
20   BY MS. PARFITT:
21       Q   Okay.  And they might look at your
22   report and say, You missed --
23           I think what I'm getting at, Dr. Diette,
24   you described their efforts as generally
25   editorial.  Is that fair?

Page 183

1            MS. BROWN:  Objection to the form.
2            THE WITNESS:  I would say administrative
3    and editorial.
4    BY MS. PARFITT:
5        Q   Okay.  So we can agree that it's both
6    administrative and editorial?
7            MS. BROWN:  Objection to the form.
8            THE WITNESS:  Correct.
9    BY MS. PARFITT:
10       Q   And as I appreciate, in addition to
11   perhaps providing you with a study or two that --
12   or three, however number, that you might have
13   omitted, is there anything substantive like that
14   that they did for you for purposes of your expert
15   report?
16       A   I insist that they don't.  I tell them
17   that I don't want any intellectual input into
18   the -- to the stuff that we're working on.  Like I
19   don't want their -- I don't even know if they have
20   opinions, but I don't want their opinions.  I
21   literally want this to look like a professional
22   product, and I want to get it done in a way that I
23   can still spend my time -- my other professional
24   time on other things.  So if I were to try to make
25   this look like this, it would take me forever.

Page 184

1        Q   And I'm not concerned about the format.
2    What I'm concerned about is the substance,
3    Dr. Diette, as you can appreciate.
4            MS. BROWN:  Objection.
5    BY MS. PARFITT:
6        Q   And so what I'm trying to -- to get some
7    clarity here is that, other than perhaps providing
8    you a study that you may have omitted from your
9    report, is there anything else that falls more in
10   the substantive area that they provided and
11   offered for you?
12       A   I -- I think I've answered as best I
13   can.
14       Q   Well, why don't we -- let's talk about
15   your contact with J&J.  When did they first reach
16   out to you to talk with you about being an expert
17   to defend them in these lawsuits?
18           MS. BROWN:  Objection to the form of the
19   question.
20           THE WITNESS:  So they never asked me to
21   defend them.  They -- they asked me to evaluate
22   the epidemiologic literature.
23           And just to be clear, because it seemed
24   like it was tripping us up before trying to talk
25   about this, when I talk about J&J, it's lawyers

Page 185

1    that are working with J&J as opposed to somebody
2    from J&J per se.  And so I'll leave it to you guys
3    to sort out what that -- what that means.
4    BY MS. PARFITT:
5        Q   Fair enough.
6        A   But -- but the first time would have
7    been a lawyer back in 2017 who asked if I would be
8    interested in reviewing the epidemiologic
9    literature.
10       Q   Who was that lawyer?
11       A   Jonathan Cooper.
12       Q   Okay.  Now, at the time that Jonathan --
13   or Jonathan Cooper contacted you, did you -- were
14   you working with MSA?
15       A   Obviously, because I said ten years,
16   and, you know, this was 2017.
17       Q   Okay.  Did you share with Jonathan
18   Cooper that you worked with this MSA company to
19   help you prepare your expert reports?
20       A   He knew about it already, because I
21   think the reason he reached out to me is because
22   he was impressed with the work I had done in
23   other -- other cases.
24       Q   Okay.  Well, when he -- when you say he
25   was impressed with you, with the work that you've

Gregory B. Diette, M.D.

Page 186

1   done, when he -- let me explore that a little bit.
2        When he called you, did you tell him
3   that you had previously worked with MSA to help
4   you with your expert reports?
5        A   I didn't have to.
6        Q   He knew that.
7        A   Yes.
8        Q   Okay.  How would Mr. Cooper have known
9   that you worked with MSA before?
10       MS. BROWN:  Objection to the form, calls
11  for speculation.
12       MR. LOCKE:  Objection.
13  BY MS. PARFITT:
14       Q   If you know.  Seems like you know.
15       A   Oh, I do.  We had -- he and I had worked
16  together on other cases.
17       Q   Okay.  What other cases did you work
18  with Mr. Cooper on?
19       A   They were asbestos-related cases with
20  plastic or phenolics, like electrical equipment.
21       Q   Okay.  And in those cases that you
22  worked with Jonathan on -- or Mr. Cooper on, did
23  you utilize the services of MSA as well to help
24  you prepare your expert report in those cases?
25       A   I did.

Page 187

1        Q   Okay.  Has MSA reached out to you and
2   engaged or asked if you would engage in assisting
3   them on any other projects currently?
4        A   What do you mean by "currently"?
5        Q   Well, are you working with MSA on any
6   other projects other than the talcum powder
7   products and ovarian cancer?
8        A   Yes.
9        Q   What projects?
10       MS. BROWN:  And again, Doctor, to the
11  extent that a confidentiality agreement doesn't
12  prevent you from disclosing other work that you're
13  doing, you can answer the question.
14       THE WITNESS:  Some cases that relate to
15  asbestos and other chemical-related cases.
16  BY MS. PARFITT:
17       Q   Okay.  Was there a time when you,
18  instead of receiving services from MSA, you
19  provided services to MSA as an affiliate expert?
20       MS. BROWN:  Objection to the form of the
21  question.
22       THE WITNESS:  I know they have that word
23  "affiliate" in their name.  I don't know what that
24  means.  But I don't provide services to them.
25  BY MS. PARFITT:

Page 188

1        Q   Okay.  Have they ever listed you on some
2   type of website as a consultant for legal
3   purposes?
4        A   Well, I see --
5        MS. BROWN:  Objection to the form,
6   calls for speculation.
7        THE WITNESS:  -- Mr. Finch is here and
8   he --
9        THE REPORTER:  Excuse me.
10       THE WITNESS:  Oh, sorry.
11       MS. BROWN:  Objection to the form, call
12  for speculation.  Thank you.
13       THE WITNESS:  Mr. Finch flashed
14  something up at a trial to suggest that they had,
15  but that wasn't an advertisement for me.  It was a
16  list of somebody who had credentials that were
17  similar to mine.
18  BY MS. PARFITT:
19       Q   Okay.  Well, my question is, have -- are
20  you aware of whether or not Medical Science
21  Affiliates has ever advertised your name out in
22  the -- the community as someone --
23       MS. BROWN:  Same objection --
24  BY MS. PARFITT:
25       Q   -- who was a specialist in pulmonology

Page 189

1   medicine?
2        MS. BROWN:  Same objection.
3        THE WITNESS:  I'm not aware that they
4   advertise.
5   BY MS. PARFITT:
6        Q   Okay.  So are there times that Medical
7   Science Affiliates reaches out to you and says,
8   Dr. Diette, we want you to do a medical -- a
9   scientific review for us on a topic?
10       A   Never.
11       Q   Okay.  They've never done that.  You've
12  never provided that service for them.
13       A   They -- they don't ask me to do work for
14  them.
15       Q   Okay.  Do their clients ask you to do
16  work for them?
17       A   Of course, that's where we started,
18  right, from ten years ago.
19       Q   Right.  And that's what I'm trying to
20  figure out.
21       MS. BROWN:  Let him finish.  I don't
22  think he was done.
23       THE WITNESS:  No, that was -- that was
24  the description of what I was saying, like how
25  the -- the first time that I met them was that

48 (Pages 186 to 189)

Gregory B. Diette, M.D.

Page 190

1   they -- there was some, you know, group that
2   wanted an epidemiologic review, and they were
3   trying to figure out if there were local
4   epidemiologists that could take on a task like
5   that, and so that's the way it worked.
6   BY MS. PARFITT:
7       Q   Okay.  So I now get --
8           MS. BROWN:  He is not done.
9   BY MS. PARFITT:
10      Q   Are you done, Doctor?  I thought you
11  were.
12      A   I'll be done.
13      Q   Okay.  So if I appreciate this
14  structure, so we can move on, a client, some
15  company can reach out to Medical Science
16  Affiliates and say, We need some work done and
17  research done on a particular area.  Will you do
18  that for me?
19          Medical Science Affiliates will say,
20  Yes, we can.  And then Medical Science Affiliates
21  reaches out to people like you?
22          MS. BROWN:  Objection to the form.
23          THE WITNESS:  So I don't know -- I don't
24  know when they say, Yes, we can.  Like I don't
25  know, for example -- like their -- I don't know

Page 191

1   what their size is, but they may say, Yes, we can,
2   and just do it themselves.  Right.  They have
3   other people that I don't work with that work
4   there.
5           I'm just saying, like you're asking the
6   question, so it's like -- so if somebody calls
7   them and says, Can you do this work?  They may
8   well say, Yes, we can do it.  They may or may not
9   need a content expert or methodologic expert to do
10  it.  So it -- I assume it depends, but I'm -- I'm
11  not familiar with their entire business operation.
12  BY MS. PARFITT:
13      Q   Okay.  All I'm trying to find out is --
14  is who comes to who, and from what I understand
15  your testimony is, a client will reach out to MSA
16  and say, We have a project.  MSA will determine
17  whether or not someone -- someone's expertise is
18  needed in order to complete that job, and then MSA
19  reaches out to you.  Is that fair?
20          MR. LOCKE:  Objection.
21          MS. BROWN:  Objection.  Speculation.
22          THE WITNESS:  I like the answer I just
23  gave.  I mean I think that really was my answer to
24  that exact question.
25  BY MS. PARFITT:

Page 192

1       Q   So you never work for MSA; you always
2   work for a corporate client?
3           MR. LOCKE:  Objection.
4           MS. BROWN:  Objection to the form of the
5   question.
6           THE WITNESS:  So I've never worked for
7   MSA.
8   BY MS. PARFITT:
9       Q   Who pays your bills?  Law firms?
10          MS. BROWN:  Objection to the form.
11          THE WITNESS:  So --
12          MS. BROWN:  What bills?  What are you
13  talking about?
14  BY MS. PARFITT:
15      Q   Who pays your bills for doing services
16  at the request of MSA?
17          MS. BROWN:  Objection to the form.
18  BY MS. PARFITT:
19      Q   Anybody?
20          MS. BROWN:  Objection.  Can we -- let's
21  have one question and let him answer.
22          Go ahead.
23  BY MS. PARFITT:
24      Q   And I'll tell you the reason I'm asking,
25  Dr. Diette.

Page 193

1           MS. BROWN:  No, no, no, no.  You ask the
2   question, he answers.  We don't need to know why
3   you're asking the question.
4           MS. PARFITT:  Excuse me.
5           MS. BROWN:  It's improper.  You're not
6   going to give a speech, Counsel.
7   BY MS. PARFITT:
8       Q   Dr. Diette, we -- has there ever been a
9   chance or an opportunity where you have reached
10  out to MSA on your own, and say, A client that
11  doesn't work or do business with you, MSA, has
12  asked me to do a report.  Can you help me?
13      A   Yes.
14      Q   Okay.  So that's one scenario, correct?
15      A   Correct.
16      Q   It's some other client has -- some other
17  individual or entity has reached out to you and
18  said, Dr. Diette, I would like to engage your
19  expertise in the legal context.  Fair?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  Or the epidemiologic
22  context, but in some context.
23  BY MS. PARFITT:
24      Q   Okay.  And then you have in turn reached
25  out to MSA and said, I need some help.

49 (Pages 190 to 193)

Gregory B. Diette, M.D.

Page 194

1          MS. BROWN:  Objection to the form.
2          THE WITNESS:  Something like that, yeah.
3     BY MS. PARFITT:
4     Q    Okay.  That's one scenario.
5          Another scenario is when a corporate
6     client, for instance, engages the services of MSA
7     to do a project and a particular expertise is
8     needed, and MSA then reaches out to folks like
9     yourself or folks in other medical specialties.
10    Fair?
11         MS. BROWN:  Objection.  Speculation.
12         THE WITNESS:  So I'm not a lawyer,
13    right.  So I'm trying to listen carefully to the
14    words that you're using, and when you say they
15    reach out and they retain MSA, I -- I actually
16    don't know if that's actually what happens, right.
17         So I gave you an example that --
18    BY MS. PARFITT:
19    Q    Okay.
20    A    -- they might retain MSA for their own
21    purposes, and nobody else gets involved.  If like,
22    for example, in this case when Jonathan Cooper
23    reached out, he wanted to work with me, and MSA
24    provided the support services for me to get that
25    work done.  So I -- I have no idea whether he

Page 195

1     retained MSA per se.  I mean that's -- that's
2     something for lawyers to kind of sort through.
3     Q    Well, did Jonathan Cooper go to you
4     directly or did Jonathan Cooper go to MSA?
5          MS. BROWN:  Objection to the form.
6          You can answer if you know.
7          THE WITNESS:  It was kind of both.  I
8     mean I think we -- we were talking about something
9     else one day, and he asked if I would be
10    interested in this.
11    BY MS. PARFITT:
12    Q    Okay.  And did Jonathan Cooper then
13    reach out to MSA as well?
14         MS. BROWN:  Objection.  Speculation.
15    BY MS. PARFITT:
16    Q    You said both.  That's why I'm asking.
17    A    Yeah, yeah, I mean --
18         MS. BROWN:  Same objection.
19         THE WITNESS:  I don't know how that part
20    worked, I mean, but -- but it was pretty clear
21    that it was such a big volume of work, that if I
22    was going to do it with him that I was going to
23    use MSA's services.
24    BY MS. PARFITT:
25    Q    When you're engaged, who does the

Page 196

1     conflicts checks?
2          MS. BROWN:  Objection.  Speculation.
3     Engaged by who?
4     BY MS. PARFITT:
5     Q    When you're engaged by a client, who
6     does the conflict --
7          MS. BROWN:  Same --
8     BY MS. PARFITT:
9     Q    -- conflicts checks for you?
10         MS. BROWN:  Same objection.
11         THE WITNESS:  I don't know that anybody
12    does conflicts checks.  I mean if there is
13    somebody, I'm not aware of who that is.  If it
14    comes up, people will ask me sometimes if I have a
15    conflict of interest.  Sometimes I'll see a
16    complaint, you know, and be asked to look at, you
17    know, the names on the complaint.
18         It all depends, but I -- I don't even
19    know if I know what a conflict checks is, I mean
20    if that's a technical term.  It's only been --
21    it's only been done the way I'm describing, which
22    somebody will say to me like, you know, Do you
23    have any conflict of interest?
24    BY MS. PARFITT:
25    Q    Okay.  You prepared two affidavits that

Page 197

1     I'm aware of, one in the Ingham case and one in
2     the Forrest.  Do you recall doing that back in
3     2018?
4     A    I do.
5     Q    Okay.  Are you aware of any other
6     affidavits you prepared in 2018 other than the
7     Ingham and the Forrest?
8     A    I don't think so.  But I mean if you
9     have one, I would be glad to help confirm it, but
10    I can't recall one off the top of my head.
11    Q    Fair enough.  How much did you charge
12    for preparation of the Ingham affidavit?
13         MS. BROWN:  Objection to the form.
14         THE WITNESS:  I don't remember.
15    BY MS. PARFITT:
16    Q    More than 50,000?
17         MS. BROWN:  Same objection.
18         THE WITNESS:  So I guess it depends upon
19    when we're talking about like me, you know,
20    because earlier you were lumping together, you
21    know, services that MSA charges for and gets paid
22    for.  So I don't remember what -- what part I got.
23    It wouldn't -- it wouldn't have taken $50,000
24    worth of my time to prepare, you know, the
25    affidavit, I don't think.  And in part, because,

50  (Pages 194 to 197)

Gregory B. Diette, M.D.

Page 198

1  you know, the input for that was stuff I was
2  already, you know, reading and interpreting
3  otherwise.
4  BY MS. PARFITT:
5      Q  All right.  How much did you charge for
6  the Forrest report?
7          MS. BROWN:  Objection to the form.
8          THE WITNESS:  The same -- same answer.
9  I don't know.  And in fact, the Forrest report, if
10  it came second, probably not very much because I
11  think it's mostly derivative from the first.  I
12  mean I try -- I'm not trying to just, you know,
13  create work to create it.  Like if there's
14  something I -- that I like the way it reads, I try
15  to use it again.
16  BY MS. PARFITT:
17      Q  Okay.  Are you aware, having actually
18  prepared both of those affidavits, they are
19  virtually the same affidavit?  Would that surprise
20  you?
21          MS. BROWN:  Objection to the form.
22          THE WITNESS:  I hope they are.  I mean
23  that -- that was the intent.
24  BY MS. PARFITT:
25      Q  Okay.  Other than the ovarian cancer/

Page 199

1  talcum powder cases, have you been engaged by
2  anyone else for opinions on a non-pulmonary issue?
3          MS. BROWN:  Objection to the form.
4          THE WITNESS:  Related to?
5  BY MS. PARFITT:
6      Q  Your work with MSA.
7      A  No, but you said -- it sounded like
8  there's something missing from the question.
9      Q  Sure.  Let me -- let me ask it again.
10  Okay.
11          Other than this case involving ovarian
12  cancer and talcum powder products, have you been
13  asked and -- or requested by anyone for your
14  opinions on a topic that was something other than
15  non-pulmonary?
16          MS. BROWN:  Objection.  Do you mean --
17          MS. PARFITT:  That was non-pulmonary.
18          MS. BROWN:  -- to exclude Ingham and the
19  other?  When you say "this case," do you mean just
20  the MDL?
21          MS. PARFITT:  Yeah.
22  BY MS. PARFITT:
23      Q  And I think that's where we're getting
24  hung up.  When I say "this case," I'm going to be
25  talking about "this case" being talcum powder

Page 200

1  products and ovarian cancer.
2          And the question I have is, in any
3  context, when the topic of interest is talcum
4  powder products and ovarian cancer, have you ever
5  been asked by MSA to do any work that's
6  non-pulmonary, other than the ovarian cancer
7  cases?
8      A  Related --
9          MR. LOCKE:  Objection.
10          THE WITNESS:  Related to talcum powder?
11  BY MS. PARFITT:
12      Q  Related to anything.
13      A  Well, wait a minute.  No, because -- so,
14  first of all, you said has MSA asked me to do it.
15  Like they don't ask me to do stuff.  Like they --
16  it's -- the relationship we described before is
17  what it is.  So if it's more general about are
18  there other cases --
19      Q  Yeah.
20      A  -- and when you say non-pulmonary, you
21  know, there are cases I've been involved in that
22  have nothing do with talcum powder that are
23  non-pulmonary.
24          So I'm just trying to figure out,
25  there's a lot of different angles to what -- to

Page 201

1  what you're asking.
2      Q  Sure.
3      A  Are you talking about talcum powder
4  cases that are related to something other than
5  ovarian cancer, and something other than a
6  pulmonary --
7      Q  I'll simplify it.  Have you ever
8  prepared a report in a -- let me do it this way.
9          Talcum powder products and ovarian
10  cancer have nothing to do with pulmonary medicine,
11  correct?
12          MS. BROWN:  Objection to the form.  Are
13  we abandoning inhalation as a theory of --
14          MS. PARFITT:  No, we're not, no.
15          MS. BROWN:  Okay.
16          THE WITNESS:  Then no.  I mean, no,
17  meaning that if that's a theory, then that
18  certainly has something to do with pulmonary
19  medicine.
20  BY MS. PARFITT:
21      Q  Okay.  And I think what I'm really
22  driving at is, it looks as though your focus for
23  the last couple of years has been talcum powder
24  products and ovarian cancer or asbestos and
25  mesothelioma.  Is that fair?

51 (Pages 198 to 201)

Gregory B. Diette, M.D.

Page 202

1     MR. LOCKE:  Objection.
2     THE WITNESS:  My focus --
3  BY MS. PARFITT:
4     Q   Focus and research --
5     MS. BROWN:  Objection.
6  BY MS. PARFITT:
7     Q   -- for preparation of expert legal
8  reports.
9     MS. BROWN:  Objection to the form.
10    THE WITNESS:  I -- I'm either not
11 hearing you well or I think things are getting
12 jumbled.
13 BY MS. PARFITT:
14    Q   Okay.
15    A   And I --
16    Q   Probably the -- the latter.
17    A   No, and I apologize.
18    Q   It's probably me.
19    A   I'm not trying to give you a hard time.
20 I just mean that -- what I -- what I heard earlier
21 is am I working on something with talcum powder
22 other than ovarian cancer or other than ovarian
23 cancer and something that isn't part of the lung?
24 Is that it?
25    Q   Are you preparing expert reports on a

Page 203

1  topic area other than talcum powder products and
2  ovarian cancer currently?
3     MS. BROWN:  Objection.  He's not
4  answering questions about reports that have not
5  been served in cases --
6     MS. PARFITT:  Understood.
7     MS. BROWN:  -- where he's not a
8  disclosed expert.
9     THE WITNESS:  You mean in my
10 professional life in general?
11 BY MS. PARFITT:
12    Q   Correct.
13    A   Yes.
14    Q   Okay.  What other areas?
15    A   Well, that's what we talked about
16 before, right.  So there was asbestos, there's
17 some chemicals, probably like mold and dampness.
18 There's malpractice cases.  I mean a whole variety
19 of different things.
20    Q   Okay.  All right.  I want to come to --
21 where I want to go is your -- your actual report.
22 I want you to take me through -- I'll ask you some
23 questions about the process that you went through
24 in actually putting this report together.
25    A   And I don't want to overbreak or

Page 204

1  anything --
2     Q   Do you want to take --
3     A   No, I'm just wondering.  Not
4  necessarily, but if it's --
5     MS. MILLER:  This would be a good time
6  for lunch.
7     THE WITNESS:  Yeah, that's what I'm
8  wondering, just if it's going to be --
9     MS. BROWN:  Yeah, it's up to you.  If
10 you want to break, counsel will give you a break.
11    MS. PARFITT:  Whatever you want to do.
12 Do you want to take a break now?
13    THE WITNESS:  It would be nice to -- to
14 get a snack, and --
15    MS. PARFITT:  You want to take a half
16 hour and grab --
17    THE WITNESS:  Would that be okay?
18    MS. PARFITT:  That's totally fine, yep.
19    THE VIDEOGRAPHER:  The time is 12:08
20 p.m., and we are going off the record.
21    (Lunch recess.)
22    THE VIDEOGRAPHER:  The time is 12:43
23 p.m., and we're back on the record.
24 BY MS. PARFITT:
25    Q   Good afternoon, Dr. Diette.

Page 205

1     A   Good afternoon.
2     Q   All right, Dr. Diette, I'd like to focus
3  for a little bit about your -- actually your
4  expert report and hopefully get to your opinions
5  here soon.
6        It's fair to say that this report is --
7  this expert report is not a report that you
8  prepared in the ordinary course of your activities
9  as a pulmonary medicine at Johns Hopkins?
10    MS. BROWN:  Objection to the form.
11    THE WITNESS:  That's correct.
12 BY MS. PARFITT:
13    Q   Okay.  And are all the opinions which
14 you will be sharing with us today, and eventually
15 the court and a jury, set forth in your -- your
16 expert report?
17    MS. BROWN:  Form.
18    THE WITNESS:  I hope so.  I mean,
19 it's -- there may be like -- like smaller opinions
20 that are underpinnings that I didn't capture, but
21 I mean the fundamental opinions should be there.
22 And assuming nothing different comes out when
23 you're asking me about it today, I guess the only
24 other thing I'd say is that I don't think that
25 I've seen all of the -- the testimony yet in this

Gregory B. Diette, M.D.

Page 206

1   case. So I don't know whether that's going to,
2   you know, spur some other thought, you know, from
3   the other -- other experts who are testifying, but
4   aside from that, then this should otherwise be
5   complete.
6   BY MS. PARFITT:
7       Q   And obviously if you see something,
8   testimony that causes you to change your opinions,
9   you will let me know, correct?
10          MS. BROWN: Form.
11          THE WITNESS: I will.
12  BY MS. PARFITT:
13      Q   All right. Dr. Diette, on the front of
14  your report it says "Expert Report of Gregory
15  Diette, MD, MHS, For General Causation Daubert
16  Hearing." Did you write that?
17      A   Not this page, no.
18      Q   All right. Who wrote that?
19          MS. BROWN: Objection to the form.
20          THE WITNESS: I -- I don't know
21  literally. I think this came from the law firm as
22  a cover page for me to -- to sign.
23  BY MS. PARFITT:
24      Q   You've testified both in general
25  causation case -- as a general causation witness

Page 207

1   and as well as a specific causation witness,
2   correct?
3       A   Generally speaking, like in legal cases?
4       Q   Correct.
5       A   Yes, I have.
6       Q   All right. So you understand the
7   difference.
8       A   I hope so, yeah.
9       Q   Okay. Have you actually testified in an
10  asbestos/meso- -- mesothelioma case on giving
11  specific causation opinions?
12      A   Yes.
13      Q   Okay. Have you also provided general
14  causation opinions in a meso/asbestos case?
15      A   Yes.
16      Q   Okay. Now, it says Daubert. Do you
17  understand what a Daubert hearing is?
18          MS. BROWN: Objection to the form.
19          THE WITNESS: Probably not the way that
20  you do. I have a general -- general sense of
21  this, but -- you know, I -- I wouldn't be able to
22  answer, you know, a lot of test questions about
23  it.
24  BY MS. PARFITT:
25      Q   Okay. All right. And would it be fair

Page 208

1   to say that that is your signature on the -- on
2   the front page, Gregory Diette?
3       A   Yes, it is.
4       Q   And you completed that on February 25th,
5   2019, correct?
6       A   Exactly right.
7       Q   Okay. And it would also -- is it also
8   fair to say that the opinions contained in this
9   report are not the opinions of Johns Hopkins
10  University?
11      A   Not as far as I know. I mean they're
12  literally just mine.
13      Q   Have you shared these opinions with any
14  of the other members of the Johns Hopkins
15  community?
16      A   No.
17      Q   All right. Did you run the opinions
18  that you have by any of the staff or your
19  superiors at Johns Hopkins?
20          MS. BROWN: Objection to the form.
21          THE WITNESS: No.
22  BY MS. PARFITT:
23      Q   Okay. Aside from this expert report and
24  the opinions retained herein, have you shared your
25  opinions with anyone else outside of the Johns

Page 209

1   Hopkins community, regulatory or scientific
2   bodies?
3           MS. BROWN: Objection to the form.
4           THE WITNESS: No. You mean other than
5   the lawyers and --
6   BY MS. PARFITT:
7       Q   Correct, other than your lawyers.
8       A   Oh, yeah, yeah, yeah.
9           MS. BROWN: Objection to the form.
10  We're not his lawyers.
11          THE WITNESS: Right, but I mean but
12  lawyers that are involved in this case, I have
13  expressed it to, but not those other kinds of
14  entities that you described.
15  BY MS. PARFITT:
16      Q   Okay. And to be clear, you have not
17  shared with the Johns Hopkins community your
18  opinions on talcum powder products and ovarian
19  cancer.
20          MS. BROWN: Objection to the form.
21          THE WITNESS: That is correct.
22  BY MS. PARFITT:
23      Q   Okay. Let's go to I believe page 2 of
24  your report, if you will.
25          And take a moment. Do you have that in

Gregory B. Diette, M.D.

Page 210

1    front of you?
2         A   I do.  Thank you.
3         Q   Okay.  Is it fair to say that your
4    report contains the bases for your opinions as
5    well?
6         A   Yes.
7         Q   All right.  And is it fair the -- do you
8    know whether or not this report has answered all
9    the questions that J&J asked you to answer for
10   them?
11            MS. BROWN:  Objection.  Lacks
12   foundation.
13            THE WITNESS:  Well, I think there's only
14   one question, right?
15   BY MS. PARFITT:
16        Q   And what was that question?
17            MS. BROWN:  Wait.  Let him finish.
18   BY MS. PARFITT:
19        Q   What was that question?
20        A   I'm sorry.  So the question was -- was
21   really about whether or not the -- what does the
22   epidemiologic evidence say about the relationship
23   between talcum powder and ovarian cancer.
24        Q   All right.  So let's turn to your
25   report, page 2, and I believe --

Page 211

1            MS. PARFITT:  And we'll put it up on the
2    ELMO here.
3            (Counsel conferring.)
4            MS. PARFITT:  I guess we won't put it up
5    on the ELMO here.
6    BY MS. PARFITT:
7         Q   Looking at the Summary of Opinions,
8    would you please read, if you will, that first
9    sentence.
10        A   Down at the bottom?
11        Q   Please.
12        A   "The body of"?
13        Q   Under "Summary of Opinions."
14        A   Yep, sure.
15            "The body of relevant epidemiological
16   evidence does not support a causal connection
17   between perineal use of talcum powder products,"
18   parentheses, "whatever constituents those products
19   may contain in addition to talc," end parentheses,
20   "and ovarian cancer."
21        Q   All right.  And then in the next page is
22   you talk about the bases for that, correct?
23        A   I think that's the right way to say the
24   bases.  I mean it's sort of an elaboration of that
25   general -- general opinion.

Page 212

1         Q   Okay.  And if you would turn -- be so
2    kind to turn to the last page of the report,
3    page 51.
4         A   Okay.
5         Q   And again, if you would read the first
6    paragraph.
7         A   At the --
8         Q   And we'll go ahead and put that up on
9    the ELMO.
10        A   Under "Conclusion" or the --
11        Q   Under the Conclusion, if you will.
12        A   Yep.  The whole thing?
13        Q   Just that -- just that first
14   paragraph -- or first sentence.
15        A   First sentence.  Oh, okay.  Yep.
16            "It is my opinion, based on my
17   qualifications and my extensive review of the
18   available epidemiology studies and scientific
19   literature, that there is not sufficient evidence
20   to conclude that there is a causal relationship
21   between perineal talcum powder exposure and
22   ovarian cancer."
23        Q   Okay.  And I know you have much to say
24   about that, but that is basically the -- the
25   general opinion that you're going to be sharing,

Page 213

1    correct?
2         A   I agree with you, yes.
3         Q   Okay.  Let me show you what we'll have
4    marked as 12, Exhibit 12.
5            (Counsel conferring.)
6            MS. PARFITT:  Let me show you, Counsel,
7    what we -- what we'll have marked as Exhibit 12.
8    There you go.
9            (Diette Exhibit No. 12 was marked
10            for identification.)
11   BY MS. PARFITT:
12        Q   Doctor, have you seen this before?
13        A   Let me take a look and see.  (Peruses
14   document.)
15            So generally speaking, yes.  The -- the
16   only reason I can't say for sure I've literally
17   seen this exact version is because that -- not
18   that I would know when it was updated otherwise,
19   but I don't know who's in charge of all these
20   different -- excuse me -- websites that you found
21   at Johns Hopkins, and so I don't know, you know,
22   whether what I looked at is literally identical to
23   what we're looking at here.
24        Q   All right.
25        A   But it's approximately something that

Gregory B. Diette, M.D.

Page 214

1    I've seen.
2        Q    Okay.  Fair.
3            Now, this is from the Sidney Kimmel
4    Comprehensive Cancer Center, correct?
5        A    That's right.
6        Q    And it's entitled "Risk Factors -- Risk
7    Factors" -- excuse me -- and Symptoms."  Do you
8    see that?
9        A    I do.
10       Q    All right.  And if you and this is for
11   ovarian cancer, you see that?
12           On the second line, "ovarian cancer," it
13   talks --
14       A    Yes.
15       Q    Okay.  Now, what I'd like you to do is
16   turn to the second page, and there is a risk
17   factor listed, amongst others.  Do you see that?
18       A    I do.
19       Q    And it says "Talcum Powder and
20   Asbestos."  Do you see that?
21       A    Yes.
22       Q    All right.  Would you read that, please.
23       A    "Habitual use of talcum powder on the
24   genital area may increase the risk for ovarian
25   cancer, but the evidence is not strong.  A study"

Page 215

1    -- the first sentence or the whole thing?
2        Q    The whole thing.
3        A    Yep.  "A study at Harvard Medical School
4    found that using talc this way doubled the risk,
5    but other studies found no increased risk.  Some
6    researchers believe that talc may be carcinogenic
7    because it contains particles of asbestos, a known
8    carcinogen.  It's been shown that rates of ovarian
9    cancer are higher than normal in women whose jobs
10   expose them to asbestos."
11       Q    All right.  Thank you.
12           Fair to say, Dr. Diette, that your
13   opinions are contrary to the opinions of what --
14   of those individuals at the Sidney Kimmel
15   Comprehensive Cancer Center?
16           MS. BROWN:  Objection to the form of the
17   question, lacks foundation.
18           THE WITNESS:  I wouldn't say globally.
19   I mean there's -- there's things here that
20   resonate with me just fine.
21   BY MS. PARFITT:
22       Q    What resonates with you fine and what
23   does not resonate with you?
24       A    Well, so, for example, when --
25       Q    And if you will, I'm going to put mine

Page 216

1    up here, and I'm going to doc- -- and I'm going to
2    go ahead and make a notation as you talk, and
3    we're going to put your initials by that which you
4    agree or don't agree, or that which resonates with
5    you or that which does not.
6            So give me a moment.  Hang with me,
7    okay?
8        A    Yeah.
9        Q    All right.
10           MS. BROWN:  Objection to the exercise.
11           THE WITNESS:  And I will say -- I mean I
12   wasn't -- you know, that I don't necessarily --
13   I'm not going to be able to necessarily agree or
14   literally disagree with each one of these, but
15   I'll just try to comment on what they -- what they
16   have here and what it says to me.
17   BY MS. PARFITT:
18       Q    All right.  Well, why don't we take the
19   first one.
20           "Habitual use of talcum powder on the
21   genital area may increase the risk for ovarian
22   cancer, but the evidence is not strong."
23       A    Yeah.
24       Q    Do you agree with that?
25       A    I agree that the evidence is not strong.

Page 217

1    And -- and I think it's a -- it's a pretty nuanced
2    statement.  It may increase, which leaves open
3    that it may not increase.  So I think it's a --
4    it's a balanced statement.  And their inclusion of
5    the evidence not being strong is what resonates
6    with me.
7        Q    Okay.  Do you disagree, though, that
8    it -- do you agree or disagree with this
9    statement: "Habitual use of talcum powder on the
10   genital area may increase the risk for ovarian
11   cancer, but the evidence is not strong"?
12           MR. LOCKE:  Objection.
13   BY MS. PARFITT:
14       Q    Do you agree with that statement?
15       A    I don't literally agree or disagree with
16   it.  I mean, I think I break it down the way that
17   I did into those two parts.
18       Q    Okay.  Well, I have a different
19   question.  I know how you want to do it, but I --
20   I do get the ask the questions.
21           MS. BROWN:  He answered your question,
22   Counsel.
23   BY MS. PARFITT:
24       Q    Habitual question -- yes or no --
25           MS. BROWN:  No.

55 (Pages 214 to 217)

Gregory B. Diette, M.D.

Page 218

1   BY MS. PARFITT:
2       Q   "Habitual use of talcum powder on the
3   genital area may increase the risk for ovarian
4   cancer." True or false?
5       MR. LOCKE:  Objection.
6       MS. BROWN:  Objection to the form of the
7   question, asked and answered.
8       You can give the same answer again.
9       THE WITNESS:  It's --
10      MS. PARFITT:  Counsel, please quit
11  instructing the witness.
12      MS. BROWN:  Counsel, don't yell at me.
13  BY MS. PARFITT:
14      Q   Go ahead.
15      MS. BROWN:  We can call the Judge.
16      MS. PARFITT:  I'm not yelling -- we can
17  call the Judge because I'll tell you, I don't
18  think he'll be -- she will be impressed.
19      MS. BROWN:  That's fine.  Let's go.
20  Let's walk right there and call her right now.
21      MS. PARFITT:  I'm not going to waste the
22  time right now.
23      MS. BROWN:  Okay.
24      THE WITNESS:  So I don't see it as a
25  true or false questions.  I think that there's two

Page 219

1   parts, and I -- I like the way that I answered it.
2   BY MS. PARFITT:
3       Q   Well, let me ask you this:  My -- if
4   Judge Wolfson, who is the judge presiding over
5   this case, says to you, Dr. Diette, I've got a
6   question for you -- this is in July -- do you have
7   an opinion whether or not habitual use of talcum
8   powder on the genital area may increase the risk
9   for ovarian cancer, what are you going to tell
10  her?
11      MS. BROWN:  Objection to the form of the
12  question and to the yelling at the witness.
13  BY MS. PARFITT:
14      Q   I'm not yelling at you, Dr. Diette.
15      MS. PARFITT:  Everyone is saying I
16  talk -- believe me, I'm not yelling at him.  I'm
17  not that disrespectful.  Trust me, please.
18      THE WITNESS:  Okay.  I don't think it
19  does, but, you know, there's so many ways you
20  could write this, which is why that it doesn't
21  strike me as something to agree or disagree with.
22  They could -- could have said "habitual use
23  causes."  They could have said that it does
24  increase the risk.
25      So, you know, those are very different

Page 220

1   than "may increase the risk," and it's very
2   different than saying it causes it.
3   BY MS. PARFITT:
4       Q   Okay.
5       A   So it's -- it's a pretty vague
6   statement.
7       Q   Okay.  And I think -- I hear what you're
8   saying, but my question, and I think you just
9   answered it, is if -- if Judge Wolfson says to
10  you, Dr. Diette, I would like an answer to my
11  question:  Does the habitual use of talcum
12  powder on the genital area increase the risk for ovarian
13  cancer?
14      My -- my question to you from Judge
15  Wolfson.
16      MR. LOCKE:  Objection.
17      MS. BROWN:  Objection to the form of the
18  question, asked and answered.
19      THE WITNESS:  And whether it does?
20  BY MS. PARFITT:
21      Q   Yeah, the question is --
22      A   Well, it doesn't say that, though.
23      Q   -- do you have -- no, no, no, I know it
24  doesn't.
25      A   Oh.

Page 221

1       Q   I'm representing -- you've already told
2   me what you said about what's here.
3       A   I see.
4       Q   What I'm asking you is, do you have an
5   opinion whether or not the habitual use of talcum
6   powder -- powder on the genital area may increase
7   the risk for ovarian cancer?
8       A   Not to quibble, but you just said does
9   increase before that, and now it's may increase?
10  Is it -- is it does increase --
11      Q   I'm going to do both, yeah.
12      A   Okay.  Well, I think this is so watered
13  down that it doesn't really say anything
14  definitive when you say "may increase."  If the
15  question is about "does increase," I would say it
16  does not increase the risk.
17      Q   Okay.  And as worded, you feel that it's
18  somewhat equivocal.  Is that fair?
19      MS. BROWN:  Objection to the form of the
20  question.
21      THE WITNESS:  Well, not the entire
22  statement.  I mean the evidence is not strong.
23  Seems like a pretty -- a pretty potent part of the
24  statement.
25  BY MS. PARFITT:

56 (Pages 218 to 221)

Gregory B. Diette, M.D.

Page 222

1    Q   Okay.  So you agree with "the evidence
2  is not strong."
3        And then what about the next part, "A
4  study at Harvard Medical School found that using
5  talc this way doubled the risk, but other studies
6  found no increased risk."  Do you agree with that
7  statement?
8        MS. BROWN:  Objection to the form of the
9  question.
10       THE WITNESS:  It's -- I would say maybe.
11 And the reason is because they -- they haven't
12 cited what the Harvard study is.  It -- I could
13 assume, but I might be wrong that maybe it's the
14 Cramer study from '82.  Maybe it's not.  So I
15 don't know.  So if they're citing that, then --
16 then that might well be a correct statement.  And
17 it's certainly correct that other studies have
18 found no increased risk.
19 BY MS. PARFITT:
20   Q   All right.  So from your review of the
21 medical and scientific literature, you have seen
22 where scientists who look at the same scientific
23 and medical literature can arrive at different
24 opinions, correct?
25       MS. BROWN:  Objection to the form of the

Page 223

1  question.
2        THE WITNESS:  Are we talking about a
3  specific topic or just you -- in general, that
4  scientists can disagree with each other?
5  BY MS. PARFITT:
6    Q   Scientists can disagree with each other.
7        MS. BROWN:  Objection to the form.
8        THE WITNESS:  I think in general, they
9  can disagree about all sorts of things.  I don't
10 think there's a good reason to disagree about this
11 topic that we're talking about.
12 BY MS. PARFITT:
13   Q   Well, in this particular sentence, Johns
14 Hopkins University is representing to consumers,
15 or anyone who wants to get onto the website, that
16 medical schools found -- that a study of the
17 Harvard Medical School found that using talc this
18 way doubled the risk, but other studies found no
19 increased risk.
20   A   Yes.
21   Q   Is it fair to say they're communicating
22 that there are science -- there's science out
23 there that goes both ways?
24       MS. BROWN:  Objection to the form --
25       MR. LOCKE:  Objection.

Page 224

1        MS. BROWN:  -- of the question,
2  misstates the document, and it's been asked and
3  answered.
4        THE WITNESS:  I'd be careful a lot of
5  ways, right?  I think it's -- it's easy to say
6  what, you know, Johns Hopkins is saying.  I don't
7  know how well this represents Johns Hopkins as an
8  entity.  I -- like I don't know who controls this
9  website.  I don't know who the author was.  I
10 don't know if it was -- you know, somebody who was
11 hired for the summer to create a website or
12 whether it's somebody who is a credible
13 researcher.
14       But I also know that these kinds of
15 things populate all kinds of different websites,
16 and they're not necessarily like a policy
17 statement, you know, of a university or a hospital
18 or an entity.
19 BY MS. PARFITT:
20   Q   And I'll --
21   A   I would just be careful, I mean just in
22 terms of saying Johns Hopkins is saying this.
23   Q   Well, I will represent to you, and you
24 can see for yourself, that the Sidney Kimmel
25 Comprehensive Center puts out this information.

Page 225

1  Your institution.
2        MS. BROWN:  Objection to the form of the
3  question, and misstates the document.
4        THE WITNESS:  It's the same issue.
5  Right.  I mean I know the Sidney Kimmel Cancer
6  Center, and I work there.  It's -- but I don't
7  know what the source is of this information, I
8  don't know who's the author, and I don't know what
9  they expect it to represent in terms of a Johns
10 Hopkins, you know, point of view.
11 BY MS. PARFITT:
12   Q   Did anyone over at the Sidney Kimmel
13 Comprehensive Cancer Center ever consult you with
14 regard to what language should be included on the
15 website with regard to risk factor information?
16   A   No.
17       MS. BROWN:  Objection to the form.
18 BY MS. PARFITT:
19   Q   Okay.  The second part, let's go on.  If
20 you will, it starts with -- if you can read on
21 "Some," if you would read that, please.
22   A   "Some researchers believe that talc may
23 be carcinogenic because it contains particles of
24 asbestos, a known carcinogen."
25   Q   All right.  And do you agree with that

57 (Pages 222 to 225)

Gregory B. Diette, M.D.

Page 226

1  statement?
2      MS. BROWN:  Objection to the form.
3      THE WITNESS:  Well, I certainly agree
4  that some researchers believe that, because we've
5  seen it in plaintiffs' experts.  So it's -- on its
6  face, I think it's a -- true -- true statement
7  that there are people who believe that.
8      And I think the part that asbestos is a
9  known carcinogen is also something I agree with.
10 BY MS. PARFITT:
11     Q   Okay.  And then it goes on to say:
12 "It's been shown that rates of ovarian cancer are
13 higher than normal in women whose jobs expose them
14 to asbestos."
15     Do you agree with that statement?
16     A   So, you know, this language is -- is not
17 great, right?  It has been shown that, right.  So
18 we could look at, you know, any one of those
19 studies that was done around World War II, for
20 example, and if you looked at one that was
21 positive, you could say it was shown that they
22 were higher.  I'm not sure whether the general
23 proposition has been established, though.
24     Q   Okay.
25     A   If you guys are going to whisper, you're

Page 227

1  going to miss what I'm saying.
2      Q   No, I was -- I was just turned.
3      A   Okay.
4      Q   I heard what you said.  Thank you.
5      A   All right.
6      Q   And fortunately, I have it right here in
7  front of you too.
8      A   Okay, good.  Good, good, good.
9      Q   Yeah, thank you.  And I thought you had
10 finished what you were saying because you finished
11 "okay," so I thought --
12     MS. BROWN:  That's your "okay," Counsel.
13 BY MS. PARFITT:
14     Q   I'm sorry.  I believe you finished.  I'm
15 not sure whether the general proposition has been
16 established.  So I thought that was the end --
17     A   That was the end --
18     Q   -- of your sentence.
19     A   Yeah.
20     Q   Right.  Okay.  All right.
21     Q   Are we done with this one?
22     Q   For the time being, yeah.  We may come
23 back to that.
24     Other than providing counsel with an
25 expert report of your opinions, have you reached

Page 228

1  out to the Food and Drug Administration to share
2  your opinions with them?
3      A   No.
4      Q   All right.  Other than counsel who has
5  retained you to provide an expert -- a legal
6  expert report, have you reached out to any
7  scientific body to share your opinions?
8      MS. BROWN:  Objection to the form.
9      THE WITNESS:  No.
10 BY MS. PARFITT:
11     Q   Okay.  Have you reached out to any
12 medical body to share your opinions?
13     MS. BROWN:  Objection to the form.
14     THE WITNESS:  No.
15 BY MS. PARFITT:
16     Q   Okay.  Did you reach out to the Sidney
17 Kimmel Comprehensive Cancer Center and the folks
18 over there and share with them what your opinions
19 are?
20     A   No.
21     MS. BROWN:  Asked and answered.
22 BY MS. PARFITT:
23     Q   Do you know Dr. Merlo?
24     A   I do.
25     Q   He's a friend of yours, right?

Page 229

1      A   He is.
2      Q   Okay.  And you're Facebook friends.
3      A   I'm friends with his wife.  He and I
4  might be also, but we're friends in -- in reality,
5  not just on --
6      Q   Not just on Facebook.
7      A   Yeah.
8      Q   Is his wife a doctor?
9      A   She is not.
10     Q   Okay.  Do you know Dr. April
11 Zambelli-Weiner?
12     A   I do.
13     Q   Okay.  You have worked with her in the
14 past, correct?
15     A   Really briefly, way back when.
16     Q   Okay.  Do you consider her -- do you
17 know she's an epidemiologist, correct?
18     A   I think I know that.
19     Q   Okay.  Do you consider her an
20 epidemiologist with expertise and well received in
21 the medical comm-- and scientific community?
22     MS. BROWN:  Objection.  Lacks
23 foundation, calls for speculation.
24     THE WITNESS:  So I don't know much
25 about -- about her lately.  I think the last time

58 (Pages 226 to 229)

Gregory B. Diette, M.D.

Page 230

1    that I saw her was when she was still training at
2    Hopkins.  And so there's a couple of decades that
3    have gone by.  So I -- so I honestly have no idea
4    what her reputation is at this point.
5    BY MS. PARFITT:
6        Q   Okay.  Did you work with her?
7        A   Sort of.  Like not -- we were -- we were
8    both involved in a research project, but we
9    weren't both involved in the same part of the
10   project.  So I -- it's -- to say that we worked
11   together, it's -- it's a little bit vague in a way
12   about whether we did.  We traveled together for
13   one particular research program we were a part of.
14   But --
15       Q   Okay.
16       A   Like I don't think we published
17   together.  I don't think.
18       Q   Do you think of her as a good scientist?
19       MS. BROWN:  Objection to the form of the
20   question, calls for speculation.
21       THE WITNESS:  I -- I honestly don't know
22   what she's -- what she's up to.  I mean it's
23   literally been a couple of decades.
24   BY MS. PARFITT:
25       Q   Sure.  Well, when you did know her back

Page 231

1    a couple of decades ago, did you consider her a
2    good scientist?
3        MS. BROWN:  Objection to the form,
4    vague, calls for speculation.
5        THE WITNESS:  I wouldn't say that I know
6    that she wasn't, but I really wasn't very familiar
7    with what her work was.
8    BY MS. PARFITT:
9        Q   Her work.  Okay.  That's fair enough.
10       Okay.  Alrighty.  Let's set this aside.
11       Dr. Diette, are you aware that just last
12   month, and I believe it was March 12th, the House
13   Committee on Oversight and Reform, Committee on
14   Economic and Consumer Policy conducted a hearing
15   about the public health risk of carcinogens in
16   talcum powder products and other consumer
17   products?  Were you aware of that?
18       MR. LOCKE:  Objection.
19       MS. BROWN:  Objection to the form.
20       THE WITNESS:  I saw that -- a question
21   about that in one of the deposition transcripts
22   that I -- that I read.  I don't remember which
23   one.  But that's my only awareness of that.
24   BY MS. PARFITT:
25       Q   Okay.  So no one requested that you

Page 232

1    appear and give testimony, correct?
2        A   Correct.
3        MS. BROWN:  Form.
4    BY MS. PARFITT:
5        Q   Right.  So no one inquired as to what
6    your opinions were on this topic; is that correct?
7        MS. BROWN:  Asked and answered.
8        THE WITNESS:  That is correct.
9    BY MS. PARFITT:
10       Q   Okay.  I'll represent to you that at the
11   hearing, both consumer and industry were invited
12   to attend.
13       Are you aware that Dr. McTiernan, who is
14   an expert in this case, was one of those
15   individuals that was invited to attend?
16       MR. LOCKE:  Objection.
17       MS. BROWN:  Objection.  Lacks
18   foundation.
19       THE WITNESS:  I don't know.
20   BY MS. PARFITT:
21       Q   Okay.  You've read her expert report,
22   correct?
23       A   I did.
24       Q   And you understand that she was one of
25   the coinvestigators with the WHI study?

Page 233

1        MS. BROWN:  Objection to the form.
2    BY MS. PARFITT:
3        Q   One of the cohorts that you rely on.
4        MS. BROWN:  Foundation, speculation.
5        THE WITNESS:  That's what I understand.
6    BY MS. PARFITT:
7        Q   Okay.  When you were writing your expert
8    report and researching the cohort studies, did you
9    ever reach out to Dr. McTiernan to consult with
10   her with regard to her thoughts and opinions about
11   that particular cohort study?
12       MS. BROWN:  Objection to the form.
13   Which study?
14       MS. PARFITT:  I said the WHI study.
15       MS. BROWN:  It's not in your question.
16       THE WITNESS:  Assuming the WHI study, I
17   did not.
18   BY MS. PARFITT:
19       Q   Okay.  Dr. McTiernan testified at that
20   hearing, and her testimony went uncontroverted,
21   that there was a statistically significant
22   increased risk of 22 to 31 percent of developing
23   ovarian cancer from genital use of talcum powder
24   products.
25       Do you agree or disagree with that?

59 (Pages 230 to 233)

Gregory B. Diette, M.D.

Page 234

1          MR. LOCKE: Objection.
2          MS. BROWN: Objection. This lacks
3    foundation. Counsel, are you giving him a
4    hypothetical? Or if not, are you going to give
5    him something that would support the statements
6    that you're making on the record?
7    BY MS. PARFITT:
8          Q   Assume that Dr. McTiernan testified
9    before the subcommittee who was investigating the
10   safety of talcum powder products, that
11   Dr. McTiernan testified that there was scientific
12   evidence that women who used talcum powder
13   products have a statistically significant
14   increased risk of 22 to 31 percent of developing
15   ovarian cancer.
16         A   So, first of all --
17         MS. BROWN: Wait, wait. What's the
18   question?
19   BY MS. PARFITT:
20         Q   And I should add developing epithelial
21   ovarian cancer having used talcum powder products.
22         MS. BROWN: What's the question? You
23   just gave an assumption.
24   BY MS. PARFITT:
25         Q   Do you --

Page 235

1          MS. PARFITT: I just was finishing.
2    BY MS. PARFITT:
3          Q   But do you agree with her statement
4    before Congress?
5          MS. BROWN: Objection to the form.
6          MR. LOCKE: Objection.
7          MS. BROWN: Incomplete hypothetical,
8    lacks foundation, calls for speculation.
9          THE WITNESS: So I don't know what she
10   said -- and I know you're asking me to assume what
11   she said -- I don't know what else she said about
12   it, so how the -- how that's framed -- it sounds
13   compatible generally with what her report had at
14   least one sentence about.
15   BY MS. PARFITT:
16         Q   Okay. Let me show you what we'll have
17   marked as Exhibit 13.
18         (Diette Exhibit No. 13 was marked
19         for identification.)
20   BY MS. PARFITT:
21         Q   And I'll represent to you that this
22   is the statement of Ann McTiernan that was
23   prepared for the Subcommittee on Economic and
24   Consumer Policy on "Examining the Public Health
25   Risks of Carcinogens in Consumer Products" dated

Page 236

1    March 12th, 2019.
2          Do you see that?
3          A   I see it.
4          Q   Okay. If I can direct your attention
5    to -- and I'll represent that this was a statement
6    that she submitted prior to the hearing, and
7    specifically -- I can put it on the ELMO here.
8    Let's go down to the third full paragraph.
9          Do you see that, it starts
10   "Summarizing"?
11         A   Yes.
12         Q   Okay. And it states: "Summarizing data
13   from all of the published studies consistently
14   shows that women who had ever used talcum powder
15   products in the genital area had a statistically
16   significant 22 to 31 percent increased risk of
17   developing epithelial ovarian cancer compared with
18   women who had never used them. Evidence suggests
19   that these associations hold across diverse race
20   and ethnic groups."
21         Did I read that correctly?
22         A   You did.
23         Q   All right. Do you agree with that
24   statement?
25         MS. BROWN: Objection to the form.

Page 237

1          THE WITNESS: Well, I think this is
2    compatible with what, you know, her report and her
3    testimony has been generally. I think it's --
4    it's -- unfortunately, it's not very balanced,
5    right. I mean she -- she's leaving out an awful
6    lot of information here and -- and really
7    referring just to one narrow slice of the evidence
8    that she's -- that she's citing here.
9    BY MS. PARFITT:
10         Q   Okay. What did she leave out, Doctor?
11         A   I'm sorry?
12         Q   What is she leaving out?
13         A   Well, saying that -- that "data from all
14   the published studies consistently shows that
15   women who had ever used talcum powder products in
16   the genital area had a statistically significant
17   22 to 31 percent increased risk," and I won't
18   finish the rest, but, you know, of developing
19   ovarian cancer.
20         So, you know, they don't all have a
21   statistically significant increase, and she's
22   leaving out information that would run counter to
23   that also, including I think -- let me just see
24   what she cites.
25         She cites Berge and Penninkilampi and

Gregory B. Diette, M.D.

Page 238

1    Terry, but there's other information in there,
2    like from Berge, for example, you know, who points
3    out that there's no risk seen in the cohort
4    studies. So I think if this were balanced, that
5    she would -- she would have more information than
6    just that particular statement.
7        Q    Okay. And we'll talk a little bit more
8    about the -- the cohorts in just -- just a moment.
9        Okay. What was the methodology you
10   employed in order to present the opinions and
11   bases for opinions in your report?
12       A    So generally, I tried to identify all of
13   the relevant epidemiologic studies -- is that what
14   you're -- you're asking?
15       Q    That is?
16       A    Okay.
17       Q    That is.
18       A    And so I tried to find them in an
19   iterative way, you know, meaning that there were
20   meta-analyses that had many of them listed. I did
21   some searches of their own reference lists to look
22   for others. I did searches, you know, using
23   web-based, you know, tools to find other -- other
24   studies, and tried to get what I thought was a
25   pretty comprehensive group of all the

Page 239

1    epidemiologic studies.
2        And then I also tried to read other
3    things, you know, IARC monographs, other -- like
4    reports from like American College of Obstetrics
5    and Gynecology, and -- and get a sense of how some
6    of the information was being interpreted by
7    other -- other bodies.
8        And -- and then ultimately looked at
9    criteria that people recognize as useful for
10   assessing causation, which are labeled sometimes
11   Bradford Hill considerations, and then other
12   things too.
13       So besides that, then, you know, looking
14   at the quality of the studies in some cases. So,
15   for example, were there valid measures of -- of
16   exposure that were used, was there evidence for
17   confounding and bias, and so forth.
18       Q    All right.
19       A    Meaning especially those latters
20   aren't -- those latter factors aren't part of
21   Bradford Hill. Like he doesn't talk about, you
22   know, bias and confounding and validity of the
23   measures and so forth. So there's more to looking
24   at it than just Bradford Hill.
25       Q    Okay. So what was -- what were the

Page 240

1    search terms that you used in order to do your
2    literature review?
3        A    I didn't -- I didn't write them down,
4    but it -- you know, this didn't start as like a --
5    like a -- like there's been some searches that
6    I've been involved in where, you know, somebody
7    might commission a review of a particular topic,
8    and you have to figure out what those search terms
9    are.
10       In this case, there's a really good head
11   start because there's meta-analyses done and
12   there's some other -- some other papers. And so
13   what I tried to use was the words that the authors
14   used, you know, assuming that they would then link
15   up and find the other -- other articles.
16       So -- so like "ovarian cancer," "talc,"
17   "talcum powder," probably some -- you know, some
18   words like "risk" and "cause" and -- I think for
19   that part of it that was -- that was kind of the
20   bulk of it. There may have been other terms that
21   came up in some of the -- some of the articles
22   that I would search for also, but that -- that was
23   the main ones.
24       Q    Did you search for the word "cancer"?
25       A    Oh, well, "ovarian cancer."

Page 241

1        Q    Okay. Did you search for the word
2    "asbestos"?
3        A    I did, but differently -- so I did sort
4    of a separate search for that, which was "asbestos
5    and ovarian cancer." Same approach, but -- but
6    different -- I thought we were just talking about
7    the talcum powder at the moment.
8        But separately, I did a search for
9    "asbestos and -- and ovarian cancer." And -- and
10   just like for this issue of talcum powder, there
11   was a good head start from -- from IARC, at least
12   having identified several -- several key studies,
13   and then looked for more because there were
14   obviously some that they didn't cite or that
15   weren't available to them at the time that they
16   did their -- their review.
17       Q    Did you search for the word
18   "inflammation"?
19       A    I did, for -- part of the searches was
20   for inflammation.
21       Q    Okay.
22       A    I should say also -- I mean there's more
23   to it if you want, just a little bit more.
24       Q    No. Let me ask you a question first.
25       A    Okay.

61 (Pages 238 to 241)

Gregory B. Diette, M.D.

Page 242

1    Q   There's no question pending.
2         I assume you did a literature search
3    back in the early part of 2017 when you were first
4    retained, correct?
5    A   Correct.
6    Q   All right.  So did you update that
7    literature search?
8    A   Oh, yeah.
9    Q   Okay.  Did you keep -- do you keep some
10   kind of recordation of material you had before and
11   then what material you're looking at now for
12   purposes of this most recent report?
13   A   No, I mean it's not sorted by -- by when
14   I found it.
15   Q   All right.  You represented, at least in
16   your report, that you looked at the databases
17   Medline and Google.
18        Did you use any other databases for your
19   research?
20   A   Well, scholar -- Google Scholar as
21   opposed to just plain Google and then main Google
22   itself.  I don't remember if I used any others.
23   Q   Okay.  Where in your report do you share
24   your systematic review and collection of the
25   various literature that formed the bases of your

Page 243

1    opinion?
2    A   I didn't write that part, I don't think,
3    but it -- I do talk about the -- the methodology
4    in general.
5    Q   Okay.  Well, you talk about the
6    methodology on page -- I believe it's page 4, and
7    there's about two paragraphs there, and then on
8    the top of page 5, where there's just two full
9    paragraphs.
10        So my question is, where do you -- is
11   there anywhere else in your report that you set
12   forth your methodology --
13   A   Yeah.
14   Q   -- employed in order to --
15   A   Sure, other places --
16   Q   -- form the basis for your opinions?
17   A   Sorry, I didn't mean to interrupt.
18   Q   No, and what I'm saying --
19   A   Were you done?
20   Q   -- you have a methodology section --
21   let's start over.
22        You have a methodology section of your
23   report.  Is it fair that that is where you set
24   forth the methodology that you employ in this
25   case?

Page 244

1    A   Some --
2        MS. BROWN:  Objection to the form.
3        THE WITNESS:  Some of it.
4    BY MS. PARFITT:
5    Q   Okay.  And how did you select the
6    case -- the cases that became part of your list of
7    cases on page 13 and 14 of your report?
8    A   What does "cases" mean?
9    Q   Studies.  You have them listed on
10   page 13, and it carries over to page 14.
11   A   It's -- the way I describe it, I don't
12   think I got to finish answering the question about
13   the -- the rest of the methodology.  You'd have to
14   turn over to page 6, and in the section called
15   "Review of Epidemiology Data," there's a
16   description of what I just told you verbally just
17   a moment ago, which is talking about MedLine and
18   Google Scholar, and reviewed the reference list of
19   the individual studies and the meta-analyses to
20   assemble a complete list of studies, and then I --
21   it goes on.  That's not the whole paragraph
22   obviously, but that's the -- that's the general
23   method of how I found them.
24   Q   Okay.  And what process did you go
25   through to select or deselect certain pieces of

Page 245

1    literature that you reviewed?
2    A   Well, I -- I included all of the ones
3    that I could find.  I mean we're talking about the
4    epidemiologic studies.
5    Q   We are.  We are indeed, yeah.
6    A   So like in terms of the cohort studies,
7    there's only three I could find.  There's more
8    than three publications that pertain to the three,
9    but I included all three, and I included all the
10   publications I could find on the topic.
11        But the case-control study, a similar
12   approach, although there's a little bit of
13   confusion with the case controls because there's
14   overlap.  There is a redundant publication where
15   some authors are presenting the same data twice,
16   and it's not entirely clear how to unravel them.
17   So I just tried to include as many of those as I
18   could that looked like distinct studies, and I
19   tried to make sure I had the -- you know, the vast
20   majority of what was being considered in the
21   meta-analysis as well.
22   Q   I think where I'm going is, where do
23   you -- where do you tell the -- the reader what
24   your inclusion criteria was for selecting studies?
25        MS. BROWN:  Objection to the form.

Gregory B. Diette, M.D.

Page 246

1    THE WITNESS:  I tried to get them all.
2    I wasn't trying to exclude any studies.
3    BY MS. PARFITT:
4         Q   So every -- so may I assume from that
5    statement that all of the literature that you've
6    listed on page 13 and 14 in the cohort studies and
7    the meta-analysis is the entire body of literature
8    that you reviewed?
9         A   Of course not.
10        MS. BROWN:  Objection to the form.
11        THE WITNESS:  No, no, what -- well, I
12   guess, if you could, please be very precise what
13   you're asking.
14        To me what I think we're talking about
15   is the case-control studies and the cohort
16   studies, and so I tried to identify every single
17   one of them.  So I didn't have an exclusion
18   criteria to say I was going to ignore this one
19   because it wasn't supportive of my view or
20   something like that.  I included them all.
21        I searched for clinical trials, but
22   there weren't any.  So that was -- that was an
23   issue as well.
24   BY MS. PARFITT:
25        Q   Were there any studies that you chose

Page 247

1    not to include on your list of 13 and 14 that you
2    had actually reviewed during the course of your
3    study?
4         A   And we're talking about case-control
5    studies and cohorts.
6         Q   Correct.
7         A   I didn't -- wait a minute.  I didn't
8    deliberately not include any of them.  I tried to
9    include every single one, with that exception
10   being -- and I don't remember which ones were
11   which, but there were a couple that were
12   redundant.  You know, the -- the authors of these
13   haven't in every case been careful about reporting
14   findings that are unique.
15        Q   Okay.  Focusing now, if I may, on your
16   chart, page 13 and 14 of the case-control studies.
17        Do you have that in front of you?
18        A   Almost.
19        Q   Okay.
20        A   I do.
21        Q   All right.  Where in this document,
22   page 13 and 14, do you identify the number of
23   ovarian cases that formed the bases of the study?
24        MS. BROWN:  Objection to the form.
25        THE WITNESS:  This is the list of the --

Page 248

1    of the risk -- risk estimates, not of the number
2    of cases.
3    BY MS. PARFITT:
4         Q   Correct.  So where on this page 13 or 14
5    do you tell the reader how many ovarian cancer
6    cases were part of that study?
7         MS. BROWN:  Objection to the form.
8         THE WITNESS:  It's not on there.
9    BY MS. PARFITT:
10        Q   Okay.  Where on your list of cases, 13
11   and 14, do you tell the reader the number of
12   controls that were involved in that study?
13        A   I didn't -- I didn't list every single
14   thing like that on here.
15        Q   You didn't list it in your report
16   either, correct?
17        MS. BROWN:  Objection to the form.
18        THE WITNESS:  Well, this is the report.
19   BY MS. PARFITT:
20        Q   Well, you didn't list it anywhere else
21   other -- that information is not contained in your
22   report.  Is that fair?
23        MS. BROWN:  Objection to the form.
24        MR. LOCKE:  Objection.
25        THE WITNESS:  The sample size?

Page 249

1    BY MS. PARFITT:
2         Q   The sample size is not information that
3    you contained -- that you included in your report,
4    correct?
5         A   I did not.
6         MS. BROWN:  Same objection.
7    BY MS. PARFITT:
8         Q   Okay.  Where in your report do you tell
9    the reader the country from where these studies
10   came from?
11        MS. BROWN:  Objection to the form.
12        THE WITNESS:  I don't list that.
13   BY MS. PARFITT:
14        Q   Okay.  Where do you tell the reader what
15   the mean age of the participants in this study
16   were?
17        MS. BROWN:  Same objection.
18        THE WITNESS:  And same answer, I
19   don't -- I don't list that either.
20   BY MS. PARFITT:
21        Q   Where in your report do you tell the
22   reader the number of adjusted variables per study
23   that were considered?
24        MS. BROWN:  Objection to the form.
25        THE WITNESS:  I didn't -- I didn't

63 (Pages 246 to 249)

Gregory B. Diette, M.D.

Page 250

1  capture that here.
2  BY MS. PARFITT:
3      Q   Okay.  And where in your report do you
4  tell the reader the type of ovarian cancer that
5  the women suffered?
6          MS. BROWN:  Objection to the form.
7          THE WITNESS:  That's not listed on -- on
8  this table either.
9  BY MS. PARFITT:
10     Q   Did you create this table yourself or
11  did you have assistance?
12     A   So, actually, I made this initially, and
13  there might have been a couple that filtered in
14  after I started to create it where -- you know,
15  where I had an assistant, you know, plug in a
16  different study.
17     Q   Where in your report do you tell the
18  reader if you applied a scoring system to the data
19  and the studies that you reviewed?
20     A   That wasn't --
21         MS. BROWN:  Objection.  Lacks
22  foundation.
23         THE WITNESS:  That wasn't my approach.
24  BY MS. PARFITT:
25     Q   Okay.  We'll talk about that in a

Page 251

1  minute.  Appreciate that.
2          Did you exercise any independent
3  judgment in determining what cases to include on
4  this chart of case-control studies on 13 and 14?
5          MS. BROWN:  Objection.  Asked and
6  answered.
7          THE WITNESS:  I tried to be inclusive.
8  BY MS. PARFITT:
9      Q   Being inclusive -- did being inclusive
10  require you to exercise professional judgment with
11  regard to selection of the cases that you reviewed
12  and included for purposes of your analysis?
13     A   So, mostly, yes.  What I would say is I
14  was trying to understand what the universe was of
15  case controls that were being listed in the
16  meta-analyses, what the case controls were that
17  were informing the opinions of the plaintiffs'
18  experts.  And so I didn't want to have some
19  arbitrary rule for saying one shouldn't be in
20  here.  I wanted to look at them all.  And so my
21  goal was actually to include them all, and not
22  deselect some because I thought that there was a
23  quality issue with them.
24         (Brief interruption.)
25  BY MS. PARFITT:

Page 252

1      Q   What specific, if any, in vitro studies
2  did you consider for purposes of your opinion?
3      A   So I -- are you good?
4      Q   Yeah, thank you.
5      A   Okay.  So I -- I don't know if you're
6  including some animal studies as in vitro studies
7  or whether you just mean sort of like ones that
8  are -- that are cell-based or in a dish.
9      Q   Well, there's a difference, isn't there?
10     A   There should be, yeah, but I just --
11  since you're asking the question, I don't know
12  you, and so I -- I just want to be clear.
13     Q   No, I'm -- I'm cognizant of the
14  difference between in vivo and in vitro, so what
15  I -- what I would ask you is what in vitro studies
16  did you consider for purposes of your analysis?
17     A   Yeah, I looked at some.  I think the
18  ones that were cited by IARC I looked at.  I don't
19  remember the full list of ones -- which ones I may
20  have listed, if any, that -- that I looked at.
21  But that wasn't really my main -- my main purpose
22  in looking at the epidemiology, which was to --
23  was to look at in vitro studies.
24     Q   Okay.  Was part of your analysis -- or
25  did part of your analysis include looking at

Page 253

1  in vivo studies?
2      A   So I looked at -- at a bunch of the
3  different animal studies that were cited, cited in
4  some of the other documents.
5      Q   Which ones?
6      A   So I don't remember the author names.  I
7  mean, there were -- there were studies of, you
8  know, rats, rabbits, primates.  I can't remember
9  if there were mouse -- there were mouse studies as
10  well.
11         So whatever that list is that was in
12  IARC that they had considered at that point, and
13  then I think I found a couple more.
14     Q   What, if any, information did you glean
15  from your review of the in vitro and in vivo
16  studies that formed the basis of your study
17  report?
18     A   Well, mostly -- so to -- to think about
19  how -- for me as an epidemiologist, and not as a
20  cancer biologist or molecular biologist, I wanted
21  to just understand generally how some of the other
22  entities were wielding that information, right.
23  So that -- like I wasn't about to become a cancer
24  biologist in reading these things or understand
25  whether their methods were appropriate or not, but

**64 (Pages 250 to 253)**

Gregory B. Diette, M.D.

Page 254

1    I did want to understand some of their
2    underpinnings.
3         Q    Okay.
4         A    And just so, for example, right, so
5    there's the -- the studies on migration, for
6    example.  I thought it was important to look at
7    those and see what kind of animals, for example,
8    had what kind of particles either put into their
9    vaginas or put into their uterus, or whatever it
10   was, so I could understand what the -- what the
11   story was there.
12        Q    Okay.  Do animals have vaginas?
13        A    Some do, yeah.
14        Q    You -- you indicated you're not a cancer
15   specialist.  Would you defer to -- on topics
16   involving those issues to a cancer biologist?
17             MS. BROWN:  Objection to the form of the
18   question.
19   BY MS. PARFITT:
20        Q    And let me clean it up because I think I
21   left that off.  You are not a cancer biologist,
22   correct?
23        A    Correct.
24        Q    All right.  So would you defer questions
25   in that wheelhouse to someone who is a cancer

Page 255

1    biologist?
2             MS. BROWN:  Same objection.
3             THE WITNESS:  So I mostly don't think
4    about deferring my opinions to other -- other
5    people's categorically.  You know, so that I think
6    if there were somebody that was a cancer specialist
7    and they had an opinion that seemed credible, I
8    would take it into account.  But to the extent
9    that I needed to understand something, I would
10   still rely on my own -- my own background and
11   knowledge.
12   BY MS. PARFITT:
13        Q    All right.  You're not a -- a molecular
14   specialist, correct?
15             MS. BROWN:  Objection.
16             THE WITNESS:  Not a molecular biologist.
17   BY MS. PARFITT:
18        Q    Okay.  I believe you stated in your
19   report that you were deferring to other experts in
20   this case as it pertains to the opinions that
21   Dr. Saed has given; is that correct?
22             MS. BROWN:  Objection to the form.
23   Counsel, is there a part of the report you're
24   referring to?
25             MS. PARFITT:  Mm-hmm, there is.

Page 256

1             MS. BROWN:  What report is --
2             MS. PARFITT:  Saed.
3    BY MS. PARFITT:
4         Q    Just give me a moment, Doctor.
5              If you turn your attention to page 42.
6         A    Mm-hmm.
7         Q    At the bottom.
8         A    Okay.
9         Q    "I leave a detailed assessment of
10   Dr. Saed's efforts to other experts.  I did review
11   Dr. Saed's report and his two depositions and was
12   struck by the irregularities in his study, which
13   render his results highly questionable."
14             So are you or are you not deferring with
15   regard to opinions concerning what Dr. Saed had to
16   say?
17             MS. BROWN:  Objection.  Misstates the
18   expert report and the opinion.
19             THE WITNESS:  I -- I meant to be
20   somewhat nuanced here, right, which is that -- you
21   know, it's possible for me to read things and
22   understand that there might be some issues with
23   what he's done.  I -- I'm not going to be the
24   person to critique the biologic aspects of his
25   work, though.

Page 257

1    BY MS. PARFITT:
2         Q    Okay.  Fair enough.  In fact, let me ask
3    you, have you read the published scientific
4    article by Dr. Saed?
5         A    Not yet.
6         Q    Okay.  Do you have any plans to do that?
7         A    I might.  I might, because I was just --
8    I was curious because I saw some of the -- like
9    the expert reports that came in after I wrote my
10   report, and there were things that just kind of
11   struck me that would be worth trying to sort
12   through, like whether he had changed like 48 to 36
13   or -- yeah, 48 hours to 72 hours, whatever it was,
14   that there were like some tables apparently that
15   were the same as an original paper, that the only
16   change was like the numbers on them.  And so just
17   to sort of understand the quality issues related
18   to the study, I thought I might take a look at it.
19        Q    All right.  But prior to preparing your
20   expert report, and, frankly, this deposition
21   today, you have not read either Dr. Saed's -- you
22   have not read Dr. Saed's most current peer-
23   reviewed paper, correct?
24        A    True for both time periods.  I don't
25   think it was published or available to me before I

Gregory B. Diette, M.D.

Page 258

1    did the report, but I could be wrong.
2         Q   Well, it's available now, isn't it?
3         A   That's what I've heard.
4            MS. BROWN:  Objection to the form.
5    BY MS. PARFITT:
6         Q   But you've not seen it.
7         A   No.  I just -- I mean like -- I mean
8    it -- sorry, it's the way I think.  It sounds like
9    two different time periods.  One was --
10        Q   No.
11        A   -- before the report and one was between
12   then and now.
13        Q   No, my question goes --
14           MS. BROWN:  Wait, he's finishing.  Let
15   him finish.
16   BY MS. PARFITT:
17        Q   My question -- are you done?
18        A   I'm good.
19        Q   My question really goes to, is it fair
20   to say that you have not read Dr. Saed's published
21   peer-reviewed article at the time of your
22   deposition?
23        A   That is correct.
24           THE WITNESS:  Sorry.
25           MS. BROWN:  That's all right.

Page 259

1    BY MS. PARFITT:
2         Q   Okay.  Now, you've mentioned IARC a
3    couple of times during the course of your
4    testimony.
5            Have you rereviewed the IARC
6    monograms -- or the IARC monogram that was
7    published in 2010 on silica?
8            MS. BROWN:  The monograph?
9            MS. PARFITT:  The monograph.  Monograph.
10           MS. BROWN:  Monograph on talc?
11           MS. PARFITT:  On talc, mm-hmm.
12           THE WITNESS:  Did you just say silica or
13   no?
14   BY MS. PARFITT:
15        Q   I did say silica.  I meant talc.
16        A   You meant talc.  Yeah, I've read the
17   talc one.
18        Q   You've read the talc one.  Have you read
19   the 2012 monograph, the one 100C, have you seen
20   that?
21        A   I have.
22        Q   Okay.  Have you read any other
23   monographs on talc or asbestos?
24        A   I've read earlier ones on asbestos.  I
25   don't know of any other ones on talc, I don't

Page 260

1    think, but I've certainly read other -- I mean
2    others that aren't on either of those topics.
3         Q   Would you agree -- would you agree that
4    IARC is a well-respected scientific organization?
5            MS. BROWN:  Object -- I'm sorry.  I
6    didn't hear the question.
7    BY MS. PARFITT:
8         Q   Would you agree that IARC is a well-
9    respected scientific organization?
10           MS. BROWN:  Objection to the form.
11           THE WITNESS:  It's -- it's hard for me
12   to characterize whole organizations, you know, in
13   terms of whether they're well respected or by whom
14   or when, but generally speaking, you know, they --
15   they do produce some -- some credible documents.
16   BY MS. PARFITT:
17        Q   They do produce some credible documents.
18           It's -- IARC is part of the World Health
19   Organization, correct?
20        A   It is.
21        Q   Okay.  And when IARC has its meetings to
22   discuss classification of carcinogens, it invites
23   world-renowned experts for whatever area and
24   specialty is being discussed.  Is that fair?
25           MS. BROWN:  Objection to the form.

Page 261

1            MR. LOCKE:  Objection.
2            MS. BROWN:  Calls for speculation.
3            THE WITNESS:  I don't know their
4    selection process, but they -- but they certainly
5    invite -- invite people to attend.
6    BY MS. PARFITT:
7         Q   Okay.  Have you ever been invited to
8    attend an IARC --
9         A   I have not.
10        Q   -- working group?
11        A   No.
12        Q   Okay.  Did IARC invite you to attend
13   their working group back in 2006 when they were
14   deliberating on the issue of talcum -- talc
15   products?
16           MS. BROWN:  Objection.  Same question,
17   asked and answered.
18           THE WITNESS:  She's right, but -- but
19   no.
20   BY MS. PARFITT:
21        Q   Okay.  Did IARC ever invite you to
22   attend and share your opinions when they had their
23   asbestos meetings?
24           MS. BROWN:  Same objection.
25           THE WITNESS:  No.

66 (Pages 258 to 261)

Gregory B. Diette, M.D.

Page 262

1    BY MS. PARFITT:
2        Q   Do you know what the NTP is?
3        A   It's like the National Toxicological
4    Program.
5        Q   Okay.  Has the National Toxicological
6    Program ever asked you to do research for them on
7    talcum powder products?
8        A   No.
9        Q   Has the National Toxicology Program ever
10   asked that you do research with them on asbestos?
11       A   No.
12       Q   Have you ever submitted any research to
13   the NTP on anything?
14       A   No.
15       Q   Have you ever submitted any research to
16   IARC on anything?
17       A   No.
18       Q   What is a risk factor?
19           MS. BROWN:  Objection to the form.
20           THE WITNESS:  Are we talking about like
21   an epidemiologic definition?
22   BY MS. PARFITT:
23       Q   Just generally, what's a risk factor?
24           MS. BROWN:  Objection.
25           THE WITNESS:  Well, I don't -- you said

Page 263

1    generally.  It could mean a million things to
2    different people.
3    BY MS. PARFITT:
4        Q   What's it mean to you?
5        A   It depends upon the context.  That's why
6    I'm asking from like an epidemiologic standpoint
7    as opposed to some other context.
8        Q   Well, let's take mesothelioma.  What are
9    the risk factors for mesothelioma?
10       A   Well, if we're talking about, you know,
11   asbestos, for example, as one risk factor, then
12   you could use it that way, that -- that an
13   exposure elevates the risk of developing a
14   disease.
15       Q   Okay.  Let's take talcum powder.  Is
16   talcum powder a risk factor for ovarian cancer?
17       A   I don't believe so.
18       Q   Are there risk factors that are
19   modifiable?
20           MS. BROWN:  Objection to the form.
21           THE WITNESS:  For what?
22   BY MS. PARFITT:
23       Q   For a disease.
24           MS. BROWN:  Same objection.
25   BY MS. PARFITT:

Page 264

1        Q   For instance, if -- is talcum powder a
2    modifiable behavior -- the use of talcum powder a
3    modifiable behavior?
4            MS. BROWN:  Objection.  Misstates his
5    prior testimony.
6            THE WITNESS:  So it -- it should be,
7    yeah.
8    BY MS. PARFITT:
9        Q   Okay.  Now, Dr. Diette, your paper or
10   your expert report was signed and executed by you
11   on February 25th, 2019.
12       A   Correct.
13       Q   Okay.  When did you actually finish the
14   paper, the report?
15       A   Oh, I think about then.  I mean --
16       Q   About then?
17       A   I think around then.  I mean it's -- I
18   don't know whether it was the day before or the --
19   or that actual day, but -- but right around then.
20       Q   Okay.  Are you aware that -- I guess it
21   was just a couple of months earlier that Health
22   Canada issued and published a critical review and
23   assessment of the science, which actually included
24   a comprehensive review of the epidemiological
25   literature?  Did you know that?

Page 265

1            MR. LOCKE:  Objection.
2            MS. BROWN:  Objection.  That misstates
3    the draft assessment.
4            THE WITNESS:  I'm familiar with it.
5    BY MS. PARFITT:
6        Q   Okay.  Have you read it?
7        A   I have.
8        Q   Have you read it in its entirety?
9        A   I don't remember if there's like
10   appendices or something, but I read all the -- you
11   know, the mean part of the text.
12       Q   Okay.  There is also meta-analysis that
13   was performed about that same time.
14       A   Yes.  Yeah.
15       Q   Have you read that?
16       A   I have.
17       Q   Okay.  Did Health Canada do what we
18   would refer to in your world of epidemiology a
19   causality assessment?
20           MS. BROWN:  Objection to the form of the
21   question.
22           THE WITNESS:  I don't know if that's
23   what they did.
24   BY MS. PARFITT:
25       Q   What did they do?

67 (Pages 262 to 265)

Gregory B. Diette, M.D.

Page 266

```
 1          MS. BROWN: Objection.
 2          THE WITNESS: It looks to me as if they
 3  create -- well, so I don't know. So they -- they
 4  have their own process. I don't know anything
 5  about Health Canada, so I don't know what they
 6  typically do. You know, I've never -- it's unlike
 7  some other entities where I would kind of
 8  understand their process because I've read their
 9  things before.
10          I don't -- I don't know anybody
11  personally that looks to Health Canada for
12  information, so I've never had a conversation with
13  anybody about, you know, what their methods are,
14  how they go about their business.
15          But it looks as if what they were trying
16  to do was to try to line up whether there was
17  information about where talcum powder is found in
18  Canada, so meaning like, you know, how many
19  different kinds of products. It looked like they
20  were trying to assess some things about dermal
21  absorption or not, whether it's ingested or not,
22  whether it's inhaled, whether perineal application
23  matters or not.
24          It seems that they commissioned yet
25  another meta-analysis of some sort by Dr. Taher,
```

Page 267

```
 1  and -- and then created the document that I guess
 2  that they put out there for -- for public comment
 3  of some sort.
 4  BY MS. PARFITT:
 5      Q   Okay. All right. Let's have marked the
 6  Health Canada report, the draft assessment. And
 7  we'll have that marked as Exhibit No. 14.
 8          (Diette Exhibit No. 14 was marked
 9          for identification.)
10          (Counsel conferring.)
11  BY MS. PARFITT:
12      Q   Do you have that in front of you?
13      A   I do.
14      Q   Okay. All right. Did the -- did Health
15  Canada look at all three types of study designs?
16  And by that, I mean case control, cohort, and
17  meta-analyses.
18          MS. BROWN: Objection to what you mean
19  by "look at." Objection to the form.
20          THE WITNESS: They've listed -- they've
21  listed some of each.
22  BY MS. PARFITT:
23      Q   All right. So they consider for
24  purposes of their analysis cohort studies,
25  case-control studies and meta-analyses. Is that
```

Page 268

```
 1  fair?
 2          MS. BROWN: Objection to the form.
 3          THE WITNESS: That looks to be part of
 4  what they've included in here.
 5  BY MS. PARFITT:
 6      Q   And you yourself, for purposes of your
 7  report, looked at case-control studies, cohort
 8  studies, and meta-analyses, correct?
 9      A   I did.
10      Q   Okay. Did Health Canada perform a
11  Bradford Hill assessment of the evidence?
12          MS. BROWN: Objection to the form.
13          THE WITNESS: They have a section here.
14  I mean, there's something here that -- that
15  resembles a Bradford Hill analysis.
16  BY MS. PARFITT:
17      Q   Okay. Let me direct your --
18          MS. BROWN: Take as long as you need,
19  Doctor, to finish your answer.
20          THE WITNESS: Well, I just -- like I
21  don't know -- I don't know how much leeway there
22  is in the world for people to say that they did a
23  Bradford Hill analysis just by listing out certain
24  keywords, right? I mean it's sort of like a word
25  salad exercise to me for some of these cases, and
```

Page 269

```
 1  so --
 2  BY MS. PARFITT:
 3      Q   I'm sorry. A word what?
 4      A   Word salad.
 5      Q   Word salad.
 6      A   Yeah. Not a technical term, but it's
 7  kind of a mess, right. So they've got -- like on
 8  page 19, they've got strength, and strength is a
 9  Bradford Hill criterion. They don't say whether
10  the risk is, you know, weak or strong. They just
11  have a list of 30 epidemiologic studies, and they
12  say a couple things about some of them being
13  statistically significant and -- and so forth.
14      Q   Okay.
15      A   And so that -- that isn't really a
16  Bradford Hill type analysis about what the --
17  whether the strength is high or low.
18          And similarly, I would just say like,
19  you know, for temporality, you know, what they've
20  said here is crazy, right. So it's like --
21      Q   I'm sorry. What they've said here is
22  what?
23      A   Crazy.
24      Q   Crazy.
25      A   Crazy.
```

68 (Pages 266 to 269)

Gregory B. Diette, M.D.

Page 270

```
 1        Q   So let me just ask --
 2        MS. BROWN:  Wait now, he is not done.
 3   You can follow up when he is done with --
 4        MS. PARFITT:  Fair enough.
 5        MS. BROWN:  Go ahead, Doctor.
 6   BY MS. PARFITT:
 7        Q   Okay.  Crazy.
 8        A   Okay.  Oh, well, they said like in all
 9   case-control studies reporting positive outcomes,
10   the participants recalled the exposure to talc
11   preceded the reported outcome.  I mean that is so
12   far afield from any realistic epidemiologic
13   principle that to say that somehow informs a
14   Bradford Hill analysis -- I don't know, maybe
15   "crazy" is the wrong word.  Maybe absurd, maybe
16   ridiculous.  But every person in the world that
17   has a particular event or outcome, everything
18   about them preceded them.  That isn't the same as
19   temporality.  Temporality in the epidemiologic
20   world is demonstrating that time flowed from the
21   time of the exposure.
22        So, that's why I say like -- you know, I
23   read the words here, I see consistency,
24   specificity, and so forth, but I don't think their
25   application to this is actually a legitimate
```

Page 271

```
 1   Bradford Hill analysis.
 2        Q   All right.  So it's absurd, it's crazy,
 3   and your opinion is that they did not do a proper
 4   Bradford Hill analysis.  Is that your opinion?
 5        A   It is.
 6        MR. LOCKE:  Objection.
 7        MS. BROWN:  Objection to the form.
 8   BY MS. PARFITT:
 9        Q   Okay.  All right.  Let me direct -- did
10   they -- let me direct your attention to page 21.
11   And we'll put that up on the ELMO.
12        All right.  Do you see that?  Okay?
13        A   I'm on page 21.
14        Q   Page 21, and it's the last paragraph,
15   and I'll read it.
16        "The most recent meta-analysis detailed
17   above, Taher, et al., 2018, and consistent with
18   the Hill criteria, suggests a small but
19   consistently statistically significant positive
20   association between ovarian cancer and perineal
21   exposure to talc.  Further available data are
22   indicative of a causal effect.  A clear point of
23   departure could not be derived from the available
24   literature.  Consequently, hazard characterization
25   is qualitative in nature."
```

Page 272

```
 1        Did I read that correctly?
 2        MS. BROWN:  You didn't, and actually you
 3   said "consistently" and the word is "consistent."
 4        MS. PARFITT:  Thank you.
 5   BY MS. PARFITT:
 6        Q   Did I read that correctly with that
 7   correction?
 8        A   Yes.
 9        Q   Okay.  Do you see where the authors
10   state that, "Further available data are indicative
11   of a causal effect"?  Do you see that?
12        A   I do.
13        Q   Do you agree with Health Canada that
14   there was a causal effect drawn from the genital
15   use of talcum powder products and ovarian cancer?
16        MS. BROWN:  Objection to the form,
17   misstates the draft assessment, lacks foundation.
18        THE WITNESS:  I don't think so, but for
19   the reason that -- being that this is -- this is
20   at some level -- maybe it's a summary, I don't
21   know -- of what they have from above.  But their
22   input information into what they're concluding
23   here is not good.  Right.
24        I mean look -- look up a couple of
25   sentences under "Biologic plausibility," and they
```

Page 273

```
 1   say:  "The presence of talc in the ovaries has
 2   been documented," and cite Heller.  And they say,
 3   "The evidence of retrograde transport supports the
 4   biologic plausibility."
 5        That Heller study doesn't -- doesn't
 6   support that, right.  So they're -- they're
 7   stringing things together here that don't
 8   literally support I think a conclusive statement
 9   here.
10        And also I would just say too, that when
11   they say that -- that with the last part of that
12   part you read where it says that "The hazard
13   characterization is qualitative in nature," well,
14   "qualitative" doesn't tell you something about
15   whether it's a strong association.  I mean they --
16   they've resisted using that -- that word here.
17   BY MS. PARFITT:
18        Q   Okay.  So my question for you,
19   Dr. Diette, is do you disagree with the draft
20   Health Canada assessment which found that there
21   was a causal relationship between the use of
22   genital talcum powder products and ovarian cancer?
23        MS. BROWN:  Objection.  That's not what
24   the draft assessment --
25        MS. PARFITT:  Counsel, objection, form.
```

69 (Pages 270 to 273)

Gregory B. Diette, M.D.

Page 274

1         MS. BROWN: You're -- it misstates the
2    document intentionally attempting to mislead the
3    witness.
4         MS. PARFITT: Objection.
5         THE WITNESS: So I -- first of all,
6    so --
7    BY MS. PARFITT:
8         Q   And, Doctor, let me just say something.
9    You can explain, but -- I have a question, and
10   then you can explain it if you wish.
11        And my question is, do you disagree with
12   the draft Health Canada assessment which found or
13   concluded that there was a causal relationship
14   between the use of genital talcum powder product
15   and ovarian cancer?
16        MR. LOCKE: Objection.
17        MS. BROWN: Objection to the form.
18        You can answer it truthfully and
19   accurately.
20        THE WITNESS: I can't answer it.
21   BY MS. PARFITT:
22        Q   You can't -- wait one second.
23        A   I cannot answer it.
24        Q   You can't answer the question as to
25   whether or not you agree that they concluded that

Page 275

1    there was a causal relationship between talcum
2    powder products and ovarian cancer?
3         A   So that --
4         MS. BROWN: Objection to the form,
5    misstates the document.
6         Go ahead, Doctor.
7         THE WITNESS: Yeah, your question has
8    morphed, right. And so I'm still stuck on the way
9    it came out when you first said it.
10   BY MS. PARFITT:
11        Q   Then let's go -- we'll go with the one
12   the --
13        MS. BROWN: Wait, let him finish.
14        MS. PARFITT: No. Excuse me.
15        MS. BROWN: Counsel, you've been doing
16   that all day. You cannot cut this witness off.
17   He needs to finish.
18        MS. PARFITT: I'm not -- he asked for
19   what question I wanted to ask, so let me ask it
20   again.
21   BY MS. PARFITT:
22        Q   Do you have -- is it -- do you -- strike
23   that.
24        Do you agree or disagree with Health
25   Canada and their assessment of causality between

Page 276

1    talcum powder products used in the genital area
2    and ovarian cancer? That's the question.
3         MS. BROWN: Objection to the form of the
4    question, misstates the document --
5    BY MS. PARFITT:
6         Q   You may answer.
7         A   Is there a specific sentence in there
8    that says that?
9         Q   It's the question that I've asked you.
10        A   Oh, so I can't answer it. I can answer
11   the --
12        Q   Is there a specific question --
13        MS. BROWN: Wait, wait, let him finish.
14   BY MS. PARFITT:
15        Q   -- 20, 21, 28, and Roman numeral iii?
16        MS. BROWN: What?
17        THE WITNESS: If there's a specific
18   sentence that says that, and you want me to agree
19   or disagree, I can agree or disagree with that
20   sentence.
21        What I can't agree with is an entire
22   document because I think it's not fair. I'm not
23   talking about just this one. I think, you know,
24   lawyers like to do this, right. They like to say,
25   Do you agree with a such-and-such paper. Well,

Page 277

1    it's nonsense. You don't agree with the paper.
2    You agree with the finding or you agree with the
3    conclusion, but not with the entire thing.
4         So here what I'm saying is, there's an
5    entire document here. There's some good stuff and
6    some bad stuff, and I can point out some of --
7    some of each.
8         But the point here is if there's a
9    specific statement that they made that says --
10   about causation, I would just like to see that
11   particular statement and tell you whether I can
12   agree with it or not.
13   BY MS. PARFITT:
14        Q   Well, look at page 28 -- or excuse me,
15   21, the page we were on.
16        Do you have that in front of you?
17        A   I do.
18        Q   Okay. "Available data are
19   indicative" --
20        MS. BROWN: Counsel, where are you?
21        MS. PARFITT: It's the paragraph just
22   above "Exposure Assessment." It says the recent
23   -- we just read it.
24   BY MS. PARFITT:
25        Q   "The most recent meta-analysis detailed

70 (Pages 274 to 277)

Gregory B. Diette, M.D.

Page 278

1  above, Taher, and consistent with the Hill
2  criteria, suggests a small but consistent
3  statistically significant positive association
4  between ovarian cancer and perineal exposure to
5  talc.  Further available data are indicative of a
6  causal effect."
7       MS. BROWN:  What's the question?
8  BY MS. PARFITT:
9     Q   Do you agree with the conclusions of
10  Health Canada?
11       MS. BROWN:  Objection to the form.  This
12  is not the conclusion section.
13       THE WITNESS:  So, first of all, the --
14  the first sentence that you read there talks about
15  a significant positive association, which isn't
16  the same as cause.  Right.  And then they say,
17  "Further available data are indicative of..."
18       I -- I think if you're trying to say
19  that something causes something, you come out and
20  you say it.  You don't say, "Further data are
21  indicative of it."  So I -- I don't think this
22  statement says talcum powder causes ovarian
23  cancer.
24  BY MS. PARFITT:
25     Q   Okay.  So your quarrel with Health

Page 279

1  Canada is the fact that they didn't say it, Talcum
2  powder products used in the genital area cause
3  ovarian cancer.
4     A   Well --
5     Q   You quarrel with their language.  Is
6  that what you're saying?
7     A   Well, I quarrel --
8       MS. BROWN:  Objection.  Misstates his
9  testimony.
10       THE WITNESS:  I quarrel a little with
11  you, I think -- I'm sorry.
12       THE REPORTER:  I'm sorry, your --
13       MS. BROWN:  I just want to object to the
14  question as misstating your testimony.
15       THE WITNESS:  Because I think your
16  initial question before you read it literally was
17  about whether or not they said that it causes it,
18  and I don't think that it said that.
19       And -- and I think otherwise that there
20  are some flaws in the -- in the information that
21  they've used up above to reach this -- I guess
22  it's a conclusion.  I don't know if it is or not.
23  BY MS. PARFITT:
24     Q   Okay.  Does it say, "Further available
25  data are indicative of a causal effect"?

Page 280

1     A   That sentence is there.
2     Q   All right.  Okay.
3       MS. BROWN:  Counsel, if you're moving to
4  another area, would --
5       MS. PARFITT:  I am.
6       MS. BROWN:  Would this be a good time
7  for a break?
8       MS. PARFITT:  Yeah.  I'm going to move
9  on and change gears.
10       THE VIDEOGRAPHER:  The time is 1:52
11  p.m., and we are off the record.
12       (Recess.)
13       THE VIDEOGRAPHER:  The time is
14  2:04 p.m., and we're back on the record.
15  BY MS. PARFITT:
16     Q   Dr. Diette, you mentioned before the
17  break the Heller article, and so I don't misquote
18  you, what was your position with regard to Heller
19  and what it stood for?
20     A   I think if we're talking about the --
21  the right one, it's the one where the ovaries were
22  removed from, I think, 24 women, and that 12 -- 12
23  had said that they were talcum powder users and 12
24  not, but they found a -- they found a similar
25  amount of talc in ovaries regardless of whether

Page 281

1  they were users or not.
2     Q   Okay.  Is -- is it your opinion that
3  talc cannot migrate to the ovaries?
4     A   I don't know that it can.  I -- if it's
5  found there, I'm not sure how it got there.
6     Q   Is it your opinion that asbestos can
7  migrate to the ovaries?
8       MS. BROWN:  Objection to the form.
9       THE WITNESS:  I've seen -- I don't think
10  I've seen anything that shows for sure that it
11  can.
12  BY MS. PARFITT:
13     Q   Okay.  If asbestos was found in the
14  ovaries, how would it get there?
15       MS. BROWN:  Objection to the form.
16       THE WITNESS:  So I don't know.  I mean,
17  it's -- I don't know of a worked-out mechanism
18  that shows how it got there.
19       (Diette Exhibit No. 15 was marked
20       for identification.)
21  BY MS. PARFITT:
22     Q   Let me show you what's been marked as
23  Heller Exhibit No. 15.  And it is a 1996 article
24  entitled "Asbestos Exposure and Ovarian Fiber
25  Burden."

71 (Pages 278 to 281)

Gregory B. Diette, M.D.

Page 282

1    (Counsel conferring.)
2  BY MS. PARFITT:
3    Q   Do you have that in front of you?
4    A   I do.
5    Q   All right.  Now, this was a different
6  Heller article than the one you were referring to?
7    A   Thank you, yes.
8    Q   Okay.  All right.  Now, let me direct
9  your attention to the Abstract section, the last
10  paragraph.
11       Okay.  And it states:  "This study
12  demonstrates that asbestos can reach the ovary.
13  Although the number of subjects is small, asbestos
14  appears to be present in ovarian tissue more
15  frequently and in higher amounts in women with a
16  documentable exposure history."
17       Did I read that correctly?
18    A   Yes.
19    Q   All right.  Do you agree with that
20  statement?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  Give me one sec, because
23  I -- it's been a while since I looked at this.
24       MS. BROWN:  Take your time, Doctor.
25       THE WITNESS:  (Peruses document.)  Yeah,

Page 283

1  again, like -- so not entirely.
2  BY MS. PARFITT:
3    Q   What part -- what part --
4       MS. BROWN:  Let him finish.
5  BY MS. PARFITT:
6    Q   What part do you agree with?
7    A   Well, the -- I think that it's -- it's
8  not -- well, so the study demonstrates that
9  asbestos can reach the ovary.  I guess if it's
10  definitely there, then -- and it got there somehow
11  and it wasn't through contamination, you know, of
12  the procedure that -- that led to it, you could --
13  you know, you could infer that there's some way
14  that it got there.
15       I think it doesn't tell us anything
16  about how to make sense of that.  And what I was
17  looking for that I remember is that they said that
18  it's unclear why so many women with no exposure
19  history did have detectable asbestos in their
20  ovaries.
21    Q   Where do you see that?
22    A   I'm sorry.  I'm on 439.
23    Q   Thank you.
24    A   And in the Conclusion paragraph.
25    Q   Mm-hmm.  Yes.

Page 284

1    A   And it's about the middle of the
2  paragraph, it says it is -- it says -- it says
3  above it, it says:  "None of the exposed subjects
4  in the study was directly occupationally exposed
5  but all were passively exposed to household
6  contact.  It is unclear why so many of the women
7  giving no exposure history did have detectible
8  asbestos in their ovaries, although it is known
9  that there is a background level of asbestos in
10  the lung tissue of non-exposed individuals."
11       So I -- I don't know.  I just don't --
12  that this -- this cements the idea that -- that we
13  know something about how asbestos, you know, can
14  get to the ovaries.
15    Q   All right.  Let me direct your attention
16  to the bottom of 438, top of 439.
17       At the bottom of 438, it says "There
18  is," and then it goes on to the top of 439:
19  "There is evidence of transport of particulate
20  matter into the female perineum by the
21  transvaginal route."
22    A   I apologize, I -- I'm not with you, and
23  I just --
24    Q   Oh, sure.
25    A   I'm just trying to --

Page 285

1    Q   It's right here, upper corner, 439.
2    A   Got you.
3    Q   Okay?
4    A   Yep.
5    Q   All right, again.  "There is evidence of
6  transport of particulate matter into the female
7  perineum by the transvaginal route in both human
8  and animal studies."  It cites Egli and Newton,
9  1961.  It cites Henderson, 1986; Venter -- and I'm
10  sure I'll destroy this name -- Iturralde, 1979;
11  Whittemore, 1988.  "Suggested that vaginal
12  exposure to particulate matter such as asbestos
13  and talc was a potential risk factor for
14  intraperitoneal ovarian exposure.  Her conclusion
15  was based on finding that in talc exposed women, a
16  previous history of hysterectomy or tubal
17  ligation, which blocks perineum access, was
18  protective against ovarian cancer."
19       It goes on to say:  "Talc has been
20  implicated as a possible etiological agent in
21  ovarian cancer," citing Harlow '89 and '92, "and
22  is related to the asbestos problem in several
23  ways.  Aside from the chemical similarities
24  between the two, many cosmetic talcs contained
25  significant amounts of asbestos, particularly

72 (Pages 282 to 285)

Gregory B. Diette, M.D.

Page 286

1  prior to '70 -- 1976, Cramer, 1982. The
2  significance of this detection of talc in the
3  majority of exposed women and in all women giving
4  no exposure history is unclear and further studies
5  are underway to further elucidate this question."
6       Did I read that correctly?
7    A  Yes.
8    Q  Question: Are there chemical
9  similarities between cosmetic talcs and asbestos?
10      MS. BROWN: Objection to the form.
11      THE WITNESS: So some of the same --
12  some of the same features chemically are present
13  in both.
14  BY MS. PARFITT:
15   Q  All right. Set that aside for a minute.
16  We may come back to that.
17      Dr. Diette, for purposes of your
18  opinions in this case, you have stated that the
19  cohort studies lack statistical significance, and
20  only a subset of the case-control studies are
21  statistically significant. Therefore, there is a
22  disparity and inconsistency between cohorts and
23  case control.
24      Have I summed it up pretty well?
25    A  That -- that's one of the -- one of the

Page 287

1  bits of evidence of inconsistency.
2    Q  Okay. Would you agree that to disregard
3  study results based upon whether they are
4  statistically significant or not statistically
5  significant would be a mistake?
6       MS. BROWN: Objection to the form.
7  Counsel, is there something you're reading from
8  that --
9       MS. PARFITT: No. Actually, my notes,
10  and he doesn't get those. Thank you.
11      THE WITNESS: Okay. So "disregard" is
12  pretty severe. Right. So I don't think that
13  somebody should disregard any study, unless it's,
14  you know, fraudulent or, you know, created out of
15  nowhere. So I think that people should regard the
16  findings and interpret them appropriately.
17      So I think that would be an overly
18  strong thing to do, which would be to disregard it
19  simply because it's statistically insignificant.
20  BY MS. PARFITT:
21   Q  Okay. Do you know who Ken Rothman is?
22    A  I -- I know of him. I don't know him
23  personally.
24   Q  Okay. What does he do for a living?
25      MS. BROWN: Objection to the form.

Page 288

1       If you know.
2       THE WITNESS: Can I assume or --
3       MS. BROWN: No, if you don't know, don't
4  answer. Then you have no basis to answer the
5  question.
6  BY MS. PARFITT:
7    Q  My question is, do you know what Ken
8  Rothman's area of expertise is?
9       MS. BROWN: Objection.
10      THE WITNESS: Well, he's -- he's made a
11  career out of -- out of case-control studies and
12  articulating, you know, features of the design and
13  so forth.
14  BY MS. PARFITT:
15   Q  All right. Is he an epidemiologist?
16    A  Well, that's what I was trying to
17  remember. Like, I would be guessing. Like,
18  I assume for him to be in that role, he would be,
19  but there are people that come to epidemiology
20  from other -- you know, other backgrounds, and so
21  I just don't know his credentials.
22   Q  Okay. What about Sander Greenland, do
23  you know who he is?
24    A  I know the name, but I don't know him.
25   Q  Okay. Have you ever -- do you know what

Page 289

1  kind of scientist Sander Greenland is?
2       MS. BROWN: Objection. Form.
3       THE WITNESS: I do not.
4       MS. BROWN: Foundation.
5  BY MS. PARFITT:
6    Q  Okay. All right. Do you know Timothy
7  Lash?
8       MS. BROWN: Objection. Foundation.
9       THE WITNESS: I don't know the name.
10  BY MS. PARFITT:
11   Q  Okay. Do you know what kind of
12  scientist Tim -- Timothy Lash is?
13      MS. BROWN: Same objection.
14      THE WITNESS: It would be hard to know
15  that --
16  BY MS. PARFITT:
17   Q  Okay.
18    A  -- without knowing him.
19   Q  Okay. Let me show you what we will have
20  marked as Exhibit No. -- 61? 16.
21      MR. TISI: We're not that high.
22      (Diette Exhibit No. 16 was marked
23      for identification.)
24  BY MS. PARFITT:
25   Q  And I will -- and I will represent,

73 (Pages 286 to 289)

Gregory B. Diette, M.D.

Page 290

1    Dr. Diette, that this is Chapter 2 out of the
2    Third Edition, Modern Epidemiology.
3         Do you see that?
4         A   I do.
5         Q   Okay.  And if you look at the front of
6    it, it has three authors.
7         Do you see that?
8         A   I do.
9         Q   Okay.  The first one is Ken Rothman.  Do
10   you see that?
11        A   Correct.
12        Q   The second one is Sander Greenland.
13        A   Correct.
14        Q   And the third author is Tim Lash.  Do
15   you see that?
16        A   I do.
17        Q   And they are -- the book that they have
18   authored is called Modern Epidemiology, Third
19   Edition.  Do you see that?
20        A   I do.
21        Q   Okay.  Let me -- let me direct your
22   attention to page 27.
23        MS. BROWN:  Counsel, are you going to
24   lay a foundation for the use of this document?
25        MS. PARFITT:  I can just ask a question.

Page 291

1    I can do that.
2    BY MS. PARFITT:
3         Q   Let me ask a question.
4         "To claim that literature, scientific
5    literature, or a set of results reported in
6    scientific literature is inconsistent simply
7    because some results are statistically
8    significant, and some are not, would be completely
9    fallacious, even if one accepts the use of
10   significant testing methods."
11        Do you agree with that statement?
12        MR. LOCKE:  Objection.
13        MS. BROWN:  Objection.  Form,
14   foundation.
15        THE WITNESS:  Is that a hybrid of a
16   couple of things?  Because I thought I was reading
17   with you, and then I might have left off.
18   BY MS. PARFITT:
19        Q   Well, why don't we do this.  We'll put
20   it back on the ELMO, and I'll represent that it is
21   a --
22        A   Yeah, I don't doubt you.  I just --
23        Q   Sure, no worries.  That's fine.
24        A   It goes on to a different sentence.
25        Q   That's fine.

Page 292

1         MS. BROWN:  I have a continuing
2    foundation.
3         MS. PARFITT:  That's fine, Counsel.
4         MS. BROWN:  -- objection to this
5    exhibit, for which no foundation has been laid.
6    BY MS. PARFITT:
7         Q   All right.  Again, I'm referring to the
8    category consistency which I represent that is in
9    Chapter 2 of the Rothman book, and we can just go
10   ahead and circle the paragraph that starts:  "One
11   mistake in implementing the consistency criterion
12   is so common that it deserves special mention.  It
13   is sometimes claimed that a literature or set of
14   results is inconsistent simply because some
15   results are statistically significant, and some
16   are not."
17        Did I read that correctly?
18        A   You did.
19        Q   "This sort of evaluation is completely
20   fallacious, even if one accepts the use of
21   significant testing methods."
22        Did I read that correctly?
23        A   You did.
24        Q   All right.  Do you agree with that
25   statement?

Page 293

1         MR. LOCKE:  Objection.
2         THE WITNESS:  So wait a minute, I just
3    want to -- so there's a couple of statements
4    there.  I think the part that makes it agreeable
5    is to say that -- that if it's claimed that
6    results are -- and I'm paraphrasing --
7    BY MS. PARFITT:
8         Q   Sure.
9         A   -- but that the results are inconsistent
10   simply, and the word "simply" to me is really
11   important here because it suggests that somebody
12   would be not looking at the entire universe of
13   evidence that they have available.
14        So I think if you just took a quick look
15   at studies and said some were significant and some
16   weren't and left it at that, you know, it's a
17   pretty strong statement, but I think -- I think
18   that would be a mistake to only do that.
19        Q   All right.  Now, you're not a
20   statistician, correct?
21        A   I'm not a statistician.
22        Q   Okay.  And you're not a biostatistician.
23        A   I'm not a biostatistician.
24        Q   Okay.  Do you know who Daniel Ford is?
25        A   I do.

74 (Pages 290 to 293)

Gregory B. Diette, M.D.

Page 294

1    Q   Okay.  Who is Daniel Ford?
2    A   If it's the one that --
3    Q   Daniel E. Ford.
4    A   I don't know his middle name, but
5   there's a Dan Ford at our -- at our place.
6    Q   Okay.  Is the Dan Ford you know vice
7   dean for clinical investigation, Johns Hopkins
8   School of Medicine?
9    A   Yes.
10    Q   Okay.  Is he a friend of yours?
11    A   We're friendly.  I mean, we don't hang
12   out, though.
13    Q   Now, he is with the Institute for
14   Clinical and Translational Research; is that
15   correct?
16    A   He has been.  I'm just trying to think
17   if that still exists.  Because I know there was a
18   funding issue, so -- but he -- he certainly was in
19   that role, and he may still be.
20    Q   He may what?
21    A   He may still be.  I just -- I just -- I
22   thought I had heard that the ICTRs were going to
23   be not funded anymore.
24    Q   Okay.
25    A   Maybe it's true, maybe not; but I'm just

Page 295

1   saying for sure he was part of that.
2    Q   Mm-hmm.  Okay.  Sure.  Okay.
3        All right.  Are you a member -- and I'm
4   assuming you're not because you're not a
5   statistician, but I should assume nothing.
6        Are you a member of the American
7   Statistical Association?
8    A   I am not.
9    Q   Okay.  Do you know who they are?
10    A   Not -- not really.  I mean, it -- it
11   sounds like the name gives them away, but I
12   don't -- I don't know, you know, who they are as
13   an entity otherwise.
14    Q   That's fair.  Okay.
15        Are you aware that due to a widespread
16   misuse by scientists and researchers regarding
17   statistical significance and p-values, that the
18   American Statistical Association issued a
19   statement back in 2016 warning the scientific
20   community of this misuse and urging them to cease
21   and desist with the p-value?
22        MR. LOCKE:  Objection.
23        MS. BROWN:  Objection to the form, lacks
24   foundation, misrepresents the facts.
25   BY MS. PARFITT:

Page 296

1    Q   Do you know about that?
2    A   I'm aware of that.
3    Q   Okay.  Now, are you -- did you read
4   Dr. Bowman's deposition?
5    A   I did.
6    Q   Okay.  Did you see that in Dr. Bowman's
7   deposition?
8    A   I saw -- I'm just trying to remember.  I
9   saw the Nature article, I think that is more
10   recently published than -- you said 2016?
11    Q   Originally, yes.
12    A   Yeah, but I can't remember if 2016 was
13   in her deposition, but for sure the more recent
14   one.
15    Q   The one in 2019?
16    A   Exactly right, yeah.
17    Q   All right.  All right.  Let me show you
18   then what's been marked as -- or will be marked as
19   17.  And it is the March 2019 --
20        (Counsel conferring.)
21   BY MS. PARFITT:
22    Q   Okay.  Let me show you what we will have
23   marked as 17, a study that appeared in The
24   American Statistician in 2019.  It's Volume 73,
25   and it's called "Moving to a World Beyond P <

Page 297

1   0.05."
2        Do you see that?
3    A   Actually, I was just sort of flipping
4   through to see what I'm looking at.  Oh, so the
5   title, yes.
6    Q   Okay.  Is this a document you were
7   referring to?
8    A   No.
9    Q   No?
10    A   I was referring to the one in Nature
11   that I think reports about this.
12    Q   Yes.  Okay.  Let's go ahead and get that
13   marked, and we'll talk about all three.
14        (Diette Exhibit No. 17 was marked
15        for identification.)
16        MS. PARFITT:  Let's have marked as
17   Exhibit No. 18.
18        (Diette Exhibit No. 18 was marked
19        for identification.)
20   BY MS. PARFITT:
21    Q   And I will represent that 18 is a Sander
22   Greenland article that appeared in Nature on
23   March 2019.
24        Okay.  Is that the article you were
25   referring to?

Gregory B. Diette, M.D.

Page 298

1    A   Yes.
2    Q   Okay.  Have you had an opportunity to
3  read Exhibit No. 18?
4    A   I have.
5    Q   Okay.  Exhibit 17, which is the
6  Wasserstein article, have you had an opportunity
7  to read it prior to today?
8    A   This -- this one, no.
9    Q   Okay.  All right.  Let's first take a
10  moment and discuss what's been marked as 18.
11      Excuse me.  No, 18.  18.
12      Are you aware that due to the American
13  Statistical Society's concern of the misuse of
14  statistical significance and p-value, that they
15  literally used their March 2019 research paper and
16  devoted attention to this issue and attached
17  almost 40 papers on statistical inference?  Are
18  you aware of that?
19      MR. LOCKE:  Objection.
20      MS. BROWN:  Objection to the form,
21  misstates the facts.  Are you referring to
22  Exhibit 17?
23      MS. PARFITT:  No.  17.  17.
24      MS. BROWN:  Yes, 17.
25      MS. PARFITT:  No, I'm not referring to

Page 299

1  that at all.  I'm just -- I'm asking a question.
2      MS. BROWN:  Objection.  Lacks
3  foundation, misstates the facts.
4      THE WITNESS:  I saw that there was a --
5  a journal issue that had many articles.  I
6  didn't -- I don't know what the count was, but
7  there -- it's probably the same thing we're
8  talking about, but I'm not sure.
9  BY MS. PARFITT:
10    Q   Okay.  Did you have a chance to read
11  those 40 or so articles?
12      MS. BROWN:  Objection to the form.
13      THE WITNESS:  I -- I wish I had that
14  kind of time, but --
15  BY MS. PARFITT:
16    Q   You and me both.
17    A   Yeah.
18    Q   Okay.  All right.  Let's stay a few
19  minutes on 17, and we'll put it up on the ELMO.
20      And it starts --
21      MS. BROWN:  Counsel, he's never seen 17
22  before, so he's going to need a minute to
23  familiarize himself with it --
24  BY MS. PARFITT:
25    Q   Take a minute to familiarize yourself.

Page 300

1      MS. BROWN:  -- before you ask him any
2  questions about it.
3  BY MS. PARFITT:
4    Q   I just have a couple of questions about
5  it.
6      MS. BROWN:  Take as long as you need.
7      THE WITNESS:  (Peruses document.)
8  BY MS. PARFITT:
9    Q   And I just have a couple of questions
10  about it.
11    A   Sure.
12      MS. BROWN:  He's never seen it, so he
13  needs --
14      MS. PARFITT:  That's fine.
15      MS. BROWN:  -- as long as he needs.
16      MS. PARFITT:  He can take -- yeah.
17      THE WITNESS:  Well, I won't be able to
18  read it in --
19  BY MS. PARFITT:
20    Q   Okay.  Let me just --
21    A   -- in realtime today.
22    Q   -- ask you a couple of questions.  I'm
23  not expecting you to digest it.
24      All right.  The first paragraph, it
25  says -- do you have it up there?

Page 301

1      "Some of you exploring this special
2  issue of The American Statistician might be
3  wondering if it's a scolding from the pedantic
4  statisticians lecturing you about what not to do
5  with p-values, without offering any real ideas of
6  what to do about the very hard problem separating
7  signal from noise in data and making decisions
8  under uncertainty.  Fear not, in this issue,
9  thanks to 43 innovative and thought-provoking
10  papers from forward-looking statisticians, help is
11  on the way."
12      Do you see that?
13    A   I do.
14    Q   Okay.  Did I read that correctly?
15    A   You did.
16    Q   And is that the 43 papers that you were
17  speaking of that you didn't have time to read?
18      MS. BROWN:  Objection to the form, lacks
19  foundation.
20      THE WITNESS:  I -- I think so.  I mean,
21  this sounds familiar.  I think it's what I was
22  looking at, but I'm not -- not a hundred percent
23  sure.
24  BY MS. PARFITT:
25    Q   Okay.  If you'd look at right under

76 (Pages 298 to 301)

Gregory B. Diette, M.D.

Page 302

1    "'Don't' is Not Enough." Do you see that?
2        A   Yes.
3        Q   All right. The first sentence says:
4    "There's not much we can say here about the perils
5    of p-values and significance testing that hasn't
6    already -- that hasn't been said already for
7    decades."
8        Did I read that correctly?
9        A   Yes.
10       Q   And then it goes down to the first one:
11   "Don't base your conclusions solely on whether an
12   association or effect was found to be
13   statistically significant. The p-value passed
14   some arbitrary threshold such as p < 0.05."
15       Did I read that correctly?
16       A   Yes.
17       Q   Do you agree with that statement?
18       MR. LOCKE:  Objection.
19       THE WITNESS:  So there's a lot to this,
20   right. I mean because, I mean, the lead in to it,
21   it says -- it says that there's not much to say
22   here, you know --
23   BY MS. PARFITT:
24       Q   That hasn't been said.
25       A   -- hasn't been said for decades.

Page 303

1        MS. BROWN:  Wait, wait, let him finish.
2        THE WITNESS:  And -- and that's --
3    that's pretty -- well, I can't say it's true
4    because I haven't read this, so I don't know
5    what's in here, but the debate about p-values and
6    statistical significance isn't brand new. I mean,
7    I've been talking about it with colleagues for
8    decades, and I'm sure there were people decades
9    before me. So that -- that part rings true.
10       And I think -- you know, I don't know
11   when they're talking about conclusions. That's
12   a -- that's a pretty broad topic, but I think the
13   word "solely" is very helpful there, that we
14   shouldn't be making decisions solely on whether
15   something is statistically significant. And
16   there's more to it than that.
17   BY MS. PARFITT:
18       Q   Okay.
19       A   But that's a -- that's a super broad
20   statement, and I don't know, you know, in every
21   circumstance whether that would be agreeable or
22   not.
23       Q   Okay. Look at the last bullet there.
24   It states: "Don't conclude anything about
25   scientific or practical importance based on

Page 304

1    statistical significance or lack thereof."
2        Do you agree with that statement?
3        MS. BROWN:  Objection to the form.
4        And, Doctor, if you need to read the
5    whole article to answer these questions --
6        MS. PARFITT:  Counsel, don't coach the
7    witness.
8        MS. BROWN:  -- you should do that.
9        Yeah, but you are knowingly --
10   BY MS. PARFITT:
11       Q   Go ahead, Doctor.
12       MS. BROWN:  -- putting a document in
13   front of him that he's never seen, so we're not
14   going to sit here --
15   BY MS. PARFITT:
16       Q   I'm asking you a question, Dr. Diette --
17       MS. BROWN:  -- and play cherry-
18   picking statements to get --
19   BY MS. PARFITT:
20       Q   -- do you agree that one should not
21   conclude anything about scientific or practical
22   importance based on statistical significance or
23   lack thereof? Do you agree with that?
24       MR. LOCKE:  Objection.
25       MS. BROWN:  Same objection.

Page 305

1        THE WITNESS:  So, anyway, I think by
2    saying "don't conclude anything," I think makes
3    this not a very agreeable statement for me.
4    BY MS. PARFITT:
5        Q   Okay. All right. Let's turn to what
6    you did read, and that's Exhibit 18.
7        Do you have that, Doctor?
8        A   I do.
9        Q   Okay. And this is an article that
10   appeared in Nature back in March of 2019, correct?
11       A   That's right.
12       Q   Okay. And you did have a chance to read
13   this; is that correct?
14       A   I did.
15       Q   Okay. And under the section "Pervasive
16   Problem," do you see that?
17       A   Yes.
18       Q   Okay. It states: "Let's be clear about
19   what must stop. We should never conclude there is
20   no difference or no association just because the
21   p-value is larger than the threshold, such as
22   0.05, or equivalently because a confidence
23   interval includes zero. Neither should we
24   conclude that two studies conflict because one had
25   a statistically significant result and the other

Gregory B. Diette, M.D.

Page 306

1  did not.  These errors waste research efforts and
2  misinform policy decisions."
3           Did I read that correctly?
4      A   You did.
5      Q   Do you agree with that?
6           MS. BROWN:  Objection to the form.
7           MR. LOCKE:  Objection.
8           THE WITNESS:  To me it's overly broad,
9  and I think that -- I think that if we go through
10 and we find a sentence or two in here that are
11 agreeable or not, there's a -- there's a much,
12 much bigger proposition here about what's going
13 on, and I don't think it boils down to any one of
14 these sentences.
15          And I think this looks like a passionate
16 opinion piece, right.  That's calling it an
17 article, but it's a commentary.  And, you know,
18 these guys might believe that, but I don't -- I
19 don't think it's a mainstream view, and it's not
20 my view, you know, without any qualifications
21 that -- that that statement is correct either.
22     Q   Okay.  Are you aware that over 800
23 statisticians and scientists signed on to this
24 document to push the concept of abandoning
25 statistical significance?

Page 307

1           MS. BROWN:  Objection to the form.
2           MR. LOCKE:  Objection.
3           THE WITNESS:  I saw that.
4  BY MS. PARFITT:
5      Q   Okay.  You weren't one of those, were
6  you?
7           MS. BROWN:  Objection to the form.
8           THE WITNESS:  I'm not a statistician.
9  BY MS. PARFITT:
10     Q   Okay.  Well, but you use statistics in
11 your practice?
12     A   I do.
13     Q   Okay.  Did anyone say you had to be a
14 statistician to sign on to that proposition?
15     A   Well, I -- I thought I heard you say
16 statisticians.  Maybe I -- I might have misheard.
17 I thought you said 800 statisticians.
18     Q   I said there are about 800 statisticians
19 and other scientists that --
20     A   Oh, and other scientists.
21     Q   -- yeah, that signed on to this.
22     A   No, I didn't hear right.  So I just --
23 so I don't know what the criteria were for who
24 could sign or not sign.
25     Q   Okay.  You didn't sign on to it, though;

Page 308

1  is that correct?
2      A   I didn't.
3           MS. BROWN:  Asked and answered.
4  BY MS. PARFITT:
5      Q   All right.  Now, let me have marked now
6  as Exhibit No. 19.
7           (Diette Exhibit No. 19 was marked
8           for identification.)
9  BY MS. PARFITT:
10     Q   Do you have that, Doctor?
11          Take a look at that, if you will.
12     A   (Peruses document.)  So is this meant to
13 be a couple of things?
14     Q   It's two things.  I will represent to
15 you that the face sheet states "Johns Hopkins
16 Institute for Clinical and Translational
17 Research."  The American Statistician special
18 issue, "Moving to a World Beyond P < 0.05."  It's
19 dated March 25, 2019.  It has The American
20 Statistician on the side.
21     A   What are we -- I'm confused, though.
22 This is -- this is Exhibit 17 with something
23 attached to it or --
24     Q   You know, that's exactly it.  And if you
25 look at Exhibit 19 --

Page 309

1      A   Mm-hmm.
2      Q   -- it is moving -- it states "Moving to
3  the World Beyond P" -- it's a special issue of The
4  American Statistician.  The lead article calls for
5  abandoning the use of status -- statistically
6  significant, and offers much, not just one thing,
7  to replace it, written by Ron Wasserstein, Allen
8  Shirm, and Nicole Lazar.  The coeditors of this
9  special issue summarize the content of the issue's
10 43 articles.
11          These articles -- and put this up
12 there -- discuss the use of p-values and
13 statistical significance that Johns Hopkins'
14 researchers may find beneficial, and it attaches
15 the full article, which is what's been marked as
16 Exhibit No. 17.
17          Do you see that?
18     A   I do.
19     Q   Okay.  Did anyone share with you at
20 Johns Hopkins that their Clinical and
21 Translational Research group was disseminating the
22 article by Wasserstein, "Moving to a World Beyond
23 P < 0.05," and urging individuals not only to
24 abandon the use of statistical significance, but
25 to discuss the use of p-values and statistical

78 (Pages 306 to 309)

Gregory B. Diette, M.D.

Page 310

1  significance with the researchers at Johns
2  Hopkins?
3        And that's a mouthful.  So let me make
4  it really clear.
5        MS. BROWN:  Let me object --
6        MS. PARFITT:  I move to strike the
7  question.
8        MS. BROWN:  You're going to strike it?
9        MS. PARFITT:  Yeah, let me strike it.
10 BY MS. PARFITT:
11    Q   Were you aware, Dr. Diette, that the
12 division of Clinical and Translational Research
13 over at Hopkins had distributed to its scientists
14 this group of 43 articles, including the
15 Wassertine -- Wasserstein, for purposes of
16 educating them with regard to this concern over
17 the misuse of statistical significance?
18       MS. BROWN:  I object to a complete
19 misrepresentation of the exhibit and to
20 foundation.
21       THE WITNESS:  So I mean, there's a lot
22 of things, right.  I'll try to answer as many as I
23 can.
24       So one is that I probably got something
25 because I'm -- I've been part of the ICTR, and I

Page 311

1  use the resources, I'm one of the people who
2  helped to write the grant to get it funded, and
3  so -- like I get a zillion things that fly by.
4        I don't know if I saw this or not, but I
5  probably wouldn't have clicked on if it came
6  through like an e-mail because I had already seen
7  it, like, as part of this -- as part of the Bowman
8  deposition.
9  BY MS. PARFITT:
10    Q   Mm-hmm.
11    A   But other than that, I mean, I think
12 it's -- I think they're smart to do it.  They
13 should always put stuff out there for people to
14 read.  It doesn't mean that we're going to get rid
15 of p of 0.05.  It doesn't mean we're going to get
16 rid of statistical significance.  They're just
17 saying it's an interesting read.
18    Q   Do you know any of the signatories to
19 this particular document?
20    A   I found one.  One that I know
21 personally, and I'm just trying to remember if
22 there was anybody else that I saw.
23    Q   Well, let me show you what we'll have
24 marked as Exhibit No. 20.
25    A   Yeah, so let me just say, so I didn't

Page 312

1  read all 800, but I looked to see if there were
2  people from Hopkins in particular that signed it,
3  and I knew one of the two.
4     Q   Okay.  Let me show you what we'll have
5  marked as Exhibit No. 20.  And I will represent to
6  you that it is a list of the 800 signatories that
7  joined together to support this movement to
8  abandon p-value in statistical significance.
9        (Diette Exhibit No. 20 was marked
10       for identification.)
11       MS. PARFITT:  Again, Counsel, I
12 apologize.  Apparently, we only have one copy of
13 this document.
14       MS. BROWN:  So is it the blog soliciting
15 the signatures, or is it just the list?
16       MS. PARFITT:  It is the list of
17 signatories.
18       MS. BROWN:  Okay, that's fine.
19 BY MS. PARFITT:
20    Q   Do you see that?
21    A   I do.
22    Q   Okay.  Do you know an Elizabeth Ogburn?
23    A   I don't.  I saw her name on here, but
24 I -- I don't know her.
25    Q   All right.  Do you know Daniel

Page 313

1  Sharfenstein (phonetic)?
2     A   Sharfstein, and I know him.  Yeah.
3     Q   Okay.  Is that -- do you know anyone
4  else that might appear on that list?
5     A   I don't know.  I didn't read it.  I
6  just -- I literally just did a word search for
7  "Hopkins," and I came up with like one person
8  whose name is Hopkins who works in England, and
9  another one, something Hopkins Institute, which is
10 not, and then two from Johns Hopkins.
11    Q   Okay.  When did you do this research?
12    A   In the last week.  I mean, after --
13 after reading the Bowman deposition.
14    Q   All right.  So you read the Bowman
15 deposition, and then you -- what caused you then
16 to -- to go back and look at that or for that?
17    A   Well, because it sounds like an
18 interesting topic, and, you know, who knows, maybe
19 one day it either will or won't change, but it's
20 an interesting thing to read about.  And so I
21 wanted to just sort of see what -- what you guys
22 were driving at.  And then since I saw that there
23 were 800 signatories, I just figured I would see
24 if there was anybody at Hopkins that was part of
25 it or not.

Gregory B. Diette, M.D.

Page 314

1    Q   Mm-hmm.  And you found a couple of
2  people from Hopkins?
3    A   Yeah, I found two.  One I know, one I
4  don't.
5    Q   All right.  Again, you were not one of
6  the signatories?
7    A   Still true, yeah.
8    Q   Okay.  Okay.  What position does
9  Dr. Sharfstein hold within the University?
10      MS. BROWN:  Objection.  Speculation.
11      THE WITNESS:  He's been in the
12  Department of Biostatistics, and I don't know
13  what -- what other ways to label what he -- what
14  his positions are.
15  BY MS. PARFITT:
16    Q   Okay.  From the time you saw the
17  discussion about statistical significance and a
18  movement away from that and did your bit of
19  research, did you ever call Dr. Sharfstein to talk
20  to him about it?
21    A   Not yet.  I'm hoping I'll just run into
22  him at some point and -- and ask him about that.
23    Q   Is the -- is your interest strong enough
24  that you might reach out to him?
25      MS. BROWN:  Objection to the form.

Page 315

1  What -- what interest are we talking about?
2  BY MS. PARFITT:
3    Q   Interest in this science that you have
4  indicated yourself seems to be pretty important.
5      MS. BROWN:  Objection.  That misstates
6  his testimony by a lot.
7      THE WITNESS:  So it -- it might be.  I
8  mean, the -- the reason there's no urgency for me
9  to do it is that I still live in the world in
10  2019, and I'm still living in a world where
11  hypothesis testing is the rule and p-values are
12  part of what you're required to report if you're
13  going to publish a paper in a credible journal.
14      And so, you know, whether -- whether
15  this gets traction or not, you know, we'll see.  I
16  don't know what the replacement is going to be.  I
17  don't know if chaos will ensue.  It's an
18  interesting topic to talk about, but it's sure not
19  ready for prime time.
20      So I think if I see Dan in the hall, I
21  might ask him about it, but there's no -- there's
22  no urgency to it.
23  BY MS. PARFITT:
24    Q   So what's the world you're living in
25  with regard to the relevance of statistical

Page 316

1  significance and p-values?
2    A   Yeah, well, I'd say the real world,
3  right.  And the real world --
4    Q   I'm sorry.  You're in the real world?
5    A   Real world, yeah.
6    Q   Okay.  And what's the real world doing?
7    A   Well, the real world, if I want to write
8  a grant, I have to provide people with a sample
9  size estimate of what it is that I'm looking for,
10  and the sample size estimate is almost always
11  based on hypothesis testing.  And you have to
12  declare a certain p-value that you find to be a
13  credible one.
14      So I can't just say, I've decided
15  because I read some editorial that I'm not going
16  to use a p-value of 0.05.  That I'm still stuck
17  with 0.05 as a -- as an estimate.  And so if I
18  want to have any success getting a grant, I'm
19  going to have to still use the rules that we've
20  used for years.
21      And if I publish a paper, I happened to
22  look because I thought it was curious, I went on
23  New England Journal's website --
24    Q   Yes.
25    A   -- and they have an extensive list of

Page 317

1  ways in order to represent your p-values and your
2  confidence intervals that you have to adhere to if
3  you want to publish your papers.  You know, Nature
4  said that they're not going to change their rules
5  based on this.
6      So, anyway, so it's like it's -- that's
7  the world that we live in right now.  If you want
8  to communicate about -- about clinical science,
9  then you're going to use the rules that
10  we've learned to -- that we've learned to use.
11    Q   Do you know if the rules you've just set
12  forth are the rules that Dr. -- or, excuse me,
13  that Dr. Rothman and Sander Greenland, esteemed
14  epidemiologists, promote in their practice?
15    A   I have no idea what they promote.
16    Q   Well, you read the article in Nature,
17  didn't you?
18    A   Yeah, but you said "their practice."  I
19  don't even know what that is even.
20    Q   Well, who is the author of the Nature
21  article?
22    A   We're talking about the -- the
23  commentary?
24    Q   That's right.
25    A   Yeah.  So it looks like Armhein,

Gregory B. Diette, M.D.

Page 318

1    Greenland and McShane.  Or maybe not.  Maybe
2    that's -- wait a minute, I could be wrong.  No,
3    it's -- it's those three.
4         Q    And again, you don't know -- do you know
5    any of them?  I know you don't know Dr. Greenland.
6    Do you know any of the others?
7         A    I do not.
8         Q    Okay.  So if I understand your opinion
9    today, you still believe in the strength of a
10   statistical significance versus not statistically
11   significant?
12        A    It's --
13             MS. BROWN:  Objection to the form.
14             THE WITNESS:  It's still a factor to
15   consider when either planning, conducting, or
16   interpreting a study.
17   BY MS. PARFITT:
18        Q    Okay.  And do you still live in the
19   world that there is a threshold of a p-value of
20   0.05?
21        A    It depends.
22        Q    Well, what do you mean "it depends"?
23        A    I'm going to explain.
24        Q    Please.
25        A    So that's why I used the example of p at

Page 319

1    0.05, right?  I could just say, I have decided
2    that now I only want to do studies with six people
3    in them, and I'll be happy to have a p-value of
4    0.5.  You'd have to wish me luck getting it
5    published anywhere because it's not going to
6    happen, right?
7             So if I still want to do research and I
8    still want to get it published, I'm going to have
9    to pick a threshold for a p-value that's agreeable
10   to the peer reviewers and to the editor.  And it
11   doesn't have to be 0.05.  In some circumstances it
12   might be 0.01.  It might be even lower than that.
13   But a -- but a p threshold is necessary, at least
14   in our current era, if you want to be able to
15   conduct and talk about your research.
16        Q    Do you -- do you think Dr. Sharfstein is
17   going to now have difficulty having his scientific
18   works published?
19             MS. BROWN:  Objection.  Based on what?
20   There's no foundation for that question.
21   BY MS. PARFITT:
22        Q    You can answer the question, Doctor.
23        A    Well, exactly that.  So -- so Sharfstein
24   has been involved in some of our research and some
25   critical illness stuff, and the approach that we

Page 320

1    took wasn't anything novel or different.  I mean,
2    I don't know at all what his plans are going
3    forward, but he still works at the University
4    where we still compete for NIH grants --
5         Q    Mm-hmm.
6         A    -- and I haven't seen any change in the
7    NIH's posture on this, and I haven't seen any, you
8    know, ground swell of support for just doing
9    whatever you feel like in order to publish your
10   paper.
11        Q    Well, are you suggesting that what
12   Dr. Greenland and others and Dr. Wasserstein have
13   suggested to do whatever you -- let me get your
14   words -- shall -- yeah.  Okay.
15             MS. PARFITT:  Tell you what, let's take
16   a quick break.  I want to find that part, and
17   we'll get back.  Let's take a quick break.
18             THE VIDEOGRAPHER:  The time is 2:44 p.m.
19   We're going off the record.
20             (Recess.)
21             THE VIDEOGRAPHER:  The time is 2:53
22   p.m., and we're back on the record.
23   BY MS. PARFITT:
24        Q    Dr. Diette, when we left just before the
25   break, you said:  "I haven't seen any ground swell

Page 321

1    of support for doing whatever you feel like in
2    order to publish your paper."
3             I'm not talking about the publication of
4    papers.  What I would like to know from you is, do
5    you agree, though, when you were evaluating the
6    consistency of evidence, that one should not
7    disregard studies that are nonstatistically
8    significant and give greater weight to those that
9    are statistically significant?
10             MS. BROWN:  Objection to the form of the
11   question.
12             THE WITNESS:  I hear two questions
13   there, and the first part I agree with, and the
14   second part, it depends.
15   BY MS. PARFITT:
16        Q    Okay.  Do you agree that when you are
17   evaluating and weighing evidence, studies, that
18   you should evaluate studies the same whether they
19   are statistically significant or not statistically
20   significant?
21             MS. BROWN:  Objection to the form.  In
22   what context?
23             THE WITNESS:  I don't know what
24   "evaluate the same" means.  I mean, I think any --
25   any study that you think should be evaluated

Gregory B. Diette, M.D.

Page 322

1    should be evaluated, you know, as thoroughly as
2    you can.
3    BY MS. PARFITT:
4        Q   When you're evaluating the consistency
5    of studies, is it proper epidemiology to consider
6    those studies whether or not they are
7    statistically significant or nonstatistically
8    significant?
9            MS. BROWN:  Objection to the form.
10           THE WITNESS:  It is.  And I think, you
11   know, regardless of what Dr. Rothman has written,
12   you know, it's part of the information that's
13   available to you, and I think to ignore it would
14   be, you know, not in your best interest.
15   BY MS. PARFITT:
16       Q   Okay.  And would you agree that one
17   should not conclude there is no association or no
18   difference just because a -- one study is
19   statistically significant and another study is
20   significant?
21           MS. BROWN:  Objection to the form.
22           THE WITNESS:  And I agree with you,
23   especially because you used "just because."
24   BY MS. PARFITT:
25       Q   All right.  So maybe -- what do you

Page 323

1    mean?
2        A   No, it's a good sentence.  I mean, I --
3    it -- I think that over and over what we're
4    talking about is that -- that you shouldn't be
5    wedded to the idea that statistical significance
6    is the only feature that you look at, but it
7    doesn't mean that you don't look at it.
8            And so when you say that, you know, if
9    you were just to hold up two studies, and one was
10   significant and the other one wasn't and -- that
11   wouldn't -- you know, you wouldn't be curious
12   enough.  You would need to know more about those
13   studies to reach the conclusion you do.
14           So I think, you know, looking at the
15   whole study, looking how it's built, looking how
16   it's interpreted, all that's important.
17       Q   All right.  So it would not be proper to
18   conclude the two studies conflict just because one
19   was significant and one was statistically
20   significant.
21           MS. BROWN:  Objection.  Misstates
22   testimony.
23           THE WITNESS:  It -- not -- not by
24   itself, but that is at least one indicator of
25   something that's different about those studies.

Page 324

1            BY MS. PARFITT:
2        Q   Okay.  Now, let's turn to -- your chart,
3    and specifically the studies that you set forth in
4    your report on pages 13 and 14.
5            And if you'd go to your report, 13 and
6    14.
7        A   I'm sorry, I've got somebody else's
8    thing here.
9        Q   That's okay.
10       A   Okay.
11       Q   Okay.  You got there?  All right.
12           What I would like -- all right.  So you
13   have that in front of you, correct, sir?
14       A   I do.
15       Q   Okay.  Now, what I'll have marked as --
16   for demonstrative purposes is a chart that we have
17   marked as Diette Exhibit 21.
18           (Diette Exhibit No. 21 was marked
19           for identification.)
20   BY MS. PARFITT:
21       Q   And let me hand that to you.
22           MS. BROWN:  Counsel, can you give a
23   representation for the record about what
24   Exhibit 21 is?
25           MS. PARFITT:  Yes, I was about to do

Page 325

1    that.
2            MS. BROWN:  Thank you.
3    BY MS. PARFITT:
4        Q   Dr. Diette, on pages 13 and 14, you
5    have -- of your report, you have listed I believe
6    25 case-control studies, 3 cohort studies and --
7    is that correct?
8            MR. LOCKE:  Objection.
9    BY MS. PARFITT:
10       Q   You've got 7 population studies on the
11   back.  That's on page 14.  You have 25
12   case-control -- hospital studies, rather, on
13   page 14, and 25 studies on page 13.  Is that
14   correct?
15           MR. LOCKE:  Do you have a copy for --
16           MS. PARFITT:  Beg your pardon?
17           MR. LOCKE:  Do you have a copy for me,
18   please?
19           MS. PARFITT:  Oh, Tom, I think we do,
20   yeah.
21           MR. LOCKE:  Thank you.  Is this a --
22   does this come from a published --
23           MS. PARFITT:  No.  Let me represent --
24   no, let me represent that Exhibit No -- Exhibit 21
25   is a demonstrative which lists all of the studies

82 (Pages 322 to 325)

Gregory B. Diette, M.D.

Page 326

1  that Dr. Diette listed in his report on page 13
2  and 14 and has put them on a graph.
3        MS. BROWN:  Who -- who put them on a
4  graph and what is the graph?
5        MS. PARFITT:  Counsel --
6        MS. BROWN:  Well, I'm going to have an
7  objection to this document, and I just want to --
8        MS. PARFITT:  You can.  You can object
9  to this --
10       MS. BROWN:  -- make sure I'm properly
11  objecting, because I don't know what it is, who
12  made it, based on what, and to the extent the
13  doctor needs the underlying studies to answer your
14  questions.  We'll --
15       MS. PARFITT:  Counsel, no speaking
16  objections.
17       MS. BROWN:  I just want to object to
18  this.
19  BY MS. PARFITT:
20    Q   Dr. Diette --
21       MS. PARFITT:  I understand, Counsel.  I
22  know what you're doing.
23       MS. BROWN:  The name is Diette.
24       MS. PARFITT:  Diette?
25       MS. BROWN:  Diette.

Page 327

1        MS. PARFITT:  Diette.
2  BY MS. PARFITT:
3    Q   I'm sorry, Dr. Diette.  I'm not doing it
4  to annoy you.
5    A   You've had it -- you've had it right all
6  day.  You're fine.
7    Q   Thank you.  Thank you.  I appreciate
8  that.
9        What I will represent to you, and you
10  can track it, Dr. Diette, that Exhibit No. 21
11  represents the sales studies you selected for
12  purposes of your expert report.  It lists them
13  study by study.  It plots them on a forest plot on
14  the right-hand side.
15       Do you see that?
16    A   I do.
17    Q   Okay.  And I'll represent that we took
18  your relative risks and confidence intervals, and
19  simply extracted those and put them on Exhibit 21
20  with one exception.
21       What I'd like you to do is look at
22  Hartge.  And we will have that marked as
23  Exhibit 22.
24       (Diette Exhibit No. 22 was marked
25       for identification.)

Page 328

1        MS. PARFITT:  Yeah, there you go.
2        There you go, Doctor.
3  BY MS. PARFITT:
4    Q   Doctor, I've handed you what's marked as
5  Exhibit 22.  It is the -- an article by Patricia
6  Hartge dated 1983 in JAMA.  Do you see that?
7    A   I do.
8    Q   Okay.  And at the top of the study, she
9  has a table entitled "Estimated Relative Risk."
10       Do you see that?
11    A   I do.
12    Q   And I'll put this up on the ELMO.
13       MS. PARFITT:  Okay.  And it's hard to
14  see.  We'll have to zero in there.  There you go.
15  Okay.
16  BY MS. PARFITT:
17    Q   You'll see on your chart you had listed
18  for Hartge, 1983, a relative risk of 0.7 with a
19  confidence interval of 0.40 to 1.10.
20       Do you see that?
21    A   Uh --
22    Q   Look at your --
23    A   I do, yep.
24    Q   -- on page 14.
25       Okay.  Now, look at the table of the

Page 329

1  Hartge study under "Genital Talc Use."
2        Do you see that?
3    A   I do.
4    Q   Okay.  And do you see where Dr. Hartge
5  reports that the relative risk for genital use
6  talcum powder is not what you have as 0.7, but 2.5
7  with a confidence interval of 0.7 to 10.
8        Do you see that?
9    A   I do.
10    Q   All right.  So that would be an error in
11  your chart; is that correct?
12       MS. BROWN:  Objection.
13       Doctor, take as long as you need to look
14  at what counsel is asking you about.
15       And --
16       MS. PARFITT:  Counsel --
17       MS. BROWN:  -- Counsel, do you mean
18  to --
19       MS. PARFITT:  Counsel --
20       MS. BROWN:  -- misrepresent the
21  paragraph?
22       MS. PARFITT:  No, Counsel.  And, listen,
23  if the Doctor doesn't have any questions -- he's a
24  very intelligent man as we've seen today --
25       MS. BROWN:  I know, but what you're

Gregory B. Diette, M.D.

Page 330

```
1    saying is not right.
2           MS. PARFITT:  Counsel, that's it.  No.
3    I'm sorry.
4           MS. BROWN:  Are you intentionally
5    misrepresenting what's in the paper?
6           MS. PARFITT:  Counsel, if you heard my
7    question -- I think Dr. Diette understands the
8    question.
9    BY MS. PARFITT:
10      Q   Dr. Diette, we have on the table a
11   genital use, which is 2.5 with a confidence
12   interval of 0.7 to 10.
13          Do you see that?
14      A   Yeah, I'm sorry.  Can you give me just
15   one second?
16      Q   Okay.  Of course I can.
17      A   Thank you.  (Peruses document.)
18          Yeah, I'm with you.
19      Q   Okay.  And the only correction I -- I
20   wish to make is that, instead of the 0.70 that you
21   have for Hartge, it should be 2.5 --
22          MS. BROWN:  Objection.
23   BY MS. PARFITT:
24      Q    -- for the genital --
25          MS. PARFITT:  Let me finish, Counsel.
```

Page 331

```
1    BY MS. PARFITT:
2       Q    -- for the genital use of talc.  Do you
3    agree with that?
4           MS. BROWN:  Objection to the form.
5           THE WITNESS:  So, maybe.  I'm just
6    trying to think about how I got --
7    BY MS. PARFITT:
8       Q   Sure.
9       A    -- got here.  Because the -- you know,
10   the text says that it's -- there were ten users,
11   so I guess like seven cases and three controls.
12      Q   Mm-hmm.
13      A   It said -- specifically mentioned use on
14   sanitary napkins, underwear, or the genital area.
15          But then it says -- but estimated is
16   2.5, but the small number of exposed women yielded
17   an unreliable estimate.  So I --
18          MS. BROWN:  It's --
19          THE WITNESS:  Yeah --
20          MS. PARFITT:  You don't have to show the
21   doctor.
22          MS. BROWN:  Do you want the truth on the
23   record, or do you want --
24          MS. PARFITT:  You know, I really do want
25   the truth.
```

Page 332

```
1           MS. BROWN:  Okay.  Then let him --
2           MS. PARFITT:  I just don't want you
3    coaching --
4           MS. BROWN:  -- answer the question.
5           MS. PARFITT:  -- and touching the paper
6    and pointing at things.
7           MS. BROWN:  You are intentionally
8    misreading this document.
9    BY MS. PARFITT:
10      Q   Doctor -- all right, Dr. Diette, you're
11   the one I'm interested in hearing from, to be
12   perfectly candid.
13          My question is, are the -- is the
14   relative risk that you have listed for Hartge
15   0.70, or should it be 2.5?
16      A   You know, the -- the study report is
17   really tough I think to decide that either one of
18   them is ideal.  And for a couple of reasons, and
19   one is just because this -- this genital with an
20   asterisk, it isn't literally just genital
21   application.  It includes sanitary napkins.
22          And you can see in a lot of the studies
23   that people have sort of broken out sanitary
24   napkin use separate from like perineal
25   application.
```

Page 333

```
1           And so, you know, that's not an ideal
2    measure for this -- this chart either.  I mean, I
3    get your point, the all over is something else.
4    But there's at least -- you know, there's more
5    than ten people at least in that particular --
6    that particular row.  So I -- I'm not sure if
7    either of these is great, but they --
8       Q   Well, the analysis you went through, did
9    you go through that analysis for each and every
10   one of the studies that you listed when you made a
11   decision as to which odds ratio to select?
12      A   I did.
13      Q   You did.
14      A   I mean, I tried to pick the one that --
15   that fit the best.
16      Q   Okay.  And is the one that fits the best
17   for Hartge the 0.70, or is the one that fits the
18   best for Hartge the 2.5?
19          MS. BROWN:  Objection to the form.
20          THE WITNESS:  So I don't know.  I mean
21   other than the fact that you've got the word
22   "genital" there, I mean "all over" is kind of
23   confusing, right, because it doesn't say like "all
24   over except the genitals," right.
25          And so that's where it gets kind of
```

84 (Pages 330 to 333)

Gregory B. Diette, M.D.

Page 334

1  confusing is how you -- it's not a great study,
2  right. I mean, I'm not saying the study is not
3  great. I'm saying the report of the study doesn't
4  really tell us everything that you could really
5  wish to know.
6  BY MS. PARFITT:
7      Q  So would you like to keep your chart
8  with the 0.70, or do you think the chart should be
9  modified to say 2.5?
10     MS. BROWN: Objection to the form.
11     THE WITNESS: I mean, I'd be happy to
12 put both rows there and just with an asterisk, and
13 explain, you know, what each one of those is.
14 BY MS. PARFITT:
15     Q  Okay. Would you -- have you done that
16 for all the other studies that you've listed here,
17 wherein there may be data for sanitary napkins and
18 data for genital use and data for cornstarch? Did
19 you go through that analysis?
20     MS. BROWN: Objection to the form.
21     THE WITNESS: So, for this table I
22 haven't, but I have gone through all the sanitary
23 napkin findings that I can. And that's one of the
24 things you'll find in my handwritten notes from
25 the -- from the prior case.

Page 335

1      In terms of cornstarch, that's a
2  different question.
3  BY MS. PARFITT:
4      Q  And, Doctor, I --
5      MS. BROWN: Wait, he needs to finish.
6  He's got to --
7  BY MS. PARFITT:
8      Q  Doctor, that's really not my question.
9      MS. BROWN: No, no, no, no, no, he --
10 BY MS. PARFITT:
11     Q  My question is this --
12     MS. BROWN: Counsel.
13     MS. PARFITT: Counsel.
14 BY MS. PARFITT:
15     Q  My question is --
16     MS. BROWN: He has to finish the
17 question.
18 BY MS. PARFITT:
19     Q  You're not answering my question. Mine
20 is a very simple one.
21     My question was -- if you'll be patient
22 with me, my question was: The analysis that
23 you've just talked about that you're going through
24 with Hartge, did you go through a similar analysis
25 for each and every one of these studies; and if

Page 336

1  you did, where is that contained in your report?
2      MS. BROWN: And you should feel free to
3  answer both questions since counsel cut you off.
4      THE WITNESS: I have no idea about what
5  you mean by where it is in the report.
6  BY MS. PARFITT:
7      Q  Well, I only have RRs here. I have a
8  table. No analyses of the different case
9  controls. Just a table of their relative risks.
10     So, you've now gone through an analysis
11 of the Hartge case and said, You know, maybe this
12 is what we should have extracted, maybe we should
13 have looked at this, but I used my judgment and
14 put the 0.7.
15     And what I'm asking is, is that analyses
16 that you just did for us on the record the kind of
17 analysis that you did for all the other studies?
18 And if it was, where in the 51 pages of your
19 report or this chart have you included that
20 information?
21     MS. BROWN: Objection. Completely
22 misstates his testimony, as well as the article,
23 as well as the report, as well as the chart.
24     THE WITNESS: Let me just see. So
25 obviously it's not -- it's not documented, but I

Page 337

1  think part of what I'm trying to do is communicate
2  what the -- what the risks are that were reported
3  and what their confidence bounds were.
4      And so, you know, the papers stand for
5  themselves. They all exist. They're all cited.
6  We can look at anything we want.
7      I think in terms of the cornstarch
8  issue --
9  BY MS. PARFITT:
10     Q  Doctor, I'm not asking about --
11     MS. BROWN: Stop cutting him off.
12 BY MS. PARFITT:
13     Q  -- the cornstarch. We can talk about
14 that later. I'm not talking about cornstarch.
15     MS. BROWN: You cannot continue to cut
16 him off, or we'll have to call the Judge.
17     MS. PARFITT: I don't have a question
18 about cornstarch.
19     MS. BROWN: He's answering your
20 question.
21     MS. PARFITT: He is not.
22     MS. BROWN: You have to let him answer
23 or we have to call the Judge. You are
24 violating --
25     MS. PARFITT: You can do it in your

85 (Pages 334 to 337)

Gregory B. Diette, M.D.

| Page 338 | Page 340 |
|---|---|

Page 338

1    direct.
2        MS. BROWN: No, you have to let him
3    answer the question or --
4        MS. PARFITT: Counsel.
5        MS. BROWN: We're going off the record.
6        MS. PARFITT: Do you want to go -- we'll
7    go off the record right now.
8        MS. BROWN: Yeah, let's go. Fine. Do
9    we need to call the Judge? You have to let him
10   answer.
11       MS. PARFITT: We'll call her. We'll
12   call her.
13       THE VIDEOGRAPHER: The time is 3:09 p.m.
14   We're going off the record.
15       (A discussion was held off the record.)
16       THE VIDEOGRAPHER: The time is
17   3:10 p.m., and we're back on the record.
18       MS. PARFITT: Thank you.
19   BY MS. PARFITT:
20       Q   Okay, Dr. Diette, all I'm trying to -- to
21   ask, and obviously very poorly, is the analysis
22   that you just discussed that you went through with
23   Hartge, as we sat here today and you did it on the
24   record, did you do that for all the other studies?
25       A   I tried to.

Page 339

1        Q   Okay. And so you had to make
2    determinations as to what relative risks to
3    extract from those studies, correct?
4        MS. BROWN: Objection to the form.
5        THE WITNESS: I -- I had to work with
6    what they reported.
7    BY MS. PARFITT:
8        Q   Okay. And just like Hartge, they
9    reported different pieces of information:
10   Diaphragms used, no diaphragm, all over, genital,
11   legs, feet, correct?
12       A   Correct.
13       Q   And you had to decide what was the most
14   appropriate data to pull from those studies to
15   include on your chart for relative risks, correct?
16       A   For the most --
17       MS. BROWN: Objection to the form.
18       THE WITNESS: Yes, of course.
19   BY MS. PARFITT:
20       Q   Okay. So my question to you is, you
21   chose for the Hartge, based upon that analysis, to
22   use the -- any talc mentioned, which gave us a
23   relative risk of 0.7, as opposed to genital, which
24   would have represented a 2.5 risk.
25       MS. BROWN: Objection to the form.

Page 340

1    BY MS. PARFITT:
2        Q   Correct?
3        A   I did.
4        Q   Okay. And my last question is, is that
5    the position you wish to take today?
6        MS. BROWN: Objection to the form.
7    BY MS. PARFITT:
8        Q   Or would you modify that and use a
9    different relative risk? That's all.
10       A   I don't --
11       MS. BROWN: Objection.
12       THE WITNESS: I don't think anybody is
13   well served by looking at this other number, other
14   than if you're just trying to make a point and
15   be -- you know, for a plaintiff or something to
16   look at this 2.5.
17       I think if you take this one that says
18   there's a small number of exposed women, ten
19   people, you know, that yields an unreliable
20   estimate. I mean, somebody should fuss about that
21   too. So that's not -- that's not an ideal
22   measure.
23       If it helps, we can put them on the
24   table, and it wouldn't really change things,
25   right. You've got confidence bounds from 0.7 to

Page 341

1    10. I mean, that's an enormous confidence value.
2    So there's not a lot of information from those ten
3    people.
4    BY MS. PARFITT:
5        Q   And the reason I ask as well, as you
6    said earlier on in your deposition, you did not
7    know for all these studies their sample size.
8        A   Oh, no, no, no. I didn't memorize it,
9    but I've got all the studies, and it's a piece of
10   cake, we can just go look at them and look at the
11   sample size. I didn't want to, like -- I didn't
12   want to, like, make -- this is already a long
13   enough report. I don't need to put every bit of
14   data from every study in it to have it make sense
15   to me.
16       Q   So somewhere you have all the sample
17   sizes pulled together for the various cases and
18   controls for each one of these studies?
19       A   It's in every one of the studies.
20       Q   I know it's in each and every one of the
21   studies, but did you document it on any kind of
22   chart or anything like that?
23       A   For what?
24       Q   So that you could tell someone like me
25   and the Court why you chose the data that you did.

Gregory B. Diette, M.D.

Page 342

1    A    We can just look at the studies.  If I
2    documented the sample size next to each one of
3    these, it wouldn't tell you why I picked this
4    particular relative risk.
5        Q    It would -- it would not offer valid
6    information as to the relevance of those relative
7    risks?
8        A    Oh, my gosh.  I mean if you were
9    interested in it, I could find it for you.  It
10   wasn't -- it wasn't important for me to
11   communicate what I was trying to communicate.
12       Q    No, I -- it's a different question.
13           Is sample size important when one is
14   doing an analysis of a scientific study?
15       A    Yeah, that's why it's in the paper.
16       Q    Okay.  Because if the sample size is too
17   small, it may be underpowered; is that correct?
18           MS. BROWN:  Objection.
19           THE WITNESS:  Well, I don't know.  I
20   mean, if we're going to do power now, I think
21   that's going to be a different -- a different
22   conversation.
23           The sample size being small can have all
24   kinds of -- all kinds of impact.  This to me is
25   actually the most generous way to look at these

Page 343

1    data, rather than picking at the same size.  I
2    mean, I can do that too, right?  I can say, This
3    is a crummy study because it's got 23 people, or
4    this is crummy one -- that wasn't my goal.  It
5    wasn't to sort of tear down the -- the
6    case-control studies.
7            I was trying to have a balanced approach
8    here, I think unlike the plaintiffs' experts, and
9    I wasn't trying to say that this one particular
10   design is awful and the other one is good.  I was
11   just trying to represent something about it in
12   order to summarize it and communicate a point.
13   BY MS. PARFITT:
14       Q    Okay.  And your balanced approach was to
15   take the lower, the 0.7 relative risk, rather than
16   the 2.5 relative risk.
17       A    Oh, my goodness.
18           MS. BROWN:  Objection to the form.
19           THE WITNESS:  I -- I think -- I mean, I
20   think this little article, that doesn't even fit
21   on an entire page, gives us so little information
22   about what to do, and I think my point about there
23   being ten people that provide a relatively
24   uninformative risk, it's not great.  If you want
25   to use it, you're welcome to, but it doesn't -- it

Page 344

1    doesn't change anything about this exercise.
2    BY MS. PARFITT:
3        Q    Okay.  Well, I didn't select Hartge.
4    You selected Hartge.
5        A    Well, I selected it because it exists.
6    I mean, I -- my -- my goal was to find all the
7    studies that exist.
8        Q    Okay.
9        A    I mean, I didn't invent it, right?  I
10   just -- I just looked at --
11       Q    Well, I just didn't want the record to
12   reflect that I was selecting your data.
13       A    No, but you -- it sounds like you would
14   prefer me to use that 2.5 from the ten people,
15   instead of the 0.7 from the nearly hundred people.
16       Q    I have --
17       A    And I'm happy to look at them both.  I
18   mean they both tell us some information.  It's not
19   like, you know, one is ideal and the other isn't.
20   But it really doesn't change the basic premise
21   here.
22       Q    All right.  So on my chart I have them
23   both.  I have 0.7 and 2.5.  Do you see that?
24       A    Um --
25       Q    Right at the bottom there, "Genital use"

Page 345

1    and "Any talc use."  Do you see that?
2        A    I do.
3        Q    Okay.  All right.  So as I appreciate
4    your testimony, you had selected 25 population
5    case controls, 7 hospital -- and 7 hospital case
6    controls, correct?
7            MS. BROWN:  Objection.
8    BY MS. PARFITT:
9        Q    Do I have the numbers right?
10       A    I wasn't listening.  I'm sorry.
11           MS. BROWN:  Look at the realtime.  I
12   just think you misspoke.  You said seven hospitals
13   twice.  Is that what you meant?
14   BY MS. PARFITT:
15       Q    As I appreciate your testimony, you
16   selected -- no, this is populate -- 25 population
17   case controls and 7 hospital case controls.  I
18   said it twice.  Correct?
19       A    That's correct.
20       Q    Okay.  And that formed the basis for
21   your selection of case studies, correct?
22           MS. BROWN:  Objection to the form.
23           THE WITNESS:  Case-control studies.
24   BY MS. PARFITT:
25       Q    Case-control studies.

87 (Pages 342 to 345)

Gregory B. Diette, M.D.

Page 346

1      A   Correct.
2      Q   Yes.  Okay.
3          Now, looking at the chart, which is 21,
4    what is the point estimate -- wait.
5          What I would like you to do, rather, I
6    would like you to circle the point estimate for
7    every study that exceeds -- that has a 1.0.
8          MS. BROWN:  Objection.  Based on the
9    document you created as 21?
10         MS. PARFITT:  Which is identical to the
11   doctor's document, with the exception of I put two
12   numbers for Hartge.
13         MS. BROWN:  You put two numbers for
14   Moorman too.
15         MS. PARFITT:  Before and after 2014,
16   correct?
17         MS. BROWN:  Nope, Moorman is 2009.  You
18   have -- you've broken out Moorman by race.
19         MS. PARFITT:  I did.
20         MS. BROWN:  So I mean, my point here is
21   just if you wanted to use his report, he's happy
22   to answer your questions, but --
23         MS. PARFITT:  He did it -- but he did it
24   too.
25         MS. BROWN:  Okay.  That's fine.

Page 347

1          MS. PARFITT:  It's on his chart.
2    BY MS. PARFITT:
3      Q   I didn't do anything -- the only
4    modification I made to your chart, Doctor, is
5    Hartge, and there I kept your 0.70 and added the
6    genital 2.5.
7          And what I'd like you to do is circle in
8    that document every point estimate or odds ratio
9    that is 1.0 or above.
10     A   1.0 or higher?
11     Q   That's right.
12         MS. BROWN:  Objection to the exercise.
13         And, Doctor, if you need the articles,
14   we'll give them to you.
15         THE WITNESS:  So just as an example, if
16   we look at Jordan 2007, which has an odds ratio of
17   1.00 --
18   BY MS. PARFITT:
19     Q   Mm-hmm.
20     A   -- you find that one that would be
21   interesting for me to circle.
22     Q   If it has a 1.0, I'd like you to circle
23   it.
24     A   Sure.
25         So in terms of your -- like, it's going

Page 348

1    to be hard for me to read it off of your figure
2    because I don't know, like -- like, the Harlow and
3    Weiss one -- what is wrong with that one?  Or is
4    it --
5          MS. BROWN:  That looks wrong, doesn't
6    it?
7          THE WITNESS:  No, it's Harlow and Weiss
8    versus Harlow.
9          So what am I circling?  I'm circling
10   the -- the -- on the forest plot?
11   BY MS. PARFITT:
12     Q   On the forest plot, if you would be kind
13   enough to circle every relative risk where the
14   point estimate was 1.0 or above.
15     A   Oh, I did it wrong.
16     Q   That's all right.
17     A   Sorry.  I'm circling the ones that
18   are -- do you have another -- another copy of
19   this?
20         MS. MILLER:  You can have mine.
21         MR. LOCKE:  I didn't --
22         MS. PARFITT:  I'm sorry.  I'm sorry,
23   Tom?
24         MR. LOCKE:  I just couldn't hear -- you
25   trailed off at the end.

Page 349

1          MS. PARFITT:  Sure.
2    BY MS. PARFITT:
3      Q   You have -- and maybe I can shorten this
4    for you, how about that, in the interest of time.
5      A   Your call.
6      Q   We have -- thank you.  I appreciate
7    that.
8          We've got about 32 studies here.  How
9    many of those studies reflect an odds ratio
10   greater than 1.0?
11         MS. BROWN:  For a relative risk?
12         MS. PARFITT:  Correct.
13         THE WITNESS:  I don't know what to do
14   with Moorman, because it's one study, right.  Two
15   different odds ratios.
16   BY MS. PARFITT:
17     Q   Mm-hmm.
18     A   But it looks like above the dotted line,
19   it's -- there's 24 studies, I guess, and then down
20   below it, there's -- one, two, three, four,
21   five -- there's 5 that are above 1.0, and you said
22   above 1.0 this time, before you said --
23     Q   Above -- I did, above 1.0.
24     A   Because the including an odds ratio of
25   1.00 is evidence of something above 1.0 would

Gregory B. Diette, M.D.

Page 350

1  be --
2      Q   Right.  So we're doing above 1.0.
3      A   Okay.
4      Q   You pointed that out, and you're right.
5      A   Yeah.  So have I done it?  There's one,
6  two, three, four -- well, I guess Hartge is --
7  one, two, three, four, five --
8      Q   Sure.
9      A   -- there's five down below the dotted
10 line, and there were --
11     Q   Okay.  And if you can just identify
12 those where the point estimate does not exceed --
13 it's not above 1.0.
14         MS. BROWN:  Counsel, can you represent,
15 on the record, what this second up from the bottom
16 is?
17         MS. PARFITT:  Sure.  Hartge and Stewart,
18 '94.
19         MS. BROWN:  Underneath that.
20         MS. PARFITT:  Wong.
21         MS. BROWN:  No, above -- what is the
22 entry above Wong?
23         MS. PARFITT:  Oh, in his table --
24         THE WITNESS:  Oh, that too.
25         MS. PARFITT:  In his table he had RR

Page 351

1  0.03, RR 0.05.  It was just extracted from his
2  table.
3          MS. BROWN:  Oh, it's the second Hartge
4  and Stewart.
5          MS. PARFITT:  Yeah.
6          THE WITNESS:  And so you want where just
7  the midpoint is above the number 1.0?
8  BY MS. PARFITT:
9      Q   Correct.
10     A   So Cramer, Harlow, Harlow, Chen, Cramer,
11 Purdie, Chang, Cook, Green, Godard, Cramer, Ness,
12 Mills, Cramer, Gates, Merritt; the two odds ratios
13 for Moorman, Wu, Rosenblatt, Kurta, Kotsopoulos,
14 Wu, Cramer, Schildkraut; and then one of the two
15 Hartge's, Whittemore --
16     Q   And are you circling those, Doctor?
17     A   I'm not, no.
18     Q   Okay.  If you could do that because
19 we'll attach it as an exhibit.  Sorry.
20     A   Should I just finish saying them --
21     Q   Sure.
22     A   -- and then go back and do it?
23         So Rosenblatt, Tzonou, and that's it.
24 So -- (circling studies.)  Okay.
25     Q   Okay.  What does the -- does the fact

Page 352

1  that those studies have a relative risk in excess
2  of 1.0 demonstrate a positive result?
3          MS. BROWN:  Objection to the form.
4          THE WITNESS:  So some -- some of those,
5  yes, and some of those, no.
6  BY MS. PARFITT:
7      Q   All right.  Would it be fair to say that
8  they're certainly trending above the null; is that
9  correct?
10         MS. BROWN:  Objection to the form.
11         THE WITNESS:  Not necessarily.  I'm just
12 trying to imagine like -- I think I understand why
13 you're doing this -- but I'm just trying to
14 imagine like standing in front of colleagues like
15 with the Tzonou one and say, I've decided that a
16 relative risk of 1.05 is a positive risk.
17         I mean, you can only guess so close to
18 1.0.  I mean, 1.0 is basically null, right?
19 There's no -- there's no effect.  So you can hope
20 for, but you're rarely going to get a 1.00.  So if
21 you get like a 1.01, 1.02, 1.03, those are
22 basically 1.0.
23         I mean, you can -- you can say -- try to
24 make some point to somebody, Oh, it's a little bit
25 above 1.0; therefore, it's a positive association.

Page 353

1  But other than this setting, you're going to get
2  laughed out of the room.  I mean, this is -- this
3  is a 1.05.  So, you know, that's -- you call it
4  what you want.  I don't call that a positive
5  finding.
6  BY MS. PARFITT:
7      Q   Okay.  Now, what I'd like you to do is
8  look at the confidence intervals for each one of
9  those studies, and circle where the confidence
10 interval shows a relative risk of 1.2.
11         MS. BROWN:  Objection to the form of the
12 question.
13 BY MS. PARFITT:
14     Q   And again, if you will just circle
15 those.
16     A   I -- I think you'd be better off drawing
17 a line, right.  Because it -- I mean, this scale
18 here isn't really -- like there's no vertical
19 scale that's labeled here.  Right.  So you've got
20 1.0, 1.1 and 1.2.  I mean if you want, I think you
21 ought to just take a ruler and run it up from 1.2.
22     Q   Why don't you just go ahead and identify
23 them, if you will, and we can go ahead and do
24 that.  Let's see.
25     A   Well, like I can --

89 (Pages 350 to 353)

Gregory B. Diette, M.D.

Page 354

1    Q   My question is just simply this:  Would
2  you identify all studies where the confidence
3  interval is 1.2 or higher?
4         MS. BROWN:  Objection to the form.
5  BY MS. PARFITT:
6    Q   And you can just circle them.
7    A   And it doesn't have to mean anything to
8  me, right?
9    Q   Nope.  Just circle anything where the
10 confidence interval is above a 1.2.
11   A   So where the confidence interval
12 includes 1.2?
13   Q   1.2, correct.
14   A   Or where it's above 1.2?
15   Q   It's above 1.2.
16        MS. BROWN:  The entire interval?
17        THE WITNESS:  Well, so there's not many,
18 right?  So there's one --
19 BY MS. PARFITT:
20   Q   You understand that it includes 1.2?
21   A   I heard -- oh, that's different,
22 because there's only one where it's above 1.2.
23   Q   It includes the 1.2.
24   A   Or two that are above it.
25        So the two that are above it, don't

Page 355

1  include it, right, so we got to start over.
2    Q   Everywhere -- sure.  You go ahead and do
3  it.  Everywhere where the confidence interval is
4  above -- includes 1.2.
5    A   That's all right.  I'm just going to put
6  a little asterisk next to them, because I already
7  made a mark --
8    Q   Sure, that's fine.
9    A   -- next to the ones that are above 1.2.
10        Okay.
11   Q   Okay.  Let's go ahead and just put this
12 here.  I appreciate that.
13        Okay.  Here we go.  Let's see here.
14        Okay.  So let's just stay with that one
15 here for a moment.  Let me give you -- give you a
16 blank one here for a moment.  Is that all right?
17 So you have something in front of you.
18   A   Sure.
19   Q   Okay.  All right.
20        Dr. Diette, looking at the chart that we
21 just talked about, you have described in your
22 report that the case-control studies are
23 inconsistent.  Is that your testimony?
24   A   I think we should look literally at what
25 I wrote, because I talked about one aspect that

Page 356

1  was inconsistent.
2    Q   And that aspect --
3         MS. BROWN:  Are you looking at the
4  report?
5         THE WITNESS:  Yeah.
6  BY MS. PARFITT:
7    Q   -- was with regard to population study
8  versus hospital-based studies?
9    A   Well, I think I made a comment about
10 both, right?
11   Q   And if I can summarize your testimony,
12 but feel free to look, but your testimony from the
13 report -- your writings and your report suggest
14 that the case-control studies are inconsistent,
15 and you focus on the fact that the hospital-based
16 controls were inconsistent with the population-
17 based controls.
18   A   That's one -- one of the areas of
19 inconsistency.
20   Q   Okay.  And you base that opinion on the
21 fact that there -- the hospital-based studies were
22 not statistically significant, but the
23 population-based studies were statistically
24 significant; is that correct?
25        MS. BROWN:  Objection to the form.

Page 357

1         THE WITNESS:  That's one piece of
2  evidence, right.  So one piece of evidence is that
3  the hospital-based ones, none of them were
4  statistically significant, and some of the
5  population-based ones were.
6  BY MS. PARFITT:
7    Q   All right.  And because you had some of
8  the population-based studies, you found
9  inconsistent because the confidence intervals were
10 not -- were such that they were not statistically
11 significant; is that correct?
12   A   That's a --
13        MS. BROWN:  Objection to the form.
14        THE WITNESS:  And as before, that's a
15 piece of -- a piece of the information here.
16 BY MS. PARFITT:
17   Q   Okay.  I've reviewed your report.  Other
18 than the distinction between the statistical
19 significance of studies versus the nonstatistical
20 significance of studies, how else did you discern
21 that they were different and not consistent?
22   A   Well, I have a section on consistency.
23 So it -- there's other things about these studies
24 that are inconsistent.
25        So, for example, the -- the

Gregory B. Diette, M.D.

Page 358

1  dose-response relationships are all over the
2  place. So that I found to be an inconsistency.
3  The findings about certain kinds of ovarian
4  cancers, some showed a particular cell type and
5  some -- some didn't.
6          Let me just --
7      Q  Let me ask you --
8          MS. BROWN: Wait, I don't think he's
9  finished.
10         MS. PARFITT: No. Let's just make sure.
11         THE WITNESS: I think we've said it, but
12  I want to make it clear, right, because we were --
13  we were really just sort of focused very -- very
14  much on population-based and hospital-based case
15  controls.
16  BY MS. PARFITT:
17      Q  That's right.
18      A  But I think the fact that there is
19  basically, you know, not a signal from the cohort
20  studies is an inconsistency with studies of
21  another design, so another form of inconsistency.
22         I think that -- and what I've tried to
23  say here, right, because I think -- I think some
24  of these Hill criteria, it's hard to -- hard to
25  keep every -- every comment you want under one

Page 359

1  particular heading, and so I've tried to get at
2  this issue here too that if it were consistent
3  that talc caused or was associated with ovarian
4  cancer, I would expect to see it under a variety
5  of circumstances, not just perineal dusting. And
6  so one of the inconsistencies is that, you know,
7  diaphragms and condoms, that we don't see that
8  signal. So I'm just saying that that's an
9  inconsistency. It's the opposite of consistency.
10         And I guess too -- I mean just while
11  we're even still on the -- on the types of
12  studies, I mean the Taher study that, I guess, you
13  know, even though it's not published yet, I mean
14  they've got a summary risk for the hospital-based
15  studies which is less than 1.0. Right. So now
16  it's not even just like -- if -- I don't know
17  whether we should like the Taher study or not, but
18  it's out there, right. And so now we've got --
19      Q  It's out there. It's a piece of
20  evidence.
21      A  Yeah, it's something that's out there,
22  so now we've got something that's unpublished from
23  2018 that's got not even a positive risk. I mean,
24  this -- this exercise of going to look and see
25  what's over 1.0, there's a 0.94 or 6 or something

Page 360

1  like that. So I'm -- that's more inconsistency.
2      Q  Okay. Dr. Diette, what I'm trying to
3  get at here is, the underbelly, I guess, of your
4  opinions seem to be from your report that cohort
5  studies are inconsistent with the case-control
6  studies, which they themselves are inconsistent
7  because population-based studies and
8  hospital-based studies, some were statistically
9  significant and some were not. Correct?
10     A  Exactly, yes.
11     Q  Okay. And that really the -- the guts
12  of your report, correct?
13         MS. BROWN: Objection to the form.
14         THE WITNESS: I -- no. I mean, those
15  are two very important points, but I'd say there's
16  a heck of a lot more than that in the report.
17  BY MS. PARFITT:
18     Q  Okay. Did you go through -- let's --
19  let's talk a little bit about that.
20         You described these relative risks of
21  the case-control studies as small, weak -- small
22  and weak, correct?
23     A  Correct.
24     Q  Okay. What type of -- those words
25  "small and weak," are those scientific words?

Page 361

1      A  So they're words that my colleagues and
2  I use. I mean, it's a word that Dr. Rothman used
3  when he did his analysis in 2000 and called the
4  summary odds ratio or the risk -- risk of 1.3, he
5  called it weak. I'm not sure whether he's citing
6  a particular definition, but, you know, it --
7  it's -- there's probably reasons, just like where
8  you talk about a p-value of 0.05 not being the
9  absolute line. I think it's why people have
10  resisted trying to say that it has to be above an
11  exact specific number.
12         But I think we can all recognize risks
13  that are large. You know, we know that a risk of
14  10 is a large risk. We know that 20 is a large
15  risk. We know that a relative risk of 1.01, it's
16  got to be tiny, right, because it can't be any
17  smaller than that on that particular scale.
18         So somewhere in there we have to use
19  some judgment, and I think if you got a 1.2 or
20  1.3, I don't know who -- I don't know who thinks
21  that's strong. It doesn't make any sense.
22     Q  Do you agree that having a weak
23  association does not rule out a causal connection?
24         MS. BROWN: Objection to the form.
25         THE WITNESS: Wait a minute, say it

91 (Pages 358 to 361)

Gregory B. Diette, M.D.

| Page 362 |
|---|

1   again because I think --
2   BY MS. PARFITT:
3     Q  Having a weak association would not rule
4   out a causal association.
5     A  That's correct.
6     Q  All right.  Would you also agree that
7   while the strength of an association is a
8   guideline for drawing an inference of causation,
9   there is no specified threshold required?
10     MS. BROWN:  Objection to the form.
11     THE WITNESS:  I don't think there's a
12   specified threshold.  I think it's a gradient,
13   right, that you have to use as you're applying
14   your judgment about all of the evidence.  And that
15   when you have a very small risk, you should be
16   more concerned about the distorting effects of
17   other factors, and if you have a larger risk, you
18   can be less worried about those distorting
19   factors.
20   BY MS. PARFITT:
21     Q  But you will agree with me under the
22   Bradford Hill factors, strong association or weak
23   association, neither are necessary for finding
24   causality, correct?
25     MS. BROWN:  Objection to the form.

| Page 363 |
|---|

1     THE WITNESS:  So there isn't a single
2   one of his considerations that all by itself is
3   completely necessary, right.  It's a -- it's a
4   method to pull together a variety of, you know,
5   information about the studies.  But he -- he
6   certainly does give us some guidance about what
7   "strong" and "not strong" might mean and the
8   implications of that.
9   BY MS. PARFITT:
10     Q  But we can agree sitting here today that
11   those general terms, "weak," "small," do not
12   dictate whether or not there is causality.
13     MS. BROWN:  Objection to the form.
14     THE WITNESS:  They don't dictate it.
15   They inform it.
16   BY MS. PARFITT:
17     Q  You mentioned that the -- I want to come
18   back to that one in a second.
19     Now, you, yourself, have actually done
20   secondhand smoke studies, correct?
21     A  I've done studies that include
22   secondhand smoke as a measure.
23     Q  Okay.  What is your understanding of the
24   relative risks for secondhand smoke?
25     A  For what?

| Page 364 |
|---|

1     Q  Secondhand smoke and lung cancer.
2     MR. LOCKE:  Objection.
3     THE WITNESS:  I think really the Surgeon
4   General has put it at -- it's either about 1.7 or
5   1.9, somewhere in there.
6   BY MS. PARFITT:
7     Q  Okay.  Let me show you -- I'm sorry.
8   1.7 or 1.9.
9     Let me show you a study by Kim.  And
10   it's entitled "Exposure to Secondhand Smoke and
11   the Risk of Cancer in Never Smokers."  And I'll
12   represent that it's in the International Journal
13   of Environment, 2018.  And this would be a
14   meta-analysis by Dr. Kim.
15     A  Do you know, is it something I cited or
16   is this new -- new to me or --
17     Q  I did not see it in your --
18     A  Okay.  Thank you.
19     Q  -- list of references.
20     In fact, good question.  None of the 167
21   articles that were in your curriculum vitae did I
22   see that you cited in support for your expert
23   report; is that correct?
24     A  That would -- I'm sure that's correct.
25     Q  Okay.  Okay.  Do you see that?

| Page 365 |
|---|

1     A  I do, yes.
2     Q  Okay.  And if you look in the abstract,
3   do you see where the authors determined that the
4   relative risks for passive smoke exposure and lung
5   cancer in never users was a relative risk rather
6   than of 1.2.
7     Do you see that?  Take a moment.
8     A  Yeah.
9     Q  We'll put it on the ELMO.
10     A  So we're looking at the abstract?
11     Q  We are, mm-hmm.
12     A  And saying -- so odds ratio involving
13   never smokers with significant exposure to
14   secondhand compared to never smokers was 1.163.
15     Q  Okay.  Do you see where it says:
16   "Passive smoke exposure and lung cancer in never
17   users was a relative risk of 1.245"?
18     And we can go ahead and circle that.
19     A  That's for females?
20     Q  Yes.
21     A  For females, yeah, 1.245.
22     Q  Okay.  So we had a 1.245 for females,
23   and, I'm sorry, you said a 1.16 for secondhand all
24   comers, right?
25     A  Exactly right.

92 (Pages 362 to 365)

Gregory B. Diette, M.D.

Page 366

1      Q   Okay.  Let me show you as well the Lv
2   study, and it was a 2015 study.  "Risk of
3   All-Cause Mortality Associated With Secondhand
4   Smoke."
5      A   Do I have that?
6      Q   I'm getting that for you.  Hold on one
7   second.
8      A   Oh, I'm sorry.  I thought I --
9      Q   No, no worries.
10     A   I thought I missed it.
11         (Diette Exhibit No. 23 was marked
12          for identification.)
13   BY MS. PARFITT:
14     Q   Do you have that in front of you?
15     A   Yes.  So this is by Lv?
16     Q   That's right.
17     A   The last name, yeah.
18     Q   And now again, looking at the abstract
19   section, does it report the relative risk for
20   never smokers exposed to secondhand smoke versus
21   unexposed?
22     A   So the pooled relative risk for never
23   smokers compared to those -- is that -- so that
24   first sentence of the results --
25     Q   That's right --

Page 367

1      A   -- 1.18?
2      Q   Correct.  And they then report in the
3   all-cause mortality and RR was 1.23 for
4   cardiovascular diseases.  Do you see that?
5      A   Yeah, although -- exactly right, yep.
6      Q   Now, there have been -- and this
7   is work that you do as well, correct?
8         MS. BROWN:  Objection to the form.
9   BY MS. PARFITT:
10     Q   You do research work on secondhand
11   smoke?
12     A   I have done, yeah, and still do.
13     Q   Okay.  And are you aware that in the
14   United States and in other countries, there have
15   been health programs implemented to reduce
16   secondhand smoke based upon relative risks, like
17   you've just seen, 1.1, 0.8, 1.2?
18         MR. LOCKE:  Objection.
19         THE WITNESS:  I mean, I don't know if
20   the programs were based on these studies, and
21   there certainly have been higher relative risks
22   before.  But I -- but I agree that there are
23   programs to reduce secondhand smoke exposure.
24   BY MS. PARFITT:
25     Q   Okay.  And would you agree today that

Page 368

1   associations that are implementing those types of
2   programs to reduce secondhand smoke for fear of
3   lung cancer have accepted this type of data, 1.1,
4   1.2, for purposes of making those policy
5   decisions?
6      A   So I don't know --
7         MR. LOCKE:  Objection.
8         THE WITNESS:  Oops, sorry.
9         Like, I don't -- I don't know what
10   inputs they -- they used, and I don't -- I'm not
11   saying they wouldn't, but I don't know whether
12   they would use these risks to drive that or not.
13   BY MS. PARFITT:
14     Q   Okay.  You would agree with me, though,
15   that the risk of 1.1 and 1.2 are very -- are
16   actually less than the relative risks that we've
17   seen with talcum powder products and ovarian
18   cancer, correct?
19         MS. BROWN:  Objection to the form.
20         THE WITNESS:  So it's less than the
21   pooled odds ratio from the case-control studies in
22   the meta-analyses.
23   BY MS. PARFITT:
24     Q   Okay.  Now, you yourself have done
25   studies on indoor particulate matter, correct?

Page 369

1      A   Correct.
2      Q   Okay.  In particular, you published a
3   study with McCormack and Diette on common
4   household exposures?
5      A   I've published a bunch with her, so I
6   don't know which -- which particular one that is.
7      Q   All right.  It's Common -- it's Common
8   Household Products, 2008."  McCormack is the lead
9   article -- author.
10     A   What journal?
11     Q   It is in the Environmental Res,
12   Environmental --
13     A   Environmental research.
14     Q   -- Research.  And it's dated February
15   2008.  And take a minute to --
16         (Diette Exhibit No. 24 was marked
17          for identification.)
18   BY MS. PARFITT:
19     Q   Do you have that in front of you?
20     A   I do.
21     Q   Okay.  Now, if you look at the first
22   page under the abstract, about the third line
23   down -- excuse me, fourth line down, it says:
24   "There is a public health imperative to
25   characterize indoor source as being less

93 (Pages 366 to 369)

Gregory B. Diette, M.D.

Page 370

1 extensively characterized" -- excuse me. I'm
2 sorry.
3         "There is a public health imperative to
4 characterize indoor sources of PM" -- I assume
5 that's particulate matter?
6     A   Correct.
7     Q   -- "with this vulnerable population to
8 enable effective intervention strategies."
9         Did I read that correctly?
10     A   You did.
11     Q   Okay.  You were the lead -- one of the
12 lead authors in that study?
13     A   Yeah, I was, by position, the senior
14 author, but I was the head of the -- the study
15 that produced this paper.
16     Q   All right.  And what is -- and do you
17 have an opinion with regard to what the relative
18 risks are for indoor ambient particulate matter?
19     A   For what?
20     Q   For --
21     A   You mean qualitative, like what
22 illnesses they cause or --
23     Q   Yes, with regard -- I believe you
24 studied a bit of asthma, so I believe it would be
25 the relative risk of indoor particulates and

Page 371

1 asthma?
2     A   Well, there's not one single way to
3 answer that, right.  So this -- this paper doesn't
4 look like the one that's actually quantified it,
5 right.  We have other ones that look at the
6 increase in, say, symptoms, for example, or
7 exacerbations per very small increment in
8 particulate matter.
9         So like, I think if you -- if you're
10 looking at our studies, you're not going to find a
11 relative risk that's, like -- that's analogous to
12 these where this is the relative risk of an
13 outcome for secondhand smoke, yes/no.  Ours are
14 reported not by that but by little tiny increments
15 or decrements of -- of particle concentrations.
16     Q   Do you know what the relative risk is
17 for indoor ambient air?
18     A   That's --
19         MS. BROWN:  Objection to the form.
20         THE WITNESS:  That's not a full
21 question.
22     BY MS. PARFITT:
23     Q   Do you -- is there a relative risk for
24 exposure to the lungs in indoor particulate
25 matter?

Page 372

1         MS. BROWN:  Objection to the form.  You
2 need the disease to link the --
3         MS. PARFITT:  Lung.  Lung.
4         MS. BROWN:  You mean cancer?  Objection
5 to the form.
6         THE WITNESS:  Anyway, I can't answer it.
7 You need more in the sentence or the question in
8 order for me to be able to answer it.
9     BY MS. PARFITT:
10     Q   Okay.  Are there any -- fair enough.
11         Are there any reported relative risks
12 between indoor particulate matter and lung
13 disease?
14         MS. BROWN:  Objection to the form.
15         THE WITNESS:  I'd want to be super
16 careful about what we're saying is lung disease,
17 because some people might think that that means
18 the risk of developing a particular lung disease,
19 and others might mean the worsening of an existing
20 disease or a lung function abnormality.
21     BY MS. PARFITT:
22     Q   Okay.  Do you know what the relative
23 risk is between indoor particulate matter and
24 asthma?
25     A   The risk of developing asthma?

Page 373

1     Q   Correct.
2     A   It's not --
3         MS. BROWN:  Objection to the form.
4         THE WITNESS:  Sorry.  It's not known.
5     BY MS. PARFITT:
6     Q   It's not known.
7     A   Not known.
8     Q   It's not been published.
9     A   Well, I can't say there's not a single
10 paper out there, but at this point the -- a
11 summary of the evidence is that we can't say for
12 sure that it's -- that it causes asthma.
13     Q   Have you reviewed in any of the
14 literature published data with regard to airborne
15 particles -- indoor airborne particles and asthma
16 as to what the relative risk may be?
17         MS. BROWN:  Objection to form.
18         THE WITNESS:  Relative risk of?
19     BY MS. PARFITT:
20     Q   Relative risk of asthma from exposure to
21 indoor air particulate.
22         MS. BROWN:  Objection to the form.
23         THE WITNESS:  So I -- I've read a ton of
24 stuff about it.  I mean if you've got a particular
25 article, I'm happy to read it and interpret it.

Gregory B. Diette, M.D.

Page 374

1  But as of this point, I think we -- should I
2  explain or just --
3  BY MS. PARFITT:
4      Q   No, I -- all I really want to know in
5  the interest of time is whether or not you have
6  reviewed any of the scientific literature data
7  that reports what the relative risk is for indoor
8  particulate matter and the risk of getting asthma?
9      MS. BROWN:  Objection to the form.
10  BY MS. PARFITT:
11     Q   And if you haven't, that's fine.
12     A   Oh, my gosh, no, it's not that.  I have.
13  I just don't think that you can answer that
14  question.  I'm not saying there's not some study
15  out there that may estimate a risk for that, but
16  it isn't established.  Like, at this point, we
17  cannot say in 2019 that indoor particulate matter
18  causes asthma.
19         And -- and you have to say more to the
20  sentence.  So let's just talk about like adults
21  living in the city.  We can't say that.  You
22  know -- you know, there's -- there's studies that
23  have looked at the relative risk of indoor
24  cooking, which is predominantly particulate
25  matter, in developing countries, but even the

Page 375

1  asthma evidence is not fully developed.
2         So it's just -- it's one of those things
3  where you may find a paper that has an estimate,
4  but it hasn't been fully established yet.
5      Q   All right.  Do you -- I understand it's
6  not fully established, but are there reported
7  relative risks from the scientific literature?
8      MS. BROWN:  Objection.
9      THE WITNESS:  I'm sure there are.
10     MS. BROWN:  Objection --
11     THE WITNESS:  I'm sure there are, but --
12  BY MS. PARFITT:
13     Q   There are.  Do you know what they are?
14     MS. BROWN:  Objection to the form.
15     THE WITNESS:  Oh, my gosh.
16  BY MS. PARFITT:
17     Q   If you know.  If -- like, do you know
18  there is a range of relative risks between
19  exposure to indoor particulate matter and asthma?
20     MS. BROWN:  Objection to the form of the
21  question.
22     THE WITNESS:  I've got to see what
23  you're talking about, because I think that when
24  you ask it that way, there may be some estimate
25  based on a particular number of micrograms per

Page 376

1  meter cubed.  It may be from a particular source,
2  like traffic-related pollution or not.
3         I mean there's more to it.  There's not
4  just like some summary that -- that I can -- I can
5  make.  Maybe you can find somebody that can just
6  say particulate matter has this risk of causing
7  asthma.  I haven't seen it.
8         But it's not there aren't like a whole
9  bunch of studies looking at the relationship
10  between indoor and outdoor particulate matter and
11  lung disease as both, you know, developing newly
12  and worsening the existing ones.
13  BY MS. PARFITT:
14     Q   Right.  Does secondhand smoke cause lung
15  cancer?
16     MS. BROWN:  Objection to the form.
17     THE WITNESS:  It seems -- it seems that
18  that -- that has been established.
19     (Counsel conferring.)
20  BY MS. PARFITT:
21     Q   Okay.  Let's talk a little bit --
22     THE WITNESS:  We're just doing a time
23  check.  I'm just trying -- do you know roughly how
24  much we --
25     THE VIDEOGRAPHER:  Five hours, 34

Page 377

1  minutes.
2      THE WITNESS:  So a little under an hour
3  and a half?  Did you guys want to do a --
4      MS. PARFITT:  A quick break here?  Sure.
5      THE WITNESS:  -- or a break here or
6  wait?
7      MS. PARFITT:  No, that's fine.  We can
8  take a quick one now.  That's fine.
9      THE VIDEOGRAPHER:  The time is 3:50 p.m.
10  We're going off the record.
11     (Recess.)
12     THE VIDEOGRAPHER:  The time is 4:10 p.m.
13  We're back on the record.
14         We're on the record, by the way.
15     (A discussion was held off the record.)
16     (Diette Exhibit Nos. 25 and 26
17     were marked for identification.)
18  BY MS. PARFITT:
19     Q   Are you ready, Dr. Diette?
20     A   I am.  Thank you.
21     Q   Very good.
22     THE VIDEOGRAPHER:  Microphone, Counsel.
23  BY MS. PARFITT:
24     Q   Dr. Diette, I -- I asked you a little
25  bit earlier about the relative risk for secondhand

95 (Pages 374 to 377)

Gregory B. Diette, M.D.

Page 378

```
 1    smoke and -- and lung cancer.
 2          And what I would like you to do is --
 3    and I apologize, I don't have copies of this -- so
 4    I'm showing you what is the report of the Surgeon
 5    General, I believe it was back in 2006, "The
 6    Health Consequences of Involuntary Exposure to
 7    Tobacco Smoke, A Report of the Surgeon General."
 8          Have you read that in the past?
 9      A   So definitely not every word, but I've
10    read big chunks of it.
11      Q   Okay.  I figured with your work you may
12    have.
13      A   Yeah.
14      Q   All right.  Let me direct your attention
15    to --
16          MS. PARFITT:  And I apologize to all, so
17    you have to look on the camera -- on the screen.
18          MS. BROWN:  Okay.  So just for the
19    record, we don't have copies of this, and so I
20    will object to the fact that we have no context or
21    ability to look at the document ourselves.
22          MS. PARFITT:  All right.
23    BY MS. PARFITT:
24      Q   And again, Doctor, you've reviewed this
25    report, correct, in the past?
```

Page 379

```
 1      A   In the past, and I've read parts of it,
 2    but as you know, I mean it's a humongous --
 3      Q   It is big.
 4      A   -- document, and so some parts
 5    weren't -- weren't for me.
 6      Q   All right.  I want to focus your
 7    attention on the conclusions of the Surgeon
 8    General's report.
 9          And 1:  "The evidence is sufficient to
10    infer a causal relationship between secondhand
11    smoke exposure and lung cancer among lifetime
12    nonsmokers.  This conclusion extends to all
13    secondhand smoke exposure, regardless of location.
14          "2.  The pooled evidence that indicates"
15    -- sorry -- "the pooled evidence indicates a 20 to
16    30 percent" -- that would be a 1.2 or 1.3 relative
17    risk -- "increase in the risk of lung cancer from
18    secondhand smoke exposure associated with a
19    smoker."
20          Did I read that correctly?
21      A   You did.
22      Q   And is that what the -- are those the
23    numbers, 1.2 and 1.3, the relative risks that the
24    Surgeon General has concluded is --
25      A   Um -- I'm sorry.
```

Page 380

```
 1      Q   That's all right.
 2          -- is related to secondhand smoke and
 3    lung cancer?
 4          MS. BROWN:  Objection to the form.
 5          THE WITNESS:  It looks like it there.  I
 6    remember there's other numbers in there as well,
 7    but I mean, I remember it being 1-point something
 8    and --
 9    BY MS. PARFITT:
10      Q   Does that refresh my memory?
11          MS. BROWN:  Well, let him finish,
12    please.
13          THE WITNESS:  I think there's somewhere
14    else in there where there's other estimates, but
15    still not like -- not sky high.  Still less than
16    2.0.
17    BY MS. PARFITT:
18      Q   But you don't disagree with the Surgeon
19    General's conclusion that the pooled evidence
20    indicates a 20 to 30 percent increase in the risk
21    of lung cancer from secondhand smoke exposure
22    associated with living with a smoker, correct?
23          MR. LOCKE:  Objection.
24          MS. BROWN:  Objection.  He doesn't have
25    the document, he can't review it.
```

Page 381

```
 1    BY MS. PARFITT:
 2      Q   Are you disputing that conclusion?
 3          MS. BROWN:  Objection.  He has no basis
 4    to do it, he doesn't have the document.
 5    BY MS. PARFITT:
 6      Q   Are you disputing that, Doctor?
 7      A   I would --
 8          MR. LOCKE:  Objection.
 9          THE WITNESS:  I would say it fits with
10    what I understood to be true at the time that that
11    was published.
12    BY MS. PARFITT:
13      Q   Fair enough.  Thank you.  I appreciate
14    that.
15          Dr. Diette, is it fair that -- to say
16    that we don't have, and you've not reviewed, any
17    Johnson -- Johnson & Johnson specific epidemiology
18    with regard to a study of just Johnson & Johnson
19    Baby Powder?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  That is correct.
22    BY MS. PARFITT:
23      Q   Okay.  And so what we rely on, and what
24    you've relied on, rather, is data and
25    epidemiological science on all comers, all brands,
```

Gregory B. Diette, M.D.

Page 382

1  correct?
2      MS. BROWN:  Objection to the form.
3      MR. LOCKE:  Objection.
4      THE WITNESS:  I -- I wouldn't
5  characterize it exactly that way.  I mean I would
6  say that I can't really sort between different
7  brands based on the epidemiologic literature, but
8  whatever all brands is, I don't -- you know, I
9  don't know what that represents.
10 BY MS. PARFITT:
11     Q   And would it be fair then if one product
12 that contained -- one product, talcum powder
13 product contained asbestos, and another did not,
14 that would result in a conclusion that would draw
15 it towards the null?  Is that fair?
16     MS. BROWN:  Objection to the question.
17     THE WITNESS:  I don't understand that.
18 BY MS. PARFITT:
19     Q   Okay.
20     A   I mean I understand the idea of drawing
21 something to the null.  I just don't understand --
22     Q   Sure.
23     A   -- what preceded that.
24     Q   If you have a product like Johnson &
25 Johnson, and you -- and it has a carcinogen in it,

Page 383

1  and you lump it together with other products that
2  are not infected or contaminated with asbestos,
3  what does that do to the overall relative risk --
4      A   Oh.
5      Q   -- when studying that product?
6      MS. BROWN:  Objection to the incomplete
7  hypothetical.
8      THE WITNESS:  So concept and reality,
9  right.  So the concept would be, if you knew that
10 there were enough asbestos that led to an exposure
11 that was enough in order to cause a disease from
12 one product, and it was pooled with another
13 product that didn't have that same amount or
14 didn't have any asbestos but you knew that there
15 was enough to cause disease, then it would -- it
16 would do exactly what you're saying, is it would
17 move it towards -- towards one.
18     The reality is there wouldn't be any
19 impact whatsoever because the epidemiology already
20 takes into account whatever those brands are, and
21 so it doesn't change the totality of the evidence
22 that we have available for us.
23     So concept, I mean you could sort of
24 imagine what you're saying to be true, but
25 reality, no.

Page 384

1  BY MS. PARFITT:
2      Q   Okay.  When you say it doesn't change
3  the totality of the evidence that we have
4  available for us, isn't it true that the presence
5  of a carcinogen, like asbestos in talcum powder
6  products, supports the biological -- biologically
7  plausible mechanism for association between talcum
8  powder products and ovarian cancer?
9      MS. BROWN:  Objection to the form of the
10 question.
11     THE WITNESS:  I -- I'd say no.  And for
12 reasons, if you want them, or just leave it at no.
13 BY MS. PARFITT:
14     Q   Well, you've testified that asbestos is
15 a carcinogen.  Correct?
16     A   Correct.
17     Q   All right.  And the fact that asbestos
18 might be in the talcum powder product does not
19 impact your opinions with regard to the increased
20 biologically plausible mechanism for talc to cause
21 ovarian cancer.
22     MS. BROWN:  Objection to the form.  Are
23 you talking about a Johnson & Johnson product?
24     MS. PARFITT:  Just generally.
25     MS. BROWN:  Objection to the form.

Page 385

1      THE WITNESS:  It -- it does not.
2      As you ask these things, I'm trying to
3  figure out if I'm supposed to explain what I'm
4  saying or is --
5      MS. BROWN:  No, you answered the
6  question.
7      THE WITNESS:  Okay.
8      MS. BROWN:  She'll ask you another one
9  if she has one.
10     THE WITNESS:  Okay.  All right.
11 BY MS. PARFITT:
12     Q   Does Johnson & Johnson sell baby powder
13 that's 99 percent asbestos and 1 percent
14 fragrance?
15     MS. BROWN:  Objection to the form of the
16 question.
17     THE WITNESS:  If they do, I'm not aware
18 of that.
19 BY MS. PARFITT:
20     Q   Okay.  And if I understand, the presence
21 of asbestos in a talcum powder product does not in
22 your mind impact the biologically plausible
23 mechanism for talcum powder products to cause
24 ovarian cancer.
25     MR. LOCKE:  Objection.

Gregory B. Diette, M.D.

Page 386

1        THE WITNESS:  No, there's not enough
2  information in what you said there.
3  BY MS. PARFITT:
4      Q   What would you need?
5      A   So I would need a couple of things.  One
6  is I would need to have some estimate of what the
7  dose would be, and some assurance from somewhere,
8  which I don't have, that that represented a dose
9  that was sufficient to cause -- and by dose, I'm
10 talking about dose of asbestos, right -- that that
11 was a sufficient dose to cause ovarian cancer.
12       And based on what I've seen, I can't
13 make that link.  I can't -- I haven't seen
14 anything that says that there's a plausible
15 concentration or dose that people would be exposed
16 to that links to anything I can find in the
17 epidemiologic literature about how much, if any,
18 it would take in order to -- to cause ovarian
19 cancer.  And what I -- should I finish?
20      Q   Mm-hmm, yeah, finish.
21      A   Okay.  I'm sorry.
22      Q   I'm trying not to interpret you.
23      A   No, no, you're not.  I didn't mean -- I
24 didn't think you were.
25      Q   So doing better.

Page 387

1      A   I didn't think you were.
2        So I mean there's more, right.  I mean
3  so the -- if you look at IARC and what those
4  studies represented, they represent for the most
5  part -- and by IARC, I'm talking about IARC and
6  ovarian cancer and asbestos -- you know, mostly
7  circumstances that aren't typical of American
8  women.  For example, so women in Europe who were
9  working at a time and place when there was
10 different forms and lots of asbestos that may have
11 been sufficient to cause other asbestos-related
12 diseases.
13       So if you -- if those -- if those
14 findings are absolutely accurate -- you know, you
15 take away the issue of misclassification or
16 anything else -- if they're absolutely accurate,
17 you've got a relative risk in the neighborhood of
18 like 1.75 or something like that.
19       So I'm not saying that's not an
20 important risk, but it's not a huge risk, right?
21 So we're taking heavy industrial exposure to get
22 to a 1.75.  I haven't seen anything that could
23 tell me that anything we're talking about here
24 could possibly rise to the level of heavy
25 industrial exposure.

Page 388

1        And then I think if you -- if you pair
2  that with more modern studies, if you take like
3  the Reid study from Australia, you take women who
4  worked, you know, in and around a crocidolite
5  mine, they certainly had enough exposure to get
6  asbestos-related diseases, but they don't get
7  ovarian cancer.
8        And so I think that the -- you know, the
9  sum total of all that just -- it doesn't make
10 sense that just knowing the fact that there's some
11 particle -- even if it's true, that some particle
12 of asbestos is going to be enough to cause
13 disease.
14      Q   Okay.  Have you -- have you read -- I
15 didn't see it in your reliance list -- Reid, 2012?
16      A   I have two Reids, I think, and if I only
17 listed one, I meant to include two.
18      Q   Yeah, you only listed 2011 Reid.  You
19 didn't list 2012 Reid.
20      A   I meant -- so I don't know which one is
21 there.  There's one from Whitnum, which is the
22 study of the women that -- you know, that I was
23 just describing, and a separate one is -- it's
24 basic -- basically like a meta-analysis or a
25 reanalysis of the ovarian cancer and asbestos

Page 389

1  literature.
2      Q   Okay.  Do you recall from your reading
3  that the scientists in Reid 2012 determined that
4  childhood exposure to asbestos was associated with
5  an increased risk of cancer mortality which was
6  3.5 times greater than the general population?  Do
7  you recall those numbers?
8      A   I don't, but cancer mortality to --
9        MS. BROWN:  Objection.
10       THE WITNESS:  Can you tell me which --
11 because I don't remember which year links to which
12 Reid study.
13 BY MS. PARFITT:
14      Q   That was the 2012 that I was speaking
15 of.
16      A   No, I understand that.  I heard the
17 year, but I don't know what the title is.
18      Q   Oh, the title is "All-cause mortality in
19 cancer incidence among adults exposed to blue
20 asbestos during childhood."
21      A   I think that's a third study then,
22 because I think the two I'm referring to are --
23 are two different ones.
24      Q   All right.  So did you read the 2012 or
25 that just wasn't one you read?

Gregory B. Diette, M.D.

Page 390

1      MS. BROWN:  Well, Counsel, can you show
2  it to him and he'll tell you?
3      MS. PARFITT:  Sure.
4      THE WITNESS:  I don't know if either of
5  the ones that I cite, you know, that I'm familiar
6  with are from 2012, but I don't think I read the
7  one that you're talking about.
8  BY MS. PARFITT:
9      Q   Okay.  From looking at your curriculum
10  vitae and the studies you cited, you cited Reid --
11  actually you cited three Reids.  You cited Reid
12  2011, you cited Reid 2008, and you cited Reid
13  2009.  The study that you did not cite was Reid
14  2012.
15      A   That -- that sounds believable.  That
16  makes sense.
17      Q   All right.  So for purposes of the
18  opinions in your report, you did not rely on Reid
19  2012, is that fair?
20      MS. BROWN:  Objection to the form of the
21  question.
22      THE WITNESS:  I -- I don't think I'm
23  familiar with that study.
24  BY MS. PARFITT:
25      Q   Okay.  Fair enough.

Page 391

1      Are you able to share with us,
2  Dr. Diette, what the minimum dose of asbestos is
3  necessary in order to cause an ovarian cancer?
4      MS. BROWN:  Objection to the form of the
5  question.
6      THE WITNESS:  I haven't seen that
7  published.  I can tell you that at least in one of
8  those Whitnum studies that women were exposed to
9  as much as 40 fiber/cc years cumulatively of
10  crocidolite, and -- and that apparently wasn't
11  enough to cause ovarian cancer.  But I didn't see,
12  you know, good measurements or estimates from
13  the -- the more historic to say what the exposures
14  were.
15  BY MS. PARFITT:
16      Q   Okay.  IARC looked at the issue of
17  asbestos and ovarian cancer, correct?
18      A   They did.
19      MS. BROWN:  Form.
20      THE WITNESS:  Sorry.
21  BY MS. PARFITT:
22      Q   All right.  IARC concluded that asbestos
23  causes ovarian cancer.
24      MS. BROWN:  Form.
25      MR. LOCKE:  Objection.

Page 392

1      THE WITNESS:  I'm not disagreeing with
2  you, I think that's the language they use, but
3  they -- they used their -- their strongest --
4  their strongest grading.
5  BY MS. PARFITT:
6      Q   How many of the IARC studies that formed
7  the basis for IARC's conclusion that asbestos
8  causes ovarian cancer was there information
9  concerning the exposure and the dose?
10      A   So I think you said something that you
11  didn't mean to, because I think you said how many
12  of the IARC studies that IARC considered.  I
13  think -- did you mean how many of the underlying
14  studies that IARC considered?
15      Q   Correct.
16      A   Okay.  And so there's at least five that
17  I remember that were like sort of factory worker
18  type studies, and then I think there were a couple
19  of more.  I'd have to go back, though, to look and
20  see what -- what they had about dose, if anything.
21  My -- I'm thinking like at least for the World
22  War II era ones, they probably didn't have good
23  measures at all, you know, if any.
24      Q   Okay.  Let me show you what I will have
25  marked as Exhibit 27.

Page 393

1      (Diette Exhibit No. 27 was marked
2      for identification.)
3      MR. ROSEN:  26, for the record, is the
4  Surgeon General's report, which we'll supplement
5  with a paper copy.
6      THE WITNESS:  The same one -- the same
7  one that we were talking about before the
8  secondhand smoke or involuntary smoke?
9      MR. ROSEN:  Right, so there won't be a
10  26 in the file.
11      THE WITNESS:  Got you.
12  BY MS. PARFITT:
13      Q   Let me show you what we have marked as
14  Exhibit 27.
15      Do you have that in front of you?
16      A   I have the "Arsenic, Metals, Fibres and
17  Dusts," 100C IARC.
18      Q   That's correct, that's the right one.
19      Okay.  Let me direct your attention to
20  the bottom of page 253.
21      Do you have that?
22      A   253?
23      Q   253, correct.
24      A   I do.
25      Q   All right.  And it says: "An

Gregory B. Diette, M.D.

Page 394

1  examination of the association between asbestos
2  and ovarian cancer was not undertaken by the IOM,"
3  and then it has a 2000 -- a 2006 date. Correct?
4      A   Yes.
5      Q   Okay. Now, before we get to Table 2.8,
6  what I want you to do is turn over to page 256.
7          All right. And again, directing your
8  attention to the far right column. Are you there?
9  And it starts with, "Working group"?
10     A   I am. I'm sorry, I'm distracted because
11 I think there's --
12         MS. BROWN: It has a weird --
13         THE WITNESS: -- there's like a font
14 issue or something, like somebody's printer didn't
15 have the right --
16 BY MS. PARFITT:
17     Q   That might have been ours. I apologize.
18 Not ideal circumstances.
19         All right. Do you see where it says,
20 "The working group"?
21     A   I do.
22     Q   All right. "The working group noted
23 that a causal association between exposure to
24 asbestos and cancer of the ovary was clearly
25 established based on five strongly positive cohort

Page 395

1  mortality studies of women with heavy occupational
2  exposure to asbestos."
3          Do you see that?
4      A   I do.
5      Q   Okay. And then if you go -- and then it
6  cites those studies.
7          Do you see that?
8      A   I do.
9      Q   And go down to where it starts: "The
10 working group carefully considered the
11 possibilities that cases of peritoneal
12 mesothelioma may have been misdiagnosed as ovarian
13 cancer, and that these contributed to the observed
14 excesses."
15         Do you see that?
16     A   I do.
17     Q   Okay. Did I read that correctly?
18     A   Yes.
19     Q   Okay. In your report you stated that it
20 was your belief that perhaps the results were
21 limited by virtue of the fact that there may have
22 been misdiagnosis between peritoneal mesothelioma
23 and ovarian cancer cases.
24         Do you remember writing that?
25     A   I do.

Page 396

1      Q   Okay. Do you see where the working
2  group of IARC considered all of the data, and they
3  made a determination that there were not, at the
4  bottom, sufficient -- they ruled out the
5  possibility that there may have been a
6  misdiagnosis?
7          Do you see that?
8          MS. BROWN: Objection to the form.
9          THE WITNESS: I see that they've -- that
10 they reached that -- that conclusion.
11 BY MS. PARFITT:
12     Q   Okay. And that's different than the
13 conclusion you raised in your report, correct?
14     A   Well, it's different --
15         MS. BROWN: Objection.
16         THE WITNESS: It is different, yes.
17 BY MS. PARFITT:
18     Q   All okay. Right. Let's go back to
19 again page 253.
20         And you will see it references a table,
21 Table 2.8. Do you see that on the top of 254?
22     A   Okay.
23     Q   Okay. Got that.
24         Okay. Let me show you what we'll have
25 marked as Exhibit 28.

Page 397

1          (Diette Exhibit No. 28 was marked
2          for identification.)
3  BY MS. PARFITT:
4      Q   Okay. Diette Exhibit 28, if you will.
5  There you go.
6          MS. PARFITT: And, Counsel, I have a
7  copy for you.
8          MS. BROWN: Thank you.
9          MS. PARFITT: Of course.
10         Sorry, guys. I'm going to need one.
11 I'm sorry. I'll give you this one later.
12 BY MS. PARFITT:
13     Q   Okay. I will represent to you that that
14 is -- that is Table 2.8, which is referenced in
15 the IARC report on page 253 and 254.
16         And it says: "Epidemiological studies
17 of asbestos exposure and ovarian cancer," and then
18 in parens, "and for comparison, lung cancer and
19 mesothelioma."
20         Do you see that?
21     A   I do.
22     Q   All right. Look over at the first study
23 mentioned there, the Atkinson study from 1982.
24     A   Mm-hmm.
25     Q   All right. Do you see that the relative

Gregory B. Diette, M.D.

Page 398

1  risk for ovarian cancer and lung cancer, for
2  ovarian cancer it was 2.75, and for lung cancer it
3  was 2.41. Do you see that?
4      A  I do.
5      Q  Okay. Then move down to the Wignall and
6  Fox study. It's a 1982 study. Do you see that?
7      A  I don't -- oh, yeah, the next one down,
8  yeah.
9      Q  Okay, yeah. Do you see that the
10  relative risk for ovarian cancer were 2.13, and
11  for lung cancer 2.73?
12      A  Correct.
13      Q  And let's move down to Pira in 2005. Do
14  you see where the relative risk for ovarian cancer
15  were 2.61 and for lung cancer 2.82?
16      A  I do.
17      Q  All right. And then let's move to
18  Magnani, a 2008 study.
19          All right. Do you see -- and this is
20  one of the studies that the working group of IARC
21  looked at. They determined that the relative risk
22  for -- not determined -- they indicated that the
23  relative risk for ovarian cancer on the Magnani
24  study was 2.27, and for lung cancer 2.20.
25          Do you see that?

Page 399

1      A  I do.
2      Q  All right. And let's go on to the
3  Ferrante study. Do you see that?
4      MS. BROWN:  Where -- where are you?
5      MS. PARFITT:  On the last page.
6  BY MS. PARFITT:
7      Q  Do you see that? It's on the last page,
8  Ferrante, 2007. Do you see that?
9      A  I do.
10      Q  Okay. And the relative risk for ovarian
11  cancer was 1.43, and for lung cancer it was 1.17.
12          Now, I'll represent to you, Doctor --
13  or, Dr. Diette, is it fair to say that this
14  Table 2.8 of epidemiological exposures, asbestos
15  exposure and ovarian cancer formed part of the
16  bases for IARC's decision in their IARC report
17  that asbestos -- or ovarian -- asbestos causes
18  ovarian cancer?
19      A  I assume so, yeah.
20      Q  Okay. All right. Let's talk a little
21  bit -- do you intend to give an opinion in this
22  case that fibrous talc is a carcinogen?
23      MS. BROWN:  Objection to the form.
24      THE WITNESS:  I just want to correct
25  something real quick.

Page 400

1  BY MS. PARFITT:
2      Q  Sure.
3      A  In one of your questions a little while
4  back, you were asking me to agree that you were
5  reading fine, and you were for the relative risks.
6      Q  Yeah.
7      A  None of these are relative risks,
8  though. They're SMRs and SIRs. So just a
9  slightly different --
10      Q  I appreciate that. Thank you. Thank
11  you for the correction. Thank you.
12          Next question. Do you intend to give an
13  opinion that fibrous talc is a carcinogen?
14      MS. BROWN:  Form.
15      THE WITNESS:  I'm not sure I understand
16  what fibrous talc is.
17  BY MS. PARFITT:
18      Q  Okay. Let me direct your attention
19  to -- we'll go back to the IARC on ovarian
20  cancer -- or, excuse me, IARC on asbestos.
21  Paragraph 1.1 on page 219.
22          Are you there?
23      A  Paragraph 1, yes.
24      Q  Yes. Okay. Do you see where after it
25  has IARC, '73, and USGS, 2001, it states:  "The

Page 401

1  conclusions reached in this monograph about
2  asbestos and its carcinogenic risks apply to these
3  six types of fibres wherever they are found, and
4  that includes talc containing asbestiform fibres."
5          Do you see that?
6      A  Yes.
7      Q  All right. Do you intend to give an
8  opinion in this case that talc containing
9  asbestiform fibers can cause ovarian cancer?
10      MS. BROWN:  Objection to the form.
11  That's different than the original question.
12      MS. PARFITT:  It is.
13      MS. BROWN:  Did you mean it to be?
14      MS. PARFITT:  No. I mean the new
15  question.
16      MS. BROWN:  Okay.
17      THE WITNESS:  So, because to me, the way
18  I have read this before and then also again now, I
19  think, although I can't know what they were
20  intending, but this to me says basically talc with
21  asbestos in it -- what we would agree is talc with
22  asbestos in it, as opposed to something else.
23          And I don't think you need the "talc
24  containing." I think you could say anything
25  containing asbestos, you know, could potentially

Gregory B. Diette, M.D.

Page 402

1    increase carcinogenic risk if there's enough of a
2    dose.
3    BY MS. PARFITT:
4        Q   Okay. Did you see anywhere in the IARC
5    working group document that we've been talking
6    about that the working group determined that there
7    was a causal association between asbestos and
8    ovarian cancer, but it depended on the dose?
9            MR. LOCKE: Objection.
10           MS. BROWN: Objection to the form of the
11   question.
12           THE WITNESS: I don't recall.
13   BY MS. PARFITT:
14       Q   Okay. You've worked an secondhand smoke
15   studies, correct?
16       A   Yes.
17       Q   How do you determine the dose for those?
18           MS. BROWN: Objection to the form.
19           THE WITNESS: So the dose of secondhand
20   smoke?
21   BY MS. PARFITT:
22       Q   Mm-hmm.
23       A   So it depends, right. So at the moment,
24   it -- so it depends upon which kind of study. And
25   when you say "you," do you mean you in the broad

Page 403

1    sense or me, Greg Diette?
2        Q   Well, Greg Diette has been doing
3    research on secondhand smoke, and you, Greg
4    Diette, has indicated that dose is important to
5    you. So what I'd like to know is how you measure
6    the dose in your secondhand smoke.
7        A   Yeah, so a lot of different --
8            MS. BROWN: Objection. Dose is
9    important to him as it relates to secondhand
10   smoke, is that what the question is asking?
11           MS. PARFITT: No.
12   BY MS. PARFITT:
13       Q   I was just reiterating that you,
14   Dr. Diette, have done several secondhand smoke
15   studies, correct?
16       A   Yes.
17       Q   Okay. And how do you measure the dose
18   in the studies that you have performed?
19       A   So different ways, depending upon the
20   studies. So for some studies, it's simple enough
21   to ask, especially if you're talking about an
22   adult, whether or not they've had secondhand smoke
23   exposure from their parents, often broken down by
24   whether it's mother or father. And for some --
25   some studies, that's a sufficient indicator of a

Page 404

1    sufficient dose. It's not a measurement of dose.
2    It's an indicator of sufficient -- sufficient
3    exposure to be linkable to things like lung
4    cancer.
5            The same kind of question for being
6    around coworkers, and so a yes/no to that has been
7    sufficient.
8            In our other studies, we -- we get more
9    precise so that we'll -- and use a variety of
10   overlapping methods. So one is to -- to query --
11   if it's a child study, to query the parent about
12   the number of cigarettes that are smoked per day
13   in the home, and with a very elaborate procedure
14   of asking not only the person who is answering the
15   questionnaire but about all the other people that
16   are in and out of the house that day, so we get a
17   count of cigarettes.
18           We also use different types of
19   particulate matter monitors, and we've established
20   that you can estimate about 1 microgram per meter
21   cubed of particulate matter per cigarette smoked
22   in the home. So we've got an estimate that way.
23           We -- we collect nicotine and cotinine
24   from a variety of sources, so we've collected
25   hair, saliva, urine, and blood. And so depending

Page 405

1    upon which study and which population, we can
2    estimate something about dose based on what
3    their -- what their sort of biomarker is.
4        Q   All right. How much have you --
5    understanding those metrics, for lack of a better
6    word, how much smoke does a patient need to
7    actually inhale?
8            MS. BROWN: For what?
9    BY MS. PARFITT:
10       Q   In order to determine whether or not
11   they have been impacted by secondhand smoke.
12           MS. BROWN: Objection to the form.
13           THE WITNESS: That's a complicated
14   question, I guess, because we don't -- at least in
15   our studies, we don't measure -- like I don't know
16   what that means, like how much they inhale. I can
17   tell you, you know, what their absorbed dose is of
18   nicotine, right, which has some implication about
19   how much they might have inhaled, but I don't
20   relate that to like sort of a volume of smokey air
21   or something like that, the way that you might if
22   you were doing like a smoke machine, you know,
23   study.
24           So it's really -- it's implied, right.
25   If you find it in the urine and the blood, they

102 (Pages 402 to 405)

Gregory B. Diette, M.D.

Page 406

```
 1    inhaled it enough in order to get that particular
 2    fluid level high enough to -- for you to measure
 3    it.  And same with saliva and same with hair.
 4    BY MS. PARFITT:
 5        Q.  Okay.
 6        A.  I left one out too.  We also measure
 7    airborne nicotine, and so that's another
 8    indicator.  So I was talking about cotinine that's
 9    measured in -- in the people, but we also have
10    nicotine matches, and we'll measure nicotine
11    directly in the environment.
12        Q.  Based upon -- I meant to ask this
13    earlier.  Based upon your study of ovarian cancer
14    and talcum powder products that you've done for
15    Johnson & Johnson, have you made any of these
16    recommendations to Johnson & Johnson as to how --
17    what kind of study they could perform in order to
18    ascertain dose?
19            MS. BROWN:  What?
20            MR. LOCKE:  Objection.
21            MS. BROWN:  Objection to the form of the
22    question.
23    BY MS. PARFITT:
24        Q.  Let me ask it again.
25        A.  Oh, no, I heard it.  I was just -- I
```

Page 407

```
 1    guess the broad answer is no.  I mean I haven't
 2    made any recommendations about studies to Johnson
 3    & Johnson for -- for anything.
 4        Q.  Okay.  And the reason I ask is, your
 5    work appears to be reviewing and surveying the
 6    literature for Johnson & Johnson in order to give
 7    litigation opinions on whether or not talcum
 8    powder products can cause ovarian cancer.
 9            MR. LOCKE:  Objection.
10            MS. BROWN:  Objection to the form of the
11    question.
12    BY MS. PARFITT:
13        Q.  Correct?
14        A.  Can you say it again?
15        Q.  Sure.
16        A.  I spaced out a little bit.
17        Q.  No, that's all right.  It's getting late
18    in the day.
19            Your work for Johnson & Johnson appears
20    to be surveying the literature, preparing
21    litigation reports, and then giving testimony in a
22    court that the Johnson & Johnson product is safe.
23            And my question for you is, what have
24    you done in order to inform the scientific
25    community of the results of your -- your now
```

Page 408

```
 1    couple-year study and, you know, tens of thousands
 2    of dollars spent doing it?
 3            MR. LOCKE:  Objection.
 4            MS. BROWN:  Objection to the form.
 5    There are multiple questions in there, Counsel.
 6    Can you rephrase?
 7    BY MS. PARFITT:
 8        Q.  Do you understand the question?
 9        A.  The -- the last part you said -- I'll
10    try to paraphrase it so we know we're talking
11    about the same thing.  I have not -- I have not
12    done anything to inform the medical community
13    about the findings so far from my -- you know,
14    from my work on these cases.
15        Q.  Do you intend to do so?
16        A.  I don't have any active intention to do
17    it right now.
18        Q.  Okay.  Do you intend to have your report
19    peer -- published?
20        A.  It's not in the right format for that.
21        Q.  Okay.  Do you intend to do any
22    meta-analysis of your work?
23            MS. BROWN:  Objection to the form.
24            THE WITNESS:  Not on that -- not on that
25    topic.
```

Page 409

```
 1    BY MS. PARFITT:
 2        Q.  Okay.  And if you saw with regard to
 3    Health Canada, they have given -- they gave
 4    individuals an opportunity to comment on the work
 5    that they did and present that to them.
 6            You saw that, correct?
 7        A.  Yes.
 8        Q.  Okay.  So you had an opportunity as
 9    someone who's reviewed the literature to write to
10    Health Canada and inform them of your concern
11    about the manner in which they conducted their
12    study.  Fair?
13            MS. BROWN:  Objection to the form, lacks
14    foundation.
15            THE WITNESS:  I guess.  I actually don't
16    know who they're asking.  Like I haven't looked to
17    see whether they're looking for people outside of
18    Canada.
19            I don't even know who they are.  I mean
20    the only reason I've heard of Health Canada is
21    because of this litigation and because something,
22    you know, opportunistic came up.  But otherwise, I
23    mean I wouldn't be talking to Health Canada about
24    anything or reading whatever they've written.
25    BY MS. PARFITT:
```

Gregory B. Diette, M.D.

Page 410

```
 1        Q   Something opportunist came up.  Is that
 2   the fact that you are being engaged in this
 3   litigation --
 4        A   No.
 5            MS. BROWN:  Objection --
 6   BY MS. PARFITT:
 7        Q   -- as an expert witness?
 8            MS. BROWN:  Objection to the form.
 9            THE WITNESS:  Oh, no, I just see -- I
10   think the reason that I have it in front of me is
11   because it -- it seemed to help -- help
12   plaintiffs' experts to be able to say something
13   else about this -- this story.  And if -- if it
14   had said something else, then I probably wouldn't
15   even have heard about it.
16   BY MS. PARFITT:
17        Q   Okay.  This story, Dr. Diette, is about
18   women who are dying of ovarian cancer --
19            MS. BROWN:  Careful -- what's the
20   question?
21   BY MS. PARFITT:
22        Q   -- having been exposed to talcum powder
23   products.
24            Do you understand that?
25            MR. LOCKE:  Objection.
```

Page 411

```
 1            MS. BROWN:  Objection to the form of the
 2   question.
 3            THE WITNESS:  I understand the general
 4   notion is about ovarian cancer and whether there
 5   is or is not a risk from talcum powder.
 6   BY MS. PARFITT:
 7        Q   I appreciate that.
 8            All right, Dr. Diette, do you agree that
 9   there is scientific evidence published in the
10   peer-reviewed journal that talcum powder products
11   can migrate from the vagina to the peritoneal
12   capacity up through the ovaries?
13            MS. BROWN:  Objection to the form.
14            MR. LOCKE:  Objection.
15            THE WITNESS:  From the perineum?
16   BY MS. PARFITT:
17        Q   From the perineum.
18            MS. BROWN:  Objection.
19            THE WITNESS:  I have not seen that.
20   BY MS. PARFITT:
21        Q   Okay.  Do you have -- have you seen in
22   your review of the literature that talcum powder
23   products can migrate from the vagina to the
24   ovaries?
25            MR. LOCKE:  Objection.
```

Page 412

```
 1            MS. BROWN:  Objection.
 2            THE WITNESS:  The only studies I've seen
 3   are the ones that -- I think that were cited by --
 4   by IARC with -- if that's what we're talking
 5   about, is like women who were about to have
 6   surgery for some other reason and -- and different
 7   things placed either in their uterus or vagina,
 8   although not necessarily talc.  I mean all kinds
 9   of things, you know, carbon particles,
10   radiolabeled particles, different things that
11   aren't talc.
12            (Counsel conferring.)
13   BY MS. PARFITT:
14        Q   So sitting here today, is it your
15   testimony that you have not reviewed or seen in
16   the medical literature that particles of talc can
17   migrate to the ovaries, lymph nodes, of a woman's
18   body?
19            MS. BROWN:  Objection to the form of the
20   question.
21            MR. LOCKE:  Objection.
22            THE WITNESS:  So -- so the study would
23   be one where somebody applied talc to the perineum
24   and then demonstrated that it migrated from there
25   to the ovaries or into some lymph node somewhere?
```

Page 413

```
 1   BY MS. PARFITT:
 2        Q   That's right.
 3        A   I have not seen that study.
 4        Q   Okay.  You've read the Schildkraut
 5   study, correct?
 6        A   Yes.
 7        Q   Okay.  Do you agree with the authors of
 8   the Schildkraut study that chronic inflammation
 9   resulting from the use of exposure to baby powder,
10   whether through inhalation or through a
11   transvaginal route, may lead to an increased risk
12   of ovarian cancer?
13            MR. LOCKE:  Objection.
14            MS. BROWN:  Objection to the form of the
15   question.
16            THE WITNESS:  I've read the study.  I'd
17   like to see whether that's in the introduction or
18   the conclusion.
19   BY MS. PARFITT:
20        Q   Okay.  Let me show you Schildkraut.
21        A   Because it's certainly not a conclusion
22   of their study.
23            (Diette Exhibit No. 29 was marked
24            for identification.)
25            MS. BROWN:  Do you guys want a number on
```

104 (Pages 410 to 413)

Gregory B. Diette, M.D.

Page 414

1  this?
2         MS. PARFITT:  Sure.  What number are we
3  up to?
4         MS. BROWN:  Oh, 29.  I'm sorry.  It's
5  there.  My bad.
6  BY MS. PARFITT:
7     Q   Do you have that in front of you,
8  Doctor?
9     A   I do.
10    Q   Okay.  And if I can direct your
11 attention to pages 14, 16.
12    A   Got you.
13    Q   Do you have that?
14        Do you see where the authors state:
15 "Lung inhalation of powder could be a biologically
16 plausible mechanism for the association between
17 nongenital powder use and increased EOC risk,
18 particularly non-serous EOC."
19        Do you see that?
20    A   I do.  It's the top of the first column
21 in the -- the rest of the incomplete paragraph.
22    Q   Okay.  Do you see that?
23    A   I do.
24    Q   Okay.  Do you agree with that?
25        MR. LOCKE:  Objection.

Page 415

1         THE WITNESS:  Only -- well, no.  Only in
2  the broadest sense that lots of things could be,
3  but not because there's any evidence to show that
4  inhalation of powder is a way to get to the
5  ovaries.
6  BY MS. PARFITT:
7     Q   All right.  So you dispute that
8  inhalation of talcum powder products can cause
9  ovarian cancer.  Is that your testimony?
10    A   Inhalation?
11    Q   Inhalation.
12    A   I haven't seen any evidence that it can.
13 I mean there's not affirmative evidence to say
14 that it absolutely can't, but there's no evidence
15 that there's been talcum powder inhaled, leading
16 to other -- other diseases along the way, and I
17 haven't seen any study that has shown that it can
18 migrate from the lungs to the ovaries.  And so --
19 I mean people could say that, but it's not based
20 on -- on studies.
21    Q   Does the fact that talcum powder
22 products can be inhaled support a biologically
23 plausible mechanism for talcum powder products to
24 cause ovarian cancer?
25    A   No.

Page 416

1         MR. LOCKE:  Objection.
2  BY MS. PARFITT:
3     Q   Okay.  Do you agree that there is
4  reliable scientific literature in the
5  peer-reviewed studies to support that it is
6  biologically plausible for talc products to
7  migrate from the vagina to the ovaries following
8  perineal application?
9     A   I'm not aware of that study that has
10 shown that.
11    Q   Have you seen the Penninkilampi study?
12    A   Oh.
13        MS. BROWN:  Objection.
14        THE WITNESS:  Yes, I have.
15 BY MS. PARFITT:
16    Q   Okay.  Why don't we take a look at that.
17        Let's pull it up, and we'll make it
18 Exhibit No. 30.
19        (Diette Exhibit No. 30 was marked
20        for identification.)
21 BY MS. PARFITT:
22    Q   Right here.  And if I may, Doctor, let
23 me direct your attention to the discussion section
24 of Penninkilampi on page 45.
25    A   Page 45?

Page 417

1     Q   45.
2     A   Yep.
3     Q   Do you have that?
4     A   I'm there, yep.
5     Q   Okay.  It says:  "The present
6  meta-analysis" -- and it is meta-analysis,
7  correct?
8     A   Yeah, part of this study is a
9  meta-analysis.
10    Q   "The present meta-analysis reports a
11 positive association between perineal talc use and
12 ovarian cancer, specifically of the serous and
13 endometriode -- and endometrioid histology site --
14 subtypes.  The mechanism by which perineal talc
15 use may increase the risk of ovarian cancer is
16 uncertain.  It has been previously proposed that
17 talc as a foreign body may ascend from the vagina
18 through to the uterine tubes and instigate a
19 chronic inflammatory response, which may
20 predispose to the development of ovarian cancer."
21        Did I read that correctly?
22    A   You did.
23    Q   Okay.  Do you agree with that?
24        MR. LOCKE:  Objection.
25        MS. BROWN:  Objection to the form.

105 (Pages 414 to 417)

Gregory B. Diette, M.D.

Page 418

1    THE WITNESS:  So -- so I agree with a
2  lot of this, right.  So I agree that the mechanism
3  is uncertain.  Right.  I agree that it has been
4  previously proposed 20 years ago by the citation
5  that they have that that may ascend from the
6  vagina, and instigate a chronic inflammation
7  response.
8    They don't cite anything more modern
9  than that one from 20 years ago, though.  And
10  where it talks about it may be mutagenic and
11  promote carcinogenesis --
12  BY MS. PARFITT:
13    Q   Correct.
14    A   -- I don't -- I don't think that's well
15  supported either.
16    Q   Is migration of talc a biologically
17  plausible mechanism by which talc can reach the
18  ovaries?
19    MS. BROWN:  Objection to the form.
20    MR. LOCKE:  Objection.
21    THE WITNESS:  If it were true, it could
22  be supportive of that.  But I don't see any -- any
23  evidence that it's true.
24  BY MS. PARFITT:
25    Q   Is biological plausibility essential for

Page 419

1  causality?
2    A   No, it's -- it's one important criterion
3  to consider.
4    Q   Does biological plausibility mean it
5  must be proved?
6    MS. BROWN:  Objection.
7    THE WITNESS:  And I assume we're talking
8  about in the context of a Bradford Hill?
9  BY MS. PARFITT:
10    Q   Correct.
11    A   Yeah, so -- so the answer is, no, it
12  doesn't have to be proved.
13    Q   Look at the lower right-hand corner of
14  that article.
15    MS. BROWN:  Are we done with that
16  paragraph, Counsel?
17    MS. PARFITT:  We are.  Thank you very
18  much, yeah.
19  BY MS. PARFITT:
20    Q   And if you will go down to the lower
21  right, it starts with "We also found."
22    A   Okay.
23    Q   Do you see that?
24    Okay.  It says:  "This finding also
25  supports the chronic" -- I'm sorry -- "chronic

Page 420

1  inflammatory hypothesis, as repeated exposure
2  would induce a longer period of chronic
3  inflammation, and therefore should increase the
4  predisposition to the development of ovarian
5  cancer."
6    Did I read that correctly?
7    A   You did.
8    Q   All right.  Do you agree with that
9  statement, that chronic inflammation as a
10  biologically plausible hypothesis could induce
11  carcinogenicity?
12    MR. LOCKE:  Objection.
13    MS. BROWN:  Counsel, are you
14  intentionally not reading the rest of that
15  paragraph?
16    MS. PARFITT:  No, I -- I'm getting
17  there.
18    MS. BROWN:  Okay.
19    MS. PARFITT:  Yeah.
20    THE WITNESS:  Well, I disagree with the
21  fact that the small difference between 3600, plus
22  or minus, lifetime applications supports a -- an
23  inflammatory theory, because that's got nothing
24  too do with inflammation.  It's really just a -- a
25  total number of applications.

Page 421

1  BY MS. PARFITT:
2    Q   Perhaps I can simplify my answer.  Do
3  you have an opinion as to whether or not chronic
4  inflammation can be a biologically plausible
5  method for promoting carcinogenesis?
6    MS. BROWN:  Objection to the form.
7    THE WITNESS:  In -- in all kinds of
8  cancer or ovarian cancer?
9  BY MS. PARFITT:
10    Q   In ovarian cancer.
11    A   So I -- I don't think there's strong
12  evidence to support that.
13    Q   Is there evidence at all?
14    MS. BROWN:  Let him finish.
15    THE WITNESS:  So not much.  I mean
16  there's -- I know that folks have looked at, you
17  know, whether NSAIDS and aspirin, whether that use
18  would lead to a limitation in risk, and it seems
19  like the -- the findings are kind of mixed.  And
20  sometimes aspirin in a particular dose is
21  protective and aspirin of another dose is not.
22  That NSAIDS are sometimes protective, but mostly
23  not.
24    Since preparing my report, I saw
25  Dr. Shih -- Shih's report talking about the stick

106 (Pages 418 to 421)

Gregory B. Diette, M.D.

Page 422

1  cells, like these precursor cells, and -- and at
2  least, you know, from histologic specimens, not
3  seeing evidence of inflammation.  And I haven't
4  really seen much that -- that would confirm that
5  there's a link between chronic inflammation.
6  BY MS. PARFITT:
7      Q   What I'm asking you is, based upon your
8  review, Dr. Diette, have you seen anything in the
9  peer-reviewed literature that there are
10  biologically plausible mechanisms of talc's
11  carcinogenicity demonstrated by chronic
12  inflammation from migration of the talc to the
13  ovaries?
14         MS. BROWN:  Objection.  I don't
15  understand that question.
16         MR. LOCKE:  Objection.
17         THE WITNESS:  Would you --
18  BY MS. PARFITT:
19      Q   The question -- let me rephrase it.
20      A   Okay.
21      Q   Is there -- are there studies in the
22  peer-reviewed literature that support an
23  association of inflammation and increased risk of
24  ovarian cancer?
25         MS. BROWN:  Objection to the form, asked

Page 423

1  and answered.
2  BY MS. PARFITT:
3      Q   Is there something in the literature?
4         MS. BROWN:  Objection.
5  BY MS. PARFITT:
6      Q   Not whether there is a lot or a little.
7  Is there anything in the peer-reviewed literature
8  that you've seen that supports an association
9  between inflammation and an increased risk of
10  ovarian cancer?
11         MS. BROWN:  Objection to the form.
12         THE WITNESS:  I've seen the paper where
13  C-reactive protein in the serum popped out of
14  dozens of different markers of inflammation and
15  predated the diagnosis of ovarian cancer.
16         I guess I haven't really seen something
17  that shows that chronic inflammation in the
18  ovaries is -- is a precursor to ovarian cancer or
19  that talc induces that particular chronic
20  inflammation that would in turn lead to cancer.
21  BY MS. PARFITT:
22      Q   Have you read Taher?  You've read the
23  Taher study, correct?
24         MR. LOCKE:  Objection.
25         THE WITNESS:  How do you spell it?

Page 424

1  BY MS. PARFITT:
2      Q   T-A-H-E-R.
3      A   Oh.
4      Q   2018.
5      A   Sorry, I was saying Taher.
6      Q   No, no problem.
7      A   But I don't now how you --
8      Q   You could be right on that.  Probably
9  are.
10      A   I don't know.
11         I did.
12      Q   Do you see where Taher authors found
13  that there was biologically plausible evidence of
14  inflammation from talc exposure?
15         MS. BROWN:  Objection.  Counsel, can we
16  see the article if you want to ask him about it?
17         MR. LOCKE:  Objection.
18  BY MS. PARFITT:
19      Q   You've read the article.  Do you know
20  the answer to that?
21         MS. BROWN:  But it's not a memory test.
22         MS. PARFITT:  No, it's not, but perhaps
23  he can answer.  I didn't ask you the question.
24  BY MS. PARFITT:
25      Q   Do you know the answer to that?

Page 425

1      A   Well, the paper wasn't about that, so I
2  don't -- I don't remember whether there was sort
3  of a preamble thing, but they -- they weren't
4  really analyzing that.  They were doing a
5  meta-analysis, you know, sort of combining the epi
6  studies.  So, I mean, I don't remember what their
7  statement was, but when you --
8      Q   All right.  Did you --
9      A   I'm sorry, I just want to say, but if
10  you say that they found it, by finding it, I don't
11  think they demonstrated it or it was a finding
12  from their study per se.
13      Q   Okay.  Have you read Langseth, 2008?
14      A   Langseth, 2008?
15      Q   Correct.
16      A   Is that a meta-analysis?
17      Q   Correct.
18      A   Yes.
19      Q   All right.  And do you see where the
20  Langseth authors also found migration and -- and
21  concluded that there was chronic inflammation that
22  was biologically plausible?
23         MS. BROWN:  No, I -- I object.  If
24  you're going to quote articles --
25  BY MS. PARFITT:

Page 426

1  Q  Do you remember?
2  MS. BROWN: -- I would request the
3  article.
4  MS. PARFITT: I can do that.
5  BY MS. PARFITT:
6  Q  Do you know, Doctor?
7  A  I don't remember what they said.
8  (Counsel conferring.)
9  MS. PARFITT: Doctor, if we can take a
10  quick break here --
11  THE WITNESS: Sure.
12  MS. PARFITT: -- right now, so maybe I
13  can --
14  THE WITNESS: Yeah, it's a good time.
15  MS. PARFITT: -- shorten things.
16  THE VIDEOGRAPHER: The time is 4:59 p.m.
17  We're going off the record.
18  (Recess.)
19  THE VIDEOGRAPHER: The time is 5:12 p.m.
20  and we're back on the record.
21  MS. PARFITT: I apologize.
22  BY MS. PARFITT:
23  Q  Dr. Diette, and I apologize, I have only
24  one copy that isn't marked up, so we're going to
25  have to put this and substitute it on the -- on

Page 427

1  the ELMO, if I may. We've done pretty good with
2  copies all day today.
3  So here we go.
4  MR. ROSEN: This will be Exhibit 31.
5  (Diette Exhibit No. 31 was marked
6  for identification.)
7  BY MS. PARFITT:
8  Q  All right. Dr. Diette, this is an
9  article from Ultrastructural Pathology, and it's
10  entitled "Correlative polarizing light and
11  scanning electron microscopy for the assessment of
12  talc in pelvic region lymph nodes."
13  Do you see that?
14  A  I do.
15  Q  And the lead author is Dr. McDonald,
16  along with Cramer and Godleski, and others.
17  Do you see that?
18  A  I do.
19  Q  All right. This is published in 2019.
20  Have you had an opportunity to review
21  this article?
22  A  I have not seen this one.
23  Q  Okay. I just have one question about
24  it. And if --
25  MS. BROWN: Well, I'm going to object.

Page 428

1  He doesn't have the article.
2  MS. PARFITT: That's fine.
3  MS. BROWN: And he's never read it.
4  BY MS. PARFITT:
5  Q  Look at the abstract, first sentence.
6  It says: "Perineal talc use is associated with
7  ovarian carcinoma in many case-control studies.
8  Such talc may migrate to pelvic organs and
9  regional lymph nodes, with both clinical and legal
10  significance."
11  Did I read that correctly?
12  A  Yes.
13  Q  All right. Would it be -- I believe you
14  had some concerns about the Heller study that we
15  talked about earlier because it involved some
16  unexposed -- what you testified were unexposed
17  women.
18  MS. BROWN: Objection to the form.
19  THE WITNESS: Correct, women who
20  reported not being perineal talc users.
21  BY MS. PARFITT:
22  Q  Right. Okay. You understand in this
23  study that what Drs. McDonald and Godleski were
24  doing were looking at particles in exposed women.
25  MS. BROWN: No, he doesn't understand

Page 429

1  that because he doesn't have the study and he
2  hasn't read it. I object. It's not fair.
3  THE WITNESS: I honestly have no idea
4  what they've done.
5  BY MS. PARFITT:
6  Q  Okay. Well, do you dispute that talc
7  particles can migrate to the pelvic organs and
8  regional lymph nodes?
9  A  I don't -- I don't know.
10  MR. LOCKE: Asked and answered.
11  BY MS. PARFITT:
12  Q  You don't know. You don't know. You
13  don't know one way or another?
14  MS. BROWN: Objection, misstates his
15  private -- his prior testimony.
16  THE WITNESS: Migrate from where to
17  where? From --
18  BY MS. PARFITT:
19  Q  It says right here: "Talc may migrate
20  to pelvic organs and regional lymph nodes."
21  MS. BROWN: Right, but he can't --
22  THE WITNESS: Oh, I saw the "to," but I
23  don't see the "from."
24  BY MS. PARFITT:
25  Q  Does it make a difference to you?

Gregory B. Diette, M.D.

Page 430

1      MS. BROWN:  Of course.
2   BY MS. PARFITT:
3      Q  If it's from the vaginal area to the
4   ovaries and the lymph nodes, does that make a
5   difference whether --
6      MR. LOCKE:  Objection.
7      MS. BROWN:  Objection to the form, lacks
8   foundation, calls for speculation about a document
9   he told you he's never read.
10      MR. LOCKE:  Does the witness have a
11   copy?
12      MS. BROWN:  No.  That's the objection.
13      MS. PARFITT:  Tom, we didn't -- we only
14   have one copy of it.
15      MR. LOCKE:  I think you need to disclose
16   to the witness that three of these authors are
17   paid experts, et cetera --
18      MS. PARFITT:  Tom, Tom, Tom, Tom.
19      MR. LOCKE:  Come on.
20      MS. BROWN:  No, but to be fair, you
21   guys, if you want to ask him questions, he's got
22   to look at it.  I'm going to take it off the ELMO
23   and give it to him if you're going to continue
24   asking him questions.
25   BY MS. PARFITT:

Page 431

1      Q  I'm not going to ask him any more
2   questions on it, Doctor.
3      A  Okay.  Thank you.
4      Q  All right.  Let me show you --
5      MR. LOCKE:  Come on.  Give him -- if
6   you're going to give him -- if you're going to ask
7   him about it --
8      MR. TISI:  You're not even on record.
9      MS. PARFITT:  Tom, it was just --
10      MS. BROWN:  Hey, hey, hey, guys.  It's
11   the end of the day.
12      MS. PARFITT:  Okay.  Let's don't --
13      MS. BROWN:  Let's get through this.
14      (Diette Exhibit No. 32 was marked
15      for identification.)
16   BY MS. PARFITT:
17      Q  32.  Let me show you what's been marked
18   as Plaintiffs' Exhibit 32.
19      I need a copy.  There you go.  Sorry.
20      A  Thank you.
21      Q  Okay.  You previously testified that you
22   -- take a look at it.  You read this before, the
23   FDA letter 2014?
24      A  I've seen this.
25      Q  Okay.  Very good.

Page 432

1      You had testified earlier that you
2   disagree with Health Canada when they state that
3   talc can migrate to the ovaries; is that correct?
4      MR. LOCKE:  Objection.
5      MS. BROWN:  Objection.  Misstates prior
6   testimony.  I don't even think he said that.
7   BY MS. PARFITT:
8      Q  Well, let me ask you.  In the Health
9   Canada report, they discuss the fact that it is
10   biologically plausible for talc to migrate to the
11   ovaries and cause an inflammatory process.
12      Do you agree or disagree with that?
13      MR. LOCKE:  Objection.
14      MS. BROWN:  Objection.  Lacks
15   foundation.  Do you want to show him where they
16   said that?
17      THE WITNESS:  I don't remember their
18   statement about that.
19   BY MS. PARFITT:
20      Q  You don't.  Okay.
21      How about this statement.  Go down to --
22   I believe it's -- one, two, three -- the third
23   paragraph.  Do you see that?  It starts with
24   "While."
25      A  No.

Page 433

1      Q  No?
2      A  Oh, I'm on a different page.
3      Q  I'm sorry.  Page 5.  Page 5.
4      A  Okay.
5      Q  Okay.  "While there exists no direct
6   proof of talc and ovarian carcinogenesis, the
7   potential for particles to migrate from the
8   perineum into the vagina to the peritoneal cavity
9   is indisputable."
10      Do you see that?
11      A  I do.
12      Q  Okay.  Do you agree with the FDA?
13      MS. BROWN:  Objection to the form.
14      THE WITNESS:  So there's no citation for
15   that.  I don't know how they get -- I mean I don't
16   know why they make that statement, and I -- it
17   certainly doesn't seem to be indisputable, because
18   there -- several of the articles that we've looked
19   at today and others say it's not clear what the
20   mechanism is or the biologic plausibility.  So
21   it's -- it's obviously disputable, at the very
22   least, but there's no citation, so it's hard to
23   know how to -- how to process this.
24   BY MS. PARFITT:
25      Q  If this is the FDA's position with

Gregory B. Diette, M.D.

Page 434

1  regard to whether or not talc can migrate, do you
2  dispute that?
3         MS. BROWN:  Objection.  Misstates the
4  document.
5         THE WITNESS:  I don't -- I don't dispute
6  that they said it obviously, because it's right
7  here, but there's just no citation for it, and
8  there's no information that tells who in
9  particular thinks that.
10 BY MS. PARFITT:
11     Q   Well, the Food and Drug Administration
12 is our regulatory body here in the United States,
13 correct?
14     A   It is one.
15         MR. LOCKE:  Objection.
16 BY MS. PARFITT:
17     Q   All right.  Would you agree that
18 dissemination of information that is accurate and
19 truthful is -- is something that they would
20 probably take quite seriously?  Would you agree?
21         MS. BROWN:  Objection.
22         THE WITNESS:  I -- I hope so.
23 BY MS. PARFITT:
24     Q   Right.  And would you agree that the FDA
25 would not be disseminating information about the

Page 435

1  potential for particulates to migrate from the
2  perineum, the vagina to the peritoneal cavity, and
3  say it's indisputable if they didn't have some
4  evidence?
5         MS. BROWN:  Objection. Calls for
6  speculation.
7         MR. LOCKE:  Objection.
8         THE WITNESS:  I don't know why they
9  wrote it.  I just think it would be odd to find
10 that the FDA knew this, and it's not out there
11 generally otherwise.  I mean I don't -- I don't
12 know what they considered.
13 BY MS. PARFITT:
14     Q   When you say it's not out there
15 generally, we talked today about several
16 peer-reviewed articles that have in fact talked
17 about talcum powder part- -- particles migrating
18 to the ovaries, have we not?
19         MS. BROWN:  Objection.  We have not.
20         THE WITNESS:  No, I was going to say, I
21 mean, you've said that a lot, but I mean -- but we
22 haven't looked at a study that shows that.  I mean
23 we've talked about whether -- whether or not talc
24 applied to the perineum has been shown to migrate
25 to the ovaries, and a bunch of questions back, I

Page 436

1  think my answer was along the lines of I haven't
2  seen a study that shows that that's true.
3  BY MS. PARFITT:
4      Q   We talked about Schildkraut.  We talked
5  about Schildkraut, didn't we?
6      A   Yeah, they didn't show that either,
7  though.
8      Q   When you say they didn't show it, have
9  they opined in medical -- or let me ask you this
10 question.  I see the disconnect.
11         Is there evidence contained in
12 peer-reviewed scientific articles wherein it is
13 stated that talcum powder products can migrate to
14 the ovaries?
15         MS. BROWN:  Objection.
16         MR. LOCKE:  Objection.
17         MS. BROWN:  Misstates everything we've
18 looked at and his testimony.
19         THE WITNESS:  I think there's been
20 opinions of different people in different articles
21 that are both supportive and not supportive of
22 that statement.
23 BY MS. PARFITT:
24     Q   All right.  So you've seen scientific
25 writers who have said talc can migrate to the

Page 437

1  ovaries, and you've seen scientific articles that
2  say that's more questionable.  Is that fair?
3         MS. BROWN:  Objection.  Not fair.
4  Misstates prior --
5         THE WITNESS:  It's sort of fair, but I
6  can't find anybody who's actually shown that it's
7  true.  I mean, you know, people may write that,
8  but I mean I haven't seen a study that's shown
9  that you can actually apply talc to the perineum
10 and then find it in the ovaries.
11 BY MS. PARFITT:
12     Q   Okay.  Let me show you what we'll have
13 marked as exhibit -- oh, thank you.
14         (Counsel conferring.)
15 BY MS. PARFITT:
16     Q   It's the end of the day, and we are
17 running out of copies, Doctor.
18         Let me show you --
19         (Diette Exhibit No. 33 was marked
20         for identification.)
21         MR. ROSEN:  Exhibit 33.
22         MS. PARFITT:  Beg your pardon?  33?
23         THE WITNESS:  This one says 32 on it.
24         MR. ROSEN:  Ah, you're correct.
25 BY MS. PARFITT:

110 (Pages 434 to 437)

Gregory B. Diette, M.D.

Page 438

1      Q   So I'm going to share this with you,
2   and -- actually, if we could put it on the ELMO,
3   and then I will give it to you so I can at least
4   identify it for counsel.
5      Is that fair?
6      A   Yeah.  We will see how it goes.
7      Q   All right.  Let me show you -- it is
8   marked September 30th, 2004, and I will represent
9   that it is to Bill Ashton from Richard Zazenski,
10  and it's a Luzenac document.
11     MS. BROWN:  What?  I'm going to object
12  on form and foundation.
13  BY MS. PARFITT:
14     Q   Okay.  Can you see that, Doctor?  I
15  don't want to strain your eyes too much.
16     MS. BROWN:  No, we need to give him --
17  he's never seen it.  He hasn't reviewed it.  His
18  opinions are not based on it.  If you want to ask
19  him questions about it, he needs to hold it and
20  look at it.
21  BY MS. PARFITT:
22     Q   I'm going to give it to you.  I'm going
23  to let you hold it in one moment.
24     Dr. Diette, this is a document I will
25  represent that's dated September 30, 2004, and

Page 439

1   that would have preceded any litigation.
2      And it states:  "Bill, I came across
3   this paper this morning published in the April
4   2004 journal Human Reproduction, an official
5   journal of the European Society for Human
6   Reproduction and Embryology.  It offers some
7   compelling evidence in support of the migration
8   hypothesis.  Combine this evidence with the theory
9   that the talc deposition on the ovarian epithelium
10  initiates epithelium inflammation, which leads to
11  epithelium carcinogenesis, and you have a
12  potential formula for NTP classifying talc as a
13  causative agent in ovarian cancer."
14     Now, did I read that correctly?
15     A   Yes.
16     Q   So let me -- because counsel wants you
17  to hold it, let me have you take --
18     MS. BROWN:  Well, only if you're going
19  to ask him questions about it.
20     MS. PARFITT:  I am.  I am.  But I can't
21  do both.
22  BY MS. PARFITT:
23     Q   I've got to hand it to you because she
24  says she wants you to hold it.
25     And attached to that is the article.

Page 440

1   Take a moment and take a look at that, to eyeball
2   that.
3      MS. BROWN:  Take as long as you need to
4   inform your response --
5      MS. PARFITT:  It's a one-page document.
6      MR. LOCKE:  No.  This -- this is a
7   document that he hasn't seen before.
8      MS. PARFITT:  That's correct.
9      MR. LOCKE:  Why don't we go off the
10  record.
11     MS. PARFITT:  It's one page, Doctor.
12     MS. BROWN:  Right, and that's just fair.
13     MS. MILLER:  If you're going to ask him
14  questions about what you just threw out here --
15     MS. BROWN:  That's fine.  That's fine,
16  but you understand there's no foundation.  He's
17  never relied it.
18     MS. PARFITT:  Okay, guys --
19     MS. BROWN:  So if we want to ask
20  questions --
21     THE REPORTER:  Excuse me.
22     MS. PARFITT:  I'm not having him --
23  whoa, whoa.
24     (A discussion was held off the record.)
25  BY MS. PARFITT:

Page 441

1      Q   Dr. Diette, I'm simply referring to the
2   cover letter.
3      A   Oh.
4      Q   And that's all, just one page.  Do you
5   see that?
6      A   I do.
7      Q   Okay.  And that's what I just read into
8   the record.  Do you see that?
9      A   I do.
10     Q   Okay.  And do you see back in 2004,
11  there was information with regard -- and I have to
12  see it, I can't be -- sorry.  I can't memorize it
13  either.
14     So you see back in 2004, the company's
15  being advised that there is indeed literature
16  compelling evidence in support of a migration
17  hypothesis --
18     MS. BROWN:  Object.
19  BY MS. PARFITT:
20     Q   -- that was shared between the two
21  companies.
22     Did J&J ever share with you this
23  document that they had in their company files that
24  they had support -- actually compelling evidence
25  of support of the migration hypothesis?

111 (Pages 438 to 441)

Gregory B. Diette, M.D.

Page 442

1          MS. BROWN:  Objection to the speech,
2    lacks foundation.  I also believe that's an Imerys
3    document.
4          THE WITNESS:  So a few things, right.
5    So one is I -- I've never seen that, so I don't
6    even know what it is.  I don't know who those
7    people are.  That -- I don't know what their
8    qualifications are to consider something to be
9    compelling evidence or if that's the word that was
10   used.
11   BY MS. PARFITT:
12      Q   Mm-hmm.
13      A   I have not seen the article that's
14   attached to the back of it.
15      Q   Okay.
16      A   But it's hard to say much about that.
17      Q   Yes.
18          Let me show you what we will have marked
19   as Exhibit 34, and I'll represent to you it's an
20   article by Roberta Ness, "Possible Role of Ovarian
21   Epithelial Inflammation."
22          (Diette Exhibit No. 34 was marked
23          for identification.)
24   BY MS. PARFITT:
25      Q   Have you seen this article before?

Page 443

1      A   I have.
2      Q   Okay.  Do you see on page 2 --
3          MS. PARFITT:  Where is the other one?
4          (Counsel conferring.)
5    BY MS. PARFITT:
6      Q   If I could -- you have in front of you
7    the Zazenski -- thank you.
8          Okay.  Now, do you see the graph, I'll
9    call it, it's the chart there on Zazenski?  And
10   then look at Figure No. 1.  Do you see that,
11   "Inflammation is a common mechanism underlying
12   ovarian cancer"?
13      A   I do.
14      Q   Okay.  And do you see that -- you can
15   look at it.  Do you see that that's the same
16   figure in the Zazenski letter as it is in
17   Dr. Ness's letter?  Do you see that?
18          MS. BROWN:  Objection to the form, lacks
19   foundation.
20   BY MS. PARFITT:
21      Q   Or Dr. Ness's report.
22          MS. BROWN:  Same objection.
23          THE WITNESS:  I mean it -- it looks the
24   same.
25          But what does that mean?  Does that mean

Page 444

1    it -- that this -- is this an e-mail or a fax?  It
2    has something from Ness's paper or Ness's paper
3    has something from this --
4    BY MS. PARFITT:
5      Q   They have something from Ness's paper,
6    correct.
7          MS. BROWN:  Well, objection.
8          THE WITNESS:  But this is --
9          MS. BROWN:  Don't -- don't speculate.
10   No one wants you to guess.
11          MS. PARFITT:  So we won't talk about --
12          MS. BROWN:  Just wait for a question,
13   and we'll do the best we can.
14   BY MS. PARFITT:
15      Q   Okay.  Do you see on the first page of
16   Dr. Ness's article, in the left-hand column
17   towards the bottom, where Dr. Ness states:
18   "Inflammation entails cell damage, oxidative
19   stress, and elevations of cytokines and
20   prostaglandins, all of which may be mutagenic.
21   The possibility that inflammation is a
22   pathophysiological contributor to the development
23   of ovarian cancer suggests a directed approach to
24   future research."
25          Do you see that?

Page 445

1      A   I do.
2      Q   Okay.  Do you agree with that statement?
3          MR. LOCKE:  Objection.
4          MS. BROWN:  Objection to the form.
5          THE WITNESS:  So, I haven't read this
6    article in a while.  It is from about 20 years
7    ago.  And so I don't know if 20 years ago that was
8    a reasonable thing to consider, but it sounds as
9    if 20 years have gone by and this still hasn't
10   been proven.  And so whether I agree with it still
11   now, I'm not sure.  I'm not sure if it would be a
12   fruitful endeavor or not.
13   BY MS. PARFITT:
14      Q   Does biological plausibility mean that
15   something must be proven?
16          MR. LOCKE:  Objection.  Asked --
17          MS. BROWN:  Objection.  Asked and
18   answered.
19          THE WITNESS:  It doesn't mean that
20   it's -- that it's been proven, but it's one of the
21   ways to provide supportive information about
22   whether or not an observed association is causal
23   or not.
24   BY MS. PARFITT:
25      Q   Okay.  So you agree that you do not --

112 (Pages 442 to 445)

Gregory B. Diette, M.D.

Page 446

1  one does not need to prove mechanism in order to
2  find causality, correct?
3      A   I need to prove --
4          MR. LOCKE:  Objection.
5          MS. BROWN:  Objection to form.
6          THE WITNESS:  Sorry.  Wow, sorry.
7  BY MS. PARFITT:
8      Q   We had a chorus.
9      A   Yeah.
10         No, you don't need to prove it, but
11 it's --
12     Q   You don't need to prove mechanism.
13     A   You don't need to prove mechanism in
14 order to establish causation, but it's hard to get
15 there for a low observed risk if you don't have
16 biological plausibility.
17     Q   I'll take that back -- yes, I'm sorry.
18         I hope I didn't ask you this before, but
19 is biological plausibility the same as proof of
20 mechanism?
21         MR. LOCKE:  Objection.
22         MS. BROWN:  Objection to the form of the
23 question.
24         THE WITNESS:  Proof of -- I don't know
25 if I would use the -- so "proof of mechanism"

Page 447

1  sounds like a term in a way, but maybe not one
2  that's in my vocabulary.  Like people talk about
3  proof of concept just as a study design, which --
4  I don't know if that's the same thing, but I
5  don't -- I don't -- I don't know "proof of
6  mechanism" as a -- as a term.
7          (Counsel conferring.)
8          MS. PARFITT:  Let's go off the record
9  for a moment.
10         THE VIDEOGRAPHER:  The time is 5:30 p.m.
11 We're going off the record.
12         (Recess.)
13         THE VIDEOGRAPHER:  The time is 5:37 p.m.
14 and we're back on the record.
15 BY MS. PARFITT:
16     Q   Doctor, what is your definition of
17 "biological plausibility"?
18         MS. BROWN:  Objection.  Asked and
19 answered.
20         THE WITNESS:  I don't have a single one.
21 I think it's in my report somewhere, or at least
22 what I tried to capture from Bradford Hill's
23 statement, but in a general sense, you know, being
24 evidence that whatever -- if we're talking about
25 an exposure, that there is a pathway by which that

Page 448

1  exposure can lead to the outcome that you're
2  interested in.
3  BY MS. PARFITT:
4      Q   Okay.  Doctor, from your review of the
5  peer-reviewed scientific literature, have you read
6  where study authors who have actually looked at
7  the issue of migration and other biological
8  plausible methods by which talc can get to the
9  ovary?
10     A   I guess --
11         MS. BROWN:  I object.  I don't
12 understand.
13         THE WITNESS:  I mean I've looked at both
14 the human and the animal studies that I could find
15 cited on the topic.  And -- and you said that
16 talc -- talc can get to the ovary?
17 BY MS. PARFITT:
18     Q   Mm-hmm.
19     A   Because, you know, some are not talc,
20 right.  There -- there are other kinds of
21 particles or substances.  And so I've looked at
22 both the animal and the human studies that I could
23 find.
24     Q   And in those studies that you have
25 reviewed, have you seen where those authors who

Page 449

1  have studied the issue of biological plausibility
2  and mechanisms by which talc can get to the ovary
3  have concluded in their articles that that is
4  indeed a pathway?
5          MS. BROWN:  Objection.
6          MR. LOCKE:  Objection.
7          MS. BROWN:  Misstates his testimony and
8  the documents.
9          THE WITNESS:  That there is -- well, I
10 guess we've got to -- we'd have to look at each
11 one, right.  Because, I mean, there's ones like,
12 for example, you know, if we're talking about
13 humans, like where women are basically placed
14 upside down in a -- in an usual position and
15 having something deposited directly into their
16 vagina, and then that may or may not then migrate
17 to their ovaries, but that wouldn't be the same as
18 saying that's a plausible mechanism for applying
19 something to the perineum and then finding it in
20 the ovaries.
21         And then I just want to -- I don't have
22 a lot to say about it, but I would just say with
23 the animals, it looks like certain animals that
24 application of -- of particles does, and then in
25 others it doesn't migrate.  And then so I -- I

113 (Pages 446 to 449)

Gregory B. Diette, M.D.

Page 450

1    took that as kind of mixed evidence that even in
2    animals, assuming that there is an appropriate
3    animal model, that they're not getting the same
4    answer based on which animal it is.
5    BY MS. PARFITT:
6        Q   Does exposure of a disease have to be
7    proven in order to have a biologically plausible
8    mechanism?
9            MS. BROWN:  Objection to the form.
10           MR. LOCKE:  Objection.
11           THE WITNESS:  So I don't know if I
12   understand that.  So are you saying that -- so say
13   it again.  I'm sorry.
14   BY MS. PARFITT:
15       Q   Sure.  It was probably a bad question.
16           MS. BROWN:  The realtime --
17   BY MS. PARFITT:
18       Q   Does one need -- does a scientist need
19   to know the precise mechanism in order to
20   determine whether or not it's biologically
21   plausible for some toxin to cause some disease?
22           MS. BROWN:  Objection to the form.
23           MR. LOCKE:  Objection.
24           THE WITNESS:  So "precise" might be a --
25   a term that matters, but -- but it can be a work

Page 451

1    in progress in the sense that you can have some
2    information or no information or lots of
3    information.  So there can be, you know, quite a
4    spectrum of information you would have about the
5    plausibility.
6    BY MS. PARFITT:
7        Q   I think what I'm asking is, does the
8    mechanism of disease need to be proven in order to
9    find causality?
10           MS. BROWN:  Objection to the form.
11           THE WITNESS:  I -- I think we keep doing
12   this over and over, because this -- I think -- I
13   think this is the same -- unless it's meant to be
14   different, like I don't know how to answer that
15   differently.  It's -- you know, obviously it
16   doesn't have to be proven, but it certainly is
17   important.  And when you have a very small
18   estimated risk, then it becomes even more
19   important.
20   BY MS. PARFITT:
21       Q   Okay.  Have you seen in the literature
22   that you've reviewed numerous authors who have
23   proposed a biologically plausible mechanism by
24   which talcum powder products can cause ovarian
25   cancer?

Page 452

1            MS. BROWN:  Objection to the form.
2            MR. LOCKE:  Objection.
3            THE WITNESS:  So I -- I looked -- for
4    all the things that we talked about -- I don't
5    know which ones we're talking about now in terms
6    of the epidemiology studies.
7    BY MS. PARFITT:
8        Q   Correct.
9        A   So I've seen some that do and some that
10   don't propose that.  Some I think are -- and I'm
11   paraphrasing -- but are sort of more along the
12   lines of we just don't know or there's a lot more
13   work needed, and -- and things of that sort.
14       Q   Are there a lot on the lines of
15   migration of talc -- excuse me.
16           Are there a lot of articles that you've
17   reviewed where they have -- authors have stated
18   that talc can migrate to the ovaries?
19       A   I wouldn't say --
20           MS. BROWN:  Objection.
21           THE WITNESS:  I wouldn't say a lot.  And
22   I haven't seen anything as strong as that FDA
23   statement, you know, I mean, where -- where
24   there's some, you know, certainty that is coupled
25   with that kind of a statement.

Page 453

1    BY MS. PARFITT:
2        Q   But you've certainly seen where the
3    authors have opined and discussed biologically
4    plausible mechanism by -- mechanisms by which
5    talcum powder products can cause ovarian cancer.
6            MR. LOCKE:  Objection.
7            MS. BROWN:  Objection.  Continues to
8    misstate his testimony.
9            THE WITNESS:  What's -- what's different
10   about that than what I already answered?
11   BY MS. PARFITT:
12       Q   Well, what I'm trying to get at is,
13   whether or not you believe it or don't believe it,
14   I'm simply trying to understand from you whether
15   or not in your read of the scientific literature
16   have you seen where authors who have actually
17   studied this topic where they have determined and
18   written in their reports that there are
19   biologically plausible mechanisms by which talc
20   can migrate to the ovaries?
21           MR. LOCKE:  Objection.
22           MS. BROWN:  No, objection.  He's
23   answered this a hundred times, and it's --
24   BY MS. PARFITT:
25       Q   And if it's no, then it's no.  If you've

114 (Pages 450 to 453)

Gregory B. Diette, M.D.

Page 454

1  seen it, you've seen it.  If you dispute it, you
2  dispute it.
3       A   Well, it's -- it's none of those.
4          But you just said reports.  Does that --
5  are we now talking about expert reports or are --
6       Q   No.
7       A   -- we still talking about --
8       Q   No, we're still talking --
9       A   Okay.  We're talking about like
10 peer-reviewed publications?
11      Q   That's right.
12      A   So I've seen a mixture, yeah.  It's like
13 when you look at the epi literature, I mean the --
14 the way I read it is like -- is, you know, an
15 epidemiologist is supposed to be able to get up to
16 speed without becoming an expert in absolutely
17 everything, right?
18         So I already told you I'm not a cancer
19 biologist, but I do count on the authors to set
20 the stage with the introduction and then interpret
21 their findings and the discussion and sort of take
22 us at least partway towards there.
23         So even the recent meta-analysis, if you
24 look at Berge or Burge (phonetic), however you say
25 that, and Penninkilampi, you know, they talk about

Page 455

1  there -- there being uncertainty about the
2  mechanism.  So I'm just saying even as recently as
3  the -- the very latest meta-analysis, there's
4  uncertainty expressed.
5       Q   Do you see uncertainty being expressed
6  by biologically plausible mechanisms?
7          MS. BROWN: Objection.
8          THE WITNESS: Well, I don't know if
9  they're plausible or not.  I mean that's the whole
10 point, right?  You know, I mean you can say
11 something, but it doesn't make it true.
12 BY MS. PARFITT:
13      Q   You reminded me of something.  In your
14 review of the various case-control studies, did
15 you exercise a process known as vote counting?
16         MS. BROWN: Objection.
17         THE WITNESS: No.
18 BY MS. PARFITT:
19      Q   You did not?
20      A   I did not.
21      Q   That would be improper to do so,
22 correct?
23         MS. BROWN: Objection.
24         THE WITNESS: Well, if we're talking --
25 so I guess, just to be clear, so vote counting

Page 456

1  probably means one thing in the world in general.
2  I think if you're talking about Rothman, yeah,
3  Rothman has written about that --
4  BY MS. PARFITT:
5       Q   Right.
6       A   -- and about it being simply a
7  competition of sort of counting those that are
8  significant and those that are not.
9          I didn't see that.  I think the way I
10 described it I think was -- was the way I
11 approached it, which said some of the information
12 that's available is that some of the studies were
13 statistically significant and some weren't.  It's
14 informative, but it's not literally the same as
15 saying, I'm just going to count them up and stop
16 there.
17      Q   Because that would be improper, correct?
18         MS. BROWN: Objection.
19         THE WITNESS: To only do that, yes.
20 BY MS. PARFITT:
21      Q   Okay.  All right.  Let me ask a couple
22 of question -- questions.
23         What is the minimal level of exposure to
24 cigarette smoke in terms of cigarette smoke at
25 home that's necessary to cause lung cancer?

Page 457

1          MS. BROWN: Form.
2          THE WITNESS: I do not know.
3  BY MS. PARFITT:
4       Q   Okay.  What is the minimal level of
5  exposure to asbestos fibers inhaled that is
6  sufficient to cause ovarian cancer?
7          MS. BROWN: Form.
8          MR. LOCKE: Objection.
9          THE WITNESS: We -- we did that before.
10 I don't -- I don't have any more information than
11 what I did, like meaning, you know, I have some --
12 some guideposts like the -- the Whitnum 40
13 fiber/cc years of -- of crocidolite, which did not
14 seem to be adequate to cause it.
15         And then, you know, when we looked at
16 the IARC, I didn't -- even when you and I looked
17 at it together, I didn't see information that
18 talked about what dose would be required.
19 BY MS. PARFITT:
20      Q   Okay.  Same question.  What's the
21 minimal level of exposure to asbestos fibers
22 inhaled that is sufficient to cause mesothelioma?
23         MS. BROWN: Objection.
24         MR. LOCKE: Objection.
25         THE WITNESS: Pleural or peritoneal

115 (Pages 454 to 457)

Gregory B. Diette, M.D.

Page 458

1    or --
2    BY MS. PARFITT:
3        Q   Pleural.
4        A   So the -- so the amount for pleural
5    mesothelioma is -- and did you say fiber type or
6    you didn't mention fiber type?
7        Q   I didn't.  I just said fibers.
8        A   Okay.  So it would matter fiber type.
9    If it's chrysotile predominant, then above 200 to
10   400 fiber/cc years would be, you know, one
11   estimate of the dose.  If it's crocidolite, you
12   know, you could divide that by 500.  And if it's
13   amosite, by a hundred, and other amphiboles, you
14   know, somewhere in between those sort of ranges.
15       And so, you know, I think for
16   amphiboles, above like the single digit fiber/cc
17   years, and for chrysotile, above the couple of
18   like 200 to 400 fiber/cc years.
19       Q   Is it true that the dose-response curve
20   for any genotoxic carcinogen intersects with zero?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  Well, there's got to be a
23   zero point if there's zero exposure, right?  If
24   there's literally zero exposure, then there can't
25   be -- there can't be a signal from that zero.

Page 459

1    BY MS. PARFITT:
2        Q   What does the -- what does it mean if a
3    dose-response curve intersects zero?
4        MS. BROWN:  Form.
5    BY MS. PARFITT:
6        Q   What does that mean?
7        A   It's not a term that's familiar.  I
8    mean, it's just -- I'm not sure -- if you've got
9    zero exposure, you can't have any outcome from
10   that.  So I -- I assume that's what we're talking
11   about is just like a -- like a no exposure
12   estimate.
13       If you're talking about like -- the
14   place I've seen people talk about it is like with
15   low doses of things and what happens, you know,
16   below the concentration or the level at which
17   there's known effects, then what happens between
18   there and zero.  But if it's literally zero -- if
19   there's literally zero exposure, it's got to be
20   zero outcome.
21       (Counsel conferring.)
22   BY MS. PARFITT:
23       Q   Okay.  You reviewed the cohort studies
24   in this case, correct?
25       A   The three -- three cohort studies.

Page 460

1        Q   Okay.  You criticize the plaintiffs'
2    experts for what you called a muted examination of
3    the case-control studies that they reviewed.
4        Do you remember saying that in your
5    report?
6        A   I don't remember that word, but it's --
7    it makes a lot of sense to me.
8        Q   Okay.  Where in your -- report did
9    you set forth all of the limitations and
10   weaknesses of the cohort studies of talcum --
11   talcum powder products and asbestos -- and ovarian
12   cancer?
13       A   Well, there's a bunch, right.  So --
14       Q   Well, where did you --
15       A   I'm telling you.
16       Q   -- provide us in your report that
17   information --
18       A   I'm telling you.
19       MS. BROWN:  Let him finish --
20       THE WITNESS:  I understand your
21   question.
22       MS. BROWN:  -- and answer your question.
23       THE WITNESS:  So one of the criticisms,
24   which I think is pretty profound, which is the
25   lack of a validated measure of talcum powder

Page 461

1    exposure that could have someone estimate whether
2    or not somebody is exposed at all or whether or
3    not there's a dose-response, and that applies to
4    all the studies, right.  So that's uniformly
5    applied to whether they're case-control studies
6    or -- or cohort studies.
7    BY MS. PARFITT:
8        Q   That would be the exposure
9    misclassification.
10       MS. BROWN:  Objection.
11       THE WITNESS:  No, no, no.  So it would
12   be -- you could misclassify it, but it -- but what
13   I'm talking about is, that in order to measure an
14   exposure, you need a valid measure of that
15   exposure.  That doesn't exist, or at least if it
16   exists, it hasn't been employed in the -- in the
17   published literature.  And that applies to the
18   cohort studies and the case controls.
19       What I -- what I did was I tried to
20   actually not denigrate any of the study designs.
21   I thought that was appalling.  You know, when you
22   talk about where this came from, you know, to sort
23   of single out the cohort studies repeatedly by
24   the -- by the plaintiffs' expert and say, you
25   know, This is a terrible design, or this is

116 (Pages 458 to 461)

Gregory B. Diette, M.D.

Page 462

1    terrible for whatever reason, it's extraordinary,
2    and it's -- to me it's unprecedented for -- for
3    epidemiologists or other healthcare professionals
4    to sort of look at cohort studies and find that
5    those are so awful, and that case-control studies
6    are suddenly so sturdy. It doesn't make any
7    sense.
8        So -- so for me, like the task wasn't
9    really so much -- I wasn't trying to criticize
10   either form of the study, but just to point out
11   realistically that there are biases, that there
12   are confounding issues, and -- and things of
13   that -- that sort.
14   BY MS. PARFITT:
15       Q   In your review of the literature for
16   purposes of your opinions today, did you see
17   evidence from any of the studies that you read
18   that there was a dose-response associated between
19   talcum powder products and ovarian cancer?
20       A   So in total, no. In a couple of
21   studies, there are purported dose-response
22   findings, right. So the latest Cramer study is an
23   example. There may have been another, but there
24   are so many studies that show absolutely the
25   opposite, meaning either flat dose-response,

Page 463

1    upside down dose-response, zig-zaggy, haphazard
2    dose-response. So I would say looking at the
3    evidence in total, it's a mess. I mean it's
4    certainly not supportive.
5        And I'll you the truth, if you go back
6    to -- like to 2000 -- and I know we're in a hurry,
7    so I will try to talk a little faster -- but the
8    Rothman -- the Rothman review, at least up until
9    2000, they -- they plotted out all the
10   dose-response they found, and they found an
11   inverse relationship overall, which is one of the
12   things they found to be inconsistent with there
13   being causation.
14       So I think, you know, from 1982, when
15   the first case-control study was published, to
16   2000, at least when it's assessed by Rothman and
17   his colleagues, is actually upside down.
18       Q   What about Terry? Terry in 2013
19   reported a dose-response, did they not?
20       MS. BROWN: Objection to the form.
21       THE WITNESS: I don't remember what they
22   showed. I don't -- I don't doubt you, but I --
23   but there's just -- there's a couple of studies
24   that have demonstrated that.
25   BY MS. PARFITT:

Page 464

1        Q   Okay. So you would agree with me there
2    are studies in the peer-reviewed literature that
3    have demonstrated a dose-response between talcum
4    powder products and ovarian cancer?
5        MS. BROWN: Objection --
6        MR. LOCKE: Objection.
7        MS. BROWN: -- to the form.
8        MS. PARFITT: Let him answer, please.
9        MS. BROWN: I get to object.
10       THE WITNESS: I think just a couple.
11       MS. PARFITT: Let's go off the record.
12       THE VIDEOGRAPHER: The time is 5:53 p.m.
13   We're going off the record.
14       (Recess.)
15       THE VIDEOGRAPHER: The time is 5:58 p.m.
16   We're back on the record.
17       MR. HEASLIP: Can we go off for one
18   moment? I apologize.
19       THE VIDEOGRAPHER: The time is 5:58 p.m.
20   We're going back on the record.
21       (A discussion was held off the record.)
22       THE VIDEOGRAPHER: The time is 5:59 p.m.
23   We're back on the record.
24       CROSS-EXAMINATION
25   BY MR. FINCH:

Page 465

1        Q   Good afternoon, Dr. Diette. My name is
2    Nate Finch. You and I have met before, correct?
3        A   Yes.
4        Q   You were asked a question about the
5    dose-response curve to genotoxic carcinogens. Do
6    you recall that question?
7        A   I do.
8        Q   And your answer was something to the
9    effect of if the dose was zero, then it would be
10   an intersection of zero.
11       Do you recall that answer?
12       A   Something like that.
13       Q   All right. I want you to assume that
14   we're talking about a dose-response curve where
15   there is a positive dose, not a dose of zero.
16   Your typical dose-response curve looks something
17   like this (indicating), right, with dose on the
18   X-axis and response on the Y-axis?
19       A   You can draw it that way.
20       MS. MILLER: Is that a exhibit?
21       MR. FINCH: You can mark it as an
22   exhibit. It's got somebody's notes on the back of
23   it, but...
24   BY MR. FINCH:
25       Q   Isn't it true, Dr. Diette, that for a

117 (Pages 462 to 465)

Gregory B. Diette, M.D.

Page 466

1   genotoxic carcinogen where there is a positive
2   dose, the dose-response curve always intersects
3   with zero?
4          MS. BROWN: Objection to form.
5          THE WITNESS: That's not something that
6   I say. I mean I don't -- people may say that, but
7   I -- I think when we're talking about -- like zero
8   is zero, right. So zero exposure means zero risk.
9   BY MR. FINCH:
10         Q   I'm not -- I'm not talking about zero.
11         MS. BROWN: Wait, let him finish,
12   please.
13         THE WITNESS: Well, I know. That's what
14   I'm talking about when I -- when I hear that
15   question.
16   BY MR. FINCH:
17         Q   All right. So if someone were to
18   testify when you're talking about a genotoxic
19   carcinogen where there is a positive exposure,
20   there -- the dose-response curve intersects with
21   zero, meaning that there -- isn't it true that
22   that means that there -- at any level of exposure,
23   there's an excess risk of cancer for a genotoxic
24   carcinogen?
25         MS. BROWN: Objection to the form.

Page 467

1          THE WITNESS: So I don't know. That may
2   be part of some field that's not my field. But I
3   -- but in the fields that I work in, I recognize
4   that you need a certain amount of exposure in
5   order to cause a disease, including cancer.
6   BY MR. FINCH:
7          Q   Okay. But you cannot dispute that
8   genotoxic carcinogens, the dose-response curve
9   intersects with zero. You haven't studied that
10   issue; is that correct?
11         MR. LOCKE: Objection.
12         MS. BROWN: Objection to the form.
13         THE VIDEOGRAPHER: Seven hours.
14         MS. BROWN: You're done. Wait.
15         THE WITNESS: So I mean, my answer is
16   the same as it was before.
17         MS. BROWN: I can ask from here.
18         (A discussion was held off the record.)
19                CROSS-EXAMINATION
20   BY MS. BROWN:
21         Q   Good evening, Dr. Diette.
22         A   Hi.
23         Q   Just a couple of quick questions, and we
24   will get you on your way.
25         We had some discussion earlier today

Page 468

1   about the sort of mechanical process of writing
2   your report. Do you remember that?
3          A   I do.
4          Q   And to be clear, Doctor, did you write
5   every substantive word of the expert report that
6   we've marked as an exhibit in this case?
7          A   To the -- yes, everything substantive.
8          Q   Did MSA or Medical Science Affiliates
9   make any substantive contributions to your expert
10   report in this proceeding?
11         A   No.
12         Q   You spoke a little bit earlier today
13   about some administrative support that you
14   received from MSA. Do you remember that?
15         A   I do.
16         Q   And tell us what you meant by
17   "administrative support."
18         A   So by "administrative support," I meant,
19   you know, gathering -- like collating materials
20   for me, helping to -- to format the report, you
21   know, putting -- you know, putting the reference
22   citations in correctly. You know, creating the --
23   the list of reliance documents at the end. You
24   know, things of that sort. And then -- and then
25   generating invoices.

Page 469

1          I'm trying to think what else.
2   Whatever -- whatever I said earlier was the -- was
3   the full list, I think.
4          Q   You also mentioned earlier today
5   receiving some editorial support from the folks at
6   MSA. Tell us what you meant by that.
7          A   So to look for typos or -- I gave the
8   example of like where I had a really long
9   paragraph, and they broke it up with bullets to
10   make it look more readable, that sort of thing,
11   and -- and just making this actually have the
12   physical appearance that it does.
13         Q   Did MSA provide anything other than
14   administrative formatting type support in
15   connection with your report in this case?
16         A   No.
17         Q   If someone were to suggest that the
18   opinions in your expert report are not entirely
19   your own, would that be the truth?
20         A   I'm sorry. I was reading that going by,
21   and I didn't listen.
22         Q   Sure. If someone were to suggest that
23   some of the opinions in your expert report are not
24   entirely your own, would that be the truth?
25         A   No.

118 (Pages 466 to 469)

Gregory B. Diette, M.D.

| Page 470 |
| --- |

1     MS. PARFITT: Objection.
2     THE WITNESS: They're -- they're all my
3 opinions.
4 BY MS. BROWN:
5     Q   If someone were to suggest that MSA
6 wrote some of the substantive pieces of your
7 report, would that be the truth?
8     MS. PARFITT: Objection.
9     THE WITNESS: No.
10     MS. BROWN: Thanks very much for your
11 time, Dr. Diette. I have no further questions.
12     MS. PARFITT: Anybody? No. Thank you.
13 Dr. Diette, thank you very much.
14     THE WITNESS: Thank you.
15     MS. PARFITT: I appreciate it.
16     THE VIDEOGRAPHER: The time is 6:04
17 p.m., April 9th, 2019. Going off the record,
18 completing the videotaped deposition.
19     (Whereupon, the deposition of
20     GREGORY B. DIETTE, M.D. was
21     concluded at 6:04 p.m.)
22
23
24
25

| Page 471 |
| --- |

1     CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2     The undersigned Certified Shorthand Reporter
3 does hereby certify:
4     That the foregoing proceeding was taken before
5 me at the time and place therein set forth, at
6 which time the witness was duly sworn; That the
7 testimony of the witness and all objections made
8 at the time of the examination were recorded
9 stenographically by me and were thereafter
10 transcribed, said transcript being a true and
11 correct copy of my shorthand notes thereof; That
12 the dismantling of the original transcript will
13 void the reporter's certificate.
14     In witness thereof, I have subscribed my name
15 this date:  April 10, 2019.
16
17     _____
18     LESLIE A. TODD, CSR, RPR
19     Certificate No. 5129
20 (The foregoing certification of
21 this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)
25

| Page 472 |
| --- |

1     INSTRUCTIONS TO WITNESS
2     Please read your deposition over carefully and
3 make any necessary corrections. You should state
4 the reason in the appropriate space on the errata
5 sheet for any corrections that are made.
6 After doing so, please sign the errata sheet
7 and date it.
8     You are signing same subject to the changes
9 you have noted on the errata sheet, which will be
10 attached to your deposition.  It is imperative
11 that you return the original errata sheet to the
12 deposing attorney within thirty (30) days of
13 receipt of the deposition transcript by you. If
14 you fail to do so, the deposition transcript may
15 be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

| Page 473 |
| --- |

1         - - - - - -
2         E R R A T A
3         - - - - - -
4 PAGE LINE CHANGE
5     _____
6 REASON: _____
7     _____
8 REASON: _____
9     _____
10 REASON: _____
11     _____
12 REASON: _____
13     _____
14 REASON: _____
15     _____
16 REASON: _____
17     _____
18 REASON: _____
19     _____
20 REASON: _____
21     _____
22 REASON: _____
23     _____
24 REASON: _____
25

119 (Pages 470 to 473)

Gregory B. Diette, M.D.

Page 474

1          ACKNOWLEDGMENT OF DEPONENT

2          I,_____, do hereby

3     certify that I have read the foregoing pages, and

4     that the same is a correct transcription of the

5     answers given by me to the questions therein

6     propounded, except for the corrections or changes

7     in form or substance, if any, noted in the

8     attached Errata Sheet.

9

10     _____

11     GREGORY B. DIETTE, M.D.            DATE

12

13

14     Subscribed and sworn to

15     before me this

16     _____ day of_____,20____.

17     My commission expires:_____

18     _____

19     Notary Public

20

21

22

23

24

25