# EXHIBIT B27

H. Nadia Moore, Ph.D.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

----------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

----------------------------x

VIDEOTAPED DEPOSITION OF

H. NADIA MOORE, Ph.D.

WASHINGTON, D.C.

THURSDAY, APRIL 4, 2019

8:53 A.M.

Reported by: Leslie A. Todd

H. Nadia Moore, Ph.D.

| | Page 2 |
|---|---|
| 1 | Deposition of H. NADIA MOORE, Ph.D., held at |
| 2 | the offices of: |
| 3 | |
| 4 | |
| 5 | SKADDEN, ARPS, SLATE, MEAGHER & |
| 6 | FLOM, LLP |
| 7 | 1440 New York Avenue, N.W. |
| 8 | Washington, DC 20005 |
| 9 | (202) 371-7000 |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | Pursuant to notice, before Leslie Anne Todd, |
| 18 | Court Reporter and Notary Public, who officiated |
| 19 | in administering the oath to the witness. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | SUSAN M. SHARKO, ESQUIRE |
| 4 | DRINKER BIDDLE & REATH LLP |
| 5 | 600 Campus Drive |
| 6 | Florham Park, New Jersey 07932-1047 |
| 7 | (973) 549-7000 |
| 8 | |
| 9 | GEOFFREY M. WYATT, ESQUIRE |
| 10 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| 11 | 1440 New York Avenue, N.W. |
| 12 | Washington, DC 20005 |
| 13 | (202) 371-7000 |
| 14 | |
| 15 | ON BEHALF OF THE PCPC: |
| 16 | THOMAS T. LOCKE, ESQUIRE |
| 17 | SEYFARTH SHAW LLP |
| 18 | 975 F Street, N.W. |
| 19 | Washington, D.C. 20004-1454 |
| 20 | (202) 463-2400 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | FOR THE PLAINTIFFS: |
| 4 | TED G. MEADOWS, ESQUIRE |
| 5 | P. LEIGH O'DELL, ESQUIRE |
| 6 | RYAN BEATTIE, ESQUIRE |
| 7 | BEASLEY, ALLEN, CROW, METHVIN, |
| 8 | PORTIS & MILES, P.C. |
| 9 | 218 Commerce Street |
| 10 | Montgomery, Alabama 36103-4160 |
| 11 | (334) 269-2343 |
| 12 | |
| 13 | RUDIE R. SOILEAU, JR., ESQUIRE |
| 14 | KRISTIE M. HIGHTOWER, ESQUIRE |
| 15 | LUNDY, LUNDY, SOILEAU & SOUTH, L.L.P. |
| 16 | 501 Broad Street |
| 17 | Lake Charles, Louisiana 70601 |
| 18 | (337) 439-0707 |
| 19 | |
| 20 | ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS: |
| 21 | MICHAEL C. ZELLERS, ESQUIRE |
| 22 | TUCKER ELLIS LLP |
| 23 | 515 South Flower Street, 42nd Floor |
| 24 | Los Angeles, California 90071-2223 |
| 25 | (213) 430-3301 |

| | Page 5 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF PHARMATECH INDUSTRIES (PTI): |
| 4 | MATTHEW P. MORIARTY, ESQUIRE |
| 5 | TUCKER ELLIS, LLP |
| 6 | 950 Main Avenue, Suite 1100 |
| 7 | Cleveland, Ohio 44113-7213 |
| 8 | (216) 696-4835 |
| 9 | |
| 10 | ALSO PRESENT: |
| 11 | KATIE TUCKER, Legal Assistant (Beasley Allen) |
| 12 | DANIEL HOLMSTOCK, Videographer |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 2 to 5)

H. Nadia Moore, Ph.D.

Page 6

```
 1              C O N T E N T S
 2   EXAMINATION OF H. NADIA MOORE, Ph.D.      PAGE
 3      By Mr. Meadows            11
 4      By Mr. Zellers                  334
 5
 6
 7              E X H I B I T S
 8          (Attached to transcript)
 9   MOORE DEPOSITION EXHIBITS           PAGE
10   No. 1   Rule 26 Report of H. Nadia Moore,
11           Ph.D., DABT, ERT           14
12   No. 2   Documents produced to plaintiffs
13           4/3/2019               17
14   No. 3   Toxic Tort and Environmental
15           Litigation, Talc -- the Next
16           Asbestos? Analyzing the Recent
17           Explosion of Talc Related Claims   113
18   No. 4   ACI Document, Toxic Tort &
19           Environmental Litigation, June 21-
20           23, 2017, Chicago, IL       113
21   No. 5   Document headed "William Long, Ph.D.
22           Material Scientist"        156
23   No. 6   Document headed "Ghassan Saed, Ph.D.
24           Obstetrics, Gynecology, and Ovarian
25           Cancer"                160
```

Page 7

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3   MOORE DEPOSITION EXHIBITS           PAGE
 4   No. 7   Draft Screening Assessment, Talc,
 5           Chemical Abstracts Service Registry
 6           Number 14807-96-6, Environment
 7           And Climate Change Canada Health
 8           Canada, December 2018       168
 9   No. 8   Article entitled "Molecular Basis
10           Supporting the Association of Talcum
11           Powder Use With Increased Risk of
12           Ovarian Cancer"           178
13   No. 9   Demonstrative created during
14           deposition, headed "Expert"     204
15   No. 10  Letter from FDA to Samuel Epstein,
16           Dated April 1, 2014       213
17   No. 11  Article entitled "Safety Assessment
18           of Talc as Used in Cosmetics"    210
19   No. 12  Ultrastructural Pathology article
20           "Correlative polarizing light and
21           scanning electron microscopy for
22           the assessment of talc in pelvic
23           region lymph nodes"       232
24   No. 13  National Cancer Institute, Ovarian
25           Cancer Prevention         241
```

Page 8

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3   MOORE DEPOSITION EXHIBITS           PAGE
 4   No. 14  Article entitled "Asbestos
 5           (Chrysotile, Amosite, Crocidolite,
 6           Tremolite, Actinolite, and
 7           Anthophyllite)"           249
 8   No. 15  OSHA Safety and Health Topics,
 9           Asbestos               267
10   No. 16  Document Bates DAN 01081, attaching
11           NIOSH Notes            268
12   No. 17  Rule 26 Report of Michael M. Crowley,
13           Ph.D. Regarding the Fragrance
14           Chemical Constituents in Johnson &
15           Johnson Talcum Powder Products   296
16   No. 18  Appendix E, Photographs of Baby
17           Powder Products and Their Warnings  301
18   No. 19  Dr. Carson's report (retained by
19           counsel for J&J)           323
20
21
22
23
24
25
```

Page 9

```
 1              P R O C E E D I N G S
 2          --------------------
 3          MS. O'DELL:  Last night at 6:56, :57
 4   p.m., we received a response to the notice of
 5   deposition, and attached to it were materials that
 6   had not previously been provided to plaintiffs,
 7   including a new reliance list, 21 pages of
 8   literature and other references, the majority of
 9   which had not previously been disclosed.
10          In addition, there was a multi-page
11   analysis of drill cores and other geologic
12   documents that have never been produced to the
13   plaintiff.  There were two analyses of fragrance
14   chemicals that were approximately 20 pages, all of
15   which plaintiffs had no time essentially to
16   evaluate for purposes of the deposition today.
17   Therefore, we will move to have additional time
18   with Dr. Moore in order to examine her on these
19   particular areas.
20          MR. ZELLERS:  I will just state for the
21   record, in response, that I was at a number of the
22   depositions of the plaintiffs' experts, five
23   different depositions, and at each of those
24   depositions I was presented with the materials for
25   that witness right at the start of the deposition.
```

H. Nadia Moore, Ph.D.

Page 10

1          So I'll say that for the record, and
2   then we can talk about it later.
3          MS. O'DELL:  We can present this to --
4   if we can't reach an agreement, I'm hoping we can,
5   because as you both know -- Mike and Susan knows
6   -- there was additional time for certain
7   plaintiffs' experts when there were analyses that
8   were produced at the deposition.  We're going to
9   take that position in this case.
10         And the instances you're talking about
11  were a couple of articles, and certainly not
12  multi-page analyses that had not previously been
13  provided.
14         MS. SHARKO:  We disagree.  We will
15  oppose vigorously any effort for you to get more
16  time.  I submit that there's not all that much new
17  stuff in there.
18         MS. O'DELL:  Well, we will present it to
19  Judge Pisano and let him decide.
20         THE VIDEOGRAPHER:  We are now on the
21  record.  My name is Daniel Holmstock.  I'm the
22  videographer for Golkow Litigation Services.
23  Today's date is April 4th, 2019, and the time on
24  the video screen is 8:56 a.m.
25         This video deposition is being held at

Page 11

1   Skadden, Arps at 1440 New York Avenue, Northwest,
2   Washington, D.C., in the matter of In Re:
3   Johnson & Johnson Talcum Powder Products,
4   Marketing, Sales Practices, and Products Liability
5   Litigation, MDL No. 2738, pending before the
6   United States District Court for the Eastern
7   District of New Jersey.
8          Our deponent today is Dr. H. NADIA
9   MOORE.
10         Counsel will be noted for appearances on
11  the stenographic record.
12         The court reporter is Leslie A. Todd,
13  who will now administer the oath.
14         H. NADIA MOORE, Ph.D.,
15         and having been first duly sworn,
16         was examined and testified as follows:
17         DIRECT EXAMINATION
18  BY MR. MEADOWS:
19     Q   Good morning, Dr. Moore.
20     A   Good morning.
21     Q   My name is Ted Meadows.  We met briefly
22  before the deposition started, and I'm here to ask
23  you some questions today.
24         I -- just curious, have you ever given a
25  deposition before?

Page 12

1      A   I have.
2      Q   Okay.  How many times have you given a
3   deposition?
4      A   Once.
5      Q   Okay.  And I believe that's referenced
6   in the materials that you've given to us?
7      A   It's -- yes.
8      Q   The case that you were involved in?
9      A   Yes.
10     Q   And have you ever testified in court
11  before?
12     A   Yes.
13     Q   How many times?
14     A   Once.
15     Q   And was that the same case?
16     A   It was.
17     Q   Okay.  We'll talk about that case a
18  little bit later when we get to your materials.
19         I'm sure your lawyers have told you that
20  I've got a lot -- probably have a number of
21  questions to ask you today.  I'll try to be as
22  clear as I can.  If you think I'm not clear,
23  you're welcome to -- to tell me that you're not
24  understanding my question, and I'll do my best
25  to -- to rephrase it for you.

Page 13

1          I'll tell you up front, I have been
2   wrestling with a head cold for -- it seems like
3   for weeks, and these beautiful cherry blossoms in
4   D.C., as much as I like looking at them, they may
5   be messing with me a little bit as well.  So as
6   the day goes on, I might be coughing, I might be
7   clearing my throat, things like that, and I
8   apologize for that ahead of time.
9          Okay?
10     A   Sure.
11     Q   I guess the first thing I'd like to do
12  is get your -- your full name.
13     A   Hope Alexandria Moore.  I go by H. NADIA
14  MOORE.
15     Q   Okay.  And where do you live?
16     A   I live in Washington state.
17     Q   How long have you lived there?
18     A   Decades.
19     Q   Are you originally from Washington
20  state?
21     A   I moved there when I was a small child.
22     Q   Okay.  And you work there as well?
23     A   I do.
24     Q   Okay.  I tell you what, let's go ahead
25  and mark your report.

4 (Pages 10 to 13)

H. Nadia Moore, Ph.D.

Page 14

1          (Moore Exhibit No. 1 was marked
2     for identification.)
3     BY MR. MEADOWS:
4          Q   I've marked as Exhibit 1 what is
5     identified as -- well, your Rule 26 report,
6     Dr. Moore.
7          Do you recognize that?
8          A   I do.
9          Q   Okay.  And that's your signature on the
10    front?
11         A   It is.
12         Q   Okay.  And this was apparently signed by
13    you, if we look at the first page.  It appears it
14    was signed by you on March 25th of this year,
15    correct?
16         A   No.  Sorry, you said March.
17         Q   Excuse me.  February 25th of this year.
18         A   Correct.
19         MR. ZELLERS:  That was a test.
20         MR. MEADOWS:  Yeah, an inadvertent one.
21    BY MR. MEADOWS:
22         Q   Okay.  And so this report reflects your
23    opinions in this case; is that correct?
24         A   Yes, it does.
25         Q   And is it a complete recitation of your

Page 15

1     opinions in this case?
2          MR. ZELLERS:  Objection.  Form.
3          THE WITNESS:  So it's the opinions that
4     I had when I wrote the report, yes.
5     BY MR. MEADOWS:
6          Q   Okay.  Do you have new opinions?
7          A   Not that I know of, no.
8          Q   Okay.  Well, if you do, I need to know
9     about it, so --
10         A   Yes.
11         Q   So my question is, does this report
12    represent the -- the whole of your opinions in
13    this case?
14         MR. ZELLERS:  Object to form.
15         THE WITNESS:  Well, it represents
16    everything that -- that I know that -- everything
17    that I understood to be the scientific matter, and
18    what you may ask me today may change my opinions.
19    BY MR. MEADOWS:
20         Q   Okay.  You're saying that if I present
21    you with some evidence today that suggests that
22    your opinions are incorrect, that you're willing
23    to change your opinions?
24         A   Well, I think in general as a scientist,
25    I always have to evaluate new data, but right now

Page 16

1     this is -- this is my opinion.
2          Q   Okay.
3          A   These represent my opinions.
4          Q   All right.  And the opinions that you've
5     expressed in this report that we've marked as
6     Exhibit 1, you've also referenced either in the
7     report or in an attachment to the report marked
8     as --
9          MR. MEADOWS:  References, I don't see it
10    on here.  Okay.  Excuse me.
11    BY MR. MEADOWS:
12         Q   On page 5 of your report --
13         A   Yes.
14         Q   -- you have a list of -- and it's
15    paragraph D there, a list of materials received
16    for review.  Do you see what I'm talking about?
17         A   Correct.
18         Q   And are those the materials that you
19    reviewed in order to reach the opinions you have
20    in this case?
21         A   So these were the materials that I
22    received from the attorneys in this case.
23         Q   Okay.  Does that represent all of the
24    materials that you reviewed in order to reach the
25    opinions expressed in this report?

Page 17

1          A   No.
2          Q   Okay.  Well, where would I find the -- a
3     reference to the materials that -- any additional
4     materials you reviewed in order to reach your
5     opinions in this case?
6          A   So the -- the -- the references that are
7     cited in the footnotes in the report were used to
8     reach my opinions in this case, as well as there's
9     a -- I apologize, I don't know the exact name of
10    the supplemental list that was distributed.
11         Q   Okay.  So you're -- you just refer --
12    referenced a supplemental list.  Is that the list
13    that was provided to us last night?
14         A   I'm not sure.  I believe it is.
15         Q   Okay.  So last night I received -- or
16    Ms. O'Dell, my law partner, received an e-mail
17    from Katherine McBeth at 5:57 p.m. --
18         MS. O'DELL:  Central Time.
19    BY MR. MEADOWS:
20         Q   -- Central Time that attaches -- I tell
21    you what, let's mark this.
22         (Mr. Meadows and Ms. Tucker conferring.)
23         (Moore Exhibit No. 2 was marked
24    for identification.)
25    BY MR. MEADOWS:

H. Nadia Moore, Ph.D.

Page 18

1      Q   All right.  So that's Exhibit 2 that
2  I've marked.
3          MR. ZELLERS:  Mr. Meadows, Exhibit 2 is
4  the cover -- cover e-mail, and then with the
5  attachments.  Is that --
6          MR. MEADOWS:  Correct.  That's what we
7  received last night.
8          MR. ZELLERS:  And there were a number of
9  attachments, I guess six attachments?
10         MR. MEADOWS:  There were a lot.
11         MR. ZELLERS:  Okay.
12  BY MR. MEADOWS:
13     Q   So you're -- Dr. Moore, are you familiar
14  with the materials I just handed to you?
15     A   (Peruses document.)
16         MR. ZELLERS:  And before she responds, I
17  don't think she's familiar with the cover letter,
18  but she can answer as to everything else.
19         MR. MEADOWS:  You're referring to the
20  cover e-mail?
21         MR. ZELLERS:  Yeah, the cover e-mail.
22         MR. MEADOWS:  Okay.
23         THE WITNESS:  So I didn't go through
24  obviously every page, but I am -- it seems like
25  I'm familiar with the materials minus the cover

Page 19

1  e-mail.
2  BY MR. MEADOWS:
3     Q   Okay.  And so you're -- you're saying
4  that those materials that are found in Exhibit 2,
5  with the exception of the -- the cover e-mail, are
6  ones that you reviewed -- materials you reviewed
7  in order to reach the opinions that you expressed
8  in your report as reflected in Exhibit 1 and dated
9  February 25th of 2019.
10         MR. ZELLERS:  Objection.  Misstates her
11  testimony.
12         THE WITNESS:  Okay.  So -- sorry, I
13  missed the question, I guess.
14  BY MR. MEADOWS:
15     Q   Okay.
16         MR. ZELLERS:  Well, and Mr. -- you know,
17  there's a section of the materials that have been
18  produced, which I believe tried to be a
19  comprehensive list of all the materials that she
20  has reviewed with anything that she reviewed after
21  she issued her report having an asterisk so you
22  would be able to distinguish that.
23  BY MR. MEADOWS:
24     Q   Okay.  Well, why don't you show me that.
25     A   Can I take these out of order?

Page 20

1          MR. ZELLERS:  Well --
2          THE WITNESS:  I mean, or do they need to
3  stay in order?
4          MR. ZELLERS:  There should be a cover
5  page to that.
6          THE WITNESS:  Yeah.  So this document,
7  it looks like maybe 20 pages in.
8          MR. ZELLERS:  You tell us the title.
9          THE WITNESS:  Sure.  It's a "Complete
10  List of Materials Reviewed and Considered by
11  H. Nadia Moore, PhD, DABT, ERT, as of April 3rd,
12  2019."
13  BY MR. MEADOWS:
14     Q   Okay.  And how can I tell which ones you
15  reviewed before you wrote the report dated
16  February 25th of 2019?
17     A   So the ones that are marked with an
18  asterisk, the asterisk is defined on each page as
19  "Reviewed after February 25th report issued."
20     Q   Where am I going to find this asterisk?
21  Is it going to be on the left or the right of
22  each --
23     A   It's after each one.  So if you -- the
24  easiest example is to go to the end of the
25  document on page 21, and there's the expert

Page 21

1  reports that were received in this matter that I
2  received after I issued my report, and they all
3  have asterisks on the back.  I think if you print
4  this in color, the asterisks are actually like a
5  reddish color so they'll stand out.
6     Q   So you're saying that everything that
7  does not have an asterisk next to it, you reviewed
8  before you drafted and signed your report dated
9  February 25th of 2019?
10     A   I reviewed it to some extent, yes.
11     Q   Okay.  To some extent?  Tell me what you
12  mean by that.
13     A   So when you say "read," I don't know
14  that I agree with that connotation.  "Read" to me
15  make -- makes it sound like I analyzed it and
16  evaluated the references.  It was material that I
17  considered when I -- before I issued my report.
18     Q   Well, are there any of these materials
19  you did not read in total?
20         MR. ZELLERS:  Objection.  Form.
21         THE WITNESS:  I don't know what you mean
22  "in total."
23  BY MR. MEADOWS:
24     Q   Well, I mean, are there -- can you tell
25  me which ones you read the entire material?  For

6 (Pages 18 to 21)

H. Nadia Moore, Ph.D.

Page 22

1    each entry you have here, can you tell me which
2    ones you read in total?
3        A  So I think we'd have to go through each
4    one, and I can look at it and give you my opinion.
5        Q  With respect to those materials, did
6    you -- have you at any point in time since you
7    signed your report read the -- the entire
8    reference material?
9            MR. ZELLERS: Objection. Form.
10           THE WITNESS: I don't understand the
11   question.
12   BY MR. MEADOWS:
13       Q  Okay.  Well, you -- you've -- I'm under
14   the impression that there are certain items in
15   here that you have read and studied thoroughly and
16   others that you have not.
17           So my question is, can you tell me --
18   well, have you since the signing of your report
19   gone back and read in total everything that you're
20   now telling us that is a reference material?
21           MR. ZELLERS: Objection. Form.
22           THE WITNESS: So, again, I just -- I
23   don't understand the question.
24   BY MR. MEADOWS:
25       Q  Okay.  Let me ask you this:  Did this

Page 23

1    list that you provided yesterday to us, did it
2    exist as of the date you signed this report on
3    February 25th, 2019?
4        A  The list as it -- as it is written?
5        Q  Did it exist in any form?
6        A  Well, I guess I -- what do you mean "in
7    any form"?  It's a list of materials that I
8    reviewed, so --
9        Q  But my question is -- I'm having
10   a hard time understanding what you have reviewed
11   before you signed your report and what you
12   reviewed since.  Can you explain that to me?
13       A  So --
14           MR. ZELLERS: Go ahead.
15           THE WITNESS: So the materials that I
16   reviewed before my report are the ones without an
17   asterisk on this list.
18   BY MR. MEADOWS:
19       Q  Okay.  And so did this list -- even
20   though you may not have reviewed the materials as
21   of the time you signed the report, did the list in
22   some way, shape or form exist at the time you
23   signed the report?
24           MR. ZELLERS: Objection. Misstates her
25   testimony.

Page 24

1            THE WITNESS: So I think I said that I
2    had reviewed the materials at the time of the
3    report. So I -- I guess I don't understand your
4    question.
5    BY MR. MEADOWS:
6        Q  Yeah, and I -- I'm not understanding
7    what you did and didn't do as of the time you
8    signed your report and what you've done since.
9        A  Okay.  As of the time I signed my
10   report, I reviewed the references that did not
11   have a star.  Since then I've gone back and
12   reviewed some references that I had already
13   reviewed.
14       Q  Okay.  So you've gone back and reviewed
15   some references that you had already reviewed.
16   Now, that -- that throws me off.
17       A  I don't understand why.
18       Q  Okay.  Well, what prompted you to review
19   these -- these new materials that we were provided
20   with last night?
21       A  So I didn't review -- there's very few
22   new materials on my list.
23       Q  Okay.  That's not my question.  There
24   are some new materials on your -- on your list you
25   gave us last night, right?

Page 25

1        A  What --
2        Q  I mean you've identified them --
3        A  -- what is the definition of new, I
4    guess?
5        Q  Well, the ones that have an asterisk
6    next to them.
7        A  Okay.
8        Q  Okay.  What prompted you to consider
9    those materials since you -- since you wrote this
10   report in February?
11           MR. ZELLERS: Well, and let me just
12   instruct you not to get into any discussions
13   between the attorneys and yourself, but with that
14   caveat, please answer Mr. Meadows' question.
15           THE WITNESS: Okay.  I want to refresh
16   myself with the question.
17           Okay.  So the question was what prompted
18   me to consider those materials since you wrote the
19   report, and most of the materials that were newly
20   considered were expert reports that were written
21   in this matter.
22   BY MR. MEADOWS:
23       Q  I understand that.
24           My question is, what prompted you to --
25   to read those since you wrote -- wrote your

H. Nadia Moore, Ph.D.

Page 26

1  report?
2      A   I wanted to understand what the other
3  experts were -- what their opinions were.
4      Q   Okay. What prompted you to want to --
5  to know what these other experts were saying?
6          MR. ZELLERS:  And again, I'm going to
7  instruct the witness not to get into any
8  discussions between counsel and the witness.  If
9  she can answer that question without that, please
10 go ahead.
11         THE WITNESS:  So I don't know how to
12 answer that, I guess.  Is that -- so I mean the
13 reports were supplied to me by the attorneys in
14 this matter.
15 BY MR. MEADOWS:
16     Q   Okay. So the lawyers prompted you to
17 read it?
18         MR. ZELLERS:  Objection.  I -- misstates
19 her testimony, but I don't want her -- and I will
20 tell you, please, don't get into conversations
21 between counsel and yourself.
22 BY MR. MEADOWS:
23     Q   I'm not asking you what the lawyers
24 said.  I'm just asking you what prompted you to
25 read this material.

Page 27

1          MR. ZELLERS:  And I believe that gets
2  into discussions between counsel and the -- the
3  witness.
4          Can you add anything more to your
5  previous answer?
6          THE WITNESS:  I think I've already
7  answered the question.
8  BY MR. MEADOWS:
9      Q   Now, so far you've kind of answered
10 these questions as if this is all about reports
11 generated in this litigation, but it's not just
12 reports generated in this litigation that you've
13 read since you signed your report on
14 February 25th, 2019, right?
15     A   Correct.
16     Q   I mean, there -- there are -- there's
17 medical literature in here, right?
18     A   Well, you have to show me which one.
19     Q   I don't.  I'm just asking you, is there
20 medical literature that you marked with an
21 asterisk?
22         MR. ZELLERS:  So take your time and look
23 at it, and answer Mr. Meadows' question.
24         THE WITNESS:  (Peruses document.)
25 BY MR. MEADOWS:

Page 28

1      Q   Dr. Moore, let me just ask you --
2      A   Sure.
3      Q   -- without looking, can you tell me
4  whether or not there's medical literature on this
5  list that's marked with an asterisk?
6      A   So how --
7      Q   I'm not asking him.  I'm asking you --
8      A   Sorry, I didn't want to cut him off.
9      Q   -- can you tell me without looking at
10 that list whether there's medical literature
11 that's marked with an asterisk on that list?
12         MR. ZELLERS:  Objection.  Form.
13         THE WITNESS:  So how would you define
14 "medical literature"?
15 BY MR. MEADOWS:
16     Q   How do you define "medical literature"
17 as a professional?
18     A   I'm just asking so I'm accurate in
19 response.
20     Q   Okay.  Well, you tell me how you would
21 define it.
22     A   Something that relates -- I mean it's
23 very vague in general.  Right?  So I would say
24 almost all of this literature is medical, so I was
25 trying to understand what -- what asterisk you

Page 29

1  were --
2      Q   Okay.  So my question is, can you tell
3  me, without looking, whether there's any asterisks
4  next to medical literature on that list?
5          MR. ZELLERS:  Objection.  Form.  It's
6  not a memory test.
7          THE WITNESS:  So there are asterisks on
8  this list that's related to publications from
9  PubMed.
10 BY MR. MEADOWS:
11     Q   Okay.
12     A   That's --
13     Q   And what prompted you to look at that --
14 those materials?
15         MR. ZELLERS:  Same instruction, not to
16 identify communications with counsel.
17 BY MR. MEADOWS:
18     Q   And I'm not asking you what lawyers
19 said --
20     A   So --
21     Q   -- or what you said to lawyers.
22         I'm asking you, what prompted you to
23 look at that -- at that medical literature that's
24 marked with an asterisk?
25     A   So I can't remember why I looked at

H. Nadia Moore, Ph.D.

Page 30

1    medical literature, but I can tell you that a lot
2    of what I did was based on reviewing some of the
3    depositions in this matter and understanding what
4    was -- what discussions were being engaged.
5         Q   And when did that list come into
6    existence?
7             MR. ZELLERS:  Foundation.  She may not
8    know.
9             But when did you first see this list?
10            Is that fair?  Or -- or --
11            MR. MEADOWS:  Sure.
12   BY MR. MEADOWS:
13        Q   When did you first see that list?
14        A   So in its entirety or as a draft?
15        Q   As we're looking at it here.  I mean,
16   I -- we've looked at it several times now.
17        A   Right.
18        Q   When did this come into existence?  When
19   did you first see it?
20        A   So -- so we finished this list
21   yesterday.
22        Q   Okay.  When you say "we," who are you
23   talking about?
24        A   So I started the list, my office helped
25   me prepare it, and then the attorneys also helped

Page 31

1    put some of the reports and depositions into it.
2         Q   Okay.  So tell me who at your office
3    participated and which of the lawyers participated
4    in creating this list.
5             MR. ZELLERS:  And foundation as to the
6    lawyers.
7             But go ahead.
8             THE WITNESS:  So myself and Jennifer
9    Hobden at my office.
10   BY MR. MEADOWS:
11        Q   Okay.  Who is Jennifer Hobden?
12        A   She is a toxicologist at Veritox.
13        Q   How do you spell her last name?
14        A   H-O-B-D-E-N.
15        Q   Okay.  And you said she is a
16   toxicologist at Veritox?
17        A   Correct.
18        Q   And how long has she been working there?
19        A   Longer than I have.
20        Q   And how involved has she been in -- in
21   this litigation?
22        A   I don't understand the question.
23   What -- define "this litigation."
24        Q   You understand you're testifying in the
25   talcum powder litigation?

Page 32

1         A   Correct.
2         Q   Okay.  So --
3         A   I just thought you meant in litigation
4    in general.
5         Q   I mean this case that you wrote a report
6    for on February 25th, 2019.
7         A   So she's been helping me since the
8    beginning.
9         Q   Since the beginning.  And when was the
10   beginning?
11        A   I think the attorneys first contacted me
12   the end of November.
13        Q   And what attorneys contacted you?
14        A   Ms. Curry.
15        Q   Ms. Curry?
16        A   Mm-hmm.
17        Q   Of -- and this was the end of November
18   of 2018?
19        A   Of 2018.
20        Q   Who is Ms. Curry?
21        A   She is the attorney that's involved in
22   this litigation.
23        Q   Okay.  Did you know Ms. Curry before she
24   reached out to you?
25        A   I did not.

Page 33

1         Q   Had you had any involvement in the --
2    this -- the subject matter that is involved in
3    this litigation before Ms. Curry reached out to
4    you?
5         A   I did.
6         Q   Tell me about that.
7         A   So I had given a presentation at the --
8    at an ACI conference in the summer of 2017.
9         Q   And so we'll talk about that a little
10   bit more in a little bit.
11            I think you actually provided us with
12   your PowerPoint slides from that conference; is
13   that correct?
14        A   Correct.
15        Q   And before you presented at that
16   conference in the summer of 2017, had you been
17   involved at all in the subject matter that is the
18   basis of this litigation?
19        A   So I had obviously done research for
20   that presentation but had not been involved in the
21   litigation.
22        Q   You had done research for the
23   presentation.
24        A   Correct.
25        Q   Okay.  But prior to your preparation for

H. Nadia Moore, Ph.D.

Page 34

1   that presentation, had you been involved in doing
2   any research in -- in the subject matter that is
3   the basis of this litigation?
4       A   Beyond reading the occasional article,
5   no.
6       Q   And what would have prompted you to read
7   the occasional article?
8       A   Just as part of my general scientific
9   reading.
10      Q   Okay.  Now, going back to those who
11  assisted you in coming up with this list that
12  we've been talking about.  Jennifer Hobden at
13  Veritox was involved, right?
14      A   Correct.
15      Q   Anybody else at Veritox involved?
16      A   No.  I don't believe so.
17      Q   Has anybody else at Veritox been
18  involved beyond the preparation of this list?  And
19  I mean has anybody else at Veritox been involved
20  in -- in helping you understand the literature,
21  doing legwork for you to -- to gather materials,
22  any -- any involvement by anyone else at Veritox
23  that has helped you prepare for this -- your
24  participation in this litigation?
25      A   Yes, I have had some staff members help

Page 35

1   me.
2       Q   Okay.  And who -- who are they?
3       A   So Lara, L-A-R-A, Diener, D-I-E-N-E-R.
4   Brianna Bennett.
5       Q   Okay.
6       A   And Rebecca Ticknor, T-I-C-K-N-O-R.
7       Q   Okay.  Anybody else?
8       A   Those -- probably, but those are the
9   main people.
10      Q   And what have they done to assist?
11      A   They helped me do literature searches
12  and to compile references, and that type of thing.
13      Q   Okay.  And Jennifer Hobden, is -- is she
14  a Ph.D.?
15      A   No.
16      Q   Okay.  Is she the only non-staff member
17  who's assisted you in this regard at Veritox?
18      A   Sorry, I didn't understand.
19      Q   Yeah.  So far you've given me four
20  names, Jennifer Hobden, Lara -- I think Diener,
21  Diner (phonetic) --
22      A   Right.
23      Q   -- Brianna Bennett, Rebecca Ticknor.
24  Are there any other people who have been involved
25  from Veritox in assisting you in any way in this

Page 36

1   litigation?
2       A   So there's been other people that have
3   been involved.  Those are the main people that I
4   can recall right now.
5       Q   All right.  What lawyers were involved
6   in helping you put this list together?
7           MR. ZELLERS:  Foundation objection.
8       If you know.
9           THE WITNESS:  So I worked with -- I
10  think a paralegal in putting this together.
11  BY MR. MEADOWS:
12      Q   A paralegal.
13      A   Yeah.
14      Q   And what was her -- what was his or her
15  name?
16      A   Tara, and I'm blanking on the last name.
17      Q   Okay.  So no lawyers worked directly
18  with you to compile this list?
19      A   Well, there was a lawyer obviously
20  involved with Tara.  I don't know what her
21  involvement was with the list.
22      Q   What was her -- what was her name?
23      A   Jessica Miller.
24      Q   And once this list was -- well, let me
25  ask you this:  Was -- let me make sure I get this

Page 37

1   correct here.
2           So this list originated at -- with you
3   at Veritox, or did it originate with the lawyers
4   that are involved in this case?
5       A   It originated with me.
6       Q   And so did you write out -- handwrite
7   out a list or type a list that you gave to the
8   lawyers?
9       A   No.  I typed out this list that I --
10      Q   You typed out this list that I have in
11  front of me right --
12      A   Very similar to that list, a first
13  draft.
14      Q   So you typed out a draft, and then you
15  submitted it to the lawyers.
16      A   Correct.
17      Q   And then the lawyers added some more
18  materials to the list.
19      A   So I had discussions with the
20  attorney -- with Tara, and whether or not we were
21  going to add all the expert reports or not, and
22  she said she had a list, and so she just cut and
23  pasted that list, the reports that I had received.
24      Q   Okay.  And how do I know which materials
25  on the list were ones that were originally on your

10  (Pages 34 to 37)

Page 38

1    list and those that the lawyers put on?
2        A    The lawyers put on the ones that the --
3    the expert reports and -- and depositions.
4        Q    Okay.  Did the lawyers add any of the
5    medical literature that we found on there that has
6    an asterisk on it?
7            MR. ZELLERS:  Objection.  Form.
8            Okay.  I do not want you to get into any
9    discussions with lawyers.
10           So I think that calls for a privileged
11   communication as to what her discussions with the
12   lawyers were.
13           MR. MEADOWS:  Okay.  Well --
14           MR. ZELLERS:  I mean she's answered your
15   question.  I've let her go in terms of answering
16   the question, but I'm going to instruct her not to
17   answer that question.
18           MR. MEADOWS:  Well, I'm trying to find
19   out what she considered important in reviewing,
20   and I'm not -- unless she can give me her list
21   that she created that she gave to the lawyers, I
22   have no way of knowing which ones she thought were
23   important and which ones the lawyers thought were
24   important.
25           MR. ZELLERS:  Well, she has said the

Page 39

1    lawyers added the depositions, but I am sure she
2    can go through this list and identify for you each
3    of the references, whether it came from her office
4    or not.
5    BY MR. MEADOWS:
6        Q    Do you still have the list that you gave
7    the lawyers?
8        A    I don't know.
9        Q    Okay.  If you do, will you give it to
10   us?
11           MR. ZELLERS:  Okay.  Objection.  I'll --
12   you know, you can make whatever request you want
13   of counsel, and we will respond.
14           Well, yes, I mean I do believe it would
15   be a privileged draft because this is part of her
16   report, and the rule's clear on that.
17   BY MR. MEADOWS:
18       Q    So how -- with respect to the entire
19   list, not just the ones that -- that have
20   asterisks next to them but all of them, how were
21   those references identified?
22       A    So -- oh, how did I go back and generate
23   the list?  Is that what you're asking me?
24       Q    Well, I mean, were -- are all of these
25   materials important to you in -- in the opinions

Page 40

1    that you have expressed in your report?
2            MR. ZELLERS:  Objection.  Form.
3            THE WITNESS:  So it's hard for me to put
4    an importance asterisk on each reference.  My
5    report has references in it that I selected to
6    include.  These are all the references that I
7    considered in making my report.
8    BY MR. MEADOWS:
9        Q    Okay.  And my question is, how did you
10   go about deciding what you were going to put on
11   that list?
12       A    So these were the references that I had
13   reviewed when I -- when I wrote the report.
14       Q    I understand.  Why did you decide to
15   review those and how did you make the decision
16   that that was going to be the materials that you
17   would review in order to render your opinions in
18   this case?
19           MR. ZELLERS:  Objection.  Form, vague.
20           THE WITNESS:  So, my job, as I saw it --
21   my task was to evaluate the scientific literature
22   that was related to this issue.  As part of that,
23   I identified a lot of articles that I considered
24   as part of my opinion, and that's what's reflected
25   in this.

Page 41

1    BY MR. MEADOWS:
2        Q    Okay.  My question is, how did you go
3    about identifying them?
4        A    So that was done through searching,
5    PubMed searching as well as Google searching,
6    evaluating articles that came from those searches,
7    and then looking at those references of those
8    articles, pulling another iteration of that.  So I
9    would pull more references, I would consider the
10   references, and then I would evaluate the
11   citations in those references and get another
12   round of references.
13       Q    How did you decide what -- I assume that
14   you used search terms in order to decide what the
15   universe was of documents you were going to or
16   references you were going to look at.  Is that a
17   fair assumption?
18       A    Yes, I used search terms.
19       Q    What type search terms did you use?
20       A    A used a variety of search terms.
21   "Ovary" -- probably "ovary and talc," "talc and
22   ovarian cancer," "talc and cancer," as well as
23   searching for cobalt, chromium, nickel, the
24   fragrance ingredients, and probably others that I
25   can't think of today right at this moment, but if

11 (Pages 38 to 41)

Page 42

1    I look through my report, I can probably come up
2    with more terms if you'd like.
3         Q   Well, do you have notes somewhere that
4    you -- that would reflect the search terms that
5    you used?
6         A   I do not.
7         Q   Who came up with the search terms?  You?
8         A   I -- I did.
9         Q   Can you characterize as you sit there
10   today how much of the materials referenced in this
11   list, what percentage of them are new?
12        A   I haven't gone back to look at that --
13   at the percentage.  I'd say a very small
14   percentage of the scientific articles are new.
15        Q   When you say "very small," you mean,
16   what, 10 percent?
17        MR. ZELLERS:  Please do the calculation.
18   Look at the page and give Mr. Meadows your --
19        THE WITNESS:  Okay.  Can I borrow your
20   pen?
21   BY MR. MEADOWS:
22        Q   Well, let me --
23        A   I was --
24        Q   -- let me ask you this:  What is -- if
25   somebody told you that it was -- at least 25

Page 43

1    percent of it was new, would you disagree with
2    that?
3         MR. ZELLERS:  Objection.  Calls for
4    speculation.
5         THE WITNESS:  I haven't evaluated that
6    as far as numbers.  I would have to go back and
7    look.
8    BY MR. MEADOWS:
9         Q   Okay.
10        A   (Peruses document.)
11        Q   So will you agree that the new materials
12   that you have provided on this list, all those
13   materials were available to you at the time you
14   wrote your original report in February of 2019,
15   weren't they?
16        MR. ZELLERS:  Objection.  Form.
17   Misstates the evidence.
18        THE WITNESS:  No.
19   BY MR. MEADOWS:
20        Q   No?
21        A   No, I don't believe so.
22        Q   So some of that medical literature and
23   some of those reports only came into existence in
24   the last month?
25        A   So a lot of the materials I reviewed

Page 44

1    were the expert reports in this matter that didn't
2    become available until after I signed my report.
3         Q   What about the medical literature?
4         MR. ZELLERS:  Okay.  Take a look,
5    please, at your list, and then -- I don't know
6    that the two of you have identified medical
7    literature.
8    BY MR. MEADOWS:
9         Q   Dr. Moore, can you tell me whether any
10   of the medical literature that is on that list
11   came into existence in the last 30 days?
12        MR. ZELLERS:  Objection.  Form.
13   Don't guess.
14        THE WITNESS:  I -- I --
15   BY MR. MEADOWS:
16        Q   I'm -- I mean --
17        A   Right.
18        Q   -- you are a professional, right?
19        A   I am.
20        Q   Okay.  You're a toxicologist, right?
21        A   That's correct.
22        Q   I'm to call you doctor, right?
23        A   Please.
24        Q   Okay.  And medical literature is the
25   foundation upon which you operate every day,

Page 45

1    right?
2         MR. ZELLERS:  Objection.
3    BY MR. MEADOWS:
4         Q   I mean you -- medical literature is
5    something you look at every day in your career,
6    right?
7         A   I look at research literature.
8         Q   Okay.  Can you tell me sitting there
9    today, is there any -- anything new that has come
10   out in the last 30 days that is on -- on this
11   list?
12        MR. ZELLERS:  Take your time and --
13   don't guess -- and look.
14   BY MR. MEADOWS:
15        Q   I'm asking you to go based on your
16   recollection, Dr. Moore.
17        A   Well, I -- I understand what you're
18   asking me.
19        Q   I mean, if there was literature that
20   came out on this -- on this topic in the last 30
21   to 45 days, it would be important, wouldn't it?
22        MR. ZELLERS:  Objection.  Form,
23   foundation.
24   BY MR. MEADOWS:
25        Q   Would it be important?

12  (Pages 42 to 45)

H. Nadia Moore, Ph.D.

Page 46

```
 1        A   I would have to evaluate that
 2  literature.
 3        Q   Okay.  And if it's on this list, then it
 4  really is important, right?
 5        MR. ZELLERS:  Objection.  Form.
 6        THE WITNESS:  So this list is just the
 7  materials that I considered in this matter.
 8  BY MR. MEADOWS:
 9        Q   Right.  And it's import- -- the list
10  that is reflected here, it was important enough
11  for you to put on a list that you had considered
12  it, right?
13        MR. LOCKE:  Objection.
14        MR. ZELLERS:  Objection.  Form, vague.
15        THE WITNESS:  So what was the question
16  again?  Sorry.
17  BY MR. MEADOWS:
18        Q   Listen, all I'm asking you is, did any
19  medical literature, did any studies come out in
20  the last 30 or 45 days that you put on this list?
21  I'm asking you based on your recollection, is
22  there anything that was important enough that came
23  out in the last 30 or 45 days that you considered
24  and put on this list?
25        MR. ZELLERS:  Objection.  Argumentative.
```

Page 47

```
 1        THE WITNESS:  So I --
 2        MR. ZELLERS:  Go ahead.
 3        THE WITNESS:  So I read a lot of
 4  literature every day, and so it's hard for me to
 5  disseminate what happened in the last 30 or 45
 6  days with all of the literature that I reviewed.
 7  This is a long list, and I'd like to look through
 8  it and I'll -- let me look through it for a minute
 9  and I'll let you know.
10  BY MR. MEADOWS:
11        Q   Now, I was just asking based on your
12  recollection.  I mean you can look at it on your
13  own time.  I was asking based on your
14  recollection.  Obviously you don't recall, right?
15        MR. ZELLERS:  Objection.  Misstates the
16  evidence.
17        THE WITNESS:  That's not what I said at
18  all.
19  BY MR. MEADOWS:
20        Q   Let me ask you this:  Did any of this
21  new material that was provided last night, has any
22  of it changed your opinions in this case at all?
23        MR. ZELLERS:  Objection.  Misstates her
24  testimony.
25        THE WITNESS:  So this isn't new
```

Page 48

```
 1  material.
 2  BY MR. MEADOWS:
 3        Q   Well, the stuff that's got an asterisk
 4  next to it were reviewed after February 25th was
 5  submitted -- after the February 25th report was
 6  submitted, right?
 7        We established that the stuff that's
 8  marked with an asterisk was reviewed after you
 9  wrote your report that was submitted on
10  February 25th of 2019, right?
11        A   The materials with an asterisk were
12  considered by me after I wrote the report.
13        Q   Right.  Did any of those materials
14  change your opinions in this case?
15        A   No.
16        Q   I want to go back to your original -- or
17  your report that we were looking at as Exhibit 1,
18  and I want to go to your CV.
19        Now, I think -- I haven't looked at
20  it -- at them closely, but I think that last night
21  we were provided -- if my recollection is correct,
22  and you please correct me if I'm wrong -- but I
23  think we were provided with a CV last night as
24  well, were we not?
25        MR. ZELLERS:  It's right after the list
```

Page 49

```
 1  of references.
 2        THE WITNESS:  Oh.  Yes, I found it.
 3  BY MR. MEADOWS:
 4        Q   Okay.  So I'm just -- I'm trying to
 5  figure out why we got this last night because I --
 6  it -- it appears to be -- I mean, just in page
 7  length maybe it's different.  Am I missing
 8  something here?
 9        MR. ZELLERS:  I'm --
10        MR. MEADOWS:  I'm just trying to
11  reconcile what the difference is between the two
12  CVs.  I mean, and --
13        MR. ZELLERS:  I -- let's ask the witness
14  here.
15        MS. SHARKO:  You did ask for it.
16        MR. ZELLERS:  Right.
17        THE WITNESS:  So I don't see a
18  difference.
19  BY MR. MEADOWS:
20        Q   No?  Okay.
21        Well, the reason that I ask is because
22  it appears that the one that you gave us that was
23  attached to your report back in February appears
24  to be six pages long, and the one that you gave us
25  last night appears to be -- excuse me -- okay.  We
```

13 (Pages 46 to 49)

H. Nadia Moore, Ph.D.

Page 50

1   got -- it's in a different part here. Okay. All
2   right. So they seem to have the same number of
3   pages.
4        Can you -- can you tell me, to satisfy
5   my curiosity, are they the same? Has your CV
6   changed at all --
7        A   No, I don't --
8        Q   -- since you submitted your report?
9        A   -- believe so, no.
10       Q   Okay. All right. So let's look at your
11  CV for just a minute. It was attached to your
12  report, correct?
13       A   Yes.
14       Q   Okay. All right. So we see here you
15  have a Ph.D. in toxicology, right?
16       A   Yes.
17       Q   And you got your Ph.D. in 2008, right?
18       A   Correct.
19       Q   That's when people started calling you
20  doctor. Is that fair enough?
21       A   Fair.
22       Q   Okay. Before that, you had a BS in
23  chemistry, right?
24       A   Yes.
25       Q   Okay. Going on down, it looks like

Page 51

1   you're a member of the American Board of
2   Toxicology, right?
3        A   Correct.
4        Q   Okay. You're a member of a couple of
5   other groups, right?
6        A   The groups that are listed there.
7        Q   Yeah. Now, going down to your
8   experience, I want to kind of work our way through
9   that chronologically, if I can. It looks like in
10  1992 you went to work for Battelle; is that right?
11       A   Yes.
12       Q   And tell -- tell us what Battelle is.
13       A   Battelle is a research institute, a
14  nonprofit institute that does a variety of
15  research projects and operates different
16  laboratories across the country and
17  internationally.
18       Q   Okay. And you worked there as a
19  research scientist. I guess this is right after
20  you got your chemistry degree?
21       A   So, yeah, actually I had a number of
22  different titles while I was there.
23       Q   Okay. And I'm curious, I know of at
24  least one other person who worked at Battelle, and
25  that was a fellow by the name of Alfred Wiener.

Page 52

1   Are you familiar with Alfred Wiener?
2        A   I've seen his name.
3        Q   Okay. Did you ever meet Dr. Wiener?
4        A   I did not.
5        Q   Was he working there at Battelle while
6   you were working there?
7        A   I don't know.
8        Q   Don't know. Have you ever had any
9   communications with Dr. Wiener?
10       A   No.
11       Q   And then it looks like you continued
12  working at Battelle as a principal research
13  scientist first and a senior research scientist
14  thereafter.
15       And then you went to work at the
16  University of Washington -- no, actually, I guess
17  you were a student at the University of Washington
18  for five years; is that correct?
19       A   I was a student and a research
20  associate.
21       Q   Okay. All right. And while you were
22  there, did you continue working at Battelle?
23       A   I -- I had a leave of absence at
24  Battelle.
25       Q   Okay. And so how did that work when

Page 53

1   you -- because it looks like you went back to work
2   at Battelle after you left the University of
3   Washington, right?
4        A   I did.
5        Q   Did you work at Battelle at all while
6   you were at the University of Washington?
7        A   I was an hourly employee.
8        Q   And so how did -- tell me about that.
9   How did you end up going from Battelle to the
10  University of Washington, continuing to work
11  there? What prompted you to do that and -- and
12  how did all that work?
13       A   So when I was at Battelle, some of the
14  senior scientists encouraged me to go back to get
15  a graduate degree, and so that's -- that's what
16  prompted me to go back to school and as well as a
17  love of toxicology.
18       So at Battelle there's -- there was at
19  the time a system that was set up whereby you
20  could take an educational leave of absence, and
21  they would continue to support you to a small
22  extent while you were attending school. And then
23  in -- in exchange for that, I -- you went back to
24  work at Battelle after you were done.
25       Q   Okay. So that was the arrangement that

14 (Pages 50 to 53)

H. Nadia Moore, Ph.D.

Page 54

1    you had with Battelle was they would assist you
2    in -- financially in going to school and -- but
3    you had promised that you would come back?
4        A   Correct.
5        Q   Okay.  And who were the senior
6    scientists that encouraged you to -- to do that?
7        A   Terry Mast.
8        Q   Terry Mast?
9        A   Mm-hmm.
10       Q   Anybody else?
11       A   And my manager, Gordon Billard.
12       Q   Anybody else?
13       A   Probably those are the two that stand
14   out.
15       Q   Okay.  And so what were you working on
16   at Battelle in the years leading up to your
17   departure to go to University of Washington?  What
18   type of projects did you work on?
19           MR. ZELLERS: Can you answer that
20   generally?
21           THE WITNESS: Yeah.
22           MR. ZELLERS: Okay.  Go ahead.
23           THE WITNESS: So generally, toxicology
24   projects, risk assessment projects.
25   BY MR. MEADOWS:

Page 55

1        Q   Okay.  And can you tell me -- well, can
2    you tell me, were there specific areas of research
3    or issues that you were assigned to during that
4    time period?
5        A   So while I was at Battelle Toxicology
6    Northwest, most of that was inhalation toxicology
7    work, but not all.  And then when I was at the --
8    then when I transferred to the National
9    Laboratory, a lot of that work was more general
10   risk assessment as well as inhalation.
11       Q   Okay.  And were there specific
12   inhalation issues that you were working on?
13       A   It depended on the project.
14       Q   Okay.  And I guess that's what I'm
15   asking, what -- what were those projects?
16       A   So part of the work was done for
17   commercial entities, and a lot of that is
18   confidential matters, but pharmaceuticals, drugs.
19   And then the other part of the business was
20   working for the National Toxicology Program,
21   running a lot of inhalation experiments that went
22   through the National Toxicology Program, and then
23   other projects as well.
24       Q   Did any of those projects have to do
25   with or pertain to talc or asbestos issues?

Page 56

1        A   No.
2        Q   And did -- was your work exclusively
3    inhalation exposure or did you also work on other
4    types of exposures?
5            MR. ZELLERS: Objection.  Misstates her
6    testimony.  Are you talking about her initial
7    work?
8            MR. MEADOWS: Yeah, I guess -- well,
9    during this time period, if that's what your issue
10   is.  I'm trying -- I'm trying to figure out what
11   type of exposure issues she worked on in her lead
12   up to going to University of Washington.
13           THE WITNESS: So at Battelle Toxicology
14   Northwest, we primarily did inhalation work, and
15   then when I was at the National Lab, we did a
16   variety of risk assessments for different routes
17   of exposure, cumulative exposures.
18   BY MR. MEADOWS:
19       Q   And did you do any work on perineal
20   exposures?
21       A   Not specifically, but in a whole body
22   chamber, the entire animal is exposed.
23       Q   Okay.  But you didn't do any specific
24   work pertaining to perineal exposures?
25       A   That's correct.

Page 57

1        Q   Have you ever done any work pertaining
2    to perineal or -- that is specific to perineal
3    exposures?
4            MR. ZELLERS: Objection.  "Work" is
5    vague.
6            But go ahead.
7            THE WITNESS: So do you mean laboratory-
8    based research?
9    BY MR. MEADOWS:
10       Q   I mean any type of -- of research.
11           Have you ever done any type of research
12   that is specific to perineal exposures?
13       A   So I've evaluated this dataset that was
14   specific for perineal exposures.
15       Q   Okay.  When -- when you say "this
16   dataset," you're talking about the work that you
17   did that's reflected in your expert report in this
18   case.
19       A   That's correct.
20       Q   So before you did the expert report in
21   this case or the preparation for the expert report
22   in this case, you had never done any work that's
23   specific to perineal exposures?
24           MR. ZELLERS: Objection.  Misstates her
25   testimony.  She talked about that program in 2017,

15 (Pages 54 to 57)

H. Nadia Moore, Ph.D.

Page 58

1  but --
2  BY MR. MEADOWS:
3      Q  You can answer.
4      MR. ZELLERS:  Well --
5      THE WITNESS:  So --
6  BY MR. MEADOWS:
7      Q  Are you going to tell me about that
8  stuff in 2017 now?
9      MR. ZELLERS:  She's already told you.  I
10  mean you asked.
11      MR. MEADOWS:  Well, I -- she can answer
12  it.
13      MR. ZELLERS:  All right.  I will let
14  her.
15      THE WITNESS:  All right.  So apart from
16  reviewing --
17      MR. MEADOWS:  Thank you.
18      THE WITNESS:  -- the literature
19  associated with perineal exposure to talc, I have
20  not done.
21  BY MR. MEADOWS:
22      Q  So when you -- when you made the
23  arrangement with Battelle to go to school and then
24  come back, was -- were there specific projects
25  that Battelle was hoping that you would come back

Page 59

1  and participate in or was this just a general
2  arrangement?
3      MR. ZELLERS:  Foundation.  Objection.
4      THE WITNESS:  I don't know what the
5  management at Battelle was thinking.
6  BY MR. MEADOWS:
7      Q  Well, I guess to the extent that you --
8      A  To the extent that I knew, you can't
9  predict what the work is going to be like in five
10  years.
11      Q  Did you have a feel- -- a feeling that
12  there was going to be certain projects they would
13  want you to work on when you came back?
14      MR. ZELLERS:  Objection.  Form.  Vague.
15      THE WITNESS:  That would be -- that
16  would be speculation, I guess.  But --
17      MR. ZELLERS:  Go ahead, answer.
18      THE WITNESS:  I can guess that --
19      MR. ZELLERS:  No, don't guess, please.
20  BY MR. MEADOWS:
21      Q  And my ask -- my question was simply,
22  did you have a feeling for the type of work you
23  thought that they would want you to work on when
24  you come -- came back?
25      MR. ZELLERS:  Objection.  Form.

Page 60

1      THE WITNESS:  So they didn't encourage
2  me to pursue any certain discipline besides
3  toxicology.  So that to me inferred that they did
4  not have a specific project other than a
5  toxicology-related field.
6  BY MR. MEADOWS:
7      Q  And -- I mean on that topic, I mean,
8  you -- toxicology is your area of expertise,
9  correct?
10      A  Correct.
11      Q  Okay.  All right.  So after working
12  at -- after finishing your education at University
13  of Washington, you came back to Battelle to work
14  there and fulfill your obligations in that regard,
15  the agreement that you had with them to come back
16  and work, correct?
17      A  So -- say that -- sorry, so -- so that
18  was the intent.  But that's not what happened.
19      Q  What happened?
20      A  I should clarify.  So that was the
21  intent.  That was the agreement that was made with
22  the National Lab, and then when I finished school,
23  the National Lab actually didn't have funding for
24  a position.
25      And so Toxicology Northwest is actually

Page 61

1  a different group of people, and they had an
2  opening for a toxicologist.  So -- so then I went
3  to Toxicology Northwest without any obligations at
4  all.
5      Q  Okay.  So Battelle Toxicology Northwest
6  is different from Battelle Pacific Northwest, is
7  that --
8      A  So it's -- it's all under the global
9  Battelle organization, and then Battelle also runs
10  independent national labs.  So the National Lab is
11  its own entity that's operated by Battelle, and
12  then Battelle Toxicology Northwest is an
13  organization that's run directly under Battelle
14  Memorial Institute.  So it's a different -- at the
15  end, there's one manage -- there's one CEO, but
16  they're different management organizations.
17  BY MR. MEADOWS:
18      Q  All right.  So you worked there for
19  roughly five years?
20      A  Yes.
21      Q  And then you went to work for Veritox,
22  which is where you work now, right?
23      A  Correct.
24      Q  And what type of work have you done at
25  Veritox in the five years that you've been there?

16 (Pages 58 to 61)

H. Nadia Moore, Ph.D.

Page 62

1      A    Primarily risk assessment and risk
2  communication, toxicology assessments, safety
3  assessments, those type of projects.
4      Q    Okay.  And I assume Veritox -- well,
5  what does Veritox do generally?
6      A    So they're an environmental health
7  consulting company that consults in toxicology-
8  related issues, environmental -- sorry,
9  environmental hygiene issues.  There's also a
10 component that's represented by engineering staff,
11 and so it's called GT Engineering, they do
12 business as GT Engineering, and they do failure
13 analyses type work.
14     Q    I assume that Veritox works for
15 companies; is that correct?
16     A    They -- they do work for a lot of
17 organizations.
18     Q    How does Veritox make money, I guess is
19 the question?
20     A    Pardon?
21     Q    How does Veritox make money?
22     A    Oh.  They do work.
23     Q    Okay.  For whom?
24     A    For people who come to us.
25     Q    And those people are generally

Page 63

1  corporations?
2      A    I -- I don't know what the breakdown is.
3  There's -- there's certainly companies, school
4  districts, fire departments, a variety of
5  different entities.
6      Q    As a part of your work, are you -- are
7  you obliged to generate clientele for Veritox?
8      MR. ZELLERS:  Objection.  Form.
9      THE WITNESS:  So I guess I don't
10 understand your question.
11 BY MR. MEADOWS:
12     Q    Does Veritox expect you to bring
13 business in?
14     A    Yes, they --
15     MR. ZELLERS:  Same objection.
16     THE WITNESS:  -- they expect me to have
17 project work to do.
18 BY MR. MEADOWS:
19     Q    And so how do you go about generating
20 business?
21     MR. ZELLERS:  Objection form.
22     THE WITNESS:  So I guess I don't
23 necessarily just -- I guess I'm not a business
24 major.  So I go to scientific conferences, meet
25 people, present scientific subjects.

Page 64

1  BY MR. MEADOWS:
2      Q    Now, in this instance, you are -- you've
3  been hired to be an expert witness in this case,
4  correct?
5      A    Correct.
6      Q    And I'll assume that you are charging
7  Johnson & Johnson to testify in this case, right?
8      MR. ZELLERS:  Objection.  Form.
9      THE WITNESS:  So we -- we bill the hours
10 that are done to -- to counsel for Johnson &
11 Johnson.  I'm not sure where our bills go, but --
12 BY MR. MEADOWS:
13     Q    How did you go about landing this
14 business with Johnson & Johnson to work on this
15 case?
16     MR. ZELLERS:  Objection.  Form.
17     THE WITNESS:  I -- I guess I -- I don't
18 know the answer to that.  I mean, I received a
19 call from Ms. Curry in this matter.
20 BY MR. MEADOWS:
21     Q    Well, did you reach out to Johnson &
22 Johnson and tell them that you could provide
23 services for them?
24     A    No.
25     Q    Did you reach out to any lawyers and

Page 65

1  tell them that you could provide services for
2  them?
3      A    No.
4      Q    Ms. Curry just called you out of the
5  blue one day?
6      A    I received a phone call from Ms. Curry.
7      Q    Now, in addition to your work as -- in
8  litigation, you -- what else do you do to generate
9  business for Veritox?
10     MR. ZELLERS:  Objection to form.
11     THE WITNESS:  So I guess --
12 BY MR. MEADOWS:
13     Q    Generate income.  Excuse me.
14     A    Well, I didn't understand the preface to
15 the question, I guess.
16     Q    Well, what other -- let's just try it
17 this way.
18         What projects have you -- or what
19 companies have you worked for, say, over the last
20 12 months at Veritox?
21     A    So I don't know that I can give you
22 exact companies with conflict -- you know, for
23 secrecy issues, but I can tell you generally.
24 Does that -- does that work?
25     Q    I don't know.  You can give it a try.

17 (Pages 62 to 65)

H. Nadia Moore, Ph.D.

Page 66

```
 1      A   So there's a company that I work with
 2   that makes food -- food additives.  Another --
 3   let's see -- I'm trying to think.
 4          So a pharmaceutical company, some
 5   chemical companies.  I'm trying to think.  In
 6   general terms -- maybe I could probably come up
 7   with some later just in general.
 8      Q   Well, let me get more specific then.
 9   Have you ever done any work for Johnson & Johnson
10   before?
11      A   I had.
12      Q   Okay.  Can you tell me about those
13   projects?
14      A   Generally.
15      Q   Go ahead.
16      A   So I was asked to look at some of the
17   scientific data regarding toxicology of asbestos
18   and cleavage fragments.
19      Q   And when was that?
20      A   It began probably December-ish 2017.
21      Q   And is that -- I have a note here, and
22   my notes are not always right, but I have a note
23   here that you -- Ms. Curry reached out to you at
24   the end of November of 2018, right?  Or -- yeah.
25      A   Yes.
```

Page 67

```
 1      Q   Okay.  So you're saying that you
 2   actually had done some work for J&J approximately
 3   a year earlier.
 4      A   Well, that was the date that they
 5   contacted me.
 6      Q   And was this pertaining to baby powder?
 7      A   It was just toxicology of cleavage
 8   fragments in general.
 9      Q   In general.  So it wasn't in the context
10   of talcum powder or baby powder.
11      A   It probably was.  Just my -- my
12   investigation was just some literature searching
13   to try to understand that topic.
14      Q   And what -- what specifically did they
15   want you to do?
16          MR. ZELLERS:  Okay.  I'm going to --
17   she's given you the area that she consulted with a
18   Johnson & Johnson lawyer or outside lawyer on.
19   I'm not going to let her get into discussions that
20   she had with counsel or what that consulting
21   project was.
22          So she's answered generally.  If you
23   want to try to ask her some more general questions
24   about what that -- the scope of that work, but I
25   do think that that is privileged.
```

Page 68

```
 1          And actually as I'm making my objection,
 2   you know, I believe that she was retained as a
 3   consultant, you know, on a separate project, and
 4   so I'm going to instruct her not to answer further
 5   than she has.
 6   BY MR. MEADOWS:
 7      Q   Have you done any other work for J&J?
 8      A   No.
 9      Q   Are you aware of whether Veritox has
10   done any other work for J&J?
11      A   They have.
12      Q   Can you tell me about that?
13      A   Generally.
14      Q   Go ahead.
15      A   It's work that Dr. Bryan Hardin has
16   done.
17      Q   Did it pertain to baby powder or talcum
18   powder?
19          MR. ZELLERS:  If you know.
20          THE WITNESS:  I -- I don't know for
21   sure, but I believe it did.
22   BY MR. MEADOWS:
23      Q   And do you know when that work started?
24      A   No.
25      Q   Has Veritox done any work for Imerys?
```

Page 69

```
 1      A   I don't know.
 2      Q   Have you ever done any work for Imerys?
 3      A   No.
 4      Q   Has Veritox or you ever done any work
 5   for PCPC?
 6      A   I don't know what that is.
 7      Q   Okay.  PCPC is the Personal Care
 8   Products Council, also formally known as the
 9   Cosmetic Toiletries Fragrance Association.
10      A   I mean, I've heard of that, but --
11      Q   Yeah, that one's memorable, isn't it?
12          MR. ZELLERS:  That wasn't a question.
13   BY MR. MEADOWS:
14      Q   So they are the trade association for
15   the cosmetic industry.  Does that ring any bells
16   that have you or Veritox ever done any work for
17   PCPC or CTFA?
18          MR. LOCKE:  Objection.  Form.
19          THE WITNESS:  I have not.  I don't know
20   if Veritox has.
21   BY MR. MEADOWS:
22      Q   With respect to the work that Veritox or
23   that -- that you did for J&J, did you issue a
24   report of any type?
25      A   No.  Well, other than the report in this
```

18 (Pages 66 to 69)

H. Nadia Moore, Ph.D.

Page 70

1    matter.
2        Q.   Okay.  Well, now, was that work that you
3    did in December of 2017 for J&J related to the
4    work that you have done here that's now the
5    subject of your report?
6        MR. ZELLERS:  Okay.  I'll let her answer
7    that question, but -- but not go further.
8        THE WITNESS:  So I guess --
9        MR. ZELLERS:  Do you understand the
10   question?
11       THE WITNESS:  Not really.  Well, so I
12   didn't really understand the question, and then
13   the time -- and the time frame.  So...
14   BY MR. MEADOWS:
15       Q.   Okay.  I believe you told me earlier
16   that you did some work for J&J starting around
17   December of 2017 that pertained to asbestos and
18   cleavage fragments.
19       Do you remember talking about that
20   earlier?
21       A.   I do.
22       Q.   Okay.  So my question is, did you
23   generate a report that pertained to that -- that
24   work?
25       A.   To the work that was started in December

Page 71

1    of --
2        Q.   Correct.
3        A.   -- 2017.  So there was no report on the
4    asbestos and cleavage fragment literature review
5    that I did.
6        Q.   Okay.  And then as a follow-up, did that
7    work have anything to do with or result in
8    information that you considered in -- in
9    generating the report that you've done in this
10   case?
11       MR. ZELLERS:  Objection.  Vague,
12   ambiguous.
13       THE WITNESS:  So I don't think I can
14   answer that with any certainty.  And so there's
15   articles that I read there that -- you know, I
16   don't know which articles I read for that that may
17   also pertain to the matter that -- that we're
18   discussing today.
19   BY MR. MEADOWS:
20       Q.   Did you reach any conclusions or
21   opinions as a result of the work that you did in
22   December of 2017?
23       MR. ZELLERS:  Objection.
24       You can answer that "yes" or "no."
25       THE WITNESS:  Well, I don't know that I

Page 72

1    can answer it "yes" or "no."
2        MR. ZELLERS:  Okay.  I'm going to
3    instruct her not to answer.  Our position is, is
4    that that was a consulting assignment that she did
5    that was unrelated to the work that she's doing
6    here.  So, I mean, I think you've --
7        MR. MEADOWS:  I hear that is your
8    position, but that's not what I heard is her
9    position.  She's not sure whether or not it was
10   related to the work she did in this case.
11       MR. ZELLERS:  I thought she answered --
12       MR. MEADOWS:  She can't -- she had a
13   hard time separating it out is what I heard.
14       MR. ZELLERS:  Well, I mean, I believe
15   she's answered your question on that.  So do you
16   have a new question?
17   BY MR. MEADOWS:
18       Q.   Any of the materials that you reviewed
19   for your project in December of 2017, are they
20   included in the materials that you've provided to
21   us in this case as being ones that you've relied
22   on?
23       MR. ZELLERS:  Objection.  Form,
24   foundation.
25       THE WITNESS:  So again, I can't -- I

Page 73

1    can't answer "yes" or "no" because I'm -- there's
2    probably articles that were read in that matter
3    that are also pertinent to this matter, but
4    without evaluating each article, I can't say
5    whether, yes or no, it applied to both or one.
6    BY MR. MEADOWS:
7        Q.   So that project started in December of
8    2017, you had said, or thereabouts?
9        A.   That's when the first contact was made.
10   I don't remember when it actually started.
11       Q.   And specifically I'm talking about
12   the -- the work pertaining to the asbestos and
13   cleavage fragments.
14       A.   Okay.
15       Q.   Okay.  So how long did that project go
16   on?
17       A.   It was ongoing.
18       Q.   Till when?
19       A.   I'd say it's still -- I haven't done --
20   we haven't closed that project, but I haven't done
21   any work on it in quite a while.
22       Q.   I assume you billed J&J for that work?
23       A.   Veritox probably did.
24       Q.   Mm-hmm.  So the same lawyer, Ms. Curry,
25   reached out to you for both projects, the one in

19 (Pages 70 to 73)

H. Nadia Moore, Ph.D.

Page 74

1  2017 and the one that's the -- the report that you
2  generated in this case?
3      A  No.
4      Q  Can you clarify that for me?  Who -- who
5  reached out to you for the 2017 project?
6      A  It was Jonathan Cooper.
7      Q  Okay.  And is Jonathan Cooper with J&J
8  or is he a lawyer?
9      A  He's a lawyer.
10     Q  Who's he with?
11     A  Tucker Ellis, I believe.
12     Q  And then the report you did in this
13  case, that was -- your initial contact came from
14  Ms. Curry; is that right?
15     A  That's correct.
16     Q  And who's she with?
17     A  I'm not sure.  I haven't had a lot of
18  contact with her.
19     Q  What's her first name?
20     A  I met her, but I can't remember.  I'm
21  sorry.
22     Q  Jennifer Curry, does that ring a bell?
23  No?
24         MS. SHARKO:  Do you want to know the
25  name?

Page 75

1         MR. MEADOWS:  The law firm -- sure.  Put
2  you under oath.
3         MS. SHARKO:  Well, you're not going to
4  put me under oath.
5         MR. MEADOWS:  No?
6         MS. SHARKO:  Although that might be fun.
7         MR. MEADOWS:  That would be fun.
8         MS. SHARKO:  But her name is Dawn Curry.
9         MR. MEADOWS:  Thank you.
10        THE WITNESS:  Thank you.
11 BY MR. MEADOWS:
12     Q  All right.  So -- a couple of things I
13  wanted to ask you about.  Ovarian cancer
14  experience, have you ever -- I know we talked
15  earlier about perineal exposure, and I think you
16  told me that you hadn't done any work on anything
17  specific to perineal exposure.
18        What about ovarian cancer, have you ever
19  done any work that's specific to ovarian cancer
20  until you got involved in this case?
21        MR. ZELLERS:  Okay.  Objection.
22  Misstates the evidence.
23        THE WITNESS:  Okay.  So --
24 BY MR. MEADOWS:
25     Q  Did I misstate anything just then?  If I

Page 76

1  did, you tell me.  Okay?
2      A  Okay.  So I think we can clarify that --
3  that I did do perineal work regarding this case,
4  but --
5      Q  But I'm talking about before this
6  case --
7      A  Okay.
8      Q  -- you -- you told me that you had never
9  done any work that's specific to perineal
10  exposure, correct?
11        MR. ZELLERS:  Same objection.
12 BY MR. MEADOWS:
13     Q  Is that what you told me earlier?
14     A  So no studies that had the -- the
15  purpose stated was a perineal exposure.
16     Q  Tell me what work you have done that is
17  specific to perineal exposure.
18     A  So perineal exposure would occur in a
19  whole body chamber.
20     Q  That's not specifically perineal
21  exposure, is it?  That's whole body exposure,
22  right?
23     A  That's correct, but the perineal
24  exposure also occurs.
25     Q  All right.  So ovarian cancer, have you

Page 77

1  ever done any work pertaining to ovarian cancer
2  before you got involved in this case?
3      A  So I have done carcinogenicity studies
4  for the National Toxicology Program, which
5  evaluates all organs, including ovarian tissues.
6      Q  Okay.  Tell me what work you've done
7  that's been specific to ovarian cancer.
8      A  So I just said I've done whole body --
9  or carcinogenicity studies in rodents that
10  evaluate ovarian tissue and carcinogenicity.
11     Q  Are you an expert on ovarian cancer?
12        MR. ZELLERS:  Objection.  Form.
13        THE WITNESS:  So I'm a toxicologist, and
14  I've studied carcinogenesis.
15 BY MR. MEADOWS:
16     Q  Are you telling me you're an expert on
17  all types of cancers?
18     A  I -- no, I'm not saying that.  What I'm
19  saying is I'm a toxicologist, and we evaluate
20  carcinogenicity endpoints.
21     Q  So are you an expert on ovarian cancer?
22        MR. ZELLERS:  Objection.  Form.
23        MR. LOCKE:  Objection to form.
24        THE WITNESS:  Well, again, I said I'm a
25  toxicologist, and we evaluate carcinogenesis

Page 78

1  endpoints.
2  BY MR. MEADOWS:
3       Q   All right.  What cancers are you an
4  expert on?
5       A   So I guess you need to define what you
6  mean by "expert" in cancer.
7       Q   Well, what do you think an expert would
8  be?
9       A   Well, so I've --
10      MR. ZELLERS:  Go ahead.
11      THE WITNESS:  So I evaluate test
12  chemicals and their propensity to cause cancer.
13  That's -- as an expert, that's what I do.
14  BY MR. MEADOWS:
15      Q   All right.  But work that was specific
16  to ovarian cancer, you've not done that, right?
17      MR. ZELLERS:  Objection.  Form.
18      THE WITNESS:  Again, carcino- -- in
19  general, carcinogenicity studies that I -- that
20  I'm involved in don't specifically call out
21  a priori the tissue that's going to be evaluated.
22  We evaluate all tissue.
23  BY MR. MEADOWS:
24      Q   Mm-hmm.  What work have you done -- or
25  have you done any work that's specific to

Page 79

1  mesothelioma?
2       A   So, again, that would be the same
3  answer.
4       Q   So any cancer I were to name today, you
5  would say that you have expertise in it.
6       A   In as far as the endpoint.
7       Q   There's not a cancer that I could throw
8  out there that you wouldn't say, I'm an expert on
9  that?
10      MR. ZELLERS:  Objection.  Form.
11      THE WITNESS:  I don't know.
12  BY MR. MEADOWS:
13      Q   You don't know.  Okay.
14      I think you provided us with some --
15      MR. MEADOWS:  I'm not sure what I did
16  here.  Should I get -- okay.
17      MR. ZELLERS:  And just as you're
18  looking, it was counsel that provided you with
19  materials last night, so...
20  BY MR. MEADOWS:
21      Q   By the way, when did the list that you
22  and Ms. Diener and Ms. Bennett and Ms. Ticknor --
23  the list that y'all came up that you gave to the
24  lawyers, when did you give that to them?
25      A   So I -- I don't think that's what I

Page 80

1  said.  I believe that I worked on that list with
2  Jen Hobden.  I generated the list.
3       Q   Okay.  And when did -- the question is,
4  when did you give it to the lawyers?
5       A   So it was an iterative process.
6       Q   It was a what?
7       A   Iterative.  So many times going back and
8  forth.
9       Q   Okay.  When was it finished as far as
10  your part that you gave to the lawyers?
11      A   So I -- I don't -- I don't speciate
12  between -- it was always my list.
13      Q   Well, that's -- okay.  I'm assuming
14  that's the case.  So -- but your -- the part --
15  you told me earlier that there were some things
16  that you put on the list and there were some
17  things that the lawyers put on the list, right?
18      A   Yes.
19      Q   So the part that you did, that you were
20  finished with, when did you give that to the
21  lawyers?
22      A   So there were -- I went through early on
23  weeks ago and put together the list, the majority
24  of it, and then as I received more materials, we
25  added that to that list.

Page 81

1       Q   So this effort started when?
2       A   Well, the effort started in -- in
3  December of 2018 with this writing of my report.
4       Q   Well, now, I'm referring to the -- the
5  part of the list that's new that had an asterisk
6  next to it that you didn't include with your
7  report that you generated back in February.
8       So when did -- when did you start
9  creating that list?
10      MR. ZELLERS:  The list of new materials?
11      MR. MEADOWS:  Correct.
12      THE WITNESS:  The list of new materials
13  began shortly after I issued my report.
14  BY MR. MEADOWS:
15      Q   And you were providing that to the
16  lawyers on an ongoing basis?
17      MR. ZELLERS:  I'm going to instruct her
18  not to answer more about the communications back
19  and forth with the lawyers.
20  BY MR. MEADOWS:
21      Q   Okay.  I need to go back to your CV for
22  the moment.
23      And I want to flip over to the section
24  entitled "Selected Publications."  It's on page 3.
25      Do you see where I'm talking about?

21 (Pages 78 to 81)

Page 82

1    A   Yes, I do.
2    Q   So the title leaves me wondering if
3  there are others.  Are there other publications
4  that were not selected?
5    A   There may have been some from the '90s,
6  you know.
7    Q   So this is not a complete list of your
8  publications?
9    A   I would have to go back and check.
10  If what -- what you call publications, there may
11  have been some abstracts in the '90s dealing with
12  analytical chemistry work.
13    Q   What are you going to have to do to go
14  check on that?
15    A   I don't know.  I'd have to go back and
16  see if -- because this is my -- my CV.  I -- yeah,
17  I don't know how I would find that information
18  right now.
19    Q   If you flip over to page 4, you see that
20  word again "Selected Continuing Education."
21    A   Right.
22    Q   So this is not a complete list, is it?
23    A   So again, there may have been some
24  courses that I didn't put on there, you know, an
25  hour or two here.  This is the pertinent

Page 83

1  continuing education as -- as it applies to my CV.
2    Q   And what would you need to do to go
3  figure out how to make this list complete?
4        MR. ZELLERS: Objection.  Form.
5        THE WITNESS:  I would call this a
6  complete list.  These are the ones that I -- there
7  may have been a class that I went to that --
8  that's not on there, so I added the word
9  "selected."
10  BY MR. MEADOWS:
11    Q   Earlier you mentioned some NTP studies
12  that you were involved in.  Did I hear that
13  correctly?
14    A   Yes.
15    Q   Okay.  And can you tell me, has the data
16  from those studies been published?
17    A   Some have through the NTP website.  I
18  don't know about the peer-reviewed literature.
19    Q   Can you tell me about that?
20    A   Vaguely.
21    Q   Vaguely?
22    A   Vaguely.  Just from memory, I don't --
23    Q   Go ahead.
24    A   I'd have -- I'd have to go back and
25  look, because I want to be accurate about what I'm

Page 84

1  saying.
2    Q   Okay.  Was any of it mentioned on your
3  CV?
4    A   So that wouldn't be -- I am not listed
5  as an author on those publications.
6    Q   Is there anything that you have here
7  today that you could look at to tell us what data
8  has been published on those NTP studies you were
9  involved in?
10    A   So the data itself is -- I'd have to
11  look on the NTP website to see which studies may
12  have been published through the NTP, and I
13  don't -- and then I'd have to figure out from
14  there if they've been published by the NTP whether
15  or not they have been -- submitted those results
16  to the peer-reviewed literature.
17        So it's something that you could figure
18  out.
19    A   Yes.
20    Q   Okay.  All right.  So where were we?
21        THE WITNESS:  Could we take a break at
22  some point?
23        MR. MEADOWS:  Yep, sure, that's fine
24  with me, if your -- if your lawyer's okay with it.
25        MR. ZELLERS:  It's up to you.  You're

Page 85

1  the questioner.
2        MR. MEADOWS:  Am I in complete control?
3  Did I just give it all to me?
4        THE VIDEOGRAPHER:  The time is
5  10:28 a.m., and we're going off the record.
6        (Recess.)
7        THE VIDEOGRAPHER:  The time is
8  10:40 a.m., and we're back on the record.
9  BY MR. MEADOWS:
10    Q   All right.  Dr. Moore, what did you do
11  to prepare for your deposition?
12    A   I reviewed my report, looked at some --
13  and looked at some articles.  Also I read through
14  some depositions.
15    Q   Okay.  And what articles did you look
16  at?
17    A   Various ones.
18    Q   Okay.  Which ones?
19    A   Well, I'd have to -- I'd have to go
20  through my report and point them out.
21    Q   Go right ahead.
22    A   Okay.  (Peruses document.)
23        I think I probably concentrated -- I'm
24  just going to -- let's see.  So I looked through
25  IARC, Volume 93.

22 (Pages 82 to 85)

H. Nadia Moore, Ph.D.

Page 86

1    Some of the case-control and cohort
2  studies. I don't recall exactly which ones I
3  reviewed. Wu -- I know I reviewed one of the Wu
4  studies, maybe both. Cramer, some of the studies
5  that were published by Cramer.
6    Penninkilampi, Gertig, the Gates
7  studies, Claughton, Gonzales.
8    Again, there are a lot of case-control
9  studies. I don't know if I can recall exactly
10  which ones I may have reviewed.
11    Are we talking since I issued my report?
12    Q   My question is, what did you do to
13  prepare for your deposition?
14    A   Right. And so that would be anything
15  that related -- I read -- so I looked at the
16  Hamilton study. The NTP studies. Keskin's.
17    I really just went through my report and
18  refreshed myself with some of these articles. And
19  there's probably some that aren't in my report
20  that are just on my -- what was the title of this
21  list? Just the materials that I considered.
22    Looked at Wahrheit. The NTP study of
23  1,3-butadiene. The NTP study of -- I don't -- oh,
24  yeah. So the NTP studies of benzene, of
25  4-cyclo -- sorry, 4-vinylcyclohexene. The NTP

Page 87

1  studies of nitrofurazone. The NTP study of
2  nitrofurantoin. The NTP study of N-methylmac --
3  sorry, N-methylolacrylamide. The NTP study of
4  4-vinyl 1-cyclohexydene diepoxide. The NTP study
5  of urethane, ethanol, urethane/ethanol. NTP
6  studies of acrylamide.
7    Schildkraut. The study by Keskin. The
8  study by Henderson. There are multiple studies by
9  Henderson that I reviewed. A study by Heller.
10  The study by -- I think I already said IARC,
11  Volume 93. Saed study from 2017. Trabert -- the
12  Trabert study.
13    I cannot remember the last time that I
14  reviewed the data for pleurodesis, if that was
15  before I wrote my report or in -- in preparations
16  for today, specifically.
17    The study by Berry, Wignall, Pira,
18  Magnani, Wilczynska, Wang, Magnani, Langseth,
19  Ferrante.
20    Should I err on the side of caution if I
21  can't remember if I read them directly?
22    Q   When did you start preparing for this
23  deposition?
24    A   Well, in preparation meaning
25  understanding this topic that we're discussing

Page 88

1  today, right?
2    Q   Well, I mean specifically getting ready
3  to sit there and give testimony today, when did
4  that process start?
5    A   Well, I guess when I started reviewing
6  the data for this project.
7    Q   Have you met with lawyers to prepare for
8  this deposition?
9    A   I have.
10    Q   When did that start?
11    A   I can't remember the exact date, but
12  probably a month ago.
13    Q   Since you submitted your report? Or did
14  it start before then?
15    MR. ZELLERS: The preparation for
16  deposition?
17    MR. MEADOWS: Yes.
18    THE WITNESS: So the meetings I had for
19  preparation of deposition started about a month
20  ago, which would be after I generated my expert
21  report.
22  BY MR. MEADOWS:
23    Q   Who did you meet with to prepare for
24  your deposition?
25    A   Mr. Zellers, Jessica Miller, Geoffrey

Page 89

1  White --
2    MR. WYATT: Wyatt.
3    THE WITNESS: Wyatt. All right. Wyatt.
4  Not good with the names obviously.
5    And then also Su-Lyn Combs.
6  BY MR. MEADOWS:
7    Q   I'm sorry?
8    A   Su-Lyn, S-U, dash, L-Y-N, Combs,
9  C-O-M-B-S.
10    Q   How many times did you meet with them?
11    MR. ZELLERS: Meet with the lawyers?
12    MR. MEADOWS: Yes.
13    THE WITNESS: About five.
14  BY MR. MEADOWS:
15    Q   And how many hours each time?
16    A   A few hours each time.
17    Q   What's a few?
18    A   Somewhere between two and five,
19  estimating.
20    Q   So you're saying you spent a total of 10
21  to 25 hours with lawyers in preparation for your
22  deposition today?
23    A   So I said we met about five times, two
24  to five hours. That's what I said.
25    Q   Okay. That'd be a total of about 10 to

23 (Pages 86 to 89)

H. Nadia Moore, Ph.D.

Page 90

1    25, right?
2        A   In general.
3        Q   Where did these meetings take place?
4        A   Some occurred here and in our Seattle
5    office or Red -- we're in Redwood, Washington.
6        Q   And the meetings never lasted any more
7    than five hours at a time?
8        A   Generally, that's my recollection.
9        Q   Were you ever videotaped in preparation
10   for your deposition today?
11       A   I was not.
12       Q   Anything else you did besides review
13   your report, look at articles, read depositions,
14   and meet with lawyers in order to prepare for your
15   deposition today?
16       A   So I think that's -- that's the
17   totality, as far as I can recall.
18       Q   Are there specific depositions that you
19   read in the last -- or since you drafted your
20   report that you read in preparation for this
21   deposition today?
22       A   So I -- they are in my -- in my -- the
23   complete list of materials, they're listed there.
24   If you would like me to find them.
25       Q   I really want you to tell me based on

Page 91

1    your memory, are there any specific depositions
2    that you read in preparation for your deposition
3    today?
4            MR. ZELLERS: Objection. Vague. Form.
5            THE WITNESS: So I -- I read through
6    these depositions to understand more about the
7    deposition process. I don't know if a specific --
8    if that meets the criteria of your question or
9    not.
10   BY MR. MEADOWS:
11       Q   So the depositions that are -- that were
12   not listed -- well, I don't know if there were any
13   listed on your original that were -- the
14   depositions that you -- that now have an asterisk
15   next to them, are those ones that you read in
16   preparation for this deposition?
17           MR. ZELLERS: Objection. Form.
18           THE WITNESS: So I read them after I
19   issued my report.
20   BY MR. MEADOWS:
21       Q   Correct.
22       A   Right. And to understand this
23   deposition process.
24       Q   Let me go back for a minute to the work
25   that you did for J&J regarding asbestos and

Page 92

1    cleavage fragments.
2            How many hours have you spent on that?
3        A   I didn't look to see how many hours I
4    spent on that project.
5        Q   Is that -- has that been a big project?
6        A   I -- I don't know what you mean by
7    "big."
8        Q   Has it consumed most of your time?
9        A   Well, it depends what the time period
10   you're asking.
11       Q   Okay. What time period did it consume
12   most of your time?
13           MR. ZELLERS: Objection. Form.
14           THE WITNESS: I don't think that's what
15   I said.
16   BY MR. MEADOWS:
17       Q   Okay. What did you say?
18       A   I was asking you, sorry, to clarify your
19   question.
20       Q   Well, has there been a period of time
21   since you started the project where the majority
22   of your time has been spent working on that
23   particular project?
24           MR. ZELLERS: Objection. Vague.
25           THE WITNESS: So which project are we

Page 93

1    talking about?
2    BY MR. MEADOWS:
3        Q   Asbestos and cleavage fragments.
4        A   Okay. And what is the time period that
5    you're asking?
6        Q   Well, you told me that that's an ongoing
7    project that started around December of 2017, and
8    it continues to -- it hasn't been closed.
9            So my question is, has there been a
10   period of time where the majority of your time has
11   been spent working on that project?
12       A   Right.
13           MR. ZELLERS: Objection. Form.
14           THE WITNESS: Well, and my question to
15   you was, what is the time period that you're
16   defining? Is your time period a one day or is it
17   a week, is it a month? I don't understand the
18   question.
19   BY MR. MEADOWS:
20       Q   Okay. How about a month.
21       A   So -- so what is your question? Sorry.
22   Now -- I was too sidetracked on the time period.
23       Q   All right. What -- is the rate that you
24   charged on that project the same rate that you are
25   charging J&J in this case?

24 (Pages 90 to 93)

H. Nadia Moore, Ph.D.

Page 94

1    A   I'd have to go back and look, but my --
2  because I'm not sure if my rate has changed over
3  that time period.  But my rate is my rate that I
4  would charge on every project, the same rate.
5    Q   What is your rate?
6    A   It's $400 an hour for consulting, and
7  $600 for deposition and trial testimony.
8    Q   And has that rate changed since -- was
9  that rate different in December of 2017?
10   A   It may have been and probably was,
11 because it was before I was promoted to principal.
12   Q   And what was the last rate that you had
13 before the 400 and 600?
14   A   I would have to go back to company
15 records to look.
16   Q   Just don't remember?
17   A   I don't.  I don't want to be inaccurate.
18   Q   Mm-hmm.  And the records that you do
19 have pertaining to your billing and your work on
20 the J&J project that started in December of 2017
21 regarding asbestos and fragments, those are at
22 your office, right?
23   A   Those are in our office records, I
24 assume, yeah.
25   Q   Well, I'm going to ask you to make sure

Page 95

1  those don't get disposed of because we're going to
2  be asking for them.  Okay?
3        MR. ZELLERS:  And you -- she hears your
4  statement.  So...
5  BY MR. MEADOWS:
6    Q   Just to be clear, we will be asking for
7  your billing records and all records pertaining to
8  that project at some point in time.  So do not let
9  those get destroyed, okay?
10       MR. ZELLERS:  All right.  So that was a
11 statement.  That's not a question.  And,
12 Mr. Meadows, we will be objecting, but we can
13 discuss it offline and later.
14 BY MR. MEADOWS:
15   Q   What's the difference between senior
16 toxicologist and principal toxicologist at
17 Veritox?
18       I see that you were senior toxicologist
19 from 2013 to 2018, and then 2018 you became
20 principal toxicologist.
21   A   That's correct, I became a principal in
22 2018.
23   Q   What is a -- what's a "principal" mean
24 at Veritox?
25   A   So it's a -- a different status of

Page 96

1  employee.  It's more of an ownership position.
2    Q   What month in 2018 did that start?
3    A   April.
4    Q   So it's been about a year?
5    A   Yes.
6    Q   And before that, from 2013 to 2018, you
7  were senior toxicologist.  Tell -- tell me how
8  that is different from being a principal.
9    A   So the only difference is regarding an
10 ownership position in the company.
11   Q   Is the pay the same?
12   A   The pay is the same.
13       MR. ZELLERS:  You don't have to get into
14 the pay, but -- all right, you answered.
15       THE WITNESS:  Well -- sorry.
16       MR. ZELLERS:  That's fine.
17       THE WITNESS:  Yeah, my salary is the
18 same.
19 BY MR. MEADOWS:
20   Q   But now you're an owner in the company,
21 correct?
22   A   I was before as well.
23   Q   As a senior toxicologist you were an
24 owner in the company?
25   A   Correct.

Page 97

1    Q   Okay.  I'm still not -- then I'm not
2  understanding the difference between a senior and
3  principal.  Can you tell me what the difference
4  is?
5    A   The level of ownership.
6    Q   The level of ownership.  Okay.
7        So tell me how that's changed for you
8  from becoming a -- from going to a senior to a
9  principal.
10       MR. ZELLERS:  In generalities.  So...
11       THE WITNESS:  So in generalities, I
12 would say that it hasn't changed -- sorry.  Let me
13 go back.  What was your question?
14 BY MR. MEADOWS:
15   Q   Well, you told me the difference between
16 being a senior and a principal at Veritox is level
17 of ownership.  So I'd like to know the difference
18 between -- you know, levels of ownership between
19 those two positions.
20   A   So -- so the actual percentage wasn't
21 that different.  So still I'm -- I would -- I had
22 to buy some more, but still I'm a minor owner of
23 the company, and then the difference is in the
24 bonus structures.
25   Q   So your salary is the same, but your --

H. Nadia Moore, Ph.D.

Page 98

1    you have a different level of ownership in the
2    company, and your bonus, I assume, is potentially
3    greater now.  Is that fair to say?
4         A    The bonus structure is different.
5         Q    I would assume it's better as a
6    principal than it is as a senior toxicologist.
7             MR. ZELLERS:  Objection.  Form.
8             THE WITNESS:  So I would say it's
9    different and it -- it depends on the year.
10   BY MR. MEADOWS:
11        Q    Tell me why is it that you became a
12   principal.  How did that happen and why did it
13   happen?
14        A    I -- the -- the company right now, the
15   principals are older, and they want some younger
16   people to come in to assume hopefully in the
17   future bigger ownership roles, and so they're
18   trying to get younger people in.
19        Q    Was Veritox doing any work for J&J
20   before you started doing the asbestos/cleavage
21   fragment work for them in December of 2017?
22        A    I'm not sure when Bryan Hardin --
23   Dr. Hardin's work began.
24        Q    So Dr. Hardin's work may have started
25   after yours did?

Page 99

1         A    I don't know when his started.
2         Q    Is he still doing work for J&J?
3         A    I don't know the status of his projects.
4         Q    What is his position at Veritox?
5         A    He's a principal.
6         Q    How long has he been a principal?
7         A    Longer than I've been there.
8         Q    Did -- has Veritox been paid more from
9    J&J as a result of the asbestos/cleavage fragment
10   work than they've been paid from J&J on the
11   litigation work that you've done?
12        A    So I'm not in a position right now to --
13   to speculate on how much was with the asbestos and
14   cleavage fragment work.  That would be a guess.
15        Q    Well, have you spent more hours working
16   on the asbestos and cleavage fragment work than
17   you have spent so far working on the litigation
18   work?
19        A    Well, I haven't thought about how many
20   hours in total I -- I worked on the asbestos and
21   cleavage fragment work in order to do a
22   comparison.
23        Q    Just no clue as to whether one is more
24   than the other.
25             MR. ZELLERS:  Objection.  Form.

Page 100

1             THE WITNESS:  I work on a lot of
2    projects, a lot of different -- for a lot of
3    different people and entities, and I just -- right
4    now I can't pick -- pick that out of my brain.
5    I'm sorry.
6    BY MR. MEADOWS:
7         Q    Maybe let's get a little context then.
8    Why don't we look at your billing in this case.
9             So -- so I was provided with some
10   billing records last night as part of materials
11   that your lawyers sent to us.
12            Do you have those in front of you?
13        A    I do.
14        Q    Okay.  And does that reflect -- do those
15   documents reflect the billing that you've done to
16   date in this case?
17        A    These documents are through the February
18   billing.
19        Q    Okay.  So it looks like -- okay.  So
20   have you billed for March yet?
21        A    We have not.
22        Q    And do the -- the rates -- I -- I don't
23   think I saw the rates on here anywhere.  But I
24   would assume that if I did the math, then I'm
25   going to find that it's -- this all comes out to

Page 101

1    be $400 an hour on here.  Is that correct?
2         A    No.  So this reflects work that was done
3    by both myself and my staff.
4         Q    Okay.  And it starts on December 5th of
5    2018; is that right?  At least that's the first --
6         A    Yes.
7         Q    -- date that you started billing for; is
8    that right?
9         A    That's what -- let me -- let me make
10   sure that's right.  Just different.  It looks like
11   the first, yes, date was December 15th, 2000 --
12   oh, no.  There's another one on the second page,
13   that was December 4th, 2018.
14        Q    Okay.
15        A    So the beginning of December 2018 is
16   when we started.
17        Q    And that would be consistent with you
18   having been -- Ms. Curry having reached out to you
19   at the end of November of 2018, right?
20        A    Ms. Curry reached out to me the end of
21   November 2018.
22        Q    And at that point, did you enter into a
23   written engagement between -- well, did you enter
24   into a written engagement at that point?
25        A    No, there was not a written engagement.

26 (Pages 98 to 101)

H. Nadia Moore, Ph.D.

Page 102

1    Q   Is there one now?
2    A   No, there's not.
3    Q   There's no formal written contract
4   between you or Veritox and J&J or anyone else that
5   is -- that would be the basis of what you're --
6   the services you're performing in this case.
7    A   It was not a retainment letter, I think
8   is what you're referring to, for -- for this,
9   correct.
10   Q   Is that standard for Veritox?  Do they
11  usually enter into written agreements with the
12  people they work for?
13   A   So some -- I would say some clients do
14  have written agreements and some don't.
15   Q   And why do some have and others don't?
16   A   I don't know why --
17   Q   What's --
18   A   -- people do what they do.
19   Q   Well, what is Veritox's typical practice
20  in that regard?
21       MR. ZELLERS: Objection. Form.
22  Foundation.
23       THE WITNESS: Well, so like I said,
24  sometimes there are written engagements and
25  sometimes there are not.

Page 103

1   BY MR. MEADOWS:
2    Q   Well, is Veritox the one in whatever
3   relationship that dictates whether or not there is
4   going to be a written engagement or is it the
5   person that's hiring you?
6       MR. ZELLERS: Objection. Form.
7       THE WITNESS: So I guess I don't
8   understand the question.
9   BY MR. MEADOWS:
10   Q   Well, you tell me that sometimes there's
11  a written engagement and sometimes there's not.
12  I'm trying to figure out why that happens, why
13  sometimes there's one and why sometimes there's
14  not.
15       Is that something that Veritox dictates
16  or is that something that your clients dictate?
17   A   I -- so I think it is a client-by-client
18  issue or principal-by-principal issue.  I don't --
19  I don't think you can say globally that -- I can't
20  answer that.
21   Q   Was there a written engagement on the
22  J&J work that you started on in December of 2017?
23   A   No, there was not.
24   Q   Approximately how much have you billed
25  so far in this litigation as reflected in the

Page 104

1   documents you have there?
2    A   It's probably about 300,000.
3    Q   About 300,000.  Okay.
4       So that's 300,000 for work done over the
5   course of three months?
6    A   Yes.
7    Q   So about $100,000 a month roughly?
8    A   If you do the -- that's the average.
9    Q   All right.  So going back to the work
10  that started with J&J in December of 2017, have
11  you -- has there been any month where you have
12  billed in the neighborhood of $100,000 to J&J for
13  that work?
14   A   Well, I'd have to again go back and look
15  at the records.
16   Q   You just have no way of having any feel
17  for that as you sit here today.
18   A   Well, I could guess, but I didn't think
19  I was supposed to guess.  I mean, I want to be
20  accurate in my testimony.
21   Q   When were your -- when does -- we're now
22  at April 4th.  When will your March bill go out?
23   A   I don't know exactly when it will go
24  out.  I'm -- I assume our accounting department is
25  working on it.

Page 105

1    Q   I see on this bill that it looks like
2   it's going to the law firm of Orrick.
3    A   Correct.
4    Q   Attention Peter Bicks.  Do you know
5   Peter?
6    A   No.
7    Q   Have you had any contact with lawyers at
8   Orrick?
9    A   No, I don't believe so.
10   Q   Who do your bills go to on the project
11  that was started back in 2017?
12       MR. ZELLERS: If you know.
13       THE WITNESS: I believe they go to the
14  same address and attention.
15  BY MR. MEADOWS:
16   Q   Before Ms. Curry called you in -- I
17  believe you told me she -- she called you for the
18  work at -- the asbestos/cleavage fragment work,
19  correct?
20   A   No.
21   Q   Okay.  Who called you to work on the J&J
22  project for asbestos and cleavage fragment?
23       MR. ZELLERS: Objection. Form, asked
24  and answered.
25       THE WITNESS: So that was -- the person

27 (Pages 102 to 105)

H. Nadia Moore, Ph.D.

Page 106

1    that called me for the asbestos and cleavage
2    fragment work was Jonathan Cooper.
3    BY MR. MEADOWS:
4        Q   Jonathan Cooper.  I'm sorry.  Right.
5            And had you ever met Mr. Cooper before?
6        A   I didn't recall meeting him before.
7        Q   Did he seem to feel like y'all had met
8    before?
9            MR. ZELLERS:  Well, again, I'm going to
10   instruct her not to talk about or divulge
11   communications with counsel.
12           So I'll instruct you not to answer that
13   question.
14   BY MR. MEADOWS:
15       Q   Was Mr. Cooper present at your summer of
16   2017 presentation that we have slides for here
17   today?
18           MR. ZELLERS:  Foundation, form
19   objection.
20           THE WITNESS:  So I don't know exactly
21   who was present and who wasn't present.  He -- he
22   told me that he was there.
23           MR. ZELLERS:  Okay.  And again, I'd ask
24   you not to divulge or talk about communications
25   with counsel.  But that's -- that's fine.

Page 107

1            THE WITNESS:  Okay.
2    BY MR. MEADOWS:
3        Q   What percentage of your work since
4    December of 2017 has been with respect -- or has
5    been for Johnson & Johnson?
6        A   So I don't keep track of those type of
7    numbers.
8        Q   Well, has it been more than 50 percent?
9        A   I don't keep track of those numbers.
10       Q   Well, have you spent most of your time
11   working on these J&J projects over -- over the
12   last year?
13           MR. ZELLERS:  Objection.  Form.
14           THE WITNESS:  So that's a long time
15   period.  I would say no, not the majority of my
16   time over the last year, since this -- what, since
17   December of 2017.
18   BY MR. MEADOWS:
19       Q   I know that we -- you have disclosed a
20   case that you testified in, but have you also done
21   litigation work that -- where you have not
22   testified?
23       A   I have.
24       Q   And what -- has any of that litigation
25   work pertained to asbestos and/or talcum powder?

Page 108

1        A   No, not those specific test articles.
2        Q   What percentage of your work pertains to
3    litigation, whether you've testified or not?
4        A   Again, I don't -- our company doesn't
5    keep track of those type of records.  So that
6    would be a guess.
7        Q   Well, is more of your work dedicated to
8    litigation than anything else?
9            MR. ZELLERS:  Objection.  Form.
10           THE WITNESS:  So it -- it depends on the
11   current project workload.
12   BY MR. MEADOWS:
13       Q   So over the last year, has more of your
14   work been dedicated to litigation or not?
15       A   Again, it's hard -- hard to say.  I work
16   on a variety of projects for a lot of different
17   entities.  So obviously this work in the last
18   three months, if we're talking about an average,
19   is going to impact the overall average.  So I'm
20   not -- I'm not sure.
21       Q   Did in -- in the course of your
22   preparation of your -- well, in the course of your
23   work on this case, have you been provided with any
24   internal company documents?
25       A   So the -- the work on this case, I

Page 109

1    received some documents that were attachments
2    to -- so I guess the simple answer is yes, and I
3    can -- I can tell you which ones.
4        Q   They would be referenced in your list?
5        A   They would be.
6        Q   Okay.  I want to turn now to the
7    conference that you spoke at in the summer of
8    2017.  And I believe your -- well, I know that
9    your lawyer provided that to me last night.
10           Have you found that in the materials?
11       A   I have, yes.  Thank you.
12       Q   So how many pages are you showing that
13   presentation to be?
14           It might be easier just to identify what
15   the last page is for me and show it to me so we
16   make sure we're on the same page.
17       A   So the last slide from the actual
18   presentation was this (indicating) slide, and then
19   there were some additional slides that weren't
20   shown.
21       Q   Okay.
22       A   If that's what you're asking.  So then
23   the actual end of the materials that were
24   submitted -- that were available at the conference
25   I think included these extra slides that I didn't

28 (Pages 106 to 109)

H. Nadia Moore, Ph.D.

Page 110

1    present, and then it goes to this human studies.
2        Q   Okay.
3            MR. ZELLERS:  And that's the last page
4    of the materials that were available?
5            THE WITNESS:  Yes, for --
6            MR. ZELLERS:  For the summer --
7            THE WITNESS:  Yeah, this is the last
8    page of the materials that were available for the
9    conference attendees.
10   BY MR. MEADOWS:
11       Q   That's the one that has -- it's "Talc
12   Dusted Diaphragms"?
13       A   Yes.
14       Q   But as far as what you presented, it
15   ends somewhere before that.
16       A   Right.  It ends the one right before
17   the -- that page that says "Additional slides."
18       Q   "Additional slides."  Okay.  Good
19   enough.  Thank you.
20           All right.  So tell me how this -- how
21   did this come about that you had this opportunity
22   to -- to speak at this conference?
23       A   So one of my colleagues, Dr. Kelman,
24   came and asked me, he said there's -- there was an
25   opportunity that someone had asked him to do an

Page 111

1    analysis of -- the causation analysis of --
2    between talc and ovarian cancer, and understand
3    the difference in the causation analysis between
4    asbestos and mesothelioma.
5        Q   This was Dr. Kelman?
6        A   Kelman.  K-E-L-M-A-N.
7        Q   Okay.  Someone had come and -- to him
8    and asked him what?
9        A   Asked him to do a presentation on the
10   subject matter.
11       Q   Okay.  And who is Dr. Kelman again?
12       A   So he is the principal and president of
13   Veritox.  A principal toxicologist and president.
14       Q   Okay.  All right.  So somebody asked
15   him --
16       A   Asked him to do it --
17       Q   -- to do a presentation --
18       A   -- and he was unable to do it, and asked
19   me if I was -- was interested and would be
20   available.
21       Q   When you say he was unable to do it,
22   what -- what do you mean by that?
23       A   He had some kind of conflict, I believe.
24       Q   So he asked you to do it.
25       A   Right.

Page 112

1        Q   Approximately what time period was that?
2        A   Before June.  I -- I don't know exactly
3    when it was.  Months before that.
4        Q   And who asked him to do this
5    presentation?
6        A   Who asked him?
7        Q   Yes.
8        A   I don't know.
9        Q   And so you agreed to present?
10       A   I -- I did agree to present, to do the
11   literature -- to review the literature and
12   present the subject.
13       Q   Okay.  So this group of slides that we
14   have here -- well, first of all, let me ask you
15   this:  This was done --
16           MR. MEADOWS:  Let me have this.
17           (Counsel conferring.)
18   BY MR. MEADOWS:
19       Q   Who is the American Conference?  Is that
20   who -- is that who sponsors this?
21       A   It's put on by the American Conference
22   Institute.
23       Q   Okay.  We're going to mark these -- what
24   are we on, 3?
25           MR. MEADOWS:  Okay.  Mark this as 3 and

Page 113

1    that as 4.
2            (Moore Exhibit Nos. 3 and 4 were
3            marked for identification.)
4    BY MR. MEADOWS:
5        Q   Let me show you what I've marked as
6    Exhibits 3 and 4.
7            MR. ZELLERS:  Do you have any copies?
8    Okay, great.
9            MR. MEADOWS:  I believe I do.
10           MR. ZELLERS:  Thank you.
11           THE WITNESS:  Thank you.
12           MR. MORIARTY:  Do you have any extras?
13   BY MR. MEADOWS:
14       Q   Have you had a chance to take a glance
15   at least No. 3, Exhibit 3?
16       A   Yes, I have seen this.
17       Q   Okay.  And to me it appears to be an
18   agenda for this particular conference.  How would
19   you characterize it?
20           MR. ZELLERS:  Form, foundation.
21   Objection.
22           THE WITNESS:  So I don't know what this
23   is, to be honest.  It seems to be about this
24   conference.
25   BY MR. MEADOWS:

29 (Pages 110 to 113)

H. Nadia Moore, Ph.D.

Page 114

1    Q   Okay.  In any event, your name is on
2  there, right?
3    A   It is.
4    Q   Dr. H. NADIA MOORE,
5  AmericanConference.com, Sixth Annual Toxic Tort
6  Environmental Litigation.
7        And it identifies you as a speaker,
8  right?
9    A   Yes, I believe that's true.
10   Q   And so have you ever spoken at one of
11 these conferences before?
12   A   I had not.
13   Q   No?  Okay.  And Exhibit 4 -- first of
14 all, before we go to Exhibit 4, Exhibit 3
15 describes what the conference is all about.  I
16 notice the title is "Talc:  The Next Asbestos?
17 Analyzing Recent Explosion of Talc Related
18 Claims."
19       And then it describes what the
20 conference is all about, right?
21   A   Well, so that's the title.  I don't know
22 who -- who made up this description, "What is it
23 about?"
24   Q   The date, June 22, 9:30 a.m., is that
25 when the conference was?

Page 115

1        I highlighted it for you up there on the
2  screen if that helps.
3    A   That's what it says.  I can't remember
4  if that was the exact time.
5    Q   Okay.  And this was at the Wyndham Grand
6  in Chicago, right?
7    A   Yes.
8    Q   It looks like it was a three-day
9  conference.
10       MR. ZELLERS:  Can you show her what
11 you're looking at?
12       MR. MEADOWS:  Yeah.  Right here
13 (indicating).
14       THE WITNESS:  Oh, I think originally it
15 was three, but it wasn't actually.
16 BY MR. MEADOWS:
17   Q   All right.  So back to my question, have
18 you ever spoken at one of these conferences
19 before?
20   A   So at an ACI conference?
21   Q   Yeah.
22   A   I thought I answered that, no, I had
23 not.
24   Q   Okay.  Do you know if Dr. Kelman had?
25   A   I don't know.

Page 116

1    Q   And then here we've got Exhibit 4.
2  American Conference Institute, and down here it
3  says it's sponsored by Hepler -- HeplerBroom,
4  right?
5    A   That -- I mean that's --
6        MR. ZELLERS:  Objection.  Form.
7        Go ahead.
8        THE WITNESS:  That's what it says.
9  BY MR. MEADOWS:
10   Q   Okay.  Are you familiar with that law
11 firm?
12   A   No.
13   Q   There's some other law firms in here
14 referenced.
15       Blank Rome, are you familiar with that
16 firm?
17   A   Where are you?  No.
18   Q   All right.  So going back to your --
19 your PowerPoint presentation.
20   A   Okay.
21   Q   I'm going to flip over to what I think
22 is the second page of it.
23       And this is the slide you created,
24 right?
25   A   Yes.

Page 117

1    Q   By the way, who did create this
2  PowerPoint presentation?
3    A   So I -- I did.
4    Q   You did.  You did all of it?
5    A   Well, with some help from some staff.
6  So these slides that were -- that are in this
7  deck, yes.
8    Q   Okay.  And did you consult at all with
9  J&J before you agreed to give this presentation?
10   A   No.
11       MR. ZELLERS:  Object to form.
12 Foundation.
13 BY MR. MEADOWS:
14   Q   Did J&J look at your presentation before
15 it was given?
16   A   No.
17   Q   Or submitted?
18   A   No.
19   Q   And so the first bullet point you have
20 on today's presentation bounds says:  "Talc refers
21 to cosmetic talc without asbestos."
22       Is that the way that reads?
23   A   That is.  You read that correctly.
24   Q   And then it says:  "Cosmetic talc
25 arguably could be contaminated with asbestos, but

H. Nadia Moore, Ph.D.

Page 118

1  the majority of ovarian cancer cases do not
2  allege asbestos contamination and, thus, talc ^ Ck
3  today is without asbestos."
4      Is that what you said?
5      A  Yes, I believe that's what you -- you
6  read that correctly.
7      Q  And then down here you've got, "Asbestos
8  refers to fibrous amphiboles."  Right?
9      A  Yes.
10     Q  And then, "Exposure/disease relationship
11 of asbestos and mesothelioma causation
12 established," and then "talc and ovarian cancer,"
13 you have a question mark.  Right?
14     A  You've read that slide, yes.
15     Q  You would agree that cosmetic talc can
16 be contaminated or it can have asbestos in it,
17 right?
18         MR. ZELLERS:  Objection to form.
19         THE WITNESS:  So that's a pretty general
20 question.
21 BY MR. MEADOWS:
22     Q  Well, you said it right here:  "Cosmetic
23 talc arguably could be contaminated with
24 asbestos."  Right?
25     A  The -- correct.  There's been some

Page 119

1  debate.
2      Q  Now, did you -- at this conference did
3  you have opportunity to meet with or communicate
4  with lawyers who are working on this litigation?
5          MR. ZELLERS:  Objection.  Foundation.
6          THE WITNESS:  So at the time, I guess I
7  didn't know who was working on the litigation and
8  who wasn't working on the litigation.
9  BY MR. MEADOWS:
10     Q  Well, there were others there speaking
11 on this topic as well, right?
12     A  That's -- other people spoke, yes.
13     Q  There were lawyers there who were
14 speaking on this topic, right?
15     A  Correct.
16     Q  And so my question is, did you get an
17 opportunity to meet those other speakers?
18     A  Right.  But I think your -- your
19 question also said other attorneys that were
20 working in this litigation, and I didn't know if
21 they were actually working in the litigation or if
22 they were just presenting material like I was
23 that -- that it occurred.
24     Q  Did you have any communications with
25 lawyers or others at -- at this conference or as a

Page 120

1  result of this conference about the prospect of
2  you working in this litigation?
3          MR. ZELLERS:  Objection.  Forming -- or
4  foundation, form.
5          THE WITNESS:  Okay, so I guess, can you
6  rephrase that a little bit?
7  BY MR. MEADOWS:
8      Q  Well, did you -- did you ever talk to
9  any lawyers at this conference regarding the
10 possibility of you working in this litigation?
11     A  No.
12     Q  Did -- as a result of this conference,
13 did you have follow-up communications with any
14 lawyers about the prospect of working in this
15 litigation?
16         MR. ZELLERS:  And -- and you can answer
17 that question, but I'm going to instruct you not
18 to discuss communications that you and Mr. Cooper
19 had, you know, on or after he contacted you in
20 December of 2017.  But, otherwise, you can answer
21 the question.
22         THE WITNESS:  Let me refresh myself.  So
23 I did talk to Jonathan Cooper, as we mentioned
24 earlier.
25 BY MR. MEADOWS:

Page 121

1      Q  Okay.
2      A  And he -- he was at this conference.
3      Q  He reached out to you.
4      A  He did.
5      Q  Now, there's also another PowerPoint
6  presentation that was provided to us last night.
7  That I found --
8      A  Yes.
9      Q  -- in the materials.
10     A  Yes.  Yes.
11     Q  When -- is that yours as well?
12     A  It is, yes.
13     Q  Okay.  And when was that conference?
14     A  That was in May of 2018.
15     Q  So May of 2018, that was after you had
16 started doing the asbestos/cleavage fragment work
17 for J&J, correct?
18     A  That is correct.
19     Q  Tell me how this opportunity came about
20 for you to -- to make a presentation at this
21 conference.
22     A  So we had already -- I had already
23 assembled a lot of the literature that we just
24 discussed for the ACI talk, and in talking with
25 others in my office, we thought it would be a good

31 (Pages 118 to 121)

H. Nadia Moore, Ph.D.

Page 122

1    idea to present at AIHce.  And so I got together
2    with two other individuals and we put together a
3    proposal for a session at AIHce, which is the
4    American Industrial Hygiene Conference and
5    Exposition.
6        Q    So this was Veritox -- you and Veritox
7    making a decision that you wanted to make a
8    presentation at this particular conference, right?
9        A    So this is a scientific conference.  We
10   were always looking for opportunities to present
11   science that we've done, and so we looked for the
12   opportunity, and submitted a proposal for this
13   work.
14       Q    Okay.  But by now you had been doing
15   work for J&J on the asbestos/cleavage -- cleavage
16   fragment issue, right?
17       A    Well, so the proposal -- that was true
18   when I gave the talk.  The proposal was due in
19   fall of 2017.  So that would have been before I
20   started the cleavage fragment consultation.
21       Q    And so it looks like you -- you gave
22   this presentation along with two others; is that
23   correct?
24       A    Two others helped me with the
25   presentation, yes.

Page 123

1        Q    Okay.  And they both are from Veritox?
2        A    Yes.
3        Q    And that's Bryan Hardin and Karen
4    Heymann?
5        A    That's correct.
6        Q    Who put this presentation together, the
7    PowerPoint?
8        A    The three of us did together.
9        Q    And did you -- did this -- was this
10   PowerPoint submitted to the conference managers
11   before or after you started doing work for J&J in
12   December of 2017?
13       A    So what was the question?  Sorry.
14       Q    When was this PowerPoint presentation
15   submitted?
16       A    So the proposal for the PowerPoint was
17   submitted in the fall of 2017, which would have
18   been the abstract for the work.  And then the
19   PowerPoint was finished in 2018, which would have
20   been after we started consult -- consulting, or I
21   started consulting for J&J.
22       Q    And did you talk to J&J about the fact
23   that you were going to be giving this
24   presentation?
25       A    So --

Page 124

1        MR. ZELLERS:  Okay.  Hold on.  So I will
2    let you answer that question "yes" or "no."  I --
3    I am instructing you not to talk about the
4    consulting you did for J&J, but you can answer
5    Mr. Meadows' question if you're able to.
6        THE WITNESS:  So by -- by J&J, you mean
7    the attorneys?
8    BY MR. MEADOWS:
9        Q    Anybody.  I mean did you -- did you talk
10   to the attorneys or J&J directly about the fact
11   that you were going to be giving this
12   presentation?
13       A    I let them know that I was giving the
14   presentation.
15       Q    And did -- did you submit your slides or
16   your ideas about the presentation to J&J or the
17   lawyers before you -- before you turned it in for
18   presentation?
19       MR. ZELLERS:  All right.  I'll allow you
20   to answer that question.
21       THE WITNESS:  So I can't remember the
22   exact timing of when that occurred, but we gave
23   the J&J attorneys a copy of the PowerPoint.  And
24   again, I don't know which came first, the
25   submission for AIHce or that e-mail that went to

Page 125

1    the attorneys.  We copied basically both places at
2    the same time.
3    BY MR. MEADOWS:
4        Q    Did anyone outside of Veritox, whether
5    it be J&J or lawyers or anybody else, have any
6    input or suggestions about the presentation?
7        A    No.
8        Q    All right.  I want to turn to your
9    report now.
10       Okay.  And so we've already marked it, I
11   believe, as Exhibit 1.  So I want to go to the
12   first paragraph.  The first paragraph.
13       We'll start off in the first paragraph,
14   "Summary of Primary Opinions."
15       Right up here.  Are you with me?
16       A    Yes.
17       Q    All right.  So it says:  "I was asked to
18   provide an expert opinion as a toxicologist
19   regarding alleged adverse health effects from
20   exposure to Johnson's Baby Powder and Shower to
21   Shower."
22       Did I read that correctly?
23       A    Yes, you read that correctly.
24       Q    Are you an expert in anything other than
25   toxicology?

32 (Pages 122 to 125)

H. Nadia Moore, Ph.D.

Page 126

1        MR. ZELLERS: Objection. Form.
2        THE WITNESS: So I'm an expert in
3    toxicology, and the practice of toxicology
4    actually involves multiple disciplines.
5    BY MR. MEADOWS:
6        Q   Okay. So what do you consider yourself
7    to be an expert in?
8        A   So as a toxicologist, I have to
9    integrate a lot of datasets from exposure science,
10   molecular biology, cancer biology, physiology,
11   epidemiology. So basically integrating the entire
12   scientific dataset to understand toxicology
13   issues.
14       Q   We know you're -- you hold yourself out
15   as an expert in toxicology, right?
16       A   Yes.
17       Q   All right. I want you to tell me what
18   are the areas you claim to be an expert in.
19       MR. ZELLERS: Objection. Asked and
20   answered.
21       THE WITNESS: So I think as a
22   toxicologist, I have to practice in many areas.
23   So you have molecular biology listed. Also I need
24   to understand and critically review epidemiology
25   studies. Exposure science. Chemistry and

Page 127

1    properties of test materials. Physiology.
2        And I'm not going to represent that's
3    the entire universe of -- of what I'm versed in,
4    but those --
5    BY MR. MEADOWS:
6        Q   I didn't ask you what you were versed
7    in. I asked you what you're an expert in.
8        A   Right. But as being an expert in
9    toxicology, you need -- I -- I need to understand
10   to critically evaluate and review data out of all
11   those disciplines.
12       Q   Do you have a degree in molecular
13   biology?
14       A   My degree is not in molecular biology,
15   but as a toxicologist, I practice in molecular
16   biology and I've taken coursework in molecular --
17       Q   Do you have a degree in molecular
18   biology?
19       A   My degree does not say molecular
20   biology.
21       Q   Do you have a degree in epidemiology?
22       A   Again, I practice in many different
23   areas as a toxicologist, and epidemiology is one
24   of them.
25       Q   Do you have a degree in epidemiology?

Page 128

1        MR. LOCKE: Objection.
2        THE WITNESS: My degree does not say
3    epidemiology. Epidemiology is part of public
4    health, which is where my discipline comes from.
5    BY MR. MEADOWS:
6        Q   Do you have a degree in exposure
7    science?
8        A   Again, exposure science is part of the
9    broader context of toxicology.
10       Q   Can anyone get a degree in exposure
11   science?
12       MR. ZELLERS: Objection. Form.
13       Go ahead.
14       THE WITNESS: So that -- that is a
15   degree.
16   BY MR. MEADOWS:
17       Q   Okay. That you do not have, correct?
18       A   That's correct.
19       Q   All right.
20       A   But I can just also add that I am a
21   board certified toxicologist. Part of the boards
22   involve testing in a variety of areas. All of
23   these areas that we've listed are on the board
24   exams.
25       Q   Okay. I wrote it down toxicology, you

Page 129

1    are board certified, right?
2        A   That's correct.
3        Q   You have a degree, right?
4        A   I do have a degree.
5        Q   Chemistry and properties of test
6    materials, do you have a degree in that?
7        A   I do have a degree in chemistry.
8        Q   Okay. Is -- is that a specialized
9    degree, chemistry and properties of test
10   materials?
11       A   So it's characterization of test
12   materials involving chemistry and other physical
13   attributes.
14       Q   I know you can get a degree in
15   chemistry. I guess my question is, can you get a
16   degree in characterization of test materials?
17       A   So it's, again like toxicology, an
18   applied field.
19       Q   My question is, can one get a degree in
20   characterization of test materials?
21       A   I do not know of a degree as character
22   -- in characterization of test materials.
23       Q   But you would say -- well, we know you
24   have a degree in chemistry, right?
25       A   Correct.

H. Nadia Moore, Ph.D.

Page 130

1      Q    Okay.  You don't have a degree in
2    characterization of test materials, but that may
3    just be because they don't have a degree for that,
4    right?
5      A    Sure.
6      Q    But you would say that you are an expert
7    in that, nonetheless, correct?
8      A    Correct.
9      Q    Physiology.  Do you have a degree in
10   physiology?
11     A    I do not have a degree in physiology,
12   but again toxicology covers many disciplines, and
13   I have taken coursework and my board certification
14   would encompass all of the fields that you've
15   listed.
16     Q    Well, I didn't list them.  You listed
17   them.
18     A    I -- I stated them, and I'm just
19   clarifying the list that you wrote down.
20     Q    Okay.  What is physiology?
21     A    Physiology is the -- the way the body
22   works.
23     Q    And you would agree that there are
24   people out there who do have degrees in molecular
25   biology, right?

Page 131

1      A    There are degrees in molecular biology.
2    Of course, I use molecular biology as part of my
3    toxicology practice.
4      Q    And there are people out there who have
5    degrees in epidemiology, right?
6      A    I -- yes, there are people out there
7    that have degrees in epidemiology.  But again, I
8    use epidemiology as part of my toxicology practice
9    as do all toxicologists, or most -- I'll say most
10   of them.
11     Q    And there are people out there who have
12   degrees in exposure science?
13     A    There are people who have degrees in
14   exposure science.  Again, I use exposure science
15   in my toxicology practice.
16     Q    And there are people who have degrees in
17   physiology, right?
18     A    There -- there are people who have
19   degrees in physiology.  But again, I use
20   toxicology -- I use physiology as part of my
21   toxicology practice.
22     Q    Do you think people who have degrees in
23   these particular fields have a greater degree of
24   expertise than you do?
25          MR. ZELLERS:  Objection.  Form,

Page 132

1    foundation.
2          THE WITNESS:  So -- so say that again.
3    Sorry, I was -- or I can read it.
4    BY MR. MEADOWS:
5      Q    Does someone who has a degree in these
6    fields have a greater degree of expertise than you
7    do?
8      A    I think --
9          MR. ZELLERS:  Same objections.
10         THE WITNESS:  I think that depends on
11   the subject matter that you are evaluating.
12   BY MR. MEADOWS:
13     Q    All right.  So you gave me a list of --
14   one, two, three, four, five -- six, and we'll
15   throw in characterization of test materials as
16   seven areas that you claim to be an expert in,
17   right?
18     A    Again, these are fields that I use as
19   part of my daily practice as a toxicologist.
20     Q    Do you claim to be an expert in these
21   fields or not?
22         MR. ZELLERS:  Objection.  Asked and
23   answered, form.
24         THE WITNESS:  So I'm an expert in
25   toxicology, and part of that expertise involves

Page 133

1    those disciplines.
2    BY MR. MEADOWS:
3      Q    So are you telling me that you're an
4    expert in molecular biology?
5          MR. ZELLERS:  Objection.  Form.
6          THE WITNESS:  As part of my realm as a
7    toxicologist, I critically review, evaluate
8    epidemiology studies.
9    BY MR. MEADOWS:
10     Q    So are you claiming to be an expert in
11   epidemiology?
12         MR. ZELLERS:  Objection.  Form.
13         THE WITNESS:  Again, part of my
14   toxicology expertise involves using epidemiology
15   to assess adverse health effects on humans.
16   BY MR. MEADOWS:
17     Q    Are there any other areas of science or
18   any other topics that you touch on in your report
19   that you claim to be an expert in?
20     A    So --
21     Q    I need to know this now before we get
22   into all this other stuff.  I need to know what --
23   a list of every area that you claim to be an
24   expert in.
25     A    So -- so toxicology encompasses many

34 (Pages 130 to 133)

H. Nadia Moore, Ph.D.

Page 134

1  disciplines, and it depends where you draw the
2  line when you enter into subdivisions of the areas
3  we use in our practice.
4      Q   I'm a lawyer.  I know a little bit about
5  wills and a little bit about criminal law, but I
6  would never claim to be an expert on it.  I know
7  that wills and the criminal law can have an impact
8  on what I do as a lawyer, like the type of
9  practice that I'm doing right now, but I would
10  never claim to be an expert on it.  Because there
11  are lawyers out there who are experts on it.
12      I understand that you need a basis, a
13  basic little understanding of different areas of
14  science.  But my question is, has to do with
15  whether you claim to be an expert in -- in
16  specific fields.
17      I'm going to ask you one more time.  Are
18  you an expert in epidemiology?
19          MR. ZELLERS:  Objection.  Asked and
20  answered, form.
21          THE WITNESS:  So again, epidemiology is
22  part of the practice of toxicology.
23  BY MR. MEADOWS:
24      Q   Let's try it this way.  Dr. Moore is an
25  expert in epidemiology.  True or false?

Page 135

1          MR. ZELLERS:  Objection.  Form, asked
2  and answered.
3          THE WITNESS:  So again, this --
4  epidemiology is part of a larger subset of the
5  practice that I use every day as part of tox- --
6  as part of being a toxicologist.
7  BY MR. MEADOWS:
8      Q   Did you take true or false tests when
9  you were in school?
10          MR. LOCKE:  Objection.
11          THE WITNESS:  Of course I did.
12  BY MR. MEADOWS:
13      Q   When your teacher gave you the option of
14  true or false, did you give her something other
15  than true or false as an answer?
16          MR. LOCKE:  Objection.
17          MR. ZELLERS:  Objection.  Form.
18  Argumentative.
19          THE WITNESS:  So questions that are
20  entered in grade school have true or false
21  answers.  Is Wednesday a day of the week?  Yes,
22  true, or false, no.  That is a question that's
23  appropriate for a true or false question.
24  BY MR. MEADOWS:
25      Q   So this question is not appropriate for

Page 136

1  a true or false answer, correct?
2      A   That's not what --
3          MR. LOCKE:  Objection.
4          MR. ZELLERS:  Objection to form.
5          THE WITNESS:  That's not what I said.
6  BY MR. MEADOWS:
7      Q   So you cannot answer that one true or
8  false?
9          MR. ZELLERS:  Objection.  Asked and
10  answered.
11          THE WITNESS:  I -- I answered that, that
12  epidemiology is part of toxicology.
13  BY MR. MEADOWS:
14      Q   True or -- or false.  I'm going to
15  circle "or."  I didn't hear a true or false on
16  that one.  Dr. Moore is --
17          MR. ZELLERS:  Okay.  Just misstates the
18  evidence.  But go ahead, Counsel.
19  BY MR. MEADOWS:
20      Q   -- an expert in molecular biology.  True
21  or false, which one should I mark?
22      A   Again, molecular biology is one of the
23  fundamental tools that we use as a toxicologist.
24  So -- so that's what my answer is.
25      Q   This is another one that you can't

Page 137

1  answer true or false to?
2          MR. ZELLERS:  Objection.  Argumentative.
3  Misstates the evidence.
4          THE WITNESS:  Again, I said molecular
5  biology is part of the practice of toxicology.
6  BY MR. MEADOWS:
7      Q   And I will mark that one as an "or"
8  also.
9          MR. ZELLERS:  And objection, misstates
10  the evidence.
11  BY MR. MEADOWS:
12      Q   All right.  Dr. Moore is an expert in
13  exposure science.  True or false?
14      Can we answer that one?
15          MR. ZELLERS:  Objection.  Form.
16          THE WITNESS:  Again, exposure science
17  is -- is part of the larger discipline of
18  toxicology.  We use that as a tool all the time.
19  These are subjects that were on my board exams.
20  BY MR. MEADOWS:
21      Q   That's another one of those you can't
22  answer true or false, right?
23          MR. ZELLERS:  Objection.  Form.
24          THE WITNESS:  Again, expose --
25          MR. ZELLERS:  Misstates evidence.

35 (Pages 134 to 137)

H. Nadia Moore, Ph.D.

Page 138

1          THE WITNESS:  Sorry.
2          MR. ZELLERS:  Go ahead.
3          THE WITNESS:  Exposure science is part
4     of toxicology.
5     BY MR. MEADOWS:
6          Q   All right.  We'll mark that one with an
7     "or" also.
8          MR. ZELLERS:  Same objection.
9     BY MR. MEADOWS:
10         Q   Let's see here.  Dr. Moore is an expert
11    in physiology.  True or false?
12         MR. ZELLERS:  Objection to form.
13         THE WITNESS:  Okay.  Again, physiology
14    is one of the tools that we use as a tox- -- in
15    toxicology.
16    BY MR. MEADOWS:
17         Q   It's another one of those that you can't
18    answer, true?
19         A   As a toxicologist, I -- I employ
20    physiology all the time.
21         Q   I still haven't heard the word "true or
22    false."  And is that -- still can't give me an
23    answer on that one?
24         A   Physio- --
25         MR. ZELLERS:  Objection.  Form.

Page 139

1          Go ahead.
2          THE WITNESS:  Physiology is part of the
3     larger practice of toxicology.
4     BY MR. MEADOWS:
5          Q   All right.  Sounds like another "or."
6          MR. ZELLERS:  Objection.
7     BY MR. MEADOWS:
8          Q   Any -- any other --
9          MR. ZELLERS:  Mr. Meadows, just a
10    second.  Objection.  Misstates the evidence.
11         Go ahead.
12    BY MR. MEADOWS:
13         Q   Any other areas that you claim to be an
14    expert in?
15         A   So I'm an expert in toxicology and all
16    the disciplines that we use as tools underneath
17    it.
18         Q   Good point.  Let's do that.  Dr. Moore
19    is an expert in toxicology.  True or false?
20         Which one is it?
21         MR. ZELLERS:  Objection to form.
22         THE WITNESS:  Toxicology.
23    BY MR. MEADOWS:
24         Q   Is it true or false that you're an
25    expert in toxicology?

Page 140

1          A   T-O-X-I.
2          Q   She's also much more versed in how to
3     spell "toxicology" than I am.
4          A   That discipline I've -- I've seen and,
5     yes, I'm an expert in toxicology.
6          Q   So you would say "true" on that one.  I
7     can mark "T" on that one?
8          MR. ZELLERS:  Objection.  Form.
9          THE WITNESS:  True, I'm an expert --
10    BY MR. MEADOWS:
11         Q   True.  There we go.  All right.
12         A   -- in toxicology, which -- which also
13    encompasses epidemiology, molecular biology,
14    exposure science, physiology, as well as chemistry
15    and characterization of test materials.
16         Q   Okay.  All right.  So any other areas
17    you're claiming expertise in?  I just want to make
18    sure before we keep moving.
19         A   Again, toxicology encompasses many
20    different exposures -- sorry, toxicology
21    encompasses many different sciences, and there may
22    be something I haven't said up there.  But right
23    now, that's all I can think of.
24         Q   There may be other areas you're expert
25    in that you just can't think of right now?

Page 141

1          A   That's not what I said.
2          Q   Okay.  Well, if there are --
3          A   So you're --
4          Q   -- other areas that you're an expert in,
5     I need to know them now so that I know how to talk
6     to you about all this.
7          A   So toxicology.
8          Q   Toxicology, you're an expert in that.
9     Okay.  All right.
10         A   I guess we didn't mention expert in
11    chemistry.  You left that off the list.
12         Q   Oh, okay.  Yeah, perfect.
13         Dr. Moore is an expert in chemistry.
14         A   And again, that is just -- chemistry is
15    one of the tools that we use in toxicology as part
16    of our daily practice.
17         Q   But you have a degree in that, right?
18         A   That is correct, but just another of
19    those tools that we use.
20         Q   Yeah.  So I can mark that one true?
21         A   Well, I would mark that the same way
22    you've done all the others.  It's just another
23    tool in toxicology.
24         Q   Okay.  Well, it's up to you.
25         MR. ZELLERS:  Mr. Meadows, when it's

H. Nadia Moore, Ph.D.

Page 142

1    convenient, I'd like to take a break.
2         MR. MEADOWS: Okay. Now is fine with
3    me.
4         MR. ZELLERS: Is this okay?
5         MR. MEADOWS: Yeah.
6         THE VIDEOGRAPHER: Okay. The time is
7    12:06 p.m., and we're going off the record.
8         (Recess.)
9         THE VIDEOGRAPHER: The time is 12:19
10   p.m., and we're back on the record.
11   BY MR. MEADOWS:
12        Q   Okay. So let's go back to your report,
13   Dr. Moore.
14        A   Okay.
15        Q   And I highlighted the first sentence:
16   "I was asked to provide an expert opinion as a
17   toxicologist regarding alleged adverse health
18   effects from exposure to Johnson's Baby Powder and
19   Shower to Shower."
20        And then it goes on to say: "I have
21   also been asked to respond to plaintiffs' expert
22   reports, focusing on those submitted by
23   Drs. Carson, Crowley, Longo, Plunkett and
24   Zelikoff, because they all touch on my field of
25   toxicology."

Page 143

1         Right?
2         A   That's what it says, yes.
3         Q   Okay. Now, this first sentence, "I have
4    also been asked to respond to plaintiffs' expert
5    reports," what did you -- what did you mean by
6    that?
7         A   So I was asked to look at the
8    methodology that they used in reaching their
9    opinions.
10        Q   Okay. Why didn't you say, I've been
11   asked to look at the methodology that these
12   experts used?
13        MR. ZELLERS: Objection. Form.
14   BY MR. MEADOWS:
15        Q   Why did you say -- why did you say, I
16   was asked to respond?
17        MR. ZELLERS: Objection. Form.
18        THE WITNESS: Those are the words that I
19   selected.
20   BY MR. MEADOWS:
21        Q   Are those the words you selected or are
22   those the words the lawyers used when they asked
23   you to -- to render opinions in this case?
24        MR. ZELLERS: Objection. Form.
25        THE WITNESS: Those are the words that I

Page 144

1    selected.
2    BY MR. MEADOWS:
3         Q   So, what I hear you saying now is
4    that -- are you saying that the lawyers asked you
5    to assess the methodology used by these particular
6    experts? Is that what you're saying?
7         A   So I was asked to -- to respond to the
8    methodology that was used by these -- by the
9    experts, to read their reports and respond to --
10   to the methodology that they used in rendering
11   their opinions.
12        Q   Okay. And so I'm curious, what type --
13   I mean, I understand you're an expert in
14   toxicology and you can opine on issues pertaining
15   to toxicology, right?
16        A   I'm an expert in toxicology.
17        Q   And are you claiming to also be an
18   expert in assessing the methodologies used by
19   other experts with varying degrees of -- of
20   expertise?
21        A   So not all the methodologies that they
22   used, but as they pertain to toxicology.
23        Q   But not all of these experts are
24   toxicologists, are they?
25        A   So I'd have to look at each one. Some

Page 145

1    of them are.
2         Q   As you sit here today, do you know which
3    ones are toxicologists and which ones are not?
4         MR. ZELLERS: Objection. Form.
5         THE WITNESS: So I know which ones are
6    toxicologists, but I'm not sure on -- on others.
7    BY MR. MEADOWS:
8         Q   So is there --
9         A   I would have to refresh myself.
10        Q   Is there something in your training as a
11   toxicologist that provides you with the expertise
12   to assess some other scientists' methodology?
13        MR. ZELLERS: Objection. Form.
14        THE WITNESS: So the methodology that I
15   assessed was as it related to toxicology.
16   BY MR. MEADOWS:
17        Q   So to the extent that these experts gave
18   opinions that are not toxicology opinions, you're
19   not -- you're not criticizing them. Is that what
20   you're saying?
21        MR. ZELLERS: Objection. Form.
22        THE WITNESS: So I think my criticisms
23   are called out in my report, and we can go through
24   them in detail if you'd like.
25   BY MR. MEADOWS:

37 (Pages 142 to 145)

H. Nadia Moore, Ph.D.

Page 146

1      Q   Oh, we're going to go through some of
2   them, that's for sure.  But I -- I'm just -- I'm
3   trying to make sure I understand what makes you
4   think that you are qualified to question the
5   methodology of an expert that's not a
6   toxicologist.
7          MR. ZELLERS:  Objection.  Form.
8          THE WITNESS:  So again, I'm -- I've
9   evaluated the methods as they related to
10  toxicology, and as toxicology, we went through I
11  think extensively through the break, encompasses a
12  lot of other disciplines.  If we want to go
13  through the individual critiques that I had
14  regarding their -- their methodology, we can.
15  BY MR. MEADOWS:
16     Q   Have you ever been trained in how to go
17  about critiquing the methodologies of other
18  scientists?
19         MR. ZELLERS:  Objection.  Form.
20         THE WITNESS:  So as part of my training
21  as a toxicologist, one of the emphasis points was
22  critical review of scientific data and articles,
23  and methodology specifically.
24  BY MR. MEADOWS:
25     Q   So, what is your methodology that you

Page 147

1   used to go about critiquing other experts?
2      A   So I think we'd have to look into each
3   expert and each critique individually.
4      Q   So you tailor your methodology to
5   whichever expert it is that you're critiquing?
6      A   So I think you have to evaluate the
7   method as an independent question.
8      Q   What textbooks or articles or literature
9   inform you on how to go about critiquing another
10  expert's methodology?
11     A   So I don't know that there's one
12  specific textbook.  It's a -- it's a training that
13  you go through as a graduate student on how to
14  critique work and how to do methods correctly.
15  Generally accepted methodology we all learn.
16     Q   Is there a section in your report that
17  describes the methodology that you've used to go
18  about critiquing these other experts' methodology?
19  Is there a section in this report that cites to
20  articles and textbooks that tell us how to go
21  about properly critiquing another expert's
22  methodology?
23         MR. ZELLERS:  Objection.  Form.
24         THE WITNESS:  So again, I don't -- I
25  guess I don't understand that question.  I mean,

Page 148

1   understanding methods and critically reviewing
2   articles is just something that every graduate
3   student is taught how to do.
4   BY MR. MEADOWS:
5      Q   So you're saying any graduate student
6   can critique any expert and use any methodology
7   that they come up with, and that's acceptable.
8          MR. ZELLERS:  Objection.  Form.
9          THE WITNESS:  That's not what I said at
10  all.
11  BY MR. MEADOWS:
12     Q   Is there a textbook or is there a body
13  of literature that informs you on how to go about
14  critiquing another expert's work?
15         MR. ZELLERS:  Objection.  Form.
16  BY MR. MEADOWS:
17     Q   Did you cite to that in your report?
18     A   Okay.
19         MR. ZELLERS:  Objection.  Form.
20         Go ahead.
21         THE WITNESS:  Okay.  So methods are
22  defined on a method-by-method basis, so you need
23  to understand what the method is in order to
24  understand how to evaluate it.
25  BY MR. MEADOWS:

Page 149

1      Q   Is there any section in your report or
2   in your reference materials that cites to
3   literature, articles, textbooks, that informs you
4   how to critique another expert's work?
5          MR. ZELLERS:  Objection.  Form.  Asked
6   and answered.
7   BY MR. MEADOWS:
8      Q   It's a simple question.  It's a "yes" or
9   a "no."  And listen, I know you've been taught to
10  not say "yes" or "no," but that's going to make
11  this thing go on forever and forever, and I don't
12  give up.  So I'm going to keep asking the
13  questions until I get an answer.  Okay?
14         So here's the question -- here's the
15  question.
16         MR. ZELLERS:  All right.  Move to strike
17  the comment of counsel.
18         MR. LOCKE:  Objection.
19         MR. ZELLERS:  Ask your question if you
20  have a question.
21  BY MR. MEADOWS:
22     Q   Here's the question.  Is there any part
23  of your report or your reference materials where
24  we can find a textbook or an article that you --
25  that is -- that informs you on how to go about

38 (Pages 146 to 149)

H. Nadia Moore, Ph.D.

Page 150

1    critiquing another expert's methodologies?
2         MR. ZELLERS: Objection. Form. Asked
3    and answered.
4         THE WITNESS: So I think there's
5    references in here -- actually, I know there's
6    references in here regarding correct
7    methodologies.
8    BY MR. MEADOWS:
9         Q   That's not what I'm asking you. I'm
10   asking you if there are any textbooks or articles
11   that talk about how you or any other scientist
12   can -- can perform a proper methodology in
13   critiquing another expert's methodology?
14        MR. ZELLERS: Objection. Form.
15   BY MR. MEADOWS:
16        Q   Is there -- is there any body of
17   literature in that regard, period?
18        MR. ZELLERS: Objection. Form.
19        THE WITNESS: Well, so that's just part
20   of a practice of toxicology and any -- any
21   scientific field.
22   BY MR. MEADOWS:
23        Q   Okay. My question was, is there any
24   textbook or literature that you can tell -- is
25   there one textbook you can name for me right now

Page 151

1    that tells you how to go about critiquing another
2    expert's methodology?
3         MR. ZELLERS: Objection. Form.
4         THE WITNESS: So I can tell you that
5    there's coursework that you attend every -- that
6    you learn how to do this. This is not something
7    that is kind of black or white or can be defined,
8    because it changes for every method that you
9    evaluate.
10   BY MR. MEADOWS:
11        Q   Dr. Moore, your expert report is over a
12   hundred pages long. The vast majority of it is
13   a -- is a criticism of Drs. Carson, Crowley, Longo
14   Plunkett and Zelikoff.
15        Are you telling me that there's no place
16   in this report or in that reference list that I
17   can find one textbook or one article that
18   explains, Dr. Moore, or anybody else, this is how
19   you go about critiquing another expert's work?
20        MR. ZELLERS: Objection. Form.
21   BY MR. MEADOWS:
22        Q   Is there any textbook -- number one, any
23   textbook that gives you -- that informs you in
24   that regard?
25        MR. ZELLERS: Objection. Form.

Page 152

1    BY MR. MEADOWS:
2         Q   It's a simple one. It's a "yes" or a
3    "no."
4         MR. ZELLERS: Objection. Form. Asked
5    and answered.
6         THE WITNESS: Okay. So there was a lot
7    in that last statement/question, so can you break
8    it down one more time?
9    BY MR. MEADOWS:
10        Q   Yeah.
11        All right. I wrote a statement here.
12   There is no textbook that tells you, Dr. Moore,
13   how to critique another expert's methodology. Is
14   that true or false?
15        MR. LOCKE: Objection.
16        MR. ZELLERS: Objection. Form, asked
17   and answered.
18        THE WITNESS: Okay. So each method
19   is -- is a standalone --
20   BY MR. MEADOWS:
21        Q   Yeah, but see, this is a true or false
22   question.
23        MR. ZELLERS: Okay. Let her answer the
24   question, please.
25   BY MR. MEADOWS:

Page 153

1         Q   But my question is a true or false one.
2    So is it a true, a false or an "or"?
3         A   So --
4         MR. ZELLERS: Same objections.
5         You can answer.
6         THE WITNESS: All right. So each method
7    has to be evaluated independently.
8    BY MR. MEADOWS:
9         Q   Okay. I didn't hear the words "true" or
10   "false" there, so I'm going to circle "or."
11        MR. ZELLERS: Objection. Misstates the
12   evidence.
13   BY MR. MEADOWS:
14        Q   How do we know whether your methodology
15   in critiquing is proper? I mean, if there's no
16   textbook that you can cite me to, there's no
17   article that you can cite me to, then how do we
18   know that your methodology in critiquing somebody
19   else's methodology is proper?
20        MR. ZELLERS: Objection. Form.
21        THE WITNESS: So the methodology itself
22   is defined and -- and referenced.
23   BY MR. MEADOWS:
24        Q   All right. It sounds like "or" again.
25        MR. ZELLERS: Objection.

H. Nadia Moore, Ph.D.

Page 154

1          MR. LOCKE:  Objection.
2          MR. ZELLERS:  Form.  Argumentative.
3     Misstates the evidence.
4          (Mr. Meadows and Ms. Tucker conferring.)
5     BY MR. MEADOWS:
6     Q   All right.  While she's gathering that,
7     I want to go back to something I asked you.
8          Well, let me ask you this:  Can your
9     methodology in critiquing experts and their
10    methodology be replicated in some way?
11    A   So -- say that one more time.  I don't
12    understand the question.
13    Q   Yeah, can your methodology be
14    replicated?
15    A   Well, if someone were to evaluate the
16    same issue, they'd probably come to the -- any
17    reasonable scientist would come to the same
18    conclusion.
19    Q   Any reasonable scientist would come to
20    the same conclusions that you've reached in your
21    report?
22    A   So if you eval- --- if you evaluate the
23    same dataset, they would come to the -- using the
24    established methodologies, they would come to the
25    same conclusions because that's what the

Page 155

1     scientific data support.
2     Q   And where would they go to look and find
3     out what that methodology is, that methodology
4     that you're using?
5     A   So the methodology -- so now I'm
6     confused.  What methodology are we talking about?
7     Q   Well, the methodology you used to
8     critique everybody else.
9     A   The methodology is -- is simply to look
10    at the method and see how it's generally accepted
11    in science today.
12    Q   What -- let me ask you this:  What --
13    have you ever published on the issues of talc and
14    ovarian cancer?
15    A   I have not published in peer-reviewed
16    literature, no.
17    Q   Have you ever published on anything
18    pertaining to talc?
19    A   No, I have not.
20    Q   Have you ever published on anything
21    pertaining to ovarian cancer?
22    A   No, I have not.
23    Q   So the first time you ever wrote
24    anything that pertains to talc and ovarian cancer
25    was when you wrote this expert report, right?

Page 156

1          MR. ZELLERS:  Objection.  Form.
2     Misstates the evidence.
3          THE WITNESS:  So this expert report was
4     the first time I consolidated or wrote an opinion
5     regarding talc and ovarian cancer.
6     BY MR. MEADOWS:
7     Q   So the answer is "yes"?
8     A   In a report.
9     Q   So the answer is "yes"?
10    A   Well, I did the slide decks before.
11    Q   Okay.  You're talking about the slides
12    you did for the -- for the conferences?
13    A   Correct.
14    Q   As far as a writing goes, as far as a --
15    something other than a PowerPoint presentation,
16    the only time you've ever written on the topic of
17    talc and ovarian cancer is what you provided in
18    this case.
19    A   Correct.
20    Q   I'm going to show you --
21         MR. MEADOWS:  I want to mark these.
22         (Moore Exhibit No. 5 was marked
23         for identification.)
24    BY MR. MEADOWS:
25    Q   I show you what I marked as -- here,

Page 157

1     let's give you this one -- Exhibit 5.
2     Q   Dr. Longo, you criticize him, right?
3     A   I discuss --
4          MR. ZELLERS:  Objection.  Form.
5          Go ahead.
6          THE WITNESS:  I discuss his analyses.
7     BY MR. MEADOWS:
8     Q   Well, it's more than a discussion.
9     You -- you criticize his methodology, right?  You
10    say he's -- his methodology is all wrong, right?
11         MR. ZELLERS:  Objection.  Form.
12         THE WITNESS:  Well, if you want to
13    discuss it, we can look in --
14    BY MR. MEADOWS:
15    Q   We will.  My -- my question right now
16    is, you -- you will agree with me that you have
17    been critical of Dr. Longo's methodology, right?
18    A   So Dr. Longo's --
19    Q   You can't answer that one yes or no?
20    A   Well, I'd have to look.  I know we used
21    his data as a worst case assumption.
22    Q   Well, let's take a look at what his
23    qualifications are.  You understand he's a
24    materials scientist, right?
25         MR. LOCKE:  Objection.

H. Nadia Moore, Ph.D.

Page 158

1    THE WITNESS:  I'd have to see his CV.
2  BY MR. MEADOWS:
3    Q   You don't know this?  You don't know
4  what his qualifications are?
5    A   I -- I do not know what his degree is
6  in.
7    Q   You don't know what degree Dr. Longo's
8  is, and you spend pages upon pages criticizing his
9  work.  You don't even know what he's -- what his
10  degree is in?
11    MR. ZELLERS:  Objection.  Form.
12    THE WITNESS:  So again, I don't know
13  that I go pages on pages criticizing his work.
14  We'd have to go through that to demonstrate that,
15  and I'd have to see his CV to -- to see what his
16  actual degree is in.  I understand what he did in
17  this matter.
18  BY MR. MEADOWS:
19    Q   Are you -- are you or are you not
20  critical of Dr. Longo's work?
21    MR. ZELLERS:  Objection.  Form.
22    THE WITNESS:  So my analysis takes his
23  analysis as a worst case scenario.
24  BY MR. MEADOWS:
25    Q   What does that mean?

Page 159

1    A   Well, I don't -- so let's -- let's look
2  at my report what I did.
3    Q   No, I don't --
4    A   No.
5    Q   I'm not asking you to look at your
6  report.  I'm asking you about your criticism of
7  Dr. Longo.  Are you -- are you critical of his
8  work or not?
9    MR. ZELLERS:  Okay.  Objection.  She's
10  entitled to answer your question and use what she
11  needs to answer it.
12  BY MR. MEADOWS:
13    Q   My question is, are you critical of
14  Dr. Longo's work or not?
15    Dr. Moore, I asked you a question.  Are
16  you critical --
17    A   I understand.
18    Q   -- of Dr. Longo's work or not?
19    A   (Peruses document.)  I just want to
20  accurately reflect what I have in my report.
21    Q   You can't answer that question yes or
22  no?
23    MR. ZELLERS:  Objection.
24    MR. LOCKE:  Objection.
25    MR. ZELLERS:  Form.

Page 160

1    Dr. Moore, you can answer the
2  question --
3  BY MR. MEADOWS:
4    Q   We'll move on to the next question.  The
5  report says what it says.  We'll go with that.
6    A   Right.  But you know --
7    Q   So you understand -- well, no, you
8  don't, because you don't know what his degree is
9  in.  So let's move on to the next one.
10    (Moore Exhibit No. 6 was marked
11    for identification.)
12  BY MR. MEADOWS:
13    Q   I show you what I marked as Exhibit 6.
14  Dr. Saed, now, you -- you're critical of
15  his work too, right?
16    MR. ZELLERS:  Objection.  Form.
17    THE WITNESS:  So --
18  BY MR. MEADOWS:
19    Q   Are you critical of Dr. Saed's work?
20    A   I was trying to -- I was trying to
21  respond.
22    Q   Yeah, well, that "so" is --
23    MR. ZELLERS:  Well, hold on now.  Let's
24  not argue with her.  Let her respond.
25    MR. MEADOWS:  No, I -- "so" does not

Page 161

1  lead in -- is not an answer.
2  BY MR. MEADOWS:
3    Q   It's real simple.  Are you critical of
4  Dr. Saed's work in this case or not?
5    MR. LOCKE:  Objection.
6    MR. ZELLERS:  Objection.  Form.
7    You may answer the question.
8    THE WITNESS:  For Dr. Saed, I was
9  critical of the methodology that he used.
10  BY MR. MEADOWS:
11    Q   That's a "yes" but without saying "yes,"
12  right?
13    MR. LOCKE:  Objection.
14    MR. ZELLERS:  Objection.  Argumentative.
15  BY MR. MEADOWS:
16    Q   Okay.  So critical of Dr. Saed's work.
17  Now --
18    A   Which I think I was critical of the
19  methods that Dr. Saed used.
20    Q   Now, unlike Dr. Longo, are you familiar
21  with Dr. Saed's qualifications?
22    A   Again, I have not memorized these
23  people's qualifications, so I'd have to see his CV
24  on his report.
25    Q   Well, generally, do you know what kind

41 (Pages 158 to 161)

H. Nadia Moore, Ph.D.

Page 162

1  of expert he is?
2      A  Generally, yes, I do.
3      Q  What is he?
4      A  He studies ovarian cancer.
5      Q  Okay.  So he -- he's an expert on
6  ovarian cancer, right?
7          MR. LOCKE:  Objection.
8          MR. ZELLERS: Objection. Form,
9  foundation.
10         THE WITNESS:  Well, again, I don't know
11  what he's -- he presents himself as an expert,
12  yes, but -- but I don't know if this is accurate
13  or not.  I would have to see his CV.  I don't know
14  where this came from.
15  BY MR. MEADOWS:
16     Q  So you don't know how long he's been --
17  had experience in -- with an emphasis on ovarian
18  cancer?
19         MR. ZELLERS: Objection. Form.
20         THE WITNESS: I reviewed the methods
21  that he used.  Not his experience.
22  BY MR. MEADOWS:
23     Q  So it wasn't important to you as part of
24  your methodology in critiquing these experts'
25  methodology to figure out the extent of their

Page 163

1  expertise.
2          MR. ZELLERS: Objection. Form.
3          THE WITNESS: So, again, I -- I
4  evaluated the methodology that was used.
5  BY MR. MEADOWS:
6      Q  Okay.  Well, this gets back to your
7  methodology of critiquing experts.  I take it that
8  a part of your methodology in critiquing experts
9  does not include assessing their degree of
10  expertise.  Is that fair to say?
11         MR. ZELLERS: Move to strike the
12  statement of counsel.  Objection. Form.
13         THE WITNESS: Can you repeat your
14  question?  Sorry.
15  BY MR. MEADOWS:
16     Q  Well, I -- I still don't know what your
17  methodology is, but I would assume from what
18  you're saying that your methodology of going about
19  critiquing experts does not include determining
20  the degree of expertise a particular expert has
21  before you assess and critique his or her work.
22  Is that fair to say?
23         MR. ZELLERS: Objection.  Misstates the
24  evidence.
25         THE WITNESS: So I'm a scientist and I

Page 164

1  reviewed their work as a scientist.  So I looked
2  at the methods that they used, the results they
3  obtained, as I would any scientific review.
4  BY MR. MEADOWS:
5      Q  It makes no difference to you that
6  Dr. Saed has 30-plus years of experience with an
7  emphasis on ovarian cancer?
8          MR. LOCKE:  Objection.
9          MR. ZELLERS: Objection. Form.
10  Foundation.
11         THE WITNESS: I think I've answered
12  that.  But again, I evaluated the methods that
13  they used.
14  BY MR. MEADOWS:
15     Q  Does it make any difference to you in
16  your methodology that Dr. Saed has 30-plus years
17  of experience with an emphasis on ovarian cancer?
18         MR. ZELLERS: Objection. Form,
19  argumentative, asked and answered.
20         THE WITNESS: My analysis -- sorry.
21         MR. ZELLERS: Go ahead.
22         THE WITNESS: My analysis was on the
23  methods that were used to -- to derive the
24  opinions in this case.
25  BY MR. MEADOWS:

Page 165

1      Q  So it makes no difference to you that
2  Dr. Saed has 30-plus years of experience with an
3  emphasis on ovarian cancer?
4          MR. ZELLERS:  Same objections.
5          THE WITNESS:  Again, my methods were
6  based -- or on evaluating the scientific methods
7  that he -- that the experts used when they derived
8  their opinions in this case.
9  BY MR. MEADOWS:
10     Q  How many years of experience do you have
11  with an emphasis on ovarian cancer?
12         MR. ZELLERS: Objection. Form.  Asked
13  and answered.
14         THE WITNESS:  So since I've been reading
15  this literature or in general?
16  BY MR. MEADOWS:
17     Q  Well, before you started working on
18  litigation, how many years of experience do you
19  have with an emphasis on ovarian cancer?
20     A  So, what would you -- so I would say I
21  was evaluating the association with ovarian cancer
22  for probably a year-ish before I was involved in
23  the litigation.
24     Q  Okay.  Nowhere near 30 years, right?
25         MR. ZELLERS: Objection. Form.

42 (Pages 162 to 165)

H. Nadia Moore, Ph.D.

Page 166

1    THE WITNESS: So one is not near 30, I
2 would agree.
3 BY MR. MEADOWS:
4    Q   Okay.  Well, we found something we could
5 agree on, huh?
6    MR. ZELLERS: Okay.  That's a statement,
7 not a question.
8    (Counsel conferring.)
9 BY MR. MEADOWS:
10    Q   All right.  So the next thing I want to
11 do is go on down: "My primary opinions regarding
12 potential adverse health effects from exposure to
13 Johnson's Baby Powder and Shower to Shower talcum
14 powder products are as follows," the first one,
15 number 1: "Cosmetic talc.  The scientific
16 literature does not support a causal relationship
17 between perineal talc use and ovarian cancer."
18    Did I read that right?
19    A   You did read that correctly.
20    Q   All right.  So, now, we know that when
21 you wrote this, you didn't consider the Health
22 Canada publication, did you?
23    MR. MORIARTY: I'm sorry.  Could you
24 repeat that, please?
25 BY MR. MEADOWS:

Page 167

1    Q   I said we know that when you wrote this
2 report that you didn't consider the Health Canada
3 publication, did you?
4    A   Well, I read the Health Canada
5 publication but did not include that in my report.
6    Q   Okay.  Is that referenced in the
7 materials you provided?
8    A   Yes.  I believe so, yes.
9    Q   So somewhere in your expert report it
10 said -- it references Health Canada?
11    A   So that's in the complete list of
12 materials.
13    Q   The complete list.
14    A   The complete list that we talked about
15 earlier today.
16    Q   Oh, the one that I got last night.
17    A   That I -- that's what you said when you
18 got it, yeah.
19    Q   Yeah.  So that was not in the materials
20 that you apparently -- well, that you provided
21 with your report.  I didn't see where you cited to
22 Health Canada in your report anywhere.  Am I wrong
23 about that?
24    MR. ZELLERS: Okay.  That's -- that's a
25 lot of questions.  Could you just ask the one you

Page 168

1 want her to answer?  I'm sorry.
2 BY MR. MEADOWS:
3    Q   Is Health Canada referenced in your
4 report?
5    A   The Health Canada draft screening
6 assessment was not referenced in my report.
7    Q   But you are now -- you have now made
8 reference to it in the list that was provided to
9 me by your lawyers last night.  Is that what
10 you're telling me?
11    A   So the list that I created of all the
12 materials that I reviewed, that was provided to
13 you last night, doesn't include Health Canada.
14    Q   So let's look at Health Canada --
15    (Moore Exhibit No. 7 was marked
16    for identification.)
17 BY MR. MEADOWS:
18    Q   -- marked as Exhibit 7.
19    All right.  You got it, Exhibit 7 there?
20    A   I do.
21    Q   Are you familiar with this?
22    A   I have seen this.
23    Q   You have seen this.  Okay.
24    When did you first see this?
25    A   Probably December or January in this

Page 169

1 last -- December 2018, January 2019.
2    Q   Okay.  So you saw it before you wrote
3 and signed your report, right?
4    A   Correct.  January was before February,
5 when I signed my report.
6    Q   And yet it's not referenced anywhere in
7 your report, is it?
8    A   That's correct.
9    Q   But at some point in time, it became
10 important enough to you to include it on the list
11 that you provided to us last night, right?
12    MR. LOCKE: Objection.
13    MR. ZELLERS: Objection.  Form.
14    THE WITNESS: So -- so the -- so my
15 report contains all the references that I cited.
16 This list considers everything that I also
17 considered but didn't cite.  It's a complete list
18 of references.
19 BY MR. MEADOWS:
20    Q   Right.  To be clear, Health Canada again
21 was not cited to or referenced in your report,
22 correct?
23    A   The draft screening assessment that was
24 published by Health Canada is not referenced in my
25 report.

43 (Pages 166 to 169)

H. Nadia Moore, Ph.D.

Page 170

1    Q    But you were aware of it at the time you
2  signed your report, correct?
3    A    I was aware of it, yes.
4    Q    Okay.  I want to flip over to page 28.
5    And again, your report says:
6  "Scientific literature does not support a causal
7  relationship between perineal talc use and ovarian
8  cancer."  Right?
9         MR. ZELLERS:  Okay.  Objection.  You
10  said her report.  Is that what you meant?
11        MR. MEADOWS:  Yeah, that's what I'm
12  looking at here on the screen, her -- again, her
13  report.
14        MR. ZELLERS:  Okay.
15  BY MR. MEADOWS:
16    Q    Your report, Dr. Moore.
17        MR. ZELLERS:  I apologize, Counsel.
18  BY MR. MEADOWS:
19    Q    It's on the screen right there.  It
20  says: "Scientific literature does not support a
21  causal relationship between perineal talc use and
22  ovarian cancer."
23        That's what you said in February of
24  2019, correct?
25    A    Correct.

Page 171

1    Q    Exhibit 7, Health Canada came out in
2  December 2018, and you said you were aware of
3  it --
4    A    That is correct.
5    Q    -- shortly after it came out and before
6  you wrote your report, right?
7    A    While I was writing my report, yes.
8    Q    Okay.  So Health Canada says: "The meta
9  analyses of the available human studies in the
10  peer-reviewed literature indicate a consistent and
11  statistically significant positive association
12  between perineal exposure to talc and ovarian
13  cancer.  Further, available data are indicative of
14  a causal effect."
15        Did I read that correct?
16    A    You did read that correctly.
17    Q    "Given that there is the potential for
18  perineal exposure to talc from the use of various
19  self-care products, a potential concern for human
20  health has been identified."
21        Did I read that correctly?
22    A    You have read that correctly.
23    Q    Specifically Health Canada says it's
24  indicative -- the data is indicative of a causal
25  effect, correct?

Page 172

1         MR. ZELLERS:  Objection.  Form.
2         THE WITNESS:  Okay.  So those --
3  BY MR. MEADOWS:
4    Q    Is that what it says?
5    A    Those words are written in this draft
6  screening assessment.
7    Q    Okay.  So what you said in your report
8  is not correct, is it?
9         MR. LOCKE:  Objection.
10        MR. ZELLERS:  Objection.  Form.
11        THE WITNESS:  So what I said in my
12  report is correct, according to the scientific
13  literature.
14  BY MR. MEADOWS:
15    Q    "Scientific literature does not support
16  a causal relationship between perineal talc use
17  and ovarian cancer."
18        Are you saying that Health Canada is not
19  scientific literature?
20    A    So I'm saying that what I did was
21  different than what Health Canada did.
22    Q    Okay.  Now, I'm asking you -- you wrote
23  this sentence, right?
24        "Scientific literature does not support
25  a causal relationship between perineal talc use

Page 173

1  and ovarian cancer?"  You wrote that, right?
2    A    I did write that.
3    Q    And Health Canada -- you knew at the
4  time you wrote that that Health Canada had found a
5  causal effect, right?
6         MR. ZELLERS:  Excuse me.  Objection.
7  Form.  Foundation.
8         THE WITNESS:  So I don't believe that --
9  I think you misstated what Health Canada found.
10  And I based my studies, my whole assessment based
11  on the scientific dataset that's available today.
12  BY MR. MEADOWS:
13    Q    Well, Health Canada was available when
14  you wrote this, right?
15    A    Health Canada is not a scientific study.
16    Q    Oh, okay.  So you say Health Canada is
17  not a scientific study.
18    A    So Health Canada is an assessment that
19  was done.  It's a draft.  It's based on a
20  publication that has not been accepted for peer
21  review, so it's a prepublication, is the basis for
22  a lot of the opinions that are expressed in this
23  draft screening assessment.  So it's unclear what
24  the final assessment will say.
25    Q    You're saying this is not peer-reviewed?

44 (Pages 170 to 173)

H. Nadia Moore, Ph.D.

Page 174

1    A   That's not what I said.  The Taher
2  article, the manuscript that this is based on, I
3  don't know if it's been peer-reviewed or not.
4    Q   You don't know if Taher has been
5  peer-reviewed?
6    A   That's correct.
7    Q   Okay.  You just don't as you sit here
8  today whether --
9        MR. LOCKE:  Objection.
10 BY MR. MEADOWS:
11   Q  -- Taher has been peer-reviewed.
12       MR. ZELLERS:  Objection.  Form.
13       THE WITNESS:  So I base my scientific
14 opinions on scientific knowledge that is -- that
15 is known.  I didn't have access to the Taher
16 publication until -- the supplemental materials
17 until after the publication -- until after I wrote
18 my report.  So I couldn't even assess what Taher
19 had done.
20 BY MR. MEADOWS:
21   Q   At the end of the day, why didn't you
22 include Health Canada in that sentence in some
23 way, shape or form, even it was to put a footnote
24 or asterisks?  Because it clearly says "causal,"
25 doesn't it?

Page 175

1    A   Well --
2        MR. ZELLERS:  Go ahead.
3        THE WITNESS:  -- that word is in the
4  sentence, but it doesn't -- nowhere in the
5  conclusions do I say -- does this say that there
6  is a causal relationship.
7        If you look at the paragraph before
8  that, it in no way indicates that there's a causal
9  relationship.  And so, I mean, this is one
10 sentence that's pulled out of context with the
11 word "causal" in it.
12 BY MR. MEADOWS:
13   Q   You know, there are other sentences in
14 there that talk about "causal."
15       So you -- what you're saying is that
16 Health Canada has no weight in your analysis.
17   A   That's not what I --
18       MR. LOCKE:  Objection.
19       THE WITNESS:  That's not what I said.
20 BY MR. MEADOWS:
21   Q   Okay.  Well, I don't see where it was
22 referenced in your report anywhere, right?
23       MR. ZELLERS:  Objection.  Asked and
24 answered.  Form.
25       THE WITNESS:  So Health Canada is a

Page 176

1  draft assessment based on a publication that's not
2  been published.  It's based on methodology that
3  was perhaps different than mine.
4  BY MR. MEADOWS:
5    Q   So you didn't even take a -- take it
6  into account in your analysis, right?
7    A   So this was a different analysis.  It's
8  a draft publication.  I didn't think it was --
9  it -- pertinent because it's a draft based on an
10 unpeer-reviewed source.
11   Q   You keep using the word "draft."  You do
12 understand that the government of Canada has now
13 started issuing warnings to the public about the
14 dangers of genital talc use.
15       MR. ZELLERS:  Objection.
16 BY MR. MEADOWS:
17   Q   Are you aware of that?
18       MR. ZELLERS:  Objection.  Form,
19 foundation.
20       THE WITNESS:  I'm not aware.
21 BY MR. MEADOWS:
22   Q   I mean, they're not considering this a
23 draft.  They -- they have decided that the public
24 needs to know about this risk.  Are you aware of
25 that?

Page 177

1        MR. ZELLERS:  Objection.  Form,
2  foundation.
3        THE WITNESS:  Again, I'm aware of the
4  conclusions that it says "may or may not."
5  BY MR. MEADOWS:
6    Q   What says "may or may not"?
7    A   Sorry, I stand corrected.  It may --
8  that have or may have an effect.
9    Q   That's not the language they use right
10 here, is it?  They say "indicative of a causal
11 effect," right?
12       MR. ZELLERS:  Objection.  Form.
13       THE WITNESS:  Well, again, that's one
14 statement.  Health Canada uses precaution in their
15 assessment, which takes -- that makes assumptions
16 regarding data that are not available in the
17 literature.
18 BY MR. MEADOWS:
19   Q   All right.  I want to move on to the
20 next document here.  We're still on the same
21 topic, by the way, which is your statement that:
22 "Scientific literature does not support a causal
23 relationship between perineal talc use and ovarian
24 cancer."
25   A   Thank you.

45 (Pages 174 to 177)

H. Nadia Moore, Ph.D.

Page 178

1          MR. ZELLERS: What number are we on?
2          MS. TUCKER: 8.
3          MR. ZELLERS: 8? Thank you.
4          (Moore Exhibit No. 8 was marked
5      for identification.)
6   BY MR. MEADOWS:
7      Q   All right. I've given you what I marked
8   as Exhibit 8.
9          Are you familiar with that?
10     A   (Peruses document.)
11         I haven't seen the published form, but I
12  believe this is the Saed manuscript that I
13  reviewed.
14     Q   Okay. This is the one that you're
15  critical of, right?
16         MR. ZELLERS: Objection. Form.
17         THE WITNESS: So I was critical of the
18  methodology that was used to generate the -- this
19  data.
20  BY MR. MEADOWS:
21     Q   Have you written a letter to the editor
22  of this journal telling them that the methodology
23  is all screwed up?
24     A   I have not.
25     Q   Are you planning on doing that?

Page 179

1      A   I haven't thought about it.
2      Q   No?
3          Let's -- let's go through some of the
4   findings here. And again, we're talking about
5   your statement: "Scientific literature does not
6   support a causal relationship between perineal
7   talc use and ovarian cancer."
8          When did this come out, by the way? Do
9   you know?
10     A   I do not. It says 2019, but it doesn't
11  have a date beyond that -- I don't see a date
12  beyond that.
13     Q   So the title of it is "Molecular Basis
14  Supporting the Association of Talcum Powder Use
15  with Increased Risk of Ovarian Cancer."
16         We've already talked about Dr. Saed, and
17  I'll highlight his name there.
18         There's a number of other scientists
19  named here. Do you know any of them?
20     A   No, I do not.
21     Q   Dr. Nicole Fletcher; Dr. Amy Harper, MD;
22  Irma Memaj; Rong Fan; Robert T. Morris, MD.
23         You don't know any of those folks?
24     A   No, I don't know them.
25     Q   And you don't know Dr. Saed, do you?

Page 180

1      A   No, I do not.
2      Q   Do you know what their qualifications
3   are, all these people?
4      A   No, I do not.
5      Q   But that wasn't important to you as far
6   as your methodology in criticizing their work,
7   right?
8          MR. ZELLERS: Objection.
9   BY MR. MEADOWS:
10     Q   It didn't make any difference to you
11  what the degree of expertise they have, right?
12         MR. ZELLERS: Objection. Form.
13         THE WITNESS: So, again, I criticized
14  the methodology that was used.
15  BY MR. MEADOWS:
16     Q   And as a part of your methodology, you
17  don't look at what another expert's qualifications
18  are, do you?
19         MR. ZELLERS: Objection. Form, asked
20  and answered.
21         THE WITNESS: So method and scientific
22  data stand on their own.
23  BY MR. MEADOWS:
24     Q   So that's a yes, I don't look at
25  qualifications, right?

Page 181

1          MR. ZELLERS: Objection. Form.
2          THE WITNESS: Well, it's a pretty
3   general statement that I don't -- I don't feel
4   comfortable answering yes or no.
5   BY MR. MEADOWS:
6      Q   I mean, you -- you're being critical not
7   only of Dr. Saed but all these other doctors too,
8   right, including MDs?
9          MR. ZELLERS: Objection. Form.
10  BY MR. MEADOWS:
11     Q   Are you an MD?
12     A   I am not an MD. So I don't know --
13         MR. ZELLERS: Hold on. There's no
14  question pending.
15  BY MR. MEADOWS:
16     Q   So let's go down here in the abstract.
17         It says: "Here we demonstrated that
18  talc induces significant changes in key redox
19  enzymes and enhances the prooxidant state in
20  normal and EOC cells."
21         Do you know what EOC stands for?
22     A   I can assume, but it's -- it's
23  epithelial ovarian cancer. It's down in the
24  introduction.
25     Q   You go on down in the abstract, it says:

46 (Pages 178 to 181)

H. Nadia Moore, Ph.D.

Page 182

```
 1    "These findings are the first to confirm the
 2  cellular effect of talc and provide a molecular
 3  mechanism to previous reports linking genital
 4  talc use -- genital use to increased ovarian
 5  cancer risk."
 6         Did I read that correctly?
 7     A  I believe so, yes, you read that
 8  correctly.
 9     Q  So that alone disproves your statement,
10  doesn't it?
11         MR. LOCKE:  Objection.
12  BY MR. MEADOWS:
13     Q  "Scientific literature does not support
14  a causal relationship between perineal talc use
15  and ovarian cancer."
16         MR. LOCKE:  Objection.
17         MR. ZELLERS:  Objection.  Form.
18         THE WITNESS:  So the sentence that you
19  read from this individual paper is perhaps out of
20  context.  You have to evaluate -- so from -- for
21  me, I evaluated the notebooks and the data that
22  created these results.  So I -- that does not
23  disprove my opinion that scientific data do not
24  support that talc is a cause of ovarian cancer.
25  BY MR. MEADOWS:
```

Page 183

```
 1     Q  Well, let's flip over and just see if --
 2  see if maybe this changes your mind.  Flip over to
 3  page 5.
 4         It says down here:  "In this study we
 5  have shown beyond doubt that talc alters key redox
 6  and inflammatory markers, enhances cell
 7  proliferation and inhibits apoptosis, which are
 8  hallmarks of ovarian cancer."
 9         Did I read that correctly?
10     A  You read that correctly.
11     Q  "More importantly, this effect is also
12  manifested by talc in normal cells, including
13  surface ovarian epithelium, fallopian tube, and
14  macrophages.  Oxidative stress has been implicated
15  in the pathogenesis of ovarian cancer."
16         Did I read that correctly?
17     A  Yes.  You have read those sentences
18  correctly.
19     Q  So does that change your mind at all?
20         MR. ZELLERS:  Objection.  Form.
21         THE WITNESS:  Again, I'd have to go back
22  to my earlier answer that I evaluated the
23  methodology that he used in evaluating these
24  opinions.  That doesn't change my opinion at all
25  that perineal use of ovarian -- perineal use of
```

Page 184

```
 1  talc does not -- is not causally linked to ovarian
 2  cancer.
 3  BY MR. MEADOWS:
 4     Q  Okay.  But your -- your statement here
 5  is a little different.  It says:  "Scientific
 6  literature does not support a causal relationship
 7  between perineal talc use and ovarian cancer."
 8     A  That's right.
 9     Q  So you're just saying you can't even
10  take that one into consideration.  That that Saed
11  study, we're not even going to consider it.
12         MR. ZELLERS:  Hold on.  Objection.
13  Form, misstates her testimony.
14         THE WITNESS:  So that's not what I said.
15  BY MR. MEADOWS:
16     Q  Okay.  Well, we know we -- we know you
17  didn't consider Health Canada.  Right?
18         MR. ZELLERS:  Objection.
19         THE WITNESS:  That's not what I said.
20  BY MR. MEADOWS:
21     Q  Well, it's not in your report, is it?
22     A  It's a draft assessment that's based its
23  -- its findings on an unpublished source.  I did
24  not include that in my report.
25     Q  Right.  And then as far as Saed goes,
```

Page 185

```
 1  you talk about Saed and talk about his methodology
 2  and saying that it's wrong, but you don't take
 3  into account that this is in the medical
 4  literature.
 5         I mean this is medical literature, is it
 6  not?
 7         MR. ZELLERS:  Objection.  Form.
 8         THE WITNESS:  Again, I -- the term
 9  "medical literature" is a new one to me.  This is
10  in scientific literature is how I would refer to
11  it.
12  BY MR. MEADOWS:
13     Q  While I'm looking for one other thing to
14  talk to you about, this particular article was
15  published in the journal -- I think the Journal of
16  Reproductive Sciences; is that right?
17     A  It says "Reproductive Sciences."  I
18  don't know what the -- the long -- long term is.
19     Q  Are you familiar with that journal?
20     A  I've seen articles, but I'm not familiar
21  any more than reading articles from it.
22     Q  Any reason to believe it's not a
23  reputable journal?
24         MR. ZELLERS:  Objection.  Form,
25  foundation.
```

47 (Pages 182 to 185)

H. Nadia Moore, Ph.D.

Page 186

```
 1          THE WITNESS:  I don't know what --
 2          MR. ZELLERS:  Hold on, please.  Excuse
 3   me.
 4          THE WITNESS:  Sorry.
 5          MR. ZELLERS:  Objection.  Form,
 6   foundation.
 7          Go ahead.
 8          THE WITNESS:  So I don't know what you
 9   mean by "repute- -- reputable journal."
10   BY MR. MEADOWS:
11      Q   Okay.  All right.
12          On the subject of Dr. Saed, are you
13   aware how many published articles he has on the
14   issues related to oxidative stress and ovarian
15   cancer?
16      A   I do not know.
17      Q   Have you performed any in vitro
18   laboratory research relating to ovarian cancer?
19      A   I have not.
20      Q   Have you published any studies relating
21   to the molecular basis of ovarian cancer?
22      A   I have not.
23      Q   Have you published any article that even
24   has "ovarian cancer" in the title?
25      A   No, I have not.
```

Page 187

```
 1      Q   Have you performed any in vitro
 2   laboratory research relating to the type -- to any
 3   type of cancer?
 4      A   So I think the answer to that is no.
 5      Q   Good enough.
 6      A   Yeah.
 7      Q   Have you ever performed any studies on
 8   the biological effects of particles?
 9      A   Yes.
10      Q   Tell me about those.
11      A   So inhalation studies of particulate
12   matter.
13      Q   Have you ever performed any studies
14   relating to the role of oxidative stress and
15   cancer?
16      A   So I've performed studies on test
17   articles related to the propensity to cause
18   cancer, and some of those may have been related to
19   oxidative stress.
20      Q   Have you published any articles related
21   to -- relating to the molecular basis for any type
22   of cancer?
23      A   I hesitate because I'm not sure if some
24   of my graduate work has -- was published in the
25   field of related cancer effects or not.
```

Page 188

```
 1      Q   Are you aware that Dr. Saed's talcum
 2   powder research has been presented at at least
 3   three national scientific meetings?
 4          MR. ZELLERS:  Objection.  Form,
 5   foundation.
 6          THE WITNESS:  No.  I -- I knew at least
 7   one.  I didn't know how many.
 8   BY MR. MEADOWS:
 9      Q   Going back to your answer regarding
10   having performed studies on the biological effects
11   of particles, were any of those in peer-reviewed
12      A   So those were National Toxicology
13   studies.  They wouldn't have been in peer-reviewed
14   literature, no.
15      Q   I missed the end of that.
16      A   They would not have been in peer-
17   reviewed literature.  They're just generated
18   study -- internal study reports.
19      Q   Have you presented any research on
20   ovarian cancer or related topics at national
21   scientific meetings?
22      A   No.  Except for the -- the presentations
23   that we discussed earlier.
24      Q   Okay.  Do you consider those national
25   scientific meetings?
```

Page 189

```
 1      A   Well, the AIHce, the American Industrial
 2   Hygiene Conference and Expo is the annual meeting
 3   of industrial hygienists.
 4      Q   Okay.  So one.
 5      A   Correct.
 6      Q   Have you submitted any proposals for
 7   molecular studies to J&J?
 8      A   I have not.
 9      Q   Has J&J asked you to perform any
10   molecular studies on talcum powder and ovarian
11   cancer?
12      A   No.
13      Q   Have you ever reviewed any articles for
14   any journal on the topic of ovarian cancer?
15      A   No.
16      Q   And you're not an expert on ovarian
17   cancer, are you?
18          MR. ZELLERS:  Objection.  Form.
19          THE WITNESS:  So I'm an expert in
20   toxicology, and as a toxicologist, we study all
21   kind -- all kinds of cancers, including ovarian
22   cancer.
23   BY MR. MEADOWS:
24      Q   You're not qualified to critique the
25   work of a molecular biologist, are you?
```

48 (Pages 186 to 189)

Page 190

```
1           MR. ZELLERS: Objection. Form,
2    foundation.
3           THE WITNESS: I am qualified to review
4    methodology.
5    BY MR. MEADOWS:
6       Q   My question was, you're not qualified to
7    critique the work of a molecular biologist, are
8    you?
9           MR. ZELLERS: Objection. Form.
10          THE WITNESS: No, as a toxicologist, I
11   can -- I am qualified to critique molecular
12   biology experimentations, especially as they
13   relate to the field of toxicology.
14   BY MR. MEADOWS:
15      Q   Do you have any reason to believe that
16   this article by Fletcher and Saed and others,
17   Exhibit 8, was not peer-reviewed?
18      A   No, I -- I believe this article was
19   peer-reviewed.
20      Q   Are you aware of any of the peer
21   reviewers stating that the methodology was flawed?
22      A   I have read the reviewers' comments.  I
23   don't believe that -- that they issued those same
24   concerns.
25      Q   You mean your concerns.
```

Page 191

```
1       A   Well --
2           MR. ZELLERS: Objection. Foundation.
3    Go ahead.
4           THE WITNESS: So I reviewed Dr. Saed's
5    notebooks, not his manu-- and -- and then later
6    his manuscript.
7    BY MR. MEADOWS:
8       Q   Okay.  So you're aware that the peer
9    reviewers did not find any method-- --
10   methodological flaws in his work, correct?
11          MR. ZELLERS: Objection. Form.
12          MR. LOCKE: Objection.
13          MR. ZELLERS: Foundation.
14          THE WITNESS: So the methods that I
15   reviewed, those methods would not have -- the
16   methodology, the specific methodology that was
17   done, the number of replicates, and -- and his
18   precise methodology was not available to the
19   reviewers.  It is not in this manuscript.  This
20   manuscript also, as I discuss in my report,
21   misrepresents what his lab -- his lab notebooks
22   said.
23   BY MR. MEADOWS:
24      Q   You're saying he lied to the reviewers?
25          MR. ZELLERS: Objection. Form.
```

Page 192

```
1           THE WITNESS: I don't know what he did
2    to the reviewers.
3    BY MR. MEADOWS:
4       Q   Well, now, if a -- there's a fraud going
5    on here, you're going to report it, aren't you?
6           MR. ZELLERS: Okay. Objection.
7    Argumentative.
8           THE WITNESS: So -- so I don't know that
9    it's fraud or misrepresentation.
10   BY MR. MEADOWS:
11      Q   All right.  Are you going to report this
12   to the reviewers, your findings that this
13   methodology is flawed?
14          MR. ZELLERS: Okay. Objection.
15   Argumentative.
16          THE WITNESS: I have -- I had not
17   considered that.
18   BY MR. MEADOWS:
19      Q   Okay.  Well, I'm asking you now, are you
20   going to -- are you going to do it?
21          MR. ZELLERS: Okay. Objection. Form,
22   argumentative.
23          THE WITNESS: Again, I -- I'd have to
24   think about that issue.
25   BY MR. MEADOWS:
```

Page 193

```
1       Q   Well, how long have you been aware that
2    his methodologies were flawed?
3       A   I don't know the exact time frame, but
4    certainly before this report was issued.
5       Q   Are you aware of any criticisms that the
6    reviewers had about his work?
7       A   So I'd have to go back and see those
8    documents.
9       Q   So as you sit here today, you don't
10   recall the reviewers saying things like:
11   "Overall, this is a well-written manuscript and
12   conclusions are supported by the results.
13          "The current in vitro study does provide
14   novel information."
15          "The significance of this study would be
16   greatly enhanced if a mouse model corroborated the
17   cell line findings."
18          "This is an important but controversial
19   topic in need of rigorous scientific inquiry."
20          "The authors compellingly show changes
21   in several key enzymes relating redox potential
22   to -- in cells exposed to talc."
23          "The editor in general stated the work
24   is not without merit and encouraged submission to
25   another journal."
```

49 (Pages 190 to 193)

H. Nadia Moore, Ph.D.

Page 194

```
 1            You're not aware of any of that?
 2        MR. LOCKE:  Objection.
 3        MR. ZELLERS:  Objection.  Form.
 4        THE WITNESS:  Generally I'm aware of the
 5    reviewers' comments.  I'm aware of the first
 6    rejection.  I'm aware that the second one was
 7    accepted.
 8            Beyond that, if you want to talk about
 9    individual comments, we could pull them out and
10    look at them to determine which ones are pertinent
11    to the task at hand.
12    BY MR. MEADOWS:
13        Q   Do you believe Dr. Saed to be
14    incompetent?
15        MR. ZELLERS:  Objection.  Form.
16        THE WITNESS:  I don't know Dr. Saed.
17    BY MR. MEADOWS:
18        Q   Do you believe he's dishonest?
19        MR. ZELLERS:  Objection.  Form.
20        THE WITNESS:  Again, I don't know
21    Dr. Saed.  I don't know who wrote the article.
22    All I can tell you is the -- that the methods were
23    flawed.
24    BY MR. MEADOWS:
25        Q   Explain what was flawed.
```

Page 195

```
 1        A   So --
 2        Q   Well, let me ask you this in the
 3    interest of time:  Have you thoroughly explained
 4    your criticisms in your report regarding Dr. Saed?
 5        A   I believe there are criticisms that are
 6    thoroughly explained in my report.
 7        Q   Okay.
 8        MR. MEADOWS:  All right.  Y'all want to
 9    take our break for lunch?
10        MR. ZELLERS:  It's your show.
11        THE VIDEOGRAPHER:  The time is 1:23 p.m.
12    We're going off the record.
13        (Lunch recess.)
14        THE VIDEOGRAPHER:  The time is 2:16 p.m.
15    We're back on the record.
16    BY MR. MEADOWS:
17        Q   Dr. Moore, I want to go back to your
18    billing statements.
19        A   Okay.
20        Q   Do you have them?
21        A   I do.
22        Q   Somebody helped me out with a little bit
23    of math on this during the break, and there
24    appeared to be periods of time where the average
25    amount being charged per hour exceeds $400.
```

Page 196

```
 1            And as I understood it, your hourly rate
 2    is $400 an hour, right?
 3        A   It is.
 4        Q   So are there others who were working
 5    during that time period that had a higher rate
 6    that would bring the average up?
 7        A   So the average --
 8        Q   Yeah, the average for -- for a period of
 9    time, there were times when your -- your average
10    was higher than $400 an hour.  So it tells me that
11    somebody was doing work that charges in excess of
12    $400 an hour.
13        A   Okay.
14        Q   Who was it?
15        A   I don't know who it was specifically.  I
16    know that Bruce Kelman -- or Dr. Kelman helped me
17    in the beginning of the project.
18        Q   Dr. Kelman, you referred to him earlier?
19        A   Correct.  He's the president of Veritox
20    as well as a principal toxicologist.
21        Q   He was the one who was invited to speak,
22    and you went in his place.
23        A   He was the one who -- the invitation was
24    offered, yes.
25        Q   Okay.  And then there are -- so what is
```

Page 197

```
 1    Dr. Kelman's rate?
 2        A   I don't know.
 3        Q   You don't know.  And did he do any work
 4    in 2019 on this?
 5        A   I don't -- I don't know.  He probably
 6    did some work in 2019.
 7        Q   There are other time periods where the
 8    average is less than $400 an hour, which leads me
 9    to believe that there were other people working on
10    it who charge a little lesser or lower rate.  Who
11    were those people?
12        A   So those people included Jennifer
13    Hobden.
14        Q   Jennifer --
15        A   Hobden.
16        Q   Hobden.
17        A   Yeah, Jennifer, and then H-O-B-D-E-N.
18        Q   Yeah.  Okay.
19        A   Lara Diener, L --
20        Q   You mentioned her earlier.
21        A   Right.
22        Q   Okay.  Who else?
23        A   Brianna Bennett.
24        Q   I think you mentioned her earlier as
25    well.
```

50 (Pages 194 to 197)

H. Nadia Moore, Ph.D.

Page 198

1    A    Probably Rebecca Ticknor.
2    Q    Yeah.
3    A    And there's probably some others that
4  helped with literature citation checks and things.
5    Q    Okay.  To be clear, I want to -- I can't
6  remember how I've asked this or whether I've asked
7  it the right way, but I want to make sure I'm
8  clear on my understanding of your -- whether
9  you've done any testing involving talc.
10       Have you ever done any testing involving
11 talc?
12   A    So by testing, you mean --
13   Q    Lab tests.
14   A    Laboratory-based testing?
15   Q    Yes.
16   A    No, I have not.
17   Q    And that would include cell testing,
18 microscopic analysis, any -- any type of testing.
19 I just want to make sure I'm not missing anything
20 here.
21   A    I have not tested talc in a laboratory
22 setting.
23   Q    Okay.  Have you had any communications
24 with other experts in the talc litigation?
25   A    No.

Page 199

1    Q    Do you know who any of them are?
2    A    I know their names.
3    Q    How do you know their names?
4    A    From seeing them in this talc
5  litigation, and some of them I -- I knew the names
6  beforehand.
7    Q    Did you -- do you know any of the
8  experts involved in this litigation -- well, do
9  you know any of them personally?
10   A    Personally, to walk up and say hello?
11   Q    Yes.
12   A    No.
13   Q    Have you ever met any of them before?
14   A    I think I may have met Dr. Zelikoff, but
15 I'm not sure.
16   Q    Where would that have been if you think
17 it happened?
18   A    At the Society of Toxicology annual
19 meetings.
20   Q    Do you know Ann Wylie?
21   A    No.  I know the name, but I don't know
22 her personally.
23   Q    Kelly Tuttle?
24   A    No.  Again, just by name.
25   Q    Jonathan Borak?

Page 200

1    A    I missed the last --
2    Q    Jonathan Borak.
3    A    No, I don't know him.
4    Q    Brooke Mossman?
5    A    No.  Again, I know -- know her name, but
6  I don't know her personally.
7    Q    Okay.  Let's go back to your report.  I
8  would like to flip over to page 22.
9        Give me a minute.  I'm a little lost on
10 where -- I don't think I'm pointing you in the
11 right direction.
12       (Counsel conferring.)
13 BY MR. MEADOWS:
14   Q    Forget about that page.  If you disagree
15 with what I have written down as a quote from your
16 report, then we'll go hunting for it.
17       But I have a note here that in your
18 report, you say: "Johnson's Baby Powder and
19 Shower to Shower have not been shown to contain
20 asbestos fibers."
21       Does that sound familiar?  Am I -- or do
22 we need to hunt this down?
23   A    You probably need to hunt that down.
24   Q    Okay.
25       MR. MEADOWS:  Have you got it?

Page 201

1  BY MR. MEADOWS:
2    Q    Go to page 19.
3    A    Okay.
4    Q    I'll highlight it for you.
5        See where I'm talking about?
6    A    I do.
7    Q    You agree you wrote that?
8    A    I wrote that.
9    Q    What's your base -- basis for that
10 statement?
11   A    That they have not been shown to contain
12 asbestos fibers.
13   Q    What's your basis for the statement:
14 "Johnson's Baby Powder and Shower to Shower have
15 not been shown to contain asbestos fibers"?
16   A    The scientific dataset does not support
17 that asbestos fibers have been found in Johnson's
18 Baby Powder and Shower to Shower products.
19   Q    Have you seen internal documents from
20 Johnson & Johnson involving the testing of talc
21 for asbestos?
22   A    I probably have.
23   Q    You probably have?
24   A    Yeah, they're in the materials that I
25 received, there are some.  If you want to talk

51 (Pages 198 to 201)

H. Nadia Moore, Ph.D.

Page 202

1  about them in specifics, we can go through those
2  materials.
3       Q   Have you seen positive results in those
4  documents?
5            MR. ZELLERS: Objection. Form, vague.
6            THE WITNESS: Positive results, meaning?
7  BY MR. MEADOWS:
8       Q   For asbestos.
9       A   So it depends how you define "asbestos."
10      Q   How do you define "asbestos"?
11      A   Asbestos would be one of the six
12  regulated minerals that I -- I have in my report
13  listed.
14      Q   Okay. So have you seen positive results
15  for that?
16           MR. ZELLERS: Objection. Form.
17           THE WITNESS: So again, the results that
18  I've seen, it's my understanding they're
19  unconclusive whether or not it is asbestos or not.
20  That's what the statement reflects.
21  BY MR. MEADOWS:
22      Q   Okay. So the basis for that statement
23  right there in your report is, in part, as a
24  result of viewing internal Johnson & Johnson
25  documents that you say show inconclusive positive

Page 203

1  results.
2            MR. ZELLERS: Objection. Form,
3  foundation.
4            THE WITNESS: That's not what I said.
5  BY MR. MEADOWS:
6       Q   What did you say?
7       A   I said the scientific literature is not
8  conclusive.
9       Q   So you didn't take into account internal
10  documents reflecting positive results, did you?
11           MR. ZELLERS: Objection. Form,
12  foundation.
13           THE WITNESS: So again, I'm not a
14  geologist or a mineralogist. I've seen some
15  reports that, you know, we could talk about it,
16  each one of them independently if we want. But
17  they do not provide evidence that asbestos was
18  definitively found in Johnson's Baby Powder.
19  BY MR. MEADOWS:
20      Q   I believe you just said that you're not
21  an expert in geology or mineralogy. Correct?
22      A   So what I meant by that statement is I'm
23  not an expert in the -- the exact mechanics of
24  geology or mineralogy, how minerals are formed.
25  As a toxicologist, I interpret geology and

Page 204

1  mineralogy reports. But that's what I meant by
2  that statement.
3       Q   True or false, Dr. Moore is not an
4  expert in geology or mineralogy?
5            MR. ZELLERS: Objection. Form. Asked
6  and answered.
7            THE WITNESS: So again, I would say the
8  same response, which is that toxicology
9  encompasses a lot of different disciplines that we
10  use as tools for the practice of toxicology. One
11  of those is understanding the basics of mineralogy
12  and geology in applying expert opinions.
13  BY MR. MEADOWS:
14      Q   It sounds like another "or."
15           MR. ZELLERS: Objection. Form.
16  Misstates the evidence and her testimony.
17           MR. MEADOWS: Let's mark this.
18           (Moore Exhibit No. 9 was marked
19           for identification.)
20  BY MR. MEADOWS:
21      Q   So I marked this "true or false" quiz
22  Exhibit 9. Do you see I did that?
23           MR. ZELLERS: Is that a --
24  BY MR. MEADOWS:
25      Q   We've been having a discussion about

Page 205

1  this all day, right?
2            MR. ZELLERS: Is that a question?
3            MR. MEADOWS: Yeah.
4  BY MR. MEADOWS:
5       Q   We've been having a discussion about
6  Exhibit 9 over the course of today, right?
7            MR. ZELLERS: Objection. Form.
8            MR. LOCKE: Yeah, I'm going to object to
9  having that -- whatever it is -- marked as an
10  exhibit.
11  BY MR. MEADOWS:
12      Q   We've been discussing this over the
13  course of today, right, your expertise?
14           MR. ZELLERS: Hold on. Objection.
15  Form.
16           Are you asking about her expertise or
17  are you asking about the notes you put together as
18  Exhibit 9.
19           MR. MEADOWS: The notes I put together
20  as Exhibit 9.
21  BY MR. MEADOWS:
22      Q   I mean, you've seen me write these notes
23  out, right, today?
24      A   I saw you write those notes based on
25  elaborate discussions that we've had.

52 (Pages 202 to 205)

H. Nadia Moore, Ph.D.

Page 206

1     Q   Okay. Now, with respect to your
2 statement regarding baby powder and Shower to
3 Shower have not been shown to contain asbestos
4 fibers, have you seen testing from Battelle that
5 confirmed the presence of asbestos in baby powder
6 and Shower to Shower?
7     A   I don't recall where the documents
8 originated.
9     Q   All right. Even though you worked at
10 Battelle, that didn't -- that's just not something
11 that registered with your memory?
12    A   No.
13    Q   No?
14        All right. Going back to the -- your
15 report, on page 17.
16        You have a statement here: "On balance,
17 scientific literature provides no support for a
18 potential relationship between perineal cosmetic
19 talc and ovarian cancer."
20        Did I read that correctly?
21    A   Yes.
22    Q   What does "on balance" mean?
23    A   It means when you evaluate the entirety
24 of the data.
25    Q   Is that a scientific term?

Page 207

1     A   It's a term that I used in this report.
2     Q   Have you seen that term used in
3 scientific literature?
4     A   I can't say one way or another. It's an
5 expression.
6     Q   Well, you would agree that there is
7 scientific literature that does provide a support
8 for a relationship between perineal talc use and
9 ovarian cancer, wouldn't you?
10        MR. ZELLERS: Objection. Form.
11        THE WITNESS: So my opinion is that when
12 you evaluate the entire scientific dataset, that
13 there is no causal association between perineal
14 talc use and ovarian cancer.
15 BY MR. MEADOWS:
16    Q   Yeah, my question was, you would agree
17 that there is scientific literature that does
18 provide support for a relationship between
19 perineal talc and ovarian cancer.
20        MR. ZELLERS: Objection. Form.
21        THE WITNESS: So I think we need to
22 evaluate the scientific literature independently
23 and look at -- look at each study, and then decide
24 how the scientific body of evidence weighs in.
25 BY MR. MEADOWS:

Page 208

1     Q   So when you say "on balance," what --
2 what do you mean by "balance"?
3     A   "Balance" means when you review all the
4 totality of the data.
5     Q   So it leads me to believe that there is
6 some literature that does support a relationship.
7 I mean if you're having to balance it, wouldn't
8 you agree that that means that there is some
9 literature that supports the idea that perineal
10 talc use causes ovarian cancer?
11        MR. ZELLERS: Objection. Form.
12 Misstates her testimony.
13        THE WITNESS: So the -- the question at
14 hand has to be done -- it can't be done in an
15 iso- -- isolated fashion by evaluating one study
16 versus another. It's an evaluation of the
17 scientific dataset.
18 BY MR. MEADOWS:
19    Q   As you sit here today, you are not
20 willing to concede that there is some scientific
21 literature that provides support for a
22 relationship between perineal talc use and ovarian
23 cancer.
24        MR. ZELLERS: Objection. Form.
25        THE WITNESS: Well, I think we can go

Page 209

1 through each of my opinions, and then we can
2 discuss that.
3 BY MR. MEADOWS:
4     Q   I'm asking you a question right here and
5 right now. Is there scientific literature that
6 supports the idea of a relationship between
7 perineal talc use and ovarian cancer?
8        MR. ZELLERS: Same objection.
9        THE WITNESS: Sorry, I couldn't hear
10 you.
11        So again, you have to evaluate the
12 entire dataset in order to answer that question.
13 So the -- the scientific dataset does not support
14 a causal relationship between perineal talc use
15 and ovarian cancer.
16 BY MR. MEADOWS:
17    Q   Well, "on balance" to me means that
18 you've weighed the available information. Is that
19 fair to say?
20    A   So I've evaluated the available
21 information.
22    Q   There's some information that says
23 there's no relationship and there's some
24 information that says there is a relationship,
25 right?

53 (Pages 206 to 209)

H. Nadia Moore, Ph.D.

Page 210

1    MR. ZELLERS: Objection. Form.
2    THE WITNESS: So again, maybe it was a
3  bad phrase to use in my report, but my -- what my
4  report says is that there is no causal
5  relationship between perineal talc use and the
6  use -- and the development of ovarian cancer.
7  BY MR. MEADOWS:
8    Q  Well, on balance, how much weight or
9  percentage of studies must there be for you to say
10  that there is a relationship?
11    A  So there's not a specific formula. Each
12  causal relationship has to be evaluated
13  independently, and you have to evaluate the
14  dataset that's there. Like I said, if you want to
15  go through the opinions, we can go through them.
16    Q  Tell me what your methodology was for
17  reaching that conclusion.
18    A  For the conclusion that --
19    Q  The one that's highlighted right here
20  that we've been talking about: "On balance,
21  scientific literature provides no support for a
22  potential relationship between perineal talc use
23  and ovarian cancer."
24    A  So the methodology is -- is my report,
25  and so in the introduction sections of my report,

Page 211

1  I lay out what toxicology is, what a risk
2  assessment is, hazard versus dose, and then in the
3  subsequent sections, I evaluate the -- the
4  literature based on those criteria. It's a
5  general toxicology assessment.
6    Q  When you wrote that statement, you
7  didn't take into account Health Canada that we
8  discussed earlier. Right?
9    MR. ZELLERS: Objection. Misstates her
10  testimony.
11    THE WITNESS: Well, I think we did
12  discuss -- while we did discuss Health Canada
13  earlier, they did a different methodology than I
14  did.
15  BY MR. MEADOWS:
16    Q  But you didn't take that into account
17  when you wrote this report, did you, Health
18  Canada?
19    MR. ZELLERS: Same objection.
20  BY MR. MEADOWS:
21    Q  It's not referenced anywhere in your
22  report, right?
23    A  So my task was to perform an independent
24  evaluation of the scientific literature to
25  understand whether or not there was a causal

Page 212

1  relationship between perineal talc use and ovarian
2  cancer.
3    Q  All right. In addition to Health
4  Canada, you didn't take into consideration the
5  Saed findings, right?
6    A  So the Saed findings, as we discussed,
7  were methodologically flawed.
8    Q  So you didn't take into account Saed
9  because you say his and others -- all the others
10  who -- who participated in writing that article
11  and those who peer-reviewed it are just wrong
12  about the methodology.
13    MR. ZELLERS: Objection. Form.
14  BY MR. MEADOWS:
15    Q  Right?
16    A  That's -- that's not what I said.
17    Q  No?
18    A  No.
19    Q  So their methodology is okay, you agree
20  with it now?
21    A  I said it was flawed, not wrong.
22    Q  Okay. And that Health Canada, you can't
23  take that into consideration when you wrote this
24  statement --
25    MR. MEADOWS: Objection. Misstates the

Page 213

1  evidence.
2  BY MR. MEADOWS:
3    Q  -- because you just didn't. You didn't
4  include it anywhere in your report, right?
5    MR. ZELLERS: Objection. Compound.
6  BY MR. MEADOWS:
7    Q  Is Health Canada in your report?
8    A  Health Canada is not included in my
9  report.
10    Q  Thank you.
11    A  Health Canada did a different type of
12  assessment than I did.
13    Q  Is it your opinion that talc cannot
14  migrate from the perineum to the ovaries?
15    A  There's been no scientific data to show
16  that talc can migrate from the external perineum
17  to the ovaries.
18    Q  You're aware the FDA has stated the
19  opposite, right?
20    MR. ZELLERS: Objection. Form.
21    THE WITNESS: So I'd have to again see
22  what you're discussing to make sure we're on the
23  same page with that statement.
24    MR. MEADOWS: Okay.
25    (Moore Exhibit No. 10 was marked

54 (Pages 210 to 213)

Page 214

1      for identification.)
2    BY MR. MEADOWS:
3      Q   I show you what I marked as Exhibit 10.
4      A   Thank you.
5      Q   Flip over to page 5 -- well, first of
6    all, are you familiar with this document?
7      A   Yes, I have seen this document.
8      Q   Page 5. You'll see I have highlighted
9    on the page, I already highlighted the area I want
10   to talk about. I'll read the whole paragraph.
11         "While there exists no direct proof of
12   talc and ovarian carcinogenesis, the potential for
13   particulates to migrate from the perineum and
14   vagina to the peritoneal cavity is indisputable."
15         MR. ZELLERS: Where -- I'm sorry,
16   Counsel. Are you reading the highlighted
17   paragraph or -- oh, okay, up above. Excuse me.
18   Thank you.
19   BY MR. MEADOWS:
20     Q   "It is therefore plausible the perineal
21   talc and other particulate that reaches the
22   endometrial cavity, fallopian tubes, ovaries,
23   peritoneum -- and peritoneum may elicit a foreign
24   body type reaction and inflammatory response that
25   in some exposed women may progress to epithelial

Page 215

1    cancers. However, there has been no conclusive
2    evidence to support causality."
3         Did I read that correctly?
4      A   You read that statement correctly.
5      Q   With respect to this sentence here --
6    well, let me ask you this: What part of that do
7    you disagree with?
8         MR. ZELLERS: Objection. Form.
9    BY MR. MEADOWS:
10     Q   Do you disagree with -- do you disagree
11   with any of that paragraph?
12         MR. ZELLERS: Same objection.
13         THE WITNESS: So there is no scientific
14   data that shows that particulates can migrate from
15   the perineum to the ovary -- to the ovaries.
16   BY MR. MEADOWS:
17     Q   You disagree with the FDA?
18     A   So this is a letter from the FDA, right,
19   that --
20     Q   Yeah, I realize that.
21     A   Right. And so I --
22     Q   What I need to know is whether you
23   disagree with the letter from the FDA.
24     A   So there's --
25         MR. ZELLERS: Hold -- hold on. So you

Page 216

1    want her now to look at the whole letter
2    or just --
3         MR. MEADOWS: No, I don't.
4         MR. ZELLERS: -- what you read or that
5    paragraph?
6         MR. MEADOWS: I don't. I want her to
7    answer my question.
8    BY MR. MEADOWS:
9      Q   Do you disagree --
10         MS. O'DELL: Object to --
11         MR. ZELLERS: Okay. Object to form.
12         MS. SHARKO: Are you objecting too?
13         MS. O'DELL: I'm objecting to his
14   objection.
15   BY MR. MEADOWS:
16     Q   Do you disagree with anything in this
17   paragraph?
18     A   So --
19         MR. ZELLERS: Excuse me. The whole
20   paragraph or just what you read?
21         MR. MEADOWS: I read the whole
22   paragraph.
23         MR. ZELLERS: You didn't read the first
24   part of the paragraph.
25         MR. MEADOWS: I absolutely did.

Page 217

1         MR. ZELLERS: Okay.
2         MR. MEADOWS: Go back and read the
3    record. I said I have highlighted a certain
4    portion of the paragraph. We will read the entire
5    paragraph.
6         MR. ZELLERS: Then I apologize,
7    Mr. Meadows.
8    BY MR. MEADOWS:
9      Q   I'll circle it in red. Do you disagree
10   with anything in red there?
11     A   I do disagree with that statement.
12     Q   Okay.
13     A   Insomuch that it implies that there is
14   proof that -- that particles travel from the
15   perineum to the -- to the vagina and up to the
16   ovaries.
17         And qualify that because this paragraph
18   has no references. I don't know the data that
19   they evaluated to come to this conclusion. And
20   furthermore, there are a lot of "potential" and
21   "mays" and other wishy-washy words in that. And
22   despite the word "indisputable," it's a pretty
23   wishy-washy statement.
24     Q   You're saying the word "indisputable" is
25   wishy-washy?

H. Nadia Moore, Ph.D.

Page 218

1     A   I'm saying that "potential" is -- is not
2   forceful.  "Plausible," again, I don't know what
3   they mean by the word "plausible" in that
4   sentence.  And then "may elicit," again not
5   definitive, not conform -- confirmatory.  There
6   are no studies that are cited.  And "may
7   progress."  I mean, again, not a supportive
8   statement, not a definitive statement, and
9   absolutely no literature citations to support
10  any of -- anything that's written in that
11  statement.
12     Q   So you disagree with Health Canada.
13  Right?
14     A   So again, it's not about agreeing or
15  disagreeing.  I think they came to -- I came to my
16  conclusion, and I don't really understand what
17  they did.  It was a different process to mine.
18     Q   You disagree with Health Canada.  You
19  disagree with the FDA.  You disagree with Saed and
20  all the other scientists who wrote the Saed
21  article and who peer-reviewed the Saed article.
22  Right?
23         MR. LOCKE:  Objection.
24         MR. ZELLERS:  Objection.  Misstates her
25  testimony, argumentative.

Page 219

1   BY MR. MEADOWS:
2     Q   Do you disagree with any of them?
3     A   Okay.  So again, it's about the science,
4   what -- and what was done.
5     Q   Let's see if we can find something you
6   do agree with.
7         (Moore Exhibit No. 11 was marked
8          for identification.)
9   BY MR. MEADOWS:
10    Q   I show you what I marked as Exhibit 11.
11    A   Thank you.
12    Q   Are you familiar with that document?
13    A   I have seen this document.
14    Q   In fact, you cite to it in your report,
15  don't you?
16    A   Yes.
17    Q   You don't know?
18    A   I said I've seen it, yes.  I didn't -- I
19  didn't know the question -- you said -- you asked
20  me if I was familiar with this document.  I am
21  familiar with this document.
22    Q   Yeah.
23    A   That was the question.
24    Q   And then I just asked you if you cited
25  to it in your report.

Page 220

1     A   Yes.  Sorry.
2     Q   Flip over to page -- I guess it's 122-S.
3   I'm not real sure how to read that.
4     A   122 --
5     Q   It's toward the back.
6     A   Okay.  I get it.  They all have S's.
7   Okay.
8     Q   Let me try to draw -- just put this up
9   here.
10        All right.  I've highlighted a section
11  on here.
12        "As evidenced in this safety assessment,
13  numerous studies have been performed to
14  investigate whether or not a causative
15  relationship exists between the cosmetic use of
16  talc in the perineal area and ovarian cancer.  A
17  panel reviewed these studies thoroughly and
18  determined they do not support a causal link.  The
19  panel stated that causation would depend on the
20  migration of talc from the perineum to the
21  ovaries.  There is no conclusive explanation for
22  the presence of talc in the ovaries reported in
23  some studies.  However, the panel agreed that
24  there is no known physiological mechanism by which
25  talc can plausibly migrate from the perineum to

Page 221

1   the ovaries."
2         Do you agree with that?
3         MR. ZELLERS:  Objection.  Form.
4         THE WITNESS:  So do I agree with the
5   statement as you've read it or the statement in
6   general?
7   BY MR. MEADOWS:
8     Q   The statement as I just read, do you
9   agree with that?
10    A   So I guess I don't know what the panel
11  actually reviewed, but that -- this is consistent
12  with my opinion.
13    Q   Okay.  Now flipping over.  It says:
14  "Finally, the panel warned that talc should not be
15  used on skin where the epidermal barrier is
16  removed or on skin that has greater than first
17  degree burns.  Case reports were available in
18  which granulomas formed if talc was applied to
19  skin when the epidermal barrier was absent."
20        Did I read that correctly?
21    A   Yes, you did.
22    Q   Do you agree with that?
23        MR. ZELLERS:  Objection.  Form.
24        THE WITNESS:  So I have not evaluated
25  the use of talc on skin where the epider-- --

56 (Pages 218 to 221)

H. Nadia Moore, Ph.D.

Page 222

1  epidem- -- epidermal barrier has been removed.  So
2  I need -- in order to evaluate that statement, I
3  would need to look to see what they evaluated in
4  making that statement.
5  BY MR. MEADOWS:
6      Q   So as a part of your assessment of the
7  safety of talc, you've not looked at whether talc
8  causes granulomas when applied to skin where the
9  barrier is -- epidermal barrier is absent?
10         MR. ZELLERS:  Objection.  Form.
11         THE WITNESS:  So I -- I need to see what
12  the -- these are -- they're referencing case
13  reports.  In general, case reports are -- are --
14  are -- how should I -- case reports need to be
15  evaluated, and I have not evaluated case reports.
16  I know that talc can cause granulomas, but I'm not
17  familiar with, you know, when they break the --
18  what -- what case reports they're talking about
19  here, and what the dose was that was associated
20  with these events.
21  BY MR. MEADOWS:
22      Q   Do you agree with the statement I've
23  underlined:  "Talc should not be used on skin
24  where the epidermal barrier is removed or on skin
25  that has greater than first degree burns"?

Page 223

1         MR. ZELLERS:  Object.  Asked and
2  answered.
3         THE WITNESS:  Again, I'd have to see the
4  case reports --
5  BY MR. MEADOWS:
6      Q   I'm not asking about the case reports.
7  I'm asking about this one statement.  If I have to
8  pull this away and write it out, I'll do that.
9         But I'm just asking about this one
10  statement.  I'm not asking about the case report.
11  I've underlined exactly what I'm asking you about.
12  It's a concept:  Talc should not be used on skin
13  where the epidermal barrier is removed or on skin
14  that has greater than first degree burns.
15         Do you agree with that as a toxicologist
16  or do you disagree with it?
17         MR. ZELLERS:  Objection.  Form, asked
18  and answered.
19         THE WITNESS:  Again, I would have to go
20  back and look at the case reports that they're --
21  that they're discussing here to understand what
22  type of dose was associated with these case
23  reports.
24  BY MR. MEADOWS:
25      Q   Is talc toxic?

Page 224

1      A   Talc is --
2         MR. ZELLERS:  Objection to form.
3  BY MR. MEADOWS:
4      Q   Is talc toxic?
5      A   It depends on the dose.
6      Q   Can talc cause granulomas?
7         MR. ZELLERS:  Objection.  Form.
8         THE WITNESS:  So again, it depends on
9  the dose, the route of administration.  It depends
10  on a lot of things.  As a hazard assessment, so
11  just an effect that it -- that it can or may
12  cause, that's one hazard associated with talc.
13  BY MR. MEADOWS:
14      Q   Okay.  So you'll agree that talc can
15  cause granulomas.
16         MR. ZELLERS:  Objection.  Form.
17         THE WITNESS:  Correct, I would agree.
18  As long as the dose and the route of exposure are
19  accounted for.
20  BY MR. MEADOWS:
21      Q   And does it follow that if talc can
22  cause granulomas, that if it's -- if talc is
23  exposed to ovarian tissue, that it can also cause
24  a foreign body reaction?
25      A   So again, this is a pretty -- a pretty

Page 225

1  general statement and very hypothetical.  So if
2  you want to talk about the studies, we can talk
3  about the studies.
4      Q   No, I want you to answer my question.
5         MR. ZELLERS:  Objection.  Form.
6  BY MR. MEADOWS:
7      Q   If it's a hypothetical or not, I want --
8      A   Well, you're making an assumption that
9  the talc actually makes it to the ovaries.
10      Q   There we go.  That's what it all comes
11  down to with you, right?
12         MR. ZELLERS:  Objection.  Argumentative.
13  BY MR. MEADOWS:
14      Q   It's all about whether the talc can make
15  it to the ovaries, right?
16      A   No.
17      Q   So if talc is deposited on the ovary,
18  does it have the potential to be toxic?
19         MR. ZELLERS:  Objection.  Form.
20         THE WITNESS:  Again, you'd have to look
21  at the dose.
22  BY MR. MEADOWS:
23      Q   Okay.  At what level does talc become
24  toxic on an ovary?
25         MR. ZELLERS:  Objection.  Form,

57 (Pages 222 to 225)

H. Nadia Moore, Ph.D.

Page 226

```
1    foundation.
2         THE WITNESS: Okay.  That is a complete
3    hypothetical.
4    BY MR. MEADOWS:
5         Q   Okay.  I'm asking you.
6         MR. ZELLERS: Same objections.
7         THE WITNESS: At the concentration -- so
8    again, I'm unable to accept that assumption to
9    answer that question.
10   BY MR. MEADOWS:
11        Q   You cannot answer the question as to
12   whether talc can be toxic to an ovary.
13        MR. ZELLERS: Objection.  Asked and
14   answered.
15        THE WITNESS: So I said it can be toxic
16   if it reaches a dose that's associated with
17   toxicity.
18   BY MR. MEADOWS:
19        Q   Okay.  So you would agree that talc can
20   be toxic to the ovary.
21        MR. ZELLERS: Objection.
22        THE WITNESS: So what are you defining
23   as "toxic"?
24   BY MR. MEADOWS:
25        Q   Well, that's a term you use as a
```

Page 227

```
1    toxicologist.
2         A   Right.
3         Q   So whatever you think "toxic" means.
4         MR. ZELLERS: Okay.  Objection.  Vague.
5         THE WITNESS: Okay.  So -- so what was
6    the -- what did you ask me?
7    BY MR. MEADOWS:
8         Q   You would agree with me that talc can be
9    toxic to the ovary.
10        MR. ZELLERS: Objection.  Form.
11        THE WITNESS: Well, again --
12   BY MR. MEADOWS:
13        Q   Well, let me rephrase it again.
14   Whatever you -- "toxic" is a term that you use as
15   a toxicologist, right?
16        A   Correct.  Yeah, it's --
17        Q   And that's part of the lingo.
18        A   Yes.
19        Q   Okay.  So whatever your definition of
20   "toxic" is as a toxicologist, the question is, can
21   talc be toxic to the ovary?
22        MR. ZELLERS: Objection.  Form.
23        THE WITNESS: So everything is toxic
24   given enough dose.
25   BY MR. MEADOWS:
```

Page 228

```
1         Q   Including talc on an ovary.
2         MR. ZELLERS: Objection.  Form.
3         THE WITNESS: So every substance known
4    to man is toxic given a high enough dose.
5    BY MR. MEADOWS:
6         Q   But your position is that the ovary can
7    never be exposed to a high enough level of talc in
8    order to be toxic, right?
9         MR. ZELLERS: Objection to form.
10        THE WITNESS: That's not my opinion.
11   BY MR. MEADOWS:
12        Q   It's not your opinion?
13        A   So your -- your question is very
14   general.  So I don't believe that perineal
15   exposure is associated with ovarian exposure.
16        Q   Right.  That -- that -- your position is
17   that talc can never get there, right?
18        MR. ZELLERS: Objection.
19   BY MR. MEADOWS:
20        Q   It can never get to the ovary.
21        MR. ZELLERS: Objection.  Form.
22   Misstates her testimony.
23        THE WITNESS: So the scientific data do
24   not show that talc applied perineal -- perineally
25   can migrate to the ovaries.
```

Page 229

```
1    BY MR. MEADOWS:
2         Q   And so that -- in that opinion, you
3    disagree with the FDA.  We've already established
4    that, right?
5         MR. ZELLERS: Objection.  Asked and
6    answered.
7         THE WITNESS: So again, we can go back
8    to the EPA document, and I can discuss --
9    BY MR. MEADOWS:
10        Q   Well, I was on the FDA document.
11        A   Or, sorry, my fault.  Yeah, yeah.
12   Sorry.  Go back to the FDA document and discuss
13   that.
14        Q   Well, let me ask you this.
15        (Counsel conferring.)
16   BY MR. MEADOWS:
17        Q   So when you say that, are you
18   discounting the literature that is there that is
19   evidence of talc migrating to the ovaries?
20        And in particular, I'm referring to the
21   ones I have on the screen here.
22        "Cramer, 2007.  Presence of talc in
23   lymph nodes provides evidence that talc used
24   externally is capable of migrating to the
25   pelvis -- into the pelvis."
```

58 (Pages 226 to 229)

H. Nadia Moore, Ph.D.

Page 230

1      "Langseth, 2008. Talc particles can
2  migrate from the vagina to the peritoneal cavity
3  and ovaries."
4      "Cramer, 2016. Biologic credibility of
5  the talc epithelial/ovarian cancer association is
6  enhanced by persuasive evidence that inert
7  particles the size of talc present in the vagina
8  can migrate to the upper genital tract."
9      "Schildkraut, 2016. Increased risk of
10  African-American women consistent with localized
11  chronic inflation -- inflammation in the ovary due
12  to particulates that travel through a direct
13  transvaginal route."
14      And then McDonald, which --
15      MR. MEADOWS: Have we already talked
16  about McDonald?
17      MS. TUCKER: No.
18  BY MR. MEADOWS:
19      Q   Okay. We'll talk about McDonald in just
20  a minute.
21      So you disagree with those articles that
22  I just highlighted and put on the screen, right?
23      MR. ZELLERS: Objection. Form,
24  compound.
25      THE WITNESS: So those statements, I'm

Page 231

1  not sure if they're accurate from those
2  publications or not without looking at the
3  publications. They're one sentence that's been
4  extracted potentially out of context, so I don't
5  know what context those sentences are from. It
6  could be potentially misleading. I -- I just -- I
7  can't comment on the -- on those -- on those
8  supposed quotations, unless we're going to look at
9  those articles individually.
10  BY MR. MEADOWS:
11      Q   Well, assuming that I read them
12  correctly and I did not take them out of context,
13  do you agree with them?
14      MR. ZELLERS: Objection. Form.
15      THE WITNESS: So the scientific dataset
16  that I've evaluated does not show that there's
17  migration from the external perineal into the
18  ovary.
19  BY MR. MEADOWS:
20      Q   Okay. So you just didn't review these
21  articles.
22      A   That's not what I said.
23      Q   Okay. Well --
24      A   Those are individual sentences that
25  could be taken out of context, and one of them

Page 232

1  doesn't have a period at the end. You know,
2  let's -- let's take out those articles, and we can
3  review those articles one by one.
4      Q   Well, all right. So those articles are
5  not ones that are -- you're very familiar with
6  that you can -- you and I can talk about without
7  having the article right in front of us?
8      MR. ZELLERS: Objection. Form.
9      THE WITNESS: So I've read a lot of
10  articles, and just in order to be accurate here
11  today, I would like to look at the article.
12  You're pulling one sentence --
13  BY MR. MEADOWS:
14      Q   Let's take a look at McDonald. That's
15  the latest pronouncement on this.
16      (Moore Exhibit No. 12 was marked
17      for identification.)
18  BY MR. MEADOWS:
19      Q   I handed you what I think is marked as
20  Exhibit 12.
21      A   Yep.
22      Q   So this is an article entitled
23  "Correlative Polarizing Light and the Scanning
24  Electron Microscope for the Assessment of Talc in
25  Pelvic Region Lymph Nodes."

Page 233

1      The first name is McDonald. It's Sandra
2  McDonald?
3      I'm -- I'm going to assume it's Yuwei
4  Fan, William Welch, Daniel Cramer, Rebecca
5  Stearns, Liam Sheedy, Marshall Katler, and John
6  Godleski.
7      Did I read that correctly?
8      A   I believe so.
9      Q   Do you know any of those folks?
10      A   No, not -- not to my knowledge.
11      Q   And this was published I guess in a
12  journal called Ultrasound Pathology. Are you
13  familiar with that --
14      MR. ZELLERS: Objection --
15  BY MR. MEADOWS:
16      Q   -- journal?
17      MR. ZELLERS: -- form, foundation.
18      THE WITNESS: I don't know if I've ever
19  read an article out of Ultrasound Pathology
20  before, one way or another.
21  BY MR. MEADOWS:
22      Q   Have any reason to believe that these --
23  the authors of this article are unqualified or
24  incompetent?
25      MR. ZELLERS: Objection. Form.

59 (Pages 230 to 233)

H. Nadia Moore, Ph.D.

---

Page 234

1    Foundation.
2         THE WITNESS:  No, I do not.
3    BY MR. MEADOWS:
4         Q   Have you ever read this article?
5         A   No, I don't believe I have.
6         Q   Flip over to page 12.
7              You'll see on the screen I've
8    gone about, I don't know, maybe a quarter of the
9    way down.  The paragraph starts with "Talc."
10             "Talc, when applied to the perineum, is
11   believed to migrate to the upper genital tract,
12   passing through the open tract to the fallopian
13   tubes, and eventually reaching the ovaries."
14             Go on down to the next paragraph.  "This
15   study supports earlier observations that talc
16   particles from perineal exposure can and do
17   migrate to the pelvic lymph nodes."
18             Did I read that correctly?
19             MR. ZELLERS:  Objection.  Form.
20             THE WITNESS:  So you read that sentence
21   correctly, but again, I haven't seen this article
22   to understand its context.
23   BY MR. MEADOWS:
24        Q   Go to the next page.
25        A   Hold on a second.

---

Page 235

1         Q   I highlighted another sentence.
2         A   Okay.
3         Q   "This adds perspective to the known
4    migratory capabilities and overall biologic
5    role/impact of talc."
6              Did I read that correctly?
7              MR. ZELLERS:  Objection.  Form.
8              THE WITNESS:  Again, that is an
9    individual sentence that you read correctly, but
10   I'm unable to put it into context.
11   BY MR. MEADOWS:
12        Q   Flip over to the second to last page.
13        A   Okay.
14        Q   "Exposure such as perineal application,
15   whether known clinically or not, often results in
16   significant deposition of talc in the tissues."
17             Did I read that correctly?
18             MR. ZELLERS:  Objection.  Form.
19             THE WITNESS:  Again, you read this
20   statement correctly, but I'm unable to put that
21   into context in the article.
22   BY MR. MEADOWS:
23        Q   You would disagree with those
24   statements, right?
25             MR. ZELLERS:  Objection.  Form,

---

Page 236

1    foundation.
2         THE WITNESS:  So --
3    BY MR. MEADOWS:
4         Q   Do you disagree with those statements?
5              MR. ZELLERS:  Same objection.  You've
6    given her an article.  You've isolated out a
7    couple of sentences, and then asked her if she
8    agrees or disagrees.
9    BY MR. MEADOWS:
10        Q   Do you disagree with those statements?
11        A   So my opinion is that -- that the
12   evi- -- the scientific evidence did not support
13   that talc migrates from the perineum to the
14   ovary -- to the ovarian tissue.
15             If you could put those quotations back
16   on the screen for a second.  Can I see them again,
17   please?  The ones you highlighted.
18        Q   Sure.  You got the whole article right
19   there.
20        A   Well, I didn't --
21        Q   Do you need a highlighter to highlight
22   as I go?  You can --
23        A   Can I --
24        Q   Sure.
25             MR. ZELLERS:  I don't want you to

---

Page 237

1    highlight the court copy.
2              THE WITNESS:  Okay.  Well, I just -- I
3    just wanted to look at the -- I don't need to
4    highlight it.  I was -- I was going from memory.
5    BY MR. MEADOWS:
6         Q   "Talc, when applied to the perineum, is
7    believed to migrate to the upper genital tract,
8    passing through the open tract to the fallopian
9    tubes, and eventually reaching the ovaries."
10             Do you agree with that statement?
11             MR. ZELLERS:  Objection.  Form.
12             THE WITNESS:  So that statement, it's --
13   is a hypothesis.  It's believed.  The references
14   do not support that statement, and the scientific
15   literature does not support that statement, and I
16   do not support that statement.
17   BY MR. MEADOWS:
18        Q   Go on down.  "This study supports
19   earlier observations that talc particles from
20   perineal exposure can and do migrate to pelvic
21   lymph nodes."
22             Did I -- do you agree with that
23   statement?
24             MR. ZELLERS:  Same objection.  Form.
25             THE WITNESS:  So again, it's one -- one

---

60 (Pages 234 to 237)

H. Nadia Moore, Ph.D.

Page 238

1  sentence.  It's out of context.  There are no
2  references for me to evaluate that -- that
3  reference.
4  BY MR. MEADOWS:
5      Q   Next page.  "This adds perspective to
6  the known migratory capabilities and overall
7  biological role/impact of talc."
8      Do you disagree with that statement?
9      MR. ZELLERS:  Objection.  Form,
10  foundation.
11      THE WITNESS:  Well, again, this is one
12  sentence without references and without overall
13  context.  I can't review why they put that in
14  there, but I do not -- well, the scientific
15  literature does not agree with that statement.
16  BY MR. MEADOWS:
17      Q   Last one.  "Exposure such as perineal
18  application, whether known clinically or not,
19  often results in significant deposition of talc in
20  the tissues."
21      Do you disagree with that statement?
22      MR. ZELLERS:  Objection.  Form.
23      THE WITNESS:  So again, it's a -- one
24  sentence that's taken out of context with
25  absolutely no references, and it -- it does

Page 239

1  contradict what I observed when I evaluated the
2  scientific dataset, which does not support that
3  perineal exposure to talc -- that the talc can
4  migrate to the ovaries.
5  BY MR. MEADOWS:
6      Q   So you disagree with McDonald, Fan,
7  Welch, Cramer, Stearns, Sheedy, Katler, Godleski,
8  all the authors of the Cramer 2000 study, all the
9  authors of the Langseth 2008 study, all the
10  authors of the Cramer 2016 study, all the authors
11  of the Schildkraut 2016 study, and all of those
12  who peer-reviewed these articles, and the FDA on
13  whether talc can migrate to the ovaries, right?
14      MR. LOCKE:  Objection.
15      MR. ZELLERS:  Objection.  Form,
16  argumentative, compound.
17      THE WITNESS:  So all of the statements
18  that you put up, the ones you put up previously,
19  Langseth -- and I can't remember all the others
20  that were up on the board -- those were individual
21  sentences that were pulled potentially out of
22  context.  I'm unable to evaluate the context of
23  those and -- and whether or not those were
24  accurately represented.
25      Again, the McDonald were just certain

Page 240

1  sentences that were pulled out of their
2  publication.  Again, I haven't had time to
3  review -- evaluate the context.
4  BY MR. MEADOWS:
5      Q   At one point in your report you cite to
6  the NCI website in support of your opinions,
7  right?
8      A   Let's look at the -- where in the report
9  that I had written that, please.  Find that.
10      Q   Page 18.
11      A   Thank you.
12      Yes, I see that in my -- I have NCI in
13  my report.
14      Q   And you consider the NCI website to be
15  medical or scientific literature?
16      A   I consider it to be a -- a source of
17  information regarding cancer.
18      Q   You cited to it in your report, right?
19      A   I did.
20      Q   Did -- did you look at their cites,
21  their references?
22      A   I -- I probably did.  I mean, I know I
23  did.  I just can't recall them at this moment.
24      Q   Did you look at what they've stated over
25  the years regarding talc use and ovarian cancer?

Page 241

1      A   I have not -- I can't remember if I did
2  that or not.
3      (Moore Exhibit No. 13 was marked
4      for identification.)
5  BY MR. MEADOWS:
6      Q   I show you what's been marked as
7  Exhibit 13.
8      A   Thank you.
9      Q   Flip over to -- actually, this is a page
10  from the NCI website.  This is what you were
11  citing to, right?
12      A   I was citing to the NCI.
13      Q   Yeah.
14      A   I don't know that it's the same website
15  or not.
16      Q   And the date on this is from 2014, so it
17  would have been a few years ago, right?
18      A   It appears to be the case, yes.
19      Q   Okay.  So if you flip over, and it says,
20  "Talc."  The NCI in 2014 said:  "The use of talc
21  may increase the risk of ovarian cancer.  Talcum
22  powder dusted on the perineum (the area between
23  the vagina and the anus) may reach ovaries by
24  entering the vagina."
25      Do you see that?

61 (Pages 238 to 241)

H. Nadia Moore, Ph.D.

Page 242

1    A   You read that correctly.
2    Q   You read my mind.
3        You disagree with that?
4        MR. ZELLERS: Objection. Form.
5        THE WITNESS: So the scientific dataset
6    does not support that talcum powder dusted on the
7    perineum reaches the ovaries.
8    BY MR. MEADOWS:
9    Q   So you'd say the NCI got it wrong that
10   time, right?
11       MR. ZELLERS: Objection to form.
12       THE WITNESS: So I don't know what the
13   NCI did in their evaluation when they put that
14   statement --
15   BY MR. MEADOWS:
16   Q   Because you haven't looked at that, have
17   you?
18       MR. ZELLERS: Objection. Form.
19       THE WITNESS: So this is the first time
20   that I've seen this document, so I'd have to
21   research into this and look to see if -- how they
22   evaluated that and whether or not there was any
23   scientific basis behind that statement.
24   BY MR. MEADOWS:
25   Q   Now, we talked earlier about the CIR,

Page 243

1    right?
2    A   Pardon? I don't -- the CIR?
3    Q   Yeah. You don't remember talking about
4    that?
5        MR. ZELLERS: Objection. Form, vague.
6        THE WITNESS: So refresh me. I -- we've
7    talked about a lot of things today.
8    BY MR. MEADOWS:
9    Q   Yeah. CIR is the one that says talc
10   does not migrate, therefore it can't cause ovarian
11   cancer, but make sure you don't put it on open
12   wounds or first degree burns.
13       Do you remember that document?
14       MR. ZELLERS: Form.
15       THE WITNESS: So again, those are some
16   statements that were taken from the document.
17   I -- that -- we -- we reviewed the document by
18   Fume -- I don't know how to pronounce the name.
19   Fume?
20   BY MR. MEADOWS:
21   Q   Fiume?
22   A   Fiume.
23   Q   Yeah.
24   A   Thank you.
25   Q   Yeah. Well, the reason I asked you

Page 244

1    about us having talked about the CIR earlier is
2    because you cite to it on page 18 of your report,
3    second bullet point under the NCI.
4        Do you see that?
5    A   I do see that.
6    Q   Got it on the screen there. Is it
7    ringing a bell now, the CIR, Cosmetic Ingredient
8    Review?
9    A   I do see that --
10   Q   C-I-R.
11   A   -- yes.
12   Q   Okay.
13   A   Yeah, sorry. I was referring to it in
14   my head as Fiume.
15   Q   So you cited to the CIR as support for
16   your opinions, right?
17   A   These were just examples of other
18   opinions, yes.
19   Q   Mm-hmm.
20   A   They did not inform my opinions. The
21   scientific dataset informed my opinions.
22   Q   Okay. So we don't -- how am I supposed
23   to consider that in -- this whole section then?
24   Is it not -- does not inform your opinions or form
25   the basis of your opinions?

Page 245

1    A   They do help to form the basis of
2    opinions, yes.
3    Q   Okay. Well, the CIR, do you consider
4    them to be a reliable source?
5    A   I consider all references, all
6    scientific studies independently, and evaluate
7    them.
8    Q   At the time you wrote this, you had
9    Dr. Plunkett's report, right?
10   A   Yes, I did.
11   Q   And you read in Dr. Plunkett's report
12   her assessment of CIR, didn't you?
13   A   I can't recall that -- that assessment.
14   Q   You don't recall what -- what she said
15   about the CIR?
16   A   I would have to see that document in
17   order to discuss that. There's been a lot of
18   documents that I've read.
19   Q   Well, before criticizing her opinions,
20   did you -- did you analyze her assessment of the
21   CIR?
22       MR. ZELLERS: Objection. Form.
23       THE WITNESS: So I evaluated
24   Dr. Plunkett's methodology.
25   BY MR. MEADOWS:

62 (Pages 242 to 245)

H. Nadia Moore, Ph.D.

Page 246

1    Q   Mm-hmm. Well, part of her methodology
2  was that she didn't find the CIR to be reliable.
3  Does that ring a bell with you?
4        MR. LOCKE: Objection.
5        MR. ZELLERS: Objection. Form.
6        THE WITNESS: Again, I'd have to see the
7  document in order to understand this discussion.
8  BY MR. MEADOWS:
9    Q   Well, if you will remember, Dr. Plunkett
10 says that she's seen sworn testimony that supports
11 the idea and confirms the idea that the CIR is an
12 industry-funded group, cosmetic industry-funded
13 group. Were you aware of that?
14       MR. ZELLERS: Objection. Form,
15 foundation.
16       THE WITNESS: So again, I'd have to see
17 the document in order to comment on this.
18 BY MR. MEADOWS:
19   Q   And that there are internal documents
20 that show that outside influences orchestrated the
21 drafting of the CIR report that we were looking at
22 earlier that you cite to here, did you see that in
23 her report?
24       MR. LOCKE: Objection.
25       MR. ZELLERS: Objection. Form.

Page 247

1        THE WITNESS: Again, I would want to see
2  her document, her report in order to discuss this
3  issue.
4  BY MR. MEADOWS:
5    Q   And she also called into question the
6  expertise of the panel that -- that reviewed
7  the -- data before writing the CIR report.
8        MR. ZELLERS: Same object --
9  BY MR. MEADOWS:
10   Q   Do you remember seeing that in her -- in
11 her report?
12   A   Again --
13       MR. ZELLERS: Same object -- hold on,
14 please. Same objection.
15       MR. LOCKE: Objection.
16       THE WITNESS: Again, I would want to see
17 her report in order to have this discussion.
18 BY MR. MEADOWS:
19   Q   And she also called into question the
20 whole review process of the CIR and -- and
21 questioned how robust it actually is. Do you
22 remember seeing that in Dr. Plunkett's report?
23       MR. ZELLERS: Objection. Form.
24       THE WITNESS: Again, I want to see the
25 report in order to have this discussion.

Page 248

1  BY MR. MEADOWS:
2    Q   Okay. Well, you've seen the report, and
3  apparently it didn't -- her findings and -- and
4  the evidence that she cited to and was available
5  to you did not have any influence on you with
6  respect to CIR because you cite to them, right?
7        MR. ZELLERS: Objection. Form.
8        THE WITNESS: Again, I would want to see
9  her report in order to have this discussion.
10       MR. MEADOWS: I tell you what, let's
11 take a short break, and let me see if I can meet
12 with my colleagues and --
13       MR. ZELLERS: Sure. Sounds good.
14       MR. MEADOWS: -- Whittle some things.
15       THE VIDEOGRAPHER: The time is 3:23
16 p.m., and we're going off the record.
17       (Recess.)
18       THE VIDEOGRAPHER: The time is 3:43
19 p.m., and we are back on the record.
20 BY MR. MEADOWS:
21   Q   Dr. Moore, going back to your report,
22 the first page of your report, under "Asbestos."
23 Number 2, you state: "Scientific studies do not
24 support the theory that asbestos, as an alleged
25 contaminant in talc, causes ovarian cancer in

Page 249

1  women."
2        Did I read that correctly?
3    A   You did read that correctly, yes.
4    Q   Do you stand by that today?
5    A   I do.
6        (Moore Exhibit No. 14 was marked
7        for identification.)
8  BY MR. MEADOWS:
9    Q   I hand you what I marked as Exhibit 14.
10       Do you recognize that document?
11   A   I do.
12   Q   It's the IARC report, correct, on
13 asbestos?
14       MR. ZELLERS: Objection. Form. Vague.
15       THE WITNESS: Okay. So maybe the
16 complete citation.
17 BY MR. MEADOWS:
18   Q   I'm sorry?
19   A   So, sorry, so this is the IARC version
20 what, just so it's clear?
21   Q   Yeah, you tell me, what is it? You're
22 familiar with IARC, right?
23   A   I am.
24   Q   Okay.
25   A   But this is an excerpt out of 100C, I

63 (Pages 246 to 249)

Page 250

1  believe.
2      Q.  Correct.  IARC Monograph 100C.  I think
3  it's -- it's on at least every other page in the
4  document --
5      A.  Okay, I see it.
6      Q.  -- in the left-hand corner.  Yeah.
7      A.  Yeah.
8      Q.  Okay.  If you will join me in turning
9  over to page 256.
10      Look in the right-hand column, I've
11  highlighted paragraph -- a portion of a paragraph
12  in the right-hand column.  I'll read it aloud.
13      "The working group noted that a causal
14  association between exposure to asbestos and
15  cancer of the ovary was clearly established based
16  on fine -- five strongly positive cohort mortality
17  studies of women with heavy occupational exposure
18  to asbestos."
19      Did I read that correctly?
20      A.  You did read that correctly.
21      Q.  And that would be contrary to what your
22  statement says, right?
23      MR. ZELLERS:  Objection.  Form.
24      THE WITNESS:  That's not what my
25  statement says.

Page 251

1  BY MR. MEADOWS:
2      Q.  Well, your statement says:  "Scientific
3  studies do not support the theory that asbestos,
4  as an alleged contaminant in talc, causes ovarian
5  cancer in women."
6      Did I read that correctly?
7      A.  You did.
8      Q.  Well, do you agree with what's
9  highlighted on the screen?
10      A.  So I agree that there was an observed
11  association between heavily exposed cohorts and
12  ovarian cancer.
13      Q.  Well, to be clear, it says:  "The
14  working group noted a causal association between
15  exposure to asbestos and cancer of the ovary was
16  clearly established."
17      Did I read that correctly?
18      MR. ZELLERS:  Objection.  Form.
19      MR. LOCKE:  Objection.
20      THE WITNESS:  So you read that statement
21  correctly.
22  BY MR. MEADOWS:
23      Q.  If you flip over to page 294, under the
24  "Evaluation" section on the right, I've
25  highlighted a portion of the paragraph that says:

Page 252

1  "Asbestos causes mesothelioma" -- excuse me --
2  "mesothelioma and cancer of the lung, larynx and
3  ovary."
4      Did I read that correctly?
5      MR. LOCKE:  Objection.
6      MR. ZELLERS:  Same objection.  Form.
7      THE WITNESS:  So you read that statement
8  correctly.
9  BY MR. MEADOWS:
10      Q.  Do you agree with that statement?
11      MR. ZELLERS:  Objection.  Form.
12      THE WITNESS:  So again, the -- there's
13  association between heavily exposed occupational
14  cohorts and ovarian cancer.
15  BY MR. MEADOWS:
16      Q.  This says asbestos causes cancer of the
17  ovary.  Do you agree with that?
18      MR. LOCKE:  Objection.
19      MR. ZELLERS:  Objection.  Form, asked
20  and answered.
21      THE WITNESS:  Okay.  So what I said was
22  that there's an association that's been drawn
23  between asbestos exposure and heavily exposed
24  occupational cohorts and ovarian cancer.
25  BY MR. MEADOWS:

Page 253

1      Q.  Earlier we were having an exchange --
2  and if we need to go back to the transcript to
3  find it, we can -- but I was asking you about
4  asbestos testing, and you said that "They are in
5  the materials I received," and I think you were
6  saying that they -- that you had produced some
7  asbestos testing materials to us that you had
8  considered in your -- in reaching your conclusion;
9  is that correct?
10      MR. ZELLERS:  Objection.  Form.
11      THE WITNESS:  So I don't know that I --
12  I -- so I received them.  I don't know if I read
13  every document, but I received those as part of
14  the materials --
15  BY MR. MEADOWS:
16      Q.  Where are those identified on your
17  reliance list?
18      A.  Those are in my report.
19      MR. ZELLERS:  He asked about your
20  reliance list.
21      THE WITNESS:  Oh, the reliance list?
22      MR. ZELLERS:  But if it's easier to do
23  it from your report, whichever is easier.
24  BY MR. MEADOWS:
25      Q.  I think it may be --

H. Nadia Moore, Ph.D.

Page 254

1    A   I can do it on the reliance list, that's
2   fine.
3    Q   It may be referenced in your report on
4   page 5 through 7.
5    A   Well, I'm -- either way. I have my
6   reliance list right here. It's right on top.
7        Well, it's long. I'll just do my
8   report. How's that?
9        So the question was where in this
10  list --
11   Q   We're trying -- we're trying to find
12  where they are. I mean we're trying -- I don't
13  think we've received those.
14   A   So those were the Cook documents that
15  were cited in the Cook report from Johnson &
16  Johnson documents and Imerys documents, and then
17  the Krekeler documents cited in the report, the
18  Johnson & Johnson documents, and the Krekeler
19  documents cited in report, the Imerys documents.
20   Q   Tell you what, let's -- let me just
21  highlight this as we go --
22   A   Okay.
23   Q   -- so we're on the same page. If you
24  don't mind starting over so I can --
25   A   Oh, sorry. Sorry. Okay, ready?

Page 255

1    Q   Yes.
2    A   Okay. So the Cook --
3        MR. ZELLERS: So what page are you on in
4   the report?
5   BY MR. MEADOWS:
6    Q   This is page 6. I think you're on
7   page 6, aren't you?
8    A   Sorry. Yes, I am on page 6.
9    Q   Okay. All right.
10   A   Okay. So like two-thirds of the way
11  down maybe, "Cook documents cited in report -
12  Johnson & Johnson."
13   Q   Okay. I highlighted that on the screen.
14   A   Then "Cook documents cited in report -
15  Imerys."
16   Q   Okay.
17   A   "Krekeler documents cited in report -
18  Johnson & Johnson."
19   Q   Okay.
20   A   And "Krekeler documents cited in report
21  - Imerys."
22   Q   Okay.
23   A   And "Crowley documents cited in report -
24  Imerys and Johnson & Johnson."
25   Q   Okay.

Page 256

1        MR. ZELLERS: You did a good job.
2        MR. MEADOWS: Taking orders from my
3   boss.
4   BY MR. MEADOWS:
5    Q   All right. Sticking with your report, I
6   want to flip over to page 38.
7        Actually, we've already covered that.
8   Flip over to page 40.
9        And the first paragraph is where I am.
10   A   Okay.
11   Q   And actually, I think it's the third
12  sentence is where I'm going to start from.
13       You wrote: "Some studies showing
14  increased mesothelioma rates in humans
15  occupationally exposed to high levels of asbestos
16  also observe statistically significant but much
17  lesser increases in ovarian cancer rates. It
18  follows then that if ovarian cancer is associated
19  with asbestos exposure, levels that are not
20  associated with mesothelioma will also not cause
21  ovarian cancer."
22       Did I read that correctly?
23   A   I believe that was read correctly.
24   Q   Okay. So my question is -- questions,
25  what do you mean by high level of asbesto- --

Page 257

1   asbestos?
2    A   Okay. So let me just back up and say,
3   to put this into context, you missed the first
4   sentence, which is "Dose-response is the key
5   metric for evaluating these type of results."
6        And your question was, What was meant by
7   high levels of asbestos?
8    Q   Mm-hmm.
9    A   All right. So those are high levels of
10  asbestos that are associated with mesothelioma
11  development in those populations, as I define in
12  my report. We can go through each study.
13   Q   So you've defined "high level" in your
14  report, is that what you're saying?
15   A   So I'm just saying that -- it's a term
16  that I used to describe the studies that are
17  listed in this section.
18   Q   So I guess what I want to make sure I
19  understand is, is when I go back and read this
20  again later, I understand what you mean when you
21  say "high levels."
22       Is it -- can you point me to something
23  or can you quantify that for me or can you point
24  to something that helps me understand what you
25  mean by "high levels."

65 (Pages 254 to 257)

H. Nadia Moore, Ph.D.

Page 258

```
1        A   So "high levels" are -- at the end of
2   the page there before the footnote starts.  So,
3   for example, "Asbestos cement workers, the 1971
4   average concentrations measured in the mixing and
5   production areas of the asbestos cement plant were
6   303.8 and 13.5 fibers per cc, respectively."
7        Q   Okay.  Continuing on in the same
8   paragraph we just read, I have a few more
9   questions.
10           Down here at the bottom:  "If ovarian
11   cancer is associated with asbestos exposure,
12   levels that are not associated with mesothelioma
13   will also not cause ovarian cancer."
14           What's your basis for that statement?
15       A   So the basis is risk levels.
16       Q   Okay.  Well, can you point to any
17   peer-reviewed publications that support that
18   statement?
19       A   So this is an analysis of peer-reviewed
20   publications.
21       Q   Okay.  Well, which peer-reviewed
22   publications support that statement?
23       A   So the peer-reviewed publications that
24   are listed in this report.
25       Q   Okay.  Can you tell me which ones they
```

Page 259

```
1   are?
2        A   So the report demonstrates that the risk
3   of mesothelioma exceeds the -- is more sensitive
4   than the risk of ovarian cancer in those
5   populations.
6        Q   Okay.  Can you point to one peer-
7   reviewed publication that supports that statement?
8            MR. ZELLERS:  Objection.  Form.
9            THE WITNESS:  So again, I think if you
10   evaluate each of these publications, you can see
11   that the risk of mesothelioma is more sensitive
12   than the risk of ovarian cancer.
13   BY MR. MEADOWS:
14       Q   How many peer-reviewed publications are
15   there that support that statement?
16       A   So this was an analysis that I did based
17   on the dataset that was available.
18       Q   Are you able to give me a list of the
19   peer-reviewed publications that exist that support
20   that statement?
21       A   So again, it's an analysis of the
22   toxicology dataset that's available, evaluating
23   each study and synthesizing that information.
24       Q   You're not able to tell me one study
25   that supports that statement.
```

Page 260

```
1        A   Well, again, it's general toxicology
2   practice to assess risk.
3        Q   And I'm trying again -- I mean, I -- I'm
4   trying to understand here, but I -- I have not
5   heard you give me a single peer-reviewed published
6   article that -- that supports that statement.  I
7   have no idea what you are using to support that
8   statement.
9        A   It's a general toxicology principle.
10   So, for example, if you're looking at a
11   carcinogenicity study and you see tumors in one or
12   any effect, any kind of adverse effect in one
13   organ system, say at 10 milligrams per cubic -- or
14   10 milligrams per kilogram dose, and then you see
15   another organ system that's affected at 100
16   milligrams per kilogram as well as that one, the
17   organ system that is affected -- that's uniquely
18   affected at the lower dose becomes the more
19   sensitive endpoint.
20       Q   And where does that come from?  What --
21   what peer-reviewed public -- publication says
22   that?
23       A   That's general toxicology information.
24       Q   I understand that's Moore on toxicology,
25   but I need to know about peer-reviewed
```

Page 261

```
1   publications that support that statement.
2            MR. ZELLERS:  Objection.  Form.
3            THE WITNESS:  Sorry, I missed the -- the
4   word that -- that you qualified toxicology with.
5   BY MR. MEADOWS:
6        Q   Well, what I heard was Moore on
7   toxicology and asbestos.  I want to hear -- you
8   haven't published on that, have you?
9        A   So that is --
10           MR. LOCKE:  Objection.
11           THE WITNESS:  -- a general toxicology
12   principle that is applied in all toxicology
13   studies.  So in a toxicology assessment in a
14   carcinogenicity study, that would be a conclusion
15   that I would have made at a study report.
16   BY MR. MEADOWS:
17       Q   You're not going to tell me of a
18   publication that supports that statement, are you?
19           MR. ZELLERS:  Objection.  Form, asked
20   and answered.
21           THE WITNESS:  I cannot think of one off
22   the top of my head.  I can get back to you.
23   BY MR. MEADOWS:
24       Q   Okay.  All right.  So next one.  We'll
25   go on down, page 43.  If I can find it.
```

66 (Pages 258 to 261)

H. Nadia Moore, Ph.D.

Page 262

1          All right, I think I found it.
2          Now I'm lost again.
3          "Assuming that the asbestos fibers were
4   present at the maximum concentration alleged by
5   Drs. Longo and Rigler."
6          Do you see that phrase that you wrote?
7    A   I do see that section.
8    Q   What level are you referring to?
9    A   So that level is a -- is the number --
10   the maximum number of structures that Drs. Longo
11   and Rigler identified in their report in a bottle
12   of Johnson's Baby Powder or Shower to Shower.
13   Q   Now, are you referring to exposure by
14   inhalation here?
15   A   So -- so -- so in that sentence?
16   Q   Well, in that -- that whole section.
17   A   This whole section?
18   Q   Yes.
19   A   Yes, that is inhalation exposure.
20   Q   How about genital application?
21   A   That was not considered.  This was in
22   comparison to the heavily exposed studies that
23   were identified.
24   Q   Okay.  So you're not considering
25   genital -- genital application here.

Page 263

1          MR. ZELLERS:  Objection.  Form.
2          THE WITNESS:  So -- so this was a
3   comparison to the heavily exposed occupational
4   cohorts.
5   BY MR. MEADOWS:
6    Q   Yeah.  So typically don't have much
7   genital application in the occupational setting,
8   do you?
9    A   Presumably not, but you can't -- can't
10   discount that.
11   Q   Well, are you considering that in --
12   that there is a genital application here?
13   A   So this is an exercise of inhalation
14   exposure.
15   Q   What's your understanding of the
16   exposures of the plaintiffs involved in this
17   litigation in the MDL?
18   A   That it's --
19          MR. ZELLERS:  Hold on.  Form, foundation
20   objection.
21          Go ahead.
22          THE WITNESS:  Perineal.
23   BY MR. MEADOWS:
24   Q   And what's your understanding of the
25   frequency of the -- any exposure of the plaintiffs

Page 264

1   in the MDL?
2          MR. ZELLERS:  Same objection.  Form,
3   foundation.
4          THE WITNESS:  Again, I don't know the --
5   the plaintiffs' frequency in this case.  I can talk
6   about what the case-control and cohort studies --
7   BY MR. MEADOWS:
8    Q   What's your understanding of the
9   duration of the exposure of the plaintiffs in the
10   MDL?
11          MR. ZELLERS:  Objection.  Form,
12   foundation.
13          THE WITNESS:  Again, I don't know the
14   plaintiffs in this case.  I'm just evaluating what
15   the scientific dataset is.
16   BY MR. MEADOWS:
17   Q   And what's your understanding of the
18   amount used per application by the plaintiffs in
19   the MDL?
20          MR. ZELLERS:  Same objections.
21          THE WITNESS:  Again -- well, I don't
22   think I've said there before, but dose is -- I --
23   I don't know the plaintiffs.  I don't know what
24   the -- I don't --
25   BY MR. MEADOWS:

Page 265

1    Q   You don't know.
2    A   The dose --
3    Q   You don't have any --
4    A   The dose is -- is a shortcoming of a lot
5   of the -- or all of the case-control and cohort
6   studies.
7    Q   Okay.  Well, that's not what I asked
8   you.  What's your understanding of the amount used
9   per application by the plaintiffs in the MDL?
10          MR. ZELLERS:  Objection.  Form.
11   BY MR. MEADOWS:
12   Q   Do you have an understanding --
13   A   There's --
14   Q   -- of the amount used per application by
15   the plaintiffs in the MDL?
16   A   My analysis was a scientific analysis of
17   the dataset for -- in between talc and the
18   possible cause with ovarian cancer.
19   Q   Yeah, that's not what I asked you.  I'll
20   try it one more time.
21          What's your understanding of the amount
22   used per application of the plaintiffs in the MDL?
23          MR. ZELLERS:  Objection.  Form.
24          THE WITNESS:  Again, my analysis was of
25   the scientific dataset that exists today regarding

67 (Pages 262 to 265)

H. Nadia Moore, Ph.D.

Page 266

1 the relationship between perineal use and ovarian
2 cancer.
3 MR. MEADOWS: Move to strike,
4 nonresponsive.
5 BY MR. MEADOWS:
6 Q All right. Going on down.
7 "The OSHA permissible exposure limit,
8 PEL, for asbestos fibers is more than 4,000 times
9 higher than alleged asbestos exposure from talc."
10 Did I read that correctly?
11 MR. MORIARTY: What page is that?
12 MR. MEADOWS: Same page, 43.
13 THE WITNESS: Yes, you read that
14 correctly.
15 BY MR. MEADOWS:
16 Q What alleged exposure are you referring
17 to?
18 A The exposure that -- that occurs
19 assuming the maximum concentration that Drs. Longo
20 and Rigler found in any of the analysis of bottles
21 of Johnson's Baby Powder and Shower to Shower upon
22 using that with the exposure assumptions that I --
23 that I made on the subsequent pages.
24 Q Is it your opinion that OSHA says
25 there's a safe level of asbestos exposure?

Page 267

1 MR. ZELLERS: Objection. Form.
2 THE WITNESS: So OSHA has set the
3 permissible exposure limit, the PEL, to be
4 protective of workers.
5 BY MR. MEADOWS:
6 Q So you're saying that OSHA has said
7 there's a safe level of asbestos exposure?
8 MR. ZELLERS: Objection. Form.
9 THE WITNESS: I'm saying that at that
10 level, there's been no associations with increased
11 disease.
12 BY MR. MEADOWS:
13 Q What level is that?
14 A 0.1 structures per cc as an eight-hour
15 time-weighted average.
16 (Moore Exhibit No. 15 was marked
17 for identification.)
18 BY MR. MEADOWS:
19 Q I show you what has been marked as --
20 what?
21 MR. ZELLERS: Do you have copies? Oh,
22 okay. Sorry. That's okay.
23 15, Counsel?
24 MR. MEADOWS: P-15.
25 BY MR. MEADOWS:

Page 268

1 Q Dr. Moore, are you familiar with this
2 document?
3 A It appears to be a website from OSHA.
4 Q Okay. And in this document, if you go
5 down, you'll see it's entitled "Asbestos" and
6 talks about what asbestos is.
7 If you go down, "What can be done to
8 reduce hazards of asbestos- -- asbestos?"
9 Look right here that I highlighted
10 already. It says: "There is no safe level of
11 asbestos exposure for any type of asbestos fiber."
12 Did I read that correctly?
13 A You did read that correctly.
14 Q Do you agree with that?
15 MR. ZELLERS: Objection. Form.
16 THE WITNESS: So, I do not agree with
17 that.
18 There are background levels of asbestos
19 everywhere that we're all being exposed to.
20 (Moore Exhibit No. 16 was marked
21 for identification.)
22 BY MR. MEADOWS:
23 Q I show you what's been marked as
24 Plaintiffs' 16.
25 A Thank you.

Page 269

1 Q Are you familiar with that document?
2 A I don't know if I've seen this before or
3 not.
4 Q Okay. Are you familiar with NIOSH?
5 A I do know what NIOSH is.
6 Q Okay. What does it stand for?
7 A So National Institute of Occupational
8 Safety and Health.
9 Q So this is a NIOSH note, right?
10 MR. ZELLERS: Objection. Form,
11 foundation.
12 THE WITNESS: That's what the document
13 title is.
14 BY MR. MEADOWS:
15 Q Okay. Let's just read what's
16 highlighted here.
17 "Findings of joint NIOSH/OSHA work group
18 concerning health effects of asbestos. At a news
19 briefing in Washington on April 17, 1980, the
20 findings of a joint NIOSH/OSHA work group were
21 announced concerning the group's review of recent
22 scientific information about the health effects of
23 asbestos. Present for the briefing were
24 Dr. Anthony Robbins, Director of HEW's National
25 Institute for Occupational Safety and Health."

68 (Pages 266 to 269)

H. Nadia Moore, Ph.D.

Page 270

1       And there are others who were present as
2  well. If you go down it says what doctor wrote --
3  Dr. Robbins said the group had confirmed, and it
4  says: "They confirmed there is no safe exposure
5  limit for asbestos."
6       Did I read that correctly?
7    A   You did read that correctly.
8    Q   And if you go over to the right, I've
9  got more highlights over here.
10      It says: "The group reconfirmed that
11  there is no safe exposure level for asbestos.
12  Although the data suggests that lower exposure
13  results -- lower exposures result in a lower risk
14  of developing cancer, there is no known level
15  below which asbestos-related disease do not
16  occur."
17      Did I read that correctly?
18   A   You did read that correctly.
19   Q   Do you agree or disagree with the
20  statements that I just read?
21      MR. ZELLERS: Objection. Form.
22      THE WITNESS: So this is 1980. I point
23  that out and --
24  BY MR. MEADOWS:
25   Q   And that's significant why?

Page 271

1    A   It was a long time ago.
2    Q   Yeah.
3    A   Yeah. So science evolves every year.
4  I -- scientific datasets, first of all, cannot
5  prove a negative, so you can't prove that exposure
6  doesn't cause a disease. You can only observe --
7  make observations.
8       There are ambient asbestos exposures
9  that everyone is exposed to on a daily basis,
10  without disease occurring. There's thresholds for
11  exposures. There's thresholds for -- there's
12  thresholds for exposures that generate responses.
13      So, and NIOSH is a regulatory
14  organization that's charged with protecting the
15  public. So -- so I -- and I believe there is a
16  threshold for disease with asbestos.
17   Q   What's that based on? What's your
18  belief based on?
19   A   The belief is based on -- on no -- no
20  increased rates of disease with the occupational
21  exposure limit of 0.1 structures per cc.
22   Q   And what -- do you just think that in
23  1980 they just didn't get it? Is that why you
24  reference the fact that it's from 1980?
25      MR. ZELLERS: Objection. Form. She

Page 272

1  testified she hadn't seen this before.
2       THE WITNESS: As I say, it's 1980. I
3  don't -- I'd have to read the context behind all
4  the statements and what was the state of the
5  science at that time.
6  BY MR. MEADOWS:
7    Q   So you disagree with OSHA and NIOSH, at
8  least according to what they said in 1980. Right?
9       MR. ZELLERS: Objection.
10      MR. LOCKE: Objection.
11      MR. ZELLERS: Form. Misstates the
12  evidence.
13  BY MR. MEADOWS:
14   Q   Is that right?
15   A   Is there a question pending? I missed
16  it.
17   Q   I'm just asking you. I mean, I -- you
18  disagree with OSHA and NIOSH in what they stated
19  in 1980, right?
20      MR. ZELLERS: Objection. Form.
21  Misstates the evidence.
22      THE WITNESS: So I agree there's a
23  threshold for asbestos-related disease.
24  BY MR. MEADOWS:
25   Q   Okay. So you disagree with OSHA, NIOSH,

Page 273

1  you disagree with Health Canada, you disagree with
2  FDA, you disagree with a host of experts who have
3  written and been published on the subject of talc
4  and ovarian cancer.
5       Is there anybody that you do agree with?
6       MR. ZELLERS: Objection. Form.
7  BY MR. MEADOWS:
8    Q   Who says that talc is related to ovarian
9  cancer?
10      MR. ZELLERS: Objection. Form,
11  argumentative, misstates the evidence.
12      THE WITNESS: My task in this -- in this
13  work was to do an independent evaluation of the
14  scientific dataset to evaluate the relationship
15  between talc and ovarian cancer. And in doing so,
16  I concluded that the scientific data does not
17  support a causal relationship between the perineal
18  use of talc and ovarian cancer.
19  BY MR. MEADOWS:
20   Q   Right. You disagree with OSHA, NIOSH,
21  FDA, Health Canada, and a laundry list of people
22  who published on this topic. Right?
23      MR. ZELLERS: Objection.
24      MR. LOCKE: Objection.
25      MR. ZELLERS: Asked and answered,

Golkow Litigation Services - 877.370.DEPS

H. Nadia Moore, Ph.D.

Page 274

1    argumentative.
2         THE WITNESS:  Again, that's not what I
3    said.  I said my -- my task was to do an
4    independent evaluation of the scientific dataset.
5    BY MR. MEADOWS:
6         Q   Okay.  Going back to page 43.
7            Next bullet point:  "The lowest
8    cumulative tremolite asbestos concentration
9    associated with mesothelioma is more than 29,000
10   times higher than alleged asbestos exposure from
11   talc."
12           Did I read that correctly?
13        A   Yes, you did.
14        Q   What's your citation for that statement?
15        A   So the citation -- there's multiple
16   citations, but it's the analysis that's contained
17   in the subsequent pages of my report.
18        Q   You can't point me to a citation or two
19   or three that supports that statement?
20        A   So, I mean the -- the anal- -- we can go
21   through the analysis and go through each of the --
22        Q   I'm not asking for your analysis.  I'm
23   asking for you to give me a citation that supports
24   that statement.  Can you give me one?
25        MR. ZELLERS:  Objection.  Form.

Page 275

1            Go through your report and do it.
2            THE WITNESS:  Okay.
3    BY MR. MEADOWS:
4         Q   I'm not asking you to go through your
5    report.  I'm asking you to tell me, do you have a
6    citation for that particular bullet point?
7         A   So there's --
8         Q   I don't see one.  Do you have one?
9         A   So there's many citations in the report,
10   and you have to go through them all in order to
11   get to that --
12        Q   Okay.  So --
13        A   That's -- that's a conclusion that's
14   reached through -- through the next subsequent
15   pages.
16        Q   Okay.  So if we look through your report
17   and the next subsequent pages, we will find a
18   citation that supports that statement.  Is that
19   what you're saying?
20        A   You will find multiple citations that --
21   that support the basis of that statement.
22        Q   You just can't tell me off the top of
23   your head one that supports that statement.
24        MR. ZELLERS:  Objection.  Form.
25           Please do take the time and give

Page 276

1    Mr. Meadows --
2    BY MR. MEADOWS:
3         Q   I'm not asking for that.  I'm not asking
4    for you to go through your statement.
5         MR. ZELLERS:  You are asking.
6    BY MR. MEADOWS:
7         Q   I'm asking you just to give me one --
8    one citation.
9         MR. MEADOWS:  And she can't seem to do
10   it.
11        MR. ZELLERS:  It's --
12        MR. MEADOWS:  All right.  We'll move on.
13        MR. ZELLERS:  Okay.
14   BY MR. MEADOWS:
15        Q   Now, with respect to this statement,
16   what are you referring to in terms of talc
17   exposure?
18        A   I flipped my page.  Sorry.  What page
19   are we on?
20        Q   Same bullet point.
21        MR. ZELLERS:  43.
22   BY MR. MEADOWS:
23        Q   43.
24        A   So the alleged asbestos exposure is
25   again based on the highest concentration of

Page 277

1    structures that were identified in any one bottle
2    of baby powder from Dr. Longo and Rigler's expert
3    report.  And those were converted into airborne
4    concentrations.
5    BY MR. MEADOWS:
6         Q   Okay.  So you're talking in terms of
7    inhalation here, right?
8         A   This analysis is in terms of inhalation.
9         Q   You're not talking in terms of perineal
10   application here, are you?
11        A   This analysis was inhalation in order to
12   compare it to the heavily exposed cohorts that had
13   observed an association with ovarian cancer.
14        Q   Okay.  All right.  Let's go to page 45.
15           And there's a section there at the
16   bottom:  "Converting Dr. Longo and Rigler's bulk
17   measurements to airborne concentrations."
18           Did I read that correctly?
19        A   Yes, sir, you did.
20        Q   And what was your purpose in evaluating
21   air -- airborne exposure?
22        A   It's to understand the concentration of
23   asbestos that could allegedly be in the air,
24   assuming the -- largest number of structures
25   that were reported by Dr. -- Drs. Longo and

H. Nadia Moore, Ph.D.

Page 278

1    Rigler.
2         Q   And when did you undertake the
3    calculations that are found in here?
4         A   During the time I wrote my report.
5         Q   Did anybody assist you in that regard?
6         A   I did the calculations; other people
7    reviewed them.
8         Q   Who did the reviewing?
9         A   I don't recall.  I know Dr. Robbins, an
10   industrial hygienist, reviewed them as well.
11        Q   Dr. Robbins works at Veritox?
12        A   Yes.
13        Q   Again, did you mention him as somebody
14   who's been billing for this?
15        A   No, I had forgotten that those are the
16   only section that they looked at.
17        Q   And what Dr. Robbins -- how long has he
18   been at Veritox?
19        A   It's a she.  Longer than I have.
20        Q   Do you have any notes pertaining to your
21   calculations in that regard?
22        A   No, I don't believe so.
23        Q   Were there drafts of efforts to do the
24   calculations?
25        MR. ZELLERS:  Objection.

Page 279

1         Are the calculations part of the report
2    or are they separate?
3         THE WITNESS:  Yeah, they're -- they're
4    in the report.
5         MR. ZELLERS:  Okay.  Then I'm going to
6    instruct her not to talk about drafts as they're
7    drafts that are part of the report.
8    BY MR. MEADOWS:
9         Q   Were you asked by J&J to make this
10   calculation prior to being engaged as an expert?
11        A   No.
12        Q   Have you published on findings
13   estimating airborne exposure to asbestos with talc
14   use?
15        A   No.
16        Q   Did you consider exposure through
17   perineal application and migration through the
18   upper genital tract as another route of exposure?
19        MR. ZELLERS:  Objection.  Form.
20        THE WITNESS:  So that's pretty -- that's
21   a pretty general statement.  In my report I did
22   consider perineal application -- the potential for
23   perineal application and migration.
24   BY MR. MEADOWS:
25        Q   Well, I'm talking in the context of this

Page 280

1    section of your report.
2         A   The -- this section of my report was an
3    inhalation -- an exercise to understand the
4    inhalation concentrations in order to relate that
5    to the heavy asbestos exposures of the
6    occupational cohorts.
7         Q   So did you do -- did you ever consider
8    or assume that talcum powder, with all of its
9    constituents including asbestos, and -- or the
10   potential for asbestos and heavy metals, did you
11   ever assume that talcum powder does reach the
12   ovaries in any of your calculations?
13        MR. ZELLERS:  Objection.  Form.
14        THE WITNESS:  So I guess -- let me read
15   the question.
16   BY MR. MEADOWS:
17        Q   You want me to try to restate it --
18   reask it?
19        A   Yeah.  Yeah, if you would reask it.
20        Q   Okay.  Assume that talcum powder with
21   all its constituents reach -- reaches the ovaries,
22   have you done any calculations that are relevant
23   to the amount that reaches the ovary?
24        MR. ZELLERS:  Objection.  Form.
25        THE WITNESS:  So I guess I still don't

Page 281

1    understand the hypothetical.
2    BY MR. MEADOWS:
3         Q   Well, all of these calculations that
4    you've done, they've been done in the context of
5    airborne exposure, right?
6         A   This section was an exercise in the
7    inhalation exposure to compare that to inhalation
8    exposures of asbestos.
9         Q   And you -- have you done any -- is there
10   a section in here that considers calculations
11   based on perineal application?
12        A   So in order to understand the potential
13   dose from perineal application, you'd have to make
14   a lot of assumptions that the data do not support.
15   So I did not do that.
16        Q   With respect to airborne analysis, what
17   method did you use to calculate -- calculate
18   airborne concentrations?
19        A   So the method I used to do potential
20   airborne calculations was to review studies that
21   had consumers that had used talc products and
22   measured airborne concentrations of talc itself,
23   pure talc, the talc that's contained in the baby
24   powder, and then I used those concentrations with
25   the maximum concentrations that -- again, the

71 (Pages 278 to 281)

H. Nadia Moore, Ph.D.

Page 282

1  maximum concentration that Drs. Longo and Rigler
2  had reported in any one bottle of Johnson's Baby
3  Powder or Shower to Shower.
4      Q  Going back to your calculations.  Were
5  there any calculations that were done or at least
6  undertaken but not included in the report?
7      A  No.
8      Q  What is the background level of
9  anthophyllite?
10         MR. ZELLERS: Objection.  Form.
11         THE WITNESS: So I addressed the
12  background level of asbestos.
13  BY MR. MEADOWS:
14      Q  Well, did you look at the background
15  levels of the different types of asbestos?
16      A  So the background level of asbestos
17  includes all types of asbestos.
18      Q  Specifically anthophyllite, did you look
19  at that?
20         MR. ZELLERS: Objection.  Form.
21         THE WITNESS: So I would -- if you want
22  to pull out the publication that I used to --
23  BY MR. MEADOWS:
24      Q  No, I didn't ask you that.  I just asked
25  you if you looked at the background level of

Page 283

1  anthophyllite.
2      A  I'm just saying I -- I can't remember
3  off the top of my head.  I'd have to look at that
4  publication to make that distinction.
5      Q  So if you did do it, it would be
6  reflected in your report?
7         MR. ZELLERS: Objection.  Form.
8         THE WITNESS: Again, I'd have to look at
9  that publication to understand the -- the
10  intricacies of your question.
11  BY MR. MEADOWS:
12      Q  What's the background level of
13  tremolite?
14         MR. ZELLERS: Same objection.  Form.
15         THE WITNESS: So there's different types
16  of tremolite.  There's tremolite and then there's
17  tremolite asbestos.  The background -- I reported
18  the asbestos concentration as background -- as
19  general asbestos.
20  BY MR. MEADOWS:
21      Q  Do you have any opinions regarding the
22  presence of fibrous talc in baby powder -- powder
23  or Shower to Shower?
24         MR. ZELLERS: Objection.  Form.
25         THE WITNESS: So my analysis looked at

Page 284

1  the baby powder as it existed in the bottle, and
2  the evidence between exposure to the baby powder
3  or the shower and shower -- Shower to Shower and
4  its propensity to cause ovarian cancer.
5  BY MR. MEADOWS:
6      Q  So my question is, do you have any
7  opinions regarding the presence of fibrous talc in
8  baby powder?
9         MR. ZELLERS: Objection.  Form.
10         THE WITNESS: So, again, I just -- I
11  evaluated what was in the baby powder bottles and
12  the Shower to Shower that had been used in the
13  marketplace.
14  BY MR. MEADOWS:
15      Q  Do you know what fibrous talc is?
16      A  I do.
17      Q  Is fibrous talc found in baby powder?
18         MR. ZELLERS: Objection.  Form.
19  Foundation.
20         THE WITNESS: So I -- to be honest, I
21  evaluated the powder that existed in the bottle,
22  and probably better -- one of the other experts in
23  this matter would be better accustomed or better
24  versed to tell you the -- the makeup of the powder
25  that was in the bottles that I evaluated.

Page 285

1  BY MR. MEADOWS:
2      Q  So you evaluated some powders in -- in
3  bottles?
4      A  So I evaluated the evidence for the
5  products that were used by the consumers.  No, I
6  didn't personally evaluate any powder.
7      Q  Okay.  So who do I need to talk to that
8  you're referring to?
9      A  So, Dr. Dyar, Dr. Wylie, I read their
10  reports.
11      Q  You defer to them on whether there's
12  fibrous talc in baby powder?
13      A  So again, my opinion, this is based on
14  the scientific dataset that exists for the baby
15  powder products that are on the market.
16      Q  But you don't have an opinion one way or
17  the other as to whether or not there's fibrous
18  talc in baby powder as you sit here today?
19         MR. ZELLERS: Objection.  Form.
20         THE WITNESS: So I don't want to
21  speculate.  That's not part of my report and it's
22  not part of my opinions.
23  BY MR. MEADOWS:
24      Q  Well, I'm not asking you to speculate on
25  what your opinion is.  All I'm -- all I'm asking

72 (Pages 282 to 285)

H. Nadia Moore, Ph.D.

Page 286

1    is, do you have an opinion one way or the other as
2    you sit here today as to whether or not baby
3    powder has fibrous talc in it?
4            MR. ZELLERS: Objection. Form.
5            THE WITNESS: Again, I evaluated the
6    product that was in the bottle.
7    BY MR. MEADOWS:
8        Q   And you determined there is or is not
9    fibrous talc in the bottle?
10       A   So I de- -- I looked at the scientific
11   evidence of the material that was in the bottle to
12   cause -- perineal use of the material that was in
13   the bottle to cause ovarian cancer.
14       Q   Would you agree with me or would you
15   agree that chromium is listed as a known human
16   carcinogen by NTP and IARC?
17           MR. ZELLERS: Objection. Form.
18           THE WITNESS: So when we talk about
19   chromium, you need to be specific as to the -- the
20   form that you're specifying.
21   BY MR. MEADOWS:
22       Q   Well, would you agree with me that
23   chromium, regardless of its form, is -- is listed
24   as a known human carcinogen by NTP and IARC?
25           MR. ZELLERS: Objection. Form.

Page 287

1            THE WITNESS: Again, I do know that
2    valance state -- we need to discern the valence
3    state that you're talking about chromium.
4    BY MR. MEADOWS:
5        Q   How about positive 6, is it listed as a
6    known human carcinogen by NTP and IARC?
7        A   Chromium 6 is a known carcinogen listed
8    as a Group 1 carcinogen by IARC.
9        Q   If you go to page 50 of your report.
10   Under the section of "Chromium Key Opinions," you
11   say: "No association has been found between
12   chromium and ovarian cancer in humans or animals."
13           Did I read that correctly?
14       A   Correct.
15       Q   Are you saying that chromium is not
16   carcinogenic?
17           MR. ZELLERS: Objection. Form.
18   Misstates the evidence.
19           THE WITNESS: That's not what I said.
20   BY MR. MEADOWS:
21       Q   You agree that IARC and NTP have found
22   chromium to be carcinogenic, correct?
23           MR. ZELLERS: Objection. Form.
24   Misstates the evidence.
25           THE WITNESS: So IARC has found -- has

Page 288

1    concluded that chromium 6 is a Group 1 carcinogen.
2    BY MR. MEADOWS:
3        Q   The only way you could confirm if it's
4    carcinogenic to the ovary would be to expose it to
5    the ovary, right?
6            MR. ZELLERS: Objection. Form,
7    foundation.
8            THE WITNESS: That's not how
9    carcinogenicity studies occur.
10   BY MR. MEADOWS:
11       Q   Well, it would be unethical to put a
12   carcinogen in a human, wouldn't it?
13           MR. ZELLERS: Objection. Form,
14   foundation.
15           THE WITNESS: When I test or when
16   toxicologists test for carcinogenic action, we use
17   animal models, which is what was done with
18   chromium.
19   BY MR. MEADOWS:
20       Q   Yep. And so in order to make a
21   determination as to whether or not it's
22   specifically carcinogenic to the ovary, then you
23   would have to subject it to the ovary to make that
24   final determination, wouldn't you?
25           MR. ZELLERS: Objection. Form.

Page 289

1    Foundation.
2            THE WITNESS: So in carcinogenicity
3    studies, in cancer studies, we dose animals and
4    evaluate all organs for effects. There's systemic
5    doses of the test article, like chromium 6, to the
6    animals, and then we evaluate where in the animal,
7    which organs are affected, and it depends on the
8    test article which organs are affected.
9    BY MR. MEADOWS:
10       Q   Do you agree that cobalt is listed as a
11   possible human carcinogen by IARC?
12       A   So IARC has different carcinogenicity
13   ratings based on what type of cobalt the exposure
14   is to.
15       Q   Right. And specifically, cobalt is
16   listed as a possible human carcinogen by IARC and
17   as being reasonably anticipated to be a human
18   carcinogen by NTP, right?
19           MR. ZELLERS: Objection. Form,
20   foundation.
21           THE WITNESS: Cobalt metal without
22   tungsten carbide is possibly carcinogenic by IARC,
23   a Group 2B. Cobalt sulfate and other soluble
24   cobalts(II) salts are possibly carcinogenic to
25   humans as determined by IARC. In other words,

H. Nadia Moore, Ph.D.

Page 290

1    Group 2B.  And cobalt metal with tungsten
2    carbon -- carbide is probably carcinogenic to
3    humans as determined by IARC, and its
4    classification is Group 2A.
5    BY MR. MEADOWS:
6        Q    Nickel, page 62 of your report, and you
7    say:  "No association has been found between
8    exposure to nickel and ovarian cancer in animals
9    or humans."  Right?
10       A    Yes, that's the statement.
11       Q    Nickel is listed as a known human
12   carcinogen by IARC and by NTP, right?
13           MR. ZELLERS: Objection.  Form.
14   Foundation.
15           THE WITNESS:  So nickel compounds in
16   general are listed as a Group 1 carcinogenic to
17   humans by R -- by IARC.
18   BY MR. MEADOWS:
19       Q    All right.
20           THE WITNESS:  Is now a good time for a
21   break or --
22           MR. MEADOWS:  If you need a break,
23   that's fine.
24           THE WITNESS:  Is that okay?
25           MR. MEADOWS: Sure.  Sure.

Page 291

1            THE VIDEOGRAPHER:  The time is 4:40 p.m.
2    We're going off the record.
3            (Recess.)
4            THE VIDEOGRAPHER:  The time is 5:00
5    p.m., and we're back on the record.
6    BY MR. MEADOWS:
7        Q    All right.  We'll go back to your
8    report, page 87.
9            Go down here to -- under "Science-based
10   Concerns."  "Opinions by some of plaintiffs'
11   experts that any exposure to a carcinogen can
12   cause cancer are not consistent with generally
13   accepted methods used by toxicologists to analyze
14   and assess risk to human health."
15           And then under that -- let's see here.
16   Make sure I'm in the right place.  Okay.  Sorry.
17           "A number of plaintiffs' experts,
18   including Dr. Crowley, take the position that it
19   would suffice to establish that talcum powder or
20   its alleged constituents are carcinogenic because
21   any exposure to a carcinogen can cause cancer, but
22   this position lacks scientific support.
23   Carcinogens exist everywhere."
24           That's what you said, right?
25       A    That -- you read my report correctly.

Page 292

1        Q    Okay.  Now, I want to go to
2    Dr. Crowley's report.
3            (Counsel conferring.)
4            MR. MEADOWS:  Give us just a minute.
5    We've gotten some -- I think some typos here that
6    have me confused.
7            Okay.  All right.
8    BY MR. MEADOWS:
9        Q    So with respect -- with reference to
10   Dr. Crowley, I want to ask you some questions
11   about that, and I have Dr. Crowley's report here,
12   which I assume you've read, right?
13       A    I have read his report.
14       Q    You spent a lot of time responding to
15   his report, right?
16       A    So I critiqued the methods that he used
17   in his report.
18       Q    So now we're -- you're willing to use
19   the word "critique"?
20       A    Well --
21           MR. ZELLERS: Objection.  Form.
22   BY MR. MEADOWS:
23       Q    Okay.  I like the word "critique"
24   because I think that's exactly what you did --
25       A    Well --

Page 293

1            MR. ZELLERS:  Well, hold on.  There's no
2    question.
3    BY MR. MEADOWS:
4        Q    -- as opposed to respond.
5            MR. ZELLERS:  No question.
6    BY MR. MEADOWS:
7        Q    So, yes, you did spend a lot of time
8    critiquing Dr. Crowley's report, along with a
9    number of the other experts.
10           And that's what you did here when you
11   said:  "A number of plaintiffs' experts, including
12   Dr. Crowley, take the position that it would be --
13   it would suffice to establish that talcum powder
14   or its alleged constituents are carcinogenic
15   because any exposure to a carcinogen can cause
16   cancer, but this position lacks scientific
17   support.  Carcinogens exist everywhere."
18           Right?  That's what you said.  Yes, you
19   said that?
20           MR. LOCKE:  Objection.
21           THE WITNESS:  So I -- I'm not clear if
22   there was a question or if I'm just agreeing with
23   what -- what you said my report said.
24   BY MR. MEADOWS:
25       Q    Yeah, that's what I just read.  I just

H. Nadia Moore, Ph.D.

Page 294

1    read from your report.
2        A    I know, but you started by saying
3    something else.  That's why I was trying to read
4    the monitor.
5        Q    Okay.  All right.  Well, suffice to --
6    let's read this again.  I want to make sure we're
7    on the same page.
8        A    Okay.
9        Q    You say in your report, it's up on the
10   screen: "A number of plaintiffs' experts,
11   including Dr. Crowley, take the position that it
12   would suffice to establish that talcum powder or
13   its alleged constituents are carcinogenic because
14   any exposure to a carcinogen can cause cancer, but
15   this position lacks scientific support.
16   Carcinogens exist everywhere."
17       You said that, correct?
18       A    You read that correctly, yes.
19       Q    Okay.  Actually, I want to go -- I want
20   to go to what Dr. Crowley actually says in his
21   report.
22       A    Can I have a copy, please?
23       Q    Well, it's up there on the screen.
24       MR. ZELLERS:  Well, she needs a copy if
25   she's going to address questions.

Page 295

1        MR. MEADOWS:  Can we have his report?
2    BY MR. MEADOWS:
3        Q    Looky there, we killed a tree for you.
4        A    Thank you.
5        MR. ZELLERS:  And I'm sorry, do you have
6    another or -- you don't want to take them all back
7    anyway.  Thank you.
8        THE WITNESS:  Do you have to put a
9    number on this one or --
10       MS. TUCKER:  No.  That's okay.
11       THE WITNESS:  Okay.
12   BY MR. MEADOWS:
13       Q    All right.  So we're on page 65 of
14   Dr. Crowley's report.
15       It says: "Accordingly" --
16       MR. ZELLERS:  Hold on.  Hold on.
17       THE WITNESS:  Hold on a second.  I want
18   to get there.
19       All right.
20   BY MR. MEADOWS:
21       Q    There?
22       "Accordingly, in my opinion, the
23   fragrance chemicals in the Johnson & Johnson
24   talcum powder products contribute to the potential
25   inflammatory properties, toxicity and potential

Page 296

1    carcinogenicity of these products."
2        Did I read that correctly?
3        A    Yes, you did read that correctly.
4        (Counsel conferring.)
5    BY MR. MEADOWS:
6        Q    Okay.  I'm being told we need to mark --
7    we need to mark this.  So let's mark it as
8    Exhibit 17.
9        (Moore Exhibit No. 17 was marked
10       for identification.)
11   BY MR. MEADOWS:
12       Q    There you go.  And that's Dr. Crowley's
13   report.
14       A    Thank you.
15       Q    We're going to get this question and
16   exchange off the ground here shortly.  It's a long
17   taxi, but we're getting there.
18       Okay.  So Dr. Crowley actually says:
19   "Accordingly, in my opinion, the fragrance
20   chemicals in the Johnson & Johnson talcum powder
21   products contribute to the inflammatory
22   properties, toxicity, and potential
23   carcinogenicity of these products."
24       Did I read that correctly?
25       A    You did read that correctly.

Page 297

1        Q    So do you disagree with Dr. Crowley's
2    opinion that the fragrance chemicals added to the
3    powder can contribute to the inflammatory
4    properties?
5        MR. ZELLERS:  Objection.  Form.
6        THE WITNESS:  So I think -- can you just
7    restate that question one more time?
8    BY MR. MEADOWS:
9        Q    Yeah.  My question is, do you disagree
10   with Dr. Crowley's opinion that the fragrance
11   chemicals added to the powder could contribute to
12   the inflammatory properties of the powder?
13       MR. ZELLERS:  Objection.  Form.
14       THE WITNESS:  So that question assumes
15   that there are inflammatory properties of the
16   powder.
17   BY MR. MEADOWS:
18       Q    Okay.  So you disagree with
19   Dr. Crowley's statement, I assume because you
20   don't think that there are any inflammatory
21   properties; is that right?
22       MR. ZELLERS:  Objection.  Form.
23       THE WITNESS:  So I think that it's
24   important to understand dose when we're evaluating
25   different situations and chemicals and potential

Page 298

1 toxicities.
2 BY MR. MEADOWS:
3 Q Okay. You think that Dr. Crowley
4 disagrees with that?
5 MR. ZELLERS: Form, foundation
6 objection.
7 THE WITNESS: I don't understand what --
8 BY MR. MEADOWS:
9 Q And I don't understand your response. I
10 mean, I just simply asked you if you disagreed
11 with Dr. Crowley's opinion that the fragrance
12 chemicals added to the powder could contribute to
13 the inflammatory properties of -- of the powder.
14 So what's your answer to that?
15 MR. ZELLERS: Objection. Form.
16 THE WITNESS: So again, my answer to
17 that is you have to understand dose as well assume
18 that there is inflammatory properties to
19 contribute to.
20 BY MR. MEADOWS:
21 Q Okay. So what do you -- what do you
22 assume are not assumed with regard to the
23 inflammatory properties?
24 MR. ZELLERS: Objection. Form, vague.
25 THE WITNESS: So can you restate that?

Page 299

1 BY MR. MEADOWS:
2 Q Well, what do you assume or not assume
3 regarding the inflammatory properties of -- of
4 baby powder?
5 MR. ZELLERS: Same objection.
6 THE WITNESS: So I've evaluated the
7 literature in this regard, and at high enough
8 doses, you get a foreign body reaction to the
9 talcum powder.
10 BY MR. MEADOWS:
11 Q Okay. And we know that powder -- that
12 baby powder should not be on open -- used on an
13 open -- open skin or a wound, right?
14 MR. ZELLERS: Objection. Form,
15 foundation, asked and answered.
16 THE WITNESS: Again, I'd have to
17 evaluate those -- the -- the article, the sentence
18 that we -- the one sentence that we evaluated
19 attributed that statement to case -- case reports,
20 and I would have to evaluate those case reports to
21 understand what the dose was in that setting.
22 BY MR. MEADOWS:
23 Q No, but you agreed when we were having
24 that discussion of the CIR report, CIR finding,
25 that -- that talc can cause granulomas, did you

Page 300

1 not?
2 A Okay. So I guess I'm confused with the
3 state -- the statements that you're having me
4 agree or disagree to. I thought we were just
5 discussing the skin --
6 Q Yeah, and I -- let's try this again,
7 because I -- I feel like my question is pretty
8 simple, but I feel like you're taking me to
9 something else that has to do with dose. I hadn't
10 asked you anything about dose.
11 So my question is, do you disagree with
12 Dr. Crowley's opinion that fragrance chemicals
13 added to the powder could contribute to the
14 inflammatory properties of the powder?
15 MR. ZELLERS: Objection. Form, asked
16 and answered.
17 THE WITNESS: Again, that statement has
18 to incorporate dose in order to evaluate it.
19 BY MR. MEADOWS:
20 Q Well, are you aware that, irre- --
21 irrespective of what CIR says -- because I know
22 you're getting hung up on the case-control thing
23 that's in that paragraph -- irrespective of that,
24 are you aware of the fact that it is not
25 recommended that baby powder be used on open skin

Page 301

1 or a wound?
2 MR. ZELLERS: Objection.
3 BY MR. MEADOWS:
4 Q Are you aware of that?
5 MR. ZELLERS: Form, foundation.
6 THE WITNESS: You'd have to show me that
7 document, and I can evaluate that.
8 (Counsel conferring.)
9 (Moore Exhibit No. 18 was marked
10 for identification.)
11 BY MR. MEADOWS:
12 Q Let me show you what I marked as
13 Exhibit 18.
14 Are you familiar with the -- the baby
15 powder bottle?
16 A In general, that's in the baby powder
17 bottle.
18 Q Well, did you look at the baby powder
19 bottle at all when you were preparing your report?
20 A So again, my task here was to evaluate
21 the scientific evidence and the dataset that
22 exists between perineal use of talc, use of talc
23 and development of ovarian cancer.
24 Q Yeah, and my question is simply, did you
25 look at the baby powder bottle as a part of your

76 (Pages 298 to 301)

H. Nadia Moore, Ph.D.

Page 302

1 efforts to prepare your report? Either you did or
2 you didn't. I'm just asking if you did.
3        MR. LOCKE: Objection.
4        THE WITNESS: So I evaluated the
5 scientific data that -- that was germane to my
6 report. I -- there was -- I mean, I can't say if
7 I did or if I did not review specifically the baby
8 powder bottle in reference to this case.
9 BY MR. MEADOWS:
10       Q   Okay. Well, did you read all of
11 Dr. Plunkett's report?
12       A   It's been a long time. I read through
13 it. I don't know if I read every word or not.
14       Q   Did you read all of the materials that
15 Dr. Plunkett cited to in support of her report?
16       A   Are you talking about every reference
17 that she cited in her report?
18       Q   Yeah.
19       A   I don't know if I read every one. I
20 didn't go one by one. We can go one by one and
21 compare it to my list if you'd like.
22       Q   Did you read all of Dr. Crowley's
23 report?
24       A   I did read Dr. Crowley's report. I
25 don't know if I read every page of the references

Page 303

1 and appendix and things, but -- sorry, of the
2 appendices. I didn't mean references.
3        Q   Exhibit 18 is a compilation of pictures
4 of various body powders. The first one is baby
5 powder.
6            Were you aware before looking at this
7 that the ingredients to baby powder are talc and
8 fragrance?
9        A   I was aware that those are the
10 ingredients.
11       Q   And there's a section next to the baby
12 with an X or the face with an X over the mouth.
13 It says "Warning." Do you see that?
14       A   I can see where it says that.
15       Q   "Keep powder away from child's face to
16 avoid inhalation, which can cause breathing
17 problems."
18            Were you aware that children can have
19 breathing problems as a result of inhaling baby
20 powder?
21       MR. ZELLERS: Objection. Form,
22 foundation.
23            THE WITNESS: So this again, this gets
24 towards dose.
25 BY MR. MEADOWS:

Page 304

1        Q   Okay. Well, I didn't ask you anything
2 about dose. I'm just asking you, were you aware
3 that children can have breathing problems from
4 inhaling baby powder?
5        MR. ZELLERS: Form, foundation
6 objection.
7            THE WITNESS: So --
8 BY MR. MEADOWS:
9        Q   Were you aware of it or not? I mean
10 that's all I'm asking.
11       MR. ZELLERS: Same objections. Give her
12 a chance to answer, please.
13            THE WITNESS: I was aware that the
14 hazard for inhalation of particles exists, yes.
15 BY MR. MEADOWS:
16       Q   Next sentence --
17       A   As long as there's enough dose, it's
18 treated as a hazard.
19       Q   Next sentence.
20       A   A risk.
21       Q   "Avoid contact with eyes."
22            Why would that be significant?
23       A   So these are warning labels on -- on the
24 label. I'm not a warnings expert. I don't know
25 what the -- what the rationale is for that label.

Page 305

1        Q   So in your studies of the potential ill
2 effects of baby powder, you haven't run across any
3 literature that might shed any light on why that
4 warning would be on there?
5        MR. ZELLERS: Hold on. Form, foundation
6 objection.
7            THE WITNESS: Yeah, I can speculate,
8 based on my general knowledge of particles, why
9 those warnings would be on there, but it would be
10 a lot nicer to see the documentation that supports
11 those -- why those warnings were put on there.
12 BY MR. MEADOWS:
13       Q   I'm not asking you to speculate, but as
14 a toxicologist, I just -- maybe it's not your area
15 of expertise. But -- but I would assume a
16 toxicologist would know why a substance could
17 cause problems with various parts of the body,
18 especially if they've been studying it for the
19 last couple of months and getting paid for it.
20            What -- do you not know why that would
21 be a problem to get baby powder in your eyes?
22       MR. ZELLERS: Objection. Form.
23 Foundation. Argumentative.
24            THE WITNESS: Again, I'd be speculating
25 as to the exact reasons these warnings were put

77 (Pages 302 to 305)

H. Nadia Moore, Ph.D.

Page 306

1  on. They're preventative warnings or based on
2  scientific data. I -- I would need the scientific
3  data to see why those labels were put on there.
4  Otherwise, it would be pure speculation or guess,
5  and that's not what I'm here today to do.
6  BY MR. MEADOWS:
7      Q   The next sentence says: "For external
8  use only."
9          Did I read that correctly?
10     A   Yes.
11     Q   What would baby powder do if it was used
12  internally?
13         MR. ZELLERS: Objection. Form.
14  Foundation.
15         THE WITNESS: Again, that's a pretty
16  generic question. So specifically, where
17  internally? What is the dose internally? It's a
18  lot of generalization in that question.
19  BY MR. MEADOWS:
20     Q   Mm-hmm. Well, do you think that that
21  admonition or that warning "For external use only"
22  has anything to do with the CIR comments about not
23  allowing baby powder to be used on an exposed
24  dermal?
25         MR. ZELLERS: Objection to form.

Page 307

1  BY MR. MEADOWS:
2      Q   Or -- or an area --
3          MR. ZELLERS: Sorry.
4  BY MR. MEADOWS:
5      Q   -- that does not have a dermal barrier?
6          MR. ZELLERS: Objection. Form.
7  Foundation. Speculation.
8          THE WITNESS: So these are warnings that
9  the manufacturer put on based on a set of criteria
10  that -- that we're not evaluating here today. I'd
11  need to see those set of criteria and the
12  scientific data that support those decisions that
13  were made to put those warning labels on the
14  bottle.
15  BY MR. MEADOWS:
16     Q   Well, as a toxicologist, isn't it
17  important for you to understand potential toxicity
18  of -- of whatever you're studying at the time,
19  regardless of -- of where it's applied and how
20  much it's applied?
21         MR. ZELLERS: Same objections. Form,
22  foundation.
23         THE WITNESS: So I evaluated the
24  scientific dataset for Johnson's Baby Powder and
25  Shower to Shower, the studies that are available

Page 308

1  and the scientific literature, to evaluate -- to
2  come to my conclusions that are spelled out in my
3  report.
4          And I'm happy to discuss each one of
5  those studies, and we can go through it as to why
6  or why not it may apply to one of these warning
7  labels. But without knowledge of the criteria
8  that the manufacturer used in putting these
9  warning labels on the bottle, it would be complete
10  speculation to guess.
11  BY MR. MEADOWS:
12     Q   Are you aware that there are other
13  products on the market now that provide a warning
14  regarding ovarian cancer?
15     A   No, I did not know that.
16     Q   Let's look at a couple of them. Next
17  page.
18         Angel of Mine Baby Powder. Are you
19  familiar with that product?
20     A   No, I've never heard of it.
21     Q   If you go down here, it says: "This
22  product contains talcum powder."
23     A   Wait. Where are we?
24     Q   Down here (indicating).
25     A   Oh, I see. Okay.

Page 309

1      Q   It has a similar warning. "Keep out of
2  reach of children. For external use only. Avoid
3  contact with eyes. Discontinue use if irritation
4  persists. Avoid ingestion or accidental
5  inhalation by baby."
6          This -- and then it says in bold: "This
7  product contains talcum powder and it is intended
8  for external use only. Frequent application of
9  talcum powder in the female genital area may
10  increase the risk of ovarian cancer."
11         Did I read that correctly?
12     A   I believe you read that correctly, yes.
13     Q   Have you ever seen that before?
14     A   So I hadn't seen this product before,
15  and I had not seen the label before. And I do not
16  know, again, what the criteria the manufacturer
17  used in developing this warning label.
18         In my -- in my review of the scientific
19  dataset, scientific dataset does not support that
20  talcum powder use in the perineal region is a
21  cause of ovarian cancer.
22     Q   The next one, next page is called
23  "Shower and Bath." And this one has a warning
24  that says: "This product contains talcum powder
25  and is intended for external use only. Frequent

78 (Pages 306 to 309)

H. Nadia Moore, Ph.D.

Page 310

1   application of talcum powder in the female genital
2   area may increase the risk of ovarian cancer."
3        Do you see that?
4        A   Yes, you read that correctly from the
5   label.
6        Q   It's different from the Johnson's Baby
7   Powder labels, isn't it?
8        A   Well --
9            MR. ZELLERS:  Objection -- hold on.
10  Objection.  Form.
11           Go ahead.
12           THE WITNESS:  Well, again, I do not know
13  what the criteria was for the manufacturer to
14  decide to put this label on the -- onto the powder
15  bottle.
16           What I can say is the scientific dataset
17  does not support that there's a causal association
18  or that perineal use of ovarian -- sorry.  I can
19  say that scientific -- the scientific dataset does
20  not support a causal relationship between the
21  perineal use of talc, talcum products, and the
22  development of ovarian cancer.
23  BY MR. MEADOWS:
24       Q   If you go down on this under
25  "Ingredients," it talks about ingredients being --

Page 311

1   this one has talc and cornstarch.
2            Were you aware that some body powders
3   contain cornstarch?
4        A   Yes, some body -- I was aware that some
5   body powders contain cornstarch.
6        Q   And have you looked at the
7   carcinogenicity capacity for cornstarch?
8        A   So what I said is I evaluated the
9   scientific dataset for Johnson's Baby Powder and
10  Shower to Shower.
11       Q   Okay.  Well, I understand that's what
12  you evaluated for your report.  I'm asking you if
13  you've ever looked at the carcinogenicity for
14  cornstarch.
15       A   I have not done a comprehensive
16  literature review or assessment of cornstarch.
17       Q   Then there's one more here, I think.  I
18  think the last one here is a foot powder.  One
19  more body powder on here.
20           Next page.  This is Spring Fresh Poudre
21  Talco.  And it's -- it's got talc in it.  And a
22  caution down here.  "For adult use only.  Keep out
23  of reach of children.  If the product enters the
24  eye, wash out thoroughly with plenty of clean
25  water.  Keep powder away from children's mouth --

Page 312

1   nose and mouth.  Medical evidence suggests that
2   women who use talcum powder as a feminine hygiene
3   product run a greater risk of developing ovarian
4   cancer."
5            Did I read that correctly?
6        A   You did read that statement correctly.
7        Q   There's --
8        A   But this -- this statement is internally
9   inconsistent.  So again, I have no idea, you know,
10  what was the rationale for the manufacturer to put
11  on that statement.
12       Q   And you said it earlier, you're not a
13  regulatory expert, right?  Not a warnings expert?
14       A   I do not know the regulations regarding
15  the warnings, but what I can say is -- and I
16  definitely don't know what -- what criteria they
17  used for this cautionary statement that's on here.
18       Q   Mm-hmm.
19       A   You know, they say, "For adult use
20  only," and then they include, "Keep powder away
21  from children's nose and mouth," like -- so,
22  again, I don't know what the review process was,
23  what the scientific dataset was that they used to
24  make up that caution statement or that they added
25  to that label.

Page 313

1        Q   Now, to make sure I'm clear, I know you
2   have not offered opinions as a regulatory expert
3   in this case, but I want to make sure I have an
4   understanding.  Do you have -- you didn't claim
5   expertise in -- in regulatory matters earlier.  Do
6   you have expertise in regulatory matters?
7        A   So that's a pretty broad term.
8        Q   Cosmetics.  Do you have expertise in the
9   regulation of cosmetics?
10       A   Just in -- in the realm of a
11  toxicologist.
12       Q   But you don't know anything about when a
13  warning is triggered -- a warning requirement is
14  triggered in the cosmetic context?
15           MR. ZELLERS:  Form, foundation
16  objection.
17           THE WITNESS:  So, no, I wouldn't know
18  that.
19  BY MR. MEADOWS:
20       Q   Okay.  Going back to Dr. Crowley's
21  opinion.  Do you disagree with Dr. Crowley's
22  opinion that the fragrance chemicals added to the
23  powder could contribute to the toxicity of the
24  powder?
25           MR. ZELLERS:  Objection to form.

Page 314

1    THE WITNESS:  Could you just state that
2  again in a different manner?
3  BY MR. MEADOWS:
4    Q   Yeah.  Do you disagree with
5  Dr. Crowley's opinion that the fragrance chemicals
6  added to the powder could contribute to the
7  toxicity of the powder?
8    MR. ZELLERS:  Same objection.
9    THE WITNESS:  So Dr. Crowley's
10  methodology that he used to assess the fragrance
11  ingredients did not assess dose, and that is a
12  critical component in any toxicological
13  assessment.  So I disagree with the methods that
14  he used in a -- in reaching any conclusions.
15  BY MR. MEADOWS:
16    Q   Do you disagree with Dr. Crowley's
17  opinion that the fragrance chemicals added to the
18  powder could contribute to the potential
19  carcinogenicity of the powder?
20    MR. ZELLERS:  Object to form.
21    THE WITNESS:  So again, I said what I
22  disagreed with -- what I disagree with Dr. Crowley
23  is the methodology that he used to generate his
24  opinions that -- because he did not assess dose in
25  any of his opinions, in any of his methods that he

Page 315

1  used to generate his opinions, and so his methods
2  were flawed.
3  BY MR. MEADOWS:
4    Q   Applying general principles of
5  toxicoly -- -cology -- let me start again.
6  Remember that cold I told you about earlier?  It's
7  catching up to me.
8    Applying general principles of
9  toxicology, is it acceptable and a good practice
10  to add fragrance chemicals to baby powder that do
11  not have an established governmental or industry
12  standard?
13    MR. ZELLERS:  Objection.  Form,
14  foundation.
15    THE WITNESS:  So I guess I don't
16  understand -- which -- which bullet point are you
17  now referencing?
18  BY MR. MEADOWS:
19    Q   I'm just talking about Dr. Crowley's
20  opinions, generally.
21    A   Generally?
22    Q   Yeah.
23    A   So generally, I think we need to look
24  at -- at my report to assess the ingredients.
25    Q   Well, all I asked you is a general

Page 316

1  toxicological principle.
2    A   Okay.
3    Q   Applying general principles of
4  toxicology, is it acceptable or a good practice to
5  add fragrance chemicals to baby powder that do not
6  have an established governmental or industry
7  standard?
8    MR. ZELLERS:  Objection.  Form.
9  Foundation.
10    THE WITNESS:  So the reason I'm having
11  problems with that statement is the -- the way
12  that Dr. Crowley identified the industrial
13  standards that he applied in his report were
14  flawed.
15  BY MR. MEADOWS:
16    Q   Applying general -- excuse me --
17  applying general principles of toxicology, is it
18  acceptable or a good practice to add a substance
19  to baby powder that is prohibited as a fragrance
20  chemical and is not permitted for use on the body?
21    MR. ZELLERS:  Objection.  Form.
22  Foundation.
23    THE WITNESS:  Well, again, if we look
24  at -- can we look at my report for the fragrance
25  that Dr. Crowley references that's prohibited?

Page 317

1  Because he was actually incorrect in his methods
2  to evaluate the fragrance chemicals.
3  BY MR. MEADOWS:
4    Q   Well, mine is just a general principle
5  question.
6    Applying general principles of
7  toxicology, is it acceptable or a good practice to
8  add a substance to baby powder that is prohibited
9  as a fragrance chemical and is not permitted for
10  use in the body?
11    MR. ZELLERS:  Objection.  Form,
12  foundation, asked and answered.
13    THE WITNESS:  Again, we'd have to --
14  Dr. Crowley's -- his -- the entire reason he
15  generated that statement was because he identified
16  a chemical using flawed methodology.
17  BY MR. MEADOWS:
18    Q   Applying general principles of
19  toxicology, is it acceptable or a good practice to
20  add a substance to baby powder that is not
21  permitted for fragrance or flavor use?
22    MR. ZELLERS:  Objection.  Form,
23  foundation.
24    THE WITNESS:  Again, Dr. Crowley
25  identified the ingredient that we're talking about

H. Nadia Moore, Ph.D.

Page 318

1    in this exchange based on flawed methodology.
2    BY MR. MEADOWS:
3        Q   Applying general principles of
4    toxicology, is it acceptable or a good practice to
5    add a substance to baby powder that is not
6    permitted for cosmetic use by the FDA?
7        MR. ZELLERS: Objection. Form.
8    Foundation.
9        THE WITNESS: Again, the substance that
10   we're speaking of was identified by Dr. Crowley
11   using scientifically flawed methodology.
12   BY MR. MEADOWS:
13       Q   Applying general principles of
14   toxicology, is it acceptable or a good practice to
15   add a substance to baby powder that is not a
16   fragrance, does not have an IFR standard, and is
17   not listed by CIR?
18       MR. ZELLERS: Objection. Form.
19   Foundation.
20       THE WITNESS: So you'd have to evaluate
21   each substance independently. And again, you
22   know, each -- Dr. Crowley's methodology was flawed
23   when he identified many substances that he
24   characterized -- and I'm sorry, I don't know what
25   the IFR standard is.

Page 319

1    BY MR. MEADOWS:
2        Q   You're not familiar with the IFR
3    standard -- IFRA standard, you're not familiar --
4        A   The IFR -- the IFRA standard, yeah.
5        Q   You're not -- you're not familiar --
6        A   Sorry, I am.
7        Q   You are familiar.
8        A   I am familiar with -- so you're talking
9    about the International Fragrance Association
10   standards? That -- can we spell out the acronym,
11   please?
12       Q   Sure. Is that what it is?
13       A   Is that -- I'm asking you.
14       Q   Yeah.
15       MR. ZELLERS: Objection. Vague.
16   Ambiguous.
17       (Counsel conferring.)
18   BY MR. MEADOWS:
19       Q   Applying general principles of
20   toxicology, is it acceptable or a good practice to
21   add a substance to baby powder that's not
22   permitted in cosmetics according to the Cosmetic
23   Ingredient Review Expert Panel?
24       MR. ZELLERS: Objection. Form.
25   Foundation.

Page 320

1        THE WITNESS: Again, I would have to
2    evaluate each chemical independently. This is a
3    esoteric question, so...
4    BY MR. MEADOWS:
5        Q   What was flawed about his methodology
6    with respect to these questions?
7        A   So he -- well, we can go through his
8    report.
9        Q   Well, if you want to look and tell me,
10   if looking at your report will refresh your
11   recollection about what was flawed about his
12   methodology with respect to adding these
13   substances to baby powder, then go right ahead.
14       MR. ZELLERS: Objection. Form. Asked
15   and answered.
16   BY MR. MEADOWS:
17       Q   You seem to be insinuating that he was
18   using the wrong chemical in his methodology. But
19   maybe I'm wrong in my assumption.
20       A   (Peruses document.)
21       Q   Go ahead.
22       A   So for myroxylon pereirae, the Balsam
23   Peru oil, on page 79 of my report, this is my
24   criticism.
25       Q   Okay.

Page 321

1        A   So he ascertains that this -- it's
2    called Balsam Peru oil, if that's okay, is
3    prohibited by the International Fragrance
4    Association for use as a fragrance ingredient.
5    And so that was incorrect.
6        In his search, he failed to recognize
7    the difference -- that there were actually two
8    different Balsam Peru extractor distillates in --
9    in this, and that they shared the same cast
10   number.
11       So that's what I was describing earlier
12   when -- with the prohibited substance involvement
13   in -- potentially in -- added to the fragrance
14   material that was added to Johnson & Johnson.
15       Q   Okay. So you're saying that his
16   methodology was flawed because he misidentified
17   Balsam Peru oil as a -- a banned fragrance
18   chemical.
19       A   That was one of the problems.
20       Q   Okay. Were there other chemicals that
21   he got wrong?
22       A   Well, I wouldn't say -- the
23   methodology -- I wouldn't say that he got it
24   wrong. The methodology that he used was not
25   correct.

81 (Pages 318 to 321)

H. Nadia Moore, Ph.D.

1    Q   But my question is, were there other
2   chemicals other than the Balsam Peru oil that he
3   got wrong?
4        A   Well, his --
5            MR. ZELLERS:  Objection.  Form.
6            THE WITNESS:  So -- let me just find --
7   so in his -- so in his report, he identified
8   chemicals with IFRA standards as potential
9   concerns in the -- the baby powder, and then ones
10  without it were -- were not included.  So he
11  missed the entire IFRA transparency list
12  evaluation in his report.
13  BY MR. MEADOWS:
14       Q   All right.  Dr. Carson.
15           MR. MEADOWS:  Do you have that?
16  BY MR. MEADOWS:
17       Q   I want to -- I think we're going to --
18  make sure I'm right.
19           (Counsel conferring.)
20  BY MR. MEADOWS:
21       Q   Okay.  So page 83 of your report, you
22  say:  "Because Dr. Carson did not consider the
23  nature and magnitude of doses associated with
24  human risk, his analysis is not consistent with
25  generally accepted scientific methodology."

1        Did I read that correctly?
2        A   Yes, you read that correctly.
3        Q   Okay.  So let's take a look at what
4   Dr. Carson actually said.
5            MR. MEADOWS:  What exhibit are we?
6            MR. ZELLERS:  19.
7            (Moore Exhibit No. 19 was marked
8            for identification.)
9   BY MR. MEADOWS:
10       Q   I hand you what I marked as Exhibit 19.
11           (Counsel conferring.)
12  BY MR. MEADOWS:
13       Q   Okay.  I think I finally found it, from
14  Dr. Carson's report.
15           "Numerous studies" --
16       A   Sorry, what page?
17       Q   I'm sorry.  Page 7 at the top.
18           Are you there, Dr. Moore?
19       A   I am.  Sorry.
20       Q   "Numerous studies have interviewed women
21  regarding their personal practices of application
22  of talc-based powders to the perineal area.  Due
23  to variations in these practices, it has been
24  difficult to estimate dose in order to evaluate
25  the dose-response relationship for ovarian cancer.

1   It is also difficult to exactly estimate the
2   quantity of talcum powder administration during
3   personal hygiene activities.  For studies that
4   attempted to determine amount of exposure, most
5   relied on a method of estimating the frequency of
6   application and/or duration of those practices,
7   then simply multiplying to reach a total number of
8   applications over time."
9        Did I read that correctly?
10       A   You did read what he wrote correctly.
11           But he only has, you know, two
12  citations, so I don't know what his basis was for
13  all those statements.
14       Q   Okay.  Did you read those citations?
15       A   I believe -- I'd have to look at my list
16  to -- and compare them to what he has specifically
17  referenced here.
18       Q   So as --
19       A   I could do that.
20       Q   -- you're sitting here today, you don't
21  know whether or not you looked at those citations
22  before you criticized him here?
23           MR. ZELLERS:  Objection.  Form.
24  Foundation.
25           THE WITNESS:  Well, I -- I'm looking at

1   his statement, and he is saying that for studies
2   that attempted to determine the amount of -- most
3   relied on, so that -- that in itself, "most" means
4   there's more than -- there has to be more than two
5   studies evaluated if he has "most."  At least one
6   out of -- or two out of three, that's what the
7   word "most" means to me.
8   BY MR. MEADOWS:
9        Q   Okay.  Let's turn over to page 9.  Down
10  at the bottom.
11           "Although some studies have failed to
12  find evidence of a dose-response relationship,
13  several more recent reports have shown a clear
14  dose-response when the number of subjects rose to
15  a level producing sufficient statistical power to
16  allow the analysis after subdivision of subjects
17  into pertinent categorical groups and frequency
18  and duration were measured."  And he cites to
19  Schildkraut, Cramer and Wu.
20           Did I read that correctly?
21       A   So I believe you read that correctly.
22           MR. MEADOWS:  How am I doing on time?
23  One minute?
24           MR. ZELLERS:  Make it good.
25           MR. MEADOWS:  Well, got a whole lot more

H. Nadia Moore, Ph.D.

Page 326

1  than one minute here.
2  BY MR. MEADOWS:
3      Q   So I want to go back to Exhibit 2, which
4  we identified this morning.
5      A   What was the name of that document?
6      Q   It's -- it's actually the e-mail that we
7  got at 7 o'clock last night with your materials.
8      MR. ZELLERS:  Okay.  I have a copy if
9  you need it, so let's --
10     THE WITNESS:  Okay.  Mine may be out of
11 order.
12     MR. ZELLERS:  Let's just see what his
13 question is.
14     THE WITNESS:  Okay.  Or is out of order.
15 BY MR. MEADOWS:
16     Q   Okay.  So I want to flip over to this
17 page up here --
18     A   I think I can find that in here.
19     MR. ZELLERS:  Do you see which page he
20 is asking you about?
21     THE WITNESS:  I see generally, yeah,
22 this document, right.
23 BY MR. MEADOWS:
24     Q   It's entitled "Fragrance Ingredient" --
25     A   Yeah, I have it.

Page 327

1      Q   -- "Concentrations:  Baby Powder."
2      A   I'm trying to find -- find the first
3  page.  Sorry.
4      Okay, I'm with you.
5      Q   Okay.  So what is this?
6      A   So this is a list of the fragrance
7  ingredients from the Exhibit 1, 2 and 3 that --
8  that's listed in my report, the "Attorneys' eyes
9  only" document.
10     And then we used the percent -- so -- so
11 that's the first column and the second column.
12 Then we used the -- the maximum percentage -- this
13 first page is for baby powder, and so we used the
14 maximum percentage that fragrance was in the baby
15 powder, which was 0.22 in the records, to -- and
16 then we -- we -- in response to the notice for
17 deposition, we included this formula column.
18     And then to show you how we derived this
19 last column, which was the maximum that the
20 ingredient on that row was calculated to be in the
21 product, and in this case, the product is the baby
22 powder, as referenced at the top of this page.
23     Q   And so what's the purpose of this
24 document?
25     A   The purpose of this document is to

Page 328

1  ascertain the maximum percentage of each fragrance
2  ingredient in the formulated baby powder and
3  Shower to Shower products.
4      Q   And where did all this data come from?
5      A   So the first column and the second
6  column were from Exhibits 1, 2 and 3, "For
7  attorneys eyes only."  That's the only way that
8  they were labeled when we received them.  That's
9  consistent with what Dr. Crowley had in his
10 report, Exhibits 1, 2 and 3.
11     And then -- so your question was how do
12 we get to these?  Sorry, I got lost.
13     Q   Yeah, well --
14     MR. ZELLERS:  What is the purpose of
15 this document was the question.
16 BY MR. MEADOWS:
17     Q   Well, I was asking where the data came
18 from.  I think.
19     A   Okay.  Sorry.
20     So that's where those first two columns
21 came from.  The 0.22 was derived from
22 specification sheets and formulation sheets that
23 we -- that we received -- that we asked for and
24 received, as well as in the materials that we
25 received from Dr. Crowley's list of cited

Page 329

1  materials.  And then -- so 25 percent times 0.22
2  percent in the final product is 0.055.  That's the
3  product is the percentage.
4      Q   Did you prepare this chart?
5      A   I did.
6      Q   When?
7      A   So this chart was prepared when I
8  prepared my report, and then last week or -- I
9  forget the exact day, I added this formula
10 calculation, because the notice said we had to
11 have the formulas included in our calculations.
12     Q   And did you rely on -- excuse me -- did you
13 rely on the data in this table in reaching your
14 opinions that are expressed in this report?
15     A   So these -- this dataset was used to
16 evaluate the concentrations compared to the IFRA
17 standards.
18     Q   Yeah, my question is, did you rely on
19 the data in this table in reaching your opinions?
20     A   Well, we compared those to the IFRA
21 standards to evaluate the concentrations.
22     Q   Well, I'm -- what do you mean by "we"?
23     A   Sorry, I did.
24     Q   Well, who were you referring to when you
25 said "we"?

83 (Pages 326 to 329)

Page 330

```
 1        A   I was -- I was thinking of the team
 2   that helped review my document, the citation
 3   checks.
 4        Q   All right.  So one more time.  Did you
 5   rely on the data in the table in reaching your
 6   opinions?
 7        A   Again, I don't know how to answer the
 8   question.  We used that -- this data to compare it
 9   to the concentrations that were in the IFRA
10   standards.
11        Q   Flip on over --
12            MS. SHARKO:  I'll just note for the
13   record that that exhibit has "Attorneys' eyes
14   only" on it, so it shouldn't be circulated
15   probably and should be treated appropriately
16   under the order.  That is, it shouldn't be
17   circulated.
18            MR. ZELLERS:  So those are --
19            MR. MEADOWS:  I couldn't hear you.  You
20   trailed off on me.
21            They shouldn't be circulated what?
22            MS. SHARKO:  Several of the attachments
23   to that last exhibit are marked "Attorneys' eyes
24   only," so it needs to be treated at a higher
25   level of protection.  Exhibit 2.
```

Page 331

```
 1   BY MR. MEADOWS:
 2        Q   So what is this chart that we're looking
 3   at here?
 4        A   So this is similar to the other
 5   document.  It had the fragrance ingredient names
 6   on the left.  And then this is a compilation of
 7   whether or not each ingredient was on the IFRA
 8   transparency list.
 9            And then part of our data review was to
10   evaluate each ingredient as to whether or not it
11   had a RIFM review.  And I captured that
12   information on -- in this, I guess, second or
13   third column, however you count the columns.
14            And then for each ingredient name, was
15   there an IFRA standard, the type of standard that
16   was included, and then the limit that was
17   specified in each IFRA standard.
18            And then these last two columns came
19   from the previous file that we were -- I was just
20   speaking of, which was the maximum percentage of
21   each ingredient within baby powder or the Shower
22   to Shower ingred-- -- products.
23        Q   Did you -- well, did you rely on
24   this data in the table to reach opinions in this
25   case?
```

Page 332

```
 1        A   So again, the data in this table was
 2   used to evaluate each -- the status of ingredients
 3   against -- and it's written in my report, the
 4   number of ingredients with IFRA transparency list
 5   status and with RIFM reviews, and we also
 6   discussed the IFRA standards.
 7            So this was a worksheet that we used,
 8   but all the opinions are in the report that are
 9   represented in this table.
10   BY MR. MEADOWS:
11        Q   All right.  This is entitled "Review of
12   Metal Analysis Exhibits Cited in the Report of
13   Mark Krekeler."
14            Did I read that correctly?
15        A   Yes, I believe so.
16        Q   So what is this?
17        A   So this was a summary that was -- of the
18   information regarding metal analyses that was in
19   the documents that we received -- let me see what
20   the -- I want to be precise here, what the name
21   of -- so we received another -- a number of
22   documents that were the "Krekeler documents cited
23   in the report - Johnson & Johnson," and the
24   "Krekeler documents cited in the report -
25   Imerys."
```

Page 333

```
 1            And so we wanted to -- or I wanted to
 2   understand what -- what types of analyses existed
 3   in that -- in those -- in the volumes of data that
 4   were supplied in those two groupings that I just
 5   described.
 6            And so -- so this is a summary of the
 7   analyses for chromium, cobalt and nickel that
 8   could be gleaned from that dataset.
 9            (Counsel conferring.)
10            MS. O'DELL:  Why don't we go off the
11   record.
12            THE VIDEOGRAPHER:  The time is 6:05 p.m.
13   We're going off the record.
14            (Pause.)
15            THE VIDEOGRAPHER:  The time is 6:06 p.m.
16   We're back on the record.
17            MR. MEADOWS:  All right.  I think my
18   boss has something that we need to put on the
19   record.
20            MS. O'DELL:  No further questions at
21   this time.
22            As we noted at the beginning of the
23   deposition, in light of the late production of
24   substantial analyses as well --
25            THE REPORTER:  I'm sorry?
```

84 (Pages 330 to 333)

H. Nadia Moore, Ph.D.

Page 334

1       MS. O'DELL:  -- substantial analyses as
2   well as the additional reliance materials, which
3   were also quite significant, we will be discussing
4   additional time.
5       Assuming that we can't reach agreement,
6   we will let Judge Pisano decide.
7       MS. SHARKO:  Okay.  And we disagree with
8   your characterization, and we will reply to it.
9       MR. ZELLERS:  Before we adjourn, I have
10  one question for Dr. Moore.
11          CROSS-EXAMINATION
12  BY MR. ZELLERS:
13      Q   Dr. Moore, you were asked a number of
14  questions regarding asbestos, Johnson's Baby
15  Powder and Shower to Shower.
16      Do you stand by the statements in your
17  report?
18      A   I do.
19      MR. ZELLERS:  I have nothing else.
20      THE VIDEOGRAPHER:  Okay.
21      MR. MEADOWS:  All done.
22      THE VIDEOGRAPHER:  The time is 6:07 p.m.
23  on April 4, 2019.
24      We're going off the record, completing
25  today's videotaped session.

Page 336

1       CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2       The undersigned Certified Shorthand Reporter
3   does hereby certify:
4       That the foregoing proceeding was taken before
5   me at the time and place therein set forth, at
6   which time the witness was duly sworn; That the
7   testimony of the witness and all objections made
8   at the time of the examination were recorded
9   stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14      In witness thereof, I have subscribed my name
15  this date:  April 5, 2019.
16
17          _____
18          LESLIE A. TODD, CSR, RPR
19          Certificate No. 5129
20  (The foregoing certification of
21  this transcript does not apply to
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)
25

Page 335

1       (Whereupon, the deposition of
2       H. NADIA MOORE, Ph.D. was
3       concluded at 6:07 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 337

1       INSTRUCTIONS TO WITNESS
2       Please read your deposition over carefully and
3   make any necessary corrections. You should state
4   the reason in the appropriate space on the errata
5   sheet for any corrections that are made.
6   After doing so, please sign the errata sheet
7   and date it.
8       You are signing same subject to the changes
9   you have noted on the errata sheet, which will be
10  attached to your deposition.  It is imperative
11  that you return the original errata sheet to the
12  deposing attorney within thirty (30) days of
13  receipt of the deposition transcript by you. If
14  you fail to do so, the deposition transcript may
15  be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

H. Nadia Moore, Ph.D.

Page 338

```
 1          ------
 2        E R R A T A
 3          ------
 4    PAGE LINE CHANGE
 5    ____ ____ _____
 6    REASON: _____
 7    ____ ____ _____
 8    REASON: _____
 9    ____ ____ _____
10    REASON: _____
11    ____ ____ _____
12    REASON: _____
13    ____ ____ _____
14    REASON: _____
15    ____ ____ _____
16    REASON: _____
17    ____ ____ _____
18    REASON: _____
19    ____ ____ _____
20    REASON: _____
21    ____ ____ _____
22    REASON: _____
23    ____ ____ _____
24    REASON: _____
25
```

Page 339

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2        I,_____, do hereby
 3    certify that I have read the foregoing pages, and
 4    that the same is a correct transcription of the
 5    answers given by me to the questions therein
 6    propounded, except for the corrections or changes
 7    in form or substance, if any, noted in the
 8    attached Errata Sheet.
 9
10    _____
11    H. NADIA MOORE, Ph.D.          DATE
12
13
14    Subscribed and sworn to
15    before me this
16    _____day of_____,20___.
17    My commission expires:_____
18    _____
19    Notary Public
20
21
22
23
24
25
```