# EXHIBIT B28

Ie-Ming Shih, M.D., Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &        :
JOHNSON TALCUM POWDER     :
PRODUCTS MARKETING,       :
SALES PRACTICES, AND      :  NO. 16-2738
PRODUCTS LIABILITY        :  (FLW) (LHG)
LITIGATION                :
                          :
THIS DOCUMENT RELATES     :
TO ALL CASES              :

- - -

March 26, 2019

- - -

            Videotaped deposition of
IE-MING SHIH, M.D., Ph.D., taken pursuant
to notice, was held at Venable, LLP, 750
East Pratt Street, Baltimore, Maryland,
beginning at 9:06 a.m., on the above
date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Ie-Ming Shih, M.D., Ph.D.

| Page 2 |
|---|

```
1    APPEARANCES:
2
     RESTAINO LAW, LLC
3    BY: JOHN M. RESTAINO, JR., DPM, ESQ.
     130 Forest Street
4    Denver, Colorado 80220
     (303) 839-8000
5    Jrestaino@restainollc.com
6      - and -
7    ASHCRAFT & GEREL, LLP
     BY: MICHELLE A. PARFITT, ESQ.
8    4900 Seminary Road, Suite 650
     Alexandria, Virginia 22311
9    (703) 931-5500
     mparf@aol.com
10
       - and -
11
     NAPOLI SHKOLNIK, PLLC
12   BY: ALASTAIR J.M. FINDEIS, ESQ.
     400 Broadhollow Road, Suite 305
13   Melville, New York 11747
     (631) 224-1133
14   afindeis@napolilaw.com
15     - and -
16   HAUSFELD, LLP
     BY: STEVEN B. ROTMAN, ESQ.
17   One Marina Drive
     Suite 1410
18   Boston, Massachusetts 02210
     (617) 207-0602
19   Srotman@hausfeld.com
     Representing the Plaintiffs
20
21
22
23
24
```

| Page 4 |
|---|

```
1    APPEARANCES:  (Cont'd.)
2
     SEYFARTH SHAW, LLP
3    BY: THOMAS T. LOCKE, ESQ.
     975 F Street, NW
4    Washington, D.C. 20004
     (202) 463-2400
5    tlocke@seyfarth.com
     Representing the Defendant, PCPC
6
7
     ALSO PRESENT:
8
9    VIDEOTAPE TECHNICIAN:
       Dan Holmstock
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

| Page 3 |
|---|

```
1    APPEARANCES:  (Cont'd.)
2
     SKADDEN ARPS, LLP
3    BY: JESSICA D. MILLER, ESQ.
     1440 New York Avenue, N.W.
4    Washington, D.C. 20005
     (202) 371-7850
5    Jessica.miller@skadden.com
6      - and -
7    DRINKER, BIDDLE & REATH, LLP
     BY: SUSAN M. SHARKO, ESQ.
8    600 Campus Drive
     Florham Park, New Jersey 07932
9    (973) 549-7000
     susan.sharko@dbr.com
10
       - and -
11
     DRINKER BIDDLE & REATH, LLP
12   BY: KATHERINE McBETH, ESQ.
     One Logan Square,
13   Suite 2000
     Philadelphia, Pennsylvania 19103
14   (215) 988-2706
     katherine.mcbeth@dbr.com
15   Representing the Defendants, Johnson
     & Johnson entities
16
17   TUCKER ELLIS, LLP
     BY: JAMES W. MIZGALA, ESQ.
18   233 South Wacker Drive,
     Suite 6950
19   Chicago, Illinois 60606
     (312) 624-6307
20   james.mizgala@tuckerellis.com
     Representing the Defendant, PTI
21   Royston LLC and PTI Union LLC
22
23
24
```

| Page 5 |
|---|

```
1              - - -
2            I N D E X
3              - - -
4
     Testimony of:
5
          IE-MING SHIH, M.D., Ph.D.
6
     By Dr. Restaino          10
7
8
9
             - - -
10
           E X H I B I T S
11
             - - -
12
13   NO.      DESCRIPTION        PAGE
14   Shih-1    Notice of Deposition  13
15   Shih-2    Expert Report of    17
          Dr. Shih, M.D., Ph.D.
16        2/25/19
17   Shih-3    Curriculum Vitae    17
          Ie-Ming Shih, M.D., Ph.D.
18
19   Shih-4    Study Report to     18
          Determine Whether
20        Chronic Inflammation
          Causes Ovarian Cancer
21        (Shih)
22   Shih-8    Risk Factors &     268
          Symptoms
23        (Sidney Kimmel)
24
```

Ie-Ming Shih, M.D., Ph.D.

Page 6

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5    NO.      DESCRIPTION      PAGE
 6    Shih-10    Pre-Diagnostic    275
             Serum Levels of
 7           Inflammation Markers
             (Trabert)
 8
      Shih-12    Papillary Tubal    411
 9           Hyperplasia: The
             Putative Precursor
10           (Kurman)
11    Shih-15    The Hallmarks of   305
             Cancer
12           (Hanahan)
13    Shih-16    Hallmarks of      308
             Cancer: The
14           Next Generation
15    Shih-20    Journal of        361
             Ovarian Research
16           Role of CA-125
             (Gupta)
17
      Shih-21    Tumor-Associated   365
18           Autoantibodies as
             Early Detection
19           (Kaaks)
20    Shih-22    Early Detection    370
             Of Ovarian Cancer
21           (Elias)
22
23
24
```

Page 8

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5    Direction to Witness Not to Answer
 6    PAGE   LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE   LINE
      None.
10
11    Stipulations
12    PAGE   LINE
      None.
13
14    Questions Marked
15    PAGE   LINE
      333   10
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5    NO.      DESCRIPTION       PAGE
 6    Shih-23    Identifying Post   378
             Menopausal Women
 7           At Elevated
             Risk for Epithelial
 8           Ovarian Cancer
             (Urban)
 9
      Shih-24    Critical Questions  384
10           In Ovarian Cancer
             Research and
11           Treatment
             (Bast)
12
      Shih-26    Smoking and       432
13           Carcinoma of the Lung
             (Doll, Hill)
14
      Shih-27    Methylomic Analysis 102
15           Of Ovarian Cancers
             (Pisanic)
16
      Shih-29    Reported Incidence  125
17           And Survival of
             Fallopian Tube
18           Carcinomas
             (Trabert)
19
      Shih-30    Genomics of       136
20           Ovarian Cancer
             Progression(Eckert)
21
      Shih-39    Molecular Basis    213
22           Supporting the
             Association of
23           Talcum Powder Use
             (Fletcher
24
```

Page 9

```
 1           THE VIDEOGRAPHER:  We are
 2    now on the record.
 3           My name is Daniel Holmstock.
 4    I'm the videographer for Golkow
 5    Litigation Services.
 6           Today's date is March 26,
 7    2019.
 8           The time on the video screen
 9    is 9:06 a.m.
10           This video deposition is
11    being held at the Law Offices of
12    Venable LLP, at 750 East Pratt
13    Street, Suite 900 in Baltimore,
14    Maryland, In Re Johnson & Johnson
15    Talcum Powder Products Marketing,
16    Sales Practices, and Products
17    Liability Litigation, MDL number
18    2738, pending before the United
19    States District Court for the
20    Eastern District of New Jersey.
21           Our deponent today is
22    Dr. Ie-Ming Shih.
23           Counsel for appearances will
24    be noted on the stenographic
```

3  (Pages 6 to 9)

Ie-Ming Shih, M.D., Ph.D.

Page 10

1    record.
2        Our court reporter is
3    Michelle Gray, who will now
4    administer the oath.
5            - - -
6    ... IE-MING SHIH, M.D., Ph.D.,
7    having been first duly sworn, was
8    examined and testified as follows:
9            - - -
10            EXAMINATION
11            - - -
12   BY DR. RESTAINO:
13       Q.   Good morning, Dr. Shih.
14       A.   Good morning.
15       Q.   My name is John Restaino,
16   and I will be the attorney asking you
17   some questions today.  I note from the
18   materials we have received that you have
19   been deposed before, correct?
20       A.   Correct.
21       Q.   But I still -- there's still
22   a few things that I want to go over
23   because I heard you talk about water
24   before the deposition started.  We will

Page 11

1    be taking a break about every hour or so;
2    however, in between that period of time,
3    if you need to take a break for whatever
4    reason, you just let us know.  Do you
5    understand?
6        A.   Yes.
7        Q.   Today is not going to be a
8    memory test for you.  So if you need to
9    review documents, it's open book.
10           And if you -- and it's not a
11   physical test.  So once again, feel free
12   to call for a break whenever you need to
13   if we don't.  Do you understand that?
14       A.   Okay.
15       Q.   Now, it's important that you
16   let me know if you don't understand my
17   question.  If I become tongue-tied or I
18   use different terminology that you're not
19   used to, let me know and I'll repeat the
20   question.  But if you answer a question,
21   the presumption will be that you
22   understood the question.  Agreed?
23       A.   I will try my best to answer
24   your question.

Page 12

1        Q.   And I will too.  And so far
2    we've been doing fine.  But there's the
3    court reporter to your right and my left,
4    and she's going to try to take down
5    everything we say.  And if we -- all of
6    us were having a normal conversation on a
7    Friday evening somewhere, it's not
8    uncommon to step on each others'
9    sentences without being rude.
10           But today, if we do that,
11   then in essence we are being rude to the
12   court reporter.  So I will do my best to
13   listen for that final period in your
14   answer, if you will do your best to
15   listen for the question mark on mine.
16   Agreed?
17       A.   Okay.
18       Q.   Now, I'm going to hand you
19   what was previously marked this morning
20   as Plaintiffs' Exhibit Number 1, which is
21   the notice of the deposition.
22           MR. ROTMAN:  I handed you
23   one earlier, right?
24           DR. RESTAINO:  Yes, I gave

Page 13

1    it back to Michelle.
2            MR. ROTMAN:  These are the
3    other copies.
4            (Document marked for
5    identification as Exhibit
6    Shih-1.)
7    BY DR. RESTAINO:
8        Q.   Doctor, have you seen that
9    before?
10       A.   I remember I saw it --
11       Q.   Okay.
12       A.   -- recently.
13       Q.   If you would turn to Page 4,
14   it becomes the language that's most
15   germane to this morning.  You see Number
16   1, we're requesting your most current
17   curriculum vitae.
18           Have you provided that to
19   us?
20       A.   I believe so.
21       Q.   Thank you.
22           Number 2 is copies of any
23   materials that pertain to your retention
24   or payment for services as an expert.

4 (Pages 10 to 13)

Ie-Ming Shih, M.D., Ph.D.

Page 14

1    And have you provided, for example, any
2    retainer agreement that you may have?
3        A.   I don't remember I have a
4    retention agreement.
5        Q.   Okay.  Have you provided any
6    documents, invoices, for the time that
7    you have incurred so far in the
8    litigation since you've been retained as
9    an expert?
10       A.   I sent J&J attorney my
11   invoice.
12       Q.   This morning I was provided
13   with an invoice for the draft of expert
14   opinion report dated January 19, 2019.
15   And it states from December 12th to
16   Jan -- of 2018 to January 19th of 2019.
17           And this invoice is for a
18   total of 18 hours at $800 an hour and
19   $14,400.  Does that sound familiar --
20           MS. MILLER:  Can we have a
21       copy of that?
22           THE WITNESS:  Can I see it?
23       Can I see the document?
24   BY DR. RESTAINO:

Page 15

1        Q.   Yes.
2        A.   And can I review it?
3            MS. MILLER:  Dr. Shih, it's
4        redacted because the work you did
5        is confidential, so we blacked
6        this out.
7            THE WITNESS:  Okay.
8        Understand.
9            MS. MILLER:  This is not the
10       way it looked when you sent it to
11       us.
12   BY DR. RESTAINO:
13       Q.   Does that look familiar,
14   sir?
15       A.   Yes.
16       Q.   Does that look accurate?
17       A.   Correct.
18       Q.   And may I assume that you
19   have put in more hours since January 19th
20   of 2019?
21       A.   I spent additional times on
22   this matter.
23       Q.   Okay.  Can you estimate for
24   us how much more time you have spent

Page 16

1    since January 19, 2019, on this matter?
2        A.   I do not have an exact
3    number, because this is still ongoing,
4    and I'm very busy.  But I would give you
5    my estimation.  About 90 hours,
6    plus/minus 15 hours.
7        Q.   Okay.  Have you provided to
8    counsel and through counsel to us any
9    records that you may have in the sense of
10   notes, draft materials, anything that
11   comprise your folder, for example, on the
12   study you have conducted?
13           MS. MILLER:  Wait.
14       Objection.  If you're talking
15       about draft materials related to
16       his report, that would be
17       privileged, as you know.  Are you
18       asking for draft materials related
19       to his report, or are you only
20       asking about his -- what you're
21       calling his study?
22           DR. RESTAINO:  His study.
23           MS. MILLER:  Okay.  Can you
24       explain what you mean by his

Page 17

1    study.
2    BY DR. RESTAINO:
3        Q.   You have attached to your
4    expert report in the back a document that
5    is a study of analysis that you've
6    conducted of histopathology slides,
7    correct?
8        A.   Could you show me where you
9    are talking about?
10       Q.   Sure.  Why don't we go
11   ahead, and I'm going to hand you what we
12   have marked as Exhibit Number 2.
13           (Document marked for
14       identification as Exhibit
15       Shih-2.)
16   BY DR. RESTAINO:
17       Q.   And this is your expert
18   report.  This obviously, you're going to
19   want to keep open and next to you.
20           MR. ROTMAN:  John, give me
21       one, please.
22           (Document marked for
23       identification as Exhibit
24       Shih-3.)

5 (Pages 14 to 17)

Ie-Ming Shih, M.D., Ph.D.

Page 18

BY DR. RESTAINO:
Q.   I'm going to hand you what we have marked as Exhibit Number 3.  This is titled "Curriculum Vitae Version February 8, 2019."
(Document marked for identification as Exhibit Shih-4.)
BY DR. RESTAINO:
Q.   Exhibit 4 is a document titled "Study Report to Determine Whether Chronic Inflammation Causes Ovarian Cancer."
MS. MILLER:  This isn't numbered.  Do you have one with a sticker?
DR. RESTAINO:  Sorry.  That one was for you.
THE WITNESS:  I would like to make sure these are my copies.
BY DR. RESTAINO:
Q.   Okay.  What do you mean by making sure that it's your copy?
A.   There is no missing pages

Page 19

and additional material.
Q.   You are now looking at your -- the exhibit that's your study report, sir?
A.   I want to make sure there's no missing pages or additional material inserted.
Q.   Sir, are you finished?
A.   I guess so.
Q.   Okay.  Sir, do you have your curriculum vitae which we've marked as Exhibit 3 and you have gone through, do you have that document memorized?
A.   Could you repeat your question one more time?
Q.   Your CV that you just went through, do you have that document memorized in your mind?
MS. MILLER:  Objection.
THE WITNESS:  What do you mean memorize?
BY DR. RESTAINO:
Q.   Do you know it by heart?  If I was to ask you to write down what

Page 20

publication Number 123 is, could you tell me without looking?
MS. MILLER:  Objection.
THE WITNESS:  I know my right quote, but I cannot remember every word and sequence, if you want to test my memory.
BY DR. RESTAINO:
Q.   No, sir.  I don't want to test your memory, but you just spent a lot of time going through your CV -- CV to see if anything was missing.
How would you know if anything was missing from your CV if you don't have it memorized?
A.   I look at the pages to see whether they are in sequence, or anything unusual that I don't put it in my original CV.
Q.   Okay.  So the pages are numbered like, for example, 1 through 53, correct?
A.   1 to 53.
Q.   Is that correct?

Page 21

A.   Yes.
Q.   So in order to determine whether or not there were any pages missing, all you had to do was look at the page numbers at the bottom, instead of running your finger down every publication, isn't that true?
A.   I want to make sure --
MS. MILLER:  Objection.  Please give me time to object.  These questions are objectionable.
THE WITNESS:  Okay.  Sure.
BY DR. RESTAINO:
Q.   Now, you also looked at the document which I believe we've marked as Number 4, which is your study report to determine whether chronic inflammation causes ovarian cancer, correct?
A.   This is my report.
Q.   And in your report, there's a table that lists each of the 59 slides you have reviewed, correct?
A.   You mean which page?

6 (Pages 18 to 21)

Ie-Ming Shih, M.D., Ph.D.

Page 22

1    Q.   I don't know the page
2  offhand.  But there's a table that you
3  just went through and looked at, correct?
4    A.   You mean the -- these
5  tables?
6    Q.   Yes, sir.
7    A.   Okay.  That's what you
8  indicated.
9    Q.   Okay.  And when you were
10  checking to see if anything was missing,
11  you ran your finger down every one of
12  those slides, didn't you?
13    A.   I just want to see whether
14  there's any disruption in the number.
15    Q.   Ah.  You have those numbers
16  memorized in your head?
17    A.   I know this number, but I
18  don't -- but I don't remember the case ID
19  number for each, because this is the
20  data.
21    Q.   And so how would you know if
22  there was a slide taken out of that?
23    A.   Because there's additions,
24  from 1, 2, 3, 4, 5, to 59, I want to make

Page 23

1  sure if anything missing in between.
2    Q.   Now, sir, have you, in -- in
3  conducting that study --
4    A.   Which study you mean?
5    Q.   Well, yes.  Let's -- let's
6  discuss your study report to determine
7  whether chronic inflammation causes
8  ovarian cancer.
9    A.   You mean this report?
10    Q.   Yes, sir.  For the -- for --
11  so that I don't have to name or state
12  that title all day today, would you be
13  comfortable if we referred to that as
14  your study reports?
15    A.   If I'm not clear, I will ask
16  one more time.
17    Q.   Please do.  Thank you.
18         And I will also -- you have
19  also written what we have marked as
20  Exhibit Number 2, an expert report in
21  this litigation, correct?
22    A.   You mean this one?
23    Q.   Yes.
24    A.   Yes.  This is my report.

Page 24

1    Q.   And I will refer to that
2  with your permission as your expert
3  report?
4    A.   Okay.  Again, if I'm not
5  clear I will ask you one more time.
6    Q.   Okay.  In the Exhibit
7  Number 1, the notice to produce, we asked
8  for any and all documents that you have
9  that may pertain to scientific or
10  technical publications, written, prepared
11  or presented by you.  Number 7 on Page 6.
12         Do you see that, sir?
13    A.   Yes.
14    Q.   Have you produced those
15  documents?
16    A.   I believe so.
17    Q.   Okay.  If you would turn to
18  Page 8 and you see a list of requests
19  there starting with authors of any
20  published scientific studies.  And then
21  the second one is the Center For
22  Regulatory Effectiveness.
23         Do you see that, sir?
24    A.   Yes.  B.

Page 25

1    Q.   Have -- looking down through
2  those, have you had any communication
3  with any of those organizations listed
4  there that is germane to the talcum
5  powder ovarian cancer litigation?
6    A.   Could you repeat your
7  question one more time?
8    Q.   Looking down through those
9  entities listed there, have you had any
10  communication with any of those
11  organizations that is germane to the
12  talcum powder ovarian cancer litigation?
13    A.   Your communications means
14  personal or?
15    Q.   Personal.
16    A.   Be specific.
17    Q.   E-mail, telephone, snail
18  mail, any -- any communication
19  whatsoever.
20    A.   No.
21    Q.   Now, Number 15 asks for all
22  documents related to research -- I'll
23  wait for you to get there, sir.
24    A.   14?

7 (Pages 22 to 25)

Ie-Ming Shih, M.D., Ph.D.

Page 26

1          Q.   No, not page.  Number,
2     request Number 15.  It's on Page 11.
3          A.   11?  There's only Page 9.
4               MS. MILLER:  I think you
5          must be looking at the responses
6          and he's looking at the requests.
7          He's -- he's got it.
8     BY DR. RESTAINO:
9          Q.   Page 9?
10         A.   Are you sure, Page 9?
11         Q.   Yes, Page 9.  My apologies,
12    sir.
13              Number 15 on Page 9.
14         A.   Yes.
15         Q.   All documents related to
16    research, experiments, testing or any
17    other study that's been done or planned
18    by you which you may rely -- rely upon in
19    the talcum powder litigation.
20              So first, regarding all
21    documents pertaining to experiments that
22    you've performed, you have conducted, as
23    we discussed, and we've called the study
24    report, correct?

Page 27

1          A.   So --
2               MS. MILLER:  Objection.
3               THE WITNESS:  So what do you
4          mean testing?
5     BY DR. RESTAINO:
6          Q.   Well, testing, let's use the
7     definition of looking at
8     histopathological slides.
9               In that study report, in
10    looking at the histopathological slides,
11    did you produce any and all documents
12    that pertained to that experiment?
13         A.   The documents I produce is
14    the photographs that are shown in my
15    exhibit.
16         Q.   When you were sitting at the
17    microscope looking at a particular
18    histopathological slide, did you take any
19    notes on that slide?
20         A.   No.
21         Q.   Okay.  Did you assign that
22    slide a grading system of any sort?
23         A.   What do you mean grading
24    system?

Page 28

1          Q.   Well, did you -- if you were
2     looking for the presence or absence of
3     lymphocytes and a particular slide had X
4     number of lymphocytes, did you record
5     that somehow?
6          A.   I used the criteria that
7     practicing pathologists used to diagnose
8     chronic inflammation.  So those
9     pathologists do not really quantify
10    lymphocytes.  It's part of the very basic
11    training for all board-certified
12    pathologists.  So I use the same practice
13    for this study.
14         Q.   Occasionally, during the day
15    I may ask a question that your attorney,
16    to your left, finds objectionable.  And
17    she may say objection.  That's for the
18    court, and that's lawyer speak.  And
19    occasionally during the day, I may say,
20    "Move to strike nonresponsive," which is
21    sort of my side of the table, my way of
22    saying objection.  There's no disrespect
23    meant.
24              I'm going to move to strike

Page 29

1     your previous answer because what I asked
2     you -- and I'll modify it now with what
3     you just said.
4               Using basic
5     histopathological technique that a
6     board-certified pathologist would use
7     when looking at a histopathological slide
8     for the presence of lymphocytes, did you
9     make any recordation of whether or not
10    there were lymphocytes in that slide?
11              MS. MILLER:  Objection.
12              THE WITNESS:  What do you
13         mean "recordation"?
14    BY DR. RESTAINO:
15         Q.   Did you write down any notes
16    regarding that particular slide and the
17    presence of lymphocytes?
18         A.   We made the diagnosis based
19    on many informations from the microscopic
20    findings.  And we did not write down.
21         Q.   When it was -- when that
22    examination of a particular slide, Slide
23    Number 1, the first one you looked at, if
24    there was no lymphocytes noted on that

8 (Pages 26 to 29)

Ie-Ming Shih, M.D., Ph.D.

Page 30

1    slide -- on that slide, by the time you
2    got to Slide 59, how do you remember what
3    Slide Number 1 was?
4         A.   So the basis is not based on
5    the Case 1 or prior cases.  It's based on
6    the knowledge, the training.  And I am a
7    pathologist, practicing and doing
8    research for 20 years.  And I am the
9    Richard TeLinde distinguished research
10   professor in gynecology pathology, which
11   is probably only one in the professorship
12   in the United States.
13        And this professorship is
14   regarded as the most premium position in
15   the country.  So I trained so many
16   pathologists, and I practice
17   pathologists.  I don't need to write down
18   every single details of pathology
19   findings.  And we only need what we need,
20   is the final diagnosis.  That does
21   matter.
22        Everything is computing in
23   our brain to come up with the conclusion
24   and the final diagnosis without going to

Page 31

1    any details.  Lymphocytes, plasma cells,
2    and, like, NK cells, epithelial cells,
3    and how many blood vessels, how many red
4    blood cells, white blood cells, how many
5    fibroblasts, and how many epithelial
6    cells.
7         This is not our basis.  Our
8    basis is to take into -- take the whole
9    thing into the final decision.  Every --
10   we can consider every aspect and come to
11   our final diagnosis, rather than based on
12   single lymphocytes, endothelial cells,
13   and morphological features.
14        So basically, I think this
15   is very important for non-pathologists or
16   nonmedical doctors to understand, how do
17   we make the diagnosis of pathology.
18        So pathology -- what we
19   meant pathology, like, when you have a
20   tumor, whether is it benign or malignant,
21   it's very important, right?  You know,
22   your nevus -- could there -- this a
23   melanoma that will kill you, or is it
24   benign nevus, and you are fine?

Page 32

1         So it based on two things.
2    One is architecture of the histology, the
3    relationship between the epithelial cells
4    different, microenvironment,
5    extracellular cells, the architecture,
6    number one.
7         But it's not sufficient,
8    okay, for the final diagnosis.  That is
9    required.  The second important thing is
10   cytology.  Cytology means the
11   morphological features of the single
12   cells or group of cells.
13        And we look at the nucleus,
14   if it is benign, or normal, usually they
15   are more homogenous.  Okay.  It looks
16   very similar to -- to the neighboring
17   cells.  But in cancer, in cancer, you
18   will see a lot of different things, we
19   call nuclear --
20        Q.   Sir, I'm going to have to
21   interrupt you now.  I'm going to make a
22   motion to strike as unresponsive, because
23   all I asked you is not the technique that
24   a board-certified pathologist may or may

Page 33

1    not use, but when a pathologist is
2    looking at a large number -- God bless
3    you -- large number of slides, and in
4    this case, 59 slides, without recording,
5    making notes of the number, the
6    quantitative analysis of each slide of
7    the number of lymphocytes, how can you
8    remember when you're all done with your
9    analysis, the total number that are
10   present in each slide?
11        A.   Sir, I need to give you the
12   complete and full answer; otherwise, you
13   will not understand how the pathologist
14   made the diagnosis.  So if you don't
15   listen to that, you can never understand
16   what your pathology doctor diagnose your
17   tumor or your lesions --
18        Q.   Okay.
19        A.   -- of course, if you had
20   one.
21        Q.   We will discuss that in
22   detail, then, when we get to your study
23   report --
24        A.   Okay.

9 (Pages 30 to 33)

Ie-Ming Shih, M.D., Ph.D.

Page 34

1      Q.   -- and go through the
2  methodology that you employed at that
3  time.
4          Now, Doctor, you were -- you
5  provided deposition testimony in a number
6  of cases involving transvaginal mesh,
7  correct?
8      A.   That's -- I remember.
9      Q.   Okay.  And were you an
10  expert at that time for C.R. Bard
11  Incorporated and Ethicon Incorporated?
12         MS. MILLER:  Objection.
13         THE WITNESS:  Could you
14     repeat the companies' names?
15  BY DR. RESTAINO:
16     Q.   First, C.R. Bard.  Does that
17  sound familiar?
18     A.   Okay.  How about the other
19  one?
20     Q.   Ethicon.
21     A.   Yes, I remember.
22     Q.   And you were an expert for
23  the defense, correct?
24         MS. MILLER:  Objection.

Page 35

1          THE WITNESS:  I was asked as
2      a pathology expert to look at the
3      slides, whether there is any
4      evidence of abnormality on the
5      tissues.
6          I did not give any opinion
7      outside my pathology expertise.
8  BY DR. RESTAINO:
9      Q.   Okay.  Did you -- in the
10  transvaginal mesh litigation, have you
11  ever testified on behalf of a woman
12  instead of the company?
13         MS. MILLER:  Objection.
14         THE WITNESS:  Could you
15     repeat the question one more time?
16  BY DR. RESTAINO:
17     Q.   In the transvaginal mesh
18  litigation, were you ever retained as an
19  expert on behalf of one of the
20  plaintiffs, one of the women, complaining
21  of morbidity associated with her mesh?
22     A.   In which case?  Bard or --
23     Q.   Either one or any other
24  case.  Have you ever -- in the

Page 36

1  transvaginal mesh, did you testify on
2  behalf of any woman?
3         MS. MILLER:  Objection.
4         THE WITNESS:  I testified my
5      pathology findings.
6  BY DR. RESTAINO:
7      Q.   As an expert for C.R. Bard
8  or Ethicon, correct?
9         MS. MILLER:  I think these
10     are --
11         THE WITNESS:  I think I
12     answer --
13         MS. MILLER:  Objection.
14         THE WITNESS:  -- your
15     question.
16         MS. MILLER:  I think these
17     are legal terms.  I think Dr. Shih
18     is a pathologist.  Dr. Shih is not
19     a native English speaker.  And I
20     don't think it's fair to ask him
21     trick questions.
22         DR. RESTAINO:  We're going
23     to have a nice depo today.  We're
24     not going to have speaking

Page 37

1      objections.  Those are,
2      "Objection."
3  BY DR. RESTAINO:
4      Q.   Doctor --
5         MS. MILLER:  No, that is not
6      fair.  He obviously doesn't
7      understand your question.  And
8      you're purposely trying to trick
9      him.  And that's just not
10     appropriate.
11  BY DR. RESTAINO:
12     Q.   Doctor, have you -- in the
13  transvaginal mesh litigation, were you
14  retained by any lawyer that represents
15  any of the women harmed by transvaginal
16  mesh?  Do you understand that question?
17         MS. MILLER:  Objection.
18         THE WITNESS:  I cannot
19     understand the question.
20         MS. MILLER:  Lacks
21     foundation.
22  BY DR. RESTAINO:
23     Q.   Okay.  Did you write expert
24  report as an expert in the transvaginal

10 (Pages 34 to 37)

Ie-Ming Shih, M.D., Ph.D.

Page 38

1    mesh?
2        A.   I report the pathology
3    finding under microscope, whether the
4    tissue has foreign body material or
5    anything that I can show in my report, I
6    report it.
7        Q.   Did you make an analysis of
8    whether that pathology was due to the
9    presence of mesh?
10       A.   I think I defer to clinician
11   for this question.
12       Q.   Okay.  When were you first
13   contacted to be an expert in this current
14   litigation, the talcum powder litigation?
15       A.   I think it's in the end
16   December 2018.
17       Q.   And who first contacted you?
18       A.   I think who was Johnson &
19   Johnson attorney firm.
20       Q.   And do you know the name of
21   the lawyer who first contacted you?
22       A.   Who was Jessica.
23       Q.   Okay.  Have you worked with
24   Jessica before?

Page 39

1        A.   I don't remember.
2        Q.   Did you work with Jessica,
3    for example, in the transvaginal mesh
4    litigation?
5        A.   I did not.
6        Q.   And when you first met with
7    Jessica, what were you asked to do?
8            MS. MILLER:  Objection.
9        Please don't reveal any of our
10       privileged conversations.  Any
11       conversation that you and I had is
12       privileged.
13   BY DR. RESTAINO:
14       Q.   That -- that's a fair
15   objection.  Let me strike the question.
16       I'll represent to you that
17   the expert reports on behalf of the
18   plaintiff, so for example Dr. Sarah Kane,
19   Dr. Saed, those reports were produced to
20   the defense counsel and the courts on --
21   in mid November of 2018.
22       Did you see those expert
23   reports in November of 2018?
24           MS. MILLER:  Objection.  He

Page 40

1    testified that he didn't talk to
2    me till December.
3            DR. RESTAINO:  Well, we've
4        had some confusion with some
5        answers, so I just want to make
6        sure, from two different ways,
7        that, in fact, he wasn't working
8        for them in November.
9    BY DR. RESTAINO:
10       Q.   Did you see any expert
11   reports from any of the plaintiffs in
12   November of 2018?
13           MS. MILLER:  Same objection.
14       Mischaracterizes the plaintiff's
15       testimony and further efforts to
16       try to confuse somebody who is not
17       a native English speaker.
18   BY DR. RESTAINO:
19       Q.   Did you understand my
20   question?
21       A.   Could you repeat one more
22   time?
23       Q.   The expert report of
24   Dr. Sarah Kane, did you see that expert

Page 41

1    report in November of 2018?
2        A.   I first know about this
3    litigation after December.
4        Q.   Now, prior to your
5    deposition today, and prior to being --
6    to meeting with Jessica, did you ever
7    meet with any plaintiffs' lawyers?
8        A.   Who are the plaintiffs'
9    lawyers?
10       Q.   The defense lawyers are
11   sitting on your side of the table.  The
12   lawyers here are the plaintiff lawyers,
13   in addition to others who are not here.
14       A.   I do not remember their
15   faces.
16       Q.   Okay.  Do you remember the
17   lovely lady sitting to my right, Michelle
18   Parfitt?
19       A.   I cannot recognize your
20   faces.
21           MS. PARFITT:  I've aged.
22           THE WITNESS:  I hope not.
23   BY DR. RESTAINO:
24       Q.   Do you recall meeting with

11 (Pages 38 to 41)

Ie-Ming Shih, M.D., Ph.D.

Page 42

1    Ms. Parfitt in 2015?
2         A.   I cannot remember that.
3         Q.   Do you remember having any
4    conversations with a female lawyer in
5    2015 regarding talcum powder and ovarian
6    cancer?
7         A.   I cannot remember at all.
8         Q.   Do you -- do you recall
9    informing any female attorney in 2015
10   that in order to render an expert opinion
11   regarding talcum powder and ovarian
12   cancer, you would need to do a rat study?
13        A.   Rat study?
14        Q.   Yes.
15        A.   I cannot remember that
16   either.
17        Q.   Okay.  Do you have -- do --
18   when you meet with lawyers, do you
19   typically charge the lawyers for your
20   time?
21        A.   I think that's correct.
22        Q.   And would you have any
23   record of receiving money from
24   Ms. Parfitt or -- or the law firm

Page 43

1    Ashcraft Gerel in 2015 or -- or 2016?
2         A.   I cannot recall that.
3         Q.   If you did, when you do
4    receive money from attorneys or a law
5    firm for medical/legal consultation, for
6    example now from Johnson & Johnson, does
7    the money go to you directly or does it
8    go to a particular fund at Johns Hopkins
9    or elsewhere?
10        A.   If I receive a check with my
11   name, it come to me.
12        Q.   Would you --
13            MS. MILLER:  And, Michelle,
14       this is all new to us.  If there
15       is a conflict issue that you're
16       raising, I -- I submit you should
17       have brought this to our attention
18       many months ago.
19            MS. PARFITT:  We can talk
20       about it off the record.  I'm not
21       being examined now.  We can talk
22       about it.  I need to hear what the
23       doctor has to say.
24            MS. MILLER:  Shall we go off

Page 44

1    the record to talk about it?
2            MS. SHARKO:  Do you want to
3       step out in the hall and you can
4       explain it to me?
5            MS. PARFITT:  No, actually
6       I'd like to continue the
7       deposition.  We can take a break
8       at another time.  I'd like to
9       continue with the doctor's
10      deposition.
11           MS. SHARKO:  You can go
12      ahead with the deposition, but I
13      think this is kind of unfair.  But
14      proceed.
15           MS. PARFITT:  Well, I'm
16      just -- I think when we continue
17      to talk with the doctor, I don't
18      think you'll find anything unfair.
19      The doctor doesn't remember
20      speaking to me.  Again, I'm not
21      being examined.
22   BY DR. RESTAINO:
23        Q.   Dr. Shih, if you checked
24   your checking account or savings account

Page 45

1    for any deposits in 2015 or 2016 from a
2    law firm would you be able to determine
3    that you received money for that
4    consultation?
5         A.   I need to study this.
6         Q.   Okay.  Thank you.
7            Prior to meeting with
8    Jessica in the end of December of 2018 --
9            MS. MILLER:  Objection.  He
10      did not testify that he met with
11      me in the end of December of 2018.
12      He testified that I contacted him.
13      That's mischaracterizing the
14      testimony.
15   BY DR. RESTAINO:
16        Q.   When -- when Jessica
17   contacted you in December of 2018, before
18   you agreed to become -- to -- to work as
19   an expert on behalf of Johnson & Johnson,
20   did you need to approach the Johns
21   Hopkins University ethics department for
22   permission?
23        A.   I don't think there's a
24   guideline for that.  I would need to

12 (Pages 42 to 45)

Ie-Ming Shih, M.D., Ph.D.

Page 46

1   report is so-called outside activity.  So
2   we report all the outside activity, like
3   consultation and expert witness and we
4   disclose it to our system.  And that's
5   it.  And I did.
6        Q.   In order to conduct what we
7   have marked as Exhibit Number 4 and
8   agreed to refer to as your study report,
9   did you have to obtain permission from
10  Johns Hopkins University or any other
11  entity to conduct that study?
12       MS. MILLER:  Objection.
13       THE WITNESS:  Can I give you
14       the complete answer?
15  BY DR. RESTAINO:
16       Q.   It's a yes or no.  Did you
17  have to -- did you contact Johns Hopkins
18  University about conducting this study?
19       A.   This study is part of our
20  basic research and our whole team
21  starting from 2012.  And this study is in
22  continuation of our 2014, if I can
23  remember correctly, from Ardighieri study
24  published in International Journal of GYN

Page 47

1   Pathology.  And this is the continuation
2   of a study.  It is not particularly for
3   this litigation, and my opinion is not
4   dependent on this study.  And so this
5   study is only part of our ongoing
6   research in answering what is the
7   pathogenesis in initiating high grade
8   ovarian serous carcinoma.
9        And as you know, there's
10  different types of ovarian cancer.  In
11  this study we only focus on, as this
12  chart, I think it's useful for my
13  explanation, is a high grade serous
14  carcinoma.  So that is one of our major
15  focus's point.
16       Q.   Okay.  This is the
17  Department of Defense grant that you're
18  referring to; is that correct?
19       A.   Correct.
20       Q.   Did you have to obtain
21  permission from anyone involved with that
22  grant to conduct this study?
23       A.   Again, to conduct this study
24  is not for this litigation purpose.  It

Page 48

1   just coincidental that we have this
2   research going on.  And when I was
3   involved in reviewing the articles and
4   plaintiff material, et cetera, and I feel
5   one of the most important question to be
6   answered is the precursor lesions, which
7   is the -- where the ovarian high grade
8   serous carcinoma originate.
9        And so this one issue,
10  whether there is chronic inflammation
11  involved in this carcinogenesis of high
12  grade ovarian cancer, is that right?  So
13  that is why I think our current study
14  will be able to provide cogent evidence
15  to show or -- or to not show, meaning
16  refute or support.
17       I don't have any pre-set
18  mind whether chronic inflammation is
19  present in the early precursor ovarian
20  cancer lesions.  So that's my purpose.
21       Q.   Sir, you're going to have to
22  ask -- listen to my question carefully
23  and I'll repeat it as -- as many times as
24  you need for me to repair it -- repeat

Page 49

1   it.  I'm going to move to strike as
2   unresponsive because my question, sir,
3   was did you have to obtain permission
4   from anyone that -- involved in that
5   grant in order to conduct what you just
6   described as a continuing study from that
7   grant?
8        A.   So as a scientist, we
9   publish papers.  We don't need to report
10  every time to the grant -- grant agency,
11  NIH or DOD, to afford permission.  This
12  is the freedom of academia.
13       Q.   Okay.  And that grant
14  involves millions of dollars, does it
15  not?
16       A.   For many investigators and
17  many institutions.
18       Q.   Now, for the time that you
19  spent developing the methodology that you
20  were going to employ to do the study, for
21  the time spent looking at -- looking at
22  the histopathological slides, for the
23  time spent writing your study report, are
24  you billing the grant for that time?

13 (Pages 46 to 49)

Page 50

1        A.   The grant has expired, okay.
2   So my research on this is supported by my
3   own time.
4        Q.   Are you -- did you bill or
5   will you bill anyone representing Johnson
6   & Johnson for the time you spent
7   developing the methodology for the study,
8   reviewing the histopathological slides,
9   and writing your expert report?
10       A.   I will not.
11       Q.   So all of that time that
12  you've spent, you will not be reimbursed
13  for -- from anyone for that time; is that
14  correct?
15       A.   Anyone means?
16       Q.   Any -- the university, any
17  other grant money, any other entity.
18  Will anybody be paying you for that time
19  that you spent?
20       A.   Sir, you need to understand,
21  when we do a research, every research,
22  okay, there's many publications.  We
23  report it.  We did not charge each
24  publication to any agency, no, we are

Page 51

1   not.  We are paid by the fixed salary to
2   do this, to do all the academic research,
3   education, clinical practice, and
4   administration.
5            This is just part of the
6   academia success in the United States.
7   You cannot break into every single one.
8            For example, I interview
9   with a faculty.  I charge the
10  institution.  We did not do it that way.
11  So this is totally different for other
12  business.
13           In academia -- let me
14  finish.  This is very important.  We are
15  the scientists.  We are here to do
16  education, clinical practice, research
17  for the benefit of all the women in whole
18  wide world for ovarian cancer.
19       Q.   Sir, again, I have to
20  interrupt you.  I'm going to move to
21  strike as unresponsive.  My simple
22  question is, are you billing anyone for
23  the time you spent designing, conducting,
24  and writing up your report from that

Page 52

1   study?
2            MS. MILLER:  Objection.
3   Asked and answered.
4            He said he wasn't.
5            THE WITNESS:  I did answer
6   your question very clearly.
7   BY DR. RESTAINO:
8        Q.   Your answer is no?
9        A.   I already answered your
10  question.
11       Q.   Okay.  Sir, do you consider
12  yourself an expert in epidemiology?
13       A.   I am a cancer biologist who
14  focus on -- I understand what initiate
15  ovarian cancer, and I am also practicing
16  gynecology pathologist.  And I also
17  run -- educator to train residents,
18  pathology residents, post-doc fellows,
19  and the graduate students in ovarian
20  cancer research and diagnosis.
21       Q.   Do you have expertise in
22  epidemiology?
23       A.   As a scientist, I always
24  review epidemiology literatures.  It's

Page 53

1   part of my background to study it, the
2   issue.  And also it's in my context.
3            So you cannot say a
4   scientist only focus on biology without
5   knowing the other fields.  I don't think
6   it will work.  Any great scientist shall
7   not do that.  They should review all the
8   literatures related.
9        Q.   I'm sorry, sir.
10       A.   Sorry.
11       Q.   And by reviewing the
12  published literature dealing with
13  epidemiology, does that give you
14  expertise in epidemiology?
15           MS. MILLER:  Objection.
16           THE WITNESS:  As I said, I
17  reviewed other literatures in
18  order to know better about the
19  issues, about the -- what is the
20  origin of ovarian cancer.
21           And it is a background in my
22  study and also in my context.
23  BY DR. RESTAINO:
24       Q.   Okay.  Do you have expertise

Ie-Ming Shih, M.D., Ph.D.

Page 54

1    in toxicology?
2         A.   Again, I'm a cancer
3    biologist and gynecology pathologist.
4         Q.   Okay.  Do you have expert --
5    expertise in mineralogy?
6         A.   How do you define
7    mineralogy?
8         Q.   How would you define
9    mineralogy?
10              MS. MILLER:  Objection.
11              THE WITNESS:  Because I
12         can't understand your word.  Could
13         you explain that.
14    BY DR. RESTAINO:
15         Q.   The study of minerals, for
16    example talc and asbestos.
17         A.   Ah.
18         Q.   Are you an expert?
19         A.   No, I am not.
20         Q.   Do you consider you're an
21    expert in talcum powder products?
22              MS. MILLER:  Objection.
23              THE WITNESS:  Could you be
24         more specific for the question?

Page 55

1    BY DR. RESTAINO:
2         Q.   Are you familiar with talcum
3    powder products?
4              MS. MILLER:  Objection.
5              THE WITNESS:  What do you
6         mean familiar with?
7    BY DR. RESTAINO:
8         Q.   Do you know what is in, for
9    example, bottles of Johnson & Johnson
10    talcum powder?
11         A.   I think you have several
12    questions in a stream.  Could you --
13    might go by steps, your question, one by
14    one by one, so I can answer your question
15    more effectively.
16         Q.   Do you know what the
17    constituent parts of Johnson & Johnson's
18    talcum powder is or are?
19         A.   You mean the Johnson &
20    Johnson's powder in the market?
21         Q.   Yes.
22         A.   Or in -- back to ten years
23    ago, 20 years ago, 30 years ago?  What do
24    you mean?

Page 56

1         Q.   Today.
2         A.   Today, I did not see any
3    Johnson & Johnson's powder.
4         Q.   Okay.  Have you heard of Sir
5    Austin Bradford Hill?
6         A.   Could you spell the name
7    correctly?
8         Q.   Sir Austin Bradford Hill.
9    Have you heard of him?
10         A.   I saw -- I know the
11    documents -- I know the documents.  Okay.
12    Through this kind of expert opinion,
13    investigation, and I -- I remember I saw
14    that document, but I cannot remember any
15    single word.
16         Q.   Did you conduct an analysis
17    in this case utilizing the Bradford Hill
18    viewpoints on causation?
19         A.   Again, can I have this Brad
20    Hill -- Bradford Hill documents before we
21    can further discuss?
22         Q.   I'm not sure what you mean
23    by the Bradford Hill documents.  But do
24    you recall reading at any time in your

Page 57

1    professional career a 1965 publication by
2    Sir Bradford Hill regarding viewpoints
3    for determining causation?
4         A.   Can I see the viewpoints for
5    our discussion?
6         Q.   I just want to know if you
7    recall seeing that paper.
8         A.   I need to see the paper in
9    order to answer your question.
10         Q.   Do you recall anytime
11    reading a published paper dealing with
12    causation and viewpoints that consisted
13    of, for example, the strength of
14    association, analogy, biological
15    gradient, biological plausibility,
16    analogy, experimentation, and coherence?
17    Do you recall ever seeing any document
18    like that?
19              MS. MILLER:  Objection.
20         Compound.
21              THE WITNESS:  I need to see
22         the documents before we can
23         further discuss.
24    BY DR. RESTAINO:

15 (Pages 54 to 57)

Ie-Ming Shih, M.D., Ph.D.

Page 58

1    Q.   Without seeing any document,
2  you can't recall ever reading or seeing a
3  study or publication dealing with
4  viewpoints of causation?
5    A.   I saw the viewpoint, but I
6  need to see documents to see which ones
7  specifically you refer.
8    Q.   When you were doing your
9  analysis of the published literature and
10 your study report to make a determination
11 as to whether or not the Johnson &
12 Johnson's talcum powder products were
13 associated with any form of ovarian
14 cancer, did you go through a list of
15 viewpoints to determine whether the
16 association was causal?
17       MS. MILLER:  Objection.
18 You -- you --
19       DR. RESTAINO:  Objection
20 works.
21       MS. MILLER:  There's no
22 foundation.  This mischaracterizes
23 his testimony.  These questions
24 are really not fair.

Page 59

1        When did he say that he did
2  an analysis of the published
3  literature and a study report to
4  make a determination as to whether
5  not Johnson & Johnson's talcum
6  powders were associated with any
7  ovarian -- form of ovarian cancer?
8        I'm sorry to be giving
9  speaking objections, but as I
10 said, this gentleman is a
11 scientist.  He is not a native
12 English speaker, and I think the
13 questions should be fair.
14       DR. RESTAINO:  Your
15 objection is noted.  Let's keep it
16 to objection.  They are the
17 federal rules.
18       MS. MILLER:  I'll say
19 objection unless I feel that the
20 question is stated in such a way
21 that it is intended to mislead
22 this witness.
23       DR. RESTAINO:  Actually
24 you're going to keep it to

Page 60

1  objection or we're going to call
2  the judge.
3        MS. SHARKO:  Okay.
4        DR. RESTAINO:  We can fight
5  about it over another time.  I'm
6  trying to be clear as I can for
7  someone whose English is a second
8  language.  I know that and I
9  respect it.
10 BY DR. RESTAINO:
11   Q.   Doctor --
12       MS. MILLER:  Your question
13 embedded an entire assumption that
14 had never been made in this
15 deposition, that had never been
16 accepted by the witness.  And I
17 think that's hard for somebody to
18 understand who doesn't -- who is
19 not -- English -- who does not
20 speak English as a first language.
21       So I'm just asking to please
22 keep the questions to
23 straightforward questions that
24 don't embed false assumptions.

Page 61

1  BY DR. RESTAINO:
2    Q.   Doctor, if you would turn in
3  your expert report which is marked as
4  Exhibit Number 2 and turn to Page 11.
5  And now, there's a figure there.  Figure
6  Number 2 on Page 11, correct?
7    A.   Correct.
8    Q.   And right above that,
9  there's a sentence where you write,
10 "Without this direct molecular pathology
11 evidence," do you see where I am, sir?
12   A.   I'm sorry, where are you?
13   Q.   The sentence right above the
14 figure.
15   A.   Okay.  Okay.  I saw it.
16   Q.   "Without this direct
17 molecular pathology evidence, a causal
18 relationship of talc and ovarian cancer
19 cannot be established (see below)."
20       Do you see that, sir?
21   A.   Let me finish the whole
22 section, okay.
23   Q.   No, sir.  I just want to
24 know if you -- if you can see that

16 (Pages 58 to 61)

Ie-Ming Shih, M.D., Ph.D.

Page 62

1    sentence that I just read.
2        A.   Okay.
3        Q.   Do you see that, sir?
4            MS. SHARKO: He's just
5        directing your attention to that
6        sentence.
7            THE WITNESS: Oh, okay,
8        yeah, I saw the sentence you --
9    BY DR. RESTAINO:
10       Q.   You see the sentence.
11       A.   -- you mentioned.
12       Q.   And it is your expert
13   opinion, is it not, that without direct
14   molecular pathology evidence, a causal
15   relationship of talc and ovarian cancer
16   cannot be established; is that correct?
17       A.   I think any cancer biologist
18   will agree that you need to see the
19   genetic mutation in order to establish
20   causal relationship. As you know, the
21   cancer biology, cancer origin is based on
22   genetics, and cancer is a genetic
23   disease. It must have mutations.
24   There's a difference between cancer and

Page 63

1    normal cells.
2            So in order to understand
3    the sentence I wrote, you need to
4    understand that cancer is just not coming
5    from nowhere. It has a basis of
6    molecular genetic changes, including
7    somatic mutations in cancer driver genes,
8    which is in contrast to cancer mutational
9    genes. And the cell, this is the origin
10   that every cancer can -- can develop.
11   Without mutations, there's no way that
12   you can say that this is the -- the
13   causal.
14       Q.   Okay. So is it your expert
15   opinion that before a causal relationship
16   between an environmental agent and cancer
17   can be established, you have to see
18   evidence of direct molecular pathology?
19           MS. MILLER: Objection.
20       Mischaracterizes the witness's
21       testimony.
22           THE WITNESS: What I said is
23       you need to have cogent evidence
24       and credible science and

Page 64

1        methodology to support biological
2        plausibility and the mechanism.
3        And mutation is one of them, is
4        one of them.
5    BY DR. RESTAINO:
6        Q.   Do you recall in any of your
7    readings the statement that -- regarding
8    biological plausibility? Are you
9    familiar with that term?
10       A.   Could you define your
11   definition? I don't know which
12   biological plausibility you refer to.
13       Q.   I'm not referring to any
14   specific form of biological plausibility.
15   You as an expert, can you define for us
16   what is meant by biological plausibility?
17       A.   Okay. In my opinion,
18   biological plausibility is the evidence,
19   based on very good methodology, that can
20   support a statement. For example, talc
21   is causal to ovarian cancer.
22       Q.   And is it biologically
23   plausible in your mind as an expert that
24   talc, talcum powder, is associated with

Page 65

1    ovarian cancer?
2            MS. MILLER: Objection. He
3        said causal, you're saying
4        association.
5            THE WITNESS: I said causal.
6        You say association. I don't mean
7        association.
8            Association doesn't mean
9        it's causal. It is a very basic
10       scientific logic, everybody should
11       know that.
12   BY DR. RESTAINO:
13       Q.   Would you -- do you agree
14   that the biological plausibility depends
15   upon the science of the day, would you
16   agree?
17       A.   That's too general. I
18   cannot answer that. If you have more
19   specific, give me an example, then I can
20   give you an answer.
21       Q.   Would you agree that science
22   is a continuum and what scientists know
23   one year from now might be different from
24   what scientists know today?

17 (Pages 62 to 65)

Ie-Ming Shih, M.D., Ph.D.

Page 66

1      A.   It depends on what kind of
2  science.  Only true science will survive.
3      Q.   Okay.  Would you -- do you
4  agree that research is never finished,
5  but carries on and on?
6           MS. MILLER:  Objection.
7           THE WITNESS:  This is too
8  general.  I don't know what this
9  means.
10          MS. MILLER:  Doctor, please
11  remember to give me ten seconds --
12          THE WITNESS:  Okay.
13          MS. MILLER:  -- between his
14  question and your answer so that I
15  can lodge my objection and the
16  record is clear.
17 BY DR. RESTAINO:
18      Q.   And I'm sorry, regarding
19  research, would you agree that research
20  never is finished?
21          MS. MILLER:  Objection.
22  Vague.
23          THE WITNESS:  Is too vague a
24  question.  I cannot answer that.

Page 67

1  BY DR. RESTAINO:
2      Q.   You don't understand what I
3  mean by asking --
4      A.   It's too vague.  It's not --
5  I cannot understand.
6      Q.   Are you familiar -- familiar
7  with basic epidemiological principles?
8      A.   What do you mean basic
9  principle?  It's too general.
10      Q.   Do you know how, when
11  looking at a study that has some degree
12  of epidemiology in it, do you know how to
13  interpret a confidence interval?
14      A.   Again, I'm a cancer
15  biologist and a gynecology pathologist.
16  I review those articles that is relevant
17  and important and -- and related.  I am
18  not epidemiology expert.  You can -- you
19  should defer those question to them.  I
20  can -- I am here -- okay.  This is very
21  important.
22          My job here is served as an
23  expert in cancer biology and gynecology
24  pathology to answer whether talc is -- is

Page 68

1  causal or not.
2      Q.   And you looked, did you not,
3  at various epidemiological studies
4  looking at the association of talcum
5  powder and ovarian cancer, correct?
6      A.   I study some of them.
7      Q.   In fact, if you look in your
8  expert report on Page 11?
9      A.   Yes, I saw it.
10      Q.   Okay.  Are you on Page 11?
11      A.   Yes, I am -- I think so.
12      Q.   Do you see there on -- on
13  Page 11 a description of epidemiological
14  studies that you reviewed?
15      A.   Which -- which line you are
16  talking about?  Which study?  Could you
17  name the first author of the study and
18  year?
19      Q.   On the -- on the bottom of
20  Page 11, you have a numbered paragraph,
21  Number 4, correct?
22      A.   Yes.
23      Q.   Do you see there where
24  you've written, "A number of

Page 69

1  epidemiological studies clearly fail to
2  show an association between talc exposure
3  and women who develop ovarian cancer
4  including prospective cohort studies
5  (Houghton, et al., 2014; Gertig, et al.,
6  2000; Gates, et al., 2010; Gonzalez et
7  al., 2016)?"
8          Do you see that, sir?
9      A.   Yes, I did.
10      Q.   Now, you reviewed those
11  studies?
12      A.   I reviewed the study quickly
13  and come to my report.  But I -- I should
14  say I reviewed those articles and not
15  only these four, but several here.  So I
16  just come up with my general opinion as a
17  sum, as a cancer biological view, like a
18  bird's-eye-view about epidemiology.  I
19  cannot give you the full-blown -- and the
20  details about a specific study.
21          So what I feel after I
22  review this, Gertig, Gates, Gonzalez,
23  Houghton, and several others perhaps, my
24  thinking is number one, those

18 (Pages 66 to 69)

Ie-Ming Shih, M.D., Ph.D.

Page 70

1  epidemiology studies did not show
2  consistent result.  For example, as you
3  know, there are two basic epidemiology
4  studies.  One is longitudinal cohort --
5  okay, cohort.
6         MS. SHARKO:  Dr. Shih, I'm
7  going to interrupt you to help
8  Mr. -- Dr. Restaino out.  He just
9  wants to know if you looked at
10  those studies.  And so --
11        THE WITNESS:  Okay.  Thank
12  you very much.
13        DR. RESTAINO:  Thank you.
14        MS. SHARKO:  That's his
15  question.  Then he's going to ask
16  you another question.
17        THE WITNESS:  Okay.  Yes, I
18  reviewed those studies.
19  BY DR. RESTAINO:
20     Q.   When you --
21        MS. MILLER:  Is this -- oh,
22  sorry.
23        DR. RESTAINO:  I'm sorry.
24  Go ahead.

Page 71

1         MS. MILLER:  I think we've
2  gone an hour.  I think we could
3  all use a bathroom break.  Is this
4  a good time?
5         DR. RESTAINO:  This is a
6  good time.
7         THE VIDEOGRAPHER:  The time
8  is 10:09 a.m., and we are going
9  off the record.
10        (Short break.)
11        THE VIDEOGRAPHER:  The time
12  is 10:24 a.m.  We are back on the
13  record.
14  BY DR. RESTAINO:
15     Q.   Welcome back, Doctor.
16     A.   Thank you.
17     Q.   When we broke and we were
18  talking about your review of the
19  different epidemiological studies.  And I
20  believe you said that your view of this
21  was a bird's-eye-view; is that correct?
22     A.   I summarized what I studied
23  from this literature.
24     Q.   As far as the strengths and

Page 72

1  weaknesses of each epidemiological study,
2  would you defer to someone who has
3  expertise and a degree in epidemiology?
4         MR. LOCKE:  Objection to
5  form.
6         MS. MILLER:  Objection.
7         THE WITNESS:  If the
8  strength is really high, like a
9  20, 30, like cigarette smoking, I
10  think everybody will accept that's
11  a risk factor.
12        If really low, like 1.5,
13  below, 1.1, it could be just by
14  chance and that's needed expert --
15  experts to look into that to study
16  the confounding factors, case
17  number and et cetera, et cetera.
18  BY DR. RESTAINO:
19     Q.   When you are writing an
20  academic paper for publication, any
21  paper, do you typically conduct a review
22  of the literature for articles germane to
23  the paper you were going to write?
24     A.   I will cite many papers that

Page 73

1  are relevant to my study, but will not be
2  able to comprehensively list all the
3  literatures.
4     Q.   How do you determine what is
5  all of the literature?
6     A.   You can go to PubMed search
7  or Google Scholar search about the
8  keywords that you have an interest and
9  related to that specific studies.
10    Q.   Did you do that before you
11  wrote your expert report in this
12  litigation?
13    A.   Yes, I did.
14    Q.   And can -- as you sit here
15  today, can you recall and share with us
16  some of the keywords that you used?
17    A.   Okay.  If I can remember I
18  will let you know, okay.
19        One is talc, talcum powder,
20  ovarian cancer -- could I go slowly --
21  pathogenesis, tumor initiation, TP53 --
22  that's a gene name -- high grade serous
23  carcinoma, and of course ovarian cancer.
24    Q.   Okay.  Do you know the

19 (Pages 70 to 73)

Ie-Ming Shih, M.D., Ph.D.

Page 74

1  difference when conducting a review of
2  the literature between a systematic
3  review of the literature and a narrative
4  review of the literature?
5       MS. MILLER: Objection.
6       THE WITNESS: I think that's
7    too general a question, could you
8    become more specific?
9  BY DR. RESTAINO:
10      Q.   Yes, sir.  Have you heard of
11  the term "systematic review of the
12  literature"?
13      A.   The system review of
14  literature is what I did.  That's my
15  definition, looked into the search
16  engine, like Google Scholar and PubMed
17  and put in the keywords.  Then you will
18  come out with a list of article, right?
19  So then, I scan quickly, the authors, the
20  titles, and to determine whether this is
21  relevant, either by looking at titles and
22  the authors.  If I decide it is an
23  interesting one, I will read more
24  carefully.

Page 75

1       Q.   Do you know what is meant by
2  the term "narrative review of the
3  literature"?
4       MS. MILLER: Objection.
5       THE WITNESS:  Does that mean
6    review -- read review articles?
7  BY DR. RESTAINO:
8       Q.   Yes.
9       A.   Okay.  That's what you
10  meant?
11      Q.   Yes.
12      A.   I did that also too
13  occasionally, if this is germane to my
14  study and is useful for the paper.
15      Q.   Did you -- and I know it's
16  not a memory test, did you use the
17  keyword "inflammation" when you were
18  doing your search of PubMed, Google
19  Scholar, and whatever database?
20      A.   Yes, I believe so.
21      Q.   Okay.  And you reviewed the
22  expert report of Dr. Sarah Kane, correct?
23      A.   I think I was provided with
24  Saed's report.

Page 76

1       Q.   And you were also provided
2  with the report of Dr. Sarah Kane, which
3  you describe in your expert report; is
4  that true, sir?
5       A.   I cannot remember that.
6       Q.   Do you remember reviewing an
7  expert report of a gynecologic
8  pathologist from up in Boston?
9       A.   Oh, yes.
10      Q.   Do you recall reviewing the
11  methodology that she used to write her
12  expert report?
13      A.   I know she report pathology,
14  methodology, but I need to have the
15  documents before I can further discuss.
16      Q.   Okay.  Do you know as you
17  sit here today, if she conducted a
18  systematic review of the literature and
19  then wrote her expert report?
20      A.   I don't know.
21      Q.   Do you know as you sit here
22  today, if you disagree with the
23  methodology that Dr. Sarah Kane utilized
24  to write her expert report?

Page 77

1       A.   I need to see the report
2  first.  I cannot recall at this moment.
3       Q.   Okay.  Do you recall reading
4  Dr. Saed's expert report?
5       A.   Yes, I recall it.
6       Q.   And you have criticisms of
7  the methodology he employed to write his
8  expert report?
9       A.   Yes.  And this is in my
10  expert reports shown in Exhibit 2.
11      Q.   Yes, sir.  Thank you.
12      A.   Yeah, here.
13      Q.   Now, in -- I believe it's
14  expert -- excuse me -- Exhibit 4, your
15  study report.  It's titled "Study Report
16  to Determine Whether Chronic Inflammation
17  Causes Ovarian Cancer."
18         Do you have that, sir?
19      A.   Yes.
20      Q.   Now, you are the sole author
21  listed on the version that we were
22  provided; is that true?
23      A.   Correct.
24      Q.   And will there be other

20 (Pages 74 to 77)

Ie-Ming Shih, M.D., Ph.D.

Page 78

1    authors -- strike that. I'm sorry.
2            Doctor, do you plan on
3    submitting this publication for peer
4    review and publication?
5        A.   Yes.
6        Q.   Have you submitted it
7    already?
8        A.   Not yet.
9        Q.   The -- as you sit here
10   today, do you know if the version that
11   you submit for peer review and
12   publication will have co-authors with
13   you?
14       A.   I have no plan yet what kind
15   of other data will be included. So I
16   cannot answer the question for the future
17   tense.
18       Q.   Is it fair to say then that
19   your study report as provided today is an
20   unfinished product?
21       A.   It is an ongoing project.
22       Q.   Have you discussed the
23   methodology that you used with this
24   report with any other investigator at

Page 79

1    Johns Hopkins University?
2        A.   No.
3        Q.   Did you study the -- did you
4    discuss the methodology that you would
5    use for your study report with any
6    representative of Johnson & Johnson?
7        A.   No.
8        Q.   Did you discuss the
9    methodology that you would use for your
10   study report with any scientist that's --
11   or physician not with Johnson & Johnson
12   and not with Johns Hopkins?
13       A.   Could you repeat that
14   question one more time?
15       Q.   Did you discuss your
16   methodology with anyone else other than a
17   scientist from Johnson & Johnson or a
18   representative from Johnson & Johnson or
19   physician/scientist from Johns Hopkins?
20       A.   As I said, this is my own
21   study.
22       Q.   I appreciate that -- that
23   it's your own study. But in discussing
24   how to do the study and how to best glean

Page 80

1    the truth from your study, did you
2    discuss the study methodology for
3    example, with Dr. Kurman?
4            MS. MILLER: Objection. You
5        said in discussing how to do the
6        study, but he said he didn't
7        discuss the study. So I'm
8        confused by the question.
9            THE WITNESS: Yeah, I think
10       I answered your question already.
11   BY DR. RESTAINO:
12       Q.   Prior to writing your study
13   report, did you discuss what you were
14   doing with Dr. Kurman?
15       A.   No.
16       Q.   Has Dr. Kurman, to the best
17   of your knowledge, seen the version of
18   the study report that we have at this
19   time?
20       A.   I don't know whether he see
21   it or not.
22       Q.   Now, if you -- on the first
23   page of your study report, underneath
24   your name and your address, there's time

Page 81

1    frame, January 1st, 2019, to February 11,
2    2019; is that correct?
3        A.   This time frame was
4    generated based on when I draft this
5    report, and I think I can finish between
6    January 1st to February 11, 2019. That's
7    my projection.
8        Q.   In any period of time
9    between January 1st and today, did you
10   share any drafts of your study report
11   with anyone?
12       A.   Anyone means?
13       Q.   Anyone but you. Has anyone
14   else seen any drafts of your study
15   report?
16       A.   I think it's included in
17   this exhibit, so everybody now see it.
18       Q.   Okay. Prior to today, and
19   prior to it being distributed amongst the
20   attorneys, did you share any drafts of
21   that report with anyone?
22       A.   I did not share it with any
23   of my colleague scientists --
24       Q.   Okay.

21 (Pages 78 to 81)

Ie-Ming Shih, M.D., Ph.D.

Page 82

1    A.   -- and any other colleagues
2  near -- near me.
3    Q.   Did you share any draft of
4  the study report with any representative
5  of Johnson & Johnson?
6    A.   You mean a draft, no.
7    Q.   Okay.  Are there drafts of
8  your study report?
9    A.   There is no draft.
10   Q.   And when you first sat down
11 and thought about what study you would
12 like to do, to look at the question
13 regarding chronic inflammation and
14 ovarian cancer precursor cells, did you
15 write up a protocol for yourself?
16   A.   What do you mean protocol?
17   Q.   Did you write down a plan
18 for how you anticipated conducting the
19 study?
20   A.   No.
21   Q.   Now, for your histological
22 analysis, you identified cases that were
23 showing ovarian cancer precursor lesions
24 without concurrent ovarian cancer; is

Page 83

1  that correct?
2    A.   Yes.  But which page are you
3  referring to now?
4    Q.   I'm just asking in a general
5  sense.
6    A.   Yes.
7    Q.   Okay.  And then you also
8  selected some cases with ovarian cancer
9  as control; is that correct?
10   A.   I -- you must refer to the
11 table, yes.
12   Q.   Okay.  Now, how did you
13 identify the cases that had ovarian
14 cancer precursor lesions without
15 concurrent ovarian cancer?  Were the
16 slides labeled?
17   A.   No.  It's based on the
18 pathology reports and my re-review of the
19 slides.
20   Q.   Who wrote the pathology
21 reports that pertain to each specific
22 slide?
23   A.   The individual pathologist
24 who diagnosed that case.  And I

Page 84

1  re-reviewed the whole material before I
2  conducted this study and write down my
3  results as shown in the table.
4    Q.   So if you wanted to see the
5  slide that had evidence of p53 signature
6  lesions, was there a list of those slides
7  that had that pathology?
8    A.   I think that's correct.  But
9  I need to re-review -- re-review them.
10 Sometimes they are not present anymore
11 for study because they are very small and
12 minute.
13   Q.   I'm sorry, sir, what are
14 small and minute?
15   A.   So could you go back to this
16 Figure 2 so I can explain to you what
17 this minute means.
18       Table 2 in my report.
19   Q.   The listing of your 59
20 slides?
21   A.   No, no, no, not that one.
22 This one.
23       MS. MILLER:  He's talking
24 about his report.  I think.

Page 85

1        DR. RESTAINO:  Oh, I'm
2  sorry.  Forgive me.
3        THE WITNESS:  Oh this one
4  here.  Page 11 here.
5  BY DR. RESTAINO:
6    Q.   Yes, sir.
7    A.   So you need to understand
8  this precursor lesions are very small.
9    Q.   I understand precursor
10 lesions --
11   A.   Okay.
12   Q.   -- probably more than I want
13 to.
14       My question is, sir, if you
15 were going to determine if there were
16 lymphocytes associated or -- or listed in
17 a particular slide with p53 lesions in
18 it, was there a list of the -- of the
19 slides that already had p53 lesions or
20 did you have to go through every slide to
21 find them?
22   A.   I think your question has
23 two parts.  One is p53 signatures,
24 whether this is listed?

22 (Pages 82 to 85)

Ie-Ming Shih, M.D., Ph.D.

Page 86

1      Q.   Yes.
2      A.   Okay.  I think it is listed.
3  But I need to re-review them.
4      Q.   Okay.
5      A.   Okay.
6      Q.   Okay.  And then also --
7      A.   Second question, chronic
8  inflammation.
9      Q.   Okay.  Now -- but can the
10  same thing be said for the --
11          DR. RESTAINO:  Excuse me.
12  God bless you.
13          MS. SHARKO:  Thanks.
14  BY DR. RESTAINO:
15      Q.   Regarding other pathology,
16  in other words, you looked at the p53
17  signature lesions and you also looked at
18  the serous tubal intraepithelial cells,
19  correct?
20      A.   Yeah, very good.
21      Q.   Can we call them STIC?
22      A.   Please.
23      Q.   Okay.  Did you -- is there a
24  listing in the data bank where you

Page 87

1  obtained these slides of the slides with
2  STIC lesions in them?
3      A.   This would be really
4  complicated to answer, because basically
5  I need to retrieve the slides and I need
6  to re-review all of them to make the
7  diagnosis.  So I will say the diagnosis,
8  this -- in this table is based on my
9  review of all the cases, is my own
10  diagnosis.
11      Q.   Okay.  With that table open
12  in front of you, sir, if you took at
13  lesion Number 1, the very top one?
14      A.   Yes.
15      Q.   Case ID S8001 diagnosis p53
16  SIG, does that stand for signature
17  lesion?
18      A.   Yes.
19      Q.   Okay.  Now, did -- did you
20  take out slide -- or excuse me, Lesion 1,
21  slide S8001, 8001, and did you make the
22  diagnosis of p53 signature lesion or was
23  there a listing of slides that said, if
24  you want to see p53 signature lesion,

Page 88

1  look at this slide?
2      A.   Okay.  I get you.  So I made
3  a diagnosis of p53 signature by myself in
4  this study.
5      Q.   Thank you.
6      Okay.  So how many slides
7  are in the data bank that you --
8      A.   I don't know.  I need to --
9  I don't know that number.
10      Q.   How did you derive or decide
11  upon which 59 slides that you were going
12  to look at?
13      A.   I looked at those slides
14  with the lesions, and they are available
15  for me to review.
16      Q.   But how did you know which
17  slides had which lesions to pull them?
18      A.   Okay.  So your question is,
19  how can I select those cases, right?
20      Q.   Yes, sir.
21      A.   Okay.  So, basically, this
22  study we collect all the tubal lesions,
23  including p53 signatures and STIC from
24  the pool of cases.  Then we combine them

Page 89

1  into our study.
2      So in order to know exactly
3  is a p53 signature STIC or there is no
4  lesion anymore, or there's a cancer, I
5  need to review every single case of that.
6      Q.   So for Slide Number 1, Case
7  ID S80001, when you sat down at the
8  microscope, you knew that someone had
9  already diagnosed p53 signature lesions
10  in that slide; is that correct?
11      A.   I think this cohort -- not
12  cohort -- collection, labels, tubal
13  lesions, including p53 signature and
14  STIC.  And sometimes they have STICs and
15  p53 signature and cancer or without
16  cancer.  So it's really complicated.
17  It's not only p53 signature.
18      This pool that I -- we just
19  talking about is the collection of all
20  tubal lesions.  It's really vague.  It's
21  just labeled positive.  Then I need to
22  diagnose and confirm the diagnosis before
23  I conduct these experiments.
24      Q.   Okay.  If you would turn to,

23 (Pages 86 to 89)

Ie-Ming Shih, M.D., Ph.D.

Page 90

1  in your full study, on Page 1, you have a
2  paragraph that you have titled
3  "Hypothesis"; is that correct?
4      A.   Correct.
5      Q.   And if you look down five
6  lines, sir, in the middle of that
7  paragraph, towards the right of the
8  paragraph, there's a sentence that
9  starts, "We hypothesize that if ovarian
10 cancer."
11         Do you see that, sir?
12     A.   Oh, okay.  Yes.
13     Q.   If you're the sole author,
14 who is the "we"?
15     A.   Okay.  So, let me see this.
16 I will actually explain to you.  So in
17 scientific community, we always use "we."
18 So this is engrained into my brain.  I
19 never say I, because we are not so
20 arrogant.  Scientists is always very poor
21 people.
22         MS. MILLER:  Sorry to laugh
23     at you.
24         THE WITNESS:  We try to test

Page 91

1      all the hypothesis, many
2      hypothesis, but all failed.
3  BY DR. RESTAINO:
4      Q.   Okay.
5      A.   So it's really --
6      Q.   I was just trying to
7  confirm, sir, if you did --
8      A.   Yeah.
9      Q.   -- this alone or if there
10 were others.
11     A.   Of course.  Of course.  Of
12 course.
13     Q.   Now, under study design, on
14 the next page, you have a paragraph
15 titled "Study Design and Case Selection,"
16 correct?
17     A.   Yes.
18     Q.   And you write, "The cases
19 were retrieved from the archival files
20 from the ovarian cancer precursor
21 registry supported by U.S. Department of
22 Defense (USA MRMC) directed medical
23 research programs (CDMRP) grant title
24 'Prevention of Ovarian High Grade Serous

Page 92

1  Carcinoma by elucidating Its Early
2  Changes,' Grant Number W81XWH-11-2-0230."
3         Did I read that correctly,
4  sir?
5      A.   Yes.
6      Q.   Now, that's an -- that was
7  the ongoing grant that you have many
8  publications for; is that correct?
9      A.   This grant has ended.
10     Q.   Okay.  There's no more money
11 to be obtained from that grant?
12     A.   I wish, but no.
13     Q.   Now, associated with this
14 grant, the slides that were available for
15 you to review, are they located at the
16 Johns Hopkins University slide bank, or
17 did you have to go to another university
18 to get them?
19     A.   It's inside of Johns Hopkins
20 research building, and this is a
21 government funded, so we are responsible
22 to take care of them.
23     Q.   Okay.  And associated with
24 each slide, is there a medical history of

Page 93

1      the woman from whom the tissue was
2  obtained?
3      A.   I cannot recall that,
4  because it's under the IRB regulations,
5  so that's -- I cannot remember correctly
6  what IRB said.
7      Q.   And in fact, in several of
8  the publications that you have published
9  or co-authored that involves a
10 histopathological analysis of the slides
11 from this grant that we just discussed,
12 you list that you obtained internal
13 review board approval, correct?
14     A.   Correct.
15     Q.   Did you obtain -- oh, excuse
16 me.  Internal review board.  Would it be
17 okay if for the rest of the day, we just
18 say IRB?
19     A.   I agree.
20     Q.   You're familiar with IRB?
21     A.   That's why we did study.
22     Q.   Okay.  Did you obtain IRB
23 approval to conduct the study that we are
24 discussing today?

24 (Pages 90 to 93)

Ie-Ming Shih, M.D., Ph.D.

Page 94

1      A.   I think every time DOD give
2  the fund, they need to approve every
3  regulatory documents.
4          MS. SHARKO: Dr. Shih, he's
5      just asking you, if to do this
6      slide review that you did, you
7      first got IRB approval.
8          THE WITNESS: Yes.  And this
9      is required.
10 BY DR. RESTAINO:
11     Q.   For this study that we're
12 discussing today, the -- the appropriate
13 IRB gave you approval to do the study?
14     A.   Yes.  This -- okay.  So this
15 study, the IRB in the original form, and
16 actually the IRB continues, okay, even
17 the grant expired, because IRB is defined
18 as the study, not dependent on whether we
19 have it funded or not.  It's only
20 research oriented.
21         So we obtain the IRB in the
22 very beginning for many, many years, and
23 so it's include different kinds of
24 studies.

Page 95

1      Q.   So, is it your testimony
2  that you did not need specific IRB
3  approval to pull these 59 slides and look
4  at them?
5      A.   In fact, I submit addendum
6  of the IRB report, including to
7  investigate chronic inflammation in the
8  precursor lesion, and the
9  microenvironment, epigenetic study, and
10 to many other things.
11     Q.   And to whom did you submit
12 the addendum?
13     A.   To the Johns Hopkins eIRB.
14     Q.   And when did you do that?
15     A.   I cannot recall.
16     Q.   Prior to conducting this
17 study?
18     A.   Again, as I said, this study
19 about the chronic inflammation and the
20 microenvironment was ongoing for many
21 years.  And as you can see, there's
22 Ardighieri publication, 2014, in the
23 International Journal of GYN Pathology,
24 and this is in continuation.

Page 96

1      Q.   You do not -- or do you
2  state in the study report anywhere that
3  IRB approval was obtained?
4      A.   Could you repeat the
5  question one more time?
6      Q.   Can you show us in the study
7  report that you have in front of you
8  where you state that IRB approval was
9  obtained?
10         MS. MILLER: Objection.
11     Lacks foundation.
12         MS. SHARKO: He wants to
13     know if, looking at your report,
14     you refer anywhere to getting IRB
15     approval.
16 BY DR. RESTAINO:
17     Q.   Do you understand what I
18 mean, sir?
19     A.   I did not recall I put that
20 in, but in future publication, definitely
21 I will put that in.
22     Q.   Okay.  In your -- in the
23 version of the study report that we have,
24 can you show me where you discuss the

Page 97

1  limitations of your study?
2      A.   This is the data I want to
3  show to you guys today.  But the
4  limitation, definitely I will say that in
5  my publications.  And actually in -- I
6  think I put the limitation in more
7  speculated terminology in my study
8  reports, based on my publication records.
9  This is very different from some very
10 sloppy bench science publication, without
11 acknowledge any of the limitation.
12     Q.   As you sit here today, do
13 you know if you've ever published a paper
14 pertaining to a study wherein you did not
15 describe the limitations of the study?
16     A.   The limitation depends on
17 how you present it.  It can become
18 speculative.  It is possible.  And
19 further study is required.  So the
20 limitation, the term may not be used by
21 the implication of the limitations
22 exercise in the report.
23     Q.   Do you -- I'm sorry, sir.  I
24 did not mean to step on your sentence.

25 (Pages 94 to 97)

Ie-Ming Shih, M.D., Ph.D.

Page 98

1       In the version of the study
2   report that was provided to us, can you
3   show us where you describe the
4   limitations of your study?
5       MS. MILLER:  Objection.  He
6       said earlier that --
7       THE WITNESS:  I did answer
8       your question.
9   BY DR. RESTAINO:
10      Q.   Is the word "limitations" to
11  be found anywhere in this -- in the
12  version of the report that we've been
13  provided with?
14      A.   Again, this is ongoing
15  projects, ongoing results, it is by no
16  means that this will be the final
17  publication report.  And of course we
18  have not written the paper yet, but when
19  we -- when I -- I am sorry.  When I
20  finish this study and try to publish it
21  and when I draft the manuscript,
22  definitely like in other publication I
23  did, I will use the term to show the
24  limitation, but not necessarily using the

Page 99

1   term, the word of limitation in the study
2   outcome.
3       Q.   Sir, if you would turn now
4   to your expert report instead of the
5   study report, but your expert --
6       A.   Expert report.
7       Q.   Your expert report, please.
8   And -- and turn to Page 16 of your expert
9   report.
10      Do you see, sir, the first
11  full paragraph at the top which starts,
12  "In reality," --
13      MS. MILLER:  Page?
14      THE WITNESS:  Page 16?
15      MS. MILLER:  I don't have
16      that on Page 16.
17      DR. RESTAINO:  It may not be
18      Page 16.
19      Page 15, forgive me.
20  BY DR. RESTAINO:
21      Q.   Page 15.  Do you see the
22  paragraph up above, it starts, "In
23  reality, chronic inflammation."
24      Do you see where I am, sir?

Page 100

1       A.   Yes.
2       Q.   Now, the second sentence
3   states, "My recent study, which is
4   included in full at the end of this
5   report, offers significant support for
6   this conclusion."
7       Did I read that correctly?
8       A.   Yes.
9       Q.   Is it your testimony today
10  that the -- your recent study we've been
11  discussing is not the full report but is
12  going to be modified?
13      MS. MILLER:  Objection.
14      THE WITNESS:  This is the
15      data I have, but when you wrap up
16      a study, you have other
17      ingredients, like introduction,
18      methodologies, result, discussion.
19      This is not full report as a
20      publication.  I mean a full report
21      meaning it's publication.  Okay.
22      But this is a full result I
23      have at this moment.
24  BY DR. RESTAINO:

Page 101

1       Q.   A moment ago you testified
2   that it could change, your opinions could
3   change.  You state, again, this is
4   ongoing projects, ongoing results.
5       A.   Yes.
6       Q.   So, is it fair to say that
7   your opinions in your expert report, in
8   the study report that you've provided to
9   us and that you are providing today, are
10  preliminary results?
11      MS. MILLER:  Objection.
12      THE WITNESS:  Could you
13      repeat the question?  I think
14      there's two questions in your
15      previous statement.  Could you
16      break it up?
17  BY DR. RESTAINO:
18      Q.   You stated that there were
19  ongoing results.  So if there's ongoing
20  results --
21      A.   No.
22      Q.   -- is it --
23      A.   It is ongoing study, not
24  results.

26 (Pages 98 to 101)

Ie-Ming Shih, M.D., Ph.D.

Page 102

1    Q.  Okay.  And so that there
2  isn't any confusion, particularly on my
3  part, sir, I want to give you what's been
4  marked as Exhibit 27 I believe.
5        (Document marked for
6        identification as Exhibit
7        Shih-27.)
8  BY DR. RESTAINO:
9    Q.  And do you recognize that
10  paper, sir?
11    A.  Yes, I recognize it.
12    Q.  Okay.  If -- if you turn to
13  Page 6546.  Okay, sir?  Are you there?
14    A.  Yeah.
15    Q.  Do you see there's a section
16  titled "Acknowledgments"?
17    A.  Yes.
18    Q.  And do you see that they --
19  that there is written there, "The work
20  was supported by the Honorable Tina
21  Brozman, B-R-O-Z-M-A-N, Foundation and
22  the Department of Defense CDMRP," and
23  then there's the grant number that we
24  discussed earlier.  That's the same grant

Page 103

1  that we have been discussing; is that
2  correct?
3    A.  I think so.
4    Q.  And were the materials that
5  were utilized for this study, "Methylomic
6  analysis of ovarian cancers identifies
7  tumor-specific alterations readily
8  detectable in early precursor lesions,"
9  obtained from the same Johns Hopkins
10  University tissue or slide bank as your
11  present study?
12    A.  Could you indicate where is
13  the sentences?
14    Q.  I was -- put your attention
15  to the acknowledgments.  Do you see under
16  acknowledgments?
17      MS. MILLER:  Do you want me
18    to show him?
19      DR. RESTAINO:  Sure.  Thank
20    you.
21      THE WITNESS:  Yeah, I saw
22    that acknowledgment.
23  BY DR. RESTAINO:
24    Q.  Okay.  And you see that the

Page 104

1  grant number is listed there, correct?
2    A.  Correct.
3    Q.  And that's the same grant
4  that we've been talking about so far this
5  morning?
6    A.  This is only one of the
7  grants with acknowledgments.
8    Q.  Okay.  And I just wanted --
9  for the record, it's the same grant?
10    A.  Yes.
11    Q.  Now, for the slides for this
12  paper, the methylomic analysis, were they
13  obtained from the same Johns Hopkins
14  tissue bank?
15    A.  They are obtained from
16  different resources within Johns Hopkins.
17    Q.  Okay.  Now, if you would
18  turn to Page 6537 of that article.  And
19  you'll see there that there is a
20  materials and methods section.
21    A.  Right.
22    Q.  And the first full sentence
23  of that section, it is written, "This
24  study was performed after approval by

Page 105

1  Institutional Review Board (IRB) and
2  conducted in accordance with the U.S.
3  Common Rule."
4      Do you see where I read that
5  from, sir?
6    A.  Yes.
7    Q.  Will your final paper, your
8  study report that when it's submitted for
9  publication, will that contain that
10  similar language?
11      MS. MILLER:  Objection.
12      THE WITNESS:  It will.
13  BY DR. RESTAINO:
14    Q.  But it does not at this
15  time, correct?
16    A.  It's not a paper yet.  We
17  have not -- I have -- I'm sorry, excuse
18  me as a scientist.  We are teamwork.
19      I did not submit the paper
20  yet.  I did not write the paper yet.
21    Q.  So what is it that we are
22  looking at when we see the full study
23  report, as you describe it, what is that?
24    A.  Excuse me, what, could you

27 (Pages 102 to 105)

Ie-Ming Shih, M.D., Ph.D.

Page 106

1  repeat one more time?
2      Q.   Exhibit 4, your -- the study
3  itself.
4      A.   Yeah.
5      Q.   What you describe as being
6  attached in full to your expert report,
7  if it's not a paper yet, what are we --
8  is it, what are we looking at, sir?
9      A.   It's interim report to show
10  that -- to address one of the most
11  important questions regarding whether
12  talc will cause inflammation,
13  inflammation will cause precursor lesion
14  where ovarian cancer originate from.
15      Q.   But your expert report
16  describes it as a full report.  Is it a
17  full report as in your expert report or
18  is it an interim report as you just
19  stated?
20      A.   Which were you -- which --
21  which one are you talking about?  I'm
22  confused.
23      Q.   The study report.
24      A.   Okay.  My study report.

Page 107

1  This one?
2      Q.   Yes.
3      A.   And where --
4      Q.   Is that a full report or is
5  it an interim report?  It's Exhibit 4.
6  It should be marked as Exhibit 4.
7      A.   Yeah, right.
8          This is the full report at
9  this moment.
10      Q.   Okay.  Going back to the
11  paper we just handed to you, the
12  methylomic paper, and if you turn to
13  Page 6545.
14          Are you there, sir?
15      A.   Yeah.
16      Q.   There's a large paragraph,
17  right column down towards the bottom that
18  starts, "There are a number of
19  limitations to our study."
20          Do you see that, sir?
21      A.   Yes.
22      Q.   Okay.  I'll read it in full.
23          "There are a number of
24  limitations to our study that warrant

Page 108

1  consideration."
2          Do you have that language in
3  the full interim report that you have
4  provided to us?
5          MS. MILLER:  Objection.
6          THE WITNESS:  I think I
7  answered your question already.  I
8  think in the final publication we
9  prepared, I will do that.
10          And this is my style.  In
11  every paper I will be sure this
12  will be included.
13  BY DR. RESTAINO:
14      Q.   Thank you, sir.  I
15  understand.
16          As you sit here today, can
17  you share with us any of the limitations
18  that exist regarding the study you
19  conducted that we've been discussing?
20      A.   Could you repeat one more
21  time and more specific, what do you want
22  me to do?
23      Q.   Yes.
24      A.   Okay.

Page 109

1      Q.   Thank you, sir.
2          What are the limitations of
3  your study as you've performed it?
4      A.   In this Exhibit 4?
5      Q.   Yes, sir.
6      A.   Okay.  So I think you are
7  asking me if I have -- if I wrote or
8  write the publication or manuscript,
9  including this result, what shall I say,
10  right?
11      Q.   Yes.
12      A.   So when a scientist write a
13  paper -- so for example, I am going to
14  write this paper, it depends what kind of
15  data I want to include.  So this will be
16  part of it, and it will join other data,
17  which we don't know, to come up with the
18  best publication to submit at very high
19  impact journal.  That's our purpose.
20          So at this moment, we don't
21  -- I'm sorry, I don't know whether this
22  will be a single long paper just
23  reporting this finding or in combination
24  with other finding as multiple reports or

28 (Pages 106 to 109)

Ie-Ming Shih, M.D., Ph.D.

Page 110

1    a single one publication report.  I have
2    no idea yet.
3         Q.    But as you sit here today,
4    can you share with us some of the
5    limitations of your study that you as a
6    board-certified pathologist know exists
7    when conducting this study.  Do you
8    understand what I'm asking, sir?
9         A.    Yes.
10        Q.    Okay.  What are the
11   limitations to your study as you know
12   them today?
13        A.    The other way to put this
14   around is how can I improve this study?
15        Q.    No, sir.  No, sir.  I just
16   want to know, if you were to write today,
17   "The limitations of this study are," what
18   would you write?
19        A.    So this is based on the
20   cross-sectioned data at this moment,
21   right?
22        Q.    Yes, sir.
23        A.    We are not talking about
24   what else would be included?

Page 111

1         Q.    Yes, sir.
2         A.    Okay.  So I would say I will
3    increase a little bit case number on this
4    because this is from 48 women, 59
5    samples, and this is very important here.
6    This is world's largest study about the
7    precursor lesion without cancer.  You
8    cannot ever, ever fund any study with
9    this number, and this is world largest.
10             But we -- as a good
11   scientist like me, I would like to
12   increase the case number a few more to
13   increase the -- to expand more patients.
14   I think that would be important for the
15   reviewers to be highly impressed that we
16   have even more, more than 48 women.
17        Q.    Now, in doing so, you will
18   be looking at more slides; is that
19   correct?
20        A.    Correct.
21        Q.    Okay.  And in looking at
22   more slides is it possible that the
23   results will change that will change your
24   opinion regarding the association of

Page 112

1    chronic inflammation and the precursor
2    lesions?
3         A.    So -- so my opinion as in
4    the Exhibit 2 is not totally dependent on
5    the results.  And these results can
6    support some of the important arguments.
7    But again, my opinion will not change,
8    even there is a different result in my
9    official publications.  My opinion is
10   based on my literature search about
11   epidemiology, chronic inflammation,
12   carcinogenesis, molecular genetics, and
13   my 20 years of experience as a scientist
14   and pathologist.
15        Q.    Sir, if you were to look at
16   another 59 slides, okay, if you were
17   going to --
18        A.    There should be not so many,
19   to be honest.
20        Q.    If you were to look at
21   another X number of slides and every one
22   of them shows evidence of chronic
23   inflammation, lymphocytes, macrophages,
24   dendritic cells, all the stuff that we

Page 113

1    learn in pathology and physiology, would
2    that change your opinion regarding the
3    association of chronic inflammation and
4    precursor lesions of ovarian cancer?
5         MS. MILLER:  Objection.
6         THE WITNESS:  I cannot
7    observe your assumption in the
8    beginning.  What you say is
9    looking for this lymphocytes --
10   you are very good -- NK cells and
11   plasma cells, that's the normal
12   immunity.
13             Every single normal -- your
14   skin, liver, brain, they have
15   those cells.
16             What I'm talking about here
17   is chronic inflammation.  Chronic
18   inflammation, of course, contain
19   lymphocytes.  But a normal tissue
20   also contain lymphocytes;
21   otherwise, you would get sick, you
22   would get infected, and sepsis.
23             So what I mean chronic
24   inflammation is, as compared to

29 (Pages 110 to 113)

Ie-Ming Shih, M.D., Ph.D.

Page 114

1    normal tissue, like I say increase
2    the number and density of those
3    cells.
4  BY DR. RESTAINO:
5       Q.   So if you --
6       A.   That's very important.
7       Q.   If you were to look at X
8  number of slides --
9       A.   Right.
10      Q.   -- and those X number of
11 slides all showed evidence of chronic
12 inflammation associated with the
13 precursor lesions, would your opinion in
14 this regard change?
15      A.   I think it's a purely
16 hypothetical.  But I can tell you one
17 thing.  Based on all scientific practice,
18 when you see zero of 10, then you don't
19 know what's the other two, right.  And
20 then if you look at zero -- okay.  How
21 about we start over again.
22           We look at two cases and
23 they have no chronic inflammation.  So we
24 are not really sure whether this is -- we

Page 115

1  are really confident about that.
2           But when you look at this
3  number and the -- are you listening?
4       Q.   I am listening.  I'm reading
5  too.
6       A.   So if there is zero of this
7  48 cases, the probability, you know,
8  probability, right, the chances would be
9  extremely, extremely low.
10           So of course I cannot
11 predict what happens.  But I think the
12 likelihood that we'll see chronic
13 inflammation in those STIC, p53
14 signature, without cancer, would be very,
15 very low.
16           And especially I would not
17 include another 100, 200 cases, because
18 there's a limitation of the science.
19 There's no such material.
20           Probably I will increase a
21 few number of cases.
22           Even this, in a single one,
23 and this -- use a P-value, 95 percent
24 confidence interval, you know that,

Page 116

1  right?  So I think we are pretty safe to
2  reach the conclusion, because we have a
3  really solid basis, zero, of any cases we
4  found.
5       Q.   Did you obtain consent from
6  the women from whom these slides came
7  from to evaluate the slides?
8       A.   I think I answered that
9  question again, already.
10           We just follow the IRB.
11 What IRB allows to do, we just do it.  So
12 I cannot reveal any details, that is
13 privileged and confidential.
14      Q.   Would one of the limitations
15 of your study be that you did not have
16 the associated medical records of the
17 women?
18      A.   What does that matter?  As a
19 scientist, again, the purpose is for the
20 official paper.  Again, I don't know what
21 is the title of the official paper is,
22 but the report, as in the Exhibit 4, this
23 table, it is very clearly we try to
24 answer one single question.  But in the

Page 117

1  paper we may need to answer many
2  questions.
3           But for this specific one,
4  we just want to answer whether -- this is
5  very important -- whether the ovarian
6  cancer precursors, like p53 signature and
7  STIC, has any chronic inflammation.  If
8  no, ovarian cancer is not related to
9  chronic inflammation.
10           It could be related to other
11 etiologies, that we, scientist, we are
12 fighting for to look for and to help the
13 women with ovarian cancer.
14      Q.   And is it your opinion that
15 the medical history of the women from
16 whom these slides came from is irrelevant
17 for your diagnosis?
18      A.   No, definitely not.
19      Q.   Then my question --
20      A.   I said -- okay.
21           MS. MILLER:  Can you let him
22 finish?
23           THE WITNESS:  I have not
24 finished yet.

Ie-Ming Shih, M.D., Ph.D.

Page 118

1    What I have said is for this
2  particular study -- you can look
3  at here -- I want to know whether
4  there is increased inflammation
5  associated with those precursor
6  lesions.
7        So in this study, I don't
8  need clinical information.  But in
9  other -- many other ways, other
10  studies, we need that information.
11  Okay.  So it depends on the
12  specific question you want to ask.
13  You cannot say it's in general
14  not.  It's not fair.
15  BY DR. RESTAINO:
16    Q.   Are there other limitations,
17  other than increasing the case number.
18  As you sit here today, can you share with
19  us any other limitation of your study?
20    A.   Limitation to this
21  particular question?
22    Q.   Yes.
23    A.   Or study I want to publish?
24  I'm confused.

Page 119

1    Q.   The study report that you
2  have in front of us.
3    A.   Study report.  Very good.
4    Q.   Are there other
5  limitations --
6    A.   Very good.
7    Q.   -- other than the case
8  number and you did not have access to the
9  medical records, are there any other
10  limitations?
11    A.   It doesn't mean that I
12  cannot access the medical records.
13    Q.   Did you?
14    A.   I don't think it's relevant
15  to this study.
16    Q.   Okay.  If you would turn now
17  to -- yes, thank you.
18    A.   Which page.
19    Q.   Other than increasing the
20  case number and the -- at this time, not
21  review of the medical records, are there
22  any other limitations to your study that
23  you can share with us?
24        MS. MILLER:  Objection.

Page 120

1        THE WITNESS:  I already
2  answer your question.
3        For this particular
4  questions, I think that's the
5  limitation I can think about.
6        But for the in the future
7  study, because it has not come
8  yet, so I don't know what's their
9  limitations.
10  BY DR. RESTAINO:
11    Q.   So is it fair to say we
12  cannot rely upon this interim study for a
13  description of the limitations and how
14  those limitations may affect our reading
15  of your conclusion?
16    A.   Already -- okay.
17        MS. MILLER:  Objection.
18  Please, Doctor.  Ten seconds.
19        THE WITNESS:  I have no
20  patience.
21        MS. MILLER:  I know.  I'm
22  aware.  That's very honest of you.
23  But please give me a chance.  I
24  know you're excited to answer the

Page 121

1  question.
2        THE WITNESS:  I'm very
3  excited.  Very.
4        MS. MILLER:  I can see.
5  BY DR. RESTAINO:
6    Q.   Is it fair to say, Doctor,
7  that we cannot rely upon this interim
8  study for a description of the
9  limitations of your study?
10        MS. MILLER:  Objection.
11        THE WITNESS:  Yeah, could
12  you repeat one more time, slowly
13  and using simple language about
14  it?
15  BY DR. RESTAINO:
16    Q.   You're -- you're very
17  comfortable using English, are you not?
18    A.   It depends.
19    Q.   As a matter of fact, you
20  quote Shakespeare at times, don't you?
21    A.   What do you mean that?
22        MS. MILLER:  Objection.
23  BY DR. RESTAINO:
24    Q.   Do -- you don't know what I

31 (Pages 118 to 121)

Ie-Ming Shih, M.D., Ph.D.

Page 122

1    mean by quoting Shakespeare.  You know
2    who Shakespeare is?
3         A.   I don't think this is my
4    opinion in my report.
5         Q.   No, it probably isn't.  But
6    have you quoted Shakespeare at lectures?
7         A.   I don't know it's me or my
8    co-authors, I cannot remember.
9         Q.   I'm asking you.  Have you --
10            MS. MILLER:  He said he
11        doesn't remember.
12   BY DR. RESTAINO:
13        Q.   -- ever been videotaped
14   wherein you've quoted Shakespeare?
15        A.   For what purpose?
16        Q.   For educating lay people,
17   perhaps?  Have you ever heard of the
18   Endometriosis Foundation?
19        A.   Yes.
20        Q.   Have you ever -- have you
21   recently been interviewed by them?
22        A.   I need to double-check.  I
23   never see the interview.
24            Could you show me?

Page 123

1         Q.   It's your interview, sir.
2    And you can just look for it on YouTube
3    and -- and on the internet.  But you --
4    you speak English quite well in the
5    interview wherein you quote Shakespeare,
6    is that true?
7             MS. MILLER:  Objection.
8         Let's just take down the
9         temperature of it.  He is not
10        purporting to not understand
11        things he understands and that's
12        what you're insinuating.
13            DR. RESTAINO:  I'm not
14        insinuating anything.  I'm saying
15        it.
16   BY DR. RESTAINO:
17        Q.   Now, Doctor, let's turn to
18   Page 24 of your study report.  The study
19   report.
20            And you see you have a
21   question to ask in the middle, sir?
22        A.   Yes.
23        Q.   And in the middle of that
24   paragraph, you have language,

Page 124

1    "accumulating evidence suggests."
2             Do you see that, sir?  It's
3    right about the middle -- as a matter of
4    fact it's right above all the references.
5    There's a sentence that starts
6    "accumulating evidence"?
7         A.   Okay.  I saw it.
8         Q.   And I'll read it and just
9    make sure I read it correctly, sir.
10   "Accumulating evidence suggests that
11   serous tubal intraepithelial" --
12   "epithelial carcinoma (STIC) or its
13   precursor lesions, including p53
14   signature and serous tubal
15   intraepithelial lesions (STIL) located at
16   fallopian tubes or cortical inclusion
17   cysts of the ovary, are the precursors of
18   ovarian HGSC."  And then there's a bunch
19   of references.
20            Did I read that correctly,
21   sir?
22        A.   Yes.
23        Q.   And that is your opinion
24   today, that these precursor lesions are

Page 125

1    the precursors of ovarian high grade
2    serous carcinomas; is that correct?
3         A.   So are you -- are you asking
4    me about my opinion where is the
5    precursor lesions located?
6         Q.   No, sir.  I'm just asking,
7    is it your opinion today as you put in
8    your expert report, that the -- that
9    these precursor lesions are the
10   precursors of HGSC?
11        A.   That is my opinion, yes.
12        Q.   And HGSC, so there's no
13   confusion, is high grade serous
14   carcinoma?
15        A.   Perfect.
16        Q.   Okay.  Thank you.
17            Now, I'd like to hand to you
18   what we have marked as Shih Exhibit 29.
19            (Document marked for
20        identification as Exhibit
21        Shih-29.)
22   BY DR. RESTAINO:
23        Q.   And it's an article by
24   Trabert, et al.  Have you seen this

32 (Pages 122 to 125)

Ie-Ming Shih, M.D., Ph.D.

Page 126

1 article before, sir?
2 A. May I have the time to see
3 the content in order to recall my memory,
4 okay. Just a few -- give me a few
5 seconds.
6 I don't recall this paper.
7 Q. You don't. Do you recall
8 writing an editorial about this paper?
9 A. Well, maybe. I need to
10 see -- make sure that I -- this bringing
11 to my memory first.
12 Q. As you sit here today, do
13 you recall writing and publishing that
14 this was an important study for which the
15 authors should be congratulated? Does
16 that sound familiar?
17 A. I cannot recall the
18 sentence. You have it -- can you show
19 me, please?
20 Q. I just want to know if you
21 recall saying that. The literature will
22 show what the literature shows.
23 If you would turn to
24 Page 755 of this paper. And are you

Page 127

1 there, sir?
2 A. Let me see.
3 Okay. In Table 3 you meant?
4 Q. No. Just on Page 755, if
5 you look in the right column, all the way
6 down, that little paragraph that starts
7 and goes over to the next page.
8 Do you see that, sir?
9 A. Starting for "STIC is
10 found"?
11 Q. Perfect.
12 A. Okay.
13 Q. "STIC is found with
14 late-stage high-grade serous carcinomas
15 in 11 percent to 61 percent of cases when
16 the tube is extensively scrutinized;
17 however, limited molecular data suggest
18 that STIC is not always the source of
19 carcinomatosis. Reference Number 13."
20 Did I read that correctly?
21 A. 13, let me see which
22 reference. Is Chan, by Chan, et al.
23 STIC associated with high grade serous
24 carcinoma, systemic review. 2017. Okay.

Page 128

1 Q. Did I read that correctly,
2 sir?
3 A. Yes. This is the word in
4 the paper. But it may not --
5 Q. Okay. Can you tell us what
6 is meant by the word carcinomatosis?
7 A. This is a term that medical
8 doctors and scientists used to the
9 spread -- the spread of ovarian cancer,
10 in peritoneal cavity or elsewhere.
11 Q. Does carcinomatosis only
12 apply to ovarian cancer?
13 A. No.
14 Q. Now, what they write here is
15 that the STIC lesions can be found as
16 little as in 11 percent of cases when the
17 tube is extensively scrutinized; is that
18 correct?
19 A. But this is referred to
20 Reference 13. It's not --
21 That's for me?
22 MS. MILLER: Yes.
23 THE WITNESS: Okay. Thank
24 you. I'm sorry.

Page 129

1 BY DR. RESTAINO:
2 Q. Do you agree that that's
3 what the statement says, that STIC is
4 found with late-stage high-grade serous
5 carcinomas in 11 to 61 percent of cases?
6 That was what is written in
7 a study that I represent to you, you
8 describe as an important study for which
9 the authors should be congratulated?
10 A. No. This is for the
11 Reference 13, okay? So it's not this
12 paper. It's a Reference 13. So you need
13 to go back to original paper by Chan, et
14 al.
15 Do you have the paper so we
16 can discuss it further?
17 Q. Is it your knowledge as you
18 sit here today, that STIC is found with
19 late stage high grade serous carcinomas
20 in 11 to 61 percent of cases when the
21 tube is extensively scrutinized?
22 MS. MILLER: Objection.
23 THE WITNESS: So could you
24 repeat your question and what do

Ie-Ming Shih, M.D., Ph.D.

Page 130

1    you -- what is your specific
2    question that you want me to
3    answer?
4    BY DR. RESTAINO:
5        Q.   Is it your --
6        A.   And your question about
7    Number 13, then we need to review the
8    article.  We can discuss.  I'm happy to
9    do that.
10       Q.   I want to discuss what was
11   published by Trabert, et al., last year,
12   in a study you described as an important
13   study for which the authors should be
14   congratulated.
15            Is it your expert opinion
16   that STIC lesions are found with late
17   stage high grade serous carcinomas
18   between 11 and 61 percent of the time?
19            MS. MILLER:  Objection.
20   Multiple objections to this
21   question.  You are refusing to
22   show him where he made this
23   statement.  It's completely taken
24   out of context.  We don't -- I

Page 131

1    think you should show him his
2    editorial to be fair.
3            THE WITNESS:  Number 13.
4            MS. MILLER:  And he's saying
5    that he cannot respond to this
6    question without seeing the
7    underlying study that it cites.
8    And you are asking him if he
9    agrees with it, and he's saying he
10   wants to see the study to know if
11   he agrees with it.
12           THE WITNESS:  Yes.
13           MS. MILLER:  I think those
14   are reasonable points that he's
15   making.
16   BY DR. RESTAINO:
17       Q.   Okay.  Let's move on then to
18   the top of Page 756.
19            Very first sentence on the
20   next page, sir.  Top of Page 756.  They
21   write, Trabert, et al., writes, "A recent
22   genomic analysis revealed STIC as a
23   precursor of sporadic high grade serous
24   carcinoma in 50 percent (4 in 8) of

Page 132

1    tumors, but also suggested that
2    25 percent (2 in 8) of STICs were
3    metastases from other organ sites, (e.g.,
4    endometrium)."  And Reference 31.
5            "If corroborated these data
6    challenge the view that identification of
7    STIC automatically justifies labeling a
8    concurrent cancer as a tubal primary."
9            Did I read that correctly?
10       A.   This has been written in the
11   paper, in the discussion.  It's not the
12   author's results.  So don't get confused
13   about their discussion and their data.
14   Okay.
15            So this is in a discussion.
16            And also you see the 31, the
17   Reference 31.  So it's by Eckert,
18   published in 2016, Cancer Discovery.
19            So could you please show me
20   the Cancer Discovery paper, and I can
21   show you what's going on.
22       Q.   Doctor, as you sit here
23   today, do you recall any paper describing
24   genomic analysis revealing STICs as

Page 133

1    precursors of sporadic high grade serous
2    carcinoma in 50 percent of tumors and
3    also suggested 25 percent were mets from
4    other organ sites.
5            Do you recall that?
6            MS. MILLER:  Objection.
7            THE WITNESS:  You need to
8    show me the documents before
9    further discussion.
10   BY DR. RESTAINO:
11       Q.   While we're looking for that
12   and pulling it to show you, can you
13   explain to the court, what are
14   metastases?  What is meant by the word
15   "metastases" as it relates to cancer?
16       A.   Sure.  That's my pleasure.
17   So metastasis is a term that is broadly
18   used by cancer biologist, cancer
19   geneticist, and also pathologist.  For
20   me, and many people will agree, that
21   metastasis is an additive -- is an
22   additive process that the tumor cells in
23   their primary location need to break
24   their basement membrane and go into the

34 (Pages 130 to 133)

Page 134

1  stroma, S-T-R-O-M-A, stroma tissue, and
2  to find the lymphatic or blood vessel and
3  go into there and circulate.
4          Then -- and it's only
5  50 percent, then circulate, because you
6  are asking me about metastasis.
7          Q.   I just asked you the
8  definition of metastasis.  Would you
9  agree that a metastasis is the spread of
10  cancer from a primary tumor to a distant
11  site?
12          MS. MILLER:  Objection.
13  BY DR. RESTAINO:
14          Q.   Simple as that.  Would you
15  agree that's what is meant by metastasis
16  in cancer research?
17          MS. MILLER:  Objection.
18          THE WITNESS:  It depends on
19      who you are asking.  For me, okay,
20      you want to ask me my opinion --
21  BY DR. RESTAINO:
22          Q.   Do you disagree with that
23  definition?
24          A.   No, I did not say that.

Page 135

1  Okay, as I said, my opinion, metastasis
2  is an additive process that need to leave
3  the primary site, go into broad
4  circulation and settle down in the other
5  place.
6          Q.   So if there are metastatic
7  lesions in the fallopian tube, then by
8  definition, those metastatic cells have
9  come from somewhere else, correct?
10          MS. MILLER:  Objection.
11          THE WITNESS:  I would say
12      disseminated, not metastasis.  So
13      this is quite confusing, even in
14      pathology field.
15  BY DR. RESTAINO:
16          Q.   Well, if we go to the
17  Trabert study.
18          A.   Trabert.  Okay.
19          Q.   Okay.  And 756, these
20  researchers state that -- they use the
21  word "metastases."  They do not use the
22  word "disseminated."  Would you agree?
23          A.   It was written that way.
24          Q.   Okay.  So when you as a

Page 136

1  cancer biologist see the word
2  "metastases" there, does that suggest to
3  you that the cells they observed came
4  from somewhere else and were not the
5  primary lesion?
6          A.   You can say that.
7          Q.   Okay.  Now if you can turn
8  to what we gave to you as the Eckert
9  paper.
10          (Document marked for
11          identification as Exhibit
12          Shih-30.)
13  BY DR. RESTAINO:
14          Q.   That was their Reference 31.
15  Do you recognize this paper, sir?
16          A.   I remember seeing this
17  paper.  But I cannot recall in detail.
18  So I need to --
19          Q.   Let's read the first couple
20  sentences of the abstract.  "Accumulating
21  evidence has supported the fallopian tube
22  rather than the ovary as the origin for
23  high grade serous ovarian cancer,
24  (HGSOC).  To understand the relationship

Page 137

1  between putative precursor lesions and
2  metastatic tumors, we performed
3  whole-exome" -- E-X-O-M-E -- "sequencing
4  on specimens from eight HGSOC patient
5  progression series consisting of serous
6  tubal intraepithelial carcinomas (STIC),
7  invasive fallopian tube lesions, invasive
8  ovarian lesions, and omental metastases."
9          Did I read that correctly,
10  sir?
11          A.   It was written this way.
12          Q.   Okay.  Thank you.  And
13  putative precursor lesions means
14  reported, or reputed to be precursor
15  lesions, correct?
16          A.   I get lost.  Let me see.
17  Which line are you at right now?  I'm
18  sorry.  Which line?
19          Q.   One, two, three lines down.
20          A.   Three down.  Okay.
21          Q.   Underneath accumulating
22  evidence, they describe them as putative
23  precursor lesions.
24          Do you see that?

Ie-Ming Shih, M.D., Ph.D.

Page 138

1    A.   "Phylogentic analyses
2  supported STIC as a precursor."  That's
3  what you are talking about, or before
4  that?
5    Q.   Just the third line, sir.
6    A.   From the top?
7      MS. MILLER:  "To understand
8  the relationship"?
9      DR. RESTAINO:  Right next --
10 pardon me?
11     MS. MILLER:  Are you at "To
12 understand the relationship"?
13 BY DR. RESTAINO:
14   Q.   Forgive me.  Yes.  "To
15 understand the relationship between
16 putative precursor lesions," do you see
17 where I am?
18   A.   Okay.
19   Q.   Okay.  Now, stop at the word
20 "putative."
21     Do you see that?
22   A.   That's the author's opinion.
23   Q.   In this peer-reviewed
24 published paper, correct?

Page 139

1    A.   This is not peer-reviewed.
2  I'm sorry.  This is a true original
3  publication.  I think you get confused.
4    Q.   You don't believe that this
5  paper by Eckert, et al., that has been
6  published in Cancer Discovery is
7  peer-reviewed?
8    A.   It's -- it's peer-reviewed,
9  but it's not review paper.  Maybe we got
10 lost from --
11   Q.   Well, we know it's not a
12 review paper.  But it's been reviewed by
13 peers of these authors.  Would you agree?
14   A.   That's correct.
15   Q.   Okay.  And they allowed the
16 use "putative precursor lesion," correct,
17 because that's why it's in the article?
18   A.   In science we just use a
19 more liberal way to describe things,
20 because we are not very sure about
21 things.
22   Q.   Well, you're sure that these
23 lesions are precursors to high grade
24 serous carcinoma, as you write in your

Page 140

1  expert report.  You don't state they are
2  putative.  You say they are precursor
3  lesions, correct?
4    A.   This is based on -- there
5  are many hypotheses --
6      MS. MILLER:  He's in the
7  middle of answering a question.
8      DR. RESTAINO:  I know.  I'm
9  just asking if you are ready for a
10 break.
11     THE WITNESS:  So I --
12     DR. RESTAINO:  I'm sorry.  I
13 misunderstood what you were
14 asking, or what you were -- my --
15 my -- I misread your body
16 language.  And I was -- I thought
17 I was answering you.  I'm sorry.
18     MS. MILLER:  No, no, no.
19 Wait.
20 BY DR. RESTAINO:
21   Q.   Forgive me, sir.
22   A.   Could you repeat one more
23 time your question?
24   Q.   Yes.  These authors describe

Page 141

1  the lesions as putative precursor
2  lesions.  You state in your expert report
3  that they are precursor lesions.  Do you
4  disagree with these authors?
5    A.   In order to answer your
6  question, I need to give you background
7  about the -- this field.  Because this is
8  a medicine field --
9    Q.   I don't need background on
10 it, trust me on this, sir, I don't need
11 background on it.  I just need to know
12 whether it's your opinion that the STIC
13 lesions and the p53 signature lesions are
14 putative precursor lesions, or if they
15 are precursor lesions.
16   A.   I would say they are most
17 biologically plausible precursors at this
18 moment.
19   Q.   Okay.  At this moment.  But
20 it might change, because research never
21 finishes, correct?
22   A.   But we are talking about the
23 science here as you elaborate in the very
24 beginning.

36 (Pages 138 to 141)

Ie-Ming Shih, M.D., Ph.D.

Page 142

1      Q.   Okay.  Now, if you go down
2   to Page 1348 of the Eckert study.  Are
3   you there, sir?
4      A.   Yes.
5      Q.   And it's the first full
6   paragraph in the right column.
7      A.   First.
8      Q.   Okay.  The first full
9   paragraph starts with "the data presented
10  herein."
11          Do you see that, sir?
12     A.   Yes.
13     Q.   "The data presented herein
14  may lead us to develop our perception of
15  STIC in HGSOC could be
16  primary or metastatic."
17          Do you agree with that, sir?
18     A.   No.
19     Q.   You disagree with these
20  authors that it could be a primary, or it
21  could be metastatic?
22     A.   I disagree about the
23  statement.
24     Q.   Okay.  Sir, did you, in your

Page 143

1   study for which we have your interim
2   report, did you conduct phylogenetic
3   analyses of the material?
4      A.   Could you repeat that
5   question one more time?
6      Q.   In the slides, the materials
7   you reviewed for the study report we're
8   discussing, did you conduct phylogenetic
9   analysis?
10     A.   The study that's in
11  Exhibit 4, as I said many times, the
12  purpose is to determine whether there is
13  a chronic inflammation associated with
14  those precursor lesions.  So what is
15  phylogenetic coming to this picture?  I
16  cannot understand your question.  It's
17  not relevant.
18     Q.   Okay.  Sir, if you would go
19  back to the abstract of the Eckert paper
20  that we're looking at.
21     A.   Okay.
22     Q.   Okay.  And now to make it a
23  little easier, it's one, two, three,
24  four, five lines up from the bottom of

Page 144

1   the first paragraph of the expert.
2   There's a sentence that starts with
3   "phylogenic analyses."
4          Do you see that, sir?
5      A.   No.
6      Q.   It's about four or five
7   lines up from the bottom of the first
8   paragraph.
9      A.   Ah, the first paragraph.
10  Okay.  One, two, three, four, five.
11  Phylogenetic analysis...
12     Q.   Do you want to read that
13  into the record out loud, sir, or you
14  want me to?
15     A.   You do it.  You do a better
16  job.
17     Q.   Phylogenic -- I don't know.
18  Phylogenic --
19          MS. MILLER:  Slowly.
20          THE WITNESS:  I'm not
21  English speaking.
22  BY DR. RESTAINO:
23     Q.   You know, English is my
24  second language and I don't have a first.

Page 145

1          "Phylogenic analyses
2   supported STIC as precursor lesions in
3   half of our patient cohort, but also
4   identified STIC as metastases in two
5   patients."
6          Did I read that correctly,
7   sir?
8      A.   That has been written this
9   way.
10     Q.   Okay.  So now my question
11  is, did you conduct a phylogenic analysis
12  of the tissue that you examined for your
13  study report?
14     A.   Again, my study report is
15  not answer this question whether the STIC
16  is a precursor or not.  I think it has
17  been shown in many papers.
18          The question is, what I want
19  to show is, whether there is chronic
20  inflammation associated with the
21  precursor.  I think that is most
22  important question.  Whether chronic
23  inflammation has ever, ever played a role
24  in this tumor initiation.

37 (Pages 142 to 145)

Ie-Ming Shih, M.D., Ph.D.

Page 146

1    I hope you agree that this
2  is the best study to show in this way,
3  rather than a genetic tree, because it is
4  not relevant.  We are answering different
5  questions.
6        Q.   Okay.  But in order to
7  answer the question that you seek to --
8  to answer, as Trabert stated in
9  referencing --
10        A.   Trabert?
11        Q.   The Trabert study.
12        A.   Yeah.
13        Q.   They referenced, remember,
14  Number 31, on Page 756, in the right
15  column.  And they referenced the Eckert
16  study showing that 25 percent of the
17  tumors that are --
18        A.   Tumors, are you talking STIC
19  or carcinoma?
20        Q.   -- that 25 percent of the
21  STICs were metastasis from other organ
22  sites, correct?
23        A.   That has been written.
24        Q.   Okay.  Now, it is your

Page 147

1  hypothesis, that chronic inflammation was
2  not seen in the STIC lesions and the p53
3  signature lesion slides that you
4  observed, correct?
5        MS. MILLER:  Objection.
6        THE WITNESS:  I think I
7  already tell you about the answer.
8  BY DR. RESTAINO:
9        Q.   Of the slides that you saw?
10        A.   Which slides are you talking
11  about?
12        Q.   The 59 slides that make up
13  your expert report, sir.
14        MS. MILLER:  Objection.
15  They do not make up his expert
16  report.
17        DR. RESTAINO:  Of the study
18  report.
19  BY DR. RESTAINO:
20        Q.   The 59 slides that are
21  listed in your study report.
22        DR. RESTAINO:  Thank you,
23  Jessica.
24        MS. MILLER:  Sorry.  I just

Page 148

1  want clarity.
2  BY DR. RESTAINO:
3        Q.   Of those 59 slides as you
4  sit here today, how many -- what
5  percentage of the STIC lesions developed
6  there at the primary site that you
7  examined or were metastases from
8  elsewhere?
9        MS. MILLER:  Objection.
10        THE WITNESS:  You ask very
11  important question.  I think the
12  methodology matters a lot in this
13  field.
14        So many study in the past,
15  they analyze, can I show you the
16  Figure 2?  I think it will be much
17  easier to explain it to you.  Or
18  you don't need it?  I think it
19  will be useful for you.
20  BY DR. RESTAINO:
21        Q.   Oh the diagram.  The
22  cartoon?
23        A.   The cartoon, yeah.  Right.
24        Q.   Sir it's a simple question.

Page 149

1        What percentage of the STICs
2  lesions that you evaluated were
3  metastases?
4        A.   Do you remember, when you
5  read my study report carefully, I say --
6  this is very important.  I think this is
7  a whole confusing point for your part.
8        I say in order to prevent
9  this metastases, I intentionally focus on
10  studying those STIC and precursor
11  signature with cancer, so they cannot
12  metastases.
13        Q.   Were there STIC lesions in
14  women who had concurrent ovarian cancer?
15        A.   I include those as well.
16        Q.   And what percentage of those
17  STIC lesions were metastases?
18        A.   There are very few.  So it's
19  not the purpose of this study report.
20  The study report, again, is not for that
21  purpose.
22        Q.   Would -- would you agree
23  that if sub -- that if X number of the
24  STIC lesions you evaluated were

38 (Pages 146 to 149)

Ie-Ming Shih, M.D., Ph.D.

Page 150

1  metastases, then the absence of chronic
2  inflammation around that STIC lesion, as
3  you're looking at it, might not exist
4  because the chronic inflammation is back
5  at the primary tumor, wouldn't you agree?
6      A.  I think this is too long
7  question.  Could you break up small one,
8  and simple one individually so I can
9  better answer you and more effectively.
10      Q.  If chronic inflammation
11  caused cancer somewhere, and that --
12      A.  If.  Okay.  In ovarian
13  cancer or in other tissue types?
14      Q.  In an anatomic site where
15  metastases could go to the fallopian
16  tube.  And that tumor spread or
17  metastasized to the fallopian tube and
18  was on some of the slides that you looked
19  at that were labeled STIC, you wouldn't
20  expect to see chronic inflammation around
21  those lesions as the precursor to their
22  development, would you?
23      MS. MILLER:  Objection.
24      THE WITNESS:  I think you're

Page 151

1  asking whether the STIC with and
2  without cancer, they are
3  associated with chronic
4  inflammation; is that correct?
5  BY DR. RESTAINO:
6      Q.  I was asking about the STICs
7  that were present in the slides from
8  women who had a concurrent ovarian
9  cancer.
10      A.  Yes.
11      Q.  Were those STIC cells
12  primary there at the site that you
13  examined, or were they metastases or
14  don't you know?
15      A.  That, I don't know.
16      DR. RESTAINO:  The water is
17  having its effect on me.  May we
18  take a break?
19      THE WITNESS:  I think that's
20  a good idea.
21      THE VIDEOGRAPHER:  The time
22  is 11:43 --
23      MS. MILLER:  It's 11:43.  I
24  was going to try to go till lunch.

Page 152

1  But I guess you only -- do you
2  want to come back and do a half an
3  hour and then go to lunch?  It's
4  kind of early.
5      DR. RESTAINO:  Does that
6  work for everyone?
7      MS. MILLER:  Yes.
8      DR. RESTAINO:  I just need
9  to --
10      THE VIDEOGRAPHER:  The time
11  is 11:44 a.m.  We're going off the
12  record.
13      (Short break.)
14      THE VIDEOGRAPHER:  The time
15  is 12:03 p.m.  We are back on the
16  record.
17  BY DR. RESTAINO:
18      Q.  Welcome back, Dr. Shih.
19      A.  Can I have one small comment
20  here?  Or no?  There's some confusion
21  about the terminology we just discussed
22  about the STIC.
23      Q.  Sir, I don't have a question
24  pending.  What I should have shared with

Page 153

1  you in the beginning of the deposition,
2  and I forgot to do so.  There are times
3  when I might ask you a question that I'm
4  asking, just yes or no, but you want to
5  explain it further.
6      At the end of the deposition
7  today, Jessica gets to then also ask you
8  questions.
9      "Now, do you remember when
10  John asked you this question?  Would you
11  like to expand upon it?"
12      So if you're cut off, you're
13  not totally cut off.  You'll get a chance
14  to explain it.
15      I would like for you to go
16  to your expert report.  And if you look
17  on Page 10 of the expert report, you have
18  a table there, correct?
19      A.  Right.
20      Q.  And then under the table
21  that's a paragraph that's listed, or has
22  a designation of Number 1, correct?
23      MS. MILLER:  "The new
24  paradigm"?

Ie-Ming Shih, M.D., Ph.D.

Page 154

1    BY DR. RESTAINO:
2        Q.   Yes.  The new paradigm.
3        A.   The new paradigm.
4        Q.   Yes.  "The new paradigm of
5    ovarian cancer genesis -- that ovarian
6    serous carcinomas originate not in
7    ovarian tissues, but rather in the
8    precursor lesions in the fallopian
9    tubes -- has been widely accepted (Kurman
10   and Shih Ie, 2011, 2016; Kurman and Shih,
11   2010; Wu, et al., 2018)."
12            Did I read that correctly,
13   sir?
14       A.   Yes.
15       Q.   Now, the first article,
16   Kurman and Shih Ie, 2011, that's you; is
17   that correct?
18       A.   Correct.
19       Q.   And Dr. Kurman, that is
20   Dr. Robert Kurman?
21       A.   Correct.
22       Q.   And did you train under
23   Dr. Kurman?
24       A.   I worked with him, yes.

Page 155

1        Q.   Okay.  Is Dr. Kurman an
2    expert for Johnson & Johnson in this
3    litigation also?
4        A.   That's my understanding.
5        Q.   Okay.  Now, the next one is
6    Kurman and Shih Ie, 2016, correct?
7        A.   Correct.
8        Q.   And that, again, Dr. Shih is
9    you, correct?
10       A.   Correct.
11       Q.   The next one is Kurman and
12   Shih 2010.  And that's the same
13   Dr. Robert Kurman and the same Dr. Shih,
14   correct?
15       A.   Correct.
16       Q.   And then the final article
17   is Wu, et al., 2018, correct?
18       A.   Correct.
19       Q.   And you are actually an
20   author with Dr. Wu; is that correct?
21       A.   I'm the co-author.
22       Q.   You're a co-author with
23   Dr. Wu.  In fact -- yes, that's the
24   genomic landscape paper, correct?

Page 156

1        A.   Correct.
2        Q.   Doctor, is it -- so for
3    support of your opinion that the ovarian
4    serous carcinomas originated not in
5    ovarian tissues, but rather in the
6    precursor lesions in the fallopian tube
7    has been widely accepted, the only papers
8    that you have listed to support that
9    statement are statements -- are papers
10   which you and Dr. Kurman are the authors,
11   correct?
12       A.   No.
13       Q.   Is there another paper there
14   that is not -- where you and Dr. Kurman
15   are not an author?
16       A.   So if you --
17       Q.   Sorry, Doctor.  Is there
18   another paper listed in your expert
19   report that does not list Dr. Kurman or
20   you as the author?
21           MS. MILLER:  Objection.
22           THE WITNESS:  There are so
23   many paper.  These are review
24   papers based on many, many

Page 157

1    reviews.
2        So if you go to references
3    of this paper, you will be readily
4    identifying there's many other
5    articles.
6        But because we don't need to
7    show everyone here, because, you
8    know, based on my status and
9    Dr. Kurman's expertise in this
10   field, we are well recognized as
11   the paradigm shifter along with
12   other investigators in the
13   nations.  So I don't think this is
14   a question here.
15   BY DR. RESTAINO:
16       Q.   Okay.  Sir, in your expert
17   report that you've submitted to the
18   court, would you agree that the only
19   articles that you've referenced for
20   support of your opinion that this
21   hypothesis has been widely accepted are
22   papers that you and Dr. Kurman are
23   co-authors on, correct?
24       A.   Again, they are review

Ie-Ming Shih, M.D., Ph.D.

Page 158

1  papers based on many, many original
2  studies.
3          DR. RESTAINO: I'm going to
4      move to strike.
5  BY DR. RESTAINO:
6      Q.   The only papers listed in
7  your expert report are those that you and
8  Dr. Kurman are the co-authors on,
9  correct?
10     A.   They are review papers --
11         MS. MILLER: Objection.
12     Please remember to give me
13     ten seconds.
14         THE WITNESS: I'm sorry.
15  BY DR. RESTAINO:
16     Q.   Do you agree with that
17  statement, sir?
18     A.   They are review papers based
19  on many original articles.
20     Q.   Review papers for which you
21  and Dr. Kurman are the co-author,
22  correct?
23     A.   Our review paper is summary
24  of all many original articles.

Page 159

1      Q.   Okay. If you would go now
2  down to your study report, which I think
3  is Exhibit 4.
4      A.   Yes.
5      Q.   And go to Page 26.
6  Actually, I think it's the bottom of 25.
7  It's where your Table 2 is the listing of
8  the slides.
9          MS. MILLER: There's nothing
10     on the table on Page 25. I'm
11     confused. Are you looking for
12     this, on Page 29?
13         DR. RESTAINO: Yes. 29.
14     Thank you.
15  BY DR. RESTAINO:
16     Q.   29. Who drew up this table,
17  sir?
18     A.   Repeat the question one more
19  time.
20     Q.   Who made up this table?
21     A.   I did.
22     Q.   Okay. Who named Lesion 1 --
23  who gave it a case ID of S8001?
24     A.   This is from the slides

Page 160

1  labeled.
2      Q.   Okay. So --
3      A.   And assigned.
4      Q.   So if you pick up
5  Slide S8001, it already has that number
6  on it?
7      A.   I think it should be written
8  on the slides.
9      Q.   You think, sir, or you know
10  that they are?
11     A.   As I recall they should be
12  there.
13     Q.   And the next column has a
14  diagnosis of p53 SIG. Could we agree
15  that SIG stands for signature lesion?
16     A.   Yes.
17     Q.   And on that slide, S8001,
18  does it list p53 SIG on it?
19     A.   You mean on the slides?
20  I --
21     Q.   Is it listed somewhere, so
22  that if you pick up this slide, S8001,
23  you're able to look and say ah, p53
24  signature lesions?

Page 161

1      A.   Based on this Table 2.
2      Q.   Yes.
3      A.   Yes. Based on this Table 2.
4      Q.   Okay. And this slide did
5  not have evidence of concurrent cancer,
6  correct?
7      A.   Yes.
8      Q.   At the bottom of Table 2,
9  you define, where the asterisk is,
10  inflammation and you define it as,
11  "Increased lymphocytic infiltrate
12  associated with the lesions as compared
13  to the background normal tissue of
14  mucosa"; is that correct, sir?
15     A.   Yes.
16     Q.   And that's the definition
17  you used in the entire chart for whether
18  there was inflammation or not?
19     A.   As I believe I also look at
20  this plicae fusion, P-L-I-C-A-E, fusion
21  as a sign of chronic salpingitis.
22         THE REPORTER: Chronic what?
23         THE WITNESS: Salpingitis,
24  S-A-L-P-I-N-G-I-T-I-S.

41 (Pages 158 to 161)

Ie-Ming Shih, M.D., Ph.D.

Page 162

1    BY DR. RESTAINO:
2        Q.   Okay.  When -- when you
3    make -- when you list -- listing here the
4    diagnosis of p53 SIG, did you make that
5    diagnosis or was it made for you already
6    by someone in -- in listing this slide?
7        A.   I review the slides and make
8    the diagnosis as listed.
9        Q.   You made the diagnosis as
10   it -- or did you confirm the diagnosis
11   that was listed?
12       A.   In this study I think I made
13   the final diagnosis.  I don't care about
14   what has been written.  But I would look
15   at the primary report and they are all
16   consistent.
17       Q.   So your diagnosis was
18   consistent with the existing primary
19   diagnoses of these slides?
20       A.   I cannot remember I check
21   everyone, okay.  But the most important
22   thing is the diagnosis I listed is my
23   final decision.
24       Q.   And I'm not trying to

Page 163

1    confuse you.  I'm just trying to be
2    clear.
3            If this is Slide S8001, and
4    you put it under the microscope to look
5    for the p53 signature lesions, is there a
6    report somewhere or a listing somewhere
7    that you say, ah, yes, p53 SIG lesions,
8    and then you look in the microscope and
9    you confirm it?
10       A.   Oh, okay.  I understand your
11   question.  I did not do that.
12       Q.   You did not confirm the
13   diagnosis?
14       A.   No, I did not see the
15   original diagnosis, but as you know on
16   this page, they must have some diagnosis
17   already.  Okay.
18       Q.   In other --
19       A.   This says tubal lesions.
20       Q.   Okay.
21       A.   But I -- I just made the
22   diagnosis by myself.
23       Q.   How did you select or know
24   to select the slides that had p53 SIG

Page 164

1    lesions in them?
2        A.   I just search from the --
3    from the list we have, contending any
4    tubal lesions or abnormalities like a
5    cancer.
6            As you can see here --
7        Q.   Yes.
8        A.   -- it's our brain cancer
9    listed.  And that's -- that's what I did.
10   Then I retrieve them, then I review under
11   the microscope, and then I put a
12   diagnosis.
13       Q.   And then you were able to
14   confirm the presence of the p53 SIG
15   lesion?
16           MS. MILLER:  Objection.
17           THE WITNESS:  By myself.
18   BY DR. RESTAINO:
19       Q.   And is that the same
20   methodology you did with the STIC
21   lesions, find those slides that had STIC
22   lesions in them, look under the
23   microscope, confirm that there was STIC
24   lesions?

Page 165

1        A.   This is not a confirmation
2    study.  This is a study to understand
3    chronic inflammation.  So I select those
4    abnormal fallopian tube lesions,
5    including cancer or no cancer.  Then I
6    make my final diagnosis.
7        Q.   How many slides did you have
8    to look at in order to come up with the
9    number of slides that -- in order to come
10   up with the 18 p53 signature lesions, how
11   many slides did you have to go through to
12   find those 18 slides?
13       A.   Do you mean from the
14   original or in our list?  Because as you
15   need to understand, so this study is all
16   about the tubal lesions.  So if there is
17   a normal fallopian tube, usually we did
18   not include in this study, because that's
19   not our purpose.
20           So that means if we include
21   the eligible case or cases in the list,
22   they must have some tubal lesions.
23       Q.   Okay.  And the -- and the
24   tubal lesions that of interest to you for

42 (Pages 162 to 165)

Ie-Ming Shih, M.D., Ph.D.

Page 166

1  your study that you selected were the p53
2  SIG lesions, or STIC, correct?
3      A.   With -- without cancer or
4  with cancer.
5      Q.   Understood.  Okay.
6      A.   I should tell you, the STIC,
7  I say here, okay, so without cancer, I
8  think the STIC.  With cancer, I label
9  STIC, but actually it's a STIC-like
10  lesion.  Because we never know if it's a
11  metastases of cancer or it's original
12  ones.
13      Q.   Okay.
14      A.   So -- so this even for the
15  pathologist very confusing, because STIC,
16  what do you mean.  My definition here is,
17  under microscope, if STIC was cancer,
18  that is STIC-like lesions.  So this apply
19  to all the deposition today.  It's not
20  only STIC, because it's too confusing.
21      Q.   Do you use the term
22  "STIC-like lesions" in your -- in your
23  study report?
24      A.   It depends.  I -- I'm sorry,

Page 167

1  say that again.
2      Q.   Do you use the term
3  "STIC-like lesions" in your study report
4  that you've performed -- that you have
5  produced to us?
6      A.   I don't think so.  I think
7  in that way would confuse more people.  I
8  think it's better for explanation
9  colloquially.
10      Q.   Would you agree that
11  approximately 40 percent of high grade
12  serous epithelial carcinomas don't have
13  precursor cells?
14      A.   Which type of cancer are you
15  talking about?
16      Q.   HG -- the cancer we are
17  talking about, the high grade serous
18  epithelial ovarian cancer.
19          MS. MILLER:  Right there.
20  BY DR. RESTAINO:
21      Q.   Would you agree that
22  approximately 40 percent don't have
23  precursor cells?
24      A.   It depends on study, but I

Page 168

1  cannot say 40 percent exact.
2      Q.   If you were to sit for us
3  today and estimate for us, what would be
4  the estimate of the number of high grade
5  serous carcinomas do not have precursor
6  cell lesions?
7      A.   I think this is a question,
8  that based on your assumption is a
9  precursor.  I want to restate your
10  question is whether there is a STIC-like
11  lesion associated with cancer.  Then I
12  can answer that question.  Because I
13  don't know if it is really a precursor or
14  not.
15      Q.   Okay.  Now, you state that
16  for example, on your Lesion 1, there's no
17  inflammation; is that correct?
18      A.   Correct.
19      Q.   And the inflammation is
20  defined as below, by increased
21  lymphocytic infiltrate, correct?
22      A.   Plus whether there is plicae
23  fusion as I mentioned in my methodology
24  in my report.

Page 169

1      Q.   Did you observe macrophages
2  in that slide?
3          MS. MILLER:  Objection.
4          THE WITNESS:  I examine
5      inflammatory cells that can
6      constitute our pathologic
7      diagnosis of chronic inflammation.
8      Whatever we are trained, I
9      exercise here.
10          DR. RESTAINO:  Doctor, I'll
11      move to strike as unresponsive.
12  BY DR. RESTAINO:
13      Q.   Did you observe macrophages
14  in slides with Lesion Number 1?
15      A.   I examine all the
16  inflammatory cells.
17      Q.   Does that include
18  macrophages?
19          MS. MILLER:  Objection.
20          THE WITNESS:  If there is
21      present.  If it is not present, I
22      cannot say it.
23  BY DR. RESTAINO:
24      Q.   Did you examine for the

43 (Pages 166 to 169)

Ie-Ming Shih, M.D., Ph.D.

Page 170

1    presence of dendritic cells?
2        A.   Which -- dendritic cells?
3        Q.   Yes.
4        A.   This is not in the criteria
5    for us to diagnose chronic inflammation.
6    Every pathologist who are practicing
7    pathology diagnosis, they don't need to
8    look at specific cell type to make up the
9    inflammation.
10        Q.   Then why did you look at
11   lymphocytes?
12        A.   Lymphocytes is the most
13   important criteria to the pathologists
14   who are able to make up, because they are
15   most common.
16        Q.   More common than polynuclear
17   cells, polymorphonuclear cells PMNs?
18        A.   PMN is a component of acute
19   inflammation.
20        Q.   And you observed evidence of
21   acute inflammation in your slide
22   analysis, didn't you?
23        MS. MILLER:  Objection.
24        THE WITNESS:  Yes.  And I

Page 171

1    did not find any acute
2    inflammation.
3    BY DR. RESTAINO:
4        Q.   And --
5        MS. MILLER:  Wait.  I think
6    you're speaking past each other.
7        THE WITNESS:  Okay.  Can we
8    start over again?
9    BY DR. RESTAINO:
10        Q.   Yeah, would you agree that
11   chronic inflammation is acute
12   inflammation which doesn't go away?
13        MS. MILLER:  Objection.
14        THE WITNESS:  Chronic
15   inflammation is enriched by
16   lymphocytes.  They can come in
17   from different resources.  Like,
18   autoimmune disease you don't have
19   acute inflammation, but you have
20   chronic inflammation.  So it
21   depends on the context and biology
22   and the pathogenesis.
23   BY DR. RESTAINO:
24        Q.   So of the components of the

Page 172

1    innate immune system, including
2    lymphocytes, B-cells, T-cells, dendritic
3    cells, macrophages, PMNs, the sole cell
4    type that you decided to look for was
5    lymphocytes, correct?
6        A.   I think --
7        MS. MILLER:  Objection.
8    Please, Dr. Shih.
9        THE WITNESS:  Can you repeat
10   one more time.
11   BY DR. RESTAINO:
12        Q.   So of the components of the
13   innate immune system, including
14   lymphocytes, beta cells, T-cells,
15   dendritic cells, polymorphonucleocytes,
16   PMNs, and lymphocytes, the sole type that
17   you chose to look for in your -- in this
18   study are the lymphocytes, correct?
19        A.   You said in innate system
20   including B -- T-cells.  I don't think
21   T-cells is part of innate immune system.
22        So I don't know what you're
23   talking about.
24        Q.   Okay.  Then I'll strike the

Page 173

1    question and I'll ask you this way.
2        As part of the immune
3    response the cells of the body include
4    B-cells, T-cells, PMN, macrophages, and
5    lymphocytes, correct?
6        A.   You can say that.
7        Q.   Okay.  And you chose to look
8    for lymphocytes, correct?
9        A.   No, I said I look for
10   inflammatory cells, including
11   lymphocytes.
12        Q.   Okay.  Do you list in your
13   study anywhere the presence or absence of
14   macrophages?
15        A.   I don't see any prominent
16   macrophages at all in those cases.
17        Q.   And how about PMNs?
18        A.   I don't see any.
19        Q.   In any of them, even in --
20   if you go down to Lesion Number 14, Slide
21   ID 10146, where there's yes under
22   inflammation, did you see macrophages?
23        A.   I think you are talking
24   about the STIC or STIC-like lesions.  You

44 (Pages 170 to 173)

Ie-Ming Shih, M.D., Ph.D.

Page 174

1  are talking about every cases here?  I
2  just want to make sure that you're
3  talking about the whole list.
4       Q.   In this entire list, do you
5  list anywhere -- did you quantitate the
6  presence of macrophages?
7       A.   I cannot recall in ovarian
8  cancer I see any macrophages, because
9  that -- these cells are not
10  characteristics component.
11       Q.   Of?
12       A.   Of high grade serous
13  carcinoma.  Usually they are T-cell,
14  B-cell and the plasma cells and these
15  other things.  So it could be part of it,
16  but I did not say it here.
17       Q.   What about the chronic
18  inflammatory process instead of the high
19  grade serous carcinoma?  Are macrophages
20  part of an inflammatory process?
21       A.   No.
22       Q.   Are PMNs part of an
23  inflammatory process?
24       A.   In a STIC or STIC-like

Page 175

1  lesions?
2       Q.   In anything?
3       A.   Well --
4       Q.   Any inflammation that goes
5  on in the body.
6       A.   Ah, okay.
7       Q.   Tendinitis from playing too
8  much tennis.
9            MS. MILLER:  Wait a minute.
10       Can we have just one question?
11       Because now we're having a back
12       and forth.  I just want to know
13       what the question is so I know
14       it's objectionable or not, and
15       then I want him to answer.
16  BY DR. RESTAINO:
17       Q.   In the body's response to
18  inflammation, do the cells include PMN,
19  macrophages, lymphocytes, dendritic
20  cells?  Agreed?
21       A.   It depends on what type of
22  inflammation and the insult and tissue
23  type.
24       Q.   Okay.  Let's talk about

Page 176

1  chronic inflammation.
2       A.   Okay.
3       Q.   What are the normal immune
4  cells that you as a pathologist would
5  look for when making the diagnosis of
6  chronic inflammation?
7       A.   We look at any inflammatory
8  cells.  Again, okay, so the lymphocyte,
9  macrophages and those that we can easily
10  identify by H&E slides under microscope,
11  we do that.  So it's not based on only
12  lymphocytes.  It's based on macrophages
13  and other inflammatory cells taken
14  together.
15       Q.   Okay.  Thank you.  We'll
16  move on.
17            Under the case ID column,
18  just to clear up some questions, the
19  first seven slides are S80001 to S80007.
20            Do you see that, sir?
21       A.   Yes.
22       Q.   But then the next one is
23  10150?
24       A.   Yeah.

Page 177

1       Q.   Why?
2       A.   Just a different labeling
3  system.  There's no -- nothing curious.
4       Q.   Is that your labeling system
5  or the way the slides were labeled in the
6  tissue -- in the slide bank?
7       A.   I cannot remember that.  My
8  job is to pull out the slides and make my
9  diagnosis and record my results.
10       Q.   Couple more down.  When I'm
11  looking at Lesion 9 and 10, there are two
12  slides that have Case ID 10149.
13            Do you see that, sir?
14       A.   10 --
15       Q.   10149.  It's Lesion Number
16  9, Lesion Number 10?
17       A.   9, 10, yes.
18       Q.   And why are there two IDs --
19  same identical IDs assigned to two
20  slides?
21       A.   So I think there's a
22  Figure 2, would be important for you.
23  You need to understand that ovarian
24  cancer lesion here, has multiple lesions

45 (Pages 174 to 177)

Ie-Ming Shih, M.D., Ph.D.

Page 178

1  before the cancer develop.  That's really
2  our really nice study to show to the
3  scientists that the fimbriated end of
4  fallopian tube contain multiple precursor
5  lesions, and our hypothesis is only one,
6  or very few, maybe only one, can develop
7  into carcinoma.
8          So that's why this carcinoma
9  can destroy the other -- other tissue in
10  the fallopian tube.
11          And usually what happens --
12          DR. RESTAINO:  Sir, I'm
13      going to move to strike.
14  BY DR. RESTAINO:
15      Q.  I'm just asking you, why are
16  these two slides -- why do they both have
17  the same ID number?
18      A.  They have Signature 1 and
19  Signature 2.  Can you see that?
20      Q.  I see that.
21      A.  Yeah.  So there's one here,
22  two here.  These are discrete lesions for
23  the same patient.  Is that clear?
24      Q.  Okay, sir.

Page 179

1      A.  Okay.
2      Q.  So 10149, that would refer
3  to the same patient?
4      A.  Correct.
5      Q.  Okay.  Thank you.
6          And then going down -- and
7  I'm not going to go through all these
8  different questions because I think I
9  understand now.
10          These numbers, the case ID
11  number, you didn't assign that case
12  number to a particular slide.  That was
13  the existing case number for that slide;
14  is that correct?
15          MS. MILLER:  Objection.  I
16      thought he said he didn't know.
17          THE WITNESS:  I think I
18      answered your question.
19  BY DR. RESTAINO:
20      Q.  For the very first slide,
21  Lesion 1, S8001, did you make up that
22  case ID number?
23          MS. MILLER:  Objection.
24          THE WITNESS:  I told you

Page 180

1  already.
2          MS. MILLER:  Objection.
3      Asked and answered.
4          Please, Dr. Shih, give me
5      five seconds.  I'll give up on ten
6      seconds.  I'm asking now for five.
7          THE WITNESS:  Okay.
8  BY DR. RESTAINO:
9      Q.  I'm sorry, I keep asking the
10  question.  I still don't understand who
11  came up with that case ID number, you or
12  was it an existing ID number?
13      A.  I cannot recall.
14      Q.  Okay.  And would it be the
15  same thing, like for example, if you go
16  down to the last four instead of the
17  numbers that we've been seeing above, now
18  all of the sudden we have 20001 NFT.
19          Do you see that, sir?
20      A.  Yes.
21      Q.  Who came up with that
22  number, you or somebody else?
23      A.  These four cases, NFT, do
24  you know what is NFT?  Normal fallopian

Page 181

1  tube.
2      Q.  Okay.
3      A.  So, as in my report, if you
4  read it, it says that in order to come
5  out with control and we combine the
6  previous study in Ardighieri study and
7  the new cases of fallopian tube, so
8  that's -- we randomly select from our
9  file of the normal fallopian tube to be
10  included.
11      Q.  Okay.  So therefore, with
12  those four, when you sat down at the
13  microscope and you took the histology
14  slide 2001 NFT, you knew that the
15  previous -- or the preexisting diagnosis
16  was normal fallopian tube, correct?
17      A.  In our diagnosis, we say
18  histologically unremarkable.
19      Q.  Yes, but who made the
20  initial diagnosis of normal fallopian
21  tube leading to the case ID 20001 NFT?
22      A.  I don't know.  It's for our
23  files.
24      Q.  Okay.  In conducting a

46 (Pages 178 to 181)

Ie-Ming Shih, M.D., Ph.D.

Page 182

1    research study such as this one or any
2    other that you have done in the past and
3    published, there are studies where you
4    describe yourself as being blinded to
5    preexisting information and looking at a
6    slide for the first time, correct?  Do
7    you understand what I mean by blinded?
8         A.   In some studies.
9         Q.   Yes.  And what's the reason
10   for blinding in some studies?
11        A.   The blinded study are
12   important for the correlation with
13   clinical outcome.  Like survival,
14   resistant to chemotherapy, et cetera.
15   And we usually, what happens is for this
16   blinded, so we have clinical data about
17   clinical outcome, and a pathology review
18   the slides without knowing the clinical
19   outcome.  So I think these are blinded
20   studies.
21        Q.   Okay.
22        A.   Because when you look at
23   pathology slides, you are not a
24   diagnosis, it cannot be blinded.  So it

Page 183

1    is different form of research designs.
2         Q.   When a -- when a pathologist
3    is blinded for specific studies, that's
4    to reduce bias, correct?
5              MS. MILLER:  Objection.
6              THE WITNESS:  Can you say
7         that again?
8    BY DR. RESTAINO:
9         Q.   The use of blinding is to
10   reduce the potential for bias --
11             MS. MILLER:  Object again --
12   BY DR. RESTAINO:
13        Q.   -- agreed?
14             MS. MILLER:  I'm sorry.
15   Objection.
16             THE WITNESS:  What kind of
17        bias you -- you are talking about?
18   BY DR. RESTAINO:
19        Q.   How about, are you familiar
20   with the term "confirmation bias"?
21        A.   Maybe.
22        Q.   You don't know?
23        A.   I know.  But I don't know
24   what that mean to you, but I have my own

Page 184

1    definition.
2         Q.   What is your definition,
3    sir?
4         A.   Meaning if you know
5    something like a clinical outcome that
6    will affect your interpretation of the
7    result.  But for the pathology diagnosis
8    it's black and white.  You cannot -- you
9    don't have discount bias.
10             Because if we have a bias in
11   pathology practice, then what happened to
12   the patient's diagnosis, right?
13             Okay.  So for example, we
14   have a tissue, perform a biopsy on a
15   woman with a lump in the breast.  We want
16   to know, woman here want to know if this
17   is benign or malignant.  We can answer,
18   oh, this is malignant.  So we -- we
19   change our diagnosis or set our mind to
20   this opinion.  No.
21             This is really breach the --
22   the pathology practice.  So a pathologist
23   is evidence based.  It's different
24   information like data and -- and risk

Page 185

1    factors and this and that because they
2    can really bias.
3             Pathology, it's really black
4    and white.  Otherwise what pathology
5    diagnosis need to exist in medical
6    system?  So pathology is a finite
7    diagnosis.  You cannot change -- you
8    cannot challenge that.
9         Q.   And bias is a form of
10   confounding, correct?
11        A.   It depends what you mean.
12   Could you be more specific for that?
13        Q.   Do you understand --
14   understand the word confounding as it's
15   used in science?
16        A.   So my confounding definition
17   is some factors, they are not driving,
18   but they are associated with the outcome.
19   For example, in many epidemiology
20   studies, especially those with very low
21   risk, 1.3, they are full of confounding
22   factors.
23        Q.   Right.  Would that hold true
24   for passive smoking and lung cancer,

47 (Pages 182 to 185)

Ie-Ming Shih, M.D., Ph.D.

Page 186

1    which has an odds ratio of 1.3?
2        A.   Can you say that one more
3    time?
4        Q.   Would that hold true also
5    for passive smoking and lung cancer which
6    has an odds ratio of 1.3?
7        A.   I am not the expert in that
8    field.  So I cannot answer your question.
9        I am here to answer the
10   causal relationship of talc, including
11   Johnson & Johnson powder, whether it
12   cause ovarian cancer, any biological
13   plausibility.
14       Q.   What steps did you take in
15   conducting your study to rule out
16   confounders?
17       A.   Which -- which study?
18       Q.   The study we are talking
19   about, the study that you have produced
20   to us, what steps have you taken to rule
21   out confounding elements?
22       MS. MILLER:  Objection.
23       THE WITNESS:  So your
24   question is, what are the

Page 187

1        confounding factors in this study?
2    BY DR. RESTAINO:
3        Q.   No, sir.  What steps did you
4    take to rule out confounding factors?
5        A.   Okay.  I don't have any
6    pre-set mind whether ovarian cancer
7    precursors, including p53 signature and
8    STIC without cancer is inflammatory or
9    not, because if yes or no, they are big
10   deal in this field.  They are equally
11   exciting in the biological studies.  So I
12   welcome any good results that can show
13   convincingly yes or no.
14       If yes, we can do a whole
15   set of new studies, quite exciting.  And
16   the -- the opposite is true, if there is
17   no inflammation, we just direct to the
18   other research field to answer what is
19   the course, the biological basis of
20   ovarian high grade serous carcinoma.
21       DR. RESTAINO:  I'll move to
22   strike as nonresponsive.
23   BY DR. RESTAINO:
24       Q.   Doctor, can you define for

Page 188

1    us what -- what the word lymphocytopenia
2    means?
3        A.   Could you spell it for me?
4        Q.   As a physician and
5    pathologist, you don't recognize the word
6    lymphocytopenia?
7        A.   Lymphocytopenia.
8        Q.   Lymphocytopenia.
9        A.   That means -- okay.  If I
10   understand your pronunciation correctly.
11   Means -- penia means deficient or lower.
12   The less means.  Lymphocyte has reduced
13   their number in circulation.
14       Q.   Only in circulation?
15       A.   That's what I understand.
16   Usually people use that term in cancer
17   patient after chemotherapy.
18       Q.   If a patient has documented
19   lymphocytopenia as determined from a --
20   from blood test, and decreased
21   lymphocytes circulating in the blood and
22   serum, would you also expect to see less
23   lymphocytes at sites of inflammation?
24       A.   So again, I tell you

Page 189

1    already -- I have told you already, that
2    two claims whether there is chronic
3    inflammation as shown in this Table 2,
4    it's based on not on the absolute number
5    of lymphocytes I see as compared to the
6    adjacent normal or histologically
7    unremarkable mucosa as compared.
8        If there is a cyto --
9    lymphocytopenia, okay, so you should be
10   able to see increased number as compared
11   to the normal mucosa for the same
12   leukopenia patient.
13       Q.   Unless there were
14   confounding factors present, correct?
15       A.   Say that again.
16       Q.   Unless there were
17   confounding factors present, like, for
18   example lymphocytopenia.  And if one had
19   lymphocytopenia that was drug-induced
20   from example for the anti --
21   chemotherapeutic Imuran, I-M-U-R-A-N,
22   azathioprine, then if that patient has
23   drug-induced lymphocytopenia, regardless
24   of what tissue you look at, there's going

48 (Pages 186 to 189)

Ie-Ming Shih, M.D., Ph.D.

Page 190

1  to be a decreased number of lymphocytes
2  present, isn't there?
3       A.   Yeah, but that will not
4  affect my chronic inflammation diagnosis.
5  I use the comparison to the same area.
6            Okay.  So if in the normal,
7  it's 100, and we have 300 in the STIC,
8  that's chronic inflammation.  In the
9  leukocytopenia, if you only can count 50,
10  okay.  It's lower, right?
11  Leukocytopenia, right, 50.  Now if you
12  count 100, now you still call it chronic
13  inflammation.
14            So it's relative, rather
15  than -- so I don't think this is a
16  confounding factor at all.
17       Q.   How many of the women from
18  whom these slides were obtained were on
19  azathioprine?
20       A.   What is that?  Can you spell
21  it for me.
22       Q.   A-Z-A-T-H-I-O-P-R-I-N-E.
23  The generic name that -- the brand name
24  is Imuran, I-M-U-R-A-N, or Azasan

Page 191

1  A-Z-A-S-A-N.  They are cancer therapeutic
2  agents.
3       A.   I'm a pathologist.  I am not
4  a medical oncologist.
5       Q.   Do you know if those drugs
6  can cause lymphocytopenia?
7       A.   I am a pathologist.  I am
8  not a medical oncologist to have this
9  knowledge.
10       Q.   How many of the women from
11  whom these slides were obtained were on
12  carbamazepine, also known as Tegretol,
13  used to treat seizures, nerve pain,
14  bipolar disorders.  How many patients
15  suffered from those conditions and was on
16  carbamazepine, also known as Tegretol?
17       A.   I don't think this
18  information is relevant to my study and
19  my conclusion at this moment.
20       Q.   Is -- do you know if
21  carbamazepine causes lymphocytopenia?
22       A.   Again, I'm not medical
23  oncologist, I did not directly take care
24  of the patients.  I -- my job is to

Page 192

1  review the -- under the microscope to see
2  whether there is increased inflammation
3  as compared to the adjacent normal tissue
4  from the same patient, no matter what he
5  actually take.
6       Q.   How many patients took
7  cimetidine over-the-counter, also known
8  as Tagamet?
9       A.   Could you spell the.
10       Q.   Cimetidine is
11  C-I-M-E-T-I-D-I-N-E.  Tagamet.  Do you
12  know how many of them took Tagamet
13  over-the-counter?
14       A.   This is not relevant to our
15  discussion.
16       Q.   Do you know if Tagamet is
17  associated with lymphocytopenia?
18       A.   As we discussed, cytopenia
19  is not a confounding factor in my study.
20       Q.   Are you familiar with the
21  class of drugs known as the
22  corticosteroids?
23       A.   I know the name, but could
24  you specify which corticosteroids we're

Page 193

1  talking about.  There are so many
2  different kinds for different --
3       Q.   The class itself is known as
4  anti -- or is known as antiinflammatory
5  drugs, correct?
6       A.   Again, I'm not the
7  first-line medical doctor.  I'm a
8  pathologist.  So -- and most importantly,
9  I think your questions are not relevant
10  to my study.
11       Q.   If a patient had rheumatic
12  fever -- excuse me -- has rheumatoid
13  arthritis and was taking prednisone for
14  that condition, prednisone, a
15  corticosteroid, is an antiinflammatory
16  agent, correct?
17       A.   Again, this is also not in
18  my opinion and my expertise.
19       Q.   Okay.  Are you familiar with
20  methotrexate?
21       A.   I think my answer is the
22  same.  This is not relevant.  It's not
23  confounding factors, because I diagnose
24  chronic inflammation in my -- in my

49 (Pages 190 to 193)

Ie-Ming Shih, M.D., Ph.D.

Page 194

1  specimens based on comparison, based on
2  comparison of the -- whether there is
3  chronic inflammation associated with p53
4  signature, STIC, and the adjacent normal
5  tissue at the same time, as I give you
6  the example.  Normal patient is 100 -- so
7  100, you get 300, then you have chronic
8  inflammation.
9        Now if the patient take
10  methotrexate, steroid, whatever that
11  cause leukopenia, it will reduced from
12  100 to 60.  Okay.  Then if I see is 80 or
13  100 in the STIC, and then I will call it
14  chronic inflammation.
15        So this is definitely not
16  confounding factors because of my study
17  design.
18        Q.   Sir, if you look at your
19  Table 2, and we'll just look at Lesion
20  Number 7.
21        DR. RESTAINO:  I'm going to
22        move to strike your previous
23        answer as unresponsive.
24  BY DR. RESTAINO:

Page 195

1        Q.   Let's look at Lesion Number
2  7.  It's a STIC lesion, no concurrent
3  cancer, no inflammation, correct?
4        A.   Number 7 you mean?  The
5  number is S --
6        Q.   Yes, it's S80007.  Okay.
7  That was a histology slide that had
8  evidence of a STIC lesion in it, correct?
9        A.   I saw it.
10        Q.   Okay.  What slide did you
11  compare that against?
12        A.   The same slide, because
13  remember, this is a Figure 2.  The STIC
14  is only a microscopic focus.  It is very
15  small.  You cannot see it in the gross.
16  So it only occupies less than one percent
17  of the tissue I examined.  So there's a
18  99 percent -- at least 99 percent more
19  histologically unremarkable.
20        Q.   Okay.  So you're comparing
21  the STIC lesion in that slide compared to
22  the normal tissue in that same slide?  Is
23  that my understanding?
24        A.   That is one way.

Page 196

1        Q.   Is that the way you did it?
2        A.   That's only one way.
3        Q.   What else did you do?
4        A.   The other way is to compare
5  to the NFT, as you just mentioned in the
6  inquiry.  And so we have two references.
7        Q.   For the same patient?
8        A.   Different patients.
9        Q.   So --
10        A.   We compare same patients and
11  also compare two different patients.
12        Q.   So you're comparing the
13  presence and quantifying the inflammatory
14  process in Patient A to Patient B who has
15  normal fallopian tube, and making a
16  comparison; is that true?
17        A.   I think you have a wrong
18  statement.  I did not quantify.  Again, I
19  used the pathology knowledge and
20  background and training, experience, to
21  make the chronic inflammation.
22        We did not really count one
23  by one; otherwise, the pathology practice
24  in every hospital will come to a halt.

Page 197

1        Q.   Sir, would you expect to see
2  increased lymphocytes, PMNs, macrophages,
3  any of the inflammatory cells with the
4  normal fallopian tubal tissue?
5        MS. MILLER:  Objection.
6        THE WITNESS:  It depends.
7  BY DR. RESTAINO:
8        Q.   What does it depend upon?
9        A.   If there is ectopic
10  pregnancy, okay, you know, ectopic
11  pregnancy in the fallopian tube, it is
12  ruptured, and it will cause inflammation.
13        Q.   Okay.  That wouldn't be a
14  normal fallopian slide, though, would it?
15        A.   No, no, I would not review
16  that.
17        Q.   Okay.  So I'll ask the
18  question again.  In comparing the
19  inflammatory infiltrate that you define
20  as lymphocytic, increased lymphocytic
21  infiltrate, in comparing that with normal
22  tissue --
23        A.   What do you mean "normal
24  tissue"?

50 (Pages 194 to 197)

Ie-Ming Shih, M.D., Ph.D.

Page 198

1    Q.   The normal fallopian tissue.
2    A.   Okay.
3    Q.   NFT.  Okay.  So I believe I
4  understood you that you said in one slide
5  you look at the STIC lesion and you
6  looked at the normal tissue; is that
7  correct?
8    A.   From the same specimen.
9    Q.   Okay.  And you compare the
10  presence of the inflammatory lymphocytes
11  around the STIC lesion, if there was any,
12  with the normal tissue, correct?
13    A.   For the same patients?
14    Q.   Yes?
15    A.   I did that way, yes.
16    Q.   Now, why would you expect to
17  see inflammatory cells around normal
18  fallopian tissue if there is no disease
19  process going on?
20    MS. MILLER:  Objection.
21    THE WITNESS:  I cannot
22    understand your question.  One
23    more time.
24  BY DR. RESTAINO:

Page 199

1    Q.   If you looked at the
2  normal -- if you looked at the bottom
3  slide, Number 59, 2004 NFT, with no
4  concurrent cancer, no inflammation, you
5  looked at the fallopian tube tissue and
6  it's normal, you wouldn't expect to see
7  increased lymphocytic cells, correct?
8    A.   I did not see increased
9  inflammation as compared to control.
10    Q.   Which control?
11    A.   Ovarian cancer.
12    Q.   Okay.  So now if you don't
13  see increased inflammation around the
14  normal fallopian tube, now you look at
15  the STIC lesion to see if there's
16  increased lymphocyte infiltrate, correct?
17    A.   Yes.
18    Q.   And you compare the two.
19  How many lymphocytes are around the
20  normal tissue, how many lymphocytes are
21  around from the STIC lesion?
22    A.   From the same specimen.
23    Q.   Yes.  Okay?  Agreed?  And
24  that's what you did.

Page 200

1    MS. MILLER:  Objection.
2  BY DR. RESTAINO:
3    Q.   Now, if that lady was on
4  Tagamet, you wouldn't expect to see a
5  decrease in the normal fallopian tissue
6  because they are not there.  But you
7  would expect to see decreased lymphocytes
8  around the STIC lesion because that's
9  what lymphopenia leads to, or
10  corticosteroids lead to, are decreased
11  inflammatory cells, correct?
12    MS. MILLER:  Objection.
13    THE WITNESS:  I think
14    there's many typo errors.  I
15    cannot read this.
16    Could you repeat your
17    question?
18  BY DR. RESTAINO:
19    Q.   There are typo errors where?
20    MS. MILLER:  He was trying
21    to read the realtime and the
22    realtime is -- because there are
23    so many complicated words --
24    THE WITNESS:  I think you

Page 201

1  speak too fast.  I'm sorry.  I --
2    even the specialist cannot
3    understand what you are talking
4    about.  I'm sorry.
5  BY DR. RESTAINO:
6    Q.   What I believe you did in
7  this study, sir, was look at slides that
8  were designated as having p53 signature
9  lesions in them, or STIC, or cancer, and
10  you compared the inflammation, if it was
11  there, around those lesions, with normal
12  tissue, correct?
13    MR. LOCKE:  Objection.
14  BY DR. RESTAINO:
15    Q.   Correct?
16    A.   From the same patient?
17    Q.   Whatever you did in this
18  study.  Whether it was in the same slide,
19  or -- let me ask you this.
20    Why would you compare the
21  number of lymphocytes around a STIC
22  lesion in Patient A and compare her with
23  the number of lymphocytes in Patient B?
24    A.   Ah, okay.  I think you are

51 (Pages 198 to 201)

Ie-Ming Shih, M.D., Ph.D.

Page 202

```
 1    more clear now.
 2            So this normal fallopian
 3    tubes without STICs, without cancer, it's
 4    just a control.  It's not the point we
 5    want to study, okay.  So I want to make
 6    sure that our -- my reference in
 7    pathology interpretation is correct.  I
 8    use a normal fallopian tube that has been
 9    shown in the patient's medical record
10    showing there's no evidence of
11    morphologically remarkable lesions.
12            So if I see -- okay, just in
13    case.  If I see chronic inflammation in
14    NFT by which in the medical record did
15    not -- did show -- did not show that,
16    then I need to have this serve as a
17    calibration of my methodology and my
18    methods.  So it's as a control.  Yeah.
19    It's not the studies --
20        Q.   I'm sorry.
21            So when you're comparing the
22    noncontrol slide with the control, what
23    do you know about that control -- the
24    noncontrol slide's patient's medical
```

Page 203

```
 1    history?
 2            Did this patient have
 3    medical disorders leading to
 4    lymphocytopenia?  Did this patient take
 5    medications that led to lymphocytopenia?
 6    You don't know that, do you, sir?
 7            MS. MILLER:  Objection.
 8        Asked and answered multiple times.
 9            THE WITNESS:  I already
10        ask -- I already answered this
11        question many, many times.  Do you
12        want me to repeat?  I'm happy to.
13    BY DR. RESTAINO:
14        Q.   I don't believe you've
15    answered it.  The record --
16        A.   I do, I do.  I do.  Look at
17    the transcript.
18        Q.   The record will speak for
19    itself.
20        A.   Look at the transcript.
21    Please look at the transcript.
22            DR. RESTAINO:  Okay.  Is
23        lunch here?  Shall we break for
24        lunch at this point?
```

Page 204

```
 1            MS. MILLER:  I was going to
 2        try to push through till one, but
 3        we can quit now.
 4            DR. RESTAINO:  I can go --
 5        ask a few more questions.
 6    BY DR. RESTAINO:
 7        Q.   Now, sir, when did you start
 8    doing your study?
 9        A.   Which study?
10        Q.   The study that we've been
11    discussing all morning?
12        A.   Again, this study, I would
13    say this research project.  Okay.  So
14    it's different.  It's like STIC-like
15    lesion and STIC, we have a different
16    opinion, so that causes confusion in the
17    previous transcript that come to my
18    notice.
19        Q.   Okay.  If you pick up
20    Exhibit Number 4.
21        A.   Number 4.
22        Q.   Which is your study report.
23        A.   Yes.
24        Q.   Okay.  Look at the first
```

Page 205

```
 1    page.
 2        A.   Yes.
 3        Q.   Time frame January 1st,
 4    2019.  On January 1st, New Year's Day, is
 5    that when you started some part of this
 6    study?  What did you do, January 1st,
 7    19 -- sorry.  January 1st, 1953, is my
 8    birthday.
 9            January 1st, 2019.  What did
10    you do on New Year's Day?
11            MS. MILLER:  Objection.
12            THE WITNESS:  I celebrate
13        the new year.
14    BY DR. RESTAINO:
15        Q.   Okay.  What part -- what did
16    you do for the study here on January 1st
17    of 2019?
18        A.   I start searching the
19    eligible work cases.
20        Q.   Okay.  And at that point you
21    were a retained expert for Johnson &
22    Johnson?
23        A.   Correct.
24        Q.   Where in your study report
```

52 (Pages 202 to 205)

Ie-Ming Shih, M.D., Ph.D.

Page 206

1    do -- do you disclose that you're a paid
2    litigation expert for Johnson & Johnson?
3        A.    In this Exhibit 4?
4        Q.    Yes.
5        A.    This was not paid by J&J at
6    all. I think this is our continuation of
7    our research discovery, and we want to
8    understand pathogenesis of ovarian cancer
9    to help women.
10       Q.    Okay. When you submit this
11   paper for publication, do you not believe
12   it's going to be required of you to
13   disclose that you were an expert for
14   Johnson & Johnson?
15           MS. MILLER: Objection. He
16   never said that.
17           THE WITNESS: I'm
18   distracted.
19   BY DR. RESTAINO:
20       Q.    I'll ask it --
21           MS. MILLER: Sorry. I
22   didn't mean to distract you.
23   BY DR. RESTAINO:
24       Q.    I'll ask the question again,

Page 207

1    differently.
2           In the study report that
3    you've attached to your expert report
4    that you describe in your expert report
5    as the full report, where is the
6    disclosure?
7        A.    I'm sorry --
8           MS. MILLER: Objection.
9           THE WITNESS: -- you say
10   full report? This is not a full
11   study yet.
12   BY DR. RESTAINO:
13       Q.    Okay. Sir, we went through
14   that before. And it's listed in your
15   expert report wherein you state, "The
16   full report is attached to the back of my
17   expert report."
18       A.    At that time, yes.
19       Q.    Okay. So where in this
20   report is your disclosure, your conflict
21   of interest disclosure, that at the time
22   you've been conducting this study you are
23   a paid expert for Johnson & Johnson?
24           MS. MILLER: Objection.

Page 208

1           THE WITNESS: So if in my
2    future manuscript submitted to the
3    journal for the consideration of
4    publication, if I talk about
5    talcum powder, including Johnson &
6    Johnson products, and I cite any
7    reference -- references related to
8    talcum powder, I will disclose it
9    and I will say this study was not
10   sponsored by J&J.
11           This is very, very
12   important. This -- this is
13   so-called ethics in publication.
14   And like some study like Saed he
15   did not disclose during the
16   submission, which is totally
17   trigger the suspicion of
18   misconduct.
19   BY DR. RESTAINO:
20       Q.    Did you -- did you review
21   for your opinion that you just testified,
22   his draft report or the final published
23   article?
24       A.    Both.

Page 209

1        Q.    And in his final published
2    article, does he state that he's a paid
3    expert?
4        A.    Can I have the reference to
5    further discuss? Because I need to read
6    whether he -- how he disclose it.
7        Q.    It's listed in your expert
8    report. As you sit here today, do you
9    not recall how he -- how he lists --
10       A.    I would like to see the
11   documents. Do you have that? Dr. Saed?
12   Dr. Saed's 2019? It is a really
13   important point. I will show you the
14   contrast, how I did it right.
15       Q.    How you did it right? Where
16   did you do it at all?
17       A.    I'm sorry, sir?
18       Q.    Where did you do it at all?
19   Where in this full report did you
20   disclose that you are an expert for
21   Johnson & Johnson?
22       A.    I was saying --
23           MS. MILLER: Objection.
24   I've got to object to this. This

53 (Pages 206 to 209)

Ie-Ming Shih, M.D., Ph.D.

Page 210

1    report was attached to an expert
2    report which has only been
3    submitted to plaintiffs, who
4    obviously know he is an expert.
5           This is just an incredibly
6    unfair line of questioning.
7           THE WITNESS:  I said I will
8    disclose it when I submit to the
9    journal editor for publication.
10   Okay.  So this --
11   BY DR. RESTAINO:
12   Q.    But your criticism of
13   Dr. Saed was on his nonpublished draft.
14   Did you -- did you look at his final
15   published article with his declaration?
16   A.    So the point is, as I serve
17   in editorial boards to review many, many
18   papers, and I also serve as
19   editor-in-chief in a medical magazine, so
20   whoever submitted for review, okay, it
21   should be disclosed.
22          Do you know why?  It's so
23   important for the reviewers to judge
24   whether there is any conflict of interest

Page 211

1    during the review process.
2    Q.    Okay.  Did Dr. Saed on his
3    final published article declare the
4    following potential conflicts of interest
5    with respect to research, authorship,
6    and/or publication to this article:
7    "Dr. Saed has served as a paid consultant
8    and expert witness in the talcum powder
9    litigation"?
10          MS. MILLER:  Objection.
11   BY DR. RESTAINO:
12   Q.    Did he disclose that?
13          MS. MILLER:  Objection.
14   Dr. Shih has asked multiple times
15   could he see the study so he can
16   answer the question accurately.
17   And you're refusing to show it to
18   him.  If we go off the record, I
19   can get a copy of it if you don't
20   have it.
21          DR. RESTAINO:  Why don't we
22   just break for lunch, and we'll
23   come back and he can take a look
24   at it.  Want to do that?

Page 212

1           MS. MILLER:  Great.
2           THE WITNESS:  Okay.  Good.
3           THE VIDEOGRAPHER:  The time
4    is 1:01 p.m.  we're going off the
5    record.
6              - - -
7           (Lunch break.)
8              - - -
9    A F T E R N O O N   S E S S I O N
10             - - -
11          THE VIDEOGRAPHER:   The time
12   is 1:35 p.m.  And we're back on
13   the record.
14             - - -
15          EXAMINATION (Cont'd.)
16             - - -
17   BY DR. RESTAINO:
18   Q.    Welcome back, Dr. Shih.
19   A.    Thank you.
20   Q.    When we broke, we were
21   finishing up our discussion with the
22   Dr. Saed, et al., study, correct?
23   A.    Correct.
24   Q.    And you asked to see the

Page 213

1    study.  We were able to get a copy of it,
2    which I'll now mark as exhibit next.
3           (Document marked for
4    identification as Exhibit
5    Shih-39.)
6           (Whereupon, a discussion was
7    held off the record.)
8    BY DR. RESTAINO:
9    Q.    Doctor, have you seen that
10   publication before?
11   A.    This publication?
12   Q.    Yes, sir.
13   A.    Yes, I did.
14   Q.    And now if you would look at
15   the Page 9 where the authors have their
16   declaration of conflicting interests.
17          Do you see that, sir?
18   A.    Yes.
19   Q.    "The authors declared the
20   following potential conflicts of interest
21   with respect to research, authorship,
22   and/or publication of this article."
23   And, "Dr. Saed has served as a paid
24   consultant and expert witness in the

Ie-Ming Shih, M.D., Ph.D.

Page 214

1  talcum powder litigation."
2        Did I read that correctly,
3  sir?
4        A.   Yes, they are showing in the
5  paper.
6        Q.   Sir, is it -- as you sit
7  here today, having read that, is it still
8  your opinion that Dr. Saed's disclosure
9  is inadequate?
10       A.   I believe this is inadequate
11  because this disclosure need to be
12  submitted in the time during the peer
13  review process, because that's most
14  important factor affecting the reviewers'
15  opinion, whether -- how this study is
16  supported and what other biased can be
17  generated in this report.
18       I think it's really
19  important.  And as I reviewed his
20  deposition I was provided by J&J law
21  firm, and at that time, I don't see this
22  statement.  And also I learn from other
23  expert reports, and I know that there is
24  a serious problem because Dr. Saed

Page 215

1  testified that he was paid for writing
2  this articles.
3        And as you know, this is a
4  job for any academic professor or staff,
5  that's their job, to write articles,
6  because for their scientific discovery
7  and exposure, rather than is supported by
8  any parties outside of academic.
9        So I think clearly, as a
10  editor-in-chief, I served that before, I
11  will be really shocked about this late
12  disclosure.
13       It did not cover up what has
14  been done in the past during the review
15  process.  I think that's most important.
16       Q.   Doctor, once published, this
17  paper is available to the entire medical
18  and scientific community to review,
19  correct?
20       A.   It was shown in PubMed and
21  other search engines.
22       Q.   And, therefore, any
23  investigator desiring to read this
24  article will pull the article and see

Page 216

1  that disclosure, correct?
2        MS. MILLER:  Objection.
3        THE WITNESS:  Can you say
4  that one more time, slowly?
5  BY DR. RESTAINO:
6        Q.   So any -- any investigator,
7  any researcher, any physician, who pulls
8  the article to review the article will
9  see the disclosure that you're looking
10  at, correct?
11       A.   Correct.
12       Q.   And the purpose of such a
13  disclosure, is to allow then that reader
14  to make up his or her own mind as for the
15  potential of bias, correct?
16       A.   I cannot agree, because the
17  purpose of peer review system, as you
18  know, is the theater that the publisher
19  can select the good articles, no biased,
20  no -- without any conflict of interest to
21  present to the audience who did not know
22  what happens before.
23       But this clearly is not the
24  case, because there's two parts.  One is

Page 217

1  a review process to determine whether
2  this paper is -- is anything that's
3  without conflict of interest.  That's the
4  first thing.  Because it can severely
5  affect the reviewer's mind.  So when I
6  have time to look at the first submission
7  to Oncology, which was rejected, and then
8  later in the Reproductive Science, then
9  you can see there's a big difference in
10  Reproductive Science.
11       There's only single review.
12  And this is unusual in any review
13  process, only allow for only one review.
14       And further, I can just
15  reform the other opinions, that this
16  really complicated relationship between
17  the editorial office, authors, and I
18  don't know what's going on.  I don't have
19  direct evidence.
20       But it's really -- I am so
21  intrigued how this paper can be
22  published.  Omission -- this is junk
23  science totally without any biological
24  plausibility.

55 (Pages 214 to 217)

Ie-Ming Shih, M.D., Ph.D.

Page 218

1      DR. RESTAINO:  I will
2  strike -- move to strike the last
3  statement as being unresponsive to
4  the question.
5  BY DR. RESTAINO:
6      Q.   Doctor, I just want to go
7  over -- because in my mind I'm little a
8  little bit confused about the chronology
9  that we're dealing with.  We discussed
10  the grant that you have described in this
11  paper and many other papers, the
12  Department of Defense grant that you now
13  say has expired, correct?
14      A.   The funding has expired.
15      Q.   If that began in 2014, is
16  that -- is that what you testified?
17      A.   Which one?
18      Q.   Working with the grant?
19      A.   The grant?
20      Q.   Yes.
21      A.   The DOD grant.
22      Q.   Yes.
23      A.   I think it's clearly marked
24  in my CV.  I can give you the specific

Page 219

1  date.  Hold on a moment.  It's very easy
2  to find.
3          So on Page 34.  "Prevention
4  of Ovarian High-Grade Serous Carcinoma by
5  Elucidating its Early Changes,"
6  W81XWH-11-2-0230.  This is from
7  October 1st, 2011.
8      Q.   Okay.  So in 2011, now
9  you've published a number of papers
10  utilizing the histopathology slides that
11  come under the umbrella of that grant,
12  correct, you have several publications?
13      A.   I am not sure if it's a
14  review paper or not reviews.  I need to
15  see which one you talk about.
16      Q.   Just talking in general.
17  Did you publish papers based upon the
18  work that you've done under the auspices
19  of this grant?
20      A.   So as you know that the
21  grant, we cannot only rely on one grant
22  to publish something.
23      Q.   Okay.
24      A.   It is a network of grants,

Page 220

1  from this DOD, from different things,
2  from private foundation, for my own
3  funding, to come out with this.  So you
4  really can't -- you can delineate which
5  parts use this grant.  There's no way
6  that I can delineate that for you,
7  neither could any scientist can opine
8  you.
9      Q.   So now between 2011 and
10  December 31st of 2018, the end of last
11  year and that entire time, you did not
12  consider conducting an experiment to look
13  at the role of chronic inflammation and
14  precursor cells associated with ovarian
15  cancer; is that correct?
16      A.   For which period of time?
17      Q.   The entire period of time
18  from December 31, 2018, back.
19      A.   Actually, chronic
20  inflammation is one of the -- many of the
21  hypothesis.  So of course we have an
22  interest to look at that.  So our first
23  paper publish in -- in by Ardighieri as
24  you -- you know about.  That is the one

Page 221

1  that we publish as a best line, as a
2  reference in the normal fallopian tube.
3  What's the immune cell over there.  Now
4  this is a continuation of that.
5      Q.   I'm sorry.  I'm sorry.
6  During that time --
7      A.   Which time?
8      Q.   The time period of the last
9  few years, working and publishing papers,
10  did you -- you were aware of the -- the
11  controversy regarding talc powder and
12  ovarian cancer, correct?
13      A.   Between 2001 and --
14      Q.   Between 2011 and
15  December 31st of 2018.  You were aware of
16  the controversy, correct?
17      A.   I heard from the news.  But
18  this is not my interest of research.  I
19  don't have any interest on that,
20  because...
21      Q.   But after meeting with the
22  attorneys for Johnson & Johnson it became
23  an interest of yours and then you started
24  your study a couple of weeks later; is

56 (Pages 218 to 221)

Ie-Ming Shih, M.D., Ph.D.

Page 222

1    that correct?
2                MS. MILLER:  Objection.  I
3    believe --
4                THE WITNESS:  I'm interested
5    in chronic inflammation.  Okay.
6    Chronic inflammation, not talc.
7                And in this study I did
8    actually has nothing to do with
9    talc.  It's to do with chronic
10   inflammation is present, absent or
11   what happens associated with STIC
12   and precursor signature.  So this
13   is not for the STIC litigation.
14   It's part of a continuation of
15   scientific curiosity.  So it's not
16   relevant.
17   BY DR. RESTAINO:
18       Q.   In every publication dealing
19   with chronic inflammation and ovarian
20   cancer, prior to this interim report that
21   we're now dealing with, you had
22   co-authors working with you on every
23   publication, correct?
24               MS. MILLER:  Objection.

Page 223

1                THE WITNESS:  I need to
2    review the list, but I believe not
3    all of them.
4    BY DR. RESTAINO:
5        Q.   Have you published any paper
6    that's not an editorial in which you
7    did -- did not have co-authors?
8        A.   So you meant single author
9    in what kind of paper?
10       Q.   Yes.  You are the single
11   author on this paper, correct?
12               MS. MILLER:  Objection.  I
13   think that mischaracterizes his
14   testimony earlier today.
15               THE WITNESS:  We discussed
16   that before.  I said for the
17   official publication we have not
18   decided yet.  I don't have time to
19   think about what we want to come
20   out with the research.  It's a
21   multiple research, or a single
22   research, combined with molecular
23   environment, molecular genetic,
24   metabolomic, metagenetic.

Page 224

1                And as I said, we have no
2    idea yet, because I cannot predict
3    what happen next year.
4    BY DR. RESTAINO:
5        Q.   So when you write in your
6    expert report that this paper is the
7    final answer regarding the chronic
8    inflammation in precursor cells, what are
9    we to take from that?
10               MS. MILLER:  Objection.  Can
11   you point us to where he says
12   that?
13   BY DR. RESTAINO:
14       Q.   If you would look at the
15   top -- first paragraph of Page 28 of his
16   study report.
17               MS. MILLER:  You said when
18   you write in your expert report.
19               THE WITNESS:  Expert
20   reports?
21               MS. MILLER:  Now, you are
22   talking about the study reports?
23               DR. RESTAINO:  The study
24   reports.

Page 225

1                MS. MILLER:  Okay.  That was
2    not the question.
3                Now, you said when you write
4    in your expert report that this
5    paper is the final answer, are you
6    withdrawing that question?
7                DR. RESTAINO:  I'm
8    withdrawing that question.
9    BY DR. RESTAINO:
10       Q.   So when you write in your
11   study report, "So the final answer from
12   this study is that ovarian cancer
13   precursor lesions are not associated with
14   chronic inflammation, thus refuting the
15   hypothesis that chronic inflammation is
16   the cause of ovarian cancer," that that
17   would not be an accurate statement at
18   this time, correct?
19       A.   I'm sorry, I'm behind of
20   you.
21       Q.   Okay.
22       A.   So where are you talking
23   about, this page?
24       Q.   Study report, Page 28.  Top

Ie-Ming Shih, M.D., Ph.D.

Page 226

1    paragraph of 28.
2         A.   Okay.
3         Q.   Okay.  And so the final --
4    the last sentence of that top paragraph
5    on Page 28 states, "So, the final answer
6    from this study is that ovarian cancer
7    precursor lesions are not associated with
8    chronic inflammation, thus refuting the
9    hypothesis that chronic inflammation is
10   the cause of ovarian cancer."
11        So, Doctor, you're making
12   that statement in this study report based
13   solely on your interim results, correct?
14        MS. MILLER:  Objection.
15        THE WITNESS:  This is the
16   opinion I gave in this interim
17   report.
18   BY DR. RESTAINO:
19        Q.   Okay.  Is that a litigation
20   opinion?
21        A.   Litigation opinion.  What do
22   you mean?
23        Q.   I don't know, sir.  You
24   described the opinions of Dr. Saed and

Page 227

1    Dr. Kane in your expert report as
2    litigation opinion.
3         What do you mean?
4         MS. MILLER:  Objection.
5         THE WITNESS:  I think that
6    study was paid at least by writing
7    by the company.
8    BY DR. RESTAINO:
9         Q.   You think.  What about
10   Dr. Kane, the gynecological pathologist,
11   why are her expert opinions litigation
12   opinions and yours are not?
13        A.   Can you show me what I say
14   over that?
15        Q.   Sure.  Let's go now to the
16   expert report.
17        A.   Okay.
18        Q.   And if you go to your
19   page -- first page --
20        A.   First page.
21        Q.   -- Introduction of Scope of
22   Report and Summary of Opinions.
23        Do you see that, sir?
24        Okay.  And then your -- the

Page 228

1    third line down you write, "I was asked
2    to review these litigation opinions and
3    to assess their scientific validity."
4         So, sir, I have to ask you,
5    what do you mean by litigation opinions?
6         A.   Litigation opinions to me is
7    to review the material provided to me,
8    including deposition reports and their
9    opinions.
10        Q.   Okay.  So in reviewing the
11   deposition of Dr. Saed, to review
12   Dr. Kane's report, Dr. Saed's report, and
13   any other plaintiff expert you may have
14   reviewed, is it fair and equal to say
15   that your opinions that you're giving in
16   your expert report and today are
17   litigation opinions?
18        MS. MILLER:  Objection.
19        THE WITNESS:  It is my
20   research opinion.
21   BY DR. RESTAINO:
22        Q.   Is it your research opinion
23   regarding the methodology that Dr. Kane
24   utilized?

Page 229

1         MS. MILLER:  Objection.
2         THE WITNESS:  Those are two
3    different questions.
4    BY DR. RESTAINO:
5         Q.   Well, you have an opinion
6    regarding Dr. Kane's methodology,
7    correct?
8         A.   Where did I say that?
9         Q.   In your expert report.
10        A.   Where?  Where?  I'm sorry.
11        Q.   Oh, I'm sorry.  Number 2 on
12   that page, Dr. Saed's experimental
13   results.
14        MS. MILLER:  Are you talking
15   about --
16   BY DR. RESTAINO:
17        Q.   No, I'm sorry, Number 1.
18   "Dr. Saed's and Dr. Kane's opinions
19   related to biological plausibility of the
20   theory that talc powder use can cause
21   ovarian cancer or increase the risk of
22   ovarian cancer are not the product of
23   reliable methods and are contrary to
24   established scientific knowledge."

58 (Pages 226 to 229)

Ie-Ming Shih, M.D., Ph.D.

Page 230

1          Doctor, what was Dr. Kane's
2    methodology that, in your opinion, is
3    unreliable?
4          A.   You meant Dr. Saed and
5    Dr. Kane together, or do you want me to
6    separate?
7          Q.   Let's separate.  I want to
8    talk --
9          A.   Okay.  All right.
10         Q.   Dr. Kane's methodology, what
11   about it was flawed?
12         A.   I -- my opinion is she
13   reached the conclusion by leaving many
14   holes in between without showing any
15   biological plausibility in the mechanism.
16   Can I see that one?
17             MS. MILLER:  What do you
18        want?  Dr. Kane's report?
19             THE WITNESS:  Yeah, Dr. Kane
20        report.
21             MS. MILLER:  You have to ask
22        them if they're okay with that.
23             THE WITNESS:  Is that okay,
24        that I can have a better

Page 231

1         discussion for that?
2    BY DR. RESTAINO:
3         Q.   As you sit here today, can
4    you tell us, without looking at your
5    expert report, what are the flaws in what
6    Dr. Kane utilized as her methodology?
7             MS. MILLER:  I'm going to
8        object to that, because as I
9        recall at the beginning of the
10       deposition, you said this was not
11       a memory test.
12            THE WITNESS:  Correct.
13            MS. MILLER:  I mean, he
14       addresses Dr. Kane in his report.
15       Is he allowed to turn to where he
16       addresses Dr. Kane --
17            DR. RESTAINO:  Not if he's
18       going to sit here with his finger
19       going over every word in his
20       report, because if so, we're going
21       off the record.
22   BY DR. RESTAINO:
23       Q.   Doctor, do you need to look
24   at Dr. Kane's report to refresh your

Page 232

1    memory on the flaws in her methodology?
2             MS. MILLER:  That's actually
3        not what I said.  I said may he
4        look at his discussion of
5        Dr. Kane's opinions without
6        looking at Dr. Kane's report.
7    BY DR. RESTAINO:
8         Q.   What do you need to look at
9    to tell us what part of Dr. Kane's
10   methodology was flawed?
11        A.   It would be helpful to --
12   for me to review it.
13        Q.   Review what, sir?  Let me
14   strike that question.  Let me ask you
15   this.
16             Did Dr. Kane conduct a
17   systematic review of the literature?
18             MS. MILLER:  Objection.
19             THE WITNESS:  That, I don't
20        know.
21   BY DR. RESTAINO:
22        Q.   As you sit here today, what
23   do you believe that Dr. Kane was basing
24   her opinions upon?

Page 233

1             MS. MILLER:  Objection.
2             THE WITNESS:  From based on
3        what I recalled, she did a
4        literature search.  I think she's
5        a pathologist.
6    BY DR. RESTAINO:
7         Q.   And pathologists don't know
8    how to do literature researches?
9         A.   I say she did literature
10   search.
11        Q.   As you did also, correct?
12        A.   I'm not sure what does that
13   mean, the same.  We may use different key
14   words and search engines.  I don't know
15   what she searched.
16        Q.   So you're speculating on her
17   methodology?
18             MS. MILLER:  No, he's not
19        speculating.
20             THE WITNESS:  No, no.
21             MS. MILLER:  You're refusing
22        to give him the report.
23             THE WITNESS:  Yeah.
24             MS. MILLER:  He'd like to

59 (Pages 230 to 233)

Ie-Ming Shih, M.D., Ph.D.

Page 234

1    look at the report. He's not
2    speculating. You're pressing him
3    to answer without the report.
4    BY DR. RESTAINO:
5        Q.   Do you need to see
6    Dr. Kane's report?
7        A.   If you have one, that would
8    be great.
9        DR. RESTAINO: I don't even
10   know if we have one.
11   BY DR. RESTAINO:
12       Q.   If you assume that she used
13   the same keywords, chronic inflammation,
14   ovarian cancer -- you're shaking your
15   head no.
16       A.   No, I don't know what you --
17   what you meant. Could you speak slowly.
18       MS. MILLER: Shall we go off
19   the record and get a copy of the
20   report?
21       DR. RESTAINO: Sure.
22       THE WITNESS: I think that's
23   the best way.
24       MS. MILLER: Okay. Let's go

Page 235

1    off.
2        THE VIDEOGRAPHER: The time
3    is 1:56 p.m. We're going off the
4    record.
5        (Short break.)
6        THE VIDEOGRAPHER: The time
7    is 2:09 p.m. We're back on the
8    record.
9    BY DR. RESTAINO:
10       Q.   Doctor, during the break,
11   did you have a chance to review Dr. Sarah
12   Kane's expert report?
13       MS. MILLER: No, he didn't.
14       As soon as I got it printed, I
15       brought it in here. I don't think
16       he had a chance. I mean, we got
17       it printed, and I brought it.
18   BY DR. RESTAINO:
19       Q.   Doctor, in your expert
20   report, can you show me where you
21   describe the flaws in Sarah Kane's
22   methodology?
23       A.   Sure. I think that's a fair
24   question.

Page 236

1        In my report, Page 8, Number
2    3, Dr. Kane's opinions. And I should
3    tell you that the methodologies Dr. Kane
4    used has many, many flaws, just like
5    Dr. Saed. And their opinions, the flawed
6    opinions, share a lot.
7        So I can tell you Dr. Kane's
8    incorrect methodology unique to her
9    report first. Then we can go back to
10   Saed because they overlap.
11       Q.   What is it about her
12   methodology that you find to be flawed?
13       A.   Okay. Number 1, is showing
14   in the Page 8, she claimed the lymphatic
15   transport -- should I go over the
16   sentences? I can do that.
17       Q.   No. That's her opinion,
18   isn't it?
19       A.   Right. So I can show you.
20       Q.   I'm asking you, as to her
21   methodology to get to her opinions, what
22   about her methodology was flawed?
23       MS. MILLER: Objection.
24       THE WITNESS: She reached

Page 237

1    her conclusion, which is
2    incorrect, based on those reports.
3    But that's her misinterpretation
4    of the result. And there's many
5    holes in between that prevent her
6    to come to a conclusion.
7        For example, the lymphatic
8    transport, the similarity between
9    talc structure and asbestos, and
10   also she confused mesothelioma and
11   high grade serous carcinoma. And
12   that's based on her search.
13       And then she claimed that
14   the talc is causal for ovarian
15   cancer, in which the methodology
16   is totally flawed, and there is no
17   biological plausibility.
18       As an example, I think she
19   is a pathologist. She knows
20   what's the difference between
21   mesothelioma and high grade serous
22   carcinoma, and she claim that
23   based on her experience that these
24   two are very similar.

60 (Pages 234 to 237)

Ie-Ming Shih, M.D., Ph.D.

Page 238

1      But it's not.  They are not.
2  Every well -- every trained, I'm
3  sorry, every trained
4  board-certified pathologist can
5  tell them apart.  They are so
6  different, not only in morphology,
7  their pathogenesis and the
8  clinical outcome, they are
9  different.
10      That's one.  I think that
11  she did not have a correct
12  methodology in that opinion.
13      The other one is the
14  lymphatic spread --
15  BY DR. RESTAINO:
16      Q.   Okay.  Let's go over the
17  first one there.
18      A.   Okay.  Okay.  All right.
19      Q.   We'll get too far ahead of
20  ourselves.  Okay?  Regarding the -- or
21  you believe that she has a flawed opinion
22  regarding how the human body will react
23  to different stimulus.  If the -- if the
24  talc is absorbed in the lymphatic system

Page 239

1  and -- and goes throughout the body,
2  correct?
3      MS. MILLER:  Objection.  I
4  don't think that was what he said.
5  BY DR. RESTAINO:
6      Q.   Well, to -- to read what
7  you -- to read what you say about
8  lymphatic transport.  "If talc particles
9  can travel through the lymphatic channel
10  to the ovaries, they should be able to
11  reach other human body parts and tissues
12  as well, because the lymphatic system
13  runs throughout the body.  There are no
14  reports showing that talc is associated
15  with other types of female (or male)
16  cancer like colon cancer, liver cancer,
17  stomach cancer, prostate cancer, and
18  pancreatic cancer (where lymphatic
19  circulation is active) just to name a
20  few."
21      Okay.  Now, Doctor, is it
22  your expert opinion that all tissue in
23  the human body will react the same way to
24  the same stimulus?

Page 240

1      A.   It depends.  It depends on
2  what kind of tissues you are talking
3  about and the concentration of the talc
4  powders.
5      Q.   Therefore, not all body
6  tissues are going to respond the same to
7  an external stimulus, correct?
8      MR. LOCKE:  Objection.
9      THE WITNESS:  But if the
10  concentration is the same, the
11  patients respond in a similar way.
12  BY DR. RESTAINO:
13      Q.   Okay.  Have you heard of the
14  bacterium Helicobacter pylori or
15  H. pylori?
16      MS. MILLER:  Objection.
17      THE WITNESS:  Yes.
18  BY DR. RESTAINO:
19      Q.   Yes.  It's known to cause
20  stomach adenocarcinoma, correct?
21      A.   It cause peptic ulcer and
22  chronic inflammation.
23      Q.   And hepatic carcinoma,
24  correct?

Page 241

1      A.   That's everybody believe.
2      Q.   Everybody -- in fact, IARC
3  lists H. pylori as a Class I carcinogen,
4  does it not?
5      MS. MILLER:  Objection.
6      THE WITNESS:  I don't have
7  the documents with me.
8  BY DR. RESTAINO:
9      Q.   And H. pylori is -- it is
10  contracted typically orally, correct?
11      MS. MILLER:  Objection.
12      THE WITNESS:  I'm a
13  pathologist, and a cancer
14  biologist and not
15  gastroenterologist.
16  BY DR. RESTAINO:
17      Q.   Does the H. pylori travel
18  through the mouth and esophagus to get to
19  the stomach?
20      A.   I'm not a microbiologist
21  either.
22      Q.   Okay.  Does the -- are
23  the -- are you aware of any reports of
24  H. pylori causing tongue cancer?

61 (Pages 238 to 241)

Ie-Ming Shih, M.D., Ph.D.

Page 242

1      A.   Again, I'm not the H. pylori
2  specialist.
3      Q.   Does it cause upper
4  esophageal cancer?
5      A.   I'm a gynecology
6  pathologist.  We only care about below
7  diaphragm.
8      Q.   Okay.  So you don't know if
9  those tissues react differently to that
10 external stimulus, correct?
11     A.   It's outside my opinion.
12     Q.   Certain strains of human
13 papilloma virus or HPV are generally
14 accepted to cause cervical, vaginal,
15 vulvar, penile and oropharyngeal cancer,
16 correct?
17     A.   Can you show me the
18 evidence?
19     Q.   Are you not aware of what
20 forms of cancer H. papilloma virus cause?
21     A.   H. pylori?  Not HPV, right?
22     Q.   Human papillomavirus.
23     A.   Okay.
24     Q.   HPV.

Page 243

1      A.   HPV.  I think you said
2  H. pylori or --
3      Q.   Okay.  I'll strike the
4  question and I'll ask it over again.
5           Certain strains of human
6  papilloma virus, HPV, generally accepted
7  to cause cervical, vaginal, vulvar --
8  vulvar, penile and oropharyngeal cancers,
9  correct?
10     A.   I think it has been shown in
11 many articles.
12     Q.   But they are not known to
13 cause cancers of the upper reproductive
14 tract, are they?
15     A.   Upper reproductive, meaning
16 from which organs?
17     Q.   As a pathologist, what do
18 you -- what organs do you classify as
19 being of the upper reproductive tract?
20          MS. MILLER:  Objection.
21 BY DR. RESTAINO:
22     Q.   I want to use the organs you
23 are most comfortable with, sir.
24          MS. MILLER:  Is that a

Page 244

1  question?
2           THE WITNESS:  How is this
3  relevant to -- to my role as a
4  cancer biologist in this case?
5  BY DR. RESTAINO:
6      Q.   You are offering an opinion
7  that Dr. Kane's opinion regarding
8  lymphatic transport is different and
9  you're using an example of why it doesn't
10 cause cancer or problems in other body
11 parts.  There you are an expert; is that
12 correct?
13          MS. MILLER:  Objection.
14 Argumentative.
15          THE WITNESS:  The lymphatic
16 transport of talcum powder as
17 Dr. Kane opined in the -- the
18 lymphatic system and the lymph
19 node, this is not relevant to
20 tubal -- okay.  STIC and precursor
21 signatures.
22          Because in the fallopian
23 tube there is no lymph nodes.
24 BY DR. RESTAINO:

Page 245

1      Q.   Doctor.
2      A.   Yeah.
3      Q.   In your critique of
4  Dr. Kane's opinions, it is true, is it
5  not, that different body tissues react
6  differently to different stimuli,
7  correct?  The esophagus does not react to
8  H. pylori, the antrum of the stomach
9  does, correct?
10     A.   There is no evidence to show
11 the esophageal cancer at this moment.
12 But I don't know whether it will be shown
13 in the future years.
14     Q.   And you don't know whether
15 it's going to be shown in the future
16 years or whether talc is transported
17 through the lymphatic system to the
18 pelvic lymph nodes where it could cause a
19 problem, or are you aware of a
20 publication this week on talc migrating
21 to the pelvic lymph nodes?  Are you aware
22 of that publication, sir?
23          MR. LOCKE:  Objection.
24          MS. MILLER:  Objection.

62 (Pages 242 to 245)

Ie-Ming Shih, M.D., Ph.D.

Page 246

1    That was like seven different
2    questions.
3         THE WITNESS: I think I'm
4    distracted by your different
5    questions so --
6    BY DR. RESTAINO:
7         Q.   I'll strike that --
8         A.   How is it relevant to -- to
9    the -- to the Dr. Kane's opinion?
10        Q.   Okay. You don't understand
11   it; is that right?
12        A.   I don't know how relevant
13   those questions that is -- that I can
14   help you to answer.
15        Q.   Okay. How about
16   hepatitis C, that's a bloodborne
17   pathogen, correct?
18        A.   Yes.
19        Q.   Gets in the blood. So
20   therefore, by definition it goes
21   throughout the entire human body,
22   correct?
23        A.   Right.
24        Q.   And hepatitis C form --

Page 247

1    causes what form of cancer?
2         A.   Liver cancer.
3         Q.   It goes through all the
4    different organs to get to the liver,
5    correct, but it doesn't cause cancer in
6    those other organs, right?
7         A.   That's hepatitis C itself.
8         Q.   Yes.
9         A.   But it cannot be
10   extrapolated to other agents. Every
11   agent are different.
12        Q.   Okay. Like H. pylori only
13   affects the stomach, right? It's
14   spreading and each body tissue is acting
15   differently.
16        Let's go and talk about the
17   chemical similarities --
18        MS. MILLER: Is that a
19   question?
20        THE WITNESS: No, that is
21   not a question.
22   BY DR. RESTAINO:
23        Q.   No. I'm moving on to Page 9
24   now of your expert report. You talk

Page 248

1    about, you criticize Dr. Kane for talking
2    about chemical similarities between
3    asbestos and talc, correct?
4         A.   I talk about that.
5         Q.   Yes. Now, when you were
6    taking, as a student way back when, you
7    took organic chemistry, correct?
8         A.   I did not teach organic
9    chemistry.
10        Q.   Did you take it as a
11   student?
12        A.   Many, many years ago.
13        Q.   I understand. Now, when you
14   were taking chemistry, did you study the
15   structural composition of various
16   components, various chemicals, minerals,
17   whatever, when you were taking organic or
18   inorganic chemistry, you studied the
19   structure of those compounds, correct,
20   even water, $H_2O$, did you study that
21   analysis, that structure?
22        MS. MILLER: Hey, can we try
23   to stick to one question at a
24   time?

Page 249

1         DR. RESTAINO: Yes, I'm
2    sorry.
3         THE WITNESS: So --
4         MS. MILLER: I know you were
5    getting excited, but I don't know
6    that we understand what the
7    question is.
8         THE WITNESS: You were
9    asking about water. Okay. I can
10   answer -- answer you any water
11   questions, can I? I don't know
12   what kind of question of water in
13   the biophysics and bioengineering
14   and biochemistry.
15   BY DR. RESTAINO:
16        Q.   There's a structure to water
17   of two hydrogen atoms and an oxygen atom,
18   correct?
19        A.   Yes.
20        Q.   Okay. So you are looking
21   at -- studying the chemistry of water,
22   you're looking at the structure of it,
23   correct?
24        MS. MILLER: Objection.

63 (Pages 246 to 249)

Ie-Ming Shih, M.D., Ph.D.

Page 250

1    I'm sorry.
2        THE WITNESS:  I cannot
3    remember what I took, the content
4    in my organic chemistry back to
5    many, many years ago.
6    BY DR. RESTAINO:
7        Q.   Doctor, is there a
8    difference in your mind between the
9    chemical structure of talc and asbestos
10   or the structural structure?
11       MS. MILLER:  Objection.
12       THE WITNESS:  Structure of
13   the --
14       MS. MILLER:  Structural
15   structure?
16       THE WITNESS:  I'm not a
17   mineralogist.
18   BY DR. RESTAINO:
19       Q.   You are not a -- but you
20   criticize Dr. Kane for saying that there
21   were chemical similarities between
22   asbestos and talc, correct?
23       A.   I use my general opinions to
24   show that structural similarity.  It

Page 251

1    doesn't mean that they are the same,
2    carry the same effect on human tissue.
3    That's why I'm going to say very general
4    things.  Okay.  You -- if you want to ask
5    me what's the really difference, oxygen
6    and the bindings, I'm not -- it's outside
7    my expertise and my opinion.
8        Q.   It is your opinion, though,
9    that both talc and asbestos have
10   structural similarity to some degree.
11   Talc is not asbestos; is that correct?
12       MS. MILLER:  Are you reading
13   a sentence from here?
14       DR. RESTAINO:  It's middle
15   of the large paragraph on Page 9
16   of the report.
17       THE WITNESS:  Okay.
18   BY DR. RESTAINO:
19       Q.   "Therefore, both" --
20   "although both talc and asbestos have
21   structural similarity to some degree."
22       Do you see that, sir?
23       A.   Yes.
24       Q.   And that's what Dr. Kane

Page 252

1    said, correct?
2        MS. MILLER:  Objection.  Can
3    you show him where Dr. Kane says
4    that?
5        THE WITNESS:  Right.  I need
6    to have a close comparison.  I'm
7    not sure that's what Dr. Kane
8    said.
9    BY DR. RESTAINO:
10       Q.   Okay.
11       A.   Could you have that line
12   of -- and we can compare.
13       Q.   In your report, don't you
14   criticize on Page 5 of the report that --
15       A.   Page 5?
16       Q.   Your expert report.  I
17   believe it's Page 5, and that's where you
18   write, "There are chemical similarities
19   between asbestos and talc, and there are
20   striking pathological similarities
21   between invasive serous ovarian cancer
22   and mesothelioma."
23       And you criticize Dr. Kane
24   for saying that there's chemical -- that

Page 253

1    there aren't not chemical similarities,
2    don't you?
3        A.   I'm sorry.  I'm so confused.
4    You're jumping 9 and 5 and which section
5    are you talking about?  We are talking
6    about Dr. Kane's opinion or my report?
7        MS. MILLER:  I'm not seeing
8    anything on Page 5 that you just
9    read.  Page 5 is Dr. Saed.
10       THE WITNESS:  Right.
11       MS. MILLER:  So I'm really
12   confused.
13       THE WITNESS:  I cannot see
14   the arguments.
15       DR. RESTAINO:  Okay.  Give
16   me one second then.
17       MS. MILLER:  On Page 8 he
18   quotes Dr. --
19   BY DR. RESTAINO:
20       Q.   On Page 9 of your expert
21   report.
22       A.   Okay.  Page 9.
23       Q.   Okay.  You have in quotation
24   marks, "Chemical similarities between

64 (Pages 250 to 253)

Ie-Ming Shih, M.D., Ph.D.

Page 254

1 asbestos and talc," do you not?
2          Page 9 of your expert
3 report.
4          MS. MILLER: That's quoting
5 Dr. Kane, who he quotes in full on
6 Page 8.
7          DR. RESTAINO: Yes. I want
8 to get him to say on the record
9 that's Dr. Kane's words.
10          THE WITNESS: That's Page 8?
11 BY DR. RESTAINO:
12     Q.   Page 9. You have a
13 paragraph that's titled, "Chemical
14 Similarities Between Asbestos and Talc,"
15 correct?
16     A.   Yes.
17     Q.   And then you say, "This is
18 incorrect."
19          What -- do you see where I
20 am?
21     A.   Yeah.
22     Q.   Okay. So my question, I was
23 talking to you before about the chemical
24 similarities, you state -- your opinion

Page 255

1 is that there are structural
2 similarities, correct?
3     A.   No. This is quote from
4 Dr. Kane. I did not say that.
5     Q.   You write the next sentence,
6 "Structural similarity of chemical
7 compounds does not mean they have the
8 same function or effects."
9          Correct?
10     A.   "This structural
11 similarity," in the second line, is
12 referring to Dr. Kane's quotes, "Chemical
13 similarity between asbestos and talc."
14 That's her opinion, not my opinion.
15     Q.   Now, what Dr. Kane in her
16 report was -- are you familiar with the
17 Bradford Hill viewpoint of analogy?
18     A.   Could you show me the
19 Bradford Hill?
20     Q.   Do you not know -- you are
21 not aware of using analogy to determine
22 causation?
23     A.   But that's back to 1965 when
24 the science is really arcane and there is

Page 256

1 no biological plausibility -- I mean, the
2 methodologies and the techniques for
3 confirming -- not confirming, I'm sorry,
4 strike that out -- to support the
5 evidence that something is A or B or C.
6 So at the time, meaning the technology,
7 we don't have that yet.
8     Q.   So is it your opinion
9 sitting here today, that it's no longer a
10 valid scientific question to look at and
11 see whether two compounds are analogous
12 to one another in their effect on the
13 body?
14          MS. MILLER: Objection.
15          THE WITNESS: Oh, this is
16 really big questions. It's so
17 general. There's many questions
18 embedded in your question. Can
19 you specify them as specific as
20 possible?
21 BY DR. RESTAINO:
22     Q.   Is it your opinion that it's
23 no longer scientifically valid to
24 consider analogy when looking at a causal

Page 257

1 question?
2          MS. MILLER: Objection.
3          THE WITNESS: It depends.
4 BY DR. RESTAINO:
5     Q.   Okay. So Dr. Kane, when
6 she's looking at talc and asbestos and
7 making an analogy with them, is that an
8 improper methodology for her to employ?
9          MS. MILLER: Objection.
10          THE WITNESS: It's incorrect
11 methodology in this specific case,
12 because asbestos is different from
13 talc.
14 BY DR. RESTAINO:
15     Q.   Have you asked any
16 representative of Johnson & Johnson to
17 provide you with any documentation they
18 have on the similarity between talc and
19 asbestos?
20          MS. MILLER: Objection.
21          THE WITNESS: I do not
22 recall.
23 BY DR. RESTAINO:
24     Q.   Did anyone from Johnson &

Ie-Ming Shih, M.D., Ph.D.

Page 258

1    Johnson provide you with any
2    documentation that they have on the
3    similarity between talcum powder and
4    asbestos?
5            MS. MILLER:  Objection.
6    Lacks foundation.
7            THE WITNESS:  This is not
8    relevant to my reason to be here
9    today.  I'm here to testify
10   biological plausibility and
11   molecular mechanism together with
12   gynecology and pathology to
13   determine there's no biological
14   plausibility.  Everything is not
15   credible science and the full
16   technology in this case.  Period.
17           DR. RESTAINO:  Move to
18   strike as unresponsive.
19   BY DR. RESTAINO:
20       Q.   Did anyone from Johnson &
21   Johnson provide you with any
22   documentation they may have on the
23   similarity between talc and asbestos?
24       A.   I think I already answered

Page 259

1    your question.  This is not relevant to
2    my position here.
3        Q.   It's a yes or no question,
4    Doctor.  Did anyone give you any
5    documentation that Johnson & Johnson may
6    have on the similarities between talc and
7    asbestos?
8            MS. MILLER:  Same objection.
9            MS. SHARKO:  Mr. Restaino, I
10   don't believe that any company
11   documents were supplied to
12   Dr. Shih if that is helpful.
13           DR. RESTAINO:  I'll proceed
14   with your representation.
15           THE WITNESS:  I don't know
16   that.  Yeah.
17           MS. MILLER:  Anything that
18   we provided him would be on his
19   reliance list, which you have.
20   BY DR. RESTAINO:
21       Q.   Do you understand that
22   Johnson & Johnson has admitted that
23   asbestos has been in their talcum powder
24   products in the past?

Page 260

1            MS. MILLER:  Objection.
2            MR. LOCKE:  Objection.
3            MR. MIZGALA:  Objection.
4            MS. MILLER:  Three
5    objections at once.  I think they
6    call that a jinx.  Kids.  I don't
7    know if they still do that.
8            THE WITNESS:  I don't know.
9            MS. MILLER:  In my day they
10   called it a jinx.
11   BY DR. RESTAINO:
12       Q.   Had you -- have you reviewed
13   the deposition of any Johnson & Johnson
14   mineralogist?
15           MS. MILLER:  Objection.  As
16   I said, anything that he has
17   reviewed would be on his list,
18   so...
19   BY DR. RESTAINO:
20       Q.   Have you reviewed any --
21       A.   As I said, I reviewed
22   whatever had been provided.
23       Q.   So, Doctor, when you are
24   approaching this now from your area of

Page 261

1    expertise, as is Dr. Kane, is there a
2    difference between disagreeing with her
3    methodology and disagreeing with her
4    conclusions?
5            MS. MILLER:  Objection.
6            THE WITNESS:  Her
7    methodology is flawed, and her
8    conclusion is coming from nowhere.
9    BY DR. RESTAINO:
10       Q.   Where in your expert report
11   does it discuss her methodology and why
12   it's flawed?
13       A.   You mean Dr. Kane
14   specifically, right?
15       Q.   Yes.
16       A.   So as we discussed, there
17   are many thing that overlap with
18   Dr. Saed.  So I would start from the --
19   really the beginning.
20           Number one -- can I have the
21   report so I can refer to the figures
22   tables, Dr. Kane's?  Or you don't need
23   that?
24       Q.   No, the question is where in

66 (Pages 258 to 261)

Ie-Ming Shih, M.D., Ph.D.

Page 262

1  your expert report do you discuss her
2  methodology.
3      A.   In -- okay.  Page 8 and
4  Page 9 specifically, but there are also
5  overlap opinions against her in other
6  pages, like Page 5 and I believe on
7  Page 4, 5 -- I should say Page 4, 5, 6,
8  7, 8 and 9.
9      Q.   What I see on each of them,
10  Doctor, is, in fact, for example, if you
11  go to Page 8, you have a Number 3,
12  Dr. Kane's opinions, correct?
13      A.   Right.
14      Q.   Where is your description of
15  how she got to those opinions which in
16  your opinion is flawed?
17          MS. MILLER:  Objection --
18  BY DR. RESTAINO:
19      Q.   Where is -- I'm sorry.
20  Where is the description of her
21  methodology?
22          MS. MILLER:  -- methodology.
23  Could we start over because that
24  is confusing.  That was different

Page 263

1  questions.
2          What is your question?
3          THE WITNESS:  So it
4  should --
5  BY DR. RESTAINO:
6      Q.   Listed here is Dr. Kane's
7  opinions.  Where is your description in
8  your expert report of the -- of the
9  methodology employed and why in your
10  opinion it was flawed?
11          MS. MILLER:  Objection.
12          THE WITNESS:  She had -- she
13  had several opinions like Dr. Saed
14  for example.  Like ROS, reactive
15  oxygen trace --
16  BY DR. RESTAINO:
17      Q.   I'm going to move to strike.
18          Doctor, I understand, sir,
19  respectfully, I understand that you
20  disagree with her opinions.  I'm asking,
21  where is your analysis of the method she
22  employed to get to her opinion.
23          MS. MILLER:  Objection.
24          THE WITNESS:  So I would say

Page 264

1  that the literatures I reviews,
2  and based on my credential, as you
3  can see my CV, and I review so
4  many papers, publish so many
5  papers, and with more than 32,000
6  citations, that's my expertise,
7  and I can judge as an authority in
8  ovarian cancer biology field that
9  her methodology is flawed.
10          And I already expressed my
11  concern in -- in this report.
12  BY DR. RESTAINO:
13      Q.   Doctor, other than
14  disagreeing with her opinions, where in
15  your expert report do you describe what
16  methodology Dr. Kane used and why that
17  methodology is flawed?
18          MS. MILLER:  Objection.
19          THE WITNESS:  Her
20  methodology is based on the
21  literature she reviewed, and the
22  jump into the conclusion.  But
23  there is many things that should
24  not prevent this jumping style

Page 265

1  conclusion.
2          So her conclusion is based
3  on no credible science and the
4  cogent evidence at all.  So her
5  entire methodology she used is
6  wrong, because you jump around.
7  BY DR. RESTAINO:
8      Q.   What methodology did she
9  use?
10          MS. MILLER:  Objection.
11          THE WITNESS:  The
12  methodology is like -- okay.  So
13  this is the difference between
14  Dr. Kane and me.  So it's very
15  difficult to prove negative.
16          So if this is a case Dr. --
17  Dr. Kane and -- or Dr. Saed
18  propose that talcum powder can
19  cause ovarian cancer, you need to
20  show evidence.
21          So again, this is very
22  important.  Science is evidence
23  driven.  Evidence is held --
24  BY DR. RESTAINO:

67 (Pages 262 to 265)

Ie-Ming Shih, M.D., Ph.D.

Page 266

1      Q.   Doctor, with all due
2  respect, sir. I'm going to move to
3  strike.
4          MS. MILLER: Well, you asked
5     what methodology she used and he
6     was trying to explain that.
7          THE WITNESS: Yeah, that's
8     my -- that's my --
9          MS. MILLER: I think that
10    actually he was answering your
11    question fairly.
12         THE WITNESS: Right. So
13    that's my -- my methodology.
14         MS. MILLER: He's trying to
15    explain the difference between his
16    methodology and her methodology.
17         THE WITNESS: Right. My
18    methodology is different from her
19    role. Her role is to demonstrate
20    the evidence positive. Okay. My
21    methodology, I cannot find any
22    positive credible science, cogent
23    evidence that can support the
24    biological mechanism of talc can

Page 267

1    induce ovarian cancer. So her
2    methodology, I -- totally is
3    wrong, okay, because she cannot
4    prove that, or she cannot provide
5    evidence for biological
6    plausibility.
7  BY DR. RESTAINO:
8      Q.   Doctor, is there -- it is
9  your opinion, is it not, that there is no
10 evidence that talcum powder causes
11 ovarian cancer, correct?
12         MS. MILLER: Objection. Can
13    you point to where he said that?
14 BY DR. RESTAINO:
15     Q.   Is that your opinion,
16 Doctor?
17     A.   Do you know where -- where
18 is in the -- in my reports? Could you
19 show me line and the page?
20     Q.   Well, first in your
21 testimony today, you said my methodology,
22 I cannot find any positive credible
23 science, cogent evidence, that support
24 the biological mechanism of talc can

Page 268

1    induce ovarian cancer.
2          Is that correct? That's
3  what you just said.
4      A.   Yes, I did.
5      Q.   Okay. Now, you are the --
6  you are -- is it your position that the
7  Kimmel Center, is that you are the
8  director or co-director?
9      A.   I'm co-director.
10     Q.   You are the director?
11     A.   Co-director.
12     Q.   Co-director. I'm sorry,
13 sir.
14     A.   Of breast and ovarian cancer
15 program.
16     Q.   Okay.
17     A.   Okay.
18         DR. RESTAINO: I'd like to
19    have marked as -- it's already
20    marked.
21         (Document marked for
22    identification as Exhibit
23    Shih-8.)
24 BY DR. RESTAINO:

Page 269

1      Q.   Exhibit 8, a copy of the
2  website from the Sidney Kimmel
3  Comprehensive Cancer Center.
4          Do you see that, sir?
5          Do you see at the top it
6  says Johns Hopkins University, Sidney
7  Kimmel Comprehensive Cancer Center,
8  correct?
9      A.   Yes.
10     Q.   And on the bottom of that
11 page, above age, it says, "Ovarian cancer
12 risk factors."
13         Do you see that, sir?
14     A.   Can I take a minute to see
15 what's this about, because this is the
16 first time I ever see.
17     Q.   You don't know what her own
18 website says -- states?
19     A.   No, we -- I do not maintain
20 a website. I do research.
21     Q.   Okay. Well, if you turn to
22 the bottom of the second page, do you see
23 where they list there, talcum powder and
24 asbestos?

Ie-Ming Shih, M.D., Ph.D.

Page 270

1       A.   Where?
2       Q.   Page two at the bottom,
3   talcum powder and asbestos.
4           Do you see that, sir?
5       A.   "Habitual use of talcum
6   powder on the genital area may" -- "may
7   increase the risk of ovarian cancer, but
8   the evidence is not strong."
9       Q.   But there's evidence.  You
10  just stated that there was no evidence.
11  Your website says the evidence is not
12  strong?
13          MS. MILLER:  That misstates
14      his testimony.  And you read his
15      testimony.  His evidence was about
16      biological plausibility.  I mean,
17      this is the second time you're
18      misstating his testimony.
19  BY DR. RESTAINO:
20      Q.   Do you agree, Doctor, that
21  there is evidence linking talcum powder
22  with ovarian cancer?
23          MS. MILLER:  Objection.
24          THE WITNESS:  There is no

Page 271

1   credible science and cogent
2   evidence to support the biological
3   plausibility of talcum powder can
4   induce ovarian cancer.
5   BY DR. RESTAINO:
6       Q.   Why would it not -- why
7   would it say that on the website if there
8   was no biological plausible evidence?
9       A.   When you see this, it say
10  "may increase," okay.  Then, "The
11  evidence is not strong," but this is --
12  this is not the word that we use here.
13  And also you can say -- you can see in
14  the following sentence, okay -- from my
15  view, this is totally hypothetical.
16  There's no biological evidence to support
17  biological plausibility and the mechanism
18  at all.
19      Q.   And you're looking at the
20  epidemiological evidence also, correct?
21          MS. MILLER:  Objection.
22      What do you mean by that?
23          THE WITNESS:  So review,
24      what do you mean I review?  I

Page 272

1   review everyone?  Or what?
2           MS. MILLER:  I don't
3   understand the question.
4           THE WITNESS:  I don't
5       understand.  Yeah, I can't
6       understand.
7   BY DR. RESTAINO:
8       Q.   In your review to make the
9   determination that you do not find any
10  evidence -- "I did not find any evidence
11  molecular, biological, pathological, or
12  epidemiological in nature that supports
13  the conclusion that talc can cause or
14  increase risk of ovarian cancer."
15          Now do you understand what I
16  mean by epidemiological evidence?
17      A.   Could you show me where --
18      Q.   Your Opinion Number 3.  Take
19  a look at your expert report.  First
20  page. Opinion Number 3.
21      A.   Which?
22      Q.   Number 3, "Based on the
23  recent research findings as published, I
24  did not find any evidence" --

Page 273

1       A.   Hold on.  Hold on.  I do not
2   see that.  Page 3?
3       Q.   No, first page.
4       A.   First page.
5       Q.   Opinion Number 3.
6       A.   Okay.
7       Q.   "Based on the recent
8   research findings as published, I did not
9   find any evidence -- molecular,
10  biological, pathological or
11  epidemiological in nature -- that
12  supports the conclusion that talc can
13  cause or increase the risk of ovarian
14  cancer."
15          Did I read that correctly?
16      A.   This has been written in my
17  report.
18      Q.   Yes.  Now, in the website
19  for Sidney Kimmel Cancer Center, it
20  states that there is evidence, although
21  it's not strong, correct?
22          MS. MILLER:  Objection.
23      That misstates what the website
24      says.

69 (Pages 270 to 273)

Ie-Ming Shih, M.D., Ph.D.

Page 274

1    THE WITNESS:  I don't know
2    who wrote this.  This is not from
3    me.  So I cannot comment on that.
4    BY DR. RESTAINO:
5    Q.   Okay.  As part of your work
6    to -- for your opinions in your expert
7    report, you looked at the epidemiology of
8    chronic inflammation and the development
9    of cancer?
10    MS. MILLER:  Objection.
11    THE WITNESS:  Again, I'm not
12    an epidemiologist.  But I review,
13    quickly scan several articles in
14    epidemiology field --
15    BY DR. RESTAINO:
16    Q.   Okay.  Including --
17    A.   -- to come to my conclusion,
18  not based on single, not based on single
19  individual reports.
20    Q.   Doctor, before we move on to
21  this study, I want to discuss with you
22  your Opinion Number 3 on the first page
23  of your report.
24    A.   Can you read it?  Are we on

Page 275

1  the same page?
2    Q.   Opinion Number 3 on the
3  first page, the same one we were just
4  looking at.
5    Did you write that opinion?
6    A.   You mean starting from,
7  "Based on recent research findings"?
8    Q.   Yes.
9    A.   "As published."
10    Q.   Did you write that?
11    A.   Yes.
12    Q.   No one else helped you with
13  any part of your report?
14    A.   I don't think so.
15    Q.   You don't think so, or you
16  know so?
17    A.   There's nobody to help me.
18    Q.   Nobody else?
19    A.   Yes.
20    Q.   Okay.
21    (Document marked for
22    identification as Exhibit
23    Shih-10.)
24  BY DR. RESTAINO:

Page 276

1    Q.   Doctor, I just handed you a
2  paper by Trabert, T-R-A-B-E-R-T.
3    MS. MILLER:  No, it's fine.
4    I have that online.  I think I
5    have the same study.
6  BY DR. RESTAINO:
7    Q.   The title of it is
8  "Prediagnostic Serum Levels of
9  Inflammation Markers and Risk of Ovarian
10  Cancer in the Prostate, Lung, Colorectal
11  and Ovarian Cancer (PLCO) Screening
12  Trial."
13    Did I read that correctly?
14    A.   That's the title.
15    Q.   Yes.  And this study is not
16  referenced in your expert report, is it?
17    A.   Yes, it's not listed.
18    Q.   And this paper was published
19  in Gynecologic Oncology in 2014, correct?
20  The citation is right above the title.
21    Do you see that, sir?
22    A.   Yes, I do.
23    Q.   Do you recognize that as
24  being Gynecological Oncology, 2014,

Page 277

1  November, correct?
2    A.   Yes.  135, Page 297, yes.
3    Q.   Okay.  Now, in the title
4  we're dealing with inflammation markers
5  and the risk of ovarian cancer, correct?
6    A.   That was written down in the
7  title.
8    Q.   Okay.  Now, if one was
9  conducting -- such as yourself,
10  conducting a review of the literature
11  after 2014 using keywords "inflammation"
12  and "ovarian cancer," one should find
13  this article, correct?
14    A.   That's a hypothetical.  How
15  can you know that we have come up with
16  this one?
17    Q.   Okay.  When you conducted
18  your literature search utilizing the
19  keywords ovarian cancer and inflammation,
20  did you find this article?
21    A.   I cannot recall.  But I
22  did -- I pull out those references, the
23  most relevant, and provide biological
24  plausibility or mechanism.  Then I will

Ie-Ming Shih, M.D., Ph.D.

Page 278

1  take a look and cite it. But this one
2  is -- it's junk science. It did not tell
3  you anything about biological
4  plausibility.
5       Q.  What are you referring to?
6       A.  This paper.
7       Q.  How do you know that if you
8  haven't even looked at the paper?
9       A.  Now I remember. I saw this
10 paper.
11      MS. MILLER: This paper is
12 on his supplemental reliance list
13 produced yesterday, sir.
14      THE WITNESS: Yeah, I
15 remember that I saw this.
16      MS. MILLER: I don't know if
17 you noticed.
18 BY DR. RESTAINO:
19      Q.  So you remember -- so you
20 have reviewed this?
21      MS. MILLER: He never said
22 he hadn't.
23 BY DR. RESTAINO:
24      Q.  Okay. Now --

Page 279

1       MS. MILLER: If you look at
2  his supplemental reliance list, it
3  was listed on there.
4  BY DR. RESTAINO:
5       Q.  Okay. Now, sir, each of
6  these authors are with the National
7  Cancer Institute, correct?
8       A.  I need to double-check.
9           Division of Cancer
10 Epidemiology, National -- NCI -- NIH, HPV
11 Immunology, Frederick National Laboratory
12 for Cancer Research, National Cancer
13 Institute, National Institute of Health
14 Department of Health Human Service,
15 Frederick, Division of Cancer Prevention,
16 National Cancer Institute, National
17 Institute of Health.
18      MS. MILLER: If you're going
19 to read to yourself, you need to
20 read to yourself.
21      THE WITNESS: Correct. You
22 are totally correct. They are for
23 NIH.
24 BY DR. RESTAINO:

Page 280

1       Q.  And none of these
2  individuals are experts in the talcum
3  powder litigation, correct?
4       A.  I don't know.
5       Q.  Do you know if -- if members
6  of the NCI are allowed to work in legal
7  controversies such as this?
8       A.  This is beyond my expert.
9       Q.  Okay. Fair enough. Fair
10 enough.
11      Turn to the introduction on
12 Page 1 which is the next -- or it's
13 actually Page 2, the next page.
14 Introduction.
15      Do you see that, sir?
16      A.  Yes.
17      Q.  Very first paragraph under
18 the word introduction states,
19 "Epidemiological evidence implicates
20 chronic inflammation as a central
21 mechanism in the pathogenesis of ovarian
22 cancer, the most lethal gynecologic
23 cancer among women in the United States.
24 Reference 1."

Page 281

1       Did I read that correctly?
2       A.  That's the words in this
3  paper.
4       Q.  I'm sorry?
5       A.  That's the words put in the
6  paper.
7       Q.  The wart?
8       A.  The words. The words.
9       MS. MILLER: Words.
10 BY DR. RESTAINO:
11      Q.  Words, okay. In the paper,
12 correct?
13      A.  Yes. It is words. Just
14 words.
15      Q.  Okay. Now, if you turn and
16 you look at reference Number 1, in the
17 back, on Page 9, are you there, sir?
18      A.  Yes.
19      Q.  The authors from the
20 National Cancer Institute are referencing
21 the Centers For Disease Control and
22 Prevention, ovarian cancer statistics.
23 2010, correct?
24      A.  That's what was cited.

71 (Pages 278 to 281)

Ie-Ming Shih, M.D., Ph.D.

Page 282

1      Q.   Okay.  And the Centers For
2  Disease Control and Prevention, they are
3  known as the CDC, would you agree?
4      A.   Agree.
5      Q.   So we've got authors from
6  the NCI referencing the CDC, correct?
7      A.   As it appears.
8      Q.   Okay.  Now I want to break
9  down that first sentence for you, sir.
10 It has two parts.
11         First part is,
12 "Epidemiologic evidence implicates
13 chronic inflammation as a central
14 mechanism in the pathogenesis of ovarian
15 cancer."
16         Do you see that -- that
17 verbiage, sir?
18     A.   As it has been written in
19 this way.
20     Q.   Okay.  Do you have any
21 objective evidence to contradict that
22 statement?
23         MS. MILLER:  Objection.
24         THE WITNESS:  Your statement

Page 283

1  or this statement, or --
2  BY DR. RESTAINO:
3      Q.   The statement "epidemiologic
4  evidence implicates chronic inflammation
5  as a central mechanism in the
6  pathogenesis of ovarian cancer."
7      A.   So this is the first
8  sentence you are referring to, right?
9      Q.   Yes, sir.
10     A.   Do you know how many
11 sentences in this article?
12     Q.   Sir, I'm just asking if you
13 agree with these authors from the NCI
14 when they write, "Epidemiologic evidence
15 implicates chronic inflammation as a
16 central mechanism in the pathogenesis of
17 ovarian cancer."
18         Do you disagree with that?
19         MS. MILLER:  Objection.
20         THE WITNESS:  I don't know
21 any credible science and cogent
22 evidence to show chronic
23 inflammation can cause ovarian
24 cancer.  And I don't know which

Page 284

1  type of ovarian cancer they are
2  talking about in this paper.  High
3  grade serous, low grade serous,
4  endometriosis, carcinoma, sarcoma,
5  I don't know.
6          So this one is too vague.
7  BY DR. RESTAINO:
8      Q.   Do you think -- do you think
9  the researchers from the National Cancer
10 Institute know the difference?
11         MS. MILLER:  Objection.
12 Calls for speculation.
13         DR. RESTAINO:  I'll withdraw
14 it.
15 BY DR. RESTAINO:
16     Q.   Doctor, can a reasonable
17 scientist agree with the statement,
18 "Epidemiologic evidence implicates
19 chronic inflammation as a central
20 mechanism in the pathogenesis of ovarian
21 cancer"?
22         MS. MILLER:  Objection.
23         THE WITNESS:  They -- no,
24 they should not.  Because there is

Page 285

1  no credible science, cogent
2  evidence to support biological
3  plausibility.  If it's
4  epidemiology, it's epidemiology.
5  If it's an association study,
6  association is not causal.  So I
7  think that's a key point.
8          Association.  It's just
9  association.  So many things can
10 be associated with something.
11 BY DR. RESTAINO:
12     Q.   So, Doctor, is it your
13 opinion that these authors from the
14 National Cancer Institute publishing in
15 Gynecological Oncology are not reasonable
16 scientists?
17         MS. MILLER:  Objection.
18         THE WITNESS:  I view the
19 science not by the authors or
20 their institutions or the journal
21 they published.  I am a scientist.
22 I think I am a good scientist.
23 Probably one of the best
24 scientists in gynecology fields,

72 (Pages 282 to 285)

Ie-Ming Shih, M.D., Ph.D.

Page 286

1    okay.
2       So that's why we did.
3    That's why we teach students,
4    based on the science.  If it's
5    good science, it's good science.
6    If it's bad science, it just don't
7    support at all.  Don't even create
8    any anything to --
9       DR. RESTAINO:  I move to
10   strike as unresponsive.
11   BY DR. RESTAINO:
12      Q.   Doctor, can a reasonable
13   scientist agree with the scientists from
14   the National Cancer Institute when they
15   publish in Gynecologic Oncology and
16   reference the CDC, is it reasonable for a
17   scientist to rely upon that?
18      MS. MILLER:  Objection.
19      MR. LOCKE:  Objection.
20      MS. MILLER:  That is just
21   objectionable in so many ways, I
22   won't go into them.  I don't want
23   to get in trouble for too many
24   speaking objections that Michelle

Page 287

1    doesn't like.
2       THE WITNESS:  I think my
3    answer can apply to this question
4    too.  So I don't need to
5    reiterate.
6    BY DR. RESTAINO:
7       Q.   Okay.  Let's look at the
8    next sentence.
9       A.   Okay.
10      Q.   "Chronic inflammation can
11   induce rapid cell division, increasing
12   the possibility for replication error,
13   ineffective DNA repair and subsequent
14   mutation."
15      Did I read that correctly?
16      A.   It has been written in this
17   way.
18      Q.   Okay.  And do you have any
19   objective evidence to contradict the NCI
20   researchers when they state that chronic
21   inflammation can induce rapid cell
22   division?
23      MS. MILLER:  Objection.
24      THE WITNESS:  Where is the

Page 288

1    citation for this statement?
2       DR. RESTAINO:  Move to
3    strike as unresponsive.
4    BY DR. RESTAINO:
5       Q.   Doctor, from your knowledge
6    as a pathologist, okay, just using that
7    alone, rapid cell division increases the
8    possibility for replication error, does
9    it not?
10      MS. MILLER:  Objection.
11      THE WITNESS:  As a
12   scientist, probably one of the
13   best scientists in this field, I
14   only trust the evidence, not based
15   on whatever, whoever talk about
16   this.
17      I need to see the evidence.
18   Where is the citation?
19   BY DR. RESTAINO:
20      Q.   Have you -- have you ever
21   seen evidence that chronic inflammation
22   induces rapid cell division?  That's
23   common pathological physiology, is it
24   not, sir?

Page 289

1       A.   It depends on the --
2       MS. MILLER:  Objection.
3    Hold on, Dr. Shih, let me object.
4       THE WITNESS:  Okay.  I'm
5    sorry.
6       MS. MILLER:  There were two
7    questions there.  Which one do you
8    want him to answer?
9       THE WITNESS:  Right.
10   BY DR. RESTAINO:
11      Q.   Do you agree chronic
12   inflammation can induce rapid cell
13   division?
14      A.   That's too general.  It
15   depends on the tissue type, your severity
16   of chronic inflammation, the patient's
17   immunity, and also the defense mechanism
18   and also circulation, ischemic status,
19   and many things.
20      Q.   Can a reasonable scientist
21   agree that chronic inflammation induces
22   rapid cell division in carcinogenicity?
23      A.   No.  I don't see any
24   evidence for that though.

73 (Pages 286 to 289)

Ie-Ming Shih, M.D., Ph.D.

Page 290

1    Q.   Okay.  Can a reasonable
2  scientist agree that rapid cell division
3  increases the possibility of replication
4  error?
5         MS. MILLER:  Objection.
6         Agree with what?
7         DR. RESTAINO:  Who it's
8         from --
9         THE WITNESS:  Who say that?
10        Who say that statement?  Who are
11        the scientists and --
12  BY DR. RESTAINO:
13        Q.   The researchers from the
14  NCI.  We just read it.  I'll read it
15  again for you.  Please keep this in your
16  mind, Doctor.
17        "Chronic inflammation can
18  induce rapid cell division increasing the
19  possibility for replication error,
20  ineffective DNA repair, and subsequent
21  mutations written by researchers from the
22  National Cancer Institute, published in
23  the peer reviewed publication Gynecologic
24  Oncology 2014."

Page 291

1         Doctor, can a reasonable
2  scientist agree with these scientists
3  from the NCI when they state that chronic
4  inflammation can induce rapid cell
5  division?
6         MS. MILLER:  Objection.
7         THE WITNESS:  There is no
8         credible science and cogent
9         evidence to show that chronic
10        inflammation, where two of those
11        things envelop into epithelial
12        cells, which is irrelevant to
13        ovarian cancer -- I mean, high
14        grade serous carcinoma.
15        DR. RESTAINO:  I'm going to
16        move to strike.
17  BY DR. RESTAINO:
18        Q.   Is it -- the question,
19  Doctor, is it reasonable for a reasonable
20  scientist to agree with these scientists
21  from the NCI?
22        MS. MILLER:  Objection.
23        Asked and answered.  Vague.  Many
24        other things, but my head hurts

Page 292

1  too much to list to them all.
2         THE WITNESS:  Which tissue?
3         Which cell you said?  Different
4         scientist has a different --
5  BY DR. RESTAINO:
6         Q.   Doctor, do you agree, then,
7  that rapid cell division in the generic
8  sense increases the possibility for
9  replication error?
10        MS. MILLER:  Objection.
11        THE WITNESS:  I'm a
12        scientist, okay.  Our research is
13        involving very similar in this
14        field.  And we are the experts on
15        the endometrial repair and cancer
16        genetics.
17        So I can tell you as one --
18        I am one of this authority in this
19        replication and DNA damage repair.
20        This question is making no
21        sense.
22        It depends on the context,
23        tissue, cell lines, and
24        methodology you used.

Page 293

1         This question, I cannot
2         answer.  Probably if you break up
3         into 20 specific questions, maybe
4         I can answer you individually.
5  BY DR. RESTAINO:
6         Q.   Okay.  Doctor, is limitless
7  replication potential one of the
8  hallmarks of carcinogenicity?
9         MS. MILLER:  Objection.
10        THE WITNESS:  So you are
11        talking about the cancer, what is
12        the feature of cancer?  So you
13        said endless replication --
14        MS. MILLER:  Limitless.
15  BY DR. RESTAINO:
16        Q.   Limitless.
17        A.   Oh, limitless.
18        MS. MILLER:  Like without
19        limits.
20        THE WITNESS:  Okay.
21        Replication.  Is like uncontrolled
22        proliferation.
23  BY DR. RESTAINO:
24        Q.   Is that one of the hallmarks

74 (Pages 290 to 293)

Ie-Ming Shih, M.D., Ph.D.

Page 294

1    of cancer?
2            MS. MILLER: Objection.
3        Vague.
4            THE WITNESS: It's one of
5        them is not sufficient for the
6        cancer. But you said
7        carcinogenicity, which is wrong.
8            Carcinogenicity meaning
9        initiation.
10           So in the precursor lesion,
11       which I'm the expert in the
12       precursor of high grade serous
13       carcinoma, which is p53 signature,
14       and STIC. In the p53 signature,
15       there is no proliferation at all.
16   BY DR. RESTAINO:
17       Q.   Doctor, in what -- it is
18   true, is it not, that another hallmark of
19   cancer is self-sufficiency and growth
20   signals, correct?
21           MS. MILLER: Objection.
22           THE WITNESS: In which
23       context? And what kind of
24       evidence that -- where does that

Page 295

1        statement come from?
2    BY DR. RESTAINO:
3        Q.   You're not familiar with
4    that statement? "Self-sufficiency and
5    growth signals is a hallmark of cancer"?
6        A.   Can you show me the
7    reference?
8        Q.   We'll get back to that in a
9    moment.
10       A.   Please.
11       Q.   How about insensitivity to
12   antigrowth signals? Is that a hallmark
13   of cancer?
14       A.   What?
15           MS. MILLER: Objection.
16   BY DR. RESTAINO:
17       Q.   Insensitivity to antigrowth
18   signals. Have you heard that phrase
19   before?
20           MS. MILLER: Objection.
21           THE WITNESS: It depends on
22       the cancer type. But in ovarian
23       high grade carcinoma here, I don't
24       see any evidence. If you have

Page 296

1            one, please show me.
2    BY DR. RESTAINO:
3        Q.   Okay. How about tissue
4    invasion and metastases, is that a
5    hall -- are they a hallmark of cancer?
6            MS. MILLER: Objection.
7            THE WITNESS: It's one of
8        the features.
9    BY DR. RESTAINO:
10       Q.   Evading apoptosis, is that
11   another feature or hallmark of cancer?
12           MS. MILLER: Objection.
13           THE WITNESS: It is -- okay.
14       It's one of the features
15       that someone proposed. But it
16       depends on the tissue type. In
17       ovarian cancer I did not show -- I
18       did not see any cogent evidence to
19       show that biological evidence that
20       this occur in ovarian high-grade
21       serous carcinoma. If it's HGSC,
22       it's what we refer.
23           But I would agree, this is
24       in generic. But if you focus on a

Page 297

1        specific type, you need -- one
2        need to be careful.
3    BY DR. RESTAINO:
4        Q.   Let's look again at the
5    Trabert paper, sir. The very next
6    sentence states, "Ovarian cancer has been
7    linked to several events and conditions
8    which are related to inflammation and
9    repair, including incessant ovulation,
10   endometriosis, exposure to talc and
11   asbestos, and in some studies, pelvic
12   inflammatory disease [Reviewed in [2]]."
13           Did I read that correctly,
14   sir?
15       A.   It is stemming from the
16   review articles.
17       Q.   Okay. Do you agree with the
18   statement, sir?
19           MS. MILLER: Objection.
20           THE WITNESS: I don't see
21       any credible science and
22       biological evidence to support
23       this argument.
24           And this, you show me the

75 (Pages 294 to 297)

Ie-Ming Shih, M.D., Ph.D.

Page 298

```
 1        good references.
 2   BY DR. RESTAINO:
 3        Q.   Do you agree that incessant
 4   ovulation has been linked to ovarian
 5   cancer?
 6        A.   It has been proposed.
 7        Q.   Do you agree that
 8   endometriosis has been epidemiologically
 9   linked with ovarian cancer?
10        MS. MILLER:  Objection.
11        THE WITNESS:  Endometriosis,
12   there are different types.  Only
13   certain type can do that, can
14   have -- increase very, very slight
15   risk.
16   BY DR. RESTAINO:
17        Q.   So you're saying there's a
18   chance?
19        MS. MILLER:  When you say --
20   I'm confused.  If you understand
21   his answer.  When you say only
22   certain types, are you talking
23   about other than certain types of
24   endometriosis, or only certain
```

Page 300

```
 1   related to ovarian endometriotic
 2   cysts, or so-called endometrioma,
 3   so-called chocolate cyst.
 4        So that is where the origin
 5   of this clear cell endometrial
 6   carcinoma, form this endometrioid
 7   cyst.  But the regular invasive
 8   endometriosis and the superficial
 9   endometriosis will not cause clear
10   cell and malignant carcinoma.  Why
11   I know this?  Because we just
12   publish one paper on this issue.
13        DR. RESTAINO:  I'm going to
14   move to strike as unresponsive.
15        MS. MILLER:  It was
16   completely responsive.  You asked
17   him whether endometriosis was
18   related to endometrioid --
19        THE WITNESS:  Yeah.  Right.
20        MS. MILLER -- whether
21   endometriosis was related to
22   ovarian cancer.  And he's giving
23   you a full answer, because there
24   is no one entity called ovarian
```

Page 299

```
 1   types of ovarian cancer?
 2        THE WITNESS:  Oh, I'm sorry.
 3   Look at this chart, okay.  So this
 4   is the origin of different types
 5   of ovarian cancer.  You can see
 6   there is -- fallopian tube
 7   epithelium is the origin of high
 8   grade and low grade serous
 9   carcinoma, we see here.
10        And endometriosis may be
11   related to endometrioid and clear
12   cell carcinoma.  Actually, this is
13   very good evidence.
14   BY DR. RESTAINO:
15        Q.   So these --
16        MS. MILLER:  Let him finish
17   his answer.
18        THE WITNESS:  How do you
19   know what I'm going to say?  I'm
20   sorry.  I want to give you the
21   complete answer.
22        You see endometriosis,
23   especially the endometrioid type,
24   cancer and clear cells, they are
```

Page 301

```
 1   cancer.  If he wants to talk about
 2   the subtypes, that's a totally,
 3   completely responsive answer.
 4        THE WITNESS:  Otherwise,
 5   I --
 6        MS. MILLER:  Otherwise your
 7   question was misleading.
 8   BY DR. RESTAINO:
 9        Q.   Doctor, these researchers
10   from the National Cancer Institute write
11   that endometriosis is linked with ovarian
12   cancer.  Do you disagree or agree with
13   that?
14        A.   Can you say that one more
15   time?  Because now we are jumping
16   endometriosis to this.
17        Q.   The authors here state --
18        A.   Yeah.
19        Q.   -- "Ovarian cancer has been
20   linked to several events and conditions
21   which are related to inflammation and
22   repair" --
23        A.   Right.
24        Q.   -- "including incessant
```

76 (Pages 298 to 301)

Ie-Ming Shih, M.D., Ph.D.

Page 302

1    ovulation."
2        A.   Right.
3        Q.   Endometriosis, do you agree
4    that endometriosis has been linked to
5    with inflammation and ovarian cancer?
6            MS. MILLER:  Objection.
7            THE WITNESS:  You said
8        linked to the inflammation, that I
9        don't know.
10   BY DR. RESTAINO:
11       Q.   Okay.  How about exposure to
12   talc and asbestos?
13       A.   Definitely not.
14       Q.   You disagree with that.
15   "And in some studies pelvic inflammatory
16   disease."
17           Do you agree with that?
18           MS. MILLER:  Objection.
19           THE WITNESS:  I did not say
20       I agree.
21           MS. MILLER:  With what?
22           THE WITNESS:  With what --
23       and what -- what's your subjects?
24   BY DR. RESTAINO:

Page 303

1        Q.   Do you need me to read the
2    sentence to you again?
3        A.   No.  No.
4        Q.   Because I will.  I'll read
5    it for as long as it takes the Number 1
6    pathologist in ovarian cancer to get it.
7        Ovarian cancer -- you
8    understand that, right?
9            MS. SHARKO:  Wait, wait,
10       wait, Doctor.
11           MS. MILLER:  Let's take a
12       break so you can relax.  Let's
13       take a break so you can catch your
14       breath because you are kind of
15       shouting at the witness.
16           THE WITNESS:  Right.  Right.
17           MS. MILLER:  Let's go off
18       the record.
19           THE VIDEOGRAPHER:  Okay.  Go
20       off?
21           I need confirmation from
22       both sides.
23           DR. RESTAINO:  Yes.
24           THE VIDEOGRAPHER:  The time

Page 304

1    is 3:11 p.m.  We are going off the
2    record.
3        (Short break.)
4            THE VIDEOGRAPHER:  The time
5    is 3:21 p.m.  We are back on the
6    record.
7    BY DR. RESTAINO:
8        Q.   Welcome back, Doctor.
9            Now, Doctor, several times
10   today if I recall correctly, you've
11   stated that you are -- your publications
12   are frequently cited in the medical
13   literature; is that correct?
14       A.   Frequently means -- do you
15   have a quantification?
16       Q.   I -- I think you said, was
17   it 30,000 times?
18       A.   32,800.  I don't know.  I
19   cannot keep track on that.
20       Q.   Okay.  But it's about 30,000
21   or 32,000?
22       A.   About.
23       Q.   And that means that there is
24   a lot of publications that are -- that

Page 305

1    are relying upon your publications,
2    correct?
3        A.   Rely on.  I would say they
4    may reference my paper --
5        Q.   Okay.
6        A.   -- as part of their purpose
7    for that specific study.  But I cannot
8    know how they cite it.  Because there's
9    33,000.  I cannot track on that.
10       Q.   Okay.  Okay that's a big
11   number, isn't it?
12           MS. MILLER:  Objection.
13           THE WITNESS:  Some number.
14   BY DR. RESTAINO:
15       Q.   Okay.  I believe we now
16   marked as Shih Exhibit 15, a paper by
17   Douglas Hanahan and Robert A. Weinberg
18   titled "The hallmarks of cancer"
19   published in Cell in January of 2000.
20           (Document marked for
21       identification as Exhibit
22       Shih-15.)
23   BY DR. RESTAINO:
24       Q.   Doctor, are you familiar

77 (Pages 302 to 305)

Ie-Ming Shih, M.D., Ph.D.

Page 306

1    with this paper?
2         A.   I want to make sure.  Cell,
3    January 7th, 2000.  That's 19 years ago.
4         Q.   Correct.
5         A.   "The hallmarks of cancer,"
6    by Hanahan and Robert A. Weinberg.  I
7    remember, saw this paper before.
8         Q.   Okay.  In fact I will
9    represent to you that last night when I
10   checked on this paper, this one paper has
11   been cited 30,119 times all by itself.
12        Have you cited this paper in
13   your publications?
14        A.   I cannot remember.  I'm on
15   my 300 something papers --
16        Q.   Okay.
17        A.   -- whether I cite this or
18   not.
19        Q.   Okay.  If you would turn to
20   Page 2, they have a diagram.
21        A.   You mean Figure 1, acquired
22   capabilities of cancer?
23        Q.   Yes, sir.  And they describe
24   these as the six hallmarks of cancer, do

Page 307

1    they not?
2         A.   That's the legend in the
3    figure.
4         Q.   Okay.  And one of them is
5    self-sufficiency in growth signals.
6    Agreed?
7         A.   You mean the green, the top
8    one, yes.
9         Q.   Yes.  And then evading
10   apoptosis is one of the hallmarks of
11   cancer, correct?
12        A.   Yes.
13        Q.   And then -- and alongside of
14   that is insensitivity to antigrowth
15   signals, correct?
16        A.   Correct.
17        Q.   And then down below they
18   have three, the one on the left is
19   sustained angiogenesis.  Agreed?
20        A.   Yes.
21        Q.   And then tissue invasion in
22   metastases, correct?
23        A.   I saw that.
24        Q.   And then limitless --

Page 308

1         A.   Replicative.
2         Q.   -- potential, correct?
3         A.   That's in the figure.
4         Q.   That's all in the figure in
5    the paper that's been cited 32,000 times.
6         Now, do you know if these
7    authors have published a follow-up to
8    that 2000 paper?
9         A.   I did not follow this paper.
10        Q.   Okay.
11        (Document marked for
12   identification as Exhibit
13   Shih-16.)
14   BY DR. RESTAINO:
15        Q.   We have marked as Shih-16,
16   Hanahan and Weinberg, 2011, "Hallmarks of
17   cancer:  The next generation."
18        Do you recall seeing this?
19        A.   I cannot recall.
20        Q.   Okay.  This is published in
21   the journal Cell.  You've published in
22   the journal Cell yourself, have you not?
23        A.   I am co-author in Cell.
24        Q.   Okay.  And I will represent

Page 309

1    to you that as of yesterday, this paper
2    by itself has been cited 34,292 times.
3    So with the first paper, these two papers
4    have been cited over 60,000 times.
5         Now, we don't know, do we,
6    of those articles that have referenced
7    this how many times those references have
8    been referenced, would you agree?
9         A.   How many references have
10   been referenced, what does that mean?
11        Q.   Well, if these two papers --
12        A.   Yeah.
13        Q.   -- have been cited over
14   60,000 times, then those 60,000 papers
15   may have also been referenced, correct?
16        MS. MILLER:  Objection.
17   That is not logical.
18        THE WITNESS:  They are not
19   related to these two papers.  They
20   are just --
21   BY DR. RESTAINO:
22        Q.   Fair enough.  I'll --
23   I'll --
24        A.   How can this be --

78 (Pages 306 to 309)

Ie-Ming Shih, M.D., Ph.D.

<table>
<tr><td>

Page 310

1        MS. MILLER:  When you say
2    they were cited 60,000 times, do
3    you mean 60,000 times in 60,000
4    separate papers or were they
5    sometimes cited in the same paper?
6    I just don't -- I think there's
7    some illogic in the math there
8    but --
9        DR. RESTAINO:  How can they
10   be cited in the same paper?
11       MS. MILLER:  Okay.  You
12   could cite both of these.
13       DR. RESTAINO:  No -- okay --
14   or both papers --
15       MS. MILLER:  If this was
16   cited 30,000 times and this was
17   cited 30,000 times.  In diagrams,
18   some of them may have been cited
19   in the same paper.
20       DR. RESTAINO:  Well, as it
21   happens in PubMed, when papers are
22   cited, they're cited individually.
23   The first one was cited over
24   30,000 times.  The second one has

</td><td>

Page 312

1    hallmarks, have they not?
2        A.  I saw those boxes.
3        Q.  And then down below they
4    have enabling characteristics on the
5    left, "Genome instability and mutation,"
6    and on the right, "Tumor promoting
7    inflammation," correct?
8        A.  Okay.  Okay.  I need to
9    understand this diagram, okay.  So this
10   emerging hallmarks and enabling
11   characteristics.  I cannot understand the
12   individual symbols, can you?  This, this,
13   this, this.
14       Q.  Without getting into what
15   the two individual signals are, just
16   directing your attention to the new ones
17   that they've added.  And if you look over
18   on Figure 3 on the legend on the
19   right-hand side, do you see the
20   verbiage --
21       A.  I need to read.  I'm sorry.
22       Q.  If you look at the bottom of
23   the legend.
24       A.  So additional hallmarks of

</td></tr>
<tr><td>

Page 311

1    been cited over 30,000 times.
2    Collectively, these two papers --
3        MS. MILLER:  You said then
4    those 60,000 papers.  I don't
5    think you established they've been
6    cited in 60,000 papers.
7        THE WITNESS:  It should be
8    60,000 citations.  Not papers.
9    BY DR. RESTAINO:
10       Q.  Okay.  Now, let's move on
11   to, on this paper here, to Page 658.
12   Okay.  And they have --
13       A.  Hold on.
14       Q.  658 and Figure 3.
15       A.  So you are referring Figure
16   3?
17       Q.  Yes, sir.
18       A.  Imaging hallmarks and
19   enabling characteristics.
20       Q.  All right.  Now, in addition
21   to the six hallmarks of cancer that they
22   published in 2000, they've now added
23   deregulating cellular energetics and
24   avoiding immune destruction as emerging

</td><td>

Page 313

1    cancer are involved in the pathogenesis
2    of some and perhaps...
3            (Reading to himself.)
4        Because neither capability
5    is yet generalized and fully validated.
6    Neither.
7            Thank you for your patience.
8        Q.  Doctor, the final sentence
9    in that legend they write, "Inflammation
10   by innate immune cells, designed to fight
11   infections and heal wounds, can instead
12   result in their inadvertent support of
13   multiple hallmark capabilities, thereby
14   manifesting the now widely accepted" --
15   "widely appreciated tumor-promoting
16   consequences of inflammatory responses."
17       Did I read that correctly?
18       A.  This is talking about cancer
19   in general.
20       Q.  Doctor, did I read that
21   correctly?
22       A.  You read correctly as shown
23   in the figure legend.
24       Q.  Okay.  Now, do you have any

</td></tr>
</table>

79 (Pages 310 to 313)

Ie-Ming Shih, M.D., Ph.D.

Page 314

1  objective evidence to contradict Hanahan
2  and Weinberg in this paper that's been
3  cited over 32,000 times that inflammation
4  by innate immune cells designed to fight
5  infections and heal wounds can instead
6  result in their inadvertent support of
7  multiple hallmark capabilities, thereby
8  manifesting the now widely accepted
9  tumor-promoting consequences of
10  inflammatory responses?
11          Do you disagree with that
12  statement?
13          MS. MILLER: Objection.
14          THE WITNESS: It depends.
15  If we talk about specific type of
16  cancer like ovarian high grade
17  serous carcinoma, I don't see
18  evidence, cogent evidence and
19  credible science to do that.
20          I think Dr. Weinberg is
21  saying in general, okay, take
22  every cancer, testicular cancer,
23  prostate cancer, brain tumor,
24  everything together into

Page 315

1  consideration.
2          But it did not specify
3  ovarian cancer can do that. If
4  you have evidence that
5  Dr. Weinberg say ovarian cancer,
6  could you please show me?
7  BY DR. RESTAINO:
8      Q.  Okay. So is it your opinion
9  that in discussing the hallmarks of
10  cancer, each and every cancer has to be
11  looked at individually?
12      A.  That's --
13          MS. MILLER: Objection.
14          THE WITNESS: That's a
15  totally different question. Okay.
16  You ask me another set of
17  question.
18  BY DR. RESTAINO:
19      Q.  I did. It was another
20  question.
21      A.  Okay. So could you repeat
22  your new question one more time.
23      Q.  Yes. Is it your opinion
24  that when discussing the hallmarks of

Page 316

1  cancer as these two gentlemen did in
2  these two separate publications that have
3  been cited over 60,000 times, that you
4  have to look at each and every cancer
5  specifically? Is that your expert
6  opinion?
7      A.  So we are, as a scientist, I
8  will tell you what we're going to do. We
9  want to demonstrate the credible science
10  and the cogent evidence of biological
11  plausibility, may include those hallmarks
12  they say, but we did not find any
13  plausible evidence at this moment.
14          I think this is very good
15  guideline for the general cancer
16  biologist. But for individual one, we
17  need to demonstrate at least some of
18  these features.
19          So I did not say that I
20  disagree with Dr. Weinberg as a whole in
21  cancer biology in general, like teaching
22  medical students.
23          What I'm saying, this -- we
24  are still fighting. We try to struggle

Page 317

1  very much in our laboratory to find those
2  evidence. So that's our aim. We want to
3  find this evidence. But we don't have
4  any evidence to show in ovarian cancer
5  research.
6          Also, I want to tell you,
7  Nobel Prize Laureate, the finding -- has
8  been cited so many times.
9          So, again, I'm looking at
10  the science, not where it come from, the
11  institution, authors, and citations.
12  Citation's a good indicator, but it does
13  not mean too much. Especially as a
14  review paper.
15      Q.  You yourself have reported
16  that you've been referenced over 30,000
17  times twice today, correct, Doctor?
18      A.  Yes, I just tell you.
19  That's a number that I tell you. But I
20  cannot tell you that my reputation is
21  solely based on my citation. It's based
22  on my research findings.
23      Q.  You state, "We try to
24  struggle very much in our laboratory to

Ie-Ming Shih, M.D., Ph.D.

Page 318

1  find those evidence, so that's our aim.
2  We want to find this evidence.  We don't
3  have any evidence to show in ovarian
4  cancer research."
5       Do you have any evidence to
6  show that the hallmarks and emerging
7  characteristics as listed by Hanahan and
8  Weinberg do not apply to ovarian cancer?
9       MS. MILLER:  Objection.
10      THE WITNESS:  I need to
11  review your question.  Okay?
12      What I said, there's no
13  evidence to support that ovarian
14  high grade serous carcinoma if
15  this is the type we are talking
16  about, because otherwise it's so
17  confusing, because every type is
18  different.  That's the problem
19  with epidemiologic studies.
20      So we'll go back.
21      So what you said is do not
22  apply to ovarian cancer.  What
23  does that mean?
24      I said we don't have

Page 319

1       evidence to show, including, okay,
2       this hallmarks in ovarian cancer
3       precursor lesions, the high grade
4       precursor means STIC and p53
5       signature.  We don't have any
6       evidence to show.  It doesn't mean
7       no evidence.  It doesn't mean it's
8       not applicable.  Okay.  We just
9       don't have evidence to show.
10      There's no credible science.
11  BY DR. RESTAINO:
12      Q.   You don't have evidence to
13  contradict these two researchers,
14  correct?
15      MS. MILLER:  Objection.
16      THE WITNESS:  These two
17  researchers, they claim -- they
18  come up with these features in
19  cancer biology in general.  It
20  cannot be applicable to specific
21  cancer type, like, for example,
22  cholangiocarcinoma, sarcoma, high
23  grade serous carcinoma, low grade
24  serous carcinoma, clear cell

Page 320

1       carcinoma, renal cell carcinoma,
2       endometrioid carcinoma.
3            I don't find any cogent
4       evidence for this biological
5       mechanism in the literature.
6            DR. RESTAINO:  I'm going to
7       move to strike as nonresponsive.
8       BY DR. RESTAINO:
9            Q.   Doctor, in the form of
10      ovarian cancer that you study, any form,
11      you can pick the form, whatever form you
12      study, one hallmark of ovarian cancer is
13      that it sustains proliferative signaling
14      and keeps going, correct?  That's a
15      hallmark of every cancer known to man,
16      correct?
17           MS. MILLER:  Objection.
18           THE WITNESS:  Can you say
19      that one more time?  Every single
20      tumor cells?
21      BY DR. RESTAINO:
22           Q.   Every single tumor --
23           A.   Tumor.  Not tumor cells,
24      okay.

Page 321

1            Q.   -- undergoes sustained
2       proliferative signaling.  That's what
3       makes it an out-of-control cancer,
4       correct?  Every cancer.
5            MS. MILLER:  Objection.
6            THE WITNESS:  Not in their
7       precursor lesion.  That would be
8       another different landscape.  You
9       talk about cancer including
10      precursor in situ cancer, or are
11      you -- you mean the metastases?
12      If you say metastases, of course,
13      they can expand, uncontrolled
14      proliferation.
15      BY DR. RESTAINO:
16           Q.   I'm talking about --
17           A.   When you talk about cancer
18      precursor, that's a different thing.
19           And this is our focus today,
20      is whether talc and -- or asbestos can
21      cause ovarian cancer.  We should focus on
22      the precursor lesion, not the big
23      blown -- the full-blown, the cancer that
24      kill patients.

81 (Pages 318 to 321)

Ie-Ming Shih, M.D., Ph.D.

Page 322

1    Q.   Okay.  I know that's what
2  you want to focus on, but there are many
3  other experts that are not focused on
4  that and they're looking at the totality
5  of the evidence of linking ovarian cancer
6  with inflammation and inflammation
7  secondary to talc.
8         And inflammation-promoting
9  properties has been listed by these
10  authors as widely appreciated in the
11  medical field, correct?
12    A.   Could you show me the -- the
13  references -- references to show this
14  part?
15    Q.   I've showed you the article.
16    A.   That's a review.
17    Q.   Okay.
18    A.   But do you have any single
19  paper that you claim that you were happen
20  in ovarian cancer?
21    Q.   Do you have a single paper
22  that shows that inflammation is not
23  pro-growth in the cancer arena?
24         MS. MILLER:  Objection.

Page 323

1  BY DR. RESTAINO:
2    Q.   A single paper that shows
3  that -- that inflammation, whether it's
4  caused by the cancer itself or the body's
5  innate response to that cancer, a single
6  paper that shows that inflammation does
7  not promote the growth of the cancer?
8         MS. MILLER:  Objection.
9      Please let me get my objection.  I
10      know you're excited to answer.
11      But that was objectionable.
12         THE WITNESS:  Yeah, right.
13  BY DR. RESTAINO:
14    Q.   Okay.  What don't I
15  strike -- do you need the question asked
16  again, Doctor?
17    A.   Please.
18    Q.   Okay.  Doctor, can you show
19  us or refer us to a single paper that is
20  of cogent evidence which shows that
21  inflammation, whether caused by the tumor
22  or promoting the tumor does not affect
23  the growth of cancer?
24         MS. MILLER:  Objection.

Page 324

1         MR. LOCKE:  Objection.
2         THE WITNESS:  I think I
3  answered your question in this
4  morning's discussion, I believe.
5  What I said is scientists -- okay.
6  I will say science is evidence --
7  evidence-driven, evidence-driven.
8         We can prove positivity to
9  show the evidence, but we cannot
10  prove negativity, because this
11  against the science practice.
12  This is not logic in science.  How
13  can we prove there is no -- no
14  tumor in a person?  We need to see
15  the tumor, so we can say, oh, you
16  are a cancer patient, until we
17  find it.
18         DR. RESTAINO:  I'm going to
19  move to strike.
20  BY DR. RESTAINO:
21    Q.   Doctor, what paper,
22  peer-reviewed, published, are you relying
23  upon for the basis of your opinion that
24  inflammation plays no role in the growth

Page 325

1  promotion of ovarian cancer?
2         MS. MILLER:  Objection.
3  He's answered this question
4  multiple times, and it was an
5  objectionable question even before
6  he answered it multiple times.
7         MS. PARFITT:  "Objection" is
8  fine.
9         THE WITNESS:  I answer your
10  questions multiple times, and my
11  answer was remains the same if you
12  keep asking me 100 times.
13  BY DR. RESTAINO:
14    Q.   I'm sorry.  I -- I missed
15  your -- the name of the paper that you --
16  that you are relying upon.  I'm -- I'm
17  sharing with you a paper that has been
18  cited over 32,000 times which states that
19  it is now widely appreciated
20  tumor-promoting consequences of
21  inflammatory response.
22         Your response was that it
23  doesn't apply to ovarian cancer.  I'm
24  asking for one paper --

82 (Pages 322 to 325)

Ie-Ming Shih, M.D., Ph.D.

Page 326

1          MR. LOCKE:  Objection.
2    BY DR. RESTAINO:
3          Q.   -- that is cogent evidence
4    that the tumor-promoting consequences of
5    inflammatory response does not apply to
6    ovarian cancer.
7          MS. MILLER:  Objection.
8    Same -- I'll --
9          THE WITNESS:  Same answer.
10   I can repeat one more time.
11   BY DR. RESTAINO:
12         Q.   Give me the name of the
13   paper.
14         A.   I can give you one more time
15   my answer.
16         Q.   I want the name of the
17   paper.
18         A.   Science -- science,
19   practicing science, as a scientist, our
20   job is to find the positive evidence to
21   support hypothesis.  This by no means we
22   can come up with negative results because
23   this is not logic in science.
24         Q.   You can't come out with

Page 327

1    negative results --
2          A.   Because this a logic
3    problem.  Okay.  We cannot prove
4    negativity.  The science is -- is
5    evidence driven.
6          Q.   Okay.
7          A.   Only evidence there can
8    become positive.  Okay.  With a positive,
9    you can claim something to be further
10   tested.  But no one in the whole wide
11   world can prove negativity.  Period.
12         Q.   Okay.  So you can't give me
13   the name of a single paper?
14         A.   The answer is I just --
15         MS. MILLER:  Objection.
16   Doctor, please let me object.
17   BY DR. RESTAINO:
18         Q.   Okay.  And -- and, Doctor,
19   it is your expert opinion that it is your
20   job to come up with positive evidence to
21   support a hypothesis, and by no means you
22   can come up with negative results,
23   because that's not logic in science,
24   correct?

Page 328

1          MS. SHARKO:  Object to the
2    form.
3          THE WITNESS:  No, what I
4    said is that's the scientist's
5    job.  Okay.  If you have a
6    hypothesis, talcum powder can
7    cause ovarian cancer, you need to
8    show the cogent evidence and
9    credible science to support the
10   biological plausibility.  That's
11   what I said.  It doesn't mean I --
12   okay, I need to review those
13   evidence --
14   BY DR. RESTAINO:
15         Q.   Okay.  And --
16         A.   -- to see whether they are
17   credible or not.
18         Q.   And have you reviewed
19   evidence that shows that inflammation
20   does not promote ovarian cancer?
21         MS. MILLER:  Objection.
22   Asked and answered like 15 times.
23         THE WITNESS:  I already
24   answered.

Page 329

1    BY DR. RESTAINO:
2          Q.   And you gave me the name of
3    the -- okay, then, what is the -- what is
4    the lead author's name of the paper that
5    you were relying upon?
6          MS. MILLER:  Objection.
7    That's argumentative.  That's
8    misstating the witness's
9    testimony.  And he's answered this
10   question in a hundred different
11   forms multiple, multiple times.
12   BY DR. RESTAINO:
13         Q.   Doctor, you can't name a
14   single paper, can you?
15         MS. MILLER:  Objection.
16         THE WITNESS:  What kind of
17   paper you are referring to?
18   BY DR. RESTAINO:
19         Q.   A peer-reviewed published
20   paper that contradicts Hanahan and
21   Weinberg's paper, which has been cited
22   32,000 times, which talks about the
23   widely appreciated tumor-promoting
24   properties of inflammation.

83 (Pages 326 to 329)

Ie-Ming Shih, M.D., Ph.D.

Page 330

```
 1            MS. MILLER: Objection.
 2  BY DR. RESTAINO:
 3       Q.   Doctor, are you thinking,
 4  or --
 5            MS. SHARKO: Well, you all
 6  were talking.
 7            MS. MILLER: I don't even
 8  know where we are. I think --
 9            MS. SHARKO: Same question.
10            MS. MILLER: Okay. Same
11  question, same objection. It's
12  been asked and answered in many,
13  many different ways.
14            MS. PARFITT: The doctor
15  needs to answer the question.
16            MS. MILLER: The doctor has
17  answered the question.
18            MS. PARFITT: The doctor has
19  not answered the question. The
20  doctor --
21            THE WITNESS: I believe I
22  answered the question.
23  BY DR. RESTAINO:
24       Q.   You've given -- you've given
```

Page 331

```
 1  me the name of the article you're relying
 2  upon?
 3       A.   I said -- I answered --
 4            MS. MILLER: That is a
 5  misleading question.
 6            MS. PARFITT: Objection to
 7  form, Counsel, is really the --
 8  the appropriate response. We
 9  tried to be patient with that.
10            MS. MILLER: Well, I'm
11  trying to be patient --
12            MS. SHARKO: Well, you guys
13  also can't just make editorial
14  comments on his answer.
15            MS. PARFITT: I don't think
16  that we have.
17            DR. RESTAINO: The record
18  will report what the record
19  reports.
20            MS. MILLER: You have the
21  answer multiple times.
22  BY DR. RESTAINO:
23       Q.   Have you ever published a
24  paper that contradicts the statement that
```

Page 332

```
 1  the tumor-promoting properties of
 2  inflammation is widely appreciated?
 3            MS. MILLER: Objection.
 4            THE WITNESS: In my research
 5  team, we have many top priority
 6  projects. And this is not the
 7  research area we want to be
 8  engaged. We want to develop early
 9  detection methods and effective
10  treatments for ovarian cancer
11  patients.
12  BY DR. RESTAINO:
13       Q.   Is that no?
14            MS. MILLER: Objection.
15            THE WITNESS: What has been
16  no?
17  BY DR. RESTAINO:
18       Q.   Is your answer no, that
19  you've not published a paper that refutes
20  Hanahan and Weinberg's statement that the
21  tumor-promoting properties of
22  inflammation are widely appreciated?
23            MS. MILLER: Objection.
24            THE WITNESS: I answered
```

Page 333

```
 1  your question before.
 2            THE VIDEOGRAPHER: Counsel,
 3  we need to go off the record. The
 4  time is 3:50 p.m. We are going
 5  off the record.
 6            (Short break.)
 7            THE VIDEOGRAPHER: The time
 8  is 3:56 p.m. We are back on the
 9  record.
10            DR. RESTAINO: I'm going to
11  ask Madam Court Reporter,
12  Michelle, to mark the deposition
13  regarding the discussion we had
14  regarding an article refuting the
15  Hanahan and Weinberg analysis.
16  BY DR. RESTAINO:
17       Q.   And, Doctor, I want to
18  change channels, so to speak. And let's
19  go to your expert report. And if you
20  would look on Page 5, and there you have
21  a criticism of the cancer cell lines that
22  Dr. Saed has used, correct?
23       A.   That's my opinion.
24       Q.   Okay. Down at the bottom of
```

84 (Pages 330 to 333)

Ie-Ming Shih, M.D., Ph.D.

Page 334

1    it -- one, two, three, four -- five lines
2    up you state, "Another problem with the
3    study design is the researchers
4    mistakenly used an A2780 cell line as an
5    ovarian high grade serous cancer cell
6    line. But in fact A2780 is unlikely an
7    ovarian high-grade serous cancer line and
8    should not have been relevant in this
9    study, reflecting the limited knowledge
10   of the research group in studying ovarian
11   cancer (Anglesio, et al., 2013;
12   Domcke" -- D-O-M-C-K-E -- "et al.,
13   2013.)"
14          Did I read that correctly,
15   Doctor?
16       A.   That is what is my opinion.
17       Q.   Now, was your opinion there
18   derived from reviewing the Saed paper
19   itself?
20       A.   You mean this publication's
21   precursor?
22       Q.   That publication? It's --
23       A.   No, its precursor, meaning
24   the manuscript.

Page 335

1        Q.   Okay. And you looked at
2    that, correct?
3            And let's look at the
4    study --
5            MS. MILLER: Wait a minute.
6    This is under a part of his report
7    that says Dr. Saed's statements in
8    his expert report, not the part of
9    the report that says Dr. Saed's
10   in-press paper. There are two
11   sections of this report. One
12   refers -- I just want to make sure
13   that the record is clear because I
14   think that was not accurate.
15           Dr. Saed's statement in his
16   expert report, that's where he
17   discusses that.
18           Then on Page 6 it says
19   Dr. Saed's in-press paper. So
20   this is based on the expert
21   report, based on looking at the
22   report. That's what it says.
23           DR. RESTAINO: What is based
24   on the expert report?

Page 336

1            MS. MILLER: If you look at
2    Dr. Shih's expert report, I think
3    what you said misstates what is
4    here. He has two sections in his
5    expert report as I'm reading it
6    now.
7            One says Dr. Saed's
8    statement in his expert report.
9    Another says Dr. Saed's in-press
10   paper in Reproductive Science. So
11   are you focused on the expert
12   report or Reproductive Science
13   manuscript now?
14           DR. RESTAINO: I'm focused
15   on Dr. Shih's expert report on
16   Page 5.
17           MS. MILLER: Right.
18           DR. RESTAINO: Where he has
19   a paragraph there titled "Use of
20   cancer cell lines."
21           MS. MILLER: Right. And
22   that refers to Dr. Saed's expert
23   report, not Dr. Saed's manuscript.
24   So you misstated that. I just

Page 337

1    wanted to get that clear on the
2    record.
3            DR. RESTAINO: Okay. Duly
4    noted.
5    BY DR. RESTAINO:
6        Q.   Okay. I would like to take
7    a look at Dr. Saed's published paper.
8        A.   This one. In Reproductive
9    Science, 2019?
10       Q.   Correct. If you would turn,
11   Doctor, to the second page on the lower
12   left-hand side there's a section titled
13   "Material and Methods." And then "Cell
14   Lines."
15           Do you see that, sir?
16       A.   Right. I saw it here.
17       Q.   Okay. And there they
18   discuss, under their cells and the cell
19   lines, that they use ovarian cancer cells
20   capital S -- all caps -- SK-OV-3(ATCC),
21   A2780 (Sigma-Aldrich at St. Louis,
22   Missouri), and TOV112D (a kind gift from
23   Gen Sheng" -- S-H-E-N-G -- "Wu" -- W-U --
24   "at Wayne State University, Detroit,

Ie-Ming Shih, M.D., Ph.D.

Page 338

1  Michigan), and normal cells, human
2  macrophages (EL-1; ATC, Manassas,
3  Virginia), human primary normal ovarian
4  epithelial cells (Cell Biologic Chicago,
5  Illinois), human ovarian epithelial cells
6  (HOSEpiC; ScienCel" -- S-C-I-E-N-C-E-L --
7  "Research Laboratories Incorporated,
8  Carlsbad, California), and immortalized
9  human fallopian tubes secretory
10 epithelial cells (FT33; Applied
11 Biological Materials, Richmond, British
12 Columbia, Canada) were used."
13       Did I read that correctly,
14 Doctor, with all those letters and
15 everything?
16      A.  This were -- this sentence
17 has been written in this paper.
18      Q.  Okay.  They use normal cell
19 macrophages in their study, did they not?
20          MS. MILLER:  Objection.
21 BY DR. RESTAINO:
22      Q.  That's the fourth line?
23      A.  I don't think they're normal
24 anymore.  If it become a cell line,

Page 339

1  meaning they're immortalized, and the
2  macrophages, as you know, according to
3  Dr. Weinberg, the charts, they are
4  normal, but the cell line, they can be
5  maintained in tissue culture, and they
6  can divide all the time.
7       So this is -- by no means is
8  normal macrophages.  It has some -- as
9  Dr. Weinberg said, just as you, candidly,
10 as you do to me, that's one of the
11 feature of cancer.
12      Q.  But in normal cells, like in
13 normal macrophages, they have a limited
14 number of mitotic events before they
15 begin to die out, correct?
16      A.  I don't even know whether
17 human macrophages can ever replicate in
18 tissue culture, because they are
19 terminally differentiated immune cells.
20      Q.  Okay.  Well, in addition to
21 using the macrophages as listed in the
22 paper, they also used human primary
23 normal ovarian epithelial cells, correct?
24      A.  You mean the human primary

Page 340

1  normal epithelial -- Cell Biologicals,
2  Chicago, Illinois.
3       I never know this so-called
4  normal ovarian epithelial cells, because
5  every time, when they culture the
6  epithelial cells, they have really finite
7  life spans.  They cannot -- they are not
8  cancer, right?  So as we remember vividly
9  from the Weinberg's charts, this normal
10 cells cannot proliferate all the time.
11      But in order for that
12 society to study in culture, they need to
13 expand that.  And when they expand, they
14 are not normal epithelial cell already.
15 When we look at normal epithelial cells
16 in human tissue, they may not be
17 proliferative.  So I don't think how
18 relevant this cell line will be to this
19 study.
20      Q.  Have you ever used the human
21 primary normal ovarian epithelial cells
22 from Cell Biologics, Chicago, Illinois?
23      A.  I cannot recall.  But if I
24 did, we are doing -- we are asking

Page 341

1  different scientific questions, okay.
2  It's totally irrelevant.
3       Q.  Okay.  In addition for his
4  study, they used human ovarian epithelial
5  cells or HOSEpiC obtained from ScienCel
6  Research Laboratories, correct?
7       A.  Yeah, they're in California.
8  This has been written.
9       Q.  Okay.  And as I'm going
10 through this, the only cell line that
11 you're criticizing in your expert report
12 is that they use the A2780, correct?
13      A.  Let me go back to my report.
14      Q.  Yes, sir.  It's Page 5,
15 paragraph titled "Use of Cancer Cell
16 Lines."
17          MS. MILLER:  Are you asking
18       anywhere in his report if that's
19       the only place --
20          THE WITNESS:  I saw this
21       paragraph.
22          At the time I believe this
23       is the most important deficiency
24       in the methodology, meaning cell

Ie-Ming Shih, M.D., Ph.D.

Page 342

1   lines cannot -- ovarian cancer
2   cell lines cannot be used to
3   answer the question of where it
4   starts.  You need to start from
5   the normal epithelial cells.  So
6   this is -- I -- this is totally
7   methodology incorrect.
8   BY DR. RESTAINO:
9   Q.   Okay.  And Dr. -- the Saed
10  team also utilized immortalized human
11  fallopian secretory epithelial cells,
12  FT33, obtained from Applied Biological
13  Materials, correct?
14  A.   It has been written.  But
15  that's a really bad idea.
16  Q.   Okay.  Whether it's your
17  opinion of a good idea or a bad idea,
18  did -- do you discuss in your expert
19  report the fact that they use these --
20  these various cell lines?
21  A.   To the scientific community,
22  I think this is so obvious flaw.  So I
23  just mention the ovarian cancer cell line
24  issue here.  But I think everybody will

Page 343

1   agree, this is totally not correct
2   methodology to answer the specific
3   question about the carcinogenesis.
4   Q.   The Saed team tested three
5   cancer cell lines in addition to normal
6   cell lines and immortalized cell lines,
7   did they not?
8   A.   I will not say normal cell
9   line.  A cell line cannot be normal
10  anymore.
11  Q.   They used ovarian cancer
12  cells, SK-OV-3, correct?
13  A.   Yes.
14  Q.   That's not listed in your
15  expert report, is it?
16  MS. MILLER:  That's a lie.
17  It's right here on Page 6.  I'm
18  looking at it.
19  DR. RESTAINO:  Well, it's
20  not a lie.  I just -- I just
21  word-searched it.
22  MS. MILLER:  Just -- okay.
23  SK-OV-3?  I'm looking at it.
24  DR. RESTAINO:  It's got no

Page 344

1   hyphen in it.
2   MS. MILLER:  Oh, it's got no
3   hyphen.
4   THE WITNESS:  It's the same,
5   everybody know SK-OV-3.
6   MS. MILLER:  I'm sorry.
7   That was -- object to foundation.
8   I retract what I said.  I just was
9   looking right at the word.
10  BY DR. RESTAINO:
11  Q.   Okay.  Doctor.
12  A.   Yes.
13  Q.   Now, talking about the A2780
14  cell line.  In fact, despite your
15  criticism, the medical literature is
16  replete with research articles pertaining
17  to ovarian cancer which utilize A2780,
18  correct?
19  A.   Could you repeat the
20  question one more time, slowly.
21  Q.   Yes.  The medical literature
22  is filled with current research articles
23  pertaining to ovarian cancer and
24  utilizing the A2780 cell line?

Page 345

1   MR. LOCKE:  Objection.
2   THE WITNESS:  This cell line
3   has been used in the past without
4   knowing that the origin is now
5   ovarian cancer.
6   And as a result, as you can
7   see, the -- the reference I cited,
8   Domcke 2013 and Anglesio 2013.  I
9   think that's why this is so
10  important.  I think these are two
11  papers can allow, as a scientist,
12  we try very hard to do ovarian
13  cancer research, that we need to
14  be really careful about our cell
15  lines and the most up-to-date
16  knowledge we should perform in
17  tissue culture studies.
18  BY DR. RESTAINO:
19  Q.   Doctor, would you be
20  surprised if I represent to you that
21  since January 1st of 2018, so we're
22  dealing with maybe 15 months, not going
23  back to Domcke in 2013.  Since
24  January 1st, 2018, 139 peer-reviewed

87 (Pages 342 to 345)

Ie-Ming Shih, M.D., Ph.D.

Page 346

1  articles have been published utilizing
2  the A2780 ovarian cancer cell line?
3        MR. LOCKE:  Objection.
4  BY DR. RESTAINO:
5        Q.   Would that surprise you,
6  sir?
7        MS. MILLER:  Objection.
8        THE WITNESS:  That's
9  unfortunate that scientists did
10  not be aware of that.  Some
11  scientists may be aware of that,
12  but they still use A2780.
13        You know why?  Because this
14  cell line is very easy to grow and
15  people love it, because it's -- it
16  proliferates very well.  So people
17  know maybe, they know that this is
18  not a good model.  But they still
19  continue using it, pretending
20  nobody know this trick.
21  BY DR. RESTAINO:
22        Q.   So it is your subjective
23  opinion that the A2780 is not an adequate
24  cell line to use, but objectively

Page 347

1  researchers continue to publish the
2  results including for treatment of
3  ovarian cancer; isn't that correct?
4        MS. MILLER:  Objection.
5        MR. LOCKE:  Objection.
6  BY DR. RESTAINO:
7        Q.   I'll represent to you,
8  Doctor, functional and transcriptomic
9  characterization of carboplatin resistant
10  A2780 ovarian cancer cell line was
11  published in biological research last
12  week.  And these researchers are looking
13  at this A2780 ovarian cancer cell line
14  that they've now made carboplatin
15  resistant in order to determine what they
16  can do to help patients who become
17  resistant to carboplatin therapy.  Are
18  you aware of that, Doctor?
19        MS. MILLER:  Objection.
20        THE WITNESS:  I need to see
21  the reference.  Do you have the
22  paper with you?
23  BY DR. RESTAINO:
24        Q.   I'm just asking you if you

Page 348

1  are aware of that publication as of last
2  week?
3        MS. MILLER:  Objection.
4        THE WITNESS:  In order -- in
5  order to answer your question, I
6  need to see that.
7  BY DR. RESTAINO:
8        Q.   Is carboplatin the most
9  used, widely used chemotherapy regimen
10  for ovarian cancer?
11        A.   I don't really --
12        MS. MILLER:  Objection.
13        THE WITNESS:  This is
14  totally irrelevant.  We are
15  talking about the carcinogenesis.
16        Ovarian cancer precursor,
17  talcum powder, including Johnson &
18  Johnson product, can cause ovarian
19  cancer, then we are talking about
20  the technical part of cell lines.
21  I think we are off track.
22  BY DR. RESTAINO:
23        Q.   Then would you withdraw your
24  criticism of Dr. Saed's use of A2780?

Page 349

1        MS. MILLER:  Objection.
2        THE WITNESS:  No.  It's
3  wrong --
4  BY DR. RESTAINO:
5        Q.   Then it is -- then it is
6  irrelevant to our discussion.  I know you
7  want to talk about your work.  But we're
8  also here to talk about the flaws you
9  feel that Dr. Saed has in his paper?
10        A.   Okay.
11        Q.   And my representation --
12  representation to you is that despite
13  your subjective opinion, A2780 is still
14  being widely used and published up to
15  last week.
16        MS. MILLER:  Objection.
17        MS. SHARKO:  That's not a
18  question.
19        MS. MILLER:  Please give me
20  time me object.
21        That's true too.
22        THE WITNESS:  What do you
23  mean widely used?
24  BY DR. RESTAINO:

88 (Pages 346 to 349)

Ie-Ming Shih, M.D., Ph.D.

Page 350

1    Q.   How about 139 publications.
2    A.   As compared to what?
3    Q.   As compared to zero
4  publications?
5    A.   Where does zero come from?
6    Q.   Well, if it was no longer a
7  recognized viable cell line, then people
8  would stop using it and publishing it.
9  Peer reviewers wouldn't approve it, and
10  journals wouldn't publish it; isn't that
11  true?
12       MS. MILLER:  Objection.
13       MR. LOCKE:  Objection.
14       MS. MILLER:  We are
15  synchronized.
16       THE WITNESS:  That's why
17  good science is so important;
18  otherwise, how can we cure ovarian
19  cancer now, right?  It's because
20  we need to really update and keep
21  abreast of new knowledge, and
22  using the correct methodologies.
23  So I only care about the science,
24  whether the credible science,

Page 351

1  cogent evidence can support
2  biological plausibility regarding
3  this issue.  That's my concern.
4  And this is incorrect cell lines
5  to be used.  Totally incorrect and
6  not relevant to ovarian cancer.
7  BY DR. RESTAINO:
8    Q.   Have you conducted research
9  of PubMed to look at how many individuals
10  are still publishing using A2780 since
11  January 1st of 2018?
12       MS. MILLER:  Objection.
13       THE WITNESS:  I have so many
14  thing to do.  Top priority.  This
15  is incorrect methodology to be
16  used, why it bother me.
17  BY DR. RESTAINO:
18    Q.   Okay.  I'll move on.  Let's
19  take a look at your expert report where
20  you talk about the irrelevance of CA-125.
21    A.   Which page?  I'm sorry.
22    Q.   I believe it's on Page 5?
23       MS. MILLER:  So again, I
24  just want to point out that it's a

Page 352

1  little bit confusing, because, as
2  I noted -- and I think this is why
3  you didn't find the SKOV thing.
4  But this -- there's a section on
5  Dr. Saed's statements in his
6  expert report as one, and then
7  Dr. Saed's in-press paper, and so
8  CA-125 is covered both on Pages 5
9  and 7.  And that was also what
10  happened with the cell lines, why
11  you didn't find it.
12       So just specify whether
13  you're referring to the CA-125
14  discussion on Page 5 or Page 7.
15       DR. RESTAINO:  Okay.  I'm
16  looking --
17       MS. MILLER:  That was some
18  confusion in the last round of
19  questions.
20       DR. RESTAINO:  I appreciate
21  that.  Thank you.  Yes.
22  BY DR. RESTAINO:
23    Q.   I'm looking at your
24  paragraph on Page 5 wherein you -- it's

Page 353

1  titled "Irrelevance of CA-125."
2       Do you see that, sir?
3    A.   Yes.
4       DR. RESTAINO:  Jessica, are
5  you on the same page?
6       MS. MILLER:  Yep.
7  BY DR. RESTAINO:
8    Q.   Okay.  Now, CA-125 stands
9  for cancer antigen 125, correct?
10    A.   Correct.
11    Q.   And an antigen is a toxin or
12  a foreign substance for which the
13  immune -- the body has an immune
14  response, including the production of
15  antibodies, correct?
16    A.   No.
17    Q.   Well, how -- okay.  Then
18  I'll use your definition.  How do you
19  define an antigen?
20    A.   It's not my definition.
21  It's a scientific definition.  It's not
22  only me.  It's everybody accept.
23    Q.   Sir, I'll use your
24  definition or the definition that you

89 (Pages 350 to 353)

Ie-Ming Shih, M.D., Ph.D.

Page 354

1  have adopted from the scientific
2  community.  What is an antigen?
3       A.   Antigen is the protein that
4  can be recognized by our immune system.
5       Q.   CA-125 is expressed as a
6  membrane-bound protein on the surface of
7  cells that undergo metaplastic
8  differentiation into mullerian
9  epithelium, correct?
10           MS. MILLER:  Objection.  Are
11      you reading from something?
12           DR. RESTAINO:  My notes.
13           THE WITNESS:  What do you
14      mean "under surface of cells"?  I
15      can't understand.
16  BY DR. RESTAINO:
17      Q.   Oh, the protein on the
18  surface of the cell.
19      A.   Oh, on the cell.  Not under.
20      Q.   Right.  Doctor, I'll adopt
21  your definition of an antigen, but that's
22  what CA-125 --
23      A.   Well, I'm not finished.
24           MS. MILLER:  Are you

Page 355

1      withdrawing that question?  Or do
2      you want him to answer that
3      question?  I just -- again --
4           THE WITNESS:  I'm not
5      finished reading your thoughts.
6  BY DR. RESTAINO:
7      Q.   Okay.
8      A.   CA-125 is also known as a
9  mucin 16, was first identified by Dr. Bob
10  Bast at M.D. Anderson Cancer Center.
11      So, I am not sure this is
12  correct.  You said, metaplastic
13  differentiation and into mullerian
14  epithelial cells.  I don't know that's
15  correct, unless you show me the
16  reference.
17      Q.   Do you know it to be
18  incorrect?
19      A.   I need to see the reference
20  to make sure you are correct.
21      Q.   Okay.  I'll -- you then in
22  your paragraph that we're reading from,
23  irrelevance of CA-125 finding, you talk
24  about cancer specific -- or cancer

Page 356

1  biomarker, correct?
2      A.   You refer to the Line 3, is
3  definitely not a cancer-specific
4  biomarker.  Is that one?
5      Q.   The word "biomarker" is used
6  several times.  I'm just going to ask you
7  what you mean by biomarker?
8      A.   Oh.  Okay.
9           MS. MILLER:  Objection.
10           THE WITNESS:  Biomarker --
11      biomarker is a term generally used
12      in different research and by
13      different meanings for different
14      scientists and medical doctors.
15      By the CA-125, is biomarkers,
16      meaning it is something associated
17      with ovarian cancer but not a
18      precursor.  That's the point.  Not
19      a precursor, but ovarian cancer.
20      So what happened is
21      CA-125 -- usually I call it MUC16,
22      same thing -- is expressed by the
23      mullerian, normal mullerian duct
24      epithelial cells.

Page 357

1      So every woman has a low
2      level of that.  But ovarian
3      cancer, when they become
4      transformed -- are you ready?
5      If they are transformed,
6      they have more and more cells.  It
7      may not be that individual tumor
8      cells express higher, but because
9      the number is more.
10      So this is very different.
11      They are not causal.  They are
12      just biomarkers.  There are so
13      many biomarkers without known
14      etiology or biological mechanism.
15      In terms of tumor
16      progression -- I mean in terms of
17      tumor initiation.
18      So it has been shown, CA-125
19      in a serum can be a marker to
20      follow, monitor, disease
21      progression, but never be used as
22      biomarker to identify ovarian
23      cancer in the detection and
24      screening.

90 (Pages 354 to 357)

Ie-Ming Shih, M.D., Ph.D.

Page 358

1      And it is by no means is it
2  important in the transition of
3  normal fallopian tube to a STIC or
4  p53 signature.
5      So FDA approved, this can be
6  followed, monitored to see if we
7  have a cancer.  I think this is
8  important because that's --
9      DR. RESTAINO:  Doctor, I'm
10  going to move to strike.
11  BY DR. RESTAINO:
12      Q.   I just asked you what's your
13  definition of a biomarker.  If I asked
14  you the time, I don't need for you to
15  make a watch.  I just want to know the
16  time.
17      What is a biomarker?
18      A.   Biomarker is different
19  types, tissue bio marker, serum
20  biomarkers.  Do you want me to continue
21  or not?
22      Q.   I just want you to define a
23  biomarker so we get to the --
24      A.   That's why I'm going to

Page 359

1  define.  Biomarkers, like serum
2  biomarkers, CA-125, has been approved by
3  FDA to -- as a biomarker -- this is so
4  irrelevant -- to monitor whether the
5  tumor come back.
6      Q.   Doctor, I understand that
7  you want to get to that.
8      A.   That's biomarkers, right?
9      Q.   Doctor, would you agree that
10  a biomarker is a measurable substance in
11  an organism whose presence is indicative
12  of some phenomenon, such as disease,
13  infection or environmental exposure?
14  That's a biomarker.  Would you agree with
15  that?
16      A.   I need to see your -- what
17  you said.  I think this is one of the
18  definitions.
19      Q.   Okay.  Is it an acceptable
20  one to use for our purposes -- our
21  discussion right now.  Are you
22  comfortable with using that?
23      A.   I have only problem
24  indicative.  What do you -- what do you

Page 360

1  mean indicative?
2      Q.   Suggesting.
3      A.   It's -- it's causally
4  related or not?
5      Q.   No, just suggesting
6  something is going on.
7      A.   So it's no causally related
8  as this biomarker.
9      Q.   Okay.  Now, if we look at
10  your -- the paragraph you wrote, and once
11  again, so the record is clear, we're
12  looking on Page 5 of your expert report,
13  in that paragraph, irrelevance of CA-125,
14  you don't have a single reference for any
15  of your opinions in that paragraph, do
16  you?
17      A.   Which paragraph, the top
18  paragraph?
19      Q.   Irrelevance of CA-125.
20      A.   This is general medical
21  knowledge.  Every medical student will
22  know.
23      Q.   Okay.  Doctor --
24      A.   Every pathologist will know.

Page 361

1  Every medical doctor will know.
2      Q.   Okay.
3      A.   It's common, common
4  knowledge.
5      Q.   Does that mean that no,
6  there's not a reference to the medical
7  literature in that paragraph?
8      A.   This -- there should be
9  many.  But this is a common sentence.  So
10  I don't need to reference each one.
11      Q.   Okay.  So it is your -- it
12  is your opinion that CA-125 should not be
13  considered as indicating the onset or
14  heightened risk of the development of
15  ovarian cancer, correct?
16      A.   Definitely is not.
17      Q.   Okay.  I'd like to show you
18  a paper we've marked as Exhibit 20 from
19  the Journal of Ovarian Research.
20      (Document marked for
21  identification as Exhibit
22  Shih-20.)
23      THE WITNESS:  Okay.  Hold on
24  one moment.

91 (Pages 358 to 361)

Ie-Ming Shih, M.D., Ph.D.

Page 362

1  BY DR. RESTAINO:
2       Q.   And this one was
3  published -- we're going back.  This one
4  was published ten years ago.
5       A.   What.
6       Q.   Okay.  Now, if you look at
7  the second page.
8       A.   Okay.
9       Q.   There's a heading there of
10  CA-125 and ovarian cancer.
11      A.   CA-125.  Yes, I saw that.
12      Q.   And do they state there,
13  "The most widely used tumor marker in
14  ovarian cancer, often considered the gold
15  standard is CA-125, Reference 19"?
16      A.   Let me see the 19.
17           19 is, okay, cancer antigen
18  125.  That's 2008, 11 years ago.
19      Q.   Yes.  Do you agree that at
20  that time, CA-125 was the most widely
21  used tumor marker in ovarian cancer?
22           MS. MILLER:  Objection.
23           THE WITNESS:  What do you
24      mean widely used, most widely

Page 363

1       used?  As compared to?
2  BY DR. RESTAINO:
3       Q.   That's the language that
4  those researchers use, that it was the
5  most -- what do you -- how do you
6  interpret most widely used?
7       A.   Most widely used.  Do you
8  have Reference 19?  Because this
9  statement is coming from the 19.
10      Q.   Correct.
11      A.   So I want to see the
12  original articles.  Do you have one?
13      Q.   Well, no.  In the original
14  that underlying article might also
15  reference another article which could
16  reference another article.  We're just
17  going by this published article.
18      A.   Then...
19           MS. MILLER:  Is there a
20      question pending?
21           DR. RESTAINO:  It was an
22      answer to his question.
23           MS. MILLER:  I'm losing my
24      mind here.

Page 364

1           DR. RESTAINO:  The question
2  pending is -- is his
3  interpretation of most widely used
4  tumor marker.
5           MS. MILLER:  Do you
6      understand the question that's
7      pending for you?  If you
8      understand, great; I don't.
9           THE WITNESS:  Okay.  Back to
10      the time.  And do you have a
11      reference?  Let me take a look.
12  BY DR. RESTAINO:
13      Q.   Okay.  No, we don't have it.
14      A.   Oh, you don't have it.
15      Q.   No.
16      A.   Okay.  So you don't have the
17  evidence to show, okay.
18           Then I believe that this is
19  a common belief at that time, back to ten
20  years.
21      Q.   Okay.
22      A.   Okay.  And this is the
23  biomarker for the therapeutic index, but
24  nothing to -- to be related to screening,

Page 365

1  early lesions, pathogenesis.  It just
2  reflect how many tumor cell you have, how
3  many tumor cell you have.
4       Q.   Okay.
5           (Document marked for
6           identification as Exhibit
7           Shih-21.)
8  BY DR. RESTAINO:
9       Q.   And I'll hand you what we've
10  now marked as Shih-21.  And this paper
11  has been published in the International
12  Journal of Cancer, lead author Kaaks,
13  K-A-A-K-S.  It's titled "Tumor-Associated
14  Auto Antibodies As Early Detection
15  Markers For Ovarian Cancer:  A
16  prospective evaluation."  Published 2018.
17           And this, as the title
18  suggests, was a prospective study,
19  correct?
20      A.   I need -- I never see this
21  paper, okay.  Let me take some time to
22  read even the title.
23      Q.   Doctor, while you are
24  looking at that, look at where your

92 (Pages 362 to 365)

Ie-Ming Shih, M.D., Ph.D.

Page 366

1  fingers are on the bottom.  Do you see
2  the language right underneath your
3  finger?
4       A.   Which one?
5       Q.   Down at the bottom of the
6  page.
7       A.   International Journal of
8  Cancer?
9       Q.   No.  The -- the language
10  from the journal underneath the -- what's
11  new?
12       A.   The box under the what's
13  new?
14       Q.   Under the box, yeah.
15       A.   Okay.  Okay.  I have not go
16  there yet, but we can start.
17       Q.   Okay.
18       A.   You can read to me.
19       Q.   Okay.  Sir, yeah, I was
20  concerned only because the -- what I --
21  the only section that I wanted to read to
22  you, I kept noticing your thumb was
23  covering it.
24       A.   Thank you very much for your

Page 367

1  help.
2       Q.   On the -- on the bottom it
3  states, "Cancer Antigen-125 (CA-125) is
4  the best available biomarker for
5  epithelial ovarian cancer, and the only
6  marker tested in prospective screening
7  trials so far."
8            Did I read that correctly?
9       A.   That has been said here.
10       Q.   Yes.  And it --
11       A.   But there is no reference,
12  so I'm surprised.  Where is -- is the
13  basis coming from?
14       Q.   Okay.  Do you have any
15  reason to -- to contradict them when they
16  say it's the best available biomarker for
17  epithelial ovarian cancer?
18            MS. MILLER:  Objection.
19            THE WITNESS:  This question
20       is too general.  I don't know if I
21       can --
22  BY DR. RESTAINO:
23       Q.   Okay.  Do you disagree that
24  that's the only marker tested across

Page 368

1  prospective screening?
2       A.   Which --
3            MS. MILLER:  Objection.
4            THE WITNESS:  Same.  I don't
5       know what does that mean, it's too
6       general.  What do you mean?
7  BY DR. RESTAINO:
8       Q.   What part don't you
9  understand?  Do you need different help
10  with prospective or screening?
11            MS. MILLER:  Object --
12       objection.
13            THE WITNESS:  Where -- where
14       are you, your prospective term
15       coming from?
16            Could you pinpoint
17       specifically which sentence you
18       are talking about, please?
19  BY DR. RESTAINO:
20       Q.   Yes, sir.
21       A.   Okay.
22       Q.   Down at the bottom.  First
23  column on the left, Cancer Antigen-125.
24       A.   Yes, I saw that.

Page 369

1       Q.   That's the best available
2  biomarker for epithelial ovarian cancer.
3  Published this year -- excuse me, 2018,
4  correct?
5       A.   No.  This is -- refer the
6  author's opinion as introduction.  This
7  is not based on real result.  Okay.
8       Q.   Okay.
9       A.   So this is a part of
10  introduction.  They need to show the
11  readers about why they want to do a
12  study.  And there is no citation.  So I
13  don't know where this come -- comes from.
14       Q.   And there's no citation in
15  your paragraph, in your expert report,
16  where your -- where your contrary
17  conclusions come from, are there -- is
18  there, Doctor?
19            MS. MILLER:  Objection.
20            THE WITNESS:  Which?
21            MS. MILLER:  Objection.
22  BY DR. RESTAINO:
23       Q.   Your paragraph in your
24  expert report does not contain a single

93 (Pages 366 to 369)

Ie-Ming Shih, M.D., Ph.D.

Page 370

```
 1   citation, yet you are criticizing these
 2   individuals in a peer-reviewed
 3   publication for the lack of a citation.
 4   So where is your citation, sir?
 5       A.   Okay.  So which part are you
 6   talking about?
 7       Q.   Your expert report.
 8   Irrelevance of 125 finding as you
 9   criticize Dr. Saed.  You are putting down
10   your subjective opinions in paragraph
11   titled "Irrelevance of CA-125 Finding"
12   without a citation, correct?
13           MR. LOCKE:  Objection.
14   BY DR. RESTAINO:
15       Q.   Is it correct?  Do you have
16   a citation?
17       A.   They are different.  They
18   are different.  They are different.
19       Q.   Okay.  Now I'd like to show
20   you another paper we've marked as
21   Shih-22.
22           (Document marked for
23           identification as Exhibit
24           Shih-22.)
```

Page 371

```
 1   BY DR. RESTAINO:
 2       Q.   And, Doctor, the -- your --
 3   your professional life is all about early
 4   detection of ovarian cancer, correct?
 5           MS. MILLER:  Objection.
 6   BY DR. RESTAINO:
 7       Q.   Is that a main part of your
 8   professional life?
 9       A.   What do you mean
10   professional life?
11       Q.   The work that you do at
12   Johns Hopkins?
13       A.   I diagnose patients' tissues
14   as well.
15       Q.   Yes, I did -- I was -- I did
16   not mean to demean all the work that you
17   do.
18       A.   So can you repeat your
19   question.
20       Q.   I'll strike the question.
21           MS. MILLER:  Why don't we go
22   on.
23   BY DR. RESTAINO:
24       Q.   Exhibit Shih-22, "Early
```

Page 372

```
 1   Detection of Ovarian Cancer" by Elias, et
 2   al., and this is published in Hematology,
 3   Oncology Clinics of North America.
 4       A.   Thank you.
 5       Q.   You're welcome.
 6       A.   Early detection.
 7       Q.   Do you remember seeing this
 8   paper at all, Doctor?
 9       A.   No.  This is in a very
10   unusual journal.  We usually -- as an
11   ovarian cancer researcher, we really
12   don't read that kind of journals.
13       Q.   Okay.  Are you speaking for
14   all ovarian cancer researchers in the
15   country?
16       A.   No, just me.  I say me.  Of
17   course.
18       Q.   Okay.  If you look at the
19   key points --
20       A.   I'm sorry, can I study the
21   authors and this and that.
22       Q.   Sure.  Do you know any of
23   the authors?
24       A.   Again, I don't think the
```

Page 373

```
 1   authors are important.  The scientific
 2   content is more important for our
 3   discussion.
 4       Q.   I'm -- okay.
 5           You asked if you could study
 6   the authors.  So I was just asking if you
 7   know the authors.
 8       A.   I know the name of Bast.
 9       Q.   Okay.  Underneath there, do
10   you see the key points for the paper?
11   Listed underneath the authors.  And
12   there's keywords, and then key points.
13           Do you see that, sir?
14       A.   So there are four key
15   points.
16       Q.   Okay.  First bullet point
17   states, "Given the low prevalence of
18   ovarian cancer, even among postmenopausal
19   women (1:2,500), an effective screening
20   strategy requires high sensitivity
21   (greater than 75 percent) and extremely
22   high specificity (99.7 percent)."
23           Did I read that correctly,
24   sir?
```

94 (Pages 370 to 373)

Ie-Ming Shih, M.D., Ph.D.

Page 374

1      A.  Yes.
2      Q.  Do you agree with that
3  statement, that an effective screening
4  strategy requires high sensitivity,
5  extremely high specificity?
6      A.  So again, I don't know what
7  kind of ovarian cancer they are talking
8  about because for the detection
9  screening, it's so important for the
10  histological subtypes.
11      Q.  And if you can turn to Page
12  906.
13      A.  Okay.  Nine -- okay.
14      Q.  And there's a -- right above
15  the Figure 1, there's a heading protein
16  biomarkers.
17      Do you see that, sir?
18      A.  Yes.
19      Q.  And they write, "CA-125
20  remains the most sensitive and specific
21  protein biomarker for detecting early
22  stage disease in apparently healthy
23  populations."
24      Did I read that correctly?

Page 375

1      A.  It has been written this
2  way.
3      Q.  Okay.  And this is a
4  publication also in 2018 regarding
5  CA-125, correct?
6      A.  I don't believe this, this
7  statement.
8      Q.  Okay.  Now, in your paper,
9  you also discuss a paper by Urban, et
10  al., U-R-B-A-N.
11      Do you recall that name?
12      A.  Could you show me?
13      Q.  Yeah, I'll look for it.
14      DR. RESTAINO:  Jessica has
15  much better luck finding these
16  things than I do.
17      MS. MILLER:  You want to
18  know where he cites Urban in his
19  report?
20      DR. RESTAINO:  I think I'm
21  seeing it.
22  BY DR. RESTAINO:
23      Q.  Yes, on Page 12, top
24  paragraph.  In the middle of the

Page 376

1  paragraph, to the right of Gonzalez, et
2  al. 2016, you start a sentence, "In
3  another important study."
4      Do you see that, sir?
5      A.  Yes.
6      Q.  "In another important study,
7  reported by Nicole Urban" -- U-R-B-A-N --
8  "et al., based on 74,786 Women's Health
9  Initiative (WHI) observational study (OS)
10  participants, the authors concluded that
11  CA-125 and HE4 contribute significantly
12  to a risk prediction classifier combining
13  serum markers with epidemiologic risk
14  factors.  The hybrid risk classifier may
15  be useful to identify postmenopausal
16  women who would benefit from timely
17  surgical intervention to prevent ovarian
18  cancer."
19      Did I read that correctly,
20  sir?
21      A.  Yes, you did.
22      Q.  And you described Urban as
23  an important study, correct?
24      A.  I did not cite this as

Page 377

1  important study.
2      Q.  Well, you started off by --
3  I started off by reading, "In another
4  important study."
5      A.  Okay.
6      Q.  Did you -- did you actually
7  read the WHI observational study?
8      A.  I remember that I read that
9  before, but when I say important, is
10  important in this context, okay.
11      It doesn't mean anything
12  else.  So you need to be careful.  When I
13  say important, you need to read the whole
14  paragraph, and even the entire report to
15  know what I say is important.  You cannot
16  just crop a sentence, one here, there,
17  here.  That's not fair.
18      Q.  Okay.  Doctor, I can only go
19  by the words that you use in your expert
20  report.
21      Now, if you -- this paper
22  that we handed you, Urban, it's
23  Exhibit 23, "Identifying Postmenopausal
24  Women At Elevated Risk For Epithelial

95 (Pages 374 to 377)

Ie-Ming Shih, M.D., Ph.D.

Page 378

1    Ovarian Cancer."
2         MS. MILLER:  Can we have a
3    copy?
4         (Document marked for
5         identification as Exhibit
6         Shih-23.)
7    BY DR. RESTAINO:
8         Q.    Doctor, if you turn to the
9    second page -- well, first, on the front
10   page, this is a 2015 paper, correct?
11        A.    That's correct.
12        Q.    So we're not as far back as
13   2008, nor are we as current as 2018,
14   correct?
15        A.    Yes.
16        Q.    And if you turn to Page 254,
17   which is the second page, and I'm going
18   to try to draw your attention -- left
19   paragraph, bottom -- I'm sorry.  Left
20   column, bottom paragraph, six lines up.
21   On the right-hand side, you see CA-125?
22        A.    Right.
23        Q.    And they write, "CA-125 is a
24   predictive marker for EOC that becomes

Page 379

1    increasingly sensitive with proximity to
2    disease."
3         Doctor, what is meant by
4    EOC?
5         A.    This is not a regularly used
6    term in ovarian cancer community.  So I
7    need to figure out what is their
8    definition.
9         Q.    Well, Doctor, this paper is
10   published in Gynecologic Oncology.
11        And is it your opinion that
12   oncologists and gynecological
13   pathologists don't know what EOC stands
14   for?
15        MS. MILLER:  Objection.
16        THE WITNESS:  Different --
17        MS. MILLER:  Objection.
18        THE WITNESS:  Different
19        groups of people using different
20        abbreviations.  So this is a
21        private abbreviation.
22   BY DR. RESTAINO:
23        Q.    Okay.  Do you understand
24   when they use EOC here that they are

Page 380

1    utilizing that as, in the title,
2    epithelial ovarian cancer?
3         A.    So that would be where?
4         Q.    Is that your understanding,
5    EOC means epithelial ovarian cancer?
6         A.    That's their definition and
7    abbreviation.
8         Q.    And so they write here that
9    "CA-125 is a predictive marker for EOC
10   that becomes increasingly sensitive with
11   proximity to diagnosis."  And then just
12   below it in the final sentence, they say,
13   "Both CA-125 and HE-4 show promise as
14   risk and early detection markers."
15        Did I read that correctly?
16        A.    It has been written in this
17   way.
18        Q.    Okay.  And actually there
19   they have Reference 16, and then they
20   have References 20, 21, 22 and 23.  So
21   they have five references to support that
22   statement, correct?
23        A.    It depends on what -- what
24   kind of references.  Good or bad.  I need

Page 381

1    to see them.  Okay.  16.
2         Do you have those
3    references, that would be wonderful for
4    the discussion.  By looking at the title
5    I don't know the science quality inside
6    this paper.
7         Q.    Okay.  Do you have any
8    reason to believe that this paper in
9    Gynecologic Oncology is misrepresenting
10   what the references state?
11        MR. LOCKE:  Objection.
12        THE WITNESS:  I don't know
13        how they interpret their reading
14        and the interpretation.  So I
15        cannot answer that question.
16        That's written, that's their
17        opinion, it's not my opinion.
18   BY DR. RESTAINO:
19        Q.    Okay.  I see.  Okay.  So,
20   Doctor, it was okay for you to rely upon
21   this paper, and for you to cite this
22   paper in your expert report as an
23   important study when you were discussing
24   it in your expert report, but now in your

96 (Pages 378 to 381)

Ie-Ming Shih, M.D., Ph.D.

Page 382

1    deposition, now you can't rely upon
2    anything that's published in this paper?
3        MS. MILLER: Objection.
4        MR. LOCKE: Objection.
5        MS. MILLER: That's not what
6    he said. You are misstating his
7    testimony.
8        If you -- would you like to
9    explain?
10       THE WITNESS: Okay.
11       So you just tell me in the
12   introduction, you crop the couple
13   of sentences and ask me about the
14   opinion.
15       But you know how many
16   sentences in this article? You
17   don't know, right? Many.
18   BY DR. RESTAINO:
19       Q. No. But I do know that
20   you've quoted two sentences in your
21   expert report from this sentence -- from
22   this paper.
23       A. Okay. Let me -- let me go
24   back and make sure.

Page 383

1        Q. Sure.
2        MS. MILLER: We are at
3    exactly five hours. Do you want
4    to take a break now?
5        DR. RESTAINO: I -- I do.
6        MS. MILLER: Six hours. I'm
7    sorry, six hours. I just thought
8    maybe this would be a good time
9    for a last break.
10       DR. RESTAINO: Sure. One
11   more paper to go through and we'll
12   take a break.
13       THE WITNESS: Okay. All
14   right.
15       The -- okay. Can I start?
16   BY DR. RESTAINO:
17       Q. Yeah, sure.
18       A. So the purpose I cite this
19   paper --
20       Q. Yes.
21       A. -- is to show that talc use
22   did not carry any significant -- or any
23   risk for ovarian cancer. That's my
24   purpose.

Page 384

1        Q. Okay.
2        A. In -- in terms of CA-125 as
3    a biomarker is not relevant to talcum
4    powder at all. Biomarker is just a
5    serum -- is just a circulating proteins.
6    It doesn't mean that is important for
7    normal fallopian tube epithelium cells,
8    to become p53 signature or STIC. So it's
9    not totally relevant.
10       In early detection is a
11   biomarker association does not mean there
12   is a causal relationship.
13       Q. Okay.
14       (Document marked for
15       identification as Exhibit 24.)
16   BY DR. RESTAINO:
17       Q. Doctor, one more paper in
18   this area. You may recognize the title.
19   "Critical Questions in Ovarian Cancer
20   Research in Treatment: Report of the
21   American Association For Cancer Research
22   special conference."
23       Does that sound familiar to
24   you, sir?

Page 385

1        A. I need to see it.
2        Q. Sure.
3        A. Yes, I'm one of the
4    co-authors.
5        Q. That you are.
6        A. Yes.
7        Q. And if you look at the
8    bottom of the first page. Very, very
9    bottom, in the tiny little print, all the
10   way down at the bottom, it says,
11   "Received August 24, 2018. Revised
12   December 17, 2018. Accepted 2019. And
13   published online month 00 2019."
14       So this is a very current
15   paper, correct?
16       A. I agree.
17       Q. Okay. And, Doctor, did you
18   have any part to -- to play in the
19   revised version that was submitted on
20   December 17, 2018?
21       A. To be honest, I am on this
22   as a co-author, because we participate in
23   a meeting. And this is like a meeting
24   report. So everybody talk about things,

97 (Pages 382 to 385)

Ie-Ming Shih, M.D., Ph.D.

Page 386

1  and so Dr. Bast, the first author as you
2  can see here, the CA-125 discover person,
3  and he write -- I think probably he wrote
4  this paper by summarizing our opinion
5  during the conference -- conference.
6  Okay?
7        So after that, I did not see
8  the revision and this and that. So I am
9  participating in this as a co-author,
10 because I contribute to the discussion
11 during the -- during the symposium of
12 ovarian cancer.
13    Q.   Okay. If you -- if you turn
14 to Page 8 of this paper?
15    A.   8?
16    Q.   Yes, sir.
17    A.   Okay. Yes.
18    Q.   And on the right side where
19 there's conflict of interest disclosure,
20 your name is not listed, correct? Were
21 you a retained expert for Johnson &
22 Johnson while you were engaged in this
23 process?
24    A.   I think this is way before I

Page 387

1  am involved in this litigation.
2    Q.   Okay. Now, if you -- on the
3  left column, that's a section called
4  "Conclusions," correct?
5    A.   Correct.
6    Q.   And in this paper that was
7  published in 2019, this group including
8  yourself write, "In answering these
9  'critical questions,' we have learned
10 that screening algorithms measuring the
11 trend of CA-125 values over time can
12 achieve adequate specificity, but we must
13 improve the sensitivity of panels of
14 biomarkers for early detection of ovarian
15 cancer, possibly utilizing
16 autoantibodies, antigen-autoantibody
17 complexes, and nucleic acid."
18        Did I read that correctly?
19    MS. MILLER: Objection.
20        THE WITNESS: I think this
21 is Dr. Bast's opinion, because
22 that's his research field exactly.
23 And he is the author who wrote
24 this paper.

Page 388

1  BY DR. RESTAINO:
2    Q.   Okay. So, Doctor,
3  reasonable scientists can reasonably
4  disagree, correct?
5    MS. MILLER: Objection.
6  Vague.
7        THE WITNESS: It's too
8  vague. What's your question?
9  BY DR. RESTAINO:
10   Q.   Okay. While you are
11 disagreeing with Dr. Saed's use of CA-125
12 and I've now shown you four papers
13 supporting the use of CA-125 including a
14 2019 paper for which you are a co-author.
15   MS. MILLER: Objection.
16 Those papers did not use CA-125 in
17 the same way as Dr. Saed. That is
18 such a disingenuous question.
19   MS. PARFITT: It's objection
20 to form.
21 BY DR. RESTAINO:
22   Q.   Doctor, can reasonable
23 scientists reasonably disagree?
24   MS. MILLER: Objection.

Page 389

1        THE WITNESS: No. It's
2  based on biological plausibility
3  and the specific question you want
4  answered.
5        I'm asking, or we are
6  addressing the early STIC and p53
7  signature in the fallopian tube,
8  whether talc can cause ovarian
9  cancer and cause the precursor.
10 Now, you are diverting the
11 discussion into the CA-125. And
12 CA-125 is a biomarker for
13 monitoring disease for -- this is
14 well known.
15       So I don't know why this
16 question is relevant. And this
17 is -- should be not existent.
18 BY DR. RESTAINO:
19   Q.   So when you disagree that
20 CA-125 is a clinically irrelevant
21 biomarker for ovarian cancer, you
22 disagree with the authors that we've just
23 discussed, right?
24   MR. LOCKE: Objection.

98 (Pages 386 to 389)

Ie-Ming Shih, M.D., Ph.D.

Page 390

1     MS. MILLER: Objection. I'm
2  sorry.
3     THE WITNESS: Okay.
4  BY DR. RESTAINO:
5     Q.  Go back to the paragraph in
6  your expert report. "Irrelevance of
7  CA-125," the final sentence, "Thus
8  Dr. Saed's statement in the conclusion of
9  the report that CA-125 is 'clinically
10  relevant biomarker for ovarian
11  cancer'" -- and there's your reference --
12  "'is misleading and data from CA-125 are
13  not relevant to support the research and
14  conclusion.'"
15     A.  I'm sorry.  Where are you?
16  Which page?
17     Q.  I'm sorry.  Page 5.
18     A.  Right.
19     Q.  The paragraph -- second
20  paragraph from the bottom, "Irrelevance
21  of CA-125 Findings."
22     A.  Oh, I know what's that.  So
23  you need to be careful for the context.
24     So why I want to say that is

Page 391

1  irrelevant of why we are discuss.  That's
2  why we want to bring the discussion
3  relevant here.
4     What I say here is Dr. Saed
5  treat ovarian cancer cell line which is
6  total incorrect methodology, with talcum
7  powder, Johnson & Johnson powder, and
8  took CA-125.  Then he misrepresented,
9  totally wrong that CA-125 because of the
10  increased CA-125, that talcum powder is a
11  carcinogen, which is totally incorrect,
12  in this specific context.
13     So don't -- you need to be
14  careful about what you are referring to.
15     Q.  When Dr. Saed states that
16  CA-125 is a, "Clinically relevant
17  biomarker for ovarian cancer," he is not
18  being misleading, for we've just read
19  four papers, including one by yourself,
20  that supports the use, between 2008 and
21  2019, the use of CA-125 for the early
22  detection of ovarian cancer, correct?
23     MR. LOCKE:  Objection.
24     MS. MILLER:  That's again

Page 392

1  mischaracterizing his testimony.
2     MS. PARFITT:  It's
3  "objection to form."
4     MS. MILLER:  And as I said,
5  you are mischaracterizing how
6  Dr. Saed uses CA-125.
7     THE WITNESS:  Right.  You
8  should read Dr. Saed paper.
9  BY DR. RESTAINO:
10     Q.  Sir, I'm reading your expert
11  report in your language.
12     A.  My language is referring to
13  Dr. Saed's.  You see here my opinion
14  about Dr. Saed's.  So we need to go back
15  to Dr. Saed's paper.  And we can discuss.
16  How about that?
17     Q.  I'm just going by what
18  you've stated in your expert report.
19     DR. RESTAINO:  We can take
20  our break now.
21     THE WITNESS:  Okay.  Sure.
22     THE VIDEOGRAPHER:  The time
23  is 4:56 p.m.  We're going off the
24  record.

Page 393

1     (Short break.)
2     THE VIDEOGRAPHER:  The time
3  is 5:14 p.m.  We are back on the
4  record.
5  BY DR. RESTAINO:
6     Q.  Doctor, looking at your
7  expert report, please, on the bottom of
8  Page 5, you have a paragraph there which
9  goes over to 6 titled "Extrapolation From
10  an In Vivo Experiment," correct?
11     A.  What I meant is -- let me
12  see.
13     MS. MILLER:  Are you just
14  asking if those words are there?
15     DR. RESTAINO:  Just
16  directing him to that area.
17     MS. MILLER:  Page 5.
18     DR. RESTAINO:  Page 5 going
19  over to Page 6.
20     MS. MILLER:  Oh, okay.
21  BY DR. RESTAINO:
22     Q.  Do you see that, Doctor?
23     A.  Yes.
24     Q.  And actually, you started

99 (Pages 390 to 393)

Ie-Ming Shih, M.D., Ph.D.

Page 394

1  off by saying, "What I meant is."
2  Doctor, what did you mean in that
3  paragraph?
4      A.   I expressed my opinion about
5  Dr. Saed's claims in his summary
6  paragraph.  And what he said, this is
7  very important.
8          "This study has shown a
9  dose-dependent significant increase in
10  key pro-oxidants and concomitant increase
11  in key anti-oxidant enzymes in all talc
12  retreated cells, both normal and ovarian
13  cancer, compared to their control."
14         But we know this is in vitro
15  study.
16         What I mean is they don't
17  have any in vivo support, because
18  carcinogen, I think that's -- if you
19  agree, that's the main things about the
20  talcum powder issue.
21         So the carcinogen based on
22  the definition from the dictionary or
23  NCI, is the chemical compounds, reagents
24  that can cause cancer, and of course

Page 395

1  cancer meaning from a tissue.  So they
2  did not show any evidence biologically
3  plausible evident that talcum powder
4  is -- can cause ovarian cancer.
5          This -- everything is just
6  in vitro evidence.
7      Q.   Yes, and in vitro means in
8  essence either looking at a slide or a
9  petri dish, correct?
10      A.   No.  Slide is human tissue.
11  I think that's a tissue study.  In vitro
12  meaning -- we need to be careful here.
13  We need to define this very well.  In
14  vitro meaning not inside animal tissue or
15  human tissues.  Everything is based on
16  cell culture in petri dish, and you add
17  the drug in the condition,
18  un-physiologically high concentration.
19  And you measure the proliferation,
20  apoptosis, and that is exactly what
21  Dr. Saed did.
22      Q.   Okay.  Now, Doctor, to be
23  fair, in scientific research, it is not
24  uncommon for a person or a team to

Page 396

1  conduct an in vitro study, determine the
2  results of that study, and based upon the
3  results, perhaps then say, now let's do
4  an in vivo study and see if we see this
5  in animals.  And if so, and it's perhaps
6  a treatment, now let's do a Phase I
7  study, clinical study, and find out the
8  dose or the safety parameters, and based
9  upon that, do a Phase II study, and based
10  upon that do a Phase III study.  And
11  perhaps in some cases even a Phase IV
12  postmarketing study.
13         So that from in vitro to
14  Phase IV is not uncommon in science
15  research, correct?
16         MS. MILLER:  Objection.
17         THE WITNESS:  You are
18  talking about general science?
19  BY DR. RESTAINO:
20      Q.   Yes, sir.
21      A.   So general science --
22      Q.   Yes, sir?
23      A.   -- cannot apply to the
24  individual ones.

Page 397

1          For example, in this case,
2  if we want to test talcum powder is
3  carcinogenic at all, this kind of lousy
4  science is not helpful at all.  They --
5  they are just end -- without quotes,
6  without evidence, cultured evidence to
7  show anything biologically meaningful and
8  any mechanism.  It's just in vitro.  And
9  Dr. Saed -- go ahead.
10      Q.   Okay.  Okay.  Well, as you
11  write, the significance of the finding is
12  unclear.
13         Well, the significance of
14  every finding becomes clearer and clearer
15  as we step up in the different studies.
16  In vitro to in vivo or animal, to human
17  testing, correct?
18      A.   This depends on your in
19  vitro study, how solid it is.  How much
20  biological plausibility it can offer.  So
21  if this is the case, then people will
22  be -- love to test in vivo, in human
23  trial.  But in the first phase, like
24  Saed's paper, they are filled with a lot

Ie-Ming Shih, M.D., Ph.D.

Page 398

1  of problems and the wrong methodologies.
2      I don't think any people
3  will look at this paper and will carry
4  any meaningful significance biologically
5  to them.
6      Q.   You're purely speculating on
7  what other readers are going to take away
8  from this paper, aren't you?
9          MS. MILLER: Objection.
10  Objection.
11          THE WITNESS: Which readers?
12  Can you pinpoint which readers?
13  BY DR. RESTAINO:
14      Q.   Any reader. When you say
15  that, "I don't think any people will look
16  at this paper," what people were you
17  talking about?
18          MS. MILLER: Objection.
19  That's --
20          MS. PARFITT: "Objection to
21  form" is fine.
22          MS. MILLER: Thank you,
23  Michelle.
24          MS. PARFITT: You're

Page 399

1      welcome.
2          THE WITNESS: People. What
3      do you mean people? Where I said
4      people, right? That's why --
5  BY DR. RESTAINO:
6      Q.   Can we agree that --
7          MS. MILLER: You read back
8      only half the sentence. That's --
9  BY DR. RESTAINO:
10      Q.   Doctor, can we agree that
11  there's no --
12      A.   Can I see that?
13          Okay. The people here means
14  the scientists who really read this
15  paper, and I'm very sure they will still
16  agree that this is really shocking paper
17  to them, because there is no -- this is
18  just like a script by some other party
19  for litigation purpose.
20      Q.   But, Doctor, it's not
21  inappropriate to look at the results of
22  an in vitro study, and then based upon
23  those results, do the next study in line,
24  perhaps an in vivo or animal study,

Page 400

1  correct?
2          MS. MILLER: Objection.
3  BY DR. RESTAINO:
4      Q.   There's nothing
5  inappropriate about that?
6          MS. MILLER: Objection.
7          THE WITNESS: I answer your
8      question already.
9  BY DR. RESTAINO:
10      Q.   Okay. Doctor, do you have
11  an opinion on whether the talcum powder
12  products that we are discussing in this
13  case contain asbestos?
14          MS. MILLER: Objection.
15          THE WITNESS: I don't know.
16  BY DR. RESTAINO:
17      Q.   Okay. Do you have an
18  opinion as to whether the talcum powder
19  products at issue in this case ever
20  contained asbestos?
21          MS. MILLER: Objection.
22          THE WITNESS: I don't know.
23  BY DR. RESTAINO:
24      Q.   Do you have an opinion on

Page 401

1  whether the talcum powder products at
2  issue in this case contain fibrous talc
3  also known as talc in an asbestiform
4  habit?
5          MS. MILLER: Objection.
6      Foundation.
7          THE WITNESS: This is beyond
8      my expertise and you should ask
9      mineralogist and a toxicologist,
10      geologist.
11  BY DR. RESTAINO:
12      Q.   Does that -- I'm sorry.
13  Does that mean you don't have an opinion?
14      A.   I already answered my
15  question.
16      Q.   Okay. Do you have an
17  opinion on whether the talcum powder
18  products at issue in this case contain --
19  ever contained fibrous talc, also known
20  as talc in an asbestiform habit?
21          MS. MILLER: Objection.
22          THE WITNESS: Same answer to
23      that previous question.
24  BY DR. RESTAINO:

101 (Pages 398 to 401)

Ie-Ming Shih, M.D., Ph.D.

Page 402

1    Q.  Do you have an opinion on
2  whether asbestos is a known carcinogen?
3        MS. MILLER:  Objection.
4        THE WITNESS:  I did not
5  study asbestos.
6  BY DR. RESTAINO:
7    Q.  Do you have an opinion on
8  whether fibrous talc is a known
9  carcinogen?
10        A.  I did not study it either.
11    Q.  Do you have an opinion on
12  whether asbestos can cause ovarian
13  cancer?
14        A.  There is no credible science
15  and cogent evidence.  If you have one,
16  please show it to me.
17    Q.  Do you have an opinion on
18  whether fibrous talc, also known as talc
19  in an asbestiform habit, can cause
20  ovarian cancer?
21        MS. MILLER:  Object to form.
22  I think you already asked
23  this.
24        THE WITNESS:  You asked me

Page 403

1  several times.
2  BY DR. RESTAINO:
3    Q.  No.
4    A.  Same answer.
5    Q.  Okay.  And do you have an
6  opinion -- so your opinions in this case,
7  is it fair to say, are limited to talcum
8  powder products that do not contain
9  asbestos or fibrous talc?
10        A.  I cannot --
11        MS. MILLER:  Objection.  No,
12  that is not what he said.
13        THE WITNESS:  No.
14        MS. PARFITT:  Objection to
15  form is fine.  Jessica, don't
16  coach the witness.
17        MS. MILLER:  He can't -- I'm
18  not coaching the witness.  He's
19  mischaracterizing his testimony.
20        MS. PARFITT:  He asked a
21  question, asked an opinion.  He
22  said do you have an opinion.
23        MS. MILLER:  No, he said
24  it's fair --

Page 404

1        THE WITNESS:  No.
2        MS MILLER:  That's not what
3  he said.
4        THE WITNESS:  No.
5  BY DR. RESTAINO:
6    Q.  I'll rephrase it.  Do you
7  have an opinion as to whether your
8  opinions in this case are limited to
9  talcum powder products that do not
10  contain asbestos or fibrous talc?
11        MS. MILLER:  Objection.
12        MS. SHARKO:  I don't
13  understand the question.
14        MS. MILLER:  That's just an
15  incomprehensible question.
16        THE WITNESS:  Could you ask
17  a question that is easily
18  understood?  The limitation was
19  limited.
20  BY DR. RESTAINO:
21    Q.  Do your opinions in this
22  case -- are your opinions in this case
23  limited to talc, talcum powder products,
24  which do not contain asbestos?

Page 405

1        MS. MILLER:  Objection.
2        THE WITNESS:  So are you
3  asking me whether this talc,
4  talcum powder products contain
5  asbestos?
6  BY DR. RESTAINO:
7    Q.  No, sir.
8    A.  But that's what you ask --
9  you are asking me.
10    Q.  No, I'm asking you if your
11  opinions in this case are limited to the
12  evaluation of talcum powder products
13  which do not contain asbestos.
14        MS. MILLER:  Again, I'm
15  going to object to that question.
16  I think it's misleading.  I think
17  it's confusing.  And I -- he said
18  his opinions are related --
19        THE WITNESS:  Okay.  I'm
20  here as expert to express my
21  opinion on whether talcum powder
22  can cause ovarian cancer.  And
23  also I bring up the issue of
24  Dr. Saed's paper, which is

Ie-Ming Shih, M.D., Ph.D.

Page 406

1    really -- emperor has no clothes.
2    There's no evidence. That is my
3    position here today.
4        DR. RESTAINO: Move to
5    strike as unresponsive.
6    BY DR. RESTAINO:
7        Q.   Doctor, did you assume for
8    purposes of your opinions today that
9    talcum powder products do not contain
10   asbestos?
11       MS. MILLER: Objection.
12   Asked and answered in a
13   different -- with different
14   wording. And I feel like
15   you're --
16       MS. PARFITT: Objection to
17   form.
18       MS. MILLER: -- trying to
19   confuse the witness because he's
20   not --
21       MS. PARFITT: Object to
22   form.
23       MS. MILLER: Because he
24   doesn't have English as his first

Page 407

1    language.
2        DR. RESTAINO: Your expert.
3        MS. MILLER: So what?
4        DR. RESTAINO: So if he
5    can't understand English that's
6    not my problem.
7        MS. MILLER: No, it's not
8    that he can't understand. It's
9    that you are asking very confusing
10   questions and repeating the same
11   questions in multiple different
12   ways in an attempt to confuse him.
13       MS. PARFITT: Counsel,
14   object to form. Please. We're
15   almost done.
16       THE WITNESS: Okay. So I'm
17   so distracted. So could you ask
18   one more time in a way that you
19   think I will understand?
20       MS. SHARKO: Do you want --
21   do you want me to help you,
22   Mr. Restaino --
23       DR. RESTAINO: Sure.
24       MS. SHARKO: Do you want me

Page 408

1    to help you? Because I can
2    easily.
3        DR. RESTAINO: Sure.
4        MS. SHARKO: Dr. Shih was
5    asked to assume talcum powder is
6    what it is in the container and he
7    was not asked to address asbestos
8    or heavy metals or fragrances or
9    all that. Just whatever the
10   talcum powder is.
11       MS. PARFITT: That's not
12   your question.
13       DR. RESTAINO: Yeah, yeah.
14   Truthfully that's not my question.
15       MS. PARFITT: Thank you,
16   Susan. I appreciate that.
17       MS. MILLER: That is exactly
18   your question. You asked him what
19   was --
20       MS. SHARKO: Then ask the
21   question.
22       MR. LOCKE: Yeah, that's --
23       MS. PARFITT: Michelle,
24   Could you please.

Page 409

1        (Whereupon, the court
2    reporter read back the requested
3    portion of testimony.)
4        MS. MILLER: Objection.
5    Asked and answered.
6        THE WITNESS: I already
7    answered that in the very
8    beginning.
9        MS. PARFITT: Could you
10   repeat your answer?
11       THE WITNESS: I already
12   answered.
13   BY DR. RESTAINO:
14       Q.   But what is your answer?
15       A.   You can see in the
16   transcript.
17       Q.   It's your assumption that
18   the talcum powder does not contain
19   asbestos?
20       MS. MILLER: Objection.
21   BY DR. RESTAINO:
22       Q.   Was that your answer?
23       MS. MILLER: Objection.
24       THE WITNESS: I already

Ie-Ming Shih, M.D., Ph.D.

Page 410

1  answered.
2  BY DR. RESTAINO:
3      Q.   Doctor, are your opinions in
4  this case limited to talcum powder
5  products that do not contain fibrous
6  talc?
7          MS. MILLER:  Objection.
8          THE WITNESS:  So based on my
9  literature search and the Saed's
10  paper, I reviewed those studies
11  using talcum powder and the
12  Johnson & Johnson's products in
13  all the epidemiology research and
14  the Saed research, in animal
15  studies.
16          That's -- that's my
17  knowledge about this talcum
18  powder.
19  BY DR. RESTAINO:
20      Q.   Okay.  Doctor, have you
21  heard a term "biologic plausibility"?
22      A.   Yes.
23      Q.   And what does that mean to
24  you?

Page 411

1      A.   I think I said that in the
2  morning, probably forgot, that's fine.  I
3  can say that one more time.
4          Biological plausibility
5  means credible science, cogent evidence
6  to support the biological plausibility of
7  statement.  In this statement, is the
8  talcum powder induced ovarian cancer.
9  And I don't find any biological
10  plausibility in this case.
11          (Document marked for
12          identification as Exhibit
13          Shih-12.)
14          DR. RESTAINO:  Michelle, can
15      we go ahead and mark this -- oh,
16      it's already been marked.  Forgive
17      me.  I'm sorry.
18  BY DR. RESTAINO:
19      Q.   Shih-12.
20          MS. MILLER:  I'm confused.
21      How do you have it if you've
22      already marked it?
23          MS. PARFITT:  Premarked.
24          DR. RESTAINO:  Because they

Page 412

1  were premarked earlier this
2  morning.  And we went -- I went
3  out of my chronological plan.
4          MS. MILLER:  Okay.
5  BY DR. RESTAINO:
6      Q.   Doctor, this is a paper --
7          MS. MILLER:  Do we have a
8      copy?
9          DR. RESTAINO:  Oh, I didn't
10      give it to you.
11          MS. MILLER:  I don't think I
12      got one.
13  BY DR. RESTAINO:
14      Q.   This is a paper titled
15  "Papillary Tubal Hyperplasia:  The
16  Putative Precursor of Ovarian Atypical
17  Proliferative (Borderline) Serous Tumors,
18  Non-Invasive Implants, and
19  Endosalpingosis."
20  E-N-D-O-S-A-L-P-I-N-G-O-S-I-S.
21          Lead author is Robert J.
22  Kurman, correct?
23      A.   Yes.
24      Q.   And last named author is

Page 413

1  yourself, correct?
2      A.   I am.
3      Q.   And this is published in the
4  American Journal of Surgical Pathology in
5  2011, correct?
6      A.   Yes.
7      Q.   And if you look down at the
8  very, very last line in the abstract on
9  the front page, you see, you and
10  Dr. Kurman, et al., write, "We propose a
11  model for the development of ovarian and
12  extraovarian low grade serous
13  proliferations (APST, non-invasive
14  epithelial implants and endosalpingosis)
15  that postulates that all of these lesions
16  are derived from PTH, which appears to be
17  induced by chronic inflammation.  If this
18  hypothesis is confirmed, then it can be
19  concluded that low and high grade ovarian
20  tumors develop from tubal epithelium and
21  involve the ovary secondarily."
22          Did I read that correctly?
23      A.   Correct.
24      Q.   Doctor, in 2011 was it

104 (Pages 410 to 413)

Page 414

1  biologically plausible that chronic
2  inflammation would initiate this
3  pathology?
4      A.   Say that one more time.
5      Q.   In 2011, when you and
6  Dr. Kurman, et al., wrote this paper, was
7  it biologically plausible that chronic
8  inflammation would initiate this
9  pathology?
10      MS. MILLER:  Which
11  pathology?
12      DR. RESTAINO:  The pathology
13  that I just read about, described
14  in his paper.
15      MS. MILLER:  Objection.
16      THE WITNESS:  This paper
17  presents our hypothesis in 2011.
18      So how can science advances?
19  It is because we have different
20  findings, come out with
21  hypothesis, or just generate
22  hypothesis from nowhere.
23      Then scientists can decide
24  to test this hypothesis using the

Page 415

1      correct methodologies to prove or
2      to provide biological plausibility
3      of this hypothesis.  So that's
4      what we meant here.
5  BY DR. RESTAINO:
6      Q.   Okay.  But you would not
7  develop, nor would Dr. Kurman, a
8  hypothesis that wasn't based on
9  biological plausibility, would you?
10      MS. MILLER:  Objection.
11      THE WITNESS:  Can you say
12      that one more time.
13  BY DR. RESTAINO:
14      Q.   You would not develop, nor
15  would Dr. Kurman, a hypothesis that
16  wasn't based on biological plausibility?
17      MS. MILLER:  Objection.
18      THE WITNESS:  Okay.
19      Biological plausibility should be
20      more than hypothesis.  And this is
21      a hypothesis awaiting for
22      proven -- not proven -- to support
23      it by credible science in the
24      future.

Page 416

1      So again, this is a
2      hypothesis.
3  BY DR. RESTAINO:
4      Q.   Did you think that your
5  hypothesis was biologically plausible?
6      MS. MILLER:  Objection.
7      THE WITNESS:  I already say
8      that.  Biological plausibility
9      should be more than hypothesis.
10  BY DR. RESTAINO:
11      Q.   If you turn to Page 8 of
12  this paper, sir, in the second paragraph,
13  it starts on, "Based on the findings in
14  this study."
15      Do you see that, sir?
16      A.   Which page?
17      Q.   Page 8.
18      A.   Okay.  Here you go.
19      Q.   Yeah.
20      A.   And which paragraph?
21      Q.   Second paragraph.
22      A.   Okay.
23      MS. MILLER:  First full
24  paragraph?

Page 417

1  BY DR. RESTAINO:
2      Q.   First full paragraph.  It
3  says, "Based on the findings in this
4  study."
5      Do you see that, sir?
6      A.   Yes.
7      Q.   Okay.  "Based on the
8  findings of this study, we propose the
9  following model for the origin and
10  development of the entire spectrum of
11  pelvic low grade serous proliferations.
12  Chronic inflammation induces a
13  proliferation of tubal epithelium that
14  could progress to PTH in some women."
15      Doctor, in 2011 when you
16  wrote this, was it biologically plausible
17  for chronic inflammation to induce
18  proliferation of tubal epithelium?
19      MS. MILLER:  Objection.
20      THE WITNESS:  As we state --
21      so the answer is no.  What we say,
22      we propose it.  We hypothesize
23      this model for future scientists
24      or pathologists to test.  You have

105 (Pages 414 to 417)

Ie-Ming Shih, M.D., Ph.D.

Page 418

1  seen the right methodology. And
2  to provide, like, for instance a
3  mouse study, et cetera. I don't
4  want to deliberate here too much.
5      This is hypothesis, for the
6  future biological plausibility to
7  provide the evidence.
8      So this is a hypothesis.
9  And again, there's many
10  hypothesis. I said this many
11  times.
12      Biological plausibility
13  should be more than hypothesis.
14  You need to have credible science
15  and a cogent evidence to support.
16  BY DR. RESTAINO:
17      Q.   So, Doctor, on the bottom
18  paragraph, of this, on the same page that
19  starts, "In conclusion," in the third
20  line down, you have a sentence that
21  starts, "The process begins with chronic
22  inflammation, leading to tubal
23  hyperplasia, which, if it progresses to
24  PTH, can shed and implant tubal

Page 419

1  epithelium on ovarian and peritoneal
2  surfaces resulting in a variety of low
3  grade serous proliferations. If this
4  hypothesis is confirmed it would indicate
5  that all ovarian tumors, low and high
6  grade, originate from tubal epithelium
7  and involve the ovary secondarily."
8      Did I read that correctly?
9      A.   That's what we wrote.
10      Q.   Okay. Now, Doctor, isn't it
11  generally accepted today that ovarian
12  serous tumors originate in the tubal
13  epithelium?
14      A.   Okay. So we have two
15  things. You're talking about low grade
16  serous carcinoma right, or are you
17  talking about high grade serous
18  carcinoma?
19      Q.   You are talking about both
20  in this paper, aren't you?
21      A.   Okay. So for the low grades
22  it is a hypothesis, right? We
23  hypothesize this and that.
24      But for high grade serous

Page 420

1  carcinoma, we have a -- the mouse study,
2  we put a TP53 mutation into the mullerian
3  epithelial cells. And they develop STIC
4  and they become cancer.
5      Q.   Okay. Doctor --
6      A.   And that's the cancer cell
7  reports for several years ago. And
8  that's the best evidence.
9      Q.   After this paper was
10  published --
11      A.   Right.
12      Q.   -- did you alone or with
13  Dr. Kurman or anyone else test the
14  hypothesis to determine whether -- when
15  the process begins with chronic
16  inflammation, if it did, in fact, lead to
17  ultimately the development of low grade
18  and high grade serous epithelial tumors?
19      MS. MILLER: Objection. I
20  don't think that accurately states
21  the hypothesis.
22      THE WITNESS: No. As you
23  can see in this chart, low grade
24  serous carcinoma, high grade

Page 421

1  serous carcinoma, they are totally
2  different.
3      High grade serous carcinoma
4  is a Type II. Low grade serous
5  carcinoma is a Type I disease.
6      Okay. So their origin is
7  fallopian tube. By their
8  pathogenesis, molecular genetic
9  changes, they are all different.
10  So you cannot lump them together
11  for discussion.
12  BY DR. RESTAINO:
13      Q.   Okay. If you go back to
14  Page 2 --
15      A.   Which paper?
16      Q.   -- of your paper, please.
17  The one we are talking about with
18  Dr. Kurman, the papillary studies. If
19  you go to Page 2, back to the top. The
20  very last sentence above the line states,
21  "If this hypothesis is confirmed, it can
22  be concluded that low and high grade
23  ovarian tumors develop from tubal
24  epithelium and involve the ovary

106 (Pages 418 to 421)

Ie-Ming Shih, M.D., Ph.D.

Page 422

1    secondarily."
2         Did you conduct a follow-up
3    study to prove or disprove your
4    hypothesis?
5         MS. MILLER:  Objection.
6    BY DR. RESTAINO:
7    Q.   It's just yes or no.
8    A.   So again you are confused
9    about low grade and high grade.  They are
10   two different diseases.
11        Okay.  For the low grade is
12   a hypothesis.  And you know low grade
13   serous carcinoma is only 5 percent of
14   ovarian cancer.  Really, really small
15   population.  So I don't know whether low
16   grade serous carcinoma has been shown in
17   any epidemiology studies, any
18   epidemiology study break, high grade, low
19   grade, clear cell endometriosis, and et
20   cetera.  Otherwise, I don't know what you
21   are talking about.
22   Q.   Well, I'm talking about what
23   you wrote, sir.
24   A.   Yes.

Page 423

1    Q.   So I'm going to move to
2    strike your answer, because there's no
3    confusion on my part, because I can read
4    English.  And what's stated here is if
5    this hypothesis is confirmed, then it can
6    be concluded that low and high grade
7    ovarian tumors developed from tubal
8    epithelium and involve the -- the ovary
9    secondarily.  So I'm combining low grade
10   and high grade because that's what's
11   written here, correct, Doctor?
12        MR. LOCKE:  Objection.
13        MS. SHARKO:  Objection.
14        THE WITNESS:  That's not how
15   we meant.
16   BY DR. RESTAINO:
17   Q.   Oh, so is it your testimony
18   today that a future reader, when they
19   read this sentence, should call you up
20   and say, Dr. Shih, what did you mean by
21   this?
22   A.   No.  This the --
23        MS. MILLER:  Objection.
24        Give me time to object.  That was

Page 424

1    obviously an objectionable
2    question.
3         Objection.
4    BY DR. RESTAINO:
5    Q.   Did the peer reviewers know
6    what you meant?
7         MS. MILLER:  Objection.
8         THE WITNESS:  Who are the
9    peer reviewers?
10   BY DR. RESTAINO:
11   Q.   I'm sorry?
12   A.   Who are the peer reviewers?
13   Q.   Well, they are typically
14   anonymous, aren't they?
15   A.   Yes.
16   Q.   So I wouldn't know that.
17   But somebody peer reviewed this, don't
18   you agree?
19        MS. MILLER:  Objection.
20        THE WITNESS:  That's not
21   relevant to this question.
22   BY DR. RESTAINO:
23   Q.   Okay.  Doctor, in 2011, was
24   it biologically plausible that low and

Page 425

1    high grade ovarian tumors stimulated by
2    chronic inflammation develop in the tubal
3    epithelium, was it just biologically
4    plausible?
5         MS. MILLER:  Objection.
6         Objection.  Asked and answered.
7         THE WITNESS:  No.
8         I answered your question.
9    BY DR. RESTAINO:
10   Q.   Okay.  When you submitted
11   the paper for publication, did any peer
12   reviewer come back and say, this is not
13   biologically plausible, we're not going
14   to publish this?
15        MS. MILLER:  Objection.
16        THE WITNESS:  Could you
17   repeat that question one more
18   time?
19   BY DR. RESTAINO:
20   Q.   When you submitted the paper
21   for publication.
22   A.   Yes.
23   Q.   Did any peer reviewer come
24   back and say, this is not biologically

107 (Pages 422 to 425)

Ie-Ming Shih, M.D., Ph.D.

Page 426

1    plausible?
2         A.   In the peer review systems,
3    my -- I serve editor-in-chief.  This is
4    not our focus.  We want to publish
5    hypothesis, review articles, epidemiology
6    study, which don't have any biological
7    plausibility, right?
8             We publish all the data that
9    is peer reviewed.  So that's our job.
10   It's not required, it's not required for
11   any publication to need that biological
12   plausibility.
13            DR. RESTAINO:  Move to
14       strike as unresponsive.
15   BY DR. RESTAINO:
16       Q.   Do you know what the peer
17   reviewers --
18            MS. MILLER:  It was
19       responsive.
20            THE WITNESS:  Why, why, why.
21   BY DR. RESTAINO:
22       Q.   Do you know what the peer
23   reviewers did in this case, did anyone
24   say to you, this is not biologically

Page 427

1    plausible?
2             MS. MILLER:  Objection.
3             THE WITNESS:  I think I
4        answered your question.
5    BY DR. RESTAINO:
6        Q.   I'm -- I'm sorry, you
7    didn't.
8             Did you get something back
9    from peer reviewers saying this is not
10   biologically plausible, please provide
11   more information or do this further
12   study?
13            MS. MILLER:  Objection.
14            THE WITNESS:  I think I
15       already answered your question.
16       Biological plausibility is
17       not required for any publications.
18            MS. SHARKO:  I can help you
19       out.  Dr. Shih --
20            THE WITNESS:  Yeah.
21            MS. SHARKO:  -- he's just
22       asking you if any of the peer
23       reviewers said that to you.
24            So if you remember what the

Page 428

1    peer reviewers said, then you
2        should tell him that.
3             THE WITNESS:  Oh, I cannot
4        remember that.
5    BY DR. RESTAINO:
6        Q.   Okay.  And, Doctor --
7             DR. RESTAINO:  Thank you,
8        Susan.
9    BY DR. RESTAINO:
10       Q.   If you would turn now to
11   your expert report, Page 9.
12       A.   Okay.  I'm sorry.  Which
13   one, page?
14       Q.   Page 9 of your expert
15   report, I think it is.
16            The lack of sufficient
17   evidence to support talc as a cause of
18   ovarian cancer?
19       A.   You mean the C, right, under
20   the Section C?  We are looking at
21   different pages.
22       Q.   Just give me a chance to get
23   there.  C, the lack of sufficient
24   evidence to support talc as a cause of

Page 429

1    ovarian cancer.
2             Okay.  In the middle
3    paragraph, you have a section that starts
4    "according to Merriam-Webster's
5    dictionary."
6             Do you see that, sir?
7        A.   Right.
8        Q.   Okay.  Then the final two
9    sentences to the -- that starts to the
10   right of Martincorema 2017, you write,
11   "Thus, in order to prove that any
12   substance is carcinogenic it is not
13   sufficient to demonstrate exposure.  One
14   must also demonstrate that the exposure
15   can cause biological effects and
16   tissue/cellular changes (like precursor
17   lesions)."
18            Did I read that correctly?
19       A.   Yes.
20       Q.   And is it still your opinion
21   today that one must demonstrate the
22   exposure causes biological effects and
23   tissue/cellular changes?
24       A.   Cause biological effects,

Ie-Ming Shih, M.D., Ph.D.

Page 430

1  meaning biological plausibility to
2  support, to support this issue.
3      Q.   I'm sorry, Doctor, you are
4  not saying biological plausibility here.
5  What you wrote here was very specific,
6  that "in order to prove that any
7  substance is carcinogenic, it is not
8  sufficient to demonstrate exposure, one
9  must also demonstrate the exposure can
10  cause biological effects and
11  tissue/cellular changes."
12      Is that still your opinion,
13  sir?
14      A.   You need to see why I say
15  that.  You cannot just quote -- quote one
16  sentence.
17      You see my previous
18  sentences.  "Carcinogens cause cancer due
19  to their ability to damage DNA," blah,
20  blah, blah.
21      "Thus, in order to prove
22  that any substance is carcinogenic, it's
23  not sufficient to demonstrate exposure."
24      What I mean is the mere

Page 431

1  experience -- the appearance of
2  something, like talcum powder, I don't --
3  I don't believe, I don't see any credible
4  evidence, ever in the fallopian tube,
5  beneath the epithelial cells, okay, if we
6  assume, but this is not possible, assume
7  it's there, it's not sufficient to
8  demonstrate that it is causal.  You need
9  to provide biological evidence to
10  support, for example.
11      You need to show that talcum
12  powder existence, right, can support
13  there is a carcinogenic effect on the p53
14  signature.  And a -- and a STIC and a
15  biological mechanism behind that.
16  There's many biological mechanisms.
17      That's why I say in -- in
18  reference to the previous sentence,
19  that's what I said.
20      Q.   Doctor.
21      A.   Right.
22      Q.   That's the exact argument
23  tobacco industry made in the 1950s and
24  the 1960s that one cannot rely upon

Page 432

1  evidence of -- of epidemiology exposure,
2  that there had to be scientific evidence
3  of mutagenic activity.  Isn't that
4  correct?
5      MR. LOCKE:  Objection to
6  form.
7      MS. MILLER:  Objection.
8      MR. MIZGALA:  Objection.
9      MS. MILLER:  You got three
10  objections at the same time there.
11  Did you get them all?
12      THE WITNESS:  Do you have
13  the reference or documents for
14  that?
15  BY DR. RESTAINO:
16      Q.   Well, Doctor, I'll show you
17  what I've been marked as Shih-26.
18      (Document marked for
19  identification as Exhibit
20  Shih-26.)
21  BY DR. RESTAINO:
22      Q.   It's a Saturday,
23  September 30, 1950, publication in the
24  British Medical Journal titled "Smoking

Page 433

1  and Carcinoma of the Lung," by Richard
2  Doll and Austin Bradford Hill.
3      A.   Wow.
4      Q.   Doctor, if you take a look
5  at it, the --
6      A.   Hold on a moment.  I need to
7  see British Medical Journal.  1950.
8      Q.   Now, sir, you see on the
9  right-hand column there's a heading
10  possible causes of the increase?
11      A.   Could you hold a moment.  I
12  need to see what is this article.
13      Q.   What part -- what do you
14  need to look up for this article?
15      A.   I want to know --
16      Q.   It's published in British
17  Medical Journal in 1950.  It's written by
18  Sir Richard Doll and Sir Austin Bradford
19  Hill.  What else do you need to see?
20      MS. MILLER:  Objection.  Is
21  that actually a question or are
22  you just being argumentative?  If
23  you'd like him to answer, he can.
24  But I'm guessing you're just being

Ie-Ming Shih, M.D., Ph.D.

Page 434

1  argumentative.  Tempers are
2  flaring.  The day's been long.
3      DR. RESTAINO:  We've got
4  about nine minutes.
5  BY DR. RESTAINO:
6      Q.   Doctor, look at, "Possible
7  causes of the increase.  Two main causes
8  have from time to time been put forward."
9      A.   Okay.  I did not follow.  I
10  just want to see any reference, okay.
11  That's a point.
12      Q.   A pre-1950 reference is
13  going to help you?
14      A.   No, no.  Whether they cite
15  any references.  That's what I'm going
16  to.  Okay.
17          This one, two, three, four,
18  five, six, seven, eight references in
19  1947 and 1944, 1939.  Okay.  What's your
20  question?
21      Q.   Possible causes of the
22  increase.
23      A.   Wait, wait, wait a second.
24  Okay.

Page 435

1      Q.   Front page, right column.
2  "Two main causes from time to time have
3  been put forward:  One a general
4  atmospheric pollution from the exhaust
5  fumes of cars, from the surface dust of
6  tarred roads, and from gas-works,
7  industrial plants, and coal fires; and to
8  the smoking of tobacco."
9          Did I read that correctly?
10      MR. LOCKE:  Objection.
11      MS. MILLER:  I'm going to
12  raise several objections here.
13  The witness has never seen this.
14  This is outside his area of
15  expertise.  You haven't given him
16  time to read it.  And you've
17  plucked one sentence out of it in
18  order to make some point, unclear.
19  And I think that's grossly unfair.
20      THE WITNESS:  This is 1950.
21      MS. MILLER:  You can't ask a
22  scientist to comment on one
23  sentence --
24      MS. PARFITT:  "Object to

Page 436

1  form," Counsel.  You have really
2  crossed the line on this last one.
3  We've got seven minutes.  Please,
4  or I'll call Judge Pisano.
5      THE WITNESS:  So before I
6  can answer any question, I need
7  to -- so which -- which sentence
8  you are referring to?
9  BY DR. RESTAINO:
10      Q.   Well, sir, I was referring
11  to the fact that the two -- of the two --
12      A.   Oh, the paragraph.
13      Q.   -- causes listed there, one
14  of them is smoking of the -- smoking of
15  tobacco.
16          As a pathologist, in your
17  medical school education and in your
18  training as a pathologist, did you study
19  the association of smoking and lung
20  cancer?
21      MS. MILLER:  So objection.
22  You said two main causes.  And we
23  don't know of what.
24      DR. RESTAINO:  I read them

Page 437

1  into the record, what they are.
2      MS. MILLER:  Causes of what?
3  You just pulled out a sentence
4  that says "two main causes."  Of
5  what?
6      DR. RESTAINO:  How about the
7  title of the article?
8      MS. MILLER:  Well, you
9  didn't even put that.  I mean, he
10  hasn't had a chance to look at it.
11      THE WITNESS:  So this is a
12  few sentences.  Do you know how
13  many sentences here?
14  BY DR. RESTAINO:
15      Q.   Yes.
16      A.   How many sentences?
17      Q.   I've read it.
18      A.   Yeah, how many sentences?
19      Q.   A lot.
20      A.   Well, how many?
21      Q.   Is it your opinion that --
22      MS. MILLER:  Not going to
23  argue.
24  BY DR. RESTAINO:

Ie-Ming Shih, M.D., Ph.D.

Page 438

```
 1        Q.   -- that the association with
 2   smoking and lung cancer established in
 3   the 1950s and 1960s by case-control
 4   epidemiological studies depended upon the
 5   molecular evidence that you put into your
 6   record that must be present for there to
 7   be an association?
 8            MS. MILLER: Objection.
 9            MR. LOCKE: Objection to
10        form and beyond the scope.
11            MS. MILLER: Thank you.
12        Because I've been chided for
13        apparently objecting improperly.
14            MS. PARFITT: Counsel, I'm
15        just following the CMO.
16            MS. MILLER: Did you guys
17        follow the CMO when you were
18        defending depositions?
19   BY DR. RESTAINO:
20        Q.   Can you answer the question,
21   Doctor?
22        A.   I am a gynecology
23   pathologist. My field of research is
24   vulva, vagina, cervix, uterus, right
```

Page 439

```
 1   fallopian tube, left fallopian tube,
 2   right ovary, and the left ovary.
 3        Q.   Okay. And, Doctor, in that
 4   paragraph that you wrote at the bottom of
 5   the page where you start with, "According
 6   to Merriam-Webster's dictionary," and you
 7   describe a carcinogen as a substance that
 8   causes cancer, every one of those
 9   anatomic parts that you just said are not
10   in this paragraph, correct?
11            MS. MILLER: Objection.
12   BY DR. RESTAINO:
13        Q.   This paragraph talks about
14   cancer in general, does it not?
15            MS. MILLER: Objection.
16            MR. LOCKE: Objection.
17            MS. MILLER: There's two
18        questions there.
19            THE WITNESS: You speak too
20        fast. This embedded different
21        questions.
22   BY DR. RESTAINO:
23        Q.   Okay.
24        A.   Could you dissect this out
```

Page 440

```
 1   and ask me one by one? Thank you very
 2   much.
 3        Q.   Doctor --
 4        A.   Yes.
 5        Q.   -- carcinogen causes cancer
 6   due to their ability to damage the genome
 7   and induce a cancer driver but not
 8   passenger mutations that promote cancer
 9   development; is that correct?
10        A.   I need to see that, please.
11        Q.   Just read from your paper.
12   I'm reading what you wrote.
13        A.   Yeah, I need to -- do you
14   remember when I said that, in what
15   context? What kind of question you ask?
16        Q.   You need to have context for
17   knowing -- for answering whether or not
18   the word ovary is in that paragraph?
19            MS. MILLER: Objection.
20            THE WITNESS: Ovary in the
21        paragraph.
22            MS. MILLER: Please, Doctor,
23        let me do my job.
24            THE WITNESS: Okay. Okay.
```

Page 441

```
 1            What do you mean ovary in
 2        that paragraph? I'm confused.
 3   BY DR. RESTAINO:
 4        Q.   Doctor, this paragraph
 5   describes what carcinogens are in a
 6   general sense, not limited to the
 7   genitourinary tracts of a woman, correct?
 8        A.   You mean this paragraph
 9   in -- in "Smoking and Carcinoma of the
10   Lung"?
11        Q.   No, Doctor.
12        A.   Which -- which paragraph are
13   you referring to?
14        Q.   The paragraph we're reading
15   from Page 9 of your expert report --
16        A.   Page 9, okay.
17        Q.   "Lack of sufficient evidence
18   to support talc as a cause of ovarian
19   cancer.
20        A.   Where is that now?
21        Q.   On Page 9, C.
22        A.   Okay. C, yes.
23        Q.   You asked me about letter C.
24   Letter C, "The lack of sufficient
```

Ie-Ming Shih, M.D., Ph.D.

Page 442

```
1    evidence to support talc as a cause of
2    ovarian cancer."
3         In the paragraph, "according
4    to Merriam-Webster's dictionary," you do
5    not describe the ovaries, nor the
6    genitourinary tract, but rather you
7    discuss carcinogens and cancer in a
8    general sense, do you not?
9         MS. MILLER: Objection.
10        THE WITNESS: Okay. So your
11        question is you talk about the
12        definition of the carcinogen and I
13        did not have over here. And you
14        said this is the general
15        description.
16   BY DR. RESTAINO:
17        Q.   Correct? Correct?
18        A.   That's from the definition
19   of the dictionary.
20        Q.   So is your opinion outside
21   the genitourinary tract, but as cancer in
22   general, that one must also demonstrate
23   exposure can cause biological effects and
24   tissue/cellular changes like precursor
```

Page 444

```
1         approximately 6:00 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 443

```
1    lesions before you can make a causal
2    connection between an environmental
3    carcinogen and cancer?
4         A.   No --
5         MR. LOCKE: Objection.
6         MR. MIZGALA: Objection.
7    BY DR. RESTAINO:
8         Q.   Okay.
9         A.   Is not must. Is has the
10   biological plausibility to support.
11   That's what I mean.
12        DR. RESTAINO: Okay. I
13        think we're done.
14        MS. SHARKO: Thank you very
15        much.
16        DR. RESTAINO: No further
17        questions.
18        THE VIDEOGRAPHER: The time
19   is 6:00 p.m. March 26, 2019.
20   Going off the record.
21        This ends the videotaped
22   deposition.
23        (Excused.)
24        (Deposition concluded at
```

Page 445

```
1
2              CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
          It was requested before
8    completion of the deposition that the
     witness, IE-MING SHIH, M.D., Ph.D., have
9    the opportunity to read and sign the
     deposition transcript.
10
11
12        _____
          MICHELLE L. GRAY,
13        A Registered Professional
          Reporter, Certified Shorthand
14        Reporter, Certified Realtime
          Reporter and Notary Public
15        Dated: March 27, 2019
16
17
18        (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

112 (Pages 442 to 445)

Ie-Ming Shih, M.D., Ph.D.

Page 446

1    INSTRUCTIONS TO WITNESS

2

3         Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8         After doing so, please sign
9    the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 448

1

2    ACKNOWLEDGMENT OF DEPONENT

3

4         I,_____, do
5    hereby certify that I have read the
6    foregoing pages, 1 - 449, and that the
7    same is a correct transcription of the
8    answers given by me to the questions
9    therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   IE-MING SHIH, M.D., Ph.D.     DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24

Page 447

1         - - - - - -
          E R R A T A
2         - - - - - -
3
4    PAGE LINE CHANGE
5    ____ ____ _____
6         REASON: _____
7    ____ ____ _____
8         REASON: _____
9    ____ ____ _____
10        REASON: _____
11   ____ ____ _____
12        REASON: _____
13   ____ ____ _____
14        REASON: _____
15   ____ ____ _____
16        REASON: _____
17   ____ ____ _____
18        REASON: _____
19   ____ ____ _____
20        REASON: _____
21   ____ ____ _____
22        REASON: _____
23   ____ ____ _____
24        REASON: _____

Page 449

1    LAWYER'S NOTES
2    PAGE LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____