# EXHIBIT B30

Judith K. Wolf, M.D.

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF NEW JERSEY
 2
    IN RE:  JOHNSON &      :
 3  JOHNSON TALCUM POWDER :
    PRODUCTS MARKETING,    :
 4  SALES PRACTICES, AND   :
    PRODUCTS LIABILITY     :   CASE NO. 16-2738
 5  LITIGATION             :    (FLW)  (LHG)
                           :
 6  THIS DOCUMENT RELATES :
    TO ALL CASES           :
 7                         :
    MDL Docket No. 2738    :
 8
                    -   -   -
 9
              Monday, January 7, 2019
10
                    -   -   -
11
12            Videotaped Oral Deposition of
13  JUDITH K. WOLF, M.D. taken pursuant to
14  notice, was held at the Hilton Austin, 500
15  East 4th Street, Austin, Texas, beginning at
16  9:08 a.m., on the above date, before Micheal
17  A. Johnson, Registered Diplomate Reporter,
18  Certified Realtime Reporter, and Notary
19  Public for the State of Texas.
20                  -   -   -
21
22
23
24
```

Judith K. Wolf, M.D.

| | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S : |
| 2 | BEASLEY ALLEN, PC |
| | BY: P. LEIGH ODELL, ESQUIRE |
| 3 | leigh.odell@beasleyallen.com |
| | Margaret M. Thompson, ESQUIRE |
| 4 | margaret.thompson@beasleyallen.com |
| | 218 Commerce Street |
| 5 | Montgomery, Alabama 36104 |
| | (334) 269-2343 |
| 6 | Counsel for Plaintiffs' Steering |
| | Committee |
| 7 | |
| 8 | ROBINSON CALCAGNIE, INC. |
| | BY: CYNTHIA L. GARBER, ESQUIRE |
| 9 | cgarber@robinsonfirm.com |
| | 19 Corporate Plaza Drive |
| 10 | Newport Beach, California 92660 |
| | (949) 720-1288 |
| 11 | Counsel for Plaintiffs' Steering |
| | Committee |
| 12 | |
| 13 | BLOOD HURST & O'REARDON LLP |
| | BY: PAULA R. BROWN, ESQUIRE |
| 14 | pbrown@hbolaw.com |
| | 501 West Broadway, Suite 1490 |
| 15 | San Diego, California 92101 |
| | (619) 338-1100 |
| 16 | Counsel for Plaintiffs' Steering |
| | Committee |
| 17 | |
| 18 | WEIL, GOTSHAL & MANGES LLP |
| | BY: ALLISON M. BROWN, ESQUIRE |
| 19 | allison.brown@weil.com |
| | 17 Hulfish Street, Suite 201 |
| 20 | Princeton, New Jersey 08542-3792 |
| | (609) 986-1104 |
| 21 | Counsel for Johnson & Johnson entities |
| 22 | |
| 23 | |
| 24 | |

| | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S : |
| 2 | WEIL, GOTSHAL & MANGES LLP |
| | BY: ALEXIS KELLERT, ESQUIRE |
| 3 | alexis.kellert@weil.com |
| | 767 Fifth Avenue |
| 4 | New York, New York 10153-0119 |
| | (212) 310-8468 |
| 5 | Counsel for Johnson & Johnson entities |
| 6 | |
| 7 | DRINKER BIDDLE & REATH, LLP |
| | BY: KATHERINE MCBETH, ESQUIRE |
| 8 | katherine.mcbeth@dbr.com |
| | One Logan Square, Suite 2000 |
| 9 | Philadelphia, Pennsylvania 19103-6996 |
| | (215) 988-2706 |
| 10 | Counsel for Johnson & Johnson entities |
| 11 | GORDON REES SCULLY MANSUKHANI LLP |
| | BY: MICHAEL R. KLATT, ESQUIRE |
| 12 | mklatt@gordonrees.com |
| | 816 Congress Avenue, Suite 1510 |
| 13 | Austin, Texas 78701 |
| | (512) 391-0197 |
| 14 | Counsel for Imerys Talc America |
| 15 | |
| | COUGHLIN DUFFY LLP |
| 16 | BY: MARK K. SILVER, ESQUIRE |
| | msilver@coughlinduffy.com |
| 17 | 350 Mount Kemble Avenue |
| | Morristown, New Jersey 07962 |
| 18 | (973) 267-0058 |
| | Counsel for Imerys Talc America |
| 19 | |
| 20 | TUCKER ELLIS LLP |
| | BY: TARIQ M. NAEEM, ESQUIRE |
| 21 | tariq.naeem@tuckerellis.com |
| | 950 Main Avenue, Suite 1100 |
| 22 | Cleveland, Ohio 44113-7213 |
| | (216) 696-3675 |
| 23 | Counsel for Pharmatech ("PTI") |
| 24 | |

| | Page 4 |
|---|---|
| 1 | A P P E A R A N C E S : |
| 2 | SEYFARTH SHAW, LLP |
| | BY: RENEE B. APPEL, ESQUIRE |
| 3 | rappel@seyfarth.com |
| | 975 F Street, N.W. |
| 4 | Washington, D.C. 20004-1454 |
| | (202) 463-2400 |
| 5 | Counsel for Personal Care Products |
| 6 | |
| 7 | V I D E O G R A P H E R : |
| | Shane Ramirez, |
| 8 | Golkow Litigation Services |
| 9 | |
| | - - - |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 5 |
|---|---|
| 1 | INDEX |
| | JUDITH K. WOLF, M.D. |
| 2 | January 7, 2019 |
| 3 | |
| | APPEARANCES 2 |
| 4 | |
| | PROCEEDINGS 9 |
| 5 | |
| 6 | |
| | EXAMINATION OF JUDITH K. WOLF, M.D.: |
| 7 | |
| 8 | BY MS. BROWN 9 |
| | BY MR. KLATT 388 |
| 9 | |
| | BY MS. O'DELL 446 |
| 10 | |
| | BY MS. BROWN 461 |
| 11 | |
| | BY MR. KLATT 470 |
| 12 | |
| | BY MS. O'DELL 482 |
| 13 | |
| | BY MS. BROWN 482 |
| 14 | |
| 15 | |
| | CERTIFICATE 485 |
| 16 | |
| | ACKNOWLEDGMENT OF DEPONENT 486 |
| 17 | |
| | ERRATA 487 |
| 18 | |
| | LAWYER'S NOTES 488 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Judith K. Wolf, M.D.

DEPOSITION EXHIBITS
JUDITH K. WOLF, M.D.
January 7, 2019

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Notice of Oral and Videotaped Deposition of Judith Wolf and Duces Tecum | 11 |
| Exhibit 2 | Reprint from UpToDate, Evidence-based medicine | 12 |
| Exhibit 3 | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Preamble | 31 |
| Exhibit 4 | Reproductive Sciences, Original Manuscripts | 35 |
| Exhibit 5 | Invoices for TALC MDL | 36 |
| Exhibit 6 | Curriculum Vitae | 52 |
| Exhibit 7 | Rule 26 Expert Report of Judith Wolf, MD | 66 |
| Exhibit 8 | Rule 26 Expert Report of Ellen Blair Smith, MD | 100 |
| Exhibit 9 | FDA.gov, Ingredients, Talc | 128 |
| Exhibit 10 | Excerpt from Arsenic, Metals, Fibres, and Dusts, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans | 157 |

DEPOSITION EXHIBITS
JUDITH K. WOLF, M.D.
January 7, 2019

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 17 | Genital use of talc and risk of ovarian cancer: A meta-analysis, by Wera Berge, et al. | 247 |
| Exhibit 18 | Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ) - Health Professional Version | 272 |
| Exhibit 19 | African-Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates, by Anna Wu, et al. | 294 |
| Exhibit 20 | The Future of Ovarian Cancer Diagnosis Is Now - Through These 4 Strategies | 350 |
| Exhibit 21 | How to find the best doctor for ovarian cancer, by Judy Wolf | 353 |
| Exhibit 22 | Arsenic, Metals, Fibres, and Dusts, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans | 427 |

DEPOSITION EXHIBITS
JUDITH K. WOLF, M.D.
January 7, 2019

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 11 | The Association Between Talc Use and Ovarian Cancer, A Retrospective Case-Control Study in Two US States | 198 |
| Exhibit 12 | The relationship between perineal cosmetic talc usage and ovarian talc particle burden, by Debra S. Heller, MD, et al. | 213 |
| Exhibit 13 | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 93, Carbon Black, Titanium Dioxide, and Talc | 224 |
| Exhibit 14 | April 1, 2014, Letter, Steven Musser to Samuel Epstein | 233 |
| Exhibit 15 | American Association for Cancer Research, Research Article, Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES) | 238 |
| Exhibit 16 | Perineal Talc Use and Ovarian Cancer, A Systematic Review and Meta-Analysis | 245 |

PROCEEDINGS

1
2        THE VIDEOGRAPHER:  Here begins
3   the deposition of Dr. Judy Wolf.
4        Today's date is January 7th, 2019.
5   The time is 9:08 a.m.
6             Will the court reporter please
7   swear in the witness.
8        JUDITH K. WOLF, M.D.,
9   called as a witness, having been duly sworn
10  by a Notary Public, was examined and
11  testified as follows:
12        EXAMINATION
13  BY MS. BROWN:
14       Q.    Good morning, Dr. Wolf.
15       A.    Good morning.
16       Q.    My name is Ally Brown and I
17  represent Johnson & Johnson, and I'll start
18  with some questions for you here today.
19  Okay?
20       A.    Okay.
21       Q.    Have you ever been deposed
22  before?
23       A.    One time.
24       Q.    And when was that?

3 (Pages 6 to 9)

Judith K. Wolf, M.D.

Page 10

1      A.    That was -- I want to say, was
2  nearly three years ago.  It was a wrongful
3  termination case at a hospital I used to
4  work.
5      Q.    And were you the plaintiff in
6  that case?
7      A.    No.
8      Q.    Okay.  Were you a witness in
9  that case?
10     A.    A witness.
11     Q.    Okay.  And you're probably
12 familiar with some of the rules of a
13 deposition, having done this not too long
14 ago, but I'll just remind you a little bit.
15     A.    Okay.
16     Q.    We'll try and talk one at a
17 time, so that the court reporter can get down
18 all of my questions and all of your answers.
19 Do you understand that you are under oath
20 here today same as if you were in a court of
21 law?
22     A.    Yes.
23     Q.    Okay.  If you don't understand
24 one of my questions, will you let me know?

Page 11

1      A.    Yes.
2      Q.    And if you go ahead and answer
3  them, is it fair to assume you understood
4  what I was asking?
5      A.    Yes.
6      Q.    Okay.  We'll take breaks
7  throughout the day.  It's not a marathon, so
8  just let me know if you need a break and
9  we'll be happy to accommodate you.  Okay?
10     A.    Okay.
11     Q.    I'm handing you, Dr. Wolf, what
12 we have marked as Exhibit 1 to your
13 deposition, which is the notice of your
14 deposition.
15         (Deposition Exhibit 1 marked
16         for identification.)
17 BY MS. BROWN:
18     Q.    Have you seen this document
19 before?
20     A.    Yes.
21     Q.    Okay.  And when was that?
22     A.    I saw it several days ago.  I
23 can't remember exactly when.
24     Q.    Okay.  And prior to starting

Page 12

1  today, you were -- the attorney representing
2  plaintiffs provided me with a number of
3  documents in request to this notice that I'd
4  like to mark and ask you about.
5      A.    Okay.
6      Q.    And so the first one we'll mark
7  as Exhibit 2 to your deposition.
8         (Deposition Exhibit 2 marked
9         for identification.)
10 BY MS. BROWN:
11     Q.    Which is an UpToDate printout
12 from January 5th, 2019.
13     A.    Yes.
14     Q.    We only have one copy, so let
15 me hand it to you and ask you to describe
16 what Exhibit 2 is.
17     A.    This is an article from
18 UpToDate that describes what evidence-based
19 medicine is, which is -- I provided because
20 this is how I reviewed the subject and how I
21 review any subject when I'm looking to treat
22 a patient or taking care of a patient or
23 working on a research project, and I thought
24 that this was a good outline and description

Page 13

1  of what I do.
2      Q.    Do you consider UpToDate to be
3  a reliable source in your field?
4      A.    I think it's a --
5         MS. O'DELL:  Object to form.
6      A.    I believe it's a good starting
7  place.  If I read something on UpToDate and I
8  want something more in depth, the first thing
9  I usually do is go to the references and look
10 at those.  If -- and if I want more
11 information and there's an UpToDate, I'll do
12 a general PubMed literature search to find
13 other articles.
14 BY MS. BROWN:
15     Q.    As part of your methodology in
16 your report that we're here to talk about
17 today in the MDL, did you employ the
18 evidence-based medicine approach described in
19 Exhibit 2?
20     A.    Yes.
21     Q.    And describe that for us
22 briefly, if you would.
23     A.    So first is formulating a
24 question and the question is, does talcum

4 (Pages 10 to 13)

Judith K. Wolf, M.D.

Page 14

1  powder product cause ovarian cancer?  And
2  then the next part is finding the available
3  evidence, which is, for me, looking at the
4  literature that I had at my house to start,
5  going on PubMed and searching literature,
6  looking at references from those, going --
7  finding more literature from the references
8  that I pulled.  Some references were provided
9  by the attorneys, some other information that
10 I asked for, they provided.  And so trying to
11 go through as many sources as I could find,
12 to find as much information about the topic
13 that I could find, both in human studies and
14 in vitro studies and in animal studies.
15     Q.    And so if I understand your
16 methodology, it was first formulating a
17 question?
18     A.    Yes.
19     Q.    Is that right?  And the
20 question at issue as it relates to this MDL
21 report was, does genital application of
22 talcum powder product cause ovarian cancer; is that right?
23     A.    Does genital -- does talcum
24 powder product cause ovarian cancer.

Page 15

1     Q.    That's the question that you
2  endeavored to answer in your report?
3     A.    Yes.
4     Q.    Is that right?
5     A.    Yes.
6     Q.    And when you say talcum -- does
7  talcum powder cause ovarian cancer, do you
8  have a particular product in mind?
9     A.    I'm thinking about talcum
10 powder product in general.
11     Q.    And how do you define a "talcum
12 powder product"?
13     A.    Anything that comes in a powder
14 form that people might apply to their body or
15 someone else's body.
16     Q.    What about deodorizing sprays
17 that contain talcum powder?  Do you include
18 that in your definition?
19     A.    I would include that in my
20 definition.
21     Q.    Okay.  What about soaps that
22 contain talcum powder?  Would you include
23 that in your definition as well?
24     A.    I hadn't thought about that,

Page 16

1  but if there's talcum powder in them, yes.
2     Q.    Okay.  What about tampons or
3  other feminine products that contain talcum
4  powder?  Are you including that in your
5  definition of a "talcum powder product"?
6     A.    Again, I haven't really thought
7  about tampons as containing talcum powder as
8  a possibility, so I would say I hadn't
9  considered that.
10     Q.    Okay.  What about talc-dusted
11 condoms?  Are you including that in your
12 definition of a "talcum powder product"?
13     A.    I am, but my understanding is,
14 that since the '90s, that practice has
15 stopped because of concerns.
16     Q.    And tell me what you're relying
17 on for that understanding.
18     A.    I have a reference in my
19 report.  I have to look up the name of the
20 author.
21     Q.    Okay.  And the reference in
22 your report is actually to an internal PCP
23 document.  Is that what you're relying on for
24 your understanding that condoms no longer

Page 17

1  contain talcum powder?
2     A.    No.  Well, can I look at my
3  report for a second?
4     Q.    Absolutely.
5          (Witness reviews document.)
6     A.    There are actually references
7  above the PCP report, talking about concerns
8  of ovarian cancer and talc on condoms, Kang,
9  Griffin and Ellis, Casper and Chandler.
10 BY MS. BROWN:
11     Q.    And for the record, Doctor,
12 what page are you on?
13     A.    I'm on page 5.
14     Q.    Okay.  And your understanding
15 that condoms no longer are dusted with talc
16 comes from Kang, Griffin and Ellis 1992, and
17 Casper and Chandler 1995, as well as an
18 internal PCPC document and McCullough in
19 1996; is that right?
20     A.    My understanding that there was
21 concern about talcum powder on condoms is
22 from the Kang, the Griffin and the Casper
23 articles, and then my understanding about
24 stopping dust in condoms was from the PCP

Golkow Litigation Services - 877.370.DEPS

Judith K. Wolf, M.D.

Page 18

1  document and the McCullough document.
2      Q.   Have you reviewed the
3  epidemiology as it relates to whether or not
4  there is an increased risk for ovarian cancer
5  as a result of talc-dusted condoms?
6          MS. O'DELL:  Object to the
7      form.
8      A.   The papers, the Kang, the
9  Griffin and the Casper paper, that's part of
10 what they were looking at.
11 BY MS. BROWN:
12     Q.   And are you familiar with what
13 the conclusion of the body of studies looking
14 at talc-dusted condoms in ovarian cancer
15 conclude?
16         MS. O'DELL:  Dr. Wolf, if
17     you -- you have your records here.  If
18     you'd like to look at them, you're
19     certainly welcome to do that.
20         THE WITNESS:  Let me get that.
21 BY MS. BROWN:
22     Q.   Doctor, if you would, just
23 identify the document you're looking at for
24 us on the record.

Page 19

1      A.   So I'm looking at the Kang,
2  Griffin and Ellis paper right now.
3      Q.   Okay.  Great.
4          (Witness reviews document.)
5      A.   Now I'm looking at the Casper
6  paper.
7  BY MS. BROWN:
8      Q.   And before we move the -- move
9  from the Kang paper, Doctor, is there
10 anything in the Kang paper that informs your
11 view about whether or not there's an
12 increased risk of ovarian cancer with
13 talc-dusted condoms?
14     A.   This paper is just looking at
15 the pathologic changes from talc powder on
16 gloves or condoms and is looking at
17 pathologic changes in the intraabdominal
18 cavity.  It doesn't specifically look at the
19 risk of ovarian cancer.
20         Multiple other papers, both
21 prior and subsequent to this, though,
22 indicate that inflammation is an important
23 part in the development of ovarian cancer,
24 and so it does -- this paper does not

Page 20

1  directly talk about ovarian cancer, but the
2  fact that the powder causes inflammation
3  would lead me to be concerned about that.
4      Q.   Okay.  And we're going to talk
5  about inflammation.  But you cited this Kang
6  paper for the proposition that concerns were
7  raised in the medical literature regarding
8  ovarian cancer for talc being used on
9  condoms.  Does this paper speak to that in
10 your mind, Doctor?
11         MS. O'DELL:  Object to the
12     form, asked and answered.
13     A.   It specifically talks about
14 inflammation from this, which inflammation is
15 related to ovarian cancer.
16 BY MS. BROWN:
17     Q.   Is it your understanding,
18 Doctor, that all inflammation leads to
19 ovarian cancer?
20     A.   It's my understanding, from
21 reviewing the literature and my own knowledge
22 from practicing GYN oncology and doing the
23 research in it over the years, is that it's
24 more the concern of chronic inflammation

Page 21

1  versus acute inflammation.
2          When I look at the pathology of
3  ovarian tumors, sometimes we see a lot of
4  chronic, sometimes we see a mix of chronic
5  and acute inflammation, sometimes you don't
6  see inflammation.  That doesn't mean it's not
7  there; it just means it's not there in the
8  slide that you're looking at.  But in
9  general, more concern about chronic
10 inflammation.
11     Q.   Because, Doctor, you would
12 agree, that you can certainly have
13 inflammation that does not cause cancer,
14 right?
15         MS. O'DELL:  Object to the
16     form.
17     A.   Inflammation itself doesn't
18 always cause cancer.  However, inflammation
19 has been correlated with the development of
20 ovarian cancer in multiple studies, and since
21 the '30s, it's been suggested in the
22 implication of all cancers -- or many cancers
23 anyway.  I'll stop there.
24

Judith K. Wolf, M.D.

Page 22

1  BY MS. BROWN:
2      Q.    Would you agree, Doctor, that
3  the inflammation that was being caused by
4  powders on surgical gloves was not
5  inflammation that was -- was suspected of
6  leading to cancer?
7          MS. O'DELL:  Object to the
8      form.
9      A.    I can't -- I don't know that I
10 can say that, because if there's deposits of
11 talc from the surgical gloves into the
12 abdominal cavity and it stays there because
13 it's not dissolved, that can lead to chronic
14 inflammation.
15 BY MS. BROWN:
16     Q.    Do you have any -- can you cite
17 any evidence in the medical literature of
18 talc from surgical gloves causing a
19 procancerous inflammatory response?
20         MS. O'DELL:  Object to the
21     form.
22     A.    Can you define for me what you
23 mean by a "procancer inflammatory response"?
24 BY MS. BROWN:

Page 23

1      Q.    Sure.  Can you cite us any
2  evidence in the medical literature that talc
3  from surgical gloves led to chronic
4  inflammation that caused cancer.
5          MS. O'DELL:  Object to the
6      form.
7      A.    I can cite literature that talc
8  from surgical gloves causes inflammation and
9  there is the concern that it leads to cancer.
10 BY MS. BROWN:
11     Q.    Okay.  And for the proposition,
12 the second part of what you're testifying
13 about, the concern that surgical gloves were
14 causing, not just granulomas or adhesions or
15 foreign body reactions, but cancer, but what
16 literature are you relying on for that
17 proposition?
18         MS. O'DELL:  Object to the
19     form.  Excuse me just for a minute.
20     Micheal, would you make the screen --
21     I don't know how that --
22         THE WITNESS:  So I can see it.
23         MS. O'DELL:  Yes.
24

Page 24

1  BY MS. BROWN:
2      Q.    Just for the record, Doctor,
3  the lawyer for the plaintiffs has asked that
4  you be able to look at the transcript of my
5  questions and your answers, to assist you
6  with your testimony under oath here today; is
7  that right?
8          MS. O'DELL:  No, actually,
9      she's -- she's had it there, not to
10     assist her, but just to make sure
11     she's read the -- understood the
12     question correctly.  I'll put it that
13     way.  You can answer.
14 BY MS. BROWN:
15     Q.    Just for the record, you'll be
16 looking at the realtime questions and answers
17 and testifying here today; is that right?
18     A.    That's my understanding, yes.
19         So now I'm going to have to ask
20 you to repeat the question.
21     Q.    Fair enough, Doctor.  We were
22 talking a little bit about talcum powder on
23 surgical gloves.  Do you remember that?
24     A.    Yes.

Page 25

1      Q.    And is it your opinion that
2  talcum powder that was used on surgical
3  gloves could lead to cancer?
4      A.    It's my opinion that talcum
5  powder generally has a concern for
6  carcinogenesis, and because it was known to
7  cause inflammation in adhesions, it has been
8  removed from surgical gloves and from
9  condoms.
10     Q.    And what are you relying on for
11 your understanding that dusting powders were
12 removed from surgical gloves because of a
13 concern for cancer?
14     A.    I believe that we've already
15 talked about that, the PCPC report that's
16 referenced on page 5 in my report.
17     Q.    Okay.  So that's an internal
18 company document that you cite in connection
19 with condoms, right?
20     A.    Yes.
21     Q.    Okay.  And so my question was a
22 little bit different, which is, what
23 scientific literature are you relying on to
24 support your opinion that dusting powder on

Judith K. Wolf, M.D.

Page 26

1 surgical gloves can lead to cancer?
2          MS. O'DELL:  Object to the
3     form.
4      A.   I'm going to give you the same
5 answer that I think I've given before is
6 that, the concern is that dusting powder on
7 surgical gloves has been shown to cause
8 inflammation and then that inflammation can
9 lead to cancer.
10 BY MS. BROWN:
11      Q.   And my question's just a little
12 bit different, which is, I'm asking you to
13 identify the scientific literature on which
14 you rely for that opinion, and "that opinion"
15 being that powders on surgical gloves can
16 cause cancer?
17          MS. O'DELL:  Object to the
18     form, asked and answered.  That's
19     probably the third time the question's
20     been repeated.
21          Dr. Wolf, you're welcome to
22     respond to the question.
23      A.   I have the same answer that I
24 gave before.  And powder has been removed

Page 27

1 from surgical gloves because of the concern
2 of adhesions and inflammation.
3 BY MS. BROWN:
4      Q.   I understand that testimony
5 perfectly.  And maybe we're just not
6 connecting, Dr. Wolf.  I understand your
7 opinion, and what I'm asking is, for the
8 scientific support for that opinion.  And so
9 what information are you relying on that
10 dusting powders on surgical gloves can cause
11 cancer?
12          MS. O'DELL:  Object to the
13     form, asked and answered the sixth
14     time.
15      A.   My understanding is what you're
16 asking me is, can I cite you a paper that
17 says that dusting powder on surgical gloves
18 causes cancer?
19 BY MS. BROWN:
20      Q.   My question to you is, what is
21 the scientific support, what articles in the
22 scientific literature, what studies have you
23 looked at that brings you to that conclusion?
24 If it's a paper, then we'll take the paper.

Page 28

1      A.   So the studies suggest -- or
2 show inflammation after talcum powder on --
3 or talc, talcum powder product on surgical
4 gloves, dusting powder, and therefore it was
5 taken off the market.  I am not aware of a
6 study where talcum-dusted, dusting powdered
7 gloves was used to see if it caused cancer.
8 I believe that would be unethical.  And so
9 the concern that there is inflammation was
10 enough that that was pulled off the market.
11      Q.   Okay.  And when you talk about
12 "unethical," you're talking about running a
13 randomized, controlled clinical trial, right?
14      A.   A prospective study of any
15 kind.
16      Q.   Sure.  And certainly it would
17 not be unethical to look at people who have
18 had operations with surgical gloves to study
19 this issue, correct?
20          MS. O'DELL:  Object to the
21     form.
22      A.   So you're -- could you
23 retrospectively look and see if people who
24 had surgery with powdered gloves got cancer

Page 29

1 more than those that did not?  Is that what
2 you're asking me?
3 BY MS. BROWN:
4      Q.   Sure.  What I'm trying to clear
5 up is, you didn't mean to suggest this is an
6 area of science that cannot be studied.
7 Fair?
8          MS. O'DELL:  Object to the
9     form.
10      A.   My suggestion would be that it
11 would be an area of study that would be
12 challenging to study.  I'm not saying it
13 couldn't be.  I'm saying it could be
14 challenging.
15 BY MS. BROWN:
16      Q.   Have you reviewed, in
17 connection with your opinions in this case,
18 the reasoning of the FDA when they banned
19 powders on surgical gloves?
20      A.   I don't recall that I have.
21      Q.   Are you aware of whether or not
22 the FDA made a determination about whether or
23 not the science supported your opinion here,
24 that use of powders on gloves can lead to

8 (Pages 26 to 29)

Judith K. Wolf, M.D.

Page 30

1  cancer?
2       A.   I don't recall.
3       Q.   Do you consider the FDA to be a
4  reliable public health authority?
5            MS. O'DELL:  Object to the
6  form.
7       A.   I consider that the FDA does
8  its best to be a reliable health authority.
9  The FDA, or any agency, is not without the
10  ability to make a wrong decision or a
11  decision that they later change.
12  BY MS. BROWN:
13      Q.   Do you consider the work that
14  scientists at the FDA do in connection with
15  public health issues, to be important to
16  consider in forming your opinions regarding
17  scientific theories?
18           MS. O'DELL:  Object to the
19  form.
20      A.   I think it's a piece of
21  information to consider.
22  BY MS. BROWN:
23      Q.   And as it relates to your
24  opinion about dusting powders on surgical

Page 31

1  gloves, you have not had the opportunity to
2  review the FDA's research on that score; is
3  that fair?
4       A.   That's correct.
5       Q.   Another item, Doctor, that
6  counsel for plaintiffs handed me before we
7  began the deposition, I will mark as
8  Exhibit 3, and it is the preamble to the IARC
9  monograph -- IARC monographs from the
10  evaluation of carcinogenic risk to humans.
11  This is an amendment of January 2006.
12           (Deposition Exhibit 3 marked
13           for identification.)
14  BY MS. BROWN:
15      Q.   I can hand you the copy we've
16  marked. Let me know -- first of all, when
17  did you review the preamble, Doctor?
18      A.   When I looked at the IARC
19  monographs more than a year ago, I read the
20  whole thing, but this preamble specifically I
21  re-reviewed a few days ago when I pulled the
22  UpToDate article about evidence-based
23  medicine, to see how they review -- what
24  methods they used to review a subject to try

Page 32

1  to answer a question and pulled it today
2  or -- or gave it today because they actually
3  use very similar methods.
4       Q.   Do you consider the
5  International Agency on the Research of
6  Cancer to be a respected public health
7  authority?
8       A.   I do.
9       Q.   Do you look to the research
10  that the scientists at IARC do, when
11  considering your own evaluation of scientific
12  theories?
13      A.   I do.
14      Q.   Do you think that IARC is
15  generally an impartial body that endeavors to
16  do the best research it can on cancer?
17      A.   I do.
18      Q.   And have you considered IARC's
19  conclusions as it relates to the opinions
20  that you've provided in your report, your MDL
21  report?
22      A.   Yes.  I considered them amongst
23  many things.
24      Q.   Sure.  Is there anything

Page 33

1  different between the UpToDate source that
2  you provided as Exhibit 2 and the preamble
3  that you've directed us to on Exhibit 3?
4            MS. O'DELL:  Object to the
5  form.
6  BY MS. BROWN:
7       Q.   That wasn't a great question.
8  Do you find that Exhibit 2, the UpToDate
9  summary of evidence-based medicine, is
10  generally in concert with the preamble to the
11  IARC monographs?
12      A.   I think in general, it is.  I
13  think that the UpToDate evidence-based
14  medicine article is something that I as a MD,
15  a clinician, a practicing doctor, this is how
16  I think about questions.  How IARC thinks
17  about it may not be exactly the same, but the
18  general principles are the same.
19      Q.   Is UpToDate a peer-reviewed
20  publication, do you know, Doctor?
21      A.   It is a peer-reviewed
22  publication.  I would say it's -- it is.
23      Q.   And what knowledge do you have
24  about the peer-reviewed process for the

Judith K. Wolf, M.D.

Page 34

1    UpToDate articles?
2        A.    I don't know their peer review
3    process.  I've never put any article into
4    UpToDate.  So I don't understand -- I don't
5    know the details of it.
6        Q.    Okay.  What basis do you have
7    for saying that the UpToDate information
8    you've provided as Exhibit 2 is peer
9    reviewed?
10       A.    Well, it's my understanding
11   that it is.  Like any article that's
12   published in the medical literature, there's
13   usually some kind of reviewed process, where
14   the editor receives it and asks a panel of
15   experts to comment on it.
16       Q.    Okay.  But this UpToDate
17   information, that's not published in a
18   medical journal, right?
19       A.    It's published online.
20       Q.    Right.
21       A.    As many medical literature now
22   is published online, not in a hard journal.
23       Q.    Okay.  But to be fair, you're
24   not aware of whether or not the information

Page 35

1    you've provided as Exhibit 2 has gone through
2    the formal peer-reviewed process, as we know
3    it, as it relates to medical journals?
4        MS. O'DELL:  Object to the
5            form, misstates her testimony.
6        A.    I don't understand -- I don't
7    know the details of their peer review
8    process.
9    BY MS. BROWN:
10       Q.    Fair enough.  Counsel for the
11   plaintiff also provided us with a manuscript,
12   which we'll mark as Exhibit 4.
13           (Deposition Exhibit 4 marked
14            for identification.)
15   BY MS. BROWN:
16       Q.    And this is a manuscript, one
17   of the coauthors is Dr. Saed.  Can you tell
18   me, Doctor, when you reviewed the manuscript
19   that we've marked as Exhibit 4?
20       A.    I received this manuscript and
21   reviewed it on Friday, whatever date that
22   was.  I think the 4th of January.
23       Q.    And so this is something you
24   have recently taken a look at; is that right?

Page 36

1        A.    That's correct.
2        Q.    So as it relates to the
3    opinions in your report, dated November 16,
4    2018, the Saed manuscript that we've marked
5    as Exhibit 4, did not inform those opinions;
6    is that fair?
7        A.    That's correct.
8        MS. O'DELL:  Object to the
9            form.
10       A.    I had an abstract that has some
11   of this data that had been accepted to the
12   SGO meeting for this year, but I did not have
13   the entire report.
14   BY MS. BROWN:
15       Q.    The next piece of information
16   that counsel for plaintiffs provided, is a
17   list of your invoices.
18           (Deposition Exhibit 5 marked
19            for identification.)
20   BY MS. BROWN:
21       Q.    Did you type these invoices,
22   Dr. Wolf?
23       A.    Yes.
24       Q.    Okay.  And so it looks like

Page 37

1    there's actually a little different format
2    between the first invoice, which appears to
3    be January 2017, and later invoices; is that
4    right?
5        A.    Can I see those, please?
6        Q.    Yeah, absolutely.  I only have
7    one copy, so we'll have to share.
8        A.    This is me.  I typed this.
9        Q.    Okay.
10       MS. O'DELL:  We'll just say,
11           for the record, the invoice in the
12           form was done for purposes of my
13           office paying it.  So that's the
14           format we use.
15           But Dr. Wolf, you can explain
16           how you conveyed your hours.
17       A.    Yes.  I mean, this is how I
18   sent them every time.
19   BY MS. BROWN:
20       Q.    Okay.
21       A.    In an e-mail like this.  I --
22   this might be attached to my payment, but I
23   hadn't really seen this form.
24       Q.    Okay.  That's helpful.  So a

10 (Pages 34 to 37)

Judith K. Wolf, M.D.

Page 38

1  few follow-up questions, if I can grab that
2  back from you.  As I understand it, Dr. Wolf,
3  the very first page of Exhibit 5, which is
4  entitled "Judith Wolf, Medical Expert Hours,"
5  January 2017, at $600 an hour, that's a
6  document you typed.  Fair?
7      A.   That's correct.
8      Q.   Okay.  And for each subsequent
9  invoice, you typed a document similar to the
10 first page of Exhibit 5.  True?
11     A.   Yes.
12     Q.   Okay.  And the remaining pages
13 of Exhibit 5 have sort of a -- a different
14 format.  Would you agree?
15     A.   The hours look the same, but --
16 I mean the format of the hours look the same,
17 but the invoice at the top, no -- yes, that
18 looks different.
19     Q.   Right.  And I'm not trying to
20 be tricky, but you didn't type everything
21 after page 1 of Exhibit 5; is that fair?
22     MS. O'DELL:  What I'm
23 conveying -- what I said.
24     MS. BROWN:  Let's get an answer

Page 39

1  and then I'm happy to have you make
2  the statement for the record.  I just
3  want an answer to that question.
4      MS. O'DELL:  That's fair.  You
5  can answer the question.
6      A.   I didn't type the other ones.
7      MS. O'DELL:  So the invoice was
8  prepared after the hours were
9  submitted to my office for purposes of
10 facilitating payment.  So the data --
11 to be clear, the data that was
12 provided was from Dr. Wolf.
13     MS. BROWN:  Understood.
14 BY MS. BROWN:
15     Q.   When you invoice the lawyers at
16 Beasley Allen, do you send a document that
17 looks like page 1 of Exhibit 5?
18     A.   Yes.
19     Q.   Okay.  And have you done that
20 for every invoice that you've submitted
21 through your work on this matter?
22     A.   Yes.
23     MS. BROWN:  Okay.  So I'm going
24 to request production of the original

Page 40

1  invoices that Dr. Wolf sent to Beasley
2  Allen.  For the record, what we have
3  are four additional pages of
4  Exhibit 5, which appear to be have
5  been generated by Beasley Allen.  So
6  we'll request the underlying invoices
7  that came from the doctor.
8      MS. O'DELL:  Fair enough.
9      MS. BROWN:  Thank you.
10     MS. O'DELL:  I would just note
11 for the record, just so there's no
12 suggestion otherwise, those are
13 contemporaneously provided.  There's
14 no generation of that in conjunction
15 with this deposition.  So I'm happy to
16 provide --
17     MS. BROWN:  And to be fair, I
18 don't mean to suggest anything
19 untoward.
20     MS. O'DELL:  I want the record
21 to be clear.
22     MS. BROWN:  As do we.
23     MS. O'DELL:  So I will -- happy
24 to ask my office for the other

Page 41

1  documents.
2      MS. BROWN:  Terrific.  And so
3  we'll request the original invoices
4  that came from Dr. Wolf.
5  BY MS. BROWN:
6      Q.   A couple of questions,
7  Doctor --
8      MS. O'DELL:  There weren't
9  invoices.  Fair enough.  You've made
10 your statement, but that's not what
11 they were.
12     MS. BROWN:  We're on the same
13 page.
14     MS. O'DELL:  Not maybe -- maybe
15 we're not.  But anyway, we will -- I
16 will ask for whatever the list was
17 that was originally received.
18 BY MS. BROWN:
19     Q.   Now, Dr. Wolf, the first
20 document we have in Exhibit 5, includes the
21 hours that you billed to Beasley Allen for
22 your work in January 2017.  True?
23     A.   Yes.
24     Q.   And the very first entry that

11 (Pages 38 to 41)

Judith K. Wolf, M.D.

Page 42

1   you have here is for a one and a half hour
2   meeting with Margaret Thompson.  True?
3        A.    Yes.
4        Q.    Who is Margaret Thompson?
5        A.    Margaret Thompson is one of the
6   attorneys for Beasley Allen.
7        Q.    Okay.  And how is it -- and
8   Ms. Thompson's here today; is that right?
9        A.    Yes.  She's sitting right
10  there.
11       Q.    And how is it that you came to
12  meet Ms. Thompson?
13       A.    So one of my neighbors, her
14  name is Ali Gallagher, lives in the same
15  building as I do.  She is an attorney and
16  also a nurse practitioner by training.  And I
17  met her at a social setting in the lobby of
18  my building.  We have happy hours on Fridays.
19  And we sort of became friendly and talked and
20  then we became friends after that.  She knows
21  what I do for a living.  I'm a gynecologic
22  oncologist and take care of women with
23  ovarian cancer.
24             And one day we were talking

Page 43

1   about work, because she has a medical
2   background and lots of people ask me about
3   work, even if they don't.  And we came about
4   talk -- she may have asked me, do I know
5   anything about talc and ovarian cancer, and I
6   said I was aware of articles about the risk
7   of talcum powder and ovarian cancer, and she
8   mentioned that she had a friend, a colleague,
9   who was working on a case.  And I said I
10  would be interested in becoming more
11  involved, in learning more about it, so she
12  introduced us.
13       Q.    To your knowledge, is
14  Ms. Gallagher an attorney at Beasley Allen?
15       A.    To my knowledge, she is not.
16       Q.    To your knowledge, is she a
17  plaintiffs' attorney?
18       A.    To my knowledge, I don't really
19  know what kind of law she practices.
20       Q.    Okay.  And what is your
21  understanding of how Ms. Gallagher knows
22  Ms. Thompson?
23             MS. O'DELL:  If you know.
24       A.    You know what?  I don't really

Page 44

1   know.  I know that they both have lived in
2   Austin for a long time.
3   BY MS. BROWN:
4        Q.    When did this conversation take
5   place?
6        A.    I don't remember.  Sometime
7   before January of 2017, but I don't remember
8   the date.  And it had to happen after 2015,
9   because I didn't meet her until then, so
10  sometime in that two-year period.
11       Q.    Okay.  And what did she tell
12  you about the question of talc and ovarian
13  cancer?
14       A.    She was --
15             MS. O'DELL:  Are you referring
16  to Ms. Gallagher?
17             MS. BROWN:  Yeah.  Thank you.
18  BY MS. BROWN:
19       Q.    I want to talk a little bit
20  about the conversation with Ms. Gallagher.
21       A.    Yeah.
22       Q.    As I understand it, this was
23  the first conversation you had regarding this
24  potential expert witness work; is that right?

Page 45

1        A.    Yes.
2        Q.    Okay.
3        A.    So the conversation -- again,
4   the conversation happened more than two years
5   ago.  My recollection was she asked me did I
6   know anything about the risk of ovarian
7   cancer in talcum powder use, and then we
8   started talking about it and I told her I
9   knew a little, I was aware of some
10  epidemiologic data suggesting it.  And she
11  said she was asking because she had -- she
12  knew that there was some litigation about it.
13  And I said, one of my concerns with ovarian
14  cancer is there's very little we can do to
15  cure women.  They present late, there's no
16  screening tests, the symptoms are nonspecific
17  and that if there's something that we can do
18  to prevent it, it would be helpful.  And the
19  conversation went on and she asked me would I
20  be interested in talking to the people she
21  knew who were involved in the case, and I
22  said yes.
23       Q.    And in 2015, where were you
24  working, Dr. Wolf?

12 (Pages 42 to 45)

Judith K. Wolf, M.D.

Page 46

1      A.    In 2015, I was working for a
2  diagnostic company called Vermillion, and I
3  was doing some clinical medicine as locum
4  tenens covering practices here and there,
5  just so I could keep my clinical skills up.
6      Q.    And where were you doing your
7  clinical medicine during your time at
8  Vermillion?
9      A.    At -- in Atlanta and in
10  Indianapolis.
11      Q.    What facility in Atlanta?
12      A.    Northwest Memorial, I believe
13  is the name of the hospital.
14      Q.    And what was the other location
15  where you performed --
16      A.    Community Health in
17  Indianapolis.
18      Q.    And so were you a physician on
19  staff at both of those locations?
20      A.    On staff at the hospital, yes.
21      Q.    And Vermillion, of course, was
22  aware of your clinical practice as well?
23      A.    Yes.
24      Q.    Okay.  And how many patients

Page 47

1  would you say you were treating at that time?
2      A.    You know, I was only
3  intermittently treating, so I can't really
4  give you a number.  I don't know.
5      Q.    Did you have set office hours
6  or hospital hours during that time period?
7      A.    In Atlanta, I covered probably
8  three or four weeks a year when the doctors
9  were on vacation.  In Indianapolis, when I
10  started, that's what I was doing.  There was
11  one doctor and when he was gone, there was no
12  one to cover.
13      Q.    Fair to say clinical medicine
14  was a small part of your practice during the
15  time period you were at Vermillion?
16      A.    Yes.
17      Q.    Did you treat any ovarian
18  cancer patients during the time period you
19  worked for Vermillion?
20      A.    Yes.
21      Q.    About how many patients would
22  you estimate you treated during that time
23  period?
24      A.    I don't remember how many

Page 48

1  patients I treated.  I would say that, in
2  general, my practice in the last five years
3  has been about a third ovarian cancer and
4  about 50 percent endometrial cancer.
5      Prior to 2014, when I was
6  practicing full time GYN oncology, more than
7  50 percent of my practice was ovarian cancer
8  because patients came from around the country
9  to see me, specifically with that issue.
10      Q.    And that was during the time
11  period you were practicing at MD Anderson?
12      A.    In Houston at MD Anderson and
13  at Banner health -- Banner MD Anderson in
14  Arizona.
15      Q.    And as I understand, you left
16  MD Anderson to go to Vermillion, correct?
17      A.    I left MD Anderson in Houston
18  to go to MD Anderson in Arizona.  I left
19  Arizona to go to Vermillion.
20      Q.    Okay.  And then from Vermillion
21  you went to another start-up?
22      A.    Provista Diagnostics, yes.
23      Q.    Did you continue to treat
24  patients while you were at Provista?

Page 49

1      A.    I did.
2      Q.    At the same two locations?
3      A.    I don't believe I covered any
4  more in Atlanta, because the need was greater
5  in Indianapolis and, in fact, the last year
6  that I was working at Provista, I was
7  covering one week a month in Indiana.
8      Q.    In what states are you licensed
9  to practice medicine?
10      A.    My active licenses are in
11  Indiana, Georgia and Arizona.
12      Q.    And you no longer have an
13  active license in Texas; is that right?
14      A.    That's correct.
15      Q.    Any other states that are no
16  longer active for you?
17      A.    Minnesota.
18      Q.    And then as I understand it,
19  you left Provista in about January of 2017?
20      A.    No, I left Provista just -- my
21  official last day was October 1st of 2018.
22      Q.    And so during part of the time
23  when you began your expert work for the
24  plaintiffs' lawyers in the talc litigation,

13 (Pages 46 to 49)

Judith K. Wolf, M.D.

Page 50

1  you were working at Provista; is that right?
2      A.    That's correct.
3      Q.    Okay.  Did you do any of
4  work -- any expert work for plaintiffs'
5  lawyers in the talc litigation while you were
6  working at Vermillion?
7      A.    Let me think about that.  Yes,
8  I believe I did.
9      Q.    Did you disclose to Vermillion
10  your work for plaintiffs' lawyers in the talc
11  litigation?
12          MS. O'DELL:  If you did -- if
13      you did any work during that time
14      period.
15      A.    Yeah, I don't recall.  I don't
16  recall.
17  BY MS. BROWN:
18      Q.    Do you recall if Vermillion had
19  a policy about its officials doing expert
20  witness work?
21      A.    My recollection was that they
22  did not have a policy.
23      Q.    And what were the circumstances
24  that led to you leaving Provista in October

Page 51

1  of 2018?
2      A.    Provista?  I could see that the
3  company was having trouble getting funding,
4  and, in fact, on October 1st, 2018, the
5  company shut down.  And so I had already been
6  looking and I knew that Indiana wanted me to
7  come there, so...
8      Q.    So when you say "the company
9  shut down," what do you mean by that?
10      A.    They dissolved.
11      Q.    Was there any investigation
12  into the company that led to the dissolution?
13      A.    No, it was just -- ran out of
14  money, couldn't find new investors.
15      Q.    And since October of 2018,
16  you've been working at the Indiana --
17  Indianapolis location?
18      A.    Yes.
19      Q.    Okay.  What's the name of that?
20      A.    Community Health Network.
21      Q.    And you're a physician there
22  part-time; is that right?
23      A.    That's correct.
24      Q.    And how many -- what percentage

Page 52

1  of your time would you say is devoted to
2  treating patients at the Community Health
3  Network?
4      A.    60.
5          MS. O'DELL:  Just for
6      clarification, are you asking for her
7      time she's working at Community Health
8      in Indianapolis, what percentage of
9      her time is devoted to treating
10      patients, or are you asking overall?
11      It was just confusing.
12          MS. BROWN:  So the question --
13      I'm looking at the real time.  The
14      question said, "devoted to treating
15      patients at Community Health Network."
16          MS. O'DELL:  Okay.  Thank you.
17  BY MS. BROWN:
18      Q.    Doctor, the final document that
19  the lawyer for the plaintiffs, Ms. O'Dell
20  gave me this morning, is -- we will mark as
21  Exhibit 6, which appears to be an updated CV
22  for you, dated January 4th, 2017.
23          (Deposition Exhibit 6 marked
24      for identification.)

Page 53

1  BY MS. BROWN:
2      Q.    Do you have a copy in front of
3  you?
4      A.    Yes, I do.
5      Q.    So the copy that was attached
6  to your report, I believe was dated 2016.
7      A.    Yes.
8      Q.    Now, why would that be?
9      A.    Because from the time I started
10  working with a company actually, I haven't
11  had an assistant to help me update it and I'm
12  not -- I haven't been good at keeping it
13  updated.
14      Q.    Well, here's what I'm trying to
15  understand.  We got Exhibit 6, which is dated
16  January of 2017, correct?
17      A.    Oh, it should be 2018.  That's
18  my -- see, I'm not a good typist.
19      Q.    So the correct date of
20  Exhibit 6 is really January 4th, 2018.
21      A.    That's correct.
22          MS. O'DELL:  Should it be 2019?
23      A.    '19.  '19.
24

14 (Pages 50 to 53)

Judith K. Wolf, M.D.

1  BY MS. BROWN:
2      Q.   Okay.  I think we're all on the
3  same page now.  All right.  And you've
4  updated this with additional employment that
5  you've had --
6      A.   Yes.
7      Q.   -- since the time of your
8  last --
9      A.   And a few publications that
10  weren't on there.
11      Q.   Have you ever -- just to speak
12  generally about your resumé, Doctor, have you
13  ever published any peer-reviewed article
14  regarding talcum powder and ovarian cancer?
15      A.   No.
16      Q.   Have you ever given any
17  presentation regarding talcum powder and
18  ovarian cancer?
19      A.   No.
20      Q.   Have you ever been invited to
21  speak at any conference that dealt with
22  issues regarding talcum powder and ovarian
23  cancer?
24      A.   No.

1      Q.   I've seen over the years,
2  Doctor, you've done some popular press and
3  news segments; is that right?
4      A.   Yes.
5      Q.   Have you ever given any news
6  interviews regarding talcum powder and
7  ovarian cancer?
8      A.   No.
9      Q.   You have, however, been an
10  advocate for women's health issues over the
11  years, correct?
12      A.   Yes.
13          MS. O'DELL:  Object to the
14      form.
15  BY MS. BROWN:
16      Q.   And you've given a number of
17  issues -- a number of interviews regarding
18  ovarian cancer; is that fair?
19      A.   Yes.
20      Q.   Including the causes of ovarian
21  cancer.  True?
22      A.   In the popular -- are you
23  asking me about in the popular press?
24      Q.   Uh-huh.

1      A.   In the popular press, I have
2  talked about the use of birth control pills
3  to reduce the risk of ovarian cancer, I've
4  talked about the symptoms of ovarian cancer,
5  I've talked about some of my research and
6  treatment of ovarian cancer.  I don't recall
7  that I specifically talked about the risk of
8  ovarian cancer.
9      Q.   Do you recall -- have you ever
10  spoken -- have you ever gone on any -- strike
11  that.
12          Have you ever done any news
13  interviews in which you have indicated your
14  opinion in this case, which is that you
15  believe that talc -- talcum powder causes
16  ovarian cancer?
17      A.   I have not.  But until I
18  started reviewing all the literature for this
19  case, I was generally aware of some
20  epidemiologic studies, but I wasn't as
21  convinced after reviewing the entire body of
22  literature that I was able to review, that
23  talcum powder causes ovarian cancer in some
24  women and puts all women who use it at risk

1  for ovarian cancer.
2      Q.   Prior to being hired as an
3  expert witness for plaintiff lawyers in the
4  talcum powder litigation, you, Dr. Wolf, were
5  not as convinced that talcum powder causes
6  ovarian cancer.  True?
7          MS. O'DELL:  Object to the
8      form, misstates her testimony.
9      A.   Prior to being hired, I hadn't
10  reviewed all the literature to be able to
11  formulate my opinion.
12  BY MS. BROWN:
13      Q.   Prior to being hired by
14  plaintiffs' lawyers in the talcum powder
15  litigation, you did not hold the opinion that
16  talcum powder causes ovarian cancer, correct?
17          MS. O'DELL:  Object to the
18      form.
19      A.   Prior to reviewing all the
20  literature for this case, I wasn't aware of
21  all the literature.  I would say that I was
22  aware that there was some indication that
23  talcum powder increased the risk of ovarian
24  cancer.  What I was always told when I

Judith K. Wolf, M.D.

Page 58

1 brought that up was that, not to worry,
2 talcum powder doesn't contain asbestos
3 anymore and so that data is old and it
4 doesn't matter.
5        After reviewing all the
6 literature and the information that I have
7 seen, I don't believe that's true anymore.
8 BY MS. BROWN:
9    Q.    You have formed the opinion
10 that talcum powder causes ovarian cancer
11 since being hired by the plaintiffs' lawyers
12 in the talcum powder litigation, correct?
13        MS. O'DELL: Object to the
14    form.
15    A.    I want to think about how I
16 want to answer that, because the question is
17 a little confusing to me because I believe
18 what I said was, until I was aware of all of
19 the literature and looked at it as a whole,
20 all of the evidence, I hadn't formed the
21 opinion that talcum powder causes ovarian
22 cancer. I knew there was data that suggests
23 that talcum powder product increases the risk
24 of ovarian cancer and once I had all the

Page 59

1 information, I fully believe it. And now I
2 tell all my patients, whether they have
3 ovarian cancer or not, not to use it or to
4 stop using it if they are. I tell all my
5 friends and family the same thing.
6 BY MS. BROWN:
7    Q.    Prior to reviewing all of the
8 literature regarding talcum powder and
9 ovarian cancer, it was not your practice, as
10 a gynecologic oncologist, to tell your
11 patients not to use talcum powder. True?
12    A.    Prior to reviewing all the
13 literature, I think it was not my practice to tell
14 patients, but I believe that I was naive, and
15 that when I take care of patients that come
16 to me that have cancer or they think they
17 have cancer, this was not something that I
18 focused on because I wasn't spending my time
19 reviewing all the literature.
20    Q.    You practiced, Doctor, as a
21 gynecologic oncologist in a number of
22 different institutions for nearly 30 years
23 before being hired by plaintiffs' lawyers; is
24 that true?

Page 60

1    A.    Twenty-four years.
2    Q.    And for the 24 years that you
3 practiced as a gynecologic oncologist prior
4 to being hired by the plaintiffs' lawyers, it
5 was not your regular practice to ask your
6 patients if they used talcum powder. True?
7        MS. O'DELL: Object to the
8    form.
9    A.    Prior to reviewing all the
10 literature and becoming convinced that it was
11 a concern, it was not my regular practice.
12 BY MS. BROWN:
13    Q.    And you keep answering the
14 question by saying "prior to reviewing all
15 the literature." You reviewed all of the
16 literature at the request of the plaintiffs'
17 lawyers, correct?
18        MS. O'DELL: Object to the
19    form, asked and answered.
20    A.    I reviewed all the literature
21 when I got -- when I wanted to learn more
22 about it, to become involved with deciding on
23 my own, whether this was something that I
24 should be concerned about. And if I reviewed

Page 61

1 the literature and felt there was no concern,
2 I would have a different opinion.
3 BY MS. BROWN:
4    Q.    You reviewed all of the
5 literature regarding talcum powder and
6 ovarian cancer at the request of the
7 plaintiffs' lawyers, correct?
8    A.    You're asking me at the
9 "request," and I -- that's the word that I'm
10 not -- I don't recall that being asked, but
11 the question at hand was, does talcum powder
12 cause ovarian cancer?
13    Q.    I think I understand the
14 disconnect. You reviewed all of the
15 literature regarding talcum powder and
16 ovarian cancer in connection with your work
17 to answer a question that the plaintiffs'
18 lawyers asked you; is that fair?
19    A.    In connection with this work, I
20 reviewed all of the literature.
21    Q.    Okay. So if we wanted to date
22 the time at which you formed the opinion that
23 talcum powder causes ovarian cancer, it would
24 be after the time that you were hired by the

16 (Pages 58 to 61)

Judith K. Wolf, M.D.

1 plaintiffs' lawyers, correct?
2      A.    I would say the date that I was
3 convinced that talcum powder products cause
4 ovarian cancer was after I reviewed all the
5 literature. Prior to that, I knew that there
6 was some papers that suggested there was a
7 risk, but I didn't review all the literature
8 to formulate an opinion about it.
9      Q.    And the reason that you
10 formulated an opinion by reviewing all of the
11 literature, was because you had been hired as
12 an expert witness by plaintiffs' lawyers.
13 True?
14           MS. O'DELL:  Object to the
15      form.
16      A.    I'm confused with the question.
17 Because --
18 BY MS. BROWN:
19      Q.    Well, let me see if I can
20 orient you, Dr. Wolf.  Here's what we're
21 trying to understand.  I understand your
22 testimony was that for about 24 years as a
23 practicing gynecologic oncologist, the
24 potential association between talcum powder

1 and ovarian cancer was not something you
2 were, quote, focused on; is that right?
3           MS. O'DELL:  Object to the
4      form.
5      A.    It's not something that I was
6 researching.
7 BY MS. BROWN:
8      Q.    Okay.  Nonetheless, you worked
9 as an advocate for women's health during
10 those 24 years.  True?
11      A.    Most of those years.
12      Q.    You published a number of
13 papers in the area of women's health,
14 correct?
15      A.    Yes.
16      Q.    You were invited to a number of
17 conferences and seminars and symposia on
18 issues regarding ovarian cancer and women's
19 health.  True?
20      A.    Yes.
21      Q.    You published chapters in
22 textbooks regarding ovarian cancer.  True?
23      A.    Yes.
24      Q.    You gave interviews to women's

1 health publications and went on TV shows,
2 like Dr. Oz.  True?
3      A.    Yes.
4           MS. O'DELL:  Object to the
5      form.
6 BY MS. BROWN:
7      Q.    And during those 24 years, you
8 did not publish, write or speak about the
9 opinion that talcum powder causes ovarian
10 cancer, correct?
11      A.    What I published was my
12 research, which was on talcum powder
13 products and ovarian cancer.  What I spoke
14 about was what I was asked to speak about,
15 which was not talcum powder and ovarian
16 cancer.  When I was on the public -- when I
17 was on the television or in the news, there
18 was specific questions that I was being asked
19 to speak about.  They were not talcum powder
20 and ovarian cancer.
21      Q.    But to be fair, some of the
22 questions you were asked about is, what
23 increases a woman's risk for ovarian cancer,
24 right?

1           MS. O'DELL:  Object to the
2      form.
3      A.    I don't remember the questions
4 that I was asked about on Dr. Oz.  I know
5 that the purpose for me to go on that was to
6 talk about the reduction in the risk of
7 ovarian cancer by using birth control pills
8 and I don't remember all of the questions.
9 As far as I can recall, the other times I was
10 on the news, that was not a question that was
11 raised.
12 BY MS. BROWN:
13      Q.    When is the first date you can
14 recall forming the opinion that you've
15 provided in your expert report in the MDL?
16           MS. O'DELL:  Object to the
17      form.  Are you moving off going
18      through the -- sort of the notice and
19      the documents requested?  I'm not --
20           MS. BROWN:  Shortly.  You
21      almost ready for a break?
22           MS. O'DELL:  Well, probably in
23      the next five minutes or so, but what
24      I was going to say and I neglected to

17 (Pages 62 to 65)

Judith K. Wolf, M.D.

Page 66

1    say earlier is, there were certain
2    documents that were requested through
3    the notice.  And just for the record,
4    I wanted to state that plaintiffs
5    served objections to certain of those
6    requests and we produced documents
7    here consistent with those objections.
8         MS. BROWN:  Right.  We're in
9    receipt of your objections.
10   BY MS. BROWN:
11        Q.   So Doctor, what -- let's mark
12   your report as Exhibit 7.
13        (Deposition Exhibit 7 marked
14        for identification.)
15   BY MS. BROWN:
16        Q.   And my question for you is
17   that -- when's the first date by which you
18   formed the opinions that are contained in
19   this report that we've marked as Exhibit 7?
20        MS. O'DELL:  Object to the
21        form.
22        A.   I cannot recall the first date.
23   BY MS. BROWN:
24        Q.   Okay.  At the time that you

Page 67

1    were approached by Ms. Gallagher in 2005, you
2    did not hold the opinion that talcum powder
3    causes ovarian cancer, correct?
4         MS. O'DELL:  Object to the
5         form.
6         A.   I didn't meet Ms. Gallagher
7    till 2015.
8    BY MS. BROWN:
9         Q.   Correct.  I misspoke.  I'm
10   sorry.
11        A.   And the question was, I did not
12   hold the opinion that -- I had concerns about
13   talcum powder uses in ovarian cancer and I
14   had enough concerns that I was interested
15   enough to become involved in learning more
16   about it.
17        Q.   To close the loop, then,
18   Doctor, on the requests we made in the
19   deposition notice that we've marked as
20   Exhibit 1, we've marked a number of documents
21   that lawyers for the plaintiffs produced
22   early this morning.  We're aware of the
23   objections that lawyers for the plaintiffs
24   have made.

Page 68

1         Is there anything else that
2    you've brought with you today in response to
3    our requests contained in Exhibit 1?
4         MS. O'DELL:  Other than the
5         notebooks she's brought for her
6         reference materials?
7         A.   No, I haven't -- I brought
8    this -- it has my report and my reference
9    list and my CV.  These are all my references
10   and all of that is contributing material.
11   BY MS. BROWN:
12        Q.   Okay.  So for the record, let's
13   identify what you've just pointed out to us.
14   You have a small binder in front of you --
15        A.   Yeah.
16        Q.   -- which appears to be tabbed.
17   Did you do that tabbing?
18        A.   I did.  And it just sort of
19   says which section is which in my report.
20        Q.   Do you have any notes in your
21   report, other than the tabs?
22        A.   No.
23        Q.   Okay.  And what else is
24   contained in that binder?

Page 69

1         A.   My CV and then this is a list
2    of all of the contributing material.
3         Q.   And then you have next to you
4    three larger binders, which I think you said
5    contain the references in the report; is that
6    right?
7         A.   The references and also the
8    other articles that you were provided, the
9    new are in these and then that's all the
10   contributing material.
11        Q.   Okay.  And so for the record,
12   behind you there's probably another ten or 12
13   binders that you're suggesting contain the
14   documents contained in -- listed in Exhibit B
15   to your report?
16        A.   That's correct.
17        Q.   Okay.  You didn't type Exhibit
18   B to your report, did you, Doctor?
19        A.   I did not type it.
20        Q.   Do you know where Exhibit B to
21   your report came from?
22        A.   The attorneys typed it up for
23   me from all of my reference -- contributing
24   material.

18 (Pages 66 to 69)

Judith K. Wolf, M.D.

Page 70

1    Q.    Okay.  Did the attorneys
2  provide you with all of the materials that
3  are listed on Exhibit B?
4    A.    No.
5    Q.    Which of the materials on
6  Exhibit B were provided by the attorneys?
7    A.    I can't tell you.  It's a mix
8  of what I provided them, what they provided
9  me, what I asked them to provide to me.
10   Q.    Well, let's start by
11  understanding the difference between your
12  reference list on page 18 of your report and
13  then Exhibit B to your report.  Can you
14  explain to me the difference there?
15   A.    The reference lists are
16  articles that I actually reference in my
17  report.  And this is all the articles that
18  I -- or pieces of information that I
19  considered when drafting my report.
20   Q.    Did you consider every piece of
21  information that's listed on the 28-page
22  Exhibit B?
23   A.    Yes.
24   Q.    Did you read every entry on the

Page 71

1  28-page Exhibit B?
2    A.    I did not read every word of
3  every entry.  Some of them I looked at a
4  piece of it, if it was a reference from
5  something else that I wanted to confirm.
6  Some of it I looked at and set aside, didn't
7  feel like it was added -- additive or
8  pertinent to what I was reviewing.  And --
9  but these are all of the things that I looked
10  at in some way.
11   Q.    How did you maintain all of the
12  documents contained at Exhibit B?  And by
13  that I mean, do you have all of these
14  documents electronically or do you have a
15  hard copy at your house or office?
16   A.    Both.
17   Q.    Okay.  You have a -- hard
18  copies of every document contained on Exhibit
19  B?
20   A.    Yes.
21   Q.    Okay.  So you have 12 binders
22  in hard copy?
23   A.    Yes.
24   Q.    Do they have notes on them?

Page 72

1    A.    No.
2    Q.    Did you take any notes when you
3  were reviewing any of the materials cited in
4  your report?
5    A.    I didn't take separate notes.
6  What I did was, I started writing things down
7  and used that as the draft of my report and
8  then just updated it every time I read more,
9  changed more, added, subtracted to it.
10   Q.    Take a look, if you would, at
11  page 13 of Exhibit B.  There are a number of
12  entries that begin with the letters J&J.  Do
13  you see that?
14   A.    I do.
15   Q.    What are those?
16   A.    Those are internal documents
17  from J&J that were provided to me from the
18  plaintiffs' attorneys.
19   Q.    And did you request internal
20  documents be provided to you from the
21  plaintiffs' lawyers?
22   A.    Some of them I might have
23  requested and some of them were provided to
24  me.  But I can't tell you which is which by

Page 73

1  looking at that list.
2    Q.    In the normal course of your
3  practice as a gynecologic oncologist, do you
4  review internal company documents in making
5  medical decisions?
6    A.    I don't have access to them.
7        MS. O'DELL:  Object to the
8     form.
9  BY MS. BROWN:
10   Q.    So as part of your work as a
11  treating physician, you don't rely on
12  internal company documents.  Fair?
13       MS. O'DELL:  Object to the
14     form.
15   A.    I don't have access to internal
16  company documents.
17  BY MS. BROWN:
18   Q.    So you don't rely on them,
19  right?
20       MS. O'DELL:  Object to the
21     form.
22   A.    Well, I don't have access to
23  them.
24

19 (Pages 70 to 73)

Judith K. Wolf, M.D.

Page 74

1  BY MS. BROWN:
2      Q.   Do you have any -- so that
3  means you haven't used them in your practice
4  as a gynecologic oncologist, right?
5          MS. O'DELL:  Object to the
6      form.
7      A.   Not that I recall.
8  BY MS. BROWN:
9      Q.   And the 20-some-odd J&J
10 documents you have listed here at Exhibit 13,
11 do you have any idea what percentage of the
12 entire document production from J&J these 20
13 documents comprise?
14     A.   Of all of J&J's internal
15 documents?  I don't.
16     Q.   Was it important to you, to
17 consider the context of all of the internal
18 documents you have cited at Exhibit 13?
19         MS. O'DELL:  Object to the
20     form.
21     A.   Say that again.
22 BY MS. BROWN:
23     Q.   Was it important to you --
24 first of all, did you request that the

Page 75

1  lawyers give you some of these internal
2  documents?
3      A.   I don't recall specifically if
4  I requested these or they gave them to me.  I
5  just don't recall.
6      Q.   Do internal J&J documents form
7  the basis of your opinions in this
8  litigation?
9          MS. O'DELL:  Object to the
10     form.
11     A.   The basis of my opinion is the
12 review of everything that I looked at in
13 total, not -- there isn't any one thing that
14 forms the basis of my opinion.  It's the
15 whole of the evidence.
16 BY MS. BROWN:
17     Q.   Okay.  So identify for me what
18 information in the internal Johnson & Johnson
19 documents you're relying on to form your
20 opinion.
21     A.   Well, these are in my
22 contributing data lists, not in my reference
23 lists.  So I'd have to look at all of them
24 to --

Page 76

1      Q.   I want to know -- sitting here
2  today, it's my opportunity to understand what
3  forms the basis of your opinions and I want
4  know if there's information in an internal
5  Johnson & Johnson document that forms the
6  basis of your opinion that talc causes
7  ovarian cancer.
8          MS. O'DELL:  Objection, asked
9      and answered.
10     A.   My opinion is not based on any
11 one single document or any one single source
12 of documents.  It's the whole of the
13 documents that I reviewed.
14 BY MS. BROWN:
15     Q.   So what information do you rely
16 on from the whole of the 20 J&J documents you
17 looked at?
18         MS. O'DELL:  Objection,
19     mischaracterizes the witness's
20     testimony.
21     A.   So I'm going to say that this
22 is my contributing materials list.  It's not
23 even -- none of the -- those internal
24 documents are referenced in my -- in my

Page 77

1  opinion.  So I don't know how else to answer
2  to you, other than to say I looked at all of
3  the evidence.  The things that I felt were
4  important, I referenced in my opinion.  I
5  don't recall what's in all of those.
6  BY MS. BROWN:
7      Q.   So there are internal company
8  documents listed on page 13 of Exhibit B, the
9  contents of which, sitting here today, you're
10 unaware of; is that fair?
11         MS. O'DELL:  Object.  That
12     misstates her testimony.
13     A.   What I --
14         MS. O'DELL:  Excuse me.  Object
15     to the form of the question.
16         You may answer.
17     A.   What I said is, I can't recall
18 what those individually are, sitting here
19 today.  I could look at them if you'd like me
20 to.
21 BY MS. BROWN:
22     Q.   Well, I want you to do that if
23 it forms the basis of your opinion.  If it
24 doesn't and it's just something that was

20 (Pages 74 to 77)

Judith K. Wolf, M.D.

Page 78

1 given to you by the plaintiffs' lawyers, we
2 can move on. But if there's something in the
3 20 documents that the plaintiffs' lawyers
4 have listed on page 13 of Exhibit B to your
5 report that forms the basis of your opinion,
6 I want to know what that is.
7         MS. O'DELL: Objection to the
8     form, asked and answered three times
9     now.
10    A.    The basis of my opinion is not
11 formed by any one document.
12 BY MS. BROWN:
13    Q.    Is the basis of your opinion
14 formed, in part, by internal Johnson
15 & Johnson documents?
16        MS. O'DELL: Object to the
17    form.
18    A.    I would have to look at all of
19 those documents again to tell you if there
20 was something specifically in there and what
21 the -- I just -- they're numbers to me.
22 Looking at them here, I don't recall that --
23 what's in each one of those to tell you if
24 there's something specifically that formed my

Page 79

1 opinion.
2         MS. O'DELL: And you're
3     referring to page 13.
4         THE WITNESS: Of Exhibit B.
5         MS. O'DELL: Of Exhibit B.
6     We've been going about an hour and ten
7     minutes.
8 BY MS. BROWN:
9     Q.    Sure. I'll just finish real
10 quick on the company documents. If you just
11 look at page 12 of your report, you list a
12 number -- sorry, Exhibit B to your report,
13 you list a number of Imerys entries. Do you
14 see that there?
15    A.    I do.
16    Q.    Who is Imerys?
17    A.    Imerys is a mining company.
18    Q.    Did you select these internal
19 Imerys documents to review?
20    A.    These were provided to me.
21    Q.    And same with the J&J document,
22 did you select those to review or were they
23 provided to you?
24        MS. O'DELL: Objection to the

Page 80

1 form. I think Dr. Wolf stated
2 previously they were provided to her
3 because they weren't available
4 elsewhere.
5         MS. BROWN: Well, I need her to
6     say that, though. I need that
7     testimony from her.
8 BY MS. BROWN:
9     Q.    Dr. Wolf, did you -- were the
10 J&J documents on page 13 provided to you by
11 plaintiffs' lawyers?
12        MS. O'DELL: Object to the
13    form.
14    A.    The documents were provided to
15 me by plaintiffs' lawyers.
16 BY MS. BROWN:
17    Q.    And are you -- can you provide
18 us with an understanding of the methodology
19 the plaintiffs' lawyers employed in terms of
20 which documents to select for your review?
21        MS. O'DELL: Object to the
22    form, asked and answered.
23    A.    I'm not sure what you're
24 asking.

Page 81

1 BY MS. BROWN:
2     Q.    Do you have an understanding of
3 how the plaintiffs' lawyers went about
4 picking the 20 J&J documents and the 15
5 Imerys documents that appear on Exhibit B to
6 your report?
7         MS. O'DELL: Object to the
8     form.
9     A.    I didn't specifically ask them
10 how they came about finding them, looking for
11 them, if that's what you're asking me.
12 BY MS. BROWN:
13    Q.    Do you have any understanding,
14 sitting here today, of how the internal
15 documents listed on page B of your report,
16 were compiled for your review?
17        MS. O'DELL: Object to the
18    form, asked and answered.
19    A.    I'm not aware of how the
20 plaintiffs' attorneys compiled the report. I
21 didn't ask them their methodology.
22 BY MS. BROWN:
23    Q.    Having reviewed the internal
24 documents that the plaintiffs' lawyers gave

21 (Pages 78 to 81)

Judith K. Wolf, M.D.

Page 82

1  you, did you ask them for additional internal
2  documents?
3      A.   I don't recall.
4      Q.   Did you ask the plaintiffs'
5  lawyers any questions about any of the
6  internal documents they provided you?
7          MS. O'DELL:  Excuse me, I'm
8  going to object to that question.
9          MS. BROWN:  I'll rephrase.
10         MS. O'DELL:  You're not
11 entitled to understand --
12         MS. BROWN:  I'll rephrase --
13         (Simultaneous discussion
14 interrupted by reporter.)
15         MS. O'DELL:  Let me finish my
16 objection before you interrupt me.
17         MS. BROWN:  Sure.
18         MS. O'DELL:  So she's not
19 entitled to ask you questions about
20 your conversations with counsel.
21         MS. BROWN:  That's not entirely
22 true.
23 BY MS. BROWN:
24     Q.   I'm certainly entitled to know

Page 83

1  about information that counsel provided to
2  you that you're relying on to form your
3  opinions.  So I will rephrase the question to
4  ask just for whether you asked for any -- you
5  have any questions about these internal
6  documents that you asked of plaintiffs that
7  you are relying on for your opinions here?
8          MS. O'DELL:  Dr. Wolf, I'm
9  going to instruct you not to discuss
10 conversations you had with counsel.
11         You're certainly entitled,
12 under the rules, to know what
13 materials were provided for Dr. Wolf,
14 which we are doing that, but you're
15 not entitled to understand any
16 conversations that occurred between
17 Dr. Wolf and counsel.  I'm going to
18 instruct the witness not to answer.
19         MS. BROWN:  But that's not the
20 law.  So the law is --
21         MS. O'DELL:  The law is --
22         MS. BROWN:  Let me finish.  I
23 let you put your statement on the
24 record.  Let me just finish.

Page 84

1          MS. O'DELL:  Fair enough.
2          MS. BROWN:  If she asked you,
3  as lawyers for the plaintiffs, for any
4  information on which she is relying
5  for her opinion, then that's
6  discoverable.  And so my question -- I
7  appreciate your work-product concern.
8  My question is meant to stay within
9  the bounds of the Federal Rules, which
10 is that -- was there any information
11 that you provided her about these
12 documents on which she is relying to
13 form her opinion.  That's
14 discoverable.
15         MS. O'DELL:  That's not the
16 question you asked her.
17         MS. BROWN:  Yes, absolutely.
18         MS. O'DELL:  You asked if she
19 asked any questions, which goes to
20 communication.  And what the rule
21 allows discovery on are the materials
22 provided to Dr. Wolf, which are
23 available here for your review.
24 They're available from the list that

Page 85

1  you've been provided.  You're not
2  entitled to any discussions, and that
3  was what the question focused on.  So
4  why don't we --
5          MS. BROWN:  We are entitled --
6  I just want to finish this question
7  and we'll absolutely take a break.  We
8  are entitled to any information,
9  verbal or otherwise that you may have
10 given her, if she's relying on it.
11 And so I will rephrase the question to
12 make clear, that all I want to know is
13 if she asked the lawyers a question
14 about the documents, the answer to
15 which she relies on for her opinion.
16 That is 100 percent discoverable.
17         MS. O'DELL:  It is not.  That's
18 a communication between counsel and
19 she's not going to testify.  Now, all
20 the materials that she's relying on
21 are present in the -- excuse me.
22 They're present before Dr. Wolf and on
23 the table beside Dr. Wolf.  Those are
24 the materials she's relying on and

22 (Pages 82 to 85)

Judith K. Wolf, M.D.

Page 86

1  you're welcome to ask all of the
2  questions you'd like.  But in terms of
3  communications between counsel and
4  Dr. Wolf, you're not entitled to
5  discover that and I'm going to
6  instruct the witness not to answer.
7          MS. BROWN:  Here's what we need
8  to do so we can take it to the judge.
9  I need an answer to the question, is
10  she relying on information from the
11  lawyers regarding the documents.  I
12  need -- that's a yes or no.  That's
13  not even questionable.  If she says
14  yes and you instruct her not to
15  answer, we'll take it to the judge.
16  We need an answer to that straight up.
17          MS. O'DELL:  So I want to make
18  sure I understand.  Are you asking her
19  if she relies on these materials?
20          MS. BROWN:  No.  Here's where
21  we are.  I want to know if she asked
22  the lawyers a question about the
23  documents, she got an answer and she's
24  relying on that answer to form the

Page 87

1  basis of her opinion, and that is
2  discoverable under the Federal Rules.
3  So we're going to start with that
4  question, did you rely on something
5  the lawyers told you about the
6  documents, and then if you want to
7  instruct from there, we'll tee it up
8  and talk to the judge about it because
9  that's discoverable.
10          MS. O'DELL:  I think the issue
11  is the discussion about "rely."  And
12  what -- but you're asking her about
13  discussions with counsel.  And that's
14  different.  And so she's not going to
15  testify about discussions with
16  counsel.  The materials that she
17  considered and she relied on are
18  present in front of her and to her
19  side.
20          MS. BROWN:  Let me --
21          MS. O'DELL:  That's what's
22  discoverable and that's where we're
23  going to stay.
24          MS. BROWN:  Okay.  We're

Page 88

1  missing each other, so let me ask my
2  question and you instruct.
3          MS. O'DELL:  I don't think we
4  are.
5          MS. BROWN:  We'll have it on
6  the record and be able to take it up.
7  For the record, my position is, any
8  information from counsel or otherwise,
9  on which the witness relies for her
10  opinion is plainly discoverable under
11  the Federal Rules.
12          MS. O'DELL:  Disagree with that
13  position.
14  BY MS. BROWN:
15      Q.   Dr. Wolf, one quick question
16  here, and then we'll certainly take a break.
17  I know we've been going a while.
18          Did counsel for the plaintiffs
19  provide you with any information regarding
20  internal company documents on which you are
21  relying to form the basis of your opinions in
22  this lawsuit?
23          MS. O'DELL:  Object to the
24  question.  And answer the question to

Page 89

1  the degree you understand it.  If you
2  don't understand the question, you
3  don't have to answer it, Dr. Wolf.
4      A.   My understanding of the
5  question, what I hear you asking me, is did I
6  ask counsel questions about this, information
7  I got from them, not from the documents but
8  from the answer to my question, did I use
9  that information to form my opinion?  The
10  answer to that is no.
11  BY MS. BROWN:
12      Q.   Thank you, Dr. Wolf.
13          MS. BROWN:  Why don't we go
14  ahead and take a break.
15          MS. O'DELL:  Okay.
16          MS. BROWN:  Thank you.
17          THE VIDEOGRAPHER:  Going off
18  the record.  The time is 10:21 a.m.
19          (Recess taken from 10:21 a.m.
20  to 10:33 a.m.)
21          THE VIDEOGRAPHER:  Back on the
22  record.  The time is 10:33 a.m.
23  BY MS. BROWN:
24      Q.   Welcome back, Dr. Wolf.

23 (Pages 86 to 89)

Judith K. Wolf, M.D.

Page 90

1     A.   Thank you.
2     Q.   Dr. Wolf, counsel for the
3   plaintiffs indicated to me earlier this
4   morning, that there are some additional
5   documents that you have reviewed since the
6   time of your report.  That would include the
7   pending health Canada risk assessment; is
8   that correct?
9     A.   Yes.
10    Q.   Okay.  When did you review
11  that?
12    A.   Sometime within the last few
13  weeks.  I don't remember the exact date.
14    Q.   Counsel indicated that you've
15  reviewed an article with the lead author
16  Taher, T-a-h-e-r; is that correct?
17    A.   That's correct.
18    Q.   When did you review that?
19    A.   Around the same time as the
20  Canadian health assessment.
21    Q.   Were both the health Canada
22  proposed report and the Taher article
23  provided to you by counsel for the
24  plaintiffs?

Page 91

1     A.   Yes.
2     Q.   Do you know if the Taher
3   article is publicly available yet?
4     A.   I don't know.  The copy that I
5   have says that it's submitted for publication
6   or is going to be submitted for publication.
7   I haven't done a search to see if it's
8   publicly available yet.
9     Q.   Have -- did you note in your
10  review of the Taher article, that it
11  references, in numerous places, supplemental
12  materials?
13    A.   Yes.
14    Q.   Have you reviewed the
15  supplemental materials on which Taher relies?
16    A.   I haven't reviewed them all.
17  Some of them I had reviewed otherwise, but
18  I -- I haven't reviewed them all, no.
19    Q.   Did plaintiffs' lawyers give
20  you access to the supplemental materials
21  relied on in Taher?
22    A.   I don't know.
23    Q.   Do you have those materials
24  with you here today?

Page 92

1     A.   I don't have the supplemental
2   materials.  I just have the Taher somewhere.
3     MS. BROWN:  Counsel, has that
4   material been provided to the doctor?
5     MS. O'DELL:  Yes.
6     MS. BROWN:  Okay.  We'll
7   request production of the supplemental
8   materials as referenced in the Taher
9   report.
10    MS. O'DELL:  Let me make sure.
11  What do you mean "supplemental"?  Let
12  me make sure I understand what you're
13  saying.  She's provided the Taher and
14  the -- she's provided the Taher paper
15  and the causal assessment.
16    MS. BROWN:  Okay.  The Taher
17  paper makes references in numerous
18  places to supplemental materials, and
19  my question was whether you've
20  provided those supplemental materials
21  to the witness and if so, I'll request
22  production of it.
23    MS. O'DELL:  Okay.  Let me
24  check that.

Page 93

1     MS. BROWN:  Okay.  Thank you.
2   BY MS. BROWN:
3     Q.   For your purposes, though,
4   Dr. Wolf, it's not something you have on hand
5   sitting here today?
6     A.   It's not.
7     Q.   And because these materials
8   were recently provided to you by counsel for
9   the plaintiffs, they did not form the basis
10  of the report that you authored, dated
11  November 16th, 2018; is that fair?
12    A.   That's fair.
13    Q.   Okay.  Counsel indicated you
14  have seen some of the other expert reports
15  from witnesses for plaintiffs' lawyers in
16  this litigation; is that right?
17    A.   That's correct.
18    Q.   Okay.  Can you tell me which
19  ones you've reviewed?
20    A.   Can I see the list of all of
21  them?  I don't --
22    MS. O'DELL:  I don't have a
23  list.
24    A.   I reviewed some of the

24 (Pages 90 to 93)

Judith K. Wolf, M.D.

Page 94

1  epidemiology ones, but I don't remember the
2  names.  I reviewed part of one of the other
3  GYN oncology ones.  It seemed to be similar
4  to mine.  I don't read it all.  I didn't read
5  the third.  I can't remember.
6  BY MS. BROWN:
7      Q.    Okay.  So let's back up.  How
8  many -- I assume the reports of these other
9  experts were provided to you from the
10  plaintiffs' lawyers; is that right?
11     A.    That's correct.
12     Q.    Okay.  When did you -- did you
13  receive them all at once?
14     A.    I did.
15     Q.    And do you recall approximately
16  when you received them?
17     A.    I don't know.  Sometime after
18  the reports were all submitted.  I don't
19  remember the date.
20     Q.    Okay.  Prior to issuing your
21  report, dated November 16th, 2018, did you
22  see any other expert reports?
23         MS. O'DELL:  Object to the
24     form.

Page 95

1      A.    I didn't see any of the expert
2  reports for this case.
3  BY MS. BROWN:
4      Q.    Okay.  In -- fair to say, then,
5  the opinions that you have contained in your
6  report, dated November 16, 2018, you're not
7  relying on any other plaintiff expert in
8  forming these opinions; is that right?
9         MS. O'DELL:  Object to the
10     form.  Other than cited in her actual
11     report.
12         MS. BROWN:  Counsel, it's
13     objection to form.  Don't testify for
14     her.
15     A.    Well, the Plunkett deposition,
16  I believe, is a reference in my report.
17  BY MS. BROWN:
18     Q.    Well, it couldn't be a
19  reference in your report because it didn't
20  happen till after your report, right?
21     A.    Sorry.  Yes.
22     Q.    Okay.  So we're going to get to
23  Plunkett.  Let's keep that to the side.  What
24  I'm interested -- you understand that lawyers

Page 96

1  for the plaintiffs submitted reports like
2  yours from a number of different people,
3  right?
4      A.    Yes.
5      Q.    And there came a point in time
6  when the plaintiffs' lawyers sent you some of
7  those reports, correct?
8      A.    Yes.
9      Q.    Did they send you completed
10  reports or did they sent you draft reports?
11     A.    They sent me the completed
12  reports that had already been submitted and
13  turned in.  I didn't see any drafts of
14  anybody else's reports.
15     Q.    Got it.  So in writing your
16  report in this case, which we have marked as
17  Exhibit 7 and which is dated November 16th,
18  2018, you did not rely on the opinions of
19  another expert.  Fair?
20         MS. O'DELL:  Object to the
21     form.
22     A.    My understanding what you're
23  asking me is, did I rely on the opinions of
24  the expert reports in this case?  No, I had

Page 97

1  not seen them.
2  BY MS. BROWN:
3      Q.    That was exactly what I was
4  asking.  Did you type the report that we've
5  marked as Exhibit 7 yourself, Doctor?
6      A.    You mean my fingers on?
7      Q.    Correct.
8      A.    I typed some of the drafts.
9  The final report, I dictated most of it.
10     Q.    So to whom did you dictate the
11  report?
12     A.    I don't remember her name.
13  Someone who works with the plaintiffs'
14  attorneys.  I'm not a typist.
15     Q.    Fair enough.  How many hours
16  did you spend preparing the report that we've
17  marked as Exhibit 7?
18         MS. O'DELL:  Object to the
19     form.
20     A.    An estimate of how much time, I
21  would say 20 to 30 hours, total.  I mean,
22  there were several drafts and then even when
23  I thought it was a final draft, a few tweaks
24  and revisions here and there.  And I still

25 (Pages 94 to 97)

Judith K. Wolf, M.D.

1  see some typos and errors that if I had it
2  back, I would fix and change.
3  BY MS. BROWN:
4      Q.   Did someone other than you
5  write some of the information contained in
6  Exhibit 7?
7      A.   Exhibit 7 is my report?
8      Q.   Correct.
9      A.   Other than things that I have
10 in quotes that I've pulled from articles, no
11 one else wrote it.
12     Q.   Other than information that you
13 have in quotes, it's your testimony that all
14 of the language that we see in Exhibit 7 is
15 your own; is that right?
16         MS. O'DELL:  Object to the
17     form.
18     A.   I wrote the report, the entire
19 report.
20 BY MS. BROWN:
21     Q.   Do you know who Dr. Blair Smith
22 is?
23     A.   Dr. Blair Smith?
24     Q.   Correct.

1      A.   Is that -- is that Ellen Blair
2  Smith?
3      Q.   Correct.
4      A.   I do know her, yes.
5      Q.   Okay.  Did you work with
6  Dr. Blair Smith on your report?
7      A.   I did not.
8      Q.   Okay.  Do you know why a
9  paragraph in your report would be exactly the
10 same as that contained in Dr. Smith -- Blair
11 Smith's report?
12     A.   I don't.
13     Q.   Okay.  Let's take a look at
14 that.  If you look at page 8 of your report,
15 Doctor.  Right above the bold text that says
16 "Meta-Analysis," do you see that sentence?
17     A.   Uh-huh.
18     Q.   It says, "All of the cohort
19 studies are limited by lack of power, failure
20 to make the appropriate queries, selection
21 bias and short follow-up."
22         Do you see that?
23     A.   I do.
24     Q.   Are those your words?

1      A.   Yes.
2      Q.   You wrote that sentence?
3      A.   Yes.
4      Q.   Okay.  Skipping down to the
5  paragraph below "Summary of Epidemiological
6  Evidence," the paragraph that begins, "When
7  looking at epidemiological studies in their
8  totality" -- are you with me?
9      A.   Yes.
10     Q.   Did you write this entire
11 paragraph here?
12     A.   Yes.
13     Q.   Did you give Dr. Ellen Blair
14 Smith the authority to copy that into her
15 report?
16     A.   I didn't speak with Dr. Ellen
17 Blair Smith.
18     Q.   Are you surprised to learn that
19 the information that you wrote on page 8 also
20 appears in Dr. Blair Smith's report, which
21 I'm handing you as Exhibit 8.
22         (Deposition Exhibit 8 marked
23     for identification.)
24         MS. O'DELL:  Object to the

1  form.
2      A.   Is it marked somewhere here
3  what it is?
4  BY MS. BROWN:
5      Q.   It is.  If you look at page 16,
6  Doctor.  And I'll direct you to the -- one,
7  two, three -- the end of the first -- go to
8  the third complete paragraph that begins "In
9  my opinion."  You with me?
10     A.   Uh-huh.
11     Q.   Okay.  And the end of that
12 paragraph contains the very first sentence I
13 asked you to read, right?  "All of the cohort
14 studies are limited by lack of power."
15 Correct?
16         MS. O'DELL:  Object to the
17     form.
18     A.   What I can say when I look at
19 these, she cited the same limitations as I
20 did, and that's not that surprising to me.
21 BY MS. BROWN:
22     Q.   Okay.  And if you look at --
23 when looking at the epidemiology studies, do
24 you see that that paragraph is the same,

26 (Pages 98 to 101)

Judith K. Wolf, M.D.

Page 102

1   Doctor?
2         MS. O'DELL:  Object to the
3   form.  Are you referring to when --
4   the fourth -- the last paragraph above
5   "Mechanism"?
6         MS. BROWN:  "When looking at
7   epidemiological studies."
8   BY MS. BROWN:
9         Q.    Do you see that, Doctor?
10        A.    Is that the last -- you're
11  talking about the last paragraph?
12        Q.    Sorry, of your report.  Page 8.
13  Is that your language, Doctor?
14        A.    This is my language; this is
15  her language.  I see some words that are the
16  same.  The conclusions are similar, but --
17  BY MS. BROWN:
18        Q.    And you see some sentences --
19        MS. O'DELL:  Excuse me.  She's
20  not finished.
21        Would you like to finish,
22  Dr. Wolf?
23        A.    But I mean, I'm just mostly
24  looking at the length of it and it's not even

Page 103

1   the same length, so I don't see how it's the
2   exact same thing.
3   BY MS. BROWN:
4         Q.    You see some sentences that are
5   identical, right, Doctor?
6         MS. O'DELL:  Object to the
7   form.
8         A.    I don't see -- give me a chance
9   to look at the entire thing.
10  BY MS. BROWN:
11        Q.    Sure.
12        A.    Because I don't see -- I see
13  one sentence is the same.  "There appears to
14  be no significant publication bias."
15        Q.    And also, Doctor, the sentence
16  that we just talked about, "All of the cohort
17  studies are limited by failure," that's the
18  same, right?
19        MS. O'DELL:  Object to the
20  form.
21        A.    No, it's not the same.  It
22  raises the same points, but it's not the
23  same.
24

Page 104

1   BY MS. BROWN:
2         Q.    In writing your report, Doctor,
3   did you take any language from other
4   articles?
5         MS. O'DELL:  Sorry, do you mean
6   quote language?
7   BY MS. BROWN:
8         Q.    Did you -- is any of the
9   language contained in your report not your
10  own; meaning did it come from publicly
11  available sources or articles?
12        MS. O'DELL:  Object to the
13  form.
14        A.    Quotes in my report came from
15  articles.
16  BY MS. BROWN:
17        Q.    In writing your report, did you
18  consult Wikipedia?
19        A.    Did I do what?
20        Q.    Did you consult Wikipedia?
21        A.    No.
22        Q.    Do you know what that is?
23        A.    I do, but I don't consult for
24  any medical literature or scientific

Page 105

1   literature.
2         Q.    You don't consider Wikipedia to
3   be a scientifically reliable source; is that
4   right?
5         A.    I don't.
6         Q.    Okay.  And in coming up with
7   your report, that's not something that you
8   cut and pasted from; is that right?
9         A.    I didn't look at Wikipedia to
10  prepare my report.
11        Q.    And there aren't parts of your
12  report that someone else did for you; is that
13  right?
14        MS. O'DELL:  Object to form.
15        A.    That's right.
16  BY MS. BROWN:
17        Q.    On page 2 of your report,
18  Doctor, you indicate the method -- you talk
19  about the methodology you employed here.  Do
20  you see that?
21        A.    Yes.
22        Q.    Describe for us -- I understand
23  you have it discussed in your report, but
24  describe for us what methodology you employed

27 (Pages 102 to 105)

Judith K. Wolf, M.D.

Page 106

1  to answer the question in this case.
2      A.    So that's -- this is why I
3  provided the UpToDate evidence-based
4  medicine.  So I started with the question.
5  The question is, does general use of talcum
6  powder cause ovarian cancer.  And then
7  researched the literature, looking for human
8  studies, animal studies, in vitro studies.
9  And then evaluated the validity of the
10  studies as a whole, by looking at their
11  materials and methods, the results and
12  conclusions that they drew, what journal
13  the -- if it was published in a peer-reviewed
14  journal, what journal it was in, what year it
15  was published, were there multiple studies
16  showing similar findings, were there
17  outliers, and then from that formed my
18  opinion.
19      Q.    And your conclusion is that
20  genital talc use causes ovarian cancer,
21  correct?
22      A.    That is -- genital talcum
23  powder use, yes.
24      Q.    And is your opinion limited to

Page 107

1  a certain quantity of genital powder use?
2          MS. O'DELL:  Object to the
3      form.
4      A.    It's not.  And I had a hard
5  time with that issue just because I don't
6  know what a dose is, because how much do you
7  shake, how much do you apply, it's hard to
8  know a certain amount.
9  BY MS. BROWN:
10      Q.    In forming your opinions in
11  this case, have you attempted to quantify how
12  much talcum powder an individual woman would
13  be exposed to when using it in the genital
14  area?
15          MS. O'DELL:  Objection to the
16      form.  Dr. Wolf's being offered for
17      general causation, not for a specific
18      plaintiff.
19      A.    Repeat the question again.
20  BY MS. BROWN:
21      Q.    Sure.  We were talking about
22  how much powder use, in your opinion, causes
23  ovarian cancer.  And my question is, have you
24  attempted to quantify how much talcum powder

Page 108

1  a woman is exposed to when she uses it
2  perineally?
3          MS. O'DELL:  Object to the
4      form.
5      A.    Are you asking me if I've done
6  a study?  I'm not sure what you're asking.
7  BY MS. BROWN:
8      Q.    In forming your opinion in this
9  case, that talcum powder causes ovarian
10  cancer, have you attempted to quantify how
11  much talcum powder causes ovarian cancer?
12          MS. O'DELL:  Object to the
13      form.
14      A.    In reviewing the articles, some
15  of the studies have tried to look at length
16  of time, frequency of use, years of use,
17  total applications.  It's hard for me to know
18  what that amount is, because I don't know in
19  each individual woman, like, how much she put
20  in.  And I also don't know in each individual
21  woman, what her risk might be from the talc,
22  based on her own genetic makeup and other
23  things in her immune system and how she
24  responds to it.

Page 109

1  BY MS. BROWN:
2      Q.    Have you calculated how much
3  genital talc powder is needed to cause
4  ovarian cancer?
5          MS. O'DELL:  Object to the
6      form.
7      A.    Again, I think that my -- it's
8  difficult, even from reviewing the literature
9  and from all the questions that were asked,
10  queried, to know how much any woman is
11  exposed to when she uses it.
12  BY MS. BROWN:
13      Q.    So what you're identifying is
14  one of the limitations of the talc
15  epidemiology, correct?
16          MS. O'DELL:  Object to the
17      form.
18      A.    What I'm identifying is one of
19  the limitations of knowing what dose is safe.
20  BY MS. BROWN:
21      Q.    In your mind, is there a dose
22  of genital talcum powder that does not cause
23  ovarian cancer?
24      A.    I don't know.

28 (Pages 106 to 109)

Judith K. Wolf, M.D.

Page 110

1     Q.   Have you investigated whether
2 or not there is an amount of talcum powder
3 that can be used perineally without
4 increasing the risk for ovarian cancer?
5         MS. O'DELL:  Objection, asked
6   and answered.
7     A.   I don't know if there is an
8 amount that's safe.  I don't know how I could
9 ethically test that.  I'm not aware of
10 anything in the literature that says, "This
11 dose is safe, this dose is not."  Because
12 even in all of the studies, what is a dose?
13 One shake?  Two shakes?  A hard shake?  A
14 light shake?
15 BY MS. BROWN:
16     Q.   Is your opinion, Dr. Wolf, that
17 some amount of perineal talcum powder use
18 causes ovarian cancer, is that opinion
19 dependent on an assumption that talcum powder
20 is contaminated with asbestos?
21     A.   No, because --
22         MS. O'DELL:  Object to the
23   form.
24     A.   -- talcum powder is a mix of

Page 111

1 things, right?  It's a mix of platy talc,
2 fibrous talc, asbestos, heavy metals have
3 been found in it, nickel and chromium and
4 cobalt, and then all of the fragrances.  And
5 I have seen the expert report of Michael
6 Crowley, where he assessed the irritant
7 quality of some of the fragrances.  And so
8 when I look at the talcum powder product, I
9 look at it as a whole.
10 BY MS. BROWN:
11     Q.   Do you believe there is
12 asbestos in talcum powder?
13     A.   I've seen evidence that there
14 is asbestos found in at least 60 percent of
15 talcum powder that's been evaluated that I've
16 seen.
17     Q.   Is it your opinion in this
18 case, that 60 percent of talcum powder is
19 contaminated with asbestos?
20         MS. O'DELL:  Object to the
21   form, asked and answered.
22     A.   In the reports that I've seen,
23 60 percent of the time there was evidence of
24 asbestos.

Page 112

1 BY MS. BROWN:
2     Q.   Are you referring to
3 plaintiffs' expert witness reports?
4     A.   Let me look in my report here
5 for just one second.  I'm sorry, I just need
6 to look in here to find it.  Because there is
7 plaintiffs' expert witness, but --
8         MS. O'DELL:  Take your time,
9   Doctor.
10         THE WITNESS:  All right.
11 BY MS. BROWN:
12     Q.   And, Doctor, maybe I can help.
13 On page 9 of your report, you reference in
14 the third paragraph --
15     A.   Yes.
16     Q.   -- that you believe Dr. Longo
17 and Rigler have demonstrated talc to be --
18 may be contaminated with asbestos.  Do you
19 see that?
20     A.   That's correct.  And then also
21 there's the deposition of John Hopkins.
22     Q.   What information are you
23 relying on from the deposition of John
24 Hopkins?

Page 113

1     A.   A report that I saw.
2     Q.   Okay.  What -- you just pulled
3 out a document from your binder.  What is
4 that, Doctor?
5     A.   That is the -- this is part of
6 the deposition, right?  Yeah.  It's in my
7 references.
8 BY MS. BROWN:
9     Q.   Okay.  Can I see it?
10     A.   Yeah.  It was just printed
11 separately so it can be bigger.
12     Q.   And what you have just handed
13 me, Dr. Wolf, is -- it bears an exhibit
14 sticker Hopkins 28, and do you know -- it
15 appears to be a large printout of some kind
16 of Excel chart.  Do you know what this is?
17     A.   This was from his deposition of
18 testing of talcum powder products.
19     Q.   Did you read the deposition of
20 Dr. John Hopkins?
21     A.   I did not see the entire
22 deposition.
23     Q.   Were you provided with the
24 deposition?

29 (Pages 110 to 113)

Judith K. Wolf, M.D.

Page 114

1      A.    If I was, I don't recall.
2      Q.    Did you ask to see Exhibit 28
3 to John Hopkins' deposition?
4      A.    Specifically ask for that?  I
5 did not.  I was provided it.
6      Q.    So the lawyers decided to give
7 you John Hopkins' Exhibit 28; is that right?
8      A.    I received it from the lawyers.
9      Q.    Okay.  And do you know what's
10 contained within Exhibit 28?
11      A.    Do I know what's contained
12 within it?  It's a chart of testing of talcum
13 powder from various sources and various time
14 periods, how the test was done and what the
15 results showed, as well as a few other things
16 on there.
17      Q.    Did you -- do you know who
18 created this chart, Dr. Wolf?
19      A.    I don't.
20      Q.    Do you have any idea if the
21 four pages of testing contained in Exhibit 28
22 to John Hopkins' deposition is representative
23 of all the testing that was done on Johnson
24 & Johnson's product?

Page 115

1            MS. O'DELL:  Object to the
2      form.
3      A.    I don't know if it is or it
4 isn't, but what I know is what I see there,
5 is that the results show evidence of asbestos
6 contamination over a period of time.
7 BY MS. BROWN:
8      Q.    Do you know -- are you familiar
9 with the test method "XRD"?
10      A.    I'm not a geologist and I don't
11 understand the test methods.  So I'm going to
12 have to say I would defer to the geologist to
13 answer a question about that.
14      Q.    So in terms of whether or not a
15 test method known as "XRD" is even capable of
16 distinguishing between asbestiform and
17 nonasbestiform minerals, you would defer to
18 somebody else on that question; is that
19 right?
20            MS. O'DELL:  Object to the
21      form.
22      A.    What I'm going to say is that
23 the details of how that's performed, I am not
24 aware of.

Page 116

1 BY MS. BROWN:
2      Q.    So in terms of interpreting the
3 findings of the chart, which list a number of
4 different test methods, you'd agree you're
5 not a microscopist.  True?
6            MS. O'DELL:  Object to the
7      form.
8      A.    Can you define what a
9 "microscopist" is in your -- from what you're
10 asking me?
11 BY MS. BROWN:
12      Q.    Sure.  Are you -- do you hold
13 yourself out to the medical community as an
14 expert in light microscopy in looking --
15 using various different types of microscopy
16 to study minerals?
17      A.    No, I'm not.
18      Q.    And you understand that the
19 chart you just handed me includes a number of
20 different test methods, correct?
21      A.    Yes.
22      Q.    And you're not aware whether
23 those test methods are even capable of
24 distinguishing or finding asbestos, correct?

Page 117

1            MS. O'DELL:  Object to the
2      form.
3      A.    I'm assuming since they found
4 asbestos, that they are.  I'm assuming that
5 since they were used to try to identify
6 asbestos, that they are.
7 BY MS. BROWN:
8      Q.    Show me on this chart what
9 asbestos finding you're referring to, Doctor.
10      A.    The second page, tremolite --
11 here, tremolite, tremolite, actinolite
12 fibrous talc, tremolite, tremolite,
13 actinolite, tremolite, actinolite -- sorry.
14 I'm sorry.  I didn't mean to go so fast.  I'm
15 looking at what tests revealed.
16      Q.    And are you familiar, Doctor,
17 with the fact that tremolite exists both as
18 tremolite asbestos and as the nonasbestiform
19 version of that mineral?  Are you aware of
20 that?
21      A.    Yes.
22      Q.    Okay.  And do you -- what
23 information are you relying on that the
24 tremolite that's indicated in that chart is

Page 118

1 tremolite asbestos and not the nonasbestiform
2 version?
3           MS. O'DELL: Object to the
4     form.
5     A.    I wasn't given that
6 information. All I can say is that there
7 is -- some of them say "tremolite," others
8 say "fibrous crocidolite, fibrous tremolite,
9 actinolite."
10 BY MS. BROWN:
11     Q.    And whether the information
12 that's contained on the exhibit from
13 Dr. Hopkins' deposition that was given to you
14 by the plaintiffs' lawyers, whether that, in
15 fact, indicates a finding of asbestos, you're
16 not the expert in that. Fair?
17           MS. O'DELL: Object to the
18     form.
19     A.    I'm looking at the results, and
20 even if I take out ones that just say
21 "tremolite," and don't tell me if it's the
22 asbestos form or not, I see -- I see others
23 that do say "asbestos, asbestos fibers,
24 fibrous talc" --

Page 119

1 BY MS. BROWN:
2     Q.    Show me where it says
3 "asbestos."
4     A.    This one says "confirmed
5 asbestos."
6     Q.    And did you ask -- did you look
7 at the product that was being tested here,
8 Doctor? Meaning, do you even know if this
9 was cosmetic talcum powder?
10           MS. O'DELL: Object to the
11     form. If you want her to look at the
12     exhibit in full, you can ask a
13     question.
14 BY MS. BROWN:
15     Q.    Sure. You just pointed me to a
16 line on the chart that says they're testing
17 ore mud. Do you have any source of
18 information that would lead you to believe
19 that that was ore that was used to make
20 cosmetic talc?
21           MS. O'DELL: Object to the
22     form.
23     A.    Are you talking about the one
24 below it that says --

Page 120

1 BY MS. BROWN:
2     Q.    And have you reviewed -- what
3 you just pointed me to, Dr. Wolf, is a
4 testing from the 1970s by Dr. Langer,
5 correct?
6     A.    Can I see the whole thing?
7     Q.    Sure. You pointed me to
8 Dr. Langer, Mount Sinai, 1975, right?
9     A.    Yes.
10     Q.    Okay. Are you familiar with
11 Dr. Langer's testing of talcum powder
12 products in the 1970s?
13           MS. O'DELL: Object to the
14     form. And if you're going to ask
15     questions about the exhibit, if you'll
16     put it back in front of the witness.
17           MS. BROWN: Absolutely.
18           MS. O'DELL: You've asked a
19     question, she's going to respond, so
20     hand her back Exhibit 28.
21           MS. BROWN: I'm not sure she
22     needs it to answer it.
23           MS. O'DELL: I'm sure counsel
24     has a copy of Exhibit 28 if you -- if

Page 121

1 you need it. I'm sure you have it
2     committed to memory.
3     A.    Can you ask the question again?
4 BY MS. BROWN:
5     Q.    Sure. In supporting your view
6 that 60 percent of talcum powder products are
7 contaminated with asbestos, you've handed me
8 a chart that the lawyers gave you from
9 Dr. Hopkins' deposition and pointed me to an
10 entry of a test that Dr. Langer performed in
11 the 1970s, right?
12           MS. O'DELL: Object to the
13     form, misstates her testimony as to
14     the percentage. It's not what she
15     referred to.
16     A.    That's the line I pointed at.
17 BY MS. BROWN:
18     Q.    Okay. But to be fair,
19 Dr. Wolf, you are not familiar with the
20 testing that Dr. Langer did on talcum powder
21 products in the 1970s, right?
22     A.    I am not.
23     Q.    Okay. And you are certainly
24 not aware of the work that the Food and Drug

Judith K. Wolf, M.D.

Page 122

1  Administration did to check all of the work
2  that Dr. Langer did, correct?
3       MS. O'DELL:  Object to the
4   form.
5       A.    I am not aware of all of the
6  testing or checking that the FDA did to test
7  Dr. Langer's work.
8  BY MS. BROWN:
9       Q.    And so in giving that
10  testimony, you were not aware that the FDA
11  tested that Dr. Langer sample and determined
12  there was no asbestos?
13       A.    That specific --
14       MS. O'DELL:  Excuse me.
15  BY MS. BROWN:
16       Q.    Let me just --
17       MS. O'DELL:  No.  I get to --
18  BY MS. BROWN:
19       Q.    I need to ask my question.
20       MS. O'DELL:  I need to have the
21   opportunity to object.  If you'd give
22   me just a moment.  Object to the form
23   of the question.  Misstates the
24   record.

Page 123

1       MS. BROWN:  But here's what
2  happened.  I didn't get the question
3  out.
4       MS. O'DELL:  Yes, you did.
5       MS. BROWN:  So let me get the
6  question on the record --
7       MS. O'DELL:  Yes, you did.
8       MS. BROWN:  -- and then we'll
9  leave time for Ms. O'Dell to object
10  and then, Doctor, you can answer.
11       So my question was, you're not
12  aware that the FDA tested all of the
13  Langer samples that were conducted in
14  the 1970s and determined that J&J's
15  product was free from asbestos, right?
16       MS. O'DELL:  Object to the
17   form, misstates the record.
18       A.    I'm not aware that the FDA
19  tested all of Dr. Langer's testing, no.
20  BY MS. BROWN:
21       Q.    Were you aware that the FDA
22  tested Johnson & Johnson's baby powder in the
23  1970s at all?
24       A.    Yes.

Page 124

1       Q.    Did you review the testing that
2  the FDA did of Johnson's Baby Powder in the
3  1970s?
4       MS. O'DELL:  Object to the
5   form.
6       A.    I don't recall reviewing in
7  detail the testing that they did.
8  BY MS. BROWN:
9       Q.    Were you aware that the FDA
10  determined, based on its own testing of
11  Johnson's baby powder product in the 1970s,
12  that it was asbestos free?
13       MS. O'DELL:  Object to the
14   form.
15       A.    I was aware that they reported
16  that.
17  BY MS. BROWN:
18       Q.    Did you consider the finding of
19  the United States Food and Drug
20  Administration's own testing of baby powder's
21  product, before coming to your opinion that
22  60 percent of baby powder is contaminated
23  with asbestos?
24       MS. O'DELL:  Object to the

Page 125

1   form.
2       A.    What I said, I believe, was
3  that what I saw of the samples that I saw
4  tested, 60 percent showed evidence.  I'm not
5  saying that -- I didn't say that -- what I
6  said was, of what I saw, 60 percent showed
7  evidence of asbestos.
8  BY MS. BROWN:
9       Q.    And you're getting that 60
10  percent figure from an expert report for a
11  plaintiffs' lawyer in litigation, correct?
12       MS. O'DELL:  Object to the
13   form.
14       A.    Are you referring to the Longo
15  and Rigler report?
16  BY MS. BROWN:
17       Q.    I am.
18       A.    Yes.
19       Q.    Okay.  So the basis for your
20  opinion that 60 percent of baby powder
21  products are contaminated with asbestos is a
22  plaintiffs' expert report in litigation.
23  True?
24       MS. O'DELL:  Object to the

32 (Pages 122 to 125)

Judith K. Wolf, M.D.

Page 126

1    form.
2        A.    My -- 60 percent of what I saw
3    tested had evidence.
4    BY MS. BROWN:
5        Q.    So the entire basis of your
6    opinion that 60 percent of what was tested
7    had asbestos comes from this Longo report,
8    right?
9            MS. O'DELL:  Object to the
10    form.
11        A.    60 percent of what I saw.
12    BY MS. BROWN:
13        Q.    What methodology did you employ
14    in terms of weighting the evidence from
15    Dr. Longo, a plaintiffs' expert witness, or
16    the Food and Drug Administration?
17            MS. O'DELL:  Object to the
18    form.
19        A.    I will have to say I took them
20    both into consideration.  Given that there's
21    been a continued concern since the 1970s and
22    beyond, that there is a relationship with
23    general talcum powder use and ovarian cancer,
24    I had to look at all of the information.  And

Page 127

1    if there is any asbestos in baby powder, it's
2    one of the components that could be
3    carcinogenic.
4    BY MS. BROWN:
5        Q.    Okay.  We're talking about the
6    basis for your opinion to believe there is
7    asbestos in baby powder.  Are you with me?
8            MS. O'DELL:  Object to the
9    form.
10        A.    Yes.
11    BY MS. BROWN:
12        Q.    Okay.  And I understand one of
13    the things you relied on was Dr. Longo's
14    report, right?
15        A.    Yes.
16        Q.    And you are testifying that you
17    also took into consideration the FDA's
18    testing in the 1970s, correct?
19        A.    Yes.
20        Q.    Did you consider the FDA's
21    testing in 2009 and 2010?
22        A.    I'd have to look at that
23    information.
24        Q.    Did you know that the FDA

Page 128

1    tested baby powder in 2009 and 2010?
2        A.    I don't recall.
3        Q.    Is it important to you, to have
4    considered that information before offering
5    an expert opinion that baby powder's
6    contaminated with asbestos?
7            MS. O'DELL:  Object to the
8    form.
9        A.    Can you show me that
10    information?
11    BY MS. BROWN:
12        Q.    Sure.
13            THE WITNESS:  Can you pull up
14    the Longo report for me?
15            (Deposition Exhibit 9 marked
16    for identification.)
17    BY MS. BROWN:
18        Q.    I'm marking, Dr. Wolf, as
19    Exhibit 9 to your deposition, a printout from
20    the FDA's website regarding talc, and this,
21    I'll represent to you, is a report from the
22    FDA's testing of baby powder products for
23    asbestos in 2009-2010.  Certainly take as
24    long as you need to review it, but I'd refer

Page 129

1    you to the very last page, which tests the
2    Johnson's baby powder product and reports, by
3    both PLM and TEM, no asbestos.
4            MS. O'DELL:  Would you -- would
5    you mind -- is it 9?  Exhibit 9?
6            MS. BROWN:  Yes.  Sorry,
7    Exhibit 9.  Sorry.
8            MS. O'DELL:  And feel free to
9    take an opportunity to review
10    Exhibit 9, Dr. Wolf.
11    BY MS. BROWN:
12        Q.    Dr. Wolf, I see you're looking
13    at the Longo report, which I'm going to give
14    you plenty of time to look at, but I just
15    want to ask you a question about Exhibit 9,
16    the FDA's testing.
17        A.    And what is your question?
18        Q.    Were you aware of the FDA's
19    testing of Johnson's baby powder products in
20    2009 and 2010?
21        A.    I can't recall specifically
22    that I was aware of that.  Am I surprised
23    that they tested?  I'm not.
24        Q.    Right.  So what -- did you

33 (Pages 126 to 129)

Judith K. Wolf, M.D.

Page 130

1    consider third-party testing of Johnson's
2    baby powder, like Princeton, MIT, Colorado
3    School of Mines?  Did you consider any of
4    those testings?
5        MS. O'DELL:  Object to the
6        form.
7        A.    Well, some of those were on
8    this report.
9    BY MS. BROWN:
10       Q.    Did you consider the testing
11   that they did in connection with the 1970s
12   Langer findings that determined there was no
13   asbestos in Johnson's baby powder?
14       MS. O'DELL:  Object to the
15       form, misstates the record.
16       A.    I'm getting a little confused
17   about what you're asking, about "the
18   consider."  I mean, I considered everything
19   that I saw.
20   BY MS. BROWN:
21       Q.    And that's what I'm trying to
22   find out.  So I understand you are here today
23   giving us an opinion that baby powder
24   contains asbestos.  True?

Page 131

1        A.    Some baby powder, I believe,
2    contains asbestos, yes.
3        Q.    What percentage of baby powder
4    contains asbestos?
5        A.    It doesn't matter what
6    percentage to me, if any of it does.  I'm
7    telling you the reports that I've seen, 60
8    percent in the testing that I've seen.  I
9    don't care if that's -- if you took all baby
10   powder and it's 60 percent or not.  If
11   there's any in there, it's a concern to me.
12       Q.    Okay.  So I understand you to
13   have an opinion there is asbestos in some
14   amount of baby powder, correct?
15       MS. O'DELL:  Object to the
16       form.
17       A.    In the testing that I've seen,
18   yes, I believe there's asbestos in some baby
19   powder.
20   BY MS. BROWN:
21       Q.    Okay.  And you're talking about
22   Dr. Longo's litigation testing, right?
23       MS. O'DELL:  Object to the
24       form.

Page 132

1        A.    Yes.  As well as the Hopkins
2    data.
3    BY MS. BROWN:
4        Q.    But we talked about --
5        MS. O'DELL:  Excuse me.
6    Dr. Wolf, when you say the "Hopkins
7    data," are you referring to the
8    Exhibit 28?
9        THE WITNESS:  Yes.
10   BY MS. BROWN:
11       Q.    We talked about Exhibit 28,
12   Doctor, and admittedly you're not able to
13   interpret the testing methods that were used
14   there, correct?
15       MS. O'DELL:  Object to the
16       commentary.  It's not what she said.
17       It misrepresents her testimony.
18       A.    You asked me about --
19       MS. BROWN:  Hold on.
20   BY MS. BROWN:
21       Q.    Your counsel thinks I'm
22   misrepresenting your testimony and I
23   certainly don't mean to do that.  We agreed,
24   Doctor, did we not, that you're not a

Page 133

1    microscopist?
2        MS. O'DELL:  Object to the
3        form.
4        A.    See, when you say
5    "microscopist," I say that that -- that's a
6    term to me that means more than I think
7    you're meaning to say.  I routinely look at
8    light microscopy, a pathology of gynecologic
9    cancers.  So in that area, would you say I'm
10   a microscopist?  I don't know.  Do I
11   routinely look for asbestos?  I do not.
12   BY MS. BROWN:
13       Q.    Right.  You don't hold yourself
14   out to the medical community as someone who
15   is qualified to look at bulk samples of baby
16   powder for the presence of asbestos.  True?
17       A.    I do not.
18       Q.    You have never used a
19   transmission electron microscope.  True?
20       A.    I might have used one when I
21   was in medical school or a fellowship.
22       Q.    It's not a regular part of your
23   practice to use TEM or SEM electron
24   microscopes.  True?

34 (Pages 130 to 133)

Judith K. Wolf, M.D.

Page 134

1    A.   It's not.
2    Q.   Okay.  We're going to have to
3  change the tape in a few minutes, but you
4  hold the opinion, do you not, Doctor, that
5  baby powder is contaminated with asbestos?
6         MS. O'DELL:  Object to the
7    form, asked and answered.
8    A.   I believe that some baby powder
9  contains asbestos.
10  BY MS. BROWN:
11    Q.   Do you believe that to be true
12  in terms of current baby powder on the shelf?
13    A.   The testing that I've seen goes
14  up through the 1990s.  So that's all I can
15  speak to.
16    Q.   Okay.  You're not offering an
17  opinion that any baby powder after the 1990s
18  contains asbestos; is that right?
19         MS. O'DELL:  Object to the
20    form.
21    A.   I'm not offering any opinion
22  about what's in baby powder tests beyond
23  where I've seen testing of it.
24

Page 135

1  BY MS. BROWN:
2    Q.   And the testing that you've
3  seen is in the form of Dr. Longo's report.
4  True?
5    A.   Yes.
6    Q.   Okay.  Where did Dr. Longo get
7  the samples that he tested; do you know?
8    A.   I thought that some of them --
9  I'll have to look here again.  From J&J.
10    Q.   Did you review, Doctor -- and
11  when you say "J&J," do you mean the samples
12  that came through warehouses and were
13  archived in the J&J "museum"?
14         MS. O'DELL:  Object to the
15    form, misstates the record.
16  BY MS. BROWN:
17    Q.   Well, that's a good point.
18         MS. O'DELL:  Testify to what
19    you've seen, Doctor.
20    A.   What I see is the source of the
21  talcum powder for these J&J historical
22  samples came from Italian Vermont talc mines.
23  So they were J&J historical powder samples.
24  Where they were stored at J&J -- is that what

Page 136

1  you're asking me?  I don't know -- I don't
2  have that information.
3  BY MS. BROWN:
4    Q.   Have you reviewed Dr. Longo's
5  report on the samples he acquired, in part,
6  from eBay?
7    A.   I'm laughing at eBay.
8    Q.   I know.  It sounds funny,
9  doesn't it?
10         MS. O'DELL:  Object to the
11    form.
12    A.   I believe there was some
13  commercial -- commercial products.  I didn't
14  know it was eBay.  But commercial product
15  that was off the shelf.
16  BY MS. BROWN:
17    Q.   Did you review and are you
18  relying on Dr. Longo's report of vintage baby
19  powder bottles that he purchased on eBay?
20         MS. O'DELL:  Object to the
21    form.
22    A.   I'm just looking for his
23  sources.
24         (Witness reviews document.)

Page 137

1    A.   When I looked in this report
2  for where -- the materials and methods, I
3  don't see anything about eBay on here.
4  BY MS. BROWN:
5    Q.   Did the lawyers for plaintiffs
6  give you Dr. Longo's prior reports?
7    A.   Yes, they're here somewhere.
8  BY MS. BROWN:
9    Q.   And I don't mean to have you
10  have to do homework here, Dr. Wolf.  I just
11  want to know if you're relying on Dr. Longo's
12  testing of the eBay samples.
13         MS. O'DELL:  Object to the
14    form.
15    A.   I'm relying on whole -- the
16  whole of Dr. Longo's testing.
17  BY MS. BROWN:
18    Q.   Okay.  And explain to us how
19  you employed your methodology of the weight
20  of the evidence to evaluate Dr. Longo's
21  findings, the FDA's findings, third-party
22  institution findings?
23         MS. O'DELL:  Objection to the
24    question, vague and unclear.

35 (Pages 134 to 137)

Judith K. Wolf, M.D.

Page 138

1    THE WITNESS:  Am I to answer or
2    not answer?
3    MS. O'DELL:  If you understand
4    the question.  If you don't understand
5    the question, you may ask that it be
6    rephrased.
7    A.    Can you rephrase the question?
8    BY MS. BROWN:
9    Q.    How did you weight the evidence
10   contained in Hopkins Exhibit 28 in connection
11   with the findings of the FDA?
12   MS. O'DELL:  Object to the
13   form.
14   A.    I considered the weight of all
15   of the evidence in the whole of the risk of
16   talcum powder in ovarian cancer.  This is a
17   small piece of it.
18   BY MS. BROWN:
19   Q.    I want to concentrate just on
20   your opinion that there's asbestos in talc.
21   And I want to know, did you weight
22   Dr. Longo's litigation reports the same as
23   the testing by the FDA?
24   MS. O'DELL:  Object to the form

Page 139

1    of the question, misstates her
2    testimony.
3    MS. BROWN:  It's a question.
4    There's no testimony.  We've got to go
5    off anyway.  Let's take a break.
6    THE VIDEOGRAPHER:  Going off
7    the record.  The time is 11:18 a.m.
8    (Recess taken from 11:18 a.m.
9    to 11:27 a.m.)
10   THE VIDEOGRAPHER:  This marks
11   the beginning of disk 2.  Back on the
12   record.  The time is 11:27 a.m.
13   BY MS. BROWN:
14   Q.    Dr. Wolf, before we took a
15   break, we were discussing your opinion that
16   talcum powder contains asbestos.  I
17   understand you are relying in part on
18   Dr. Longo's reports for that opinion; is that
19   true?
20   A.    Yes.
21   Q.    You are also relying on the
22   Exhibit 28 to Dr. Hopkins' deposition.  True?
23   A.    Yes.
24   Q.    And were you provided with any

Page 140

1    of the documents that are cited in Hopkins'
2    Exhibit 28?
3    A.    No.
4    Q.    Do you know who created
5    Hopkins' Exhibit 28?
6    A.    Specifically, no.
7    Q.    Okay.  Do you know whether
8    these represent final or preliminary test
9    results?
10   MS. O'DELL:  Object to the
11   form.
12   A.    I don't know.
13   BY MS. BROWN:
14   Q.    Do you know whether the entries
15   that indicate testing of ore is industrial or
16   cosmetic talc ore?
17   A.    I don't.
18   MS. O'DELL:  Object to the
19   form.
20   BY MS. BROWN:
21   Q.    Other than Hopkins' Exhibit 28,
22   Dr. Longo and the two FDA reports we've
23   discussed, are you relying on anything else
24   to inform your opinion that talcum powder is

Page 141

1    contaminated with asbestos?
2    A.    I also have the deposition of
3    Dr. Blount.
4    Q.    And what in the deposition of
5    Dr. Blount informs your opinion that talc is
6    contaminated with asbestos?
7    A.    Let me get it out.
8    THE WITNESS:  It's probably
9    over there.  This is not the right
10   reference.  There it is.  Sorry.  I
11   even had it marked.
12   (Witness reviews document.)
13   BY MS. BROWN:
14   Q.    Are you relying in part on
15   Dr. Blount's testimony, Dr. Wolf?
16   A.    Yes.
17   Q.    Have you reviewed Dr. Blount's
18   published articles?
19   A.    I have one here from 1991.
20   Q.    Did you review that in forming
21   your opinion that talc is contaminated?
22   A.    I did review it, but I'm going
23   to have to look at it here one second.
24   (Witness reviews document.)

36 (Pages 138 to 141)

Judith K. Wolf, M.D.

Page 142

1    A.    And the question is, did I use
2  this -- this -- this article that I have is
3  from 1991.  I'm looking at my references.
4  Yes, I did -- did use this.
5  BY MS. BROWN:
6    Q.    And when you say "this," is it
7  your testimony that you are relying on the
8  information contained in Blount's 1991
9  article to inform your opinion that talc is
10 contaminated with asbestos?
11   A.    I'm relying on all of the --
12 all of the references that I have in my list.
13 That's one of them.
14   Q.    Well, some of these references
15 have nothing to do with Johnson's baby
16 powder, right?
17   A.    Yes.  The references that
18 specifically are the testing for Johnson's
19 baby powder that I'm relying on for my
20 statement that some baby -- some talcum
21 powder product contains asbestos, are the
22 Hopkins data that I showed you, the Longo
23 testing and the deposition of Dr. Blount.
24   Q.    So did you write the paragraph

Page 143

1  that cites, for example, Paoletti and Rohl
2  1976?
3    A.    Yes.
4    Q.    Okay.  Why would you include
5  Rohl 1976 as evidence that talcum powder --
6  Johnson's baby powder is contaminated?
7    A.    I'd have to read it again to
8  tell you what specifically I pulled out of
9  there.  Would you like me to do that?
10   Q.    Let me see if I can ask you
11 some questions and save us some time.  The
12 article --
13       MS. O'DELL:  Excuse me.  Feel
14 free to turn to it, if you'd like.
15       THE WITNESS:  All right.
16       MS. O'DELL:  I believe it's in
17 this one.
18 BY MS. BROWN:
19   Q.    The article reports on some
20 products tested being contaminated and others
21 not.  Do you remember that?
22   A.    Yeah.
23   Q.    And what information are you
24 relying on to support your opinion that the

Page 144

1  products that are contaminated with asbestos
2  are Johnson & Johnson baby powder products?
3    A.    Let me look at one thing and
4  then I'll answer your question.
5       (Witness reviews document.)
6    A.    Given that the market of
7  Johnson -- of talcum powder products is --
8  the majority is Johnson's baby powder and
9  Johnson & Johnson products.  I'm assuming
10 that in this, where they've got consumer
11 products, that some of those were Johnson &
12 Johnson.
13 BY MS. BROWN:
14   Q.    And you understand that some of
15 the consumer products they tested did not
16 have asbestos?
17   A.    Yes.
18   Q.    Did you understand that?
19   A.    I understand that.
20   Q.    Okay.  What informs your
21 opinion that the products that were all
22 tested in 1976, in which he found asbestos,
23 were Johnson & Johnson products?
24       MS. O'DELL:  Object to the

Page 145

1  form.
2    A.    That each one specifically that
3  was tested is a Johnson & Johnson product?
4  Is that what you're asking me?
5  BY MS. BROWN:
6    Q.    Are you relying on Rohl 1976 to
7  support your opinion that Johnson's baby
8  powder is contaminated with asbestos?
9    A.    This was a consumer talcum
10 powder product.  The majority of consumer
11 talcum powder product is Johnson & Johnson.
12 I'm assuming that some of this is Johnson &
13 Johnson.  Some of it tested positive.  That,
14 along with all of the other evidence, leads
15 many to have the opinion that some Johnson &
16 Johnson talcum powder products contain
17 asbestos.
18   Q.    You have assumed that some of
19 the positive test results from Rohl 1976 were
20 Johnson & Johnson products; is that right?
21       MS. O'DELL:  Object to the
22 form.
23   A.    I'm assuming that some of them
24 were.

37 (Pages 142 to 145)

Judith K. Wolf, M.D.

Page 146

1    BY MS. BROWN:
2        Q.    And other than your assumption,
3    are you relying on any other information for
4    your -- to support your opinion that Rohl
5    1976 tested Johnson baby powder products and
6    found asbestos?
7        A.    The fact that the majority of
8    consumer products are made by Johnson &
9    Johnson.
10       Q.    So Dr. Wolf, as I understand
11   your methodology, you've made an assumption,
12   that because the majority of talcum powder
13   products are made by J&J, the positive
14   results in the Rohl study must have included
15   J&J products?
16       A.    I used -- I -- what I'm saying
17   is that this supports all the other evidence
18   that there's been asbestos found in some
19   Johnson & Johnson products.
20       Q.    Right. But my question was a
21   little different. You've made an assumption,
22   that because J&J sells a lot of talcum powder
23   products, they must be one of the positive
24   test results in the Rohl 1976 article. True?

Page 147

1            MS. O'DELL: Object to the
2        form, it misstates Dr. Wolf's
3        testimony.
4        A.    I don't believe that's what I
5    said. I believe that -- my assumption is
6    that some of the powder tested in this is
7    Johnson & Johnson product. Some of the
8    powder tested in this tested positive for
9    asbestos.
10           In the other studies some of
11   the powder tested, some of which was Johnson
12   & Johnson, some of which might be from some
13   other company, tested positive, and therefore
14   the whole of the evidence, in my belief,
15   shows that some Johnson & Johnson product --
16   talcum powder products contain asbestos.
17   BY MS. BROWN:
18       Q.    You've made an assumption that
19   Johnson & Johnson's baby powder products that
20   were tested by Rohl in 1976 contained
21   asbestos, correct?
22           MS. O'DELL: Object to the
23       form.
24       A.    My answer remains the same

Page 148

1    that -- that the majority of the products are
2    Johnson -- sold products -- consumer products
3    are Johnson & Johnson, that I -- I do assume
4    that some of the ones that were tested in
5    this are Johnson & Johnson. I took that
6    information and put it with the other
7    information to make my conclusion.
8    BY MS. BROWN:
9        Q.    And if you were wrong about
10   your assumption regarding Rohl 1976, how
11   would that affect your opinion here?
12       A.    I don't believe it would affect
13   my opinion that talcum powder products
14   include asbestos. So I don't think it would
15   change my opinion.
16       Q.    So whether Rohl found a
17   positive test result for a Johnson & Johnson
18   product or not doesn't affect your opinion;
19   is that right?
20           MS. O'DELL: Objection to the
21       form.
22       A.    My concern is that overall
23   multiple testing, over multiple years from
24   multiple sites, suggests that some talcum

Page 149

1    powder product contains asbestos.
2    BY MS. BROWN:
3        Q.    Have you formed an opinion
4    about what percentage of Johnson & Johnson
5    talcum powder product contains asbestos?
6        A.    I don't care what percentage
7    does. If there's any in it, it's too much.
8        Q.    Okay. But we're going to get
9    through this so much faster if you just
10   listen to my question. Which was, have you
11   formed an opinion about how much of Johnson &
12   Johnson's talcum powder products are
13   contaminated with asbestos?
14           MS. O'DELL: Excuse me,
15       Dr. Wolf. Move to strike the
16       commentary. You may answer the
17       questions in any way you feel
18       appropriate, Dr. Wolf. So object to
19       the form of the question.
20       A.    Sorry, you're going to -- what
21   your question was again.
22   BY MS. BROWN:
23       Q.    I'll re-ask it, rather than
24   have you read the realtime, Doctor. Have you

Judith K. Wolf, M.D.

Page 150

1  attempted to quantify or estimate what
2  percentage of Johnson & Johnson powder --
3  Johnson & Johnson baby powder products are
4  contaminated with asbestos?
5        MS. O'DELL:  Object to the
6        form.
7        A.   I haven't attempted to quantify
8  what percentage of Johnson & Johnson baby
9  powder products contain asbestos.  I hold the
10  opinion that if any of it contains asbestos,
11  it's too much.
12  BY MS. BROWN:
13        Q.   Have you formed an opinion
14  about what type of asbestos is contaminating
15  Johnson & Johnson baby powder products?
16        A.   It doesn't matter to me.  All
17  types of asbestos are carcinogenic.
18        Q.   And that wasn't my question.
19  My question was, have you formed an opinion
20  about what type of asbestos is contaminating
21  Johnson & Johnson's baby powder products?
22        MS. O'DELL:  Excuse me.  Object
23        to the form of the question, asked and
24        answered.

Page 151

1        A.   I'll restate that.  Because it
2  doesn't matter to me what -- which type of
3  asbestos might be contained in a sample of
4  Johnson & Johnson's talcum powder product, I
5  don't have any opinion as to what type.
6  BY MS. BROWN:
7        Q.   Do you have an opinion as to
8  how much contamination is in each individual
9  bottle of Johnson & Johnson's baby powder?
10        MS. O'DELL:  Object to the
11        form.
12        A.   Because it doesn't matter to me
13  how much there is, whether it's a small
14  amount, a large amount, a medium amount, my
15  concern is that if there's any in it, it's
16  dangerous; I haven't formed an opinion about
17  how much there is.
18  BY MS. BROWN:
19        Q.   Do you believe that there's no
20  amount of asbestos that's safe?
21        MS. O'DELL:  Object to the
22        form.
23        A.   I believe that any amount of
24  asbestos in talcum powder product is

Page 152

1  dangerous.
2  BY MS. BROWN:
3        Q.   And in terms of your
4  methodology for analyzing the epidemiology in
5  this case, have you done that with an
6  assumption that the talcum powder evaluated
7  in the epi contained asbestos?
8        A.   That question is not clear to
9  me.  Are you --
10        Q.   Let me rephrase.  I understand
11  you looked at a number of epi studies in
12  forming your opinion here, correct?
13        A.   Yes.
14        Q.   Have you made the assumption
15  that the talcum powder that was studied in
16  those epi studies contained asbestos?
17        MS. O'DELL:  Object to the
18        form.
19        A.   So I'm going to say that when
20  I -- when reviewing all of the studies, I
21  wasn't really thinking specifically about the
22  components of talcum powder product.  I was
23  looking at the epidemiology of the findings
24  of talcum powder product and its risk for

Page 153

1  ovarian cancer, and then separately, in
2  investigating and looking at all the
3  components of talcum powder as a way to
4  explain the results of the epidemiology
5  studies.
6        So I'm not -- in the end, as a
7  whole -- it's part of the whole, but
8  specifically looking at the epidemiology
9  studies, that wasn't my biggest concern.  My
10  concern was, did the use of genital talcum
11  powder increase the risk of ovarian cancer?
12  BY MS. BROWN:
13        Q.   Do you believe that talc that's
14  not contaminated with asbestos can cause
15  ovarian cancer?
16        A.   I think of the product as a
17  whole versus separate, and my concern is that
18  in the talcum powder product, whether or not
19  a particular sample has asbestos, yes, there
20  are other things in there that can be
21  carcinogenic and inflammatory and cause
22  ovarian cancer.
23        Q.   Do you believe that talcum
24  powder without asbestos causes ovarian

39 (Pages 150 to 153)

Judith K. Wolf, M.D.

Page 154

1   cancer?
2        MS. O'DELL:  Objection to the
3   form.
4        A.   I believe that asbestos is one
5   of the products -- one of the components of
6   talcum powder that causes carcinogenesis of
7   the ovary or cancer of the ovary, but I think
8   that in a specific sample, whether or not
9   there's asbestos, there's enough other
10  products that can be carcinogenic that, yes,
11  I think it's still at risk.
12  BY MS. BROWN:
13       Q.   Okay.  Have you reviewed, in
14  connection with your opinions, Doctor, IARC's
15  review of asbestos?
16       A.   Yes.
17       Q.   Do you believe that asbestos is
18  a recognized cause of ovarian cancer?
19       A.   Yes.
20       Q.   Have you ever diagnosed a
21  patient with ovarian cancer caused by
22  asbestos?
23       A.   I have, that I can recall, at
24  least one patient.

Page 155

1        Q.   And what was the asbestos
2   exposure of this patient encounter?
3        A.   I don't recall.  It was a long
4   time ago.
5        Q.   And you documented in a
6   patient's chart that you believed her ovarian
7   cancer was caused by asbestos?
8        A.   I'd have to go back and review
9   the chart.  I don't think I, personally, put
10  that in the chart.  I'd have to review the
11  chart.  It may be in her chart, in the
12  pathology report that they saw evidence of
13  fibers in the cancer.  It might be it was her
14  exposure.  I just remember one patient where
15  I went and reviewed the literature on
16  asbestos in ovarian cancer because that was
17  the concern.
18       Q.   Did this patient have
19  occupational exposure to asbestos?
20       A.   I don't recall.
21       Q.   You --
22       A.   And I don't have access to her
23  medical records.
24       Q.   Where were you the treating

Page 156

1   physician when you treated this patient?
2        A.   At MD Anderson.
3        Q.   You'd agree that the literature
4   that IARC relies upon in finding that
5   asbestos can cause ovarian cancer is in the
6   occupational context?
7        MS. O'DELL:  Object to the
8   form.
9        A.   Yes, I would say that they
10  looked at inhalation generally and dermal
11  contact, yes.
12  BY MS. BROWN:
13       Q.   And they looked at that in the
14  heavy occupational exposure context, correct?
15       MS. O'DELL:  Objection to the
16  form.
17       A.   You know, I'd have to look at
18  the wording in that IARC again to answer that
19  question.
20  BY MS. BROWN:
21       Q.   Dr. Wolf, I'll hand -- we'll
22  mark as Exhibit 10, IARC's monograph on
23  asbestos and ovarian cancer.
24

Page 157

1        (Deposition Exhibit 10 marked
2        for identification.)
3   BY MS. BROWN:
4        Q.   I'll direct your attention to
5   page 256.  Did you review all of the studies
6   in this monograph before forming your
7   opinions in this case?
8        MS. O'DELL:  Do you have a copy
9        for me, Counsel?
10       A.   Are you asking did I separately
11  read all of the articles in this monograph?
12  BY MS. BROWN:
13       Q.   Yes.
14       A.   The references?
15       MS. O'DELL:  Counsel, excuse
16  me.  Can I just ask, is this going to
17  be Exhibit 10?
18       MS. BROWN:  No, I marked
19  Exhibit 10.
20       MS. O'DELL:  Okay.  This is --
21       A.   I don't think I reviewed all of
22  these articles.
23  BY MS. BROWN:
24       Q.   Do the asbestos studies that

40 (Pages 154 to 157)

Judith K. Wolf, M.D.

Page 158

```
 1   IARC relies on in what we've marked as
 2   Exhibit 10, inform your opinion in this case?
 3       A.   My opinion that asbestos causes
 4   cancer?
 5       Q.   Yes.
 6       A.   It's part of the opinion, yes.
 7       Q.   What do you rely on to support
 8   your opinion that asbestos causes ovarian
 9   cancer?
10       A.   I would say that this and all
11   of the literature.  And some of this
12   literature, I believe, is in my
13   contributing -- contributing materials that I
14   reviewed.  The Reid paper, the Langseth
15   paper, the Magnani paper.  Just didn't read
16   them all, but all of their references.
17       Q.   And you would agree that the
18   studies that IARC reviewed were in the heavy
19   occupational exposure context, correct?
20           MS. O'DELL:  Object to the
21       form.
22       A.   Occupationally exposed.
23   BY MS. BROWN:
24       Q.   Let's look at page 256, the
```

Page 159

```
 1   second column, the first full paragraph.
 2   "The Working Group noted that a causal
 3   association between exposure to asbestos and
 4   cancer of the ovary was clearly established
 5   based on five strongly positive cohort
 6   mortality studies of women with heavy
 7   occupational exposure to asbestos."
 8           Right?
 9           MS. O'DELL:  Object to the
10       form.
11   BY MS. BROWN:
12       Q.   That's what IARC concluded,
13   right?
14           MS. O'DELL:  Object to the
15       form.
16       A.   Well, that's part of the
17   conclusion.  The next study shows that women
18   and girls with environmental but not exposure
19   to -- occupational exposure had positive but
20   not a significant increase in ovarian cancer
21   also.
22   BY MS. BROWN:
23       Q.   Right.  The environmental
24   studies that IARC considered did not show a
```

Page 160

```
 1   statistically significant increase of ovarian
 2   cancer, correct?
 3           MS. O'DELL:  Object to the
 4       form.
 5       A.   There's an increase, but not a
 6   statistically significant increase.
 7   BY MS. BROWN:
 8       Q.   Well, that's an important
 9   distinction, isn't it, Doctor?
10       A.   So it would be -- it would be
11   stronger evidence if it was statistically
12   significant.  I'm not writing it off as not
13   important, because the overall conclusion is
14   that asbestos increases the risk of ovarian
15   cancer.  And I certainly wouldn't suggest
16   that anyone expose themselves to asbestos,
17   whether it's an occupational hazard or not,
18   not just for its risk of ovarian cancer, but
19   for the risk of other cancers, lung cancers,
20   pleural cancers, renal cancers.
21       Q.   The only studies on which IARC
22   relies to support its conclusion that
23   asbestos causes ovarian cancer that have a
24   statistically significant finding are in the
```

Page 161

```
 1   heavy occupational context, correct?
 2           MS. O'DELL:  Object to the
 3       form.
 4       A.   In that paragraph, that's what
 5   it says.
 6   BY MS. BROWN:
 7       Q.   Do you believe that studies
 8   looking at women who are experiencing heavy
 9   occupational exposure to asbestos, can be
10   relied on in the cosmetic exposure context?
11       A.   Can be relied on --
12       Q.   Do you think that women
13   experiencing heavy occupational exposure to
14   asbestos are exposed to the same amount of
15   asbestos as women using talcum powder
16   perineally?
17       A.   I don't know the answer to
18   that.
19       Q.   Have you attempted to quantify
20   the difference between heavy occupational
21   asbestos exposure and perineal talc asbestos
22   exposure?
23           MS. O'DELL:  Objection to the
24       form.
```

41 (Pages 158 to 161)

Judith K. Wolf, M.D.

Page 162

1    A.   I haven't attempted to
2 quantify.  But if we go back to what I'm
3 talking about here is the talcum powder
4 product, which I believe some of which
5 contains asbestos but also contains fibrous
6 talc, heavy metals and fragrances that are
7 irritating.  So it's hard -- it's apples and
8 oranges.  It's asbestos occupationally that
9 we're saying here.  It's a talcum powder
10 product of which one of the concerning
11 components is asbestos and so it's more than
12 just asbestos.
13 BY MS. BROWN:
14    Q.   Are you aware of any scientific
15 literature that has attempted to quantify the
16 difference in exposure between heavy
17 occupational asbestos exposure and cosmetic
18 talcum powder use?
19    A.   Of asbestos specifically, is
20 that what you're asking me?  What are you
21 asking?
22    Q.   Are you aware of any scientific
23 literature that attempts to quantify the
24 difference between how much a woman is

Page 163

1 exposed -- how much asbestos a woman is
2 exposed to in the occupational context versus
3 if she uses a cosmetic talcum powder product
4 that you believe is contaminated with
5 asbestos?
6        MS. O'DELL:  Object to the
7    form.
8    A.   I'm not aware of any literature
9 that specifically would answer that question
10 because how much, how often the talcum powder
11 is used would have -- would differentiate
12 there.
13 BY MS. BROWN:
14    Q.   Are you aware of any scientific
15 support that exposure -- nonoccupational
16 exposure to asbestos causes ovarian cancer?
17        MS. O'DELL:  Object to the
18    form, asked and answered.
19    A.   So these papers referred here,
20 in fact the Reid paper, suggests that in
21 nonoccupational exposure, there's an
22 increase, although not a statistically
23 significant risk of ovarian cancer in women
24 exposed to what would be presumed to be

Page 164

1 environmental asbestos.  I don't know if
2 those women used talcum powder in their
3 perineum.  But again, talcum powder product
4 is more than asbestos.
5 BY MS. BROWN:
6    Q.   Are you relying on the
7 nonstatistically significant findings in the
8 environmental studies of women exposed to
9 asbestos to support your view that cosmetic
10 talcum powder exposure causes ovarian cancer?
11        MS. O'DELL:  Object to the
12    form.
13    A.   I'm relying on the fact that
14 asbestos is carcinogenic, fibrous talc is
15 carcinogenic, platy talc via IARC is a
16 possible carcinogenic, heavy metals, chromium
17 and nickel are carcinogenic, cobalt is
18 possibly carcinogenic and many of the
19 fragrances in talcum powder product are
20 irritating, that that combination of product
21 causes ovarian cancer in some women and puts
22 any woman who uses it on her perineum at
23 risk -- increased risk for ovarian cancer.
24

Page 165

1 BY MS. BROWN:
2    Q.   Other than the nonstatistically
3 significant studies discussed in IARC's
4 monograph on asbestos, are you aware of any
5 scientific support linking asbestos to
6 ovarian cancer outside of the heavy
7 occupational context?
8        MS. O'DELL:  Object to the
9    form, asked and answered.
10    A.   I'm going to say I'm not aware
11 of that, but it doesn't form my opinion.  I'm
12 going to go back to -- and I know I keep
13 repeating the same thing over again -- it's
14 not the asbestos alone.  Asbestos is one of
15 the -- one of the issues that's a component
16 of talcum powder product that I'm concerned
17 about, that I believe the combination of all
18 of those things can increase the risk of
19 ovarian cancer.
20 BY MS. BROWN:
21    Q.   Isn't it important for you to
22 know or have established how much asbestos
23 you believe is contaminating baby powder
24 products before you can make that opinion?

42 (Pages 162 to 165)

Judith K. Wolf, M.D.

Page 166

1      MS. O'DELL:  Object to the
2  form.
3      A.    To me it is not and that's
4  because if -- if things work in an additive
5  or synergistic way, the amount of asbestos
6  that on its own might increase or not
7  increase the risk of ovarian cancer is
8  separate from the amount of asbestos that in
9  combination with all of the other components
10  might increase the risk of ovarian cancer.
11  BY MS. BROWN:
12      Q.    What scientific support do you
13  have for your opinion that asbestos works in
14  an additive way with the other constituents
15  of talcum powder to increase a woman's risk
16  for ovarian cancer?
17      A.    I don't know that specifically
18  for asbestos, but I know that in general,
19  cancer doesn't occur because of one thing; it
20  occurs because of multiple things.  And that
21  toxins can work in combination and that
22  causes of cancer can work in combination.
23  For instance, the human papilloma virus
24  causes cervical cancer, but if you smoke on

Page 167

1  top of that, your risk of cervical cancer is
2  greater than if you don't smoke.
3      So things can be additive and
4  are synergistic.  I don't know if these are
5  additive and/or synergistic.  My concern is
6  that they're all toxic and more than likely,
7  I suspect, there are some additivity plus or
8  minus synergism.
9      Q.    So if I understand you,
10  Dr. Wolf, you have an understanding generally
11  that multiple factors can work together to
12  cause cancer; is that fair?
13      A.    That's correct.
14      MS. O'DELL:  Object to form.
15  BY MS. BROWN:
16      Q.    As it relates to whether or not
17  multiple elements of a talcum powder product
18  work together to form -- to increase a
19  woman's risk of cancer, you're not aware of
20  any scientific support for that opinion.
21  True?
22      MS. O'DELL:  Object to the
23  form.
24      A.    I'm not aware of -- as far as I

Page 168

1  know, as far as my understanding, there isn't
2  a study that's taken one out and looked at
3  the difference in carcinogenicity, whether
4  one or the other is not there, but it doesn't
5  matter to me because they're there.  Asbestos
6  is carcinogenic.  Heavy metals are
7  carcinogenic.  Nickel and chromium.  Platy
8  talc is possibly carcinogenic.  Fibrous talc
9  is asbestos.  It's carcinogenic.
10  BY MS. BROWN:
11      Q.    Is there a threshold exposure
12  to asbestos in your mind that is needed to
13  cause ovarian cancer?
14      A.    Are you asking about asbestos
15  on its own?
16      Q.    Asbestos on its own.
17      A.    I'm not aware what that
18  threshold is.
19      Q.    Have you attempted to survey
20  the literature to see if there is any
21  scientific studies examining whether there is
22  a threshold level of asbestos exposure that
23  causes ovarian cancer?
24      MS. O'DELL:  Object to the

Page 169

1  form.
2      A.    Hold on one second.  Because
3  I'm looking on my papers about an asbestos
4  exposure, but those are not human studies.
5  So my -- my brain says how I would test that,
6  would be to give humans varying amounts of
7  asbestos knowing what you're giving them and
8  seeing who got cancer or not, and that study
9  hasn't been done and can't be done.
10  BY MS. BROWN:
11      Q.    And other than kind of your gut
12  or your understanding about how cancer works,
13  is there anything else you're relying on in
14  the scientific literature to support this
15  idea that asbestos is working in combination
16  with something else in talcum powder to
17  increase a woman's risk for ovarian cancer?
18      MS. O'DELL:  Object to the
19  form.
20      A.    So I'm going to step back and
21  say that my point is that all of those
22  components are toxic in talcum powder.  How
23  much asbestos is in there on its own doesn't
24  matter to me because if it's in there and

43 (Pages 166 to 169)

Judith K. Wolf, M.D.

Page 170

1  this is in there and this is in there and
2  this is in there, and what I mean is fibrous
3  talc, platy talc, heavy metal, irritating
4  fragrances, it doesn't matter to me how much
5  asbestos is in there.  If there's a sample of
6  baby powder that doesn't have asbestos in
7  there, it doesn't matter, because all of
8  those other things also are carcinogenic or
9  possibly carcinogenic or irritating and
10  inflammatory.
11  BY MS. BROWN:
12      Q.    So in forming your opinions in
13  this case, Dr. Wolf, it is not important to
14  you to know the chemical composition of an
15  individual bottle of talcum powder; is that
16  right?
17          MS. O'DELL:  Object to the
18      form.
19      A.    In women who use talcum powder
20  on their perineum, if they're using it
21  regularly, whatever -- however that is
22  defined as once a day, once a week, twice a
23  day, over a period of years they're going to
24  be exposed to more than one bottle of baby --

Page 171

1  of talcum powder product.  And so whether one
2  of those bottles did or did not have asbestos
3  in it doesn't matter to me.
4  BY MS. BROWN:
5      Q.    Because in your view, there are
6  other things in talcum powder that cause
7  cancer?
8      A.    Because there are other things
9  in talcum powder that are carcinogenic or
10  possibly carcinogenic, and if a woman has
11  used more than one bottle over her lifetime,
12  the chances are pretty high that one of those
13  bottles did contain asbestos in addition to
14  the others.
15      Q.    Is it your opinion that the
16  fragrances in Johnson & Johnson's baby powder
17  cause ovarian cancer?
18      A.    No, I never stated that.  It's
19  my opinion that some of them are known
20  irritants or can be inflammatory, and that
21  was from Dr. Crowley's report, which I did
22  see before I wrote my report, his expert
23  report.
24      Q.    Time-out.  Time-out.  Are we --

Page 172

1  you're going to change your testimony from
2  earlier this morning?
3          MS. O'DELL:  Object to the
4      commentary.  She's not changing her
5      testimony.  She's referred to
6      Dr. Crowley numerous times in her
7      deposition thus far.
8  BY MS. BROWN:
9      Q.    Dr. Wolf, you remember telling
10  me this morning you didn't look at anybody's
11  expert report before you wrote yours, right?
12      A.    Yes.  But I was incorrect, and
13  I'm clarifying it now, because I did see
14  Dr. Crowley's report and I did see
15  Dr. Longo's report.
16      Q.    Did you rely on Dr. Crowley's
17  report in forming the opinions in your
18  report?
19      A.    About the fragrances, yes.
20      Q.    When did you see Dr. Crowley's
21  report?
22      A.    Sometime before I turned my
23  report in so that I had time to review it.
24      Q.    Did you see a draft version of

Page 173

1  Dr. Crowley's report?
2      A.    I think I saw his final report.
3      Q.    How many days did you spend
4  reviewing Dr. Crowley's report?
5          MS. O'DELL:  Object to the
6      form.
7      A.    I don't recall.
8  BY MS. BROWN:
9      Q.    What information did you use or
10  rely on from Dr. Crowley's report?
11      A.    I can pull it up, but I believe
12  you have a list of all of the things that
13  were in there and looking at them, what they
14  were -- what was known about all of the
15  different components.
16      Q.    Did you do anything to verify
17  the accuracy of Dr. Crowley's list of
18  components of talcum powder?
19          MS. O'DELL:  Object to the
20      form.
21      A.    Such as?  What are you
22  suggesting?
23  BY MS. BROWN:
24      Q.    Did you do anything, as an

44 (Pages 170 to 173)

Judith K. Wolf, M.D.

Page 174

1  independent expert witness, to check the list
2  that you received from Dr. Crowley?
3       MS. O'DELL:  Object to the
4    form.
5       A.   I don't know how I could have
6  done that because I didn't have the list of
7  what was in there myself.  And I don't --
8  so -- and I don't do the testing myself.  I
9  relied on the expert, that he tested and
10  found those things in the report, in the
11  fragrance -- or in the product, sorry.
12  BY MS. BROWN:
13       Q.    And is it your opinion that
14  some of the elements on Dr. Crowley's list
15  increase a woman's risk of ovarian cancer?
16       A.   No.  It's my opinion that some
17  of the ingredients on the list are
18  inflammatory.  And I know that inflammation
19  plays a role in the development and
20  progression of ovarian cancer.
21       Q.    Are you relying on any
22  scientific literature to support your
23  opinion, that some of the chemicals in
24  Johnson & Johnson's baby powder cause an

Page 175

1  inflammatory reaction that can lead to
2  cancer?
3       MS. O'DELL:  Object to the
4    form.
5       A.   I'm relying on the literature
6  that says ovarian cancer is related to
7  inflammation, both development and
8  progression, and knowing that those are
9  inflammatory, I have a concern about them.
10  BY MS. BROWN:
11       Q.    Do you have any scientific
12  support that the chemicals in Johnson &
13  Johnson's baby powder are inflammatory in
14  human beings?
15       MS. O'DELL:  Object to the
16    form.
17       A.   I'd have to look at the report
18  of how they were all tested.  I know that --
19  I'm assuming most of it was in animals, not
20  in humans.  So I'd have to look at the
21  report.
22  BY MS. BROWN:
23       Q.    Are you relying on the presence
24  of certain of the chemicals listed on

Page 176

1  Dr. Crowley's list, are you relying on the
2  presence of those in the baby powder product
3  to support your opinion that it increases a
4  woman's risk of ovarian cancer?
5       A.   I believe it's one of the
6  things that could.
7       Q.    So what I want to know is what
8  ingredients do you believe could increase a
9  woman's risk of ovarian cancer, and then,
10  two, what scientific support you have for
11  that?
12       MS. O'DELL:  Excuse me.  Object
13    to the form.
14       A.   I never said that those
15  ingredients themselves could increase the
16  risk of ovarian cancer.  What I'm saying is
17  that some of the ingredients can be
18  inflammatory.  Inflammation is associated
19  with development and progression of ovarian
20  cancer.  Those fragrances on their own --
21  excuse me, in conjunction with all of the
22  other components of talcum powder are
23  concerning to me.
24

Page 177

1  BY MS. BROWN:
2       Q.    And what support do you have in
3  the scientific literature that would lead you
4  to be concerned about the inflammatory
5  process you just described?
6       A.   Oh, in ovarian cancer?
7       Q.    No, with these chemicals, what
8  support do you have -- the list of
9  fragrances, what support do you have that
10  those elements cause inflammation that could
11  lead to cancer in humans?
12       MS. O'DELL:  Object to the
13    form.
14       A.   I never said I had that
15  evidence.  What I'm saying, is that the
16  expert report says that many of them are
17  inflammatory and that I know that
18  inflammation has -- plays a large role in
19  ovarian cancer and there's more and more
20  papers suggesting that, and that this is one
21  of the components of talcum powder product
22  that I'm concerned about.
23  BY MS. BROWN:
24       Q.    And do you have any evidence

45 (Pages 174 to 177)

Judith K. Wolf, M.D.

Page 178

1  that those elements have been tested in human
2  beings, have caused inflammation in human
3  beings?
4           MS. O'DELL:  Object to the
5      form.
6      A.   I would have to review his
7  report again.  My -- so I can't answer that
8  question offhand.  I would suspect that most
9  of these were tested in animals, not in human
10  beings.
11  BY MS. BROWN:
12     Q.   For purposes of your opinion,
13  Dr. Wolf, are you relying on a finding in
14  animals of inflammation, to support your
15  opinion that talcum powder causes ovarian
16  cancer?
17          MS. O'DELL:  Object to the
18      form.
19     A.   No.  What I'm relying on is --
20  let me clarify it.  What I'm relying on is
21  that these cause inflammation, even if it's
22  in animals.  They are part of the talcum
23  powder product and concerning to me, in
24  addition with all of the other parts of

Page 179

1  talcum powder that are concerning, asbestos,
2  fibrous talc, platy talc, heavy metals.
3  BY MS. BROWN:
4      Q.   What support do you have that
5  the inflammation you're referring to leads to
6  cancer?
7           MS. O'DELL:  Object to the
8      form.
9  BY MS. BROWN:
10     Q.   What I'm after is, where are
11  the scientific studies that say this
12  inflammation in an animal caused cancer, of
13  the list of fragrances Dr. Crowley opines on?
14          MS. O'DELL:  Object to the
15      form, asked and answered.
16     A.   Yeah, I believe I've already
17  answered that question.  I don't have a study
18  that I can point to that says, using this
19  agent it produced cancer, in this agent that
20  it produced cancer.  But if they're
21  inflammatory, that's concerning enough to me,
22  especially with ovarian cancer, that they
23  could play a role in the toxicity of talcum
24  powder on the perineum to increase the risk

Page 180

1  of ovarian cancer.
2  BY MS. BROWN:
3      Q.   Other than your understanding
4  that some of the fragrances have been
5  inflammatory in animals, is there anything
6  else you're relying on to support your
7  opinion, that the presence of the fragrances
8  in Johnson & Johnson's baby powder increase a
9  woman's risk of ovarian cancer?
10          MS. O'DELL:  Object to the
11      form.
12     A.   I'm just reading the question
13  again.  The fact that I know that
14  inflammation in a proinflammatory state is
15  related to the development of ovarian cancer
16  and the progression of ovarian cancer, I'm
17  concerned about anything in talcum powder
18  product that would increase -- potentially
19  increase inflammation.
20  BY MS. BROWN:
21     Q.   How -- have you made a
22  determination of how much of the fragrances
23  are present in the talcum powder product?
24     A.   I do not know that.

Page 181

1      Q.   Isn't it important for you in
2  forming your opinion, to know the amount of
3  exposure that a woman would get from
4  fragrances in talcum powder?
5           MS. O'DELL:  Object to form.
6      A.   I'm going to go back to what I
7  said about asbestos and the amount.  First of
8  all, I don't know how you would quantify the
9  amount when I don't know how you would quantify the
10  often someone uses it, how much they use, how
11  long they used talcum powder product.  And
12  then in addition, each individual woman, her
13  makeup, her response is going to be
14  different.
15          And so given that there isn't
16  testing of dosing to see if each of these
17  individual things increases the risk of
18  ovarian cancer and there's some concern that
19  they increase inflammation, my concern is
20  that any amount is worrisome.
21  BY MS. BROWN:
22     Q.   And the basis for your opinion
23  that it's worrisome is your understanding
24  that in some dose, these chemicals can cause

46 (Pages 178 to 181)

Judith K. Wolf, M.D.

Page 182

1 inflammation in animal models.  True?
2         MS. O'DELL:  Object to the
3     form.
4     A.     And more than that, that
5 inflammation can cause -- be one of the
6 causes of ovarian cancer and this is
7 something that's in a product that has
8 multiple things that have been associated
9 with increased inflammation and/or
10 carcinogenicity of the ovaries.
11 BY MS. BROWN:
12     Q.     And tell me, Doctor, I
13 understand you believe that there is asbestos
14 in baby powder, right, we talked about that?
15     A.     I have seen data to support
16 that there is asbestos in some baby powder
17 product.
18     Q.     And you have not made a
19 determination as to how much may be in baby
20 powder, correct?  How much asbestos?
21         MS. O'DELL:  Objection to the
22     form --
23     A.     My concern is that I don't -- I
24 don't know specifically how much, and I don't

Page 183

1 really have a threshold of how much is safe.
2 I'm concerned with any.
3 BY MS. BROWN:
4     Q.     And you've not made a
5 determination as to how much fragrance is in
6 any individual bottle of baby powder,
7 correct?
8     A.     Well, an individual fragrance,
9 no, I don't know.
10     Q.     Is it your testimony that any
11 amount, including trace levels of fragrances,
12 can cause inflammation that lead to cancer?
13         MS. O'DELL:  Objection to the
14     form.
15     A.     I don't know how much of the
16 fragrances are required to cause
17 inflammation.  Given that I don't know how
18 much is safe, I'm concerned about any amount.
19 BY MS. BROWN:
20     Q.     But do you have scientific
21 support for the fact that any amount of
22 fragrance can cause inflammation that leads
23 to cancer?
24         MS. O'DELL:  Object to the

Page 184

1     form.
2     A.     I believe I've answered this
3 question multiple times, that these fragrance
4 ingredients, some of them cause inflammation,
5 at least in animals, that ovarian cancer, one
6 of the causes, is a proinflammatory state and
7 inflammation can also enhance the progression
8 of ovarian cancer.  And so if there's a
9 product that I know contains -- one of the
10 components can cause inflammation, and I
11 don't know what level is safe, I don't know
12 that I can answer that there's a safe level.
13 BY MS. BROWN:
14     Q.     Are you familiar with talc
15 pleurodesis?
16     A.     Yes.
17     Q.     You understand that that is a
18 procedure in which talc is placed inside a
19 person's lung for its inflammatory response,
20 correct?
21     A.     So it's not placed in the lung.
22 It's placed in the pleura.
23     Q.     Pleura.  Right?
24     A.     Yes.

Page 185

1     Q.     And the purpose of placing it
2 in the pleura is to initiate an inflammatory
3 response, correct?
4     A.     That's correct.
5     Q.     And that's, in fact, one of the
6 reasons that talc is what's used in
7 pleurodesis because it produces in large
8 quantities, an inflammatory response, right?
9     A.     So that is one of the reasons
10 that talc has been used.  It's not used very
11 much anymore because a lot of ovarian cancer
12 patients get malignant pleural effusions.
13 And so I've had a lot of personal experience
14 in -- I'm not doing the pleurodesis myself,
15 but referring, and most places for malignant
16 pleural effusions these days, they don't use
17 any kind of chemical pleurodesis.  They put
18 in a drain, that the patient can drain as
19 needed when they're short of breath.
20     Q.     You, Doctor, have never
21 performed talc pleurodesis; is that right?
22     A.     I have referred patients to my
23 colleagues to do it, but I haven't personally
24 done it.

Judith K. Wolf, M.D.

Page 186

1  Q.   Part of your care as a
2  gynecological oncologist includes from time
3  to time referring patients for talc
4  pleurodesis; is that right?
5      MS. O'DELL:  Object to the
6      form.
7      A.   Referring patients for
8  management of malignant pleural effusion.
9  And I would say that in the last 15, at
10 least, years, none of my patients have had
11 talc pleurodesis or any kind of chemical
12 pleurodesis.  They've all had drains placed.
13 BY MS. BROWN:
14     Q.   And you're not a pulmonologist,
15 right, Doctor?
16     A.   I'm not a pulmonologist.
17     Q.   You are not the primary person
18 that patients go to when they're suffering
19 from diseases of the pleura like
20 mesothelioma, correct?
21     MS. O'DELL:  Object to the
22     form.
23     A.   No.
24

Page 187

1  BY MS. BROWN:
2      Q.   And so whether or not talc
3  pleurodesis is and remains the standard of
4  care at a number of institutions treating
5  patients with mesothelioma is not something
6  that you necessarily know; is that fair?
7      MS. O'DELL:  Object to the
8      form.
9      A.   I would say it's my
10 understanding that in general, talc
11 pleurodesis is not as common as it used to
12 be.
13 BY MS. BROWN:
14     Q.   And you would agree with me,
15 Doctor, that talc pleurodesis is something
16 that IARC considered in reviewing the
17 literature on talc, right?
18     MS. O'DELL:  Object to the
19     form.  Which monograph are you
20     referring to?
21 BY MS. BROWN:
22     Q.   On talc.
23     A.   Oh, the 2010?  Yes.
24     Q.   Right.  And one of the things

Page 188

1  that IARC noted is that in -- certainly, talc
2  pleurodesis causes an inflammatory response,
3  right?
4      A.   Yes.
5      Q.   And that those patients have
6  been followed for decades, to see if that
7  inflammatory response leads to cancer, right?
8      A.   Some of those patients.
9      Q.   And by and large -- have you
10 reviewed the epidemiology as it relates to
11 patients who have undergone talc pleurodesis?
12     A.   Yes.
13     Q.   And you would agree with IARC,
14 that the conclusions are that talc
15 pleurodesis does not cause cancer.  True?
16     MS. O'DELL:  Object to the
17     form.
18     A.   So my interpretation of the
19 literature on that, is that it's a -- most of
20 the time it's a one-time application of talc.
21 Many of those patients have a terminal
22 disease and don't live long enough to know
23 what happens down the road.  Some of them
24 have been followed a long time, but the talc

Page 189

1  pleurodesis, it happens once, maybe twice,
2  but it's not a repeated application of talc.
3  BY MS. BROWN:
4      Q.   Have you attempted to quantify
5  the difference between how much talc is
6  applied to the mesothelial cells of the
7  pleura versus how much talc could enter a
8  woman's body from perineal use?
9      MS. O'DELL:  Object to the
10     form.
11     A.   I haven't done that.  I'm not
12 sure how you could do that, unless you
13 measured how much a woman used over time.
14 BY MS. BROWN:
15     Q.   You would agree with me that in
16 the pleurodesis context, talc causes an
17 inflammatory response that does not cause
18 cancer, right?
19     MS. O'DELL:  Object to the
20     form.
21     A.   I would agree that it causes an
22 acute inflammatory response, that's why it's
23 used.  And I would say that many of the --
24 much of -- it's given once, and much of the

48 (Pages 186 to 189)

Judith K. Wolf, M.D.

Page 190

1    time we don't know -- the patients don't live
2    long enough to know if there's any effect.
3    In the patients that have lived long and have
4    been followed, there hasn't seen an increase
5    risk of cancer, but again, it's a one-time
6    application.
7    BY MS. BROWN:
8        Q.    And in terms of how much -- of
9    the one-time application, how much talc gets
10   into a person's body, that's not something
11   you know, right?
12       A.    No, because I think that if a
13   woman's using it, I don't know how much she's
14   using over time.  And although maybe one time
15   using it in the perineum is less than the
16   amount used for talc pleurodesis, if somebody
17   uses talcum powder product in their peroneum
18   daily, monthly, weekly for years, I don't
19   know how that relates to what's used in a
20   one-time talc pleurodesis.
21       Q.    Right.  You don't have any
22   information or any basis to compare the
23   amount of talc that's injected into a person
24   who's getting talc pleurodesis with the

Page 191

1    amount of talc that may or may not migrate up
2    the genital track to the ovaries.  True?
3            MS. O'DELL:  Object to the
4        form.
5        A.    What I'm saying is that I can't
6    compare the two.  It's certainly not bottles
7    of talcum powder that -- multiple bottles
8    that are used in pleurodesis.
9    BY MS. BROWN:
10       Q.    Do you know how many grams of
11   talcum powder are used in talc pleurodesis?
12       A.    I don't remember offhand.
13       Q.    Have you attempted to quantify
14   how much talcum powder could ascend the
15   genital tract through perineal dusting?
16           MS. O'DELL:  Object to the
17       form.
18       A.    Are you asking me have I
19   personally done that?
20   BY MS. BROWN:
21       Q.    Well, in connection with your
22   opinion -- I assume your opinions in this
23   case are based on a belief that talc can
24   migrate to the ovaries.  True?

Page 192

1        A.    I believe that talc, as well as
2    many inert materials can migrate to the
3    ovaries.
4        Q.    What other inert materials can
5    migrate to the ovaries?
6        A.    Dead sperm, carbon particles,
7    radioactive material that's been studied.
8        Q.    Are you aware --
9        A.    Menstrual blood that flows
10   retrograde.
11       Q.    What about particles from the
12   exterior of the vagina?  Are you aware of any
13   evidence that those particles can migrate to
14   the ovaries?
15       A.    So -- I want to say it's in one
16   of the animal studies.  There is definitely
17   inflammation of the genital tract with
18   perineal application of rats from talc.  It's
19   not necessarily a migration study.
20       Q.    So my question is, do you have
21   any scientific support that particles on the
22   exterior of the vagina can migrate up the
23   genital tract to the ovaries?
24           MS. O'DELL:  Object to the

Page 193

1        form.
2        A.    So I don't know how to say
3    this.  Because of the position of the
4    perineum, because of the opening of the
5    vagina, because of the opening of the cervix,
6    unless a woman has cervical stenosis, and the
7    opening of the fallopian tubes, unless she
8    has her tubes tied or removed, it's an open
9    tract from the outside up through the vagina
10   and to the ovaries in humans.  Some animals
11   not, but in humans.  And it's generally
12   accepted in the gynecologic community and by
13   the FDA that migration occurs.
14   BY MS. BROWN:
15       Q.    And I understand in connection
16   with your report on page 10, you cite to a
17   number of studies that support your opinion;
18   is that right?
19       A.    That's correct.
20       Q.    And none of these studies
21   involve studying whether talcum powder
22   applied outside of the vagina can travel up
23   to the ovaries; is that right?
24       A.    That's correct, in these

Page 194

1    studies.
2        Q.    And in fact, none of these
3    studies investigate whether any particle
4    applied outside of the vagina can travel up
5    to the ovaries.  True?
6        A.    Not -- no, that's correct.
7        Q.    And, in fact, there is no
8    evidence in the scientific community at all,
9    that would show a talcum powder particle
10   outside of the vagina traveling up to the
11   ovaries; that investigation has not been
12   done, correct?
13       MS. O'DELL:  Objection to the
14   form.
15       A.    So the studies that I have
16   quoted for -- referenced for migration are
17   not talcum powder.  There are other inert
18   substances.  The studies on talcum powder
19   were not on the perineum in the vagina, but
20   there's -- there's no reason to think or
21   believe, and from my perspective and from the
22   perspective of the gynecologic community,
23   that any inert substance couldn't travel from
24   the outside up into the ovaries.  In fact,

Page 195

1    it's been known for decades, that if a woman
2    has that system blocked in some way, if her
3    tubes are tied or her tubes are removed or
4    she's had a hysterectomy, that reduces her
5    risk of ovarian cancer.  And before there was
6    any hint of what might be coming from the
7    outside, the hypothesis in the medical
8    community, at least in the gynecologic
9    community, is that it's an external substance
10   that gets to the ovaries.
11       And the fact that that could
12   happen is based on the fact that all of these
13   other things that are known to travel back
14   from the outside.  And if something's on the
15   outside, it can be pushed up into the inside
16   through the vagina by intercourse, by going
17   to the bathroom, by wiping, by having --
18   riding a bike, by exercising, by walking.
19   And I think that's -- that's where I'm going
20   to stop.
21   BY MS. BROWN:
22       Q.    And you know that none of the
23   talc-dusted condom studies show an increased
24   risk of ovarian cancer, right?

Page 196

1        MS. O'DELL:  Object to the
2    form.
3        A.    So there was a concern for
4    that.  I think we talked about that earlier.
5    BY MS. BROWN:
6        Q.    I'm talking about the epi that
7    looked at women who had used, with their
8    partners, talc-dusted condoms and you know
9    that epi shows no increased risk of ovarian
10   cancer, right?
11       MS. O'DELL:  Object to the
12   form.
13       A.    So just because those
14   studies -- okay.  I'm going to say okay, yes.
15   BY MS. BROWN:
16       Q.    How did that body of
17   epidemiology, how did you take that into
18   account in forming your opinion in this case?
19       MS. O'DELL:  Object to the
20   form.
21       A.    So I mean, I'm going to say
22   that it's a piece of the information, but
23   when I look at all of the information as a
24   whole, as in epidemiology as far as talcum

Page 197

1    powder product exposure, the weight of the
2    evidence suggests that there is an increased
3    risk of ovarian cancer with genital talcum
4    powder application.
5    BY MS. BROWN:
6        Q.    Did you -- in considering the
7    epidemiology that looked at women whose
8    partners had used talc-dusted condoms, did
9    you weight that epidemiology differently than
10   some of the other studies you considered?
11       MS. O'DELL:  Object to the
12   form.
13       A.    So I'm going to say that the
14   studies I gave the most weight to in the epi
15   review, were those that were larger, newer
16   meta-analysis or a prospective of the cohort
17   studies.
18   BY MS. BROWN:
19       Q.    I think one of the ones you
20   pointed us to was Cramer 2016, right?
21       A.    Yes.
22       Q.    And you know that -- and how
23   did you consider Cramer's findings as it
24   related to women who had had tubal ligation?

50 (Pages 194 to 197)

Page 198

1    A.    So I believe he didn't see a
2  difference.  I have to look at the paper
3  again.  Some of them they saw a difference if
4  the tubes were tied and some of them they
5  didn't and I can't remember.
6        MS. O'DELL:  If you need to
7    take a look at the paper.
8  BY MS. BROWN:
9    Q.    Let's take a look at the paper
10 and refresh you on what Dr. Cramer found, and
11 I'll ask you some questions about that.
12   A.    2016.  This one.
13   Q.    That's going to be this one.
14 Doctor, I want to direct you to page 339, and
15 we'll mark it as an exhibit.  This will be
16 Wolf 11, Dr. Cramer's 2016 article.  And I
17 think you stated in your report that this was
18 an article that you found to be of
19 particularly high quality; is that right?
20   A.    Yes.
21        (Deposition Exhibit 11 marked
22    for identification.)
23 BY MS. BROWN:
24   Q.    And what -- what's your

Page 199

1  definition of a "high-quality case-control
2  study"?
3    A.    So I looked at the size of the
4  study, the -- I was trying to focus on the
5  newer studies just because this would be more
6  related to talcum powder products in the last
7  20 or 30 years.  Dr. Cramer has expertise in
8  this area.  This is something that he studied
9  before.  And he also looked at multiple --
10 multiple -- how often the talc was used and
11 multiple factors that might influence whether
12 there was an impact.
13   Q.    So as I understand you,
14 Dr. Wolf, the factors you considered in
15 deeming that a study was, quote/unquote, high
16 quality, include looking at the number of
17 people studied; is that right?
18   A.    Uh-huh.
19   Q.    The author of the study,
20 correct?
21   A.    Uh-huh.
22   Q.    The --
23   A.    The expertise of the author.
24   Q.    The expertise of the author.

Page 200

1    A.    If I know it.  I don't always
2  know.
3    Q.    The date of the publication
4  with a preference for more recent studies?
5    A.    Yes.
6    Q.    Okay.  And anything else that
7  went into your determination that
8  Dr. Cramer's 2016 study was high quality?
9        MS. O'DELL:  Other than what
10   she said previously.
11   A.    And also all of the different
12 potential cofactors that are evaluated.
13 BY MS. BROWN:
14   Q.    By "cofactors that are
15 evaluated," do you mean that the author
16 controlled for confounders?
17   A.    Or at least looked at other
18 things that might have an impact.
19   Q.    And one of the things you know
20 that Dr. Cramer found on page 339, is that
21 there was a statistically significant
22 increased risk in women who had had their
23 tubes tied who had used talcum powder, right?
24   A.    (Nods head.)

Page 201

1    Q.    Do you see that?
2    A.    Yes, I see that.
3    Q.    Okay.  And that's the opposite
4  of what you would expect, based on your
5  opinion and theory.  True?
6        MS. O'DELL:  Object to the
7    form.
8    A.    If we knew when they had their
9  tubes tied.  Did they have their tubes tied
10 before they started using talcum powder, or
11 after, or when?
12 BY MS. BROWN:
13   Q.    Well, in any event, what you
14 would expect, Doctor, is that the finding in
15 a woman who had her tubes tied should show
16 less of a relative risk in those who did
17 not have their tubes tied, based on your
18 theory of migration.  True?
19        MS. O'DELL:  Object to the
20   form.
21   A.    Only if those tubes were tied
22 before she was ever exposed to talcum powder
23 product.
24

51 (Pages 198 to 201)

Judith K. Wolf, M.D.

Page 202

1    BY MS. BROWN:
2        Q.    And you know Dr. Cramer did an
3    analysis of that as well, right?
4        A.    I don't know that he was able
5    to.
6        Q.    What he said, as you recall, is
7    that the number of women who only used talcum
8    powder after their tubes were tied were too
9    small to even analyze, right?
10       A.    That's the answer --
11           (Simultaneous discussion
12       interrupted by reporter.)
13           MS. O'DELL:  Give me a chance.
14       If you need to look at the paper,
15       don't -- don't assume based on what
16       the question is.
17           (Witness reviews document.)
18   BY MS. BROWN:
19       Q.    Doctor, you would agree that,
20   based on your theory of migration, you would
21   expect to see a significantly decreased risk
22   in women who had a tubal ligation.  True?
23           MS. O'DELL:  Doctor, feel free
24       to continue to refresh yourself before

Page 203

1        you answer any questions.
2        A.    I just want to read the -- I
3    want to look at one more thing and then I'll
4    answer your question.
5            (Witness reviews document.)
6        A.    I can't find it in the written
7    part of the article.
8    BY MS. BROWN:
9        Q.    Doctor, I'm going to withdraw
10   the question because I really do want to move
11   on.  I understand you want to spend some time
12   with the study and we can do that on a break.
13           MS. O'DELL:  She's about to
14       answer your question.
15       A.    I mean, it basically says that
16   he didn't have enough women to be able to
17   explain why that was the case.
18   BY MS. BROWN:
19       Q.    Okay.  So as a concept, though,
20   Doctor, you would expect, based on your
21   theory, that the epidemiology would show a
22   decreased risk of ovarian cancer with powder
23   use in women who have their tubes tied before
24   they use the powder use, correct?

Page 204

1            MS. O'DELL:  Object to the
2        form.
3        A.    I'm not sure.  I would -- if
4    the only way that they might get cancer from
5    an ovary is from migration, yes.  Unless
6    their tubes weren't adequately tied.
7    However, if the talc got to their ovaries
8    from another source through inhalation, then
9    there may still be some confounding and some
10   increased risk.
11   BY MS. BROWN:
12       Q.    Is it your opinion, Doctor,
13   that talc can get to a woman's ovaries
14   through inhalation?
15       A.    Yes.
16       Q.    Have you considered the
17   findings of the epidemiology as it relates to
18   body-only powder use?
19           MS. O'DELL:  Object to the
20       form.
21       A.    Yes.
22   BY MS. BROWN:
23       Q.    And what have those studies, by
24   and large, shown?

Page 205

1        A.    That it's -- that there's no
2    carcinogenicity.
3        Q.    The epidemiology shows, by and
4    large, no increased risk of ovarian cancer
5    with body-only use of talcum powder, correct?
6        A.    Yes.
7            MS. O'DELL:  Object to the
8        form.
9    BY MS. BROWN:
10       Q.    How did you consider that
11   epidemiology in forming your opinion that a
12   woman might be exposed to talcum powder
13   through inhalation?
14           MS. O'DELL:  Object to the
15       form.
16       A.    I'm not sure how those two
17   things relate.
18   BY MS. BROWN:
19       Q.    If a woman uses talcum powder
20   on her body, how is she exposed to the talcum
21   powder?
22       A.    On her skin.  I don't know what
23   you're asking me.
24       Q.    Do you think there's

52 (Pages 202 to 205)

Judith K. Wolf, M.D.

Page 206

1   potential -- more of a potential for a woman
2   to be exposed from inhaling talcum powder
3   when she puts it in her underwear than if
4   she's using it on her chest?
5       A.   I don't know.
6       Q.   Have you evaluated how much
7   talcum powder a woman using body-use-only
8   would be exposed to?
9           MS. O'DELL:  Object to the
10      form.
11      A.   I know that body-use-only does
12  not increase carcinogenicity --
13  carcinogenesis, I'm sorry.  But I'm not
14  ruling out that someone who routinely daily
15  uses it on the perineum couldn't also have
16  inhalation exposure.
17  BY MS. BROWN:
18      Q.   And what support do you have in
19  the scientific literature for that opinion?
20      A.   I would say the finding of talc
21  in lymph nodes is one potential -- pelvic
22  lymph nodes near the ovary, although the
23  pelvic lymph nodes could also come from the
24  ovary in the other direction.  I mean,

Page 207

1   migration could lead to talc in pelvic lymph
2   nodes.
3       Q.   What you're referring to is a
4   case report from 2007 that -- by Dr. Cramer?
5       A.   Yes.
6       Q.   Okay.  Did you know that
7   Dr. Cramer was an expert witness for the
8   plaintiffs?
9       A.   I did.
10      Q.   Did you consider Dr. Cramer's
11  work as an expert witness in evaluating and
12  reaching the determination that his 2016
13  paper was high quality?
14      A.   No.
15      Q.   The fact that Dr. Kramer is
16  being paid by plaintiffs' lawyers in talcum
17  powder litigation did not affect your
18  evaluation of his 2016 article; is that
19  right?
20      A.   No.
21          MS. O'DELL:  Object to the
22      form.
23  BY MS. BROWN:
24      Q.   Other than Dr. Cramer's 2007

Page 208

1   case report, do you have any other support in
2   the scientific literature that a woman using
3   talcum powder perineally would be exposed via
4   inhalation?
5       A.   Hang on one second.
6           (Witness reviews document.)
7       A.   I'm looking at my report and my
8   references, but they don't specifically talk
9   about perineal application and inhalation.
10  All I'm saying, to answer your first
11  question, to go back a few, is that -- your
12  question was, if somebody had their tubes
13  tied before they ever used talcum powder,
14  would that negate any increased risk of
15  ovarian cancer?  And my answer was, if the
16  tubes were tied, it couldn't migrate up, but
17  there's still the possibility that she could
18  have it from inhalation.  That's all I'm
19  saying.
20  BY MS. BROWN:
21      Q.   And I want to know what support
22  you rely on in forming the opinion that a
23  woman could inhale talcum powder that could
24  reach her ovaries and cause ovarian cancer?

Page 209

1       A.   I'm going to talk -- say that
2   talcum powder has been found not only in the
3   lymph nodes but in the ovaries of women, both
4   who report using and not using perineal
5   talcum powder.
6       Q.   So you're talking about the
7   Heller study, right?
8       A.   Yes.
9       Q.   Okay.  How does the fact that
10  talcum powder has been potentially found in
11  the ovaries of women who did not report using
12  talcum powder, support your view that a woman
13  could inhale talcum powder from perineal use
14  and have that powder reach her ovaries and
15  cause cancer?
16      A.   To me it just supports the idea
17  that talcum powder can get to the ovaries
18  through inhalation.
19      Q.   And did you read the findings
20  of that study as it related to whether or not
21  the talcum powder that was allegedly found in
22  the ovary induced an inflammatory response?
23          MS. O'DELL:  Object to the
24      form.

53 (Pages 206 to 209)

Judith K. Wolf, M.D.

Page 210

1    A.    So sometimes there was an
2  inflammatory response and sometimes not, is
3  my recollection.
4  BY MS. BROWN:
5    Q.    Okay.  Let's take a look at the
6  paper.
7    A.    Okay.
8        MS. O'DELL:  We've been going
9  about an hour and a half.  It's 12:45.
10        MS. BROWN:  If we could finish
11  Heller, then we can take a break.
12        MS. O'DELL:  What do you
13  anticipate on Heller?
14        MS. BROWN:  Ten minutes.
15        MS. O'DELL:  Okay.  Is ten
16  minutes okay with you, Doctor?
17        THE WITNESS:  Uh-huh.
18  BY MS. BROWN:
19    Q.    Thanks, Doctor.
20    A.    So it doesn't look like they
21  looked at inflammation.
22    Q.    Hold on one second.  And one of
23  the things you know that this --
24        MS. O'DELL:  Are you going to

Page 211

1  mark an exhibit?
2        MS. BROWN:  Uh-huh.
3  BY MS. BROWN:
4    Q.    I'm trying to find it.  We'll
5  take a break and I can find it for you,
6  Doctor.  But you know that they reported that
7  the talc that was found did not show evidence
8  of a foreign body reaction.  Do you remember
9  that?
10        MS. O'DELL:  Object to the
11  form.
12    A.    That's not anywhere in the
13  results.
14  BY MS. BROWN:
15    Q.    I'll show it to you.  We'll
16  take a break and I'll show it to you.  Would
17  that be important for you to consider?
18        MS. O'DELL:  Object to the
19  form.
20    A.    I'm going to say not
21  necessarily, because it depends on did they
22  look at the entire ovary, depends on the
23  timing of when they looked at it, whether
24  there's a response -- an inflammatory

Page 212

1  response or not.  But what I'm going to tell
2  you, I'm reading their entire results.
3  BY MS. BROWN:
4    Q.    I promise you I will point it
5  out to you.  I don't want to waste time.
6  This is going to be the first thing we do
7  when we come back.
8        Is it your testimony, based on
9  talc causing an inflammatory response, that
10  leads to cancer?
11    A.    Yes.
12    Q.    And so how -- when talc -- a
13  talc particle is found, would you expect it
14  to show an inflammatory response?
15    A.    What I'm trying to say is, that
16  I don't know the timing of the talc being
17  placed and looking at the specimen, was the
18  entire specimen looked at.  When you look at
19  pathology slides, you look at a little piece
20  of the tissue.  You don't generally look at
21  the entire tissue.  And so it could be that
22  the area that was looked at did not show
23  inflammation and in an area that wasn't in
24  the slide did show inflammation.

Page 213

1    Q.    In your opinion, can talc be in
2  the ovaries and not cause inflammation?
3    A.    No, that's not what I'm saying.
4  I'm saying you might not see it if you don't
5  look at the entire specimen, the entire
6  ovary.
7        MS. BROWN:  Let's take a break
8  and have lunch and we'll come back and
9  finish Heller, which I will mark.
10        MS. O'DELL:  Okay.
11        THE VIDEOGRAPHER:  Going off
12  the record.  The time is 12:44 p.m.
13        (Recess taken from 12:44 p.m.
14  to 1:41 p.m.)
15        THE VIDEOGRAPHER:  Back on the
16  record.  The time is 1:41 p.m.
17        (Deposition Exhibit 12 marked
18  for identification.)
19  BY MS. BROWN:
20    Q.    Dr. Wolf, I'm handing you what
21  I've marked as Exhibit 12 to your deposition,
22  and which is the article by Heller from 1996
23  that we were discussing before lunch.
24    A.    Yes.

54 (Pages 210 to 213)

Judith K. Wolf, M.D.

Page 214

1    Q.    And this is --
2        MS. O'DELL: Excuse me, do you
3    have a copy for me?
4        MS. BROWN: Sorry.
5    BY MS. BROWN:
6    Q.    This is one of the articles
7    that you pointed me to in support of your
8    opinion that talc particles can migrate to
9    the ovaries, correct?
10   A.    Yes.
11   Q.    Okay. And you would agree with
12   me, though, that this study looked at whether
13   or not the talc particles that they allegedly
14   found were causing an inflammatory response,
15   right?
16       MS. O'DELL: Object to the
17   form.
18   A.    Well, in -- in reading that
19   full paragraph, they looked at one of the
20   specimens for an inflammatory response, out
21   of 24.
22   BY MS. BROWN:
23   Q.    And the conclusion was that
24   there was no evidence of a response to talc,

Page 215

1    such as foreign body giant cell reactions or
2    fibrosis in the tissue, right?
3    A.    In one out of 24.
4    Q.    That wasn't my question. That
5    was their finding, right?
6        MS. O'DELL: Object to the
7    form.
8    A.    Their finding in one out of 24.
9    BY MS. BROWN:
10   Q.    Do you have evidence that in
11   the other 23 they saw evidence of an
12   inflammatory reaction to talc?
13   A.    I don't have any evidence that
14   they looked at the other 23.
15   Q.    Do you have any evidence at all
16   that talc found in the ovary produces an
17   inflammatory response?
18   A.    Yes.
19   Q.    And what's that?
20   A.    So I'm going to look at --
21       THE WITNESS: Can I get
22   Henderson? Two thousand -- 1971.
23   BY MS. BROWN:
24   Q.    I have it here. Let's just

Page 216

1    keep moving.
2        (Witness reviews document.)
3    A.    Okay. Sorry, this one does not
4    talk -- they don't mention any -- whether
5    they even looked for inflammation.
6        MS. O'DELL: Dr. Wolf, for the
7        record, you were referring to
8        Henderson '71?
9        THE WITNESS: Yes.
10   BY MS. BROWN:
11   Q.    So to be clear for the record,
12   then, Dr. Wolf, in Heller '96 the case that
13   they reported on found no evidence of a
14   response to talc, correct?
15       MS. O'DELL: Object to the
16       form.
17   A.    They looked at one out of 24
18   cases and in that one case, they did not see
19   a response to talc.
20   BY MS. BROWN:
21   Q.    And you have no evidence that
22   there was anything different in the other 23
23   cases. True?
24       MS. O'DELL: Object to the

Page 217

1        form.
2    A.    I don't have any evidence on
3    the other 23 cases.
4    BY MS. BROWN:
5    Q.    And in the Henderson article
6    that you just pointed us to, there's
7    similarly no evidence about whether or not
8    there was an inflammatory reaction. True?
9    A.    It doesn't look like they
10   looked.
11   Q.    And the way we got started
12   talking about -- and you would agree, based
13   on the pleurodesis studies, that it is
14   possible for talc to cause an inflammatory
15   reaction that does not lead to cancer. True?
16   A.    In the talc -- in pleurodesis
17   studies, that's an acute reaction. The
18   inflammation that is concerning to lead to
19   cancer is a chronic reaction, not an acute
20   reaction.
21   Q.    And how -- what do you rely on
22   for how much exposure to talc takes someone
23   from a chronic in- -- an acute inflammatory
24   response to a chronic inflammatory response?

55 (Pages 214 to 217)

Judith K. Wolf, M.D.

Page 218

1       MS. O'DELL:  Object to the
2   form.
3       A.    What do I rely on for how much
4   exposure of talc?  Exposure to talc over
5   time, can lead to a chronic response, chronic
6   inflammatory response.  If you're looking
7   under the microscope at an ovary or something
8   that has talc in it, in that slide you may or
9   may not see an inflammatory response, either
10  acute or chronic, for several reasons.  One,
11  that if the talc has been there a long time,
12  you might be -- not be looking when you see
13  obvious inflammatory response either acute or
14  chronic.  The second is that you might not be
15  looking at every part of the specimen, to
16  determine if it's just the section that
17  you're looking at.
18  BY MS. BROWN:
19      Q.    Have you attempted to quantify
20  how much exposure over time leads to the
21  chronic inflammation you were just
22  describing?
23      MS. O'DELL:  Object to the
24  form.

Page 219

1       A.    When I look at the literature
2   as a whole, again, going back to the
3   epidemiology literature that attempted to
4   look at dose response, it seems like the --
5   that several of the studies suggests that
6   more doses, and I'm putting that in quotes
7   because it's not measured, it's not a
8   specific amount, but more exposure increases
9   the risk of ovarian cancer.  And so my
10  inference from that, from putting the whole
11  of the literature together, is that the
12  longer -- the more dose, the more likely
13  the more inflammation and more cell damage,
14  inflammation causing an oxidative response
15  that then can lead down to DNA damage and, in
16  fact, in Saed's most recent abstract genetic
17  changes from talc.
18  BY MS. BROWN:
19      Q.    You billed time to the
20  plaintiff's lawyers for speaking to Dr. Saed;
21  is that right?
22      A.    Yes.
23      Q.    What was the purpose of that
24  conversation?

Page 220

1       A.    I know he was doing some
2   research and I wanted to hear from him about
3   what exactly he was looking at, how he was
4   studying it and what his plans were to try to
5   investigate in an in vitro way, the mechanism
6   by which talc can cause ovarian cancer.
7       Q.    Would you agree that the
8   mechanism or the proposed mechanism by which
9   talc can cause ovarian cancer, is not well
10  understood today?
11      MS. O'DELL:  Object to the
12  form.
13      A.    I would agree that there are
14  several lines of evidence, including all of
15  the body of Dr. Saed's work, as well as
16  Dr. Shukla's paper and Dr. Buz'Zard's paper,
17  that suggest that inflammation plays a role
18  in the carcinogenesis of talcum powder
19  product to cause ovarian cancer.  And that
20  the most recent work from Dr. Saed's lab,
21  which he's not the first author but the
22  senior author, shows that there's a dose
23  response for the amount of talc and that it's
24  not just inflammation that secondarily causes

Page 221

1   genetic changes, but there's actual genetic
2   changes in the cells that can be
3   carcinogenic.
4   BY MS. BROWN:
5       Q.    You testified earlier, I
6   believe, that the opinion that talc particles
7   can migrate to the ovaries is well accepted
8   in the medical community.  Do you remember
9   that?
10      A.    That migration of inert
11  substances is well accepted in the medical
12  community and, in fact, by the FDA.
13      Q.    And would you consider that to
14  include talcum powder?
15      A.    I would.
16      Q.    And, in fact, you state in your
17  report on page 17, that, "The evidence
18  supporting migration is robust and
19  universally accepted by the gynecologic
20  community."
21          Right?
22      A.    Yes.
23      Q.    Now, IARC doesn't agree with
24  that, right?

56 (Pages 218 to 221)

Judith K. Wolf, M.D.

Page 222

1    MS. O'DELL:  Object to the
2    form.
3    A.    So my sentence here says
4  "within the gynecologic community."
5  BY MS. BROWN:
6    Q.    Did you mean to exclude the
7  international research on cancer?
8    MS. O'DELL:  Object to the
9    form.
10    A.    No.  I'm saying that my
11  sentence here says it's universally accepted
12  within the gynecologic community.
13  BY MS. BROWN:
14    Q.    Were you aware that it's
15  rejected by IARC?
16    MS. O'DELL:  Object to the
17    form.
18    A.    My understanding is that it's
19  not rejected, that in that report that you're
20  referring to, which I think is the 2010
21  report, that they -- that the evidence that
22  they looked at, they said that it was weak,
23  not rejected.
24

Page 223

1  BY MS. BROWN:
2    Q.    And have you looked at any
3  additional evidence, other than that which
4  IARC considered, which leads you to believe
5  that it's universally accepted?
6    A.    I'd have to look at everything
7  that IARC looked at and compare it to what I
8  looked at to say if it's different.
9    Q.    Well, what was your methodology
10  in terms of considering the International
11  Agency for Research on Cancer's conclusion
12  that the evidence for migration is weak?
13    MS. O'DELL:  Object to the
14    form.
15    A.    You know, I -- as I've stated
16  before, I used all of the information as a
17  whole, to determine my opinion and my -- and
18  when I look at the bulk of the evidence and
19  with my experience and with what I know about
20  gynecology, there's multiple lines of
21  evidence that show that migration of inert
22  particles occurs, and that retrograde
23  migration occurs.
24

Page 224

1  BY MS. BROWN:
2    Q.    And you would agree with me,
3  Doctor, that all of the information you cite
4  on pages 10 and 11 was available to the
5  International Agency for Research on Cancer
6  in 2010.  True?
7    MS. O'DELL:  Object to the
8    form.
9    A.    I'd have to look at everything
10  that they reviewed to see if they reviewed
11  all of that.
12  BY MS. BROWN:
13    Q.    I'm handing you what we've
14  marked as Exhibit 15.
15    (Deposition Exhibit 13 marked
16    for identification.)
17  BY MS. BROWN:
18    Q.    And I want to start by
19  directing your attention to page --
20    MS. BROWN:  I'm sorry, we have
21    a copy for you, Counsel.
22  BY MS. BROWN:
23    Q.    This is IARC monograph on talc,
24  2010, and I want to start by directing your

Page 225

1  attention to page 33, under the section
2  entitled "Mechanistic and other relevant
3  data."
4    MS. O'DELL:  What page?
5    THE WITNESS:  Thirty-three.
6    MS. BROWN:  Sorry, is that 13?
7  I may have mismarked it.
8    MS. O'DELL:  That says that's
9    15.
10    A.    15.
11    MS. BROWN:  Should be 13.
12    We'll correct it.
13    A.    Do you want it back?
14  BY MS. BROWN:
15    Q.    Yeah, sorry.  Thank you,
16  Doctor.  Handing back to you what is
17  Exhibit 13.
18    MS. BROWN:  Thank you, Alexis.
19  BY MS. BROWN:
20    Q.    And I want to direct your
21  attention to page 33.  And this IARC
22  monograph on talc, nonasbestiform talc, of
23  course, you reviewed in connection with your
24  opinions in this case.  True?

57 (Pages 222 to 225)

Judith K. Wolf, M.D.

Page 226

1    A.    Yes.
2    Q.    Okay.  And you are aware that
3  IARC considers the strength of the evidence
4  as it relates to a proposed mechanism for
5  cancer, correct?
6    A.    Yes.
7    Q.    Okay.  And you see here on
8  page 33 that IARC evaluates those, using
9  terms such as "weak," "moderate" or "strong,"
10 correct?
11   A.    Yes.
12   Q.    Okay.  And IARC, if you would
13 turn to page 411, evaluated the data as it
14 relates to migration, right?
15       MS. O'DELL:  Object to the
16   form.
17 BY MS. BROWN:
18   Q.    And I'll direct you, excuse me,
19 Doctor --
20   A.    Are you directing me to
21 something specific on this page?
22   Q.    I am.
23   A.    Okay.
24   Q.    I'll direct you to the -- one,

Page 227

1  two, three -- fourth paragraph that begins
2  with "Perineal exposure."
3    A.    Okay.
4    Q.    And you see that IARC reports
5  on its review of the studies on potential
6  migration.  True?
7    A.    Yes.
8    Q.    And on balance, what the IARC
9  working group concluded was that the evidence
10 for retrograde transport of talc to the
11 ovaries in normal women is weak, right?
12   A.    Yes.
13   Q.    And that is their lowest
14 classification of mechanistic evidence,
15 correct?
16   A.    Yes.
17   Q.    And you believe IARC is a
18 reputable international health agency, right?
19   A.    Yes.
20   Q.    And so you considered its
21 conclusion, that the evidence for retrograde
22 migration is weak, right?
23   A.    I did.
24   Q.    And so tell me what methodology

Page 228

1  you employed to arrive at a conclusion that
2  is diametrically opposed to the one IARC
3  wrote about in 2010?
4        MS. O'DELL:  Object to the
5    form.
6    A.    I don't -- I don't believe it's
7  diametrically opposed and I believe that when
8  I reviewed all of the evidence and from my
9  own knowledge of gynecology and practicing
10 and my expertise in the last 30 years and
11 seeing multiple patients with endometriosis
12 and evidence of retrograde menstruation, that
13 my opinion is that migration occurs.  And
14 that I believe that it's the opinion of the
15 general gynecology community that migration
16 does occur.  And another reputable
17 institution is the FDA, who says that the
18 ability for particulates to migrate is
19 indisputable.
20 BY MS. BROWN:
21   Q.    And what you're referring to is
22 the 2014 citizen's petition, right?
23   A.    Yes.
24   Q.    And do you find that to be a

Page 229

1  reliable authority on the review of the
2  literature regarding talc and ovarian cancer?
3    A.    This is not regarding --
4  necessarily regarding talc and ovarian
5  cancer.  It's the idea that things can
6  migrate from the perineum through the genital
7  tract.  That's what I based my opinion on
8  that.
9    Q.    We're talking about two
10 different things.  You just referenced the
11 2014 response to a citizen's petition, right?
12   A.    Yes.
13   Q.    And do you -- and in that
14 response, the FDA went through its review of
15 the literature on talc and ovarian cancer,
16 correct?
17   A.    Yes.
18   Q.    And do you regard that as
19 authoritative and reputable?
20       MS. O'DELL:  Object to the
21   form.
22   A.    Yes.
23 BY MS. BROWN:
24   Q.    Okay.  And one of the things

58 (Pages 226 to 229)

Judith K. Wolf, M.D.

Page 230

1  you're pointing to, is the FDA's statement
2  that particles can migrate from the perineum
3  in the vagina to the peritoneal cavity,
4  correct?
5       A.   That's correct.
6       Q.   And the FDA, of course, doesn't
7  cite to any evidence that talc can migrate
8  from the exterior of the vagina to the
9  ovaries, correct?
10          MS. O'DELL:  Object to the
11      form.  If you're pointing -- going to
12      point Dr. Wolf to a particular part of
13      the letter, then I would ask you to
14      show it to her.
15          MS. BROWN:  Absolutely.
16          MS. O'DELL:  So if you need to
17      see the letter --
18      A.   Yeah, let me see the letter.
19          MS. O'DELL:  -- to respond to
20      the question, please ask for it.
21  BY MS. BROWN:
22      Q.   I'm going to show you the
23  letter and I want to talk about it, but you
24  raised the statement about the particles,

Page 231

1  right?
2          MS. O'DELL:  She did.  But she
3      doesn't have to answer questions about
4      the letter aside from what she said.
5          MS. BROWN:  I'm not talking --
6          MS. O'DELL:  If you want to ask
7      specific questions about the letter --
8          MS. BROWN:  I'm going to show
9      her the letter.
10          MS. O'DELL:  Then show her the
11      letter.
12          MS. BROWN:  Okay.  But I can
13      ask lead-up questions about the
14      letter.
15          MS. O'DELL:  Right.
16          MS. BROWN:  It doesn't have
17      to --
18          MS. O'DELL:  Let me finish.  In
19      order to answer any of the questions,
20      counsel asked if you need the letter,
21      please ask for it and I'm sure she'll
22      provide it to you.
23  BY MS. BROWN:
24      Q.   Dr. Wolf, did you review the

Page 232

1  response to the citizen's petition by the FDA
2  in 2014?
3       A.   I'm sure I did.
4       Q.   And, in fact, as support for
5  your opinion that talc applied on the
6  exterior of the vagina can migrate to the
7  ovaries, you referenced a sentence from that
8  letter, right?
9       A.   That's correct.
10      Q.   Okay.  But we agree that the
11  FDA was talking about particles generally,
12  correct?
13          MS. O'DELL:  Object to the
14      form.
15      A.   The FDA was talking about
16  particulates in general.
17  BY MS. BROWN:
18      Q.   Okay.  And did you review, and
19  I'll hand you what we've marked as
20  Exhibit 14, the entirety of what the FDA had
21  to say about the epidemiology and the
22  evidence as it relates to talc and ovarian
23  cancer?
24

Page 233

1          (Deposition Exhibit 14 marked
2      for identification.)
3          MS. O'DELL:  Object to the
4      form.
5          (Witness reviews document.)
6      A.   You asked me if I reviewed the
7  entire thing as to their opinion.  And the
8  answer is yes.  And what did you --
9  BY MS. BROWN:
10      Q.   That was the only question.
11      A.   That was the only question.
12      Q.   All right.  And you'll agree on
13  the first page, third paragraph, the FDA
14  concludes that it did not find that the data
15  submitted presented conclusive evidence of a
16  causal association between talc used in the
17  perineal area and ovarian cancer, right?
18          MS. O'DELL:  Object to the
19      form.
20  BY MS. BROWN:
21      Q.   That's what the FDA said?
22      A.   That's what the letter says.
23      Q.   That was the FDA's sentence in
24  a letter to the Cancer Prevention Coalition

59 (Pages 230 to 233)

Judith K. Wolf, M.D.

Page 234

1  in April of 2014, correct?
2      A.    Yes.
3      Q.    And you, Dr. Wolf, disagree
4  with that.  True?
5      A.    I do.
6      Q.    Okay.  And so what methodology
7  did you employ to distinguish your review of
8  the literature from the Food and Drug
9  Administration's review?
10     A.    The first thing is, is that I
11 have more literature to support my opinion
12 that was not yet available for the FDA.
13     Q.    And so tell me what that is,
14 Doctor.
15     A.    So all of the -- there are
16 three of the case report studies that I have
17 referenced in my article:  Wu and Cramer and
18 Schildkraut.  And, in fact, Schildkraut was
19 an NCI-sponsored study of African-American
20 women and use of talcum powder and risk of
21 ovarian cancer.  And after it's been
22 published, the NCI did update their talcum
23 powder on ovarian cancer, to say that this
24 study has shown that it increases risk of

Page 235

1  ovarian cancer in African-American women.
2  And then the meta-analysis Penninkilampi 2018
3  was not available.  The recent abstracts and
4  now paper from Dr. Saed on causation was not
5  available.
6      Q.    So the three case-control
7  studies that you believe distinguish your
8  review of the literature from the FDA's are
9  Wu 2015, Cramer 2016, and Schildkraut 2016,
10 correct?
11     A.    Yes.
12     Q.    In addition to a -- is it a
13 published paper by Dr. Saed?
14     A.    It's accepted for publication
15 and there's four abstracts.
16     Q.    Okay.  Has it been published
17 yet, to your knowledge?
18     A.    It hasn't yet been published.
19     Q.    Okay.  So in addition to the
20 three case-control studies, there is an
21 unpublished paper by a plaintiffs' expert in
22 the talc litigation, that you say you're
23 using to distinguish your review from the
24 FDA's review?

Page 236

1          MS. O'DELL:  Excuse me.  Object
2      to the form.  Give me just a minute to
3      object.  Fair enough.  Sorry.
4      A.    Additionally, the
5  meta-analysis, the Penninkilampi study that
6  was published in 2017.
7  BY MS. BROWN:
8      Q.    And that didn't include any new
9  information, though, right?  It's a
10 meta-analysis of old data.  True?
11     A.    Of all of the data, some of
12 which wasn't available when the FDA wrote
13 this letter.
14     Q.    Sure.  But if we're trying to
15 identify new data that you, Dr. Wolf, are
16 relying on that the FDA didn't have, we have
17 three case-control studies and an unpublished
18 manuscript by a plaintiffs' expert?
19         MS. O'DELL:  Object to the --
20     excuse me, object to the form,
21     misstates her testimony.
22     A.    There's also two of the three
23 cohort studies, the Nurses Health and Women's
24 Health Initiative, the Sister Study.  The

Page 237

1  Women's Health Initiative was published in
2  2014, so they wouldn't have had it, likely
3  wouldn't have, and the Sister Study.
4  BY MS. BROWN:
5      Q.    And what was the finding as it
6  relates to an increased talc use in ovarian
7  cancer in the Sister Study?
8      A.    The Sister Study did not find a
9  statistically significant increase, one of
10 the issues with all of the three cohort
11 studies is none of them are large enough to
12 detect a difference and none of them looked
13 at use over time.
14     Q.    Well, we're going to talk about
15 that.  But you'd agree that the Sister Study
16 and the follow-up to the Nurses Health Study
17 would not have changed the opinion of the
18 FDA, that there's not a causative link twine
19 talcum powder and ovarian cancer --
20         MS. O'DELL:  Object to the
21     form.
22 BY MS. BROWN:
23     Q.    -- right?
24     A.    I'm going to say that

Judith K. Wolf, M.D.

Page 238

1  indirectly they might have if they had had
2  the meta-analysis by Penninkilampi, because
3  in that meta-analysis of the cohort studies
4  there was a statistical significantly
5  increase in serous carcinoma, which is the
6  most common type of epithelial ovarian
7  cancer, that if you were going to find
8  something in those number of women, serous
9  would be the most likely that you would find
10  a significant increase when they looked at
11  all of the cohort studies together.
12      Q.   Now, of course Wu, the other
13  study that you pointed us to, found a greater
14  increase in the nonserous cancers, right?
15          THE WITNESS:  Do you have Wu
16      for me to review?
17          MS. O'DELL:  Yeah.
18      A.   Yeah, it's not here.
19  BY MS. BROWN:
20      Q.   I'll give you a copy, Doctor.
21  So we'll mark Wu as Exhibit 14.
22          (Deposition Exhibit 15 marked
23      for identification.)
24

Page 239

1  BY MS. BROWN:
2      Q.   I'll direct you to page 1414,
3  which is the "Subgroup Analysis by Histologic
4  Type."
5          MS. BROWN:  Counsel, I have a
6      copy for you.  Page 1414.  I have two,
7      actually.
8      A.   This must not be the right
9  paper either.  There's no page 1414.
10          MS. BROWN:  Wrong --
11      A.   Because there's a couple of
12  Wu's.
13  BY MS. BROWN:
14      Q.   Yeah, there's two.  We'll
15  remark it.  This is it.  No, this is another
16  Wu.  I misspoke, Doctor.  I meant to point
17  you to Schildkraut 2016, which is another
18  study that you identified as high quality,
19  right?
20      A.   Yes.
21      Q.   We'll mark that, as was my
22  intention, as 14.  And you know one of the
23  findings of Schildkraut was a greater
24  association with the nonserous histologic

Page 240

1  subtype, right?  And I'll direct you to Table
2  3 for that.
3          MS. O'DELL:  Just for you to
4      orient yourself, Doctor.
5          THE WITNESS:  Got it.
6      A.   Which Schildkraut?
7  BY MS. BROWN:
8      Q.   2016.
9      A.   2016.
10          MS. BROWN:  I'll give you a
11      copy right now.
12      A.   So it does show a --
13  significant in nonserous.
14  BY MS. BROWN:
15      Q.   Right.  And that's not
16  consistent with some of the other studies,
17  like Penninkilampi that you were talking
18  about earlier, correct?
19      A.   Well, what I was specifically
20  talking about Penninkilampi was the cohort
21  studies, finding a statistical significantly
22  increase in serous cancers.  If you look at
23  all of the studies, varying -- often it's
24  serous.  It doesn't have to be serous.  Some

Page 241

1  of the other studies found an increase in
2  endometrioid borderline tumors, other cell
3  types of ovarian tumors.
4      Q.   Is it your opinion, Doctor,
5  that talcum powder use perineally increases a
6  woman's risk of all different histologic
7  types of ovarian cancer?
8      A.   Well, I'm going to say that
9  we're looking at epithelial ovarian cancer,
10  and I don't have any evidence that has any
11  effect on stromal tumors or dermal cell
12  tumors.  I think of all of the epithelial
13  subtypes, that it's been shown to have -- in
14  some studies, in various studies, an increase
15  in serous or endometrioid.  And the other
16  subtypes are usually so small that there's
17  probably enough to know statistical
18  significance, such as clear cell or mucinous.
19  In this study by Schildkraut, it's just
20  serous or nonserous.  They don't break up the
21  other subtypes, at least in this table.
22      Q.   And the finding of the
23  nonserous increased risk is not consistent
24  with Penninkilampi's finding on that score,

61 (Pages 238 to 241)

Judith K. Wolf, M.D.

Page 242

1  correct?
2       MS. O'DELL:  Object to the
3    form.
4       A.    In the cohort studies, it was
5  serous.  That was statistically significant.
6  The two are not -- one does not negate the
7  other.  What I'm saying is that any of the
8  epithelial varying tumors could possibly be
9  increased, any cell type.  This one shows
10  nonserous.  The meta-analysis of the cohorts
11  showed serous, even though, except for the
12  first report of the Nurses Health Study there
13  wasn't any statistical increase in the cohort
14  studies, one does not negate the other.
15  BY MS. BROWN:
16       Q.    Gates was a follow-up to
17  Gertig's --
18       A.    Gertig -- yeah.
19            (Simultaneous discussion
20       interrupted by reporter.)
21  BY MS. BROWN:
22       Q.    Gates was a follow-up to --
23       A.    Gertig --
24            MS. O'DELL:  If you would let

Page 243

1       her finish and vice versa, I'll do my
2       best not to interrupt you.
3  BY MS. BROWN:
4       Q.    Dr. Wolf, Gates was a follow-up
5  of the cohort that was followed in the Gertig
6  Nurses Health Study, correct?
7       A.    That's correct.
8       Q.    And when that cohort was
9  followed longer in Gates, there was no
10  association with serous cancer, correct?
11       A.    That's correct.
12       Q.    And do you agree that it's
13  important, when evaluating a body of
14  literature, to evaluate all available
15  information?
16       A.    Yes.
17       Q.    And particularly as it relates
18  to the follow-up of individuals who were
19  initially studied for perhaps a shorter
20  period of time.  Fair?
21            MS. O'DELL:  Object to the
22       form.
23       A.    So long-term follow-up is
24  always helpful, yes.

Page 244

1  BY MS. BROWN:
2       Q.    Sure.  As a scientist
3  evaluating data on cancer, the longer folks
4  are studied, the more available information
5  there is.  True?
6            MS. O'DELL:  Object to the
7       form.
8       A.    That's true.
9  BY MS. BROWN:
10       Q.    And in evaluating the body of
11  literature on talc and ovarian cancer, you
12  wouldn't want to close your eyes to some of
13  the studies that include additional
14  follow-up.  True?
15            MS. O'DELL:  Object to the
16       form.
17       A.    I don't.
18  BY MS. BROWN:
19       Q.    Did you know that Penninkilampi
20  does not include the Gates study?
21       A.    So I'm going to look at that
22  paper again to see why he might have left --
23  he or she left the Gates study out.
24       Q.    And for the record, we'll mark

Page 245

1  Penninkilampi as Exhibit 16 your deposition.
2            (Deposition Exhibit 16 marked
3       for identification.)
4  BY MS. BROWN:
5       Q.    And to help with your review,
6  Doctor, if you want to, take as much as you
7  need, but page 46 lists the name of the
8  studies that are included and Table A was the
9  meta-analysis for ever use in ovarian cancer.
10  And you agree with me that Gates 2010 is not
11  included?
12            MS. O'DELL:  Feel free to take
13       a look at the paper before you answer
14       the questions, Doctor.
15       A.    I see that it was not included.
16  BY MS. BROWN:
17       Q.    And in writing your report and
18  identifying Gates as one of the higher
19  quality studies, were you aware at the time
20  that Gates had omitted the follow-up to the
21  Nurses Health Study as published in Gates
22  2010?
23            MS. O'DELL:  Object to the form
24       of the question.  I don't think that

62 (Pages 242 to 245)

Judith K. Wolf, M.D.

Page 246

1  she referred to Gates as a
2  high-quality study in her report.
3          MS. BROWN:  Let me rephrase.
4  That's my fault.
5  BY MS. BROWN:
6      Q.    In writing your report and
7  identifying Penninkilampi as one of the
8  higher quality studies, were you aware that
9  Penninkilampi excluded the Gates 2010
10  follow-up to the Nurses Health Study?
11      A.    Given that they left it out or
12  they didn't include it, to me it doesn't
13  negate that I think the Penninkilampi study
14  is a good study.  I was trying to see if
15  there was a reason why they didn't look at it
16  and I don't see anything mentioned in their
17  methods or in their discussion or their
18  results as to why they did not include it.  I
19  still think the Penninkilampi is a good
20  study.
21      Q.    Okay.  And you are not at all
22  concerned -- would you weigh Penninkilampi
23  less, given the fact that it did not include
24  the most complete data from the Nurses

Page 247

1  Health?
2          MS. O'DELL:  Object to form.
3      A.    I'm -- I can't answer that
4  question because I don't know what the data
5  would look like if they included the study.
6  BY MS. BROWN:
7      Q.    Well, did you review the Berge
8  analysis, the meta-analysis that was done
9  close to the same time?
10      A.    Yes.
11      Q.    Okay.  And were you aware that
12  Berge actually did include Gates as the most
13  recent representation of the Nurses Health
14  cohort?  We'll mark the Berge meta-analysis
15  as Exhibit 17.
16          (Deposition Exhibit 17 marked
17      for identification.)
18          (Witness reviews document.)
19      A.    So what I don't see in the
20  Berge paper is if they separated out serous
21  for the cohort studies.  They looked at
22  serous separately in the study.  What I don't
23  see, that they looked at serous histology in
24  the case-control versus the cohorts.

Page 248

1  BY MS. BROWN:
2      Q.    So your critique of the Berge
3  paper is that there's not a subgroup analysis
4  by histologic type?
5          MS. O'DELL:  Object to the
6      form.
7      A.    That's -- that wasn't a
8  critique, it's a piece of information.  That
9  differently from the Penninkilampi study,
10  which was looking specifically at serous
11  histology of the cohorts, the Berge study
12  didn't look at serous from the cohort
13  separately, they looked at serous overall
14  separately.  It's just a difference.  It's
15  not a critique.
16  BY MS. BROWN:
17      Q.    So one of the things that
18  Penninkilampi looked at was whether ever use
19  of talc increases the risk for ovarian
20  cancer.
21      A.    Yes.
22      Q.    Do you understand that?
23      A.    Yes.
24      Q.    And that is the same question

Page 249

1  that was investigated by Berge, correct?
2      A.    Yes.
3      Q.    And Penninkilampi excluded the
4  most recent data on the Nurses Health cohort
5  and Berge included it, correct?
6      A.    Yes.
7          MS. O'DELL:  Object to the
8      form.
9      A.    And in ever use of talc in the
10  cohort studies, both of them found no --
11  nothing, no significant increase.
12          In the Penninkilampi study,
13  which I understand does not include the Gates
14  data, when they looked specifically at the
15  cohort studies, there was a significant
16  increase in serous.
17          In the Berge study when they
18  looked at everything, case-control and
19  cohorts together, there was a significant
20  increase in the risk for serous histology.
21  BY MS. BROWN:
22      Q.    I'm sorry, say that last part
23  again, in the --
24      A.    In the Berge study --

63 (Pages 246 to 249)

Judith K. Wolf, M.D.

Page 250

1    Q.    Uh-huh.
2    A.    -- what I'm reading here is,
3  there is a significant increase in serous
4  histology.
5    Q.    In the case-control studies,
6  correct?
7    A.    I don't see that they separated
8  out the case-control studies.
9    Q.    In reviewing the Berge and
10  Penninkilampi meta-analyses, did you pay
11  attention to the tests for heterogeneity that
12  the authors did in terms of which studies
13  could and could not be combined?
14    A.    In which study are you asking
15  me about?  I'm sorry.  I'm still distracted
16  by the Berge one here.
17    Q.    Do you understand the concept
18  of heterogeneity in meta-analysis?
19    A.    Yes.
20    Q.    Okay.  And so you understand
21  that there are certain studies that can --
22  because of their study design cannot be
23  combined, correct?
24    A.    Yes.

Page 251

1    Q.    And in evaluating the
2  Penninkilampi meta-analysis and the Berge
3  meta-analysis, did you undertake an effort to
4  evaluate the heterogeneity of the studies
5  that were combined in those two
6  meta-analyses?
7    A.    And compare the two, is that
8  what you're asking me?
9    Q.    Sure.  Here's what I'm after,
10  Doctor.  I understand that you made a
11  determination Penninkilampi is one of the
12  more high-quality studies?
13    A.    Yes.
14    Q.    And I want to understand your
15  methodology in selecting Penninkilampi as a
16  higher quality study than Berge.
17    MS. O'DELL:  Object to the
18    form.
19    A.    So when I look at all of the
20  meta-analyses, they all show a significant
21  increase in the risk of ovarian cancer with
22  minimal use of talcum powder use.  I
23  specifically chose the Penninkilampi one
24  because it was the most recent one.

Page 252

1  BY MS. BROWN:
2    Q.    Even though it excludes the
3  most recent data from the Nurses Health
4  Study.  True?
5    MS. O'DELL:  Object to the
6    form.
7    A.    I specifically chose it because
8  it's the most recent one.
9  BY MS. BROWN:
10    Q.    Okay.  And you understand that
11  the Berge meta-analysis was published at
12  right about the same time, right?
13    MS. O'DELL:  Object to the
14    form.
15    A.    I have to look at the exact
16  date.
17    MS. BROWN:  We need to change
18    the tape, so let's go off for a
19    second.
20    THE VIDEOGRAPHER:  Going off
21    the record.  The time is 2:21 p.m.
22    (Recess taken from 2:21 p.m. to
23  2:26 p.m.)
24    THE VIDEOGRAPHER:  This marks

Page 253

1  the beginning of disk 3.  Back on the
2  record.  The time is 2:26 p.m.
3  BY MS. BROWN:
4    Q.    Dr. Wolf, before we took a
5  break, we were discussing the difference
6  between Penninkilampi and the Berge
7  meta-analyses.  I want to direct your
8  attention to page 42 of the Penninkilampi
9  article.
10    A.    That's in this one.  Page 42.
11    Q.    And in the first paragraph on
12  the left-hand column, one of the things the
13  authors of Penninkilampi note, is that the
14  majority of the evidence as it relates to
15  perineal talc use in ovarian cancer has come
16  from case-control studies, correct?
17    MS. O'DELL:  Where are you
18    reading?
19    A.    Where are you reading?
20  BY MS. BROWN:
21    Q.    "The evidence for the
22  association between perineal talc use and
23  ovarian cancer is based on the body of
24  knowledge from observational studies and most

Judith K. Wolf, M.D.

Page 254

```
 1    of these have been retrospective case-control
 2    studies prone to recall bias."
 3            Do you see that?
 4       A.   I see that.
 5       Q.   And do you agree with that,
 6    Doctor, that most of the case-control studies
 7    that you evaluated and that form the body of
 8    epidemiology on talc and ovarian cancer are
 9    prone to recall bias?
10            MS. O'DELL:  Object to the
11       form.
12       A.   I don't agree with that
13    statement.  I do agree that one concern of
14    case-control studies is recall bias.  I
15    believe that was acknowledged in most, if not
16    all, of the case-control studies and felt not
17    to be an issue.  And I looked at that, but
18    the weight of the evidence suggests that most
19    of the studies showed a relationship.
20            Also in a rare disease like
21    ovarian cancer, although a prospective study
22    would be -- might be -- give us more
23    information, the number of women and the
24    amount of time that it would take to do a
```

Page 255

```
 1    prospective study makes it challenging, and
 2    that's one of the challenges with all of the
 3    cohort studies.  None of them are big enough
 4    and most of them are not followed long
 5    enough.
 6            And so case-control studies are
 7    what -- the best way to study a rare disease
 8    like this.  And given the consistency in the
 9    findings, although recall bias can occur, I
10    don't believe it -- after my review of the
11    entire literature, I'm not concerned that
12    recall bias had an effect on the results.
13    BY MS. BROWN:
14       Q.   You state in your report on
15    page 8, that all of the cohort studies are
16    limited by lack of power.
17       A.   Yes.
18       Q.   Is that your opinion?
19       A.   Lack of power to ask the
20    specific question, yes.
21       Q.   Lack of power to ask?
22       A.   To answer the specific
23    question.
24       Q.   Okay.  And you are not a
```

Page 256

```
 1    biostatistician, correct?
 2       A.   No.
 3       Q.   Okay.  Did you perform a power
 4    calculation on any of the studies that you
 5    reviewed?
 6       A.   I did not, but Dr. Narod
 7    published a paper where he actually looked at
 8    that question and estimated that it would
 9    take about 200,000 women to answer the
10    question, and none of these studies have
11    that.
12       Q.   And have you calculated how
13    many women were studied in all of the
14    prospective studies and whether or not that
15    was more or less than 200,000?
16       A.   Well, if you look at all of
17    them together, putting them together, there
18    are more than 200,000.
19       Q.   And did that inform your
20    opinion that the prospective studies -- how
21    did you consider that fact in making the
22    statement that the cohort studies are limited
23    by a lack of power?
24       A.   Because each individual study
```

Page 257

```
 1    is limited by lack of power.  And two of the
 2    three studies are limited by the amount of
 3    follow-up and all of the studies are limited
 4    by the documentation of how much -- how often
 5    and how frequent powder was used.  The --
 6    short of the Sister Study, the primary
 7    endpoints of the Nurses Health Study and the
 8    Women's Health Study were not to look at the
 9    relationship of talc and ovarian cancer.  It
10    was a secondary add-on study that was done
11    while the studies were ongoing.  So they
12    weren't designed to answer that question.
13       Q.   Did you consider the published
14    power calculation done by Berge?
15       A.   Let me look at Berge's
16    published power calculation.
17       Q.   Do you know that -- do you
18    know -- do you recall reviewing that in
19    connection with your --
20       A.   I recall --
21       Q.   -- testimony?
22       A.   -- reviewing the paper.  I
23    don't recall specifically what his -- his
24    person -- I don't know this person.
```

65 (Pages 254 to 257)

Judith K. Wolf, M.D.

Page 258

1    Q.    I'll direct your attention,
2  then, Doctor, to page 6 of the Berge paper.
3  It looks like you might have a different
4  version than I do, but page 6 of the
5  publication, second column, first paragraph
6  on the --
7    A.    What part of the paper is it
8  in?
9    Q.    The discussion section.
10   A.    Okay.
11   Q.    It's my third paragraph of the
12 discussion section.
13   A.    Gotcha.
14   Q.    And let me just read this into
15 the record to expedite us here.  "An
16 important feature of the present
17 meta-analysis is the inclusion of several
18 cohort studies, which enabled an analysis
19 stratified by study design.  This analysis
20 provided evidence of a heterogeneity of
21 results between the two groups of studies
22 with an association generally detected in
23 case-control studies but not in cohort
24 studies.  It should be noted that the cohort

Page 259

1  studies included in the meta-analysis
2  comprised of a total of 429 cases of ovarian
3  cancer exposed to genital talc and 943
4  unexposed:  The statistical power of the
5  meta-analysis of these cohort studies to
6  detect a relative risk of 1.25, similar to
7  the result of the meta-analysis of
8  case-control studies, was .99.  Thus, low
9  power of cohort studies cannot be invoked as
10 an explanation of the heterogeneity of the
11 results."
12        Did you consider Berge's power
13 calculation when you made the statement in
14 your report, that all of the cohort studies
15 are limited by lack of power?
16   A.    My statement is in relationship
17 into each study on their own, not all of them
18 together.  And my statement about the lack of
19 power for all over, my opinion about that was
20 based on Narod's paper of needing 200,000
21 women.  But this is about -- this is -- this
22 statement here is about each study on their
23 own.  None of those studies had 200,000
24 women.

Page 260

1        MS. O'DELL:  Excuse me, when
2  you say "here," are you referring to
3  your report?
4    A.    In my report, under "Summary of
5  Epidemiological Evidence" on page 8.
6  BY MS. BROWN:
7    Q.    And one of the things, Doctor,
8  you provided a site that meta-analyses can be
9  some of the highest form of epidemiological
10 evidence, correct?
11   A.    Yes.
12   Q.    And the Penninkilampi study
13 that you pointed to was one of the highest --
14        MS. O'DELL:  Why don't we go
15 off the record.
16        MS. BROWN:  Let's try to keep
17 going.
18 BY MS. BROWN:
19   Q.    The Penninkilampi study that
20 you pointed to as one of the higher quality
21 studies is, in fact, a meta-analysis,
22 correct?
23   A.    That's correct.
24   Q.    And you are certainly not

Page 261

1  meaning to suggest that there's something
2  improper about pooling or combining data in a
3  meta-analysis, correct?
4        MS. O'DELL:  Object to the
5  form.
6    A.    I don't believe I ever said
7  anything about -- negative about a
8  meta-analysis.
9  BY MS. BROWN:
10   Q.    Do you -- did you consider
11 Berge's power calculation of the pooled
12 prospective cohorts when you opined as you
13 did in your report on page 8, that all of the
14 cohort studies are limited by lack of power?
15        MS. O'DELL:  Object to the
16 form.
17   A.    The two are not comparing the
18 same thing.  His power analysis is looking at
19 the pooled analysis.  My statement was
20 regarding each individual cohort study on its
21 own.
22 BY MS. BROWN:
23   Q.    Do you think there is enough
24 power in the pooled prospective cohorts to

66 (Pages 258 to 261)

Judith K. Wolf, M.D.

Page 262

1  detect a relative risk of 1.25?
2      A.   I see that Berge says that in
3  his discussion.  I'm not a statistician.  I'd
4  have to -- I'm not sure I could answer that
5  and I guess I'm going to ask you to -- do you
6  think there's enough power in the pooled
7  prospective cohorts to detect a relative risk
8  of 1.25?  I'm going to say possibly.  I don't
9  know.
10      Q.   In identifying Penninkilampi as
11  one of the higher quality studies, did you do
12  an independent verification that the data
13  Penninkilampi reports in his article is
14  indeed accurate?
15      A.   Are you -- my understanding of
16  what you're asking me is, did I recalculate
17  the results?  Is that what you're asking me?
18      Q.   No.  I'm asking you, for
19  example, on page 46 of Penninkilampi -- we
20  have them as exhibits, if that makes it
21  easier.
22      A.   No, I -- okay.  Page 46.
23      Q.   Penninkilampi reports studies,
24  a purported odds ratio, a lower limit and an

Page 263

1  upper limit.  Do you see that?
2      A.   Yeah.
3      Q.   Did you go back to the
4  individual studies to verify that
5  Penninkilampi was correct in that reporting?
6      A.   Oh, that -- in these charts?
7      Q.   Correct.
8      A.   That every -- I did not.
9      Q.   Would it be important to you in
10  determining that a study is of high quality,
11  that the authors accurately report the odds
12  ratios and the confidence intervals?
13      A.   It would, but it's not my
14  routine or standard for me to go back and
15  re-review the odds ratios of every paper to
16  confirm that.  I would assume that is part of
17  the peer-review process that has happened.
18      Q.   And if there were, in fact,
19  errors in the reporting of the odds ratios or
20  the confidence intervals, would that call
21  into question your reliance on the study?
22      A.   I would want to see it
23  recalculated, if there were -- if there were
24  errors.

Page 264

1      Q.   In evaluating the Penninkilampi
2  meta-analysis and the Berge analysis, explain
3  to me how you weighted both of them.
4          MS. O'DELL:  Object to the
5      form.
6      A.   When I was looking at all of
7  the meta-analysis, including the Berge and
8  the Penninkilampi, to me it -- all of them
9  showed a positive correlation between genital
10  talcum powder use and ovarian cancer.  I
11  chose the most recent one to include in my
12  report.
13  BY MS. BROWN:
14      Q.   Other than the fact that
15  Penninkilampi is the most recent, is there
16  any reason -- any other reason you didn't
17  include Berge in your report?
18          MS. O'DELL:  Object to the
19      form.
20      A.   Was there any other reason I
21  didn't include Berge?
22  BY MS. BROWN:
23      Q.   Correct.
24      A.   The reason I chose

Page 265

1  Penninkilampi was because it was the most
2  recent.  And in my interpretation of the
3  meta-analysis, they all show a positive
4  correlation, so I just wanted to show the
5  most recent.
6      Q.   And you'll agree with me that
7  both meta-analyses -- or the Berge
8  meta-analysis shows no increased risk in the
9  cohorts, correct?
10      A.   No increased risk in the
11  cohort -- pooled cohorts in the Berge paper.
12      Q.   And if you consider the Gates
13  study as the most recent data available on
14  the Nurses Health cohort, you'll agree with
15  me there is no evidence at all in the
16  prospective cohorts of any increased risk of
17  ovarian cancer with talc use.  True?
18          MS. O'DELL:  Object to the
19      form.
20      A.   With the -- the other issues
21  with the cohort studies is they ask ever use,
22  not current use, length of use, time of use.
23  Both the Gates and Gertig and the Houghton,
24  the Women's Health Initiative, those studies

67 (Pages 262 to 265)

Judith K. Wolf, M.D.

Page 266

1  were not designed to be able to ask those
2  questions and so we can't have that
3  information.  And so the limitations of the
4  cohort studies, as -- as I said before,
5  individually, lack of power, not making the
6  correct queries and short follow-up, except
7  the second follow-up of Gates, but that's
8  only one study and it's still not large
9  enough.
10 BY MS. BROWN:
11     Q.    That wasn't my question.  My
12 question was, if you consider Gates as the
13 most recent data on the Nurses Health cohort,
14 you would agree with me that there is no
15 evidence in any of the prospective studies
16 that shows a statistically significant
17 increased risk of ovarian cancer with
18 perineal task use.  True?
19         MS. O'DELL:  Object to the
20     form.
21     A.    I would say that all the
22 cohorts or cohort studies have the same
23 limitations, not large enough, not asking the
24 right questions, and the only one that

Page 267

1  doesn't have the shortest -- short follow-up,
2  which it still may not be long enough, is the
3  Nurses Health Study.  And with those caveats,
4  there was no statistically significant
5  increase in ovarian cancer in perineal talcum
6  powder use.  But given that ovarian cancer's
7  a rare disease and with those caveats, I'm
8  not sure that they're designed to answer the
9  question.  So it doesn't say to me there
10 isn't a risk.
11 BY MS. BROWN:
12     Q.    But that wasn't my question.
13 My question was just, there is not a single
14 prospective study that shows an increased
15 risk of ovarian cancer with talcum powder
16 use.  That's it.  It's yes or no.
17         MS. O'DELL:  Excuse me.  No,
18     it's not.  Objection to form.  You may
19     answer it in any way you choose,
20     Dr. Wolf.
21     A.    The studies are all limited by
22 lack of power, by short follow-up in two of
23 the three and maybe short follow-up in all
24 three, by not asking the correct questions

Page 268

1  that might get at the answer, two of the
2  three by not being designed to answer that
3  question.  And so with those caveats, they
4  saw no statistically significant increase in
5  ovarian cancer with talcum powder use
6  reported as ever use.
7  BY MS. BROWN:
8      Q.    What's your methodology for --
9  do you weight the cohorts and the case
10 controls equally in your analysis?
11         MS. O'DELL:  Objection to the
12     form.
13     A.    I consider all of the evidence,
14 not only the epidemiologic evidence but the
15 causation evidence, the animal in the in
16 vitro data as a whole and formed my opinion.
17 BY MS. BROWN:
18     Q.    My question was, do you weight
19 the case controls equally to the cohorts?
20         MS. O'DELL:  Objection, asked
21     and answered.
22         You may answer it.
23     A.    I look at the entire evidence,
24 all the epidemiologic evidence, as well as

Page 269

1  the in vitro and in vivo evidence and made my
2  decision.
3  BY MS. BROWN:
4      Q.    Are you not understanding that
5  question?
6          MS. O'DELL:  Counselor, you can
7      ask the questions, but she's given you
8      an answer.  Just because you don't
9      like the answer doesn't mean she
10     didn't answer the question.
11         MS. BROWN:  I've heard the same
12     answer nine times.  The question is --
13         MS. O'DELL:  You're asking the
14     question over and over again.
15         MS. BROWN:  You're wasting so
16     much time.
17 BY MS. BROWN:
18     Q.    My question really just goes to
19 weight.  Okay.  I understand you marked at
20 the beginning of the deposition weight of the
21 evidence from UpToDate.  Do you remember
22 that?
23     A.    Yeah.
24     Q.    And my question is just, when

68 (Pages 266 to 269)

Judith K. Wolf, M.D.

Page 270

1  you did this analysis, did you give equal
2  weight to the cohorts and the case controls?
3        MS. O'DELL: Objection to the
4     preamble, which was incorrect, but you
5     may answer.
6        A.   So I weighted every piece of
7  evidence not separating by the type of study,
8  but looking at the strengths and the
9  weaknesses of the study and then together put
10  the evidence to make my opinion.
11  BY MS. BROWN:
12     Q.   On page 3 of your report,
13  Doctor, you reference the National Cancer
14  Institute and that's the public health
15  authority's definition of a risk factor.  Do
16  you remember that?
17     A.   Yes.
18     Q.   Fair to say one of the reasons
19  you reference the National Cancer Institute
20  is that you consider it to be a leading
21  public health authority, particularly when it
22  comes to cancer?
23        MS. O'DELL:  Object to the
24     form.

Page 271

1     A.   Specifically here, I reference
2  the National Cancer Institute because of
3  their definition of "associations" versus
4  "causative" risk factors.
5  BY MS. BROWN:
6     Q.   And you consider the National
7  Cancer Institute to be a leading public
8  health authority.  True?
9        MS. O'DELL:  Objection to the
10     form, asked and answered.
11     A.   So if you're asking me -- what
12  I think I hear you asking me is why did I
13  reference the National Cancer Institute here,
14  and I referenced it because of this
15  definition.
16  BY MS. BROWN:
17     Q.   The National Cancer Institute
18  has reviewed the epidemiology on talc and
19  ovarian cancer, correct?
20     A.   That's correct.
21     Q.   Did you consider the National
22  Cancer Institute's review of the epidemiology
23  in forming your opinions in this case?
24     A.   I read it and I did consider

Page 272

1  it.
2        (Deposition Exhibit 18 marked
3     for identification.)
4  BY MS. BROWN:
5     Q.   I'm handing you what we've
6  marked as Exhibit 18 to your deposition,
7  which is a printout from the NCI's website,
8  entitled "Ovarian, Fallopian Tube and Primary
9  Peritoneal Cancer Prevention, Health
10  Professional Version."  Do you see that,
11  Doctor?
12     A.   Yes.
13     Q.   And during your work as a
14  gynecologic oncologist, did you look to the
15  NCI for information on how to treat your
16  patients?
17     A.   Occasionally, but not
18  routinely.
19     Q.   Do you consider the National
20  Cancer Institute to be a reliable source of
21  information on cancer epidemiology?
22        MS. O'DELL:  Object to the
23     form.
24     A.   I consider it a reliable source

Page 273

1  on cancer as a whole.  And again, to me
2  it's -- it's one of the pieces of evidence
3  that I might look to to find some
4  information.
5  BY MS. BROWN:
6     Q.   And what the National Cancer
7  Institute has done here is evaluate risk
8  factors for ovarian cancer, correct?
9     A.   Yes.
10     Q.   And, for example, if you look
11  at page 3 of 21, the National Cancer
12  Institute's information begins with factors
13  with adequate evidence of an increased risk
14  of ovarian cancer, correct?
15     A.   Yes.
16     Q.   Okay.  And they list things
17  like endometriosis, correct?
18     A.   Yeah.
19     Q.   They list hormone replacement
20  therapy.  True?
21     A.   Yes.
22     Q.   And the National Cancer
23  Institute goes on -- and one of the things
24  they do not list as a factor with adequate

69 (Pages 270 to 273)

Judith K. Wolf, M.D.

Page 274

1   evidence of an increased risk is talcum
2   powder use, correct?
3        A.    That's correct.
4        Q.    And what the National Cancer
5   Institute does, is it identifies some area
6   where there's uncertainty in terms of a risk
7   factor, right?
8        A.    Yes.
9        Q.    And so on page 7 of 21, for
10  example, they identify infertility treatment
11  as an area of uncertainty, correct?
12       A.    Yes.
13       Q.    And when it comes to perineal
14  talc use, however, the National Cancer
15  Institute has determined that that is a
16  factor with inadequate evidence of an
17  association of the risk of ovarian cancer,
18  correct?
19           MS. O'DELL:  Object to the
20       form.
21       A.    That's where they placed it in
22  this, yes.
23  BY MS. BROWN:
24       Q.    And directing your attention to

Page 275

1   page 14 of 21, what the National Cancer
2   Institute has concluded is that, "The weight
3   of the evidence does not support an
4   association between perineal talc exposure
5   and an increased risk of ovarian cancer.
6   Results from case-control and cohort studies
7   are inconsistent."
8           Do you see that?
9           MS. O'DELL:  Object to the
10      form.  Can I just ask where you're
11      reading from?  You said page 21.
12      A.    Yeah, I don't see that.
13  BY MS. BROWN:
14       Q.    Page 14 of 21.
15           MS. O'DELL:  We don't have 21.
16      We have 18 pages.
17      A.    And page 14 is references.
18  BY MS. BROWN:
19       Q.    You have a different version
20  than I do.  I'll get you there.  Right here,
21  perineal talc exposure.
22           MS. O'DELL:  So repeat the
23      question, please.
24           MS. BROWN:  Sure.

Page 276

1   BY MS. BROWN:
2        Q.    Let's reorient ourselves now
3   that we're all on the same page.  The
4   National Cancer Institute has classified
5   perineal talc exposure as a factor with
6   inadequate evidence of an association with
7   ovarian cancer, correct?
8           MS. O'DELL:  Object to the
9       form.
10      A.    It's listed under factors with
11  inadequate evidence, that's correct.
12  BY MS. BROWN:
13       Q.    All right.  And the National
14  Cancer Institute has factors with adequate
15  evidence, right?
16      A.    Yes.
17       Q.    We just looked at some.
18      A.    Yes.
19       Q.    It has factors with uncertain
20  evidence, right?
21      A.    Yes.
22       Q.    And then it has factors with
23  inadequate evidence, and that includes
24  perineal talc exposure, correct?

Page 277

1        A.    That's correct.
2           MS. O'DELL:  Object to the
3       form.
4   BY MS. BROWN:
5        Q.    And what the National Cancer
6   Institute has determined here is that the
7   weight of the evidence does not support an
8   association between perineal talc exposure
9   and an increased risk of ovarian cancer.
10      A.    That's the part I don't --
11       Q.    Results --
12      A.    That's where I'm trying to find
13  --
14       Q.    Let me read it and then I'm
15  going to help you.
16           "Results from case-control and
17  cohort studies are inconsistent."  And what
18  I'm reading are the first two lines of the
19  perineal talc exposure section.
20      A.    Okay.  Okay.  What's your
21  question?
22       Q.    You, Dr. Wolf, disagree with
23  the National Cancer Institute, correct?
24      A.    In this instance, I do.

70 (Pages 274 to 277)

Judith K. Wolf, M.D.

Page 278

1    Q.    And tell me what methodology
2  you have employed that is different from the
3  weight of the evidence approach, referenced
4  here by the National Cancer Institute.
5    A.    So I see that the National
6  Cancer Institute has referenced five
7  articles.  So one of the things is that I
8  believe that my review of the entire body of
9  literature is much broader than five
10  articles.  And when I look at the most recent
11  article, they do have one article from 2016,
12  which is the Schildkraut data, which is --
13  they just now at the end of 2018, added that
14  data into theirs.  So I would say there's
15  other data that they either didn't have when
16  they did the review or didn't include when
17  they did the review.
18    Q.    And in offering that opinion,
19  have you considered, Doctor, that according
20  to this document from the NCI, board members
21  meet monthly to review recently published
22  articles?  I'll point you to the section
23  entitled "About This PDQ Summary," at the
24  very end, under the section "Reviewers and

Page 279

1  Updates," do you see the National Cancer
2  Institute's --
3    A.    I see that.
4    Q.    -- board members meeting
5  monthly to review recently published
6  articles, right?
7    A.    Yes.
8        MS. O'DELL:  Object to the
9    form.
10  BY MS. BROWN:
11    Q.    And we see at the very last
12  page, that this particular document was
13  updated a few weeks ago in December 21st of
14  2018?
15    A.    Yes.
16    Q.    Okay.  Do you have any other
17  scientific evidence or methodology that would
18  distinguish your review of the literature
19  from the folks at the National Cancer
20  Institute?
21    A.    I'm going to go back to the
22  review of the entire body of the literature.
23  I don't know which articles they look at once
24  a month to make a determination with their

Page 280

1  opinion.  It's my experience that in order to
2  get someone like the National Cancer
3  Institute or some other guideline to suggest
4  something, there's generally a lag of several
5  years between publication of all the
6  literature and when the committee changes
7  something.  An example of that is that the
8  Schildkraut paper was published in 2016.  It
9  wasn't until the -- end of 2018 that they
10  included it.
11    Q.    Dr. Wolf, are you aware of any
12  public health authority that has concluded
13  talcum powder causes ovarian cancer?
14        MS. O'DELL:  Object to the
15    form.
16    A.    I'm aware that IARC has
17  considered that talc is possibly
18  carcinogenic, that asbestos is carcinogenic.
19  BY MS. BROWN:
20    Q.    IARC has not concluded that
21  talc causes ovarian cancer, correct?
22        MS. O'DELL:  Object to the
23    form.
24    A.    One of the reasons for the

Page 281

1  review of talc was the concern of ovarian
2  cancer.  The fact that they have considered
3  it possibly carcinogenic, to me is an
4  indication that they think it's possibly
5  carcinogenic.
6  BY MS. BROWN:
7    Q.    Okay.  Let's break that up.
8  Are you aware of any public health authority
9  that agrees with your opinion that talcum
10  powder causes ovarian cancer?
11        MS. O'DELL:  Object to the
12    form.
13    A.    When I formed my opinion, I
14  looked at all of the data that was available
15  to me, including the data as recent as
16  December.  The Canada health assessment, the
17  Taher paper.  And I believe that my opinion
18  is based on a greater weight of the evidence
19  than the review of the National Cancer
20  Institute or anything that was available
21  prior to this for a body to review.  And if I
22  go back to the talc and IARC study, even with
23  papers only till 2007 and 2008, there was
24  enough evidence that they thought that talc

71 (Pages 278 to 281)

Judith K. Wolf, M.D.

Page 282

1  was possibly carcinogenic.
2  BY MS. BROWN:
3      Q.    IARC did not consider three of
4  the four prospective cohort studies that
5  showed no increased risk of with talcum
6  powder, true?
7      A.    They also did not show --
8  include any paper that was published after
9  2007.
10     Q.    And that would include three of
11 the four prospective cohort studies that
12 showed no risk, right?
13     A.    That would include anything
14 published after 2007.
15     Q.    And as I understand your
16 testimony as it relates to the National
17 Cancer Institute, you believe that despite
18 the fact that the NCI updated its position as
19 recently as a few weeks ago, they have not
20 reviewed the most latest literature.  Is that
21 your testimony?
22          MS. O'DELL:  Object to the
23     form.
24     A.    I'm saying that I don't know if

Page 283

1  they have.  The most recent literature that
2  they cited is two years old.
3  BY MS. BROWN:
4      Q.    And what literature do you
5  think has come out in the next -- in the last
6  two years that IARC -- excuse me, that NCI,
7  despite a publication last month, did not
8  cite?
9      A.    Well, I'm going to say both the
10 Berge meta-analysis and the Penninkilampi
11 meta-analysis.
12     Q.    IARC has a classification for
13 agents that it believes to be carcinogenic,
14 correct?
15     A.    Yes.
16     Q.    And that is a group 1, correct?
17     A.    That's correct.
18     Q.    And IARC has and does make a
19 determination that with some substances,
20 there is sufficient evidence of
21 carcinogenicity.  True?
22     A.    That's correct.
23     Q.    And IARC does have a category
24 that an agent may be probably carcinogenic,

Page 284

1  correct?
2      A.    Yes.
3      Q.    And IARC has and done -- has
4  and does make that determination as it
5  relates to certain substances, correct?
6      A.    Yes.
7      Q.    Okay.  IARC has not determined
8  that nonasbestiform talc is -- strike that.
9          IARC has not determined that
10 there is sufficient evidence that
11 nonasbestiform talc causes ovarian cancer,
12 correct?
13          MS. O'DELL:  Object to the
14     form.
15     A.    In the IARC opinion on talc,
16 platy talc, what was assumed to be platy talc
17 without any fibrous contamination, the score
18 was 2B, which is possibly carcinogenic.
19 BY MS. BROWN:
20     Q.    And in explaining what IARC
21 means by "possibly carcinogenic," IARC
22 explains that chance, bias or confounding
23 can't be ruled out with reasonable
24 confidence, correct?

Page 285

1      A.    That's correct.
2      Q.    And you think as it relates to
3  IARC's interpretation of epidemiology,
4  they're wrong, right?
5          MS. O'DELL:  Object to the
6     form.
7      A.    I think that they made the
8  decision that they thought was correct with
9  the information that they had at the time
10 that they made it.
11 BY MS. BROWN:
12     Q.    At the time that IARC
13 determined that talc -- nonasbestiform talc
14 had limited evidence of carcinogenic, you
15 believe that was correct?
16          MS. O'DELL:  Object to the
17     form.
18     A.    I'm going to say again what I
19 said the last time.  That I believe that they
20 came to that conclusion based on their review
21 of the literature that they had at the time.
22 BY MS. BROWN:
23     Q.    And you understand when IARC
24 does a literature review, it employs the

72 (Pages 282 to 285)

Judith K. Wolf, M.D.

Page 286

1   Bradford Hill criteria?
2       A.   Yes.
3       Q.   And is that the criteria you
4   evaluated the literature with here too?
5       A.   I actually -- I didn't know
6   that's what I was doing until I read the
7   Bradford Hill criteria paper myself and
8   realized that that's what I do when I review
9   the literature and it fit very nicely into
10  that criteria.  So in my report, yes.
11      Q.   As a practicing gynecologic
12  oncologist, you don't use the epidemiologic
13  tool of Bradford Hill criteria; is that fair?
14      MS. O'DELL:  Object to the
15      form.
16      A.   In my general practice, I don't
17  use the Bradford Hill criteria, specifically
18  calling it that, but all of those criteria
19  are what I use when I evaluate something.
20  BY MS. BROWN:
21      Q.   And you understand that when
22  the scientists at IARC evaluate whether or
23  not a substance is carcinogenic, they too
24  employ the Bradford Hill criteria, correct?

Page 287

1       A.   Yes.
2       Q.   Okay.  Is there something
3   different in your mind, about how you
4   employed Bradford Hill and how IARC employed
5   Bradford Hill?
6       A.   We had different information.
7       Q.   And the different information
8   you're referring to are some additional
9   case-control studies and additional
10  meta-analysis?
11      A.   And cohort studies and in
12  inflammatory papers, causation papers that
13  weren't published before 2007.
14      Q.   And you would agree with me
15  that --
16      MS. O'DELL:  Excuse me,
17      published before 2007?
18      THE WITNESS:  Were not.  Were
19      not.
20  BY MS. BROWN:
21      Q.   You would agree with me that
22  the general relative risks seen in the
23  additional case-control studies that you're
24  referring to, range from about 1.2 to 1.6,

Page 288

1   right?
2       A.   Yes.
3       Q.   Okay.  There had been prior
4   case-control studies in that same relative
5   risk range, correct?
6       A.   Yes.
7       Q.   Okay.  There was nothing new or
8   different about the relative risks shown in
9   the most recent case-control studies,
10  correct?
11      MS. O'DELL:  Object to the
12      form.
13      A.   There was additional -- it's
14  just confirmation and -- of the same
15  information, showing consistency, which is
16  one of the tenets of the Bradford Hill
17  criteria.
18  BY MS. BROWN:
19      Q.   And, in fact, there's no
20  consistency with the findings of the
21  prospective studies, right?
22      MS. O'DELL:  Object to the
23      form.
24      A.   The three cohort studies, I'll

Page 289

1   say once again, had limitations which I don't
2   think allowed us to answer the question about
3   talc and ovarian cancer, the size, the
4   information about use and the follow-up.
5   BY MS. BROWN:
6       Q.   In your review of the
7   literature, did you make the determination
8   that the case-control studies asked different
9   questions about use than the prospective
10  studies?
11      A.   The case-control studies, many
12  of them, asked more specific questions and
13  were able to obtain more information.
14      Q.   Is it -- you state in your
15  report that the case-control studies are
16  consistent, right?
17      A.   Yes.
18      Q.   And they are not -- when you
19  look at the case-control studies and the
20  cohort studies, though, there is not
21  consistency, correct?
22      MS. O'DELL:  Object to the
23      form.
24      A.   When I look at the

73 (Pages 286 to 289)

Judith K. Wolf, M.D.

Page 290

1  epidemiologic data as a whole, as well as all
2  of the rest of the data about causation and
3  the makeup and the chemicals -- the
4  components of talcum powder product, it's
5  all -- it's consistent to me, the weight of
6  the evidence is consistent.
7  BY MS. BROWN:
8      Q.    Prospective studies have not
9  found an increased risk, correct?
10          MS. O'DELL:  Object to the
11     form.
12     A.    Prospective studies have
13  limitations, which I have described multiple
14  times, size, follow-up, length of follow-up,
15  information about talc use.  And given those
16  caveats, they have not shown a statistical
17  increase -- significant increase in ovarian
18  cancer.
19  BY MS. BROWN:
20     Q.    And you state that -- in your
21  report at page 6, "Overall, the case-control
22  studies are consistent showing a 30-50
23  percent increase in risk of ovarian cancer
24  with talcum powder use."

Page 291

1          Do you see that?
2      A.    Yes.
3      Q.    Okay.  And are you referring to
4  ever use and ovarian cancer?
5      A.    I'm referring to however it was
6  reported in the case-control studies.
7      Q.    Have you done an analysis of
8  the case-control studies to see what the
9  finding is when the same question is asked?
10     A.    So I, personally, haven't.
11  That's where I point to the meta-analysis, to
12  look at specific questions about how -- which
13  questions were asked.
14     Q.    And are you aware that when you
15  look at the ever used question in the
16  case-control studies, the majority of those
17  studies do not show an increased risk?
18          MS. O'DELL:  Object to the
19     form.
20     A.    Which is one of the limitations
21  of prospective studies because they only
22  asked ever used without details about how
23  often, how frequent, how long.
24

Page 292

1  BY MS. BROWN:
2      Q.    One of the studies you pointed
3  us to as a high quality study was the Wu
4  study, right?
5      A.    Yes.
6      Q.    And one of the things that's
7  reported in the Wu study and that you know as
8  a practicing gynecological oncologist, is
9  that the incident rate of ovarian cancer is
10  much lower in African-American women than it
11  is in Whites, correct?
12     A.    That's correct.
13     Q.    And one of the things that Wu
14  reports is that talcum powder use is much
15  higher in African-American women than in
16  Whites, correct?
17     A.    That's correct.
18     Q.    And how do you reconcile those
19  two facts, Doctor, that the population that
20  has the highest use of talcum powder has the
21  lowest incidence of ovarian cancer?
22     A.    Well, if we could pull up the
23  Wu study, I don't recall how many
24  African-American women were in that study,

Page 293

1  but the number was, I believe, small.
2      Q.    Welt, wasn't this one of the
3  studies you identified as being particularly
4  high quality?
5      A.    Yes.
6      Q.    Okay.
7      A.    Just because it didn't have a
8  lot of African-American patients doesn't make
9  it -- doesn't make it not a good study; it's
10  just a fact.
11     Q.    But your critique of the cohort
12  studies is that they didn't have enough
13  people, right?
14     A.    For a primary analysis.  This
15  is a secondary point of African-Americans.
16  When you look at the Schildkraut study, which
17  was specifically for African-Americans, there
18  was a significant increase.
19     Q.    The primary focus of the Wu
20  paper was whether African-American women had
21  an increased risk of talcum powder use.
22     A.    This is not the right Wu paper.
23          MS. O'DELL:  Let me get it for
24     you.

74 (Pages 290 to 293)

Judith K. Wolf, M.D.

Page 294

1    THE WITNESS:  I don't have the
2  right Wu paper.
3    MS. O'DELL:  Just a second
4  here.
5  BY MS. BROWN:
6    Q.    Is that what you're looking
7  for, Doctor?  We can mark it.
8    A.    Yes, this is the one.
9    MS. O'DELL:  Thank you.
10  BY MS. BROWN:
11    Q.    Let me just stick 19 on that
12  for you.
13    (Deposition Exhibit 19 marked
14    for identification.)
15  BY MS. BROWN:
16    Q.    Doctor, I have marked for the
17  record as Exhibit 19, the Wu article we've
18  been discussing.  And my question for you
19  here is how -- what methodology you employed
20  to reconcile some of the facts that are
21  reported in Wu; namely, that African-American
22  women had the lowest incidence of ovarian
23  cancer and the highest incidence of talcum
24  powder use?

Page 295

1    A.    So the title of the Wu paper
2  says, "African-Americans and Hispanics Remain
3  at Lower Risk of Ovarian Cancer," but when
4  you read the purpose of this study, it was to
5  elucidate risk factors for disease and to
6  evaluate differences across -- across
7  Hispanics.
8    Q.    Sure.
9    A.    But not specifically
10  African-Americans.
11    Q.    No, Doctor, I'm using the
12  information reported in this study that you
13  identified as high quality to pose a
14  commonsense question for you.  Which is that,
15  how do you reconcile the idea that the
16  population that has the lowest amount of
17  ovarian cancer has the highest amount of
18  powder use?
19    MS. O'DELL:  Object to the
20    form.  She's answered your question
21    previously.
22    But you may respond.
23    A.    So the reason I wanted to look
24  at this paper was to see, of the 1700 women,

Page 296

1  how many were African-American.  There were
2  128.
3  BY MS. BROWN:
4    Q.    1700?  Are you looking at Wu?
5    A.    Yes.
6    MS. O'DELL:  Her testimony was
7    not -- was 128.
8    A.    128 African-Americans.
9  BY MS. BROWN:
10    Q.    I misheard you.
11    A.    1700 women total.  Of those,
12  128 were African-American, most of them were
13  non-Hispanic/White.  So that study isn't
14  powered to answer the question about
15  African-Americans and the relationship of
16  talcum powder and ovarian cancer.  It's not
17  enough.
18    Q.    We're missing each other.  I
19  want you to put this study aside.  I'm asking
20  you a question about facts that are reported
21  here that you know as a gynecologic
22  oncologist.  One of the those facts, you'll
23  agree with me, is that African-American women
24  have a lower incidence of ovarian cancer than

Page 297

1  white women, right?
2    MS. O'DELL:  Object to the
3    form.
4    A.    Yes.
5  BY MS. BROWN:
6    Q.    Okay.  And one of the things
7  you know from reading Wu, because they report
8  it, is that African-American women are
9  traditionally higher talcum powder users than
10  white women, right?
11    A.    Yes.
12    Q.    And so what methodology have
13  you employed in opining that talcum powder
14  causes ovarian cancer to explain this
15  difference?
16    A.    Because when I look at the
17  Schildkraut study, which was a larger study
18  of African-American women, I believe, I have
19  to look at the numbers, there was a
20  statistical significant difference increase
21  in ovarian cancer in women --
22  African-American women.
23    Q.    Right.  But you know the annual
24  incidence of ovarian cancer in

75 (Pages 294 to 297)

Judith K. Wolf, M.D.

Page 298

1  African-American women is historically and
2  remains much lower?
3       A.   Yes.
4            MS. O'DELL:  Objection, form,
5       asked and answered.
6  BY MS. BROWN:
7       Q.   I mean, do you understand what
8  I'm saying here?  How do you reconcile that?
9  If talcum powder use really did cause ovarian
10 cancer, why is the population that uses
11 talcum powder the most, the population that
12 gets ovarian cancer the least?
13           MS. O'DELL:  Objection to the
14      form, asked and answered.
15           You may answer.
16      A.   Okay.  So there are multiple
17 risk factors for ovarian cancer.  If
18 African-American women have some protection
19 from getting ovarian cancer, for whatever
20 reason they don't get it as often, it doesn't
21 matter what the risk factor is.  If you look
22 at an individual risk factor in that
23 population alone and it increases their risk
24 over their baseline, it's a risk factor.

Page 299

1  BY MS. BROWN:
2       Q.   What methodology have you
3  employed to explain the fact that a
4  population that uses this product the most
5  gets ovarian cancer the least?  How do you
6  reconcile that?
7            MS. O'DELL:  Objection, asked
8       and answered.  You've asked the same
9       question ten times.  The doctor --
10           MS. BROWN:  When I get an
11      answer, I'll be happy to move on.
12           MS. O'DELL:  Excuse me, I'm
13      not -- you want an answer you want.
14      She's given you an answer to the
15      question.
16           MS. BROWN:  Counsel, form.
17           MS. O'DELL:  Let me finish.
18           MS. BROWN:  But it's form.
19      Federal Rules.
20           MS. O'DELL:  I can say what I'm
21      going to say.
22           MS. BROWN:  Well, we can get
23      the judge.
24           MS. O'DELL:  Fine.

Page 300

1            MS. BROWN:  Your objection is
2       to form.
3            MS. O'DELL:  Fine.  I think
4       Judge Pisano would understand my
5       objection.  And what I've objected to
6       is the fact that you've asked the same
7       question ten times, often with facial
8       expressions, with gestures toward the
9       witness, which is inappropriate under
10      the protocol.  But I'm not being
11      critical of that.  I'm pointing it out
12      for the record.  So if you've got a
13      question, ask it, the doctor will
14      answer it to the best of her ability
15      as she's been doing.  But to keep
16      berating the witness with the same
17      question is really not appropriate.
18           MS. BROWN:  Counsel, your
19      objection under the Federal Rules is
20      to form.  If there's something you'd
21      like to discuss off the record, I'd be
22      happy to do that.  We need to move on
23      here.  We're wasting a lot of time.
24      If Dr. Wolf would answer the question,

Page 301

1  I would be happy to move on.
2            MS. O'DELL:  She's answered
3       your question.
4            You may answer it again --
5  BY MS. BROWN:
6       Q.   Please answer it again,
7  Dr. Wolf.
8            MS. O'DELL:  -- Dr. Wolf, and
9       feel free to give the same answer if
10      it's the same answer.
11      A.   My understanding of your
12 question is, how do -- how do I -- given that
13 African-American women are less likely to get
14 ovarian cancer and given that they use more
15 talcum powder, why don't we see more ovarian
16 cancer from talcum powder in African-American
17 women?  Is that what you're asking?
18 BY MS. BROWN:
19      Q.   No, Doctor.  Have you
20 considered that as a factor that your opinion
21 might not be right?
22           MS. O'DELL:  Object to the
23      form.
24      A.   My opinion is based on a study

76 (Pages 298 to 301)

Judith K. Wolf, M.D.

Page 302

1  of African-American women who use or did not
2  use talcum powder and ovarian cancer in the
3  case-control study of Schildkraut, which was
4  the most recent paper mentioned in the NCI
5  update on talc and ovarian cancer.
6  BY MS. BROWN:
7      Q.    And do you have Schildkraut in
8  front of you?  We marked it as Exhibit 19.
9      A.    I have it.
10     Q.    15, I'm sorry.  One of the
11 things that Schildkraut attempted to address
12 was recall bias as a result of talcum powder
13 lawsuits, correct?
14          MS. O'DELL:  Object to the
15     form.
16 BY MS. BROWN:
17     Q.    And I'll direct you, Doctor,
18 to --
19     A.    Because I'm looking at the
20 primary endpoint of the study and the primary
21 endpoint of the study was to analyze the
22 relationship of genital powder and nongenital
23 powder exposure in African-American women in
24 a case-control study of invasive ovarian

Page 303

1  cancer -- epithelial ovarian cancer in
2  African-American women.
3      Q.    In forming your opinions in
4  this case, did you consider the subgroup
5  analysis that Schildkraut conducted on women
6  who were interviewed before and after the
7  class action lawsuits began in 2014?
8          MS. O'DELL:  Objection to form.
9      A.    I'm looking for those results
10 in the paper.
11 BY MS. BROWN:
12     Q.    In forming your opinion in the
13 case, did you consider those?
14          MS. O'DELL:  Object to the
15     form.
16     A.    I need to remind myself what
17 those results were.
18 BY MS. BROWN:
19     Q.    Okay.  I'll direct you to Table
20 2 of the paper, which in my copy is 1414.
21     A.    I see that.  And what was your
22 question?
23     Q.    Do you recall, based on your
24 review of this paper, that one of the things

Page 304

1  Schildkraut endeavored to do was to determine
2  whether the class action lawsuits in 2014
3  created recall bias in the women who were
4  diagnosed with ovarian cancer?
5      A.    Okay.
6          MS. O'DELL:  Object to the
7     form.
8  BY MS. BROWN:
9      Q.    Do you recall that?
10     A.    I do.
11     Q.    And do you think that that is
12 an important thing for an author of a
13 case-control study to analyze?
14     A.    I do.
15     Q.    And you recall that when
16 Schildkraut analyzed folks who had been
17 interviewed prior to the lawsuits in 2014 and
18 after the lawsuits in 2014, there was a
19 significant difference in the number of
20 people diagnosed with ovarian cancer who
21 reported talcum powder use.  Do you remember
22 that?
23     A.    Well, I'm looking for that -- I
24 see in the query in the table, but I don't

Page 305

1  see a statistical significant difference, and
2  that's what I'm looking for in the results,
3  and I don't see it.  If you know where it is,
4  you can point it out to me.
5      Q.    Here's what I want to ask you
6  about.  In two thousand -- you looked at this
7  table, right, you considered this subgroup
8  analysis?
9      A.    Yes.
10     Q.    Because you would agree with
11 Schildkraut, that recall bias, particularly
12 where there's been a lot of lawsuit
13 attention, is important to investigate,
14 correct?
15          MS. O'DELL:  Object to the
16     form.
17     A.    Recall bias is always something
18 to investigate.
19 BY MS. BROWN:
20     Q.    But it's -- it could be
21 particularly acute in the context of a lot of
22 media attention due to lawsuits, right?
23          MS. O'DELL:  Object to the
24     form.

77 (Pages 302 to 305)

Judith K. Wolf, M.D.

Page 306

1    A.    Something to look at.
2  BY MS. BROWN:
3    Q.    And one of the things
4  Schildkraut actually did in its analysis, was
5  it controlled for the recall bias -- it tried
6  to control for that recall bias, right?
7    A.    Well, it looked at it, yes.
8    Q.    And the reason it felt it had
9  to control -- he felt -- she felt she had to
10  control for it was because she found a
11  statistically significant effect modification
12  by year of interview, right?
13         MS. O'DELL:  Object to the
14         form.
15  BY MS. BROWN:
16    Q.    And that conclusion is at the
17  end of the results -- second paragraph of the
18  results on page 1413.  Do you recall
19  reviewing that?
20    A.    I don't see anything that says
21  about the year of -- year of review.
22    Q.    The second paragraph in the
23  results section of the paper concludes, "A
24  test for effect modification by year of

Page 307

1  interview was statistically significant with
2  P equaling 0.005."
3         Do you see that?
4         MS. O'DELL:  Object to the
5         form.
6    A.    Okay.  "Although increased,
7  exposure prevalences were not significantly
8  different from those interviewed before
9  2014."
10         So the exposure was no
11  different.
12  BY MS. BROWN:
13    Q.    Well, it was and the authors
14  concluded that they couldn't rule it out as
15  inflating the odds ratios, didn't they?
16         MS. O'DELL:  Objection, form.
17    A.    It was not statistically
18  different.
19  BY MS. BROWN:
20    Q.    They found a statistically
21  significant effect modification.  Do you see
22  that conclusion?
23         MS. O'DELL:  Object to the
24         form.

Page 308

1    A.    What I'm reading, it says, "In
2  2014 and later, we observed an increase in
3  any powder use.  Although increased, these
4  exposure prevalences were not statistically
5  significant for those interviewed before
6  2014."
7  BY MS. BROWN:
8    Q.    Did you consider the author's
9  conclusion that there was a statistically
10  significant effect modification by year of
11  interview when you reviewed this paper?
12         MS. O'DELL:  Object to the
13         form.
14    A.    Yes.  But -- yes, but this does
15  not clarify why that would be, because there
16  was no statistical difference in reported
17  use.
18  BY MS. BROWN:
19    Q.    And what happened, Doctor, if
20  you look at Table 2, is that prior to --
21  those folks who were interviewed about
22  whether or not they had used powder before
23  2014, 34 percent of the controls reported it
24  and about 36 and a half percent of the cases

Page 309

1  reported it, right?
2         MS. O'DELL:  Object to the
3         form.
4  BY MS. BROWN:
5    Q.    Do you see me --
6    A.    I see that.
7    Q.    And then when they stratified
8  by interview date and they asked people after
9  the lawsuits if they had used powder, the
10  folks who did not get ovarian cancer reported
11  it at about the same percentage, right, 34.4
12  percent?
13         MS. O'DELL:  Object to the
14         form.
15    A.    Yes, 30 and 42 percent.
16  BY MS. BROWN:
17    Q.    Well, 34 and 34.4.
18    A.    Oh, I'm sorry.  After --
19    Q.    You see that?  Any genital use.
20    A.    Yes.
21    Q.    Okay.  So 34 percent of people
22  who did not have ovarian cancer reported talc
23  use before 2014, right?  And 34.4 percent of
24  people who did not have ovarian cancer

78 (Pages 306 to 309)

Judith K. Wolf, M.D.

Page 310

1  reported talc use after 2014, right?
2      A.    Yes.
3      Q.    That's about exactly the same,
4  correct?
5      A.    Yes.  Yes.
6      Q.    But as it relates to folks who
7  unfortunately were diagnosed with ovarian
8  cancer, those who were asked that question
9  before 2014, 36.5 percent of them reported
10 talc use, right?
11     A.    (Nods head.)
12     Q.    And then that number shot up to
13 51.5 percent after 2014, right?
14         MS. O'DELL:  Object to the
15     form.
16     A.    I see that.
17 BY MS. BROWN:
18     Q.    And what the authors conclude
19 on page 1416, is that although -- because
20 of -- this is -- I'm reading from 1416, the
21 first full sentence of the second column.
22 "Because of publicity, we adjusted for date
23 of interview.  However, there is still a
24 possibility that recall bias may have caused

Page 311

1  some inflation of the OR" -- or the odds
2  ratios, correct?
3      A.    But if you read the rest of
4  that study, "Our data do not support that
5  recall bias alone before or after 2014 would
6  account for the associations with body powder
7  and epithelial ovarian cancer.  It was not
8  statistically significantly different."
9      Q.    Did you consider the author's
10 finding as it related to recall bias in
11 evaluating the Schildkraut paper?
12     A.    I did.
13     Q.    And would you agree that
14 particularly given the media attention to
15 lawsuits beginning in 2014, that recall bias
16 is a concern of the case-control studies?
17     A.    If there was a statistically
18 significant change and difference in change
19 in reporting, it might -- it might be
20 something to consider, but there was not.
21     Q.    All of the studies that you
22 identified -- or the three studies you
23 identified as being "high quality," were all
24 published after the lawsuits began in 2014,

Page 312

1  correct?
2      A.    Yes.
3      Q.    And what method did you employ
4  to assure yourself that those results were
5  not confounded by recall bias?
6      A.    By reviewing the methods and
7  analyzing the methods, just like we did with
8  this paper.
9      Q.    And what did you find in the Wu
10 article, for example, that leads you to
11 believe that the findings were not the
12 subject of recall bias?
13     A.    I would have to read the Wu
14 materials and methods again.  If you'd like
15 me to, I will.
16     Q.    Well, did you undertake an
17 analysis of the post-2014 papers with an
18 effort to investigate whether the findings
19 were subject to recall bias?  That's my
20 question.
21         MS. O'DELL:  Object to the
22     form.  She's answered your question.
23     A.    When I reviewed all of the
24 papers, that was one of the things -- bias is

Page 313

1  one of the things you wanted to -- I wanted
2  to look at and I looked at.  And if you're
3  asking me specifically about this one, you
4  know, I can read through it and tell you what
5  it was specifically.
6  BY MS. BROWN:
7      Q.    No, I don't need specifics of
8  the study.  I was asking for your
9  methodology.  How do you -- how -- when you
10 evaluate a paper post-2014, how do you --
11 what methodology do you employ to make sure
12 that the results are not inflated by the
13 lawsuit media attention?
14         MS. O'DELL:  Objection to form,
15     asked and answered.
16     A.    In all of the studies, I review
17 the methodology, I look for any evidence of
18 bias, recall bias or anything else.  Not
19 every study compared before 2014 and after
20 2014.  This one did.  They found no
21 significant difference in recall of use.
22 BY MS. BROWN:
23     Q.    They concluded that an
24 inflation of the odds ratio due to recall

79 (Pages 310 to 313)

Judith K. Wolf, M.D.

Page 314

1  bias could not be ruled out.  Did you
2  consider that?
3      A.    When you -- when I look at
4  their methods -- that was their -- that was
5  their interpretation of the data as a
6  possible explanation.  When I look at the
7  results, the results showed that there was no
8  statistically significant difference between
9  before and after 2014.
10      Q.    And so as it relates to their
11  conclusion, do you discount that?
12      MS. O'DELL:  Object to the
13      form.
14      A.    When I read conclusions of this
15  paper or any paper, these are -- these are
16  possible explanations.  It's not facts.  The
17  facts are the results.
18  BY MS. BROWN:
19      Q.    And did you discount the
20  statistically significant effect modification
21  by interview year and date?
22      A.    No.
23      MS. O'DELL:  Object to form.
24      A.    That was statistically

Page 315

1  significant.
2  BY MS. BROWN:
3      Q.    You considered that?
4      A.    Yes.
5      MS. BROWN:  Let's take a break.
6      THE VIDEOGRAPHER:  Going off
7  the record.  The time is 3:24 p.m.
8      (Recess taken from 3:24 p.m. to
9  3:40 p.m.)
10      THE VIDEOGRAPHER:  Back on the
11  record.  The time is 3:40 p.m.
12  BY MS. BROWN:
13      Q.    Dr. Wolf, in evaluating the
14  talc epidemiology, do you agree with IARC
15  that the use of talcum powder for feminine
16  hygiene is acquired in young adulthood?
17  Approximately 80 percent of the women who use
18  powder start before the age of 25?  Do you
19  agree with that?
20      A.    I'm going to agree with you on
21  adulthood.
22      Q.    And so in evaluating the
23  epidemiology here, you assumed that most
24  folks in these studies started using powder

Page 316

1  in young adulthood; is that right?
2      MS. O'DELL:  Object to the
3      form.
4      A.    I assumed they started using
5  powder sometime after menarche.
6  BY MS. BROWN:
7      Q.    Okay.  And the average age of
8  menarche is 12; is that right?
9      A.    I think it's ten in the US now.
10  I know.
11      Q.    My gosh.  Good thing I have
12  boys.  You say in your report that the
13  latency period for ovarian cancer is at least
14  20 years, correct?
15      A.    Yes.
16      Q.    Okay.  And you would agree with
17  me that most of the prospective studies
18  enrolled women in their sort of mid --
19  middle-age women to postmenopause women, so
20  women in their 40s and 50s, correct?
21      A.    Yes.
22      Q.    And so if those women began
23  using powder, as IARC concludes, in young
24  adulthood, they would have been approximately

Page 317

1  anywhere from, you know, ten- to 20- to
2  30-year users at the time they enrolled in
3  the study, correct?
4      MS. O'DELL:  Object to the
5      form.
6      A.    I don't think we know that for
7  sure because they weren't asked when they
8  started or how long they used it.
9  BY MS. BROWN:
10      Q.    Did you consider that WHI did
11  do a subgroup analysis on women who used
12  powder for more than 20 years?
13      A.    Yes.
14      Q.    And what was the finding of
15  that, Doctor?
16      A.    There was not a statistically
17  significant increased risk in those women.
18      Q.    How did -- how does your
19  understanding of when powder use generally
20  begins in women and the latency period for
21  ovarian cancer, how does that inform your
22  critique that the prospective studies are not
23  long enough to detect ovarian cancer?
24      MS. O'DELL:  Object to the

80 (Pages 314 to 317)

Judith K. Wolf, M.D.

Page 318

1  form.
2      A.    The only thing that prospective
3  studies looked at was one point in time, so
4  we don't know how long.  You can't -- you
5  can't make a determination of a study based
6  on thinking that's how long they used it.
7  BY MS. BROWN:
8      Q.    Well, if the prospective study
9  asked a 55-year-old if she was a talcum
10  powder user, you would agree with me, based
11  on your understanding of when people began
12  using talcum powder, that she likely started
13  in young adulthood, right?
14          MS. O'DELL:  Objection to form.
15      A.    I think the question was often
16  ever use, and so I don't know if she started
17  in young adulthood and did it for 20 or 30
18  years, or she started at middle age and did
19  it later, or she lived in the North and
20  didn't use it and then moved to the South and
21  started using it because she was hotter,
22  because sweating is often a reason that
23  people -- women give for using powder, and
24  men.  I don't know that I can infer that from

Page 319

1  the data in the study.
2  BY MS. BROWN:
3      Q.    Well, IARC has stated that 80
4  percent of women who use body powder start
5  before the age of 25.  Do you agree with
6  that?
7          MS. O'DELL:  If you need to
8      look at that study --
9      A.    Yeah, I need to look at the
10  IARC paper.
11  BY MS. BROWN:
12      Q.    We have marked that as
13  Exhibit 13.  And it's page 305.
14      A.    I don't see that one, because
15  it's a thick one.  It's not here.
16      Q.    Did we mark IARC --
17          MS. O'DELL:  Here we go.
18      A.    Here we go.
19          MS. O'DELL:  What page?
20          MS. BROWN:  305.
21          MS. O'DELL:  Actually, this is
22      the wrong one.  I'm assuming you're
23      looking at 2010?
24          MS. BROWN:  Yeah.  She had --

Page 320

1  the witness has it.
2          MS. O'DELL:  Do you have the
3      right one?
4          THE WITNESS:  I don't have
5      page 305.
6          MS. O'DELL:  She has 100 C, not
7      2010.
8          THE WITNESS:  I have 100 C.
9  BY MS. BROWN:
10      Q.    Didn't we mark this?
11      A.    It's hiding.  Here it is.  Here
12  it is.
13          MS. O'DELL:  Yeah, sorry,
14      excuse me.
15  BY MS. BROWN:
16      Q.    And so my question was, to
17  orient you, Doctor, I'll direct you to
18  Section B, third paragraph, the conclusion
19  there, that, "The use of talcum powder for
20  feminine hygiene is acquired in young
21  adulthood, since 80 percent of women who use
22  body powder start before the age of 25.  IARC
23  cites Harlow and Weiss from 1989."
24          Do you agree with that?

Page 321

1      A.    Yes.
2      Q.    Okay.  And you know that the
3  Nurses Health Study enrolled women -- middle
4  age women, correct?
5      A.    Postmenopausal women.
6      Q.    Ages 30 to 55 in 1976, and that
7  would have been ages 36 to 61 in 1982, right?
8      A.    I thought we were talking about
9  the Women's Health Initiative.  We're talking
10  about the Nurses Health Study?
11      Q.    Well, one question is Nurses
12  Health.  We'll go to Women's Health next.
13      A.    All right.
14      Q.    And so if most women, majority
15  80 percent, start at age 25, many of the
16  women enrolled in Nurses Health, for example,
17  would have already been using talcum powder
18  for decades prior to enrollment in that
19  study, correct?
20      A.    I'm just adding up.  So they
21  would have been aged 36 to 61.
22      Q.    Correct.
23      A.    So some of them might have,
24  yes.

81 (Pages 318 to 321)

Judith K. Wolf, M.D.

Page 322

1    Q.    Well, at least everyone who was
2  enrolled would have been using it for at
3  least ten years, right?
4         MS. O'DELL:  Object to the
5    form.
6    A.    We don't know that.  We're
7  inferring from another paper where it was
8  reported that 80 percent of women use it
9  before age 25, that women who were asked did
10  they ever use it had been using it their
11  whole -- since age 25.
12  BY MS. BROWN:
13    Q.    And in evaluating the
14  epidemiology, did you make that conclusion?
15         MS. O'DELL:  Object to the
16    form.
17    A.    I didn't make that inference
18  because it wasn't clear in the paper, that
19  that was something that was considered or
20  asked about how long they used it.
21  BY MS. BROWN:
22    Q.    When you evaluated the Nurses
23  Health Study, did you believe that the women
24  ages 36 to 61, who were asked about talcum

Page 323

1  powder use in 1982, had just begun using
2  talcum powder?
3    A.    I don't know have any
4  information --
5         MS. O'DELL:  Object to form.
6    A.    -- to confirm or dispute that.
7  BY MS. BROWN:
8    Q.    Did you consider the
9  information from IARC, that most women who
10  use talcum powder start at age 25?
11         MS. O'DELL:  Object to the
12    form.
13    A.    But in the Nurses Health Study,
14  I don't have that information about when they
15  started.
16  BY MS. BROWN:
17    Q.    My question was, did you
18  consider the information from IARC, that most
19  women who use talcum powder start at age 25?
20         MS. O'DELL:  Object to the
21    form.
22    A.    And my answer is the two are
23  not -- I can't draw a conclusion from one to
24  the other.

Page 324

1  BY MS. BROWN:
2    Q.    In evaluating the Women's
3  Health Initiative data, you did consider the
4  data that they had on folks who reported
5  using powder for more than 20 years, right?
6    A.    Yes.
7    Q.    And you know that that resulted
8  in a nonstatistically significant finding,
9  correct?
10    A.    That's correct.
11    Q.    And so your critique, as it
12  relates to the fact that the cohorts were not
13  long enough, does not relate to the Women's
14  Health Initiative; is that right?
15         MS. O'DELL:  Object to the
16    form.
17    A.    My critique does relate to the
18  Women's Health Initiative, because even if
19  they were using it for 20 -- more than 20
20  years -- let me step back and say this, so
21  that it's clear in my mind.
22         I don't know at what point in
23  their use that 20 years till cancer occurs
24  starts.  I don't know if it's after one dose,

Page 325

1  if it's after a year, if it's after five
2  years, if it's after ten years.  When does
3  that zero point go to 20 years, and I don't
4  think there's any way we can know that.
5  BY MS. BROWN:
6    Q.    Is what you're saying, Doctor,
7  you don't know how much talcum powder
8  exposure is needed to cause ovarian cancer?
9         MS. O'DELL:  Object to the
10    form.
11    A.    I'm saying that in an
12  individual patient, it might take a different
13  amount and different time for ovarian cancer
14  to develop as a result of talcum powder use.
15  And so even guessing when the women started
16  doesn't give me enough information to know
17  when that lag period started or if that lag
18  period is 20 years or if it might be up to 40
19  years, which is reported in some studies as
20  how long it takes to develop cancer from a
21  toxin.
22  BY MS. BROWN:
23    Q.    In your opinion as a
24  gynecologic oncology, what's the latency

Golkow Litigation Services - 877.370.DEPS

Judith K. Wolf, M.D.

Page 326

1  period for ovarian cancer?
2       A.   I'm going to answer you the way
3  I answer all of my patients.  And I don't
4  think we know for sure.  The only data that
5  we actually have that I'm aware of is the
6  Hiroshima data, that 15 to 20 years after the
7  atomic bomb was dropped, but when patients
8  come to me and they say, "How long had I had
9  this cancer?  When did this cancer develop?"
10 Well, we never sit and watch somebody from
11 the time they have the first hint of cancer,
12 to know how long it takes to develop, or
13 somebody who has a precancerous lesion,
14 although there isn't a good one for ovarian
15 cancer, so we don't know the answer to that.
16      Q.   So in fact, Doctor, the latency
17 period for ovarian cancer could be even
18 shorter than 15 or 20 years?
19           MS. O'DELL:  Objection to form.
20      A.   I don't know the latency period
21 for sure.  The only data that I -- you know,
22 that is clear is the data after the bombs,
23 and I think, could it be shorter, could it be
24 longer...

Page 327

1  BY MS. BROWN:
2       Q.   We don't know.  Fair?
3            MS. O'DELL:  Objection to form.
4       A.   I think it's variable.
5  BY MS. BROWN:
6       Q.   Have you evaluated the
7  case-control data and come to an opinion on
8  the amount of time between exposure and
9  development of ovarian cancer based on the
10 case-control data?
11           MS. O'DELL:  Object to the
12      form.
13      A.   So I'm going to answer the same
14 way, in that, I'm not sure that I can, based
15 on an individual person's response to the
16 powder and -- the talcum powder product and
17 dosage, to be able to say what the latency
18 period is.
19           If I have someone who has some
20 other intrinsic sensitivity risk for
21 developing ovarian cancer or risk for
22 developing ovarian cancer if they're exposed
23 to talcum powder product, it might not take
24 as long; it might not take the same amount of

Page 328

1  dose versus somebody else.
2            For instance, the
3  African-Americans who have, genetically, a
4  low -- it appears a low risk of ovarian
5  cancer, there are individual differences in
6  patients' intrinsic risk as well as any
7  external risks.
8  BY MS. BROWN:
9       Q.   Ware you aware of any
10 scientific article that has attempted to
11 quantify the latency period between first
12 exposure to perineal use of talc and the
13 development of ovarian cancer?
14           MS. O'DELL:  Object to the
15      form.
16      A.   As far as my understanding, we
17 don't have that information.  And I think
18 from my interpretation of reading the papers,
19 it might be hard to confirm or deny that.
20 BY MS. BROWN:
21      Q.   Would you agree that one of the
22 limitations of the talc epidemiology is the
23 self-reported nature of talcum powder use and
24 exposure?

Page 329

1            MS. O'DELL:  Objection to form.
2       A.   Anytime there's self-reporting
3  of anything, it's one thing to consider as a
4  potential bias in the study.
5  BY MS. BROWN:
6       Q.   In your review of the talc
7  epidemiology, did you find evidence of a dose
8  response?
9       A.   Some of the papers do show
10 evidence of a dose response and some do not.
11      Q.   Do you agree with the FDA in
12 its 2014 denial of the citizen's petition
13 that dose response evidence is lacking?
14           MS. O'DELL:  Object to the
15      form.
16      A.   I would say that if we look at
17 the -- many of the studies published after
18 2014, there does appear to be a dose
19 response, and so that information wouldn't
20 have been available.  The Wu -- the original
21 Wu study did show a response.  The Cramer
22 study 2016, the Schildkraut study, the
23 Penninkilampi meta-analysis all showed some
24 hint of a dose response.  They wouldn't have

Judith K. Wolf, M.D.

Page 330

1  had any of those, except the Wu.
2  BY MS. BROWN:
3      Q.   And those studies did not --
4  for example, Cramer did not show a dose
5  response with duration of use, right?
6      A.   I thought they showed an
7  increase with frequency and duration of use.
8      Q.   And so if you look, for
9  example, at Table 1 of Cramer, we actually
10  see a decrease in the risk after 35 years,
11  right?
12      A.   Can I --
13      Q.   Absolutely.
14      A.   Is that one of the exhibits?
15  Because it's not in there.
16      Q.   Right.
17      A.   Or I can't find it.
18      Q.   We marked it as 11.
19      A.   Yeah.
20      MS. O'DELL:  Here we go.
21      A.   Years used.  So I'm looking at
22  Table 1.  Is that what you're looking at?
23  BY MS. BROWN:
24      Q.   Right.  If you look at the

Page 331

1  years used, you'd agree with me that there's
2  actually a slight decreased risk after 35
3  years of use?
4      A.   But there's an increased risk
5  between 8 and 20, up to 35, and all of those
6  are fairly similar.
7      Q.   And what Cramer himself
8  includes -- concludes, is that the trend for
9  years used was flat, right?
10      A.   Yes.
11      Q.   So what he did not find was
12  that the longer you used talcum powder, a
13  significant increase in your risk of ovarian
14  cancer, correct?
15      MS. O'DELL:  Object to the
16  form.
17      A.   The more frequently you used
18  it, an increase.
19  BY MS. BROWN:
20      Q.   Right.  But as to the number of
21  years, he did not find any dose response,
22  correct?
23      A.   That's correct.
24      Q.   And even to be fair as to the

Page 332

1  frequency, if you look at Table 1 continued
2  on the very next page, there was -- while
3  there was an increase of use up to 7200
4  applications, after 7200 applications, the
5  use decreased, right?
6      MS. O'DELL:  Object to the
7  form.
8      A.   No, the top part of that, it
9  goes up, it goes down, it goes back up.  The
10  bottom part of that -- the last part of that
11  table is assuming 12 months per year
12  missing -- these are people with missing
13  months.
14  BY MS. BROWN:
15      Q.   And so you agree there's not a
16  linear increase in frequency of application,
17  correct?
18      A.   In this paper, there's not a
19  linear increase, but there is an increase
20  with more frequent application.  And I want
21  to say, again, and I think I've said this
22  earlier, is that what's a dose?  Frequency of
23  use, in my head, I can't get my head around,
24  is it the same amount every time?  There

Page 333

1  isn't -- it's not like it's a 5-milligram
2  pill.  It's powder in your panties.  And to
3  look at any of this data and try to
4  equivilate dose, I think it's challenging.
5      Q.   One of the things you say in
6  your report is, given those challenges, the
7  evaluation of a dose response was not as
8  important to your analysis; is that right?
9      A.   Yes.
10      MS. O'DELL:  Object to form.
11  BY MS. BROWN:
12      Q.   And what -- and that's
13  different than the Bradford Hill criteria,
14  right?
15      MS. O'DELL:  Object to the
16  form.
17      A.   That's one of the tenets of the
18  Bradford Hill.  It's not the only one.
19  BY MS. BROWN:
20      Q.   Right.  But in your analysis,
21  you determined that that factor of the
22  Bradford Hill was less important, correct?
23      A.   Because it's hard to
24  quantitate, as I just stated, what's a dose.

84 (Pages 330 to 333)

Judith K. Wolf, M.D.

Page 334

1  Even if you know for sure how many times
2  someone used talcum powder, you don't know
3  what dose they used and where it went.  Did
4  it go all in their panties?  Did it go on the
5  floor?  Did it got in their groins?  Did go
6  it up their backside?  How much did they use?
7      None of these papers attempted
8  to and understandably it's hard to quantitate
9  how much is a dose.  And so given that it's
10  challenging to answer the question about dose
11  response, it's hard to put a lot of weight on
12  that.
13      Q.    And what you say in your report
14  at page 15, is that given the limitations of
15  the data, and those would be the limitations
16  you just described, right?
17      A.    Yes.
18          MS. O'DELL:  Objection to form.
19  BY MS. BROWN:
20      Q.    And what that means is that
21  this product, the use of this product is
22  difficult to quantify, correct?
23          MS. O'DELL:  Object to the
24      form.

Page 335

1      A.    The dose of using this product
2  is difficult to quantify.
3  BY MS. BROWN:
4      Q.    Right.  And when you say "the
5  dose is difficult to quantify," that just --
6  you're referring to just the dose that
7  somebody puts on their perineum or on their
8  underwear, right?
9          MS. O'DELL:  Object to form.
10      A.    Their exposure dose, I'm
11  referring to now -- wherever they put it on
12  their perineum.
13  BY MS. BROWN:
14      Q.    So are you -- would you agree
15  that both the amount that they used is
16  difficult to quantify?  Fair?
17      A.    Yes.
18      Q.    As well as the amount that
19  actually reaches the ovary, right?
20          MS. O'DELL:  Object to the
21      form.
22      A.    The amount they used, the
23  amount that reaches the ovary, their own body
24  sensitivity to whatever amount reaches

Page 336

1  their -- all of those things are hard to
2  quantify.
3  BY MS. BROWN:
4      Q.    Is there any scientific data
5  that you are aware of that shows a particular
6  percentage of perineal powder reaching the
7  ovary?
8      A.    I'm not aware that there's any
9  data that's ever looked at that.
10      Q.    For purposes of your opinion,
11  however, you have assumed that some amount of
12  the powder that's applied perineally reaches
13  the ovary; is that right?
14          MS. O'DELL:  Object to the
15      form.
16      A.    I assume that there's migration
17  of talc particles through the open genital
18  tract to get to the ovary.
19  BY MS. BROWN:
20      Q.    And for your opinion to hold
21  true, that talcum powder that reaches the
22  ovary causes ovarian cancer, is there a
23  particular amount of talcum powder in your
24  mind that needs to reach the ovary?

Page 337

1          MS. O'DELL:  Objection to form.
2      A.    I think -- I have no idea what
3  that amount would be and I don't know that
4  that amount is the same for everyone.
5  BY MS. BROWN:
6      Q.    Is there any scientific
7  literature on which you rely that establishes
8  that individuals are susceptible to talcum
9  powder in a different way?
10      A.    Individuals are susceptible to
11  all cancer risk factors in a different way.
12  Everyone who has a BRC1 mutation doesn't get
13  ovarian cancer.  Everyone who has a lynch
14  syndrome mutation doesn't get colon cancer.
15  There are individual differences in risk
16  factors.  And everyone who uses
17  postmenopausal hormones doesn't get ovarian
18  cancer or breast cancer.  So there are
19  individual differences.  Everybody's made up
20  differently, has a different immune response.
21  So it only makes sense to me that if it's
22  different in every other circumstance, it's
23  going to be different in talcum powder use
24  exposure.

85 (Pages 334 to 337)

Judith K. Wolf, M.D.

Page 338

1    Q.    Based on your review of the
2 epidemiology, is it your opinion that
3 individuals are put at risk for ovarian
4 cancer through perineal exposure more likely
5 than through inhalation of genital talcum
6 powder?
7        MS. O'DELL:  Object to the
8    form.
9    A.    In my review of the
10 epidemiology, all of the studies are
11 particularly looking at perineal exposure.
12 So through -- through that lens, I believe
13 that most of the information in those studies
14 is looking at that particular question,
15 perineal exposure, not necessarily
16 inhalation.
17 BY MS. BROWN:
18    Q.    When you're evaluating a
19 patient for a suspected ovarian cancer, do
20 you inquire about any markers of asbestos
21 exposure, like pleural plaques or
22 mesothelioma or anything like that,
23 interstitial fibrosis?
24    A.    Do I inquire about them?  Do

Page 339

1 you mean do I investigate --
2    Q.    Yes.
3    A.    -- if they have any of those,
4 yes.
5    Q.    Do you believe that if talcum
6 powder was contaminated with asbestos, that
7 it would be causing asbestos-related
8 diseases, like mesothelioma?
9        MS. O'DELL:  Object to the
10    form.
11    A.    Do I believe that if talcum
12 powder is contaminated with asbestos, would
13 it cause mesothelioma?
14 BY MS. BROWN:
15    Q.    Uh-huh.
16    A.    That's your question?  I do
17 believe that talcum powder is contaminated
18 with asbestos and I believe that it causes --
19 it can increase the risk of both mesothelioma
20 of the ovary and epithelial ovarian cancer.
21 And I'm investigating for any signs of
22 abnormality in the chest, I'm looking for any
23 abnormalities, evidence of mesothelioma or
24 any other abnormalities in the chest that may

Page 340

1 or may not be related to the patient's
2 cancer.
3    Q.    Have you -- in connection with
4 that opinion, Dr. Wolf, have you evaluated
5 the epidemiology on the miners and millers of
6 cosmetic talcum powder?
7    A.    I believe that's in the IARC
8 paper or study.
9    Q.    You recall that IARC points to
10 that as some of the best evidence, that
11 inhalation of nonasbestiform talc is not
12 carcinogenic?
13        MS. O'DELL:  Object to the
14    form.
15    A.    I don't recall that specific
16 conclusion.  I'd have to look at it again.
17 So are we talking about IARC 10?  Which one
18 are you --
19 BY MS. BROWN:
20    Q.    I'm just asking if you recall
21 and if you considered that conclusion?
22        MS. O'DELL:  Could you repeat
23    the question, please?
24

Page 341

1 BY MS. BROWN:
2    Q.    Do you recall and did you
3 consider IARC's conclusion, that some of the
4 best epidemiology as it relates to inhalation
5 of a nonasbestiform talc, is the miners and
6 the millers of cosmetic talc?
7    A.    I do recall that.
8    Q.    Does that make sense to you as
9 a gynecologic oncologist, that one of the
10 best places to look in the epi world would be
11 the folks who are exposed to inhalation the
12 most?
13        MS. O'DELL:  Object to the
14    form.
15    A.    It makes sense to look at a
16 group of people who are going to be exposed.
17 BY MS. BROWN:
18    Q.    And in concluding, as you have
19 done here today, Doctor, that cosmetic talcum
20 powder is contaminated with asbestos, how, if
21 at all, did you consider the results of the
22 miners and miller studies that IARC points to
23 as some of the best evidence?
24        MS. O'DELL:  Object to the

86 (Pages 338 to 341)

Judith K. Wolf, M.D.

Page 342

1    form, asked and answered.
2         A.    So I'm not sure what you're
3    asking.  What I believe I'm hearing is,
4    you're asking if there's asbestos in talcum
5    powder, why don't miners and millers get
6    ovarian cancer?
7    BY MS. BROWN:
8         Q.    Exactly.  Have you considered
9    the fact that that epidemiology shows no
10   mesothelioma?
11        MS. O'DELL:  Object to the
12   form.
13        A.    That's a different question,
14   because I'm not talking about mesothelioma.
15   I'm talking about epithelial ovarian cancer.
16   BY MS. BROWN:
17        Q.    And a second ago I asked you if
18   you thought your talc was contaminated with
19   asbestos and people were really breathing it
20   in, shouldn't it be causing mesothelioma in
21   women?  And I thought your testimony was yes.
22        MS. O'DELL:  Object to the
23   form.
24        A.    No, you asked me do I

Page 343

1    investigate if women who I think might have
2    ovarian cancer might have abnormalities in
3    the chest, including abnormalities associated
4    with mesothelioma, and I said, yes, I do,
5    because women with ovarian cancer often have
6    abnormalities in the chest.  Usually if they
7    do, it's from their ovarian cancer, but
8    certainly I'm looking at any other potential
9    cause.
10   BY MS. BROWN:
11        Q.    Understood.  Bad question on my
12   part.  We're missing each other.  If -- you
13   hold the opinion that talcum powder is
14   contaminated with asbestos.  And my question
15   is, if that were true, shouldn't we be seeing
16   mesothelioma in the miners and the millers of
17   cosmetic talcum powder?
18        MS. O'DELL:  Object to the
19   form.
20        A.    I'm not sure how to answer
21   that, because I think that talcum powder has
22   multiple components that could cause cancer.
23   Is it only the asbestos that could be --
24   certainly, in people who work in mines,

Page 344

1    there's a lot of abnormalities in the lung
2    from breathing in talcum powder.  And I'm
3    losing myself because I'm not sure of the
4    question again.  Should -- can you -- let me
5    tell you what I think you're asking me.
6    BY MS. BROWN:
7         Q.    Why don't I just rephrase the
8    question and try to do this bit by bit.
9         A.    Okay.
10        Q.    You would agree that
11   mesothelioma is a disease that is often
12   caused by asbestos exposure?
13        A.    Yes.
14        Q.    Some people refer to it as a
15   signature asbestos-related disease, correct?
16        MS. O'DELL:  If you know.
17        A.    I don't know that term
18   "signature."  That's not something that --
19   BY MS. BROWN:
20        Q.    And you have offered the
21   opinion here today that talcum powder is
22   contaminated with asbestos, right?
23        A.    Yes.
24        Q.    And you have offered the

Page 345

1    opinion that perineal use of talcum powder
2    could reach the ovaries via inhalation,
3    correct?
4         A.    Yes.
5         Q.    And so my question to you is,
6    if talcum powder is really contaminated with
7    asbestos and if women who use it perineally
8    really do inhale it, shouldn't they be
9    getting asbestos-related diseases like
10   mesothelioma?
11        MS. O'DELL:  Object to the
12   form.
13        A.    I'm going to say that they
14   might.
15   BY MS. BROWN:
16        Q.    And in forming that opinion,
17   have you considered the epidemiology on the
18   miners and millers of cosmetic talcum powder?
19        A.    Yes.  That we just talked
20   about.
21        Q.    Okay.  And those studies show
22   that the folks with the highest, highest
23   exposure to cosmetic talcum powder via
24   inhalation, don't get mesothelioma, right?

87 (Pages 342 to 345)

Judith K. Wolf, M.D.

Page 346

1    MS. O'DELL:  Object to the
2 form.
3    THE WITNESS:  Are you just
4 objecting?
5    MS. O'DELL:  Yes.
6    THE WITNESS:  I wasn't sure if
7 I was supposed to answer or not.
8    A.   In that study, those patients
9 did not get mesothelioma.  So again, the
10 question is, might talcum powder applied
11 perineally cause ovarian cancer by -- via an
12 inhalation route?  Yes, I think that could
13 happen.  Do I think those people should be
14 getting mesothelioma, because I have evidence
15 that that talcum powder is contaminated with
16 mesothelioma?  I don't know.  Maybe.
17 BY MS. BROWN:
18    Q.   Did you look, in evaluating the
19 occupational studies that IARC relies on in
20 concluding that heavy occupational exposure
21 to asbestos causes ovarian cancer, did you
22 look at how the relative risks for ovarian
23 cancer in those studies compared to the
24 relative risks for mesothelioma?

Page 347

1    A.   Yes.
2    Q.   And what was the conclusion
3 there, Doctor?
4    A.   The relative risks of
5 mesothelioma is higher.
6    Q.   By how much?
7    A.   I can't remember.  A lot.
8    Q.   Okay.  So do you recall seeing
9 relative risks for ovarian cancers in the 1.5
10 to 2.5 range?
11    A.   Yeah.
12    Q.   And for mesothelioma in the 40
13 range?
14    A.   Yes.
15    Q.   And so if someone is truly
16 exposed to heavy amounts of asbestos through
17 inhalation, they -- based on that data that
18 IARC considered, they're far more likely to
19 get mesothelioma than ovarian cancer, right?
20    MS. O'DELL:  Object to the
21 form.
22    A.   If people are exposed to heavy
23 doses of asbestos, they're more likely to get
24 mesothelioma than ovarian cancer, yes.

Page 348

1 BY MS. BROWN:
2    Q.   Does your current institution,
3 the Community Health Practice, does it advise
4 women that perineal use of talcum powder
5 causes ovarian cancer?
6    A.   So in my practice, it's me, a
7 physician's assistant and a nurse
8 practitioner and one other GYN oncologist.  I
9 do, my physician's assistant does, my nurse
10 practitioner does.  I don't know about my
11 partner.
12    Q.   And we talked a little bit
13 earlier about when you started that practice.
14 Do you recall when you started telling
15 patients your belief that talcum powder use
16 causes ovarian cancer?
17    A.   I started asking my patients
18 about their use and telling them to stop or
19 not use it once I started reviewing all of
20 the literature and formed my opinion.
21    Q.   You made a motion, all the
22 literature that's in front of you, right?
23    A.   Yes.
24    Q.   So you --

Page 349

1    MS. O'DELL:  Which is not just
2 in front of you, but we're talking
3 about what's on the side table as
4 well.
5    THE WITNESS:  Yes.
6    MS. BROWN:  Fair.
7 BY MS. BROWN:
8    Q.   So to be clear, you started the
9 practice of asking patients if they used
10 talcum powder after you had undertaken review
11 of the literature in connection with your
12 expert work, correct?
13    MS. O'DELL:  Object to the
14 form.
15    A.   After I undertook review of the
16 literature.
17 BY MS. BROWN:
18    Q.   And I understand that you
19 undertook a review of the literature in
20 connection with your expert work, right?
21    A.   That's when I read all of the
22 literature -- began reading all of the
23 literature.  I was aware of some of the data,
24 but when I began reviewing all of the

Judith K. Wolf, M.D.

Page 350

1   literature, yes.
2       Q.   Okay.  And so prior to that
3   time, it was not your practice to ask
4   patients whether or not they used talcum
5   powder, correct?
6       A.   Not as a routine.  However, if
7   I saw somebody who, when I examined them,
8   obviously was using talcum powder, I
9   recommended they not use it.  They stop.
10      Q.   Do you agree, Doctor, that much
11  about ovarian cancer is shrouded in mystery,
12  from causes to early detection to effective
13  treatments?
14          MS. O'DELL:  Object to the
15  form.
16      A.   I would not agree with that
17  statement.
18  BY MS. BROWN:
19      Q.   Let's mark this as Exhibit 20.
20          (Deposition Exhibit 20 marked
21  for identification.)
22  BY MS. BROWN:
23      Q.   Handing you, Doctor, an article
24  entitled "The Future of Ovarian Cancer

Page 351

1   Diagnosis is Now - Through These 4
2   strategies," by Judy Wolf, November 11th,
3   2015.  Is this an article that you wrote,
4   Doctor?  First of all, is that your picture
5   next to Judy Wolf on the first page?
6       A.   It is.
7       Q.   Okay.  And this article, dated
8   November 11th, 2015, has your byline and
9   picture, right?
10      A.   It does.
11      Q.   Okay.  And do you recall,
12  during the time period that you were in the
13  private sector, authoring a number of
14  articles that were posted on a website called
15  nopelvicmass.com?
16      A.   Yes.
17      Q.   And was this one of those
18  articles potentially?
19      A.   Yes.  Yes.
20      Q.   Okay.  And as we just -- as I
21  just read, the article that has your picture
22  and name on it says, "So much about ovarian
23  cancer is shrouded in mystery, from causes to
24  early detection to effective treatments."

Page 352

1       Q.   Right?
2       A.   Yes.
3       Q.   And as of November 2015, that
4   was information that you signed off on,
5   correct?
6       A.   Yes.
7       Q.   Okay.  And so as of
8   November 2015, you do not believe that one of
9   the well-known causes of ovarian cancer is
10  talcum powder use.  True?
11      A.   I can't remember the time.  I
12  can tell you that this was used as part of
13  patient information in relationship to the
14  company that I was working, and the point of
15  this was not to talk about risk factors.  It
16  was to talk about the importance of diagnosis
17  and informing women, the general lay
18  population, about getting to a gynecologic
19  oncologist if they had a pelvic mass.
20      Q.   The information contained in
21  Exhibit 20 was meant for patients who --
22      A.   For women.
23      Q.   For women.
24      A.   For women.

Page 353

1       Q.   Okay.  And certainly as a
2   doctor, as a gynecologic oncologist, you
3   think it's important to be truthful with
4   women when you write about issues concerning
5   women's health, right?
6           MS. O'DELL:  Object to the
7   form.
8       A.   I don't see anything on here
9   that was -- is untruthful.
10  BY MS. BROWN:
11      Q.   I'm not suggesting that.  I was
12  just asking you, that when you write, as you
13  do often, information about women's health,
14  you'd agree it's important to be truthful?
15      A.   Yes.
16      Q.   Because the intended recipient
17  of your writing are women who have or may
18  have ovarian cancer, right?
19      A.   Yes.
20          (Deposition Exhibit 21 marked
21  for identification.)
22  BY MS. BROWN:
23      Q.   I'm handing you, Doctor, what
24  we have marked as Exhibit 21 to your

89 (Pages 350 to 353)

Judith K. Wolf, M.D.

Page 354

1  deposition.  This is another article with
2  your name and picture, entitled "How to find
3  the best doctor for ovarian cancer."  Do you
4  recall writing this article?
5      A.   Not specifically, but I know I
6  did a lot of these while I was working at
7  Vermillion.
8      Q.   Okay.  And just to close the
9  loop, Exhibit 20, even though you don't
10  necessarily recall writing it, you don't
11  dispute this is something that you did write,
12  correct?
13      A.   I'm not disputing that.
14      Q.   Okay.  And the same for
15  Exhibit 21, you don't dispute that this
16  article is something you wrote in December of
17  2015?
18      A.   That's correct.
19      Q.   Okay.  And this, again, was an
20  article aimed at folks who -- women who may
21  be concerned about ovarian cancer, correct?
22      A.   Yes.
23      Q.   And one of the things you did
24  in this article was to identify risk factors

Page 355

1  for ovarian cancer.  True?
2      A.   All listed here are familial
3  risk factors.
4      Q.   And the title of the section
5  you have in this -- well, first, you say,
6  "What are the odds," right?  The odds of
7  getting ovarian cancer, right?  And you say
8  one place to start is by considering your
9  risk factors.  True?
10      A.   Yes.
11      Q.   All right.  And then you state,
12  "You're more likely to be at risk of ovarian
13  cancer if" -- and then you have a number of
14  bullets, correct?
15      A.   Yes.  And all of those bullets
16  relate to genetic risk.
17      Q.   Exactly.  And so the first
18  deals with a first-degree relative, right?
19      A.   Yes.
20      Q.   The second is a prior history
21  of breast cancer, correct?
22      A.   Yes.
23      Q.   The third is a prior history of
24  breast cancer and a relative with breast or

Page 356

1  ovarian cancer, right?
2      A.   Yes.
3      Q.   And then the fourth is close
4  relatives with a history of breast cancer or
5  ovarian cancer at any age, right?
6      A.   Yes.
7      Q.   And then the fourth and fifth
8  have to do with the Ashkenazi Jewish
9  heritage, correct?
10      A.   Yes.
11      Q.   And one of the things you did
12  not list in December of 2015 as a risk factor
13  for ovarian cancer, was genital use of talcum
14  powder, correct?
15      A.   I did not use -- list any
16  nonhereditary risk.
17      Q.   And that would include talcum
18  powder, correct?
19      A.   Including talcum powder,
20  endometriosis, obesity, any hormonal
21  replacement.
22      Q.   Sorry.  Are you done?
23      A.   I'm done.
24      Q.   And that's in part, Doctor,

Page 357

1  because in December of 2015, you had not
2  formed the opinion that genital use of talcum
3  powder causes ovarian cancer.  True?
4          MS. O'DELL:  Object to the
5      form.
6      A.   That was prior to my doing any
7  of the review of all the literature.
8  BY MS. BROWN:
9      Q.   Right.  And so at the time of
10  these articles, that Exhibit 20 and 21, you
11  did not hold the opinion that talcum powder
12  use perineally causes ovarian cancer,
13  correct?
14      A.   I wasn't convinced, as I am
15  today.
16      Q.   Have you done any prior expert
17  work, Dr. Wolf?
18      A.   No.
19      Q.   Have you reviewed any
20  individual plaintiff cases who are suing in
21  the talcum powder litigation?
22      A.   No.
23      Q.   Okay.  Has the extent of your
24  involvement in the talcum powder litigation

90 (Pages 354 to 357)

Page 358

1 related to the report that we've been
2 discussing today?
3     A.   Yes.
4     Q.   Okay.  And in total, does it
5 sound about right to you, you've charged the
6 plaintiffs' lawyers for about 83 hours in
7 connection with your work?
8     A.   That seems about right.
9     Q.   And your rate is $600 an
10 hour --
11     A.   Yes.
12     Q.   -- is that correct?  And how
13 did you come up with that rate?
14     A.   I asked -- I asked my friend
15 Ali, what do people usually charge for this
16 kind of thing, and then I kind of picked a
17 rate in -- what I felt like was in the
18 middle.
19     Q.   And so if I wanted to know how
20 much money the plaintiffs' lawyers have paid
21 you in total for your work in the talc
22 litigation, I could multiply 600 by 83 and
23 that should be about right?
24     A.   That should be about right.

Page 359

1     Q.   Do you have any additional
2 plans to do additional expert work for the
3 plaintiffs in the talc litigation?
4     A.   I mean, completing out whatever
5 happens with this case.
6     Q.   Other than what we're here
7 about today, right?
8     A.   That's -- that's all I have
9 planned.
10     Q.   Do you have a website in
11 connection with your current practice?
12     A.   I do.
13     Q.   And do you indicate on your
14 website that talcum powder causes ovarian
15 cancer?
16     A.   I don't believe I talk about
17 any risk -- specific risk factors for ovarian
18 cancer.  That website is to introduce
19 patients to who I am and how I like to
20 practice.
21     Q.   Do you have any plans to
22 publicize your belief that talcum powder
23 causes ovarian cancer?
24     A.   I actually do plan to take my

Page 360

1 report and the references and write a review
2 paper and submit it for publication.
3     Q.   Have you done any work to that
4 end yet, Doctor?
5     A.   I haven't.
6     Q.   Do have you have any journals
7 in mind where you intend to submit that
8 review?
9     A.   I haven't decided for sure yet.
10 The journals that I read the most and most
11 GYN oncologists read, are the GYN Oncology,
12 the Journal of Clinical Oncology, The Gray
13 Journal, the ACOG journal, which is called
14 The Green Journal.  So I would probably
15 choose one of those because clinicians read
16 them.
17     Q.   Are you a member of ACOG?
18     A.   I am.
19     Q.   And are you a member of SGO?
20     A.   I am.
21     Q.   And in forming your opinions in
22 this case, did you consider the risk factors
23 that ACOG and SGO recognize for ovarian
24 cancer?

Page 361

1     A.   Yes.
2     Q.   And are you aware that in their
3 patient-facing websites, as well as any of
4 their publicly related information about
5 ovarian cancer, neither SGO nor ACOG
6 identifies perineal use of talcum powder as a
7 risk factor for ovarian cancer?
8     A.   I am aware of that.
9     Q.   And do you believe that the
10 doctors and the scientists at SGO and ACOG
11 simply have not reviewed all of the data
12 regarding perineal use of talcum powder and
13 ovarian cancer?
14     A.   It's my understanding that most
15 of the GYN oncologists probably have not
16 reviewed the literature to the extent of
17 which I have reviewed it.  And given that the
18 volume of literature has increased recently,
19 it takes time for societies like SGO and ACOG
20 to come up with an opinion.  It has to go
21 through a committee and various steps to come
22 out.  I don't think this is something that's
23 risen to their attention enough.  That's part
24 of the reason that I want to write a paper

Judith K. Wolf, M.D.

Page 362

1    about it, to help inform my colleagues.
2         Q.    Have you contacted anyone at
3    ACOG or SGO and told them that you think they
4    need to update their website and list that
5    talcum powder causes ovarian cancer?
6         A.    I haven't yet.
7         Q.    Do you intend to do that?
8         A.    I intend to write a letter to
9    SGO with my concerns, asking them to review
10   it. I think that's the first step, is they
11   have to review the literature on their own.
12        Q.    And you have been doing this
13   talcum powder work for the plaintiffs'
14   lawyers for a little over a year now; is that
15   right?
16        A.    Yes.
17        Q.    And during that time period,
18   you haven't contacted any of your
19   professional organizations to inform them of
20   your view that talc causes ovarian cancer?
21        MS. O'DELL:  Object to the
22        form.
23        A.    I have talked to individual
24   colleagues who practice GYN oncology, and I

Page 363

1    have talked to the National Ovarian Cancer
2    Coalition Medical Advisory Board, of which
3    I'm on the board. I used to be on the
4    advisory board. And at the time that I
5    raised it, there wasn't a lot of interest in
6    pursuing it.
7    BY MS. BROWN:
8         Q.    And so one of the organizations
9    you referenced and to your credit have done a
10   lot of work with, is the National Ovarian
11   Cancer Coalition, right?
12        A.    Yes.
13        Q.    And as you well know, as
14   someone who's been very active in that
15   organization, they too have a statement on
16   talcum powder, right?
17        A.    Yes.
18        Q.    And the National Ovarian Cancer
19   Coalition does not believe that the evidence
20   supports that talcum powder causes ovarian
21   cancer, right?
22        MS. O'DELL:  Object to form.
23        A.    That's what their statement
24   says.

Page 364

1    BY MS. BROWN:
2         Q.    Okay. And it sounds like you
3    nonetheless, have raised the issue with some
4    folks at the coalition, correct?
5         A.    Yes.
6         Q.    And it sounds like they don't
7    agree with your assessment, correct?
8         MS. O'DELL:  Object to the
9        form.
10        A.    The last time I raised it,
11   which was in the spring, at the meeting that
12   is in conjunction with the Society of GYN
13   Oncology, they didn't want to address it,
14   they didn't want to take it on as something
15   to review.
16   BY MS. BROWN:
17        Q.    But do you think, generally,
18   the doctors and the scientists at
19   organizations like ACOG and SGO and the
20   National Ovarian Cancer Coalition are working
21   very hard to protect women's health issues?
22        MS. O'DELL:  Object to the
23        form.
24        A.    I think that all of those

Page 365

1    societies and many other advocacy groups are
2    doing what they think is best to protect
3    women's health.
4    BY MS. BROWN:
5         Q.    Have you considered the
6    possibility that these folks at ACOG, at SGO,
7    at NCI, at FDA, at IARC have reviewed the
8    same data that you have and come to a
9    different conclusion?
10        MS. O'DELL:  Object to the
11        form.
12        A.    I don't have all of the
13   information about what they've reviewed or
14   not reviewed. And some of those, I know that
15   they didn't have all of the data and some of
16   them, like the National Ovarian Cancer
17   Coalition, I know they haven't reviewed the
18   data. I don't know that SGO has done that at
19   any time recently. If you go to their
20   website, they refer to ACOG. So I can't
21   make that statement.
22   BY MS. BROWN:
23        Q.    You don't have those -- sitting
24   here as someone who's been active in the

92 (Pages 362 to 365)

Judith K. Wolf, M.D.

Page 366

1  women's health field for almost 30 years, you
2  don't have any reason to believe that the
3  folks at ACOG, SGO, FDA, NCI, CDC have not
4  kept up-to-date with the talc and ovarian
5  cancer epidemiology?
6          MS. O'DELL: Object to the
7      form, misstates her testimony, assumes
8      things not in the record.
9      A.    My assumption is that some
10 people in all of those have probably read
11 some of the data. I'm not sure who, if
12 anyone, in any of those has looked at all of
13 the evidence in the way that I have done.
14 BY MS. BROWN:
15     Q.    And the way that you've looked
16 at the evidence is by using sort of your
17 interpretation of Bradford Hill; is that
18 right?
19         MS. O'DELL: Object to the
20     form.
21     A.    I would say evidence-based
22 medicine and then using the tenets of
23 Bradford Hill to explain how I interpreted
24 the data that I reviewed.

Page 367

1  BY MS. BROWN:
2      Q.    I'm sorry to interrupt. And
3  your methodology, though, as it relates to
4  Bradford Hill, employs a methodology that has
5  less reliance on dose response, right?
6          MS. O'DELL: Object to the
7      form.
8      A.    Not less reliance on dose
9  response, just that in this particular case,
10 determining what the dosage is makes it hard
11 to determine the dose response.
12 BY MS. BROWN:
13     Q.    And you say in your report that
14 you consider that a less important factor,
15 right?
16         MS. O'DELL: Object to the
17     form.
18 BY MS. BROWN:
19     Q.    And so that's your report on
20 page 15, I think we talked about this
21 earlier, "Given the limitations of the data,
22 I consider this to be a less important factor
23 compared to strength of association,
24 consistency and biologic mechanism"?

Page 368

1      A.    Because there's limitations in
2  the data that we'll never know the answer to.
3      Q.    And as it relates to strength
4  of the association, in your review of the
5  data, what is the relative risk associated
6  with talcum powder use and ovarian cancer?
7          MS. O'DELL: Object to the
8      form.
9      A.    The overall -- looking at the
10 studies as a whole, 1.3 to 1.4 odds ratio.
11 BY MS. BROWN:
12     Q.    And do you consider that to be
13 a strong association?
14     A.    I consider it to be a
15 consistent, reliable association. It doesn't
16 have to be a high number, and Bradford Hill
17 explains that in FedEx paper, that it's the
18 consistent association and finding that
19 association. It doesn't have -- it's not
20 number dependent.
21     Q.    You'd agree that 1.3 and 1.4 is
22 not a high relative risk?
23         MS. O'DELL: Object to the
24     form.

Page 369

1      A.    1.3 and 1.4 is not 10, but 1.2
2  was the risk of hormone -- postmenopausal
3  hormone replacement therapy, and I believe
4  that's a real risk also.
5  BY MS. BROWN:
6      Q.    Have you considered in your
7  review of the epi, the FDA's concern that the
8  studies that have found small positive
9  associations have lower confidence limits
10 that are pretty close to 1? Have you looked
11 into that?
12         MS. O'DELL: Object to the
13     form.
14     A.    So when the odds ratio's 1.3,
15 your confident intervals might be close to 1
16 sometimes. However, if it doesn't cross 1,
17 it's statistically significant.
18 BY MS. BROWN:
19     Q.    And one of the reasons -- do
20 you understand why the FDA is concerned if
21 the confidence interval is getting close to
22 1?
23     A.    That it might be by random
24 chance, yes.

93 (Pages 366 to 369)

Judith K. Wolf, M.D.

Page 370

1    Q.    And do you share that concern
2  as you evaluate the confidence intervals
3  here?
4    A.    If I didn't see such a
5  consistent average of 1.3 to 1.4, I would be
6  more concerned about it.  As a whole, I'm not
7  concerned about it when I look at all of the
8  evidence.
9    Q.    And when you say "consistent,"
10  you're referring within the population
11  case-control studies, right?
12         MS. O'DELL:  Object to the
13    form.
14    A.    Yes.
15  BY MS. BROWN:
16    Q.    Because if you look at the
17  prospective cohorts, there's not consistency
18  in the case controls, right?
19    A.    When you look at the
20  meta-analyses, everything as a whole, yes,
21  1.3 to 1.4.
22    Q.    Okay.  If you bear with me for
23  just one minute, Dr. Wolf, I want to just
24  make sure I'm not forgetting anything and

Page 371

1  then I'm going to turn the questioning over
2  to some of my colleagues.
3         When you say on page 8, "The
4  risk elevation is 20-60 percent," do you
5  think it's more like 30 to 40?
6    A.    I think if you look at all the
7  papers, some of them are 20 and some of them
8  are as high as 60.
9    Q.    And, of course, if the actual
10  risk is as high as 60, Narod's critique is
11  not accurate.  Fair?
12    A.    That's the range of what's been
13  reported.  The average is 1.3 to 1.4, and I
14  believe that's what he estimated the 200,000
15  on.
16    Q.    Did you understand him to be
17  estimating how many he needed to study if the
18  true relative risk was 1.2?
19    A.    I don't remember if it was 1.2
20  or 1.3.
21    Q.    Okay.  Real quick, Doctor, I
22  want to just make sure I understand your
23  opinion as it relates to the composition of
24  talcum powder.  Do you believe that -- list

Page 372

1  for me everything, other than talc, that you
2  believe is in Johnson & Johnson baby powder
3  and causes ovarian cancer.
4         MS. O'DELL:  Object to the
5    form.
6    A.    What I believe is in talcum
7  powder product and that can be -- cause
8  inflammation and/or be carcinogenic is platy
9  talc, fibrous talc, asbestos, heavy metals,
10  including nickel, chromium and cobalt, and
11  fragrance products that can be irritating and
12  inflammatory.
13  BY MS. BROWN:
14    Q.    And you have not formed an
15  opinion in connection with your analysis, as
16  to how much each of the items that you just
17  listed make up baby powder, right?
18         MS. O'DELL:  Of a particular
19    bottle, over time or --
20         MS. BROWN:  Any --
21         MS. O'DELL:  -- what's the
22    context of the question?
23         MS. BROWN:  At all.
24

Page 373

1  BY MS. BROWN:
2    Q.    I mean, have you attempted to
3  quantify how much heavy metal is in baby
4  powder?
5    A.    I haven't attempted to quantify
6  it.  The fact that there's any heavy metal in
7  there that's carcinogenic is of concern.
8    Q.    And what are you relying on for
9  your opinion that there's heavy metals in
10  baby powder?
11    A.    So that I believe is in Julie
12  Pier's -- let me find it -- deposition.
13  Julie Pier -- Exhibit 47.
14    Q.    Other than Exhibit 47 to Julie
15  Pier's deposition, are you relying on
16  anything else to support your opinion that
17  baby powder products are contaminated with
18  heavy metals?
19    A.    And also the testing by Longo
20  and Rigler.
21    Q.    Other than Julie Pier, Longo
22  and Rigler, are you relying on anything else
23  to support your opinion that heavy metals
24  contaminate Johnson & Johnson baby powder

94 (Pages 370 to 373)

Judith K. Wolf, M.D.

Page 374

1  products?
2      A.   No.
3      Q.   And as to asbestos, we reviewed
4  your reliance materials before. You're
5  relying on the articles you pointed me to,
6  Hopkins Exhibit 28, Blount's testimony and
7  her '91 article and Longo's reports, to
8  support your opinion that talcum powder
9  contains asbestos, correct?
10     A.   And also the deposition of
11  Julie Pier.
12     Q.   And again, as it relates to
13  asbestos, you haven't made a determination as
14  to how much asbestos is contaminating talcum
15  powder, right?
16         MS. O'DELL: Object to the
17      form.
18     A.   I've made a determination that
19  these testings show evidence of asbestos in a
20  significant amount of talcum powder that was
21  tested.
22  BY MS. BROWN:
23     Q.   Okay. But in terms of how much
24  asbestos is in an individual bottle, you

Page 375

1  haven't attempted to quantify that, right?
2      A.   I haven't and it wouldn't
3  change my opinion.
4      Q.   Okay. As it relates to fibrous
5  talc, what are you relying on for your
6  opinion that fibrous talc is contained in
7  Johnson & Johnson baby powder products?
8      A.   I don't have it referenced
9  here, but my understanding is that it's hard
10  to get pure platy talc and it's always
11  contaminated with some fibrous talc and I
12  can't tell you where I've seen it, but I've
13  seen it -- reports as small as 2 percent, as
14  high as 20 percent.
15     Q.   And sitting here today, you're
16  not sure of the site for that 2 to 20 percent
17  fibrous talc?
18     A.   I'm not. No.
19     Q.   Other than platy talc, 2 to 20
20  percent fibrous talc, some amount of heavy
21  metals and some amount of asbestos, is there
22  anything else you believe is in Johnson &
23  Johnson baby powder products that causes
24  ovarian cancer?

Page 376

1         MS. O'DELL: Object to the
2      form.
3      A.   I didn't say these cause
4  ovarian cancer. I say that they're known to
5  be carcinogenic and could be the cause of why
6  talcum powder products causes ovarian cancer.
7  And the other thing in there that I know can
8  be inflammatory, from reading Dr. Crowley's
9  report, are some of the fragrances that are
10  used. And since inflammation is a risk
11  factor and an initiator in -- leads -- is
12  related to the progression of ovarian cancer,
13  I have concerns about those.
14  BY MS. BROWN:
15     Q.   And your opinion, then, Doctor,
16  as I understand it, is that you're not sure
17  which or what combination of all the items
18  you just listed to me are working to cause
19  cancer; is that right?
20         MS. O'DELL: Object do the
21      form.
22     A.   My opinion is that it's the
23  talcum powder product as a whole that
24  increases the risk of ovarian cancer, and

Page 377

1  I've listed things that I know are in there
2  that can be carcinogenic or inflammatory.
3  BY MS. BROWN:
4      Q.   And to be clear, though, you
5  don't have an opinion as to the amounts of
6  any of the items you just listed for me as
7  they appear in baby powder, right?
8         MS. O'DELL: Object to the --
9      object to the form.
10  BY MS. BROWN:
11     Q.   That was a bad question.
12  Here's what I want to know. I understand
13  your opinion is based on your assumption that
14  fragrance, platy talc, fibrous talc, heavy
15  metals and asbestos are in Johnson &
16  Johnson's products, correct?
17         MS. O'DELL: Object to the
18      form.
19     A.   It's in talcum powder product.
20  BY MS. BROWN:
21     Q.   And that would include Johnson
22  & Johnson's products, correct?
23     A.   Would include any talcum powder
24  product.

95 (Pages 374 to 377)

Judith K. Wolf, M.D.

Page 378

1      Q.    Are you of the opinion that --
2   we need to change the tape.  Sorry.
3            THE VIDEOGRAPHER:  Going off
4      the record.  The time is 4:40 p.m.
5            (Recess taken from 4:40 p.m. to
6      4:52 p.m.)
7            THE VIDEOGRAPHER:  This marks
8      the beginning of disk 4.  Back on the
9      record.  The time is 4:52 p.m.
10  BY MS. BROWN:
11     Q.    Dr. Wolf, before we took a
12  break, we were discussing your opinion that
13  J&J's talcum powder products contain
14  fragrances, platy talc, fibrous talc, heavy
15  metals and asbestos.  Do you recall that?
16     A.    I do.
17     Q.    And my question for you,
18  Doctor, is it your opinion that J&J's talcum
19  powder products contained all of those things
20  at all periods of time?
21     A.    Well, what I know for sure and
22  what testing that I've seen shows, that
23  evidence of asbestos, heavy metals from the
24  '70s through the '90s and testing looking for

Page 379

1   fibrous talc at that same time -- actually
2   Longo tested for fibrous talc too and found
3   it in 41 of 42 specimens.  I don't know about
4   the fragrance because I don't know how long
5   this particular fragrance formulation has
6   been used, if it's been -- how long it's been
7   there.  And platy talc and fibrous talc I
8   would assume have always been there.
9      Q.    Have you done any investigation
10  into the different source mines J&J has used
11  over the years for its talcum powder
12  products?
13     A.    They have used talcum powder
14  from Vermont, from Italy -- I think Italy
15  first and then Vermont and then China.
16     Q.    And do you believe that the
17  components of talcum powder have changed over
18  time?
19     A.    I believe that there's probably
20  slight differences coming from different
21  areas in the world.  But as far as I can
22  tell, the testing that I have seen throughout
23  the Italian and Vermont and into early Asian,
24  which I assume meant China, testing, that

Page 380

1   there's evidence of asbestos at least.
2      Q.    And that's the Longo testing
3   you referred to earlier?
4      A.    Yes.
5      Q.    Okay.  Final question -- final
6   area of questioning, Dr. Wolf, would be
7   page 20 of your report.  To be clear, you
8   believe that the mechanism by which talcum
9   powder causes cancer is chronic inflammation;
10  is that right?
11     A.    This is a reference page.  Are
12  you looking at a different page?
13     Q.    Page 12 of your report?
14        MS. O'DELL:  You said 20.
15     A.    You said 20.
16  BY MS. BROWN:
17     Q.    Sorry.  Tired.
18     A.    I know.  I understand.  I
19  believe it's inflammation that leads to
20  oxidative stress that then causes DNA damage,
21  and I believe with Saed's most recent papers,
22  that it actually induces gene mutations that
23  change ovarian epithelial cells and culture.
24     Q.    Do you rely on anyone else,

Page 381

1   other than Dr. Saed, for your opinion that
2   talcum powder is -- do you believe that talc
3   is genotoxic?
4      A.    I believe that Dr. Saed's paper
5   that he found gene -- point gene mutations
6   after application of talc -- talcum powder.
7      Q.    Do you believe that talcum
8   powder is genotoxic to ovarian cells?
9      A.    I believe that his paper shows
10  that there's genetic mutations that occur
11  with exposure to talcum powder.
12     Q.    Independent of inflammation?
13     A.    Independent of inflammation.
14     Q.    So in fact, you think there are
15  two ways by which talcum powder can cause
16  ovarian cancer:  Chronic inflammation and
17  genetic mutations, correct?
18        MS. O'DELL:  Object to the
19     form.
20     A.    So chronic inflammation that
21  leads to changes within the cell and changes
22  the oxidative state that then causes,
23  secondarily, cytokine stimulation and changes
24  in the cell, and then Saed's paper also shows

96 (Pages 378 to 381)

Judith K. Wolf, M.D.

Page 382

1  evidence of gene -- point gene mutations that
2  change the oxidative state of the cell to a
3  prone inflammatory state.
4  BY MS. BROWN:
5      Q.    And other than Dr. Saed's work,
6  are you relying on any other published
7  literature to support your belief that talc
8  is genotoxic?
9          MS. O'DELL:  Object to the
10     form.
11     A.    Dr. Saed's work, as per my
12  review, is the most convincing data that I've
13  seen of genetic changes, separate from
14  inflammatory changes, when talc was exposed
15  to both ovarian epithelial cells, ovarian
16  cancer cell lines and fallopian tube
17  epithelial cell lines.
18  BY MS. BROWN:
19     Q.    And one of the papers you cited
20  for us in your early footnotes, lists sort of
21  a weight of the hierarchy of evidence.  Do
22  you recall that paper?
23         MS. O'DELL:  Object to the
24     form.

Page 383

1  BY MS. BROWN:
2      Q.    You had a footnote 4 and 5,
3  some cites that dealt with sort of he weight
4  of the evidence, generally.  Do you remember
5  those?
6      A.    I just want to see what they
7  are, 4 and 5.
8      Q.    Footnote 4 and 5.
9      A.    These are talking about the
10  difference between cohort studies and
11  meta-analysis?
12     Q.    Right.  And they contained a
13  chart with a hierarchy of evidence.  Do you
14  recall reviewing that?
15     A.    Yes.
16     Q.    And you would agree that expert
17  witness opinions are the very lowest rung of
18  that chart?
19         MS. O'DELL:  Object to the
20     form.
21     A.    I've referenced those charts in
22  relationship to evaluating cohort studies and
23  meta-analysis studies.
24

Page 384

1  BY MS. BROWN:
2      Q.    And finally, Doctor, you
3  reference on page 12, in support of your
4  opinion -- page 12 of your report in support
5  of your opinion, that talcum powder causes
6  inflammation and oxidative stress in vitro
7  and in vivo.  You reference the NTP study; is
8  that right?
9      A.    Yes.
10     Q.    Have you reviewed the FDA's
11  analysis of that NTP study?
12     A.    I'm aware that they had some
13  concerns about the analysis.
14     Q.    Do you share the concerns and
15  the -- first of all, you understand the FDA
16  concluded that the paper had serious flaws,
17  right?
18         MS. O'DELL:  Object to the
19     form.
20     A.    I understand that the FDA had
21  concerns about the paper.
22  BY MS. BROWN:
23     Q.    Do you share those concerns?
24     A.    I think that the NTP toxicology

Page 385

1  studies of talc is one of the pieces of
2  evidence that I believe supports that
3  inflammation occurs after talcum powder
4  application and can cause -- be a
5  carcinogenic -- mechanism of carcinogenesis.
6      Q.    Do you agree with the
7  conclusion of the 1994 FDA workshop, that the
8  NTP study has no relevance to human risk?
9          MS. O'DELL:  Object to the
10     form.
11     A.    I believe that the NTP study
12  helps as an informative, along with all of
13  the other studies listed there, that talcum
14  powder causes inflammation and oxidative
15  stress in ovarian cells and in cells in
16  general and that this can be carcinogenic.
17  It's a piece of the evidence, not the whole
18  evidence.
19  BY MS. BROWN:
20     Q.    Finally, Doctor, before I turn
21  the questioning over to my colleague, you
22  testified a little earlier that you plan to
23  write a review article based on the
24  information contained in your report?

97 (Pages 382 to 385)

Judith K. Wolf, M.D.

Page 386

1    A.    Yes.
2    Q.    Do you have plans to disclose
3  your work as an expert witness when you
4  author that publication?
5    A.    Of course I would.
6    Q.    Would you plan to disclose the
7  amount of money that you've made working for
8  plaintiffs' lawyers in connection with that
9  litigation -- paper?
10    MS. O'DELL:  Object to the
11    form.
12    A.    As I've never written a
13  paper -- as I've never been an expert witness
14  before, I don't know what you need to
15  disclose as far as that.  I know that if you
16  have grant or funding for anything, you
17  disclose the amount and who it's from.  I'm
18  assuming it would be the same for this, but I
19  don't know.  I would check with the journal
20  and see what was required and do whatever was
21  appropriate.
22  BY MS. BROWN:
23    Q.    And finally, Doctor, do you
24  know of any scientific support for the

Page 387

1  opinions that women who have had children
2  have a stretched-out vaginal tract such that
3  migration is more likely?
4    MS. O'DELL:  Object to the
5    form.
6    A.    I wouldn't put -- I would never
7  say that women who have had children have a
8  stretched-out vaginal tract.  All women have
9  an open vaginal tract.  Women who have had
10  multiple vaginal deliveries may or may not
11  have a larger opening to their vagina than
12  women who do not.
13  BY MS. BROWN:
14    Q.    You haven't seen any data to
15  suggest that having more kids increases your
16  risk of ovarian cancer because more
17  carcinogens can migrate to your ovaries,
18  right?
19    MS. O'DELL:  Object to the
20    form.
21    A.    So that seems like a multistep
22  question.  I do believe that at least one of
23  the case-control studies looked at parity as
24  a possible risk factor.  Personally, I don't

Page 388

1  think you can make the step to say that it's
2  because their vagina was stretched out more.
3    MS. BROWN:  Thanks for your
4    time today, Dr. Wolf.  I'm going to
5    hand it over to my colleague.
6    Can we go off for a second?
7    MR. KLATT:  Yeah, let's do
8    that.
9    THE VIDEOGRAPHER:  Going off
10    the record.  The time is 5:02 p.m.
11    (Recess taken from 5:02 p.m. to
12    5:06 p.m.)
13    THE VIDEOGRAPHER:  Back on the
14    record.  The time is 5:06 p.m.
15    EXAMINATION
16  BY MR. KLATT:
17    Q.    Good afternoon, Dr. Wolf.
18    A.    Good afternoon.
19    Q.    My name is Mike Klatt and I
20  represent Imerys Talc America in this case.
21  You said earlier that you were aware that
22  Imerys is a mining company, correct?
23    A.    That's correct.
24    Q.    I'm going to skip around,

Page 389

1  because I've just been following what's been
2  going on today and I just have a lot of
3  questions in different areas.  So there's
4  probably not going to be necessarily a
5  logical progression.  So if you'll just bear
6  with me, I'd appreciate it.
7    A.    Okay.
8    Q.    A minute ago, I believe that
9  Ms. Brown asked you, that if you end up
10  writing a letter or a review article to any
11  organization about talc and ovarian cancer,
12  you think it's important to disclose that
13  you've been an expert in litigation regarding
14  talc and ovarian cancer, correct?
15    A.    Yes.
16    Q.    Do you think it's important
17  that you specifically disclose that you've
18  been a retained, paid witness for plaintiffs
19  in talc ovarian cancer in making that
20  disclosure?
21    A.    Again, I've never been an
22  expert witness before.  I don't know what the
23  rules of what I have to disclose, so that
24  anyone who reads my article can read it with

98 (Pages 386 to 389)

Judith K. Wolf, M.D.

Page 390

1  all of the information.  Whatever the journal
2  said I needed to disclose, I would disclose.
3      Q.    But don't you think it's
4  important for your readers to know which side
5  you're involved in in this litigation?
6          MS. O'DELL:  Object to the
7      form.
8      A.    I don't know if that's
9  something that is routinely done.  If it is,
10 I definitely would do that.
11 BY MR. KLATT:
12     Q.    But I'm asking if you,
13 personally, think that's an important fact to
14 disclose.  Wouldn't you want to know that if
15 you were a doctor not involved in this in
16 reading an article, which side the person who
17 authored the article was testifying for?
18         MS. O'DELL:  Object to the
19     form.
20 BY MR. KLATT:
21     Q.    Would that be important to you
22 to know?
23     A.    I would want to know all the
24 information that I could know.  I'm assuming

Page 391

1  that that's information that would be
2  required to be disclosed and I would disclose
3  it.
4      Q.    Okay.  Can you look at Exhibit
5  No. 4, which is Dr. Saed's manuscript.
6      A.    Yes.
7      Q.    That's not a published article,
8  correct?
9      A.    It's an accepted article.
10     Q.    Well, it hasn't even been peer
11 reviewed yet, correct?
12     A.    No, it has been peer reviewed.
13     Q.    Can you hand me the article?
14 Do you see how on multiple pages, virtually
15 every page in blueprint, it says "for peer
16 review"?
17     A.    Yes.
18     Q.    So that's being submitted for
19 peer review, correct?
20         MS. O'DELL:  Object to the
21     form.
22     A.    It has been submitted.  It has
23 been reviewed.
24         THE WITNESS:  Do we have the

Page 392

1  letter somewhere?
2          MS. O'DELL:  Uh-huh.
3      A.    And it has been accepted with
4  some reviewer comments, which Dr. Saed
5  addressed.  I gave counsel one that was not
6  marked.
7          THE WITNESS:  Is it on the
8      back?
9      A.    Oh, yes, here.
10 BY MR. KLATT:
11     Q.    And are there any peer review
12 or comments compared -- put forth in what
13 you're looking at?
14     A.    The reviewer's -- yeah.  Say
15 that question again.
16     Q.    When people peer review an
17 article --
18     A.    Yes.
19     Q.    -- they submit comments,
20 correct?
21     A.    Yes.
22     Q.    Suggestions for revising the
23 article or adding data or adding explanation
24 or whatever, correct?

Page 393

1      A.    Yes.
2      Q.    Where are those comments
3  regarding Saed's article in what you're
4  looking at?
5      A.    There's nothing here.  There's
6  also a letter from Dr. Saed when he sent the
7  paper back in with the comments from the
8  reviewers and his addressing of those
9  comments.  This article has the changes that
10 the reviewer has recommended.
11     Q.    Have you seen this other
12 document that has the peer reviewer comments?
13     A.    I have.
14     Q.    I'm sorry?
15     A.    I have seen his letter.  I
16 don't recall that it has all the specific
17 comments.  It has what he's viewing as him
18 addressing the comments, but I don't know if
19 there are comments or --
20     Q.    Do you have that letter with
21 you?
22     A.    I thought I had it.
23         MS. O'DELL:  No.  I mean, I
24     think there may be some confusion on

Page 394

1    that point.
2    BY MR. KLATT:
3        Q.    Well, if there's anything else
4    regarding Dr. Saed that you've reviewed that
5    you haven't brought here and marked as an
6    exhibit, we'd request that, please.
7        A.    Okay.
8        Q.    Is that fine with you?
9        A.    Yes.
10       Q.    Now, looking at Dr. Saed's
11   manuscript that's been marked as Exhibit 4,
12   I'm going to turn you to --
13           THE WITNESS:  Do I have my own
14       copy of that?  Yes, here it is.
15   BY MR. KLATT:
16       Q.    I'm going to turn you to
17   page 12 of Exhibit 4.
18       A.    Yeah.
19       Q.    And do you see down at the
20   bottom of the page, it says "Conflict of
21   Interest"?
22       A.    Yes.
23       Q.    It says, "The corresponding
24   author, Dr. Ghassam Saed, acted as a

Page 395

1    consultant regarding this topic for a fee,
2    otherwise, the authors declared that there
3    are no conflicts of interest."
4           There's no disclosure there
5    that Dr. Saed's involved in litigation on
6    behalf of plaintiffs in talc ovarian cancer
7    cases, is there?
8           MS. O'DELL:  Object to the
9       form.
10       A.    My assumption is that what
11   Reproductive Scientists [sic] requested be
12   disclosed is what is stated here.  And so
13   this is what it says.
14   BY MR. KLATT:
15       Q.    Who paid the fee to Dr. Saed
16   for doing this work?
17       A.    This particularly doesn't say.
18   I'm assuming that attorneys paid the fee.
19       Q.    Do you know who paid?
20       A.    I believe that in support of
21   some of this data -- of this research that he
22   received money from Beasley Allen.
23       Q.    Okay.  Other than Beasley
24   Allen, what contributors to this work are

Page 396

1    listed here?
2        A.    Beasley Allen isn't listed here
3    either.
4           MS. O'DELL:  Object to form.
5        A.    It just says he received a
6    consulting fee.  So I don't know where else
7    the money -- what other money he used.
8    BY MR. KLATT:
9        Q.    But Beasley Allen isn't even
10   listed here, as you said, as a source of the
11   money for his work, correct?
12           MS. O'DELL:  Object to the
13       form.
14       A.    That's correct.
15   BY MR. KLATT:
16       Q.    Okay.  This isn't an adequate
17   conflict of interest disclosure, is it?
18           MS. O'DELL:  Object to the
19       form.  If you know.  Don't guess.
20       A.    I'm assuming that this is the
21   conflict of interest that they requested from
22   Reproductive Scientists [sic], and if they
23   accept it, then I consider it adequate.
24

Page 397

1    BY MR. KLATT:
2        Q.    So whatever the journal says is
3    adequate is adequate in your mind?
4           MS. O'DELL:  Object to the
5       form.
6    BY MR. KLATT:
7        Q.    Is that what you're saying?
8        A.    I'm saying that as far as --
9    this is what's disclosed.  The journal
10   accepted the article.  I'm assuming they
11   considered it was adequate disclosure.
12       Q.    But if you're a physician, a
13   gynecologic oncologist out there in the
14   field, not involved in the talc ovarian
15   cancer litigation and you ultimately read
16   Dr. Saed's paper in Reproductive Scientists
17   [sic], aren't you going to want to know that
18   he was a paid witness for the plaintiffs in
19   that litigation?
20           MS. O'DELL:  Object to the
21       form.
22   BY MR. KLATT:
23       Q.    That's something you'd want to
24   know, isn't it?

Judith K. Wolf, M.D.

Page 398

1    MS. O'DELL:  Object to the
2    form.
3    A.    If I had questions about
4    exactly where the money came from, I would
5    call Dr. Saed and ask him.
6    BY MR. KLATT:
7    Q.    Have you ever done that for any
8    article you've read in a journal?
9    A.    I haven't.
10    Q.    What do you know about the
11    Journal of Reproductive Sciences?
12    A.    I don't know that much about
13    it.  It's not a journal that I routinely
14    read.
15    Q.    And as a gynecologic
16    oncologist, there's a certain set of journals
17    that you routinely review, correct?
18    A.    Yes.
19    MS. O'DELL:  Object to the
20    form.
21    BY MR. KLATT:
22    Q.    And Reproductive Sciences is
23    not one of those, right?
24    A.    It is not one of those.

Page 399

1    Q.    Had you ever heard of it
2    before?
3    A.    I can't tell you if I've ever
4    heard of it.  I've heard of lots of journals
5    over the years and I don't remember all of
6    them.
7    Q.    You don't remember of ever
8    hearing of Reproductive Sciences before you
9    saw Exhibit 4, correct?
10    A.    I can't recall.
11    Q.    Now, earlier, you said in
12    response to Ms. Brown's questions, that
13    things that you feel like may be playing a
14    role in talc-based body powder products and
15    ovarian cancer, if I got it right, were platy
16    talc; is that right?
17    MS. O'DELL:  Object to the
18    form.  If you're going to go -- I'll
19    object each time, but I object to the
20    preparatory language.
21    BY MR. KLATT:
22    Q.    What things in talc-based body
23    powder products do you think cause ovarian
24    cancer?

Page 400

1    A.    In talcum-based body products,
2    my concerns for carcinogenesis are platy
3    talc, fibrous talc, asbestos, heavy metal,
4    specifically the ones that have been found,
5    nickel, chromium and cobalt and inflammation
6    from the fragrances, which I know that
7    inflammation is associated with ovarian
8    cancer and so I have concerns about all of
9    those.
10    Q.    Well, having concerns is one
11    thing, but testifying based on a reasonable
12    degree of medical certainty that these things
13    are, in fact, a cause of ovarian cancer is a
14    different thing.  So is it your opinion that
15    all of these items, platy talc, fibrous talc,
16    asbestos, nickel, chromium, cobalt and
17    fragrance are contributing causes of ovarian
18    cancer in women who use talc-based body
19    powder products?
20    MS. O'DELL:  Object to the
21    form.
22    A.    It's my opinion that
23    talcum-based -- perineum use of talcum-based
24    body products causes ovarian cancer in some

Page 401

1    women and increases the risk in all.  When I
2    look to see what is in it that could be
3    dangerous, potentially dangerous to women, I
4    see some things that are known to be
5    carcinogenic, such as fibrous talc and
6    asbestos and heavy metals.  I see some things
7    that are possibly carcinogenic, such as platy
8    talc, and I see fragrances that are known to
9    be irritating and causing inflammation.
10    BY MR. KLATT:
11    Q.    Do you think any one of those
12    things by itself is capable of causing
13    ovarian cancer in women who use talc-based
14    body powder products?
15    A.    I didn't evaluate the data that
16    way and I don't look at the product that way.
17    I'm looking at it as a whole.
18    Q.    So if you testify in the
19    hearing of Judge Wolfson this year and she
20    asks you, because judges can ask witnesses
21    questions, which one of these items that
22    you've mentioned are capable by themselves of
23    causing ovarian cancer in women using
24    talc-based body powder products, you're going

101 (Pages 398 to 401)

Judith K. Wolf, M.D.

Page 402

1 to tell her you can't tell her which one of
2 these is capable by itself?
3        MS. O'DELL: Object to the
4 form, misstates her testimony.
5    A.    I'm going to tell her just what
6 I said, that I evaluated the product as a
7 whole and I found evidence of multiple
8 carcinogenic, possibly carcinogenic and
9 inflammatory substances that could account
10 for that.  Because they're all in the
11 product, I can't separate them out and say
12 which one is causing it.
13 BY MR. KLATT:
14    Q.    And you can just say that they
15 possibly cause it, correct, not that they
16 probably cause it?
17        MS. O'DELL: Object to the
18 form, misstates her testimony.
19 BY MR. KLATT:
20    Q.    You just said "possibly."
21 Didn't I understand that?
22        MS. O'DELL: Object to the
23 form.  That's not what she said.
24

Page 403

1 BY MR. KLATT:
2    Q.    Let's read it back.  I think
3 you just said "possibly cause," correct?
4        MS. O'DELL: Object to the
5 form.
6    A.    No, that's not what I said.  I
7 said there are multiple that are
8 carcinogenic, possibly carcinogenic and
9 inflammatory.
10 BY MR. KLATT:
11    Q.    So you're saying they're
12 possibly carcinogenic --
13    A.    No, I'm saying some of the
14 agents --
15    Q.    Let me finish -- not probably
16 carcinogenic, correct?
17        MS. O'DELL: Excuse me.
18    A.    No.
19        MS. O'DELL: Excuse me, let me
20 object.  Object to the testimony --
21 excuse me, object to the question
22 because it misrepresents her
23 testimony.
24        You may answer if you

Page 404

1 understand.
2    A.    So let me list them again.
3 Platy talc has been determined to be possibly
4 carcinogenic, asbestos has been determined to
5 be carcinogenic, fibrous talc has been
6 determined to be carcinogenic, nickel and
7 chromium are -- have been determined to be
8 carcinogenic, cobalt has been determined to
9 be possibly carcinogenic, and the
10 fragrances -- some of the substances in the
11 fragrance are known to be inflammatory or
12 cause -- inflammatory or irritating.
13        And therefore, when I look at
14 the product of the whole, with all of that
15 spectrum of stuff in it, things in it, that
16 at the very least some are, the fragrances
17 are inflammatory and/or irritating and at the
18 very most, several are known to be
19 carcinogenic, that it's the combination of
20 that that increases the risk of ovarian
21 cancer in women who use perineal talcum
22 powder product.
23 BY MR. KLATT:
24    Q.    Are any of these things that

Page 405

1 you've listed by themselves capable of
2 causing ovarian cancer in women who use
3 talc-based body powder products?
4    A.    I'm not aware that anybody has
5 looked at using any of those things by
6 themselves to cause -- to assess the risk of
7 ovarian cancer.  And since the product
8 contains all of them, I don't know how that
9 can be evaluated.
10    Q.    So if you evaluated the
11 talc-based body powder product as a whole
12 with all these things in them, you weren't
13 just evaluating Imerys raw talc by itself,
14 correct?
15        MS. O'DELL: Object to the
16 form.
17    A.    I was evaluating the product.
18 BY MR. KLATT:
19    Q.    The product as used by women?
20    A.    The product as used by women --
21 the product as used by women.
22    Q.    Which is the product that sold
23 off the shelf, correct?
24        MS. O'DELL: Object to the

102 (Pages 402 to 405)

Judith K. Wolf, M.D.

Page 406

1    form.
2        A.    The product that women could
3    obtain to use on their perineum.
4    BY MR. KLATT:
5        Q.    From retail stores, correct?
6            MS. O'DELL:  Object to the
7    form.
8        A.    From wherever they get it.
9    BY MR. KLATT:
10       Q.    And you understand Imerys
11   doesn't sell any talc directly to women?
12       A.    I understand that.
13       Q.    And you understand fragrance is
14   added after the talc leaves Imerys'
15   possession?
16       A.    I understand that.
17       Q.    Do any and all forms of
18   inflammation cause or contribute to ovarian
19   cancer?
20       A.    In the studies on inflammation
21   in ovarian cancer, it's -- and most cancers
22   and inflammation, it's the concern of chronic
23   inflammation.  T cells, lymphocytes, macro
24   fascias causing changes in the oxidation

Page 407

1    making free -- oxygen free radicals that can
2    cause changes in the DNA.  Not so much
3    concerned about acute inflammation, but
4    chronic inflammation.
5        Q.    Do all forms of chronic
6    inflammation cause ovarian cancer?
7        A.    I'm not sure what forms of
8    chronic inflammation you're asking about.
9        Q.    Well, are you saying that
10   chronic inflammation inevitably can cause
11   ovarian cancer?
12       A.    Chronic inflammation is a cause
13   of ovarian cancer.  You could have chronic
14   inflammation and not get ovarian cancer.
15       Q.    Are you aware that corn
16   starch-based body powder can cause
17   granulomas, adhesions, fibrous tissue
18   reactions and it's been banned by the FDA
19   from surgical gloves and from patient
20   examination gloves?
21       A.    I am aware of that.
22       Q.    Does the granulomas and
23   adhesions and fibrous that corn starch
24   causes in patients cause ovarian cancer?

Page 408

1        A.    There's never been any evidence
2    of that, that I'm aware of.
3        Q.    When you -- you've done
4    abdominal surgeries on hundreds, if not maybe
5    even thousands of women in your career,
6    correct?
7        A.    Yes.
8        Q.    Now, that surgery itself can
9    cause fibrosis, inflammation and adhesions,
10   correct?
11       A.    That's correct.
12       Q.    And those adhesions can be
13   long-term complications for women, correct?
14       A.    Yes.
15       Q.    And that's a form of
16   inflammation, correct?
17       A.    It's a form of acute
18   inflammation that leads to a scar or
19   fibrosis.
20       Q.    And that's exactly what talc
21   leads to, correct?
22           MS. O'DELL:  Object to the
23   form.
24       A.    There's not evidence of chronic

Page 409

1    inflammation in adhesions secondary to
2    surgery.  There's an acute reaction and
3    change and then fibrosis can occur, and
4    that's what adhesions are, are fibrosis.
5    BY MR. KLATT:
6        Q.    And that's what happens when
7    talc in sufficient amounts is placed inside
8    the body, the exact same thing, correct,
9    Dr. Wolf?
10           MS. O'DELL:  Object to the
11   form.
12       A.    It's one of the things that can
13   happen when talc is placed inside the body.
14   BY MR. KLATT:
15       Q.    Well, is there anything else
16   other than that type of tissue reaction that
17   talc can cause?
18           MS. O'DELL:  Object to the
19   form.
20       A.    Yes.  When talcum powder --
21   when talc was placed, in an animal study, in
22   the bursa of rat's ovaries, there was
23   proliferation and precancerous changes in the
24   ovaries.

103 (Pages 406 to 409)

Judith K. Wolf, M.D.

Page 410

1  BY MR. KLATT:
2      Q.    Did those animals develop
3  ovarian cancer?
4      A.    They did not.  But they were
5  sacrificed in a short period of time.
6      Q.    Can you name for me a single
7  animal study that you've ever seen, where
8  talc caused ovarian cancer in the animals?
9      A.    I cannot.
10     Q.    Can you name -- in fact, can
11 you name for me any animal study you've ever
12 seen, where asbestos put in animals caused
13 ovarian cancer?
14         MS. O'DELL:  Object to the
15     form.
16     A.    So ovarian cancer is quite rare
17 in most animals and so it's very difficult to
18 have an animal model of something that causes
19 ovarian cancer.
20 BY MR. KLATT:
21     Q.    You know there's animal models
22 of peritoneal mesothelioma due to asbestos,
23 correct?
24     A.    I do.

Page 411

1      Q.    Are there animal models that
2  show that asbestos instilled in animals'
3  abdominal cavities can cause ovarian cancer?
4      A.    Not that I'm aware of.
5      Q.    Do you warn women before you do
6  surgery on them, that your surgery can cause
7  inflammation and adhesion -- long-term
8  adhesion formation that could cause ovarian
9  cancer?
10         MS. O'DELL:  Object to the
11     form.
12     A.    I inform my patients that
13 surgery can cause inflammation and adhesions.
14 BY MR. KLATT:
15     Q.    Can that cause ovarian cancer?
16     A.    Not the adhesions that are
17 formed from the acute inflammation from
18 surgery.  I would also say that 90-plus
19 percent of my patients, their ovaries come
20 out when I operate on them.
21     Q.    How do you know that these
22 long-term adhesions that result from
23 abdominal surgery that you've done on
24 hundreds of patients doesn't result in

Page 412

1  ovarian cancer?
2          MS. O'DELL:  Object to the
3      form.
4      A.    Are you asking about my
5  anecdotal experience?
6  BY MR. KLATT:
7      Q.    No, I'm asking you for the
8  medical evidence that you know, that these
9  types of long-term adhesions resulting from
10 surgery itself don't cause ovarian cancer in
11 your patients?
12     A.    I'm not aware of any literature
13 that suggests or supports that.
14     Q.    Has it ever been studied?
15     A.    I'm not aware of any studies
16 that have been published about that.
17     Q.    Well, if it hasn't been
18 studied, you can't say it doesn't cause
19 ovarian cancer, can you?
20         MS. O'DELL:  Object to the
21     form.
22 BY MR. KLATT:
23     Q.    You just don't know?
24         MS. O'DELL:  Object to the

Page 413

1      form.
2      A.    I haven't seen any studies
3  about it.
4  BY MR. KLATT:
5      Q.    So if something is not studied,
6  that means it doesn't occur?
7          MS. O'DELL:  Object to the
8      form.
9      A.    That's not what I said.
10 BY MR. KLATT:
11     Q.    Right.  Simply because there's
12 no studies doesn't prove that adhesions after
13 surgery don't cause ovarian cancer, correct?
14         MS. O'DELL:  Object to the
15     form.
16 BY MR. KLATT:
17     Q.    You'd have to do studies to
18 know that.
19         MS. O'DELL:  Excuse me.  Object
20     to the form.
21     A.    I don't believe those are
22 studies that could be done.
23 BY MR. KLATT:
24     Q.    So there are no such studies

Judith K. Wolf, M.D.

Page 414

1  that you're aware of, correct?
2      A.    Not that I'm aware of.
3      Q.    You cited about 20 Imerys
4  documents in -- as something that were
5  materials that you considered.
6      A.    Yes.
7      Q.    Is that correct?
8      A.    Uh-huh.
9      Q.    Were you give a much larger set
10  of Imerys documents and you picked those 20
11  or were those 20 handpicked for you by the
12  lawyers?
13          MS. O'DELL:  Object to the
14      form.
15      A.    Those documents were provided
16  to me by the lawyers.
17  BY MR. KLATT:
18      Q.    So you didn't look at a much
19  larger set of Imerys documents yourself and
20  select those 20 yourself, correct?
21      A.    The one that -- ones that are
22  listed on my contributing data list are the
23  ones that I saw.
24      Q.    The only ones you saw, correct?

Page 415

1      A.    Yes.
2      Q.    And those were picked by the
3  lawyers and not by you?
4          MS. O'DELL:  Object to form.
5      A.    Those were given to me by the
6  lawyers.
7  BY MR. KLATT:
8      Q.    You said earlier -- you
9  referred to Julie Pier, an Imerys scientist,
10  her Exhibit 47 in her MDL deposition.  Do you
11  recall that?
12      A.    Yes.
13      Q.    You can't point to me to a
14  single talc sample that she tested in
15  Exhibit 47 that you can show me ended up in
16  talc-based body powders, can you?
17          MS. O'DELL:  Object to the
18      form.
19      A.    Can I look at it?
20  BY MR. KLATT:
21      Q.    Sure.
22      A.    What I see on here is the date,
23  what the material was, who did the testing,
24  what the sample was, what the test revealed,

Page 416

1  who the company -- what the company it came
2  from, and the mine, if it's -- if it's noted,
3  and any comments.
4      Q.    But my point is, you don't know
5  that any of these talc samples ended up in
6  any body powder products, correct?
7      A.    I don't have that information
8  on these.
9          MS. O'DELL:  Object to form.
10  BY MR. KLATT:
11      Q.    I'm sorry?
12      A.    I don't have that information
13  on these charts.
14      Q.    Are you aware the Imerys
15  supplies talc to many industries that have
16  nothing to do with body powder?
17      A.    I am aware of that.
18      Q.    Do you understand that there's
19  types of talc that are caused -- called
20  industrial talc that are not used for
21  personal use or cosmetic products?
22      A.    Yes.
23      Q.    Do you have any idea which one
24  of these on Exhibit 47 might fall into the

Page 417

1  industrial talc category rather than the
2  cosmetic talc category?
3          MS. O'DELL:  Object to the
4      form.
5      A.    It doesn't say on this list
6  where the talc falls in.
7  BY MR. KLATT:
8      Q.    And on many of these tests,
9  there's not even any asbestos identified at
10  all, correct?
11      A.    On some of them.
12      Q.    Are you aware that certain
13  types of asbestos are ubiquitous in the
14  environment?
15          MS. O'DELL:  Object to the
16      form.
17      A.    I am aware of that.
18  BY MR. KLATT:
19      Q.    And you're aware that when talc
20  is tested for asbestos, that there can be
21  occasional asbestos particles on the test
22  equipment itself, correct?
23          MS. O'DELL:  Object to the
24      form.  Don't guess.  If you know --

Judith K. Wolf, M.D.

Page 418

1      A.   I don't -- I mean, I don't know
2  that. I don't have evidence to support that.
3  BY MR. KLATT:
4      Q.   Well, are you aware that in
5  various test methodologies testing talc to
6  see whether it has asbestos, that those
7  methods take into account that there may be
8  occasional contamination of the test
9  equipment by asbestos that has nothing to do
10 with the sample being tested?
11         MS. O'DELL:  Object to the
12     form.
13 BY MR. KLATT:
14     Q.   Are you aware of that?
15         MS. O'DELL:  Object to the
16     form.
17         Don't speculate, Dr. Wolf.  If
18     you know, please say so.  If you
19     don't --
20     A.   I don't know.
21 BY MR. KLATT:
22     Q.   If you turn over on the back of
23 page -- or second page of Exhibit 47 to
24 Ms. Pier's deposition.

Page 419

1      A.   Yes.
2      Q.   Do you see, for example, the
3  very last sample says, "finding
4  indistinguishable from background levels
5  determined using ASTM method D6620-00"?  Do
6  you see that?
7      A.   I see that.
8      Q.   Do you have any idea what that
9  method is?
10         MS. O'DELL:  Object to the
11     form.
12     A.   Well, it's -- on the left side,
13 this says "Transmission Electron Microscope
14 Analysis." I don't know if that's the
15 same as ASTM or not.
16 BY MR. KLATT:
17     Q.   But do you understand what it
18 means when it says, "Finding
19 indistinguishable from background levels
20 determined using ASTM method D6620-00"?  Do
21 you know what --
22         MS. O'DELL:  Excuse me.  Object
23     to the form.
24

Page 420

1  BY MR. KLATT:
2      Q.   Do you know what that means?
3         MS. O'DELL:  Object to the
4     form.
5      A.   I understand that using
6  whatever the ASTM method, that this finding
7  would be considered background levels.  I
8  don't know if that's the same method that was
9  used to test this.
10 BY MR. KLATT:
11     Q.   So just in summary, when you
12 cited Julie Pier's Exhibit 47 in your report,
13 you can't tell Judge Wilson that any of these
14 samples on Exhibit 47 ended up in Johnson &
15 Johnson baby powder or Shower to Shower,
16 correct?
17         MS. O'DELL:  Object to the
18     form, assumes facts not in evidence.
19     A.   I don't have that information.
20 BY MR. KLATT:
21     Q.   Let me ask you about fragrance.
22 Can you rule out fragrance as the sole cause
23 of ovarian cancer in women who use talc-based
24 body powder products?

Page 421

1         MS. O'DELL:  Object to the
2     form.
3      A.   I believe that fragrance that's
4  in the product is inflammatory and
5  irritating.  I don't know of any evidence
6  that has studied that fragrance on its own,
7  as to whether on its own it causes ovarian
8  cancer or not, or if it were out of the
9  product it would cause ovarian cancer or not.
10 All I have is the information on the whole
11 product.
12 BY MR. KLATT:
13     Q.   Do you know whether asbestos --
14 high levels of asbestos in drinking water
15 causes ovarian cancer?
16     A.   I don't believe that oral
17 ingestion has been shown to cause ovarian
18 cancer.
19     Q.   So not any -- just any
20 exposures to asbestos cause ovarian cancer,
21 correct?
22         MS. O'DELL:  Object to the
23     form.
24     A.   So what I said was, that I

106 (Pages 418 to 421)

Judith K. Wolf, M.D.

Page 422

1    don't think oral ingestion has been shown to
2    cause ovarian cancer.
3    BY MR. KLATT:
4         Q.    You're aware that there's been
5    studies of drinking -- of ovarian cancer in
6    women who consumed high levels of drinking
7    water for long periods of time that had high
8    levels of asbestos in it, correct?
9             MS. O'DELL:  Object to the
10   form.
11        A.    Restate that question.
12   BY MR. KLATT:
13        Q.    Yeah, I'm sorry, that was a bad
14   question.  You're aware there's been studies
15   done of women who consumed, over long periods
16   of time, drinking water with high levels of
17   asbestos in it and had no increased risk of
18   ovarian cancer, correct?
19            MS. O'DELL:  Object to the
20   form.
21        A.    I believe that oral intake of
22   asbestos has not been shown to increase the
23   risk of ovarian cancer.
24

Page 423

1    BY MR. KLATT:
2         Q.    Are you aware of any
3    nonoccupational studies of women living in
4    the vicinity of asbestos mines that show that
5    they had an increased risk of ovarian cancer?
6         A.    I'm not aware of any data
7    that -- studies that show that women living
8    near mines, that mine asbestos or talcum
9    powder have an increased risk of ovarian
10   cancer.
11        Q.    And, in fact, IARC said it
12   based its determination that there was a
13   potential link between asbestos and ovarian
14   cancer based only on cohort studies of high
15   occupational exposure in women, correct?
16            MS. O'DELL:  Object to the
17   form.
18            If you need to look at the IARC
19   monograph, Dr. Wolf, we'll pull it
20   out.
21        A.    So the IARC monograph, I know
22   that they looked at -- I can't remember what
23   -- if this is the right one or the other one.
24   Anyway.

Page 424

1    BY MR. KLATT:
2         Q.    Is that Exhibit 10?
3         A.    It's Exhibit 13.  It's here.  I
4    thought it was here.
5             MS. O'DELL:  This is my copy.
6    What do you have right here?
7             THE WITNESS:  That's
8    Exhibit 13.
9    BY MR. KLATT:
10        Q.    And is 13 the IARC talc
11   monograph or the IARC asbestos monograph?
12        A.    It's the IARC talc one.
13        Q.    Didn't we mark the -- we did?
14            MS. O'DELL:  I don't see it.
15            MR. SILVER:  Let's go off the
16   record while we look at the exhibit.
17            MS. O'DELL:  Well, he's asking
18   the questions.  We're looking here.
19   There's no need to go off the record,
20   I don't think.
21            MR. SILVER:  Mike, let's do it.
22            MR. KLATT:  Yeah, until we find
23   it, let's go off the record, because I
24   don't want to waste time looking for

Page 425

1    it.  I thought all the exhibits were
2    here.
3             MS. O'DELL:  Are you going to
4    mark it?
5             MR. KLATT:  No, I thought it's
6    already marked.
7             MS. BROWN:  It's already
8    marked.
9             MS. O'DELL:  Look right there.
10            THE WITNESS:  That's Dr. Saed's
11   paper.  This is my CV.  This is my
12   report.  What's this one?  There it
13   is.
14            MS. O'DELL:  There it is.
15        A.    I knew it was there.
16   BY MR. KLATT:
17        Q.    Would you look at page 256, and
18   let's identify for the record that you're
19   looking at Exhibit 10, which is the portion
20   of the IARC 2012 monograph dealing with
21   asbestos; is that correct?
22        A.    Yes.
23        Q.    And you see over in the
24   right-hand column of page 256, it says, "The

107 (Pages 422 to 425)

Judith K. Wolf, M.D.

Page 426

1  IARC Working Group noted a causal association
2  between exposure to asbestos and cancer of
3  the ovary was clearly established, based on
4  five strongly positive cohort mortality
5  studies of women with heavy occupational
6  exposure to asbestos."
7      Correct?
8      A.   I see that.
9      Q.   And do you -- can you flip over
10 to page 280 of that asbestos IARC monograph.
11     A.   I don't have 280.  I only go to
12 274.
13         MS. BROWN:  I think your
14     counsel has the -- did we give you the
15     larger copy?
16         MS. O'DELL:  You gave me this
17     copy.  But it -- and it's definitely a
18     larger one, but let's see what --
19         THE WITNESS:  I got it.  I got
20     page 280.
21         MS. BROWN:  Here's another one
22     if you need another one.
23 BY MR. KLATT:
24     Q.   Actually, that's my highlighted

Page 427

1  one.  Can I give you this one?  I just want
2  you to verify that you're looking at the same
3  thing that's been marked as Exhibit 10.
4         MS. O'DELL:  Well, it's
5     actually not the same as Exhibit 10,
6     because what you provided to her is a
7     more comprehensive copy of the
8     monograph.
9         MR. KLATT:  What I provided her
10    was the complete asbestos monograph
11    that Exhibit 10 is a part of.
12        MS. O'DELL:  Well, that's my
13    point.
14        MR. KLATT:  Okay.
15        MS. O'DELL:  It's not the same
16    thing.  And so just mark it.
17        MS. BROWN:  Let's just mark it.
18        MR. KLATT:  Yeah, let's mark
19    this as whatever our next exhibit is.
20        Do you know what that number
21    is?
22        (Deposition Exhibit 22 marked
23    for identification.)
24

Page 428

1  BY MR. KLATT:
2      Q.   I hand you what's marked as
3  Exhibit 22.
4      A.   Page 280.
5      Q.   And that is the full 2012 IARC
6  asbestos monograph that previously Exhibit 10
7  was an excerpt from --
8      A.   Yes.
9      Q.   -- is that correct?
10     A.   That's correct.
11     Q.   And we established that on
12 page 256, they said that the link between
13 ovarian cancer and asbestos was based on
14 heavy occupational exposure to asbestos in
15 women, correct?
16        MS. O'DELL:  Object to the
17     form.
18 BY MR. KLATT:
19     Q.   Is that correct?
20     A.   "The Working Group noted that a
21 causal association between exposure and
22 cancer in the" -- "to asbestos and cancer of
23 the ovary was clearly established, based on
24 five strongly positive cohort studies of

Page 429

1  women with heavy occupational exposure to
2  asbestos."
3      Yes.
4      Q.   Now, flip over, if you would,
5  to page 280.
6      A.   Okay.  I'm there.
7      Q.   I believe in the right-hand
8  column, this same exact working group, what
9  did they say about the relationship between
10 talc and ovarian cancer?
11        MS. O'DELL:  I'm sorry, where
12     are you reading, Mike?  On 280?
13 BY MR. KLATT:
14     Q.   Do you see --
15        MS. O'DELL:  Are you reading --
16 BY MR. KLATT:
17     Q.   On page 280, it makes a comment
18 about --
19     A.   They're referencing the IARC
20 10.
21     Q.   Yeah.  And what does --
22     A.   "The association between
23 exposure to talc," that one?
24     Q.   Yes.  Can you read that into

108 (Pages 426 to 429)

Judith K. Wolf, M.D.

Page 430

1    the record?
2        A.    "Potential retrograde
3    translocation to the ovarian epithelium and
4    the development of ovarian cancer" --
5            THE REPORTER:  Hold on.  You're
6        going to have to back up --
7            THE WITNESS:  Okay.
8        A.    "The association between
9    exposure to talc, potential retrograde
10   translocation to the ovarian epithelium and
11   the development of ovarian cancer is
12   controversial."
13           And this is referencing IARC
14   2010 and this volume.
15       Q.    So while the IARC working group
16   in 2012 said that asbestos exposure is
17   related to ovarian cancer based on heavy
18   occupational exposure, this same working
19   group said the association between exposure
20   to talc, retrograde translocation to the
21   ovary and development of ovarian cancer is
22   controversial, correct?
23           MS. O'DELL:  Object to the
24       form.

Page 431

1        A.    So that was the conclusion of
2    the IARC 10 talc --
3    BY MR. KLATT:
4        Q.    And it also refers to the IARC
5    2012 asbestos monograph, correct?
6            MS. O'DELL:  Object to the
7        form.
8    BY MR. KLATT:
9        Q.    Correct?
10           MS. O'DELL:  Object to the
11       form.
12       A.    It says "and this volume."
13   BY MR. KLATT:
14       Q.    And this volume is what?
15       A.    2012.
16           MS. O'DELL:  Object to the
17       form.
18   BY MR. KLATT:
19       Q.    The -- this volume that you
20   just referred to is the 2012 IARC asbestos
21   monograph, correct?
22       A.    That's correct.
23       Q.    IARC's never said that
24   chromium, cobalt or nickel are carcinogenic

Page 432

1    to the ovary, have they?
2        A.    No.  That they're carcinogenic,
3    not specifically to the ovary.
4        Q.    The type of carcinogenicity
5    they're referring to with those metals are
6    when they're breathed in fumes, correct?
7        A.    I can't recall.
8        Q.    Are you aware that chromium is
9    an essential trace heavy metal for nutrition?
10           MS. O'DELL:  Object to the
11       form.
12       A.    I haven't studied nutrition in
13   a long time.  If I saw a list and saw it on
14   there, I can't -- I don't know -- I'm not
15   aware of that.
16   BY MR. KLATT:
17       Q.    Chromium's contained in
18   multivitamins, isn't it, Dr. Wolf?
19       A.    I don't know.  I don't take
20   multivitamins and I don't recommend them to
21   my patients.
22       Q.    Chromium can help control your
23   blood sugar, right?
24       A.    Are you telling me that

Page 433

1    chromium is released from the pancreas to
2    help control blood sugar?
3        Q.    Do you know what chromium does
4    as an essential trace nutrient in the body?
5        A.    I don't.
6        Q.    Are you aware of any evidence
7    that the chromium levels in the blood or
8    tissue of women who use talc-based body
9    powder exceeds that in women who never have
10   used such products?
11       A.    I'm not aware that that study
12   has been done.
13       Q.    So you're not aware of any
14   evidence of that, correct?
15           MS. O'DELL:  Objection to the
16       form.
17       A.    I'm not aware that any study
18   like that has been performed.
19   BY MR. KLATT:
20       Q.    Are you aware that cobalt is an
21   essential part of vitamin B12?
22       A.    Yes.
23       Q.    You understand -- you know what
24   the Krebs cycle is?

109 (Pages 430 to 433)

Judith K. Wolf, M.D.

Page 434

1      A.   I do.
2      Q.   Do you know that cobalt plays a
3  vital role in the Krebs cycle in the human
4  body?
5      A.   It's also been shown to be
6  carcinogenic, possibly carcinogenic.
7      Q.   Has IARC ever said that cobalt
8  is possibly carcinogenic to the ovaries?
9      A.   Not specifically to the
10  ovaries.
11      Q.   Are you aware of any evidence
12  that the cobalt levels in the blood or tissue
13  of women who use talc-based body powder
14  exceeds that in the blood or tissues of women
15  who have never used such body powders?
16      A.   I'm not aware of any studies
17  that have been done to show that.
18      Q.   So you're not aware of any such
19  evidence, correct?
20          MS. O'DELL:  Object to the
21      form.
22      A.   I'm not aware of any studies
23  that have looked at that.
24

Page 435

1  BY MR. KLATT:
2      Q.   Are you aware that nickel is
3  found in nuts, dried beans, peas, soybeans,
4  grains and chocolate?
5      A.   I'm not aware of that.
6      Q.   Are you aware that nickel is
7  found in some multivitamins?
8          MS. O'DELL:  Object to the
9      form.
10      A.   I don't look at the list of
11  multivitamins, so I'm going to say I don't
12  know.
13  BY MR. KLATT:
14      Q.   Can you tell Judge Wolfson of
15  any evidence you know of, that the levels of
16  nickel in the blood or tissues of women who
17  use talc-based body powders exceeds that in
18  the blood or tissues of women who have never
19  used such products?
20      A.   I'm not --
21          MS. O'DELL:  Excuse me.  Object
22      to the form.
23      A.   I'm not aware that any study of
24  that nature has been performed.

Page 436

1  BY MR. KLATT:
2      Q.   So you know of no such
3  evidence, correct?
4          MS. O'DELL:  Object to the
5      form.
6      A.   I'm not aware of any
7  evidence -- any study that's looked at that
8  question.
9  BY MR. KLATT:
10      Q.   Would you agree with me that
11  foreign particles, other than talc that had
12  nothing to do with talc or talc-based body
13  powders, can be introduced into the female
14  reproductive tract by the activities you
15  listed earlier, intercourse, going to the
16  bathroom, toilet paper, riding a bike,
17  exercising, use of tampons, walking, all
18  those activities can introduce non-talc
19  foreign particles into the reproductive
20  tract?
21      A.   If they're exposed to the
22  perineal tissue, they could.
23      Q.   Are you aware that pathologists
24  hired by these plaintiffs' lawyers have found

Page 437

1  hundreds of foreign particles that have
2  nothing to do with talc-based body powders in
3  the tissues of women who have ovarian cancer?
4          MS. O'DELL:  Object to the
5      form.
6      A.   I'm not aware of that
7  information.
8  BY MR. KLATT:
9      Q.   Would that surprise you?
10      A.   It would not surprise me.
11      Q.   Why?
12      A.   Because I have multiple levels
13  of evidence that inert particles can go from
14  the vagina and reach the upper
15  reproductive -- female reproductive tract.
16      Q.   Do you have any curiosity
17  whether any of these inert particles that
18  have nothing to do with talc-based body
19  powders, might be responsible for
20  inflammation that causes ovarian cancer?
21          MS. O'DELL:  Object to the
22      form.
23      A.   If I had any evidence in an
24  epidemiologic study or concerns that there's

110 (Pages 434 to 437)

Judith K. Wolf, M.D.

Page 438

1  anything else, I would definitely want it
2  studied. I've never seen an epidemiologic
3  study that suggested that toilet paper or any
4  of those other things you mentioned are
5  potentially associated with an increased risk
6  of ovarian cancer.
7  BY MR. KLATT:
8      Q.   Are you aware in the '60s and
9  '70s, that tampons contained asbestos?
10     A.   I wasn't aware of that.
11          MS. O'DELL:  You were not or
12     you were?  I'm sorry.
13          THE WITNESS:  Was not.
14  BY MR. KLATT:
15     Q.   Have you investigated -- had
16  any curiosity about investigating the
17  non-talc-based body powder particles that
18  women's reproductive tracts may be exposed to
19  that can result in ovarian cancer?
20          MS. O'DELL:  Object to the
21     form.
22     A.   I don't have any evidence that
23  there's anything else that's been suggested
24  that something else could cause ovarian

Page 439

1  cancer, that's introduced through the
2  perineum.
3  BY MR. KLATT:
4      Q.   People just haven't looked at
5  it, correct?
6          MS. O'DELL:  Object to the
7     form.
8      A.   Generally, people look at a
9  question when they see something that happens
10  that suggests that there may be a
11  correlation.
12  BY MR. KLATT:
13     Q.   But there's lots of things that
14  can cause cancer that haven't been studied
15  yet, correct?
16          MS. O'DELL:  Object to the
17     form.
18     A.   I don't know the answer to
19  that.
20  BY MR. KLATT:
21     Q.   You would agree with me, that
22  during a woman's reproductive years, every
23  month she sheds the lining of her uterus and
24  it's eliminated out of the body, correct?

Page 440

1      A.   Most of it's eliminated out of
2  the body.  In the vast majority of women,
3  some of it goes retrograde.
4      Q.   And you talked about
5  endometriosis earlier, correct?
6      A.   Yes.
7      Q.   That's endometrial tissue
8  that's already in the uterus that may get
9  into the peritoneum, correct?
10          MS. O'DELL:  Objection.
11     A.   It's endometrial tissue that
12  during the time of menstruation goes back out
13  through the fallopian tubes and goes -- it
14  can go in the ovaries, in the pelvis,
15  anywhere in the abdomen.  I've seen it in the
16  chest.
17  BY MR. KLATT:
18     Q.   But that endometrial tissue
19  starts in the uterus, correct?
20     A.   That's correct.
21     Q.   That's halfway up the
22  reproductive tract to the ovaries, correct?
23     A.   That's in the uterus.
24     Q.   You're not aware of any sort of

Page 441

1  endometrial tissue coming from the external
2  genital area, moving up the vagina, across
3  the cervix into the uterus, correct?
4      A.   Well, there isn't any
5  endometrial tissue in the vagina or the
6  cervix.
7      Q.   That's my point.  The tissue in
8  endometriosis starts in the uterus, correct?
9      A.   Yes.
10     Q.   The talc particles that women
11  apply when they apply talc, are applied
12  externally, correct?
13     A.   That's correct.
14     Q.   Okay.  And so they're nowhere
15  near the uterus when they're applied,
16  correct?
17          MS. O'DELL:  Object to the
18     form.
19     A.   Define "near."
20  BY MR. KLATT:
21     Q.   They're on the external genital
22  area, correct?
23     A.   They're on the external genital
24  area.

111 (Pages 438 to 441)

Judith K. Wolf, M.D.

Page 442

1    Q.    And they have the entire
2  vaginal canal between the external genital
3  area and then the cervix, correct?
4    A.    Correct.
5    Q.    And then they have to cross the
6  cervix, correct?
7    A.    Yeah.
8    Q.    Before they even get to the
9  uterus, correct?
10    A.    That's correct.
11    Q.    And they're still not to the
12  fallopian tubes or ovaries, right?
13    A.    That's correct.
14    Q.    And I understand that you
15  testified earlier today, that you don't know
16  of a single study that traced talc particles
17  placed externally and traced them up the
18  vaginal canal, across the cervix, through the
19  uterus, up the fallopian tubes to the
20  ovaries, correct?
21        MS. O'DELL:  Object to the
22    form.
23    A.    I'm aware of multiple studies
24  of other inert products that cross from the

Page 443

1  genital area -- or the vagina, into the
2  ovaries and the pelvis.  As -- since other
3  inert substances do cross that way, it makes
4  sense to me that talc or something else,
5  other things that we talked about, certainly
6  could also.
7  BY MR. KLATT:
8    Q.    But none of those particles
9  that you just referred to were applied
10  externally, correct?
11    A.    They were not applied
12  externally.
13    Q.    And talc is, correct?
14    A.    And talc is.  But the vagina is
15  open to the outside.
16    Q.    Any foreign particle, not just
17  talc?
18    A.    Excuse me.  Yes.  Yes.
19        MR. KLATT:  Can we go off the
20    record for just a second.  I think I
21    have little, if anything, left.
22        MS. O'DELL:  Okay.
23        MR. KLATT:  I just want to look
24    through my notes real quick.

Page 444

1        THE VIDEOGRAPHER:  Going off
2    the record.  The time is 5:51 p.m.
3        (Recess taken from 5:51 p.m. to
4    5:52 p.m.)
5        THE VIDEOGRAPHER:  Back on the
6    record.  The time is 5:52 p.m.
7  BY MR. KLATT:
8    Q.    Dr. Wolf, just a quick question
9  about your CV.  I just want to make sure I'm
10  clear.  Have you ever held the position of
11  full professor at an institution?
12    A.    Yes.
13    Q.    Okay.  I just wasn't sure.  And
14  that's listed on your CV; is that correct?
15    A.    Yes.
16    Q.    And are you still holding a
17  full professorship, or did you give that up
18  at some point?
19    A.    I gave that up.
20    Q.    When was that?
21    A.    When I left Banner MD Anderson
22  in 2014.  I haven't had an academic position
23  since then.
24    Q.    And earlier, you said that you

Page 445

1  had seen inflammation when you operated on
2  women with ovarian cancer, I think?
3        MS. O'DELL:  Object to form.
4    A.    I have seen pathologic slides.
5  I look at all the slides of my patients with
6  ovarian cancer.  And sometimes you see
7  inflammation in relationship with the cancer.
8  BY MR. KLATT:
9    Q.    And cancer itself is capable of
10  causing inflammation, correct?
11    A.    Cancer itself can cause
12  inflammation.
13        MR. KLATT:  I think that's all
14    the questions I have.
15        MS. O'DELL:  Let's go off the
16    record.
17        THE VIDEOGRAPHER:  Going off
18    the record.  The time is 5:54 p.m.
19        (Recess taken from 5:54 p.m. to
20    6:16 p.m.)
21        THE VIDEOGRAPHER:  Back on the
22    record.  The time is 6:16 p.m.
23
24

112 (Pages 442 to 445)

Judith K. Wolf, M.D.

Page 446

1      EXAMINATION
2  BY MS. O'DELL:
3      Q.    Dr. Wolf, just a few questions
4  for you.  You were shown two exhibits today,
5  Exhibit 20 and Exhibit 21, from a website
6  from a company that you were formerly
7  employed by.  Do you recall those questions
8  and exhibits?
9      A.    Yes.
10      Q.    And have you had an opportunity
11  to review these documents?
12      A.    Yes.
13      Q.    And is there anything that's
14  contained in the materials that you -- that
15  are in these documents that's inaccurate?
16      A.    No.
17      Q.    Is there anything about what
18  was written here that's inconsistent with any
19  of the opinions that you've given in this
20  litigation?
21      A.    No.
22      Q.    And in terms of the risk
23  factors that you touched on in either of
24  these two articles, are there any risk

Page 447

1  factors other than family history or
2  familial-related risk factors?
3      A.    In the "How to find the best
4  doctor for ovarian cancer" article, I talk
5  about familial risk factors, but don't list
6  any of the other ones.
7      Q.    I'm sorry.  So you don't
8  address lifestyle risk factors such as --
9      A.    I don't.
10      Q.    -- as talc or any others?
11      A.    Or other hormonal risk factors
12  or anything else.
13      Q.    You've talked today about
14  talcum powder products.  When you've referred
15  to talcum powder products, what did you mean
16  in your testimony?
17      A.    Johnson & Johnson baby powder
18  and Shower to Shower.
19      Q.    You also were given a document
20  by counsel for J&J.  It was Exhibit No. 9.
21  It's got a title and it says "Talc."  It's
22  from the FDA website.  Do you have that in
23  front of you?
24      A.    I do.

Page 448

1      Q.    And J&J counsel purported to --
2  or suggested that FDA's testing of talcum
3  powder products, including J&J's talc, had
4  resulted in a finding that there was no
5  asbestos in baby powder.  Do you recall that?
6          MS. BROWN:  Objection to the
7      form.
8      A.    I recall that.
9  BY MS. O'DELL:
10      Q.    All right.  If you'll turn over
11  to page 2 of Exhibit 9, did the FDA state
12  that the testing that they performed was
13  evidence that there was no asbestos in
14  cosmetic talc?
15      A.    Under the results of the FDA
16  survey and what they mean, it says they found
17  no asbestos fibers or structures in any of
18  the samples that they tested, to shorten it
19  out.  But the results were limited, because
20  only four talc suppliers submitted samples,
21  and by the number of products tested.  The
22  next sentence says, "While the FDA finds
23  these results informative, they do not prove
24  that most or all talc or talc-containing

Page 449

1  cosmetic products currently marketed in the
2  United States are likely to be free of
3  asbestos contamination."
4      Q.    J&J's counsel didn't read that
5  sentence to you, did she?
6          MS. BROWN:  Objection to the
7      form.
8      A.    No.
9  BY MS. O'DELL:
10      Q.    You were also shown a -- what's
11  called a PDQ from the National Cancer
12  Institute website, Exhibit 18.  Do you have
13  that in front of you?
14      A.    I have it.
15      Q.    And you were asked questions
16  about the section that dealt with talc.  Do
17  you recall that?
18      A.    Yes.
19      Q.    And if you'll turn to page 12
20  and 13 of 18, there's a section on perineal
21  talc exposure.
22      A.    Yes.
23      Q.    And what are the references
24  that are cited in that section?  What numbers

113 (Pages 446 to 449)

Judith K. Wolf, M.D.

Page 450

1  are they?
2      A.    The reference are numbers 41,
3  42, 43, 44 and 45.
4      Q.    Do you need some water?
5      A.    Yeah, I need some more.
6      Q.    And if you'll turn to page 16
7  of 18 of Exhibit 18, you'll see it lists
8  there references 41 through 45.
9      A.    Yes.
10     Q.    And do those appear to be the
11  references that the authors at NCI relied on
12  in reaching their opinions regarding perineal
13  talc use?
14     A.    Yes.
15     Q.    And do those include -- excuse
16  me.  Do those references include the broad
17  cross section of evidence that you reviewed
18  and considered in reaching your opinions in
19  this case?
20         MS. BROWN:  Objection to the
21     form.
22     A.    No.
23  BY MS. O'DELL:
24     Q.    Are at least two of the five

Page 451

1  references in early 2000s, I think 2000 and
2  2003?
3      A.    2003, 2013.  Schildkraut, which
4  is the newest one that they just added, 2016,
5  2000, 2014.
6      Q.    Yes.  And the references
7  included here certainly do not cover all the
8  material that you reviewed, considered,
9  relied on in reaching your opinion, including
10  other meta-analyses, the mechanistic data, et
11  cetera?
12     A.    They do not include all of the
13  data that I considered, and the most recent
14  data that's even mentioned, as I said, is the
15  2016 Schildkraut study.
16     Q.    Put that aside.
17         You were asked a number of
18  questions about asbestos testing, the type of
19  testing, the methodology, whether it was
20  transmission electron microscope or XRD, I
21  think was asked of you.  Do you recall those
22  series of questions?
23     A.    I do.
24     Q.    And would you defer to other

Page 452

1  experts regarding the appropriate methodology
2  for testing asbestos in talc?
3         MS. BROWN:  Objection to the
4     form.
5      A.    I would refer to other experts
6  in that area.
7  BY MS. O'DELL:
8      Q.    Would you -- would you defer
9  to -- back up just a second.
10         You were asked questions about
11  Dr. Longo and Rigler's report in the MDL.
12     A.    Yes.
13     Q.    And you recall in Dr. Longo and
14  Rigler's report, that they do perform a
15  quantification or an estimate of the number
16  of fibers in a particular bottle if there's a
17  positive test.  Do you recall those?
18     A.    Yes.
19         MS. BROWN:  Objection to the
20     form.
21  BY MS. O'DELL:
22     Q.    Would you defer to Dr. Longo
23  and Dr. Rigler on calculations like that, in
24  terms of the specific composition of a

Page 453

1  specific bottle?
2         MS. BROWN:  Objection to the
3     form.
4      A.    Yes.
5  BY MS. O'DELL:
6      Q.    As a GYN oncologist,
7  gynecologic oncologist, that's not something
8  that you're offering opinions on or that
9  would be within your expertise, correct?
10         MS. BROWN:  Form.
11     A.    That's not something I'm
12  offering opinions on or is within my area of
13  expertise.
14  BY MS. O'DELL:
15     Q.    Okay.  And you would not --
16  would defer to Dr. Longo and Dr. Rigler on
17  that point?
18     A.    I would refer to Dr. Longo and
19  Dr. Rigler.
20     Q.    And in regard to questions you
21  received about geology or deposits, talc
22  deposits, would you defer to experts in
23  geology on those particular matters?
24     A.    Yes.

114 (Pages 450 to 453)

Judith K. Wolf, M.D.

Page 454

1      MS. BROWN:  Form.
2      MS. O'DELL:  I don't know what
3  the form objection is, but let me see
4  if I can address it.
5  BY MS. O'DELL:
6      Q.    Dr. Wolf, would you defer to
7  geology experts in terms of the composition
8  of the particular talc ore deposit?
9      A.    A talc deposit?
10     Q.    Yes.
11     A.    Yes.
12     Q.    You were also asked by
13  Mr. Klatt about adhesions and inflammation,
14  acute inflammation following a surgical
15  procedure.  Is there any evidence -- any
16  suggestion that acute inflammation following
17  a surgical procedure causes ovarian cancer?
18     A.    No.
19     Q.    Let me -- you were asked some
20  questions about the IARC monograph, Volume
21  93, the 2010 monograph.  It was marked as
22  Exhibit 13.
23     A.    This one.  Yes.
24     Q.    And, Dr. Wolf, was IARC's

Page 455

1  examination of talc at the time they looked
2  at it in 2006, I believe it was, were they
3  considering talc containing asbestiform
4  fibers?
5      MR. KLATT:  Objection, form.
6  BY MS. O'DELL:
7      Q.    Let me just ask -- let me ask
8  you a different way, see if I can address the
9  objection.
10          Why don't you turn to page 277,
11  please.  And, Dr. Wolf, what is the substance
12  that the IARC working group is considering in
13  the 2010 monograph?
14     A.    Talc not containing asbestos
15  foreign fibers.
16     Q.    In other words, the 2010
17  monograph purported not to address talc with
18  asbestos?
19     MS. BROWN:  Objection, form.
20     MR. KLATT:  Objection, form.
21     A.    To investigate what they
22  thought or assumed was pure platy talc.
23  BY MS. O'DELL:
24     Q.    Is -- based on your review of

Page 456

1  the literature, the totality of the evidence,
2  can platy talc cause inflammation?
3      A.    Yes.
4      Q.    Does inflammation in the ovary
5  cause ovarian cancer?
6      A.    Chronic inflammation in the
7  ovary can cause changes that are associated
8  with ovarian cancer, yes.  Chronic
9  inflammation can -- in the ovary can cause
10  ovarian cancer.
11     Q.    You asked a number of questions
12  about asbestos and -- in terms of studies
13  involving millers and miners.  Would you
14  explain to what ultimately would be a jury,
15  but initially will be Judge Wolfson, what the
16  possible routes of exposure are for, you
17  know, asbestos and fibrous talc reaching the
18  ovary in the context of talcum powder
19  products?
20          MS. BROWN:  Objection to the
21  form.
22     A.    So the possible routes are from
23  the perineum, through the open vagina and
24  open cervix and open fallopian tubes to the

Page 457

1  ovaries.  From inhalation, smaller particles
2  can be -- cross the membrane, be absorbed by
3  the stroma, get into the lymphatic or blood
4  system and get it that way.  Fibrous
5  particles can pierce the lung in the diagram
6  and get into the perineal cavity that way.
7  BY MS. O'DELL:
8      Q.    And is -- are those opinions
9  you've just expressed supported by the data
10  in the IARC monograph, the 2012 monograph?
11     A.    Yes.
12     MR. KLATT:  Objection, form.
13  BY MS. O'DELL:
14     Q.    And did IARC conclude that when
15  asbestos and fibrous talc reached the
16  ovaries, they can cause ovarian cancer?
17     A.    Yes.
18     Q.    And IARC concluded that
19  asbestos and fibrous talc were known human
20  carcinogens?
21     A.    Yes.
22     Q.    You were asked a number of
23  questions about whether asbestos was
24  necessary in order to reach your opinions

Judith K. Wolf, M.D.

Page 458

1    about talcum powder products causing ovarian
2    cancer.  You recall those questions?
3        A.    Yes.
4        Q.    And is asbestos, as a component
5    of talcum powder products, essential in order
6    for talcum powder, baby powder and Shower to
7    Shower causing ovarian cancer?
8            MS. BROWN:  Objection to the
9        form of the question.
10       A.    So a talcum powder product has
11   all of these substance and I assessed it as a
12   whole.  Multiple of the substances are either
13   known to be carcinogenic or other substances
14   possibly carcinogenic or fragrances
15   irritating and inflammatory.  I looked at the
16   product as a whole.
17   BY MS. O'DELL:
18       Q.    If -- and you -- and in doing
19   that, looking at the product as a whole, was
20   it important to you to consider whether there
21   was a potent carcinogen such as asbestos in
22   the product?
23           MS. BROWN:  Form.
24       A.    It was information that added

Page 459

1    to my concerns about the product.  But
2    knowing that platy talc can cause
3    inflammation and is possibly carcinogenic, as
4    per IARC, and that platy talc appears to be
5    almost universally, as per Longo's testing,
6    part of talcum powder product, 41 out of 42
7    samples that she tested, and that fibrous
8    talc is asbestos, a form of asbestos, the
9    other asbestos fibers, one way or the other,
10   just add to my concern.
11   BY MS. O'DELL:
12       Q.    Yeah.  You -- and just when you
13   were relying, I think you misspoke.  You were
14   saying the 41 out of 42 samples in
15   Dr. Longo's testing and you referred to platy
16   talc.  Did you mean to say that?
17           MS. BROWN:  Objection to the
18       form.
19       A.    No, I meant fibrous talc.
20   BY MS. O'DELL:
21       Q.    And Dr. Longo tested Johnson &
22   Johnson historical samples for the presence
23   of fibrous talc?
24       A.    That's correct.

Page 460

1            MS. BROWN:  Objection to the
2        form of the question.
3    BY MS. O'DELL:
4        Q.    And did Dr. Longo find that
5    there was fibrous talc present in 41 out of
6    42 samples?
7            MS. BROWN:  Objection.
8        A.    She found fibrous talc in 41 of
9    42 samples.
10           THE REPORTER:  Hold on a
11       second.  I'm not hearing --
12           THE WITNESS:  I'm sorry.
13       A.    She --
14           MS. BROWN:  I -- sorry.  Go
15       ahead.
16       A.    She found fibrous talc in 41
17   of --
18           MS. BROWN:  He.
19       A.    He.  I keep picturing a woman.
20   Fibrous talc in 41 of 42 samples.
21           MS. BROWN:  And, Doctor, if you
22       wouldn't mind just giving me second to
23       object before you start answering --
24           THE WITNESS:  I'm sorry.

Page 461

1            MS. BROWN:  -- it will make the
2        court reporter's job easier.
3            THE WITNESS:  Sorry.
4    BY MS. O'DELL:
5        Q.    And if you pulled any one
6    component that you've talked about today out
7    of the talcum powder products, would that
8    change your opinions?
9        A.    No.
10           MS. O'DELL:  That's all I have,
11       Dr. Wolf.  Thank you.
12           MS. BROWN:  Go off?
13           MR. KLATT:  Yeah.
14           MS. BROWN:  Can we go off for
15       one second?
16           THE VIDEOGRAPHER:  Going off
17       the record.  The time is 6:36 p.m.
18           (Recess taken from 6:36 p.m. to
19       6:44 p.m.)
20           THE VIDEOGRAPHER:  Back on the
21       record.  The time is 6:44 p.m.
22           FURTHER EXAMINATION
23   BY MS. BROWN:
24       Q.    Dr. Wolf, you were just asked

116 (Pages 458 to 461)

Judith K. Wolf, M.D.

Page 462

1  some questions by counsel for plaintiffs
2  regarding Exhibits 20 and 21, articles that
3  you authored regarding ovarian cancer.  Do
4  you recall those questions?
5      A.   Yes.
6      Q.   Okay.  And you'd agree with me
7  that over the course of your career, you have
8  authored a number of articles, both in the
9  medical press and in the popular press,
10  regarding ovarian cancer, correct?
11      A.   Yes.
12      Q.   And you have never, over the
13  course of your entire career, published the
14  opinion that talc causes ovarian cancer,
15  correct?
16      A.   I have not.
17      Q.   And you have never, over the
18  course of your career, blogged or tweeted or
19  posted anything on any of the social media
20  accounts where you have a presence, that talc
21  causes ovarian cancer, correct?
22      A.   I have not.
23      Q.   And you have never spoken at
24  any symposia or conference and offered the

Page 463

1  opinion that talc causes ovarian cancer,
2  correct?
3          MS. O'DELL:  Object to the
4      form.  It's already been covered
5      previously today.
6          MS. BROWN:  Form is the
7      objection.
8      A.   Not that I recall.
9  BY MS. BROWN:
10      Q.   You were asked some questions
11  regarding the work of Dr. Longo and
12  Dr. Rigler.  Do you recall those?
13      A.   Yes.
14      Q.   And I assume you have not met
15  Dr. Longo; is that correct?
16      A.   No, I have not.
17      Q.   Okay.  And you told counsel for
18  plaintiffs, that you are relying on
19  Dr. Longo's quantification of asbestos.  Was
20  that your testimony?
21          MS. O'DELL:  Object to the
22      form.
23      A.   Quantification of -- to
24  understand how much of the -- what she found

Page 464

1  was in her testing.  I don't remember the
2  word "quantification of asbestos."
3  BY MS. BROWN:
4      Q.   So you are relying on
5  Dr. Longo's testing for how much asbestos is
6  in baby powder?
7      A.   To interpret her findings.
8          MS. O'DELL:  His findings.
9      A.   His findings.  I'm trying to
10  make Dr. Longo a woman.  It's not working.
11  BY MS. BROWN:
12      Q.   You -- in sitting here -- and
13  when you offered your opinion in this case,
14  though, you didn't have in mind a certain
15  amount of asbestos that was needed or found
16  in the baby powder to cause ovarian cancer,
17  right?
18          MS. O'DELL:  Object to the
19      form.
20      A.   Any amount of asbestos in baby
21  talcum powder product, I'm concerned about
22  causing ovarian cancer.
23  BY MS. BROWN:
24      Q.   And if I understood your

Page 465

1  testimony to plaintiffs' lawyer earlier, if
2  you took asbestos -- the asbestos that you
3  think is in baby powder, if you took it out,
4  you would still hold the opinion that baby
5  powder causes ovarian cancer; is that right?
6      A.   Yes.
7      Q.   And, in fact, that's your
8  opinion as it relates to any of the
9  components of baby powder that you believe
10  exists, such as platy talc, fibrous talc,
11  asbestos, heavy metals and fragrances,
12  correct?
13          MS. O'DELL:  Object to the
14      form.
15      A.   If I took any one of those out,
16  I think that talcum powder products would
17  still cause ovarian cancer.
18  BY MS. BROWN:
19      Q.   And what if you took two out of
20  the five out, would you still hold the
21  opinion that powder products cause ovarian
22  cancer?
23          MS. O'DELL:  Object to the
24      form, incomplete hypothetical.

117 (Pages 462 to 465)

Judith K. Wolf, M.D.

Page 466

1    A.    If you took any one of them
2  out, I would still have the opinion that
3  talcum powder product causes ovarian cancer.
4  I don't know how you can take all of them out
5  and still have a talcum powder product.
6  BY MS. BROWN:
7    Q.    Well, you understand that there
8  is -- talcum powder exists that does not
9  include fragrances, heavy metals, asbestos
10 and fibrous talc.  Do you have that
11 understanding?
12     MS. O'DELL:  Object to the
13   form.
14   A.    I'm not sure that there's
15 talcum powder that doesn't have at least
16 fibrous talc.
17 BY MS. BROWN:
18   Q.    And so are you of the opinion
19 that platy talc and fibrous talc alone cause
20 ovarian cancer?
21     MS. O'DELL:  Object to the
22   form.
23   A.    I'm of the opinion that talcum
24 powder product contains all of those

Page 467

1  ingredients that we list and that it causes
2  ovarian cancer.
3  BY MS. BROWN:
4    Q.    I'm with you on that.  What I
5  want to know is, are you of the opinion that
6  platy talc and fibrous talc alone cause
7  ovarian cancer?
8    A.    I'm of the opinion that platy
9  talc can cause cancer and fibrous talc is
10 considered a form of asbestos and can cause
11 cancer.  And that those are two of the
12 products in talcum powder product, two of the
13 substances in talcum powder product.
14     I don't know of any evidence
15 that the product doesn't have all of the
16 substances that I've described, and I don't
17 know that I can make an opinion that says if
18 it just had this and this, it would or would
19 not cause cancer.
20   Q.    And for your opinion, that if
21 you pulled out any one component of the
22 powder products, the product would still
23 cause ovarian cancer, do you rely on the same
24 epidemiology?

Page 468

1    A.    There isn't epidemiology
2  because -- because I don't know that the
3  talcum powder product in the epidemiology
4  left any of those out.
5    Q.    So you issued a multipage
6  report in this case, right, Dr. Wolf?
7    A.    Yes.
8    Q.    And that report contains
9  numerous cites to epidemiology that looked at
10 people using cosmetic talcum powder, correct?
11   A.    That's correct.
12   Q.    Is it your testimony here today
13 that none of that epidemiology informs your
14 opinion about Johnson & Johnson baby powder
15 products?
16   A.    That is not --
17     MS. O'DELL:  Excuse me.
18   A.    -- my opinion.
19     MS. O'DELL:  Object to the
20   form, misstates her testimony.
21   A.    What my understanding of your
22 question was is, do I have epidemiologic
23 studies that show that if one -- any one of
24 those substances is left out of the product,

Page 469

1  that it causes ovarian cancer.  And what my
2  answer is, is that my understanding is that
3  all of the epidemiologic studies are looking
4  at the product as I understand it and so I
5  can't give -- I cannot refer to a study that
6  has the product without one of those.
7  BY MS. BROWN:
8    Q.    And you were asked some
9  questions about the IARC monograph on
10 nonasbestiform talc.  Do you remember that?
11   A.    Yes.
12   Q.    And many, if not most, of the
13 epidemiology studies that you cite in your
14 report are contained and considered within
15 the IARC monograph on nonasbestiform talc.
16 True?
17     MS. O'DELL:  Object to the
18   form.
19   A.    I believe that's not true
20 because the -- again, this was 2010 and many
21 of the references that I report are after
22 this was published and they were only
23 reviewing up to 2006 or 2007 when they wrote
24 this.

118 (Pages 466 to 469)

Judith K. Wolf, M.D.

Page 470

1  BY MS. BROWN:
2      Q.    Sure.  And for studies that
3  looked at talcum powder products prior to
4  2010, you have considered and relied on those
5  in your report as well?
6      A.    Yes.
7      Q.    And, in fact, the Penninkilampi
8  meta-analysis that you regard as high
9  quality, includes a majority of studies that
10  were considered by the IARC group in 2006,
11  correct?
12          MS. O'DELL:  Object to the
13      form.
14      A.    It definitely includes some of
15  those older studies.
16          MS. BROWN:  I have no further
17      questions at this time.
18          MR. KLATT:  I have a couple
19      more.
20          FURTHER EXAMINATION
21  BY MR. KLATT:
22      Q.    Can you pull out Exhibit 9,
23  Dr. Wolf.
24      A.    Exhibit 9, yes.

Page 471

1      Q.    And Exhibit 9 is the document
2  that Ms. O'Dell discussed with you a few
3  minutes ago, where the FDA around 2009-2010,
4  tested both raw talc and off-the-shelf
5  talc-based body powder products, correct?
6      A.    Yes.
7      Q.    And I think you read a portion
8  where it said only four talc suppliers had
9  submitted their products to the FDA for
10  testing.  Do you recall that?
11      A.    Yes.
12      Q.    Are you aware that my client,
13  Imerys, was one of the four that did submit
14  their talc for testing?  And I'll just tell
15  you, in case you don't know, that Imerys is
16  the successor to Rio Tinto and Luzenac.  And
17  are those talcs tested by the FDA in Exhibit
18  9?
19      A.    Yes.
20      Q.    And what did the FDA find about
21  whether there was asbestos in those talcs?
22      A.    No evidence of asbestos.
23      Q.    In either the Rio Tinto
24  Minerals/Luzenac America talc, correct?

Page 472

1      A.    That's correct.
2      Q.    Have you ever recommended to a
3  patient of yours who does not have ovarian
4  cancer yet, that she have her ovaries removed
5  because of long-term talc use?
6      A.    No.
7      Q.    Would you make that
8  recommendation in the future?
9      A.    It would be a discussion that I
10  would have with the patient.  Looking at all
11  of her risk factors, if her only risk factor
12  was talcum powder usage, I would just want
13  her to know that she's at an increased risk
14  and let her make the decision about that.
15      Q.    Are you aware of any
16  professional --
17          MS. O'DELL:  Excuse me, Mike.
18          MR. KLATT:  I'm sorry.
19          MS. O'DELL:  I'm sorry.  Were
20      you done, Dr. Wolf?
21      A.    I mean, that's a tough
22  question.  The challenge is there's no
23  screening for ovarian cancer, right?  So if
24  you have someone who's at an increased risk,

Page 473

1  you can't say, well, we'll look at you more
2  often, we'll test you more often.  There's no
3  test to find ovarian cancer early.
4          On the other hand, the
5  generally accepted lifetime risk for ovarian
6  cancer to push a doctor to recommend
7  prophylactic surgery removal of the tubes and
8  ovaries, is a 10 percent or greater lifetime
9  risk.
10  BY MR. KLATT:
11      Q.    And talc use doesn't confer
12  that level of use, correct?
13      A.    It does not.
14      Q.    Okay.  And you're not aware of
15  any medical professional organization or
16  agency that has ever made the recommendation
17  that women who have used genital talc for a
18  certain period of time should consider having
19  their ovaries and fallopian tubes removed,
20  correct?
21      A.    I am not aware of any.
22      Q.    Can you show me one single
23  study, case report, case series, any type of
24  study at all, showing that a woman who used

119 (Pages 470 to 473)

Page 474

```
 1   Johnson & Johnson baby powder or Shower to
 2   Shower product, had inflammation of her
 3   reproductive tract as a result of that
 4   powder?
 5        MS. O'DELL:  Objection to the
 6   form.
 7        A.   I can't -- I can't show you a
 8   paper that shows that.
 9   BY MR. KLATT:
10        Q.   You believe that talc can get
11   to the ovaries via inhalation, correct?
12        A.   Yes.
13        Q.   Are you aware that talc's
14   ubiquitous in the environment?
15        A.   Yes.
16        Q.   Are you aware that women just
17   walking around on city streets can breathe
18   talc particles in during the course of their
19   life?
20        MS. O'DELL:  Objection to form.
21        A.   I'm aware that talc is
22   ubiquitous to the environment.
23   BY MR. KLATT:
24        Q.   Which means you can breathe it
```

Page 475

```
 1   in every single breath you take, correct?
 2        MS. O'DELL:  Object to the
 3   form.
 4        A.   I'm aware that talc is
 5   ubiquitous to the environment.
 6   BY MR. KLATT:
 7        Q.   And so since it's ubiquitous in
 8   the environment and since you take a breath,
 9   you know, many times a minute, you're
10   probably inhaling talc particles every time
11   you breath, or at least every minute you
12   breath, correct?
13        MS. O'DELL:  Objection to the
14   form.
15        A.   I don't have evidence to
16   support that.
17   BY MR. KLATT:
18        Q.   Well, you -- and you know, for
19   example, that there's asbestos fibers in this
20   room as we sit here right now, don't you, Dr.
21   Wolf?
22        MS. O'DELL:  Objection to form.
23        A.   Do I know that for a fact?
24   BY MR. KLATT:
```

Page 476

```
 1        Q.   Sure.  You've seen -- you've
 2   read the IARC monograph, you know in indoor
 3   air and outdoor air in urban areas, there's
 4   concentrations of asbestos fibers just in the
 5   air we breath.
 6        MS. O'DELL:  Objection to form.
 7        A.   I would have to test the air to
 8   know for sure that there's asbestos fibers in
 9   the air here.
10   BY MR. KLATT:
11        Q.   You haven't seen that data in
12   the IARC monograph that you reviewed?
13        A.   In this -- about the air in
14   this room, no.
15        Q.   I'm talking about indoor air
16   and outdoor area in urban areas.  You've seen
17   in the IARC monograph, that there's a certain
18   quantity of asbestos fibers in that air,
19   correct?
20        A.   There is a certain amount of
21   asbestos fibers in the air.
22        Q.   And so when you breathe that
23   air, you can inhale those asbestos fibers
24   and, according to you, they can end up in the
```

Page 477

```
 1   ovary, correct?
 2        A.   Yes.
 3        Q.   And the same with talc
 4   particles, correct?
 5        A.   Yes.
 6        Q.   Didn't even necessarily come
 7   from body powder, correct --
 8        MS. O'DELL:  Objection, form.
 9   BY MR. KLATT:
10        Q.   -- just from the environment?
11        MS. O'DELL:  Objection to the
12   form.
13        A.   You can inhale it from the air
14   and it can get to the ovaries.
15   BY MR. KLATT:
16        Q.   How long have you known
17   Margaret Thompson, who is sitting here today?
18        A.   I met her about two -- a little
19   over two years ago.
20        Q.   Okay.  You've never seen or
21   been referred any patients by her; is that
22   correct?
23        A.   No.
24        Q.   Have you communicated with any
```

Judith K. Wolf, M.D.

Page 478

1   of the other plaintiffs' consultants by -- in
2   person, by phone, by e-mail, in any form or
3   fashion at all?
4       A.   The only one I spoke with was
5   Dr. Saed. I spoke on the phone with him once
6   about, I'm going to say, a year or so ago.
7       Q.   And what was the substance of
8   that conversation?
9       A.   It was about his research. I
10  had questions about what he was doing.
11      Q.   And what did you ask him?
12      A.   I don't recall exactly.
13      Q.   Did you keep notes?
14      A.   I did not.
15      Q.   How long was the phone call?
16      A.   I think it was about a half an
17  hour.
18      Q.   And when was that phone call?
19          MS. O'DELL: I think she just
20      said.
21      A.   I think it was about a year
22  ago. I can see I was standing in Arizona,
23  which meant I was still working for Provista,
24  so it was sometime before I left there.

Page 479

1   BY MR. KLATT:
2       Q.   Which month would that have
3   been?
4       A.   I don't know.
5       Q.   When did you leave there?
6       A.   My last working day there was
7   October 1st, but I hadn't been to Arizona for
8   months by then.
9       Q.   October 1st of?
10      A.   2018.
11      Q.   Okay. But you think it was
12  about a year ago that you spoke to him?
13      A.   I do.
14      Q.   Approximately January of 2018?
15          MS. O'DELL: Objection to form.
16      She's given her best estimate.
17      A.   Approximately.
18  BY MR. KLATT:
19      Q.   Can you tell me anything else
20  about the substance of what you talked about
21  with Dr. Saed on that phone call?
22      A.   I asked him what research he
23  was doing, what he was looking at, what type
24  of cell lines, what was he looking for. We

Page 480

1   talked a little bit about the fact that he
2   worked in Detroit at Wayne State, where I
3   know the GYN oncologist, and we were friendly
4   about that. I told him I thought his
5   research was interesting and important. That
6   was it.
7       Q.   Are any of the Wayne State
8   gynecologic oncologists you know coauthors of
9   Dr. Saed's paper?
10      A.   Yes. Dr. Robert Morris.
11      Q.   Have you talked to Dr. Morris
12  about this research?
13      A.   I haven't spoken with
14  Dr. Morris about anything in a couple of
15  years.
16      Q.   Have you communicated in any
17  form or fashion with any governmental
18  agencies about talc and ovarian cancer?
19      A.   I have not.
20      Q.   Did you keep any notes of your
21  discussion with Dr. Saed? Maybe I asked
22  that.
23          MS. O'DELL: Asked and
24      answered.

Page 481

1       A.   I did not.
2   BY MR. KLATT:
3       Q.   Did you ask Dr. Saed during
4   that phone call, who was funding his
5   experiments or work that he was doing?
6       A.   I don't remember.
7       Q.   What prompted that phone call?
8       A.   Margaret and I spoke about that
9   he was doing some research and she asked him
10  would it be okay if I talked to him, and so I
11  called him.
12      Q.   How long have you been a
13  gynecologic oncologist?
14      A.   I finished my fellowship in
15  1995.
16      Q.   Had you ever heard of Dr. Saed
17  before your discussion with Margaret
18  Thompson?
19      A.   I had not. He's a Ph.D., so
20  it's not necessarily that I would know who he
21  was.
22      Q.   Well, you've been an academic
23  gynecologic oncologist for decades, right?
24      A.   Yes.

121 (Pages 478 to 481)

Page 482

1    Q.    You have never once heard of
2  Dr. Saed, correct?
3    A.    I had not.
4        MR. KLATT:  That's all the
5  questions I have.
6        MS. O'DELL:  I just have one
7  question.
8        FURTHER EXAMINATION
9  BY MS. O'DELL:
10   Q.    Dr. Wolf, are your opinions in
11  this case contained in your report and in the
12  deposition you've given here today?
13   A.    Yes.
14        MS. O'DELL:  That's all I have.
15        MS. BROWN:  Just one final
16  question to that.
17        FURTHER EXAMINATION
18  BY MS. BROWN:
19   Q.    One final question, Doctor.
20  You're not relying on any materials to form
21  your opinion that are not contained in your
22  report or were discussed or marked as
23  exhibits here today, correct?
24   A.    My report, no, and my

Page 483

1  references, everything that's here today.
2  Nothing else.
3    Q.    And for a housekeeping item,
4  are all of the binders on that table to your
5  left, are those documents on Exhibit B of
6  your report?
7    A.    Yes.
8    Q.    Nothing additional, right?
9    A.    Nothing additional.
10   Q.    And all of the binders on the
11  table are the references in your report?
12   A.    The references and the
13  additional information that we provided
14  today.
15   Q.    Okay.  So with that, I don't
16  think it's necessary, unless anyone
17  disagrees, to mark all of the binders.
18        MS. BROWN:  And I have no
19  further questions.  Thanks.
20        MR. KLATT:  As long as the
21  binders don't contain any highlighting
22  or notations.
23        THE WITNESS:  Nothing.
24        MS. BROWN:  We're off the

Page 484

1  record.
2        THE VIDEOGRAPHER:  This
3  concludes the deposition of Dr. Judy
4  Wolf.  Going off the record.  The time
5  is 7:03 p.m.
6        (Deposition concluded at
7  7:03 p.m.)
8        – – – – – – –
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 485

1        CERTIFICATE
2
3        I, MICHEAL A. JOHNSON, Registered
   Diplomate Reporter and Certified Realtime
4  Reporter, do hereby certify that prior to the
   commencement of the examination, JUDITH K.
5  WOLF, M.D. was duly sworn by me to testify to
   the truth, the whole truth and nothing but
6  the truth.
7        I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
         I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
   employee of such attorney or counsel, and
13  that I am not financially interested in the
   action.
14
15
16
   _____
17  MICHEAL A. JOHNSON,
   NCRA Registered Diplomate Reporter
18  NCRA Certified Realtime Reporter
   Certified LiveNote Reporter
19
   Dated:  January 8, 2019
20
21
22
23
24

122 (Pages 482 to 485)

Judith K. Wolf, M.D.

Page 486

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3
4          I,_____, do
    hereby certify that I have read the foregoing
5   pages and that the same is a correct
    transcription of the answers given by me to
6   the questions therein propounded, except for
    the corrections or changes in form or
7   substance, if any, noted in the attached
    Errata Sheet.
8
9
10
11
12  _____
13  JUDITH K. WOLF, M.D.          DATE
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
```

Page 487

```
1          – – – – – – –
              ERRATA
2          – – – – – – –
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 488

```
1          – – – – – – –
          LAWYER'S NOTES
2          – – – – – – –
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```