# EXHIBIT B31

Judith Zelikoff, Ph.D.

Page 1

```
 1        IN  THE  UNITED  STATES  DISTRICT  COURT
 2      FOR THE EASTERN DISTRICT OF NEW JERSEY
 3                       -   -   -
 4
         IN RE:   JOHNSON &        :
 5      JOHNSON TALCUM POWDER    :
         PRODUCTS MARKETING,       :
 6      SALES PRACTICES, AND     :   NO. 16-2738
         PRODUCTS LIABILITY       :   (FLW) (LHG)
 7      LITIGATION                :
                                   :
 8      THIS DOCUMENT RELATES    :
         TO ALL CASES             :
 9
                         -   -   -
10
                  January 21, 2019
11
                         -   -   -
12
13              Videotaped deposition of
        JUDITH ZELIKOFF Ph.D., taken pursuant to
14      notice, was held at the Sheraton Mahwah
        Hotel, 1 International Boulevard, Mahwah,
15      New Jersey, beginning at 9:11 a.m., on
        the above date, before Michelle L. Gray,
16      a Registered Professional Reporter,
        Certified Shorthand Reporter, Certified
17      Realtime Reporter, and Notary Public.
18                       -   -   -
19
20          GOLKOW LITIGATION SERVICES
            877.370.3377 ph| 917.591.5672
21                deps@golkow.com
22
23
24
```

Judith Zelikoff, Ph.D.

---

**Page 2**

```
1   APPEARANCES:
2
3   BEASLEY ALLEN, P.C.
    BY:  P. LEIGH O'DELL, ESQ.
    BY:  JENNIFER K. EMMEL, ESQ.
4   234 Commerce Street
    Montgomery, Alabama 36103
5   (334) 269-2343
    leigh.odell@beasleyallen.com
6   Jennifer.emmel@beasleyallen.com
7    - and -
8   LEVIN PAPANTONIO THOMAS
    MITCHELL RAFFERTY & PROCTOR, PA
9   BY:  CHRISTOPHER V. TISI, ESQ.
    316 South Baylen Street,
10  Suite 600
    Pensacola, Florida 32502
11  (888) 435-7001
    Ctisi@levinlaw.com
12
     - and -
13
    GOLOMB & HONIK P.C.
14  BY:  RICHARD M. GOLOMB, ESQ.
    1835 Market Street, Suite 2900
15  Philadelphia, PA 19103
    (215) 985.9177
16  Rgolomb@golombhonik.com
17   - and -
18  NAPOLI SHKOLNIK, PLLC
    BY:  ALASTAIR J.M. FINDEIS, ESQ.
19  400 Broadhollow Road, Suite 305
    Melville, New York 11747
20  (631) 224-1133
    afindeis@napolilaw.com
21  Representing the Plaintiffs'
    Steering Committee
22
23
24
```

**Page 3**

```
1   APPEARANCES:  (Cont'd.)
2
3   SHOOK, HARDY & BACON, LLP
    BY:  MARK C. HEGARTY, ESQ.
4   2555 Grand Boulevard
    Kansas City, MO 64108
5   (816) 474-6550
    Mhegarty@shb.com
6    - and -
7   SKADDEN ARPS, LLP
    BY:  BENJAMIN S. HALPERIN, ESQ.
8   4 Times Square
    New York, New York 10036
9   (212) 735-2453
    Benjamin.halperin@skadden.com
10  Representing the Defendant, Johnson
    & Johnson entities
11
12  GORDON & REES, LLP
    BY:  KENNETH J. FERGUSON, ESQ.
13  816 Congress Avenue, Suite 1510
    Austin, Texas 78701
14  (512) 391.0183
    kferguson@gordonrees.com
15
     - and -
16
    COUGHLIN DUFFY, LLP
17  BY:  MARK K. SILVER, ESQ.
    350 Mount Kemble Avenue
18  Morristown, New Jersey 07962
    (973) 267-0058
19  msilver@coughlinduffy.com
    Representing the Defendant, Imerys
20  Talc America, Inc.
21
22
23
24
```

**Page 4**

```
1   APPEARANCES:  (Cont'd.)
2
3   SEYFARTH SHAW, LLP
    BY:  THOMAS T. LOCKE, ESQ.
4   975 F Street, NW
    Washington, D.C. 20004
5   (202) 463-2400
    tlocke@seyfarth.com
6   Representing the Defendant, PCPC
7
    TUCKER ELLIS, LLP
8   BY:  JAMES W. MIZGALA, ESQ.
    233 South Wacker Drive, Suite 6950
9   Chicago, Illinois 60606
    (312) 624-6307
10  james.mizgala@tuckerellis.com
    Representing the Defendant, PTI
11  Royston LLC and PTI Union LLC
12
13
14  ALSO PRESENT:
15
    VIDEOTAPE TECHNICIAN:
16    Henry Marte
17
18
19
20
21
22
23
24
```

**Page 5**

```
1         - - -
2       I N D E X
3         - - -
4
    Testimony of:    JUDITH ZELIKOFF, Ph.D.
5
      By Mr. Hegarty  14, 464, 523, 576
6
      By Mr. Ferguson      442
7
      By Ms. O'Dell      486, 571
8
9
10
          - - -
11
       E X H I B I T S
12
          - - -
13
14  NO.      DESCRIPTION      PAGE
15  Zelikoff-1  Compilation of     16
                Invoices of
16              Dr. Zelikoff
17  Zelikoff-2  Rule 26 Expert     35
                Report of Judith
18              Zelikoff, Ph.D.
                11/16/18
19
    Zelikoff-3  Longo & Rigler     36
20              Report
                1/15/19
21
    Zelikoff-4  Rule 26 Report     40
22              Of Michael Crowley
23  Zelikoff-5  Listing of Chemicals 43
24
```

Golkow Litigation Services - 1.877.370.DEPS

Judith Zelikoff, Ph.D.

Page 6

- - -
E X H I B I T S  (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-6 | Notice of Deposition Of Dr. Zelikoff | 50 |
| Zelikoff-7 | Thumb Drive | 53 |
| Zelikoff-8 | Molecular Basis Supporting the Association of Talcum Powder Use with Increased Risk of Ovarian Cancer (Saed) | 55 |
| Zelikoff-9 | Data Screening Assessment 12/2018 | 57 |
| Zelikoff-10 | Systematic Review and Meta-Analysis Of the Association Between Perineal Use of Talc And Risk of Ovarian Caner (Taher) | 60 |
| Zelikoff-11 | Exhibit C Listing of Bates Numbered Documents | 62 |
| Zelikoff-12 | Academic Integrity For Students at NYU | 78 |
| Zelikoff-13 | Comparison of Quotes with Shawn Levy | 83 |

Page 7

- - -
E X H I B I T S  (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-14 | Comparison of Quotes with Smith-Bindman | 88 |
| Zelikoff-15 | Comparison of Quotes with Genetics Home Reference | 92 |
| Zelikoff-16 | Comparison of Quotes with Simone Reuter | 102 |
| Zelikoff-17 | Comparison of Quotes with Environmental Chemistry.com | 106 |
| Zelikoff-18 | Comparison of Quotes with Rakoff-Nahoum | 115 |
| Zelikoff-19 | Comparison of Quotes with Health Effects | 119 |
| Zelikoff-20 | Why Cancer Inflammation? (Rakoff-Nahoum) | 118 |
| Zelikoff-21 | Comparison of Quotes with Kasprzak | 121 |
| Zelikoff-22 | Curriculum Vitae Of Dr. Zelikoff | 175 |

Page 8

- - -
E X H I B I T S  (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-23 | Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention NCI | 393 |
| Zelikoff-24 | (Skipped) | |
| Zelikoff-25 | Comparison of Quotes with Cancer Research How Cancer Starts | 125 |
| Zelikoff-26 | Comparison of Quotes with Safety Assessment of Talc as Used in Cosmetics | 125 |
| Zelikoff-27 | Comparison of Quotes with CSEM | 125 |
| Zelikoff-28 | Comparison of Quotes with NIH Public Access Chromium Toxicity | 125 |
| Zelikoff-29 | Comparison of Quotes with IARC Monograph | 125 |

Page 9

- - -
E X H I B I T S  (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-30 | Comparison of Quotes with NIH Public Access Environmental Toxicants | 125 |
| Zelikoff-31 | Comparison of Quotes with Peters | 125 |
| Zelikoff-32 | Comparison of Quotes with Trabert | 125 |
| Zelikoff-33 | Response Letter To Citizen's Petition 4/1/14 | 430 |
| Zelikoff-34 | Perineal Talc Use And Ovarian Cancer (Penninkilampi) | 398 |
| Zelikoff-35 | Consumer Talcums And Powders (Rohl) | 405 |
| Zelikoff-36 | Arsenic, Metals Fibres Excerpt (IARC Monograph) | 457 |
| Zelikoff-37 | Ingredients Talc | 454 |

Judith Zelikoff, Ph.D.

Page 10

```
 1           - - -
 2       E X H I B I T S  (Cont'd.)
 3           - - -
 4
 5   NO.     DESCRIPTION        PAGE
 6   Zelikoff-38  Talcum Powder    469
              Chronic Pelvic
 7            Inflammation
              (Merritt)
 8
     Zelikoff-39  Markers of       471
 9            Inflammation
              And Risk
10            (Wu)
11   Zelikoff-40  Binder Labeled   480
              Saad 2010 -
12            Zambelli 2013
13   Zelikoff-41  Binder Labeled   480
              Production Documents
14
     Zelikoff-42  Binder Labeled   480
15            Depositions
              ACGIH 2010 -
16            Frank & Jorge 2011
17   Zelikoff-43  Binder Labeled   480
              IARC 1977 -
18            IARC 2006
19   Zelikoff-44  Binder Labeled   480
              Gamble 1979 -
20            IARC 1976
21   Zelikoff-45  Binder Labeled   480
              Ingersoll 2011 -
22            Marconi 1990
23
24
```

Page 11

```
 1           - - -
 2       E X H I B I T S  (Cont'd.)
 3           - - -
 4
 5   NO.     DESCRIPTION        PAGE
 6   Zelikoff-46  Binder Labeled   480
              Mattenklott 2007 -
 7            Rossi 2009
 8   Zelikoff-47  Binder Labeled   480
              IARC 2009 -
 9            IARC, 2012
10   Zelikoff-48  Alterations in   481
              Gene Expression
11            In Human Mesothelial
              Cells
12            (Shukla)
13   Zelikoff-49  Experts of Transcript 549
              Of Robert Glenn
14            10/18/18
15   Zelikoff-50  Presence of      562
              Talc in Pelvic
16            Lymph Nodes of a Woman
              (Cramer)
17
     Zelikoff-51  Does Long-Term   567
18            Talc Exposure
              Have a Carcinogenic
19            Effect
              (Keskin)
20
21
22
23
24
```

Page 12

```
 1           - - -
 2     DEPOSITION SUPPORT INDEX
 3           - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE  LINE
     None.
 7
 8   Request for Production of Documents
 9   PAGE  LINE
     None.
10
11   Stipulations
12   PAGE  LINE
     None.
13
     Questions Marked
14
     PAGE  LINE
15   None.
16
17
18
19
20
21
22
23
24
```

Page 13

```
 1        THE VIDEOGRAPHER:  We are on
 2   the record.  My name is Henry
 3   Marte.  I am a videographer with
 4   Golkow Litigation Services.
 5        Today is January 21st, 2019,
 6   and the time is 9:11 a.m.
 7        This video deposition is
 8   being held in Mahwah, New Jersey,
 9   in the matter of Talcum Powder
10   Litigation.
11        The deponent today is Dr.
12   Judith Zelikoff.
13        All appearances will be
14   noted on the stenographic record.
15   Will the court reporter please
16   administer the oath to the
17   witness.
18        - - -
19        ... JUDITH ZELIKOFF, Ph.D.,
20   having been first duly sworn, was
21   examined and testified as follows:
22        - - -
23        EXAMINATION
24        - - -
```

Judith Zelikoff, Ph.D.

Page 14

1    BY MR. HEGARTY:
2         Q.   Good morning, Dr. Zelikoff.
3         A.   Good morning.
4         Q.   My name is Mark Hegarty.  I
5    represent the J&J defendants in this
6    action.  Can you please state your full
7    name for the record, please?
8         A.   Judith Terri Zelikoff.
9         Q.   Dr. Zelikoff, who is your
10   current employer?
11        A.   New York University School
12   of Medicine, also known as NYU Langone
13   Health.
14        Q.   What is your title at New
15   York University School of Medicine?
16        A.   Professor with tenure.
17        Q.   How long have you held that
18   position?
19        A.   Since 1982.
20        Q.   Do you have any separate
21   personal consulting business for
22   litigation purposes?
23        A.   I do not.
24        Q.   Where do the fees go that

Page 15

1    you earn as an expert witness in this
2    case?
3         A.   They go to household
4    expenses as well as charity.
5         Q.   But they go to you, correct?
6         A.   They go to me.
7         Q.   Other than your work at New
8    York University and the fees that you're
9    earning as part of this litigation, do
10   you have any other sources of income?
11        A.   Just income that I have from
12   advisory boards or -- when you -- when
13   you sit on panels, they also pay you.
14   But other than that, no.
15        Q.   Tell me an example of an
16   advisory board for which you receive
17   income.
18        A.   It's on a very sporadic
19   basis.  And it depends on what it is.
20   But the NIEHS, National Institute of
21   Environmental Health Sciences.  And it's
22   an NIH institute.  And I serve as a -- I
23   review grants for them.
24        Q.   What are you charging

Page 16

1    plaintiffs' counsel for your services in
2    this litigation?
3         A.   $350 per hour.
4         Q.   Is there any difference in
5    your rate depending on whether it's
6    literature review, sitting for a
7    deposition, trial testimony?
8         A.   Sitting for a deposition or
9    trial testimony is $450.
10        Q.   Did anyone outside of
11   plaintiffs' attorneys assist you in any
12   way with your expert report in this case?
13        A.   No one with my expert
14   report.
15        Q.   We were provided today a
16   copy of several invoices that you have
17   prepared for your work in this case.  I'm
18   going to mark as Exhibit Number 1 a copy
19   of those invoices.
20             (Document marked for
21             identification as Exhibit
22             Zelikoff-1.)
23   BY MR. HEGARTY:
24        Q.   Dr. Zelikoff, would you look

Page 17

1    at Exhibit Number 1 and tell me whether
2    those are all the invoices that you have
3    generated and provided to plaintiffs'
4    counsel in this case.
5         A.   It appears to be.
6         Q.   Thank you.  The last work
7    noted is December 24, 2018.
8             Have you spent any
9    additional time on this case for which
10   you intend to bill plaintiffs' counsel --
11        A.   Yes, I have.
12        Q.   -- that's not reflected in
13   the invoices?
14        A.   Yes, I have.
15        Q.   How much additional time?
16        A.   Approximately 25 to 30 hours
17   by the end of this deposition.  Not
18   including the deposition.
19        Q.   With regard to these
20   invoices, have they all been paid?
21        A.   Yes, they have.
22        Q.   Were you paid a retainer for
23   your work on this case?
24        A.   I don't recall.

5 (Pages 14 to 17)

Judith Zelikoff, Ph.D.

Page 18

1    Q.   Dr. Zelikoff, as you know
2  we're here to take your deposition in the
3  case of In Re Johnson & Johnson Talc
4  Litigation, which is an MDL setting.  Are
5  you aware you've been designated as an
6  expert in that case?
7    A.   I am aware.
8    Q.   When were you first
9  contacted about serving as an expert in
10 this case?
11   A.   Early 2017.  I was
12 requested -- I was requested if I had
13 interest in it.
14   Q.   The first invoice that you
15 provided has a date of April 5, 2017.
16 When in relation to the first invoice
17 entry was that initial contact?
18   A.   To the best of my knowledge,
19 it was January or February.
20   Q.   Of 2017?
21   A.   Of 2017, right.
22   Q.   Who contacted you?
23   A.   Jennifer Emmel.
24   Q.   Did you know her before she

Page 19

1  contacted you?
2    A.   Not at all.
3    Q.   How was the contact made, by
4  telephone?
5    A.   By telephone.
6    Q.   Apart from anything that
7  attorneys for plaintiffs may have told
8  you, do you know how she came to contact
9  you?
10   A.   I'm not aware as to how she
11 came to contact me.
12   Q.   Did you have any prior
13 litigation work with her?
14   A.   Not with Ms. Emmel, no.
15   Q.   How do you spell her name?
16   A.   How do I --
17   Q.   Yes.
18   A.   -- spell her name?
19   Q.   Yes.
20   A.   To the best of my knowledge,
21 it's E-M-M-E-L.
22   Q.   Have you had any prior
23 litigation work with any of the lawyers
24 with whom you have met that are

Page 20

1  representing plaintiffs?
2    A.   No, sir.
3    Q.   Did you agree to serve as an
4  expert witness at the time of Ms. Emmel's
5  first contact with you?
6    A.   No, sir.  I told her that I
7  would have to do some literature
8  searching myself and come up with a
9  conclusion as to whether or not I felt
10 comfortable based on the science in
11 serving in that capacity.
12   Q.   At one point -- at what
13 point between -- at what point did you
14 come to or did -- strike that.
15        At what point did you agree
16 to serve as an expert witness in this
17 litigation in relation to that first
18 call?
19   A.   Probably about a month
20 later.
21   Q.   What did Ms. Emmel tell you
22 at that first call about the litigation?
23       MS. O'DELL:  We just
24       instruct -- I mean conversations,

Page 21

1  in terms of -- let me just strike
2  that and say don't discuss
3  anything that you communicated to
4  us or we communicated to you after
5  you decided to become an expert in
6  the case.
7  BY MR. HEGARTY:
8    Q.   Correct.  I'm talking about,
9  right now I'm talking about that initial
10 phone call where you said you had not --
11 where you did not agree at that point in
12 time to serve as an expert witness.
13 That's the only call I'm talking about.
14       What did Ms. Emmel tell you
15 about the litigation or about what they
16 wanted you to do at that first call?
17   A.   Well, I don't remember the
18 details as it was about over a year ago.
19 But to the best of my knowledge and my
20 recollection, it was just that they
21 represented the plaintiffs in a case of
22 ovarian cancer and its relationship to
23 talcum powder products, and was I
24 familiar with it, did I know anything

6 (Pages 18 to 21)

Judith Zelikoff, Ph.D.

Page 22

1  about it, and did I have -- did I have
2  interest in being associated with, and I
3  responded to her that I follow the
4  science, that's all I do is I follow the
5  science.
6         And if the science leads me
7  in a direction that I would have interest
8  or that I felt comfortable in doing this,
9  then I would let her know.
10        Q.   What was your response when
11  she asked you if you were familiar with
12  the science of talc and ovarian cancer?
13        A.   I was familiar with it at
14  that time in a superficial manner.  I
15  work in a very high-powered department of
16  environmental medicine.  And we discuss
17  current events over lunch.
18        Q.   When you say in a
19  superficial manner, what do you mean?
20        A.   Certainly not to the depth
21  that I'm aware of the issue currently.
22        Q.   Is it correct that you had
23  not formed any opinions as to any link
24  between talc and ovarian cancer as of the

Page 23

1  time of that first call with Ms. Emmel?
2        A.   I had -- I had no opinion at
3  that time.
4        Q.   Did you have any discussions
5  with Ms. Emmel or any other lawyer
6  representing plaintiffs between that
7  initial phone call and when you agreed to
8  serve as an expert witness?
9        A.   To my -- to the best of my
10  knowledge, I had not spoken to
11  Ms. O'Dell.  So to the best of my
12  knowledge it was just Ms. Emmel.
13        Q.   Again, focusing on that
14  first phone call -- well, strike that.
15        Had you had any further
16  discussion with Ms. Emmel between the
17  time of that first call and the time you
18  agreed to serve as an expert witness?
19        A.   I'm sorry, between the time
20  of the first call and the time I agreed,
21  could you repeat the question please?
22        Q.   Sure.  Did you have any
23  additional discussions with Ms. Emmel
24  between the time of the first call and

Page 24

1  the time that you agreed to serve as an
2  expert witness in the case?
3        A.   No, not -- not to my
4  recollection.
5        Q.   Do you recall anything else
6  that you discussed with Ms. Emmel at that
7  first call besides what we talked about
8  already?
9        A.   No, sir.
10        Q.   Did Ms. Emmel at that first
11  call tell you anything about plaintiffs'
12  theory of causation or theory of
13  mechanism of action or biologic
14  plausibility?
15        A.   No, sir, not at all.
16        Q.   Did she send you any
17  documents before you agreed to serve as
18  an expert witness?
19        A.   Not to my knowledge.  I
20  think the -- I'm sure the literature
21  reviews that I did at that time were
22  solely my own.
23        Q.   Had you heard of lawsuits
24  involving talc and ovarian cancer before

Page 25

1  being contacted by Ms. Emmel?
2        A.   I actually had not.
3        Q.   What then were your sources
4  of knowledge about talc and ovarian
5  cancer as of the time of the first call?
6        A.   The media, whatever I might
7  have read in the paper and any
8  discussions that might have been brought
9  up by my colleagues.
10        Q.   Do you recall any colleague
11  who brought the -- anything up about talc
12  and ovarian cancer?
13        A.   I do not recall a specific
14  colleague.  Lunchroom chatter.
15        Q.   Did you form any opinions
16  from the material you did read in the
17  media or from discussion with your
18  colleagues?
19        A.   I had no opinion.
20        Q.   And you were ultimately
21  retained and asked to give expert
22  opinions in this case, correct?
23        A.   I was ultimately retained,
24  yes, correct.

7 (Pages 22 to 25)

Judith Zelikoff, Ph.D.

Page 26

1  Q.   The lawyers for the
2  plaintiffs in this case have paid you to
3  review materials and offer opinions,
4  correct?
5       MS. O'DELL:  Objection to
6  the form.
7       THE WITNESS:  Do I answer
8  the question?
9  BY MR. HEGARTY:
10  Q.   Yes.
11      MS. O'DELL:  Yes.
12      THE WITNESS:  They have
13  remunerated me for my time and
14  effort in reading hundreds of
15  articles.
16  BY MR. HEGARTY:
17  Q.   The opinions that you've
18  formulated were ultimately set out in
19  your November 16, 2018, MDL report,
20  correct?
21  A.   That's correct.
22  Q.   The hours you spent in
23  preparing that report are reflected in
24  the invoices we marked as Exhibit

Page 27

1  Number 1, correct?
2  A.   I don't recall what exhibit
3  number it is, but it is in one of the
4  invoices.
5  Q.   A description that you have
6  in your invoices includes report
7  preparation.  Is that a description which
8  describes your -- the time you spent
9  preparing your report?
10  A.   Yes, it is.
11  Q.   Every entry under report
12  preparation would be the time that you
13  spent preparing your report?
14  A.   Yes, that's true.  That
15  could include reading material, searching
16  for material or writing.
17  Q.   The invoices we marked as an
18  exhibit also reflect the time you spent
19  with lawyers for plaintiffs; is that
20  correct?
21  A.   It does.
22  Q.   With regard to your
23  deposition here today, how much time did
24  you spend preparing to come here and

Page 28

1  testify today?
2  A.   It would be in my invoice,
3  but if I had to approximate that without
4  the knowledge of having that in front of
5  me, I would say 30 to 50 hours.
6  Q.   What attorneys did you meet
7  with to prepare for your deposition here
8  today?
9  A.   I met with Ms. O'Dell and
10  Ms. Emmel.
11  Q.   Anyone else?
12  A.   In a face-to-face.
13  Q.   Face-to-face.  There were
14  phone calls as well?
15  A.   There were -- one of -- one
16  of the phone calls, it may have been two.
17  I also -- Chris, and I'm not familiar
18  with your last name, sorry.
19      Chris from the --
20      MS. O'DELL:  Tisi.
21      THE WITNESS:  Tisi?  Chris
22  Tisi and Alistair --
23      MR. FINDEIS:  Findeis.
24      MS. O'DELL:  Findeis.

Page 29

1       THE WITNESS:  Findeis -- was
2  on the phone, and there may have
3  been one or two others, but I
4  don't recall.
5  BY MR. HEGARTY:
6  Q.   Have you spoken with any of
7  your colleagues about your work in this
8  litigation?
9  A.   What -- can you explain what
10  you mean by colleagues?
11  Q.   Well, you mentioned
12  colleagues in discussing talc and ovarian
13  cancer.  So those colleagues.
14  A.   If -- do you mean other
15  faculty?
16  Q.   Correct.
17  A.   And the question again,
18  please?
19  Q.   Sure.  Have you spoken with
20  other faculty at New York University
21  regarding your work on this litigation?
22  A.   No, I have not.
23  Q.   Have you told any faculty at
24  New York University of your opinions in

Judith Zelikoff, Ph.D.

Page 30

1  this case?
2      A.   I have not.
3      Q.   Have you told anyone at NYU
4  School of Medicine of your opinions?
5      A.   I have not.  I have
6  discussed, not my opinion, but in my
7  class, my toxicology course, to graduate
8  students at NYU.
9         I have, in my course on
10  speaking about reproductive toxicology
11  and developmental toxicology, in
12  discussing risk factors, two graduate
13  students I have discussed -- I've
14  included talc as a potential risk factor.
15      Q.   When did you start including
16  talc as a potential risk factor in that
17  course?
18      A.   Prior -- if you're asking me
19  was it prior to or -- prior to my
20  retainment, it was prior to my
21  retainment.
22      Q.   So prior to your
23  retainment -- let me -- let me word it
24  differently.

Page 31

1         Prior to the call from
2  Ms. Emmel, you had included in your
3  course to -- your toxicology course a
4  discussion about talc and ovarian cancer?
5      A.   Not a discussion, just
6  didactic lecture saying that this is the
7  female reproductive tract.  Ovarian
8  cancer is part of an adverse outcome of
9  disease.  It's very prevalent.  And there
10  are factors including early menarche,
11  late menopause, and there's some issues
12  currently on the table as to whether
13  cosmetic talc also plays a role.
14         No opinion was given to my
15  class.  Just information.
16      Q.   Do you have any materials
17  for your course, whether in PowerPoint
18  form or other form that sets out that
19  discussion you just had?
20      A.   No.
21      Q.   Is that the extent of the
22  discussion that you had with your
23  toxicology students about talc and
24  ovarian cancer?

Page 32

1      A.   Yes.
2      Q.   Does that continue to be the
3  extent of any discussion you had with any
4  students at New York University about
5  talc and ovarian cancer?
6      A.   Well, right now we're on
7  break.  I -- I probably will -- I will
8  continue after the deposition to also
9  talk with them and list it as
10  a -- as a risk factor for ovarian cancer.
11      Q.   What about -- strike that.
12         Did you have discussions,
13  that same discussion with toxicology
14  students between -- I should say before
15  you were contacted by Ms. Emmel and
16  today, have you had -- continued to have
17  that same discussion with your toxicology
18  students?
19      A.   I've not --
20         MS. O'DELL:  Objection to
21      form.
22         Doctor, give me just a
23      moment after the question if I
24      need to object.  Thank you.

Page 33

1         THE WITNESS:  Shall I
2  continue?
3  BY MR. HEGARTY:
4      Q.   Sure.
5      A.   Could you repeat the
6  question, please?
7      Q.   Sure.  You mentioned that
8  the discussion that we just went over was
9  before your contact by Ms. Emmel,
10  correct?
11      A.   I said that it started.  My
12  lectures started prior to my conversation
13  with Ms. Emmel.
14      Q.   What was -- what was the
15  name of the course that you had that
16  lecture?
17      A.   Organ system toxicology.
18      Q.   Have you taught that course
19  since your call with Ms. Emmel?
20      A.   Actually it's coming up
21  this -- this semester, starting the 30th
22  of January.
23      Q.   So between -- as of the
24  first part of 2017 through today you have

Judith Zelikoff, Ph.D.

Page 34

1  not taught that same course?
2      A.   It's taught every other
3  year.
4      Q.   Have you communicated with
5  anyone outside of plaintiffs' counsel in
6  this case about your opinions in your
7  report?
8      A.   Not about my opinions, no.
9      Q.   Have you talked with anyone
10  outside of plaintiffs' counsel in this
11  case about your report?
12      A.   Only to say that I -- to my
13  friends, when I refuse to go anywhere
14  with them, because I have to stay home
15  and work, only to say that I'm working on
16  a report.
17      Q.   Have you discussed the
18  litigation or your report with any other
19  experts retained by the plaintiffs in
20  this case?
21      A.   No, sir, I have not.
22      Q.   Have you reviewed any of the
23  other plaintiffs' experts' MDL reports in
24  this litigation besides those referenced

Page 35

1  in your report?
2      A.   I reviewed Dr. Dydek's.  I
3  reviewed -- did you say the plaintiffs'
4  witnesses?
5      Q.   Yeah, let me -- let me -- in
6  your report -- and I can -- we can get it
7  out here in a moment.  But you list
8  the -- in your list of reports, you list
9  the report of Michael Crowley.
10      A.   I'm sorry, sir.  Can you --
11      Q.   It's in Exhibit B at the end
12  of Exhibit B of your report.  If you need
13  a copy I can give it to you now.
14      A.   Can you give me a copy.
15          (Document marked for
16          identification as Exhibit
17          Zelikoff-2.)
18  BY MR. HEGARTY:
19      Q.   I'm marking Exhibit 2 Dr.
20  Zelikoff's report that was provided to us
21  in this case.
22      A.   Thank you.  And what page
23  are you referring to?
24      Q.   It is the last page of

Page 36

1  Exhibit B.  It should be the very last
2  page of that document.
3      A.   Thank you.
4      Q.   The very last page of
5  Exhibit B of your report, you list a
6  number of expert reports, correct?
7      A.   I do.  Deposition and
8  exhibits.
9      Q.   Have you reviewed any other
10  expert reports -- strike that.
11          Did you review any other
12  expert reports for purposes of your
13  expert report besides those listed here?
14      A.   No, sir.  Unless --
15  Dr. Longo, December 2018 supplement, that
16  was a report, and I did review that.
17      Q.   We were provided today with
18  a copy of a report of Longo and Rigler,
19  January 15, 2019.  And I'm going to mark
20  that as Exhibit 3.
21          (Document marked for
22          identification as Exhibit
23          Zelikoff-3.)
24  BY MR. HEGARTY:

Page 37

1      Q.   Is that the supplemental
2  report that you described for us?
3      A.   It is, sir.  It's an
4  analysis Johnson & Johnson Historical
5  Product Containers and Imerys' Historical
6  Railroad Car Samples, etc..
7      Q.   That report is dated
8  January 15th, 2019, correct?
9      A.   Yes, sir.
10      Q.   When did you receive this
11  report?
12      A.   In January.
13      Q.   When in relation to
14  January 15, 2019?
15      A.   Today is the --
16      Q.   Is the 21st.
17      A.   Today is the 21st.  I would
18  say somewhere between the 15th and the
19  21st.  Actually it was this past Saturday
20  as it was placed in my Dropbox and I
21  could not open my Dropbox.
22      Q.   When did you review Exhibit
23  Number 3?
24      A.   That same report?

10 (Pages 34 to 37)

Judith Zelikoff, Ph.D.

Page 38

1    Q.   Yes.
2    A.   I received it on Saturday.
3  I reviewed it on Sunday.
4    Q.   How much time did you spend
5  reviewing this additional Longo and
6  Rigler report?
7    A.   Sorry.  About three hours.
8    Q.   Did you read every page?
9    A.   I read -- I reviewed each
10  page but I did not scrutinize every page.
11    Q.   Did you read the entirety of
12  the text in this supplemental report?
13    A.   May I see the report,
14  please.
15        MS. O'DELL:  Objection.
16  Asked and answered.  That's the
17  same question.
18        THE WITNESS:  Should I
19  answer?
20        MS. O'DELL:  Yes, you may.
21        THE WITNESS:  I reviewed the
22      text going up to Page 32 with
23      greater rigor than I did the
24      tables.

Page 39

1  BY MR. HEGARTY:
2    Q.   When you say "reviewed,"
3  does that mean that you read every -- all
4  the words on every page up to Page 32?
5    A.   I did.
6    Q.   You included in the list of
7  reports that you reviewed, the report of
8  Michael Crowley, correct?
9    A.   Every one of the reports
10  were not read with the -- read with
11  the -- sorry, I'm caught up in the
12  microphone -- were not read with the same
13  intensity and duration of time put into
14  it.  I reviewed it.  To what extent, I'm
15  not clear at this moment.
16    Q.   The first report that you
17  list in the list of reports in Exhibit B
18  is the expert report of Michael M.
19  Crowley, correct?
20    A.   It's written that way, yes.
21    Q.   Did you prepare this list of
22  reports?
23    A.   I did not.
24    Q.   Who did?

Page 40

1    A.   The attorneys.
2    Q.   I'm going to show you --
3    A.   Plaintiffs' attorneys.
4        (Document marked for
5      identification as Exhibit
6      Zelikoff-4.)
7  BY MR. HEGARTY:
8    Q.   I'm going to show you what I
9  marked as Exhibit Number 4.  This is the
10  MDL report provided to us for Michael
11  Crowley.
12    A.   Mm-hmm.
13    Q.   Did you read the entirety of
14  that report?
15    A.   I cannot say that I read the
16  entirety of this report.  I reviewed the
17  report.
18    Q.   Okay.  Well, your report is
19  dated November 16, 2018.  And that report
20  is dated November 12, 2012, -- 2018.
21  When did you receive the report by
22  Dr. Crowley in relation to the date on
23  the first page, November 12th.
24    A.   I really cannot say with

Page 41

1  certainty.  It seems to me that I
2  received this prior to my report
3  conclusion.
4    Q.   There are 212 pages there.
5  Again, did you read every word of every
6  page?
7    A.   No, sir.  Did I look at
8  every word of every page?  Yes.
9    Q.   No, my question is did you
10  read every word of every page.
11    A.   My answer is --
12        MS. O'DELL:  She answered
13      your question.
14        THE WITNESS:  -- I looked at
15      every page.
16  BY MR. HEGARTY:
17    Q.   Did you read all the
18  references that he has in that report?
19    A.   I looked at the references.
20    Q.   Did you actually pull the
21  references and read the citations that he
22  refers to?
23    A.   No, sir.  I did my own -- my
24  own literature search in terms of

11 (Pages 38 to 41)

Judith Zelikoff, Ph.D.

Page 42

1  fragrance and chemicals within the
2  fragrances.  And I did receive that as an
3  exhibit this morning.
4       Q.   I'm sorry.  What did you
5  say?
6       A.   I said I did my own
7  literature search in terms of fragrances,
8  and I think you received a copy of that
9  this morning.  In that report that I did,
10 that I prepared, I was assessing
11 carcinogenicity of each of the compounds.
12      Q.   Going back to the Crowley
13 report, did you read all the tables in
14 that report?
15      A.   I did not read.  I reviewed.
16      Q.   What is --
17      A.   I looked at them.
18      Q.   Okay.  What is the
19 difference between reading and reviewing
20 to you?
21      A.   In my mind, reading is
22 in-depth assessment, and whereas
23 reviewing is looking over.  Reading is
24 more intense.

Page 43

1       Q.   You pointed to us -- pointed
2  to us -- strike that.
3            You pointed to the document
4  that was provided to us this morning,
5  which you say is -- what I think you said
6  reflects your own literature search with
7  regard to fragrances; is that correct?
8       A.   Mine and a student.
9       Q.   What student?
10      A.   A graduate student in my
11 laboratory.
12           (Document marked for
13           identification as Exhibit
14           Zelikoff-5.)
15 BY MR. HEGARTY:
16      Q.   I've marked as Exhibit
17 Number 5 the document that was produced
18 to us this morning.  Can you tell me what
19 Exhibit Number 5 is?
20      A.   Exhibit Number 5 is -- is a
21 list of the chemicals that -- part of
22 which, if not in its entirety, were taken
23 from the fragrances that were -- and the
24 chemicals that were listed in

Page 44

1  Dr. Crowley's report.  And with that I --
2  I used the case number.  I reviewed each
3  one of the chemicals in terms of their
4  potential carcinogenicity by, number one,
5  putting -- writing down the chemical,
6  looking to see if there were other
7  structures or chemicals -- or chemicals
8  that had similar names.
9            I reviewed through Google,
10 through PubMed and through Tox Lit and
11 IARC reports to see whether or not there
12 was a listing for them in terms of
13 carcinogenicity.  And that is the result.
14 This is the result.
15      Q.   When did you do all of that?
16      A.   I did that post the
17 report --
18      Q.   When -- sorry.
19      A.   -- as part of my preparation
20 for the deposition.
21      Q.   When did you do it post
22 report in relation to today?
23      A.   One to two weeks ago.
24      Q.   Did you review -- strike

Page 45

1  that.
2            Did you read all the MSDSes
3  that you list in Exhibit Number 5?
4       A.   I did not read all of the
5  MSDSes.  But I did look at them.  I
6  reviewed them to make sure they were
7  accurate.
8       Q.   Did you -- did you look at
9  and review every MSDS listed in Exhibit
10 Number 5?
11      A.   No, sir.
12      Q.   I'm sorry?
13      A.   No, sir.
14      Q.   Approximately how many did
15 you look at in review?
16      A.   I would say I looked at
17 perhaps half.  Looked -- looked at, not
18 reviewed.
19      Q.   But with regard to your
20 analysis of the fragrances that are
21 reportedly in Johnson's Baby Powder, you
22 did not do any of your own analysis as of
23 the time of your report, correct?
24      A.   I --

12 (Pages 42 to 45)

Judith Zelikoff, Ph.D.

Page 46

1          MS. O'DELL:  Objection to
2     the form.
3          THE WITNESS:  I did no
4     analysis except to gather the
5     information that is out there by
6     reputable organizations.
7     BY MR. HEGARTY:
8          Q.    Well, did you gather that
9     information before you completed your
10    expert report?
11         A.    I did this after my expert
12    report.
13         Q.    And my question was, before
14    your expert report, did you do any of
15    your own analysis of the fragrances that
16    we -- are listed in Exhibit Number 5?
17         MS. O'DELL:  Objection to
18    form.
19         THE WITNESS:  I'm not sure
20    what you mean by analysis.
21    BY MR. HEGARTY:
22         Q.    Well, did you do any of your
23    own research, review of the literature,
24    anything with regard to fragrances as of

Page 47

1     the time of your signing of your expert
2     report November 16, 2018?
3          A.    I very briefly looked up
4     limonene and eugenol.  And it wasn't in
5     regards to this case.  It was in regards
6     to work that I do with electronic
7     cigarettes.  They are being used as
8     flavorants.
9          Q.    Was that the extent of your
10    review of the fragrances as of the time
11    of your expert report, November 16, 2018?
12         MS. O'DELL:  Object to form.
13    You may answer.
14         THE WITNESS:  Whatever is in
15    the report from Dr. Crowley that
16    listed, I looked at those.
17    BY MR. HEGARTY:
18         Q.    But as you indicated, you
19    did not read all the citations, the
20    literature resources that Dr. Crowley
21    cites in his report and review them
22    yourself?
23         MS. O'DELL:  Object to the
24    form.

Page 48

1          THE WITNESS:  I --
2     post-report, I did my own search.
3     BY MR. HEGARTY:
4          Q.    But my question was, before
5     your report, with regard to Dr. Crowley's
6     report, did you actually pull the
7     literature references that he cites and
8     read them yourself?
9          A.    No, sir.
10         Q.    You also make reference to
11    reviewing Dr. Longo's report, MDL report,
12    which is dated November 14, 2018.  That's
13    in the last page of Exhibit Number B.  Do
14    you see that?
15         A.    I -- I see that, yes.
16         Q.    Did you read every page of
17    that report?
18         A.    No, sir, I did not.  But I
19    did read every page of the December 2018
20    Longo mass supplement report.
21         Q.    Well, focusing on the
22    November 14, 2018, report, that report is
23    over 2,000 pages.  Are you aware of that?
24         A.    Yes, sir.

Page 49

1          Q.    Did you read all 2,000
2     pages?
3          A.    No, sir.  I did not.
4          Q.    Did you read any of those
5     2,000 pages?
6          A.    I reviewed several of those
7     pages.
8          Q.    Okay.  How about the rest of
9     the reports that are listed there?  Did
10    you read every page of the reports that
11    are listed there?
12         A.    I read every page of the
13    Dr. Thomas Dydek's report.  And I read
14    two-thirds of Dr. Plunkett's.
15         Q.    As to the rest, did you
16    review the remaining reports?
17         MS. O'DELL:  Object to the
18    form.
19    BY MR. HEGARTY:
20         Q.    Or not look at them at all?
21         A.    I glanced over them.
22         Q.    Do you recall if you were
23    ever provided any draft reports from any
24    of the plaintiffs' experts in the MDL,

Judith Zelikoff, Ph.D.

Page 50

1  where you understood them to be drafts?
2      A.   I never received anything
3  that I understood to be a draft document.
4          (Document marked for
5          identification as Exhibit
6          Zelikoff-6.)
7  BY MR. HEGARTY:
8      Q.   Dr. Zelikoff, I'm marking
9  Exhibit Number 6 a copy of your
10 deposition notice for purposes of today's
11 deposition.
12     A.   Yes, sir.  I see it.
13     Q.   Did you have a chance to
14 look at that before today?
15     A.   I did not.
16     Q.   What materials did you bring
17 with you to the deposition today?
18         MS. O'DELL:  I would just
19         reassert that the objections that
20         plaintiffs have served regarding
21         certain of the requests and would
22         state that Dr. Zelikoff has
23         brought binders of her cited
24         materials, and then I believe I

Page 51

1          gave you a jump drive of all the
2          reference materials.
3  BY MR. HEGARTY:
4      Q.   Let me go back to my
5  question.  Sitting to your right are
6  binders of materials.  Do you know what
7  those binders are, Dr. Zelikoff?
8      A.   I do know what those black
9  binders are to my right.
10     Q.   What are they?
11     A.   They are binders containing
12 materials, papers, literature --
13 literature, in alphabetical order of
14 papers that are relevant to my -- to my
15 testimony, as well as production
16 documents which include letters, reports
17 of internal documents.
18     Q.   Your Exhibit B in your
19 report starts with a page Materials and
20 Data Considered.  Do you see that?
21     A.   Page please?
22     Q.   It's Exhibit B.
23     A.   Materials and data
24 considered, I have it, yes, sir.

Page 52

1      Q.   Is it correct that the
2  binders to your right are copies of
3  everything in -- under the listing --
4  under the heading of Materials and Data
5  Considered?
6          MS. O'DELL:  Object to the
7          form.
8          THE WITNESS:  I cannot say
9          that every single paper in here is
10         in there.  Maybe in something that
11         I have looked up, but I can't say
12         with likely certainty that yes,
13         everything is in there.  Although
14         I cannot tell you that I reviewed
15         every single one and matched it to
16         this page.
17 BY MR. HEGARTY:
18     Q.   Who prepared -- who prepared
19 the document Materials and Data
20 Considered?
21     A.   What do you mean by
22 prepared?
23     Q.   Did you prepare it?
24         MS. O'DELL:  Object to the

Page 53

1          form.
2          THE WITNESS:  I supplied
3          data, references, and in
4          coordination and complementation
5          with the plaintiffs' attorneys,
6          they prepared this.
7          (Document marked for
8          identification as Exhibit
9          Zelikoff-7.)
10 BY MR. HEGARTY:
11     Q.   I'm marking as Exhibit
12 Number 7 a flash drive that we were
13 provided here today.  Do you know what
14 Exhibit Number 7 is?
15     A.   I do not.
16     Q.   Do you know what's contained
17 on the flash drive?
18     A.   I have not seen the data
19 within the flash drive.
20         MS. O'DELL:  I'll just
21         represent that I prepared the
22         flash drive and the flash drive
23         has all the materials on
24         Exhibit B, on behalf of

14 (Pages 50 to 53)

Judith Zelikoff, Ph.D.

Page 54

1   Dr. Zelikoff.
2  BY MR. HEGARTY:
3       Q.   Are the materials you also
4  cited -- I'm sorry.  Are the references
5  you also cited in the body of your report
6  contained in those notebooks to your
7  knowledge?
8       A.   To my knowledge, they are.
9       Q.   Are the materials that --
10  that are in those notebooks materials you
11  reviewed or had access to prior to
12  completion of your expert report?
13      A.   Prior to the completion.
14  However I also prepared my own.  So in
15  going through -- in coming to my
16  conclusion and opinion, I also went
17  through the literature using various
18  websites including, as I said Tox Lit,
19  Google and PubMed.  And I arranged my
20  documents that I thought were relevant
21  after reviewing all of the ones that came
22  up in my literature search, and I
23  reviewed the abstracts and if I found
24  them to be relevant, I placed them in --

Page 55

1  in order and in bins, in silos, in
2  different areas, and I prepared my own.
3      Q.   We were also provided today,
4  this morning, what I've marked as Exhibit
5  Number 8 which is a manuscript from a
6  publication called Reproductive Sciences.
7  The lead author, Ghassam Saed.
8          (Document marked for
9          identification as Exhibit
10         Zelikoff-8.)
11 BY MR. HEGARTY:
12     Q.   Can you tell me when you
13 received that manuscript?
14     A.   I received the manuscript in
15 December.
16     Q.   Approximately when in
17 December?
18     A.   Let me say that it was
19 either December or early January.  I
20 cannot be more exact than that.
21     Q.   Have you read that
22 manuscript?
23     A.   Have I -- yes, I've read
24 this manuscript.

Page 56

1       Q.   You had not read that
2  manuscript at the time you
3  completed your report, correct?
4       A.   No, I did not, sir.
5       Q.   So that manuscript did not
6  inform the opinions set out in your
7  report, correct?
8          MS. O'DELL:  Objection to
9          form.
10         THE WITNESS:  Do I answer?
11         MS. O'DELL:  Yes, you may
12 answer.
13         THE WITNESS:  Okay.
14         MS. O'DELL:  Yes.
15         THE WITNESS:  I -- I had
16 access to an abstract from the
17 same author with emerging results
18 that was brought forward in larger
19 context and in greater detail in
20 the publication.  So I had -- so
21 the abstract did go into my
22 thinking.
23 BY MR. HEGARTY:
24     Q.   The manuscript though we

Page 57

1  marked as Exhibit 8 did not go into your
2  thinking?
3       A.   The manuscript -- no, sir,
4  it did not.  It did post my report and it
5  added supplementary and compelling
6  evidence for my opinion.
7          (Document marked for
8          identification as Exhibit
9          Zelikoff-9.)
10 BY MR. HEGARTY:
11     Q.   I've also marked as Exhibit
12 Number 9 another document we were
13 provided this morning which is -- which
14 is called Draft Screening Assessment.
15         When did you receive this
16 draft screening assessment?
17     A.   January.
18     Q.   Approximately when in
19 January?
20     A.   About two weeks ago.
21     Q.   Who -- what was your source
22 for getting that document?
23     A.   Ms. Emmel.
24     Q.   Did Ms. Emmel also provide

15 (Pages 54 to 57)

Judith Zelikoff, Ph.D.

Page 58

1   the -- the Saed manuscript?
2       A.   Yes, sir, she did.
3       Q.   So neither the Canadian
4   assessment nor Dr. Saed's manuscript were
5   materials you found on your own, correct?
6       A.   Correct.
7       Q.   Do you know how Ms. Emmel
8   came to receive an unpublished
9   manuscript, apart from any discussions
10  that you had with plaintiffs' counsel?
11      A.   Actually, which manuscript
12  are you referring to?
13      Q.   Well, there's only one
14  manuscript in front of you?
15      A.   Reproductive Science --
16      Q.   Dr. -- yes.
17      A.   -- Dr. Saed?
18           To my knowledge, this has --
19  and seeing the cover letter that was
20  associated with this, this is not a
21  manuscript.  This is an in-press
22  manuscript, and there is a very large
23  difference.
24      Q.   Okay.  Apart from anything

Page 59

1   that counsel for plaintiffs may have told
2   you, do you know how this manuscript
3   became available for you to review?
4       A.   I have no knowledge.
5       Q.   With regard to the
6   Canadian -- sorry, the draft screening
7   assessment, did you read the entirety of
8   this assessment?
9       A.   I'm looking for it right
10  now.
11      Q.   Sorry.
12      A.   Thank you.  Except for the
13  references, I read the entirety of the
14  text.
15      Q.   Did you pull the references
16  and review the references themselves?
17      A.   No, sir, I did not.
18      Q.   There are also supplemental
19  materials associated with this -- or do
20  you know whether there are supplemental
21  materials associated with this draft, or
22  with this draft screening assessment?
23      A.   I was also provided a
24  document by Dr. Taher.  I'm not sure if

Page 60

1   that is a supplement of that or a -- an
2   adjacent document.
3       Q.   Do you have that document
4   with you?
5       A.   Perhaps.  I do, yes, sir.
6       Q.   May I see it, please.
7            (Document marked for
8            identification as Exhibit
9            Zelikoff-10.)
10  BY MR. HEGARTY:
11      Q.   I'm going to mark as Exhibit
12  Number 10 what you just handed to me,
13  which is titled "Systematic Review and
14  Meta-Analysis of the Association Between
15  Perineal Use of Talc and Risk of Ovarian
16  Cancer," lead author Taher.
17           When did you receive Exhibit
18  Number 10?
19           MS. O'DELL:  Did we skip
20      nine?
21           MR. HEGARTY:  Exhibit 9 is
22      the draft screening assessment.
23           MS. O'DELL:  Okay.  I'm
24      sorry.  I had that as Number 8.

Page 61

1            MR. HEGARTY:  Number 8 is
2       the manuscript by Dr. Saed.
3            MS. O'DELL:  Okay.  I'm
4       sorry.
5   BY MR. HEGARTY:
6       Q.   Going back to my question,
7   when did you receive the article by
8   Taher?
9       A.   At the same time that I
10  received the health -- the screening
11  health assessment from Health Canada.
12      Q.   Who provided it to you?
13      A.   Ms. Emmel.
14      Q.   Did you read the entirety of
15  that document?
16      A.   I read the entirety of this
17  document minus the references.
18      Q.   Did you pull the literature
19  cited in the Taher article and review it
20  yourself?
21      A.   I may have looked at
22  references that have -- were on the
23  reference list of the Saed document, but
24  I did not go through each individual

16 (Pages 58 to 61)

Judith Zelikoff, Ph.D.

Page 62

1   reference in the document and pull it
2   specifically.
3        Q.   The Taher article -- strike
4   that.
5            You were provided the Taher
6   article after you completed your expert
7   report in this case, correct?
8        A.   That's correct.
9        Q.   So it's correct that it did
10  not inform your opinions in your report,
11  correct?
12       A.   It informed my opinions --
13  let me say that it added to my opinions
14  following the writing of my report.  It
15  supported my position.
16       Q.   Did the assessment conclude
17  that talc use causes ovarian cancer?
18  Strike that.  Let me strike that
19  question.  We'll come back to that.
20           (Document marked for
21           identification as Exhibit
22           Zelikoff-11.)
23  BY MR. HEGARTY:
24       Q.   I'm going to mark next as

Page 63

1   Exhibit Number 11 a copy of the Exhibit C
2   that's referenced in your report.
3            Did you prepare Exhibit
4   Number C?
5        A.   If you mean by preparation,
6   did I write it, did I prepare the
7   summary, no, sir I did not.
8        Q.   Do you know who prepared it?
9        A.   From my reading, it appears
10  as though the attorneys may have prepared
11  it based upon -- to my knowledge, based
12  upon other deponents.
13       Q.   Other than the documents
14  that we have talked about that are laid
15  out before us, did you bring any other
16  documents with you to the deposition?
17       A.   Other than the documents
18  that are to my right in the folders, the
19  health assessment from the -- the
20  screening health assessment from Canada,
21  Dr. Taher's paper, a letter -- this is in
22  the documents to my right, a letter from
23  Luzenac to Dr. Al Wehner, my CV, the
24  expert report, Exhibit B, my CV, no, sir.

Page 64

1        Q.   Have you reviewed any
2   materials since completion of your report
3   for purposes of your work on this case
4   that we have not talked about this
5   morning?
6        A.   I reviewed -- since my
7   report, I reviewed Dr. Pier's deposition.
8   Is that what you mean?
9        Q.   Dr. Julie Pier's deposition?
10       A.   Yes.  Three-quarters of it.
11  It is a very long deposition.
12       Q.   The second-to-last page of
13  Exhibit Number B under depositions makes
14  reference to depositions and exhibits of
15  Julie Pier dated 9/12 to 9/13/2018.
16           Do you see that?
17       A.   Sorry, sir.  Fifth line
18  down, deposition/exhibits of Julie Pier.
19       Q.   Is that the deposition to
20  which you just referred?
21       A.   To the best of my knowledge.
22       Q.   Anything else that you have
23  reviewed for purposes of your work on
24  this case that we have not talked about

Page 65

1   this morning or made reference to?
2        A.   I reviewed Dr. Hopkins'
3   report.
4        Q.   Let me ask it different.
5   Anything that you have reviewed that's
6   either not listed somewhere in your
7   report or we have not marked as an
8   exhibit?
9        A.   To the best of my knowledge,
10  no.
11       Q.   With regard to Exhibit C,
12  did you review all the documents that are
13  referenced in Exhibit Number C?
14       A.   Can I see that, please.
15       Q.   I think you still have a
16  copy in front of you.
17       A.   Okay.
18       Q.   It's Exhibit Number 11,
19  which is marked Exhibit -- which is
20  Exhibit C.  Did you actually pull the
21  documents and confirm the accuracy of the
22  information --
23       A.   No, sir.
24       Q.   -- contained in Exhibit C?

17 (Pages 62 to 65)

Judith Zelikoff, Ph.D.

Page 66

1    A.   There are no -- there are no
2  references in here, as I understand it.
3        Q.   Well, there are Bates
4  numbers --
5        A.   Bates numbers.
6        Q.   -- that are listed at the
7  right, which correspond to documents,
8  correct?
9        A.   Yes, but when I -- when I
10  hear references I think of citations,
11  papers.
12        Q.   Did you actually pull the
13  documents whose Bates numbers are listed
14  and confirm the accuracy of the
15  information contained in Exhibit C?
16        A.   I did not pull them as part
17  of reviewing this exhibit, but I have
18  looked at them, because I have gone
19  through all of the production documents.
20        Q.   With regard to your expert
21  report in this case, is it correct that
22  you prepared that report -- strike that.
23            With regard to your expert
24  report it defines the scope of your

Page 67

1  testimony in this case, correct?
2        MS. O'DELL:  Objection to
3    form.
4        THE WITNESS:  Yes, it does.
5  BY MR. HEGARTY:
6        Q.   And is it correct that the
7  report was prepared with the same
8  methodology and approach as you would
9  have prepared an article for publication
10  in a scientific journal?
11        A.   An article, a grant, a
12  review, an advisory board report, with
13  the same rigor and the same scrutiny,
14  yes.
15        Q.   In other words, is it
16  correct that you prepared this report in
17  the same manner as you had prepared all
18  of your articles for publication?
19        MS. O'DELL:  Asked and
20    answered.
21        THE WITNESS:  I used the
22    same methodology, the same
23    scrutiny and the same rigor to
24    prepare this, yes.

Page 68

1  BY MR. HEGARTY:
2        Q.   You agree that the standard
3  for proving biologic plausibility or any
4  other scientific issue in the medical
5  literature is the same one that applies
6  in litigation, correct?
7        MS. O'DELL:  Object to the
8    form.  If you know.
9        THE WITNESS:  Can you repeat
10    that, please.
11  BY MR. HEGARTY:
12        Q.   Sure.  You agree that the
13  standard for proving biologic
14  plausibility or any other scientific
15  issue in a medical literature or in
16  science should be the same that is
17  applied in litigation?
18        MS. O'DELL:  Object to the
19    form.
20        THE WITNESS:  I will use the
21    same scrutiny and rigor, as I said
22    before.
23  BY MR. HEGARTY:
24        Q.   You would -- you intend to

Page 69

1  apply the same standards to your report
2  and your opinions in this case as you
3  would apply if you were looking at this
4  as simply a professor at New York
5  University?
6        A.   Well, I don't see simply a
7  professor.
8            If I were -- I review
9  papers.  I think I've answered this
10  already.  But I review papers and
11  literature with the same scrutiny as I
12  prepared this report.
13        Q.   Did you apply the same
14  standard for assessing biologic
15  plausibility as you apply in your work at
16  NY University?
17        A.   I do.
18        Q.   Did you sign your report
19  dated November 16, 2018, with the same
20  intent as if signed under penalty of
21  perjury?
22        A.   Could you repeat that
23  please.
24        Q.   Sure.  Did you sign your

18 (Pages 66 to 69)

Judith Zelikoff, Ph.D.

Page 70

1  expert report dated November 16, 2018,
2  with the same intent as if signed under
3  penalty of perjury?
4        MS. O'DELL:  Object to form.
5        THE WITNESS:  I'm not sure I
6     understand what that question
7     means.
8  BY MR. HEGARTY:
9     Q.   Well, did you -- by signing
10 this report, did you confirm to the
11 accuracy of everything contained in the
12 report?
13    A.   To the best of my knowledge,
14 I signed this report knowing that I
15 prepared this report and there is -- with
16 the same intent of accuracy and rigor.
17    Q.   You understand this is
18 supposed to be your testimony as if on a
19 stand before a judge or a jury, correct?
20       MS. O'DELL:  Object to the
21    form.
22       THE WITNESS:  My
23    understanding of the deposition is
24    that it is a legal document and

Page 71

1     testifying my -- my opinion.  And
2     that it has to be honest and
3     truthful and transparent.
4  BY MR. HEGARTY:
5     Q.   Well, this time I'm talking
6  about your report.  Do you understand
7  your report is supposed to be your
8  testimony as if you are before a judge
9  and a jury?
10       MS. O'DELL:  Object to the
11    form.
12       THE WITNESS:  I -- I
13    understand that this has to be
14    honest and truthful, and this will
15    be -- could be, will be, the basis
16    for my testimony in a court trial,
17    if that is what you're asking.
18 BY MR. HEGARTY:
19    Q.   You understand it's supposed
20 to set out your -- the entirety of your
21 opinions in this case?
22       MS. O'DELL:  Object to the
23    form.
24       THE WITNESS:  I understand

Page 72

1     that these are my -- my report
2     reflects my opinion.
3  BY MR. HEGARTY:
4     Q.   Are they -- are there any
5  necessary changes, or revisions to your
6  report?
7     A.   Not to my knowledge.
8     Q.   And all the opinions that
9  you intend to offer in this litigation
10 are set out in your report, as you just
11 said, correct?
12    A.   To come to my decision or my
13 opinion, prior to -- included all the
14 documents that I had in my possession and
15 were -- had access to prior to my report.
16    Q.   My question is a little bit
17 different, Doctor.  My question is, the
18 opinions that you intend to offer as you
19 just indicated, those are set out in your
20 report, correct?
21    A.   The opinions that I intend
22 to offer, yes.
23    Q.   As your report shows, you
24 don't intend to offer the opinion that

Page 73

1  use of Johnson's Baby Powder or Shower to
2  Shower causes ovarian cancer, correct?
3     A.   My mission, the question
4  that I was asked by plaintiff attorney
5  was to confer or to assess biological
6  plausibility in the causation of talc for
7  ovarian cancer.
8     Q.   And as your report shows,
9  you did not do a risk assessment or
10 Bradford Hill analysis of all the
11 literature looking at talc products and
12 ovarian cancer, correct?
13    A.   I think I answered that, but
14 I'm not an epidemiologist, and my -- my
15 question was to look at biological
16 plausibility.
17    Q.   And all the materials that
18 you intend to rely upon for purposes of
19 your opinions, are those set out in your
20 report, those we've talked about here
21 this morning, correct?
22    A.   Yes, including the
23 contributions that were made after my
24 report including Dr. Longo's supplement,

Judith Zelikoff, Ph.D.

Page 74

1   including Dr. Saed's paper.  They added
2   to my opinion, supplemented them.  But it
3   is -- but my -- my opinion stays the same
4   as the report.
5        Q.   Okay.
6        MR. HEGARTY:  The next
7   section I have is pretty long.  I
8   don't know if you want to take a
9   quick break now or just keep
10  going.  It's up to you.
11       MS. O'DELL:  We've been
12  going about an hour.  I think
13  that's probably a good idea.
14       MR. HEGARTY:  Because
15  otherwise it's not -- there's not
16  going to be a good break time.  So
17  we should probably do it now.
18       MS. O'DELL:  Well, we can
19  definitely do it now, but we'll --
20  of course we'll break when the
21  witness needs to break.
22       MR. HEGARTY:  Understood.
23  Understood.  But you know what I
24  mean.

Page 75

1        MS. O'DELL:  Yeah.
2        THE VIDEOGRAPHER:  Stand by
3   please.  The time is 10:11 a.m.
4   Off the record.
5        (Short break.)
6        THE VIDEOGRAPHER:  We are
7   back on the record.  The time is
8   10:26 a.m.
9   BY MR. HEGARTY:
10       Q.   Dr. Zelikoff, with regard to
11  your expert report, do you have that in
12  front of you?
13       A.   I do now.  Thank you.
14       Q.   We marked that as exhibit
15  what?
16       A.   Exhibit 2.
17       Q.   With regard to Exhibit
18  Number 2, is it your testimony that all
19  of the sentences in your report are your
20  own words and not copied from others,
21  except where you used quotations?
22       A.   Mm-hmm.  The way I report
23  and write publications is if something
24  is, I feel, common knowledge or provided

Page 76

1   by more than one investigator, and is a
2   compilation of different points, then
3   I -- I will use -- I will not necessarily
4   put quotations around it.  And I will not
5   necessarily reference it, because it's --
6   may have been taken from another document
7   but it's common knowledge.
8        Q.   What about --
9        A.   And it's --
10       Q.   I'm sorry.  I didn't mean to
11  interrupt.
12       A.   I couldn't -- I'm sorry.  I
13  couldn't write it any better than as it
14  was put.
15       Q.   What about if you take
16  materials from a published article for
17  purposes of your report, did you
18  reference those articles?
19       A.   In some cases, not.  Again,
20  it's my opinion that if there is
21  something that is stated by an
22  investigator and it's written extremely
23  well, and it's common knowledge for
24  scientists in that area, as well as

Page 77

1   others, then I will -- I will use it.
2        Q.   That's not how you prepare
3   your report -- that's not how you prepare
4   your articles for journals though,
5   correct?
6        A.   No, that's the same way I
7   prepare them.
8        If they are -- if they are,
9   again, common knowledge, I will not
10  necessarily cite them.
11       Q.   Is it not your approach that
12  authors are to cite material to which
13  they are relying on or referring to in
14  published articles?
15       A.   Again, I think you're asking
16  me the same question.  But again, if
17  something is well known, then I do not
18  necessarily reference it.
19       Q.   What is the definition --
20  what is your definition of well known?
21       A.   For example, if chromium --
22  let's use nickel instead.  If nickel is
23  being spoken about by IARC, by U.S. EPA,
24  by National Toxicology Program, and

20 (Pages 74 to 77)

Judith Zelikoff, Ph.D.

Page 78

1  they're all saying the same thing, I in
2  some cases may take what the IARC has
3  said and put it in my reference.
4      Q.   And it's your testimony that
5  you do that in all -- you've done that in
6  all the articles that you've ever
7  published?
8          MS. O'DELL:  Objection to
9      form.
10         THE WITNESS:  I can't say
11     about all the articles.  I
12     published over 130 --
13         MR. HEGARTY:  Mark --
14         THE WITNESS:  --
15     publications and book chapters.
16         (Document marked for
17     identification as Exhibit
18     Zelikoff-12.)
19  BY MR. HEGARTY:
20     Q.   Let me mark as Exhibit
21  Number 12 the academic integrity for
22  students at NYU policy.  Is this the
23  policy applicable to your university?
24     A.   It appears to be that you've

Page 79

1  taken it off the website in the academic
2  integrity for students at NYU.
3      Q.   If you turn to the second
4  page, there is a definition of
5  plagiarism, that says, "Presenting
6  others' works without adequate
7  acknowledgment of its source as though it
8  were one's own."
9      A.   I'm sorry.
10     Q.   Do you agree with that
11  definition?
12     A.   I'm sorry.  What --
13     Q.   Second page of Exhibit 12.
14     A.   You mean on the back?  Is it
15  under Number 2, Number 1?
16     Q.   Number 1.  The definition of
17  plagiarism by your university for your
18  students is, "Presenting others' work
19  without adequate acknowledgment of its
20  source as though it were one's own."
21         Do you agree with that --
22  that definition?
23     A.   I agree that there's many
24  different ways to interpret that.

Page 80

1      Q.   Is that not -- is that a
2  definition you agree with?
3      A.   I agree that there's ways to
4  interpret that.
5      Q.   Is that -- is that the
6  definition New York University applies to
7  its students?
8      A.   This sentence, "Presenting
9  others' work without adequate
10  acknowledgment of its source as though it
11  were one's own," that is for students.
12  That is not what I'm doing in my opinion.
13         In my opinion, I'm taking
14  common knowledge and presenting it.
15     Q.   Well, they go on to give
16  examples of plagiarism that include, "A
17  sequence of words incorporated without
18  quotation marks."
19         Do you see where I'm
20  reading?
21     A.   I do see it.  "A sequence of
22  words incorporated without quotation
23  marks."
24     Q.   It also says that,

Page 81

1  "Plagiarism is an unacknowledged passage
2  paraphrased from another's work."
3      Do you see that?
4      A.   Some examples of plagiarism,
5  "Unacknowledged passage rephrased from
6  another's work."
7      Q.   Do you agree those are --
8  the two definitions that I just read from
9  your university's own policy for students
10  are examples of plagiarism?
11     A.   This is the NYU
12  interpretation or what they've put on the
13  website, yes.
14     Q.   Should this be a policy --
15  strike that.
16         Is this a policy that
17  applies to students at NY university?
18     A.   It applies -- it's an
19  academic integrity for students at NYU.
20     Q.   Do you agree that professors
21  at NY university should also conform to
22  this policy?
23     A.   I believe that honesty,
24  transparency is the key factor for all

21 (Pages 78 to 81)

Judith Zelikoff, Ph.D.

Page 82

1  scientists at any level.
2       Q.   You would agree that this
3  should apply to your work as well,
4  correct?
5       A.   I think that this definition
6  is open to interpretation.
7       Q.   Well, do you either agree or
8  disagree that this -- well, strike that.
9       Do you agree that this
10 policy should be applied to your work in
11 this case?
12      A.   I agree that plagiarism is
13 defined as presenting others' work
14 without adequate acknowledgment of its
15 source as though it were one's own.
16 That's the NYU policy for students.
17      Q.   Did you -- you did that in
18 your own report, correct?
19      MS. O'DELL:  Object to form.
20      THE WITNESS:  I did what in
21   my own report?
22 BY MR. HEGARTY:
23      Q.   You plagiarized portions of
24 other people's work without proper

Page 83

1  acknowledgment, correct?
2       MS. O'DELL:  Objection to
3    form.
4       THE WITNESS:  That is
5    totally incorrect.
6       I used sentences from other
7    people's -- other people's papers
8    because they were common knowledge
9    and contributed by multiple
10   authors.  And it was --
11 BY MR. HEGARTY:
12      Q.   I'm going to mark -- sorry.
13      A.   And it was stated in a way
14 that I couldn't have stated better.
15      Q.   I'm going to mark as
16 Exhibit 13 a report -- a portion of your
17 report dated November 16, 2018.  And the
18 back of that is a portion of Rule 26
19 expert report of an expert by the name of
20 Shawn Levy.
21      (Document marked for
22   identification as Exhibit
23   Zelikoff-13.)
24 BY MR. HEGARTY:

Page 84

1       Q.   Do you know who Shawn Levy
2  is?
3       A.   I do not.
4       Q.   Did you review Dr. Levy's
5  report for purposes of your -- preparing
6  your report in this case?
7       A.   I actually looked at it, but
8  did not -- did not read it.
9       Q.   When did you have a chance
10 to look at his expert report?
11      A.   I have looked at it -- I'm
12 trying to gather the knowledge.  I
13 actually do not recall when I looked at
14 it.
15      Q.   If you look at your report
16 on Page 20.  In that exhibit, Doctor.
17      A.   Oh okay.
18      Q.   Your report and the portion
19 of Dr. Levy's report is attached, and if
20 you look at your report Page 20 and his
21 report Page 5 --
22      MS. O'DELL:  I think, Mark,
23   I think there's confusion because
24   there's two documents put together

Page 85

1  in this --
2       MR. HEGARTY:  Right.  One is
3    her report and one is Levy's
4    report.
5       MS. O'DELL:  I just think
6    that that was the confusion.
7       THE WITNESS:  Thank you.
8  BY MR. HEGARTY:
9       Q.   So the -- do you see that
10 sentences marked as 1 and 2 from
11 Dr. Levy's report are identical to
12 sentences marked 1 and 2 in your report?
13      MS. O'DELL:  Object to form.
14      And, Doctor, if you need to
15   take the documents apart and
16   compare them, rather than flipping
17   back and forth, if that would be
18   helpful to you, feel free to do
19   that.
20      THE WITNESS:  Good idea.  I
21   actually don't recall.  Could
22   you -- could you tell me when my
23   report is dated please?
24 BY MR. HEGARTY:

22 (Pages 82 to 85)

Judith Zelikoff, Ph.D.

Page 86

1    Q.   November 16.  His report is
2  also dated November 16.
3         A.   I did not actually see this
4  report until after mine.
5              However, let me address your
6  question to the best of my ability.
7              "Things stated as both
8  inherited and acquired gene mutations
9  work together to cause cancer."
10             Everyone from the time of
11 their scientific career back in college
12 knows that.
13             "While genetic testing" --
14 let me make sure I have both -- "both
15 inherited and acquired gene mutations
16 work together to cause cancer."
17             How -- there is no way for
18 me to say that differently.  This is a
19 very well statement, very well put
20 statement.  I used it without a
21 reference.  Even if one --
22        Q.   My question -- I'm sorry.  I
23 thought you were finished.
24        A.   "Even if one has inherited a

Page 87

1  genetic mutation that predisposes one's
2  chances, doesn't mean he or she has to
3  get cancer."  Again, common knowledge
4  from everyone.
5        Q.   Well, Dr. Zelikoff, my
6  question is different than that.
7              My question is, can you
8  explain to us here today, given that you
9  did not see Dr. Levy's report until after
10 you completed your report, how you have
11 several identical sentences between your
12 report and Dr. Levy's report?
13        MS. O'DELL:  Object to the
14        form.
15 BY MR. HEGARTY:
16        Q.   Dr. Levy's report.
17        A.   I cannot -- I -- I don't
18 know.  The only -- what I can say is that
19 there was likely a publication.  But that
20 is speculation, because I have not looked
21 that over.
22        Q.   But is it your testimony
23 here today that the words in your report
24 were solely your own words and not taken

Page 88

1  from either Dr. Levy's report or from
2  somewhere -- some other source?
3        A.   The thoughts are the same.
4  The words seem to be identical.  And
5  again, if you interpret that one way and
6  I interpret it another, I certainly do
7  not interpret it as plagiarism.
8        Q.   Let me show you another
9  example.
10             (Document marked for
11             identification as Exhibit
12             Zelikoff-14.)
13 BY MR. HEGARTY:
14        Q.   I'm going to mark as
15 Exhibit 14, again a portion of your
16 report Page 12 and a portion of a report
17 by Rebecca Smith-Bindman.  Do you know
18 who that is?
19        A.   Not at all.
20        Q.   Did you see her report in
21 this case before preparing your report?
22        A.   I never looked at her
23 report.
24        Q.   If you would look at the two

Page 89

1  reports side by side under the
2  definition -- under the heading
3  Fragrances --
4        A.   I'm sorry, I don't have her
5  report.
6        Q.   You have one page of her
7  report in that exhibit.  You have the --
8  the front page and the one page of her
9  report, and you have Page 12 of your
10 report, correct?
11        A.   I see.  Correct.
12        Q.   Do you see that the section
13 under the heading Fragrances is identical
14 between the two reports?
15        A.   Yes.  They are identical
16 wording.
17        Q.   And none of those sentences
18 are common knowledge, correct?
19        MS. O'DELL:  Object to the
20        form.
21        THE WITNESS:  It's a
22        statement.
23 BY MR. HEGARTY:
24        Q.   But it's not common

Judith Zelikoff, Ph.D.

Page 90

1  knowledge, correct, Doctor?
2      A.   But it's a -- it is -- there
3  are more than 150 different chemicals
4  added to Johnson's Baby Powder and Shower
5  to Shower products.  I reviewed the
6  expert report from Dr. Crowley that
7  concludes that some of these chemicals
8  may contribute to the inflammatory
9  response, toxicity, and potential
10 carcinogenicity.  I concur with his
11 opinion.
12      I say the same thing as
13 Dr. Smith-Bindman.
14     Q.   Is it your testimony that
15 you and Dr. Smith-Bindman came to the
16 exact same words just by coincidence?
17     MS. O'DELL:  Object to the
18     form.
19     THE WITNESS:  We came to the
20     same conclusions.
21 BY MR. HEGARTY:
22     Q.   That's not my question.  My
23 question is, is it your testimony here
24 today that you and Dr. Smith-Bindman came

Page 91

1  to the exact -- to say the exact same
2  thing under the section Fragrance simply
3  by coincidence?
4      MS. O'DELL:  Objection to
5      form.
6      THE WITNESS:  I don't do
7      anything usually by coincidence.
8  BY MR. HEGARTY:
9      Q.   Okay.  Is it your testimony
10 that the words that you wrote under the
11 section Fragrances on Page 12 are your
12 words and came from nowhere else?
13     A.   I don't quite understand
14 where they could have come from because I
15 did not review her report.
16     Q.   Is it your testimony that
17 the words in your report under the
18 section Fragrances are your words and
19 your words alone from no other source?
20     MS. O'DELL:  Object to the
21     form.
22     THE WITNESS:  Could you
23     please repeat the question?
24 BY MR. HEGARTY:

Page 92

1      Q.   Sure.  Is it your testimony
2  that the words in your report under
3  section -- under the section Fragrances
4  are your words and your words alone from
5  no other source?
6      MS. O'DELL:  Object to the
7      form.
8      THE WITNESS:  I don't quite
9      understand what you mean by no
10     other source.
11     These are my words.  They
12     confer my opinion.
13 BY MR. HEGARTY:
14     Q.   Well, did you copy those
15 words from some source besides
16 Smith-Bindman's report?
17     A.   I did not copy words.  I --
18 I don't know how this happened.
19     If I was in error, I own
20 that responsibility.
21     (Document marked for
22     identification as Exhibit
23     Zelikoff-15.)
24 BY MR. HEGARTY:

Page 93

1      Q.   I'm going to show you what
2  I'm next marking as Exhibit 15.
3      MS. O'DELL:  Is this one
4      exhibit?
5      MR. HEGARTY:  That's one
6      exhibit.
7  BY MR. HEGARTY:
8      Q.   Doctor, Exhibit Number 15 is
9  again a portion of your report, and also
10 attached to it is a reference from
11 Genetics Home Reference dated June 27,
12 2017.  Do you see both documents?
13     A.   I do see both documents.
14     Q.   We have highlighted and
15 numbered in Exhibit 15 the portions from
16 your report which are taken word for word
17 from Genetics Home Reference without a
18 single reference to that authority
19 anywhere in your report, including in the
20 materials considered or reviewed.
21     MS. O'DELL:  Objection.
22 BY MR. HEGARTY:
23     Q.   Do you see that?
24     MS. O'DELL:  Objection to

Judith Zelikoff, Ph.D.

Page 94

1    form.
2         And -- and, Doctor, take a
3    moment to review both, because the
4    way this is put together is a
5    little confusing.
6         THE WITNESS:  I see what
7    you're referring to.
8    BY MR. HEGARTY:
9         Q.    And did you copy, for
10   purposes of your report, without citation
11   to this authority, the words that we've
12   identified from this reference to Genetic
13   Home Reference?
14        MS. O'DELL:  Objection to
15   the form.
16        THE WITNESS:  So when you
17   have things like, "Inherited
18   mutations are passed down from
19   parent to child and are present
20   throughout a person's life in
21   virtually every cell of the
22   body."  Biology 101, basically,
23   where that came from.
24        "These mutations are called

Page 95

1    germ line mutations because
2    they're present in the parents'
3    egg or sperm, a germ cell."
4         Yes, some of these sentences
5    appear to be the same as what is
6    in here.
7         However, again, I stand on
8    the fact that all of these -- all
9    of my statements are common
10   knowledge that have come from
11   numerous references.  Although the
12   words may be the same, the
13   thoughts are -- are said as well
14   as they can be said.
15   BY MR. HEGARTY:
16        Q.   Dr. Zelikoff, have you ever
17   seen this reference to Genetic Home
18   Reference before right now?
19        A.   Not to my knowledge.
20        Q.   So is it your testimony that
21   you did not copy the words from Genetic
22   Home Reference that we have highlighted
23   that correspond by number to the portions
24   in your report for purposes of preparing

Page 96

1    your report in this case?
2         A.   I may have used -- it
3    appears that I have used the same words.
4         And if I did that, which it
5    appears that I have, then I've done it
6    with the intent to get those same points
7    across.
8         Q.    But you do agree that you
9    have included in your report a sequence
10   of words incorporated from another source
11   without quotation marks, correct?
12        MS. O'DELL:  Objection to
13   form.
14        THE WITNESS:  I don't use --
15   I don't usually use quotation
16   marks.
17   BY MR. HEGARTY:
18        Q.   Well, you have used other
19   people's words without acknowledging
20   where they came from, correct?
21        MS. O'DELL:  Object to the
22   form.
23        THE WITNESS:  I could have
24   used quotation marks.  And if I

Page 97

1    were to do this over, I would use
2    quotation marks.
3    BY MR. HEGARTY:
4         Q.   You're not telling us,
5    Doctor, that if you prepared an article
6    for publication in a journal, that you
7    would take references from another source
8    like Genetic Home Reference, include them
9    in the article, verbatim, not use
10   quotation marks and not reference that
11   cite.  Is that what you're saying?
12        MS. O'DELL:  Objection to
13   form.
14        THE WITNESS:  I'm standing
15   on my interpretation, and that is
16   that in a reference that I would
17   prepare in a publication, it would
18   be accepted for peer review if
19   there was something that I felt
20   was common knowledge, that I would
21   not reference it.
22        To your point, if I had to
23   do this over, I would have put
24   quotation marks around this.

25 (Pages 94 to 97)

Judith Zelikoff, Ph.D.

Page 98

1  BY MR. HEGARTY:
2      Q.   You would have cited to the
3  authority, as well, from which that --
4  those passages were lifted, correct?
5          MS. O'DELL:  Objection to
6      form.
7          THE WITNESS:  I certainly
8      could if that was a concern from
9      the journal or from the reviewer,
10     then I would definitely put in the
11     reference.
12  BY MR. HEGARTY:
13     Q.   If a student had prepared
14  this, and you became aware that the
15  student had lifted portions from Genetic
16  Home Reference without any citation,
17  without acknowledging where it came from,
18  would that be okay with you?
19         MS. O'DELL:  Objection to
20     form.
21         THE WITNESS:  There are --
22     this is a large document.  And in
23     order for something to be copied
24     or, as you put it, plagiarized,

Page 99

1      there has to be a certain amount
2      or percentage of the document that
3      has to be the same.
4          And this document, my
5      report, is quite large.  So if a
6      student prepared this, and their
7      term paper, for example, was 50
8      pages, I would let them know that
9      if prepared the next time they
10     might want to put in a reference.
11         But I would have to look at
12     the entire size of the document
13     and the percentage of it which had
14     similar -- similar statements and
15     sentences.
16  BY MR. HEGARTY:
17     Q.   You do agree that under the
18  policy we marked, we're talking about
19  what you did with regard to this Genetics
20  Home Reference cite, meets the definition
21  of plagiarism?
22         MS. O'DELL:  Objection to
23     form.
24         THE WITNESS:  I certainly

Page 100

1      will not -- this is the -- what
2      you gave me was an interpretation,
3      was NYU policy, an interpretation
4      of that, which is not the same as
5      mine.
6  BY MR. HEGARTY:
7      Q.   Well, you do agree, though,
8  that between the -- your report, the
9  portions taken from your report and the
10  Genetic Home Reference reference are
11  identical?
12         MS. O'DELL:  Object to the
13     form.
14         THE WITNESS:  I agree that
15     there are sentences that are
16     identical.  Yes.
17  BY MR. HEGARTY:
18     Q.   You did not acknowledge that
19  source anywhere in your report, correct?
20     A.   If you say so.
21     Q.   Do you think that's okay to
22  do that?
23         MS. O'DELL:  Objection to
24     form.

Page 101

1          THE WITNESS:  If I had not
2      thought it was okay, I would not
3      have done it.
4  BY MR. HEGARTY:
5      Q.   Would that -- would that be
6  acceptable for purposes of publishing
7  your report?
8          MS. O'DELL:  Objection to
9      the form.
10         THE WITNESS:  My opinion
11     stands.  And that is my
12     interpretation of what is okay to
13     do based on common knowledge and
14     multiple sources, stands the same.
15  BY MR. HEGARTY:
16     Q.   If you were to publish your
17  report, as it is, would you go back and
18  use quotation marks and cite the
19  reference that we just looked at --
20     A.   If I had --
21     Q.   -- Exhibit Number 16?
22         MS. O'DELL:  Excuse me,
23     Doctor.  Just let him finish.
24         THE WITNESS:  Of course.

26 (Pages 98 to 101)

Judith Zelikoff, Ph.D.

Page 102

1    I'm sorry.
2         MS. O'DELL:  Thank you.  And
3    just give me a moment to object.
4    Thank you.
5    BY MR. HEGARTY:
6         Q.   Did you hear my question?
7         A.   Could you repeat your
8    question, please?
9         Q.   Sure.  If you were to
10   publish a report as it is, would you go
11   back and use quotation marks and cite the
12   reference that we just looked at in
13   Exhibit Number 16?
14        A.   Now that you've pointed out
15   your interpretation of it, I would
16   certainly consider that.
17            (Document marked for
18        identification as Exhibit
19        Zelikoff-16.)
20   BY MR. HEGARTY:
21        Q.   Let me show you what I'm
22   next marking as Exhibit Number 16.
23            MS. O'DELL:  I'll reach
24        over, instead of you throwing it.

Page 103

1    BY MR. HEGARTY:
2         Q.   This is another portion of
3    your report which we've correspondingly
4    referenced to an article by Simone
5    Reuter.  And you can see where we've
6    identified six different times where
7    sentences have been copied verbatim from
8    this article without any quotation or any
9    acknowledgment of its -- of the source.
10   Do you see that?
11            MS. O'DELL:  Object --
12       excuse me.  Object to the form.
13       Feel free to review it, the
14       reference or the exhibit.  There
15       are two things paper clipped
16       together, if you need to look at
17       it in more detail.
18            THE WITNESS:  Again, there
19       are sentences such as, "During
20       inflammation macrophages, mast
21       cells, and neutrophils were
22       recruited at the site of damage,
23       leads to a respiratory burst and
24       increased uptake of oxygen, and an

Page 104

1    increased release of ROS."
2         That is a very common --
3    commonly known point.
4    BY MR. HEGARTY:
5         Q.   How about Point Number 4 in
6    the abstract?
7         A.   As --
8         Q.   That's -- is it your
9    testimony that Point Number 4 in the
10   abstract is what you consider common
11   knowledge?
12        A.   "Activation of the
13   transcription factors can lead to the
14   expression of over 500 genes, including
15   more for growth factors."  And I'm going
16   to read the entire abstract.
17            Actually this is a review
18   paper.  And this is not a unique finding
19   to this particular author.
20            And thus "Activation of
21   transcription factors," again as I read,
22   is an outcome of many, many authors.  And
23   as I said, is a review paper, not a
24   unique investigator-initiated outcome.

Page 105

1         Q.   You keep referring to common
2    knowledge.  Who is -- who has this common
3    knowledge?
4         A.   People who read scientific
5    journals.
6         Q.   So is it your testimony that
7    someone who would read your report would
8    understand that that is not -- those are
9    not your words but taken from
10   somewhere -- somewhere else?
11            MS. O'DELL:  Object to the
12       form.
13            THE WITNESS:  It would
14       depend upon who is reading it.
15   BY MR. HEGARTY:
16        Q.   Can you cite for me any
17   publication that you have ever written
18   where you have cited another authority
19   word for word and did not use quotation
20   marks and did not reference that
21   authority?
22        A.   Not off the top of my head.
23        Q.   But you did do that in your
24   expert report in this case, correct?

27 (Pages 102 to 105)

Judith Zelikoff, Ph.D.

Page 106

```
1           MS. O'DELL:  Object to the
2      form.
3           THE WITNESS:  It appears
4      from what you're showing me, that
5      in my interpretation of common
6      knowledge and multiple -- multiple
7      investigators, I have done that,
8      yes.
9           (Document marked for
10     identification as Exhibit
11     Zelikoff-17.)
12 BY MR. HEGARTY:
13     Q.   I'm going to mark next
14 Exhibit Number 17, another portion of
15 your report where you, again, take
16 sentences from a publication called
17 EnvironmentalChemistry.com.
18         You cite them word for word
19 in your report and you make no reference
20 anywhere in your report to this
21 authority.
22     A.   I said --
23         MS. O'DELL:  Excuse me.
24     Excuse Me, Doctor.  Excuse me.
```

Page 107

```
1           MR. HEGARTY:  I'm not
2      finished with my question.
3           MS. O'DELL:  I thought you
4      were finished with your question.
5           MR. HEGARTY:  Because I just
6      made a statement.
7           MS. O'DELL:  Well, I object
8      to the statement.  You ask your
9      question, and I'll probably object
10     to that.
11         But give me a chance, the
12     two of you, please.
13 BY MR. HEGARTY:
14     Q.   Let me -- Doctor, this --
15 the reference that we have here in the
16 Exhibit Number 17 is to a website called
17 EnvironmentalChemistry.com.  Did you
18 review this website in preparing your
19 report?
20     A.   I don't recall.
21     Q.   Do you see where we make
22 reference to five different places where
23 you copied word for word from
24 EnvironmentalChemistry.com?
```

Page 108

```
1           MS. O'DELL:  Object to the
2      form.
3           THE WITNESS:  Yes, I see
4      what you're saying.
5 BY MR. HEGARTY:
6      Q.   And nowhere in your report
7 do you give acknowledgment to
8 EnvironmentalChemistry.com as a source of
9 the information that you copied, correct?
10         MS. O'DELL:  Object to the
11     form.
12         THE WITNESS:  I do say the
13     U.S. EPA defines asbestos by
14     limiting the term to six specific
15     fibrous minerals from two distinct
16     groups.  And I go on from there.
17     That is a referral to the U.S.
18     EPA.
19 BY MR. HEGARTY:
20     Q.   Doctor, nowhere in your
21 report, in those notebooks or anywhere do
22 you cite to EnvironmentalChemistry.com,
23 do you?
24         MS. O'DELL:  Object.  Object
```

Page 109

```
1      to the form.
2           THE WITNESS:  Not to my
3      knowledge.
4      EnvironmentalChemistry.com, I
5      don't even recall reviewing it.
6 BY MR. HEGARTY:
7      Q.   But don't you agree that you
8 would have had to review it based on the
9 fact that there are identical sentences
10 taken from -- that are identical
11 sentences, in Environmental Chemistry and
12 in your report?
13         MS. O'DELL:  Object to the
14     form.
15         THE WITNESS:  This -- again,
16     this information is common
17     knowledge.  This is not a creation
18     of EnvironmentalChemistry.com.
19     They are not an individual
20     investigator finding this data.
21     They are reporting this data on
22     the internet for people's review.
23 BY MR. HEGARTY:
24     Q.   Is
```

Judith Zelikoff, Ph.D.

Page 110

1 EnvironmentalChemistry.com a reliable
2 authority?
3          MS. O'DELL:  Object to the
4 form.
5          THE WITNESS:  I have no
6 idea -- sorry.
7          MS. O'DELL:  Go ahead.
8          THE WITNESS:  I have no idea
9 of the impact factor or the
10 reliability of this.  However, in
11 talking about this, and saying the
12 things that I -- that you have
13 said I have used identically,
14 which appear to be the case --
15 "while amphibole and serpentine
16 asbestos may have fibrous habits,
17 they have very different forms.
18 Amphibole are double-chain
19 silicates."
20          This is known in the
21 asbestos -- in the asbestos
22 literature.  And the basic
23 structural unit is silicone oxide.
24 This is not Environmental

Page 111

1 Chemistry's individual
2 investigator initiated.
3          I think you may be confusing
4 an individual paper where an
5 investigator sits down in the
6 laboratory and works out or comes
7 up with a fact and that it's his.
8 As opposed to data that's just out
9 there in the internet, out there
10 in the world, out there in book
11 chapters, out there everywhere,
12 that people know.
13          This is not an investigator
14 initiated, whether it's
15 EnvironmentalChemistry.com.
16          So I will -- I will say to
17 you that in many cases, I did use
18 the same sentence.  Certainly
19 EnvironmentalChemistry.com is not
20 an investigator-initiated point of
21 reference.  It's just facts that
22 are supported by other experts.
23 BY MR. HEGARTY:
24     Q.   Can you cite for me any

Page 112

1 published methodology which says that
2 your interpretation of what you are to
3 quote and what you are to cite in an
4 article is an accepted methodology in
5 publishing scientific literature?
6     A.   It's my professional opinion
7 after 30 years of work.
8     Q.   Well, can you cite for me
9 any published authority that says your
10 definition of what you are to cite and
11 what you are to reference is the
12 definition that's applicable to medical
13 literature?
14          MS. O'DELL:  Objection to
15 form.
16          THE WITNESS:  I have never
17 been accused or cited by any
18 publication in any of my 135
19 papers or my over 30 book chapters
20 of having anything that was of a
21 dubious nature, ever.
22 BY MR. HEGARTY:
23     Q.   That's not my question.  My
24 question was can you cite for me any

Page 113

1 written authority that says that in
2 publishing medical literature, if you're
3 citing what you call general knowledge
4 word for word from another source, you
5 don't have to quote it and you do not
6 have to give it any reference.
7     A.   Just my professional opinion
8 of 30 years of work.
9     Q.   Okay.  And in a -- and
10 you've never done that in any medical
11 article you -- any article you have
12 published, correct?
13     A.   I cannot -- I cannot speak
14 to all.
15     Q.   Well, if you were to write a
16 medical article -- a scientific article
17 today, and you were to quote something
18 from -- take something word for word from
19 EnvironmentalChemistry.com, is it your
20 testimony you wouldn't give any reference
21 to it or wouldn't use quotation marks?
22          MS. O'DELL:  Object to the
23 form.
24          THE WITNESS:  I -- I stand

29 (Pages 110 to 113)

Judith Zelikoff, Ph.D.

Page 114

```
1        on the opinion that I have, that
2    it would be common knowledge.
3    BY MR. HEGARTY:
4        Q.   That's not my question.  My
5    question is if you were to write an
6    article today and you were to cite
7    Environmental.com word for word, is it
8    your testimony you would not quote
9    that -- those words or give any reference
10   or acknowledgment to environmental --
11   to --
12       A.   EnvironmentalChemistry.com.
13       Q.   EnvironmentalChemistry.com?
14           MS. O'DELL:  Object to the
15       form.
16           THE WITNESS:  I would do the
17       same thing I've done for this
18       report.
19   BY MR. HEGARTY:
20       Q.   Okay.  And is that true for
21   every resource that we've looked at so
22   far?  You would -- if you were to write a
23   scientific journal today, you would --
24   and quoted from all those resources, you
```

Page 115

```
1    would not use quotation marks and you
2    would not give any acknowledgment in
3    any -- if you were to write a scientific
4    article today?
5           MS. O'DELL:  Object to form.
6       Misstates her testimony.
7           THE WITNESS:  I -- I did say
8       that there are certain cases that
9       if I had to do it over and based
10      upon your rigorous opinion of
11      this, that I would place quotation
12      marks or add a reference, yes.
13          (Document marked for
14      identification as Exhibit
15      Zelikoff-18.)
16   BY MR. HEGARTY:
17       Q.   I'm going to show you what
18   I'm next marking as Exhibit 18.
19           This is another portion of
20   your report.  In addition to that
21   exhibit -- or with that exhibit is a
22   reference to a publication by
23   Rakoff-Nahoum, where you again made
24   references to four different sentences
```

Page 116

```
1        that you have copied verbatim from that
2    publication without giving any
3    acknowledgment to Dr. Rakoff-Nahoum or
4    use any quotation marks.  Do you see
5    that?
6           MS. O'DELL:  Object to the
7       form.
8           THE WITNESS:  So on Page 124
9       of the review by Seth
10      Rakoff-Nahoum -- Nahoum, if you
11      look on -- under cancer and
12      inflammation, and one of the
13      points that you make here -- and
14      by the way, this is a review
15      paper, again not an independent
16      investigator-initiated data from
17      the laboratory -- "Epidemiological
18      evidence points to a connection
19      between inflammation and" -- "and
20      predisposition for the development
21      of cancer, i.e., long-term
22      inflammation leads to the
23      development of dysplasia," there's
24      no reference there.
```

Page 117

```
1           So this author also,
2       Dr. Rakoff-Nahoum -- sorry, I'm
3       murdering his name -- also gives
4       no reference to that.
5           Again, in this case, using
6       my analogy of something that has
7       been gathered by numerous other
8       investigators and is common
9       knowledge to the -- to the
10      scientific population, he did also
11      not use a reference.  And I did
12      not use a reference.
13   BY MR. HEGARTY:
14       Q.   But if -- but if you look at
15   his -- the last reference, Number 4, he
16   does acknowledge a resource for all of
17   those statements, Resource 20 in the
18   publication, correct?
19           MS. O'DELL:  Objection.
20       Could you provide, if you're
21       going to use this exhibit, provide
22       the full manuscript that
23       identifies Resource 20.
24           (Document marked for
```

30 (Pages 114 to 117)

Judith Zelikoff, Ph.D.

Page 118

1    identification as Exhibit
2    Zelikoff-20.)
3    BY MR. HEGARTY:
4        Q.   I'll mark as 20, the
5    entirety of the Rakoff-Nahoum article,
6    which does include 20, which is a
7    reference to Hussain, "Radical Causes of
8    Cancer."
9        A.    Citation 20 in Exhibit 20 is
10   also a review paper, and none of these
11   references are going back to the
12   independent investigator who actually
13   said this.
14        So these are reviewed in.
15   Again, standing by my opinion that
16   oftentimes in review articles which --
17   in -- in review articles, they often take
18   the liberty, as seen in your first point,
19   that you do not use a reference.
20        Now, I would have to read
21   Reference 20 in order to see whether
22   that, in fact, reviews Points 2, 3 and 4
23   in your "Why Cancer and Inflammation"
24   paper.

Page 119

1        I do not know that
2    Reference 20 actually reviews all of
3    these points and are the reference.
4        Also, many of these
5    points -- and again, another review
6    paper.
7        Many of these points, the
8    chronic inflammatory states associated
9    with infection, irritation, may lead to
10   environments that foster genomic lesions
11   in tumor initiation, no reference there.
12        One effect and mechanism, et
13   cetera, et cetera. Hydroxyl radicals,
14   reactive oxygen species, no reference
15   there. No quotation marks.
16        So I don't know whether he,
17   in fact, uses the same logic that I did.
18        (Document marked for
19   identification as Exhibit
20   Zelikoff-19.)
21   BY MR. HEGARTY:
22        Q.   I'm going to show you
23   Exhibit 19. This is another reference
24   where you copied portions of a

Page 120

1    publication by OSHA for purposes of your
2    report. Do you see that?
3        MS. O'DELL:  Objection to
4    form.
5        THE WITNESS:  I do see what
6    you're pointing to. I also will
7    tell you that Point 1 that you
8    point out in the OSHA United
9    States Department of Labor, on
10   hexavalent chromium, which is off
11   the internet, adverse health
12   effects associated, yes, I used
13   adverse health -- health effects
14   other than cancer, and then I had
15   these different words.
16        I'm just explaining what I
17   see.
18        With chromium-6, hexavalent
19   chromium exposure include
20   occupational asthma, eye
21   irritation and damage, perforated
22   ear drums, et cetera, et cetera.
23   This can be found in numerous,
24   numerous references. This again

Page 121

1    is common knowledge for anyone
2    doing chromium -- chromium
3    studies.
4        Again, did I use the same
5    words? In many cases, I did here.
6        "Can also develop an
7    allergic skin reaction called
8    allergic contact dermatitis." I'm
9    not quite sure how else you can
10   say that, that phrase.
11        So I still feel confident in
12   what I did was based upon my
13   professional judgment.
14        (Document marked for
15   identification as Exhibit
16   Zelikoff-21.)
17   BY MR. HEGARTY:
18        Q.   Okay. I'll show you what I
19   next marked as Exhibit 21. Exhibit 21 is
20   again a portion of your report where we
21   have identified statements that are taken
22   verbatim without acknowledgment from the
23   publication attached thereto by Kasprzak.
24        A.   Kasprzak. I'm sorry, sir.

31 (Pages 118 to 121)

Judith Zelikoff, Ph.D.

Page 122

1    MS. O'DELL:  Did you finish
2  your question?
3  BY MR. HEGARTY:
4    Q.   No.  Do you see where I'm
5  talk -- do you see where I'm referencing?
6    MS. O'DELL:  Object to form.
7    THE WITNESS:  I --
8    MS. O'DELL:  Take a moment
9  if you need to, Doctor.
10    THE WITNESS:  So what I see
11  in the abstract of a paper, a
12  review paper called Nickel
13  Carcinogenesis by Kasprzak and
14  Sunderman and Konstantine
15  Salnikow, you say -- you're
16  pointing to, "The exact mechanisms
17  of nickel-induced carcinogenesis
18  are not known and have been
19  subject of numerous
20  epidemiological and experimental
21  investigations."
22    That is not -- that -- okay.
23  And what's in my paper is, "The
24  exact mechanisms of nickel-induced

Page 123

1  cainogenesis are not known but
2  likely involve genetic and
3  epigenetic routes."
4    That's not the same as this
5  sentence.  It has portions of the
6  same, but not the entire sentence
7  is the same.
8    "Are likely to evolve
9  genetic and epigenetic routes."
10  Not quite sure how else you would
11  say this.
12    And this again is a review
13  paper.  And going through it, here
14  I can cite a sentence.
15  "Occupational exposure to nickel
16  occurs predominantly in mining,
17  refining, alloy production,
18  electroplating, and welding."
19  This is in the review by Kasprzak.
20  There's no reference there either.
21    In this sentence, "In 1990
22  the International Committee on
23  Nickel Carcinogenesis in Man
24  suggested that respiratory cancer

Page 124

1  risks are primarily related to
2  exposure to soluble nickel
3  concentrations," et cetera, et
4  cetera.
5    But in many cases throughout
6  this reference, I can also -- it
7  being a review paper, I can also
8  tell you there's epidemiological
9  evidence on possible cancer risk
10  from general environment and
11  dietary nickel exposures not cited
12  as a reference, not quoted.
13  BY MR. HEGARTY:
14    Q.   Are you finished?
15    A.   I am, thank you.
16    THE WITNESS:  Excuse me.
17  May I just point out that it's
18  getting even colder in here and
19  I'm a bit uncomfortable.
20    (Whereupon, a discussion was
21  held off the record.)
22    THE WITNESS:  May I go get
23  my scarf?
24    MR. HEGARTY:  Off the

Page 125

1  record.
2    THE VIDEOGRAPHER:  The time
3  is 11:11 a.m.  Off the record.
4    (Short break.)
5    THE VIDEOGRAPHER:  The time
6  is 11:23 a.m.  Back on record.
7    (Documents marked for
8  identification as Exhibits
9  Zelikoff-25 through 32.)
10    MR. HEGARTY:  We're back on
11  the record.  I'm going to mark --
12  I've marked as Exhibits 25 through
13  32, other examples taken from
14  Dr. Zelikoff's report where --
15  along with the references to which
16  they were taken.  And I'm just
17  going to mark those for purposes
18  of the deposition as those
19  exhibits.
20    MS. O'DELL:  What's the
21  exhibit number?
22    MR. HEGARTY:  Exhibits 25
23  through 32, and I did skip over
24  through 22 through 24, but I'll

32 (Pages 122 to 125)

Judith Zelikoff, Ph.D.

Page 126

1    come back to it.  So we did get
2    kind of out of order in the way I
3    marked those.
4         MS. O'DELL:  So plaintiff
5    objects to the Exhibit 25 through
6    32 being added to the record.
7    There's no testimony from
8    Dr. Zelikoff.  So any assertion
9    that counsel has made that those
10   are relevant, we would object
11   and -- and oppose their being
12   included.
13   BY MR. HEGARTY:
14        Q.   Doctor, if you would look at
15   your report which is Exhibit Number 2.
16        A.   Yes, sir.
17        Q.   On Page 2 of your report,
18   under the section Mandate and
19   Methodology?
20        A.   Yes, sir, I see it.
21        Q.   You say your mandate was to
22   look at the scientific literature and
23   assess whether there is biologic
24   plausibility for talc to cause ovarian

Page 127

1    cancer from perineal use; is that
2    correct?
3         MR. GOLOMB:  I'm sorry.
4    What page are you on?
5         MR. HEGARTY:  Page 2.
6         THE WITNESS:  Are you done?
7    BY MR. HEGARTY:
8         Q.   Yes.
9         A.   My mandate was to review the
10   scientific literature and assess whether
11   there was biological plausible
12   explanation for the increased risk of
13   ovarian cancer with perineal use of
14   talcum powder products, yes, that is
15   correct.
16        Q.   Who gave you that mandate?
17        A.   That was the plaintiff
18   attorney, Ms. Emory [sic] and Ms. O'Dell.
19        Q.   You say --
20        A.   They -- I -- but let me add
21   they -- when you say gave me that
22   mandate, can you explain what you mean by
23   gave me that mandate?
24        Q.   Well, from --

Page 128

1         A.   That was my -- that was --
2    the request was to assess biological
3    plausibility.
4         Q.   You say in that portion that
5    we just reviewed that -- you say for the
6    increased risk of ovarian cancer with
7    talc use.  Did you assume for purposes of
8    your report that there is, in fact, an
9    increased risk of ovarian cancer with
10   talc use?
11        A.   I'm sorry, sir, can you tell
12   me exactly which paragraph?
13        Q.   In the first paragraph under
14   the section Mandate and Methodology, you
15   say "assess whether there is biologic
16   plausibility" -- "biologically plausible
17   explanation for the increased risk of
18   ovarian cancer with the perineal use of
19   talcum powder products."
20            Do you see that?  See where
21   I'm reading?
22        A.   I am sorry, sir, I do not.
23        Q.   First paragraph under
24   page -- on Page 2 under mandate and

Page 129

1    methodology.
2         A.   Is that the notion of
3    biological plausibility paragraph, or are
4    you --
5         Q.   It's the first paragraph
6    under the section Mandate and
7    Methodology.
8         A.   Well, sir, there are two,
9    two paragraphs.  One says mandate.  I was
10   asked to review the scientific
11   literature.  Then there is another
12   paragraph that says the notion of
13   biological plausibility is
14   multifactorial.
15        Q.   Doctor, if you'd listen to
16   my question.  I said the first paragraph
17   under mandate and methodology.  Do you
18   understand that?
19        A.   I do not -- I do not see it
20   and you can --
21        Q.   You don't see the first
22   paragraph that begins mandate?
23        A.   I just read that to you,
24   sir.

Judith Zelikoff, Ph.D.

Page 130

```
1      Q.   And -- and you understand
2  that's the first paragraph of -- under
3  the section Mandate and Methodology?
4      A.   Under mandate it says, "I
5  was asked to review the scientific
6  literature and assess whether there is
7  biological plausible explanation for the
8  increased risk of ovarian cancer and the
9  perineal use of talcum powder products."
10     Q.   And for purposes of your
11 mandate, did you assume that there was,
12 in fact, an increased risk of ovarian
13 cancer with the perineal use of talcum
14 powder?
15     A.   I made no assumptions.
16     Q.   Did you individually assess
17 whether there is an increased risk of
18 ovarian cancer with the perineal use of
19 talcum powder products?
20     A.   Could you please slow down?
21 You are asking the question very quickly.
22     Q.   Okay.  Did you
23 individually -- did you do an analysis of
24 whether there's an increased risk of
```

Page 131

```
1  ovarian cancer with perineal use of
2  talcum powder products?
3      A.   No.  As you can see by the
4  mandate I was asked to assess the
5  biological plausibility.  I did no
6  analysis of causation.
7      Q.   You did no analysis of
8  whether there is, in fact, an increased
9  risk of ovarian cancer with the perineal
10 use of talcum powder products?
11     A.   I did no analysis of
12 causation. I'm not an epidemiologist.
13     Q.   You also discuss in the
14 third paragraph, which begins "I
15 performed an independent comprehensive
16 literature review."
17     A.   I see that, yes.  Thank you.
18     Q.   That you did do a literature
19 search, correct?
20     A.   I did do a literature
21 search, correct.
22     Q.   Did you do this yourself?
23     A.   I did do this myself along
24 with several graduate students.
```

Page 132

```
1      Q.   What graduate students
2  assisted you?
3      A.   Are you asking me for their
4  names?
5      Q.   Yes.
6      A.   Nick Lawrence who was a
7  master student.  And Catherine Fecchi who
8  was my master student.  Both of them have
9  which graduated.
10     Q.   Did you bill plaintiffs'
11 counsel for their time?
12     A.   I paid them out of my
13 pocket.
14     Q.   And how much did you pay
15 them per hour?
16     A.   $25 per hour.
17     Q.   Do you describe -- strike
18 that.
19          Anyone else assist you with
20 your literature search?
21     A.   I'm sorry, anyone else?
22     Q.   Assist you in your
23 independent comprehensive literature
24 review.
```

Page 133

```
1      A.   No, sir.
2      Q.   So doing the searches was
3  part of your methodology for preparing
4  your report, correct?
5      A.   Doing the searches were my
6  initial, my initial, yes.
7      Q.   Did you prepare in advance a
8  written protocol on how you were going to
9  do the searches?
10     A.   I followed the same protocol
11 that I used for papers, publications,
12 advisory boards, grant -- grant reviews
13 and grants that I write.
14     Q.   That's not my question.  My
15 question is, did you prepare a written
16 protocol as far as how you were going to
17 do the literature review for purposes of
18 your report?
19     A.   I did not do a written
20 outline as to how to do this.  I've been
21 doing this for over 35 years.
22     Q.   You agree that it was part
23 of your methodology is -- for your
24 literature search, to find and review all
```

Judith Zelikoff, Ph.D.

Page 134

1  literature that touch on talc and its
2  biologic effects, correct?
3          MS. O'DELL:  Object to the
4      form.
5          THE WITNESS:  My purpose was
6      to examine the literature, assess
7      the literature, first identify the
8      literature that I felt was --
9      well, all -- all the literature
10      that I could find or that the
11      students could find, and from me
12      to review them in terms of
13      relevancy and pertinence to the
14      question that I was being asked.
15  BY MR. HEGARTY:
16      Q.  Did you do any testing of
17  your methodology of doing searches to
18  ensure that you had captured all the
19  relevant literature?
20          MS. O'DELL:  Object to the
21      form.
22          THE WITNESS:  What do you
23      mean by testing?
24  BY MR. HEGARTY:

Page 135

1      Q.  Well, I don't know.  Did you
2  do any tests, having someone else do
3  searches, repeating the searches, to see
4  if your original searches captured all of
5  the relevant literature?
6      A.  We did several searches
7  doing -- using different words and
8  different aspects, so that we could -- we
9  got numerous duplicates because we came
10  in with different words, and key --
11  keywords and key phrases.
12      Q.  You do agree that it would
13  be necessary for a proper methodology to
14  reach opinions about biologic
15  plausibility, that you have reviewed all
16  the pertinent literature, correct?
17          MS. O'DELL:  Object to the
18      form.
19          THE WITNESS:  To my
20      knowledge I reviewed the
21      literature that was pertinent to
22      the question that I was being
23      asked.
24          I am not stating that I

Page 136

1  reviewed all of the literature out
2  there.  I have no way of knowing
3  that I reviewed or have not.
4          I gathered the literature in
5      a systematic fashion and I
6      reviewed that literature.
7  BY MR. HEGARTY:
8      Q.  Did you read every paper
9  that you found from your literature
10  search?
11      A.  Only those that were
12  relevant.  I read the abstracts to
13  determine whether it was in fact related
14  to the question that I was being asked.
15          When you do a literature
16  search, you come up with things that are
17  related and some that are not related at
18  all.
19      Q.  Does your report anywhere
20  describe or include a description of how
21  you weighed the various authorities that
22  you reviewed?
23      A.  My report talks about under
24  mandate and methodology how I -- the last

Page 137

1  paragraph, and that begins more than 300
2  publications, will -- talks about how
3  I -- how I looked at the publications and
4  how I decided how to cut down or dismiss
5  certain papers based on a closer
6  scrutiny.  And I focused specifically for
7  biological plausibility and being a
8  toxicologist on in vitro, in vivo, and ex
9  vivo studies as well as cell studies,
10  animal studies, and tissues.
11      Q.  Did you assign any numerical
12  value to each authority as they relate to
13  the importance to you?
14      A.  I did not assign any
15  numerical value.  There was no
16  quantitative measurement done.
17      Q.  Was it also part of your
18  methodology to review all expert reports
19  in the litigation that concerned biologic
20  plausibility?
21          MS. O'DELL:  Object to the
22      form.
23          THE WITNESS:  Can you ask me
24      that again, please.

35 (Pages 134 to 137)

Judith Zelikoff, Ph.D.

Page 138

1  BY MR. HEGARTY:
2      Q.   Sure.  Was it part of your
3  methodology to review all expert reports
4  in the litigation concerning biologic
5  plausibility?
6      A.   I -- I looked at reports
7  that had relevancy in terms of animal
8  models, in vitro cultures or ex vivo
9  studies, yes.  My opinion was formed
10  primarily by the publications and the
11  science that I reviewed.
12      Q.   Was it part of your
13  methodology for purposes of your opinions
14  to review the expert witness reports from
15  the litigation that touch on biologic
16  plausibility?
17          MS. O'DELL:  Object to the
18      form.  Asked and answered.
19          THE WITNESS:  I reviewed the
20      publications and the book chapters
21      and information that I thought
22      would go towards my -- my opinion.
23  BY MR. HEGARTY:
24      Q.   Your expert report, as we

Page 139

1  have looked at, includes references to
2  several other experts' reports, correct?
3  We looked at that earlier.
4      A.   If you say so, yes.
5      Q.   Did you select those expert
6  reports for purposes of your review?
7          MS. O'DELL:  Object to the
8      form.
9          THE WITNESS:  I formed my
10      opinion with contributions from
11      some of the reports that I had.
12      But it was primarily based upon
13      literature reviews.
14  BY MR. HEGARTY:
15      Q.   The reports that you had
16  were provided to you by plaintiffs'
17  counsel, correct?
18      A.   Reports that I received was
19  supplied to me by plaintiffs' counsel.
20      Q.   They selected the reports
21  that they were going to provide to you,
22  correct?
23          MS. O'DELL:  Object to the
24      form.

Page 140

1          THE WITNESS:  To my
2      knowledge, I have no knowledge as
3      to how they selected the reports
4      or which reports they selected to
5      send.
6  BY MR. HEGARTY:
7      Q.   You didn't have -- get a
8  list of all expert reports and decide
9  which ones you wanted, correct?
10          MS. O'DELL:  Object to the
11      form.
12          THE WITNESS:  I -- no.  I
13      did not get a list of an entirety.
14  BY MR. HEGARTY:
15      Q.   Do you know plaintiffs'
16  counsel methodology for purposes of
17  selecting the reports to provide to you?
18      A.   I do not know their
19  methodology, but I would guess since
20  papers were supplied to me that had both
21  opinions and conclusions that led to
22  either positive associations or lack of
23  positive or data from scientific in vivo
24  studies, et cetera, that showed effects

Page 141

1  and no effects, I would assume that I got
2  all the literature both -- from both
3  perceptions.
4      Q.   Can you identify any medical
5  literature that you had reviewed prior to
6  being contacted by Ms. Emmel?
7      A.   Medical literature on?
8      Q.   Let me finish my question.
9      A.   I'm sorry.
10      Q.   Can you identify any
11  scientific or medical literature that you
12  reviewed before being contacted by
13  Ms. Emmel concerning talc and ovarian
14  cancer?
15      A.   There is no literature that
16  I reviewed prior to me being contacted by
17  Ms. Emmel.
18      Q.   Also in Exhibit B --
19      A.   B as in boy?
20      Q.   -- boy -- to your report.
21  There is a listing of produced documents
22  by Bates number.
23      A.   Correct.  I see it,
24  "materials and data considered."

36 (Pages 138 to 141)

Judith Zelikoff, Ph.D.

Page 142

1    Q.   Did the plaintiffs' counsel
2  provide you with copies of those
3  documents?
4    A.   I have not gone through
5  every paper in those multiple binders.  I
6  would assume that many of them are in
7  there.
8    Q.   That's not my question,
9  Doctor.  My question was, were those
10  documents provided to you by counsel for
11  plaintiffs?
12      MS. O'DELL:  What documents
13   are you referring to?
14      MR. HEGARTY:  The documents
15   that are listed by Bates number in
16   Exhibit B.
17      THE WITNESS:  Oh, you're
18   talking about produced documents?
19  BY MR. HEGARTY:
20    Q.   Yes.
21    A.   Repeat your question,
22  please.
23    Q.   Sure.  Were the documents
24  listed by Bates number under produced

Page 143

1  documents provided to you by counsel for
2  plaintiffs?
3    A.   Produced documents were
4  supplied to me in the folder that is
5  listed, production documents.
6    Q.   Did you ask for those
7  specific documents?
8    A.   I did not.
9    Q.   Do you know what the
10  methodology was for selecting those
11  specific documents to send to you?
12    A.   I do not.
13      MS. O'DELL:  Object to the
14   form.
15      THE WITNESS:  Sorry.
16  BY MR. HEGARTY:
17    Q.   Did you ask for any
18  additional documents that would fall
19  under the definition of produced
20  documents besides those plaintiffs'
21  counsel provided to you?
22    A.   Not to my knowledge.
23    Q.   Did you review all the
24  documents that are listed under the

Page 144

1  section "produced documents"?
2    A.   I reviewed all of the
3  documents that are in the binder listed
4  as production documents.  I did not check
5  one for another, so I cannot say I did
6  all of these --
7    Q.   Did you receive --
8    A.   -- or they did not.
9    Q.   I'm sorry.  Did you receive
10  from counsel from plaintiffs all the
11  documents that have been produced in this
12  litigation that concerned biologic
13  plausibility?
14      MS. O'DELL:  Object to the
15   form.
16      THE WITNESS:  I have no
17   knowledge of whether I received
18   every single document there is out
19   there.
20  BY MR. HEGARTY:
21    Q.   Did you ask for -- did you
22  ask counsel for plaintiffs to provide you
23  all the documents that have been produced
24  in this case concerning biologic

Page 145

1  plausibility?
2      MS. O'DELL:  Object to the
3   form.
4      THE WITNESS:  Did not ask it
5   in that manner.
6      I did ask for in vitro
7   studies that they could find, ex
8   vivo studies, and I also did my
9   own literature search.  Yes.
10  BY MR. HEGARTY:
11    Q.   Were you -- did you
12  understand that -- or do you understand
13  that you've been provided with all the
14  produced documents that concern biologic
15  plausibility?
16      MS. O'DELL:  Object to form.
17      THE WITNESS:  I have no
18   knowledge of whether I received
19   all documents.
20  BY MR. HEGARTY:
21    Q.   With regard to the produced
22  documents, did you sign a protective
23  order before reviewing those documents?
24    A.   Regarding these produced

37 (Pages 142 to 145)

Judith Zelikoff, Ph.D.

Page 146

1  documents --
2      Q.  Yes.
3      A.  -- did I sign a protective
4  order?
5      Q.  Yes.
6          MS. O'DELL:  Object to the
7      form.  It's a confidentiality
8      order in this litigation.  You may
9      not be aware of it.
10         MR. HEGARTY:  Okay, well,
11     confidentiality order.
12         MS. O'DELL:  Just so it's
13     not unclear to the witness.
14  BY MR. HEGARTY:
15     Q.  Did you sign a
16  confidentiality order before reviewing
17  the Bates-stamped documents?
18     A.  I signed a confidentiality
19  agreement early on.
20     Q.  Do you rely on any tests for
21  purposes of your opinions that are not
22  reported in the medical literature?
23     A.  Again --
24         MS. O'DELL:  Object to the

Page 147

1      form.
2          THE WITNESS:  Please
3      describe "tests."
4  BY MR. HEGARTY:
5      Q.  Well, did you rely on any
6  testing or tests for purposes of your
7  opinions that are not contained in the
8  medical literature --
9          MS. O'DELL:  Objection to
10     form.
11  BY MR. HEGARTY:
12     Q.  -- that we wouldn't have
13  access to but that you did?
14         MS. O'DELL:  Object to the
15     form.  Besides those produced in
16     the litigation.
17         MR. HEGARTY:  Yeah, that
18     goes without saying.
19         MS. O'DELL:  It doesn't go
20     without saying.  It's an unfair
21     question.
22         THE WITNESS:  So if I
23     understand your question to mean
24     are there any laboratory

Page 148

1      experiments that I'm aware of that
2      were done that I have knowledge
3      of?  No I have no knowledge of any
4      laboratory testing or experimental
5      testing in this field.
6  BY MR. HEGARTY:
7      Q.  You did not do any testing
8  yourself for purposes of developing your
9  opinions in this case, correct?
10     A.  I did not do any laboratory
11  tests.
12     Q.  All the opinions that are
13  set out in your report about biologic
14  plausibility between talc and ovarian
15  cancer were formed after being contacted
16  by counsel for plaintiffs about
17  testifying as an expert in this case,
18  correct?
19         MS. O'DELL:  Objection to
20     form.
21         THE WITNESS:  After being
22     contacted by the plaintiffs I did
23     a literature search and followed
24     the science.

Page 149

1  BY MR. HEGARTY:
2      Q.  That's not my question,
3  Doctor.
4          My question is, all the
5  opinions set out in your report about
6  biologic plausibility as they relate to
7  talc and ovarian cancer were formed after
8  being contacted by counsel for
9  plaintiffs, correct?
10     A.  That is correct.
11     Q.  Can you cite for us any
12  occasion where you've done the exact same
13  thing that you have done here to prepare
14  your report; that is, do an analysis of
15  the literature on the biologic
16  plausibility between the exposure to a
17  substance and a disease?
18     A.  Nothing has been done
19  exactly like it's been here, but for
20  advisory boards that I've been on,
21  including the National Toxicology Board,
22  the Institute of Medicine, the Institute
23  of Engineering for the National Academies
24  of Science, we have -- we were requested

Judith Zelikoff, Ph.D.

Page 150

1 to do literature reviews on the question
2 that's in front of them and come up with
3 an opinion based upon our literature
4 reviews.
5     Q.   Have you ever published an
6 article in the medical literature where
7 you've done the same thing that you've
8 done here, which is to review all the
9 literature on a substance and a disease
10 and offer opinions as to whether there's
11 biologic plausibility between that
12 substance and a disease?
13     A.   I have written reviews that
14 are a culmination of all of the
15 literature that I reviewed on topics.
16 Never one on ovarian cancer and talc.
17         And to my knowledge, I have
18 not offered an opinion, but followed a
19 conclusion from the science.
20     Q.   I think my question is a
21 little bit different.  My question is,
22 have you published any article in the
23 literature where you have done
24 essentially the same thing that you have

Page 151

1 done here, which is review all the
2 literature on an exposure and a disease
3 and offer opinions as to whether there's
4 biologic plausibility between the
5 exposure and the disease?
6     A.   Most of the papers that I
7 publish will offer a potential, whether a
8 speculative potential or one that is
9 defined within other published literature
10 as a potential mechanism of action or as
11 potential plausible outcome.
12         So for any published paper
13 from the research that I've done or that
14 people do, we explain an observation that
15 has been found in our laboratory from
16 testing, as you call it.  And we will
17 explain the observation in terms of
18 biological plausibility, if that's what
19 you're referring to.
20     Q.   Well, have you ever used the
21 phrase "biologic plausibility" in any
22 published article?
23     A.   I cannot cite them for you,
24 but I -- I am confident that I have used

Page 152

1 the words "biological feasibility" or
2 "potential mechanisms" or "plausible" --
3 I may have used the word "plausibility,"
4 but I have used words that are similar to
5 those.
6     Q.   Doctor, when did you first
7 become aware of an alleged link between
8 ovarian cancer and talc use?
9         MS. O'DELL:  Object to the
10     form.
11         THE WITNESS:  When did I
12     first become aware of the alleged
13     link between ovarian cancer and
14     talc use?  From -- from the media.
15     I would say maybe a year prior to
16     being contacted by Ms. Emmel.
17 BY MR. HEGARTY:
18     Q.   Can you cite for me any
19 scientific or medical group, entity or
20 organization who has concluded that
21 genital talc use causes ovarian cancer?
22     A.   I -- really, my opinion is
23 based on biological plausibility.
24     Q.   I understand that.  But my

Page 153

1 question is simply from your knowledge,
2 here today, can you cite for me any
3 scientific or medical group, entity or
4 organization who has concluded that
5 genital talc use causes ovarian cancer?
6         MS. O'DELL:  Object to the
7     form.
8         THE WITNESS:  Well,
9     concluded is -- is a word for
10     discussion.
11         IARC in the 1993 report from
12     inhalation toxicology and
13     inhalation of talc did show that
14     there was tumor induction in
15     female rats in the lungs and that
16     there was adrenal gland tumors
17     that were formed.
18 BY MR. HEGARTY:
19     Q.   Well, IARC has never
20 concluded that the use of talc in the
21 genital area causes ovarian cancer,
22 correct?
23     A.   You asked me whether there
24 was any body of literature or any

Judith Zelikoff, Ph.D.

Page 154

1  advisory boards or any institution which
2  has concluded that there is a causal
3  relationship.  And I've cited to you a
4  study --
5      Q.   That's not my question.  My
6  question was can you cite for me any
7  scientific or medical group, entity or
8  organization who has concluded that
9  genital talc use causes ovarian cancer.
10          MS. O'DELL:  Object to the
11      form.
12          THE WITNESS:  I have -- I
13      have given you information on a
14      study done at the national
15      toxicology program.
16  BY MR. HEGARTY:
17      Q.   Is that the extent of your
18  answer?
19      A.   There are -- to my
20  knowledge, that's the best study that I
21  can cite to you.
22      Q.   That's a study, correct?
23      A.   That was a study, and they
24  are also a body that makes conclusions.

Page 155

1      Q.   That study did not involve
2  any commentary on ovarian cancer,
3  correct?
4      A.   The study did not involve
5  commentary on that.
6      Q.   Can you name any regulatory
7  body who has stated that talc use is a
8  cause of ovarian cancer?
9      A.   Not as I sit here right now.
10  But again, making conclusions on
11  causation was not my question, is not
12  my -- is not within my purview.
13          And there are different
14  levels of cancer conclusion.  For
15  instance, IARC has several
16  classifications.  And -- as you know, I,
17  II-A, II-B, et cetera.
18      Q.   And what is IARC's
19  classification of talc use in the genital
20  area?
21          MS. O'DELL:  Object to the
22      form.
23          THE WITNESS:  To my
24      knowledge, I think it's a II-B.

Page 156

1  BY MR. HEGARTY:
2      Q.   II-B is possibly
3  carcinogenic, correct?
4      A.   To humans.
5      Q.   I'm sorry?
6      A.   To humans.  Possibly
7  carcinogenic to humans.  That doesn't
8  exclude the fact that there is animal
9  data supporting that conclusion.  If
10  there were no animal data it -- it would
11  not even be considered a II-B.  So
12  there -- there's evidence that the IARC
13  evaluated and came up with a II-B
14  classification.
15      Q.   Is it your opinion that the
16  biologic plausibility of talc products
17  causing ovarian cancer has been generally
18  accepted in the medical community?
19      A.   I think it depends on the
20  medical community.
21      Q.   Well, aside from any medical
22  community that has accepted that there is
23  biologic plausibility between the use of
24  talc products in -- in ovarian cancer.

Page 157

1  Let me -- let me restate that.
2          Can you cite for me any
3  medical community that has accepted that
4  there is biologic plausibility of talc
5  products causing ovarian cancer?
6      A.   I'm not knowledgeable at --
7  about all the medical communities and
8  what disciplines they are in.
9      Q.   Well, can you cite for me
10  any medical or scientific community that
11  has accepted that there is biologic
12  plausibility of talcum powder products
13  causing ovarian cancer?
14      A.   I have no knowledge of that.
15  That doesn't mean it's not out there.  It
16  means that I have no knowledge of that.
17      Q.   You have no knowledge --
18  you -- so you cannot testify that the
19  medical or scientific communities have
20  accepted that there is biologic
21  plausibility of talcum powder products
22  causing ovarian cancer?
23          MS. O'DELL:  Object to the
24      form.

40 (Pages 154 to 157)

Judith Zelikoff, Ph.D.

Page 158

1    THE WITNESS:  What I'm
2  saying is I have no knowledge of
3  the documents they have put out
4  with a conclusion as a white paper
5  or any other published literature
6  that has made that conclusion.
7  BY MR. HEGARTY:
8    Q.   What does -- sorry.
9    A.   Or has not made that
10  conclusion.
11    Q.   What does general acceptance
12  mean to you?
13    A.   General acceptance -- for
14  example, benzine, it causes leukemia and
15  other blood cancers.  That is a general
16  acceptance by the medical community which
17  we all adhere to, abide by, based upon
18  the excessive amount of literature that
19  is out there showing -- proving and
20  addressing Hill's criteria and coming up
21  with the fact that it is a -- it is a
22  carcinogen for blood cancers.
23    That is general knowledge.
24  General knowledge is something saying

Page 159

1  that nickel can be a carcinogen, nickel
2  is a carcinogen and is classified by IARC
3  as a I.  In that case, the general
4  population is aware of that.
5    Q.   Before being hired by the
6  plaintiffs' lawyers in this case, you had
7  never written anything about talc,
8  correct?
9    A.   That's correct.
10    Q.   Or commented on talc in any
11  setting, correct?
12    A.   Other than teaching?
13    Q.   Other than the teaching
14  reference you cited earlier?
15    A.   That's correct.
16    Q.   Before being hired by
17  plaintiffs' counsel you had never written
18  anything about any cosmetic, correct?
19    MS. O'DELL:  Object to the
20  form.
21    Could you please -- it's
22  vague in terms of cosmetic.  Do
23  you have a definition in mind?
24    THE WITNESS:  Exactly.

Page 160

1    Thank you.
2  BY MR. HEGARTY:
3    Q.   You don't -- you don't know
4  what a cosmetic is?
5    A.   I'm asking you what your
6  definition is.
7    Q.   Well, I -- what is your
8  definition?
9    A.   A definition of a cosmetic
10  is -- since I'm not in the cosmetic
11  field -- a cosmetic is something that is
12  used for hygiene or aesthetics and used
13  dermally.
14    Q.   Have you ever written any
15  scientific article about a cosmetic under
16  your definition?
17    A.   Not to my knowledge, but I
18  would have to look at all of my papers
19  again, if you'd like me to do that.
20    Q.   Can you cite for me any
21  publication of yours where you comment on
22  asbestos?
23    A.   I would have to look at my
24  references.  I go back from 1982.

Page 161

1    Q.   Sitting here today, can you
2  cite for us, without looking at any
3  references, any article you've ever
4  written about asbestos?
5    MS. O'DELL:  Doctor, if you
6  need to look at your CV, you're
7  welcome to do that.
8  BY MR. HEGARTY:
9    Q.   Well, my question didn't ask
10  about the CV.  I said just simply sitting
11  here today, just based on your memory --
12    A.   Okay.
13    Q.   -- are you able to recall
14  any article you've ever written about
15  asbestos.
16    MS. O'DELL:  If you would
17  like to look at your CV, it's in
18  front of you.  You are welcome
19  to -- to do that.
20    MR. HEGARTY:  I'll withdraw
21  the question.
22  BY MR. HEGARTY:
23    Q.   Doctor, have you ever
24  written any article about a fragrance?

41 (Pages 158 to 161)

Judith Zelikoff, Ph.D.

Page 162

1    A.   I would also like to look at
2  my CV.
3       Q.   Without looking at your CV,
4  you can't say one way or the other?
5       A.   I can't say conclusively.
6  My CV and my publications go back to
7  1982.  It was quite a while ago.
8       Q.   And you can't say
9  conclusively whether you've written an
10 article about asbestos?
11      A.   I would rather look at my --
12 my publications.
13      Q.   Okay.  Have you ever
14 written --
15      A.   Would you like me to do
16 that, sir?
17      Q.   No.  I'm not asking you to
18 do that right now.
19      A.   Thank you.
20      Q.   Sitting here today without
21 looking at your CV, can you cite for me
22 any article you've ever written about
23 asbestos?
24      MS. O'DELL:  Objection to

Page 163

1  form.
2      THE WITNESS:  To my
3  knowledge at this particular
4  moment, I cannot cite for you an
5  article that I specifically wrote
6  on asbestos.  Whether or not I was
7  a co-author on one, I cannot
8  recall.
9  BY MR. HEGARTY:
10      Q.   Would that be the same
11 answer as to a fragrance?
12      A.   I -- I would really rather
13 look at my CV and my publications and
14 book chapters.
15      Q.   Before being contacted by
16 counsel for plaintiffs in this case, you
17 had never developed or offered any
18 opinions about talc, correct?
19      A.   That is correct.
20      Q.   You've never written
21 anything about ovarian cancer, correct?
22      A.   Again, just to put on the
23 record, I would really like to look at my
24 CV and look at my publications.  We are,

Page 164

1  as scientists, involved as co-authors,
2  oftentimes.  And I do not recall back to
3  1982.
4       Q.   Well, for purposes of your
5  report, you do not cite to any of your
6  own work, correct?
7       A.   That is correct.
8       Q.   You've never written
9  anything about talc and ovarian cancer,
10 correct?
11      A.   I think I asked and answered
12 that.  I think I answered that.  But I
13 can repeat it.
14      Q.   No, you did not.  I did not
15 ask you that question, ma'am.
16      A.   So can --
17      Q.   I asked you had you ever
18 written anything about talc.  My question
19 that I just asked you is have you ever
20 written anything about talc and ovarian
21 cancer?
22      A.   To my knowledge, as I sit
23 here now without looking at my
24 publications, no.

Page 165

1      Q.   Prior to being contacted by
2  plaintiff's counsel have you ever
3  reviewed the body of literature on the
4  etiologies or biology related to ovarian
5  cancer?
6      A.   Not prior to being
7  contacted, no.
8      Q.   You've never published any
9  opinions about the causes of ovarian
10 cancer, correct?
11      A.   To my knowledge, sitting
12 here, no.
13      Q.   You never published any
14 opinions about the risk factors for
15 ovarian cancer, correct?
16      A.   I really -- I'm not sure.  I
17 know that I have given that information,
18 not an opinion, but have given that
19 information in teaching courses.
20      Q.   Have you ever taught any
21 courses on asbestos?
22      A.   Asbestos has been included.
23 I give lectures in my organ system
24 toxicology course as well as in my

Judith Zelikoff, Ph.D.

Page 166

1  toxicology course for biology masters.  I
2  give courses in air pollutants and
3  cancer-causing agents and the toxicology
4  of -- of airborne.
5       Q.   Have you ever taught in your
6  courses any discussion about fragrances
7  and toxicity?
8       A.   It may have come up as a
9  minor point.  We talk about pesticides,
10  we talk about air pollutants.  We talk
11  about metals.  Fragrances, we talked
12  about limonene, eugenol, menthol and
13  other fragrances in that realm in the
14  discussion of electronic cigarettes and
15  the aerosols produced by them.
16       Q.   And you provided to us all
17  the lectures or the content of lectures
18  that you've given where you mentioned
19  talc, correct?
20       A.   I was not asked to --
21          MS. O'DELL:  Object to the
22       form.
23          THE WITNESS:  I was not
24       asked to provide them.  But please

Page 167

1       let me explain my teaching style.
2          My teaching style is such
3       that I use few PowerPoints as
4       queues.  And much of my teaching
5       is done verbally, one-on-one.  And
6       they're not recorded.
7          So there is really not that
8       much -- there is nothing to supply
9       to counsel.
10  BY MR. HEGARTY:
11       Q.   Well, other than the
12  reference that you provided to us earlier
13  about talc and ovarian cancer, you have
14  not otherwise lectured regarding this
15  subject, correct?
16       A.   That is correct.
17       Q.   There are toxicologists who
18  focus on issues dealing with reproductive
19  medicine or reproductive sciences such as
20  ovarian cancer and uterine cancer,
21  correct?
22       A.   There are scientists whose
23  major focus is on talc and ovarian cancer
24  and there are OB/GYNs as well as

Page 168

1  reproductive docs who do focus on this,
2  yes.
3       Q.   And that has not been an
4  area of your focus, correct?
5       A.   Not -- not in past.  Has not
6  been a primary focus.
7       Q.   You have provided for us
8  your CV, correct?
9       A.   That is correct.
10       Q.   That's included as part of
11  Exhibit B to your expert report, correct?
12          MS. O'DELL:  Objection to
13       form.
14          THE WITNESS:  I think it's
15       stated here as Exhibit A.
16  BY MR. HEGARTY:
17       Q.   It's Exhibit A to your
18  expert report.  Is that a current CV of
19  yours?
20       A.   It was updated in
21  August 2018.  So it is not completely
22  updated as of January 2019.
23       Q.   Did you bring an updated CV
24  to your deposition?

Page 169

1       A.   I did not.
2       Q.   As you stated --
3       A.   I'm sorry.  I can provide
4  that.
5       Q.   Does your CV anywhere list
6  any professional experience on ovarian
7  cancer?
8       A.   Excuse me.  Not to my
9  knowledge, in briefly reviewing my CV,
10  and not to my knowledge as I sit here.
11       Q.   Does your CV list any
12  professional experience regarding
13  asbestos?
14       A.   Specifically, asbestos as I
15  review, no.  No, sir.
16       Q.   Does your CV list any
17  professional experience regarding
18  fragrances?
19       A.   Not to my knowledge, no,
20  sir.  But you're asking me only what's in
21  my CV.
22          I have -- I have worked -- I
23  have looked at or heard about from other
24  advisory boards things to do with

Judith Zelikoff, Ph.D.

Page 170

1 flavorants, as I said with electronic
2 cigarettes, hookah and smokeless tobacco.
3 So I am familiar with other -- which may
4 not be listed here in detail, which is
5 not listed here in detail, on flavorants
6 and some of those same flavors used in
7 electronic cigarettes are also, I found,
8 listed here.
9     Q.    Has any entity or agency
10 consulted you with regard to diseases of
11 the female reproductive tract?
12        MS. O'DELL:  Object to the
13     form.
14        THE WITNESS:  Not to my
15     knowledge.
16 BY MR. HEGARTY:
17     Q.    And no one has ever asked
18 you to look into any of the issues set
19 out in your report besides plaintiffs'
20 counsel, correct?
21     A.    I'm sorry.  Again?
22     Q.    No one has asked you to look
23 at the issues set out in your expert
24 report in this case other than

Page 171

1 plaintiffs' counsel, correct?
2     A.    This specific ovarian cancer
3 and asbestos, that is correct.
4     Q.    You have not submitted your
5 expert report in this case for peer
6 review, correct?
7     A.    The only ones who have seen
8 my report have been the plaintiff
9 attorneys, to my knowledge.
10        If that was given out to
11 others at that point, I do not -- I do
12 not have knowledge of that.
13     Q.    You certainly have not
14 submitted your report for peer review,
15 correct?
16     A.    I have not submitted my
17 report for peer review.
18     Q.    Have you spoken to any
19 physicians who treat ovarian cancer
20 regarding talc and ovarian cancer?
21     A.    I have not.
22     Q.    Other than experts
23 identified by plaintiffs in this
24 litigation, can you identify any doctor

Page 172

1 or scientist who believes that there is
2 biologic plausibility between use of
3 talcum powder and ovarian cancer?
4        MS. O'DELL:  Object to form.
5        THE WITNESS:  I have not
6     spoken to any doctors in that
7     regard.
8 BY MR. HEGARTY:
9     Q.    How about any scientists?
10     A.    I have not spoke to any
11 scientists in that regard.
12     Q.    Have you --
13     A.    My opinion was specifically
14 based upon the scientific literature that
15 I had access to.
16     Q.    Have you ever had your
17 deposition taken before?
18     A.    I have.  Yes, sir.
19     Q.    How many times?
20     A.    One that I can recall.  Two
21 that I'm now recalling.  One that was
22 in -- for Dow Chemical on breast implants
23 and relationship with autoimmune disease
24 and one from a personal attorney who

Page 173

1 was -- who had a client who was exposed
2 to wood burning from a wood stove, an
3 outdoor wood stove.
4     Q.    As to the latter case, do
5 you know where that case was pending or
6 was filed?
7     A.    I was deposed in New York
8 City.
9     Q.    Do you know the name of the
10 case?
11     A.    I'm afraid not, sir.
12     Q.    How long ago was it?
13     A.    15 years.
14     Q.    You were testifying on
15 behalf of the plaintiff in that case?
16        MS. O'DELL:  Object to form.
17        THE WITNESS:  I was not
18     testifying.  I was deposed for
19     the -- sorry, for the person who
20     was making the claim that they had
21     increased asthma as a result of
22     neighbors use of a wood boiler.
23 BY MR. HEGARTY:
24     Q.    In the Dow Chemical breast

Judith Zelikoff, Ph.D.

Page 174

1  implant case, were you testifying as an
2  expert witness?
3      A.   I was.
4      Q.   On behalf of the plaintiffs?
5      A.   If you're talking about on
6  the part of Dow, yes.
7      Q.   Well, on the part of Dow who
8  was the defendant or the plaintiffs?
9      A.   Dow was the defendant.  I'm
10 sorry.
11     Q.   Were you testifying on
12 behalf of Dow?
13     A.   I was.
14     Q.   Any other cases you've been
15 deposed in?
16     A.   Not that I can recall.
17     Q.   Have you been identified in
18 any other cases as an expert witness
19 besides this one to your knowledge?
20     A.   I have done literature
21 reviews for a number of attorneys but
22 have not been deposed.
23     Q.   My question is specific to
24 whether you -- whether you are aware that

Page 175

1  you've been designated, identified, in
2  the case as a testifying expert besides
3  this case.  Are you aware of any such
4  cases?
5      A.   Not to my knowledge.
6      Q.   I know I referred earlier to
7  your CV.  But I'm marking it as
8  Exhibit 22.  You can look at that one or
9  Exhibit 22.
10          (Document marked for
11      identification as Exhibit
12      Zelikoff-22.)
13 BY MR. HEGARTY:
14     Q.   Are there any publications
15 of yours that relate to any of the issues
16 in this case that are not included in
17 your CV?
18          MS. O'DELL:  Object to form.
19          THE WITNESS:  Let's talk
20      about the issues of the case.  Can
21      you define them a little better?
22 BY MR. HEGARTY:
23     Q.   Yeah, let me ask you a
24 different question.  Are there any

Page 176

1  cases -- are there any articles on which
2  you rely for purposes of your opinions --
3  strike that.  Let me ask it a different
4  way.
5          How many articles have you
6  published since August of 2018?
7      A.   I'm going to look at the
8  last publication.
9          I have one that was accepted
10 in press on the Garfield community and
11 looking at chromium exposure and doing
12 community engagement for the community
13 and looking at blood level of
14 measurements -- or toenail measurements,
15 excuse me, toenail measurement of
16 chromium, as they're impacting
17 communities environmentally.
18          Also two publications have
19 come out with the lead author, my being a
20 corresponding author with the lead author
21 being from the University of Rochester in
22 the area of inhaled particulate matter
23 and -- during pregnancy and effects on
24 the -- on the offspring and on the fetus.

Page 177

1      Q.   You are not a medical
2  doctor, correct?
3      A.   I am not a medical doctor,
4  although I did go to medical school for
5  my Ph.D. training.
6      Q.   You can't treat patients,
7  correct?
8      A.   I do not treat patients.
9      Q.   You are not an oncologist,
10 correct?
11     A.   I am not an oncologist.
12     Q.   You have no training in
13 oncology, correct?
14     A.   I have no training in
15 oncology.  I have training in pathology,
16 which is what I got my Ph.D. degree in at
17 a medical school.
18     Q.   You have never diagnosed or
19 treated a disease in a patient, including
20 cancer, correct?
21     A.   That is correct.
22     Q.   You have no expertise in
23 treating patients with ovarian cancer,
24 correct?

45 (Pages 174 to 177)

Judith Zelikoff, Ph.D.

Page 178

```
1         A.   I have no expertise in that,
2    no.
3         Q.   You have no expertise in
4    diagnosing ovarian cancer, correct?
5         A.   I do not.
6         Q.   You are not an expert on
7    asbestos, correct?
8         A.   I have not been classified
9    as an expert in asbestos, although as I
10   said, I do work in air pollution and if
11   asbestos is in the confines -- taken in
12   the confines of air pollution, I could
13   speak to that.  But I have not been
14   designated as an expert.
15        Q.   What's the difference
16   between amphibole and serpentine forms of
17   asbestos?
18        MS. O'DELL:  Object to form.
19   BY MR. HEGARTY:
20        Q.   You can answer.
21        A.    It depends on whether it's
22   asbestiform or non-asbestiform.
23        Q.   Okay.  Asbestiform.  What's
24   the difference between amphibole and
```

Page 179

```
1    serpentine forms?
2         A.   Well --
3         MS. O'DELL:  Object to the
4    form.
5         THE WITNESS:  Amphibole
6    lists serpentine which is
7    associated with chrysotile.  They
8    all have an aspect ratio of,
9    depending on who you are looking
10   at, whether it's three to one or
11   five to one.  Johnson & Johnson
12   includes it as five to one, which
13   is length-to-width ratio.  They
14   both have the same length-to-width
15   ratio.
16       If they're asbestiform, then
17   they are fibers that are made up
18   of fibrils.  They both have that.
19       And they go in a
20   longitudinal manner and they are
21   in one direction.
22       Amphibole includes within it
23   the crocidolite, and as well as
24   tremolite, amosite, and some of
```

Page 180

```
1    those forms can exist both in
2    crystalline form or in a
3    non-asbestiform.
4         So they are both -- both
5    concluded to be asbestos.
6    BY MR. HEGARTY:
7         Q.   Well, are there any
8    differences between --
9         A.   By the EPA.
10        Q.   Are there any differences
11   between amphibole and serpentine forms of
12   asbestos?
13        MS. O'DELL:  Object to form.
14        THE WITNESS:  Well, they are
15   different -- they are different
16   minerals.  But they are both
17   classified as asbestos.
18   BY MR. HEGARTY:
19        Q.   Any other differences?
20        A.   It -- both of which contain
21   carcinogenic -- classified I, as IARC.
22   Both have within them carcinogenic
23   asbestos.  To my knowledge, that is --
24   that is all I --
```

Page 181

```
1         Q.   What was the most
2    commercially used asbestos?
3         A.   Well, it -- it depends on
4    the time.  But for commercial use, in
5    paints and housing and insulation, it was
6    either chrysotile was used commercially
7    and crocidolite was also used
8    commercially.
9         Q.   Okay.  How did the supposed
10   toxicities various -- vary across the
11   various forms of asbestos?
12        MS. O'DELL:  Object to the
13   form.
14        THE WITNESS:  When you say
15   toxicity what do you mean?
16   BY MR. HEGARTY:
17        Q.   The -- the toxicities vary
18   across the various forms.
19        MS. O'DELL:  Object to the
20   form.
21        THE WITNESS:  Mm-hmm.  It
22   depends on the chemical
23   composition.  It depends on the
24   surface material.  It depends on
```

Judith Zelikoff, Ph.D.

Page 182

1  the amount of iron.  It depends on
2  the size of the fiber or the
3  crystal.
4       And so depending upon those
5  factors you are going to have
6  differences in toxicity.
7  BY MR. HEGARTY:
8       Q.   Well, how does -- does
9  tremolite asbestos compare to chrysotile
10 asbestos in terms of toxicity?
11      A.   I don't really -- I don't
12 think I can answer that in terms of
13 ranking it.  I can tell you that
14 chrysotile is a well-known carcinogen,
15 well-established carcinogen by the
16 agencies.  That tremolite is an amphibole
17 and it can exist in both forms, either
18 asbestiform in the long longitudinal
19 fibriles, or it can exist as a mineral
20 that has dimensions in all different
21 directions.
22      So tremolite -- it's
23 difficult to rank, but chrysotile appears
24 to be -- when you say more toxic, you

Page 183

1  have to understand what is the outcome
2  that you're looking at.  They can both
3  cause toxicity.  I don't know what you
4  exactly mean by more toxic.
5       Do you mean at a given
6  dose -- what -- what do you mean by --
7       Q.   I didn't -- I didn't use the
8  word "more toxic."  I just -- I asked you
9  how does tremolite asbestos compare to
10 chrysotile asbestos in terms of toxicity.
11      A.   I think I -- yeah, that's a
12 very difficult question to a
13 toxicologist.  Because when you compare
14 toxicity across -- across lines, you have
15 to somehow rank them based on a
16 particular outcome.
17      So toxicity could be does it
18 produce more lactate dehydrogenase when
19 put in a macrophages culture of -- of
20 pulmonary cells, or does it produce more
21 apoptosis.  You can't just say toxicity
22 in my opinion.  You have to give me an
23 outcome.  Does this produce more toxicity
24 in this area.

Page 184

1       Q.   You are not an expert in
2  fragrances, correct?
3            MS. O'DELL:  Object to form.
4            THE WITNESS:  I have -- I
5       have not been listed as an expert
6       in fragrances.
7  BY MR. HEGARTY:
8       Q.   Would you consider yourself
9  an expert in fragrances?
10      A.   I am a toxicologist so I can
11 review chemicals and make a decision or
12 assess their toxicity based on outcomes.
13      Q.   Before being contacted by
14 Ms. Emmel in this case, would you have
15 considered yourself an expert in
16 fragrances?
17           MS. O'DELL:  Objection.
18           THE WITNESS:  Expert in
19      fragrances.  It is not something I
20      studied in my own laboratory.
21           However, a toxicologist
22      should be able to go into the
23      literature and have a greater
24      knowledge than most people in

Page 185

1  looking up different chemicals.
2  BY MR. HEGARTY:
3       Q.   You are not an expert on
4  talc, correct?
5            MS. O'DELL:  Object to the
6       form.
7            THE WITNESS:  I have done
8       much work in dust, including the
9       World Trade Center dust.  I've
10      done work on diesel exhaust and
11      other things that are powders.  So
12      particularly talc, I don't think I
13      am classified as a talc expert.
14      But as I said I've done much
15 work in other dusts, other
16 aerosols, vapors, gases,
17 particles, and I am an expert in
18 particles.
19 BY MR. HEGARTY:
20      Q.   You are not a geneticist,
21 correct?
22      A.   I'm -- if a geneticist is
23 someone who has been trained specifically
24 in genetics, I have not been trained in

47 (Pages 182 to 185)

Judith Zelikoff, Ph.D.

Page 186

1  genetics.  I have had courses in
2  molecular toxicology and I do teach some
3  molecular toxicology.
4       Q.   You are not a mineralogist,
5  correct?
6       A.   I am not a mineralogist.
7       Q.   You are not an expert on
8  testing for the presence of asbestos,
9  correct?
10      A.   I am not a chemist.
11      Q.   You are not an expert on
12 testing the air for asbestos, correct?
13      A.   We collect -- I collect
14 particles in the air.  I do air
15 measurements.  That is the basis of my
16 research.
17           When it comes to asbestos,
18 we will send those -- those filters out
19 to be analyzed by an expert laboratory,
20 and then we will help interpret the data.
21      Q.   You are not an industrial
22 hygienist, correct?
23      A.   I work with industrial
24 hygienists, but I do not have a degree in

Page 187

1  it.
2       Q.   You are not an expert on
3  Johnson's Baby Powder, correct?
4           MS. O'DELL:  Objection to
5  form.
6           THE WITNESS:  I am not an
7  expert on -- I -- could you
8  rephrase that?
9  BY MR. HEGARTY:
10      Q.   I don't think I can.
11      A.   I don't know what you mean
12 by expert.  I mean I need to have -- I
13 think I need to have some criteria that
14 would make me an expert.  If you are
15 talking about the number of publications
16 I have or whether I've testified.
17           I -- the word "expert"
18 throws me off a bit.
19      Q.   Well, where is the talc for
20 J&J's Baby Powder been mined over the
21 years?
22      A.   In Vermont, in Italy, and
23 also in Korea.
24      Q.   What are the current

Page 188

1  components by percentage of Johnson's
2  Baby Powder?
3           MS. O'DELL:  Object to the
4  form.  Vague.
5           THE WITNESS:  I cannot --
6  although I have looked at it, I
7  cannot tell you that off the top
8  of my head.  I would have to
9  look -- refresh my memory by
10 looking at an exhibit or a
11 document.
12 BY MR. HEGARTY:
13      Q.   What were the current
14 components of Johnson's Baby Powder by
15 percentage from the 19 -- 1900s through
16 the present?
17      A.   I cannot --
18           MS. O'DELL:  Excuse me.
19 Excuse me.  Object to the form.
20 Vague.
21           THE WITNESS:  I cannot give
22 you percentages off the top of my
23 head.  If you allow me to look at
24 a document I -- I could tell you.

Page 189

1  BY MR. HEGARTY:
2       Q.   Are the opinions in your
3  report specific to particular
4  formulations of talcum powder consumer
5  products?
6           MS. O'DELL:  Object to the
7  form.
8           THE WITNESS:  Are the
9  opinions in your report specific
10 to particular formulations.
11           My opinion is based on
12 biological plausibility based on
13 studies that have used talcum
14 powder or talc or fibrous talc or
15 nonfibrous talc.
16 BY MR. HEGARTY:
17      Q.   Did you analyze specifically
18 the biologic plausibility of the
19 components of Johnson's Baby Powder for
20 purposes of your opinions?
21           MS. O'DELL:  Object to the
22 form.
23           THE WITNESS:  I looked at
24 the individual components that I

48 (Pages 186 to 189)

Judith Zelikoff, Ph.D.

Page 190

1    was aware of.  And looked at their
2    ability to cause inflammation,
3    let's say, or their carcinogenic
4    potential.
5    BY MR. HEGARTY:
6        Q.    But did you look
7    specifically -- did you specifically
8    analyze biologic plausibility specific to
9    J&J's -- strike that.
10           Did you analyze biological
11   plausibility specific to Johnson's Baby
12   Powder in your report?
13       A.    If the literature was there,
14   there was some -- I'm sorry, I can't
15   remember the author now.  But there were
16   authors and investigators that did use
17   Johnson's Baby Powder in their studies,
18   and if they used those studies, and I
19   used that for -- to provide biological
20   plausibility, then yes.
21       Q.    What studies were done
22   specific to Johnson's Baby Powder?
23           MS. O'DELL:  Object to the
24       form.

Page 191

1           THE WITNESS:  Of course all
2    of the product documents.
3           Sorry, I'm having difficulty
4    recalling that -- the particular
5    name.  It's not a memory test.
6    I'm sorry.
7    BY MR. HEGARTY:
8        Q.    With regard to ovarian
9    cancer, what are the subtypes of the
10   disease?
11       A.    Well, as -- as --
12           MS. O'DELL:  Object to the
13       form.
14           THE WITNESS:  -- was pointed
15       out, I'm not an OB/GYN.  I can
16       tell you just from cursory
17       knowledge that there are serous,
18       high grade, low grade serous,
19       endometrioid, mucous cell,
20       epithelioid.
21   BY MR. HEGARTY:
22       Q.    What are the differences in
23   subtypes?
24       A.    Again, this is not in my --

Page 192

1    in the question that I was asked to
2    comment on, but from cursory knowledge
3    there are different cell types.
4        Q.    What's the difference
5    between a low grade and high grade tumor?
6        A.    The induction of
7    invasiveness and proliferation capacity.
8        Q.    What is thought to be the
9    primary origin of high-grade serous
10   ovarian cancer?
11           MS. O'DELL:  Object to the
12       form.
13           THE WITNESS:  Primary
14       origin.  I'm not sure what that
15       means.
16   BY MR. HEGARTY:
17       Q.    Well, what is -- what is
18   typically the primary location or origin
19   of high-grade serous?
20       A.    Do you mean in the ovary?
21       Q.    I don't think I can ask it
22   any different way.
23       A.    Well, I don't quite
24   understand your question.

Page 193

1        Q.    What is the primary origin
2    of clear cell carcinoma?
3           MS. O'DELL:  Object to the
4       form.
5           THE WITNESS:  If you're
6       asking me the types, I don't
7       recall the type of cell for clear
8       cell carcinoma.  Again, I'm not an
9       OB/GYN, and I'm not a histologist.
10   BY MR. HEGARTY:
11       Q.    For purposes of your report,
12   did you analyze biologic plausibility for
13   each subtype of ovarian cancer?
14       A.    No, sir.
15       Q.    Is it your opinion that the
16   etiology of each of the subtypes of
17   ovarian cancer is the same?
18       A.    There are many
19   commonalities.
20           As I said, from my cursory
21   knowledge and my background, early
22   background in 1980, of being a --
23   pathology when this was not even
24   considered or thought about, there is

49 (Pages 190 to 193)

Judith Zelikoff, Ph.D.

Page 194

1    etiologies -- I'm sorry, I had to refresh
2    my memory of your question.
3              There are different
4    etiologies.  Many -- and many of the
5    same, and so I think that -- if I may
6    gather my thoughts and refresh your
7    question.
8              So as I said, in terms of my
9    opinion that the etiology in each of the
10   subtypes of ovarian cancer is the same,
11   there are many commonalities in --
12   etiology being the underlying reason.
13   There are many commonalities for the same
14   cancers, including things like cancer
15   stem cells in ovarian cancer, which are
16   now being identified in the literature as
17   a possibility for recurrence of ovarian
18   cancer.
19             So, yes, there are definite
20   commonalities in terms of the induction
21   of ovarian types of cancer.
22        Q.   Well, my question was, is it
23   your opinion that the etiologies of each
24   subtype are the same?

Page 195

1              MS. O'DELL:  Objection to
2    form.
3              THE WITNESS:  I have --
4              MS. O'DELL:  Asked and
5    answered.
6              THE WITNESS:  I have no
7    opinion on that.
8    BY MR. HEGARTY:
9         Q.   Is it your opinion --
10             MS. O'DELL:  Excuse me.
11             THE WITNESS:  Other than
12   what I --
13             MS. O'DELL:  Sorry.
14             THE WITNESS:  I'm sorry.
15             MS. O'DELL:  You may finish.
16   I didn't mean to cut you off.
17             THE WITNESS:  Other than
18   what I've just given.
19             MS. O'DELL:  So, Mark, we've
20   been going about an hour and ten
21   minutes, I think.
22             MR. HEGARTY:  Okay.  Take a
23   break.
24             THE VIDEOGRAPHER:  Stand by.

Page 196

1    Remove your microphones.  The time
2    is 12:22 p.m.  Off the record.
3              (Lunch break.)
4              THE VIDEOGRAPHER:  We are
5    back on the record.  The time is
6    1:17 p.m.
7    BY MR. HEGARTY:
8         Q.   Doctor, we're back on the
9    record.  I want to go back to something
10   we talked about at the beginning, that
11   is, the initial call that you had from
12   Ms. Emmel.
13             You mentioned that you
14   reviewed materials between the time of
15   the call and the time that you agreed to
16   serve as an expert witness.  Do you
17   recall saying that?
18        A.   I do recall.
19        Q.   What materials did you
20   review?
21        A.   Just random, whatever I got
22   from the -- that came out using keywords
23   of talc, talcum powder, ovarian cancer.
24   Those were my initial keywords.

Page 197

1         Q.   Do you recall, sitting here
2    today, any particular articles, whether
3    by author name or by name of that initial
4    search that you did before agreeing to
5    serve as an expert?
6         A.   I looked at Ghio, G-I --
7    G-H-I-O.  Did inhalation of talc and
8    airway cells in in vitro study.
9              I also looked at
10   Dr. De Boers and migration of carbon
11   black material.
12             I also looked at Dr. Venter
13   and Iturralde, who talked about
14   administered radiolabeled microspheres.
15             I read Dr. Weiner's --
16   Weiner's -- Dr. Weiner's publication.  I
17   read Dr. Epstein's letter.
18        Q.   Is that something that you
19   found on your own?
20        A.   Excuse me.  It wasn't
21   Dr. Epstein's letter.  I'm sorry.  I
22   stand corrected.
23             I read the National
24   Toxicology Report, the NTP 1993.

Judith Zelikoff, Ph.D.

Page 198

1    Q.   Did you do a more expansive
2  literature search and literature review
3  after agreeing to serve as an expert
4  witness?
5    A.   Of course.
6    Q.   Did you form any opinions,
7  though, from that initial search that you
8  performed?
9    A.   My opinion at that time was
10 that there was certainly -- I had a great
11 deal of interest in the topic, that there
12 was certainly enough information and
13 enough evidence to provide -- that was
14 provided by these publications that --
15 certainly that particles of the size of
16 talc can be -- can be translocated,
17 migrated, and that -- at least from the
18 lung, and so that there was biological
19 plausibility for movement within the
20 body.
21       And I found it convincing
22 that I could -- that I could get involved
23 in this case and that I believe that
24 there was, at that point with only

Page 199

1  superficial literature searching, that
2  there was indeed room for an opinion.
3  And that opinion being that there
4  certainly was information provided that
5  could lead me to provide biological
6  plausibility in that regard.  Otherwise,
7  I would not have taken the case.
8       What I would like to say is
9  that I would have done the same thing if
10 you had called me, sir, to answer the
11 question of what my beliefs are and where
12 the science is.
13    Q.   If you look at Page 2 again
14 of your expert report.
15    A.   Yes, sir.
16    Q.   That's Exhibit 2.  Again,
17 under the section mandate --
18    A.   Yes.
19    Q.   -- and methodology.
20    A.   I see it.
21    Q.   You say at the end of the
22 second paragraph that, "Biological
23 plausibility does not mean proof of
24 mechanism, but rather whether what is

Page 200

1  known about the product is consistent
2  with a cause-and-effect relationship."
3       Do you see that where I'm
4  reading?
5    A.   I see where you're reading.
6    Q.   Where does that definition
7  of biological plausibility come from?
8    A.   It is my professional
9  opinion.
10    Q.   Is there still biological
11 plausibility if what is known about a
12 substance and a disease is consistent
13 with no cause-and-effect relationship?
14       MS. O'DELL:  Object to the
15 form.
16       THE WITNESS:  Biological
17 plausibility, to me, as stated
18 here -- and I will state it a
19 different way, is that there is
20 actually literature and
21 information, reliable, sound
22 science that could -- that
23 provides evidence that there is a
24 mechanism or mechanisms as well as

Page 201

1  underlying information that could
2  prove the -- although it's not
3  necessary in Hill's criteria, that
4  could be used to prove a causal
5  relationship.
6       And in this case, that
7  talcum powder, in particular
8  Johnson & Johnson talcum powder,
9  can lead to ovarian cancer.
10 BY MR. HEGARTY:
11    Q.   Well, do you agree that the
12 finding of biologic plausibility by
13 itself does not mean causation?
14    A.   Biological plausibility is
15 used to supplement or to add on.  It is
16 actually one of Hill's criteria.  One
17 that he listed in his 1962 paper that is
18 not absolutely necessary but does provide
19 compelling evidence.  And I do believe
20 that biological plausibility is extremely
21 important, in my personal opinion, in
22 causal relationship.  And Hill agrees to
23 that as well.
24    Q.   You agree, though, that the

51 (Pages 198 to 201)

Judith Zelikoff, Ph.D.

Page 202

1  other Hill factors should be applied to
2  determine causality, other than -- in
3  addition to biological plausibility?
4      A.   Well, I really can't say.
5  Again, I know -- I know of Hill's work,
6  and I know of his groundbreaking
7  publication.  But again, I'm here to talk
8  about plausibility, not causation.
9      Q.   At the bottom of Page 2 you
10 say as part of your analysis you
11 reviewed, "Depositions and numerous
12 documents, internal memorandum and
13 published and unpublished studies and
14 testing results that I have found in my
15 own searches of documents, documents
16 provided by attorneys, and documents that
17 I requested."  That's carrying over to
18 Page 3.
19         Do you see that?
20     A.   Toxicological studies.  Are
21 we talking about toxicological studies
22 including in vivo and in vitro?
23     Q.   No.  I'm looking at the very
24 last sentence of the paragraph at the

Page 203

1  bottom of Page 2, carrying over to the
2  top of Page 3?
3      A.   In addition, I've reviewed
4  depositions and numerous documents
5  internal memorandum and published and
6  unpublished studies and testing results
7  that I have found in my own searches.
8      Q.   Correct.  In any scientific
9  analysis that you have done, have you
10 ever included as part of that analysis
11 documents provided by attorneys?
12     A.   In my -- when I publish, I
13 look at all relevant information that I
14 have access to.  It's about the science.
15     Q.   Not my question.  My
16 question is in any prior work that you
17 have done where you have published an
18 article, have you included in the review
19 for purposes of publishing that article,
20 documents provided by lawyers?
21     A.   No, sir, not to my
22 knowledge.
23     Q.   Have you ever included as
24 materials that you have reviewed for any

Page 204

1  publication of yours, depositions or
2  expert reports in a litigation?
3      A.   No.  However, there are
4  papers and regulatory -- regulatory
5  documents that are not considered
6  published, published.  If you mean
7  peer-reviewed literature, that's one way
8  of publishing.  But another way of
9  publishing is also documents that are in
10 a report.
11         And I have used reports in
12 my own publications, if they -- if they
13 are accessible to me.
14     Q.   Have you ever in a published
15 scientific article of yours cited to an
16 expert report from a doctor in a
17 litigation?
18     A.   I'm sorry.  I have to look
19 down at your question.
20         Not that I recall.  But
21 that's not to say that I would not.
22         If it was appropriate for
23 the paper that I was writing, I would
24 certainly use it.

Page 205

1      Q.   Can you identify any
2  scientific group -- strike that.
3          Before I ask you about
4  causation, now I want to ask you about
5  biological plausibility.  Can you cite
6  for me any scientific group, body, or
7  even paper that has concluded that there
8  is biological plausibility between
9  perineal talc use and ovarian cancer?
10     A.   Mm-hmm-hmm.  If you look at
11 -- I don't know what exhibit it is.  But
12 it is the Health Canada report.  And --
13 Canadian U.S. EPA.  And if you look at
14 Taher's paper, systemic review and
15 meta-analysis, in both of those -- okay.
16 So the environmental -- Health Canada and
17 Canadian EPA, they put out this -- this
18 document, which is an assessment, a
19 screening assessment document, to look at
20 biological plausibility as well as the
21 other epidemiological literature.
22         And they do speak to the
23 causation and they do speak to biological
24 plausibility of talc and its association

Judith Zelikoff, Ph.D.

Page 206

1    or talc and it's causation for ovarian
2    cancer.  So they do in that document.
3            The systematic review and
4    meta-analysis 2018 of Taher also speaks
5    of it and reviews the 30 -- I think it's
6    30 -- 30 studies, of which there are 26
7    case-controls and -- studies, and I think
8    four cohort studies.  And they do also
9    conclude that, by looking at the
10   meta-analysis, that there are -- that
11   there is causation associated -- that
12   there is causation for talcum powder and
13   ovarian cancer.
14       Q.   Actually, Doctor, both
15   documents to which you reference conclude
16   only that perineal use of talcum powder
17   is a possible cause of ovarian cancer,
18   correct?
19           MS. O'DELL:  Object to the
20       form.
21           THE WITNESS:  They state
22       cause.  And if you give me a
23       moment, I can look for it, within
24       the document.  So I'm looking at

Page 207

1        the Health Canada document.
2            Meta -- page -- I'm sorry.
3        Roman Numeral III, "Meta-analysis
4        of the available human studies in
5        the peer-reviewed literature
6        indicate a consistent and
7        statistically significant positive
8        association between perineal
9        exposure to talc and ovarian
10       cancer.  Further available data
11       are indicative of causal effect."
12   BY MR. HEGARTY:
13       Q.   Okay.  What is their
14   ultimate conclusion?
15       A.   This is part of their
16   conclusion.
17       Q.   Can I look at that document?
18       A.   Absolutely.
19           MR. TISI:  Is this marked as
20       an exhibit, Mark?
21           MR. HEGARTY:  Yes.
22           MR. FINDEIS:  Sorry, which
23       number is it marked?  So the
24       record is clear.

Page 208

1            MS. O'DELL:  It's Exhibit 9.
2    BY MR. HEGARTY:
3        Q.   If you would look -- do you
4    have the Taher review?
5        A.   I do.
6        Q.   What's that marked as?
7        A.   That is Exhibit 10.
8        Q.   Exhibit 10?
9        A.   Based on your yellow mark,
10   yes.
11       Q.   If you look at the abstract
12   under the conclusion section, it
13   concludes that perineal use of talcum
14   powder is a possible cause of human
15   ovarian cancer.
16           Do you see that?
17       A.   Excuse me.  I dropped my
18   microphone.
19           Okay.  Please repeat your
20   question.  Your comment.
21       Q.   Second page under the
22   conclusion section.  The conclusion of
23   the Taher article is, "The perineal use
24   of talc powder is a possible cause of

Page 209

1    human ovarian cancer," correct?
2            MS. O'DELL:  Objection to
3        form.
4            THE WITNESS:  I see that
5        conclusion sentence.
6    BY MR. HEGARTY:
7        Q.   Nowhere in here do they say
8    that talcum powder causes ovarian cancer,
9    correct?
10           MS. O'DELL:  Objection to
11       form.
12           THE WITNESS:  If you're
13       looking for a specific sentence,
14       allow me to review.
15   BY MR. HEGARTY:
16       Q.   Well, are you going to need
17   to review the entirety of the paper?
18       A.   I may.
19       Q.   Okay.  Well, I can't -- we
20   don't have time for you to review the
21   entirety of the paper so I'll withdraw
22   the question.  If you need to review the
23   entirety of the paper.
24           Can you cite here without

Judith Zelikoff, Ph.D.

Page 210

1 reviewing it anywhere where they say
2 talcum powder causes ovarian cancer?
3     A.   I cannot --
4        MS. O'DELL:  Excuse me.  And
5     you're referring specifically to
6     Exhibit 10?
7        MR. HEGARTY:  Correct.
8        MS. O'DELL:  The Taher
9     paper?
10       THE WITNESS:  I can't say it
11    without looking at the paper.
12 BY MR. HEGARTY:
13    Q.   Has the Taher paper been
14 peer reviewed?
15    A.   The Taher paper has -- is a
16 document that, yes, has been peer
17 reviewed.  To my knowledge.
18    Q.   Okay.  What publication peer
19 reviewed that document?
20    A.   Excuse me?
21    Q.   Who peer reviewed that
22 document?
23    A.   I have -- I have no
24 knowledge of that.

Page 211

1     Q.   How do you know it's been
2 peer reviewed?
3     A.   The -- the plaintiff lawyers
4 have shown me a document, a cover letter,
5 information, I specifically asked that
6 question of them.
7     Q.   And are you relying on what
8 they provided to you for purposes of
9 saying it's peer reviewed?
10    A.   Please allow me to -- I'm
11 going to take a look into the document
12 again.  There may be evidence that's in
13 the document which says it's peer
14 reviewed.
15    Q.   Doctor, what are you looking
16 at for purposes of peer review?  I asked
17 you --
18    A.   I'm looking to see -- sorry,
19 please finish your question.
20    Q.   I asked you how do you know
21 it's been peer reviewed.
22    A.   And I stated that the
23 plaintiff lawyer -- the plaintiffs'
24 lawyers have shown me a document, a cover

Page 212

1 letter, information.  And I specifically
2 asked that same question.
3     Q.   Now, are you relying on the
4 fact it's been peer reviewed for your
5 opinions in this case?
6     A.   I'm relying on the science.
7     Q.   Well, are you relying on
8 whether -- on what plaintiffs' counsel
9 told you as far as whether it's been peer
10 reviewed?
11       MS. O'DELL:  Object to the
12    form.
13       THE WITNESS:  That is what
14    I'm trying to look, whether there
15    is an acknowledgment and whether
16    there is a statement within it
17    which says it's peer reviewed.
18    It -- it's stated that in
19    order for this -- in order for a
20    document such as this, and again
21    it depends on what you mean by
22    peer review, whether it's a
23    community or whether it's the
24    government.  The government has

Page 213

1     looked at this, and they were
2     submitted by Health Canada, and as
3     of now it's been submitted for
4     peer review, but it was looked at
5     by the Health Canada and by EPA.
6 BY MR. HEGARTY:
7     Q.   What document were you shown
8 that shows it's been peer reviewed?
9     A.   On the first page,
10 Exhibit 10, materials submitted to Health
11 Canada, materials submitted to journal
12 for peer review.
13    Q.   So it's not been peer
14 reviewed?
15    A.   To my knowledge, it has been
16 peer reviewed.  And again I'm relying on
17 plaintiffs' attorney with that
18 information.
19    Q.   Have you ever cited in a
20 scientific article of yours a publication
21 that's not been peer reviewed?
22    A.   All the time.
23    Q.   So that's something that --
24 that you have done as part of your

54 (Pages 210 to 213)

Judith Zelikoff, Ph.D.

Page 214

1  methodology?
2          MS. O'DELL:  Object to the
3      form.
4          THE WITNESS:  It's
5      something -- if there is -- based
6      on my opinion of the study design,
7      the information, the science, if
8      it -- if it needs to be stated, if
9      the science needs to be out there,
10     then I have cited numerous times
11     unpublished information.
12  BY MR. HEGARTY:
13     Q.   Do you understand that for
14  purposes -- that the -- strike that.
15         Do you understand that the
16  Health Canada risk assessment is a --
17  only a draft assessment at this point in
18  time?
19     A.   It is going to be reviewed,
20  yes.  I understand that it -- it is a
21  draft assessment.  I also understand that
22  it has gone through scrutiny by both
23  Health Canada and Canadian EPA.
24     Q.   Do you understand that

Page 215

1  there's a comment period that's going on
2  right now?
3      A.   I understand that, yes.
4      Q.   And that this is not a final
5  statement?
6      A.   Final statement.  In any
7  document, any regulatory document that --
8  those that are put out by the National
9  Academy of Science, whatever document
10  you're using, there's always a peer
11  review or comment period.
12         In my opinion, in my
13  professional career, documents do not
14  change that drastically based upon the
15  comments that come in.  Based upon
16  National Academy of Science, and the
17  National Toxicology Program.  There are
18  usually not -- there are no -- by the
19  time it reaches this point, there are no
20  substantive comments that allow for
21  extensive changes.
22     Q.   Other than the Canadian
23  documents you just cited, can you cite
24  for me any other scientific group, body

Page 216

1  or paper that has concluded that there is
2  biologic plausibility between talcum
3  powder use and ovarian cancer?
4      A.   Biological plausibility, in
5  my case, and for my review and for my
6  report, I'm looking at the inflammation
7  as a biological plausibility.
8          There is data going back and
9  scientific reviews and publications going
10  back to the '60s which implicate
11  inflammation as a biological mediator for
12  cancer.
13     Q.   Doctor, listen to my
14  question.  My question is very specific
15  to talc and the biologic plausibility
16  between talc and ovarian cancer.
17         Can you cite for me, besides
18  the Canadian documents you cited, any
19  scientific group, body or organization
20  that has concluded that there is biologic
21  plausibility between talcum powder use
22  and ovarian cancer?
23     A.   There is biological
24  plausibility and there is evidence that

Page 217

1  in Step 1, that talc causes inflammation.
2  In Step 2, that inflammation is a
3  well-known and well-established factor
4  in -- in cancer.
5      Q.   Doctor, you are not
6  answering my question.  Do you want to
7  read my question?  My question is very
8  specific.
9          Can you cite for me any
10  scientific body or group or organization,
11  other than what you say the Canadian
12  group or groups did, that has concluded
13  that there is biologic plausibility
14  between talcum powder use and ovarian
15  cancer?
16         MS. O'DELL:  Objection.
17     Objection to the question.  Asked
18     and answered.
19         THE WITNESS:  I stand by my
20     answer.  That, again, talc can
21     cause inflammation.  It's well
22     known.  And inflammation is an
23     underpinning for cancer.
24  BY MR. HEGARTY:

55 (Pages 214 to 217)

Judith Zelikoff, Ph.D.

Page 218

1    Q.   Okay.  Cite for me any
2  scientific group, body or organization
3  who has said that.
4    A.   That is throughout
5  literature.  If you go back to 1960 and
6  talk about the Vertel and the role of
7  inflammation in cancer, and numerous
8  other publications since that, if you
9  look at -- talc is used to induce
10 pleurodesis because of its inflammatory
11 responsiveness.
12    Q.   Doctor, you still are not
13 answering my question.  My question is
14 name a scientific body, organization or
15 group who has concluded, as you have
16 done, or you say you do in your paper,
17 that there is biologic plausibility
18 between talc and ovarian cancer.
19       MS. O'DELL:  Objection to
20    the form.
21       THE WITNESS:  I gave you --
22 BY MR. HEGARTY:
23    Q.   Cite for me the groups.
24       MS. O'DELL:  Excuse me.  Let

Page 219

1    me -- objection to form.  Asked
2    and answered.  The doctor has
3    answered your question.  You may
4    not like the answer, but she's
5    answered it.
6  BY MR. HEGARTY:
7    Q.   Cite for me the groups by
8  name.
9       MS. O'DELL:  Objection to
10    form.
11       THE WITNESS:  Ask the
12    question again?
13 BY MR. HEGARTY:
14    Q.   Cite for me any name of any
15 group that has reached the same opinion
16 as you?
17    A.   Besides the Health Canada?
18    Q.   Correct.
19    A.   There are -- I -- you're
20 asking for something that is not -- I'm
21 answering the question by telling you
22 that you have talc which is an
23 inflamagogue, and you have talc and its
24 relationship with cancer.  And that is a

Page 220

1  biological mechanism that everyone
2  including the National Toxicology, the
3  IARC, the National Academy of Science,
4  EPA, all recognize.
5    Q.   Cite for me any group.
6  Again, you are not answering my question.
7       My answer --
8    A.   Okay.
9    Q.   -- my question is other than
10 the Canadian groups you've cited, cite
11 for me any group by name who has reached
12 the same opinion as you about biologic
13 plausibility.
14       MS. O'DELL:  Objection to
15    form.  Other than those she just
16    listed in her last answer?
17       MR. HEGARTY:  Well, she
18    didn't list any.  I think the
19    record shows that.
20       MS. O'DELL:  Yes, she did.
21       MR. HEGARTY:  Which ones did
22    she list?
23       MS. O'DELL:  NTP.  IARC.
24       MR. HEGARTY:  Okay.  Are you

Page 221

1  going on the record to say NTP has
2  concluded that talcum powder use
3  is a biologic
4  plausibility/plausible cause of
5  ovarian cancer?
6       THE WITNESS:  We're not --
7       MS. O'DELL:  She was talking
8    about inflammation and cancer, as
9    you well know.
10       MR. HEGARTY:  Right, which
11    is why she's not answering my
12    question.
13       MS. O'DELL:  No, no.  Your
14    question was not in relation to
15    specific talc and biologic
16    plausibility.
17       So the doctor has answered
18    your question.
19       MR. HEGARTY:  I think the
20    record will reflect otherwise.
21 BY MR. HEGARTY:
22    Q.   Doctor, listen to my
23 question --
24       MS. O'DELL:  No, it will

Judith Zelikoff, Ph.D.

Page 222

1    not.
2    BY MR. HEGARTY:
3        Q.   Listen to my question.
4            Can you cite for me any
5    group besides the Canadian group who has
6    concluded that there is biologic
7    plausibility, who has made a statement
8    that there is biologic plausibility
9    between talcum powder use and ovarian
10   cancer?
11       A.   I'm telling -- as I said
12   before, you're leaving out the word
13   "inflammation."
14       Q.   Doctor, you -- you need to
15   answer the question I ask.
16       A.   I -- I --
17       Q.   Your counsel can come back
18   and ask you that question. I under -- I
19   want to know the name of any organization
20   by name who has concluded that there is
21   biologic plausibility between perineal
22   use of talc and ovarian cancer.
23       A.   Anyone --
24           MS. O'DELL:  Other than the

Page 223

1    ones she -- she's listed.
2            THE WITNESS:  Anyone that
3    you say -- any -- I'll do it
4    again. National Toxicology
5    Program.  IARC.  Institute of
6    Medicine.
7            They may not say the
8    sentence you are -- you are
9    implying or you're stating.  But
10   they all show that talc has --
11   produces inflammation.
12           I don't think that the -- I
13   think that's a very common
14   knowledge that talc or talcum
15   powder products does produce
16   inflammation.
17   BY MR. HEGARTY:
18       Q.   Doctor, where have you ever
19   published a methodology for determining
20   whether there is biologic plausibility
21   between an exposure and a disease?
22       A.   Almost every paper that I
23   have in my CV talks about the biological
24   plausibility for the observations that

Page 224

1    I've shown, whether it's in air pollution
2    or whether it's in tobacco products or
3    nicotine products or World Trade Center
4    dust or metal inhalation or nanoparticle
5    inhalation.  They all give biological
6    plausibility statements for the
7    observations that have been found in my
8    laboratory.
9        Q.   Where have you ever
10   published step-by-step methodology for
11   how you go about determining whether
12   there is biological plausibility between
13   a substance and a disease?
14       A.   I use my professional
15   judgment.
16       Q.   Have you ever published that
17   professional judgment?
18           MS. O'DELL:  Objection to
19   form.
20           THE WITNESS:  I don't think
21   that would be publishable
22   material.
23   BY MR. HEGARTY:
24       Q.   In the end, Doctor, your

Page 225

1    report is your subjective take on the
2    studies, correct?
3            MS. O'DELL:  Objection to
4    form.
5    BY MR. HEGARTY:
6        Q.   I mean, you don't speak for
7    any scientific group, do you?
8        A.   I'm an expert toxicologist,
9    recognized clearly by the Society of
10   Toxicology as an expert in my field.
11   And -- I'm sorry.  I --
12       Q.   Well, is your report
13   speaking for the society --
14           MS. O'DELL:  Excuse me.
15   BY MR. HEGARTY:
16       Q.   Is your report speaking for
17   the Society of Toxicology?
18           MS. O'DELL:  She wasn't
19   finished.
20           THE WITNESS:  I wasn't.  I
21   was --
22           MS. O'DELL:  She wasn't
23   finished.  Please let the witness
24   finish.

57 (Pages 222 to 225)

Judith Zelikoff, Ph.D.

Page 226

1  MR. HEGARTY:  I'll withdraw
2  the question.
3  BY MR. HEGARTY:
4  Q.  Doctor, do you speak for the
5  Society of Toxicology for purposes of
6  your opinions in your report?
7  A.  No.
8  Q.  Do you speak for any
9  society, any toxicology society --
10  society for purposes of your opinions?
11  A.  You didn't let me finish my
12  answer.
13  I do not speak for the
14  society of toxicology.  But I am a
15  recognized toxicology expert, recognized
16  by the Society of Toxicology as an
17  expert.  And I have written this report
18  based upon literature, scientific
19  evidence, and my professional judgment.
20  Q.  What society has recognized
21  you as an expert in talc and ovarian
22  cancer?
23  A.  I'm recognized as expert in
24  toxicology.

Page 227

1  Q.  What society has --
2  A.  Society of Toxicology.
3  Q.  Has the Society of
4  Toxicology recognized you as an expert in
5  talc and ovarian cancer?
6  MS. O'DELL:  Objection to
7  form.
8  THE WITNESS:  I was
9  recognized as an expert in tox and
10  ovarian cancer and talc by the
11  very basis that I'm sitting here.
12  BY MR. HEGARTY:
13  Q.  You don't speak for your
14  university, do you?
15  A.  No one -- no one speaks
16  directly for the university.  But what we
17  say, we understand our paychecks come
18  from the university, and we follow within
19  the university and the medical school
20  guidelines.
21  Q.  Are your opinions in this
22  case the opinions of New York University?
23  A.  This is my --
24  MS. O'DELL:  Objection to

Page 228

1  form.
2  You can answer.
3  THE WITNESS:  This is my
4  opinion based upon my systematic
5  review of all the scientific
6  literature.  And they -- by the
7  nature of hiring me, they have
8  approved of my -- my opinions.
9  Maybe not specifically in this
10  case, but they would not have
11  hired me or kept me for 35 years
12  if they did not agree that I was a
13  well-known established
14  toxicologist whose opinions are
15  based in my professional judgment.
16  BY MR. HEGARTY:
17  Q.  Did you tell the university,
18  New York University, of your opinions in
19  this case?
20  A.  I did not.
21  Q.  Have you told them that
22  you're an expert witness for plaintiffs
23  in this litigation?
24  A.  I have, yes.

Page 229

1  Q.  Have you reported, in your
2  financial disclosure, the money that
3  you've made in this litigation?
4  A.  Up until -- we are asked
5  that question -- we have to fill out
6  reports on transparency and conflicts of
7  interest.  And I think the last time I
8  did it was in November of 2018.  And I
9  reported up to that time, yes.  We are
10  required to do that and, yes, I am
11  completely transparent.
12  So any money that I've made
13  since November, or since the filing of
14  the confidentiality agreement has not
15  been reported but will be coming in March
16  or April.
17  Q.  You don't speak for any
18  journal for the purpose of your report,
19  do you?
20  A.  For purposes of this report
21  I do not speak for journals.  But I do
22  speak for journals because I'm an editor,
23  I'm an associate editor and on the
24  editorial boards for numerous

58 (Pages 226 to 229)

Judith Zelikoff, Ph.D.

Page 230

1  environmental health and toxicology
2  journals.
3       Q.   At the top of Page 3 of your
4  report, you say in the first full
5  paragraph that you considered the studies
6  that did not find an increased risk of
7  ovarian cancer with talc use.
8       Do you see that?
9       MS. O'DELL:  What page are
10  you on?  I'm sorry.
11  BY MR. HEGARTY:
12       Q.   Page 3.
13       A.   I'm sorry.  I know we're on
14  Page 3.
15       Q.   The first full paragraph.
16       A.   My opinions below?
17       Q.   The first full paragraph.
18       A.   My opinions below.  "My
19  opinions below" --
20       Q.   At the very -- at the very
21  end, you say you considered those studies
22  that did not find an increased risk.
23       Do you see that?
24       A.   I'm reading it.

Page 231

1       Yes, okay.  You were reading
2  in the middle of the sentence.  "To my
3  knowledge, I considered and evaluated the
4  majority of all available relevant
5  studies in the process of evaluating the
6  literature, including those that reported
7  an elevated risk of ovarian cancer with
8  exposure to talc and those where other
9  chemicals were reported within talc-based
10  body powders, including those that did
11  not find an increased risk."  Yes.
12       Q.   You did not cite a single
13  paper in your report that did not find an
14  increased risk of ovarian cancer with
15  talc use, did you?
16       MS. O'DELL:  Objection to
17  form.
18       THE WITNESS:  There were --
19  in reading over the meta-analysis
20  of -- I'm sorry, I'm probably
21  going to get his name wrong --
22  Penninkilampi.
23       In reading over the
24  meta-analysis of several -- from

Page 232

1  several, there are case-control
2  studies as well as cohort studies
3  which showed negative
4  associations.
5  BY MR. HEGARTY:
6       Q.   You did not cite any of
7  those in your report, though, did you?
8       A.   No.  What I said -- I'm
9  sorry.  Let me try and make it clear.
10       Yes, those meta-analyses
11  were included in the report or -- I need
12  to find the names.  Systematic review
13  that I cited was
14  P-E-N-N-I-N-K-I-L-A-M-P-I 2018.  And that
15  was a meta-analysis which reviewed the
16  epidemiological case-control and cohort
17  studies which showed that there were
18  studies that had negative associations.
19       Q.   Is that the only reference
20  that you included in your report, to
21  studies that did not find an increased
22  risk of ovarian cancer with talc use?
23       MS. O'DELL:  Object to the
24  form.

Page 233

1       THE WITNESS:  No.  No.
2       MS. O'DELL:  Excuse me.
3  Object to the form.
4       THE WITNESS:  No.  Under the
5  animal models on Page 13, there
6  were -- with rats that were
7  exposed by the peritoneum --
8  perineum, sorry, to either talc or
9  no treatment.  And while they did
10  find inflammatory response --
11  again, going back to my biological
12  plausibility -- they did not find
13  neoplasms.
14  BY MR. HEGARTY:
15       Q.   So that would be an example
16  of a study that did not show an increased
17  risk of ovarian cancer with talc use,
18  correct?
19       A.   That is --
20       MS. O'DELL:  Object to the
21  form.
22       Go ahead.
23  BY MR. HEGARTY:
24       Q.   Is that correct?

59 (Pages 230 to 233)

Judith Zelikoff, Ph.D.

Page 234

1    A.   Sorry.  Repeat the question.
2  Repeat the question, please.
3    Q.   Sure.  So that is an example
4  of a study that, in your opinion, does
5  not show an increased risk of ovarian
6  cancer with talc use?
7       MS. O'DELL:  Objection to
8     form.  Go ahead.  Sorry.
9       THE WITNESS:  Sorry.
10      This is a study which shows
11      biological plausibility by showing
12      that there is a foreign body
13      reaction and inflammatory
14      response.  However, it does not
15      show that there was any change in
16      neoplasm -- or any induction of
17      neoplasms or cancer.
18  BY MR. HEGARTY:
19    Q.   Did you read any cell study
20  that showed that talc is not cytotoxic?
21    A.   Can you please explain what
22  you mean by cytotoxic?  I want to answer
23  the question as you understand it.
24    Q.   What is your definition of

Page 235

1  cytotoxicity?
2    A.   I'd like to answer the
3  question that you're asking me.
4    Q.   I'm asking you your
5  definition.  The way a deposition works
6  is I ask you questions.  You don't ask me
7  questions.
8       MS. O'DELL:  Don't be -- be
9     courteous to the witness, please.
10      MR. HEGARTY:  I am.
11      THE WITNESS:  I appreciate
12      that.  I just want to, as a
13      toxicologist, the word
14      "cytotoxicity" carries many
15      meanings.
16  BY MR. HEGARTY:
17    Q.   What is your definition --
18  basic definition of cytotoxicity?
19    A.   There are many meanings.
20  Cytotoxicity taken literally meaning
21  toxicity to a cell.  Cyto, cell;
22  toxicity, toxic.  However, toxicity can
23  be measured by numerous endpoints.
24    Q.   Did you read any studies

Page 236

1  showing that talc was not toxic to cells?
2    A.   I read comparison studies.
3  Let me please find that, the exact names.
4    Q.   Let me withdraw the
5  question.  Doctor, in your opinion is
6  talc mutagenic?
7    A.   How do you define
8  "mutagenic"?
9    Q.   Doctor, what's your --
10  mutagenic is mutation to genes.  Does
11  talc mutate genes?
12    A.   Talc leads to changes in
13  gene expression which can be inferred as
14  a mutation.  However, when you talk about
15  mutation, you have many different
16  mechanisms of mutation.  Mutation can
17  occur as a result of a genotoxic or
18  direct impact on DNA, or it can occur as
19  a result of changes in the epigenome,
20  which leads to changes in expression of
21  the gene.
22    Q.   Does talc directly mutate
23  genes?
24    A.   Talc has been shown to

Page 237

1  cause -- to cause changes in particular
2  enzymes in the gene expression.  So a
3  mutation -- yes, it has been -- it has
4  been shown for mutation.  But I just
5  need -- I need the attorneys to
6  understand that there are many ways to
7  mutate a cell, not only can you do it by
8  chemical agent, but you can also -- it
9  occurs with aging.
10      So you do not need -- I'm
11  sorry.  You do not need genotoxicity to
12  produce mutagenesis.
13      Now, if you look at many
14  different assays such as the Ames assay
15  which uses bacteria to assess
16  mutagenicity, you are not going to see
17  that as a possibility for talc because
18  the bacteria cannot engulf the particle
19  and the particle needs to be ingested in
20  order to show mutagenesis.
21    Q.   Doctor, on Page 4 above your
22  section "fibrous talc" --
23    A.   I see it.
24    Q.   -- you refer to particle

60 (Pages 234 to 237)

Judith Zelikoff, Ph.D.

Page 238

1  size for talc.
2      A.   That's correct.
3      Q.   Is knowing particle size
4  part of your methodology for your
5  opinions in your report?
6      A.   I'm sorry.  I don't
7  understand what you mean by was it part
8  of my methodology.
9      Q.   Well, what is the threshold
10 size of a talc particle to establish
11 biologic plausibility?
12         MS. O'DELL:  Object to form.
13         THE WITNESS:  I don't think
14     you can answer that question.
15         In -- let me say this.
16         In doing my methodology and
17     accumulating literature, I -- as I
18     said, I binned or siloed
19     individual things.
20         And one of the silos and one
21     of the categories that I -- that I
22     wanted to read was size.  Size
23     makes a very big difference in
24     particles, and for example, if the

Page 239

1      particle is greater than
2      10 microns it's going to be what
3      we call inhalable as opposed to
4      respirable.  So where a particle
5      can go in terms of, and now I'm
6      using the lung as an example,
7      where the particle can go will
8      depend upon its size and how long
9      it will remain in a tissue.
10         So in my bins, in my silos
11     were -- certainly size was a
12     parameter.
13 BY MR. HEGARTY:
14     Q.   And what is the threshold
15 size of a talc particle to establish
16 biologic plausibility between talc and
17 ovarian cancer?
18         MS. O'DELL:  Objection to
19     the form.
20 BY MR. HEGARTY:
21     Q.   What size must the particle
22 be?
23         MS. O'DELL:  Objection to
24     form.

Page 240

1         THE WITNESS:  Establishing
2      my biological plausibility was --
3      was travel -- is traveling through
4      migration and the ability for a --
5      for the powder to migrate or the
6      constituents to migrate.  And --
7      and also the ability to be
8      inflammatory.
9  BY MR. HEGARTY:
10     Q.   Well, what size -- what size
11 of particle -- what size must the
12 particle be to cause inflammation that
13 leads to ovarian cancer?
14     A.   Particles of any --
15         MS. O'DELL:  Objection to
16     form.  You may go.
17         THE WITNESS:  Particles of
18     any size can cause inflammation.
19 BY MR. HEGARTY:
20     Q.   What about talc particles,
21 what size of talc particle must there be
22 to cause inflammation?
23     A.   Talc particles of any size
24 can cause inflammation.

Page 241

1      Q.   And is there --
2      A.   However, there are
3  differences, from reading the literature,
4  that indicates that the smaller the
5  particle the greater the inflammation.
6         And that's universally
7  known.
8      Q.   Was part of your analysis,
9  did you -- did that involve investigating
10 biologic plausibility as it relates to
11 particle size?
12     A.   That was -- that was part of
13 my reading and part of my -- my thought
14 process, my gathering of information,
15 yes.
16     Q.   And is there a certain size
17 of particle necessary to establish
18 biologic plausibility under your opinion?
19         MS. O'DELL:  Objection.
20     Asked and answered.
21         THE WITNESS:  Well, I do
22     think I answered that question.
23     But again there's really --
24     apart -- it is not just particle

Judith Zelikoff, Ph.D.

Page 242

1    size which is important in
2    producing an inflammation.  It is
3    many parameters.  And so there was
4    no one size or one cutoff that
5    induces inflammation or does not.
6    It's chemical composition, it's
7    shape of the particle, it's
8    bioavailability of the particle.
9  BY MR. HEGARTY:
10    Q.   Can you cite for me the --
11  the particle size for Johnson's Baby
12  Powder over the last 120 years?
13        MS. O'DELL:  Objection to
14        form.
15        THE WITNESS:  I'm not sure I
16    can cite it over the last
17    120 years.  But I can tell you
18    from the information in the
19    documents that I -- that I
20    reviewed, that particle size goes
21    from above 50 microns,
22    micrometers, microns, down to
23    0.3 micron with an average size of
24    10.5 to 11.5 depending on the

Page 243

1    document that you read.  So an
2    average or median size.
3  BY MR. HEGARTY:
4    Q.   So did you -- did you do
5  analysis for biologic plausibility
6  purposes of every size of talc particle?
7        MS. O'DELL:  Objection.
8        Asked and answered.
9        THE WITNESS:  Did I do
10    analysis -- I -- no, as I said, I
11    gave you the size of the -- of the
12    talcum that was reviewed, that I
13    reviewed within the documents.
14  BY MR. HEGARTY:
15    Q.   You, on -- on page -- strike
16    that.
17        Under the section Fibrous
18  Talc, you say that -- is it your
19  testimony that -- strike that.
20        Is it your opinion that
21  asbestiform talc is also called fibrous
22  talc?
23    A.   Talc and asbestos are -- are
24  different minerals.

Page 244

1    Q.   Well, fibrous talc is only
2  talc that grows in an -- in an
3  asbestiform habit, correct?
4    A.   Fibrous talc refers to the
5  shape and the longitudinal direction of
6  the fibers.  That's what fibrous talc is,
7  and asbestiform refers to the same
8  longitudinal pattern of the particular
9  fibrils and -- to form a bundle or to
10  form a fiber.
11    Q.   So you don't agree that
12  fibrous talc is only talc that grows in
13  an asbestiform habit?
14        MS. O'DELL:  Objection to
15        form.
16        THE WITNESS:  Fibrous talc
17    by its very nature is saying that
18    it grows in an asbestiform-like
19    phenotype or asbestiform-like
20    morphology.  That's the nature of
21    asbestiform.
22        Asbestiform is a form.
23  BY MR. HEGARTY:
24    Q.   You state in the middle

Page 245

1  paragraph, in that section, that talc in
2  its fibrous form has been classified by
3  IARC as Group I, a known carcinogen.
4  That's not correct, is it?
5        MS. O'DELL:  Objection to
6        form.
7        THE WITNESS:  I'm sorry,
8    could you say again?
9  BY MR. HEGARTY:
10    Q.   Well, you agree that only
11  talc containing asbestiform fibers has
12  been classified as Group I by IARC,
13  correct?
14    A.   Are you referring to in 2010
15  IARC expanded or -- I'm sorry, in its
16  fibrous form, talc has been classified as
17  a Group I known carcinogen?
18    Q.   Correct.
19    A.   Asbestiform fibers have been
20  listed by IARC as a carcinogen.
21    Q.   A talc containing
22  asbestiform fibers is the only form of
23  talc that's been designated as a class --
24  as a Category I carcinogen by IARC,

62 (Pages 242 to 245)

Judith Zelikoff, Ph.D.

Page 246

1  correct?
2       A.   It's not the only one that's
3  been associated with it, but for the
4  purpose of my report that I put down,
5  it's the asbestiform that has been
6  classified by the IARC.
7       Q.   Well, it's talc containing
8  asbestiform fibers, correct?
9            MS. O'DELL:  Objection to
10  form.
11           THE WITNESS:  It's -- it's
12  fibrous talc.
13  BY MR. HEGARTY:
14       Q.   Is that -- that's your --
15  your -- it's your opinion that IARC's
16  designation in 2012 is of asbestiform
17  talc?
18       A.   Their designations is
19  form -- is talc fibers, which are
20  asbestiform in nature.
21       Q.   Do you cite to any published
22  data in the medical literature that
23  asbestiform talc has been found in
24  Johnson's Baby Powder?

Page 247

1       A.   I'm sorry.
2            You cite -- do you cite to
3  any published data in the medical
4  literature that asbestiform talc...
5            The documents, the published
6  documents within Johnson & Johnson and
7  the Longo report, Longo's 2017, as well
8  as 2018 supplement from December, shows
9  asbestiform fibers.
10       Q.   My question though is can
11  you cite any data published in the
12  medical literature that has found
13  asbestiform talc in Johnson's Baby
14  Powder?
15       A.   I thought I just did in
16  terms of the Longo report.
17       Q.   Is the Longo report
18  published in the medical literature?
19       A.   It's -- I'm not sure whether
20  it's accessible in the medical -- medical
21  literature at this point.  But I'm sure
22  it could be gathered.
23       Q.   My -- my question is solely
24  as to the published medical literature.

Page 248

1  Can you cite for me any published medical
2  literature finding asbestiform talc in
3  Johnson's Baby Powder?
4       A.   Page 6 of my report speaks
5  of the Crowley report, and that the fiber
6  content ranged from 8 percent to
7  30 percent.  And that Pooley and Rohl
8  analyzed 27 talc powders and detected
9  tremolite fibers in three samples.
10       Q.   Is it your testimony that
11  Crowley -- Crowley's article refers to
12  Johnson's Baby Powder?
13       A.   I would have to see the
14  article.
15       Q.   How about Pooley and Rohl,
16  do they refer to Johnson's Baby Powder?
17       A.   I would have to see the
18  article.
19       Q.   In the end, for purposes of
20  your opinion as to asbestos and talc,
21  you're relying on the report of Longo and
22  Rigler, correct?
23            MS. O'DELL:  Objection to
24  form.

Page 249

1            THE WITNESS:  No, I rely on
2  the scientific literature, not on
3  any one paper.  I used weight of
4  evidence to come to my opinion.
5  BY MR. HEGARTY:
6       Q.   Did you include in your
7  weighing of evidence the expert reports
8  of Longo and Rigler?
9       A.   I read the Longo supplement
10  2018 after I wrote the report.
11       Q.   For purposes -- for purposes
12  of the opinions again in this case, do
13  you rely in any way on the Longo and
14  Rigler reports?
15            MS. O'DELL:  Objection to
16  form.
17            THE WITNESS:  I'm not sure I
18  understand your question.  As I
19  said, I wrote the report on
20  November 16th.  I read the Longo
21  supplement report in -- about two
22  weeks ago.
23  BY MR. HEGARTY:
24       Q.   But you cite in your report

Judith Zelikoff, Ph.D.

Page 250

1  the -- the MDL report of Longo and
2  Rigler, correct?
3      A.   What page is that please?
4      Q.   At the end of Exhibit B.
5      A.   I -- okay.
6           Excuse me.  I referred to
7  Longo on page -- there is no page.
8  Sorry.
9           The cosmetic talc in the
10 Lancet and cosmetic talc in -- and
11 ovarian cancer in the Lancet.  Those are
12 very early papers which I -- which I
13 reviewed.  Those papers were considered.
14 The latest papers from Longo were not
15 considered in my report.
16     Q.   Are you talking about the
17 latest --
18     A.   2017, 2018.  They were not
19 read until after the report was
20 finalized.
21     Q.   Do you know Longo and
22 Rigler?
23     A.   Not at all.
24          THE VIDEOGRAPHER:  Doctor,

Page 251

1  can you raise your microphone up?
2          THE WITNESS:  Oh, sure.
3  BY MR. HEGARTY:
4      Q.   Did you do anything to
5  assess their expertise in this area?
6      A.   I -- I --
7          MS. O'DELL:  Are you
8  referring to Dr. Longo and
9  Dr. Rigler?
10         MR. HEGARTY:  Yes.
11         THE WITNESS:  I read the --
12 the bio sketch, a brief, very
13 brief bio sketch of Ray Longo.
14 And I looked up his credentials in
15 terms of how long he's been in
16 the -- in this company, how he
17 started this company or at least
18 was president of this company for
19 a short period of time.
20         From what I know of my own
21 work in the laboratory and working
22 with other chemists and technical
23 instrumentation people in the
24 laboratory, I -- the XRD that they

Page 252

1  use, the polarized light
2  microscopy and the TEM all seem to
3  be the way he describes it.  His
4  methodologies were spot on in
5  terms of what other people do.
6  BY MR. HEGARTY:
7      Q.   Are you an expert in XRD?
8      A.   As I stated, I worked with
9  people who used the instrumentation.  An
10 expert, again, I'm not sure what you mean
11 by expert.  Have I done XRD on my own,
12 no.  But in our department we have
13 numerous people who -- who use that
14 instrumentation.
15     Q.   Are you an expert in TEM?
16     A.   I have done TEM for my Ph.D.
17 thesis.
18     Q.   Have you do TEM -- have you
19 ever done TEM to detect asbestos?
20     A.   I have not done TEM to
21 detect asbestos.  But I looked at his
22 methodologies, his study design, and the
23 instruments that he used.  And they are
24 state of the art.

Page 253

1      Q.   Have you ever performed the
2  test that he describes in his articles or
3  reports?
4      A.   I have used polarized light
5  microscopy.
6      Q.   That's not my question.  My
7  question is have you performed the same
8  tests in your lab or in any -- in your
9  experience that he has performed and
10 reported on in his reports?
11     A.   Personally, no.
12     Q.   Starting on Page 5, you talk
13 about asbestos.
14     A.   Page 5 of what?
15     Q.   Of your report.
16     A.   Thank you.
17     Q.   Is it your opinion that any
18 amount of exposure to asbestos, even to a
19 single fiber, can cause disease?
20     A.   From the scientific
21 literature it is -- it appears -- it
22 appears pretty conclusive that there is
23 no threshold for the amount of
24 asbestiform asbestos that is needed to at

Judith Zelikoff, Ph.D.

Page 254

1   least start a disease process.
2       Q.   Before being contacted by
3   counsel for plaintiffs in this case, had
4   you read any literature concerning
5   asbestos and ovarian cancer?
6       A.   I have not read literature
7   prior to that on asbestos and ovarian
8   cancer.  However, I am familiar with, as
9   I said, other particles, other dusts,
10  other fibers that I have worked with in
11  the laboratory.
12      Q.   Had you even heard of a link
13  between asbestos and ovarian cancer
14  before being contacted by plaintiffs'
15  counsel?
16      A.   Yes.
17      Q.   Where did you hear that
18  from?
19      A.   Discussed it with my
20  colleagues.  As I said, I've listened to
21  the media on discussing it.  And my
22  colleagues are a very good source,
23  although they do not do this work in
24  their laboratory, we all try to keep up

Page 255

1   with the latest emerging scientific
2   debates.
3       Q.   What is the minimum number
4   of asbestos fibers necessary to cause
5   ovarian cancer?
6       A.   Can -- do you mean -- I said
7   that there is really no threshold.  And
8   it can be one fiber.  It depends on the
9   individual and the susceptibilities and
10  the vulnerabilities of that particular
11  individual.
12      Q.   So it's your opinion that
13  one fiber of asbestos can cause ovarian
14  cancer?
15      A.   Under certain conditions,
16  yes, it is my opinion.
17      Q.   Can you cite for me any
18  authority for that opinion specific to
19  one fiber?
20          MS. O'DELL:  Object to form.
21  BY MR. HEGARTY:
22      Q.   And ovarian cancer.
23          MS. O'DELL:  Object to the
24      form.

Page 256

1           THE WITNESS:  I don't think
2   that's -- I don't think that's --
3   I don't personally think that's
4   the question.
5           The question is, asbestos is
6   well classified, well known as a
7   Class 1 carcinogen by IARC.  And
8   one fiber has the potential to
9   initiate the biological processes
10  or provides biological
11  plausibility that there, in fact,
12  by producing inflammation and
13  producing reactive oxygen
14  intermediates, one fiber can start
15  the process for ovarian cancer.
16          And again, let me just
17  repeat that my mission, my
18  question that was asked, was to
19  provide biological plausibility
20  for talc, not to define causation
21  as an epidemiologist.
22  BY MR. HEGARTY:
23      Q.   So it's your opinion that a
24  single fiber of asbestos in talc can

Page 257

1   establish biological plausibility between
2   talc and ovarian cancer?
3       A.   My --
4           MS. O'DELL:  Object to the
5       form.
6           THE WITNESS:  My opinion is
7       that a single fiber can induce
8       inflammation and reactive oxygen
9       species and can change the cell
10      into a pro-oxidant cell that
11      starts the process for ovarian
12      cancer.
13  BY MR. HEGARTY:
14      Q.   Do you agree that there are
15  background rates of asbestos in certain
16  areas?
17      A.   Do you mean in the air?
18      Q.   In the air?
19      A.   In the air, it depends on
20  that area.  If that's an area where
21  there's mining or there's a house being
22  redone from the 1970s or 19 -- early '80s
23  that might have used asbestos, then there
24  will be asbestos in the air.  But not

65 (Pages 254 to 257)

Judith Zelikoff, Ph.D.

Page 258

1  sitting in this room, unless there is
2  asbestos in the walls, which I doubt
3  because it was only built about ten years
4  ago.
5      Q.   Do the background rates of
6  asbestos in certain areas cause ovarian
7  cancer?
8      A.   Asbestos has been shown to
9  cause ovarian cancer by inhalation, yes.
10     Q.   Is it your opinion that
11 background rates of asbestos in the air
12 can cause ovarian cancer?
13         MS. O'DELL:  Object to the
14     form.
15         THE WITNESS:  I don't --
16     again, background rates, it has
17     been shown that workers that are
18     in places where asbestos is made
19     have a higher incidence of lung
20     cancer as shown by Dr. Selikoff
21     many, many years ago.
22 BY MR. HEGARTY:
23     Q.   Doctor, you know what a
24 background rate of -- background level of

Page 259

1  a particle in air is, right?
2      A.   Yes, sir, I do.
3      Q.   Okay.  And is it your
4  opinion that background levels of
5  asbestos in the air can cause ovarian
6  cancer?
7          MS. O'DELL:  Objection to
8      form.
9          THE WITNESS:  As I said,
10     sitting in this room, there should
11     not be any background level of
12     asbestos.  So if you're talking
13     about background level in a
14     particular institute or industry
15     where they're developing it, those
16     levels are quite high, and yes, I
17     do believe that those levels
18     within a working environment can
19     indeed cause inflammation that can
20     lead to causation.
21 BY MR. HEGARTY:
22     Q.   There are background levels
23 of asbestos in the air in New York City,
24 correct?

Page 260

1      A.   It depends.  After the World
2  Trade Center, there was.
3      Q.   Are those background
4  levels -- do those background levels
5  cause ovarian cancer?
6          MS. O'DELL:  Objection to
7      the form.
8          THE WITNESS:  The studies
9      that have been done by my
10     colleagues in the aftermath of the
11     World Trade Center disaster where
12     asbestos was generated have not at
13     this time -- and New York City
14     Public Health has not at this time
15     looked at ovarian cancer.  Ovarian
16     cancer occurs within 10 to 30, up
17     to 40 years later.  So since 9/11
18     was only 2001, there is -- there
19     is not sufficient time to have
20     developed ovarian cancer.
21 BY MR. HEGARTY:
22     Q.   Doctor, before 9/11 there
23 were background levels of asbestos in
24 certain parts of New York City, correct?

Page 261

1      A.   When there are houses that
2  were built with it.  There is -- asbestos
3  is not just -- should not be -- unless
4  there's a source, asbestos should not --
5  it would not be coming from jet engines.
6  It would not be coming from other
7  sources.  If it's there, it came from a
8  specific source.  It's like we should not
9  have lead in our body at all.  But we do
10 because the lead came from the air where
11 there was lead in the gasoline.
12         So there shouldn't be
13 background levels of asbestos just
14 hanging around unless there's an adequate
15 source that produced it.
16     Q.   Does EPA allow background
17 levels of asbestos in water?
18     A.   I'm not familiar with that
19 information.  That's in water.  You asked
20 me about air.
21     Q.   I asked you a different
22 question.  I can ask you a different
23 question, Doctor.
24     A.   I understand the question,

66 (Pages 258 to 261)

Judith Zelikoff, Ph.D.

Page 262

1  yes.
2       Q.   Does EPA allow background
3  levels of asbestos in water?
4       A.   I have not reviewed that
5  literature.
6       Q.   As a toxicologist, you agree
7  that dose or level of exposure determines
8  the toxicity of substances, correct?
9           MS. O'DELL:  Object to the
10  form.
11          THE WITNESS:  I believe that
12  dose as well as frequency,
13  duration, time of exposure are
14  all -- as well as dose contribute
15  to the toxicity of an agent.
16  BY MR. HEGARTY:
17      Q.   You agree that a substance
18  can produce a harmful effect only if it
19  reaches a susceptible biological system
20  within the body in high enough
21  concentration, correct?
22          MS. O'DELL:  Objection to
23  form.
24          THE WITNESS:  It depends on

Page 263

1  the -- let me read your question
2  over.  It was a lengthy question.
3  It depends on the -- on the
4  toxicant that you're talking
5  about.  There is dose that you're
6  exposed to, or concentration that
7  you're supposed to, and dose to
8  the target tissue.  And for every
9  different -- every different
10  chemical, there is a different
11  target dose that could start a
12  biological process.
13  BY MR. HEGARTY:
14      Q.   And what is the target dose
15  that is necessary to start the biologic
16  process of talc and ovarian cancer?
17          MS. O'DELL:  Object to the
18  form.
19          THE WITNESS:  Well, if
20  you -- if you look at talc as a
21  whole, to give you a
22  concentration, a threshold
23  concentration, I'm not sure that
24  has been -- I don't -- that has

Page 264

1  not been done.
2       There are -- there is
3  information on no observable
4  adverse effect level that has been
5  established using a dose-response
6  by the NTP, National Toxicology
7  Program.
8       And two milligrams of talc
9  that they used produced minimal --
10  minimal affects in the rats and
11  mice that they tested.  So
12  somewhere below at least, from an
13  inhalation perspective, is --
14  produces no effect.
15          However, they saw effects
16  even at the lowest, two milligrams
17  per.
18  BY MR. HEGARTY:
19      Q.   My question was specific to
20  ovarian cancer.  That study did not --
21  did not identify any ovarian cancers in
22  the mice -- in the mice or rats, correct?
23      A.   That's not what they looked
24  for.

Page 265

1       Q.   My question is specific to
2  ovarian cancer.
3       A.   Let me read your question
4  over again.  Could you repeat your
5  question.  It's already gone past.
6       Q.   What is the target dose that
7  is necessary to start the biologic
8  process of talc and ovarian cancer?
9       A.   Well, as I talked about, one
10  fiber of asbestos could start the
11  biological process.  It is not clear if
12  there is a threshold dose or a
13  concentration, or whether one -- and
14  we're talking about the whole talcum
15  powder product.  We're not talking about
16  any one product.  You're talking about
17  the whole process and how much it will
18  start the biological process.
19          It's unknown, it's not in
20  the literature.  But I will tell you that
21  even small doses that are used of the
22  talcum -- of a talcum product, if you
23  take a woman who takes a handful, if you
24  take a woman that takes a little bit on a

67 (Pages 262 to 265)

Judith Zelikoff, Ph.D.

Page 266

1  powder puff, that amount could even,
2  depending upon the woman, the
3  susceptibility, the vulnerability, can
4  all start the process.
5          We're talking about the
6  process, in my opinion. What you're
7  talking about and in the opinion that I
8  report here, is that that can start an
9  inflammatory process.
10     Q.    And what is the number of
11 particles of talc necessary to start the
12 biologic process?
13         MS. O'DELL: Object to form.
14         THE WITNESS: That is not in
15     the scientific literature.
16 BY MR. HEGARTY:
17     Q.    Over Pages 6 through 8 of
18 your report you discuss asbestos. Is the
19 presence of asbestos in talc necessary
20 for your biologic plausibility opinions?
21     A.    I looked at the entire
22 product.
23     Q.    Well, do you intend to
24 testify that there is biologic

Page 267

1  plausibility between pure talc, the platy
2  talc, and ovarian cancer?
3          MS. O'DELL: Object to the
4      form.
5          THE WITNESS: I don't
6      think -- my opinion is that there
7      may not be anything such as platy
8      talc in a pure form.
9  BY MR. HEGARTY:
10     Q.    Okay. It's your opinion
11 that pure talc does not exist?
12         MS. O'DELL: I'm not sure
13     she -- she finished her answer.
14         Had you finished, Doctor,
15     before?
16         THE WITNESS: I actually
17     need a little water.
18         MS. O'DELL: Okay. Sure.
19         Had you finished your answer
20     before the second question was
21     asked?
22         THE WITNESS: No.
23         MS. O'DELL: Okay. You may
24     finish.

Page 268

1          THE WITNESS: Can -- can you
2      address the question again?
3  BY MR. HEGARTY:
4      Q.    Is it your opinion that pure
5  talc does not exist?
6          When I say pure talc, I mean
7  talc without asbestos, without heavy
8  metals, without fragrance.
9          MS. O'DELL: Objection to
10     form.
11         THE WITNESS: The idea of
12     talc is that it has, within its
13     lattice, metals.
14         So platy talc refers to the
15     structure or the morphology of the
16     talc, how it looks, what
17     dimensions it's in.
18         So, do I think there is
19     platy talc? Of course there is
20     platy talc.
21 BY MR. HEGARTY:
22     Q.    Is there platy talc without
23 asbestos?
24     A.    Well, according to the

Page 269

1  studies out of Mossman's laboratories,
2  they used asbestos, they used talc that
3  contained nonfibrous talc.
4      Q.    Do you have an opinion on
5  whether there is talc without asbestos?
6          MS. O'DELL: Object to the
7      form.
8          THE WITNESS: In many of the
9      documents from Johnson & Johnson,
10     they measured fibrous talc as well
11     as other forms, non-asbestiform,
12     and they -- they found that there
13     were samples, individual samples
14     that they reported as
15     nondetectable as having
16     asbestiform talc.
17 BY MR. HEGARTY:
18     Q.    Well, do you have an opinion
19 of whether there is talc without
20 asbestos?
21     A.    It depends where -- where
22 it's mined. If it's mined in an area
23 where people were extremely cautious,
24 there could be.

68 (Pages 266 to 269)

Judith Zelikoff, Ph.D.

Page 270

1    Q.   Did you do analysis of
2  biologic plausibility for talc without
3  asbestos?
4         MS. O'DELL:  Objection to
5    form.
6         THE WITNESS:  My biological
7    assessment, my -- my biological
8    plausibility was looking at the
9    entire product of talcum powder.
10 BY MR. HEGARTY:
11   Q.   And how do you define the
12 entire product?
13   A.   The entire product is
14 whatever are the ingredients or listed
15 within the documents or the test results
16 from Imerys that -- that indicate what
17 they measured, including the metals, the
18 asbestos, the -- the asbestiform fibers,
19 the fragrances.
20   Q.   So you did your biologic
21 plausibility analysis with -- based on
22 talc that has asbestos, heavy metals and
23 fragrance in it, correct?
24         MS. O'DELL:  Objection to

Page 271

1    form.
2         THE WITNESS:  I did my
3    biological plausibility on talcum
4    powder products.
5         I looked at individual
6    products, individual constituents
7    in adding to my -- to my report,
8    to my document.  But I looked at
9    the entire product.  And it is my
10   opinion that the entire product
11   causes inflammation and that
12   inflammation then goes on as a
13   triggering mechanism to turn on
14   certain genes and to bind iron
15   that can lead to the changes
16   needed for cancer in the ovary.
17 BY MR. HEGARTY:
18   Q.   You did not do a separate
19 analysis of talc without asbestos or
20 without -- and without heavy metals and
21 without fragrance, correct?
22         MS. O'DELL:  Object to the
23   form.
24         THE WITNESS:  I'm not even

Page 272

1    sure how that would be done or I
2    don't think it could be done.
3         What I did was I did it for
4    the entire product.
5  BY MR. HEGARTY:
6    Q.   And what do you -- what do
7  you think -- what is your opinion --
8  strike that.
9         What is in the entire
10 product in your opinion?
11   A.   Based upon the Johnson &
12 Johnson documents.  That's where my --
13 that's where I will tell you what is in
14 there.
15         As -- as far as the product
16 documents, it indicates that there are
17 metals, including -- not -- not totally
18 inclusive of, but to mention a few of the
19 more well-known ones, cobalt, chromium
20 and nickel.
21         There are also, according to
22 the Crowley report, there are also many
23 chemicals that make up a fragrance.  And
24 there -- and in many of the samples

Page 273

1    tested, there was asbestos or asbestiform
2  fibers, some of which were called fibrous
3  talc, others were called asbestiform and
4  others in which they were called asbestos
5  fibers, or amphiboles or anthophyllite.
6    Q.   Did you review all the
7  test --
8    A.   Anthophyllite.
9    Q.   I'm sorry.
10        Did you review all the
11 testing documents produced by Johnson &
12 Johnson and Imerys in this case?
13   A.   I reviewed the documents
14 that are in the production document black
15 binder to my right.
16   Q.   Those were provided to you
17 by plaintiffs' counsel, correct?
18   A.   That is correct.
19   Q.   Did you ask them if they
20 provided to you all testing documents
21 that had been produced in this case with
22 regard -- by Johnson & Johnson and
23 Imerys?
24   A.   I did not ask that question

69 (Pages 270 to 273)

Judith Zelikoff, Ph.D.

Page 274

1  specifically.
2       Q.   Do you know whether there
3  are additional documents of tests --
4  documents describing tests that were done
5  by Johnson & Johnson and/or Imerys with
6  regard to asbestos, heavy metals,
7  fragrances and talc?
8            MS. O'DELL:  Object to form.
9            THE WITNESS:  Plaintiff
10      counsels and myself did talk about
11      that, some of that information,
12      and --
13           MS. O'DELL:  Doctor,
14      don't -- in terms of our
15      conversations --
16           THE WITNESS:  I'm sorry.
17           MS. O'DELL:  -- those
18      conversations are our work
19      product.
20           But to the degree that your
21      answer doesn't depend on our
22      conversations, you may -- you may
23      answer.
24           THE WITNESS:  I -- I made it

Page 275

1      clear that I would like to see
2      documents that could go into my
3      assessment of biological
4      plausibility.
5  BY MR. HEGARTY:
6       Q.   Would you like to see
7  documents showing that there is no
8  asbestos in talcum powder, in particular
9  Johnson's Baby Powder?
10      A.   I will review any documents
11  that are provided to me, if asked to
12  review them.
13      Q.   Did you ask plaintiffs'
14  counsel to provide you documents of
15  testing showing no asbestos in Johnson's
16  Baby Powder?
17      A.   Many of those -- of the
18  documents that are in the product
19  production document show that there are
20  samples that do not contain asbestos, or
21  I will say asbestiform or talc fibers.
22  So there is information in there showing
23  when there is -- it is present and
24  information in there showing when it was

Page 276

1  not present.
2       Q.   You relied on plaintiffs'
3  counsel to select for you the testing
4  documents that you reviewed, correct?
5       A.   I -- I read and reviewed
6  whatever they sent me.
7       Q.   And did you do anything to
8  verify that you had all the documents
9  regarding the testing of Johnson's Baby
10  Powder?
11      A.   I did nothing personally
12  other than ask the -- the attorneys if
13  there was anything else I needed in
14  forming my opinion.  In -- of production
15  documents, if we're just referring to
16  that.
17           I have no access to
18  production documents on my own or through
19  the internet.  And I know none of the
20  other deposees.
21      Q.   Did you do a comparison of
22  biologic plausibility across various
23  brands of talcum powder products?
24      A.   I did not personally do any

Page 277

1  of that.  However many of the documents
2  and many of the studies including the
3  Longo supplement did compare, for
4  example, I think I misspoke when I said
5  one of the places that Johnson & Johnson
6  gets their talc is Korea.  What I meant
7  was China.  I should have said Asia.  So
8  Korea is also a mine that provided, but
9  not to Johnson & Johnson.
10           MS. O'DELL:  Hey, Mark,
11      we've been going about an hour and
12      15 minutes.
13           MR. HEGARTY:  Okay.
14           MS. O'DELL:  Can we take a
15      break?
16           MR. HEGARTY:  Yeah.
17           THE VIDEOGRAPHER:  The time
18      is 2:27 p.m.  Off the record.
19           (Short break.)
20           THE VIDEOGRAPHER:  We are
21      back on the record.  The time is
22      2:45 p.m.
23  BY MR. HEGARTY:
24      Q.   Doctor, if evidence was that

70 (Pages 274 to 277)

Judith Zelikoff, Ph.D.

Page 278

1  there is no asbestos in Johnson's Baby
2  Powder, would that change your opinions
3  as to biological plausibility?
4      A.   No, sir, it would not.
5      Q.   Same question with regard to
6  heavy metals.  If there were no heavy
7  metals in Johnson's Baby Powder, would
8  that change your opinions on biological
9  plausibility?
10      A.   I looked at the entire
11  product and it would not -- it would not
12  change my opinion, as it exists
13  currently, with biological plausibility
14  that it would cause ovarian cancer
15  through -- through inflammation, is my
16  opinion.
17      Q.   In looking at your heavy
18  metals section, beginning at Page 8 of
19  your report -- are you there?
20      A.   I'm not.  I had to put my
21  glasses on.  Thank you.
22      Q.   There are no studies that
23  have looked at the effects of these
24  metals in powder dusted on the perineum,

Page 280

1  ludicrous actually.
2      Q.   None of the studies that you
3  cite in your heavy metals section link
4  the exposures that you discussed to
5  ovarian cancer risk, correct?
6      THE WITNESS:  I'm sorry.
7  This is not coming up.
8          (Whereupon, a discussion was
9  held off the stenographic record.)
10      THE WITNESS:  They -- the
11  studies that I list for the
12  individual metals talk about the
13  potential inflammatory and
14  carcinogenic potential of those
15  particular metals.  And based on
16  the Crowley report, there are, and
17  other production documents from
18  Johnson & Johnson, they list three
19  particular metals that are
20  associated with Johnson & Johnson
21  products, cobalt, nickel and
22  chromium.
23  BY MR. HEGARTY:
24      Q.   That was not my question.

Page 279

1  correct?
2      A.   Your question is there are
3  no studies looking at these individual
4  metals?
5      Q.   Correct?
6      A.   Perineal studies in the
7  ovarian --
8      Q.   No, my question is, there
9  are no studies that looked at the effects
10  of these metals in powder dusted on the
11  perineum, correct?
12      A.   I'm not sure I understand
13  your question.
14      Q.   You don't cite any studies
15  that have looked at the effect of
16  applying these metals to the perineum,
17  correct?
18      A.   To my knowledge, there are
19  no specific animal studies that show
20  nickel was applied to the perineal.
21      Q.   There are no human studies
22  either, correct?
23      A.   To my knowledge, there are
24  no human studies.  That would be

Page 281

1  My question is, none of the studies that
2  you cite --
3      A.   On the --
4      Q.   -- in your section on heavy
5  metals, evaluate ovarian carcinogenicity
6  potentials of these metals, correct?
7      MS. O'DELL:  Object to the
8  form.
9      THE WITNESS:  I do not talk
10  about ovarian cancer in particular
11  relation to these three metals
12  that I cited --
13  BY MR. HEGARTY:
14      Q.   No studies --
15      A.   -- in the report.
16      Q.   -- that you cite refer to
17  risk of ovarian cancer with exposure to
18  these metals, correct?
19      A.   With my charge being
20  biological plausibility, I thought that
21  it was my opinion -- my professional
22  opinion is that it was more important to
23  discuss the potential for inflammatory
24  responsiveness and carcinogenic

71 (Pages 278 to 281)

Judith Zelikoff, Ph.D.

Page 282

1  potential.
2      Q.   Doctor, you don't cite any
3  studies that look at -- look at the
4  ovarian carcinogenicity potential of any
5  of these metals, correct?
6          MS. O'DELL:  Object to form.
7          THE WITNESS:  Not in my
8      report.
9  BY MR. HEGARTY:
10     Q.   What are the exposure levels
11 of these metals necessary to have
12 biologic plausibility of ovarian cancer?
13     A.   As far as biological
14 plausibility of these metals, these
15 metals are -- unless there are particular
16 standards for a particular metal, nothing
17 is really established for what it would
18 take for nickel to cause ovarian cancer.
19         However, the ability of
20 these metals to produce inflammation are
21 very, very low levels.  And if they
22 produce inflammation, then they have the
23 potential to go on to produce cancer.
24 And many of these metals do.

Page 283

1      Q.   Well, none of these studies
2  report a threshold level of exposure to
3  cobalt, chromium, or nickel to increase
4  the risk of ovarian cancer, correct?
5          MS. O'DELL:  Object to the
6      form.
7          THE WITNESS:  That was not
8      the purpose of my writing.
9          My -- my writing was to
10     exemplify the carcinogenic
11     potential and the inflammatory and
12     some of the human health effects
13     that are commonly seen.  Ovarian
14     cancer is not that common.  And so
15     it's not unusual that other --
16     that ovarian cancer was not looked
17     into in some of these studies.
18 BY MR. HEGARTY:
19     Q.   Well, you found no studies
20 looking at exposure to any of those
21 metals and risk of ovarian cancer,
22 correct?
23     A.   It's not that I didn't find
24 any.  I wasn't particularly looking for

Page 284

1  them.
2      Q.   Did you find any?
3      A.   Again, the purpose of
4  writing this section on heavy metals had
5  to do with bringing out the inflammatory
6  and the biological plausibility that in
7  my mind is linked to talc and ovarian
8  cancer.
9      Q.   Doctor, listen to my
10 question.  Did you find any studies
11 reporting on a risk of ovarian cancer
12 with exposure to any of those metals?
13         MS. O'DELL:  Objection to
14     form.
15         THE WITNESS:  I found in
16     cobalt, but it does not have to do
17     with ovarian cancer, but I did
18     find that the absorption of cobalt
19     is much higher in women than in
20     men.  And that many of these
21     studies show that you have
22     increased proliferation.  And as I
23     said, mine was -- my question that
24     I needed to address was biological

Page 285

1  plausibility.
2          So I did find many of these
3      factors, many of these metals, all
4      of these metals have the potential
5      to produce the changes that are in
6      the carcinogenic process.
7  BY MR. HEGARTY:
8      Q.   I'm going to ask the
9  question one more time.  And if we don't
10 get an answer I'm going to call Judge
11 Pisano.
12         Cite for me, which study did
13 you find that linked exposure to these
14 metals to ovarian cancer?
15         MS. O'DELL:  Objection to
16     the form.
17         Dr. Zelikoff has answered
18     your question multiple times.
19     But you may answer it again.
20 BY MR. HEGARTY:
21     Q.   Let me ask it differently.
22 Did you find any studies reporting on a
23 risk of ovarian cancer with exposure to
24 any of these metals, that being cobalt,

72 (Pages 282 to 285)

Judith Zelikoff, Ph.D.

Page 286

1   chromium, or nickel?
2       A.   I was not looking
3   specifically for that.  So, no, I did not
4   find that.
5       Q.   Which of the studies that
6   you report show that the exposure levels
7   evaluated in those studies are in any way
8   related to human exposure levels through
9   Johnson's Baby Powder?
10          MS. O'DELL:  Object to the
11   form.
12          THE WITNESS:  Are you
13   talking about inhalation or
14   perineal application?
15   BY MR. HEGARTY:
16       Q.   Either method of exposure.
17       A.   So many of the inhalation
18   numbers are concentrations, and looking
19   at the Johnson & Johnson documents in
20   terms of what is in the head and in the
21   face area after diapering as well as
22   during powdering, indicates that the
23   concentrations that are possibly inhaled
24   contain particles that can initiate a

Page 287

1   response.
2          Also, from looking at the
3   Johnson & Johnson documents, many of
4   those results indicate -- and I think we
5   have an exhibit here of the table of the
6   concentrations that were found.
7          Well, it's not at my local
8   fingertips here.  But --
9          MS. O'DELL:  Are you looking
10   for Exhibit C, Doctor, I think
11   it's right there with -- on
12   your -- on your paper clip.
13          MR. HEGARTY:  Let me
14   withdraw the question.
15   BY MR. HEGARTY:
16       Q.   Doctor, how much nickel,
17   cobalt and chromium reach the ovary with
18   one application of Johnson's Baby Powder
19   to the perineum?
20          MS. O'DELL:  Object to the
21   form.
22          THE WITNESS:  Since much of
23   the -- since Johnson's Baby Powder
24   has a high concentrations of some

Page 288

1   of these metals in terms of parts
2   per million, whatever talc reached
3   there, there's -- there is a
4   strong potential that that amount
5   of the concentration of the metal
6   would also reach the target organ.
7   BY MR. HEGARTY:
8       Q.   That's not my question,
9   Doctor.
10          How much nickel, cobalt and
11   chromium reached the ovary with a single
12   application of Johnson's Baby Powder to
13   the perineum?
14       A.   I don't have -- that
15   information is not available.
16          They did show in studies, in
17   a few studies, I think it was the
18   Hamilton study that -- or Henderson
19   study -- that there -- talc indeed does
20   reach the ovary from perineal application
21   or from intravaginal application.  And
22   whatever is -- whatever the concentration
23   is that reached the ovary, carried with
24   it these -- one -- one or more or all of

Page 289

1   these three metals.
2       Q.   You agree --
3       A.   So it was a similar
4   concentration.
5       Q.   You agree that all of the
6   metals you talk about are in -- are all
7   around us, they are in food, correct?
8       A.   The metals nickel, chromium,
9   cobalt can be in food, yes.
10       Q.   They are in the air,
11   correct?
12       A.   They are in certain ambient
13   environments.
14       Q.   These are metals that are
15   considered ubiquitous, correct?
16          MS. O'DELL:  Objection to
17   the form.
18          THE WITNESS:  They are --
19   chromium not as much -- I'm sorry,
20   cobalt not as much.  But chromium
21   and nickel, they are in the air,
22   and depending upon the environment
23   that is producing it, if you go to
24   Sundre, Canada, you can have lots

73 (Pages 286 to 289)

Judith Zelikoff, Ph.D.

Page 290

```
 1    of nickel in the air.  But if you
 2    go to New York City, concentrate
 3    as we've measured in my laboratory
 4    prior to this deposition, or prior
 5    to this case, my involvement in
 6    this case, you will see very small
 7    concentrations of nickel.  There
 8    should not be a lot in the air.
 9         And we also measured
10    chromium, and it should not be --
11    unless you have a polluted
12    environment there should not be a
13    lot of these metals in the air.
14  BY MR. HEGARTY:
15       Q.   Is the metal are not -- the
16    metals that are in the air, nickel and
17    chromium, sufficient to have biologic
18    plausibility with those metals and
19    ovarian cancer?
20       A.   Those -- those metals, yes,
21    the metals in the air can cause an
22    inflammatory response.  The
23    concentrations of the metals in the air
24    can cause an inflammatory response and
```

Page 291

```
 1    can start processes and change gene
 2    expression within cells.
 3       Q.   Cite for me any study that
 4    shows that inflammatory response has ever
 5    occurred in the ovary.
 6         MS. O'DELL:  Objection to
 7         form.
 8         THE WITNESS:  There are
 9         granulomas that have been found in
10         animal studies of -- in the lung.
11         You are talking about in the
12         ovary, I understand that.
13  BY MR. HEGARTY:
14       Q.   I'm talking about the
15    studies that have not looked at talc, but
16    have looked at cobalt, chromium --
17       A.   Okay.
18       Q.   -- nickel and cobalt without
19    regard to talc, cite for me any studies
20    that have shown that those metals have
21    caused inflammation in the ovary?
22       A.   By themselves, there are no
23    studies that demonstrate that, that I'm
24    aware of.
```

Page 292

```
 1       Q.   Did you do an analysis
 2    yourself of Johnson's Baby Powder for the
 3    presence of these heavy metals?
 4       A.   I did not do any
 5    instrumentation studies measuring the
 6    amount.  I -- I relied on the documents.
 7       Q.   But you are capable of doing
 8    that analysis, correct?
 9       A.   We are capable, in my
10    laboratory, along with colleagues, of
11    measuring by XRF, x-ray fluorescence, and
12    by ICP mass spec, measuring the amounts
13    of metals in tissues, correct.
14       Q.   But you did not do that
15    testing here, correct?
16       A.   My job was to define
17    biological plausibility based upon
18    literature, relevant literature and
19    documents, internal documents.
20       Q.   Nowhere in your report do
21    you identify the exposure levels of any
22    of these metals that are necessary to
23    cause ovarian cancer, correct?
24         MS. O'DELL:  Objection to
```

Page 293

```
 1    form.  Asked and answered.
 2         THE WITNESS:  There is no
 3    literature that says you need one
 4    particle or ten particles.
 5         The inflammatory response
 6    that nickel causes is extremely
 7    well established, even at very low
 8    concentrations.  And -- and the
 9    same is true for hexavalent
10    chromium and for chromium,
11    trivalent chromium.
12  BY MR. HEGARTY:
13       Q.   Are there any studies that
14    report on exposure of these metals to the
15    ovaries?
16       A.   Are you talking about alone?
17       Q.   Individually or together,
18    but the metals themselves.
19       A.   Just the metals --
20         MS. O'DELL:  Object --
21    objection to form.
22         THE WITNESS:  These metals
23    by themselves have been tested
24    extensively in cells and in -- in
```

74 (Pages 290 to 293)

Judith Zelikoff, Ph.D.

Page 294

```
1      animals to produce inflammation,
2      to change the epigenome of the
3      cells, to change gene expression.
4      And there was no -- there was no
5      reason to believe whether or not
6      there are specific studies
7      associated with the ovary.  There
8      are no reason to believe that it
9      would not do the same effects in
10     cells as well as in the ovary, in
11     the lung, and the kidney and the
12     liver.
13  BY MR. HEGARTY:
14     Q.   Doctor, you are not aware of
15  any studies that have looked at the
16  effects of these metals on human ovarian
17  cells, correct?
18         MS. O'DELL:  Object to the
19  form.
20         THE WITNESS:  Again, I'm not
21  an epidemiologist, so -- and I'm
22  not a clinical toxicologist.  So I
23  will have to stand by the -- the
24  data that I do know in -- in
```

Page 295

```
1      extensive -- have extensive
2      knowledge of.  And that's human ex
3      vivo and in vitro studies.  And I
4      am not aware.
5          That is not to say that they
6      are not out there.  And I
7      especially do not know about the
8      humans, because I focus as a
9      toxicologist.  I'm an animal
10     toxicologist.
11  BY MR. HEGARTY:
12     Q.   Did you do any comparison
13  between the doses of -- of the metals
14  reported in the studies that you cited to
15  those in women using talc?
16     A.   I did no calculations on --
17  on my own.
18     Q.   Did you do any calculations
19  that tested these metals in animals to
20  determine what the -- that -- that they
21  relate in any way to the dose that a
22  human would experience through Johnson's
23  Baby Powder use?
24         MS. O'DELL:  Objection to
```

Page 296

```
1      form.
2          THE WITNESS:  The exposures
3      are similar, or can be similar.
4          But as I stated before, for
5      these metals as well as for
6      asbestiform fibers, all it takes
7      is a small amount, if not just one
8      fiber, to cause the response and
9      to start the process of
10     inflammation, gene expression,
11     upregulation of genes that are
12     associated with biological
13     mediators, proinflammatory
14     cytokines.
15  BY MR. HEGARTY:
16     Q.   Yet you cite no study that
17  reports that response in human ovarian
18  cells, correct?
19         MS. O'DELL:  Object to the
20  form.
21         THE WITNESS:  I -- if you're
22  still talking about individual
23  metals, no.
24         But if you're talking about
```

Page 297

```
1      in vitro studies like those of
2      Saed who looked for oxidative
3      stress and -- and prooxidant
4      changes, and if you are talking
5      about Shukla study who also looked
6      at ovarian cells, human ovarian
7      cells, and looked at changes in
8      gene expression associated with
9      oxidant production and reactive
10     oxygen species production, then
11     yes, in cell culture using human
12     ovarian epithelial cells, because
13     that's what we are talking about
14     here.
15  BY MR. HEGARTY:
16     Q.   None of those studies
17  applied nickel to human ovarian cells,
18  did they?
19     A.   No, they did not.
20     Q.   None of those studies
21  applied cobalt to human ovarian cells,
22  correct?
23     A.   No, they did not.
24     Q.   None of those studies
```

Judith Zelikoff, Ph.D.

Page 298

1  applied chromium to ovarian -- human
2  ovarian cells, correct?
3      A.   Correct.  But what we're
4  talk -- what I'm talking about and the
5  basis of my opinion is the product in its
6  entirety, not breaking it down to
7  individual constituents.
8      Q.   Is it necessary for purposes
9  of your biologic plausibility opinion
10 that talc reach the ovary?
11     A.   Not necessarily.
12         Talc does -- talc and any
13 other particle does not have to reach the
14 site of deposition.  They can, and -- and
15 do, I believe that they not only migrate
16 to an area and they can get to an area
17 and then cause inflammation which then
18 can be -- the cytokines where there's
19 tumor necrosis factor, interleukin-1, or
20 any of the other proinflammatory
21 cytokines can then get to the air, the
22 site of this -- this target organ.
23         So you do not have to have,
24 in particle toxicology and in talc

Page 299

1  toxicology, you do not have to have the
2  presence.  Although, in early studies
3  they have found talc particles not only
4  in the ovary, but also in the lymph
5  node -- in the lymphatics that drain the
6  ovary.
7      Q.   Cite for me any study that
8  has reported inflammation in the ovaries
9  from inflammation of -- due to a particle
10 in the lung -- strike that.
11         Is it your contention that
12 inflammation in the lung due to a
13 particle will cause inflammation in the
14 ovaries?
15         MS. O'DELL:  Objection to
16     form.
17         THE WITNESS:  I'm telling
18     you that --
19         MS. O'DELL:  Go ahead.
20         THE WITNESS:  -- there's
21     biological plausibility to suggest
22     that.
23         When you have a particle
24     coming in and going to a local

Page 300

1  target site, let's say in the case
2  of inhalation or in the case of
3  direct application to the perineal
4  area, you will have the process of
5  impacting with those cells and
6  generating cell mediated reactions
7  and immunological reactions and
8  inflammatory responses.
9          And those inflammatory
10 responses and those reactive
11 oxygen species, except for
12 hydrogen peroxide which can't
13 travel a far distance, can get
14 into -- can and do get into the
15 blood circulation and then can
16 reach distant organs.
17 BY MR. HEGARTY:
18     Q.   Cite for me any published
19 authority that says that inflammation in
20 the lungs will cause inflammation in the
21 ovaries.
22         MS. O'DELL:  Object to the
23     form.  Misstates her testimony.
24         THE WITNESS:  To that

Page 301

1  specific question, no.  But I
2  can -- I can cite you many studies
3  that show in terms of other
4  particles for the lungs that has
5  been shown to cause inflammation
6  in other areas.
7          For example, in the case of
8  Ghio and other investigators, you
9  will find inflammation not only in
10 the blood by the measurement of
11 cytokines in the blood, even
12 though the first target organ was
13 the -- was the lungs.
14         Also, if you look at
15 obesity, obesity is a pro-oxidant
16 state, and that can generate --
17 the reason obesity causes other
18 health effects is because it's a
19 big mass of inflammation.  And the
20 inflammation in that particular
21 site of all those fatty cells,
22 they can release inflammatory
23 mediators that go all over.  And
24 that literature is out there.

76 (Pages 298 to 301)

Judith Zelikoff, Ph.D.

Page 302

1  BY MR. HEGARTY:
2      Q.   So is it your opinion for
3  purposes of your biological
4  plausibility -- strike that.
5          Is it -- is your biological
6  plausibility opinion that talc inhaled
7  and in the lungs causes inflammation in
8  the ovaries that can lead to ovarian
9  cancer?
10     A.   There's plausibility for
11  that, yes.
12     Q.   And can you cite for me any
13  published authority that says that talc
14  inhaled in the lungs will cause
15  inflammation in the ovaries that can lead
16  to ovarian cancer?
17     A.   There's multiple parts of
18  that question.
19     Q.   That's a very specific
20  question to that very specific subject
21  area. Can you cite to me any published
22  literature that says that?
23         MS. O'DELL:  Would you mind
24     repeating the full question or

Page 303

1      read it.
2          THE WITNESS:  Any published
3      authority that says that -- that
4      says that talc inhaled in the
5      lungs will cause inflammation in
6      the ovaries that can lead to
7      ovarian cancer.
8          For that particular, and
9      that specific of a question, I
10     cannot cite you.
11  BY MR. HEGARTY:
12     Q.   You have published
13  extensively on particulates in the air
14  causing inflammation in the lungs,
15  correct?
16     A.   In the lungs and
17  systemically.
18     Q.   And those particulates
19  include?
20     A.   Air particulates;
21  particulate matter, called PM, ambient
22  PM; diesel exhaust particles.  I'm also
23  going to go to my CV.  Nanoparticles,
24  metal nanoparticles, specifically

Page 304

1  cadmium.
2      Q.   So in other words a lot of
3  particles besides talc, according to you,
4  can cause inflammation of the lungs,
5  correct?
6      A.   Many do.  There are others
7  that do not, like titanium dioxide which
8  were used in many studies as a control.
9      Q.   And those nanoparticles,
10  those air particles --
11     A.   In fact --
12     Q.   -- those diesel particles.
13     A.   I'm sorry.
14     Q.   Okay.  And those
15  nanoparticles, those diesel particles,
16  air particles that can cause inflammation
17  in the lungs, will also cause
18  inflammation in the ovaries, correct?
19         MS. O'DELL:  Objection to
20     form.
21         THE WITNESS:  I said they
22     will cause inflammation
23     systemically.  I did not indicate
24     the ovaries.

Page 305

1  BY MR. HEGARTY:
2      Q.   Well, there's no -- there's
3  nothing unique about talc particles
4  versus the other particles you mentioned,
5  correct?
6          MS. O'DELL:  Object to form.
7          THE WITNESS:  Size, chemical
8      composition, they -- they --
9      particles -- particles are -- they
10     can -- they can be different and
11     they can be the same.  So many
12     studies use model particles to
13     look at a negative effect like in
14     the Shukla study where they used
15     titanium dioxide particles of a
16     similar size in their -- as a
17     control and got no gene expression
18     changes.
19         Particles in the air, if
20     you're looking at -- there are
21     many factors that go into how a
22     particle behaves, including size,
23     including composition, including
24     morphology.

77 (Pages 302 to 305)

Judith Zelikoff, Ph.D.

Page 306

1  BY MR. HEGARTY:
2      Q.   Well, by your methodology,
3  any particle inhaled that causes
4  inflammation in the lungs is biologically
5  plausible, can lead to ovarian cancer,
6  correct?
7          MS. O'DELL:  Object to form.
8          THE WITNESS:  No, it can --
9  sorry.  It can lead to
10  inflammation systemically.
11  BY MR. HEGARTY:
12      Q.   That can lead to ovarian
13  cancer, correct?
14      A.   Inflammation --
15          MS. O'DELL:  Object to the
16  form.
17          Go ahead.
18          THE WITNESS:  Sorry.
19          MS. O'DELL:  Sorry.
20          THE WITNESS:  Inflammation
21  is responsible for -- in my
22  opinion, is the underlying
23  mechanism, a key underlying
24  mechanism for the association for

Page 307

1          ovarian cancer, yes.
2  BY MR. HEGARTY:
3      Q.   And that mechanism can be
4  initiated by any particle inhaled into
5  the lungs, correct?
6      A.   No, it's --
7          MS. O'DELL:  Objection to
8  form.
9          THE WITNESS:  Sorry.
10          Well, as -- again, as I
11  stated, it depends on the -- it
12  depends on the particle.  For
13  example, titanium dioxide will not
14  produce inflammation in the lungs.
15  However, other particles, many
16  other particles, including
17  cadmium, cadmium oxide particles
18  do cause inflammation, as well as
19  asbestos does, as well as talc has
20  been shown to.
21          They can all produce
22  inflammation or oxidative stress.
23  BY MR. HEGARTY:
24      Q.   Cadmium particles induce the

Page 308

1  same inflammation that you believe that
2  talc does, correct?
3      A.   Inflammation is
4  characterized by certain key components.
5  Inflammation -- whether it's an
6  inflammation in the ovary or an
7  inflammation in the lung or inflammation
8  in the kidney, inflammation is an immune
9  response.  And it's going to involve key
10  cells, including the macrophage, the
11  neutrophil, the natural killer cell, all
12  of which can produce reactive oxygen
13  species -- well, primarily the
14  macrophages and neutrophils produce
15  oxygen radicals.
16          However, the natural killer
17  cell, they all produce cytokines, which
18  can produce inflammation.  So
19  inflammation is characterized by the same
20  components.
21      Q.   And you can't cite for me
22  any different components of the
23  inflammation caused by cadmium as you
24  believe the inflammation that is caused

Page 309

1  by talc, correct?
2      A.   When I measured inflammatory
3  responses to the inhalation of cadmium
4  nanoparticles, I looked for the standard
5  inflammatory markers.  So I measured in
6  the lung and in the circulation.  I
7  measured the percentages of neutrophils,
8  which is a key indicator, key criteria
9  for inflammation.  I determined
10  macrophage numbers as well as function in
11  terms of their ability to phagocytose, in
12  their ability to produce reactive oxygen
13  species.  And I looked for lung injury,
14  as measured by lactose, lactate
15  dehydrogenase.
16          So when one looks for
17  inflammation in the body, whether it's an
18  animal or a human, C-reactive protein,
19  you are going to be looking for all the
20  same markers.
21      Q.   You identified, based on
22  your opinion, no difference in the
23  inflammation caused by talc and the
24  inflammation caused by cadmium, correct?

78 (Pages 306 to 309)

Judith Zelikoff, Ph.D.

Page 310

1     A.   I did not do talc inhalation
2  in my laboratory.  The studies
3  indicate -- looked for the same thing.
4  They look for changes in gene expression
5  of activating transcription factors.
6  They did in the Shukla study.
7         They look for the percentage
8  of neutrophils.  They look for macrophage
9  activation.  We all look at the same
10  thing when coming to the conclusion of
11  inflammation.
12     Q.   And according to you, talc
13  and cadmium act similarly with regard to
14  inducing inflammation in the lungs?
15         MS. O'DELL:  Objection to
16     form.
17         THE WITNESS:  Do they act
18     similarly?  Well, I think I
19     answered that question.
20         Inflammation is -- is the --
21     inflammation is modified by the
22     same components, the same soluble
23     factors, the same cell type
24     factors, including macrophages and

Page 311

1     neutrophils, dendritic cells,
2     whatever.  So inflammation,
3     whether it's acute or chronic
4     inflammation used the same
5     parameters.
6         We call inflammation -- we
7     call inflammation when you -- in a
8     tissue or in organs when you see
9     these characteristics.  And we say
10     these are markers indicative.
11     These are pathologies
12     indicative -- these are -- of an
13     inflammatory response.
14  BY MR. HEGARTY:
15     Q.   So according to your
16  opinion, that's biologic plausibility
17  between cadmium exposure and ovarian
18  cancer?
19         MS. O'DELL:  Objection to
20     form.
21         THE WITNESS:  I would have
22     to do more research on that to be
23     able to say that.  I would not say
24     biological plausibility, only

Page 312

1     because I haven't investigated
2     that literature.
3         But inflammation --
4     inflammation doesn't change.  It
5     can get out of the particular
6     local organ.  I don't think that
7     cadmium has been investigated in
8     terms of the ovary.  It's
9     certainly been investigated in
10     terms of the kidney, which is
11     local -- which is systemically a
12     distant organ from the local
13     target, which is the lung.  And it
14     can cause inflammation in the
15     kidney.
16  BY MR. HEGARTY:
17     Q.   You haven't identified any
18  differences between the inflammation
19  caused by other particulates and the
20  inflammation caused by talc, correct?
21         MS. O'DELL:  Objection to
22     form.
23         THE WITNESS:  Inflammation
24     is inflammation.

Page 313

1  BY MR. HEGARTY:
2     Q.   You referred to fragrances.
3     A.   I'm sorry.  Could you give
4  me a page?
5     Q.   Over on Page 12.  You cite
6  to a single study that discusses what
7  exposure levels of these fragrances have
8  been shown to induce a biologically
9  plausible effect in the ovary.
10         MS. O'DELL:  Object to the
11     form.
12         THE WITNESS:  Many of these
13     fragrances, many of these
14     chemicals within a specific
15     fragrance, it can consist of maybe
16     150 or even more chemicals within
17     any one given fragrance.  Many of
18     them have been shown to cause
19     inflammation.
20  BY MR. HEGARTY:
21     Q.   Have any of the chemicals in
22  the fragrances that you looked at been
23  reported in the medical literature to
24  induce inflammation in the ovaries?

79 (Pages 310 to 313)

Judith Zelikoff, Ph.D.

Page 314

1    A.   No one specifically -- to my
2    knowledge, no one specifically looked at
3    inflammation in the ovaries.  But again,
4    if you go back to the idea of
5    inflammation being caused by a particle
6    at a local site and then having the
7    potential -- or having the capacity I
8    should say, to -- to have that
9    inflammation go to a distant -- a more
10   distant site.
11        So the fact that no one has
12   looked at it does not delete the fact
13   that certainly inflammation can get to
14   distant sites, including the ovary.
15   Q.   Well, what is the dose of
16   nickel or -- and cobalt and chromium
17   individually that must -- that the woman
18   must be exposed to in vivo to induce
19   inflammation in the ovaries?
20        MS. O'DELL:  Object to the
21   form.  Asked and answered.
22        THE WITNESS:  There are --
23   as I said, there's really -- one
24   particle, one piece can start the

Page 315

1    process for inflammation.
2    BY MR. HEGARTY:
3    Q.   So it --
4    A.   It could be one.
5    Q.   -- it's your opinion that
6    one particle of nickel will induce
7    inflammation in the ovaries?
8        MS. O'DELL:  Objection.
9    BY MR. HEGARTY:
10   Q.   Is that correct?
11   A.   Will?  I can't -- I haven't
12   gone through the literature, but could,
13   certainly.
14   Q.   And what literature can you
15   cite that would say that one particle of
16   nickel could cause inflammation in the
17   ovary?
18   A.   It's my professional
19   judgment being an expert toxicologist in
20   the area of metals.
21   Q.   Okay.  Same question as to
22   cobalt and chromium.
23   A.   Well, metals can't be lumped
24   together like that.  Metals are indeed

Page 316

1    metals, but there's also -- if you look
2    at nickel and it's a micronutrient, so
3    you can have very, very, very tiny
4    amounts in the body -- very tiny.  And it
5    can be used as a micronutrient.
6        You can have lead, but that
7    should not be in the body at all.  And
8    there is no safe level of lead.  So
9    despite what the regulatory agencies say,
10   there is no safe level which is what
11   their conclusion is moving towards.
12        And -- so a metal is not a
13   metal is not a metal.
14        Now, when you look at these
15   three metals, so for example you have
16   nickel which is classified as a 1A
17   carcinogen, but --
18   Q.   I'll withdraw the question.
19   You're not -- Doctor, you're not
20   answering my question.
21        MS. O'DELL:  She is
22   answering your question.
23        MR. HEGARTY:  No, she is
24   not.

Page 317

1        MS. O'DELL:  Yes, she is.
2    And if you don't -- let her
3    finish.
4        MR. HEGARTY:  Okay.
5    We'll -- we'll call Judge Pisano
6    and he'll see if we're asking the
7    question -- if she's answering the
8    question.
9        MS. O'DELL:  Are you
10   threatening the witness by saying
11   that?
12        MR. HEGARTY:  No, I'm
13   talking to you.  We'll go off the
14   record --
15        MS. O'DELL:  You're
16   threatening the witness and -- no,
17   we're not going off the record.
18        MR. HEGARTY:  Go off the
19   record, let's go off the record.
20        MS. O'DELL:  No, we are not
21   going off the record.
22        MR. HEGARTY:  Yes, let's go
23   off the record.
24        MS. O'DELL:  If she's

80 (Pages 314 to 317)

Judith Zelikoff, Ph.D.

Page 318

```
 1    answering your question, she --
 2    she gets the right to finish her
 3    answer.  You don't cut her off,
 4    Mark.
 5        MR. HEGARTY:  Let's go off
 6    the record.
 7        MS. O'DELL:  No, we're not
 8    going off the record.  She's
 9    finishing her answer.
10        MR. HEGARTY:  Let's go off
11    the record.  I'm not --
12        MS. O'DELL:  And then you
13    can ask her another question.
14        MR. HEGARTY:  Let's go off
15    the record.  It's my deposition.
16        MS. O'DELL:  No.  It's your
17    deposition, but it's not fair to
18    mistreat this witness if she is
19    answering your question.
20        MR. HEGARTY:  I'm not
21    mistreating the witness.
22        MS. O'DELL:  Yes, you are.
23        MR. HEGARTY:  We'll go off
24    the record and call Judge Pisano.
```

Page 319

```
 1        MS. O'DELL:  You are
 2    mistreating the witness by not
 3    allowing her to finish her --
 4        MR. HEGARTY:  I withdrew the
 5    question.
 6        MS. O'DELL:  Well, okay.
 7    The with -- the question was
 8    withdrawn.  Ask a question, let
 9    her --
10        MR. HEGARTY:  No, we're off
11    the record.  We're going to call
12    Judge Pisano.
13        MS. O'DELL:  Okay.  Great.
14        THE VIDEOGRAPHER:  Off the
15    record.  The time is 3:21 p.m.
16    Off the record.
17        (Whereupon, a discussion was
18    held off the record.)
19        THE VIDEOGRAPHER:  We are
20    back on the record.  The time is
21    3:23 p.m.
22    BY MR. HEGARTY:
23        Q.    Dr. Zelikoff, is it your
24    opinion that one particle of nickel
```

Page 320

```
 1    either inhaled or applied to the perineum
 2    will induce inflammation in the ovaries?
 3        A.    It's my opinion that it
 4    could.
 5        Q.    What literature do you have
 6    to support that opinion?
 7        A.    My professional opinion as a
 8    toxicologist in metals with over
 9    30 years.
10        Q.    Next question.  Is it your
11    opinion that one particle of cobalt,
12    either inhaled or applied to the
13    perineum, will induce inflammation in the
14    ovaries?
15        A.    Again, it's my opinion that
16    it -- it could.  It has the biological
17    plausibility to, because inflammation,
18    although not as toxic in many ways as
19    it's classified as a 2B -- 2B by IARC
20    is -- has the potential -- does cause
21    inflammation, and that inflammation can
22    leave the site of the target site.
23        Q.    What authority do you have
24    for that opinion?
```

Page 321

```
 1        A.    My professional opinion.
 2        Q.    Is it your opinion that one
 3    particle of chromium, either inhaled or
 4    applied to the perineum, will induce
 5    inflammation in the ovaries?
 6        MS. O'DELL:  Objection to
 7    the form.
 8        THE WITNESS:  It depends on
 9    the form of the chromium.
10    BY MR. HEGARTY:
11        Q.    What form of chromium does
12    it need to be?
13        A.    A trivalent chromium
14    which -- I'm sorry, hexavalent chromium
15    which will then get into the cell, start
16    the process and -- and convert to
17    chromium-3, 4 and 5.
18        Q.    That's chromium-6, correct?
19        A.    Hexavalent chromium is
20    chromium-6, right.
21        Q.    Is it your opinion that one
22    particle of chromium-6, either inhaled or
23    applied to the perineum, will induce
24    inflammation in the ovaries?
```

81 (Pages 318 to 321)

Judith Zelikoff, Ph.D.

Page 322

1    MS. O'DELL:  Objection to
2    form.
3    THE WITNESS:  It could,
4    because inflammation again could
5    leave the target site.  And it
6    depends on the form of the metal.
7    So we have soluble metals --
8    I don't want to go on too long.
9    You have soluble metals and
10   insoluble metals.  Some of them
11   are more toxic and more -- and
12   potentially more carcinogenic than
13   other forms.  There are many salts
14   within those metals that you gave.
15 BY MR. HEGARTY:
16   Q.   And what authority do you
17 have for the statement that one particle
18 of chromium, either inhaled or applied to
19 the perineum, will induce inflammation in
20 the ovaries?
21   A.   My professional judgment.
22   Q.   Will one particle of the
23 fragrance of the chemicals that you list
24 from the fragrances, either inhaled or

Page 323

1 applied to the perineum, cause
2 inflammation to the ovaries?
3    MS. O'DELL:  Objection to
4    the form.
5    THE WITNESS:  If -- I -- I
6    don't have the knowledge, I don't
7    have the literature knowledge to
8    answer that question.
9 BY MR. HEGARTY:
10   Q.   Will one -- will one
11 particle of -- of cadmium, either inhaled
12 or applied to the perineum, cause
13 inflammation in the ovaries?
14   A.   It can cause --
15   MS. O'DELL:  Objection to
16   form.  You can answer.
17   THE WITNESS:  It can cause
18   inflammation in the area if it's
19   inhaled in the lung and that
20   inflammation can get out
21   systemically.
22   Now it depends, again, on
23   the size of the particle.  Metals,
24   as I said before, cannot be

Page 324

1 lumped.  And particles oftentimes,
2 if they're different in size, if
3 they're different in chemical
4 structure, if they have iron or
5 don't have iron, you have -- you
6 may have differences.
7 BY MR. HEGARTY:
8    Q.   Will one particle from
9 diesel exhaust, inhaled or applied to the
10 perineum, cause inflammation in the
11 ovary?
12   MS. O'DELL:  Object to the
13   form.
14   THE WITNESS:  Again, same
15   answer, it could.  Depends on the
16   particle size, the particle type,
17   the particle morphology.  And it
18   has the potential to induce
19   inflammation as shown in cells.
20   And can produce an oxidant state.
21 BY MR. HEGARTY:
22   Q.   Doesn't inflammation just
23 reflect the body's normal response to the
24 presence of the particles?

Page 325

1    A.   There are two -- there are
2 two forms of -- well, there are multiple
3 forms of inflammation.  But the two that
4 are of concern and in -- in response to
5 your question, is that they are acute
6 inflammation and there is chronic
7 inflammation.
8    And with acute inflammation,
9 the first response to a foreign -- a
10 foreign particle or an antigen on a
11 bacterial cell or an infectious agent, is
12 for the body to mount an immune response.
13   How it does that is through
14 the same cell types that I just
15 mentioned.  Polymorphonucleocytes, also
16 known as neutrophil.  Macrophages, and
17 those are the two key players, but
18 natural killer cells all come into it.
19   That involves the innate
20 immune system.  And so the first thing to
21 protect the body, whether it's a viral
22 infection or whether it's a bacterial
23 infection or whether it's a foreign
24 particle, is to mount that kind of immune

Judith Zelikoff, Ph.D.

Page 326

1  response to kill or negatively impact
2  that particular particle.
3          That will then -- that's an
4  innate immune response being active.
5  That will then, in some cases, upregulate
6  the T-cell and -- and humoral or -- and
7  cell-mediated immune response.
8          Now, that is, in terms of
9  cancers and in terms of tumors, that is
10  called immunosurveillance and that's the
11  first thing.  And you're absolutely
12  right.  The purpose of the immune system
13  is to protect the body.  That is the
14  function.
15          However, there are three
16  stages or three types of processes for
17  the immune system in carcinogenesis.  The
18  second being immuno equilibrium.  But the
19  part that is the last part is that the
20  tumor can actually quiet or cause
21  immunosenescence of the immune system.
22          So in a chronic
23  inflammation, it does not always act in
24  the best interest of the -- of the host

Page 327

1  but in the best interest of the tumor.
2          So your -- the answer to
3  your question is yes, that's the function
4  of it.  But it can behave, it's a
5  two-prong sword.
6      Q.    You said there are multiple
7  types of inflammation and you listed two
8  types:  Acute and chronic.  Are there any
9  other types besides those two?
10      A.    Well, you have the reactions
11  to those inflammation in terms of having
12  a foreign body reaction.  That is part of
13  an inflammatory response.  So in terms of
14  temporality or timing, inflammation is
15  acute and is chronic.
16          What occurs during that
17  time, such as a foreign body reaction
18  where macrophages all come together and
19  engulf the particle or the fiber and try
20  to keep it within a localized space, that
21  is a process that can occur within
22  inflammation.
23          So my answer to you is that
24  there are two major types of

Page 328

1  inflammation.  Not that they involve
2  different cell types or different
3  mechanisms.  But they are called, in
4  terms of timing or temporality, acute
5  which will kill whatever right away and
6  then chronic which unfortunately keeps
7  playing back on itself and the
8  inflammation will continue.
9      Q.    Granulomas which you just
10  mentioned don't cause cancer, correct?
11      A.    Granulomas do not -- I'm
12  sorry.
13      Q.    Granulomas which you just
14  mentioned don't cause cancer, correct?
15      A.    Granulomas are in response
16  to a foreign body.  In the case of
17  asbestos or in the case of another type
18  of fiber, macrophage will come over and
19  their normal process in what we call
20  innate immunity is to engulf the fiber.
21  And unfortunately, many times the fiber
22  cannot be engulfable or the particle
23  cannot be engulfable.
24          And so many macrophage will

Page 329

1  come over, and they will try to engulf it
2  as a body.  And that is called a
3  granulomatous reaction.
4          And that's what happens
5  during tuberculosis when the organism
6  forms, many macrophages come over to kill
7  the organism, but it can't, and so they
8  form granulomas.
9      Q.    Doctor, listen to my
10  question.  I didn't ask you what a
11  granuloma was.  I asked you, granulomas
12  don't cause cancer, correct?
13          MS. O'DELL:  Object to form.
14          THE WITNESS:  There is no
15      literature to my knowledge that
16      shows a granuloma, meaning immune
17      response, forming macrophages
18      engulfing, can cause cancer.
19  BY MR. HEGARTY:
20      Q.    And a reaction to
21  inflammation can include the development
22  of fibrosis or scar tissue, correct?
23      A.    That is a long-term chronic
24  response associated with chronic

83 (Pages 326 to 329)

Judith Zelikoff, Ph.D.

Page 330

1　inflammation.
2　　　　Q.　And there's no literature
3　linking fibrosis to cancer, correct?
4　　　　　MS. O'DELL:  Object to the
5　form.
6　　　　　THE WITNESS:  My
7　professional opinion is that there
8　is literature -- let me just read
9　over the question, please.
10　　　　So fibrosis is produced by
11　release of factors from the
12　macrophage.  And it causes
13　scarring within that particular
14　target organ.
15　　　　Now, whether or not that --
16　those -- that scarring can
17　actually make that site more
18　vulnerable to cancer, like in the
19　case of hepatitis, where you get
20　scarring, and you get cancer as a
21　result of that particular
22　fibrosis, but they are two
23　different diseases.
24　　　　But whether the area of

Page 331

1　　　fibrosis creates a more vulnerable
2　　　tissue base that can -- that can
3　　　progress or go to cancer is a
4　　　question that there is some
5　　　examples of, but -- in the liver
6　　　in particular.
7　BY MR. HEGARTY:
8　　　　Q.　Well, there's no literature
9　reporting an increased risk of cancer in
10　any organ because there's fibrosis in
11　that organ, correct?
12　　　　A.　What I'm saying is that in
13　terms of the liver and in terms of
14　fibrosis, let's say from ethanol or
15　acetaminophen ingestion, you get fibrosis
16　which is a whole disease or symptomology
17　by itself, and then you have cancer,
18　which is another disease.  But what I'm
19　saying is that in the area where the
20　injury and the fibrosis occurs, in the
21　liver there is a higher risk of getting
22　cancer.
23　　　　Q.　Fibrosis doesn't morph or
24　turn into cancer?

Page 332

1　　　　A.　Fibrosis does not morph or
2　turn into cancer.  That is correct.
3　　　　Q.　In Section 12 -- I'm sorry.
4　On Page 12, under your section
5　"exposure," talc particle access to the
6　body.
7　　　　Do you see that section?
8　　　　A.　Is this Paragraph 1, 2, or
9　3?
10　　　　Q.　Well, I'm looking just at
11　the Section Number 4 right now.
12　　　　A.　Yes.  Okay.  Section Number
13　6 is on Page 12.
14　　　　Q.　Section 6.  I'm sorry.  I
15　had those transposed.
16　　　　A.　And please repeat your
17　question.
18　　　　Q.　You never -- prior to being
19　contacted by counsel for plaintiffs, you
20　never looked at the studies reporting on
21　whether talc can reach the ovaries via
22　inhalation or perineal application,
23　correct?
24　　　　A.　I did not study the

Page 333

1　literature or review the literature prior
2　to being contacted.  But I studied it and
3　reviewed it extensively after being
4　contacted.
5　　　　Q.　On Page 12 of the last
6　paragraph -- I'm sorry -- second-to-last
7　paragraph, which begins, "A common
8　exposure route."
9　　　　Do you see that paragraph?
10　　　　A.　I do.  Thank you.
11　　　　Q.　You write, "Again, a common
12　exposure route for cosmetic talc is via
13　the dermal route including vaginally
14　after perineal application."
15　　　　A.　Yes.
16　　　　Q.　Is it your testimony that
17　there's biologic plausibility with talc
18　applied to the skin?
19　　　　A.　Applied to the skin, talc
20　does not -- is not absorbed into the skin
21　or through the skin, although there is
22　some question as to whether if there's
23　injury or scratch or openings in the
24　skin, whether the talc can penetrate.

84 (Pages 330 to 333)

Judith Zelikoff, Ph.D.

Page 334

1  But in and of itself talc cannot
2  penetrate through the skin.
3         However, we're not -- when
4  we're talking about perineal or vaginal
5  application, you are not talking about an
6  epidermal subcutaneous keratinized skin.
7         Q.   None of the studies that you
8  cite in this paragraph researched
9  particle transport through the
10 reproductive tract through perineal
11 application, correct?
12        MS. O'DELL:  Object to the
13     form.
14        THE WITNESS:  These -- it is
15     extremely technically difficult,
16     from my knowledge as an animal
17     toxicologist, to do perineal
18     application to a mouse.
19 BY MR. HEGARTY:
20     Q.   I'm going to withdraw the
21 question.  Doctor, you will not respond
22 to my question.  My question is simply,
23 none of the studies that you cite in this
24 paragraph researched particle transport

Page 335

1  through the reproductive tract through
2  perineal application.  That's correct?
3     A.   There is a study, and I'm
4  afraid the name of the author does not
5  come to me.  So allow me to look at my
6  report.
7     Q.   And I'm just talking about
8  the authorities that you cite in the
9  second paragraph beginning, "A common
10 exposure route."
11        MS. O'DELL:  Feel free to
12     look at your report if you need
13     to, Doctor.
14        THE WITNESS:  I understand.
15     On Page 13, animal models --
16 BY MR. HEGARTY:
17     Q.   Doctor, that's not my
18 question.  My question is in the
19 paragraph that I referenced beginning a
20 common exposure route, none of those
21 authorities looked at transport of the
22 particles via application of those
23 particles to the perineum?
24        MS. O'DELL:  Objection to

Page 336

1  the form.
2  BY MR. HEGARTY:
3     Q.   Correct?
4        MS. O'DELL:  Excuse me.  You
5     may answer his question any way
6     you'd want to, Doctor.
7        THE WITNESS:  None of these
8     that I have stated on Page 12
9     refer to perineal exposure in the
10    second paragraph in terms of
11    Venter, Iturralde, Sjosten and
12    Heller.
13        However, on Page -- on Page
14    13, there is a study by Keskin,
15    who used rats and did a vaginal or
16    perineum to talc.
17 BY MR. HEGARTY:
18     Q.   I'm going to move to strike.
19 We're going to go off the record.
20        MR. HEGARTY:  We're going to
21     call Judge Pisano.  There's no
22     reason to add that additional part
23     to the answer to that question.
24     And I'm not -- I'm tired of that

Page 337

1  happening.  So we'll call him
2  unless you're going to talk to the
3  witness.
4        MS. O'DELL:  Is your
5     objection she didn't answer your
6     question?  Because she -- you
7     asked her about the paragraph.
8     She said "no; however" --
9        MR. HEGARTY:  We're off the
10    record.
11        MS. O'DELL:  No, we're not
12    off the record.
13        MR. HEGARTY:  We're off the
14    record.
15        MS. O'DELL:  No, we --
16        MR. HEGARTY:  We're going
17    off the record.
18        MR. LOCKE:  We are off.  Let
19    me throw out something.  We've got
20    seven hours.  I think there's a
21    plan here to stall, and we need to
22    do a better job of keeping things
23    moving, or we are going to have to
24    ask the court for more time.

Judith Zelikoff, Ph.D.

Page 338

1    MR. HEGARTY:  Let's go off
2  the record.
3    MS. O'DELL:  The suggestion
4  that there's -- let me just --
5  before we go off the record, the
6  suggestion that there's somehow a
7  plan to -- is incorrect, and
8  improper.  So if you want to go
9  off the record, I think you've got
10  an answer to your question, which
11  was, "No, not in the paragraph."
12    However, she has a right to
13  point to evidence in her report.
14  That's perfectly appropriate.
15    MR. HEGARTY:  We'll let
16  Judge Pisano decide.  We'll go off
17  the record.
18    THE VIDEOGRAPHER:  The time
19  is 3:39 p.m.  Going off the
20  record.
21    (Short break.)
22    THE VIDEOGRAPHER:  The time
23  is 4:04 p.m.  Back on the record.
24    MR. HEGARTY:  We're back on

Page 339

1  the record and we're going to
2  continue without calling Judge
3  Pisano at this time.  But we do
4  reserve the right to ask Judge
5  Pisano for more time based on our
6  belief that Dr. Zelikoff has many
7  occasions over the course of this
8  deposition not been responsive to
9  the questions asked and as a
10  result has -- has wasted the
11  defendant's time and to our
12  prejudice.
13    So -- but we're going to go
14  forward and see if we can finish
15  this deposition.
16    MS. O'DELL:  Plaintiffs will
17  obviously oppose that -- that
18  motion.  Dr. Zelikoff has been
19  responsive to your questions.
20  BY MR. HEGARTY:
21    Q.  Dr. Zelikoff, we're talking
22  about the section on talc particle's
23  access to the body.  There have been no
24  studies in either animals or humans that

Page 340

1  have looked at transport of dry powder
2  talc to the perineum showing that the --
3  that talc transports to the ovaries,
4  correct?
5    MS. O'DELL:  Object to the
6    form.
7    THE WITNESS:  When we say --
8    when you say talc, you're
9    referring to talcum powder
10    products?
11  BY MR. HEGARTY:
12    Q.  Correct, correct.
13    A.  That's correct to my
14  knowledge.
15    Q.  And are you aware that talc
16  is in toilet paper?
17    A.  Yes, I just learned that
18  recently.
19    Q.  Can talc in toilet paper
20  migrate to the ovaries?
21    MS. O'DELL:  Object to the
22    form.
23    THE WITNESS:  Can -- my
24    knowledge is that talc in toilet

Page 341

1    paper is -- is bound to the
2    other -- the other components
3    there.  So unless it becomes
4    bioavailable it cannot migrate
5    from the toilet paper.
6  BY MR. HEGARTY:
7    Q.  How about talc -- talc in
8  soap, is there talc in soaps?
9    A.  To my knowledge there is.
10    Q.  Can talc in soaps, if
11  applied to the perineum, migrate to the
12  ovaries?
13    A.  If it becomes --
14    MS. O'DELL:  Object to form.
15    THE WITNESS:  If it becomes
16    bioavailable.  Likely bound up to
17    the other components.
18  BY MR. HEGARTY:
19    Q.  When you say bioavailable,
20  what do you mean?
21    A.  To me, "bioavailable" means
22  that the body can see it, and it
23  becomes -- it becomes -- it has access to
24  biological responsiveness.

Judith Zelikoff, Ph.D.

Page 342

1    Q.   And do you know a
2  Dr. Benjamin Neel at NY University -- New
3  York University?
4    A.   Dr. Neel, isn't he the head
5  of the cancer center?
6    Q.   He is.
7    A.   He is the head of the cancer
8  center.
9    Q.   Do you know him?
10   A.   I do not know him.
11   Q.   Does he know more about
12 cancer biology than you do?
13       MS. O'DELL:  Object to the
14       form.
15       THE WITNESS:  I've not seen
16       his CV.  I would assume as head of
17       the cancer center, that he
18       probably does.  Since that is not
19       my area of study.
20 BY MR. HEGARTY:
21   Q.   Are dose-response
22 relationships important in evaluating
23 potential carcinogenicity of a substance?
24   A.   Dose-response --

Page 343

1  dose-responses are -- contribute to, as I
2  said frequency, duration, exposure route.
3  They all contribute to carcinogenicity.
4    Q.   In other words, in
5  evaluating the carcinogenicity of a
6  substance, it's important to look at dose
7  relationships, correct?
8    A.   Are you speaking about
9  dose-response, or more than one dose?
10   Q.   Let me ask it again.  In
11 evaluating the substance for
12 carcinogenicity purposes, it's important
13 to look at dose-response relationships,
14 correct?
15   A.   It's important to look at
16 dose-response relationships, but it's not
17 the only factor, is what I'm saying.
18   Q.   In your report, you cite a
19 number of reactions to talc that have
20 been reported, pleural inflammation,
21 granulomas, pulmonary
22 interstitial fibrosis --
23   A.   What page are you referring
24 to?

Page 344

1    Q.   You need a specific page?
2  Over on Page 16.  Over the course of this
3  page and carrying over to the next page,
4  you cite a number of studies that refer
5  to talc causing pleural inflammation,
6  correct?
7    A.   Yes.
8    Q.   Talc causing granulomas,
9  correct?
10   A.   Yes.
11   Q.   Talc causing pulmonary
12 interstitial fibrosis, correct?
13   A.   Talcum powder can do those
14 things, yes.
15   Q.   And talc causing
16 carcinogenic activity in the lungs,
17 correct?
18   A.   Are you referring to a
19 specific line?
20   Q.   No, I'm not referring to a
21 specific line.  I'm talking about
22 generally from this part of your report.
23   A.   In general, this is the
24 section on inhalation.  I'm talking

Page 345

1  about -- yes, I'm talking about talcum
2  powder and its ability to bring about
3  changes in the lungs that could lead to
4  carcinogenic -- carcinogenesis.
5    Q.   Of the reactions that we
6  just talked about, have any of those been
7  reported in women using talc on the
8  perineum?
9    A.   There have been no studies
10 to my knowledge showing that application
11 of perineal talc can produce -- produces
12 lesions in the lungs.
13   Q.   And there's been no studies
14 that you are -- of which you are aware
15 that have reported findings of granulomas
16 in women using talc in the perineum,
17 correct?
18   A.   There is evidence of
19 inflammation clearly, but there -- to my
20 knowledge, I have not seen any of the
21 literature which shows a granuloma in the
22 ovary.
23   Q.   What studies have you seen
24 that have reported seeing inflammation in

Judith Zelikoff, Ph.D.

Page 346

1  the ovaries of women using talc on the
2  perineum?
3          MS. O'DELL:  Object to the
4      form.
5          THE WITNESS:  I'm just
6      trying to find the section.
7          There were many studies, I
8      can't right now, without finding
9      it in my report, identify any one
10     in particular.
11 BY MR. HEGARTY:
12     Q.   Well, sitting here today,
13 can you cite any study that has reported
14 on finding inflammation of the ovaries
15 following perineal application of talc?
16     A.   As I said, there are many --
17 there are many examples in animal models
18 that was not perineal, that was vaginal,
19 as you stated.
20         There were studies --
21 study -- an early study which identified
22 talcum powder particles in the ovary with
23 inflammatory responsiveness or
24 inflammatory responses.  That was a

Page 347

1  very -- that was a very early study.  I'm
2  not sure if it was Hamilton or Henderson.
3  If I may.
4          I'm sorry it's not coming to
5  mind now.
6      Q.   Okay.  Over on Page 20 you
7  discuss the role of the immune system --
8      A.   Yes, sir.
9      Q.   -- correct?
10     A.   I see that, yes.
11     Q.   You agree that it's not
12 generally accepted by the medical or
13 scientific communities that all cancers
14 are caused by chronic inflammation,
15 correct?
16     A.   There are other mechanisms
17 that are associated with carcinogenesis
18 and the process of carcinogenesis.  If
19 you'd like, I can identify those.
20     Q.   You agree that there are
21 types of chronic inflammation that are
22 not related to cancer.  Rheumatoid
23 arthritis is one, correct?
24     A.   That's an autoimmune

Page 348

1  disease.
2      Q.   Okay.  Rheumatoid arthritis
3  does not increase the risk of cancer,
4  correct?
5      A.   Rheumatoid arthritis, for
6  what's known now, does not increase the
7  risk of cancer.
8      Q.   Psoriasis is another chronic
9  inflammatory process, correct?
10     A.   Another autoimmune disease
11 and another inflammatory process, yes.
12     Q.   Having psoriasis does not
13 increase the risk of any form of cancer,
14 correct?
15     A.   Not that -- not that we know
16 with the current knowledge.
17     Q.   So just having chronic
18 inflammation does not mean cancer will
19 develop, correct?
20         MS. O'DELL:  Object to the
21     form.
22         THE WITNESS:  Just having
23     chronic inflammation does not have
24     to indicate.  It's one -- again,

Page 349

1      it's one mechanism that provides
2      biological plausibility for the
3      cancer induction.
4          If I may give an example.
5  BY MR. HEGARTY:
6      Q.   Well, let me -- that's not
7  what I asked you for.
8      A.   Okay.  I thought I answered
9  your question.
10     Q.   Does having pelvic
11 inflammatory disease cause ovarian
12 cancer?
13     A.   The inflammation has been
14 linked with ovarian cancer, yes.
15     Q.   In your opinion is there a
16 biologically plausible mechanism between
17 PID and ovarian cancer?
18     A.   Well, PID is usually
19 associated with an infection.  And what's
20 related to cancer and why there's higher
21 risk in inflammatory diseases of
22 endometriosis and pelvic inflammatory
23 disease is through a mechanism of
24 inflammation.

88 (Pages 346 to 349)

Judith Zelikoff, Ph.D.

Page 350

1    Q.   Your biologically plausible
2  mechanism for talc and ovarian cancer is
3  inflammation, correct?
4    A.   That's primary, yes.
5    Q.   You make reference to MUC-1.
6  That's not your biological plausibility
7  mechanism, is it?
8    A.   You mean MUC-1 --
9    Q.   Yes.
10   A.   -- antibodies?
11   Q.   Correct?
12   A.   MUC-1, if I may explain it,
13 is mucin.  And --
14   Q.   I don't want to interrupt.
15 I'm not after an explanation.  I just
16 wanted to know whether it's part --
17 whether the references you include in
18 your report to MUC-1 are included in your
19 biologically plausible opinion?
20   A.   It is included in my -- in
21 reaching my opinion, yes.
22   Q.   Is that a separate mechanism
23 from inflammation?
24   A.   It is a separate mechanism

Page 351

1  from inflammation.  It's seen in ovarian
2  cancer as a marker.  And when you have --
3  evidence has shown that if you have
4  antibodies to MUC-1, and if they're
5  decreased as is seen in response to talc,
6  that you will have less of an immune
7  response and protection.
8    Q.   Can you cite for me any
9  study that has correlated MUC-1 levels
10 with ovarian cancer risk?
11       MS. O'DELL:  Object to form.
12       THE WITNESS:  They use it as
13   a marker.  The literature uses
14   MUC-1 as a marker of cancer.  Can
15   I cite you any studies that links
16   it with ovarian cancer?  No, I
17   cannot.
18 BY MR. HEGARTY:
19   Q.   Are there any studies that
20 link the levels of MUC-1 to ovarian
21 cancer risk?
22   A.   Do you mean human studies or
23 animal?
24   Q.   Yes, human studies only.

Page 352

1    A.   It's -- the only evidence
2  out there that addresses this is when
3  they do correlation studies with the
4  level of antibodies to MUC-1.  And when
5  the antibody levels are decreased, then
6  you have -- they found that you have an
7  increased risk of ovarian cancer.
8    Q.   There are no studies
9  reporting or correlating MUC-1 levels in
10 talcum powder users to ovarian cancer
11 risk, correct?
12       MS. O'DELL:  Object to form.
13       THE WITNESS:  Not to my
14   knowledge.
15       MS. O'DELL:  Sorry.
16 BY MR. HEGARTY:
17   Q.   And measuring MUC-1 is not
18 used to diagnose ovarian cancer, correct?
19   A.   MUC-1 is also known as
20 CA-125, and it is used as a marker.
21   Q.   My question is, is MUC-1
22 used to -- levels -- strike that.
23       Are MUC-1 levels used to
24 diagnose a woman with ovarian cancer?

Page 353

1    A.   My response to that is MUC-1
2  is synonymous with CA-125.  CA-125 is a
3  shed marker in the blood associated with
4  ovarian cancer, so yes.
5    Q.   Okay.  Is it your testimony
6  that for purposes of -- strike that.
7       Is it your testimony that
8  CA-125 levels are used to diagnose
9  ovarian cancer?
10       MS. O'DELL:  Object to the
11   form.
12       THE WITNESS:  I'm saying
13   that CA-125 is used as a
14   biological marker of progression,
15   extent, and intensity and whether
16   ovarian cancer is present.
17 BY MR. HEGARTY:
18   Q.   My question is, in a woman
19 who comes in complaining of symptoms that
20 might be ovarian cancer, is CA-125 used
21 to diagnose ovarian cancer?
22   A.   I'm sorry, I'm not a
23 physician.  I can't answer that question
24 in terms of what -- what an OB/GYN or an

89 (Pages 350 to 353)

Judith Zelikoff, Ph.D.

Page 354

1   oncologist would do.
2        Q.   And measuring CA-125 levels
3   does not give you any evidence of the
4   etiology of the ovarian cancer, correct?
5        A.   Not to the etiology.
6   However, it is an epithelial-associated
7   protein.
8        So if we are talking about
9   epithelial, and we are talking about
10  epithelial ovary carcinoma, it is related
11  to -- to that.
12       Q.   Does all types -- do all
13  types of inflammation irreparably damage
14  tissue?
15       A.   Irreparably.  Do you mean
16  persistently without -- is there
17  recovery?
18       Q.   No, my question is do all
19  types of inflammation, all acute, all
20  chronic inflammation, damage tissue where
21  it's not repaired?
22       A.   Where it's not repaired?
23       Q.   Yes.
24       A.   No, you can have -- with

Page 355

1   acute inflammation, of course you can
2   have repair of -- it's there to protect
3   against the invader.
4        Q.   Does having inflammation in
5   one organ or one tissue in the body
6   always mean that other tissues in the
7   body will be inflamed?
8        A.   It does not always mean
9   that.
10       Q.   The medical community has
11  not generally accepted that chronic
12  inflammation is a cause of ovarian
13  cancer, correct?
14       MS. O'DELL:  Objection to
15  form.
16       THE WITNESS:  Again, I'm not
17  quite sure what you mean by
18  generally accepted.  Everyone
19  has -- every medical community has
20  its own opinion.  I'm sure there
21  are many doctors who do embrace
22  it.  And I'm sure there are many
23  doctors who do not.  I'm not sure
24  whether they've done the extent of

Page 356

1   the systematic review of the
2   literature as I have.  But each
3   doctor, I'm sure, makes their own
4   opinion.
5   BY MR. HEGARTY:
6        Q.   Can you cite any doctor who
7   treats ovarian cancer or researches
8   ovarian cancer who believes that the
9   biological plausible mechanism of ovarian
10  cancer is inflammation?
11       A.   I have not spoken to any
12  doctors in that regard.
13       Q.   What does the inflammation
14  in the ovary look like in your opinion
15  from talc exposure?
16       A.   It looks like any other
17  local target of inflammation, in that
18  there are neutrophils, immune cells that
19  migrate into the area.  There are
20  macrophages that migrate into the area.
21  There can be higher levels of cytokines
22  like interleukin and chemotactic factor,
23  growth factor.
24       Q.   Such inflammation, if it was

Page 357

1   occurring would be visible, correct?
2        A.   Not necessarily.  In a -- in
3   a chronic -- first of all, you can get
4   different time periods.  So
5   inflammation -- if it's chronic
6   inflammation you are talking about one
7   thing.  And then you might see some
8   remnants of the inflammation.
9        But if you look at a period
10  of time, you can miss the inflammatory
11  response.  It can be there, impact the
12  cells and then be gone.
13       Q.   Even with chronic
14  inflammation?
15       A.   With chronic inflammation,
16  if you looked hard enough you would find
17  the remnants of its presence and you will
18  also likely find neutrophilic
19  infiltration.
20       Q.   Has that --
21       A.   That does not last forever.
22       Q.   Has that ever -- that --
23  those findings ever been reported in
24  women using talc in the perineum?

Judith Zelikoff, Ph.D.

Page 358

1    A.   The inflammatory response?
2    Q.   Correct.
3    A.   Or the infiltration?  Not
4  that I'm aware of.  Not in my report.
5    Q.   How many applications of
6  talc to the perineum does it take to
7  cause chronic inflammation in the
8  ovaries?
9    A.   That's -- that
10  information -- that is not known how many
11  applications, whether it could be one or
12  it needs to be over a period of three
13  years or a period of ten years.  Some of
14  the meta-analysis evaluations indicated
15  that there were some temporal
16  associations with it, and that it needed
17  to be used longer than ten years, where
18  you saw responsiveness.  And others
19  indicated less than ten years.
20        So it's -- it's difficult to
21  say, and it's also associated with the
22  woman.
23    Q.   Does acute inflammation
24  cause cancer?

Page 359

1    A.   Acute inflammation has not
2  been linked to my knowledge to cancer.
3  As I said, it's used as an immune
4  surveillance and protective mechanism as
5  you pointed out.
6    Q.   Over on Pages 20 and 21 of
7  your report you refer to CRP and other
8  inflammatory markers, cytokines,
9  inflammatory mediators.  Do you see the
10  section I'm referring to?
11    A.   I -- roles of the immune
12  system, and then Section E, ovarian
13  cancer inflammation?
14    Q.   Correct.
15    A.   Which section are you
16  referring to?
17    Q.   Well, the section ovarian
18  cancer inflammation at the bottom of
19  Page 20, carrying over to the top of
20  Page 21.
21    A.   I see that.
22    Q.   And there you talk about a
23  number of inflammatory markers, correct?
24    A.   Correct.

Page 360

1    Q.   None of those inflammatory
2  markers are tested to diagnose or monitor
3  a woman for developing ovarian cancer,
4  correct?
5    A.   To my knowledge, tumor
6  necrosis factors, C-reactive protein,
7  none of the interleukins are monitored.
8        But again, I have to say
9  that I'm not an OB/GYN and so I'm not --
10  I'm not familiar with what their -- what
11  they are using other than what's in the
12  literature.
13    Q.   And no study has clinically
14  correlated those markers with ovarian
15  cancer or ovarian cancer risk, correct?
16        MS. O'DELL:  Objection to
17    form.
18        THE WITNESS:  In looking at
19    biological plausibility, which
20    I'm -- which I'm focused on, the
21    indication of those elevated
22    levels as well as decreased levels
23    of antioxidants are associated
24    with inflammation and are

Page 361

1    associated with ovarian cancer.
2  BY MR. HEGARTY:
3    Q.   Well, can you cite for me
4  any study that has clinically correlated
5  those findings to ovarian cancer risk?
6        MS. O'DELL:  Objection.
7    Asked and answered.
8        THE WITNESS:  First of all,
9    I'm not -- and again, not an
10    OB/GYN.
11        I can tell you that those
12    risk factors, which are
13    inflammatory markers, are used as
14    an indicator of inflammation as a
15    biological plausible mechanism.
16  BY MR. HEGARTY:
17    Q.   Well, do you cite in your
18  paper any studies that have --
19    A.   I'm sorry, do you mean the
20  report?
21    Q.   In your report.  Do you cite
22  in your report any studies that have
23  found that women with these markers have
24  a higher -- higher or an increased risk

91 (Pages 358 to 361)

Judith Zelikoff, Ph.D.

Page 362

1  of ovarian cancer?
2      A.  Well, what I -- no.  But
3  what I have found is that in women who
4  have ovarian cancer, when they measure
5  concurrently or subsequently, that the
6  levels of certain inflammatory markers
7  are elevated.
8      Q.  My question was specific to
9  women prior to being diagnosed with
10  ovarian cancer, has any study shown that
11  women with higher levels of these
12  inflammatory markers have an increased
13  risk of ovarian cancer?
14      MS. O'DELL:  Objection to
15      form.
16      THE WITNESS:  Not in that
17      particular context.  But again I'm
18      not an OB/GYN.
19  BY MR. HEGARTY:
20      Q.  Has any study shown that
21  these inflammatory factors are elevated
22  in women using talc on the perineum?
23      MS. O'DELL:  Objection to
24      the form.

Page 363

1      THE WITNESS:  It's not a
2      common thing to measure
3      inflammatory mediators as a result
4      of the common use of talcum powder
5      products.  So there is no
6      indication of that because there
7      are no studies of that.
8  BY MR. HEGARTY:
9      Q.  If you look over on Page 24
10  of your report under the section Role of
11  Oxidants in Ovarian Cancer.  Do you see
12  that section?
13      A.  Section C on Page 24?
14      Q.  Correct.
15      A.  Yes.
16      Q.  All the processes that you
17  describe in this section occur in
18  everyone everyday, correct?
19      MS. O'DELL:  Object to the
20      form.
21      THE WITNESS:  To a degree,
22      yes.
23  BY MR. HEGARTY:
24      Q.  The reactive oxygen species

Page 364

1  are a normal product of cell activity,
2  correct?
3      A.  That is correct --
4      Q.  For example, for many --
5      A.  -- for many cells.
6      Q.  -- reactive oxygen species
7  increase if we exercise, correct?
8      A.  As well as antioxidants
9  increase, yes.
10      Q.  The same is true for
11  reactive nitrogen species, correct?
12      A.  Yes.
13      Q.  These --
14      A.  It's a matter of degree.
15      Q.  Reactive oxygen species and
16  reactive nitrogen species increase if
17  we're under stress, correct?
18      A.  They have been shown to do
19  that, yes.
20      Q.  And the body has defense
21  mechanisms to handle this increase in
22  reactive oxygen species and reactive
23  nitrogen species, correct?
24      MS. O'DELL:  Objection to

Page 365

1      form.
2      THE WITNESS:  The body has
3      antioxidant mechanisms, including
4      superoxide dismutase, catalase, et
5      cetera, that are -- that elevate
6      in response to reactive oxygen
7      species.  But they can be
8      overwhelmed by the amount of ROS
9      release.
10  BY MR. HEGARTY:
11      Q.  But it would be improper to
12  say that simply by the generation of
13  reactive oxygen species or reactive
14  nitrogen species, DNA mutations and tumor
15  development will occur, correct?
16      MS. O'DELL:  Object to form.
17      THE WITNESS:  One couldn't
18      say that just by the -- as you
19      point out, as the normal -- under
20      normal circumstances, endogenously
21      within the body, and not in
22      response to a particular agent
23      does produce these.  So one cannot
24      say, to answer your question, that

92 (Pages 362 to 365)

Judith Zelikoff, Ph.D.

Page 366

1    it -- just the presence of
2    reactive oxygen species will lead
3    to cancer.
4    BY MR. HEGARTY:
5        Q.    What data shows that the
6    body's response system to reactive oxygen
7    species and reactive nitrogen species is
8    unable to handle those species that might
9    be generated by talc exposure?
10        A.    Numerous cell studies and
11    numerous animal studies.  And you would
12    look at that by the level of antioxidants
13    that are also present.  And if a
14    substance such as talcum powder product
15    reduces antioxidants, then the cell or
16    the tissue is going to be overwhelmed by
17    that product.
18        Q.    Has that process ever been
19    shown in vivo?
20        A.    In a -- I'm not sure if this
21    answers your question.  I'll do my best
22    to answer it.  And your question was has
23    that process, meaning the process of
24    antioxidant change -- is that your

Page 367

1    question?
2        Q.    No.  The process where the
3    cell or the tissue is going to be
4    overwhelmed, has that process ever been
5    shown in vivo in women?
6        A.    In women?
7        Q.    Yes.
8        MS. O'DELL:  Object to the
9    form.  You can answer.
10        THE WITNESS:  Certainly in
11    animals, but not to my knowledge
12    in women.
13        I'm sorry.  I'm still
14    thinking.
15        Whenever the antioxidant
16    levels are decreased, that is an
17    indicator of being overwhelmed by
18    the reactive oxygen species or the
19    oxidation stress.
20    BY MR. HEGARTY:
21        Q.    And what studies have shown
22    the antioxidant levels are decreased in
23    women using talc?
24        A.    In women using talc -- most

Page 368

1    of the literature comes from in vivo
2    animal studies as well as in vitro cell
3    studies.  But my role is to -- is to look
4    at biological plausibility.  And so
5    studies that reveal or indicate that
6    response in an animal model and in cell
7    culture indicates to me that there's no
8    likely reason why it could not happen in
9    women.
10        Q.    Okay.  At the top of Page 25
11    of your report, you say that even a
12    single dose of a carcinogen can produce
13    effects that are adverse to cells and
14    tissue at the site of exposure.
15        Do you see where I'm
16    reading?
17        A.    Yes.
18        Q.    When you say dose, do you
19    mean exposure at a dose or volume of
20    exposure to a substance that studies have
21    proven are adverse to cells and tissues?
22        MS. O'DELL:  Object to the
23    form.
24        THE WITNESS:  That's a

Page 369

1    multiple question.  But when I
2    refer to even a single dose, I
3    mean even a single exposure.
4    BY MR. HEGARTY:
5        Q.    Are you saying there a
6    single molecule of the substance?
7        A.    What I meant in this report
8    is even a single exposure.  The
9    concentration of which could be unknown.
10    A single exposure to a certain
11    concentration, whatever that
12    concentration is, can produce effects.
13    I'm not saying can produce cancer.  What
14    I'm saying is can start the process of
15    either inflammation or oxidative stress.
16        Q.    And to what tissue does that
17    single dose need to reach to have the
18    adverse effects that you describe there?
19        MS. O'DELL:  Object to the
20    form.
21        THE WITNESS:  Whatever that
22    particular -- it depends upon the
23    carcinogen or the inflammagogue
24    that one is looking at in terms of

93 (Pages 366 to 369)

Judith Zelikoff, Ph.D.

Page 370

1      a single exposure.  And it depends
2      on the susceptibility of the
3      tissue.  So to answer your
4      question, doses or concentration
5      to the target tissue is unknown or
6      open.
7   BY MR. HEGARTY:
8      Q.   You're not saying that a
9   single application of talc to the
10  perineum can produce effects that are
11  adverse to cells and tissue in the
12  ovaries, correct?
13         MS. O'DELL:  Object to the
14     form.
15         THE WITNESS:  I'm not saying
16     that it can't.  I think I
17     testified earlier that a single --
18     depending upon what that product
19     is -- in this case we're talking
20     about talcum powder product --
21     that one exposure, one
22     application, one perineal direct
23     exposure could in fact trigger the
24     cells to start a process leaning

Page 371

1      towards inflammation.
2   BY MR. HEGARTY:
3      Q.   And where the talc -- where
4   does the talc need to go in the body to
5   trigger that mechanism?
6      A.   Well, once it gets -- once
7   it's applied to the perineal region, it's
8   my belief that it then migrates up to
9   the -- to the vaginal area.  And in the
10  vaginal area, it could also start
11  mechanisms, gene expression changes in
12  the vaginal tissues that could lead to
13  inflammation, or it could get to the
14  point of the cervix or to the fallopian
15  tubes.  It causes changes in cells,
16  whether it's gene expression or an
17  inflammation, at any one of those
18  upward -- upward reproductive tract organ
19  systems or tissues.  They're all made up
20  of cells that are susceptible to oxidant
21  stress.
22     Q.   Can you cite to us any study
23  that has shown that process in women
24  using talc to the perineum?

Page 372

1      A.   In women?
2      Q.   Yes.
3      A.   I can -- I cannot off the
4   top of my head or looking at my report
5   tell you that.  Again, I just want to
6   repeat that my charge was to look at
7   biological plausibility and I -- I see
8   those effects or processes that you're
9   indicating in cells and animal models,
10  but I do not have that information with
11  humans.
12     Q.   Are you aware of any study
13  correlating the exposures used in those
14  cell and animal models to the exposures
15  that women would experience with perineal
16  application of talc?
17         MS. O'DELL:  Object to the
18     form.
19         THE WITNESS:  Well, in my
20     mind, and in reality, women use
21     different amounts, whether it's
22     different handfuls.  So I can't
23     really give you a concentration.
24     But there are studies, the in

Page 373

1      vitro studies, that did use more.
2         However, when you're looking
3      at toxicology and you're looking
4      to define a mechanism or a
5      potential mechanism, if you use
6      even a higher dose, you're
7      still -- you still can elicit the
8      same mechanism.
9         So perineal application --
10     to answer your question, perineal
11     application can put a lot or a
12     little.  But it also depends on
13     the frequency and the duration of
14     the use.
15  BY MR. HEGARTY:
16     Q.   Doctor, my question, though,
17  was, has any study correlated the
18  exposures in the animal or cell studies
19  to which you are referring to, to show
20  that those same exposures are occurring
21  in women applying talc to the perineum?
22     A.   No.
23     Q.   For purposes of your
24  opinions on biological plausibility, do

94 (Pages 370 to 373)

Judith Zelikoff, Ph.D.

Page 374

1 you rely on the studies that you cite in
2 your report done by Dr. Saed?
3        A.   I relied on the information
4 from Dr. Saed.  It went into making up my
5 opinion, yes.
6        Q.   If those studies were not
7 available to you, would your opinions
8 still be the same?
9        A.   As I said, one of the -- one
10 of the manuscripts came after my report.
11 And it was -- I looked at an abstract, so
12 I had information.  And other -- others
13 of Dr. Saed's I reviewed.  But I would
14 have come to the same conclusion.  That
15 was just -- that was supplemental and
16 complementary and compelling.
17        Q.   Have you ever cited an
18 abstract in any published article of
19 yours?
20        A.   Yes, I have.
21        Q.   Are you an expert in the
22 kinds of testing that Dr. Saed has
23 reported in the materials you reviewed?
24        A.   Yes, I am.

Page 375

1        Q.   Do you understand that
2 Dr. Saed is an expert for the plaintiffs
3 in this litigation?
4        A.   I do understand that from
5 looking at his publication.
6        Q.   Did you do anything yourself
7 to verify the reliability of the testing
8 that he performed whose results you have
9 read in his publications?
10        A.   I focused my review and
11 reading of the study design, which is --
12 and the experimental approach, which are
13 key factors for evaluating any study.
14 And I agree with the experimental
15 approach and the study design that he
16 used.
17             He used proper controls.  He
18 used a dose-response.  He used the proper
19 techniques in analyzing for cell
20 survivability as well as for oxidative
21 stress and gene expression changes.
22        Q.   Have you ever done studies
23 using epithelial cell lines?
24             MS. O'DELL:  Ovarian or

Page 376

1 just?
2 BY MR. HEGARTY:
3        Q.   Ovarian epithelial -- thank
4 you.
5             Have you ever done studies
6 using any type of ovarian epithelial cell
7 lines?
8        A.   I have not.
9        Q.   Have you ever done any study
10 using ovarian cancer cell lines?
11        A.   I have not.  Not personally.
12        Q.   What data shows that the
13 doses that Dr. Saed used in his studies
14 are comparable to those to which
15 epithelial ovarian cells would be exposed
16 to via perineal application of talc?
17             MS. O'DELL:  Objection to
18        form.
19             THE WITNESS:  There was no
20        comparison in his study directly.
21        But if I may, I just want to say,
22        when you're looking at biological
23        plausibility, which was the
24        question that I was asked,

Page 377

1        oftentimes higher doses in vitro
2        studies are used to provide a
3        mechanism or a plausibility or
4        feasibility that that can -- that
5        that product, in this case, talcum
6        powder product, can induce
7        inflammation, inflammatory
8        responses and changes in
9        antioxidant levels.
10             So it is not uncommon to use
11        higher doses in in vitro studies
12        than what might be seen in a human
13        for biological plausibility
14        studies.
15 BY MR. HEGARTY:
16        Q.   Can you cite any study that
17 has shown the results reported in
18 Dr. Saed's studies in vivo in women using
19 talc?
20             MS. O'DELL:  Objection to
21        form.
22             THE WITNESS:  May I get
23        Dr. Saed's paper?
24 BY MR. HEGARTY:

95 (Pages 374 to 377)

Judith Zelikoff, Ph.D.

Page 378

1    Q.   Well, I'm actually not
2  asking about Dr. Saed's paper.
3    A.   Okay.
4    Q.   But my question is -- you've
5  read Dr. Saed's papers, correct?
6    A.   Yes, I have.
7    Q.   Can you cite for me any
8  study that has shown the results he
9  reports in his studies in women using
10 talc?
11       MS. O'DELL:  Object to form.
12       THE WITNESS:  His studies
13    were in vitro studies.
14 BY MR. HEGARTY:
15    Q.   Are there any such studies
16 looking at the effects in vivo of talc?
17       MS. O'DELL:  Objection.
18       THE WITNESS:  In vivo in
19    humans or in vivo in animals?
20 BY MR. HEGARTY:
21    Q.   In humans.
22       MS. O'DELL:  Object to the
23    form.
24       THE WITNESS:  When you refer

Page 379

1     to such studies, can you tell me
2     which studies -- which types of
3     studies again are you referring
4     to?
5  BY MR. HEGARTY:
6     Q.   The cell studies that you
7  reference by Dr. Saed on Page 25 of your
8  report.
9     A.   And the question is are
10 there any?
11    Q.   Studies in humans showing
12 such effects following application of
13 talc to the perineum?
14       MS. O'DELL:  Objection to
15    form.
16       THE WITNESS:  Not to my
17    knowledge.
18       Excuse me.  You said that
19    was on Page 25 that you were
20    referring to?
21 BY MR. HEGARTY:
22    Q.   Correct.
23       Have you ever published a
24 paper discussing single nucleotide

Page 380

1  polymorphisms?
2     A.   I need to look at my CV
3  again, as being co-investigator.  I've
4  worked with other people.  I have not
5  performed studies looking at single
6  nucleotide polymorphisms.  But I have
7  worked with people who have -- have done
8  them.  And if I look at my curriculum
9  vitae, I can tell you if I've been on any
10 publications.
11    Q.   Okay.  Because of time, just
12 sitting here today, recognizing for the
13 record you haven't looked at your CV, do
14 any such studies come to mind?
15    A.   I don't -- I have not done
16 those studies in my own laboratory.
17 Although I'm -- I'm just saying that I
18 may have been on a publication where
19 colleagues of mine have used that -- that
20 method, those methods.
21    Q.   Do you have an opinion about
22 talc in single nucleotide polymorphisms
23 or SNPs?
24       MS. O'DELL:  Objection.

Page 381

1        THE WITNESS:  I think
2     there -- there is literature
3     showing, including in Dr. Saed's
4     papers, that there are single --
5     and in -- in a paper that looked
6     at women and looked at antioxidant
7     enzymes and they showed there was
8     single nucleotide polymorphism
9     changes in those women.
10       Looking at, I think it was
11    glutathione S-transferase M 1.
12       So what is my -- so if your
13    question is what is my opinion on
14    single nucleotide polymorphisms in
15    ovarian cancer?
16 BY MR. HEGARTY:
17    Q.   Well, let me ask a different
18 question.  Is your biologic mechanism --
19 I'm sorry.  Is your biologic plausibility
20 opinion between talc and ovarian cancer
21 the process or action that Dr. Saed
22 describes in his studies?
23    A.   I believe that it could be
24 adding to the -- the plausibility of the

96 (Pages 378 to 381)

Judith Zelikoff, Ph.D.

Page 382

1  relationship or of the causation between
2  ovarian cancer and talcum powder
3  products.
4       Q.   Well, is it your opinion
5  that the mechanism by which talc can be
6  biologically -- be a biological plausible
7  cause of ovarian cancer, that's cited by
8  Dr. Saed in his cell studies?
9       MS. O'DELL:  Objection to
10  form.
11       THE WITNESS:  I believe
12  that -- in my opinion and what I'm
13  stating here in the report, is
14  that inflammation is the
15  primary -- one of the primary
16  biological mechanisms.
17       Whether it appears from the
18  literature that single nucleotide
19  polymorphisms may, in fact, play a
20  role.
21  BY MR. HEGARTY:
22       Q.   Okay.  But is -- is that --
23  is it your opinion that -- not that they
24  play -- just that they play a role, but

Page 383

1  that is the mechanism for biologic
2  plausibility between talc and ovarian
3  cancer?
4       A.   I -- I do not believe it
5  is -- it is not my opinion that -- it is
6  my opinion that single nucleotide
7  polymorphisms, along with inflammation
8  and -- and perhaps other mechanisms may
9  be involved that talc is associated with.
10       I focused my -- my opinion
11  on the assessment of inflammation and its
12  role.
13       MR. HEGARTY:  Off the record
14  for a minute.
15       THE VIDEOGRAPHER:  The time
16  is 4:48 p.m.  We are off the
17  record.
18       (Short break.)
19       THE VIDEOGRAPHER:  We are
20  back on the record.  The time is
21  5:08 p.m.
22  BY MR. HEGARTY:
23       Q.   Dr. Zelikoff, I'm going to
24  jump around a little bit from topic to

Page 384

1  topic.  I'll introduce the topic each
2  time that I ask you a question.
3       Going back to the Canadian
4  health assessment that you provided to us
5  at the beginning of the day.
6       A.   Yes.
7       (Brief interruption.)
8  BY MR. HEGARTY:
9       Q.   Doctor, we talked earlier
10  about Canada's health assessment with
11  regard to talc.  Are you familiar with
12  the process by which the Canadian
13  authorities do that health assessment?
14       A.   I am -- only from what is in
15  the document.
16       Q.   Have you ever been a part of
17  that, of a Canadian health assessment
18  like the one shown with talc?
19       A.   I've worked with Health
20  Canada.
21       Q.   Okay.  Have you ever worked
22  with Health Canada on doing a health
23  assessment like that reflected in the
24  document we looked at earlier today?

Page 385

1       A.   No, I have not.
2       Q.   Do you know what kind of
3  standards that they apply in determining
4  whether to call -- whether to say whether
5  there's a potential for harm with a
6  substance?
7       A.   Just what is in the
8  document.  And then I use my own
9  professional judgment, whether I agree
10  with that or not.
11       Q.   Did plaintiff's counsel
12  provide you with some scientific and
13  medical literature with regard to talc or
14  ovarian cancer?
15       A.   So the question is whether I
16  was provided with some scientific and
17  medical literature with regard -- yes,
18  many of the articles in the binders were
19  provided to me by them.
20       Q.   Are you able to identify
21  which of those articles came from
22  plaintiffs' counsel versus which you
23  found on your own?
24       A.   I may be able to do that

97 (Pages 382 to 385)

Judith Zelikoff, Ph.D.

Page 386

1  with some, yes.  But this is over a
2  period of, as I said, 2017 to now.
3          Q.   With regard to your
4  invoices -- do you have your invoices
5  there?
6          A.   I do not.
7          Q.   They've been marked as an
8  exhibit.
9          A.   Oh.
10         Q.   Can someone help her find
11 those invoices?
12         MS. O'DELL:  Did you take
13     them back?  I don't know that --
14     there was only one copy.
15         MR. HEGARTY:  I don't think
16     I did.  I think it was Exhibit 1.
17         MS. O'DELL:  The reason I
18     say that is I did not see it
19     during the lunch break when I
20     looked at --
21         THE WITNESS:  I do have the
22     invoices in my binder here.
23 BY MR. HEGARTY:
24         Q.   Okay.  If you can turn to

Page 387

1  your binder, please.
2          A.   If I recall.
3          Q.   If we can find that exhibit,
4  that would be helpful?
5          MS. O'DELL:  I'm not sure
6      there are any invoices in her
7      binder.
8          Is it in the stack that's
9      right there?
10         MR. HEGARTY:  No, I don't
11     think so.
12 BY MR. HEGARTY:
13         Q.   Yeah invoices.  I found it.
14         Your invoices, Doctor,
15 reflect that you prepared a final report
16 delivered on February 4, 2018.
17         Do you see that?
18         A.   I do see that.
19         Q.   That was almost a year ago,
20 correct?
21         MS. O'DELL:  Objection to
22     form.
23         THE WITNESS:  Yes.
24 BY MR. HEGARTY:

Page 388

1          Q.   What are the differences
2  between your current report dated
3  November 16, 2018, and the final report
4  that you provided as shown here back in
5  February of 2018?
6          A.   It was -- I own that.  It
7  should have said draft report.  And the
8  difference is that that's more literature
9  and more time had gone by for the
10 emergence and review of more literature.
11         Q.   You go from a reference on
12 February 4, 2018, to the next reference
13 on September 20th -- I'm sorry.  Did I
14 say -- let me back up.
15         You go form a reference on
16 February 4, 2018, to the next cite for
17 time on September 20, 2018.  Did you
18 review any additional literature between
19 February 4th and September 20, 2018?
20         A.   Yes, I'm sure I did.  And I
21 also reviewed the production documents
22 within that time.  More of the production
23 documents.
24         Q.   Your report doesn't show any

Page 389

1  time invoiced between February 4, 2018,
2  and September 20, 2018.  Did you spend
3  time reviewing literature or otherwise
4  working on your report that's not
5  contained in your invoices?
6          A.   It -- I may have.  I did not
7  always invoice for something that I spent
8  maybe an hour on.
9          Q.   Are you able to cite for me
10 the sections in your report that you
11 added or changed between the report that
12 you prepared on February 4, 2018, and the
13 November 16, 2018, report?
14         A.   Not without seeing both
15 reports side by side.
16         Q.   Do you still have a copy of
17 the February 4, 2018, report?
18         A.   Not with me.
19         Q.   Does it exist?
20         A.   It likely does on my
21 computer, yes.
22         Q.   You mentioned that you
23 referred to -- that you reviewed Julie
24 Pier's deposition testimony?

98 (Pages 386 to 389)

Judith Zelikoff, Ph.D.

Page 390

1    A.   I said three-quarters of the
2  deposition, half to three-quarters.
3    Q.   That was provided to you by
4  counsel for plaintiffs, correct?
5    A.   Yes, correct.
6    Q.   Do you know how they went
7  about selecting the deposition
8  transcripts to provide to you for
9  purposes of your review in this case?
10   A.   I do not.
11   Q.   Did you ask for any
12 deposition -- did you ask for the
13 depositions of all experts who have
14 testified in this litigation?
15       MS. O'DELL:  Objection to
16       form.
17       THE WITNESS:  I did not ask
18       for depositions.
19       Let me -- let me retract
20       that, please.  If in reading my
21       literature there was something
22       that I thought might be in a
23       deposition of someone, I asked the
24       plaintiff attorneys if they had

Page 391

1        anything in that regard that would
2        lend to my opinion.
3  BY MR. HEGARTY:
4    Q.   And did you ever ask for any
5  additional depositions beyond those that
6  were provided?
7    A.   No, I did not.
8    Q.   Going back to the Health
9  Canada assessment.  Have you ever cited
10 to a Health Canada assessment in any
11 written publication of yours?
12   A.   Without looking at my
13 publications, I cannot.  But I can tell
14 you that coming to mind just sitting
15 here, as I said, I worked with Health
16 Canada, and I worked with them on my
17 research in fish immunology, and it is
18 possible that I cited Health Canada --
19 Health Canada literature in those
20 publications concerning fish.
21   Q.   Sitting here today, can you
22 recall at any point in time when you --
23 when your opinions were informed by a
24 draft screening assessment by Health

Page 392

1  Canada, like Exhibit Number 9?
2    A.   I'm sorry.
3        MS. O'DELL:  Objection to
4        form.
5        THE WITNESS:  All I can say
6        is that in working with Health
7        Canada on immunology in my early
8        career days, that I may have used
9        an assessment like that.
10 BY MR. HEGARTY:
11   Q.   Can you cite for me, sitting
12 here today, anytime that you -- your
13 opinions were informed by a Health Canada
14 safety assessment or screening
15 assessment?
16       MS. O'DELL:  Object to the
17       form.  Other than what she said?
18       THE WITNESS:  Except for
19       what I said, I cannot recall.
20 BY MR. HEGARTY:
21   Q.   Did you review for purposes
22 of your opinions in this case the current
23 National Cancer Institutes position --
24 healthcare -- healthcare -- health

Page 393

1  professional PDQ, or the NCI PDQ?
2    A.   I have seen that recently.
3    Q.   I'll mark as Exhibit Number
4  23, a copy of the NCI PDQ that mentions
5  talc.
6        (Document marked for
7        identification as Exhibit
8        Zelikoff-23.)
9  BY MR. HEGARTY:
10   Q.   Have you seen what I marked
11 as Exhibit 23 before -- or as of the time
12 that you drafted your report?
13   A.   No, sir.
14   Q.   Plaintiffs' counsel did not
15 provide you a copy of that?
16   A.   Not prior to my report, no.
17   Q.   How did you happen -- who --
18 strike that.
19       Did -- from where did you
20 receive a copy of Exhibit 23 after
21 preparing your report?
22   A.   From the plaintiff attorney.
23   Q.   Did you ask for it?
24   A.   In general, I asked for all

99 (Pages 390 to 393)

Judith Zelikoff, Ph.D.

Page 394

1 relevant literature and internal
2 information. But I did not specifically
3 ask for the NCI report.
4      Q.   When you asked for all
5 relevant information, internal
6 information, was that prior to preparing
7 your expert report?
8      A.   That's pretty much on a
9 chronic level, in other words from the
10 time that I was recruited or asked to
11 participate in this, I always asked, "Is
12 there literature? Is there more
13 literature? Here is the literature that
14 I have found," which were quite a number.
15 "Is there anything else that you can add
16 to this?" So I provided literature, and
17 they provided me with literature.
18      Q.   You did not find the NCI's
19 PDQ yourself?
20      A.   I did not find it myself.
21      Q.   Did the NCI PDQ statements
22 on perineal talc exposure inform your
23 opinions in this case?
24      A.   As I said, I only saw it

Page 395

1 within the last few days.
2      Q.   Understood. But you also
3 reviewed the Saed manuscript, you
4 reviewed the Canadian health assessment.
5 You said both those documents informed
6 your opinions.
7           So my question is, did the
8 NCI PDQ also inform your opinions.
9           MS. O'DELL: Object to the
10      form.
11           THE WITNESS: Well, the --
12      the documents that you previously
13      mentioned do not inform my opinion
14      prior to my report of
15      November 16th. However, it's
16      information that has added to me
17      to get to this place where I am
18      right now.
19           So my opinion has not
20      changed from my report until
21      sitting here today.
22 BY MR. HEGARTY:
23      Q.   Did the NCI PDQ add to your
24 opinions in this case?

Page 396

1      A.   I reviewed their opinions.
2 I have many questions about how they
3 reached their opinions and what studies
4 they used.
5           If we can just be on the
6 same page in terms of what their opinion
7 is?
8      Q.   I'm looking at the section
9 under perineal talc exposure. And my --
10 my question is -- strike that.
11           I'm looking at the section
12 on perineal talc exposure which is about
13 four pages from the end.
14      A.   I see.
15      Q.   And my question is only
16 whether that section informed your
17 opinions in this case.
18           MS. O'DELL: Object to the
19      form.
20           THE WITNESS: I reviewed it.
21      It did not change my opinion.
22      Did -- did it inform my opinion?
23      It did not change my opinion.
24 BY MR. HEGARTY:

Page 397

1      Q.   Do you agree with the NCI
2 PDQ statement on perineal talc exposure?
3      A.   If we are talking about
4 their final conclusion?
5      Q.   I'm talking -- yes. We can
6 talk about their final conclusion.
7      A.   Okay. If I'm recalling
8 this, their final conclusion that -- was
9 that there was no causal relationship
10 between talc -- talcum powder exposure
11 and ovarian cancer. Is that --
12      Q.   Well, the -- the weight of
13 the evidence does not support an
14 association between perineal talc
15 exposure and an increased risk of ovarian
16 cancer. Do you agree with that
17 statement?
18      A.   I do not agree with that
19 statement.
20           And I find, in reading this
21 document, that I'm not sure how they
22 reached that conclusion. On several
23 points, if you're interested.
24           One is --

Judith Zelikoff, Ph.D.

Page 398

1      Q.   No, I'm just asking you
2  whether you agreed with it.
3      A.   I do not agree with their
4  final conclusion.
5      Q.   Neither FDA nor any
6  scientific regulatory or other group has
7  ever sought out your opinions with regard
8  to the biologic plausibility of talc and
9  ovarian cancer, correct?
10     A.   That is correct.
11     Q.   You made reference earlier
12 to the Penninkilampi article.  Do you
13 recall that?
14     A.   I recall mentioning it, yes.
15     Q.   I'm going to mark as
16 Exhibit 34 a copy of the Penninkilampi
17 article.  That's the article that you
18 were talking about earlier, correct?
19     A.   2018, correct.
20         (Document marked for
21          identification as Exhibit
22          Zelikoff-34.)
23 BY MR. HEGARTY:
24     Q.   If you turn over to page --

Page 399

1  strike that.
2          This is an article that you
3  rely on for purposes of your opinions in
4  this case, correct?
5      A.   This is an article that I
6  reviewed and played into, yes, informed
7  my opinions.
8      Q.   Did you find it to be a
9  reliable source of information?
10         MS. O'DELL:  Object to the
11     form.
12         THE WITNESS:  I found no
13     problems in the study design as I
14     read it.
15         Again, I'm not an
16     epidemiologist.  So getting into
17     the nuances of this.  I'm a
18     toxicologist and I depend on my
19     epidemiology colleagues to fill in
20     the gaps.
21 BY MR. HEGARTY:
22     Q.   Over on Page 45, under the
23 section Discussion.  Do you see that
24 section?

Page 400

1      A.   Yes, I do.
2      Q.   Third line down it says,
3      "The mechanism by which perineal talc use
4      may increase the risk of ovarian cancer
5      is uncertain."
6         Do you agree with that
7     statement?
8         MS. O'DELL:  Objection to
9     form.
10         THE WITNESS:  I think
11     there's no -- in providing
12     biological plausibility,
13     biological plausibility, in and of
14     itself, says that there is a
15     possible mechanism or action that
16     could provide evidence for the
17     causation.
18         So the mechanism by which
19     perineal talc use may increase the
20     risk of ovarian cancer is
21     uncertain.  It does not mean
22     it's -- it means it's uncertain,
23     that there are many viewpoints on
24     it.

Page 401

1  BY MR. HEGARTY:
2      Q.   At the very -- in the very
3  last line of that article -- I'm sorry,
4  the very last line of that paragraph it
5  says, "The potential mechanism by which
6  genital talc is associated with an
7  increased risk of ovarian cancer hence
8  remains unclear."
9         Do you agree with that
10 statement?
11     A.   I think there is -- in -- in
12 regards to your previous questions that
13 asked me if it was -- if there was an
14 agreement among the medical population,
15 and I said that I didn't know that there
16 was agreement or was not agreement.  I
17 thought that there were not agreement.
18 So I agree with the statement that there
19 is still room for further study.
20         Unclear does not mean
21 unknown or that there are not biological
22 plausible mechanisms that could be
23 entertained.
24     Q.   Is inflammation part of a

101 (Pages 398 to 401)

Judith Zelikoff, Ph.D.

Page 402

1  normal mechanism of response to the
2  presence of particles in the lungs?
3        A.   Depending upon the particle,
4  inflammation can be a normal part of a
5  response, yes.
6        Q.   Can tumors occur in the
7  respiratory system with very high
8  exposure to particles that overwhelm the
9  body's clearance mechanisms and lead to
10  particle overload of lung macrophages?
11        A.   Are you referring to the NTP
12  study?
13        Q.   I'm not referring to any
14  study in particular.  That was just a
15  question in general.
16        A.   Okay.  Can you repeat the
17  question?
18        Q.   Yeah.  Can tumors occur in
19  the respiratory system with very high
20  exposure to particles that overwhelm the
21  body's clearance mechanisms and lead to
22  particle overload of lung macrophages?
23        MS. O'DELL:  Object to form.
24        THE WITNESS:  That is a --

Page 403

1        that has been seen as a
2        potential -- as a potential to
3        occur, yes.
4  BY MR. HEGARTY:
5        Q.   Are there any publications
6  that indicate such a mechanism of
7  particle overload can occur in the
8  ovaries?
9        MS. O'DELL:  Objection to
10        form.
11        THE WITNESS:  No studies
12        that I'm aware of that -- that
13        refer to particle overload in the
14        ovaries in this regard, in regard
15        to talcum powder.  There's
16        evidence, of course, as I said
17        that there is talcum powder in the
18        ovary.
19  BY MR. HEGARTY:
20        Q.   Over on Page 5 of your
21  report, Exhibit 2.
22        A.   Page headed by Section 4,
23  Asbestos?
24        Q.   Correct.  You make a

Page 404

1  statement in the third paragraph at the
2  end that says even incidental -- the
3  third paragraph at the end.
4        A.   I was looking for a pen.
5  Excuse me.
6        Okay.  Go ahead.
7        Q.   Says, "Even incidental
8  contamination by amphibole forms of
9  asbestos is hazard enough to cause
10  asbestos-related illnesses."
11        Do you see where I'm
12  reading?
13        A.   I'm sorry, are you in the
14  first paragraph?
15        Q.   Third paragraph.
16        A.   Third paragraph.
17        Q.   At the end.
18        A.   At the -- traces of these
19  types of asbestos are --
20        Q.   No, third paragraph.
21  Even -- the last line.  "Even incidental
22  contamination by amphibole forms of
23  asbestos is hazard enough to cause
24  cancer-related illnesses."

Page 405

1        Do you see where I'm
2  reading?
3        A.   Says, "Cause
4  asbestos-related illnesses."
5        Q.   I'm sorry.  "Can cause
6  asbestos-related illnesses."  You cite --
7        A.   I see where you are reading.
8        Q.   -- the Rohl and Langer
9  paper?
10        A.   Yes.
11        Q.   I'll mark as Exhibit 35 the
12  Rohl and Langer paper that you've cited.
13        (Document marked for
14        identification as Exhibit
15        Zelikoff-35.)
16  BY MR. HEGARTY:
17        Q.   Doctor, nowhere in that
18  paper did the author say that incidental
19  contamination by amphibole forms of
20  asbestos is hazard enough -- hazardous
21  enough to cause asbestos-related
22  illnesses, do they?
23        MS. O'DELL:  Objection to
24        form.

Judith Zelikoff, Ph.D.

Page 406

1    THE WITNESS:  I'm sorry, I'm
2  not certain that this is the same
3  paper.  This is Rohl, et al.  The
4  paper that I cited is Rohl and
5  Langer.
6  BY MR. HEGARTY:
7    Q.   It's dated 1976 --
8    A.   1976.
9    Q.   -- correct?
10   A.   That's correct.
11   Q.   If you look in the abstract
12  of that paper --
13   A.   Yes.  The paper --
14   Q.   -- the paper that I marked
15  as Exhibit 35.
16   A.   Rohl, et al, yes.
17   Q.   Yes.  It says, "It's
18  possible adverse health effects from
19  intermittent use of these products,
20  especially those that contain asbestiform
21  and fragmented anthophyllite, tremolite,
22  chrysotile, quartz, and trace minerals
23  are presently unknown and warrant
24  evaluation."

Page 407

1    Did I read that correctly?
2    A.   I'm sorry, you are in the
3  abstract, but I don't know what line you
4  are on.
5    Q.   The very last line of the
6  abstract.
7    A.   "Possible adverse health
8  effects from intermittent use of these
9  products especially those that contain
10  asbestiform and fragmented anthophyllite,
11  tremolite, chrysotile, quartz, and trace
12  minerals are presently unknown and
13  warrant evaluation."
14      Yes.  This is also dated
15  1976.
16   Q.   Which is the date that you
17  cite to the Rohl and Langer paper?
18   A.   Yes, I -- I understand that,
19  sir.  However, because this is a Rohl et
20  al., it is certainly possible that I
21  miscited and it was Rohl et al.  But my
22  citation in there is Rohl and Langer.  So
23  it may have been an error on my part.
24  However, there's pause.

Page 408

1    Many investigators,
2  including myself, have papers that come
3  out the same year but with different
4  authors.
5    Q.   If you -- you turn over to
6  Page 6 of your report.
7    A.   Yes, sir.
8    Q.   At the end of the first
9  paragraph, at the top of the page.
10   A.   Yes.
11   Q.   You say that "the close
12  proximity of asbestos in talc and mineral
13  deposits makes extraction of either
14  material alone difficult, if not
15  impossible."
16      Do you see where I'm
17  reading?
18   A.   Yes, I do.
19   Q.   Is it your testimony that it
20  is impossible to extract talc from
21  mineral deposits without asbestos?
22      MS. O'DELL:  Objection to
23  form.
24      THE WITNESS:  I'm not a --

Page 409

1    I'm not a geologist.  I cannot --
2    I can only rely on the references
3    that are there.
4  BY MR. HEGARTY:
5    Q.   Can you list all the steps
6  used in the processing of pharmaceutical
7  grade talc?
8    A.   I can give you an overview.
9  But again, I'm not a commercial talc
10  production person, nor am I a geologist,
11  nor am I in the industry.  So I can only
12  give you a superficial glimpse.
13   Q.   Can you describe the
14  benefication for talc?
15      MS. O'DELL:  Objection to
16  form.  Asked and answered.
17      THE WITNESS:  Not in -- not
18  in detail.  I only know in general
19  that there is -- actually, I
20  prefer not to answer that at all
21  because I don't want to be
22  inaccurate.  It's not my field.
23  BY MR. HEGARTY:
24   Q.   Can you turn over to Page 7

103 (Pages 406 to 409)

Judith Zelikoff, Ph.D.

Page 410

1  of your report.
2      In the second paragraph you
3  refer to the deposition of Alice Blount.
4      Do you see that?
5      A.   Yes, I do.  Second sentence.
6      Q.   And you contend that the
7  sample she tested claimed to include
8  asbestos, including asbestos in Johnson's
9  Baby Powder.  Do you see where you make
10  that reference?
11      A.   Yes, I'm citing her
12  deposition.
13      Q.   Did you read the entirety of
14  her deposition?
15      A.   No, sir.
16      Q.   What testing method did she
17  use?
18      A.   I'd like to see the
19  deposition again.
20      Q.   Did you see from her
21  deposition where she testified that her
22  results published in 1991 came from a
23  Johnson's Baby Powder bottle purchased in
24  1996?

Page 411

1      A.   You know, I'm waiting for
2  the -- see the article, please.
3      Q.   Let me withdraw the
4  question.  I don't have time to cover
5  that.
6      If you turn over to -- if
7  you look at Page 7, the second-to-last
8  paragraph you make reference there to the
9  testimony of Dr. Hopkins and the
10  testimony of Julie Pier.
11      Do you see that?
12      A.   I see reference to
13  Dr. Hopkins in the third sentence.  And
14  in the same paragraph, I see on the last
15  sentence, deposition of Julie Pier,
16  corporate representative of Imerys.
17      Q.   You've already testified
18  that you have not completed reading the
19  deposition of Julie Pier, correct?
20      A.   I have testified to that,
21  yes.
22      Q.   Did you read the entirety of
23  the deposition of Dr. Hopkins?
24      A.   I read the entirety, yes.

Page 412

1      Q.   You read every word of it?
2      A.   I reviewed it.  And I read
3  it to the best of my ability.
4      Q.   You make reference there to
5  Exhibits 47 and 28, 47 from Julie Pier
6  deposition and 28 from Dr. Hopkins'
7  deposition.
8      Do you see that?
9      A.   Yes, I do.
10      Q.   Do you know who prepared
11  those exhibits?
12      A.   I do not.  I would make an
13  assumption that it was attorneys.
14      Q.   Were you aware that they
15  were prepared by counsel for plaintiffs?
16      MS. O'DELL:  Objection to
17      form.
18      THE WITNESS:  As the
19      questions were asked by some of
20      the attorneys for the plaintiff, I
21      would make that assumption.
22  BY MR. HEGARTY:
23      Q.   Did you do anything yourself
24  to verify the accuracy of the information

Page 413

1  in any of those exhibits?
2      A.   I'm not sure what you mean
3  did I do anything myself.  I read them,
4  and I did not do any further literature
5  searching, if that's what you mean.
6      Q.   Did you review the test
7  results themselves that are supposedly
8  reported in those two exhibits?
9      MS. O'DELL:  Objection to
10      form.
11      THE WITNESS:  Did I review
12      the testing methodology?  I did
13      not review it in the sense that I
14      did further literature searching,
15      but I -- I looked at and reviewed
16      the testing methods that they --
17      that they said they used.
18  BY MR. HEGARTY:
19      Q.   Did you actually pull the
20  tests that are referenced in those
21  exhibits and look at the test results
22  yourself?
23      A.   I did not.
24      Q.   Are you aware that in 2009

Judith Zelikoff, Ph.D.

Page 414

1 FDA pulled -- did its own testing with
2 regard to asbestos and talc?
3     A.   I am aware of that.
4     Q.   Did you review the results
5 of those tests?
6     A.   I did review the results.
7 It doesn't come to mind right now.  I'd
8 like to see a copy of it, if I may.
9     Q.   Nowhere in your report do
10 you cite those test results, do you?
11     A.   Not that I can recall.
12         I do cite a paper or a
13 comment by Epstein writing to the FDA in
14 here.  And the FDA's response in terms of
15 migration.
16         But in answer to your
17 question -- can you repeat your question?
18     Q.   Sure.  Did you cite -- you
19 agree that you didn't cite anywhere --
20 strike that.
21         You did not cite anywhere in
22 your report the results of the FDA's
23 testing of talc in 2009, correct?
24     A.   It doesn't appear so, no.

Page 415

1     Q.   Did you have that
2 information before you finalized your
3 report?
4     A.   I'm not certain.  Probably
5 yes.
6     Q.   Did you review all the
7 epidemiologic literature looking at
8 asbestos exposure and ovarian cancer?
9     A.   Well, as I said, I'm not an
10 epidemiologist.  So I looked at several
11 of the meta-analyses, including
12 Dr. Taher.
13     Q.   Did you read all the
14 meta-analyses that had been published
15 with regard to asbestos and ovarian
16 cancer?
17     A.   No, I have not.
18     Q.   The medical literature
19 looking at asbestos exposure and ovarian
20 cancer was based on exposure to --
21 based on a heavy industrial exposure,
22 correct?
23         MS. O'DELL:  Objection to
24     form.

Page 416

1         THE WITNESS:  There are many
2     studies that IARC used, not just
3     worker study populations.
4 BY MR. HEGARTY:
5     Q.   But their conclusion with
6 regard to designating talc -- sorry,
7 designating asbestos as Category 1 was
8 based on five cohort studies involving
9 heavy industrial exposure, correct?
10     A.   The preponderance -- or the
11 weight -- the weight of evidence was
12 contributed among all studies, but it's
13 my -- it's my thought that the worker
14 studies were probably weighted as heavy
15 as any others.
16     Q.   You agree -- you agree that
17 nowhere in your report do you analyze
18 what asbestos exposure levels had been
19 shown to induce a biologically plausible
20 effect in tissues, correct?
21         MS. O'DELL:  Object to the
22     form.
23         THE WITNESS:  Again, what do
24     you mean by analyze?

Page 417

1 BY MR. HEGARTY:
2     Q.   Well, nowhere do you cite
3 studies in your report reporting on the
4 effect of asbestos in tissues, correct?
5     A.   I certainly do talk about
6 asbestos.  If you give me a minute to
7 review.
8         I talk about it on Page 7
9 being listed as a Group 1 carcinogen.
10     Q.   My question is nowhere in
11 your report do you analyze the studies
12 that look at the toxicity or discuss the
13 toxicity of asbestos in human tissue,
14 correct?
15         MS. O'DELL:  Object to the
16     form.
17         THE WITNESS:  I -- I did not
18     look at -- I did not analyze in
19     depth, no, the studies that are
20     associated with the IARC report,
21     if that's what you're asking.
22 BY MR. HEGARTY:
23     Q.   What type of chromium --
24 strike that.

Judith Zelikoff, Ph.D.

Page 418

1  Is chromium-6 in Johnson's
2  Baby Powder?
3      A.   Chromium is in Johnson's
4  Baby Powder.
5      Q.   I'm sorry?
6      A.   Chromium is present.
7      Q.   Is chromium-6 present in
8  Johnson's Baby Powder?
9      A.   There are indications.  They
10  just discuss total chromium.
11      Q.   Can you testify here today
12  that Johnson's Baby Powder has chromium-6
13  in it?
14          MS. O'DELL:  Object to the
15      form.
16          THE WITNESS:  Again, not
17      being a geologist and only going
18      by the internal documents, and if
19      I may also look at one of the
20      exhibits that has the data for the
21      metals.  I'm sorry.
22          MS. O'DELL:  It's Exhibit C
23      that was marked.
24          THE WITNESS:  I don't want

Page 419

1      to go by my memory alone.  I'd
2      like to see that.
3          Thank you very much.
4          In the document prepared as
5      Exhibit C, chromium has not been
6      speciated and it's listed as total
7      chromium.  I would make the
8      assumption from my professional
9      opinion that in mining, you do get
10      both chromium-6 and chromium-3
11      when you have -- when you're
12      mining talc.  But I'm not a
13      geologist.
14  BY MR. HEGARTY:
15      Q.   Does chromium-6 only come
16  through industrial processing?
17      A.   No.  It can actually be
18  found in the soil as a product of
19  contamination.
20      Q.   If you look over --
21      A.   And it can be re-oxidized.
22  Yes.
23      Q.   If you look over on Page 9?
24      A.   Of?

Page 420

1      Q.   Of your report.  The third
2  paragraph from the bottom where it
3  begins, "Chromium-3."
4      A.   Yes.
5      Q.   You say, "Chromium-3 has
6  weak cell membrane permeability, allowing
7  it to cross the cell membrane in order to
8  bind to DNA and cause lesions."  That's
9  not correct, is it?
10      A.   That is not correct.  That
11  is an error on my part in the report.
12  Chromium-3 has strong membrane
13  permeability.  And when you asked me the
14  question initially whether there was an
15  error in my report, I should have looked
16  at it, and that is an error.  Yes.
17      Q.   In fact chromium-3 does not
18  cross the cell membrane, correct?  It's
19  unable to cross the cell membrane?
20      A.   Chromium-6 crosses the cell
21  membrane and then converts into -- is
22  oxidized to chromium-3.  And chromium-3
23  is the actual component which causes the
24  instability.

Page 421

1      Q.   But chromium-3 is unable to
2  cross the cell membrane, correct?
3      A.   Completely.  To some degree
4  it has -- it can cross to some -- some
5  minimal degree.  But it's hexavalent
6  chromium which can cross -- which has
7  great capacity to cross the cell
8  membrane, yes.
9          May I take a minute, please.
10          Let me -- let me restate
11  based upon the third paragraph that
12  starts, "Chromium-3 has weak cell
13  membrane permeability."
14          It has weak to no cell
15  membrane permeability.
16          It is the active oxidized
17  product of hexavalent chromium or
18  chromium-6, that along with chromium-4
19  and chromium-5 which is responsible for
20  genetic instability and oxidative stress.
21  So it's chromium-3.
22      Q.   If you turn over to Page
23  13 -- I'm sorry, Page 12 of your report.
24  Section entitled C, Fragrances?

106 (Pages 418 to 421)

Judith Zelikoff, Ph.D.

Page 422

1      A.   Yes.
2      Q.   As of the time you prepared
3  your report, your entire opinions with
4  regard to fragrances was based on the
5  report by Michael Crowley, correct?
6      A.   That is correct.
7      Q.   You understand --
8      A.   And, and what I know about
9  some of the components from other --
10  other studies.
11     Q.   Have you had any prior work
12  experience with him?
13     A.   Dr. Michael Crowley?
14     Q.   Yes.
15     A.   No.
16     Q.   Do you know anything about
17  his qualifications beyond -- beyond what
18  you read in his report?
19     A.   No.  Just in his report and
20  the information that he gives about
21  himself.  And the questions that were
22  asked to him and the responses.
23     Q.   You say that you concur --
24  "I concur with his opinion."  Does that

Page 423

1  mean that you agreed with everything that
2  he says in his report?
3         MS. O'DELL:  Object to the
4      form.
5         THE WITNESS:  I concur with
6      his statement which says that
7      "some of these chemicals in
8      fragrances may contribute to the
9      inflammatory response, toxicity
10      and potential carcinogenicity of
11      Johnson & Johnson talcum powder
12      products."
13         And that's based on the
14      knowledge of some of the chemicals
15      as I said that I've reviewed for
16      other studies.  And they are indeed
17      inflammatory and can cause
18      toxicity.
19  BY MR. HEGARTY:
20     Q.   Prior to reading
21  Dr. Crowley's report, had you ever
22  concurred with a finding as to toxicity
23  of a substance based on the reading of an

Page 424

1  expert witness report in litigation?
2         MS. O'DELL:  Object to the
3      form.
4         THE WITNESS:  I am trying to
5      recall whether or not I have ever
6      had that opportunity.
7  BY MR. HEGARTY:
8      Q.   Sitting here right now, can
9  you recall when you had such an
10  opportunity?
11     A.   In this particular setting
12  of being deposed?
13     Q.   Or in any -- in any setting
14  where you are concurring with the opinion
15  of someone who -- who comments on
16  toxicity in an expert witness report
17  written for litigation?
18         MS. O'DELL:  Objection to
19      form.
20         THE WITNESS:  I would --
21      I -- I would comment on it if I
22      agreed.
23         And in this case, you know,
24      having the knowledge base that I

Page 425

1      have, not on -- certainly not on
2      all 150 different chemicals, which
3      is why I did my own literature
4      search, but on the chemicals that
5      I do know, I did agree with the
6      fact that they -- they do
7      contribute to inflammatory
8      responses, toxicity, some are
9      cytotoxic and produce cell injury
10      and potential carcinogenicity.
11         So as ethyl benzene as one
12      of the ingredients or one of the
13      constituents in fragrances, is
14      listed as a type -- as a Class 2
15      carcinogen.  So I did agree with
16      it.
17         If I had any question, I did
18      my own search.
19  BY MR. HEGARTY:
20     Q.   Over on page -- Pages 12 and
21  13, again you discuss exposure routes of
22  talc either through perineal exposure or
23  through inhalation, correct?  And that
24  carries over to Pages 14 and 15, and 16

107 (Pages 422 to 425)

Judith Zelikoff, Ph.D.

Page 426

1   and 17.
2       A.   Okay.
3       Q.   So in that section, did you
4   in any way analyze whether the particles
5   that -- whether talc can transport in the
6   same way that the particles do in the
7   studies that you cite?
8       MS. O'DELL:  Objection to
9   form.
10  BY MR. HEGARTY:
11      Q.   In other words, did you cite
12  any authority showing that talc particles
13  transport in the same way as the
14  particles you reference in these studies?
15      A.   Not conclusively.  But as I
16  said, if the particles are of similar
17  sizes, which they are in these -- in
18  these animal studies, then I would have
19  no reason to believe that the talc
20  particles did not move in the same
21  manner.
22      Q.   Well, do you agree that it
23  is important when talking about transport
24  of particles, that -- strike that.  Let

Page 427

1   me ask it a different way.
2       You cite to an authority
3   that makes the following statement, I
4   don't want to ask you -- I want to ask
5   you if you agree with it.
6       A.   Okay.
7       Q.   In an experiment to
8   evaluate --
9       A.   I'm sorry.  What page?
10      Q.   It's -- it's not on -- it's
11  not in your report.  It's part of my
12  question.
13      A.   Okay.
14      Q.   Do you agree that in an
15  experiment to evaluate the translocation
16  of solid particles, the characteristics
17  of the particle, i.e., size and material,
18  should be considered carefully?
19      A.   I agree that the size should
20  be considered very carefully.
21      Q.   And did you do any
22  comparison with the size of particles
23  that are referenced in the literature
24  that you cite, to the size of particles

Page 428

1   that are applied to talc via the perineal
2   route?
3       A.   What I did was I looked at
4   the internal documents, found that the --
5   according to the -- the instrumentation
6   and the graphics that they did, as well
7   as Dr. Longo, and looked at the size
8   range of the particles.  As I said, the
9   median and the average is around 10.5 to
10  11.5, but there were particle size range
11  in the talc -- talcum powder products
12  that range all the way from 50 microns or
13  larger all the way down to 0.3 microns or
14  300 nanometers.
15      Q.   Well, did you do any
16  correlation to determine whether the --
17  the size of the particles studied in
18  the -- in the articles you cite in any
19  way correlate or relate to the particle
20  sizes in Johnson's Baby Powder?
21      MS. O'DELL:  Object to the
22  form.
23      THE WITNESS:  The size of
24  particles that were used in many

Page 429

1       of the animal studies certainly
2       fall within the range that I just
3       gave you.
4   BY MR. HEGARTY:
5       Q.   Well, a number of the animal
6   studies used nanoparticles, correct?
7       A.   They used .1 micron, but
8   they also used larger particles.
9       Q.   Is it your testimony that
10  there are nanoparticles of talc in
11  Johnson's Baby Powder?
12      A.   If a particle -- a particle
13  is considered an ultra fine particle if
14  it's .1 micron or less.
15      Q.   But my question is as to
16  nanoparticles.  Are there nanoparticles
17  in Johnson's Baby Powder?
18      A.   Not that your literature
19  showed.  But ultra fines are also -- can
20  be called nanoparticles because they go
21  as low as .1.
22      Q.   If you look over on Page 14
23  of your report, you cite in the second
24  paragraph a letter from FDA to

108 (Pages 426 to 429)

Judith Zelikoff, Ph.D.

Page 430

1  Dr. Epstein, correct?
2      A.   That's correct.
3      Q.   I marked as Exhibit
4  Number 33 a copy of that letter.
5          (Document marked for
6          identification as Exhibit
7          Zelikoff-33.)
8  BY MR. HEGARTY:
9      Q.   Is that a copy of the letter
10 that you are referencing in that
11 paragraph?
12     A.   If you could point me to the
13 paragraph, please.
14     Q.   Well, it's the second --
15 it's the second paragraph at the top of
16 Page 14.
17     A.   Stating "further evidence
18 for migration"?
19     Q.   Correct.
20     A.   Okay.  Yes.  This is the
21 letter that I'm referring to.
22     Q.   In the same paragraph that
23 you reference, where you make -- where
24 you -- in the same paragraph where you

Page 431

1  pull out the statement that you cite
2  here, "FDA states that while there exists
3  no direct proof of talc in ovarian
4  carcinogenesis" --
5      A.   Genesis?
6      Q.   Genesis, carcinogenesis.
7  It's getting late for me too.
8          Did you cite that finding by
9  FDA in this paragraph?
10     A.   No.  What I was trying to
11 cite was referring to migration through
12 the upper genital tract.  So citing the
13 information on carcinogenesis would not
14 have been appropriate in that paragraph.
15     Q.   If you turn over to Page 4
16 of the FDA's letter.  At the very bottom
17 FDA states, "A cogent biological
18 mechanism by which talc might lead to
19 ovarian cancer is lacking."
20         Do you see that?
21     A.   I do see that.
22     Q.   You do not cite that
23 statement anywhere in your report,
24 correct?

Page 432

1      A.   I did not.
2      Q.   Why not?
3      A.   And in terms of my report,
4  and talking about migration, again, the
5  ovarian cancer and cogent biological
6  mechanism was not appropriate for that,
7  where I cited the original statement.
8      Q.   But you cite elsewhere in
9  your report statements and studies you
10 contend support your opinion that there
11 is a biologically plausible mechanism
12 between talc and ovarian cancer, correct?
13     A.   Yes, I do.
14     Q.   This statement by FDA
15 concerns where there's a biologically
16 plausible mechanism between talc and
17 ovarian cancer, correct?
18     A.   That is -- that is what the
19 FDA says, yes.
20     Q.   Did you cite FDA's statement
21 about -- as to its view of whether a
22 cogent biological mechanism exists
23 anywhere in your report?
24     A.   I did not cite this

Page 433

1  statement.
2      Q.   You cite one statement by
3  FDA that you believe they are correct
4  about?
5      A.   They put a lot of weight
6  into that statement and...
7      Q.   Well, how did you weigh that
8  statement versus the other statement that
9  I read at the bottom of Page 4?
10     A.   Sorry, I'd like to find it.
11         And repeat the question
12 please.
13     Q.   How did you weigh the
14 statements you cite about migration
15 versus the other statement that I read at
16 the bottom of Page 4 about a cogent
17 biologic mechanism?
18     A.   In terms of the migration,
19 this is something that not only has been
20 found by the FDA and -- and is being
21 reiterated as a result of numerous
22 studies, this, Number 4, a cogent
23 biological mechanism by which talc led to
24 ovarian cancer is lacking is the FDA's

Judith Zelikoff, Ph.D.

Page 434

1  opinion in 19 -- in 2014, and I did not
2  know at all how they came to that
3  conclusion.
4          So in terms of migration,
5  that's been ferreted out and it's well
6  known in the literature for migration of
7  particles.  But the -- their opinion, the
8  FDA's opinion on this, I could not
9  substantiate in terms of what they were
10  basing that conclusion on.
11      Q.   What methodology did you use
12  to determine which of the statements by
13  FDA in this letter you believed are
14  correct and which you believed are not
15  correct?
16          MS. O'DELL:  Object to the
17  form.
18          THE WITNESS:  Well, if it
19      was a common finding such as that
20      which particles can migrate which
21      has been shown since late 1990s,
22      versus information that is given
23      in this report and is the basis --
24      and is what the FDA is opining on,

Page 435

1      however, I don't know what the --
2      what the literature is that they
3      reached in that conclusion.
4  BY MR. HEGARTY:
5      Q.   IARC includes a citation in
6  its 2010 monograph saying essentially
7  that the evidence of migration to the
8  ovaries is weak.  Do you recall reading
9  that?
10      A.   I do not recall reading
11  that.  I've reviewed the IARC paper, but
12  I -- I do not recall.  And I could look
13  at it and tell you what I thought.
14      Q.   You made reference earlier
15  in the deposition to the 1992 NTP study,
16  correct?
17      A.   Yes.
18      Q.   Do you find that to be a
19  well-done study?
20      A.   For what it was, I do find
21  it to be a well-done study.  I've worked
22  with the NTP.  I've served as an advisory
23  board member.  And I think that the work
24  they do are -- is with rigor and

Page 436

1  scrutiny.  I think that for what they
2  did, they did a good job.
3      Q.   If you look at Page 3 of the
4  FDA letter.
5      A.   Okay.
6      Q.   At the bottom, do you see
7  they comment on the very NTP study --
8      A.   Yes.
9      Q.   -- that you just mentioned,
10  right?
11          MS. O'DELL:  Which page are
12      you on?
13          MR. HEGARTY:  Page 3.
14          THE WITNESS:  There were a
15      number --
16  BY MR. HEGARTY:
17      Q.   I'm not -- I'm haven't asked
18  a question.
19      A.   Oh, I'm sorry.
20      Q.   My question was simply, do
21  you see where they comment on that NTP
22  study?
23      A.   I see that, yes.
24      Q.   Do you cite anywhere in your

Page 437

1  report FDA's commentary on the NTP study?
2      A.   I can find it in my report.
3  I did comment on some of the other that
4  there's been some controversy by
5  Dr. Warheit and Dr. Goodman.  They had
6  some pushback on this.  I think I
7  commented on that, but I'd like to find
8  the page where I said that.
9      Q.   You agree that you didn't
10  cite to FDA's commentary about the NTP
11  study in its February 14, 2014, letter?
12      A.   Not -- not that I recall,
13  no.  But as I said, I did comment on
14  other -- their -- the FDA's comments are
15  very similar to those made by other
16  scientists.
17      Q.   You say the FDA's comments
18  are very similar to those made by other
19  scientists.  You are talking about the
20  comments on Page 3?
21      A.   I am.  And I'm talking about
22  the comments made by Dr. Jay Goodman and
23  Dr. David Warheit that pushed back on the
24  studies by the NTP and the conclusion.

110 (Pages 434 to 437)

Judith Zelikoff, Ph.D.

Page 438

1      Q.   For purposes of your
2  analysis in this case, did you review all
3  the studies on talc miners and millers?
4      A.   No, I did not.
5      Q.   For purposes --
6      A.   I am not an epidemiologist.
7      Q.   For purposes of your
8  analysis in this case, did you look at
9  all the studies looking at talc --
10  looking at long-term effects of talc
11  pleurodesis?
12          MS. O'DELL:  Object to the
13      form.
14          THE WITNESS:  It was -- it
15      was not my question to look at --
16      only to bring the pulmonary
17      aspects in in manners that relate
18      to ovarian effects and
19      inflammation and plausibility.
20          So, no, I did not.  I
21      reviewed several studies on
22      pleurodesis, in terms of
23      understanding it, why talcum
24      powder is used, and the effect of

Page 439

1      talcum powder on pleurodesis.
2  BY MR. HEGARTY:
3      Q.   What is the volume of talc
4  that gets introduced in vivo with a
5  single application to the perineum?
6          MS. O'DELL:  In pleurodesis?
7          THE WITNESS:  For
8      pleurodesis?
9  BY MR. HEGARTY:
10      Q.   No, just in women in
11  applying -- strike that.
12          MS. O'DELL:  I'm sorry.
13  BY MR. HEGARTY:
14      Q.   What is the volume of talc
15  that gets introduced in vivo with a
16  single application of talc to the
17  perineum?
18          MS. O'DELL:  Objection to
19      form.
20          THE WITNESS:  I do not know
21      the concentration.  It depends on
22      the person and how they're using
23      it.  It also depends on the
24      frequency that they are using it.

Page 440

1      So when you're looking at
2      toxicology, it's not just the
3      concentration that you use.  It's
4      also the length and duration and
5      frequency of the use and their
6      cumulative effects.
7  BY MR. HEGARTY:
8      Q.   Is it your opinion that a
9  single particle of talc is sufficient for
10  biologic plausibility?
11          MS. O'DELL:  Objection to
12      form.
13          THE WITNESS:  I'm pretty
14      sure I answered that question
15      before.  But I will -- again,
16      talcum powder is known to produce
17      inflammation, and inflammation is
18      known to be a biological mechanism
19      for cancer.
20  BY MR. HEGARTY:
21      Q.   My question is, is a single
22  particle of talc in vivo sufficient for
23  your biologic plausibility opinion in
24  this case?

Page 441

1      A.   If it produces inflammation,
2  it could be used that way.  As a matter
3  of relevancy, I don't think that there's
4  anyone who produces -- who uses a single
5  molecule.  But in answer to your
6  question, if that single talc -- talcum
7  powder product produced inflammation,
8  then yes, it could -- it could be related
9  to biological plausibility.
10      Q.   Can you cite any published
11  authority that supports that opinion?
12      A.   That shows me that one
13  particle could produce inflammation?
14      Q.   That could lead to cancer.
15      A.   That could lead to cancer.
16  I cannot show you.  It's not that I don't
17  know if it's there or not there.  I just,
18  to my knowledge, I am not aware.
19          MR. HEGARTY:  I'm going to
20      let Mr. Ferguson ask you some
21      questions for a little bit.  Then
22      I will come back and finish up.
23          THE WITNESS:  Okay.  Thank
24      you.

111 (Pages 438 to 441)

Judith Zelikoff, Ph.D.

Page 442

1      THE VIDEOGRAPHER:  The time
2  is 6:00 p.m.  Off the record.
3      (Short break.)
4      THE VIDEOGRAPHER:  The time
5  is 6:25 p.m.  Back on the record.
6          - - -
7      EXAMINATION
8          - - -
9  BY MR. FERGUSON:
10     Q.   Hello, Dr. Zelikoff.
11     A.   Hello.
12     Q.   How are you?
13     A.   Good, thank you.
14     Q.   My name is Ken Ferguson, and
15  I represent Imerys, one of the parties to
16  this litigation.  Do you understand that?
17     A.   I understand what you said,
18  yes.
19     Q.   Okay.  And I'm going to have
20  some questions for you, which I'm going
21  to maybe try to go through pretty
22  quickly.  But just stop me if I speed up
23  too much.  I'm told that I talk slowly.
24  So maybe I won't be speeding up too much.

Page 443

1      So first of all, let me just
2  go back briefly to your background and
3  qualifications.
4      A.   Okay.
5      Q.   Just briefly, do you
6  currently have a laboratory?
7      A.   I do have a laboratory.
8      Q.   And how many personnel do
9  you have employed in the laboratory?
10     A.   Today?
11     Q.   Yes, ma'am.
12     A.   Today I have no one
13  employed, but three graduate students.
14     Q.   And where does the funding
15  come from to support that laboratory?
16     A.   It comes from the NIEHS,
17  National Institute of Environmental
18  Health Sciences from a center grant.  And
19  that is the main source at this moment.
20     Q.   Are you the principal
21  investigator of any extramural or
22  intramural funding at the current time?
23     A.   I have -- as of today, I'm
24  not.

Page 444

1      Q.   Have you ever been elected
2  to membership in any of the national
3  academies, for example the National
4  Academy of Science?
5      A.   I've not been elected as a
6  member, but I have served on the advisory
7  body numerous times.
8      Q.   Okay.  But you haven't been
9  elected to membership; is that right?
10     A.   No, that is correct.
11     Q.   Dr. Zelikoff, have you
12  communicated with any regulatory bodies
13  of any country regarding the issue of
14  talc and ovarian cancer that we've been
15  discussing today?
16     A.   I have not.
17     Q.   Have you communicated with
18  any scientific journals or publications
19  regarding talc and ovarian cancer?
20     A.   I have not.
21     Q.   So, can you turn to your
22  report, which is Exhibit Number 2.
23     A.   I have it.
24     Q.   Okay.  Can you look at the

Page 445

1  top of Page 3, please.
2      A.   Yes, sir.
3      Q.   And in the first full
4  paragraph on that page, it says, "My
5  opinions below are based upon my
6  experience as a toxicologist and research
7  scientist and have been reached through
8  employing the same scientific methodology
9  and rigor that I employ in my academic
10  research and professional duties."
11  Correct?
12     A.   Yes, sir, I see that.
13     Q.   And is that true?
14     A.   That is true.
15     Q.   And in your professional
16  duties and academic research, do you
17  customarily rely on peer-reviewed
18  publications in the scientific literature
19  for your research?
20     A.   I do -- peer reviews, I rely
21  on.  Abstracts come into play.
22  Documents.  Whatever is needed, I will
23  use and cite in my publications.
24     Q.   Do you customarily rely on

Judith Zelikoff, Ph.D.

Page 446

1  non-peer-reviewed research that is paid
2  for by a party that has a direct
3  financial interest in the outcome of the
4  study?
5          MS. O'DELL:  Object to the
6      form.
7          THE WITNESS:  I go by the
8      science.  I don't look at the
9      funding.  Many scientists do.  But
10     I think if the science is sound, I
11     look at the science -- I go by the
12     science.
13 BY MR. FERGUSON:
14     Q.   Look at -- look at Page 8,
15 please.
16     A.   Yes, sir.
17     Q.   There in the first full
18 paragraph, you talk about recent TEM
19 testing on historic samples.
20         Do you see that sentence?
21     A.   Recent TEM testing on
22 historic samples, yes.
23     Q.   And you cite Longo and
24 Rigler from 2018, correct?

Page 447

1      A.   Mm-hmm-hmm, yes.
2      Q.   Okay.  And are you aware
3  that Longo and Rigler are paid expert
4  witnesses who were hired by plaintiffs'
5  counsel to testify in talc litigation,
6  including this matter you're working on?
7      A.   I understand -- I understand
8  today that they are plaintiffs'
9  witnesses, experts.
10     Q.   Can you cite any scientific
11 articles that you've authored in the past
12 in which you cited an unpublished paper
13 that was authored by expert witnesses
14 hired by a party in litigation on the
15 very topic that you're writing on?
16         MS. O'DELL:  Objection to
17     form.
18         THE WITNESS:  I relied
19     primarily on Longo.  But it is, as
20     I said, or as I will say, it's a
21     Johnson & Johnson product that
22     they are testing, so in my
23     opinion, who better to know what's
24     there than someone who did the

Page 448

1      testing from the company?
2  BY MR. FERGUSON:
3      Q.   And my question was, can you
4  cite any scientific articles that you've
5  authored in which you cited an
6  unpublished paper authored by an expert
7  witness who is being paid in the
8  litigation on the very topic that you're
9  writing on?
10     A.   I have not had that
11 opportunity so the answer is no.
12     Q.   So, you've never done that
13 in your academic writings, correct?
14     A.   If you mean that -- by that,
15 that I have never cited an unpublished
16 paper authored by an expert witness?
17     Q.   Yes, ma'am.
18     A.   I have not done -- I have
19 not had the opportunity to do that.  My
20 publications are primarily, if not
21 solely, based either on reviews or -- or
22 results that have emerged from my own
23 laboratory or a colleague's laboratory.
24         I've not had that

Page 449

1  opportunity.  So the answer is no.
2      Q.   If you look at Page 7.
3      A.   Of the report?
4      Q.   Of -- of your report.  Yes
5  please.
6          On Page 7 you say, "In 2004,
7  a television station reported that
8  Johnson's Baby Powder had been analyzed
9  and found anthophyllite asbestos at
10 0.2 percent," correct?
11     A.   I see that.  That's in the
12 last paragraph.  The second sentence:  In
13 2004, a television station reported
14 Johnson's Baby Powder had been analyzed
15 and found anthophyllite asbestos at
16 0.2 percent, yes.
17     Q.   In your previous academic
18 research, have you ever cited to stories
19 run on local television stations?
20     A.   I have.
21     Q.   And is that something that
22 you think shows scientific rigor?
23         MS. O'DELL:  Objection to
24     form.

113 (Pages 446 to 449)

Judith Zelikoff, Ph.D.

Page 450

1    THE WITNESS:  It depends on
2  the scientific paper.  And it --
3  it depends on the source of the
4  media.
5  BY MR. FERGUSON:
6    Q.   If we go to Pages 6 --
7    A.   If -- if I may add to that,
8  my recollection is that that television
9  station data was given to Johnson &
10  Johnson and it was not -- I did not cite
11  television station itself, but the -- the
12  document that was turned over to Johnson
13  & Johnson.
14    Q.   If you go to Page 6 of
15  your --
16    A.   Page what, I'm sorry?
17    Q.   6.
18    A.   6?
19    Q.   So on Pages 6 to 8 you cite
20  documents or other sources that you claim
21  show the presence of asbestos in talc
22  powder, correct?  You --
23    A.   Pages 6 to 8?
24    Q.   Yeah.  Why don't you go to

Page 451

1  the top of 7.  Let me go to it
2  specifically.
3    One of the things you cite
4  to is Paoletti in 1984?
5    A.   Yes, sir.
6    Q.   Okay.  And the Paoletti
7  study was completed -- I don't know if I
8  can do my math very well, but is that
9  36 years ago?
10    A.   36, yes.
11    Q.   And you notice they have
12  assessed, according to your own report,
13  contamination in industrial and cosmetic
14  talcs, correct?
15    A.   9 of the 24 pharmaceutical
16  and cosmetic grade talcs contain
17  tremolite fibers.
18    Q.   And they are from the
19  Italian market, correct?
20    A.   From the Italian market.
21    MS. O'DELL:  Objection to
22  form.
23    THE WITNESS:  And the
24  European pharmacopeia.

Page 452

1  BY MR. FERGUSON:
2    Q.   And that's in your report,
3  correct?
4    A.   On Page 7 at the top.
5    Q.   Then you also cited
6  Dr. Blount's paper that you and
7  Mr. Hegarty talked about, correct?
8    A.   I'm sorry, can you give me a
9  location?
10    Q.   Sure.  It's the second
11  paragraph on Page 7.
12    A.   Van Gosen?
13    Q.   No, the second full
14  paragraph, cosmetic and pharmaceutical
15  talc products, et cetera --
16    A.   Yes, deposition of Alice
17  Blount.  Yes.
18    Q.   Correct.
19    A.   Sorry to interrupt.
20    Q.   And Dr. Blount's paper was
21  some 30 or so years ago, correct?
22    A.   1991.
23    Q.   And -- and I won't go
24  through this in detail, but Mr. Hegarty

Page 453

1  discussed with you the fact that U.S.
2  Food and Drug Administration conducted a
3  survey of cosmetic grade raw material
4  talc and some cosmetic products
5  containing talc.  And you were generally
6  aware of that, correct?
7    A.   The FDA report that he -- he
8  pointed me to, yes.
9    Q.   Okay.  You were aware but
10  you didn't cite it, correct?
11    A.   I was aware but I did not
12  cite it.
13    Q.   And that came from 2010 as
14  opposed to 1984 or 1991, correct?
15    MS. O'DELL:  Objection --
16    THE WITNESS:  Yes --
17    MS. O'DELL:  Excuse me.
18  Objection to form.
19    If you're going to ask a
20  specific -- about a specific date,
21  I would ask -- or a specific item
22  of that -- in that document I
23  would just ask that you show the
24  witness.

Judith Zelikoff, Ph.D.

Page 454

1 BY MR. FERGUSON:
2     Q.   Do you -- do you recall when
3 that survey was from?
4     A.   The FDA was 2014. I don't
5 recall a specific.
6     Q.   Well, okay. Counsel's
7 suggested it. Why don't we go ahead and
8 mark as Exhibit 37.
9         (Document marked for
10        identification as Exhibit
11        Zelikoff-37.)
12 BY MR. FERGUSON:
13    Q.   And is this a document that
14 you've reviewed before?
15    A.   This is a document that I
16 have reviewed, yes.
17    Q.   Okay. If you look at Page 2
18 at the top of the paragraph, in the second
19 paragraph there, it says, "The study ran
20 from September 28, 2009, to September 27,
21 2010," correct?
22    A.   So I'm trying to put that
23 sentence into context. So I need to read
24 the above sentences.

Page 455

1         I assume that the study they
2 are talking about was the contract with
3 the AMA analytical services to conduct
4 the laboratory survey.
5         Is that the study that they
6 are referring to? It's unclear.
7     Q.   And in your review of this
8 document, did you read that there was no
9 asbestos detected by the survey by the
10 FDA in either the cosmetic grade raw
11 material talc, or the finished product
12 cosmetic products containing talc,
13 correct?
14    A.   I'm trying to find where
15 that was stated.
16    Q.   If you look at Page 3?
17    A.   Yes, sir.
18    Q.   See where it says at the top
19 of the page, "Cosmetic raw material
20 talc"?
21    A.   I see that, yes, sir.
22    Q.   Correct?
23        Then there is a list of
24 suppliers called Rio Tinto Minerals

Page 456

1 Luzenac America, correct?
2     A.   Correct. On the left side.
3     Q.   On the left side. And on
4 the right side there are two columns that
5 say percentage asbestos by PLM and
6 percentage asbestos by TEM, correct?
7     A.   I see that.
8     Q.   And each of those says NAD,
9 correct?
10    A.   They say NAD.
11    Q.   And from your review of
12 this, do you know that NAD means no
13 asbestos detected?
14    A.   Yes, I do. That means that
15 the measurements that they had and the
16 scientific -- and the sensitivities that
17 they were using at the given time, they
18 did not see any, is my interpretation of
19 that.
20    Q.   According to the paper that
21 you said, NAD means no asbestos detected,
22 correct?
23    A.   In this study, yes, correct.
24    Q.   Let's take a look. You've

Page 457

1 cited to IARC several times during
2 your -- in your report, correct?
3     A.   Yes, I did.
4     Q.   And let's look at the IARC
5 monograph 100 C, which was published in
6 2012 that I've marked as Exhibit 36.
7         (Document marked for
8         identification as Exhibit
9         Zelikoff-36.)
10        THE WITNESS: Entitled
11        Arsenic Metals, Fibrous and Dusts?
12 BY MR. FERGUSON:
13    Q.   Correct.
14        And if you -- I've provided
15 you a page there, correct?
16    A.   You've provided me with
17 three pages.
18    Q.   Okay. And was that
19 Page 225?
20    A.   225 starts 1.5 human
21 exposure.
22    Q.   Okay. If you look at the
23 top of 225. Do you have that page?
24    A.   Yes, sir.

Judith Zelikoff, Ph.D.

Page 458

1    Q.   In an exposure it says,
2  "Inhalation and ingestion are the primary
3  routes of exposure to asbestos," correct?
4         MS. O'DELL:  Objection to
5    form.
6  BY MR. FERGUSON:
7    Q.   The very first sentence.
8    A.   Mm-hmm-hmm.  I cannot attest
9  to ingestion, but certainly inhalation is
10 a primary.
11   Q.   But you'd agree that -- that
12 this is what IARC said, correct?
13   A.   I agree that this is what's
14 in IARC, yes, 2012.
15   Q.   And then there's another
16 section called exposure of the general
17 population, correct?
18   A.   Yes, sir.
19   Q.   And in the second paragraph
20 under that, do you see that paragraph
21 starts in studies of asbestos
22 concentrations?
23   A.   I do.
24   Q.   Okay.  And -- and let's --

Page 459

1  let's read it and see if it -- you and I
2  agree on what it says.
3         "In studies of asbestos
4  concentrations in outdoor air, chrysotile
5  is the predominant fiber detected.  Low
6  levels of asbestos have been measured in
7  outdoor air in rural locations; typical
8  concentration, 10 fibers per cubic meter.
9  Typical concentrations are about tenfold
10 higher in urban locations and about 1,000
11 times in close proximity to industrial
12 sources of exposure, e.g., asbestos mine
13 or factory demolition site, or improperly
14 protected asbestos-containing waste
15 site," correct?
16   A.   That's what's written here,
17 yes.
18   Q.   Okay.  And if you go down to
19 the first sentence of the next paragraph,
20 it says, "In indoor air, for example in
21 homes, schools and other buildings,
22 measured concentrations of asbestos are
23 in the range of 30 to 6,000 fibers per
24 cubic meter," correct?

Page 460

1    A.   That's what's here, yes.
2    Q.   Okay.  So certainly based on
3  what IARC has said, a person could inhale
4  or ingest one or more asbestos fibers
5  from the air that they breathe, correct?
6         MS. O'DELL:  Objection to
7    form.
8         THE WITNESS:  Based on the
9    measurements, I can't really tell
10   where they took these, where they
11   took the measurements or how they
12   measured them, from this Page 225,
13   but based on what they are saying
14   here, they have measured in
15   outdoor air and rural locations,
16   10 fibers per cubic meter, yes.
17        As I said, if you look down
18   in that paragraph it also
19   indicates that asbestos has been
20   measured in the air in a disaster
21   such as the World Trade Center, in
22   higher concentrations by
23   Dr. Longo.
24 BY MR. FERGUSON:

Page 461

1    Q.   And then if you look at
2  Page 229.  Are you with me?
3    A.   Yes, I am.
4    Q.   Under B, dietary exposure.
5    A.   Yes.
6    Q.   It says in the first
7  sentence under that paragraph heading,
8  "The general population can be exposed to
9  asbestos in drinking water," correct?
10   A.   It can happen under certain
11 conditions, yes.  It says, "The general
12 population can be exposed to asbestos in
13 drinking water."
14   Q.   And then below it says about
15 nine lines down, "In the U.S.A., the
16 concentration of asbestos in most
17 drinking water supplies is less than one
18 fiber per milliliter even in areas with
19 asbestos deposits or with asbestos cement
20 water supply pipes."  Correct?
21   A.   That's what it says here.
22   Q.   And then it says, "However,
23 in some locations the concentration in
24 water may be extremely high containing 10

116 (Pages 458 to 461)

Judith Zelikoff, Ph.D.

Page 462

1  to 300 million fibers per liter or even
2  higher." Correct?
3        MS. O'DELL: Objection to
4     form.
5        THE WITNESS: That's what it
6     says here.
7  BY MR. FERGUSON:
8     Q.   So --
9     A.   But it's talking about --
10 it's talking about specific locations and
11 it's also saying "can." This is not a
12 normal situation. Normal -- this is a
13 contaminated situation.
14    Q.   But as IARC said, in the
15 first line we talked about, inhalation
16 and ingestion can be routes of exposure
17 to asbestos for the general population,
18 correct?
19    A.   It can be. Can being the
20 keyword.
21    Q.   I've got some more questions
22 that I could ask. But I'm going to pass
23 it back to Mr. Hegarty.
24       THE WITNESS: Hello again.

Page 463

1        MR. HEGARTY: Hello again.
2        MS. O'DELL: So are you
3     finished with your questions?
4        MR. FERGUSON: I have other
5     questions that I could ask. But
6     I'm trying to share the limited
7     time that we have.
8        MS. O'DELL: I understand.
9     I'm just trying -- typically we
10    don't go back and forth between
11    the parties. The plaintiffs' side
12    has had time to ask questions. So
13    I guess I'm just trying to figure
14    out what y'all are doing.
15       MR. HEGARTY: Let's go off
16    the record real quick and have a
17    discussion. Because what we
18    planned to do, I took the time
19    that Ken was using to organize my
20    notes and to finish up the
21    remaining time.
22       Go off the record.
23       THE VIDEOGRAPHER: The time
24    is 6:45 p.m. Off the record.

Page 464

1        (Whereupon, a discussion was
2     held off the record.)
3        THE VIDEOGRAPHER: The time
4     is 6:46 p.m. Back on the record.
5        - - -
6        EXAMINATION
7        - - -
8  BY MR. HEGARTY:
9     Q.   Doctor, you have done a
10 number of studies looking at inhalation
11 of particles in animal species primarily,
12 correct?
13    A.   In animal species primarily,
14 but also I have done studies in cell
15 culture, yes.
16    Q.   In any of the studies where
17 you have looked at inhalation of
18 particles in animals, have you reported
19 finding those particles in the ovaries?
20    A.   I did not look in the
21 ovaries.
22    Q.   So have you ever evaluated
23 the ovaries in any study that you have
24 done?

Page 465

1     A.   I have evaluated -- in the
2  cadmium particle studies, we looked for
3  the soluble ions, that's what we
4  measured, using atomic absorption and ICT
5  mass spec. And we did find cadmium --
6  sorry. Sorry. We did find soluble
7  cadmium ions in the -- in the tissue --
8  in the ovaries.
9     Q.   Of what animal?
10    A.   Mice.
11    Q.   So there's nothing unique
12 with regard to talc in your opinion with
13 regard to its ability to transport within
14 the body, correct?
15       MS. O'DELL: Object to the
16    form.
17       THE WITNESS: Talc is a
18    fiber and will transport as a
19    fiber. It's also hydrophilic so
20    it will require some time for the
21    other products within the talc
22    molecule to be released. I am not
23    sure if I answered your question.
24 BY MR. HEGARTY:

117 (Pages 462 to 465)

Judith Zelikoff, Ph.D.

Page 466

1    Q.   What about platy talc?  Will
2  platy talc travel in the body as cadmium
3  would travel?
4    A.   Cadmium is a -- has traveled
5  as a soluble ion.  So platy talc --
6  neither platy talc nor asbestos will
7  travel as a soluble ion.  They are
8  fibers.
9    Q.   Have you done --
10    A.   They are -- I'm sorry, platy
11  talc is a crystal with different forms.
12  But my understanding is that platy talc
13  can fracture and also form fragments and
14  they could travel, given their size.
15    Q.   Could they travel as cadmium
16  has traveled in your studies, if that
17  happens?
18    A.   No, in -- in my studies we
19  did not measure -- we did not look for
20  the presence of the particle -- of the
21  nanoparticle in the tissues.  We measured
22  for the metal in those tissues.
23       So we are of the opinion
24  that it was the soluble ion that was

Page 467

1  released, and in this case, I know of no
2  studies off the top of my head that
3  measured how much of the other components
4  were released.
5    Q.   Can any particle that's
6  inhaled reach the ovary?
7    A.   If it -- if it meets certain
8  size constituents.  There's no reason why
9  a particle could not reach the ovary or
10  the kidney or the liver or -- under
11  proper circumstances.
12    Q.   Is there a certain size
13  limitation?
14    A.   Well, something that's
15  inhaled, is that what you're talking
16  about?
17    Q.   Yes.
18    A.   Something that's inhaled, if
19  it's 10 micrometers or greater, it's
20  going to be caught in the upper airways
21  and probably dismissed through the
22  mucociliary escalator.  If it's of a
23  smaller nature, then depending on where
24  the impaction is for the lung, it's going

Page 468

1  to reach -- it can reach the deep lung,
2  if it's five micrometers or smaller.
3       And --
4    Q.   Go ahead.
5    A.   And in that case since it's
6  not disposed of through the mucociliary
7  escalator, then it is in the other parts
8  of the lung and it can reach the
9  capillaries.  And once it gets into the
10  bloodstream, it can be transported.
11  Certain particles have predilections for
12  where they go.
13    Q.   When you say it can be
14  transported, does that include to the
15  ovaries?
16    A.   Are you asking specifically
17  about talc or particles in general?
18    Q.   Particles in general that
19  meet the size standards that you just
20  referenced of getting into the deep lung?
21    A.   Mm-hmm-hmm.  There's no
22  reason not to believe that it couldn't
23  get into the ovaries.
24    Q.   Did you examine, for

Page 469

1  purposes of your biological plausibility
2  opinion, all the studies looking at
3  NSAIDs and use of aspirin in women with
4  ovarian cancer?
5    A.   I looked at several studies.
6  I'm sure I --
7       (Document marked for
8       identification as Exhibit
9       Zelikoff-38.)
10  BY MR. HEGARTY:
11    Q.   I'm going to show you what I
12  marked as Exhibit 38, which is a study
13  that you cited by Wu 2009.
14    A.   Actually, it's Merritt.
15    Q.   I'm sorry.  It's Merritt
16  2008, correct?
17    A.   Yes.  And let me find it in
18  my report.
19    Q.   You cite it on Page 26.
20  Above the italicized paragraph --
21  italicized paragraph at the bottom.
22    A.   I see it.  "At high
23  concentrations with chronic exposure,
24  reactive oxygen species, known as ROS,

118 (Pages 466 to 469)

Judith Zelikoff, Ph.D.

Page 470

1  can damage cellular macromolecules and
2  contribute to neoplastic transformation
3  and/or tumor growth.  Other likely
4  manifestations of talc."  That's the
5  paragraph that you're referring to.
6       Q.   You do agree that a relevant
7  body of literature is whether NSAIDs or
8  aspirin have an effect on ovarian cancer
9  risk, if you're considering inflammation
10 as a biologically plausibility mechanism.
11      A.   NSAIDs being an -- one type
12 of anti-inflammatory, it could reduce
13 oxidative stress, yes, to different
14 degrees.
15      Q.   If you look at the abstract
16 on the first page of the Merritt paper.
17      A.   Yes.
18      Q.   At the very end, they say,
19 "We conclude that on balance chronic
20 inflammation does not play a major role
21 in the development of ovarian cancer."
22      Do you see where I'm
23 reading?
24      A.   I'm seeing the last

Page 471

1  sentence, yes.
2       Q.   Do you agree with that
3  statement in general?
4       A.   I do not agree with that
5  statement.  That's -- my biological
6  plausibility is associated with the
7  oxidative stress and inflammation.  Also
8  this paper was written in 2008.
9       Q.   Did you cite that finding
10 that I just read anywhere in your report?
11      A.   I cite Merritt.
12      Q.   Do you cite for the reader
13 of your report the statement that I just
14 read in the abstract?
15      A.   Not to my recollection.
16      (Document marked for
17      identification as Exhibit
18      Zelikoff-39.)
19 BY MR. HEGARTY:
20      Q.   I'm showing you what I've
21 marked as Exhibit Number 39.  That is the
22 Wu paper.
23      A.   Mm-hmm-hmm.
24      Q.   You cite the Wu paper over

Page 472

1  on Page 21 of your report?
2       A.   Can you direct me to it?
3  Oh, I see it.  Second paragraph.  "Wu, et
4  al, 2009, performed a study to determine
5  the role of talc in the development of
6  ovarian cancer considering the history of
7  endometriosis."
8       Q.   If you look at the abstract
9  of the Wu paper, about two-thirds of the
10 way down, it reads, "Contrary to the
11 hypothesis."
12      Do you see that start of the
13 sentence?
14      A.   I do.
15      Q.   "Contrary to the hypothesis
16 that risk of ovarian cancer may be
17 reduced by use of NSAIDs, risk increased
18 with increasing the frequency in years of
19 NSAID use," citing the relative risk, the
20 confidence intervals.  "This was
21 consistent across types of incident."
22      Do you see where I'm
23 reading?
24      A.   I do see where you're

Page 473

1  reading.
2       Q.   That finding is inconsistent
3  with inflammation as a mechanism by which
4  ovarian cancer can occur, correct?
5       MS. O'DELL:  Object to the
6       form.
7       THE WITNESS:  This -- NSAIDs
8       are known as antioxidants.  And
9       yes, that's true, but there are
10      other antioxidants from other
11      papers that demonstrate that it
12      does indeed reduce inflammation.
13 BY MR. HEGARTY:
14      Q.   Well, did you cite the
15 finding of the Wu paper with regard to
16 its data on NSAID use and the risk of
17 ovarian cancer?
18      A.   I did have a section, to my
19 recollection, on the papers of Wu and
20 Merritt.
21      Q.   Well, in the section that I
22 was referring to, in the middle of the
23 paragraph on Page 21, middle paragraph on
24 Page 21, you don't cite that study's

Judith Zelikoff, Ph.D.

Page 474

1 findings as to NSAIDs and risk of ovarian
2 cancer, correct?
3       A.   I do not cite that
4 particular sentence, no.
5       Q.   Over on Page 23, you refer
6 to the Shukla study?
7       A.   Yes, sir.
8       Q.   That's second to the last
9 paragraph?
10      A.   "In a molecular cell study
11 by Shukla"?
12      Q.   Yes.  The -- strike that.
13           Gene expressions like those
14 measured in the Shukla study occur
15 everyday in everyone, correct?
16           MS. O'DELL:  Objection to
17           form.
18           THE WITNESS:  There are
19           changes in genes per day.  But
20           I'm -- I'm not -- I do not know
21           nor do I have knowledge of whether
22           the gene for ATF3 or ATF1 is
23           changed everyday by no exposure.
24 BY MR. HEGARTY:

Page 475

1       Q.   But the -- the fact of gene
2 expression is not a -- strike that.
3           The fact that gene
4 expression occurs does not mean that
5 cancer will occur, correct?
6       A.   No.  My role is to look for
7 biological plausibility, and when you
8 have a transcription factor which is so
9 well immersed into oxidation and reactive
10 oxygen species and inflammation, and I
11 would say that changes or upregulation of
12 the -- of the ATF gene certainly is
13 linked with inflammation.
14      Q.   Can you cite for me any
15 studies that have used measurements of
16 level -- of the levels of ATF3 to assess
17 ovarian cancer risk?
18      A.   I cannot cite those studies
19 to you, but again, going back to
20 biological plausibility, I can tell you
21 that this gene is extremely important in
22 growth factors and proinflammatory
23 cytokines.  So an upregulation is going
24 to lead to the production of

Page 476

1 proinflammatory cytokines and oxidase,
2 yes.
3       Q.   Is there any study that
4 sites the clinical significance of ATF as
5 it relates to ovarian cancer risk?
6           MS. O'DELL:  Object to the
7           form.
8           THE WITNESS:  No study that
9           I'm currently aware of.  But there
10          are many studies that link ATF
11          upregulation to inflammation and
12          then inflammation to -- in the
13          process of carcinogenesis, both
14          progression and initiation.
15 BY MR. HEGARTY:
16      Q.   If you turn over to the
17 second to the last page of your report,
18 Page 27.
19           In Paragraph 3, you say that
20 exposure to talcs --
21      A.   Excuse me, Number 3?
22      Q.   I called it Paragraph 3.
23 You can call it Number 3.
24      A.   It's listed as Number 3.

Page 477

1       Q.   3.  You state that "exposure
2 to talcum powder products causes an
3 inflammatory tissue reaction which may
4 result in the following," and then you
5 list --
6       A.   Elevation.
7       Q.   -- a number of -- of events
8 that you label as A through F -- I'm
9 sorry, A through G carrying over to the
10 top of the next page.
11      A.   I see that, thank you.
12      Q.   Can you cite for me any
13 studies showing any of that activity in
14 women using talc on the perineum?
15          MS. O'DELL:  Object to the
16          form.
17          THE WITNESS:  If I can
18          recall the Health Canada study, I
19          think they looked at -- they also
20          included inflammatory responses
21          that are seen in some of their
22          meta-analysis.
23 BY MR. HEGARTY:
24      Q.   Well, the Health Canada

Judith Zelikoff, Ph.D.

Page 478

1  study, the Taher study, was a
2  meta-analysis, correct?
3      A.   Yes, correct.
4      Q.   Can you cite for me any
5  studies reporting that -- reporting these
6  events occurring in women using talc on
7  the perineum?
8          MS. O'DELL:  Object to the
9      form.
10         THE WITNESS:  If you're
11     asking me if gene alterations or
12     mutations or the level of
13     apoptosis has been measured in any
14     women exposed, no, I do not recall
15     that.
16  BY MR. HEGARTY:
17     Q.   Have any of the processes --
18     A.   Excuse me.  If I may add.
19  But inflammatory markers have been looked
20  at in women with ovarian cancer and they
21  are elevated.
22     Q.   And my question, as you'll
23  recall, is specific to talc users,
24  correct?

Page 479

1          MS. O'DELL:  Objection to
2      form.
3          THE WITNESS:  Talc -- yes,
4      talc products.
5  BY MR. HEGARTY:
6      Q.   Can you -- can you cite to
7  me any studies showing elevations of any
8  of these processes in women using talc?
9          MS. O'DELL:  Object to the
10     form.
11         THE WITNESS:  Well,
12     neoplastic transformation and
13     proliferation is clearly seen
14     in -- obviously if there's a
15     variant answer, you've had
16     neoplastic transformation
17     proliferation.
18  BY MR. HEGARTY:
19     Q.   Well, my question is
20  specific to women using talc prediagnosis
21  of ovarian cancer.
22     A.   I see.  No, sir.
23         MR. HEGARTY:  For purposes
24     of the deposition, we want to mark

Page 480

1  as exhibit -- Exhibits 40 through
2  48 -- I'm sorry, 47 -- the
3  notebooks that had been produced
4  for purposes of the deposition
5  here today.
6          (Documents marked for
7      identification as Exhibits
8      Zelikoff-40 through 47.)
9  BY MR. HEGARTY:
10     Q.   Over on Page 23, you --
11     A.   Of my report?
12     Q.   Of your report, with regard
13  to the Shukla study.
14         I'm sorry, over on Page 26.
15  You cite again the Shukla study.  Do you
16  see that where -- do you see where you
17  say "nonfibrous talc at low in vitro
18  exposure concentrations caused increased
19  expression of transcription factors
20  associated with the inflammatory process
21  in a time and dose dependent manner"?
22     A.   I'm sorry, I'm not clear
23  on --
24     Q.   Middle of the second full

Page 481

1  paragraph.
2      A.   Not -- after the Mori
3  citation?
4      Q.   Yes.
5      A.   "Nonfibrous talc at low in
6  vitro exposure concentrations caused
7  increased expression of transcription
8  factors associated with the inflammatory
9  process in a time and dose dependent
10  manner."  Yes, I see that.
11     Q.   What did you mean by say --
12  by time and dose manner?
13     A.   May I see the paper?
14         (Document marked for
15     identification as Exhibit
16     Zelikoff-48.)
17  BY MR. HEGARTY:
18     Q.   Marking as Exhibit 49 -- 48
19  that paper.
20     A.   Thank you.
21         MR. TISI:  We are at seven
22     hours by the way.
23         MS. O'DELL:  We are at seven
24     hours?

121 (Pages 478 to 481)

Judith Zelikoff, Ph.D.

Page 482

1    MR. TISI:  Yes, we are.
2    MS. O'DELL:  We're at seven
3  hours, Mark.
4    MR. HEGARTY:  Okay.  Are you
5  going to instruct her not to
6  answer that question?
7    MS. O'DELL:  Well, the
8  federal rules limit this
9  deposition to seven hours and --
10    MR. HEGARTY:  No, I
11  understand, but I also remember a
12  deposition where I think I let
13  Chris go over about two or
14  three minutes.
15    MR. TISI:  Yeah, but you are
16  using a whole new exhibit.
17    MS. O'DELL:  You just marked
18  it --
19    MR. HEGARTY:  I just want to
20  make sure that was --
21    MR. TISI:  Are you going to
22  suggest --
23    MR. HEGARTY:  No, I just
24  want to know if that -- if you

Page 483

1  want to end the deposition for me
2  right here?
3    MR. TISI:  That was a fact
4  witness, as you know.
5    I leave it to Leigh.  If
6  we're going to -- if we're going
7  to have this rule, we need to kind
8  of be consistent with it.
9    MR. HEGARTY:  No, I'm not
10  looking to apply another rule.
11  Just tell me whether you'll let
12  her answer the question or if the
13  time -- because the time is up,
14  that question will not be
15  answered.
16    MS. O'DELL:  The time -- the
17  time is up.  What is your -- what
18  was your question?
19    MR. HEGARTY:  My question
20  was, "What do you mean where you
21  say time and dose dependent
22  manner."  But I'm not going to
23  insist on any applicable rule.
24  I'll let you decide whether you

Page 484

1  want to let her answer or not.
2  It's simply up to you.  If you say
3  we're done, then I will -- I'm not
4  going to dispute it.
5    MS. O'DELL:  We are -- I
6  will let you answer that question.
7  But after that, we're -- we're
8  done.
9    MR. HEGARTY:  Okay.  Thank
10  you.
11    MS. O'DELL:  Do you recall
12  the question, Dr. Zelikoff?
13    THE WITNESS:  Yes.  The
14  question is -- what -- I'll repeat
15  it from here.
16    What did I mean by a time
17  and dose dependent manner?
18  BY MR. HEGARTY:
19    Q.   Yes.
20    A.   In the Shukla study?
21    Q.   Correct.
22    A.   Well, if we look at Figure 2
23  concerning cell viability in the Shukla
24  paper, Page 117.

Page 485

1    So we can see, I'm trying to
2  find the exact one that I want to refer
3  to.  Figure A, one can see that in terms
4  of the concentration and over time, that
5  the number -- total number of viable
6  cells were altered.  And in Figure 2, 15
7  and 75 -- no, scratch Figure 2, sorry.
8    So on Page 118, in looking
9  at number of genes that were
10  significantly changed, we can see looking
11  at the concentration -- and this is for
12  asbestos -- there was a change in effect
13  in asbestos.  If one looks at -- I think
14  that's it.  That's what I meant.
15    MR. HEGARTY:  Okay.  Thank
16  you.
17    MS. O'DELL:  Off the record.
18    THE VIDEOGRAPHER:  The time
19  is 7:07 p.m.  Off the record.
20    (Short break.)
21    THE VIDEOGRAPHER:  We are
22  back on the record.  The time is
23  7:30 p.m.
24    - - -

Judith Zelikoff, Ph.D.

Page 486

1          EXAMINATION
2            - - -
3   BY MS. O'DELL:
4        Q.   Dr. Zelikoff, I have a few
5   follow-up questions for you.
6           Prior to your involvement in
7   litigation, this litigation, did you hold
8   the opinion that inflammation causes
9   cancer?
10          MR. HEGARTY:  Objection to
11      form.
12          THE WITNESS:  Yes.  I held
13      the opinion for a very long time
14      that inflammation causes cancer.
15  BY MS. O'DELL:
16       Q.   And in terms of your
17  knowledge and opinion prior to your
18  involvement in the litigation, did you --
19  did you have an opinion regarding the
20  role of oxidative stress in the
21  development of cancer?
22       A.   Yes, I did.  My opinion was
23  that oxidative stress was closely
24  involved with the causation of cancer.

Page 487

1        Q.   So to the degree that your
2   work in this case addressed new
3   considerations, were those considerations
4   primarily focused on talc and its ability
5   to cause inflammation and oxidative
6   stress?
7           MR. HEGARTY:  Objection to
8       form.
9           THE WITNESS:  That is
10      correct.
11  BY MS. O'DELL:
12       Q.   Can you -- if I could ask
13  you to take your report.  I think it's
14  right to your left.  I'm going to ask
15  you -- if you'll turn to Page 12.  Do you
16  see that?  The subsection involving
17  fragrance, fragrance chemicals?
18       A.   Yeah.  C, fragrances.
19       Q.   And did you rely on
20  Dr. Crowley's report and his review of
21  the relevant literature and other
22  information regarding the chemicals that
23  are included in the fragrance for Baby
24  Powder and Shower to Shower?

Page 488

1        A.   I relied on his report, yes.
2        Q.   And did Dr. Crowley conclude
3   that the chemicals involved in the
4   fragrances for both Johnson & Johnson's
5   Baby Powder and Shower to Shower may
6   contribute to the inflammatory response,
7   toxicity and potential carcinogenicity of
8   Johnson & Johnson's talcum powder
9   products?
10          MR. HEGARTY:  Objection to
11      form.
12          THE WITNESS:  Yes.  I concur
13      with that whole opinion.
14  BY MS. O'DELL:
15       Q.   And in fact, that's the
16  specific opinion he included in his
17  report that you relied on?
18       A.   Yes, that's correct.
19          MR. HEGARTY:  Objection to
20      form.
21  BY MS. O'DELL:
22       Q.   And so if another expert was
23  also relying on Dr. Crowley's analysis,
24  it wouldn't be surprising that the same

Page 489

1   wording was used?
2           MR. HEGARTY:  Objection to
3       form.
4           THE WITNESS:  Absolutely
5       not.
6   BY MS. O'DELL:
7        Q.   Let me ask you other
8   questions about the general principles in
9   your report.  I think you testified, you
10  were asked a number of questions about
11  general principals.  And in your
12  judgment, is it generally accepted to --
13  to use common phrasing for general
14  principles in scientific publications?
15       A.   Yes.
16          MR. HEGARTY:  Objection to
17      form.
18          THE WITNESS:  I answered
19      that question before, and yes.
20      Common, well-publicized,
21      well-established concepts, yes.
22  BY MS. O'DELL:
23       Q.   You were asked during the
24  early part of the day certain questions

123 (Pages 486 to 489)

Judith Zelikoff, Ph.D.

Page 490

1  about whether you were an expert in areas
2  such as talc and inflammation?
3      A.   Yes.
4      Q.   And I think if you recall
5  the response you answered you were not
6  classified as an expert.  What did you
7  mean by that?
8          MR. HEGARTY:  Objection to
9      form.
10         THE WITNESS:  What I meant
11     was in terms of legal, whether --
12     one of the questions that arose
13     was, in the past, have I been
14     listed as an expert in other
15     cases.  And so I followed that
16     line of thought and thought that
17     we were still talking about
18     litigation and formal declaration
19     as an expert in that area.
20 BY MS. O'DELL:
21     Q.   Are you an expert in the
22 toxicological effects of minerals on
23 the -- on humans?
24         MR. HEGARTY:  Objection to

Page 491

1      form.
2          THE WITNESS:  I'm expert in
3      toxicology of environmental
4      chemicals, including mixtures,
5      including fibers, including
6      particles, including talc.
7  BY MS. O'DELL:
8      Q.   And would that -- would that
9  also include -- when you said fibers,
10 would that also include asbestos and
11 fibrous talc?
12         MR. HEGARTY:  Objection to
13     form.
14         THE WITNESS:  Yes.
15 BY MS. O'DELL:
16     Q.   Are you an expert in the
17 toxicological effects of heavy metals on
18 the humans?
19         MR. HEGARTY:  Objection to
20     form.
21         THE WITNESS:  Yes, I am.
22 BY MS. O'DELL:
23     Q.   And what do you base that
24 statement on?

Page 492

1      A.   My numerous publications in
2  that area of metal toxicology that I've
3  been doing for many, many, many years.
4      Q.   And in addition to your
5  training, experience, do you also make
6  those statements based on your review of
7  the available scientific and medical
8  literature?
9      A.   In regards to metals?
10     Q.   In all the environmental
11 exposures we've just discussed?
12     A.   Yes.  I rely on
13 literature --
14     Q.   You were asked questions --
15     A.   -- as well as my own
16 scientific research.
17     Q.   Excuse me.  I didn't mean to
18 cut you off, Doctor.
19         You were asked questions
20 about whether there were any studies or
21 evidence that you relied on involving
22 Johnson's Baby Powder.
23         Do you recall that?
24     A.   I do recall that question,

Page 493

1  yes.
2      Q.   And do the -- strike that
3  and start again.
4          Did Dr. Saed in the testing
5  that was done and reported in not only
6  the abstracts but also his manuscript,
7  involve Johnson's Baby Powder?
8          MR. HEGARTY:  Objection to
9      form.
10         THE WITNESS:  Yes.
11     Dr. Saed's did.  Thank you for
12     reminding me.
13 BY MS. O'DELL:
14     Q.   Was Dr. Longo and Rigler's
15 testing of historical samples of talcum
16 powder products produced in this
17 litigation, including Johnson's Baby
18 Powder and Shower to Shower?
19     A.   Dr. Longo stated he did use
20 products over time from Johnson & Johnson
21 talcum powders.
22     Q.   And was the evidence that
23 was presented in Hopkins Exhibit 28, did
24 it involve Johnson's talcum powder

124 (Pages 490 to 493)

Judith Zelikoff, Ph.D.

Page 494

1  products?
2      A.   Yes, it did.
3      Q.   Was evidence that you relied
4  on in the form of Pier Exhibit 47, did
5  those also involve talc that was taken
6  from sources used to supply Johnson's
7  talcum powder products?
8          MR. SILVER:  Objection to
9  form.
10         MR. HEGARTY:  Objection to
11 form.
12         THE WITNESS:  Dr. Pier?
13 BY MS. O'DELL:
14     Q.   Yes.
15     A.   To my recollection, yes.  If
16 you'd like, I can look at the paper and
17 confirm that.
18     Q.   Let me ask you about
19 Dr. Blount.  You were asked previously
20 about her publication in 1991.
21         Did Dr. Blount test
22 Johnson's Baby Powder?
23     A.   Yes.  But again, if I looked
24 at the reference I could give you -- I

Page 495

1  could give you specifics.
2      Q.   Okay.  And do you recall
3  that that -- did -- let me just ask it
4  this way.
5          Did Dr. Blount find that
6  there was asbestos in the Johnson's Baby
7  Powder samples that she tested?
8      A.   Yes.  To my recollection,
9  she did, yes.
10     Q.   You were asked about some
11 testing that had been done by the FDA on
12 certain cosmetic powders.  Do you
13 remember that?  It was Exhibit 37.
14         MS. O'DELL:  And is that in
15 the bottom of that stack, 37?
16         Thanks, Mark.  If you'll
17 hand those to me.  I appreciate
18 it.
19         THE WITNESS:  Sorry.  My
20 microphone.
21         MS. O'DELL:  Oh, did it come
22 off?
23         THE VIDEOGRAPHER:  Raise it
24 up as high as possible.  There you

Page 496

1  go.
2  BY MS. O'DELL:
3      Q.   Did the FDA conclude in
4  Exhibit 37 that -- well, let me just ask
5  the question this way.
6          If you'll turn to Page 2 of
7  Exhibit 37, what was the FDA's conclusion
8  regarding the testing that they had
9  performed on the cosmetic powders?
10         Doctor, I'll direct you to
11 the second-to-the-last paragraph at the
12 bottom of the page, the middle sentence.
13 Do you see that, "Beginning for these
14 reasons"?
15     A.   Yes, I see that.
16     Q.   And what was the FDA's
17 conclusion?
18     A.   "For these reasons, while
19 FDA finds these results informative, they
20 do not prove that most or all talc or
21 talc-containing cosmetic products that
22 are currently or currently marketed in
23 the United States are likely to be free
24 of asbestos contamination."

Page 497

1      Q.   You were also asked a number
2  of questions regarding the FDA response
3  to Dr. Epstein's letter in April of 2014,
4  Exhibit 33.
5          Do you recall those
6  questions?
7      A.   I recall that questions were
8  asked in this regard, yes.
9      Q.   While at this point in the
10 day, I wouldn't expect you to recall the
11 specific question, but you recall those
12 general discussions?
13     A.   Yes, I do.
14     Q.   All right.  Let me ask you,
15 if you wouldn't mind, to turn to Page 3
16 of -- of Exhibit 33.
17         And the second paragraph.
18     A.   Starting, "The survey
19 found"?
20     Q.   Yes.  Yes, ma'am.
21         And as of April 2014, was it
22 the FDA's conclusion that their testing
23 results did not prove that
24 talc-containing cosmetic powders

125 (Pages 494 to 497)

Judith Zelikoff, Ph.D.

Page 498

1  currently marketed in the U.S. are free
2  of asbestos contamination?
3          MR. HEGARTY:  Objection to
4      form.
5          THE WITNESS:  Yes.  I can
6      read the sentence, "While FDA
7      found this data informative, the
8      results were limited by the fact
9      that only four suppliers submitted
10     samples and the number of products
11     used.  They do not prove that all
12     talc containing cosmetic products
13     currently marketed in the United
14     States are free of asbestos
15     contamination."
16 BY MS. O'DELL:
17     Q.   Okay.  While we are on this
18 Exhibit 33, Doctor, if you'll turn to
19 Page 5 of the exhibit.  About two-thirds
20 of the way down, the paragraph beginning,
21 "While."
22     A.   "While there exists no
23 direct proof"?
24     Q.   Yes.  And would you mind

Page 499

1  reading, you know, the -- the -- those
2  first two sentences of that paragraph,
3  please?
4      A.   "While there exists no
5  direct proof of talc and ovarian
6  carcinogenesis, the potential for
7  particulates to migrate from the
8  peritoneum" -- "the perineum and vagina
9  to the peritoneal cavity is
10 indisputable."
11     Q.   And then if you'll read the
12 next sentence?
13     A.   "It is, therefore, plausible
14 that perineal talc and other particulate
15 that reaches the endometrial cavity, the
16 fallopian tubes and ovaries and the
17 peritoneum may elicit a foreign body-type
18 reaction and an inflammatory response
19 that in some exposed women may progress
20 to epithelial cancers."
21     Q.   And are those statements
22 written by the FDA consistent with your
23 opinions regarding the biologic
24 plausibility of talcum powder products

Page 500

1  causing ovarian cancer?
2          MR. HEGARTY:  Objection to
3      form.
4          THE WITNESS:  They are
5      consistent with my opinion, yes.
6  BY MS. O'DELL:
7      Q.   Let me ask you if you would,
8  Doctor, to -- I'll do it for you.
9  Because it was marked here.
10         I'm going to hand to you the
11 Health Canada draft screening assessment
12 that was marked previously as Exhibit 9.
13     A.   I see it.
14     Q.   And let me ask you if you
15 would please, Doctor, first, did you
16 submit your report in this case prior to
17 Health Canada issuing the draft causal
18 assessment?
19     A.   I submitted my -- my final
20 report November 15th or 16th.  I'm not
21 quite clear on the date.  And received
22 this or saw it for the first time in
23 January.  So it did not go into my -- it
24 was not cited in my report and was not

Page 501

1  reviewed for my report.
2      Q.   And by virtue of the fact
3  that came out after your report, did --
4  did the health -- strike that and start
5  again.
6          Did the Health Canada
7  assessment inform your opinions in this
8  case?
9      A.   It -- it could not have
10 informed my opinion that's written out in
11 the report.  It was compelling evidence
12 that helped support the opinion that I
13 came to.
14     Q.   Did it confirm your
15 opinions?
16         MR. HEGARTY:  Objection to
17     form.
18         THE WITNESS:  Yes.  It
19     confirmed my opinions on many
20     lines, including methodology.
21 BY MS. O'DELL:
22     Q.   If you'll look at Page 18 of
23 the assessment.
24     A.   Yes.  I see it.

Judith Zelikoff, Ph.D.

Page 502

1    Q.   And looking at the
2 literature that is cited in this section,
3 did you cite in support of your opinions
4 Keskin 2009?
5    A.   Keskin 2009, yes.
6    Q.   And did you -- of course we
7 talked about it before.  You cited
8 Penninkilampi 2018?
9    A.   Yes, I did.
10    Q.   And did you cite other
11 references included in the mode of action
12 discussion that was undertaken by Health
13 Canada on Pages 18, 19 and, you know, 20
14 of the Health Canada assessment?
15    A.   Yes, I did.  Do you want me
16 to tell you which ones?
17    Q.   Just give us a few.  Just
18 give us a few.
19    A.   Henderson 1971.  These are
20 the ones that come to mind readily.
21 Edelstam 1997.  Egli and Newton 1961.  De
22 Boer in 1972.  Venter and Iturralde,
23 1979.  Heller 1996.  Cramer in 2007.
24        Would you like me to go on?

Page 503

1    Q.   So it's fair to say that
2 many of the references that you read,
3 reviewed, relied on in your report are
4 some of the same studies that Health
5 Canada relied on in their causal
6 assessment?
7        MR. HEGARTY:  Objection to
8    form.
9        THE WITNESS:  Yes.  This was
10    very validating for my -- my
11    report in my opinion.
12 BY MS. O'DELL:
13    Q.   Were you aware of the -- of
14 the assessment prior to it being issued
15 to the public?
16    A.   Not at all.  It was -- it
17 came out in late 2018, in December.
18    Q.   In the assessment that was
19 undertaken by Health Canada, did they
20 assign any numerical weights in the
21 causal assessment to certain studies?
22    A.   No, they do not.
23    Q.   Did they discuss
24 inflammation as a sort of recognized

Page 504

1 mechanism for the cause of cancer?
2        MR. HEGARTY:  Objection to
3    form.
4        THE WITNESS:  Biological
5    plausibility.
6 BY MS. O'DELL:
7    Q.   They -- let me ask a better
8 question.  Did they -- did they discuss
9 chronic inflammation, inflammation as a
10 biologically plausible mechanism for the
11 development of ovarian cancer?
12    A.   Yes, they did.
13    Q.   Did they discuss the role of
14 reactive oxygen species as part of the
15 biologically plausible mechanism of talc
16 in the development of ovarian cancer?
17        MR. HEGARTY:  Objection to
18    form.
19        THE WITNESS:  Oxidative
20    stress, yes.  Yeah.  React -- ROS.
21    Oxidative stress.
22        May I give the statement?
23 BY MS. O'DELL:
24    Q.   Yes.

Page 505

1    A.   With respect to talc,
2 specifically local chronic irritation
3 leading to inflammatory response is one
4 possible mechanism of tumor progression
5 that is frequently hypothesized.
6    Q.   And that's consistent with
7 your -- with your opinion in this case?
8        MR. HEGARTY:  Objection to
9    form.
10        THE WITNESS:  Yes.
11 BY MS. O'DELL:
12    Q.   Is that consistent with your
13 opinion in this case?
14    A.   Yes, it is.
15    Q.   Did they discuss migration
16 as part of the biologically plausible
17 mechanism for the connection between
18 perineal use of talc and development of
19 ovarian cancer?
20    A.   Yes, they did.
21    Q.   Okay.  Did they, on Page 15
22 and 16, did they discuss some of the
23 animal studies that you reference and
24 rely on in reaching your opinions in this

127 (Pages 502 to 505)

Judith Zelikoff, Ph.D.

Page 506

1  case?
2      A.   Yes, they do.
3          MR. HEGARTY:  Objection to
4  form.
5          THE WITNESS:  And --
6  BY MS. O'DELL:
7      Q.   Excuse me.
8      A.   They include Hamilton et
9  al., 1984.  Keskin 2009.  Hamilton 1984
10  again.  Keskin again.
11      Q.   Okay.  And if you'll turn to
12  Page 21.  You'll see at the top of the
13  page, they have a section on biologic
14  plausibility.
15      A.   Yes, they do.
16      Q.   Is -- is their discussion of
17  biological plausibility as outlined on
18  Page 21 consistent with your opinions in
19  this case?
20          MR. HEGARTY:  Objection to
21  form.
22          THE WITNESS:  Definitely
23  consistent.  Particles of talc are
24  hypothesized to migrate into the

Page 507

1      pelvis and ovarian tissue causing
2      irritation and inflammation.  And
3      the presence of talc in the
4      ovaries as I discussed previously
5      has been documented by Heller in
6      1996.
7  BY MS. O'DELL:
8      Q.   Great.  Thank you.
9          Doctor, you were also asked
10  some questions about the Penninkilampi
11  paper.
12          Do you recall those?
13      A.   I do recall being asked,
14  yeah, from that.
15      Q.   Potentially the most
16  difficult name to pronounce in the
17  litigation.
18          The Penninkilampi paper
19  was -- was marked as Exhibit 34.  Do you
20  recall that?
21      A.   I see, I see it here.  Yes.
22      Q.   And if I can ask you to turn
23  to Page 45.
24      A.   I see Page 45.

Page 508

1      Q.   Counsel directed your
2  attention to the sentence -- counsel for
3  Johnson & Johnson -- direct -- directed
4  your attention to the sentence near the
5  bottom of the left column.
6      A.   An important finding of this
7  study is that talc use?
8      Q.   Yeah, the -- the potential
9  mechanism by which genital talc is
10  associated with an increased risk of
11  ovarian cancer --
12      A.   I'm sorry.  Again,
13  discussion on the left side?
14      Q.   Yes.  At the bottom of the
15  first paragraph, the last sentence.
16      A.   Okay.  I'm sorry.
17  "Potential mechanism by which general
18  talc associated with an increased risk of
19  ovarian cancer hence remains unclear."
20      Q.   And Johnson & Johnson's
21  counsel asked you about that sentence.
22      A.   Yes, they did.
23      Q.   But they didn't ask you
24  about other sentences in this -- this

Page 509

1  paper, fair?
2      A.   That's fair.
3      Q.   So if you'll look to the
4  right column on Page 45.  Do you see the
5  sentence beginning "if chronic
6  inflammation"?
7      A.   I do.  "If chronic
8  inflammation due to ascending foreign
9  bodies is indeed the mechanism by which
10  talc use is associated with increased
11  ovarian cancer risks, then the results
12  fit the picture."
13      Q.   Is -- is that statement that
14  the authors of the Penninkilampi study
15  included in their report, excuse me, in
16  their article, is that consistent with
17  your opinions in this case?
18      A.   It is consistent.
19      Q.   And does it confirm the
20  opinions that you reached in this case?
21      A.   It acts to confirm, yes, it
22  does.
23      Q.   Okay.  You were asked
24  about -- a number of questions about

128 (Pages 506 to 509)

Judith Zelikoff, Ph.D.

Page 510

1   asbestos and the specific amount of
2   asbestos that would be introduced with
3   the perineal application of -- of talc.
4        A.   Yes --
5        Q.   And let me ask you --
6        A.   -- I recall.
7        Q.   You recall those questions?
8        A.   Yes, I do.
9        Q.   Is there any safe level of
10  asbestos --
11            MR. HEGARTY:  Objection to
12  form.
13  BY MS. O'DELL:
14       Q.   -- in the perineum?
15       A.   My opinion and conclusion is
16  no.
17       Q.   Is asbestos a known potent
18  carcinogen?
19       A.   It is.  According --
20       Q.   Excuse me.  Please go ahead.
21       A.   According to the regulators
22  and the documents, it is, yes, a known
23  carcinogen, and it's extremely potent.
24  If you look at the effects that it causes

Page 511

1   and at the dose levels that it causes
2   these effects.
3        Q.   And of course IARC has --
4        A.   IARC has classified it as a
5   Class 1A.
6        Q.   And did you review and rely
7   on IARC's conclusion regarding asbestos?
8        A.   I did.
9        Q.   Excuse me.  And its
10  contribution to the -- to the development
11  of ovarian cancer?
12       A.   Yes, I did.
13       Q.   Did you review and rely on
14  IARC's conclusions regarding fibrous talc
15  or talc in an asbestiform habit regarding
16  its ability to cause ovarian cancer?
17            MR. HEGARTY:  Objection to
18  form.
19            THE WITNESS:  I did.
20  BY MS. O'DELL:
21       Q.   If you'll turn to Page 6 in
22  your report.
23       A.   Yes, I see it.
24       Q.   Did you -- did you cite the

Page 512

1   deposition of Robert Glenn in your
2   report?
3        A.   I'm sorry, the deposition of
4   who?
5        Q.   Robert Glenn.  Page 6, about
6   midway down.
7        A.   Yes, I did.  "Because
8   asbestos is a known carcinogen, its
9   presence in cosmetic talc is
10  unacceptable, FDA 2012, FDA 2015."
11       Q.   And do you recall that --
12  was Mr. Glenn a former director of the
13  National Institute for Occupational
14  Safety and Health or NIOSH?
15       A.   Yes.
16       Q.   And what did Mr. Glenn
17  testify to regarding the presence of
18  asbestos in talc-based products?
19       A.   He says, "As stated in a
20  recent deposition, that if there were a
21  fiber of asbestos in talcum-based
22  products, it would certainly 'provide a
23  biologically plausible mechanism for
24  increased lung disease' and that he

Page 513

1   suspected that it would also have a
2   similar mechanism of disease in other
3   tissues and organs."
4        Q.   And you were asked a number
5   of questions about the different
6   constituents of talcum powder products.
7        A.   Yes.
8        Q.   If talcum powder products
9   did not contain asbestos, would that
10  change your opinion about the biological
11  plausible mechanism of -- that explains
12  talc -- talc-based products causing
13  ovarian cancer?
14       A.   No, it would not.
15       Q.   You were asked questions
16  about a Dr. Neel from NYU.
17       A.   The NYU Cancer Center.
18       Q.   And you were asked if you
19  knew Dr. Neel.
20       A.   Yes, I recall the question.
21       Q.   And what's your
22  understanding of Dr. Neel's position?
23       A.   My understanding is that he
24  is the chair -- he may not be called the

129 (Pages 510 to 513)

Judith Zelikoff, Ph.D.

Page 514

1 chair -- but he is the director of the
2 cancer center for NYU Langone Health and
3 NYU Medical School. It morphs into
4 different names.
5 Q. And in regard to the
6 toxicity of talcum powder products and
7 its effects, toxicological effects,
8 would -- would you be more knowledgeable
9 about those particular effects than a
10 clinician who diagnoses and treats
11 ovarian cancer?
12 MR. HEGARTY: Objection to
13 form.
14 BY MS. O'DELL:
15 Q. Like Dr. Neel?
16 A. I'm a toxicologist, and so
17 my main area of focus and understanding
18 and literature has to do with toxicology,
19 toxicological mechanisms, toxicological
20 effects.
21 Q. So --
22 A. So my knowledge base in
23 those areas would -- I would suspect very
24 strongly would exceed that of Dr. Neel's,

Page 515

1 who is a clinician.
2 Q. You were asked some
3 questions about the Shukla paper.
4 A. Yes.
5 Q. And -- and the Shukla paper
6 involved the use of talcum powder?
7 A. Yes.
8 Q. And if the --
9 A. Do you recall what exhibit
10 that was?
11 Q. I think it was the last
12 exhibit.
13 A. May I have a copy?
14 Q. 48. And did the Shukla
15 study involve the testing of, or the use
16 of talcum powder?
17 A. Yes. As they call it,
18 non-fibrous talc.
19 Q. And if the talcum powder
20 used in the Shukla study contained
21 nickel, that would be -- the data that
22 was reported in that study would be
23 relevant for the effects of nickel, fair?
24 MR. HEGARTY: Objection to

Page 516

1 form.
2 THE WITNESS: Could you
3 clarify that question?
4 BY MS. O'DELL:
5 Q. Yeah. It was a bad
6 question. I'm sorry. I'm getting tired.
7 A. If you're asking -- would
8 you like to ask -- rephrase it, or should
9 I give you my thought of what you were
10 trying to ask?
11 Q. Well, why don't you
12 interpret my question, and I'll follow
13 up.
14 A. If you're asking me if
15 nickel was a component of the non-fibrous
16 talc, then was nickel also in place when
17 it was treated, when the cells were
18 treated?
19 Q. That's correct.
20 A. Yes, if nickel was in the
21 non-fibrous talc then, yes, it was also
22 there when the cells were being exposed.
23 Q. And so -- and that would be
24 true of chromium and cobalt?

Page 517

1 A. Yes.
2 Q. And so, the results from the
3 Shukla study would have bearing on the
4 effect of those heavy metals if contained
5 in talcum powder?
6 MR. HEGARTY: Objection to
7 form.
8 THE WITNESS: Yes, if they
9 were -- yes, as constituents, they
10 would -- I would imagine and know
11 that they would play -- they could
12 be playing a role in the
13 toxicity -- the cell toxicity or
14 the gene expression changes that
15 were observed.
16 BY MS. O'DELL:
17 Q. Thank you. And in regard to
18 your opinions related to cobalt,
19 chromium, and nickel, you were asked a
20 number of questions about whether there
21 were any human studies measuring the
22 effect of -- of nickel at -- in the
23 ovary. Do you recall that?
24 A. I recall that question --

130 (Pages 514 to 517)

Judith Zelikoff, Ph.D.

Page 518

1   those questions.
2       Q.   Would it be possible to
3   design a study in humans where nickel was
4   deposited at their ovary to see if a
5   female would develop ovarian cancer?
6       A.   I think I answered and said
7   that would be ridiculous in the sense
8   that this would be totally unethical to
9   take a known carcinogen or a classified
10  1A carcinogen and use it for experimental
11  studies in humans by placing it in the
12  perineal -- or anywhere within the body
13  intentionally.
14      Q.   And would that also be true
15  for similar reasons for cobalt and
16  chromium?
17      A.   Yes.
18      Q.   Would the same also be true
19  of designing a study that applied
20  asbestos to a female's ovary for purposes
21  of seeing if she developed cancer?
22      A.   I'm smiling because it holds
23  true for any -- any known or suspected
24  carcinogen cannot be used intentionally

Page 519

1   on a human being for testing.  It's
2   unethical, and would probably in all
3   likelihood not be approved by the
4   institutional review board of academic
5   institutions or any reputable scientists.
6       Q.   Would that be true of
7   fibrous talc?
8           MR. HEGARTY:  Objection to
9       form.
10  BY MS. O'DELL:
11      Q.   You may answer.
12      A.   That would be true of
13  fibrous talc.
14      Q.   Would it be true of platy
15  talc, if there is such a thing as pure
16  platy talc?
17      A.   If there is a -- if there is
18  any suspicion that any product, including
19  platy talc, might be involved in
20  producing inflammation or any other type
21  of adverse health effect, then it would
22  be very unethical to go ahead and
23  intentionally use that in a human study,
24  in my opinion, and in the opinion of most

Page 520

1   IRBs.
2       Q.   Okay.  You looked at, as I
3   understand it, for your purposes of your
4   task in this case, you looked at the
5   issue of biologic plausibility for
6   perineal talc use and ovarian cancer.
7       A.   Yes, I did.
8       Q.   Did you -- did you -- was
9   that inquiry focused on epithelial
10  ovarian cancer in particular?
11      A.   It -- it was -- most, if not
12  all the studies I looked at in animals
13  and -- were associated with epithelial
14  ovarian cancer.
15          Some studies in humans did
16  look -- did break out the differences.
17      Q.   Let me ask you if you
18  wouldn't mind, to turn to Page 8 of your
19  report.  And you'll look at the top of
20  the page.  In the first full paragraph,
21  middle of the -- that paragraph discusses
22  Dr. Longo and Rigler's recent report that
23  reports that talcum powder products
24  manufactured by Johnson's Baby Powder and

Page 521

1   Shower to Shower have contained and
2   continue to contain asbestos.  Do you see
3   that sentence?
4       A.   Yes, I do.
5       Q.   And then it goes on, you go
6   on to report his results from test of
7   samples manufactured from the 1960s and
8   1990s.
9       A.   Through -- through the
10  1990s.
11      Q.   Through the 1990s, that's
12  correct.
13          And you -- you have a
14  footnote here to Footnote 7?
15      A.   Yes.
16      Q.   And Dr. Longo and Rigler's
17  report is noted in the footnote and it's
18  dated November 14, 2018.
19      A.   Yes.
20      Q.   Do you see that?
21      A.   Yes.
22      Q.   And just, did you have in
23  your possession and review Dr. Rigler and
24  Longo's November 14, 2018, report during

Judith Zelikoff, Ph.D.

Page 522

1 the completion of your own report?
2      A.   I had it available prior to
3 the submission of my final report, yes.
4           The only thing I did not
5 have was the December 2018 supplement.
6      Q.   His most recent supplement?
7      A.   His most recent supplement,
8 yes.
9      Q.   I think just to be clear,
10 that -- was his most recent supplemental
11 report you're referring to, was that the
12 report dated in January, I think 16th or
13 15th of this month?
14      A.   It was sometime in January.
15      Q.   Okay.
16      A.   Yes.  I could answer that
17 question specifically if I saw the
18 exhibit.
19      Q.   And I've handed you what's
20 been marked I think as Exhibit --
21      A.   3.
22      Q.   3.  And is Exhibit 3 the
23 supplemental report --
24      A.   Yes, it is.

Page 523

1      Q.   -- that you reviewed
2 recently?
3      A.   I'm sorry, yes.
4      Q.   And what's the date on the
5 report?
6      A.   January 15, 2019.
7      MS. O'DELL:  Okay.  I have
8 nothing further, Doctor.  Thank
9 you.
10      MR. HEGARTY:  Take a break.
11 I need to use the restroom.
12      THE VIDEOGRAPHER:  The time
13 is 8:10 p.m.  Going off the
14 record.
15      (Short break.)
16      THE VIDEOGRAPHER:  We are
17 back on the record.  The time is
18 8:16 p.m.
19           - - -
20           EXAMINATION
21           - - -
22 BY MR. HEGARTY:
23      Q.   Dr. Zelikoff, I have some
24 questions in follow-up to the questions

Page 524

1 that Ms. O'Dell asked you.
2           First of all, you were
3 referred to Page 12 of your report
4 under -- under Section C, Fragrances.
5 Would you go to that portion of your
6 report please?
7      A.   I will, thank you.  Yes.
8 I'm here.
9      Q.   You were asked about this
10 part of your report being identical to
11 the same part of Smith-Bindman's report.
12 Do you recall being asked those
13 questions?
14      MS. O'DELL:  Object to the
15 form.
16      THE WITNESS:  Smith --
17 Smith-Bindman report?  I'm sorry,
18 I don't recall -- oh, in the
19 beginning of the deposition?
20 BY MR. HEGARTY:
21      Q.   Yes.
22      A.   Okay.  That was a long time
23 ago.
24      Q.   First of all, are you aware

Page 525

1 that Dr. Crowley has been deposed in this
2 litigation?
3      A.   Yes.
4      Q.   Did you read his deposition?
5      A.   I did.
6      Q.   When did you read his
7 deposition?
8      A.   I'm sorry, I don't recall
9 the exact date.
10           May I see Dr. Crowley's
11 deposition?
12      Q.   Well, I just asked you if
13 you had read it.  That's my only
14 question.
15           Other than Dr. Crowley's
16 deposition, have you read the depositions
17 of any other plaintiffs' experts deposed
18 in the MDL, this litigation?
19      A.   Any of the other plaintiffs'
20 depositions?
21      Q.   Correct.
22      A.   Dr. Dydek.
23      Q.   Anybody else?
24      A.   I'm looking to see the

Judith Zelikoff, Ph.D.

Page 526

1  others.
2      Q.   It's at the end of Exhibit
3  B.
4      A.   Okay.  Thank you.  Thank
5  you.
6      Q.   Well, my question -- let me
7  ask a different question.  Let me ask
8  whether you have reviewed the MDL
9  depositions; that is, the depositions
10  that plaintiffs' experts have taken in
11  this litigation over their expert reports
12  besides Dr. Crowley?
13          MS. O'DELL:  Object to form.
14          THE WITNESS:  Dr. Longo.
15      Sorry.
16  BY MR. HEGARTY:
17      Q.   Dr. Longo has not yet been
18  deposed in --
19      A.   I read his report.
20      Q.   -- for his MDL report.
21          No, I'm talking about the
22  deposition --
23      A.   I'm sorry.
24      Q.   -- of an expert who has

Page 527

1  been -- who is being deposed about their
2  report in the MDL.
3          You said Dr. Crowley.  Have
4  you read anyone else's deposition that
5  have discussed their report in the MDL?
6          MS. O'DELL:  I think there
7      may be some confusion between
8      report and deposition.
9          THE WITNESS:  Yes.  There
10      was.
11  BY MR. HEGARTY:
12      Q.   Did you read Dr. Crowley's
13  deposition over his report?
14      A.   I read Dr. Crowley's report.
15  I'm sorry.  I stand corrected.
16      Q.   Dr. Crowley's report does
17  not contain the sentences that you've
18  included under your Section C,
19  fragrances, correct?
20          MS. O'DELL:  Object to the
21      form.
22          THE WITNESS:  What page are
23      we going back to, please?
24  BY MR. HEGARTY:

Page 528

1      Q.   Page 12.
2      A.   "There are more than 150
3  different chemicals"?
4      Q.   Those four sentences, or
5  three -- or strike that.
6          The second sentence in that
7  section is not in Dr. Crowley's report.
8  He did not write, "I reviewed the expert
9  report of Dr. Michael Crowley that
10  concludes that some of these chemicals
11  may contribute to the inflammatory
12  response, toxicity, and potential
13  toxicity of Johnson & Johnson's talcum
14  powder products."
15          MS. O'DELL:  Objection.
16  BY MR. HEGARTY:
17      Q.   That sentence is not in
18  Dr. Crowley's report?
19          MS. O'DELL:  Objection.
20          THE WITNESS:  I'm terribly
21      sorry.  I'm going to silence that
22      or we can and talk over it.
23          MS. O'DELL:  Go ahead and
24      silence it.

Page 529

1          (Brief interruption.)
2          MR. HEGARTY:  Let's go off
3      the record.
4          THE VIDEOGRAPHER:  The time
5      is 8:21 p.m.  Off the record.
6          (Whereupon, a discussion was
7      held off the record.)
8          THE VIDEOGRAPHER:  The time
9      is 8:21 p.m.  Back on the record.
10  BY MR. HEGARTY:
11      Q.   The second sentence under
12  your section fragrances is nowhere in
13  Dr. Crowley's report?
14      A.   That --
15          MS. O'DELL:  Objection to
16      form.
17          THE WITNESS:  That sentence
18      is not there, but I concluded that
19      when he talked about the
20      fragrances, I concluded that -- I
21      inferred from his -- from his
22      report, that these chemicals do
23      contribute to the inflammatory
24      response, toxicity and potential

Judith Zelikoff, Ph.D.

Page 530

1    carcinogenicity.
2  BY MR. HEGARTY:
3    Q.   The sentence, "I concur with
4  his opinion," is not in Dr. Crowley's
5  report, is it?
6    A.   No.  That was my opinion.
7    Q.   That same opinion, stated
8  exactly the same way, is in the
9  Dr. Smith-Bindman report, correct?
10    A.   Can I see that report?
11    Q.   Do you recall without
12  looking at it, that that same section is
13  in her report?
14    A.   I do not.  I do not recall.
15    Q.   Okay.  Did you -- do you
16  know -- have you ever spoken to
17  Dr. Smith-Bindman?
18    A.   Not at all.
19    Q.   Do you know who she is?
20    A.   I don't.
21    Q.   Do you know her expertise?
22    A.   I do not.
23    Q.   Have you ever heard her name
24  before today?

Page 531

1    A.   Not -- not to my knowledge.
2  But I would like to see -- to refresh my
3  memory, if it's available.
4    Q.   You were asked about your
5  expertise as it relates to talc and
6  inflammation.  Before you were contacted
7  by Ms. Emmel, you had no expertise in
8  talc, correct?
9       MS. O'DELL:  Objection to
10    form.
11       THE WITNESS:  I performed no
12    scientific studies in it.
13  BY MR. HEGARTY:
14    Q.   You also reviewed no
15  scientific studies concerning talc,
16  correct?
17       MS. O'DELL:  Objection to
18    form.
19       THE WITNESS:  I have
20    reviewed papers.  I am editor and
21    associate editor on an editorial
22    board so that in my past
23    experience, I likely reviewed
24    papers --

Page 532

1  BY MR. HEGARTY:
2    Q.   Doctor, you --
3    A.   -- that included talc.
4    Q.   Doctor, you testified
5  earlier in this deposition that your
6  information as it relates to talc and
7  ovarian cancer came from the media and
8  discussion with colleagues, correct?
9    A.   Prior to being contacted.
10    Q.   Right.  So prior to being
11  contacted for counsel for plaintiffs, you
12  had no expertise in talc and ovarian
13  cancer, correct?
14    A.   As a toxicologist -- I'm
15  sorry.  I'm getting hung up on the word
16  "expert" as you're using it.  As a
17  toxicologist, I am familiar with talc.  I
18  am familiar with much of the toxicity of
19  it.  But the primary -- in discussing
20  talc and its relationship to cancer, it
21  was through colleagues and the media,
22  yes, correct.
23    Q.   You had not studied, prior
24  to being contacted by plaintiffs'

Page 533

1  counsel, any issues reported in the
2  medical literature with regard to talc
3  and ovarian cancer, correct?
4    A.   I have not studied in my
5  laboratory, that's correct.
6    Q.   You also did not review any
7  literature discussing talc and ovarian
8  cancer prior to being contacted by
9  counsel for plaintiff?
10    A.   That is correct.
11    Q.   Prior to being contacted by
12  counsel for plaintiffs you had not
13  studied the toxicology -- toxic aspects,
14  if any, of talc, correct?
15       MS. O'DELL:  Object to the
16    form.
17       THE WITNESS:  I have -- as I
18    stated, I have reviewed papers
19    that have looked at it.  And I've
20    reviewed them for acceptance into
21    journals.
22  BY MR. HEGARTY:
23    Q.   Can you cite for us today
24  any such papers?

134 (Pages 530 to 533)

Judith Zelikoff, Ph.D.

Page 534

1    A.    Over my career, I cannot.
2  Sorry.
3    Q.    Can you identify any study
4  you have published that investigated or
5  discussed the toxicity of cobalt?
6    A.    I've written review articles
7  on the toxicology of metals in general
8  and cobalt was in there, and in book
9  chapters.
10    Q.    But it's your testimony that
11  you have written review papers where you
12  discussed the toxicity of cobalt?
13    A.    I did not say review papers.
14  I said book chapters.
15    Q.    So you had written a book
16  chapter to discuss the toxicity of
17  cobalt?
18        MS. O'DELL:  Objection to
19     form.
20        THE WITNESS:  I was an
21     editor of a book, several books --
22     two books actually, which looked
23     at the toxicity of cobalt --
24     looked at the toxicity of metals.

Page 535

1      And cobalt, to my recollection,
2      was in both of those books.
3  BY MR. HEGARTY:
4    Q.    Did you write those
5  chapters?
6    A.    I reviewed those chapters
7  for publication in those books.
8    Q.    My question was did you
9  write those chapters?
10    A.    I'm sorry.  Did I write
11  those chapters on cobalt?  No, I did not.
12    Q.    Have you ever written any
13  published chapter or article discussing
14  the toxicity of cobalt?
15    A.    I have not --
16     MS. O'DELL:  Objection.
17        THE WITNESS:  -- written an
18     article in the area of cobalt, but
19     I am familiar with metals, very
20     much so from the department and
21     the research that I do.
22  BY MR. HEGARTY:
23    Q.    Have you written any
24  published article discussing toxicity of

Page 536

1  nickel?
2    A.    Yes.
3    Q.    What published article have
4  you -- have you written discussing the
5  toxicity of nickel?
6    A.    One that comes to my mind,
7  without looking at my CV, is an early
8  publication associated with the
9  immunology and immunotoxicity of nickel
10  in fish.
11    Q.    What nickel -- was it a
12  nickel compound?
13    A.    It was a nickel chloride, a
14  soluble nickel compound.
15    Q.    Are nickel compounds in
16  Johnson's Baby Powder?
17    A.    Nickel -- according to the
18  J&J documents and other -- other internal
19  documents, yes.
20    Q.    Okay.  What nickel compounds
21  are in Johnson's Baby Powder?
22    A.    The report indicates nickel.
23  It does not break it down to a particular
24  salt or a particular compound of nickel.

Page 537

1    Q.    Have you written any papers
2  looking at the toxicity of chromium-3?
3    A.    I'm going to look in my --
4  in my CV.
5    Q.    Well, without looking at
6  your CV, for purposes of time, can you
7  recall any such article?
8        MS. O'DELL:  If you need to
9     take a moment, Doctor, feel free
10     to.
11        MR. HEGARTY:  We'll go off
12     the record if she needs to take a
13     moment.
14  BY MR. HEGARTY:
15    Q.    Because I qualified my
16  question by asking you, without looking
17  at your CV, are you able to cite an
18  article that you've written?
19    A.    I want to give actual data
20  to you.  In my mind, I recall a paper
21  that I wrote with Dr. Max Costa on
22  chromium.  And -- and possibly with Toby
23  Rossman.  But without looking, I can't be
24  absolutely sure.

135 (Pages 534 to 537)

Judith Zelikoff, Ph.D.

Page 538

1      Q.   You refer over on pages --
2  or on Page 25 of your report --
3      A.   Yes.
4      Q.   -- to --
5      A.   Talc-induced inflammation.
6      Q.   Well, let me finish my
7  question.
8      A.   Oh, I'm sorry.
9      Q.   You refer over on Page 25 in
10  the fourth paragraph to an abstract and
11  other material by Dr. Harper and
12  Dr. Saed, correct?
13     A.   Yes.  In the last -- in the
14  last paragraph, in the last sentence.
15     Q.   And none of those
16  publications refer to testing using
17  Johnson's Baby Powder, correct?
18         MS. O'DELL:  Objection to
19         form.
20         THE WITNESS:  To my
21         knowledge, no, but I would have to
22         look at the paper to be absolutely
23         sure.  But they did use talc,
24         yes -- talcum powder.

Page 539

1  BY MR. HEGARTY:
2      Q.   Can you cite for me any
3  animal or cell studies that you reviewed
4  for purposes of preparing your report
5  that tested Johnson's Baby Powder other
6  than Dr. Saed's recent manuscript?
7      A.   I know I have, I just can't
8  recall.
9         You are talking about
10  publications, correct?
11     Q.   Yes.  That you've cited in
12  your report.
13     A.   I can't find it at the
14  moment, so I would have to say no.
15     Q.   Did you find Exhibit 33, the
16  FDA's response letter to Dr. Epstein.
17     A.   Thank you.
18     Q.   You were referred to Page 3
19  in FDA's statement with regard to its
20  testing of samples of cosmetic grade raw
21  material talc and cosmetic products for
22  asbestos?
23     A.   Yes, I did.
24     Q.   You did not refer to any of

Page 540

1  the statements that you were asked about
2  by plaintiffs' counsel in your expert
3  report, correct?
4         MS. O'DELL:  Object to form.
5         THE WITNESS:  Not without
6         checking my document, I can't
7         answer conclusively.
8  BY MR. HEGARTY:
9      Q.   You did not rely on this
10  portion of the FDA's letter for purposes
11  of your opinions in this case, correct?
12         MS. O'DELL:  Regarding the
13         asbestos testing?
14  BY MR. HEGARTY:
15     Q.   The portion that I just
16  referred you to, the top two paragraphs
17  at Page 3.
18     A.   They do not prove that all
19  talc-containing cosmetic products
20  currently marketed in the United States
21  are free of asbestos.  Is that --
22     Q.   Yes.
23     A.   Okay.  And the question was?
24     Q.   You did not refer to that

Page 541

1  statement in your report, correct?
2      A.   That is correct, yes.
3      Q.   Also you did not cite on
4  Page 5 in your report the statement that
5  "it is, therefore, plausible that
6  perineal talc and other particulate that
7  reaches the endometrial cavity, et
8  cetera, may elicit foreign body-type
9  reaction and inflammatory response that
10  in some exposed women may progress to
11  epithelial cancers."
12         You did not cite that
13  sentence in your report either, correct?
14     A.   I did not --
15         MS. O'DELL:  Objection to
16         form.
17         THE WITNESS:  I did not cite
18         that sentence in my report either.
19         However, this document was in
20         my -- in my citations in the
21         overall reliance -- reliance
22         document.
23  BY MR. HEGARTY:
24     Q.   With regard to the draft

136 (Pages 538 to 541)

Judith Zelikoff, Ph.D.

Page 542

1    screening assessment by Canada, Canada
2    employs a precautionary principle.  Are
3    you aware of that?
4        A.   Yes.
5        Q.   Do you know what a
6    precautionary principle is?
7        A.   I do know what a
8    precaution --
9        Q.   What is it?
10       A.   A precautionary principle is
11   one where you -- in my -- in my opinion
12   and what -- to my knowledge, it's a
13   principle in which you use every
14   precaution in terms of assessment, in
15   terms of use in animal models and human
16   models.  You follow precaution.
17       Q.   Okay.  The draft screenings
18   assessment, Exhibit Number 9, contains
19   the following statement -- and I only --
20   I only have your copy.
21       A.   Oh okay.
22       Q.   I'm going to read it to you
23   and tell me whether you agree with it.
24       A.   Okay.

Page 543

1        Q.   "The etiology of most
2    ovarian tumors in general has not been
3    well established."
4            MS. O'DELL:  What page are
5        you on, please?
6            MR. HEGARTY:  Page 18.
7    BY MR. HEGARTY:
8        Q.   Do you agree with that
9    statement?
10       A.   Please read it again.
11       Q.   "The etiology of most
12   ovarian tumors in general has not been
13   well established."
14       A.   The etiology is -- has not
15   been well established.  But it has been
16   studied.  But there -- okay.  I'm done.
17       Q.   The -- on page -- strike
18   that.  On Page 21 --
19       A.   Of my report?
20       Q.   No, of the --
21       A.   Health Canada.
22       Q.   -- health assessment states
23   the following statement and tell me
24   whether you agree with it.

Page 544

1            "The specific mechanisms and
2    cascade of molecular events by which talc
3    might cause ovarian cancer have not been
4    identified."
5            MS. O'DELL:  Wait.  Do you
6        mind showing Dr. Zelikoff?
7            MR. HEGARTY:  Well, then I
8        won't have -- I'm just reading
9        this statement.
10           MS. O'DELL:  Well, but if
11       you're reading from the draft
12       assessment --
13           MR. HEGARTY:  You know what,
14       I -- this is the only copy I have.
15       If you want to hand me your copy.
16           MR. TISI:  I have my copy.
17       It has my notes on it.  If you...
18       Do you want it?
19           MS. O'DELL:  You're welcome
20       to my copy.
21           MR. HEGARTY:  Thank you.
22   BY MR. HEGARTY:
23       Q.   Page 18, second paragraph.
24   I was on Page 18, Doctor.

Page 545

1        A.   You handed it to me like
2    this, sir.
3        Q.   Right.  On page -- I'm
4    sorry, Page 21.
5        A.   This is Page 21.
6        Q.   Sorry.  Page 21, second
7    paragraph.  The statement at the end
8    reads, "However, the specific mechanisms
9    and cascade of molecular events by which
10   talc might cause ovarian cancer have not
11   been identified."
12           Do you agree with that
13   statement?
14           MS. O'DELL:  Objection to
15       form.
16           THE WITNESS:  That's a
17       statement here.
18   BY MR. HEGARTY:
19       Q.   Do you agree with that
20   statement?
21       A.   Oh, I'm sorry.  I'm sorry,
22   I've lost -- Page 21, what --
23       Q.   Page 21, second paragraph --
24       A.   -- what paragraph?

Judith Zelikoff, Ph.D.

Page 546

1    Under --
2    Q.   Last two lines.
3    A.   Under --
4    Q.   Under -- in the biologic
5  plausibility section.
6    A.   I see it.  Thank you.
7    Q.   It read -- the statement
8  reads:  The specific mechanisms and
9  cascade of molecular events by which talc
10 might cause ovarian cancer have not been
11 identified.
12       Do you agree with that
13 statement?
14    A.   Yes, they have not been
15 clearly and conclusively identified.
16    Q.   But that's not what that
17 sentence reads.  My question was do you
18 agree with the sentence that I just read
19 to you.
20    A.   It is -- I think it's a
21 sentence taken out of text.
22       Do I agree with the sentence
23 as it is written?  No.  I would have to
24 add the words, "have not been clearly

Page 547

1  identified."
2    Q.   So you don't agree with
3  everything in the --
4    A.   Or established.
5    Q.   So you don't agree with
6  everything in Health Canada's risk
7  assessment, correct?
8       MS. O'DELL:  Objection to
9    form.
10       THE WITNESS:  I -- I do not
11    agree with this sentence, correct.
12 BY MR. HEGARTY:
13    Q.   You do rely on, for purposes
14 of your opinions in this case, the draft
15 screening assessment, correct?
16       MS. O'DELL:  Objection.
17       THE WITNESS:  No.  That came
18    out well after I handed in my
19    final report, so it was not used
20    to inform my opinion.  It was
21    supporting validation for my
22    opinion.
23 BY MR. HEGARTY:
24    Q.   So still -- still through

Page 548

1  today it's not -- you're not using it to
2  inform your opinions, correct?
3    A.   It is -- it is support and
4  validation of my opinions.
5    Q.   You referenced IARC and its
6  designation of asbestos.  What has IARC
7  designated talc for genital uses as?
8       MS. O'DELL:  Objection.
9       THE WITNESS:  I -- in -- in
10    terms of classification, may I
11    look at the document?
12 BY MR. HEGARTY:
13    Q.   Well, they've designated
14 talc used --
15    A.   Fibrous -- fibrous --
16    Q.   -- for perineal use as 2B,
17 correct?
18    A.   2B, yes.  Fibrous talc,
19 correct.
20    Q.   You were asked about the
21 deposition of Robert Glenn, correct?
22    A.   The past manager and
23 director of NIOSH.
24    Q.   Yes.

Page 549

1    A.   Yes.
2    Q.   Did you read the entirety of
3  his deposition?
4    A.   No, I did not.
5    Q.   Did you agree with
6  everything he said in his deposition?
7    A.   I said I did not read the
8  entirety.  I can't answer.
9       (Document marked for
10    identification as Exhibit
11    Zelikoff-49.)
12 BY MR. HEGARTY:
13    Q.   I'm going to mark as
14 Exhibit 49, portions of the deposition of
15 Dr. Robert Glenn.  If you turn to the
16 first page of that exhibit, Page 482.
17    A.   Page 482, yes.
18    Q.   Yes.  Mr. Glenn was asked in
19 the middle of the page, Lines 12 to 14,
20 "Has the data also showed that talcum
21 powder is not cytotoxic, meaning it
22 doesn't damage cells?"
23       Mr. Glenn answer's, "Yes."
24    A.   Yes.

138 (Pages 546 to 549)

Judith Zelikoff, Ph.D.

Page 550

1   Q.   Did you cite that portion of
2  his testimony in your expert report?
3       MS. O'DELL:  Objection to
4  form.
5       THE WITNESS:  No.
6  BY MR. HEGARTY:
7   Q.   Did you read it?
8   A.   I said that I did not read
9  this in its -- in its entirety.
10      Q.   Do you agree with that
11 sentence?
12      I'm sorry, do you agree with
13 his answer to that question?
14      MS. O'DELL:  Objection to
15 form.
16      THE WITNESS:  To the
17 question, "Has the data also
18 showed that talcum powder is not
19 cytotoxic, meaning it doesn't
20 damage cells?"
21      So if the question is do I
22 agree with that sentence -- do I
23 agree with his answer of yes,
24 there have been data showing, in

Page 551

1   certain circumstances, in certain
2   cell lines, that talcum powder has
3   not been shown to be cytotoxic at
4   certain concentrations.
5  BY MR. HEGARTY:
6   Q.   Looking down at the next
7  question, 18 through 21, he's asked, "And
8  has the data also showed that talcum
9  powder is not mutagenic, meaning it
10 doesn't mutate genes?"
11      "Answer:  Yes."
12      Do you agree with his answer
13 to that question?
14      A.   I do not agree.  I think
15 that the -- I do not agree with his
16 answer.  I think that his -- that the
17 question has to be -- the question in my
18 opinion, it was ambiguous.  And I'm not
19 sure what he was basing that on in terms
20 of his response.
21      If you -- if he was looking
22 at mutagenicity in terms of Ames assays
23 or yes, they have not shown mutagenicity.
24      So is there data that also

Page 552

1  shows that talcum powder is not
2  mutagenic?  There is.
3       Q.   Did you cite that portion of
4  Mr. Glenn's testimony in your report?
5       A.   No, I did not.
6       Q.   If you look at the next page
7  at the top.  The question, 2 through 7,
8  with the answer on 8.
9       A.   Mm-hmm-hmm.
10      Q.   Did you cite that question
11 and answer in your report?
12      MS. O'DELL:  Object to the
13 form.
14      THE WITNESS:  I did not cite
15 any of Dr. Glenn's information
16 because I -- I did not read it in
17 detail.
18 BY MR. HEGARTY:
19      Q.   You can put that aside.
20      Is it your testimony that
21 you're more knowledgeable regarding talc
22 and ovarian cancer than Dr. Neel?
23      A.   No, what my testimony is to
24 is that I have extensive knowledge in

Page 553

1  toxicological aspects, the cytotoxicity
2  of it, and the inflammatory responses
3  from an -- from an academic perspective
4  and a biological mechanism perspective.
5       Q.   What is Dr. Neel's knowledge
6  of the toxicological aspects and the
7  toxicity of talc?
8       A.   I do not know.
9       Q.   What's his -- is he a
10 cancer -- strike that.
11      He is a cancer biologist,
12 correct?
13      MS. O'DELL:  Objection to
14 form.
15      THE WITNESS:  The only thing
16 I know about Dr. Neel is that he
17 is the director of the Cancer
18 Institute.  I am not familiar with
19 his research.
20 BY MR. HEGARTY:
21      Q.   Have you ever evaluated his
22 qualifications?
23      A.   No.  I was not on the search
24 committee nor do I have access to his CV.

139 (Pages 550 to 553)

Judith Zelikoff, Ph.D.

Page 554

1    Q.    You made statements
2  indicating that you believe that you are
3  more knowledgeable than Dr. Neel
4  regarding the toxicities of talc.  Is
5  that true?
6        A.    What I do know is that he is
7  not a toxicologist.
8        Q.    Do you know what his area of
9  expertise is?
10        A.    He's -- OB/GYN and oncology.
11        Q.    Do you know what his level
12  of knowledge is in the area of
13  toxicology?
14        A.    I do not.
15        Q.    Have you ever met him?
16        A.    Yes, I have met him.
17        Q.    Have you ever talked to him
18  about his qualifications in the area of
19  toxicology?
20        A.    No, I have not.  But I know
21  he is not a -- he is not considered a
22  toxicologist by his peers, by colleagues.
23  He is known as a cancer oncologist.  He
24  is not known or recognized as a

Page 555

1  toxicologist.
2        Q.    Who have you ever asked --
3  who have you ever spoken with regarding
4  to Dr. Neel's qualifications as it
5  relates to toxicology?
6        A.    I have not spoken to him
7  about his qualifications.  My answer
8  comes from the fact that I am an active
9  member in the Society of Toxicology, but
10  nationwide and internationally.  And also
11  I'm an active member in the International
12  Union of Toxicology and active member in
13  the other -- other toxicology programs
14  and societies.
15        And I have -- I have not
16  seen Dr. Neel at any of these, nor have I
17  heard of him being spoken at or about in
18  these -- in these meetings.
19        Q.    Do you go to OB/GYN
20  conferences?
21        A.    I do not.
22        Q.    Do you go to oncology
23  conferences?
24        A.    I do not.

Page 556

1    Q.    Are you a board-certified
2  oncologist?
3        A.    I am not, never claimed to
4  be.
5        Q.    Are you a board-certified
6  gynecologic oncologist?
7            MS. O'DELL:  Wait a minute.
8            THE WITNESS:  I am not, nor
9  have I ever claimed to be.
10        Because --
11  BY MR. HEGARTY:
12        Q.    You were asked -- you were
13  asked about whether you could do --
14  whether there could be studies looking at
15  risk of cancer in women exposed to
16  cobalt, chromium, and nickel.  Do you
17  recall those questions?
18        A.    I do.
19        Q.    Studies looking at exposures
20  of metals in humans are done all the
21  time.  They are called retrospective
22  case-control studies, correct?
23        A.    They are not done in a
24  laboratory nor is there insertion of

Page 557

1  those metals into humans.
2        Q.    That's not my question.  You
3  said -- you testified that there is no
4  way that you can do a study looking at
5  the effect of nickel in humans.  That's
6  not true, is it?
7            MS. O'DELL:  Objection to
8  form.  Misstates --
9            THE WITNESS:  I'm sorry.
10            MS. O'DELL:  -- the question
11  and the testimony.
12        Excuse me, Doctor.
13            THE WITNESS:  I was -- I was
14  talking about clinical studies and
15  studies in people.
16  BY MR. HEGARTY:
17        Q.    There are retrospective
18  case-control studies looking at exposure
19  of humans to nickel, correct?
20        A.    That is -- those are
21  epidemiological studies.  My
22  understanding of the question that was
23  asked of me had to do with laboratory
24  studies and intentional exposure.

140 (Pages 554 to 557)

Judith Zelikoff, Ph.D.

Page 558

1    Q.   Well, can you cite for me
2  any epidemiologic studies showing an
3  increased risk of ovarian cancer in women
4  exposed to nickel?
5    A.   Nickel alone, I have not
6  reviewed that.  But I do know the IARC
7  document talks about it as a Class 1
8  carcinogen.
9    Q.   Can you cite for me, any
10 retrospective case-control studies,
11 showing an increased risk of ovarian
12 cancer in women exposed to chromium?
13   A.   Chromium alone?
14   Q.   Yes.
15   A.   No, I cannot.
16   Q.   Same question as to cobalt?
17   A.   No, I cannot.
18   Q.   Can you cite for me any
19 case-control studies looking at whether
20 there's an increased risk of ovarian
21 cancer in women exposed to nickel,
22 chromium, and cobalt in combination?
23   A.   I hope I understand your
24 question right.  But what I am -- what

Page 559

1  I'm saying is yes, there is an increased
2  risk in exposure to talc because talc
3  contains, according to the J&J documents,
4  and according to other studies that just
5  looked at talcum powder products,
6  contains nickel, cobalt, and chromium in
7  elevated levels.
8    Q.   My question is specific to
9  looking only at exposure to cobalt,
10 nickel, and chromium.  Can you cite for
11 me any case-control studies showing an
12 increased risk of ovarian cancer in women
13 exposed to those three metals in
14 combination?
15   A.   No, I can't.
16   MS. O'DELL:  Objection.
17   Asked and answered.
18 BY MR. HEGARTY:
19   Q.   It would not be unethical to
20 do such a case-control study, correct?
21   MS. O'DELL:  Objection.
22   THE WITNESS:  A case-control
23 study or an epidemiological study
24 which uses data from populations

Page 560

1  is not unethical, but to use it in
2  a clinical study would be
3  extremely unethical.
4  BY MR. HEGARTY:
5    Q.   It would also be appropriate
6  to do cell studies looking at nickel,
7  cobalt, and chromium in ovarian cancer
8  cells, correct?
9    MS. O'DELL:  Objection to
10 form.
11   THE WITNESS:  Alone -- I'm
12 sorry.  Alone or in combination?
13 BY MR. HEGARTY:
14   Q.   Or all of the above.
15   A.   Your question was it would
16 be unethical to do cell culture studies?
17   Q.   Would it be unethical in
18 your opinion?
19   A.   Not to do cell culture
20 studies.
21   Q.   Have such studies been done?
22   A.   I'm not sure about the
23 combination.  There have been studies, a
24 number of studies that have been done in

Page 561

1  cell culture.  I can't cite them all,
2  because there are numerous that have
3  looked at nickel or cobalt or chromium in
4  cell culture studies, and many that have
5  been done in my own laboratory.
6    Q.   Can you cite to me any such
7  studies that have done those tests in
8  ovarian cells?
9    A.   I'm sorry.  When you say
10 "any such studies," do you mean cell
11 culture studies?
12   Q.   Yes.
13   A.   Well, the Shukla study, the
14 Saed studies.
15   Q.   So the Shukla and Saed
16 studies applied nickel, chromium and
17 cobalt to the cells?
18   A.   I'm sorry.  I'm sorry.  I
19 thought you said talcum powder.
20   Q.   Doctor, listen to my
21 question.  My question is can, you cite
22 for me any culture studies that have
23 applied nickel, cobalt, or chromium or
24 all three to ovarian cancer cells?

141 (Pages 558 to 561)

Judith Zelikoff, Ph.D.

Page 562

1    A.   I cannot -- I have not seen
2  that literature, no.
3    Q.   Those studies could be done,
4  correct?
5    A.   Those studies could be done.
6    Q.   They could be done in your
7  laboratory, couldn't they?
8    A.   I have the facilities to
9  carry out those studies.
10   Q.   You have not done those
11 studies?
12       MS. O'DELL:  Objection to
13       form.
14       THE WITNESS:  Correct.
15 BY MR. HEGARTY:
16   Q.   You cited to the Cramer 2007
17 study, which I'm marking as Exhibit
18 Number 40.
19       (Whereupon, a discussion was
20       held off the stenographic record.)
21       (Document marked for
22       identification as Exhibit
23       Zelikoff-50.)
24 BY MR. HEGARTY:

Page 563

1    Q.   I'm marking as Exhibit
2  Number 50 the Cramer 2007 study that you
3  referred to in response to counsel's
4  questions.
5    A.   Mm-hmm-hmm.
6        MS. O'DELL:  Objection.
7        That misstates the record.  I
8        never referred to the Cramer
9        study.
10       MR. HEGARTY:  She cited it
11       in response to your questions.
12       MS. O'DELL:  No, she did
13       not.  But you may ask questions
14       about it, but that's not a proper.
15       MR. HEGARTY:  Well, she
16       cited the Cramer 2007 article.
17 BY MR. HEGARTY:
18   Q.   Do you find this article to
19 be a credible source of information for
20 you?
21   A.   It was published in
22 Obstetrics and Gynecology.  That is good
23 journal, reputable journal.
24   Q.   And if you look at the top

Page 564

1  of the first page on the right-hand
2  column.
3    A.   Yes.
4    Q.   The authors state that
5  the -- "First, the association is a
6  relatively weak" -- "a relatively weak
7  one; i.e., summary relative risk of
8  approximately 1.3."
9        Do you agree with that
10 statement?
11       MS. O'DELL:  Objection to
12       form.
13       THE WITNESS:  Number one, I
14       am not an epidemiologist so I'm
15       not testifying to epidemiological
16       odds ratio, whether that is weak
17       or not weak.
18 BY MR. HEGARTY:
19   Q.   The next sentence says,
20 "Second, no clear increase in risk or
21 duration of use has been found in most
22 studies."
23       Do you agree with that
24 sentence?

Page 565

1        MS. O'DELL:  Objection to
2        form.
3        THE WITNESS:  There are many
4        studies that do show that duration
5        plays a role.
6  BY MR. HEGARTY:
7    Q.   That's not my question.  My
8  question is do you agree with that
9  sentence?
10   A.   I see.
11       MS. O'DELL:  Objection to
12       form.  Asked and answered.
13       THE WITNESS:  I do not agree
14       that there is no clear -- there is
15       some evidence that leads to an
16       increase in risk associated with
17       duration of use.
18 BY MR. HEGARTY:
19   Q.   So you don't agree with that
20 sentence?
21   A.   So I do not completely agree
22 with that sentence.
23   Q.   The next sentence reads,
24 "Third, the ability of talc used in the

142 (Pages 562 to 565)

Judith Zelikoff, Ph.D.

Page 566

1    genital area to enter the pelvic cavity
2    has not been conclusively proven."
3           Do you agree with that
4    sentence?
5       A.   None of these are -- none of
6    these sentences are cited or referenced
7    by the way.
8           It has not been conclusively
9    proven.  I agree with the sentence.
10          May I --
11      Q.   You cited as well to the
12   Keskin paper.  You cited that several
13   times, including in response to counsel's
14   questions.
15      A.   Yes, I did.  I recall that.
16      Q.   The Keskin paper was an
17   animal study that did not show tumor
18   formation from application of talc,
19   correct?
20          MS. O'DELL:  Object to the
21      form.
22          THE WITNESS:  If you allow
23      me to specifically look for that,
24      please.

Page 567

1    BY MR. HEGARTY:
2       Q.   I'll mark it as Exhibit 51.
3           (Document marked for
4           identification as Exhibit
5           Zelikoff-51.)
6    BY MR. HEGARTY:
7       Q.   The Keskin paper over in the
8    conclusion section on Page 927 says that
9    with regard to the reported effects of
10   talc, "This effect seems to be in the
11   form of foreign body reaction or
12   infection rather than a neoplastic
13   change."
14      A.   Which is inflammation.
15      Q.   And in this study it showed
16   no neoplastic changes in any of the
17   animal study, correct?
18          MS. O'DELL:  Object to the
19      form.
20          You may answer.
21          THE WITNESS:  It was -- he
22      did not find or they did not find
23      that there was neoplastic changes,
24      but they did find a number of

Page 568

1    findings that led to inflammation
2    including an increased number of
3    follicles, and that goes to
4    biological plausibility.
5    BY MR. HEGARTY:
6       Q.   Did you agree with that
7    finding?
8       A.   That there were increased
9    number of follicles?
10      Q.   Yes.
11      A.   And the histopathology?
12          That there was foreign body
13   reactions and that there were infections,
14   I agree with those studies.
15      Q.   Do you agree with the
16   statement that the author made that this
17   effect seems to be in the form of foreign
18   body reaction or infection rather than a
19   neoplastic change?
20      A.   I'm sorry, could you tell me
21   where that might be?
22      Q.   Again, in the conclusion
23   section that we have just been looking
24   at.

Page 569

1       A.   Mm-hmm-hmm.
2           Well, a foreign body
3    reaction can -- is an immunological
4    response.  Whether it's considered a
5    neoplastic change, likely not.  A foreign
6    body reaction does not necessarily -- is
7    not necessarily known as a neoplastic
8    response, correct.
9       Q.   And you -- you didn't cite
10   that statement from the Keskin paper in
11   your report, did you?
12      A.   Not that I recall.
13      Q.   Do you agree with the --
14      A.   But my -- my role was to
15   define biological plausibility.  So what
16   I did -- what I did put in my report were
17   the things that indicated to me that
18   there was inflammation.
19      Q.   You agree with the
20   conclusions from the Taher paper?
21          MS. O'DELL:  Object to the
22      form.
23          Doctor, it's in this stack.
24          THE WITNESS:  Okay.  Thank

143 (Pages 566 to 569)

Judith Zelikoff, Ph.D.

Page 570

1    you.  Oh, thank you.
2  BY MR. HEGARTY:
3       Q.   Second page, Line 34, on the
4  second page.
5       A.   In the abstract?
6       Q.   Yes.
7          MS. O'DELL:  Give me just a
8       moment, I'm sorry.  I'll pull out
9       my copy.
10         THE WITNESS:  I'm sorry,
11      should I wait?
12         MR. HEGARTY:  I think Leigh
13      wants you to wait.
14         MS. O'DELL:  Okay.  Go
15      ahead.  I'm sorry.
16  BY MR. HEGARTY:
17      Q.   Do you agree with the
18  statement made in Line 34?
19      A.   Perineal use of talc powder
20  is a possible cause of human ovarian
21  cancer?
22      Q.   Yes.
23      A.   I believe that it's more
24  than a possible cause.  I believe that

Page 571

1  there's biological plausibility which
2  shows that it -- it could be, it is
3  linked to human ovarian cancer.
4       Q.   So you don't -- you disagree
5  with that statement?
6       A.   One could say that, taking
7  it literally, that it is certainly a
8  possible cause.  I just believe that it
9  is greater than a possible cause.
10         MR. HEGARTY:  Okay.  Thank
11      you.  I think that's it for my
12      time.
13         MS. O'DELL:  Okay.
14             - - -
15          EXAMINATION
16             - - -
17  BY MS. O'DELL:
18      Q.   Doctor, I just have two
19  questions for you.
20          I think you had the causal
21  assessment in front of you.
22      A.   Do you mean the Taher?
23      Q.   No, ma'am.  The actual
24  causal assessment -- actually I think

Page 572

1  counsel has it.  I'll hand it to you.  If
2  you'll --
3       A.   Oh.  You mean the draft
4  screening assessment?
5       Q.   Yes.  Sorry, I was going to
6  it by the wrong name.  It is Exhibit --
7       A.   9.
8       Q.   Thank you.
9          If you'll turn to Page 16.
10      A.   I see that, Keskin et al.,
11  2009, it's the first statement under
12  human studies.
13      Q.   Yes.  Right above that when
14  it refers to the Keskin and colleagues
15  2009.  What was the conclusion that the
16  sentence beginning "while no cancer"?  Do
17  you see that above human studies on
18  Page 16?
19      A.   The conclusion, "while no
20  cancer"?
21      Q.   Yes.
22      A.   "While no cancer/precancer
23  effects were observed, Keskin and
24  colleagues noted the study's duration may

Page 573

1  have been too short to note these types
2  of effects."
3       Q.   And in regard to -- and
4  that -- that statement's consistent with
5  the statements that you've included in
6  your report, fair?
7          MR. HEGARTY:  Objection to
8       form.
9          THE WITNESS:  Yeah.
10  BY MS. O'DELL:
11      Q.   And then secondly you were
12  asked a question, several questions about
13  the actual Keskin paper itself.  And I
14  think it's still in front of you.  Do you
15  see that?  It's Exhibit 51.  Yeah,
16  Exhibit 51.
17      A.   This is it, thank you.
18      Q.   Okay.  And I'll turn you to
19  the conclusion please, Dr. Zelikoff.
20      A.   That is on Page 930?
21      Q.   It's 927 actually.  One of
22  the conclusions, at least the ones I -- I
23  was looking at.
24          927.  Do you see that?

Judith Zelikoff, Ph.D.

Page 574

1    A.   I see.
2    Q.   And counsel directed your
3  attention to the sentence that said,
4  "However this effect seems to be in the
5  form of foreign body reaction or
6  infection rather than neoplastic change."
7        Do you see that?  Recall
8  those questions --
9    A.   In the conclusion section?
10   Q.   Yes.
11   A.   On Page --
12   Q.   927.
13   A.   "However this effect seems
14 to be in the form of a foreign body
15 reaction or infection rather than a
16 neoplastic change."
17        Yes, I see that.
18   Q.   And if you'll look to the
19 next sentence, what also did the authors
20 conclude?
21   A.   "Results of previous studies
22 are in favor of a neoplastic effect,
23 particularly in the ovaries."
24        And they conclude that more

Page 575

1  experimental and clinical studies are
2  warranted.
3    Q.   All right.  And one other
4  question.  You were asked about the Saed
5  studies regarding talc and cell culture,
6  both ovarian cancer cells and regular
7  cells.
8    A.   Yes.  I recall.
9    Q.   And you were asked earlier
10 about the manuscript that's been marked
11 as --
12   A.   Exhibit 8.
13   Q.   -- Exhibit 8.
14        Is it -- is it -- turn to
15 Page 5 of the manuscript please.
16   A.   I see it.
17   Q.   And looking at the top, did
18 Dr. Saed use Johnson's Baby Powder as a
19 part of the -- his treatment of cells?
20   A.   Yes.  It's Page 5, top,
21 treatment of cells, talcum powder from
22 Fisher -- Fisher Scientific or Baby
23 Powder from Johnson & Johnson, and the
24 numbers of the lots are given were

Page 576

1  dissolved in DMSO.
2    Q.   Is -- is the data included
3  in this manuscript, was that part of
4  the -- the data you relied on in abstract
5  in reaching your opinions in this case?
6    A.   In abstract form, yes.  That
7  was all that was -- that was available
8  since this only came out a few weeks ago.
9        MS. O'DELL:  Okay.  I have
10 nothing further.
11        THE WITNESS:  Accepted for
12 E-press a few weeks ago.
13        MS. O'DELL:  Okay.  I have
14 nothing further.
15        - - -
16        EXAMINATION
17        - - -
18 BY MR. HEGARTY:
19   Q.   Dr. Zelikoff, in looking at
20 the Keskin paper, in -- in particular at
21 the portion of the conclusions section
22 that counsel asked you to read --
23   A.   Yes.
24   Q.   -- the results of previous

Page 577

1  studies, that sentence?
2    A.   Yes, I see it on Page 927.
3    Q.   Can you cite for me any
4  previous studies to Keskin which were in
5  favor of a neoplastic effect?
6    A.   Culture cell studies that
7  have looked at proliferation, increased
8  proliferation which was seen in the Saed
9  studies and in the abstract.
10 Proliferation is one hallmark of the
11 carcinogenic process.
12   Q.   Doctor, listen to my
13 question.  This publication was in 2008.
14   A.   Okay.  I'm sorry.
15        MS. O'DELL:  2009 I believe,
16 but go ahead.
17        THE WITNESS:  2009.
18 BY MR. HEGARTY:
19   Q.   Received December 2009.
20 Published 2009.
21        The sentence reads:  The
22 results of previous studies before 2009
23 are in favor of neoplastic effect.
24        What studies are they

Judith Zelikoff, Ph.D.

| Page 578 |
|---|
| 1  referring to? |
| 2      A.   I don't know because it's |
| 3  not referenced. |
| 4          MR. HEGARTY:  I don't have |
| 5  any additional questions. |
| 6          MS. O'DELL:  Nothing |
| 7  further, Doctor. |
| 8          THE VIDEOGRAPHER:  Stand by |
| 9  please.  This marks the end of |
| 10  today's deposition.  The time is |
| 11  9:03 p.m.  Off the record. |
| 12          (Excused.) |
| 13          (Deposition concluded at |
| 14  approximately 9:03 p.m.) |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 580 |
|---|
| 1          INSTRUCTIONS TO WITNESS |
| 2 |
| 3          Please read your deposition |
| 4  over carefully and make any necessary |
| 5  corrections.  You should state the reason |
| 6  in the appropriate space on the errata |
| 7  sheet for any corrections that are made. |
| 8          After doing so, please sign |
| 9  the errata sheet and date it. |
| 10          You are signing same subject |
| 11  to the changes you have noted on the |
| 12  errata sheet, which will be attached to |
| 13  your deposition. |
| 14          It is imperative that you |
| 15  return the original errata sheet to the |
| 16  deposing attorney within thirty (30) days |
| 17  of receipt of the deposition transcript |
| 18  by you.  If you fail to do so, the |
| 19  deposition transcript may be deemed to be |
| 20  accurate and may be used in court. |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 579 |
|---|
| 1 |
| 2          CERTIFICATE |
| 3 |
| 4 |
| 5      I HEREBY CERTIFY that the witness was duly sworn by me and that the |
| 6  deposition is a true record of the testimony given by the witness. |
| 7 |
| 8      It was requested before completion of the deposition that the |
| 9  witness, JUDITH ZELIKOFF Ph.D., have the opportunity to read and sign the deposition transcript. |
| 10 |
| 11 |
| 12  _____ |
| 13  MICHELLE L. GRAY, A Registered Professional Reporter, Certified Shorthand |
| 14  Reporter, Certified Realtime Reporter and Notary Public |
| 15  Dated:  January 23, 2019 |
| 16 |
| 17 |
| 18      (The foregoing certification |
| 19  of this transcript does not apply to any |
| 20  reproduction of the same by any means, |
| 21  unless under the direct control and/or |
| 22  supervision of the certifying reporter.) |
| 23 |
| 24 |

| Page 581 |
|---|
| 1          - - - - - - |
| 1              E R R A T A |
| 2          - - - - - - |
| 3 |
| 4  PAGE  LINE  CHANGE |
| 5  ____  ____  _____ |
| 6      REASON:  _____ |
| 7  ____  ____  _____ |
| 8      REASON:  _____ |
| 9  ____  ____  _____ |
| 10      REASON:  _____ |
| 11  ____  ____  _____ |
| 12      REASON:  _____ |
| 13  ____  ____  _____ |
| 14      REASON:  _____ |
| 15  ____  ____  _____ |
| 16      REASON:  _____ |
| 17  ____  ____  _____ |
| 18      REASON:  _____ |
| 19  ____  ____  _____ |
| 20      REASON:  _____ |
| 21  ____  ____  _____ |
| 22      REASON:  _____ |
| 23  ____  ____  _____ |
| 24      REASON:  _____ |

146 (Pages 578 to 581)

Judith Zelikoff, Ph.D.

Page 582

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4      I,_____, do
5 hereby certify that I have read the
6 foregoing pages, 1 - 583, and that the
7 same is a correct transcription of the
8 answers given by me to the questions
9 therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16 JUDITH ZELIKOFF Ph.D.      DATE
17
18
19 Subscribed and sworn
     to before me this
20 _____ day of _____, 20____.
21 My commission expires:_____
22
     _____
23 Notary Public
24

Page 583

1      LAWYER'S NOTES
2 PAGE  LINE
3 _____  _____  _____
4 _____  _____  _____
5 _____  _____  _____
6 _____  _____  _____
7 _____  _____  _____
8 _____  _____  _____
9 _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____

Golkow Litigation Services - 1.877.370.DEPS