# EXHIBIT B32

Karla Ballman, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &         :
JOHNSON TALCUM POWDER      :
PRODUCTS MARKETING,        :
SALES PRACTICES, AND       :  NO. 16-2738
PRODUCTS LIABILITY         :  (FLW) (LHG)
LITIGATION                 :
                           :
THIS DOCUMENT RELATES      :
TO ALL CASES               :

- - -

March 22, 2019

- - -

　　　　Videotaped deposition of
KARLA BALLMAN, Ph.D., taken pursuant to
notice, was held at Skadden Arps, Four
Times Square, New York, New York,
beginning at 9:04 a.m., on the above
date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

Karla Ballman, Ph.D.

| Page 2 | Page 4 |
|---|---|
| 1  APPEARANCES:<br>2<br>3  LEVIN PAPANTONIO THOMAS<br>    MITCHELL RAFFERTY & PROCTOR, PA<br>    BY:  CHRISTOPHER V. TISI, ESQ.<br>4  316 South Baylen Street,<br>    Suite 600<br>5  Pensacola, Florida 32502<br>    (888) 435-7001<br>6  Ctisi@levinlaw.com<br>7    - and -<br>8  LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>    BY:  RUDIE R. SOILEAU, JR., ESQ.<br>9  501 Broad Street<br>    Lake Charles, Louisiana 70601<br>10  (337) 439-0707<br>    Rudiesoileau@gmail.com<br>11<br>    - and -<br>12<br>    RESTAINO LAW, LLC<br>13  BY: JOHN M. RESTAINO, JR., DPM, ESQ.<br>    130 Forest Street<br>14  Denver, Colorado 80220<br>    (303) 839-8000<br>15  Jrestaino@restainollc.com<br>    Representing the Plaintiffs<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 | 1  APPEARANCES:  (Cont'd.)<br>2<br>3  SEYFARTH SHAW, LLP<br>    BY:  THOMAS T. LOCKE, ESQ.<br>    975 F Street, NW<br>4  Washington, D.C. 20004<br>    (202) 463-2400<br>5  tlocke@seyfarth.com<br>    Representing the Defendant, PCPC<br>6<br>    TELEPHONIC APPEARANCES:<br>7<br>    ASHCRAFT & GEREL, LLP<br>8  BY:  MICHELLE A. PARFITT, ESQ.<br>9  4900 Seminary Road, Suite 650<br>    Alexandria, Virginia 22311<br>10  (703) 931-5500<br>    mparf@aol.com<br>11  Representing the Plaintiffs<br>12<br>    ALSO PRESENT:<br>13<br>14  VIDEOTAPE TECHNICIAN:<br>    Henry Marte<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 |

| Page 3 | Page 5 |
|---|---|
| 1  APPEARANCES:  (Cont'd.)<br>2<br>3  SKADDEN ARPS, LLP<br>    BY:  JESSICA D. MILLER, ESQ.<br>4  1440 New York Avenue, N.W.<br>    Washington, D.C. 20005<br>5  (202) 371-7850<br>    Jessica.miller@skadden.com<br>6    - and -<br>7  DRINKER, BIDDLE & REATH, LLP<br>    BY:  SUSAN M. SHARKO, ESQ.<br>8  600 Campus Drive<br>    Florham Park, New Jersey 07932<br>9  (973) 549-7000<br>    susan.sharko@dbr.com<br>10<br>    - and -<br>11<br>    DRINKER BIDDLE & REATH, LLP<br>12  BY:  KATHERINE McBETH, ESQ.<br>    One Logan Square,<br>13  Suite 2000<br>    Philadelphia, Pennsylvania 19103<br>14  (215) 988-2706<br>    katherine.mcbeth@dbr.com<br>15  Representing the Defendants, Johnson<br>    & Johnson entities<br>16<br>17  TUCKER ELLIS, LLP<br>    BY:  MICHAEL ANDERTON, ESQ.<br>18  950 Main Avenue, Suite 1100<br>    Cleveland, Ohio 44113<br>19  (216) 696-4835<br>    Michael.anderton@tuckerellis.com<br>20  Representing the Defendant, PTI<br>    Royston LLC and PTI Union LLC<br>21<br>22<br>23<br>24 | 1      - - -<br>2    I N D E X<br>3      - - -<br>4<br>    Testimony of:<br>5<br>    KARLA BALLMAN, Ph.D.<br>6<br>    By Mr. Tisi          13, 566<br>7<br>    By Ms. Miller         564<br>8<br>9<br>10      - - -<br>11    E X H I B I T S<br>12      - - -<br>13<br>14  NO.      DESCRIPTION      PAGE<br>15  Ballman-1   Expert Report      13<br>            Karla Ballman, Ph.D.<br>16          2/25/19<br>            P1.0200<br>17<br>    Ballman-2   Demonstrative      48<br>18          Ballman Conclusion<br>            Page 53, Excerpt<br>19          P1.0201<br>20  Ballman-3   Ovarian Cancer      55<br>            And Talc<br>21          (Cramer)<br>22  Ballman-4   Draft Screening      87<br>            Assessment Talc<br>23          12/2018<br>            P1.0198<br>24 |

2  (Pages 2 to 5)

Karla Ballman, Ph.D.

Page 6

```
              - - -
       E X H I B I T S  (Cont'd.)
              - - -

NO.      DESCRIPTION        PAGE
Ballman-5  Demonstrative        104
           Health Canada
           Conclusion
           Page 28 Excerpt
           P1.0202
Ballman-6  The Environment and  145
           Disease:  Association
           Or Causation
           (Bradford Hill)
           P2.0056
Ballman-7  Talc and Ovarian     155
           Cancer
           (Narod)
           P2.0052

Ballman-8  Demonstrative        161
           Narod Conclusion
           Page 2
           P1.0203
Ballman-9  Older Version        180
           Curriculum Vitae
           (Withdrawn)
Ballman-10  Notice of Deposition  187
Ballman-10-A Supplemental List of  189
           Materials Reviewed
           And Considered by
           Karla Ballman, Ph.D.

Ballman-10-B Addendum to List    189
           Of Materials Reviewed
           And Considered
```

Page 8

```
              - - -
       E X H I B I T S  (Cont'd.)
              - - -

NO.      DESCRIPTION        PAGE
Ballman-15  ASA Listing of      250
           Fellows/Nominations
           Printout
           (No Bates)

Ballman-16  Weill Cornell       257
           Biostatistics and
           Epidemiology Courses
           P1.0208
Ballman-17  Efficacy of Adjuvant  277
           Trastuzumab for
           Patients with Human
           Epidermal Growth Factor
           (O'Sullivan)
           P2.0057

Ballman-18  Expert Report of    306
           Karla Ballman
           (Viagra)
           P1.0211
Ballman-19  Case-Control Studies  313
           (Rothman)
           P2.0067
Ballman-20  Six Persistent      320
           Research Misconceptions
           (Rothman)
Ballman-21  Interpretation of    337
           Epidemiologic Studies
           On Talc and Ovarian
           Cancer
           (Rothman, 11/28/00)
           P1.0125
```

Page 7

```
              - - -
       E X H I B I T S  (Cont'd.)
              - - -

NO.      DESCRIPTION        PAGE
Ballman-10-C Invoice dated 3/7/19  189
Ballman-10-D E-mail Thread      189
           3/21/19
           Subject, Additional
           Disclosure

Ballman-10-E Lectures/Workshops  199
           Re Epidemiology/
           Biostatistics (Last 2
           Years)
Ballman-11  Weill Cornell Profile  232
           Biostatistics and
           Epidemiology
           Karla Ballman
           P1.0204
Ballman-12  Anesthesiology and   243
           Respiratory Therapy
           Devices Panel
           6/14/18
           P1.0205
Ballman-13  Profile of Karla     245
           Ballman, Ph.D. SARC
           Statistician
           P1.0206

Ballman-14  ASA: Promoting the   247
           Practice and Profession
           Of Statistics
           P1.0207
```

Page 9

```
              - - -
       E X H I B I T S  (Cont'd.)
              - - -

NO.      DESCRIPTION        PAGE
Ballman-22  Systematic Review and  375
           Meta-Analysis of the
           Association Between
           Perineal Use of Talc
           And Risk of Ovarian
           Cancer
           (Taher)
           P2.0034

Ballman-23  Epidemiology Faces   390
           Its Limites
           Special News Report

Ballman-24  Science, Letters,    394
           The Discipline of
           Epidemiology
           P2.0062
Ballman-25  National Cancer      401
           Institute
           Ovarian, Fallopian Tube
           And Primary Peritoneal
           Cancer Prevention
           P2.0060

Ballman-26  Expert Report Excerpt  425
           Christian Merlo, MD
           2/25/19
           P1.0215
Ballman-27  Modern Epidemiology  440
           Chapter 2
           (Rothman)
           Causation and Causal
           Inference
           P2.0061
```

3  (Pages 6 to 9)

Karla Ballman, Ph.D.

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5  NO.     DESCRIPTION       PAGE
 6  Ballman-28  The American      483
            Statistician
 7          The ASA's Statement
            On P-Values:  Context
 8          Process, and Purpose
            (Wasserstein)
 9          P2.0063.1
10  Ballman-29  Comment, Retire    487
            Statistical Significance
11          (Valentin)
12  Ballman-30  Demonstrative     519
            Quote from Ballman
13          Expert Report
            P1.0213
14
    Ballman-31  Demonstrative     532
15          Quote from Ballman
            Expert Report
16          P1.0214
17  Ballman-32  Introduction to   548
            Meta-Analysis
18          (Borenstein)
19
20
21
22
23
24
```

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  PAGE  LINE
    None.
 7
 8  Request for Production of Documents
 9  PAGE  LINE
    None.
10
11  Stipulations
12  PAGE  LINE
    None.
13
14  Questions Marked
15  PAGE  LINE
    None.
16
17
18
19
20
21
22
23
24
```

```
 1              - - -
 2          THE VIDEOGRAPHER:  We're now
 3  on the record.  My name is Henry
 4  Marte.  I am a videographer with
 5  Golkow Litigation Services.
 6          Today's date is March 22nd,
 7  2019, and the time is 9:04 a.m.
 8          This videotaped deposition
 9  is being held at Four Times Square
10  in New York, New York, in the
11  matter of Talcum Powder
12  Litigation.
13          The deponent today is
14  Dr. Karla Ballman.
15          Counsel are all introduced
16  for the record, for the
17  stenographic record.
18          Will the court reporter
19  please administer the oath to the
20  witness.
21              - - -
22          ... KARLA BALLMAN, Ph.D.,
23  having been first duly sworn, was
24  examined and testified as follows:
```

```
 1              - - -
 2          EXAMINATION
 3              - - -
 4  BY MR. TISI:
 5      Q.   Good morning?
 6      A.   Good morning.
 7      Q.   Would you please state your
 8  name.
 9      A.   Karla Ballman.
10      Q.   And it's Karla Ballman,
11  Ph.D.?
12      A.   Well, that's my degree, is a
13  Ph.D.
14      Q.   Correct.  You know that
15  you've been identified by Johnson &
16  Johnson lawyers as an expert in the
17  talcum powder litigation?
18      A.   Yes.  I've been retained by
19  Johnson & Johnson as an expert.
20      Q.   Okay.  At the request of
21  Johnson & Johnson's lawyers, did you
22  prepare an expert report on behalf of
23  Johnson & Johnson?
24      A.   I did prepare an expert
```

4 (Pages 10 to 13)

Karla Ballman, Ph.D.

Page 14

1  report.
2      Q.   Okay.  And I'd like to have
3  that marked as Exhibit Number 1.
4          (Document marked for
5      identification as Exhibit
6      Ballman-1.)
7  BY MR. TISI:
8      Q.   Now Dr. Ballman, does
9  this -- does this report that you issued
10  address the epidemiologic question about
11  whether talcum powder products are
12  capable of causing ovarian cancer?
13      A.   Yes.  I had been asked to
14  look at all the evidence and totality and
15  come to -- to determine whether or not
16  ovarian cancer -- I mean talcum powder
17  causes ovarian cancer.
18      Q.   Okay.  And you reached that
19  to a reasonable degree of medical
20  certainty?
21      A.   My -- my expertise is in
22  epidemiology and statistics, and so I
23  reached it to a reasonable degree of
24  certainty coming from it, from an

Page 15

1  epidemiology standpoint.  I'm not sure
2  what you mean by medicine.  I'm not an
3  M.D.
4      Q.   Okay.  What does reasonable
5  degree of certainty mean to you?
6      A.   It means that I don't see
7  any evidence that supports that
8  hypothesis.
9      Q.   Okay.  No evidence?
10      A.   Credible evidence.
11      Q.   The report that you issued
12  is your epidemiologic assessment of that
13  general causation question about whether
14  talcum powder products is capable of
15  causing ovarian cancer, true?
16      A.   What do you mean by general
17  causation?  I know that lawyers use
18  different words than what I use.  And
19  they place a lot of emphasis on the words
20  they use, like I do on the numbers.  So
21  I'm not quite sure what you mean by
22  general causation.
23      Q.   Whether or not -- let's take
24  the word general causation out.

Page 16

1          This question -- this report
2  addresses the question about whether or
3  not, in your opinion, to a reasonable
4  degree of certainty, that talcum powder
5  products cause or does not cause ovarian
6  cancer.
7      A.   Yeah.  So this report
8  describes the -- what I went through to
9  look at the data in totality with respect
10  to the question as to whether there is
11  evidence to support the hypothesis that
12  talcum powder applied to the perineum
13  causes ovarian cancer.
14      Q.   And in fact, the cover page
15  which you signed says "Expert Report of
16  Karla Ballman Ph.D. for General Causation
17  Daubert Hearing."
18          Do you see that?
19      A.   Okay.  I see that.  So I
20  didn't know what the legal terms were.
21  So I did do this report, yes.
22      Q.   And this report is your
23  assessment of both the epidemiologic and
24  non-epidemiologic evidence through a

Page 17

1  framework that we will be talking about
2  today called the Bradford Hill framework,
3  correct?
4      A.   What do you mean by
5  non-epidemiologic?
6      Q.   I think I used -- those were
7  the words that you used in the report.
8      A.   Did I?  Can you point me to
9  the page where I used those words?
10      Q.   I'm not going to waste my
11  time to do it.  But you -- I think you
12  talked about that you were looking at
13  both the observational studies and the
14  non-observational evidence?
15          MS. MILLER:  Objection.
16          THE WITNESS:  So as -- as an
17      expert in epidemiology and
18      statistics, and I do this like day
19      in and day out, as part of my
20      life, I look at the totality of
21      the evidence.
22          So some of the evidence
23      involved human.  And some of the
24      evidence may involve some animal

5 (Pages 14 to 17)

Karla Ballman, Ph.D.

Page 18

1      experiments, and some evidence I
2      look at might involve some cell
3      line experiments.
4   BY MR. TISI:
5      Q.   Okay.  And we'll talk about
6   that.  We'll talk about that for sure.
7          In collecting that evidence
8   did you organize your evidence
9   considering what I think the record will
10  reflect is the Bradford Hill framework?
11     A.   Within my report I do have
12  sections that go through the Bradford
13  Hill framework.
14     Q.   Okay.  And you know what the
15  Bradford Hill framework is, correct?
16     A.   I do.
17     Q.   And after collecting the
18  evidence, did you then weigh the
19  evidence?
20     A.   So weigh it in what respect?
21     Q.   I'm asking you, how did
22  you -- how did you -- well, we'll come
23  back to this.
24          But you looked at the

Page 19

1   evidence and you decided which evidence,
2   if any, was credible or not, correct?
3      A.   I looked at the evidence in
4   totality.  And what I -- and I think I
5   lay out in my report, you know, there --
6   there is sort of a general hierarchy of
7   epidemiologic evidence that goes from,
8   like, lowest -- it's like a pyramid.  I
9   think it's Figure 2 in my report -- up to
10  the highest evidence.  And that's the
11  type of weight I put on it.
12          So, for instance, I place
13  sort of evidence coming out of -- bless
14  you -- cohort studies higher than
15  evidence coming out of case-control
16  studies.
17     Q.   Okay.  And your -- and we'll
18  talk about this.  But your opinion is
19  that cohort studies are stronger
20  evidence, more reliable evidence than
21  case -- case-control studies?
22     A.   I believe epidemiology,
23  that's a fairly well established
24  principle.

Page 20

1      Q.   Okay.  And that's your
2   opinion?
3      A.   I just work with -- I don't
4   think that's my opinion.  I think it's
5   the basis of what all epidemiologists put
6   together as --
7      Q.   And so it's your opinion
8   that all epidemiologists agree that
9   cohort studies are better than
10  case-control studies?
11         MS. MILLER:  Objection.
12         THE WITNESS:  Again, it
13     depends.  Are you saying cohort
14     studies in general --
15  BY MR. TISI:
16     Q.   Yes.  Prospective --
17     A.   -- or are you talking
18  about --
19     Q.   Prospective cohort studies
20  are better than case-control studies on
21  your hierarchy of evidence.
22         MS. MILLER:  Objection.
23         THE WITNESS:  You know,
24     again, it depends.  That's a

Page 21

1      pretty general thing.  I'm just
2      saying that if you -- you look in
3      epidemiology textbooks, if you
4      look in any other places where
5      this is discussed, cohort studies
6      as a whole in general are placed
7      higher than the evidence coming
8      out of case-control studies.
9   BY MR. TISI:
10     Q.   And we'll talk about that.
11  But that's one of the guiding foundations
12  of your expert opinion, correct?
13         MS. MILLER:  Objection.
14         THE WITNESS:  It's again
15     established in the epidemiology
16     literature, and I just applied
17     that to the evidence that I
18     assessed.
19  BY MR. TISI:
20     Q.   Okay.  Actually my question
21  is different, Doctor.
22          That's one of the guiding
23  principles of your expert report that --
24         MS. MILLER:  Object --

6 (Pages 18 to 21)

Karla Ballman, Ph.D.

Page 22

BY MR. TISI:
1    Q.   -- you have weighed --
2         MR. TISI:  Wait.
3         MS. MILLER:  Sorry.
4    BY MR. TISI:
5    Q.   -- that you have weighed
6    cohort studies as a whole higher than
7    case-control studies as a whole.
8         MS. MILLER:  Objection.
9    She's asked -- she's answered this
10   question like four times.
11        THE WITNESS:  And with all
12   the interruptions, again, can --
13   BY MR. TISI:
14   Q.   I'll rephrase the question.
15        Okay.  You asked what other
16   epidemiologists do, and I'm asking you
17   what you did.
18        For the purposes of your
19   report, did you -- the framework in which
20   you looked at the different studies, you
21   placed cohort studies higher than
22   case-control studies?
23        MS. MILLER:  Same objection.

Page 23

1         Just make sure you give me
2    time to object.
3         THE WITNESS:  Thank you.
4         So again, I looked at the
5    evidence in totality and saw what
6    it looked like.  I applied
7    established epidemiology
8    principles that say cohort studies
9    have higher degree of evidence for
10   causality above case-control
11   studies.
12   BY MR. TISI:
13   Q.   And you relied, and we'll
14   talk about this, the hierarchy, you
15   referred to that as levels of evidence
16   throughout your report, correct?
17   A.   I believe I do.
18   Q.   Okay.  And you also found,
19   and we'll talk about this, that the
20   statistically significant results in the
21   case-control studies were inconsistent
22   and -- contrary to the
23   nonstatistically significant results of
24   the non-case-control studies, correct?

Page 24

1    A.   What I found is in the
2    case-control studies, about 50 percent of
3    the studies had a statistically
4    significant result with regard to the
5    association between talcum powder use and
6    ovarian cancer.  And I found within the
7    cohort studies none of them had a
8    statistically significant association
9    between the use of perineal talcum powder
10   and ovarian cancer.
11   Q.   And it was your opinion that
12   the nonstatistically significant results
13   were inconsistent with the statistically
14   significant results?
15   A.   So if -- if some -- one
16   thing is statistically significant and
17   another thing is not statistically
18   significant, those are two different
19   things.
20   Q.   Okay.  They may be two
21   different things, but is it your opinion
22   that they are contrary to each other?
23   They are inconsistent?
24   A.   So when -- when I looked at

Page 25

1    the cohort studies, I believe --
2    case-control studies, I want to make
3    sure -- I believe that the range of -- of
4    the risk ratios that -- that were shown
5    went about -- were about fourfold and
6    were higher than the cohort studies of
7    which their range was maybe about
8    1.75-fold, so much tighter and lower.
9    Q.   Okay.  But my question is
10   different.  I'm focusing on statistical
11   significance now.
12        Is it your opinion that the
13   nonstatistically significant results were
14   contrary to the statistically significant
15   results in the studies irrespective of
16   study design?
17        MS. MILLER:  Objection.
18        THE WITNESS:  So I'm not
19   sure what you mean as contrary.
20   And what statisticians, how
21   statisticians and epidemiologists
22   approach problems is you assume
23   the null hypothesis is true, which
24   would mean no association, and

7 (Pages 22 to 25)

Karla Ballman, Ph.D.

Page 26

1  then you look to see if there's
2  evidence of an association.
3       So the cohort studies found
4  no evidence of an association and
5  about half of the -- in a
6  statistically significant sense,
7  and about half of the case-control
8  studies found a statistically
9  significant association.
10 BY MR. TISI:
11      Q.   And so because of your --
12 your opinion that statistically
13 significant results, insignificant
14 results prove the null, and -- and
15 statistically significant results suggest
16 an association, those two conflict with
17 each other and, therefore, we have
18 inconsistency?
19      MS. MILLER:  Objection.
20 That mischaracterizes her
21 testimony.
22      THE WITNESS:  So first of
23 all, you can't prove the null.
24 BY MR. TISI:

Page 27

1       Q.   Okay.
2       A.   Okay.  And so, again, you
3  assume until -- it's sort of like law.
4  You assume innocence until proven guilty.
5       Q.   Okay.
6       A.   And so you assume no
7  association, and you have to see whether
8  or not there is evidence of an
9  association.
10      Q.   Okay.  So changing that a
11 little bit --
12      MS. MILLER:  Were you done?
13 Were you done answering?
14      THE WITNESS:  Well, I'll --
15 I was going to repeat again is
16 that in the cohort studies they
17 consistently found no association,
18 whereas in the case-control
19 studies, even among themselves,
20 some found an association and some
21 did not.
22 BY MR. TISI:
23      Q.   Okay.  And so your -- your
24 view was that statistically significant

Page 28

1  results are inconsistent with the
2  statistically insignificant results?
3       MS. MILLER:  Objection.
4  We've now asked and answered this
5  I think ten times.
6       MR. TISI:  Well, she hasn't
7  answered it.
8  BY MR. TISI:
9       Q.   Go ahead.
10      MS. MILLER:  I disagree.
11 BY MR. TISI:
12      Q.   Are they -- are they
13 inconsistent in your opinion?
14      A.   I believe, as I said, the
15 cohort studies find no association.
16      Q.   Right.
17      A.   And the case-control
18 studies, some of them find an
19 association, some do not.
20      Q.   And so those are
21 inconsistent?
22      MS. MILLER:  Objection.
23      THE WITNESS:  Those are
24 clearly different.

Page 29

1  BY MR. TISI:
2       Q.   And so are they
3  inconsistent?
4       MS. MILLER:  Objection.
5       THE WITNESS:  Those -- those
6  again are clearly different.  And
7  so if -- if -- I think it would be
8  a different situation if -- if,
9  you know, every single study found
10 an association which was not the
11 case here.
12 BY MR. TISI:
13      Q.   Okay.  But consistency is
14 one of the elements of the Bradford Hill
15 criteria, right?
16      A.   That is correct.
17      Q.   Okay.  So I'm using a term
18 of art, okay.
19      Is it your opinion that --
20 that the -- the statistically significant
21 results are inconsistent with the
22 statistically not significant results?
23      A.   I think what I said and what
24 Bradford Hill said, that there -- there

8 (Pages 26 to 29)

Karla Ballman, Ph.D.

Page 30

1 are two ways of looking at consistency.
2        The first level is whether
3 or not they are coming up with
4 statistical significance or not.  So
5 the -- the case-control studies were
6 mixed with that.  And the cohort studies
7 all came up with an -- a nonsignificant
8 result.
9        Q.   Okay.  So those are
10 inconsistent -- in your opinion.  I
11 just -- I really want to focus on my --
12 my question.
13        Is it your opinion that the
14 nonstatistically significant results that
15 you described of the cohort and some of
16 the case-control studies are inconsistent
17 with the case-controlled studies that
18 showed a statistically significant
19 result?
20        A.   And again, I -- I don't know
21 how to answer other than to say that
22 there is a difference between something
23 that's statistically significant and
24 something that's not.

Page 31

1        If that's your definition of
2 inconsistency, then in that regard, they
3 are inconsistent.
4        Q.   Doctor, I -- you applied the
5 Bradford Hill criteria which is
6 consistency is an element.  And I'm
7 asking you, using that framework, are
8 statistically significant results that
9 you have described inconsistent with the
10 statistically significant results?
11        A.   So give me a minute here.  I
12 want to make -- I'm thinking perhaps I
13 stated it more clearly in here.
14        So it's my opinion that the
15 consistency of the association criteria
16 has not been demonstrated.
17        Q.   And is that because there
18 are statistically significant results on
19 one hand and statistically insignificant
20 results on the other hand?
21        MS. MILLER:  Objection.  I
22 think she's now asked and answered
23 this 20 times.
24        MR. TISI:  She hasn't.

Page 32

1 She's been dancing around the
2 question.
3        THE WITNESS:  So the
4 case-control studies generally
5 report risk ratios greater than
6 one.  A little over half are
7 statistically significant.  And
8 the range of the magnitude of the
9 estimate is quite large.  There's
10 no consistency between the --
11        MS. SHARKO:  You've got to
12 read much slower.
13        MR. TISI:  We're going to
14 have one or two.  We're going to
15 back to what you said -- what you
16 said to me yesterday, that we only
17 have one person.
18        MS. MILLER:  All she said
19 was that she should read more
20 slowly.
21        MR. TISI:  I understand.
22        MS. MILLER:  I can tell her
23 that.
24        MR. LOCKE:  If you would

Page 33

1 encourage that, that was something
2 that you did in breach.
3 BY MR. TISI:
4        Q.   Go ahead.
5        MS. MILLER:  If you read too
6 quickly, the court reporter can't
7 take it down.
8        THE WITNESS:  Sorry about
9 that.
10        So "Although the
11 case-control studies generally
12 report risk ratios greater than
13 one, and a little over half of the
14 studies had statistically
15 significant results, the range of
16 the magnitude is quite large."
17        And then I do say, "More
18 importantly there is no
19 consistency between the
20 case-control studies and the
21 cohort studies."
22 BY MR. TISI:
23        Q.   And is that in part because
24 of the statistical significance?

9 (Pages 30 to 33)

Karla Ballman, Ph.D.

Page 34

1      MS. MILLER: Objection.
2          THE WITNESS: I think I
3  just -- I just stated that there.
4  BY MR. TISI:
5      Q.   Okay.  Then that's -- then
6  that's the answer.  I appreciate that.
7          Okay.  Could you turn to
8  Page 53 of your -- first of all, after
9  weighing the evidence, did you reach a
10  conclusion about the causation question?
11      MS. MILLER: Objection.
12  Vague.
13          THE WITNESS: Yeah.  What --
14      MR. TISI: Okay.  Let me ask
15      the question.
16  BY MR. TISI:
17      Q.   After weighing all the
18  evidence that you collected, did you
19  reach a conclusion about whether, in your
20  opinion, to a reasonable degree of
21  certainty, that talcum powder does or
22  does not cause ovarian cancer?
23      A.   So it is my professional
24  opinion that there is no evidence of a

Page 35

1  causal relationship between talcum powder
2  exposure and ovarian cancer.
3      Q.   And you used your
4  professional judgment based upon your
5  experience and training to reach that
6  conclusion?
7      A.   It's based on my extensive
8  and rigorous review of the epidemiology
9  studies, and to some extent my review of
10  the scientific literature and my
11  experience and expertise in assessing
12  studies for level of evidence of the
13  data.
14      Q.   Okay.  And did you use your
15  professional judgment in reaching that
16  conclusion?
17      A.   I don't know what you mean
18  by professional judgment.
19      Q.   Did you -- did you use your
20  judgment in looking at the data?
21      A.   I --
22      MS. MILLER: Objection.
23      THE WITNESS:  I'm sorry.
24      I applied epidemiological

Page 36

1  principles in reaching that
2  conclusion.
3  BY MR. TISI:
4      Q.   Okay.  And in applying those
5  principles in your judgment, there is no
6  evidence of causation, true?
7      MS. MILLER: Objection.
8  That mischaracterizes the
9  testimony again.
10      MR. TISI: I'm asking the
11  question. I'm asking --
12      MS. MILLER: Yeah, but
13  you're mischaracterized her
14  testimony.
15      MR. TISI: I'm asking her a
16  question, Counsel.  You are --
17      MS. MILLER:
18  Mischaracterizing her testimony.
19      MR. TISI: Fine, object.
20      MS. MILLER: I am.
21      MR. TISI: Good.
22      THE WITNESS: May you repeat
23  that, please.
24  BY MR. TISI:

Page 37

1      Q.   Yes, in your judgment based
2  upon your analysis of the evidence, the
3  epidemiologic and non-epidemiologic
4  evidence, you have concluded that there
5  is no risk of ovarian cancer with talcum
6  powder products?
7      MS. MILLER: Objection.
8  Same objection.
9      THE WITNESS: I'm sorry.  I
10  keep not --
11      I believe I said that I
12  applied established
13  epidemiological principles in
14  evaluating the data in totality
15  and came to the conclusion that
16  the evidence does not support a
17  causal relationship between talcum
18  powder exposure and ovarian
19  cancer.
20  BY MR. TISI:
21      Q.   Now, if you look on Page 53,
22  of your report you have a conclusion.
23      A.   Yes.
24      Q.   And on the conclusion, you

10 (Pages 34 to 37)

Karla Ballman, Ph.D.

Page 38

1    state the following.  You state, "In my
2    professional opinion, there is no
3    evidence of a causal relationship between
4    perineal genital talcum powder exposure
5    and ovarian cancer.  This is based on my
6    extensive and rigorous review of the
7    epidemiology studies, and to a lesser
8    extent my review of the scientific
9    literature, and my experience and
10   expertise in assessing studies for the
11   level of evidence in the data."
12            Did I read that correctly?
13       A.   You did read that correctly.
14       Q.   And that is your opinion?
15       A.   It's what I wrote there.
16       Q.   Okay.  I'm going to mark,
17   just so we don't have to read the whole
18   report and come back to that.
19            (Document marked for
20       identification as Exhibit
21       Ballman-2.)
22            MR. TISI:  This is your
23       opinion.  I'm going to mark this
24       as Exhibit Number 2, which is the

Page 39

1            statement that I just read.
2    BY MR. TISI:
3        Q.   And you can keep that and
4    put that aside for a moment.  We're going
5    to come back to that.
6             Are the bases for this
7    Ballman causation conclusion all
8    described in your epidemiology report
9    which we've marked as Exhibit Number 1?
10       A.   I'm sorry.  Could you repeat
11   the question?
12       Q.   Yes.  Are the bases for your
13   conclusion that is in Exhibit Number 2
14   all described in your report which is
15   Exhibit Number 1?
16       A.   I believe that is the case.
17   I go through and support and describe the
18   methods that I used and the reasons why I
19   came to various conclusions.
20       Q.   Okay.  We discuss this in
21   more detail, but let me just back up for
22   a minute.
23            You're not a gynecologist,
24   true?

Page 40

1        A.   I am not a gynecologist.
2        Q.   You are not an oncologist?
3        A.   I am not an oncologist.
4        Q.   You are not now nor have you
5    ever been licensed to practice medicine
6    in any jurisdiction?
7        A.   That is correct.
8        Q.   You're not a toxicologist?
9        A.   That is correct.
10       Q.   You're not a mineralogist?
11       A.   That is correct.
12       Q.   You're not a geologist?
13       A.   That is correct.
14       Q.   In fact, you do not have a
15   formal degree from any university in
16   epidemiology, do you?
17       A.   My degree is in operations
18   research.  And it might be of interest
19   that Bradford Hill's degree actually was
20   in economics.  And I feel we followed
21   sort of the same career path in that our
22   jobs that we took subsequently, first of
23   all, we had the basis, the quantitative
24   basis.  I had some statistics courses as

Page 41

1    part of my degree.  I also took some -- I
2    don't know if it was for credit or not --
3    a seminar that was looking at sort of
4    confounding and biases in published
5    literature.  And so that sort of sparked
6    my interest in statistics.  And since
7    statistics was one of the tools in the
8    toolbox of operations research, my career
9    started going the direction of
10   statistics.
11            MR. TISI:  Okay.  I'm going
12       to move to strike.
13   BY MR. TISI:
14       Q.   My question was:  Do you
15   have a formal degree from any university
16   in epidemiology?
17       A.   Again, I have no formal
18   degree, but I have extensive experience
19   in epidemiology and statistics through my
20   20 years of work.  I mean, that's what I
21   do day in and day out.
22       Q.   So the record is clear, you
23   do not have a Ph.D. in epidemiology,
24   correct?

11 (Pages 38 to 41)

Karla Ballman, Ph.D.

Page 42

1        MS. MILLER: Objection.
2        THE WITNESS: My Ph.D. is in
3    operations research. But what I'm
4    saying is I have --
5    BY MR. TISI:
6        Q.   I understand what you're
7    saying. I need to --
8        MS. MILLER: Please don't
9    interrupt the witness.
10       MR. TISI: No, we're going
11   to -- we're going to --
12       MS. MILLER: No. No, you're
13   not going to interrupt her.
14       MR. TISI: We will call --
15   no. We're going to call the
16   judge. I asked her a very
17   simple --
18       MS. MILLER: That's fine.
19       MR. TISI: -- question.
20       MR. MILLER: That's fine if
21   you're going to call the judge --
22   BY MR. TISI:
23       Q.   Are you --
24       MR. MILLER: -- and I'll

Page 43

1    tell the judge that you are interrupting
2    the witness.
3    BY MR. TISI:
4        Q.   Are you -- are you -- do you
5    hold a Ph.D. in -- in epidemiology?
6        MS. MILLER: Objection.
7    Asked and answered twice.
8        THE WITNESS: I do not have
9    a Ph.D. in epidemiology, but I was
10   explaining that I do have
11   extensive experience in statistics
12   and epidemiology. That's all I've
13   been doing, living and breathing
14   for the last 20 years.
15   BY MR. TISI:
16       Q.   Do you have a masters degree
17   in epidemiology?
18       A.   My masters degree is in
19   operations research which contains,
20   again, some statistical training and some
21   training in epidemiology. But the formal
22   degree is operations research.
23       Q.   In fact, when you introduce
24   yourself to your professional colleagues,

Page 44

1    you do introduce yourself as a
2    statistician, correct?
3        MS. MILLER: Objection.
4        THE WITNESS: So it depends
5    what colleagues I'm introducing
6    myself to. I mean, sometimes I
7    introduce myself as a clinical
8    researcher.
9    BY MR. TISI:
10       Q.   Okay. Do -- when you speak
11   to the FDA, do you introduce yourself as
12   a statistician?
13       A.   When I speak to the FDA, I
14   do introduce myself as a statistician,
15   because usually, you know, it just again
16   depends upon what skills the individuals,
17   you know, are -- are in need at that
18   time.
19       But I have to say that there
20   is incredible overlap between
21   biostatistics and epidemiology. If you
22   look at any first textbook you will see
23   basically the same topics in -- whether
24   the book says epidemiology on it or

Page 45

1    whether the book says statistics on it.
2    And, in fact, many departments and
3    divisions across the country, like my
4    own, are departments and divisions of
5    biostatistics and epidemiology, just due
6    to the amount of overlap when it comes to
7    medical research.
8        Q.   Doctor, I'm going to -- I'm
9    really going to stop and we're going to
10   call the judge.
11       I am asking you a very
12   simple, straightforward question.
13       When you introduce yourself
14   to the FDA, do you list yourself as a
15   statistician, yes or no?
16       MS. MILLER: Objection.
17   Objection. If she doesn't feel
18   like yes or no is a proper answer,
19   she needs to give you the full
20   context.
21       MR. TISI: Well, she -- I
22   will ask her -- if she needs to
23   give me full context, she can tell
24   me that and I will then ask a

12 (Pages 42 to 45)

Karla Ballman, Ph.D.

Page 46

1 follow-up.
2     MS. MILLER:  Please don't --
3 BY MR. TISI:
4     Q.   Are you -- when you
5 introduce yourself to the FDA --
6     MS. MILLER:  Please don't
7     argue with me.
8 BY MR. TISI:
9     Q.   -- do you introduce yourself
10 as a statistician?
11     A.   When we go around the room
12 and say -- I -- I say I -- when I
13 introduce myself around the room, when we
14 have to introduce ourselves at FDA
15 meetings, I say, usually, "I'm Karla
16 Ballman, the division chief of
17 biostatistics and epidemiology.  I am a
18 statistician."
19     Q.   Okay.  When you apply for
20 grants for research, do you describe
21 yourself as a statistician?
22     A.   I don't know if I state
23 anywhere in a grant for research as to if
24 I'm a statistician or not.  It's usually

Page 47

1 investigator or co-investigator.
2     Q.   Okay.  Let's move to another
3 topic.
4         You know I represent women
5 who claim their use of Johnson &
6 Johnson's talcum powder products caused
7 ovarian cancer, true?
8     A.   I -- I don't know what you
9 do.
10     Q.   Okay.  When we were first --
11 when were you first contacted by J&J's
12 lawyers to consult on the question that
13 you have given your report on regarding
14 the link between ovarian cancer and
15 talcum powder products, or the lack of a
16 link?
17     MS. MILLER:  Objection.
18     THE WITNESS:  I was
19     contacted by Johnson & Johnson
20     lawyers, I was contacted by
21     Ms. Sharko in November of 2018.
22 BY MR. TISI:
23     Q.   Okay.  Prior to being
24 retained by lawyers at J&J, have you ever

Page 48

1 researched the causation question that
2 you are here to testify about today?
3     A.   I had read some literature.
4     Q.   Okay.
5     A.   Did not perform formal
6 research.
7     Q.   Okay.  Had you ever reached
8 a conclusion about whether or not talcum
9 powder products cause ovarian cancer
10 before being retained by Ms. Sharko?
11     A.   No.
12     Q.   Prior to being retained by
13 Johnson & Johnson lawyers to defend them
14 in lawsuits, have you ever expressed an
15 opinion one way or the other as to
16 whether or not talcum powder products are
17 capable of causing ovarian cancer?
18     MS. MILLER:  Objection.  She
19     wasn't retained to defend us.
20     MR. TISI:  Okay.  Then let
21     me rephrase the question.
22     MS. MILLER:  But we're the
23     lawyers.  Not -- not she.
24 BY MR. TISI:

Page 49

1     Q.   Where -- before being
2 contacted by the lawyers to be a
3 potential expert in litigation involving
4 women who claim that they may die as a
5 result of ovarian cancer caused by talcum
6 powder products, did you ever express an
7 opinion about whether or not talcum
8 powder products cause ovarian cancer?
9     MS. MILLER:  Objection.
10     Your restated question was as
11     objectionable as your first
12     question.
13     THE WITNESS:  And I'm sorry.
14     That was a very long question.  So
15     I don't know when I answer it
16     what -- what I'm agreeing to and
17     what I'm not agreeing to, so could
18     you --
19 BY MR. TISI:
20     Q.   Prior to -- then let me
21 rephrase the question.
22         Prior to November of 2018
23 have you ever expressed an opinion as to
24 whether or not talcum powder products

Karla Ballman, Ph.D.

Page 50

1  cause ovarian cancer?
2       A.   Not in any sort of formal
3  sense.  I don't know if in casual
4  conversation someone may have said what
5  do you think.  But no, I didn't read a
6  form -- a formal opinion.
7       Q.   Okay.  Is it fair to say
8  that the opinions that you have on the
9  subject about whether or not talcum
10 powder products cause ovarian cancer
11 occurred after you've spoke to the
12 lawyers for the first time in November of
13 2018?
14       MS. MILLER:  Objection.
15       THE WITNESS:  So my opinion
16 as to whether or not there is
17 evidence that talcum powder causes
18 ovarian cancer, is based upon the
19 research that I had done.
20       I -- I did not reach a
21 formal opinion until I had done
22 the research and looked at the
23 data in totality.
24 BY MR. TISI:

Page 51

1       Q.   And that was after November
2  of 2018?
3       A.   Well, I -- I -- that's when
4  I started the research --
5       Q.   Right.
6       A.   -- on -- on the issue.
7       Q.   So the answer to my question
8  is, the first time you ever reached a
9  conclusion based upon your evaluation of
10 the data did not occur until after you
11 first met with Ms. Sharko in 2018 --
12       MS. MILLER:  Object.
13 BY MR. TISI:
14       Q.   -- November?
15       MS. MILLER:  Objection.
16       THE WITNESS:  So -- so how I
17 would say it is I did not start
18 doing research on the issue until
19 after November of 2018.  And as a
20 result of that research, I reached
21 a conclusion which obviously,
22 since I didn't start the research
23 until November, I didn't reach the
24 conclusion until after November.

Page 52

1  BY MR. TISI:
2       Q.   And that would have been
3  after you met with the lawyers for
4  Johnson & Johnson, correct?
5       A.   I was --
6       MS. MILLER:  Objection.
7       Please remember to give me
8  time to object.
9       THE WITNESS:  I did not
10 start the research until after
11 November 2018.
12 BY MR. TISI:
13       Q.   When you first met the
14 Johnson & Johnson lawyers?
15       MS. MILLER:  Objection.
16       THE WITNESS:  Again, I had
17 no reason to do any research
18 before that, and so I started the
19 research after I was retained to
20 do -- to render an opinion.
21 BY MR. TISI:
22       Q.   Now, is it fair to say that
23 you never published on the subject of
24 talcum powder and ovarian cancer?

Page 53

1       A.   That is correct.  There are
2  no publications with my name on it.
3       Q.   And though you have by my
4  count over 200 publications in the
5  literature, you didn't cite any of your
6  own literature for -- or any of your
7  published work in your report, correct?
8       A.   I again just used the
9  research tools that I use when I do any
10 sort of research.  And, you know, there
11 are many publications, as you see, that I
12 have there where I cite none of my own
13 work.  I just use what's relevant to
14 doing research for the question at
15 hand.
16       Q.   And your work was not
17 relevant to your report, correct?
18       MS. MILLER:  Objection.
19 BY MR. TISI:
20       Q.   Or you would have cited it?
21       MS. MILLER:  Objection.
22       THE WITNESS:  So my
23 experience is extremely relevant
24 to my opinion, and my work is my

Karla Ballman, Ph.D.

Page 54

1    experience.  And so --
2  BY MR. TISI:
3    Q.    Okay.  But your published
4  research, you did not rely on any of your
5  published research in crafting your
6  report because it's not -- it's not in
7  the bibliography or the -- anything
8  relied on that was given to us, so I'll
9  represent to you that I looked through
10  all -- all of your citations, and there's
11  not a single reference to any of your
12  published work.  Is that accurate?
13        MS. MILLER:  Objection.
14        THE WITNESS:  So there are
15    no references --
16  BY MR. TISI:
17    Q.    Okay.
18    A.    -- to my own published work.
19  But that wasn't necessary -- in my --
20  that -- because it was based upon my
21  experience and I used what were the
22  relevant pieces of the epidemiology and
23  actually, you know, the reports that I
24  read, and that is in my report.

Page 55

1    Q.    Okay.  And you know that the
2  first epidemiologic study that described
3  the potential association between talcum
4  powder products and ovarian cancer was
5  published by researchers out of Harvard
6  University in 1982, correct?
7        MS. MILLER:  Objection.
8        THE WITNESS:  So it -- I
9    don't know with complete
10    confidence, but I do know that the
11    first publication that I reviewed
12    that had an association in it, I
13    believe was in 1982 by Cramer.
14  BY MR. TISI:
15    Q.    Okay.  I'm just going to,
16  for purposes of the record, I will attach
17  the Cramer article as Exhibit Number 3.
18        (Document marked for
19    identification as Exhibit
20    Ballman-3.)
21  BY MR. TISI:
22    Q.    Is that the same -- Exhibit
23  Number 3 the Cramer article that you
24  referenced?

Page 56

1    A.    Yes.  I do reference this
2  article.
3    Q.    Okay.  Since 1982, you would
4  agree with me that there are over 30
5  epidemiologic studies that have been
6  published?
7    A.    Since this time, I believe
8  the studies that I have in my report and
9  I reviewed included a total of about 30
10  that were case-control studies or cohort
11  studies, and meta-analyses.
12    Q.    Right.  So between 1982 and
13  the time that we sit here today in 2019,
14  there are over 30 studies, and these
15  include population-based case-control
16  studies, correct?
17    A.    There are population-based
18  case-control studies.
19    Q.    They include hospital-based
20  case-control studies, right?
21    A.    There are hospital-based
22  case-control studies.
23    Q.    Cohort studies, which you
24  mentioned.

Page 57

1    A.    There are cohort studies.
2    Q.    Meta-analyses of the
3  epidemiologic studies?
4    A.    There are meta-analyses of
5  the observational studies.
6    Q.    A pooled analysis?
7    A.    There is a pooled analysis.
8    Q.    And there are biologic
9  studies, which you also refer to?
10    A.    There are -- there are some
11  biological studies.
12    Q.    Okay.  And of all those
13  studies in the past 40 years, you have
14  not been involved in any of them, your
15  name doesn't appear in any of those
16  studies, correct?
17    A.    I am not an author on any of
18  those studies that you cited.
19    Q.    Well, you were not involved
20  in any way in any of those studies,
21  correct, because your involvement in
22  this -- this issue didn't really happen
23  until after November of 2018, correct?
24    A.    So involvement, I'm not sure

15 (Pages 54 to 57)

Karla Ballman, Ph.D.

Page 58

1  how to quite interpret that.  I mean, I
2  have vast amount of experience of
3  analyzing data that are in these types of
4  studies --
5        MS. MILLER:  Please don't
6     interrupt her.
7        THE WITNESS:  -- in terms of
8     coming to a conclusion.
9  BY MR. TISI:
10     Q.   Doctor, I'm not asking you
11  what your background is now.  I'm asking
12  you prior to November of 2018, had you
13  ever been involved in any study,
14  observational or otherwise, in any
15  capacity involving talcum and ovarian
16  cancer?
17     A.   I have no publications in
18  talc and ovarian cancer.
19     Q.   I'm not limiting it to
20  publications.  I'm asking you, had you
21  had any involvement in any fashion with
22  any study involving ovarian cancer and
23  talc?
24     A.   So again, I'm not sure what

Page 59

1  you mean by the term "involvement." I
2  mean --
3     Q.   Did anyone -- then I'll
4  rephrase it.  Okay.
5        Did anyone ever call you and
6  say, "You know, we're doing a study,
7  Dr. Ballman.  Can you give us your
8  informal advice on how to design it,"
9  involving ovarian cancer --
10        MS. MILLER:  Objection.
11  BY MR. TISI:
12     Q.   -- and talcum powder
13  products?
14        MS. MILLER:  Objection.
15        THE WITNESS:  I have not
16     received such a phone call.
17  BY MR. TISI:
18     Q.   Okay.  And would you agree
19  with me that there are literally dozens
20  of scientists that have been involved in
21  this issue over 40 years, involved in the
22  epidemiology studies, toxicologists,
23  pharmacologists, mineralogist, have been
24  involved in the ovarian cancer talc issue

Page 60

1  for over 40 years.  You've seen -- you've
2  seen articles across the spectrum,
3  correct?
4        MR. LOCKE:  Objection.
5        MS. MILLER:  Objection.
6     That's like seven different
7     questions all in one.
8        MR. TISI:  Yes.
9  BY MR. TISI:
10     Q.   There are multiple
11  scientists -- let me rephrase the
12  question.
13        There are multiple
14  scientists from multiple disciplines that
15  have looked at the questions related to
16  ovarian cancer and talc for over
17  40 years, true?
18        MS. MILLER:  Objection.
19        THE WITNESS:  So I don't
20     know what you mean by "multiple."
21     But when there's any sort of topic
22     that's researched, it involves,
23     you know, many different people.
24     It's never -- I mean, it's not

Page 61

1     valuable research if it's just one
2     person.  So I don't think talcum
3     powder and ovarian cancer is any
4     different from any other research
5     field that you had mentioned.
6  BY MR. TISI:
7     Q.   Right.  And so the answer to
8  the question is there are literally
9  dozens of scientists across the spectrum
10  that have been looking at these issues
11  and publishing in this area for 40 years,
12  true?
13        MS. MILLER:  Objection.
14        THE WITNESS:  I can't answer
15     that with certainty.  I don't know
16     how many scientists.  I don't know
17     how long it's been --
18  BY MR. TISI:
19     Q.   There are many.  How about
20  many?
21     A.   Just like any other research
22  topic, it's -- it's what one would
23  expect, yes.
24     Q.   Okay.  Have any of them been

16 (Pages 58 to 61)

Karla Ballman, Ph.D.

Page 62

```
 1    you?
 2            MS. MILLER:  Objection.
 3    We've been through this.
 4            THE WITNESS:  You know, I --
 5    I have not done myself a study in
 6    ovarian cancer, a published study
 7    in ovarian cancer and talc.  I
 8    have done research on this topic
 9    as we talked about after
10    November 2018 --
11    BY MR. TISI:
12       Q.   Okay.
13       A.   -- using all the expertise I
14    have in similar types of studies that
15    I've been involved in, but just didn't
16    have the topic ovarian cancer and talcum
17    powder.
18       Q.   Now, I can represent to you
19    that Johnson & Johnson has produced, as
20    they tell me all the time, millions of
21    pages of documents in connection with
22    this litigation.  And I'll represent that
23    to you.  And that covers the time span
24    since the 1960s and perhaps even before.
```

Page 63

```
 1           Would it surprise you that
 2    your name, Karla Ballman, isn't mentioned
 3    as having been contacted even once by
 4    Johnson & Johnson on the issue of ovarian
 5    cancer and talcum powder products in that
 6    whole time?
 7            MS. MILLER:  Objection.
 8            THE WITNESS:  I wouldn't --
 9    I'm -- don't even know how to
10    answer that.
11    I -- I wouldn't know why a
12    company would contact me or have
13    my name in any sort of documents
14    that -- that they generated if I
15    hadn't been working with the
16    company.  I just don't know how to
17    answer that.
18    BY MR. TISI:
19       Q.   Would it surprise you that
20    there's no -- nobody ever mentioned we
21    need to contact Karla Ballman and obtain
22    her expertise about whether or not talcum
23    powder product caused ovarian cancer in
24    that 40-year period?
```

Page 64

```
 1            MS. MILLER:  Objection.
 2    Asked and answered.
 3            THE WITNESS:  Yeah, again, I
 4    just don't know why -- why a
 5    company -- I -- I don't know how
 6    companies operate.  I don't know
 7    if they engage experts to do
 8    research for them personally.
 9            I mean, some companies may
10    and some companies may not, I just
11    don't know.
12    BY MR. TISI:
13       Q.   Johnson & Johnson never
14    contacted you in 40 years to ever perform
15    a study or advise them in any fashion
16    about either how to design a study to
17    look at the question of ovarian cancer,
18    did they?
19       A.   I --
20            MS. MILLER:  Objection.
21    Please give me ten seconds.
22            THE WITNESS:  I know it.
23    I'm so sorry.
24            MS. MILLER:  That's all it
```

Page 65

```
 1    takes.
 2            THE WITNESS:  Again, I'm
 3    just at a loss.  I don't know why
 4    they would.
 5    BY MR. TISI:
 6       Q.   Okay.  Well --
 7       A.   Because again, I don't know
 8    if they do research.  I don't know if
 9    they contact people to do research from
10    them for them, so I -- I just don't --
11       Q.   Well, I'll represent to you
12    that they have.  Okay.
13            Among other people they've
14    contacted, do you know who Ken Rothman
15    is?
16       A.   No.
17       Q.   You don't know -- you
18    testified in your Viagra litigation that
19    you knew who Ken Rothman was.  He's an
20    epidemiologist who published a textbook
21    on epidemiology.
22       A.   Oh, yeah.
23       Q.   Do you remember that?
24       A.   Yeah, yeah, yeah, yeah,
```

17 (Pages 62 to 65)

Karla Ballman, Ph.D.

Page 66

1    yeah.  I don't know him personally.
2         Q.   Right.  But he is a -- he is
3    a well-established epidemiologist,
4    correct?
5              MS. MILLER:  Objection.
6              THE WITNESS:  He is an
7         epidemiologist and I've heard his
8         name.
9    BY MR. TISI:
10        Q.   Right.  And you also --
11   and -- contacted Drs. Huncharek and
12   Muscat.  You've seen those names,
13   correct?
14        A.   I have seen those names.
15        Q.   Okay.  And I'm going to tell
16   you, over the course of 40 years, they
17   have contacted people from various
18   disciplines to -- for various questions
19   related to talc and ovarian cancer.  I
20   want to ask you to assume that that is
21   true.  And I will --
22             MS. MILLER:  Objection.
23             MR. TISI:  I haven't even
24        asked the question, counsel.

Page 67

1              MS. MILLER:  I didn't even
2         know.  I can't tell what's a
3         question and what's a lecture.
4              MR. TISI:  Well, then
5         wait -- wait till the end.
6    BY MR. TISI:
7         Q.   At no time did any scientist
8    or regulatory person from Johnson &
9    Johnson ever contact Dr. Ballman to ask
10   her opinions until the lawyers contacted
11   you in November of 2018, would that be a
12   true statement?
13             MS. MILLER:  Objection.
14             THE WITNESS:  Again, as I
15        said, I -- I just don't know how
16        companies operate.  You tell me
17        they've had -- they hire experts
18        and I have no evidence one way or
19        another if they do.
20             But I had not been contacted
21        by Johnson & Johnson, but I don't
22        know if that's unusual.  I just --
23   BY MR. TISI:
24        Q.   I'm not asking you whether

Page 68

1    it's unusual.  I'm just asking you the
2    simple question.  They never -- none of
3    the lawyers -- excuse me.
4              None of the scientists at
5    Johnson & Johnson ever contacted you over
6    the past 40 years to seek your advice,
7    true?
8         A.   I have not been --
9              MS. MILLER:  Objection.
10             THE WITNESS:  Oh, sorry.
11   BY MR. TISI:
12        Q.   You may answer.
13        A.   Yeah.
14        Q.   She is going to object to
15   everything, so just --
16        A.   I'll wait, I need to wait.
17             MS. MILLER:  I'm not going
18        to object if you don't ask
19        objectionable questions.
20             MR. TISI:  Okay.
21             MS. MILLER:  It's a simple
22        solution.
23             THE WITNESS:  I have not
24        been contacted by anyone in

Page 69

1         Johnson & Johnson.
2    BY MR. TISI:
3         Q.   Related to the issue of
4    talcum powder products and ovarian
5    cancer, true?
6         A.   If you don't count the
7    lawyers, and I'm not sure what that
8    relationship means, I -- I have not.
9         Q.   Okay.  Would it surprise you
10   that when we looked in the Johnson -- in
11   the millions of pages of documents that
12   Johnson & Johnson sent to us, that not a
13   single article of research that you have
14   ever done has appeared in -- in any
15   bibliography for any issue related to
16   ovarian cancer, would that surprise you?
17             MS. MILLER:  Objection.
18             THE WITNESS:  You know,
19        again, I don't know what documents
20        or what's in those million pages.
21        So I don't know if that would
22        surprise me or not.
23   BY MR. TISI:
24        Q.   Well, can you think of any

18 (Pages 66 to 69)

Karla Ballman, Ph.D.

1    article that you've ever written that
2    would be relevant to the question of
3    whether or not ovarian cancer is caused
4    by talcum powder products?
5        MS. MILLER: Objection.
6        THE WITNESS: Well, I have
7    expertise in other -- in -- in
8    just sort of this type of thing in
9    general. But if -- if it's
10   related to ovarian cancer and
11   talcum powder as we discussed,
12   there would not be any
13   publications with my name on it
14   that -- that address ovarian
15   cancer and talcum powder.
16   BY MR. TISI:
17   Q.   Now, even as of today, we're
18   now in March of 2019, since Ms. Sharko
19   found you as an expert witness in this
20   litigation, have you ever been in contact
21   with any J&J scientist that -- where they
22   said well, now that we found you,
23   Dr. Ballman, maybe you can help us design
24   a study or give us your advice on

1    causation or any -- anything related to
2    talcum powder products and ovarian
3    cancer, have you spoken to any scientist
4    at J&J since November of 2018?
5        A.   I have not spoke --
6        MS. MILLER: You've got to
7    let me object. There was like,
8    seven questions in there. You've
9    got to give me time to object.
10   That was objectionable.
11       THE WITNESS: Can you
12   rephrase? Not rephrase. Just
13   repeat.
14   BY MR. TISI:
15   Q.   Since you've been found as
16   an expert witness in November of 2018,
17   has any scientist at Johnson & Johnson
18   reached out to you to ask your opinion on
19   talcum powder products and ovarian
20   cancer?
21       A.   Since I have been retained
22   by the lawyer -- by Johnson & Johnson in
23   2018 for this case, I have not been
24   contacted by anyone in Johnson & Johnson.

1        Q.   Okay. And that would be for
2    research, correct?
3        A.   I haven't been contacted by
4    anyone in Johnson & Johnson.
5        Q.   And that would be to help
6    them in any regulatory issue, correct?
7        A.   I have not been contacted by
8    anyone in Johnson & Johnson.
9        Q.   Okay. So it's the
10   company -- and I'm distinction the
11   company from the lawyers.
12       The company has not spent
13   any time and effort trying to understand
14   your opinions or the basis of it, just
15   the lawyers, true?
16       MS. MILLER: Objection.
17       THE WITNESS: Again, I'm not
18   sure how to answer that because I
19   was retained in terms of the
20   litigation. I don't know if
21   there's any rules that surround
22   that or whatever. I have no idea.
23   BY MR. TISI:
24   Q.   But the answer would be no,

1    you've not been retained and spoken to
2    anybody at Johnson & Johnson in
3    connection with any scientific question
4    outside of the legal arena, correct?
5        A.   As I mentioned, I have not,
6    as far as I know, talked to anyone from
7    Johnson & Johnson.
8        Q.   In fact, Johnson & Johnson
9    makes hundreds of products for
10   pharmaceuticals, medical devices and
11   cosmetics. You know that to be true,
12   correct?
13       MS. MILLER: Objection.
14       THE WITNESS: I know they
15   make lots of products. I don't
16   know how many. I don't know what
17   the span is of the different
18   areas.
19   BY MR. TISI:
20   Q.   Has any Johnson & Johnson
21   scientist ever reached out to you to help
22   them understand any scientific question
23   for any reason?
24       MS. MILLER: Objection.

Karla Ballman, Ph.D.

Page 74

1        THE WITNESS:  Again, I don't
2    know how companies operate.  I
3    don't know -- I mean I presume
4    they have their own scientists.
5    I'm not sure if they are reaching
6    out.  I just --
7  BY MR. TISI:
8        Q.   I'm asking you what they did
9  for you.  And I am not asking you to get
10 in their mind and figure out what their
11 policies are or anything like that.
12       Has Johnson & Johnson, any
13 Johnson & Johnson scientist ever reached
14 out to Dr. Karla Ballman to ask her help
15 in understanding any scientific question
16 for any reason?
17       A.   Again, I have not talked to
18 anyone in an official capacity from
19 Johnson & Johnson.
20       Q.   And you have a career
21 spanning how many decades now?
22       A.   Oh, easily about two to
23 three decades.
24       Q.   Okay.  And in that two or

Page 75

1  three decades, no one from Johnson &
2  Johnson ever reached out to you and asked
3  you, "Hey, you know, we got this problem
4  here.  Can you help us design a study or
5  analyze data, perform a causation
6  analysis," anything scientist related?
7        MS. MILLER:  Objection.
8        THE WITNESS:  So I am in
9    academia.  So, you know, I don't
10   know why they would necessarily
11   reach out to me in particular.  No
12   other companies do either.
13 BY MR. TISI:
14       Q.   You've never done studies
15 for any company?
16       A.   I didn't say that.
17       Q.   Okay.  You've done studies
18 for companies, true?  You've done studies
19 that have been sponsored by companies,
20 correct?
21       A.   So now you'll have to
22 define --
23       Q.   Have you received funding
24 from companies to do studies?

Page 76

1        A.   I believe -- myself, or just
2    the institution I work for?
3        Q.   Your team.  You and your --
4    anybody that you may collaborate with?
5        A.   There might have been one or
6    two occasions.
7        Q.   Okay.  But they've not been
8    Johnson & Johnson?
9        A.   That is correct.
10       Q.   Johnson & Johnson never
11 asked you to represent them on any issue
12 before the FDA related to talcum powder
13 products, have they?
14       MS. MILLER:  Objection.
15       THE WITNESS:  I have not
16   been before the FDA on behalf of
17   Johnson & Johnson.
18 BY MR. TISI:
19       Q.   For any reason including --
20       A.   For any reason.
21       Q.   Okay.  You know that IARC
22 looked at the question of ovarian cancer
23 and talcum powder products in 2006
24 correct?

Page 77

1        A.   I read a report from IRAC
2    (sic) who -- that looked at that
3    question.
4        Q.   And were you asked by
5    anybody in the talc industry to help them
6    understand that talc-ovarian-cancer
7    connection in connection with the IARC
8    proceedings in 2006?
9        A.   I was not part of the IRAC
10   (sic) committee that looked at that
11   question.
12       Q.   You say IRAC.  Is it IRAC
13 or --
14       A.   I'm sorry.  IARC.  I know.
15 I did that -- I do that often.
16       Q.   That's okay.  I do it too.
17       A.   It's IARC.
18       Q.   Okay.  And what does IARC
19 stand for?
20       A.   International Agency -- I
21 don't remember the title.  I can get it.
22       Q.   Did J&J scientists --
23       MS. MILLER:  Wait.  She's
24   looking for the answer.

Karla Ballman, Ph.D.

1      MR. TISI:  Actually, that's
2   fine.
3      MS. MILLER:  Are you
4   striking the question?
5      MR. TISI:  No, I just --
6   it's fine.
7      MS. MILLER:  If you're not
8   striking the question --
9      MR. TISI:  She didn't
10   know -- she didn't know the
11   answer.
12      MS. MILLER:  Well, she's
13   checking her report and she'd like
14   to finish answering.
15   BY MR. TISI:
16      Q.   Do you know without looking
17   in your report, Doctor?
18      A.   I am not very good at all
19   acronyms and stuff.
20      Q.   Okay.
21      A.   And as you see I don't even
22   pronounce them correctly because I get
23   the letters mixed up.  So I want to be
24   correct when I say what the title is

1   of -- of that agency.
2          And it's right here
3   somewhere.  International Agency For
4   Research on Cancer.
5      Q.   Have you ever been asked by
6   can IARC to participate in any
7   deliberation about whether or not a
8   substance causes cancer?
9      A.   I have not been on any IARC
10   committee.
11      Q.   Has IARC a well respected
12   scientific organization?
13      MS. MILLER:  Objection.
14      THE WITNESS:  I believe IARC
15   gets experts in the areas that
16   they need to adjust -- to address
17   the questions that come before
18   them or that they deem of
19   interest.
20   BY MR. TISI:
21      Q.   Do you --
22      A.   That's all I know.
23      Q.   Do you consider them a well
24   respected scientific organization?  Are

1   they someone that you come in contact
2   with through the literature and your
3   understanding of the -- of cancer and
4   cancer research?
5      MS. MILLER:  Objection.
6   That was two questions.
7      THE WITNESS:  Again, as I
8   said, I mean, IARC is an
9   established committee that people
10   know do research on cancer to
11   determine whether or not there is
12   carcinogenic risk to humans and
13   people refer to them, as I do
14   myself.
15   BY MR. TISI:
16      Q.   And are they -- when you say
17   refer to them, they rely on them,
18   correct?
19      MS. MILLER:  Objection.
20      THE WITNESS:  I'm not sure
21   what you mean rely on them.
22   BY MR. TISI:
23      Q.   You go --
24      A.   I mean, they go -- I go -- I

1   look at them to see what -- what their
2   evidence is and what their conclusions
3   are.
4      Q.   Okay.  Are they considered
5   to be a respectable scientific
6   organization?
7      MS. MILLER:  Objection.
8      THE WITNESS:  They -- again,
9   they are an organization.  I mean,
10   it depends upon what you mean by
11   respectable.  I mean, as I said
12   they're well established.  I use
13   them as a reference.  Many other
14   people use them as references.
15   BY MR. TISI:
16      Q.   Okay.  Now, this IARC report
17   that you refer to in your report was
18   issued in 2010.  But you do understand
19   that IARC looked at evidence before 2006,
20   correct?  It was published in 2010, but
21   the conclusions were reached as of 2006.
22   Do you understand that to be true?
23      MS. MILLER:  Objection.
24      THE WITNESS:  I -- I believe

21 (Pages 78 to 81)

Karla Ballman, Ph.D.

Page 82

1        I'd have to look at the dates to
2    make sure. But I -- I do agree
3    that the actual monograph came out
4    after they had done analyses and
5    the data that they use for that
6    analyses.
7 BY MR. TISI:
8        Q.   Now, you do know that in
9 December 2018, two months before you
10 issued your litigation report for J&J's
11 lawyers, Health Canada looked at the
12 question as to whether or not, in your
13 words, the epidemiology studies and
14 scientific literature supported a causal
15 relationship between talcum powder
16 products and ovarian cancer.
17        Do you -- do you know that
18 to be true?
19        MS. MILLER:  Objection.
20        THE WITNESS:  So are you
21     asking me if I'm aware that Health
22     Canada has issued a -- could --
23     could you rephrase that?
24 BY MR. TISI:

Page 83

1        Q.   Yes.  Yes.  Do you know that
2 in December 2018 they issued a, call it a
3 draft report, about assessing the various
4 lines of evidence using the Bradford Hill
5 criteria on the question about whether or
6 not talcum powder products is capable of
7 causing ovarian cancer?
8        A.   I know that Health Canada
9 has issued -- did issue a draft report
10 late last year.
11        Q.   Okay.  And you know that
12 they looked at the evidence through the
13 Bradford Hill criteria, correct?
14        MS. MILLER:  Objection.
15        THE WITNESS:  I -- can
16     you -- can I see the report,
17     please?  I can't --
18 BY MR. TISI:
19        Q.   I will give it -- I will
20 give it to you.  But you -- it was
21 provided to you.  I saw it on your
22 supplemental reliance list that was
23 turned over to us last night.
24        Did you have that at the

Page 84

1 time that you wrote your report?
2        A.   I -- I actually looked it up
3 before -- as I was writing my report,
4 before it was finalized.
5        Q.   Okay.  So you were familiar
6 with it, but didn't list it in your
7 report as something that you had
8 considered in connection with your
9 opinions?
10        A.   I did not reference it.
11 And -- and actually, I may have
12 misspoken.  I -- it's been such a blur
13 these last two year -- months -- I
14 don't -- even years, it feels like years.
15        I -- I'm not sure exactly
16 when I looked at what, so -- but I do
17 believe I did see it before I finalized
18 my report, because I do reference the
19 Taher meta-analysis.
20        Q.   Right.  Well, you know the
21 Taher meta-analysis was commissioned by
22 Health Canada and then used in the Health
23 Canada report, you know that they are two
24 separate reports?

Page 85

1        A.   They are two separate
2 reports.
3        Q.   Okay.  Now, Health Canada,
4 just for the record, is the Canadian
5 equivalent to the U.S. FDA?
6        A.   That --
7        MS. MILLER:  Objection.
8        THE WITNESS:  That's what
9     I've been told.  I -- I don't
10     know.  I didn't know one way or
11     the other.
12 BY MR. TISI:
13        Q.   And other than for
14 litigation purposes, and I mean on both
15 sides, plaintiffs' experts and
16 defendants' experts, are you aware of any
17 more recent analysis of the causation
18 question through a Bradford Hill
19 framework than the one conducted by
20 Health Canada outside of litigation, are
21 you aware of anything else?
22        A.   That's a long question.  Do
23 you want to do -- I mean, I don't know --
24        Q.   Let me -- let me --

22 (Pages 82 to 85)

Karla Ballman, Ph.D.

Page 86

1          A.   -- because you're putting
2     Bradford Hill in there and --
3          Q.   Let me rephrase the question
4     then.
5               Do you know of any authors,
6     published or unpublished, apart from
7     litigation, which has done a causation
8     analysis of the question of ovarian
9     cancer and talc more recently than Health
10    Canada in December of 2018?
11         A.   So the Health Canada report,
12    you mean, unpublished report, draft
13    report?
14         Q.   Correct.
15         A.   Has there been another
16    published study?
17         Q.   Has there been any other
18    published or unpublished analysis of the
19    question of about whether ovarian cancer
20    and talcum powder products are linked,
21    is -- is that the most recent, outside of
22    litigation, that you can think of?
23         A.   Oh, out --
24              MS. MILLER:  Objection.

Page 87

1               THE WITNESS:  Outside of
2          litigation?  I -- I don't know off
3          the top of my head.  I'd have to
4          go through and look at all the
5          reports.
6     BY MR. TISI:
7          Q.   Okay.  Okay.  I'm going to
8     have marked as Exhibit 4 a document which
9     is the draft screening assessment from
10    Health Canada.
11              Now, this is on the
12    supplemental reliance list that was
13    served on us last night, correct?
14         A.   I --
15              MS. MILLER:  I don't think
16         she knows when it was served.
17    BY MR. TISI:
18         Q.   Okay.  Well -- all right.
19    You've seen this, correct?
20         A.   I have seen this, correct.
21         Q.   Okay.
22              (Document marked for
23         identification as Exhibit
24         Ballman-4.)

Page 88

1     BY MR. TISI:
2          Q.   And in your -- in your
3     practice of -- in your professional
4     practice outside of litigation, is it
5     important for you to consider the
6     opinions and views of other scientists
7     who look at the same or similar questions
8     that you were asked to look at?
9          A.   That's a really broad
10    question.
11         Q.   Do you consider the views of
12    other scientists?
13              MS. MILLER:  Objection.
14              THE WITNESS:  When I do
15         research, I -- I look at
16         publications.  So I believe those
17         probably are views of -- of other
18         scientists.  I mean, to do
19         research, you -- you need to look
20         at the literature.
21    BY MR. TISI:
22         Q.   Do you speak -- do you speak
23    to colleagues and get their opinions?
24         A.   If we're doing research in

Page 89

1     the same area, I may speak to a colleague
2     with respect to a research question I'm
3     working on.
4          Q.   Do you go to meetings where
5     information is presented orally or on
6     posters?
7          A.   I go to many meetings, and
8     so often there are information presented
9     orally and on posters.
10         Q.   And on -- on the whole, the
11    views of other scientists is information
12    that you integrate into your knowledge
13    base when you look at scientific
14    questions, true?
15              MS. MILLER:  Objection.
16              THE WITNESS:  So it all
17         depends.  It depends upon the
18         quality of -- of the data.  I look
19         at the data.  I -- I -- you know,
20         determine whether or not the
21         conclusions that they reach is --
22         is justified by the data that they
23         have and their study design.  And
24         so, I -- I -- you know, just

23 (Pages 86 to 89)

Karla Ballman, Ph.D.

Page 90

1    because it's another scientist
2    doesn't necessarily mean...
3    BY MR. TISI:
4        Q.   Now --
5            MS. MILLER:  We've been
6    going about an hour.  Is this a
7    good time for a break or?
8            MR. TISI:  Actually let me
9    finish this -- this area here.
10   BY MR. TISI:
11       Q.   In -- the other report, I'm
12   going to talk about, you were involved in
13   the Viagra/Cialis litigation?
14       A.   Yes.
15       Q.   Okay.  And you issued a
16   report in that litigation as well?
17       A.   I did.
18       Q.   You had a section in that
19   report dealing with regulatory issues and
20   the regulatory views of various European
21   and -- and U.S. agencies.  Do you recall
22   that?
23       A.   Can I see it, please?
24       Q.   I don't have it with me,

Page 91

1    but -- but do you recall that, I'm asking
2    whether you recall --
3            MS. MILLER:  Objection.
4            THE WITNESS:  No, I -- I
5    don't recall any specifics.
6    BY MR. TISI:
7        Q.   Okay.
8            MS. MILLER:  Give me time to
9    object, please.
10           Objection.
11           THE WITNESS:  So, sorry.
12   BY MR. TISI:
13       Q.   Let me ask you this.  Go to
14   Page 16 --
15           MS. MILLER:  Of what?
16           MR. TISI:  Of Exhibit 4.
17   BY MR. TISI:
18       Q.   There's a Table 6.1.  Do you
19   see that?
20       A.   I do see the table.
21       Q.   And it's a study entitled
22   "Available human epidemiologic studies
23   investigating the association of perineal
24   talc use and ovarian cancer."

Page 92

1        Do you see that?
2            MS. MILLER:  Objection.
3        It's not a study.  It's a table.
4    BY MR. TISI:
5        Q.   Do you see that?
6        A.   I see a table that's titled
7    "Available Human Epidemiological Studies
8    Investigating the Association of Perineal
9    Talc and Ovarian Cancer."
10       Q.   And as you glance through
11   these, the studies that are listed here,
12   these are studies that are familiar to
13   you, correct?
14       A.   These look like they include
15   some of the case-control studies and
16   cohort studies that have been used in
17   other meta-analyses.
18       Q.   Okay.  They cover -- for
19   example, I see the Cramer study from 1982
20   that we marked?
21       A.   I see that.
22       Q.   Okay.  And they cover
23   case-control studies, population-based
24   and hospital-based studies.

Page 93

1        Do you see that?
2        A.   I see that study type is
3    listed.  I don't know which are hospital
4    based and which are population based.
5        Q.   And if -- if you look on
6    Page 18, it includes the cohort studies.
7    Do you see that?
8        A.   Yes.  I see page 18 lists
9    cohort studies.
10       Q.   And they considered the
11   meta-analyses that you also looked at.
12   If you look at Page 16 under human
13   studies.  It has the sentence, "Several
14   meta-analyses are available of the
15   epidemiologic data have been published,
16   some very recently.  (Huncharek, 2003;
17   Langseth, 2008; Terry, 2018; Berge, 2018;
18   Penninkilampi and Eslick, 2018; Taher,
19   2018)."
20       Do you see that those?
21       A.   I see that.  I didn't
22   realize that Taher has been published.
23       Q.   It's -- it's not been
24   published yet.

Karla Ballman, Ph.D.

Page 94

1      A.   But it says published.
2      Q.   Okay.  So let me ask you
3  this.  Those are all studies that you're
4  familiar with, correct?  You've seen
5  those?
6      A.   I have seen those studies.
7      Q.   All right.  And so does it
8  appear from looking at the studies, they
9  considered pretty much -- they considered
10  the same studies that you considered?
11      A.   I -- I -- I mean, I'd have
12  to go through and look and compare
13  whether or not every single study here is
14  what every single study that I looked at.
15  But I do -- it appears that, you know, I
16  recognize the names of many of these
17  studies here.  I don't know if it's a
18  complete match.
19      Q.   Okay.  Now, can you turn to
20  Page 19 through 21.  On the very bottom
21  of the page on 19 it has a section called
22  "Strength"?
23      A.   Yes, I see that.
24      Q.   That's one of the Bradford

Page 95

1  Hill criteria, correct?
2      A.   Mm-hmm.
3      Q.   And if you look on the next
4  page?
5      A.   Wait.  I'm sorry.  I don't
6  know if this is actually referring to the
7  Bradford Hill criteria.  It just says
8  "Strength."
9      Q.   Well, if you look at the
10  sentence above, it says Hill criteria,
11  1965, the paragraph directly above?
12      A.   Okay.
13      Q.   Okay.  So if you look at the
14  next page, Page 20, it talks --
15      MS. MILLER:  You're positing
16  that strength means strength of
17  association?  Is that --
18      MR. TISI:  Yes, correct.
19  BY MR. TISI:
20      Q.   Okay.  Next -- next page it
21  has consistency.  That's also a Bradford
22  Hill criteria?
23      A.   I see where it says
24  consistency.

Page 96

1      Q.   Next page -- next paragraph
2  says "Specificity."  That's also a
3  Bradford Hill aspect?
4      A.   I see where it says
5  "specificity."
6      Q.   "Temporality" is also a
7  Bradford Hill aspect?
8      A.   I see where it says --
9      Q.   Biologic gradient is also a
10  Bradford Hill aspect?
11      A.   I see that.
12      Q.   Biologic plausibility?
13      A.   I see that section.
14      Q.   Coherence, they have that,
15  correct?
16      A.   I see that section.
17      Q.   Okay.  And all of those are
18  the same -- that's the same framework
19  that you used in your report, correct?
20  You considered all those factors?
21      A.   I applied the Bradford Hill
22  criteria when I looked at the totality of
23  the data.
24      Q.   And those are the -- you

Page 97

1  applied those same factors from Bradford
2  Hill that I just described, you looked
3  at -- you looked at -- you looked at
4  strength, consistency, specificity,
5  temporality, biologic gradient, biologic
6  plausibility, and coherence.  You looked
7  at all of those things, correct?
8      A.   When I evaluate the totality
9  of the data, I did look at all the
10  criteria of the Bradford Hill --
11      Q.   Okay.  Now --
12      A.   -- framework.
13      Q.   If you go to Page 19 of 21
14  of the report?
15      MS. MILLER:  Of her report
16  or of the draft analysis?
17      MR. TISI:  Of the draft --
18      MS. MILLER:  Draft screening
19  assessment?
20      MR. TISI:  Of Exhibit Number
21  4.
22  BY MR. TISI:
23      Q.   On Page 28 at the very
24  top --

25 (Pages 94 to 97)

Karla Ballman, Ph.D.

Page 98

1    A.   So we're not on 21?
2         MS. MILLER:  You said 19 to
3    21.
4         MR. TISI:  I'm actually
5    moving through.  28 at the very
6    top.
7  BY MR. TISI:
8    Q.   You would agree with me that
9  after discussing the Bradford Hill
10 criteria or Bradford Hill analysis that
11 we just talked about before, they say the
12 following:  "The meta-analyses of the
13 available human studies in the
14 peer-reviewed literature indicate a
15 consistent and statistically significant
16 positive association between perineal
17 exposure to talc and ovarian cancer.
18 Further available data are indicative of
19 a causal effect."
20      Do you see that?
21      MS. MILLER:  Objection.  You
22   said after the Bradford Hill?
23   I'm confused.
24      THE WITNESS:  It's on 28.

Page 99

1         MR. TISI:  You don't need to
2    be.
3         Yes.
4  BY MR. TISI:
5    Q.   So after having looked at
6  the Bradford Hill criteria, or Bradford
7  Hill aspects, they say the following:
8  "The meta-analyses of available human
9  studies in the peer-reviewed literature
10 indicate a consistent and statistically
11 significant positive association between
12 perineal exposure to talc and ovarian
13 cancer.  Further available data are
14 indicative of a casal effect."
15      Do you see that?
16      MS. MILLER:  Objection.
17   That's a dishonest question.
18 BY MR. TISI:
19   Q.   You can --
20   A.   That's what's written on the
21 page there.  They do say that.
22   Q.   Okay.  And they say it
23 again.  Actually, if you go back.  Since
24 counsel was saying that I was being

Page 100

1  dishonest, let's go back.  They say it
2  again, exactly after -- on Page 21, after
3  the discussion of coherence.  They say
4  the most -- do you see where it says,
5  "The most recent meta-analyses detailed
6  above (Taher, 2018) and consistent with
7  the Hill criteria, suggest a small but
8  consistent statistically significant
9  positive association between ovarian
10 cancer and perineal exposure to talc.
11 Further available data are indicative of
12 a causal effect."
13      Do you see that?
14   A.   I see the words on that
15 page.  But I'd like to point out that --
16   Q.   No.  There's no question
17 pending.
18      MS. MILLER:  Excuse me.  I
19   think she should be allowed to
20   finish her statement.
21      MR. TISI:  I'd like to point
22   out.  No.  I asked her if those
23   were the words -- did I read that
24   correctly.  There's nothing more

Page 101

1  to say, Counsel.
2         MS. MILLER:  I think we're
3    ready for a break.  I asked for a
4    break five minutes ago.
5         MR. TISI:  I am just -- I'm
6    just going to mark an exhibit, and
7    then we'll move on.
8         I'm going to attach the --
9         MS. MILLER:  Why don't we
10   just mark it after the break?
11      MR. TISI:  No, I'm going to
12   mark it right now.
13      THE WITNESS:  I would really
14   like a break soon.
15      MR. TISI:  We're going to
16   take it as soon as I mark it.
17      I'm going to mark the Health
18   Canada conclusion that I read into
19   the record on Page 28, and I'm
20   going to mark that as Exhibit 5.
21      MS. MILLER:  I'm going to
22   object to that.
23      THE WITNESS:  The Health
24   Canada draft conclusion.

26 (Pages 98 to 101)

Karla Ballman, Ph.D.

Page 102

1  BY MR. TISI:
2      Q.   Yes.
3      A.   And I don't see draft there.
4      Q.   Okay.  We can -- it says --
5          MS. MILLER:  Also, where
6  does it say "conclusion" in the
7  document?
8  BY MR. TISI:
9      Q.   -- it actually says -- it
10  says draft screening assessment.
11         MS. MILLER:  Actually,
12  conclusion would be this
13  (indicating).  The conclusion is
14  what's on Page 29.  So I object --
15         MR. TISI:  That's not -- you
16  could -- you could say what you --
17         MS. MILLER:  I object to
18  this --
19         MR. TISI:  You can object.
20  Object.
21         MS. MILLER:  Okay.  Let me
22  finish.
23         MR. TISI:  Object.  Fine.
24         MS. MILLER:  You are not

Page 103

1  letting me finish my sentence,
2  sir.
3          MR. TISI:  I don't need --
4  object is fine.
5          MS. MILLER:  No, it's not
6  fine.
7          I object to this exhibit,
8  because the Health Canada
9  conclusion is actually on Page 29
10  where it says conclusion --
11         MR. TISI:  That's the
12  regulatory -- that's the
13  regulatory conclusion.
14         MS. MILLER:  This is not a
15  conclusion.
16         MR. TISI:  Okay.
17         MS. MILLER:  So that's a
18  false statement there.  Health
19  Canada conclusion.
20         MR. TISI:  That's fine.  You
21  can --
22         MS. MILLER:  Okay.  I think
23  we're ready for a break?
24         MR. TISI:  That's an

Page 104

1  exhibit.  Here you go.
2          (Document marked for
3  identification as Exhibit
4  Ballman-5.)
5          THE VIDEOGRAPHER:  Off the
6  record?  Remove your microphone
7  please.  The time is 10:10 a.m.
8          (Short break.)
9          THE VIDEOGRAPHER:  We are
10  back on the record.  The time is
11  10:25 a.m.
12  BY MR. TISI:
13      Q.   Doctor, going back to
14  Exhibit Number 5, the Health Canada
15  statement.  We'll call it a statement.
16         The -- they use the word
17  consistent.
18         Do you see that?
19      A.   So when I read this
20  statement -- and it's also referring to
21  meta-analyses.  And so it appears that
22  it's not just one meta-analysis.  So --
23  so they are saying that the meta-analyses
24  are consistent.

Page 105

1      Q.   Okay.  And the meta-analyses
2  are made up of all of the -- of all of
3  the observational studies, correct?
4      A.   But the meta-analyses are
5  all analyzing essentially the same data.
6  They are reworking the same data.  So it
7  would be strange if they would come up
8  with quite different results.
9      Q.   So -- and they are all
10  consistent, correct?
11     A.   But as I said, they are --
12  they are analyzing exact same data in
13  essentially the same way.  And so it
14  would be very strange if they didn't come
15  up with similar numbers.
16     Q.   But you -- you think there
17  is no consistency, correct, your opinion
18  is there is no consistency in the
19  observational studies, correct, or is
20  there consistency?
21         MS. MILLER:  Objection.
22         THE WITNESS:  When I applied
23  the Bradford Hill, I state that I
24  feel that the consistency criteria

Karla Ballman, Ph.D.

1    was not met.
2  BY MR. TISI:
3        Q.   Okay.  And they say that
4  there was consistency shown when they
5  looked at the meta-analyses, correct?
6        A.   Well, they are saying
7  meta-analyses are consistent.  But as I
8  said, they keep -- meta-analyses, these
9  meta-analyses are essentially all
10  analyzing the same data.  So reworking
11  the same data is like doing a
12  replication.  So one would expect that
13  the numbers are similar.
14       Q.   Well, the meta-analyses,
15  depending upon their time frame, did not
16  all use the same studies, did they?
17       A.   They -- the earlier ones
18  used a subset of the studies used in the
19  later ones, because there were additional
20  studies done since when the earlier ones
21  were done.
22       Q.   So they -- so they were not
23  all the same, correct?
24       A.   Essentially though, I mean

1  in -- in statistics and in epidemiology,
2  you know, reworking data that are not
3  completely independent of each other, we
4  would expect similar results and
5  correlation.
6        Q.   And they say, "Further
7  available data are indicative of a causal
8  effect."
9             Do you see that?
10       A.   I -- I see what's stated
11  there.  I -- I have no idea what that is
12  based upon.  That -- I do see that
13  statement.
14       Q.   And you disagree with that,
15  correct?
16       A.   I -- I don't know if I agree
17  or disagree with it.
18       Q.   So --
19       A.   I mean I -- I -- that's what
20  they wrote.  I do agree with that.
21       Q.   Okay.  Do you agree that the
22  available data is indicative of a causal
23  effect or you disagree with the
24  Canadian -- the Canadian assessment here?

1             MS. MILLER:  Objection.
2             THE WITNESS:  So I'm not
3  sure what available data they are
4  referring to, and being indicative
5  of a causal effect, this is -- is
6  taken out of context.  I would
7  have to go back and -- and read
8  through the entire document.  I
9  mean, I don't know what basis.  I
10  don't know what data that that's
11  like being based upon.
12  BY MR. TISI:
13       Q.   Well, we went through that,
14  Doctor.  We went through and that's why I
15  took the time and showed you all the
16  studies that they looked at.  And I -- I
17  showed you the Bradford Hill aspects that
18  they analyzed and they went through all
19  of that.
20             And based upon what they
21  looked at, okay, they concluded that the
22  totality of the evidence was indicative
23  of a causal effect, correct?
24             MS. MILLER:  Objection.

1             THE WITNESS:  I think you
2  just -- that's a slightly
3  different question.
4  BY MR. TISI:
5        Q.   Okay.
6        A.   But we didn't look at all
7  the studies that they looked at in terms
8  of, we just went through and -- and I
9  quickly glanced and saw that they had a
10  category that said strength, they had a
11  category that said -- I didn't look
12  through carefully to see what exact
13  studies they looked at.
14       Q.   Did you -- didn't you do
15  that when you were preparing for your
16  deposition today, didn't -- weren't you
17  interested to see how they reached this
18  conclusion which was different than
19  yours?
20       A.   I -- you know, I glanced and
21  I read through the document as you noted.
22  I did not cite it in my report.
23       Q.   Mm-hmm.
24       A.   I -- it's just a draft.  So

28 (Pages 106 to 109)

Karla Ballman, Ph.D.

Page 110

```
 1    it could change.  And I didn't want --
 2    all my report is essentially based upon
 3    published literature.  I didn't want to
 4    incorporate a draft of something that
 5    might change, and we don't know which way
 6    they may change due to all the comments
 7    they get.  The -- I believe it's out for
 8    comment right now, so...
 9         Q.   Well, that was -- that's
10    going to be my question too.
11            First of all, Health Canada
12    is not involved in this litigation to
13    your knowledge, is it?
14         A.   I have no idea one way or
15    the other.
16         Q.   But you are, you are a paid
17    witness, correct?
18         A.   I'm --
19            MS. MILLER:  Objection.
20    BY MR. TISI:
21         Q.   You're a paid -- you've been
22    paid for your -- the work you did on your
23    report, correct?
24         A.   I am an expert witness for
```

Page 111

```
 1    Johnson & Johnson.  I really haven't been
 2    paid yet.  I'm still waiting for --
 3    sorry.
 4         Q.   Okay.  You are going to --
 5    well, I am sure -- I am sure Susan is
 6    good for her -- good for her word on
 7    that.  I'm sure she will pay you
 8    imminently.
 9         A.   Yes.
10         Q.   But -- but you have been
11    paid anywhere between, up and through, I
12    saw your bill, up and through -- it's
13    $56,000.  But I assume you've billed
14    since then.
15            How much have you --
16            MS. MILLER:  Objection.  She
17       just said she hasn't been paid,
18       and you just said you have been
19       paid.
20            MR. TISI:  Fine.  I'm not --
21       I'm not quibbling with you.
22            MS. MILLER:  Well, I mean,
23       but just --
24            MR. TISI:  You know -- you
```

Page 112

```
 1    know what I mean.
 2            THE WITNESS:  I billed for
 3       $56,000.
 4    BY MR. TISI:
 5         Q.   And -- and that will --
 6         A.   And I anticipate I will be
 7    paid.
 8         Q.   Right.  And -- and you have
 9    incurred additional time from the time of
10    your last billing until today, correct?
11         A.   Yes, I have.
12         Q.   Okay.  About how much time?
13         A.   Probably on the order, 20,
14    30 hours.
15         Q.   Okay.  And so would it be
16    fair to say that as of today, you will
17    ultimately bill anywhere between 75 and
18    $100,000?
19         A.   If the math works out.
20         Q.   Okay.  And so you are a paid
21    expert in this case, true?
22            MS. MILLER:  Objection.
23            THE WITNESS:  I am being
24       paid for my expert opinion.
```

Page 113

```
 1    BY MR. TISI:
 2         Q.   Okay.  Now, would you agree
 3    with me -- let me put it this way.  You
 4    would not write this -- you do not agree
 5    based upon your analysis of the evidence,
 6    with the statement in Exhibit Number 5
 7    from Health Canada.  You would disagree
 8    with that, true?
 9            MS. MILLER:  Objection.
10       Asked and answered twice.
11            MR. LOCKE:  And I just want
12       to assert an objection.  I don't
13       believe -- I believe there are
14       words italicized here that are not
15       italicized in the original.
16            MR. TISI:  And that's fine.
17       You're exactly right, Tom.
18    BY MR. TISI:
19         Q.   So I will make a
20    representation I -- that I italicized
21    those because I was going to ask you
22    questions about those.  But the record
23    will reflect that those are not
24    italicized in the original.
```

29 (Pages 110 to 113)

Karla Ballman, Ph.D.

Page 114

```
 1          That being the case, you
 2   would not write the statement that Health
 3   Canada did because you do not believe
 4   that the data as a whole that you looked
 5   at was indicative of a causal effect?
 6          MS. MILLER:  Objection.
 7          THE WITNESS:  Again, you
 8       know, this is taken out of their
 9       report at some section, and as we
10       discussed I believe it's not even
11       in their conclusions.  And I -- I
12       don't know -- I mean, I wrote in
13       my expert report what I wrote.  So
14       I don't have a statement in my
15       expert report that says this.
16   BY MR. TISI:
17       Q.   And you would disagree with
18   that -- those statements, correct?
19       A.   I just --
20          MS. MILLER:  Objection.
21          THE WITNESS:  I just looked
22       at the data as a whole and did my
23       analyses and came up with the
24       conclusion that I came up with.
```

Page 115

```
 1          Again, this is a draft.  I
 2   mean, I -- yeah.
 3   BY MR. TISI:
 4       Q.   So your conclusion --
 5       A.   I don't agree or disagree.
 6   I'm just saying that --
 7       Q.   So you don't disagree with
 8   this?
 9       A.   I said I don't agree or
10   disagree.  And I'm saying that when I
11   look at the science and I did my
12   analyses, I have put forward my
13   conclusion.
14          I obviously -- you know,
15   even if I believed what they did, I would
16   probably not have the exact same words.
17   That would be plagiarism.
18       Q.   But you would just -- okay.
19   Let me ask you this statement.  Let me
20   ask you the question directly.
21          Do you believe that the data
22   are indicative of a causal effect,
23   irrespective of this statement?  Do you
24   believe that the data as a whole that you
```

Page 116

```
 1   looked at are indicative of a causal
 2   effect?
 3       A.   So it is my professional
 4   opinion that there's no evidence of a
 5   causal relationship between perineal or
 6   genital talcum powder exposure and
 7   ovarian cancer.
 8       Q.   So you do not think there's
 9   a causal effect?
10       A.   That is my opinion.
11       Q.   Okay.  So -- and Health
12   Canada, at least as of today, has a
13   contrary view, true, subject to your view
14   that they may change?  But as of today,
15   they have a different view based upon
16   their analysis of the Bradford Hill
17   criteria, true?
18          MR. LOCKE:  Objection.
19          MS. MILLER:  Objection.
20          THE WITNESS:  Yeah, I --
21       I -- I would have to again read
22       through this carefully.
23   BY MR. TISI:
24       Q.   Okay.
```

Page 117

```
 1       A.   I would agree that they did
 2   not write a sentence exactly the way I
 3   wrote a sentence there.
 4          You know, again, I'd have to
 5   read through this carefully to make sure
 6   that this -- this -- this excerpt here
 7   reflects the entirety of their analyses
 8   and their opinions.
 9       Q.   Well, it's not unusual,
10   Doctor, for experts in epidemiology to
11   disagree on issues of causation when they
12   do their analysis, true?
13       A.   It depends.
14       Q.   Okay.  Well, in many -- you
15   know, there are experts -- in fact, you
16   mention it in your report that some
17   experts believe that ovarian cancer --
18   some people believe that ovarian cancer
19   can be caused by talcum powder; other
20   people don't.  That's not unusual; is
21   that true?
22       A.   So when I did my analyses
23   and looked at the data, I don't think
24   there's any scientific basis for any
```

Karla Ballman, Ph.D.

Page 118

1  other opinion that there is no evidence,
2  credible evidence, of a causal
3  relationship between --
4      Q.   That is not my question.
5  You know, honestly, at some point I
6  really am going to have to call the
7  judge.
8          My question to you is, it is
9  not unusual for experts in epidemiology
10 to look at the same data and come to
11 different conclusions, true?
12         MS. MILLER:  Please let her
13 finish her answer without --
14         MR. TISI:  Well, I'm not --
15 I'm not going to sit --
16         MS. MILLER:  She was in the
17 middle of a sentence.
18         MR. TISI:  I'm not -- I am
19 not going to sit here and listen
20 to her filibuster.  I'm not going
21 to do it.
22         MS. MILLER:  She's not
23 filibustering.  She's answering
24 the question.  You're trying to

Page 119

1  put words in her mouth.
2          MR. TISI:  I am not -- I'm
3  allowed --
4          MS. MILLER:  You're trying
5  to put words -- can you let me
6  finish my sentence?
7          MR. TISI:  No, actually
8  yours --
9          MS. MILLER:  You're not
10 going to let me finish my
11 sentence?
12         MR. TISI:  You're limited to
13 "objection."  That's what you're
14 limited to in this deposition.
15         MS. MILLER:  I think that if
16 you're not allowing --
17         MS. SHARKO:  I don't think
18 that's true.
19         MS. MILLER:  -- the witness
20 to finish her sentences.  I am
21 allowed to speak.  And if you want
22 to call the judge, I am happy to.
23         MR. TISI:  If your -- if
24 your witness is going to sit here

Page 120

1  and filibuster --
2          MS. MILLER:  She's not
3  filibustering.  You're trying to
4  put words in her mouth.  She is
5  trying to answer as an
6  epidemiologist from her scientific
7  experience, and you're trying to
8  put words in her mouth for sound
9  bytes you want.  And you're
10 frustrated because she's trying to
11 give you honest, complete answers
12 as an epidemiologist.
13         MR. TISI:  Oh, that's so
14 good of you.  I'm so -- I'm so
15 glad that you said that.
16 BY MR. TISI:
17     Q.   So, Doctor, in epidemiology,
18 cancer, cancer with cigarettes, for a
19 long time there was a debate in the
20 scientific community about whether
21 cigarettes cause cancer, true?
22     A.   I haven't looked at that
23 literature in depth.  I mean, possibly.
24 I mean, I'd have to --

Page 121

1      Q.   Okay.  It's not unusual in
2  the field of epidemiology for experts in
3  epidemiology to look at data and reach
4  different conclusions in their
5  professional judgment, true?
6          MS. MILLER:  Objection.
7          THE WITNESS:  So again, I --
8  all I can say is I looked at the
9  data in its totality.  I did the
10 analyses and wrote the report with
11 all sort of my methodology and how
12 I arrived at the opinions.  And I
13 do not believe there's scientific
14 credible evidence that there is a
15 causal relationship between
16 talcum -- perineal talcum powder
17 exposure and ovarian cancer.  To
18 me, that's the --
19 BY MR. TISI:
20     Q.   So, all right.
21         That wasn't my question.
22 And my question was a general question.
23         Having -- I'm going to take
24 talcum powder products out of -- out of

31 (Pages 118 to 121)

Karla Ballman, Ph.D.

Page 122

1    the equation now.  So you don't have to
2    answer me the question about what you did
3    in talc.  Okay.
4            Is it not a true statement
5    that in general, epidemiologists when
6    looking at a causation question, can look
7    at the same data and reach different
8    conclusions?  Does that not happen?
9            MS. MILLER:  Objection.
10           THE WITNESS:  I think it has
11       to depend upon what the question
12       is of interest and what level of
13       data are available.  I mean, I
14       cannot answer that question
15       without knowing more specifics.
16   BY MR. TISI:
17       Q.   Have you responded -- you
18   said there's a comment period.  The
19   comment period was from December 6th
20   through February 6th.
21           Did you respond to
22   comment -- do you feel -- I gather you
23   feel strongly about your opinions,
24   correct?

Page 123

1       A.   I don't know if I feel
2    strongly or not.  I would say that I -- I
3    believe my opinions are based upon the
4    science.
5       Q.   Well, you would agree with
6    me that ovarian cancer is a serious
7    disease?
8       A.   It kills women.  It's a
9    serious disease.
10      Q.   Okay.  And you would agree
11   with me that the mortality involved in
12   ovarian cancer is very, very high?
13      A.   I -- I know that there are
14   different subtypes of ovarian cancer and
15   I -- the high grade serous has -- has --
16   is not a very good prognosis.  I agree a
17   lot of people die from it.
18      Q.   And would you agree that
19   whether or not, irrespective of your view
20   of the evidence, whether or not talcum
21   powder products can cause ovarian cancer,
22   would be an important public health
23   issue?
24      A.   What -- could you ask that

Page 124

1    again?
2       Q.   Would you agree with me that
3    whether or not talcum powder products
4    cause ovarian cancer, the question you're
5    here to answer for us today, is an
6    important public health issue?
7       A.   I believe what's an
8    important public health issue is -- is
9    trying to reduce the mortality from
10   ovarian cancer.
11      Q.   Okay.  And the question --
12   you understand that there's been a debate
13   in the medical and scientific community
14   for decades on the question of whether or
15   not talcum powder products cause ovarian
16   cancer, correct?
17           MS. MILLER:  Objection.
18   BY MR. TISI:
19      Q.   IARC addressed it.  FDA
20   addressed it.  Health Canada addressed
21   it.  It's been in the published
22   literature.  You would agree with me on
23   that, right?
24           MS. MILLER:  Are you asking

Page 125

1    the last question that I objected
2    to or have you changed your
3    question?
4    BY MR. TISI:
5       Q.   I'm asking you the question
6    I asked.  You --
7           MS. MILLER:  Which?
8    BY MR. TISI:
9       Q.   You understand that various
10   agencies have looked at this question,
11   that there is a debate in the
12   medical and scientific community as to
13   the meaning of the science on ovarian
14   cancer and talc, true or not true?
15           MS. MILLER:  Objection.
16           THE WITNESS:  There is
17       different parts in there.  What
18       I -- I would say is IARC looked at
19       the question.  I'm not sure how
20       deeply the FDA has looked at it.
21       And I know that there's a draft
22       Health Canada document at this
23       point.  So those agencies have
24       done something with respect to

Karla Ballman, Ph.D.

Page 126

1    this.
2  BY MR. TISI:
3      Q.   And you agree that the --
4  the questions that they are wrestling
5  with is an important one?
6          MS. MILLER:  Objection.
7          THE WITNESS:  Important in
8  what sense?
9  BY MR. TISI:
10     Q.   Important public health
11 question.  They are addressing an
12 important public health question.
13     A.   If -- if there were evidence
14 that there was a causal relationship
15 between perineal and genital talcum
16 exposure and ovarian cancer, if there was
17 evidence that that is the case, then it
18 would translate into a public -- probably
19 a considerable public health.
20     Q.   Okay.  And you feel strongly
21 about your opinion that there is no such
22 evidence, true?
23     A.   Again, my -- I don't -- I
24 don't know how to use that word strongly.

Page 127

1          I believe that my evidence
2  is -- my statement is based upon my
3  scientific analyses of the data in
4  total --
5      Q.   Have you shared --
6      A.   -- and is supported.
7      Q.   I apologize.
8          Were you -- did you share
9  that -- your opinions with Health Canada?
10     A.   I did not.
11     Q.   Okay.  Did you -- have you
12 tried to contact the FDA?
13     A.   I have not done that.
14     Q.   Have you contacted the
15 National Cancer Institute to tell them
16 there's no problem?
17         MS. MILLER:  Objection.
18         THE WITNESS:  I -- I
19 wouldn't know who to contact.  I
20 don't even know if there's such a
21 mechanism to do so.
22 BY MR. TISI:
23     Q.   Okay.  Well, you know last
24 week the United States House of

Page 128

1  Representatives held hearings on talc
2  and causation.  Do you know that?
3      A.   I did not know that.
4      Q.   Do you know that one of the
5  epidemiologists, Dr. McTiernan, you know
6  her?
7      A.   I know the name.
8      Q.   Okay.  You know she appeared
9  at that hearing.  Do you know anything
10 about that?
11     A.   Again, I -- I wasn't aware
12 of the hearing so I do not know.  I -- so
13 I wouldn't know that she appeared.
14     Q.   Did J&J ask you, say, you
15 know, Dr. Ballman, you're an expert in
16 the field of analyzing causation from an
17 epidemiology standpoint, would you
18 represent us before the House of
19 Representatives on this important
20 question?
21         MS. MILLER:  Objection.
22         THE WITNESS:  I was not
23 contacted by J&J to appear in a
24 congressional.

Page 129

1  BY MR. TISI:
2      Q.   Have you presented your
3  opinions on the subject to your medical
4  and scientific colleagues at Weill
5  Cornell?
6          MS. MILLER:  Objection.
7          THE WITNESS:  I have not
8  discussed this with my colleagues
9  at Weill Cornell.
10 BY MR. TISI:
11     Q.   I mean, there are -- you
12 have an oncology division, and a
13 gynecology division at Weill Cornell I
14 assume?
15     A.   I'm not sure what their
16 terms are.  But there is a group that
17 works on gynecology -- gynecology
18 issues -- gynecology, and there is a
19 hem/onc.  And I don't know if they are
20 divisions or departments, that sort of
21 thing.
22     Q.   Have you reached out to them
23 and said to -- to any of them, gee, you
24 know, I have done this causation

33 (Pages 126 to 129)

Karla Ballman, Ph.D.

Page 130

1    analysis, and, you know, you really could
2    tell women they can use talcum powder
3    products everyday for the next 40 years
4    and it be not be a problem in terms of
5    increasing their risk for ovarian cancer.
6        MS. MILLER: Objection.
7    BY MR. TISI:
8        Q.   Have you done that?
9        MS. MILLER: Objection.
10       THE WITNESS: I -- I have
11   not contacted any -- I have not
12   discussed this with -- with any
13   one of my colleagues.
14   BY MR. TISI:
15       Q.   If -- if one of your
16   colleagues at Weill Cornell, your
17   oncology colleagues, came up to you and
18   said look, I heard you were involved in
19   the -- looking at talcum powder products
20   and ovarian cancer for the -- in the
21   litigation involving Johnson & Johnson,
22   you've done your analysis, do you think
23   it's okay if I tell my patients that they
24   can dust everyday for the next 30 years

Page 131

1    and it won't increase the risk?
2        MS. MILLER: Objection.
3        THE WITNESS: I -- I would
4    say it's my professional opinion
5    that there's no evidence of a
6    causal relationship between
7    perineum-talcum powder exposure
8    and ovarian cancer.
9        I'm not a gynecologist. So
10   I would not presume to tell a
11   gynecologist what they should tell
12   their patients with -- with
13   respect to anything.
14   BY MR. TISI:
15       Q.   Now, you do understand that
16   in this case there is an allegation that,
17   among other things, that talcum powder
18   products used by -- manufactured and sold
19   by J&J contained asbestos. Have you seen
20   that?
21       MS. MILLER: Objection.
22       THE WITNESS: I think I saw
23   somewhere in the media, it might
24   have been a tweet or something,

Page 132

1    that -- that that -- that that
2    issue has been raised, that --
3    that -- I don't know who is saying
4    that there may be asbestos in
5    talcum powder.
6    BY MR. TISI:
7        Q.   So you have not reviewed
8    evidence in this case that asbestos may
9    or may not be in the talcum powder
10   products that Johnson & Johnson sold?
11       MS. MILLER: Objection.
12       THE WITNESS: So I believe
13   my opinion -- my -- not believe.
14       But my opinion is based upon
15   talcum powder, whatever it's
16   composed of. So I don't know
17   what's in it. But talcum powder,
18   whatever it's composed of, I don't
19   find any evidence -- or credible
20   evidence that there's a causal
21   relationship.
22   BY MR. TISI:
23       Q.   Well, if there was asbestos
24   in talcum powder products, would you, if

Page 133

1    that same oncologist at Weill Cornell
2    came up to you and said Dr. --
3    Dr. Ballman, I know that you are involved
4    in litigation. You've looked at the
5    causation question. If there is asbestos
6    in the talcum powder that my patients
7    use, is that okay for her to dust every
8    day? What would you tell them?
9        MS. MILLER: Objection.
10       THE WITNESS: I would say
11   the same thing I answered to the
12   talcum powder question, because I
13   analyze whether or not there's
14   evidence of a causal relationship
15   between talcum powder -- whatever
16   is in it -- I have no idea what's
17   in it -- causes ovarian cancer.
18       And so I would say that
19   that's my opinion. And again I
20   would not presume to tell a
21   gynecologist what they should tell
22   their patients one way or another,
23   because I am not an M.D.
24   BY MR. TISI:

34 (Pages 130 to 133)

Karla Ballman, Ph.D.

Page 134

1      Q.   Well, one of the -- one of
2  the aspects of Bradford Hill -- and we're
3  going to talk about this -- is the issue
4  of biologic plausibility, correct?
5      A.   That is one of the criteria
6  within the Bradford Hill framework.
7      Q.   If -- I'm going to ask you
8  to assume for the purposes of my question
9  that talcum powder products -- you would
10 agree with me that asbestos is a
11 carcinogen, correct?
12         MS. MILLER:  Objection.
13         THE WITNESS:  I have not
14     looked into the talcum powder data
15     and literature.  So I only know
16     that there seems to be a strong
17     association that increases the
18     risk of mesothelioma, so a risk
19     factor for sure, between asbestos
20     exposure and mesothelioma.
21 BY MR. TISI:
22     Q.   And looking at the issue of
23 whether or not there's a biologically
24 plausible explanation for the

Page 135

1  increased -- an association, would the
2  presence of a carcinogen be important to
3  look at?
4      A.   So looking at biological
5  plausibility, what would be important is
6  that in the biological experiments that
7  are done, that they use talcum powder,
8  the same type of talcum powder that women
9  use, to see if that talcum powder leads
10 to transformation in animals, let's say,
11 to ovarian cancer.
12     Q.   But if one of the components
13 was a known carcinogen, wouldn't that be
14 a plausible explanation for the
15 association seen in the meta-analyses?
16         MS. MILLER:  Objection.
17         THE WITNESS:  Again, I mean,
18     the question isn't asbestos.  The
19     question is whether talcum powder,
20     however it's composed --
21 BY MR. TISI:
22     Q.   And if it's composed
23 partially of asbestos, if it's composed
24 partially of asbestos -- let me -- let

Page 136

1  me -- let me ask you this way.  Let me
2  give you a hypothetical.  Let me withdraw
3  the question.
4          Okay.  If we had a bottle,
5  and the bottle was full of asbestos and
6  nothing else.  Would you tell -- would
7  you tell a woman that she could use it to
8  dust her perineal -- her perineum?
9          MS. MILLER:  Objection.  I
10     think she said --
11         MR. TISI:  I don't -- I
12     don't care what you think she
13     said.  Objection.
14         MS. MILLER:  You've asked
15     this question 100 times.
16         MR. TISI:  I'm asking -- I'm
17     asking --
18         MS. MILLER:  She said she
19     doesn't give advice.
20         MR. TISI:  She's not.  I'm
21     asking -- I'm asking you a
22     hypothetical.
23 BY MR. TISI:
24     Q.   If -- if I had a bottle of

Page 137

1  pure asbestos, would that be a
2  biologically -- let me -- let me give you
3  a different hypothetical.
4          MS. MILLER:  Are you
5     striking the question?
6          MR. TISI:  Yes, I am,
7     Counsel.
8  BY MR. TISI:
9      Q.   If I had five epidemiology
10 studies all showed an increased risk of
11 ovarian cancer and asbestos, and I had a
12 bottle of asbestos, would you say that
13 that would be okay to dust on the
14 perineum?
15         MS. MILLER:  Objection.
16         THE WITNESS:  So that's
17     difficult.  First of all, I would
18     want to know what the five
19     epidemiology studies are, if there
20     are, you know, observational
21     studies.  I mean, I don't know.
22         I would need to know the
23     dose.  The dose makes the poison.
24     I don't know.  I did not do any

35 (Pages 134 to 137)

Karla Ballman, Ph.D.

Page 138

1    study on asbestos, so I wouldn't
2    render an opinion to a woman what
3    she should or should not use in
4    general either.
5  BY MR. TISI:
6        Q.   Would you tell a family --
7  would you tell a family member it's okay
8  to dust with asbestos?
9        MS. MILLER:  Please stop
10       interrupting her answers, please.
11 BY MR. TISI:
12       Q.   Would you tell a family
13 member that it's okay to dust with
14 asbestos?
15       A.   Yeah, again, this is a
16 hypothetical.
17       Q.   Absolutely.
18       A.   I mean, you know, I -- I
19 wouldn't say -- I -- I wouldn't say one
20 way or the other.  I would have to look
21 at the literature and see sort of whether
22 or not that that would be -- I don't know
23 asbestos.  And so that's why I'm having a
24 hard time answering this question.

Page 139

1        Q.   Okay.  So just the record is
2  clear, if I had a bottle of asbestos and
3  you were advising a family member and a
4  family member came to you and said,
5  "Dr. Ballman, do you think it's okay if I
6  dust with asbestos," you wouldn't know
7  what answer to give?  You'd say I have to
8  take out the literature and look at it?
9        MS. MILLER:  Objection.
10       Maybe -- you don't need to have
11       those facial expression.
12       THE WITNESS:  I mean, that's
13       a real hypothetical, because I
14       couldn't imagine anyone coming to
15       me and saying can they dust with
16       asbestos.  So that's why I'm
17       having a hard time answering this
18       question.  I just don't see any --
19       any -- what would be the purpose
20       of dusting with asbestos?  What
21       would be the -- I just don't --
22 BY MR. TISI:
23       Q.   Honestly I can't imagine
24 either.  So let me ask you the question.

Page 140

1  I can't imagine why anyone would dust
2  with asbestos.  So my question -- my
3  second question would be, if the bottle
4  was half asbestos and half talc, would
5  you say that that would be okay?
6        MS. MILLER:  Objection.
7        THE WITNESS:  So my -- what
8        I was going to try to finish in
9        the last one is, it would be like
10       if it were something -- if it were
11       full of cinnamon and someone came
12       to me and said, can I dust with
13       cinnamon?  I mean, why would you
14       want to dust with cinnamon.  I --
15       I mean, that's a weird question to
16       me.
17 BY MR. TISI:
18       Q.   And so the question -- why
19 would you want to dust with asbestos,
20 right?
21       A.   Well, I -- you know, I'm not
22 seeing a purpose for doing it.
23       Q.   I'm asking you from a
24 safety -- from a safety perspective.

Page 141

1  Let's assume there was a purpose -- I'm
2  going to add to my hypothetical.
3        Let's assume there was a
4  purpose to do it, and somebody came up to
5  you and said, "I think it's -- I think
6  I'd like to dust with asbestos."
7        Would you say that that
8  would be okay?
9        MS. MILLER:  Objection.
10       THE WITNESS:  I just can't
11       imagine that situation.
12 BY MR. TISI:
13       Q.   Okay.
14       A.   So it's very -- I can't
15 answer that.
16       Q.   I'm asking -- bear with me
17 in the hypothetical.  We're allowed to do
18 that in a deposition.
19       If -- if -- if there were a
20 reason and somebody came up to you and
21 asked you for advice.  Would you say to
22 them, sure, dust with asbestos?
23       MS. MILLER:  Objection.
24       THE WITNESS:  So, what I

36 (Pages 138 to 141)

Karla Ballman, Ph.D.

Page 142

```
 1    feel comfortable in saying, and
 2    this is what I addressed, is if
 3    that cup were full of talcum
 4    powder and someone really would
 5    have asked my opinion as to
 6    whether or not they should use it,
 7    I would just say it's my
 8    professional opinion that, you
 9    know, whatever is in there, you
10    know, that's no causal
11    relationship between dusting on
12    the perineum and ovarian cancer.
13    BY MR. TISI:
14        Q.   Okay.  And that would
15    include, whatever in there, if there is
16    asbestos in there?
17        A.   Well, whatever talcum
18    powder, that's the literature I looked
19    at, whatever that talcum powder is
20    composed of, there is no evidence that
21    it -- credible evidence that it causes
22    ovarian cancer.
23        Q.   Let me switch topics again.
24        Go to Exhibit Number 1,
```

Page 143

```
 1    which is the report you were going to --
 2    you gave.
 3        A.   Yes, I'm there.
 4        Q.   Okay.  Front page says --
 5    I'm sorry, let me -- let me just -- you
 6    signed that page, correct?
 7        A.   Yes.
 8        Q.   Was every talc-specific
 9    opinion contained in this report reached
10    after meeting with the J&J lawyers?
11        MS. MILLER:  Objection.
12        This has been addressed already
13        before.
14    BY MR. TISI:
15        Q.   Yeah, okay.
16        A.   This -- this entire report
17    and all the research done for this report
18    was done after I started working on
19    this -- well, I did it as part of
20    generating this report which happened
21    after November 2018.
22        Q.   Does the report give all the
23    opinions you're prepared to give in this
24    case?
```

Page 144

```
 1        A.   Unless new information comes
 2    to light.
 3        Q.   Okay.  Does it fully
 4    describe the methodology that you use to
 5    reach your opinions?
 6        A.   I -- I don't know what you
 7    mean by fully.  But I do explain the
 8    methodology that I used and -- and
 9    provide bases for why I come to
10    conclusions.
11        Q.   Did you grade the evidence
12    giving numerical values?  Did you say,
13    well, this is a four on a scale of five,
14    this is a two on a scale of five, you
15    didn't do that, right?
16        A.   Grade what evidence?
17        Q.   Any of the evidence you
18    used.  Did you provide -- in weighing the
19    evidence, did you grade them?
20        MS. MILLER:  Objection.
21    BY MR. TISI:
22        Q.   Did you provide any
23    numerical values?
24        A.   I'm -- I'm confused by the
```

Page 145

```
 1    question.  I mean, when one does
 2    research, it's not common to grade every
 3    piece of data that's on hand in any --
 4    any way.  So I'm not sure.  So I -- I
 5    think I don't understand your question.
 6        Q.   Thank you.  I appreciate
 7    that.
 8        Now, we discussed this
 9    before, but you employed what are called
10    the Bradford Hill analysis, correct?
11        A.   Something along those terms.
12        Q.   Okay.
13        MR. TISI:  And for the
14        record, I want to attach as
15        Exhibit Number 6 Dr. Hill's
16        article.
17        (Document marked for
18        identification as Exhibit
19        Ballman-6.)
20    BY MR. TISI:
21        Q.   Is this the article, 1965
22    article that you were referring to in
23    your report?
24        A.   Yes.
```

37 (Pages 142 to 145)

Karla Ballman, Ph.D.

Page 146

1    Q.   Thank you.
2         Is this a -- is it fair to
3    say that in the field of epidemiology, as
4    you understand it, this is a seminal --
5    seminal analysis of how to do a causation
6    analysis?
7         A.   I would say it -- it
8    provides the framework for how
9    epidemiologists go about in determining
10   whether there is a causal relationship.
11        Q.   And while there are a lot of
12   published articles out there, you would
13   consider this to be a fairly important
14   piece of -- this would be, you know, kind
15   of a different category in terms of its
16   impact on how we look at causation
17   questions?
18        A.   Again, I think I -- I would
19   say it sort of frames today how -- how
20   people evaluate causation questions.
21   It's -- it's the first basis of it.
22        Q.   When is -- prior to meeting
23   with the lawyers in this case, had you
24   ever seen the Hill criteria -- had you

Page 147

1    ever seen the Hill article?
2         A.   Yes.
3         Q.   Okay.  And is the Hill
4    criteria applied any differently
5    depending upon where you live?
6         In other words, do -- do
7    people in France apply the Hill criteria
8    the same way they apply it in the United
9    States?
10        MS. MILLER:  Objection.
11   BY MR. TISI:
12        Q.   People in England apply it
13   the same way they apply it in Canada?
14        MS. MILLER:  Is that -- is
15   that --
16   BY MR. TISI:
17        Q.   I'm -- I'm asking you
18   geographically.  Is there -- if anyone
19   were to stand up in court and say well,
20   you know, this is an English scientist
21   and, therefore, they apply it differently
22   in England than they apply it in the
23   United States.
24        MS. MILLER:  I think you

Page 148

1    keep piling question -- objection.
2    I'd like to say something.
3         You keep piling question
4    upon question upon question so --
5         MR. TISI:  Objection is --
6         MS. MILLER:  Okay.
7         MR. TISI:  Objection is
8    fine, Counsel.
9         MS. MILLER:  And I think
10   it -- it's impossible for her to
11   know which question to answer.  I
12   don't think it's fair.
13        MR. TISI:  How about the
14   last one?
15        Well, when she looks at
16   me --
17        THE WITNESS:  Can you repeat
18   the last one, please?
19        MR. TISI:  Yes.
20        MS. MILLER:  Can you just
21   try to ask one question at a time.
22   That's all I ask.
23   BY MR. TISI:
24        Q.   Is -- is there -- is there

Page 149

1    any --
2         MS. MILLER:  I'll object
3    less that way.
4    BY MR. TISI:
5         Q.   Is there any difference
6    between how scientists approach a
7    causation question depending upon where
8    they happen to live and practice?
9         A.   I believe that
10   epidemiologists apply this criteria.  I
11   have no evidence that it would be
12   dependent upon geographic location of --
13   of the epidemiologist.
14        Q.   Okay.  And so for example,
15   we use the issue, we -- we looked at the
16   Health Canada report before.  You have no
17   reason to believe that they apply the --
18   the Bradford Hill criteria different in
19   Canada than they do in the United States?
20        A.   I -- I think any good
21   epidemiologist would -- would apply
22   scientifically based methods to -- to
23   come up with their conclusions.
24        Q.   Okay.  And certainly the

38 (Pages 146 to 149)

Karla Ballman, Ph.D.

1    Hill framework is a scientifically based
2    framework for looking at causation?
3         A.   It provides a framework in
4    which people can look at -- at the issue
5    of causation.
6         Q.   Okay.  Did you write your
7    general causation report Exhibit 1?
8         A.   I wrote everything in it
9    except for -- title.  Except for the
10   materials reviewed and considered piece.
11        Q.   Okay.  And are all the words
12   and sentences in the report yours?
13        A.   I -- I wrote the entire
14   report.
15        Q.   Did the lawyers for J&J
16   write any of the words and sentences
17   contained in your report?
18        A.   I -- I wrote the entire
19   report.
20        Q.   When did you actually start
21   to write the report?
22        A.   From the beginning,
23   essentially.  Because as I was reviewing
24   the literature, I -- I put sections into

1    a document that was the basis of my
2    report.
3         Q.   When did you first start
4    becoming an expert witness?  I know you
5    were involved in the Viagra case and I --
6         When did you -- when did you
7    first make yourself available as an
8    expert witness in litigation?
9         MS. MILLER:  Objection.
10        THE WITNESS:  I never made
11        myself available as an expert
12        witness.  I was contacted first by
13        Sidley Austin with respect to a
14        patent case.  But they contacted
15        me.  I didn't even know how that
16        came about.
17   BY MR. TISI:
18        Q.   Okay.  And when would that
19   have been?
20        A.   You are stretching my memory
21   now.  2016.
22        Q.   Have you ever told anybody
23   that you think it would be a good way to
24   make additional money to be a -- to be an

1    expert witness?  Have you told anybody
2    that?
3         MS. MILLER:  Objection.
4         THE WITNESS:  Have I told
5         someone that it --
6    BY MR. TISI:
7         Q.   Have you ever told anybody,
8    you know, being an expert witness I can
9    make a little extra money, or words to
10   that effect?
11        MS. MILLER:  Objection.
12        THE WITNESS:  Not that I
13        recall.
14   BY MR. TISI:
15        Q.   If you go to Page 21 of your
16   report -- actually, let me change it.
17        You rely on the -- you look
18   at the observational studies and
19   evidence, correct?
20        A.   I -- I -- I looked at
21   observational studies as part of my
22   analyses.
23        Q.   And in addition you looked
24   at the biologic evidence and that's on

1    Page 48 and 49 of your report?
2         A.   48 and 49?
3         Q.   Mm-hmm.  I'm sorry.  I must
4    have mistyped it.  I apologize.  Maybe
5    it's 38 and 39.
6         MS. MILLER:  There's a table
7         of contents.
8    BY MR. TISI:
9         Q.   Yeah, that may have it.  On
10   Page 36.
11        A.   Yes, I'm there.
12        Q.   And that contains your
13   analysis of the non-epidemiologic
14   evidence, correct?
15        A.   I don't think I would call
16   it non-epidemiologic evidence.  I mean,
17   biological plausibility is part of the
18   Bradford Hill criteria.  And that's what
19   epidemiologists use to --
20        Q.   Okay.  Now, going back to
21   your conclusion, you say there was no
22   evidence of a causal relationship between
23   perineal and genital talcum powder
24   exposure and ovarian cancer, correct?

Karla Ballman, Ph.D.

Page 154

1    A.   That's what I state.
2    Q.   And that's -- those are your
3  words?
4    A.   Those are my words.
5    Q.   And isn't it true that
6  outside of litigation -- now, this is a
7  litigation report.  This was paid for by
8  Johnson & Johnson for the work that you
9  did, correct?
10   MS. MILLER:  Objection.
11  There's two questions.
12  BY MR. TISI:
13   Q.   The report -- the generation
14  of this report was paid for by Johnson &
15  Johnson?
16   MS. MILLER:  Objection.
17   THE WITNESS:  I did this
18   report as part of my expert
19   witness activities on the behalf
20   of Johnson & Johnson.
21  BY MR. TISI:
22   Q.   For which you are paid?
23   A.   For which I am paid.
24   Q.   Okay.  And isn't it true

Page 155

1  that experts outside of litigation have
2  published the opinion that you expressed
3  here as disingenuous?
4    A.   Can you show me?
5    Q.   I'm going to.  Have you
6  ever -- have you ever seen a description
7  of -- of that opinion as being
8  disingenuous?
9    MS. MILLER:  Objection.
10  BY MR. TISI:
11   Q.   In the published literature?
12   A.   Not to my knowledge.  Can I
13  see --
14   Q.   Sure.
15   A.   -- what you're referring
16  to -- what you're referring to?
17   Q.   Do you know of a -- do you
18  know of a publication by a Steven Narod,
19  M.D.?
20   A.   Which publication?  I'm sure
21  he has many.
22   (Document marked for
23   identification as Exhibit
24   Ballman-7.)

Page 156

1  BY MR. TISI:
2    Q.   Well, I'm going to show you
3  one.  Do you know who Dr. Narod is?
4    A.   Not personally.
5    Q.   Do you know him
6  professionally by reputation?
7    A.   I know that I read an
8  article that he had published.
9    Q.   Okay.  And this article is
10  in Gynecologic Oncology.  It's in your
11  report.
12   A.   Yes.  It's published in
13  Gynecologic Oncology.
14   Q.   And it's an article entitled
15  "Talc and Ovarian Cancer"?
16   A.   Yes.
17   Q.   And it's an -- is this a
18  respected peer-reviewed journal?
19   A.   I don't know what the impact
20  factor is of this journal.  It is a
21  peer-reviewed journal.
22   Q.   Does impact factor always
23  reflect the quality of the journal, the
24  actual academic quality of the journal?

Page 157

1    A.   It depends upon who you talk
2  to.  So journals that have high impact
3  factors tend to think it does.  Probably
4  more than journals with low impact
5  factor.  But in general, I think the
6  higher the impact factor there is a
7  correlation with the quality of the
8  journal.
9    Q.   Have you published in
10  relatively low impact journals?
11   A.   I have.
12   Q.   So you don't have a
13  criticism of anybody who publishes in
14  a -- in a low impact journal, do you?
15   A.   I don't know.  That's a
16  broad question.
17   Q.   Well we had some testimony
18  the other day from a witness who said,
19  "Well, only if it's a high impact" --
20  paraphrasing, and I am paraphrasing, that
21  low impact journals are not as
22  significant as high impact journals in
23  terms of their scholarly -- scholarly
24  importance.

40 (Pages 154 to 157)

Karla Ballman, Ph.D.

Page 158

1      MS. MILLER: Objection.
2      THE WITNESS: That's just
3  really broad. I mean, I think my
4  take on it is that high impact
5  journals have definitely probably
6  more of a rigorous peer review
7  process than do some lower impact
8  journals. But that -- that is not
9  an absolute.
10 BY MR. TISI:
11     Q.   Because you publish --
12     A.   But I'm sure there's --
13     Q.   Because you publish in --
14     A.   -- exceptions.
15     Q.   -- low impact journals,
16 right?
17     MS. MILLER: Objection.
18     Please stop interrupting
19 her.
20 BY MR. TISI:
21     Q.   You publish in low impact
22 journals, correct?
23     A.   I have. I don't -- I'm sure
24 there are some of the publications on my

Page 159

1  list that are in lower impact journals
2  than others.
3      Q.   Okay. Now, if I go to the
4  Narod article which is on your reference
5  list or on one of the lists. I forget
6  which one it is.
7      On the bottom of the
8  left-hand column, on the bottom, it
9  says -- I'm reading --
10     MS. MILLER: What page are
11 you on?
12 BY MR. TISI:
13     Q.   From about --
14     MR. TISI: The second page.
15 BY MR. TISI:
16     Q.   Left-hand column, about
17 60 percent of the way down.
18     Okay. It says the
19 following: And I'm going to read it, and
20 you tell me whether I read it correctly.
21     It is unlikely that the
22 association between talc and ovarian
23 cancer --
24     A.   Wait, wait. Can I find

Page 160

1  exactly where you're reading?
2      Q.   Sure. I'll show you mine.
3      A.   Oh, there, thank you. Thank
4  you.
5      MS. SHARKO: Can I see it?
6      MR. TISI: You have it right
7  there.
8      MS. SHARKO: Thank you.
9  BY MR. TISI:
10     Q.   It is unlikely that the
11 association between talc and ovarian
12 cancer is due to confounding, and so it
13 is fair to say that if there's a
14 statistically -- a statistically robust
15 relationship between talc and ovarian
16 cancer, it is likely to be causal, albeit
17 with intermediate factors, such as
18 inflammation. In any case, given the
19 number of hazard ratios in the literature
20 between 1.1 and 1.4 in both case-control
21 and cohort studies, it's disingenuous to
22 state there is no evidence that talc is
23 associated with ovarian cancer.
24     Do you see that?

Page 161

1      A.   I do see that. You did read
2  that correctly.
3      Q.   Okay. I'm going to have
4  that statement of Dr. Narod --
5      MS. MILLER: I was just
6  going to say you left one word out
7  in your reading --
8      MS. SHARKO: I think he
9  says --
10     THE WITNESS: Oh, you didn't
11 read that correct.
12     MR. TISI: I thought you
13 said you did read -- did I --
14     THE WITNESS: I'm sorry.
15 BY MR. TISI:
16     Q.   I'll read it again. Let me
17 put it in front of you.
18     (Document marked for
19 identification as Exhibit
20 Ballman-8.)
21 BY MR. TISI:
22     Q.   This is Exhibit Number 8.
23 And I've highlighted --
24     MS. MILLER: Again, this is

41 (Pages 158 to 161)

Karla Ballman, Ph.D.

Page 162

1  called a conclusion but it comes
2  in the middle of the document. I
3  have --
4       MR. LOCKE: This is
5  definitely -- I'm going to object.
6  This is definitely not the
7  conclusion. Read the last
8  paragraph.
9       MS. MILLER: I have an
10  objection to the mislabeling of so
11  far each of these exhibits.
12       MR. TISI: Let me tell you
13  what. I'm going to take out --
14  you can block out the conclusion
15  if you want, if that will make you
16  happy, Counsel.
17       MS. MILLER: Thank you for
18  that offer.
19       MR. TISI: Okay. So you
20  won't do it.
21  BY MR. TISI:
22       Q.  So, I'm -- Doctor, did I
23  read the statement correctly, that it is
24  unlikely that the association between

Page 163

1  talc and ovarian cancer is due to
2  confounding, and so it is fair to say
3  that if there's a statistically robust
4  relationship between talc and ovarian
5  cancer is likely to be causal, albeit
6  with intermediate factors such as
7  inflammation.
8       Did I read that correctly?
9       MS. SHARKO: No, you didn't.
10  Is the word use missing here
11  too? He misread that.
12       MS. MILLER: That word "use"
13  is missing again.
14       MR. TISI: "Talc use and
15  ovarian cancer is likely to be
16  causal."
17       Did I not say that?
18       MS. MILLER: "Talc use".
19  BY MR. TISI:
20       Q.  Do you see that statement?
21       A.  Yeah, I see that statement.
22  And I'll take your word you read it
23  correctly.
24       Q.  The statement will be what

Page 164

1  the -- the statement will be -- the
2  record will be --
3       A.  Yeah.
4       Q.   -- from the article.
5       Do you see where it says,
6  "It's disingenuous to state that there is
7  no evidence that talc is associated with
8  ovarian cancer"?
9       A.  Talc is --
10       MR. TISI: Counsel, please.
11       MS. MILLER: I --
12       THE WITNESS: "It is
13  disingenuous to state that there
14  is no evidence that talc is
15  associated with ovarian cancer."
16  BY MR. TISI:
17       Q.  That's what he writes in his
18  non-litigation report, do you see it?
19       A.  I -- I do see that.
20       Q.  Okay. And you would
21  disagree with that statement, correct?
22       A.  Well, I mean, it depends
23  upon how you parse things out. So you
24  know, it's disingenuous to state that

Page 165

1  there is no evidence that talc is
2  associated with ovarian cancer. So if
3  you mean that there are no studies that
4  have a statistically significant
5  association, that would be correct.
6       Q.  Okay.
7       A.  He is not stating there that
8  there is no evidence that talc is -- that
9  talc is -- that there's a causal
10  relationship between talc and ovarian
11  cancer.
12       Q.  What -- he also says that
13  there -- that the association between
14  talc and ovarian cancer is unlikely due
15  to confounding, do you see that in the
16  first sentence?
17       A.  Yes.
18       Q.  And you disagree with that,
19  true?
20       A.  Now, which sentence, can you
21  read --
22       Q.  The first sentence. "It is
23  unlikely that the association between
24  talc and ovarian cancer" --

Karla Ballman, Ph.D.

Page 166

1    A.  Oh, that one.
2    Q.  -- "is due to confounding."
3        Do you disagree with that?
4        MR. LOCKE:  Objection to the
5    term, "the first sentence."
6        THE WITNESS:  Yeah.
7        MR. TISI:  The first --
8    okay.
9        THE WITNESS:  It's of that
10   document.
11   BY MR. TISI:
12   Q.  Correct.  Of -- of exhibit
13   that --
14   A.  This one.
15   Q.  Correct.
16   A.  8?
17   Q.  Yes.
18   A.  I -- I don't see any
19   references there's -- references to
20   support that statement.
21   Q.  So you would disagree with
22   the statement?
23   A.  Well, I -- I don't see any
24   references to support that.

Page 167

1    Q.  So you disagree with the
2    statement?
3        MS. MILLER:  Objection.
4        THE WITNESS:  I'm just
5    saying I don't see any
6    references --
7    BY MR. TISI:
8    Q.  I understand.  I'm not
9    asking you whether you see references.
10   I'm asking you whether you disagree with
11   the statement.
12   A.  I believe in any sort of
13   observational study it is not possible to
14   conclude that there is no confounding.
15   Q.  Okay.  That's not what he
16   said, did he?
17       He said, "It is unlikely
18   that the association between talc and
19   ovarian cancer is due to confounding."
20       Do you see that?
21   A.  I see he says unlikely.  But
22   again, I -- there's -- there's no
23   references to support that.
24   Q.  Okay.  So my question is, is

Page 168

1    his conclusion wrong?
2        A.  I -- I would have to see the
3    references upon which he's making that
4    conclusion in order to assess that.
5        The data I looked at in
6    totality, I do see evidence of
7    confounding.  In fact, we can go to the
8    Schildkraut study, and -- and there is a
9    pretty resounding evidence there that
10   there is recall bias, which is --
11   Q.  After 2014, correct?
12   A.  Well, there's recall bias --
13   no, there's recall bias even before that.
14       But it shows sort of how
15   much magnitude recall bias can have just
16   due to tweaking one little thing.
17       But I did not say that
18   there's no recall bias before 2014.
19   Q.  So would you defer to the
20   authors of that study as to what the
21   meaning of that data meant?
22   A.  No.  Scientists don't do
23   that.  Scientists look at publications.
24   They look at -- they looked at the

Page 169

1    methods.  The methods of to be published.
2    They look at the analyses that were done
3    and the results that were done.  And --
4    and they evaluate whether or not they --
5    they believe to the strength that the
6    authors do, that the authors' conclusions
7    are supported by all that.
8    Q.  Now, Dr. Narod published his
9    opinions, correct?
10   A.  Are these opinions?  Yeah?
11   Q.  Okay.  I'm going to -- I'll
12   characterize them as opinion.  Okay.
13       He published these
14   statements, correct?
15   A.  Yes.  This is statements
16   made in a paper that was published.
17   Q.  Okay.  And so he submitted
18   his -- his views to the scientific and
19   medical community, correct?
20   A.  Yeah.  I mean, the -- all
21   the views that's in this entire article,
22   I mean, so, you know, there's more words
23   than this than just the -- the two
24   sentences that were pulled out.

43 (Pages 166 to 169)

Karla Ballman, Ph.D.

Page 170

1    Q.   I agree, I agree.  But he
2  submitted his -- his views to the
3  scientific and medical community for what
4  that's worth, correct?
5    A.   This paper has been
6  published.
7    Q.   Okay.  The Health Canada
8  paper, even in its draft form, was put on
9  the internet.  That's where you found it,
10  correct?
11    A.   The Health Canada draft is
12  available for people to review.
13    Q.   Okay.  And comment on, which
14  you have not done, right?
15    A.   I have not commented on the
16  Health Canada.
17    Q.   Have you published your
18  opinions about talc?
19    A.   I did research on this.  And
20  I wrote an expert report.  I have not
21  published my expert report.
22    Q.   Have you submitted your
23  report to peer review?
24    A.   That's sort of -- that would

Page 171

1  be sort of odd.  This -- this expert
2  report is written for a specific purpose.
3  If I'm going to do a peer-reviewed
4  article, it -- it would look a little
5  different from -- from this expert
6  report.
7    Q.   So what specific purpose was
8  this article -- was this report written
9  for?
10    MS. MILLER:  Objection.
11    THE WITNESS:  So this report
12  was written to look at the
13  totality of the evidence that's
14  been published to determine
15  whether there is an association
16  between talc and ovarian cancer, a
17  causal relationship between talc
18  and ovarian cancer.
19  BY MR. TISI:
20    Q.   Now, did you -- so would
21  you -- have you decided -- now that
22  you've done this review, are you going to
23  write a paper that would put out, just
24  like Dr. Narod did, just like Health

Page 172

1  Canada did, just like any of the other
2  authors of the studies that you've
3  reviewed, what your views on the level of
4  evidence there is for the general
5  causation question.
6    Are you -- do you intend to
7  publish?
8    MS. MILLER:  Objection.
9    Again, that was two questions.
10    The first one was the
11    objectionable one.
12    THE WITNESS:  So --
13    MR. TISI:  Let me rephrase
14    the question.
15  BY MR. TISI:
16    Q.   Do you intend to publish on
17  the question about whether or not ovarian
18  cancer is caused by talcum powder
19  products?
20    A.   I do not plan to publish.
21    Q.   Now, in addition to offering
22  your own professional opinion on the
23  sufficiency of the evidence on talc and
24  ovarian cancer, I understand you may

Page 173

1  offer criticisms of plaintiffs'
2  epidemiology experts in this case; is
3  that true?
4    A.   So, in my report, I point
5  out some -- I point out things that --
6  other experts had said that -- that I
7  believe have limitations or that I don't
8  agree with.
9    Q.   Well, for the record the
10  experts that you referred to in your
11  report are Jack Siemiatycki?
12    A.   He's one expert.
13    Q.   Do you know who Jack
14  Siemiatycki is?
15    A.   I know who -- I know who he
16  is.  But I've not met him.
17    Q.   You understand that he's
18  well published in the field of cancer
19  epidemiology?
20    MS. MILLER:  Objection.
21    THE WITNESS:  I did not look
22  at his publication records.  So I
23  don't know if he's well published
24  or not.

44 (Pages 170 to 173)

Karla Ballman, Ph.D.

Page 174

BY MR. TISI:
     Q.   You know that he was the
chair of the IARC panel that dealt with
the issue of ovarian cancer and talc?
     A.   I believe when I read the
IARC -- I believe when I read his expert
report, that is what he stated.
     Q.   Do you have any reason to
believe that he's unqualified to offer
his opinions in this case on the general
question?  Whether you disagree with his
conclusions, put that aside for a moment.
          I'm asking you do you have
any qualms with his qualifications to
offer an opinion on the issue of general
causation?
          MS. MILLER:  Objection.
          THE WITNESS:  I don't think
     it's my place to decide whether or
     not someone has the qualifications
     to offer an opinion.
BY MR. TISI:
     Q.   Well, we had a witness the
other day who said that he thought

Page 175

another one of plaintiffs' witnesses was
unqualified.  I'm asking you, are you --
do you think that this witness -- that
Dr. Siemiatycki is unqualified?
     A.   I believe he has -- he has
credentials in this area, and he's
done -- he was, as you said, the chair of
the IARC committee, and may even have
published in this area.
          So, you know, when people
publish, yeah -- I don't know what the
word "qualified" means, but I think, you
know, he is a scientist.
     Q.   What about Anne McTiernan?
Do you have any qualms about her
qualifications to render an opinion on
the question of whether or not talc
causes ovarian cancer?
          MS. MILLER:  Objection.
          THE WITNESS:  I can't speak
     to the qualifications.
BY MR. TISI:
     Q.   Okay.
     A.   I know that she's an

Page 176

epidemiologist and has -- I can't
remember if she's published in the area.
I presume she has.  And, you know, one
can look at her publications.
     Q.   So I guess what I'm
hearing -- so let --
          THE VIDEOGRAPHER:  Sorry.
     You're covering your microphone.
BY MR. TISI:
     Q.   Let me summarize it.  Do
you -- of any of plaintiffs' experts in
this case, do you intend to offer any
opinions that any of them are unqualified
to render an opinion on the general
causation question?
          MS. MILLER:  Objection.
          THE WITNESS:  I -- it's -- I
     don't -- I was not asked to render
     an opinion if I think that any of
     the experts are unqualified or
     not.  And so I haven't seen
     thought about that.
BY MR. TISI:
     Q.   And that's fine.  Are all of

Page 177

your opinions of these experts contained
in your expert report, Exhibit 1?
          MS. MILLER:  Objection.  She
     just said she has no opinions.
          THE WITNESS:  Are my
     opinions of the actual experts?
BY MR. TISI:
     Q.   Yes.  Of the actual experts,
of their conclusions, of their
methodology, are all of those opinions
contained in your expert report, Exhibit
Number 1?
          MS. MILLER:  Objection.  I
     don't understand that question.
          MR. TISI:  You don't have
     to.  As long as she understand it.
          THE WITNESS:  Yeah, I'm
     confused too.
          MS. MILLER:  What?
          THE WITNESS:  Because I
     thought I heard my opinions of the
     experts --
BY MR. TISI:
     Q.   I said --

45 (Pages 174 to 177)

Karla Ballman, Ph.D.

1      A.   -- and I don't know why I
2  would have --
3      Q.   Are your criticisms of
4  your -- are all of the criticisms that
5  you have on plaintiffs' experts contained
6  in your expert report?
7          MS. MILLER:  Her criticisms
8      of the experts' opinions?
9          MR. TISI:  Yes.
10         MS. MILLER:  Okay.  That's
11     not what you said.
12         THE WITNESS:  No, no, you
13     said experts.  And so I'm still
14     confused.
15 BY MR. TISI:
16     Q.   Okay.  Are all of the
17 opinions related to plaintiffs' experts
18 contained in your expert report?
19     A.   Are all my opinions related
20 to plaintiffs' experts?
21     Q.   Mm-hmm.
22     A.   Themselves?
23     Q.   Mm-hmm.  Of their opinions,
24 their methodology, any aspect --

1      A.   Okay.  That's a little
2  different.  Again, I heard, are my
3  opinions of the qualifications, or
4  whatever -- of the experts.
5      Q.   I said -- I'm reading
6  verbatim.  Are all of the opinions
7  related to plaintiffs' experts that you
8  have contained in your expert report?
9      A.   See, that says are my
10 opinions of all the plaintiff experts.
11 To me, that's like my opinions on the
12 experts themselves, which I did not
13 address.
14     Q.   Okay.  I said related to the
15 expert.  Okay.  Let me -- let me rephrase
16 the question.
17         Are all of your criticisms
18 about the opinions that plaintiffs'
19 experts will offer in this case contained
20 in your report?
21     A.   I mean, the ones I thought
22 were -- the most important are in here.
23 I can -- you know, I didn't go through
24 and say, okay, I disagree with this

1  number here.  I disagree with that number
2  there, or I disagree -- so I guess I have
3  to say it's not complete.
4      Q.   Okay.  Are there any
5  opinions that you have as you sit here
6  today about any of the opinions that they
7  gave that are not in your report?
8      A.   Without going through their
9  reports and going through my report to
10 make sure that every single criticism I
11 might have has been made, I can't answer
12 that with any sort of certainty.
13     Q.   Okay.  I'm going to have it
14 marked as Exhibit Number 9, your
15 curriculum vitae.
16         (Document marked for
17     identification as Exhibit
18     Ballman-9.)
19 BY MR. TISI:
20     Q.   This is the one that was
21 provided with your expert report.  Is
22 this your most recent curriculum vitae?
23     A.   No.
24     Q.   Is there one subsequent to

1  that?
2      A.   This says June 5th on it.
3      Q.   Okay.  Is the expert
4  report --
5          MS. MILLER:  She's looking.
6          THE WITNESS:  The thing
7      that's attached as Exhibit A on my
8      expert report says February 22nd.
9  BY MR. TISI:
10     Q.   Okay.  So let's --
11     A.   So --
12     Q.   That's an old one.  I have
13 it says February 22nd there.  Am I wrong?
14         MS. MILLER:  The one that
15     you gave us says June 5th.
16         MR. TISI:  Okay.  My office
17     must have printed it out wrong.
18 BY MR. TISI:
19     Q.   Okay.  So is Exhibit A to
20 your expert report your most recent
21 curriculum vitae?
22     A.   It's the most --
23         MS. MILLER:  Shall we just
24     all refer back to Exhibit 1 for

Karla Ballman, Ph.D.

Page 182

1    this portion of the questioning?
2         MR. TISI: Yes, correct.
3    Exhibit A.
4         MS. MILLER: Of your
5    Exhibit 1?
6         MR. TISI: Exhibit 1.
7         MS. MILLER: Exhibit A to
8    Exhibit 1.
9         MR. TISI: Correct.
10        MS. MILLER: Just so we're
11   all on the same page.
12        MR. TISI: Thank you.
13        THE WITNESS: It's the
14   latest one that I updated.
15   BY MR. TISI:
16        Q.   Okay. Does this CV
17   accurately summarize the experience that
18   you believe qualifies you to render an
19   epidemiologic opinion on the causation
20   question in this case?
21        A.   That -- that's a broad
22   question. I mean, I don't know if you
23   can capture 20 years of -- of experience,
24   you know, in one document, but it

Page 183

1    captures, you know, some highlights, yes.
2         Q.   Well, is there anything that
3    you can think of in your experience,
4    beyond what is in your expert report as
5    you sit here right now, that would
6    qualify you to testify on the issue of
7    whether or not ovarian cancer is caused
8    by talcum powder products?
9         A.   Well, in the -- in the
10   addition to what is written here is my
11   day in and day out daily activities
12   when -- that I do as part of my job.
13   That -- that has built up the experience
14   over the years.
15        Q.   When is the last time -- do
16   any of your publications anywhere refer
17   to the Bradford Hill criteria?
18        A.   I have no idea. Nothing
19   comes to the top of my head, but I can't
20   say with certainty.
21        Q.   Okay.
22        A.   As you mentioned, there's
23   like 200 some.
24        Q.   But none you can think of,

Page 184

1    correct?
2         A.   Not off the top of my head.
3         Q.   Okay. One more plaintiffs'
4    epidemiology referred to in your expert
5    report is April Zambelli-Wiener-Weiner.
6    Do you remember? She looked at the
7    Huncharek and Muscat publications in 2003
8    and 2000 -- 2007, and then the 2011
9    publication of the -- of their report to
10   the FDA. Do you remember reading that?
11        A.   I remember reading her
12   expert report. Can I -- can I see it? I
13   don't remember if those were the actual
14   studies that she -- I thought 2003 was --
15   and I don't remember a 2011. So --
16        Q.   Okay. Let --
17        A.   -- but I did read her expert
18   report.
19        Q.   Let's put aside 2011 for a
20   moment. The diaphragm study, which was
21   2007 and 2003 meta-analysis, you did read
22   her report on those, correct?
23        A.   I read her expert report.
24        Q.   Okay. And you agree that

Page 185

1    those reports contain -- those studies
2    contain errors, correct?
3         A.   Yeah. Can I see her expert
4    report, please?
5         Q.   I don't have it with me.
6         Do you -- do you have any
7    opinions as to whether -- did you look --
8    when you were preparing your report, did
9    you look at her report and try to confirm
10   or not the errors that she identified
11   with respect to those studies?
12        MS. MILLER: Objection.
13   BY MR. TISI:
14        Q.   Was that part of what you
15   were asked to do?
16        MS. MILLER: Objection. I
17        am sorry, objection after the
18        first question. I didn't realize
19        there would be two.
20        THE WITNESS: So --
21   BY MR. TISI:
22        Q.   Was it part of your -- in --
23   in connection with preparing your expert
24   report, did you look at whether or not

47 (Pages 182 to 185)

Karla Ballman, Ph.D.

Page 186

```
 1    there were substantive flaws in the
 2    analyses conducted by Drs. Huncharek and
 3    Muscat that Dr. Zambelli-Wiener-Weiner
 4    had identified?
 5         A.   So you're asking me to
 6    remember, just off the top of my head
 7    what's in her report.  I would very much
 8    like to see that report --
 9         Q.   I'm asking you what you --
10    I'm asking you what you did.  Okay.
11         Did you --
12         A.   I did look at her report and
13    I did read through it.
14         Q.   Did you do any analysis of
15    the Huncharek and Muscat articles?
16         A.   Oh, did I -- that's a
17    different question.  Did I do any
18    analyses of their articles?  I read
19    through her report.  I do remember that.
20    I do remember her finding some error --
21    or what she called errors, numbers that
22    she couldn't match that they had reported
23    in their report that came from other
24    case-control studies and so forth.
```

Page 187

```
 1         And I -- I remember her
 2    doing various different analyses that if
 3    they really used the studies that they
 4    claimed they used, what would the
 5    dose-response relationship, say, look
 6    like.  And I remember it didn't matter,
 7    because there still was no dose-response
 8    relationship even when she did the
 9    analyses in the way she thought it should
10    have been done.
11         Q.   So other than that, do you
12    have any criticisms of her?
13         A.   I would have to go through
14    my -- my report here and -- and see if
15    I -- I actually sort of mention anything
16    with respect to her actual report.  I
17    don't remember off of the top of my head.
18         Q.   Now, Exhibit Number 10 is
19    the -- I'm going to ask --
20         (Document marked for
21         identification as Exhibit
22         Ballman-10.)
23    BY MR. TISI:
24         Q.   I'm going to mark the notice
```

Page 188

```
 1    of deposition --
 2         MS. MILLER:  If you want
 3    Dr. Zambelli-Wiener-Weiner's
 4    report, we can have it brought in
 5    here.
 6         MR. TISI:  I don't need to.
 7    BY MR. TISI:
 8         Q.   This is the notice of
 9    deposition that we filed in this case.
10    Have you seen that before?
11         A.   I have seen this document.
12         Q.   Okay.  And you -- your
13    counsel provided documents last night.
14    And I'm not going to mark all of them.
15    But because they will go out of order
16    here, I'm going to mark them as 10, A, B,
17    C, D, because they are in response to
18    this notice of deposition.
19         A supplemental list of
20    materials, I'm going to have this marked
21    as Exhibit Number 10A.
22         (Document marked for
23         identification as Exhibit
24         Ballman-10.)
```

Page 189

```
 1         (Document marked for
 2         identification as Exhibit
 3         Ballman-10-A.)
 4    BY MR. TISI:
 5         Q.   And this one, Number 2, is
 6    the Health Canada document that we marked
 7    previously.
 8         A.   It has it on it here, yes.
 9         Q.   Okay.
10         (Document marked for
11         identification as Exhibit
12         Ballman-10-B.)
13         (Document marked for
14         identification as Exhibit
15         Ballman-10-C.)
16         (Document marked for
17         identification as Exhibit
18         Ballman-10-D.)
19    BY MR. TISI:
20         Q.   The next is an addendum to
21    list of materials reviewed and considered
22    by Karla Ballman.  And I'm going to have
23    this marked as Exhibit Number 10-B.
24         10-C is your invoice dated
```

Karla Ballman, Ph.D.

1    3/7/2019, the one that Ms. Sharko has not
2    paid.
3             MS. MILLER:  It's Skadden.
4    I think it's me who hasn't paid.
5             MR. TISI:  Okay.
6             MS. MILLER:  I'm the bad guy
7    here.
8    BY MR. TISI:
9        Q.   Next one is an e-mail I'm
10   going to ask you in a moment about, from
11   Dr. Karla Ballman to Sandra Oquendo at
12   the FDA.
13            Can you tell me what that's
14   about?
15            MS. MILLER:  Is that a
16   question now?
17            MR. TISI:  Yes.
18            MS. MILLER:  Are you done
19   marking them?
20            MR. TISI:  No, I'm not done
21   marking them.  I'm just going to
22   stop right there.
23            MS. MILLER:  Oh, okay.
24   BY MR. TISI:

1        Q.   That's an e-mail that you
2    drafted on March 21, 2019, which would
3    have been -- I don't know what today's
4    date is.  That may have been yesterday.
5        A.   Yeah, I've been getting my
6    dates mixed up this week.
7        Q.   This is an e-mail disclosing
8    to the FDA that you are an expert for
9    Johnson & Johnson in the talc litigation?
10       A.   So the first e-mail I -- is
11   sending an updated disclosure form to the
12   FDA.
13       Q.   Right.
14       A.   The second e-mail is a
15   response from them asking for
16   clarification or answers to some specific
17   questions.
18            And then the last e-mail is
19   my saying here are my responses.
20       Q.   Okay.  But -- but is it fair
21   to say that you initially provided a
22   disclosure form to -- for the FDA that
23   did not disclose you were an expert for
24   Johnson & Johnson and that this e-mail

1    exchange back and forth was to clarify
2    that you were?
3             MS. MILLER:  Objection.
4             THE WITNESS:  So can I see
5    the disclosure form?
6    BY MR. TISI:
7        Q.   I don't -- I didn't print --
8    it came too late last night for me to
9    print at the hotel.
10            But you --
11            MS. MILLER:  You printed the
12   e-mail but you didn't print the
13   disclosure it related to?
14            MR. TISI:  Excuse me,
15   Counsel.  I did not.
16            MS. MILLER:  Okay.  I --
17            MR. TISI:  Okay.  If you
18   have a copy, you can feel free to
19   show it to her.
20            MS. MILLER:  Can I get a
21   copy?
22            MR. TISI:  But -- but --
23   well, we'll go off the record and
24   you can get a copy.

1             MS. MILLER:  Okay.  Let's go
2    off the record and I'll get a
3    copy.
4             THE VIDEOGRAPHER:  Remove
5    your microphones.  The time is
6    11:33 a.m.  Off the record.
7             (Short break.)
8             THE VIDEOGRAPHER:  Okay.  We
9    are back on the record.  The time
10   is 11:48 a.m.
11   BY MR. TISI:
12       Q.   Doctor, we took a quick
13   break so that you could look at some
14   documents.  Could you tell us why you
15   amended your FDA form yesterday to
16   indicate that you had done some
17   consulting on the talc litigation with
18   J&J?
19       A.   So this is for an FDA panel
20   and they wanted a disclosure.  And so the
21   first time that I submitted my disclosure
22   I believe it was January 23rd.  I listed
23   Johnson & Johnson and $12,000.  So I
24   looked at the box, it says, "Expert

1  witness, last 12 months." I saw last
2  12 months. "I appeared for or against
3  the following listed firms/issues."
4       And then I saw amount
5  received.
6       So when I saw that, I was
7  like okay, what they want is in the last
8  12 months any money I got from -- that I
9  actually physically got in the last
10  12 months from doing expert work. And so
11  this was the amount that I had received
12  in the last 12 months.
13       So as part of the, what is
14  this notice called? As part of
15  document -- Exhibit 10, the request was
16  for all disclosures made to the FDA, so I
17  was looking through and trying to find
18  all disclosures. And I -- I am learning
19  through my experience here that I need to
20  understand and look at words much more
21  carefully. And so I re-read this again.
22       And then I saw -- and I am
23  sure I read it the first time. But it
24  just didn't register to me. It says "or

1  under negotiation."
2       And so I started thinking
3  about that, and I thought, well, you
4  know, they probably don't really mean
5  just under negotiation, that probably
6  encompasses ongoing work.
7       So I felt it was prudent to
8  amend my disclosure to the FDA to let
9  them know about the ongoing work for
10  which I had not received any money in the
11  last 12 months. And that is the document
12  that is -- is dated incorrectly. I sent
13  the document on the 20th. 3/21/2019. I
14  had my dates mixed up.
15       In there I went through and
16  another thing I had missed is it said
17  firm/issue. So I -- I thought, well, I
18  better also put the issue -- I -- I
19  missed that too the first time.
20       So you now see it says,
21  "Johnson & Johnson/Zytiga patent
22  (prostate cancer)," the amount received.
23  That did not change.
24       And then I added this

1  ongoing work that I'm doing, Johnson &
2  Johnson talc powder litigation -- that's
3  the issue -- and the amount that I
4  billed.
5       Q.   And now I notice that these
6  do not contain -- it's supposed to go
7  back 12 months?
8       A.   Yes.
9       Q.   They did not contain the
10  Viagra work that you've done?
11       A.   There was another
12  confidential document that accompanied
13  this, that I believe the decision was
14  made -- I don't know what the legal terms
15  are. And there was a list of all the
16  companies that they wanted just that
17  information on, if I had any sort of
18  engagement with the companies on that
19  list.
20       Q.   Who is they? The FDA?
21       A.   The FDA. There was another
22  document that accompanied this that
23  explains sort of, you know, the
24  confidentiality disclosure. It says

1  confidential on top. And that's why it
2  wasn't shared.
3       And Johnson & Johnson was
4  the only firm that I've done any work
5  with that was on that list.
6       Q.   Okay. And so you didn't
7  feel that you needed to indicate that you
8  were an expert witness for the
9  manufacturers in Viagra/Cialis, based
10  upon Number F -- Letter F on this form,
11  that says, "Expert witness last 12 months
12  or negotiation, I appeared for or against
13  the following firms/issues."
14       MR. LOCKE:   Objection to
15  form.
16       THE WITNESS:   Yes,
17  because --
18  BY MR. TISI:
19       Q.   It doesn't -- it doesn't
20  limit to it on the attached list. It
21  simply says --
22       A.   No, but in the confidential
23  document that wasn't, it said, "Please
24  disclose any" -- "Please disclose for the

Karla Ballman, Ph.D.

Page 198

1    firms listed on this list."
2         MS. MILLER: There's a cover
3    memo. I can explain. There's a
4    cover memo. And it said do not
5    disclose. Because it said do not
6    disclose and it wasn't the actual
7    conflicts, we did not produce it.
8    BY MR. TISI:
9         Q.   Okay. But can we agree the
10   form doesn't -- the form itself -- the
11   disclosure form doesn't limit -- I mean,
12   I can't test this -- your -- because I
13   can't see the document.
14        But what I'm asking you is,
15   the form itself that's filed doesn't list
16   Viagra/Cialis litigation, does it?
17        A.   I mean, as you see on the
18   form there, it is not listed, because
19   again, in the cover letter that went with
20   this, the confidential cover letter that
21   says, "Please disclose any engagement
22   with these specific companies," Lilly was
23   not on that.
24        Q.   Okay. Let me ask you -- I'm

Page 199

1    going to mark this as 10-E.
2         (Document marked for
3         identification as Exhibit
4         Ballman-10-E.)
5    BY MR. TISI:
6         Q.   This is the lectures and
7    workshops on epidemiology. And you wrote
8    epidemiology biostatistics. Is it fair
9    to say that all of these -- all of these
10   have to do with trial designs,
11   statistical methods, or biostatistics?
12        A.   So you would say that
13   meta-analyses is not epidemiology? You
14   would say trial design is most
15   epidemiology? I think most
16   epidemiologists would disagree with that.
17        Q.   I'm asking you -- there's a
18   difference between trial design and trial
19   analysis and causation analysis, is there
20   not?
21        MS. MILLER: Objection.
22   BY MR. TISI:
23        Q.   I mean, doing a study and
24   doing a review of the medical literature

Page 200

1    is a different -- two different things,
2    correct?
3         A.   Now I'm confused. I mean --
4         Q.   Okay. Let me -- because I
5    don't want to get -- I don't want to get
6    bogged down.
7         Would you agree with me that
8    these three -- these courses that you
9    taught deal primarily with trial design,
10   statistical methods or biostatistics
11   review?
12        MS. MILLER: Objection.
13   BY MR. TISI:
14        Q.   We can argue about whether
15   it's epidemiology or not later. Would
16   you agree that that is the focus?
17        MS. MILLER: Objection.
18   Really try to stick to one
19   question. I'm really pleading
20   with you.
21        MR. TISI: She's looking at
22   me like I've lost my mind.
23        THE WITNESS: Well, no,
24   because, I mean -- I mean -- I

Page 201

1    mean, clinical trials is
2    epidemiology. It's study design.
3    Biomarker development, that had
4    epidemiology in it because it's
5    very dependent upon study design
6    and what you can say and what you
7    can't say.
8         The trial -- the value of
9    trials, we were talking about
10   meta-analyses. So that -- that,
11   that lecture involved
12   meta-analyses and what a
13   meta-analysis is so forth. As you
14   see in most -- you know, this
15   litigation involves many
16   meta-analyses, and we're calling
17   it epidemiology.
18   BY MR. TISI:
19        Q.   I didn't ask you whether --
20   I simply asked you -- and, you know,
21   forgive me if I think you're being
22   defensive here.
23        MS. MILLER: Objection.
24   BY MR. TISI:

Karla Ballman, Ph.D.

Page 202

1      Q.   Okay. Okay. Because I've
2   simply asked are these primarily focused
3   on trial design, statistical methods, and
4   biostatistics review.
5          MS. MILLER: Objection.
6          THE WITNESS: I don't know
7      how to answer that because, I
8      mean, that's what the titles say.
9   BY MR. TISI:
10     Q.   Thank you.
11     A.   But it does not say sort of
12  what the content is of --
13     Q.   I'm going to ask you that
14  question. You really need to -- you
15  really need to answer my question, and
16  then I will ask the follow-up questions.
17         So are these -- the next
18  question that I'm going to ask, do any of
19  these in any of these courses or
20  lectures, did you teach students how to
21  do a Bradford Hill analysis?
22         MS. MILLER: Objection. Is
23     this about courses? I thought it
24     was just lectures.

Page 203

1          MR. TISI: Lectures. In any
2   of these lectures.
3          MS. MILLER: You said
4      courses.
5          THE WITNESS: I don't
6      believe Bradford Hill was
7      mentioned in -- in these
8      particular lectures, no.
9   BY MR. TISI:
10     Q.   Okay. Okay. Now before we
11  discuss any further, let me just go back
12  and -- and ask you.
13         The front page of your
14  report talks about general causation
15  Daubert hearings, the page that you
16  signed, correct, on Exhibit 1?
17     A.   That's what it says.
18     Q.   Okay. And has -- has it
19  been explained to you or do you have any
20  understanding -- let me rephrase the
21  question.
22         Do you have any
23  understanding as to what Daubert hearings
24  are?

Page 204

1      A.   Just, just a very vague.
2      Q.   What is your understanding?
3          MS. MILLER: Objection.
4   That's a legal question. I don't
5   think that's a question for an
6   expert. That's a question for a
7   lawyer.
8   BY MR. TISI:
9      Q.   What is your --
10         MR. TISI: I understand.
11  BY MR. TISI:
12     Q.   What is your understanding?
13         MS. MILLER: She's not an
14  expert on the law --
15         MR. TISI: I'm asking her
16  what her understanding is.
17         THE WITNESS: I --
18         MS. MILLER: I understand,
19  but I don't think that's an
20  appropriate question.
21         MR. TISI: Okay. Fine.
22         THE WITNESS: Yeah, I don't
23  even know if I -- I even want to
24  hazard what my understanding is,

Page 205

1   because that's outside the scope
2   of my expertise.
3          And I -- I've been learning,
4   as I have mentioned, I've been
5   learning through these processes
6   that the words I use are very
7   important. And so I am just not
8   even going to hazard.
9   BY MR. TISI:
10     Q.   Whether you -- do you know
11  whether or not in these hearings the
12  question is going to be whether or not
13  the witnesses are qualified?
14         MS. MILLER: Objection.
15  BY MR. TISI:
16     Q.   Do you have any
17  understanding of that?
18         MS. MILLER: Objection.
19  Again, that was two questions. I
20  think it's really hard when you
21  ask two questions. I'm sorry to
22  keep repeating this.
23  BY MR. TISI:
24     Q.   Do you have -- do you have

52 (Pages 202 to 205)

Karla Ballman, Ph.D.

Page 206

1   any understanding as to one in the issues
2   in the Daubert hearings is whether the
3   witness is qualified to give an opinion
4   on which they are proffered to give an
5   opinion on?
6       A.   I -- I -- my understanding
7   is, is experts should be experts in -- in
8   the area that they were retained for.
9       Q.   And use a proper
10  methodology, correct?
11      A.   Well, if they were experts,
12  I would presume that -- that they use --
13  they are experts in their area so they
14  know what to do.
15      Q.   Do you have any --
16          MS. MILLER:  Objection.
17  BY MR. TISI:
18      Q.   And that -- so, you agree
19  with me that being qualified experts in
20  the field, that the plaintiffs' experts
21  as your -- have used a proper
22  methodology, they all looked at Bradford
23  Hill, correct?
24          MS. MILLER:  Objection.

Page 207

1           THE WITNESS:  Yeah, that's
2   starting to go beyond my -- my
3   understanding of law.  I mean I
4   know that the -- both sides have
5   experts and they -- both sides'
6   experts say what they're experts
7   in, are -- were retained on the
8   basis of what their expertise is,
9   but that -- that's basically all I
10  know.
11  BY MR. TISI:
12      Q.   Do you have any reason to
13  believe, based upon -- you may disagree
14  with some of the weights or -- and I
15  think you're pretty clear in your report
16  of some of the criticisms that you have
17  about the way in which certain evidence
18  was looked at by some plaintiffs'
19  experts.  Putting aside Smith-Bindman's
20  meta-analysis for a moment.
21          Isn't it fair to say that
22  they applied the same general methodology
23  that you did?
24          MS. MILLER:  Objection.

Page 208

1           THE WITNESS:  I mean,
2   that -- that's a very vague
3   question.  So I -- I can say what
4   I did.  I looked at the totality
5   of the evidence using established
6   epidemiology framework, and I came
7   to the conclusion that there is no
8   credible evidence --
9   BY MR. TISI:
10      Q.   Okay.
11      A.   -- of a causal association
12  between talc and --
13      Q.   I understand that you --
14          MR. TISI:  Again, she's not
15  answering my question --
16          MS. MILLER:  She still has
17  to --
18          MR. TISI:  No, I understand,
19  but she can't filibuster.
20  BY MR. TISI:
21      Q.   I'm -- I didn't ask you what
22  you did.
23          I'm asking you, did the
24  experts when you read their reports on

Page 209

1   the plaintiffs' side, whether you agreed
2   or disagreed with their conclusions, did
3   they use the same framework that you did?
4           MS. MILLER:  Objection.
5           THE WITNESS:  I -- I can't
6   say that.
7   BY MR. TISI:
8       Q.   Okay.
9       A.   I mean, I -- I don't know --
10      Q.   And that's fine then.  Just
11  answer it that way.
12      A.   Okay.  I -- I can't say that
13  with certainty.
14      Q.   That's fine.
15          Is there any methodologic
16  flaw, apart from you that you gave
17  different -- different weights to the
18  evidence and you looked at the evidence
19  differently, is there any methodologic
20  flaw that you have identified in any of
21  the plaintiffs' experts' reports?
22          MS. MILLER:  Objection.  Is
23  there a specific expert you're
24  referring to?

53 (Pages 206 to 209)

Karla Ballman, Ph.D.

Page 210

1          MR. TISI:  I'm -- if she
2     says yes, I will then go through
3     them.
4     BY MR. TISI:
5          Q.    Apart from Smith-Bindman.
6     And I know you have a whole section on
7     Smith-Bindman.
8          A.    Well, I -- I also have sort
9     of -- I -- I address other opinions that
10    experts have made and -- and say why I --
11    I don't believe that the scientific
12    evidence supports what they -- they came
13    to.
14          So obviously, I mean that --
15    that's -- that I think is part and parcel
16    as to --
17          Q.    But that's a conclusion
18    question, right?  So -- so --
19          MS. SHARKO:  You can't
20    interrupt the witness.
21          MR. TISI:  You know, she --
22          MS. MILLER:  This is crazy.
23          MR. TISI:  All right.  You
24    know --

Page 211

1          MS. MILLER:  You've
2     interrupted every sentence that
3     she's given you since we came back
4     from the break and that's just not
5     fair.
6          MR. TISI:  I must tell you,
7     you are not going to do this.
8          MS. MILLER:  I'm not going
9     to do what?
10          MR. TISI:  So -- so -- let
11    me -- let me --
12          MS. SHARKO:  You're not
13    going to do this.
14          MR. TISI:  Are we doing one
15    or two now?
16          MS. SHARKO:  Mr. Tisi, you
17    can't interrupt the witness.
18          MR. TISI:  Okay.
19          MS. SHARKO:  You know that,
20    so behave yourself.
21          MR. TISI:  We have -- so why
22    don't you switch seats -- you can
23    switch seats and we can go --
24    we -- we can have one at a time.

Page 212

1          I assume your learned
2     counsel here knows how to defend a
3     deposition.  Can I assume that?
4          MS. SHARKO:  Are we going to
5     take my deposition now?
6          MR. TISI:  Well, I mean,
7     unless -- if you want to go under
8     oath I'm happy to ask you
9     questions.
10          MS. SHARKO:  Is that a --
11          MR. TISI:  Otherwise --
12    otherwise, I would appreciate it
13    if you would simply observe.
14    BY MR. TISI:
15          Q.    So, Dr. Ballman, have you
16    identified any methodologic -- apart from
17    disagreeing about some of the weights
18    that Dr. Siemiatycki ascribed to certain
19    studies, do you have any criticism of the
20    methodology he used?
21          A.    Of what he used in his
22    meta-analyses?
23          Q.    In hi -- in any -- in his
24    report, entirely.

Page 213

1          A.    So, I mean, overall, you
2     know, I -- I think that there are flaws
3     in the methodology of all the experts.
4          Q.    Okay.  Tell me what -- tell
5     me what they are.
6          A.    Well, we can go through my
7     report.
8          Q.    No, I want you -- you can go
9     through your report.  But I -- just give
10    me a general understanding about what
11    your criticism with Dr. Siemiatycki is.
12          MS. MILLER:  If you need to
13    look at your report --
14          THE WITNESS:  Yeah, I
15    can't --
16          MS. MILLER:  -- don't let
17    him prevent you from looking at
18    your report.
19          THE WITNESS:  Yeah, and I
20    need to -- I need to look at
21    his -- the expert report of
22    Dr. Siemiatycki in order to make
23    sure that --
24    BY MR. TISI:

54 (Pages 210 to 213)

Karla Ballman, Ph.D.

Page 214

1    Q.   As you sit here right now
2 without looking at his report, do you
3 have any criticisms of Dr. Siemiatycki
4 that you can -- that you can articulate
5 for me?
6         MS. MILLER: Objection.
7    That's not fair. The witness said
8    she needs to look at her report.
9    She needs to look at his report.
10   This is not a memory test, is it?
11       MR. TISI: I'm here to take
12   her deposition.
13 BY MR. TISI:
14   Q.   So I'd like to know, as you
15 sit here -- I assume you spent time with
16 counsel preparing, correct?
17   A.   I would like to see the
18 reports, please, because I don't want to
19 misstate something just because my memory
20 is -- is not well -- doing well right
21 now.
22   Q.   So you cannot -- you
23 cannot -- is it fair to say that you
24 cannot offer an opinion as to the

Page 215

1 methodologic flaws of Jack Siemiatycki
2 without sitting here and going through
3 his report?
4         MS. MILLER: Objection.
5 BY MR. TISI:
6    Q.   Because I assumed you would
7 have done that before today.
8         MS. MILLER: Objection.
9         THE WITNESS: I think it's
10   fair to say that I have reviewed
11   many expert reports. I wrote my
12   report. And everything is
13   becoming a jumble. And I just
14   want to make sure that I -- I can
15   refresh my memory in order to
16   render the opinions you're looking
17   for.
18 BY MR. TISI:
19   Q.   Do you understand that in a
20 Daubert hearing that you too will be
21 questioned about your -- both your
22 qualifications and your methodology? Do
23 you understand that?
24   A.   I -- I -- I'm not a lawyer,

Page 216

1 so I don't know exactly what I'm going to
2 be questioned on.
3    Q.   Okay. Now, you offered an
4 opinion in the Viagra Cialis product
5 liability litigation?
6    A.   I did.
7    Q.   Like in this case, you were
8 asked by a pharmaceutical company lawyer
9 to testify on issues about whether or not
10 a product causes a disease, correct?
11       MR. LOCKE: Objection.
12       THE WITNESS: In Viagra, I
13   was asked to evaluate the totality
14   of the evidence that exists as to
15   whether or not exposure to Cialis,
16   in particular, I think, because
17   Lilly, I think, is Cialis and not
18   Viagra.
19       Whether or not it causes
20   melanoma.
21 BY MR. TISI:
22   Q.   Okay. So the answer to my
23 question is you were asked to look at a
24 general causation question as to whether

Page 217

1 or not a product causes a disease?
2         MS. MILLER: Objection.
3         THE WITNESS: I don't
4    know --
5         MS. MILLER: Please.
6         THE WITNESS: -- that the --
7    I'm sorry.
8    Can I answer?
9 BY MR. TISI:
10   Q.   Please.
11       MS. MILLER: Of course.
12   Just give me time. That's all I'm
13   asking.
14       THE WITNESS: So, I don't
15   know what general causation means.
16 BY MR. TISI:
17   Q.   I didn't ask you general
18 causation.
19   A.   I thought you did.
20   Q.   If I did -- the question was
21 to whether --
22       MS. MILLER: "So the answer
23   to my question is you were asked
24   to look at a general causation

55 (Pages 214 to 217)

Karla Ballman, Ph.D.

Page 218

```
 1        question." You did say --
 2            MR. TISI:  Well, I wasn't
 3        talking general causation.
 4    BY MR. TISI:
 5        Q.   A general question about
 6    whether or not a product causes a
 7    disease.
 8            MS. MILLER:  Objection.
 9            THE WITNESS:  Again, I told
10        you what I was asked to look for
11        there.  I was -- and I am giving
12        specifics rather than
13        generalities.  I was asked to look
14        at the totality of the
15        epidemiology literature as to
16        whether or not there is evidence
17        that use of Cialis or a PDE5
18        inhibitor more generally causes
19        melanoma.
20    BY MR. TISI:
21        Q.   Okay.  And so you were
22    looking about a causation question?
23            MS. MILLER:  Objection.
24            THE WITNESS:  Again, I told
```

Page 219

```
 1        you what I was -- I don't know
 2        why --
 3    BY MR. TISI:
 4        Q.   You can't tell me whether or
 5    not you were looking at a causation
 6    question in Viagra/Cialis?
 7        A.   I think I answered that.  I
 8    want to be very specific at what I looked
 9    at.
10        Q.   And I'm being very -- and
11    I'm trying to ask you a question.
12            Let me ask you.  Let me
13    change it.
14            Did your talc general
15    causation report lay out your
16    qualifications -- let me rephrase the
17    question.
18            Your Viagra/Cialis report
19    was issued last year in mid-2018,
20    correct?
21        A.   I believe that's about
22    the -- or October maybe.  I'm not -- I
23    don't know.
24        Q.   That was your deposition.
```

Page 220

```
 1    That was your deposition.
 2        A.   Oh, okay.  Okay.
 3        Q.   Okay.  Your --
 4        A.   Yeah, the report was
 5    probably midyear.
 6        Q.   Was the causation --
 7    causation methodology that you employed
 8    to look at the question about whether or
 9    not Cialis was capable of causing
10    melanoma the same methodology you used in
11    this case?
12        A.   My general approach was
13    similar.  I review the data.  I -- or the
14    literature.  I -- I, you know, determine,
15    you know, whether or not there appears to
16    be evidence of causation using
17    established epidemiology principles and I
18    come to a conclusion.
19        Q.   Is there any -- did you
20    change your methodology at all between
21    Viagra/Cialis and this case.  In other
22    words, did you use a different -- a
23    different standard to evaluate evidence
24    or the same standard?
```

Page 221

```
 1            MS. MILLER:  Objection.
 2    BY MR. TISI:
 3        Q.   In that case as you did
 4    here?
 5            MS. MILLER:  Sorry.  I
 6        thought you were done.  Objection.
 7            THE WITNESS:  I don't know
 8        what you mean different standard
 9        versus the same standard.
10            Are you talking about did I
11        use different words in my report?
12        Did I use different --
13    BY MR. TISI:
14        Q.   No.  I'm asking whether you
15    used the same general framework.  For
16    example, did you use the Bradford Hill
17    framework with respect to Viagra Cialis
18    that you used here?
19        A.   I used established
20    epidemiology principles for looking at
21    causation, which are based in the
22    Bradford Hill criteria.
23        Q.   Okay.  And is there anything
24    that you can think of that would be
```

56 (Pages 218 to 221)

Karla Ballman, Ph.D.

Page 222

1    different -- in other words, if I looked
2    at your Viagra Cialis deposition and your
3    expert report, would it reflect the same
4    methodology that you used here?
5        A.   I -- I don't know how you
6    would --
7        Q.   Putting aside the evidence.
8            MS. MILLER:  She was in the
9    middle of --
10           MR. TISI:  Well, I -- I --
11           MS. MILLER:  She was
12   literally in the middle of the
13   sentence.  I don't think --
14           MR. TISI:  I am going to
15   withdraw the question, Counsel.
16           MS. MILLER:  Okay.
17   BY MR. TISI:
18       Q.   Okay.  Putting aside the
19   fact that the evidence is different -- I
20   mean, obviously it's a different product,
21   different disease here.  Putting that
22   issue aside.
23           If the same -- did you apply
24   the same general framework and approach

Page 223

1    in looking at the causation question in
2    Viagra/Cialis as you did here?
3            MS. MILLER:  Same
4    objections.
5            THE WITNESS:  So, as I
6    explained, I -- I -- and I don't
7    know how to explain it any
8    differently.
9            So I -- I looked at all the
10   available evidence that was in the
11   literature.  I used the Bradford
12   Hill criteria as the basis for
13   looking at whether or not there
14   was causation, and then I -- I
15   rendered sort of what I -- what my
16   opinion was.
17   BY MR. TISI:
18       Q.   And that is the -- that is
19   the standard epidemiologic methodology,
20   true?
21           MS. MILLER:  Objection.
22           THE WITNESS:  I think it's
23   an accepted epidemiological -- or
24   epidemiologic methodology.

Page 224

1    BY MR. TISI:
2        Q.   Okay.  And is there any
3    difference that you can think of in the
4    approach that you made in Viagra-Cialis
5    than you did here?
6        A.   I -- I'm not sure what
7    you're looking for.  I have my --
8        Q.   I'm not looking for
9    anything.  I'm just looking to say, if
10   you were giving a lecture to -- to
11   students and say, you know, in both of
12   these I use the same -- you know, this is
13   how you do it.  For example, in
14   Viagra-Cialis I did it the same way I did
15   it in the talc litigation.
16           MS. MILLER:  Objection.
17   BY MR. TISI:
18       Q.   Did you do it the same?
19       A.   Again, I said I reviewed the
20   literature, I applied Bradford Hill
21   criteria as the basis as to determining
22   whether or not there is causality, and I
23   rendered an opinion.
24       Q.   Was the description of the

Page 225

1    methodology you used in Viagra-Cialis
2    truthful?
3            MS. MILLER:  Objection.  Do
4    you want to put in front of her --
5            MR. TISI:  No, I don't.
6            MS. MILLER:  But that's not
7    fair.
8            MR. TISI:  I asked her --
9            MS. MILLER:  You are turning
10   this deposition into a memory
11   test.
12           MR. TISI:  Counsel.
13   Counsel, this is not a memory
14   test.
15           MS. MILLER:  Okay.
16   BY MR. TISI:
17       Q.   Did you -- is there
18   anything -- have you re-read your
19   deposition in Viagra-Cialis?
20       A.   My deposition?
21       Q.   Mm-hmm.
22       A.   No.
23       Q.   Do you know that there's --
24       A.   Well, the deposition?

57 (Pages 222 to 225)

Karla Ballman, Ph.D.

Page 226

1    Q.   Mm-hmm.
2    A.   In Viagra-Cialis?
3    Q.   Mm-hmm.
4    A.   I've read parts of it, yes.
5    Q.   Okay.  Do you know that
6  there's a Daubert challenge to you in
7  Viagra-Cialis?
8    A.   Yes, I am aware of that.
9    Q.   Okay.  And you know that the
10 hearing is in June, correct?
11   A.   No, I didn't know that.
12   Q.   Okay.  Have you not been
13 told that there's a hearing set?
14   A.   No, I have not been told
15 that.
16   Q.   And is there anything about
17 your approach in Viagra-Cialis as a
18 result of re-reading your testimony that
19 you would change about your approach that
20 you did it here?
21   A.   No.
22       MS. MILLER:  Objection.
23 BY MR. TISI:
24   Q.   Okay.  So that --

Page 227

1        MS. MILLER:  Please try to
2  remember to leave me time to
3  object, please.
4  BY MR. TISI:
5    Q.   Would you --
6        MS. MILLER:  You two are
7  talking over each other and I'm
8  not having an opportunity to
9  object properly.
10       I want the record to show my
11 objection before your answer.
12       MR. TISI:  How about if I
13 just agree that you object to
14 every question and we can move on?
15       MS. MILLER:  How about we
16 just agree that you start asking
17 unobjectionable questions?  It
18 would be so much smoother --
19       MR. TISI:  I am so happy --
20       MS. MILLER:  -- and the depo
21 would go so much quicker.
22       MR. TISI:  -- I will submit
23 every question I have to the
24 court.

Page 228

1        MS. MILLER:  Okay.  Go
2  ahead.
3  BY MR. TISI:
4    Q.   Would you agree that --
5  you've testified to this before, sort of
6  about epidemiology and biostatistics.
7  While there's some overlap obviously
8  between biostatistics and epidemiology,
9  you've pointed that out.  And these are
10 related fields, that they are two
11 distinct scientific disciplines?
12   A.   I think, as I mentioned,
13 that at the basic level, the overlap is
14 almost complete between epidemiology and
15 biostatistics.
16   Q.   Okay.
17   A.   So Epi 101 and Biostats 101
18 are -- are very, very similar.  If you
19 would look at table of contents of books
20 they would have similar concepts being --
21 being taught.
22       I would also say that within
23 clinical research the overlap between
24 epidemiology and biostatistics is very

Page 229

1  complete.
2        I would also say that
3  epidemiology as a field has other areas
4  that aren't so overlapped with
5  biostatistics, such as public health.
6  That -- that is a pure epi sort of topic.
7        Within biostats, there are
8  areas in biostats that are not that
9  overlapping with epidemiology.  It's the
10 area where people want to develop new
11 mathematical techniques and so that's
12 almost more overlapping with mathematics
13 because of the theory beneath it.
14       And so I, as a clinical
15 research in my career over the last
16 20-some years, sits right in that really
17 overlapped area.  And so that's what --
18 what I do.
19   Q.   Okay.  Let me -- let me move
20 to strike the answer because it wasn't --
21 that wasn't my question.
22       My question was, would you
23 agree -- let me -- me give you a
24 different question.

Karla Ballman, Ph.D.

Page 230

1          Would you agree that being
2   an epidemiologist does not automatically
3   qualify a professional as a statistician
4   or biostatistician?
5          MS. MILLER:  Objection.
6          THE WITNESS:  I -- I'm not
7   sure what exactly you're -- you're
8   asking there.
9   BY MR. TISI:
10         Q.   Has every -- can every
11  epidemiologist do what you do?
12         A.   I -- I would have to see
13  what the particular epidemiologist --
14         Q.   I'm not asking that --
15         A.    -- the experience and
16  training is in order to --
17         Q.   Because -- because they are
18  distinct fields, true?
19         There is overlap, just like
20  cardiology and cardiac surgery, overlap,
21  right?
22         MS. MILLER:  Objection.
23  She's --
24  BY MR. TISI:

Page 231

1          Q.   Epidemiology and
2   biostatistics overlap, true?
3          MS. MILLER:  That's three
4   questions.  I'm looking at the --
5   BY MR. TISI:
6          Q.   I'm asking you the question:
7   Do epidemiology and biostatistics
8   overlap?
9          A.   They overlap considerably in
10  some areas.
11         Medicine and epidemiology
12  overlap.  There are medical doctors that
13  do epidemiology.  But medicine is very
14  different and distinct discipline from
15  epidemiology.
16         Q.   Is epidemiology concerned
17  with the distribution causation and
18  control of disease across time and space
19  and human populations?
20         A.   I believe that's one
21  definition that one could use.
22         Q.   In fact, that's the
23  definition on your website, is it not?
24         A.   It may well be.

Page 232

1          MS. MILLER:  Objection.
2   What do you mean by her website?
3          MR. TISI:  Can we have the
4   next exhibit, please.  Exhibit 11.
5          (Document marked for
6   identification as Exhibit
7   Ballman-11.)
8   BY MR. TISI:
9          Q.   This is your website from
10  Weill Cornell?
11         A.   I -- I don't know if it's my
12  website.  I believe it's the division's
13  website of biostatistics and
14  epidemiology.
15         Q.   It has your picture on it?
16         A.   Well, it has my picture on
17  it, but it says biostatistics and
18  epidemiology.  It doesn't say Karla
19  Ballman at the top.
20         Q.   Actually it says, "Weill
21  Cornell Medical Center Biostatistics and
22  Epidemiology," correct?
23         A.   Way at the top, yes.
24         Q.   Right.  And underneath your

Page 233

1   picture it says Dr. Karla Ballman?
2          A.   Yes, that's correct.
3          Q.   And underneath that it has
4   two separate definitions, one for
5   biostatistics and one for epidemiology,
6   correct?
7          A.   Yeah, that's what's there.
8          Q.   "Epidemiology says it's
9   concerned with the distribution,
10  causation, and control of disease across
11  time and space in human population."
12         Do you see that?
13         A.   Yes, that's what's written
14  there, yes.
15         Q.   Okay.  And underneath --
16  above that is a section that says,
17  "Biostatistics is the application of
18  statistical techniques to scientific
19  research in health-related fields
20  including medicine, biology, and public
21  health in the development of novel
22  methodologies that could improve the
23  application.  Since the beginning of the
24  Twentieth Century, the field of

59 (Pages 230 to 233)

Karla Ballman, Ph.D.

Page 234

```
 1    biostatistics has become an in
 2    dispensable tool in improving health and
 3    reducing illness."
 4             Correct?
 5        A.   What you read there is what
 6    it states.  I mean, I'll point out that's
 7    this is a biostatistics --
 8        Q.   That's all I asked.
 9        A.   -- and epidemiology
10    department --
11        Q.   All I asked is whether I
12    read it correctly.
13        A.   You did read it correctly.
14        Q.   Thank you.  This is your
15    website for your department, correct?
16        A.   So I don't think you're
17    letting me sort of address what you're
18    trying to imply.
19        Q.   I'm not trying to imply
20    anything.
21             MS. MILLER:  Please, let her
22    answer.
23             MR. TISI:  No, the problem
24    is -- I think her answer really
```

Page 235

```
 1        illustrates the problems here.
 2    She's anticipating where she
 3    thinks that I'm going.  I'm asking
 4    her very straightforward
 5    questions.
 6    BY MR. TISI:
 7        Q.   The question is, is this
 8    your department's web page?
 9        A.   Yes.
10             MS. MILLER:  I think you
11    know the answer to that.  So
12    that's --
13             MR. TISI:  Okay.  Well, I
14    have to put it on the record,
15    Counsel.
16    BY MR. TISI:
17        Q.   Is it your department's web
18    page?
19        A.   I believe it is.  I haven't
20    been out at that web page in -- I don't
21    know when.  So if you say this is what
22    you got from our -- as our division's web
23    page, I will take that as your word.
24        Q.   And it has two separate
```

Page 236

```
 1    definitions, one for biostatistics and
 2    one for epidemiology, correct?
 3             MS. MILLER:  Objection.
 4             THE WITNESS:  It has -- it
 5    has two statements there.  One for
 6    biostatistics and one for
 7    epidemiology.  And then it has,
 8    "The mission of the division of
 9    biostatistics and epidemiology."
10    And that's not -- that's the
11    mission of our division --
12             MR. TISI:  Counsel --
13             THE WITNESS:  -- which is to
14    develop epidemiologic studies in
15    the fields of hypertension,
16    women's health, perioperative --
17             MR. TISI:  -- honestly can
18    you just ask your witness to
19    answer the question.
20             THE WITNESS:  -- outcomes and
21    anesthesiology.  And that is
22    actually quite outdated because we
23    do more than that.
24             MR. TISI:  Okay.  Okay.
```

Page 237

```
 1        Counsel, I'm really going to ask
 2    you, maybe we can take a break and
 3    you can ask your witness to answer
 4    the question.
 5    BY MR. TISI:
 6        Q.   I'm simply asking, are there
 7    two separate definitions on this page?
 8             MS. MILLER:  You've asked
 9    that three times.
10             MR. TISI:  Well, but I'm not
11    getting an answer.  She wants to
12    go and read the rest of the
13    document.
14             MS. MILLER:  You said it
15    has -- she did answer.  "It has
16    two separate definitions" --
17             MR. TISI:  And she goes on.
18             MS. MILLER:  -- "one for
19    biostatistics and one for
20    epidemiology, correct?"  And she
21    says, "It has two statements
22    there, one for biostatistics and
23    one for epidemiology.  And then it
24    has the mission of division of
```

60 (Pages 234 to 237)

Karla Ballman, Ph.D.

Page 238

1     biostatistics" --
2           MR. TISI:  Did I ask her
3     that?  Did I ask her about the
4     mission?
5           MS. MILLER:  Did she not
6     answer your question, sir?
7           MR. TISI:  Yes, but then she
8     goes on a speech.
9           MS. MILLER:  You are pulling
10    statements out of context --
11          MR. TISI:  I'm not pulling
12    it out of context.
13          MS. MILLER:  -- and she's
14    providing some context.  She's
15    providing the context --
16          MR. TISI:  Counsel.
17    Counsel.
18          MS. MILLER:  Why are you
19    yelling at me?
20          MR. TISI:  Because I think
21    this is bizarre.
22          MS. MILLER:  Really?  I
23    think you're --
24          MR. TISI:  I simply asked

Page 239

1     are there two definitions on the
2     page, one for epidemiology.  I did
3     not ask anything about the mission
4     of the department, did I?
5           MS. MILLER:  She answered
6     your question.
7           THE WITNESS:  Actually, can
8     I -- can I.  You said two
9     definitions.  And I said -- I
10    think I said two statements.  It
11    nowhere here says these are
12    definitions.
13    BY MR. TISI:
14          Q.   Okay.
15          A.   These are just descriptions,
16    and it's not a definition.  And -- okay.
17          Q.   I'll let -- I'll let -- I'll
18    let the judge and jury decide whether or
19    not these are definitions when it says
20    "biostatistics is" and "epidemiology is."
21    We'll let them decide that.
22          MS. MILLER:  What jury are
23    you talking about?
24    BY MR. TISI:

Page 240

1           Q.   These are two separate --
2     these are two separate statements by
3     biostatistics and epidemiology, true?
4           MS. MILLER:  Objection.
5     Asked and answered four times or
6     five.
7     BY MR. TISI:
8           Q.   Are they separate
9     statements?
10          A.   They are separate
11    statements.
12          Q.   Thank you.
13          A.   Because --
14          MS. MILLER:  Finish your
15    sentence if you'd like to.
16          THE WITNESS:  Well, they are
17    separate statements, because it
18    says biostatistics and
19    epidemiology on top.  So, I mean,
20    why wouldn't you have sort of two
21    separate, you know --
22    BY MR. TISI:
23          Q.   I am not asking why you
24    would.  I'm just asking whether you do.

Page 241

1           A.   Yeah, there are two
2     separate --
3           Q.   Perfect.
4           A.   -- descriptions.
5           Q.   Perfect.  Now, the next
6     question is, there are people within your
7     department who actually do have degrees
8     in epidemiology, true?
9           A.   I know of one.  Can you name
10    several more?
11          Q.   Dr. Drusin.  He's a medical
12    doctor with a degree in epidemiology?
13          A.   He is adjunct -- he is in my
14    department -- my division I think.  But
15    it's unclear as to whether he belongs
16    there, because we had a whole -- had a
17    whole restructure of our department a
18    while ago.  And there were other
19    divisions, and he belonged to a different
20    division and got put into my --
21          Q.   Does Dr. Gerber have a Ph.D.
22    in epidemiology?
23          A.   She does have a Ph.D. in
24    epidemiology and does -- and we talked

61 (Pages 238 to 241)

Karla Ballman, Ph.D.

Page 242

1    about her work --
2         Q.   I just asked you whether she
3    had it.  That's all.  Simple question.
4         A.   Okay.  I'm just trying to
5    say that she feels she's more of a
6    biostatistician.
7         Q.   I'm not asking what she
8    feels, Doctor.  I really am asking you,
9    does she have a degree in epidemiology.
10        A.   She has a degree in
11   epidemiology.
12        Q.   Does Dr. -- does Professor
13   Christos have a master's in epidemiology?
14        A.   I don't know.  I believe
15   it's in public health.
16        Q.   Okay.
17        A.   Which is different from
18   epidemiology --
19        Q.   Now --
20        A.   -- in the same way as
21   statistics -- a lot of overlap, like with
22   biostatistics.
23        Q.   Doctor, I'm going to show
24   you what's marked as Exhibit Number 12.

Page 243

1              This will be very quick.
2              (Document marked for
3         identification as Exhibit
4         Ballman-12.)
5    BY MR. TISI:
6         Q.   This is a portion of a
7    transcript from the Center For Devices
8    and Radiologic Health Medical Advisory
9    Committee that you sat on in June of
10   2018.
11             Do you see that?
12        A.   Well, I -- I see the
13   document that you handed me, yes.
14        Q.   And in the -- on Page 7 it
15   says, from Dr. Nathan, it says -- fourth
16   paragraph down, "Before we begin, I'd
17   like to ask our distinguished panel
18   members and FDA staff seated at this
19   table to introduce themselves.  Please
20   state your name, your area of expertise,
21   your position, and your affiliation.
22   We'll go counterclockwise and start with
23   Ms. Barnes."
24             Do you see that?

Page 244

1         A.   You read that correctly.
2         Q.   Would you please go to the
3    next page and look down the page, and
4    when you were asked that question, what
5    did you say?
6         A.   So -- and I believe I
7    answered this before.
8         Q.   I'm just asking what you
9    said.  Would you read into the record
10   what you said.
11        A.   I will.  I will.
12        Q.   Thank you.
13        A.   And again, I'm just
14   reiterating that this is --
15        Q.   You don't need to reiterate.
16   I'm just simply asking you what you said.
17        A.   So it says, "I'm Karla
18   Ballman.  I'm the division chief of
19   biostatistics and epidemiology at Weill
20   Cornell Medicine in New York City, and
21   obviously I'm a statistician."
22        Q.   Thank you.
23        A.   Let me point out that there
24   are others here who also have MPH

Page 245

1    degrees, and they identify themselves as
2    doctors.
3              So again it depends upon
4    what role you play within these
5    committees.
6         Q.   Doctor, you are a member of
7    SARC, what is SARC?
8         A.   SARC is the -- is a
9    nonprofit organization that does research
10   in sarcoma.
11        Q.   Okay.  And there's a web
12   page for you on SARC.
13             (Document marked for
14        identification as Exhibit
15        Ballman-13.)
16   BY MR. TISI:
17        Q.   Exhibit Number 13.
18             Does it identify you as
19   statistician at the top?
20        A.   It does say statistician at
21   the top.  But it says I'm professor of
22   biostatistics in the division of Weill
23   Cornell biostatistics and epidemiology.
24   "She is a recognized expert in cancer

62 (Pages 242 to 245)

Karla Ballman, Ph.D.

Page 246

1  research study design and analyses for
2  clinical trials."
3          There's that overlap again
4  with epidemiology.
5          Q.   Does it say anything about
6  causation there?
7          MS. MILLER:  Objection.
8  BY MR. TISI:
9          Q.   To say I'm an expert in
10 analyzing whether or not substances cause
11 disease?
12         MS. MILLER:  Objection.
13         THE WITNESS:  That -- that's
14 very specific.
15         Let me say that if you --
16 BY MR. TISI:
17         Q.   Does it say that there?
18         MS. MILLER:  Objection.
19         THE WITNESS:  Well, it
20 doesn't say that there, but --
21 BY MR. TISI:
22         Q.   Thank you.
23         A.   -- it doesn't say many
24 things that -- that I do.

Page 247

1          Q.   Are you a member of the --
2  what's known as the American Statistical
3  Association?
4          A.   I am.
5          Q.   What is the American
6  Statistical Association?
7          A.   It's the American
8  Statistical Association.
9          Q.   Is it a reputable
10 organization of statisticians?
11         MS. MILLER:  Objection.
12         THE WITNESS:  And
13 epidemiologists.
14 BY MR. TISI:
15         Q.   Okay.  And -- and
16 epidemiologists.  Okay.
17         And the American Statistical
18 organization, is -- and I'm going to have
19 this marked as exhibit -- what is this,
20 Exhibit 14?
21         (Document marked for
22         identification as Exhibit
23         Ballman-14.)
24 BY MR. TISI:

Page 248

1          Q.   This is the website of the
2  American Statistical Association.  And it
3  says the -- it says, "The American
4  Statistical Association is the world's
5  largest community of statisticians.  The
6  Big 10 for statistics."
7          Do you see that?
8          A.   Yeah.  I -- I just don't
9  know.  This is -- I -- I don't know where
10 you pulled this off from the ASA.  So I
11 mean, that's what it says on this
12 particular page.
13         Q.   And it has a directory, if
14 you go to the last page, and you are
15 listed as a consultant.
16         Do you see that?
17         A.   Yes, I see that.
18         Q.   It has your phone number and
19 your e-mail address and all the
20 information?
21         A.   Yeah, mm-hmm.
22         Q.   Okay.  Could you read --
23 read for the record what you identified
24 to your colleagues as your areas of

Page 249

1  expertise?
2          A.   Biometrics, and
3  biostatistics, and -- and data collection
4  procedures, operations research, and
5  statistical training.
6          Q.   Anything else?
7          A.   Well, I just want to point
8  out that again data collection procedures
9  is -- is an area of epidemiology, and
10 biometrics and biostatistics, as I said,
11 also have considerable overlap with
12 epidemiology.
13         Q.   By the way, the American --
14 you were an officer in the American
15 Statistical Association, I think you
16 said?
17         A.   Did I say that?
18         Q.   I think it's in your -- I
19 think it's in your CV, your CV.
20         A.   I'll have to look at my CV.
21 But I -- I did play some roles in there
22 at some point.
23         Q.   They were volunteer roles,
24 right?

63 (Pages 246 to 249)

Karla Ballman, Ph.D.

1    A.   They were volunteer roles.
2    Q.   Have you ever -- do you know
3  what it takes to be a fellow at the
4  American Statistical Association?
5    A.   No, I do not.
6    Q.   Okay.  Do you know that they
7  have a fellow program where colleagues
8  have -- can nominate people with
9  distinguished careers in statistics for
10  membership in their organization?
11    A.   I --
12    MS. MILLER:  She just said
13  she doesn't know what it is.
14    MR. TISI:  Then let's mark
15  it.
16    THE WITNESS:  Well, I -- I
17  don't know the specifics of it.
18  But I -- I believe that's the
19  purpose of -- and most fellowships
20  in any profession have that.
21    (Document marked for
22  identification as Exhibit
23  Ballman-15.)
24  BY MR. TISI:

1    Q.   I'm going to -- yeah.
2    Other than my -- and I -- I
3  sent this to my e-mail address, and I
4  apologize.
5    But other than that, this is
6  a list from the website from the ASA.
7    A.   Mm-hmm.
8    MR. TISI:  I only have one
9  copy I printed out this morning,
10  I'm sorry, Counsel, if you would
11  share it.
12  BY MR. TISI:
13    Q.   It says, "A designation of
14  an ASA fellow has been a significant
15  honor for nearly 100 years.  People
16  can" --
17    MS. MILLER:  Actually isn't
18  every page the same?
19    THE WITNESS:  Oh yeah.
20    MR. TISI:  Maybe it is.  I
21  apologize.
22    MS. MILLER:  Wait, this is
23  confusing.  I just want to state
24  for the record that this is a

1  three-page exhibit.  But the first
2  two pages are Page 1 of 2 and the
3  last one is Page 2 of 2.
4    Do you want me to pull out
5  this so that it's an accurate
6  exhibit?
7    MR. TISI:  That's fine.
8  Thank you.
9    MS. MILLER:  So here we go.
10  I've pulled out the middle page,
11  and now we have Page 1 of 2 and
12  Page 2 of 2.
13  BY MR. TISI:
14    Q.   Okay.  Have you ever been
15  nominated as an ASA fellow, do you know?
16    A.   I have no idea.
17    Q.   Okay.  Have you -- are --
18  you are not an ASA fellow, are you?
19    A.   I am not an ASA fellow.
20    Q.   Okay.  And to be clear, an
21  ASA fellow would be somebody whose
22  contribution to the advancement of
23  statistical science and places due weight
24  on public works, positions held with

1  employer, ASA activities, membership and
2  accomplishments in societies, and
3  professional activities.
4    And you are not -- you
5  have -- you are not a fellow, correct?
6    MS. MILLER:  Objection.
7    THE WITNESS:  I am not.
8    MS. MILLER:  Please.
9    THE WITNESS:  You read that
10  correctly.  I am not a fellow.
11  BY MR. TISI:
12    Q.   In applying for funds --
13  actually let me stop for a second.
14    You know, from time to time
15  the ASA issues statements about
16  statistical issues?
17    A.   I'm vaguely aware that they
18  issue statements from time to time.
19    Q.   Okay.  In your CV do you
20  identify past or present current grants.
21  Have you -- do you know if whether you
22  have ever asked for a -- identified
23  yourself as an epidemiologist by title,
24  as an epidemiologist, not as part of your

64 (Pages 250 to 253)

Karla Ballman, Ph.D.

Page 254

1  department?
2        MS. MILLER: Objection.
3  BY MR. TISI:
4        Q.   As you are describing
5  yourself, in a -- in a grant that you
6  have ever given for any purpose?
7        MS. MILLER: You just kicked
8        me. Objection.
9        MR. TISI: I apologize.
10       THE WITNESS: I -- I have
11       been on so many grant and grant
12       applications that I cannot off the
13       top of my head tell you whether or
14       not I have ever said I am an
15       epidemiologist.
16  BY MR. TISI:
17       Q.   Have you ever to your
18  knowledge ever stood up in a public
19  meeting and said, "I, Karla Ballman, is
20  an -- I am an epidemiologist"?
21       MS. MILLER: Objection.
22  BY MR. TISI:
23       Q.   Like you did before, and
24  say, "I'm a statistician"?

Page 255

1        MS. MILLER: Objection.
2  BY MR. TISI:
3        Q.   Have you ever told your
4  colleagues, "I am an epidemiologist"?
5        MS. MILLER: It's really
6        hard, because I don't know when
7        your question ends. Because you
8        ask a question, and then I object,
9        and then you keep going.
10       MR. TISI: Okay. Fine. I'm
11       sorry.
12       MS. MILLER: It's a very
13       complicated --
14       MR. TISI: I'm sorry it's
15       hard.
16       MS. MILLER: -- record. But
17       it's not fair to the witness,
18       because I don't -- do you know
19       what question --
20       THE WITNESS: I'll --
21  BY MR. TISI:
22       Q.   Have you ever stood up in a
23  public professional meeting and said, "I,
24  Karla Ballman, an epidemiologist"?

Page 256

1        A.   I have been to many
2  professional and public meetings, I don't
3  know if I've ever stood up and said with
4  certainty -- I cannot answer if I've ever
5  stood up and said that.
6        I do have to say that when
7  people hear biostatistics and clinical
8  research, they intertwine epidemiology
9  and biostatistics, so --
10       Q.   But you have never
11  represented to your colleagues
12  affirmatively, "I, Karla Ballman, an
13  epidemiologist"?
14       MS. MILLER: Objection.
15       THE WITNESS: Again, in
16       situations and studies I'm in, by
17       saying a biostatistics and knowing
18       that I do cancer research, they
19       know what that means and they know
20       it involves study design. As you
21       can look in my CV, I have many
22       case-control -- I've done
23       case-control studies. I've done
24       cohort studies. I've done --

Page 257

1  BY MR. TISI:
2        Q.   Okay. Your department, your
3  department offers a two-month review
4  course in epidemiology, taught by
5  Dr. Christos. Do you know that? In
6  October/November of every year?
7        A.   Is it called a review
8  course?
9        Q.   Yes.
10       A.   I'm just having some -- and
11  can I see where you are getting at and
12  what it is?
13       Q.   Exhibit 16.
14       A.   I just want to see what
15  program it's a part of. I'm not
16  disputing that.
17            (Document marked for
18            identification as Exhibit
19            Ballman-16.)
20       THE WITNESS: Is it part of
21       the CTSC program?
22       MR. TISI: Honestly, I've
23       got to -- I thought it was here.
24  BY MR. TISI:

65 (Pages 254 to 257)

Karla Ballman, Ph.D.

Page 258

1    Q.    This is Exhibit Number 17,
2  which is the list of courses that I got
3  from the Weill Cornell website.
4    A.    I see, okay.
5    Q.    Do you see where I'm
6  referring to?
7    A.    Are you -- go ahead.  Ask
8  your question.  I'll let you say it.
9         MS. MILLER:  This is 17.
10  Catherine saying she says that she
11  doesn't believe there's a 16, that
12  you went from 15 to 17.  Is that
13  correct?
14         MR. SOILEAU:  He referenced
15  a 16, but then essentially
16  withdrew it and moved to a new
17  document and marked it as 17.
18         MR. TISI:  So why don't we
19  mark it as 16.
20         MS. MILLER:  Why don't we
21  mark it 16 for clarity going
22  forward.  Thank you, Catherine.
23  BY MR. TISI:
24    Q.    So to be clear, this is the

Page 259

1  list of courses that are offered by the
2  Weill Cornell Medical Center in
3  biostatistics and epidemiology?
4    A.    I don't know.  Because Madhu
5  Mazumdar who is listed there, that was
6  the individual I replaced.  So I don't
7  know where -- I mean, his is not
8  reflective of anything we're --
9    Q.    You see the date on top is
10  three -- March 2019.  I mean, it's off
11  the website.  I don't know what to tell
12  you, other than that's where I got it.
13    A.    Yeah, I agree.  I don't know
14  what to tell you either.  But that just
15  shows you that we don't keep our website
16  up to date.  But Madhu Mazumdar has not
17  been at Weill Cornell for almost four
18  years, if not more than four years so.
19    Q.    Let me ask you this.  Have
20  you ever taught a course with the word
21  "epidemiology" in it?
22         MS. MILLER:  Objection.  In
23  the course or in the course --
24  BY MR. TISI:

Page 260

1    Q.    I'm asking with -- the title
2  of the course.  I'm not asking the
3  content now.  So you made that very
4  clear, that it overlaps, and the record
5  is clear on that.
6         I'm asking you have you ever
7  taught a course with the word
8  "epidemiology" in it?
9    A.    I do not believe I've taught
10  a course with epidemiology in it.  Most
11  of those courses would be intro courses,
12  and when I teach intro courses, I come at
13  it and teach it from the biostats side.
14  That includes epidemiology as a part of
15  it.  But I have not taught an
16  epidemiology 101 course.  No, I've not
17  had a course with epidemiology in the
18  title.
19    Q.    In fact -- in fact, the only
20  two courses that you taught at Cornell
21  Weill are introduction to biostatistics
22  and biostatistics 1?
23    A.    I'm trying to remember the
24  titles.  And, again, I don't know where

Page 261

1  you're getting that information from.  So
2  I want to make sure the titles are
3  correct.
4         MS. MILLER:  Is that in your
5  CV?
6         MR. TISI:  It is.
7         THE WITNESS:  Okay.  If it's
8  in my CV.  Thank you.  And if -- I
9  have only taught two courses.  I
10  am not quibbling about that.
11  BY MR. TISI:
12    Q.    Thank you.
13    A.    I'm just trying to see, you
14  know, if it says intro to biostats or --
15  okay.  Yeah one is part of the executive
16  MBA/MS program.  And the other is part of
17  our biostatistics and data science
18  program.  Those are two courses that I
19  have taught at Weill Cornell.
20    Q.    Does Weill Cornell offer a
21  Ph.D. or an MPH in epidemiology?
22    A.    Weill Cornell itself?
23    Q.    Mm-hmm.
24    A.    No, it does not.

66 (Pages 258 to 261)

Karla Ballman, Ph.D.

Page 262

1      Q.   Does -- and Cornell only
2   offers epidemiology as a minor, correct?
3      A.   I -- I couldn't comment on
4   that.  I don't know what the main campus
5   offers.
6           MS. MILLER:  Were you asking
7      Cornell, as in not Weill Cornell
8      but undergraduate?  You said -- as
9      in undergraduate courses?
10          MR. TISI:  I said in
11     Cornell, regular Cornell, the
12     Cornell upstate in Ithaca.
13  BY MR. TISI:
14     Q.   To be clear, you have no
15  publications on ovarian cancer, correct?
16          MS. MILLER:  Objection.
17     Asked and answered.
18          THE WITNESS:  I have no
19     publications that have -- I
20     believe, that are on ovarian
21     cancer.
22  BY MR. TISI:
23     Q.   Any publications on the risk
24  factors for ovarian cancer?

Page 263

1           MS. MILLER:  Objection.
2           THE WITNESS:  Again, I just
3      said I have no publications in
4      ovarian cancer.  I have
5      publications on -- that evaluate
6      risk factors for many other
7      cancers.
8   BY MR. TISI:
9      Q.   But not ovarian?
10     A.   Not ovarian, per se, but
11  ovarian cancer is not any different from
12  other cancers in terms of how one would
13  evaluate risk factors.
14     Q.   That's not what Dr. Neel
15  told us the other day.  So we'll have to
16  see whether he's right or you're right.
17     A.   Can you show me that
18  statement?  I believe he was talking
19  about that there's issues about different
20  subtypes of ovarian cancer.  I didn't see
21  that -- and that -- I don't think he said
22  that --
23     Q.   He was very clear that risk
24  factors are different between the two.

Page 264

1      A.   But the --
2      Q.   But let's let --
3           MS. MILLER:  That's not what
4      he said.
5           THE WITNESS:  He didn't say
6      the methodology differed.
7           MR. TISI:  Let's -- let's
8      move on.
9           THE WITNESS:  He said the
10     individual risk factors differed
11     is my understanding.
12          MS. MILLER:  She said in
13     terms of how one would evaluate
14     factors.  You're mischaracterizing
15     her testimony.
16  BY MR. TISI:
17     Q.   Are there any publications
18  on your CV related to talc?
19     A.   No, there are not.
20     Q.   Any publications even
21  mention talc and cancer in the same
22  article?
23          MS. MILLER:  Objection.
24     We've been through this.

Page 265

1           THE WITNESS:  I cannot say
2      that with certainty.
3           I -- you know, it's
4      definitely not in the title, but I
5      can't say for sure if -- if there
6      was talc somewhere mentioned in
7      all 200 publications.  I don't
8      know with certainty.
9   BY MR. TISI:
10     Q.   Any publications about
11  asbestos?
12     A.   No.
13     Q.   Any publications about
14  asbestos and ovarian cancer?
15     A.   Again, there are no
16  publications in ovarian cancer.  So no.
17     Q.   Any publications where you
18  reviewed evidence regarding causation for
19  any disease through a Bradford Hill
20  guideline?
21     A.   So that is a little harder
22  to -- to -- I'll have to go through and
23  look through all the things.  I mean,
24  I -- I don't know for certain whether or

67 (Pages 262 to 265)

Karla Ballman, Ph.D.

1    not I discuss -- any of the publications
2    discuss causation.
3            I know I have publications
4    that establish associations with things.
5    And we just don't go any further, because
6    association is not causation and there
7    was no reason to establish whether it was
8    causal or not.
9        Q.   Right.  So my question is,
10   have you ever done an article where you
11   did what you did here, which is look at
12   all the evidence, try to synthesize it
13   and determine whether or not there's
14   cause and effect that you can think of?
15           MS. MILLER:  Objection.
16           THE WITNESS:  So I would
17       have to say that I believe there
18       are articles here that we have
19       established association and we
20       realize that it -- it didn't merit
21       going through Bradford Hill
22       because it was -- because of the
23       methodology we did, that, you
24       know, we weren't -- we didn't

1        think there -- it was sufficient
2        to, like perhaps the odds -- the
3        risk ratio was like 1.3 or
4        something, pretty small.
5    BY MR. TISI:
6        Q.   Okay.  And so the answer to
7    my question is, because of the results
8    that you got in your studies, you have
9    never done in your published literature a
10   full-blown Bradford Hill causation
11   analysis because you didn't get that far?
12           MS. MILLER:  Objection.
13       That mischaracterizes the
14       testimony.
15   BY MR. TISI:
16       Q.   If it is, correct me,
17   please.
18       A.   No.  In order to establish
19   causation, you have to start with that.
20   And if it doesn't show that there's
21   causation, why would you write in sort of
22   a whole article, you know, we did
23   Bradford Hill criteria?  I mean, I'm
24   saying that the same methodology is used

1    in publication, in some of my
2    publications, as I used in this analysis.
3        Q.   Do you think that if I went
4    through each and every article there
5    would be any mention of Bradford Hill?
6        A.   I'm not sure with
7    100 percent certainty.  But that may well
8    be the case.  Just again, because it
9    doesn't say Bradford Hill does not mean
10   that the underlying methodology that was
11   used was not based on the Bradford Hill
12   framework.
13       Q.   Isn't it true that your
14   contribution to the vast majority of your
15   200-plus articles is statistical design
16   and statistical evaluation and to the
17   statistical methods you used in the paper
18   and that you are not either the first
19   author or the last author?
20           MS. MILLER:  Objection.
21       That's like very, very, very
22       compound.
23           THE WITNESS:  I don't quite
24       understand the question.  I mean,

1        I can point out to numerous
2        publications, like, for clinical
3        trials.  Typically, the first
4        author is the chair of the
5        clinical trial.  The second author
6        is the -- the statistician that is
7        on the clinical trial, to
8        recognize their role in the design
9        of the study, as well as the
10       interpretation of the data.
11   BY MR. TISI:
12       Q.   My question is --
13           MS. MILLER:  She's answering
14       your question.
15           MR. TISI:  You're not
16       answering my question, Doctor,
17       honestly.
18           MS. MILLER:  She's doing her
19       best.
20           MR. TISI:  She's not.
21   BY MR. TISI:
22       Q.   I said in, how many -- very
23   few of these articles -- in fact, I think
24   I counted eight.  I have to go back and

68 (Pages 266 to 269)

Karla Ballman, Ph.D.

Page 270

1  check, it's certainly under ten, where
2  you were either the first or last author.
3  Would that be about accurate?
4        MS. MILLER:  Objection.
5        THE WITNESS:  Yeah, I -- I
6  don't know.  I mean, if you say
7  you counted it, I can go through
8  and count.  But I'm just not sure.
9  I'm trying to answer sort of what
10  my role is in these studies.
11  BY MR. TISI:
12      Q.   It would --
13      A.   And again, you don't know
14  this field, but in clinical trials, I
15  would never be the first and last author
16  because I am not the study chair.
17        The role -- what shows the
18  contribution of me is the second
19  position, and there are many where I am
20  the second position.  And in fact, on
21  things that have changed practice.
22      Q.   You have criticized
23  Dr. Smith-Bindman and her meta-analysis,
24  correct?

Page 271

1        A.   I -- I show where I think
2  there are some limitations in her
3  analyses, yes.
4        Q.   Well, you said that they
5  were flawed.  I think that's -- you used
6  the word flawed."
7        A.   I may have used the word
8  "flawed."
9        Q.   Do you know that
10  Dr. Smith-Bindman, unlike yourself, is
11  actually submitting her analysis to peer
12  review.  Does that surprise you?
13      A.   I did not know that.
14        MS. MILLER:  When you're
15  ready, they sometimes take away
16  the food away by 1:00.  So we
17  should probably wrap up and take a
18  break.
19        MR. TISI:  I'm almost done
20  with this section here.
21        MS. MILLER:  Okay.
22  BY MR. TISI:
23      Q.   So you've published.  You've
24  been on articles where -- three

Page 272

1  meta-analyses that I can count.  She has
2  six published in JAMA.  JAMA is a high
3  impact journal, would you agree?
4        A.   Yes, JAMA is a high impact
5  journal.
6        Q.   Right.  She has two
7  meta-analyses in high impact journals.
8  Can you tell me whether or not you've
9  ever published a meta-analysis in any
10  high impact journal?
11      A.   Can you show me those
12  references to the meta-analyses that she
13  published?
14      Q.   47 -- 47 -- she or you?
15      A.   Not me.  Hers.
16      Q.   I'm asking about yours.
17        MS. MILLER:  But you asked
18  about --
19        THE WITNESS:  No, you asked
20  about her.
21        MS. MILLER:  You said she
22  has six published in JAMA.  Would
23  you agree?
24        MR. TISI:  No, I said two.

Page 273

1  BY MR. TISI:
2        Q.   No, I didn't ask -- I said I
3  will represent to you that she has two
4  published in JAMA.  She has six
5  meta-analyses published total.
6        MS. MILLER:  I'm looking at
7  the realtime.  It says, "You have
8  published -- you've been on
9  articles or three meta-analyses
10  that I can count.  She has six
11  published in JAMA.  JAMA is a high
12  impact journal.  Would you agree?"
13  BY MR. TISI:
14      Q.   Okay.  Well, let me rephrase
15  the question.  She has six meta-analyses,
16  two published in JAMA.  You would agree
17  that JAMA is a high impact journal?
18      A.   Well, I just want to see --
19  I want to see those citations --
20      Q.   I'm not asking you --
21      A.   -- because you're saying
22  she.  I mean, does it -- where is she in
23  the author list.  I don't know even what
24  you're --

Karla Ballman, Ph.D.

Page 274

1    Q.   Is that important?
2    A.   I don't know.  I just want
3  to see what the titles are of the --
4    Q.   Then let's talk about you.
5    A.   -- articles.
6    Q.   Let's talk about you.  In
7  your three published meta-analyses,
8  Number 47, 68, and 142 on your CV, were
9  you the lead designer of the study?
10    A.   I was --
11         MS. MILLER:  Do you want to
12  see?
13  BY MR. TISI:
14    Q.   47, 68, and 142.
15    A.   Thank you.  Yeah, yeah,
16  yeah.
17         MS. MILLER:  Would it be on
18  this list?  I found the 47.
19         THE WITNESS:  No, it's not
20  that list.
21         MS. MILLER:  There's so many
22  lists.
23         THE WITNESS:  It would be my
24  CV maybe?  Is that what you're

Page 275

1  talking about my CV?
2         MR. TISI:  Let me see it.
3         MS. MILLER:  Is this the
4  document?  It's 47, Witt, Ballman.
5         THE WITNESS:  That's one.
6         MS. MILLER:  So then I think
7  this is maybe the right list.
8         THE WITNESS:  Yeah, I see
9  it.
10         MS. MILLER:  Okay.  Great.
11         THE WITNESS:  Again, you see
12  I'm second.  So that means I
13  played a very integral role in
14  this --
15  BY MR. TISI:
16    Q.   That's Number 47?
17    A.   Yep.
18    Q.   And what's that one called?
19    A.   "The Incidence of Stroke
20  After Myocardial Infarction:  A
21  Meta-Analysis."
22         MS. MILLER:  Again, I just
23  want to suggest that we break for
24  lunch soon because --

Page 276

1         MR. TISI:  I understand.
2  I'm almost done.  The food is
3  not --
4         MS. MILLER:  I think we've
5  just been going an hour.  It's a
6  good time to break.
7         MR. TISI:  I understand.
8  I'm just at the end of the --
9         MS. MILLER:  Okay.  Great.
10         MS. SHARKO:  Did you miss
11  me?
12  BY MR. TISI:
13    Q.   The next one is which one,
14  68?
15    A.   And I see that one.
16    Q.   And that's -- which one is
17  that one?  Is that O'Sullivan, or is that
18  142?
19    A.   No, 68 is Witt, Gami,
20  Ballman, Brown.
21    Q.   And the other one is -- 142
22  is O'Sullivan.
23    A.   Yes.
24         (Document marked for

Page 277

1  identification as Exhibit
2  Ballman-17.)
3  BY MR. TISI:
4    Q.   I'm going to hand you
5  O'Sullivan.  Did you play a substantial
6  role in the meta-analysis which is 142,
7  the O'Sullivan meta-analysis?
8    A.   What do you mean by a
9  substantial role?
10    Q.   Did you design it?
11    A.   I was part of the group, so
12  this is actually a pooled analyses.
13    Q.   It says meta-analysis in the
14  title.
15    A.   Yeah.  So you can't get
16  everything out of titles, right?  So a
17  pooled analysis is a type of
18  meta-analysis.  It's a much stronger
19  meta-analysis in the sense that what
20  happens is you get individual patient
21  level data.
22         So this is pooling data
23  from, like, the largest clinical trials
24  that were done in adjuvant trastuzumab,

70 (Pages 274 to 277)

Karla Ballman, Ph.D.

Page 278

1   and that's Herceptin for women that have
2   HER2 positive breast cancer.  I control
3   the data for one of the big trials in
4   trastuzumab.
5           And so I was part of this
6   group that just came together and said,
7   wow, we should use all this data, pool it
8   together to address a rare type of
9   situation, which was done here.
10      Q.   Did you do any of the
11  writing of this?
12      A.   I -- I did not do the first
13  draft, but I did go through and make
14  revisions and comments.
15      Q.   Isn't it true that you were
16  identified as primarily the collection
17  and assembly of data?
18      A.   That was probably the
19  biggest role that I played in this study.
20  But I did -- yeah.
21      Q.   Isn't that kind of what
22  you -- isn't that kind of what you've
23  done in the meta-analysis that you've
24  done, you're primarily the collection of

Page 279

1   data?
2       A.   No, that's not true.
3       Q.   Okay.  So the other two
4   would be ones that you did more than
5   that, 47 and 58?
6       A.   Well, you know --
7       Q.   47 and 68.  Excuse me.
8       A.   Yes, I mean I -- I -- I --
9   it's sort of -- it's a whole
10  collaborative thing.  It's not like, you
11  know, this is a service that you're
12  trying to imply.  It's a scientific
13  endeavor that's done as a collaborative
14  experience among various different
15  scientists with different expertise.
16      Q.   Do you think you're as --
17  just have one -- do you think you have
18  the same qualifications or better than
19  Dr. Smith-Bindman in doing a
20  meta-analysis?
21          MS. MILLER:  Objection.  I
22  think she testified that she
23  wasn't testifying about other
24  witnesses' qualifications three

Page 280

1       times.
2   BY MR. TISI:
3       Q.   I'm asking you -- I'm asking
4   you whether or not you, by training and
5   experience, you think you have better
6   qualifications than Dr. Smith-Bindman?
7       A.   I can't answer that.  I
8   mean, I don't know.  I mean, I would have
9   to go through and look at all -- at all
10  the stuff she's done.  My only exposure
11  to her was the study that she's done, and
12  I don't think it was done particularly
13  well.
14      Q.   The one she's submitting for
15  peer review?
16      A.   Has she submitted it?  Has
17  it been published?  I wonder if it will
18  be published actually.
19      Q.   Well, we'll have to see how
20  that goes.
21          MR. TISI:  I am -- this is
22  a -- this is a good time for
23  lunch.
24          THE VIDEOGRAPHER:  The time

Page 281

1       is 12:49 p.m.  Off the record.
2           - - -
3           (Lunch break.)
4           - - -
5   A F T E R N O O N   S E S S I O N
6           - - -
7           THE VIDEOGRAPHER:  We are
8   back on the record.  The time is
9   1:27 p.m.
10          - - -
11          EXAMINATION (Cont'd.)
12          - - -
13  BY MR. TISI:
14      Q.   Doctor, before lunch -- I
15  want to finish up talking about your
16  qualifications.  I want to move onto a
17  new topic here.
18          I want to ask you about two
19  questions, two or three questions I think
20  about Bradford Hill, and then we're going
21  to move on to your analysis.
22      A.   Okay.
23      Q.   Okay.  Just so we know,
24  we'll talk about case -- case-control and

71 (Pages 278 to 281)

Karla Ballman, Ph.D.

Page 282

1   cohort studies, just to kind of give you
2   a little bit of roadmap of where I'm
3   going.  All right?
4           Bradford Hill, we can both
5   agree, we've used the word criteria, but
6   we both agree that these are -- this
7   is -- these are guidelines, correct?
8       A.   I call it a framework.
9       Q.   Okay.  And just to be clear,
10  you use the word criteria.  And I've
11  actually used it in my -- in my
12  questions.
13          When you use the word
14  criteria, we really are talking about,
15  these are different considerations that
16  should be looked at when you're looking
17  at the question of causation generally.
18      A.   Yeah.  So Bradford Hill has
19  nine different considerations that one
20  should consider with -- within the
21  framework of doing a Bradford Hill
22  analysis.
23      Q.   Right.  And just -- just to
24  be clear for the record, this isn't like

Page 283

1   a cookbook or a mathematical formula.
2   Bradford Hill is -- is a balancing of the
3   evidence using that -- that framework as
4   a guideline?
5           MS. MILLER:  Objection.
6           THE WITNESS:  So I mean,
7       research is not a cookbook.  But,
8       you know, one can apply Bradford
9       Hill -- I mean I think there's
10      incorrect ways of applying
11      Bradford Hill.
12  BY MR. TISI:
13      Q.   Okay.  And one of them,
14  you -- you -- and this leads into my next
15  question is, you believe that there are
16  levels of evidence that trump other
17  levels of evidence, generally speaking?
18          MS. MILLER:  Objection.
19          THE WITNESS:  In the
20      epidemiology literature, it's
21      pretty much I think agreed upon
22      that there are -- there are
23      different levels of evidence based
24      upon what type of study design is

Page 284

1   being used.
2   BY MR. TISI:
3       Q.   And that's a -- that's a
4   methodologic flaw that you identified
5   that you think the plaintiffs' experts
6   didn't adequately consider the -- that --
7   that cohort studies are higher on the
8   evidentiary ladder than case-control
9   studies, true?
10      A.   I -- I believe that some of
11  plaintiffs' experts just sort of, just
12  flat out say that case-controlled studies
13  have the higher evidence than the cohort
14  studies.
15      Q.   Let's talk about that for a
16  moment.  On Page 3, on your -- your --
17  excuse me.  On your conclusion, we -- it
18  talks about the levels of evidence.  Do
19  you remember, you -- we -- we talked
20  about that, that's Exhibit Number 2.  You
21  actually mention it in your conclusion,
22  right?
23      A.   So I'm sorry, where --
24  where --

Page 285

1       Q.   It's the second sentence, it
2   says, "In assessing studies for the level
3   of evidence in the data."
4       A.   Okay.
5       Q.   And we agreed --
6       A.   Yeah.  So I used that word.
7   Yeah, I used that word.
8       Q.   And we agreed before that
9   the level of evidence you were talking
10  about was prospective case-controlled --
11  prospective cohort studies versus case
12  controls?
13      A.   No, no, no.  That's not
14  correct here.
15      Q.   Okay.
16      A.   This here, as I'm looking at
17  the evidence in totality across
18  everything I looked at.
19      Q.   Okay.  But below in the --
20  on Page 53 you say, "Cohort studies
21  provide stronger evidence than do
22  case-control studies."
23          It's near the -- like five
24  lines --

72 (Pages 282 to 285)

Karla Ballman, Ph.D.

Page 286

1    A.   "Cohort studies provide
2  stronger evidence do" -- "than do
3  case-control studies."
4         That's stated there, yes.
5    Q.   Okay.  And you think that's
6  a general epidemiologic principle,
7  correct?
8    A.   I do.
9    Q.   And you repeat that
10 repeatedly throughout your report,
11 correct?
12   A.   I -- I may state it several
13 times.
14   Q.   Okay.  Let's -- let's look
15 at them.
16        First of all, if you go to
17 Page 4 of your report, you talk about the
18 levels of evidence with increasing
19 reliability.  It says, on -- "Figure 1
20 illustrates the level of evidence with
21 each trial design with increasing
22 evidence moving up the pyramid."
23        Do you see that?
24   A.   I do see that.

Page 287

1    Q.   And then you have a pyramid?
2    A.   I do.
3    Q.   Okay.  And what is the
4  purpose of this illustration that you
5  included in your report on Page 4?
6    A.   Just -- just to -- to give a
7  visual for how the different study
8  designs compared to each other in terms
9  of -- of the level of evidence that
10 epidemiologists believe are -- are
11 conveyed in each of the different types
12 of studies.
13   Q.   And below randomized
14 controlled trial -- there's randomized
15 and there's meta-analysis, and by that
16 you mean meta-analysis of controlled
17 trials, correct?
18   A.   Yes.
19   Q.   Okay.  And then underneath
20 are RCTs?
21   A.   Mm-hmm.
22   Q.   Okay.  And under that are
23 cohort studies?
24   A.   Yes.

Page 288

1    Q.   And under that are
2  case-control studies?
3    A.   Yes.
4    Q.   And under that are case
5  reports and case series?
6    A.   Yes.
7    Q.   Okay.  And you have kind of
8  bright lines between the two, to really
9  differentiate for the reader, that there
10 is -- these are established principles,
11 correct --
12        MS. MILLER:  Objection.
13 BY MR. TISI:
14   Q.   -- that -- that cohort
15 studies are -- are better than
16 case-control studies, are better than
17 case reports and case series, et cetera?
18        MS. MILLER:  Objection.
19        THE WITNESS:  I -- I don't
20 think I said better.  And I think
21 the lines are there just -- just
22 so there has -- there doesn't have
23 to be lines there.
24        And what it's trying to show

Page 289

1  is the level of evidence contained
2  in those.  I don't -- I mean, I
3  don't know what you mean by
4  better.
5  BY MR. TISI:
6    Q.   Well, okay. Cohort studies,
7  according to your chart, are more
8  reliable than case-controlled studies?
9    A.   Again, they -- they have a
10 higher level of evidence.  I don't -- I
11 don't know if I would say reliable is the
12 same as level of evidence.
13   Q.   Okay.  Now, you don't have
14 any citation for this, for this chart, do
15 you?
16        Did you create this or is
17 this from some other place?
18   A.   I -- I have seen this in
19 numerous, numerous different places, but
20 I made this particular figure by myself.
21   Q.   Okay.  So there's no
22 citation for this?
23   A.   Not in this document, but
24 there is in the epidemiology literature.

73 (Pages 286 to 289)

Karla Ballman, Ph.D.

Page 290

1      Q.   Okay.  Well, there's no
2   citation for this, correct?
3           MS. MILLER:  Objection.
4       Asked and answered.
5   BY MR. TISI:
6       Q.   Because what I'm going to
7   ask -- I'm going to ask you questions
8   about that, but you did not provide a
9   citation for Figure 1 --
10          MS. MILLER:  Objection.
11  BY MR. TISI:
12      Q.   -- where you got that
13  statement from?
14          MS. MILLER:  I'm sorry, I
15      just always think you're done with
16      your question so I object, and
17      then you keep going.  That's now
18      three questions and it's one
19      question.  We're having the same
20      ongoing issue that we had before.
21          Objection to all three parts
22      of that question.
23  BY MR. TISI:
24      Q.   Okay.  Doctor --

Page 291

1           MS. MILLER:  So which
2       question is --
3   BY MR. TISI:
4       Q.   Doctor, do you have a
5   citation to this chart?
6       A.   I made the chart up myself.
7   And -- and it is just an underlying
8   epidemiological principle, so it -- it
9   doesn't have a citation.  It would be
10  like cite -- citing what a T test is.
11      Q.   Okay.4?
12      A.   It's sort known through the
13  literature as to this is...
14      Q.   Okay.  So your -- so your --
15  your view if it's a general principle,
16  you don't have to cite something to
17  support it?
18          MS. MILLER:  Objection.
19          THE WITNESS:  You know,
20      again, it's -- it's a general
21      principle and, you know, and when
22      one is talking about odds ratios
23      or P-values and things like that,
24      we, you know, we're not citing,

Page 292

1       you know, how the P-values were --
2       were calculated because it's --
3       it's sort of a given --
4   BY MR. TISI:
5       Q.   Okay.
6       A.   -- knowledge.
7       Q.   On Page 7 of your report.
8   And I'm just going to read a couple
9   places where you make this point.
10          On Page 7, 3.3, you say,
11  "Generally in my experience, prospective
12  cohort studies yield a higher level of
13  evidence than case-control studies."
14          That's the first sentence
15  in --
16      A.   That is what it says there.
17      Q.   Okay.  Could you just put a
18  line next to that so we can -- we may
19  come back to that.  Could you just put
20  a --
21      A.   May I write?
22      Q.   Yeah, you can write on that.
23          MS. MILLER:  I think she
24      can --

Page 293

1   BY MR. TISI:
2       Q.   Yeah, would you, please?
3   Yes, it's an exhibit.  Thank you.
4           MS. MILLER:  Why don't we
5       just use a sticky?
6           MR. TISI:  No, because I'm
7       going to -- I want a record of
8       what we did.
9   BY MR. TISI:
10      Q.   So on page -- and there's no
11  citation --
12          MS. MILLER:  She is not
13      creating an exhibit here.
14          MR. TISI:  Yeah, she is.
15          MS. MILLER:  No.
16          MR. TISI:  Yeah, she is.
17          MS. MILLER:  Well, I am
18      objecting to that.
19          MR. TISI:  You can object to
20      it.
21          MS. MILLER:  If you want
22      stickies she can put stickies.
23          MR. TISI:  You can object to
24      it.  You can object to it, and

74 (Pages 290 to 293)

Karla Ballman, Ph.D.

Page 294

1    we'll ask the -- we can take a
2    break and call the judge if you
3    want to do that.
4         MS. MILLER:  Any time you
5    want.  You seem to be threatening
6    that a lot.
7         MR. TISI:  Do you want to do
8    that?
9         MS. MILLER:  It's up to you.
10        MR. TISI:  Do you want to do
11   that?  Because I'm happy to --
12   because I would like to draw on
13   that exhibit there where she --
14        MS. MILLER:  Well, she's
15   already drawn it.  I will see what
16   else you ask of her.
17   BY MR. TISI:
18        Q.   On Page 17, second full
19   paragraph.
20        A.   Yes.
21        Q.   Does it say -- does it say,
22   "When the results across study designs
23   are not consistent, i.e., case-control
24   study reports a statistically significant

Page 295

1    association, but cohort studies do not,
2    the study with the accepted higher level
3    of evidence is the cohort study because
4    it eliminates bias such as recall bias"?
5         A.   That's what it states.
6         Q.   Okay.  Can you put a little
7    star next to that, please?
8         MS. MILLER:  A star.
9    BY MR. TISI:
10        Q.   Or a whatever.  So -- I want
11   to be able to come back to it.  Could you
12   do that, ma'am?
13        A.   I'll remember where it is.
14        Q.   No, could you just put a --
15   please, would you do what I've asked,
16   please?
17        MS. MILLER:  I have a
18   standing objection to this.  I
19   think this is improper.
20        MR. TISI:  You can object.
21   BY MR. TISI:
22        Q.   On Page 26 -- and of course
23   you do not have a cite to that?
24        A.   As I mentioned, this is

Page 296

1    going off of Figure 1, which is a
2    generally accepted principle in
3    epidemiology.
4         Q.   Okay.  But the answer there
5    is there's no citation there, right?
6         MS. MILLER:  Objection.
7         THE WITNESS:  There's no
8    citations for many things that are
9    general sort of principles of
10   epidemiology or other facts.
11   BY MR. TISI:
12        Q.   Please go to Page 26,
13   please.
14        A.   There's no citation there.
15   I take it back.  But I do have citations
16   in -- and if you give me a minute to
17   look, I can --
18        Q.   No, I want to see --
19        A.   -- find citations where
20   there's a higher level of evidence --
21        Q.   I'm going through every
22   place where you've said it.  And I want
23   to put this, Doctor.  First, follow me.
24        MS. MILLER:  Chris, excuse

Page 297

1    me.
2         MR. TISI:  I ask -- I'm
3    asking the questions.
4    BY MR. TISI:
5         Q.   Is there a citation after
6    that statement?  The answer is no.
7         The next one, on Page 26, do
8    you see that it says, "It is well
9    established as discussed above that there
10   are more potential or confounding
11   case-control studies compared to
12   prospective cohort studies since the
13   prospective cohort studies are not prone
14   to participant selection, recall bias
15   with respect to exposure, which is why
16   they're considered to yield stronger
17   level of evidence than case-control
18   studies."
19        Do you see that?
20        A.   On Page 26?  No, I --
21        Q.   Second sentence of the first
22   full paragraph.  "It is well
23   established" --
24        A.   Which it says, "As discussed

Karla Ballman, Ph.D.

Page 298

1  above." So I'm going to go and look at
2  the "as discussed above" for the
3  citations.
4          So I have a citation to a
5  book called case-control studies. And
6  actually my references are transposed
7  there.
8          That discusses sort of the
9  level of evidence.
10     Q.   Okay. So you think that's
11  the citation. What is the name of that?
12  What is the name of that one?
13     A.   So it's listed as six. But
14  it should be seven there, "Case-Control
15  Studies: Design, Conduct and Analyses."
16     Q.   Okay. I'll look that up.
17          Let's go to page --
18     A.   And also -- I also think I
19  have more. Oh, it's in the meta-analyses
20  that we were talking about. And so
21  there's a Citation 23. And I say, "So
22  this is because, due to the effects of
23  confounding and bias, observational
24  studies may produce estimates that

Page 299

1  deviate from a true causal."
2          That's -- that's
3  observational studies in general.
4     Q.   But nothing saying that it's
5  a higher level of evidence? I'm looking
6  for a citation that says cohort studies
7  are a higher level of evidence as a
8  general rule than case-control studies?
9     A.   So again, I think -- it is
10  implied throughout.
11     Q.   It's implied, but it's not
12  cited. And I'm looking for a citation to
13  that. It's not only implied. Actually,
14  you come right out and say it several
15  times.
16     A.   Yes.
17     Q.   Okay. So let's go to Page
18  28, last paragraph, last sentence.
19     A.   Yes.
20     Q.   It says, "Cohort studies
21  yield a higher level of evidence." No
22  citation for that either?
23     A.   I'm sorry. Last sentence?
24     Q.   Cohort studies. Page 28.

Page 300

1     A.   "Cohort studies yield a
2  higher level of evidence. Hill observed,
3  'I would put myself at a good deal of
4  weight upon similar results reached in
5  quite different ways, i.e., prospectively
6  and retrospectively."
7     Q.   But they're not -- you can
8  have prospective case-control studies and
9  you can have retrospective case-control
10  studies. You could have prospective --
11     A.   How can you have prospective
12  case-control studies?
13     Q.   Actually, you're right. You
14  can have prospective and retrospective
15  cohort studies, correct?
16     A.   It depends upon how you
17  define it.
18     Q.   He didn't talk about
19  case-controls and cohorts, did he?
20     A.   I don't know. I'll have to
21  look up Bradford Hill.
22     Q.   Okay. But you do say,
23  without citation, "Cohort studies yield a
24  higher level of evidence," correct, on

Page 301

1  Page 28?
2     A.   There's no explicit citation
3  on -- for the sentence that you read.
4     Q.   Let's go to Page 35. Third
5  paragraph, last sentence. "Now, the
6  cohort studies observed a dose-response
7  relationship. Cohort studies provide a
8  higher level of evidence than do
9  case-control studies."
10          (Brief teleconference
11  interruption.)
12          THE WITNESS: Yes, there's
13          no citation after that particular
14          sentence, I agree.
15  BY MR. TISI:
16     Q.   Okay. So in this one
17  there's no citation to cohort studies
18  providing a higher level of evidence than
19  do case-control studies, true?
20     A.   There's no citation after
21  that particular sentence. You are
22  correct.
23     Q.   Okay. And you have a
24  statement in the conclusion that cohorts

76 (Pages 298 to 301)

Karla Ballman, Ph.D.

Page 302

1  are better than case-control, and that
2  also doesn't have a citation, correct?
3      A.   What conclusion?
4      Q.   On the conclusion on Page
5  53.
6      A.   I do not have a citation
7  after that sentence.
8      Q.   Now, on Page 45, in your
9  criticism of Dr. Smith-Bindman, you say,
10  in the middle of the page, "As I said
11  above there is evidence in the literature
12  that cohort studies provide less biased
13  information than case-control studies,
14  and I have not found instance where
15  the -- instances where the opposite is
16  argued."
17          Do you see that?
18      A.   Mm-hmm.
19      Q.   Okay.  And there's no
20  citation to that as well, right?
21      A.   Well, if I didn't find any
22  instances where that has been showing,
23  there wouldn't be citations.
24      Q.   Did you look?

Page 303

1      A.   I did.
2      Q.   You did?
3      A.   Yeah.  I have not seen a
4  study that has said there is a higher
5  level of evidence in case-control studies
6  than there is in cohort studies as a
7  whole.
8      Q.   Actually, I didn't --
9  actually, I didn't say higher level.  I
10  said that cohort studies are as a whole
11  better than case-control studies.
12      A.   No.  Can -- what -- was that
13  the question?
14      Q.   The statement is, "I have
15  not found the opposite to be true."
16      A.   Exactly.  And I don't have a
17  citation for "I have not found the
18  opposite to be true," because -- because
19  there is no literature that says the
20  opposite is true.
21      Q.   Okay.  The truth is that
22  your methodology, your opinions -- and
23  we've gone through several places in your
24  report -- rely very heavily on, and your

Page 304

1  conclusion, rely very heavily on the
2  concept that, as a general rule, cohort
3  studies are better than case --
4  case-control studies; is that true?
5          MS. MILLER:  Objection.
6          THE WITNESS:  It's not a
7  concept.  It is a generally
8  accepted and well accepted
9  principle of epidemiology that
10  there is more evidence in cohort
11  studies than there is in
12  case-control studies because they
13  eliminate confounding.
14          And I'm just -- I need to
15  look, and I'm sure there are some
16  citations here.
17  BY MR. TISI:
18      Q.   Well, the only cite you
19  mention are -- are -- it's Number 7 in
20  your report, the case-control studies --
21      A.   Right, but buried within
22  some of these other studies there are
23  statements such as, you know, it was
24  thought that oral contraceptives, you

Page 305

1  know, cause breast cancer based on
2  case-control studies, but then when
3  cohort studies were done, the opposite
4  was found due to the fact that they are a
5  lower level of evidence and biases and
6  confounding --
7      Q.   Are there other --
8      A.   -- in case-control studies.
9      Q.   I apologize.
10          Are there other instances
11  where case-control studies have found the
12  real cause that cohorts haven't?
13      A.   I don't know off of the top
14  of my head.
15      Q.   But you know full well that
16  the current view in epidemiology is that
17  evidentiary period does not provide a
18  bright line between -- between
19  case-control and cohorts, don't you?
20          MS. MILLER:  Objection.
21          THE WITNESS:  Can you show
22  me where -- where getting you're
23  that information and why I should
24  know full well?

77 (Pages 302 to 305)

Karla Ballman, Ph.D.

BY MR. TISI:
1
2    Q.   Let's start with your own
3  statement in the Viagra litigation.
4  Okay.
5        Let's -- let me show you
6  what I have marked as Exhibit Number 21.
7        (Document marked for
8        identification as Exhibit
9        Ballman-18.)
10 BY MR. TISI:
11   Q.   Do you remember -- do you
12 remember --
13       MR. SOILEAU:  This is not
14 going to be 21 in this deposition.
15       MR. TISI:  I'm sorry.  For
16 the record, this is 18.
17 BY MR. TISI:
18   Q.   And you have a -- do you
19 recall having a section in your Viagra
20 report which talks about levels of
21 evidence?
22   A.   Not off of the top of my
23 head.  I need to see it.
24       MS. MILLER:  Is this the

1  whole report or just a portion of
2  the report?
3        MR. TISI:  It's a portion of
4  the report.
5        MS. MILLER:  Yeah, I don't
6  think that's right.  I think that
7  you need to give her the whole
8  report.
9        MR. TISI:  You can object --
10 you know, you haven't even looked
11 at it.
12       MS. MILLER:  Would you like
13 a whole report?
14       THE WITNESS:  I would like
15 the whole report.
16       MR. TISI:  Okay.  Let me --
17 you may like it.  You can use your
18 time to do that.
19 BY MR. TISI:
20   Q.   Doctor, I'm -- there's a
21 section in here, full paragraph on levels
22 of evidence.  Do you see that?
23   A.   Yes.  There is a -- yes.
24   Q.   Okay.  Would you please read

1  for the record what you wrote in Viagra?
2    A.   Yeah, this is -- this is
3  very abbreviated.  Because I see I have a
4  section on randomized clinical trials
5  right here --
6    Q.   I'm asking you what you
7  read -- can you read -- can you read what
8  you wrote in Viagra?
9        MS. MILLER:  Objection.
10       THE WITNESS:  Read what?
11 BY MR. TISI:
12   Q.   Read where it says levels of
13 evidence.  Section B.  There's a full
14 paragraph under levels of evidence.
15       Could you read what it says?
16   A.   Sure.  "Cancer epidemiology
17 attempts to identify risk factors that
18 are causative agents of cancer.  Knowing
19 what causes a cancer may lead to
20 therapies that benefit patients and/or
21 strategies to minimize the exposure to a
22 risk.  There are different levels of
23 evidence for determining whether a factor
24 is causal based on the underlying study

1  design.  A recognized ranking of common
2  study designs from the greatest level of
3  evidence to lowest is, one, randomized
4  clinical trials, two, cohort and
5  case-control studies, and three, case
6  reports and case series."
7        Then I go on and --
8    Q.   And just -- just --
9    A.   -- I list Number 1 --
10   Q.   I just asked you -- I simply
11 just --
12   A.   I -- I'm not finished.
13 Please, can you let me finish.  Please.
14   Q.   No.  I asked you to read in
15 the record.  Your lawyer if they want to
16 can do that.  Okay?  And I'm going to --
17       MS. SHARKO:  No, she has the
18 right to finish her answer,
19 Mr. Tisi, and you know that --
20       MR. TISI:  Who is -- who
21 is -- she has a right -- I asked
22 her to read the paragraph.
23       MS. SHARKO:  You know that.
24       MR. TISI:  That is -- to my

Karla Ballman, Ph.D.

1       knowledge --
2           MS. SHARKO:  What kind of
3    question is that?  A reading test?
4           MR. TISI:  I asked -- yes.
5    That's what I asked her to do, and
6    she read it.  Thank you.
7           THE WITNESS:  But this
8    misrepresents what this --
9           MS. SHARKO:  No, but she has
10   the right --
11          THE WITNESS:  -- this
12   paragraph is saying, because it's
13   incomplete and taken out of
14   context.
15   BY MR. TISI:
16       Q.   I'm going to --
17       A.   And I see that you've
18   provided -- it says Number 1, randomized
19   clinical trials, and then -- and then it
20   goes over on the next page.  And then it
21   stops because I'm sure I have a section
22   on -- on case-control studies and a
23   section on cohort studies, and it's
24   consistent with what I say here.

1        Q.   But you lump them --
2        A.   They are lumped together --
3        Q.   But you -- Doctor, this
4    isn't -- this really isn't an argument.
5    I'm asking you whether for the purposes
6    of your Viagra case, where you describe
7    the level of evidence, instead of five
8    levels, you describe three.
9        A.   I think that is a
10   mischaracterization --
11       Q.   Okay.
12       A.   -- because this is not
13   complete.
14       Q.   All right.
15       A.   That they are put together
16   because they are both observational
17   studies, and then I'm sure I have a
18   separate section that talks about the
19   different aspects of clinical -- of
20   case-control studies and cohort studies,
21   and say essentially the same thing
22   because it's an accepted underlying
23   epidemiology principle.
24       Q.   So let me ask you this.

1    Have you looked in textbooks to see
2    whether that is true?
3        A.   Yes.
4        Q.   Okay.  I'm going to show you
5    Dr. Rothman's textbook -- textbook on --
6    on epidemiology.
7        A.   The whole textbook?
8        Q.   I'm showing you the entire
9    chapter.  The entire chapter.
10       A.   And the table of contents?
11          MR. TISI:  I can give --
12   actually, I can give you the whole
13   book.  Let's do this.
14   BY MR. TISI:
15       Q.   And if you feel like you
16   need to look at the book, I'm happy to do
17   it.
18          MS. MILLER:  I don't think
19   there's any reason to take that
20   tone with the witness --
21          MR. TISI:  I mean, you know,
22   honestly --
23          MS. MILLER:  We've been very
24   polite in these depositions.  This

1    is the first deposition that I'm
2    aware where the -- where the
3    lawyer has been so rude to the
4    witness.
5           MR. TISI:  I don't think I'm
6    being rude at all.  I don't think
7    I'm being rude at all.
8           Okay.
9           MS. SHARKO:  Maybe not by
10   your standards.
11          MR. TISI:  Certainly not by
12   your standards.
13          MS. SHARKO:  I would
14   disagree with that.
15   BY MR. TISI:
16       Q.   Okay.  Chapter -- I have the
17   book.  I'll give you the book.
18          For the record, I'm going to
19   have this marked as Exhibit Number 19.
20          (Document marked for
21   identification as Exhibit
22   Ballman-19.)
23   BY MR. TISI:
24       Q.   I'm looking at Chapter 8.

Karla Ballman, Ph.D.

Page 314

1    And I'm going to give you the exhibit
2    right in front of you.  And you can look
3    at the book if you'd like.
4         Doctor?
5         A.  Yes, I'm -- I'm --
6         Q.  I have -- I'd like you to
7    look at the exhibit.  You can look at the
8    book if you need to --
9         A.  I'm sorry, did -- did you
10   hand it to me?
11        Thank you.
12        Q.  Now, this is Chapter 8.
13   It's called "Case-Control Studies."
14        Do you see that?
15        A.  It does say case-control
16   studies.
17        Q.  And the first
18   paragraph introduces the concept.  It
19   says, "In this chapter, we will review
20   case-control designs and contrast their
21   advantages and disadvantages with cohort
22   designs."
23        Do you see that?
24        A.  I'm sorry.  Which page?

Page 315

1         Q.  First page.  The first
2    paragraph just introduces the topic.
3         A.  Yes.
4         Q.  Last sentence says, "In this
5    chapter we will review case-control to
6    study designs and contrast their
7    advantages and disadvantages to cohort
8    designs."
9         Do you see that?
10        A.  I see that.
11        Q.  Okay.  The next sentence in
12   the first paragraph.  "Conventional
13   wisdom about case-control studies is that
14   they do not yield estimates of effect
15   that are as valid a measure obtained from
16   cohort studies.  This thinking may
17   reflect a common misunderstanding in
18   conceptualizing case-control studies
19   which will be clarified later."
20        Do you see that?
21        A.  I -- I see that, you read
22   that correctly.
23        Q.  Okay.  And then he
24   describes, so if you want to go down to

Page 316

1    the next paragraph.  It says, "Cohort
2    studies are not immune from problems
3    often thought to be particular with
4    case-control studies.  For example, while
5    a cohort study may gather information on
6    exposure for an entire source population
7    at the outset of the study, it still
8    requires tracing subjects to ascertain
9    exposure variation and outcomes."
10        Do you see that?
11        A.  So I'm sorry.  I'm trying to
12   take in a lot of information.  I'm sorry.
13   I'm going to have to ask you to rephrase.
14        Q.  Okay.  Does he not say,
15   "Cohort studies are not immune from
16   problems often thought to be particular
17   to case-control studies"?
18        A.  That's what that sentence
19   says.
20        Q.  Next sentence, he gives an
21   example.  "For example, while cohort
22   studies may gather information on
23   exposure for the entire source
24   population, at the outset of the study it

Page 317

1    still requires tracing of subjects to
2    ascertain exposure variation and
3    outcomes."
4         Do you see that?
5         A.  Yes, it does say that.
6         MS. MILLER:  Do you want to
7    give her the time to actually read
8    this, instead of plucking out
9    sentences from it?
10        THE WITNESS:  Yeah, I
11   mean --
12        MS. MILLER:  You are
13   plucking out one sentence from a
14   paragraph.
15   BY MR. TISI:
16        Q.  I'm happy to do -- I'm just
17   asking whether -- where it says -- do you
18   agree with that statement?
19        MS. MILLER:  But she has to
20   read the whole thing.
21        THE WITNESS:  But I don't
22   know.
23        MR. TISI:  No, she doesn't.
24   I'm asking her whether she agrees

80 (Pages 314 to 317)

Karla Ballman, Ph.D.

Page 318

1    with that statement.
2    BY MR. TISI:
3        Q.   Do you agree that, "Cohort
4    studies may gather information on
5    exposure for an entire source population
6    at the outset of the study and still
7    requires tracing of subjects to ascertain
8    exposure variations and outcome.  If the
9    success of this tracing is related to the
10   exposure and the outcome, the resulting
11   selection bias will behave analogously to
12   the often raised concern of case-control
13   studies."
14       Do you agree with that or
15   disagree with that?
16       MR. LOCKE:  Objection.
17       THE WITNESS:  I cannot say
18   just off the fly like this because
19   I have to see where they're going
20   with this, if they are just sort
21   of setting up, you know, why are
22   people doing case-control studies
23   in the first place, because they
24   have, like, lower level of

Page 319

1    evidence than cohort studies.  I
2    just -- I can't really comment if
3    I agree or disagree with that.
4    BY MR. TISI:
5        Q.   Okay.  You can't agree or
6    disagree with that statement.
7        A.   Well, with the limited
8    information -- I'm given a couple
9    sentences that I'm asked to look at out
10   of an entire chapter that comes out of an
11   entire book, I do not feel that I can
12   give a complete and truthful answer.
13       Q.   Let's see if this helps.
14   Okay.  I'm going to show you an article
15   that Dr. Rothman wrote on this very
16   topic.
17       MS. MILLER:  Are we done
18   with this exhibit?
19       MR. TISI:  For now.  You
20   can put it to aside.  You can
21   leave the book there if you like
22   to.  You can refer to it if you
23   need to.
24       (Document marked for

Page 320

1    identification as Exhibit
2    Ballman-20.)
3    BY MR. TISI:
4        Q.   It's entitled "Six
5    Persistent Research Misconception."
6        Do you see that?
7        A.   Yes, I do see that.
8        Q.   Have you seen this article
9    before?
10       A.   You know, I think in my
11   career I have seen this article before.
12       Q.   Okay.  And again,
13   Dr. Rothman you would agree, he's the
14   founder of the Journal of Epidemiology.
15   You understand that, correct?
16       MS. MILLER:  Objection.
17       THE WITNESS:  I have no idea
18   if he's the founder of the Journal
19   of Epidemiology.
20   BY MR. TISI:
21       Q.   This is a fairly well known
22   article, correct?
23       A.   I don't know that either.
24       Q.   Okay.  Well, let's look at

Page 321

1    Misconception Number 1, because actually
2    as opposed to reading the whole article,
3    which I'm more than happy to have you
4    take a look at if you'd like to, but
5    Misconception Number 1, would you read
6    that?  He puts a bullet point there.
7    Would you please tell the judge and the
8    jury what he says is Misconception Number
9    1.  Read that, please.
10       A.   I'll read what he says.  He
11   says, "The misconceptions are, number
12   one, there is a hierarchy of study
13   designs, randomized trials provide the
14   greatest validity" -- and he's talking
15   validity there -- "followed by cohort
16   studies, with case-control studies being
17   the least reliable."
18       Q.   Okay.  He calls that a
19   misconception, does he not?
20       A.   You know, I don't know what
21   he means by validity, and I don't know
22   what he means by least reliable.  I'm
23   talking about levels of evidence.  So I
24   don't know if those terms mean exactly

81 (Pages 318 to 321)

Karla Ballman, Ph.D.

Page 322

1    the same thing.
2        Q.   Okay.  Let's see what he
3    actually says.  Does he say -- in the
4    first paragraph he talks about RCT, first
5    two paragraphs.  Let's talk about the
6    next paragraph.
7            It says, "Both cohort and
8    case-control studies will yield valid
9    results when properly designed and
10   carried out."
11           Do you see that?
12       A.   Where it is again?  Again,
13   you're making me come -- you know, go
14   through a whole lot of information and
15   so --
16       Q.   Well, you know, I'm going to
17   tell you, if you feel like you need to
18   take a look at this entire misconception,
19   feel free to do it.
20       A.   So, I mean, I'm surprised --
21   I just want to point out a couple things
22   and --
23       Q.   No, I don't -- there's no
24   question pending.  You said you wanted to

Page 323

1    take a look at it.  Feel free to take a
2    look at it, and I'll ask you questions
3    about it.
4        A.   Okay.
5        Q.   I want to be fair.
6        A.   All right.  Go ahead.
7        Q.   Does he not say, in the
8    second paragraph, "Both cohort studies
9    and case-control studies will yield a
10   valid result when properly designed and
11   carried out"?
12       A.   That's what he says.
13       Q.   Okay.  Now, I'm going to
14   read -- he says, "Similarly" -- on the
15   next page, second-to-last paragraph,
16   "Similarly, discrepancies between cohort
17   studies and case-control studies should
18   not be explained away superficially by a
19   presumed validity advantage for cohort
20   studies over case-control studies."
21           True?
22       A.   I'm sorry.  Where are you
23   reading from again?
24       Q.   The next -- the

Page 324

1    second-to-last paragraph on the first
2    column.
3        A.   Okay.  Thank you.
4        Q.   It says, "Discrepancies
5    between cohort studies and case-control
6    studies should not be explained away
7    superficially by a presumed validity
8    advantage for cohort studies over
9    case-control studies."
10           Does he not say that?
11       A.   That's what is written
12   there.
13       Q.   Okay.  And if you go --
14       A.   And I want to point out --
15   and he goes on and says, "Properly
16   designed case-control studies will
17   produce the same results as properly
18   designed cohort studies."
19           So what that means is the
20   studies need to not have recall bias and
21   they need not to have selection bias,
22   which is almost theoretically impossible
23   to do.
24           Also, this is the only

Page 325

1    author out there that has written on
2    this, is one textbook, same author, one
3    paper, same author.  And the author goes
4    on to, say, "These misconceptions have
5    been perpetuated in journals, classrooms
6    and textbooks."
7            And so I could do the same
8    thing and find a vast majority more
9    papers and textbooks and so forth that
10   would dispute that.
11       Q.   But you didn't, Doctor.  You
12   didn't even cite it for any -- for any of
13   the times.  We went through your report,
14   and you didn't cite one instance.  You
15   said one article that was in a different
16   place, case-control -- case-control
17   textbook.  And I'm going to look that up.
18           Okay.  But other than that,
19   you had no citations whatsoever, true?
20           MS. MILLER:  Objection.
21           THE WITNESS:  I disagree
22   with that, because if we go back
23   to -- to my report, I have -- I
24   have like real evidence in the

82 (Pages 322 to 325)

Karla Ballman, Ph.D.

Page 326

1    literature that shows that
2    case-control studies do, and
3    cohort studies do not -- when you
4    do -- have the opportunity to do a
5    randomized trial, it comes up with
6    a completely different conclusion.
7         And I have several
8    references that show that.  And
9    that's real life data.  That's not
10   purporting, you know, evidence
11   against what's a generally
12   accepted epidemiology principle.
13   BY MR. TISI:
14        Q.   Let's look at the last
15   sentence in this section.  It says, "When
16   properly designed" --
17        A.   And, you know, this says
18   it's a review too.  It doesn't say it's a
19   research article.  This is, like, I think
20   someone's opinion.  I mean --
21        Q.   Like your report.  Like your
22   report.  Your report is your opinion.
23        MS. SHARKO:  Don't interrupt
24   the witness.

Page 327

1    BY MR. TISI:
2         Q.   Your report is your opinion,
3    right?
4         MS. MILLER:  Objection.
5         THE WITNESS:  Those are two
6    different things.
7    BY MR. TISI:
8         Q.   One is for litigation, and
9    one isn't?
10        MS. MILLER:  Objection.
11   BY MR. TISI:
12        Q.   Dr. Ballman, you know,
13   you're offering a lot of commentary of
14   things that I haven't asked.  Okay?
15        I'm asking you, first of
16   all, this is published in the peer
17   reviewed literature, correct?
18        MS. MILLER:  Objection.
19        MR. LOCKE:  Objection.
20        THE WITNESS:  So I think I'm
21   trying to give a complete and
22   truthful answer which I swore to
23   at the beginning of the
24   deposition, and I don't feel like

Page 328

1    I'm allowed to -- to give the
2    complete truth.
3    BY MR. TISI:
4         Q.   Okay.
5         A.   I feel like we're doing half
6    truths here.
7         Q.   Okay.  I'm perfectly happy
8    to stand on this article.
9         Let me -- let me look at the
10   last sentence.  "When properly designed
11   case-control studies can achieve" -- "can
12   achieve the same excellent validity as
13   properly designed cohort studies, whereas
14   poorly designed trial can be unreliable.
15   The type of study should be not taken as
16   a guide to the study's validity."
17        Does he not say that?
18        A.   He does say that there.
19        Q.   Okay.  Thank you.  Do you
20   agree or disagree?
21        A.   I disagree with his -- his
22   entire thing.  I think for individual
23   studies there could be an individual
24   case-control study that might be better

Page 329

1    designed than an individual cohort study.
2         But I think as a body of
3    evidence as a whole, it is accepted as a
4    principle in epidemiology literature,
5    that what comes out of case-control
6    studies in total and what comes out of
7    cohort studies in total, are both under
8    randomized trials, and cohort studies
9    have less biases in terms of selection
10   biases and recall biases than do
11   case-control studies, which is why they
12   have a higher level of evidence.
13        Q.   It has other biases too.
14   For example, if you only ask the
15   patient -- if the cohort study is not
16   designed to -- to look at a particular
17   question, and you only ask a person once
18   in 25 years whether they use talcum
19   powder, that can change over time,
20   correct?
21        A.   So -- so what's the
22   question?
23        Q.   The question is:  That's a
24   bias as well, that would bias towards the

Karla Ballman, Ph.D.

Page 330

1    null?
2         MS. MILLER: Objection.
3    BY MR. TISI:
4         Q.    If a patient, in a
5    hypothetical cohort study, that was not
6    designed specifically to look at whether
7    talc causes ovarian cancer, and that
8    patient -- and it's a 20-year study, and
9    upon enrollment they are asked one time
10   about their exposure to talc, is it
11   possible that over two decades, the
12   patient could change their behavior?
13        MS. MILLER: Objection.
14   There were three questions in
15   there. I objected to the first.
16        MR. TISI: There's not --
17   that's fine. You can object --
18   you can object to the question.
19        MS. MILLER: Okay. I don't
20   know what the question is.
21        MR. TISI: That's fine.
22        THE WITNESS: Can you ask
23   one by one what -- what the --
24   BY MR. TISI:

Page 331

1         Q.    You understand that there
2    are biases that are also inherent in
3    cohort studies as well?
4         A.    I -- I think I'm pretty --
5    pretty clear that I think all
6    observational studies have some sort of
7    biases in them.
8         Q.    Right. And you have to
9    consider all of them, correct?
10        A.    All of what?
11        Q.    All the biases and all the
12   different kinds of studies.
13        A.    You have to consider -- I --
14   I looked -- I don't know what that means.
15        Q.    You don't dismiss biases in
16   cohort studies because they happen to be
17   cohort studies, right?
18        A.    Again, it depends upon what
19   the individual studies are and the
20   question that is being addressed with the
21   cohort study so that we can see what the
22   individual biases are --
23        Q.    Right.
24        A.    -- and then, you know, one

Page 332

1    could -- could make comment on them.
2         Q.    In all the cohort studies
3    regarding talc, the patients were asked
4    on only one occasion whether they used
5    talc early on in the study, correct?
6         A.    So the cohort --
7         MR. LOCKE: Objection.
8         THE WITNESS: So the cohort
9    studies in talc were done in -- in
10   cohorts of women that tended to be
11   older. And -- and I can go
12   through the different cohorts.
13   BY MR. TISI:
14        Q.    I'm asking -- I didn't ask
15   you to -- to recite me. I'm asking you,
16   in each of those studies, the women
17   enrolled in those studies were asked
18   about talc exposure on one occasion,
19   true?
20        MR. LOCKE: Objection.
21        THE WITNESS: So I was
22   trying -- and your previous
23   question I think was a little bit
24   different and I was trying to

Page 333

1    answer that before you interrupted
2    me with -- with the second
3    question, and so --
4    BY MR. TISI:
5         Q.    Okay. Then let me withdraw
6    the question.
7         I'm going to ask you, can
8    you name for me a cohort study --
9         MS. MILLER: You just
10   interrupted her again. She was
11   like literally -- when she says
12   "and so," you start talking. Let
13   her finish her sentences.
14        MR. TISI: I'm going to
15   ask -- I'm going to ask -- I
16   withdrew the question.
17   BY MR. TISI:
18        Q.    My question is this --
19        MS. MILLER: You can't just
20   withdraw a question in the middle
21   of an answer.
22   BY MR. TISI:
23        Q.    Doctor, can you name me one
24   cohort study involved in the talc science

84 (Pages 330 to 333)

Karla Ballman, Ph.D.

Page 334

1 where the patients were asked more than
2 once about their talc exposure?
3       A.   I cannot, but I'm not -- I'm
4 trying to say why that's not really a
5 relevant question.
6       Q.   Okay.  I just want to know
7 if they were asked more than once in any
8 of these studies.
9       A.   They weren't asked more than
10 once in the case-control studies either.
11      Q.   Well, that was only because
12 they were retrospective, right?
13      A.   Well, there are reasons why
14 that asking only once in the cohort study
15 also is not entirely relevant.
16           Having to do with at the age
17 that women generally start using talc,
18 which is early adulthood, and the fact
19 that it's a habitual use and it's very
20 unlikely that a woman age, say 55, who
21 hadn't been using talc would all of the
22 sudden start using talc.
23      Q.   Are you -- do you think that
24 you're a better qualified epidemiologist

Page 335

1 than Ken Rothman is?
2           MR. LOCKE:  Objection.
3           MS. MILLER:  Objection.
4 What's with these questions?
5           THE WITNESS:  I'm not
6 speaking on -- I'm not speaking on
7 qualifications or not.
8           I'm speaking on the fact
9 that there -- this is probably one
10 of the only papers that -- that
11 takes this stance that the general
12 accepted principles of
13 epidemiology are wrong.
14 BY MR. TISI:
15      Q.   Do you know -- do you know
16 that Dr. Rothman was actually -- unlike
17 you, Dr. Rothman was actually asked by
18 the talc industry, including Johnson &
19 Johnson, to consult for them on the
20 talc-ovarian cancer association, did you
21 know that?
22           MR. LOCKE:  Objection.
23           MS. MILLER:  Objection.
24           THE WITNESS:  I -- I have no

Page 336

1 idea and I don't know what the
2 relevance is in terms of -- of me
3 having issues -- or the
4 limitations of this particular
5 study.
6 BY MR. TISI:
7      Q.   Well -- well, then let me --
8 let me --
9           MR. SOILEAU:  Let me do this
10 and fix this, because we may have
11 gotten off.  I don't think --
12           MS. SHARKO:  I thought only
13 one person --
14           MR. SOILEAU:  I'm doing
15 exhibits.  I'm not asking
16 questions.
17           MR. TISI:  It's an exhibit
18 issue.
19           MS. SHARKO:  But I'm happy
20 to have you talk.  That's okay.
21           MR. SOILEAU:  I'm just going
22 to -- I think we agreed that we
23 had 18 as the Viagra report, 19 as
24 Chapter 8 of the Rothman text.

Page 337

1           And I do not believe in the
2 record that the "Six Persistent
3 Research Misconceptions" that has
4 been discussed over the last pages
5 with the witness was actually
6 identified by number.
7           It has a sticker on it
8 that's wrong.  It should be
9 Exhibit 20.
10           MS. MILLER:  It says 19.  Do
11 you want to make it 20?
12           MR. SOILEAU:  Yeah, here's a
13 sticker.  You can just stick it
14 over the top of it.
15           MS. MILLER:  I wrote 20
16 right over it.
17           MR. SOILEAU:  Okay.  Very
18 good.  And I apologize for
19 interrupting.
20           (Document marked for
21 identification as Exhibit
22 Ballman-21.)
23           MR. TISI:  I'd like to show
24 you Exhibit Number 24.

85 (Pages 334 to 337)

Karla Ballman, Ph.D.

1          MS. MILLER: Wait. 21?
2          MR. TISI: 21. I'm sorry.
3    21.
4          MS. MILLER: You just
5    skipped 21, 22, 23.
6          MR. TISI: I'm sorry.
7    You're right.
8    BY MR. TISI:
9          Q.   I'm going to represent to
10   you, Doctor, that Dr. Rothman and his
11   colleagues were asked to draft a report
12   for the national toxicology program in
13   2000 related to talc and ovarian cancer.
14         Have you seen this before?
15         A.   Now is this published
16   somewhere?
17         Q.   It was for the talc industry
18   including Johnson & Johnson.  They
19   actually contributed to paying for it.
20         MR. LOCKE: Objection.
21         THE WITNESS: Sort of like
22   an expert report is in litigation?
23   BY MR. TISI:
24         Q.   Sort of like -- absolutely

1    absolutely.  Sort of like that.  Like
2    in --
3          A.   Like I've been asked to do?
4          Q.   Like in real time, when the
5    issues were -- but the difference is,
6    see, they were asked by scientists at
7    Johnson & Johnson that they contacted
8    Dr. Rothman.  It's the lawyers who
9    contacted you.
10         MS. MILLER: Objection.  Was
11   that a question or are you just
12   giving speeches now?
13         MR. TISI: Well, no, she's
14   giving me a speech.
15         MS. MILLER: She's -- she's
16   sitting --
17         MS. SHARKO: The witness --
18   you know, it's really rude to call
19   a woman "she."
20         MR. TISI: Okay.
21         MS. SHARKO: Her name is
22   Dr. Ballman, and I would ask you
23   to treat the witness with respect.
24         MR. TISI: Okay.

1    BY MR. TISI:
2          Q.   Dr. Ballman --
3          A.   Yes.
4          Q.   Unlike you, the scientists
5    at Johnson & Johnson, reached out to
6    Dr. Rothman in 2000 to draft a report
7    related to talc.  Do you see that?
8          MR. LOCKE: Objection.
9          THE WITNESS: I -- can you
10   show me where this was
11   commissioned by Johnson & Johnson?
12   BY MR. TISI:
13         Q.   I'm going to ask you to --
14   I'm going to ask you to assume that,
15   because that's what the record will show.
16   This was a report submitted to the
17   National Toxicology Program on the part
18   of J&J?
19         MR. LOCKE: Objection.
20   BY MR. TISI:
21         Q.   So let me -- let me show
22   you.
23         A.   But where does it say that?
24   Where does it say the National

1    Toxicology --
2          Q.   I'm asking you to assume it.
3    I'm allowed -- I'm allowed to ask you to
4    assume it.  And counsel will correct me
5    later if I'm wrong.
6          A.   Okay.
7          Q.   The judge will strike me.
8          A.   Okay.
9          Q.   Okay?
10         MS. MILLER: I don't know if
11   the judge will actually strike
12   you.
13   BY MR. TISI:
14         Q.   So on Page 3 -- on Page 3,
15   Dr. Rothman and his two colleagues --
16   this wasn't just written by him, right?
17         A.   But again, Dr. Rothman, it's
18   not independent of Dr. Rothman.
19         Q.   Okay.  That's fine.  He
20   writes, "Exposure misclassification."
21         Do you see that section?
22         A.   Yes.
23         Q.   Okay.  He says this:
24   "Nearly all the studies were case-control

Karla Ballman, Ph.D.

Page 342

```
 1    studies.  It is commonly believed that
 2    the validity of case-control studies is
 3    worse than cohort studies, but this view
 4    is mistaken."
 5           Do you see that?
 6        A.    Yes, I do.
 7        Q.    Okay.  And you disagree with
 8    that?
 9        A.    Again, it's the same opinion
10    by the same individual and -- and I have
11    stated that the general principles of
12    epidemiology just does not support that.
13        Q.    Okay.  And the next
14    sentence, "The validity of a study design
15    depends on the specifics of the study
16    design.  The nature of the data and the
17    nature of the hypothesis that the study
18    addresses."
19           Do you agree with that?
20        A.    So now he's getting into
21    specifics.  And I said I do agree that
22    one case-control study when compared to
23    one cohort study could be the case that
24    the case-control study is done a little
```

Page 343

```
 1    better than the one cohort study.  But
 2    I'm arguing that -- I'm not arguing.  I'm
 3    sorry.
 4           I'm just stating what the
 5    general epidemiology principle is, is
 6    that cohort studies, as a whole, have a
 7    higher level of evidence for causality
 8    than do case-control studies.
 9        Q.    He makes the point, if you
10    go next sentence -- he gives an example.
11    Next sentences says, "Although the
12    exposure information might be accurate at
13    the time that it was collected, the
14    exposure status of cohort members will
15    change with time and the initial measure
16    might only be poorly correlated with a
17    more meaningful measure."
18           Do you see that?
19        A.    And -- but this has to do in
20    particular with coffee drinkers and a
21    one-time dietary assessment.  So drinking
22    coffee or not is different from whether
23    one uses talcum powder or not --
24        Q.    Why?
```

Page 344

```
 1        A.    -- in terms of the habits.
 2           I don't know, I haven't
 3    looked at this literature.  So I'd have
 4    to look to see.  Do most coffee drinkers
 5    start when they're in their early
 6    adulthood?  Do most -- versus starting at
 7    age 55.  You know, it all depends on the
 8    specifics of the study.
 9        Q.    The last two sentences here,
10    state what I think his -- his rule is.
11    "The effect of having a poor measure of
12    exposure will be considerable
13    nondifferential misclassification.  A
14    type of error that introduces bias into
15    study results that tends to drive effect
16    estimates towards the null condition of
17    no effect.
18           "In contrast, it may be
19    possible to get more detailed information
20    from a study subject in a case-control
21    study which might avoid some of the
22    biases that would result in the cohort
23    study."
24           Do you see that?
```

Page 345

```
 1           MR. LOCKE:  Objection to
 2    form and to the reference to the
 3    last two sentences.
 4           MS. MILLER:  I'm sorry.  I
 5    can't hear you.
 6           MR. LOCKE:  Objection to
 7    form and the reference to the last
 8    two sentences.
 9    BY MR. TISI:
10        Q.    Read it to yourself.  Do you
11    agree or disagree with those last two
12    sentences?
13        A.    It's just a very general
14    statement.  I'm not sure what to agree
15    with or not to agree with.  Again, I
16    think it depends very much on what the
17    question that's under consideration or
18    the study under consideration.  And I
19    have to point out that says, "Which might
20    thus avoid some of the biases that would
21    result in a cohort study."
22           It doesn't say will.  It
23    doesn't say anything definitive.  It says
24    might.
```

87 (Pages 342 to 345)

Karla Ballman, Ph.D.

Page 346

1          Q.   But that's the point,
2    Doctor.  And I'm really trying to back up
3    a little bit.
4             The point really here is,
5    what you really have to do is look at the
6    data and look at the studies, the cohort
7    and the case-control studies like you
8    said in your Viagra report.  You look at
9    them together, and you decide which one
10   is better and which one is worse, true?
11            MS. MILLER:  Objection.
12        That -- where did she say that in
13        the Viagra report that you should
14        look at them together?  Can you
15        show that us?  Because you showed
16        us part of the report.  It didn't
17        say that.  You're misrepresenting
18        her testimony.
19            MR. TISI:  Counsel, please
20        stop.
21            MS. MILLER:  You're
22        misrepresenting her report.  This
23        is crazy.
24            MR. TISI:  Stop.  It is

Page 347

1        crazy.  What is crazy is your
2        speaking/coaching objections.
3        That's crazy.
4    BY MR. TISI:
5          Q.   Doctor, in your case -- in
6    your Viagra report you put case-control
7    and cohort studies in the same level of
8    evidence, did you not?
9          A.   I do not believe I do.
10         Q.   Okay.
11         A.   I was just given one case
12   where -- where I -- no, I do not believe
13   I do.
14         Q.   Okay.  Now, isn't it true
15   that you're really, instead of just
16   blindly saying cohort is better than
17   case-control, you have to look at the
18   studies, how they're designed, what they
19   ask, and what the data shows; isn't that
20   true?
21         A.   And that's what I did, and I
22   applied underlying epidemiological
23   principles.  And so there were three
24   cohort studies, not just one.  All three

Page 348

1    did not show a statistically significant
2    result, whereas in the case-control
3    studies, some did, some didn't.  And by
4    levels of -- as I say throughout my
5    report, as levels of evidence, one needs
6    to go with the cohort studies because
7    they have a higher level of evidence.
8    I'm not comparing one individual cohort
9    study to one individual case-control
10   study, where it might be the case that in
11   that particular comparison of two
12   different studies, maybe case-control was
13   done a little better than cohort.
14         Q.   So -- okay.  So we'd talked
15   about statistical significance in a short
16   while.
17            So but -- so what you're
18   saying is where there is a -- if you have
19   some studies that are cohort studies that
20   are not statistically significant and
21   some studies that are case-controls that
22   are statistically significant, the cohort
23   studies win?
24            MS. MILLER:  Objection.

Page 349

1            THE WITNESS:  I am -- not in
2    general.  I am saying -- no, I did
3    not say that in general.  I said
4    in the data and the analyses I
5    looked at, that was one component
6    of the whole totality of the
7    analyses.
8    BY MR. TISI:
9          Q.   Okay.  And statistical
10   significance was very important to you in
11   that way, in other words you kind of
12   put -- you saw whether there's a pattern.
13   You put together the statistically
14   significant results, the statistically
15   nonsignificant results, and you felt that
16   the statistically nonsignificant results
17   had the better reliability?
18         A.   Again, I don't -- what I did
19   was I looked at the totality of the data.
20   I saw in the case-control studies, there
21   were some statistically significant and
22   some not statistically significant.
23            I did not group those with
24   the cohort studies which also were not

88 (Pages 346 to 349)

Karla Ballman, Ph.D.

Page 350

1  statistically significant. So I do not
2  believe that I just sort of put all the
3  nonstatistically significant studies
4  together and the statistically
5  significant studies together. I do not
6  believe that's what I did.
7      Q.  Do you think statistical
8  significance is the issue that is the --
9  defines your opinion? In other words --
10  in other words, where you feel that there
11  is inconsistency between the
12  observational data, because some studies
13  were not statistically significant and
14  others were.
15      MS. MILLER: Objection.
16  BY MR. TISI:
17      Q.  True?
18      MS. MILLER: Objection.
19      THE WITNESS: I don't
20  believe that's what I stated. And
21  I believe I stated all along that
22  I did the Bradford Hill analyses.
23  You know, I looked at strength of
24  association. I looked at

Page 351

1  consistency. And I made a note in
2  terms of consistency that there
3  was no consistency on many -- a
4  lack of consistency on many
5  different levels.
6  BY MR. TISI:
7      Q.  Okay. Are you done?
8      MS. MILLER: Are you -- are
9  you still talking?
10      THE WITNESS: So this
11  factor -- so consistency is that,
12  you know, it needs to be multiple
13  studies across different locations
14  and populations, and study designs
15  have to show a similar association
16  between the exposure and outcome.
17      I would also note within the
18  case-control studies --
19  BY MR. TISI:
20      Q.  Can I -- can I ask you --
21      A.  -- the hospital-based --
22      Q.  -- a question here? Can I
23  ask you --
24      A.  I'm not finished, please.

Page 352

1  The hospital-based controls, none of them
2  were statistically significant. And
3  those were case-control studies. You
4  know, so you look at the different study
5  designs, and you're getting different
6  sort of results, and that's an
7  inconsistency.
8      Q.  Okay. And so they're
9  inconsistent in that some are
10  statistically significant and others
11  aren't?
12      MS. MILLER: Objection.
13      THE WITNESS: Again, taken
14  as a whole -- and I also talk
15  about the fact that if you look at
16  the magnitude of the estimates --
17  BY MR. TISI:
18      Q.  We'll talk about that.
19      A.  -- that were produced --
20  well, that has to do with consistency
21  too.
22      Q.  I'm going to talk about -- I
23  need to --
24      A.  Well, no, you asked me if my

Page 353

1  consistency is just on the basis if --
2      Q.  I didn't.
3      A.  -- there's statistical
4  significance or not.
5      Q.  Doctor, you know, when I
6  ask -- when I ask a question, it involves
7  different variables, I get accused of
8  asking a compound question. So I'm
9  asking you one question at a time.
10      Is statistical significance,
11  when you looked at these studies overall,
12  did you find that the statistically
13  significant results were counter-balanced
14  by the statistically insignificant
15  results?
16      MS. MILLER: Objection.
17      THE WITNESS: I do not --
18  I'm sorry.
19      I do not know what you mean
20  by counterbalance.
21  BY MR. TISI:
22      Q.  In other words, did they
23  negate them?
24      MS. MILLER: Objection.

89 (Pages 350 to 353)

Karla Ballman, Ph.D.

Page 354

1          THE WITNESS: That's not
2     what I said.
3     BY MR. TISI:
4          Q.   Are they inconsistent with
5     them? Is it inconsistent that some
6     studies are statistically significant and
7     others aren't?
8          A.   Again, consistency requires
9     that multiple studies across different
10    locations, populations, and study designs
11    show similar association between the
12    exposure and the outcome.
13          So I looked at case-control
14    studies, which is one design. And within
15    case-control studies you have
16    population-based case-control studies,
17    which is a design. You have
18    hospital-based control studies, which is
19    a design.
20          You also have cohort
21    studies, which is another different
22    design.
23          And when you look across
24    that, you do not come up with the same

Page 355

1     association.
2          Q.   Isn't that why you do a
3     meta-analysis?
4          A.   No.
5          Q.   Okay. Well --
6          A.   Meta-analysis -- let me
7     answer -- finish that.
8          Meta-analyses are not meant
9     that if results differ from each other
10    you throw them all together to get a
11    result that you want. And in fact if
12    results are different from each other,
13    you shouldn't do a meta-analyses. That's
14    heterogeneity --
15          Q.   So you think --
16          A.   -- and that's going to lead
17    to an incorrect conclusion.
18          Q.   So you think nobody --
19          MS. MILLER: Are you done?
20          THE WITNESS: I'm done.
21    BY MR. TISI:
22          Q.   So you think that -- there
23    are five or six meta-analyses. Do you
24    think those shouldn't have been done?

Page 356

1          A.   I didn't say that they
2     shouldn't be done. But to be done
3     correctly and how to look at them
4     correctly, and -- is to do a separate
5     case -- meta-analyses of the case-control
6     studies, and a separate of the cohort
7     studies, and not just do one case -- or
8     one meta-analysis that combine both
9     together.
10          And a lot of the
11    meta-analysis, they do report out
12    separately for the case-control studies
13    and the cohort studies.
14          Q.   But they do a meta-analysis
15    combining all the studies, every single
16    one of them combine all the studies?
17          MS. MILLER: Objection.
18          THE WITNESS: Yes. And I
19    have -- I do know that I have
20    citations in here somewhere that
21    shows that that is a problem with
22    meta-analysis. Because it lumps
23    over -- you won't be able to see
24    consistency or not, but you -- you

Page 357

1     just have one result. So you
2     can't see where the results
3     differ.
4     BY MR. TISI:
5          Q.   Now, in criticize --
6          MS. MILLER: Is this a good
7     time for a break?
8          MR. TISI: No. Unless you
9     need it. Do you need it?
10          MS. MILLER: Do you need it?
11          THE WITNESS: I need it.
12          MS. MILLER: It's not about
13    me. It's about her.
14          MR. TISI: Absolutely. If
15    she needs it, she can always ask
16    for it.
17          THE WITNESS: Yeah, I'm
18    sorry. I was trying to be polite.
19    Thank you.
20          MS. MILLER: Yeah, she's
21    very polite. She's not going to
22    ask.
23          THE VIDEOGRAPHER: Stand by,
24    please. The time is 2:23 p.m.

90 (Pages 354 to 357)

Karla Ballman, Ph.D.

Page 358

1     Off the record.
2     (Short break.)
3     THE VIDEOGRAPHER:  Okay.  We
4     are back on the record.  The time
5     is 2:34 p.m.
6  BY MR. TISI:
7     Q.   In your report -- Doctor,
8  we're talking about the talc studies
9  now -- you have some criticisms of the
10 plaintiffs' experts in how they addressed
11 the biases in the cohort studies and you
12 give your opinions about them, and it's
13 pretty clear in your report.  You know
14 that section, correct?
15    MS. MILLER:  Is that a
16    question?
17    MR. TISI:  Yes.
18    THE WITNESS:  Can you point
19    me to the section, please?
20 BY MR. TISI:
21    Q.   Sure.  I'm happy to do that.
22 On Page 28.  Do you see you're addressing
23 the issues that the plaintiffs' experts
24 raise about the cohort studies and you

Page 359

1  address them and your opinions about them
2  are pretty clear.
3     A.   So you're talking about the
4  paragraph that says, "The final argument
5  made by plaintiffs' experts"?
6     Q.   Yeah.  Actually and it
7  starts -- you talk about all of the --
8  you address all of the issues that -- I
9  mean, this is not a trick question.
10    A.   Yeah.
11    Q.   You are addressing all of
12 the issues that the plaintiffs' experts
13 raise about the cohort studies here, and
14 you don't think that they're valid, and
15 you give the reasons for that, correct?
16    MS. MILLER:  Objection.
17    Objection.
18    THE WITNESS:  So yeah, you
19    know, as it says here, I -- I say
20    plaintiffs cite certain things,
21    and I point out why I disagree
22    with their methodology.
23 BY MR. TISI:
24    Q.   Okay.  In your opinion?

Page 360

1     A.   It's why I disagree with the
2  methodology.
3     Q.   Okay.  And for the record,
4  the cohort studies are what?  Gertig,
5  Gates, Houghton and Gonzales?
6     A.   Yeah, it depends on how you
7  count cohort studies.  But those are
8  publications on the cohort studies.
9     Q.   And so it's not that the
10 plaintiffs' experts don't consider the
11 cohort studies, they just think that on
12 balance they're not as reliable as --
13    MR. TISI:  What are you
14    shaking your head for?
15    MS. MILLER:  Because
16    you're -- okay, I'll wait.  I'll
17    object at the end.  I didn't mean
18    to be shaking my head.
19    MR. TISI:  You've been doing
20    it the whole time.
21    MS. MILLER:  There's a video
22    that will --
23    MR. TISI:  It will.
24 BY MR. TISI:

Page 361

1     Q.   So the question is not --
2  your contention is not that the
3  plaintiffs' experts don't address the
4  cohort studies.  You just disagree about
5  the interpretation that they give to the
6  cohort studies; is that fair?
7     MS. MILLER:  Objection.
8     Objection.
9     THE WITNESS:  My concern is
10    the methodology used by the
11    plaintiffs in doing their -- their
12    whole analyses of the data in
13    total.
14 BY MR. TISI:
15    Q.   And what methodology do you
16 think that you used wrong with respect
17 to the cohort studies?
18    A.   I -- well, again, I think
19 that they -- in terms of the methodology,
20 I was talking about methodology, sort of
21 in general.  I don't think that they're
22 applying the Bradford Hill criteria in a
23 methodologically correct manner.
24    And so for the cohort

Karla Ballman, Ph.D.

Page 362

1  studies, I point out, you know, what they
2  say as to why, you know, they say that,
3  well, the cohort studies, you know,
4  really have no play in terms of
5  determining consistency.
6          Q.   Is that what you think they
7  say?
8          A.   I'm paraphrasing.  I do
9  not -- I do not see -- I don't know
10  offhand, and I'll have to read through
11  carefully.  But it's I seem to remember
12  that none of the plaintiffs' experts said
13  that -- that they gave cohort studies
14  more weight than they did the
15  case-control studies.
16          Q.   And you think that they
17  should have said cohort studies should be
18  given more weight than case-control
19  studies?
20          A.   I'm --
21          MS. MILLER:  Objection.
22          THE WITNESS:  I'm saying --
23          MS. MILLER:  Please give me
24  time to object.  I know everybody

Page 363

1          is tired this afternoon.
2  BY MR. TISI:
3          Q.   I mean, I'm reading what
4  you.  You said, "I don't know offhand but
5  I'll have to read through carefully.  But
6  it seemed -- I seem to remember that none
7  of plaintiffs' experts said that they
8  gave cohort studies more weight than they
9  did case-control studies."
10          And you think that's a
11  methodologic flaw?
12          A.   I -- I -- in the end I may
13  be misremembering exactly what they said.
14  But I do believe some of them said I
15  weighted the case-control studies more
16  because here are flaws in the cohort
17  studies and that sort of makes them
18  invalid.
19          And due to the generally
20  accepted principle in epidemiology that
21  cohort studies have higher evidence than
22  do case-control studies, I don't think
23  that's correct.
24          Q.   But the biases that the

Page 364

1  plaintiffs' experts, there's several of
2  them.  There's misclassification bias
3  that they identified.  You know what that
4  is, right?
5          A.   Can you point in particular
6  where they identified a mis --
7          Q.   Well, I'm asking you.  You
8  identified it in your report.  You said
9  that one of the issues that were raised
10  was that they did not -- the issue that
11  Dr. Rothman raised --
12          MS. MILLER:  Do you want to
13  tell us what page you are reading?
14          MR. TISI:  Page 28.
15          MS. MILLER:  That would help
16  a lot.
17          MR. TISI:  I'm on Page 28.
18  I told you before.
19          THE WITNESS:  Yeah, yeah,
20  but I don't know from there where
21  you're reading.
22  BY MR. TISI:
23          Q.   Okay.  Let me ask you this.
24  Did they identify misclassification bias?

Page 365

1          A.   I don't know.  I mean, can
2  you --
3          Q.   I'm asking you.  You're the
4  expert.  I'm just a lawyer.  Did they
5  identify misclassification bias?
6          A.   I'll have to go through all
7  the expert reports and see which ones.
8          Q.   I'm asking, in your
9  report -- in your report, do you identify
10  that she would -- that the witness's
11  plaintiff were concerned about
12  misclassification bias?
13          A.   I'll have to go through my
14  report.
15          MR. LOCKE:  Objection to
16  form.  Maybe it's just the
17  pronouns.  But are you talking
18  about a specific witness?
19          MR. TISI:  No.  She's
20  lumping them altogether.
21          MS. MILLER:  Where is she
22  lumping them altogether?
23  BY MR. TISI:
24          Q.   Plaintiffs' experts.  It

Karla Ballman, Ph.D.

Page 366

1    says the final argument made by
2    plaintiffs' experts.
3          A.   Yes.  And I cite two of
4    them, so what is 15 and 73?
5          So one is, as I -- we've
6    been talking about, is that the level of
7    evidence in cohort studies is weaker than
8    that in case-control studies.
9          And number 15 and 73 are --
10   so that would be McTiernan and Moorman.
11         Q.   Okay.  So now let me ask you
12   this.  Do the witnesses -- do as a whole,
13   do the plaintiffs' experts, one, or all
14   of them, talk about the issue of
15   misclassification bias?
16         MS. MILLER:  Objection.
17         THE WITNESS:  I can't
18   remember off the top of my head.
19   BY MR. TISI:
20         Q.   But you know what
21   misclassification bias is, right?
22         A.   Yes, I do.
23         Q.   What is it?
24         A.   It's when you put a case

Page 367

1    into the control group or you put a
2    control into the case group.
3          Q.   Okay.  And that is a
4    recognized bias and that's what
5    Dr. Rothman was talking about -- is a
6    recognized bias within -- within cohort
7    studies, correct?
8          A.   It doesn't have to be just
9    cohort studies you can have
10   misclassification biases in case-control
11   studies.
12         Q.   Okay.  But that is a
13   recognized concern about cohort studies,
14   right?
15         A.   It's something one needs to
16   be aware of when they are looking at
17   cohort studies.  It doesn't mean that
18   every cohort study has misclassification
19   bias.
20         Q.   Isn't it also another
21   concern that the studies -- that cohort
22   studies are difficult to design if
23   they're studying a rare disease?
24         MS. MILLER:  Objection.

Page 368

1          THE WITNESS:  That's more of
2    a feasibility question and a
3    resource question and I don't see
4    how that creates any biases or
5    confounding or issues like that.
6    BY MR. TISI:
7          Q.   One of the things that you
8    raised is that Narod had mentioned that
9    there should be 200,000 patients.  Do you
10   remember that?
11         A.   Yes, I do.  We can look at
12   it here.
13         Q.   Let me ask you.  Did you
14   ever -- did you -- did you do any power
15   calculation to determine how big a cohort
16   study would have to be in order to
17   identify a risk of ovarian cancer?
18         MR. LOCKE:  Objection.
19   BY MR. TISI:
20         Q.   If you disagree -- if you
21   disagree with Dr. Narod?
22         MS. MILLER:  Objection.
23         Is the question the first
24   one or is the second question?

Page 369

1          Is, "Do you disagree with
2    Dr. Narod a question?"  Or is it
3    editorial content?  What is that?
4          Objection.
5          MR. TISI:  Thank you.
6    That's -- that's all you have to
7    say.
8          MS. MILLER:  Well, I need to
9    know.
10         MR. TISI:  You don't.
11         MS. MILLER:  The witness
12   needs to know.
13         MR. TISI:  She's doing just
14   fine.
15         MS. MILLER:  Do you know
16   what the question is?
17         THE WITNESS:  I'm not sure.
18   BY MR. TISI:
19         Q.   Doctor --
20         A.   But I heard that I --
21         Q.   Because you were queued by
22   your lawyer, let me ask you this --
23         MS. MILLER:  It doesn't take
24   a queue to know.

93 (Pages 366 to 369)

Karla Ballman, Ph.D.

BY MR. TISI:
Q.   You recall -- you recall --
MR. TISI:  Counsel, please.
BY MR. TISI:
Q.   You recall that you -- that
Dr. Narod said that you would have to
have 200,000 patients in a cohort study
in order to detect -- detect ovarian
cancer, do you remember that?
A.   We can go to the Narod
study.  I just want to make sure exactly
what he said, but...
MS. MILLER:  Is there a
specific part of her report that
you're referring to?
MR. TISI:  I'll find it for
you.  Honestly, she remembers it,
so you don't have to keep doing
that.
BY MR. TISI:
Q.   Do you see in the middle of
Page 26 where it says, on your report,
"Across two different prospective
studies, there were approximately 1,400

women diagnosed with ovarian cancer and
more than 200,000 women who were not
diagnosed with ovarian cancer."
Do you see that?
A.   Yes.  I see that.
Q.   Okay.  So now my question
is, did you do any power calculations to
determine how big the cohort studies
would have to be to detect ovarian
cancer, or are you relying on Narod?
A.   I think if you go down.  It
says the power to detect a hazard ratio
of 1.2 or larger is over 90 percent with
a two-sided level of confidence of 0.05.
Clearly this is sufficient power for an
association of 1.26 that is observed in
the case-control studies to be found
statistically significant.
So that -- so that is a
power statement.
Q.   Okay.  I'm asking you how
many patients would have to be enrolled
in a study.  So what would that turn out
to be?

A.   I'm saying on the basis of
what we have here, I mean, if you read
that whole thing, it says, "Across the
three prospective studies there's 1,400
women with ovarian cancer, over 200,000
without."  So if you take those numbers,
the power to detect a hazard ratio of 1.2
or larger is over 90 percent with a
two-sided level of significance of .05.
Q.   Do you know whether or not
other people outside of litigation have
actually looked at the concerns about the
cohort studies that the plaintiffs'
experts have identified?
A.   I'm not sure what the
question is.
Q.   Well, I'll read it again.
A.   I mean, is there a
publication that looked at the cohort --
Q.   Do you know whether or not
people -- people, scientists outside of
litigation, have looked at the issues
related to the talc cohort studies and
agreed with the plaintiffs?

MS. MILLER:  Objection.
THE WITNESS:  I'm -- I mean,
the meta-analyses obviously looked
at the cohort studies, and I do
not remember --
BY MR. TISI:
Q.   Did you read the Taher?
A.   The unpublished study that
hasn't been through peer review yet?
Q.   Actually -- it's actually
been through peer review.  But it's not
been published yet.  You're correct.
But let me ask you --
A.   So there's a notification of
publication?
Q.   Doctor, just I'm not
under -- I'm not under oath here.
A.   Sorry.
Q.   I'm asking you -- I'm asking
you this question?
A.   Yeah.
MR. TISI:  Are we laughing?
Is that part of -- part of
deposition protocol?

94 (Pages 370 to 373)

Karla Ballman, Ph.D.

1          MS. SHARKO:  Well, you
2     represented that it was
3     peer-reviewed.
4          MR. TISI:  I'm
5     representing --
6          MS. SHARKO:  And then you say
7     you're not under oath.  Can we see
8     the peer review?  Are you guys
9     part of that?
10    BY MR. TISI:
11        Q.   Doctor -- Doctor --
12         MR. TISI:  I'm not part of
13    it, Counsel.  You know I'm not
14    part of it.
15         MS. SHARKO:  No, I don't.
16    BY MR. TISI:
17        Q.   Do you know whether or not
18    the Taher authors have identified the
19    same weaknesses with the cohort study as
20    the plaintiffs' experts did?
21        A.   I don't remember off the top
22    of my head --
23        Q.   Let's look at it.
24        A.   -- but I would have sort of

1          was no question pending, Counsel.
2     BY MR. TISI:
3         Q.   Okay.  If you go to Page 43.
4     It says at the top, Although the reasons
5     are unclear, the difference potentially
6     due to issues related to latency, study
7     power or exposure misclassification.
8          And they're talking about
9     the difference between cohort and case
10    controls.
11         Do you see that?
12        A.   I'm sorry, where were you
13    reading again?  Was it starting
14    "although"?
15        Q.   And the very top, "The
16    effect estimates of the meta-analysis
17    reported on 24-case-control studies" --
18        A.   Yes.
19        Q.   -- "and three cohort studies
20    and refer to ever versus never use of
21    perineal talc.  And it talks about the
22    fact that there's a difference between
23    the case-control and the cohort studies.
24         Do you see that?

1     the same...
2          MR. TISI:  Yes, hers has the
3     tab.
4          MS. MILLER:  Do you want
5     this tab?
6     BY MR. TISI:
7         Q.   You read the -- you read
8     the --
9          MR. TISI:  Yes, I did that
10    to make her life easy.
11         (Document marked for
12    identification as Exhibit
13    Ballman-22.)
14         THE WITNESS:  So this looks
15    like a draft.
16    BY MR. TISI:
17        Q.   Yes, correct.
18        A.   So whether it's been
19    peer-reviewed.
20        Q.   I'm asking you -- I'm asking
21    you whether they identified --
22         MS. MILLER:  You just
23    interrupted her.
24         MR. TISI:  Okay.  I -- there

1         A.   Yes, I do.
2         Q.   Okay.  And "Although the
3     reasons for this are unclear, the
4     difference could potentially be due to
5     issues related to latency, study power or
6     exposure misclassification," correct?
7         A.   You know, that's what he
8     says there.  And I think it's really
9     striking that he doesn't talk about what
10    most people talk about in terms of the
11    limitations of the case-control studies.
12    So most people would say well, the reason
13    is, is because there's recall bias.  And
14    we do have evidence of how recall bias
15    can affect these results from
16    Schildkraut.  And so -- and so there it
17    can be kicked around --
18        Q.   There's no question --
19    there's no question pending.
20        A.   Well, you asked me --
21        Q.   I didn't ask you.  I asked
22    you whether I read that right.
23         MS. MILLER:  Please stop
24    interrupting her.

95 (Pages 374 to 377)

Karla Ballman, Ph.D.

Page 378

1       MR. TISI: I asked you --
2       MS. MILLER: She wants to
3   give full, accurate answers.
4       MR. TISI: But there was no
5   question pending.
6       MS. MILLER: And you're
7   trying to stonewall her.
8       MR. TISI: No, she's trying
9   to stonewall me.
10  BY MR. TISI:
11      Q.  I'm asking you this. I said
12  their reason they identify three reasons
13  why there could be a difference between
14  the case-control and the cohort studies,
15  did they not? And the answer is either a
16  yes or no.
17      MS. MILLER: Sometimes in
18      life an answer isn't yes or no.
19      And if the witness feels like she
20      needs to give a complete answer,
21      please allow her to give a
22      complete answer.
23  BY MR. TISI:
24      Q.  Doctor, did I read the

Page 379

1   following statement correct:
2       "Although the reasons for
3   this are unclear, the difference could
4   potentially be due to issues related to
5   latency, study power, or study
6   misclassification."
7       A.  You read that sentence
8   correct. But you were saying that --
9   that there are experts outside of
10  litigation that have the same objections
11  as do the plaintiffs' experts. And so I
12  was -- and you're citing this.
13      Q.  Okay.
14      A.  And I'm trying to be
15  completely, you know, truthful. And I'm
16  saying this is surprising to me, because
17  first of all, it hasn't been put through
18  peer review. So I don't know if this
19  will stand. The reviewers may say --
20  well, you can say this the other way,
21  which most people would, is the issue is,
22  is that the case-control studies have
23  recall bias and selection bias.
24      Q.  Have those not been

Page 380

1   addressed in this paper?
2       A.  I don't know.
3       Q.  Okay.
4       A.  And let me just point --
5       Q.  So now, let's talk about the
6   cohort studies, which is what we were
7   talking about.
8       MS. MILLER: She was in the
9       middle of a sentence.
10  BY MR. TISI:
11      Q.  The next paragraph talks
12  about latency. It says, "Although cohort
13  designs are efficient in examining
14  diseases with long latency periods, it is
15  essential that the period between talc
16  exposures and cancer's diagnosis be
17  specific" -- "sufficiently long.
18  Gonzales suggested that the latency
19  period for ovarian cancer is between 15
20  and 20 years.
21      "In the cohort studies
22  included in this review, Houghton
23  reported a mean follow-up of 12.4 years
24  while Gates followed a cohort of women

Page 381

1   for 24 years. Gertig and Gonzales
2   noticed that" -- "noted that one of their
3   studies' main limitations one was the
4   relatively short follow-up period that
5   may not accurately detect a potential
6   association between talc exposure and
7   ovarian cancer."
8       Do you see that?
9       MR. LOCKE: Objection.
10      THE WITNESS: I do see that.
11  BY MR. TISI:
12      Q.  Okay. And that is the very
13  same thing that the plaintiffs' experts
14  identify, correct?
15      MS. MILLER: Objection.
16  BY MR. TISI:
17      Q.  You disagree with it, but
18  they identified it?
19      MS. MILLER: Objection.
20      THE WITNESS: And I'm saying
21      that the methodology and -- and
22      sort of what's being stated here
23      is -- is not a true representation
24      of what's going on.

96 (Pages 378 to 381)

Karla Ballman, Ph.D.

Page 382

```
 1    BY MR. TISI:
 2         Q.   Okay.  So they're wrong?
 3             MS. MILLER:  Objection.
 4             THE WITNESS:  I'm saying
 5        that I -- I think that the
 6        methodology applied has not -- has
 7        some flaws in it.
 8    BY MR. TISI:
 9         Q.   Okay.  So the methodology of
10    these folks outside of litigation are
11    wrong --
12         A.   But these --
13         Q.   -- but yours is right?
14         A.   Sorry.
15         Q.   Correct?
16             MS. MILLER:  Objection.
17             THE WITNESS:  I'm saying
18        that I followed the general
19        principles of evaluating causation
20        on the basis of epidemiology good
21        practice.
22             And this has not even been
23        peer-reviewed yet, so...
24    BY MR. TISI:
```

Page 383

```
 1         Q.   So the next -- nor has your
 2    report, right?
 3             MS. MILLER:  Objection.
 4    BY MR. TISI:
 5         Q.   Your report hasn't been
 6    peer-reviewed, right?
 7             MS. MILLER:  Objection.
 8             THE WITNESS:  So I'm not
 9        using anything outside of
10        litigation that hasn't been
11        peer-reviewed to say, look, you
12        know, this --
13    BY MR. TISI:
14         Q.   But your --
15         A.   -- is in support of that.
16    And so that's --
17         Q.   But your report --
18         A.   -- what I'm saying.
19         Q.   -- has not been
20    peer-reviewed, correct?
21         A.   But that wasn't the relevant
22    thing.
23         Q.   Okay.
24         A.   You were pointing to
```

Page 384

```
 1    something outside of litigation that
 2    hasn't been published to say, look, this
 3    is in support of our experts' opinion.
 4    So I don't know how that has much weight.
 5         Q.   The next statement is --
 6    deals with the power issue.  In addition
 7    cohort studies included -- may have
 8    underpowered -- may have been
 9    underpowered to detect an odds ratio of
10    1.3 from the case-control studies.  This
11    was noted by Narod who suggested a cohort
12    of at least 200,000 women would be needed
13    to reach statistical significance if the
14    true odds ratio is 1.3.  The cohort
15    studies included in this review included
16    much smaller cohort studies, ranging
17    between 41,000 and 78,000 women.
18             Do you see that?
19         A.   I see where it's stated
20    there.
21             MS. MILLER:  You didn't read
22        that exactly.
23             MR. TISI:  I didn't read it
24        exactly.  You're right.
```

Page 385

```
 1             MS. MILLER:  No, you didn't.
 2    BY MR. TISI:
 3         Q.   My question is --
 4             MS. MILLER:  So --
 5    BY MR. TISI:
 6         Q.   -- were any -- were any of
 7    the cohort studies above 80,000 women?
 8         A.   I'm saying that if you look
 9    at the meta-analyses of the cohort
10    studies, there -- it meets, as I said in
11    my report, meets the 200,000, and there
12    is sufficient power there.  And The
13    meta-analyses of the cohort studies did
14    not find a statistically significant
15    result.
16         Q.   Where was the meta-analysis
17    for the cohort studies?  Where was that?
18         A.   Oh, let's look at -- I think
19    Berge has meta-analysis of the cohort.
20    Penninkilampi also has a meta-analysis.
21    Those are the two most recent ones.  And
22    those are published.
23         Q.   The next -- the next thing
24    deals with the misclassification bias.
```

97 (Pages 382 to 385)

Karla Ballman, Ph.D.

Page 386

1        MR. TISI:  God bless you.
2   BY MR. TISI:
3        Q.    On the next page, it says,
4   Finally, in cohort studies talc exposure
5   was assessed at cohort entry and was used
6   to measure -- as a measure of chronic
7   talc use during follow-up.
8        It is possible women who
9   were not exposed to perineal talc at the
10  time of cohort entry began using talc
11  later time and vice versa, possibly
12  introducing nondifferential
13  misclassification of exposure, which
14  could have biased the risk estimate
15  towards the null value of unity.
16       MS. MILLER:  I just want to
17  say object.  That was paraphrased.
18       It wasn't read exactly.
19  BY MR. TISI:
20       Q.    Do you read that?
21       A.    I see where you're reading
22  from.
23       Q.    And that's the same
24  misclassification bias that Dr. Rothman

Page 387

1   mentioned and plaintiffs' experts also --
2   experts also mentioned as well.
3        A.    Yeah.  And that's just a
4   statement there, but it doesn't go into
5   sort of how this applies to talc in
6   general.  It's just a general statement.
7        So for instance, it doesn't
8   acknowledge that most women begin talc
9   use in their early adulthood.  It doesn't
10  acknowledge that -- so that means that
11  most women by the time they're 55,
12  probably wouldn't start using talc at
13  that point.
14       And even if they did, there
15  probably wouldn't be sufficient follow-up
16  time at that point for ovarian cancer to
17  develop.
18       So these are much more
19  subtle than just sort of stating a
20  platitude that, oh, yeah, this is a thing
21  you have to look out for in cohort
22  studies and, therefore, it's true.
23       It is something that you
24  have to look out for.  But you have to

Page 388

1   sort of take a deeper dive and see if
2   there's any evidence for or against that.
3        Q.    Let's talk about strength of
4   association.
5        You -- I'm going to do this
6   pretty quickly I think.  On Page 22 of
7   your report you talk about that, correct?
8        A.    I have a section that says
9   strength of association.
10       Q.    And the first two sentences,
11  you say, "The criterion does not have a
12  hard threshold.  There is no cut-off
13  value for the magnitude of an association
14  between an exposure required for a
15  relationship to be causal."
16       And you agree with that,
17  correct?
18       A.    There's no hard threshold.
19  I mean, there is no hard number that, you
20  know, people would say, oh, it's 1.31.
21  No, it's 1.32.
22       Q.    Okay.  On Page 22, again,
23  you say, "Most epidemiologists regard the
24  relative risk odds ratio or risk ratios

Page 389

1   are less than 1.5 to be weak
2   relationships."
3        Do you see that?
4        A.    Yes.  And I have citations
5   there.
6        Q.    Okay.  And then you go on to
7   say, "Although there are instances where
8   ratios under 1.5 are established to be
9   causal based upon observational data,
10  there are more instances where they are
11  spurious due to confounding or bias."
12       Do you see that?
13       A.    Yep.  With the citation.
14       Q.    Okay.  That citation is to
15  an article by Taubes?
16       A.    Mm-hmm.
17       Q.    Okay.  Who is Gary Taubes?
18       A.    I don't know offhand who he
19  is.
20       Q.    Gary Taubes, is he a doctor?
21       A.    I -- I don't know offhand.
22  If I could see the article.  I could see
23  if he has a Ph.D. or M.D. behind his
24  name.

Karla Ballman, Ph.D.

1    MR. TISI:  Exhibit 30,
2    please.
3        MS. MILLER:  So that would
4    be 23.
5        MR. SOILEAU:  Yes, that
6    would be 23.
7        MS. MILLER:  I can't figure
8    out your code.  But you're always
9    off by a always a different
10   number.
11       MR. TISI:  Yes, it is,
12   because I'm off my --
13       MS. MILLER:  It's not like I
14   can even add or subtract.
15       (Document marked for
16   identification as Exhibit
17   Ballman-23.)
18   BY MR. TISI:
19   Q.   I don't have the whole
20   thing.  But I'm going to give you mine.
21   This is an article by Dr. Taubes.  And it
22   has my highlighting on it, which of
23   course I will be glad to substitute one.
24       MS. SHARKO:  We don't mind

1    really well respected journal.
2    Q.   Do you know, Doctor, that
3    Taubes is a journalist and not a doctor?
4    A.   Oh, I did not realize that.
5    But he's quoting many individuals in here
6    who are famous epidemiologists, Norman
7    Breslow.
8    Q.   Doctor, do you see a nice,
9    big picture of --
10   A.   I see Ken Rothman in there.
11   Q.   Yeah.
12   A.   Who you say is -- so he --
13   he may be reporting.  But it's -- Sander
14   Greenland.
15   Q.   That's the other guy who, if
16   you look at the book there, they both
17   co-authored the book on epidemiology?
18   A.   Right.
19   Q.   All right.  And first of
20   all, is this a peer-reviewed article?
21   A.   Since it says "Special news
22   report," I don't know if it was
23   peer-reviewed or not.
24   Q.   Did you look and see whether

1    your highlighting.
2        MR. TISI:  That's okay.  I'm
3    happy to have you show it to the
4    jury.
5        MS. MILLER:  There's no jury
6    here.  This is a Daubert
7    proceeding.  We've established
8    that like 16 times.  So I don't
9    know which jury you're talking
10   about.
11       MS. SHARKO:  There's never
12   going to be a jury.  We're going
13   to be done after Daubert.
14       MR. TISI:  There have been
15   plenty of juries.  They've all
16   said the same thing.
17   BY MR. TISI:
18   Q.   Is that the article that
19   you've referred to?
20   A.   Yes, it is.
21   Q.   Okay.  Can you tell me
22   whether Dr. Taubes -- first of all, it's
23   a news article, isn't it?
24   A.   In -- in Science, which is a

1    or not the people who were quoted in this
2    news article, first of all, do you
3    typically cite news articles in your
4    published -- published papers?
5        MS. MILLER:  Objection.
6        THE WITNESS:  Well, if they
7    interview epidemiologists -- so
8    the epidemiologist interviewed by
9    Science, so I believe that
10   journalist would sort of report
11   correctly what the epidemiologist
12   said that they interviewed.
13   BY MR. TISI:
14   Q.   So you don't -- you don't
15   buy fake news, huh?
16       MS. MILLER:  Objection.
17   BY MR. TISI:
18   Q.   Let me ask you this, Doctor.
19       MS. MILLER:  Was that a
20   question that you actually want
21   her --
22       MR. TISI:  Yeah.  I withdraw
23   it.  I was making a joke, Counsel.
24       MS. MILLER:  It's hard to

Karla Ballman, Ph.D.

Page 394

```
 1        tell.
 2   BY MR. TISI:
 3        Q.   Did you see -- did you see
 4   whether or not the people who were quoted
 5   wrote a rebuttal to this report?
 6        A.   No, I did not look.
 7             (Document marked for
 8        identification as Exhibit
 9        Ballman-24.)
10   BY MR. TISI:
11        Q.   In the same article, and you
12   use the same rigor in doing -- in
13   drafting your report that you would do in
14   any publication, right?
15             MS. MILLER:  Objection.
16   BY MR. TISI:
17        Q.   In drafting your expert
18   report, you use the same scientific rigor
19   that would you use in every publication
20   that you -- that you'd use?
21             MS. MILLER:  Objection.
22             THE WITNESS:  I applied
23        scientific rigor in doing my
24        analyses and writing my report.
```

Page 395

```
 1   BY MR. TISI:
 2        Q.   So in the same journal of
 3   Science, Drs. -- if you look at the next
 4   page, Drs. Willett, Greenland, MacMahon
 5   Rothman, Thomas, Thun and Weiss wrote a
 6   letter.
 7             Do you see that?
 8        A.   Yes, I see that.
 9        Q.   Okay.  And the first
10   sentence says, "In the special news
11   report, "Epidemiology Faces Its Limits,"
12   Gary Taubes assembles a series of
13   quotations from ourselves and others
14   about potential methodologic pitfalls in
15   epidemiologic studies that might leave
16   readers with the misimpression that
17   evidence-based epidemiologic findings are
18   not usually credible."
19             Did I read that right?
20        A.   Yeah, you read that right.
21   Does -- are we talking about -- is this
22   all in relation to threshold?
23        Q.   This is all in relationship
24   to the study that you relied on to
```

Page 396

```
 1   support your -- your statement, yes.
 2             MS. MILLER:  Objection.
 3        That's --
 4   BY MR. TISI:
 5        Q.   The next sentence, he says,
 6   A problem does -- A problem does not
 7   exist with general medical reports about
 8   single scientific studies.
 9             Correct?
10             MS. MILLER:  Objection.
11             MR. LOCKE:  Objection.  You
12        added a "not".
13   BY MR. TISI:
14        Q.   "A problem does exist with
15   general media reports about single
16   scientific studies."
17             Correct?
18        A.   Yes, that's what it says
19   there.
20        Q.   And most of the examples
21   that are cited in the Taubes articles had
22   one observational study, correct?
23        A.   Yeah.  That might be the
24   case.
```

Page 397

```
 1        Q.   Okay.  Now, talc has, we
 2   established earlier, over 30, correct?
 3        A.   Well, again, it depends upon
 4   how you measure studies.  I don't know if
 5   they are 30 independent with different
 6   datasets.
 7        Q.   Certainly over one?
 8        A.   That's correct.
 9        Q.   Okay.  It says, "Taubes
10   seems to perpetuate this confusion by
11   listing several media reports of
12   published findings and telling the
13   reader, 'You should be the judge.'"
14             Do you see that?
15        A.   I see where you're reading
16   from.
17        Q.   Okay.  It goes on to say,
18   "In any scientific field, findings of
19   individual studies are not usually
20   considered seriously until confirmed by
21   others.  Also, in epidemiology, as in
22   another scientific fields, more powerful
23   studies need to be conducted to evaluate
24   smaller fixed."
```

100 (Pages 394 to 397)

Karla Ballman, Ph.D.

1          Do you see that?
2          MR. LOCKE:  Objection.
3          THE WITNESS:  Yep.
4    BY MR. TISI:
5          Q.   Okay.  So you cited the
6    Taubes article but you didn't really
7    consider the quotations, the
8    epidemiologist who thought differently,
9    correct?
10         MS. MILLER:  Objection.
11         THE WITNESS:  But I think
12    there are other quotations, such
13    as, "Often doing so will require
14    large and long-term prospective
15    studies."
16         And it also states that,
17    "Taubes writes that, I have
18    expressed the view that a fourfold
19    risk should be taken seriously.
20    This is correct, but only when the
21    finding stands in the biological
22    vacuum" --
23    BY MR. TISI:
24         Q.   Right.

1          A.   -- "and has no" -- "or no
2    biomedical credibility."
3          Q.   Okay.
4          A.   "We all take seriously small
5    relative risk when there are credible
6    hypothesis in the background."
7          Q.   And you don't think the
8    hypothesis that talc could cause ovarian
9    cancer is credible?
10         A.   After doing my complete
11    scientific review, I -- I again come to
12    the conclusion that there's no evidence
13    of a causal relationship between
14    peritoneal talcum powder exposure and
15    ovarian cancer.
16         Q.   Okay.  You mentioned that
17    you think that the -- most
18    epidemiologists would categorize the
19    risks seen in these studies as weak?
20         A.   I -- yes.
21         Q.   Okay.  Who is the National
22    Cancer Institute?
23         A.   What is it?
24         Q.   Do you know who the National

1    Cancer Institute is?
2          A.   You mean what is it?
3          Q.   Yes.
4          A.   I thought you said who.  Is
5    it who or what?
6          Q.   What is the National Cancer
7    Institute?
8          A.   So it's -- it's a government
9    agency that funds cancer research.
10         Q.   Okay.  Would it surprise you
11    that the National Cancer Institute
12    characterized risks as low as 1.2 as a
13    moderate risk and not a weak risk?
14         MR. LOCKE:  Objection.
15         THE WITNESS:  Can I see what
16    you're citing that from, please?
17         MR. TISI:  Sure.
18    BY MR. TISI:
19         Q.   National Cancer Institute,
20    PDQ on the NI -- from "Ovarian Fallopian
21    Tube and Primary Peritoneal Cancer:
22    Peritoneal Cancer Prevention."
23         (Document marked for
24    identification as Exhibit

1    Ballman-25.)
2    BY MR. TISI:
3          Q.   Do you see that?
4          A.   Yes, I see that.  That's the
5    title of the article.  Yes.
6          Q.   And if you go to Page 3.  It
7    identifies factors with adequate evidence
8    of increased risk of ovarian, fallopian
9    tube and primary peritoneal cancer.
10         Do you see that?
11         A.   Yes, I do.
12         Q.   Okay.  And it talks about
13    for each one of them, the magnitude of
14    the effect?
15         A.   Yes, I see that.
16         Q.   Okay.  The magnitude of
17    effect for endometriosis is modest with
18    an observed relative risk rate of 1.8 to
19    2.4?
20         A.   Yes.
21         Q.   Magnitude of the effect for
22    hormone replacement therapy is modest
23    with a relative risk of 1.2 to 1.8?
24         A.   Yes.

Karla Ballman, Ph.D.

Page 402

```
 1        Q.   And obesity and height talks
 2   about, "Based on fair evidence, obesity
 3   and height are associated with a modest
 4   increase of ovarian cancer," which they
 5   describe down below as a 1.1.
 6        A.   Yes.  I see that.
 7        MS. MILLER:  Can you --
 8   BY MR. TISI:
 9        Q.   Are there -- so would you --
10   would you agree with me that at least in
11   this document, that there are people who
12   define magnitude of risk of 1.1 to 1.2 as
13   a modest risk?
14        MS. MILLER:  Objection.  Are
15   we talking about relative risks?
16   Or are we talking --
17        MR. TISI:  You can clarify,
18   Counsel.  She's looking at it.
19        MS. MILLER:  That's an
20   objectionable question.
21        MR. TISI:  Of course.  Every
22   one of my questions is.
23        MS. SHARKO:  Exactly.
24        MS. MILLER:  Fix that.
```

Page 403

```
 1        THE WITNESS:  So this has
 2   nothing to do with --
 3        MS. MILLER:  You have the
 4   power to change that.
 5        MR. TISI:  Every one of my
 6   questions is.  You've made that
 7   clear.
 8        THE WITNESS:  This has
 9   nothing to do with trying to
10   identify what the strength of an
11   association is within the context
12   of a Bradford Hill.
13   BY MR. TISI:
14        Q.   So is the Bradford --
15        A.   This is more, I think, for
16   lay people.  I mean, it says, "Who's at
17   risk?"  I don't think this is for
18   scientists.
19        And so, you know, so I don't
20   know what their reference basis is.  And
21   I note that --
22        Q.   I have -- no question is
23   pending.
24        A.   Let me go through, but I
```

Page 404

```
 1   don't think talc is listed here.
 2        Q.   I understand.  Counsel --
 3   counsel can ask you this question.  This
 4   is not your opportunity to pontificate.
 5        MR. LOCKE:  Objection.
 6        MS. MILLER:  Objection.
 7   BY MR. TISI:
 8        Q.   Let's talk about consistency
 9   and statistical significance now, because
10   this is a big part of your report.
11        Please pull out Exhibit 6,
12   which is the Bradford Hill article.
13        A.   Yes, I have.
14        Q.   On Page 8 it talks about
15   consistency.  It says, "Next to my list."
16        A.   Yes.
17        Q.   Okay.  It does not say
18   different designs, does it?  Can you read
19   it for the record, please?
20        A.   Yes.  It says, "Has it been
21   repeatedly observed by different persons
22   in different places, circumstances, and
23   times?"
24        Q.   Okay.  It doesn't talk about
```

Page 405

```
 1   study design, does it?
 2        A.   I don't know.  Circumstances
 3   could fall under -- I mean, study design
 4   could fall under circumstances.
 5        Q.   It doesn't say anything
 6   about statistical significance, does it?
 7        A.   You know, I read -- where
 8   did I read --
 9        So it's going to take me a
10   while to go through where he talks
11   about -- yeah, so the lesson here is
12   that, "Broadly the same answer has been
13   reached in quite a wide variety of
14   situations and techniques."
15        So I would consider study
16   design a technique.  In other words, it's
17   not due to some constant error or fallacy
18   that permeates every inquiry.
19        Q.   Okay.  So now the next thing
20   if I go to Page 17 of your report under
21   consistency, the second sentence.
22        A.   Under consistency.
23        Q.   Right.  It says -- I'll read
24   it into the record.  "Results across
```

102 (Pages 402 to 405)

Karla Ballman, Ph.D.

Page 406

1  studies are consistent if the risk ratios
2  are numerically close to one another and
3  the results are statistically significant
4  in most studies."
5      A.  Yes.
6      Q.  Let's take each part.
7  Numerically close to one another.  First
8  of all, there's no citation to that
9  whatsoever, is there?
10      A.  Again, I mean, it's like
11  what does consistency mean.  Well, I
12  mean, it means that you have numbers that
13  are close to each other.  A number
14  wouldn't be consistent if one is one and
15  another is 100.  I think that's common
16  sense.
17      Q.  Okay.  Well -- okay.
18      A.  And as well as, you know,
19  results are statistically significant in
20  most studies.  Again, I think that's how
21  most people -- most epidemiologists would
22  interpret consistency.
23      Q.  Well, on Page 26 of the
24  report, if you go there, you criticize

Page 407

1  the plaintiffs' experts in another
2  context.  You say, "Arguments have been
3  made by plaintiffs' experts that the
4  results are consistent.  Some experts
5  emphasize what they see is a relative
6  stability of the estimates across time,
7  diverse population, and across diverse
8  study designs.  Unfortunately, they do
9  not indicate what is meant by relative
10  stability."
11      Do you see that?
12      A.  I'm sorry, no.  I haven't
13  gotten there.
14      Q.  It's the last paragraph.
15      A.  Yes.  I see that.
16      Q.  And you're critical of the
17  plaintiffs' experts for in the defining
18  the terms, right?
19      A.  But if you go on --
20      Q.  I'm asking you a question.
21  You're critical of plaintiffs' experts
22  for not defining their terms, correct?
23      A.  Can I finish?
24      Q.  No, I'm asking you -- I'm

Page 408

1  asking you one question at a time,
2  Doctor.
3      A.  I don't think it's a yes or
4  no answer.
5      Q.  Are you not criticizing
6  them -- "Unfortunately, they do not
7  indicate what is meant by relative
8  stability.  They did not provide a
9  definition."
10      Do you see that?
11      A.  I did not say that they did
12  not provide a cross --
13      Q.  You say, "Unfortunately,
14  they do not indicate what is meant by
15  relative stability."
16      A.  Right.  I did not say
17  definition.
18      Q.  Okay.  Do you indicate what
19  you mean by numerically close to one
20  another --
21      A.  So --
22      Q.  -- on Page 17?
23      MS. MILLER:  Objection.
24      THE WITNESS:  I -- I --

Page 409

1  that's where I was going.  It's
2  transfer -- I do have sort of
3  criteria -- where was it, Page 17?
4      So when I apply the
5  criteria, I say how I apply it.
6  And so I'm trying to look for that
7  right now.
8  BY MR. TISI:
9      Q.  No, I'm asking you the
10  general principles, Doctor.  What is --
11  how do you define numerically close?
12  What is your definition and your
13  authority for that?
14      A.  Common sense.  And I'm going
15  to where I applied it, as the plaintiffs
16  did not give this a definition in their
17  sort of how to do consistency and their
18  general setup of consistency, what I'm
19  saying is when they reported their
20  results on consistency, they just make a
21  statement that it's relatively stable,
22  but they don't give an indication of
23  what they mean by relatively stable.
24      Q.  And you don't think the --

103 (Pages 406 to 409)

Karla Ballman, Ph.D.

1      A.   So in my --
2          MS. MILLER:  She's still
3   talking.
4          THE WITNESS:  In my general
5   setup, I do not indicate.  But I
6   do when I go through sort of the
7   consistency evaluation, I do give
8   magnitudes of the ranges that were
9   reported in the case-control
10  studies that are almost fourfold
11  different.
12  BY MR. TISI:
13     Q.   I understand.
14     A.   Versus -- well, that's
15  what -- you asked me about consistency.
16     Q.   No.  But I'm asking you
17  where you -- no, but I'm asking --
18     A.   And that's how I --
19     Q.   You're not answering my
20  question.
21         MS. MILLER:  Stop talking
22  over each other.  Let her finish
23  her sentence.
24  BY MR. TISI:

1          THE WITNESS:  -- the
2   analysis -- I'm answering.
3   BY MR. TISI:
4      Q.   You are not --
5          MS. MILLER:  Let her finish
6   her sentence.
7   BY MR. TISI:
8      Q.   You are not answering my
9   question with all due respect.
10         MS. SHARKO:  You haven't
11  heard her whole answer.
12         MR. TISI:  This is --
13         MS. MILLER:  Maybe -- maybe
14  she was about to give you the
15  answer you wanted.
16         MR. TISI:  This is --
17         MS. MILLER:  You have to let
18  her finish talking.
19  BY MR. TISI:
20     Q.   This is -- you provide --
21         MS. MILLER:  You don't let
22  me talk either.
23  BY MR. TISI:
24     Q.   You provide a statement,

1      Q.   You are really not answering
2   my question.
3          Doctor, with all due
4   respect, and I -- because I think it's
5   important here.  I want to know what your
6   definition is of numerically close, and I
7   want to know where you get it from.
8      A.   So I think this is a bit
9   unfair.  You're asking me for a
10  definition of numerically close.  And
11  when I just sort of give a general
12  gestalt of what's meant by consistency.
13         And then you're saying but
14  you criticize the other plaintiffs'
15  experts because they don't say what
16  relatively stable is.  And their
17  statements are in terms of when they
18  looked at consistency, not a definition
19  of consistency.
20         So I'm saying let's look and
21  I'll show you why I say they're not
22  consistent.  And when I invoke --
23     Q.   But you're not answering.
24         MS. MILLER:  Let her finish.

1   okay, here about consistency.  This is in
2   your general section, 5.1.2, correct?
3   Without regard to talc.
4      A.   I -- I say -- I provide a
5   general statement there.
6      Q.   Okay.  And your general
7   statement is that numerically close --
8      A.   Yes.
9      Q.   Okay.  You use numerically
10  close.  And I want to know where -- other
11  than you said common sense and gestalt,
12  okay, those are your two things, kind of
13  like the sniff test that you used in
14  Viagra, right?
15         MR. LOCKE:  Objection.
16  BY MR. TISI:
17     Q.   I want to know where your --
18  where your --
19         MS. MILLER:  He wasn't done
20  with the question.  I was going to
21  object.  Don't worry.
22  BY MR. TISI:
23     Q.   Okay.  Then let me back up.
24  You remember the sniff test that you used

104 (Pages 410 to 413)

Karla Ballman, Ph.D.

Page 414

1    in Viagra, right?
2         MS. MILLER:  Objection.
3         THE WITNESS:  I don't
4    remember exactly how I used it.  I
5    do remember using those terms.
6    BY MR. TISI:
7         Q.   Right.  So this is the
8    gestalt test or the common sense test
9    that you used.
10         MS. MILLER:  Objection.
11    BY MR. TISI:
12         Q.   I want to know exactly where
13    you get your cut-off for what is
14    numerically close for the consistency
15    prong of Bradford Hill?
16         MR. LOCKE:  Objection.
17         THE WITNESS:  You know what,
18    again, it all depends upon the
19    situation.  And that's why there's
20    no solid number within the
21    definition for the general thing.
22         You also then brought up --
23    and that's what I'm trying to get
24    the whole truth out there, is I

Page 415

1    criticize the plaintiffs' experts
2    by saying relatively stable
3    without giving any sort of
4    indication.
5         But their relatively stable
6    was just in their conclusion that
7    they're consistent, whereas when I
8    look at the consistency analyses,
9    I give more numbers and ranges as
10    to why I believe those numbers are
11    not consistent.
12    BY MR. TISI:
13         Q.   Right.  But that's your
14    opinion.  You don't give any basis for
15    it.  You don't give any citation.  You
16    don't give any published peer-reviewed
17    literature which would -- against which
18    we could measure your opinion, do you?
19         MS. MILLER:  Objection.
20         THE WITNESS:  There wouldn't
21    be any published peer-reviewed
22    literature that would say that.
23         But I am -- I'm giving my criteria
24    and metrics and how I came to my

Page 416

1    conclusion, versus the plaintiffs'
2    experts, which just say they're
3    relatively stable.
4    BY MR. TISI:
5         Q.   Okay.  Let me do the next
6    one.  Last paragraph in the consistency
7    section, last -- I'm going to read it
8    into the record.  It's the first
9    paragraph.
10         "However" --
11         MS. MILLER:  You said last
12    paragraph.  Then you said first
13    paragraph.
14    BY MR. TISI:
15         Q.   First paragraph, last couple
16    sentences.
17         Tell me where you are.  Are
18    you with me, Doctor?  Right here.
19    Consistency.  Page 17.
20         A.   No, I was on 24.  Yes.
21         Q.   Okay.  You say -- I'll read
22    it into the record.  "However, if
23    adequately powered studies do not achieve
24    statistical significance, this is

Page 417

1    evidence of inconsistency."
2         Do you stand by that
3    statement, first of all?
4         A.   However if adequately
5    powered studies do not achieve
6    statistical significance... Yes.
7         Q.   Okay.  Next thing.  "Another
8    way an inconsistency can rise is if
9    95 percent confidence intervals for the
10    risk ratio estimates have no to little
11    overlap with one another for adequately
12    powered studies.  If one study has a
13    statistically significant result and the
14    other does not, it means that the
15    magnitude of the relative risk differs
16    considerably, which is an inconsistency
17    between the size of the estimated risk.
18         Do you see that?
19         A.   I do see that.
20         Q.   Okay.  Can you tell me
21    what -- how you define no to little
22    overlap?  What's the -- what's the
23    criteria for that and where do you get it
24    from?

Karla Ballman, Ph.D.

Page 418

1    First of all, there's no
2  citation for any of this, is there?
3         MS. MILLER:  Objection.
4  First of all, so what is --
5         MR. TISI:  I was --
6         MS. MILLER:  You can't ask a
7  question that way.
8         MR. TISI:  Counsel, I said
9  first of all, there is --
10        MS. MILLER:  Is the first
11  question stricken?
12        MR. TISI:  Yes.
13        MS. MILLER:  Okay.
14  BY MR. TISI:
15     Q.   First of all, in the second
16  part of the paragraph you do not provide
17  a single citation, correct?
18     A.   I do not provide a citation
19  there.
20     Q.   Okay.  Secondly -- okay, can
21  you tell me what you mean by no to little
22  overlap?  What is the criteria and where
23  do you get it from?
24     A.   That's was what I was trying

Page 419

1  to answer.  I'm trying to see if I have
2  that citation here.  And if I don't, I
3  can provide a citation.  No, I don't
4  provide a citation there.  But in the
5  literature, there are articles that state
6  how much -- in fact, confidence intervals
7  can overlap and the results still are
8  statistically significantly different.
9     Q.   In fact, Doctor -- and we're
10  going to talk about this.  Aren't you
11  aware that even this week, the American
12  Statistical Association published a
13  whole -- a whole volume of 43 articles
14  with an editorial recommending that they
15  get rid of the issue of statistical
16  significance and look at confidence
17  intervals?
18     A.   Well, that's what I'm citing
19  there, that one can look at confidence
20  intervals and see if they overlap or not.
21     Q.   Perfect.  And we're going to
22  talk about that.  Okay?
23        But you do understand that
24  the American Statistical Association in

Page 420

1  2016 and again just this week have
2  indicated that statistical significance
3  should not even be -- should not even be
4  mentioned when we are talking about
5  analyses like these, true?
6         MR. LOCKE:  Objection.
7         MS. MILLER:  Objection.
8         THE WITNESS:  I have no idea
9  what it's referring to.  But let
10  me -- let me sort of explain to
11  you the relationship between
12  statistical significance and
13  confidence intervals.
14        If one has a confidence
15  interval, one can infer whether or
16  not a result is statistically
17  significant at a certain level.
18        So one can sort of infer if
19  the P-value is going to be less
20  than or greater than .05 if you're
21  using a 95 percent confidence
22  interval.
23        So the reason they're saying
24  this, and I tell this people all

Page 421

1  the time when I teach, I never
2  just want to see a P-value, I want
3  the magnitude of the difference.
4         I want to know what is the
5  size of the difference and a
6  confidence interval on that, and I
7  would agree.  I don't need the
8  P-value.
9  BY MR. TISI:
10     Q.   And --
11     A.   And I could infer
12  statistical significance just based upon
13  the confidence interval.
14        So they are not saying don't
15  worry about statistical significance.
16  They are saying don't place so much
17  emphasis on the P-value itself.
18     Q.   But also -- we're going to
19  talk about this for a moment.  You would
20  agree that almost all of these studies
21  with a handful of exceptions, regardless
22  of study design, their confidence
23  intervals overlap at 1.2?
24     A.   I have no idea.

106 (Pages 418 to 421)

Karla Ballman, Ph.D.

Page 422

```
 1          Q.   We'll talk about that.
 2          MS. MILLER:  Do you need a
 3   break?
 4          THE WITNESS:  No, I'm good.
 5   BY MR. TISI:
 6          Q.   On Page 26, you say the
 7   following with respect to the talc
 8   evidence:  "There is clear
 9   inconsistency" -- Page 26?
10          A.   Yeah, I'm there.  I'm not
11   seeing where that statement -- or where
12   that --
13          Q.   The last sentence of the
14   paragraph in the middle?
15          A.   Okay.  I'm with you.
16          Q.   There is clear inconsistency
17   between different study types with
18   case-control studies yielding a
19   statistically significant association
20   ranging from 1.26 to 1.35 and cohort
21   studies yielding a nonstatistically
22   significant association ranging from 1.02
23   to 1.06, hence no evidence of a causal
24   relationship because the results are
```

Page 423

```
 1   inconsistent."
 2          Do you say that?
 3          A.   I do.
 4          Q.   Okay.  And so you think that
 5   because these two sets of results are --
 6   one is statistically significant and one
 7   is not statistically significant, they
 8   are inconsistent?
 9          MS. MILLER:  Objection.
10          THE WITNESS:  I'm saying
11          that one set of results is
12          establishing an association that's
13          statistically significant.  And
14          I'm saying another one is saying
15          there is no association because
16          this is no statistical
17          significance.
18   BY MR. TISI:
19          Q.   Okay.  Now, you didn't put a
20   Forest plot of the studies in your
21   report, did you?
22          A.   I believe there is no Forest
23   plot.
24          Q.   Okay.  Have you reviewed the
```

Page 424

```
 1   expert reports of any of the other
 2   defense experts in this case?
 3          A.   Other defense experts?
 4          Q.   Have you read Christian
 5   Merlo's?
 6          A.   Yes, I have.
 7          Q.   Did you have any problems
 8   with his report?
 9          A.   Problems?  What do you mean
10   by problems.
11          Q.   Anything that you thought
12   was wrong?
13          A.   I wasn't evaluating whether
14   or not I agree or disagree with his
15   report.
16          Q.   I'm going to show you a
17   chart that he put in his report because
18   you don't have one in yours.  And I will
19   stipulate that it is accurate to the
20   extent that it is --
21          A.   Comes from his report?
22          Q.   I'm going to ask you to
23   assume that it comes from his report and
24   I'm going to use his numbers.
```

Page 425

```
 1          MS. MILLER:  I'll check my
 2   laptop to make sure that's true.
 3          (Document marked for
 4          identification as Exhibit
 5          Ballman-26.)
 6   BY MR. TISI:
 7          Q.   Do you remember seeing this
 8   chart?
 9          A.   I was expecting a Forest
10   plot.  Yes, I see this chart here.  I've
11   seen so many charts that if this comes
12   from his study, yes, I believe --
13          Q.   And I'm using his because
14   I'm sure the defense would object to me
15   using anything else but their evidence.
16   I'm using your evidence, and I'm putting
17   it in front of you.  Okay?
18          MS. MILLER:  Objection.
19   BY MR. TISI:
20          Q.   And I'm asking you to assume
21   it's true.
22          MS. MILLER:  If there's a
23          statement there, I'm objecting.
24          If there's a question there, I'm
```

107 (Pages 422 to 425)

Karla Ballman, Ph.D.

Page 426

1   objecting. If there's a statement
2   there, I don't know what the point
3   of it was.
4   BY MR. TISI:
5       Q.   There are 30 observational
6   studies here. And he identified them as
7   hospital-based case-control,
8   population-based case-controls, pooled
9   case-control studies, and cohort studies,
10  correct?
11      A.   Yes, that's --
12          MR. LOCKE: Objection.
13      Before you answer that question, I
14      don't have a copy of what you're
15      looking at.
16          MR. TISI: Oh, I'm sorry.
17          MS. MILLER: Wait. I'm
18      sorry. Did you just read us a
19      sentence?
20          THE WITNESS: No, he was --
21          MR. TISI: They're
22      categorized. No, it's not.
23      They're categorized. One,
24      hospital based case-control

Page 427

1   studies, population based
2   case-control studies --
3           MS. MILLER: You talked so
4       fast, I thought you were reading
5       something that I didn't have.
6           I didn't realize you were --
7           MR. TISI: I am reading it.
8   BY MR. TISI:
9       Q.   Okay. There are four
10  categories of studies in this chart,
11  correct?
12      A.   Yes, he lists four
13  categories of studies in the chart.
14      Q.   And these four categories
15  are -- these studies are studies you
16  recognize, correct?
17      A.   Yes. I recognize studies
18  that I reviewed. I don't know if they
19  are all there or if any extra or there.
20  But yes, in general.
21      Q.   Okay. Now, would you agree
22  that irrespective of -- and I'm going to
23  put this aside for a minute. I'm going
24  to say it. Irrespective of the

Page 428

1   statistically -- statistical significance
2   issue, you would agree with me for the
3   hospital case-control studies with the
4   exception of the two Hartge papers, all
5   show a risk ratio greater than one?
6       A.   The two Hartge pages?
7       Q.   Yes.
8       A.   Yes. That's what it's
9   showing here.
10      Q.   Okay. You would also agree
11  with me that the population based
12  case-control studies, every single one of
13  them, whether they were statistically
14  significant or not, had a risk ratio of
15  greater than one.
16          MS. MILLER: Objection.
17          THE WITNESS: In this chart
18      that is true.
19  BY MR. TISI:
20      Q.   Okay. The pooled
21  case-control study, Terry had a risk
22  ratio great]er than one?
23      A.   That's true. That's what
24  this --

Page 429

1       Q.   As was -- as is Cramer on
2   the next page?
3       A.   Yes.
4       Q.   And the cohort studies all
5   had risk ratios greater than one with the
6   exception of Gonzalez, correct?
7       A.   Yes, that's correct.
8       Q.   And would you agree with me,
9   risk ratio, the RR, is the same thing as
10  the point estimate, correct?
11      A.   Yeah. Either it's an odds
12  ratio or it's a relative risk. But they
13  are point estimates.
14      Q.   And the point estimate, just
15  for anybody going to read this, is the
16  most likely place where the risk resides?
17      A.   It's more subtle than that.
18      Q.   Okay. But just -- well, how
19  would you describe it?
20      A.   I would say that what a
21  confidence interval shows, and this is
22  why people hate statistics, is that --
23          (Brief telephone
24  interruption.)

Karla Ballman, Ph.D.

1          MS. SHARKO:  That's someone
2  who loves statistics.
3          MR. TISI:  Troy Rafferty was
4  calling to you.
5          MS. SHARKO:  I'm happy to
6  talk with Troy.
7          THE WITNESS:  Sorry.  I was
8  trying to concentrate.
9          MS. MILLER:  Yeah, that's
10 not fair to Dr. Ballman.  Should
11 we -- the banter has confused her.
12 Should we go back and hear the
13 question again.
14 BY MR. TISI:
15     Q.   Yeah.  My question -- my
16 question is, what is your definition of a
17 point estimate.
18          Actually, let me -- let
19 me -- actually, that was not the
20 question.  The question was, the point
21 estimate is the place within the
22 confidence interval that it's most likely
23 to be the true risk?
24     A.   No, that's not correct.

1     Q.   Okay.  Well, what is it?
2     A.   So it's just the point
3  estimate that comes on based on the
4  actual data that you have on hand and
5  that you calculated.  And it's for that
6  data.
7          And a confidence interval is
8  the interval such that if you would redo
9  the study with a different random set,
10 selected exactly the same way, many, many
11 times 95 percent of those intervals would
12 contain the real risk ratio.
13     Q.   And is the number that is
14 reported, the risk ratio, more likely or
15 less likely than the number that's at the
16 tails?
17     A.   I don't know how you would
18 measure that necessarily.  Because you
19 have no idea what truth is.  So you have
20 no idea within a given confidence
21 interval where the real estimate lies.
22     Q.   But you would agree with me
23 that -- that all of these studies with
24 the exceptions that we talked about

1  before, Gonzalez, the -- cohort study,
2  and the two Hartge studies, that all of
3  the risk ratios here show a positive risk
4  ratio greater than one?
5          MS. MILLER:  Objection.
6          THE WITNESS:  As we
7  mentioned, most of the numbers
8  here are bigger than one.
9  BY MR. TISI:
10     Q.   Okay.  And that's what we
11 call a positive association, a positive
12 risk ratio?
13          MS. MILLER:  Objection.
14          THE WITNESS:  Well, I think
15 that --
16 BY MR. TISI:
17     Q.   Putting statistical
18 significance aside for a moment.  I'll
19 talk about statistical significance.
20     A.   Yeah, but I think it's
21 important.  I think one would not say
22 there's a positive association if it's
23 not statistically significant.  I mean,
24 it depends upon the context in which he

1  was saying, so that might be misleading.
2  I mean, you know, a lot of people might
3  say, oh, they said there's a positive
4  association, and they would assume that
5  it was statistically significant.
6     Q.   I understand.  And we're
7  going to talk about statistical
8  significance in a moment.  But I'm asking
9  you, all of these numbers with the
10 exception of the ones that I mentioned,
11 the two Houghton studies and the Gonzalez
12 cohort study, show a positive risk ratio?
13          MS. MILLER:  Objection.
14          THE WITNESS:  I mean, that's
15 one thing, yes, here in the study.
16 BY MR. TISI:
17     Q.   Okay.
18     A.   Risk ratios that are -- you
19 know, rated as weak, or no risk -- no
20 significant association.
21     Q.   Okay.  Now, I'm going to ask
22 you a hypothetical.  If every one of
23 these studies was statistically
24 significant instead of some of them yes,

Karla Ballman, Ph.D.

Page 434

1    some of them no, would you find
2    consistency?
3           MS. MILLER: Objection.
4           THE WITNESS: If every what?
5    BY MR. TISI:
6       Q.   If every one --
7       A.   That that's not -- but
8    that's not the case.
9       Q.   I understand. This is a
10   hypothetical. And I'm allowed to ask
11   hypotheticals.
12          If this chart were that
13   every one of these results were
14   statistically significant, would that --
15   would those be consistent in your
16   opinion?
17          MS. MILLER: Objection.
18          THE WITNESS: Again, I mean,
19   I would have to look at the
20   ranges. They said it's just
21   magnitude. And then even
22   furthermore, you know, the next
23   step then would be consistent
24   what, and consistently biased,

Page 435

1    because these are all population
2    studies, and hence that's probably
3    why --
4    BY MR. TISI:
5       Q.   Well, no. There are cohort
6    studies in there. There's
7    hospital-based. If all of these studies,
8    regardless of design, was statistically
9    significant and the risk ratios were the
10   same, would they be consistent in your
11   opinion?
12      A.   You know, again, I would
13   have to see what the actual numbers
14   were --
15      Q.   These are the numbers.
16      A.   -- and so forth.
17      Q.   These are the numbers.
18      A.   But -- yeah, but you're
19   asking me to hypothesize something on
20   numbers that did not yield statistically
21   significant results.
22      Q.   I understand. I'm
23   allowed -- I'm allowed to do that. I
24   really -- and your lawyers will tell you

Page 436

1    that. I'm allowed to ask you
2    hypotheticals.
3           Okay. So my hypothetical is
4    that this chart -- this chart is exactly
5    as it is, except in the right-hand
6    column, there would be -- let's say --
7    let's call them all weak associations.
8    Let's call them all weak but they would
9    all be statistically significant.
10          If that were to change,
11   would those, in your opinion, be
12   consistent?
13          MS. MILLER: Objection.
14          THE WITNESS: I think it
15   depends. And I think there
16   wouldn't be agreement in terms of
17   what the actual association is,
18   which would be quite weird. And
19   the fact that, you know, in
20   general, the cohort studies have
21   much lower estimates than do the
22   case-control studies.
23   BY MR. TISI:
24      Q.   So is your answer they would

Page 437

1    be inconsistent?
2       A.   I am saying it depends in
3    this hypothetical situation. I mean, I
4    would have to look at it more carefully
5    and do an analysis to see --
6       Q.   Would you --
7       A.   -- because that wasn't the
8    analyses that I did. I did the analyses
9    on -- on these observed results.
10      Q.   Okay. Would you agree that
11   most of these risk ratios are between
12   approximately 1.1, some higher, some
13   lower, and 1.5?
14      A.   No. There are some that's
15   3.9, I see.
16      Q.   Well, so my next point --
17      A.   You know that's for
18   concerning. 2.49.
19      Q.   Right.
20      A.   I see a .7. I see a .3.
21      Q.   I said most of them. Most
22   of -- most of them are in the range of
23   1.1 to 1.5. Not all of them. I
24   wasn't -- I was clear about that.

Karla Ballman, Ph.D.

Page 438

```
 1        A.  Well, you're right.
 2        MS. MILLER:  Objection.
 3   Wait, is that a question?
 4        MR. TISI:  Yes.
 5   BY MR. TISI:
 6        Q.  I'm asking you --
 7        MS. MILLER:  Or just a
 8   statement?  That's a statement.
 9   BY MR. TISI:
10        Q.  I'm asking you, were -- are
11   most -- most of these results are between
12   1.1 and 1.5, true?
13        A.  So I would say that the
14   statement you made, however you define
15   most, I'm not quite sure, look like that
16   could be true, yes.
17        MS. MILLER:  Is this a good
18   time for a break?
19        MR. TISI:  Let me just --
20        THE WITNESS:  Yeah.
21        MS. MILLER:  My head is
22   pounding.
23        THE WITNESS:  So is mine,
24   actually.
```

Page 439

```
 1        MS. MILLER:  Soon as the
 2   statistics started my head started
 3   hurting.
 4        MR. TISI:  Let me just --
 5   let me just finish this, like, one
 6   or two sentences, if you don't
 7   mind.
 8        MS. MILLER:  Sure.
 9   BY MR. TISI:
10        Q.  Now, you said before on Page
11   17 -- on Page 17, "However, adequately
12   powered studies do not achieve
13   statistical significance, that is
14   evidence of inconsistency."
15        A.  That is correct.
16        Q.  So you are relying on the
17   statistically significant metric as part
18   of your analysis of consistency, true?
19        A.  I am, or you could put it
20   another way and say that all of the
21   adequately powered studies would have to
22   have as their lower bound above 1.0.
23        MR. TISI:  Okay.  That's
24   fine.  Let's take a break.
```

Page 440

```
 1        THE VIDEOGRAPHER:  All
 2   right.  The time is 3:35 p.m. off
 3   the record.
 4        (Short break.)
 5        THE VIDEOGRAPHER:  We are
 6   back on the record.  The time is
 7   3:51 p.m.
 8   BY MR. TISI:
 9        Q.  Doctor, we were talking
10   before the break about role of
11   statistical significance and the issue of
12   consistency.  Do you remember that?
13        A.  I know that we were talking
14   about consistency and statistical
15   significance, yes.
16        Q.  Okay.  I'm going to hand you
17   another chapter from Rothman's textbook.
18        I'll have that marked as the
19   next exhibit.
20        MR. SOILEAU:  Which will be
21   27.
22        (Document marked for
23   identification as Exhibit
24   Ballman-27.)
```

Page 441

```
 1   BY MR. TISI:
 2        Q.  Give that to your counsel.
 3   Now, there is a section here on
 4   consistency in the Bradford Hill
 5   criteria, and it starts on Page 25 of 30.
 6        Do you see that?
 7        A.  So causal criteria is on
 8   this page, and strength.
 9        Q.  Correct.  That's the section
10   that talks about Bradford Hill.  Do you
11   see that?  He refers to Bradford Hill, a
12   commonly used set of criteria was based
13   on a list of considerations or viewpoints
14   composed by Sir Bradford Hill.  That's
15   the second paragraph there.
16        Do you see that?
17        A.  Yes, I do.
18        Q.  Okay.  And he then goes
19   through the nine aspects.  I'm just
20   orienting you here.  There's a section on
21   consistency.
22        Do you see that?
23        A.  Yes.
24        Q.  Okay.  Feel free to look at
```

111 (Pages 438 to 441)

Karla Ballman, Ph.D.

Page 442

1    it if you want. It's only two
2    paragraphs. But I'm going to focus on
3    the second paragraph. First of all,
4    consistency is not a necessary criteria
5    according to Dr. Rothman, right?
6            MS. MILLER: Have you read
7        this?
8            THE WITNESS: No, I'm still
9        reading. Okay, I've read it.
10   BY MR. TISI:
11       Q.   Okay. Does he not say, in
12   the second paragraph, "One mistake in
13   implementing the consistency criterion is
14   so common it deserves special attention.
15   It is sometimes claimed that a literature
16   or set of results is inconsistent simply
17   because some results are statistically
18   significant and some are not.
19           "This sort of evaluation is
20   completely fallacious, even if one
21   accepts the use of significance testing
22   methods."
23           Did I read that correctly,
24   first of all?

Page 443

1        A.   That is what it says.
2        Q.   Okay. Do you agree with
3    that?
4        A.   So it also says that --
5        Q.   I'm asking whether you agree
6    with that statement. Okay. Do you agree
7    with it?
8        A.   Well, I do not agree with
9    it. And I'm going to explain why.
10       Q.   Okay.
11       A.   It goes on to -- well, it
12   says that -- I agree with it in some
13   sense. In the sense that the results --
14   effect estimates from a set of studies
15   could all be identical even if they --
16   many were -- many were significant and
17   many were not, the difference in
18   significance arising solely because of
19   differences in the standard error or
20   sizes of the study.
21           And if you recall, I said
22   adequately powered studies, which is what
23   he made this statement here.
24       Q.   Did you analyze each of the

Page 444

1    studies for power in the talc litigation?
2        A.   I did not.
3        Q.   You did not. So you don't
4    know whether they were adequately powered
5    or not, do you?
6        A.   I -- I did not go through
7    and do a powered calculation for the
8    studies.
9        Q.   So you can't determine
10   whether or not you applied that rule
11   correctly because you don't know whether
12   or not these were adequately powered
13   studies or not, do you?
14       A.   I don't know if it was a
15   rule. I'm just saying that this is one
16   aspect of consistency. That's what I
17   said.
18       Q.   Okay. So do you agree with
19   Dr. -- Dr. Rothman that just because some
20   studies are not statistically significant
21   and others are, it does not make them
22   inconsistent?
23       A.   So what is adequately
24   powered is if one does a meta-analyses of

Page 445

1    all the case-control studies and one does
2    a meta-analyses of all the cohort
3    studies.
4        Q.   I didn't ask you that
5    question, respectfully. Okay. My
6    question was --
7            MS. MILLER: Try not to
8        interrupt her.
9    BY MR. TISI:
10       Q.   Do you agree --
11           MS. MILLER: It's so tiring.
12           MR. TISI: No, it is --
13       listening to her speechify is
14       really disrupting.
15           MS. MILLER: That's the pot
16       calling the kettle black.
17   BY MR. TISI:
18       Q.   Do you agree with
19   Dr. Rothman that because some studies are
20   not statistically significant and others
21   are, it does not make them inconsistent?
22   Do you agree with that statement as a
23   general proposition?
24           MR. LOCKE: Objection.

112 (Pages 442 to 445)

Karla Ballman, Ph.D.

```
 1          THE WITNESS:  It depends.
 2   BY MR. TISI:
 3      Q.   Okay.  And it depends upon
 4   the power, correct?
 5      A.   No.  It depends upon the
 6   situation, as I was trying to explain and
 7   you wouldn't let me finish.
 8      Q.   Okay.  Does it depend upon
 9   the power of the study to detect an
10   association?
11      A.   You mean a statistically
12   significant association?
13      Q.   Yes.
14      A.   That is what power is about.
15      Q.   Correct.  Okay.  The study,
16   each study has to be powered to find the
17   association, correct, adequately powered?
18      A.   No.  Just because a study is
19   adequately powered, it could not find an
20   association because there really is no
21   real relationship there.
22      Q.   Let's go to Exhibit Number
23   23.  Again, this was Dr. Rothman's six
24   misconceptions.
```

```
 1      A.   Yes.  20.
 2      Q.   Exhibit 20.  I'm sorry.  Go
 3   to Misconception Number 6.  Can you read
 4   what it is?
 5      A.   Okay.
 6      Q.   Could you read -- could you
 7   read it for the record, Misconception
 8   Number 6?
 9      A.   Oh, read it out loud?
10      Q.   Yes.
11      A.   Just that piece?
12      Q.   Just what the misconception
13   is, and we can talk about what he says.
14      A.   Okay.  It says,
15   "Misconception 6.  Significance testing
16   is useful and important for the
17   interpretation of data."
18      Q.   Okay.  Is that what -- isn't
19   that what you've done here, is you've
20   looked at, you've looked at which studies
21   are statistically significant and which
22   ones aren't, and you've said that they
23   were inconsistent and, therefore, you did
24   not find inconsistency?
```

```
 1      A.   No.  That's not what I'd
 2   done.  I would like some time please to
 3   read the rest of this.
 4      Q.   Sure.
 5      A.   He does say, "Focusing on
 6   the magnitude" --
 7      Q.   Just -- I thought you were
 8   going to read the whole -- I thought you
 9   were going to read the whole thing.
10   Let's read the whole thing and we can
11   talk about it.  Thank you.
12      A.   Okay.
13          MS. MILLER:  It would be
14   really nice if you would not talk
15   over the witness.
16          MR. TISI:  It would be
17   really nice if she'd --
18          MS. MILLER:  It's especially
19   offensive for the way you are
20   talking to her.
21          MR. TISI:  Okay.  You know,
22   I find it offensive that a witness
23   would come in here, and I ask her
24   whether or not this pen is red and
```

```
 1   she talks about all the reasons
 2   why the blue pen down the table is
 3   blue.  Okay.  I find that
 4   offensive.  That's not the way
 5   this works.
 6          MR. LOCKE:  Objection.
 7          MS. SHARKO:  That's not what
 8   happened.  That's not what just
 9   happened.
10          MS. MILLER:  You just kicked
11   me again.  I hope you're not doing
12   that on purpose.
13          MR. TISI:  I'm definitely
14   not doing it on purpose.  I would
15   not do that.  And you kicked me
16   before, and I said nothing about
17   it.
18          MS. MILLER:  I don't think
19   my legs are long enough.
20          MR. TISI:  Well, if they
21   aren't long enough, how did I --
22          THE WITNESS:  Okay.  Is
23   there a question?
24   BY MR. TISI:
```

113 (Pages 446 to 449)

Karla Ballman, Ph.D.

Page 450

1      Q.   Yes.  So my question is,
2  Doctor, didn't you -- wasn't the issue of
3  which studies were statistically
4  significant and which ones weren't,
5  wasn't that an important factor in your
6  discussion of the talc studies in the
7  context of the consistency aspect of
8  Bradford Hill?
9          MR. LOCKE:  Objection.
10         THE WITNESS:  So when I
11      looked at the analyses for
12      consistency, just for sake of
13      argument, to go through this
14      quickly, let's -- I look at the --
15      the meta-analyses of the
16      case-control studies, which is
17      statistically significant.
18          I looked at the
19      meta-analyses of the cohort
20      studies, which show no significant
21      association.  And that is an
22      inconsistency.
23  BY MR. TISI:
24      Q.   Okay.  So the determining

Page 451

1  factor, because even the cohort studies
2  had a positive risk ratio, correct?
3      A.   I don't know why that plays
4  into anything.
5      Q.   Well, okay.  They both
6  showed a positive -- they were in your
7  report on Page 26.  It was 1.02 to 1.06,
8  whereas the statistically significant
9  results from the case-control studies
10  were 1.26 to 1.35.
11         MS. MILLER:  When you say
12      "they both," what are you
13      referring to?
14  BY MR. TISI:
15      Q.   Okay.  On Page 26 of your
16  report, you say, "There is clear
17  inconsistency between different study
18  designs with the case-control studies
19  yielding a statistically significant
20  association ranging from 1.26 to 1.35,
21  and cohort studies yielding a
22  nonstatistically significant association
23  ranging from 1.02 to 1.06, correct?
24      A.   That is what it says there.

Page 452

1      Q.   All right.  Both of those if
2  you're just looking at the risk ratios
3  are positive, correct?
4          MR. LOCKE:  Objection.
5  BY MR. TISI:
6      Q.   1.02 to 1.06 is a positive
7  risk ratio, correct?
8          MS. MILLER:  Objection.
9          THE WITNESS:  But -- but --
10      they are positive.  But again, I
11      don't see where this is playing
12      into --
13  BY MR. TISI:
14      Q.   I'm asking you the question.
15  Okay.  The difference is one is
16  statistically significant result and the
17  other one is not.  And you make a point
18  of that in this sentence, correct?
19      A.   And that follows the point I
20  made above, which also plays into my
21  consistency is that Berge found there was
22  a statistically significant different
23  association for the perineal talc
24  powder -- or perineal/genital talc powder

Page 453

1  exposure and ovarian cancer between the
2  case-control studies and the cohort
3  studies.
4      Q.   And he's looking at
5  P-values, right.  P-.07?
6      A.   Yeah.  He is looking at
7  P-values, and that is what most of
8  medical literature does and bases their
9  evidence on.
10         And I looked -- and then I
11  look at the magnitude of the differences
12  between the two, and I do see that they
13  are different.
14      Q.   Did you look to see whether
15  the confidence intervals overlapped?
16      A.   What confidence intervals?
17      Q.   Well, if you go above.  The
18  same results here, if you go above in
19  your paragraph, it says 1.26, 95 percent
20  confidence interval 1.17 to 1.35.
21         Do you see that?  You're
22  basically talking about the same dataset.
23      A.   What do you mean the same
24  dataset?

114 (Pages 450 to 453)

Karla Ballman, Ph.D.

Page 454

1    Q.  If you go above, you said
2  1.26 to 1.35.  But above, you're
3  including the confidence intervals,
4  correct?
5    A.  Yes.
6    Q.  Okay.  The confidence
7  intervals for all of those results cross
8  1.2, for each and every one of them,
9  don't they?
10    A.  I don't know how that's
11  relevant.
12    Q.  I know you don't.  I'm
13  asking you do they all cross 1.2?  Do all
14  the confidence intervals for every one of
15  these risk ratios have 1.2 in the
16  confidence interval?
17    A.  Well, I don't know what you
18  mean by in.  The one from 1.02 goes from
19  .85 to 1.2.  I suppose you could call
20  that in it.
21    But, yeah, if you look at
22  ranges, other than the one that it's on
23  the actual point, the ranges would
24  contain 1.2.

Page 455

1    Q.  Okay.  So all of these
2  reports are consistent in that the
3  confidence intervals include 1.2, would
4  you agree with that?
5    MR. LOCKE:  Objection.
6    THE WITNESS:  No I would not
7  agree with that whatsoever.
8  BY MR. TISI:
9    Q.  Okay.  So let me go back to
10  Dr. Rothman's statement in -- in the
11  conclusion that he says -- in the
12  conclusionary statement of his six
13  misconceptions, persistent research
14  misconceptions.
15    He says, "It's easy to
16  declare a result is not statistically
17  significant, falsely implying that there
18  is no indication of an association" --
19    A.  I -- I'm sorry.  I'm just
20  stopping you because I really don't know
21  where you're reading from.
22    Q.  It's the last of the
23  conclusion sentence.
24    A.  Conclusion section on what

Page 456

1  page of --
2    Q.  At the -- page -- on the
3  last page.
4    A.  In the conclusions?
5    Q.  Yeah, 102 -- 10 --
6    A.  Okay.  I'm sorry.  I didn't
7  understand.
8    Q.  No, that's fine.  I should
9  have oriented you.  I apologize.
10    A.  So the last sentence in the
11  conclusion?
12    Q.  Right.  And I'll read it.
13    A.  Okay.
14    Q.  "Why do such important
15  misconceptions about research" --
16    A.  Wait, wait, the last
17  sentence in the conclusion?  Mine says
18  to the extent --
19    Q.  I'm on the conclusions.  I'm
20  on the conclusions.  The very --
21    A.  Oh, the first sentence.
22  Yes.
23    Q.  "Why do such important
24  misconceptions about research persist?

Page 457

1  To a large extent these misconceptions
2  represent substitutes for more thoughtful
3  and difficult tasks.  It's simpler to
4  resolve a discrepancy between a trial and
5  a non-experimental study in favor of a
6  trial without undertaking a laborious
7  analysis that Herman, et al., did.  It's
8  easier to declare that a result is not
9  statistically significant, falsely
10  implying that there is no indication of
11  an association, rather than consider
12  quantitatively the range of associations
13  that the data actually support."
14    Do you see that?
15    A.  I -- that those are what --
16  those are the words.
17    Q.  Okay.  And the range of
18  associations for the data is represented
19  by the confidence intervals, correct?
20    A.  Now, where are you reading
21  that?
22    Q.  I'm asking you that
23  question.  The range of associations in
24  any reported study is the numbers that

115 (Pages 454 to 457)

Karla Ballman, Ph.D.

## Page 458

1    are between the confidence intervals?
2         MS. MILLER:  Objection.
3         THE WITNESS:  That's not
4    necessarily true.  In the
5    meta-analyses, we have the range
6    of associations of the point
7    estimates.  Those are not
8    confidence intervals.
9         MADAM COURT REPORTER:
10   Chris, can we go off the record
11   for a second, just briefly?
12        THE VIDEOGRAPHER:  The time
13   is 4:07 p.m.  Off the record.
14        (Brief pause.)
15        THE VIDEOGRAPHER:  We are
16   back on the record.  The time is
17   4:12 p.m.
18   BY MR. TISI:
19   Q.    Doctor, isn't it true, that
20   the statistical -- the statistics
21   community has abandoned the looking only
22   at -- looking at statistical significance
23   in favor of looking at where the
24   confidence intervals are on studies in

## Page 459

1    terms of making decisions about things
2    like causation?
3         MR. LOCKE:  Objection.
4         THE WITNESS:  So there's two
5    different questions there.  The
6    first I heard, isn't it true that
7    the statistical community
8    abandoned using P-values for
9    statistical significance.
10        And I -- I don't think I --
11   I'm not sure what you mean by the
12   statistical community.  But I know
13   in the medical literature and all
14   studies that I've worked on and
15   all studies that I published, we
16   had P-values in them.
17        So I don't know who you mean
18   by the statistical community
19   abandoning P-values.
20   BY MR. TISI:
21   Q.    Well, what about the
22   American Statistical Association?
23   A.    Well, you told me that there
24   was a statement that was just out this

## Page 460

1    week.  I have not read that.
2         So did you give me that
3    statement so I can --
4    Q.    I haven't yet.  I'm going to
5    do it.  But it's not just this week.  Did
6    you know in 2016 the American Statistical
7    Association was so concerned about the
8    misuse of statistical significance in
9    P-values that it took the extraordinary
10   step, never before taken before, and
11   never before taken since, to issue a
12   statement about the misuse of P-values
13   and statistical significance?
14   A.    If you say that's true, I
15   would have to see what that statement was
16   at that time.
17   Q.    Had you ever -- had you ever
18   heard of that?
19   A.    I --
20        MS. MILLER:  Objection.
21        THE WITNESS:  I heard
22   that -- I may have heard there was
23   a P-value statement.  But again, I
24   didn't read it.

## Page 461

1    BY MR. TISI:
2    Q.    You didn't know that?
3    Somebody as accomplished as you in the
4    scientific and statistical community, you
5    don't know when the American Statistical
6    Association position, as a member, what
7    the position is on P-values and
8    statistical significance?
9         MR. LOCKE:  Objection.
10        THE WITNESS:  I said I
11   haven't read the statement.
12   BY MR. TISI:
13   Q.    Did you not know that it
14   even existed before I brought it up to
15   you?
16   A.    Again, I didn't know what
17   type of statement it is and the way you
18   characterized it.  As I said, I think I
19   heard there was some things on
20   P-values --
21   Q.    Did you bother to look it
22   up?
23   A.    I'm on Listservs.
24        No, I did not look it up.

Karla Ballman, Ph.D.

1      MS. MILLER:  Objection.
2 BY MR. TISI:
3      Q.   So having heard there was a
4 statement about statistical significance
5 and P-values by the American Statistical
6 Association, it wasn't important for you
7 to look it up and see, well, what do my
8 colleagues say about this?
9      A.   I don't think it's a matter
10 of importance.  I think it's a matter of
11 time.  And you know, I -- when that came
12 out, I may have thought, oh, that's
13 something worth looking at.  But, you
14 know, my time got consumed by more
15 pressing matters, and I never got to it.
16      Q.   This came out in 2016.  This
17 is 2019.  You mean you had no time in the
18 past three years to look at a
19 two-three-page statement about the misuse
20 of P-values and statistical significance?
21      MS. MILLER:  Objection.
22      THE WITNESS:  That's not
23 what I said or meant.  What I
24 meant is that at the time it came

1      out, I likely thought, oh, if I
2      ever have a spare minute, this
3      would be something interesting to
4      look at.  But I don't think I came
5      out with -- I -- the spare minute
6      probably may have happened later.
7      But by that point, I had forgotten
8      about it.
9 BY MR. TISI:
10      Q.   Well, in the interim you had
11 written two reports, one in
12 Viagra/Cialis -- Cialis outside of your
13 work and one here for 56 hours or
14 whatever it happened to be.
15      And you mentioned
16 statistical significance a lot in your
17 report.
18      Could you have taken one of
19 those hours to look up what the American
20 Statistical Association says about
21 statistical significance?
22      MS. MILLER:  Objection.
23      THE WITNESS:  I'm not sure
24      how that would be relevant,

1      because all the studies I looked
2      at were talking about statistical
3      significance.  So it would be odd
4      if I didn't talk about statistical
5      significance.
6      Can you show me a report
7      where there wasn't a P-value in
8      the studies I reviewed.
9 BY MR. TISI:
10      Q.   I'm asking you the
11 questions.  I'm asking you the questions.
12 And the question that I'm asking you is,
13 since you were doing a whole causation
14 analysis, looking at the totality of the
15 evidence, 30-some odd studies and dealing
16 with an issue of consistency, and relying
17 on statistical significance, not for one
18 study, but looking across studies,
19 looking across design, did you not think
20 it important to say, you know, I remember
21 that the American Association for --
22 American Statistical Association came out
23 with this really unique statement.  Maybe
24 I ought to pick it up and take a look at

1 it?
2      MR. LOCKE:  Objection.
3      THE WITNESS:  Again, I don't
4      see how that's relevant, because
5      to do the analyses I've done, I
6      rely upon how the papers report
7      their results and so forth.  And I
8      can't impose sort of a different
9      way for them to analyze their
10      data.
11 BY MR. TISI:
12      Q.   They didn't do -- they
13 didn't do Bradford Hill tests, did they?
14 You did.  You did in this litigation.
15 All the studies, very -- none of these
16 studies did a Bradford Hill -- Bradford
17 Hill analysis, but you did, true?
18      MS. MILLER:  Objection.
19      THE WITNESS:  I don't know
20      how P-values are relevant just to
21      Bradford Hill.  I don't get that.
22 BY MR. TISI:
23      Q.   You applied your own
24 independent -- independent expertise as a

Karla Ballman, Ph.D.

Page 466

1  statistician at a medical university and
2  you are unaware what the American
3  Statistical Association says about
4  P-values?
5      MS. MILLER: Objection.
6      THE WITNESS: Again, I
7  looked at all the literature that
8  exists. And I -- I used the
9  Bradford Hill criteria to
10 determine whether or not there is
11 a causal relationship between
12 perineal talc exposure and ovarian
13 cancer.
14     And the methodology that I
15 used is the methodology that all
16 others use. And so I don't see
17 the relevance of having to look
18 up -- or I don't see the relevance
19 of looking up a statement on
20 P-values to do that analyses.
21 BY MR. TISI:
22     Q.   You know that looking at the
23 plaintiffs' experts reports they -- you
24 clearly were critical of the plaintiffs'

Page 467

1  experts for looking at the point
2  estimates and not considering the --
3  whether a study was statistically
4  significant or not, true?
5      A.   Can you point me to --
6      Q.   I'm asking whether that's
7  true. We can go through it. I'm asking
8  you, was that -- or is that one of your
9  criticisms?
10     A.   Well, you told me that was a
11 criticism.
12     Q.   Is it a criticism?
13     A.   I'm asking you show me in my
14 report where that --
15     Q.   Is that a criticism?
16     A.   I can't --
17     MS. MILLER: Please don't
18 talk over the witness.
19 BY MR. TISI:
20     Q.   Is that -- is that a
21 criticism of yours --
22     MS. MILLER: How many times
23 do I have to say it?
24 BY MR. TISI:

Page 468

1      Q.   Is that a criticism --
2      MS. MILLER: And also talk
3  over me.
4      MR. TISI: I'm going to talk
5  because --
6      MS. MILLER: Do you just
7  talk over all women?
8      MR. TISI: Oh, please don't
9  do that to me. I have no problem
10 with you -- with you objecting.
11     But your constant speaking
12 objections are -- are really
13 overboard.
14 BY MR. TISI:
15     Q.   Doctor --
16     MS. SHARKO: I don't think
17 the record will demonstrate that.
18     MR. TISI: I think the
19 record will demonstrate that.
20 BY MR. TISI:
21     Q.   Doctor, did you -- isn't one
22 of your criticisms of the plaintiffs'
23 experts, one of them, is that they --
24 they were looking at the point estimate

Page 469

1  and not the -- of these studies for
2  consistency, and not considering whether
3  or not they were statistically
4  significant or not? I'm asking you, is
5  that -- as you sit here today, is that
6  one of your criticisms?
7      A.   I'm asking you to point that
8  out to me, because you --
9      Q.   I'm asking you -- I'm asking
10 you, is that one of your criticisms?
11     A.   I -- I'll have to read
12 through all my criticisms. I'm happy to
13 do so.
14     Q.   I thought you would have
15 done that in preparation for today.
16     A.   Yeah, and I'm tired. And
17 it's a long day, and I don't -- I did not
18 memorize my, you know, 40-some-page
19 report. So I will --
20     Q.   When's the last time you --
21     A.   I will take the time and go
22 through and --
23     Q.   When was the last time that
24 you read it before today?

118 (Pages 466 to 469)

Karla Ballman, Ph.D.

1        MS. MILLER:  She's in the
2    middle of a sentence again.
3    BY MR. TISI:
4        Q.    When's the last time you
5    read it before today?
6        MR. TISI:  This is a
7    filibuster, and you know it.
8        THE WITNESS:  I'm trying to
9    answer your question.  And you're
10   asking me if I made that
11   criticism.  And I'm saying that I
12   can't remember off the top of my
13   head.
14   BY MR. TISI:
15       Q.    Okay.
16       A.    And if you know where it is
17   in here, that I made that criticism, I
18   ask for the help.  You said no, I'm not
19   going to do that.  You need to remember
20   that.  And --
21       Q.    I didn't say that.
22       A.    Well, that's how I
23   interpreted it.
24       Q.    Okay.

1        A.    And then I said, well, okay,
2    then I'll have to go through and read to
3    see if I made that criticism.
4        Q.    Okay.  As you sit here
5    today, okay, because honestly, I don't
6    have the time to go through this.  But I
7    know it's in there.
8        A.    Well, then please show it to
9    me.
10       Q.    I said I know it's in there,
11   and I don't have the time to go through
12   it.  But I'm asking you, as you sit here
13   today, do you have an opinion to a
14   reasonable degree of scientific certainty
15   that the plaintiffs' experts were wrong
16   and used an improper methodology if they
17   looked at the point estimates and did not
18   consider statistical significance?  If
19   that were shown to be true, would that be
20   wrong?
21       MS. MILLER:  Objection.  If
22   what was shown to be true?
23       MR. TISI:  Read the
24   question, Counsel.

1        MS. MILLER:  Would you like
2    me to re-read?
3        MR. TISI:  No.  She's not
4    asking to re-read.  You are.
5        THE WITNESS:  Well, I am.  I
6    am.  I'm confused.  What is the
7    question?
8    BY MR. TISI:
9        Q.    Doctor -- doctor -- okay.
10   Do you have an opinion to a reasonable
11   degree of scientific certainty that the
12   plaintiffs' experts were wrong and used
13   an improper methodology if they looked at
14   the point estimates for consistency and
15   did not consider statistical
16   significance?  If that was shown to be
17   true, would that be wrong?
18       A.    I think if someone only
19   looked at point estimates and did not
20   look at statistical significance, that
21   would be incorrect.
22       Q.    Okay.  What if they looked
23   at the point estimate and the confidence
24   interval, irrespective of statistical

1    significance?
2        A.    Again, I'd have to see the
3    analyses.  The analyses that I looked at
4    in terms of consistency was
5    methodologically flawed.
6        Q.    Okay.  Let's look at the ASA
7    statement on P-values.  If you go to the
8    "ASA statement on P-values:  Context and
9    purpose, the editorial."
10       Do you see that?  Second
11   page.
12       A.    I don't have that document.
13       Q.    It's right in front of you,
14   I believe.
15       A.    28?
16       Q.    Mm-hmm.
17       A.    Second page?
18       Q.    Yep.  It says, "ASA
19   statement on P-values:  Context, process,
20   and purpose."
21       A.    Okay.
22       Q.    And if you go down -- and
23   I'm just going to ask you one question
24   here, so I don't think it's necessary for

Karla Ballman, Ph.D.

Page 474

1    you to read the whole thing.
2          It says, "When the ASA board
3    decided to take up" -- at the very last
4    paragraph at the bottom of the left
5    column. "When the ASA board decided to
6    take up the challenge of developing
7    policy statements on P-values and
8    statistical significance, it did so
9    recognizing this was not a lightly taken
10   step. The ASA has not previously taken
11   positions on specific matters of
12   statistical practice."
13         Is that true? I mean, is
14   that -- did I read that correctly?
15         A.   You read the words, yes.
16         Q.   Okay. Have you ever seen
17   the ASA do -- issue a statement other
18   than what I've just presented you here,
19   about statistical practice?
20         A.   Well, they state that they
21   previously -- have not previously taken
22   positions. So if what they are saying is
23   true, there would be nothing to see.
24         Q.   Okay. And if you look at

Page 475

1    the next page, some of the people who
2    were involved in this are, among other
3    people, Sander Greenland, and Kenneth
4    Rothman. You see their names there?
5          A.   I'm sorry. Where are you?
6          Q.   Next page. Do you see the
7    bullet points on the right?
8          A.   Yeah. There's a list of
9    individuals. Yes, I see that.
10         Q.   Among them Sander Greenland,
11   Kenneth Rothman, the two people that
12   we've been talking about all day,
13   correct?
14         A.   So, again, can you point
15   me -- you mean these bullets?
16         Q.   Yeah.
17         A.   Well, these are references.
18         Q.   Okay. All right. If you go
19   to the next page, the ASA statements on
20   statistical significance.
21         A.   On what page? Could you
22   just --
23         Q.   Next page.
24         A.   -- say the page number,

Page 476

1    please?
2          Q.   Page 131. We are at the
3    bottom, 63.4.
4          A.   Okay. Yes, I'm there.
5          Q.   Do you see Number 2 where it
6    says, "P-values" -- let me ask you if
7    this is a true statement or not.
8    "P-values do not measure the probability
9    that a study hypothesis is true or the
10   probability that the data was produced by
11   random chance alone."
12         Do you see that?
13         A.   Yes, I do.
14         Q.   Okay. It says, "Researchers
15   often wish to turn P-values into a
16   statement the truth of a null hypothesis
17   or about the probability that random
18   chance produced the overall data. The
19   P-value is neither. It is a statement
20   about the data in relation to a specified
21   hypothetical explanation and it is not a
22   statement about the explanation itself."
23         Is that true?
24         A.   Yeah, I -- I'll have to

Page 477

1    parse it in different ways.
2          So it is true that the
3    P-value is not the truth about a
4    hypothesis. To calculate a P-value, you
5    need to assume the hypothesis is true.
6          Therefore, it can't be the
7    probability that the hypothesis is true
8    because you assumed it was true. So,
9    yes, I agree with that.
10         Q.   But it also says --
11         THE VIDEOGRAPHER: Chris,
12   watch your -- watch your
13   microphone. Sorry.
14   BY MR. TISI:
15         Q.   But it also says it is not a
16   statement of the truth of the null
17   hypothesis.
18         A.   That's what I mean. You're
19   assume the null hypothesis is true in
20   order to calculate a P-value. So
21   therefore the P-value cannot be the
22   probability the null hypothesis is true
23   because that was the assumption to get
24   the P-value.

120 (Pages 474 to 477)

Karla Ballman, Ph.D.

1      Q.    The next statement is
2    "Scientific conclusions and business
3    policy decisions should not be based only
4    on whether a P-value passes a specific
5    threshold.  Practices that reduce data
6    analysis to scientific inferences to
7    mechanical bright-line rules, i.e.,
8    P-value .05 for justifying scientific
9    claims and conclusions, can lead to
10    enormous beliefs and poor decisionmaking.
11        "A conclusion does not
12    immediately become true on one side of
13    the divide and false on the other."
14        Do you agree with that?
15      A.    I agree that you read the
16    sentence.  And I go on, and what makes
17    me -- this true is researchers should
18    bring many contextual factors into play
19    to derive scientific inferences,
20    including the design of a study, the
21    quality of the measurements, the external
22    elements for the phenomenon under study,
23    and the validity of the assumptions that
24    underlie the data analysis.  And to me,

1    this sort of encompasses what the
2    Bradford Hill framework is doing.
3      Q.    And let's read the rest of
4    it.  It goes on to say, "Pragmatic
5    considerations often require binary yes
6    and no decisions, but does not mean that
7    the P-value alone can ensure that a
8    decision is correct or incorrect.  The
9    widespread use of statistical
10    significance, generally interpreted as a
11    P-value less than or equal to .05, is a
12    license for making a claim of a
13    scientific finding or implied truth,
14    leads to considerable distortion of the
15    scientific process."
16        Is that true or not?
17      A.    That is true in the context
18    of what they mean in that you cannot use
19    a single study to say this study was
20    statistically significant, therefore, I
21    have proven something scientifically, a
22    single study.
23      Q.    Okay.  At the very end of
24    it, on conclusion, it says -- at the last

1    sentence says --
2      A.    No, no, no.  Very end of
3    what?
4      Q.    The very end of the
5    conclusion section.
6      A.    On a different page now?
7      Q.    On a different -- next page.
8    The next sentence says, "No single index
9    should substitute for scientific
10    reasoning."
11        Do you agree with that?
12      A.    I haven't -- again, that's
13    taken out of context.  I agree with the
14    whole thing that's, "Good statistical
15    practice is an essential component of
16    good scientific practice, emphasizes
17    principles of good study design and
18    conduct, a variety of numerical and
19    graphical summaries of data,
20    understanding the phenomenon under study,
21    and interpretation of results in context,
22    complete reporting and proper and logical
23    quantitative understanding of what the
24    data summaries mean."

1      Q.    And then the next sentence
2    says?
3      A.    "No single index" -- I don't
4    know what they're referring to there.  It
5    doesn't say the P-value alone -- "should
6    substitute for scientific reasoning."  It
7    says no single index.  It could be any
8    index, the mean.
9      Q.    Now, do you know that the
10    American Statistical -- and you were not
11    asked to be on this panel, I assume,
12    since you didn't even know that -- you
13    hadn't even read it.  So you were not on
14    this panel.  You were not asked by your
15    colleagues to participate in this,
16    correct?
17        MS. MILLER:  Objection.
18        Please let me object.
19        THE WITNESS:  Could you show
20      me who was on the panel?
21    BY MR. TISI:
22      Q.    I'm just asking you, were
23    you asked to be on this panel?
24      A.    I -- I -- yeah, I don't know

121 (Pages 478 to 481)

Karla Ballman, Ph.D.

1    how -- who is on the panel and how many
2    people are on the panel.
3        Q.   I didn't ask you that.
4        A.   But I have a feeling that
5    there are many people that weren't on the
6    panel.
7        Q.   I didn't ask that.  I asked
8    whether you were asked to be on the
9    panel.
10       A.   No, I was not asked to be on
11   the panel.
12       Q.   That was the answer to the
13   question.  Thank you.
14           Next question is -- now, I
15   represented to you that this week the
16   American -- you know, -- do you get the
17   journal, the American Statistician?
18       A.   Yes.
19       Q.   It's probably the most
20   important journal in the statistical --
21   in the field of statistics.  Would you
22   agree?
23       MS. MILLER:  Objection.
24   BY MR. TISI:

1        Q.   It's a high-impact journal
2    within that field?
3        MS. MILLER:  Objection.
4        THE WITNESS:  Wait, what's
5    the journal again?
6        (Document marked for
7        identification as Exhibit
8        Ballman-28.)
9    BY MR. TISI:
10       Q.   The American -- the
11   American -- what's the journal of the
12   American Statistical Society?
13       A.   What is the journal?  The
14   journal -- JASA.
15       Q.   Yeah.  Actually, just give
16   me -- I'm sorry.  I apologize.
17       A.   JASA, I believe, is the
18   Journal of ASA.  The Journal of the
19   American Statistical --
20       Q.   It's the American
21   Statistician.  The American Statistician.
22       A.   Yeah, that's sort of a -- I
23   get that journal.  I don't know if people
24   would characterize it as the most

1    important statistics journal that there
2    is.  I think it depends upon -- no.  I --
3        Q.   Did you know just this week,
4    as I indicated, that the journal devoted
5    its entire volume to the issue of
6    statistical significance?
7        A.   So this week's journal?
8        Q.   Mm-hmm.
9        A.   And, you know, I don't even
10   know if I had been in my office to get
11   it.  So I am not aware of that.
12       Q.   You weren't aware that it
13   was coming out, were you?
14       A.   I don't know why I would be
15   aware that it's coming out.
16       Q.   Sometimes if something big
17   is happening in the world of statistics,
18   kind of a lot of people involved, it gets
19   out that they are putting together a
20   volume devoted to a specific topic.
21           You didn't -- you were
22   unaware of it?
23       A.   I -- well, I -- I don't know
24   if that statement is true or not.  I

1    mean, I know in JCO, we put out very --
2    we put out special issues.  And I don't
3    think all of oncology is aware it's
4    coming out.
5        Q.   So I'm going to show you in
6    the -- is the journal Science a good
7    journal?  Sorry.  Nature.  I'm sorry.
8        A.   Yes.  Nature is a very good
9    journal.
10       Q.   The entire ASA journal was
11   devoted to 43 studies, 43 papers on this
12   topic.
13       MS. MILLER:  What's ASA?
14       MR. TISI:  The American
15   Statistical Association.
16       MS. MILLER:  That's not a
17   journal.  That's an association.
18   You said --
19       MR. TISI:  You're
20   interrupting me now.
21       MS. MILLER:  Fine.
22       MR. TISI:  Their journal is
23   the American Statistician.
24       MS. MILLER:  I think she

Karla Ballman, Ph.D.

Page 486

1  said that's not their journal.
2        THE WITNESS: No, I didn't
3  say that.
4        MS. MILLER: Oh, I
5  misunderstood.
6        THE WITNESS: I said I don't
7  believe it's the most important.
8        Could -- I don't know if
9  there's 40-some articles.
10  BY MR. TISI:
11     Q.   I'm going to represent to
12  you that it is.
13        And I'm -- you know, you can
14  either believe me or not.  My guess is at
15  some point this week, you may go home and
16  take a look at it.  But I didn't bring
17  all 43 articles.  And you'd want to read
18  them all anyway.  So we don't have the
19  time to do that.
20     A.   But I'd at least like to
21  look at the titles.
22        MR. TISI: Okay.  Well, John
23  can you pull up the titles of the
24  43?  If you can get them on your

Page 487

1  computer, please.
2  BY MR. TISI:
3     Q.   But in the meantime, a
4  commentary related to this, this
5  publication was published in Nature by
6  Drs. Greenland, Blake McShane and
7  Valentin Amrhein.
8        (Document marked for
9        identification as Exhibit
10        Ballman-29.)
11  BY MR. TISI:
12     Q.   Okay.  Let me show you that.
13  Now, the title of this is "Retire
14  Statistical Significance."
15        Do you see that, Doctor?
16     A.   It says "Retire Statistical
17  Significance."
18     Q.   Okay.  And actually,
19  underneath it says, Valentin Amrhein,
20  Sander Greenland, and Blake McShane, and
21  more 800 signatories, call for an end to
22  hyped up claims and dismissal --
23  dismissal of possibly crucial effects.
24        Do you see that?

Page 488

1        MS. MILLER: Objection.
2  That was not read correctly.
3  BY MR. TISI:
4     Q.   These three authors and more
5  than 800 signatories call for an end to
6  hyped claims and the dismissal of
7  possibly crucial effects.
8        Do you see that?
9     A.   I see how that's stated
10  there.
11     Q.   Okay.  And I'm happy to give
12  you an opportunity to read it.  And since
13  you haven't read it, and this will take a
14  moment, I'm happy to do it, but I am
15  going to focus your attention to certain
16  things.
17        Do you want to glance
18  through it, I'm more than happy to have
19  you glance through it, but we can do it
20  off the record.
21        MR. TISI: Go off the
22  record, please.
23        MR. LOCKE: No, no.
24        MR. TISI: That's what we've

Page 489

1  done -- if it's a long --
2        MR. LOCKE: No, we have not.
3        MR. TISI: Yes, we have.
4        MR. LOCKE: No, we have
5  not--
6        MR. TISI: Yes, we have.
7  Yes, we have.
8        MS. MILLER: I thought we go
9  off the record if it's something
10  the witness --
11        MR. TISI: Hadn't seen,
12  yeah.
13        MS. MILLER: No, if it was
14  something the witness had cited
15  and a reference.  But if it's
16  something the witness had never
17  seen before, I don't think we'd go
18  off --
19        MR. TISI: No, that's what
20  we -- that's what we've been
21  doing.
22        MR. LOCKE: That's not what
23  we've been doing.
24        MR. TISI: That's exactly

123 (Pages 486 to 489)

Karla Ballman, Ph.D.

Page 490

```
 1        what we've been doing.
 2            Anyway, she's looking at it.
 3   BY MR. TISI:
 4        Q.   Let's go through.  I'm going
 5   to ask you to read down to the bottom of
 6   the left-hand column.  I'll ask you some
 7   questions about that.
 8        A.   How far do you want me to
 9   read?
10        Q.   Just to the bottom of the
11   left-hand column?
12        A.   Second page?
13        Q.   Second page, correct.
14        A.   Okay.  Just the bottom of
15   that first column.
16        Q.   Correct.
17        A.   I have read that.
18        Q.   Actually, and you can
19   continue to the next -- the first
20   paragraph on the next page.
21            MS. MILLER:  The first
22        paragraph on the next column or
23        the --
24            MR. TISI:  Next column.
```

Page 491

```
 1   BY MR. TISI:
 2        Q.   Actually, you can read the
 3   whole -- read the whole column up until
 4   the next category.
 5        A.   Yes.  I read it.
 6        Q.   So, Doctor, under the
 7   section that says -- first of all, these
 8   are all -- these authors are all people
 9   that you know in your field, correct?
10        A.   I've heard of their names.
11        Q.   Okay.  These are all widely
12   respected statisticians and
13   epidemiologists, correct?
14            MS. MILLER:  Objection.
15            MR. LOCKE:  Objection.
16            THE WITNESS:  I -- I -- I
17        can't speak to what respect they
18        do or they do not have.  I know
19        their names.
20   BY MR. TISI:
21        Q.   And do you have respect for
22   them?
23            MS. MILLER:  Objection.
24            THE WITNESS:  The only name
```

Page 492

```
 1   that I actually know is Sander
 2   Greenland.  I do not know who
 3   Blake McShane is, nor Valentin
 4   Amrhein.
 5   BY MR. TISI:
 6        Q.   Do you know -- do you have
 7   respect for Sander Greenland?
 8            MS. MILLER:  Objection.
 9            THE WITNESS:  Again, I know
10        his name.  I know he's done -- you
11        know, he's authored some books and
12        so forth.
13   BY MR. TISI:
14        Q.   So what they say here -- and
15   of course, I'm reading in the second
16   page.  It says, "We agree" -- "We are far
17   from alone.  We invited others to read
18   this draft" -- "read a draft of this
19   comment and sign their names if they
20   concurred with our message.  250 did so
21   within 24 hours.  A week later, we had
22   more than 800 signatories, all checked
23   for academic affiliation or other
24   indication of present or past work in a
```

Page 493

```
 1   field that depends on statistical
 2   modeling."
 3            Do you see that?
 4        A.   That's what it says there.
 5        Q.   Okay.  So this has been
 6   endorsed by 800 of your colleagues?
 7            MR. LOCKE:  Objection.
 8   BY MR. TISI:
 9        Q.   Correct?
10        A.   I don't know who the 800
11   people are.
12        Q.   Okay.  And they say, "The
13   pervasive problem" -- here on Page 1,
14   says, "Let's be clear about what must
15   stop.  We should never conclude that
16   there is no difference or no association
17   just because a P-value is larger than a
18   threshold of .05, or equivalently because
19   a confidence interval includes zero.
20            "Neither should we conclude
21   that two studies conflict because one had
22   a statistically significant result and
23   the other did not.  These errors waste
24   much research efforts and misinform
```

124 (Pages 490 to 493)

Karla Ballman, Ph.D.

Page 494

1    policy decisions."
2         Do you see that?
3         A.   That's what they say.
4         Q.   Do you agree?
5         A.   I -- I -- I don't know if I
6    agree or not.  I mean, I have to read
7    this more through more carefully.  There
8    are some aspects that I agree.  I agree
9    that, you know, it's wrong to conclude
10   that two studies conflict because one has
11   statistically significant results or not.
12        So I agree with the example
13   that they give, null or one has a risk
14   ratio of 1.2, that it is statistically --
15   that has -- that is statistically
16   significant, or just is not statistically
17   significant by the .05 level if P-value
18   of .091.
19        Another one also has a risk
20   ratio of 1.2, so similar risk ratios.
21   And its P-value is statistically
22   significant.  So I agree that I would not
23   conclude that those two studies conflict.
24        Q.   And they result -- and they

Page 495

1    talk about the American Statistical
2    Association in the statement that we just
3    read from 2016, right?  The associated
4    statement in the American Statistician,
5    warning against the misuse of statistical
6    significance.  And that was what we just
7    talked about as Exhibit Number --
8         A.   28.
9         Q.   -- 28, correct?
10        A.   They cite that statement,
11   yes.
12        Q.   And it says, "Eradicating
13   categorization will help halt" --
14        A.   Now where do you -- where
15   are you now?
16        Q.   In the middle.  In the blue.
17        A.   Okay.
18        Q.   "Eradicating categorization,
19   will help halt overconfident claims,
20   warranted claims of no different and
21   absurd statements about replication
22   failure."
23        Do you agree with that?
24        A.   Again, I think it depends.

Page 496

1         Q.   Okay.  But their statement
2    is definitive.  They're not hedging at
3    all?  They're saying don't do this.
4         MS. MILLER:  Objection.
5         THE WITNESS:  They are
6    hypothesizing.
7    BY MR. TISI:
8         Q.   They are not hypothesizing.
9    They're saying let's be clear about what
10   must stop.
11        A.   That, they're clear about.
12   But again, if I could -- you asked me if
13   I agree with this statement.  And you cut
14   me off when I said that they are
15   hypothesizing.  So may I finish that?
16        Q.   Sure.
17        A.   So they are hypothesizing by
18   saying eradicating -- and I'm surprised
19   statisticians are doing this.
20   "Eradicating categorization will help to
21   halt overconfident claims, unwarranted
22   declarations of no difference, and absurd
23   statements about replication failure.
24        I don't see any evidence.

Page 497

1    This is a hypothesis, that doing this is
2    going to stop this.  I don't see any
3    evidence here, unless it's in here, which
4    I haven't been able to read in detail,
5    that there's evidence doing so is going
6    to prevent these things.
7         Q.   Let's go to the next page.
8    And there's a paragraph that I want you
9    to read.  I'm going to ask you to read it
10   in entirety because it deals with an
11   issue that we talked about before.
12        Go to the next page.  It
13   says under the term second on the
14   left-hand side.  And it says -- and I'll
15   read it into the record.
16        "Second, not all values
17   inside" -- they're talking about inside
18   the confidence interval -- are equally
19   compatible with the data, given the
20   assumptions.
21        "The point estimate is the
22   most compatible, and the values near it
23   or more compatible than those at the
24   outer" -- "near the limits.  That is why

Karla Ballman, Ph.D.

Page 498

1  we urge authors to discuss the point
2  estimate, even when we have large
3  P-values or a wide interval, as well as
4  discussing the limits of that interval.
5           "For example, authors above
6  could have written, "Like a previous
7  study our results suggest a 20 percent
8  increased risk on new onset atrial
9  fibrillation in patients given
10  antiinflammatory drugs.  Nonetheless, the
11  risk difference ranging from a 3 percent
12  decrease, a small negative association,
13  to a 48 percent increase, a substantial
14  positive association, is also reasonably
15  compatible with our data.
16           "Interpreting the point
17  estimate while acknowledging its
18  uncertainty will keep you from making
19  false declarations of no difference and
20  then making overconfident claims."
21           Do you see that?
22      A.  I -- that's what it says
23  there.
24      Q.  Okay.  Now, let's go back to

Page 499

1  talk about talc.  First of all, do you
2  agree with that?
3      A.  Again, I -- I would need to
4  read.  I don't know what study they are
5  talking about above.  I mean, I think
6  I --
7      Q.  Well, they're talking about
8  the one we read on the prior page, the
9  example that we read on the prior page
10  with the example that we talked about --
11  that was talked about, that I asked you
12  to read before.
13      A.  So I'm not comfortable
14  agreeing or disagreeing with something
15  that I was just handed and told, okay,
16  you have a few minutes to read through
17  this, you know, quickly and not have time
18  to think about it.  So I'm just not
19  comfortable saying whether I agree or
20  not.
21      Q.  Well, let's go to
22  Dr. Merlo's chart if we could, back to
23  that.
24           MS. MILLER:  Do you remember

Page 500

1  the number?
2           THE WITNESS:  And after
3  that, and I'm willing to do this.
4  But I do need a bathroom break.
5  That water I drank.
6           Yes, I have it.
7           MR. SOILEAU:  It's 26.
8           MS. MILLER:  I got it.
9           THE WITNESS:  We have it.
10  BY MR. TISI:
11      Q.  First, we talked about --
12  the comment that we talked about before
13  if you look at the -- the most likely, do
14  you agree with the statement in this,
15  "The point estimate is the most
16  compatible with" -- "and the values near
17  it are more compatible than those near
18  the limits in terms of the true risk."
19      A.  Yeah, so can I place
20  something -- it says compatible with the
21  data.  It doesn't say compatible with the
22  truth.  We don't know the truth.
23           So compatible with the data,
24  I agree.  Compatible with the truth, I do

Page 501

1  not agree because we don't know the
2  truth.  And we're just trying to estimate
3  it with the data.  But it could be
4  drastically wrong, like if there are
5  recall biases and selection biases.
6      Q.  But one of the things that
7  statisticians do is they say, look at the
8  whole confidence interval, right?  They
9  say, here, the real thing that you really
10  need to do is look at the range
11  represented by the confidence interval.
12      A.  I think -- yeah, they're
13  just saying one should look at the
14  uncertainty in the estimate by looking at
15  the confidence interval.
16      Q.  Okay.  And the example they
17  give is, if the confidence interval goes
18  from a negative, and like a .97 all the
19  way up to a 1.48, that you should talk
20  about the fact that, yes, it crosses
21  zero.  And you might have some risk that
22  is negative.  But most of the risk lies
23  in the positive area.
24      A.  Yeah, I don't know where you

126 (Pages 498 to 501)

Karla Ballman, Ph.D.

Page 502

1    are getting that confidence interval. I
2    don't see a .97.
3        Q.    It says here, "Nonetheless,
4    the risk difference ranging from a 3
5    percent decrease" --
6        A.    Oh, I see.
7        Q.    -- "a small negative
8    association" --
9        A.    Okay.
10       Q.    -- "to a 48 percent" -- "a
11   substantial" --
12       A.    I see. So you took one
13   minus 3 percent. I got it. I'm with
14   you.
15       Q.    Okay. Okay. And so what
16   they're saying is you look at the
17   entirety of the confidence interval and
18   use your judgment. And you don't rely on
19   a snap decision of saying statistically
20   significant or not, true?
21       A.    Say -- ask the question
22   again.
23       Q.    They're saying you don't
24   just flip a switch on statistical

Page 503

1    significance. They say you look at the
2    entirety of the confidence interval in
3    the context of everything, correct?
4        A.    Yeah. They're saying one --
5    one can report the confidence interval so
6    that you know the uncertainty that's
7    associated with the point estimate.
8        MS. MILLER: Okay. I think
9    she asked for a break.
10       MR. TISI: Sure. Although
11   we're in the -- yeah, if you need
12   to do a break, we'll do that.
13       THE WITNESS: It can only be
14   like two minutes.
15       THE VIDEOGRAPHER: All
16   right. Stand by, please. Remove
17   your microphones. The time is
18   4:48 p.m. Off the record.
19       (Short break.)
20       THE VIDEOGRAPHER: We are
21   back on the record. The time is
22   4:54 p.m.
23   BY MR. TISI:
24       Q.    Doctor, if you can go back

Page 504

1    to the exhibit with Dr. Merlo's exhibit
2    there. Would you please take for me, if
3    you could -- I'm going to give you this
4    pen. And would you please highlight for
5    me every single risk ratio that's above
6    one?
7        MS. MILLER: Objection.
8        THE WITNESS: The risk ratio
9    itself?
10   BY MR. TISI:
11       Q.    Yes.
12       A.    I'm sorry. I goofed.
13       MS. MILLER: Can you give a
14   new one? She made a mistake.
15       THE WITNESS: Can I color it
16   in green or something so --
17   BY MR. TISI:
18       Q.    Yeah, color it -- well, why
19   don't we put an X by it. This way we'll
20   know. Which one did you do it wrong?
21       A.    The last one.
22       Q.    Okay. That's Gonzalez. For
23   the record, Gonzalez is not greater than
24   one, correct?

Page 505

1        MS. MILLER: Objection.
2        THE WITNESS: Yes, that's
3    correct.
4    BY MR. TISI:
5        Q.    So now --
6        A.    The risk ratio.
7        Q.    Now, the next thing that
8    Dr. Greenland and his colleagues point
9    out here is that we look at the
10   confidence interval, correct?
11       A.    What do you mean by the next
12   thing?
13       Q.    Well, one of the things he
14   says, you need to look not at statistical
15   significance so much as the confidence
16   interval, correct?
17       A.    Where is that statement?
18       Q.    Well, he says here, he says,
19   "The point estimate is the most
20   compatible value and the values near the
21   most comparable" -- "comparable than
22   those near the limits. That's why you
23   urge authors to discuss the point
24   estimate even when you have a large

127 (Pages 502 to 505)

Karla Ballman, Ph.D.

Page 506

1    P-value or wide interval."
2         Okay.  And then he talks
3    below about where the confidence interval
4    rates go, correct?
5         A.    Well, you didn't quite
6    complete that sentence.  So when they
7    have a large P-value or wide interval as
8    well as discussing the limits of the
9    interval.
10        Q.    Okay.  So let's discuss the
11   limits of the interval for a moment.
12        A.    Okay.
13        Q.    Okay.  I'm going to ask you,
14   if you wouldn't mind, to circle every
15   P-value on -- every confidence interval
16   that includes 1.2 -- actually, let me use
17   a black pen, use that -- that includes
18   1.2 either as -- within the upper or
19   lower bounds.
20        A.    Every confidence interval?
21        Q.    Yeah, where 1.2 is within
22   the confidence interval.  I'll ask you to
23   do one other thing.  This is the last
24   thing I'll asked you to do with art.

Page 507

1         Take this blue pen, and
2    would ask you to put a mark by the side
3    of anything that in any of those studies
4    that include within the confidence
5    interval of 1.25.
6         MS. MILLER:  Objection.
7    BY MR. TISI:
8         Q.    Or maybe you can highlight
9    the inside of the -- however you want to
10   do it.  It's up to you.
11        A.    (Witness complies.)
12        Q.    Doctor, when you were
13   looking at this, you had an opportunity
14   to take a look at this, and you've done a
15   little bit of art here on this.
16        Irrespective of the
17   statistically -- statistical
18   significance, would you agree that,
19   irrespective of design, every one of
20   these studies that -- the vast majority
21   of them, have a point estimate greater
22   than one?
23        MS. MILLER:  Objection.
24        THE WITNESS:  I mean, the

Page 508

1    numbers on the page, for most of
2    these, are greater than one.
3    BY MR. TISI:
4         Q.    Okay.  Would you also agree
5    that irrespective of design, every one of
6    these -- every one of these studies that
7    you highlighted in yellow, the vast
8    majority of -- excuse me, highlighted in
9    red --
10        A.    Pink.
11        Q.    -- pink are consistent with
12   a 20 percent increased risk of ovarian
13   cancer?
14        MS. MILLER:  Objection.
15        THE WITNESS:  That I
16   disagree with.
17   BY MR. TISI:
18        Q.    Okay.  Why would you say
19   that?
20        A.    Because we know that
21   population-based case-control studies --
22   or, sorry, case-control studies and --
23   well, and to some degree the cohort
24   studies have confounding and bias in

Page 509

1    these.
2         And so, therefore, it's hard
3    to know what the true risk ratio is,
4    because if you're consistently
5    overestimating something, just because
6    every study that has the same design that
7    consistently overestimates something,
8    doesn't make the truth.  That's something
9    that is estimated.
10        Q.    Let me put it this way.
11   Would you agree with me with respect to
12   the cohort studies and the case-control
13   studies, that the vast majority of them
14   have in common a 20 percent -- have
15   20 percent in their confidence interval?
16        MS. MILLER:  Objection.
17        THE WITNESS:  I don't know
18   why that would be relevant,
19   because as what you were just
20   having me read before, it says
21   look at the risk ratios and see
22   sort of if they're the same.  Like
23   the example they gave, they had
24   two risk ratios which were exactly

128 (Pages 506 to 509)

Karla Ballman, Ph.D.

1    the same.  One was statistically
2    significant, one was not.
3         And as I pointed out in my
4    report, the risk ratios across the
5    case-control studies differ by as
6    much as four times.  And so --
7    BY MR. TISI:
8         Q.   Do you really expect in any
9    set of studies in anything that you've
10   ever done, that the risk ratios be
11   exactly the same?
12        A.   To be exactly the same?
13   Again, it depends upon the studies that
14   I'm comparing.
15        Q.   In fact, wouldn't you be
16   suspicious of a set of studies of any
17   design which had exactly the same risk
18   ratio?
19        MS. MILLER:  Objection.
20        THE WITNESS:  Again, I would
21        have to see -- it depends on what
22        the studies are that I'm looking
23        at and so forth.
24   BY MR. TISI:

1         Q.   Have you ever seen that
2    happen, a group of five studies where
3    they all have exact same risk ratio?
4         MS. MILLER:  Objection.
5         THE WITNESS:  The exact
6         same -- I mean, to how many
7         decimal places?  I've seen studies
8         that -- yeah.
9    BY MR. TISI:
10        Q.   Where five studies done in
11   different populations, have the exact
12   same risk ratio.
13        MS. MILLER:  Objection.
14   BY MR. TISI:
15        Q.   You've seen that happen?
16        A.   Again, I -- I don't know.  I
17   mean, I -- it depends upon what level you
18   are measuring at, is the same.  If one
19   would say, oh, look, you know, all these
20   have a risk ratio of one because someone
21   rounded 1.2 down to one, 1.1 down to one,
22   then, yes, that study could have all the
23   same.
24        Q.   So, Doctor, let me ask you

1    this.  Because I want to get kind of --
2    isn't the decision -- the vast majority
3    of these studies have a risk ratio
4    between 1.1 -- irrespective of design,
5    1.1 and 1.5.  Would you agree with that?
6    There is some outliers on the low end and
7    outliers on the high end.  But the vast
8    majority of them.
9         A.   But your -- so your --
10   your -- your --
11        Q.   Go ahead.
12        A.   So when I look at numbers, I
13   can say that those numbers fall in that
14   range.
15             As to whether or not the
16   true risk ratio is in that range, I have
17   no idea, because I know of the biases
18   that exist, especially in the
19   case-control studies.
20        Q.   Now, didn't Dr. -- have you
21   calculated a confounding -- how big a
22   confounder would have to be in order to
23   create a risk ratio of 1.3?
24        A.   I think it depends.  It

1    depends upon many factors.
2         Q.   Well, how big would it have
3    to be?
4         A.   I can't answer that because
5    I need to know many things in order to
6    calculate that.
7         Q.   If you go back to Dr.
8    Rothman's Exhibit Number -- this one, the
9    one that looks like this.
10        MR. SOILEAU:  It should be
11        21.
12   BY MR. TISI:
13        Q.   21.
14        A.   Yes, I have it.
15        Q.   Okay.  Here's a section in
16   here, a paragraph on confounding in the
17   case-control studies, on Page 5.
18        Do you see that?
19        A.   Yes, I see that paragraph.
20        Q.   Okay.  Can you read that
21   paragraph?  You can read it to yourself.
22        A.   You know, I see that --
23        Q.   I just asked you to read it.
24   There's no question pending.

Karla Ballman, Ph.D.

Page 514

1    A.   Okay.  Okay, sorry.  Yes, I
2  read that.
3    Q.   Okay.  Does he not say that,
4  "Family history, ethnicity, obesity and
5  some reproductive risk factors are
6  positively associated with the risk of
7  ovarian cancer"?
8    A.   Yes.
9    Q.   He says, even if you combine
10 all of those together, they would not
11 explain increased risk?
12   A.   You know, he states that
13 there, but I would need to see the
14 calculation.  I don't see any
15 calculation.  So I don't know if that
16 statement is correct or not.
17   Q.   Well, have you done the
18 calculations that would say that -- how
19 big the confounding would have to be in
20 order to explain the consistent risks
21 seen across all these case-control
22 studies?
23       MS. MILLER:  Objection.
24       THE WITNESS:  I have not

Page 515

1  done that calculation, but I don't
2  see a calculation here either.
3  BY MR. TISI:
4    Q.   I'm not asking you.  He's --
5  he made his assertion.  You're here, I'm
6  getting to ask you questions.  You've
7  made a big deal about confounding in your
8  report.  A big deal.
9        I'm asking you, have you
10 made any calculation as to how big the
11 confounder would have to be to explain
12 what the meta-analysis show as
13 approximately 1.3 risk associated with
14 ovarian cancer and talc?
15       MS. MILLER:  Objection.
16       THE WITNESS:  Again, I -- I
17 have not made such a calculation,
18 but -- can I see -- is it the
19 Gonzalez study?
20 BY MR. TISI:
21   Q.   Did you bring it with you?
22       MS. MILLER:  I've got all
23 the studies in the next room.  Do
24 you want to go off the record and

Page 516

1  get it?
2        THE WITNESS:  That would be
3  great.  That's the one with the
4  douching?
5        MS. MILLER:  Sure.  Let's go
6  off the record, and I'll get it.
7        THE VIDEOGRAPHER:  The time
8  is 5:09 p.m.  Off the record.
9        (Brief pause.)
10       THE VIDEOGRAPHER:  The time
11 is 5:11 p.m.  Back on the record.
12 BY MR. TISI:
13   Q.   Okay.  So let me turn to
14 dose-response, which is another area you
15 spend a lot of time on.  And I'm going to
16 spend rest of my time on dose-response,
17 which is another of Hill's criteria.
18       First of all, do you agree
19 with me that Bradford Hill said himself
20 that dose-response was not a required
21 finding in order to make a causation
22 assessment, correct?
23   A.   I believe Bradford Hill
24 indicates that none of these are -- are a

Page 517

1  requirement to establish causation, and I
2  agree with that.
3    Q.   Okay.  The next -- the next
4  statement on page -- turn to Page 19 of
5  your report.  On Page 19, you say -- and
6  it's your general discussion of
7  dose-response.
8        Do you see that?
9    A.   Under biological --
10   Q.   No.  Above -- above
11 plausible -- yes, under -- above
12 plausibility.
13   A.   Oh, so we're on 19.
14   Q.   Yes.
15   A.   Okay.
16   Q.   You talk about biologic
17 gradient.  You start out by saying it's
18 not necessary.  And the next -- but the
19 next paragraph is what I'm going to ask
20 you about.
21   A.   I dent see where I say it's
22 not necessary.
23   Q.   Okay.
24   A.   I see that I see if

130 (Pages 514 to 517)

Karla Ballman, Ph.D.

1  dose-response is seen, it's more likely
2  the association is causal.
3      Q.   Okay.  So let's go to the
4  next paragraph.  It says, "Regardless of
5  the nature of the dose-response
6  relationship, it needs to be demonstrated
7  consistently across available studies.
8  Specifically the same type of
9  dose-response relationship needs to be
10  exhibited in the different studies.  If a
11  threshold relationship is hypothesized,
12  it would require evidence of a threshold
13  value as well, and the value is similar
14  across studies.
15          "If only a few studies
16  exhibit a dose-response rather than all,
17  this criterion" -- "criterion would not
18  be convincingly met."
19          I'm going to have that
20  marked as Exhibit Number 36 (sic).  I
21  just pulled that paragraph out.
22          (Document marked for
23          identification as Exhibit
24          Ballman-30.)

1  BY MR. TISI:
2      Q.   First of all, you would
3  agree with me -- would you agree with me
4  that you have not cited a single
5  reference for any of those statements?
6      A.   I just think it's common
7  knowledge in terms of the general
8  principles of epidemiology for
9  establishing a dose-response.
10      Q.   So where is your -- I'm
11  going to hand you Exhibit Number 30.  I'm
12  going ask you about the highlighted ones.
13          Where is your authority
14  for -- in fact, you had indicated that
15  dose-response wasn't even necessary
16  according to Bradford Hill, right?  You
17  agreed with that?
18      A.   Qualified.  I would say --
19  and I state throughout my report, that if
20  the initial association that's
21  established is weak then it's important
22  that other criteria be met.
23      Q.   And where is your basis for
24  that?

1      A.   I give citations for that.
2  So you're going to have to bear with me.
3  And I will find --
4          So 30 and 31.  "Hence,
5  observational studies that yield small to
6  modest levels of association require a
7  higher level of supporting evidence to
8  reach a conclusion of causality than do
9  studies with strong levels of
10  association."
11      Q.   Okay.  So if I look at 30
12  and 31, references to those will be in
13  there?
14      A.   That will support that
15  statement.  Mm-hmm.
16      Q.   Okay.  I'll look them up.
17          So now let's go -- let's go
18  to the next -- let's go to exhibit
19  number -- the exhibit that I just gave
20  you, the pull-out of your report.
21          We agreed that, okay --
22  where is your statement that
23  dose-response needs to be demonstrated
24  consistently across the available

1  studies?
2      A.   Well, I think I'm sort of
3  explaining what I mean by consistently.
4  I mean, if one study out of 40 had a
5  dose-response, that likely is just due to
6  the fact of multiple comparisons.  So
7  that would not establish a dose-response.
8          So dose-response is very
9  similar to establishing whether -- I
10  mean, consistency is sort of implied in
11  terms of dose-response.  You can't have
12  one study showing a dose-response out of
13  many and conclude there is a
14  dose-response.
15      Q.   Okay.  Actually -- I'm
16  actually asking you this.
17          Regardless of the nature of
18  the dose-response, it needs to be
19  demonstrated consistently across the
20  available studies.  Where is your support
21  for that statement that it needs to be
22  consistent across all -- across available
23  studies?
24      A.   So just -- just common sense

Golkow Litigation Services - 1.877.370.DEPS

Karla Ballman, Ph.D.

1    off the top of my head, but I can go
2    through and try to find references if
3    you'd like.
4           But if something is causal,
5    it would be quite odd that it would only
6    have a dose-response in, say, one out of
7    40 studies. And again, I think I
8    explained that in my previous answer.
9           Q.   The next sentence says,
10   "Specifically, the same type of
11   dose-response relationship needs to be
12   exhibited in the different studies."
13          Could you -- you have no
14   citation for that, right?
15          A.   Again, if something is
16   causal, it would be odd that in one
17   study, it's a threshold effect, and in
18   another study it's a sign effect, and yet
19   in another study it's a decreasing
20   effect, and in another study it's an
21   increasing effect. What would you
22   conclude? How could you conclude it to
23   be causal?
24          Q.   Well, it depends on what you

1    measure, correct? It depends on the
2    power of the study. It depends upon a
3    lot of things, right?
4           A.   Dose-response looks for
5    patterns. I'm not even talking
6    statistically significant here. So
7    things that you just mentioned are
8    talking about statistical significance,
9    which you say people are going to
10   abandoned in the future.
11          I'm talking about looking
12   for evidence that supports a
13   dose-response. And if you have one study
14   that it shows it's going up and down,
15   another study that it's going down,
16   another study that even if it's not
17   statistically significant, that would
18   raise red flags.
19          Q.   What study, what study
20   showed that it was going down? Would
21   that be the Huncharek study?
22          A.   I can tell you in a minute.
23   Wong? So -- well, here's one that's up
24   and down. So Wong, one point -- one to

1    nine years .9. Ten to 19 is 1.4.
2    Greater than 20, it's .9.
3           So that's going up and down.
4           Q.   Can I stop and ask you that
5    question? Do you know how many people
6    were in the last category?
7           A.   No. I have no idea how many
8    people were in the last category. But
9    the width of the confidence intervals
10   there look like it's relatively close to
11   perhaps what's in the previous
12   categories.
13          Q.   Okay. Let me ask you
14   another question here. On the next
15   sentence?
16          A.   Wait -- I can show you one
17   where -- Whittemore, it goes down. It's
18   1.9, it's 1.6, and greater than ten years
19   it's 1.1.
20          Q.   Is that -- is that
21   never/ever? What is that?
22          A.   That's duration.
23          Q.   Okay. So wouldn't the best
24   measurement be frequency?

1           MS. MILLER: Objection.
2    BY MR. TISI:
3           Q.   Or total number -- total
4    number of applications?
5           MS. MILLER: I assume my
6    objection applies to the second
7    question.
8           MR. TISI: Yes, it would.
9    BY MR. TISI:
10          Q.   Wouldn't the total --
11          MS. MILLER: That was the
12   second question.
13   BY MR. TISI:
14          Q.   Wouldn't --
15          MS. MILLER: Those are two
16   different things.
17          MR. TISI: I got it. I got
18   it.
19   BY MR. TISI:
20          Q.   Wouldn't the total --
21   wouldn't the best measure be the total
22   number of applications?
23          A.   Well, if we're getting into
24   measurements, first of all, there's no

Karla Ballman, Ph.D.

1  valid instrument as to how to best
2  measure talc exposure.  So having no
3  valid instrument in the first place, I
4  don't think one can say what's the best
5  measure for a dose-response.  If
6  something is truly causal and you are
7  measuring increasing dose with some
8  metric that has increasing, so duration
9  would be increasing, that, you know, the
10  longer you use, the more likely you would
11  get ovarian cancer.
12       Frequency would be also a
13  measure of dose-response because using it
14  once a week is, you know, much less than
15  using it every day.  And so they are all
16  some measures of dose-response.
17       So if there's a true causal
18  relationship, one would expect seeing
19  consistent sort of dose-responses across
20  any of those measures.
21       Q.  And the Terry study did show
22  that, didn't it, when you combine
23  frequency and duration, correct?
24       A.  Well, that -- it -- it looks

1  if you do five studies would you expect
2  the same relative risk.
3       And, you know, these all
4  could be sort of the same underlying
5  relative risk and just come up with the
6  variations, because the numbers don't
7  differ that much.  So it's sort of a flat
8  relationship.
9       Q.  This is -- this is a
10  meta-analysis, isn't it?  This is looking
11  at all studies together?
12       A.  Yeah, I don't know if that
13  makes it any stronger or not because,
14  again, there's no valid measure that was
15  used.  So combining a bunch of studies
16  that use a bunch of different measures
17  together and no valid measure of talc
18  exposure in general, and then no, you
19  know, valid measure as to what the total
20  applications were or consistent
21  standardized measure, you know, it's hard
22  to interpret --
23       Q.  And Penninkilampi --
24       A.  -- the pooled --

1  like -- do we have the Terry study?
2       Q.  I'm just asking -- you have
3  the results in your -- in your Table 3.
4       A.  Oh, in Table 3.  Thank you.
5       Q.  Mm-hmm.
6       A.  Yeah, I see it now.  Thanks.
7  I thought it was here.  You know, I --
8  I -- I actually gave it the benefit of
9  the doubt because there's a couple issues
10  here.  One needs to -- so the test for
11  trend is not statistically significant.
12       And if you look at this, you
13  see that it goes from 1.14 to 1.23 down
14  to 1.22 and then up to 1.32.  So I don't
15  know if I'd call that a --
16       Q.  So you're kind of quibbling
17  with the Q3 going down from 1.23 to 1.22,
18  as showing, oops, it dropped a tenth of
19  the point?
20       A.  Well, I'm quibbling that --
21  actually if you look at, you know, the
22  last three values there, you know, it
23  well may be the case that there are
24  really -- as you were pointing out, that

1       Q.  I'm sorry.  I didn't mean to
2  interrupt you.
3       A.  Sorry.  It's just hard to
4  interpret a pooled study.
5       Q.  And Penninkilampi also
6  looked at less than 3,600 applications
7  and more than 3,600 applications, and
8  there was a difference there as well,
9  right?
10       A.  And, again, if a test for a
11  trend were done the correct way where you
12  do not have the never category in, it's
13  likely that that would not be a
14  statistically significant difference.
15  But that aside, looking at these point
16  estimates, those again could probably
17  happen -- it doesn't indicate sort of a
18  clear difference between those two
19  numbers --
20       Q.  How about Schildkraut?
21       A.  -- and those point
22  estimates.
23       Q.  In your study -- in your
24  chart, on the prior page, on Table 1,

Karla Ballman, Ph.D.

1    Schildkraut shows less than 3,600, had a
2    1.16, and at greater than 3,600 had a
3    1.67, to a P-value of .01.
4        A.   That's not really -- that's
5    not really a test for dose-response
6    because there's only two levels.  So it's
7    sort of like just comparing two levels to
8    each other.  You don't know for certain.
9        Q.   So -- so let me go back to
10   your statement.  It says Exhibit
11   Number -- exhibit right there, what
12   number -- what exhibit?
13       A.   30.
14       Q.   Exhibit 30.  Last sentence
15   says, "If only a few studies exhibit
16   dose-response rather than all, the
17   criterion would not be convincingly met."
18       First of all, you have no
19   citation for that either, do you?
20       MS. MILLER:  Objection.
21       THE WITNESS:  Other than
22   what we discussed before, because
23   if there's true causality, it
24   would be quite odd that only,

1    like, two studies show any sort of
2    dose-response relationship and the
3    rest do not.
4        And you know, we can do the
5    counting exercise and go through
6    and see of all these, these
7    different measures of
8    dose-response, how many of them
9    actually are potentially.  And I
10   don't even know if I would call
11   the highlighted ones showing a
12   dose-response relationship.
13   BY MR. TISI:
14       Q.   Let's go to the next -- Page
15   29 of your report.  You say -- on Page
16   29, you say, "Given" -- sorry.  Let me
17   see where I find it.  Where is the word
18   "given"?  Hold on.
19       Oh, okay.  On the first
20   paragraph you say -- second sentence, you
21   say, "Given that available data are from
22   observational data and the association is
23   weak, additional evidence is required to
24   rule out a spurious association making

1    this criterion more important.
2        And you say that those
3    two -- there's no citation here.  But you
4    gave me the citation to that concept
5    earlier, right?
6        A.   I did.
7        Q.   Okay.  The next paragraph
8    says, "To establish a dose-response
9    relationship, the necessary evidence is
10   increasing risk with increasing dose,
11   statistical significance, and
12   consistency.  Consistency in this context
13   includes repeated demonstration of the
14   result across different studies,
15   including different study designs and
16   different measures of dose."
17       Do you see that?
18       A.   Mm-hmm.
19       Q.   And I have that pulled out
20   here as well as Exhibit Number --
21       (Document marked for
22       identification as Exhibit
23       Ballman-31.)
24   BY MR. TISI:

1        Q.   As with the prior statement,
2    you don't have a single citation for that
3    do you?
4        A.   I think we discussed all
5    this before in Exhibit 30 about why
6    consistency is important.  And why the
7    same type of dose-response needs to be
8    important.  I think I --
9        Q.   But you didn't cite it
10   there, and you don't cite it here?
11       MS. MILLER:  Objection.
12   BY MR. TISI:
13       Q.   You didn't cite it in the
14   prior exhibit, and you don't cite
15   anything here.
16       MS. MILLER:  Sorry.  I
17       thought the last thing was a
18       question, so I objected to that.
19       But this is a new question.  I
20       object to this one as well.
21   BY MR. TISI:
22       Q.   Yeah.  Okay.  We looked at
23   two --
24       A.   Yeah, yeah, yeah, yeah.

Karla Ballman, Ph.D.

Page 534

1    Q.   -- Exhibit Number 30, and
2  Exhibit Number 31.  They're both the same
3  statement about consistency, and you
4  don't have a citation for either one of
5  those?
6    A.   And I explained why there is
7  no citation is, again, that if there is a
8  causal relationship that is in fact true,
9  one would expect to see the same type of
10  relationship because if it goes up in one
11  study, down in another, up and down, or
12  stays flat, it's hard to understand how
13  something that truly has a causal effect
14  would come up with these different sort
15  of dose-responses.
16        And again, consistency is,
17  again, that you don't have these
18  different patterns going on in the data.
19    Q.   But you have no citation for
20  that whatsoever, and the meta-analyses
21  that were done, the two of them that
22  looked at it, whether it be Terry -- or
23  you pointed out.  I'm blanking on the
24  other one.  Both showed evident of a

Page 535

1  dose-response -- Terry and
2  Penninkilampi -- that looked at total
3  number of -- those are the only two that
4  looked at the total number of
5  applications, and they both showed
6  increasing dose -- increasing risk with
7  increasing number of applications, true?
8    A.   That is -- again, there's no
9  evidence that that's the right metric
10  because there's no validated instrument
11  for measuring talc in the first place.
12  And so it's sort of cherry-picking to
13  say, oh, okay, that one shows it but a
14  measure of frequency doesn't show it, a
15  measure of duration doesn't show it, even
16  within the same studies.
17        And so I think most
18  reasonable people would say, if there
19  really is a dose-response, why does it
20  have to be sort of the total lifetime
21  applications, but I'm not seeing it in
22  the total of years, which goes into that
23  calculation, nor the frequency, which
24  goes into that calculation.  And I don't

Page 536

1  even know if there's any valid measure of
2  that.
3    Q.   But you would agree with me
4  that both of these are peer-reviewed
5  studies, and when you looked at the total
6  number of applications, which is a
7  measure of dose, we saw an increased
8  risk.  Whether you think it's the right
9  inference or not is fine, but you agree
10  with that -- that that's what they
11  showed, both Penninkilampi and Terry.
12  And that's on Page 34 of your report.
13    A.   I don't think I said that.
14  I think I said Penninkilampi, you can't
15  even infer dose-response because there's
16  only two doses.  It's only two lines.  So
17  you can't -- I mean, only like -- you
18  know, dichotomous things.
19        So one can't really infer a
20  dose-response, and it's not even clear
21  that those two numbers in reality differ
22  from each other because we had this
23  discussion about, you know, point
24  estimates, you know, not having -- that

Page 537

1  they don't have to be the same, and if
2  they are pretty close to each other, who
3  knows.
4        So that's the same with the
5  Terry study too.  So I do not agree.
6    Q.   Okay.  But different -- you
7  know that in those studies, that both of
8  them, they noted an evidence of
9  dose-response, correct?
10        MS. MILLER:  Objection.
11        THE WITNESS:  I would have
12    to see the studies and see exactly
13    how they stated their conclusions.
14    Can you --
15  BY MR. TISI:
16    Q.   I'm just -- I'm just asking
17  you, do you recall that that was the
18  case?
19    A.   Off the --
20        MS. MILLER:  Objection.
21        MR. LOCKE:  Objection.
22  BY MR. TISI:
23    Q.   I'm asking you, do you
24  recall or not?  If you don't recall,

Karla Ballman, Ph.D.

Page 538

1    that's fine.
2          A.    Off the top of my head, I do
3    not recall.
4          Q.    Okay.  I want to ask you a
5    couple questions about meta-analysis and
6    kind of move on from there.
7                First of all, not all
8    dose-responses are monotonic, are they?
9          MS. MILLER:  Objection.
10          THE WITNESS:  I believe --
11          there can be different type of
12          dose-responses.
13    BY MR. TISI:
14          Q.    Okay.  Have you considered
15    that?
16          A.    In what sense?
17          Q.    Have you considered it at
18    all?
19          MS. MILLER:  Objection.
20          THE WITNESS:  I think I --
21          just in -- I mean, in what sense?
22    BY MR. TISI:
23          Q.    In connection with
24    dose-response?

Page 539

1          A.    Well, in cancer it would be
2    very rare -- in a non-monotonic, one
3    would be that the higher the dose, the
4    less the risk.  It could be concave.  I
5    mean, that would be quite --
6          Q.    Could it --
7          A.    -- bizarre different from
8    any other cancers I've seen.
9          Q.    Have you ever heard
10    depletion of the susceptibles?
11          A.    No, I have not.
12          Q.    Okay.  That as people die,
13    they're not going to be showing a --
14    anyway.  I'll move on.
15                What about a trend test
16    when -- when the trend test was used in
17    non-users, did they show a dose-response?
18          MS. MILLER:  Objection.
19    BY MR. TISI:
20          Q.    When a trend test was used,
21    did it show a dose-response?
22          MS. MILLER:  Well, where?
23          THE WITNESS:  Trend test
24          used where, meaning what?

Page 540

1    BY MR. TISI:
2          Q.    In any of the studies.
3          A.    Well, I know it looks like
4    Terry did a test for trend that does not
5    include the never/none category.  And
6    it's P-value is .17.  So -- and that is a
7    flat relationship.
8                Checking to see.
9                So Cramer 1999 did the
10    correct test.  He did a trend test.  And
11    his P-value of .48 and .16, that's a
12    trend test that does not include the
13    never category.
14          Q.    Right, but when he looked at
15    the total number of applications, you saw
16    an increase that went from 1.1 to 1.38,
17    went down to 1.36, and up to 1.49.
18          A.    I think we're talking about
19    the different Cramer.  Sorry.
20          Q.    Cramer 2016?
21          A.    No.  I was looking -- I said
22    Cramer 1999.  I'm sorry.
23          Q.    I'm looking --
24          A.    I misspoke that.

Page 541

1                You asked me which ones did
2    the correct trend test.  And I'm saying
3    Cramer 1999.
4          Q.    What about Cramer 2016?
5          MS. MILLER:  You didn't
6          misspeak.  You said 1999.
7    BY MR. TISI:
8          Q.    What about Cramer 2016?
9          A.    That one does -- that test
10    for trend includes the never versus none
11    category.
12          Q.    All right.  Okay.  Let me
13    ask you a couple questions about -- about
14    meta-analyses.
15                We've been talking about the
16    individual studies.  Is it your view
17    that -- you know, you mentioned several
18    times.
19          MR. TISI:  I'm sorry.  I'm
20          sorry.  You reached over.  You
21          reached over that time.
22          MS. MILLER:  I'm moving
23          back.
24          MR. TISI:  You reached over

136 (Pages 538 to 541)

Karla Ballman, Ph.D.

Page 542

1    that time.
2         MS. MILLER:  I'm so sorry.
3         MR. TISI:  And you kicked
4    me.
5         MS. MILLER:  I'm so sorry.
6         MR. TISI:  And I don't take
7    it personally.
8         MS. SHARKO:  Can I do that
9    too.
10        MS. MILLER:  I had to
11   stretch my legs.  It's been a very
12   long day.  I can only stretch that
13   far.
14   BY MR. TISI:
15        Q.   Doctor, you mentioned
16   several times that a certain number of
17   case-control studies found a
18   statistically significant result, and a
19   certain found -- didn't.  And then a
20   certain number of case -- cohort studies
21   did not find a statistically significant
22   result.
23        Do you remember that kind of
24   general testimony?

Page 543

1         MS. MILLER:  Objection.
2    BY MR. TISI:
3         Q.   Yeah, I mean.  Yes?
4         A.   What's your question?
5         Q.   My question is do you
6    remember that testimony.  I'm kind of
7    referring you.  Remember you listed,
8    well, you know, you kind of looked at
9    them together.  And some were
10   statistically significant, some weren't.
11   Some were in case-control, some were in
12   cohort.  Do you remember that testimony?
13        MS. MILLER:  Objection.
14        MR. TISI:  You can object.
15        THE WITNESS:  So what I --
16   what I -- I recall sort of when
17   looking at the evidence in
18   totality is that you know, the --
19   the hospital-based controls did
20   not find statistical significance.
21        The population-based
22   controlled studies -- case-control
23   studies, some found a statistical
24   significant association, some did

Page 544

1    not.
2         Looking at the cohort
3    studies, none of them found a
4    statistically significant
5    association.
6         And the magnitude of the
7    risk ratios for these groups of
8    studies also vary.
9    BY MR. TISI:
10        Q.   Would you agree with me that
11   it is wrong to simply count the number
12   of -- count the number of studies and
13   kind of do it like a democracy.  There
14   are a certain number of studies that say
15   X that's not statistically significant.
16   Certain number that say Y, they are, and
17   the non-statistical numbers win?
18        A.   It depends.
19        Q.   Okay.  Do you ever do that?
20        A.   It depends.  I mean, again,
21   I -- it depends upon many things.
22        You know, if I have, like,
23   you know, randomized controlled trials,
24   you know, and, you know, all of them show

Page 545

1    an effect, and then or none of them show
2    an effect, let's say.  So I have
3    randomized control trials --
4         Q.   But that's not what we're
5    talking about.  We're not talking about
6    randomized controlled.
7         Let's just talk about, for
8    example, in the case-control studies.
9         A.   You asked me if there are
10   any situations, and I was trying to
11   answer that.
12        Q.   And we're not talking about
13   that.  And I apologize, because we're
14   talking about in the context of this
15   case.  There are no randomized control
16   trials because it would be unethical to
17   do so, correct?
18        MS. MILLER:  Objection.
19        THE WITNESS:  Again, I
20   talked about reasons why, you
21   know, randomized control studies
22   are not done and, you know --
23   yeah, so anyway.
24   BY MR. TISI:

137 (Pages 542 to 545)

Karla Ballman, Ph.D.

1    Q.   They could not be done here
2  because you can't test somebody --
3  assuming you can even design such a
4  study, you couldn't -- with the
5  hypothesis being, let's expose people to
6  something and see whether it causes
7  cancer?
8        MS. MILLER:  Objection.
9  BY MR. TISI:
10    Q.   It would be unethical to do
11  that, right?
12    A.   Yeah.  I mean, just in
13  general, one would not do a clinical
14  trial and say, okay, we're going to
15  expose people to something that there's
16  evidence for that it's harmful, but I
17  don't know if it applies in this case.
18        It's been purported that the
19  use of talc is harmful.  But I don't know
20  if there is --
21    Q.   Would you ever participate
22  in a study that would test the hypothesis
23  that talc would cause ovarian cancer?
24        MS. MILLER:  Objection.

1  done, and the intent for
2  meta-analyses is that the
3  randomized controlled trials, back
4  when trials were starting to
5  become popular, were too small on
6  their own to have statistical
7  significance.
8        So the idea was there were
9  several trials done in the same
10  disease, essentially, of the same
11  treatments, and so to get the
12  necessary power in order to make a
13  definitive statement,
14  meta-analyses were used.
15        MR. TISI:  Okay.
16        (Document marked for
17  identification as Exhibit
18  Ballman-32.)
19  BY MR. TISI:
20    Q.   Let me show you a textbook,
21  a chapter of a textbook called
22  "Introduction to Meta-Analyses" by
23  Borenstein.  Is that something that
24  you've ever seen before?

1  BY MR. TISI:
2    Q.   A clinical trial?
3        MS. MILLER:  Objection.
4        THE WITNESS:  Again, I don't
5    think people would do such a
6    clinical trial --
7  BY MR. TISI:
8    Q.   And you wouldn't --
9    A.   -- with that question.
10        I mean, I would participate
11  in one if it says talc would prevent sort
12  of this from happening because I would
13  see a benefit.  I wouldn't participate in
14  a trial where there's no benefit being
15  hypothesized.
16    Q.   So now the question is, why
17  do we do meta-analysis?  Why do we do
18  meta-analysis?
19        MS. MILLER:  Objection.
20        THE WITNESS:  Well,
21    meta-analysis, and the history of
22    meta-analysis are that they were
23    first used for randomized
24    controlled trials.  And they were

1    A.   I haven't seen this
2  particular textbook.
3    Q.   I'm marking it as Exhibit
4  Number 32?  And I pulled out --
5        MS. MILLER:  Is this Xerox
6    on cardboard?
7        MR. TISI:  I know.  The
8    machine, it was weird.  It was the
9    FedEx office.
10  BY MR. TISI:
11    Q.   Chapter 28 is called "Vote
12  Counting, a New Name For an Old Problem."
13        Do you see that?
14    A.   I'm sorry.  What page are we
15  on?
16    Q.   It's chapter 28.  If you go
17  in, there's the chapter there?
18    A.   Oh, I see.  It says "Vote
19  Counting, a New Name For an Old Problem."
20  Yes.
21    Q.   So just -- you would agree
22  with me just looking at the number of
23  studies that show statistically
24  significant results and the numbers that

138 (Pages 546 to 549)

Karla Ballman, Ph.D.

Page 550

1  don't is not a good scientific
2  methodology, correct?
3      A.    Again, it depends.
4      Q.    Well, at the very end of in
5  statement -- and I guess that was a
6  pretty non-controversial thing, at least
7  I thought it was.  At the very end,
8  there's a box that says "Summary Points"
9  on Page 255.
10         I'm going to ask you if this
11  is true.  "Vote counting" -- and by vote
12  counting, I mean counting the number of
13  positive and negative studies.  "Vote
14  counting is the process of counting the
15  number of studies that are not (sic)
16  statistically significant and comparing
17  those with the number that are not
18  statistically significant."
19         Do you see that?
20      A.    Yes, I see what you read.
21      Q.    And it says, "Vote counting
22  treats a nonsignificant P-value as
23  evidence that an effect is absent.  In
24  fact, though small, moderate, and even

Page 551

1  large effects may yield nonsignificant
2  P-values due to inadequate statistical
3  power.  Therefore, vote counting is never
4  a valid approach."
5      A.    Yes, I see that -- that
6  stated there.
7      Q.    Do you agree that vote
8  counting -- in other words, counting the
9  number of studies that are not
10  statistically significant and comparing
11  them with the numbers that are, is never
12  a valid approach?
13      A.    Again, I said it depends.
14  So if all the studies were of the same
15  sample size done in the same population
16  using the same treatment, and all of them
17  were adequately powered, and, like, two
18  only found a statistically significant
19  result, and the rest did not, I think
20  that's evidence right there that there
21  really is no effect.
22      Q.    And that -- that's why we do
23  meta-analyses, correct?
24      A.    We do meta-analyses when the

Page 552

1  studies being combined -- again, as I
2  mentioned the intent of a meta-analyses
3  was for randomized clinical trials.  And
4  it was to combine small, underpowered
5  studies together in order to get
6  sufficient power.
7      Q.    Do you agree that it is
8  appropriate to use meta-analysis to
9  combine observational studies, even
10  observational studies of different
11  design?
12      A.    No.  I think it is incorrect
13  to do a meta-analyses to combine
14  observational studies, especially
15  observational studies of different
16  designs.
17      Q.    Yet in the talc area, you
18  know of at least four, five or six
19  meta-analyses that have been done that
20  have done exactly that, that have passed
21  peer review, correct?
22      A.    Yeah, and I hope ASA comes
23  out with a statement on that, because the
24  intent of meta-analyses was not to

Page 553

1  combine observational studies.  And
2  that's why in the meta-analyses, in that
3  chart of increasing evidence that I --
4  I -- we had discussed previously in my
5  report, the meta-analyses at the top are
6  meta-analyses of randomized trials.  I've
7  never seen any pyramid of evidence of
8  that that puts in meta-analyses of
9  observational studies anywhere in that
10  pyramid because it's unknown.
11      Q.    But I'm -- let me just get
12  it down.  There are six meta-analyses in
13  this -- in this litigation, five which
14  have been published, one of which is
15  being submitted to peer review, right,
16  the Taher study.
17      A.    Yes, correct.
18      Q.    And there's -- there's six
19  altogether, five of which are
20  published --
21      A.    Oh, wait?  Six altogether.
22  No, I'm sorry.  Go through the numbers
23  again.  My count is seven published.
24      Q.    Okay.  Fine.

Karla Ballman, Ph.D.

Page 554

1    A.   And -- okay.
2    Q.   Fine.  Whatever the number
3  happens to be, it happens to be.  I'm
4  doing it off the top of my head.
5         Are you saying that because
6  all of those studies combined
7  observational studies -- let's just deal
8  with that issue -- that that was
9  unscientific, and they should not have
10 passed peer review?
11   A.  I am saying that they're
12 good for hypothesis generating, and
13 that's about it.  They are not good for
14 making definitive statements with respect
15 to things such as causality or whether
16 there truly is an association.
17   Q.  Do you think that those
18 should have passed peer review.  If you
19 were peer reviewers on any of the
20 meta-analyses that are in this case,
21 would you have given a green light to
22 allow those to be published?
23        MS. MILLER:  Objection.
24        THE WITNESS:  Again, they

Page 555

1  are good for hypothesis
2  generating.  And I didn't say that
3  hypothesis generating is not --
4  not good -- or is not -- I'm
5  getting tired.  I'm searching for
6  words here.
7         I did not say that
8  hypothesis generating should not
9  be published.
10 BY MR. TISI:
11   Q.  You would agree with me that
12 people disagree with you on the value of
13 meta-analyses, correct?
14        MS. MILLER:  Objection.
15        THE WITNESS:  Well, I -- I
16 don't know.  All I know is JCO,
17 the journal I'm deputy editor for,
18 which has quite a high impact
19 factor, we would never, ever
20 publish a meta-analyses -- well, I
21 shouldn't say that.  That's too
22 strong.
23        It would be very rare that
24 we ever would publish a

Page 556

1  meta-analyses of observational
2  data.
3  BY MR. TISI:
4    Q.  Okay.  And you think it
5  would be inappropriate to rely on that
6  data for consideration in the -- of the
7  Bradford Hill criteria for causation in
8  talc and ovarian cancer?
9         MS. MILLER:  Objection.
10        THE WITNESS:  As I said,
11 meta-analyses are good for
12 hypothesis generating, but they
13 are not sufficient evidence to --
14 to make a definitive statement
15 about causation.
16 BY MR. TISI:
17   Q.  I didn't ask about
18 definitive statements.  I'm asking, are
19 they even appropriate to consider in a
20 Bradford Hill analysis, or is that a
21 methodologic flaw if anybody were to
22 consider a meta-analysis in the context
23 of doing a Bradford Hill test or analysis
24 for ovarian cancer and talc?

Page 557

1         MS. MILLER:  Objection.
2         THE WITNESS:  As I -- I do
3  cite one of the articles here that
4  says -- I don't -- within Bradford
5  Hill, it says look at the totality
6  of the data.  But it's more
7  important to look at the
8  individual studies and see what
9  the conclusion comes from there,
10 rather than a meta-analyses.
11        So I'm not sure how a
12 meta-analyses sort of plays into
13 the Bradford Hill except coming up
14 with some summary values.
15 BY MR. TISI:
16   Q.  But you do know that most
17 people looking at this question have
18 looked at -- at the meta-analyses,
19 correct, in connection -- I mean, Health
20 Canada did, correct?  Are they wrong for
21 having done so?
22        MS. MILLER:  Objection.
23        THE WITNESS:  I didn't say
24 that.  I mean, I said even I've

140 (Pages 554 to 557)

Karla Ballman, Ph.D.

Page 558

1    looked at the meta-analyses
2    because that's the totality of the
3    data, to see if there's any sort
4    of additional information that it
5    brings forward.
6  BY MR. TISI:
7        Q.   But do you remember the
8    statement -- and I pulled it out there.
9    I think it was Exhibit Number 5.  That
10   statement says that they found a
11   consistent result across meta-analyses
12   and additional evidence is consistent
13   with causation.
14       MS. MILLER:  Who is "they"?
15       MR. TISI:  Health Canada.
16       THE WITNESS:  I'm trying to
17   find Exhibit 5.
18       MR. LOCKE:  Can I ask for a
19   time check?
20       MR. TISI:  We've got about
21   four minutes.
22       THE WITNESS:  I'm looking
23   for Exhibit 5.  Do you have it
24   handy?  Oh, I got it.  I got it.

Page 560

1        MS. MILLER:  Objection.
2        THE WITNESS:  And I said
3    that when one is doing a proper
4    sort of causal analyses that's
5    based upon, you know, established
6    epidemiology principles, one looks
7    at all studies, including
8    meta-analyses.
9  BY MR. TISI:
10       Q.   Are they wrong for having
11   relied on them?  Having looked at them,
12   can they rely on them?
13       MS. MILLER:  Objection.
14       THE WITNESS:  I'm not sure
15   if they relied on them from this
16   statement here.  I can't tell that
17   they relied just on meta-analyses
18   or not.
19  BY MR. TISI:
20       Q.   What is the journal JCO?
21       A.   The Journal of Clinical
22   Oncology.
23       Q.   One final question.  You
24   made a comment in the Taher study that

Page 559

1        I got it.  Okay.
2  BY MR. TISI:
3        Q.   Were they wrong -- were
4    Health Canada wrong in Exhibit 5 for
5    relying on that?
6        A.   So I think I said that
7    meta-analyses, it's not surprising that
8    they are consistent because they are
9    analyzing the same set of data, and so
10   one would expect --
11       Q.   I didn't ask you that.  I
12   didn't ask you about consistency.  I'm
13   asking were they wrong for even
14   considering them?
15       A.   But that's a different
16   question --
17       Q.   It is a different question.
18       A.   -- than what you just asked
19   me there.
20       Q.   I'm asking you, are they
21   wrong for having considered them in the
22   context of looking at the causal
23   inference for talcum powder and ovarian
24   cancer?

Page 561

1    they indicated that they thought it was a
2    possible association.  And you said that
3    you thought that as a peer reviewer, they
4    would take that out?
5        A.   No.  They said a possible
6    causal --
7        Q.   Causal association.
8        A.   -- association.
9        Q.   And you would take -- you
10   thought that that was something that
11   would be taken out by peer reviewers,
12   correct?
13       A.   Of -- of high quality
14   journals, yes.
15       Q.   And you -- but that's pure
16   speculation on your part, right?
17       A.   No, I do not believe so.
18   Through all my experience in the numerous
19   papers that I've reviewed and -- both for
20   JCO and as a reviewer of other things,
21   that's pushing the data, because one
22   assumes no causal relationship, and you
23   need evidence for it before you can state
24   causality.

141 (Pages 558 to 561)

Karla Ballman, Ph.D.

1     Q.   Would it surprise you to
2  know that we have meta-analyses in JCO,
3  correct?  Would that surprise you?  You
4  mentioned that you've never published
5  meta-analyses or rarely.  Would that
6  surprise you?
7     A.   There are meta-analyses --
8        MS. MILLER:  Objection.  She
9  said meta-analyses -- objection.
10        THE WITNESS:  There are
11     meta-analyses in JCO of randomized
12     clinical trials.  And in fact, one
13     of the studies you showed me today
14     was a meta-analysis.  It was a
15     pooled analysis, of individual
16     patient-level data.
17  BY MR. TISI:
18     Q.   Okay.  So is it your
19  statement that JCO would not publish a
20  meta-analyses -- meta-analysis of
21  observational data?
22        MS. MILLER:  Objection.
23  Misstates --
24        THE WITNESS:  I said it

1     was --
2        MS. MILLER:
3  Mischaracterizes her testimony.
4        Please let me finish my
5  objection, even though you're
6  eager to talk.
7  BY MR. TISI:
8     Q.   You can answer the question.
9     A.   Okay.  So I said that it
10  would very rarely happen.  I had
11  corrected.  I had said never, but I said,
12  no, wait a minute, it would very rarely
13  happen.
14     Q.   Okay.  So -- so you would
15  agree with me that there have been
16  observational meta-analyses in JCO?
17     A.   I have no idea if there have
18  been or not.  I cannot say that off the
19  top of my head.
20        MR. TISI:  I don't think I
21  have any questions.  I think I'm
22  down to the --
23        MS. MILLER:  You have one
24  minute.  Go crazy with your last

1  minute.
2        MR. TISI:  I'm totally okay.
3  I'll give you -- I'll give you my
4  minute.
5        Thank you very much.  I have
6  no further questions.
7        MS. MILLER:  I just have a
8  few questions for you, Dr.
9  Ballman.
10        - - -
11        EXAMINATION
12        - - -
13  BY MS. MILLER:
14     Q.   Can you please turn back to
15  Exhibit Number 25.
16        MR. TISI:  Which is what?
17        THE WITNESS:  The National
18  Cancer Institute one.  This one?
19  BY MS. MILLER:
20     Q.   Can you tell me what the
21  title of that exhibit is?
22     A.   The title is "Ovarian,
23  Fallopian Tube, and Primary Peritoneal
24  Cancer" -- I don't know if there's

1  anything under the sticker --
2  "Prevention, Health Professional
3  Version."
4     Q.   And what is this document?
5     A.   It's a document that was
6  published by the National Cancer
7  Institute that's talking about who's at
8  risk for ovarian cancer and established
9  risk factors of ovarian cancer, I
10  believe, as best I can tell.
11     Q.   Please turn to Page 11.
12     A.   Yes, I'm there.
13     Q.   Do you see the subheading
14  titled "Perineal Talc Exposure"?
15     A.   Oh, yes, I see "Perineal
16  Talc Exposure."  Yes.
17     Q.   Can you please read the
18  sentence under that?
19     A.   "The weight" --
20     Q.   You did a lot of reading
21  today.  I thought we should you read,
22  too.
23     A.   "The weight of evidence does
24  not support an association between

Karla Ballman, Ph.D.

Page 566

```
1    perineal talc exposure and an increased
2    risk of ovarian cancer."
3        Q.   Did Mr. Tisi read this
4    sentence to you?
5        A.   No.  And it goes on to say
6    that the result from case-control and
7    cohort studies are inconsistent.
8            MS. MILLER:  I have no
9    further questions.
10           MR. TISI:  I have a
11   question.  I'll use my minute and
12   add a couple minutes to yours.
13           MS. MILLER:  Wait.  I used
14   30 seconds.  So you have a minute
15   and 30 seconds.
16           MR. TISI:  Okay.  Well don't
17   waste my 30 seconds.  I don't
18   think I'll use 30 seconds.
19              -  -  -
20           EXAMINATION
21              -  -  -
22   BY MR. TISI:
23       Q.   In that section, it
24   refers -- there are four footnotes under
```

Page 567

```
1    the perineal talc section.
2        Do you see that?
3        A.   Yeah, I'm sorry.  I thought
4    I was done.
5        Q.   On -- on Page 12.  Footnote
6    43 through footnote 46.
7        Do you see that?
8        A.   I see -- I see Reference 42
9    and I see a reference 43.  I don't see
10   where you see -- oh, there's 44.  Yeah, I
11   see -- I see a bunch of --
12       Q.   And 46?
13       A.   44, 45, 46.
14       Q.   Right.  So there are five
15   references in this paragraph, correct?
16       A.   Yes.
17       Q.   Okay.  And so we can assume,
18   can we not, that those are the references
19   they looked at?
20           MS. MILLER:  Objection.
21   Calls for speculation.
22           THE WITNESS:  I don't know
23   if it's all the references that
24   they looked at.  I think they are
```

Page 568

```
1    references for the values that
2    they're reporting before the
3    reference --
4    BY MR. TISI:
5        Q.   So if you go to the back --
6        A.   -- such as, "However, a
7    dose-response relationship was not
8    found," which is reference 42.
9        Q.   Can you look at Page 16 of
10   18.
11           MS. SHARKO:  I really think
12   your time is up at this point.
13           MS. MILLER:  Yeah, your time
14   is way up.
15           THE WITNESS:  I'm there.
16           MS. MILLER:  You've just
17   gone over two more minutes.
18           MR. TISI:  Counsel, you've
19   been wasting my time.  I'm going
20   to ask this question.  And if you
21   want to -- you want to walk out,
22   that's fine.  I'll ask the judge
23   for the time.
24   BY MR. TISI:
```

Page 569

```
1        Q.   How many -- how many
2    references -- of all these references,
3    there are five references.  Do you have
4    any -- any suggestion that the NCI
5    actually did a causation analysis like
6    you or Health Canada or the plaintiffs'
7    experts or anybody else did?
8            MS. MILLER:  Objection.
9            THE WITNESS:  I don't know.
10   I don't know what they did.
11           MR. TISI:  Thank you very
12   much.
13           THE VIDEOGRAPHER:  Stand by,
14   please.  Remove your microphones.
15   The time is 5:54 p.m.  This
16   completes today's deposition.
17           (Excused.)
18           (Deposition concluded at
19   approximately 5:54 p.m.)
20
21
22
23
24
```

143  (Pages 566 to 569)

Karla Ballman, Ph.D.

| Page 570 | Page 572 |
|---|---|

**Page 570**

```
1
2                    CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
       witness was duly sworn by me and that the
6      deposition is a true record of the
       testimony given by the witness.
7
         It was requested before
8      completion of the deposition that the
       witness, KARLA BALLMAN, Ph.D., have the
9      opportunity to read and sign the
       deposition transcript.
10
11
12     _____
       MICHELLE L. GRAY,
13     A Registered Professional
       Reporter, Certified Shorthand
14     Reporter, Certified Realtime
       Reporter and Notary Public
15     Dated:  March 24, 2019
16
17
18         (The foregoing certification
19     of this transcript does not apply to any
20     reproduction of the same by any means,
21     unless under the direct control and/or
22     supervision of the certifying reporter.)
23
24
```

**Page 572**

```
1              - - - - - -
               E R R A T A
2              - - - - - -
3
4      PAGE  LINE  CHANGE
5      ____  ____  _____
6        REASON: _____
7      ____  ____  _____
8        REASON: _____
9      ____  ____  _____
10       REASON: _____
11     ____  ____  _____
12       REASON: _____
13     ____  ____  _____
14       REASON: _____
15     ____  ____  _____
16       REASON: _____
17     ____  ____  _____
18       REASON: _____
19     ____  ____  _____
20       REASON: _____
21     ____  ____  _____
22       REASON: _____
23     ____  ____  _____
24       REASON: _____
```

| Page 571 | Page 573 |
|---|---|

**Page 571**

```
1           INSTRUCTIONS TO WITNESS
2
3            Please read your deposition
4      over carefully and make any necessary
5      corrections.  You should state the reason
6      in the appropriate space on the errata
7      sheet for any corrections that are made.
8            After doing so, please sign
9      the errata sheet and date it.
10           You are signing same subject
11     to the changes you have noted on the
12     errata sheet, which will be attached to
13     your deposition.
14           It is imperative that you
15     return the original errata sheet to the
16     deposing attorney within thirty (30) days
17     of receipt of the deposition transcript
18     by you.  If you fail to do so, the
19     deposition transcript may be deemed to be
20     accurate and may be used in court.
21
22
23
24
```

**Page 573**

```
1
2           ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5      hereby certify that I have read the
6      foregoing pages, 1 - 574, and that the
7      same is a correct transcription of the
8      answers given by me to the questions
9      therein propounded, except for the
10     corrections or changes in form or
11     substance, if any, noted in the attached
12     Errata Sheet.
13
14
15     _____
16     KARLA BALLMAN, Ph.D.          DATE
17
18
19     Subscribed and sworn
       to before me this
20     _____ day of _____, 20____.
21     My commission expires:_____
22
       _____
23     Notary Public
24
```

144 (Pages 570 to 573)

Karla Ballman, Ph.D.

Page 574

```
 1              LAWYER'S NOTES
 2      PAGE  LINE
 3      ____ ____ _____
 4      ____ ____ _____
 5      ____ ____ _____
 6      ____ ____ _____
 7      ____ ____ _____
 8      ____ ____ _____
 9      ____ ____ _____
10      ____ ____ _____
11      ____ ____ _____
12      ____ ____ _____
13      ____ ____ _____
14      ____ ____ _____
15      ____ ____ _____
16      ____ ____ _____
17      ____ ____ _____
18      ____ ____ _____
19      ____ ____ _____
20      ____ ____ _____
21      ____ ____ _____
22      ____ ____ _____
23      ____ ____ _____
24      ____ ____ _____
```

Golkow Litigation Services - 1.877.370.DEPS