# EXHIBIT B33

Confidential - Pursuant to Protective Order

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


IN RE: JOHNSON &          )
JOHNSON TALCUM POWDER  )
PRODUCTS MARKETING     )
SALES PRACTICES AND    )   MDL 16-2738
PRODUCT LIABILITY      )   (FLW)(LHG)
LITIGATION             )
_____  )
THIS DOCUMENT          )
PERTAINS TO ALL CASES  )


WEDNESDAY, DECEMBER 19, 2018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -


          Videotaped deposition of Laura

Plunkett, Ph.D., DABT, held at the Four

Seasons Hotel, 999 North 2nd Street, St.

Louis, Missouri, commencing at 9:12 a.m., on

the above date, before Carrie A. Campbell,

Registered Diplomate Reporter, Certified

Realtime Reporter, Illinois, California &

Texas Certified Shorthand Reporter, Missouri

& Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Pursuant to Protective Order

## Page 2

1    A P P E A R A N C E S :
2
3    BEASLEY, ALLEN, CROW, METHVIN,
     PORTIS & MILES, P.C.
     BY: TED MEADOWS
4        Ted.Meadows@BeasleyAllen.com
         RYAN BEATTIE
5        Ryan.Beattie@BeasleyAllen.com
     218 Commerce Street
6    Montgomery, Alabama 36104
     (334) 269-2343
7
8    ASHCRAFT & GEREL, LLP
     BY: MICHELLE A. PARFITT
9        mparfitt@ashcraftlaw.com
     4900 Seminary Road, Suite 650
10   Alexandria, VA 22311
     (703) 931-5500
11
12   LEVIN, PAPANTONIO, THOMAS, MITCHELL,
     RAFFERTY & PROCTOR, P.A.
13   BY: CHRISTOPHER V. TISI
         ctisi@levinlaw.com
14   316 South Baylen Street, Suite 600
     Pensacola, Florida 32502
15   (850) 435-7000
16
17   GOLOMB & HONIK, P.C.
     BY: RICHARD GOLOMB
18       rgolomb@golombhonik.com
     1835 Market Street, Suite 2900
19   Philadelphia, Pennsylvania 19103
     (215) 278-4449
20   Counsel for Plaintiffs
21   KIRKLAND & ELLIS LLP
22   BY: KIMBERLY OLVEY BRANSCOME
         kimberly.branscome@kirkland.com
         WILLIAM SMITH
23   333 South Hope Street
     Los Angeles, California 90071
24   (213) 680-8370
     Counsel for Defendant Johnson &
25   Johnson

## Page 3

1    DYKEMA
     BY: JANE E. BOCKUS
2        jbockus@dykema.com
         RYAN J. SULLIVAN
3        rsullivan@dykema.com
     112 East Pecan Street, Suite 1800
4    San Antonio, Texas 78205
     (210) 554-5500
5    Counsel for the Defendant Imerys
     Talc America
6
7    SEYFARTH SHAW LLP
     BY: THOMAS T. LOCKE
8        tlocke@seyfarth.com
     975 F Street, N.W.
9    Washington, DC 20004
     (202) 463-2400
10   Counsel for Defendant Personal Care
     Products Council
11
12   TUCKER ELLIS LLP
     BY: CAROLINE M. TINSLEY
13       caroline.tinsley@tuckerellis.com
     100 South Fourth Street, Suite 600
14   St. Louis, Missouri 63102
     (314) 571-4965
15   Counsel for PTI Union, LLC and PTI
     Royston, LLC
16
17
     ALSO PRESENT:
18   KATIE TUCKER, Beasley Allen
19
     V I D E O G R A P H E R :
20   JACOB ARNDT,
     Golkow Litigation Services
21
            - - -
22
23
24
25

## Page 4

1                     INDEX
2                                 PAGE
3    APPEARANCES............................  2
4    EXAMINATIONS
5      BY MS. BRANSCOME......................    8
6      BY MS. BOCKUS..................... 287
7      BY MR. LOCKE................... 319
8
9              EXHIBITS
10   No.   Description              Page
11   1    Notice of Oral and Videotaped        8
          Deposition of Plaintiffs' Expert
          and Duces Tecum
12
13   2    Expert Report of Laura M. Plunkett,   13
          Ph.D., DABT, October 5, 2016
14
15   3    Supplemental Expert Report of Laura   13
          M. Plunkett, Ph.D., DABT, August
          29, 2018
16
17   4    Rule 26 Expert Report of Laura M.     13
          Plunkett, Ph.D., DABT, November 16,
          2018
18
19   5    "Systematic Review and               16
          Meta-Analysis of the Association
20        between Perineal Use of Talc and
          Risk of Ovarian Cancer," Taher, et
          al.
21
22   6    Printout of Health Canada's risk     17
          assessment of talcum powder
23   7    "Ovarian, Fallopian Tube, and       111
          Primary Peritoneal Cancer
24        Prevention (PDQ)-Health
          Professional Version," National
25        Cancer Institute

## Page 5

1    8    "Weight of Evidence:  General        211
          Principles and Current Applications
2         at Health Canada"
3         (Exhibits attached to the deposition.)

Confidential - Pursuant to Protective Order

Page 6

1     VIDEOGRAPHER:  We are now on
2  the record.
3     My name is Jacob Arndt.  I'm a
4  videographer for Golkow Litigation
5  Services.
6     Today's date is December 19,
7  2018, and the time is 9:12 a.m.
8     This deposition is being held
9  in St. Louis, Missouri, In Re: Johnson
10  & Johnson Products Marketing Sales
11  Practices, for the United States
12  District Court for the District of
13  New Jersey.
14     The deponent is Dr. Laura
15  Plunkett.
16     Will counsel please identify
17  themselves?
18     MR. MEADOWS:  Ted Meadows for
19  plaintiffs.
20     MS. PARFITT:  Michelle Parfitt
21  for the plaintiffs.
22     MR. BEATTIE:  Ryan Beattie for
23  plaintiffs.
24     MR. TISI:  Chris Tisi for
25  plaintiffs.

Page 7

1     MR. GOLOMB:  Richard Golomb for
2  plaintiffs.
3     MR. LOCKE:  Tom Locke for the
4  Personal Care Products Council.
5     MS. TINSLEY:  Caroline Tinsley
6  for PTI Union, LLC, and PTI Royston,
7  LLC.
8     MR. SULLIVAN:  Ryan Sullivan
9  for Imerys.
10     MS. BOCKUS:  Jane Bockus for
11  Imerys.
12     MR. SMITH:  William Smith for
13  Johnson & Johnson.
14     MS. BRANSCOME:  Kimberly
15  Branscome for Johnson & Johnson.
16     VIDEOGRAPHER:  Thank you.
17     The court reporter is Carrie
18  Campbell and will now swear in the
19  witness.
20     LAURA PLUNKETT, Ph.D., DABT,
21  of lawful age, having been first duly sworn
22  to tell the truth, the whole truth and
23  nothing but the truth, deposes and says on
24  behalf of the Defendant Johnson & Johnson, as
25  follows:

Page 8

1     DIRECT EXAMINATION
2  QUESTIONS BY MS. BRANSCOME:
3     Q.   All right.  Good morning,
4  Dr. Plunkett.  I introduced myself right
5  before we started, but my name is Kimberly
6  Branscome, and I am here on behalf of Johnson
7  & Johnson.
8     Is it your understanding today
9  that you are giving your deposition for the
10  purpose of a Daubert analysis in the MDL
11  related to Johnson's baby powder?
12     A.   That's my understanding, yes.
13     (Plunkett Exhibit 1 marked for
14  identification.)
15  QUESTIONS BY MS. BRANSCOME:
16     Q.   I want to start by handing you
17  what I will mark as Plunkett Deposition
18  Exhibit 1.
19     Do you recognize the document
20  that I just handed you?
21     A.   Yes.
22     Q.   Okay.  Have you seen this
23  document before?
24     A.   Yes.
25     Q.   All right.  When was this

Page 9

1  document provided to you?
2     A.   Either earlier this -- this
3  week or late last week.  I don't recall if it
4  was Friday or Monday.
5     Q.   Okay.  For the purposes of the
6  record, could you just identify what the
7  document is that I just handed you as
8  Plunkett Deposition Exhibit Number 1?
9     A.   It's a notice of oral and
10  videotaped deposition for myself, dated -- I
11  don't see the date, but probably on the very
12  last -- do you need that or just -- is that
13  enough of an identification?
14     Q.   That's all right.
15     Now, contained within the
16  deposition notice there is a reference to a
17  request for materials that are identified in
18  more detail in Schedule A.
19     Do you see that?
20     A.   Yes.
21     Q.   Have you reviewed Schedule A?
22     A.   Yes.
23     Q.   Did you bring any documents
24  with you in response to the request in
25  Schedule A?

3  (Pages 6 to 9)

Confidential - Pursuant to Protective Order

Page 10

1    A.    The only thing that I believe
2  that I had to bring that had not already been
3  provided was additional billing since the
4  time of my last deposition.
5    Q.    Okay.  And is it my
6  understanding that the documentation related
7  to additional billing that you have done
8  since your prior deposition was produced
9  yesterday at the deposition in the Forrest
10 case?
11   A.    That's correct.
12   Q.    All right.  And the information
13 contained in the documents produced at the
14 Forrest deposition yesterday, do those
15 contain an up-to-date record of the billing
16 that you have submitted for your work in
17 connection with the litigation against
18 Johnson & Johnson?
19   A.    Yes, with the understanding
20 that I haven't submitted a bill for December
21 yet.
22   Q.    Okay.  How much time have you
23 spent working in connection with your
24 opinions in the case against Johnson &
25 Johnson related to its baby powder in the

Page 11

1  month of December?
2    A.    So I'm -- on all the cases that
3  I am involved in that are pending, not just
4  this deposition?
5    Q.    I'll ask first all cases and
6  then we'll narrow it to the deposition.
7    A.    So in all --
8    Q.    I mean to the MDL, I'm sorry.
9    A.    Okay.  So in all cases this
10 month, probably eight hours so far, maybe
11 ten.
12   Q.    Does that include the time that
13 you've spent attending deposition?
14   A.    No, that's not including
15 yesterday's deposition time.  I apologize.  I
16 forgot about that.
17   Q.    And how much of the eight to
18 ten hours that you have spent this month
19 working on these cases against Johnson &
20 Johnson, setting aside the time you spent in
21 deposition yesterday, relate to the MDL
22 specifically?
23   A.    So it will probably be
24 billed -- it will be one bill for the
25 preparation time because the prep overlapped,

Page 12

1  but I'll bill separately for the time I spent
2  yesterday right before the deposition and
3  then at the deposition, so...
4    Q.    What did you do to prepare for
5  your deposition today?
6    A.    I reviewed my reports, the
7  three reports that I filed in the litigation.
8  I had a meeting with attorneys on Monday, and
9  then we had a short meeting yesterday evening
10 because some attorneys arrived that were not
11 here on Monday.
12         And essentially went through
13 some of the documents that -- went through
14 some of the documents that I had cited in the
15 report in certain paragraphs, just to refresh
16 my memory of what they were.  So if you want
17 me to tell you which paragraphs, I can do
18 that.
19   Q.    I will in just a moment.  Okay.
20   A.    Want me to repeat that?  I'm
21 sorry.
22   Q.    That's all right.
23         Dr. Plunkett, you referenced
24 the fact that you reviewed specific
25 paragraphs of your expert reports in

Page 13

1  preparation for today's deposition.
2          Could you identify those
3  paragraphs for me?
4          And it's helpful to you, we can
5  go ahead and mark your three expert reports,
6  if you're referring to all three.
7    A.    I'm going to refer just to the
8  MDL report because that's what we're here to
9  talk about.  I mean, if you want to talk
10 about what I did to get ready for yesterday
11 separately or --
12         MR. MEADOWS:  Might be helpful
13   to go ahead and mark them.
14         MS. BRANSCOME:  Why don't we go
15   ahead and just mark the three reports,
16   and then we can walk through.
17         (Plunkett Exhibits 2, 3 and 4
18   marked for identification.)
19 QUESTIONS BY MS. BRANSCOME:
20   Q.    So, Dr. Plunkett, do you have a
21 copy of your three reports in front of you?
22   A.    Yes, I do.
23   Q.    Do those contain any markings,
24 highlightings or flags?
25   A.    No, they don't.

4 (Pages 10 to 13)

Confidential - Pursuant to Protective Order

Page 14

1       Q.   Okay.  Do you mind if we mark
2   your copies as the official records?
3       A.   No, that's fine.
4       Q.   So we will mark -- well, let's
5   do this in chronological order.  So I am
6   marking as Plunkett Deposition Exhibit
7   Number 2 the expert report of Dr. Plunkett
8   dated October 5, 2016.
9            Could you confirm,
10  Dr. Plunkett, that that's what I marked as
11  Deposition Exhibit Number 2?
12      A.   Yes, it is.
13      Q.   And then we will mark as
14  Deposition Exhibit Number 3 supplemental
15  expert report of Dr. Laura Plunkett dated
16  August 29, 2018.
17           Dr. Plunkett, could you confirm
18  that I marked that as Exhibit Number 3?
19      A.   Yes, that's correct.
20      Q.   And then Exhibit Number 4, we
21  will mark the expert report dated
22  November 16, 2018, by Dr. Plunkett that was
23  produced in the MDL.
24           Could you confirm that I marked
25  that as Deposition Exhibit Number 4?

Page 15

1       A.   Yes, that's correct.
2       Q.   All right.  And so now back to
3   the question of you referenced the fact that
4   you looked at specific paragraphs of your
5   expert report in preparation for today's
6   deposition.  If you could, using Deposition
7   Exhibit Number 4, identify which paragraphs
8   you looked at specifically in preparation for
9   the deposition.
10      A.   So it wasn't the paragraphs.
11  There were certain documents in paragraphs,
12  so that's what I was referring to, so...
13           So starting in paragraph 38
14  where I'm talking about sort of the timeline
15  of information about human health hazards and
16  talc dust.  So I just went back and refreshed
17  on a few of the older papers.
18           I looked again at the patent
19  documents that are cited in the first bullet.
20           I looked again at a paper by
21  Eberl, 1948, which is in the last bullet.
22  The patent documents are also there as well.
23           And that -- so that would be
24  all I pulled in that paragraph.
25           I believe that those documents

Page 16

1   are also cited in paragraph 39 as well, some
2   of those same ones that are...
3            And then in Section 5 of my
4   report where I'm talking about exposure, I
5   looked again at Parmley and Woodruff.  I
6   looked again at Vetner and Iturrulde and Egli
7   and Newton last night.
8            And the only other thing I
9   looked at is not cited in this report because
10  it came out after the report was filed, and
11  that was -- and I did bring a copy of that.
12  That was the risk assessment that was done in
13  Canada.  Some people refer to it as -- by the
14  first author's last name, Taher, T-a-h-e-r.
15  And I may be pronouncing that wrong, but...
16           (Plunkett Exhibit 5 marked for
17           identification.)
18  QUESTIONS BY MS. BRANSCOME:
19      Q.   All right.  And I see that you
20  brought a copy of that document with you.
21  Just for the purposes of the record, let's
22  mark that as Plunkett Deposition Exhibit
23  Number 5.
24           Are there any markings,
25  highlightings or notations on that document?

Page 17

1       A.   No, there's not.
2            And then the other document I
3   looked at that was not cited in the report,
4   there is a printout from the government of
5   Canada website that talks about some
6   statements on talc, and so I printed that out
7   as well.  This was published at the same time
8   that the risk assessment was published.
9            (Plunkett Exhibit 6 marked for
10           identification.)
11  QUESTIONS BY MS. BRANSCOME:
12      Q.   All right.  We'll mark that for
13  purposes of the record as Plunkett Deposition
14  Exhibit Number 6.  We might come back to
15  those documents.
16           So returning briefly to the
17  deposition notice and the requests in
18  Schedule A, the billing information you
19  produced yesterday and then we just discussed
20  additional information with respect to that,
21  are there any other documents that you have
22  in your possession that are responsive to
23  requests identified in Schedule A that have
24  not been produced?
25      A.   I don't believe so, no.

5 (Pages 14 to 17)

Confidential - Pursuant to Protective Order

Page 18

1    Everything -- I do believe that there were
2    some objections filed to this, so there's
3    some things that I did not provide based on
4    that.
5         Some of the things I don't
6    have, too. I think you asked for -- maybe
7    you didn't ask for that. Usually people ask
8    for copies of old depositions, and I don't
9    keep those. And maybe you didn't ask for
10   that, but that's usually a request.
11        Let me see.
12   Q.   Okay. Now, you mentioned that
13   you met with attorneys on Monday. And who
14   was present at that meeting?
15   A.   So on Monday it was
16   Mr. Meadows, sitting here. Ms. Tucker,
17   Mr. Beattie, were at the meeting on Monday.
18   Q.   All right. And how long did
19   that meeting last?
20   A.   Probably six hours, I guess,
21   six hours with them, and then I also did some
22   other work on my own, but...
23   Q.   Okay. And then you mentioned
24   that you had another meeting last night.
25        Who was present at that

Page 19

1    meeting?
2    A.   So that was probably about an
3    hour, and that would have been Mr. Tisi -- or
4    maybe two hours. Mr. Tisi joined us
5    yesterday afternoon. And Mr. Golomb, too,
6    I'm sorry.
7    Q.   All right. Okay. Now, looking
8    at the three reports that you have produced
9    in the litigation involving Johnson's baby
10   powder, I wanted to get an understanding of
11   how those three reports relate to one
12   another.
13        So you have the first report
14   that you produced that was dated October 5,
15   2016. I believe that was originally produced
16   in the Uhl case; is that correct?
17   A.   I'm not sure the name of the
18   first case, but it was in the -- some of the
19   St. Louis cases, yes.
20   Q.   All right. And when did you
21   begin work on that report?
22   A.   You'd have to look at my
23   billing record, which I know was an exhibit
24   to yesterday's deposition. I believe they
25   started in 2015.

Page 20

1    Q.   All right. And then you
2    produced a supplemental report earlier this
3    year, on August 29, 2018, and that's been
4    marked as Deposition Exhibit Number 3,
5    correct?
6    A.   Yes.
7    Q.   When did you begin work on the
8    supplemental report that you produced at the
9    end of August in 2018?
10   A.   I want to say -- let's see. I
11   want to say sometime in the summer. Maybe as
12   early as May, but I believe May -- May, June
13   time frame of 2018.
14        My billing would reflect that,
15   so, again, we can pull my billing. And I
16   would have called it preparation of the
17   supplemental report in my billing.
18   Q.   Okay. Why did you choose to
19   draft a supplemental expert report?
20   A.   So over the time I had worked
21   on different trials here in St. Louis
22   particularly, additional documents that were
23   not cited in my original report became
24   reliance materials based on their
25   presentation at trial. So there were enough

Page 21

1    of those that I thought it was important to
2    add to the original report with additional
3    documents that I had reviewed over time.
4         Since October of 2016 through,
5    let's say, the summer of 2018, there were a
6    variety of additional documents that I had --
7    I had seen.
8         It was also my understanding
9    that during that time period Johnson &
10   Johnson had provided additional documents
11   that weren't provided or available to me in
12   2016, so additional discovery that was now
13   available to look at. So some of this is a
14   matter of additional evidence that wasn't
15   available when I wrote my initial -- my
16   initial report.
17   Q.   All right. Now when you say
18   the additional documents became reliance
19   materials in trial, what do you mean by that?
20   A.   So additional documents that we
21   refer to in trial that I use to support
22   opinions that weren't necessarily
23   specifically cited within the body of my
24   report or described within the body of my
25   report. They were likely on my larger

Confidential - Pursuant to Protective Order

Page 22

1  reliance list, but they weren't things that
2  were cited.
3        In other words, if you look at
4  my original report in -- when I say the body,
5  the paragraphs.  I always put a reference
6  list and then I'll have Bates numbers.  So
7  during trial, things that were from my larger
8  reliance list that weren't specifically
9  discussed in my report became support for
10  different opinions that -- based on questions
11  at trial.
12       Q.    Okay.  When you say these were
13  documents that "we" refer to at trial, you're
14  referring to yourself and attorneys
15  representing the plaintiffs?
16       A.    Yes, that's correct.
17       Q.    Okay.  And understanding that
18  the purpose of today's deposition is focused
19  specifically on the MDL, then you produced a
20  report specific to the MDL on November 16,
21  2018, that we've marked as Exhibit 4,
22  correct?
23       A.    Yes.
24       Q.    When did you begin work on the
25  report that you produced specifically in the

Page 23

1  MDL?
2        A.    Sometime right after -- I would
3  say early fall of 2018, sometime after
4  this -- the supplemental report was filed.
5  Probably right after that.
6        Q.    Okay.  So is it fair to say
7  that you began work on your MDL report after
8  completing the supplemental expert report
9  that has been marked as Exhibit 3?
10       A.    Yes, that's correct.
11       Q.    Okay.  Who was involved in the
12  drafting of the report that's been identified
13  as Exhibit 4?
14       MR. MEADOWS:  Objection.  Hang
15       on a second.
16       Are you asking about
17       communications between attorneys and
18       Dr. Plunkett?
19  QUESTIONS BY MS. BRANSCOME:
20       Q.    Dr. Plunkett, none of the
21  questions I will ask you here today are
22  intended to elicit information that's
23  protected by the attorney-client privilege.
24       So setting that aside, anything
25  that you understand to be privileged, I can

Page 24

1  ask who the -- who was involved in the
2  drafting of the report that was produced in
3  the MDL?
4        MR. MEADOWS:  Hold on just one
5        second.
6        Ask the question one more time.
7        I want to make sure we're not
8        venturing into attorney work product
9        realm here.
10  QUESTIONS BY MS. BRANSCOME:
11       Q.    Dr. Plunkett, do you consider
12  the report that you have issued in the MDL
13  which is identified as Exhibit 4 to be
14  attorney work product?
15       MR. MEADOWS:  Objection.  Don't
16       answer that.  That calls for a legal
17       conclusion, and at this point I'm
18       going to instruct you not to answer
19       questions about how the report came
20       into be.
21       MS. BRANSCOME:  Are you
22       instructing her to refuse to answer
23       any questions that involve the
24       development of her expert report?
25       MR. MEADOWS:  I'm instructing

Page 25

1  her not to answer your last question.
2  QUESTIONS BY MS. BRANSCOME:
3        Q.    Are you following your
4  attorney's instructions, Dr. Plunkett?
5        A.    Yes.
6        MS. BRANSCOME:  At this point I
7        would like to go off the record,
8        please.
9        VIDEOGRAPHER:  Okay.  We are
10       going off the record at 9:30 a.m.
11       (Off the record at 9:30 a.m.)
12       VIDEOGRAPHER:  We are back on
13       the record at 9:32 a.m.
14  QUESTIONS BY MS. BRANSCOME:
15       Q.    Dr. Plunkett, other than
16  attorneys, if attorneys were involved -- I am
17  not asking questions about that -- were there
18  any individuals who assisted you in preparing
19  the report that has been marked as Exhibit 4?
20       A.    There was no one that actually
21  assisted in writing the report.  I do -- when
22  I did my literature searches, I had my
23  husband help me retrieve articles that I
24  identified for retrieval, but certainly there
25  was no -- he doesn't participate in the

7 (Pages 22 to 25)

Confidential - Pursuant to Protective Order

Page 26

1    actual review of articles or in drafting of
2    the report.  That's all my work.
3        Q.    Okay.  And when you say that
4    your husband retrieved articles, was this
5    simply -- what information did you provide
6    him in order to enable him to retrieve a
7    particular article?
8        A.    So we use a service in Houston
9    called Loansome Doc, which is affiliated with
10   our local medical library system and also
11   with the National Library of medicine and NIH
12   libraries.  So I give him an online search
13   that I put into a clipboard.  He takes that,
14   makes the request or retrieves -- some of
15   them will be free, and so he'll actually go
16   to the websites for the -- and then put them
17   into a folder for me.
18       So he does that physical part
19   of it through the computer, but he doesn't --
20   he doesn't do the searches or decide which
21   ones to retrieve.  I do that.
22       Q.    Okay.  Did you have any
23   discussions with your husband about the
24   substantive content of the report that's
25   identified as Exhibit 4?

Page 27

1        A.    No.
2        Q.    Does he do any evaluation --
3    for example, if you were to provide him a
4    search and it generates multiple documents by
5    a given author, does he identify additional
6    articles that you might want to consider?
7        A.    Only -- he has done that, but
8    only with the streams of letters to the
9    editor.  So I ask him always if I'm pulling
10   an article.  Happens a lot at the New England
11   Journal of Medicine or some of the other
12   medical journals where there's pretty active
13   letter to the editor correspondence that
14   happens.
15       So I always say to him, "If
16   there's any citation to this through the
17   letter to the editor comments, would you
18   please retrieve those," and so he will do
19   that search to look for that.
20       Q.    Okay.
21       A.    And I'm not sure that that
22   happened in any of these articles, but I'm
23   talking my general process that we use.
24       Q.    Okay.  In terms of the
25   relationship of the three reports that have

Page 28

1    been marked as Exhibits 2, 3 and 4 to each
2    other, what is your -- what is your position
3    with respect to opinions that you have stated
4    or language you have used in Exhibits 2 and 3
5    that may not appear in Exhibit 4?
6        A.    I don't think I understand what
7    your -- what you mean by my position.  Are
8    you asking --
9        MS. PARFITT:  And I'll object
10   to that question.
11       THE WITNESS:  Are you asking me
12   to describe -- I mean, I could
13   describe for you the overlap.  I mean,
14   there's not complete overlap.  Is that
15   what you're asking me or --
16   QUESTIONS BY MS. BRANSCOME:
17       Q.    I am.  Why don't you take a
18   shot at it and then I may narrow my question,
19   but I'm just trying to understand how the
20   reports relate to one another.
21       MR. MEADOWS:  Objection.
22       THE WITNESS:  So they relate to
23   each other, I would say, based on
24   timing first, because obviously the
25   first report was two years ago, and

Page 29

1    then many more documents.  So that's
2    how the 1 and 2 relate -- or Exhibit 2
3    and 3 relate to each other.
4        In the MDL litigation, I was
5    asked to address very specific topics
6    and things because there's a -- it's a
7    different -- I don't know all of them,
8    but there's a different set of experts
9    that work in different litigations.
10       So my role in the MDL, I
11   believe, is set out based on this
12   report, whereas in the original
13   reports I may have had -- I did have a
14   broader role in some of those cases.
15   QUESTIONS BY MS. BRANSCOME:
16       Q.    Okay.  Can you describe for me
17   your understanding of your role in the MDL?
18       A.    It's my understanding that I
19   have been asked to provide opinions related
20   to the -- generally the toxicology of talcum
21   powder products, including all the individual
22   constituents that make up that product; to
23   look historically back in time about what was
24   known and when about the toxic effects of
25   talc and different constituents within talc.

Confidential - Pursuant to Protective Order

Page 30

1   And that was sort of the -- that's been --
2   I consider that sort of the meat of what I've
3   been asked to do.
4           But separate from that, another
5   part important part of my testimony or things
6   I was asked to provide was an overview of the
7   regulatory process for cosmetics and then the
8   information that accumulated scientifically,
9   how that related to what a company is
10  required to do under the regulations in order
11  to provide consumers with appropriate
12  information about the safety of the product.
13  So kind of the regulatory opinions, I guess
14  you want to call it, that area.
15          I have sections on that, and I
16  think you can see that by the different
17  sections in my report where I set out
18  different general topics.
19          And then I was also asked to
20  address some of the issues related to how the
21  information on the safety of talc has been
22  disseminated publicly and also based on my
23  review of different internal company
24  documents, both from Johnson & Johnson -- or
25  from Johnson & Johnson, Imerys, as well as

Page 31

1   the PCPC, which is the Personal Care Products
2   Council, formerly known as the CTFA, to look
3   at those interactions and how those companies
4   set about to influence the process around the
5   safety assessment of talc over the years.  So
6   different activities that happened with
7   respect to the ISRTP meetings in the '90s,
8   with respect to the NTP process at different
9   points in time.
10          The CIR process, I think I
11  cover, and I also talk a little bit about
12  IARC, I believe, as well.
13          So the interactions of the
14  industry with the science and then how that
15  science ends up getting described within --
16  either to regulators or to bodies that are
17  reviewing the science related to the
18  products.
19      Q.    You mentioned as one of the
20  categories that you were asked to opine about
21  in the MDL that you were looking to set about
22  the influence that companies may have exerted
23  over the regulatory process or PCPC.
24          When you began that analysis,
25  did you start with the predicate belief that

Page 32

1   the companies had, in fact, influenced the
2   regulators or PCPC?
3           MR. MEADOWS:  Objection.
4           THE WITNESS:  Not in my -- not
5   when I first started this process.  So
6   that is -- those opinions actually go
7   back into my original report.  So
8   that's not something, I don't believe,
9   that was not covered in my original
10  report or even in my supplemental
11  report.  I just have different -- some
12  additional documents that I have
13  reviewed.
14  QUESTIONS BY MS. BRANSCOME:
15      Q.    Okay.
16      A.    And this is something when I
17  first evaluated the case and first started
18  looking at the documents, those are opinions
19  that I had formed based on my review.
20          Certainly by the time I drafted
21  the MDL report, I think if you listened to
22  my -- read my trial testimony, you understand
23  I had those opinions at the time I started
24  writing this report.
25      Q.    Now, what I'd like to

Page 33

1   understand next is, are there -- of the
2   topics that you just identified that you
3   understand that you're offering opinions
4   about in the MDL, which, if any, of those
5   topics are in your view new as compared to
6   the opinions that you have offered that are
7   contained in Exhibits 2 and 3?
8           MS. PARFITT:  Objection.
9           THE WITNESS:  So I don't think
10  any of the MDL opinions are new.
11  QUESTIONS BY MS. BRANSCOME:
12      Q.    Okay.
13      A.    I think that they may have --
14  they may -- they may cite to additional
15  documents that haven't been cited to in the
16  first two reports, but I believe there's a
17  significant overlap even on the documents
18  that are cited.
19      Q.    And you mentioned that your
20  role in the MDL is more narrow than the role
21  you've served in other cases.
22          What topics have you opined
23  about in other cases that you are not
24  intending to opine about in the MDL?
25      A.    So I am not doing general

Confidential - Pursuant to Protective Order

Page 34

1  causation in the MDL, although I am indeed
2  providing opinions on certain aspects of the
3  cause and effect relationship such as -- you
4  know, I talk about biologic plausibility,
5  underlying knowledge about different
6  toxicities of the compounds over time, but
7  I'm not doing a full causation analysis in my
8  MDL report, and hopefully you see that when
9  you read the report.
10        Q.   So as you sit here today,
11  Dr. Plunkett, you are not intending to offer
12  the opinion in the MDL that Johnson's baby
13  powder causes ovarian cancer; is that
14  correct?
15        A.   Not in those words.  I think if
16  you read my report, I talk about the
17  fact that Johnson -- it's my opinion that
18  Johnson's baby powder increases the risk of
19  cancer -- ovarian cancer, which is a
20  different assessment than the way you stated
21  it.
22        Q.   All right.  And it is -- as you
23  sit here today, Dr. Plunkett, it is your
24  understanding that you are not being offered
25  to give a, as you termed it, a general

Page 35

1  causation opinion in the MDL, correct?
2        A.   That's my understanding, yes.
3        Q.   Now, you mentioned that the
4  analysis as to whether a substance increases
5  the risk of a particular outcome is different
6  than a causation analysis.
7            Can you explain to me what you
8  meant by that?
9        A.   So I discussed this yesterday
10  in my deposition.  There's -- there's a
11  process called risk assessment.  Sometime --
12  in the area of consumer products you can also
13  refer to it as safety assessment.  And then
14  there's the process of what I call general
15  causation analysis, or full causation
16  analysis.
17            So even though the types of
18  information that are considered may overlap
19  between those two, the outcome or the
20  statements or the -- the way you go about
21  assessing the information is a bit different.
22        Q.   Explain to me how they're
23  different.
24        A.   So in a risk assessment, the
25  process starts with setting out some basic

Page 36

1  principles of, first, is there a hazard, is
2  the first step.  Is there a hazard that would
3  be relevant to human health.
4            Then looking at the data and
5  determining whether that -- that body of data
6  allows you to either quantify risk in some
7  way or to qualitatively shows you that
8  there's a change in risk based on exposure to
9  the product.
10            So your statement may be as
11  simple as there's an increased risk, or you
12  can take data in a risk assessment and do a
13  quantification such as in a -- a cancer risk
14  assessment based on an animal data set.  You
15  might actually calculate a cancer potency
16  factor, for example.  Those kinds of things.
17  That's another application of risk
18  assessment.  Same basic process but focusing
19  just, for example, on one study.
20            My human health risk assessment
21  or safety assessment, like the causation
22  analysis, does look across all kinds of data,
23  but my goal was not to analyze the data under
24  the Hill considerations, which is what I
25  would typically do, in order to go through

Page 37

1  the process of making that final opinion that
2  indeed baby powder -- exposure to baby powder
3  through genital application is a cause of
4  ovarian cancer in women.  That's -- to me,
5  that's a different way to go about thinking
6  about the question that you have to answer.
7            And also the -- some of the
8  data that you evaluate is evaluated a bit
9  differently.  So, for example, in my
10  increase -- in my issue of increased risk, I
11  use the epidemiology as supporting evidence,
12  but I'm really focused on -- on -- more on
13  the underlying sort of the biologic
14  information that we have that identifies
15  hazard and risk.  So looking at the animal
16  data, the exposure potential for the product,
17  and then using that along with what we know
18  with the human experience to characterize
19  risk.
20        Q.   Is there a different level of
21  certainty required to render a causation
22  opinion than to render an opinion that
23  there's an increased risk?
24        A.   I don't know that I'd describe
25  it quite that way but -- because to me it's a

Confidential - Pursuant to Protective Order

Page 38

1  different process.  I certainly have to be
2  just as certain about what I say about risk
3  when I do a risk assessment as I do about --
4  as I do when I'm doing a causation analysis.
5      I don't -- maybe you mean
6  something else, so maybe you can -- I mean,
7  I -- I certainly use the same basic standards
8  in my mind, how I weigh evidence to do the
9  different processes, but I go about them in a
10  little bit different way when I do a risk
11  assessment versus -- versus a causation
12  analysis.
13      Q.    In your view, does the strength
14  of the evidence have to be greater in order
15  to determine that an agent causes a disease,
16  for example, than it does simply to say that
17  an agent increases the risk of a particular
18  outcome?
19          MR. MEADOWS:  Objection.
20          THE WITNESS:  I don't think
21  I've ever thought about it that way.
22  I would say to you that strength --
23  the strength of the association is a
24  consideration under Hill that you
25  apply the epidemiology data mainly, so

Page 39

1  that is a different consideration
2  under causation than you do -- as you
3  would do it in a risk assessment.
4      But the strength of the
5  evidence, it's still a judgment based
6  on your experience and training as far
7  as whether or not there is enough
8  information to be able to say that you
9  believe that there is -- enough
10  information to say that the risk is
11  increased based on that exposure and
12  those conditions and whatever the
13  toxicity profile of that compound is.
14  QUESTIONS BY MS. BRANSCOME:
15      Q.    Okay.  We'll get into this more
16  a little bit later, but when you say that a
17  risk is increased, is there a threshold level
18  of increase that you need to see in order to
19  render an opinion in a court of law that an
20  agent increases the risk of a particular
21  outcome?
22          MR. MEADOWS:  Objection.
23          THE WITNESS:  So I need you to
24  define what you mean by threshold.
25  Are you asking me a specific

Page 40

1  statistical test you would apply, or
2  what are you asking?
3  QUESTIONS BY MS. BRANSCOME:
4      Q.    So understanding that for the
5  most part if you're looking at statistical
6  significance, you're looking whether the
7  confidence interval crosses 1.
8      Are you following?
9      A.    Yes, I know that, yeah.
10      Q.    All right.  And so when you're
11  evaluating, though, whether a particular
12  substance, in this case Johnson's baby
13  powder, increases the risk of an outcome,
14  again, in this case ovarian cancer, would it
15  be sufficient for you if that increase was
16  .01 percent, for example?
17          MR. MEADOWS:  Objection.
18          THE WITNESS:  That doesn't make
19  sense to me, an increase of .01
20  percent, but maybe I can answer it
21  this way for you based on what you've
22  laid out there.
23      Certainly when I do a risk
24  assessment and I make it -- if I'm
25  going to make the conclusion that I

Page 41

1  believe that it's my opinion to a
2  reasonable degree of scientific
3  certainty that exposure to baby powder
4  in women increases the risk of cancer,
5  I'm having to rely on -- I do rely on
6  data that allows me to draw
7  conclusions because either there's a
8  statistical significant finding found
9  or the -- there's a consistency among
10  the pattern of the data that shows
11  there's information that fits together
12  consistently.  And maybe -- you want
13  me to explain what I mean by that?
14  No?
15      Whereas I think what you're
16  asking is when an epidemiologist
17  applies -- looks at a body of -- in a
18  causation analysis looks at a body --
19  and I do this, too -- looks at a body
20  of epidemiological studies and you
21  weight the studies, obviously you're
22  weighting the studies differently
23  based on whether they have shown
24  statistical significance or not,
25  right?

11  (Pages 38 to 41)

Confidential - Pursuant to Protective Order

Page 42

1    And it isn't that it's a one to
2  one.  If you have one positive and one
3  negative, that isn't how you may
4  decide to finally weight that
5  evidence, but certainly you have to
6  consider whether or not what was seen
7  or reported is showing you something
8  reliable -- or you can make a
9  statement reliably about whether or
10  not that finding was biologically
11  significant.  And biologically
12  significant would typically be linked
13  to a finding that has statistical
14  significance in an epi study unless
15  the study was not designed to be able
16  to answer the question properly.
17    So -- and I've discussed that a
18  little bit yesterday with Mr. Smith on
19  the issue of power to detect.  So
20  that's something you do consider in
21  epi.
22    But, yes, statistical
23  significance certainly goes into your
24  weight of the evidence there.
25

Page 43

1  QUESTIONS BY MS. BRANSCOME:
2    Q.   Okay.  You talked about you're
3  intending to offer an opinion with respect to
4  what a company is required to do under the
5  regulations; is that correct?
6    A.   Yes.
7    Q.   Okay.  What regulations are you
8  specifically referring to?
9    A.   So cosmetic regulations that
10  exist within -- so it's the entire process as
11  I describe how cosmetic -- what -- are
12  cosmetics subject to regulation by FDA?  Yes.
13  What are the types of things that companies
14  have to do before they're marketed, what does
15  the company have to do once the product is on
16  the market, those kinds of things.
17    Q.   Have you ever worked directly
18  for any regulatory agency?
19    A.   No, I have not.
20    Q.   And suffice it to say you have
21  never been in a decision-making position
22  within a regulatory agency, correct?
23    A.   That's correct, I have not.
24    Q.   Have you ever been in a
25  decision-making position with respect to a

Page 44

1  company evaluating compliance with FDA
2  regulations with respect to cosmetics?
3    A.   Yes.
4    Q.   Okay.  What is your experience
5  with respect to that?
6    A.   So that's -- one of the clients
7  that I currently work for where I am asked to
8  provide input on advertising, promotion and
9  labeling of some of the products and then
10  also some of the ingredients that are being
11  promoted for use to -- to produce cosmetic
12  products.  So it's the idea of providing that
13  advice over my understanding of the
14  regulations what can be said and can't be
15  said about certain ingredients.
16    This company is involved in
17  making both ingredients but also some
18  finished products now based on -- it's a
19  large company that owns a lot of little
20  subsidiaries.
21    Q.   My question, though,
22  Dr. Plunkett, was, have you ever been in a
23  decision-making position for a company
24  evaluating compliance with FDA regulations
25  with respect to cosmetics?

Page 45

1    MS. PARFITT:  Objection.  Asked
2  and answered.
3    THE WITNESS:  So that's what
4  I'm saying.  They're relying on my
5  input to make a decision on what will
6  go in the materials.
7  QUESTIONS BY MS. BRANSCOME:
8    Q.   Do you have decision-making
9  authority within that company or, as you
10  described it, are you providing advice and
11  input?
12    A.   I'm providing advice, but the
13  things I'm advising on are the things that
14  happened.  So in other words, they don't have
15  anybody in the company that understands the
16  process of what they can say.  So I -- I
17  advise them that you need to remove this
18  language or that this is more appropriate
19  language.  They make those changes, and then
20  that is what is done.
21    So I agree, I'm not an employee
22  of that company.  I am a consultant working
23  with the company, but it is a little
24  different than some of the work that I do
25  where I -- what I -- the advice that I'm

12 (Pages 42 to 45)

Confidential - Pursuant to Protective Order

Page 46

1  giving is actually something that I know
2  actually happened. Sometimes you give advice
3  to companies, but it doesn't -- we have no
4  idea whether the company actually follows our
5  advice.
6      Q.   My question is slightly
7  different, Dr. Plunkett.
8          If you were to give advice to
9  the company that you've referenced as having
10 experience with cosmetic regulation
11 compliance that that company chose not to
12 follow, that company has the ability to
13 ignore your advice, correct?
14     A.   Yes, I would imagine that they
15 could do that.
16     Q.   Okay. Have you ever drafted
17 regulations that relate to cosmetics?
18     A.   Actually drafted a regulation?
19 No, I have not.
20     Q.   All right. You reference in
21 your report language out of 21 CFR 740.1, and
22 specifically -- you reference it in a few
23 places. And I can direct you specifically to
24 paragraph 22 in Exhibit 4.
25     A.   Yes. I'm there.

Page 47

1      Q.   All right. And do you see here
2  you have replicated language from 21 CFR
3  740.1 that reads, "The label of a cosmetic
4  product shall bear a warning statement
5  whenever necessary or appropriate to prevent
6  a health hazard that may be associated with
7  the product"?
8          Do you see that?
9      A.   Yes.
10     Q.   And you added emphasis on
11 particular portions of this sentence,
12 correct?
13     A.   Yes, I did that, exactly.
14     Q.   All right. Now there's a
15 clause in this sentence that states,
16 "Whenever necessary or appropriate."
17         Do you see that?
18     A.   Yes.
19     Q.   You did not emphasize that
20 language; is that correct?
21     A.   That's correct, I did not.
22     Q.   What is your understanding
23 as -- what you describe as an FDA regulatory
24 specialist of the meaning of "whenever
25 necessary or appropriate" in 21 CFR 740.1?

Page 48

1      A.   So it's -- first off, you would
2  use the common English language definition.
3  I don't believe that those -- I haven't seen
4  a definition separate within the regulations.
5  Sometimes there will be.
6          So based on that and my
7  experience and the looking into what others
8  have described about this, this is the idea
9  of considering how the product is used, is
10 one of the -- one of the concerns that you
11 have, and whether or not the -- based on how
12 the product is used and how the product is
13 being sold, that in order to prevent a health
14 hazard, a warning hazard -- a warning
15 statement would be needed.
16     Q.   Can you cite to me any language
17 within the regulation or even supporting
18 documentation, a comment, something of that
19 nature, that would define "whenever necessary
20 or appropriate" with respect to how the
21 product is used?
22         MS. PARFITT: Objection.
23         THE WITNESS: I don't think I
24 understand your question.
25         Are you asking me to cite to a

Page 49

1  reference or a part of the regulation
2  where they explain it, or what are you
3  asking me? Guidance document or --
4  QUESTIONS BY MS. BRANSCOME:
5      Q.   Yes. Can you point me to
6  anything other than your personal view of the
7  interpretation of this language that would
8  tie the requirement "whenever necessary or
9  appropriate" to how a product is used?
10         MS. PARFITT: Objection. Form.
11         THE WITNESS: I'll have to go
12 look for you whether there's a
13 guidance that states it that way.
14 This is based on my experience in
15 dealing with the products in the past.
16     I think that's also consistent
17 with what is described, I would say to
18 you, within -- it's consistent -- what
19 I'm describing to you, it's consistent
20 as well with how the CIR standard for
21 safety assessment is done, looking at
22 the issue of the -- of the -- of the
23 use.
24 QUESTIONS BY MS. BRANSCOME:
25     Q.   When you say that you're basing

13 (Pages 46 to 49)

Confidential - Pursuant to Protective Order

Page 50

1    your interpretation of the clause "whenever
2    necessary or appropriate" on your personal
3    experience, can you point me to something
4    specific?
5         MS. PARFITT:  Objection.
6         THE WITNESS:  Are you asking
7    me -- are you asking me if I've ever
8    had a company that I worked for that
9    that particular clause in here was
10   extremely important to how we
11   interpreted it?  I don't think I can
12   point you to that.  I don't recall
13   ever having to do that specifically.
14        Or is it something different
15   you're asking me?
16   QUESTIONS BY MS. BRANSCOME:
17        Q.   Dr. Plunkett, I asked you what
18   your basis was for interpreting the language
19   "whenever necessary or appropriate" means
20   that it's related to how a product is being
21   used, and the answer that you provided was
22   that it was based off of your personal
23   experience.
24        So I'm asking you, what is that
25   personal experience that gives you the basis

Page 51

1    for that specific interpretation?
2         MR. MEADOWS:  Objection.
3         MS. PARFITT:  Objection.
4         THE WITNESS:  So it's in my
5    experience in dealing with companies
6    that make products and what types of
7    warnings are put or not put onto -- or
8    not -- or on labeling.  So I don't
9    know how else to answer it other than
10   that.
11        I can go back and look at the
12   guidance documents to see if that is
13   described in another way, but I don't
14   recall that.
15   QUESTIONS BY MS. BRANSCOME:
16        Q.   So as you sit here today,
17   you're not able to provide me either with a
18   third-party document or an independent
19   document interpreting "whenever necessary or
20   appropriate" as you've suggested today, nor
21   can you give me specific example from your
22   personal experience; is that correct?
23        MS. PARFITT:  Objection.
24        THE WITNESS:  Well, I
25   certainly -- I'd have to go back and

Page 52

1    look at my documents in order -- the
2    first part of your question, I'd have
3    to go back and look.  Off the top of
4    my head, I can't tell what I would
5    point you to.
6         On the second one, I think I
7    was telling you, is I don't -- I've
8    never -- I don't have a client that
9    I've worked for where that part of the
10   language was the only issue that I had
11   to deal with when I'm looking at
12   whether or not the product needs a
13   warning or not.
14        So typically -- I'm just
15   telling you that when I have looked at
16   labeling for products and looked at
17   the issue of does it need a warning
18   statement, when I'm reading it as
19   "whenever necessary or appropriate,"
20   I'm looking at whether or not the
21   ingredient that I'm concerned about
22   within the product, how that is used
23   or what the exposure pattern would be,
24   route of exposure, how those things
25   might relate to how I would assess the

Page 53

1    safety issue at hand.  And so that's
2    what I'm trying to tell you.
3    QUESTIONS BY MS. BRANSCOME:
4         Q.   Okay.  You also have --
5    changing topics a little bit, in this -- in
6    your report marked as Exhibit 4, if you could
7    turn to paragraph 10.
8         On page 7, you state on the
9    first paragraph on page 7, "In other
10   instances I have directed others to perform
11   searches on my behalf," and this is with
12   respect to identifying documents for review
13   in forming your opinions.
14        What did you mean by that?
15        A.   So in addition to doing my own
16   searches of the database, sometimes I -- I
17   have called the attorney's office and asked
18   them to -- to do a search for certain things
19   that I'm looking for to add to.  So in other
20   words, I have a document I've identified.
21   I'm looking for other documents like that in
22   the large millions and millions of documents
23   that are available.  And so sometimes I will
24   ask attorneys to do -- to look in the
25   database for other documents like the ones

14 (Pages 50 to 53)

Confidential - Pursuant to Protective Order

Page 54

1   that I've identified.
2       Q.    And without getting into
3   anything that would be -- that would call for
4   information protected by the attorney/client
5   privilege or attorney work product, what
6   percentage of the overall searches for
7   relevant documents from these particular
8   databases that are discussed in paragraph 10
9   would you say that you have done yourself as
10  opposed to directed others to do?
11      A.    Well, initially when I first
12  started searching, those were my own searches
13  exclusively.  I would say that more recently,
14  in the last year, since I haven't added any
15  real new areas but there's new documents that
16  have become available, so anything -- any of
17  the searches probably in the last year that
18  dealt with new discovery that was produced, I
19  would have asked the attorneys to do some of
20  the searching in that for me.  Like I'm
21  looking for documents that are similar to
22  this document that I cited in my original
23  report around this same frame that may be
24  discussing this same topic area.
25          So in the last year I have

Page 55

1   asked them to do that more than I have done
2   it, but initially it was what I did
3   initially.
4       Q.    Okay.  Do you keep any records
5   of the various document searches either that
6   you have performed or you have asked to be
7   performed?
8       A.    No, I don't.  My record would
9   be -- the initial -- the record would have
10  been what I listed in my reliance list for
11  you in the initial report, but since then it
12  would just be what is going to be changing
13  within my reliance list, looking at
14  additional documents.  That's the only way I
15  could identify for you.  That would be my --
16  my trail to know what was new and what was
17  not.
18      Q.    My question is slightly
19  different.  Understanding that you have
20  provided to some extent a record of the
21  documents, my question is:  Do you have any
22  type of record for the nature of the
23  searches, what it was that you set out to
24  identify in the database and how did you go
25  about finding those documents?

Page 56

1       A.    So that might cross over into
2   work product because it's not my database,
3   but I don't know how to answer that.  I mean,
4   I'm sure -- it's very possible that in the
5   database you can track that, but I -- I don't
6   know.
7           MR. MEADOWS:  Okay.
8           THE WITNESS:  I don't have
9       anything saved on my computer that
10      way, but when you go to the database
11      itself, it's possible you could track
12      that.  I just don't have a record on
13      my computer in my office.
14  QUESTIONS BY MS. BRANSCOME:
15      Q.    When you made the decision at
16  some point in time -- it may have been even
17  prior to you issuing your first report --
18  that you wanted to look at company documents,
19  did you set out specific categories of
20  documents that you wanted to review?
21      A.    Not so much categories but key
22  words.  So -- and areas.  I guess areas is
23  what I -- yes, I was focusing, for example,
24  in my initial report on documents that
25  described what was known -- what the company

Page 57

1   was discussing about cancer, ovarian cancer,
2   cancer generally.  So that was a key word
3   used.
4           And then I also was linking
5   that in different searches with different
6   time periods such as the NTP review process
7   and dates.  You can, you know, narrow down by
8   dates or by the CIR process.  Those kinds of
9   things.
10          So I did start with that,
11  trying to understand what -- what is -- what
12  was in the company files or in the files I
13  had access to, the database, that dealt with
14  those kinds of things because those aren't
15  things that I could get to publicly.
16  Obviously in the literature.  So I had to --
17  if I wanted to understand what the company
18  knew, I had to go into their database to find
19  out, you know, what they knew -- what they
20  knew or were discussing over time about the
21  ovarian cancer issue or about asbestos in
22  talc or about CIR process, things like that.
23      Q.    Using the reports that you have
24  produced, Exhibits 2, 3 and 4, really, and
25  the full -- the entirety of the materials

15 (Pages 54 to 57)

Confidential - Pursuant to Protective Order

Page 58

1   that you have produced in the MDL, is there
2   any way that someone reviewing those
3   documents, and those documents alone, could
4   replicate the searches that you have
5   conducted in the company databases?
6         MR. MEADOWS:  Objection.
7         THE WITNESS:  I don't know.
8   That's a good question.  I've never
9   thought about whether you could
10  replicate or not.
11        I mean, I think I've told you
12  what I did.  My strategy was to focus
13  on topic areas.  So I think you
14  might -- by topic areas, if you use
15  the same kinds of topics areas as
16  described, I think you would come up
17  with documents that -- what it focused
18  down to.
19        For example, I also would
20  sometimes, as linking those words, I
21  might put in J&J documents only or
22  Imerys documents only, because the
23  database has a variety -- and the
24  PCPC.  There's some different ways by
25  the Bates numbers that you can

Page 59

1   segregate documents as well.  But I
2   don't know other than that.  That's
3   all I can tell you.
4   QUESTIONS BY MS. BRANSCOME:
5         Q.   You would agree with me that
6   your report does not contain a complete
7   explanation of the process by which you
8   identify company documents to review,
9   correct?
10        A.   I haven't laid out my search
11  structure, that is true.
12        Q.   All right.  Now, the articles
13  that you have listed on your reliance list,
14  have you read each and every one of those
15  articles?
16        A.   Unfortunately, yes, over time I
17  have.  Some of them I have only read parts of
18  them.  For example, if I started reading a
19  document and I felt that it was something I
20  pulled that really wasn't directly on point
21  for an area I'm covering, I may not have read
22  every word, but certainly I have been through
23  each of those, yes.
24        Q.   Are there any articles in your
25  reliance list, that you maintained on your

Page 60

1   reliance list, that you read, but then once
2   you started reading decided weren't relevant
3   to the opinions that you were offering?
4         A.   I would have to look to answer
5   that for you.  I don't know.  If you want me
6   to do that, I'd have to look.
7         Q.   I ask you more as a process
8   matter.
9         A.   Oh.
10        Q.   If you pull an article and you
11  start reading it and you realize that it is
12  not relevant to the opinions that you offered
13  in this case, the example that you just gave,
14  is it something that you would include in
15  your reliance list?
16        A.   Yes, I -- I have given you
17  everything I retrieved.  So if I retrieved
18  it, you would have, yes, absolutely.
19        Q.   Okay.  So it's fair to say of
20  the articles that are on your reliance list,
21  you could not say as you sit here today that
22  you have read each and every word of each and
23  every one of them, correct?
24        A.   That's correct.  And I could
25  probably tell you -- I could give you a

Page 61

1   little guidance in that possibly if I went to
2   my list, I could try to pull some out that I
3   recognize, but that's all I would be able to
4   do for you.
5         Q.   Okay.  How did you go about
6   identifying what articles you wanted to
7   review in forming your opinions in the MDL?
8         A.   So first off, I went back to
9   what I already had.  So my MDL report is a --
10  is a compilation of a lot of material that's
11  in my first few reports.  That was the basis
12  for some of the things that went into it.
13        So I didn't -- I did do,
14  though, a updating on literature searches for
15  the MDL report, looking for anything new, for
16  example, in the area, especially the area of
17  cancer data or reports of dealing with
18  ovarian cancer either -- or any articles
19  dealing with the link between inflammation
20  and cancer, ovarian cancer, generally.
21  That's one of the areas I updated looking at.
22        And then I did -- I don't think
23  I did any large, new searches, however,
24  because honestly the areas covered here are a
25  little narrower than what was covered here.

16 (Pages 58 to 61)

Confidential - Pursuant to Protective Order

Page 62

1  I don't believe that there was any from the
2  published -- the publicly available medical
3  literature.  There wasn't a need to do a
4  whole new area of search.  It was more
5  updating the things that I've done in the
6  past.
7       So it's a real easy search to
8  update because you can just put in talc and
9  cancer and just look at -- get lots, but you
10  can then just start chronologically and look
11  what was published in the last year, for
12  example.
13      Q.   Okay.  Earlier when we were
14  discussing the fact that you in some
15  instances have asked your husband to pull
16  articles, have you maintained any records of
17  the searches that you have done with respect
18  to scientific literature, including the
19  searches that you have asked your husband to
20  do?
21      A.   I have not.  It's possible that
22  there are records on billing from the library
23  that tells you how many I ordered at
24  different times, but that is the only
25  records, because we do have to pay the

Page 63

1  library for the retrieval.
2       Q.   Okay.  And if I understood what
3  you said earlier correctly, you indicated
4  that any article you have ever pulled for
5  review, you have listed on your reliance
6  list; is that correct?
7       A.   Yes.  And when I -- and let's
8  just make sure we're talking about the same
9  thing.
10      So, you know, in my reports I
11  typically have articles cited in the report
12  separate from the reliance list.  So I'm
13  talking about the reliance list, right?
14  Okay.
15      So -- because I do -- I do
16  usually -- I don't know whether I did that in
17  this report, but I typically have a list of
18  articles cited at the back called references,
19  that is, things that you're actually seeing
20  in the report body, and then there should be
21  a separate reliance list sent to you as an
22  appendix.  I don't know what the appendix
23  was.
24      Q.   Well, so then let's clarify
25  that.  So, Dr. Plunkett, when you're

Page 64

1  referring to the reliance list, are you
2  referring to the list of articles that begins
3  on page 40 of Exhibit 4, or is there a
4  separate document?
5       A.   There's a separate document.
6  So it -- that's -- I usually call reliance
7  list the separate document.  I call this
8  references cited.  So I apologize for that
9  confusion.
10      So these, I have read every
11  word.  If it's in my reference list, those
12  are not an issue of not having read every
13  word, and these should all be cited somewhere
14  in the report.
15      Q.   Okay.  If you could turn to
16  paragraph 21 in your initial report.
17      A.   Yes, I'm there.
18      Q.   Okay.  So we're looking at
19  paragraph 21 in Exhibit 2.  This is on
20  page 10.
21      Do you see there is a sentence
22  here that refers to -- it's referring
23  generally to the topic of the ability of talc
24  to migrate from the site of application to
25  the ovaries.

Page 65

1       Do you see that?
2       A.   Yes.
3       Q.   And then the next sentence
4  states, "This issue was discussed by
5  scientific and regulatory bodies that review
6  the toxicokinetics of talc."
7       Do you see that?
8       A.   Yes.
9       Q.   And in parentheses it
10  identified EPA 1992, IARC 2010, and CIR 2013.
11      Do you see that?
12      A.   Yes.
13      Q.   Okay.  And then if you could
14  turn to Exhibit 4, which is your MDL report,
15  at paragraph 43.  It's on page 28.
16      Are you with me?
17      A.   Yes, I am.
18      Q.   You see that the exact same
19  sentence appears -- well, not the exact same.
20  It's been slightly modified to combine the
21  first two sentences.  But here you cite only
22  to EPA 1992 and IARC 2010.
23      Why did you remove CIR 2013?
24      A.   Because of my further
25  evaluation since my initial report in 2016 of

Confidential - Pursuant to Protective Order

Page 66

1    the process that was involved in the drafting
2    of the CIR and the actual production of the
3    report.
4        Q.   Is it your position that the
5    migration of talc was not evaluated as part
6    of CIR 2013?
7        A.   No.  That's not my position,
8    no.
9        Q.   Okay.  And so would the
10   sentence that's contained in paragraph 43 in
11   Exhibit 4, which is your MDL report, if you
12   cited to CIR 2013 in the parenthetical there,
13   would that not be an accurate citation?
14       A.   I believe it would not be an
15   accurate citation because I have formed
16   opinions about the reliability of that
17   document at this point in time.
18           So it has to do with -- I'm
19   citing to authorities here that I believe are
20   reliable as far as the discussion that I see,
21   and it's a different -- I have a different
22   opinion now about the CIR report, which I lay
23   out in pretty detail, I think.
24           In fact, if you go to my
25   section following this now in -- you'll

Page 67

1    understand one of the issues I had was the --
2    the difference in the evidence that was
3    actually available once you dig into it a
4    little further versus what they actually
5    reviewed.  That's one of the issues.
6        Q.   And I'll follow up with some
7    more questions about the CIR, but my question
8    here is, the sentence in your report simply
9    states, "The migration of talc internally
10   after perineal application was discussed by
11   scientific and regulatory bodies that review
12   the toxicokinetics of talc."
13           Would it be inaccurate to say
14   that as part of the CIR 2013 process that
15   body did, in fact, discuss the migration of
16   talc internally after perineal application?
17       A.   It is true that they did
18   discuss it.  I just have an issue with the
19   reliability of their findings.
20       Q.   And so you made the decision to
21   just remove it from the citation; is that
22   correct?
23       A.   Yes, at this point -- at this
24   point, at this report, that's exactly right.
25       Q.   All right.  And then I had

Page 68

1    another question.  In paragraph 43, you added
2    two studies from your prior -- that were --
3    that did not appear in your prior report, and
4    it was Gardner 1981 and Edelstam 1997.  This
5    related to animal studies showing that in
6    some species talc can migrate from the lower
7    to the upper genital tract?
8        A.   Yes.
9        Q.   Okay.  Were those studies that
10   you were aware of before drafting your prior
11   reports?
12       A.   I don't know that they -- I
13   can't answer that without looking at my
14   reliance materials for the original report.
15   I did identify additional articles, and
16   there's also additional articles cited here
17   in earlier paragraph 43 that were not cited
18   in my original report as well.  I don't think
19   I had the -- the Kunz article then cited.
20   I'd have to go back and look.
21           So it's possible that they were
22   in my -- when I say my reliance materials, my
23   original report also had a larger list of
24   literature I didn't cite.  So I'd have to
25   look.  I can't tell you whether I had them or

Page 69

1    I did not.
2        Q.   Okay.  With respect to Edelstam
3    1997 study, do you happen to know the title
4    of that article?  Even an approximation would
5    work.
6        A.   It'll be -- should be back
7    here.  Just a second.  If it's not here,
8    that's a mistake.
9            Oh, here it is.  "Retrograde
10   migration of starch in the genital tract of
11   rabbits."
12       Q.   So you are citing that article
13   for the proposition that animal studies have
14   demonstrated that talc can migrate from the
15   lower to upper genital tract?
16       A.   Yes, I'm citing it because it's
17   relevant to the issue of particle migration,
18   which talc is a particle.  So, yes, that's
19   correct.
20       Q.   Okay.  But that study did not
21   specifically deal with talc migration,
22   correct?
23       A.   No.  Well, it -- it's relevant
24   to talc migration, but you're exactly right,
25   they looked at the starch migration, yes.  Or

18 (Pages 66 to 69)

Confidential - Pursuant to Protective Order

Page 70

1    particles that were starch, yes.
2        Q.    We'll cover this in more
3    detail, but is it your opinion that all
4    particles have similar characteristics with
5    respect to their ability to migrate in the
6    genital tract?
7        A.    It's my -- I don't know if I'd
8    state it quite that way.  What I would say is
9    that the evidence shows that particles
10   generally have the ability to move up the
11   reproductive tract in women, yes, and that if
12   a particle is one that is similar to talc or
13   some of the other ones where the information
14   has been collected, I would characterize that
15   as being within that, quote/unquote,
16   relevance of particles.
17            That doesn't mean all
18   particles, but certainly in the ones that I
19   have looked at and the data I've relied upon,
20   there's a variety of different types of
21   particles or substances that have been
22   studied and shown to be able to migrate.
23       Q.    So let's take Edelstam 1997 as
24   an example.
25            Did you do any analysis that

Page 71

1    you can point me to that establishes that
2    starch would have a similar migration pattern
3    as talc?
4        A.    So I would say that the paper
5    itself shows -- talks about the movement of
6    starch, but are you asking something
7    different?
8            Are you asking me have I done a
9    specific analysis of any differences that may
10   occur between the migration pattern of starch
11   and talc?  Is that what you're asking me?
12       Q.    That is what I'm asking you.
13       A.    I certainly didn't do an
14   in-depth analysis of the differences, no, but
15   based upon my review of the literature, I
16   believe that that paper is relevant to the
17   overall question of migration of particulate
18   through the reproductive tract, including
19   particles of talc.
20       Q.    Regardless of whether or not it
21   was an in-depth analysis, can you point me to
22   anything other than just your belief after
23   having read these articles that starch and
24   talc would have similar migratory
25   characteristics in the human or animal

Page 72

1    genital tract?
2            MS. PARFITT:  Objection.
3            THE WITNESS:  Again, I haven't
4    done an in-depth analysis.  I mean, as
5    a toxicologist, there are differences
6    between starch and talc, absolutely.
7    For example, starch would -- I would
8    expect to be more easily solubilized
9    within fluids, and so that could
10   affect the ability of them to actually
11   not migrate as well as a talc
12   particle, which would be less soluble
13   than the starch would be.
14            And there's -- I even --
15   there's a paper I have in here, and I
16   can look for it if you want, that
17   talks about that difference, and it's
18   one of the issues of cornstarch versus
19   talc, on whether or not you would
20   expect to get the long-term chronic
21   responses with the difference between
22   those two substances.
23            So I do think there's
24   difference, absolutely, as
25   toxicologists generally.  And the only

Page 73

1    reason I'm citing this paper is
2    because I'm trying to be complete
3    about people that have looked at this
4    issue.  And certainly it was a study
5    that looked at this issue and talks
6    about the movement.
7            But I wouldn't expect starch
8    and the talc to have the same
9    liabilities, and I also wouldn't
10   expect them to move exactly the same
11   speed maybe.  That's very true.
12   QUESTIONS BY MS. BRANSCOME:
13       Q.    So you would agree with me that
14   Edelstam is not a study demonstrating that
15   talc can migrate from the lower to upper
16   genital tract, correct?
17            MS. PARFITT:  Objection.  Form.
18            THE WITNESS:  I wouldn't say it
19   that way.  What I would say instead is
20   that Edelstam is a study that forms
21   the overall weight of the evidence for
22   the ethics -- for the studies that are
23   available that address the issue of
24   migration, but certainly it is not
25   studying talc.  So I don't disagree

19 (Pages 70 to 73)

Confidential - Pursuant to Protective Order

Page 74

1     with you there.
2         Unfortunately, the majority of
3     the information that I have relied
4     upon, and others such as the FDA in
5     making their statements about
6     migration, is not all directed studies
7     just to talc. It's looking at the
8     issue of particle movement.
9     QUESTIONS BY MS. BRANSCOME:
10        Q.    Now, in terms of doing your
11    risk assessment -- well, let me get back. We
12    covered this earlier, and I want to return to
13    it for a moment. Just to confirm: For your
14    work in the MDL, you did not do a Bradford
15    Hill analysis, correct?
16        A.    I did not sit down and do a
17    Bradford Hill analysis when I started writing
18    this report. I have done a Bradford Hill
19    analysis in the past, which is in my original
20    reports, but I certainly did not redo a
21    Bradford Hill when I sat down to draft my MDL
22    report, that is true.
23        Q.    Okay. Let me be more precise.
24        In the report that you have
25    produced that contains a description of your

Page 75

1     opinions in the MDL, you have not set forth a
2     Bradford Hill analysis in that document which
3     is identified as Exhibit 4, correct?
4         A.    That is true, yes.
5         MS. PARFITT: Objection.
6     QUESTIONS BY MS. BRANSCOME:
7         Q.    And in fact, the paragraph that
8     you -- or paragraphs that you have in your
9     prior reports that reference a Bradford Hill
10    analysis, those have not -- those have
11    actually not been replicated in any form in
12    Exhibit 4, correct?
13        A.    Yes, because, again, it was not
14    my role to do general cause.
15        Q.    Okay. So then when we look at
16    the methodology that you employed in reaching
17    your opinions that are contained here in
18    Exhibit 4, how would you characterize the
19    methodology?
20        A.    As I have in the report. I
21    talk about it being a risk assessment or a
22    safety assessment, that you could use those
23    terms interchangeably here. And then I've
24    also used a weight of the evidence as a tool
25    to go through the different steps of the risk

Page 76

1     assessment.
2         Q.    Okay. What publication would
3     you direct me to that has used the same
4     methodology that you have used to reach your
5     opinions in Exhibit 4?
6         A.    I think I cite you to -- cite
7     you to some of those. You could -- well, the
8     directly relevant one would be looking at the
9     chapter on risk -- toxicology in the
10    reference manual on scientific evidence.
11        You can also go to the NRC
12    report where they -- it lays out the
13    different steps that you use when you kind of
14    break data apart into exposure versus
15    response information.
16        And then I cite to -- there are
17    some guidance documents that I cite to, and
18    this is in paragraph 13. And I'd have to
19    pull them out again to tell you which ones
20    relate to different pieces because some of
21    these are -- some of these documents are
22    specific to only, for example, maybe one part
23    of what I did.
24        But certainly the risk
25    assessment process at IARC is -- they do what

Page 77

1     I call a hazard assessment. They identify
2     hazard and they couldn't quantify risk, but
3     the steps they go through are essentially the
4     same types of steps that I went through as
5     far as gathering data on not just response
6     but also the potential for exposure and how
7     that relates to the response.
8         And then also the data that
9     I've collected on the biologic effects of
10    talc, toxicology of talc, are also discussed
11    within that document as well.
12        Q.    Okay. Focusing specifically on
13    the weight of the evidence tool, as you
14    describe it, is there a particular document
15    or publication that I would go to that could
16    lay out the same process that you used for
17    how you weighted certain pieces of evidence?
18        A.    So the documents that I've
19    cited for you in paragraph 13 talk about what
20    weight of the evidence is generally, but if
21    you read what it is, it's essentially a
22    process that each scientist brings their
23    experience, training and judgment to.
24        So I try to lay out for you in
25    my discussion of the literature my thought

20  (Pages 74 to 77)

Confidential - Pursuant to Protective Order

Page 78

1    process as I review each piece of
2    information, and that is what you do as part
3    of weight of the evidence.  You gather all of
4    the relevant information that you can find
5    that address the question you're trying to
6    answer, and since I'm looking at both
7    exposure and response, I gather different
8    pools of information.
9        Q.   You would agree that there are
10   ways to do a weight of the evidence
11   assessment of published literature that
12   assign, for example, quantitative values to
13   particular pieces of evidence, correct?
14       A.   Certain individuals have put
15   together, but there's no one general accepted
16   process that everyone uses.  So I -- that's
17   the issue.  Again, there are certain --
18   certain cases where I've seen that done, and
19   then there are many -- most cases that it's
20   not what's done.
21       Q.   Okay.
22       A.   Another body, by the way, that
23   I -- it's new.  It's not in paragraph 13.  I
24   just want to make sure I tell you that so
25   we're clear.  If you look at the Canadian

Page 79

1    document, they also -- in fact, a lot of what
2    they have, you'll see the same literature
3    described within my assessment as well.
4        Q.   So using the Canadian
5    assessment as an example, for instance, in
6    that assessment there were actually values
7    assigned to particular pieces of literature,
8    correct?
9        A.   Mainly the epidemiological
10   literature, that is true.  Again, but I'm not
11   doing causation, so I didn't approach it that
12   way.
13          But certainly if you look at
14   what I did, it's consistent with that because
15   I talk about the differences between the
16   limitations of a case-control versus a
17   prospective study.  I talk about both the
18   positives and the negatives within the
19   database, but I don't lay it out in a table
20   like they do.  But it's certainly the same
21   basic process.
22          I was actually quite surprised
23   at how similar the database of information
24   that they reviewed was to what I honed in on
25   as well.

Page 80

1        Q.   Okay.  As you were forming your
2    opinions, Dr. Plunkett, about whether or not
3    there is a risk associated with the use of
4    Johnson's baby powder with respect to ovarian
5    cancer, how do you keep track of the pieces
6    of scientific evidence that you have reviewed
7    and the respective weight that you give to
8    them?
9          Presumably you did not read
10   everything in one day, for example?
11       A.   No.  That's correct.  So I
12   typically will -- I typically will save the
13   papers -- when I read the papers, I will
14   often highlight in yellow information that I
15   think is going to -- will be extremely
16   relevant.  I don't put notes on the document.
17   I highlight in yellow on the PDF file to use
18   that to write.
19          And I also start drafting
20   report very early, which then gets
21   overwritten and actually ends up looking like
22   an outline that eventually becomes the
23   report.
24          So one of the ways I keep track
25   of things is I may put a paragraph name that

Page 81

1    I know I'm going to write, such as exposure
2    migration, and then I -- as I'm reading a
3    paper, I'll type in a paper -- the ones that
4    I believe are important to my overall
5    assessment.  So I will do that as I'm -- as
6    I'm going through the evidence.
7          So that's one of the tools I
8    use, but I don't keep notes.  I just kind of
9    use that as a living document that eventually
10   becomes a report.
11       Q.   Do your opinions ever change as
12   you read additional pieces of scientific
13   evidence?
14       A.   Yes, it does.  It may change.
15   And it often -- often the changes, though,
16   are not that I believe -- with the exception
17   of epidemiology.  In other areas.
18   Epidemiology is a little bit different issue
19   when you're reviewing studies.
20          But on toxicology I always
21   start with reviews and regulatory
22   authorities, looking at what others have said
23   generally about the toxicology.  And so even
24   though I may refine opinions differently or I
25   might change, I certainly wouldn't agree to

21 (Pages 78 to 81)

Confidential - Pursuant to Protective Order

Page 82

1    work on a project to start with if my initial
2    reviews on hazard, for example, didn't
3    convince me that I believe that there is a
4    hazard. But you refine it from there.
5    That's exactly right.
6            So there are cases, however,
7    where I'm asked to work on a project where
8    there is no review or regulatory authority or
9    any kind of assessment over a period of
10   years, and in those cases there are times
11   when I start working on a project and I stop
12   and say, "I can't do this." Because that
13   happens, yes.
14           So opinions do change sometimes
15   based on review of additional information.
16       Q.   Is there any documentation that
17   you've produced either in your report or
18   otherwise in the MDL that would allow someone
19   reviewing the material to understand the
20   order in which you reviewed materials or the
21   specific weight that you assign them?
22       A.   So order of review, no. I
23   don't think you would know that other than --
24   you will note order of review if you look at
25   the differences in the literature cited in my

Page 83

1    original report versus in the MDL.
2            So in my original reliance
3    list, if there were documents that weren't
4    there and they're now here, obviously that
5    tells you it was a review.
6            On the issue of a -- of the
7    weight of the evidence process, the only
8    answer I can give you for that is that
9    articles that I believe are -- are reliable,
10   are relevant and are -- those are kind of
11   the -- you look at the reliability of the
12   studies, whether they're peer-reviewed or not
13   or if they have proper controls put into
14   place, things like that, whether or not
15   the -- they're relevant to the question at
16   hand. That you can get from looking at how I
17   discuss them in the document. But certainly
18   there's no, like, summary of that.
19           But certainly -- I think you
20   understand -- you should understand when you
21   read my report what weight I'm giving based
22   on how I'm describing those -- those
23   materials. I mean, it's --
24       Q.   Well, for example, you do have
25   different studies that you've identified in

Page 84

1    your report that have been criticized by
2    others at some point in time, correct?
3        A.   Yes, that's true.
4        Q.   Okay. Now, in some instances
5    you state that you then give little weight to
6    those studies, correct?
7        A.   Yes.
8        Q.   But in other instances you find
9    the criticized study to be helpful and
10   informative, correct?
11       A.   That's true. Because, again,
12   judgment -- as anybody does weight of the
13   evidence, different scientists can have
14   different judgment.
15           Mainly, I think, when I look at
16   the differences in that -- in that regard, I
17   think you should pay attention to what the
18   person is. So as a toxicologist, I may view
19   a certain type of -- piece of data very
20   differently than an epidemiologist may view
21   it, as far as the reliability or the
22   relevance, because we're coming at it from a
23   different training and experience and
24   judgment -- set of judgment on what is
25   important to a toxicologist when I'm talking

Page 85

1    about risk versus how an epidemiologist might
2    talk about risk.
3        Q.   Could two different
4    toxicologists review the same piece of
5    literature and give it very different weight?
6        A.   I don't know about different
7    weight, but they certainly -- I know people
8    come to different conclusions based on their
9    overall assessments. That happens,
10   definitely. I mean, there are always going
11   to be individuals that look at things
12   differently.
13           I know in this case there are
14   people -- I've seen defense experts that
15   reports in -- not in the MDL but in other
16   cases, where people disagree with some of my
17   opinions, and I disagree with their opinions.
18   That happens.
19       Q.   Okay. And so if I were --
20   well, let me just ask something. You have
21   not provided any sort of quantitative
22   assessment of the weight that you gave
23   different pieces of evidence that you cite in
24   forming your opinions in the MDL, correct?
25           MS. PARFITT: Objection.

22 (Pages 82 to 85)

Confidential - Pursuant to Protective Order

Page 86

1    Misstates her testimony.
2         MR. MEADOWS:  Objection.
3         THE WITNESS:  So I don't report
4    for you a table where I quantify that,
5    that is correct, but certainly that
6    is -- because, again, based upon
7    looking at the way that I was trained
8    and the documents that I'm talking --
9    I'm pointing you to to describe how to
10   do weight of the evidence, it is
11   not -- it is not a numerical exercise,
12   how many here, how many there, this
13   one gets 5 points because of this or
14   6 points because of this.
15        It's more an issue, again, of
16   judgment.  It's the idea of looking
17   across all of the available
18   information and determining whether or
19   not, based on that, it's your opinion
20   that there -- that, for example,
21   talc -- talc's toxicity profile
22   includes cancer.  That's one of the
23   judgments -- weight of the evidence
24   judgments you make, for example.
25

Page 87

1    QUESTIONS BY MS. BRANSCOME:
2         Q.   So -- but, Dr. Plunkett, just
3    to be clear, you do not provide a numerical
4    value to the particular pieces of evidence
5    that you have considered as part of your
6    weight of the evidence assessment in the MDL,
7    correct?
8         MS. PARFITT:  Objection.  Form.
9         THE WITNESS:  So I do not
10   provide a numerical value as you see
11   it laid out, for example, in the
12   Canadian table, but certainly I do
13   judge articles that I include in my
14   weight of the evidence based on a
15   system that includes different
16   considerations such as -- like I said,
17   peer-reviewed or not, that makes an
18   issue.
19        Whether or not the study that's
20   being reported is the only one -- the
21   first or is this something that is --
22   that is describing an assessment
23   that's been done by someone else and
24   so you see a repetition or a
25   consistency among the studies that

Page 88

1    you're looking at.
2         The robustness of the data.
3    For example, the NTP GLP quality
4    animal study, very high quality in the
5    weight of the evidence.  And I talked
6    to you about that.  In fact, it --
7    even though people criticize that
8    study, that study is very valuable for
9    looking at biologic changes that are
10   consistent with a carcinogenic
11   mechanism being initiated.
12        So even though you may say that
13   you can't quantify risk from that
14   animal study as far as calculating a
15   cancer potency factor, what you can do
16   is use that study of high quality to
17   make judgments within a weight of the
18   evidence for risk.
19   QUESTIONS BY MS. BRANSCOME:
20        Q.   Dr. Plunkett, you understand I
21   have seven hours today, and I -- while I'm
22   very interested in the answers that you give,
23   if we could just -- we will get to things
24   like NTP when we get there, if you could just
25   attempt to answer the question that I've

Page 89

1    asked.
2         I simply asked the question:
3    Are there numerical values assigned to the
4    particular pieces of evidence that you have
5    considered as part of your weight of the
6    evidence assessment in reaching your opinions
7    in the MDL; yes or no?
8         A.   And I said to you, not in the
9    way that it's done -- I assume you're
10   referring to something like what was done --
11   what's in the Canadian epidemiology table.  I
12   have not done that, no.
13        Q.   Okay.
14        A.   That's exactly right.
15        Q.   Have you provided a qualitative
16   chart, for example, of the evidence that you
17   have considered in forming your opinions in
18   the MDL?
19        MS. PARFITT:  Objection.  Form.
20        THE WITNESS:  I don't know what
21   you mean by qualitative chart.  I
22   certainly have -- I certainly, I
23   believe, have given you qualitative
24   descriptions of my weight within my
25   discussions of each study, yes, I have

23 (Pages 86 to 89)

Confidential - Pursuant to Protective Order

Page 90

1     done that.
2     QUESTIONS BY MS. BRANSCOME:
3         Q.   You mention in response to the
4     prior question that you have a system for
5     weighting the pieces of evidence that you
6     have reviewed.
7             Can you point me to paragraphs
8     in your report marked Exhibit 4 that would
9     outline in detail the system that you used to
10    apply different weight analysis to different
11    pieces of evidence?
12            MS. PARFITT: Objection. Form.
13            THE WITNESS: And I think I
14    answered that, that there's no system
15    written down by anyone. But what
16    there is, instead, is if you read
17    these -- if you read these
18    descriptions of use of weight of the
19    evidence that I've cited in
20    paragraph 13 as well as the discussion
21    of methodology in the Canadian
22    document, that is consistent with what
23    I do. It's the idea that you start
24    with a literature search for
25    peer-reviewed, publicly available

Page 91

1     information. You look at the quality
2     of the studies, the statistically
3     significant findings. Those are all
4     things that are discussed within these
5     documents I'm pointing you to.
6     QUESTIONS BY MS. BRANSCOME:
7         Q.   Now, you --
8         A.   But it's -- it's -- I don't
9     know of anyone who has written down a
10    specific system that applies in all
11    circumstances, no.
12        Q.   Okay. Have you written down a
13    system that applies specifically in this
14    case?
15        A.   I think I have tried to do that
16    for you when I describe what I did.
17        Q.   Okay. You just referenced the
18    fact that your system can be found in the
19    Canadian document.
20            You agree that the Canadian
21    analysis was actually published or produced
22    after you had completed your report in the
23    MDL, correct?
24            MS. PARFITT: Objection. Form.
25            THE WITNESS: Certainly it was

Page 92

1     published afterwards, and what I
2     thought I said to you was that if you
3     look at that document -- it's not in
4     paragraph 13, but if you look at that
5     document, it lays out a process. And
6     I wouldn't call it a system. It's a
7     process. It's a process by which you
8     screen information for relevance to
9     the question being asked and how,
10    then, based on that, you look at
11    characteristics of that information
12    such as -- and I tried to give you
13    some of those.
14            And I've said this before in
15    depositions in these cases. You know,
16    you look at the issue of whether or
17    not the study was peer-reviewed,
18    whether or not there was
19    statistically -- statistical
20    significance or at least statistics
21    applied to the data. What was the
22    quality of the study as far as the
23    size in order to be able to answer the
24    question being asked. Those are the
25    kinds of things that you look at.

Page 93

1             And then also the question --
2     when you're looking at a specific
3     question, you may pull in -- like you
4     asked me about the starch particle.
5     You may pull in things that you give
6     less weight because obviously that's
7     not just talc, that's starch, and you
8     have to consider that. So that is
9     part of the process.
10    QUESTIONS BY MS. BRANSCOME:
11        Q.   Dr. Plunkett, the question I
12    asked you simply was: The paper that you
13    reference that contains some detail about the
14    Canadian analysis, that was published after
15    you completed your report that's marked here
16    as Exhibit 4; is that correct?
17            MR. MEADOWS: Objection.
18            THE WITNESS: Yes, and I
19    believe I answered that at the start.
20    I usually try to answer your question,
21    and then I try to explain further some
22    details I think are important context
23    on my answer.
24    QUESTIONS BY MS. BRANSCOME:
25        Q.   I understand that,

24 (Pages 90 to 93)

Confidential - Pursuant to Protective Order

Page 94

1    Dr. Plunkett.  You have given many
2    depositions.  You understand I can ask you
3    for more detail if that would be helpful to
4    me.
5           If you could, just focus on the
6    question that I asked, and we can explore
7    additional areas if that's something I'm
8    interested in doing.
9           Okay?
10          MR. MEADOWS:  Objection.
11    She's --
12          MS. BOCKUS:  Break?
13          MR. MEADOWS:  After I finish my
14    objection.
15          She's going to answer the
16    question as thoroughly as she feels
17    like she needs to answer the question
18    based on the way you ask it.
19          Want to take a break now?
20          MS. BRANSCOME:  We can go off
21    the record.
22          VIDEOGRAPHER:  We're going off
23    the record at 10:41 a.m.
24     (Off the record at 10:41 a.m.)
25          VIDEOGRAPHER:  We are back on

Page 95

1    the record at 10:56 a.m.
2    QUESTIONS BY MS. BRANSCOME:
3    Q.    All right.  Dr. Plunkett, we
4    started talking a little bit about the CIR
5    analysis that was done in 2013.
6           Am I correct that you no longer
7    consider that reliable?  Is that your
8    opinion?
9    A.    Yes.
10   Q.    Okay.  And you identify in your
11   report marked as Exhibit 4, I believe it's
12   paragraph 56?
13   A.    Yes, that's correct.  And I
14   think I talked about it later on as well, but
15   definitely I do here.
16   Q.    Okay.  And in paragraph 56, you
17   state that the CIR panel failed to account
18   for all the studies that informed on the
19   issue of migration of particles such as talc
20   upwards through the reproductive tract.
21          Is that your opinion?
22   A.    Yes.
23   Q.    Okay.  And then you state that
24   because of that you assign, quote, little
25   weight to the conclusions reached by the CIR

Page 96

1    panel; is that correct?
2    A.    Yes.
3    Q.    And so is it your view that a
4    study or an analysis that reaches a
5    particular conclusion should be assigned
6    little weight if it fails to consider all
7    relevant scientific evidence to the issue
8    that it's evaluating?
9           MS. PARFITT:  Objection.
10          THE WITNESS:  I think it
11          depends on the situation, but that
12          could be the case, yes.  It depends
13          on -- on the -- depends on -- I think
14          it would depend on each case, the
15          question being asked, and what was
16          omitted.  But, yes, I think it could.
17   QUESTIONS BY MS. BRANSCOME:
18   Q.    Okay.  And in this situation
19   you identify -- I believe you claimed that
20   eight human studies were not considered by
21   the CIR 2013 panel; is that correct?
22   A.    Let me look at the number, but
23   that sounds about right.  Yes.
24   Q.    All right.  And returning,
25   actually, to your prior answer, you said that

Page 97

1    the failure to consider all relevant
2    scientific evidence on a topic would lead you
3    to assign little weight to a particular
4    conclusion.  You said that that could happen.
5           Under what circumstances would
6    you assign a conclusion little weight for
7    failing to consider what you consider to be
8    all relevant pieces of scientific literature?
9    A.    Well, I think it depends --
10   well, the reason I specifically addressed
11   that in this case is because that was -- the
12   conclusions about migration is the main
13   reason why the CIR panel then draws
14   additional conclusions later on.
15          So my issue is, migration was
16   key to what -- the decisions they made about
17   the safety issues of talc.  And so in that
18   particular case, this -- this failure to
19   consider all the evidence was extremely
20   important, in my view, and I gave it little
21   weight.
22          There might be a situation
23   where some -- for example, you may only look
24   at six or eight studies, even though there
25   may be dozens out there.  You may have a

Confidential - Pursuant to Protective Order

Page 98

1     reason for why you only looked at six or
2     eight, or it may be -- and as a result you
3     may lay that out and, therefore, you may
4     still give weight to conclusions drawn.  Or
5     it may be that the six or eight are --
6     studies that you discuss are not -- the
7     weight is not affected by what you've
8     omitted.
9              I believe that the weight is
10    affected by what is omitted when you look at
11    some of the articles being review articles,
12    which give you an understanding of what was
13    generally accepted within the scientific
14    community when you get to reviews, those
15    kinds of things.  So it really is a
16    case-by-case basis.
17             But certainly I do believe that
18    it is possible that in another circumstance
19    where things are omitted you would come to
20    the same conclusion, that you give those
21    conclusions less weight.
22        Q.    Is there a way, if someone were
23    try to replicate the weighting of particular
24    evidence based upon your process, for them to
25    know whether or not the omission of a

Page 99

1     citation of certain studies means that a
2     study should be given little weight or
3     whether it wouldn't affect the weighting of
4     that scientific article?
5              MS. PARFITT:  Objection.  Form.
6              THE WITNESS:  So I think this
7     is the issue of judgment, training and
8     experiencing that is applied to all
9     such assessments, and this is why
10    different scientists may come to
11    different conclusions.  But certainly
12    it is -- it was important to my
13    assessment on this issue because of
14    the prominent role that the CIR report
15    gives to their conclusions here for
16    why they then drew conclusions about
17    safety.  And so that link was
18    extremely important.
19             MS. BRANSCOME:  Can we pause
20    for just a moment?
21             VIDEOGRAPHER:  We are going off
22    the record at 11:00 a.m.
23             (Off the record at 11:00 a.m.)
24             VIDEOGRAPHER:  We are back on
25    the record at 11:01 a.m.

Page 100

1     QUESTIONS BY MS. BRANSCOME:
2         Q.    Okay.  Of the eight studies
3     that you identify on page 37 of your report
4     that you contend the CIR panel did not
5     account for, do any of those eight studies
6     specifically discuss the migration of talc in
7     human subjects?
8         A.    No, I don't believe they do,
9     but there are a couple of these studies that
10    I found to be extremely important if you want
11    me to explain that to you.
12        Q.    Do you break out in your report
13    in any other paragraphs which of these eight
14    articles you consider to be extremely
15    important?
16             And if you could just point me
17    to paragraph numbers, that's good enough if
18    you have, in fact, broken them out.
19        A.    I have.  I -- this whole
20    section I break -- I talk about each one
21    individually.  So I think you can tell by
22    what I read -- what I'm discussing what I
23    thought was important and informative about
24    each of those.
25        Q.    Do you rank the eight studies

Page 101

1     in any way by their importance to you?
2         A.    Not with any numerical rank,
3     no, but certainly I think I do that for you
4     when I talk about the studies.  I give you an
5     understanding of ones that I think are
6     particularly informative and ones that are
7     not.
8              So, for example, I weight the
9     human data -- I think I tell you that -- more
10    than the animal data because of the
11    differences between the reproductive tracts
12    of humans versus animals generally, upright
13    versus -- upright and habits and things that
14    humans do that relate to insertions in and
15    out of the reproductive tract, I guess is a
16    nice way to describe it, versus an animal,
17    that those can have, and then also the
18    differences between animals and humans in
19    terms of bursal sac around the ovary, those
20    kinds of things.
21             So I do -- that -- I guess that
22    ranking I do give you here.  I tell you that
23    I think these -- I think that the most
24    relevant are going to be the human studies
25    versus the animal studies.

26 (Pages 98 to 101)

Confidential - Pursuant to Protective Order

Page 102

1    Q.    Right.
2         So my question specifically is,
3    where would you point me to in your report to
4    understand the weight that you gave each of
5    these particular eight studies?
6    A.    At my descriptions of those
7    studies and what I describe.  That's all I
8    can tell you.
9         Q.    And I'm just asking,
10   Dr. Plunkett, can you point me in the report
11   to where that discussion takes place?
12   A.    It takes place -- I have a
13   discussion for each study, and I would -- and
14   if you read what I say about each study, I
15   try to go through what the strengths and
16   weaknesses of those studies are.
17        And those -- that would be,
18   let's see -- you want me to give you the
19   starting paragraph?
20   Q.    So, for example, Parmley and
21   Woodruff.  Can you point me to where in your
22   report you discuss Parmley and Woodruff, such
23   that I can understand the weight that you
24   gave that particular study?
25   A.    So the year of it is...

Page 103

1         So I think I discuss it in
2    paragraph 44, and so I describe for you what
3    important information is in there, which is
4    the information that I take as forming part
5    of my weight of the evidence.
6         So one of the most important
7    things is what -- they have a figure they
8    show, and they're showing -- which is one of
9    the unique figures in all of the published
10   literature.  But it talks about the
11   differences between the female reproductive
12   tract and the male reproductive tract, and it
13   shows the actual -- it talks about a
14   discussion of movement from substance in the
15   environment through -- into the vagina, into
16   the fallopian tubes.  So it's a paper that
17   addresses that very specific issue.
18   Q.    So my question to you, though,
19   is, where do you have a discussion of the
20   weight that you give to these particular
21   articles?
22   A.    So the discussion of the weight
23   has to do with the information described.  I
24   don't give them a numerical ranking.  I told
25   you that.

Page 104

1         So what I do is, when I'm
2    discussing about these -- all of these papers
3    here contribute to my weight of the evidence.
4    And if it's a human study, I'm giving those
5    more weight than I'm giving animal studies.
6    And that's described.
7         And then within papers I'm
8    pulling out information that contributes to
9    what I think is important about what the
10   study says, and that -- and the importance of
11   what is described within the study
12   contributes to my weight.
13        And I don't know how else to
14   describe it to you.  That is the process that
15   scientists go through when they evaluate
16   data.
17   Q.    And so my question to you:
18   Earlier you said of these eight studies, some
19   of them were particularly important to you.
20        How would I, using only what's
21   written in your report, understand which of
22   those eight studies was of particular
23   importance to you?
24   A.    So it would have to do with
25   what I discuss about the study.  So I'm

Page 105

1    telling you, when I -- if you look through
2    this entire section, this is the Parmley and
3    Woodruff paper.  It is important because it
4    addresses the specific issue of movement of
5    environmental substances from the outside to
6    the inside.  So I'm giving that importance in
7    my evaluation because of what that author is
8    actually discussing.
9         I don't know how else to
10   describe that.  I apologize.  I mean, to me,
11   weight of the evidence is a process that
12   scientists use bringing their training and
13   experience and judgment, and it's not a
14   numerical process across the board, it just
15   is not, based on the way weight of the
16   evidence is used within science.
17   Q.    Now, Dr. Plunkett, though, you
18   would acknowledge that if you wanted to
19   assign numerical values to the studies, that
20   has been something that has been done by
21   other authors and other authors on whom you
22   rely, correct?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  I don't believe
25   that's true.  I'll need to look -- I

27 (Pages 102 to 105)

Confidential - Pursuant to Protective Order

Page 106

1    don't believe that's true with respect
2    to the biological information.  I
3    believe it may be true with respect to
4    the epidemiology studies.
5          You want me to look real quick
6    to confirm that?  I can do that really
7    quick, but...
8    QUESTIONS BY MS. BRANSCOME:
9          Q.    I'm simply saying, could you
10   assign a numerical value if you chose to do
11   so?
12          MR. MEADOWS:  Objection.
13   Objection.  Form.
14          THE WITNESS:  And I'm -- what
15   I'm trying to say to you is I think
16   that I -- that there is no one set of
17   rules that you would assign in order
18   to do that for all the types of
19   studies that you weigh.
20          I would agree that I have seen
21   it routinely done -- well, not
22   routinely, but I've seen it done
23   within the epidemiological community
24   when they go through the epi data.
25   But not -- it's not something that

Page 107

1    I've seen done when you talk about
2    weight of the evidence as part of a
3    human health risk assessment.  That is
4    not something that scientists
5    typically do as far as giving
6    numerical rankings.
7    QUESTIONS BY MS. BRANSCOME:
8          Q.    You're familiar with the
9    National Cancer Institute, correct?
10         A.    Yes, I am.
11         Q.    All right.  They are considered
12   to be the nation's leader in cancer research,
13   correct?
14          MS. PARFITT:  Objection to
15   form.
16          THE WITNESS:  The National
17   Cancer Institute?
18          Yes, they are.  I don't know if
19   they're "the" leading, but they're one
20   of the leading, that's true.
21   QUESTIONS BY MS. BRANSCOME:
22         Q.    Okay.  And you're familiar with
23   publications that they issue called physician
24   data queries?
25         A.    Yes, I am.

Page 108

1          Q.    All right.  And you are aware
2    that there is, in fact -- called PDQs,
3    correct?
4          A.    That's the abbreviation, yes.
5          Q.    Right.  And you're aware that
6    the National Cancer Institute has in fact
7    published a PDQ that addresses a potential
8    connection between talc and ovarian cancer,
9    correct?
10         A.    I'm aware of several that have
11   been done over the years, but, yes, I'm aware
12   of that.
13         Q.    And have you reviewed those?
14         A.    Yes, I have.
15         Q.    Are they listed on your
16   reliance list?
17         A.    No, but they're listed within
18   the materials as discussed within my
19   depositions, and I thought -- and my
20   testimony.  I thought that was part of my
21   reliance list.  I believe that it -- it was
22   in my reliance list, is encompassing all of
23   the testimony as well as the actual
24   documents.  Maybe I'm mistaken, but that was
25   my understanding.

Page 109

1          Q.    Okay.  If they are not on your
2    reliance list, should they be?
3          A.    I believe that they are on my
4    reliance list by it having been pointed to as
5    part of the testimony that I have given and
6    the documents that I have relied upon during
7    testimony.
8          Q.    Okay.  And you are aware that
9    they have issued a PDQ that -- on the website
10   as of today, correct?
11         A.    I haven't looked today, so I'm
12   sure -- but I know that -- I don't believe it
13   has been removed, so I believe that there is
14   something there, yes.
15         Q.    All right.  And what is your
16   understanding of the position stated in the
17   PDQ with respect to a possible link between
18   talc and ovarian cancer?
19         A.    So I'd have to look at the one
20   today to tell you what it says, but it's
21   evolved over time and it's changed over time,
22   and I have specific opinions that I've
23   expressed at trial about that issue.
24          Do you want me to go into that
25   details or I mean --

28 (Pages 106 to 109)

Confidential - Pursuant to Protective Order

Page 110

1     Q.   I'm not asking about your
2  opinions about what their position is.  I'm
3  simply asking you, Dr. Plunkett, the most
4  recent NCI PDQ that you have reviewed, what
5  is the position that the National Cancer
6  Institute has taken with respect to the
7  relationship between talc and ovarian cancer?
8     A.   So I would want to pull it out
9  to give you the specific statement of their
10  position, but their position has changed such
11  that later in time they've weakened the
12  link -- their statements about the link
13  between ovarian cancer and genital talc use.
14        So it used to be seen as a
15  cause, and now I believe it's not seen as a
16  cause.  I don't know the exact language,
17  though.  I'd have to look at it as -- maybe
18  risk factor is the better word to use.
19        And I need to look at the most
20  recent one.  And that would be the best way.
21  Let's just see what it says.
22     Q.   Okay.  'Cause is it your
23  position as you sit here today that the
24  National Cancer Institute has ever issued a
25  statement that talc causes ovarian cancer?

Page 111

1     A.   I believe it was listed as a
2  risk factor for ovarian cancer in the older
3  PDQs.
4        (Plunkett Exhibit 7 marked for
5        identification.)
6  QUESTIONS BY MS. BRANSCOME:
7     Q.   I do have a copy here.  Just
8  for the sake of the record, we will mark this
9  as Plunkett Deposition Exhibit Number 7.
10        Handing a copy to you,
11  Dr. Plunkett, do you recognize the document
12  that I just handed you that's marked as
13  Exhibit 7?
14        MR. LOCKE:  What's the date of
15        that?
16        MS. BRANSCOME:  This was
17        printed on December 14, 2018.
18        THE WITNESS:  It's -- the
19        updated date is June 22, 2018, if that
20        helps.
21        MR. LOCKE:  Yes, thank you.
22        THE WITNESS:  I have seen this
23        one, yes.
24  QUESTIONS BY MS. BRANSCOME:
25     Q.   All right.  And you can review

Page 112

1  any -- whatever portion of this is helpful to
2  you.
3        And then if you could answer my
4  question, Dr. Plunkett, of what is the
5  position as stated in Deposition Exhibit
6  Number 7 of the National Cancer Institute
7  with respect to the relationship between talc
8  and ovarian cancer?
9     A.   So I would be looking at the
10  section on page 12 of 18, and maybe you're
11  looking somewhere else, but that's where they
12  actually talk about perineal talc exposure.
13  And it's under the section where they have
14  now moved into factors with an adequate
15  evidence of an association and they describe
16  it here.  So they're calling it an
17  association where the weight of the evidence
18  is not adequate to support that association.
19     Q.   All right.  And so the first
20  sentence of the section under perineal talc
21  exposure states, "The weight of the evidence
22  does not support an association between
23  perineal talc exposure and an increased risk
24  of ovarian cancer."
25        Did I read that correctly?

Page 113

1     A.   You did read that correctly.
2     Q.   All right.  And it indicates
3  that "results from case-control and cohort
4  studies are inconsistent."
5        Did I read that correctly,
6  Dr. Plunkett?
7     A.   You did.
8     Q.   And the question that I would
9  ask simply is, do you discuss the National
10  Cancer Institute PDQ in the report that
11  you've issued in the MDL, which is identified
12  as Exhibit 4?
13     A.   I don't specifically discuss
14  this document, no, I do not.
15     Q.   Okay.  And you understand that
16  the NCI PDQ did a weight of the evidence
17  analysis that followed a formal evidence
18  ranking system, correct?
19        MS. PARFITT:  Objection.
20        THE WITNESS:  So I -- it's not
21        laid out here, but they do have a
22        process they use.
23        Is that what you're asking me?
24  QUESTIONS BY MS. BRANSCOME:
25     Q.   Yes.

29 (Pages 110 to 113)

Confidential - Pursuant to Protective Order

Page 114

1      A.    Yes.  And again, they're
2  ranking the epidemiological data, and so I
3  understand that that is there, yes.
4      Q.    Now, you've said a few times
5  that you could qualitative -- you could give
6  a quantitative weight to an epidemiological
7  study, somehow suggesting that it is
8  different from other types of studies.
9            What is it about a
10  toxicological study, for example, that would
11  prevent someone from giving a quantitative
12  weight in a weight of the evidence analysis?
13      A.    Because it is just what is
14  typically done and not done.  There are
15  certain practices within the community, what
16  is kind of -- I would say that scientists use
17  routinely, or scientists have used.  Not all
18  scientists give numerical rankings to
19  epidemiological data either, because even
20  within a Bradford Hill assessment, when you
21  use the considerations, there's no
22  requirement for ranking studies in order to
23  meet the requirements of use of that
24  methodology.
25      Q.    Okay.

Page 115

1      A.    But I have seen it done in the
2  epidemiology community, and that is the most
3  common place I see it.  I do not see other
4  toxicologists that are assessing animal
5  studies and in vitro studies doing it that
6  same way.
7            When you do a human health risk
8  assessment, that isn't routine practice to do
9  numerical rankings on studies.
10      Q.    Okay.
11      A.    At least in my experience and
12  in my training, and I was trained in the use
13  of risk assessment by one of the individuals
14  who actually invented the process.
15      Q.    Okay.  Okay.  But do you
16  consider the epidemiological evidence as part
17  of your risk assessment in the MDL?
18      A.    I do, because I'm looking at it
19  in the context of what is out there and
20  what's available.  I don't always have human
21  data when I do risk assessments, but in this
22  one I do.  So I do consider them, yes.
23      Q.    Okay.  Did anything prevent you
24  from doing a quantitative assessment of the
25  weight that you were giving different pieces

Page 116

1  of epidemiological evidence?
2      A.    If by -- you mean prevent, was
3  someone stopping me from doing that, no.  But
4  if you ask what would be standard practice
5  based on my experience, I would not be doing
6  that.
7      Q.    Has anyone -- and I'm not
8  referring in this case to any attorneys.  But
9  has anyone reviewed your -- the weighting
10  that you gave specific pieces of evidence as
11  essentially a form of a peer review process?
12      A.    If by that you mean have I
13  submitted my opinions for publication, no, I
14  have not done that.  Part of -- that's partly
15  driven by my understanding of the evidence
16  that I reviewed, that some of it may not be
17  something that I should be discussing
18  necessarily in a public form outside of the
19  cases I'm working in.
20            But certainly I have not
21  submitted it for publication, if that's what
22  you mean.  No, I have not done that.
23      Q.    Okay.  Has the methodology that
24  you have used in the MDL, has that been --
25  have you submitted any type of analysis using

Page 117

1  that methodology for publication even outside
2  of particularly looking at Johnson's baby
3  powder, for example?
4      A.    Yes, in -- if you look at my
5  publications that describe risk assessments
6  that I have done.  So the one that would come
7  to -- to play that's similar as far as the
8  scope of the weight of the evidence would --
9  at least with the animal and the in vitro
10  studies, would be the paper that I published
11  on copper, looking at the database of copper
12  and identifying points of departure and
13  target organs and risk -- risk issues based
14  on copper use in humans, trying to set a --
15  understand what a safe exposure level could
16  be to copper in water.  And that was
17  published -- that actually was one of the
18  papers that's published with Dr. Krewski, who
19  is one of the authors of this risk assessment
20  in Canada.
21      Q.    And is it your position that
22  you follow the same methodology in what
23  you've reported in the MDL with respect to
24  Johnson's baby powder that you did in your
25  analysis of copper?

Confidential - Pursuant to Protective Order

Page 118

1    A.    Yes, with the process of going
2  through all of the publicly available
3  information, putting it together based on its
4  relevancy and reliability.
5         We did a process where we
6  grouped it based on animal versus human, just
7  like I've done here.  And we call it the
8  bins, but it's the same idea.  I have a bin
9  of human idea, I have a bin of animal data
10  and a bin of in vitro data.  And so, yes, the
11  process was very, very similar.
12     Q.    Okay.  Returning back to some
13  documents that you chose not to cite in your
14  report, you do not discuss in the Gonzales 2016
15  study in your report for the MDL, correct?
16         MS. PARFITT:  Objection.  Form.
17         THE WITNESS:  I'll have to
18         look.  It is not cited in the
19         reference list to my report, that is
20         true.  So that means it would not be
21         mentioned specifically in the body of
22         the report.
23  QUESTIONS BY MS. BRANSCOME:
24     Q.    You're familiar with the
25  Gonzalez 2016 study, correct?

Page 119

1    A.    If you want me to talk about
2  it, you'd have to pull it out for me, but I
3  know the name, yes.
4     Q.    Okay.  And it was looking at an
5  association between the perineal use of talc
6  and ovarian cancer, correct?
7     A.    That, I'd have to look at it to
8  tell you.  I believe it was a human study
9  that would be consistent with that, but I
10  need to pull it out to look at it.
11     Q.    All right.  Do you, as you sit
12  here today, do you know why you did not
13  discuss it in your report?
14     A.    I wasn't doing a full causation
15  analysis in this report, so as a result I'm
16  not trying to characterize every piece of
17  human data.  But I certainly am looking at
18  the consistency across the studies, and
19  that's what I've done.
20         And I mention it here.  I do
21  think I mention here that there are studies
22  that came to different conclusions than the
23  ones that I'm specifically describing.
24     Q.    Okay.  And so why is it that --
25  why is it acceptable for you to choose not to

Page 120

1  include something like the Gonzales 2016
2  study, but yet you will disagree the
3  2013 -- the CIR 2013, you will give it little
4  weight for not discussing particular studies?
5     A.    So that's a very different
6  exercise.  You want me to explain my thinking
7  on that?  I can do that for you, but I
8  believe that's apples and oranges question.
9         My reasons for giving little
10  weight to the CIR overall assessment versus
11  my weight or the assessment I make of an
12  individual piece of data, that's different.
13  And that's what you're describing for me.
14         And I believe Gonzales is in my
15  overall reliance list, so I have read
16  Gonzales.  It is something that I have
17  considered; it's not something that I've
18  cited in my paragraphs.  So it doesn't mean
19  it didn't go into my weight of the evidence,
20  because I do have it and I have reviewed it.
21  I just don't recall the details on it.
22     Q.    Is it your position as you sit
23  here today that you know for sure that the
24  CIR panel did not -- was not aware of or even
25  considered any of the eight studies that you

Page 121

1  contend the omission of which makes it of
2  little weight?
3         MS. PARFITT:  Objection.  Form.
4         THE WITNESS:  I would say I'm
5         99.9 percent sure, based on the
6         process that is -- that goes in.  And
7         if you want me to explain, I'll tell
8         you why I feel that level of surety.
9         You know, I can always say that
10  maybe there was someone that came to
11  the panel that did a search on their
12  own, but that is not what's done.  The
13  individuals that come to the panel are
14  given a body of information provided
15  to them in written form that they
16  review.  So it's not like they -- they
17  have access to anything that isn't
18  cited in the actual report.
19  QUESTIONS BY MS. BRANSCOME:
20     Q.    Okay.  The eight articles that
21  you discuss that are not mentioned in the CIR
22  panel's work, they are publicly available
23  pieces of scientific literature, correct?
24     A.    Yes, which was why it's
25  interesting to me that those were not grabbed

Confidential - Pursuant to Protective Order

Page 122

1 and included within -- within the assessment
2 done by the -- by the PCPC's group that
3 handles CIR -- handled the CIR process here.
4      Q.   Okay.  We received just before
5 your deposition, a few days in advance, a
6 list of materials that have been added to
7 your reliance list since you produced your
8 report in this case.
9           Did you provide that list of
10 materials to counsel to -- are you aware of
11 the materials that were identified?
12     A.   Yes, I am.  They're ones that I
13 have reviewed since my report and -- yes,
14 which would have been, I believed, important
15 for you to know about, because obviously you
16 wouldn't know if I hadn't provided that to
17 you, and fair game for you to ask me about.
18     Q.   On that list was contained a
19 number of news articles.
20     A.   Uh-huh.
21     Q.   Are news articles pieces of
22 scientific information that you typically
23 consider in performing a risk assessment?
24     A.   No, they're not part of my risk
25 assessment, but they -- but they were

Page 123

1 relevant to -- they were relevant to my
2 overall assessment of the issue of what the
3 company is doing with regard to public
4 dissemination of information.
5           So it's not the risk assessment
6 part.  It's more on the issue of the -- when
7 I talk about the different influences of the
8 company on public dissemination of
9 information, I went through the different
10 specific issues.  So this would be a specific
11 issue related to a news report that someone
12 comes out with, the Reuters report, and then
13 looking at what the company is saying in
14 addition to that.
15           So it's understanding -- for
16 example, the documents that Reuters
17 discusses, many of those I'm sure I have
18 seen, although I don't have access to -- I
19 wasn't able to go on websites and download
20 everything that they cite.  But certainly
21 they looked familiar, some of the ones I did
22 see.
23           So it's that issue of -- the
24 last part of my report, I think.  Want me to
25 tell you the section?  It would be in the

Page 124

1 section on the role of the industry in
2 Section 7.
3      Q.   Okay.  So the newspaper
4 articles are not something that you are
5 considering as part of your analysis of
6 whether there is a risk of ovarian cancer
7 from Johnson's baby powder, correct?
8      A.   No, that's a separate issue
9 because it's not -- it's not scientific data,
10 per se.
11     Q.   Okay.  All right.  Now, if you
12 could turn to paragraph 31 in your report.
13           Okay.  You discuss the
14 biological effects of talc in this paragraph
15 and in others, correct?
16     A.   Yes, I would call this my
17 introductory paragraph to transition into a
18 specific topic, yes.
19     Q.   Okay.  And you talk here about
20 the structure and size of talc affecting its
21 properties.
22           What do you mean by that?
23     A.   So whether it's fibrous enough,
24 platy, fibrous.  Whether it is particle sizes
25 of less than 10 microns, less than 5 microns,

Page 125

1 greater than 75 microns.  There's
2 different -- certain pieces of literature
3 deal with different size ranges of talc.  The
4 smaller the size range, the more toxic it is,
5 for example, to lung tissue; the more likely
6 it is to be able to move, based upon the
7 size, versus being engulfed by a macrophage
8 if it's a larger particle, things like that.
9      Q.   So focusing specifically on
10 ovarian cancer, what role does size and
11 structure of a talc particle play with
12 respect to a risk of ovarian cancer in your
13 opinion?
14     A.   I don't think I formed a
15 opinion that it has to be a specific size or
16 structure, because the -- my opinions are
17 related to the fact that we have a complex
18 mixture of ingredients within the body
19 powder, and my assessment's been on the
20 overall consumer product, not on any one
21 particular ingredient only within it.
22           So it's the idea of just
23 understanding that size and structure of
24 these particles are general principles that
25 affect toxicology.  So a larger particle or a

32 (Pages 122 to 125)

Confidential - Pursuant to Protective Order

Page 126

1  fibrous particle may have a different tissue
2  toxicity response than a smaller particle.
3          So in other words -- I think I
4  discuss this later in a paragraph about
5  pleurodesis, the idea that you can get acute
6  versus chronic inflammation, or respiratory
7  distress or not.  So it's just this idea of a
8  general principle that outlines how you would
9  think about particles generally as a
10 toxicologist.
11     Q.   Well, okay.  So you said that
12 your assessment is based on the overall
13 consumer product.  That would be Johnson's
14 baby powder or SHOWER TO SHOWER®, correct?
15     A.   Yes.
16     Q.   All right.
17     A.   Or Shimmer.  I think that's the
18 other name.  There's a third product.
19     Q.   Okay.  But my question to you
20 is, you actually cite a number of pieces of
21 literature in the section about the alleged
22 toxicity of talc that don't relate to the
23 overall consumer products at issue in this
24 case, correct?
25          MS. PARFITT: Objection.  Form.

Page 127

1          THE WITNESS:  No, I would
2     disagree with that when you use the
3     word "relate."  Relate to me means is
4     it relevant to the assessment, and
5     they are, even if they're not just on
6     the finished product.
7          But if what you mean is that
8     there are studies that did not test
9     the consumer product but individual
10    ingredients or -- that is true, yes,
11    but all of that is relevant or relates
12    to the overall risk assessment.
13 QUESTIONS BY MS. BRANSCOME:
14     Q.   Okay.  So given your view that
15 information about the individual constituents
16 is relevant to evaluating the overall
17 toxicity of the ultimate consumer products,
18 then my question to you is:  How does the
19 structure and size of the component talc
20 particles play a role in toxicity with
21 respect to ovarian cancer?
22     A.   Just generally -- it's not
23 just -- well, with respect to ovarian cancer,
24 we start with irritation, inflammation
25 potential.  Size of particles and shape are

Page 128

1  known to affect tissue toxicity as far as
2  adverse events like inflammation and/or
3  irritation.
4      Q.   Okay.  So that's -- that's what
5  I'm trying to understand in more detail.
6          What is your opinion with
7  respect to -- let's take size to start with.
8  Is there a particular size talc particle that
9  is more or less likely to cause inflammation,
10 in your opinion?
11     A.   It depends whether you're
12 talking about acute or chronic.  I would say
13 for acute inflammation the larger particles,
14 such as some of the particle sizes that are
15 used in the pleurodesis products, are more
16 likely to initiate an acute inflammatory
17 response due to the fact that they're large
18 enough that the body will recognize them with
19 a fairly robust foreign body response.
20     Q.   What is your definition of
21 large?
22     A.   So the literature varies, but
23 certainly particles that are above -- some of
24 the literature talks about particles that are
25 in the range of 25 to 75.  Some of them talk

Page 129

1  about larger particles even than that.
2          It has to do with the fact
3  that -- this is complicated by the fact that
4  any consumer product -- or any talc sample
5  will have a range of sizes because they don't
6  select for one size.  They select for smaller
7  than.  So a 200 mesh, a 400 mesh, that has do
8  with what will filter through.
9          So pleurodesis, they try to
10 avoid for those products the really small --
11 large amounts of less than 10 because that
12 leads to respiratory distress, whereas many
13 of the consumer talc products are using much
14 smaller, finer particles to get that feel and
15 performance they want from the consumer body
16 powders.
17     Q.   Have you reviewed -- focusing
18 specific on Johnson & Johnson's products,
19 have you reviewed the documents that relate
20 to the specifications for the Johnson's
21 products with respect to the size of the
22 plate particles?
23     A.   I have seen those, yes.  I
24 can't tell you what each of them says without
25 pulling them out, but, yes, that is certainly

Confidential - Pursuant to Protective Order

Page 130

```
 1    documents I have seen and relied upon.
 2        Q.   Is it consistent with your
 3    understanding that it was Johnson & Johnson's
 4    intention to select large platy talc
 5    particles for its products?
 6        MS. PARFITT:  Objection to
 7        form.
 8    QUESTIONS BY MS. BRANSCOME:
 9        Q.   Have you seen that in the
10    documents?
11        A.   I don't know that it's
12    described quite that way, but they certainly
13    were doing a 200 mesh selection.  So -- for
14    their body powders products.  So -- and they
15    were trying -- and they did make attempts to
16    look for sources that were more platy talc
17    than other forms, but that doesn't ensure
18    that everything is platy talc.
19        Q.   Are you familiar with the term
20    "fines"?
21        A.   Yes, generally, but I'm not --
22    but I'm not an expert in the processing of
23    talc as far as how you would go about
24    choosing an ore or a mine.  There's others
25    that will be addressing that.  That's not my
```

Page 131

```
 1    area.
 2        Q.   What is your understanding of
 3    the term "fines"?
 4        A.   My understanding of the term
 5    "fines" has to be looking for a sample or a
 6    group that has been processed such that it
 7    has certain characteristics.
 8        Other than that, I would refer
 9    you to the individuals in litigation that are
10    going to be dealing with the processing.
11        Q.   Okay.  Have you taken into
12    account in your analysis in any way the
13    beneficiation process that occurs between the
14    time that the talc is mined and it ends up in
15    one of the consumer products that is relevant
16    to your analysis?
17        MR. MEADOWS:  Objection.
18        THE WITNESS:  So what do you
19        mean by taking it into account?  Am I
20        aware that they have something that's
21        in place for that?  Yes.
22        But take into account, what do
23        you mean by that?
24    QUESTIONS BY MS. BRANSCOME:
25        Q.   Are you familiar with the
```

Page 132

```
 1    effects that beneficiation can have on the
 2    level of the component -- the components in
 3    talc and what ultimately ends up in one of
 4    Johnson & Johnson's consumer products?
 5        MR. MEADOWS:  Objection.
 6        THE WITNESS:  So I'm not -- I'm
 7        not familiar with all the details, but
 8        I am familiar that it is a process
 9        they're using to attempt to result in
10        a product that has characteristics
11        that would be desirable for a consumer
12        product.
13        Again, there is my
14        understanding that others are going to
15        be discussing the geology or the
16        processing, and that is not something
17        I'm looking at.
18        The literature as it relates to
19        what has been tested in the public
20        literature in particular, and that
21        would be either an ingredient or a --
22        or a consumer product or a -- they may
23        discuss exposure occupationally to
24        mining or milling, which is -- which
25        is an issue that you can consider when
```

Page 133

```
 1    you're reviewing that literature as
 2    well.
 3    QUESTIONS BY MS. BRANSCOME:
 4        Q.   Okay.  And so when you cite --
 5    for example, you have a significant number
 6    of -- I'm trying to find the right paragraph.
 7        You have a section in your
 8    report where you discuss a number of
 9    different articles that relate to talc, and
10    in parentheses you identify that the talc
11    source might be cosmetic, it might be
12    industrial, things of that nature, correct?
13        A.   Yes, I do that on purpose
14    because I wanted -- I did look at the
15    literature to understand what they were --
16    what they were -- what type of exposure they
17    were describing.
18        Q.   Okay.  And so understanding
19    that some of those products are not
20    representative of what ultimately is in
21    Johnson's baby powder, do you have anything
22    in your report that explains how you did or
23    did not give weight to those particular
24    studies?
25        MS. PARFITT:  Objection.  Form.
```

34 (Pages 130 to 133)

Confidential - Pursuant to Protective Order

Page 134

1    THE WITNESS:  Let me look and
2  see what I say.
3    If the question has to do with
4  numerical rankings, no, I did not do
5  that.  But you're asking something
6  else, right, broader than that,
7  correct?
8  QUESTIONS BY MS. BRANSCOME:
9    Q.   The question that I have is,
10  how did -- is there somewhere in this report
11  that I can understand the weight that you
12  assigned to say a study that related to
13  industrial talc as opposed to information
14  about cosmetic talc, for example?
15    MR. MEADOWS:  Objection.
16    THE WITNESS:  So I -- I'm -- I
17  believe I address that.  I don't know
18  it's exactly answering your question,
19  but I lay it out for you the
20  characteristics of the literature in
21  paragraph 37, and I point out that the
22  scientific literature varies.
23    And the fact -- and I point --
24  and I admit -- I'm not admitting.  I'm
25  stating the fact that in some cases

Page 135

1  the authors will not describe it
2  specifically as the type of talc, but
3  just talc, whereas -- with no
4  description of purity or state, for
5  example.  But in cases where the
6  literature does, I did consider that
7  in my weight of the evidence.
8    So, for example, when I -- when
9  I lay it out here in these bullets
10  where I'm putting for you tremolite
11  mining industrial grade cosmetic, it
12  certainly is something that I weighed.
13  And obviously as much information as I
14  can get on cosmetic-grade talc is
15  going to be most important in the
16  assessment, but that doesn't mean the
17  other information isn't relevant.
18    You want me to explain why?
19  QUESTIONS BY MS. BRANSCOME:
20    Q.   Well, so, for example, you
21  describe the Dreessen article that related to
22  trimellitic talc that's mined out of
23  New York.
24    You would agree that
25  trimellitic talc from New York is not

Page 136

1  something that ever ended up in Johnson's
2  products, correct?
3    MR. MEADOWS:  Objection.
4    THE WITNESS:  I don't think I
5  can answer that yes or no.  I haven't
6  done an assessment to see whether it
7  ever ended up in the products.  That's
8  a different question.
9    I certainly am aware of the
10  fact that was not a primary source of
11  their talc, that is true.  I do know
12  that.
13    In other words, I don't have
14  records from -- going back from 1894
15  on what the source of their talc was.
16  So I can't tell you over time.
17    What I do know, what's been put
18  into depositions and testimony of
19  company employees more recently, where
20  it's my understanding that the
21  principal sources over the years were
22  either the Vermont mine, the Italian
23  mine or the Chinese mine.  And there
24  were different interruptions in time
25  where different mines were used,

Page 137

1  depending on sourcing.
2  QUESTIONS BY MS. BRANSCOME:
3    Q.   So as part of your expert
4  analysis where you are evaluating articles
5  that relate to different types of talc from
6  different sources of talc, have you done an
7  analysis of how those particular types of
8  talc do or do not relate to what is in the
9  consumer product manufactured by Johnson &
10  Johnson?
11    MS. PARFITT:  Objection.  Form.
12    THE WITNESS:  The first part of
13  your question, again?  I'm sorry.
14    MS. BRANSCOME:  Would you read
15  it back?
16    THE WITNESS:  Could you read it
17  back to me again?  I didn't mean to
18  wander, but the first few words I
19  missed.
20    (Court Reporter read back
21  question.)
22    THE WITNESS:  Okay.  So I
23  certainly did, which is why I'm
24  breaking this out here for you this
25  way.

35 (Pages 134 to 137)

Confidential - Pursuant to Protective Order

Page 138

1    So I am -- I am certainly
2  recognizing, and I analyzed on the
3  paper -- through the papers what type
4  of product, if available, that the
5  data is on.
6    But if you read my report in
7  the process of risk assessment, all of
8  these categories of papers are
9  relevant to telling you something
10  about what talc can do.  And then when
11  you talk about drawing final
12  conclusions, I'm looking for
13  information, if I can, and I have it,
14  that is on point to the product that
15  was sold.
16    So certainly the studies that
17  give me information on cosmetic-grade
18  talc are extremely important to my
19  assessment, and they're ones that I've
20  discussed or we've even used in trial
21  before when we've talked about putting
22  together a timeline.
23    That's what this is about, by
24  the way.  This discussion here, I'm
25  starting to lay out what information

Page 139

1  was available over time, and that's
2  simply what this is.  It's a survey of
3  the literature that talks about
4  adverse effects of talc, and if I can,
5  I separate it into different qualities
6  or purities.
7  QUESTIONS BY MS. BRANSCOME:
8    Q.  Dr. Plunkett, respectfully, I
9  don't believe you answered my question.
10    Can you point me to anywhere in
11  your expert report that's been produced in
12  this MDL where you do an analysis of how the
13  different talc types and sources that you are
14  citing as support for the toxicity of talc
15  generally relate to the products manufactured
16  by Johnson & Johnson?
17    MR. MEADOWS:  Objection.
18    THE WITNESS:  So I don't know
19  how else to answer that but to tell
20  you I think that's what this whole
21  section is about.  I step you
22  through -- I identify different types
23  of evidence.  I identify for you what
24  was tested in those different pieces
25  of evidence, and then I step through

Page 140

1  that to draw conclusions based upon
2  what was available for me to assess.
3  QUESTIONS BY MS. BRANSCOME:
4    Q.  Okay.
5    A.  I don't know how else to answer
6  it for you.  That's what the section is meant
7  to do, and that's why I broke it out that
8  way.  You know, I recognize that there is
9  data on different things.
10    What's interesting about even
11  the data on different things, there's a
12  common mechanism that is involved with the
13  type of tissue toxicity you get, and that's
14  irritation and inflammation.  Regardless of
15  whether it is of a certain grade or not, you
16  get certain types of adverse reactions.  May
17  be a more sustained reaction with a
18  industrial grade versus cosmetic grade, but
19  they all have the capability to produce that
20  type of adverse effect.
21    Q.  Dr. Plunkett, where can you
22  point me to in your report that you discuss
23  the weight that you give studies that relate
24  to talc from New York as opposed to studies
25  that relate to cosmetic talc that ultimately

Page 141

1  ended up in Johnson's baby powder?
2    MS. PARFITT:  Objection.  Form.
3    THE WITNESS:  I've tried to
4  answer that for you.  The weight that
5  I'm giving -- the weight that I'm
6  giving is part of my assessment.  So,
7  again, I don't give numerical
8  rankings.  I've answered that for you.
9  I don't do that.
10    What I instead do is I'm
11  looking at everything that's relevant,
12  everything that's available.  I do
13  categorize it, so I am selecting -- I
14  am identifying or analyzing the
15  information for what it describes.
16  And then if you go further on down, I
17  try to tell you what I think is
18  important about that information.
19    The overall conclusions I'm
20  drawing in the report, though, when I
21  cite to specific studies in the risk
22  assessment, the majority of those
23  studies I believe that I'm citing for
24  you, outside of notice, have to do
25  with -- that's more of a warnings

36 (Pages 138 to 141)

Confidential - Pursuant to Protective Order

Page 142

1      issue -- have to do with the issue of
2      cosmetic talc. Because the human
3      studies are describing cosmetic talc.
4      The NTP studies is a pure talc. Many
5      of the in vitro studies and other
6      animal studies are looking at,
7      quote/unquote, a talc that is not an
8      industrial grade or from a mine that
9      would have -- be looked at in that
10     way. So --
11     QUESTIONS BY MS. BRANSCOME:
12     Q.    You understand that there are
13     different types of cosmetic talc, correct?
14     A.    Yes, I am aware.
15     Q.    And cosmetic talc can be mined
16     from a number of different mines globally,
17     correct?
18     A.    That's correct.
19     Q.    And some of the studies that
20     you cite in your report are testing cosmetic
21     talc from other consumer products, for
22     example, Cashmere Bouquet, correct?
23     A.    Some. The majority of them are
24     not, but I would agree that some do, yes.
25     Q.    Okay. Have you done an

Page 143

1      analysis of how the talc that is used in
2      Cashmere Bouquet, for example, relates to the
3      talc that is used in Johnson's baby powder?
4             Is that an analysis that you
5      have done before relying on that information
6      in your report?
7      MR. MEADOWS: Objection.
8      MS. PARFITT: Objection.
9      THE WITNESS: My analysis -- I
10     did do an analysis to look at what was
11     described, what products are
12     described, but I certainly -- I
13     certainly did not throw out studies
14     that described Cashmere Bouquet
15     because I would -- I still believe as
16     a toxicologist and a risk assessor
17     that those types of products are
18     important to the overall weight of the
19     evidence about the hazard and the
20     risks posed by talc.
21            You know, I just -- I just -- I
22     guess I disagree with you if you're
23     saying they're irrelevant. I don't
24     believe that they are.
25

Page 144

1      QUESTIONS BY MS. BRANSCOME:
2      Q.    I was simply asking: Did you
3      do an analysis that would allow you to
4      compare the ingredients in another product,
5      like consumer Cashmere Bouquet, before you
6      rendered an opinion with respect to Johnson's
7      baby powder based on tests of Cashmere
8      Bouquet? Did you do that analysis?
9      MR. MEADOWS: Objection.
10     THE WITNESS: I do not have
11     access to internal company documents
12     for the manufacturers of Cashmere
13     Bouquet, so I certainly couldn't do
14     the analysis in the same way that I
15     can do it here, where I can identify
16     what Johnson & Johnson and Imerys
17     describe as sources of the talc that
18     was used for the Johnson & Johnson
19     baby powder, without --
20     QUESTIONS BY MS. BRANSCOME:
21     Q.    So you have no way of knowing
22     one way or the other whether that talc is
23     similar, correct?
24     MR. MEADOWS: Objection.
25     MS. PARFITT: Objection.

Page 145

1      THE WITNESS: Well, I think I
2      do know it's similar, if you look on
3      the bottle as far as what is described
4      it being, but if you're asking me --
5      if you're asking did we fingerprint it
6      to only a particular mine, this is the
7      beauty of the data. The data shows
8      that regardless of the type of product
9      you're looking at, there's consistency
10     across the study.
11            So -- but I did not try to
12     segregate out studies that only dealt
13     with Cashmere Bouquet, no, I did not
14     do that.
15     QUESTIONS BY MS. BRANSCOME:
16     Q.    Okay. As you sit here today as
17     a toxicologist, is it your position that
18     industrial-grade talc that might contain up
19     to 70 percent tremolite presents the same
20     level of toxic effect as cosmetic talc that
21     may contain no tremolite or tremolite at a
22     very, very low level?
23     MS. PARFITT: Objection. Form.
24     THE WITNESS: I haven't formed
25     that opinion, no.

37 (Pages 142 to 145)

Confidential - Pursuant to Protective Order

Page 146

1  QUESTIONS BY MS. BRANSCOME:
2      Q.   Okay.  And so have you formed
3  an opinion that I could find in your report
4  that discusses in any way the relative
5  toxicity of different types of talc?
6      A.   That, you may find.  I need to
7  go back and look how I set it out, but I
8  think I -- I talked with you about the
9  difference between fibrous versus platy.  I
10 do discuss that.
11     And I talk about the problems
12 when you have a complex mixture that has
13 added to it things like asbestos and heavy
14 metals, because I talk about the additivity
15 issue that can come to play.  So that -- in
16 other words, increased risk when you have a
17 complex mixture with additional components
18 that all share the same toxic properties as
19 far as target organs or types of effects or
20 mechanisms that are triggered in the body.
21 That's what I point you to.
22     I -- I don't -- that's the only
23 way I can answer that for you, I think, based
24 on what I know I have in here.
25     Q.   Okay.  You talk about the term

Page 147

1  "asbestiform talc."
2      You talk about asbestiform
3  talc.
4      Are you familiar with that?
5      A.   I do mention that in my report,
6  yes.
7      Where are you?
8      Q.   At paragraph 30.  It's on
9  page 19 of your report.
10     A.   Yes, I'm here.
11     Q.   Okay.  And the first sentence
12 in paragraph 30 you state, "In the published
13 medical literature, there is often discussion
14 of talc using terms such as fibrous talc,
15 asbestiform talc, non-asbestiform talc or
16 tremolite."
17     Do you see that?
18     A.   Yes, I do.
19     Q.   Okay.  Is it your opinion that
20 tremolite is a form of talc?
21     A.   So tremolite is a -- is a -- is
22 a type of fiber or a -- tremolite is a -- is
23 a substance or a entity that has been
24 identified as a specific morphology, I guess,
25 identified characteristics of a -- it has

Page 148

1  identified characteristics.
2      There's -- within the
3  asbestos -- the asbestos literature
4  there's -- it's one of the forms -- forms of
5  asbestos that's described.  For example, in
6  IARC, they describe all of the ones that have
7  carcinogenic properties.  It's one of them.
8      Within the literature within
9  Johnson & Johnson's documents, there's
10 tremolite discussed as -- I assume them
11 referring to asbestos tremolite, asbestos in
12 a tremolite characteristic.  I have seen
13 tremolite talc also mentioned in the
14 literature.
15     If you want a specific
16 discussion of each of those, again,
17 there's -- I understand there's experts that
18 are going to describe the distinguishing
19 characteristics of each of those.
20     I'm only setting out this is
21 what I have seen, talked about, in the
22 literature.
23     Q.   So you are not an expert on the
24 differences between fibrous talc, asbestiform
25 talc, non-asbestiform talc and tremolite as

Page 149

1  it relates to toxicity.  Is that your opinion
2  today?
3      A.   No, that's not what I'm saying.
4  I'm saying that if you want me to -- I'm --
5  if you want me to describe the
6  characteristics and the morphology of each of
7  those individually, that's something a
8  geologist would do.
9      But certainly as far as the
10 toxicity assessment I did, each of these
11 types of -- each of these words, I guess, or
12 names have been applied in the literature
13 when they talk about toxicity of talc.  Some
14 of the literature talks about fibrous talc or
15 just -- other literature just talks about
16 talc.  Some of it, for example, the IARC
17 monographs, distinguish between asbestiform
18 talc and non-asbestiform talc in their
19 assessments of the cancer risk.
20     And then tremolite is discussed
21 as a component of talc.  And I have seen
22 papers that talk about tremolite --
23 nontremolite talc or tremolite-containing
24 talc.  That's how you most often see it.
25     So it's the idea that it is a

38 (Pages 146 to 149)

Confidential - Pursuant to Protective Order

Page 150

1  constituent of certain mines that -- and
2  that's my understanding of it.  But if you
3  want -- and they all -- they all certainly do
4  show that the toxicity can be affected,
5  whether it's a fiber or a platy particle.  So
6  tremolite being a fiber would certainly
7  affect my overall assessment of risk.  The
8  more tremolite that you would have would
9  make -- would make it more likely to be
10  reactive in terms of a foreign body response,
11  depending on the size.
12     Q.    What's your basis for saying
13  that?
14     A.    That's based on a fibrous form
15  versus a platy particle form.  That's the
16  issue of -- I have that paragraph where I
17  talk about what macrophages look for, can
18  engulf or not engulf.  So those are all
19  things that are important to a toxicologist
20  to understand exist.
21        But certainly within my
22  assessment I have to include literature from
23  all of those because of the fact that all of
24  those are relevant to the toxicity profile,
25  since I know that the cosmetic baby powders

Page 151

1  and the data I've seen shows detection of
2  something called fibrous talc.
3        I see detection of tremolite
4  within certain samples of baby powder.
5        And then I have just the
6  general category of asbestiform versus
7  non-asbestiform when I consider the way, for
8  example, IARC has reviewed the
9  carcinogenicity.
10        So those are -- those are terms
11  that I'm laying out because I think they are
12  something you need to understand exists in
13  the literature.
14     Q.    Okay.  But I'm trying to
15  understand, not helping me understand the
16  literature.  I'm trying to understand your
17  opinions with respect to toxicity.
18        Is it, for example, your
19  opinion that fibrous talc has the same toxic
20  potential -- let's focus specifically with
21  respect to ovarian cancer -- as tremolite?
22     A.    I haven't formed that opinion,
23  but, again, I would -- my opinion has been
24  formed on the fact that we have complex
25  mixture that includes all of these things.

Page 152

1     Q.    Okay.  And so when you're
2  looking at a complex mixture, you would agree
3  as a toxicologist it would be important to
4  understand the constituent elements of that
5  mixture, correct?
6     A.    Yes, it is important to
7  understand that this is -- what is in the
8  mixture, and that's -- that's part of what I
9  try to do.
10     Q.    Okay.  And it would be
11  important before drawing conclusions from one
12  study that might have different constituent
13  components, it's important to understand the
14  relative toxicity of individual constituent
15  elements, correct?
16     A.    Depends if you can or not.  I
17  mean, there's certain types of studies you
18  can, where in the published literature that's
19  been described.  That's why I'm pointing this
20  out.  It's the idea that within the
21  literature, when you go through, it's
22  important to understand what you can say
23  about the consistency across the literature
24  where maybe different types of talc are
25  discussed.

Page 153

1        And that's what I -- I think I
2  lay out for you.  I tell you there's
3  consistency in certain toxic effects that are
4  seen.  Regardless of the form that you're
5  looking at, talc has certain properties, and
6  all of these things are -- been shown to be
7  in the complex mixture, so I have -- as a
8  result, all of that literature has relevance
9  to at least the hazard part of my assessment,
10  and certainly have relevance to -- when you
11  want to talk about warning and the final risk
12  assessment, they're definitely relevant, but
13  certainly the -- when I go through this
14  process, I am trying to focus as much as I
15  can on a product that is most similar to the
16  one I'm assessing.
17        So obviously that's why --
18  that's one of the reasons I do look at the
19  human data, because the human data is
20  involving a consumer product use, which is
21  what I'm talking about here.
22     Q.    Is it using specifically
23  Johnson's baby powder?
24     A.    Many of them are, yes.
25     Q.    Okay.

39 (Pages 150 to 153)

Confidential - Pursuant to Protective Order

Page 154

1      A.   Based on my understanding of
2  what I see discussed within the literature.
3      Q.   Did you identify in your report
4  specifically which report -- which studies
5  have used a consumer product manufactured by
6  Johnson & Johnson?
7      A.   I haven't laid them out
8  individually, no, but I am aware of
9  discussions of this general issue within some
10  of the documents I've seen, and essentially
11  Johnson's body powders products were the
12  overwhelming share of the market.
13      Q.   But you would agree that
14  studies that did not involve the consumer
15  product manufactured by Johnson & Johnson
16  should be given less weight when analyzing
17  whether or not there are risks associated
18  specifically with Johnson & Johnson's
19  products?
20      MS. PARFITT:  Objection.  Form.
21      MR. MEADOWS:  Objection.
22      THE WITNESS:  It depends on the
23  question being asked within the
24  assessment, the risk assessment.  It
25  really does, I mean, because each of

Page 155

1  these studies brings a piece of
2  evidence to the risk assessment.
3      And so the question is -- for
4  each one, you consider it on a
5  case-by-case basis.  It is possible,
6  yes, that you would give less weight.
7  It's also possible that you would not,
8  dependent upon what you know about
9  that study and how it relates to other
10  studies that are out there.
11  QUESTIONS BY MS. BRANSCOME:
12      Q.   So methodologically, how would
13  I understand from your report marked as
14  Exhibit 4 under what circumstances to give a
15  study that relates to, for example,
16  industrial talc less weight than a study that
17  actually used Johnson's baby powder?
18      MR. MEADOWS:  Objection.
19      THE WITNESS:  Well, I've tried
20  to tell you that.  That's what I said
21  for you.  That's why I am doing it.  I
22  certainly am trying to focus in on
23  studies that deal with the consumer
24  product.
25      But what I find when I look

Page 156

1  across the studies that are dealing
2  with not the consumer product but
3  other descriptions, there is a
4  consistency in the types of effects
5  you see.
6      And since I'm not quantifying
7  the risk but identifying it as being
8  increased or not, in other words, is
9  it more likely than not that someone
10  exposed in this way could be at a risk
11  of ovarian cancer, that's what I'm
12  talking about.
13      So again, it's -- if I was
14  trying to identify differences in
15  cancer potency factors for different
16  types, then, yes, if I had an animal
17  study on each of those, I could
18  compare potency for cancer, but that
19  hasn't been done.
20  QUESTIONS BY MS. BRANSCOME:
21      Q.   Okay.
22      A.   So instead, what I have to do
23  is rely on what is available to me.  And
24  based on my judgment, that's how I review the
25  studies.

Page 157

1      Q.   And so for the opinions that
2  you are offering in the MDL, you agree that
3  you are not quantifying the risk associated
4  with Johnson's baby powder, SHOWER TO SHOWER®
5  or Shimmer with respect to the potential for
6  causing ovarian cancer?
7      MS. PARFITT:  Objection.  Form.
8      THE WITNESS:  In terms of a
9  cancer potency factor, that is true, I
10  am not.  Instead, what I am doing is I
11  am quantifying whether or not I
12  believe that the risk is increased
13  above a background risk.
14      That has to do with -- that's
15  where I bring in, in my risk
16  assessment, the human data, because
17  the human data is showing
18  statistically significant increases in
19  risk in populations using the consumer
20  product.
21      So I have a quantification
22  where I'm using the word "increased,"
23  and I believe to a reasonable degree
24  of medical certainty that indeed the
25  risk is increased.  So I'm quantifying

40 (Pages 154 to 157)

Confidential - Pursuant to Protective Order

Page 158

1    in that way, but I'm not giving it a
2    number.  I'm not saying that the
3    cancer potency factor is such that you
4    increase the risk from one in a
5    million to 10 in a million to 1 in a
6    thousand.  That I have not done
7    because I don't have the data, the
8    studies.  The company has not done
9    studies on each of these to allow me
10    to do that.
11    QUESTIONS BY MS. BRANSCOME:
12    Q.    Okay.  The reference that you
13    made to the human data that you believe shows
14    a statistically increased risk in populations
15    using the consumer product, have -- which --
16    have you identified in your report which of
17    those studies are specifically using a
18    product that was manufactured by Johnson &
19    Johnson?
20    A.    I don't lay that out for my
21    report, I do not, but certainly it is
22    something that for some of the studies I
23    believe you can -- you might be able to get
24    some of that information from.  But certainly
25    I have not laid that out individually in my

Page 159

1    report, no.
2    Q.    And you would agree that for
3    some of those studies there is no information
4    as to the specific type of consumer talc that
5    the individuals who are being studied used,
6    correct?
7    MS. PARFITT:  Objection.  Form.
8    THE WITNESS:  I would agree
9    that in some of those studies they're
10    not saying, but that is why you look
11    at the evidence overall.
12    And what's important to look at
13    in terms of now -- if you wanted to go
14    to Bradford Hill, that's why you look
15    at things such as consistency.  So
16    what do the studies show.  We see a
17    certain level of increased risk across
18    studies, regardless of who did the
19    study or what population was being
20    looked at.
21    So that's the best way I can
22    answer that for you.  That is -- that
23    is part of the -- of the assessment
24    that you look at.
25

Page 160

1    QUESTIONS BY MS. BRANSCOME:
2    Q.    In reaching your opinion in the
3    MDL that there is an increased risk above
4    background of ovarian cancer from the use of
5    products manufactured by Johnson & Johnson,
6    have you made an attempt to identify
7    specifically which studies, the human studies
8    on which you rely, test or look at people who
9    have used Johnson & Johnson's products?
10    MS. PARFITT:  Objection.  Form.
11    THE WITNESS:  It's my -- my
12    review of the study indicates that I
13    would say for the vast majority of
14    them you cannot do that.
15    But you can take what is
16    reported and look at things such as
17    market share and those kind of things
18    to get an idea of what you believe the
19    exposure would have been.
20    But certainly I have not -- I
21    have not tried to apply some kind of a
22    numerical value to how many people in
23    the study may have used Johnson's baby
24    powder or not, no, that has not been
25    done.  I don't think anybody -- any of

Page 161

1    the bodies that have looked at this
2    have done that.
3    QUESTIONS BY MS. BRANSCOME:
4    Q.    You have not done a market
5    share analysis, correct?
6    A.    No, I've seen this in documents
7    only.  I have not done my own.  There are
8    company documents that talk about their
9    market share.
10    Q.    Okay.  Have you made an attempt
11    to examine the levels of fibrous talc or
12    asbestiform talc that are in different
13    consumer products, aside from Johnson's baby
14    powder or SHOWER TO SHOWER® or Shimmer?
15    A.    So for that are you referring
16    to things such as -- other types of cosmetics
17    like foundations or lipsticks or --
18    Q.    I'll rephrase.
19    Have you made any attempt to
20    examine whether other cosmetic talc body
21    powders have a different percentage of
22    fibrous, or what you refer to as asbestiform
23    talc, from the Johnson & Johnson products?
24    Have you done any analysis to
25    make that comparison one way or the other?

41 (Pages 158 to 161)

Confidential - Pursuant to Protective Order

Page 162

1      MS. PARFITT: Objection. Form.
2      THE WITNESS: I certainly
3  haven't done -- I certainly didn't do
4  a directed analysis to try to
5  determine that, but there is
6  information, I believe, in -- I think
7  if you look at some of Dr. Longo's
8  work, that may be there.
9      And I believe in Dr. Blount's
10  published paper there may be a
11  discussion of the type of powder
12  product used, where she was looking
13  for -- at least for asbestiform --
14  asbestos within the talc.  It may be
15  tremolite as well, but -- if you want
16  me to look, I can do that.  I just
17  don't recall whether -- I think she
18  did talk about sources of the talc,
19  where it came from, so...
20  QUESTIONS BY MS. BRANSCOME:
21      Q.    Okay.  But as you sit here
22  today, you can't point me to any analysis
23  that you did or an analysis that you relied
24  on that would relate different brands of
25  cosmetic talc body powders with respect to

Page 163

1  their constituent components?
2      MS. PARFITT:  Objection.
3  Completely misstates her testimony.
4  She mentioned Dr. Blount.  She
5  mentioned others.
6      THE WITNESS:  So I think what I
7  started with, I said I haven't done a
8  directed analysis to try to determine
9  specifically how this product versus
10  this product versus this product may
11  have looked over time, because I don't
12  have access to a full data to do that.
13      But what I do have is data that
14  has -- I do see published data, for
15  example, Blount and maybe some of the
16  other published studies, that looked
17  at this issue, at least of asbestos
18  presence in talc.  And I believe
19  Dr. Longo also had things that weren't
20  just Johnson's.  I believe he had
21  Cashmere Bouquet, for example, samples
22  in some of the things he looked at.
23      So I can point you to those
24  things that I have reviewed, but I
25  haven't -- there's nowhere in here

Page 164

1  that I state for you that it's my
2  opinion that Cashmere Bouquet has this
3  specific pattern of constituents as
4  compared to Johnson & Johnson's.  No,
5  I have not done that.
6  QUESTIONS BY MS. BRANSCOME:
7      Q.    Okay.  And that would be true
8  for any other brand of cosmetic talc, body
9  powders, Jean Nate, Lily of the Valley, not
10  just Cashmere Bouquet, correct?
11      MS. PARFITT:  Objection.
12      THE WITNESS:  That is correct,
13  I don't have access to that
14  information.
15  QUESTIONS BY MS. BRANSCOME:
16      Q.    Have you done any analysis of
17  the constituent components of talc and how
18  they have changed even within Johnson's --
19  Johnson & Johnson's manufactured products,
20  how the constituents of the consumer products
21  may or may not have changed over time?
22      A.    I've done some of that, yes,
23  and I laid that out, I think, for you, when I
24  talk about the differences in the products
25  that are described within the documents, the

Page 165

1  company documents, from the '70s versus the
2  '80s versus later on, as far as the changes
3  that were made to specifications of the
4  product, for example.  That's something --
5  and I think I've talked about that a bit at
6  trial as well.
7      Q.    Okay.  And is it your view that
8  the risk potential for Johnson & Johnson's
9  manufactured products have changed at all
10  over time with respect to ovarian cancer?
11      MS. PARFITT:  Objection.
12      THE WITNESS:  I have not -- I
13  have not attempted to differentiate a
14  risk potential at only one point in
15  time.
16      What I have done over points of
17  time is looked at the issue of
18  warnings and what should be warned
19  about.
20      But my analysis related to the
21  hazard or the risk assessment of the
22  products is considering all of the
23  available information, which would be
24  all of that information over time.
25

42 (Pages 162 to 165)

Confidential - Pursuant to Protective Order

Page 166

QUESTIONS BY MS. BRANSCOME:
Q.   Okay.  You talk about, in paragraph 35 primarily -- we'll talk about the fragrance components in more detail, but you talk about the idea of chemicals being a potential irritant.
Are you familiar with that?
A.   Yes, that's correct.
Q.   Is it your position that any product that contains chemicals that could be an irritant should be labeled with a health warning?
MS. PARFITT:  Objection.
MR. MEADOWS:  Okay.
THE WITNESS:  I don't think that's -- no, I don't think I've formed that specific opinion.
But the opinion that I think I'm expressing here is that when you have a -- the information that I have, which unfortunately the company hasn't given us percentages or actual levels, instead, what I do as a toxicologist, I look at what is there.  And when I see over a hundred chemicals there,

Page 167

that 70 percent of them have been linked as an irritant hazard, there is the issue of toxicological additivity to consider.
So certainly as a risk assessor, when I have that many potential sources of irritation as far as chemicals going into a complex mixture, certainly I think I have formed the opinion that I think that is something that needs to be considered when you're talking about providing information to consumers, yes.
QUESTIONS BY MS. BRANSCOME:
Q.   As a toxicologist, would it be important to you to understand the exact percentages of all of the constituent components of, say, Johnson's baby powder, for example?
A.   Are you talking about just the fragrance or are you talking about everything that's in it?
Q.   Dr. Plunkett, you referenced the fact that the company has not provided

Page 168

you with specific percentages, and so I'm asking you, is that something that as a toxicologist would be important information to you?
A.   Depends.  Certainly with the fragrance -- and I'm talking about the conversation about this paragraph is focusing on the fragrance components.
So, yes, I mention that it would be nice to know, it would be good to know, if we could, exactly what was in there, because I could quantify the hazard or quantify the risk, actually.  So instead, I have -- I identify it as a hazard, but I can't quantify it without those levels.
But does that change -- make a difference in the overall conclusions I draw?  No, it doesn't affect the overall conclusions that I have drawn, but it adds that other piece of the puzzle that deals with the fact that we have a complex mixture that have a combination of ingredients that target irritation.
And irritation and the potential to produce an inflammatory

Page 169

response, in my -- if you've read my report, you understand that I think that's a key factor in increasing the risk for ovarian cancer.
Q.   Understanding the percentages of the constituent components, is that limited only to fragrance, or would it also be important to understand the percentages for the heavy metals that you contend are in Johnson's baby powder?
A.   So if I was trying to define the hazard of each component, I would certainly want one to know that.  As a result, what I'm doing instead is looking at the complex mixture.  In other words, this is a mixture of all these things.
I break out those individual components, or constituents, to tell you about the hazard that is brought to play or the toxicity profiles that exists.  And what's important about that in my overall evaluation of the end product, which is what my risk assessment is based on, the end product, shows that I have multiple components with similar types of effects.

Confidential - Pursuant to Protective Order

Page 170

1    And as a toxicologist, when you do that, that
2    affects the conclusion that you can draw
3    about a body of literature.
4         Q.   Okay.  You do understand that
5    there is testing data available about the
6    percentages of the constituent components
7    with respect to heavy metals, et cetera, that
8    have been in Johnson's baby powder over time,
9    correct?
10        A.   There is some information.
11   Unfortunately, the information is not
12   complete as to every lot or every sample, as
13   far as what I have seen.  And also, there's
14   some -- some of the sampling is reported as
15   more of a limit versus an actual
16   quantification.  So it depends upon which --
17   which result, study result or document,
18   you're looking at.
19        There is some there, yes, and
20   that's one of the reasons why I identified
21   these as part of my risk assessment, because
22   I look for a pattern of these metals that are
23   known to carry a hazard and whether or not
24   these are ones I'm seeing detected time and
25   time again.

Page 171

1         Q.   But you made no attempt to
2    quantify the risk with respect to any of
3    those components or use that data in any way,
4    correct?
5         MS. PARFITT:  Objection.  Form.
6         THE WITNESS:  No, I used
7    that -- that data as part of -- my
8    risk assessment as part of my hazard
9    assessment, absolutely.  It's part of
10   the hazard assessment.
11        But as far as quantifying them
12   individually, no.  I am quantifying
13   the risk and looking at the risk of
14   the entire product, not of just one
15   individual component of the product.
16   QUESTIONS BY MS. BRANSCOME:
17        Q.   Well, we already discussed
18   you're not quantifying the risk with respect
19   to the entire product, correct?
20        A.   Well, I'm quantifying it in
21   terms of an increase above background, which
22   I'm not giving you a -- I told you I wasn't
23   giving you a cancer potency factor.  That is
24   true.  That I am not doing.
25        But I am quantifying it by

Page 172

1    using a word such as an increase -- an
2    increased risk.
3         Is that a specific number?  Am
4    I telling you that it's increased by two
5    times or four times or six times?  No.  The
6    data available did not allow us to do that,
7    with the exception of the epidemiological
8    data.  And the epidemiological data can show
9    you that in that piece of evidence there
10   appears to be a 30 percent increased risk
11   above background.
12        Q.   Did you make an attempt to
13   quantify the risk with the data that you had
14   available to you with respect to the final
15   consumer product?
16        A.   I could not, based on the data
17   I had, because I didn't have a
18   well-controlled animal study to be able to
19   pull that out that way.
20        Instead, what I -- in this type
21   of weight of the evidence, you look at what
22   you might be able to quantify based on the
23   human data.  And certainly the human data
24   showing the statistically significant
25   consistent findings across studies for that

Page 173

1    30 percent increased risk, that is part of my
2    overall weight of the evidence for me making
3    the statement the risk is increased.
4         But you'll notice I don't say
5    increased risk of 30 percent, because I don't
6    believe that I can state that with certainty
7    in the way I do a risk assessment.  But
8    certainly as any one individual -- any one
9    individual piece of evidence or any one body,
10   like the epi data, others have made -- other
11   bodies who have looked at the -- talked about
12   the consistency of the increased risk signal
13   in the epi studies as being in the range of
14   30 percent.
15        Q.   Okay.  But you would agree that
16   based on the methodology that you applied in
17   this case, you could not say to a reasonable
18   degree of scientific certainty that there is
19   an increased risk of, for example, 30 percent
20   with respect to use of Johnson's baby powder
21   and ovarian cancer, correct?
22        MR. MEADOWS:  Objection.
23        THE WITNESS:  I have not done
24   that.  And I'm not saying that
25   somebody else couldn't do that.  I

44 (Pages 170 to 173)

Confidential - Pursuant to Protective Order

Page 174

1    have not -- I have not chosen to do
2    that based on my evaluation of the
3    data.
4    QUESTIONS BY MS. BRANSCOME:
5        Q.    And the same would be true if I
6    asked that question and substituted any
7    particular number, a 10 percent increased
8    risk, a 20 percent increased risk, correct?
9            MR. MEADOWS:  Objection.
10           THE WITNESS:  I haven't given a
11       specific number in my final opinions,
12       that is true.
13   QUESTIONS BY MS. BRANSCOME:
14       Q.    Okay.
15       A.    I've tried to explain to you
16   what evidence I do think is there, however.
17       Q.    Now, we've talked about
18   different types of talc that might have
19   different constituent components, but you
20   also look at exposure to talc in an
21   occupational setting.
22           Do you recall that?
23       A.    Some of the studies that I've
24   relied upon, yes, some of them were
25   occupational.

Page 175

1        Q.    Okay.  And you understand that
2    in an occupational setting, you would agree
3    that the exposure, particularly via
4    inhalation, would be much higher than it
5    would be through the use of a consumer
6    product, correct?
7        A.    It depends on the occupation,
8    but, yes.  For example, I would agree a miner
9    would be expected to have that, but there are
10   certain, quote/unquote, occupational studies
11   where the exposure levels that -- for
12   example, there are -- I believe there's at
13   least one study that looked at application of
14   talc powders in -- maybe in a material,
15   coating materials in a factory.  Those kinds
16   of studies would be different than a mining
17   study.
18           But, certainly, yes, I
19   understand that occupational studies, the
20   inhalation exposure is the pathway that would
21   be predominant versus in the consumer body
22   powder use, I'm talking about the predominant
23   exposure pathway in my opinion is going to be
24   through perineal use, even though inhalation
25   exposure can occur.

Page 176

1        Q.    Is it your opinion as you sit
2    here today that someone could develop ovarian
3    cancer through -- exclusively through the
4    inhalation of Johnson's baby powder?
5            MS. PARFITT:  Objection.
6            THE WITNESS:  I haven't formed
7        that opinion at this point in time.
8    QUESTIONS BY MS. BRANSCOME:
9        Q.    Have you done any analysis or
10   can you point me to any analysis in your
11   report that makes a comparison of the
12   exposure levels that might be seen in an
13   occupational setting to what would be seen by
14   a consumer?
15       A.    Are you asking me for a piece
16   of evidence that does that comparison, or is
17   there evidence that allows you to do that
18   comparison?
19       Q.    Have you cited or discussed any
20   of the evidence or done an analysis in any
21   way that would compare exposure levels in an
22   occupational setting to what you would
23   anticipate a consumer using Johnson's baby
24   powder might be exposed to?
25       A.    I don't think I did it as a

Page 177

1    separate analysis, but as part of my analysis
2    I considered evidence that showed -- provided
3    me with such data.  So, for example, if you
4    want, I can point you to a -- I have an
5    inhalation paragraph, I think.
6            Let me look for it real quick.
7    See if I can find it quickly for you.  I
8    don't want to waste your time.
9        Q.    Sure.
10       A.    So there's -- I don't see it
11   cited here, but there's at least one document
12   I reviewed where the company themselves made
13   a comparison, and I have seen that, of
14   inhalation exposure to talc suspended in air
15   with diapering.  Dr. Longo has done a
16   measurement of exposure in air with perineal
17   application of talc.  So I'm aware of those
18   studies.
19           And then I certainly am aware
20   of the fact that those numbers are different,
21   or smaller, than many of the numbers I see
22   reported in some of the occupational studies.
23   But I can't say that's true for all.
24           I would certainly, though, say
25   that if you're just talking inhalation, I

45 (Pages 174 to 177)

Confidential - Pursuant to Protective Order

Page 178

1    certainly would expect a miner or a miller to
2    have a greater potential for inhalation
3    exposure than routine use of the consumer
4    product, with the exception of the studies --
5    the reports of large amounts of exposure in
6    children where the inhalation -- where they
7    were inhaling large amounts of powder.
8            And so that's a different
9    story.  That's sort of an acute overdose
10   exposure, I guess, versus the typical daily
11   exposure through occupational or consumer
12   use.
13       Q.    And that raises an interesting
14   question.  You discuss health hazards
15   associated with talc being known, and in some
16   cases deaths had been reported.
17           You're aware that those relate
18   to asphyxiation deaths, correct?
19       A.    Or long-term injury to lungs.
20   Maybe not an immediate asphyxiation, but lung
21   damage produced by large amounts -- some of
22   the children would go to the hospital and be
23   sick for a while and then die.  So they
24   didn't asphyxiate immediately, right?  But
25   some of them did.  You're exactly right.

Page 179

1            Both of those things occur, and
2    I address that also in my warning section
3    about the fact that that warning didn't --
4    was not put on the product for a long period
5    of time even though those types of reports
6    were coming in early.
7        Q.    You would agree that that is a
8    completely different biologic mechanism than
9    what you are proposing the biological
10   mechanism is for ovarian cancer to develop
11   with respect to talc use, correct?
12           MR. MEADOWS:  Objection.
13           THE WITNESS:  I would agree
14   that it's an acute response versus
15   chronic, yes, that I agree with.
16           It's not entirely different in
17   some cases because some of the tissue
18   reactions you saw were indicative of
19   irritation when some of the lung
20   samples were looked at.  But
21   certainly, yes, that's acute exposure
22   versus chronic exposure, and I'm
23   focusing on ovarian cancer on chronic
24   exposure scenarios.
25

Page 180

1    QUESTIONS BY MS. BRANSCOME:
2        Q.    Okay.  Now, you would agree
3    that -- so let's set aside inhalation.
4            You agree that for talc -- for
5    Johnson's baby powder or another one of
6    Johnson & Johnson's consumer talc products to
7    reach an individual's ovaries, it must pass
8    from the perineum, through the vagina and the
9    cervical canal, move across the uterus -- and
10   again, it's the ciliary motion of the
11   fallopian tubes -- cross the peritoneal space
12   between the fimbriae and ovaries, escape
13   phagocytosis in the peritoneal space, and
14   then attach to the surface of the ovaries,
15   correct?
16           MS. PARFITT:  Objection.  Form.
17           MR. MEADOWS:  Okay.
18           THE WITNESS:  If the issue is
19   attaching to the surface, yes.
20   There's also some information
21   indicates the site of attack may be
22   actually at the fallopian tube exit to
23   the peritoneum.  But, yes, that's
24   correct, there's been some discussion
25   in the literature on ovarian cancer

Page 181

1    about whether the tumors are arising
2    in the tubes versus the ovaries.
3            But I would agree, I think
4    both -- I think both of those
5    things -- those things -- there is a
6    passage that has to happen, regardless
7    of whether the end point is at the
8    fallopian tube or at the ovary.
9    QUESTIONS BY MS. BRANSCOME:
10       Q.    Okay.  Is it your view that the
11   consensus has been reached that ovarian
12   cancer can be caused by talc landing in the
13   fallopian tubes?
14       A.    I haven't formed that opinion,
15   though I do believe this will be discussed by
16   some of the other experts.
17       Q.    Okay.  Have you personally
18   conducted any tests or experiments to confirm
19   the theory that talc migrates from
20   application at the perineum to the ovaries?
21       A.    If by that you mean something
22   where I performed a laboratory test myself,
23   no, I have not done that.
24       Q.    As a toxicologist, are you
25   capable of doing that?

46 (Pages 178 to 181)

Confidential - Pursuant to Protective Order

Page 182

1       A.   Yes, I believe if asked I
2   could -- I could attempt to design something
3   to look at that issue.
4       Q.   Okay.
5       A.   But I would argue that I think
6   it doesn't make a lot of sense to revisit
7   based upon what we already know from the
8   scientific literature and the review papers
9   from the gynecological community.  I believe
10  it's -- it's understood that it can migrate.
11      Q.   In your opinion, has an animal
12  model been successfully developed that would
13  allow the testing of talc migration in humans
14  from the perineum to the ovaries?
15      A.   I think I tell that you in my
16  report.  I believe that the human data is the
17  relevant data to look at this issue.
18          So it would be very difficult
19  to design a study to do this based on the
20  typical laboratory species that are used in
21  toxicology testing.  Even -- even the monkeys
22  have issues, and the biggest issues with
23  monkeys is the ethicality of using a monkey
24  to settle -- to address a question that I
25  believe is settled within the gynecological

Page 183

1   and scientific community.
2       Q.   Now, you state in your report
3   that talc that's applied through perineal
4   use -- I believe the term you use --
5   routinely migrates to the ovaries.
6           Is that your opinion?
7       A.   Are you reading from my report?
8           MR. MEADOWS:  To the extent
9   that question is still lingering, I
10  object to it.
11  QUESTIONS BY MS. BRANSCOME:
12      Q.   On paragraph 43 on page 29.
13      A.   So I think as I've stated it,
14  the studies that I have reviewed demonstrate
15  that inert particles routinely move from the
16  lower female reproductive tract up into
17  fallopian tubes and towards the ovaries.
18      Q.   What do you mean by routinely?
19      A.   It's the percentages of
20  movement that are reported in the patients.
21  In other words, if you look at some of the
22  individual studies -- if you want we can pull
23  them out, but, you know, eight of ten
24  patients, nine of ten patients, all the
25  patients showed movement of the particles.

Page 184

1           And then on top of that, you
2   have the review articles that talk about
3   migration of particles in the female
4   reproductive tract and are describing it as
5   an event that is known to occur.  So it's
6   those things weighed together.
7           But certainly routine could be
8   supported by the observations where the
9   majority of the patients in the studies were
10  showing movement of inert particles.
11      Q.   Is it your opinion that every
12  perineal application of cosmetic talc powder
13  results in talc being deposited on the
14  ovaries?
15      A.   I have not formed that opinion,
16  no.
17      Q.   Have you formed an opinion as
18  to with what frequency -- so let's say
19  someone uses a cosmetic talc on a perineal
20  application ten times.  Out of those ten
21  times, have you formed an opinion as to how
22  many of those instances would talc deposit on
23  the ovaries?
24          MS. PARFITT:  Objection.
25          THE WITNESS:  I haven't formed

Page 185

1   an opinion in that particular way, no.
2   I think what I've -- I've tried to
3   describe to you in my report is that I
4   believe it is known that inert
5   particles have the ability to migrate.
6   And based on that, I form the opinion
7   that it's my opinion to a reasonable
8   degree of scientific certainty, which
9   would be a more likely than not
10  standard, that particles of talc would
11  be migrating when women are using them
12  perineally.  But I haven't told you
13  that it has to be a specific number,
14  no.
15  QUESTIONS BY MS. BRANSCOME:
16      Q.   Have you done any analysis to
17  establish over a lifetime use of cosmetic
18  talc where the app -- the perineal
19  application, with what frequency during a
20  lifetime the talc may have been deposited on
21  that individual's ovaries?
22      A.   So I certainly looked for
23  information to allow me to assess that, but
24  unfortunately those kinds of studies would be
25  unethical to do.  Because that would be a

47 (Pages 182 to 185)

Confidential - Pursuant to Protective Order

Page 186

1   matter of sampling women during -- using them
2   and then taking biopsies, and that's
3   something that would be difficult to do.  I
4   would say impossible to get approval to do
5   under human testing guidelines.
6       Q.   Okay.  So it's your opinion
7   that it is possible for talc that is applied
8   through a perineal application to reach the
9   ovaries, but you cannot say with what
10  frequency that occurs?
11      MS. PARFITT:  Objection.  Form.
12  Misstates her testimony.
13      THE WITNESS:  That's not --
14  what I'm telling you is, I think it --
15  that to a reasonable degree of
16  scientific certainty that it migrates,
17  and that would be the standard of more
18  likely than not.  I think it's more
19  likely than not that the talc is
20  reaching the ovaries when people are
21  using it perineally.
22      I did form the opinion -- and
23  I've talked about this at trial and
24  yesterday.  I have formed the opinion
25  that this is a issue of chronic or --

Page 187

1   or use of the products.  In other
2   words, people aren't just using it
3   once, but people are using it -- you
4   can use the word "routinely," as a
5   habit, in their daily life perineally.
6   And that would be consistent with the
7   studies that have been done that have
8   looked at the issue of dose response.
9       And I discuss that in my
10  report, too.
11  QUESTIONS BY MS. BRANSCOME:
12      Q.   Okay.  But you have not made an
13  attempt to quantify, nor have you seen it in
14  the literature, the overall dose of talc that
15  someone might be exposed to in terms of
16  contact with the ovaries throughout their
17  lifetime, chronic use of cosmetic talc?
18      MS. PARFITT:  Objection.  Form.
19      THE WITNESS:  Those -- that's
20  the kinds of studies that have not
21  been done and I believe could not be
22  done based upon ethics of human
23  testing.  But certainly I -- that --
24  that data is not available that I'm
25  aware of.

Page 188

1       MS. BRANSCOME:  Okay.  Can we
2   just go off the record for a second?
3       VIDEOGRAPHER:  We are going off
4   the record at 12:23 p.m.
5       (Off the record at 12:23 p.m.)
6       VIDEOGRAPHER:  We are back on
7   the record at 12:24 p.m.
8   QUESTIONS BY MS. BRANSCOME:
9       Q.   As you sit here today, how
10  would you characterize the biological
11  mechanism by which you claim Johnson's baby
12  powder, their other cosmetic talc products,
13  present a risk of ovarian cancer?
14      A.   So I outline this for you in
15  the MDL report.  I think I have a section
16  on -- let's see if I can -- you want me to
17  tell you where or...
18      So paragraph 65, I think I set
19  out part of this argument or part of this.
20  And then also in paragraph -- I believe in
21  67.
22      Q.   All right.  Well, let me take a
23  step back.
24      Is it your opinion that the
25  biological mechanism by which talc, cosmetic

Page 189

1   talc, can in your view cause ovarian cancer,
2   is that something that has been definitively
3   established?
4       A.   What do you mean by
5   definitively?  I mean, I think -- I believe
6   more likely than not that -- so I believe I
7   have reached a conclusion that I think what
8   the most likely biologically plausible
9   mechanism, but maybe you're ask -- meaning
10  something else.
11      Q.   Okay.  Well, let's start with
12  specifically you discuss a number of
13  different potential mechanisms in your
14  report.  So if you believe you have reached
15  an opinion more likely than not about the
16  specific biological mechanism by which
17  cosmetic talc and specifically Johnson &
18  Johnson's products can cause ovarian cancer,
19  can you describe that for me?
20      A.   So it's a chronic inflammatory
21  process, and so -- but like all compounds,
22  constituents, even drugs that we look at, we
23  don't know each individual step within the
24  molecular mechanism.
25      Instead, what we know is that

48 (Pages 186 to 189)

Confidential - Pursuant to Protective Order

Page 190

1    there are certain components to the process
2    of cancer that are consistent with the
3    effects produced by talc, and we know that
4    talc can produce a chronic inflammatory
5    process.
6            And so that's why I was
7    pointing you to the paragraph 65 and I think
8    67.
9        Q.   Is it your opinion that
10   consensus has been reached in the scientific
11   community that cosmetic talc can cause
12   ovarian cancer through a chronic inflammatory
13   response?
14           MS. PARFITT:  Objection.
15           THE WITNESS:  I don't know that
16       that's exactly the opinion I've
17       formed.
18           Would you like me to -- I could
19       restate what I believe, but I don't
20       think that's exactly how I would state
21       it, no.
22   QUESTIONS BY MS. BRANSCOME:
23       Q.   Okay.  So then yes or no:  Has
24   consensus been reached in the scientific
25   community that cosmetic talc can cause

Page 191

1    ovarian cancer through a chronic inflammatory
2    process?
3        A.   I don't believe I formed the
4    opinion either way, that it's yes or no,
5    because I haven't tried to -- I haven't tried
6    to form the opinion about what the -- in
7    other words, I haven't -- I can't say for
8    every scientist out there.
9            I certainly can tell you what I
10   believe based on what the consensus of
11   science says about mechanisms underlying
12   cancer and the consistency of those
13   mechanisms with talc, and then I have an
14   opinion about what I believe that information
15   says.
16           I do believe my opinions,
17   however, are consistent with some consensus
18   statements, such as the issue on the
19   mechanism is consistent with consensus
20   opinion reached by IARC, where they discuss
21   the inflammatory process as an underlying
22   biologically plausible mechanism that can
23   lead to ovarian cancer.
24           I think it's consistent with
25   the Canadian risk assessment where they

Page 192

1    discuss those issues.
2            I think it's consistent with --
3    I don't know if the ACOG statement goes that
4    far on mechanism, but it does talk about
5    ovarian cancer.  That's a recent statement.
6            And I believe it's consistent
7    with some of the -- I believe my opinions are
8    consistent with some of the opinions reached
9    by others in science, but that's the only way
10   I can answer that for you.
11       Q.   Okay.  Because you have not,
12   one way or the other, done an evaluation of
13   whether or not chronic inflammatory process
14   is a biological mechanism on which the
15   scientific community has reached general
16   consensus with respect to the causation of
17   ovarian cancer; is that correct?
18           MR. MEADOWS:  Objection.
19           THE WITNESS:  I can't tell you
20       that -- I can't tell you that every
21       body that's looked at it, but I have
22       tried to point you to evidence that I
23       believe is consistent with that.
24           For example, the IARC would be
25       a good example of consensus on

Page 193

1    biologic mechanism because they have a
2    whole part of their assessment of
3    non-asbestiform talc and perineal
4    cancer -- of perineal use and ovarian
5    cancer that discusses mechanism.  And
6    that is consistent with what I have
7    said.  So there is a consensus
8    opinion.
9            But I guess what I'm saying to
10   you is I can't tell you that all --
11   all people who have put statements
12   have come to that exact opinion.  But
13   there aren't that many places out
14   there that are addressing that issue
15   as far as the consensus on a
16   mechanism.  There's more statements
17   about the relationship between ovarian
18   cancer and talc use than there are
19   drilling down to what the mechanism
20   must be.
21   QUESTIONS BY MS. BRANSCOME:
22       Q.   Okay.
23       A.   So that's the issue.  It's a
24   little -- it's a little hard to answer that
25   yes or no because of that.

49 (Pages 190 to 193)

Confidential - Pursuant to Protective Order

Page 194

1      Q.    Okay.  When we talk about the
2  idea of biologic -- a biologically plausible
3  mechanism, what is your understanding of the
4  term "plausible" in that expression?
5      A.    When I use the word
6  "biologically plausible mechanism" or
7  "biologic plausibility," I'm using it
8  consistent with what Bradford Hill uses,
9  that's it's the idea that the evidence that
10  available makes -- the evidence that
11  available supports a pathway where you can go
12  to exposure to response.
13          So in other words, there's a --
14  the biological information is consistent with
15  how we know cancer can develop.  That's the
16  response we're looking at.  And the exposure
17  we're looking at is known to produce those
18  kind of biologic events.
19          So as a result, based upon
20  knowing that there's a consistency between
21  the data that we have on the -- on the
22  exposure and the data that we have on the way
23  cancer can occur, those things -- those
24  things align.  So that makes it biologically
25  plausible that that could occur.

Page 195

1      Q.    But you would agree that
2  biological plausibility suggests that it is a
3  plausible explanation, but it may not have
4  been established as the definitive pathway by
5  which a disease is caused, correct?
6          MS. PARFITT:  Objection.  Form.
7          THE WITNESS:  Well, I would
8      agree that in the discussion of
9      biologic plausibility in the Bradford
10      Hill paper that is true.  But if you
11      look at people's discussion of the use
12      of -- I want to say "biological
13      mechanism" rather than the word
14      "biologic plausibility," because
15      really as a toxicologist I'm trying to
16      understand whether there's a biologic
17      mechanism that makes sense.  Those are
18      words I like to use.  Does it make
19      sense that this exposure could lead to
20      this response.
21          And that involved looking at
22      the mechanistic data or the data on
23      the way toxic responses are produced
24      by talc, and whether or not they align
25      with the types of toxic insults that

Page 196

1      are known to be able to produce,
2      specifically, ovarian cancer.
3  QUESTIONS BY MS. BRANSCOME:
4      Q.    Is it your opinion that IARC,
5  for example, has concluded that the
6  biological mechanism by which talc may cause
7  ovarian cancer is chronic inflammation?
8          MS. PARFITT:  Objection.
9          THE WITNESS:  I don't know that
10      they have used -- they've described it
11      quite that way, but they do describe
12      what they believe is the biologically
13      plausible mechanism.  Because they do
14      organize and use within the
15      definitions of how they describe some
16      things that are consistent with what
17      Bradford Hill uses.
18  QUESTIONS BY MS. BRANSCOME:
19      Q.    Okay.  And obviously you're
20  familiar with the IARC evaluation of talc
21  with respect to the possibility of causing
22  ovarian cancer, correct?
23      A.    Yeah.  If you mean the recent
24  one, yes, the most recent assessment.
25      Q.    Yes.

Page 197

1          And that IARC has in fact
2  classified cosmetic talc not containing
3  asbestos as possibly carcinogenic to humans,
4  correct?
5      A.    It's a possible human
6  carcinogen 2B, that's correct.
7      Q.    Okay.  And if a product is
8  listed in the 2B category, does that
9  necessarily mean the product, in your view,
10  is carcinogenic?
11      A.    Not always, because that comes
12  down to an assessment of -- then you're
13  putting together a -- a risk assessment that
14  looks at -- looks at -- across the
15  information that you have available.  And
16  that may be that -- that the -- the possible
17  is all you can say, or it may be that you
18  believe that the information -- there's
19  enough information there to take it further.
20          Has a possibility -- that's
21  what I said, they do a hazard assessment.
22  They rank things on hazard based on -- on
23  unlikely -- not enough evidence, less -- the
24  possibility, the probability or it's known.
25      Q.    In your opinion, is your

Confidential - Pursuant to Protective Order

Page 198

1    characterization of the risk of Johnson's
2    baby powder or talcum powder products with
3    respect to ovarian cancer, are you in the MDL
4    characterizing that risk as a higher level of
5    risk than what IARC characterized it, or do
6    you agree with the 2B characterization of
7    possibly carcinogenic?
8        MS. PARFITT: Objection. Form.
9        THE WITNESS: So I'm not IARC,
10   so I don't try to second-guess there.
11   They have reached a conclusion, and I
12   use that as part of my weight of the
13   evidence. So I haven't formed the
14   opinion they're right or wrong.
15       But I have done a different
16   assessment. My assessment, first off,
17   includes more information than IARC
18   had, so as a result, I have formed the
19   conclusion that I believe that it's
20   more likely than not that exposure
21   to -- perineal exposure to talc body
22   powders increases the risk of ovarian
23   cancer in women who use that product.
24       And I will put the caveat this
25   has to be chronic use or repeated use,

Page 199

1    because I've gone -- I've said that
2    many times.
3        So that -- that is my opinion.
4    So that's a different statement and a
5    different assessment than what IARC
6    does.
7        But -- so I don't disagree with
8    their possible -- I weigh that, but I
9    believe the evidence for the risk
10   assessment shows me that it's more
11   likely than not that this -- this
12   exposure will increase the risk above
13   a background risk for women who are
14   using this product.
15   QUESTIONS BY MS. BRANSCOME:
16       Q.   And how do you define chronic
17   or repeated use?
18       A.   Well, that is variable within
19   the literature. For me, chronic is
20   exposure -- if as a toxicologist, I would
21   typically say chronic use is years of use.
22   It doesn't have to be daily, but it would be
23   years. That's the most common description
24   you see in toxicology, so I would say that's
25   fair. That's a fair assessment of my

Page 200

1    opinion.
2        Q.   Is there a threshold of the use
3    of Johnson & Johnson's talcum powder products
4    below which there is no increased risk, in
5    your opinion, of ovarian cancer?
6        A.   We have not identified that
7    threshold. That's what's missing within
8    the -- the literature that exists today. So
9    I can't tell you whether or not with only a
10   thousand applications over a lifetime that
11   is -- is not enough for every individual or
12   not, but certainly I do believe that the --
13   that the exposure has to be habit, routine,
14   chronic, something that is done maybe not on
15   a daily basis but on a routine basis in a
16   woman's life.
17       So that is consistent, I think,
18   with the literature.
19       MS. BRANSCOME: Okay. We can
20   go off the record.
21       VIDEOGRAPHER: We are going off
22   the record at 12:36 p.m.
23   (Off the record at 12:36 p.m.)
24       VIDEOGRAPHER: We are back on
25   the record at 1:35 p.m.

Page 201

1    QUESTIONS BY MS. BRANSCOME:
2        Q.   Good afternoon again,
3    Dr. Plunkett.
4        A.   Good afternoon.
5        Q.   I want to talk a little bit
6    about the Health Canada assessment.
7        We talked about this before,
8    but this is something that you reviewed after
9    you completed your report which has been
10   marked as Exhibit 4, correct?
11       A.   Yes, and I wanted to tell you,
12   I did not bring all those documents printed.
13   I apologize. So there is a separate Health
14   Canada draft risk assessment that I didn't
15   print.
16       Q.   Okay. So when you're referring
17   to the Health Canada analysis, what document
18   are you specifically referring to?
19       A.   So I'm referring to the -- the
20   combined documents, but there are times when
21   you've asked me questions that I've been
22   referring -- and I tried to say, I believe,
23   Taher.
24       But, yes, some of the questions
25   you asked me when I said Health Canada, I was

Confidential - Pursuant to Protective Order

Page 202

1    talking about the combined documents, which
2    would include their -- I guess it's called a
3    draft risk assessment document, yeah, which
4    refers to this document but is a separate --
5    is their own separate statement.
6          Q.    As you sit here today, what is
7    your understanding of the current position
8    that has been articulated in the collection
9    of documents that you refer to as Health
10   Canada with respect to any potential
11   relationship between cosmetic talc and
12   ovarian cancer?
13         A.    So that's why I did print out
14   the small one, because I think it summarized
15   it. So here, if you look at this Exhibit 6,
16   it makes specific conclusions or draws --
17   makes statements. And essentially it talks
18   about talc being a possible risk of ovarian
19   cancer, but then it gives women specific
20   advice about what to do in order to minimize
21   exposure to the products, and some of that
22   was relevant as well.
23         Just one reason I printed it
24   out, it has to do with either choosing an
25   alternative product or avoiding genital

Page 203

1    exposure to talc.
2          And let me see the exact words
3    that they use, but --
4          Q.    Before you do that, do you
5    agree with the characterization that cosmetic
6    talc presents a possible risk of ovarian
7    cancer?
8          A.    No, I don't think that's my
9    opinion. I think my opinion is stronger than
10   that.
11         But are you talking about my
12   causation analysis opinion or just my risk
13   assessment opinion?
14         Q.    I'm asking about any opinion
15   you intend to offer in the MDL.
16         A.    Okay. So I will not be giving
17   the causation analysis opinion, so that -- I
18   will take that off the table.
19         So I think my opinion is a
20   little stronger because I say that the
21   exposure to the perineal -- the talc by
22   perineal application in women increases the
23   risk. So I'm not saying it's a possible
24   risk. I'm actually -- I believe that it
25   increases the risk. And I do believe that

Page 204

1    there is a association between those two
2    things, the exposure and the response, which
3    is more than a possible association, if you
4    want to use those words.
5          But my assessment that I've
6    done is not exactly the same, for example, as
7    IARC does, which is more of just a hazard
8    assessment.
9          Q.    Right.
10         So I'm focusing my questions
11   now on your risk assessment as compared to
12   the documents that you've supplied us with
13   with respect to Health Canada. And if I
14   understand it correctly, are you stating that
15   your opinion with respect to the relationship
16   between cosmetic talc and ovarian cancer, you
17   believe that it is an association that is
18   stronger than a possible risk; is that
19   correct?
20         A.    Well, I don't say it's a
21   possible risk; I say there is an increased
22   risk. So I think it's a different statement,
23   yes, absolutely.
24         Of course, I'm not Health
25   Canada, so, you know, they have a framework

Page 205

1    upon which they make decisions, and I'm doing
2    an analysis based on what I have done. And
3    so it's not exactly the same, although some
4    of the same documents and information is
5    weighed within -- and then that's when you
6    have the issue of what Health Canada does
7    versus what they rely upon.
8          But this Taher risk assessment
9    is just one piece of information that Health
10   Canada has weighed in their assessment if you
11   read their -- their draft risk assessment.
12         Q.    So the question I have about
13   the Taher risk assessment, earlier you were
14   referring to the fact that you have only seen
15   a quantitative assessment of the weight of
16   particular components of scientific evidence
17   in evaluating epidemiological studies; is
18   that correct?
19         A.    So that's what I typically see,
20   yes. And I don't know that -- I've never
21   seen it. But the typical approach would be
22   to use it there as opposed to using it in the
23   context of a human health risk assessment
24   based on animal in vitro data.
25         Q.    All right. Are you familiar

52 (Pages 202 to 205)

Confidential - Pursuant to Protective Order

Page 206

1  with something called the Klimisch scoring
2  system?
3       A.   I don't know if I am now.
4  You'll need to show me what it is you're
5  referring to.  The name doesn't ring a bell,
6  no.
7       Q.   Okay.  So it's not something
8  that you've used in the past?
9       A.   No, not that I recall using.
10      Q.   All right.
11      A.   Unless it has another name, and
12 that's why I'm asking you.
13      Q.   All right.  So if you have
14 actually -- it's the document in front of you
15 that we've already marked as Deposition
16 Exhibit 5, I believe.
17      A.   Yes.
18      Q.   And that is the Taher study
19 that we were discussing and is cited by the
20 Health Canada risk assessment.
21           If you turn to page 5 -- well,
22 actually beginning on page 4, do you see
23 there is a section entitled "Literature
24 Search and Identification of Relevant
25 Nonhuman Studies"?

Page 207

1           Do you see that?
2       A.   Yes.
3       Q.   And this is related to an
4  analysis that these authors performed on
5  potentially relevant animal and in vitro
6  studies, correct?
7       A.   Yes, that is true.
8       Q.   All right.  And it states here
9  that "all retrieved studies were examined for
10 relevance, reliability and overall quality
11 using the Klimisch scoring system."
12           Do you see that?
13      A.   Yes, I do see that.  So I have
14 seen that before.  I just didn't -- I didn't
15 recall it.
16      Q.   Okay.  And so would you agree
17 that it is possible and in fact has been done
18 in a study that you rely on to apply a
19 quantitative scoring system to animal and in
20 vitro studies, particularly in the context of
21 looking at the relationship between talc and
22 ovarian cancer?
23      A.   Well, I didn't say it was
24 impossible.  I said I don't believe it's
25 routine based on my experience.

Page 208

1           So, yes, if they stated they've
2  done -- we'd have to pull the supplementary
3  materials out, but I recall them doing
4  scoring based on epi studies but not on
5  the -- all of the animal studies that they
6  talk about.  But we can pull it out and look.
7  I could be wrong.
8       Q.   Okay.  Did you review the
9  supplementary material 7, 8 and 9?
10      A.   Yes, I did, and we'd have to
11 pull them out because I don't recall the
12 details.
13      Q.   All right.  We may take a look
14 at those in a minute.
15           It talks about them classifying
16 the animal and in vitro studies into four
17 categories of reliability.
18           Do you see that?
19      A.   Yes.
20      Q.   So did you make any attempt,
21 when you were reviewing the various studies
22 in reaching your opinion about the potential
23 risk of talc in causing ovarian cancer, did
24 you make any attempt to separate out the
25 different pieces of evidence into categories

Page 209

1  of reliability like the authors of this paper
2  have done?
3       A.   I didn't do it exactly the way
4  they did it, but I certainly do do that as
5  part of my screening.
6           I told you one of the
7  characteristics or one of the assessments I
8  make is whether I believe the data is
9  reliable data that I can -- that I can use in
10 a weight of the evidence.  So I make a -- and
11 when I talk about reliability, I'm talking
12 then about things such as I mentioned, peer
13 review, whether or not there is statistical
14 analysis, whether or not the study is
15 designed in a way that's consistent with
16 general principles of toxicology, control
17 groups or not control groups.
18           Those kinds of things I do -- I
19 do consider when I am assessing the use of a
20 study or not.
21      Q.   Is it your testimony here today
22 that contained within your report that's
23 marked as Exhibit 4, I could find
24 categorization of reliability of each of the
25 pieces of scientific literature that you have

53 (Pages 206 to 209)

Confidential - Pursuant to Protective Order

Page 210

1  included in your weight of the evidence
2  analysis?  Is that your testimony today?
3      A.    No, that's not what I'm telling
4  you, no.
5      Q.    Okay.  So you would agree that
6  you did not -- first of all, did you develop
7  categories of reliability in which you
8  separated the particular scientific studies
9  into as part of your weight of the evidence
10 analysis?
11     A.    I do look at -- I do categorize
12 studies based upon my assessment of their
13 reliability and their ability to be used to
14 answer the question I'm asking, but I -- I
15 already told you, I didn't do it the way it's
16 set out here.  I didn't have these specific
17 five categories, no.  That's not what I did.
18     Q.    Okay.  Other than the CIR 2013
19 publication, which you have said that you do
20 not find reliable and you assign little
21 weight to it, can you point me to another
22 place in Exhibit 4 where you assign a
23 specific category of weight that you have
24 given to a particular study that you include
25 in your weight of the evidence analysis?

Page 211

1      A.    If what you're asking me is do
2  I make a specific statement next to each
3  study that I discuss about little weight or
4  great weight, no, I don't do that, if that's
5  what you're asking me.
6      Q.    Okay.  As part of the
7  collection of documents that relate to Health
8  Canada that was provided to us as part of
9  your new reliance list, did you review a
10 document entitled weight of the evidence --
11 or "Weight of evidence:  General principles
12 and current applications of Health Canada"?
13     A.    Yes, I've seen that.
14         (Plunkett Exhibit 8 marked for
15 identification.)
16 QUESTIONS BY MS. BRANSCOME:
17     Q.    All right.  We will mark this
18 as Plunkett Deposition Exhibit Number 8.
19         All right.  The document that I
20 just handed you that's marked as Plunkett
21 Deposition Exhibit Number 8, are you familiar
22 with that document, Dr. Plunkett?
23     A.    Yep, I've seen this before.
24     Q.    Is this listed among the new
25 materials that have been added to your

Page 212

1  reliance list?
2      A.    I believe it was, yes.
3      Q.    Okay.  And so for this one I
4  just want to direct your attention to the
5  conclusion section -- well, let me ask you
6  first:  How does this document relate to the
7  collection of documents with respect to
8  Health Canada that you identified as relevant
9  to your opinion?
10     A.    It was one of the materials
11 that they rely upon or they cite.  That's the
12 reason I pulled it.  It was -- I pulled
13 documents that they provided on the website
14 that were cited.
15     Q.    Okay.  And if you could turn to
16 page 11 of that document, there's a
17 conclusion section.  The first sentence of
18 the third paragraph reads, "The given --
19 given the context-specific nature of each
20 risk assessment and the diversity of tools
21 and criteria applicable, transparent
22 documentation of the specific application of
23 the WOE approach is especially important."
24         Did I read that correctly?
25     A.    Yes, you did.

Page 213

1      Q.    And is your understanding of
2  WOE that it is weight of evidence?
3      A.    Yes, that's correct.
4      Q.    Do you agree with this
5  statement?
6      A.    In a regulatory context, I do
7  believe that that is true, because within the
8  regulatory context when they do the risk
9  assessment, there's a need to understand why
10 decisions are made.  So, absolutely, in a
11 regulatory context, I would agree that this
12 kind of transparency is even being adopted by
13 EPA.
14     Q.    And is it your opinion then
15 that a different level of transparency is
16 needed for expert testimony in court?
17     A.    No, that's not what I'm saying.
18 I'm saying that's a different process.  And
19 that's what part of this process is.  It's
20 understanding the ability to provide a dialog
21 about what was done.
22         So as a result, this is
23 something that is common to the work that
24 I've done in the past.  Even in a
25 nonlitigation context with my regulatory

54 (Pages 210 to 213)

Confidential - Pursuant to Protective Order

Page 214

1  clients, doing a risk assessment doesn't
2  necessarily involve the same level of detail
3  that a regulatory -- a regulator would apply
4  to the transparency of the assessment.  Not
5  to say that it couldn't be done, but it's
6  just -- I would say it's not necessarily
7  typical.
8      Q.    So this specifically refers to
9  transparent documentation.
10         Do you see that?
11     A.    Yes.
12     Q.    Would you agree that the report
13  that you have produced in the MDL does not
14  have documentation of the specific
15  application of the weight of evidence
16  approach?
17         MS. PARFITT:  Objection.
18  Excuse me, objection.  Form.
19         THE WITNESS:  I disagree to an
20  extent because I did attempt to
21  provide in my report a description of
22  the methods that I used and the
23  resources that I've relied upon for a
24  discussion of how those methods are
25  used.

Page 215

1         And then in addition to that,
2  I've attempted to lay out for you in
3  my report a discussion of the pieces
4  of evidence that I've relied upon,
5  including some -- for some of those --
6  that's one of the reasons I got so
7  detailed in the section on migration
8  and providing you an analysis of each
9  of the papers that I relied upon and
10  what I thought was important within
11  them that led to my -- the formation
12  of my opinions.
13         So I disagree to some extent.
14  QUESTIONS BY MS. BRANSCOME:
15     Q.    Okay.  Turning back to what
16  Taher did in classifying different studies
17  into different categories of reliability.
18  Have you done that type of analysis in the
19  past where you have separated out different
20  studies into different categories of weight
21  or reliability as part of an overall
22  analysis?
23     A.    Well, I do that every time I do
24  a weight of the evidence when I separate into
25  categories first based upon the type of

Page 216

1  study.  In other words, as I discussed many
2  times in deposition, when you're talking
3  about doing a human health risk assessment,
4  there's certain types of data that are most
5  relevant.  I mean, when they use the word
6  "reliable" -- I don't know that many of these
7  studies have the same level of reliability as
8  far as peer review, but they're -- for
9  example, on the issue of migration, it's my
10  opinion that the data from the human studies
11  is a more reliable or relevant source of
12  information.  And I've laid out why, because
13  of differences in the anatomy, things like
14  that, with the data.
15     Q.    Are you familiar with the term
16  "binning exercise"?
17     A.    Yes, I am.  And that is
18  certainly something that I have used in other
19  aspects of work that I have done.
20     Q.    Did you do a binning exercise
21  in rendering your opinions and what you've
22  provided to us in the context of your
23  opinions in the MDL?
24     A.    Yes, that's the exercise I
25  start with.  I'm binning them into human,

Page 217

1  animal, mechanistic, in vitro data.  That's
2  the first bins.
3         In fact, in the copper work we
4  did, that's what we did.  We separated the
5  data into in vitro/only mechanistic
6  information, animal studies, did we have
7  human studies.
8         And we also looked at
9  studies -- we had a separate bin of exposures
10  like I do.  I have studies that just address
11  the issue of exposure potentially.
12         So, yes, it's -- it's
13  consistent with doing that.  It's --
14  essentially binning is just separating the
15  information into groups based on what
16  questions those -- those data can answer.
17     Q.    Okay.  Have you ever -- do you
18  ever separate them into bins based on the
19  level of weight that you would give a
20  particular study?
21     A.    I do that when I'm analyzing
22  each of the studies within that group or that
23  bin.  That's what I do.  I give them -- in my
24  weight -- in my analysis, I weigh those
25  studies based upon my judgment on the

55 (Pages 214 to 217)

Confidential - Pursuant to Protective Order

Page 218

1  relevance, the reliability, the power of the
2  study, the statistical analysis that's done,
3  the inclusion in animal studies, in
4  particular, of controls.  Those are all parts
5  of that analysis that I do.  So, yes, I do do
6  that.
7        And then in -- there have been
8  exercises that I've done in the past with
9  other individuals where we may have taken a
10  yellow sticky note and put down on top of it
11  animal data with exposure information, animal
12  data without exposure information.  That's
13  the process that I'm doing when I am looking
14  across the data.  I'm separating those pieces
15  of data into groups and what types of
16  questions they can answer.
17        So that is consistent with what
18  I do when I do a weight of analysis approach
19  in the work that I do in both nonlitigation
20  and litigation context.
21     Q.    Okay.  But we have no specific
22  documentation of the different ratings that
23  you gave the various pieces of evidence that
24  you included in your weight of the evidence
25  analysis, aside from occasional references to

Page 219

1  giving something less or more weight,
2  correct?
3     A.    Well, I certainly -- I told you
4  I have not given numerical values that you're
5  asking me, but I've attempted to do that when
6  I have described them in groups, when I talk
7  about human versus animal versus in vitro.
8  Because I've already told you, I believe,
9  it's my opinion that certain types of
10  information are more informative than others.
11  And so the more informative it is, the more
12  weight you're giving it in -- obviously in
13  your analysis.
14        But it is a different exercise
15  than what is described here.  And here I'm
16  pointing to Exhibit 8.  And it's a different
17  exercise, obviously, than what a regulatory
18  body is required to do where they are trying
19  to come up with ways to increase the
20  transparency when no one can go and actually
21  talk to each of the regulators individually
22  to understand what their thinking was.
23     Q.    Okay.  Returning to biological
24  mechanism for a minute, why doesn't
25  inflammation generally, including chronic

Page 220

1  inflammation, cause ovarian cancer?
2     A.    Because it doesn't change the
3  phenotype of the cell.  It has to -- the --
4  and I discuss that.  You have to -- you have
5  to set up a chronic inflammatory process that
6  leads to changes within the cellular
7  phenotype to go from a cell that is -- that
8  is -- is dividing normally to a cell that
9  isn't.
10        So it's -- it's the same issue
11  that you address even in a study in animals.
12  Why do not all animals exposed to -- exposed
13  to a chemical develop tumors.  It's the idea
14  that something has to be initiated beyond the
15  exposure or maybe beyond inflammation to lead
16  to the series of events.
17        And so, yes, it's recognized
18  that you can get inflammation, and
19  inflammation can go down the road in becoming
20  a carcinogenic process, or inflammation can
21  no longer -- can stay where it is.  It
22  doesn't progress beyond just a chronic
23  inflammatory process.
24     Q.    And so if you had a study that
25  demonstrated that a particular agent causes

Page 221

1  inflammation, you would need more information
2  in order to make the conclusion that that
3  agent can in fact cause cancer, correct?
4        MR. MEADOWS:  Objection.
5        THE WITNESS:  You would look
6     for more informative information,
7     exactly, which is why, when I've
8     talked about the individual
9     constituents in the context of
10    consistency on mechanism for cancer,
11    I've pointed to documents where that
12    information has been discussed.
13        So like when I talk about
14    asbestos or cobalt or I point to
15    the -- for example, the IARC
16    assessment where they go through
17    that -- that discussion of the fact
18    that there's not just data showing
19    that a biologically plausible
20    mechanism may be inflammation, but
21    there's also data to show that that
22    can lead to tumor development as well.
23  QUESTIONS BY MS. BRANSCOME:
24     Q.    Okay.  How does talc change the
25  phenotype of the ovarian cell?

56 (Pages 218 to 221)

Confidential - Pursuant to Protective Order

Page 222

1      A.   So this is one of the details
2  we don't know, other than generally it's
3  changing the phenotype to go from a normal
4  cell to a tumor cell.  That is being
5  observed.  When you find the presence of the
6  tumor, that is what you're observing.
7      Q.   Does pure talc with no other
8  constituent components, can it change the
9  phenotype of an ovarian cell?
10      MR. MEADOWS:  Objection.
11      THE WITNESS:  So that's a
12  difficult question to answer with
13  certainty because of the fact that I
14  don't believe that we have assurance
15  that any of the studies are done with
16  essentially pure talc.
17      However, in the studies that
18  claim to have been done with pure
19  talc -- for example, the NTP study
20  claims to have been done with pure
21  talc.  So if that is pure talc, truly
22  is, then that study is an example of
23  evidence for the chronic inflammatory
24  process leading to preneoplastic
25  lesions that are setting down the road

Page 223

1  mechanism towards cancer.
2      So there are data out there.
3  The problem you have, I believe, in
4  the literature is whether or not,
5  based on the discussion that is
6  becoming apparent now with sensitivity
7  and ability to take the natural
8  product and actually determine exactly
9  what's in it, that I don't think there
10  is the ability to assure that any --
11  any of these studies with the samples
12  of talc they're using is absolutely,
13  100 percent, only platy talc.  I think
14  there's -- there's some concern about
15  that.  But certainly you will take --
16  you have to take what is discussed
17  within the study as evidence from what
18  they're claiming.
19      So many of the studies say we
20  used asbestos-free talc or platy --
21  pure platy talc and we got a toxic
22  response.
23  QUESTIONS BY MS. BRANSCOME:
24      Q.   Would it be possible to design
25  an experiment -- and now I'm talking about an

Page 224

1  in vitro or an animal experiment -- by which
2  you would expose either cells or animal to
3  talc with different constituent products to
4  identify or separate out the individual
5  effects of the components?  Is that a study
6  that you could design as a toxicologist?
7      A.   I think that would be difficult
8  to do, but I'm not saying impossible to do.
9  And here's the -- there are some very
10  specific considerations you'd have to put
11  into that design.
12      I would argue that some of that
13  is already available, where we have studies
14  that have looked at the dose-response effects
15  for toxicity with cobalt, with chromium, with
16  asbestos.
17      When you get to asbestos and
18  talc, it's more problematic because then the
19  question is what is -- what is it?  What are
20  the specific characteristics in all the
21  different studies of exactly what the
22  asbestos was versus exactly what the talc
23  was.
24      But I think you could attempt
25  to do that, and then the question would be,

Page 225

1  being able to use that data not so much to --
2  not so much to identify a dose response for a
3  certain insult, but to look at the fact --
4  look at potency differences across the
5  compounds.  And then there's the issue of
6  then looking at additivity when you know you
7  have a complex mixture.
8      So that could be done, but,
9  again, it would be difficult to do based on
10  what we know about talc, being able to really
11  know that -- you would have to really be very
12  careful that what it is that you're looking
13  at is -- is not containing any of those
14  things that we unfortunately know co-occur
15  with constituents within the natural product.
16      But no one has done those
17  studies.  I point that out.  I haven't seen
18  that study that you're asking for.  I have
19  not seen somebody do that.
20      Q.   And a study like that would be
21  relevant in evaluating the potency of the
22  individual constituents and what might
23  actually be the driving factor for phenotypic
24  change, correct?
25      A.   Not necessarily.  I would argue

57 (Pages 222 to 225)

Confidential - Pursuant to Protective Order

Page 226

1    that we already have an answer to that by
2    looking at the data that's been collected on
3    the complex mixture itself. So the issue
4    would be why -- the question is what do you
5    gain by being able to say that we're only
6    pointing to this constituent or that
7    constituent. That isn't what is occurring.
8         What people are exposed to is
9    the complex mixture, not just each one of
10   those individual components. To me this is
11   not a case of asbestos-only exposure. This
12   is a case of exposure to consumer products
13   that are talc that may have within them at
14   any given time -- and data indicates that
15   there are substantial chance that asbestos
16   may be in -- is in certain of these products.
17        But my opinions are not
18   dependent on there being asbestos there at a
19   particular level or copper there -- or, I'm
20   sorry, cobalt there at a particular level
21   because my opinions are based on the
22   observations we have on the complex product
23   as it exists.
24        Q.   And you recognize that
25   different types of talc and different talc

Page 227

1    products have different constituent
2    components in different amounts, correct?
3         A.   Some can. I agree with that.
4    That is true.
5         So if you're being broad, as in
6    pharmaceutical-grade versus industrial-grade
7    or chemical-grade, yeah, because they'll have
8    a purity level assigned.
9         But as far as what the -- what
10   the components are, it isn't always defined
11   even specifically within that.
12        Q.   Okay. And does the presence of
13   oxidative stress in a tissue indicate that
14   cancer will develop in that tissue?
15        A.   Will definitively develop?
16   Not -- I don't think you could say
17   definitively develop, but it's certainly in
18   the biologically plausible mechanism that's
19   been understood to lead to chronic
20   inflammation and also has been linked to
21   cancer.
22        So that's the issue of not
23   necessarily saying it has to be there, but it
24   certainly is something that is observed
25   routinely in cases where carcinogenesis has

Page 228

1    been linked to an inflammatory response.
2    Oxidative stress is often a triggering
3    mechanism.
4         Q.   Does the body have protective
5    mechanisms that limit tissue damage from
6    oxidative stress?
7         A.   Yes, which is why not everybody
8    that's exposed to any particular chemical is
9    going to get cancer. Some people will
10   respond better. Some cells will respond
11   better. Some individuals in a population at
12   one time in their life may respond better.
13        Q.   You would agree that in vitro
14   studies do not account for the body's natural
15   defenses outside of what exists at the
16   cellular level, correct?
17        A.   Depends on the in vitro study
18   that's being done and whether or not there is
19   components added.
20        So I've seen studies done where
21   they take cells and then add extra levels of
22   glutathione to try to protect the cells from
23   certain stressors that could lead to damage,
24   but I agree with you that an isolated cell on
25   its own is a different microenvironment than

Page 229

1    an intact tissue, which is a different
2    environment than an intact animal, which is
3    even different than an intact human being.
4    Yes, they're all -- you look at those levels
5    of evidence or those types of evidence
6    differently, depending upon the end points
7    you're collecting.
8         Q.   And so you would give lower
9    weight to an in vitro study as compared to an
10   in vivo study, for example?
11        A.   Depends on the question you're
12   asking. I would give a lot of weight if the
13   question is what do I know -- if I want to
14   try to understand the biologically plausible
15   mechanism, some of those in vitro studies are
16   some of the most important, because it's the
17   only ones that allow us to answer a question.
18        If the question is higher level
19   about what is the evidence to show that
20   there's an increased risk overall for cancer
21   or a hazard for cancer, then certainly you
22   need to have more than an in vitro study.
23        So as -- so on -- if you want
24   to layer it up, obviously, if all you had was
25   in vitro data, you'd have much less

58 (Pages 226 to 229)

Confidential - Pursuant to Protective Order

Page 230

1  confidence in the conclusions you can draw
2  unless you had some in vivo data.  In vivo
3  data is going to allow you to interpret the
4  in vitro data.
5        So certainly there would be
6  more weight given in that assessment to the
7  fact that you had in vivo data.
8     Q.    And so when you made the
9  statement that, for instance, you always give
10  more weight to human data, is that true, or
11  does that also depend?
12     A.    Well, it depends on whether you
13  have human data.  So if I have human data and
14  I have a doubt, any doubts at all, about
15  whether or not the exposure-response
16  relationship would be affected by the way the
17  animal studies are designed, then, yes, I
18  would give more weight to the human studies.
19        In a case, however, such as
20  inhalation exposure assessments where
21  there -- it's much better, actually, to do an
22  animal study where we can do a dose response
23  across different sizes of particles and
24  actually observe lesions as they develop over
25  time, which is why I love -- I love the NTP

Page 231

1  93 study of interim sacrifices, looking at
2  that issue.  That data is very reliable in
3  order to understand the risk of lung damage
4  as compared to a human study where we don't
5  have those serial time points, doses that are
6  defined tightly.
7        So -- and the relevance between
8  those kinds of initial lung injury in certain
9  animals versus humans match fairly well.
10        That's my problem, though, in
11  the case with the perineal exposure.  I'm
12  saying to you, because of the route of
13  contact -- we need to be able to get it there
14  to the tissue -- the human data is extremely
15  important.
16     Q.    So is it fair to say that in
17  some circumstances animal data gets more
18  weight than human data and in other
19  circumstances human data gets more weight
20  than animal data?  It is circumstance
21  dependent?
22     A.    I would put it a different way.
23  I would say in some cases animal data is
24  weighted in a similar manner to human data.
25  I don't necessarily say it would get more

Page 232

1  weight, but it could if you only had one
2  crappy human study, one really badly designed
3  human study, and I had a GLP quality cancer
4  bioassay then, absolutely.  I mean, IARC does
5  this.  They look at that animal data and say,
6  "This one tells us -- answers the questions
7  we want to answer, and this very poorly
8  designed case series isn't going to allow us
9  to do that."
10        So you could, but I would say
11  it's more the other issue, that you look at
12  animal and human more on an equal basis if
13  the relevance and the extrapolation can be
14  done reliably.
15        And that's the question you
16  have to ask, can I extrapolate from animals
17  to humans in a reliable manner.
18     Q.    Okay.  Would you agree that the
19  response to cosmetic talc can vary depending
20  on tissue type in the body?
21     A.    Yes, I would say that that is
22  true, whether or not there's certain
23  protective barriers in place, for example,
24  yes.
25     Q.    And so in order to draw

Page 233

1  conclusions based on a study of one cell
2  type's reaction to cosmetic talc to another,
3  you would need to understand the differences
4  in similarities between those two cell types,
5  correct?
6        MS. PARFITT:  Objection.
7        THE WITNESS:  It's a different
8  question.  So you were asking me
9  about -- I didn't think you were just
10  asking about cells.  I thought you
11  were asking me about like routes of
12  exposure, dermal versus inhalation.
13  Those things differ.
14        Cell types may or may not.
15  That may or may not be true.  Because
16  if two cells -- two different cell
17  types in the body share similar
18  characteristics as far as the -- for
19  example, if they're both epithelial
20  cells or mesothelial cells, those type
21  of cells you would expect to respond
22  the same way.
23        But I would agree that, for
24  example, a neuronal cell versus a GI
25  cell versus a liver cell, there could

Confidential - Pursuant to Protective Order

---

Page 234

1      be differences in how they would
2      respond, yes, and so you would -- you
3      would look at those things
4      individually.
5      QUESTIONS BY MS. BRANSCOME:
6          Q.    And so it's important to
7      understand the differences and the
8      similarities between the different cell types
9      before drawing conclusions using studies from
10     different cell types?
11         MS. PARFITT:  Objection.
12         MR. MEADOWS:  Objection.
13         THE WITNESS:  I certainly think
14     you should consider the cell types
15     that are being used and whether or not
16     those cell types are ones that are
17     relevant to your risk assessment
18     question you're asking, yes.
19     QUESTIONS BY MS. BRANSCOME:
20         Q.    Okay.  You would agree as a
21     toxicologist, dose is an important part of a
22     toxicological analysis of an agent, correct?
23         A.    If you're doing risk, yes.  If
24     you're only doing hazard, it may not be as
25     important.  It depends upon the question

---

Page 235

1      you're asking about hazard.
2          Do you want me to explain?
3          Q.    I do want you to explain the
4      difference between a risk analysis and a
5      hazard analysis.
6          A.    Okay.  So in an initial hazard
7      analysis, if the question is, is there a
8      hazard associated with exposure, let's say,
9      by inhalation, it may not matter whether it
10     was a high dose or a low dose study.  Both of
11     those can identify hazard.
12         Then you ask the question:  Is
13     there a dose-response relationship?  That's
14     the next step beyond hazard.
15         So hazard is -- to me is
16     identifying the end points that you're going
17     to monitor for toxicity, sort of the target
18     organs, those things, and so whether or not
19     there's a dose-response study available, it
20     wouldn't be as important.
21         But certainly when you go to
22     that next step to assess risk, you'd like to
23     be able to see whether or not there is a
24     dose-response relationship in the effect that
25     you're assessing.

---

Page 236

1          Q.    Okay.  And in your -- in your
2      report, as part of your risk assessment that
3      you did in the MDL -- this is paragraph 12 on
4      page 8.
5          A.    Yes, I'm there.
6          Q.    Okay.  You state about
7      two-thirds of the way down the paragraph that
8      "weight of the evidence methods were critical
9      to defining the literature that identified
10     the hazards of talc exposure as well as
11     defining the dose-response relationship
12     between talc exposure and the risk of adverse
13     health effects."
14         Did I read that correctly?
15         A.    You did.  That's correct.
16         Q.    All right.  Is it your view
17     that in the case you have reached an opinion
18     that defines the dose-response relationship
19     between talc exposure and the risk of ovarian
20     cancer?
21         A.    It depends what you mean by
22     define.  I can tell you what I mean in this
23     sentence, and maybe that would help you.
24         Q.    Dr. Plunkett, it is your
25     report.  And so I am asking you, using your

---

Page 237

1      own definition of "define," have you rendered
2      an opinion that defines the dose-response
3      relationship between talc exposure and the
4      risk of ovarian cancer?
5          A.    I have formed opinions about
6      the dose-response relationship generally, but
7      unfortunately -- I answered that question for
8      you earlier when you asked me, I think, about
9      is there -- I don't know if you used the word
10     "threshold," but I did.
11         So the available information
12     doesn't allow us to identify an ultimate
13     threshold, for example, in the case of women
14     exposed to talc perineally and their -- and
15     their development of ovarian cancer.
16         Instead, in defining the dose
17     response, what we can do with the data -- and
18     that is what I attempted to do.  This is
19     where you look at defining the dose response
20     in the animal studies, which we can look at,
21     or defining dose response in cell studies,
22     showing that as the dose increases, the
23     hazard and the risk increase.  So risk
24     actually you quantify.  There's a certain
25     response at this dose and a different

---

60 (Pages 234 to 237)

Confidential - Pursuant to Protective Order

Page 238

1    response at the next dose, or have we
2    plateaued, that the responses are the same as
3    dose increases.
4            So that, I did do that as part
5    of my assessment, trying to define the dose
6    as far as how that linked to the responses in
7    each of the studies I looked at.
8        Q.   You would agree, though, that
9    some studies did not show a dose relationship
10   between talc and ovarian cancer or the
11   clinical signs that were indicative of the
12   potential for development into ovarian
13   cancer, correct?
14           MS. PARFITT:  Objection.
15           THE WITNESS:  If you're talking
16       about the human data; is that what
17       you're referring to?  Or are you
18       talking about all -- any of the data?
19   QUESTIONS BY MS. BRANSCOME:
20       Q.   Any of the data.
21       A.   So I would disagree on the
22   animal data.  I think on the animal data they
23   often -- most of the animal studies I've
24   relied upon have looked at more than one dose
25   or at least looked a no exposure versus a

Page 239

1    dose, and most of them have looked at more
2    than one dose.
3            In the case of the human
4    studies, unfortunately, some of those studies
5    were not designed to be able to define dose.
6    In other words, the questions weren't asked,
7    for example, of the individuals even in the
8    prospective studies.  Some of those
9    included -- did not include the information
10   collected on frequency and duration of use.
11           So if it's not collected,
12   obviously, I don't have it to look at.  And
13   that's one of the limitations of human
14   epidemiological investigations, is that it
15   often is not designed appropriately to look
16   at dose response.
17       Q.   Is it your opinion that there
18   are no studies looking at talc and the risk
19   of ovarian cancer in which the authors of the
20   study have concluded there was no clear
21   pattern of increased risk with dose?
22           MS. PARFITT:  Objection.
23           THE WITNESS:  No, that's not
24       what I've said.  No.  It's very
25       possible that an individual paper

Page 240

1    or -- that they may make a -- an
2    author may make a statement, but I'm
3    talking about looking -- this is
4    weight of the evidence.  I'm looking
5    across.  And I'm saying, across the
6    data, when I look at the human data
7    versus the animal data, for example,
8    versus in vitro studies, the in vitro
9    studies and the animal studies allow
10   you to look at dose response for talc
11   toxicity.
12           The -- even the animal studies
13   allow you to look at dose response for
14   development of precancerous lesions,
15   you're on the way to cancer, for
16   example, in the NTP studies.
17           And then in the human studies,
18   some of those studies are designed
19   such that the authors could draw
20   conclusions about dose response and
21   some are not.
22           Even in some of the studies
23   where they attempted to look at dose
24   response, some of the authors indicate
25   they don't see an effect.  So that is

Page 241

1    true.  And part of that may be driven
2    by the design of the study, the number
3    of individuals in the study, the way
4    that the questions were asked.
5    There's limitations on the way that
6    information is collected.
7            If you want to look at each
8    study, we can, but --
9    QUESTIONS BY MS. BRANSCOME:
10       Q.   So my question to you, whether
11   you agree or disagree with the author's
12   conclusion, is simply that if you look at the
13   overall animal and human studies that you
14   cite in your report or have considered on
15   your reliance list that look at a potential
16   dose-response relationship for talc toxicity,
17   do some of those studies conclude that there
18   is not a dose-response relationship?
19           MS. PARFITT:  Objection.
20           THE WITNESS:  I disagree for
21       talc toxicity, but I would say if
22       you're going to limit it to the issue
23       of the ovarian cancer response, I
24       would agree.  I have seen that in some
25       of the studies.

61 (Pages 238 to 241)

Confidential - Pursuant to Protective Order

Page 242

1    I think talc toxicity, I don't
2  know if anybody has made the
3  comment -- I would doubt it -- that
4  there is no dose response for toxic
5  effects of talc.
6  QUESTIONS BY MS. BRANSCOME:
7    Q.   Okay.  You discuss in your
8  report -- wait a moment.  It's in
9  paragraph 58 on page 38.  And I just want to
10  make sure I understood what you were citing
11  here.
12    In paragraph 58 you state that
13  "It is important to remember that
14  administration of even a single dose of talc
15  in animals has been shown to produce adverse
16  effects locally at the site of the exposure."
17    What are you referring to
18  there?
19    A.   Acute doses.  In other words,
20  in studies that have described installation
21  of a single dose of talc in some form into a
22  tissue, that they are observing adverse
23  responses.
24    An example of that may be
25  the -- I think it's Hamilton.  Is that the

Page 243

1  one where they stilled it into the ovaries
2  with a single dose?
3    Q.   So these are large-dose
4  exposures?
5    A.   Well, not all --
6    Q.   Or are they, I should say?
7    A.   I don't know that they all are,
8  no.  There are -- there are -- I don't think
9  I have attempted to quantify large in this
10  sentence.
11    What I'm stating here is not an
12  issue of large versus small.  It's an issue
13  of the fact that there are toxic effects with
14  single exposures.  And I'm just making the
15  comment -- this has to do with hazard, right?
16  It's the idea even a single dose -- or a
17  single exposure you can get irritant,
18  inflammatory reactions at the site of
19  exposure.  And that's all I'm trying to say.
20  That's why I'm citing as reviewed by EPA.  I
21  believe EPA even makes a very similar
22  statement.
23    Q.   Okay.  Do you take into
24  account -- there are some studies for
25  which -- at least my reading of your report

Page 244

1  is that you give them less weight because you
2  believe that the individuals who conducted
3  the study had been paid by either a company
4  or agencies that had some investment in the
5  outcome of the study; is that correct?
6    A.   Is that my opinion?
7    Q.   Yes.
8    A.   For any particular study,
9  you'll need to show me what you're pointing
10  to.  I do have opinions about some of the
11  work by Drs. Huncharek and Muscat, yes.  I
12  think I address that specifically, and that
13  has -- that's not so much to do with my
14  weight of the evidence; that has more to do
15  with transparency and what was being
16  disseminated to the public and disseminated
17  to the FDA as far as evaluations.
18    That's a different issue than
19  the weight of -- the weight of -- the weight
20  of the evidence assessment for risk.  I think
21  those were separate.
22    Q.   So then I'll ask you that.
23    In doing your weight of the
24  evidence analysis for risk, have you
25  discounted the weight that you've given to

Page 245

1  any particular piece of scientific evidence
2  based off of potential affiliations of the
3  authors?
4    A.   I certainly did with the CIR
5  review document.  I've already told you that.
6  And that's because I have evidence that shows
7  it's not just an affiliation issue, but it's
8  actually -- it's more -- it's more important
9  than that.
10    Q.   Are there any other examples?
11    A.   I think that's the only one
12  right now as I sit here that I can tell you
13  that I had identified as carrying little
14  weight because of an issue of either
15  authorship or input in the way it was
16  described.
17    There are certainly studies
18  within my weight of the evidence evaluation,
19  some of which were performed by industry.  I
20  certainly look at that issue, but unless I
21  have -- have a reason to believe that there's
22  an inherent bias based on something I know,
23  they go into the weight of the evidence
24  without making a correction for that.
25    In many cases that I work in

62 (Pages 242 to 245)

Confidential - Pursuant to Protective Order

Page 246

1    litigation, I will find situations like the
2    situation here with Huncharek and Muscat
3    where I have, for example -- I think this
4    came up in the Risperdal litigation for me.
5    It's the idea that there was a series of
6    papers put out by an individual investigator
7    where documents that I could get access to
8    show me that indeed their analysis was not
9    done by them but it was ghostwritten by
10   somebody else.  So that gives me pause,
11   although I would never have known that unless
12   I had access to internal documents.
13          So initial weight of the
14   evidence I did not discount it, but then I
15   went back and had to reevaluate the role
16   those studies played in my overall
17   assessment.
18   Q.   Do you take into account in any
19   way in evaluating the weight of a study if it
20   is conducted by someone who serves as an
21   expert on behalf of the plaintiffs in the
22   active litigation?
23   A.   It would be the same -- same
24   issue.  I certainly consider it as part of
25   what I look at, but just like if they were an

Page 247

1    expert for the defense versus an expert for
2    the plaintiff, you judge that information
3    based on what you know.  And if I don't have
4    information to discount it, I will not
5    discount it.
6          But absolutely, I understand.
7    Just as people we all -- look at some of the
8    things I've published where I have said my
9    work was sponsored by the American Chemistry
10   Council.  You know, people -- that's why you
11   disclose the conflicts.  You put it there so
12   people can weigh it if they want, but it
13   doesn't mean you discount the work
14   automatically.
15          And so I think for any paper,
16   plaintiff, defense, whoever it is that's
17   writing it, you need to consider it based on
18   the information you have.  And if you believe
19   that you have information to indicate that
20   there's some issue with the reliability of
21   the analysis, then absolutely you consider
22   that.
23   Q.   So, for example, when you rely
24   on Dr. Longo's characterization of the
25   constituent components in samples that he has

Page 248

1    tested, that he reports are Johnson's baby
2    powder, did you also consider the work that
3    was done by experts that have been retained
4    on behalf of the defendants to characterize
5    the components of Johnson's baby powder?  Do
6    you give them equal weight?
7    A.   So I haven't seen a variety of
8    the documents that you're talking about,
9    so -- because I have not worked in the
10   litigation cases that have involved asbestos
11   only.  So -- which I think is where those
12   documents are.
13          In the litigation I -- in the
14   litigation I worked in, I am aware of what
15   other experts on both sides have said.  I
16   don't believe I've seen an analysis from a
17   defense expert that is -- that is like
18   Dr. Longo's, at least in the litigation I've
19   worked in.  Certainly I would consider that
20   and look at that if it's available, and I
21   would consider it.
22          I would point out, Dr. Longo's
23   analysis is not the piece of evidence that
24   you start with, though.  You start with what
25   I discuss in the published literature first,

Page 249

1    because there are published documents out
2    there in the literature that describe exactly
3    what Dr. Longo is now describing.
4    Q.   What published documents are
5    those?
6    A.   Those are Dr. Blount's reports
7    in 1991, which is before the litigation came
8    about, is my understanding.
9          There's also -- there's five or
10   six.  I can tell you the paragraph.
11   Q.   For Johnson's baby powder, I
12   would be interested in that, yes.
13   A.   So I -- I'll have to look and
14   see if it's Johnson's baby powder only, but
15   certainly there is other evidence on the
16   issue of asbestos contamination and
17   specifically in talc.
18          So I -- you want me to find the
19   paragraph for you?
20   Q.   Please.  If you think there is
21   published literature documenting asbestos in
22   Johnson's baby powder, I would like to see
23   that.
24   A.   So this is my paragraph 32.
25   And I'd have to pull each of these articles

63 (Pages 246 to 249)

Confidential - Pursuant to Protective Order

Page 250

1    out because I don't recall what each of them
2    says. But I'm pointing to Paoletti, Blount,
3    Mattenklott, Moon, Gordon, Anderson, Rohl,
4    Pooley and Rowlands, Blejer and Arlon,
5    Cralley, Willman.
6            And then I cite -- and then of
7    course the next piece of evidence is there
8    are actually documents from J&J and Imerys
9    that show detection of asbestos or
10   asbestos-like minerals in talc.
11       Q.    As you sit here today, can you
12   identify which of these published articles
13   that you list in paragraph 32 relate to
14   Johnson's baby powder?
15       A.    I would have to pull them to
16   answer that.
17       Q.    Okay.
18       A.    As I sit here, I'd have to pull
19   them. But I would refer you -- I know at
20   least some of them do based on the statement
21   I've made, but...
22       Q.    So you did not make an attempt
23   in this paper to identify which products were
24   being analyzed in these specific articles.
25   It's not indicated on the face of this

Page 251

1    paragraph, correct?
2        A.    I don't tell you on the face,
3    but you if read the sentence I said, "When
4    commercially available, talcum powder
5    products were analyzed, including powders
6    sold by Johnson & Johnson. The data has
7    shown that the powders contained varied
8    levels" -- and I'm saying "fibers," so it's
9    just asbestos -- "including fibers that
10   stated to be asbestos."
11           So to tell you which of those,
12   I'd have to pull them. And I apologize, I
13   didn't bring them all with me.
14       Q.    Have you been provided --
15   you're aware that Dr. Blount's paper does not
16   identify Johnson's baby powder in the face of
17   the article, correct?
18       A.    I believe that's true. You'd
19   have to go to her deposition, I believe,
20   where she's given -- where she discusses what
21   the source of that was, and maybe even a --
22   there may even be a separate document,
23   actually, not a deposition, that was -- that
24   was in the files of Johnson & Johnson that
25   goes along with that, but I'd have to go

Page 252

1    look.
2        Q.    Have you reviewed Dr. Blount's
3    deposition?
4        A.    I have reviewed a -- something
5    by Dr. Blount. Whether it was trial
6    testimony or deposition, I have seen
7    something, yes, that she has said regarding
8    this issue.
9        Q.    To the extent that there is
10   confusion about whether or not a sample
11   tested by Dr. Blount is in fact Johnson's
12   baby powder, would you reduce the weight that
13   you give that particular piece of evidence in
14   evaluating whether asbestos has been present
15   in Johnson's baby powder?
16           MS. PARFITT: Objection. Form.
17           MR. MEADOWS: Objection.
18           THE WITNESS: I don't know
19   reduce the weight because -- because
20   there's -- there are plenty of
21   documents here that talk about that.
22           I would consider it --
23   certainly it would -- it's not so much
24   weight. It's a different bin. We'll
25   call it a bin, a different bin of

Page 253

1    information. There's information on
2    talc powders generally, and then
3    there's some information that's
4    specific to certain body powders.
5            So certainly -- would I pay
6    attention if they identified it? Yes.
7            But in the statement I'm making
8    here, I'm not claiming that every one
9    of these is relating to just the
10   powder sold by Johnson & Johnson.
11   This is across the available
12   information that's public and then
13   also the information that's available
14   in the files of Johnson & Johnson.
15   QUESTIONS BY MS. BRANSCOME:
16       Q.    What is your definition of
17   asbestos?
18       A.    My definition of asbestos is
19   exactly what the different documents describe
20   it typically. It's a fibrous mineral,
21   typically. It occurs in a variety of
22   different forms. Most of the times they'll
23   say "asbestos." Sometimes they'll say
24   "chrysotile." Sometimes they'll say
25   "tremolite." Sometimes they'll say

Confidential - Pursuant to Protective Order

Page 254

1  "anthophyllite." Those are the three most
2  common ones I see.  But those are all mineral
3  forms of asbestos.
4          So just like IARC puts those
5  all within one bin, I'm putting those all in
6  one bin because they have a similar toxicity
7  profile.
8      Q.   Is it your view that each of
9  the different types of asbestos has the same
10 toxicity profile?
11     A.   They all have the same ability
12 to cause cancer, but they have different
13 potencies.  So they do have -- there will be
14 some differences in the dose response and the
15 potency of them, but certainly they've all
16 been linked as being carcinogens by IARC.
17         And I would agree, when you
18 look at their data, there is data and
19 evidence to indicate that.
20     Q.   Which type of asbestos is the
21 most potent?
22     A.   For which end point?  For lung
23 cancer?  I believe chrysotile.  For other
24 end points, I'd have to go look.  I mean,
25 chrysotile is the sharp -- is the sharp --

Page 255

1  the sharded-type structure.
2          But there's data on fibrous --
3  fiber -- the fibrous forms of asbestos
4  rather than the -- or the amphibole forms of
5  asbestos as opposed to chrysotile, which is
6  the serpentine form.
7      Q.   Do you consider yourself an
8  expert in asbestos?
9      A.   Not in --
10         MS. PARFITT:  Objection.
11         THE WITNESS:  Not the geology
12 of asbestos, no.
13         I have expertise in toxicology
14 as it relates to interpretation of the
15 data related to asbestos.  I have
16 never give -- given testimony in a
17 case on asbestos, but it's something
18 I've studied in the past in my work as
19 a toxicologist, not as a testifying
20 expert.
21 QUESTIONS BY MS. BRANSCOME:
22     Q.   What role does your analysis of
23 the possibility that there may be asbestos in
24 Johnson's talcum powder products play in your
25 risk assessment in the MDL?

Page 256

1      A.   Has to do with the fact that we
2  have a complex mixture that has multiple
3  carcinogenic substances.
4          And asbestos is important from
5  the aspect of the way that it has been
6  assessed even by regulatory bodies, the idea
7  that even very low levels of fibers pose a
8  cancer hazard and a cancer risk in
9  individuals have been shown to be
10 carcinogenic.
11         So that's what I'm saying about
12 potency of asbestos is different than potency
13 of some other carcinogens that you might look
14 at.  But the importance of it is it's a
15 complex mixture, talc, body powders, a
16 complex mixture that includes constituents
17 that are known human carcinogens as well as
18 some that are -- been ranked other ways by
19 regulatory bodies.
20     Q.   If Johnson's talcum powder
21 products do not contain asbestos, does that
22 change your opinion with respect to the risk
23 they pose with respect to ovarian cancer?
24     A.   No, and I think that was very
25 clear if you looked at my first report.  So

Page 257

1  even -- there's -- I don't think in any of my
2  reports I've opined that without looking at
3  the complex mixture that we wouldn't be here.
4          In other words, I have not
5  opined that if it doesn't have -- if it
6  doesn't have asbestos, it's not a risk.  I
7  have not opined that, and I don't believe
8  that, because I think there is independent
9  risk for the fact that we have a complex
10 mixture of talc that has been tested and
11 shown to be carcinogenic.
12         It's my opinion, I told you --
13 maybe it wasn't you.  I may have told this
14 yesterday, I'm sorry, to Mr. Smith that I
15 believe that there is evidence to show that
16 there is a significant exposure to asbestos
17 based on the data that's been collected.
18         But certainly, you know, in
19 some -- the data has shown that in the assays
20 that have been done or the analyses that have
21 been done that you can't say that talc is
22 asbestos-free.
23     Q.   Well, so --
24     A.   So --
25     Q.   -- the question I have

65 (Pages 254 to 257)

Confidential - Pursuant to Protective Order

Page 258

1    specifically relates to ovarian cancer.
2          Is it your view that through an
3    exposure route that is relevant for ovarian
4    cancer, that the use of Johnson's talcum
5    products involve a substantial exposure to
6    asbestos?
7          A.   I believe based on the use of
8    the products that -- where the data has been
9    collected that there would be a substantial
10   exposure to asbestos, regardless of how
11   you're exposed, perineal -- perineally or by
12   inhalation.
13         Q.   What is your basis for reaching
14   that conclusion?
15         A.   It's looking at the number of
16   fibers that have been detected in the
17   products, in looking at the -- the widespread
18   nature of the presence of asbestos fiber --
19   asbestos in the talcum powder products and
20   the fact that even though it's at a very low
21   level by their -- their level of detection,
22   again, can't be said to be asbestos-free.
23         So regardless of whether it's
24   talc that's being applied perineally or a
25   talc that you're inhaling while you're

Page 259

1    applying it perineally, the fibers are still
2    going to be present within that talc.
3          Q.   Have you or anyone done an
4    analysis of the dose of asbestos to which
5    someone might be exposed perineally?
6          A.   I haven't done a specific
7    calculation, no.
8          Q.   Has anyone done that
9    calculation?
10         MS. PARFITT:  Objection.  Form.
11   QUESTIONS BY MS. BRANSCOME:
12         Q.   That you have seen?
13         MS. PARFITT:  Objection.
14         THE WITNESS:  I'm trying to
15   remember whether I saw that done in
16   any of the documents related to
17   Dr. Longo.
18         I don't know.  I'd have to go
19   look.
20   QUESTIONS BY MS. BRANSCOME:
21         Q.   Okay.  So as you sit here
22   today, can you give an opinion to a
23   scientific degree of certainty, reasonable
24   degree of scientific certainty, that an
25   individual would be exposed to a dose of

Page 260

1    asbestos above background through the
2    perineal use of Johnson's talcum powder
3    products?
4          MR. MEADOWS:  Objection.
5          MS. PARFITT:  Objection.
6          THE WITNESS:  I don't think
7    that's the opinion I have formed to
8    date, but certainly the opinion I have
9    formed is that the data I have seen
10   indicates that you can't separate out
11   talc without asbestos versus talc with
12   asbestos in the information that's
13   been collected.  Because there's --
14   all -- the information that's been
15   collected has shown there's no
16   evidence that asbestos-free talc is
17   available.
18         If by asking that question
19   you're trying to say that it's the
20   asbestos alone that's causing the
21   cancer, that is not my opinion.  So
22   that is when the dose issue would
23   become very important for asbestos.
24   QUESTIONS BY MS. BRANSCOME:
25         Q.   Okay.

Page 261

1          A.   So that's -- so that's a
2    different question I have not answered.
3          Q.   And in reaching your opinion
4    that there is no evidence that asbestos-free
5    talc exists, you have not been provided with
6    the reports by the defense experts, including
7    Dr. Matthew Sanchez, analyzing Johnson's
8    talcum powder products for the presence or
9    absence of asbestos, correct?
10         MS. PARFITT:  Objection.  Form.
11         I think you're aware that the
12   MDL expert reports have not yet been
13   provided to us.
14         MS. BRANSCOME:  Yeah.
15         MS. PARFITT:  I'm just making a
16   point.
17         THE WITNESS:  I have not seen a
18   report by Dr. Sanchez.  I assume I
19   will, because typically after -- later
20   in the litigation, once all experts
21   have been deposed or revealed, I'm
22   usually given defense expert reports
23   and their deposition testimony.  So I
24   expect to see that; I just haven't
25   seen it yet.

66 (Pages 258 to 261)

Confidential - Pursuant to Protective Order

Page 262

```
 1   QUESTIONS BY MS. BRANSCOME:
 2       Q.   And you haven't seen it in any
 3   of the cases in which you've rendered an
 4   opinion, correct, not just the MDL?
 5       A.   Well, none of the cases that I
 6   have worked in have involved the issue of
 7   looking for asbestos exposure.
 8            The cases I have worked on have
 9   been talking about talc exposure that may
10   include asbestos as a constituent, but it
11   wasn't focused on asbestos exposure.
12            So, no, none of the cases I
13   worked on have provided testimony in that
14   area.
15            You understand what I'm saying?
16       Q.   Let me just make it clear.  You
17   have not, in any of the cases in which you
18   have offered opinions with respect to the
19   contents of talc, been provided with an
20   expert report or testimony by Dr. Sanchez
21   about what he did or did not find in
22   Johnson's talcum powder products with respect
23   to asbestos?
24       MS. PARFITT:  Objection.  Form.
25       THE WITNESS:  So I can't tell
```

Page 263

```
 1   you that I have not.  I don't recall
 2   it.  That's all I can say.  I don't
 3   recall that name.
 4   QUESTIONS BY MS. BRANSCOME:
 5       Q.   It's certainly not something
 6   you discuss in your report, correct?
 7       A.   No, I do not.  And I don't know
 8   that it's in my reliance materials.  That's
 9   why I'd ask you to look there, because if
10   it's in my reliance materials, then I've seen
11   it.
12       Q.   Okay.
13       A.   And I mean big reliance
14   material list, not my reference list.
15       Q.   All right.  With respect to the
16   other potential constituents of talc, have
17   you done any analysis to provide an answer as
18   to how much -- what dose of chromium, for
19   example, an individual might be exposed to
20   through the perineal use of Johnson's talcum
21   powder products over a lifetime?
22       A.   No, and I have -- well, I know
23   it's a separate deposition.  We discussed
24   this yesterday.  No, I have not done a -- a
25   calculation of a potential dose with perineal
```

Page 264

```
 1   application for any of the heavy metals.  So
 2   the three that I've mentioned, no, I have not
 3   done that calculation.
 4       Q.   You would agree, based on your
 5   training and experience as a toxicologist,
 6   that in order for an agent -- and we can talk
 7   specifically about a metal -- to present a
 8   risk of cancer it needs to be bioaccessible,
 9   correct?
10       A.   If by bioaccessible you are not
11   limiting that definition to solubilized into
12   the blood and carried systematically, yes, I
13   would agree with that.  Bioaccessible meaning
14   it has to be in a form that can somehow
15   interact with the tissue, yes, I agree with
16   that.  But it could be as simple as tissue
17   contact versus needing to be solubilized.
18       Q.   Okay.  Is silica bioaccessible?
19       A.   It depends on the form of the
20   silica.  So silica particles can be
21   bioaccessible if inhaled and found on the
22   surface of the lung.  That can cause injury
23   at the site of the lung.  So that's an
24   accessibility to that particular tissue that
25   it contacts.
```

Page 265

```
 1       Q.   We talked earlier -- it's
 2   somewhat related to bioaccessibility, but we
 3   talked about the way in which different
 4   particles might move specifically through the
 5   genital tract in women.
 6            Do you recall that?
 7       A.   Yes.  A general discussion.
 8       Q.   Yes.
 9            And when you testified that
10   starch and talc might not move at the same
11   rate, do you have an opinion as to which
12   might move more quickly through the tract?
13       A.   I haven't formed that opinion,
14   no.
15       Q.   Okay.  And do both talc and
16   starch particles remain in the body for the
17   same length of time?
18       A.   I haven't done an analysis to
19   see if the data tells us what the -- what the
20   differences might be.  I would expect there
21   to be differences, which is what I told you
22   earlier, because I would expect the starch to
23   be able to be solubilized, where I would not
24   necessarily expect the talc to act in that
25   same manner.
```

67 (Pages 262 to 265)

Confidential - Pursuant to Protective Order

Page 266

1     Q.   Is cornstarch capable of
2  causing an inflammatory process?
3     A.   It can.  It is -- but it is --
4  it's a different level of risk for
5  inflammatory responses than is talc, just by
6  its chemical nature.
7     Q.   Have you done an analysis in
8  your report that examines the differences
9  between the inflammatory response that can be
10  triggered by talc as opposed to cornstarch?
11     A.   I haven't analyzed inflammatory
12  response.  Instead, what I've done is done a
13  comparison of what the toxicity -- the
14  differences in the toxicity potential have
15  been described in medical literature, and I
16  cite -- I have a paragraph where I cite to
17  some sources that talk about the differences
18  in the toxicity potential or biocompatibility
19  of starch versus talc.
20     Q.   Now, I had a question about
21  your supplemental report that was marked as
22  Exhibit 3 to the deposition.
23        At paragraph 67...
24     A.   Okay.
25     Q.   You identify here six heavy

Page 267

1  metals - arsenic, chromium, lead, cobalt,
2  cadmium and nickel - that in your
3  supplemental report dated August 29, 2018,
4  you say have been reported across lots of
5  talc powders.
6        Do you see that?
7     A.   Are you in -- now you're in my
8  MDL report or here?
9     Q.   No.
10     A.   Oh, so where are you?  I'm
11  sorry.
12     Q.   Same report.  It's the sentence
13  that begins at the bottom of page 6.
14     A.   Okay.  Hold on.
15        About that they have varied at
16  the levels --
17     Q.   Yes.  So you identify six
18  different types of heavy metals.
19        Do you see that there?
20     A.   Yes, I do.
21     Q.   Okay.  And the question I had
22  for you was that in your report in the MDL,
23  if you look at paragraph 36 --
24     A.   Yes.
25     Q.   -- you identify -- you identify

Page 268

1  only three heavy metals:  chromium, cobalt
2  and nickel.
3        Do you see that?
4     A.   Yes.
5     Q.   Why did you remove three of the
6  heavy metals?
7     A.   It's not so much removing.
8  Those three heavy metals that I focused on in
9  my MDL report are ones that have been talked
10  about with a similar mechanism of action as
11  far as irritation and biologic -- biologic
12  plausibility mechanism being irritation and
13  inflammation.
14        So that's why I focus on those
15  three, which may not -- which is not
16  necessarily the case for some of the others,
17  even though they're also -- have a
18  carcinogenic hazard, pose a risk.
19     Q.   So in your -- as part of your
20  risk assessment that you performed in the
21  MDL, are you offering the opinion that to the
22  extent they exist in any of the Johnson
23  talcum powder products, that arsenic, lead --
24     A.   Cadmium.
25     Q.   -- and cadmium play any role in

Page 269

1  the risk of developing ovarian cancer?
2     A.   That is not an opinion that I
3  would be offering in the MDL.
4     Q.   Okay.  Now, you talk about
5  these heavy metals having been classified by
6  different agencies as either known probable
7  or possible human carcinogens, correct?
8     A.   You're in my MDL report again?
9     Q.   Oh, yes.
10     A.   Okay.  I'm sorry.  Okay.  Let
11  me get there.
12        Yeah, I do have that
13  discussion.  I'm just trying to find it.
14     Q.   Sure.
15     A.   Okay.  Yes, I'm there.
16     Q.   Is it your view, based on your
17  expertise, that because a compound can cause
18  one type of cancer, it can cause all types of
19  cancer?
20     A.   No, not necessarily.  It
21  depends on the -- well, it depends on a
22  couple of things.  It depends on what's been
23  studied.  Have all types of cancer even been
24  studied.  And then it also -- it also depends
25  upon, I believe, the route of exposure as

68 (Pages 266 to 269)

Confidential - Pursuant to Protective Order

Page 270

1  well. So can it get to where it could cause
2  that, could it distribute there. And then in
3  addition to that, what data has been
4  collected. Is there enough data, for
5  example, to show that there's extrapolation
6  from animals to humans in the types of tumors
7  or is it -- or if we have good human data,
8  then we would focus on the types of cancers
9  that you're seeing in humans, for example.
10     Q.  Okay. But you recognize even
11  where there is complete data some compounds
12  can cause one type of cancer and they are
13  incapable of causing another type, correct?
14        MS. PARFITT:  Objection. Form.
15        THE WITNESS:  I don't know
16     about incapable, but I would agree
17     that you certainly would see -- you
18     could potentially see different
19     observations.
20        If you're talking about animals
21     versus humans, or are you talking
22     about --
23  QUESTIONS BY MS. BRANSCOME:
24     Q.  If humans.
25     A.  Based on what you had seen in

Page 271

1  the animals; is that what you're asking me?
2     Q.  Yes.
3     A.  Yes. So, yes, there is not
4  always a one-to-one concordance. So that's
5  why -- that's why I made the comment that
6  it's important to have some human data or
7  experience, so that you can put in context
8  the data you collected in animals.
9        I would say to you there are
10  certain kinds of tumors in animals, for
11  example, that are shown to be not relevant at
12  all to human risk assessment. Like four
13  stomach tumors in rats is an example. I've
14  dealt with that one a lot.
15     Q.  What types of cancer -- type or
16  types of cancer are the basis for the
17  classification of chromium as a known human
18  carcinogen by IARC?
19     A.  So I have to pull it out, but I
20  believe that there may be some GI cancers and
21  maybe some skin cancers, but I'm not sure.
22  I've got it pull it out. It's been a while
23  since I've looked at it.
24     Q.  Okay. Have you done an
25  analysis to evaluate whether or not the types

Page 272

1  you can extrapolate with scientific basis
2  from one type of cancer cause to ovarian
3  cancer with respect to the heavy metals
4  specifically?
5     A.  Well, I haven't attempted to
6  that, because I haven't attempted to define a
7  independent risk for each of those metals
8  individually.
9        The issue -- the issue I have
10  with those metals is -- there's a paragraph
11  here where I talk about pathogenesis of
12  carcinogenesis, where I talk about different
13  stages of cancer development and the fact
14  that inflammatory responses may be operating
15  at all those different stages.
16        So the issue is you have
17  potential -- you have compounds that are
18  known to produce cancer or have been shown to
19  have a potential risk of cancer. They share
20  a similar mechanism to talc, so as a result
21  of that, they factor into your risk
22  assessment as far as there being an exposure
23  to a mixture.
24        But on the issue of ovarian
25  cancer, I'm looking at the data that's been

Page 273

1  collected on talc itself, which would be talc
2  with the constituents that could include the
3  metals. But certainly I'm not saying that it
4  is -- without the presence of one or the
5  other of these there would be no risk of
6  ovarian cancer. I'm not saying that either.
7     Q.  So my question is, though, can
8  you point me either to scientific literature
9  directly documenting that these heavy metals
10  can cause ovarian cancer or to scientific
11  literature that enables you to extrapolate
12  from the types of cancer that they are known
13  or believed to cause to ovarian cancer?
14     A.  So I -- on the issue of can I
15  point you to the data on ovarian cancer, I'd
16  have to go back. I can't answer that without
17  looking at the assessments.
18        But on the other -- second
19  question you asked me, that's the question I
20  was just trying to answer before. It's the
21  idea that regardless of where the cancer is
22  developing, the fact that these compounds
23  have the ability to stimulate similar toxic
24  responses in tissues could lead to a -- where --
25  setting up a situation where the -- where the

69 (Pages 270 to 273)

Confidential - Pursuant to Protective Order

Page 274

1    tissue is primed for cancer development.
2          Q.   And do you have --
3          A.   And so that --
4          Q.   Sorry.
5          A.   And that has to do with the
6    basic science of carcinogenesis when you look
7    at underlying mechanisms, especially with
8    tissue contact, direct tissue contact, with
9    irritants or inflammatory processes.
10         But I would -- I am not -- I
11   have not formed the opinion, again, that with
12   or without either one of these that I would
13   expect ovarian cancer to be the target.  I'm
14   saying that ovarian cancer risk is increased
15   based on exposure to talc, which includes a
16   variety of constituents.
17         Q.   Okay.  And do you cite anywhere
18   in your report to studies documenting -- I
19   know you said you'd need to go look at them,
20   but I'm asking if it's in your report
21   anywhere a discussion of any studies showing
22   that the particular heavy metals that you
23   cite as potential constituents of Johnson &
24   Johnson's products have been demonstrated to
25   increase a risk for ovarian cancer on their

Page 275

1    own?
2          A.   So, no, I haven't addressed
3    that in my report.  And again, I think that's
4    inconsistent with the way I'm using these
5    data.  But that's fine.  I mean, no, I
6    haven't done a specific assessment of ovarian
7    cancer risk with each of those metals
8    individually.
9          Q.   I would ask the same questions
10   for the different fragrance constituents that
11   you allege in your report are potential
12   carcinogens.
13         Have you done any analysis, and
14   can you point me to any scientific studies
15   that establish that those particular
16   compounds are capable of causing ovarian
17   cancer?
18         A.   No, I haven't done that
19   analysis, but, again, general principles of
20   toxicology and cancer risk assessment, when
21   you look at the presence of multiple --
22   excuse me, multiple carcinogens with similar
23   mechanisms of action, you would assume in
24   your risk assessment that those risks could
25   be additive.

Page 276

1          So, again, that's what I'm
2    pointing to and why I have cited the data.
3          Q.   Now, you talked about -- when
4    we were discussing mechanism, you said that
5    inflammation alone is not necessarily
6    sufficient to cause cancer, correct?
7          A.   Yes, I did.
8          Q.   All right.  Do you have
9    scientific studies that show that any of the
10   heavy metals or the fragrance constituents
11   that you identify as potential carcinogens
12   create -- generate phenotypic changes like
13   you discussed were next for the formation of
14   cancer?
15         A.   I believe that data is
16   available on nickel.  I need to go back and
17   look at chromium and cobalt, but I do believe
18   with nickel you'll find similar data on
19   tissue irritation and inflammatory processes.
20         Nickel is also a sensitizer, so
21   it has interaction with the immune system, so
22   I do believe that for nickel you can find
23   some of that data.
24         Q.   Okay.  But as you sit here
25   today, can you point me into any of that

Page 277

1    that's discussed in your report?
2          A.   No specific discussion other
3    than, again, all -- the IARC -- I'm citing to
4    the IARC assessments, and the IARC
5    assessments for each of those discuss
6    carcinogenesis and a biologically plausible
7    mechanism being linked to the ability of
8    these compounds to induce oxidative stress
9    and/or inflammatory processes.
10         Q.   Okay.  In your opinion, you
11   talk about the mixture of constituents that
12   are involved in talc.
13         Have you done any analysis to
14   look at how the different constituents
15   interact with each other?
16         A.   Well, yes, that's my issue at
17   looking at underlying mechanism.
18         But are you asking me -- I
19   certainly don't have a -- the only studies
20   that I have to rely upon on the interaction
21   of the mixture is the actual studies on the
22   powders themselves, where we know that the
23   powders contain constituents other than just
24   platy talc.
25         Q.   Okay.  And do the constituents

70 (Pages 274 to 277)

Confidential - Pursuant to Protective Order

Page 278

1    need to have the same underlying potential
2    carcinogenic mechanism for them to have an
3    additive effect?
4        A.    By general principles of
5    toxicology, yes, you look at mode -- mode of
6    action or mechanism of action before you
7    apply that additivity principle to the cancer
8    risk assessment.
9        Q.    And so as you sit here, you
10   believe there have been scientific
11   documentation that nickel might operate
12   through the same biological mechanism as you
13   purport talc to operate, but you're not sure
14   about the other heavy metals or the fragrance
15   constituents; is that correct?
16       MS. PARFITT:  Objection.
17       THE WITNESS:  For the fragrance
18   constituents, I'd definitely have to
19   pull because I haven't looked at that
20   individual assessment in a while.
21       For these three, what I do know
22   is that they do share the ability to
23   at least induce oxidative stress.
24       What I can't recall for
25   chromium and for cobalt is whether

Page 279

1        they're taking it the next step from
2        oxidative stress to inflammatory
3        process.  I believe that they do, but
4        I'd have to check, whereas I know
5        nickel has been shown to lead to an
6        inflammatory process after oxidative
7        stress has been induced.
8    QUESTIONS BY MS. BRANSCOME:
9        Q.    And you would agree, even more
10   than requiring an inflammatory process, you
11   would actually have to see that these
12   compounds can generate phenotypic changes,
13   correct?
14       MS. PARFITT:  Objection.
15       THE WITNESS:  Well, we know
16   they do because they've been shown to
17   be carcinogenic.  If you've been shown
18   to be carcinogenic, you've done a
19   phenotypic change in the cell from a
20   normal cell to a cancer cell.
21       So we know they have the
22   capability to induce tumors, or
23   cancer, all three of those, at least
24   in animals if not in humans as well,
25   because two of them are known human.

Page 280

1        So those two -- we'd have human data
2    to show that.
3        But on the issue of cobalt, it
4    may only be -- I need to go back and
5    look, but it may indeed just be animal
6    data.
7    QUESTIONS BY MS. BRANSCOME:
8        Q.    And so your basis for that
9    would be the IARC classification?
10       Is that where I would go to
11   look if I wanted to look at it after this
12   deposition?
13       A.    I'd go to the IARC reviews.
14   I'd go to those three which I believe I have
15   cited down here for you and given you where
16   to go to find them.
17       Q.    Okay.  You discuss in your
18   report -- and if you'd like to reference it,
19   it's paragraph 69 on page 47 -- the concept
20   of genotoxic and nongenotoxic carcinogens.
21       Do you recall that?
22       A.    Yes.
23       Q.    And as you sit here today, is
24   it your opinion that talc is more likely a
25   nongenotoxic carcinogen?

Page 281

1        A.    As the direct insult, yes.  And
2    I would like to -- I would like to point out
3    that in the literature -- the reason I have
4    this paragraph here is because in the
5    literature in the past, in the area of
6    chemicals, it's been -- toxicologists have
7    attempted to put two bins, direct genotoxic
8    insult versus nondirect genotoxic.  It
9    doesn't mean you can't get a genotoxic event
10   after the initiation.
11       So I want to make sure you
12   understand that.  I'm not saying that there
13   is no possibility of this chemical in its --
14   in its process of inducing cancer leading to
15   indirect genotoxicity, but I'm talking about
16   the direct mechanism at the site of the cell.
17       So talc, for example, has been
18   shown to not be genotoxic in cells.  And so
19   that's why I believe, then, when I look at
20   the rest of the data that fits, that it fits
21   the definition of a nongenotoxic carcinogen
22   by its initial mechanisms to induce cancer.
23       Q.    Okay.  And if talc is, in fact,
24   a nongenotoxic carcinogen, it would suggest
25   that there is likely a threshold dose below

71 (Pages 278 to 281)

Confidential - Pursuant to Protective Order

Page 282

1    which it does not have a carcinogenic effect,
2    correct?
3          MS. PARFITT: Objection.
4          THE WITNESS: It is possible,
5    and that's the problem. In order to
6    fully assess that, you would have to
7    have the data to prove it.
8          But that's the assumption. You
9    assume with nongenotoxic carcinogens
10   that you could identify a level where
11   you wouldn't turn on that indirect
12   mechanism. So that -- yes, that is
13   true.
14   QUESTIONS BY MS. BRANSCOME:
15       Q.   And you have not been able to
16   identify, nor can you point to, scientific
17   literature that identifies a threshold -- a
18   threshold dose for talc with respect to its
19   carcinogenic potential for ovarian cancer,
20   correct?
21       A.   Not a specific dose, but I
22   think that's why I mentioned to you -- and
23   I -- I think that's why Canada, when you look
24   at their document, they talk about
25   discouraging routine use generally. So it's

Page 283

1    the issue of what -- single use of a body
2    powder or an occasional use is a different
3    risk assessment than routine use.
4          So if you want to talk about
5    thresholds that way, that's very imprecise,
6    but you could do that. You can talk about
7    whether or not there -- I do believe there's
8    a different risk profile for one or two uses
9    of talc body powder versus a risk profile of
10   somebody who uses it routinely, because I
11   think that fits that threshold definition.
12   It's the idea that you have limited
13   availability for enough particles to migrate
14   to lead to the tissue toxicity that it cannot
15   be recovered from or repair.
16       Q.   You're familiar with the
17   concept of the precautionary principle,
18   correct?
19       A.   Yes.
20       Q.   All right. And you understand
21   that Health Canada may have made
22   recommendations with respect to product usage
23   that are purely precautionary, correct?
24         MS. PARFITT: Objection. Form.
25         THE WITNESS: I disagree that's

Page 284

1    what they've done, but is it possible
2    that they would do it? Any regulatory
3    agency, it's possible they could do
4    it, yes.
5    QUESTIONS BY MS. BRANSCOME:
6        Q.   Do you have any information
7    with respect to Health Canada's
8    decision-making, other than what you have
9    read on the face of the documents?
10       A.   That is all I have to look at
11   is what is provided on the website.
12       Q.   Okay. And so the statement
13   that you think Health Canada was suggesting a
14   dose threshold by their statement of
15   discouraging routine use, you're basing that
16   entirely on what you read on the piece of
17   paper, correct?
18         MS. PARFITT: Objection. Form.
19         THE WITNESS: Well, that's what
20   they state. So, yes, I'm -- I am
21   telling you what I see on their
22   website. If that's what you're asking
23   me, yes, that is true.
24   QUESTIONS BY MS. BRANSCOME:
25       Q.   Okay. Can you point me --

Page 285

1    well, do you discuss -- have you looked at,
2    as part of your opinion specifically in the
3    MDL, the studies exploring a potential link
4    between asbestos and ovarian cancer? Just
5    asbestos.
6        A.   Some of the studies, yes, but I
7    have not -- I have not done a separate risk
8    assessment just for asbestos by itself,
9    because I have not assumed that there is
10   asbestos-only exposure.
11         Does that make sense?
12         But I do cite -- for example, I
13   cite to some of the early literature on -- so
14   this -- I guess where this opinion comes in
15   is on hazard and warning. So in the warnings
16   I talk about when it was known that asbestos
17   was linked with cancer, because the warning
18   standard is not causation proven but the
19   identification of the potential. And so that
20   is in my report on warnings, but that is not
21   within my discussion of the weight of the
22   evidence for risk assessment of the talc
23   product.
24       Q.   Okay.
25       A.   Does that make sense?

72 (Pages 282 to 285)

Confidential - Pursuant to Protective Order

Page 286

1    Q.   Uh-huh.
2         For example, have you rendered
3    an opinion about what dose of asbestos
4    exposure would be necessary to cause ovarian
5    cancer in an individual?
6    A.   No, I have not formed that
7    opinion at this time.
8    Q.   Okay.  Do you have an opinion
9    about the background level of asbestos to
10   which individuals are exposed with no
11   increased risk of any type of cancer?
12   A.   No, I do not have an opinion.
13   I do believe others do, but I do not.
14   Q.   Okay.  You may have been asked
15   some of these questions before, but I will
16   keep them brief.
17        Have you ever published any
18   articles that state that talc causes ovarian
19   cancer?
20   A.   No, I have not.
21   Q.   Have you ever publicly
22   expressed the opinion that talc increases the
23   risk of ovarian cancer outside of literature?
24   A.   No.  My work has been in the --
25   in the courtroom.

Page 287

1         MS. BRANSCOME:  I think we can
2    take a break.
3         VIDEOGRAPHER:  We are going off
4    the record at 2:57 p.m.
5    (Off the record at 2:57 p.m.)
6         VIDEOGRAPHER:  We are back on
7    the record at 3:13 p.m.
8         MS. BRANSCOME:  Dr. Plunkett, I
9    have no more questions for you on
10   behalf of Johnson & Johnson, subject
11   to your counsel doing a direct of any
12   kind.
13        THE WITNESS:  Sure.  Thank you.
14        EXAMINATION
15   QUESTIONS BY MS. BOCKUS:
16   Q.   Good afternoon, Dr. Plunkett.
17   You and I have met before.  My name is Jane
18   Bockus, and as you know, I represent Imerys
19   in this case.
20   A.   Yes.
21   Q.   Correct?
22        I want to go back to just touch
23   briefly on a couple of issues that have
24   already been addressed.
25        Would you agree that IARC has

Page 288

1    not classified any of the heavy metals that
2    you've identified in your MDL report as
3    carcinogenic to the ovary?
4    A.   So the answer is I'd have to
5    look.  I don't recall that, but I'd have to
6    look to confirm.
7    Q.   Okay.
8    A.   That's the answer I believe I
9    gave a few minutes ago, yes.
10   Q.   So if I look at the IARC
11   website, then I can confirm whether or not
12   they have identified any of those as
13   carcinogenic to the ovary?
14   A.   Not so much the web -- well,
15   the website or the actual documents.  I think
16   I would actually point you to the actual
17   monograph --
18   Q.   To the monograph.
19   A.   -- because there may be
20   evidence in there of ovarian cancer as being
21   seen in studies.  And I'd have to go look.
22   Q.   Okay.  That was not part of
23   your consideration here, correct?
24   A.   So ovarian cancer is part of my
25   consideration, but I didn't -- in this part

Page 289

1    of my evaluation I'm trying to -- trying to
2    describe these metals.  And this is really
3    about mechanism of biologic plausibility and
4    the fact that these two things can go
5    together, and then the concept of additivity
6    is they're on hazard.  The idea if you have a
7    cancer hazard generally and you have similar
8    mode of action, regardless of the tissue, you
9    would be expected to have a potential
10   additive effect when you do a risk
11   assessment.
12        So that's my use of that data,
13   which is why I didn't do a separate ovarian
14   cancer assessment for each of the each
15   constituents but just on powder.
16   Q.   And you discuss that topic on
17   page 47, paragraph 68, of your report,
18   correct, the -- whether there's an additive
19   effect?
20        And you cite to Casarett and
21   Doull.  I don't know if I'm pronouncing those
22   names correctly.
23   A.   I'm sorry, on what page?
24   Q.   I'm on page 47, paragraph 68.
25   A.   Okay.  Sorry.  I should know

73 (Pages 286 to 289)

Confidential - Pursuant to Protective Order

Page 290

1  where it is, but...
2       Okay.  I'm there, yes.  Okay.
3       Yes, I do cite to a chapter in
4  Casarett and Doull, yes.
5       Q.   Okay.  And Casarett and Doull
6  is a resource that you cite to for a couple
7  of different toxicological principles that
8  you discuss in your -- in your report,
9  correct?
10       A.   Yes, because it's one of the
11  most well-recognized textbooks that used
12  across different either universities or
13  schools or even in regulatory agencies.
14       I would also say I cite EPA
15  2000 there.  I'm not citing just Casarett,
16  but I am citing Casarett as well as an EPA
17  guidance document.
18       Q.   In Casarett and Doull, do they
19  actually discuss talcum powder in Chapter 2,
20  or is it more just the concept of the
21  potential of the effects when you have two
22  different chemicals that you're exposed to at
23  once or three or four?
24       A.   It's the latter.  It's the --
25  because you'll notice the title is

Page 291

1  "Principles of Toxicology," so it's the
2  general chapter teaching principles for risk
3  assessment and toxicology as used in risk
4  assessment.
5       Q.   And whether there is an
6  additive effect of, say, talc and nickel,
7  that's something that an experiment could be
8  designed to study, correct?
9       MS. PARFITT:  Objection.
10       THE WITNESS:  If you're talking
11  generally for cancer and not worried
12  about the issue of ovarian cancer, if
13  you're talking about cancer, like
14  doing an inhalation experiment to look
15  what happens to the lung, that you
16  could do.
17       The problem with the animal
18  studies and ovarian cancer due to
19  perineal exposure is it's very
20  difficult to understand how you design
21  a study to expose the animals that way
22  reliably in the way that humans are
23  exposed.
24       But generally you could
25  study -- you might even be able to do

Page 292

1  a genetically susceptible mouse study
2  to hurry the process along to look at,
3  but you might not be able to do it
4  through perineal exposure.  You might
5  have to do it through another route
6  such as either inhalation or maybe
7  even you could -- you could look at it
8  through intraperitoneal injections,
9  for example.
10  QUESTIONS BY MS. BOCKUS:
11       Q.   Well, and what the textbook
12  talks about is the fact that you need to
13  study it to find out whether the effects are
14  additive, whether the effects are something
15  that multiply the risk, you know, so that the
16  two together are greater than either one
17  alone, or do the effects offset each other
18  and reduce the risk, correct?
19       A.   That is discussed there --
20       MS. PARFITT:  Objection.
21       THE WITNESS:  -- which is why
22  I've cited the EPA document.  Because
23  the EPA document addresses the issue
24  of mixtures, and this is the issue of
25  mode of action.  If you have chemicals

Page 293

1  that you're looking at on the issue of
2  additivity or no effect, you will --
3  you look at that issue of how they're
4  affecting the tissue and underlying
5  mechanism.
6       But the only way to look at the
7  magnitude absolutely of how the risk
8  would change is by doing an
9  experiment.  That is true.
10  QUESTIONS BY MS. BOCKUS:
11       Q.   And to your knowledge, that
12  experiment has never been done; is that
13  correct?
14       A.   I can't guarantee that it's
15  only been done for nickel and talc alone, but
16  I would -- I would state that based on --
17  there are studies out there that have been
18  done where they've used the body powder that
19  we know have metals -- a variety of things
20  within it that are not just platy talc, but
21  those experiments are that kind of data.
22       But as far as gathering
23  dose-response information or teasing out
24  individual components, that is not available.
25       Q.   Do you agree that dose response

74 (Pages 290 to 293)

Confidential - Pursuant to Protective Order

Page 294

1    is the fundamental principle of toxicology
2    that underpins the effects that chemicals can
3    have on living organisms?
4        A.    When you're talking general
5    toxicology, yes, I think it's talked about in
6    the textbook.
7        Q.    And you agree that it is the
8    dose of the chemical and the pattern of
9    exposure that determines whether a chemical
10   produces an adverse effect on an organism,
11   not simply the presence of the chemical?
12       A.    For a typical dose-response
13   relationship for non -- for nongenotoxic
14   events, absolutely, I would agree that is
15   probably true.  And I don't mean nongeno --
16   noncancer events.
17             In the issue of cancer biology,
18   some of those issues don't hold all the time.
19   In other words, there are certain chemicals
20   and certain ways of looking at cancer risk
21   assessment where you can't assume where the
22   threshold is or identify what a safe dose
23   would be.  But certainly I agree on the issue
24   of noncancer risk assessment generally, or
25   general end points of toxicity, that is true.

Page 295

1        Q.    And again, do you agree that in
2    general toxicology the effects that might be
3    reported at high doses will not occur at
4    lower doses if the concentration at the site
5    of action falls below the threshold for
6    toxicity?
7        A.    Yes, that could -- that could
8    be possible, yes.
9        Q.    And do you agree that
10   evidence-based toxicology and epidemiology
11   dictates that the dose of the chemical is the
12   critical factor when examining the risk posed
13   by a chemical, not just its presence even in
14   the human body?
15       A.    I would say that's generally
16   true, yes, which is why I have attempted to
17   look at the dose-response relationship as
18   well as the prevalence of the contact.
19       Q.    And with regard to the human
20   studies that you cite, would you agree that
21   none of the studies that you cite in your
22   report that have to do with migration of
23   particles within the genital tract of the
24   female involve applications to the perineum
25   or outside of the genital tract?

Page 296

1        A.    That is true with the exception
2    of Parmley and Woodruff, which addresses this
3    issue of --
4             MS. PARFITT:  Objection.
5             THE WITNESS:  Talks about the
6    issue of exposure from the outside to
7    the inside.
8             But the data that is collected
9    with the different studies they have
10   deposited at some point -- at some
11   position within the vagina, that is
12   true.
13   QUESTIONS BY MS. BOCKUS:
14       Q.    And that is not how talc is
15   deposited in women who use it regularly in
16   their daily routine, correct?
17             MS. PARFITT:  Objection.
18   Misstates the evidence.
19             THE WITNESS:  So I would say
20   that depends on what women are doing.
21   Perineal application, for example,
22   application on the underwear, can lead
23   to contact of the vaginal opening
24   depending on the woman.
25             For example, a woman who has

Page 297

1    a -- had many children has a tract
2    that is stretched.  There, indeed, you
3    can have more direct contact than you
4    can with a very tight -- so I would
5    say it depends on the woman and it
6    depends on the situation.
7             But I do think it's generally
8    accepted, based on my review of the
9    literature, that there is the
10   opportunity for exposure internally
11   from perineal application.
12   QUESTIONS BY MS. BOCKUS:
13       Q.    And if I understand what you
14   testified to earlier today and yesterday, you
15   don't have any data that would advise on --
16   out of the talc that is deposited in the
17   underwear, what percentage of it makes it
18   into the reproductive tract?
19       A.    That's the data that's missing,
20   that is true.  And unfortunately, no one has
21   done a study.  It would be -- if there was a
22   way to do that, it would be interesting to do
23   that.  I just don't see how you design that
24   study, especially knowing the hazard of talc
25   at this point.  I think that would be a

Confidential - Pursuant to Protective Order

Page 298

1  difficult study to get approval for.
2      Q.    And do you have an opinion as
3  to whether it is even correct that each day
4  that a woman uses talc in her underwear, that
5  some of the talc makes its way to the ovary?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: Have I -- can I
8      quantify that?
9          No, I haven't quantified it. I
10     think I got asked that earlier. I
11     can't quantify the amount that gets
12     there. Or, I'm sorry, I may have
13     misheard the start of your question.
14     I apologize.
15  QUESTIONS BY MS. BOCKUS:
16     Q.    Yeah, I'm really asking: Do
17  you have an opinion as to whether it happens
18  every single time a woman applies talc to her
19  perineal area? Does some of that talc make
20  it to her ovary?
21         MR. MEADOWS: Objection.
22         MS. PARFITT: Objection.
23         THE WITNESS: I don't think I
24     stated it quite that way, but
25     certainly I think the opportunity is

Page 299

1  there with every application. And of
2  course it would depend upon the amount
3  of time that the contact may be in
4  place. But the opportunity is there.
5          So, for example, if you applied
6  it to your underwear and 30 minutes
7  later you go to the bathroom, it's
8  very possible that you will have wiped
9  away, and so that that application may
10 have taken an opportunity away. But I
11 do believe that the opportunity is
12 there based on the literature I have
13 seen.
14         And so I haven't formed the
15 opinion, though, that it's absolutely
16 every time. My opinion, I think, is
17 based on the fact that I believe that
18 there is data to indicate that
19 exposure occurs, and that with
20 routine, continual habit, sort of a
21 habit exposure, that indeed that there
22 was some migration that occurs.
23 QUESTIONS BY MS. BOCKUS:
24     Q.    And is it fair to say that you
25 don't have an opinion as to whether that

Page 300

1  migration occurs every day, once a week, once
2  a month?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: I haven't
5      formulated my point -- my opinion
6      quite that way; however, I do believe
7      that it is something that is going to
8      happen routinely with exposure. I do
9      believe that migration is something
10     that is going on routinely with
11     application.
12         So with applications, I do
13     believe that that is, but I can't tell
14     you that this amount has migrated on
15     this particular day with this
16     particular application, no. That --
17     the data that we have collected is not
18     there to allow us to do that.
19 QUESTIONS BY MS. BOCKUS:
20     Q.    How do you define the word
21 "routinely" as you're using it in that
22 answer?
23     A.    So that would be the idea of
24 repeated exposures, you know, within a week,
25 within a month, within a year. So not --

Page 301

1  routine to me would not be -- would not be
2  applying it once a month one month, waiting
3  six months, doing it again, and then not
4  doing it until the next year.
5          Again, it's the idea -- some
6  people may -- routine may be during the hot
7  season of the year, they're routinely getting
8  daily exposures when it's warm, and during
9  the cold weather not applying. But then the
10 next year doing -- that's a routine for them
11 and their habits based on their pattern of
12 exposure.
13         Again, we know that talc, when
14 it -- when it migrates and gets into the
15 body, we have data to show that it is -- it
16 is able to persist in the body. The fact
17 that you may have not been exposed for three
18 months because it was cold doesn't mean that
19 you -- that that changes the fact that you're
20 still at risk with additional exposures the
21 next -- the next time that habit
22 becomes -- comes into place.
23         So I think there's multiple
24 exposure patterns that are possible, but when
25 I use routine, it's something that people are

Confidential - Pursuant to Protective Order

Page 302

1    doing throughout their -- a period of their
2    life.  And so it would be something that
3    happens either on a weekly basis for a good
4    part of the year.  I haven't defined it with
5    a particular number, though, no.
6        Q.    And my question had to do with
7    out of the number of times a given woman --
8    or an average woman uses talc, what
9    percentage of the time does talc make its way
10   into her reproductive tract?
11       A.    So I don't think that
12   anybody -- anybody can point to a piece of
13   data that tells you that, but, again, it's
14   based upon the anatomy, I would expect there
15   to be the potential each time it's applied.
16       And on your question on
17   routine, when I'm talking routine, I'm
18   looking at not just frequency but also
19   duration.  So when I'm talking about dose,
20   it's the fact that they do it on a repeated
21   basis for a number of -- a period of years as
22   well.
23       That's what the data shows in
24   the human studies.  It's not something,
25   again, that may have been done routinely for

Page 303

1    one year, but it does appear to be something
2    that's done more -- longer term than that.
3        But we can't give a number.  We
4    have no threshold.  We don't know exactly
5    what that minimum number is.
6        Q.    Do you think that the minimum
7    number is greater than a year?
8        MS. PARFITT: Objection.  Form.
9        THE WITNESS: I haven't formed
10   that opinion, no.
11   QUESTIONS BY MS. BOCKUS:
12       Q.    Do you think it's greater than
13   a month?
14       MR. MEADOWS: Objection.
15       THE WITNESS: Greater than a
16   month?
17   QUESTIONS BY MS. BOCKUS:
18       Q.    Yes.
19       A.    One month in their life?
20       Q.    One month in their life, where
21   they're using it every day for a month.
22       A.    So I haven't formed that
23   opinion at this point in time, but I'd say
24   it's more likely to occur when you do it more
25   than a month.  But I haven't formed an

Page 304

1    opinion on a set number, no.  I can't --
2    can't point you a specific number.
3        I'm not doing case-specific, so
4    I've not looked at any of those pieces of
5    information for any given plaintiff.
6        Q.    And I'm just trying to get the
7    threshold.
8        A.    Uh-huh.
9        Q.    As I understand it, that is
10   part of a toxicological evaluation, is the
11   threshold below which there's not an issue.
12       So I think you've said you
13   don't know if it's less than a year, but you
14   think it's more likely than not that it's
15   greater than one month.
16       MR. MEADOWS: Objection.
17   QUESTIONS BY MS. BOCKUS:
18       Q.    Is that fair?
19       A.    No, that's not exactly what I'm
20   saying.  I'm saying we don't know the
21   threshold.  So as a result, I'm not of the
22   opinion that it absolutely can't -- it only
23   has to be this long.
24       What I'm saying to you is per
25   general principles of toxicology and based on

Page 305

1    the human data that we have, it indicates
2    that it's more frequent than just one month,
3    but I can't tell you that it's absolutely not
4    possible.
5        That's where -- I do think when
6    you're talking about those kinds of patterns,
7    that's a case-specific issue for individuals,
8    because I think that would have to be
9    considered for each individual.  But
10   certainly as a toxicologist, I'm using the
11   words "routine," "repeated," "longer
12   duration," "chronic exposure."  And when I
13   defined "chronic" earlier, I talked about
14   years of exposure versus just one month.
15       That would be consistent with
16   what I have said, yes, but I'm not -- I -- I
17   certainly don't want to rule out that there
18   couldn't be somebody out there that could
19   show something different, because it may very
20   well be that there are people that you can
21   identify with the presence of talc in their
22   ovaries and all of their other case-specific
23   things that could -- could make that pattern
24   a -- make someone be able to draw a
25   case-specific, reliable conclusion.

77 (Pages 302 to 305)

Confidential - Pursuant to Protective Order

Page 306

1      But that's not my role. I
2  don't do case-specific.
3      Q.   And I am simply trying to get
4  the parameters of your opinions with regard
5  to the amount of talc use one would need to
6  have before you would feel comfortable --
7  well, that in your opinion would be
8  sufficient to create a toxic environment.
9          MR. MEADOWS:  Objection.
10         THE WITNESS:  Well, that's a
11     different question.  So toxic
12     environment could be with a much
13     shorter time exposure, okay?
14 QUESTIONS BY MS. BOCKUS:
15     Q.   Right.
16     A.   So but if you're talking
17 about -- the opinion that I have formed has
18 to do with an increased risk of ovarian
19 cancer.  So with that opinion, that's the
20 description, I believe, I was giving this
21 morning.  It's the idea that the data that
22 I've seen indicates that my opinion that
23 perineal use of talc body powder products
24 increases your risk for ovarian cancer above
25 that background level that you know exists.

Page 307

1      That opinion is based on data
2  that is -- is -- the supporting data would
3  indicate that it has to be a habit, routine,
4  a chronic exposure.  And so as a
5  toxicologist, I've tried to put that in
6  context.
7      I don't know what else to tell
8  you.  That's the opinions I have formed to
9  date.
10     Q.   A chronic -- a habit, routine,
11 a chronic exposure for years?
12     A.   Well, chronic --
13         MR. MEADOWS:  Objection.
14         THE WITNESS:  -- is defined as
15     years, typically, by a toxicologist,
16     and so that's what I -- that's what I
17     told you.
18 QUESTIONS BY MS. BOCKUS:
19     Q.   Shifting to your regulatory
20 opinions, you would agree that Imerys is a
21 raw material supplier to J&J; is that
22 correct?
23         MR. MEADOWS:  Objection.
24         THE WITNESS:  I would call them
25     an ingredient supplier, yes.

Page 308

1  QUESTIONS BY MS. BOCKUS:
2      Q.   Okay.  An ingredient supplier.
3      And you agree that Imerys does
4  not sell any products to the general public,
5  correct?
6          MR. MEADOWS:  Objection.
7          THE WITNESS:  I don't know
8      that's definitely true, but I'm not
9      aware that they do.
10 QUESTIONS BY MS. BOCKUS:
11     Q.   And what Imerys supplies to
12 Johnson & Johnson is not a finished cosmetic
13 that is ready to be sold on the market,
14 correct?
15         MR. MEADOWS:  Objection.
16         MS. PARFITT:  Objection.
17         THE WITNESS:  I don't know that
18     I can answer that except in the
19     context of Johnson & Johnson's baby
20     powder, SHOWER TO SHOWER® and Shimmer,
21     it's my understanding that Johnson &
22     Johnson mixes -- has some fragrance
23     added to the talc.
24     I don't believe Imerys does
25     that, but I don't know for sure.

Page 309

1      So based on what I know -- I'm
2  telling you what I know, and I would
3  call them, again, an ingredient
4  supplier, and I would call Johnson &
5  Johnson a cosmetic manufacturer.
6      Does that answer the question?
7  QUESTIONS BY MS. BOCKUS:
8      Q.   It does.
9      Would you agree that the
10 minerals that you have identified in your
11 report, that the documents that you have
12 seen, would classify their -- to the extent
13 that they are ever in the powder, that
14 they're trace ingredients?
15         MS. PARFITT:  Objection.
16         MR. MEADOWS:  Objection.
17         THE WITNESS:  So which
18     ingredients are you referring to?
19     So some of the metals, no, are
20     not trace ingredients.
21     Are you talking about the --
22     are you talking about the -- like the
23     presence of tremolite or the presence
24     of chrysotile --
25

Confidential - Pursuant to Protective Order

Page 310

1    QUESTIONS BY MS. BOCKUS:
2        Q.    No.  No, I'm sorry.  I'm
3    talking about the three metals that you
4    identify in your report.  Those are trace
5    elements that are -- that are sometimes
6    detected in the studies of the -- of the
7    talc.
8            MR. MEADOWS:  Objection.
9            THE WITNESS:  It's not how I
10   would say it.  I would say they're
11   heavy metal components that are
12   naturally occurring within the product
13   that are sometimes -- sometimes
14   detectable at levels that are reported
15   as trace based on the detection limit
16   within the analysis, but at other
17   times they're not listed as trace.
18   They're actually listed with a
19   specific amount.
20          So that's what -- how I would
21   define what I call trace.  Usually
22   that's how it will be reported in the
23   lab, trace, which means below the
24   limit of quantification, but it's
25   there.  You're detecting it.

Page 311

1            I would agree that -- that
2    there are other descriptions of heavy
3    metals in the heavy metal literature
4    that talk about trace amounts being
5    found in -- naturally occurring in
6    food, for example, and I agree that
7    that does occur.  But in the case of
8    this product, we actually have
9    often -- we actually have a -- a limit
10   that is set for acceptability in the
11   specification.
12          And so I would think it's more
13   proper to call it a level of the heavy
14   metal that is allowable by the purity
15   specifications set by the product.
16   And sometimes those levels may be
17   above, and most of the times those
18   levels are below, which is why it's
19   cleared.  Because I've seen some
20   analyses where different products may
21   have been, I guess, turned away or
22   considered not acceptable based on the
23   analysis of certain types of minerals
24   or metals.
25

Page 312

1    QUESTIONS BY MS. BOCKUS:
2        Q.    Have you seen any studies where
3    women's blood has reflected the presence of
4    nickel or cobalt or chromium?
5            MR. MEADOWS:  Objection.
6    QUESTIONS BY MS. BOCKUS:
7        Q.    Who are parts of these
8    studies -- these ovarian cancer studies?
9            MR. MEADOWS:  Objection.
10           THE WITNESS:  The
11   epidemiological literature you're
12   asking me?
13   QUESTIONS BY MS. BOCKUS:
14       Q.    Yes, ma'am.
15       A.    It's possible in the Nurses'
16   Health Study that we can go to that, because
17   I know they do collect some heavy metal
18   levels.  I've done that for other clients on
19   other issues.
20          Most of the others, I doubt
21   that we have heavy metal levels in blood.
22   But certainly there are levels of heavy metal
23   in blood, especially things like lead, for
24   example, that we have very limited capacity
25   to eliminate.

Page 313

1            So whether or not you carry
2    around a significant body burden of a heavy
3    metal in your blood is somewhat driven by the
4    exposure pattern you get.  It's something
5    that's commonly -- or can you excrete it
6    quickly or not.  So...
7        Q.    And are you familiar with any
8    studies that have suggested that the use of
9    body powders leads to a heavy burden of
10   nickel, chromium or cobalt in the blood?
11       A.    So I have not seen such
12   analysis done, no, I have not.
13       Q.    In paragraph 67 of your report,
14   which is on page 46 -- I'm sorry, on -- oh,
15   I'm sorry.  Paragraph 64, I apologize.
16       A.    No.  No, that's fine.
17       Q.    It's on page 44.
18          You cite to two abstracts --
19       A.    Yes.
20       Q.    -- one by Fletcher and one by
21   Fletcher and Saed.
22          Do you consider these abstracts
23   to be reliable sources of data?
24       A.    They're not as reliable at all
25   as a peer-reviewed article.  So there's a

Confidential - Pursuant to Protective Order

Page 314

1 difference in the weight you give an
2 abstract, absolutely.
3 However, knowing the papers
4 that Dr. Saed has actually published in the
5 peer-reviewed literature, I have -- I have
6 mentioned them in here because I do believe
7 that they are -- they are pieces of
8 information that are highly relevant to some
9 of the issues raised in other cellular
10 studies, and so that's why they're here. But
11 certainly I do not give them the same weight
12 as in my assessment of overall risk.
13 And I would say that I had the
14 same opinions on risk before I had these
15 studies. Because in my original reports,
16 obviously, I have gone further than risk and
17 talked about cause, and I didn't have the
18 Fletcher studies.
19 The Fletcher studies are more
20 on the issue of biologic plausibility and
21 mechanism versus being important
22 underpinnings, for example, for a hazard
23 assessment.
24 Q. Is there any way that someone
25 reading your report could tell that you

Page 315

1 attribute less weight to the abstracts by
2 Saed and Fletcher just by reading your
3 report?
4 MR. MEADOWS: Objection.
5 THE WITNESS: I don't know if
6 they could or not. Hopefully they
7 would based upon where they appear in
8 the report. They're not cited a lot
9 of other places, but they certainly
10 are cited.
11 So that's why I'm here today,
12 though. You're asking me these
13 questions; I'm telling you. That's
14 how I look at these studies. That's
15 all I can say.
16 I haven't -- I haven't,
17 certainly, as I've told you, given
18 things numerical weight throughout my
19 report.
20 QUESTIONS BY MS. BOCKUS:
21 Q. Looking at paragraph 118...
22 Well, when you were preparing
23 your report, were you careful with the
24 language that you used in it to be precise
25 and accurate?

Page 316

1 A. I attempted to do that. I
2 can't tell you that there isn't something in
3 here I've missed. But, yes, I read this
4 report six or seven times before I finalized
5 it, trying to make sure that the language I
6 was using was an accurate reflection of the
7 opinion I'm expressing.
8 But it's possible, if you want
9 to point to something that you want to ask me
10 about, I can tell you whether or not that was
11 something that I would change.
12 Q. So on page 77, paragraph 118 in
13 the middle of it, you say, "Based on the body
14 knowledge available by the 1950s, talc body
15 powders manufactured and sold by Imerys and
16 Johnson & Johnson."
17 And that's the question that I
18 have for you.
19 A. I see what you're saying.
20 Q. Was Imerys selling anything to
21 Johnson & Johnson in the 1950s?
22 MR. MEADOWS: Objection.
23 THE WITNESS: I'm thinking.
24 It's possible they did not. That may
25 be true.

Page 317

1 QUESTIONS BY MS. BOCKUS:
2 Q. Well, and actually --
3 A. You know what? When I wrote
4 this sentence, I assumed that they did, but
5 if that is not true, then certainly this
6 sentence should be just Johnson & Johnson.
7 Q. Well, earlier in your report,
8 in a footnote you indicate that Imerys began
9 supplying talc to Johnson & Johnson in 1989
10 or the late 1980s.
11 Do you remember making that
12 notation?
13 A. So let me look. So if that's
14 an inconsistency, then that should change.
15 Let me look.
16 Q. And that's all I want to know,
17 if it's an inconsistency, should it change.
18 A. If it is an inconsistency --
19 certainly if Imerys was not selling talc to
20 Johnson & Johnson in 19 -- the 1950s, then --
21 then certainly Johnson & Johnson's products
22 would not -- would not be affected by Imerys'
23 activity.
24 However, if Imerys is selling
25 talc to anyone that makes a consumer product

Confidential - Pursuant to Protective Order

Page 318

1    in the 1950s, then -- or a precursor company
2    to Imerys is making talc that's selling for
3    body powder to somebody other than Johnson &
4    Johnson, then that opinion would still hold.
5         So -- but I certainly agree, I
6    think I -- you're right, I think I have a
7    statement about the link between the two in
8    '89. So in that case, then certainly the --
9    the link here would be related to Johnson &
10   Johnson's products.
11        Q.   Okay. Yeah.
12        A.   Whether or not -- if they
13   weren't sourced from Imerys, then that's a
14   separate duty on a product, not this product.
15        Q.   If you look on the bottom of
16   page 7, I think you'll see the footnote I was
17   referencing.
18        And with regard to your last
19   answer, you don't have any information as to
20   whether Imerys existed and, if it did,
21   what -- who its customers were in 1950s,
22   correct?
23        A.   I don't believe I do, no.
24        MS. BOCKUS: I think that's all
25   that I have. Thank you.

Page 319

1         MR. LOCKE: I've got a few
2    questions.
3         EXAMINATION
4    QUESTIONS BY MR. LOCKE:
5         Q.   Doctor, my name's Tom Locke. I
6    represent the Personal Care Products Council.
7    We met a couple of times before, I think.
8         A.   I apologize, I don't recall
9    your name at least. The face looked
10   familiar, though. I apologize.
11        Q.   I try to maintain a low
12   profile.
13        I have relatively few
14   questions. I wanted to ask you overall about
15   your opinion.
16        Would you agree that reasonable
17   scientists can disagree with your opinion
18   that talc increases the risk of ovarian
19   cancer?
20        A.   I'd say I wouldn't say it quite
21   that way. I'd say that I agree that
22   scientists can disagree on conclusions they
23   draw, depending on the -- depending on the
24   way that they have assessed.
25        So certainly based on a

Page 320

1    complete assessment the way I did, then I
2    would agree that other people could come to a
3    different conclusion, absolutely.
4         So I think it depends what you
5    mean by "reasonable scientist." But I would
6    agree that individuals can look at the same
7    body of data and, based on their judgment and
8    experience, based on looking at that same
9    body of data, could come to a different
10   conclusion, yes. That's true.
11        Q.   You've been involved in this
12   talc litigation for at least a couple of
13   years, right?
14        A.   Yes.
15        Q.   And you know that various
16   defendants have offered experts who disagree
17   with your conclusions, right?
18        A.   Some of my conclusions, yes. I
19   don't know that there is somebody that's in
20   the litigation that does exactly what I do
21   across all the opinions I've expressed, but,
22   yes, certain parts of my opinions there are
23   other experts I'm aware of, yes.
24        Q.   Well, they -- you're aware that
25   there are defense experts who disagree with

Page 321

1    your opinion that talc increases the risk of
2    ovarian cancer; is that correct?
3         A.   Yes, I -- I am aware of that
4    fact.
5         Q.   And in your review of the
6    records that go back or the scientific
7    materials that go back 35 years or more,
8    you've seen that there's disagreement
9    regarding that issue; is that correct?
10        A.   So what documents are you
11   referring to? Are you asking me about a
12   specific -- just the published medical
13   literature? Are you asking about documents
14   like internal company documents, reviews by
15   others? What are you asking me about?
16        Q.   Well, let's focus on the
17   published medical literature.
18        There are scientists who have
19   disagreed with your opinion; is that correct?
20        MS. PARFITT: Objection.
21        THE WITNESS: I'm not aware of
22   a paper in the published medical
23   literature that has done the exact
24   assessment I have done.
25        So I am aware of the fact,

81 (Pages 318 to 321)

Confidential - Pursuant to Protective Order

Page 322

1    however, that there are individual
2    papers by scientists that, for
3    example, have concluded that there is
4    no association between exposure to
5    talc perineally and ovarian cancer,
6    yes. Individual papers, I am aware of
7    that, but that's different than what I
8    have done.
9    QUESTIONS BY MR. LOCKE:
10       Q.   Let me just ask you about what
11   you were requested to do on behalf of
12   plaintiff's counsel.
13          Plaintiff's counsel asked you
14   to provide opinions related to the human
15   health hazards posed by exposure to talcum
16   powder products and how those hazards relate
17   to the regulatory requirements for marketing
18   cosmetic ingredients and cosmetic products in
19   the United States; is that correct?
20          MR. MEADOWS:  Objection.
21          THE WITNESS:  I didn't write
22   that, but that sounds like an accurate
23   reflection of what -- what we -- what
24   I have done at least in parts of my
25   report, yes.

Page 323

1    QUESTIONS BY MR. LOCKE:
2       Q.   Well, if you look at your
3    report, I think you go to part where you were
4    asked to provide -- and I just pulled it from
5    what you said.
6       A.   So I did write it, I apologize.
7    It didn't sound like me.
8       Q.   It started with "to provide
9    opinions related to the human health hazards"
10   and so forth, so I just wanted to make sure
11   we're clear on that.
12      A.   Sure.
13      Q.   So does that sound right in
14   terms of what you were asked to do?
15      A.   I said I -- certainly those are
16   the kinds of things that I was definitely
17   asked to do.  I was asked to do two basic --
18   two basic things, which was having to do with
19   toxicology and risk assessment, and then a
20   separate issue related to regulatory
21   concerns.
22          So, yes, those are the two
23   basic, I guess, buckets of information and
24   documents that I reviewed and opinions I've
25   expressed, and I think that's consistent with

Page 324

1    what I've been doing in the litigation.
2       Q.   Okay.  As to that second
3    bucket, the US regulatory requirements for
4    marketing cosmetic ingredients and products,
5    that's not relevant to the scientific
6    question whether talc may cause ovarian
7    cancer; am I right?
8       A.   No.  I disagree with that based
9    on the fact that a company that markets a
10   cosmetic product is required to do a safety
11   assessment.  And if in that safety assessment
12   issues relate to cancer or ovarian cancer and
13   the use of talc, then those two things are
14   related.
15          But I would agree that -- that
16   doing a risk assessment like I've done is a
17   separate issue from doing a safety assessment
18   for a product, because there's actually even
19   a lesser standard for an issue of looking at
20   a safety assessment for a product versus
21   actually forming the opinion that there is an
22   increased risk of cancer with exposure to
23   talc.
24      Q.   Now, did IARC in 2006, did it
25   look at the US regulatory process in

Page 325

1    considering whether talc may cause ovarian
2    cancer?
3          MR. MEADOWS:  Objection.
4          THE WITNESS:  I don't think I
5    understand what you mean.  It's not a
6    US regulatory process, no, if that's
7    what you're asking me.
8          They have a -- they have a
9    discussion of what the products are,
10   which is part of the way they're sold.
11   But I don't think they're discussing
12   the duty of a company under the
13   regulatory process, no, that's a
14   separate issue.
15   QUESTIONS BY MR. LOCKE:
16      Q.   So their analysis of whether
17   talc may cause ovarian cancer, that's
18   different than the analysis of whether a
19   company may have a duty, whatever that duty
20   may be?
21          MR. MEADOWS:  Objection.
22          THE WITNESS:  It's a different
23   process, absolutely.  IARC is a
24   separate, independent body that does
25   an assessment looking at the issue of

Confidential - Pursuant to Protective Order

Page 326

1   cancer hazard and looking at whether
2   or not there is sufficient evidence to
3   categorize that hazard, whereas a duty
4   of a company under the regulatory
5   situation is broader than just cancer
6   hazard; it's a whole different thing.
7   It's what you do internally before you
8   market a product.  Totally different.
9       And so certainly when I --
10  that's why I have separate sections in
11  my report, and that's why I even
12  have -- I've had discussions about the
13  difference between the regulatory
14  standard for warning versus the
15  assessment of risk that may be
16  required in order to start to produce
17  a -- identify an association or an
18  increased risk or even if you did a
19  causation analysis.  Totally different
20  type of exercise.
21  QUESTIONS BY MR. LOCKE:
22      Q.   Do you first, in that exercise,
23  look at the scientific issue of whether talc
24  may cause ovarian cancer?
25      A.   Are you asking me in either of

Page 327

1   these exercises?
2       Q.   Well, let's say when you're
3   getting to -- you mentioned the duty to warn.
4   So if you're looking at the duty to warn, do
5   you first have to look at does talc cause
6   ovarian cancer?
7       MR. MEADOWS:  Objection.
8       THE WITNESS:  That's not the
9   question you asked.  No.  I would
10  argue, based on the regulations, if
11  you look at the standard, the question
12  is, is there evidence to indicate that
13  there is a chance, there is a
14  potential -- not that it does, but is
15  there a potential for that type of
16  hazard to be posed to consumers who
17  use the product.
18      It's a possibility versus being
19  a -- I'm taking it beyond possibility
20  when I'm doing my assessment for
21  increased risk.  And I talked about
22  that this morning, and I can't
23  remember her last name.  The
24  Johnson -- I apologize.  But I -- with
25  Johnson & Johnson.  I talked about

Page 328

1   this is a different assessment and
2   different standard.  It's a much lower
3   standard on cosmetics for what needs
4   to be done as far as warning.
5       Now, when a company comes and
6   initiates a safety assessment on their
7   product, before they even think about
8   what am I going to warn, they should
9   be doing a comprehensive assessment of
10  safety based on what's available
11  publicly, knowing what others have
12  reported and then what data they've
13  collected.
14      If they don't have data at all
15  on the safety of the product, then the
16  product has to say that.  We don't
17  know.  We do not know if this product
18  is safe.  And that's one of the things
19  that is allowed under FDA -- under FDA
20  regulations as well.
21      But essentially some -- some
22  assessment must be done to understand
23  from the perspective of the company
24  that this product is safe for
25  consumers to use as -- under the

Page 329

1   directions of use.
2       So in the case of this, it
3   would be a body powder being used on
4   the body surface but also perineally
5   because -- because that was an
6   exposure pattern that was understood.
7   QUESTIONS BY MR. LOCKE:
8       Q.   Okay.  You described two
9   different buckets.  They're independent
10  assessments; is that correct?
11      MR. MEADOWS:  Objection.
12      THE WITNESS:  Initially that's
13  where I started, and now I'm talking
14  two different duties.  There's a duty
15  to warn, but there's first a duty to
16  collect information before you market
17  it.  It's your premarket safety
18  assessment.
19  QUESTIONS BY MR. LOCKE:
20      Q.   Okay.  I'm not actually talking
21  about the manufacturer's duty.  I wanted to
22  just first address your scientific analysis.
23      That's a separate question that
24  led you to your opinion on the -- your
25  opinion that talc increases the risk of

83 (Pages 326 to 329)

Confidential - Pursuant to Protective Order

Page 330

1  ovarian cancer, correct?
2        MR. MEADOWS:  Objection.
3        THE WITNESS:  Yes, that's what
4  I described.  And I thought you were
5  talking about duty of the company, and
6  so I apologize.  I didn't mean to go
7  off on a tangent.
8        If you want to focus just on
9  the risk assessment -- is that what
10  you want to do? -- that's what I'm
11  doing.
12  QUESTIONS BY MR. LOCKE:
13      Q.    No, I just want to understand,
14  those are two different things, though,
15  right?
16      A.    Those are two different --
17  those are two different tasks that I
18  undertook, yes.  I undertook a risk
19  assessment task to form opinions based on
20  what I can say about risk, and then I
21  separately -- and I had done this earlier on
22  the issue of warnings, looking at what do we
23  know about the product and whether or not --
24  and when did we know it, and what should
25  consumers have been warned about based on the

Page 331

1  safety information that was available over
2  time.
3      Q.    The risk assessment task,
4  that's what you mean by your analysis that
5  talc increases the risk of ovarian cancer?
6      A.    That's correct.
7      Q.    You could have stopped at that,
8  but then you performed an additional task; is
9  that right?
10      A.    Well, actually, no, because the
11  first task I actually started with was the
12  regulatory task.  When I first started
13  getting involved in the litigation very --
14  before I wrote my first report, one of the
15  first things I was looking at was the issue
16  of the duty of the manufacturer to provide
17  warnings.
18        And then after that, I expanded
19  that role to be an inclusion as well of a
20  causation analysis.
21        And then now I'm not doing a
22  full causation analysis in this litigation,
23  but I'm using essentially some of the same
24  information to provide you with a description
25  of a -- a health risk assessment, which was

Page 332

1  also sort of -- that's a piece along the way
2  to doing a causation analysis, but it's not
3  the same.
4      Q.    Your opinion regarding the
5  FDA's responsibilities and functions, that's
6  not related to your opinion that talc may
7  cause an increased risk in ovarian cancer; is
8  that correct?
9        MR. MEADOWS:  Objection.
10        THE WITNESS:  I don't think
11  that's true the way you're asking that
12  question, because I don't know how you
13  divorce the fact that as a -- in a
14  regulatory assessment, if I identify
15  cancer hazard, I have identified a
16  duty to warn.  That's certainly
17  something that should be warned about
18  when I understand that there's not
19  only the potential, but I believe
20  there's an increased risk.
21        But I would agree with you that
22  in my report, I'm laying out for you
23  even different bodies of information
24  that -- as I step through it.
25        Does that make sense to you?

Page 333

1  QUESTIONS BY MR. LOCKE:
2      Q.    Not really.
3      A.    I'm sorry.
4      Q.    I'm talking about your
5  scientific analysis here, not your regulatory
6  analysis.
7        To do your scientific analysis,
8  you looked at scientific materials, right?
9      A.    Yes, but I do the same thing
10  for my regulatory analysis.  That's why I'm
11  confused.  I -- to me they are connected.
12        But I would agree with you, I
13  had an analysis.  Let's just talk about that,
14  my analysis on risk assessment and my
15  opinions that I've expressed.  Those are laid
16  out in a separate section of my report,
17  absolutely.  So we could talk about that if
18  you'd like.
19      Q.    Well, I just want to
20  understand, and I think I do now, that's a
21  separate issue from your regulatory opinion?
22      A.    It's not a separate issue.
23  That's where I'm having trouble with your
24  language.
25        It's a separate task because,

84 (Pages 330 to 333)

Confidential - Pursuant to Protective Order

Page 334

1 for example, I may have only been asked, but
2 I wasn't, to just describe whether or not, as
3 a human risk assessor and toxicologist, there
4 is a hazard or a risk posed by the product,
5 and I could stop there.
6         But I was asked, based on --
7 based on my experience working in the area of
8 regulatory toxicology but also on regulatory
9 issues for clients where I give advice, I was
10 asked to look at how does that scientific
11 information impact what the company should be
12 doing.
13        And so that's -- that's why I'm
14 saying you can't divorce them, because the
15 warning issue I'm talking about is intimately
16 tied into the human health risk assessment
17 results.
18    Q.    So do you consider yourself
19 primarily here as a warning expert?
20        MR. MEADOWS:  Objection.
21        THE WITNESS:  I consider that
22 one of my roles, yes, absolutely.
23        It depends upon how individual
24 cases, individual attorneys, will --
25 will ask -- decide to use me.  For

Page 335

1 example, I have been used in one trial
2 to only talk about the toxicology.
3 Other trials, I've talked about
4 toxicology as well as regulatory
5 issues.  So I think it just depends on
6 the case.
7         In the MDL, I am prepared,
8 however, to come to talk at a trial on
9 the regulatory system that guides
10 cosmetics as well as provide opinions
11 that talk about what are the hazards
12 of talc, what is the toxicology of
13 talc, what do -- how can you be
14 exposed to talc, that migration issue,
15 and then my opinions about whether or
16 not I believe that there is an
17 increased risk of ovarian cancer.
18        So I would be -- be prepared to
19 talk about both of those things.
20 That's why I said I do think I'm a
21 little different than some of the
22 other experts that you may encounter,
23 for example, in the defense side,
24 where someone may just do regulatory
25 or somebody may just do toxicology.

Page 336

1         But I practice in both those areas in
2 my consulting practice and in my
3 experience.
4 QUESTIONS BY MR. LOCKE:
5    Q.    Let me ask you a few questions
6 about your cosmetic ingredient review
7 statements, CIR.
8         We can agree to call it that,
9 right?
10    A.    Yes, that's fine.
11    Q.    In parts of your report, you
12 cite the CIR as an authoritative source on
13 cosmetic ingredients; is that correct?
14    A.    So where are you looking at,
15 the background information on the CIR?
16         Yes, they certainly are a
17 source of information that FDA relies upon as
18 far as assessments, yes, that's true.
19    Q.    Well, and on page -- or
20 paragraph 35, page 23, you cite to the CIR
21 on, for example, chemicals purportedly in
22 cosmetics.  You have a footnote there.
23    A.    So --
24    Q.    I believe it's footnote 31.
25    A.    Yes, I have looked at -- looked

Page 337

1 at the CIR as a source of information because
2 many of the chemicals, many of the
3 ingredients within the fragrance of Johnson &
4 Johnson, the only available information may
5 be found within the CIR that's publicly
6 available.
7    Q.    And you rely on the report of
8 Dr. Cralley; is that correct?
9         MR. MEADOWS:  Objection.
10        MS. PARFITT:  Objection.
11 QUESTIONS BY MR. LOCKE:
12    Q.    You reference Appendix D to
13 your report.  I believe if you stay on the
14 same page you'll see that, the same
15 paragraph.
16    A.    I wouldn't say I rely on the
17 report of Dr. Cralley because I form my
18 opinions independent of Dr. Cralley, but
19 certainly his -- I believe if you go to his
20 reports, his report is supportive of my
21 opinions in this area.
22    Q.    Did you read his report?
23    A.    I have read it now, but I did
24 not read it before I -- before I formed my
25 opinions in this particular paragraph, yes.

Confidential - Pursuant to Protective Order

Page 338

1      Q.   I'm a little confused because
2  you're citing to his report.
3           You read it or you didn't read
4  it before you wrote this paragraph?
5      A.   I read it before I wrote the
6  paragraph.  I didn't read it before I had
7  formed the opinion.  Do you understand what
8  I'm saying?
9           I did my review of the irritant
10 chemicals independently before I looked at
11 Dr. Cralley's report.  So I had formed the
12 opinion that -- of the chemicals I had
13 searched for that this is what I identified.
14 And that's what this is talking about, right?
15          I'm saying here that of the
16 more than 100 chemicals included, over
17 70 percent are compounds linked with some
18 level of irritant hazard.  That was done on
19 my own.
20          Then, if you go to look at
21 Dr. Cralley's report, I cite it here because
22 it's consistent.  That is, his report
23 provides support additionally for the
24 statement I'm making.
25          So I'm not relying on his

Page 339

1  conclusions to make my opinion, but it's
2  certainly -- I am citing it here as it being
3  a piece of evidence that is consistent with
4  my opinions.
5      Q.   Sorry, I seem to have messed up
6  my microphone.  I'll try to hold it for a
7  little bit then.
8           Do you disagree with
9  Dr. Cralley's report?
10     A.   I have not formed an opinion
11 that I agree or disagree.  He -- with his --
12 I believe he has information that is
13 consistent with the opinion I'm expressing in
14 the sentence, however.
15     Q.   And do you know that
16 Dr. Cralley repeatedly cites to the CIR as an
17 authoritative source regarding cosmetic
18 ingredients?
19     A.   I don't know that he uses that
20 exact language, but he does cite to it, yes,
21 in his report.  Certainly he does.
22     Q.   More than 20 times, right?
23     A.   That, I have not counted.  I
24 can't tell you that.  But he does, just like
25 I do, as a source of information when there

Page 340

1  is no other source available.
2      Q.   Okay.  In your report you state
3  that the CIR process is administered
4  independent of the FDA.
5           But the FDA is on the CIR
6  steering committee; is that correct?
7      A.   That is correct.
8      Q.   You don't mention that in your
9  report, although you mention others who were
10 on the CIR steering committee, correct?
11     A.   Yes, there's a paragraph where
12 I talk about others, yes.
13     Q.   But you don't mention that the
14 FDA is on the steering committee?
15     A.   I believe I -- I believe I've
16 been asked that question before, and I said
17 yes, but certainly in this report I don't
18 believe I state that, that is true.
19     Q.   CIR solicits input from the
20 public; is that correct?
21          MS. PARFITT:  Objection.
22          THE WITNESS:  I would say they
23 solicit input from industry, yes.
24 QUESTIONS BY MR. LOCKE:
25     Q.   Well --

Page 341

1      A.   But they -- and they do have a
2  public comment period, which is mainly input
3  from industry.
4           But I agree that they do -- and
5  if what you're referring to is a public
6  comment period, yes, there is that for the
7  documents.
8      Q.   You can go on the website and
9  see what ingredients CIR is going to review,
10 right?
11     A.   Yes, you can.
12     Q.   Have you done that?
13     A.   Yes, I've done it many times
14 before.
15     Q.   Okay.  And did you submit
16 comments on talc in 2012?
17     A.   No, I did not.
18     Q.   Okay.  You could -- the public
19 can submit comments many times during the
20 process of an ingredient review; is that
21 correct?
22     A.   There are different --
23 different stages of the draft document.  Is
24 that what you're asking me?  Yes, that can be
25 done.

86 (Pages 338 to 341)

Confidential - Pursuant to Protective Order

Page 342

1    Q.    Well, even before it's a draft,
2  CIR is soliciting information about the
3  ingredient to include in the initial
4  materials provided to the expert panel; isn't
5  that correct?
6    A.    Technically I believe that is
7  true, but I would disagree that that is
8  something that happens routinely.  But I
9  would agree that -- I would say technically
10  you may be -- that is something that could
11  occur, yes, but that is not the situation,
12  for example, in the case of talc.
13    Q.    Why not?
14    A.    Based upon what I have seen
15  described as how the review was done, and
16  that has to do with the testimony of
17  different -- or different documents that I've
18  reviewed and the testimony of individuals
19  related to this document.
20    Q.    Well, Dr. Cramer could have
21  submitted comments to the CIR regarding talc,
22  couldn't he?
23    MR. MEADOWS:  Objection.
24    MS. PARFITT:  Objection.
25    THE WITNESS:  You'd have to ask

Page 343

1  Dr. Cramer if he was aware that they
2  were reviewing it.  I can't answer
3  that for Dr. Cramer.
4    But if he was aware of it,
5  certainly -- if you're aware of the
6  process going on and the timing of it,
7  certainly you can submit comments.
8  I'm not disagreeing with you on that.
9  That is true.
10  QUESTIONS BY MR. LOCKE:
11    Q.    CIR publishes in advance what
12  it's going to review; isn't that correct?
13    A.    What is coming up for review?
14    Q.    Yes.
15    A.    Yes, things that are proposed
16  for the next meeting, yes, that's true.
17    Q.    And you could submit comments
18  to the first draft of the CIR report; isn't
19  that correct?
20    A.    I would agree that that is
21  possible to happen, yes.
22    Q.    And you can submit comments
23  before the final report is drafted, correct?
24    A.    Yes, as long as it's still in
25  draft form, yes, those comments can be

Page 344

1  submitted.
2    Q.    And CIR meetings are open to
3  the public, right?
4    A.    That is true, they are open to
5  the public, but in my experience it -- they
6  are not meetings that are heavily attended by
7  the public but indeed are -- tend to be
8  meetings attended by industry stakeholders
9  within the ingredients that are being
10  reviewed.
11    Q.    You know Mr. Steinberg here.
12  He was a plaintiff's expert for a while?
13    A.    I don't know him personally,
14  but I know his name and I know he was a
15  plaintiff's expert, yes.
16    Q.    You know he attended the talc
17  meeting, right?
18    A.    Yes, I believe he was working
19  with indus -- he works with industry, so I
20  believe indeed he did attend that meeting.
21    Q.    You're not claiming he was
22  working with any industry member regarding
23  talc, are you?
24    A.    That's not what I stated.  I
25  know he's a consultant to the cosmetic

Page 345

1  industry, so it doesn't surprise me.  And I
2  believe he lives in the area, so it doesn't
3  surprise me that he attended.
4    I haven't spoken to him about
5  any of that, though, so I have no specific
6  details of that.
7    Q.    Transcripts of the meeting are
8  available to the public, right?
9    A.    You can download the
10  transcripts, yes.
11    Q.    They're on the website?
12    A.    That's what I said.  You can
13  download.  I'm sorry.
14    Q.    Okay.
15    A.    Yes, you can download them from
16  the website.
17    Q.    Did you submit comments to the
18  CIR regarding talc?
19    A.    No, I did not.
20    Q.    Why not?
21    A.    I wasn't aware of the process
22  that was going on in the draft form at the
23  time.
24    Q.    Why is that?
25    A.    I was not following the CIR for

87 (Pages 342 to 345)

Confidential - Pursuant to Protective Order

Page 346

1    talc at that particular time.  I have a lot
2    of other clients and a lot of other issues
3    that go on on a routine basis, and I -- I
4    literally would not have time to follow every
5    assessment they do, considering that they do
6    thousands of chemicals.
7         Q.    Did you know of the CIR prior
8    to your retention by plaintiff's counsel?
9         A.    Yes.  In fact, I -- one of the
10   journals that I receive, International
11   Journal of Toxicology, maybe, publishes many
12   of their safety assessments.  So I certainly
13   am, yes.
14         I was aware -- when I was at
15   Eviron, I was aware of the existence of CIR.
16        Q.    Have you ever provided prior to
17   this litigation -- and by "this litigation" I
18   mean any aspect of the talc litigation -- an
19   expert opinion on cosmetics' ingredients?
20        A.    You're asking me in any other
21   litigation on a cosmetic ingredient?
22         I'm thinking back to the cases
23   I've worked on.  Not as a -- not as a
24   testifying expert.
25         At Eviron, though, we worked on

Page 347

1    litigation involving cosmetic ingredients,
2    thought I was not the testifying expert.
3         Q.    In your report you talk about
4    the percentage of -- or the number of
5    ingredients that the CIR listed as unsafe.
6         Do you recall that?
7         A.    Yes.  I mean, if you want me to
8    verify the number, I need to go there.  But,
9    yes.
10        Q.    You don't mention that CIR has
11   put limitations on approximately 50 percent
12   of the ingredients that it has reviewed, do
13   you?
14        A.    I don't mention that, but they
15   do.  They have -- they have -- when they have
16   a statement about safety, they will -- they
17   will often talk about the limitations from
18   the safe use based on either concentration or
19   even maybe route of exposure, that is true.
20        Q.    Why don't you do that?  Why
21   didn't you include that in your report?
22        A.    No particular reason.  I mean,
23   the point I'm trying to make is really the
24   workload that's going on here and the
25   impossibility of the task of providing the

Page 348

1    same level of review of any of these
2    ingredients as can be provided -- as was
3    provided by the IARC.
4         And so, again, that's one of
5    the comparisons I'm doing.  I'm talking about
6    the difference in the time, the effort, the
7    difference in the independence of the
8    reviews.  And so that -- when I'm talking
9    about, those numbers, that's what I'm
10   focusing on.  I'm focusing on the fact that
11   you have so many reviews in a very short
12   period of time, with a one-expert panel, it's
13   impossible for that level of analysis and
14   review to be anywhere near what IARC panels
15   do, and also nowhere near the level of review
16   that I have done based on the number of
17   documents that I have analyzed and looked at.
18   So it's a different type of review.
19        Q.    Let me ask you a few questions
20   because you have criticized the panel.
21         You would agree with that,
22   correct?
23        A.    Yes.  Oh, absolutely.  This
24   particular analysis I have.  I have made some
25   general criticisms of the overall process,

Page 349

1    and then I made some specific criticisms of
2    this particular review.
3         Q.    And one of your criticisms is
4    that the CIR -- I think you said two CIR
5    expert panelists had conflicts of interest;
6    is that correct?
7         A.    Yes, that -- they did, that
8    were not -- that were not -- I believe not
9    understood even by Dr. Andersen at that time.
10   I think these are things brought up to him
11   that he was not aware of.
12        Q.    All right.  Now, you read his
13   testimony in one of the trials in California,
14   right?
15        A.    Yes, that's the -- in fact,
16   that's the source of the information where
17   I'm citing to those names of those
18   individuals.  I think I refer to that, his
19   trial testimony.
20        Q.    And didn't he, though, say,
21   well, he didn't view it as a conflict of
22   interest because the money wasn't going to
23   them personally, it was going to their
24   organizations?
25        A.    He did make that statement,

88 (Pages 346 to 349)

Confidential - Pursuant to Protective Order

Page 350

1  yes.
2      Q.    And you disagree with that
3  statement?
4      A.    I don't -- I mean, his
5  testimony is what it is.
6            Are you asking me do I disagree
7  that that's a conflict of interest?
8            I disagree that you shouldn't
9  disclose that as a potential conflict in the
10  documents that are produced, just like I do
11  when I write an article and I disclose that
12  I've had funding.  I don't say what the
13  funding specifically paid for, but I've had
14  funding or support from this industry
15  individual or that industry individual.
16  It's -- it's something that just is about
17  transparency.
18      Q.    So when you write articles, you
19  say that you've been paid a lot of money by
20  plaintiffs' lawyers?
21            MR. MEADOWS:  Objection.
22            MS. PARFITT:  Objection.
23            THE WITNESS:  Well, I haven't
24      written an article that overlaps with
25      an issue that I've addressed in

Page 351

1      plaintiffs' litigation, but I
2      certainly have given my conflict of
3      interest statements that relate to the
4      issue in the article.
5            I do that -- I've done that
6      with -- on my work -- several of my --
7      several of my assessments talking
8      about risks of pesticides.  I've done
9      it with the work that I've done that
10      that's been sort of, I guess,
11      policy-type work on behalf of the
12      American Chemistry Council.
13            So absolutely I do.
14  QUESTIONS BY MR. LOCKE:
15      Q.    Okay.  You don't think it's
16  relevant that you receive 50 percent of your
17  money solely from plaintiffs' products
18  liability lawyers?
19            MR. MEADOWS:  Objection.
20            MS. PARFITT:  Objection.  Form.
21            THE WITNESS:  If it has nothing
22      to do with the issue that I'm
23      addressing in the paper, no, I do not
24      think that.
25            But when you're accepting money

Page 352

1      from an industry or a company that has
2      to do with the issue you're looking
3      at, yes, a conflict -- a conflict of
4      interest absolutely needs to be
5      described.
6  QUESTIONS BY MR. LOCKE:
7      Q.    And that would -- well, let me
8  just ask you:  You're not an ethicist, are
9  you?
10      A.    No, I'm not trained as an
11  ethicist.
12      Q.    And you're not a lawyer, are
13  you?
14      A.    Well, no, but I have passed the
15  patent bar, but I'm not trained as a lawyer.
16      Q.    That doesn't make you an
17  ethicist, right?
18      A.    No, it does not.
19      Q.    Okay.  Let's talk about one of
20  the people you criticized, Dr. Wilma
21  Bergfeld.
22            Did you know she was the first
23  woman who was the president -- to be the
24  president of the American Academy of
25  Dermatology?

Page 353

1      A.    No, I don't know her
2  personally, so, no, I did not know that.
3      Q.    Did you investigate her at all
4  when you criticized her?
5      A.    I wasn't criticizing her, I was
6  criticizing the CIR process for failing to
7  disclose the conflicts of interest of
8  individuals that were involved in their
9  assessment.
10            I certainly am not giving
11  personal criticism to either of those
12  individuals.
13      Q.    You would agree that the
14  American Academy of Dermatology is a
15  reputable organization?
16      A.    I haven't formed an opinion one
17  way or the other; however, I'm aware of them,
18  and certainly I know individuals that are
19  members of it, yes.
20      Q.    Are those individuals reputable
21  people?
22            MS. PARFITT:  Objection.
23            THE WITNESS:  They are people
24      that practice medicine that certainly
25      I would go see.  I mean, you're asking

89 (Pages 350 to 353)

Confidential - Pursuant to Protective Order

Page 354

1    me if I formed a very specific opinion
2    about them as individuals, and I
3    haven't done that.
4    QUESTIONS BY MR. LOCKE:
5        Q.    Do you have any reason to
6    believe that the American Academy of
7    Dermatology is disreputable?
8        A.    No.  Again, I haven't formed an
9    opinion one way or the other.  I'm aware of
10   the organization, and it certainly is one
11   that is -- has within its members a number of
12   people that I know that practice in
13   dermatology.
14       Q.    Did you know that Dr. Bergfeld
15   was the first woman to be president of the
16   Cleveland Academy of Medicine?
17       A.    To the what?  What was the
18   first word?
19       Q.    Cleveland Academy of Medicine?
20       A.    No.  Again, I'm not aware of
21   her CV specifically, other than what may have
22   been discussed -- it's possible her -- I know
23   her affiliation will be listed in some of the
24   documents as to where she is today, but I do
25   not know her CV and her history.

Page 355

1        Q.    Are you aware that she was the
2    first president -- or she was a president of
3    the American Society of Dermatopathology?
4        A.    No.  Same thing.  If I'm not
5    aware of her CV, I wouldn't know that.
6        Q.    How about that she was the
7    former chair to the FDA's drug -- FDA's
8    Dermatology and Ophthalmology Advisory
9    Committee?
10       A.    Same answer.  I don't know her
11   CV, so I have no knowledge.
12       Q.    Is it your opinion that
13   Dr. Bergfeld was not qualified to chair the
14   CIR panel that considered talc?
15       A.    I don't think I formed that
16   specific opinion.  Instead, what I have --
17   the opinions I formed relate to the overall
18   makeup of the panel that failed to include
19   individuals with expertise that were -- that
20   are really key to assessing the safety of
21   talc.  And that had to do with the issues of,
22   as I discuss it, epidemiology -- oh, I'm
23   sorry, I think I need to put this back --
24   period -- sorry.  In the area of epidemiology
25   is one that I talked about it specifically,

Page 356

1    and also gynecological -- gynecological
2    sciences on the issue of migration.
3        Q.    You're not a epidemiologist,
4    are you?
5        A.    Not by training.  It's a tool I
6    use all the time, but I'm not an
7    epidemiologist by training.
8        Q.    And panel members on the CIR,
9    they might have used the same tool that
10   you're using to form your opinion about talc,
11   correct?
12           MR. MEADOWS:  Objection.
13           THE WITNESS:  Based on what
14       I've reviewed from the minutes and the
15       write-up, I would disagree that that
16       is -- they have done -- they've used
17       the tools in the same way I have.  I
18       disagree with that.
19   QUESTIONS BY MR. LOCKE:
20       Q.    No, but I'm saying their
21   epidemiology could be the same background
22   that you have.  You haven't reviewed who they
23   are, so you really don't really know.
24           MR. MEADOWS:  Objection.
25           THE WITNESS:  Well, I do

Page 357

1    know -- I do know Dr. Klaassen, who I
2    believe was on the panel as a
3    toxicologist.  He is not somebody
4    that -- he is not somebody that I
5    understand does a significant amount
6    of evaluation in risk assessment for
7    epidemiological studies.  He has done
8    some of that, yes, I agree, but it's
9    different training than mine.
10   QUESTIONS BY MR. LOCKE:
11       Q.    You're better qualified than he
12   is?
13       A.    No, that's not what I'm saying.
14   I'm saying it's different background.
15           The question that I heard you
16   ask me, I believe, was directed towards the
17   differences in my background versus somebody
18   else's.
19           And I'm saying that I'm not
20   aware that he has the same background I do,
21   but there is not -- there was not somebody on
22   the panel that had specific expertise and
23   analysis of epidemiological studies as an
24   epidemiologist.  And I think that's important
25   in this case where you're analyzing in a

90 (Pages 354 to 357)

Confidential - Pursuant to Protective Order

Page 358

1 causation analysis a wide variety of studies.
2 So I do think it's important.
3      Q.   You're not a gynecological
4 oncologist, are you?
5      A.   No, I'm not.  But again, that
6 would have been an important expertise to
7 have on the panel when --
8      Q.   And yet you formed your opinion
9 with --
10          MR. MEADOWS:  Hold on.
11          MR. LOCKE:  No.  No.  Go ahead.
12          You can ask follow-up questions
13 if you want.
14          MR. MEADOWS:  You're
15 interrupting her.
16          MR. LOCKE:  Well, I've got a
17 limited amount of time, and I've got
18 to keep moving.
19          MR. MEADOWS:  Well --
20          MR. LOCKE:  They're very long
21 answers to questions that I'm not
22 asking.  So I -- you follow up if you
23 would like with your questions, but I
24 got to keep moving.
25          MR. MEADOWS:  Well, I'm sorry,

Page 359

1 but you're not going to be allowed to
2 interrupt her.
3          MR. LOCKE:  Okay.  Then we'll
4 go longer.  If she's going to answer
5 questions I'm not asking, then I need
6 to go -- I need to be able to go
7 longer.
8          MR. MEADOWS:  You're not going
9 to be allowed to interrupt her.
10 That's just the bottom line.
11 QUESTIONS BY MR. LOCKE:
12      Q.   You're not a gynecological
13 oncologist, right?
14      A.   I'm not trained as a
15 gynecologic oncologist, that is true.
16      Q.   You're not a medical doctor,
17 correct?
18      A.   I am not a physician, that is
19 correct.
20      Q.   Let's talk about the citizens
21 petition.
22          The FDA frequently seeks
23 scientific information from cosmetic
24 manufacturers; is that correct?
25      A.   First part of the question?

Page 360

1 I'm sorry.
2      Q.   The FDA frequently seeks
3 information, scientific information, from
4 cosmetic manufacturers; is that correct?
5      A.   I don't understand what you
6 mean by "frequently seeks."  They rely on
7 cosmetic manufacturers to do their own safety
8 assessments.
9          Is that what you're referring
10 to?
11      Q.   Well, they ask PCPC to comment
12 on scientific issues, correct?
13      A.   Yes, I would agree that that
14 interaction has happened, but that's not
15 where the responsibility lies.  But I agree,
16 they have.
17      Q.   I'm not asking about
18 responsibility.  I'm asking:  Has the FDA
19 asked cosmetic manufacturers for scientific
20 information?
21      A.   Yes, they have in this case.  I
22 discuss some of that, yes.
23      Q.   And they do that frequently,
24 right?  Not just in this case, but generally?
25      A.   I can't answer that for all

Page 361

1 situations.  I have seen it happen before,
2 yes.
3      Q.   The FDA asked, for example, for
4 then CTFA to cosponsor the 1994 workshop on
5 talc, correct?
6      A.   Yes, they did.
7      Q.   The FDA knew that the report
8 prepared by Dr. Huncharek and Dr. Muscat was
9 based on PCPC's retention of those
10 consultants, correct?
11      A.   So what are you -- what time
12 period are you talking about?
13      Q.   Well, now, there was only one
14 time that Drs. Huncharek and Muscat submitted
15 a report to the FDA regarding talc, correct?
16      A.   So I need to look to confirm
17 that.  Which time period are you talking
18 about?
19      Q.   2009.  Citizens petition.
20      A.   Oh, that is true.  In the
21 citizens petition, that is true, yes.  But
22 I -- but...
23      Q.   I mean, it says in the letter,
24 "We're submitting a report written by Drs.
25 Huncharek and Muscat," correct?

91 (Pages 358 to 361)

Confidential - Pursuant to Protective Order

Page 362

1     A.    In the cover letter from the
2  CRE?
3     Q.    From -- not CRE, from PCPC.
4     A.    Okay.  So let -- I need to -- I
5  need to refresh my memory on the way the
6  submissions were made.  I apologize.
7        Do you remember which paragraph
8  that you're referring to?
9     Q.    Well, it's throughout your
10  report you're talking about the citizens
11  petition.
12     A.    So it's my recollection, based
13  upon the documents that I have seen, that it
14  was not a transparent process at all times
15  that Drs. Huncharek and Muscat were being
16  identified as independent consultants and
17  were not ones that were being actually paid
18  by the industry for some of the work that
19  they did.  And I think that's discussed in my
20  report.
21     Q.    Well, let's break that down.
22     A.    If you want me to confirm the
23  issue of the 2009 -- if you will point me to
24  where you say I discuss this, I will confirm
25  that or not.

Page 363

1     Q.    Well, let me break it down.
2        Citizens petition submitted in
3  2008, right?
4     A.    Well, there were two:  one in
5  1994 and another -- I'm sorry, 1992, and
6  another in 2008.
7     Q.    Well, there are actually
8  several more than that, but let's just focus
9  on the 2008.
10        In 2008, a citizens petition
11  was submitted?
12     A.    Yes, that is true.
13     Q.    And PCPC responded to that
14  citizens petition in 2009, correct?
15     A.    They submitted comments.  Is
16  that what you're asking me?  Yes, they did.
17     Q.    Yes.
18        And that was a cover letter,
19  correct?
20     A.    A cover letter -- that's all it
21  was a cover letter?
22     Q.    Well, attached to the cover
23  letter was a report from Drs. Huncharek and
24  Muscat?
25     A.    Yes, that is true.

Page 364

1     Q.    And you're not aware of any
2  other document indicating that PCPC ever
3  hired Drs. Huncharek or Muscat?
4     A.    So that's where I'll need to go
5  back and look at the documents, because --
6  that I have discussed.  So I need to find
7  that on my paragraph.
8        If you want to go off the
9  record for a minute so I don't waste your
10  time, I will look.
11     Q.    Sure.
12     A.    It's up to you.  Or we can stay
13  on the record.
14        MR. LOCKE:  I'm fine going off.
15        VIDEOGRAPHER:  We are going off
16  the record at 4:23 p.m.
17      (Off the record at 4:23 p.m.)
18        VIDEOGRAPHER:  We are back on
19  the record at 4:25 p.m.
20  QUESTIONS BY MR. LOCKE:
21     Q.    The question I asked:  Are you
22  aware of any other document indicating that
23  PCPC ever hired Dr. Huncharek and Muscat
24  other than for the 2009 response or
25  submission to the citizens petition?

Page 365

1     A.    I would have to pull this
2  document, but in paragraph 90 I make a
3  statement:  A 2005 response written by
4  Dr. Muscat says -- this is not '09, this is
5  2005, and Dr. Huncharek critiqued the work of
6  Dr. Cramer, who also failed to disclose the
7  financial relation -- I'll start over.
8        Okay.  So I'm sorry to repeat
9  myself, but there was a little noise.
10        You asked 2009.  So the other
11  time period I have in my report in
12  paragraph 90 talks about 2005, but I'd have
13  to pull this document.
14        But I am citing to the
15  deposition of Dr. Loretz, who was a PCPC
16  employee, so I think I would need to pull
17  this in order to confirm.
18        But I see depositions of her
19  and Dr. Nicholson as talking about them
20  failing to disclose the financial
21  relationship between their work and industry.
22     Q.    So if Dr. Loretz did not
23  testify that PCPC had retained Drs. Huncharek
24  and Muscat in 2005, you'd have no other
25  evidence?

92 (Pages 362 to 365)

Confidential - Pursuant to Protective Order

Page 366

1    A.    I can't answer that
2  definitively, but this is what I would point
3  you to.  So I'd have to pull these documents
4  to confirm, but I have -- both paragraphs 89
5  and 90 address these general issues for you,
6  but I think that's the sentence and the
7  documents that I think would be relevant.
8  But I'd have to pull them to fully answer
9  your question.
10    Q.    The reason I ask the question
11  is because you frequently say "the cosmetics
12  industry" without identifying a party or a
13  person.  And -- well, I'll just leave it at
14  that.
15    A.    And I guess the reason I'm
16  saying I need to -- I'm questioning that it
17  doesn't have to do with PCPC is because I am
18  citing to a deposition of their employee.  So
19  I need to -- I would -- to affirm it, though,
20  I'd need to -- I don't want to say that
21  100 percent the answer to your question is
22  this is the evidence, but I believe that I
23  would need to go here to confirm one way or
24  the other.  But certainly I would -- this
25  raises suspicion about that for me.

Page 367

1    Q.    You have no evidence that PCPC
2  ever retained the Center for Regulatory
3  Effectiveness; is that correct?
4    A.    I believe my evidence is hiring
5  through Imerys, but let me look to make sure
6  that is true.
7    Q.    Why don't you look at page --
8  or I'm sorry, paragraph 95, page 63.
9    A.    That's where I am.  That's
10  where I am, so let me read what I have here
11  because it's been a while since I've read
12  this paragraph.
13         So the question is, do I have
14  in evidence this paragraph that PCPC directly
15  hired the CRE?
16         No, that is not provided by
17  this paragraph.
18    Q.    Okay.
19    A.    However, in this paragraph,
20  based on these documents that I'm seeing and
21  I'm -- my memory of what is discussed,
22  certainly I believe PCPC would have been
23  aware of the interaction of CRE at these time
24  points when I'm talking about this event --
25  these events.

Page 368

1    Q.    What evidence do you have of
2  that?
3    A.    Based upon the close
4  interaction between PCPC, Imerys and Johnson
5  & Johnson throughout these time periods when
6  different actions were being taken to comment
7  or to submit information on behalf of
8  industry.
9    Q.    Do you have a single document
10  you can point to or is that an assumption?
11    A.    That is something I seem to
12  remember based on my review of these
13  documents, but if you need a document, I
14  would have to -- have to go and look for it.
15    Q.    Sitting here today, you can't
16  recall?
17    A.    I can't give you a specific
18  document as I sit here today, no.
19         MR. LOCKE:  I have no further
20  questions.
21         MR. MEADOWS:  Yeah, short
22  break.  Maybe we're done, maybe we're
23  not.
24         VIDEOGRAPHER:  We are going off
25  the record at 4:30 p.m.

Page 369

1         (Off the record at 4:30 p.m.)
2         VIDEOGRAPHER:  We are back on
3  the record at 4:45 p.m.
4         CROSS-EXAMINATION
5  QUESTIONS BY MS. PARFITT:
6    Q.    All right.  Dr. Plunkett, good
7  afternoon.  I know it's been a long day.
8         Dr. Plunkett, you were asked
9  throughout the course of the day about
10  different constituents which are part of the
11  talcum powder products.
12         Do you recall those questions?
13    A.    Yes.
14    Q.    All right.  If -- without going
15  through each and every one of different
16  constituents that we've talked about that are
17  contained or could be contained in the talcum
18  powder products, if they are present, do
19  those various constituents present and
20  provide biologically plausible evidence that
21  talcum powder products can increase the risk
22  of ovarian cancer?
23         MS. BOCKUS:  Object to the
24  form.
25         THE WITNESS:  Yes, which is --

93 (Pages 366 to 369)

Confidential - Pursuant to Protective Order

---

Page 370

1  I think I have a couple of paragraphs
2  where I talk about that issue.  It has
3  to do -- there's other information as
4  well, but that is a key piece of that
5  information.  And I focused on mode of
6  action and additivity.  That's on
7  mechanism, biologic plausibility.
8       So the fact that you have a
9  variety of constituents that have a
10 known cancer hazard that share a mode
11 of action, that increases your
12 confidence in the biologic
13 plausibility of that relationship
14 between ovarian cancer and exposure to
15 talc body powders, yes.
16      MS. PARFITT:  Thank you.  I
17 have no further questions.  Thank you
18 very much, Dr. Plunkett.  And a happy
19 holiday to you.
20      THE WITNESS:  Thank you.
21      MS. BRANSCOME:  I have no
22 questions.
23      MS. BOCKUS:  No questions.
24      VIDEOGRAPHER:  The time now is
25 4:47 p.m.  This concludes the

---

Page 371

1  deposition, and we are going off the
2  record.
3  (Deposition concluded at 4:47 p.m.)
4       - - - - - - -

---

Page 372

1              CERTIFICATE
2
3       I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
5    of the examination, Laura Plunkett, Ph.D.,
     DABT was duly sworn by me to testify to the
6    truth, the whole truth and nothing but the
     truth.
7
          I DO FURTHER CERTIFY that the
8    foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
9    before me at the time, place and on the date
     hereinbefore set forth, to the best of my
10   ability.
11        I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
     that I am not financially interested in the
14   action.
15
16
17   _____
     CARRIE A. CAMPBELL,
18   NCRA Registered Diplomate Reporter
     Certified Realtime Reporter
19   California Certified Shorthand
     Reporter #13921
20   Missouri Certified Court Reporter #859
     Illinois Certified Shorthand Reporter
21   #084-004229
     Texas Certified Shorthand Reporter #9328
22   Kansas Certified Court Reporter #1715
     Notary Public
23
     Dated:  12/20/18
24
25

---

Page 373

1         INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.  You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13      It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you.  If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25

---

94 (Pages 370 to 373)

Confidential - Pursuant to Protective Order

Page 374

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4          I,_____, do
    hereby certify that I have read the foregoing
5    pages and that the same is a correct
    transcription of the answers given by me to
6    the questions therein propounded, except for
    the corrections or changes in form or
7    substance, if any, noted in the attached
    Errata Sheet.
8
9
10
11
12
    _____
13   Laura Plunkett, Ph.D., DABT      DATE
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24
25

Page 376

1          _ _ _ _ _ _ _
          LAWYER'S NOTES
2          _ _ _ _ _ _ _
3    PAGE  LINE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25

Page 375

1          _ _ _ _ _ _ _
          ERRATA
2          _ _ _ _ _ _ _
3    PAGE  LINE  CHANGE/REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25