# EXHIBIT B42

Rebecca Smith-Bindman, M.D.

Page 245

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

                                          )
IN RE:  JOHNSON & JOHNSON TALCUM   )
POWDER PRODUCTS MARKETING, SALES   )
PRACTICES, AND PRODUCTS LIABILITY  )
LITIGATION                          )
                                          )   MDL No.
                                          )   2738 (FLW)(LHG)
                                          )
_____)

VIDEOTAPED DEPOSITION OF

REBECCA SMITH-BINDMAN, M.D.

San Francisco, California

Friday, February 8, 2019

Volume II

Reported by:
MARY J. GOFF
CSR No. 13427

Rebecca Smith-Bindman, M.D.

## Page 246

```
 1
 2
 3
 4
 5          Videotaped Deposition of REBECCA
 6   SMITH-BINDMAN, M.D., Volume II, taken on behalf of
 7   Johnson & Johnson, at Levin Simes Abrams LLP,
 8   1700 Montgomery Street, Suite 250, San Francisco,
 9   California 94111, beginning at 9:26 a.m. and ending
10   at 12:48 p.m., on February 8, 2019, before MARY J.
11   GOFF, California Certified Shorthand Reporter No.
12   13427.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 248

```
 1   APPEARANCES (continued):
 2
 3   For Defendant Johnson & Johnson
 4       Tucker Ellis LLP
 5       BY:  MICHAEL C. ZELLERS
 6       Attorney at Law
 7       515 South Flower Street
 8       42nd Floor
 9       Los Angeles, California 90071
10       michael.zellers@tuckerellis.com
11       213-430-3301
12
13
14   For Defendant Johnson & Johnson
15       Skadden, Arps, Slate, Meagher & Flom, LLP.
16       BY:  BENJAMIN HALPERIN
17       Attorney at Law
18       4 Times Square
19       New York, New York 10036
20       benjamin.halperin@skadden.com
21       212-735-2453
22
23
24
25
```

## Page 247

```
 1   APPEARANCES:
 2
 3   For Plaintiffs
 4       Beasley Allen Law Firm
 5       BY:  P. LEIGH O'DELL
 6           MARGARET M. THOMPSON, MD, JD, MPAff
 7       Attorney at Law
 8       218 Commerce Street
 9       Montgomery, Alabama 36103
10       leigh.odell@beasleyallen.com
11       334-269-2343
12   For Plaintiffs
13       Robinson Calcagnie, Inc.
14       BY:  CYNTHIA L. GARBER
15       Attorney at Law
16       19 Corporate Plaza Drive
17       Newport Beach, California 92660
18       cgarber@robinsonfirm.com
19   For Plaintiffs
20       Wilentz, Goldman & Spitzer P.A.
21       Daniel R. Lapinski
22       Attorney at Law
23       90 Woodbridge Center Drive,
24       Suite 900 Box 10
25       Woodbridge, New Jersey 07095-0958
```

## Page 249

```
 1   APPEARANCE (continued):
 2   For Defendant Imerys
 3       Dykema
 4       BY:  JANE BOCKUS
 5       Attorney at Law
 6       112 E. Pecan Street
 7       Suite 1800
 8       San Antonio, Texas 78205
 9       jbockus@dykema.com
10       210-554-5549
11
12   For Defendant Imerys
13       Gordon & Rees LLP
14       BY:  JENNIFER A. FOSTER
15       Attorney at Law
16       816 Congress Avenue
17       Suite 1510
18       Austin, Texas 78701
19       jfoster@gordonrees.com
20       512-391-0197
21
22
23
24
25
```

2 (Pages 246 to 249)

Rebecca Smith-Bindman, M.D.

Page 250

```
 1   APPEARANCES (continued):
 2   For Defendant PCPC, Personal Care Products Council
 3       Seyfarth Shaw, LLP
 4       BY:  JAMES R. BILLINGS-KANG
 5       Attorney at Law
 6       975 F Street, NW
 7       Washington, D.C. 20004
 8       jbillingskang@seyfarth.com
 9       202-828-5356
10
11
12
13
14   For Defendants PTI Union, LLC and PTI Royston, LLC
15       Tucker Ellis LLP
16       BY:  CAROLINE M. TINSLEY
17       Attorney at Law
18       100 South 4th Street`
19       Suite 600
20       St. Louis, Missouri, 63102
21       caroline.tinsley@tuckerellis.com
22
23   Videographer:
24       Andrew Graves
25
```

Page 252

```
 1   EXHIBITS CONTINUED:                              PAGE
 2   Exhibit 34  Does Exposure to Asbestos Cause      324
                 Ovarian Cancer article
 3
 4   Exhibit 35  Occupational Exposure to Asbestos    327
                 article
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 251

```
 1                    INDEX
 2   WITNESS                         EXAMINATION
 3   REBECCA SMITH-BINDMAN, M.D.
 4   Volume II
 5
 6          BY MR. ZELLERS        254, 372
 7          BY MS. O'DELL         354
 8          BY MR. BILLINGS-KANG  347
 9          BY MS. BOCKUS         331, 369
10
11   NUMBER      DESCRIPTION                      PAGE
12   Exhibit 28  6/1/17 Letter, Invoice           259
13
14   Exhibit 29  Bill, Invoice 147        261
15
16
17   Exhibit 30  Perineal Use of Talc and Risk    276
                 of Ovarian Cancer article
18
19
20   Exhibit 31  Influence of Aspirin and nonaspirin  297
                 NSAID Use article
21
22   Exhibit 32  Article, Talc            317
23
24   Exhibit 33  Invoice, Tachibana, UCSF, 10/18     319
25
```

Page 253

```
 1          San Francisco, California
 2            February 8, 2019
 3               9:26 a.m.
 4
 5          THE VIDEOGRAPHER:  We are now on the
 6   record.  My name is Andrew Graves.  I'm a
 7   videographer for Golkow Litigation Services.
 8   Today's date is February 8, 2019.  The time is
 9   9:26 a.m.
10          This video deposition is being held at
11   1700 Montgomery Street, Suite 250, San Francisco,
12   California, In the Matter of In Re: Johnson &
13   Johnson Talcum Powder Products Marketing, Sales
14   Practices, and Products Liability Litigation, for
15   the United States District Court, District of
16   New Jersey.
17          The deponent is Rebecca Smith-Bindman,
18   Ph.D., Volume II.
19          Would counsel please identify yourselves.
20          MR. ZELLERS:  Can we waive that since we
21   were all here yesterday?
22          THE VIDEOGRAPHER:  Okay.  The court
23   reporter is Mary Goff, and she will now swear in the
24   witness.
25
```

3 (Pages 250 to 253)

Rebecca Smith-Bindman, M.D.

Page 254

1    REBECCA SMITH-BINDMAN, M.D., VOLUME II,
2   being first duly sworn or affirmed to testify to the
3   truth, the whole truth, and nothing but the truth,
4   was examined and testified as follows:
5        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6   BY MR. ZELLERS:
7        Q   Good morning.
8        A   Good morning.
9        Q   Dr. Smith-Bindman, did you do anything to
10   prepare -- or further prepare for your deposition
11   since the time we concluded yesterday and this
12   morning?
13        A   I did two things.  I reviewed my report
14   again, and I called the biostatistician who worked
15   on my meta-analysis to review a few of the details.
16        Q   You called Dr. Hall?
17        A   I did.
18        Q   When was the last time that you had talked
19   with Dr. Hall before yesterday?
20        A   Speaking to her at the time of -- that she
21   did the analysis.  And I -- I think there was an
22   e-mail or two over the last several weeks asking for
23   her CV or something like that, but not any
24   meaningful conversation.
25        Q   Have you produced the e-mails -- the

Page 255

1   recent e-mails with Dr. Hall?
2        A   I -- I'm not sure if I produced the one
3   asking for her CV, but the -- and actually, I don't
4   remember when I asked her for that.  I might have
5   presented --
6        MS. O'DELL:  I think that's part of the
7   production --
8        Q   (BY MR. ZELLERS) How --
9        MS. O'DELL:  -- but -- excuse me.
10        Q   (BY MR. ZELLERS) How long did you speak
11   with Dr. Hall yesterday?
12        A   About 15 -- 10-15 minutes.
13        Q   Did you make any written notes?
14        A   I -- I think I scribbled in my usual
15   scribble place.
16        Q   What notes did you make from your
17   conversation with Dr. Hall yesterday after the first
18   session of your deposition?
19        A   So -- so I did -- I did -- I did jot some
20   notes on my meta-analysis.  But mostly I asked her
21   to clarify how she did the calculations of the
22   numbers that are shown in the figures.
23        I was struggling to understand why the
24   numbers and the figures were not exactly the same as
25   the ones that you showed me in the published

Page 256

1   manuscript.
2        I was quite surprised that they weren't
3   exactly the same.  They were not meaningfully
4   different, but there was a very slight shift in
5   the ones that are in my report.
6        I mean, I asked Dr. Jane why that was the
7   case.  And in fact, the numbers are calculated using
8   the standard errors in the confidence intervals and
9   the sample size which very slightly shifts it from
10   the reported numbers.
11        So you were correct when you said the
12   numbers are not exactly the same, and she explained
13   that that's why that's the case.
14        Q   Are the numbers that were contained in
15   Figure -- Figures 2 and 3 in your report, estimates?
16        MS. O'DELL:  Object to the form.
17        A   The numbers are calculated.  So I -- I
18   think by that, you mean estimates.
19        Q   (BY MR. ZELLERS) Did you do the
20   calculations?
21        A   No.  She -- she did them.
22        Q   Do we --
23        THE COURT REPORTER:  Can you raise your
24   voice for me, please?
25        A   Yes, I can.  I apologize.

Page 257

1        Q   (BY MR. ZELLERS) Do we have her work
2   product as to the calculations that were made?
3        A   In the documents that I shared, she
4   specified the -- the software that she used, the
5   program that she used.
6        In fact, the way of estimating it, it's
7   actually in my report as well.  And so yes, it's
8   explained there, and it's in all of the documents
9   that I shared with you.
10        Q   Her calculations are contained in the
11   documents that are shared; is that right?
12        A   Yes.
13        Q   The numbers that you got from the Terry
14   study, those came from the Terry publication; is
15   that right?
16        A   Yes.
17        Q   Any additional notes you made from your
18   discussion with Dr. Hall, other than what you have
19   generally told us about?
20        A   No.  Just that.
21        Q   The notes that you added to your annotated
22   report from your discussion with Dr. Hall, which we
23   marked as Exhibit 17, those notes are on which page
24   or pages?
25        A   Page 33 and 34.

4 (Pages 254 to 257)

Rebecca Smith-Bindman, M.D.

Page 258

1    Q   It looks like you made those notes in an
2  aqua pen is -- is that right, or --
3    A   Yes.
4    Q   -- I --
5    A   Yes.
6    Q   Okay.
7    A   Yes, absolutely.
8    Q   Any --
9    A   I would say teal, but...
10   Q   Well, I think you're probably more correct
11  than I am.
12       Any other notes that you had from your
13  discussion with Dr. Hall?
14   A   No.
15   Q   Any other communications that you had with
16  Dr. Hall, other than your 10- or 15-minute phone
17  conversation yesterday afternoon or evening?
18   A   No.
19   Q   Did you communicate with Dr. Hall via
20  e-mail or any way other than just the phone call?
21   A   No.
22   Q   Did you communicate with anyone else
23  between the time we finished yesterday and this
24  morning about the subject matter that we're here to
25  talk about?

Page 259

1    A   No.
2    Q   At the start of the session today, counsel
3  for Plaintiffs, Ms. O'Dell, provided me with copies
4  of your invoices.
5       I'm going to hand you what we have marked
6  as Exhibit 28.  It is a five-page exhibit.
7       The first page is a cover letter.  It
8  looks like an engagement or general engagement
9  letter from you to -- you say Mr. Carmen Scott.
10  Is it a Ms. Carmen Scott?
11       (Exhibit 28 was marked for identification
12  and is attached to the transcript.)
13   A   It is.
14   Q   All right.  That was on June 1 of 2017.
15  The last invoice is November 13 of 2018; is that
16  right?
17   A   I'm sorry.  What was the question?  Is
18  this --
19   Q   The question is:  Are those all of our
20  invoices that you have generated thus far in the
21  talcum powder MDL litigation?
22   A   I -- I think I mentioned that there are --
23  I haven't submitted anything beyond this, but that
24  there are additional hours that I recorded after
25  this.

Page 260

1    Q   What do you -- well, I will take that as a
2  yes, that at least through November 13, 2018, that
3  Deposition Exhibit 28 are all of your invoices --
4    A   Yeah.
5    Q   -- is that right?
6    A   Yes.
7    Q   Those invoices total approximately
8  160 hours.  Does that sound right?
9    A   160?
10   Q   160.
11   A   I'm -- I'm going to believe you.
12   Q   Well, and anyone can go and check my math.
13       How many hours do you estimate that you
14  have spent up until today on this matter both doing
15  additional work, reviewing those additional studies
16  and materials we talked about yesterday, preparing
17  for the deposition, meeting with counsel for
18  Plaintiffs?
19       MS. O'DELL:  Since the last invoice?
20       MR. ZELLERS:  Since the last invoice is
21  what I had intended to ask.
22       MS. O'DELL:  Yeah.  Thank you.
23   A   I -- I think approximately 25 hours.
24   Q   (BY MR. ZELLERS) In addition, we were
25  provided with a two-page exhibit which are two

Page 261

1  invoices from Jane Hall, which total around $3,000.
2       (Exhibit 29 was marked for identification
3  and is attached to the transcript.)
4    Q   (BY MR. ZELLERS) Can you look at
5  Exhibit 29 and verify for us that those are the
6  e-mails -- strike that -- that those are the
7  invoices for the work that was done by Dr. Hall?
8    A   I -- I -- I believe so.
9    Q   Are you aware of any additional invoices
10  beyond that?
11   A   I'm not.
12   Q   Do you have any invoices from your copy
13  editor, Ms. Tachibana?
14   A   She sent me an invoice, which I forwarded
15  to counsel.
16   Q   All right.  How much was that invoice for?
17   A   I think it was about $1,500.
18   Q   How much an hour does Ms. Tachibana
19  charge?
20   A   I think it's about a hundred dollars an
21  hour.
22   Q   Was that for all of the work that she did
23  with respect to your report?
24   A   Yes.  There was no other work other than
25  that 15 -- it might have been $1,700.

Rebecca Smith-Bindman, M.D.

Page 262

1      MS. O'DELL: Excuse me. I'm sorry, Mike.
2  I apologize for not copying that. We're going to
3  make a copy, and I will provide it to your
4  momentarily at --
5      MR. ZELLERS: Very good. We'll mark it
6  before the conclusion of the deposition. Thank you.
7      Q   (BY MR. ZELLERS) Do you have your report
8  in front of you? You can use your annotated
9  version, No. -- Exhibit 17. We also marked your
10  report as Exhibit 2.
11     A   Yes.
12     Q   Do you have that in front of you?
13     A   I do.
14     Q   Go to page 17, if you will, please.
15     MR. LAPINSKI: Counsel, you said page 17?
16     MR. ZELLERS: Yes, page 17.
17     A   Yes.
18     Q   (BY MR. ZELLERS) On page 17, you make a
19  number of general statements about the advantages
20  and disadvantages of case control and cohort
21  studies; is that right?
22     A   Yes.
23     Q   There are no citations there. Is this
24  based and those statements based on your general
25  knowledge?

Page 263

1      A   Yes. This is based on Epi 101, sort of...
2      Q   You make a statement in the middle
3  paragraph on page 17 where you talk about "cohort
4  studies."
5      And you state that they rarely focus on a
6  single narrowly defined question and that that's an
7  important limitation of cohort studies.
8      Do you see that?
9      A   I do.
10     Q   Can you cite any other epidemiologists
11  who agree with you on that point?
12     A   So it's very well known the cost of doing
13  a cohort study is often very large, and so the topic
14  that's often the central focus of the cohort study
15  is very, very well done.
16     It's the ancillary topics that often get
17  short shrift. And so that -- I -- I could probably
18  find this explained in any basic textbook.
19     And -- and I -- I apologize for not citing
20  it. This is sort of just very well-known general
21  concepts of study design.
22     Q   Can you cite any published literature
23  that states that cohort studies are unlikely to
24  detect real associations for this reason?
25     MS. O'DELL: Are you reading a particular

Page 264

1  paragraph, Mike? I have lost track.
2      MR. ZELLERS: I was asking about the
3  specific statement in the middle paragraph of
4  page 17 relating to cohort studies and the
5  limitation that they rarely focus on a single
6  narrowly defined question.
7      MS. O'DELL: Yes. Thank you.
8      Q   (BY MR. ZELLERS) But my question now is --
9      A   Yes.
10     Q   -- whether or not Dr. Smith-Bindman, as
11  you sit here, can cite any published literature that
12  states the cohort studies are unlikely to detect a
13  real association -- or unlikely to detect real
14  associations for this reason.
15     A   I --
16     MS. O'DELL: Excuse me. Are you
17  quoting -- when you say "unlikely to detect real
18  associations for this reason," is that reading --
19  are you reading from her report or is that just --
20     MR. ZELLERS: No. That's my question.
21     MS. O'DELL: -- okay. Sorry.
22     MR. ZELLERS: And if it's not very
23  articulate --
24     A   I -- I think cohort -- cohort studies are
25  able to detect real associations, if they ask about

Page 265

1  those associations.
2      If they don't ask about it, then it
3  can't -- then -- then it doesn't have an ability to
4  measure it.
5      So what I am saying here is that cohort
6  studies don't have the capacity to go in depth and
7  ask.
8      I think all of the cohort studies that I
9  reviewed for -- for this review discuss the lack of
10  detail in the cohort question, meaning that it's not
11  that the study design was the problem. It was that
12  they just didn't have the right predicter
13  information being assessed.
14     Q   Despite this limitation -- or in your
15  view, limitation of cohort studies, you did include
16  the Gertig 2000 cohort study in your systematic
17  review; is that right?
18     A   I did. I just want to clarify the answer.
19  Cohort studies are a very strong study design that I
20  like very much and that I have used and currently
21  I'm -- I'm using in study designs.
22     It's rather if the study design uses a
23  cohort, which is a good design, doesn't have enough
24  detail, because that's not the focus, that
25  doesn't -- it can't be used to answer other

6 (Pages 262 to 265)

Rebecca Smith-Bindman, M.D.

Page 266

1   questions easily.
2        So I think in general I like cohort
3   designs very much, and I think it's a very powerful
4   study design. But if you haven't asked the right
5   questions, it's hard to the expand it.
6        So I did -- I read all of the cohorts on
7   this topic.
8        Q   And you concluded that the Gertig cohort
9   study, you know, asked the right information or had
10  sufficient information for you to include it both in
11  your general systematic review and in your more
12  focused systematic review which you set forth as
13  Figures 2 and 3 in your report, correct?
14       A   That's correct. That -- those -- those
15  were looking at regular use, and I thought the
16  Gertig was the cohort that allowed me to understand
17  regular use of perineal talc.
18       Q   Gertig was based on the Nurses' Health
19  Study; is that right?
20       A   Yes.
21       Q   Gertig and the authors do recognize that
22  the biologic evidence for the association of talc
23  and ovarian cancer is incomplete, correct?
24           MS. O'DELL: Object to the form.
25       A   I -- I don't have it in front of me, but

Page 267

1   it may be that they reported as of 2000, they didn't
2   have evidence of the biologic mechanism. I --
3        Q   And I will ask you about biologic
4   mechanism before we conclude here today.
5        You did not, though -- well, let me
6   withdraw that.
7        There was a follow-up cohort study to
8   Gertig 2000, and that was the Gates 2010 cohort
9   study; is that right?
10       A   Yes.
11       Q   That had a longer follow-up than Gertig;
12  is that right?
13       A   Yes.
14       Q   It was an analysis of the data collected
15  in the Nurses' Health Study; is that right?
16           MS. O'DELL: Object to the form.
17       A   It was analysis of some of the data
18  collected in the -- in the Nurses' Health Study, but
19  they did not report the variable in such a way that
20  would allow you to understand or to quantify the
21  exposure as opposed to the first cohort study which
22  did.
23       So the latter study, they -- they had the
24  data, which is why I'm answering it this way. They
25  clearly had it, because the data hadn't change, and

Page 268

1   yet they didn't report it that way.
2        They only reported on any exposure to talc
3   powder products. And that is a very vague
4   definition as opposed to the frequency of use.
5        And for that reason, I couldn't tell in --
6   in nearly the same detail as I could for the earlier
7   study, the -- the exposure. They just chose not to
8   present it that way.
9        Q   The Gates 2010 cohort study did include
10  over a hundred thousand women; is that right?
11       A   The Gates?
12       Q   Yes.
13       A   It was large, but I need to check the
14  actual numbers.
15       Q   Here. Let me hand it to --
16       A   I have it. I have it.
17       Q   Do you have it?
18       A   Yeah.
19       Q   Okay. And I am looking at page 47. And
20  it's quoting the Nurses' Health Study as involving
21  close to 109,000 --
22       A   I'm not sure.
23       Q   -- women?
24       A   I'm not sure. I'm looking at the -- the
25  Gates -- are you asking about Gates or Gertig?

Page 269

1        Q   I'm asking about Gates 2010.
2        A   In mine it says $221,000 woman with 924
3   epithelial ovarian cancer.
4        Am I looking in the wrong place?
5        Q   No. I -- and then if you look further, it
6   talks about -- at least in the Nurses' Health Study,
7   there being 108,870 women; is that right?
8        A   Yes.
9        Q   The women in the national health study,
10  which was the basis for both the Gertig 2000 cohort
11  study and Gates 2010 cohort study, those women were
12  followed from 1976 to 2006, so for 30 years --
13       A   Yes.
14       Q   -- is that right?
15       A   Yes.
16       Q   And -- and after following these hundred
17  thousand women -- or over hundred thousand women for
18  three decades, the authors in Gates 2010 concluded
19  that the data did not show a statistically
20  significant relationship between talcum powder use
21  and any type of epithelial ovarian cancer; is -- is
22  that right?
23       A   The Gates authors concluded that there was
24  no association between any talcum powder product
25  use, and it was not significant in ovarian cancer,

7 (Pages 266 to 269)

Rebecca Smith-Bindman, M.D.

Page 270

```
 1   yes.
 2      Q   Another short study that you did not
 3   include in your systematic review was the Houghton
 4   study; is that right?
 5         MS. O'DELL:  Object to form.
 6      A   Yes, that is true.
 7      Q   (BY MR. ZELLERS) The Houghton study was
 8   based on -- or is also called the Women's Health
 9   Initiative Study; is that right?
10      A   Yes, it is.
11      Q   That involved 61,000 women; is that right?
12      A   That is correct.
13      Q   Houghton 2014 did not find a statistically
14   significant relationship between perineal talc use
15   and ovarian cancer among women who had ever used
16   talc; is that right?
17      A   That is what they concluded.
18      Q   Or among women who had fewer than nine
19   years of perineal talc use, correct?
20      A   Correct.
21      Q   Or among women who had more than 10 years
22   of perineal talc use, correct?
23      A   Can you say that last part?
24      Q   Sure.
25      A   Sorry.
```

Page 271

```
 1      Q   Houghton 2014, that cohort study --
 2      A   Okay.  No.  I -- yes, that is correct.
 3      Q   And also, they did not find a
 4   statistically significant relationship between
 5   perineal talc use -- strike that.
 6         They also did not find a statistically
 7   significant relationship between the use of talcum
 8   powder on sanitary napkins or diaphragms on -- and
 9   ovarian cancer; is that right?
10      A   That's correct.
11      Q   Houghton does report on duration of use at
12   least more than 10 years of use; is that right?
13      A   Yes.
14      Q   But would you consider women who use
15   talcum powder for more than 10 years to be frequent
16   talc users?
17         MS. O'DELL:  Object to form.
18      A   So you're asking if duration of use can be
19   equated with frequency of use, and -- and I would
20   very strongly disagree that those are equivalent.
21         And that is the primary reason that I
22   discount the results of the Gonzalez and Houghton
23   and Gates studies.
24         Because frequency of use, meaning to use
25   it once a month or once a year, is not the same as
```

Page 272

```
 1   using it on a -- on a frequent basis, so I think the
 2   duration is very different measure.
 3      Q   We talked yesterday about your definition
 4   of "regular use," and you pointed me to your report
 5   where you give an extensive discussion of that.
 6         Do you remember?
 7      A   I do.
 8      Q   Did -- your definition of "regular use,"
 9   was that every psychometrically tested to
10   demonstrate any validity or reliability?
11         MS. O'DELL:  Object to the form.
12      A   Of -- are you asking about the reliability
13   of the way we defined it --
14      Q   (BY MR. ZELLERS) Yes.
15      A   -- or about the concept?
16      Q   No.  About the way you defined it.
17      A   I believe we explained in the report that
18   we tried to approximate regular use, frequency use
19   by being at least three times a week and as close to
20   daily as possible.
21         But in terms of -- if that is -- I -- I'm
22   not -- we have not validated that in different
23   studies or --
24      Q   That's something that you came up with; is
25   that right?
```

Page 273

```
 1      A   Yeah.
 2         MS. O'DELL:  Object to the form.
 3      A   Yes, it is.
 4      Q   (BY MR. ZELLERS) Gonzalez.  You criticize
 5   Gonzalez in your report for combining various types
 6   of use.  Do you recall that generally?  So that's
 7   page 21 where --
 8      A   No.  I'm -- I'm on my report.  My -- my
 9   hesitation is it's not so much that I'm criticizing
10   the study.  It's rather it doesn't contribute to
11   answering the question that I was asking, which was:
12   Does regular perineal talc exposure increase the
13   risk?
14         It doesn't mean that the questions they
15   have asked are not interesting questions.  They were
16   just not the ones I was focusing on.
17      Q   Why would combining various types of use,
18   bias the results in favor of not detecting an
19   association?
20         I guess from your statement it -- it may
21   well not bias the results; is that right?  It just
22   was just a different question --
23      A   It's just a different question.
24      Q   -- than what --
25      A   I --
```

Rebecca Smith-Bindman, M.D.

Page 274

1      Q   -- you were looking at?
2      A   -- I believe that you want to have as
3  narrow a definition, in my belief, of meta-analysis
4  as possible to understand when you're pooling
5  results, make sure -- something you said -- you're
6  combining apples to apples.
7          And I think one would expect that any
8  potential -- potential exposure to talcum powder
9  would matter what skin or surface or cell line or
10 tissue you're putting against, and you wouldn't
11 necessarily expect the same result in a cervical
12 exposure or a diaphragm exposure or a vaginal
13 exposure.
14         You -- you might have an association of
15 those places.  You might not.  I just think it's a
16 different question.
17     Q   All of the cohort studies were prospective
18 as opposed to retrospective; is that right?
19     A   Yes.
20     Q   Prospective studies are not subject to
21 recall bias like retrospective studies, correct?
22     A   Yes, that's true.
23     Q   They're also not subject to the same
24 selection bias as retrospective studies, correct?
25         MS. O'DELL:  Object to the form.

Page 275

1      A   In general, case-control studies are often
2  plagued with selection bias, but they don't have to
3  be.
4      Q   (BY MR. ZELLERS) Well, recall bias can
5  distort a scientific evaluation of whether an
6  exposure is actually related to a disease, correct?
7      A   Yes.
8      Q   So for example, recall bias could distort
9  results if women with ovarian cancer were more
10 likely to remember their exposure to talc than women
11 without ovarian cancer; is that right?
12     A   That is a theoretical risk.
13     Q   In fact, in your report on page 17, you
14 acknowledge that the risk of bias is greater for
15 case-control studies as opposed to cohort studies;
16 is that right?
17     A   Yes.
18     Q   Recall bias could explain the fact that
19 some retrospective case-control studies have found a
20 statistically significant relationship between
21 talcum powder and ovarian cancer, but the cohort
22 studies have not, correct?
23     A   That is a theoretical risk.  To do that
24 you would need to have some knowledge in the
25 population that influenced that recall bias, but

Page 276

1  absolutely that's a possibility.
2      Q   You also looked at both the hospital-based
3  and the population-based case-control studies; is
4  that right?
5      A   I did.
6      Q   None of the hospital-based case-control
7  studies show a statistically significant association
8  between talc use and ovarian cancer, correct?
9      A   I -- I'm not sure --
10     Q   Take a look at --
11     A   -- where you're getting that from.
12     Q   I will show you the Langseth paper from
13 2008, which you cite and we talked about yesterday.
14 Let's mark this as Exhibit 30.
15         (Exhibit 30 was marked for identification
16 and is attached to the transcript.)
17     A   I have it.  I have it.
18     Q   (BY MR. ZELLERS) All right.  Now -- and
19 let me just -- I'll put it in the record there.
20         MS. O'DELL:  Thank you.
21     Q   (BY MR. ZELLERS) If you look at the
22 Langseth paper, on the second page, Figure 1, they
23 list out all of the population -- or at least a
24 great number of the population-based and
25 case-control studies and the hospital-based

Page 277

1  case-control studies; is that right?
2      A   Yes, they do.
3      Q   (BY MR. ZELLERS) At least among the
4  hospital-based case-control studies that are
5  identified by Langseth in Figure 1, it appears that
6  there's six hospital-based case-control studies.
7          None of those hospital-based case-control
8  studies show a statistically significant
9  association, correct?
10         MS. O'DELL:  Object to the form.
11     A   We discussed this yesterday.  But if
12 you're asking if the individual hospital-based
13 studies overlap one, then they overlap one.
14     Q   (BY MR. ZELLERS) They do not overlap one?
15     A   The -- the hospital-based studies do
16 overlap one.
17     Q   Okay.  The population-based case-control
18 studies, which are up above in our
19 Langseth Figure 1, some of those -- if we look at
20 the individual studies -- show statistical
21 significance, and some of those do not; is that
22 right?
23     A   I'm -- I'm hesitant to be as definitive
24 about using the confidence interval that are
25 presented here as being a reflection of statistical

9 (Pages 274 to 277)

Rebecca Smith-Bindman, M.D.

Page 278

1  significance.
2      All of them are shifted to the right.  All
3  of them have a positive association.  And the
4  confidence interval for some of them overlap one.
5      But taken as a group, there's statistical
6  significance for the entirety of the population --
7  of the population of studies that he looked at.
8      Q   As we did discuss yesterday, if you look
9  at the population-based studies individually, at
10 least based upon what's reported by Langseth in his
11 Figure 1, some demonstrate statistical significance
12 and some do not; is that right?
13     A   I -- again, it's -- they're slightly --
14 it's -- it's not the only -- the confidence interval
15 overlapping one is sort of what I consider a
16 quick-and-dirty way to answer statistical
17 significance.
18     It's not exactly that way.  But some of
19 them clearly suggest statistical significance.  I
20 think ten of them.  And four of them suggest not
21 statistical significance.  So the individual
22 studies.  But it's a little more complicated than
23 that.
24     Q   Would you agree that if a study does not
25 show statistical significance, that it could mean

Page 279

1  that no risk exists?
2      A   If --
3      MS. O'DELL:  Object to the form.
4      A   -- an individual study shows no
5  statistical significance, it means -- with all
6  research -- that the most likely truth is the point
7  estimate, which is whatever that point estimate is,
8  but that you could not exclude chance as one of the
9  possible causes for the results.
10     Q   (BY MR. ZELLERS)  If we looked just at the
11 population-based case-control studies and the
12 hospital-based case-control studies that are shown
13 by Langseth in Figure 1, there is an inconsistency
14 between the two in that each of the individual
15 hospital-based case-control studies have confidence
16 intervals which overlap one, and many of the
17 population-based or at least some of the
18 population-based studies do not, correct?
19     A   I -- I do not believe there is
20 inconsistency between the pooled odds ratio for
21 population-based studies, which has a confidence
22 interval that overlaps the confidence intervals for
23 the pooled odd ratio for the hospital-based studies.
24     So using the approach that you are
25 suggesting of using confidence intervals, the way to

Page 280

1  tell if things are different or the -- or
2  indistinguishable, the confidence interval for the
3  pooled odds ratio for the population-based studies
4  goes from 1.29 to 1.52, so the truth is likely in
5  that range, where the truth for the hospital-based
6  studies is 0.92 to 1.63.  They overlap.
7      And so I would interpret that using this
8  sort of quick approach is that there's not a
9  statistical difference between the summary of the
10 pooled odd ratio based on the type of populations
11 that were recruited.
12     Again, the point estimates are a little
13 bit different for sure, 1.4 versus 1.12.  But the
14 confidence intervals overlap, suggesting that
15 they're not -- they're not different.
16     Q   You are familiar with selection bias; is
17 that right?
18     A   I am.
19     Q   Would you agree that the hospital-based
20 case-control studies may be less susceptible to
21 selection bias than population-based case-control
22 studies?
23     MS. O'DELL:  Object to the form.
24     A   I -- I would not agree with that.  In
25 general, you think about hospital-based studies as

Page 281

1  being potentially a great deal more bias.
2      Now, that -- with that caveat, it depends
3  on how you found your cases and your controls.
4      But in general, you want to find
5  population-based cases and controls, I believe,
6  rather than hospital-based.  But it matters how they
7  are recruited.
8      Q   Hospital-based control studies are
9  comparing hospitalized patients to hospitalized
10 patients; is that right?
11     A   I -- I -- in this case, yes, I think
12 that's --
13     Q   And --
14     A   -- how they define it.
15     Q   -- in population based studies, you're
16 more likely to be comparing ill people to healthy
17 people; is that right?
18     A   Again, it -- it depends on how you're
19 selecting.  If you're selecting patients who are
20 sick in the hospital and comparing that to healthy
21 patients who are outpatient population based, that
22 would be the kind of bias that you are describing.
23 That would be the worst.
24     But if you're, in fact, comparing
25 relatively comparable population-based cases and

10 (Pages 278 to 281)

Rebecca Smith-Bindman, M.D.

Page 282

1  controls, then I don't agree that hospital-based
2  controls are -- are better.
3      Q   Penninkilampi.  One of the studies that
4  you talked to us about yesterday was Penninkilampi
5  2018; is that right?
6      A   Yes.
7      Q   Penninkilampi 2018 did not include the
8  Gates 2010 cohort study; is that right?
9      A   That's correct.
10     Q   Did you verify that the data that
11 Penninkilampi reports is accurate?
12     A   I did not.  Did I go back and validate
13 their individual abstracted data?
14     Q   Yeah.
15     A   I did not.
16     Q   In determining that a study is of high
17 quality, would it be important to you that the
18 authors are accurately reporting the odds ratios and
19 confidence intervals?
20     A   Data accuracy is important to me.  And --
21 and I would look towards the journal peer review
22 process to have done that, yes.
23     Q   If -- if there were errors in reporting of
24 the odds ratios or the confidence intervals, that
25 could call into question the reliability of the

Page 283

1  study; is that right?
2      MS. O'DELL:  Object to the form.
3      A   Yes, that's definitely possible.
4      Q   (BY MR. ZELLERS) Penninkilampi 2018, that
5  study specifically states that a certain causal link
6  between talc use and ovarian cancer has not been
7  established, correct?
8      MS. O'DELL:  Object to the form.
9      A   I don't remember them concluding that.
10 But if you tell me where --
11     Q   (BY MR. ZELLERS) Sure.
12     A   -- it is --
13     Q   Look at page 42, at the end of first
14 paragraph.
15     A   Well, perineal talc use has not been shown
16 to be safe.  In a similar regard, a certain causal
17 link between the use and ovarian cancer has not been
18 established --
19     Q   And you --
20     A   -- is what --
21     Q   -- okay.
22     A   -- Penninkilampi says.
23     Q   And I think you omitted the word "talc."
24 But their specific statement is, A certain causal
25 link between talc use and ovarian cancer has not yet

Page 284

1  been established; is that right?
2      A   That is what they say.
3      Q   Meta-analyses or systematic analyses, that
4  can combine the work of other published studies into
5  one study; is that right?
6      A   Yes.
7      Q   If there are biases and confounding in the
8  underlying studies, the meta-analysis or the
9  systematic review or analysis will reflect the
10 biases and confounding; is that right?
11     MS. O'DELL:  Object to the form.
12     A   Any biases in the papers will not go away
13 by combining them.  I'm not sure what you mean by
14 "the confounding."  If -- if a paper has an
15 accounting for confounding?
16     Q   (BY MR. ZELLERS) Let me ask you another
17 question.  A proper meta-analysis or systematic
18 review must analyze the sources of heterogeneity
19 across the studies; is that right?
20     A   Yes.
21     Q   And a proper meta-analysis or systematic
22 review must examine the methodology of each of the
23 underlying studies, correct?
24     A   Yes.
25     Q   You have given some opinions -- or at

Page 285

1  least you state some opinions relating to the
2  biological mechanisms of cancer; is that right?
3      A   Yes.
4      Q   The biological mechanisms of cancer are
5  not your area of expertise; is that correct?
6      MS. O'DELL:  Object to the form.
7      A   I'm knowledgeable about the biological
8  mechanism of cancer as a scientist, as a physician,
9  as a cancer epidemiologist.
10     Q   (BY MR. ZELLERS) Would you agree that
11 there are others who are more closely involved in
12 the area of biologic plausibility as it relates to
13 the perineal use of talcum powder and ovarian
14 cancer?
15     MS. O'DELL:  Object to the form.
16     A   I believe there are others who have more
17 expertise directly in that area than I do.
18     Q   (BY MR. ZELLERS) Your opinion is that
19 talcum powder travels from the perineal region to
20 the ovaries through the women's reproductive tract;
21 is that right?
22     A   Yes.
23     Q   If talcum powder can make this migration,
24 can other substances make the same migration?
25     A   Yes.

11  (Pages 282 to 285)

Rebecca Smith-Bindman, M.D.

Page 286

1    Q   Sand from the beach?
2    A   I don't know if there's evidence of sand
3  from the beach.
4    Q   Toilet paper particles?
5    A   I -- I -- I do not know if there's
6  evidence of that.
7    Q   There are no human studies that
8  demonstrate the migration of any particulate matter
9  from outside the peri -- peritoneum to the ovaries,
10  correct?
11    MS. O'DELL:  Object to the form.
12    A   When you say "demonstrate," do you mean
13  active demonstration or a suggestion that it has
14  gone that route?
15    Q   (BY MR. ZELLERS) Active -- active
16  demonstration.
17    A   So there are no studies that I know of
18  that have taken talcum powder and then documented
19  its movement through -- to the ovaries.
20    Q   Or any particulate from outside the
21  perineum to the ovaries, correct?
22    MS. O'DELL:  Object to the form.
23    A   I -- I don't know of any sort of active
24  studies that have watched it moved.  It's rather the
25  studies have found the particulate matter at its

Page 287

1  destination and then have supposed it had to travel
2  there in some way.
3    Q   (BY MR. ZELLERS) None of the studies that
4  you cite in your report actually looked at whether
5  talcum powder can migrate from perineal application
6  through the fallopian tubes to the ovaries, correct?
7    A   Correct.
8    MS. O'DELL:  Object to the form.
9    Q   (BY MR. ZELLERS) You also cannot cite any
10  article that shows granulomas, fibrosis, or
11  adhesions anywhere up the reproductive tract of a
12  women as result of her external genital talc
13  application; is -- is that right?
14    A   Yes.
15    Q   If talcum powder migrates from the
16  perineal region to the ovaries, shouldn't exposure
17  to talc be far greater in concentration in the
18  rectal, vulvar, vaginal, cervical, and uterine
19  tissues which are closer to the area of initial
20  exposure?
21    MS. O'DELL:  Object to the form.
22    A   I think that assumes that proximity and
23  concentration, which you would expect which would
24  fall off with more distance, is the only factor that
25  would determine concentrations when, in fact, there

Page 288

1  are a lot of other factors such as sphincters or the
2  type of mucosa that it is or mucous barriers that
3  might have a very strong relationship to the
4  concentration of talc.
5    So the rectum and the bladder have
6  sphincters, and the mucosa and the vagina and the
7  bladder and rectum are very different than the
8  mucosa of the ovary.  The endometrium has different
9  tissue.
10    So I agree with you that you would expect
11  proximity would be one factor that might affect
12  concentration.  But the characteristics of the
13  tissue, the barriers, the physical or mucosal could
14  be expected to have a much bigger impact.
15    Q   No studies that you're aware of show
16  inflammation as a result of genital talc use in the
17  rectal, vulvar, vaginal, cervical, and uterine
18  tissues; is that right?
19    A   I do not know of those studies.
20    Q   And no studies show a link between
21  external genital talc use and rectal, vulvar,
22  vaginal, cervical, or uterine cancer; is that right?
23    MS. O'DELL:  Object to the form.
24    A   That is correct.
25    Q   (BY MR. ZELLERS) You have not done an

Page 289

1  expert review of the inflammation evidence yourself;
2  is that fair?
3    MS. O'DELL:  Object to the form.
4    A   I -- I have done a lot of reading of the
5  inflammation literature.  I'm not sure how I would
6  define it as an expert or not an expert -- expert
7  review.
8    Q   (BY MR. ZELLERS) You do know that not all
9  inflammatory conditions lead to cancer, correct?
10    A   There's a lot of literature about certain
11  inflammation that causes chronic -- in particular a
12  lot of different kind of cancers, more publications
13  about acute inflammation that does not lead to
14  cancer.
15    But yes, there are both cancers that are
16  very susceptible to inflammation or caused by it and
17  some that are not.
18    Q   Chronic inflammation.  There are many
19  chronic inflammatory conditions that do not lead to
20  cancer; is that right?
21    A   Yes.
22    Q   Do you agree that an agent can be a
23  carcinogenic for one type of cancer, but not for
24  others?
25    A   Yes.

12 (Pages 286 to 289)

Rebecca Smith-Bindman, M.D.

Page 290

1    Q   Rheumatoid arthritis, that is a chronic
2    inflammation condition, but it does not increase the
3    risk of my ovarian cancer, correct?
4    A   Correct.
5    Q   The same with psoriasis; is that right?
6    A   Not that I know of.
7    Q   Page 41 of your report, you conclude that,
8    Regular exposure to talcum powder products causes
9    ovarian cancer in some women.
10       Do you see that?
11   A   I do.
12   Q   Is there a certain amount of talcum powder
13   that a product must contain to cause inflammation?
14       MS. O'DELL:  Object to the form.
15   A   I -- I -- I do not know of evidence that
16   quantifies the amount of exposure that's necessary
17   that a published literature supports the amount
18   women use is an amount that leads to cancer, but
19   I -- I don't know if there's a minimum threshold
20   or...
21   Q   (BY MR. ZELLERS) Do you consider
22   cornstarch to be a talcum powder product that causes
23   inflammation?
24       MS. O'DELL:  Object to the form.
25   A   Talcum powder -- cornstarch -- talcum

Page 291

1    powder causes inflammation.  Cornstarch can also
2    cause inflammation.
3        I believe cornstarch tends to be an acute
4    inflammatory process rather than a chronic
5    inflammation process.  But --
6    Q   (BY MR. ZELLERS) You --
7    A   -- I -- I wouldn't consider cornstarch to
8    be a talcum powder --
9    Q   Is --
10   A   -- product.
11   Q   -- is there a study that you can point me
12   to that states that any inflammation from cornstarch
13   is acute and not chronic?
14       MS. O'DELL:  Object to the form.
15   A   There's a literature about cornstarch
16   leading to acute inflammation, for example, in the
17   surgical literature when it was on surgical gloves
18   or on physical exams which has led to its being
19   removed so -- so as to reproduce acute inflammatory
20   processes.
21   Q   (BY MR. ZELLERS) My question to you is:
22   Are you aware of any literature that states that
23   cornstarch is not associated with a chronic
24   inflammatory condition?
25       MS. O'DELL:  Object to the form.

Page 292

1    A   In a few of the papers I reviewed -- not
2    very many of them, but a few of them had a small
3    proportion of women who were exposed to cornstarch
4    rather than talc powder products.
5        I -- I think it -- they had negative
6    results, but they were small -- a small number of
7    women, so I wouldn't use that to prove that it's
8    safe.
9        But I don't know of any literature that
10   suggests cornstarch is carcinogenic.
11   Q   Your opinion that talcum powder products
12   cause inflammation is not based on the determination
13   that there is a threshold amount of talcum powder
14   that will be required to be in the product before
15   you can conclude that the product will cause chronic
16   inflammation; is -- is that right?
17       MS. O'DELL:  Object to the form.
18   A   I -- I -- I think I would like to agree.
19   I'm just not sure exactly of -- what I am agreeing
20   to.  So I -- I don't know any level --
21       MS. O'DELL:  That's always --
22   A   -- of --
23       MS. O'DELL:  -- a good sign you should --
24   A   -- I -- I can't --
25       MS. O'DELL:  -- be --

Page 293

1    A   -- I can't tell exactly what the -- what
2    the question is.
3        I -- there -- I don't know -- I don't know
4    an amount of talcum powder that would make a product
5    safe.
6    Q   (BY MR. ZELLERS) Do you believe that
7    cornstarch is a superior alternative to talc?
8    A   I believe that talcum powder products will
9    increase women's risk of cancer, and I would avoid
10   using it as a woman or as a doctor counseling my
11   patients.
12   Q   Well --
13   A   I don't have views that cornstarch is a
14   carcinogenic product.  So in terms of any potential
15   risk-benefit relationship of cornstarch has the same
16   value in terms of absorbency and much fewer risk of
17   harm, then if that's the question, then I think
18   cornstarch is preferable.
19   Q   There are no reports in the literature of
20   externally applied talc leading to inflammation,
21   granulomas, fibrosis, or adhesions anywhere along a
22   women's reproductive tract, correct?
23       MS. O'DELL:  Objection, asked and
24   answered.
25   A   Not that I know of.

13 (Pages 290 to 293)

Rebecca Smith-Bindman, M.D.

Page 294

1    Q   (BY MR. ZELLERS) On page 12 of your report
2  you state, The most widely accepted mechanism for
3  initiation, promotion, and progression of ovarian
4  cancer is tissue inflammation, leading to a series
5  of responses that result in cancer.
6         Do you see that statement?
7    A   I do.
8    Q   You do not cite any support in your report
9  for that proposition, correct?
10        MS. O'DELL:  Object to the form.
11   A   I -- I think my -- that first paragraph
12 was sort of an introduction to that section.  So
13 then I go on to cite, I -- I think, the supporting
14 evidence within the next few paragraphs.
15   Q   (BY MR. ZELLERS) You would agree that
16 research regarding whether chronic inflammation can
17 cause ovarian cancer is ongoing, correct?
18   A   It's an active area of research.
19   Q   Are you familiar with a paper published by
20 Melissa Merritt in 2008, entitled "Talcum Powder
21 Chronic Pelvic Inflammation and NSAIDS in Relation
22 to Risk of Epithelial Ovarian Cancer"?
23   A   I am.
24   Q   It's included in your reliance materials
25 on page 17; is that right?

Page 295

1    A   Can you tell me the title again?  Yeah.
2  Okay.
3    Q   Sure.  Do you have that or I can --
4    A   No.
5    Q   -- mark it?
6    A   No, I have it.
7    Q   If you go to page 174 of the Merritt
8  paper -- and tell me when you're --
9    A   I'm there.
10   Q   -- there -- at the bottom of the first
11 paragraph of the discussion, the authors conclude,
12 These results, in combination with previous studies,
13 suggest that chronic inflammation is unlikely to
14 play a major role in the development of ovarian
15 cancer.
16        Is that right?  Did I read that correctly?
17   A   Using the results that they had available
18 on the data in 2007, that is what Dr. Merritt
19 concluded.
20   Q   You also discuss in your report -- well,
21 let me withdraw that.
22        You're familiar with NSAIDS, nonsteroidal
23 antiinflammatory agents; is that right --
24   A   Yes, I am.
25   Q   -- and aspirin?  Those medicines reduce

Page 296

1  inflammation; is that right?
2    A   Yes, they do.
3    Q   If inflammation is a mechanism for ovarian
4  cancer, you would expect women who use NSAIDS or
5  aspirin to have a lower risk of ovarian cancer,
6  correct?
7         MS. O'DELL:  Object to the form.
8    A   Other things being equal, you might expect
9  that if you could measure inflammation or influence
10 it by using NSAIDS, that that might be associated.
11 That is true.
12   Q   (BY MR. ZELLERS) The literature, though,
13 is mixed in terms of whether or not the use of
14 NSAIDS or aspirin actually reduce the risk of
15 ovarian cancer; is that right, or the incidence of
16 --
17   A   So --
18   Q   -- ovarian cancer?
19   A   -- I have reviewed those papers and would
20 agree with you that some seem to suggest one
21 direction, some others.  I haven't quantified them
22 together or tried to summarize them.
23        But I would agree.  There doesn't seem to
24 be a consistent message in that literature.
25   Q   One of those papers is -- that's included

Page 297

1  in your reliance list is the Verdoodt 2017 paper; is
2  that right?  That's V E R D O O D T.
3    A   I am going to have to defer to seeing
4  that.
5    Q   Okay.  Let me --
6    A   I believe --
7    Q   -- show you --
8    A   -- it's on my list.
9    Q   -- I will mark that paper as Exhibit 31.
10        (Exhibit 31 was marked for identification
11 and is attached to the transcript.)
12   A   Thank you.
13   Q   (BY MR. ZELLERS) And turn, if you will, to
14 page 5 under "Discussion" on the first paragraph.
15   A   And just to confirm, this is -- I -- I
16 have read this.  This is a review article, right?
17   Q   Yes.
18   A   Okay.
19   Q   So on page 5 under "Discussion," the first
20 sentence, the authors state, The sparse and
21 equivocal results for the association between NSAID
22 use and mortality among ovarian and endometrial
23 cancer patients preclude any firm conclusions at
24 this point.
25        Is that right?

14 (Pages 294 to 297)

Rebecca Smith-Bindman, M.D.

Page 298

1     A   That is what this author concludes.  I'm
2   trying to see what references he used for that, but
3   that is what he concludes.
4        Q   Okay.  And this is an article that was
5   published in 2017, correct?
6        A   Yes.
7        Q   Yesterday counsel for plaintiffs indicated
8   that you have -- in addition to the materials in
9   your report -- reviewed a 2018 chapter by Saed and
10  the Harper and Saed 2019 abstract; is that right?
11       A   I -- I reviewed several of his abstracts
12  and -- and a recent paper, yes.
13       Q   Do you know that Dr. Saed is a paid expert
14  for the Plaintiffs in this litigation?
15       A   I know he's a very well-respected
16  scientist that they have supported in his research.
17       Q   Is that a yes?
18           MS. BOCKUS:  I object.  Nonresponsive.
19           MS. O'DELL:  Mike, excuse me.
20           MR. ZELLERS:  Sure.
21           MS. O'DELL:  You said the 2019 abstract.
22  Did you mean the abstract or the manuscript, just to
23  make sure I'm following the conversation?
24           MR. ZELLERS:  I -- I believe I mean the
25  abstract.  But we mean whatever the doctor has in

Page 299

1   her file that we marked yesterday.
2           THE COURT REPORTER:  Who objected down
3   there?
4           MS. BOCKUS:  Jane Bockus.
5           MS. O'DELL:  I think what she had in her
6   file was the manuscript.  So I think that's what you
7   marked as an exhibit, but I don't want there to be
8   confusion.
9        Q   (BY MR. ZELLERS) You have reviewed several
10  publications within the last year or two from
11  Dr. Saed --
12       A   Yes.
13       Q   -- is that right?
14       A   Yes, I have.
15           THE COURT REPORTER:  Wait.
16           MR. ZELLERS:  All right.  Are you okay,
17  Ms. Court Reporter?
18           THE COURT REPORTER:  Yes.  I just have to
19  have you wait until the end of the question, please.
20       Q   (BY MR. ZELLERS) Let me re-ask my --
21       A   Please.
22       Q   -- question.  Did you know that Dr. Saed
23  is a paid expert for the Plaintiffs in this
24  litigation?
25       A   Yes, I do.

Page 300

1        Q   Have you spoken with Dr. Saed?
2        A   I have not.
3        Q   Have you requested any information from
4   Dr. Saed?
5        A   I have not.
6        Q   The Saed study just looked at immortalized
7   cell lines; is that right?
8        A   Yes, I believe that's how the cell lines
9   were --
10       Q   Are --
11       A   -- defined.
12       Q   -- are you -- are you aware that Dr. Saed
13  testified that the cells were modified with a virus
14  to make them keep undergoing division in vitro?
15       A   I -- I'm aware that that's what happens to
16  cell lines.  I -- I don't believe I saw his
17  deposition to say that.
18       Q   Are you aware that Dr. Saed testified that
19  the P53 gene was turned off in those cells?
20       A   No, I'm not aware.
21       Q   Are you aware based upon your reading that
22  the loss of the P53 protein contributes to
23  unrestrained cellular proliferation?
24           MS. O'DELL:  Object to the form.
25       A   I -- I believe that the reason you have

Page 301

1   controls in experiment is to account for the
2   underlying expression in turnover cells so you can
3   compare something you do to the cell versus the
4   baseline in order to account for the baseline,
5   whatever it is, proliferation of the cell or
6   apoptosis levels or expression of oxidants or
7   antioxidants.
8           So I -- I -- the way you're asking the
9   question is -- is:  Are you comparing this cell line
10  to living cells in context?
11          And I would agree with you that this cell
12  line is different than living cells in context.
13          But if you're asking if it's a valid
14  comparison to do the experiment in this cell line,
15  it is because you are doing an intervention to those
16  cells that has a control group.
17          And so this cell line has a different
18  behavior than a -- a living cell does, but provides
19  a comparison group.
20       Q   (BY MR. ZELLERS) What methodology did you
21  use to apply Dr. Saed's results to normal cells in
22  actual organs?
23       A   So --
24           MS. O'DELL:  Object to the form.
25       A   -- in some of the work that I do around a

Rebecca Smith-Bindman, M.D.

Page 302

1   different environmental carcinogen -- radiation, for
2   example -- we look at changes of expression, certain
3   enzymes in cells to radiation to understand what
4   that damage does in terms of expression of relevant
5   genes, cell proliferation, and things like that.
6         So I take his research to mean that I can
7   understand the changes to pro oxidants to
8   antioxidants to apoptosis to gene expression in the
9   cell.  Not that I can come up with the exact
10  quantification in a patient that would correspond to
11  it, but rather, what mechanisms will be stimulated
12  by the talc.
13        So to answer your question, I -- it tells
14  me what parts of the cell are sensitive to it, but
15  not the quantity that might lead to that
16  sensitivity.
17        Q   (BY MR. ZELLERS) Can you cite any data
18  showing that the concentrations of exposure used in
19  the Saed study are the same as would be encountered
20  with the use of cosmetic talc in the perineal
21  region?
22        A   I cannot.  That's what I was trying to
23  express.
24        Q   Can you cite any data showing that the
25  level of concentration of exposure used in the Saed

Page 303

1   study has ever occurred in women with perineal talc
2   use?
3         MS. O'DELL:  Object to the form.
4         A   I want to clarify my answer.  I don't know
5   those data.
6         Q   (BY MR. ZELLERS) Would you agree that
7   reactive oxygen species are a normal part of cell
8   physiology?
9         A   Yes.
10        Q   Do all substances that cause oxidative
11  stress also cause cancer?
12        A   I think you care about the balance of
13  oxidative, pro oxidative, antioxidative levels.
14        That being said, I do not know that every
15  instance where you have more pro oxidative leads to
16  cancer.  I know of some where it does.  I don't know
17  if it always does.
18        Q   Does the presence of oxidative stress in a
19  tissue indicate that cancer will develop in that
20  tissue?
21        A   I think I mentioned this yesterday, that
22  there's a sense of a probability.  So the
23  probability will likely increase.
24        But most cells, thankfully, will repair
25  and -- that damage, and so most cells will not

Page 304

1   develop enough mutations to develop into cancer.
2         But the greater the oxidative stress for
3   cancer like ovarian cancer, the greater the chance
4   of inducing cancer.
5         Q   Can you cite me to any study that says
6   that?
7         MS. O'DELL:  Object to the form.
8         A   Any study that says that there's a dose
9   response related to the amount of stress and the
10  member -- numbers of cancers?
11        Q   (BY MR. ZELLERS) That supports, yes, your
12  statement and your position.
13        A   I -- the data that I am thinking of -- and
14  I'm not sure if it's quite the same as the question
15  that you're asking -- is the number of gene
16  mutations is higher in cancer cells than it is in
17  noncancer cells.  So --
18        THE COURT REPORTER:  In noncancer?
19        A   In non -- cancer cells have many more
20  genetic mutations than noncancer cells.
21        Both have generic mutations.  And the
22  environment of having more oxidative stress is
23  associated with getting more mutations --
24        Q   (BY MR. ZELLERS) If -- if it's --
25        A   -- but --

Page 305

1         Q   -- are you finished?
2         A   -- I -- I am.
3         Q   Okay.  If -- if exposure to a substance
4   causes oxidative stress in certain tissue, does that
5   mean that the substance will cause oxidative stress
6   in all types of tissues?
7         A   No.
8         Q   Does the body have a protective mechanism
9   that can limit tissue damage from oxidative stress?
10        A   Yes.
11        Q   Are there any publications that you are
12  aware of that indicate that oxidative stress is
13  involved in the development of ovarian cancer?
14        A   We discussed earlier that inflammation
15  increases oxidative stress such as pelvic
16  inflammatory disease leads to oxidative stress.
17        And pelvic inflammatory disease is
18  associated and leads to ovarian cancer.  But I'm not
19  sure if that's answers the question that you are...
20        Q   Well, if I had more time, we would discuss
21  that at greater length.  You're familiar with the
22  term "confounding" is that right?
23        A   I -- I -- Yes, I'm --
24        Q   All right.
25        A   -- familiar with that term.

16 (Pages 302 to 305)

Rebecca Smith-Bindman, M.D.

Page 306

1    Q   Confounding is where the presence of
2  another association confuses the relationship
3  between the exposure and the disease being studied;
4  is -- is that right?
5    A   Yes.
6    Q   Confounding can distort results in
7  epidemiological studies; is that right?
8    A   Yes.
9    Q   Would you agree that residual confounding
10  is possible in every observational study?
11    A   Yes.
12    Q   It's also -- strike that.
13        It's possible that unmeasured confounders
14  may be present in every observational study,
15  correct?
16    A   Yes.
17    Q   It's impossible to say that all known and
18  unknown confounding factors have been controlled for
19  in any given study; is that right?
20    A   Yes.
21    Q   Would you agree that there are new factors
22  that are being discussed that are possibly involved
23  with ovarian cancer that are just being published in
24  the literature such as a history of chlamydia
25  infection and a history of weight gain during

Page 307

1  adolescence?
2        MS. O'DELL:  Object to the form.
3    A   Chlamydia infection would be the most
4  common infection of PID, and so that's something
5  that I just mentioned.  I'm not sure that that's
6  such a new one.
7        And weight gain during adolescence is
8  something that's of interest across a range of
9  cancers, like breast cancer.  I don't know it
10  personally around ovarian cancer, but...
11    Q   (BY MR. ZELLERS) Those factors that we
12  just talked about generally have not been controlled
13  for in any of the published talcum powder ovarian
14  cancer studies; is that right?
15    A   I -- the PID, I -- I think, has it in a
16  paper or two.  And -- and the weight gain, I -- I
17  don't -- I have never seen that one.
18    Q   We talked yesterday about the Berge study.
19  Do you remember that?
20    A   I do.
21    Q   And you talk about Berge on page 25 of
22  your report.
23        What do you mean when you say, A second
24  limitation of Berge is that the included studies
25  adjusted for a variety of covariates, although this

Page 308

1  is unavoidable in this type of summary.  The large
2  difference in general between adjusted and crude
3  results emphasizes the importance of adjustments
4  when estimating particular risk?
5        THE COURT REPORTER:  When estimating?
6        MR. ZELLERS:  Particular risk.
7    A   Are you asking what I meant by that?
8    Q   (BY MR. ZELLERS) Yes.  What did you mean
9  by that?
10    A   Okay.  I -- I would say my sentence is not
11  as clear as it should have been.  What I mean -- and
12  I'm not really sure why I pointed this out just for
13  Berge -- it's really a general -- is that the
14  studies they included, adjusted for different
15  covariants.
16        They didn't all adjust for the same
17  covariates.  So a variety of covariates, meaning
18  they didn't all adjust for the exact same
19  covariates.
20        But this is unavoidable in this type of
21  study.  So I was just saying that some of the
22  included studies adjusted for A, B and C; and others
23  were adjusted for B, C, and D; and others D, E, and
24  F.
25    Q   Huncharek, page 26.  Do you see that

Page 309

1  reference where you talk about that study?
2    A   Yes.
3    Q   You say that the difference between a
4  relative risk of 1.19 and 1.38 is small; is that
5  right?
6        MS. O'DELL:  You're talking about 2007 or
7  2003?
8    Q   (BY MR. ZELLERS) Whichever --
9    A   Which page?
10    Q   -- so page 26 --
11        MS. O'DELL:  They're both on the same
12  page.
13    Q   (BY MR. ZELLERS) I think I'm looking at
14  the one at the bottom.
15        MS. O'DELL:  Okay.  All right.  2003?
16        MR. ZELLERS:  Yes.
17    Q   (BY MR. ZELLERS) So are you with me?  Are
18  you looking at your last couple of lines there on
19  page 26?
20    A   Yes.
21    Q   And you do say that the difference between
22  a relative risk of 1.19 and 1.38 is small; is that
23  right?
24    A   It -- odds ratios --
25    Q   Yeah.

17 (Pages 306 to 309)

Rebecca Smith-Bindman, M.D.

Page 310

```
 1      A  -- but yes.
 2      Q  All right.  And -- and so a difference in
 3  odds ratios of .19, you would consider that to be a
 4  small difference?
 5      MS. O'DELL:  Object to the form.
 6      A  You're asking why I said those differences
 7  are small?
 8      Q  (BY MR. ZELLERS) No.  Well, what I guess
 9  what I want to know is:  Would you agree that the
10  difference between an odds ratio of 1.0 and 1.2 is
11  small?
12      MS. O'DELL:  Object to the form.
13      A  I think the question of whether or not you
14  have a difference of absolute odds of .2 along
15  different values means the same thing.  And I would
16  say it doesn't mean the same thing.
17      So if you have an odds ratio as an example
18  of 4.7 versus 4.9, they're kind of the same number.
19  If you have a number that's 1.0 versus 1.2, those
20  are not the same number.
21      So I don't think you would want to assume
22  the shift in the absolute magnitude of the
23  difference in odds.  I often published difference in
24  odds ratios of .2 stable.
25      But I think is -- your point is well taken
```

Page 311

```
 1  that that's not a trivial difference.  I was just
 2  saying in the context of a systematic review, those
 3  are both very strong, positive associations, and
 4  that's a relatively minor difference.
 5      Q  (BY MR. ZELLERS) An odds ratio range of
 6  1.19 to 1.38 is much closer to an odds ratio of 1.0
 7  to 1.2 than it is to an odds ratio of 4.5 to 4.7,
 8  correct?
 9      A  I -- I think that's a valid -- a valid
10  comparison.
11      Q  On page 26, 27, there's a carryover there,
12  but you state that the population controls are more
13  likely relevant and valid than hospital controls.
14      What's your support for that?
15      A  It's what we discussed earlier.  I -- I
16  think population-based controls are -- are better
17  than hospital-based controls.
18      Q  With respect to your systematic review,
19  did you attempt to identify gaps or flaws in the
20  underlying studies?
21      A  I reviewed the individual studies and set
22  forth criteria that I thought were required for
23  inclusion.
24      Q  What were those criteria?  Are those
25  contained in your forms that we talked about --
```

Page 312

```
 1      A  Yeah.
 2      Q  -- yesterday?
 3      A  So the most important -- as it points out
 4  here in -- in Huncharek, the next sentence of where
 5  we are, is that this review looked at any exposure
 6  rather than quantifying.
 7      And I think the primary concern that I had
 8  was that any exposure is a very vague definition.
 9  And I thought it was much more important to have a
10  meaningful measure of exposure.
11      So the studies that I primarily included
12  were ones that had quantification of the exposure,
13  but also had some other requirements.
14      I -- I -- I want to say that my systematic
15  review was one piece of the information that I
16  considered, but my summary estimate in the
17  systematic review that I completed had the same
18  conclusion as all these other systematic reviews.
19      In the ballpark, it just gave me greater
20  confidence that we were truly looking at regular
21  exposure rather than any exposure.
22      Now, we know that the most common exposure
23  is regular exposure.  That's the -- the more
24  important -- most common.
25      Q  Take a look at page 39 in your report
```

Page 313

```
 1  where you discuss temporality; is that right?
 2      A  Yes.
 3      Q  You say that women may use talc when
 4  undergoing ovarian cancer treatment.
 5      Do you see that?
 6      A  Yes.
 7      Q  What is your support for that or what is
 8  that statement based on?
 9      A  I -- I think it's based on my clinical
10  experience that postop patients often will use
11  talcum powder products for systematic relief of
12  symptoms that could be related to the surgical
13  procedure itself.
14      Q  All right.  Asbestos.  Are your opinions
15  in this case dependent on talcum powder containing
16  asbestos?
17      A  No, they're not.
18      Q  Are your opinions in this case dependent
19  on talcum powder containing trace amounts of metals?
20      MS. O'DELL:  Object to the form.
21      A  No, they're not.
22      Q  (BY MR. ZELLERS) Are your opinions in this
23  case dependent upon talcum powder containing any
24  particular fragrance chemical?
25      A  No, they're not.
```

18 (Pages 310 to 313)

Rebecca Smith-Bindman, M.D.

Page 314

1    Q   Do you believe that talcum powder, which
2  does not contain asbestos, causes ovarian cancer?
3    A   I don't have any data on which to conclude
4  based on epidemiologic evidence that there is such a
5  product, so I don't know that there is any product
6  that has been studied that doesn't contain asbestos
7  and fibrous talc.
8       I think in a laboratory setting, people
9  have studied products that they describe as being
10 asbestos free, and those products do cause cellular
11 damage.
12      But from an epidemiologic perspective,
13 which is primarily the data I looked at, all of the
14 products that have been studied, I believe contain
15 asbestos and fibrous talc.
16   Q   You have made an assumption or it is your
17 belief that all talcum powder products contain
18 asbestos; is that right?
19      MS. O'DELL:  Object to the form.
20   A   My belief is that many talcum powder
21 products contain asbestos or --
22   Q   (BY MR. ZELLERS) If --
23   A   -- fibrous.
24   Q   -- if your assumption about contamination
25 of talcum powder products with asbestos were not

Page 315

1  true, would that change your opinions in this case?
2       MS. O'DELL:  Object to the form.
3    A   In -- in this case, it would not.  I --
4  I -- the epidemiologic evidence is very strong that
5  exposure to talcum powder products, whatever it
6  contains, is carcinogenic.
7    Q   (BY MR. ZELLERS) You have looked at
8  several reports from Dr. Longo; is that right?
9    A   I have.
10   Q   You're aware he is a paid litigation
11 expert; is that right?
12   A   Yes, I am.
13   Q   You're aware he wrote his reports for the
14 purpose of this litigation and that those reports
15 have not been published; is that right?
16   A   I -- I know that he has generated a report
17 for this, yes.
18   Q   Do you know if any defense ex -- strike
19 that.
20      Do you know if any defense experts have
21 addressed or responded to Dr. Longo's litigation
22 reports?
23      MS. O'DELL:  I would object to the form.
24 There's been no defense reports in this case, as you
25 know.

Page 316

1    A   I -- I haven't seen any.
2    Q   (BY MR. ZELLERS) Have you requested any?
3       MS. O'DELL:  Object to the form.  There
4  have been no defense expert reports in this case.
5       MR. ZELLERS:  Counsel, please object to
6  form.  There have been many defense expert reports
7  in the talcum powder litigation generally.
8       But my question was whether or not she has
9  seen anything, so she can -- I think she has already
10 answered.
11   Q   (BY MR. ZELLERS) Is that right?  Have you
12 answered the question?
13      MS. O'DELL:  Object to the form.
14   A   I have asked to seen reports.  No.  I have
15 asked to seen testing results.  I have not asked to
16 seen reports.
17   Q   (BY MR. ZELLERS) Have you seen testing
18 results from the FDA and its testing of talcum
19 powder?
20   A   I have.
21   Q   The FDA did some testing in 2010.  Did you
22 see those results?
23   A   I did.
24      MS. O'DELL:  Do you need a break or are
25 you good or --

Page 317

1    A   I actually would love a -- a break.  I
2  don't mind going a few more minutes, if that would
3  be good or -- but otherwise, I would love a break.
4       MS. O'DELL:  Whenever is a good time.
5       MR. ZELLERS:  Sure.  I'll just finish
6  this.
7    Q   (BY MR. ZELLERS) I'll hand you the
8  exhibit, Exhibit 32.
9       (Exhibit 32 was marked for identification
10 and is attached to the transcript.)
11   Q   (BY MR. ZELLERS) Is that --
12   A   Thank you.
13   Q   -- the -- at least some of the testing by
14 the FDA that you have seen?
15   A   Yes, it is.
16   Q   That testing was done by an independent
17 laboratory; is that right?
18   A   I -- I -- I don't know that, but I believe
19 you.
20   Q   Take --
21      MS. O'DELL:  Do you have a copy for me?
22      MR. ZELLERS:  Oh, I'm so sorry.  I have
23 that, yes.  Sorry.
24      MS. O'DELL:  Thanks.
25   Q   (BY MR. ZELLERS) If you go to the second

19 (Pages 314 to 317)

Rebecca Smith-Bindman, M.D.

Page 318

1  page, the second paragraph, We contracted with AMA
2  Analytical Services of Lanham, Maryland, to conduct
3  this laboratory service -- or strike that -- survey.
4       Do you see that?
5  A  I don't.  I'm on the right page.
6  Q  On the second page.
7  A  The second page.
8  Q  The second paragraph, the second --
9  A  Yes.
10  Q  -- sentence --
11  A  -- yes.  Yes.  Thank you.
12  Q  All right.
13  A  Yes.
14  Q  And at least based upon this report, no
15  asbestos was detected in the talcum powder that was
16  tested; is that right?
17  A  In the reports that they show, which
18  might -- my understanding is that they had two
19  samples of baby powder, talcum powder in this.  And
20  that in those two specimens using the testing method
21  they used, they didn't find evidence of asbestos.
22       MR. ZELLERS:  All right.  Let's take a
23  break.
24       THE VIDEOGRAPHER:  The time is 10:47 a.m.
25  We are now off the record.

Page 319

1       (A break was taken from 10:47 a.m. to
2  11:00.)
3       THE VIDEOGRAPHER:  It's 11:00 a.m.  We are
4  now back on the record.  Here begins Media No. 2 of
5  the deposition of Dr. Rebecca Smith-Bindman, Ph.D.,
6  Volume II.
7  Q  (BY MR. ZELLERS)  Dr. Smith-Bindman, I was
8  handed the invoice for Chris Tachibana, which we
9  have marked as Exhibit 33.
10       (Exhibit 33 was marked for identification
11  and is attached to the transcript.)
12  Q  (BY MR. ZELLERS)  Is that the invoice that
13  your copy editor provided to you?
14  A  Yes.
15  Q  Are there any other invoices that you have
16  received from her?
17  A  No.
18  Q  Do you expect there to be any other work
19  that Ms. Tachibana does with respect to your report?
20  A  Not with respect to my report.
21       If I move ahead to publish these results,
22  then I would likely reach out to her to help -- as
23  well.
24       THE COURT REPORTER:  To help?
25  A  If we choose to publish the results, I

Page 320

1  would like -- she edits all of my publications
2  before I submit them.
3  Q  (BY MR. ZELLERS) When we left the last
4  session, I asked you about asbestos and whether or
5  not asbestos is contained in talcum powder.
6       Is there any amount of asbestos that would
7  be safe in talcum powder products?
8  A  And the simple answer would be no, I don't
9  think there's any amount that would be safe in
10  talcum powder products.
11  Q  All right.  Is there any amount of trace
12  metals that would be safe in talcum powder products?
13       MS. O'DELL:  Object to the form.
14  A  I believe there would be amounts of trace
15  metals that would be acceptable.
16  Q  (BY MR. ZELLERS) Are there any amounts of
17  fragrance chemicals that would be safe in talcum
18  powder products?
19  A  I believe there would be in certain
20  categories.  And in others, there would not.
21  Q  There have been no fragrance chemicals, to
22  your knowledge, that have been found in a study to
23  be associated with ovarian cancer, correct?
24       MS. O'DELL:  Object to the form.
25  A  I -- I know of no -- no such exploration.

Page 321

1  Q  (BY MR. ZELLERS) Do you have an opinion on
2  what type of asbestos is in talcum powder products?
3  A  I believe asbestos is sort of a family of
4  chemicals.  I think there are six that kind of get
5  grouped together.  I think all of them have been
6  identified in talcum powder products, but I don't
7  know the distribution of the different kinds.
8  Q  What type of asbestos is associated with
9  ovarian cancer?  And by that question, you believe
10  that there's six subtypes of asbestos --
11       MS. O'DELL:  Object to the form.
12  Q  (BY MR. ZELLERS) -- is that generally your
13  understanding?
14  A  It's generally my understanding.
15  Q  Are -- are you able to give us any
16  opinions with respect to what type or types of
17  asbestos is associated with ovarian cancer?
18  A  The -- the strongest summary of the
19  relationship that I know about is in the IARC 2012
20  reports.
21       And those are from a number of different
22  studies, including some cohort studies and case
23  control studies.
24       To my knowledge, I don't know that they
25  have divided them by the type of mineral silicate

20  (Pages 318 to 321)

Rebecca Smith-Bindman, M.D.

Page 322

1  fibers that were in those studies.
2      Q   What amount of asbestos exposure is
3  associated with ovarian cancer?
4          MS. O'DELL:  Object to the form.
5      A   To the best of my knowledge, the amount
6  that's contained within talc powder products is
7  probably associated with -- the amount that's in
8  there is probably the -- cancer.
9      Q   (BY MR. ZELLERS) Can you be any more
10  definitive?
11     A   The talcum powder products that women have
12  used is associated with ovarian cancer.  And I
13  believe that to know how much asbestos it takes to
14  cause cancer, the easiest way to answer that is to
15  quantify how much asbestos is within the --
16  the powder products.
17         So I'm not in any way an expert on this.
18  But in the Longo report, it talked about an average
19  of 50,000 particles of asbestos being in each
20  gram of -- on average in each gram of baby powder
21  products.
22         And he estimates that in a container, that
23  would be millions of particles, which seems like a
24  large number to me, but -- so I don't know the
25  amount that would be required to be carcinogenic,

Page 323

1  but that's the amount that they were exposed to that
2  was carcinogenic.
3      Q   What type of ovarian cancer is asbestos
4  associated with?
5          MS. O'DELL:  Object to the form.
6      A   I think the most stable estimate of the
7  association of talcum powder products with ovarian
8  cancer is for all ovarian cancer and the
9  meta-analysis that others did.  And my summary
10  estimate was for all ovarian cancer -- epithelial
11  ovarian cancer, I should say.
12         In my more limited review, I focused on
13  serous cancer, because I think as the most common
14  cancer -- the most common invasive cancer, it's the
15  one where there's enough statistical power to
16  quantify the association, so I think the data are
17  the most compelling for serous ovarian cancer.
18         But the overall meta-analysis looks at any
19  cancer, and that's what we did as well.
20     Q   You -- you looked at talcum powder,
21  correct?
22     A   Talcum powder products, yes.
23     Q   You did not undertake a Bradford Hill
24  analysis of the literature on asbestos and ovarian
25  cancer, correct?

Page 324

1      A   I did not.
2      Q   Would you agree that research on the
3  potential relationship between asbestos and ovarian
4  cancer has only considered a small number of cases?
5          MS. O'DELL:  Object to the form.
6      A   I think the IARC review on the
7  occupational exposures to asbestos had quite a
8  number of cancers, but I would have to go back to
9  those studies to remember the number.
10     Q   (BY MR. ZELLERS) Did you review the Reid
11  2011 study?
12     A   I believe that's one that I -- I reviewed.
13     Q   Do you need me to hand that to you if --
14     A   Yes --
15     Q   -- ask you a couple of questions about it?
16     A   -- please.
17     Q   Now, in the Reid 2011 paper, which we will
18  mark as Exhibit 34 --
19     A   And is that one of the studies that
20  Camargo included in -- I think it is -- in his
21  systematic review?  Yeah.  So this is a different
22  systematic review.
23         (Exhibit 34 was marked for identification
24  and is attached to the transcript.)
25     Q   (BY MR. ZELLERS) Do you recognize

Page 325

1  Exhibit 34?
2      A   No.
3      Q   Okay.  Well, Exhibit 34 is a study and --
4  and a review by the first named author, Allison
5  Reid.
6          "Does Exposure to Asbestos Cause Ovarian
7  Cancer?"
8      A   I -- I have seen this paper.
9      Q   All right.
10     A   I'm sorry.  I didn't remember.  So sorry.
11     Q   If you look at her conclusions -- or the
12  author's conclusions on the right-hand side of the
13  first page -- so I'm --
14     A   Yes.
15     Q   -- looking right here --
16     A   Yes.
17     Q   -- the relationship between asbestos
18  exposure and ovarian cancer is not well
19  understood -- is not as well understood as -- as
20  that of asbestos-related diseases.  Studies that
21  have examined this issue have been limited for two
22  major reasons.
23         No. 1, there's a small number of cases.
24  And No. 2, there's difficulties with diagnosis and
25  specifically distinguishing between peritoneal

21 (Pages 322 to 325)

Rebecca Smith-Bindman, M.D.

Page 326

1   mesothelioma and ovarian cancer; is -- is that
2   right?
3         MS. O'DELL:  Object to the form.
4     A   So this -- those are the conclusions that
5   she makes.  But I -- I want just to explain what she
6   means by "small number of cases."
7         She's comparing it to the number of men
8   exposed to asbestos.  Just there -- there are many
9   more men exposed to asbestos than -- than women
10  exposed to asbestos.
11        So I think -- I mean, I -- I think it's a
12  challenge, but I -- wouldn't say that there are a
13  small number of cases.
14        MR. ZELLERS:  Move to strike as
15  nonresponsive.
16    Q   (BY MR. ZELLERS) Would you agree that most
17  of the studies that have been done and the data that
18  exists relates to occupational exposure of asbestos
19  and ovarian cancer?
20    A   Yes.  I --
21    Q   All right.
22    A   -- yes.
23    Q   You looked at the Camargo paper 2011; is
24  that right?
25    A   Yes.

Page 327

1     Q   That study points out that there's an
2   inability to account for nonoccupational risk
3   factors for ovarian cancer in these studies other
4   than age; is that right?
5         MS. O'DELL:  If -- if you remember.  If
6   you need to see --
7     A   I -- I don't remember.
8     Q   (BY MR. ZELLERS) All right.  Do you have
9   the Camargo paper in front --
10    A   I --
11    Q   -- of you or would you like me to give it
12  to you?
13    A   -- please.
14    Q   Camargo 2011, we will mark as deposition
15  Exhibit 35.
16        (Exhibit 35 was marked for identification
17  and is attached to the transcript.)
18    A   Thank you.
19    Q   (BY MR. ZELLERS) Do you have that in front
20  of you now?
21        MS. O'DELL:  Thank you.
22    A   Yes, I do.
23    Q   (BY MR. ZELLERS) Camargo.  Take a look, if
24  you will, you know, on page 1216.  The second
25  paragraph above "Conclusion," does Camargo and the

Page 328

1   author state, Further limitation of our analysis was
2   its inability to account for nonoccupational risk
3   factors for ovarian cancer other than age?
4     A   Yes, I do see that.
5     Q   On page 25 -- I'm sorry -- 1215.  So the
6   page before the second paragraph under "Discussion,"
7   they talk about Edelman 1992; is that right?
8     A   Yes.
9     Q   And the authors state, They concluded,
10  however, that despite the positive and significant
11  association, there was insufficient information to
12  infer that ovarian cancers were caused by
13  occupational exposure to asbestos --
14    A   I -- I'm sorry.  I --
15    Q   Sure.
16    A   -- I -- I'm lost.  Where are we?
17    Q   Okay.  So do you see under "Discussion" --
18    A   Yes.
19    Q   -- the second paragraph --
20    A   Yes.
21    Q   -- I believe the second sentence?  It
22  says, They concluded.
23        Are you with me?
24    A   Yes.  They are describing another
25  meta-analysis --

Page 329

1     Q   Yes.
2     A   -- they concluded, yes.
3     Q   This -- this is a review of different meta
4   --
5     A   Yeah.
6     Q   -- analyses; is that right?
7     A   Yes.
8     Q   And they're describing Edelman 1992.  And
9   they state, They concluded, however, that despite
10  the positive and significant association, there was
11  insufficient information to infer that ovarian
12  cancers were caused by occupational exposure to
13  asbestos because of concerns about tumor
14  misclassification, inappropriate comparison
15  populations, and the failure to take into account
16  for known risk factors.
17        Is that right?
18    A   You're reading from Camargo, who is
19  quoting from a discussion by Edelman, so that --
20  that's what it says.  I -- I don't -- I don't know
21  that that's what Edelman says, but -- but yes,
22  that's the...
23    Q   Wouldn't you expect to find higher rates
24  of other cancers in women using talc, like
25  mesothelioma, if they are being exposed to

Rebecca Smith-Bindman, M.D.

Page 330

1    substantial amounts of asbestos?
2         MS. O'DELL:  Object to the form.
3         A   I -- I'm confused.  I'm confused.  Are you
4    saying women exposed to asbestos are not getting
5    mesothelioma?
6         Q   (BY MR. ZELLERS) Well, let me ask it this
7    way:  Are -- are women who use talc in the perineal
8    region at greater risk of mesothelioma?
9         A   I do not know studies that have said that.
10        Q   Are women who use talc in the perineal
11   region at greater risk of asbestosis?
12        A   In the lungs?
13        Q   Yes.
14        A   I -- I do not know those studies.
15        Q   With respect to fragrance chemicals, you
16   have no evidence that the blood or tissue levels of
17   any trace metals are higher in genital talc users
18   compared to nonusers, correct?
19        A   I -- I don't know that literature at all.
20        Q   And you have no knowledge as to either the
21   amount or concentration of different fragrance
22   chemicals in the baby powder, correct?
23        A   I -- I do not.
24        MR. ZELLERS:  Okay.  I have no further
25   questions.  My colleagues may have some questions.

Page 331

1         MS. BOCKUS:  Could we go off the record
2    for just a minute to move the microphone down?
3         THE VIDEOGRAPHER:  The time is 11:16 a.m.
4    We are off the record.
5         (A break was taken from 1:16 a.m. to 11:17
6    a.m.)
7         THE VIDEOGRAPHER:  The time is 11:17 a.m
8    we are now back on the record.
9         EXAMINATION BY COUNSEL FOR THE DEFENDANTS
10   BY MS. BOCKUS:
11        Q   Good morning, Doctor.  I introduced myself
12   yesterday, I hope.  I'm not sure I did.  I'm Jane
13   Bockus.  I represent Imerys in this matter.
14        How are you feeling today?
15        A   I'm good.  Thank you.
16        Q   Have you gone back to work full time since
17   your skiing accident?
18        A   I am primarily a researcher, so I get to
19   choose my own hours.  So I have gone back to work
20   full time, but I often leave work a little earlier
21   and take a rest.
22        Q   Has your injury from your skiing accident
23   affected your ability to answer all the questions
24   you have been asked in the last day and a half?
25        A   It has not.

Page 332

1         Q   Okay.  So when -- if you answered a
2    question, is it because you believe you understood
3    it and that you felt able to answer it?
4         A   Yes.
5         MS. O'DELL:  Object to the form.
6         Q   (BY MS. BOCKUS) Okay.  So before being
7    hired in this case, you had not really looked at the
8    association between talc and ovarian cancer; is that
9    fair?
10        A   That's correct.
11        Q   The person who wrote to you first, do you
12   remember if it was a male or a female, the attorney?
13        A   I think it was women.
14        Q   Okay.  And have you -- tell me what search
15   you have done to locate that person's name.
16        A   I could probably search some more.  I --
17   I -- my correspondence with these lawyers that I
18   have a document of on my computer is from July.
19        But Mike reminded me that I must have met
20   with them in June.  So I could go through -- there
21   are ways I can access older e-mails to look if
22   that's important to you.  I'm happy to try and find
23   that person.
24        Q   I just was curious.  There -- because you
25   have nothing in the published literature about the

Page 333

1    etiology of ovarian cancer, correct?
2         A   I do not.  And I will tell you I asked the
3    person who contacted me what the case was about, was
4    it an area of my expertise.
5         And the person who contacted me, I think,
6    was someone who knew of me from another case.  And
7    it was my researching abilities, not my content
8    expertise, that led her to reach out to me.
9         Q   Okay.  So it was with the understanding
10   that you would start a whole new area of research in
11   order to answer the question; is that correct?
12        MS. O'DELL:  Object to the form.
13        A   Yes.
14        Q   (BY MS. BOCKUS) Okay.  In fact, when you
15   appeared before congress, you stated that you're a
16   clinical radiologist and you conduct research
17   focusing on -- or focused on assessing the risk and
18   benefits of medical imaging, correct?
19        A   If -- if you have my testimony there, I'm
20   going to believe you.
21        Q   And when you have given interviews or have
22   written opinion pieces, you identify yourself as
23   primarily a radiologist who focuses on evaluating
24   the risks and benefits of medical imaging, correct?
25        MS. O'DELL:  Object to the form.

23 (Pages 330 to 333)

Rebecca Smith-Bindman, M.D.

Page 334

1    A   So I have given a lot of interviews, and I
2  often identify as a professor of epidemiology and
3  biostatistics.  I'm not sure what interview that you
4  are looking at.
5        I often -- often introduce myself as a
6  professor of obstetrics, gynecology, and
7  reproductive sciences.
8        And my guess is that whomever is
9  publishing the interview will choose to present me
10 in a way that they think highlights my skill.
11       But -- but my -- I'm a professor in
12 radiology and epidemiology and biostatistics,
13 obstetrics, gynecology, and a member of the Philip
14 R. Lee Institute for Health Policies Studies.
15       So I -- I get presented with whichever of
16 those first the presenter thinks might highlight my
17 expertise.
18    Q   Are you board-certified in obstetrics and
19 gynecology?
20    A   I'm not.
21    Q   The Bradford Hill criteria, the first
22 consideration is the "strength of the association";
23 is that correct?
24    A   First criteria?  Yes.
25    Q   What do you consider to be a strong

Page 335

1  association?
2    A   So it overlaps a little bit with the
3  second concept of Bradford Hill in the consistency
4  of -- of the data.
5        But where the association is meaningfully
6  and legitimately documented across study designs and
7  patient populations such that the association is
8  believable and meaningful, not necessarily
9  associated with a particular point estimate of
10 association, if that's the question.
11       I don't have any particular number.  It's
12 rather the entirety of the relationship, that it's a
13 meaningful quantifiable association.
14    Q   Do you teach epidemiology?
15    A   I do.
16    Q   Can you identify textbooks that you find
17 reliable on the subject of epidemiology?
18    A   The textbook that I often use to teach
19 epidemiology is a book -- I -- I'm not sure if the
20 authorship has changed over the years, but by holly
21 Cummings that talks about principles of
22 epidemiology.  It's sort of the clearest version
23 that I know.
24       And -- and they -- and I haven't looked
25 this particular question up, but they wouldn't talk

Page 336

1  about a quantitative association, but rather, the
2  biases and legitimacy of the association.
3    Q   Are you familiar with the text "Analysis
4  of Case-Control Studies" by Breslow and Day?
5    A   I -- I -- yes.
6    Q   Do you find that to be a reliable text on
7  the subject of the analysis of case-control studies?
8        MS. O'DELL:  Object to the form.
9    A   I -- I don't know that chapter or section
10 enough to answer that question without looking at
11 it.
12    Q   (BY MS. BOCKUS) But you're familiar with
13 their work?
14    A   Yes.
15    Q   And they're well-respected
16 epidemiologists?
17    A   Yes.
18        MS. O'DELL:  Object to the form.
19    Q   (BY MS. BOCKUS) You make a statement in
20 your report on page 12 that the most widely accepted
21 mechanism for initiation, promotion, and progression
22 of ovarian cancer is tissue inflammation leading to
23 a series of responses that result in cancer.
24        And you have talked about that sentence a
25 bit with Mr. Zellers already.

Page 337

1        Did you do a survey of the literature to
2  determine what was the most widely accepted
3  mechanism for initiation of ovarian cancer?
4    A   I did.
5    Q   And did you do a survey of the cancer
6  biology literature?
7        MS. O'DELL:  Object to the form.
8    A   What was the first literature you asked me
9  about?
10    Q   (BY MS. BOCKUS) The literature that
11 supported your statement that the most widely
12 accepted mechanism was inflammation.
13       And you said you did a survey on the
14 inflammation literature -- or I mean on the
15 etiology -- let me start all over again.
16       Have you done a survey on articles that
17 discuss the likely mechanism for the etiology of
18 ovarian cancer?
19    A   Yes, I have .
20    Q   Have you -- have you -- did your survey
21 include the literature on the cancer biology --
22    A   Yes.
23    Q   -- of --
24    A   Yes, it did.
25    Q   -- of ovarian cancer?

24 (Pages 334 to 337)

Rebecca Smith-Bindman, M.D.

1     A   Yes, it did.
2     Q   And did you find that as the issue of
3   inflammation as an initiator of ovarian cancer is
4   not a settled question?
5         MS. O'DELL:  Object to the form.
6     A   I -- I would acknowledge that -- that none
7   of it is settled.  It's just the most widely
8   accepted, most widely supported, most wide -- widely
9   enhanced view supported by the data, but I don't
10  think the issue is settled.
11    Q   (BY MS. BOCKUS)  In fact, there's still
12  considerable research going on on the subject --
13    A   Yes --
14    Q   -- correct?
15    A   -- I think there is.
16    Q   In the next paragraph you talk about, for
17  example, this is the middle -- there are
18  well-described and accepted causal pathways
19  linking in -- linking inflammation to bladder
20  cancer, gastric cancer, colon cancer, et cetera.
21        You would agree and you identify the
22  inflammatory sometimes virus or whatever that's --
23  that's well described and accepted for all of the
24  different cancers that you list there, correct?
25        For example, you identify toxic chemicals

1   for the etiology of bladder cancer, correct?
2         MS. O'DELL:  Object to the form.
3     Q   (BY MS. BOCKUS)  Do you see where I'm
4   reading?
5     A   I -- I don't see where you're reading
6   exactly, but -- but I agree with you that I have
7   given examples where we know the cause of the
8   inflammation for many of those cancers.
9     Q   (BY MS. BOCKUS)  You would agree that there
10  is no equivalent literature linking ovarian cancer
11  to talcum powder use, correct?
12        MS. O'DELL:  Object to the form.
13    A   I think there's a strong literature on
14  components of the analysis.  But I think for several
15  of the examples I have given, the data are a little
16  bit clearer and further along.
17        So path -- HPV and cervical cancer has a
18  longer historical data collection period when we
19  have them --
20    Q   (BY MS. BOCKUS)  And --
21    A   -- identified.  So I think that's your
22  question.
23    Q   -- so the strength of the association
24  between HPV virus and cervical cancer is much, much
25  stronger than any association that's been reported

1   with body powder use and ovarian cancer, correct?
2         MS. O'DELL:  Object to the form.
3     A   I -- I'm going to go back to say that I --
4   I don't know what the strength of the association is
5   with -- with these individual cancers.
6         I -- I don't know if it's a 20 percent
7   increase or a 500 percent increase, except for the
8   one that I gave the example of of bladder cancer.
9         So for bladder cancer, I gave two examples
10  that cause inflammation of the bladder.  One being
11  toxic chemicals and the second being cigarette
12  smoking.
13        The toxic chemicals have a very strong
14  relative risk of 200 or 300, where I think smoking
15  has a relative risk of more like 1.3.
16        And so I -- I -- I don't know it for these
17  other cancers.  But at least for bladder cancer,
18  which I think is -- I think the second most common
19  cancer and cigarette smoke is -- I think the
20  association in the ballpark of 1.3.
21        I think I have it in here.  But -- so for
22  most of these, I don't know what that number is.
23        MS. BOCKUS:  I'm going to object as
24  nonresponsive.
25    Q   (BY MS. BOCKUS)  Because the question I

1   asked was about the HPV virus and cervical cancer --
2     A   I don't --
3     Q   -- correct?
4     A   -- know the -- the relative --
5     Q   All right.
6     A   -- risk for that.  But I -- I thought I
7   said the only one I do know is the bladder cancer
8   numbers.
9     Q   Has your methodology in determining what
10  studies to include and what studies to exclude been
11  peer reviewed in any way, shape, or form?
12    A   It has not.
13    Q   Has your math --
14    A   Oh, I'm sorry.  Has my methodology been
15  peer reviewed?
16    Q   In -- in this particular case, the method
17  --
18    A   Okay.  The method has been peer reviewed.
19  But in this particular case, it has not.
20    Q   So no one has looked over your report and
21  determined whether your decision -- and as I
22  understand it, it was your decision alone, correct,
23  as to whether to include data from a particular
24  study or not --
25    A   Again --

25 (Pages 338 to 341)

Rebecca Smith-Bindman, M.D.

Page 342

```
1       Q   -- and --
2       A   -- it was a decision between myself and
3   the -- and -- and -- and Dr. Hall --
4       Q   So --
5       A   -- just the two of us.
6       Q   -- okay.  So did Dr. Hall participate in
7   the decision-making process as to which of the
8   case-control studies and the cohort studies to
9   include and which to exclude?
10      A   It -- so it's -- it's a -- the answer is
11  partly and partly not.
12          So in terms of whether the studies were
13  included in the final analysis, Dr. Hall was
14  involved in that decision.
15          But in terms of setting up the question to
16  begin with, she was not involved in that.  I -- I
17  set that up.
18      Q   So other than you and Dr. Hall, has anyone
19  been involved in the process of determining which
20  studies were going to be involved -- in -- were
21  going to be included in your systematic review and
22  which were not?
23      A   Nobody else.
24      Q   Okay.  And has anyone other than you and
25  Dr. Hall even checked your work for transcription
```

Page 343

```
1   errors?
2           MS. O'DELL:  Object to the form.
3       A   No.
4       Q   (BY MS. BOCKUS) And has anyone other than
5   you and Dr. Hall checked your work for mathematical
6   errors?
7       A   No.
8       Q   You excluded all of the data from the
9   cohort studies with the exception of the earliest
10  reported data from the Nurses' Health Study; is that
11  correct?
12      A   Yes.
13          MS. O'DELL:  Object to the form.
14      Q   (BY MS. BOCKUS) Did you run the -- the --
15  the numbers to determine if there would be a
16  difference if you included the data from all the
17  cohort studies and if you excluded them?
18      A   So the requirement to be in our review was
19  to have a measure of regular use of talcum powder
20  products, and those other studies didn't have
21  something to plug into that equation.
22          So -- so I didn't have a number from those
23  studies to include in a sensitivity analysis.  They
24  -- they didn't report regular use, so I -- I
25  couldn't do what you are asking me to have done.
```

Page 344

```
1       Q   Would you agree that you're -- at this
2   point in time your report is not yet ready to be
3   submitted for peer review?
4           MS. O'DELL:  Object to the form.
5       A   I would agree that the description in this
6   report needs more detail, more -- to submit it to
7   peer review.  Not necessarily different work, but
8   definitely different detail and description.
9       Q   (BY MS. BOCKUS) Have you satisfied
10  yourself that the studies that you did include do
11  not overlap with regard to patients; that you
12  haven't counted the same patients multiple times?
13      A   I -- I am comfortable that I did my best
14  to do that.  But I know there were some cases where
15  I felt like I wasn't 100 percent sure.
16      Q   And you would agree that by -- including
17  the same cases and controls multiple times could
18  skew the -- the data?
19          MS. O'DELL:  Object to the form.
20      A   I think that that theoretically is a
21  concern of mine, which is why I try to you exclude
22  them if there was overlap.
23          On a practical level, the benefit of
24  pooling data from multiple sources is that the final
25  summary is less sensitive to any individual result,
```

Page 345

```
1   let alone some patients that might overlap.
2           But I agree with you that you want to
3   avoid that because of that concern.
4       Q   (BY MS. BOCKUS) All right.  Would you turn
5   to page 35 of your study.  And I am looking at
6   the -- right in the middle of the page, the
7   paragraph that starts with the word, Further talc
8   particles.
9           But I'm going to the last sentence in the
10  paragraph.
11          "The greater frequency at which talc
12  particles are discovered in ovarian cancerous tissue
13  than in normal ovarian tissue further supports that
14  these target -- particles may be causing cancer."
15          You don't have a source for that.  You
16  don't cite to any study.  And I would like to know
17  where you got that information.
18          MS. O'DELL:  Objection to the form.
19      A   I would have to review Heller and
20  Henderson.  No.  Henderson is just cancer.
21          So I would have to review -- review
22  Heller, but that -- I -- I -- I don't remember what
23  the -- cite of it.  I would have to look at the
24  articles that I cite in that paragraph and see if I
25  could remember.
```

26  (Pages 342 to 345)

Rebecca Smith-Bindman, M.D.

Page 346

1      Q    (BY MS. BOCKUS) The next statement has to
2  do with the reduction in incidence of ovarian cancer
3  after tubal ligation or hysterectomy?
4      A    Yes.
5      Q    Is it not correct that that statement is
6  true for both women who have used talcum powder
7  product and who -- let me ask a better question.
8          Here you're talking about that the
9  elevated -- that studies that look at the risk of
10 ovarian cancer associated with powder products
11 report a reduction in risk after hysterectomy or
12 tubal ligation, correct?
13     A    Yes.
14     Q    Isn't that also true in the general
15 population for all women, that there -- whether they
16 have used talcum powder products or not, that their
17 risk of ovarian cancer is reduced by hysterectomy or
18 oophorectomy --
19     A    Yes.
20     Q    -- or tubal ligation?  I'm sorry.
21     A    Yes.  It's even more reduced by
22 oophorectomy.
23     Q    Well, sure.  I misspoke.
24         MS. BOCKUS:  I believe that's all the
25 questions I have.  Thank you.

Page 347

1          MS. O'DELL:  Why don't we go off the
2  record.  I'm sorry.  Do you --
3          MR. ZELLERS:  No.
4          MR. BILLINGS-KANG:  I may have two or
5  three questions.
6          MS. O'DELL:  Oh, sorry, James.  Yeah,
7  please.
8          THE VIDEOGRAPHER:  We are still on?
9          MS. O'DELL:  Yes.
10         THE VIDEOGRAPHER:  Do we want to go off?
11         MR. BILLINGS-KANG:  Yeah.
12         MS. BOCKUS:  We need to go off to move the
13 mic.
14         THE VIDEOGRAPHER:  The time is 11:37 a.m.
15 We are going off the record.
16         (A break was taken from 11:37 a.m. to
17 11:40 a.m.)
18         THE VIDEOGRAPHER:  The time is 11:40 a.m.
19 We are now back on the record.
20         EXAMINATION BY COUNSEL FOR THE DEFENDANTS
21 BY MR. BILLINGS-KANG:
22     Q    Good morning, Dr. Smith-Bindman.  How are
23 you?
24     A    Good.
25     Q    My name is James Billings-Kang.  I'm an

Page 348

1  attorney who represents Defendant Personal Care
2  Products Council.
3          So for purposes of this deposition when I
4  reference "Personal Care Products Council," I mean
5  PCPC or CPFA or any of its predecessors.  Is that
6  okay?
7      A    Yes.
8      Q    So I want to turn to Exhibit 15, which is
9  your reference list.  And that reference list is
10 Exhibit B of your expert report; is that correct?
11     A    Yes.
12     Q    And if you can turn to page 19 of that
13 reference list.  And just let me know when you're
14 there.
15     A    I am there.
16     Q    And if you go about 75 percent of the way
17 down, there's a reference to a PCPC document.
18         Do you see that?
19     A    Yes.
20     Q    Do you happen to know what that document
21 is?
22     A    I do not.
23     Q    Did you rely on this document --
24     A    You would have to --
25         MS. O'DELL:  Object to the form.  Excuse

Page 349

1  me.  Object to the form.  If -- if --
2      A    -- you would have to tell me what it is to
3  know if --
4          MS. O'DELL:  -- or show it to her if
5  you --
6          MR. BILLINGS-KANG:  Sure.
7          MS. O'DELL:  -- have a question about it.
8      Q    (BY MR. BILLINGS-KANG) But for purposes of
9  formulating your opinion in the expert report, did
10 you rely on any PCPC-produced documents?
11         MS. O'DELL:  Object to the form.
12     A    You would have to show --
13         MS. O'DELL:  Put --
14     A    -- it to me.
15         MS. O'DELL:  -- just put it in front of
16 her if you're going to ask her a question about it
17 so she can --
18     Q    (BY MR. BILLINGS-KANG) I'm just asking:
19 Based on your memory, do you recall using any
20 PCPC-produced document to formulate your opinion.
21         MS. O'DELL:  I would -- I would just
22 object to the form.
23     Q    (BY MR. BILLINGS-KANG) That's --
24         MS. O'DELL:  None of --
25     Q    (BY MR. BILLINGS-KANG) -- that's fine.

27 (Pages 346 to 349)

Rebecca Smith-Bindman, M.D.

Page 350

1    You can answer --
2         MS. O'DELL:  None of that --
3         Q    (BY MR. BILLINGS-KANG) -- yes or no, if
4    you remember.
5         MS. O'DELL:  -- none of us would be
6    expected to remember a document based on a Bates
7    number.
8         Q    (BY MR. BILLINGS-KANG) Well, I'm asking
9    her just generally PCPC-produced documents, if she
10   relied on any of those --
11        MS. O'DELL:  Objection.
12        Q    (BY MR. BILLINGS-KANG) -- to formulate her
13   opinion?
14        MS. O'DELL:  Object to the form.  I'm
15   putting that --
16        MR. BILLINGS-KANG:  Sure.
17        MS. O'DELL:  -- that Bates number in front
18   of her.  And if you --
19        MR. BILLINGS-KANG:  Sure.
20        MS. O'DELL:  -- remember, you remember.
21        A    This is a document that lists different
22   research studies that have been done over time.  Is
23   that the document that we're --
24        Q    (BY MR. BILLINGS-KANG) Well, I -- I'm not
25   too sure.  This is a document you listed in the

Page 351

1    reference list.
2         A    I -- I'm just trying to make sure that I'm
3    looking at the document that you are --
4         Q    According to your counsel, this is what's
5    been identified on page 19 of the reference list.
6         A    I -- I do not remember this document.
7    This --
8         Q    Okay.
9         A    -- document is just a list of studies.
10        Q    So you do not recall whether you relied on
11   this document in formulating your opinion?
12        A    My --
13        MS. O'DELL:  Object to the form.
14        A    -- opinion is not based on the -- on a --
15   a list of studies.
16        Q    (BY MR. BILLINGS-KANG) Okay.  So that's --
17   that's a -- that's a yes, you do not -- you did not
18   rely on this document in formulating your opinion?
19        A    I -- I don't remember seeing this
20   document.  As I'm going through this document, there
21   are a lot of studies that I reviewed that I did rely
22   on.
23        So I don't know if you're asking me if I
24   relied specifically on some of the items in here
25   that I have relied on or the -- this document

Page 352

1    itself.
2         Q    Just --
3         A    I don't remember --
4         Q    -- the document --
5         A    -- seeing --
6         Q    -- itself.
7         A    -- this -- I don't remember seeing this
8    document.
9         Q    Okay.  You can -- you can put that away.
10   And I will go to your expert report that's
11   Exhibit 2, page 14.  Just let me know when --
12        A    I'm there.
13        Q    -- you're there.  And this -- the first
14   paragraph under "Asbestos," it's about halfway in
15   that first paragraph beginning with, Because of
16   concern that asbestos was present in talcum powder
17   products in the known carcinogenicity of asbestos,
18   it has been reported that voluntarily guidelines
19   were established by the cosmetic industry in 1976 to
20   limit the content of asbestos fibers in commercial
21   talc preparations.
22        Did I read that correctly?
23        A    You did.
24        Q    And these are your words, correct?
25        A    Yes, they are.

Page 353

1         Q    And what did you mean by "voluntarily
2    guidelines"?
3         A    I -- I have read a lot about the
4    guidelines.  And it -- the idea was that the
5    industry decided to self-regulate and to do what
6    they could to remove the asbestos, is my
7    understanding of what that was as opposed to being
8    required to submit testing to document that they had
9    done so.
10        Q    And -- and what did you rely upon for this
11   particular sentence?
12        A    This particular sentence is repeated in --
13   in at least half of the papers that I have read that
14   are epidemiology papers.
15        It's repeated in all of the news studies.
16   It's repeated in reports by consumer organizations,
17   by the FDA, by the recent Canadian report, which I
18   didn't have in hand.
19        But it's something that I -- I have read a
20   lot -- a great deal, that there were voluntarily
21   standards that were established by the industry.
22        Q    And so did you read any publication or
23   whatever reliance materials that you had that
24   described these guidelines as anything else other
25   than voluntarily guidelines?

28 (Pages 350 to 353)

Rebecca Smith-Bindman, M.D.

Page 354

1    A   I -- I -- I did not.  I looked for
2   documents like that.  I was not able to find them.
3   Required -- requirements, I was not able to find.
4          MR. BILLINGS-KANG:  Okay.  That's all I
5   have.
6          MS. O'DELL:  Why don't we take a short
7   break.
8          THE VIDEOGRAPHER:  The time is 11:45 a.m.
9   We are now off the record.
10         (A break was taken from 11:45 a.m. to
11  12:15 p.m.)
12         THE VIDEOGRAPHER:  The time is 12:15 p.m.
13  We are now back on the record.
14         EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
15  BY MS. O'DELL:
16     Q   Dr. Smith-Bindman, I have just a few
17  questions for you.  First, during all of your work
18  in this case, was it your understanding that you
19  were serving as an expert consultant?
20     A   Yes.
21     Q   And you know, throughout the early
22  meetings in June, I believe, of 2017, where you met
23  with Plaintiffs' counsel, did Plaintiffs' counsel
24  provide information regarding their theories of the
25  talcum powder litigation?

Page 355

1    A   Yes.
2    Q   And have you been paid by Plaintiffs'
3   counsel for all the work that you have billed in
4   this case?
5    A   Yes, I have.
6    Q   Okay.  You have been asked a number of
7   questions about the meta-analysis, the systematic
8   review that you performed on the regular use of --
9   of talcum powder.
10         Would you have reached your opinions in
11  this case without having performed that analysis?
12     A   My systematic review ended up with the
13  same estimates as essentially all of the other
14  well-done systematic reviews.
15         And it was very helpful for me to confirm
16  the results.  But yes, it's the same as the other
17  studies, and so my -- my conclusion about the
18  causality of talcum powder products and ovarian
19  cancer would be exactly the same, even without mine.
20         It just made me a little more comfortable
21  that I was certain about the -- the results
22  presented by other people.
23     Q   And in a sense, the analysis that you did
24  replicated the work that had been published in the
25  -- in the literature?

Page 356

1          MR. ZELLERS:  Objection, form.
2    Q   (BY MS. O'DELL) Let me strike that and
3   start again.  Did your meta-analysis replicate what
4   had been published in the literature?
5    A   The --
6          MR. ZELLERS:  Form.
7    A   -- the results of my meta-analysis and the
8   previous ones are nearly identical.  So yes, it was
9   a very close replication.
10     Q   (BY MS. O'DELL) And you have mentioned
11  your intent to publish your -- your meta-analysis,
12  your systematic review.  And I believe you testified
13  that in the published version, you would add
14  additional detail.
15         What did you mean by that?
16     A   So the analysis that I have done is
17  complete.  But the presentation of the results in a
18  paper would require more beautiful graphics, would
19  require explaining our inclusion and exclusion
20  criteria more fully than I did in this published
21  report.  Things like that.
22         And that actually is a substantial part of
23  the writing of a scientific paper, sort of
24  explaining every step of what you did, and so I
25  would have to do more of that to publish this study.

Page 357

1    Q   Is there sufficient detail in the -- in
2   your report regarding your methodology, as well as
3   in the documentation provided in the spreadsheets
4   to -- for someone to replicate the work that you
5   have done?
6          MR. ZELLERS:  Objection, form.
7    A   I believe that if someone used the
8   software that we said and had the inclusion criteria
9   that we led out -- set out, that they would get the
10  -- the same results as we got.
11         And I think the fact that our review
12  provides the same results as other systematic
13  reviews sort of, you know, also supports that.  But
14  yes, I think someone could easily replicate our --
15  our analysis.
16     Q   (BY MS. O'DELL) Okay.  You were asked a
17  number of -- before I do that, let me ask you:  Can
18  there be multiple causes of ovarian cancer?
19     A   Absolutely.  I -- I describe in the
20  report, a whole number of different risk factors for
21  ovarian cancer.
22     Q   And in a -- in a patient -- hypothetically
23  in a patient who has a BRCA1 mutation, possibly has
24  other risk factors for ovarian cancer, and also uses
25  talcum powder products, under those circumstances,

29 (Pages 354 to 357)

Rebecca Smith-Bindman, M.D.

Page 358

1  would talcum powder products be a contributing cause
2  of her cancer?
3         MR. ZELLERS: Objection, form.
4     A  I think patients can have multiple risk
5  factors and causes of -- of cancer. Some causes,
6  you would imagine, would be quite synergistic.
7         So having both together would be worse
8  than twice having either of those alone. So it
9  would be worse than having -- it -- it would be more
10  than double the initial, because they would be
11  basically enhancing.
12         So if -- if some risk factors caused lots
13  of oxidative stress and another enhanced that
14  oxidative stress and prevented repair or cell
15  apoptosis, you would get even more impact.
16         So yes, I would say multiple risk factors
17  for most diseases occur concurrently, and sometimes
18  they enhance or are synergistic.
19     Q  (BY MS. O'DELL) Can asbestos be inhaled
20  and cause ovarian cancer?
21         MR. ZELLERS: Objection, form; foundation.
22     A  Absolutely. The -- the IARC 2012 report
23  was primarily on the basis of inhalation of
24  asbestos.
25     Q  (BY MS. O'DELL) Can fibrous talc be

Page 359

1  inhaled and cause ovarian cancer?
2     A  I --
3         MR. ZELLERS: Objection, form; foundation.
4     A  -- yes.
5     Q  (BY MS. O'DELL) And what's your basis for
6  that statement?
7         MR. ZELLERS: Same objections. None of
8  this was in her report. None of this has been in
9  her opinions.
10         These are all new opinions. So inhalation
11  has not been any part of her testimony or her
12  opinion.
13         MS. O'DELL: Inhalation is mentioned in
14  her report.
15     A  I -- I -- you know, the -- the chapter on
16  asbestos and occupational exposure and IARC report
17  is -- is about inhalation.
18         I'm not sure if I -- I was explicit about
19  the route, but that is where the data come from for
20  asbestos, as well as fibrous talc.
21         And those articles talk about the fact
22  that there might be other exposures in addition, but
23  they're primarily inhalation studies.
24         MR. ZELLERS: Again, object to what the
25  defense views as a completely new opinion that was

Page 360

1  not disclosed in Dr. Smith-Bindman's expert report.
2     A  Can I read? Just on page 14, The results
3  were consistent, significant, and documented a
4  strong and compelling causal association between
5  exposure to asbestos and ovarian cancer largely
6  result in the association from cohort studies of
7  women with substantial occupational exposures.
8         That -- that was the --
9     Q  (BY MS. O'DELL) Okay. Let me -- let me
10  ask you to -- to turn, Dr. Smith-Bindman, to the
11  Langseth paper that was marked as Exhibit 30 by
12  counsel for J&J.
13         And specifically to turn to page 2 of the
14  paper to Figure 1.
15     A  Yes.
16     Q  You were asked a number of questions about
17  whether the studies that had confidence intervals
18  that cross one were essentially by chance. In other
19  words, they -- they did not speak to a potential
20  increased risk in ovarian cancer as a result of
21  talcum powder use.
22         Are the -- what's your analysis of those
23  studies and whether, as counsel put it, it was
24  equivalent to a coin toss?
25     A  So if there was no relationship between

Page 361

1  ovarian cancer and exposure to talcum powder
2  products, you would expect the forest plot in
3  Figure 1 to have half of the point estimates be
4  above one, saying there's a risk; and half of the
5  point estimates being below one, saying there isn't
6  a risk.
7         In fact, every one of the studies on this
8  table is at or above one. It's to the right. So to
9  get that by chance is highly, highly, highly
10  unlikely.
11         The best estimate is -- the point estimate
12  in all of those are very different than one.
13         And so to call that by chance doesn't make
14  sense. The fact that for an individual study, the
15  confidence interval overlap one doesn't mean it's by
16  chance.
17         So again, by chance would mean half the
18  studies have a positive association, half have a
19  protective.
20         And in fact, every one of the studies has
21  a value that's either substantially greater than one
22  or just a little greater than one.
23     Q  Okay. You were asked questions about
24  starting -- in reference to the Langseth paper you
25  were asked questions about the -- the pooled odds

Rebecca Smith-Bindman, M.D.

Page 362

1 ratio for hospital-based studies and the focus on
2 that finding being that it was not a statistically
3 significant increased risk.
4         Did the Berge paper also look at a pooled
5 analysis of the hospital-based studies?
6      A   She did.  If you look at Table 2, Table 2
7 shows the results of the case-control studies that
8 were hospital based versus community based.
9         And those individual group of
10 hospital-based studies are statistically
11 significant.
12        But I would point out that in this case
13 the -- they report the relative risk of a hospital
14 based versus community based.  They're relatively
15 similar.  They're both significant, and they're
16 relatively similar, which is what I concluded from
17 Langseth.  They're very similar.
18     Q   Okay.  You were asked about studies
19 relating to migration.  And the specific -- the
20 specific question, as I wrote it down was:  Is there
21 a study that demonstrates talc on the -- applied to
22 the perineum, traveling to the -- or migrating to
23 the ovary, and you said, No.
24        What evidence are you relying on to
25 support your opinion that talcum powder can migrate

Page 363

1 when applied -- applied to the genital area to the
2 ovary?
3      A   So I was asked a very narrow question, is
4 there a study that talks about transport from the
5 perineum.
6        But in fact, there is extensive evidence
7 that particles from the perineum could get to the
8 ovary and do get to the ovary.
9        And part of that is the perineum is
10 basically equivalent to the vagina.  It is one open
11 system to the ovary.
12        And so my evidence for that is
13 several-fold.  First, I'm a clinical radiologist,
14 and I do a lot of procedures in women where I am
15 putting catheters in the vagina and injecting fluid
16 that goes to the uterus, to the tubes.  I watch the
17 fluid spill.  It's a wide-open system.
18        Occasionally patients have complications
19 that don't let me do that, and I might inject fluid
20 literally on the perineum to get a backlash to the
21 ovaries.  And it's a wide-open connected system.
22        All of our textbooks talk about it being a
23 bi-directional system.  You know, infection goes
24 both directions.  Retrograde menstruation and
25 menstruation go both directions.

Page 364

1         There have been studies of sperm, both
2 living and dead, going in both directions.  So it's
3 not just the mobile sperm, but the dead sperm.
4         Carbon particles -- you know, a tiny
5 study -- but have been shown to move -- radioactive
6 material has been seen to move.  Material on gloves
7 has been seen.
8         So it's a wide-open system.  The idea that
9 we think of that as being a barrier system is just
10 false.
11         Now, I don't know of an individual study
12 that has put talc on the perineum.  I think that's,
13 unfortunately, not an ethical study to do.  And I
14 don't know of such a study or why you would do such
15 a study.
16         But to think that there's any barrier
17 between the perineum and the vagina makes no sense
18 whatsoever.
19     Q   Let me transition to talk about
20 inflammation for a moment, and specifically
21 inflammation as a cause of ovarian cancer first.
22         What evidence are you relying on to
23 support your opinion that inflammation -- chronic
24 inflammation causes ovarian cancer?
25     A   Okay.  So there's an enormous amount of

Page 365

1 literature that understands what we see when there's
2 inflammation, what kind of changes you see on a
3 cellular level.
4         So you see increase in pro oxidation, a
5 reduction in antioxidation.  You see increase in
6 cell turnover, reduction in cell death, expression
7 of inflammatory agents, cellular changes at the DNA
8 level that leads to greater expression.
9         We -- we understand those pathways.  And
10 those pathways occur both with talc exposure and in
11 the setting of things that cause ovarian cancer.
12         So I -- in my reference list, I reference
13 a whole bunch of references -- Saed references,
14 Shawn (phonetic) references, Ness references.
15 There's really enormous numbers of references.
16         I -- in my documents I have Shukla
17 references, BuzZard references, Hamilton references
18 that talk away sort of these inflammatory pathways
19 and biologic mechanisms that lead to changes that go
20 along with inflammation.
21     Q   I know you have reviewed Dr. Saed's
22 research in regard to whether talcum powder causes
23 inflammation in vitro.
24         First, let me ask you this:  Does
25 Dr. Saed's work support the conclusion that

31 (Pages 362 to 365)

Rebecca Smith-Bindman, M.D.

Page 366

1  Johnson's baby powder causes inflammation?
2      MR. ZELLERS:  Objection, form.
3      A   So Saed specifically looked at Johnson
4  baby powder, so his results specifically pertained
5  to Johnson baby powder.
6          He looked at several different measures
7  that -- I have just mentioned inflammation.  So he
8  looked specifically at oxidative stress, the up
9  regulation or down regulation of --
10         THE COURT REPORTER:  The?
11     A   -- up regulation or pro oxidants, down
12 regulation of antioxidants.  He looked at cell
13 proliferation.  He looked at SNPS point mutations
14 that are associated with this.
15         THE COURT REPORTER:  Snips?
16     A   S N P S, SNPS.
17         THE COURT REPORTER:  Because you're facing
18 that way, and the mic is here.  Thanks.
19     A   And showed substantial changes to talcum
20 powder to all of these.  I -- I was really quite
21 impressed with the consistency in these markers of
22 inflammation.
23         Some of them overlap clinical markers we
24 use.  Like CA125 went up very strongly just like it
25 goes up for ovarian cancer.

Page 367

1          So he very clearly showed this.  And the
2  results he showed were not different than those that
3  Shukla showed, that BuzZard showed, that -- the
4  expression in genes.
5          He -- he just had it in a very compelling
6  experiment where he showed dose response, where he
7  showed the control didn't have the changes, but that
8  the talc powder products did have the changes.
9          And so he identified, in this cellular
10 cell line model, all of the changes that you would
11 expect from inflammation.  So I think the results
12 were very compelling.
13         I -- I was asked if kind of that
14 experiment has any relevance in humans.  And I would
15 say it would be nice to do that experiment in
16 humans.
17         But you can't do that experiment in
18 humans.  And that's what --
19         THE COURT REPORTER:  Wait.
20     A   -- you can't do such an experiment in
21 humans.  So -- so that is what sort of cellular
22 studies are -- are meant to approximate.
23         There's no direct translation, so how much
24 you put in the cell versus how much you put in the
25 patient, I -- you know, I don't know how you would

Page 368

1  do that.  That's beyond me.  But that's what this
2  whole model is, to try to help you understand what
3  the effect mechanistically is from these changes.
4      Q   (BY MS. O'DELL) And is the use of that
5  model in scientific research generally accepted?
6      A   Highly.
7          MR. ZELLERS:  Objection, form.
8      A   My understanding is that is the basis for
9  much of the research that comes -- that happens at
10 my research institution.
11     Q   (BY MS. O'DELL) Just to make sure that the
12 record is clear, Dr. Smith-Bindman, in -- I asked
13 the question:  Is the use of that model in
14 scientific research generally accepted?  I'm not
15 sure your answer came through.  What's your answer?
16         MR. ZELLERS:  For your -- just objection,
17 form.  Go ahead.
18     A   Yes.  I -- I said that that's a very
19 common model at UCSF.
20     Q   Okay.
21         MS. O'DELL:  I have nothing further.
22 Thank you.
23         MR. ZELLERS:  Let's take a break for a
24 couple of minutes.
25         THE VIDEOGRAPHER:  The time is 12:34 p.m.

Page 369

1  We are now off the record.
2          (A break was taken from 12:34 p.m. to
3  12:41 p.m.)
4          THE VIDEOGRAPHER:  The time is 12:41 p.m.
5  We are now back on the record.
6          EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7  BY MS. BOCKUS:
8      Q   Doctor, you made a comment about the fact
9  that there can be a synergistic effect between
10 different risk factors; is that correct?
11     A   Yes.
12     Q   That is something that can be studied,
13 correct?
14     A   Yes.
15     Q   There are studies that can be designed to
16 determine whether there's a synergistic effect
17 between, say, BRCA mutation carriers and women who
18 have regularly used talcum powder --
19     A   Yes.
20     Q   -- correct?
21         That study has not been done, correct?
22     A   Not that I know of.
23     Q   In fact, are you familiar or aware of any
24 studies that have looked for a synergistic effect
25 between regular talc use and any other risk factors

Rebecca Smith-Bindman, M.D.

Page 370

1  for ovarian cancer?
2      MS. O'DELL:  Object to the form.
3      A   I would have to look through my papers
4  with that question in mind.  I know some of the
5  papers have looked at BRCA, but I can't remember if
6  they sort of stratified the results by -- with or
7  without BRCA, so I -- I'm not sure of the answer to
8  that.
9          I was more speaking about, from work that
10 I do, the idea of synergy between risk factors.  And
11 one of those is BRCA and radiation exposure.  So
12 I -- I -- I meant generally it can be the case.  I
13 didn't mean to suggest we know what it is for this.
14     Q   (BY MS. BOCKUS) Okay.  Then you spoke
15 about the female reproductive system being a
16 wide-open system.
17         What procedure are you doing when you are
18 putting fluid on a women's perineum to see if it
19 goes to the ovaries?
20     A   I apologize.  So the primary procedures
21 would be a hysterosonogram, which we're putting
22 water into the uterus and the tubes mostly to look
23 for patency.
24         But it turns out we end up needing to do
25 procedures in postop patients, not infrequently,

Page 371

1  where we might be looking for connections between
2  different structures, preop or postop.
3          In the ballpark of 10 percent of women to
4  20 percent have cervical stenosis, and you can't
5  catheterize.
6          Or there might be some reason we don't
7  want to catheterize or put the tubes in the vagina.
8  We might put the tube directly on the perineum and
9  see if we can create kind of a -- a way to keep,
10 let's say, a balloon in place and then inject in a
11 retrograde fashion.
12         So it feels like it comes out probably
13 every couple of months.  But we're actually pretty
14 far from the cervix.  And we're injecting usually
15 water or sometimes contrast and then looking mostly
16 with ultrasound, but sometimes with fluoroscopy.
17     Q   And when you say "inject," that means with
18 some degree of pressure, you're putting the water or
19 other fluid into the vagina?
20     A   There is some degree of pressure, yes.
21     Q   And when you do that, is the patient's
22 head lower than her hips?
23     A   Not -- not usually, no.
24     Q   Is she on her back?
25     A   Yes.

Page 372

1      Q   Do you know if anything about what you
2  just described has any correlation to the way in
3  which women use talcum powder in their perineal
4  region?
5      MS. O'DELL:  Object to the form.
6      A   I -- I don't know what -- how women use
7  talcum powder on their perineum.
8      Q   (BY MS. BOCKUS) Do you know what
9  percentage of sperm that are placed in a women's
10 vagina make it to the ovaries?
11     A   Only from child cartoons that make it seem
12 like it's a competitive race.  But percentagewise, I
13 don't know.
14     Q   Do you have any reason to believe that
15 talc makes it from the vagina to the ovaries in
16 greater percentage than sperm?
17     A   I -- I -- I would guess that that's not
18 the case.
19     MS. BOCKUS:  That's all I have.
20     MR. ZELLERS:  I have just a couple.
21     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
22 BY MR. ZELLERS:
23     Q   Dr. Smith-Bindman, did you discuss with
24 Plaintiffs' counsel, calling Dr. Hall on our break
25 between yesterday's first session and today's

Page 373

1  session?
2      MS. O'DELL:  I'm going to ask -- ask
3  you -- instruct you not to answer questions
4  regarding discussions with counsel.
5      MR. ZELLERS:  The defense agreed to split
6  this deposition of Dr. Smith-Bindman over two days
7  on the expressed condition that the extended break
8  not be used for preparation.
9          The witness and Plaintiffs' counsel
10 violated that understanding.  Further, it's entirely
11 inappropriate for an expert witness to consult with
12 a consulting expert during a break.
13         We move to strike all of
14 Dr. Smith-Bindman's testimony and will take the
15 issue to court.
16     MS. O'DELL:  The record is clear that
17 counsel did not speak with Dr. Smith-Bindman last
18 night.  There was no preparation done between the
19 conclusion of the deposition yesterday and the
20 beginning of the deposition this morning.  I think
21 the record has been clear on that.
22         That was -- we agreed to do that.  We had
23 not -- we were not compelled to do that.  Because as
24 counsel is aware, the deposition protocol allows
25 both parties, when they're putting up their

33 (Pages 370 to 373)

Rebecca Smith-Bindman, M.D.

## Page 374

1  respective witnesses, to confer with the witness.
2        And we did confer with Dr. Smith-Bindman
3  prior to the deposition this morning for about
4  10 minutes, and that's perfectly within our rights,
5  and so we would oppose any such motion.
6        MR. ZELLERS:  Done?  We are concluded.
7        THE VIDEOGRAPHER:  The time is 12:48 p.m.
8  We are now off the record.
9        (TIME NOTED:  12:48 p.m..)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 375

1
2
3
4        I, REBECCA SMITH-BINDMAN, M.D., do hereby
5  declare under penalty of perjury that I have read
6  the foregoing transcript; that I have made any
7  corrections as appear noted, in ink, initialed by
8  me, or attached hereto; that my testimony as
9  contained herein, as corrected, is true and correct.
10       EXECUTED this_____ day of_____,
11  20____, at_____, _____.
          (City)              (State)
12
13
14
        _____
         REBECCA SMITH-BINDMAN, M.D.
15       VOLUME II
16
17
18
19
20
21
22
23
24
25

## Page 376

1        I, MARY J. GOFF, CSR No. 13427, Certified
2  Shorthand Reporter of the State of California,
3  certify;
4        That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness declared under penalty of
7  perjury; that the testimony of the witness and all
8  objections made at the time of the examination were
9  recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14       That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:  ( ) that the witness has failed or
17  refused to approve the transcript.
18       I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22       I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this   day of      , 2019.
25       _____

## Page 377

1        ERRATA SHEET
2        Golkow Litigation Services
3     1650 Market Street, One Liberty Plaza, 51st Floor
4        Philadelphia, Pennsylvania 19103
5        877-370-3377
6        CASE:  Talcum Powder Litigation
7  PAGE LINE FROM            TO
8  ___|____|_____|_____|_____
9  ___|____|_____|_____|_____
10 ___|____|_____|_____|_____
11 ___|____|_____|_____|_____
12 ___|____|_____|_____|_____
13 ___|____|_____|_____|_____
14 ___|____|_____|_____|_____
15 ___|____|_____|_____|_____
16 ___|____|_____|_____|_____
17 ___|____|_____|_____|_____
18 ___|____|_____|_____|_____
19 ___|____|_____|_____|_____
20 _____
21       REBECCA SMITH-BINDMAN, M.D., VOLUME II
22 Subscribed and sworn to before me
23 this _____ day of _____, 2019.
24 _____
25       Notary Public

34 (Pages 374 to 377)