# EXHIBIT B47

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3    -------------------------------------x

4    IN RE:  JOHNSON & JOHNSON TALCUM

5    POWDER PRODUCTS MARKETING, SALES

6    PRACTICES, AND PRODUCTS          MDL NO:

7    LIABILITY LITIGATION          16-2738 (FLW)(LHG)

8    -------------------------------------x

9    THIS DOCUMENT RELATES TO

10   ALL CASES

11   -------------------------------------x

12

13

14    VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

15              SONAL SINGH, M.D., M.P.H.

16            January 16, 2019, 9:07 a.m.

17

18                   -  -  -

19    REPORTED BY: JANET M. SAMBATARO, RMR, CRR, CLR

20                   -  -  -

21          GOLKOW LITIGATION SERVICES

22      877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24

25

Sonal Singh, M.D., M.P.H.

Page 2

1
2
3
4
5
6       Deposition of SONAL SINGH, M.D., M.P.H.,
7   held at the Beechwood Hotel, 363 Plantation Street,
8   Worcester, Massachusetts, pursuant to Agreement
9   before Janet Sambataro, a Registered Merit Reporter,
10  Certified Realtime Reporter, Certified LiveNote
11  Reporter, and a Notary Public within and for the
12  Commonwealth of Massachusetts, on January 16, 2019,
13  commencing at 9:07 a.m.
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   APPEARANCES:  (Continued)
2
3   TUCKER ELLIS
4   BY:  MICHAEL C. ZELLERS, ESQ.
5   515 South Flower Street
6   Los Angeles, California 90071
7   (213) 430-3400
8   michael.zellers@tuckerellis.com
9   Representing the Defendant, Johnson & Johnson,
10  Johnson & Johnson Consumer Companies, Inc.
11
12
13
14  DRINKER BIDDLE AND REATH, LLP
15  BY:  KATHERINE MCBETH, ESQ.
16  One Logan Square, Suite 2000
17  Philadelphia, Pennsylvania 19103-6996
18  (215) 988-2700
19  katherine.mcbeth@dbr.com
20  Representing the Defendant, Johnson & Johnson,
21  Johnson & Johnson Consumer Companies, Inc.
22
23
24  - Continued -
25

Page 3

1   APPEARANCES:
2
3   ASHCRAFT & GEREL, LLP
4   BY:  MICHELLE A. PARFITT, ESQ.
5   4900 Seminary Road
6   Alexandria, Virginia 22311
7   (703) 931-5500
8   mparfitt@ashcraftlaw.com
9   Representing the Plaintiffs
10
11  LEVIN PAPANTONIO
12  BY:  CHRISTOPHER V. TISI, ESQ.
13  316 South Baylen Street
14  Pensacola, Florida 32502
15  (850) 435-7000
16  ctisi@levinlaw.com
17  Representing the Plaintiffs
18
19  RESTAINO LAW LLC
20  BY:  JOHN RESTAINO, ESQ.
21  130 Forest Street
22  Denver, Colorado 80220
23  (303) 839-8000
24  JRestaino@RestainoLLC.com
25  Representing the Plaintiffs

Page 5

1   APPEARANCES:  (Continued)
2   GORDON & REES
3   BY:  MICHAEL R. KLATT, ESQUIRE
4   816 Congress Avenue, Suite 1510
5   Austin, Texas 78701
6   (512) 391-0197
7   Representing the Defendants,
8   Imerys Talc America, Inc.
9
10  COUGHLIN DUFFY LLP
11  BY:  MARYAM M. MESEHA, ESQ.
12  350 Mount Kemble Avenue
13  Morristown, New Jersey 07962
14  (973) 267-0058
15  mmeseha@coughlinduffy.com
16  Representing Imerys Talc America, Inc.
17
18  TUCKER ELLIS
19  BY:  JAMES W. MIZGALA, ESQ.
20  233 South Wacker Drive
21  Chicago, Illinois 60606
22  (312) 624-6300
23  james.mizgala@tuckerellis.com
24  Representing PTI
25

2 (Pages 2 to 5)

Sonal Singh, M.D., M.P.H.

1   APPEARANCES:  (Continued)
2
3   SEYFARTH SHAW LLP
4   BY:  THOMAS T. LOCKE, ESQ.
5   975 F Street, N.W.
6   Washington, D.C. 20004
7   (202) 463-2400
8   Representing PCPC
9
10   ALSO PRESENT:
11   Jody Urbati, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1               E X H I B I T S
2   Number      Description            Page
3   Exhibit 11 Letter dated June 1, 2015        21
4   Exhibit 12 Email string with top e-mail
5         dated December 27, 2018        23
6   Exhibit 13 Invoices from Dr. Singh        25
7   Exhibit 14 Plaintiffs' Steering Committee's
8         Response and Objections to the
9         Notice of Oral and Videotaped
10         Deposition of Sonal Singh and
11         Duces Tecum            28
12   Exhibit 15 Article entitled "Ovarian,
13         Fallopian Tube, and Primary
14         Peritoneal Cancer Prevention
15         (PDQ) - Health Professional
16         Version            89
17   Exhibit 16 Document entitled "Health Canada
18         Decision-Making Framework for
19         Identifying, Assessing, and
20         Managing Health Risks -
21         August 1, 2000"        101
22   Exhibit 17 Document entitled "Systematic
23         Review and Meta-Analysis of the
24         Association between Perineal Use
25

1               I N D E X
2   WITNESS        DIRECT  CROSS  REDIRECT
3   SONAL SINGH, M.D., M.P.H.
4   By Mr. Zellers      11
5   By Mr. Klatt            301
6   By Mr. Locke            337
7         E X H I B I T S
8   Number      Description            Page
9   Exhibit 1  Notice of Oral and
10         Videotaped Deposition of
11         Sonal Singh and Duces Tecum      13
12   Exhibit 2  Rule 26 Expert Report of
13         Sonal Singh, MD, MPH        14
14   Exhibit 3  Sonal Singh, MD, MPH, FACP,
15         curriculum vitae        16
16   Exhibit 4  List of references        17
17   Exhibit 5  Additional Materials and
18         Data Considered        17
19   Exhibit 6  Updated Materials List      18
20   Exhibit 7  List of Trial Testimony      18
21   Exhibit 8  List of Expert Deposition      19
22   Exhibit 9  Table 1 AMSTAR        20
23   Exhibit 10 Rule 26 Expert Report of
24         Sonal Singh, MD, MPH, with
25         attachments        21

1               E X H I B I T S
2   Number      Description            Page
3   Exhibit 17 (Continued)
4         of Talc and Risk of Ovarian
5         Cancer"            109
6   Exhibit 18 Printout entitled "Ovarian
7         Cancer:  Risk Factors"        120
8   Exhibit 19 Letter dated April 1, 2014        129
9   Exhibit 20 IARC Classifications        133
10   Exhibit 21 Article entitled "Perineal use of
11         talc and risk of ovarian cancer"    143
12   Exhibit 22 Article entitled "Genital use of
13         talc and risk of ovarian cancer:
14         a meta-analysis"        157
15   Exhibit 23 Article entitled "Perineal Talc
16         Use and Ovarian Cancer, A Systematic
17         Review and Meta-Analysis"      172
18   Exhibit 24 Article entitled "The Association
19         Between Talc Use and Ovarian Cancer,
20         A Retrospective Case-Control Study
21         in Two US States"        179
22   Exhibit 25 Article entitled "Tubal Ligation
23         Induces Quiescence in the Epithelia
24         of the Fallopian Tube Fimbria"      206
25         - Continued -

3 (Pages 6 to 9)

Sonal Singh, M.D., M.P.H.

Page 10

1           E X H I B I T S
2   Number     Description          Page
3   Exhibit 26 Article entitled "New Insights
4       into the Pathogenesis of Ovarian
5       Cancer: Oxidative Stress"    228
6   Exhibit 27 Federal Register, Vol. 81,
7       No. 243              233
8   Exhibit 28 Document entitled "Interpretation
9       of Epidemiologic Studies on Talc
10      and Ovarian Cancer"          244
11  Exhibit 29 Article entitled "Association
12      between Body Powder Use and Ovarian
13      Cancer: The African American
14      Cancer Epidemiology Study (AACES)   261
15  Exhibit 30 Article entitled "Does Exposure to
16      Asbestos Cause Ovarian Cancer?
17      A Systematic Literature Review and
18      Meta-analysis"               289
19  Exhibit 31 Article entitled "Occupational
20      Exposure to Asbestos and Ovarian
21      Cancer: A Meta-analysis"    293
22  Exhibit 32 Chart             316
23
24
25

Page 11

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  We are now on the
3   record.  My name is Jody Urbati.  I am a
4   videographer for Golkow Litigation Services.
5   Today's date is January 16, 2019, and the time is
6   9:07 a.m.
7           This video deposition is being held in
8   Worcester, Massachusetts, in the matter of Talcum
9   Powder Litigation, MDL No. 2738, for the United
10  States District Court, District of New Jersey.
11          The deponent today is Sonal Singh,
12  M.D., M.P.H.
13          Counsel will be noted on the
14  stenographic record.
15          The court reporter is Janet Sambataro
16  and will now swear in the witness.
17          SONAL SINGH, M.D., M.P.H.,
18  having been duly sworn, after presenting
19  identification in the form of a driver's license,
20  deposes and says as follows:
21          DIRECT EXAMINATION
22  BY MR. ZELLERS:
23      Q.  State your name, please.
24      A.  Sonal Singh.
25      Q.  Dr. Singh, we are here to take your

Page 12

1   deposition as an expert for the plaintiffs in the
2   Talc MDL; is that correct?
3       A.  Yes.
4       Q.  You are familiar with depositions?
5       A.  Yes.
6       Q.  You've given a number of depositions in
7   your career?
8       A.  I don't know about a number.  Yes, I
9   have.
10      Q.  Can you estimate for us the number of
11  depositions that you've given?
12      A.  I think I've provided that list in the
13  last five years.
14      Q.  I understand.  My question is a little
15  different.
16          How many have you given in your career?
17      A.  I can't tell you in my career.  Maybe
18  ten.  Approximately.
19      Q.  Have you ever testified at trial?
20      A.  No.
21      Q.  You understand today that I'm going to
22  ask you a number of questions and other counsel
23  may as well; correct?
24      A.  Yes.
25      Q.  Please don't answer any question that

Page 13

1   you don't understand.
2           Can you do that?
3       A.  Yes.
4       Q.  If you don't understand a question, let
5   me know, and I'll repeat the question or rephrase
6   it, so that we can make it clear to you.
7           Can you do that?
8       A.  Yes.
9       Q.  If you answer a question that I ask,
10  then I'm going to assume that you understood it.
11  Is that fair?
12      A.  Yes.
13      Q.  You are here today pursuant to a Notice
14  of Deposition, which we have marked as Exhibit 1.
15          (Notice of Oral and Videotaped
16          Deposition of Sonal Singh and Duces Tecum
17          marked Exhibit 1.)
18  BY MR. ZELLERS:
19      Q.  Is that correct?
20      A.  Yes.
21          MR. ZELLERS:  Katherine, when I mark an
22  exhibit, I'm going to need to hand them to you.
23          MS. MCBETH:  Sure.
24          MR. ZELLERS:  Thank you.
25

Sonal Singh, M.D., M.P.H.

Page 14

BY MR. ZELLERS:
1  BY MR. ZELLERS:
2      Q.   Did you have an opportunity to review
3  Deposition Exhibit 1 before today's deposition?
4      A.   Yes.
5      Q.   Have you brought with you or provided
6  to counsel for production all materials in your
7  possession that are responsive to the Notice of
8  Deposition?
9      A.   I have.
10         MR. ZELLERS:  I will mark, as
11  Deposition Exhibit 2, your report in this matter
12  dated November 16 of 2018.
13         (Rule 26 Expert Report of Sonal
14         Singh, MD, MPH marked Exhibit 2.)
15  BY MR. ZELLERS:
16     Q.   Is that correct?
17     A.   It is.  It doesn't have the references.
18     Q.   Deposition Exhibit 2 is just a copy of
19  your report itself.  It ends at Page 66.
20         Attached to your report were some additional
21  materials; is that right?
22     A.   Yeah.  Yeah.  I just want to make sure
23  because when I refer to the report, I understand
24  it to include references and tables and so on.
25     Q.   Your report includes everything that

Page 15

1  was produced by plaintiffs' counsel as part of
2  that report; is that right?
3         And, Dr. Singh, I'm going to mark separately
4  a number of the attachments --
5      A.   Okay.
6      Q.   -- to your report.  Right now, I'm just
7  trying to identify, is the body of your report --
8      A.   Yeah.
9      Q.   -- what we have identified and marked
10  as Exhibit 2?
11         MS. PARFITT:  And if I may,
12  Mr. Zellers, object.  The body of the report,
13  Dr. Singh may include as the body of the report
14  plus all of its attachments.
15         So just so the record is clear, but I
16  understand how you'd like to conduct it, and
17  that's fine.
18         MR. ZELLERS:  Understood.
19  BY MR. ZELLERS:
20     Q.   Your counsel today has provided us with
21  two bankers boxes of your report, plus all of the
22  references from the report.  Is that correct?
23     A.   Yes.
24     Q.   You also have brought that along with
25  you; is that right?

Page 16

1      A.   Yes.
2      Q.   If at any time today you need to look
3  at any of those documents, they're available, and
4  you're free to do that.  Understood?
5      A.   It is understood.
6      Q.   You had attached or provided with your
7  report a curriculum vitae, which I understand has
8  been updated; is that right?
9      A.   Yes.
10         MR. ZELLERS:  We will mark your updated
11  CV or curriculum vitae as Deposition Exhibit 3.
12         (Sonal Singh, MD, MPH, FACP,
13         curriculum vitae marked Exhibit 3.)
14         MR. ZELLERS:  Folks, I believe that
15  Ms. Parfitt has distributed to you, before the
16  deposition, Exhibit 3.
17  BY MR. ZELLERS:
18     Q.   Can you tell us, just briefly, in what
19  respect has Exhibit 3 been updated from the CV
20  that was produced with your report in this
21  matter?
22     A.   A few publications, and then I was
23  elected to the fellowship of the American College
24  of Physicians on January 1st.  So I'm an FACP,
25  and, yes, just a couple of publications,

Page 17

1  presentations.
2      Q.   Is the curriculum vitae that we have
3  marked as Deposition Exhibit 3 complete and up to
4  date?
5      A.   Yes.  Up to January 3rd.  Yes.
6      Q.   Of 2019?
7      A.   2019.  Yeah.
8      Q.   Are there any further additions or
9  corrections that need to be made to that CV?
10     A.   No.
11         MR. ZELLERS:  Deposition Exhibit 4 is
12  the list of references from your report.  And
13  that goes from Page 67 to Page 75.
14     Q.   Is that correct?
15     A.   Yes.
16         (List of references marked
17         Exhibit 4.)
18         MR. ZELLERS:  Deposition Exhibit 5 is
19  also from your report, and it's a listing of
20  additional materials and data considered.
21         (Additional Materials and Data
22         Considered marked Exhibit 5.)
23  BY MR. ZELLERS:
24     Q.   Is that right?
25     A.   Yes.

Golkow Litigation Services - 1.877.370.DEPS

Sonal Singh, M.D., M.P.H.

Page 18

1      MR. ZELLERS:  Deposition Exhibit 6 is
2  an updated list of materials that defendants were
3  provided on January 13th of 2019.
4          (Updated Materials List marked
5      Exhibit 6.)
6  BY MR. ZELLERS:
7      Q.  Is that correct?
8      A.  Yes.
9      MR. ZELLERS:  Folks, I need one more of
10  those back.  Can I get one more?  Thank you.
11      Deposition Exhibit 7 is a listing of
12  the trial testimony and expert deposition
13  testimony that you have provided in the last five
14  years.
15          (List of Trial Testimony marked
16      Exhibit 7.)
17  BY MR. ZELLERS:
18      Q.  Is that right?
19      A.  Yes.  Actually, I have provided them an
20  update, as well, of that.  So I don't know if
21  that was with you, but --
22      Q.  You have brought with you today an
23  updated list of expert deposition testimony for
24  the last five years?
25      A.  Yes.  No. 7 is the update.

Page 19

1      MR. ZELLERS:  We will mark the updated
2  trial testimony list as Deposition Exhibit 8.
3          (List of Expert Deposition
4      marked Exhibit 8.)
5      MR. ZELLERS:  And I understand that's
6  out of order, but I premarked one other exhibit.
7  BY MR. ZELLERS:
8      Q.  What is the difference between
9  Deposition Exhibit 8, your updated list of
10  deposition testimony, and Exhibit 6, which is the
11  list of testimony you provided with your report
12  in November?
13      A.  Yes.  So there's an updated deposition
14  in a medical-legal case regarding standard of
15  care.
16      Q.  You've added that --
17      A.  Yes.
18      Q.  -- to --
19      A.  No. 7.
20      Q.  -- what we have marked as Deposition
21  Exhibit 8?
22      A.  Yes, it is.
23      Q.  In addition to the materials that we
24  have marked already, which were provided, other
25  than the updated CV and the updated expert

Page 20

1  testimony list, several additional documents that
2  counsel for plaintiffs has indicated are
3  responsive to the deposition notice.
4      Let me mark these.  I have not had a chance
5  to look at them yet substantively.
6      THE WITNESS:  Sure.
7      MR. ZELLERS:  But I will and may, at a
8  later time today, have some questions for you.
9      THE WITNESS:  Actually, I will say
10  there's a substantive document that's not here.
11  That's the table of rating that I created for the
12  report, and that should be part of the report.
13      MR. ZELLERS:  Let me see if I can find
14  that.
15  BY MR. ZELLERS:
16      Q.  It would be helpful to have that marked
17  as well; is that right?
18      A.  Yes.
19      MR. ZELLERS:  I will mark, as
20  Deposition Exhibit 9, the Amstar rating of
21  reviews, Pages 77 and 78 from your full report.
22          (Table 1 AMSTAR marked
23      Exhibit 9.)
24  BY MR. ZELLERS:
25      Q.  Is that right?

Page 21

1      A.  Thank you.
2      MR. TISI:  That was No. 9?
3      MR. ZELLERS:  No. 9.
4      Let's go off the stenographic record.
5  You can keep the video going.
6      (Discussion off the stenographic record.)
7      MR. ZELLERS:  Let's go back on the
8  stenographic record here.
9      Doctor, counsel for plaintiffs have
10  requested, and I am agreeable to marking a
11  complete copy of your report, including all of
12  the reference list and other materials that we've
13  marked individually, so the complete copy of your
14  report with all attachments, we will mark as
15  Deposition Exhibit 10.
16          (Rule 26 Expert Report of Sonal
17      Singh, MD, MPH, with attachments marked
18      Exhibit 10.)
19  BY MR. ZELLERS:
20      Q.  Have we, though, marked individually
21  your complete record -- strike that.
22      Have we marked individually your complete
23  report prior to marking Exhibit 10?
24      A.  Yes.
25          (Letter dated June 1, 2015

6 (Pages 18 to 21)

Page 22

1    marked Exhibit 11.)
2  BY MR. ZELLERS:
3    Q.  The documents that were produced by
4  counsel this morning, Deposition Exhibit 11, is a
5  June 1st, 2015 letter with Janssen
6  Pharmaceuticals at the top to you from a
7  Dr. Zanca.  Is that right?
8    A.  Yes.
9    Q.  Is this inviting you to a program?
10   A.  Yes.  Consultation for a panel on
11 products discussion manufactured by Johnson and
12 Janssen Pharmaceuticals.
13   Q.  You're producing this in response to
14 the request asking for all communications between
15 yourself and any Johnson & Johnson company; is
16 that right?
17   A.  That's what I understood it to be,
18 but -- yeah.
19   Q.  You've gone and you've made a search,
20 and in the search for additional records
21 responsive to the Notice of Deposition, which we
22 marked as Exhibit 1, you have brought these
23 additional documents that we're marking here; is
24 that correct?
25   A.  Well, I wouldn't say I made a search.

Page 23

1  I sort of read it, you know, decided, okay, what
2  other additional things that are requested and,
3  you know, recalled that I had had this
4  interaction with Johnson & Johnson employees.
5    Q.  Are you comfortable that you have
6  brought with you today all of the documents that
7  are responsive to the Notice of Deposition?
8    A.  Yes.
9        (Email string with top e-mail
10     dated December 27, 2018 marked Exhibit 12.)
11      MR. ZELLERS:  All right.
12 BY MR. ZELLERS:
13   Q.  Deposition Exhibit 12 is an e-mail
14 string.  The very last e-mail is from you to --
15 well, it's to Michelle Parfitt.  I'm assuming
16 that you were forwarding to Ms. Parfitt just the
17 e-mail below, which is from you to Mr. Restaino
18 and then, apparently, the substantive e-mail is
19 at the bottom of the first page of Exhibit 12.
20      And this is a communication e-mail from you
21 to Lee-May Chen and others; is that right?
22   A.  Yes.
23   Q.  The subject is "Up-to-date references."
24 And the section on epidemiology and risk factors
25 of ovarian cancer; is that right?

Page 24

1    A.  Yes.
2      MS. PARFITT:  And for the record,
3  Mr. Zellers, and we can go ahead and redact the
4  copy later, but just so the record is clear, that
5  communication at the top to me from Dr. Singh was
6  simply, we asked him, do you have any
7  communications, and then he sent it to me.
8      MR. TISI:  We'll redact the part with
9  your agreement.
10     MR. ZELLERS:  Yes.  We can do that at a
11 break --
12     MS. PARFITT:  At a break.
13     MR. ZELLERS:  -- or, you know, at the
14 conclusion --
15     MS. PARFITT:  I appreciate that.  Thank
16 you.
17     MR. ZELLERS:  -- of the deposition.
18 BY MR. ZELLERS:
19   Q.  Do you -- strike that.
20   The date of your e-mail at the bottom of
21 Page 1 is December 13th of 2018; is that right?
22   A.  Yes.
23   Q.  You had been retained as an expert?
24   A.  Yes.
25   Q.  And had submitted, in fact, your expert

Page 25

1  report that we have marked previously; is that
2  right?
3    A.  Yes.
4    Q.  In this communication, Exhibit 12, do
5  you at all identify yourself as a paid, retained
6  expert for the plaintiffs in the talc litigation?
7    A.  No.  This was just a communication
8  about references, and I did not.
9      MR. ZELLERS:  Dr. Singh, the next set
10 of documents that you have brought with you and
11 that we will mark collectively as Exhibit 13 are
12 your invoices.
13      (Invoices from Dr. Singh marked
14     Exhibit 13.)
15 BY MR. ZELLERS:
16   Q.  The first invoice is dated July 14 of
17 2010.  There's a total of five invoices.
18   The last invoice is from July 11, 2018, to
19 November 19, 2018.  Is that right?
20   A.  It should be 2017, not 2010.  I'm
21 sorry.  You mentioned 2010.
22   Q.  And the date is 2017?
23   A.  Yeah.  I wanted to correct that.
24   Q.  No.  Thank you for correcting that.
25   I also have not had a chance to review,

Sonal Singh, M.D., M.P.H.

Page 26

1  substantively, the invoices.
2      A.  Sure.
3      Q.  And I don't think we have a complete
4  copy.  I'm going to ask you some questions in a
5  bit.
6      A.  We do have a complete copy.  I mean, in
7  terms of --
8      Q.  No.  I understand that Exhibit 13 is a
9  complete copy of your invoices.
10     A.  Yeah.
11     Q.  That you now have the copy in front of
12 you.  I don't have the copy in front of me.  Keep
13 it.  I'll have some questions for you a bit
14 later.
15     Have we now marked all documents that are
16 responsive to the Notice of Deposition which you
17 have produced here today?  And let me withdraw
18 that.
19     Have we now marked all of the documents that
20 you have produced in response to the Notice of
21 Deposition?
22     A.  Yeah.  And I think that, you know,
23 there were some updated materials that I reviewed
24 that are part of this list.
25     Q.  All right.  And we need to be more

Page 27

1  specific --
2      A.  Sure.
3      Q.  -- as you understand from doing this
4  before.
5      You are referring to the list of updated
6  materials that was produced about a week ago?
7      A.  Yeah.
8      Q.  And that is Deposition Exhibit -- well,
9  strike that.
10     Just for the record, it was produced on
11 January 13th of 2019.  The updated materials that
12 you have reviewed are listed on Deposition
13 Exhibit 6; is that right?
14     A.  I have not reviewed these materials.  I
15 was provided these materials.  I have reviewed
16 portions of these.  I have not had a chance to
17 review all of these materials.
18     Q.  Anything else that you have responsive
19 to the deposition notice that we have not marked?
20     A.  Give me a second.  Let me read.
21     MS. PARFITT:  If we can go off the
22 stenographic record for one moment while he's
23 doing it.
24     MR. ZELLERS:  Sure.
25     (Discussion off the stenographic record.)

Page 28

1      (Plaintiffs' Steering
2  Committee's Response and Objections to the
3  Notice of Oral and Videotaped Deposition of
4  Sonal Singh and Duces Tecum marked Exhibit
5  14.)
6      MR. ZELLERS:  Back on the stenographic
7  record.
8      Dr. Singh, at the request of
9  plaintiffs' counsel, we will mark and
10 incorporate, as an Exhibit 14, the objections
11 that plaintiffs have filed to the deposition
12 notice.
13     MS. PARFITT:  Thank you.
14 BY MR. ZELLERS:
15     Q.  Have we identified and marked all of
16 the documents that you have produced pursuant to
17 the Notice of Deposition?
18     A.  We have.
19     Q.  To your knowledge, there are no
20 additional documents that you have in your
21 possession to produce; is that right?
22     A.  I don't have any additional documents.
23     Q.  The report that we have marked as
24 Deposition Exhibit 10, does that contain all of
25 the opinions that you intend to offer at trial?

Page 29

1      A.  Actually, it's Deposition Exhibit 2.
2      Q.  I understand.
3      A.  Sorry.  I'm a little confused here.
4      Q.  That's fine.  We don't want you to be
5  confused.  And I asked you in the beginning to
6  tell me if you were getting confused.
7      We have marked Deposition Exhibit 10, which
8  contains all of the attachments --
9      A.  Okay.
10     Q.  -- that we have separately marked; is
11 that right?
12     A.  Yeah.  Yeah.
13     Q.  All right.  The substance of your
14 report in terms of your written opinions, we have
15 marked separately as Exhibit 2; correct?
16     A.  Yes.
17     Q.  Does that report, Exhibit 2, and also
18 marked as Exhibit 10, contain all of the opinions
19 that you intend to offer at any trial or hearing
20 in this matter?
21     A.  Well, I mean, it's hard to say it
22 contains all the opinions because there have been
23 some updates since then and, you know, science
24 evolves.
25     Q.  Go ahead.  Finish your answer.

8 (Pages 26 to 29)

Page 30

1    A.   Science evolves, and, you know, we
2  update our opinions.  So it's not like you offer
3  an updated opinion one day and that stays that
4  way.
5    Q.   Dr. Singh, this is our opportunity to
6  ask you questions about the opinions that you
7  have formed in this matter.
8    As of today, does your report, which we've
9  marked as Exhibit 2 and also --
10       MS. PARFITT:  10.
11   Q.   -- Exhibit 10, does that include all
12  of the opinions that you intend to testify to at
13  any trial or hearing of this matter?
14   A.   Yes.  In terms of the causation
15  opinions, it does.  But in terms of what
16  additional evidence has been reviewed or what
17  additional evidence has come up that, you know,
18  supports or refutes that, that might have
19  changed.
20   Q.   Dr. Singh, do you have any new or
21  additional opinions today that you intend to
22  offer at any trial or hearing of this matter
23  beyond the opinions that are included in your
24  report which we've marked as Exhibit 2 and
25  Exhibit 10?

Page 31

1    A.   I'm sorry.  I'm just not -- it's not
2  like I don't want to answer.  I'm trying to
3  understand.  When you say "additional opinions,"
4  does it just mean like a causal opinion or does
5  it mean --
6    Q.   Dr. Singh, you have done this before;
7  right?
8    A.   Yeah.  I'm trying to understand and I'm
9  trying to be responsive.
10   Q.   This is the defense opportunity to ask
11  you what opinions you intend to offer at any
12  hearing or trial of this matter.
13   As of today, do you have any additional
14  opinions beyond the opinions that are set forth
15  in your report which you intend to offer at any
16  trial or hearing of this matter?
17   A.   I don't -- yeah -- I mean, it's, you
18  know, the opinions that I've offered are included
19  in the report.
20   Q.   Does your report identify -- and by
21  "report," we can refer to the report that we've
22  marked as Exhibit 10.
23   A.   Mm-hmm.
24   Q.   Does that report identify everything
25  that you are relying on in forming the opinions

Page 32

1  that you intend to provide at any hearing or
2  trial in this matter?
3    A.   No.  I'm relying on additional evidence
4  since then that has become available on this.
5    Q.   Let's -- I will ask you a new question.
6    Are all of the materials that you are
7  relying on in forming the opinions that you
8  expect to testify to at any hearing or trial,
9  identified either in your report, which we have
10  marked as Exhibit 10, or the updated list of
11  materials, which we have marked as Exhibit 6?
12   A.   Yes.
13       MS. PARFITT:  And 5.
14       THE WITNESS:  Okay.  That's the part of
15  the whole report.
16       MR. ZELLERS:  Yes.
17  BY MR. ZELLERS:
18   Q.   Exhibit 5 had previously been produced
19  as part of your report; is that right?
20   A.   Yes.
21   Q.   Is your report accurate?
22   A.   Yes.
23   Q.   Is your report complete?
24   A.   Yes, it is.  It has some typos, but...
25   Q.   As we go along, if there's a typo --

Page 33

1  strike that.
2    Are there any typos that are substantive
3  typos?
4    A.   No.  But sometimes it's we and they.  I
5  can point that out at some point in time.
6    Q.   Are there any documents that were in
7  your possession that you produced to counsel
8  responsive to the deposition notice that have not
9  been produced here?
10   A.   No.  Not that I can think of.
11   Q.   When were you first contacted by anyone
12  regarding the talc ovarian cancer litigation?
13   A.   So this was in 2017 by Attorney John
14  Restaino and Attorney Parfitt.  I don't know the
15  exact day, but it has to be, you know, spring
16  or summer of 2017.  Spring or summer.
17   Q.   Your invoice, your first invoice is
18  dated July of 2017; is that right?
19   A.   Yeah.  But, you know, it just covers a
20  period of background.  It's not that they
21  contacted me and may have contacted me prior to
22  that.
23   Q.   Sometime in the first part of 2017, you
24  were contacted by Mr. Restaino and by
25  Ms. Parfitt; is that right?

Sonal Singh, M.D., M.P.H.

Page 34

1     A.   Yes.
2     Q.   Anyone else?
3     A.   No.
4     Q.   What attorneys have you met with or
5  communicated with in the talc ovarian cancer
6  litigation other than Ms. Parfitt and
7  Mr. Restaino?
8     A.   So Attorney Chris Tisi, and then I have
9  communicated on the phone with Attorney Gates.
10  Is that -- no.  Margaret?
11     Q.   Margaret Thompson?
12     A.   Thompson.  Yeah.
13     Q.   Do you know Margaret Thompson?
14     A.   I mean, I know her as an attorney.  I
15  just spoke to her on the phone for 30 minutes.
16     Q.   Have you ever met in person with
17  Ms. Thompson?
18     A.   No.
19     Q.   Have you ever had any communications or
20  interactions with Ms. Thompson other than the
21  30-minute-or-so phone call?
22     A.   No.
23     Q.   When was that conversation with
24  Ms. Thompson?
25     A.   I don't know.  A couple of days ago.

Page 35

1  Yeah.
2     Q.   It was in preparation for the
3  deposition; is that right?
4     A.   Yes.
5     Q.   How much time did you spend with the
6  lawyers for plaintiffs preparing for this
7  deposition?
8     A.   With the lawyers, I've spent -- yeah,
9  I'd have to go back, maybe five or six hours.
10  But, again, I can't be very precise.
11     Q.   Any other attorneys that you've
12  communicated with that you understand to
13  represent the plaintiffs other than the attorneys
14  that you have identified?
15     A.   No.  Not that I can recall.
16     Q.   Do you understand that you are -- or
17  strike that -- have been retained as an expert by
18  plaintiffs in the MDL talc ovarian cancer
19  litigation?
20     A.   Right now, I do.  Yes.
21     Q.   Is there any other ovarian cancer
22  litigation matter that you have been retained in?
23     A.   No.
24     Q.   When you were retained back in early
25  2017 by Mr. Restaino and Ms. Parfitt, what were

Page 36

1  you asked to do?
2     A.   So to clarify, I don't know I was
3  retained at that time.
4     I was asked to consult on and provide, you
5  know, a review and look at -- look at the
6  literature on this topic.  So I'm not sure --
7  depending on semantics, you can define it as
8  being retained or, you know -- I don't think we
9  had an "agreement," but I was asked to provide a
10  consultation on that matter.  And these invoices
11  include that consult.
12     Q.   In the first part of 2017, what were
13  you asked by counsel for plaintiffs in the talc
14  litigation, ovarian cancer talc litigation, to
15  do?
16     MS. PARFITT:  Objection.  Limit your
17  response to communications with regard to simply
18  the requests, not the conversations.
19     A.   Yeah.  So I was asked to review, you
20  know, the literature on talcum powder products
21  and ovarian cancer.
22     Q.   Had you ever done that before?
23     MS. PARFITT:  Objection.  Form.
24     A.   I mean, when I say "review," yes, I had
25  read about talcum powder products and ovarian

Page 37

1  cancer.
2     Q.   You were asked to make a systematic
3  review of the literature relating to talcum
4  powder products and ovarian cancer; is that
5  right?
6     A.   Not necessarily a systematic review,
7  but they asked me to, you know, review the
8  literature, and I had been reading it from
9  other -- from my own reading in different
10  journals, and they asked me to, you know, review
11  and, you know, provide my own opinion on that
12  matter.
13     Q.   At some point, you were retained,
14  agreed --
15     A.   Yes.
16     Q.   -- to work with the attorneys for
17  plaintiffs; is that right?
18     A.   Yes.
19     MS. PARFITT:  Objection.  Form.
20     Q.   Were you ever given any new or
21  additional assignment in the MDL talc ovarian
22  cancer litigation other than to do a literature
23  review?
24     MS. PARFITT:  Objection.  Form.
25     A.   Well, I mean, I guess I was, you know,

10 (Pages 34 to 37)

Sonal Singh, M.D., M.P.H.

Page 38

1  asking the causal question that is the use of
2  talcum powder products a cause of ovarian cancer.
3      Q.   You looked at the literature --
4      A.   Mm-hmm.
5      Q.   -- to try to determine if you could
6  answer that question; is that right?
7      A.   Yeah.  So we looked at -- I looked at
8  the literature and, you know, obviously, looked
9  at other documents and performed a methodology,
10 and we can discuss that in detail later.
11     But the primary question of interest is --
12 was, is the use of perineal use of talcum powder
13 products associated with and causally related to
14 the development of ovarian cancer.
15     Q.   That has been the request from
16 plaintiffs' counsel to you in terms of providing
17 expert opinions in this matter; is that right?
18     A.   Yes.
19     Q.   When were you first asked to prepare a
20 report setting forth your opinions?
21     A.   Again, I can't recall the specific
22 timelines.  I'm sorry.  It's been a while.
23     Q.   Were you asked by plaintiffs to assume
24 any facts?
25     A.   No.  I mean, at that time, you know,

Page 39

1  and even prior to that, I was reading the
2  literature.  I was, you know, agnostic to it.
3      And, yeah, I didn't -- in fact, I didn't
4  form an opinion on this topic until -- until the
5  very end of, you know, 2018.
6      Q.   When you say you were "agnostic" --
7      A.   Mm-hmm.
8      Q.   -- to this issue, whether or not
9  talcum powder products are associated with
10 ovarian cancer, do you mean that you had not
11 formally come up with or developed any opinions
12 prior to becoming involved as an expert for
13 plaintiffs?
14     MS. PARFITT:  Objection.  Form.
15     A.   Yeah.  So my -- what I mean is I had
16 not systematically reviewed the literature to
17 form an opinion whether talcum powder products
18 is, so I had not done the processes required to,
19 you know, develop an opinion.
20     Q.   All right.  You have now done that and
21 you're here to talk about it; is that right?
22     A.   Yes.
23     Q.   Plaintiffs' counsel have paid you for
24 your time to review documents, the literature,
25 prepare a report, and render your opinions; is

Page 40

1  that right?
2      A.   Yes.
3      Q.   How much are you charging per hour for
4  your time in this case?
5      A.   $600 an hour.
6      Q.   You have invoices in front of you.
7      What is the total value of the time that
8  you've spent on the talc ovarian cancer
9  litigation, whether that's been billed or not
10 billed, paid or not paid?
11     A.   I can't calculate the time.  I can
12 calculate --
13     Q.   Can you estimate it for us?
14     A.   I don't want to give a number that's
15 inaccurate; right?  I mean, these are accurate
16 numbers.  But I will just have to sum it up --
17     Q.   Let's try to do this as quickly as we
18 can.
19     A.   Yeah.
20     Q.   The five invoices that you've marked
21 or -- strike that -- that we have marked as
22 Deposition Exhibit 13 --
23     A.   Mm-hmm.
24     Q.   -- does that capture all of your time
25 on the ovarian cancer talc litigation through

Page 41

1  November of last year?
2      A.   Yes.
3      Q.   Is there any additional time that you
4  have spent on the talcum powder litigation up
5  through November of last year that's not
6  reflected in the invoices we've marked as
7  Exhibit 13?
8      A.   No.
9      Q.   All right.  First invoice, what is the
10 total?
11     A.   9,300.
12     Q.   The second invoice, total?
13     A.   Twenty, one, zero, zero.
14     Q.   21,000?
15     A.   20,100.
16     Q.   Next invoice, total?
17     A.   5,100.
18     Q.   Next invoice, total?
19     A.   19,200.
20     Q.   Last invoice, total?
21     A.   40,800.
22     Q.   Since November of 2018, can you
23 estimate for us the number of hours that you have
24 spent on this matter?
25     A.   So, I mean, apart from three to five

11 (Pages 38 to 41)

Sonal Singh, M.D., M.P.H.

Page 42

1  hours that I spent with the lawyers, I don't
2  know.  Maybe I've spent 10, 15 hours on my own.
3  Maybe more.  I just don't have that exact number.
4  I'll have to look.
5      Q.  At some point, you will submit an
6  invoice --
7      A.  Yes.
8      Q.  -- for your time; is that right?
9      A.  After today.  Yeah.
10     Q.  Have you been disclosed as an expert in
11  any other talcum powder proceeding aside from
12  this case?
13     A.  No.
14     Q.  What percent of your professional time
15  do you currently spend performing work as a
16  consultant?
17     A.  Yeah.  It could be -- you know, varies.
18  It could be 20 to 30 percent of my time.
19  Sometimes 20 percent.
20     Q.  Has that 20 to 30 percent of your
21  professional time spent working as a consultant,
22  has that been consistent for the past five, ten
23  years?
24     A.  Yeah.  So, actually, it's been less in
25  the past, sometimes a little more, but, you know,

Page 43

1  overall, I would average out, you know, sort of
2  as I was preparing over the last five years, it
3  would probably be 15 to 20 percent, but, you
4  know --
5      Q.  Currently, though, best estimate is 20
6  to 30 percent; is that right?
7      A.  Over the last six months.  Yes.
8      Q.  What percent of your income is from
9  consulting on litigation matters?
10     A.  Again, I can't give you my gross
11  income.  I mean, I --
12     Q.  I don't want your gross income.  I'm
13  asking just for -- I just want to know a
14  percentage of your income that comes from
15  consulting in litigation cases.
16     A.  Well, again, you know, consulting is
17  not just litigation for me.  As I said, I've
18  consulted, you know, including for J&J, Eli
19  Lilly, others, that's, you know, on my CV.
20  Overall, and other, you know, insurers.  So it's
21  not just -- first of all, it's not litigation
22  consulting that I do.
23     Q.  Dr. Singh --
24     A.  Yes.
25     Q.  -- listen to my question, if you can.

Page 44

1      A.  Okay.
2      Q.  What percentage of income is from
3  consulting on litigation matters?  Give us an
4  estimate.
5      A.  Okay.  Yeah.  Maybe 30 percent.  I'm
6  doing my best to give you --
7      Q.  Is that your -- you're here to be
8  truthful; correct?
9      A.  Yeah.
10     Q.  Is 30 percent of your income from
11  consulting on litigation matters, is that your
12  best estimate as you sit here today?
13         MS. PARFITT:  Objection.  Some clarity
14  as to over what period of time?
15     A.  Yeah.  Over five years, I mean, that's
16  my best estimate.
17     Q.  Is it a little bit more now?
18         MS. PARFITT:  Objection.
19     A.  Well, over the last year, yes, but over
20  five.
21     Q.  Over the last year, what are you
22  working on?  You're working on the talc
23  litigation; is that right?
24         MS. PARFITT:  Objection.  Form.
25     Q.  Doctor, did you hear my question?

Page 45

1      A.  Yeah.  Yeah.
2      Q.  What other litigations are you serving
3  as an expert for?
4      A.  Viagra.
5      Q.  You're an expert for plaintiffs in
6  Viagra; is that right?
7      A.  Yes.
8      Q.  What other litigations are you serving
9  as an expert for plaintiffs in?
10     A.  None other than that, that I know of.
11     Q.  Are you still working as an expert for
12  plaintiffs in the Lipitor litigation?
13     A.  That ended several years ago, as far as
14  I recall.
15     Q.  You list two Tasigna cases against
16  Novartis.
17         Are you still working on those cases?
18     A.  That ended in, I think, in -- yeah, it
19  ended.
20     Q.  You list on your expert testimony,
21  2018; is that right?
22     A.  Yes.  I mean, but I listed everything
23  that was -- I have done in the five years.  It
24  doesn't mean that those are ongoing.
25     Q.  You are no longer serving as an expert,

Sonal Singh, M.D., M.P.H.

Page 46

1  to your knowledge, in the Tasigna cases; is that
2  right?
3      A.  Yes.
4      Q.  How about the Rahmoeller versus Walmart
5  litigation, is that still ongoing?
6      A.  That stopped, but, you know, it's been
7  a year since I've heard anything, so I don't
8  know.
9      Q.  You also provided testimony in a matter
10  of Brufett versus Washington University.
11      Is that still ongoing?
12      A.  That has ended.
13      Q.  Is it fair to say that all of the cases
14  in which you have been retained in the past --
15      A.  Sure.
16      Q.  -- as an expert for plaintiffs
17  involving a pharmaceutical company defendant have
18  involved prescription medications?
19      A.  Yeah.  Prescription medications, issues
20  of systems.  I mean, that's my area of research.
21      Q.  How much of your work is for plaintiffs
22  versus defense as a litigation consultant?
23      MS. PARFITT:  Objection.  Form.
24      A.  Yeah.  I mean, over the last ten years,
25  I've provided opinions to both sides, but I have

Page 47

1  not been, you know -- when you say how much of
2  your work, is it time spent or --
3      Q.  In terms of time spent, most of your
4  work is for plaintiffs; is that right?
5      A.  I would say, yeah, 70 percent.  Yeah.
6      Q.  And it can be more than 70 percent; is
7  that right?
8      MS. PARFITT:  Objection to form.
9  Objection to form.
10      A.  Well, it depends, again, for frame of
11  time and, you know, if you say yes, in the last
12  year, yes.  More than --
13      Q.  Last year, it's been more than
14  70 percent --
15      A.  Sure.
16      Q.  -- for plaintiffs; is that right?
17      A.  Yes.
18      Q.  Have you ever been retained in a case
19  involving asbestos?
20      A.  No.
21      Q.  Have you ever been involved in a
22  case -- strike that.
23      Have you ever been retained in a case
24  involving personal injuries?
25      MS. PARFITT:  Objection.  Form.

Page 48

1      A.  I don't understand.  Like, what is a
2  personal injury?  Is it like somebody -- MVA kind
3  of case or --
4      Q.  Well, you've been involved in Lipitor.
5  You have been involved in a number of other
6  litigations.  Let me withdraw that question.  Let
7  me make it a little more precise.
8      Have you ever been retained in a case
9  involving cosmetic products?
10      A.  No.
11      Q.  In the preparation of your report, did
12  you review the other expert reports provided by
13  plaintiffs in this MDL litigation?
14      A.  I mean, other than those cited, I have
15  not had a chance to review them.
16      Q.  The updated materials list that you
17  have produced here today, which we've marked as
18  Exhibit 6, it contains a number of expert reports
19  from plaintiff experts in the MDL talcum powder
20  ovarian cancer litigation; is that right?
21      A.  Yes.
22      Q.  What is Exhibit 6?  It says "Updated
23  materials."
24      Does that mean updated materials that you
25  have reviewed and considered?

Page 49

1      A.  They were provided to me at some point
2  in time between November 15th, and I haven't
3  even -- I have actually not reviewed any of the
4  expert reports other than those that have been
5  cited in my report.
6      Q.  This list of updated materials is
7  something that was provided to you by plaintiffs'
8  counsel; is that right?
9      A.  Yes.
10      Q.  Have you reviewed any of the materials
11  that are on the updated materials list, which we
12  have marked as Exhibit 6?
13      A.  Yeah.  I had a chance to review some of
14  them.
15      Q.  Which materials that are identified on
16  Exhibit 6, updated materials, have you actually
17  looked at, reviewed, and considered?
18      A.  Yeah.  So, I mean, I was already aware
19  of the Health Canada assessment and, you know, so
20  that's -- I've reviewed.
21      I have reviewed, obviously, the Up to Date,
22  that childs sent.
23      I have reviewed the state of the science.  I
24  have reviewed --
25      Q.  What do you mean "state of science"?

13 (Pages 46 to 49)

Sonal Singh, M.D., M.P.H.

Page 50

1  Where is that listed?
2      A.  No. 2.  No. 2.
3      Q.  All right.  You've reviewed Chen Up to
4  Date.  You have reviewed the second reference,
5  Committee on the State of Science.
6      A.  Yeah.
7      Q.  Have you reviewed the Evolving
8  Paradigms and Research and Care?
9      A.  Yes.
10     Q.  The Draft Screening Assessment, Talc
11  Health Canada?
12     A.  Yes.
13     Q.  The EFSA Science Committee?
14     A.  Yes.
15     Q.  The EPA documents that are listed?
16     A.  No.
17     Q.  The FDA Ingredients Talc?
18     A.  No.
19     Q.  The Fadak Burnola citation?
20     A.  Yes.
21     Q.  The Federal Register, Volume 81?
22     A.  Yes.
23     Q.  Have you reviewed the Kemp hearing
24  opinion and order?
25     A.  I don't think so.

Page 51

1      Q.  The Keys Model Information Bias?
2      A.  Yes.
3      Q.  Kunz?
4      A.  Yes.
5      Q.  Official Journal of the European Union?
6      A.  No.
7      Q.  Qiao, Q-I-A-O?
8      A.  No.
9      Q.  Risk Management Scope, Talc Health
10  Canada?
11     A.  No.
12     Q.  You have not reviewed any of the
13  plaintiff expert reports submitted in this
14  matter.  Is that your testimony?
15     A.  Yeah.  They were provided to me and,
16  you know, I formed my opinion independent of
17  them.
18     Q.  Have you reviewed any of the reports
19  prepared and submitted by plaintiffs that are
20  identified in your updated materials?
21     A.  No.  Except if any of them were cited,
22  that's the one that I reviewed it in.
23     Q.  Yup.  Did you review Talc Canada Plain
24  Language Summary?
25     A.  Yes.

Page 52

1      Q.  Did you review Talc Information Sheet,
2  Health Canada?
3      A.  Yes.
4      Q.  Talc Potential Risk of Lung Effects?
5      A.  Yes.
6      Q.  Task Force on Science Risk Assessment?
7      A.  Yes.
8      Q.  The Weed Reference?
9      A.  Yes.
10     Q.  And the Zervomanolakis citation?
11     A.  Yes.
12     Q.  Have we covered all of the materials
13  that you've reviewed on the updated materials
14  list?  Is that right?
15     A.  Yes.
16     Q.  Have you communicated or had any
17  discussions with any of the other plaintiffs'
18  experts in the talc ovarian cancer litigation?
19     A.  No.
20     Q.  Have you reviewed any deposition or
21  trial transcripts from prior talcum powder cases?
22     A.  Not prior cases, but I reviewed the
23  deposition of Dr. Plunkett.
24     Q.  Plunkett?
25     A.  Plunkett.

Page 53

1      Q.  Have you reviewed any other depositions
2  of experts that have been taken in the MDL
3  ovarian cancer talcum powder litigation?
4      A.  No.
5      Q.  Did you conduct any independent
6  investigation to reach your opinions?
7      A.  I mean, I -- my opinion is independent
8  of these.
9      Q.  As I understand it, what you did is you
10  were asked by plaintiffs to review and consider
11  and form an opinion regarding the causal
12  question.  Is that right?
13     A.  Yes.
14     Q.  To do that, you went and you reviewed a
15  number of different literature sources; is that
16  right?
17         MS. PARFITT:  Objection.  Misstates his
18  opinion.  He indicated he had reviewed some prior
19  to that.
20         MR. ZELLERS:  Ms. Parfitt, just object,
21  form.  And let's not have speaking objections.
22         MS. PARFITT:  And you won't find that I
23  will.  I want to make sure we have an accurate
24  record.
25         I can wait until the very end and do a

Sonal Singh, M.D., M.P.H.

Page 54

1  recross, but I'm trying to clean it up.
2  BY MR. ZELLERS:
3      Q.  Doctor, go ahead.
4      A.  I didn't get the question.  Can you
5  repeat?
6      Q.  Sure.  The question is:  You were asked
7  to form an opinion by plaintiffs.  You went out
8  and you reviewed the literature.
9      You considered the literature and you
10  formulated an opinion; is that right?
11     A.  Yes.
12         MS. PARFITT:  Objection.
13     A.  And it was an independent opinion.
14     Q.  An independent opinion based upon your
15  review of the literature; is that right?
16     A.  Yeah.  Based upon my review of the
17  literature and the documents and, you know,
18  whatever was available to me.
19     Q.  And those -- all of those materials
20  that you reviewed, considered and relied upon
21  have been included in the exhibits that we've
22  marked in this deposition; is that right?
23     A.  That is correct.
24     Q.  Was there anything that you asked
25  plaintiffs' counsel for to prepare your report

Page 55

1  that you were not provided with?
2      A.  No.
3      Q.  Did anyone assist you in the
4  preparation of your report?
5      A.  Well, I may have asked them to print,
6  like, these things and, you know, I may have
7  asked my -- I had means to print some articles
8  when I was preparing that.
9      Q.  Do you have a staff?
10     A.  Yes.
11     Q.  All right.  Who is your staff?
12     A.  I have several staff.  I have, you
13  know, three offices.
14     Q.  So you have three offices?
15     A.  Yes.
16     Q.  In those three offices, do you have
17  folks who help you?
18     A.  Yeah.
19         MS. PARFITT:  Objection to form.
20     Q.  Do you have folks who do research?
21         MS. PARFITT:  Objection.  Form.
22     A.  So, I mean -- so I have a dual
23  appointment in my research, and so I have
24  clinical staff and my research staff.  I have
25  people who work with me on projects.  They are

Page 56

1  not necessarily the ones who may have helped me
2  in printing articles.
3      Q.  My question is:  Who helped prepare
4  your report other than yourself?
5          MS. PARFITT:  Objection.  Objection.  I
6  believe you've asked that.  He's answered it.
7      A.  Okay.  Let me answer.
8      Q.  Sure.  Go ahead, Doctor.  Please
9  answer.
10     A.  I prepared my report.
11     Q.  I understand you prepared your report.
12     My question is:  Did anyone assist you in
13  preparing your report?
14         MS. PARFITT:  Objection.
15     A.  No.
16     Q.  You were provided some materials by
17  plaintiffs' counsel; is that right?
18     A.  Yes.
19     Q.  You reviewed some of those materials,
20  but not all of those materials; is that right?
21     A.  Yes.
22     Q.  In terms of the references, Exhibit 4.
23  And that is identified as Pages 67 through 75 in
24  your full report that we marked as Exhibit 10.
25     But looking at your references, Exhibit 4,

Page 57

1  some of these references were provided by counsel
2  for plaintiffs to you; is that right?
3          MS. PARFITT:  Objection.
4      A.  Yes.
5      Q.  Some, you went out and found on your
6  own; is that right?
7      A.  Well, it's not that way.  It's the
8  majority of the references, I would say
9  95 percent of, are my own work, and, you know, I
10  had questions about the product and the
11  mechanism, what additional documents were
12  available.
13     And that's a process.  And documents were
14  provided, and they need to be cited and are
15  cited.
16     Q.  Are you able to tell us, of the
17  references that you cite, Deposition Exhibit 4,
18  which ones came from plaintiffs' counsel and
19  which ones you came up with on your own?
20         MS. PARFITT:  Objection.  Form.
21     A.  Sure.
22     Q.  You could do that if we went through
23  one by one?
24     A.  Yeah.
25     Q.  Let me ask you the same question with

15 (Pages 54 to 57)

Sonal Singh, M.D., M.P.H.

Page 58

1  respect to the additional materials and data
2  considered, Exhibit 5.
3      Do you see that?
4      A.  Yes.
5      Q.  What's the difference between
6  Exhibit 4, references, and Exhibit 5, additional
7  materials and data considered?
8      A.  So as I went about and did my, you
9  know, systematic review and, you know, umbrella
10 review, I gathered all the materials and, you
11 know, I included studies and data that provided
12 original data on the causal question that we
13 discussed.
14     Q.  Doctor, my question was simply, what's
15 the difference between references and additional
16 materials and data considered?
17     A.  So the additional materials are those
18 that were, I would say, you know, reviewed, were
19 still reviewed in forming the opinion, but they
20 are not -- they don't -- they don't form the
21 basis of my opinion.
22     Q.  The materials that you relied on in
23 forming your opinion are what you've set forth as
24 your references, Exhibit 4; is that right?
25     MS. PARFITT:  Objection.

Page 59

1      A.  Yeah.  I mean, and then things that,
2  you know -- obviously, for the report, it is the
3  references.  Yeah.
4      I did rely on these to review them and, you
5  know --
6      Q.  Did you -- strike that.
7      MS. PARFITT:  For the record, that was
8  Exhibit 5.
9      MR. ZELLERS:  Well, no -- well, the
10 references is Exhibit 4.  The additional
11 materials and data considered is Exhibit 5.
12     MS. PARFITT:  Correct.
13 BY MR. ZELLERS:
14     Q.  So looking at Exhibit 5, additional
15 materials and data considered, were some of these
16 materials provided to you by counsel for
17 plaintiffs?
18     A.  Yeah.  They may have been.  These are
19 data considered.  So I'm not as familiar with
20 these as --
21     Q.  Have you -- are you finished?
22     A.  Yeah.  I'm not -- I mean, I reviewed
23 them.  I, you know --
24     Q.  Is it your testimony that you have
25 reviewed and considered each and every one of the

Page 60

1  additional materials and data considered, items
2  that are listed in Exhibit 5?
3      A.  By reviewed and considered, I mean,
4  have I read every word of it?  No.  I reviewed
5  and considered.
6      Q.  Who prepared the additional materials
7  and data considered list?
8      MS. PARFITT:  Objection.
9      A.  I prepared the list, but I asked them
10 also to help me with what materials they had
11 sent.
12     Q.  The lawyers for plaintiffs; is that
13 right?
14     A.  Yes.
15     Q.  So in your documents, you do have a
16 listing of the materials that were provided to
17 you by plaintiffs' counsel for consideration; is
18 that right?
19     MR. LOCKE:  Objection.  Misstates the
20 testimony.
21     A.  I'm sorry.  Can you repeat?
22     Q.  Sure.  The question is:  You do have,
23 because you requested it, a listing of the
24 documents and materials that were provided to you
25 by plaintiffs' counsel for you to consider;

Page 61

1  correct?
2      MS. PARFITT:  Objection.  Misstates his
3  testimony.
4      He didn't say he got a list.
5      MR. ZELLERS:  Okay.  Ms. Parfitt,
6  please, form, foundation.  You know, he can
7  testify, and whatever he's testified to, it's
8  part of the record.
9      MS. PARFITT:  Sure.  And, Mr. Zellers,
10 I am not trying to interrupt your deposition,
11 trust me on that, but I do want some clarity to
12 the record.
13     MR. ZELLERS:  Great.  That's what we're
14 doing right here.
15     MS. PARFITT:  Well --
16     MR. ZELLERS:  We've now asked the
17 question two or three times.
18 BY MR. ZELLERS:
19     Q.  Do you have the question?
20     MS. PARFITT:  It's a little different.
21 But go ahead.
22     A.  So I had asked for additional materials
23 in understanding the causal question between
24 talcum powder products and ovarian cancer.
25     Q.  What additional materials did you

16 (Pages 58 to 61)

Sonal Singh, M.D., M.P.H.

Page 62

1    request?
2        A.   I requested additional materials
3    regarding what are the constituents of talcum
4    powder products.  I -- you know, additional
5    materials regarding testing of talcum powder
6    products -- I -- you know, anything to you, know,
7    enhance my understanding whether there's evidence
8    to support or refute what we are seeing in the
9    epidemiologic studies about an increased risk of
10   ovarian cancer with talcum powder products.
11       Q.   When you requested these materials,
12   testing materials, ingredient materials and any
13   other materials, did you want to see all of the
14   materials that were available so that you could
15   form your opinion?
16           MS. PARFITT:  Objection.  Form.
17       A.   All is -- you know, there's only so
18   many hours.  I mean, you know, I think I wanted
19   to see as much as, you know, was relevant to
20   forming an opinion.
21       Q.   Well, you asked for records of testing
22   and you were provided with records, and we'll
23   take a look at it --
24       A.   Sure.
25       Q.   -- that purport to show that there is

Page 63

1    asbestos or asbestos has been found in talcum
2    powder; correct?
3        A.   I mean, that's not the only -- that's
4    not only --
5        Q.   Understood.
6            MS. PARFITT:  Excuse me.  Let him
7    finish his answer, if you will, please.  I'm not
8    sure he was done.  Appreciate that.
9        Q.   Are you done?
10       A.   No.  I'm not.  I want to finish my
11   answer.
12       Q.   Okay.
13       A.   So I requested documents because I
14   wanted to understand what constitutes talcum
15   powder products, and whether it is asbestos or
16   whether it is other heavy metals, that's sort of
17   a separate answer, and we can discuss that, and
18   I'm sure we will.
19       But I wanted to understand the constitution
20   of the product and, you know, whether there were
21   additional studies on, you know, whether it was
22   mechanisms that -- so because -- so that's what
23   the request was for.
24       And the documents were provided.  And my
25   review, looking at the complexity and volume of

Page 64

1    material, I can tell you, there's not enough time
2    to review all of it.  I mean, if somebody has,
3    that's great.  I can't.
4        Q.   Are you done?
5        A.   Yes.
6        Q.   Did you, when you made that request,
7    intend for plaintiffs to provide you with all of
8    the information that was available related to
9    testing or related to ingredients or whatever
10   other issues you requested documents on?
11           MS. PARFITT:  Objection.  Form.
12       A.   Yes.
13       Q.   All right.  In your report, you cite --
14   and this is in references -- to the depositions
15   of witnesses in the talcum powder litigation.
16   For example, and let's take a look at Exhibit 4,
17   your references, Cite No. 4 is to the deposition
18   of Linda Loretz.
19       Did you review this?
20       A.   Yes, I did.
21       Q.   And who is she?
22       A.   I don't recall offhand, who she is.
23       Q.   Is that information that was provided
24   to you by plaintiffs' counsel?
25       A.   Yes.

Page 65

1        Q.   Who is Joshua Muscat, reference list,
2    Cite No. 5?
3        A.   I think he did one of the
4    meta-analyses.  He's an author of one of the
5    meta-analyses as well.
6        Q.   Who is Alice Blount, Cite 27?
7        A.   Yeah.  They did a study on talc and
8    also I was deposed on that.
9        Q.   Did you request that deposition or was
10   that provided to you?
11           MS. PARFITT:  Objection.
12       A.   I requested information on -- as I
13   said, my request wasn't for deposition -- you
14   know, all documents that helped me answer the
15   causal question.
16       Q.   Whether they support plaintiffs'
17   position or refute plaintiffs' position; is that
18   right?
19       A.   To answer the causal question.  That's
20   what --
21       Q.   You wanted, though, all relevant
22   documents, whether they supported plaintiffs'
23   position or whether they refuted plaintiffs'
24   position; correct?
25       A.   To answer the causal questions.  I

17 (Pages 62 to 65)

Sonal Singh, M.D., M.P.H.

Page 66

1  don't --
2      Q.  Can you not answer that question?
3          MS. PARFITT:  Objection.  I believe --
4      A.  I'm answering your question.
5          MS. PARFITT:  -- he did.
6      Q.  My question is:  When you requested
7  documents from plaintiffs' counsel on various
8  topics, did you expect to receive whatever
9  documents may support plaintiffs' position and
10  whatever documents may refute plaintiffs'
11  position?
12      A.  Yes.
13      Q.  All right.  Who is John Hopkins,
14  reference item -- strike that -- reference list,
15  Cite 33?
16      A.  I think it's -- yeah.  It's a
17  deposition on behalf of J&J, I think.
18      Q.  Do you know who Mr. Hopkins is?
19      A.  No, I don't.
20      Q.  Do you know what role he had with
21  talcum powder?
22          MS. PARFITT:  Objection.  Form.
23      A.  I mean, he was deposed in this
24  litigation and he provided testimony.
25      Q.  The question is:  Do you know what role

Page 67

1  Mr. Hopkins played in and with talcum powder?
2      A.  He was providing testimony on behalf of
3  the company.  Is that --
4      Q.  Other than that, do you know anything
5  about what he did on behalf of the company?
6      A.  No.
7      Q.  Do you know what his positions were?
8      A.  I don't recall.
9      Q.  Do you know what his duties and
10  responsibilities were?
11      A.  I don't review that as a part of my
12  deposition, is to review positions and do
13  responsibilities.
14      Q.  And who is Julie Pier, Item 35?
15      A.  She was testifying on behalf of Imerys,
16  I think.
17      Q.  Do you know her position?
18      A.  I don't review -- you know, she was
19  testifying for the company, as that's as far as I
20  know.  Again, I don't know what role she was
21  playing and what she does.
22      Q.  Did you read, for each of these
23  depositions that you reference and cite to, did
24  you read just that section or did you read the
25  entire transcript?

Page 68

1      A.  So we can -- we can go back to the
2  sections where I cite these and then we can
3  discuss.  Is that okay?
4      Q.  No.  Well, and if you need to -- if you
5  can't answer a question, tell me you can't answer
6  a question.
7          My question is:  For these five or six folks
8  who you have quoted a snippet from their
9  deposition, did you review their entire
10  transcript or did you just review an excerpt?
11          MS. PARFITT:  Objection to the form.
12      A.  So the answer will be, we have to go
13  one by one.
14      Q.  All right.  For Mr. Hopkins, did you
15  review his entire deposition?
16      A.  No.
17      Q.  For Ms. Pier, did you review her entire
18  deposition?
19      A.  No.
20      Q.  For Ms. Blount, did you review her
21  entire deposition?
22      A.  I recall, yes.
23      Q.  Yes, you did?
24      A.  Yes.
25      Q.  For Ms. Loretz, did you review her

Page 69

1  entire deposition?
2      A.  Yes.
3      Q.  Did -- strike that.
4          For Mr. Muscat, did you review his entire
5  deposition?
6      A.  Yes, I did.
7      Q.  Did you review all of the exhibits to
8  those depositions?
9      A.  Again, those are pages and pages of
10  documents.  I don't know that -- if I reviewed
11  every single page of it.
12      Q.  Is it your practice, outside of
13  litigation, to rely on excerpts of deposition
14  testimony?
15      A.  Well, I mean, when you say "excerpts of
16  depositions," when I reviewed evidence, when I
17  try to gather evidence, as I said, you know, I
18  was trying to answer the causal question; I try
19  to gather all relevant evidence to the relevant
20  causal question at hand.
21          And sometimes these are unpublished
22  documents, and sometimes these are regulatory
23  documents and sometimes, as is in this case, they
24  are depositions.  And this approach is quite
25  consistent with other -- other approaches, such

18 (Pages 66 to 69)

Sonal Singh, M.D., M.P.H.

Page 70

1    as those conducted by, you know, Health Canada.
2        I mean, they clearly state that, you know,
3    you gather all relevant available evidence.
4        Q.   That was your goal; is that right?
5        A.   Yes.
6        Q.   Did Health Canada review deposition
7    testimony of company witnesses, to your
8    knowledge?
9        A.   Well, they were not available to them.
10       Q.   When you practice, outside of being a
11   litigation consultant, do you rely on excerpts of
12   deposition testimony?
13       A.   Well, again, you know, outside of this,
14   when I do papers -- I mean, I do include
15   unpublished or whatever you can collect,
16   whether -- whether it's excerpts of -- I mean, I
17   haven't -- if I look at my past papers, I can't
18   say that I've used excerpts of deposition
19   transcripts.
20       Q.   Did -- strike that.
21       You also cite company documents in your list
22   of references; is that right?
23       A.   Which one is that?
24       Q.   Exhibit 4.
25       A.   Which company?

Page 71

1        Q.   Well, for example, Item 116 refers to
2    an Imerys document, item 63 refers to a document
3    or set of documents produced by the
4    Johnson & Johnson defendants; correct?
5        A.   What was the second one?  I'm sorry.
6    You said 116 and then?
7        Q.   Yes.  Sixty --
8        MS. PARFITT:  63.
9        Q.   63.
10       A.   I'll have to go back and see what do
11   they cite about, to refresh my memory.
12       Q.   As you sit here, you don't remember
13   what those documents are, do you?
14       A.   Yeah.  Yeah.  I'd have to go back.
15       Q.   Is that correct?
16       A.   Yeah.  I mean, I have to go back to my
17   report and see them.
18       Q.   My question is:  Did plaintiffs'
19   counsel provide you with a large set of J&J
20   and Imerys company documents and you went through
21   and whittled them down, or did they provide you
22   with select documents?
23       MS. PARFITT:  Objection.  Form.
24       A.   Well, I mean, I feel it's a large set.
25   As you can see, I've reviewed, you know, as much

Page 72

1    as humanly possible.
2        Q.   My question is a little more specific.
3    I'm talking now just about any documents produced
4    by Johnson & Johnson defendants or any documents
5    produced by Imerys defendants.
6        You do cite to several of those in your
7    reference list; correct?
8        A.   Yes.
9        Q.   You were provided those documents by
10   counsel for plaintiffs; correct?
11       A.   Yes.
12       Q.   Were you provided a large set of
13   materials, company documents from the J&J
14   defendants and from the Imerys defendants, or
15   were you provided with select documents?
16       MS. PARFITT:  Objection.  Form.
17       A.   I mean, these are company documents.  I
18   mean, what is the difference between the two?
19   Like explain to me by example.
20       Q.   Were you provided a box of J&J
21   documents or documents produced by J&J for your
22   review by plaintiffs' counsel?
23       MS. PARFITT:  Objection.  Form.
24       A.   I don't know.  I mean, they provided
25   documents.  I see them as documents.  I don't see

Page 73

1    a difference between.  You can -- you know, you
2    can make that connection.
3        Q.   Let me do it this way.
4        A.   Sure.
5        Q.   Are the documents that you reviewed
6    relating to those produced by J&J or produced by
7    Imerys, do you list those in your references,
8    Exhibit 4, and your additional materials and data
9    considered, Exhibit 5?
10       A.   They are listed.  Yes.
11       Q.   All right.  When you are doing your day
12   job, outside of your litigation consulting work,
13   do you rely on internal company documents?
14       MS. PARFITT:  Objection.  Form.
15       A.   I mean, I have relied on company
16   documents.  When you say "internal company
17   documents," that's, you know -- yeah.  I have
18   relied on company documents.  We have relied on
19   company trial registries for publications.  We
20   have relied on -- whether you're talking about
21   company communication, that's different.
22       But in terms of if we have data available
23   from the company, there's no reason not to rely
24   on that.
25       Q.   I'm talking about company

Sonal Singh, M.D., M.P.H.

Page 74

1  communications, the types of documents that you
2  cite from or produced by J&J and by Imerys in
3  your reference list.
4      Those are not the types of materials that
5  you typically would rely on if you were doing a
6  study for publication; correct?
7      MS. PARFITT: Objection. Form.
8      A.  And, again, I've just said that, you
9  know, I gathered all the relevant evidence, as
10  would -- you know, as a methodology that's
11  acceptable and considered.
12     But, you know, in my previous reviews, I've
13  not had access to -- access to those documents.
14  And that's the only -- that's the only place
15  where you can get access to these documents.
16     Q.  The answer to my question is no, you
17  know, when you publish articles, you do not rely
18  on internal company documents or communications
19  as you are in this litigation matter; correct?
20     MS. PARFITT: Objection. Form.
21     A.  The reason is because there's a
22  confidentiality order.  And so you can't say you
23  can't publish articles when you can't access
24  them.  I mean, there's a chicken and egg, here,
25  right?

Page 75

1      Q.  Understood.
2      The answer, though, to my question is yes;
3  correct?
4      MS. PARFITT: Objection. Form.
5      A.  The reason is because these
6  documents --
7      Q.  Doctor, you need to answer the
8  question.
9      MS. PARFITT: Wait, Mr. Zellers.
10  Excuse me.  Let the witness answer the question.
11     MR. ZELLERS: I'm asking him to answer
12  the question and then I'll be happy to move on.
13     MS. PARFITT: No.  You're telling him,
14  say yes.  He's trying to answer your question.
15     Ask him again.  He'll answer the
16  question.  He's done it twice.
17     Q.  Do you need me to repeat the question?
18     A.  Yes, please.
19     MR. ZELLERS: Could you read the
20  question?
21     I'll ask it again.
22     Q.  Dr. Singh, when you publish articles,
23  you do not rely on internal company documents;
24  correct?
25     MS. PARFITT: Objection. Misstates his

Page 76

1  testimony.
2      A.  I've already stated that when I publish
3  articles, the approach is to gather all relevant,
4  available evidence.
5      And I have, in fact -- you can go back at my
6  articles -- and included data from company
7  documents in various systematic reviews and
8  meta-analyses.  So this idea that I have not
9  relied on company documents is -- you know, is
10  not.
11     The question is about deposition transcripts
12  and communiques.  Those are generally not
13  available in the published domain, and even for
14  this particular instance, you know, for there's a
15  confidentiality order.  I'm just trying to
16  explain what happens.
17     Q.  So that our record is clear, when you
18  talk about internal communiques, we're talking
19  about internal communications, in this case,
20  materials that you have been provided by
21  plaintiffs that have been produced by J&J and by
22  Imerys.
23     Those are not the types of documents that
24  you typically have available and rely upon in
25  your published work; correct?

Page 77

1      MS. PARFITT: Objection. Misstates his
2  testimony.
3      Q.  Is that correct, Doctor?
4      MS. PARFITT: Objection. Misstates his
5  testimony.
6      A.  These are just not available to form an
7  opinion in the published domain.
8      Q.  You have an additional --
9      THE WITNESS: Can I take a break?
10     MR. ZELLERS: Sure.  Of course.  At any
11  time.
12     THE WITNESS: Sorry about that.
13     MR. ZELLERS: No.  That's fine.
14     THE VIDEOGRAPHER: Off the record.
15  10:22 a.m.
16         (A recess was taken.)
17     THE VIDEOGRAPHER: Here begins media
18  No. 2 in today's deposition of Sonal Singh, M.D.,
19  M.P.H.  Back on the record, 10:35 a.m.
20  BY MR. ZELLERS:
21     Q.  Dr. Singh, are you ready to continue?
22     A.  Yes, I am.
23     Q.  When we broke, we were looking at the
24  additional materials and data considered list,
25  which we have marked as Deposition Exhibit 5.

20 (Pages 74 to 77)

Sonal Singh, M.D., M.P.H.

Page 78

1    Do you have that?
2    A.   Yes.
3    Q.   There are some documents on this list
4  that have a preface of Imerys.  And if you look
5  on Page 87, you list those documents out.  And
6  then turning to Page 88, there's a series of
7  documents that begin with J&J.
8    Do you see those?
9    A.   Yes.
10   Q.   Did you rely on those documents in
11 informing your opinions?
12   A.   No.  I mean, I reviewed -- I don't know
13 if I reviewed them in full.  I just -- you know,
14 they were provided to me.
15   Q.   That is, the set of documents that were
16 provided to you by counsel for plaintiffs; is
17 that right?
18   A.   Yes.
19   Q.   Are you able, as we sit here, to tell
20 me what those documents are?
21   A.   Yeah.  I mean, for example, some of
22 them is, you know, duplicative of expert reports
23 that are listed here.  I don't know by number and
24 number, J&J, what that means.
25   Q.   I'm referring to, for this series of

Page 79

1  questions, just to the other materials that you
2  have listed, the ones that begin with Imerys.  So
3  starting at Item 2 on Page 87.  And also
4  including the documents that begin J&J that go
5  through Item 23 on Page 88.
6    Are you able to identify and tell us what
7  those documents are?
8    A.   I mean, I was provided them.  I don't
9  know what specifically they are, you know.
10   Q.   Do you know how they were compiled?
11   A.   No.  I'm not aware of the process.
12   Q.   Do you know what percentage of internal
13 documents, internal to Johnson & Johnson
14 companies and to Imerys, have been produced in
15 the case that appear on your reliance list?
16   A.   I'm not aware of that proportion.
17   Q.   Did you request any additional J&J or
18 Imerys documents other than the ones that were
19 provided to you by plaintiffs' counsel?
20   A.   So, it's hard to say request
21 additional.  I requested question -- materials to
22 answer my question.  How would I know what
23 additional -- you know, I requested materials.
24   Q.   The way it worked is you asked
25 plaintiffs for materials that would be helpful to

Page 80

1  answer the causal question in this case; is that
2  right?
3    A.   Yes.
4    MS. PARFITT:  Objection.
5    Q.   You did not have access to internal
6  documents of J&J companies or of Imerys; is that
7  right?
8    A.   Yes.
9    Q.   You asked for those documents, the ones
10 that would be relevant to you in forming an
11 answer to the question you were asked of
12 plaintiffs' counsel; correct?
13   A.   Yeah.  Relevant to consider or support
14 or refute.  Yeah.
15   Q.   The documents that were provided to you
16 are the documents that appear with a J&J
17 preface -- preface and an Imerys preface in the
18 reference list, Exhibit 4, and in the additional
19 materials and data considered list, Exhibit 5;
20 correct?
21   A.   Yes.
22   Q.   Once you got those documents and you
23 looked at those documents -- and you're not sure
24 you looked at all of them; is that right?
25   A.   Yes.  I did not.  I mean --

Page 81

1    Q.   All right.
2    A.   -- because it is not possible to look
3  at all of them.
4    Q.   Did you make any follow-up request for
5  additional company documents, either documents
6  produced by J&J or documents produced by Imerys,
7  of plaintiffs' counsel?
8    A.   I was inundated with these, and I don't
9  think it was practical of me to request for
10 additional documents.
11   Q.   In terms of internal company documents
12 and communications produced either by
13 Johnson & Johnson and by Imerys, the only
14 documents you reviewed are the ones that were
15 hand selected by lawyers for plaintiffs; is that
16 right?
17   MS. PARFITT:  Objection.  Form.
18   A.   The documents that I reviewed are
19 listed, you know, in 4 and 5.
20   Q.   My question --
21   A.   I don't know what -- so you're asking
22 me to infer what they hand selected; right?  I
23 mean, whether they provided all, whether they
24 provided hand selected, that's not my -- I don't
25 know that.  You know that.  But I don't.

21 (Pages 78 to 81)

Sonal Singh, M.D., M.P.H.

Page 82

1    So how can I answer that they were hand
2  selected?
3       Q.   The company documents that you
4  reviewed, internal company documents, they came
5  from plaintiffs; is that correct?
6       A.   Yes.
7       Q.   The updated materials list, we marked
8  that as Exhibit 6.
9       Those are materials that were provided to
10  you by plaintiffs' counsel; is that right?
11      A.   No.  I submitted -- I mean, I had
12  access to several of these documents, you know,
13  after the submission of my report, and I reviewed
14  them and I actually sent them some of them.
15  So...
16      Q.   What documents on this list did you
17  provide to plaintiffs and what documents on this
18  list -- we're looking at Exhibit 6 -- did they
19  provide to you?
20      A.   Like I had the Fadak article.  I had
21  the Health Canada Assessment.  They provided the
22  submitted reports.  I had the Weed article.  They
23  provided the Zervo -- I don't know how to
24  pronounce that name.  Yeah.
25      So, yeah, I had access to some of these, and

Page 83

1  I provided the up-to-date article, and the
2  remainder, they provided.
3       MR. KLATT:  May I interject?  I didn't
4  understand the very first article you said.  It
5  sounded like dark.
6       THE WITNESS:  Fadak.
7       MS. PARFITT:  F-A-D-A-K.
8       THE WITNESS:  Fadak, that's a paper --
9       MR. KLATT:  Okay.  I see.  Thank you.
10      THE WITNESS:  That's a 2015 paper.
11      MR. KLATT:  I saw it.  Thank you.
12  BY MR. ZELLERS:
13      Q.   When did you review the materials that
14  are listed on the updated materials list,
15  Exhibit 6?
16      A.   So, again, maybe we circle back earlier
17  when I said I did not review all of them, like I
18  did not review the expert reports.  Yeah.
19      Q.   Of the materials that you did review,
20  on the updated materials list, when did you
21  review those?
22      A.   Sometime between December and January.
23      Q.   It was after you had prepared your
24  written report and produced it; is that right?
25      A.   Yes.

Page 84

1       Q.   It's fair to say you did not rely on
2  the updated materials list in forming your
3  opinions and preparing your report in this case;
4  correct?
5       A.   Yeah.  I did not rely on this, on these
6  materials in preparing the report, but several of
7  these materials are, you know, are helpful in
8  explaining my opinions on this, which were, you
9  know, provided in the report.
10      Q.   Have you published anywhere your theory
11  that baby powder causes ovarian cancer?
12      A.   I don't consider it my theory.  I mean,
13  several other people have studied this.  I don't
14  know how many studies.  There have been more than
15  30 studies.
16      So I don't consider it my theory.  But, no,
17  I have not published a study on it.
18      Q.   Do you plan to publish on this?
19      A.   Yes, I do.
20      Q.   Are those plans underway?
21      A.   Well, I mean, a lot of it will, again,
22  depend on, you know, the questions you asked
23  about how much of this material will become
24  eventually -- you know, I have signed a
25  confidentiality order.  So, you know, how much is

Page 85

1  allowed to be published.
2       And so, you know, a lot of it will depend
3  on, I guess, the permission of the judge, who
4  allows -- who oversees these kind of -- I would
5  like to, eventually.
6       Q.   Have you previously published on any
7  topic relating to talc and ovarian cancer?
8       A.   No.
9       Q.   Have you conducted any test or
10  experiments to confirm your theory that talc
11  migrates to the ovaries and causes cancer via
12  inflammation?
13      A.   So, again, that is not a theory that I
14  have propounded, that talc migrates through the
15  ovary, that talc migrates up to cause ovarian
16  cancer, that I have evaluated the epidemiologic
17  studies, which show a causal link between talc
18  and ovarian cancer, and several other
19  investigators, some of them which I cite, have
20  provided evidence that -- of talc-induced, you
21  know, migration.
22      So it's not my theory, as you say.
23      MR. ZELLERS:  Move to strike as
24  nonresponsive.  Try to listen.
25      Q.   My question is, I think, a simple

Page 86

1  question.
2      Have you, Dr. Singh, conducted any test or
3  experiments to confirm your statement in your
4  report that talc migrates to the ovaries and
5  causes cancer via inflammation?
6      A.  No.  I have not done any experiments.
7      Q.  Can you identify for me a single
8  article that identifies inflammation anywhere in
9  a woman's reproductive tract resulting from
10  external genital talc application?
11      MS. PARFITT:  Objection.  Form.
12      A.  Can you repeat the question?
13      Q.  Sure.  Can you identify for me a single
14  article that identifies inflammation anywhere in
15  a woman's reproductive tract resulting from
16  external genital talc application?
17      A.  I mean, again, this is, you know, when
18  I reviewed -- so this relates to the biological
19  question about talc.  And when I reviewed the
20  biological evidence, I was on migration and
21  inflammation, I was looking for evidence, support
22  or refute that.
23      And there's studies that show that talc
24  migrates through HS, you know, whatever,
25  hysterosalpingography, and induces inflammation.

Page 87

1  I mean, the definitive study is not there.
2      And, again, I did not do these studies.  So
3  I can only rely on people who have done such
4  studies.
5      Q.  Can you cite a single study, animal or
6  human, that traces externally applied talc up
7  through the reproductive tract to the ovaries?
8      MS. PARFITT:  Objection.  Form.
9      A.  Again, but I do not believe that's
10  necessary to, you know, provide my causal opinion
11  in support of a causal hypothesis.
12      MR. KLATT:  Objection.  Nonresponsive.
13      Q.  Is the answer to my question, no?
14      MS. PARFITT:  Objection.  Form.
15      A.  No, with context.
16      Q.  Health Canada Risk Assessment, that was
17  not something that you included in your
18  references or materials considered as part of
19  your report; is that right?
20      A.  Yes.  It was not available at that
21  time.
22      Q.  All right.  It is listed, the Health
23  Canada Risk Assessment is listed in your updated
24  materials list that we got over the weekend;
25  correct?

Page 88

1      A.  Yeah.  It was available to everyone in
2  December.
3      Q.  Have you looked into what other public
4  health authorities have to say about talc and
5  ovarian cancer?
6      A.  Yes.
7      Q.  Would it be important for you to know
8  that CDC does not list talc as a risk factor for
9  ovarian cancer?
10      MS. PARFITT:  Objection.  Form.
11      A.  I mean, it would be important to know,
12  you know, various agencies, you know, CDC,
13  whatever.  I mean, you would like to know of
14  many, many agencies.
15      But, again, you'd have to -- you'd have to
16  see the quality of their judgment.  I mean, what
17  is their rationale?  What are the studies they
18  reviewed?  What is the data available?
19      Just like as you said, what is the data
20  available to me to make that judgment, what is
21  data available to them?  Just because they are
22  the CDC doesn't mean that, you know -- yes, I
23  would like to know their opinion, but then what
24  is the underlying basis of their opinion?
25      Q.  You're familiar with the CDC; correct?

Page 89

1      A.  I'm very familiar with the CDC.
2      Q.  It is an unbiased governmental entity;
3  correct?
4      A.  Well, it would depend on the opinion.
5      I mean, you know, we cannot say an entity is
6  unbiased.  It would depend what is the particular
7  opinion -- you know, if the CDC provides
8  vaccination.  We have to look at the particular
9  context.
10      Q.  Are you aware that the CDC does not
11  list talc as a risk factor for ovarian cancer?
12      A.  Yes.
13      MS. PARFITT:  Objection.
14      Q.  Are you aware that the Mayo Clinic does
15  not list talc as a risk factor for ovarian
16  cancer?
17      A.  I'm not aware of Mayo Clinic.
18      Q.  You are aware of NIH; correct?
19      A.  Yes.  I'm funded by the NIH.
20      Q.  Do you know that NIH does not list talc
21  as a risk factor for ovarian cancer?
22      A.  Yes.  And I have been aware of, you
23  know, changes in the past to their -- to their
24  statements.
25      (Article entitled "Ovarian,

23 (Pages 86 to 89)

Sonal Singh, M.D., M.P.H.

Page 90

1    Fallopian Tube, and Primary Peritoneal
2    Cancer Prevention (PDQ) - Health
3    Professional Version marked Exhibit 15.)
4        MR. ZELLERS:  Take a look at Deposition
5    Exhibit 15.
6        MS. PARFITT:  Thank you.
7    BY MR. ZELLERS:
8        Q.  Deposition Exhibit 15 is a publication
9    from the National Cancer Institute; is that
10   right?
11       A.  It is.
12       Q.  National Cancer Institute is a leading
13   health authority; is that right?
14       A.  Yes.
15       Q.  It's a leading cancer research
16   institution in the world?
17       MS. PARFITT:  Objection.  Form.
18       A.  Yes.
19       Q.  Have you ever received a grant from the
20   National Cancer Institute?
21       A.  I've applied.  I have not received any.
22   I am applying again.
23       Q.  They fund more cancer research than any
24   organization in the world; correct?
25       MS. PARFITT:  Objection.

Page 91

1        A.  I don't know that particular number,
2    but -- I just don't know that answer.
3        Q.  Are you aware that the National Cancer
4    Institute reviews the peer-reviewed literature as
5    it relates to risk factors for ovarian cancer?
6        MS. PARFITT:  Objection.  Form.
7        A.  Yes.  And I don't know how updated they
8    are.  Based on the document you've provided me,
9    they have four citations for perineal talc and
10   ovarian cancer.
11       So, again, I'm not questioning the NCI's
12   motivation, but I am -- I am raising, what is the
13   quality of their judgment.
14       Q.  Did you consider the CDC's
15   determination that talc is not a risk factor for
16   ovarian cancer in formulating your opinions?
17       A.  Yes.
18       Q.  Did you consider NIH's determination
19   that talc is not a risk factor for ovarian cancer
20   in formulating your opinions?
21       A.  Yes.  Because they did not have
22   sufficient information, based on what they
23   provided in their PDQs.
24       Q.  Did you consider National Cancer
25   Institute's opinion or conclusion that talc is

Page 92

1    not a risk factor for ovarian cancer?
2        MS. PARFITT:  Objection.
3        A.  So the National Cancer Institute hasn't
4    opined on that talc is not a causal -- you know,
5    is causally linked to ovarian cancer.  It has
6    provided a listing of documents.  It has not gone
7    through any systematic process, that I'm aware
8    of, of looking at the epidemiologic data
9    systematically.
10       It has not provided any evidence of
11   inflammation or lack thereof or migration or lack
12   thereof or to even, you know, arrive at this
13   causal hypothesis.
14       Q.  Because it's important to look at both
15   sides of an issue; correct?
16       A.  Yes.  I did look -- so I'm saying that
17   I did look at this and my opinion --
18       Q.  Did you --
19       MS. PARFITT:  Please let him finish.
20       Q.  Are you finished?
21       A.  I'm saying I did look at this, and I'm
22   aware of this document.
23       Q.  Did you cite to the CDC in your report
24   or references?
25       A.  I don't -- I wasn't aware of the CDC.

Page 93

1        Q.  Did you cite to the NIH in your report
2    or your references?
3        A.  I should have.  And if it isn't, it is
4    remiss.
5        Q.  Did you cite to the National Cancer
6    Institute in your report or references?
7        A.  I have to look at it.
8        Q.  The National Cancer Institute, in fact,
9    has done an analysis, a very detailed analysis
10   which we have marked as Exhibit 15 to this
11   deposition; correct?
12       MS. PARFITT:  Objection to form.
13       A.  I don't think it's a detailed analysis
14   of perineal talc and ovarian cancer.
15       There is how many lines?  We can look at it
16   and read it together.  It's, you know -- it's 15
17   lines.  And they have references 41 to 45, which
18   is five references.
19       So I don't know it is a detailed analysis.
20       Q.  National Cancer Institute, one of the
21   things that it does is to review peer-reviewed
22   literature as it relates to risk factors for
23   ovarian cancer.  Is that right?
24       MS. PARFITT:  Objection.  Form.
25       A.  It does do that.

24 (Pages 90 to 93)

Sonal Singh, M.D., M.P.H.

Page 94

1     Q.  All right.  This document, this
2  document that we're looking at from the National
3  Cancer Institute, Exhibit 15, was updated in
4  January of 2019; is that right?
5     A.  Yeah.  But it doesn't mean the review
6  was updated, because it has no recent citations
7  of studies that have been conducted.
8     Q.  We --
9     A.  We should look at the citation.  Let's
10  look at it, because we are discussing this
11  document, we should look at it in detail.
12     Q.  Doctor, turn to Page 6.
13     A.  No.  Let me finish.  I'm not finished
14  with this document.
15     MS. PARFITT:  Go ahead.  Let him
16  finish.
17     Q.  Doctor, you have to answer my
18  questions.
19     A.  But I haven't answered it.
20     Q.  My question is look at Page 6.  Can you
21  do that?
22     A.  Okay.
23     Q.  All right.  Page 6 is a section on
24  perineal talc exposure; is that right?
25     A.  Yes.

Page 95

1     Q.  This is part of the National Cancer
2  Institute's publication on ovarian, fallopian
3  tube and primary peritoneal cancer prevention; is
4  that right?
5     A.  Yes.
6     Q.  On Page 6, the first sentence under
7  perineal talc exposure states, "The weight of
8  evidence does not support an association between
9  perineal talc exposure and an increased risk of
10  ovarian cancer."
11     Is that right?
12     A.  Based on what?  Based on these 41 to 45
13  citations?  Which are an incomplete listing of
14  studies and an incomplete review of the evidence.
15     So I'm just stating that, yes, what is the
16  underlying basis?
17     Q.  Doctor --
18     MS. PARFITT:  Wait.  Let him finish.
19  He's in the middle of a sentence.
20     A.  What is the underlying basis of this
21  opinion?
22     Q.  Dr. Singh, my question is:  Did I read
23  the conclusion of the National Cancer Institute
24  correctly?
25     MS. PARFITT:  Objection.

Page 96

1     A.  I don't know if it's the conclusion,
2  but, yes, you read that part of the statement
3  correctly.
4     Q.  Why would you rely on Health Canada,
5  but not these other public health organizations?
6     MS. PARFITT:  Objection.  Misstates his
7  testimony.
8     A.  In fact, I did rely on the Health
9  Canada when my report was conducted.  So you
10  see -- I relied on the quality of the review and
11  the breadth of my review, which had hundreds of
12  studies, the breadth of review of biological
13  plausibility, the breadth of review of, you know,
14  animal studies, applying the Bradford Hill
15  framework, and then forming an opinion.
16     Q.  How -- are you done?
17     A.  No.  I'm not done.
18     And the Health Canada Assessment came after
19  that.  And it so happened their methodology --
20  methodology -- methodology and opinions are
21  consistent with mine.
22     So it's not that I'm relying on that.  I'm
23  just saying that they are consistent and they
24  came to the same conclusions.
25     Q.  What materials and analysis was done by

Page 97

1  the CDC in determining that talc is not a risk
2  factor for ovarian cancer?
3     MS. PARFITT:  Objection.  Form.
4     A.  I don't have that.
5     Q.  What materials were reviewed and relied
6  upon by NIH in determining that talc is not a
7  risk factor for ovarian cancer?
8     A.  References 41 to 45.
9     Q.  How do you know that that's all that
10  the NIH and National Cancer Institute reviewed?
11     A.  Because that's what they cite.
12     Q.  Have you been privy to the complete
13  review and analysis of the National Cancer
14  Institute?
15     A.  But you just stated that this was the
16  complete review and analysis of the National
17  Cancer Institute?
18     Q.  I'm asking you:  Do you know what
19  specific studies and materials were reviewed and
20  what analysis was done by NIH and by the National
21  Cancer Institute?
22     A.  Yeah.  These are the studies that were
23  reviewed.
24     Q.  You are assuming that this is the
25  entire analysis and review that was done by the

Sonal Singh, M.D., M.P.H.

Page 98

1  National Cancer Institute; is that right?
2       MS. PARFITT:  Objection.  Form.
3       A.  I'm not assuming anything.  I'm
4  assuming that, just as the conclusions that you
5  are assuming are definitive, I'm also, you know,
6  stating that these are the studies that they
7  relied on to form those conclusions.
8       So we can't pick and choose, assess
9  statement of the excerpt that you -- supports
10 your opinion, but then not look at the underlying
11 evidence base that supports that opinion.
12      Q.  But we should consider all of that
13 information; correct?
14      A.  Yeah.  And the studies underlying.
15      Q.  And you did not consider the CDC's
16 opinion in your report, did you?
17      A.  I mean, CDC -- so let's just step back
18 a little.
19      When I say CDC opinion, I mean, I'm looking
20 at original studies.  I'm looking at data in
21 forming my opinion.  I did look at what IARC
22 considered and other agencies considered.
23      My opinion is based on my review and the
24 methodology and I was, you know, obviously,
25 taking into account what agencies say, but

Page 99

1  agencies' opinion is not necessarily the
2  underlying basis of my causal opinion.
3       Q.  Whether it's CDC, NIH, NCI or Health
4  Canada; correct?
5       A.  Yeah.  I mean, they're informing.  I
6  want to look at their thinking and what is the
7  quality of their judgment on this.
8       Q.  You understand Health Canada has simply
9  produced a draft assessment; is that right?
10      MS. PARFITT:  Objection.  Form.
11      A.  Yes.
12      Q.  We are at the beginning of the public
13 comment period; is that right?
14      A.  I don't know the timeline of that.
15      Q.  Are you aware that Health Canada can
16 take up to two years to take any action or no
17 action at all?
18      A.  Well, I mean, I was not asked a causal
19 question on what to do about this.  I was just
20 asked a question on causality.  And I'm not sort
21 of -- I'm not privy to their process.
22      Q.  How did you come to learn of the Health
23 Canada Risk Assessment?
24      A.  News, news documents.
25      Q.  Were you involved in the risk

Page 100

1  assessment prior to its publication?
2       A.  No.
3       Q.  Have you submitted any comments to
4  Health Canada?
5       A.  No.
6       Q.  Do you intend to submit any comments to
7  Health Canada?
8       A.  I don't know.  I mean, it will depend
9  on the timeline and I don't know what their
10 timeline is and what my -- you know, I
11 haven't -- I haven't thought about it.
12      Q.  Outside of your litigation consulting,
13 do you generally rely on draft assessments by
14 regulatory agencies?
15      MS. PARFITT:  Objection.  Form.
16      A.  Yes.  I mean, you know, we look at
17 draft assessments on regulatory.  There's no
18 reason not to.
19      Q.  Have you ever cited a draft assessment
20 by a regulatory agency in any study that you've
21 published?
22      A.  Oh, I've published 200 papers, and I
23 can't recall, you know, which one, but I know
24 that I have looked at draft assessments by the
25 FDA.

Page 101

1       Q.  Have you cited any?
2       A.  I can't recall and tell you that.  It's
3  just something I can't recall.
4       Q.  Are you familiar with the precautionary
5  principle?
6       A.  Yes.
7       Q.  What is the precautionary principle?
8       A.  It is to, you know, apply, as my
9  understanding, is to warn when there is, you
10 know, evidence of a hazard.
11      Q.  That's your understanding of the
12 precautionary principle?
13      A.  Yeah.
14      Q.  Do you understand that, as defined by
15 Health Canada, a precautionary principle means
16 taking a precautionary approach to
17 decision-making that emphasizes the need to take
18 timely preventative action even in the absence of
19 a full scientific demonstration of cause and
20 effect?
21      A.  If you're stating -- well, let's get
22 the document out before we --
23      Q.  Sure.  Take a look at deposition
24 Exhibit 16.
25      (Document entitled "Health

26 (Pages 98 to 101)

Sonal Singh, M.D., M.P.H.

Page 102

1    Canada Decision-Making Framework for
2    Identifying, Assessing, and Managing Health
3    Risks - August 1, 2000" marked Exhibit 16.)
4        A.   Okay.  Can you point out which page?
5        Q.   Sure.  Take a look at Pages 8 and 9.
6    So we identify it for the record, Exhibit 16 is
7    the Health Canada Decision-Making Framework for
8    Identifying, Assessing and Managing Health Risk;
9    is that right?
10       A.   Yes.
11       Q.   If you go to Page 8 and 9, Section 1.3
12   are the underlying principles for Health Canada;
13   is that right?
14           MS. PARFITT:  Objection.
15           MR. TISI:  You're looking at the wrong
16   document.  You're not looking at the draft
17   assessment.  You're looking at the --
18           MR. ZELLERS:  Counsel, I am --
19           MR. TISI:  But you identified something
20   as something different than what it is.
21           MR. ZELLERS:  I identified the document
22   as Health Canada Decision-Making Framework for
23   Identifying, Assessing and Managing Health Risk.
24   I'm reading the title of the document.
25           MR. TISI:  Okay.  I have it wrong.  Go

Page 103

1    ahead.
2            MR. ZELLERS:  That's okay.
3        A.   Wherever we are.
4        Q.   No problem, Doctor.
5            MS. PARFITT:  We'll orient ourselves.
6        Q.   Are we oriented?
7        A.   Yeah.  I know the document.  But the
8    page number.
9        Q.   Look at Pages 8 and 9.
10       A.   Okay.
11       Q.   1.3 are the underlying principles for
12   Health Canada decision-making.
13       Do you see that?
14       A.   Yes.
15       Q.   They list out a number of underlying
16   principles on Pages 8 and 9.
17       One of those is to use a precautionary
18   approach; is that right?
19       A.   Yes.
20       Q.   If you then turn to Page 11, at the
21   bottom, they define use of a precautionary
22   approach; is that right?
23       A.   Yes.
24       Q.   Health Canada states in this document,
25   which we've marked as Exhibit 16, "Use a

Page 104

1    precautionary approach.  A key feature of
2    managing health risk is that decisions are often
3    made in the presence of considerable scientific
4    uncertainty.  A precautionary approach to
5    decision-making emphasizes the need to take
6    timely and appropriately preventative action,
7    even in the absence of a full scientific
8    demonstration of cause and effect."
9        Did I read that correctly?
10       A.   Okay.
11       Q.   Do you agree that the recommendation by
12   Health Canada does not require a finding of
13   causation like is required in a court; correct?
14           MS. PARFITT:  Objection.  Form.
15       A.   But I mean, that's what they conclude,
16   that there is a cause.  We can look at the Health
17   Canada document.
18       Q.   Is a guiding principle of the Health
19   Canada Decision-Making and Assessment to use a
20   precautionary approach?
21           MS. PARFITT:  Objection.  Form.
22       A.   Well, no.  I mean, precautionary --
23   they are just defining a precautionary approach.
24   But when they assess talc for its whatever, you
25   know, the talcum powder products, their

Page 105

1    particular assessment clearly states it's causal.
2    And we should open that document.  We should not
3    talk about it in hypotheticals.
4        Q.   On what basis are you relying to state
5    that Health Canada did not use a precautionary
6    approach in assessing talcum powder?
7            MS. PARFITT:  Objection.  Form.
8        A.   No.  No.  No.  Let me answer that
9    question.
10       You were asking about decision-making.
11   Decision-making would be removal of talc, removal
12   of that.
13       But there's two parts to that question about
14   cause and effect.  So let's bring the document
15   out and say where they state there is a causal
16   relationship.
17       Why aren't you bringing that document out?
18   I mean, you can't talk about documents without
19   documents.
20       Q.   Dr. Singh --
21       A.   Yeah.
22       Q.   -- do you have any basis to state
23   that, in evaluating talcum powder, Health Canada
24   did not follow its underlying principle of using
25   a precautionary approach?

27 (Pages 102 to 105)

Sonal Singh, M.D., M.P.H.

1    MS. PARFITT:  Objection.  Form.
2  Misstates the evidence.
3    A.  Yeah.  But that does not preclude at
4  arriving at a causal opinion.  Just because you
5  have a precautionary approach, you can still
6  arrive at causal opinion, which they did.
7    So this is -- this principle is not
8  inconsistent with their report on a causal
9  opinion.
10    Q.  The standard under a precautionary
11  approach is that decisions can be made even in
12  the absence of a full scientific demonstration of
13  cause and effect; correct?
14    MS. PARFITT:  Objection.  Form.
15    A.  That is a threshold, but that does not
16  preclude the determination of cause and effect,
17  which has been done already.
18    Q.  Are you familiar with the Taher 2018
19  publication?
20    A.  Taher.  I don't know which one.
21    Q.  T-A-H-E-R.
22    A.  Yes.
23    Q.  Are you familiar with that publication?
24    A.  Yeah.  It was cited in the Health
25  Canada document.

1    Q.  Have you reviewed and analyzed that
2  publication?
3    A.  I mean, I reviewed it.  I don't know if
4  I analyzed it.
5    What do you mean by "analyzed"?
6    Q.  You have not included it on your
7  references or additional materials considered or
8  updated materials; is that right?
9    MS. PARFITT:  Objection.
10    A.  It was part of the Health Canada.  It
11  should have been part, because it was part, in my
12  mind, part of the Health Canada Assessment.
13    Q.  Can you show me where --
14    A.  Well, I haven't.
15    Q.  -- the Taher publication is listed in
16  your updated materials which we marked as
17  Exhibit 6?
18    MS. PARFITT:  For the record, we
19  created this list, Mr. Zellers, and part of the
20  Canadian, just for form, and you can inquire.
21    MR. ZELLERS:  That's okay.
22    MS. PARFITT:  But since we did create
23  Exhibit No. 6, additional materials, we had
24  included, I will tell you, we had given him
25  Taher.  He may have found it himself.

1    A.  No.
2    Q.  Hold on.  Stop.  Stop.
3    A.  Sure.
4    Q.  Just so we're clear, the updated
5  materials list is a list that was created by
6  plaintiffs' counsel; correct?
7    MS. PARFITT:  It was based upon
8  materials that we had either sent or we had sent
9  that he also had; correct.
10    MR. ZELLERS:  This Exhibit 6 is a list
11  of materials that were provided by plaintiffs'
12  counsel to Dr. Singh, understanding that
13  Dr. Singh has testified that he independently had
14  access to some of the materials.
15    MS. PARFITT:  Correct.  Including
16  Taher.
17    THE WITNESS:  Yeah.  And some of them,
18  I added, such as some of the published articles
19  and Health Canada.
20  BY MR. ZELLERS:
21    Q.  You have read the Taher 2018
22  manuscript; is that right?
23    A.  I mean, I read the -- yeah, I mean,
24  primarily, I read their assessment in Health
25  Canada.

1    MR. ZELLERS:  Deposition Exhibit --
2  well, strike that.
3    Q.  What you told me, when I asked you
4  about CDC and NIH and NCI, is you got to look at
5  the underlying documents, the underlying studies;
6  is that right?
7    A.  Yes.
8    Q.  One of the underlying documents and
9  studies on which Health Canada reviewed was the
10  Taher article; is that right?
11    A.  Yes.
12    (Document entitled "Systematic
13    Review and Meta-Analysis of the Association
14    between Perineal Use of Talc and Risk of
15    Ovarian Cancer" marked Exhibit 17.)
16  BY MR. ZELLERS:
17    Q.  The Taher article is what we have
18  marked as deposition Exhibit 17; is that right?
19    MS. PARFITT:  Thank you.
20    MR. TISI:  Is it Thayer or Taher?
21    A.  It is Taher, T-A-H-E-R.
22    Q.  Did you have access to the Taher 2018
23  article before it was published?
24    A.  Yes.
25    Q.  How did you have access to the Taher

28 (Pages 106 to 109)

Sonal Singh, M.D., M.P.H.

Page 110

1   2018 article?
2      A.   Yeah.  I requested access from the
3   attorneys, if they had it.  They provided it.
4      Q.   So plaintiffs' attorneys provided you
5   with access to the article we've marked as
6   Exhibit 17 prior to its publication; is that
7   right?
8      A.   Yeah.
9         MS. PARFITT:  Objection.
10     A.   I don't know if it has been published
11  yet.
12     Q.   Did you have access to the appendices
13  or supplemental tables referenced in the Taher
14  publication?
15     A.   Yes, I did.
16     Q.   In your epidemiologic -- strike that.
17     Is the Taher publication, which we've marked
18  as Exhibit 17, is that peer-reviewed?
19     A.   It's peer-reviewed, and I assume that
20  it's going to be published.  And it was reviewed
21  by Health Canada.  So I mean, it is
22  peer-reviewed, is my understanding.
23     It is -- I don't know the exact status of
24  that manuscript.
25     Q.   What organization has peer-reviewed the

Page 111

1   Taher publication, Exhibit 17?
2      A.   So I don't -- yeah, again, I take it --
3   I don't know the status of that manuscript, where
4   it is.
5      Q.   You do not know, one way or the other,
6   as to whether the Taher publication, Exhibit 17,
7   has been peer-reviewed; is that right?
8      A.   Yeah.  Whether it's been accepted or
9   submitted or -- I don't know.
10     Q.   Are you finished?
11     A.   I don't know the status.  I'm trying to
12  say that.
13     Q.   In your epidemiological work, outside
14  of litigation, do you rely on articles that have
15  not been peer-reviewed?
16     A.   Yes.  Several times, we rely on
17  articles.  Several times, we actually request
18  articles if it's key to something that we are
19  working on and we know that a particular
20  investigator is active in that area and he may
21  have.
22     So, yes, we actually -- sometimes we request
23  that.  And the majority of the times people don't
24  provide their work until it's published.  But
25  sometimes we get it.  Yeah.

Page 112

1      Q.   Why did you rely on this article,
2   Taher, Exhibit 17?
3         MS. PARFITT:  Objection to form.
4      A.   I mean, when you say I relied on, I
5   mean, I reviewed the, I mean, Health Canada
6   Assessment.  So none of this is in isolation.
7      I mean, this is just a part of, you know,
8   the body of evidence.  You know, my testimony
9   relies on -- and my report relies on the evidence
10  cited there.
11     This is, you know, another meta-analysis
12  that, you know, I reviewed the evidence in
13  slightly different ways and came to the same
14  conclusions and, you know, also did a causal
15  analysis.  So it's sort of, you know, you have to
16  review what evidence comes out.
17     If another meta-analysis comes out tomorrow,
18  then I would review it.
19     Q.   Do you know the source of funding for
20  this publication?
21     A.   I don't know.  I mean, Health Canada or
22  something else, I don't know that.  I can't
23  answer that question.
24     Q.   You're assuming that Health Canada is
25  the source of funding for this publication?

Page 113

1      A.   I don't know.  I shouldn't answer that.
2      Q.   Do you know the credentials of the
3   authors of the Taher 2018 publication,
4   Exhibit 17?
5      A.   I have no idea.
6      Q.   Do you personally know any of the
7   authors that are listed?
8      A.   No.
9      Q.   Do you know whether or not any of the
10  authors of the Taher publication, as listed out
11  on the first page of Exhibit 17, have conflicts
12  of interest?
13        MS. PARFITT:  Objection.
14     A.   Not that -- I didn't -- again, I read
15  the article.  I don't know what their, you know,
16  declarations are.  Yeah.
17     And it does say it was conducted under
18  contract to Health Canada.  So it seems like the
19  funding source is Health Canada.  And let's look
20  at their source of funding.
21     Q.   Doctor, we'll never finish if you want
22  to just go through and look at things.
23     My specific question is whether or not you
24  know whether or not any of the authors have
25  conflicts of interest?

Sonal Singh, M.D., M.P.H.

Page 114

1    MS. PARFITT:  Objection.
2       A.   That's a very vague and broad question.
3   I mean, conflicts of interest as it relates to
4   what?
5       Q.   Do you know?
6       MS. PARFITT:  Objection.  Form.
7       A.   As it relates to what?
8       Q.   You told me you don't know any of the
9   authors; right?
10      A.   Yeah.
11      Q.   I've now asked you if you know if any
12  of the authors had conflicts of interest.
13      A.   And I'm saying that I'm reading the
14  article and I'm reading their declaration, and
15  that's the only way to find out that they have
16  conflicts of interest, right.
17      Q.   I should be more precise.
18      A.   Yeah.
19      Q.   Of your own personal knowledge, do you
20  know whether or not any of the authors have
21  conflicts of interest?
22      A.   That's a separate --
23      MS. PARFITT:  Objection.
24      A.   So what I'm trying to say is, you know,
25  when you ask about conflicts of interest, if you

Page 115

1   want to ask about my article, you'd have to go
2   and read the article and see that, what is stated
3   there.
4       So that's what I'm trying to answer when you
5   ask.  I'm trying to be honest and truthful about
6   my answers.
7       MR. KLATT:  Objection; nonresponsive.
8       MR. ZELLERS:  Move to strike as
9   nonresponsive.
10      THE WITNESS:  I didn't understand the
11  question.
12      MR. LOCKE:  We all have questions to
13  ask this witness.  We're not going to make the
14  seven hours with these answers that do not answer
15  the questions.
16      THE WITNESS:  Maybe I'm not
17  understanding the question.  I'm sorry.  It's not
18  that I'm trying to --
19      Q.   Dr. Singh, the authors of the Taher
20  paper concluded that the evidence suggests that
21  asbestos contamination does not explain the
22  positive association between perineal use of talc
23  powder and ovarian cancer; is that right?
24      A.   Where do you --
25      Q.   Take a look at Page 41, the last

Page 116

1   sentence.  And I'll read it.  Have you found
2   Page 41 of Exhibit 17?
3       A.   41?
4       Q.   Yes.  Page 41.  Do you have that?
5       A.   Yeah.  Yeah.
6       Q.   The very last --
7       A.   Yeah.  I'm looking at it.
8       Q.   Tell me if I read this correctly.  "The
9   similarity of findings between studies published
10  prior to and after this point suggest asbestos
11  contamination does not explain the positive
12  association between perineal use of talc powder
13  and risk of ovarian cancer."
14      Did I read that correctly?
15      A.   Yes.
16      Q.   Do you disagree with the authors on
17  that point?
18      A.   Let me just read it.
19      Well, I mean, to the extent that they are
20  aware that asbestos does not contaminate -- talc
21  is not contaminated with asbestos, I do agree.
22  But, again, I have, you know, obviously more
23  information on that.
24      Q.   On Page 25 of Exhibit 17, the Taher
25  2018 article, is a table entitled "Summary of

Page 117

1   Evidence for Each of the Hill Criteria of
2   Causation as Applied to Perineal Application of
3   Talc and Ovarian Cancer."
4       Is that right?
5       A.   Yes.
6       Q.   One of the Hill criteria is
7   consistency; is that right?
8       MS. PARFITT:  Objection.  Form.
9       A.   Yes.
10      Q.   Looking at authors' statement on
11  consistency, it states, "15 out of the 30 studies
12  reported positive and significant associations."
13      Is that right?
14      A.   Yes.
15      Q.   15 out of 30, that's 50 percent; is
16  that right?
17      MS. PARFITT:  Objection.  Form.
18      A.   Yeah.  But I have -- I disagree with
19  their interpretation of consistency as being, you
20  know, statistically significant.  I mean, you
21  know, my assessment is, you know, estimates
22  towards greater than one.
23      MR. ZELLERS:  Move to strike as
24  nonresponsive.
25      Q.   My question was:  15 out of 30 is

30 (Pages 114 to 117)

Sonal Singh, M.D., M.P.H.

Page 118

1  50 percent?
2      A.  Yes.
3          MS. PARFITT:  Objection.  Let me
4  object, please.
5      Q.  That's no better than a coin toss;
6  correct?
7          MS. PARFITT:  Object to the form.
8      A.  It is 50 percent.
9      Q.  Would you say that 15 out of 30 means
10 there are consistent results across studies?
11     A.  Well, I mean, again, my definition of
12 inconsistency, as noted in my report, is
13 different from theirs.
14     Q.  These are just the case control
15 studies; is that right?
16     A.  When you say -- they just say 30
17 studies.  Yeah.
18     Q.  These are case-control studies; is that
19 right?
20         MS. PARFITT:  Objection.  Form.
21     A.  Well, they're both, right?  Case
22 control and core.
23     Q.  The authors in Taher also recognize
24 that there's no consistent dose-response across
25 studies; is that right?

Page 119

1          MS. PARFITT:  Objection.  Form.
2      A.  Well, let me look at the dose-response
3  section.
4      Q.  Page 21.  And I'm looking at the very
5  last sentence above Section 3.3.2.
6      A.  Tell me, which page number?
7      Q.  Sure.  Page 21.
8      A.  We do have to slow down so that I can
9  move between pages, if you don't mind.
10     Yes.
11     Q.  This is in the section "Evidence from
12 Human Studies"; correct?
13     A.  Okay.
14     Q.  Is that a yes?
15     A.  Yes.
16     Q.  The statement by the authors, "When
17 conducted, findings from trend analyses were not
18 consistent."
19     Is that right?
20     A.  The last line?
21     Q.  Yes.
22     A.  Yes.  But the criteria for
23 dose-response is just exposure-response
24 gradients.  I mean, it doesn't, you know, say
25 as -- even in -- I state in my report, there's no

Page 120

1  consistent evidence.  There are studies that
2  provide dose-response and other studies that
3  don't.
4      Q.  You currently work for the University
5  of Massachusetts; is that right?
6      A.  Yes.
7      Q.  You work for both the medical school
8  and the medical center; is that right?
9      A.  Yes.
10     Q.  Are you aware that the University of
11 Massachusetts does not claim that talcum powder
12 causes ovarian cancer?
13         MS. PARFITT:  Objection.  Form.
14     A.  I don't know what -- they're listed on
15 their website.  I'm not sure they provide any
16 information sheet that I am aware of.
17         (Printout entitled "Ovarian
18 Cancer:  Risk Factors" marked Exhibit 18.)
19 BY MR. ZELLERS:
20     Q.  Take a look, if you will, at Deposition
21 Exhibit 18.
22         MR. TISI:  What is 16?
23         MR. ZELLERS:  Exhibit 16 was the Health
24 Canada Decision-Making Framework.  It's right
25 here.

Page 121

1          MR. TISI:  Oh.  I have that, Counsel.
2  Thank you.
3  BY MR. ZELLERS:
4      Q.  Have you had an opportunity, Dr. Singh,
5  to review Deposition Exhibit 18?
6      A.  Yes.
7      Q.  This is a website from the University
8  of Massachusetts Memorial Healthcare; is that
9  right?
10     A.  Yes.
11     Q.  Are you familiar with the website?
12     A.  I mean, overall website, but not this
13 particular document.
14     Q.  On the second page of Exhibit 18,
15 there's a statement by your employer, the
16 University of Massachusetts, on use of talcum
17 powder.
18     Do you see that?
19     A.  Yes.
20     Q.  The statement is, "It's not clear if
21 using talcum powder on the genital area raises
22 the risk for ovarian cancer.  Talk with your
23 healthcare provider if you decide you want to use
24 talcum powder."
25     Did I read that correctly?

31 (Pages 118 to 121)

Sonal Singh, M.D., M.P.H.

Page 122

1    A.  Yes, you did.
2    Q.  Why doesn't your institution list talc
3  exposure as a risk factor for ovarian cancer?
4        MS. PARFITT:  Objection.  Misstates the
5  evidence.
6    A.  So, yeah, I mean, first of all, this
7  is -- I've seen this the first time here, but as
8  you can see, again, this is -- we have to go to
9  Page 3 of 4 and it's medical reviewers and they
10  are, you know, basing their opinion on whatever.
11  This was done in 2013.
12    So it depends on the -- it's not that, you
13  know, my medical, you know, employer is listing
14  it.  Obviously, it's listed there.
15    And but it's based on the quality of the
16  evidence.  This was reviewed on 2016, and it was
17  reviewed by, as you see, the credentials of --
18  did they review the -- did they review the
19  biological evidence?  Did they have any
20  additional information?
21    So I don't disagree with their opinion, I'm
22  just saying.
23    Q.  Dr. Singh, do you recommend to your own
24  patients that they avoid talcum powder use?
25    A.  Now, I do.

Page 123

1    Q.  When did you begin doing that?
2    A.  Last year.
3    Q.  Do you ask them if they use talcum
4  powder as part of a routine screening?
5    A.  In people that -- sorry.
6    In patients that I talk about ovarian
7  cancer.
8    Q.  Is that something that you began doing
9  over the past year?
10    A.  I would say sometime last year.
11    Q.  What about patients with a long history
12  of use?  Do you consider them at elevated risk of
13  developing cancer?
14        MS. PARFITT:  Objection.  Form.
15    A.  So I haven't thought about it that way.
16  I mean, you know, when that discussion about
17  ovarian cancer comes up, we talk about risk
18  factors and, you know, I recommended that.
19    Q.  Have you ever recommended prophylactic
20  surgery to remove the fallopian tubes and ovaries
21  that you think -- patients that you think may
22  have had long-term exposure to talc?
23        MS. PARFITT:  Objection.  Form.
24    A.  No.
25    Q.  Causation.  On Page 66 of your report,

Page 124

1  take a look at Exhibit 2 or Exhibit 10, whichever
2  is easier for you.
3    A.  Page 66?
4    Q.  Yes.  Your conclusion.
5    A.  Yes.
6    Q.  You state that peritoneal use of talcum
7  powder products can cause ovarian cancer;
8  correct?
9    A.  Yes.
10    Q.  Is it your opinion that it does cause
11  ovarian cancer or just that it can?
12        MS. PARFITT:  Objection to form.
13    A.  I don't know the semantics of what
14  would be -- if -- semantics of can and does.  I
15  mean, you can explain to me.  Maybe my English is
16  not as good as yours.
17    Q.  What type of exposure causes ovarian
18  cancer?
19    A.  Perineal application.  So I mean, are
20  you asking specific to talc?
21    Q.  Yes.  With respect to talc exposure,
22  what type of talc exposure causes ovarian cancer?
23        MS. PARFITT:  Objection.  Form.
24    A.  You know, perineal application of talc
25  can, you know, use of talc.

Page 125

1    Q.  What types of -- strike that.
2    What types of talcum powder cause ovarian
3  cancer?
4        MS. PARFITT:  Objection.  Form.
5    A.  So, again, I -- I -- my causal question
6  was the use of talcum powder products and ovarian
7  cancer.  I did not disaggregate between X and Y
8  and Z in terms of, you know, this type of talcum
9  powder product.
10    Q.  What type of ovarian cancer does talcum
11  powder cause?
12        MS. PARFITT:  Objection.  Form.
13    A.  Talcum powder products are, you know,
14  causally linked to the development of ovarian
15  cancer, but the link is strongest for serous
16  epithelial ovarian cancer.
17    Q.  Any other types of ovarian cancer that
18  you believe talcum powder causes?
19        MS. PARFITT:  Objection.  Form.
20    A.  You know, other studies have provided,
21  you know, causal links to borderline, you know,
22  other tumors.  But, you know, it's mainly the
23  epithelial ovarian cancer.
24    Q.  What dose of talcum powder is required
25  to cause ovarian cancer?

32 (Pages 122 to 125)

Sonal Singh, M.D., M.P.H.

Page 126

1        MS. PARFITT:  Objection.  Form.
2        A.  I examined, you know, the causal link
3   between talcum powder products and ovarian cancer
4   as the data was available in the available
5   studies.  You know, I could not -- there was
6   no -- I mean, there was data on
7   dose-responsiveness, and we can discuss that.
8        But, you know, I don't know if it's a single
9   application or it's 20 years.  I mean, it is
10  regular use and that would cause it.
11       Q.  It's correct that you have not
12  evaluated specifically what dose of talcum powder
13  is required to cause ovarian cancer; correct?
14       MS. PARFITT:  Object to form.
15       A.  Yeah.  I mean, I don't know a specific
16  dose that would cause ovarian cancer.
17       Q.  What was your methodology for
18  concluding that talc causes ovarian cancer or, I
19  guess to be more precision, serous ovarian
20  cancer?
21       A.  Yeah.  I mean, mainly --
22       MS. PARFITT:  Objection.
23       A.  Yeah.  Epithelial ovarian cancer.
24       Q.  What was your methodology?
25       A.  So, yeah, I did, you know -- so prior

Page 127

1   to that, I was aware of systematic reviews and
2   other reviews in this area.
3        So I, as a broad -- you know, we should look
4   at the methods section of this report.
5        Do you want to look at the methods?
6        Q.  Well, if you have to.  I mean, my
7   question was just simply:  What was your
8   methodology for concluding that talc causes
9   epithelial ovarian cancer?
10       MS. PARFITT:  Dr. Singh, anytime you
11  need to consult your report.
12       A.  Yeah.  I mean, the methodology was, you
13  know, gathering lines of evidence.  You know,
14  assessing for relevance, reliability and, you
15  know, again, assembling other lines of evidence
16  for animal, human studies, the constituents of
17  talc.  And then assessing them within an analytic
18  framework, the Bradford Hill, and then, you know,
19  providing a weight-of-evidence opinion based on
20  my professional judgment.
21       Q.  In other cases in which you've been
22  retained as an expert, you've conducted a
23  meta-analysis of the available data to reach a
24  conclusion about the relative risk; correct?
25       A.  I have.

Page 128

1        Q.  You did not conduct a meta-analysis
2   here; is that right?
3        A.  Yes.  And I -- partly pragmatic
4   reasons.  Partly, there were so many other
5   meta-analyses that I, you know -- although I
6   would have done things a little bit differently,
7   and I just didn't feel the need for one more
8   meta-analysis that would be informative.
9        Q.  What was your methodology for focusing
10  on certain studies or excluding other studies?
11       A.  So I'm not aware that I excluded
12  certain studies, because I, as I compare, I have
13  included all the epidemiologic studies that are
14  here.  There's always a possibility that once,
15  you know, when you do a review, that you may
16  have.
17       But, you know, I included all the relevant
18  case-control studies and the cohort studies and
19  the systematic review and meta-analysis that I
20  identified.
21       And, yeah, I mean, I may have weighed
22  studies differently based on their quality,
23  validity and reliability.
24       Q.  That's how you tried to make a
25  distinction?

Page 129

1        A.  Yeah.
2        Q.  Do you believe the standard for proving
3   causation in the scientific literature is the
4   same as the one that applies in litigation?
5        MS. PARFITT:  Objection.  Form.
6        A.  Yeah.  I mean, the standard for
7   causation, you know, is -- at least I was
8   applying the same standard.
9        Q.  Are you familiar with the FDA analysis
10  of the Bradford Hill factors and that they have
11  concluded that causation is not established with
12  respect to talc and ovarian cancer?
13       MS. PARFITT:  Objection.  Misstates the
14  evidence.
15       A.  I am aware of a FDA letter.  I'm not
16  sure that there's a Bradford Hill analysis.  And
17  if you can share that with me, that would be --
18       Q.  Please review Deposition Exhibit 19.
19          (Letter dated April 1, 2014
20       marked Exhibit 19.)
21       MS. PARFITT:  Thank you.
22  BY MR. ZELLERS:
23       Q.  Deposition Exhibit 19 is a letter from
24  the FDA to Sam Epstein, dated April 1st of 2014;
25  is that right?

33 (Pages 126 to 129)

Sonal Singh, M.D., M.P.H.

1    A.  Yes.
2    Q.  And when I say "dated," there's a stamp
3  at the top that says April 1, 2014; correct?
4    A.  Yes.
5    Q.  Have you reviewed this FDA analysis
6  before today?
7    A.  Yes.  I have reviewed the letter.
8  Yeah.
9    Q.  On Page 4 of the FDA document, at the
10  bottom, do you see that?
11    A.  I do.
12    Q.  The FDA noted that selection bias
13  and/or uncontrolled confounding result in
14  spurious positive associations between talc use
15  and ovarian cancer; is that right?
16    MS. PARFITT:  Objection.  Form.
17    A.  That's what they conclude.
18    Q.  The FDA notes a lack of consistency in
19  the study results; is that right?
20    MS. PARFITT:  Objection.
21    A.  Yes.  And this was conducted in, I
22  don't know, 2014, 2013.
23    Q.  The FDA specifically states, "Results
24  of case-control studies do not demonstrate a
25  consistent positive association across studies";

1  is that right?
2    A.  Yes.  That's what they state.
3    Q.  The FDA also states that,
4  "Dose-response evidence is lacking"; is that
5  right?
6    MS. PARFITT:  Objection.
7    A.  Where is that?  I'm sorry.
8    Q.  Look at Paragraph 3 at the bottom of
9  Page 4.
10    A.  Yes.
11    Q.  The FDA further concludes that, "A
12  cogent biological mechanism by which talc might
13  lead to ovarian cancer is lacking"; is that
14  right?
15    MS. PARFITT:  Objection to form.
16    A.  Yeah.  But it also concludes, in the
17  same letter, that there is, you know, the
18  potential for talc to migrate.  So, I mean, I'm
19  just trying to be -- that's what I reviewed.
20    Yes, it does say that there's no biological
21  mechanism.
22    Q.  You reviewed -- or strike that.
23    In addition to the FDA looking at and
24  applying the Bradford Hill criteria, IARC does
25  that as well; is that right?

1    MS. PARFITT:  Objection.  Form.
2    A.  So just to clarify, where do they say
3  they apply the Bradford Hill in this document?
4    Q.  You're familiar with the Bradford Hill
5  criteria; is that right?
6    A.  Yes.  I use it, but in this FDA
7  document, where does it state they apply the --
8    Q.  It is one of the criteria for
9  consistency across studies.  Is that a Bradford
10  Hill criteria?
11    A.  But exactly they don't go through all
12  of them.  So I don't know if they did a Bradford
13  Hill.  So how can I just assume that?  They don't
14  talk about, you know, specificity.  They don't
15  talk about strength of association.  So I can't
16  assume that they're applying Bradford Hill.
17    Q.  IARC did address the Bradford Hill
18  considerations; is that right?
19    A.  Yes.  In the year 2005.  That was
20  around 15 years ago.
21    Q.  IARC rejected classification of talc as
22  carcinogenic and, instead, assigned it to the
23  classification of possibly carcinogenic to
24  humans; is that right?
25    MS. PARFITT:  Objection.  Misstates the

1  evidence.
2    A.  So, again, you know, just clarifying
3  that this was done in 2005, with evidence that
4  has accumulated since then.  And I wouldn't
5  classify it -- I have served on IARC panels, and
6  I'm very familiar with their process.  They don't
7  reject anything.  They classify drugs in the
8  particular categories that they're supposed to
9  be.
10    So it was actually classified as possibly
11  carcinogenic.
12    Q.  Take a look at Exhibit 20.
13    (IARC Classifications marked
14    Exhibit 20.)
15  BY MR. ZELLERS:
16    Q.  Deposition Exhibit 20 are the IARC
17  classifications; is that right?
18  I'm sorry.  Did you answer the question?
19    A.  Yes.  Sorry.
20    Q.  That's okay.
21    A.  Yes.
22    Q.  All right.  It lists out, starting with
23  Group 1, carcinogenic to humans, down to Group 4;
24  is that right?
25    A.  Yes.

34 (Pages 130 to 133)

Sonal Singh, M.D., M.P.H.

Page 134

1      Q.  There are 120 agents that have been
2  determined by IARC, the International Agency for
3  Research on Cancer, as Group 1 agents,
4  carcinogenic to humans; is that right?
5      A.  Yeah.  That includes asbestos, many
6  others.
7      Q.  That is the only category in which IARC
8  finds sufficient evidence in humans; correct?
9      A.  No.  To clarify, they have -- it may be
10  in my report, that they have a particular way of
11  defining that category.  And it may not be just
12  sufficient evidence in humans.  They may be
13  something else.  If I can look back at my report.
14      Q.  Well, if it's in your report, it's in
15  your report.  And we can all read that.
16      My question to you is:  Group 1 is a
17  category where IARC has determined that there is
18  sufficient evidence in humans to classify an
19  agent as carcinogenic; is that right?
20      MS. PARFITT:  Objection.  Misstates
21  Dr. Singh's testimony.
22      A.  I mean, do I get time to --
23      Q.  Doctor, I only have seven hours here.
24  So go to Exhibit 20.  I'll make this quick.
25      Do you see Exhibit 20 in front of you?

Page 135

1      A.  Yeah.
2      Q.  This is the IARC classifications; is
3  that right?
4      A.  Okay.  Mm-hmm.
5      Q.  Group 1 states, "Carcinogenic to
6  humans."
7      A.  Yes.
8      Q.  Do you see that?
9      A.  Yeah.
10      Q.  All right.  Group 2A, there are 82
11  agents that are probably carcinogenic to humans;
12  is that right?
13      A.  Yes.
14      Q.  IARC is certainly capable of reaching a
15  decision that something is a known or probable
16  carcinogen; is that right?
17      MS. PARFITT:  Objection.
18      A.  Yes.  I mean, 15 years ago, yes, based
19  on the evidence.
20      Q.  It has placed at least 200 agents in
21  Group 1 or Group 2A; is that right?
22      A.  Yes.
23      Q.  There's only one agent in Group 4,
24  probably not carcinogenic to humans; is that
25  right?

Page 136

1      A.  Yes.
2      Q.  So out of the 1,000 agents that IARC
3  has reviewed, it has placed only one agent in
4  Group 4, probably not carcinogenic; is that
5  right?
6      A.  Yeah.  But 499 are not classifiable as
7  it relates, so.
8      Q.  IARC doesn't even have a Group 5, not
9  carcinogenic, does it?
10      A.  Well, I mean, all the -- once it's
11  probably not carcinogenic, it's not carcinogenic.
12      Q.  The best that IARC can state is that an
13  agent is probably not carcinogenic to humans,
14  which is Group 4; is that right?
15      A.  Yes.
16      MS. PARFITT:  Objection.
17      Q.  All right.  As with -- strike that.
18      With genital talc, the IARC group 2B
19  designation is based on limited evidence in
20  humans; is that right?
21      MS. PARFITT:  Objection.
22      A.  Yes.  There was some animal
23  consideration.  There were some biological
24  mechanisms, but, again, in 2005, and as I state
25  in my report, which I have, and there have been

Page 137

1  multiple studies since then.  And that, you know,
2  that they should be revisited.
3      Q.  That means IARC cannot rule out chance,
4  bias or confounding with reasonable confidence;
5  correct?
6      A.  Based on the data they had at that
7  time.
8      Q.  What else is in 2B, possibly -- strike
9  that.
10      What else is in class 2B, possibly
11  carcinogenic?  Are you familiar with Ginkgo
12  biloba?
13      MS. PARFITT:  Objection to form.
14      A.  I know the name.
15      Q.  Are you aware that that's classified as
16  a 2B agent by IARC?
17      A.  I don't know.  I mean, you know, they
18  also classify as it relates to exposure.  So I
19  haven't reviewed Ginkgo biloba to be able to
20  answer the question.
21      Q.  Pickled vegetables, 2B; is that right?
22      A.  How do I know?  Show me.
23      Q.  Occupational --
24      A.  That's what you're saying.
25      Q.  -- carpentry and joinery, 2B?  Are you

35 (Pages 134 to 137)

Sonal Singh, M.D., M.P.H.

Page 138

1  aware of that?
2      A.  Again, this is 2015.  And, you know,
3  yes.  I don't know I'm aware of that.  I mean,
4  you can't put words in my mouth that pickle --
5  how do I know that?
6      Q.  There's no chance of my putting words
7  in your mouth.  IARC can change its
8  classification for a substance; is that right?
9      A.  It does.  I mean, from what I
10  understand.
11      Q.  It has not changed its Group 2B
12  classification since it determined that talc was
13  a 2B agent; is that right?
14          MS. PARFITT:  Objection.  Form.
15      A.  It has not carried out an assessment
16  since 2005, that I'm aware of.
17      Q.  Has IARC changed its group 2B
18  classification?
19      A.  No --
20          MS. PARFITT:  Objection.
21      A.  -- and as far as I'm aware, no
22  assessment has been carried out.
23      Q.  Bradford Hill, strength of association
24  is one of the criteria; is that right?
25      A.  I don't consider them criteria.

Page 139

1  There's overviews.  I think -- I'm just picking
2  the terms.  I mean, they're overviews of Bradford
3  Hill.  Doesn't list them as criteria, because
4  criteria implies a list of things that you can
5  pick and choose from.
6      Q.  You would call them what?
7      A.  Overviews.  Actually, that's what he
8  calls them.
9      Q.  Overviews.  Strength of association is
10  a Bradford Hill overview; is that right?
11      A.  Yes.
12      Q.  Epidemiologists consider a 1.3 odds
13  ratio in case-control studies to be a weak or
14  modest association; is that right?
15          MS. PARFITT:  Objection.  Misstates the
16  evidence.
17      A.  No.  I mean, again, strength of
18  association based on -- depends on the study
19  question at hand, the study design, and, you
20  know, the quality of the underlying data.  So
21  strength of association, in and of itself, does
22  not provide any -- any -- any sort of -- any
23  answer to the causal question.  Again, I'll go
24  back to my report, because I have to go back to
25  my report.

Page 140

1      Q.  Doctor, I'm asking you questions.
2      My question is:  Epidemiologists consider a
3  1.3 odds ratio in case-control studies to be a
4  weak or modest association; correct?
5          MS. PARFITT:  Objection.  Misstates the
6  evidence and the science.
7      A.  Not the epidemiologists that I
8  contacted.  You know, we look at various, you
9  know -- as I state in my report, you know, you
10  can have modest associations and you can have a
11  relative risk of one that are lower, and if you
12  go to a low-prevalence population, and then
13  remove competing risk factors, those can be
14  attenuated.
15      So the epidemiologists that I interact with,
16  and we don't look at this as weak or modest or
17  high.  We just look at it in the whole causal
18  framework.
19      Q.  Can you point to any peer-reviewed
20  literature on talc and ovarian cancer that states
21  that 1.3 odds ratio is a strong association?
22      A.  Again, that's not -- I'm not looking at
23  talc at 1.3 is a strong association.  I'm stating
24  that, yeah, I can't point to the talc literature
25  that states that.

Page 141

1      Q.  IARC does not refer to this as a strong
2  association; correct?
3          MS. PARFITT:  Objection.  Form.
4      A.  I don't know what -- the particular
5  objective or qualifier they use.  I mean --
6      Q.  FDA doesn't refer to this as a strong
7  association, do they?
8          MS. PARFITT:  Objection to form.
9      A.  Again, you have to sort of just show me
10  where they are, and I'll agree with it.
11      Q.  Have you seen any statement from IARC
12  that there is a strong association between
13  genital talc use and ovarian cancer?
14      A.  I don't recall that particular phrase.
15      Q.  All right.  The National Cancer
16  Institute doesn't refer to this as a strong
17  association; correct?
18          MS. PARFITT:  Objection to form.
19      A.  I don't recall that particular
20  objective.
21      Q.  Do your opinions on strength of
22  association apply equally to all forms of ovarian
23  cancer?
24          MS. PARFITT:  Objection.  Form.
25      A.  Again, I'm -- you know, my opinions are

Sonal Singh, M.D., M.P.H.

1  not -- again, we can parse this out.  I mean, I
2  was just looking at the causal question.  Is talc
3  causally related to the development of ovarian
4  cancer?
5      And, you know, most of the evidence that I
6  examined were -- was provided in terms of serous
7  epithelial cancer, and --
8      Q.  I thought you told me that your
9  methodology was to look at the Bradford Hill
10 overview factors; is that right?
11     A.  Yeah.
12     Q.  All right.  And one of those factors is
13 strength of association; is that right?
14     A.  Yes.
15     Q.  And that's a factor that you looked at;
16 correct?
17     A.  Yes.
18     Q.  Do your opinions on strength of
19 association apply equally to all forms of ovarian
20 cancer?
21         MS. PARFITT:  Objection.  Form.
22     A.  Well, I did not disaggregate my, you
23 know, opinion by histologic subtype.
24     Q.  You cite to the Langseth paper; is that
25 right?

1      A.  I do.
2      Q.  You state that the authors in Langseth
3  2008 found an odds ratio ranging between 1.12 to
4  1.4, depending upon the type of study design.  Is
5  that right?  This is on Page 22 of your report.
6      A.  Okay.
7      Q.  Langseth, in fact, rejects causation
8  and says more study is needed; correct?
9          MS. PARFITT:  Objection.  Form.
10     A.  I don't know why you have stated they
11 reject causation.  Show me that statement in that
12 article.
13     Q.  Take a look, if you will, at Deposition
14 Exhibit 21.
15         (Article entitled "Perineal use
16     of talc and risk of ovarian cancer" marked
17     Exhibit 21.)
18         MS. PARFITT:  Thank you.
19         MR. ZELLERS:  Mm-hmm.
20 BY MR. ZELLERS:
21     Q.  Deposition Exhibit 21 is the Langseth
22 2008 meta-analysis that you cite in your report;
23 is that right?
24     A.  Yeah.  It's one of the meta-analyses.
25     Q.  Turn to Page 359 of Exhibit 21.  Tell

1  me when you have that.
2      A.  Yeah.
3      Q.  "Proposal to research community."  Do
4  you see that?
5      A.  Yes.
6      Q.  Tell me if I read this statement by the
7  authors correctly.
8      "The current body of experimental and
9  epidemiological evidence is insufficient to
10 establish a causal association between perineal
11 use of talc and ovarian cancer risk.
12 Experimental research is needed to better
13 characterize deposition, retention, and clearance
14 of talc to evaluate the ovarian carcinogenicity
15 of talc."
16     Did I read that correctly?
17     A.  Yes.
18     Q.  You're drawing conclusions from this
19 study that are broader than the study authors'
20 own conclusions; is that right?
21         MS. PARFITT:  Objection.
22     A.  I didn't draw.  So you were asking me
23 that whether I drew a single conclusion from the
24 Langseth.  I mean, there are -- I think I cite
25 all the meta-analyses first, and then -- so I'm

1  not just drawing inferences from there.
2      And the authors, as far as I am aware, A,
3  there have been several other studies published
4  since then.  This is 2007.  So we have 12 years
5  and several publications.  And, B, the authors
6  themselves have provided opinions that they are
7  causally related.  Dr. Siemiatycki, as far as I'm
8  aware.
9      Q.  Did you cite this paper in your report?
10     A.  Yes.
11     Q.  The authors in this paper state that
12 the current body of experimental and
13 epidemiological evidence is insufficient to
14 establish a causal association between perineal
15 use of talc and ovarian cancer risk; is that
16 right?
17         MS. PARFITT:  Objection.  Misstates the
18 evidence in this case.  The science and
19 testimony.
20     A.  It says the current body of evidence.
21 This is current as of two thousand and whenever.
22     Q.  This is the paper.  2008, Exhibit 21,
23 that you relied on --
24     A.  Yeah.
25     Q.  -- and cite in your report; correct?

37 (Pages 142 to 145)

Sonal Singh, M.D., M.P.H.

Page 146

1     A.   This is not the only --
2        MS. PARFITT:  Objection.  Form.
3     A.   -- paper.  I cited on 2017, 2018.
4     Q.   Go to the acknowledgments section.
5     Do you see the acknowledgments off to the
6  left?
7     A.   Yes.
8     Q.   The authors are IARC members; is that
9  right?
10    A.   Yes.
11    Q.   The authors of this paper, Langseth?
12    A.   Yes.
13    Q.   Another overview factor of Bradford
14  Hill is consistency; is that right?
15    A.   Yes.
16    Q.   The literature does not show a
17  consistent association between talc use and
18  ovarian cancer; right?
19       MS. PARFITT:  Objection to form.
20    A.   I disagree.
21    Q.   The cohort studies do not show an
22  association between talc use and ovarian cancer;
23  correct?
24       MS. PARFITT:  Objection to form.
25    A.   I disagree.  The cohort studies show

Page 147

1  significant -- you know, increased risk, which is
2  in the same direction as the case-control
3  studies, which, as several of the authors, such
4  as Penninkilampi and others and me, interpret as
5  evidence of consistency.
6     Q.   The cohort studies are what?
7     A.   I'm sorry?
8     Q.   List out the cohort studies for us.
9     A.   Penninkilampi is a meta-analysis.  They
10  are an interpretation of the cohort studies.
11    Q.   You told me before that to do a proper
12  analysis, you have to go and look at the
13  individual studies; is that right?
14    A.   I do.  I did.
15    Q.   And you went and you reviewed the
16  cohort studies; is that right?
17    A.   Yes.
18    Q.   And it's your testimony that those
19  cohort studies do show an association between
20  talc use and ovarian cancer.  Is that your
21  testimony?
22    A.   So I reviewed the cohort studies in
23  line with 30 case-control studies in line with
24  70, you know -- sorry -- seven other
25  meta-analyses and, you know, synthesizing the

Page 148

1  overall evidence, my testimony is that the cohort
2  study estimates are in line with the case-control
3  evidence and provide evidence of consistency.
4     Q.   The cohort studies themselves, looking
5  just at those studies, and I'm going to ask you
6  about the others --
7     A.   Sure, sure.
8     Q.   -- do not show a consistent
9  association between talc use and ovarian cancer;
10  correct?
11       MS. PARFITT:  Objection.  Misstates the
12  testimony.
13    A.   So that's not the way I look at
14  evidence.  I look at everything.  That's what you
15  want to look at.  You can look at it.
16    I just look at evidence, you know, whatever
17  is out there.  So I didn't look at cohort studies
18  in and of themselves.
19    And that's why we do systematic reviews.
20  That's why we do meta-analyses, because you want
21  to look at everything at the same time.
22    Q.   You did not look at the cohort studies
23  individually; correct?
24    A.   I did.  And they're in my report.
25    Q.   If you looked at the cohort studies

Page 149

1  individually, they do not show a consistent
2  association between talc use and ovarian cancer;
3  correct?
4       MS. PARFITT:  Objection.  Misstates the
5  evidence.
6     A.   So how can you look at individually and
7  answer questions about consistency?  To answer
8  questions about consistency, you have to look
9  across studies.  And when you look across
10  studies, you have to bring all studies.
11    And that's when you can opine on
12  consistency.
13    Q.   Doctor, my question relates just to the
14  cohort studies.
15    A.   I understand.
16    Q.   The cohort studies do not demonstrate
17  an association between talc use and ovarian
18  cancer; correct?
19       MS. PARFITT:  Objection.  Misstates the
20  evidence.
21    Q.   Just the cohort studies.
22       MS. PARFITT:  Objection.  Misstates the
23  evidence.
24    A.   First of all, you know, they do
25  increase -- an increase of serous epithelial

Page 150

1  ovarian cancer in one of them, and cumulative
2  evidence from cohort studies shows an excess risk
3  of ovarian cancer which is not statistically
4  significant.
5      Q.  Hospital-based, case-control studies
6  collectively do not show an association between
7  talc use and ovarian cancer; correct?
8          MS. PARFITT:  Objection.  Misstates the
9  evidence.
10     A.  That is incorrect, because
11 hospital-based, case-control studies also show an
12 association between talc use and ovarian cancer
13 which is not, you know -- and I would have to
14 look again.  Please bring out the studies,
15 because I want to look at some of the studies
16 before I, you know, provide specific -- you're
17 asking very specific questions about
18 hospital-based studies, so I have to look at the
19 studies.
20     Q.  If you can't answer a question, tell me
21 you can't answer it.  But my question is,
22 hospital-based, case-control studies collectively
23 do not show an association between talc use and
24 ovarian cancer; correct?
25         MS. PARFITT:  Objection.  Misstates the

Page 151

1  evidence.
2      A.  No.  I disagree.  And, again, I'd have
3  to -- can we pull the Penninkilampi paper?
4      Q.  Doctor, I'm going to ask you about that
5  paper.
6      A.  No.  But then how can I answer
7  questions?
8      Q.  I need you to answer my questions.
9      If you can't answer a question, then tell me
10 you can't answer the question.
11     A.  I'm willing to answer the question.
12 Just bring me the evidence so that I can look at
13 it.
14     I'm sorry.  I'm trying my best.
15     Q.  In your report, you state that
16 hospital-based, case-control studies may be less
17 susceptible to selection bias than
18 population-based, case-control studies; correct?
19     A.  Where do I state that?
20     Q.  Look at your report on Page 54,
21 Paragraph 8.
22     A.  Actually, I state entirely the
23 opposite.  I state that the population-based
24 studies may have --
25     Q.  So --

Page 152

1          MS. PARFITT:  Wait.  Are you in the
2  middle?
3      A.  Yeah.  That's incorrect.  It should be
4  the population-based case studies.  That's my --
5  you know, that's a misstatement on my part.
6      Q.  So you need to amend your report?
7      A.  Yeah.  Yeah.
8      Q.  So if we go to Page 54 --
9      A.  Yeah.
10     Q.  -- Paragraph 8, you state that it's an
11 error when you state, "As opposed to
12 hospital-based controls, which may be less
13 susceptible to selection bias, the
14 population-based, case-control studies have
15 consistently showed a higher estimate of
16 increased risk of ovarian cancer associated with
17 talc use."
18     A.  Yeah.  And I was applying the less
19 susceptible to the population-based statement.
20     Q.  How do you need to correct this
21 statement?
22     A.  I don't know how, you know.  Yeah, it
23 would be as opposed to hospital-based controls,
24 population-based, case-control studies may be
25 less susceptible to selection bias.

Page 153

1      Q.  You believe that population-based
2  studies may be susceptible to less selection
3  bias?
4      A.  May be less susceptible.
5      Q.  Take a look at Exhibit 21.  That's the
6  article we looked at a few minutes ago.
7      Do you see that?
8      A.  That's the Langseth?
9      Q.  Yes.  The Langseth article.
10     Do you see that?
11     A.  Yes.
12     Q.  Take a look under the hospital-based
13 studies.
14     Do you see that on Page 359?
15     A.  Yes.
16     Q.  You are the one who cites this paper
17 and relies on it; is that right?
18     A.  Yes.
19     Q.  If we look at pooled odds ratio for
20 hospital-based studies --
21     A.  Mm-hmm.
22     Q.  -- the odds ratio is 1.2 and the
23 confidence interval is a .92 to 1.36; is that
24 right?
25     A.  Yes.

Sonal Singh, M.D., M.P.H.

Page 154

1      Q.   That means that it may or may not be --
2  show an association between talc use and ovarian
3  cancer.  The pooled result; is that right?
4          MS. PARFITT:  Objection to form.
5      Q.  Given that confidence interval.
6          MS. PARFITT:  Objection to form.
7      A.  Yeah.  Again, this is -- you know, at
8  that time.  I don't know what studies have been
9  added.  We can look in the new paper, which I'm
10 not sure why it's not been brought up.
11     But, yes, it does show an excess risk, not
12 statistically significant, consistent with the
13 population studies.
14     Q.  All right.  Hospital-based control
15 studies, you're more likely to be comparing
16 hospitalized patients to hospitalized patients;
17 is that right?
18     A.  Yes.  That's why they're hospital
19 based.
20     Q.  Population-based studies, you're more
21 likely to be comparing ill people to healthy
22 people; is that right?
23     A.  Yeah.  Your source of control.  I
24 mean -- well, it depends.  How do you know if
25 it's ill people?  If you are sourcing from the

Page 155

1  population in both, it's a population-based
2  study.
3      Q.  Population-based, case-control studies,
4  the ones that you look at only show a weak
5  association between talc use and ovarian cancer;
6  is that right?
7          MS. PARFITT:  Objection.  Misstates the
8  evidence.
9      A.  I think we went about that weak.  I
10 don't believe that they are weak.  We went
11 through that.
12     Q.  That's your --
13     A.  Yeah.  My opinion is that they're not
14 weak evidence.
15     Q.  Isn't the absence of an association in
16 the cohort studies especially significant in that
17 the study design reduces the likelihood of recall
18 bias?
19         MS. PARFITT:  Objection to form.
20     A.  Yes.  I mean, it is important to look
21 at recall bias in the cohort studies.  But the
22 study design introduces several elements of other
23 bias for an outcome such as ovarian cancer.
24     You know, I'm answering your question,
25 because you asked about bias.  It introduces

Page 156

1  behavioral change bias, which attenuates towards
2  the null.  It induces an element of
3  misclassification of exposure, which goes towards
4  null.  It limits the duration of assessment,
5  which, you know, limits assessment.  So it
6  doesn't have power to suggest.
7      So, yes, recall bias is a feature that is
8  better assessed in the cohort studies, but recall
9  bias, for exposures that are daily use, such as
10 talc, are less likely, you know, to be in play.
11 Recall bias -- let me finish my explanation.
12     Recall bias would less likely be in play
13 because we don't see evidence with nonperineal
14 talc exposure.  Recall bias are less likely to be
15 in play because we only see it with epithelial
16 ovarian cancer.
17     So, yes, cohort studies less, but there are
18 other biases.
19     Q.  Couldn't recall bias explain the
20 difference between cohort studies and
21 retrospective case-control studies?
22         MS. PARFITT:  Objection.  Form.
23     A.  I don't think so.  There's multiple
24 other biases and multiple other strengths and
25 limitations that would have to be considered.

Page 157

1      Q.  You cite to Berge, a 2017 paper, in
2  your report; is that right?  Is that correct?
3      A.  Yes.
4          MR. ZELLERS:  Take a look at
5  Exhibit 22.
6          (Article entitled "Genital use
7  of talc and risk of ovarian cancer:  A
8  meta-analysis" marked Exhibit 22.)
9          MR. ZELLERS:  Ms. Court Reporter, where
10 do you want me to put it, maybe here, on top?
11         COURT REPORTER:  Sure.
12         MR. TISI:  Thank you.
13 BY MR. ZELLERS:
14     Q.  Deposition Exhibit 22 is a paper that
15 you cite by Berge, is the first named author,
16 2017.  It's a recent meta-analysis; is that
17 right?
18     A.  Yes.
19     Q.  Go to Page 6 of the Berge paper,
20 Exhibit 22.
21     The authors conclude that, "Information bias
22 from retrospective self-report of talc use is a
23 possible explanation for the association detected
24 in case-control studies."  Is that right?
25     A.  Yes.

Sonal Singh, M.D., M.P.H.

Page 158

1    Q.   What was your methodology for
2  discounting the effect of recall bias in the
3  population-based, case-control studies?
4    A.   I mean, it's not like there's a -- once
5  recall is operational, there are no methods that
6  you can and do discount.  But just the quality
7  and, you know, the quantity of evidence over
8  studies and the fact that even the cohort
9  studies, despite these limitations, show an
10  increased risk suggests that recall bias, while
11  it is potential, cannot explain -- be the only
12  explanation for a causal link between talc and
13  ovarian cancer.  You cannot adjust for recall
14  bias after the completion of the study.
15    Q.   What is the rate of error in that
16  methodology?
17    A.   I think that none of them have
18  calculated it.  And Dr. Cramer has done in his
19  last study.  And it appears that you'd have to
20  need a significant degree of recall bias.  And I
21  am going to reference my report.
22    Q.   Okay.  Didn't the cohort studies
23  involve a much greater --
24    A.   I'm not done.
25      MS. PARFITT:  Excuse me.

Page 159

1    A.   I'm done.
2      MS. PARFITT:  One moment.  He wanted to
3  reference something in his report.
4    A.   Yeah.  The risk of exposure would have
5  to be very high to nullify the increased risk.
6    Q.   Didn't the cohort studies involve a
7  much greater number of women than the
8  case-control studies?
9      MS. PARFITT:  Objection.  Misstates the
10  evidence.
11    A.   Yeah.  But their combined number of
12  ovarian cancer cases was 890.  So power is only
13  -- depends on the number of cases.
14    Q.   What was your methodology for weighing
15  the power of the cohort studies versus the
16  case-control studies?
17    A.   I mean, retrospective calculations of
18  power are, you know, not really recommended once
19  you already have the results.  I mean, we already
20  see that the overall cumulative evidence
21  from many meta-analyses suggests an increased --
22  you know, provides an increased risk.
23      And we know that there's thousands of cases
24  in the case control.  There's, you know, I don't
25  know how many cases in the cohort, so we know

Page 160

1  that the case-control stories are more powered.
2    Q.   Do you agree that some case-control
3  studies have shown statistically significant
4  findings and others have not?
5    A.   Yes.
6    Q.   What is your methodology for weighing
7  the lack of consistency in statistical
8  significance across studies?
9      MS. PARFITT:  Objection.  Form.
10    A.   I can answer that.  Yeah.
11    So the methodology for correcting the lack
12  of significance, that's why you do a
13  meta-analysis.  That's an inverse variance
14  weighted meta-analysis.  You -- so all of these
15  studies have accounted for the fact that their
16  confidence intervals are crossing 1.  And that's
17  how they've accounted for lack of a statistical
18  significance.
19    So you can see that all of these estimates
20  are weighted by sample size.  So --
21    Q.   Do you agree that if a study does not
22  show a statistically significant association, it
23  could mean that no risk exists?  Correct?
24      MS. PARFITT:  Objection.  Form.
25    A.   In the context of that study.  But,

Page 161

1  again, I am looking at the cumulative evidence.
2    Q.   It could mean -- strike that.
3    It could just be occurring by chance; is
4  that right?
5      MS. PARFITT:  Objection.  Form.
6    A.   I'm looking at the whole body of
7  evidence.
8    In the context of a single study, yes.
9    Q.   If a study is underpowered it could be
10  because the difference in risk is too small to
11  detect such as a risk ratio smaller than 1.15;
12  isn't that right?
13    A.   Yes.  It's possible.
14    Q.   All right.  You have a criticism in
15  your report of the Nurses' Health Study; is that
16  right?
17      MS. PARFITT:  Objection to form.
18    A.   I don't have -- again, I don't have
19  criticisms.  I have pointed out the strengths and
20  limitations.
21    Q.   Well, let's look at some of those.
22    On Pages 40 and 41 of your report, you
23  discuss the Gates 2008 study; is that right?
24    A.   40.  Yes.
25    Q.   The Gates 2008 study showed a

41 (Pages 158 to 161)

Sonal Singh, M.D., M.P.H.

Page 162

1   statistically significant increased risk of total
2   epithelial ovarian cancer; is that right?
3       A.   Let me just look at it.  There's so
4   many of these.  Yes.
5       Q.   The Gates 2008 study used data
6   collected in the Nurses' Health Study; is that
7   right?
8       A.   Yes.  There was another part to it as
9   well.
10      Q.   In the Nurses' Health Study, the
11  participants were asked about their talc exposure
12  in one questionnaire in 1982; is that right?
13      A.   Yes.
14      Q.   When they were asked about their talc
15  use, the participants were between 36 and 61
16  years of age; is that right?
17      A.   Yes.
18      Q.   As you state in your report, you agree
19  that, although talc exposure -- and I'm looking
20  at Page 41 --
21      A.   Yes.
22      Q.   The first paragraph.  You agree that,
23  "Although talc exposure was only measured in the
24  1982 Nurses' Health Study questionnaire, when
25  participants were between 36 to 61 years of age,

Page 163

1   the number of users who began talc use after this
2   is likely small, as shown by the fact that more
3   than 95 percent of controls with regular talc in
4   the NECC reported talc use before age 35."
5       A.   Yes.
6       Q.   Is that correct?
7       A.   Yes.
8       Q.   Later in your report, on Pages 47 and
9   48, you discuss the Gertig 2000 study; is that
10  right?
11      A.   Yes.
12      Q.   That study also uses the data from the
13  Nurses' Health Study; correct?
14      A.   Yes.  It's all part of the same cohort.
15      Q.   That study, Gertig 2000, did not find a
16  statistically significant relationship between
17  daily talc use and all types of ovarian cancer;
18  is that right?
19      A.   Yeah.  Again, I mean, they are
20  different -- they're the same cohort with
21  different follow-up time, different design.  But
22  it did not.  And it found an increased risk for
23  serous ovarian cancer.
24      Q.   Gertig 2000, that study also relied on
25  the national -- strike that -- the Nurses' Health

Page 164

1   Study questionnaire; correct?
2       A.   Yes.
3       Q.   And you cite that on Page 48 of your
4   report, second paragraph; is that right?
5       A.   Yes.
6       Q.   You state, "Further, as discussed
7   above, determining never use, based only on a
8   one-time question, near the start of the study,
9   14 years prior to terminating the study in 1996,
10  introduces undirectional behavioral change bias,
11  likely misclassifying some ever users who used
12  talc during the study as never users and biased
13  the findings toward the null."
14          Is that what you state in your report?
15      A.   Let me just read it.  Yes.
16      Q.   So when you discuss the Gertig 2000
17  study, you say that, because the participants in
18  the Nurses' Health Study were only about or only
19  asked about talc use once, near the beginning of
20  the study, women who started using talc after
21  they completed that questionnaire could have been
22  misclassified as never users; is that right?
23      A.   Yeah.
24      Q.   But when you talk about the study that
25  you believe supports your opinion --

Page 165

1       A.   Yeah.
2       Q.   -- Gates 2008, you recognize that the
3   vast majority of women who use talc initiate use
4   before age 36; is that right?
5       A.   Yeah.  But it does not -- both points
6   are valid.  I mean, I'm just stating the
7   limitations of the Gates study and the Gates
8   analysis.  So.
9           I don't see an incongruity that you're
10  trying to point out.  I'm just saying the
11  proportion of women who were never users, the
12  number of users who began is likely small.  But
13  it still does not eliminate the possibility of
14  unidirectional behavioral change bias.
15      Q.   When you're looking at a cohort study,
16  Gertig 2000 that does not support your opinion,
17  you're talking about limitations; correct?
18          MS. PARFITT:  Objection.  Misstates his
19  testimony.
20      A.   I'm not talking about a study that does
21  not support mine.  I'm looking at the strengths
22  and limitations of a study.
23      Q.   You state two different things,
24  depending upon whether you're talking about Gates
25  2008 or Gertig 2000; correct?

42 (Pages 162 to 165)

Sonal Singh, M.D., M.P.H.

Page 166

1    MS. PARFITT:  Objection.  Misstates his
2  testimony.
3    A.  I am not.
4    First of all, they are two different
5  analyses of a cohort.  So they're not two
6  different things about.
7    And I'm pointing out, you know, the reasons
8  that that -- so I'm, you know, pointing out in
9  Gates that, yes, talc exposure is a single-time
10  exposure.  And it is -- you know, introduces an
11  element of bias.
12    But I'm also pointing out in Gates why that
13  bias is likely to be, you know, small coming from
14  the other consortium.
15    Q.  But you don't say that when you discuss
16  Gertig 2000, do you?
17    A.  Yeah.  Because it wasn't done in
18  conjunction with the NECC consortium.
19    Q.  All right.  Look at Page 49 of your
20  report.  You discuss the Houghton 2014 study; is
21  that right?
22    A.  Yes.
23    Q.  All right.  Houghton did not find a
24  statistically significant increase in the risk of
25  ovarian cancer with perineal talc use; is that

Page 167

1  right?
2    A.  Yes.
3    Q.  Houghton did not find a statistically
4  significant increase in the risk of ovarian
5  cancer with use of talcum powder on sanitary
6  napkins or diaphragms; is that right?
7    A.  Yeah.  They found an increased risk
8  which was not statistically significant.
9    Q.  And Houghton 2014 did not find a
10  statistically significant increase in risk of
11  ovarian cancer with increasing durations of use
12  or when stratified by age or tubal ligation
13  status; correct?
14    MS. PARFITT:  Objection.  Form.
15    A.  I don't know that specific.  I mean,
16  you'd have to show me.  Again, I don't remember
17  these studies offhand.
18    Q.  Like the Nurses' Health Study, the
19  Houghton 2014 authors ask participants about
20  their talcum powder use at the participants'
21  entry into the study; is that right?
22    A.  Yes.  And they don't update during a
23  follow-up, introducing, you know, bias.
24    Q.  On Page 50 of your report, second
25  paragraph, you note that the average age of the

Page 168

1  participants in the Houghton 2014 study was 63.3
2  years at baseline, with 12.4 years of follow-up
3  on average; is that right?
4    A.  Yes.
5    Q.  And then you say that, because
6  participants were not asked again about talcum
7  powder use during follow-up, people who initiated
8  talc use after the study began were being
9  misclassified as never users.  Is that right?
10    A.  Yes.
11    Q.  So, again, when the study supports your
12  opinion, you recognize that the vast majority of
13  perineal talc users begin that use well before
14  age 63.
15    MS. PARFITT:  Objection.  Misstates
16  testimony.
17    A.  I don't recognize that.  How do I
18  recognize that?  I'm just citing that, in Gates,
19  they provided that opinion.  Yeah.
20    In the Gates study, they quoted data from
21  the NECC, that that's one study that provides.  I
22  don't know what's happening in the -- in this
23  Houghton study, that vast majority.  That's
24  something that you are providing.  And you
25  provide data that the vast majority of users

Page 169

1  began --
2    Q.  It's something you cited in your
3  report; correct?
4    A.  Yeah.  But it doesn't mean that that
5  applies to, you know, this Houghton study as
6  well.
7    Q.  And that's my point.  You take a piece
8  of information in terms of when women begin their
9  talc use.  You apply it differently in your
10  analysis of studies that favor plaintiffs'
11  position than studies that do not favor
12  plaintiffs' position?
13    A.  I'm sorry.  I have to object.
14    MS. PARFITT:  Objection.
15    A.  I have to object.  This is a
16  mischaracterization of my testimony.  I mean, I
17  have to object to this.  Because -- no, I have
18  to.
19    MS. PARFITT:  Let him finish.  Let
20  him --
21    A.  Because you are mischaracterizing my
22  testimony.
23    Yes, I point out the limitations in one
24  section that, you know, a majority of women.  And
25  I also point out the unidirectional change bias,

43 (Pages 166 to 169)

Sonal Singh, M.D., M.P.H.

Page 170

1  and both are entirely congruent with each other.
2  But yes --
3      Q.  Tell --
4      A.  Yes.
5      Q.  Are you finished?
6      A.  Yes.
7      Q.  All right.  On what are you relying to
8  opine that enough women begin talcum powder use
9  in their 50s and 60s such that the results of
10  Houghton or Gates 2000 are biased toward the
11  null?
12      A.  Well, I mean, we know -- exactly.  I
13  mean, we don't know that.  I mean, we can't --
14  even a small amount, and that's important to
15  know, that even a small amount of users was
16  class- -- because we didn't ask those questions.
17  So even a small amount of users who had moved to
18  the other category would have nullified -- you
19  know, would have biased it towards the null.
20      Q.  Based on all your review, the data that
21  you came across and that you cite in your report,
22  are that the vast majority of women begin talc
23  use in their 20s or earlier; correct?
24      A.  No.  I cite that in the NECC.  That's
25  the data I came across.  And that's why it is

Page 171

1  cited.  So to mischaracterize it as not being
2  cited is incorrect.
3      Q.  What is the latency period for ovarian
4  cancer?
5      A.  I don't know a specific number.  It's,
6  you know, several years.
7      Q.  Several years.
8      That's your testimony based upon all of the
9  data and material you've reviewed?
10      A.  Yes.  I mean --
11      MS. PARFITT:  Objection.
12      Q.  You've -- you've been referring to
13  Penninkilampi; is that right?
14      A.  I don't know the name.  Yes.
15      Q.  But let me give it to you and we can
16  both see if we can pronounce it together.
17      MS. PARFITT:  Before we start, it's
18  about 12:20.  We do have lunch coming.  May I
19  just take two minutes to see if it's here?
20      MR. ZELLERS:  Sure.  Or you can let me
21  ask a couple of questions about this study and we
22  can take a break, but whatever your preference
23  is.
24      MS. PARFITT:  What's your preference?
25      THE WITNESS:  Let's do it.

Page 172

1      MR. ZELLERS:  So I'll ask just a few
2  questions about this study --
3      MS. PARFITT:  And if it's not here --
4      MR. ZELLERS:  -- then we'll take a
5  break, because we've been going for a while.
6      (Article entitled "Perineal Talc
7  Use and Ovarian Cancer, A Systematic Review
8  and Meta-Analysis" marked Exhibit 23.)
9  BY MR. ZELLERS:
10      Q.  Doctor --
11      A.  I think we need a break in five
12  minutes.  I need a break.  I don't know about
13  you.
14      Q.  We don't want to wear you out.
15      A.  It's only half.  Not even half the way.
16      Q.  I'm handing you Exhibit 23.  This is
17  the Penninkilampi meta-analysis that you have
18  referred to in your report and also in your
19  testimony; is that right?
20      A.  Yes.
21      Q.  You rely on this meta-analysis,
22  Deposition Exhibit 23, in forming your opinions;
23  is that right?
24      A.  As one of the studies.  Yes.
25      Q.  It's a 2018 meta-analysis; is that

Page 173

1  right?
2      A.  Yes.
3      Q.  Are you aware that this meta-analysis
4  by Penninkilampi does not include the Gates 2010
5  update of the Nurses' Health Study?
6      A.  When you say the Gates 2002 -- the
7  study that we --
8      Q.  What we looked at before was Gates
9  2008.  And we also looked at Gertig 2000 --
10      A.  All these different studies.
11      Q.  That's all right.
12      You're aware that there are several
13  different cohort studies relating to the Nurses'
14  Health Study; is that right?
15      A.  Yes.
16      Q.  What we talked about earlier was the
17  Gertig 2000 study.
18      A.  Okay.
19      Q.  Correct?
20      A.  Yes.  And before that, we talked
21  about --
22      Q.  The Gates 2008.
23      A.  Okay.
24      Q.  Are you aware that Gates, in 2010,
25  updated the Nurses' Health Study, which we have

Sonal Singh, M.D., M.P.H.

Page 174

1    referred to as Gertig 2000?
2        A.  Yeah.  I have.  It's cited in my report
3    as well, 92.
4        Q.  Are you aware that Penninkilampi does
5    not include the Gates 2010 update of the Nurses'
6    Health Study?
7            MS. PARFITT:  Refer to your --
8        A.  Can I take a look?
9            MS. PARFITT:  Of course, you can.
10       Q.  Sure.
11       A.  Yeah.  It cites Gertig.
12       Q.  But it does not cite Gates 2010; is
13   that right?
14       A.  I don't see it.
15       Q.  Do you weigh this study, the
16   meta-analysis by Penninkilampi, less because it
17   does not include the Gates 2010 study?
18       A.  I mean, all of these meta-analyses,
19   most of them have found, you know, similar odds
20   ratio.  You know, some of them have made
21   different decisions.
22       They have made -- for example, they made
23   decisions about more than 50 cases.  Other -- if
24   you look at the Taher meta-analysis, they
25   decided, based on -- that a New Castle Tawas

Page 175

1    Skill Rating will include studies.
2        So you have to review that.  Just because
3    they excluded Gates 2010, I wouldn't weigh it
4    differently.  That's my answer.
5        Q.  Gates 2010 tends to negate an
6    association between perineal talc use and ovarian
7    cancer; correct?
8            MS. PARFITT:  Objection.  Misstates the
9    evidence.
10       A.  So negates the evidence?  I mean, in
11   fact, if you look at influence analyses conducted
12   by Taher, it sort of doesn't matter which study
13   you take out and which study you take in.  All of
14   the estimates are statistically significant.
15       Q.  If you're going to do a reliable
16   meta-analysis, you should include the pertinent
17   studies; correct?
18           MS. PARFITT:  Objection.  Misstates his
19   testimony.
20       A.  Just give me a second.
21       Yeah.  I mean, you have to include the
22   permanent study -- but as we know, as we know,
23   people have made different decisions, like Taher
24   made separate decisions, Berge has made
25   separate -- the previous analysis made.

Page 176

1        So I think it's quite reliable and, you
2    know, they were justified.  They said we're going
3    to look at case control with more than 50 cases.
4    So I don't consider it unreliable for that
5    reason.
6            MR. ZELLERS:  Let's take a break.
7            THE VIDEOGRAPHER:  Here ends Media
8    No. 2.  Off the record, 12:24 p.m.
9            (Lunch recess was taken.)
10           THE VIDEOGRAPHER:  Here begins media
11   No. 3 in today's deposition of Sonal Singh, MD,
12   M.P.H.  Back on the record, 1:02 p.m.
13   BY MR. ZELLERS:
14       Q.  Dr. Singh, another Bradford Hill
15   overview factor that you considered is
16   dose-response; is that right?
17       A.  Yes.
18       Q.  Which studies show a dose-response?
19       A.  Let me just refer to my report.
20       So in -- you know, in assessing
21   dose-response, it's very challenging with an
22   exposure such as perineal talc, particularly
23   because, you know, you need to know the amount,
24   you need to know the duration, you need to know
25   the intensity of exposure.  So there are

Page 177

1    challenges.
2        The second is the challenge of modeling
3    dose-response.  When we say dose-response -- or
4    exposure outcome, is it linear monotonic
5    relationships?
6        And, you know, several studies, some measure
7    duration, some measure intensity, some measure
8    duration and frequency.  So as I cite in my
9    dose-response section, which I'm trying to
10   find -- I'm sorry -- yeah, Page 56 of my report.
11       Q.  Which studies show a dose-response?
12       A.  I mean, this is, you know,
13   references -- with increased frequency, 51 to 55.
14   Duration, 52 to 54.  Frequency and duration,
15   58 -- 48 to 54.
16       Q.  Doctor, which studies did you review
17   that show a dose-response?
18       A.  These are the studies that I cited.
19       Q.  What page are you looking at?
20       A.  Page 56.
21       Q.  Are there studies that do not show a
22   dose-response?
23       A.  Yes.
24       Q.  Do you cite those studies that do not
25   show a dose-response in your report?

Sonal Singh, M.D., M.P.H.

Page 178

1    A.  Yes, I do.
2    Q.  On what page?
3    A.  Just give me a second.  I know I have
4  cited them, and I'm just trying to find where.
5    Yeah.  None of the cohort studies were able
6  to conduct meaningful dose-response because they
7  did not collect durational.
8    Q.  Are those the only studies, the cohort
9  studies that did not find a meaningful
10  dose-response?
11    A.  No.  There were several --
12    MS. PARFITT:  Objection to form.
13    A.  There were other case-control studies.
14  No.  If you take out 41, 55 -- I mean, these
15  references cite above -- that are, you know,
16  included in the sections, and I talk about their
17  dose-response in the respective section.
18    Q.  What is your justification for
19  disregarding the studies that did not show a
20  dose-response?
21    MS. PARFITT:  Objection.  Form.
22    A.  So I did not disregard these studies.
23  They are included in the report.  So, obviously,
24  the cohort studies already are, and we can go
25  through the case-control studies, which did not

Page 179

1  show dose-response and are included.
2    Q.  One of the studies you reviewed and
3  considered and relied upon was the Cramer 2016
4  study; is that right?
5    A.  Yeah.
6    (Article entitled "The
7    Association Between Talc Use and Ovarian
8    Cancer, A Retrospective Case-Control Study
9    in Two US States" marked Exhibit 24.)
10  BY MR. ZELLERS:
11    Q.  Exhibit 24 is the Cramer 2016 study;
12  correct?
13    A.  Yes.
14    Q.  This is a retrospective case-control
15  study published in 2016; is that right?
16    A.  Yes.
17    Q.  You claim in your report that this
18  study shows a trend for increasing risk by talc
19  years on Page 46, the last paragraph; is that
20  right?
21    A.  Yes.
22    Q.  Let's take a look at whatever the study
23  shows.  Turn to Page 337 of Exhibit 24, the
24  Cramer 2016 study.
25    A.  337?  Yes.

Page 180

1    Q.  On 337, there's a table that shows the
2  risk of ovarian cancer for women who used talc
3  daily for one year, one to five years, five to 20
4  years, and more than 20 years.  Is that right?
5    A.  Yes.
6    Q.  There was only statistical significance
7  for the time periods of one to five years of use
8  and more than 20 years of use; correct?
9    A.  Yes.
10    Q.  If there is a dose-response, shouldn't
11  there continue to be statistical significance
12  with increased exposure?
13    MS. PARFITT:  Objection.  Form.
14    A.  Yeah.  So that is -- I'm just
15  concluding what they concluded.  The trend for
16  frequency of use was significant, but the trend
17  for use -- years use was flat.  And if you look
18  at Page 337, the last line of that paragraph,
19  "Even with this imprecision, the trend remained,
20  although the increase was less monotonic."
21    Q.  When we look at the data, there is only
22  a dose-response -- strike that.
23    The data only shows statistical significance
24  for one to five years of use.  It does not show
25  statistical significance for one year or five to

Page 181

1  20 years; correct?
2    MS. PARFITT:  Objection.  Misstates the
3  evidence.
4    A.  Yeah.  So let's go to --
5    Q.  Is that correct?
6    MS. PARFITT:  Objection.
7    A.  Yes.  But let's go to the section of my
8  testimony in which -- report which discusses how
9  dose-response analysis should be interpreted,
10  because they lose statistical power.  So subgroup
11  tests lose statistical significance, and I'll
12  point out --
13    Q.  You --
14    MS. PARFITT:  Excuse me.  I think he's
15  still --
16    A.  Yeah.  I'm trying to explain something.
17  Yeah.  We are talking on the subject of
18  dose-response.  And one must be careful in
19  interpreting data from the subgroup analysis such
20  as analysis of dose categories or, you know, as
21  subgroups.  The results are important.  If the
22  test is not significant, there's lack of
23  significant difference.  However, such subgroup
24  tests can be underpowered because of reduction in
25  sample size.

46 (Pages 178 to 181)

Sonal Singh, M.D., M.P.H.

Page 182

1    Q.  Doctor, if there is a dose-response in
2  a study such as the Cramer 2016 paper, looking at
3  the data, shouldn't there continue to be
4  statistical significance with increased exposure?
5        MS. PARFITT:  Objection.
6    A.  No, no, you don't -- it doesn't have to
7  be statistical significance with, you know,
8  increased exposure.  I mean, you look at the test
9  score interaction.
10    So I don't think that, with each category of
11  exposure, you're already -- you have a power for
12  a study.  Now with each, you're decreasing the
13  number of users, so you're not going to get
14  statistical significance.
15    Q.  Then why do you get statistical
16  significance at greater than 20 years of daily
17  use?
18    A.  Yeah.  Because there's differential,
19  you know -- at that point, you know, there's
20  more -- there's, you know, more case subjects
21  have ovarian cancer.
22    Q.  Why do you not have statistical
23  significance at five to 20 years?
24    A.  Because it's underpowered at that time.
25    Q.  Why do you not have statistical

Page 183

1  significance at one year?
2    A.  It's underpowered.
3    Q.  But it is appropriately powered at one
4  to five years?
5    A.  Yes.  Based on the number of cases.
6    Q.  Isn't this an instance where you're
7  cherry-picking the data that is favorable to
8  plaintiffs' position and ignoring all of the data
9  which would tend to refute plaintiffs' position?
10        MS. PARFITT:  Objection.  Form.
11    A.  I don't know what the plaintiffs'
12  position -- but what I'm trying to say is this
13  is -- my interpretation of dose-response is based
14  on, you know, not based on statistical
15  significance.  So that's all.
16    Q.  Which studies show a dose-response for
17  asbestos exposure and ovarian cancer?
18    A.  I have not evaluated the causal link
19  between asbestos and ovarian cancer.  Other
20  agencies have, and they have opined that it
21  causes ovarian cancer.  But I have not.
22    Q.  Do you have any idea how much talcum
23  powder reaches a woman's ovaries each time she
24  uses it?
25    A.  I have not conducted that -- conducted

Page 184

1  that testing to determine how much talcum powder
2  reaches a woman's ovary after each application.
3    Q.  Do you have any idea how much asbestos
4  reaches a woman's ovaries each time she uses
5  talc, assuming that talc powder is contaminated
6  with asbestos?
7        MS. PARFITT:  Objection.  Form.
8    A.  I have not conducted that assessment.
9    Q.  How much heavy metal exposure reaches a
10  woman's ovaries, assuming that there are heavy
11  metals in talcum powder?
12        MS. PARFITT:  Objection.  Form.
13    A.  I have not conducted that assessment.
14    Q.  Do you know that heavy metals,
15  chromium, cobalt and nickel, are in vitamins?
16    A.  Yeah.  They are in, you know -- they
17  are ubiquitous in various other areas as well.
18    Q.  They're in food; right?
19    A.  I don't know which one is in which.
20  Yeah.  I can't be specific.
21    Q.  In drinking water?
22    A.  I don't know.  I don't want to say yes
23  to whichever.
24    Q.  It's in bottled water?
25    A.  I don't know that.

Page 185

1    Q.  Are heavy metals, chromium, cobalt and
2  nickel, considered essential nutrients in the
3  body?
4        MS. PARFITT:  Objection.
5    A.  Yeah.  I mean, that's, you know,
6  it's -- pertaining to this case, the question is
7  not that, whether they are in drinking water.
8    I asked myself this question, causal
9  question, what constitutes talcum powder
10  products.  And to that effect, if there are
11  substances such as, you know, chromium, cobalt,
12  and other heavy metals that have been, you know,
13  classified as Grade I or Grade II carcinogens
14  that provide further evidence of a causal link,
15  whether they are present in air, ambient air,
16  that's not the assessment I've done, and I'm not
17  making a causal claim that chromium, per se, is
18  causing that ovarian cancer in that causal
19  framework.
20    Q.  You have no evidence whatsoever that
21  the blood or tissue levels of any trace heavy
22  metals are higher in genital talc users compared
23  to nonusers; correct?
24        MS. PARFITT:  Objection.  Form.
25    A.  Blood or genital talc.  I'm sorry.  Can

47 (Pages 182 to 185)

Sonal Singh, M.D., M.P.H.

Page 186

1  you repeat?
2      Q.  Sure.  I'll ask it again.
3      You have no evidence that the blood or
4  tissue levels of any trace heavy metals are
5  higher in genital talc users compared to
6  nonusers; correct?
7          MS. PARFITT:  Objection.  Form.
8      A.  Yeah.  But I do know that there is
9  perineal talc application, and at least from the
10  documents I have reviewed, that, you know,
11  asbestos is present in talc, at least from the
12  documents I've reviewed, from the studies that
13  I've reviewed, and from a -- as you say, the
14  excerpts of the deposition.
15      And, you know, whether these are in blood
16  levels or, as you said, in the uterine tissue,
17  no, I don't know that.
18      Q.  Another Bradford Hill overview factor
19  is biological plausibility; right?
20      A.  Well, it's actually plausibility.
21      Q.  Plausibility means that a biological
22  mechanism exists; correct?
23      A.  Well, that's what we mean.  But if you
24  actually go back and read Bradford Hill, he was
25  talking even about social factors.  Yes, but, you

Page 187

1  know, we've gone forward and interpreted that as
2  biologic plausibility.
3      Q.  The biological mechanisms of cancer are
4  not your area of expertise; is that right?
5          MS. PARFITT:  Objection.
6      A.  Yes.  But, again, the question for me
7  was not, you know, to elucidate every precise
8  step either in the occurrence of ovarian cancer
9  or the talc installation into the development.
10      The precise question was, you know, the
11  epidemiology shows these findings.  Whatever is
12  the data in biology, does it support or does it
13  refute, you know, these findings in epidemiology?
14      Q.  On that topic, biologic plausibility,
15  you defer to other experts; is that right?
16          MS. PARFITT:  Objection.
17      A.  Yeah.  I would defer to other people
18  for more details on, you know, precise mechanisms
19  of ovarian cancer.
20      But I do have -- and I'm an epidemiologist.
21  I mean, I can't -- so that's why I just can't
22  look at whether it's Cramer or Penninkilampi or
23  Berge in isolation.  We have to look at the whole
24  evidence, including epidemiology, including --
25  but, yes, I can -- I have that experience to

Page 188

1  infer from whatever the biological evidence that
2  I've reviewed, that there's, you know, evidence
3  that supports biologic probability.  There are
4  some studies that, you know, don't support that
5  claim.
6      Q.  My question simply was if you defer to
7  other experts on the topic of biologic
8  plausibility.
9          MS. PARFITT:  Objection.
10      Q.  You do; correct?
11          MS. PARFITT:  Objection.  That's not
12  his testimony.
13      A.  I won't just defer to them.  I'm just
14  providing my own opinion.  Yeah.  I mean, they
15  can provide -- you know, it depends.  If it's a
16  plaintiff expert, a defense expert.  I mean, how
17  do I know?  I can't defer to somebody without
18  reading their opinion; right?
19      Q.  Is all ovarian cancer caused by the
20  same mechanism?
21      A.  No.  And neither is any kind of cancer.
22      Q.  Different subtypes of cancer have
23  different biological mechanisms; correct?
24      A.  Yes.  But we are dealing with biologic
25  plausibility.

Page 189

1      Again, I don't need to know the precise
2  biological mechanisms to arrive at a causal
3  opinion.
4      Q.  If talc is associated with all subtypes
5  of epithelial ovarian cancer, or with different
6  subtypes in different studies, doesn't that
7  suggest that the association is by chance?
8          MS. PARFITT:  Objection.  Misstates the
9  evidence.
10      A.  I mean, again, I don't know enough
11  details about the biologic plausibility of each
12  ovarian cancer subtype to say that, you know,
13  talc would be, by chance, alone.  I'd defer to
14  you know, people who evaluate these.
15      Q.  There is no one biological mechanism
16  that could tie all of these subtypes together, is
17  there?
18      A.  I will defer to people with more
19  experience.  I don't know that.  What I know is
20  biological plausibility mechanisms that inform
21  the hypothesis that I was looking at.
22      Q.  How does talc reach the ovaries?
23      A.  Well, you know, talc migrates from, you
24  know -- my understanding and opinion is that, you
25  know, perineal application of talc, you know,

48 (Pages 186 to 189)

Sonal Singh, M.D., M.P.H.

Page 190

1  migrates upwards and upwards through the, you
2  know, vaginal canal and migrates to.
3     Q.  Is that an area of your expertise?
4     A.  Again, no.  But I have reviewed the
5  studies, several studies that -- some studies
6  that I cite, several studies that were added.
7  And it's quite well accepted, at least in the
8  gynecological community, that there's, you know,
9  particulate matter can migrate upwards.
10    Q.  What studies support the theory that
11 talcum powder applied externally migrates from
12 the perineal region to the ovaries?
13    A.  Again, I reviewed various studies on
14 migration.
15    Q.  Can you name them for me?
16    A.  I'm going to look at it.
17    Yeah.  So I cite several studies in this
18 section on migration.  And, again, this in the
19 context of biologic plausibility.  Is it
20 plausible that particulate matter, such as talc,
21 can migrate?  And, again --
22    Q.  What page are you looking at?
23    A.  Sorry.  57.
24    Q.  What studies are you relying on?
25    A.  Yeah.  So I'm relying on the studies

Page 191

1  described by, you know, Heller, 64.
2     Q.  Any others?
3     A.  65.
4     Q.  What is 65?
5     A.  I'll have to go take a look.
6     It's Henderson, I think, but I don't want
7  to -- these are big documents.  Yeah, it is
8  Henderson.
9     And then 66 is presence of talc in lymph
10 nodes and then --
11    Q.  Who is the author?
12    A.  Cramer.
13    And then supportive evidence of migration of
14 other, you know, particulate matter comes from,
15 you know, 68, 87 and --
16    Q.  68 is what?
17    A.  68 is Justin.
18    Q.  Eighty -- is it -- 87 is what?
19    A.  Ness.
20    Q.  Is who?
21    A.  Ness.  Ness 2000.
22    Q.  Cramer is a litigation consultant and
23 expert for plaintiffs in the talc litigation; is
24 that right?
25       MS. PARFITT:  Objection.

Page 192

1     A.  Yeah.  I know that.
2     Q.  Ness is an expert for plaintiffs in the
3  talc litigation; is that right?
4        MS. PARFITT:  Objection.
5     A.  I'm not aware of that.
6     Q.  So Justin, that dealt with glove
7  powder; is that right?
8     A.  Which one was that, 68?
9     Q.  68.
10    A.  Yes.
11    Q.  Isn't it true that that study did not
12 involve perineal use, but an exam with force to
13 the cervix?
14    A.  Yeah.  You know, and I'm relying on it,
15 again, for biologic plausibility.  It does not
16 involve talc.  So, you know, it's glove powder
17 in --
18    Q.  Isn't it true that they found some
19 particles in women who were examined with
20 powder-free gloves?
21    A.  Yes.
22    Q.  Heller, didn't Heller find talc in
23 tissues in all 24 patients, including the 12 who
24 did not use perineal talc?
25    A.  Yes.

Page 193

1     Q.  What is the evidence in the ovarian
2  tissues that have been studied of granulomatous
3  reaction which is what you would see if there was
4  a huge amount of talc?
5     A.  Well, I mean, I'm not opining that
6  there is a huge amount of talc, but others have
7  found talc in the ovaries.  I am just -- my
8  opinion is that it is biologically plausible.  I
9  mean, you know, the FDA has stated that it is
10 biologically plausible for particles, retrograde
11 particles to migrate.
12    And so I'm opining on that.  I'm not saying
13 that talc is in the ovaries and it's inducing
14 this granulomatous reaction.  I mean, these
15 people have found that it can occur.
16    And this is sufficient evidence for my
17 opinion to support on biologic plausibility.
18    Other studies, which I cite in my report,
19 which, you know, for example, monkey models,
20 couldn't, you know detect -- didn't detect
21 translocation.  So there are studies that don't.
22    Q.  Can you cite any article that shows
23 granulomas, fibrosis, or adhesions anywhere up
24 the reproductive tract of a woman as a result of
25 her external genital talc application?

Sonal Singh, M.D., M.P.H.

Page 194

1      MS. PARFITT:  Objection.  Form.
2      A.  I did not review those studies, if
3  there are.
4      Q.  In your report, you say that, "The
5  migration theory is supported by findings of a
6  deceased risk" -- strike that.
7      In your report, you say that, "The migration
8  theory is supported by findings of a decreased
9  risk of ovarian cancer with tubal ligation and
10  hysterectomy."  Pages 18 and 19.
11      Is that right?
12      A.  Yes.
13      Q.  Don't the studies pertaining to tubal
14  ligation show mixed results?
15      A.  No.
16      MS. PARFITT:  Objection.
17      A.  As far as --
18      MS. PARFITT:  Sorry.
19      A.  I mean, as far as I'm aware, you know,
20  tubal ligation and hysterectomy are protective
21  risk factors for ovarian cancer.
22      Q.  That's your opinion based upon your
23  review and analysis of the literature; is that
24  right?
25      A.  Yeah.

Page 195

1      Q.  Take a look at the Cramer article that
2  we referred to before, Exhibit 24.  This is
3  Cramer 2016.
4      Do you have that in front of you?
5      A.  Oh, my copy?
6      Q.  Yes.  You have a copy.
7      A.  Yes.  Which page?
8      Q.  Take a look -- well, Cramer found a
9  significantly greater association between talcum
10  powder use and ovarian cancer for women who had a
11  tubal ligation or hysterectomy.  Isn't that true?
12      A.  Where is that?
13      Q.  Look at the bottom of Page 337 of
14  Exhibit 24 to the top of page -- look at 337.
15      A.  And which table?
16      Q.  I'm sorry.  Look at the bottom of
17  Page 337, that carries over to the top of Page
18  339.  This is Cramer describing his results; is
19  that right?
20      A.  Yes.
21      Q.  Tell me if I'm reading this correctly,
22  and I'm starting at the bottom of Page 337.
23      "By test for interaction, Column 3, the
24  association was significantly greater for women
25  who were African American, had no personal

Page 196

1  history of breast cancer, had a tubal ligation or
2  hysterectomy, were pre-menopausal or were
3  post-menopausal and used HT."
4      Is that correct?
5      A.  Yeah.
6      Q.  So, in fact, Cramer did find a
7  significantly greater association between talcum
8  powder use and ovarian cancer for women who had a
9  tubal ligation; is that right?
10      A.  Yeah.  But my -- my point, in Page 57,
11  is that, you know, first of all, that's more than
12  just one Cramer.  There are several studies that
13  -- in inferring biologic plausibility, tubal
14  ligation and hysterectomy are protective of
15  ovarian cancer.  It is not that talc in this had
16  a higher risk among those.
17      I mean, those, again, those are not two
18  incongruent arguments.  I mean, Cramer is making
19  a separate argument that, in his study, he found
20  a higher risk among those who had tubal ligation
21  or hysterectomy.
22      Q.  If you're correct in the opinion that
23  you set forth in your report, you would have
24  expected the Cramer study to show a decreased
25  risk of ovarian cancer for women who had tubal

Page 197

1  ligation or hysterectomy; correct?
2      MS. PARFITT:  Objection.  Form.
3  Misstates his testimony.
4      A.  Yeah.  I mean, I don't -- I mean,
5  that's probably, in that study.  Yeah.
6      Q.  How do you account for the fact that
7  Cramer and the authors of this 2016 paper found a
8  significantly greater association among women who
9  had a tubal ligation or hysterectomy?
10      A.  I have no -- you know, you can find
11  different studies have different findings, but,
12  overall, we know that tubal ligation and
13  hysterectomy are protective.
14      Q.  The Gertig 2000 Nurses' Health Study,
15  that's also a study that you have reviewed; is
16  that right?
17      A.  Yes.
18      Q.  That study did not show a reduction of
19  ovarian cancer in talc users who have had a tubal
20  ligation; correct?
21      A.  Which page is that?
22      Q.  I'm just asking, based upon your review
23  of that study.
24      A.  I can't answer.  You know, there are so
25  many different -- can I ask for the Taher

50 (Pages 194 to 197)

Sonal Singh, M.D., M.P.H.

Page 198

1  appendix, because that actually breaks it down by
2  tubal ligation and hysterectomy.
3      You're asking very specific questions.  I
4  need to have specific materials.
5      MR. TISI:  I have them.
6      Q.  What are you asking for?
7      A.  You asked a question about tubal
8  ligation.
9      Q.  I understand.  What are you asking
10  counsel for plaintiffs to get you?
11     A.  The Taher appendix.
12     Q.  You want to go back and look at the
13  Taher --
14     A.  Appendix.  Because they did stratify
15  the analysis by hysterectomy and tubal ligation.
16     Q.  That's the 2018, unpublished paper; is
17  that right?
18     A.  Yes.
19     Q.  All right.  Did the Houghton -- as
20  they're looking for this --
21     A.  Yeah.  Sure.
22     Q.  Did the Houghton two thousand -- strike
23  that.
24     The Houghton 2014 study also did not show a
25  reduction of ovarian cancer in talc users who

Page 199

1  have had tubal ligation; correct?
2      A.  Again, you know, I don't want to agree
3  or disagree with you without just looking at it.
4  I don't think I comment on it.
5      Q.  Would you agree or can you agree that
6  both Gertig 2000 and Houghton 2014 were large
7  prospective cohort studies; right?
8      A.  Yeah.  But we've already discussed
9  their limitation in terms of they were not
10  designed to study the talc ovarian cancer.  They
11  had prevalent user biases.  You know, they lost a
12  lot of users and cases of ovarian cancer.  You
13  know, they had misclassification.
14     And, yes, they were large studies, but had
15  small number of ovarian cancer cases.
16     MR. KLATT:  Objection.  Nonresponsive.
17     MR. ZELLERS:  Join.
18     Q.  You read the Ter Riet 2013
19  meta-analysis; is that right?
20     A.  Yes.
21     Q.  You rely on that; correct?
22     A.  Yes.
23     MS. PARFITT:  Objection.
24     Q.  The Ter Riet 2013 meta-analysis also
25  did not show a reduction of ovarian cancer in

Page 200

1  talc users who had a tubal ligation; correct?
2      A.  I mean, I think I need to look at the
3  data.  I think -- I don't have it.  We are trying
4  to get it, so we'll have to wait.
5      I mean, you're asking me questions.  I mean,
6  you have to show me documents.  I mean --
7      Q.  Well, you made a statement in your
8  report --
9      A.  How can I make a statement in the
10  report around Taher, because it wasn't even
11  available at that time?
12     Q.  What I'm trying to do is ask you --
13     A.  Sure.
14     Q.  -- about the statement in your report,
15  where you say that, "Migration theory is
16  supported by findings of a decreased risk of
17  ovarian cancer with tubal ligation and
18  hysterectomy."
19     A.  And I'm just stating that I just need
20  to look at a figure in the Taher appendix and
21  then I'll be able to answer that.  That's all.
22     Q.  Well, we saw that Cramer doesn't show
23  that; right?
24     A.  Yes.
25     Q.  You're not aware that Gertig 2000 or

Page 201

1  Houghton 2014 shows that.  Are you?
2      MS. PARFITT:  Objection.  Misstates his
3  testimony.
4      A.  You have not shown me that.  You have
5  not shown me documents to say one way or the
6  other.
7      Q.  When you did your analysis, didn't you
8  look at the studies to try to see if they
9  supported or refuted the points you were making?
10     A.  I -- you know, I did not look at every
11  subanalysis by, you know -- by whether it's, you
12  know, pre-menopausal, post-menopausal.
13     Q.  You cite Cramer 2016 as supportive of
14  your position and opinions.
15     A.  Sure.
16     Q.  Is that right?
17     A.  Well, again --
18     MS. PARFITT:  Objection.  Mis --
19     A.  I don't.
20     MS. PARFITT:  Let me get my objection
21  in.
22     THE WITNESS:  Sorry.  Go ahead.
23     MS. PARFITT:  No.  My objection is in,
24  I think.
25     Q.  But then you ignore those portions or

Sonal Singh, M.D., M.P.H.

Page 202

1 parts of Cramer 2016, Gertig 2000, Houghton 2014,
2 Ter Riet 2013, Rosenblatt 2011, Wong 1999, Cook
3 1997, Harlow 1992, that don't support your
4 position.
5     MS. PARFITT:  Counsel completely
6 misstates his opinion.  The question misstates --
7     A.  I don't even know what was the
8 question, and I can't answer that because I don't
9 know what the question was.
10    Q.  The question is:  When you opined in
11 your report that the migration theory is
12 supported by findings of a decreased risk of
13 ovarian cancer with tubal ligation and
14 hysterectomy, did you pick out just a couple of
15 cases to look at and cite or did you try to see
16 if there was consistency to that finding across
17 all of the studies?
18    A.  Yeah.  So when I cite that, and you can
19 see the citation, I am trying to make an
20 inference about separate from talc use, and
21 ovarian cancer, you know, is hysterectomy and
22 tubal ligation protective of that.
23    So that's the inference.  It's not that each
24 of these studies, I'm trying to ignore, you know,
25 the studies that you mentioned.  I'm just trying

Page 203

1 to say, as you're looking at mechanisms, what
2 would happen with tubal -- I'm trying to do the
3 best to explain, tubal ligation and ovarian
4 cancer.
5     If, in the individual studies, yes, as in
6 Cramer, and if we see that in the other studies,
7 then, you know, they provide a different opinion.
8 But I'm trying to make an opinion, based on the
9 general knowledge of tubal ligation and
10 hysterectomy being, you know, protective.
11    Q.  Do you agree with me, to have a
12 scientifically valid opinion --
13    A.  Sure.
14    Q.  -- you need to look at all of or at
15 least the important studies; correct?
16    A.  Yeah.  I did look at these studies.
17    Q.  And, in fact, a number of the studies
18 that you cite in your report --
19    A.  Sure.
20    Q.  -- don't support your position;
21 correct?
22    MS. PARFITT:  Objection.  Form.
23    Support his position on tubal ligation?
24    Q.  Well, right now, we're talking about
25 migration, that the migration theory is supported

Page 204

1 by findings of a decreased risk of ovarian cancer
2 with tubal ligation and hysterectomy.
3     A.  Yeah.  But it doesn't talk about, you
4 know -- so if you look at the reference, in
5 case-control studies and meta-analysis, let's
6 look at the references.  You know, so, yes,
7 there's one.  And if -- let's look at --
8     Q.  Okay.  Can you cite one reference?
9     A.  Yeah.  Let's look at that.
10    Q.  All right.
11    A.  Then let's look at 115.  So when I cite
12 115, that's not even about talc.  That's about
13 tubal ligation and hysterectomy, in general, is
14 it -- you know, so taking talc out of the
15 equation, I'm trying to opine or understand
16 whether tubal ligation and hysterectomy are
17 protective factors, and then I can infer on talc,
18 yes, should only Ness have been cited?  Yes,
19 there are other studies otherwise.
20    Q.  And there are other studies, many
21 studies --
22    A.  Yes.
23    Q.  -- that do not support your position;
24 is that right?
25    MS. PARFITT:  Objection.  Form.  His

Page 205

1 position on tubal ligation?
2     MR. ZELLERS:  Yes.
3     MS. PARFITT:  Thank you.
4     A.  Yeah.  So it's -- it's -- I think
5 there's -- I mean, whether Ness and others should
6 have been cited there, that's a valid point.  But
7 when I make a point about tubal ligation and
8 hysterectomy, it's a general point on the, you
9 know, migration hypothesis.
10 BY MR. ZELLERS:
11    Q.  You should at least cite to or make
12 some reference --
13    A.  Yeah.
14    Q.  -- right, to the studies that do not
15 support that position?
16    A.  Yeah.  And I think that I have made it
17 in the individual sections, and I can try to look
18 for it, but it will take us time there.
19    Q.  Isn't there evidence that if tubal
20 ligation has a protective effect, the protective
21 effect in ovarian cancer stems from the fact that
22 the ligation procedure itself changes the
23 fallopian tube cells?
24    A.  I am not an expert --
25    MS. PARFITT:  Objection.

52 (Pages 202 to 205)

Sonal Singh, M.D., M.P.H.

Page 206

1    A.   -- in, you know, this area to provide,
2  you know, why it would do that.
3    Q.   Did you review or are you familiar with
4  Tiourin, T-I-O-U-R-I-N, a 2015 study?
5    A.  Did I cite that?  I don't remember.
6    Q.   Are you -- is that study familiar to
7  you?
8    A.  I just can't remember the names.  There
9  are so many studies.  If you show it to me, I
10  can --
11    Q.   I'll show it to you.  You can tell me
12  if it's familiar to you.  And if it's not, I'll
13  move on.
14       (Article entitled "Tubal
15       Ligation Induces Quiescence in the
16       Epithelia of the Fallopian Tube Fimbria"
17       marked Exhibit 25.)
18       MR. ZELLERS:  25 is the --
19    A.  No, it's not.  I don't know about.
20  BY MR. ZELLERS:
21    Q.   For the record, 25 is a 2015 study by
22  Tiourin, T-I-O-U-R-I-N.
23       That's not a study that you reviewed or
24  considered; is that right?
25    A.  You know, I have to go through all the

Page 207

1  references, but I can't recall straight off
2  whether it does.
3    Q.   If talcum powder migrates from the
4  perineal region to the ovaries, shouldn't
5  exposure to talc be far greater in concentration
6  in the rectal, vulvar, vaginal, cervical and
7  uterine tissues?
8       MS. PARFITT:  Objection to form.
9    Q.   Because those are closer to the area of
10  initial exposure?
11       MS. PARFITT:  Same objection.
12    A.  Yes.  So, again, my -- I did not
13  examine, you know, which areas of -- now, as an
14  epidemiologist, I examine general exposures to,
15  you know, products and their associations.
16  Whether, you know, we want to know, yes, route of
17  exposure, whether it's perineal application.
18       But, you know, the evidence that I examined
19  was, you know, I did not distinguish within
20  whether it was perineal or vaginal, vulvar.  That
21  would have been different.
22    Q.   Let's go step by step.
23       You do agree that if talcum powder migrates
24  from the perineal region to the ovaries, the
25  exposure to talc would be far greater in

Page 208

1  concentration in the rectal, vulvar, vaginal,
2  cervical, and uterine tissues which are closer to
3  the area of the initial exposure; correct?
4       MS. PARFITT:  Objection.  Misstates his
5  testimony.
6    A.  I just don't have an opinion in terms
7  of where it will be high or low.  Because that's
8  not my area of expertise.
9    Q.   Talc particles should be causing
10  inflammation in all those organs and areas;
11  correct?
12       MS. PARFITT:  Objection.
13    A.  Again, that's -- that's, you know, I'm
14  opining on biological plausible mechanisms of
15  talc-induced ovarian cancer.  I didn't look at,
16  you know, whether it's vaginitis or vulvar or
17  whether it's, you know, rectal inflammation.  And
18  that's not my area of expertise again.
19    Q.   In fact, there are no studies that show
20  inflammation as a result of genital talc use in
21  any of those areas; correct?
22       MS. PARFITT:  Objection.  Misstates the
23  evidence.
24    A.  Again, I have not -- you know, my
25  testimony and report on talcum powder products

Page 209

1  and inflammation is looking at, are there
2  biological plausible mechanisms.
3       And, again, if there's no studies that
4  provide that talc, in and of itself, causes
5  inflammation, then there are no studies.  But,
6  you know, but there's still biologic
7  plausibility.
8       MR. KLATT:  Objection.  Unresponsive.
9    Q.   Are there any studies that you are
10  aware that show a link between external genital
11  talc use and rectal, vulvar, vaginal, cervical,
12  or uterine cancer?
13       MS. PARFITT:  Asked and answered.
14  Objection.
15    A.  I'm not aware of those.  I have not
16  reviewed those studies.
17    Q.   As part of your report, you discuss a
18  study published by Huncharik and others in 2007;
19  is that right?
20    A.  Yes.  Let's bring it out, I mean, if
21  you want to talk about that.
22    Q.   I believe it's on Page 26 of your
23  report.
24    A.  Sure.
25    Q.   Huncharik 2007 is a meta-analysis of

Sonal Singh, M.D., M.P.H.

Page 210

1  studies on the relationship between ovarian
2  cancer and using diaphragms that are dusted with
3  talcum powder; is that right?
4      A.  Yes.
5      Q.  A diaphragm is inserted directly onto a
6  woman's cervix; is that right?
7      A.  Yes.
8      Q.  On Page 26 of your report, you say
9  that, "This meta-analysis is flawed because it
10  only focuses on powder-dusted diaphragms";
11  correct?
12      A.  Well, no.  That's not the only flaw.  I
13  mean, there are several other flaws, including
14  exclusion of loss category, data extraction
15  analysis, which is, you know, really inclusion of
16  inability studies that did not disaggregate.
17      I mean, the question is if you're asking
18  about perineal exposure, yes, perineal --
19  diaphragms is one route of exposure.  But that's
20  not the only route of exposure that you should be
21  concerned about.
22      Q.  Do you state in your report, "The most
23  important limitation with the Huncharik 2007
24  meta-analysis was its exclusive focus on talc
25  powder-dusted diaphragms as the route of

Page 211

1  exposure, which could not inherently address the
2  causal question of whether genital talcum powder
3  dusting is associated with increased risk of
4  ovarian cancer"?
5      Is that what you said?
6      MS. PARFITT:  Counsel, do you have a
7  copy of the -- otherwise, may I show him the
8  Huncharik study so he's got it in front of him?
9      MR. ZELLERS:  I'm just asking general
10  questions right now.  That was just a question,
11  does he say that in his report.  If he needs to
12  review the study, then he can look at the study.
13      MS. PARFITT:  I would appreciate that.
14      MR. ZELLERS:  Sure.
15      MS. PARFITT:  I just didn't want to
16  pass something to him without your permission.
17      A.  Yeah.  I do state that.
18      Q.  You say that, "Studies on the use of
19  talcum powder-dusted diaphragms cannot address
20  the question of whether perineal use is
21  associated with an increased risk of ovarian
22  cancer"; correct?
23      A.  Where is that?
24      Q.  It's what we just read.
25      A.  No.  It doesn't mean that.  It just

Page 212

1  means that you cannot exclusively focus on one
2  route of exposure.  So it does not mean that it
3  cannot in and of itself.  You have to look at
4  perineal-dusted diaphragm.  You have to look at,
5  other, you know, perineal applications.
6      Q.  So putting aside inhalation for the
7  moment, your opinion is that talcum powder
8  travels from the perineal region to the ovaries
9  through the woman's reproductive tract; is that
10  right?
11      A.  I mean, I don't even know through the
12  ovaries.  I know it migrates upwards.  That's,
13  you know, my opinion.
14      Q.  So talcum powder must travel past the
15  labia, through the vagina, through the cervix,
16  and then to the uterus; is that right?
17      A.  Yes.  It migrates upwards through the
18  vagina, you know, the tract.
19      Q.  And then the powder travels through the
20  uterus and into the fallopian tubes to reach the
21  ovaries; is that right?
22      A.  Well, I mean, I'm not -- again, I don't
23  intend to elucidate, you know, the precise link
24  that a study has shown that talcum powder -- I
25  think we answered this earlier, I answered this

Page 213

1  earlier -- that I am not aware of one study that
2  shows that.  But, you know, several shows that
3  talc ends up in the ovaries.
4      Q.  Well, given how talc, talcum powder
5  must travel to reach the ovaries, how can you
6  exclude data about the relationship between
7  ovarian cancer and talcum powder that is applied
8  directly to the cervix?
9      MS. PARFITT:  Objection.  Misstates his
10  testimony.
11      A.  Nobody is excluding data.  So this is
12  not exclusion of this data.
13      But I am saying that this particular
14  question of talc-dusted diaphragms, A, is an
15  exclusive focus on one route of exposure, so it
16  does not answer the causal question about
17  perineal exposure.
18      And, two, it is not excluded.  It's included
19  and discussed and several flaws are noted,
20  including, you know, data extraction errors for
21  the most part, inclusion of studies.
22      And so -- and as can you see in my
23  methodological rating of meta-analyses, it is
24  weighted differently than others.  So it is not
25  excluded.

54 (Pages 210 to 213)

Sonal Singh, M.D., M.P.H.

Page 214

```
 1      Q.  But you state, as the most important
 2   limitation of the Huncharik 2007 study, is the
 3   exclusive focus on talc powder-dusted diaphragms.
 4      A.  Yeah.
 5      Q.  And those diaphragms are applied
 6   directly to the cervix; is that right?
 7      A.  Yeah.  Because -- because of its
 8   exclusive focus.  If the study had, you know,
 9   other routes of exposure, yeah.
10      What I'm trying to say is its exclusive
11   focus on one route of exposure cannot -- if
12   you're just asking the question about dust,
13   dusted diaphragm, then don't make inferences
14   about perineal routes of exposure.  You have to
15   look at broader exposures.
16      Q.  On what studies are you relying to say
17   that talcum powder affects the body differently
18   when it is applied to the perineal region and
19   travels to the cervix compared to when it is
20   applied directly to the cervix?
21      A.  I have not made a distinction between
22   those studies.
23      Q.  And, in fact, when applied to the
24   perineal region, the talcum powder would also be
25   in close contact with a woman's urethra; is that
```

Page 215

```
 1   right?
 2         MS. PARFITT:  Objection.  Form.
 3      A.  Yeah.  I mean, anatomically.
 4      Q.  Substances are capable of traveling up
 5   the urethra; correct?
 6      A.  I mean, yes.  Just as we agree that,
 7   you know, talc can migrate upwards, substances
 8   can migrate through the urethra.  If you agree
 9   talc can migrate upwards, then, you know,
10   substances can migrate through the urethra.
11      Q.  Women get urinary tract infections when
12   bacteria travels up the urethra; correct?
13      A.  Yeah.
14      Q.  But studies do not show an increase in
15   bladder cancer with talcum powder use, do they?
16         MS. PARFITT:  Objection to form.
17      A.  I did not ask the causal question about
18   that.  And, you know, I have not evaluated.
19   Maybe there are studies that show decreased risk
20   for all that I know.  I just can't answer that
21   question.
22      Q.  And studies do not show an increase in
23   rectal cancer with talcum powder use; is that
24   right?
25      A.  I don't answer the questions that I
```

Page 216

```
 1   don't know anything about.  I don't -- you know,
 2   I haven't reviewed it to answer that question.
 3      Q.  Do you have an opinion on whether
 4   inhaled talc can migrate to the ovaries?
 5      A.  Yeah.  I mean, I think the primary
 6   route of exposure is, you know, reproductive, but
 7   there are some potential, I would say, you know,
 8   potential plausible mechanisms that, you know,
 9   when perineal application is applied, it can get
10   inhaled through the lungs and potentially reach
11   the ovaries.  But I think that that mechanism is
12   probably not as plausible as the reproductive
13   mechanism.
14      Q.  Well, in fact, studies of talcum powder
15   use failed to show a statistically significant
16   association between nongenital use of talcum
17   powder and ovarian cancer; correct?
18         MS. PARFITT:  Objection.  Form.
19      A.  Yeah.  And I've cited those studies.
20      Q.  If inhaled talc could migrate to the
21   ovaries, wouldn't you expect to see increased
22   ovarian cancer risk with nongenital use of talcum
23   powder?
24         MS. PARFITT:  Objection.
25      A.  Well, I mean, it also depends on, you
```

Page 217

```
 1   know, the quantity of inhalation, the degree of
 2   talc that's -- and I don't know enough about that
 3   to say that, yes, there's a sufficient quantity,
 4   you know, migration to cause that.  I don't know
 5   which studies have evaluated sort of inhaled talc
 6   and ovarian cancer.
 7      Q.  Well, let's look back at Cramer 2016,
 8   Page -- or Exhibit 24.  Do you have that in front
 9   of you?
10      A.  Yeah.
11      Q.  In that study, Cramer found no apparent
12   risk associated with nongenital talc use; isn't
13   that correct?
14      A.  Yeah.  And I think I cite that in my
15   report, too.
16      Q.  You don't disagree that Cramer, in his
17   study, 2016, did find no apparent risk associated
18   with nongenital talc use; correct?
19      A.  Yeah.
20      Q.  The same result was found in the pooled
21   analysis that was done by OCAC, Ovarian Cancer
22   Association Consortium; is that right?
23         MS. PARFITT:  Objection.  Which study
24   are you referring to?  What year?  There have
25   been many studies by OCAC.
```

55 (Pages 214 to 217)

Sonal Singh, M.D., M.P.H.

Page 218

1    MR. ZELLERS:  I'm referring to Page 341
2  of the Cramer article.  Page -- strike that.
3        The second and third paragraphs.
4  BY MR. ZELLERS:
5    Q.  Tell me when you have that, Doctor.
6    A.  341.  Discussion?
7    Q.  Yes.  So in the second and third
8  paragraph, I'm reading the second sentence.
9  "Talc use regularly" -- strike that.
10      "Talc used regularly in the genital area was
11  associated with a 33 percent increase in ovarian
12  cancer risk overall while no apparent risk was
13  associated with talc used only in nongenital
14  areas."
15    A.  Yeah.  And I agree with their opinion.
16    Q.  All right.  Do you also agree with the
17  next sentence?  "Our results are consistent with
18  the recent pooled analysis from the OCAC which
19  reported that use of powder on genitals is
20  associated with a 24 percent increased risk and
21  no effect of nongenital use of talc."
22    A.  Yeah.
23    Q.  Have you ever performed any study
24  yourself pertaining to whether inhaled talc can
25  migrate to the ovaries?

Page 219

1    A.  No.  And I would have a different job.
2  That's not my area of expertise.
3    Q.  And you can't, as we sit here, cite me
4  to such a study; correct?
5    A.  Well, I don't know if it's -- I'll go
6  back to my report and just cite that -- that
7  Dr. Luongo, you know, has done analyses which say
8  that inhaled talc can migrate.
9    Q.  You're not expressing that opinion here
10  today; correct?
11    A.  No.  I'm not.  I'm not vouching for his
12  testimony.
13    Q.  Assuming baby powder can reach the
14  ovaries, what is the method by which baby powder
15  causes ovarian cancer?
16    A.  So, yeah.  I mean, we talked about, you
17  know, potential biological mechanisms of
18  inflammation.
19      And, again, I don't -- in my inference on
20  biologic plausibility, I don't intend to offer
21  the opinion that, A, I know the precise
22  biological mechanisms which cause biological --
23  ovarian cancer or the precise steps by which talc
24  causes it.
25      But, you know, there are several, you know,

Page 220

1  mechanisms that have been shown in terms of
2  increase in, you know, inflammatory enzymes, and
3  increase in alterations of redox potential that
4  are some of the potential plausible biological
5  mechanisms.  Again, other people who are
6  biological experts will opine on them and detract
7  from the strengths and weaknesses.
8    Q.  You have not done an expert review of
9  inflammation evidence yourself; correct?
10    A.  When you say -- I mean, expert review
11  of inflammation.
12      MS. PARFITT:  Object.
13    Q.  You're deferring to other experts on
14  the topic and subject of inflammation; is that
15  right?
16      MS. PARFITT:  Objection.
17    A.  Yeah.  I mean, other experts, I mean, I
18  can look at the evidence and see, A, one, that
19  inflammation plays a role in cancer.  Two,
20  inflammation plays a role in ovarian cancer.
21      At least my opinion is that, you know, talc
22  can, you know, induce inflammation; others will
23  provide more detailed opinion.
24    Q.  In terms of the mechanism by which
25  ovarian cancer may or may not be related to

Page 221

1  inflammation, you are deferring to other experts;
2  correct?
3      MS. PARFITT:  Objection.  Misstates his
4  testimony.  He just told you --
5      MR. ZELLERS:  I'm asking him the
6  question.  Okay?
7      MS. PARFITT:  Counsel, he did answer
8  it.  And you just asked the question again and
9  you misstated what he said.
10      MR. ZELLERS:  Ms. Parfitt, please.  I
11  thought we had a discussion.
12      MS. PARFITT:  We did.
13      MR. ZELLERS:  We ought not to have
14  speaking objections.
15      MS. PARFITT:  We don't.  But I'll tell
16  you the discussion we did have.  You can't
17  misstate --
18      MR. ZELLERS:  I'm allowed to ask the
19  witness what his opinions are and are not.
20      MS. PARFITT:  Absolutely.  But not to
21  misstate them.  That's all.  Let's ask it again.
22      THE WITNESS:  I'm sorry.  I forgot.
23      MR. ZELLERS:  It was a question.
24      THE WITNESS:  What was the question?
25      MR. ZELLERS:  Can you read the

Sonal Singh, M.D., M.P.H.

1  question?
2      MS. PARFITT:  Listen carefully to the
3  question.
4      MR. ZELLERS:  Okay.  Again,
5  Ms. Parfitt, let the witness handle himself.
6  He's an experienced, capable person.
7      MS. PARFITT:  Yes.  I would certainly
8  both agree with that.  He's quite good.
9      (The question was read by the
10     reporter, as requested.)
11     MS. PARFITT:  Objection.  Misstates his
12  testimony.
13     A.  No.  To the extent that my causal
14  question needs -- you know, evaluated the
15  evidence on the link between, you know,
16  inflammation, ovarian cancer and talc and
17  inflammation, I can opine that, you know, this
18  link supports my causal opinion.  Whereas, to the
19  precise details of such a link, I would obviously
20  defer to other experts.
21  BY MR. ZELLERS:
22     Q.  Not all inflammatory conditions lead to
23  cancer; correct?
24     A.  Yes.  And there are pro-oxidant
25  conditions and there are antioxidants.  And I

1  examined the evidence which relates to if there
2  were -- you know, if talcum powder products, for
3  example, had antioxidants or, in the Saed study,
4  they increased the level of antioxidant enzymes,
5  then that would be evidence against the link
6  between redox potential and talc and ovarian
7  cancer.  So there are various pieces of
8  evidence.
9      Q.  All of us experience inflammatory
10  reactions of one sort or another, including
11  chronic conditions, and they do not all lead to
12  cancer; correct?
13     MS. PARFITT:  Objection.  Form.
14     A.  Yeah.  But it's the balance of -- you
15  know, that is altered between pro-inflammatory
16  and anti-inflammatory conditions and the
17  pro-oxidant state and the antioxidant state in my
18  understanding that, you know, is a plausible
19  mechanism for talc in ovarian cancer.  Again,
20  based on my understanding.  Others will provide
21  details.
22     Q.  Rheumatoid arthritis is an inflammatory
23  condition; right?
24     A.  Heart disease is -- everything is
25  inflammation.

1      Q.  Rheumatoid arthritis doesn't increase
2  the risk of ovarian cancer, does it?
3      A.  I don't know that question.  I have not
4  evaluated it.
5      Q.  Psoriasis does not increase the risk of
6  ovarian cancer, does it?
7      A.  For all, it could.  We don't know that.
8  We can spend time reviewing that.  We can't
9  answer questions.
10     Q.  We're here to talk about the science;
11  correct?
12     A.  Yeah.  So the science, you have to
13  look -- I haven't looked at psoriasis and cancer.
14  I haven't looked at, for example, rheumatoid
15  arthritis increases cardiovascular disease,
16  because I've looked at it.  I can't answer
17  questions that I haven't looked at.
18     Q.  Have you done an expert review of the
19  role of inflammation in causing ovarian cancer?
20  Have you personally done that review?
21     A.  No.  I have just looked at, you know,
22  what is the role of inflammation in ovarian
23  cancer, and are there plausible biological
24  mechanisms that either support or refute whether
25  talc can induce inflammation.

1      Q.  How does an acute inflammatory response
2  lead to cancer?
3      A.  Yeah.  I mean, and I'm not making a
4  case for an acute inflammatory.  I'm not sure.
5  Did I state that?  You know, this is a chronic
6  inflammatory process.
7      Q.  What evidence is there that externally
8  applied talcum powder causes chronic
9  inflammation?
10     A.  Yeah.  I mean, you know -- can you give
11  me a second?
12     Q.  Sure.
13     A.  Yeah.  I'm not aware of a study that
14  talc specifically itself causes chronic
15  inflammation.
16     Q.  There are no reports in the literature
17  of externally applied talc leading to
18  inflammation, granulomas, fibrosis or adhesions
19  anywhere along a woman's reproductive tract;
20  correct?
21     MS. PARFITT:  Objection.
22     A.  Yeah.  There are other studies that,
23  you know, not externally applied.
24     Q.  If up to 50 percent of U.S. women have
25  used genital talc, shouldn't this be a common

57 (Pages 222 to 225)

Sonal Singh, M.D., M.P.H.

Page 226

1  finding?
2       MS. PARFITT:  Objection.  Form.
3       A.  So I'll step back and share with you
4  what epidemiology.
5       Yeah.  I mean, ovarian cancer, the incidence
6  of ovarian cancer is, what, 11 by 100,000.  It's
7  a very rare cancer.  Even if 50 percent use it,
8  you know, it increases, you know, it affects it.
9       So we are not -- nobody is saying that,
10  yeah, every woman who gets talc will get it.  So
11  just because there's an increased risk with talc,
12  how much of the U.S. population should get
13  ovarian cancer is a different question.  That's
14  not what I estimated.
15      That's -- you're asking a question about
16  attributable risk and population attributable
17  risk.  Some have attributed it to 10 percent,
18  40 percent.  I haven't done that estimation.
19      MR. KLATT:  Move to strike.
20  Nonresponsive.
21      MR. ZELLERS:  Join.
22      Q.  Granulomas, fibrosis or adhesions don't
23  cause ovarian cancer; correct?
24      MS. PARFITT:  Objection.
25      A.  I'm not aware of precise biological

Page 227

1  mechanisms of, you know, ovarian cancer.
2       Q.  Isn't the theory of inflammation as a
3  cause of ovarian cancer an unproven hypothesis?
4       MS. PARFITT:  Objection.
5       A.  Well, it's a plausible hypothesis that,
6  you know -- and it's well accepted that, you
7  know, one of the mechanisms is inflammation.
8       Q.  It's still unproven; correct?
9       MS. PARFITT:  Objection.  Misstates
10  testimony.
11      A.  Well, I'm not -- my standard wasn't
12  looking at absolute certainty that, A, talc
13  induces inflammation, and inflammation causes
14  ovarian cancer.  I'm looking for evidence for or
15  against whether inflammation, you know, induces
16  or reduces ovarian cancer.
17      Q.  What studies or evidence do you cite in
18  your report against the proposition or theory
19  that inflammation is a cause of ovarian cancer?
20      A.  Yeah.  I think -- I'm sorry.  The
21  question was what studies --
22      Q.  You told me it was important to cite
23  both the studies that support your position and
24  also the studies that refute your position; is
25  that right?

Page 228

1       A.  Yeah.  And I think it's the studies on
2  NSAIDs.  I don't remember the precise -- I don't
3  know if -- yeah.  It's Ness or --
4       Q.  I will and do intend to ask you a few
5  questions about NSAIDs and about some of those
6  studies.
7       A.  I think that's where --
8       Q.  Well, let me talk about or ask you a
9  question about a study that you do cite in
10  support of your inflammation opinion.  You rely
11  on -- is it Saed 2018 article?
12      A.  Yes.
13      MR. ZELLERS:  I'll hand you the Saed
14  2018 paper.
15      (Article entitled "New Insights
16  into the Pathogenesis of Ovarian Cancer:
17  Oxidative Stress" marked Exhibit 26.)
18      MS. PARFITT:  Thank you.
19      MR. ZELLERS:  We'll mark that as
20  Deposition Exhibit 26.
21  BY MR. ZELLERS:
22      Q.  This is a study that you cite in
23  support of your position; is that right?
24      A.  I don't know if I cite it as a support
25  of my position.  I cite it as an article that

Page 229

1  shares insight into the parthenogenesis of
2  ovarian cancer.  I mean, you know, he's the
3  expert and he'll form his opinion.
4       So it's a study cited in my report.  In
5  fact, I won't even be able to discuss the details
6  of that study with you.
7       Q.  You're not comfortable discussing the
8  details?
9       A.  Yeah.  I mean --
10      MS. PARFITT:  Objection.
11      A.  -- you can ask a question and I'll try
12  to answer to the best of my ability.  And if I
13  won't, I'll be able --
14      Q.  The point is, this is really an area
15  for other experts; agreed?
16      A.  Yes.  This is an area for other
17  expertise.
18      Q.  Saed, that paper just looked at
19  immortalized cell lines; is that right?
20      MS. PARFITT:  Objection.  Form.
21      A.  Yes.
22      Q.  The authors do not identify what either
23  the positive or the negative controls were; is
24  that right?
25      MS. PARFITT:  Objection.

58 (Pages 226 to 229)

Sonal Singh, M.D., M.P.H.

1    A.   So is this the study or is this just
2  their review article?
3    Q.   This is the paper that you cite to in
4  your report.
5    A.   Can you point out in my report which
6  reference number is that?  I know I've cited
7  them, but I'm just trying to orient myself.
8    Q.   Are you familiar with this paper?  Have
9  you looked at it before?
10   A.   Yes.  I have looked at this paper, but
11 they also have other abstracts and other papers.
12 I think that's what I was relying on.
13      Yeah.  So I'm relying on this and 125, Saed.
14   Q.   The authors in this paper that you
15 support -- strike that -- that you cite and are
16 relying on do not identify what either the
17 positive or the negative controls were; correct?
18      MS. PARFITT:  Objection.  Misstates the
19 evidence.
20   A.   Let me just look at 125, and then I'll
21 answer the question.
22      No.  That's not 125.
23   Q.   I'll move on and ask another question.
24   A.   Sorry about that.
25   Q.   That's all right.

1      Saed references unpublished data; correct?
2      MS. PARFITT:  Objection.
3    A.   Yeah.  And I've just been informed by
4  counsel that it has been accepted for
5  publication, but the data that I -- that I
6  referenced were, you know, at the time, available
7  as abstracts.
8    Q.   Saed referenced -- references
9  unpublished data that you rely on in coming up
10 with at least some of the opinions in your
11 report; is that right?
12   A.   Yeah.  I mean, it's one of the, you
13 know, number of studies that I reviewed.  It's
14 not the only study on, you know, on biological
15 mechanisms.
16   Q.   Why doesn't inflammation generally, for
17 example, in pelvic inflammatory disease, cause
18 ovarian cancer?
19   A.   Again, that's not -- you know, that is
20 not -- I'm not going to be opining on the precise
21 mechanisms of ovarian cancer in my testimony or
22 my report.  That's not my area of expertise.
23   Q.   Why don't NSAIDs and aspirin use, which
24 supposedly reduce inflammation, consistently
25 reduce the incidence of ovarian cancer in chronic

1  users?
2    A.   Yeah.  So I don't know if that's
3  consistently.  But as I mentioned earlier, and I
4  may have cited it in this study, that when I
5  talked about Ness, and I'm trying to find it,
6  but, yes, there is, you know, NSAIDs have not
7  been -- they don't consistently reduce the risk
8  of ovarian cancer, but in some studies, they have
9  shown to reduce the risk of ovarian cancer.
10   Q.   If, in fact, inflammation was a
11 causative factor in ovarian cancer, and if NSAIDs
12 and aspirin use reduce inflammation, wouldn't you
13 expect some consistency in the studies that would
14 show NSAIDs and aspirin use reduced the incidence
15 of ovarian cancer?
16   A.   So, first of all, you're asking a broad
17 question.  Inflammation.  What do you mean by
18 that?
19      And I don't know -- yeah.  Exactly.  So I
20 don't know the precise biological mechanisms of
21 ovarian cancer.  And just because the ovarian
22 cancer-mediated inflammation is different from,
23 you know, anti-inflammatory, so both may be
24 entirely consistent, I'm not saying they are, but
25 both mechanisms, you could have NSAID-induced

1  reduce inflammation and NSAID-induced increase
2  inflammation.  That's just not what -- that area
3  where other people will provide, you know, more
4  testimony.
5    Q.   If inflammation is the issue, why would
6  cornstarch be a superior alternative to talc?
7      MS. PARFITT:  Objection.  Form.
8    Q.   And to give you context, the FDA banned
9  the use of cornstarch on surgical gloves because
10 of the risk of inflammation, granulomas,
11 fibrosis, adhesions and irritation; is that
12 right?
13   A.   I'm not aware of all the particular,
14 you know, regulatory actions on cornstarch.
15   Q.   Take a look at the FDA 21 C.F.R. parts
16 878, 880, and 895.
17      MR. ZELLERS:  We'll mark that as
18 Deposition Exhibit 27.
19         (Federal Register, Vol. 81, No.
20      243 marked Exhibit 27.)
21 BY MR. ZELLERS:
22   Q.   If you look at the second page, first
23 paragraph, last sentence, so I'm under executive
24 summary.  The last sentence in the last full
25 paragraph.

59 (Pages 230 to 233)

Sonal Singh, M.D., M.P.H.

Page 234

1    "However, the use of powder on medical
2  gloves presents numerous risks to patients and
3  healthcare workers, including inflammation,
4  granulomas, and respiratory allergic reactions."
5      Did I read that right?
6      A.  Yeah.
7         MS. PARFITT:  Do you know where it is?
8  Mm-hmm.
9      A.  Okay.
10     Q.  Why, then, given that, would cornstarch
11 be considered a superior alternative to talc?
12        MS. PARFITT:  Objection.  Form.
13     A.  Am I -- did I state in my -- I mean,
14 you know, I'm not evaluating the causal role of
15 cornstarch and, you know, its role in ovarian
16 cancer.  I'm not even aware of the existence of
17 this document and what it pertains to.
18     I don't see any reference to cornstarch
19 here.  I don't evaluate how they regulate various
20 products, whether it's food or cornstarch.
21     Q.  Are you familiar with the term
22 "confounding"?
23     A.  Yes.
24     Q.  That's where the presence of another
25 association confuses the relationship between the

Page 235

1  exposure and disease being studied; correct?
2      A.  I don't -- I don't think that's the
3  definition of confounding.
4      Q.  What is wrong with that definition?
5      A.  Confusion is not an epidemiologic term.
6  There's no such thing as confusion in
7  epidemiology.  You have bias.  You have
8  misclassification.  You have measurement error.
9      Confounding is a case where you have a
10 variable that's related to the outcome and
11 that's, you know, maybe associated with the
12 exposure and is not on the causal pathway between
13 exposure and outcome.
14     And, you know, it creates an artifactual
15 relationship between exposure and outcome.
16     Q.  Confounding and confusion are similar
17 terms; correct?
18     A.  No.  They're not.  Confounding is a
19 scientific term.  Confusion is layman from that.
20 I don't think it has -- at least in my term, I
21 don't --
22     Q.  So you disagree that confounding
23 relates to the presence of another association
24 which potentially confuses the relationship
25 between the exposure and disease being studied;

Page 236

1  is that right?
2      A.  I don't disagree -- what I am trying to
3  define precisely confounding is that, you know,
4  it creates a different relationship, had the
5  confounder not been present, and I'm just trying
6  to say how it does that.
7      It's associated with the outcome.  It's
8  associated with the exposure and not, you know,
9  and not on the --
10     Q.  Let's use an example, so we're sure
11 we're talking about the same thing.
12     If you are studying the association between
13 coffee and pancreatic cancer, you need to be
14 mindful of whether cigarette smoking is more
15 common in coffee drinkers than in the rest of the
16 population; correct?
17     A.  Yes.
18     Q.  Cigarette smoking could be a confounder
19 in that situation; is that true?
20     A.  Well, so there are several parts to
21 that.  Just because it's more common in coffee
22 drinkers does not make it a confounder.  To make
23 a confounder, you have to have three specific.
24 What you're talking is, yeah, it's associated
25 with coffee.  But is it associated with

Page 237

1  pancreatic cancer?  Is it on the causal pathway?
2      So a confounder is a very precise
3  epidemiologic term.  It's not just everything we
4  pull off the air and say because it's associated
5  with the coffee, it becomes a confounder.
6      Q.  Listen to my question.
7      A.  Sure.
8      Q.  Cigarette smoking could be a confounder
9  in my hypothetical; right?
10     A.  If it was associated with pancreatic
11 cancer and not present in the causal pathway and,
12 obviously, associated with coffee.
13     Q.  Because if more coffee drinkers are
14 smokers than non-coffee drinkers --
15     A.  It could be the other way around.
16     Q.  Exactly.  An association between coffee
17 drinking and pancreatic cancer might be due to
18 smoking and not the coffee drinking; correct?
19     A.  Yes.
20     Q.  Confounding can distort results in
21 epidemiological studies; is that right?
22     A.  Yes.  And you have to adjust for
23 confounding.
24     Q.  Residual confounding is possible in
25 every occupational study; is that right?

60 (Pages 234 to 237)

Sonal Singh, M.D., M.P.H.

1          MS. PARFITT:  Objection.
2      A.  Sorry.  Can you repeat the question?
3          MS. PARFITT:  Here it is.
4      Q.  Sure.  Residual confounding is possible
5  in every observational study; correct?
6      A.  Observational.  Yeah.
7      It is possible; right?  Is that what you
8  said?
9      Q.  Yes.
10      A.  Yeah.  Residual confounding is possible
11  because you can't measure, you know, every
12  variable that you can think of.
13      Q.  And unmeasured confounders may be
14  present in every observational study; correct?
15      A.  Yeah.  There's always the potential for
16  unmeasured confounding.  It doesn't mean that it
17  exists.
18      Q.  It's impossible to say that all known
19  and unknown confounding factors have been
20  controlled for in any given study; correct?
21      A.  You don't -- you know, what you don't
22  know, you can't control for.
23      Q.  In this case, new factors possibly
24  involved in ovarian cancer are just being
25  published in the literature; is that right?

1          MS. PARFITT:  Objection.  Vague.
2      A.  Yeah.  I don't -- I don't know what
3  you're like -- just give me an example so I
4  can --
5      Q.  Okay.  History of chlamydia infection
6  and history of weight gain during adolescence are
7  two recent examples that are being published in
8  the literature as factors possibly involved with
9  ovarian cancer; correct?
10          MS. PARFITT:  Objection.  Form.
11      A.  I haven't seen them.  But I mean,
12  weight gain has been adjusted for in several of
13  the analyses.  So I don't know about that.  Yeah.
14      Q.  Well, let's assume --
15      A.  We're talking about chlamydia.
16      Q.  Let's assume that that's correct.
17      Those factors, history of chlamydia
18  infection and history of weight gain during
19  adolescence, those factors were not controlled
20  for in any of the published talc-ovarian cancer
21  studies, were they?
22          MS. PARFITT:  Objection.  Form.
23      A.  Yeah.  So if they're not known, first
24  of all, you have to evaluate and, you know, is
25  that a true -- true association?

1      But most importantly, just because, A, first
2  of all, are they associated with the outcome?
3  Then you have to ask, are they causally
4  associated, and they would have to be associated
5  with the exposure talc to be considered a
6  confounder, just because they're a risk factor.
7  Every risk factor need not be controlled in a
8  study.  You have to be associated with the
9  exposure to, you know, consider the confounder.
10      That is the precise definition of
11  confounding, is you have to be associated with
12  the exposure.  You have to be associated with the
13  outcome.  And you can't be on the path.
14      So just because chlamydia -- let me finish.
15  Chlamydia, A, has a risk factor of ovarian
16  cancer.  If I design a study tomorrow for X and
17  ovarian cancer, you know, I'm not going to
18  consider it a confounder for my analysis.
19      Q.  Confounders can distort the results in
20  epidemiological studies; correct?
21          MS. PARFITT:  Objection.  Form.
22      A.  Yeah.  We've discussed that, I think.
23          THE WITNESS:  We'll take a break.  If
24  you want to finish this confounding thing.
25          MR. ZELLERS:  No.  We can take a break

1  now.
2          MS. PARFITT:  Good.  Thank you.
3          THE VIDEOGRAPHER:  This ends Media 3.
4  Off the record, 2:17 p.m.
5          (A recess was taken.)
6          THE VIDEOGRAPHER:  Here begins Media
7  No. 4 in today's deposition of Sonal Singh, MD,
8  M.P.H.  Back on the record, 2:29 p.m.
9  BY MR. ZELLERS:
10      Q.  Dr. Singh, in your report, at Page 54,
11  Paragraph 7, you address the subject of
12  confounding in studies of talcum powder use and
13  ovarian cancer; is that right?
14      A.  Yes.
15      Q.  On Page 54 of your report, you state,
16  "Although there are some risk factors for ovarian
17  cancer," and then it continues, "for any of them
18  to be confounding to an extent that could account
19  for the positive relations that have been
20  reported, they would have to be strongly
21  correlated with talc use.  Family history,
22  ethnicity, obesity and some reproductive risk
23  factors are positively associated with the risk
24  of ovarian cancer, but the magnitude of these
25  associations does not appear high enough to

Page 242

1  introduce enough confounding either jointly to
2  explain completely the positive associations."
3      And it should be the positive association.
4      A.  Yes.
5      Q.  Is that the statement that you make?
6      A.  Yes.
7      Q.  There's no citation for that statement;
8  is that right?
9      A.  Yes.  But partly because I couldn't
10  find evidence -- and, you know, about the risk of
11  talcum powder use and these risk factors.  And so
12  that -- so the issue that I -- prior to the
13  statement, states that -- these other risk
14  factors, which we know are risk factors for
15  ovarian cancer.
16      Q.  Is this your statement that you made
17  here?
18      A.  Yeah.  Let me just explain what I did
19  here.
20      Q.  That was a simple question.
21      A.  Yeah.  It is my statement.
22      Q.  Have I read your statement?
23      A.  Yes.  But it is about the fact that we
24  don't have, you know, family history, ethnicity,
25  obesity and reproductive factors associated, but

Page 243

1  these associations, as it relates to talc use, we
2  don't have data on how these -- to be considered
3  a confounder, they have to be associated with
4  talc use.  We don't have data on that.
5      Q.  My question just is:  Did you write
6  that?
7      A.  I did.  Yeah.
8      Q.  All right.  Now, do you know who Ken
9  Rothman is?
10      A.  Yeah.  He has written a textbook on
11  epidemiology.
12      Q.  He is a well-respected epidemiologist;
13  is that right?
14      A.  Yeah.  He's well respected.
15      Q.  And he has written a textbook on
16  epidemiology that's widely recognized as one of
17  the best; is that right?
18      MS. PARFITT:  Objection.
19      A.  It is nice.  I mean, I have a copy of
20  it.
21      Q.  I've looked at your report and your
22  reliance list.  In terms of your reliance list,
23  you do not cite to a paper by Ken Rothman and
24  others published in 2000 entitled "Interpretation
25  of Epidemiologic Studies in Talc and Ovarian

Page 244

1  Cancer"; is that right?
2      A.  If I haven't, then I haven't.  Yeah.
3      Q.  You did put it on your additional
4  materials and data considered.
5      Do you see that?
6      A.  Yes.
7      Q.  It's on the last page.
8      MR. ZELLERS:  I'm going to mark that
9  paper as Exhibit 28.
10      (Document entitled
11      "Interpretation of Epidemiologic Studies
12      on Talc and Ovarian Cancer" marked
13      Exhibit 28.)
14      MS. PARFITT:  Thank you.
15      MR. ZELLERS:  You're welcome.
16  BY MR. ZELLERS:
17      Q.  Do you see Exhibit 28 in front of you?
18      A.  Yes.
19      Q.  Exhibit 28 is an article prepared by
20  Kenneth Rothman entitled "Interpretation of
21  Epidemiologic Studies of Talc and Ovarian
22  Cancer."
23      Is that right?
24      A.  Yes.
25      Q.  Take a look at Page 5 of that paper,

Page 245

1  the second paragraph.
2      Do you see where --
3      A.  Confounding, you're talking about?
4      Q.  Yes.  Where Rothman discusses
5  confounding?
6      A.  Yeah.
7      Q.  Other than the list of four risk
8  factors in parentheses, you just copied the
9  language from Dr. Rothman's article and pasted it
10  into Page 54 of your report; correct?
11      MS. PARFITT:  Objection.
12      A.  No.
13      Q.  All right.  Do you have your report in
14  front of you, Page 54?
15      A.  And you say that I don't cite this
16  article or --
17      Q.  If you don't cite that article, you
18  have just testified under oath that these are
19  your words in your report.
20      So take a look at Page 54 of your report.
21  Take a look at Page 5 of the Rothman paper.
22      A.  Yeah.  I mean, you know, I may have --
23  I think I'm talking of different risk factors.
24      Q.  Doctor --
25      MS. PARFITT:  Let him finish, please.

Sonal Singh, M.D., M.P.H.

Page 246

1       MR. ZELLERS:  Okay.
2       A.  I may have failed to cite that article.
3   You know, it's okay.  I mean, it's not okay, but
4   I'm just saying I may have failed to cite that
5   article.
6       Q.  Do you agree that the entire first part
7   of Rothman on confounding that you have cited
8   word for word in your report, and you can start
9   with "although there have been some strong risk
10  factors for ovarian cancer, for any of them to be
11  confounding."
12      A.  Yeah.
13      Q.  If you read the rest, all the way
14  through the next couple of sentences, down to
15  "positive association," it's --
16      A.  Yeah.
17      Q.  -- word for word; right?
18      A.  Yeah.  I wouldn't say I copy and
19  pasted.  I would say that I have not referenced
20  it.
21      Q.  You copied and pasted it.
22      A.  No.  I did not.  I read it, and I wrote
23  it.  And I did not reference it.
24      Q.  You didn't write it.  It's exactly word
25  for word from the Rothman paper --

Page 247

1       A.  No.  It isn't.
2       Q.  -- with the exception of you added, in
3   parentheses --
4       A.  Yeah.
5       Q.  -- "genetic risk factors, family
6   history, obesity and reproductive history"; is
7   that right?
8       A.  Yeah.  And I didn't cite it, but -- so
9   you look at a study and a paper, and, you know, I
10  wrote it.  And I was remiss in not citing it.  I
11  didn't copy and paste it.
12      Q.  Well, you copied it word for word;
13  correct?
14      A.  I did not.
15      MS. PARFITT:  Objection.  Misstates his
16  testimony.
17      A.  I'm saying what I did.  But I did not
18  cite it.
19      Q.  The fact are the facts.
20      A.  Well, the facts are that the content is
21  different and I did not cite it.
22      Q.  What content is different other than
23  you adding in --
24      A.  The risk factors.
25      Q.  -- parens, "Example, genetic risk

Page 248

1   factors, family history, obesity and reproductive
2   history," what else is different?  Show me one
3   word that is different --
4       A.  Yeah.
5       Q.  -- between what you've written here and
6   what is written by Rothman in his paper.
7       A.  Yeah.  It isn't, and I should have
8   cited it.
9       Q.  All right.  The paper by Rothman and
10  others -- well, strike that.
11      And where was this published, just -- I
12  mean, it doesn't have a citation in it.
13      Q.  If you're going to copy it word for
14  word --
15      A.  I did not.
16      MS. PARFITT:  Excuse me.  Object to the
17  question.  Don't be argumentive, Counsel.  He
18  said he didn't cut and paste it.  He said he
19  failed to cite it.  That's his testimony.
20      A.  You can, you know, go forward and say
21  that.
22      Q.  The question is:  You don't know -- let
23  me withdraw that.  You're looking at something.
24      A.  Yeah.  Go ahead and ask the question.
25      Q.  You thought that this was a reliable

Page 249

1   source; correct?
2       A.  Yes.  And I did not cite it.
3       Q.  The Rothman paper, Exhibit 28?
4       A.  Yes.
5       Q.  All right.  Now --
6       A.  Well, it's a source.  I mean, it's in
7   with other source that I rely on.
8       Q.  At least in these couple of
9   sentences --
10      A.  In the paragraph.
11      Q.  -- you agree; correct?
12      A.  Yeah.
13      MS. PARFITT:  Agree what?  Agree what?
14      Q.  Agree that the -- the two sentences
15  from Rothman are the same two sentences as in his
16  report and does he agree with those two
17  sentences?
18      A.  Well, obviously, the risk factors are
19  different, because I know more about the risk
20  factors since 2000.  And -- but the point that
21  I'm trying to make, and as you can see the
22  language is the same, and it should have been
23  cited.
24      Q.  You told us throughout this deposition
25  that it's important for you to be -- as an

Sonal Singh, M.D., M.P.H.

Page 250

1  expert, to be fair and to cite information,
2  positions on -- that both support and refute your
3  position and plaintiffs' position; correct?
4      A.  Well, it's not about their position,
5  support or refute the causal hypothesis.
6      And I'm agreeing that I was remiss in not
7  citing this.
8      Q.  You also did not cite the next sentence
9  of Rothman --
10     A.  Yes.
11     Q.  -- which states, "Of course, it remains
12  possible that yet unidentified risk factors for
13  ovarian cancer could be important confounders,
14  and several such factors in the aggregate could
15  give rise to an overall association as weak as
16  the one between talc and ovarian cancer."
17     You did not cite that; correct?
18     A.  Yeah.  And -- but that is already
19  expressed.  The same factor is also expressed in
20  the first sentence.  Confounding is one potential
21  explanation for -- so, you know, again, if I had
22  placed that sentence, you would say that, well,
23  you're taking three lines, four.
24     So I cite that confounding is one potential
25  explanation.

Page 251

1      Q.  You don't disagree with that statement.
2      A.  Yeah.  Yeah.  Because that's one, you
3  know, it's stated that, you know, one potential
4  explanation.
5      Q.  All right.  Look at, if you will, on
6  Page 1 of the Rothman paper, the middle
7  paragraph.  Rothman states, "Most of the
8  published studies are interview-based,
9  case-control studies subject to recall bias which
10  can readily give rise to associations of this
11  magnitude."
12     Did I read that correctly?
13     A.  Yes.
14     Q.  Go to Page 4, third paragraph of the
15  Rothman paper, Exhibit 28.  I'm looking at the
16  section under "recall bias," and the third
17  sentence, "Recall bias can easily introduce
18  enough bias to produce the modestly sized overall
19  effect, relative risk equals 1.3, that emerges
20  from these studies."
21     MS. PARFITT:  The only correction --
22     Q.  Is that what Rothman wrote?
23     MS. PARFITT:  I'm sorry.  It does say
24  "can readily."
25     MR. ZELLERS:  I'm sorry.

Page 252

1      MS. PARFITT:  No worries.  No worries.
2      A.  Which line are you in there?
3      Q.  Sure.  Look at "recall bias."  Does the
4  third sentence state, "Recall bias can readily
5  introduce enough bias to produce the modestly
6  sized overall effect, relative risk equal 1.3,
7  that emerges from these studies"?
8      A.  That's -- yeah, that's his
9  interpretation.
10     Q.  You don't disagree with that, do you?
11     A.  Well, I do disagree in the sense that,
12  you know, he's making inference on the magnitude.
13  I'm not disagreeing that there's a potential for
14  recall bias.  But, you know, as I've discussed in
15  my report and -- and, again, if you say that,
16  then I should be writing the Rothman paper
17  instead of my report.  Right?  You would want Ken
18  Rothman to testify.
19     You have to, you know, take -- you know, I
20  understand what he's trying to say.  He's saying
21  that recall bias can introduce an element that
22  would produce 1.3.
23     Q.  In fact, Rothman and the other authors
24  of this paper conclude that the modest positive
25  association --

Page 253

1      A.  Yeah.
2      Q.  -- seen in epidemiological studies
3  could be explained by recall bias or an
4  unidentified confounding bias; correct?
5      A.  Yes.
6      Q.  You did not note in your report
7  Rothman's conclusion -- and if you turn to
8  Page 8, his conclusion -- "More important, there
9  is also positive evidence against a causal
10  association.  The inverse dose-response trend for
11  both duration of use and frequency of use, a
12  pattern that could not be explained by a causal
13  relation.  Based on these considerations, we
14  suggest that the evidence to date does not
15  indicate that talc can be 'reasonably anticipated
16  to be a human carcinogen.'"
17     A.  Yes.  And this report was prepared on
18  November 8, 2000.  That's 20 years ago.  And we
19  have many other studies subsequent to that
20  talking about dose-response, several other
21  understandings about biological mechanisms.
22     So if I wanted -- if you want me to just
23  cite to the Rothman paper or -- there are 115,
24  you know, papers.  I mean, there are other --
25  others will have opined that talc doesn't cause

64 (Pages 250 to 253)

Page 254

1  ovarian cancer.
2      Q.  What methodology did you use to rule
3  out the effect of an unidentified confounding
4  bias or multiple unidentified confounding biases?
5      A.  Yeah.  So I mean, as the meta-analyses
6  have shown, there are no differences between --
7  most of the studies show no differences between
8  adjusted and unadjusted estimates, suggesting
9  that the potential for confounding is minimal.
10     There is no way to rule out unmeasured
11  confounding.  And that's always a possibility.
12  It doesn't mean that it exists.
13     Q.  As we discussed earlier, you did review
14  the Gertig 2000 paper and cite it in your report;
15  is that right?
16     A.  Yes.
17     Q.  On Page 48 of your report, you note
18  that Gertig 2000 found a statistically
19  significant increased risk for ever talc use for
20  serous invasive cancers; correct?
21     A.  Let me just come to that section.
22  Yes.
23     Q.  Gertig did not control for BMI or for
24  cigarette smoking, did it?
25     A.  And I'm writing age, duration of

Page 255

1  contraceptive use, BMI, smoking status.
2      Can I look at the study?  Sorry.
3      Q.  You're not wasting my time, are you?
4      A.  No.  No.  Because my writeup says that.
5  I may be incorrect.  And I just want to make sure
6  that my writeup is -- you know, if we need to
7  correct it, I need to correct it.  I'm sorry.
8      MR. TISI:  Did you mark it?
9      MR. ZELLERS:  No.
10     THE WITNESS:  I'm not wasting it, I'm
11  saying that because writeup -- I say that it
12  does.
13     MS. PARFITT:  Just so you know, mine is
14  a marked-up copy of it.
15     MR. ZELLERS:  I'm not going to mark it.
16  I'm not going to look at it.  I just want the
17  doctor to answer the question.
18     MS. PARFITT:  Sure.  Here's a copy of
19  Gertig.
20  BY MR. ZELLERS:
21     Q.  And my question is very simply --
22     A.  Age and smoking.
23     Q.  -- Gertig -- yes -- did not -- well,
24  BMI --
25     A.  Yeah.  It says it conducted for

Page 256

1  cigarette smoking and BMI.
2      Q.  That it did control for that?
3      A.  Yeah.
4      Q.  All right.  Show me where, in Gertig
5  2000, that they state that they did control for
6  BMI and for cigarette smoking.
7      A.  "For age-adjusted analysis, we
8  categorized values as oral contraceptive use,
9  tubal ligation, post-menopausal, cigarette
10  smoking and BMI."
11     Q.  What page?
12     A.  That's two -- whatever that page is,
13  250.  Yeah.  That's my understanding.
14     If you look at Table 1, they do have, you
15  know, cigarette smoking and whatnot.  That's my
16  understanding.
17     Q.  Ter Riet 2013, you cite that in your
18  report; is that right?
19     A.  It is.
20     Q.  Terry 2013 did not adjust for a hormone
21  replacement therapy usage; correct?
22     MS. PARFITT:  Here is Ter Riet.
23     A.  Just let me go back to my report.  This
24  is the Ter Riet meta-analysis?
25     Q.  Yes.  Ter Riet 2013, meta-analysis.

Page 257

1      A.  Okay.
2      Q.  The question is:  Did Ter Riet 2013
3  adjust for hormone replacement therapy usage?
4      A.  Ter Riet.
5      MS. PARFITT:  Here is a copy.
6      A.  Mine doesn't say that.  Usually,
7  Table 1 should answer that question.
8      HRT, right?  I don't have that data, and I
9  haven't included it in my report.
10     Q.  If hormone replacement therapy is a
11  risk factor for ovarian cancer, and assuming that
12  Ter Riet did not account for that, that is a
13  potential confounding factor; correct?
14     A.  Again, I have a slight difference in
15  your and my definition of confounding, that you
16  would have to obviously know if there is an
17  association with talc exposure for it to be
18  considered a confounder in that specific study.
19     Q.  All right.  You cannot say whether the
20  odds ratio of Ter Riet 2013 in that study would
21  have been lower if the authors had adjusted for
22  hormone replacement therapy usage; correct?
23     MS. PARFITT:  Objection.
24     A.  Or higher.  I mean, we cannot say one
25  way or the other.

Page 258

1    Q.   Recall bias, it's a concern in every
2  retrospective study; is that right?
3    A.   Yeah, it is a potential concern in
4  design of studies where, you know, you're asking
5  about past exposure.
6    Q.   Recall bias can distort a scientific
7  evaluation of whether an exposure is actually
8  related to a disease; correct?
9    A.   Yes.
10    Q.   For example, recall bias could distort
11  results if women with ovarian cancer were more
12  likely to remember their exposure to talc than
13  women without ovarian cancer; correct?
14    A.   I mean, but the extent here is
15  quite minimal, because we don't see it with a --
16  you know, for daily use, you know, the likely
17  magnitude is small.  We've talked about that.
18    You know, if recall bias was operational, we
19  would see it with nongenital talc use.  They
20  would be reporting that.  And we would be seeing
21  it with other types of, you know, cancer beyond,
22  you know, ovarian.
23    So, yes, recall bias is a potential, but the
24  likely magnitude is small.
25    Q.   On Page 54, Paragraph 6 of your

Page 259

1  report -- do you have Page 54, Paragraph 6?
2    A.   Yeah.  Just to clarify on the question,
3  I disagree with Rothman.  So just because it's in
4  Rothman's study, doesn't mean that it's, you know
5  --
6    Q.   I have a new question.  Are you ready?
7    A.   No.  I mean, I have to finish my last
8  question.
9    Q.   I didn't ask you a question.
10    A.   Okay.  Because we are still on the
11  topic of recall bias.
12    Q.   I asked the question.
13    A.   Okay.
14    Q.   Recall bias could distort results of
15  women with ovarian cancer were more likely to
16  remember their exposure to talc than women
17  without ovarian cancer; correct?
18    A.   Yes.
19    Q.   The next question is:  Can you turn to
20  Page 54, Paragraph 6 of your report?
21    A.   Okay.
22    Q.   You state, "case-control studies are
23  susceptible to recall bias, particularly when
24  data on exposure are self-reported.  However,
25  several studies have included these questions on

Page 260

1  talc exposure as part of larger questionnaires on
2  other risk factors, minimizing the possibility of
3  recall bias."
4    Did you write that?
5    A.   Yes.
6    Q.   How does asking about other risk
7  factors minimize recall bias as to a particular
8  risk factor?
9    A.   Yeah.  Because, you know, you're not
10  stimulating them to answer -- you know, if you're
11  asking them ten questions about, say -- so it's
12  like, well, were you -- you know, were you
13  active, were you using oral contraceptives, were
14  you -- so if you are -- let me finish.  Let me
15  finish my explanation.
16    You're introducing the question of talc use
17  within ten different questionnaires, then you
18  minimize the possibility of recall bias for that
19  particular product versus you're asking talc
20  alone.
21    Q.   On what literature are you relying to
22  say that asking about other risk factors
23  minimizes recall bias as to another risk factor?
24    A.   I mean, that's just my general
25  understanding of epidemiology.  And maybe, you

Page 261

1  know -- yeah, it's not -- I don't know if it's
2  specific to talc usage.  Just a general
3  understanding of epidemiology, about, you know --
4  yeah, recall bias.
5    Q.   Are you done?
6    A.   Yeah.
7    Q.   All right.  Let's look at the effects
8  of recall bias in a study on talcum powder use in
9  ovarian cancer.
10    Are you familiar with the Schildkraut 2016
11  study?
12    A.   Yes.
13    Q.   That was one of the studies that you
14  relied on in forming your opinions; is that
15  right?
16    A.   Yes.
17    MR. ZELLERS:  Let's mark that as
18  Deposition Exhibit 29.
19    (Article entitled "Association
20  between Body Powder Use and Ovarian Cancer:
21  The African American Cancer Epidemiology
22  Study (AACES) marked Exhibit 29.)
23    MS. PARFITT:  Got it.  Thanks.
24  BY MR. ZELLERS:
25    Q.   This is a study titled "Association

Sonal Singh, M.D., M.P.H.

Page 262

1    Between Body Powder Use and Ovarian Cancer; The
2    African American Cancer Epidemiology Study";
3    correct?
4        A.   Yes.
5        Q.   The study looked at, among other
6    things, what impact, if any, lawsuit filings in
7    2014 had on whether women recalled using talc in
8    the past; correct?
9        A.   Yeah.  It examined the issue of
10   stimulated reporting.  And I note it in my
11   report.  I don't -- I don't discount that in my
12   discussion of the Schildkraut study.
13       Q.   We'll call it Schildkraut.  Can we do
14   that?
15       A.   Whatever.  I don't know.
16       Q.   The authors in that study, Exhibit 29,
17   thought that the publicity from lawsuits might
18   influence the participants' recall of prior body
19   powder use; is that right?
20       MS. PARFITT:  Objection.
21       A.   Yes.  And I noted on Page 45 of my
22   report that although there was some evidence that
23   there was more reporting after class action
24   lawsuits in 2014, recall bias alone is
25   insufficient because there is a statistically

Page 263

1    significant risk both before and after 2014.  But
2    the authors did, you know, think it was an
3    important thing to look at.
4        Q.   The authors looked at this and tried to
5    study this; is that right?
6        A.   Yes.
7        Q.   All right.  Go to Page 4, Table 2 of
8    the Schildkraut paper.  Tell me when you have it.
9        A.   I do.
10       Q.   This is a table, Adjusted Odds Ratios
11   for the Associations Between Mode, Frequency and
12   Duration of Body Powder Use and Ovarian Cancer;
13   is that right?
14       A.   Yes.
15       Q.   The second column shows the number of
16   cases.  That's women with ovarian cancer;
17   correct?
18       A.   Yes.
19       Q.   The third column shows the controls.
20   That's the women who do not have ovarian cancer;
21   correct?
22       A.   Yes.
23       Q.   Looking at the data, before 2014,
24   before the lawsuits, the percentage of controls,
25   meaning women without ovarian cancer, who said

Page 264

1    that they used talc on their genitals was
2    34 percent; is that right?
3        A.   Where is that?  Yeah.
4        Q.   The percentage of cases, meaning women
5    with ovarian cancer, that said they used
6    talc on their genitals was 36.5 percent; is that
7    right?
8        A.   I'm just looking at this.  Give me a
9    second.
10       36 -- interview data after 2004?
11       Q.   No.  My question here is:  For women
12   who were interviewed before 2014 --
13       A.   Mm-hmm.
14       Q.    -- the control, so women without
15   ovarian cancer, they stated they used talc on
16   their genitals, 34 percent; is that right?
17       A.   Yes.
18       Q.   For that same time period, women
19   interviewed before 2014 --
20       A.   Mm-hmm.
21       Q.    -- with ovarian cancer that said that
22   they used talc on their genitals was
23   36.5 percent.
24       A.   Yes.
25       Q.   Is that right?

Page 265

1        So roughly the same reporting of genital
2    talc use between women with and without ovarian
3    cancer occurred before the lawsuits were filed in
4    2014.
5        MS. PARFITT:  Objection.
6        Q.   Correct?
7        A.   I don't know the timing of lawsuits,
8    but yes, 2014.
9        Q.   So then let's look at what happened
10   after the lawsuits were filed.
11       After 2014, what percentage of women without
12   ovarian cancer said that they used talc on their
13   genitals?
14       A.   The case -- are you talking about cases
15   or controls?
16       Q.   Yeah.  I'm talking about controls.
17       A.   34.4, 34.4.
18       Q.   So based on this data, the lawsuits had
19   essentially no effect on how many of the women
20   without ovarian cancer, the controls, remembered
21   or recalled using baby powder; correct?
22       A.   Yes.
23       Q.   It was 34 percent before 2014 and
24   34.4 percent after; is that right?
25       A.   Yes.

67 (Pages 262 to 265)

Page 266

1    Q.  For women with ovarian cancer, before
2  the lawsuits were filed, 36.5 percent of them
3  said they recalled using baby powder; correct?
4    A.  Yes.
5    Q.  But after the lawsuits were filed, the
6  percent of women with ovarian cancer who said
7  they used baby powder went up to 51.5 percent; is
8  that right?
9    A.  Yes.
10    Q.  So after the lawsuits were filed, the
11  percent of women with ovarian cancer who said
12  they used baby powder jumped by over 40 percent;
13  is that right?
14    MS. PARFITT:  Objection.  Form.
15    A.  By 40 percent?  Where is 40?
16    Q.  A difference between the 36. --
17    A.  10 percent.  It's 51 and 34.  Right?
18    Q.  It jumped -- I don't have a calculator.
19    A.  You're subtracting 51 to 36 or 51 to
20  34?
21    Q.  Well, there was --
22    A.  Sorry.
23    Q.  That's okay.  It's late.
24    There was a significant increase --
25    A.  There was an increase.

Page 267

1    Q.  -- from 36.5 percent before the
2  lawsuits were filed to 51.5 percent after; is
3  that right?
4    A.  Yes.
5    Q.  So, suddenly, women who had ovarian
6  cancer started reporting a higher incidence of
7  talc use than women had reported before 2014; is
8  that right?
9    MS. PARFITT:  Objection.  Form.
10    A.  Yes.  There was -- there was
11  incidence -- you know, evidence of stimulated
12  reporting.  But that is just one element of
13  recall bias.  That's not completely what is being
14  addressed in my statement on recall bias.  This
15  is evidence about stimulated reporting, which is
16  one -- one spectrum of recall bias.
17    Q.  It's at least an example of the
18  potential effect of recall bias; correct?
19    A.  Yes.
20    Q.  All right.  Go to Page 45 of your
21  report, the last sentence.
22    A.  Yes.
23    Q.  "Although" -- and I'm quoting you.
24  "Although there was some evidence that there was
25  more reporting of genital powder use after class

Page 268

1  action lawsuits in 2014, recall bias alone is
2  insufficient to explain these findings, because
3  there was a statistically significant increased
4  risk both before and after 2014."
5    Is that what you state?
6    A.  Yeah.
7    Q.  Let's look at what the study actually
8  shows.  So go to --
9    A.  Yeah.  I correct it.  Should be there
10  was an excess risk, because there was no
11  statistically significant.
12    Q.  Your report is in error; is that right?
13    MS. PARFITT:  Objection.
14    A.  Well, it should be corrected to an
15  excess risk.
16    Q.  It is not, and there is not a
17  statistically significant risk; is that right?
18    MS. PARFITT:  Objection.  Form.
19    A.  Yeah.  The test for effect modification
20  by year of interview was technique, but the
21  particular estimate for above -- for, you know,
22  for before 2014 was not significant.
23    Q.  Exactly.  So pre-2014, there was an
24  odds ratio of 1.19 with a confidence interval
25  ranging from .87 to 1.63; is that right?

Page 269

1    A.  Yeah.  Yeah.
2    Q.  That is not statistically significant;
3  is that right?
4    A.  Yes.
5    Q.  In the absence of statistical
6  significance, that can be indicative of no risk
7  existing; correct?
8    MS. PARFITT:  Objection.  Form.
9    A.  But, you know, I'm opining on
10  the study as a whole.  That's just one element of
11  stimulated reporting in that study, you know.
12  Yeah.  So there's an excess risk, which is in the
13  same direction, but not statistically
14  significant.
15    Q.  If the study had ended before 2014, it
16  would have found no statistically significant
17  relationship between talcum powder and ovarian
18  cancer; is that right?
19    A.  I'm not seeing the study.  I have to
20  interpret the whole study; right?
21    Q.  Well, based upon this data that we just
22  looked at --
23    A.  Yeah.
24    Q.  -- had the study ended before 2014,
25  there was not a statistically significant

Sonal Singh, M.D., M.P.H.

Page 270

1  relationship between talcum powder use and
2  ovarian cancer; correct?
3       MS. PARFITT:  Objection.  Misstates the
4  data.
5       A.  Yeah.  There was an excess risk which
6  was not statistically significant.  But, you
7  know, we are picking and choosing analysis by
8  2004.  Again, we talked about we are choosing by
9  duration.  You can pick any one of these analyses
10  to cite it.  You have to look at the cumulative
11  evidence and the cumulative evidence from
12  meta-analyses.
13      Q.  How did you account for this recall
14  bias in weighing the Schildkraut study?
15      MS. PARFITT:  Object to the form.
16      A.  So, again, I did not weigh one
17  individual study.  My weight of evidence is based
18  on the meta-analysis and the cumulative evidence
19  from meta-analysis, the biological studies,
20  animal studies, human studies.
21      So, you know, I point out the limitations of
22  the individual studies, as do the authors of the
23  meta-analyses.
24      Q.  Are your opinions in this matter
25  dependent on talcum powder containing asbestos?

Page 271

1       A.  No.  I arrived at my causal opinion
2  independent of, you know, presence of asbestos
3  or, you know, or my understanding of the
4  constituents.  But I asked to better understand
5  what are the constituents of, you know, talcum
6  powder products.
7       And I was, you know, some of the documents
8  and some of the literature even suggests and
9  shows that, and some of the testing and some of
10  the deposition testimony that I have been privy
11  to, suggests the presence of asbestos in talcum
12  powder product.
13      Q.  Do you believe that talcum powder that
14  does not contain asbestos causes ovarian cancer?
15      A.  Yes.
16      Q.  Is it fair to say that you have not
17  made any independent determination as to whether
18  or not the talcum powder products manufactured by
19  J&J Consumer Products are contaminated with
20  asbestos?
21      A.  Yes.  I have not made a determination.
22  I've looked at the literature.  I have looked at
23  the testimony of the experts that was provided,
24  and I've looked at testimony -- sorry -- the
25  report of Dr. Luongo and I have relied on their

Page 272

1  reports for that.
2       Q.  You have no personal expertise with
3  that; correct?
4       A.  No.
5       Q.  Did you consider any testing that found
6  no asbestos?
7       A.  Yeah.  I did.  I think I'm citing the
8  FDA report in my assessment that there are
9  studies that suggest the -- I don't know if it's
10  an FDA report.  It's an FDA study that talks
11  about it.
12      Q.  If your assumption about contamination
13  of talcum powder products with asbestos were not
14  true, would your opinions in this case change?
15      MS. PARFITT:  Objection.  Form.
16      A.  Well, again, you know, this is a weight
17  of evidence that, does it, you know, contain
18  talcum powder -- I mean -- does talcum powder
19  product contain asbestos?  Or, you know, these
20  other metals we've talked about.
21      But my opinion was, in fact, arrived at
22  before even I was aware of both of the deposition
23  testimony, as well as the results of testing by
24  Dr. Luongo that my causal opinion was that they
25  caused, you know, ovarian cancer.

Page 273

1       MR. ZELLERS:  Move to strike as
2  nonresponsive.  I'm going to ask the question
3  again.
4       THE WITNESS:  Sure.
5  BY MR. ZELLERS:
6       Q.  If your assumption about contamination
7  of talcum powder products with asbestos were not
8  true, would your opinions in this case change?
9       A.  No.
10      Q.  In support of your opinion that talcum
11  powder products contain asbestos, you cite to
12  exhibits from the depositions of John Hopkins and
13  Julie Pier; is that right?
14      A.  Yes.
15      Q.  Are you aware that those exhibits were
16  created by plaintiff attorneys?
17      MS. PARFITT:  Objection.  Misstates the
18  evidence.
19      A.  Yeah.  I mean, I asked them whatever
20  that -- you know, these are -- as I understand
21  them, they are, you know -- they are created as a
22  part of the testimony of these deponents on
23  behalf of, you know, the defendants.  That's my
24  understanding.
25      Q.  Were you told that the exhibits

Sonal Singh, M.D., M.P.H.

Page 274

1  Exhibit 28 to the deposition of John Hopkins and
2  Exhibit 47 to the deposition of Julie Pier were
3  exhibits that were created by plaintiffs'
4  attorneys?
5       MS. PARFITT:  Objection.  Completely
6  misstates the evidence in this case.
7       A.  You know.  I asked for constituents.  I
8  don't know what -- who created what.  So I mean,
9  I'm not going to be able to answer that type of
10 question, who created this.
11      I was asked for, you know, what are the
12 constituents, that can I learn more about this?
13      Q.  Outside of your work in litigation, do
14 you normally rely on documents created by
15 advocates in order to evaluate epidemiological
16 data?
17      MS. PARFITT:  Objection.  Again,
18 misstates the evidence as to origin of the
19 Hopkins and Pier Exhibits 28 and 40.
20      You may answer.
21      A.  Yeah.  I mean, I do.  As I said
22 earlier, I rely on our published data.  And as
23 the Health Canada approach states, that we rely
24 on whatever evidence becomes available, and, A,
25 is relevant to the particular testimony.

Page 275

1       And, importantly, just as my causal opinion
2  was arrived at independent of the constitution of
3  asbestos in talc, Health Canada also is unaware
4  of the presence of -- or at least, you know, they
5  haven't assessed the presence of asbestos in
6  talc, and they are, you know, both congruent.
7       Q.  Your testimony is that outside of your
8  work in litigation, that you normally also do rely
9  on data and documents created by plaintiffs'
10 counsel?
11      MS. PARFITT:  Objection.  Form.  Asked
12 and answered.  And misstates the evidence.
13      A.  So I, you know, rely on evidence that's
14 available in terms of epidemiologic evidence.
15 And my testimony on asbestos was based on testing
16 and based on -- testing by -- based on some of,
17 you know, there are studies which suggest the
18 presence of asbestos.
19      Q.  Do you know where the data in
20 Exhibit 28 to Hopkins and Exhibit 47 to Pier came
21 from?
22      A.  You know, I was seeing these were in
23 various mines conducted.  That's my
24 understanding.
25      Q.  Do you have an understanding, other

Page 276

1  than from communicating with plaintiffs' counsel?
2       A.  I'm not sure what -- so --
3       MS. PARFITT:  I'm going to object to
4  the form.
5       Q.  Sure.  The source of data?
6       A.  Like source of --
7       Q.  I'm asking you if you know where the
8  data in those exhibits came from.
9       A.  So I'll try to answer to the best of my
10 ability.
11      My understanding is that the data on J&J and
12 Imerys were from mines tested over the years,
13 ranging, you know, from several decades.  And
14 that contained or -- you know, were contaminated
15 with asbestos, various fibers that were created.
16      And the second was the Luongo report was
17 products that were purchased and that were tested
18 in the laboratory.  So that's where the source.
19 I mean, I assume these other two sources.
20      Q.  Have you made any effort to investigate
21 the alternative explanations for the data in
22 those charts, Exhibit 28 and Exhibit 47?
23      A.  I mean --
24      MS. PARFITT:  Objection.
25      A.  So, for example, I think that those

Page 277

1  data are, as I said earlier, my causal opinion
2  is -- is, you know, this is only a -- my causal
3  opinion is only -- you know, this is only a small
4  link in my causal opinion between talc and
5  ovarian cancer, and it's not predicated on the
6  presence of asbestos.
7       I don't have the expertise to determine
8  whether asbestos is present.
9       Q.  I'm trying to make it a simple
10 question.  I'm just trying to find out what you
11 did and what you did not do.
12      Did you make any effort to investigate the
13 alternative explanations for the data in
14 charts which are marked as Exhibit 28 and
15 Exhibit 47?
16      A.  So --
17      MS. PARFITT:  Objection.
18      A.  What is 28, 47?
19      MS. PARFITT:  Yeah.  Let's get them.
20 Do you have a copy of them here to show --
21      MR. ZELLERS:  No.
22      MS. PARFITT:  You aren't going to show
23 it to him?
24      MR. ZELLERS:  He cites to these in his
25 report.

70 (Pages 274 to 277)

Sonal Singh, M.D., M.P.H.

Page 278

1    MS. PARFITT:  Then let's get them.
2  We'll get them.  Give him a moment.
3    MR. ZELLERS:  We don't need to get them
4  to answer this question.
5    MS. PARFITT:  Do you need them,
6  Dr. Singh?
7    THE WITNESS:  Yes.
8    MS. PARFITT:  Do you want to take a
9  quick break?
10    MR. ZELLERS:  And I object.  And this
11  should not be time that gets charged me.
12  BY MR. ZELLERS:
13    Q.  My question simply is:  Did he attempt
14  to investigate any alternative causes.  He can
15  either say yes, he can say no, or he can say I
16  don't recall.
17    A.  Yes.
18    Q.  All right.  What did you do to
19  investigate alternative explanations?
20    A.  I mean, you know, I was looking at
21  the -- I was already looking at the published
22  literature, but beyond that, I was looking at
23  what are the alternate -- again, as I said, you
24  know, my expertise in determining -- I'm not a
25  mineralist that I can, you know, that I can

Page 279

1  determine that.  And, again, I'm not opining that
2  Dr. Luongo's report -- I mean, he will have to
3  vouch for his report.
4    Q.  Let me ask it a different way.
5    A.  Yeah.
6    Q.  If scientists from the J&J companies
7  and Imerys scientists say that those tests don't
8  actually show asbestos, it was just tremolite
9  reported, for example, you have no expertise to
10  dispute that; correct?
11    MS. PARFITT:  Objection.  Misstates the
12  evidence in this case, entirely.
13    Do you want to ask him a hypothetical?
14    Q.  It's a hypothetical question.
15    MS. PARFITT:  It's a hypothetical.
16    A.  Again, with my limited expertise and my
17  understanding of whatever I was provided and
18  cited there, my understanding was that there was
19  asbestos present in there and, you know, other
20  people can have different opinions and I think
21  mineralogists, geologists will --
22    Q.  Those are the --
23    A.  Yeah.
24    Q.  -- expertise or the -- those are the
25  types of experts that would have substantive

Page 280

1  knowledge on these issues; correct?
2    A.  Yeah.  I mean, for my purpose, you
3  know, it was more an understanding of the
4  constituents, whether that would provide, you
5  know, proof against biologic plausibility, proof
6  for biologic plausibility.
7    So, for example, you say, did I undertake
8  attempts to understand the constituents?  Yes.  I
9  mean, I was looking for, well, are there some
10  antioxidants that, if you had some antioxidants
11  in that product, and that were of, or anti,
12  you know, carcinogens and maybe these scientists
13  will be able to provide that.
14    Q.  Did you ask counsel for plaintiffs for
15  any information or testimony from either J&J
16  company folks or Imerys scientists as to what the
17  tests actually showed with respect to asbestos?
18    MS. PARFITT:  Other than Exhibits 28
19  and 47?
20    A.  I assume those testifying were J&J
21  scientists and Imerys, and they were speaking
22  about those tests.
23    Q.  My question is:  Did you ask for any
24  additional information?
25    A.  No.  I mean, I asked -- as I said, I

Page 281

1  asked about the causal question and I got what I
2  got.  We can go about it in various ways.
3    Like did I ask again?  No, I didn't.  And I
4  don't want any more documents.
5    Q.  We'll try to shortcut this.
6    Do you believe Luongo?  You reviewed his
7  testimony; right?
8    MS. PARFITT:  Objection.  Form.
9    Go ahead.
10    A.  Yeah.  It's like how do you believe,
11  you know -- again, it's an area of expertise.  He
12  tests, you know, these products, you know, this
13  is not my area of experience.  At least based on
14  his testing, there is presence of asbestos in
15  my -- and provides additional support.
16    Q.  Did you look at any of the experts for
17  the defendants who have opined to the opposite
18  statement or the opposite?
19    MS. PARFITT:  I think -- objection.
20    A.  I was told that the expert defendants
21  hadn't even been -- you know, haven't submitted
22  reports or haven't been, you know, opined on.
23  That's sort of my understanding.
24    Q.  You believed and accepted the Luongo
25  testing for purposes of this case; is that right?

71 (Pages 278 to 281)

Sonal Singh, M.D., M.P.H.

Page 282

1       MS. PARFITT:  Objection.  Misstates the
2  heart of his testimony.
3       A.  So, first of all, this report is 70
4  whatever pages.  Luongo is maybe a paragraph or
5  two.  So, yes, I believe that was one study.
6       For the purposes of, you know, identifying,
7  you know, I identified his.  I identified what
8  was shown and what was in those notes.  And I
9  identified some epidemiologic -- I mean, some
10  findings in the published literature.
11      I mean, that's as much as I could know about
12  it.  I mean, you had Routers' study, you know,
13  talking about it in the media.  So there's lots
14  of different things.
15      I didn't go and, you know, go looking into
16  the Routers report.  Maybe that's what I should
17  be looking at.
18      Q.  You did not confirm that any of the
19  talc samples mentioned in those charts were
20  actually from talc that was used in baby powder;
21  correct?
22      MS. PARFITT:  Objection.  Misstates the
23  evidence that was available to him.  If you want
24  to show him the charts, you can do it.
25      Q.  Can you answer that question?

Page 283

1       MS. PARFITT:  Objection.
2       A.  I did not confirm it myself.
3       Q.  You realize that the vast majority of
4  talc isn't even used for body powder; correct?
5       MS. PARFITT:  Objection.  Misstates the
6  evidence.
7       A.  I realize that -- yeah, I don't know
8  what -- you know, there are various other uses of
9  talc.
10      Q.  Do you also rely on -- well, strike
11  that.
12      How many Luongo reports have you reviewed?
13      A.  I just have to take a look.  I know
14  that I reviewed one.  And I'm not trying to slow
15  you down.  I'm just trying to be accurate.
16      Q.  I think you are, but --
17      MS. PARFITT:  Objection to the
18  characterization, Counsel.
19      A.  I'm trying to find this.
20      MS. PARFITT:  He's acted in a
21  professional way throughout all this, so it's
22  good.
23      MR. TISI:  You asked him questions
24  looking at his report.
25      MR. ZELLERS:  The witness said to me,

Page 284

1  I'm not trying to slow you down.
2       MR. TISI:  And you said you think he
3  was.
4       MR. ZELLERS:  Yes.  And it was in jest,
5  Counsel.  We all chuckled and we all laughed.
6       MR. TISI:  As long as it was in jest,
7  that's fine.
8       THE WITNESS:  I took it to be in jest.
9       I know I reviewed one, but I'm just
10  trying to see if I reviewed another one.  There
11  was -- yeah.
12      So I said, No. 30 and then 31, 32, two
13  additional reports.  Sorry.
14      Q.  Have you ever met Luongo?
15      A.  I don't know him.
16      Q.  Do you know his qualifications?
17      A.  No.
18      Q.  Had you ever heard of him before you
19  got involved in this MDL talc ovarian cancer
20  litigation?
21      A.  No.
22      Q.  Have you reviewed any Luongo testing
23  where he did not find asbestos?
24      A.  These were the three reports I
25  reviewed.  So I don't know if he has conducted

Page 285

1  additional testing.
2       Q.  Let me ask again.  Have you reviewed
3  any Luongo testing where he did not find
4  asbestos?
5       A.  I did not review any additional beyond
6  what is cited here.
7       Q.  Have you reviewed the FDA's testing of
8  talcum powder products?
9       A.  I have cited it.  I mean, I have not
10  reviewed the specific test, but I have, you know,
11  cited what -- what they -- what they found.
12      Q.  Have you made any effort to quantify
13  the amount of any alleged contaminant in the
14  Johnson & Johnson Consumer Products talcum powder
15  products?
16      A.  That's way beyond my expertise.
17      Q.  Is any amount safe?
18      MS. PARFITT:  Objection.
19      A.  Well, as of my understanding that
20  asbestos, you know, any amount of asbestos is not
21  safe, that's my understanding.  And, obviously,
22  others can --
23      Q.  Do you defer to other experts on that
24  issue?
25      A.  Yeah.  But, you know, my understanding

72 (Pages 282 to 285)

Sonal Singh, M.D., M.P.H.

Page 286

1  is that any amount -- and I think there's some
2  testimony from others to that effect as well.
3  But I'll defer to others.
4      Q.  Do you have an opinion on what type of
5  asbestos is in the baby powder products?
6      A.  Again, you know, this whole -- you
7  know, this sort of questions around constituents
8  of the product, for me, it was more trying to
9  understand whether it's asbestos or any other
10  constituents in the product, provide evidence in
11  support or against.
12      I can't tell you what amount would cause or,
13  you know, not cause baby -- in baby powder will
14  cause ovarian cancer.
15      Q.  What types of asbestos are associated
16  with ovarian cancer?
17      A.  I haven't done a causal analysis of
18  asbestos and ovarian cancer.  I know that the
19  IARC has classified asbestos as a carcinogen,
20  Grade 1, and that also stated that it caused
21  ovarian cancer, but -- about asbestos and fibrous
22  talc, but obviously others will provide more --
23  more specifics.
24      Q.  Do you have any -- strike that.
25      Do you have knowledge as to the different

Page 287

1  types of asbestos?
2      A.  No.
3      Q.  What dose of asbestos is associated
4  with ovarian cancer?
5      A.  I have not evaluated the dose of
6  asbestos with ovarian cancer.
7      Q.  What type of ovarian cancer is asbestos
8  associated with?
9      A.  I have not -- as I said earlier, I have
10  not evaluated the specific causal link between
11  asbestos and ovarian cancer.  My causal question
12  was, does talcum powder products cause ovarian
13  cancer.  And whatever the constituents are, you
14  know, whether they provide evidence in support or
15  against.  And, as you said, there may be
16  additional testing.
17      Q.  Does the type of ovarian cancer vary
18  based upon the type of asbestos?
19      A.  Again, I didn't evaluate that -- that
20  body of evidence.
21      Q.  Did you evaluate studies that have
22  explored the potential link between asbestos and
23  ovarian cancer?
24      A.  Yeah.  I mean, I didn't, again,
25  evaluate the causal link between that.  I looked

Page 288

1  at meta-analysis that, you know, cause, as well
2  as the IARC report that, you know, talks about
3  asbestos and fibrous talc as a carcinogen and
4  also cites studies that show that asbestos causes
5  ovarian cancer.  But, again, I wasn't doing a
6  formal causal analysis.
7      Q.  Do you agree that research on the
8  potential relationship between asbestos and
9  ovarian cancer has only considered a small number
10  of cases?
11      MS. PARFITT:  Objection.  Form.
12      A.  I mean, ovarian cancer is a rare, rare
13  disease.  And, you know, it's going to be a small
14  number of cases, regardless of etiology, what
15  they are trying to study.
16      Q.  How many of the studies involve
17  occupational exposure?
18      A.  I think the predominant --
19      MS. PARFITT:  Objection.
20      A.  -- studies have involved occupational
21  exposure.
22      Q.  How many were nonoccupational, if any?
23      A.  I don't recall the numbers.
24      Q.  Did any of the nonoccupational asbestos
25  studies reach statistical significance?

Page 289

1      MS. PARFITT:  Objection.  Form.
2      A.  Again, I would have to look at the
3  study that you're talking about.  And I just -- I
4  can't recall it off the top of my head.
5      Q.  Can you tell how many women were
6  studied?
7      A.  No, I can't.  I mean, you can't ask
8  questions about these things, and tell me how
9  many women.  No.  You have to show me the study
10  if you want to go down that line of questioning.
11      Q.  I'll show you a study.
12      A.  Sure.
13      Q.  Are you familiar with the Reid study
14  published May 24th of 2011?
15      A.  Yes.
16      Q.  It's one of the studies you looked at;
17  is that right?
18      A.  Yes.
19      MR. ZELLERS:  We'll mark that as
20  Exhibit 30.
21      (Article entitled "Does Exposure
22  to Asbestos Cause Ovarian Cancer?  A
23  Systematic Literature Review and
24  Meta-analysis" marked Exhibit 30.)
25      MS. PARFITT:  Thank you.

73 (Pages 286 to 289)

Sonal Singh, M.D., M.P.H.

Page 290

1    THE WITNESS:  Can you repeat the
2  question for me?
3        MR. ZELLERS:  Sure.
4        THE WITNESS:  I'm sorry.
5  BY MR. ZELLERS:
6    Q.   Go to the first page, the right column.
7    A.   Mm-hmm.
8    Q.   Reid.  And this article is entitled
9  "Does Exposure to Asbestos Cause Ovarian Cancer?"
10  Is that right?
11    A.   Yes.
12    Q.   The authors state, on the first page,
13  on the right-hand side, right above the No. 1 and
14  No. 2, "Studies that have examined this issue
15  have been limited for two major reasons.  No. 1,
16  small number of cases"; is that right?
17    A.   Yes.
18    Q.   The authors state, "Much fewer women
19  than men have been exposed to asbestos,
20  particularly in more heavily exposed occupational
21  settings where relative risks are higher."
22  You agree with that; correct?
23    A.   Yes.
24    Q.   Then the second major limitation deals
25  with difficulties of diagnosis; is that right?

Page 291

1    A.   Yes.
2    Q.   Are you aware of the difficulties that
3  have existed over time in distinguishing between
4  peritoneal mesothelioma and ovarian cancer?
5    A.   Yes.  As a general idea of -- you know,
6  because they share histologic similarities.
7    Q.   Did those difficulties affect the
8  reliability of the studies?
9    A.   Yes, but if you look at Table 2 of that
10  report, you see that, despite if you look at
11  studies that review the ovarian pathology, you
12  still see a statistically significant increased
13  risk of incidence of mortality from ovarian
14  cancer.  So, yes, overall studies, it's a higher
15  estimate, but even if you take into account
16  mesothelioma diagnoses and misclassification, you
17  still cannot, you know, account that -- we still
18  are left with that asbestos causes, you know,
19  ovarian cancer.
20    Q.   The authors of the Reid paper that you
21  reviewed and relied on, Exhibit 30, stated, "It
22  has been particularly difficult to distinguish
23  between peritoneal mesothelioma and ovarian
24  serous carcinoma"; is that right?
25        MS. PARFITT:  Counsel, I'm sorry.

Page 292

1  Where are you pointing to?
2        MR. ZELLERS:  Sure.  I'm looking at
3  the --
4        MS. PARFITT:  Thank you.
5        MR. ZELLERS:  -- No. 2.
6        MS. PARFITT:  Uh-huh.
7        MR. ZELLERS:  The last full sentence.
8        MS. PARFITT:  Thank you.  I appreciate
9  it.
10        MR. ZELLERS:  On Page -- first page of
11  the article.
12        MS. PARFITT:  Thank you.  I appreciate
13  that.
14        MR. ZELLERS:  Sure.
15    A.   Yes.
16    Q.   Have the studies addressed confounding
17  and independent risk factors?
18    A.   Well, again, you know, my examination
19  of asbestos -- I mean, I was not trying to
20  establish a causal link between asbestos and
21  ovarian cancer, you know, when in trying to look
22  at talcum powder products and ovarian cancer, you
23  know, one of the questions was constituents.
24  And, you know, the IARC agrees that, or at
25  least opines that it is, causally, is a

Page 293

1  carcinogen and lists that and lists the Kamargo
2  study as, you know, that asbestos causes ovarian
3  cancer.
4    Q.   Well, the Camargo 2011 study
5  acknowledges an inability to account for
6  nonoccupational risk factors for ovarian cancer
7  other than age; correct?
8    A.   Again, if I can --
9    Q.   Take a look.  Sure.
10    A.   These statements -- it's getting to the
11  end of the day, so...
12        MR. ZELLERS:  Deposition Exhibit 31.
13        (Article entitled "Occupational
14    Exposure to Asbestos and Ovarian Cancer:  A
15    Meta-analysis" marked Exhibit 31.)
16  BY MR. ZELLERS:
17    Q.   Deposition Exhibit 31 is the Kamargo
18  paper; is that right?
19    A.   Yes.
20    Q.   This is another paper that you have
21  reviewed?
22    A.   Yes.
23    Q.   On the first page, the overview --
24    A.   Yes.
25    Q.   -- it states, "Objective:  A recent

74 (Pages 290 to 293)

Sonal Singh, M.D., M.P.H.

Page 294

1 monograph working group of IARC conducted" -- or
2 strike that -- "concluded that there is
3 sufficient evidence for a causal association
4 between exposure to asbestos and ovarian cancer.
5 We performed a meta-analysis to quantitatively
6 evaluate this association."
7     Is that right?
8     A.  Yes.
9     Q.  If you look at Page 1216, middle
10 column -- are you there?
11     So I'm looking at the second full paragraph
12 above "conclusion."
13     "A further limitation of our analysis was
14 its inability to account for nonoccupational risk
15 factors for ovarian cancer other than age."
16     Do you see that?
17     A.  And what do you mean by that?  I mean,
18 I didn't -- again, you know, I --
19     Q.  Let me just ask.  Is that a
20 limitation --
21     A.  Yeah.
22     Q.  -- on the analysis?
23     A.  It is a limitation.
24     Q.  Hasn't failure to account for
25 misclassification and known risk factors been

Page 296

1     Q.  And you're not making a causal
2 assessment or determination --
3     A.  No.
4     Q.  -- on asbestos; is that right?
5     A.  Yes.
6     Q.  Okay.  Under "discussion," Page 1215 --
7     A.  And I'm going to take a break after
8 that whenever you're done.  I'm sorry.  I need to
9 use the restroom.
10     Q.  That's okay.  That's fine.  That's
11 fine.
12     Do you see under "discussion," this is on
13 the left-hand column, second full paragraph,
14 where they're talking about Edelman?
15     A.  Yes.
16     Q.  And the authors state, "They concluded,
17 however, that despite the positive and
18 significant association, there was insufficient
19 information to infer that ovarian cancers were
20 caused by occupational exposure to asbestos
21 because of concerns about tumor
22 misclassification, inappropriate comparison
23 populations and the failure to take into account
24 for known risk factors."
25     Is that --

Page 295

1 cited as a reason why causality cannot be
2 established?
3     MS. PARFITT:  Objection.
4     A.  We can't rely on IARC.  As you said,
5 one said that it is possibly associated and here,
6 when they haven't arrived at a -- I mean,
7 causality is just not about association in one.
8 I mean, they have to look at other biological
9 mechanisms of asbestos and ovarian cancer, you
10 know, what happens in the lab, what happens -- I
11 haven't done that evaluation.
12     So, yes, this is a limitation.  But this
13 needs to be taken into account with, you know,
14 the entire body of evidence on asbestos and
15 ovarian cancer.
16     Q.  You're looking at and relying on
17 papers, including Reid, Exhibit 30?
18     A.  The IARC monographs.
19     Q.  And Kamargo, Exhibit 31; is that right?
20     A.  Yes.  And, again, I'm clarifying that
21 I'm not making a causal determination on IARC,
22 you know.  I'm just relying on that, you know,
23 that I'm not -- first of all, I didn't set out to
24 make a causal determination on asbestos and
25 ovarian cancer.

Page 297

1     A.  Again --
2     Q.  You don't disagree with that, do you?
3     A.  Yeah.  I mean, I don't -- but I don't
4 disagree -- I mean, I'm relying on the IARC
5 assessment and others that, you know, there's a
6 causal association between exposure.  Again, I
7 did not review.  I would have gotten and reviewed
8 evidence, Edelman and White and others, if I had
9 to do it over again.
10     MR. ZELLERS:  Let's take a break.
11 We'll come back and I'll finish up.  Thank you.
12     THE VIDEOGRAPHER:  Off the record,
13 3:32 p.m.
14     (A recess was taken.)
15     THE VIDEOGRAPHER:  Here begins Media
16 No. 5 in today's deposition of Sonal Singh, MD,
17 M.P.H.  Back on the record, 3:43 p.m.
18 BY MR. ZELLERS:
19     Q.  Dr. Singh, do you agree that exposure
20 to asbestos through perineal cosmetic talc use,
21 assuming the talc contains asbestos fibers, is
22 different than the heavy occupational exposure
23 that's primarily been researched?
24     MS. PARFITT:  Objection to form.
25     A.  Again, you know, I've not professed to

75 (Pages 294 to 297)

Sonal Singh, M.D., M.P.H.

Page 298

1  be an expert in different kinds and routes of
2  asbestos exposure.  My -- my sort of -- at least
3  my understanding of my causal question was
4  exposure to talcum powder products and ovarian
5  cancer and whether the constituents can provide
6  evidence in support or refute that association.
7      So, you know, whether asbestos exposure,
8  what different kinds, others will opine on that.
9      Q.  Do you know what a cleavage fragment
10  is?
11      A.  No.  And we can go on on this kind of
12  stuff, and I'll say no.
13      Q.  Do you know how it differs from an
14  asbestos fiber?
15      A.  No.  And I'm not a mineralogist.
16      Q.  If I ask you a whole line of questions
17  about different types of asbestos, you're going
18  to defer to other folks?
19      A.  Yes.
20      Q.  Is there any epidemiology
21  substantiating the theory that fragrance
22  ingredients can cause ovarian cancer?
23      A.  I'm not aware of such studies.
24      Q.  Is there any epidemiology
25  substantiating the theory that exposure to trace

Page 299

1  amounts of the heavy metals at issue can cause
2  ovarian cancer?
3      A.  I'm not aware of -- you know, again, I
4  didn't do the evaluation, trace the specific
5  constituents of ovarian cancer.  I just was
6  trying to understand the constituents, what are
7  they.  I just, you know, whether trace -- trace
8  elements cause inflammation and -- you know, but
9  I am not aware of studies that link them directly
10  to ovarian cancer.
11      Q.  You're not opining in this case that
12  the fragrance chemicals and heavy metals that may
13  be present in baby powder are causally associated
14  with ovarian cancer.
15      MS. PARFITT:  Objection.
16      Q.  Correct?
17      MS. PARFITT:  Form.
18      A.  Yes.  I'm not -- again, I'm not opining
19  on the individual constituents of talcum powder
20  products.  My opinion is, you know, I look at the
21  exposure and the exposure is talcum powder
22  products, and the presence of constituents, some
23  of which are identified as, you know, Grade 1
24  carcinogens, others as Grade 2, provide evidence
25  in support, and others may -- you know, others

Page 300

1  may do testing and provide antioxidants and
2  substances which reduce the risk.  So that will
3  have to be weighed.
4      But I am not providing that causal link
5  between the individual constituent and ovarian
6  cancer.
7      Q.  And that would be true for any of the
8  individual fragrance chemicals and heavy metals
9  that may be present in the baby powder; correct?
10      MS. PARFITT:  Objection.
11      A.  I don't have that area of expertise on
12  individual constituents in products.
13      MR. ZELLERS:  I have no further
14  questions.  Thank you.
15      THE WITNESS:  Thank you for your time.
16  (Discussion off the record.)
17      THE WITNESS:  Thank you.
18      MR. ZELLERS:  Thank you, Doctor.
19      MR. KLATT:  Give me a minute to get
20  organized here, Doctor.
21      THE WITNESS:  Sure.
22      MR. KLATT:  Are we off the record?
23      THE VIDEOGRAPHER:  No.
24      MR. LOCKE:  Let's go off the record,
25  then.

Page 301

1      THE VIDEOGRAPHER:  Off the record,
2  3:47 p.m.
3      (A recess was taken.)
4      THE VIDEOGRAPHER:  Back on the record,
5  3:51 p.m.
6      CROSS-EXAMINATION
7  BY MR. KLATT:
8      Q.  Good afternoon, Dr. Singh.  My name is
9  Mike Klatt, and I represent Imerys Talc America
10  in this case.
11      Have you ever heard of Imerys Talc America
12  before you got involved in this case?
13      A.  I have, but, you know, I don't know in
14  what context and what, you know.
15      Q.  Do you know what Imerys Talc America
16  does?
17      A.  I don't know all the details of the
18  activities or, you know, Imerys.
19      Q.  As you know, Mr. Zellers has covered a
20  fair amount of ground already.  And so I'm going
21  to skip around just to ask you some follow-up
22  questions.
23      You said earlier today, when you were
24  talking to Mr. Zellers, that you potentially
25  intended to write up something about talc and

76 (Pages 298 to 301)

Sonal Singh, M.D., M.P.H.

Page 302

1    ovarian cancer?
2         A.   Sure.
3         Q.   And I just wanted to get a better
4    understanding of what you were referring to.
5         A.   Yeah.  So after, sort of -- and I'm not
6    going to do it until this is all over, because I
7    feel that there, you know, I have access to
8    documents that are -- that are sort of protected
9    by court order.
10        But partly what I'm thinking of is -- like
11   there have been so many systematic reviews and
12   meta-analyses that I was thinking more on the
13   kind of like an umbrella review of all these
14   reviews that I cite in my report and with, you
15   know, some of the rating of reviews.
16        And then -- and that's sort of my thinking,
17   was that what I would do is synthesize the
18   evidence, that -- what I do best is synthesize
19   the evidence from other studies in trying to --
20   you know, so it would be separate from, like,
21   because he asked the question, would you do a
22   systematic review?  You know, meta-analysis.  No.
23   Because there have been so many already.
24        Q.   Have you undertaken that project yet or
25   is this just something you're thinking of?

Page 303

1         A.   Yeah.  I'm thinking about --
2         Q.   I'm sorry.  Let me finish.
3         This is something you're just thinking about
4    doing in the future?
5         A.   In the future.  But I have
6    conceptualized, if I were to do that, that's what
7    I would do.
8         Q.   And if you do do that, you would be
9    obliged, would you not, to disclose to whatever
10   entity, body, journal, that you submitted this
11   work to, that you had been a retained, paid
12   expert by plaintiffs in the talc ovarian cancer
13   litigation; correct?
14        A.   Yeah.  And that's been my standard
15   practice.  If you go back and look at my papers,
16   you know, my papers on SGLT2 inhibitors, I've
17   disclosed that I was funded by, you know,
18   Janssen.  You know, a paper on statins that I
19   wrote last year, I was a paid expert.
20        So it's just standard practice for us to do
21   that.
22        Q.   And now that you bring that up, there's
23   absolutely nothing wrong with a company like
24   Janssen or any other company hiring an outside
25   expert to advise them and to publish on a certain

Page 304

1    subject; correct?
2         MS. PARFITT:  Objection.  Form.
3         A.   I mean, depending -- I don't know the
4    specifics on arrangement, but the question is,
5    you know, as long as the disclosure is
6    transparent, and as long as, you know, the
7    funding mechanisms, what was the reasons, yeah.
8    So it's not like they have commissioned this
9    review.
10        I mean, first of all, I have just thought
11   about it.  I haven't even done it.  I'm not sure
12   I'll do it with my time.  But you would have to
13   disclose that, yeah.
14        Q.   But my question, and, again, I think
15   we'll go quicker if we just focus on the question
16   asked and the answer to that question.
17        But my question is:  It's entirely
18   appropriate for companies to contact and retain
19   outside experts to advise them and then to
20   publish articles in the literature.
21        You've done it yourself; correct?
22        MS. PARFITT:  Objection.  Form.
23        You may answer.
24        A.   Yeah.  I have actually been, you know,
25   I have worked with Eli Lilly on systematic

Page 305

1    reviews of diabetes medications.
2         And -- to a point of clarification, I was
3    not paid by them, but I was an expert on that,
4    which is sort of a strange arrangement; right?
5    You don't get paid, but you're still working for.
6    But, you know, that's my area of expertise.  So,
7    yeah, companies hire and that's how science
8    works.
9         Q.   And, for example, if you contacted your
10   institution, the University of Massachusetts
11   Medical Center, about this ovarian cancer risk
12   factors web pages that they have, and you had any
13   input on that, you would disclose that you're a
14   paid plaintiffs' expert in talc ovarian cancer
15   litigation; correct?
16        A.   Well, so to do that, I don't know where
17   that web page came from.  I didn't contact them.
18   Yes, but, you know, I'm not trying.  So I don't
19   know if you're thinking about like the up-to-date
20   example.  I didn't want to change.  I was just
21   providing them references.
22        But, yes, if I was trying to make changes to
23   a document that that's on, you know, I'm trying
24   to write something up, then if you look at my
25   letter, it's just a contact point.  If I'm trying

77 (Pages 302 to 305)

Sonal Singh, M.D., M.P.H.

Page 306

1  to write something up and say, you know what, it
2  increases the risk of cancer, decreases, then,
3  yes, I'd disclose that.
4      Q.  And just to go over that point --
5      A.  Yeah.
6      Q.  -- when you wrote the editor about Up
7  To Date, suggesting that they update their
8  website regarding talc and ovarian cancer, you
9  did not disclose that, at that time, you were a
10  paid retained plaintiffs' expert; is that
11  correct?
12      A.  Yes.  But I asked them to clarify that
13  this was just to update the references, if you
14  look at them.
15      Q.  Now, going back to what this
16  conceptualizing you're having of potentially one
17  day publishing something about talc and ovarian
18  cancer, okay, that's what I'm asking about.
19      Are we on the same page?
20      A.  Yeah.
21      Q.  Wait.  I just want you to know what I'm
22  asking about.  Okay?
23      A.  Okay.
24      Q.  Now, you would agree with me, you
25  mentioned this morning there were confidentiality

Page 307

1  orders in place.  But you'd admit that all of the
2  case-control epidemiology and all the cohort
3  epidemiology and all the meta-analysis that
4  you've reviewed are all out there in the
5  published literature; correct?
6      A.  The majority of them, studies are,
7  yeah.  I mean, Taher is not out in the
8  literature.  It's still in somewhere.
9      Q.  There's no -- there's no meta-analysis
10  cohort study or case-control study you're aware
11  of that is controlled or -- by some sort of
12  protective order that would limit you citing it
13  in some sort of review; correct?
14      MS. PARFITT:  Objection.  Form.
15      A.  So, first of all, yeah.  As you know,
16  Taher is sort of not published.  So I don't know
17  how much of the data you can use.
18      But in terms of protective, I don't know all
19  the rules about what you can use and not use.
20  So, I mean, it's just more my unfamiliarity with
21  the process, but nothing -- if you're asking the
22  question, is something preventing me from doing
23  that?  No.
24      Q.  Okay.
25      A.  Can I go ahead and do it?  It depends

Page 308

1  on time and other considerations.
2      Q.  And, again, focusing my question very
3  specifically, the case-control studies on talc
4  and ovarian cancer, the cohort studies on talc
5  and ovarian cancer, the meta-analysis on talc and
6  ovarian cancer that you've reviewed in this case
7  and that you've cited in your expert report in
8  this case, none of those are bound by a
9  protective order that would prevent you from
10  reading them, analyzing or publishing on them;
11  correct?
12      A.  None of them are restrictive.
13  Everybody has access.  I had, too.
14      Q.  Okay.  You talked briefly about the
15  Centers for Disease Control this morning.
16      A.  Yes.
17      Q.  Have you ever worked with them?
18      A.  No.  I've applied for grants with them,
19  and I wasn't funded, but I'm aware of them.
20  Yeah.
21      Q.  Have you ever conducted a
22  population-based, case-control study yourself?
23      A.  Yes.
24      Q.  As principal investigator?
25      A.  Yes.

Page 309

1      Q.  Have you done so for cohort studies?
2      A.  No.  Not a cohort study.
3      Q.  Could we go to Langseth, whatever
4  exhibit number that is?
5      MR. TISI:  I've got it.  It's
6  Exhibit 21.  I've got a copy of it here.
7      MS. PARFITT:  Yeah.  I know.
8      MR. TISI:  Do you mind me giving our
9  copy?
10      MR. KLATT:  No.  Not at all.
11  BY MR. KLATT:
12      Q.  I just have a few more questions.  You
13  were already asked about Langseth, but I just
14  have a few more questions for you.
15      At the time the Langseth study was
16  published, you would agree with me, Doctor --
17      MS. PARFITT:  I'm sorry, Mike.  I
18  didn't hear your question.  I'm sorry.
19      Q.  Yeah.  Let me start over.
20      MS. PARFITT:  I appreciate that.
21      Q.  I'm talking about the Langseth paper
22  that we've marked as Exhibit 21; is that correct?
23  It was published in 2008 by the IARC working
24  group members; correct?
25      A.  Yes.  Some of the members.  I suspect

78 (Pages 306 to 309)

Page 310

1  the group is much larger than these folks.
2      Q.  Well, these happened to be
3  epidemiologists on the IARC working group;
4  correct?
5      A.  I don't know all their qualifications.
6      Q.  Do you know any of those people
7  personally who are listed as authors on
8  Exhibit 21?
9      A.  No.
10     Q.  I'll represent to you that they're
11 epidemiologists.  You would agree with me, that
12 if you turn over to Page 2, they listed 14
13 population-based, case-control studies up at the
14 top, and then they had six more hospital-based,
15 case-control studies; correct?
16     A.  Yes.
17     Q.  At this time, there was one cohort
18 study all on the subject of talc and ovarian
19 cancer at the time; correct?
20     A.  Yes.
21     Q.  You would admit that the
22 population-based, case-control studies did not,
23 consistently across the board, show a
24 statistically significant increased risk
25 according to the table in Exhibit 21, the

Page 311

1  Langseth paper.  Some were statistically
2  significant, and others were not; correct?
3      A.  Yeah.  But I mean, I don't view
4  statistical significance as --
5      Q.  Doctor --
6      A.  -- areas of consistency.
7      Q.  Doctor, I just asked whether they were
8  statistically significant.
9      A.  No.  All of them were not statistically
10 significant.
11     Q.  And we're talking about the 14
12 population-based, case-control studies in the
13 Langseth paper as of 2008; correct?
14     A.  Yes.  But I view them as consistent.
15     Q.  And the hospital-based, case-control
16 studies that are on Page 2 of the Langseth paper,
17 the six -- the hospital-based, case-control
18 studies, none of them were statistically
19 significant; correct?
20     A.  Yes.  But I still view them as
21 consistent with the overall findings.
22     Q.  And, in fact, when they did a
23 meta-analysis of the hospital-based, case-control
24 studies, that meta-analysis that added all
25 hospital-based, case-control studies together,

Page 312

1  it, in and of itself, was not statistically
2  significant; correct?
3          MS. PARFITT:  Object to the form.
4      A.  Yes.  But it was consistent with the
5  overall estimates.
6      Q.  And the cohort study didn't show an
7  increased risk.  And the two cohort studies since
8  Langseth have not shown an increased risk of
9  ovarian cancer in talc users; correct?
10         MS. PARFITT:  Objection.  Misstates the
11 evidence.
12     A.  I see that, A, two of the cohort
13 studies have showed an excess risk, which is not
14 statistically significant.  One study has showed
15 statistically significant increased risk, and the
16 third studies have showed, you know, risk
17 estimates lower than one, but their upper bounds
18 are entirely consistent with what we see here and
19 subsequent to this.
20     Q.  So the population-based, case-control
21 studies collectively show an increased risk.  But
22 they're inconsistent; correct?
23     A.  No.
24         MS. PARFITT:  Objection.
25     A.  I mean, let's go to Penninkilampi.  I

Page 313

1  mean, they clearly opine that --
2      Q.  I'm asking you about Langseth.
3      A.  Why are we looking at 2008 when we are
4  in 2019?
5      Q.  Because I'm asking the questions.
6      A.  Okay.
7      Q.  You would agree with me that, of the
8  three study designs, cohort studies,
9  hospital-based, case-control studies and
10 population-based, case-control studies, only one
11 of those three study designs shows an overall
12 increased risk of ovarian cancer in talc users;
13 correct?
14         MS. PARFITT:  Objection.  Misstates the
15 evidence.
16     A.  No.  I mean, at least at that time, you
17 had one, you know, cohort study.  I believe that
18 all of them show an excess risk, which is
19 consistent.  Two of those study designs that
20 you're talking about, the hospital based and the
21 cohort, did not show a statistically significant,
22 which I still believe a significant excess that's
23 consistent.
24     Q.  And you said earlier that you consider
25 and use the Bradford Hill considerations;

Page 314

1 correct?
2     A.  Sorry.  Just give me a second.
3     Yeah.  The Bradford Hill overviews as one.
4     Q.  And you know, Sir Bradford Hill himself
5 said that, in evaluating consistency, you have to
6 look at consistency across different study
7 designs; correct?
8     A.  Yeah.  And times and places and other
9 things.
10     Q.  But I'm correct that Dr. Bradford or
11 Sir Bradford Hill said that you have to look at
12 consistency across different study designs;
13 correct?
14     A.  That's what I state in my testimony, as
15 well in my report cites that specific phrase,
16 consistency across study designs, times and
17 places.  So I am not -- you know, I am, in fact,
18 quoting him when I cite that.
19     Q.  You said, on Page 15 of your report,
20 that, "Talc-based body powders are used
21 habitually for months or years rather than just a
22 single application"; correct?
23     A.  Where is that?
24     MS. PARFITT:  Page 15.
25     Q.  Page 15.

Page 315

1     A.  Where is that?  I'm sorry.  Which part
2 of it?  15.  I know I have 15.  Is it the last
3 paragraph or --
4     MS. PARFITT:  Yeah.
5     A.  I don't see -- okay.  Yeah.
6     Q.  And what did counsel just point out to
7 you?
8     A.  Yeah.  I saw that.  That's correct.
9     Q.  And can you read what you said there?
10     A.  "Talcum powder products are used
11 habitually for months or years rather than a
12 single application or single body."
13     Q.  Would you flip over to Page 54 of your
14 report, please.  In Paragraph 6 there, you say,
15 in the third sentence that, "Recall bias is less
16 likely to occur for chronic daily exposures such
17 as talc"; correct?
18     A.  That's, you know, that's my
19 understanding.
20     Q.  Talc, in your estimation, is a chronic
21 daily exposure; correct?
22     A.  That's how -- that's my understanding
23 that, you know, women are using it.
24     Q.  You, in response to Mr. Zellers'
25 questions earlier today, said that one of the

Page 316

1 things you had reviewed was an Exhibit 47 to
2 Imerys employee Julie Pier's deposition.
3     Do you recall that?
4     A.  Yes.  If you can show me that.
5     MR. KLATT:  Sure.
6     THE WITNESS:  Thank you.
7     MR. KLATT:  I'm sorry.  I'm sorry.
8     THE WITNESS:  Exhibit --
9     MR. KLATT:  Yeah.  Let's mark it as the
10 next exhibit.  And that would be 33; is that
11 correct?
12     MS. PARFITT:  32.
13     COURT REPORTER:  Here is 32 that you
14 haven't used.
15     MR. KLATT:  Let me do this.  Yes.  That
16 will be 32.
17     (Chart marked Exhibit 32.)
18     MR. TISI:  The chart?
19     MR. KLATT:  Yes.
20 BY MR. KLATT:
21     Q.  I'm going to show you what's been
22 marked as Exhibit 32 to this deposition.  But for
23 future record references, it also has, in the
24 upper right-hand corner, a photocopy, Exhibit
25 No. 47; correct?

Page 317

1     A.  Yeah.
2     Q.  Exhibit 47 was the exhibit number at
3 Ms. Pier's deposition, and Exhibit 32 is the
4 exhibit number we're marking this today; correct?
5     A.  Okay.
6     Q.  Would you agree with me that you don't
7 have the expertise or knowledge to tell me that
8 any of the samples on Exhibit 32 to today's
9 deposition show asbestos in Imerys talc that
10 ended up in Johnson & Johnson's baby powder, do
11 you?
12     MS. PARFITT:  Objection.
13     A.  I mean, it says, you know,
14 anthophyllite -- yeah.  I mean, I don't have
15 asbestos expertise here.
16     Q.  Let's -- you understand that most of
17 these samples, the source of these samples isn't
18 even identified?
19     MS. PARFITT:  Objection.  Form.
20     A.  Yeah.  But -- but, actually, can I
21 answer that?
22     So, for example, separate from the source, I
23 mean, I understand that it says chrysotile
24 asbestos for the first one.  It says serpentine.
25 It says chrysotile.

Sonal Singh, M.D., M.P.H.

Page 318

1    Q.   And where on that first one, and we're
2  looking at the very first line across the top of
3  Exhibit 32 --
4    A.   Sure.
5    Q.   -- where in the world does it say that
6  that was a sample of talc that ended up in
7  Johnson & Johnson's talc-based body powder
8  products?
9    A.   Well, my understanding, and I can share
10 that, that this was -- this was that -- that
11 testimony was given that this was a testing of
12 mines that was being mined by Imerys or -- I
13 mean, that contained asbestos.
14    Whether it ended up in baby powder was not
15 the question.  The question was:  Does talc
16 contain asbestos?
17    Q.   Did plaintiffs' counsel ask you to make
18 that assumption?
19    A.   No.  No.
20    Q.   Okay.  Well, then, I'm confused,
21 because Imerys and its predecessors have tested
22 literally thousands of samples of talc from
23 competitors, from their own mines, from mines
24 that are never used for cosmetic purposes or baby
25 powder, so how can you tell me that the first

Page 319

1  sample on Exhibit 32 has anything to do with baby
2  powder?
3    A.   Well, I'm not telling you anything to
4  do with baby powder.  My question is that, you
5  know -- that what constitutes talcum powder
6  products.  And based on this and, you know, talc
7  is mined together with all these other particles,
8  I wanted to know, what are the results.
9    And at least based on my understanding of
10 these results, again, I'm not a mineralogist,
11 they can argue whether the amount of asbestos is
12 significant or, you know, these fibers, chromium,
13 cobalt, nickel are significant.  My understanding
14 is that these particles are present.
15    Q.   Can you tell me, based on your own
16 knowledge or expertise, that any sample listed on
17 Exhibit 32 was from talc that ended up in
18 Johnson & Johnson's baby powder or Shower to
19 Shower talcum powder products?
20    A.   No.  I cannot.
21    Q.   Okay.  You referred in your report to
22 the Shukla paper; correct?
23    Do you recall that?
24    A.   Show it to me.  It's been a while.
25    Q.   Sure.  I'm going to give you the page

Page 320

1  on your report where I think you refer to it.
2    A.   I know it's in the biologic
3  plausibility section somewhere.
4    Q.   Look on page -- I believe it's Page 61
5  of your report.
6    A.   Yes.
7    Q.   No.  I'm sorry.  It's Page 59 of your
8  report.  And it's the third paragraph down.
9    A.   Mm-hmm.
10    Q.   And you say, in the middle of the third
11 paragraph, "In studies of human mesothelial
12 cells, both nonfibrous talc and asbestos have
13 shown evidence of genotoxicity," and the
14 reference is 109, and my understanding is
15 reference 109 is the Shukla paper published in
16 2009; correct?
17    A.   Where are you referring?  I'm sorry.
18 In Page 59?
19    Q.   Page 59 of your report, third
20 paragraph.
21    A.   Yeah.
22    Q.   Second sentence.
23    A.   Yeah.  It says here, should be Shukla.
24 Yeah.
25    Q.   Did you read the Shukla paper?

Page 321

1    A.   I read -- you know, I didn't read it
2  line by line.  But, yes, I read it.
3    Q.   You know the Shukla paper has nothing
4  to do with genotoxicity; correct?
5    A.   I mean, we can look at it.
6    Q.   Sure.  It's about gene expression;
7  correct?
8    MS. PARFITT:  Let's take a moment,
9  Mr. Klatt, see if he can look at the study here.
10    Q.   Do you have it handy, Doctor?
11    A.   No.  I don't.
12    MS. PARFITT:  What is he referencing,
13 109?
14    A.   Shukla.  I mean, it might be in my
15 files.
16    Q.   Well, I apologize.  I thought I brought
17 an extra copy, but I don't think I have one with
18 me.
19    (Discussion off the record.)
20    Q.   Well, just look at the title.  The
21 title is "Alterations in Gene Expression in Human
22 Mesothelial Cells Correlates with Neural
23 Pathogenicity."  Correct?
24    A.   Yes.  I remember that title and
25 abstract.  Yes.

81 (Pages 318 to 321)

Sonal Singh, M.D., M.P.H.

Page 322

1    Q.   Gene expression is something that
2  occurs in our bodies every day; correct?
3  Trillions of times every day; correct?
4    A.   Yeah.  Yeah.
5    Q.   And changes in gene expression, in and
6  of themselves, don't establish genotoxicity;
7  correct?
8    A.   Yeah.  And I'm not -- again, this, you
9  know, in the section on biologic plausibility,
10  I'm not making this argument that talc is an
11  established mutagen and, you know, whether it's a
12  genotoxic or nongenotoxic carcinogen.  I'm just
13  citing the studies.
14    So, I mean, again, I don't have that
15  expertise, and, you know, does it provide
16  evidence for or against biological plausibility
17  mechanisms.
18    Q.   Okay.  But you don't have the expertise
19  to judge that; correct?
20    MS. PARFITT:  Objection.
21    A.   No.  I have expertise to judge whether
22  these studies suggest evidence of, you know,
23  changes and we should probably just look at it --
24  give me a second.
25    Q.   Sure.

Page 323

1    MS. PARFITT:  Give me a second.
2    Q.   My specific question is you cited
3  Shukla for evidence of genotoxicity, but it says
4  nothing whatsoever about genotoxicity, does it?
5    A.   We have to look at the paper before we
6  say that.
7    It's 109.  Yeah.  Let me look in my binder.
8  I think I have all the studies.
9    Q.   Doctor, I'll represent to you, in the
10  interest of time, I've searched the Shukla paper,
11  and the word "genotoxicity" or "mutagenicity" is
12  never mentioned in the paper.
13    A.   I -- I don't want to deny that.  It may
14  be.  I just feel that I wouldn't have used that
15  term had I not seen it there.
16    Q.   In the interest of time, rather than
17  wasting time, let's move on.
18    You'd agree with me that pelvic inflammatory
19  disease is chronic inflammation of the ovaries,
20  fallopian tubes and peritoneum; correct?
21    A.   Yes.
22    Q.   And, yet, you cited the Rasmussin
23  paper, and the Rasmussin paper says that
24  high-grade serous ovarian cancer, which is the
25  most common form of ovarian cancer and the most

Page 324

1  common in these lawsuits, wasn't associated with
2  pelvic inflammatory disease; correct?
3    A.   Again, I don't remember the papers.
4  Sorry.
5    Q.   All right.  Well, it's on Page 58 of
6  your report and it's reference 122.
7    A.   Which page of my report?
8    Q.   Page 58 of your report that cites
9  reference 122.
10    MS. PARFITT:  Here's the article.
11    Q.   Do you see the reference?
12    A.   Yeah.  Yeah.
13    Q.   Do you see the reference in your
14  report?
15    A.   Sure.
16    Q.   And reference 122 is to the Rasmussin
17  paper from 2017 on pelvic inflammatory disease
18  and ovarian cancer; correct?
19    A.   Yeah.  And my citation is correct.  I
20  mean, about borderline ovarian.  I don't misquote
21  the study.
22    Q.   I didn't say you misquoted it, but the
23  study does stand for the proposition that the
24  most common form of ovarian cancer, both in the
25  U.S. and in these lawsuits, high-grade serous

Page 325

1  ovarian cancer is not associated with pelvic
2  inflammatory disease; correct?
3    A.   Where does it show that?  I didn't --
4    Q.   Can you go to the "Discussion" section?
5    A.   Again, you know, my view of
6  inflammation was, you know, I was looking for
7  evidence for or against.  And, you know, I wasn't
8  disaggregating by ovarian cancer subtype, but I'm
9  happy to look at it.
10    MS. PARFITT:  Mark, do you have a page
11  in the article?
12    MR. KLATT:  I don't know if we have the
13  same pagination, but my page is --
14    MS. PARFITT:  Here.  I got it.  It's 29
15  of 33.
16    MR. KLATT:  I believe that's right.
17    MS. PARFITT:  Okay.
18    MR. KLATT:  It's the "Discussion"
19  section.
20    MS. PARFITT:  Yes.
21  BY MR. KLATT:
22    Q.   And if you look at the "Discussion"
23  section, Doctor --
24    A.   Yes.
25    Q.   -- it starts -- the very first

Sonal Singh, M.D., M.P.H.

Page 326

1  paragraph starts with "to our knowledge";
2  correct?
3      A.  Yeah.
4      Q.  Okay.  Go down one, two, three, to the
5  fourth paragraph starting with "in the present
6  study"?
7      A.  Sure.
8      Q.  And in that paragraph, tell me if I
9  correctly quote this sentence.
10     "Conversely, no convincing associations
11 between PID," which is pelvic inflammatory
12 disease, "and the risk of high-grade serous,
13 mucinous, clear cell or endometrioid ovarian
14 cancer were noted in the main analysis."
15     Did I read that correctly?
16     A.  Yes.
17     Q.  And then if you go down to the very
18 next paragraph that begins with "nevertheless."
19     A.  Yeah.  I see that, but I --
20     Q.  Wait.  Wait.
21     A.  No.  No.  I need to answer your
22 question.
23     Q.  I'm just asking you, first of all, if
24 I'm reading this correctly.
25     A.  Sure.

Page 327

1      Q.  In the next paragraph that begins with
2  "nevertheless," do you see what I'm talking
3  about?
4      A.  Yeah.
5      Q.  There's a sentence that says,
6  midparagraph, "In contrast, no associations
7  between pelvic inflammatory disease and
8  high-grade serous ovarian cancer were observed";
9  correct?
10     Did I read that correctly?
11     A.  Our results suggest -- I'm sorry.
12 Where --
13     Q.  In contrast.  Do you see the sentence
14 that says "in contrast"?
15     A.  Where was it?  Is it in the same
16 paragraph?
17     Q.  It's the paragraph starting with
18 "nevertheless, our results."
19     A.  Yeah.  But it says differentially.
20 Where does it say in contrast?  In contrast.
21 Yeah.
22     Q.  Okay.  Can you read that sentence?
23     A.  "In contrast, no associations between
24 PID and high-grade serous ovarian cancers were
25 observed."

Page 328

1      Q.  So the paper you cited, the 2017
2  Rasmussin paper on pelvic inflammatory disease
3  and ovarian cancer is inconsistent with the
4  theory that chronic inflammation causes
5  high-grade serous ovarian cancer; correct?
6      A.  Let's go to Paragraph 3.
7      Q.  Could you just answer my question?
8      A.  Yeah.  I'm trying to.
9          MS. PARFITT:  Objection.
10     A.  No.  It isn't inconsistent.
11 Because if you look at Paragraph 3, they
12 state, "Furthermore, we observed similarly
13 increased risks of serous and mucinous borderline
14 tumors associated with PID status.  Furthermore,"
15 and they also state, "Sensitivity analysis
16 revealed statistically significant increased risk
17 of low-grade serous and endometrial when using
18 data from the North American..."
19     So I don't think your -- and concerning the
20 histologic subtypes, indications of risk of
21 low-grade serous cancers were noted in the main
22 analysis.  I wasn't disaggregating.  But this
23 entirely consistent with what I quote here, that
24 you increase serous type and you increase
25 low-grade type and you increase histologic.

Page 329

1      You are trying to disaggregate this into a
2  high-grade serous.  I don't know what's in the
3  lawsuit.  I'm really not opining on --
4      Q.  I'm not trying to disaggregate
5  anything, Doctor.  I'm saying Rasmussin, the
6  study that you --
7      A.  Yeah.
8      Q.  The study that you chose to cite --
9      A.  Sure.
10     Q.  -- in your article indicates there's no
11 association between pelvic inflammatory disease
12 that is a chronic disease of the female
13 reproductive tract and high-grade serous ovarian
14 cancer; correct?
15     A.  And the same --
16         MS. PARFITT:  Objection is.
17     A.  -- study showed an increase risk of --
18     Q.  Is that correct?
19         MS. PARFITT:  Let him finish, please.
20     A.  -- between PID and serous ovarian
21 cancer.  So it sort of is -- is consistent with
22 my hypothesis of inflammation and ovarian cancer.
23     I was not disaggregating histologic
24 subtypes.
25     Q.  My question is not about low-grade

83 (Pages 326 to 329)

Sonal Singh, M.D., M.P.H.

Page 330

1  serous that doesn't occur very often. My
2  question is about high-grade serous ovarian
3  cancer in the evidence from the Rasmussin paper,
4  and they say clearly twice, that pelvic
5  inflammatory disease is not associated with
6  high-grade serous ovarian cancer; is that
7  correct?
8      A.  That's what they state in the study.
9  But they also state clearly that serous ovarian
10  cancer is associated with PID status.  So that's
11  also clearly stated.
12      Q.  And if, indeed, as they state, there is
13  no association between high-grade serous ovarian
14  cancer and pelvic inflammatory disease, that's
15  inconsistent with the theory that inflammation
16  causes high-grade serous ovarian cancer; correct?
17          MS. PARFITT:  Objection.  Form.
18      A.  So, again, you know, first of all, you
19  know, I -- other people will opine to the
20  biologic sort of arguments about inflammation and
21  ovarian cancer.  And I did not disaggregate
22  specific, and I don't think this study is
23  inconsistent with what I state here.  And I note
24  that borderline ovarian cancer.
25          So this is entirely consistent with the

Page 331

1  inflammation hypothesis.  And I just, you know --
2      Q.  In your report, you cited what you
3  thought was consistent with the inflammation
4  theory, but you didn't cite the evidence from
5  Rasmussin that was inconsistent with the
6  inflammation theory; correct?
7          MS. PARFITT:  Objection.
8      A.  No.  I was not disaggregating to the
9  level of each histologic subtype.
10      Q.  Well, didn't -- in your report, on
11  Page 58 --
12      A.  Yeah.
13      Q.  -- didn't you make the specific point
14  that Rasmussin said inflammation was associated
15  with low-grade cancer?
16      A.  No.  It just said increased risk of
17  borderline ovarian cancer.
18      Q.  Okay.  Borderline.  That's a specific
19  type of ovarian cancer.
20      A.  Sure.
21      Q.  So you did disaggregate in your report,
22  didn't you?
23      A.  Sure.  Yeah, but I mean, if you look at
24  the study, and we want to disaggregate it, the
25  study still shows a risk of serous ovarian

Page 332

1  cancer.  So if we disaggregate it, then we have
2  to disaggregate the way they have defined it.
3      Q.  And when we disaggregate, you come to
4  the conclusion that inflammation is associated
5  with borderline ovarian cancer.  But, in
6  fairness, you have to come to the conclusion that
7  inflammation is not associated with high-grade
8  serous ovarian cancer?
9          MS. PARFITT:  Objection.
10      Q.  If you're being objective; correct?
11          MS. PARFITT:  Objection.  Misstates
12  testimony.
13      A.  I am being objective.  I am providing
14  that they conclude, not I conclude, that, you
15  know, inflammation is PID, you know, it's just
16  one aspect of inflammation.  PID is associated
17  with serous ovarian cancer.  And, yes, it is not
18  associated with high-grade epithelial ovarian
19  cancer.
20      Q.  You talked with Mr. Zellers earlier
21  today about recall bias, correct, and how it can
22  operate in case-control studies?
23      A.  I don't recall the details.
24      Q.  But you recall the subject was
25  discussed --

Page 333

1      A.  Yes.
2      Q.  -- correct?
3      A.  Yes.  And I'm going to take a break in
4  a minute.
5      Q.  Sure.  Do you know if, in any of these
6  case-control studies -- well, let me back up.
7      A case-control study takes a group of cases
8  which are women with -- who already have ovarian
9  cancer, and interviews them; correct?
10      A.  Yes.
11      Q.  And then it takes a group of controls
12  and, in the context of a population-based
13  case-control study, those controls are healthy
14  women out in the community; correct?
15      A.  Yeah.  In the context of -- yes.
16      Q.  Do you know if any of these
17  case-control studies, when they were interviewing
18  the case women who had ovarian cancer, asked them
19  when they entered the study, "Do you have any
20  preconceived notions about what might have caused
21  your ovarian cancer?"
22      A.  I didn't review that specific question.
23      Q.  Wouldn't that be an important question
24  to ask?  Because if a woman already has a
25  preconceived notion from research or word of

Sonal Singh, M.D., M.P.H.

Page 334

1  mouth what might cause her ovarian cancer, that
2  may bias the results; correct?
3         MS. PARFITT:  Objection.
4     A.  There's lots of different questions you
5  could ask them.  You know, I would have, if I had
6  designed a study, I would have asked many other
7  questions.
8     Q.  And would you have asked that one, "Do
9  you have preconceived notions as to what might
10  have caused your ovarian cancer," before you
11  entered the study?
12     A.  I don't -- you know, I don't -- I
13  haven't thought about that conceptual or new
14  study.  I'm not sure that is that important
15  question to ask.
16     Q.  It wouldn't be an important question to
17  ask women entering a study, a case-control
18  study --
19     A.  Sure.
20     Q.  -- women who have ovarian cancer, "Do
21  you have a preconceived notion about what caused
22  your ovarian cancer?"
23     A.  You know, I've done -- designed
24  case-control studies of etiology cases and
25  outcomes.  I've never asked the participants

Page 335

1  about what is your preconceived notions about
2  certain outcomes.
3     I mean, I'm just trying to understand, why
4  would you ask that, because --
5     Q.  Because you're trying to eliminate bias
6  from the study; correct?
7     A.  Yeah.
8     Q.  And if you enter the study with a
9  preconceived notion what caused your ovarian
10  cancer, you already have a bias; correct?
11         MS. PARFITT:  Objection.
12     A.  But I mean, aren't you introducing bias
13  by asking these questions?  "Okay, what is your
14  preconceived notion?"  I'm trying to understand
15  this question.  I just don't think that --
16     Q.  So it's your testimony that, typically,
17  in these case-control studies, the women who have
18  the disease of interest, in this case, ovarian
19  cancer, are not asked, when they enter the study,
20  if they already have preconceived notions about
21  what caused their ovarian cancer?
22     A.  Yeah.  In my opinion, if I were to
23  design a next case and control study, I'm not
24  sure that would be a question.  I would have to
25  think about why I would ask that question to

Page 336

1  eliminate for the possibility of recall bias.
2  Others may design it differently.
3         THE WITNESS:  I'm going to take a
4  break.
5         MR. KLATT:  Sure.
6         THE VIDEOGRAPHER:  Off the record,
7  4:30 p.m.
8         (A recess was taken.)
9         THE VIDEOGRAPHER:  Back on the record.
10  4:36 p.m.
11  BY MR. KLATT:
12     Q.  Doctor, are you board certified in
13  epidemiology?
14     A.  No.
15     Q.  Are you a member of the American
16  College of Epidemiology?
17     A.  No.
18     Q.  Are you a member of the Society for
19  Epidemiologic Research?
20     A.  No.
21         MR. KLATT:  All right.  I'm going to
22  turn it over to Mr. Locke.  Thank you for your
23  time.
24         THE WITNESS:  Thank you.
25         THE VIDEOGRAPHER:  Off the record,

Page 337

1  4:36 p.m.
2         (A recess was taken.)
3         THE VIDEOGRAPHER:  Back on the record,
4  4:38 p.m.
5         CROSS-EXAMINATION
6  BY MR. LOCKE:
7     Q.  Doctor, my name is Tom Locke.  I
8  represent the Personal Care Products Council.
9     Prior to this litigation, had you ever heard
10  of the Personal Care Products Council?
11     A.  No.
12     Q.  Sometimes it goes by the name of PCPC.
13  Have you ever heard of that?
14     A.  No.
15     Q.  Previously, the Personal Care Products
16  Council was known as the Cosmetics, Toiletries
17  and Fragrances Association.
18     Prior to this litigation, had you heard of
19  that entity?
20     A.  No.
21     Q.  And sometimes that's abbreviated, CTFA.
22  Had you heard of that entity?
23     A.  No.
24     Q.  Have you, prior to this talc
25  multi-district litigation that we're here on

Sonal Singh, M.D., M.P.H.

Page 338

1 today, have you worked with any of the
2 plaintiffs' lawyers with whom you've had dealings
3 in talc?
4     A.  Yeah.  I mentioned that I worked with
5 Attorney Restaino in the atorvastatin that is
6 listed on my testimony.
7     Q.  Anyone else?
8     A.  No.
9     Q.  Have you worked with the Beasley Allen
10 firm?
11     A.  They're not -- I don't know if they're
12 part of this talc.  The name sounds familiar.  I
13 just don't know the name of the lawyers.
14     Q.  Right.  They're part of the lead
15 plaintiffs' counsel in this multi-district
16 litigation.
17     A.  But I just have had correspondence with
18 these lawyers.  So, you know, I may have had --
19 received, I don't know, documents or -- I don't
20 know if invoices or something that may have.  But
21 I don't -- I haven't, like, corresponded with the
22 lawyers of Beasley Allen.
23     Q.  What I'm asking about is whether you
24 had worked with the Beasley Allen firm prior to
25 this talc litigation.

Page 339

1     A.  I have listed the -- you know,
2 listed the cases I worked for.  I don't remember
3 the name of the counsels and, you know, who were
4 on the firms.  So if it ended up that they were
5 involved in Viagra or something else, that's just
6 a recollection issue.
7     Q.  Okay.  Mr. Klatt asked you about
8 materials authored by defense experts.  Let me
9 elaborate on that a little bit.
10     Are you aware that various defense experts
11 authored reports in connection with prior talc
12 litigation?
13     A.  No.  I'm not aware.
14     Q.  Are you aware that there were prior
15 talc trials?
16     A.  I mean, I have seen it in the news
17 that -- I don't know if they're in state court,
18 federal court, you know.  I see it in the news.
19     Q.  Did you --
20     A.  California or something.  Yeah.  I'm
21 not aware.
22     Q.  Did you ask for the testimony of any
23 defense experts who may have testified regarding
24 epidemiology in connection with that other talc
25 litigation trials?

Page 340

1     A.  I remember asking about this specific
2 trial.  I have not asked for other trial
3 testimony, I don't think.
4     Q.  When you say "this specific trial,"
5 what do you mean?
6     A.  When I said -- you know, I said, in
7 this litigation, have epidemiology testimony been
8 submitted.  And I have asked for it.  Yeah.
9     Q.  Would it be relevant to you that other
10 scientists have analyzed the very same issues
11 that are encompassed in your report and testified
12 on behalf of defendants in other talc litigation?
13     A.  Yeah.  And as you see that, I have not
14 even had a chance to review the expert report
15 of -- on behalf of the plaintiffs that were
16 submitted in the list.
17     So, yes, it will be nice to do that.  A, how
18 much time; and, B, you know, I think it would
19 probably be more prudent to wait for the
20 epidemiologists on this particular case.
21     But, you know, as you said, I haven't even
22 had the chance to review the plaintiffs' experts.
23 And, you know, I asked for defendants' expert,
24 you know, report.
25     Q.  You asked for defendants' expert

Page 341

1 reports in this litigation.
2     A.  Sure.
3     Q.  But you didn't ask for defendants'
4 expert reports, deposition transcripts or trial
5 testimony in the prior talc litigation?
6     A.  How do I know?  I mean, I'm not very
7 familiar with how these, you know, different
8 trials are occurring, what you can share, which
9 attorneys are involved in which trials.
10     I'm sorry.  I didn't ask for it.  I know
11 that, but I'm just not familiar with that
12 process, what they can share.
13     Q.  Okay.  Can you go to Page 10 of your
14 report.  And I guess there are two exhibits to
15 it, or it's referred to in two exhibits.
16     Are you looking at Exhibit 10 there?
17     A.  Exhibit 10.
18     Q.  On the front page.
19     MS. PARFITT:  It's your report.  Yes.
20     A.  Exhibit 10.  Yes.
21     Q.  So if you could go to Page 10, I'd
22 appreciate that.  And on Page 10, you're
23 discussing, among other things, the advantages
24 and disadvantages of cohort and case-control
25 studies; is that correct?

Page 342

1    A.  Yes.
2    Q.  Okay.  If you would look at the
3  paragraph that begins with the phrase
4  "case-control studies."
5    Do you see that there?
6    A.  Yeah.
7    Q.  Okay.  You're explaining your opinion
8  why case-control studies have some advantages
9  over cohort studies in that paragraph; is that
10  correct?
11    A.  No.  Not necessarily.  I mean, that
12  just talks about the strength and weaknesses of
13  various studies designs.  I mean, in fact, you
14  know, it talks about whether, you know, that, in
15  fact, it says exposure is ascertained
16  retrospectively.
17    So I'm just talking about the strength and
18  limitations of various designs.
19    Q.  Okay.  I was using advantages and
20  disadvantages.
21    Is there a significant difference between
22  those two?
23    A.  That's just the term we use.  Yeah.
24    Q.  Okay.  Now, one of the strengths, in
25  your opinion, of a case-control study, is that it

Page 343

1  captures the entire time period when an ovarian
2  cancer illness could occur; is that correct?
3    A.  That's not necessarily like an entire
4  time.  First of all, we don't know the precise
5  number of years.
6    But, yes, we know that it is a long-term
7  exposure.  So case-control studies allow us to
8  ascertain long-term exposure.  So that's a much
9  more accurate reflection.
10    Q.  And you were saying one of the
11  weaknesses of a cohort study is that it might not
12  capture all of the ovarian cancer cases because
13  ovarian cancer can develop over a long period of
14  time; is that correct?
15    A.  Yes.  After a particular agent, if it's
16  related, you know.
17    Q.  Okay.  And you mentioned, in fact,
18  there's a sentence here, "It is important to
19  determine the latency and induction between the
20  exposure and the disease to assess the duration
21  of follow-up"; is that correct?
22    A.  It is.
23    Q.  Okay.  And then you give the example of
24  smoking.  And you talked about, if you looked at
25  it for a 12-month follow-up study, that would not

Page 344

1  be useful, because you couldn't find all of the
2  lung cancer cases.
3    A.  Yes.  And that sort of applies to
4  Gonzalez.  And it was a six-month study, and some
5  of the other cohort studies that were of limited
6  duration.
7    So, yes, I mean, I don't know about the time
8  course exactly for lung cancer risk, but can apply
9  to various outcomes.
10    Q.  Okay.  So what is the latency period
11  for perineal talc exposure and ovarian cancer?
12    A.  I do not have -- I don't know, because,
13  you know, I don't -- again, I don't elucidate the
14  mechanism of ovarian cancer and the precise link.
15  So I cannot tell you that X number of days after
16  perineal talc or months after.  I know that it is
17  long-term.  It could be months to years.  And
18  that's as much as I can say.
19    Q.  So your example, when you were talking
20  about 12 months, actually, that really wouldn't
21  be a problem or we don't know whether that's a
22  problem or not because it could be months?
23    A.  No.
24    MS. PARFITT:  Objection.
25    THE WITNESS:  Sorry.

Page 345

1    A.  So, yeah, months would be a problem.
2  It's mostly -- I mean, yes, we have some bounds,
3  but most of the studies we see, it is likely to
4  have been, you know, several years after
5  exposure.
6    Q.  And how do you know that?  Which
7  studies have you reviewed or analyzed that say
8  that it's several years after exposure?
9    A.  Well, all of -- you know, the
10  case-control studies that have provided data on
11  duration of exposure and show evidence of
12  duration responsiveness suggest that -- so, for
13  example, Penninkilampi and others suggest that
14  this is -- you know, while there are increased
15  risks before both more than 20 years or more than
16  3,600 applications as well as those are less, the
17  risk is higher among those with higher duration.
18    But, again, I cannot partition this at 20 or
19  15.
20    Q.  Okay.  You have a phrase in here that
21  says "because ovarian cancer develops over many
22  years."
23    Is that an accurate assessment of your
24  views?
25    A.  Where is that?

Sonal Singh, M.D., M.P.H.

Page 346

1    Q.  If you look at the next paragraph,
2  first sentence, last clause.
3    A.  Yeah.
4    Q.  Other plaintiffs' experts have stated
5  in their reports that the latency period could be
6  decades.
7    Would you disagree with that?
8    A.  Yeah.  I mean, when I say many years,
9  it could be -- yeah, I just --
10   Q.  You don't know?
11   A.  I don't know the precise.  I don't want
12  to quantify the number of years.
13   Q.  Okay.  I want to shift topics a little
14  bit here.  You reference Linda Loretz's
15  deposition transcript in -- I think once in your
16  report.
17   If you would go to Page 7, I believe it is.
18  It's in a footnote.  Footnote 1.
19   A.  Mm-hmm.
20   Q.  Now, did you read the entirety of
21  Dr. Loretz's deposition transcript?
22   A.  Again, these are so many documents.  I
23  mean, I reviewed, you know, not -- but I don't
24  know if I read the whole transcript.  Yeah.
25   Q.  Do you know how many days she was

Page 347

1  deposed?
2    A.  I don't recall.
3    Q.  More than one day?
4    A.  I don't know that.  I'm sorry.
5    Q.  So her deposition transcript, I'll
6  represent to you, is 1,133 pages in length.
7    Did you read all that?
8    A.  No.  I didn't agree that I read all of
9  them either.  Yeah.
10   Q.  Okay.  I was a little confused because
11  I thought you had said, for hers, that you had
12  read the whole thing.
13   A.  No.  I didn't say I had read -- you
14  know, I have read the transcript, but it doesn't
15  mean that I read every, you know, precise word
16  and precise --
17   Q.  Do you know what her background is?
18   A.  No, I don't.
19   Q.  Do you know if she's a scientist?
20   A.  I don't remember, you know, the
21  specifics of the transcript.
22   Q.  How is it that you picked out this
23  quote then on -- that's Footnote 1 or this
24  citation, Footnote 1, Page 7?
25   A.  Yeah.  I mean, it's not even -- that's

Page 348

1  not even a citation.  I mean, it's -- I feel
2  that, and we were discussing that, you know,
3  could a randomized trial be here conducted.  And
4  to my mind, it would be unethical.  So...
5    Q.  Well, yeah.  But then you say,
6  "Defendants here have admitted this fact."
7    And so I'm just wondering what brought you
8  to that particular part midway in her deposition,
9  the second day of her deposition of a three-day
10  deposition.
11   A.  Some of this has, you know -- it just
12  doesn't -- I don't know why I would, you know,
13  put it -- but it's sort of -- it's even
14  irrelevant if you take her out of it.  Because,
15  you know, it's like, are we really going to do a
16  randomized trial?
17   Q.  I agree with you.  It's irrelevant.
18   A.  Yeah.
19   Q.  If you could go to Page 62 of your
20  report.  You've got a caption there "Cosmetic
21  Expert Review Panel Report."
22   Do you see that?
23   A.  Yes.
24   Q.  Roman numeral XII?
25   A.  Yes.

Page 349

1    Q.  Do you know what the name of the
2  organization is that you're referring to in that
3  paragraph?
4    A.  I don't know the name.
5    Q.  Do you know if Dr. Loretz testified
6  regarding that review?
7    A.  If I have cited her, then I have.
8    Q.  Well, you didn't cite her on this
9  portion.  That's why I'm asking about it.
10   A.  I don't know.  I mean, you're asking
11  all these different names.  They're all -- if I
12  haven't cited her, then I haven't reviewed it.
13   Q.  Okay.  Have you heard of the Cosmetic
14  Ingredient Review?
15   A.  Yes.
16   Q.  Sometimes referred to as CIR?
17   A.  Yes.
18   Q.  Dr. Loretz, in her deposition,
19  references the CIR dozens of times, doesn't she?
20   A.  Again, as I said, I didn't review the
21  entirety of the thousand pages.
22   Q.  Okay.  I'm just trying to understand
23  what you did review and you didn't.  You wrote a
24  paragraph about the CIR.  And I'm trying to
25  understand why you didn't reference Dr. Loretz

88 (Pages 346 to 349)

Sonal Singh, M.D., M.P.H.

Page 350

1    when she testified about that.
2        A.   So, as you can see, it's reference to
3    the published report, and, you know, I
4    reviewed -- again, even that was lengthy
5    document, and, you know, I wanted to review that
6    for completeness and understand that.
7        Q.   Did you read the entirety of that
8    report?
9        A.   As much as I can.  Not every word in
10   every sentence.
11       Q.   Okay.  Do you know if the FDA plays a
12   role in the CIR's review that you're referring to
13   on Page 62 of your report?
14       A.   I'm not aware of the specific
15   composition, but I know that FDA is -- attends or
16   is a member or has some sort of role there.
17       Q.   Do you know who the Consumer Federation
18   of America is?
19       A.   No.
20       Q.   Do you know if they play any role in
21   the CIR report?
22       A.   I don't know.  And maybe it's in the
23   study and I can't tell you offhand who is in this
24   panel.
25       Q.   It's also in Dr. Loretz's deposition.

Page 351

1    That's the reason I'm exploring it.
2        Do you know that one of the missions of the
3    Consumer Federation of America is to represent
4    consumers in connection with Cosmetic Ingredient
5    Reviews?
6        A.   I'm not aware of that.
7        Q.   Okay.  Do you know who was on the panel
8    of the CIR review?
9        A.   No.
10       Q.   Do you know whether there were
11   toxicologists who were part of the panel?
12       A.   I don't know that.
13       Q.   You criticize the panel makeup because
14   it was "primarily composed of dermatologists."
15       A.   Sure.
16       Q.   Do you see that?
17       A.   Yes.
18       Q.   Do you know why dermatologists would be
19   relevant to a review of cosmetics?
20       A.   Yes.  I mean, yeah.  But, of course,
21   the majority of cosmetics are on -- you know,
22   applied on the skin.  Yeah.  It would be
23   relevant.
24       Q.   So they would be relevant to a CIR
25   review?

Page 352

1        A.   Yes.
2            MS. PARFITT:  Objection.
3        A.   But specific to talc, you would want
4    more diverse representation with gynecologists,
5    oncologists, epidemiologists.
6        So it's not that it was a criticism of the
7    CIR review panel or whoever was on that as a
8    dermatologist, but specific to it, did they have
9    the expertise to -- and maybe they did, but I'm
10   just pointing that out.
11       Q.   So you don't know, one way or another,
12   whether they had the expertise?
13       A.   Yeah.  I mean, from my understanding,
14   they didn't have expertise in carcinogenicity and
15   epidemiology.
16       Q.   What do you base that on?
17       A.   Yeah.  I mean, you know, some of the
18   names that are here, they were dermatologists.
19   That's sort of my understanding.
20       Q.   Did you look them up and investigate
21   what they do or what they have done in their
22   careers?
23       A.   No.  I have not.
24       Q.   Okay.  So you're criticizing them as
25   not having the capability of doing the review,

Page 353

1    but you don't really know their expertise?
2            MS. PARFITT:  Objection.  Misstates his
3    testimony.
4        A.   Yeah.  It doesn't say -- first of all,
5    it's not a criticism.  It just says, what is the
6    composition of the panel.  It says it was
7    composed of, you know, expertise in epidemiology
8    and carcinogen -- so it's just sometimes
9    panels -- and it may have been very appropriate
10   for the 100 and whatever products that were
11   evaluated by that panel.
12       Q.   Okay.  One of the things that you
13   say --
14       A.   Sure.
15       Q.   -- is that there was a -- the review
16   was limited or limited its assessment to animal
17   and clinical studies on talc that did not contain
18   asbestos.
19       Do you see that?
20       A.   Yeah.
21       Q.   You would agree that the CIR reviewed
22   all of the epidemiological studies that were
23   available at that time; correct?
24           MS. PARFITT:  Objection.  Misstates
25   testimony.

Sonal Singh, M.D., M.P.H.

Page 354

1      A.  I don't know -- you know, I know that
2  they reviewed the process and they looked at
3  studies, and I don't know if it was all
4  epidemiologic studies, but I think and I
5  understand that presumption was that talc does
6  not contain asbestos.  I mean, that's what -- the
7  premise they started out with.
8      Q.  Well, did the epidemiologic studies
9  make a distinction between talc and its
10  constituents or alleged constituents?
11      A.  Yeah.  I mean, there are -- as I cite
12  in my report, there are -- they don't make
13  distinctions, but they -- some of the studies --
14  you know, some of the testimony we've discussed,
15  some of the, you know, testing we've discussed,
16  and some, you know, small publications suggest
17  that talc may contain asbestos.  So you have
18  these evidence.
19      But the CIR review was already carried out
20  with the presumption that talc did not contain
21  asbestos.
22      Q.  But they reviewed all of those studies
23  that you referenced, or do you not know what they
24  reviewed?
25      MS. PARFITT:  Objection.

Page 355

1      A.  I mean, I do not know every study they
2  reviewed.  I'm just providing -- I don't know
3  every study that IARC reviewed.
4      Q.  Well, you could find that out by
5  looking at the studies; right?
6      A.  There's not enough time.  There's so
7  many studies in this and so many reports, so many
8  assessments that --
9      Q.  But you're criticizing the CIR.
10      A.  Yeah.
11      Q.  And saying it limited its assessment.
12      A.  Sure.
13      Q.  And I just want to understand the basis
14  for that statement, and what you're saying,
15  testifying here today is you don't know what the
16  CIR reviewed.
17      MS. PARFITT:  Objection.  Misstates
18  testimony.
19      A.  No.  That, and we can look at it.
20  Let's look at the, you know, the --
21      Q.  But you made the statement.
22      A.  Sure.
23      Q.  And I'm asking you, sitting here today,
24  can you say what they reviewed?
25      A.  Yes.  I know they reviewed -- because

Page 356

1  they asked -- this statement is about the
2  question they asked.  They asked the question,
3  that talc fiber not containing asbestos, does it
4  cause.
5      So if they ask the question already, we know
6  that, they presume there was no presence of.  So
7  it's about the question that I'm stating it.
8      Q.  But the epidemiologic studies, when
9  they're analyzing talc use among women, they're
10  not making a distinction between talc that
11  contains or doesn't contain constituents.
12  They're talking about women who use products;
13  correct?
14      A.  That is correct.
15      Q.  So if your theory is correct and talc
16  contains harmful substances in addition to talc,
17  then the epidemiologic studies would have
18  reviewed women's exposure to those constituents;
19  correct?
20      A.  Yeah.  So, I mean -- so if you look at
21  what I've written, the review was carried out
22  under the flawed assumption that cosmetic grade,
23  you know, talc was -- did not contain.  And
24  also limited to talc that did not contain.  And
25  also concluded that there was no evidence of talc

Page 357

1  migration.
2      I do not say that, you know, there was no --
3  they did not review the -- the epidemiologic
4  studies of talcum powder products.  That's not --
5  you know, they reviewed it.  But I'm just
6  pointing out the limitations of that.
7      Q.  Didn't CIR cite the very same studies
8  that were available as of 2013 that you cite in
9  your report?
10      A.  Yes.
11      MS. PARFITT:  Objection.  Form.
12      A.  Again, you know, I don't know if they
13  cite evidence of biologic plausibility.  I don't
14  know if they cite evidence of talc migration.  I
15  don't know how they interpreted the evidence
16  of -- just because they cited a study does not
17  mean that they interpreted the data in the same
18  way that I did.
19      So I don't know what studies specifically in
20  each section they cited.
21      Q.  Okay.  One of the things that you say,
22  "as a result of these serious methodological
23  shortcomings and funding biases."  Let me ask you
24  about that.
25      A.  Sure.

90 (Pages 354 to 357)

Sonal Singh, M.D., M.P.H.

Page 358

1    Q.  Is a review that's funded by an entity
2  with an interest in the outcome of that review
3  inherently flawed?
4    A.  No.  It isn't.  And this is just, you
5  know, one of -- and, you know, it's a potential.
6  It should be potential for funding biases.  It
7  doesn't mean that just because it was funded by
8  PCPC or CIR, it is, you know, biased.
9    But yes, I mean, so, for example, my report
10  and testimony, because it's funded by, you know,
11  should be examined for potential biases.  Just
12  like, you know, CIR's report should be.
13    Q.  I want to ask you about the timing of
14  things, because sometimes you have referred to
15  reports that were done a while ago.  And in this
16  case, you do that with CIR.  You say, "The
17  findings of this panel have been superseded by
18  several new epidemiologic studies," and so forth.
19  The line goes on.
20    Is it your opinion that -- well, let me ask
21  this way:  At what point in time can we say that
22  the epidemiologic studies have sort of been
23  completed so you could rely on that information?
24    MS. PARFITT:  Objection.  Form.
25    A.  Yeah.  I mean, so you rely on

Page 359

1  information from, what, 1982, Cramer one.  But I
2  guess the question is -- I don't know, I'm not
3  trying to put questions in your mouth.  But I
4  don't -- I can't -- because I evaluated the
5  causal question as of 2017 and didn't arrive at
6  an opinion until late 2018.
7    I did not go year by year and, say, okay, in
8  2005, when IARC looked at this, could we have
9  concluded, possible, a problem?  In 2010, when
10  Langseth looked, or 2015.
11    So I did not segmentate it by time.  And
12  you're just asking, even by epidemiologic study.
13  It doesn't work.  You have to look at the whole
14  body of evidence and come to a conclusion.
15    Q.  Isn't it true that, prior to the talc
16  litigation, no scientist had published an article
17  stating that talc causes ovarian cancer?
18    MS. PARFITT:  Objection to form.
19    A.  Yeah.  I mean, you know, I think a lot
20  of these articles have talked about -- and
21  scientists don't necessarily publish statements
22  about causation, you know.
23    You have seen that Health Canada has clearly
24  stated that talc causes ovarian cancer.  Yes, so,
25  in fact, not even scientists, but now we have

Page 360

1  regulatory agency in late 2018.  So things take
2  time.  And, you know, people, scientists take
3  time to come to conclusions.
4    Q.  Okay.  Let's go to Exhibit 22.
5    A.  Which is?
6    Q.  That's the Berge -- I believe that's
7  how it's pronounced -- report?
8    MS. PARFITT:  The Berge study?
9    MR. LOCKE:  Yes, yes.  I'm sorry.
10  BY MR. LOCKE:
11    Q.  So if you could turn to Page 9, can you
12  read the last sentence right before
13  acknowledgments, beginning with the word
14  "several."  If you could read it out loud,
15  please.
16    A.  "Several aspects of our own results,
17  including the heterogeneity between case-control
18  studies and the lack of dose-response with
19  duration of and frequency of use, however, do not
20  support a causal interpretation of the
21  association."
22    Q.  And they're referring to the
23  association between talc and ovarian cancer?
24    A.  Yes.  But other scientists, you know,
25  such as Penninkilampi, have concluded otherwise,

Page 361

1  that there is, you know, suggestive of a causal
2  association.  Health Canada has concluded
3  otherwise, that there's evidence of causal
4  association.
5    Q.  But here we are in 2018, there's a
6  study that's published saying, "Does not support
7  a causal interpretation of the association
8  between talc and ovarian cancer"; correct?
9    A.  Yes.  I mean, you know --
10    Q.  Let me just ask you:  So scientists
11  disagree about this issue?
12    A.  That's why we are here.  If we all
13  agreed, we wouldn't be here.
14    Q.  Okay.  Let me move to a different
15  topic.
16    MR. TISI:  How much time do we have?
17  How much time do we have?  That's okay.  Just
18  write it on a paper.
19    MR. LOCKE:  We're getting close.
20    Q.  Okay.  Can we go to Page 62 of your
21  report.
22    Now, did we already do that?  Maybe we
23  already did that.  Sorry.  I don't want to have
24  to do things again.
25    A.  Please don't.

91 (Pages 358 to 361)

Sonal Singh, M.D., M.P.H.

Page 362

1    THE VIDEOGRAPHER: 6:36.
2    THE WITNESS: So we have 6 minutes, 36
3  seconds?
4    Q. You have 24 minutes.
5    A. Oh, sorry.
6    Q. Sorry. We already did that one. So
7  good there.
8    Let's go to Page 15 of your report. We were
9  talking just a moment ago about regulatory
10 entities and what they found.
11   In the middle of that paragraph or middle of
12 that page, there's a part that says, "Although
13 the FDA conducted a survey."
14   Do you see that?
15   A. Yes.
16   Q. And they found no asbestos fibers or
17 structures.
18   But then you, whatever you want to call it,
19 you can call it criticism or deficiencies or
20 disadvantages, you state, "The results were
21 limited, only four out of nine talc suppliers
22 submitted samples, and the number of products
23 tested was low." Is that correct?
24   A. Well, that is a correct restatement of
25 the facts. So it is not something that I made

Page 363

1  up. I mean, it is true that four out of nine
2  suppliers --
3    Q. J&J was one of the entities that
4  supplied talc to the FDA; correct?
5    A. I didn't -- you know -- I didn't --
6  that FDA document, you know, I'm not aware of who
7  supplied.
8    Q. You didn't look at it. You criticized,
9  but you didn't look at the fact that J&J
10 submitted talc samples and product to the FDA?
11   MS. PARFITT: Objection. Misstates his
12 testimony.
13   A. I reviewed the reference and I reviewed
14 the -- you know, so I'm not testifying I reviewed
15 talcum powder products and ovarian cancer. You
16 know, and I was looking at the evidence. But I
17 didn't look at whether J&J submitted samples or
18 Imerys submitted samples, no.
19   Q. And you don't know whether, then, the
20 FDA, in fact, tested the two J&J products at
21 issue in this litigation and found no asbestos
22 fibers or structures in the samples?
23   MS. PARFITT: Objection. Misstates the
24 survey.
25   A. I don't know -- I don't -- you know, I

Page 364

1  don't know about the specifics, who are
2  manufacturers and -- yeah. But I know the
3  limitations of the survey.
4    And even they acknowledge that the study
5  could not prove that most or all talc-containing
6  cosmetic products currently marketed are likely
7  to be free. So even despite these -- whoever
8  supplied them and whoever, you know, tested them.
9    MR. LOCKE: We're almost there. Then
10 I'll turn it back over.
11 BY MR. LOCKE:
12   Q. Just one second. If you could go to
13 Page 59, please. Okay.
14   On Page 59, you've got a Roman numeral X
15 followed by a Roman Numeral III. Do you see
16 that? Talcum powder-induced inflammation. Am I
17 at the right place?
18   MS. PARFITT: I'm sorry, Tom.
19   MR. TISI: 59 of the report?
20   MR. LOCKE: Yeah.
21   A. It's probably 58.
22   Q. 58 of the report. Sorry.
23   MS. PARFITT: No worries.
24   Q. Okay. So you see that, Roman numeral
25 X, Roman Numeral III?

Page 365

1    A. Have we gone through this? I'll be
2  happy to go through it again.
3    Q. I want to ask you about something.
4    A. Sure.
5    Q. You have a statement, the first
6  sentence says, "Inflammation has long been
7  understood to be an important mechanism
8  underlying the development of ovarian cancer."
9    Do you see that?
10   A. Yes.
11   Q. And then you referenced 61. And if you
12 go to Exhibit 4, that is your list of references;
13 correct?
14   Well, for me, I was looking at it, because
15 it was broken out separately. But you could see
16 it at the back of Exhibit 10 as well.
17   A. Yeah.
18   Q. Do you see that, 61?
19   A. Yeah.
20   Q. And if you -- can you read the title of
21 the reference that you're citing to there?
22   A. The Ness study, is that?
23   Q. Right. The Ness study.
24   A. Possible Risk of Ovarian in -- Cancer.
25   Q. It's "Possible Role of Ovarian

92 (Pages 362 to 365)

Sonal Singh, M.D., M.P.H.

Page 366

1  Epithelial Inflammation in Ovarian Cancer."
2       Now, you're citing that for "long been
3  understood to be an important mechanism," but, in
4  fact, the first word in the title is "possible."
5       A.  Yeah.  And you can clarify that.  I
6  mean, this is about plausible mechanisms.
7       Q.  But it certainly doesn't say it's long
8  been understood to be an important mechanism.
9       A.  Well, I disagree.  I mean, you know,
10  maybe that -- you can't cite all the articles for
11  each statement you make.  I wish I did.
12       But inflammation, as I understand it, is an
13  important mechanism.  And at least has been known
14  for a long time about ovarian cancer.  And others
15  can opine in more detail.  Is that citation the
16  most?  Yeah, that particular citation has a
17  possible, you know, clarifier on that.
18       MR. LOCKE:  Okay.  Let me just see if
19  I've got anything else here.  That's all I have.
20       THE WITNESS:  Thank you.
21       MR. LOCKE:  Thank you.  Anyone else?
22       MS. PARFITT:  Let's take a quick break
23  and see if we have any follow-up.
24       THE VIDEOGRAPHER:  Off the record,
25  5:13 p.m.

Page 367

1       (A recess was taken.)
2       THE VIDEOGRAPHER:  Back on the record,
3  5:26 p.m.
4       MS. PARFITT:  Thank you.  Dr. Singh,
5  the plaintiffs have no questions.  I want to
6  thank you for your time today.
7       We would ask that Dr. Singh read and
8  sign.
9       MR. ZELLERS:  Thank you, Doctor.
10       THE WITNESS:  Thank you.
11       MR. KLATT:  Wait.  I've got 30 seconds.
12       THE WITNESS:  I want to thank everybody
13  for a very professional, you know -- I've done
14  this a couple of times.  And if I have raised my
15  voice, it hasn't been anything personal.  It's
16  just been trying to explain something.
17       MR. ZELLERS:  Thank you, Doctor.
18       THE VIDEOGRAPHER:  And we're off the
19  record at 5:27 p.m.
20       (Deposition concluded at 5:27 p.m.)
21
22
23
24
25

Page 368

1              - - - - - -
              E R R A T A
2              - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5       REASON:  _____
6  ____  ____  _____
7       REASON:  _____
8  ____  ____  _____
9       REASON:  _____
10  ____  ____  _____
11       REASON:  _____
12  ____  ____  _____
13       REASON:  _____
14  ____  ____  _____
15       REASON:  _____
16  ____  ____  _____
17       REASON:  _____
18  ____  ____  _____
19       REASON:  _____
20  ____  ____  _____
21       REASON:  _____
22  ____  ____  _____
23       REASON:  _____
24  ____  ____  _____
25       REASON:  _____

1       ACKNOWLEDGMENT OF DEPONENT
2
3       I, _____, do
   hereby certify that I have read the
4  foregoing pages, and that the same
   is a correct transcription of the answers
5  given by me to the questions therein
   propounded, except for the corrections or
6  changes in form or substance, if any,
   noted in the attached Errata Sheet.
7
8  _____
   SONAL SINGH, M.D., M.P.H.       DATE
9
10
11
12
13
14
   Subscribed and sworn
15  to before me this
   _____ day of _____, 20_____.
16
   My commission expires:_____
17
18  _____
   Notary Public
19
20
21
22
23
24
25

93 (Pages 366 to 369)

Sonal Singh, M.D., M.P.H.

```
 1          C E R T I F I C A T E
 2   COMMONWEALTH OF MASSACHUSETTS
 3   SUFFOLK, SS.
 4       I, Janet M. Sambataro, a Registered Merit
 5   Reporter and a Notary Public within and for the
 6   Commonwealth of Massachusetts do hereby certify:
 7       THAT SONAL SINGH, M.D., M.P.H., the witness
 8   whose testimony is hereinbefore set forth, was duly
 9   sworn by me and that such testimony is a true and
10   accurate record of my stenotype notes taken in the
11   foregoing matter, to the best of my knowledge, skill
12   and ability; that before completion of the deposition
13   review of the transcript was requested.
14       I further certify that I am not related to any
15   parties to this action by blood or marriage; and that
16   I am in no way interested in the outcome of this
17   matter.
18       IN WITNESS WHEREOF, I have hereunto set my hand
19   this 17th day of January, 2019.
20
21          _____
            JANET M. SAMBATARO
22          Notary Public
     My Commission Expires:
23   July 16, 2021
24
25
```