# Exhibit A

Cheryl Saenz, M.D.

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEW JERSEY

3

4     IN RE JOHNSON & JOHNSON TALCUM       )

      POWDER PRODUCTS MARKETING,           )

5     SALES PRACTICES, AND PRODUCTS        )

      LIABILITY LITIGATION,                )

6                                          )MDL NO.

                                           )16-2738(FLW)(LGH)

7     THIS DOCUMENT RELATES TO ALL         )

      CASES,                               )

8                                          )

9

10

11

12

13

14         VIDEOTAPED DEPOSITION OF CHERYL SAENZ, M.D.

15                    SAN DIEGO, CALIFORNIA

16                 WEDNESDAY, MARCH 13, 2019

17

18

19

20

21

22

23    STENOGRAPHICALLY REPORTED BY:

24

      Valerie C. Rodriguez

25    CSR No. 12871 (orig 6980)

Cheryl Saenz, M.D.

## Page 2

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF NEW JERSEY
3
4  IN RE JOHNSON & JOHNSON TALCUM   )
   POWDER PRODUCTS MARKETING,     )
5  SALES PRACTICES, AND PRODUCTS   )
   LIABILITY LITIGATION,        )
6                )MDL NO.
                )16-2738(FLW)(LGH)
7  THIS DOCUMENT RELATES TO ALL    )
   CASES,            )
8                )
9
10
11   VIDEOTAPED DEPOSITION OF CHERYL SAENZ, M.D., TAKEN
12   ON BEHALF OF THE DEFENDANTS, AT 12255 EL CAMINO
13   REAL, STE. 100, SAN DIEGO, CALIFORNIA, COMMENCING AT
14   9:30 a.m. AND ENDING AT 6:19 p.m. ON WEDNESDAY,
15   MARCH 13, 2019, BEFORE VALERIE C. RODRIGUEZ,
16   CERTIFIED SHORTHAND REPORTER NO. 12871 (ORIGINALLY
17   6980).
18
19
20
21
22
23
24
25

## Page 3

1  APPEARANCES:
2
3    FOR PLAINTIFF:
4      ROBINSON CALCAGNIE, INC.
       BY:  CYNTHIA L. GARBER, ESQ.
5      19 CORPORATE PLAZA DRIVE
       NEWPORT BEACH, CALIFORNIA  92660
6      949.720.1288
       CGARBER@ROBINSONFIRM.COM
7
8    FOR PLAINTIFF:
9      BEASLEY ALLEN
       BY:  MARGARET M. THOMPSON
10     MD, JD, MPAFF
       218 COMMERCE STREET
11     PO BOX 4160
       MONTGOMERY, ALABAMA 36103
12     334.269.2343
       MARGARET.THOMPSON@BEASLEYALLEN.COM
13
14   FOR PLAINTIFF:
15     BLOOD HURST & O'REARDON LLP
       BY:  PAULA R. BROWN, ESQ.
16     501 WEST BROADWAY
       SUITE 1490
17     SAN DIEGO, CALIFORNIA 92101
       619.338.1100
18     pbrown@bholaw.com
19
20   FOR DEFENDANTS JOHNSON & JOHNSON:
21     NUTTER MCCLENNEN & FISH LLP
       BY:  DAWN M. CURRY, ESQ.
22     155 SEAPORT BOULEVARD
       BOSTON, MASSACHUSETTS 02210
23     617.439.2286
       DCURRY@NUTTER.COM
24
25

## Page 4

1
   APPEARANCES CONTINUED:
2
3
     FOR DEFENDANTS JOHNSON & JOHNSON
4
       DRINKER, BIDDLE & REATH, LLP
5      BY:  SUSAN M. SHARKO, ESQ.
       600 CAMPUS DRIVE
6      FLORHAM PARK, NEW JERSEY 07932
       973.549.7000
7      SUSAN.SHARKO@DBR.COM
8
9    FOR DEFENDANT PTI ROYSTON/PTI
10     TUCKER ELLIS LLP
       BY:  MICHAEL ANDERTON, ESQ.
11     950 MAIN AVENUE
       SUITE 1100
12     CLEVELAND, OHIO 44113
       216.696.4835
13     MICHAEL.ANDERTON@TUCKERELLIS.COM
14
     FOR DEFENDANTS PCPC:
15
       SEYFARTH SHAW LLP
16     BY:  RENEE B. APPEL, ESQ.
       975 F STREET, NW
17     WASHINGTON, DC 20004-1454
       202.463.2400
18     RAPPEL@SEYFARTH.COM
19
     ALSO PRESENT:
20
       DARNELL BROWN, VIDEOGRAPHER
21
22
23
24
25

## Page 5

1    INDEX TO DEPOSITION OF CHERYL SAENZ, M.D.
2              MARCH 13, 2019
3
4  EXAMINATION BY MS. GARBER          12
5  EXAMINATION BY MS. CURRY           363
6
7            EXHIBITS
8  MARKED      DESCRIPTION        PAGE
9  Exhibit 1  Payment Type Definitions     35
10 Exhibit 2  Industry Payments to
             Obstetrician Gynecologists
11           An Analysis of 2014 Open
             Payments Data        46
12
   Exhibit 3  Notice of Deposition of
13           Cheryl Saenz, MD       78
14 Exhibit 4  Defendants' Response to
             Plaintiffs' Document Requests
15           Contained in Notice of Oral
             and Videotaped Deposition of
16           Cheryl Saenz, M.D. and Duces
             Tecum        82
17
   Exhibit 5  Expert Report of Cheryl
18           Christine Saenz, MD
             for General Causation Daubert
19           Hearing        94
20 Exhibit 6  Rule 26 Expert Report of
             Rebecca Smith-Bindman, MD    115
21
   Exhibit 7  Schildkraut paper,
22           Association between Body
             Powder Use and
23           Ovarian Cancer: The African
             American Cancer
24           Epidemiology Study (AACES)   118
25

Page 6

INDEX OF EXHIBITS CONTINUED
MARKED   DESCRIPTION        PAGE
Exhibit 8  Videotaped Deposition
           Transcript of Rebecca
           Smith-Bindman, M.D. San
           Francisco, California
           Friday, February 8, 2019,
           Volume II                    121

Exhibit 9  LB-044 - Talcum Powder
           Enhances Cancer
           Antigen 125 Levels in Ovarian
           Cancer Cells
           and in Normal Ovarian
           Epithelial Cells             142

Exhibit    214A Reproductive Sciences
10         Vol. 25. Supplement 1, March
           2018 Scientific Abstracts    144

Exhibit    Biologic Plausibility:
11         Migration/Translocation      194

Exhibit    Perineal Use of Talc and Risk
12         of Ovarian Cancer
           H Langseth, 1 S E Hankinson,
           2 J Siemiatycki, 3 E
           Weiderpass 1A,5              204

Exhibit    Factors Related to
13         Inflammation of the Ovarian
           Epithelium and Risk of
           Ovarian Cancer by Roberta B.
           Ness, 1 Jeane Ann Grisso,2
           Carrie Cottreau, 1 Jennifer
           Klapper,1 Ron Vergona, 1
           James E. Wheeler, 3 Mark
           Morgan, 4 and James J.
           Schlesselman5               207

Exhibit    12871-6980
14         ACOG COMMITTEE OPINION
           Number 374, August 2007
           Reaffirmed 2016 Committee on
           Ethics "Expert Testimony"    222

Page 7

INDEX OF EXHIBITS CONTINUED
MARKED   DESCRIPTION        PAGE
Exhibit    Letter dated April 1st, 2014.
15         Sent from the FDA to Samuel
           Epstein, MD                  224

Exhibit    Fax from Richard Zazenski to
16         Bill Ashton dated September
           30, 2004                     226

Exhibit    REVIEW-Possible Role of
17         Ovarian Epithelial
           Inflammation in Ovarian
           Cancer by Roberta B. Ness,
           Carrie Cottreau             232

Exhibit    Biologic Plausibility:
18         Chronic Inflammation         242

Exhibit    Draft Screening Assessment
19         Talc (Mg3H2(SiQ3)4)
           Chemical Abstracts Service
           Registry Number 14807-96-6
           Environment and Climate
           Change Canada - Health Canada  246

Exhibit    NIH Public Access, Author
20         Manuscript Published in final
           edited form as: Cancer
           Epidemiol Biomarkers Prev.
           2008 September; 17(9):
           2436-2444. Doi:
           10.1158/1055-9965.EPI-08-0399
           Talc use, variants of the
           GSTM1, GSTT1, and NAT2 Genes,
           and Risk of Epithelial
           Ovarian Cancer              252

Exhibit    © 2004 Wiley-Liss, Inc.
21         Publication of the
           International Union Against
           Cancer PERINEAL TALC EXPOSURE
           AND EPITHELIAL OVARIAN CANCER
           RISK IN THE CENTRAL VALLEY OF
           CALIFORNIA                  253

Page 8

INDEX OF EXHIBITS CONTINUED

MARKED   DESCRIPTION        PAGE
Exhibit    RESEARCH ARTICLE -
22         Associations Between Aspirin
           Use and the Risk of Cancers:
           A Meta-Analysis of
           Observational Studies. By
           Yan Qiao1t, Tingting Yang2)
           Yong Gan 1, Wenzhen Li1, Chao
           Wang 1, Yanhong Gong1 and
           Zuxun Lu1                    268

Exhibit    Aspirin, Nonaspirin
23         Nonsteroidal
           Anti-Inflammatory Drug, and
           Acetaminophen Use and Risk of
           Invasive Epithelial Ovarian
           Cancer: A Pooled Analysis in
           the Ovarian Cancer
           Association Consortium by
           Britton Trabert              270

Exhibit    Expert report by Cheryl
24         Saenz, MD, in the Echeverria
           matter                       279

Exhibit    Genital Use of Talc and Risk
25         of Ovarian Cancer: A
           Meta-Analysis, by Wera Berge,
           Kenneth Mundt, Hung Luu and
           Paolo Boffetta               282

Exhibit    [Review Article:
26         Gynecological Cancer]
           Genital use of talc and risk
           of ovarian cancer: A
           meta-analysis by Berge, Wera;
           Mundt, Kenneth; Luu, Hunge;
           Boffetta, Paolo             286

Page 9

INDEX OF EXHIBITS CONTINUED
MARKED   DESCRIPTION        PAGE
Exhibit    The Association Between Talc
27         Use and Ovarian Cancer
           A Retrospective Case-Control
           Study in Two US States
           Daniel W Cramer,a Allison F.
           Vitonus,. Kathryn L. Terry.
           a,b William R. Welch, c and
           Linda J. Titusd              290

Exhibit    Genital powder use and risk
28         of ovarian cancer: A pooled
           analysis of 8,525 cases and
           9,859 controls by Kathryn L.
           Terry                        297

Exhibit    Systematic Review and
29         Meta-Analysis of the
           Association between Perineal
           Use of Talc and Risk of
           Ovarian Cancer by Mohamed
           Kadry Taher                  309

Exhibit    Clinical commentary Talc and
30         ovarian cancer by Steven A.
           Narod                        317

Exhibit    Perineal Talc Use and Ovarian
31         Cancer, A Systematic Review
           and Meta-Analysis by
           Ross Penninkilampi, and Guy
           D. Eslick                    319

Exhibit    Prospective Study of Talc Use
32         and Ovarian Cancer by
           Dorota M Gertig              324

Exhibit    Risk Factors for Epithelial
33         Ovarian Cancer by Histologic
           Subtype by Margaret A. Gates  325

Exhibit    What Is New in Ovarian
34         Cancer? Best Articles From
           the Past Year by Jason D.
           Wright, MD                   342

Cheryl Saenz, M.D.

Page 10

INDEX OF EXHIBITS CONTINUED

MARKED    DESCRIPTION                    PAGE

Exhibit   Arsenig, Metals, Fibres, and
35        Dusts Volume 100 C, a Review
          of Human Carcinogens          346

Exhibit   Heller 1996 Asbestos Exposure
36        and Ovarian Fiber Burden      350

INFORMATION REQUESTED:  (None)

DIRECTIONS NOT TO ANSWER:  (None)

Page 11

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 13, 2019

2   ~~~9:30 A.M.~~~

3   -O0O-

6   THE VIDEOGRAPHER:  Good morning.  We are

7   now on the record.  My name is Darnell Brown and I'm

8   the videographer with Golkow Litigation Services.

9   Today's date is March 13th, 2019, and the

10   time is 9:29 a.m.  This video deposition being is

11   held in San Diego, California, in a matter of In Re:

12   Talc, the United States district court for the

13   district of New Jersey.

14   The deponent is Dr. Cheryl Saenz.

15   Counsel, please identify yourselves for the record.

16   MS. CURRY:  Dawn Curry on behalf of

17   Johnson & Johnson.

18   MS. SHARKO:  Susan Sharko for Johnson &

19   Johnson, the defendants.

20   MR. ANDERTON:  Michael Anderton for PTI

21   Royston and PTI Union.

22   MS. APPEL:  Renee Appel on behalf of

23   defendant Personal Care Products Council.

24   MS. GARBER:  Cynthia Garber on behalf of

25   the plaintiffs.

Page 12

1   MS. THOMPSON:  Margaret Thompson on

2   behalf of the plaintiffs.

3   MS. BROWN:  Paula Brown on behalf of the

4   plaintiffs.

5   VIDEOGRAPHER:  The court reporter is

6   Valerie Rodriguez who will now swear in the witness.

7   CHERYL SAENZ, M.D.,

8   having been first duly sworn,

9   was examined and testified as follows:

11   EXAMINATION

12   -o0o-

13   BY MS. GARBER:

14   Q    Good morning.

15   A    Good morning.

16   Q    Will you state your name for the record.

17   A    Cheryl Christine Saenz.

18   Q    You're a medical doctor?

19   A    Yes.

20   Q    Dr. Saenz, we've had the occasion to meet

21   before today, haven't we?

22   A    That's correct.

23   Q    And what is your memory of that meeting?

24   MS. CURRY:  Objection to form.

25   THE WITNESS:  I believe that you actually

Page 13

1   took my deposition in a matter in 2017.

2   BY MS. GARBER:

3   Q    That was in the Echeverria case; is that

4   correct?

5   A    That's my recollection.

6   Q    That was in the California JCCP?

7   A    I don't know what you mean by that.

8   Q    That was venued in California in

9   Los Angeles; is that correct?

10   A    Well, we took the deposition in

11   San Diego, but I believe the case was tried in

12   Los Angeles.

13   Q    Correct.  You testified at that trial;

14   did you not?

15   A    I did.

16   Q    You've testified at other talc product

17   litigation cases, have you not?

18   A    Can you define for me what you mean by

19   "testify"?

20   Q    Sure.  Did you testify in court in

21   connection with other talcum powder product cases

22   aside from California?

23   MS. CURRY:  Object to the form.

24   THE WITNESS:  Only one other case.

25   ///

Cheryl Saenz, M.D.

Page 14

BY MS. GARBER:
2   Q    What was the name of that case as you
3 recall it?
4   A    My recollection is that that case was
5 called Ingham, et al. versus Johnson & Johnson.
6   Q    Those are the only two occasions where
7 you testified in court in connection with a talcum
8 powder litigation?
9   A    That's correct.
10  Q    Do you hold yourself out as a gynecologic
11 oncologist?
12  A    Well, I don't just hold myself out.  I'm
13 board certified in the subspecialty of gynecologic
14 oncology, so I'm also recognized by the American
15 Board of OB-GYN.
16  Q    And you're a medical doctor?
17  A    Yes.
18  Q    And you're licensed in the State of
19 California to practice medicine?
20  A    Yes.
21  Q    You just mentioned you're board
22 certification.  So you're board certified by what's
23 known as ACOG?
24  A    No.
25      MS. CURRY:  Object to the form.

Page 15

BY MS. GARBER:
2   Q    I'm sorry.  By the American board of
3 obstetricians and gynecologists; correct?
4   A    Actually the board is called American
5 Board of Obstetrics and Gynecology.
6   Q    Thank you.  Are you a member of ACOG?
7   A    I am.
8   Q    You are also subspecialty board certified
9 in gynecologic oncology?
10      MS. CURRY:  Object to the form.
11      THE WITNESS:  Right.  So I actually hold
12 two boards.  I hold a board in obstetrics and
13 gynecology and a board in gynecologic oncology.
14 BY MS. GARBER:
15  Q    Are you a member of the Society of
16 Gynecologic Oncologists?
17  A    I am.
18  Q    You are here as an expert witness for
19 defendant Johnson & Johnson in connection with the
20 talcum powder product litigation; true?
21  A    I am.
22  Q    And you have given four prior depositions
23 regarding defendant Johnson & Johnson's talcum
24 powder products and the risk of ovarian cancer;
25 correct?

Page 16

MS. CURRY:  Object to the form.
2      THE WITNESS:  I don't think that's quite
3 accurate because that's not the way I look at it.
4 I've testified at deposition twice in one matter,
5 because initially, I was only offering testimony on
6 six of the plaintiffs but then I gave additional
7 testimony.
8      So I still look at that as really only
9 one deposition.
10 BY MS. GARBER:
11  Q    Let me see if I can clarify.  You've
12 offered a deposition in connection with the
13 Echeverria matter that you've already told us about;
14 correct?
15  A    Correct.
16  Q    You've also provided deposition testimony
17 in connection with the Ingham matter; correct?
18  A    Correct.
19  Q    You've also given deposition testimony in
20 the Brower matter?
21  A    Correct.
22  Q    You've also given deposition testimony in
23 the Forrest matter; correct?
24  A    Correct.  So I apologize, you're correct.
25 There are four.

Page 17

Q    Have you testified in deposition or trial
2 in any other talcum powder product cases?
3   A    No.
4   Q    You last gave a deposition in the
5 Flannigan matter in 2019?
6   A    I believe that deposition, yes, was in
7 2019, that's correct.
8   Q    Have you given any deposition since then?
9   A    No.
10  Q    Is it true that the Flannigan matter did
11 not concern talcum powder products or ovarian
12 cancer?
13  A    That's correct.
14  Q    Did the Flannigan matter concern any of
15 the issues as you deem them in this case?
16  A    No.
17  Q    The case was totally unrelated to any
18 issue in this case; is that true?
19  A    That's correct.
20      MS. CURRY:  Object to form.
21      THE WITNESS:  That's correct.
22 BY MS. GARBER:
23  Q    I know you've just recently given a
24 deposition, but I'll just basically re-cover some --
25  A    I'm sorry, ma'am.  May I stop -- I'm

Cheryl Saenz, M.D.

Page 18

1 sorry.
2    Q    Of course.
3    A    In the broadest sense that the Flannigan
4 matter did involve causation, then I would say there
5 is a similarity between these cases from the
6 Flannigan matter.  But it wasn't the same type of
7 cancer and it wasn't a talcum powder litigation.
8    Q    What was the nature of the allegations in
9 the Flannigan matter?
10    A    The nature of the allegations was that
11 the failure on the part of a practitioner, a medical
12 doctor to obtain a Pap smear on a patient led to a
13 delay in diagnosis.
14    Q    Who were you the expert witness for, the
15 defense or the plaintiff?
16    A    The defense.
17    Q    And it was your opinion that there was no
18 delay in diagnosis?
19    A    It was my opinion that the absence of a
20 Pap smear being obtained at the time that plaintiff
21 asserted it should have been did not lead to a
22 change in the patient's outcome.
23    Q    In that matter, did you testify about the
24 risk factors that may or may not be applicable for
25 endomet -- I'm sorry, uterine cancer?

Page 19

1    A    It wasn't a case of uterine cancer, so
2 no.
3    Q    Was it a case of cervical cancer?
4    A    Yes.
5    Q    Did you testify about the risk factors
6 for that disease?
7    A    Only in the most general sense.  It was
8 not really the focus of my testimony.
9    Q    Was the focus of your testimony relating
10 to causation in any way as concerning the risk
11 factors for cervical cancer?
12        MS. CURRY:  Object to form.
13        THE WITNESS:  Again, not other than in
14 the most general sense.  My testimony really was
15 more about whether or not a Pap smear should have
16 been performed at the time the plaintiff asserted it
17 should have been.
18        MS. GARBER:  Thank you.
19 BY MS. GARBER:
20    Q    Let's go over some of the ground rules
21 that govern the deposition process just as a review.
22 You're sufficiently familiar with ground rules that
23 cover the deposition process?
24    A    I believe I am.
25        MS. CURRY:  Object to the form.

Page 20

1 BY MS. GARBER:
2    Q    You understand that you've taken an oath
3 to tell the truth under penalty of perjury, which
4 carries the same force and effect as if we were
5 sitting in a court of law rather than in the
6 informal setting of this conference room.
7        You understand that, don't you?
8    A    Yes.
9    Q    You understand that if you don't
10 understand any of my questions, that it's perfectly
11 fine for you to ask for clarification; right?
12    A    Correct.
13    Q    And I'm going to hope that you will do
14 so.  If you don't understand the nature of my
15 question and you answer it, then I'll assume you
16 understood the nature of my question.
17        Is that fair?
18    A    Fair.
19    Q    You're doing a very good job of not
20 talking over the top of me and I'll try to do a good
21 job of not doing that.  So let's try to avoid that,
22 especially as it gets later in the day so we have a
23 clear record; okay?
24    A    Okay.
25    Q    It's important to be truthful in a

Page 21

1 deposition; right?
2    A    I would agree with that.
3    Q    Do you agree it's important to be candid
4 and fair because this testimony will be, could be
5 read and heard by a court and jury?
6        MS. CURRY:  Objection to the form.
7        THE WITNESS:  I don't really know what
8 will happen with this testimony today, but I agree
9 that it's important to be candid and fair.
10 BY MS. GARBER:
11    Q    Do you also agree it's important to tell
12 the truth, the whole truth, and not half truths?
13    A    Absolutely.
14    Q    We'll go through some of your sort of
15 background.  Can we agree that it is important for
16 you to avoid giving the impression that you are an
17 expert in a given area where you have no expertise?
18        MS. CURRY:  Object to form.
19        THE WITNESS:  I think I would have to
20 have you define what is expertise, because your
21 understanding of expertise may not be in agreement
22 with my understanding of expertise.
23 BY MS. GARBER:
24    Q    Certainly.  But if you understand the
25 nature of my question, you won't try to answer

Page 22

1    questions out of your understood expertise.
2         Is that a fair statement?
3       A   I think that's fair.
4       Q   For example, you've never conducted
5    research regarding the effects of talcum powder
6    products including its carcinogenicity; right?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  What do you mean by
9    research?
10   BY MS. GARBER:
11      Q   Have you done any research with regard to
12   talcum powder products?  You yourself, have you done
13   any research studies?
14      A   I'm certainly researched the literature.
15      Q   But have you done any -- okay, that's
16   fair.  Have you done any experimentation with regard
17   to talcum powder products and ovarian cancer?
18      A   You mean benchtop research or clinical
19   trials research?
20      Q   Yes?
21      A   No, I've not done either of those.
22      Q   With regard to the literature, have
23   you -- you yourself, conducted any epidemiological
24   studies in connection with talcum powder products
25   and ovarian cancer risk?

Page 23

1       A   Do you mean have I published on that?
2       Q   Yeah.
3       A   I've not published on that, but I've
4    certainly conducted research with the literature in
5    the sense of reading it in order to understand it
6    and to express an opinion.
7       Q   And that is the extent of your research
8    experience with regard to talcum powder products and
9    risk of ovarian cancer; correct?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  So I'm not entirely
12   comfortable with what I think is your vague use of
13   the term research, because research really does
14   encompass many things and what I do on a daily
15   basis.
16        So if we're discussing benchtop research
17   or publishing specifically on the issue of talc and
18   ovarian cancer, I've not done either of those.  But
19   my research experience, I think, is a broader
20   definition than perhaps what you're using.
21   BY MS. GARBER:
22      Q   So in connection with the, as you say,
23   research that you've done regarding the talcum
24   powder products literature, you -- is it true that
25   you have not endeavored to publish that research?

Page 24

1       A   That's true.
2       Q   Have you been asked to publish your
3    research?
4       A   I'm sorry.  No, I have not.
5       Q   Have you endeavored to attempt to publish
6    your expert report which was issued in connection
7    with this litigation, which is dated February 25th,
8    2019?
9       A   No, I have not.
10      Q   Have you endeavored to publish any of
11   your expert reports that you have issued in
12   connection with talcum powder product litigation?
13      A   Well, there's only one other report that
14   I've actually ever generated and no, I've not
15   endeavored to publish that either.
16      Q   And that report was the Echeverria
17   report; correct?
18      A   That's correct.
19      Q   Are you an expert with regard to causes
20   of ovarian cancer?
21      A   So I believe I'm an expert with risk fact
22   to risk factors associated with the development of
23   ovarian cancer, but I don't believe that we know in
24   any one particular patient what causes ovarian
25   cancer.  I would not use that term.

Page 25

1       Q   Doctor, haven't you testified a little
2    broader than that in the past that you have no idea
3    what causes ovarian cancer, not limiting it down to
4    a specific patient?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  No, I don't actually think
7    that's what my testimony was.  I think my testimony
8    is that, in terms of what actually causes ovarian
9    cancer from a molecular biology standpoint, and with
10   respect to any one particular patient, we don't know
11   what causes ovarian cancer.
12        We certainly know of risk factors that
13   are associated with the disease, but in any one
14   particular patient, we can't say this is the cause.
15   BY MS. GARBER:
16      Q   Doctor, do you recall when I took your
17   deposition in the Echeverria matter on May 9th,
18   2017?
19      A   Yes, I do recall.
20      Q   And do you recall I was asking you about
21   causes of ovarian cancer?  Do you recall that?
22      A   In the general sense; yes.
23      Q   And, Doctor, I asked you, "So you can't
24   think of anything that you could say would cause a
25   woman's ovarian cancer?"  And Doctor, you answered,

Cheryl Saenz, M.D.

Page 26

1  quote "I have no idea what causes ovarian cancer."
2       Do you dispute that testimony as you sit
3  here today?
4       MS. SHARKO:  Could you just show her the
5  transcript, please?
6       MS. GARBER:  I don't have a copy of it.
7       MS. CURRY:  May we see your copy that you
8  were just reading from?
9       MS. GARBER:  Sure.  It's 5 through 17.
10      MS. CURRY:  Thank you.
11      THE WITNESS:  Right.  So this is
12 referring to a woman's cancer, and as I just
13 testified, I don't believe that we have any idea
14 what causes a woman's cancer.  The question was in a
15 specific woman and that's how I responded to you.
16 BY MS. GARBER:
17      Q    Doctor, nowhere here does it say "in a
18 specific patient."  The question was not, in a
19 specific patient do we ever know what causes a
20 woman's ovarian cancer.  It was stated, in this most
21 broad sense, so you can't think of anything that you
22 could say would cause a woman's ovarian cancer.  And
23 your answer was:  I have no idea what causes ovarian
24 cancer?
25      MS. CURRY:  Object to form.

Page 27

1       THE WITNESS:  No, ma'am, I disagree with
2  you.  The question is "a woman."  I'm answering your
3  question, which was "a woman."
4  BY MS. GARBER:
5       Q    I wasn't asking you about a specific
6  woman.  I was asking you about women in general, but
7  that's fine, I'll move on.
8       A    But, ma'am, I disagree with you.  You
9  actually said "a woman" in your question, so that is
10 an individual patient.  And so I was answering you
11 for an individual patient.
12      The question was not women in general.
13 The question was a woman.
14      Q    The record stands.
15      How many -- how many papers have you
16 published about the causes of ovarian cancer in the
17 last 19 years?
18      A    None.
19      Q    What percentage of your current patients
20 have not been diagnosed with female reproductive
21 cancer?
22      MS. CURRY:  Object to the form.
23      THE WITNESS:  Of any type of cancer?
24      MS. GARBER:  Yes.
25      THE WITNESS:  I would say maybe

Page 28

1  20 percent.
2  BY MS. GARBER:
3       Q    So the majority of the patients that you
4  treat have not been diagnosed with ovarian cancer --
5  or sorry, with any form of female reproductive
6  cancer?
7       MS. CURRY:  Object to the form.
8       THE WITNESS:  No.
9       MS. CURRY:  Misstates the testimony.
10      THE WITNESS:  I think you're completely
11 misstating what I just said.  You asked me --
12      MS. GARBER:  I might have misspoke.
13 BY MS. GARBER:
14      Q    The majority of your patients have been
15 diagnosed with some form of female reproductive
16 cancer; is that true?
17      A    With either invasive cancer or
18 pre-cancer; yes, that's correct.
19      Q    How much money have you made to date from
20 defendant Johnson & Johnson testifying about their
21 talcum powder products?
22      MS. CURRY:  Object to the form.
23      THE WITNESS:  Prior to this MDL
24 litigation?
25      MS. GARBER:  Ever.

Page 29

1       THE WITNESS:  Ever.  So I have not
2  received payment for my last invoice, so to date, I
3  believe I've made around $390,000.
4  BY MS. GARBER:
5       Q    The invoice that you submitted as part of
6  my request for documents, was for 100,000 -- roughly
7  100,500; correct?
8       MS. CURRY:  Object to the form.
9       THE WITNESS:  It's exactly 100,500.
10 BY MS. GARBER:
11      Q    That's for 134 hours of work?
12      A    That's correct.
13      Q    And that was spanning from December
14 of 2018 to February 2019?
15      A    That's correct.
16      Q    So if we add that to the previous amount
17 that you've made, that would total roughly -- well,
18 nearly half a million dollars?
19      A    Nearly, it would be about $490,000 over
20 about three and a half years that I've been working
21 in this matter, that's correct.
22      Q    And since February of 2019 to today, how
23 many hours have you worked on this case?
24      A    I would say maybe 15.
25      Q    Have you invoiced for that time yet?

Cheryl Saenz, M.D.

Page 30

1    A    No, I have not.
2    Q    So the -- we would know that the totality
3  of the money that you've generated in connection
4  with Johnson & Johnson talcum powder products
5  through today by taking roughly 490,000 and adding
6  an additional 15 hours of pay at $750 an hour;
7  correct?
8    A    Over the three years, that's correct.
9    Q    Have you made other money from
10 pharmaceutical companies?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  So I have given talks on
13 behalf of Merck and in the past Genentech, speaking
14 on behalf of Gardasil, the HPV vaccine.
15        Previously I spoke about Avastin, which
16 is a drug that we use to treat ovarian and cervical
17 cancer.
18 BY MS. GARBER:
19   Q    How much money were you paid from
20 pharmaceutical companies aside from Johnson &
21 Johnson in 2018?
22   A    In 2018, I think the number was somewhere
23 around maybe $30,000.
24   Q    I think you were asked this in a previous
25 deposition or testimony that I read, but you are

Page 31

1  familiar with the Physician Payments Sunshine Act
2  that was passed in 2010?
3    A    Yes.
4    Q    What is your understanding of that Act?
5        MS. CURRY:  Object to form.
6        THE WITNESS:  With what context?
7  BY MS. GARBER:
8    Q    What did the Act state or what's your
9  understanding of it?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  My understanding of it is
12 that when I go out and speak, as I do and as I
13 stated on behalf of products such as Gardasil or
14 Avastin, that the federal government is notified of
15 those payments and those are posted for public view
16 in the public domain.
17 BY MS. GARBER:
18   Q    What is the reason, as you understand it,
19 for the Physician Payments Sunshine Act?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  My understanding is that
22 the rationale is that patients have an opportunity
23 to go to that site to see if their physicians have
24 been collecting monies from those companies because
25 that may have undue influence on the physicians'

Page 32

1  choice of drugs for their patients.
2  BY MS. GARBER:
3    Q    Is it limited to drugs?
4    A    It is in -- in terms of payments?  No, I
5  think that even if you go and you have a meal or
6  something, then the company reports that as the cost
7  associated with you attending a meeting.
8    Q    So the purpose is to inform patients of
9  any undue influence between the physician by
10 industry that may affect your medical care and
11 treatment of that patient; correct?
12        MS. CURRY:  Object to the form.
13        THE WITNESS:  No, I don't believe that's
14 what I said.  It's the potential.  There have been
15 some studies that have shown that if physicians are
16 reimbursed for issuing certain drugs or certain
17 perhaps medications for patients and they're
18 collecting money from those companies, that it may
19 influence their choices.  But it's a potential; it's
20 not necessarily a given, as you just stated.
21 BY MS. GARBER:
22   Q    There is potential for undue influence on
23 patient care; correct?
24        MS. CURRY:  Object to the form.
25        THE WITNESS:  There's potential for undue

Page 33

1  influence on the choices of medications that
2  physicians may prescribe.
3  BY MS. GARBER:
4    Q    It's limited only to undue influence on
5  prescriptions that physicians may give, it's not
6  limited, it's not concerned for undue influence on
7  medical care in general, Dr. Saenz?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  So my understanding of the
10 published peer-reviewed literature on this topic is
11 that it's limited to physicians making choices about
12 prescription medications.
13 BY MS. GARBER:
14   Q    Okay.  Tell me about your understanding
15 of the reporting attendant to the physician's
16 payment under the act.  Who does the reporting, the
17 physician or the industry manufacturer?
18        MS. CURRY:  Object to the form.
19        THE WITNESS:  I don't really know the
20 nuances of that.  I do know that if I receive a
21 payment from a company, that that is reported on
22 that website.  But there are inaccuracies in that
23 reporting.  There are methods for physicians to
24 query into if they feel that the reporting has been
25 in error.

Cheryl Saenz, M.D.

Page 34

1      So I can't honestly tell you how the
2  reporting happens.  I just know that I don't do the
3  reporting.  I believe it's the pharmaceutical
4  company, but I don't really know.  I have no
5  personal knowledge of how that happens.
6  BY MS. GARBER:
7      Q    Do you know if Johnson & Johnson
8  disclosed the money that they paid you attendant to
9  your expert work in this case?
10      MS. CURRY:  Object to the form.
11      THE WITNESS:  I don't know.
12  BY MS. GARBER:
13      Q    Did you go and look on the website to see
14  if that's disclosed?
15      A    No, I have not.
16      Q    You said that you know that you've made
17  about 30,000 in 2018.  Did you see that that
18  included any payments from Johnson & Johnson?
19      MS. CURRY:  Object to the form.
20      THE WITNESS:  No.
21      MS. CURRY:  Misstates the testimony.
22      THE WITNESS:  I believe I told you that
23  was payments from Genentech and Merck specifically.
24  So I have not been on the website.  I have no idea
25  what's reported for me on the website.

Page 35

1  BY MS. GARBER:
2      Q    You did work for Johnson & Johnson in
3  2017; correct?
4      A    Yes.
5      Q    Did you look at the website to see what
6  the disclosure was of your payments in 2017?
7      A    No.
8      MS. CURRY:  Object to the form.
9      THE WITNESS:  I've not been on the
10  website.
11  BY MS. GARBER:
12      Q    Okay.
13      (C. Saenz Exhibit 1 was marked for
14      identification.)
15  BY MS. GARBER:
16      Q    As Exhibit 1, Doctor, I will represent to
17  you that the -- this document I obtained from the
18  Openpaymentsdata.cms.gov website for the physician
19  profile of Cheryl Saenz.
20      Do you see that by turning to page two of
21  this document?
22      A    Okay.
23      Q    Doctor, on the first page, I printed out
24  the payment type definitions.  Do you see that?
25      A    Yes.

Page 36

1      Q    Do you see under the term "general" that
2  it indicates payments that are not associated with
3  any research study?
4      A    Yes.
5      Q    So that is the type -- that is a type of
6  payment; correct?
7      MS. CURRY:  Object to the form.
8      THE WITNESS:  That's what it says on the
9  piece of paper.
10  BY MS. GARBER:
11      Q    If we turn to the second page in, it
12  indicates your name; correct?
13      A    Yes.
14      Q    Does that indicate your business address,
15  3855 Health Sciences Drive?
16      A    Yes.
17      Q    That's your work address; correct?
18      A    That's one of my work addresses.
19      Q    This is for -- what's your other work
20  address?
21      A    9300 Campus Point Drive, 200 West Arbor
22  Drive.  There's -- UCSD has many facilities.
23      Q    Is this your primary office?
24      A    This is where my academic office is, yes.
25      Q    In connection with University of

Page 37

1  California San Diego; correct?
2      A    Correct.
3      Q    So it looks like this is a disclosure of
4  a payment from the year 2013; correct?
5      MS. CURRY:  Objection to the form.
6      THE WITNESS:  It's a listing of a general
7  payment in the year 2013, correct.
8  BY MS. GARBER:
9      Q    All right.  If you go under about midway
10  through the page, it says "general payments";
11  correct?
12      A    (No audible response.)
13      Q    Right above the amount?
14      A    Yes.
15      Q    It indicates that you received general
16  payments in the amount of 3,151.88; correct?
17      A    Correct.
18      Q    That was listed above the national mean
19  by about $1,500; correct?
20      A    Correct.
21      Q    If we turn to what is listed at the
22  bottom, page one of three, it gives us the
23  manufacturer who made that payment here: Merck,
24  Sharp & Dohme; correct?
25      MS. CURRY:  I'm sorry.

Cheryl Saenz, M.D.

Page 38

1       THE WITNESS:  I don't have page numbers.
2   BY MS. GARBER:
3       Q    If you look at the right-hand corner?
4       A    There's no page numbers.
5       Q    Can you go one page in.
6       A    There's no page numbers.
7       Q    All right.  If you turn four pages in, do
8   you see that the manufacturer was Merck, Sharp, &
9   Dohme who made that payment of 3,100?
10      A    Are you referring to this bar graph?
11      Q    Yes.
12      A    At the bottom?
13      Q    Yes.
14      A    Yes.
15      Q    Then if you go a couple pages further, we
16  come to the payments you received in 2014.  Do you
17  see that?
18      A    Yes.
19      Q    There you received general payments in
20  the amount of $25,751.41; is that correct?
21      A    Correct.
22      Q    And there this is above the national mean
23  for physicians by amount of 22,000-some dollars;
24  correct?
25      A    Correct.

Page 39

1       Q    The bar, so we understand the nature of
2   this document, the bar graph at the bottom is
3   showing the national average for physicians, and
4   then the sliding scale there with the person showing
5   what you made, $25,000, which is off to the right
6   above the national average, is that a fair
7   understanding of what that means?
8       A    That's what the picture shows.
9       MS. CURRY:  Object to the form.
10      THE WITNESS:  I don't necessarily know
11  what the intent of that is, but that's what the
12  picture shows.
13  BY MS. GARBER:
14      Q    Okay.  And going a couple of pages back,
15  we see for 2014 that you were paid by the industry
16  manufacturers Genentech and Merck, Sharp & Dohme;
17  correct?
18      A    Correct.
19      Q    If we go a couple more pages forward, we
20  come to the year 2015.  Are we there?
21      A    Yes.
22      Q    In 2015, you made $47,095.28; correct?
23      A    According to this.  But I want to qualify
24  something here.
25      Q    Doctor, I didn't have a question pending.

Page 40

1       A    But you asked me for my explanation --
2       MS. CURRY:  I'm sorry.
3       THE WITNESS:  -- of what these payments
4   are --
5   BY MS. GARBER:
6       Q    Do you understand that we're here, I'm
7   asking you questions and you're answering them,
8   Doctor?
9       A    I'm trying --
10      MS. CURRY:  She tried to clarify.
11      MS. GARBER:  You answered my question and
12  there was no question pending, but go ahead.
13      THE WITNESS:  I want to clarify
14  completely, because you had me skip past several
15  pages that actually talk about what some of these
16  payments are for.  And some of these payments are
17  for travel expenses to the venue.  Some of these
18  payments are for food and beverage that was consumed
19  at these.
20      So they're not all just payments.  I just
21  want to make sure we're clarifying exactly what
22  these monies are.  They're not all just payments.
23  BY MS. GARBER:
24      Q    Okay, Doctor.  The total that you were
25  paid by these medical manufacturers in the year of

Page 41

1   2015 was $47,095.28; true or false?
2       MS. CURRY:  Object to the form.
3       THE WITNESS:  So the total payments I
4   received include reimbursements as well as payments
5   for giving a talk.  So I think it's important to be
6   complete in what we're looking at.
7       MS. GARBER:  Fair enough.
8   BY MS. GARBER:
9       Q    And, Doctor, if you turn a few pages more
10  we come to 2016.  Are you there?
11      A    No.  Okay.
12      Q    There you were paid $15,606.79, which is
13  above -- again above the national mean by
14  physicians; correct?
15      A    That's what the picture shows; yes.
16      Q    We go a couple pages back, we see that
17  the medical manufacturers that paid you in 2016 were
18  again Genentech and Merck Sharp; is that true?
19      A    Couple pages back or a couple pages
20  forward?
21      Q    I'm sorry, forward.
22      A    Yes, that's correct.
23      Q    Now let's get to 2017.  This document
24  reflects that in 2017, you were paid $31,060.06;
25  correct?

Cheryl Saenz, M.D.

Page 42

1      A    I received payments in that amount;
2  correct.
3      Q    If we go a couple pages forward, we see
4  the listing of the same medical manufacturers,
5  Genentech and Merck Sharp, who made that payment;
6  correct?
7      A    Correct.
8      Q    Doctor, does this reflect the money that
9  you made from Johnson & Johnson in 2017?
10     A    It doesn't appear to.
11         MS. CURRY:  Object to the form.
12  BY MS. GARBER:
13     Q    Does it reflect the roughly 300 and some
14  thousand dollars that you earned with regard to
15  talcum powder products from Johnson & Johnson?
16         MS. CURRY:  Object to the form.
17         THE WITNESS:  Well, in 2017, I didn't
18  make 300,000 and something, but in 2017 in this
19  particular document that you've handed me, there
20  doesn't seem to be any notation about the monies
21  that I did make from Johnson & Johnson.
22  BY MS. GARBER:
23     Q    How much money did you make from Johnson
24  & Johnson in 2017?
25     A    I don't actually know the breakdown.

Page 43

1      Q    What's your best estimate?
2         MS. CURRY:  Object to the form.
3         THE WITNESS:  I'd be guessing.
4  BY MS. GARBER:
5      Q    We don't want you to guess, but your best
6  estimate?
7      A    I'd be guessing.  I only know --
8      Q    Is it more than 100,000?
9         MS. CURRY:  Object to the form.
10         THE WITNESS:  I think it might be
11  slightly more than 100,000.
12  BY MS. GARBER:
13     Q    Thanks.  So as I went through this group
14  of documents, it looks like it adds up to over
15  $100,000 spanning from 2013 to 2017; correct?
16     A    Well, it's through 2017, so that's five
17  years, yes.
18     Q    Then you told me that you thought you had
19  looked at 2018 CMCS and had seen that you had made
20  another $30,000?
21         MS. CURRY:  Object to the form, misstates
22  the testimony.
23         THE WITNESS:  So that's not what I said
24  at all.  I specifically told you that I've not
25  looked at the website, but that my recollection is

Page 44

1  that I earned about $30,000 in income from Merck and
2  Genentech.  But I've actually never looked at this
3  website, never seen any of these documents until you
4  showed me this today.
5  BY MS. GARBER:
6      Q    Okay.  I'm not showing you documents from
7  2018 because they're not on the website.  Okay?
8      A    Good to know.
9      Q    All right.  Do physicians receiving
10  substantial sums of money from the medical industry
11  have an obligation to disclose those transactions --
12         MS. CURRY:  Object --
13         MS. GARBER:  -- to their patients?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  With respect to what
16  exactly?
17  BY MS. GARBER:
18     Q    Do they have an obligation to disclose to
19  their patients that they have been paid by medical
20  manufacturers in general, we'll start there?
21         MS. CURRY:  Object to the form.
22         THE WITNESS:  So in general, I don't
23  think there is a general obligation to make such a
24  disclosure unless the particular product or
25  medication that you were discussing with a patient

Page 45

1  is from a company that you have received monies
2  from.
3         So for example, if I'm discussing with a
4  patient whether or not she should get the Gardasil
5  vaccine, I actually do tell patients that I speak on
6  behalf of the Gardasil vaccine and that I am paid
7  for such talks.
8  BY MS. GARBER:
9      Q    What is the reason that you should do
10  that?
11     A    So that there's transparency.  So that
12  patients know that you may actually have information
13  that could potentially bias you towards making such
14  a recommendation.  But I think that patients knowing
15  that are able to make an informed consent as to
16  whether or not they want to go ahead and pursue
17  whatever is your recommendation.
18     Q    Do you tell each and every patient that
19  you care for your work that you're doing for Johnson
20  & Johnson in connection with this litigation?
21     A    So I don't tell each and every patient
22  because I don't think it's influential in each and
23  every patient.  I only tell patients if specifically
24  they ask me questions about talc.
25     Q    Have you ever written a paper on this

Cheryl Saenz, M.D.

Page 46

1 topic, Doctor?
2       MS. CURRY:  Object to the form.
3       THE WITNESS:  What topic are we
4 discussing now?
5 BY MS. GARBER:
6    Q    Disclosing payments from medical
7 manufacturers and the importance of that?
8    A    No, I have not.
9       (C. Saenz Exhibit 2 was marked for
10      identification.)
11 BY MS. GARBER:
12   Q    I'll mark as Exhibit 2 a paper.  It
13 indicates original research and it's titled
14 "Industry Payments to Obstetrician Gynecologists and
15 Analysis of 2014 Open Payments Data."
16      Did I read that title correctly?
17   A    Yes.
18   Q    Are you listed as an author?
19   A    As a coauthor; yes.
20   Q    So do you now believe that you have
21 published in this area?
22   A    I don't believe this is about disclosure.
23 This is about the payments that are being received.
24      So the actual disclosure to patients and
25 that as a topic is not actually what the topic of

Page 47

1 this paper is.
2    Q    What is the topic of this paper?
3    A    The topic of this paper is taking a look
4 at what kind of monies physicians are earning from
5 industry.
6    Q    Okay, well, let's go through some of
7 this.  On the first page, in the right-hand column
8 about three quarters of way down, do you see the
9 sentence that begins the Physician Payments Sunshine
10 Act?
11   A    Yes.
12   Q    And that's what we were talking about
13 earlier; correct?
14   A    Correct.
15   Q    And there it defines the physician
16 sunshine Act that was passed in 2014; correct?
17   A    Correct.
18   Q    It says --
19   A    Actually, it's 2010.
20   Q    I'm sorry, I misspoke.  In 2010.  It
21 indicates that the Physician Payments Sunshine Act
22 was passed in 2010 as part of the Affordable Care
23 Act and it mandates that medical manufacturers
24 report financial relationships in the form of
25 payments made to physicians and teaching hospitals,

Page 48

1 and to centers for Medicare and Medicaid service.
2       Did I read that correctly?
3    A    Yes.
4    Q    If you turn to page 377, in the left-hand
5 column, last -- near the top, the paragraph that
6 begins, "the primary objective."
7       Do you see that?  It's near the top on
8 the left-hand column?
9    A    Yes.
10   Q    It indicates as to your secondary
11 objective, it was to "promote awareness of published
12 payments to encourage OB-GYNs to participate in
13 disclosure of their fiscal relationship to patients
14 and to make an active role in maintaining accuracy
15 of their payment data."
16      Did I read that correctly?
17      MS. CURRY:  To take an active role.
18      THE WITNESS:  No, you transposed "take"
19 to "make."
20 BY MS. GARBER:
21   Q    Okay.  To take an active role in
22 maintaining accuracy of their payment date?
23   A    Correct.
24   Q    Have I read that correctly now?
25   A    Yes.

Page 49

1    Q    If you turn to page 381; okay?
2       Under the discussion section, do you see
3 is the sentence beginning "according to the
4 recommendations"?
5    A    No.
6    Q    It's about three quarters of the way
7 down?
8    A    Okay.
9    Q    It reads, "according to the
10 recommendations by the college's ethics committee,
11 physicians receiving substantial sums of money from
12 the medical industry have a particular obligation to
13 their patients to disclose these transactions, and
14 to discuss their effects on clinical decision
15 making."
16      Did I read that correctly?
17   A    Yes.
18   Q    That's the obligation under the ethics;
19 correct?
20   A    Right.
21   Q    If we go over to the right-hand side,
22 about halfway down on page 381, do you see the
23 sentence which begins "a large part"?
24   A    Yes.
25   Q    "A large part of this uncertainty is the

Cheryl Saenz, M.D.

Page 50

1   result of the complexities involved in defining and
2   identifying when clinical integrity is compromised
3   by physical relationships with industry."
4        Did I read that correctly?
5   A    No, you did not.
6   Q    Fiscal.  Sorry.  I said physical, didn't
7   I.  Fiscal relationships with industry.
8        Did I read that correctly?
9   A    Yes.
10  Q    Then it goes on to say, "perhaps the
11  final important conclusion to be made from this work
12  is that physicians have an opportunity to play
13  crucial roles in promoting transparency and managing
14  conflicts of interest.  By discussing industry
15  payments with patients and in maintaining accuracy
16  of posted information, doctors can help maximize the
17  beneficial effects of disclosure and avoid
18  inappropriate influence."
19       Did I read that correctly?
20  A    Yes.
21  Q    Do you agree with that?
22  A    Completely.
23  Q    You wrote that, didn't you?
24  A    Along with the other authors in this
25  paper.

Page 51

1   Q    Finally, at the end of this paper, it
2   reads, "ongoing involvement from both physicians and
3   medical industry will ensure reliable data are made
4   available to the public."
5        Did I read that correctly?
6   A    Yes.
7   Q    So both parties have an obligation, the
8   physician and the manufacturer, to be sure that
9   there is disclosure of the payments so that patients
10  are informed as to whether or not their physician
11  has a potential conflict of interest; true?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  Both parties don't have an
14  obligation to post information on the website.
15       MS. GARBER:  I didn't say that, Doctor.
16       THE WITNESS:  Ma'am, you said both
17  parties have an obligation, and the obligation of
18  the pharmaceutical company is to post the
19  information to the website.
20       My obligation is to disclose when I have
21  a potential conflict of interest to my patients, and
22  I do that.
23  BY MS. GARBER:
24  Q    And, Doctor, in this paper, you wrote,
25  that both parties have an obligation to be sure that

Page 52

1   those payments are posted.
2   A    Where are you reading from again?
3   Q    (No audible response.)
4   A    Ma'am, where are you reading from?
5   Q    I'm looking for it.  Hold on, please.
6        On the right-hand column on 381, it says,
7   "by discussing industry payments with patients and
8   in maintaining accuracy of the posted information,
9   doctors can help maximize the benefits"?
10  A    Right.  And I do discuss payments with my
11  patients for anything that comes up that actually
12  has to do with the agents involved in the reason
13  that I receive those payments.
14  Q    Doctor, are you making $1,200 here today
15  from Johnson & Johnson in connection with your
16  deposition?
17  A    No.
18  Q    How much are you making an hour?
19  A    1,200 an hour.
20  Q    Does UCSD know that you're doing expert
21  work on behalf of Johnson & Johnson?
22  A    Yes.
23  Q    In connection -- I'm sorry.  In
24  connection with the talcum powder product
25  litigation?

Page 53

1   A    Yes, they do.
2   Q    Are you aware that the United States
3   Senate is investigating whether or not Johnson &
4   Johnson lied about asbestos being in the products?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  So I'm aware that --
7   basically through the nightly news that there's an
8   investigation as to whether or not there actually
9   was some knowledge as to whether or not asbestos was
10  in the baby powder litigation, but other than that,
11  other than what's reported on the nightly news, I'm
12  not aware of what specific agency is investigating,
13  no.
14  BY MS. GARBER:
15  Q    Have you seen any written media coverage.
16  You said the nightly news.  Have you seen any
17  newspaper articles?
18  A    No.
19       MS. SHARKO:  Is this the one where your
20  expert testified?
21  BY MS. GARBER:
22  Q    Your report in this case indicates that
23  you served as chair of the Moores UCSD cancer
24  center; is that correct?
25  A    No.

Cheryl Saenz, M.D.

Page 54

1    Q    You --
2    A    That's not correct.
3    Q    I thought I read that -- what is your
4  connection with the Moores UCSD cancer center?  What
5  is your involvement?
6    A    I'm a faculty physician there.
7    Q    You haven't been chair of the department?
8    A    No, and I didn't put that in my report.
9  That's inaccurate.
10   Q    When were you first retained by Johnson &
11 Johnson in connection with this litigation?  What
12 was the very first date as you remember it?
13       MS. CURRY:  Object to the form.  Just to
14 clarify for the record, do you mean any talcum
15 powder product litigation or the MDL?
16       MS. GARBER:  No, any talc powder
17 litigation.
18       THE WITNESS:  Any talcum powder
19 litigation?  November of 2016.
20 BY MS. GARBER:
21   Q    How was it that you were retained in this
22 matter?
23       MS. CURRY:  Object to the form.
24       THE WITNESS:  I was -- I have a vague
25 recollection of receiving a phone call and asking if

Page 55

1  I knew of the purported risks of developing ovarian
2  cancer associated with the uses of perineal talc and
3  whether or not I would be interested in reviewing
4  more of the literature than I had already reviewed
5  and giving opinions on that particular topic.
6  BY MS. GARBER:
7    Q    Who approached you first?
8    A    I think I received a phone call from a
9  gentleman named Brian Lee.
10   Q    Did you know Mr. Lee prior to that phone
11 call?
12   A    No.
13   Q    Did he offer any opinions about perineal
14 talc and risk of ovarian cancer?
15       MS. CURRY:  I'm sorry, I'm going to
16 instruct you not to disclose any communications with
17 counsel.
18 BY MS. GARBER:
19   Q    Did you understand Mr. Lee to be a
20 lawyer?
21   A    I don't honestly recall that I knew that.
22 I knew that he was from a law firm, but I don't know
23 if he was a paralegal or a legal.  But I knew he was
24 in a law firm.
25       MS. CURRY:  I can stipulate that Brian

Page 56

1  Lee is a partner with my law firm.
2  BY MS. GARBER:
3    Q    So when you were first retained, you
4  indicated that you had already reviewed some
5  literature -- you had already been aware of some
6  literature with regard to perineal talc and risk of
7  ovarian cancer; is that true?
8    A    Correct.
9    Q    What literature was that?
10   A    I don't recall specifically, but it
11 wasn't the first time that I had heard about the
12 issue of a possible association between the use of
13 perineal talc and the development of ovarian cancer.
14   Q    Were you consequently sent some
15 literature?
16       MS. CURRY:  Object to the form.
17       THE WITNESS:  I was sent a flash drive
18 with some articles on it.
19 BY MS. GARBER:
20   Q    Did you conduct your own research?
21   A    At what point?
22   Q    At that point.  When you were retained,
23 did you conduct your own research for medical
24 articles or did you rely on the lawyers to give you
25 that literature?

Page 57

1    A    Oh.  I mean, over the time course of
2  researching the issue, I conducted my own research
3  as well.
4    Q    Do you still have that flash drive?
5    A    I don't think so.
6    Q    By the way, do you have a file in this
7  case?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  What do you mean by a
10 "file"?
11 BY MS. GARBER:
12   Q    What's your understanding of the word
13 "file"?
14   A    Like a shadow file?
15   Q    Do you have any kind of file in
16 connection with your work in this case?
17   A    No.  I have my report and I have the
18 articles that I've used to read about the issues.
19   Q    Where are those articles?
20   A    On my computer.
21   Q    You don't have any printed articles?
22   A    No.
23   Q    Not one?
24   A    Not one.
25   Q    In connection with writing your expert

Cheryl Saenz, M.D.

Page 58

1  report in this case, did you make any notes?
2      A   So as I was reading plaintiffs' reports
3  and depositions, I would make notes on the computer
4  for statements of the experts that I would want to
5  make comments on in order to incorporate it into my
6  report.  But it was basically my report outline of
7  things that I wanted to incorporate, but that is my
8  report.
9      Q   Did you produce those notes that you made
10  when you were reviewing expert reports and the like?
11          MS. CURRY:  Object to the form.
12          THE WITNESS:  No, it's the draft of my
13  report.  So it is my report.  So I mean, I have
14  produced it, but that's my report.
15  BY MS. GARBER:
16      Q   So when you were making notes about a
17  given deposition, you were making a note of that on
18  your computer and now it's your testimony that
19  became your expert report?
20      A   Right.  I make a note, I'd say for
21  example, oh, there's something on page nine of this
22  person's thing, and put it in there.  And then
23  when -- I'd skip some pages, write some more, come
24  back to that.  So that it was there in the report as
25  I was drafting the report.

Page 59

1      Q   Did you write every word of your expert
2  report, and when I say "expert report," I'm meaning
3  the MDL report dated February 25th, 2019.
4      A   Did I write every word?  Absolutely.
5      Q   Do you have any drafts or copies or
6  notes?
7          MS. CURRY:  Object to the form.
8          THE WITNESS:  Of?
9  BY MS. GARBER:
10      Q   Of your report.
11      A   No.  I mean, it was an evolving process
12  that just kept getting morphed every time I would
13  add to it.
14      Q   You said you reviewed the literature
15  online.  Did you make any highlights electronically
16  of that literature?
17      A   No.
18      Q   Or notes?
19      A   No.
20      Q   How was it that you tracked what you
21  wanted to recall or remember or note about a given
22  piece of literature?
23      A   So I'd go to the article itself, I'd
24  highlight it, and you can snapshot that paragraph or
25  whatever and then put it into my report so that I

Page 60

1  could make sure that I could read it and capture the
2  essence of what it was that I was trying to point
3  out.
4          Sometimes if it was just numbers, I'd
5  have the report open, and then I'd have the article
6  open at the same time and I'd be reading it as I
7  would type my report.
8      Q   Okay.  You understand that Johnson &
9  Johnson is the manufacturer of baby powder products
10  and formerly Shower to Shower talcum powder product;
11  correct?
12      A   That's my understanding.
13      Q   You're aware that women use defendant's
14  talcum powder products for feminine hygiene?
15          MS. CURRY:  Object to the form.
16          THE WITNESS:  I mean, I don't know that I
17  would say feminine hygiene.  I would say I know that
18  they do put on it their perineum or on their bodies,
19  on their groins, in different parts.  So yes.
20  BY MS. GARBER:
21      Q   What's your understanding of why women
22  put talcum powder product on their genitals?
23          MS. CURRY:  Object to the form.
24          THE WITNESS:  I think it's variable.
25  ///

Page 61

1  BY MS. GARBER:
2      Q   What's your understanding of some of the
3  reasons?
4      A   I think some women do it because they
5  like the softness.  I think some women do it because
6  they like the fragrance.  I think some women do it
7  because they are sweaters and they want to try to
8  stay dry.  I think there are various uses.
9      Q   Do you have any first-hand information
10  about the manner in which women use it, the manner
11  in which they apply it, the amount, the nature of
12  how it's applied?
13          MS. CURRY:  Object to the form.
14          THE WITNESS:  I don't really know what
15  you mean.
16          MS. GARBER:  Sure.
17  BY MS. GARBER:
18      Q   You don't -- you don't have any firsthand
19  information about the way in which women applied it;
20  in other words, did they shake it on their hands,
21  did they shake it directly on their genitals, did
22  they apply it to toilet paper and then apply it.
23          In other words, you don't have any of
24  these details, do you?
25          MS. CURRY:  Object to the form.

Cheryl Saenz, M.D.

Page 62

1  THE WITNESS: Firsthand?
2  MS. GARBER: Yes.
3  THE WITNESS: I disagree.
4  BY MS. GARBER:
5  Q  You do?
6  A  Uh-huh.
7  Q  What's your firsthand knowledge?
8  A  I've used it.
9  Q  Okay. Besides yourself.
10  A  But that is firsthand knowledge.
11  Q  All right. You don't have any firsthand
12  knowledge of how other women use it, do you?
13  MS. CURRY: Object to the form.
14  THE WITNESS: I have not personally
15  watched another woman apply baby powder to herself,
16  that is correct.
17  BY MS. GARBER:
18  Q  And the literature, the epidemiological
19  literature does not describe the way in which it was
20  applied, and in that regard, I mean was it applied
21  to the hand, was it applied to tissue, doesn't give
22  that kind of detail, how much was applied at any
23  given time?
24  MS. CURRY: Object to the form.
25  THE WITNESS: So I've not read anything

Page 63

1  that talks about how many shakes, but there are
2  certainly studies that talk about women applying it
3  to diaphragms or women applying it to their perineum
4  or women applying it to their sanitary napkins.
5  I do believe that many of the studies
6  have looked at and asked those questions. But in
7  terms of an in-depth analysis of what constitutes a
8  dose per se and how many shakes, no, I'm not aware
9  of that.
10  BY MS. GARBER:
11  Q  Are you aware of data that indicates
12  there are women now -- there are women now with ovarian
13  cancer who used talc on their genitals in the 1950s,
14  60s, and early 70s?
15  MS. CURRY: Object to the form.
16  THE WITNESS: Can you say that again?
17  BY MS. GARBER:
18  Q  Sure. Are you aware of data that
19  indicates there are women now with ovarian cancer
20  that used genital talc in the 1950s, 60s, and early
21  70s?
22  MS. CURRY: Same objection.
23  THE WITNESS: So I'd have to kind of do
24  like a retrospective time point. I do believe that
25  if we look at some of the studies that were

Page 64

1  published in, say, 2000, 2010, knowing that on
2  average women used baby powder for at least 20 years
3  when they were users, that if somebody was diagnosed
4  with ovarian cancer in 2000, that most likely she
5  would have used it in the 70s or 80s.
6  So I do believe that that's the case.
7  BY MS. GARBER:
8  Q  So the point is women were exposed to
9  Johnson & Johnson baby powder products in the 50s,
10  60s, and 70s and have ovarian cancer; correct?
11  MS. CURRY: Object to the form.
12  THE WITNESS: I do believe that there
13  were some women that probably used it then and then
14  had ovarian cancer in later years; yes.
15  BY MS. GARBER:
16  Q  Let's talk about talcum powder product.
17  You understand that Johnson & Johnson's baby powder
18  and Shower to Shower are talcum powder products;
19  correct?
20  A  I believe that one of the constituents of
21  each of those products is talcum powder; correct.
22  Q  And in your report, when you use the word
23  "talc," what do you mean?
24  A  Baby powder products.
25  Q  And do you make an assumption that within

Page 65

1  Johnson & Johnson's talcum powder products there is
2  no asbestos?
3  A  I don't believe that what's the
4  constituents of the baby powder actually matters to
5  my opinion. My opinion is the same regardless,
6  because I do believe that if there is a risk of
7  developing ovarian cancer with the use of talc,
8  regardless of what's in that -- in that product,
9  there would be an increased risk of developing
10  ovarian cancer, borne out in the literature.
11  Q  Doctor, my question was a little
12  different. Do you make assumptions about the
13  constituents of Johnson & Johnson talcum powder
14  products when you render your opinions in your
15  expert report?
16  MS. CURRY: Object to the form.
17  THE WITNESS: No, I don't make any
18  assumptions.
19  BY MS. GARBER:
20  Q  Is it your opinion that Johnson & Johnson
21  baby powder products do not contain talc -- sorry,
22  do not contain asbestos?
23  A  So I'm going to defer to the experts that
24  are mineralogists or geologists to make that
25  analysis. My opinion is that baby powder products

Cheryl Saenz, M.D.

Page 66

1  do not increase the risk of developing ovarian
2  cancer, regardless of what the constituent products
3  are in that product.
4        MS. CURRY:  We've been going for an hour.
5  So when it's a good time to break, we'd like to take
6  one.
7        MS. GARBER:  Sure.  Just want to follow
8  up.
9  BY MS. GARBER:
10     Q    So as to the constituents of the talcum
11  powder products, and what was or wasn't constituting
12  the constituents, you are going to defer to experts
13  in other areas; is that true?
14        MS. CURRY:  Object to the form.
15        THE WITNESS:  With respect to the
16  chemical composition of the product; yes.  But not
17  with respect to the opinion that baby powder is not
18  associated with an increased risk of developing
19  ovarian cancer.
20  BY MS. GARBER:
21     Q    I understand that.
22        And the same question with regard to the
23  presence of heavy metals, are you going to defer to
24  others as to whether or not Johnson & Johnson's
25  talcum powder products contained heavy metals?

Page 67

1     A    Yes.
2     Q    Same question with regard to fragrances,
3  are you going to defer to others with regard to
4  whether Johnson & Johnson's talcum powder products
5  contained fragrances that may have been toxic or
6  carcinogens?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  So I'm not going to defer
9  that the product itself is associated with an
10  increased risk of developing ovarian cancer, meaning
11  the baby powder.  But if there are constituent
12  fragrances in that product, I'm going to defer to
13  somebody whose analysis of the chemical composition
14  of that product is their field of expertise.
15  BY MS. GARBER:
16     Q    So you know in looking at the label,
17  there's fragrance in the bottle; right?
18     A    Well, it smells good, yeah.
19     Q    It says that.  And so what those
20  fragrances constitute and whether or not they are
21  toxic or carcinogenic, you're going to defer to
22  experts in that regard; is that true?
23     A    No, that's not true.  Because if those
24  fragrances were toxic or carcinogenic, then the
25  literature that is evaluating whether or not baby

Page 68

1  powder is associated with developing ovarian cancer
2  would be borne out as showing a risk between
3  developing ovarian cancer in the use of the product.
4        What those individual constituents are,
5  I'm going to defer that analysis.  But the opinion
6  that the baby powder as it stands with the
7  fragrances, with whatever else is in it, does not --
8  is not associated with an increased risk of
9  developing ovarian cancer.  I stand by that as my
10  opinion.
11     Q    And the last question and then we'll
12  break.  Same with regard to fibrous talc, are you
13  going to defer to experts as to whether or not
14  Johnson & Johnson's talcum powder products contained
15  fibrous talc?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  Yes.
18        MS. GARBER:  Thanks.  Let's take a break.
19        THE VIDEOGRAPHER:  The time is now 10:32.
20  Going off the record.
21     (Break in the deposition taken at 10:33 a.m.)
22              0o0
23     (The deposition resumed at 10:48 a.m.)
24              0o0
25        THE VIDEOGRAPHER:  Time is now 10:47.

Page 69

1  Back on the record.
2  BY MS. GARBER:
3     Q    Doctor, are you aware that Johnson &
4  Johnson enjoys about a 70 percent market share of
5  talcum powder products?
6        MS. CURRY:  Object to the form.
7        THE WITNESS:  I don't have any knowledge
8  of what their market share is.
9  BY MS. GARBER:
10     Q    Do you know -- you understand what a risk
11  benefit assessment is in the context of medicine;
12  right?
13     A    In the context of medicine?
14     Q    Uh-huh.
15     A    I've done risk benefit analyses, sure.
16     Q    You're aware that there's no health
17  benefits for women to use defendant's talcum powder
18  products on their genitals, aren't you?
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  I don't agree with that.
21  BY MS. GARBER:
22     Q    You think there's medical benefits?
23     A    I do.
24     Q    Okay.  You've seen literature that --
25  peer-reviewed published literature that indicates

Cheryl Saenz, M.D.

Page 70

1 there's no medical benefits, haven't you?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  No, I have not.
4 BY MS. GARBER:
5   Q    What were the medical benefits?
6   A    So there are some women that sweat a lot,
7 and because they sweat, they can get candidal
8 infections.  And so some women like to apply baby
9 powder products to their genital area to decrease
10 the sweat so that they don't get candidal infection.
11   Q    If there's a medical benefit, then talcum
12 powder is a medicine; right?
13   A    No.  Patients use talcum powder in order
14 to decrease the amount that they're sweating and
15 that can result in them getting fewer candidal
16 infections.  It doesn't mean that it's a medicine.
17   Q    You understand that if there's medical
18 benefits and patients are using it for medical
19 purposes, then talcum powder isn't a cosmetic, but
20 rather a medicine by way of regulatory oversight?
21      Do you understand that?
22      MS. CURRY:  Object to the form.
23      THE WITNESS:  No.  I don't agree with
24 that.  What you asked me is if patients use it for
25 any sort of medical benefit.  It's not dispensed as

Page 71

1 a medicine.  It's not prescribed as a medicine.  But
2 women do use it in order to absorb whatever sweat
3 they may have so that they don't get candidal
4 infections or they don't have discomfort in the
5 genital area from their sweat.
6 BY MS. GARBER:
7   Q    Have you ever prescribed talcum powder
8 products to your patients for medical benefit?
9   A    I've prescribed Nystatin powder, which
10 does contain talc, to my patients, which does have a
11 medical benefit of treating candidal infections.
12   Q    That is a medication; correct?
13   A    That's a medication.
14   Q    Talcum powder products are not?
15   A    So Nystatin powder does contain talc, so
16 that is a talcum powder product.
17   Q    Nystatin powder is a medicine?
18   A    Nystatin powder is a medicine.
19   Q    Johnson & Johnson baby powder products
20 are not a medicine?
21   A    That's correct.
22   Q    What is your definition of the phrase
23 "latency period" in the context of ovarian cancer?
24   A    Latency period would be the time from --
25 when we're talking about perhaps exposures to any

Page 72

1 particular agent, it would be the time from the
2 exposure to the development of the disease.
3   Q    So in the context of the talcum powder
4 product litigation, from the exposure to Johnson &
5 Johnson's talcum powder products to the diagnosis of
6 ovarian cancer?
7      MS. CURRY:  Object to the form.
8      THE WITNESS:  Well, I didn't say the
9 diagnosis.  I said the development of the disease.
10 BY MS. GARBER:
11   Q    So when you say development, what do you
12 mean?  How do we know when the disease developed in
13 the context of ovarian cancer?
14   A    So we don't necessarily know when it
15 starts.  We do know that ovarian cancer goes through
16 various stages and you can diagnose it at various
17 stages.  Sometimes we catch it at stage 1, sometimes
18 we catch it at stage 4.
19      But in the general context of what a
20 latency period is, it's from the time of exposure to
21 the development of the disease.
22   Q    In the context of cohort studies, it's
23 from -- the latency period is from the point of
24 exposure to the point of diagnosis of the disease,
25 isn't it?

Page 73

1      MS. CURRY:  Object to the form.
2      THE WITNESS:  So in the cohort studies;
3 yes, I think that's probably accurate.
4 BY MS. GARBER:
5   Q    There are peer-reviewed published studies
6 showing that ovarian cancer has a long latency
7 period, reporting to be as long as 30 to 40 years,
8 aren't there?
9      MS. CURRY:  Object to the form.
10      THE WITNESS:  There are some that show
11 that.  There are some that show other data.
12 BY MS. GARBER:
13   Q    What is your opinion as to the latency
14 period for ovarian cancer?
15   A    So I think the literature has shown some
16 periods of 20 to 40 years.  Since I don't really
17 know what causes ovarian cancer and therefore I
18 don't really know what is the incipient underlying
19 events that have the cancer develop, I don't really
20 have a specific sense other than to say I think it
21 probably is reasonable that it's somewhere in
22 between 20 to 40 years.
23   Q    And that's a range; correct?
24   A    That's correct.
25   Q    Do you agree with the statement, if

Cheryl Saenz, M.D.

Page 74

1  talcum powder is a potential carcinogen for ovarian
2  cancer, it is likely that there is a long latency
3  period between exposure and development of the
4  disease?
5      MS. CURRY:  Object to the form.
6      THE WITNESS:  As a general statement, I
7  don't know what that word "long" necessarily means,
8  but I think as a general statement I would agree
9  with that statement.
10 BY MS. GARBER:
11     Q   Is it true that for asbestos the latency
12 period is at least 25 years, according to
13 peer-reviewed published studies?
14     MS. CURRY:  Object to the form.
15     THE WITNESS:  So I think in the IARC
16 monograph that looked at heavy occupational exposure
17 of patients to -- I should say subjects -- of
18 subjects to asbestos, there was one study that
19 tracked when the subjects were exposed to the
20 asbestos and then looked at how many years later
21 they were diagnosed with ovarian cancer, and I do
22 believe that range was somewhere between 20 to
23 25 years.
24     However, I think there are a lot of
25 problems with the asbestos studies in general.

Page 75

1  BY MS. GARBER:
2      Q   Did you do a comprehensive literature
3  review of asbestos and ovarian cancer?
4      MS. CURRY:  Object to the form.
5      THE WITNESS:  I read the studies that are
6  listed in the IARC Monograph.
7  BY MS. GARBER:
8      Q   You read each and every one of those
9  studies that's listed in the IARC Monograph?
10     A   Yes, as pertains to asbestos and ovarian
11 cancer.
12     Q   And which monograph are you speaking of?
13     A   The 2012.
14     Q   And how many studies was that, by your
15 recollection?
16     A   So IARC drew their conclusions on the
17 basis of five studies that looked at heavy
18 occupational exposure and the risk of developing
19 ovarian cancer.  There have been other studies after
20 that as well that I have read, including Reed,
21 including Camargo, at the risk of
22 developing ovarian cancer and asbestos exposure in
23 the heavy occupational setting.
24     There also were other studies that looked
25 at environmental exposure and did not find any such

Page 76

1  association.
2      Q   We will turn to that shortly.  But
3  thank you for that.
4      Do you have an opinion, then, as to the
5  latency period for asbestos, and ovarian cancer?
6      A   So again, I don't necessarily agree with
7  IARC's conclusions about developing ovarian cancer
8  with asbestos exposure, but as documented in the
9  articles that IARC cites, the latency period
10 reported is 20 to 25 years.
11     Q   And you mentioned the Camargo paper, you
12 read that one?
13     A   Yes.
14     Q   It's on your reference list?
15     A   Yes.
16     Q   And didn't that study show a
17 statistically -- showed a statistically significant
18 association after 25 years of follow up?
19     MS. CURRY:  Object to the form.  If you
20 need to see the article, I have a copy.
21     THE WITNESS:  Sure.  I'd be happy to take
22 a look at it.
23     MS. GARBER:  Okay.  Well, so first thing
24 we're going to do is we're going to make sure we
25 don't have speaking objections, Ms. Curry.  And I'm

Page 77

1  not going to pull out that article right now.  We'll
2  get to that when I want to get to that.
3  BY MS. GARBER:
4      Q   You've been designated as an expert
5  witness by Johnson & Johnson in the talcum powder
6  product litigation in the MDL; right?
7      A   Yes.
8      Q   You understand that we are here to take
9  your deposition, to get all of your opinions and the
10 bases for those opinions so we can prepare for
11 briefing, hearing, and trial.
12     Do you understand that?
13     A   Yes.
14     Q   Did you see the Notice of Deposition that
15 was served with regard to your deposition?
16     A   Yes.
17     Q   When did you see that?
18     A   I believe last week sometime.
19     Q   Have you -- did you understand that in
20 the Notice of Deposition there was a request for
21 documents for you to bring to today's deposition, or
22 actually to provide five days before today's
23 deposition?  Did you notice that?
24     A   I read the deposition notice and I know
25 that there were a number of requests, and I believe

Cheryl Saenz, M.D.

Page 78

1  that -- I don't have any documents to provide you
2  with.  I think my CV was already provided.
3      MS. CURRY:  Just for the record, the
4  Notice of Deposition was actually received by
5  Johnson & Johnson just six business days ago and the
6  responses are subject to the objections that were
7  filed on behalf of Johnson & Johnson.
8      (C. Saenz Exhibit 3 was marked for
9      identification.)
10     MS. GARBER:  I'm going to mark as
11 Exhibit 3 the Notice of Deposition.
12     THE WITNESS:  Thank you.
13 BY MS. GARBER:
14     Q   Turning, Dr. Saenz, to page five of the
15 notice.  Those are the documents that we asked you
16 to produce that you have reviewed this list.
17     A   Okay.
18     Q   Have you?
19     A   Yes.
20     Q   In connection with the request number
21 two, item B, have you produced all of the invoices
22 for the expert work that you've done so far?
23     MS. CURRY:  Subject to the objections
24 that were produced on behalf --
25     MS. GARBER:  I'll give you an ongoing

Page 79

1  objection.
2      MS. CURRY:  Thank you.
3      THE WITNESS:  Yes.
4  BY MS. GARBER:
5      Q   Have you produced all invoices and
6  payments in connection with your talcum powder
7  products work in general?
8      A   We're --
9      MS. CURRY:  Object to the form.
10     THE WITNESS:  With my -- everything that
11 I've invoiced has been produced.
12 BY MS. GARBER:
13     Q   Including from other litigations?
14     MS. SHARKO:  You need to look at the
15 objections we served.  This isn't fair to just look
16 at the note.  We responded -- although it came very
17 late, we responded yesterday.
18     MS. GARBER:  Ms. Sharko, with all due
19 respect, I think we're having one attorney at a time
20 represent the witness.  I'm sure Ms. Curry is very
21 capable of objecting.
22     MS. SHARKO:  I wish you had been at all
23 the other depositions where three of you all were
24 talking, but I understand your point.
25     MS. CURRY:  This is why I was raising the

Page 80

1  issue of subject to the objections, because the
2  objections made clear that the documents that were
3  produced were with respect to the MDL talcum powder
4  litigation and not all talcum powder litigation.
5      So I was just making that clarification
6  so that you know which documents were actually
7  produced and why.
8  BY MS. GARBER:
9      Q   Dr. Saenz, do you have any communications
10 in connection with any of the study authors
11 concerning talc or talcum powder products in ovarian
12 cancer?
13     A   With what studies?
14     Q   Any of the published studies.  Have you
15 communicated with any of the study authors?
16     A   Oh.  So I don't know that I can answer
17 that specifically, because I don't know if over the
18 course of my career I've ever communicated with
19 anybody that's ever been listed.  I mean, I
20 certainly know some of them professionally, so at
21 some point, I would have communicated with them.
22     Q   Since you've been an expert in the MDL,
23 have you communicated with any study authors?
24     A   I'm sure I have.  Again, because the
25 world of OB-GYN oncology is a rather small world and

Page 81

1  so some of the people on some of the studies are in
2  the same professional organizations that I'm in.
3      So I'm sure I've had professional
4  communications.
5      Q   Have you had professional communications
6  with any of the study authors in connection with
7  talcum powder products?
8      A   Oh.  No.
9      Q   Thank you.  Have you had any
10 communications with the Society of Gynecologic
11 Oncology in connection with talcum powder products
12 since you've been retained as an expert witness in
13 any talcum powder product litigation?
14     A   Specifically with regard to this issue?
15     Q   Yes.
16     A   No.
17     Q   Same question as to have you had any
18 communications with regard to talcum powder
19 litigation with the American Congress of Obstetrics
20 and Gynecology?
21     A   With respect to this particular issue,
22 no.
23     Q   And when you say with respect to this
24 particular issue, what do you mean so I know?
25     A   With respect to talcum powder litigation,

Cheryl Saenz, M.D.

Page 82

1   no.
2       Q     Talcum powder products and the risk of
3   ovarian cancer?
4       A     Correct.
5       Q     Thank you.  Turning to the objections
6   that were issued in this matter and the documents
7   that are attached, I want to review those briefly
8   with you; okay.  Do you have a copy?
9       A     No, I don't.
10          THE WITNESS:  Thank you so much.
11          MS. GARBER:  We'll mark that as
12   Exhibit 4.
13          (C. Saenz Exhibit 4 was marked for
14          identification.)
15   BY MS. GARBER:
16       Q     And the first document looks to be on the
17   UCSD Moores Cancer Center letterhead signed by you?
18       A     I'm sorry, ma'am, what page are we on?
19       Q     Third from the last.
20       A     Okay.
21       Q     Is that an invoice?
22       A     Yes.
23       Q     We already spoke about that earlier,
24   that's reflecting the work that was done by you from
25   December 18th to February 2019?

Page 83

1       A     Correct.
2       Q     And at a rate of $750 an hour?
3       A     That's correct.
4       Q     If we turn to the next document, it is
5   also on UCSD Medical Center Moores Cancer Center
6   letterhead; correct?
7       A     What's the title of the document?
8       Q     Legal consultation fee schedule.
9       A     Okay; yes, I'm there.
10       Q     Did you draft this document?
11       A     Yes.
12       Q     What is the nature of this document?
13       A     This is my fee schedule as of October
14   of 2016, I believe, is the last time I revised it.
15       Q     And what does out of town travel fees
16   mean?
17       A     It means I pick up, I leave San Diego
18   County, and I go someplace else.
19       Q     The third document that was produced is
20   a -- is titled "Supplement to Materials Reviewed By
21   Dr. Cheryl Saenz"; is that correct?
22       A     Yes.
23       Q     Did you draft this document?
24       A     I didn't do the actual typing, but I did
25   send an email to Ms. Curry about things that I had

Page 84

1   reviewed since I submitted my report.
2       Q     And so is it true that from the point
3   that you issued your report to today, the only
4   documents you reviewed in connection with your
5   opinions are those listed here at the supplement to
6   the materials reviewed by Dr. Cheryl Saenz?
7          MS. CURRY:  Object to the form.
8          THE WITNESS:  So no, because I actually
9   did a little bit more reading last evening.  So I
10   haven't informed anybody of that, other than what I
11   did myself.
12   BY MS. GARBER:
13       Q     Turning to that soon.  So you knew where
14   I was going.  But what did you read last night?
15       A     Last evening I reread the Penninkilampi
16   meta-analysis, and I pulled online the reference
17   where they talk about ovarian cancer -- sorry,
18   ovarian epithelial cells lacking COX-1 and COX-2,
19   and therefore, I went to see that article to see if
20   that was actually quoted properly in the
21   Penninkilampi study.
22          And then I was aware of some other
23   studies just from personal knowledge that actually
24   did document that COX-1 and COX-2 are in ovarian
25   cancer cells, so I re-reviewed those myself just to

Page 85

1   make sure that my recollection was accurate.
2       Q     What were those?  What were the titles of
3   those studies?
4       A     So I don't recall the Penninkilampi
5   title, the one that's referenced in Penninkilampi,
6   but I think it was reference 27.  I'm happy to show
7   you if you have the article, but I think it was
8   reference 27 in the Penninkilampi.
9          Then the other two articles that I read
10   were actually out of Dr. Khabele's lab, and they
11   look at the presence of COX-1 and COX-2 in ovarian
12   cancer cells.
13          And I had read that actually to -- like,
14   one was published last year and one was published a
15   few years ago.  I had read that before and I just
16   re-reread them.  But do I believe that Dr. Khabele
17   is the senior author, but -- I'm sorry, I don't
18   remember the title, but I think that Dr. Khabele was
19   the senior author on those papers.
20       Q     How do you spell Khabele?
21       A     K-H-A-B-E LE, and her first name is
22   Dineo, D-I-N-E-O.
23       Q     Do you know the second study author's
24   name?
25       A     Well, Dr. Khabele was senior author on

Cheryl Saenz, M.D.

Page 86

1 both of those, so she's actually the last author.
2    Q    Do you remember the first author?
3    A    I don't, I'm sorry.
4    Q    That's okay.  So there were two papers by
5 the Khabele lab?
6    A    Yes.
7    Q    What was the upshot of their findings?
8    A    That there is expression of COX-1 and
9 COX-2 in ovarian cancer cells, as well as production
10 of MRNA, particularly for COX-1.
11        The Penninkilampi study -- well, it
12 wasn't the Penninkilampi study, but it was the
13 reference in Penninkilampi, they actually did find
14 expression of COX-1 and COX-2 proteins in the
15 ovarian cancer cell lines that they looked at.  And
16 so Penninkilampi actually was incorrect in the way
17 that they were referencing that study.  That's why I
18 looked at it.
19    Q    So your take-away is that the
20 Penninkilampi paper miscited whether there's
21 expression of COX-1 and COX-2 in epithelial ovarian
22 cells?
23        MS. CURRY:  Object to the form.
24        THE WITNESS:  Well, the paper that they
25 cited, I think they cited it correctly, but I think

Page 87

1 they misstated the results of that study, yes.
2 BY MS. GARBER:
3    Q    So do you have opinion, Doctor, based on
4 your research as to whether epithelial ovarian cells
5 express COX-1 and COX-2?
6    A    So that gets to the point of where I
7 think Penninkilampi misrepresented the conclusions
8 of the study, because Penninkilampi stated that
9 ovarian epithelium doesn't have COX-1 or COX-2.  But
10 the study they cited wasn't on normal ovarian
11 epithelium, it was actually on cancer cells, and the
12 cancer cells actually did have expression of COX-1
13 and COX-2.
14    Q    Why did you go back and look at that in
15 particular?
16    A    Because I was reading the Penninkilampi
17 study again, and it's meta-analysis that's focused
18 on by many of your experts, and I felt it was
19 important to the whole theory of chronic
20 inflammation and why NSAIDS may or may not show a
21 decreased risk of ovarian cancer.  The literature on
22 that is very inconsistent.
23        I also am very familiar with the work in
24 Dr. Khabele's lab because -- well, she once
25 interviewed for a division director at our

Page 88

1 department, and so I knew her research and I knew
2 she had shown that COX was in ovarian cancer cells,
3 so it seemed that like strange to me that
4 Penninkilampi said that it wasn't there.
5        So that's why I went back in and wanted
6 to verify that.
7    Q    Did you do a comprehensive literature
8 review on the issue of whether epithelial ovarian
9 cancer express -- I'm sorry, epithelial ovarian
10 cells express COX-1 and COX-2?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  So I read those three
13 papers.  I had read Dr. Khabele's papers before, but
14 I read these papers last evening and read them
15 thoroughly.  So I wouldn't say I've read every
16 article ever published on it, but I certainly read
17 the paper that Penninkilampi referenced and I read
18 Dr. Khabele's work, which I think actually is some
19 of the largest volume of work given the tissue
20 microarray that she studies and how many different
21 specimens she actually looked at it.
22 BY MS. GARBER:
23    Q    And based on your review of the three
24 studies, are you going to give an opinion whether or
25 not you believe and it's your opinion whether

Page 89

1 epithelial ovarian cells express COX-1 and COX-2?
2    A    Yes.
3    Q    You're going to say they don't?
4    A    No, I'm going to say they do.
5    Q    They do --
6    A    They do express COX-1 and COX.
7    Q    So you have not produced all documents
8 that relate to your compensation for expert work in
9 this matter; correct?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  With respect to this MDL
12 work, this particular matter, I have.  I've only
13 invoiced the one invoice.
14 BY MS. GARBER:
15    Q    That was a bad question.
16        You have not produced all documents that
17 relate to your compensation for expert work done in
18 the talcum powder litigation; correct?
19        MS. CURRY:  Object to the form.  It's the
20 subject of our objections.
21        THE WITNESS:  I've only produced the
22 invoice for this particular matter.
23 BY MS. GARBER:
24    Q    With regard to the supplement to
25 materials reviewed by Dr. Cheryl Saenz, did you

Cheryl Saenz, M.D.

Page 90

1 review any other expert reports?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  On the defense side or the
4 plaintiff side?
5      MS. GARBER:  Either side.
6      THE WITNESS:  So, yes, but I think that's
7 listed in the materials reviewed.  This is only the
8 listing of the defense expert reports that I
9 reviewed subsequent to submitting my report in the
10 original materials reviewed list.
11 BY MS. GARBER:
12      Q    What was the nature of reviewing those
13 particular expert reports?  Did you ask for them?
14 Were they provided?
15      MS. CURRY:  Object to the form.
16      THE WITNESS:  The ones on the supplement
17 lists?
18      MS. GARBER:  Yes.
19      THE WITNESS:  Okay.  The ones on the
20 supplement list, I've actually been provided with
21 these expert reports, and I picked these particular
22 ones because I wanted -- after my report was
23 submitted, I felt that it was important for me to
24 see what the other expert said with regards to
25 things that I had actually given opinions on as

Page 91

1 well.
2 BY MS. GARBER:
3      Q    Prior to finalizing and signing your
4 expert report, in the MDL, did you review any draft
5 reports of any of the defense experts?
6      A    No.
7      Q    Did you ever speak with any of the
8 experts?
9      A    About --
10      MS. CURRY:  Object to the form.
11      THE WITNESS:  About this matter?
12      MS. GARBER:  Yes.
13      THE WITNESS:  No.
14 BY MS. GARBER:
15      Q    After you issued your MDL report, have
16 you spoken with any of the defense experts about
17 this litigation?
18      A    No.
19      Q    Have you ever spoken with Dr. Swisher
20 about this litigation?
21      A    No.
22      Q    Have you ever spoken with Dr. Huh about
23 this litigation?
24      A    Warner?
25      Q    Yes?

Page 92

1      A    No.
2      Q    Have you ever spoken with Dr. Holcombe
3 about this litigation?
4      A    No.
5      Q    Did you conduct any research in
6 connection with your expert opinion?
7      MS. CURRY:  Object to the form.
8 BY MS. GARBER:
9      Q    In other words, did you do a literature
10 search on PubMed or Medline?
11      A    Oh.  Yes, I often -- particularly as I
12 was reading an article, if I felt that there was
13 something that was important in one of the reference
14 lists for an article that I was reading, then I
15 would go do a lit search to find that article and
16 read that as well.
17      But yes, I've done quite an extensive
18 literature search.
19      Q    Did you ever do any general searches, for
20 instance, talcum powder products and ovarian cancer,
21 or was it just to find other papers based on the
22 papers you had previously read?
23      MS. CURRY:  Object to the form.
24      THE WITNESS:  I've done all of that.
25 ///

Page 93

1 BY MS. GARBER:
2      Q    Did counsel in the MDL provide for you
3 any published literature for you to review?
4      A    Other than that flash drive that we
5 originally talked back in November of 2016, no.
6      Oh, ma'am, I'm sorry.  For the sake of
7 the completeness, I have received a copy of that
8 Health Canada assessment which was not available to
9 me online, and also the Taher article, which has not
10 been published.  And it's in my materials reviewed,
11 but I believe that I received one or two of the
12 abstracts from Dr. Saed's lab that have yet to be
13 presented.
14      So, sorry, that was provided for me.  But
15 I asked for those materials.  They weren't provided
16 to me without me reading about them I think in
17 plaintiff's experts' depositions or reports and then
18 I asked to see them.  Sorry about that.
19      Q    Between when you were first retained in
20 2016 and were given the flash drive and completing
21 your expert report in the MDL, you were not provided
22 any published literature by Johnson & Johnson
23 lawyers.  Is that a true statement?
24      A    Other than what we've just discussed?
25      Q    I'm trying to narrow down before your

Cheryl Saenz, M.D.

Page 94

1  expert report was issued.
2      A   Oh, before it was issued?
3      Q   Yes.
4      A   But I just listed those things.  So I did
5  receive those before it was issued.
6      Q   Okay.  We're -- I'm going to mark your
7  report in a minute.  But before your expert report
8  was issued, you had received some Dr. Saed
9  abstracts, the Taher meta-analysis and the Health
10  Canada review?
11      A   The Health Canada summary, yeah, the
12  assessment; right.  Yes, before my report was
13  issued.
14      Q   Which abstracts did you receive in
15  connection with Dr. Saed's work?
16      A   I'd have to look at my expert report to
17  see exactly because they're listed there in the
18  materials reviewed.
19          MS. GARBER:  Let's mark the expert
20  report.
21          (C. Saenz Exhibit 5 was marked for
22          identification.)
23          MS. GARBER:  We'll mark the expert report
24  of Cheryl Saenz dated February 25th, 2019, as
25  Exhibit 5.

Page 95

1          Do you need one?
2          MS. CURRY:  No, I have one.
3  BY MS. GARBER:
4      Q   Doctor, let's turn in Exhibit 5 of your
5  expert report --
6          MS. CURRY:  Actually, can I just ask you
7  one thing.  The copy that Dr. Saenz has that's been
8  marked as an official exhibit is not in color, but
9  there is some color in the original report.
10          Do you want to mark the color version or
11  swap it out?
12          MS. GARBER:  If you want to -- do you
13  have a color copy?
14          MS. CURRY:  I do.
15          MS. GARBER:  Sure.
16          THE WITNESS:  I'm sorry, what page,
17  ma'am?
18  BY MS. GARBER:
19      Q   If we turn to page 32 of your report.
20      A   Yes.
21      Q   There is a document that spans from
22  page 32 to 39 that was titled "References"?
23      A   Yes.
24      Q   Can you tell me what the nature of that
25  document is?

Page 96

1      A   These are all the references that I made
2  reference to in my report.
3      Q   So these are the references that were
4  cited to in the body of your expert report?
5      A   Right.  These are the -- right, exactly.
6      Q   Then if we turn to 40 through 42, what is
7  the nature of those documents titled "Additional
8  Materials Reviewed By Dr. Cheryl Saenz"?
9      A   So these are other articles that I have
10  read over the time period that I have been giving
11  opinions in the talc litigation matters, but that I
12  didn't necessarily reference in my report.
13      Q   I notice those are listed alphabetically,
14  are they not?
15      A   Yes.
16      Q   I don't see any reference to any of
17  Dr. Saenz' work; is that true?
18      A   I am Dr. Saenz.
19      Q   I'm sorry.  I don't see any reference to
20  Dr. Saed's work.  Do you?
21      A   So if you look on page 33, reference 21,
22  Nicole Fletcher is first author on one of his works.
23  That's actually his work.
24      Q   With regard -- I was referencing the
25  second grouping.  Do you cite any of Dr. Saed's

Page 97

1  abstracts?
2      A   No, because I do in the report.  That's
3  why it's in the report.  That's why it's listed
4  there.
5      Q   I think you told me several abstracts.  I
6  don't see -- or a couple of abstracts.  I don't see
7  more than one.
8      A   I can't remember the name of his other
9  first author.  There's Fletcher and then there's --
10  I can't remember who else he published with.
11      Q   Did you read Dr. Saed's 2019 publication
12  with regard to talc and ovarian cancer molecular
13  mechanisms?
14      A   No, I don't believe that I did.  I
15  believe that I read his deposition testimony and his
16  expert report.  So I would have learned what I
17  learned about what he did from his expert report as
18  well as his deposition testimony.
19      Q   So I'm clear, you have not read his 2019
20  publication; is that true?
21      A   I don't believe that I have.
22      Q   It isn't your testimony, is it,
23  Dr. Saenz, that by reading his deposition and expert
24  report, you thereby know what is in his peer
25  reviewed and published publications?

Cheryl Saenz, M.D.

Page 98

1    MS. CURRY:  Object to the form.
2    THE WITNESS:  I've not read the
3  publication from 2019.  I have read his expert
4  report wherein he describes the experiments he did,
5  I believe, for that publication.  But no, I have not
6  read the 2019 publication.
7  BY MS. GARBER:
8    Q    You do make comments about his
9  publication in your expert report?
10    A    The one --
11    MS. CURRY:  Object to the form.
12    THE WITNESS:  -- that is cited in my
13  report; correct.
14  BY MS. GARBER:
15    Q    Did you ask Johnson & Johnson to provide
16  you with any documents?
17    MS. CURRY:  Objection to the form.
18    THE WITNESS:  What do you mean by
19  "documents"?
20  BY MS. GARBER:
21    Q    Any.  Did you ask for any documents
22  whatsoever from Johnson & Johnson?
23    A    Well, yes, we've already covered I asked
24  for the Health Canada assessment and I asked for the
25  Taher report, and I believe I asked for one of the

Page 99

1  abstracts from Dr. Saed to take a look at that.
2    Q    Which abstract was that?
3    A    I think it's the one that's referenced
4  there as reference 21.
5    Q    How did you know to ask for that?
6    A    Because I read his report and saw where
7  he talked about that.  But I also read the reports
8  of some of plaintiff's gynecological oncology
9  experts where they reference that he talked about
10  rising levels of CA 125 as a result of talc
11  treatment of ovarian cancer cells.
12    Q    How did you know to ask for the Taher
13  paper?
14    A    Because that was discussed in, I believe,
15  the depositions of some of plaintiff's experts.
16    Q    How did you know to ask for the Health
17  Canada assessment?
18    A    Again, the same thing.  I believe that
19  was discussed in some of plaintiff's experts
20  depositions.
21    Q    Did you ask Johnson & Johnson for any
22  internal documents?
23    A    Internal to Johnson & Johnson?
24    Q    Yes.
25    A    No.

Page 100

1    Q    Why not?
2    A    I didn't believe that they were important
3  to my opinion.  I don't know where they would come
4  from.  They're not peer-reviewed literature and my
5  opinion is based on my experience, my treating
6  patients with ovarian cancer, as well as assessing
7  people, and the risk factors and a review of the
8  peer-reviewed literature.
9    Q    What Johnson & Johnson, the defendant,
10  was saying about the science was not important to
11  you, Dr. Saenz?
12    MS. CURRY:  Object to the form.
13    THE WITNESS:  So I wouldn't know the
14  context of that.  What's important to me in
15  assessing whether or not application of talcum
16  powder products in the perineum is increasing the
17  risk of ovarian cancer is reading the peer-reviewed
18  literature to see if that's substantiated by that.
19  BY MS. GARBER:
20    Q    For the expert reports that are listed in
21  your reference materials, all of them, all three
22  lists, did you read every word of those reports?
23    A    Can you reference me which page we're
24  looking at now?  Are we looking at the supplemental
25  list or --

Page 101

1    Q    All three.
2    A    -- the report?
3    Q    Well, actually, it would just be the --
4  let's see what you called it -- additional
5  materials.  Have you -- which is at page 40,
6  attached to your expert report, have you read every
7  word of those expert reports?
8    A    Yes.
9    Q    Sorry.  Okay.  Have you read every word
10  of the deposition transcript of the witnesses listed
11  on page 40?
12    A    Yes.
13    Q    And similarly, have you read every word
14  of the expert reports that is listed on the
15  supplement to materials review by Dr. Cheryl Saenz?
16    A    Yes.
17    Q    You read Dr. Crowley's deposition
18  testimony; right?
19    A    Yes.
20    Q    What did you glean from his deposition
21  testimony?
22    MS. CURRY:  Object to the form.
23    THE WITNESS:  What did I glean?
24    MS. GARBER:  Uh-huh.
25    THE WITNESS:  I gleaned that I don't

Cheryl Saenz, M.D.

Page 102

1   think he necessarily understands that the vaginal
2   mucosa and the eye mucosa are the same.
3   BY MS. GARBER:
4       Q   And you've made reference to that in
5   your expert report, haven't you?
6       A   Yes.
7       Q   Did you glean anything else from reading
8   his testimony?
9           MS. CURRY:  Object to the form.
10          THE WITNESS:  Not that I wanted to remark
11  on.
12  BY MS. GARBER:
13      Q   Do you have any criticisms of his expert
14  report other than with regard to the vaginal mucosa?
15      A   Not that I know.
16          MS. CURRY:  Object to the form.
17          THE WITNESS:  Not that I intend to give.
18  BY MS. GARBER:
19      Q   What did you glean from the testimony of
20  Dr. Saed?
21          MS. CURRY:  Object to the form.
22          THE WITNESS:  I felt that based on his --
23  I believe that based on his deposition testimony,
24  that there were a lot of irregularities in the
25  research that he conducted.  I don't believe that

Page 103

1   the results as he stated them from his work
2   necessarily support the hypothesis that chronic
3   inflammation leads to the development of ovarian
4   cancer.
5   BY MS. GARBER:
6       Q   And with regard to your prior statement,
7   "I don't believe that the results as he stated them
8   from his work necessarily support the hypothesis
9   that chronic inflammation leads to the development
10  of ovarian cancer," is limited to the context of his
11  study that appears at reference 21?
12          MS. CURRY:  Object to the form.
13          THE WITNESS:  No.  I believe that what
14  you asked me about was his -- what I gleaned from
15  his deposition testimony and so I was commenting on
16  that.
17          I think that Dr. Saed is mentioned in
18  many different places, many different expert reports
19  and so to some extent, it gets confusing to me as to
20  what the source for each and every one of these
21  things is.
22          Sometimes I saw it in expert plaintiff's
23  reports or their deposition testimony.  But from
24  Dr. Saed's deposition testimony, I believe that he
25  talks about how his treatment of talc to the ovarian

Page 104

1   cancer cells causes changes in the molecular biology
2   of those cells that leads to ovarian cancer and I
3   don't believe that the reports that -- that the
4   reports of his data, the way that he puts them
5   forth, actually show that.
6   BY MS. GARBER:
7       Q   But you make that statement not having
8   read all his data, don't you?
9           MS. CURRY:  Object to the form.
10          THE WITNESS:  I read his report and I
11  read his deposition and I read at least one of the
12  papers from Fletcher and Saed, and I read definitely
13  references to him in other expert plaintiff's
14  reports.
15  BY MS. GARBER:
16      Q   Doctor, from reading his expert report
17  and from reading his two depositions; right?
18      A   There were two volumes to his deposition;
19  correct.
20      Q   You understood that he published a study
21  whereby he conducted an experiment with talc and the
22  cellular response, but yet you didn't ask for that
23  study?  You didn't ask to review that study itself?
24          MS. CURRY:  Object to the form.
25          THE WITNESS:  No, I read his testimony

Page 105

1   where he talked about those things and he had his
2   notebooks in front of him.  And I also read his
3   report, because he even discussed in his deposition
4   that the science that was in his report is the
5   experiments that he then went on to publish.
6   BY MS. GARBER:
7       Q   I see.  As a scientist, you just read a
8   deposition, you don't bother to consult the data.
9   Is that how it works?
10          MS. CURRY:  Objection.  Argumentative.
11          THE WITNESS:  No.
12  BY MS. GARBER:
13      Q   Don't you think the best source of
14  understanding Dr. Saed's work is to look at the data
15  itself, Dr. Saenz?
16          MS. CURRY:  Object to the form.
17          THE WITNESS:  I did look at the data from
18  the Fletcher and Saed paper and then --
19  BY MS. GARBER:
20      Q   But you didn't look at the 2019 data, did
21  you, Dr. Saenz?
22      A   Ma'am, I wasn't finished with my
23  response.
24      Q   I'm sorry.  Go ahead and finish.
25      A   I look at what Dr. Saed's report was and

Cheryl Saenz, M.D.

Page 106

1 there was data in that report; that is his expert
2 report. He provided data in that expert report as
3 to the experiments that he had done and that's what
4 I looked at.
5     Q    For your critique, Doctor, don't you
6 think it would be fair for you to look at the source
7 data rather than rely on his deposition testimony
8 about those data?
9         Isn't the direct data more reliable than
10 his deposition about the data?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  I didn't say his
13 deposition. I said his report. His source data is
14 in his report. He testified to as much. The
15 written report that he submitted as an -- as an
16 expert are the experiments that he says he
17 published. So he is the source and I had that
18 report and I read that report.
19 BY MS. GARBER:
20     Q    So his expert report is the totality of
21 his data that was published in the 2019 publication,
22 is that your testimony?
23     A    That's his testimony.
24        MS. CURRY:  Object to the form.
25 ///

Page 107

1 BY MS. GARBER:
2     Q    And all one needs to do is to read his
3 deposition to fully understand the data that is
4 referenced and described in the 2019 publication, is
5 that your testimony?
6        MS. CURRY:  Object to the form.
7        THE WITNESS:  You're misstating my
8 testimony. What I said --
9 BY MS. GARBER:
10     Q    Why don't you clarify?
11     A    I'd be happy to. What I said is I read
12 his report and his report is the experiments that he
13 did, that he then says he published in his
14 deposition. But the report contains the
15 experiments. He said he did that report for the
16 purposes of evaluating talc and its potential to be
17 carcinogenic, but he states it himself, he is the
18 source.
19     Q    Can you tell me from reading his expert
20 report what his methodologies and materials were
21 with regard to his study that was published in 2019?
22        MS. CURRY:  Object to the form.
23        THE WITNESS:  Can I have his expert
24 report in front of me so that I can make sure I
25 don't misquote anything?

Page 108

1        MS. GARBER:  Sure. I can't give that you
2 to you right now, but you can ask your counsel to
3 look at his report.
4        THE WITNESS:  Okay. For the purposes of
5 accuracy, I'd rather not hypothesize about what he
6 had in his report, but if I have it in front of me,
7 I would be happy to comment on it.
8        MS. GARBER:  Okay.
9 BY MS. GARBER:
10     Q    Where do you list in your references
11 Dr. Saed's abstracts?
12     A    I don't recall the name of the first
13 author on anything other than the Fletcher abstract
14 so I don't know where to find it right now. I do
15 believe that I have seen them, but I don't know
16 where it is right now.
17     Q    Is it fair to say, Dr. Saenz, that
18 Dr. Saed's abstracts are not listed on any of your
19 reference materials?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  I don't think that would be
22 fair to say, because I just am saying that I can't
23 recall who else were first authors on his papers
24 right now. And so I can't be sure that they are
25 aren't actually here, other than the Fletcher paper,

Page 109

1 or the Fletcher abstract, I should say. But without
2 recalling who the first author was, I just can't
3 recall.
4 BY MS. GARBER:
5     Q    You did read Health Canada's draft
6 screening; correct?
7     A    Yes.
8     Q    Have you read any comment letters or
9 reports issued in response to the Health Canada's
10 December DSAR?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  No, I don't believe that I
13 have.
14 BY MS. GARBER:
15     Q    Have you or are you planning to comment
16 to Health Canada regarding their assessment?
17     A    No, I am not.
18     Q    Have you been asked to reply?
19     A    No, I have not.
20     Q    Have you been asked to testify at any
21 United States or state government proceedings
22 regarding talcum powder products?
23     A    No, I have not.
24     Q    Are you conducting any research in any
25 capacity concerning talcum powder products and risk

Cheryl Saenz, M.D.

Page 110

1  of ovarian cancer, and by that I mean in your
2  laboratory or at your institution?
3      A   No, ma'am.
4      Q   Have you ever applied for a grant or any
5  monies to conduct a research project on talcum
6  powder products and ovarian cancer?
7      A   No.
8      Q   Do you sit on any editorial boards for
9  any scientific journals?
10     A   As a regular editorial board position,
11  no. But I have been an ad hoc reviewer.
12     Q   I saw that in your CV. As an ad hoc
13  reviewer, which journals have you served on?
14     A   Let me turn to my -- is that my CV? Yes.
15  So I've an ad hoc reviewer for Gynecologic Oncology,
16  for the Gray Journal, which is the American Journal
17  of Obstetrics and Gynecology, for Cancer, and for
18  the Journal of Pediatric Surgery Case Reports.
19     Q   In that regard, have you ever reviewed
20  any articles in connection with talcum powder
21  products and risk of ovarian cancer?
22     A   No.
23     Q   Turning back to your expert report and
24  going through it, there is at the back of your
25  report, a document titled "Table one, analysis of

Page 111

1  case control studies cited by Dr. Smith-Bindman,"
2  and table four of her expert report.
3          Do you see that?
4      A   Yes.
5      Q   What is the nature of that document?
6      A   The nature of this document was to
7  analyze and review the case control studies that are
8  cited by Dr. Smith-Bindman in her report as
9  influencing her opinion. But in my review, in
10  reading her report, it became obvious to me that she
11  was mis-transcribing or misquoting the numbers and
12  the odds ratios and the confidence interval from the
13  original documents into her report.
14         So in my review, I wanted to make sure I
15  had accurate data and I found a number of
16  discrepancies.
17     Q   Is it your opinion that those
18  discrepancies, as you say, were made intentionally?
19         MS. CURRY: Object to the form.
20         THE WITNESS: I have no idea.
21  BY MS. GARBER:
22     Q   Is it your opinion that those
23  discrepancies made a difference in the outcome of
24  her opinions?
25         MS. CURRY: Object to the form.

Page 112

1          THE WITNESS: I believe that these
2  discrepancies misrepresent the data, and so for the
3  sakeness [sic] of trying to be accurate with the
4  data, I wanted to make sure I had an accurate
5  representation. I do believe that this was in part
6  part of her opinion, otherwise, I don't think she
7  would have put it in her report.
8  BY MS. GARBER:
9      Q   Do you have any basis to conclude that
10  she intentionally misrepresented the data?
11         MS. CURRY: Object to the form.
12         THE WITNESS: I don't know why she
13  misrepresented the data. I only know that she did.
14  BY MS. GARBER:
15     Q   You read her deposition; did you not?
16     A   Yes, I did.
17     Q   Did you read both volumes?
18     A   Yes, I did.
19     Q   What was your understanding of her
20  testimony with regard to table four in her second
21  deposition?
22     A   I don't believe I recall specifically
23  getting asked questions about table four in her
24  deposition. I --
25     Q   You didn't read her deposition, did you,

Page 113

1  Doctor?
2      A   No, that's not true, ma'am. I did read
3  her deposition, both volumes, cover to cover. What
4  I recall the main focus of her deposition testimony
5  was on the individual analysis that she did, which
6  she called her own systematic review of the
7  literature that has been published and the different
8  conditions on which she made that analysis.
9      Q   I notice, Doctor, that your chart, which
10  is table one, of her table, table four, you have
11  indicated on the right-hand column mistakes in
12  reported -- mistakes in reported data in table four
13  of Smith-Bindman's report.
14         Is that correct?
15     A   Yes.
16     Q   Then you go down for the various studies
17  and you indicate a number. So we'll just do for
18  instance, the Schildkraut paper?
19     A   Okay.
20     Q   You indicate, Schildkraut paper, and you
21  give an odds ratio or a relative risk and then you
22  give a confidence interval; correct?
23     A   Well --
24         MS. CURRY: Object to the form.
25         THE WITNESS: I don't give that. That's

Cheryl Saenz, M.D.

Page 114

1  what the Schildkraut paper found.
2  BY MS. GARBER:
3     Q   That's what I'm trying to understand.  So
4  you -- so I understand the nature of your table,
5  you're giving Schildkraut's odds ratio or relative
6  risk for every use of genital talc, and then if we
7  move to the right, you're indicating whether or not
8  it's statistically significant or not statistically
9  significant; correct?
10    A   Again, I don't give these.  This is the
11  data as reported in the table.
12    Q   Understood.
13    A   I am generating this table, extracting
14  the data from the report as published, and comparing
15  it to what Dr. Smith-Bindman listed in her table
16  four.
17        So for ever versus never genital-only use
18  of talcum powder products, that's what Schildkraut
19  reports, and Schildkraut reported that that was a
20  statistically significant finding.
21    Q   In the next column for the mistakes, what
22  you're indicating here is that Dr. Smith-Bindman
23  reported an incorrect odds ratio in her table four?
24    A   That's correct.
25    Q   Okay.  Now I understand the nature of

Page 115

1  your table.
2     A   Okay.
3         MS. GARBER:  Let's mark
4  Dr. Smith-Bindman's table four and a couple
5  documents that sort of explain it from her report.
6  We'll mark that as Exhibit 6.
7         (C. Saenz Exhibit 6 was marked for
8         identification.)
9  BY MS. GARBER:
10    Q   And I'll represent for the record, this
11  does not include every page of her expert report.
12  It's meant to demonstrate table four.  And so if you
13  see at the bottom of 18, it starts to describe what
14  is going to be referenced at her table four.
15        Do you see that?
16    A   Where are you, ma'am?
17    Q   If you go to the top of page 19, first
18  paragraph.  It ends -- the last sentence says, "the
19  number of individual women included in each study
20  and the reported or estimated effect size for any
21  exposure to talc adjusted for other risk factors
22  such as age are in table four."
23        Did I read that correctly?
24    A   Yes.
25    Q   And so there she's just describing the

Page 116

1  nature of the table four; correct?
2     A   Hold on one second, please.
3         MS. CURRY:  Object to the form.
4         THE WITNESS:  She's describing that in
5  table four and table four is labeled, "list of
6  included studies with number of cancers, controls
7  and reported odds ratios."  So that's the odds ratio
8  that she claims was reported in the study for ever
9  versus never use of perineal -- the perineal
10  application of talc.
11  BY MS. GARBER:
12    Q   Does it say that, Doctor?
13    A   It does in the title.
14    Q   Did she provide any testimony about why
15  those odds ratios are slightly off in her table
16  four?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  I don't recall, but I'd be
19  happy to look at the deposition.  But specifically
20  with respect to table four, I don't recall.
21        MS. GARBER:  Okay.
22        THE WITNESS:  I do recall that her own
23  analysis, she changed numbers and things, but this
24  is table four, which is titled "reported odds
25  ratio."

Page 117

1  BY MS. GARBER:
2     Q   Is the gist of this table that you're
3  trying to convey she's misrepresenting the data, or
4  rather, there's mistakes and she's sloppy, or both?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  Again, as I testified
7  earlier, I don't know what her intention was and why
8  the data that is listed as reported odds ratios,
9  which means the published odds ratios, I don't know
10  why in this table it's different than what actually
11  was in the study.  I just know that it is.
12  BY MS. GARBER:
13    Q   Is it important to get it right in your
14  opinion?
15        MS. CURRY:  Object to the form.
16        THE WITNESS:  It's important that she --
17  if she's going to label this as reported odds ratio,
18  it's important that she transcribe the data
19  accurately.
20  BY MS. GARBER:
21    Q   Let's look at your table one.  Let's look
22  at the Schildkraut study.  You stated here that the
23  accurate odds ratio is 1.44 with a confidence
24  interval of 1.11 to 1.86; correct?
25        MS. CURRY:  Object to the form.

**Page 118**

1    THE WITNESS:  For ever versus never
2  genital use.
3  BY MS. GARBER:
4    Q    That's incorrect, isn't it?
5    A    No, it's correct.
6    MS. GARBER:  I'll mark the Schildkraut
7  paper, which is Exhibit 7.
8    (C. Saenz Exhibit 7 was marked for
9    identification.)
10  BY MS. GARBER:
11    Q    Doctor, in the Schildkraut paper, the
12  ever or any genital use, the odds ratio is reported
13  a 1.71 with a confidence interval of 1.26 to 2.33;
14  correct?
15    A    Where are you, ma'am?
16    Q    I'm at page 1413.
17    A    And where?
18    Q    Under the results, at the bottom of the
19  page.
20    Doctor, is that what it says?
21    A    That's --
22    MS. CURRY:  Object to the form.
23    THE WITNESS:  -- what you're reading,
24  however --
25  ///

**Page 119**

1  BY MS. GARBER:
2    Q    Doctor, is that what it says?
3    A    Ma'am, ma'am, I said that's what you're
4  reading.  But I need you to turn to the next page,
5  which is table two, which shows any genital use has
6  an odds ratio of 1.44 with a confidence interval of
7  1.11 on to 1.86, which is the ever versus never use.
8  And that is where I draw my figure from.
9    Q    Doctor, you drew your figure from the
10  abstract, didn't you?
11    A    No.
12    MS. CURRY:  Object to the form.
13    THE WITNESS:  I drew my figure from this
14  table.
15  BY MS. GARBER:
16    Q    And though you didn't report under the
17  result section any genital powder use odds ratio
18  1.71?
19    A    Because that has to do with daily use.
20  That's not any use ever.  Any use ever is what's in
21  table two.  The table four, as in the Smith-Bindman
22  study, didn't qualify that it was for any daily use.
23    What you're reading from is any daily
24  use, whereas table two is an ever versus never,
25  which doesn't qualify the dosing to be daily.

**Page 120**

1    Q    Doctor, doesn't the ever use under table
2  two give the odds ratio of 1.39 with a confidence
3  interval of 1.10 to 1.76?
4    MS. CURRY:  Object to the form.
5    THE WITNESS:  That's for body powder
6  uses, ma'am.  That's not restricted to genital use.
7  BY MS. GARBER:
8    Q    Okay, Doctor.  Let's turn to
9  Dr. Smith-Bindman's deposition testimony.
10    MS. CURRY:  We've gone an hour, so if you
11  need a break, just let us know.
12    THE WITNESS:  Okay.
13  BY MS. GARBER:
14    Q    Do you have any recollection of what she
15  said, why those numbers were slightly off on table
16  four in her deposition?
17    A    No, ma'am, I already testified I'd need
18  to look at her deposition to testify specifically.
19    Do you have a copy of her deposition
20  testimony?
21    Q    I do.
22    A    Thank you.
23  ///
24  ///
25  ///

**Page 121**

1    MS. GARBER:  I'll represent for the
2  record that this is not her complete deposition, but
3  an excerpt where she testified about this topic.
4    (C. Saenz Exhibit 8 was marked for
5    identification.)
6  BY MS. GARBER:
7    Q    Doctor, this deposition was on Friday,
8  February 8th, on 2019; correct, Volume two?
9    A    That's what it says.
10    Q    And that is reflected that you read this
11  deposition on your reference list; correct?
12    A    Yes, ma'am.
13    Q    If we turn to page 254 of her deposition.
14    A    Okay.
15    Q    She was asked, was she not, what she did
16  to prepare for the deposition since yesterday, and
17  at lines 13 through 17, does she indicate that she
18  called the biostatistician who worked on the
19  meta-analysis for review for a few details, and that
20  her name was Dr. Hall?
21    A    That's what it says.
22    Q    Do you understand from reading her
23  deposition that it was Dr. Hall, the
24  biostatistician, who ran these numbers and not
25  Dr. Bindman?

Cheryl Saenz, M.D.

Page 122

1    A    That's what I understand from the
2  deposition testimony.
3    Q    And then if you turn to page 255, at
4  lines 16 through 25, it indicates what notes did you
5  make from your conversation with Dr. Hall.  And she
6  explains that she mostly asked her to clarify about
7  how she did the calculations and the numbers that
8  are shown in the figures.
9         She goes on to explain, she was
10 struggling to see why they were not exactly the same
11 as the ones shown in the published studies.
12        And then it --
13   A    Ma'am, I'm sorry, I believe you're
14 misquoting what it says here.
15   Q    Okay.  What do you think it says?
16   A    It says, "I was struggling to understand
17 why the numbers and the figures were not exactly the
18 same as the ones that you showed me in the published
19 manuscript."  So that's not the same as saying, in
20 published studies.
21        What Dr. Smith-Bindman is testifying to
22 here is what I was referencing before.  These are
23 questions about her own meta-analysis.  These are
24 not questions that are referring to table four.
25        Table four is separate and distinct from

Page 123

1  her own meta-analysis.  So all of this conversation
2  in her deposition is with regards to the
3  meta-analysis that she did separate and apart from
4  table four.
5    Q    That's your understanding of her
6  testimony?
7    A    That is --
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  That is what is there.
10 BY MS. GARBER:
11   Q    Let's go on to page 257.  On page 257,
12 lines one through nine, does she explain that what
13 the discrepancies between the studies and what was
14 reported on table four was attributable to issues
15 with the software that the biostatistician used in
16 running those numbers?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  I'll need to read this,
19 ma'am.
20 BY MS. GARBER:
21   Q    Okay.
22   A    She makes absolutely no specific
23 reference to table four.  She talks about that there
24 are some numbers that she didn't understand, that
25 the statistician then says that there were -- it was

Page 124

1  not necessarily a problem with the software.  She
2  specified that the calculations were made by the
3  software in the program she used.  But there's
4  absolutely no reference here specifically to table
5  four.
6    Q    Do you harbor the opinion that
7  Dr. Smith-Bindman intentionally misrepresented her
8  numbers?
9         MS. CURRY:  Object to the form.
10        THE WITNESS:  I harbor the opinion that
11 table four in Dr. Smith-Bindman's report, which is
12 listed as the transcription of the reported odds
13 ratios from the published literature as ever versus
14 never use, are not actually the numbers that were in
15 that publication, or those publications.  That is
16 different than her own meta-analysis, which was her
17 own analysis that she did at the end of her report.
18        I don't know what her motivation was.  Do
19 I know that the numbers that she reported are wrong,
20 where I have highlighted that they're wrong.
21 BY MS. GARBER:
22   Q    And if in fact, it's her testimony that
23 those number are slightly off and she was not aware
24 they were slightly off, but it was attributable to
25 her biostatistician's application of a software

Page 125

1  program, do you have any criticisms of her table
2  four?
3         MS. CURRY:  Object to the form.
4         THE WITNESS:  Yes, I do.  This is not a
5  calculation.  This is a reporting of the data from
6  the studies that were published.  Whatever software
7  program her statistician used had nothing to do with
8  the production of the numbers that are in table
9  four.  The software program that she used was for
10 the purposes of her own meta-analysis.
11        Table four is supposed to be where she
12 looked at the published literature and transcribed
13 the number.  There were no computations that were
14 supposed to be getting done in table four as she
15 reported table four.
16 BY MS. GARBER:
17   Q    Do you have any basis to conclude that
18 those slight deviations from what was in the
19 published literature affected her opinions in any
20 way?
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  Yes, I do.  Because she
23 reported odds ratios that were incorrect and were
24 inflated from what was actually published in the
25 literature.

Cheryl Saenz, M.D.

Page 126

1  BY MS. GARBER:
2      Q   Were they all inflated?
3      A   No, and I didn't say they were all
4  inflated. I listed when there were no mistakes in
5  what she transcribed.
6      Q   And were there were mistakes, were those
7  always an inflation of the data or were they
8  sometimes a deflation of data?
9      A   I can't recall the exact nature of all of
10 them, ma'am. There's something like 30 studies
11 here.
12     Q   Wouldn't that make a difference,
13 Dr. Saenz? If she had deflated the value, that
14 wouldn't have affected her opinion, would it?
15         MS. CURRY: Object to the form.
16 BY MS. GARBER:
17     Q   Doesn't it show that this was not done
18 intentionally?
19     A   I don't think it -- we have any idea
20 whatsoever what her intent was. The data was wrong.
21 And when you're producing a report such as this and
22 you say that this is the data that's reported in
23 those studies, then you have a responsibility to
24 accurately report that data.
25         The directionality of it doesn't make it

Page 127

1  right or -- it's wrong to incorrectly report the
2  data.
3      Q   In reading her deposition, did you glean
4  from that that she realized that those data were
5  misreported and she tried to explain why they were
6  misreported?
7          MS. CURRY: Object to the form.
8          THE WITNESS: Again, the deposition
9  testimony that you're handing me here is an
10 explanation of what her meta-analysis was and the
11 software programming that was used in order to
12 conduct her meta-analysis, it has nothing to do with
13 what's been produced in table four.
14         MS. GARBER: That's your opinion.
15         MS. CURRY: Object to the form.
16         THE WITNESS: That's documented in her
17 report and in the testimony she gave. She talks
18 about this being for her meta-analysis, not for
19 table four.
20         MS. GARBER: Let's turn back to your
21 expert report.
22         THE WITNESS: Can we take a break?
23         MS. GARBER: Yes. It's a good breaking
24 point.
25         THE VIDEOGRAPHER: The time is 11:59.

Page 128

1  We're going off the record.
2          (Lunch break taken at 12:00 p.m.)
3              0o0
4      (The deposition resumed at 12:59 p.m.)
5              0o0
6          THE VIDEOGRAPHER: The time is now 12:58.
7  Back on the record.
8  BY MS. GARBER:
9      Q   Good afternoon, Dr. Saenz.
10     A   Good afternoon.
11     Q   With regard to Exhibit 5, your expert
12 report, your CV is attached to the back of it; is
13 that right?
14     A   Yes.
15     Q   And it looks like it was last updated
16 February of 2019; is that right?
17     A   Correct.
18     Q   Are there any amendments that you need to
19 make to your CV to make it accurate?
20     A   No.
21     Q   Does it accurately reflect all your
22 publications?
23     A   Yes.
24     Q   You don't hold yourself out as a cancer
25 biologist, do you?

Page 129

1          MS. CURRY: Object to the form.
2          THE WITNESS: I'm not formally trained in
3  cancer biology, but I have certainly worked in
4  cancer biology labs and I read the cancer biology
5  literature as it pertains to gynecologic
6  malignancies.
7  BY MS. GARBER:
8      Q   You don't have any degrees in
9  epidemiology?
10     A   I do not have any degrees in
11 epidemiology.
12     Q   You don't hold yourself out as an
13 epidemiologist, do you?
14     A   I'm not formally trained in epidemiology,
15 but I've published epidemiologic literature and I
16 certainly review epidemiologic literature on a
17 regular basis as pertains to gynecologic oncology.
18         MS. GARBER: Motion to strike as
19 nonresponsive.
20 BY MS. GARBER:
21     Q   Doctor, my question was, do you hold
22 yourself out as an epidemiologist?
23     A   I do have expertise in epidemiology and
24 gynecologic oncology.
25     Q   Do you hold yourself out as an

Cheryl Saenz, M.D.

Page 130

1  epidemiologist?  If I go to your website, does it
2  say you're an epidemiologist?
3      A    I don't have an website.
4      Q    ==If I went to a bio about you, does it say==
5  ==you're a epidemiologist?==
6      A    ==It says I'm an expert in gynecologic==
7  ==oncology and in that includes literature on the==
8  ==epidemiology of gynecologic oncology.==
9      Q    How many times have you served as an
10  ad hoc reviewer?
11      A    Upwards of 20.
12      Q    When was the last time you served as an
13  ad hoc reviewer?
14      A    Approximately two months ago.
15      Q    What journal?
16      A    Gynecologic Oncology.
17      Q    Were any of the papers that you reviewed
18  regarding ovarian cancer?
19      A    Over the course of my career?
20      Q    I'm sorry, were any of the papers that
21  you reviewed as an ad hoc reviewer, did the topic
22  concern ovarian cancer?
23      A    Right.  So for clarification purposes,
24  you mean over the course of my career?
25      Q    Yes.

Page 131

1      A    Yes.
2      Q    When was the last time?
3      A    Oh, I don't remember.  I review somewhere
4  around two to three articles a year.
5      Q    Do you know the -- based on you being an
6  ad hoc reviewer for gynecologic -- well, strike
7  that.
8          Have you reviewed abstracts for the
9  Society for Gynecologic Oncology?
10      A    Yes.
11      Q    When is the last time you did that?
12      A    You mean for the annual meeting itself?
13      Q    Yes.
14      A    I would say, two to three years ago.
15      Q    How many times have you done that kind of
16  work in general?
17      A    At least three.
18      Q    In that regard, did you ever review any
19  papers on the topic of ovarian cancer?
20      A    Yes.
21      Q    In that regard, did you review papers or
22  presentations on the topic of talc and ovarian
23  cancer?
24      A    No.
25      Q    Attendant to your work as an ad hoc

Page 132

1  reviewer for SGO, do you know what their policies
2  and procedures are for review and acceptance?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  So I think you're kind of
5  mixing apples and oranges.  When you review for the
6  annual meeting for SGO, you're not an ad hoc
7  reviewer.  You're somebody that's either volunteered
8  to review the abstracts for presentation at the
9  meeting, or you're on the program committee and it's
10  your responsibility to review those abstracts.
11          Or you're on the marketing and
12  communications committee and you're asked to do it
13  in that role as well.
14  BY MS. GARBER:
15      Q    And in the three times that you have
16  served as a reviewer, what was your role for SGO?
17      A    So two of the times, I was invited to
18  review abstracts and to score them.  And one of the
19  times, I was actually a member of the program
20  committee that year.
21      Q    The two times that you were invited to
22  review and score, what were -- what was the nature
23  of the articles you were reviewing?
24      A    It was the breath and depth of
25  gynecologic oncology because I reviewed over 300

Page 133

1  abstracts for the annual meeting on each of those
2  occasion.
3      Q    But none of those involved talcum ovarian
4  cancer?
5      A    Not that I recall.
6      Q    The one additional time, what was the
7  nature of that one?
8      A    I was on the program committee.
9      Q    What does that entail?
10      A    That entails reviewing all of abstracts,
11  scoring them, and then going to a venue, if you
12  will, almost a two to three-day retreat where the
13  people that are actually on the program committee
14  decide which abstracts are being accepted, which
15  will be posters, which will be oral presentations,
16  and which will be highlighted with reference to
17  invited speakers.
18      Q    Would you say based on your experience,
19  it's a rigorous review to be accepted to present at
20  SGO?
21          MS. CURRY:  Object to the form.
22          THE WITNESS:  In what capacity?
23  BY MS. GARBER:
24      Q    Scientific capacity.
25          MS. CURRY:  Object to the form.

Cheryl Saenz, M.D.

Page 134

1     THE WITNESS: So I think that's really
2  kind of a gross overgeneralization of the way that
3  the meeting occurs. There are different levels of a
4  claim, if you will, or scientific accord of the
5  abstracts, based on whether or not you're accepted
6  for a plenary session presentation versus a breakout
7  session versus a poster session.
8         And so the scientific acclaim with each
9  of those is really in descending order.
10 BY MS. GARBER:
11    Q    Are you familiar with, I'll use the
12 phrase, policies and procedures or sort of the
13 context in which you would review data for the SGO?
14      MS. CURRY: Object to the form.
15      THE WITNESS: What do you mean by "data"?
16 BY MS. GARBER:
17    Q    In other words, the review process, say
18 were you asked to review and you were invited to
19 review and to score data or a presentation. Are you
20 familiar with policies and procedures of how that's
21 done generally speaking?
22    A    Well --
23    Q    In other words, is it five people, is it
24 ten people? What level of review is it? Just give
25 me a feel for how that process happens.

Page 135

1      MS. CURRY: Object to the form.
2      THE WITNESS: So I'm only familiar with
3  respect to the three times that I did serve as a
4  review for the meeting. So to that extent, yes.
5  BY MS. GARBER:
6     Q    To that extent, yes, what?
7     A    During the three times that I did serve
8  as a reviewer for the annual meeting, I'm familiar
9  with the policies and procedures.
10    Q    Okay. And what are these?
11      MS. CURRY: Object to the form.
12      THE WITNESS: I don't know what the
13 current ones are, but because I'm not on the program
14 committee this year. But when I did serve, there
15 can be many dozen of people that review abstracts,
16 but then the ultimate decision amongst the program
17 committee as to what makes it to plenary sessions
18 versus breakout sessions versus a poster is decided
19 by a committee of -- I believe our program committee
20 was around 20 people.
21 BY MS. GARBER:
22    Q    Are you planning to go to SGO this year?
23    A    I was.
24    Q    What did you do to prepare for today's
25 deposition?

Page 136

1     A    Other than write the report? I, as we
2  discussed earlier, read the Penninkilampi article
3  again last evening. I looked up some other articles
4  on COX and ovarian cancer. I've read my own report.
5         I met with counsel in preparation for
6  today. And generally read all the expert reports
7  that we talked about, read the depositions that are
8  listed in my reference, and re-reviewed the
9  literature that is in my report over a long time
10 period.
11    Q    In preparation for today's deposition,
12 how many meetings did you have with counsel?
13    A    Since what time period?
14    Q    Just in preparation for today's
15 deposition as you would understand that question.
16    A    Do we mean back to when I was first
17 retained for this matter or do we mean since my
18 report was submitted?
19    Q    In connection with preparing for today's
20 deposition, did you meet with counsel?
21    A    Specifically for today's deposition, I've
22 had one meeting.
23    Q    How long was that meeting?
24    A    About two and a half hours.
25    Q    Who was present?

Page 137

1     A    Ms. Curry.
2     Q    Anybody else?
3     A    No.
4     Q    Were any lawyers on the phone?
5     A    No. I was there too obviously.
6     Q    Did you have any other meetings with
7  Ms. Curry or any other lawyers in connection with
8  today's deposition, preparing for it specifically?
9     A    No.
10    Q    With regard to the documents that you
11 reviewed that you've told us about, how many hours
12 would you say you've reviewed those?
13    A    Probably in sum total, somewhere around
14 75 to 80 hours.
15    Q    So between, I thought you said between
16 February of '19 and today, you had worked about
17 15 hours?
18    A    Correct.
19    Q    So how many hours did it take you to
20 review the documents that you reference? The
21 Penninkilampi and the COX-2 and to re-review your
22 report and those types of things, how many hours did
23 that take?
24    A    About two hours.
25    Q    Other than counsel, have you told me

Cheryl Saenz, M.D.

Page 138

1  about all conversations that you've had concerning
2  this matter?  I think it's none, but there aren't
3  any other people other than counsel you've discussed
4  this case with; is that a true statement?
5      A    That's a true statement.
6      Q    I was asking you about internal documents
7  earlier, and I want to be sure I understand some of
8  your answers.
9           Do you harbor any opinions about whether
10  or not internal documents are reliable for forming
11  the basis of an expert opinion?
12          MS. CURRY:  Object to the form.
13          THE WITNESS:  I have no opinion on that.
14  I don't believe it's -- I don't believe it's
15  important to generating my opinion.  I believe that
16  my opinion is based on what we discussed before.  So
17  internal documents don't influence my opinion one
18  way or another.
19  BY MS. GARBER:
20      Q    So if you saw a document wherein Johnson
21  & Johnson employees were admitting -- I'll just
22  throw out a hypothetical -- talc can migrate,
23  there's compelling evidence that talc can migrate,
24  that wouldn't influence your opinion?
25          MS. CURRY:  Object to the form.

Page 139

1          THE WITNESS:  I base my opinions on the
2  peer-reviewed literature and there is no literature
3  that supports that preposition [sic].
4  BY MS. GARBER:
5      Q    There's no literature?
6      A    Not on the perineum to the ovaries, no.
7      Q    Do you limit it to that?
8      A    That's the case that we're discussing,
9  that's my review.
10      Q    So when you say there's no literature
11  that supports talc can migrate, you're limiting that
12  body of literature from the perineum to the vagina;
13  is that true?
14          MS. CURRY:  Object to the form.
15          THE WITNESS:  No, I'm qualifying my
16  statement that the application of talc from the
17  perineum and whether or not it can migrate to the
18  ovaries, there's no literature that supports that
19  hypothesis.
20  BY MS. GARBER:
21      Q    Okay.  We'll get to that shortly.
22          Are you aware of circumstances where
23  scientists have gained access to internal company
24  documents and rely upon those in formulating their
25  opinions for scientific publications?

Page 140

1          MS. CURRY:  Object to the form.
2          THE WITNESS:  No.
3  BY MS. GARBER:
4      Q    Are you aware of that?
5      A    No.
6      Q    Do I now have the full list of the
7  documents that you considered in formulating your
8  opinions as referenced in your February 2019 report?
9          MS. CURRY:  Object to the form.
10          THE WITNESS:  So I think there may be
11  some confusion with respect to the Saed abstract
12  that's in my report versus what has been presented
13  in -- I should say in a published format as what was
14  the meeting that was accepted at -- I'm sorry, the
15  abstract that was accepted at a meeting, but then
16  later published in the Journal of Reproductive
17  Sciences as the abstract that had been presented at
18  the meeting.
19          During the break, I asked counsel to show
20  me the abstract and there seems to be two abstracts
21  from Fletcher and Saed that have different topics
22  but are from the same meeting.
23          So the confusion for me was that I didn't
24  realize that they were two.  One is referencing the
25  CA 125, and I think that's the abstract that was

Page 141

1  listed as to be presented at the meeting in March
2  of 2018, but then the actual journal published a
3  different abstract.
4          So that's wherein the confusion lies.
5  BY MS. GARBER:
6      Q    So are you saying now after lunch break
7  and talking to counsel, you need to correct your
8  reference list?
9          MS. CURRY:  Object to the form.
10          THE WITNESS:  I need -- so the reference
11  is correct in the sense that that is what was
12  published in the Journal of Reproductive Sciences.
13  But the abstract that talks about CA 125 looks to me
14  as though it's from the program and it's not the
15  same abstract as what was then published in the
16  Journal of Reproductive Sciences.
17          So, yes, we likely should add that other
18  abstract that wasn't in the program.
19  BY MS. GARBER:
20      Q    So you're now saying we need to add
21  something to your reference list?
22      A    Correct.  I've seen both of those.  It
23  wasn't on my list, but I think that's because one
24  was in the program, the other was in the journal,
25  and they don't match, which means most likely

Cheryl Saenz, M.D.

Page 142

1  additional data was added to what was the program
2  aspect when it finally was published in the journal.
3      Q    What is the title of the abstract that
4  you say we now need to add to your reference list?
5      MS. CURRY: I actually have a copy of it
6  if that would be helpful, if you want to mark it as
7  an exhibit.
8      MS. GARBER: Sure.
9      MS. CURRY: I'll give you a copy of both
10  of the abstracts that Dr. Saenz just testified
11  about.
12      (C. Saenz Exhibit 9 was marked for
13      identification.)
14  BY MS. GARBER:
15      Q    Doctor, I'm going to mark as Exhibit 9,
16  an abstract that --
17      A    If you want to give me the marked one --
18      Q    Thank you.  That counsel just handed me.
19  The first of two documents that counsel just handed
20  me.
21      A    Right.
22      Q    The first is dated March 10th, 2018, and
23  it's from SRI, 65th annual scientific meeting, and
24  it's titled "Talcum powder enhances cancer antigen
25  125 levels in ovarian cancer cells and in normal

Page 143

1  ovarian epithelial cells."
2      Doctor, this is the abstract that was
3  originally reflected on your reference as
4  reference 21; is that correct?
5      MS. CURRY: Object to the form.
6      THE WITNESS: I don't actually think
7  that's correct, ma'am.  I think that the second one
8  is actually the one that's listed in my reference
9  list as number 21.
10      This one, Exhibit 9, is the abstract that
11  I believe comes from the program that was to be --
12  that was for the meeting, the 65th annual meeting of
13  SRI, which was on March 10th.
14      But then when the program abstracts were
15  published, the abstract was modified.  And that's
16  what ends up in the journal and is my reference 21.
17      MS. GARBER: Okay.
18      THE WITNESS: But I've seen both of
19  these, and that's where my confusion lied, because
20  they're both from the same meeting.  It's just that
21  the one that was published in the journal was
22  modified from the one that was published in the
23  meeting program.
24  BY MS. GARBER:
25      Q    Doctor, you didn't type yourself, did

Page 144

1  you, pages 32 through 42, of your expert report, did
2  you?
3      A    I supplied the reference to counsel, but
4  I did not format this list, that's correct.
5      Q    Do you have a folder on your computer
6  which reflects the body of literature that you have
7  reviewed in connection with your expert opinions
8  that formulate the reference that you have provided
9  us?
10      A    Yes.
11      MS. CURRY: Object to the form.
12  BY MS. GARBER:
13      Q    You have not brought with you that body
14  of literature with you today.
15      A    It's all on my computer, ma'am.
16      Q    It can be downloaded to a jump drive;
17  right?
18      A    Potentially, yes.
19      MS. GARBER: Let's mark as Exhibit 10 a
20  document.
21      (C. Saenz Exhibit 10 was marked for
22      identification.)
23  BY MS. GARBER:
24      Q    And, Doctor, this would reflect an
25  abstract titled "F-098, talcum powder enhances

Page 145

1  oxidative stress in ovarian cancer cells," Nicole
2  Fletcher, Ira Memaj, and Dr. Saed.
3      Is that correct?
4      A    That's correct.
5      Q    It's your testimony that in connection
6  with your expert report, you had reviewed this
7  abstract?
8      A    Yes, ma'am.
9      Q    Do you now need to add any other
10  documents to your reference list that we have
11  reviewed today to make it accurate to reflect what
12  you have reviewed in connection with your expert
13  report or expert opinions today?
14      MS. CURRY: Object to the form.
15      THE WITNESS: So with respect to what I
16  have cited in the report, no.  Obviously, I've had a
17  very long career and there's literature that I've
18  read that is not in this report or in my reliance
19  list over the course of time, but nothing else that
20  I've referenced to or cited for the purposes of this
21  report, other than my general fount of knowledge.
22  BY MS. GARBER:
23      Q    I appreciate that.  You understand that
24  I'm entitled to know the literature you considered
25  in formulating your opinions; correct?

Cheryl Saenz, M.D.

Page 146

1    A    Absolutely.  Which is why I tried to
2  figure out at lunchtime why there was a discrepancy.
3    Q    Do you have any documentation which
4  evidences -- strike that.
5         What was your assignment as you
6  understood it when you were first retained by the
7  MDL lawyers for Johnson & Johnson?
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  For this particular matter?
10        MS. GARBER:  Yes.
11        THE WITNESS:  To review the literature on
12  the topic of perineal application of talc and the
13  risk of developing ovarian cancer, to write a report
14  on that, as well as on the same evaluation that
15  plaintiff's experts made, and to essentially get my
16  opinion down on paper.
17  BY MS. GARBER:
18    Q    Were you asked to render a causation
19  opinion?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  With respect to whether or
22  not talc causes ovarian cancer -- the perineal
23  application of talc causes ovarian cancer, I would
24  say in the broadest sense; yes.
25  ///

Page 147

1  BY MS. GARBER:
2    Q    Why do you say in the broadest sense?
3  What do you mean by that?
4    A    Well, because I don't believe in any one
5  individual woman that we know what causes ovarian
6  cancer, and the issue that was put forth to me that
7  I was asked to comment on was whether or not the
8  hypothesis that perineal application of talc
9  increased the risk of ovarian cancer made sense from
10  an epidemiologic standpoint, from a biologic
11  plausibility standpoint, from a mechanistic
12  standpoint.  So that's what I mean by in the
13  broadest sense.
14  BY MS. GARBER:
15    Q    Are you saying that scientists can
16  determine what causes ovarian cancer in women
17  generally, but not what caused a given woman's
18  ovarian cancer?
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  So I think science is
21  trying to determine in the broadest sense what
22  causes ovarian cancer, but I think the state of the
23  science as it exists right now has only been to
24  identify known associated risk factors.
25        I think that, as time goes on, it's

Page 148

1  certainly my hope that we can identify causes of
2  ovarian cancer, but I don't think the science is
3  there right now.
4  BY MS. GARBER:
5    Q    So you understood that one of the
6  questions that you were asked to determine is
7  whether talcum powder products can cause ovarian
8  cancer; in other words, a general causation opinion.
9  Generally speaking, can ovarian -- sorry, can talcum
10  powder products cause ovarian cancer?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  Right.  So in the broad
13  sense of, does -- is hypothesis supported by the
14  epidemiology, the mechanistic studies that exist,
15  the bio -- the migration theory that's been put
16  forth, the patient data, the clinical data that we
17  know and that we see, is the hypothesis that
18  perineal application of talc can cause ovarian
19  cancer, is that substantiated or not.
20  BY MS. GARBER:
21    Q    That's a different question.  I just want
22  to be sure I know your opinions because I don't
23  think it's clear from your report.
24        Are you going to give an opinion, and is
25  it your opinion, can talcum powder products cause

Page 149

1  ovarian cancer -- epithelial ovarian cancer, is that
2  your opinion?
3    A    My opinion --
4        MS. CURRY:  Object to the form.
5        THE WITNESS:  -- is that talcum powder
6  products cannot cause ovarian cancer.
7  BY MS. GARBER:
8    Q    Is it your opinion that talcum powder
9  products are a risk factor for epithelial ovarian
10  cancer?
11    A    It is my opinion that talcum powder
12  products are not a risk factor for the development
13  of ovarian cancer.
14    Q    Is it your opinion that asbestos can
15  cause ovarian cancer?
16    A    It --
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  It is my opinion that IARC
19  has identified asbestos as causing ovarian cancer in
20  women with heavy occupational exposure, but in the
21  context of whether or not there is asbestos in the
22  talcum powder products, I do not believe that
23  asbestos, nor the talcum powder products themselves,
24  can cause ovarian cancer.
25  ///

Cheryl Saenz, M.D.

Page 150

1  BY MS. GARBER:
2      Q    Is it your opinion, Doctor -- I heard all
3  that.  Is it your opinion that asbestos can cause
4  epithelial ovarian cancer?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  Independent of IARC's
7  findings?
8  BY MS. GARBER:
9      Q    I didn't ask you that.  I just want to
10 know what your opinion is.  I don't want you to
11 qualify it.  Just it's a yes-or-no question.
12         Can asbestos cause epithelial ovarian
13 cancer?
14         MS. CURRY:  Object to the form, asked and
15 answered.
16         THE WITNESS:  So I don't think I can
17 answer it as a yes-or-no question, because I don't
18 think the literature is clear on that topic.
19 BY MS. GARBER:
20     Q    Is it your opinion that heavy
21 occupational use of asbestos can cause ovarian
22 cancer?
23     A    Same answer.  I don't think I can answer
24 that as a yes-or-no question because I think the
25 literature on that topic is not entirely clear.

Page 151

1      Q    That is inconsistent with your prior
2  testimony, isn't it?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  I don't believe that it is.
5          MS. GARBER:  Okay.  We'll get to that.
6  BY MS. GARBER:
7      Q    I think -- I think we already identified,
8  but just let me be sure.  You do not have any
9  opinions as to whether heavy metals can cause
10 epithelial ovarian cancer; is that true?
11     A    So I have not reviewed the literature on
12 heavy metals in ovarian cancer, so you are correct.
13 I'm not giving an opinion on that.
14     Q    You are not giving an opinion on whether
15 fragrance can cause epithelial ovarian cancer?
16     A    Likewise, I'm not giving an opinion on
17 that.
18     Q    Is asbestos a risk factor for epithelial
19 ovarian cancer?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  So again, based on my
22 review of the IARC 2012 document, and based on the
23 literature that I reviewed, including the Langseth
24 paper, I do not believe that the literature that's
25 been published to date supports a clear role for

Page 152

1  asbestos increasing the risk of ovarian cancer.
2  BY MS. GARBER:
3      Q    I didn't ask you for a clear role.  In
4  your opinion, is asbestos a risk factor for
5  epithelial ovarian cancer?
6      A    Again, I don't think that's a yes-or-no
7  answer, because I think the literature is somewhat
8  inconsistent on that particular topic.
9      Q    So you don't have that opinion?
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  I don't have an opinion
12 that it does or that it does not; correct.
13 BY MS. GARBER:
14     Q    You reviewed some of the plaintiff's
15 expert purports; correct?
16     A    That's correct.
17     Q    Those are all indicated on your reference
18 list; correct?
19     A    Yes.
20     Q    Would you agree that there are multiple
21 epidemiological studies that are cited in those
22 reports that showed an association between genital
23 use of talcum powder products and ovarian cancer?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  I would agree that some of

Page 153

1  the experts' reports cite to different epidemiologic
2  literature.  Some of that is demonstrating a weak
3  association with the use of perineal talc in the
4  development of ovarian cancer, in particular, in the
5  case control studies, but there's also other
6  literature that does not demonstrate such an
7  association.
8  BY MS. GARBER:
9      Q    How do you define weak, as you used it?
10     A    Weak would be an odds ratio of less than
11 two.  For this literature in particular, the odds
12 ratio tends to be in the range of 1.2 to 1.4.
13     Q    Are you saying that a weak odds ratio is
14 anything less than 2.0, the point estimate?
15         MS. CURRY:  Object to the form.
16         THE WITNESS:  I'm saying that the odds
17 ratios that have been shown in the literature on the
18 case control studies are in the range of 1.2 to 1.4.
19 It's not a strong association.
20 BY MS. GARBER:
21     Q    I'm trying to get your definition of what
22 you mean by weak association.  How do you define
23 that?
24     A    I define weak as something that is above
25 one, but lower than two, and that the strength of

Cheryl Saenz, M.D.

Page 154

1 the association is such that the results of the
2 study could still be due to random chance, recall
3 bias, or confounds within the study.
4    Q   If you look at a body of literature and
5 it's greater than one, and statistically
6 significant, but does not approach a point estimate
7 of 2.0, you deem that weak literature?
8      MS. CURRY: Objection.
9      THE WITNESS: No, I would deem that weak
10 statistical association, a weak odds ratio. Not
11 weak literature, that's not what I said.
12 BY MS. GARBER:
13    Q   Okay. You deem that a weak association?
14    A   Correct.
15    Q   And what published peer review study,
16 article, text, or treatise do you have that supports
17 that statement?
18    A   So off the top of my head, I can't
19 necessarily recall one specific. This is something
20 that I've just been taught over the years in
21 reviewing epidemiologic literature that you don't
22 just look at one thing, i.e., the odds ratio, and
23 say, whether or not that proves causation.
24      There has to be other things that would
25 support the contention of the hypothesis that would

Page 155

1 allow you to evaluate whether or not that odds risk
2 is impactful, meaningful, but just simply looking at
3 the odds ratio is not enough.
4    Q   Dr. Saenz, point me to one source that
5 says that you need a 2.0 point estimate or the study
6 data is weak. Just point me to one, just one
7 source.
8      MS. CURRY: Object to the form.
9      MS. GARBER: That says that.
10      THE WITNESS: So I actually think that
11 within the context of one of the IARC monographs
12 they talk about this, the statistical calculations
13 for some of the different risk factors, especially
14 with talc and the development of ovarian cancer.
15 And it's weak, and I believe their term is weak. I
16 believe that IARC uses the term weak when we talk
17 about statistical associations and odd ratios of 1.2
18 and 1.3.
19 BY MS. GARBER:
20    Q   That's not way asked you, did I? What
21 did I ask you?
22    A   I believe that's what you asked you.
23    Q   Didn't I ask you for a source that says
24 that anything below a 2.0 is deemed to be weak?
25    A   So I don't off the top of my head have an

Page 156

1 epidemiologic textbook in my recollection right now.
2    Q   I didn't ask you for a textbook. I asked
3 you for any source, and you can't name one, can you?
4    A   As we sit here today, ma'am, I cannot
5 recall one for you.
6      MS. CURRY: Object to the form.
7 BY MS. GARBER:
8    Q   Do you believe that the plaintiff expert
9 reports that you reviewed discussed biologically
10 plausible mechanisms of carcinogenicity based on the
11 scientific data that they reviewed?
12      MS. CURRY: Object to the form.
13 BY MS. GARBER:
14    Q   Whether or not you agree with it, do you
15 agree that plaintiff's expert reports discuss
16 biologically plausible mechanisms of carcinogenicity
17 that were based on scientific data that they
18 reviewed?
19      MS. CURRY: Object to the form.
20      THE WITNESS: Which reports specifically
21 are we talking about?
22 BY MS. GARBER:
23    Q   Any of them that you reviewed.
24      MS. CURRY: Object to the form.
25      THE WITNESS: The various reports had

Page 157

1 different discussion of different things. So
2 without seeing a specific report in front of me, I
3 can't assign a name to that topic matter.
4 BY MS. GARBER:
5    Q   How about the gynecologic oncologist
6 experts of plaintiffs that you reviewed, did each of
7 them discuss biologically plausible mechanisms of
8 carcinogenicity based on scientific data that they
9 reviewed?
10      MS. CURRY: Object to the form.
11      THE WITNESS: I do know that one or two
12 or perhaps all three of them did. I just don't know
13 specifically which ones did. I do believe that they
14 had a discussion of biologic plausibility, which I
15 disagreed with.
16 BY MS. GARBER:
17    Q   While I know that you disagree with
18 plaintiff's experts' causation opinions, do you
19 acknowledge that their opinions were based on
20 informed scientific medical judgment?
21      MS. CURRY: Object to the form.
22      THE WITNESS: No.
23      MS. GARBER: Are you laughing,
24 Ms. Sharko? That seems very unprofessional to me.
25      MS. SHARKO: Well, I think your question

Cheryl Saenz, M.D.

Page 158

1  is totally misleading and very unprofessional, and
2  I'm trying to honor your request that only one
3  lawyer object.  But it's really unclear to me
4  whether you're asking her about the content or
5  whether she agrees with them.
6        MS. GARBER:  Well --
7        MS. SHARKO:  I think --
8        MS. GARBER:  -- all I heard was a laugh
9  of my question and I don't think in all my years of
10 taking depositions I've ever had defense counsel
11 laugh out loud at one of my questions.  So that's a
12 first for me, so I appreciate that.
13       MS. SHARKO:  Well, I think --
14       MS. GARBER:  Go ahead, Dr. Saenz --
15       MS. SHARKO:  -- the record will reflect
16 that you are totally exaggerating what I did.  But,
17 go ahead with what you're doing, if that's what you
18 want to do.
19 BY MS. GARBER:
20    Q    Dr. Saenz, while you do not agree with
21 plaintiff's experts' causation opinions, do you
22 acknowledge that their opinions were based on
23 informed scientific medical judgment?
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  So, no, actually.  I think

Page 159

1  there's very little evidence for what they put forth
2  as biologic plausibility.  I think a lot of your
3  experts' reports were conjecture, hypothesis without
4  any scientific basis.
5  BY MS. GARBER:
6     Q    Do you think their opinions were
7  uninformed?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  I think their opinions were
10 wrong.
11 BY MS. GARBER:
12    Q    That's very different question.  You
13 disagree.  They're wrong.  But were they uninformed?
14       MS. CURRY:  Object to the form.
15       THE WITNESS:  I think that their opinions
16 were uninformed.  I don't think that they based on
17 their opinions on the literature as published,
18 because I think that had they actually read the
19 literature and analyzed it in the manner that I
20 have, they would come to the same conclusion that I
21 have.
22 BY MS. GARBER:
23    Q    Tell me which experts' you believe
24 opinions were uninformed and the reason they were
25 uninformed.

Page 160

1        MS. CURRY:  Object to the form.
2        THE WITNESS:  I believe all three of them
3  are uninformed.
4  BY MS. GARBER:
5     Q    All three who?
6     A    Drs. Wolf, Blair Smith, and
7  Clarke-Pearson.
8     Q    Why were all three of those plaintiff's
9  experts' opinions uninformed?
10    A    Because they all concluded that perineal
11 application of talc causes ovarian cancer.
12    Q    Did they base their opinions on a review
13 of published literature which included
14 epidemiological and mechanistic data?
15       MS. CURRY:  Object to the form.
16       THE WITNESS:  Not always.
17 BY MS. GARBER:
18    Q    Did Dr. Wolf, Blair Smith, and can I call
19 Dr. CP -- Dr. Clarke-Pearson, CP, Dr. CP for short?
20    A    No, you have to call him DCP.  That's
21 what we call him.
22    Q    So DCP.  Did they base their opinions on
23 medical judgment?
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  Not always.

Page 161

1  BY MS. GARBER:
2     Q    What basis do you have to say they didn't
3  base their opinions on medical judgment?
4     A    I read their reports and I read their
5  depositions and there were times that what they
6  stated in their reports and their depositions was
7  unsupported by medical judgment.
8     Q    Which specifically are you thinking of
9  when you say that?
10    A    I would need to see the reports or
11 actually look at my reports and I could tell you
12 where I reference and critique what they said in
13 their reports.
14    Q    And so that's what I want to get to.
15 Your critique of those three plaintiff experts are
16 limited to what is referenced in your expert report;
17 is that fair?
18    A    No.  Also in their depositions as well.
19    Q    We'll get to that, but as you sit here,
20 what criticisms do you have of Dr. Wolf aside from
21 what you have referenced in your expert report?
22       MS. CURRY:  Object to the form.  Do you
23 have a copy of her deposition transcript and her
24 report?
25 ///

Cheryl Saenz, M.D.

Page 162

BY MS. GARBER:

1  Q   Go ahead, Doctor, do you understand my
2  question?
3      A   I can't just give you something broadly.
4  I've done a lot of reading for my preparation to be
5  here and I don't want to misquote her.  So I would
6  need to look at the actual report or deposition in
7  order to make sure that I'm giving you a complete
8  reference of -- just basically comprehensive review
9  of what my critiques are.
10     Q   And, Doctor, does anything come to mind?
11     A   Other than what I've already referenced
12 in my report, additional findings, not off the top
13 of my head, ma'am.  I would need to see the
14 documents.
15     Q   What about Dr. Smith?
16     A   Same thing.
17     Q   What about doctor -- DCP?
18     A   Same thing.
19     Q   And you understand that this is my
20 opportunity to get all of your opinions and
21 criticisms and bases for those opinions; correct?
22     A   I understand that.
23     Q   And you know I have seven hours.  So for
24 me to sit and watch you read a deposition would be

Page 163

1  wholly unfair of each of those witnesses; right?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  So my position, ma'am, is
4  that you want me to give you a comprehensive honest
5  answer and in order to do that, I would need the
6  document in front of me.
7  BY MS. GARBER:
8      Q   But you can't think of any other
9  criticisms as you sit here today?
10     MS. CURRY:  Object to the form.
11     MS. GARBER:  Correct?
12     THE WITNESS:  Off the top of my head,
13 ma'am, no.
14 BY MS. GARBER:
15     Q   So before you read Dr. Wolf's expert
16 report and deposition, did you know her
17 professionally?
18     A   No.
19     Q   Had you ever heard of her?
20     A   No.
21     Q   And what about Dr. Smith?
22     A   No.
23     Q   And obviously you knew DCP?
24     A   Correct.
25     Q   And you know him professionally?

Page 164

1      A   Yes.
2      Q   What are the circumstances?
3      A   What are the circumstances?
4      Q   Uh-huh.  How do you know him personally?
5      A   We're both gynecologic oncologists.  I
6  believe that I have served -- I don't know exactly
7  when.  I think I actually might have been on the
8  program committee when he was president of SGO.  I
9  think that he and I have done some work together for
10 the Foundation for Women's Cancer as well.  I think
11 we might have served on the board at the same time.
12 I don't have an exact recollection, but I think
13 that's quite possible.
14     Q   Does he enjoy an excellent professional
15 reputation?
16     MS. CURRY:  Object to the form.
17     THE WITNESS:  I believe so.
18 BY MS. GARBER:
19     Q   Do you respect him?
20     MS. CURRY:  Object to the form.
21     THE WITNESS:  Not with respect to this
22 matter, ma'am.
23 BY MS. GARBER:
24     Q   You respected him before you got involved
25 in this talc case?

Page 165

1      A   I still respect him as an individual.  I
2  don't respect his opinion with respect to talc in
3  the development of ovarian cancer.
4      Q   Doctors can look at the same evidence and
5  come to different medical judgments, can't they?
6      MS. CURRY:  Object to the form.
7      THE WITNESS:  I don't believe that's
8  true, ma'am.  I believe that anybody that has gone
9  as thorough analysis of this literature and looked
10 at all of the considerations would not draw any
11 conclusion other than the conclusion that I have
12 drawn.
13 BY MS. GARBER:
14     Q   What is the purpose of a second medical
15 opinion then?
16     A   What is the purpose of a second medical
17 opinion?
18     MS. CURRY:  Object to the form.
19     THE WITNESS:  It varies.  Sometimes
20 patients want to know that what their doctor is
21 saying is accurate and true.  Other times, patients
22 maybe don't hit it off personality-wise with a
23 certain practitioner and so they want to establish
24 care with someone else.
25 ///

Cheryl Saenz, M.D.

Page 166

```
1  BY MS. GARBER:
2      Q    And sometimes they seek a second medical
3  opinion because two doctors can look at the same set
4  of evidence and come to different conclusions;
5  correct?
6          MS. CURRY:  Object to the form.
7          THE WITNESS:  I don't actually think
8  that's why you see a second opinion.  I think you
9  see a second opinion to make sure that you're
10 exploring all possible alternatives.
11 BY MS. GARBER:
12     Q    Do you think expert witnesses can weigh
13 evidence differently?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Can you define for me what
16 you mean by "weigh"?
17 BY MS. GARBER:
18     Q    Sure.  Did you weigh the evidence in your
19 expert report?  I didn't see where you had done
20 that.
21         MS. CURRY:  Object to the form.
22         THE WITNESS:  Again, can you --
23 BY MS. GARBER:
24     Q    Did you weigh it in your mind?
25         MS. CURRY:  Object to the form.
```

Page 167

```
1          THE WITNESS:  What do you mean by
2  "weigh"?
3  BY MS. GARBER:
4      Q    So if you looked at say the cohort
5  studies versus the case control studies, did you
6  weigh the case control less heavily than you weighed
7  the cohort studies?
8      Did you put any more emphasis on one type
9  of evidence as opposed to another?
10     A    So I wouldn't use the word weigh.  I do
11 believe that the cohort studies have more scientific
12 credibility than the case control studies because
13 the case control studies are subject to more biases
14 and potential confounds than the cohort studies.
15     Q    You didn't perform a weight of the
16 evidence analysis in your expert report, did you?
17     A    No, I did not.
18     Q    Coming to a different conclusion doesn't
19 mean the methodology is flawed or improper, does it?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  So in this particular
22 matter I believe that it is.  I believe that in this
23 particular matter, if you've reviewed all of the
24 literature, looked at the data that is actually
25 available from a biologic plausibility standpoint,
```

Page 168

```
1  from a mechanistic standpoint, and not hypothesized
2  about things that don't actually exist, there is
3  only one conclusion that can be drawn.
4  BY MS. GARBER:
5      Q    There are scientific bodies that have
6  concluded that talc can cause ovarian cancer; true?
7          MS. CURRY:  Object to the form.
8          THE WITNESS:  I don't believe that that's
9  true.
10 BY MS. GARBER:
11     Q    You don't?
12     A    No, I don't.
13     Q    You don't think Health Canada has come to
14 that conclusion?
15     A    No, I absolutely don't.  That's a draft
16 screening and I don't believe that they have come to
17 the conclusion that talc applied in the perineum can
18 cause ovarian cancer.
19     Q    Do you believe that IARC has concluded
20 that talc is a possible carcinogen?
21     A    IARC has classified talc in the perineal
22 application as Group 2B, which is possibly
23 carcinogenic.  That's not saying that talc causes
24 ovarian cancer.
25     Q    You disagree with that assessment?
```

Page 169

```
1      A    No, I disagree with your statement that
2  that says that talc is causing ovarian cancer.
3      Q    Well, you disagree with IARC's 2012
4  assessment of asbestos in fibrous talc.  Do you
5  disagree with IARC's 2010 and 2006 assessment of
6  non-asbestiform talc?
7          MS. CURRY:  Object to the form, misstates
8  prior testimony.
9          THE WITNESS:  I don't agree that talc
10 causes ovarian cancer.  So -- and I do believe that
11 there's more literature that has became available
12 since IARC did its analysis.  So yeah, I don't think
13 that ovarian cancer even is possibly caused by
14 perineal application of talc.
15 BY MS. GARBER:
16     Q    So you think IARC is wrong with regard to
17 non-asbestiform talc?
18     A    I think IARC is wrong.  Talc does not
19 possibly lead to ovarian cancer.  I think IARC is
20 wrong.
21     Q    Has talc been shown to be safe?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  Has talc been shown to be
24 safe in what context?
25 ///
```

Cheryl Saenz, M.D.

Page 170

BY MS. GARBER:

1  Q   In not causing ovarian cancer.

3  A   I don't know how you would prove a
4  negative hypothesis, ma'am.

5  Q   Can you think of any data that has shown
6  that talc is safe?

7       MS. CURRY:  Object to the form.

8       THE WITNESS:  In terms of causing ovarian
9  cancer?

10      MS. GARBER:  We'll start there.

11      THE WITNESS:  I don't believe that any
12  such literature exists.

13 BY MS. GARBER:

14  Q   On page eight of your expert report --

15  A   I'm sorry, what page?

16  Q   Page eight.

17  A   Okay.

18  Q   Which is Exhibit 5.  It seems to indicate
19  that your opinion is the scientific evidence does
20  not support a causal role in the development of
21  ovarian cancer with the application of talcum powder
22  products applied to the genital region.

23      Is that a fair assessment of your report
24  on that page?

25      MS. CURRY:  You're reading -- I'm just

Page 171

1  trying to follow along with you.

2       MS. GARBER:  Under the genital
3  application of talc and risk factor of ovarian
4  cancer overview.

5  BY MS. GARBER:

6  Q   Is it your opinion that the scientific
7  evidence does not support a causal role in the
8  development of ovarian cancer with the application
9  of talc to the perineal region?

10      Does your report say that?

11  A   Are we referring something specific --

12  Q   Yeah, your report, your report, Doctor.

13  A   Can you refer me, ma'am, to exactly where
14  you're reading or are we doing a general statement?

15  Q   In the first paragraph under the heading
16  I just read.

17  A   Okay.

18  Q   Is that your opinion?

19  A   Which sentence are we starting with?

20  Q   The second sentence.

21  A   Okay.  So I write, "despite many years of
22  research on this topic, the scientific evidence does
23  not support a causal role in the development of
24  ovarian cancer, with application of talc to the
25  perineal region."  Right.

Page 172

1  Q   Is that still your opinion?

2  A   That is still my opinion.

3  Q   And in coming to that opinion as stated
4  in your report, you did not review the totality of
5  relevant literature, did you?

6       MS. CURRY:  Object to the form.

7       THE WITNESS:  I don't believe that's
8  correct.

9  BY MS. GARBER:

10  Q   Are the articles cited in the four
11  corners of your report given any more weight than
12  the articles that are not cited there?

13      MS. CURRY:  Object to the form.

14      THE WITNESS:  So everything that I've
15  read, everything that I've evaluated is in my
16  report.  If there's a particular article that you're
17  referencing that you think I've left out, I'd be
18  happy to look at it right now.

19  BY MS. GARBER:

20  Q   Do you think in coming to a causation
21  opinion, it's important to review the totality of
22  the relevant evidence as to the topic?

23      MS. CURRY:  Object to the form.

24      THE WITNESS:  I believe that I have
25  reviewed a very comprehensive breadth and depth of

Page 173

1  the literature that is available on this topic.

2  BY MS. GARBER:

3  Q   And in looking at the topic of whether or
4  not an exposure can cause cancer, I like to call
5  them little -- different buckets of evidence.

6       So would you agree that in looking at
7  that assessment, it would be important to look at
8  the human epidemiological literature?

9  A   Yes, and I have.

10  Q   And the totality of that literature;
11  correct?

12  A   Yes, and I have.

13  Q   And it would be important to look at the
14  mechanistic data or the biologically plausible
15  mechanisms by which that agent or exposure could
16  cause cancer; correct?

17  A   Yes, and I have.  And the hypothesis here
18  is that chronic inflammation from the talc is
19  leading to the development of ovarian cancer, and
20  I've looked at that literature and I don't believe
21  that that is supported.

22  Q   You believe that you've looked at the
23  full body of the literature that speaks to the issue
24  of talc and inflammation in its role in causing
25  cancer, you believe you've looked at that full body

Cheryl Saenz, M.D.

1  of the literature?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  In its role in causing
4  ovarian cancer; yes.
5  BY MS. GARBER:
6      Q    And do you believe that you've looked at
7  the full body of the literature that shows the
8  mechanistic ways in which inflammation can cause
9  ovarian cancer?
10     MS. CURRY:  Object to the form.
11 BY MS. GARBER:
12     Q    In other words, the pathways in which
13 inflammation can cause ovarian cancer?
14     MS. CURRY:  Object to the form.
15     THE WITNESS:  I believe that I've
16 thoroughly reviewed the hypothesis that chronic
17 inflammation can cause ovarian cancer or lead to the
18 development of ovarian cancer and I don't believe
19 that it is substantiated by the published
20 literature.
21 BY MS. GARBER:
22     Q    Let's talk about oxidative stress.
23     A    Okay.
24     Q    Is oxidative stress thought to be a
25 mechanism by which an agent or in general can result

1  in cancer, just speaking broad picture?
2      A    Speaking --
3      MS. CURRY:  Object to the form.
4      THE WITNESS:  Speaking broad picture,
5  oxidative stress can be a response to any particular
6  stressful situation.  Inflammation is a generalized
7  process that's not necessarily carcinogenic.
8  BY MS. GARBER:
9      Q    But oxidative stress is a mechanism
10 that's understood in the medical community; correct?
11     A    Yes.
12     MS. CURRY:  Object to the form.
13     THE WITNESS:  But not in the sense of
14 oxidative stress leading to malignant transformation
15 in ovarian cancer.  There is no literature that
16 supports that.
17 BY MS. GARBER:
18     Q    There's no literature at all?
19     A    There's no literature that supports
20 mutagenicity as a result of the generation of
21 oxidative species in ovarian cancer.
22     Q    Have you reviewed the Buz'Zard paper?
23     A    No, I've not reviewed that paper.
24     Q    Have you -- and you haven't reviewed
25 Dr. Saed's 2019 paper, have you?

1      A    Dr. Saed's 2019 paper is in his report
2  and I have reviewed his report.  Dr. Saed does not
3  ever demonstrate that generation of oxidative
4  species leads to malignant transformation.
5      Q    That's based on not reviewing his actual
6  published paper, but rather his expert report in
7  this case?
8      MS. CURRY:  Object to the form.
9      MS. GARBER:  Correct?
10     THE WITNESS:  Ma'am, his expert report is
11 what he's putting forth for his opinion to say that
12 this exists.  I've read his expert report.  There is
13 generation of oxidative stress responses.  There is
14 no data that that leads to malignant transformation.
15 BY MS. GARBER:
16     Q    Have you read the Shukla 2009 paper?
17     A    No, I have not.
18     Q    So you would have no basis to know
19 whether or not those papers provided mechanistic
20 data as to the connection between talc and ovarian
21 cancer or other forms of paper, because you've never
22 read them, right?
23     MS. CURRY:  Object to the form.
24     THE WITNESS:  There's no data, ma'am, in
25 the published literature that demonstrates that the

1  generation of oxidative stress, reactive oxygen
2  species or nitrogen species leads to malignant
3  transformation.
4  BY MS. GARBER:
5      Q    That's not my question.  Have you read
6  the -- no, strike that.
7      You have not read the Shukla 2009 paper;
8  correct?
9      A    Correct.
10     Q    You have not read the Buz'Zard 2007
11 paper; correct?
12     A    Correct.
13     Q    And you have not read the Saed 2019
14 published paper; correct?
15     A    Ma'am, this Saed 2019 paper is in his
16 report.  So the content of that paper I have read.
17 There is no generation of malignant cells in that
18 report.
19     MS. GARBER:  Motion to strike as
20 nonresponsive.
21 BY MS. GARBER:
22     Q    I just need a yes-or-no question [sic.].
23     A    It's not a yes-or-no answer.
24     Q    Have you read the paper or not?
25     MS. CURRY:  Object to the form.

Cheryl Saenz, M.D.

Page 178

1      THE WITNESS: I've read his report. His
2  report details his paper.
3      MS. GARBER: We'll get to his paper.
4  BY MS. GARBER:
5      Q    Doctor, you have not considered the
6  Shukla, Saed 2019 paper, or the Buz'Zard 2007 paper
7  in connection with your opinions; is that a true
8  statement?
9      MS. CURRY: Object to the form.
10      THE WITNESS: No, that's incorrect.
11  BY MS. GARBER:
12      Q    Because the Saed paper was contained
13  within his expert report, that's your testimony?
14      A    That is my testimony.
15      Q    Do you know what the findings were of the
16  Buz'Zard paper?
17      A    No, ma'am.
18      Q    Do you know what the findings were of the
19  Shukla paper?
20      A    I have a vague sense, just based on
21  reading other expert reports, that both of those
22  papers involved inflammation, but I also have a
23  vague sense that neither of those papers involved
24  malignant transformation.  But I've not read either
25  of those reports.

Page 179

1      Q    What was your basis for your vague
2  recollection of those papers?
3      A    Reading other expert reports, including
4  Dr. Saed's report, including some of the other
5  expert reports for plaintiff's side that reference
6  those papers.
7      Q    So we're here in a case wherein experts
8  have said that talcum powder products can cause
9  ovarian cancer, a very lethal cancer, and you are
10  aware of literature, and you're telling me you did
11  not review that literature.
12      MS. CURRY: Object to the form.
13      THE WITNESS: What I'm telling you,
14  ma'am, is that there is no literature that
15  demonstrates malignant transformation.  So have I
16  read every single paper ever published on anything?
17  No.  But I do know that there is no published
18  literature that demonstrates that talc leads to
19  malignant transformation in ovarian cells.
20  BY MS. GARBER:
21      Q    In reading the other expert reports, did
22  you review or read about Dr. Longo's testing for
23  talcum powder products and asbestos content?
24      A    I did see other experts make mention of
25  that report.

Page 180

1      Q    Did you ask for that testing from defense
2  counsel?
3      A    I did not.
4      Q    Why not?
5      A    Because I don't believe that it is
6  germane to my opinion, which based on what we've
7  already talked about before.
8      Q    You don't need to know whether or not
9  asbestos is contained in Johnson & Johnson's baby
10  powder products?
11      A    I don't, because if baby powder contained
12  asbestos or not is irrelevant to the fact that the
13  literature does not support that perineal
14  application of talc leads to an increased risk of
15  developing ovarian cancer.
16      Q    Why do you think the United States
17  government is so interested to know if Johnson &
18  Johnson's baby powder products contain asbestos?  Do
19  you think they want to know that because it doesn't
20  matter?
21      MS. CURRY: Object to the form.
22      THE WITNESS: I don't think that has
23  anything to do with the scientific medical question
24  that we're dealing with right here right now, ma'am.
25  ///

Page 181

1  BY MS. GARBER:
2      Q    Doctor, in your report, you fail to
3  address or discuss the poor study designs and
4  limitations of the cohort studies, don't you?
5      MS. CURRY: Object to the form.
6      THE WITNESS: I don't think I failed to
7  evaluate any of the studies that are in my report.
8  BY MS. GARBER:
9      Q    Do you discuss the study of limitations
10  in the cohort studies?
11      A    I don't discuss the limitations that are
12  in the cohort studies because the authors do that
13  themselves in their discussion sections.
14      Q    Don't you think it's important to
15  consider what the author says is the limitations of
16  those data in formulating your opinion?
17      MS. CURRY: Object to the form.
18      THE WITNESS: I did consider it.  I
19  considered it when I read the paper and that's what
20  allowed me to formulate my opinions.
21  BY MS. GARBER:
22      Q    In formulating your opinions, are they
23  based on fact that you believe the cohort studies do
24  not show an association between genital talcum
25  powder use and epithelial ovarian cancer?

Cheryl Saenz, M.D.

Page 182

1    MS. CURRY:  Object to the form.
2         THE WITNESS:  That's part of the data
3    that I used to formulate my opinions.
4    BY MS. GARBER:
5         Q    In formulating your opinions, I didn't
6    see any analysis in your report addressing the
7    opinions of the Health Canada assessment; is that
8    true?
9         A    So I believe that the Health Canada
10   assessment is primarily based off of the Taher
11   publishing -- actually, I take that back.  The Taher
12   manuscript, because Taher has not been published.
13   And so I don't know whether or not that actually
14   will be published; it's not something that's peer
15   reviewed.
16        And the Health Canada assessment as I
17   understand it is a draft.  That's not necessarily
18   published peer-reviewed literature either.  So
19   although I read it and I read Taher, I did not put
20   it into my analysis, because I don't think it adds
21   anything to the discussion that is already
22   incorporated in my report.
23        Q    If both of those papers were peer
24   reviewed and published -- I know that the Health
25   Canada wouldn't be peer reviewed and published, but

Page 183

1    if it was a final draft and it made the exact same
2    conclusions and the Taher paper made the exact same
3    conclusions, would that change your expert opinion
4    in this case?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  No, because I actually
7    don't think Taher adds anything to the analysis.
8    It's much the same data that was in Berge and in
9    Penninkilampi.
10   BY MS. GARBER:
11        Q    In your critique of -- is it true,
12   Doctor, that in the four corners of your expert
13   report you do not state anywhere the methodology
14   that you employed in coming to your causation
15   opinion?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  So I don't think I
18   necessarily had a paragraph that says exactly what I
19   did, but I certainly think the breadth and depth of
20   the literature I reviewed and the detailed analysis
21   of all the literature I reviewed is contained within
22   the details of my report.
23   BY MS. GARBER:
24        Q    In the four corners of your expert
25   report, you don't have a methodology section, do

Page 184

1    you?
2         A    As a separate paragraph?  No, I don't
3    have a methodology section as a separate paragraph,
4    but the details of the analysis that I did are
5    certainly in the four corners of the report.
6         Q    Doctor, nowhere in your expert report do
7    you even utilize the word "methodology," do you?
8         A    I don't know that's necessarily true.
9         Q    Doctor, isn't the point of stating what
10   your causation methodology is, so that your opinions
11   can be reproduced?
12        MS. CURRY:  Object to the form.
13        THE WITNESS:  So every single paper that
14   I read, every single opinion that I had, why I came
15   to the conclusions that I came to, is all in the
16   body of the report.
17   BY MS. GARBER:
18        Q    It is?
19        A    Yes, it is.
20        Q    Okay.  Can you point to me with regard to
21   the literature about how particulates have been
22   shown to translocate to reach the ovary?
23        Can you show me where you are discussing
24   every one of those literature, your conclusions
25   about those literature, and why you concluded the

Page 185

1    way you did with regard to those literature?
2         MS. CURRY:  Object to the form.
3         THE WITNESS:  Page 28.  "The vagina is
4    not the perineum, and no studies have ever shown
5    that something placed onto the perineum can migrate
6    to the ovaries.  While plaintiffs' experts discuss
7    in their reports that the female reproductive tract
8    is open to the external environment, there is not a
9    single study that traces something from the vulva to
10   the ovaries.  Some of plaintiffs' experts rely on
11   the study by Drs. Egli and Newton published in 1961
12   to support the hypothesis that talc can migrate from
13   the perineum to the ovaries."
14        I then go on to describe in great detail
15   the context of that study and the conditions under
16   which it was held.  And then I say why I've
17   concluded what I concluded.
18   BY MS. GARBER:
19        Q    One study?
20        A    Ma'am --
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  -- you asked me to point
23   out one place, so I did it.
24   BY MS. GARBER:
25        Q    Okay.  But I think what you told me,

Cheryl Saenz, M.D.

Page 186

1  Doctor, is that you reviewed the full body of the
2  literature and then you analyzed it in your report.
3  And I don't see that being done.  I see you maybe
4  talking about one study or another.  I don't see you
5  analyzing the data in your report --
6      A    Okay.  So --
7      Q    -- or providing methodology for the way
8  you do it.
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  Then I think you're missing
11 the context of the report because my report is quite
12 extensive.  I also reference in my reference list
13 the Ventor article which talks about migration of
14 particulate radioactive tracer from the vagina to
15 the peritoneal cavity and the ovaries.
16         So, ma'am, it's there.  It's throughout
17 the report.
18 BY MS. GARBER:
19     Q    Doctor, can you turn to me in your report
20 and tell me where I can read the methodology that
21 you employed in coming to your causation opinions?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  Ma'am, you already asked me
24 whether or not I have a section on methodology, and
25 I told you that I don't have a specific paragraph

Page 187

1  titled that.  But I do have a demonstration of the
2  extent of research that I went through in terms of
3  analyzing studies, comparing the known literature to
4  what we know based on medical and scientific fact,
5  and explaining how I came to the opinions that I
6  came to.
7          MS. GARBER:  Motion to strike as
8  nonresponsive.
9  BY MS. GARBER:
10     Q    Doctor, can you please point me to the
11 place in your report where you provide for me the
12 methodology that you employed in coming to your
13 expert opinions?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Ma'am, I already answered
16 this for you.
17 BY MS. GARBER:
18     Q    That was your answer?
19     A    Yes, ma'am.
20     Q    In other words, you can't point me to an
21 area in your report where you provide the
22 methodology, can you?
23         MS. CURRY:  Object to the form.
24         THE WITNESS:  Ma'am, I already told you,
25 I don't have a specific section titled methodology.

Page 188

1  BY MS. GARBER:
2      Q    In your critique of plaintiffs' expert's
3  opinions, you don't provide your methodology in
4  coming to those opinions, do you?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  Ma'am, I just read you a
7  section that was from the critique of one of
8  plaintiff expert's opinions where I showed you.  I
9  read an article where it talks about migration of
10 particles.  I explained the context of that article,
11 the conditions under which that study was held, and
12 why I, therefore, dispute and disagree with your
13 expert.
14         That is a thorough explanation of how I
15 came to the conclusion that I came to and why I'm
16 critical of your expert.
17 BY MS. GARBER:
18     Q    Is that the extent of your methodology?
19         MS. CURRY:  Object to the form.
20         THE WITNESS:  Throughout my report,
21 ma'am, I'm very thorough in supporting the
22 conclusions that I have come to.
23 BY MS. GARBER:
24     Q    Dr. Saenz, can you -- strike that.
25         Can you name any causation methodologies

Page 189

1  that have been peer reviewed and published as a
2  scientifically accepted methodology for rendering a
3  causation opinion?
4          MS. CURRY:  Object to the form.
5          THE WITNESS:  I don't really understand
6  what you mean.
7  BY MS. GARBER:
8      Q    Can you think of any peer-reviewed
9  methodology that's used by scientists to render
10 causation opinions?
11         MS. CURRY:  Same objection.
12         THE WITNESS:  So throughout plaintiffs'
13 expert's reports, they talk about the Bradford Hill
14 criteria and looking at things such as the
15 literature, the epidemiologic literature, whether or
16 not it supports that, the mechanistic studies,
17 biologic plausibility, strength of association,
18 consistency in the literature.
19         So I do believe that that as a system, if
20 you will, is a methodology for trying to define
21 causation.
22 BY MS. GARBER:
23     Q    And your understanding is that's peer
24 reviewed; correct?
25     A    I don't necessarily know that Bradford

Cheryl Saenz, M.D.

1 Hill criteria per se was peer reviewed because I've
2 not actually seen the publication. But I do think
3 that is well accepted in the medical and scientific
4 community as criteria by which causation can be
5 evaluated.
6    Q    You didn't apply the Bradford Hill in
7 your analysis in coming to your causation opinions
8 in this case, did you?
9         MS. CURRY:  Object to the form.
10        THE WITNESS:  Oh, I disagree with that
11 completely.  I didn't sit there and outline the
12 Bradford Hill criteria by the nine criteria that are
13 listed in the original proposition.  However, my
14 analysis itself is the way that I've always analyzed
15 certain questions in looking at it.  So the actual
16 concepts of strength of association, consistency in
17 the data, biologic plausibility, that's all there.
18 That's all in my report.
19        So I didn't title it perhaps the way that
20 you wanted me to title it, but the crux of it is all
21 there in my report.
22 BY MS. GARBER:
23    Q    Did you think I wanted you to do it in a
24 certain way?
25    A    Well, I think --

1         MS. CURRY:  Object to the form.
2         THE WITNESS:  -- there's certain things
3 that you clearly have wanted me to do in a certain
4 way that has come up a couple times now when we've
5 talked about the methodology.  So in terms of how
6 I've gone about analyzing this problem, I've
7 analyzed it the same way people go about a Bradford
8 Hill analysis.  I just haven't titled it that way.
9 BY MS. GARBER:
10    Q    You think that you have shown the reader
11 in the four corners of your expert report a Bradford
12 Hill analysis of the data in coming to your
13 causation opinions?
14    A    Absolutely.
15    Q    And how am I to find that within the four
16 corners of your report?  Where can I find that
17 Bradford Hill analysis?
18        MS. CURRY:  Object to the form.
19        THE WITNESS:  Read the report.  It's
20 throughout the report.
21 BY MS. GARBER:
22    Q    So I just have to read the report and
23 figure out where you're talking about the
24 association and whether or not you think it's weak
25 or strong or adequate?  I just have to find that

1 somewhere in your expert report?
2         MS. CURRY:  Object to the form.
3         THE WITNESS:  So my report is a total
4 report.  There are places in there that I absolutely
5 talk about the strength of the association.  I
6 absolutely talk about consistency.  I absolutely
7 talk about biologic plausibility.  I absolutely talk
8 about the mechanisms.
9         So the report is something that's to be
10 accepted in total.  It's not like there's one page
11 to pull out and say, oh, this is that.
12 BY MS. GARBER:
13    Q    You had me reference or you turned --
14 strike that.
15        With regard to migration of talc, you had
16 me turn to page 17.  Do you remember that?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  I don't actually think
19 that's the page I had you turn to.
20 BY MS. GARBER:
21    Q    Strike that.  Doctor, in your expert
22 report, you discuss migration of talc from the
23 perineum to the ovaries at pages 17 and 18; is that
24 correct?
25        MS. CURRY:  Object to the form.

1         THE WITNESS:  The topic of this section
2 is titled "Migration of Talc from the Perineum to
3 the Ovaries"; correct.
4 BY MS. GARBER:
5    Q    That appears at page -- at half of the
6 page on 17 and a full page at 18; correct?
7    A    Yes.
8    Q    And, Doctor, in that part of your report,
9 you fail to acknowledge the data in the
10 peer-reviewed and published author statements
11 regarding biologically plausible mechanisms for
12 talcum powder products' migration and its
13 carcinogenicity, don't you?
14        MS. CURRY:  Object to the form.
15        THE WITNESS:  No, there is no date from
16 migration from the perineum to the ovaries.
17 BY MS. GARBER:
18    Q    Are you saying, and are you contending
19 that there is no published data in the peer-reviewed
20 literature which indicates that talc can migrate?
21    A    I'm saying there's no data in the
22 peer-reviewed literature that can show that talc can
23 migrate from the perineum to the ovaries.
24    Q    Doctor, you're aware that there are many
25 epidemiological studies that have indicated that

Cheryl Saenz, M.D.

Page 194

1 talc can migrate from the genitals and reach the
2 ovaries, you're aware of those data; right?
3        MS. CURRY:  Object to the form.
4        THE WITNESS:  No, there are no data that
5 show that.
6        MS. GARBER:  I'm out of the stickers.
7        THE REPORTER:  Would you like to go off
8 the record while I print them up?
9        MS. GARBER:  Sure.
10       THE VIDEOGRAPHER:  The time is now 2:09.
11 Going off the record.
12       (Break in the deposition taken at 2:11 p.m.)
13              0o0
14       (The deposition resumed at 2:11 p.m.)
15              0o0
16       THE VIDEOGRAPHER:  The time is now 2:10.
17 Back on the record.
18       (C. Saenz Exhibit 11 was marked for
19       identification.)
20 BY MS. GARBER:
21   Q    Doctor, I'm handing to you what is a
22 document that we've marked as Exhibit 11, which is
23 titled "Biologic Plausibility Migration
24 Translocation."
25       Doctor, I will represent to you this is a

Page 195

1 document that I created.  I will represent to you
2 these are quotes from the published literature with
3 regard to talc and ovarian cancer.
4        Doctor, just -- I don't expect you to
5 read every single one of these, but do you have a
6 single one of these citations in the four corners of
7 your report?
8        MS. CURRY:  I'm going to object to the
9 use of this document as it's literally pulled out
10 one sentences, sometimes not even full sentences of
11 a variety of different articles without the expert
12 witness having the opportunity to actually look at
13 the totality of the article, say, that --
14       MS. GARBER:  I appreciate all that
15 testimony, Ms. Curry.
16       THE WITNESS:  I'm sorry, what's your
17 question?
18 BY MS. GARBER:
19   Q    Do you have a single one of these quotes
20 from the published literature in your expert report?
21       MS. CURRY:  And I object to the form of
22 the question.
23       THE WITNESS:  The quotes that you
24 yourself pulled and put on this document?
25       MS. GARBER:  Yes.

Page 196

1        THE WITNESS:  No, because none of these
2 quotes is actually scientific proof that talc can
3 migrate from the perineum to the ovaries.
4 BY MS. GARBER:
5    Q   Doctor, you understand that the authors
6 of these published -- these cited publications in
7 Exhibit 11 are statements that were pulled from the
8 peer-reviewed, published literature of these study
9 authors?
10       Do you understand that?
11   A   I understand --
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  I understand that, and not
14 a single one of these is actually demonstrating
15 proof that talc applied to the perineum can migrate
16 to the ovaries.  Not a single one.
17       In fact, these are described as
18 plausibility.  These are described as particles up
19 here.  This is not scientific evidence, ma'am.  This
20 is your listing pulling one sentences out of
21 articles without documented scientific proof of the
22 migration path from the perineum to the ovaries.
23 BY MS. GARBER:
24   Q   So, Doctor, do you see the title of the
25 this document, as "Biologic Plausibility."  Do you

Page 197

1 see that?
2    A   That's your title.
3    Q   Yes.  Do you know what that means?
4    A   Yes, I do.
5    Q   What?
6    A   That there is the hypothesis of how this
7 might actually happen from a biologic standpoint.
8 But there isn't a single scientific article that has
9 actually ever traced a migratory path of talc from
10 the perineum to the ovaries, not a single one, and
11 you putting a listing here of these different
12 sentences saying, well, this article says it could
13 happen doesn't make it so.
14   Q   Doctor, you've used the word "proof"
15 there a couple of times.  Is it your understanding
16 for biologic plausibility that you need proof?
17       MS. CURRY:  Object to the form.
18 BY MS. GARBER:
19   Q   Or that it's a plausible mechanism?
20   A   My understanding --
21       MS. CURRY:  Object to the form.
22       THE WITNESS:  My understanding in this
23 particular case is that there has to be some proof
24 that a particulate matter applied to the perineum
25 can actually make it to the ovaries for the

Cheryl Saenz, M.D.

Page 198

1 hypothesis that talc can cause ovarian cancer to be
2 so.
3 BY MS. GARBER:
4    Q    That's your understanding of biologic
5 plausibility?
6    A    In this particular circumstance; yes.
7    Q    What is your understanding of biologic
8 plausibility in the context of the Bradford Hill
9 guidelines?
10       MS. CURRY:  Object to the form.
11       THE WITNESS:  My understanding is that
12 there has to be biologic evidence that what you're
13 hypothesizing could actually happen.  It doesn't
14 have to be that you have to prove that talc itself
15 could migrate, but there's no studies of any
16 migration whatsoever in the human that any
17 particulate matter applied to the perineum can make
18 it all the way to the ovaries.
19       So it doesn't have to be talc, but it has
20 to show that something can actually make it from the
21 perineum to the ovaries.
22 BY MS. GARBER:
23    Q    Let's mark as Exhibit 12 -- Doctor, the
24 point I was trying to make with this Exhibit 11 is
25 this:  There are peer-reviewed, published papers

Page 199

1 where the authors concluded that talc can migrate,
2 that it's a biologically plausible mechanism that
3 talc with migrate.
4       Do you disagree with that?
5       MS. CURRY:  Object to the form.
6       THE WITNESS:  I disagree with the concept
7 that's saying that if it migrates from the vagina to
8 the ovaries, it's the same as migrating from the
9 perineum to the ovaries.
10 BY MS. GARBER:
11    Q    That wasn't my question.
12    A    But it is, ma'am, because you didn't
13 qualify.  You're just saying talc can migrate,
14 period.  That's not the same thing.  What we're
15 talking about here is whether or not we're including
16 the entire female anatomy, and we have to do that.
17       Having a study show that something can be
18 in the vagina and make it to the ovaries is not the
19 same thing as going from the perineum to the
20 ovaries.
21    Q    Let's talk about the epi.  The epi
22 studies show that talc applied to the genitals is
23 associated with epithelial ovarian cancer in some of
24 the studies.  You'll agree to that; right?
25       MS. CURRY:  Object to the form.

Page 200

1       THE WITNESS:  Some of the case control
2 studies have shown a weak increased odds ratio for
3 the development of ovarian cancer with the perineal
4 application of talc.
5 BY MS. GARBER:
6    Q    Some of the meta-analysis, or is it, in
7 fact, all of the meta-analysis, which shows an
8 association between genital talc and the development
9 of epithelial ovarian cancer?
10    A    So the meta --
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  -- the meta-analyses that
13 have been done only show that when they look at the
14 case control studies.  They don't show that when
15 they look at the cohort studies.
16 BY MS. GARBER:
17    Q    Okay.  Some of the epidemiological data
18 that shows an association between genital
19 application of talc and the development of
20 epithelial ovarian cancer also report that it's
21 biologically plausible that talc can reach the
22 ovaries from the genitals, don't they?
23    A    No.
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  It doesn't.  They suppose

Page 201

1 that.  They don't actually show that.
2 BY MS. GARBER:
3    Q    But that's the authors' conclusions, that
4 it can get there.  They think it's biologically
5 plausible?
6       MS. CURRY:  Object to the form.
7       THE WITNESS:  But there's no data for
8 that.  They can conclude that, but there's no data
9 for that.  There has to be data for which to support
10 that hypothesis.  And there's not.
11 BY MS. GARBER:
12    Q    Doctor, in the peer-review process, a
13 study author who is looking at the data of genital
14 application of talc and development of ovarian
15 cancer is saying it's biologically plausible that
16 talc can go from the genitals to the ovaries, and
17 that's been peer reviewed and published, do you
18 agree with that?
19       MS. CURRY:  Object to the form.
20       THE WITNESS:  I don't agree with that
21 statement.
22 BY MS GARBER:
23    Q    No, I know you don't agree with the --
24 with the conclusion.  But do you agree that a study
25 author who studied the topic has concluded it's

Cheryl Saenz, M.D.

Page 202

1  biologically plausible.
2      A    There's always evidence, and in fact --
3      Q    Doctor, it's a yes-or-no question --
4      A    No, it's not, ma'am.
5          MS. CURRY:  Object to the form.
6          MS. SHARKO:  Please let her finish her --
7          THE WITNESS:  It's a very complicated
8  issue.
9  BY MS. GARBER:
10     Q    My question is --
11     A    It's not a yes-or-no answer.  And IARC
12 even says that it's not entirely clear that talc can
13 migrate from the perineum.  The data on that is
14 weak.
15         MS. GARBER:  Objection.  Motion to strike
16 as nonresponsive.
17 By MS. GARBER:
18     Q    Doctor --
19     A    Ma'am, I'm trying to answer you
20 comprehensively, and I'm not going to give you a
21 yes-or-no answer to something that's a complicated
22 issue.
23     Q    I just need to know if, in your review of
24 the epidemiological literature, the study authors
25 have concluded that it's biologically plausible that

Page 203

1  talc can migrate from the genitals to the ovaries.
2  Have they said that in the studies?  I know you
3  disagree with it.  But has that been peer reviewed
4  and published?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  No one has concluded that
7  because there's no data for that.  They have offered
8  it as a hypothesis, but nobody has come to that
9  conclusion, because there's no data.
10 BY MS. GARBER:
11     Q    The study authors have indicated that
12 it's biologically plausible that talc can migrate
13 from the genitals to the ovaries; true or false?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Some of the study authors
16 have supposed that it's possible.  None of them have
17 shown that it actually happens.
18         MS. SHARKO:  Is this a good time for a
19 break?
20         MS. GARBER:  Do you want to take a break
21 now?
22         MS. CURRY:  Yes, that would be great.
23         THE VIDEOGRAPHER:  The time is now 2:19.
24 We're going off the record.
25     (Break in the deposition taken at 2:20 p.m.)

Page 204

1               0o0
2      (The deposition resumed at 2:37 p.m.)
3               0o0
4          THE VIDEOGRAPHER:  Time is now 2:36.
5  Back on the record.
6  BY MS. GARBER:
7      Q    Doctor, you cited to the Langseth paper
8  2008 in your expert report; correct?
9      A    Correct.
10     Q    But you didn't cite to or address the
11 statements that were made in that paper with regard
12 to the issue of the biologically plausible mechanism
13 by which talc can migrate to the ovaries, did you?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Can you show me exactly
16 what you're talking about.
17 BY MS GARBER:
18     Q    I can.
19     (C. Saenz Exhibit 12 was marked for
20         identification.)
21 BY MS. GARBER:
22     Q    Doctor, I've marked as Exhibit 12 the
23 Langseth 2008 paper titled "Perineal Use of Talc and
24 Risk of Ovarian Cancer."
25         You have read that paper, have you not?

Page 205

1      A    Yes, I have.
2      Q    And, Doctor, on the front page of this
3  paper in the left-hand column about halfway down, do
4  you see where it starts from the pathological
5  studies?
6      A    "From pathological studies, it is known
7  that particles and fibers that enter the body can
8  migrate to distant organs."
9      Q    Can you keep reading?
10     A    "For instance, asbestos fibers have been
11 found in ovaries from women exposed to asbestos.
12 Analogously, following perineal application, talc
13 particles can migrate from the vagina to the
14 peritoneal cavity and ovaries."
15     Q    And you disagree with that?
16     A    I do.
17     Q    And you know that --
18     A    May I explain why, ma'am?
19     Q    No, no.  It's --
20     A    Well, but you asked me a question.
21     Q    Doctor, I asked you a question, and I'll
22 ask you another.  Doctor --
23     A    That cites the Ventor article which is
24 reference six which actually does not put talc on
25 the perineum.

Cheryl Saenz, M.D.

Page 206

1    Q    Doctor --
2    A    It's in the vagina.
3    Q    Doctor --
4         MS. GARBER:  Motion to strike as
5  nonresponsive.
6  BY MS. GARBER:
7    Q    Doctor, this paper is peer reviewed,
8  correct?
9    A    Yes.
10   Q    And published?
11   A    Yes.
12   Q    Including those statements you just read.
13   A    Which are misstatements from the actual
14  original publication.
15   Q    So the authors from IARC, some of the
16  authors from IARC who published this paper got it
17  wrong in your opinion?
18   A    Got it --
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  Got it wrong in that
21  statement because that's not what Ventor article
22  shows.
23  BY MS. GARBER:
24   Q    Okay.  You also read the Ness -- you also
25  read -- or you also reference the Ness 2000 paper in

Page 207

1  your expert report; did you not?
2    A    Yes, I do.
3    Q    When I say reference, I mean it's on your
4  reference list; correct?
5    A    And I cite it in my paper.
6         (C. Saenz Exhibit 13 was marked for
7         identification.)
8  BY MS. GARBER:
9    Q    I will hand you that paper.  I've marked
10  that as Exhibit 13.
11        MS. SHARKO:  What is Exhibit 13?
12        MS. GARBER:  The paper is titled "Factors
13  Related to Inflammation of Ovarian Epithelium and
14  Risk of Ovarian Cancer."
15  BY MS. GARBER:
16   Q    Did I read that correctly?
17   A    Yes.
18   Q    Doctor, if you turn over to page 116, in
19  the left-hand column, first full paragraph, could
20  you read, could you read for me the last sentence.
21   A    I'm sorry, where?
22   Q    Left-hand column, first full paragraph --
23   A    Yes.
24   Q    -- last sentence.
25   A    "Substances that may cause lower genital

Page 208

1  tract inflammation such as talc can travel up an
2  open genital tract, but with tubal ligation or
3  hysterectomy, that pathway is cut off, thereby
4  reducing the risk of environmentally mediated
5  inflammation."
6    Q    Do you also disagree with this
7  peer-review author?
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  On what, on that sentence?
10        MS. GARBER:  Yes.
11        THE WITNESS:  That sentence says nothing
12  about the perineum.  So I don't disagree with that
13  sentence because it could be something that's in the
14  vagina.
15  BY MS. GARBER:
16   Q    Okay.  So is it your opinion that talc
17  can migrate from the vagina to the ovaries, but when
18  it's placed at the perineum, it cannot travel
19  through the perineum into the vagina up the female
20  tract to the ovaries?
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  So my opinion is that
23  there's never been a study that's looked at the
24  travel of particulate matter from the perineum to
25  the ovaries.

Page 209

1         But when we're talking about biologic
2  plausibility, there have been studies that have
3  shown that some particulate matter placed into the
4  vagina under certain experimental conditions can
5  migrate to the ovaries.
6  BY MS. GARBER:
7    Q    So is it your opinion that talc can
8  migrate from the vagina up to the ovaries?
9    A    I don't know one way or another, but I do
10  think that in terms of biologic plausibility, there
11  is some data that there can be particulate matter
12  that can make it to the ovaries, but I don't
13  actually know one way or another if talc can do
14  that.
15   Q    Does the literature support a
16  biologically plausible mechanism that talc once in
17  the vagina can reach the fallopian tubes and
18  ovaries?
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  I would say only under
21  certain controlled situations such as the literature
22  that I cited in my report where a slurry of
23  particles, be they carbon particles or albumin
24  microspheres were placed into the posterior vagina.
25  The women were placed into Trendelenburg.

Cheryl Saenz, M.D.

Page 210

1    In the Egli study, they were given
2  oxytocin injections to incite uterine contractions,
3  so under those particular experimental
4  circumstances, there has been demonstration of
5  particulate matter in a slurry making it to the
6  ovaries.  But outside of that context, there is no
7  literature.
8  BY MS. GARBER:
9    Q    So those data don't have -- cannot be
10  properly extrapolated to the human experience in
11  your opinion?
12    MS. CURRY:  Object to the form.
13    THE WITNESS:  What human experience?
14  BY MS. GARBER:
15    Q    Well, if talc is going to migrate from
16  the vagina to the ovaries, does a woman need to be
17  in Trendelenburg position?
18    MS. CURRY:  Object to the form.
19    THE WITNESS:  So there's no data without
20  that, for any particulate matter, so I can only
21  speak to what has actually been published in the
22  peer-reviewed literature, and those are the
23  experimental conditions under which particulate
24  matter has been shown to be found in the ovaries
25  after placement in the vagina.

Page 211

1  BY MS. GARBER:
2    Q    Have you read the Sjosten paper?
3    A    The -- I'm sorry, which one?
4    Q    S-J-O-S-T-E-N, with regard to starch
5  particulate on gloves following a vaginal
6  examination?
7    A    No, I've seen that referenced in some of
8  the expert reports, but that's a different
9  circumstance where my understanding is that gloves
10  were used for a pelvic exam and then they looked
11  for, I believe it was, cornstarch.
12    Q    You understand that the FDA has banned
13  powdered gloves based on properties of inflammation
14  and toxicity to the female genital tract following
15  exam.  You're aware of those data, aren't you?
16    MS. CURRY:  Object to the form.
17    THE WITNESS:  So I've not seen the FDA
18  report.  I don't know that it was actually toxicity,
19  the word that you've chosen to use.  I do know that
20  we no longer have powder on surgical gloves.
21  BY MS. GARBER:
22    Q    I asked you about that in your deposition
23  before.  Do you remember that?  You hadn't seen
24  those?  Don't remember that?
25    A    Sounds like I'm still answering the same.

Page 212

1    Q    You didn't think you wanted to go look at
2  that study or the FDA's banned and figure out why?
3    A    No.
4    MS. CURRY:  Object to the form.
5  BY MS. GARBER:
6    Q    Weren't curious?
7    A    No, ma'am, because again it's not
8  perineal application.
9    Q    Okay.  So I think I understand your
10  opinions.  If talc were in the vagina and the woman
11  was under the circumstances of exogenous oxytocin in
12  a Trendelenburg position, it may be the case that
13  talc could get there.
14    Is that the limitations of your opinion?
15    MS. CURRY:  Object to the form.
16    THE WITNESS:  So when we're talking about
17  biologic plausibility --
18    MS. CURRY:  I'm sorry, it's highly
19  distracting, Ms. Thompson, when you're making
20  gestures and faces and speaking to other co-counsel
21  when a question is pending and the witness is trying
22  to focus and --
23    MS. THOMPSON:  Okay, I apologize.  I
24  didn't realize that was -- could be overheard.  At
25  least I wasn't laughing.

Page 213

1    MS. CURRY:  Smirking is very similar, but
2  in any event, it's very distracting.
3    THE WITNESS:  When we're talking about
4  biologic plausibility, I would apply the science
5  that is known in terms of trying to demonstrate
6  whether or not there is biologic plausibility.  And
7  the only studies that exist in humans are studies
8  where the particulate matter arises in the vagina
9  under those circumstances.
10    So in that circumstance, because of that,
11  I cannot say that talc does get to the ovaries that
12  way, but I would say that it's biologically
13  plausible in those circumstances.
14  BY MS. GARBER:
15    Q    You haven't seen the Zervomanolakis paper
16  on -- with regard to mechanisms by which particulate
17  can travel, have you?
18    MS. CURRY:  Object to the form.
19    THE WITNESS:  From where to where?
20  BY MS. GARBER:
21    Q    Are you aware of that?  It's not a paper
22  that you've cited.  Are you aware of that paper by
23  study author?
24    A    No, ma'am.
25    Q    Okay.  We've already established, you

Cheryl Saenz, M.D.

Page 214

1  haven't seen the Sjosten paper; that's correct?
2      A    The paper --
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  -- itself, no, but I've
5  seen where it's been referenced, and I believe I
6  understand the crux of that study.
7  BY MS. GARBER:
8      Q    Have you seen the Koontz paper?  Do you
9  know that paper?
10     A    No, ma'am.
11     Q    Have you looked at Ventor 1981, ma'am?
12     A    Yes, ma'am, it's on my reference list.
13     Q    Have you seen Whittemore, 1988, what that
14  author says about migration?
15     A    Yes, ma'am, it's on my reference list.
16     Q    Okay.  All right.  So Dr. Ness concludes
17  in her 2000 paper that the female genital tract is
18  open; correct?
19     A    What page are we on?
20     Q    On the last page that I just had you
21  read, 116.
22     A    Where are we, ma'am?
23     Q    At the top of the paragraph you just
24  read.  Beginning with the sentence, "Substances."
25     A    Right, I disagree with her, ma'am, and

Page 215

1  she also doesn't cite a single reference for that
2  supposition.
3      Q    Did you cite a single reference when you
4  said the female genital tract was closed?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  I talk about the female
7  anatomy, ma'am.
8  BY MS. GARBER:
9      Q    Did you cite a single reference when you
10  said the female genital tract is not an open
11  conduit?
12     A    It's the anatomy.  I'm a gynecologic
13  oncologist.  I understand the anatomy.
14     Q    So that's your opinion, that's Cheryl
15  Saenz's opinion?
16     A    No.
17         MS. CURRY:  Object to the form.
18         THE WITNESS:  It's the female anatomy.
19  BY MS. GARBER:
20     Q    Doctor, when I took your deposition, did
21  you tell me that there was an open pathway --
22         MS. CURRY:  Object to the form.
23         MS. GARBER:  -- in the female genital
24  tract?
25         THE WITNESS:  From where to where?

Page 216

1  BY MS. GARBER:
2      Q    Let's look at your testimony.  It's now
3  your opinion that it's not an open conduit --
4      A    No.
5      Q    -- the female genital tract; right?
6          MS. CURRY:  Object to the form.
7          THE WITNESS:  Not from the perineum to
8  the ovaries.
9  BY MS. GARBER:
10     Q    That's not what your report says, does
11  it?  Let's go to what your report says.
12         At the bottom of page 17, your report
13  indicates, "But the vagina is not the perineum and
14  the female genital tract is not an open conduit,
15  despite Drs. Clark, Pearson, and Smith-Bindman's
16  contrary contentions in their depositions?"
17     A    Exactly.
18     Q    So it's your opinion that the female
19  genital tract is not an open system or tract;
20  correct?
21     A    From the --
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  -- outside, from the
24  perineum, which is very different than from the
25  vagina.

Page 217

1  BY MS. GARBER:
2      Q    Is it an open system once you get into
3  the vagina to the ovaries?
4      A    There is a way that you can pass up
5  through the cervix once something is in the vagina.
6  But as an external genitalia stands in a woman, it's
7  not an open pathway.
8          This is why we need to put a speculum in
9  somebody's vagina in order to see into the vagina.
10  You can't see into the vagina just from looking at
11  the perineum.  You have to separate the labia
12  majora, minora, you have to put in a speculum, and
13  you have to open it.  It's not wide open from the
14  external genitalia to the ovaries.
15     Q    Doctor, I'm going to hand you your
16  deposition testimony from the Echeverria case, and I
17  will show it to you.  But the question I asked you
18  is, is the female genital tract an open pathway from
19  the vagina to the peritoneal space.
20         And your answer was:  "In a woman that
21  has not had a hysterectomy or a tubal ligation,
22  there's a pathway of ascension."
23         Is that still your opinion, Doctor?
24     A    Yeah, that's no different than what I
25  just said to you.

Cheryl Saenz, M.D.

Page 218

1    Q    Okay.
2    A    May I see that back, please, ma'am?  I
3  just want to make sure --
4    Q    Of course.
5    A    -- you're reading it accurately.  Thank
6  you.  Yes, ma'am.  Thank you.
7    Q    Doctor, if it's an open pathway, then why
8  at the bottom of 18 in your expert report do you
9  spend a half a page talking about the barriers to
10  ascension of that open female tract?
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  Because that's the female
13  anatomy.  That would be the challenges that any
14  particular matter would face in order to ascend
15  through retrograde migration.  And what we're
16  talking about in this particular matter is the
17  perineal application of talc which is not the
18  vagina.
19  BY MS. GARBER:
20    Q    So it's your opinion that particulate
21  that sits on the perineum has no opportunity to get
22  inside the vagina.
23    A    It's my opinion that there's never been
24  anything that has been published in the
25  peer-reviewed literature that shows that something

Page 219

1  can migrate from the perineum to the ovaries.
2    Q    That study would never be approved
3  because it's ridiculous; isn't that true?
4       MS. CURRY:  Object to the form.
5  Argumentative.
6       THE WITNESS:  Why would that be
7  ridiculous?
8  BY MS. GARBER:
9    Q    Because of course something on the
10  perineum is going to get inside the vagina.  What
11  about the issue of sexual intercourse?  Are you
12  saying that sexual intercourse doesn't drive what's
13  on the outside on the inside?
14       MS. CURRY:  Object to the form.
15  BY MS. GARBER:
16    Q    Is that not a possibility, Doctor?
17       MS. CURRY:  Object to the form.
18       THE WITNESS:  There's no data to support
19  your opinion, ma'am.
20  BY MS. GARBER:
21    Q    Is there -- is the fact that a woman who
22  applies genital talc to her perineum and then wipes,
23  using the bathroom, that would not be an opportunity
24  for talc to go inside the vaginal wall?  That would
25  be an impossibility?

Page 220

1       MS. CURRY:  Object to the form.
2       THE WITNESS:  I don't know how somebody
3  would wipe in order for your possibility to exist.
4  That would be mean that you're actually putting the
5  toilet paper into your vagina which would be a very
6  different scenario than perineal application of
7  talc.
8  BY MS. GARBER:
9    Q    Would it not be an opportunity for talc
10  to get inside the vagina by way of exercise and
11  movement?
12    A    I do not --
13    Q    Moving of the tissues?
14    A    No.
15       MS. CURRY:  Object to the form.
16       THE WITNESS:  That's not how the female
17  anatomy lays and opposes upon itself.  So no.
18  BY MS. GARBER:
19    Q    So it's your opinion and you're going to
20  tell this court that what gets put on the outside of
21  the female genital tract on the perineum has zero
22  opportunity to go into the vaginal vault, that can't
23  happen, because that study hasn't been done?
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  I'm not aware of any study

Page 221

1  that has every documented the migration of any
2  particulate matter from the perineum into the vagina
3  and then to the ovaries, not a single one.
4  BY MS. GARBER:
5    Q    You know that your obligations under ACOG
6  are you're only able to testify as to what you know
7  could be peer reviewed.  Is it your testimony that
8  you would put up for peer review a statement like
9  that, that what is on the perineum can't possibly
10  get inside the vaginal vault?
11       Would you submit that for peer review,
12  Doctor?
13       MS. CURRY:  Object to the form.
14       THE WITNESS:  It's not a peer-reviewed
15  study, ma'am.  I'm making a statement very
16  consistent with what ACOG requires me to do, which
17  is to use peer-reviewed literature to render my
18  opinions.
19       And there is no peer-reviewed literature
20  to support what you're contending.  So very
21  consistent with ACOG guidelines, I'm not giving an
22  opinion to something that there is no data for.
23       ////
24       ////
25       ////

Page 222

1    MS. GARBER: Let's actually look at what
2  ACOG says. I'm going to mark as -- I'm so sorry,
3  Ms. Curry, I only have one copy of this.
4    (C. Saenz Exhibit 14 was marked for
5    identification.)
6  BY MS. GARBER:
7    Q    Doctor, this is an ACOG committee opinion
8  document, and if I could have you turn to -- it's
9  titled "Expert Testimony" and it talks about expert
10  testimony. If I could have you turn to page two of
11  three of this document.
12    MS. SHARKO: What exhibit number is this,
13  ma'am?
14    MS. GARBER: I'm sorry. 14.
15  BY MS. GARBER:
16    Q    Doctor, can you turn, please, to page two
17  of three, under the numbered principles that are
18  offered as guidelines for the physician who assumes
19  the role as an expert witness.
20    Do you see where I am?
21    A    Yes.
22    Q    Number six says, "The physician must be
23  prepared to have the testimony given in any judicial
24  proceeding subjected to peer review by an
25  institution or professional organization to which he

Page 223

1  or she belongs."
2    Did I read that correctly?
3    A    Yes.
4    Q    Would you be willing to have that
5  statement, that particulate that is sitting on the
6  perineum can't possibly get into the vaginal vault?
7  Would you be willing to have that expert opinion
8  subjected to peer review?
9    A    So first of all, I think you're
10  misquoting what I said. What I said, and I would be
11  more than happy to have subject to peer review, is
12  that I'm unaware of any literature that has
13  demonstrated the migration of something from outside
14  the perineum into the vagina and to the ovaries. I
15  would be very, very proud and supportive of that
16  being subject to peer review.
17    Q    There's zero literature that has said
18  that talc can get from the perineum to the ovary,
19  zero literature, none.
20    MS. CURRY: Object to the form.
21    THE WITNESS: Zero scientific literature
22  to support that contention. There is no experiment
23  that's ever been done that has showed that.
24  BY MS. GARBER:
25    Q    Are you aware that the FDA has said that

Page 224

1  talc from the perineum to the ovary, the migration
2  of talc from the perineum to the ovary, is
3  indisputable. You cited that in your expert report,
4  didn't you?
5    A    I did.
6    Q    So let's look at that.
7    (C. Saenz Exhibit 15 was marked for
8    identification.)
9  BY MS. GARBER:
10    Q    I will mark as Exhibit 15 a letter which
11  you have referenced in your reference list in your
12  expert report; correct?
13    A    Yes.
14    Q    It's dated April 1st, 2014. It's sent
15  from the FDA to a Samuel Epstein, MD; correct?
16    A    Yes.
17    Q    And, Doctor, you have read this letter,
18  haven't you?
19    A    Yes.
20    Q    You reference it under the migration
21  section of your expert report?
22    A    Yes.
23    Q    In fact, you say, at page 17, "And even
24  the USFDA administration have stated, quote, 'While
25  there exists no direct proof of talc in ovarian

Page 225

1  carcinogenesis, the potential for particulates to
2  migrate from the perineum to the vagina to the
3  peritoneal cavity is indisputable."
4    Then the cite to this Exhibit 15;
5  correct? That's what your expert report says?
6    A    That is what my expert report says.
7    Q    In fact, let's turn to what that says and
8  where. At page five, the middle of the page, the
9  letter actually indicates the same. It's a direct
10  quote. "While there exists no direct proof of talc
11  in ovarian carcinogenesis, the potential for
12  particulates to migrate from the perineum to the
13  vagina" --
14    A    "And the vagina" -- or "and vagina."
15    Q    -- "from the perineum and the vagina to
16  the peritoneal cavity is indisputable."
17    FDA says the fact that it can go from the
18  perineum to the peritoneal cavity is indisputable.
19  Correct?
20    A    That's what the FDA says.
21    Q    But you disagree with the FDA.
22    A    I completely disagree with the FDA, on
23  that statement.
24    MS. SHARKO: I see you laughing,
25  Ms. Thompson.

Cheryl Saenz, M.D.

Page 226

1    MS. THOMPSON:  I didn't laugh.  I smiled
2  at Ms. Garber.
3    MS. SHARKO:  I think that was a laugh.
4    MS. THOMPSON:  We'll let the --
5    MS. SHARKO:  Let the jury decide.
6    MS. THOMPSON:  Did the tape-record --
7  recording say.
8    THE WITNESS:  Ma'am, I heard you.
9    MS. THOMPSON:  Okay.  We'll let the
10  record speak for itself.
11    (C. Saenz Exhibit 16 was marked for
12    identification.)
13    MS. GARBER:  Dr. Saenz, I'm going to mark
14  another Exhibit 16, and I'll represent to you, this
15  is an internal document that was produced attendant
16  to this litigation by Johnson & Johnson.
17    MS. CURRY:  Do you have an extra copy?
18    MS. GARBER:  I do.  Sorry.
19  BY MS. GARBER:
20    Q    Doctor, so we can get oriented, I'll just
21  represent to you, Luzenac is one of the defendants
22  in this case.  Their director of product safety,
23  Richard Zazenski is emailing Bill Ashton of J&J --
24  or not emailing, sorry.  This is a fax.  The date is
25  September 30th, 2004.

Page 227

1    It reads:  "Bill, I came across this
2  paper this morning published in the April 2004
3  journal, Human Reproduction, an official journal of
4  the European Society for Human Reproduction and
5  Embryology.  It offers some compelling evidence in
6  support of the migration hypothesis?"
7    You have not seen that before, have you?
8    A    No, ma'am.
9    Q    Do you remember being shown that in the
10  Echeverria trial?
11    A    No, I don't remember.
12    Q    Johnson & Johnson -- well, strike that.
13    It looks like defendants thought that was
14  compelling evidence that talc can migrate.  Do you
15  disagree with that?
16    MS. CURRY:  Object to the form.
17    THE WITNESS:  So, one, I've not seen this
18  article that they're referencing to, so I don't know
19  what is being interpreted as compelling evidence and
20  not in a position to evaluate this facsimile on any
21  level.
22    MS. GARBER:  Okay.
23  BY MS. GARBER:
24    Q    And the article that is being discussed
25  is the Sjosten paper, which I asked you about

Page 228

1  earlier, which you said you had not seen.  The
2  Sjosten paper that is included in this facsimile is
3  titled "Retrograde Migration of Glove Powder in the
4  Human Female" -- "in the Human Female Genital
5  Tract."
6    Did I read that correctly?
7    A    Yes.
8    Q    You've not seen that study?
9    MS. CURRY:  Object to the form.
10    THE WITNESS:  I've only seen references
11  to the study.
12  BY MS. GARBER:
13    Q    Here there is a fax from Luzenac to Bill
14  Ashton, saying that the study provides compelling
15  evidence of the migration hypothesis.  Do you agree?
16    A    No.
17    Q    You don't?
18    A    No.
19    Q    You don't agree with the data or you
20  don't agree that that's what that fax says?
21    A    The fax --
22    MS. CURRY:  Object to the form.
23    THE WITNESS:  -- says that, but I don't
24  agree that the study supports that.
25  BY MS. GARBER:

Page 229

1    Q    But you've never read the street, Doctor?
2    MS. CURRY:  Object to the form.
3    THE WITNESS:  Ma'am, I've just read the
4  abstract because you've handed it to me, and I've
5  also seen it referenced in the expert reports
6  before.  And this is a study that's looking at women
7  undergoing pelvic exams with powder on the gloves.
8  That's not powder being applied to the perineum.
9    And as I read this abstract, that's
10  exactly what they say happened.  Women underwent
11  pelvic exams.  That means the fingers went into the
12  vagina.
13  BY MS. GARBER:
14    Q    Do you make a habit of looking at an
15  abstract and rendering scientific opinions?  I mean,
16  you looked at that abstract for about 30 seconds.
17  And then you rendered an opinion about the study.
18    Is that your custom and practice, Doctor?
19    MS. CURRY:  Object to the form.
20    THE WITNESS:  You asked me to comment on
21  that and whether or not I believe this facsimile
22  supported the contention of the people faxing each
23  other, ma'am.  So I thought I needed to give you an
24  answer to your question so that's why I did that.
25  BY MS. GARBER:

Cheryl Saenz, M.D.

Page 230

1    Q    The truth is, after Echeverria, you knew
2  full well about this internal document.  It was used
3  in that litigation and the study that was behind it,
4  but you never bothered to go back and read it, did
5  you?
6         MS. CURRY:  Object to the form.  Would
7  you like her to review the --
8         MS. GARBER:  I'll --
9         MS. CURRY:  -- what's attached now?
10        MS. GARBER:  I'll withdraw that question.
11 BY MS. GARBER:
12   Q    If we could go -- do you still have it in
13 front of you?
14   A    Which one, ma'am?
15   Q    Exhibit 16.
16   A    Yes.
17   Q    The fax goes on to say, "Combine this
18 evidence with the theory that talc deposition in the
19 ovarian epithelium initiates epithelial
20 inflammation, which leads to epithelial
21 carcinogenesis, and you have a potential formula for
22 NTP classifying talc as a causative agent in ovarian
23 cancer."
24        Did I read that correctly?
25   A    You read it correctly.

Page 231

1    Q    Do you understand what the author is
2  saying there?
3         MS. CURRY:  Object to the form.
4         THE WITNESS:  I understand the contents
5  of his message.  I don't agree with him
6  biologically.
7  BY MS. GARBER:
8    Q    What do you understand he's trying to
9  convey there?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  That there is a theory that
12 ovarian carcinogenesis is caused by inflammation.
13 BY MS. GARBER:
14   Q    In fact, they cut and paste a diagram or
15 a flow chart as to the mechanism by which that may
16 occur, don't they?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  I don't know.
19 BY MS. GARBER:
20   Q    You don't recognize this diagram?
21   A    No.
22   Q    You don't remember it from the Echeverria
23 trial?
24   A    No.
25   Q    Let's refresh your memory.  A source of

Page 232

1  that diagram comes from the Ness paper, the Ness
2  2099 paper --
3    A    We're not in 2099.
4    Q    I'm sorry.  Did I say that?
5    A    Uh-huh.
6    Q    I do that all the time.  Thank you.
7  1999.
8         MS. GARBER:  I'll mark that as
9  Exhibit 17.
10        (C. Saenz Exhibit 17 was marked for
11        identification.)
12 BY MS. GARBER:
13   Q    If you -- if you turn to page two of that
14 paper, do you see that the figure one diagram is the
15 same as appears on Exhibit 16, fax?
16   A    Yes, ma'am, it looks the same.
17   Q    All right.  And if we look at Exhibit 17,
18 figure one indicates inflammation as a common
19 mechanism underlying ovarian cancer.
20        Do you see that?
21   A    Yes, I see the wording saying that; yes.
22   Q    Right.  And this study was a
23 peer-reviewed, published scientific paper; correct?
24   A    Well --
25   Q    Exhibit 17?

Page 233

1    A    I wouldn't really classify it as that,
2  because it's a review article.  So it's --
3    Q    Don't peer review -- or don't review
4  papers undergo the peer review process before
5  publication?
6    A    Not necessarily --
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  -- the same way.  Sometimes
9  authors are invited to write a review article.  So
10 it doesn't actually then go out to reviewers for
11 review.
12        So no.
13 BY MS. GARBER:
14   Q    Okay.  But the defendants in this case
15 thought enough of this article that they cut and
16 paste this diagram into their fax to talk about the
17 inflammation mechanism, didn't they?
18        MS. CURRY:  Object to the form.
19        THE WITNESS:  So I'm not in a position to
20 comment on what the actual purpose of this was back
21 in 2004.  Inflammation is a hypothesis as to the
22 potential for ovarian carcinogenesis, but there is
23 not actually any mechanistic data that shows that
24 that is true.
25        So this is a hypothesis.

Cheryl Saenz, M.D.

Page 234

1   BY MS. GARBER:
2       Q    There's no mechanistic data that supports
3   inflammation as a mechanism that you've reviewed.
4            MS. CURRY:  Object to the form.
5            THE WITNESS:  Correct.
6   BY MS. GARBER:
7       Q    Let's look at this figure one.  At the
8   top left, it indicates "Epithelial Inflammation
9   Initiators."  What do you understand that to mean
10  scientifically?
11      A    I don't actually know what the author is
12  referring to here.
13      Q    Okay.
14      A    I would have to see within the article
15  what she's referring to here.
16      Q    Okay.  Then there's a downward arrow and
17  a positive sign there.  So what do you think that
18  means scientifically as a review of scientific
19  literature?
20           MS. CURRY:  Object to the form.
21           THE WITNESS:  That it has a positive
22  influence.
23  BY MS. GARBER:
24      Q    All right.  And then in that center box,
25  there is the word "inflammation"; correct?

Page 235

1       A    Yes, ma'am.
2       Q    Then below that, there's a number of
3   bullet points.  One is DNA damage and repair;
4   correct?
5       A    Correct.
6       Q    One is oxidative stress; correct?
7       A    Yes, ma'am.
8       Q    One is elevated cytokines and
9   prostaglandins; correct?
10      A    Yes, ma'am.
11      Q    Then a downward arrow ends in the words
12  "ovarian carcinogenesis"; correct?
13      A    Yes, ma'am.
14      Q    Are you aware that the Saed data
15  provide -- 2019 paper provided mechanistic data
16  supporting DNA damage?
17           MS. CURRY:  Object to the form.
18           THE WITNESS:  No, ma'am.
19  BY MS. GARBER:
20      Q    Okay.  Are you aware that the Saed data
21  provided mechanistic data between talc and inducing
22  oxidative stress?
23           MS. CURRY:  Object to the form.
24           THE WITNESS:  I do believe that he showed
25  that; yes.

Page 236

1   BY MS. GARBER:
2       Q    Are you aware that the Buz'Zard 2007 data
3   showed mechanistic data supporting talc and elevated
4   oxidative stress or reactive oxygen species?
5       A    No.
6            MS. CURRY:  Object to the form.
7            THE WITNESS:  I've not read that paper,
8   ma'am.
9   BY MS. GARBER:
10      Q    All right.  Are you aware that the
11  Shukla data supported an elevated cytokines after
12  talc exposure?
13           MS. CURRY:  Object to the form.
14           THE WITNESS:  I have not read that paper,
15  ma'am.
16           MS. GARBER:  All right.
17           MS. SHARKO:  Ms. Garber and Ms. Thompson,
18  going forward, can you please bring copies of
19  exhibits for all counsel.  I know there's two
20  defendants down here who aren't getting anything.
21  You've given one copy for us.  I think the case
22  management order addresses the number of copies.
23           MS. GARBER:  Ms. Sharko, I would be happy
24  to do that, but that was not provided to us when we
25  defended our experts and it's a significant cost and

Page 237

1   we tried to bring our own copies of things.
2            I'll do my best in the depositions I'm
3   taking to do that in the future.
4            MS. SHARKO:  Okay, well --
5            MS. GARBER:  Flying on an airplane is a
6   lot of money to take multiple copies.
7            MS. SHARKO:  All right, well, I disagree
8   with what you're saying about the other depositions,
9   and I'll take up the violation of the order with
10  your lead counsel.
11           MS. GARBER:  We did our best to provide
12  copies here today.  I understood that this witness
13  would be defended by one lawyer, and I have brought
14  copies for her.
15           MS. SHARKO:  I think my friends at the
16  end of the table would appreciate copies.
17  BY MS. GARBER:
18      Q    Doctor, we've now gone through a number
19  of studies where the tract -- where the published
20  peer-reviewed authors have stated that it's
21  biologically plausible that talc can migrate.
22           But is it a true statement that nowhere
23  in the four corners of your report do you discuss or
24  analyze those statements?
25           MS. CURRY:  Object to the form.

Cheryl Saenz, M.D.

Page 238

1    THE WITNESS: So I discuss and analyze
2 the data that's actually on studies of migration. I
3 don't discuss every proposal that any author may
4 ever have made that such a supposition is true.
5    What I discuss is the actual experiments
6 that evaluated migration.
7 BY MS. GARBER:
8    Q    And we've already established that you
9 have not considered the totality of the literature
10 in connection with the issue of whether talc can
11 migrate; correct?
12    MS. CURRY: Object to the form.
13    THE WITNESS: No, I disagree with you,
14 ma'am. Having an author put in their paper that
15 they propose migration can exist is not a scientific
16 evaluation of the migration theory. It's a
17 statement. And I'm not going to put in my report
18 statements that are not based on -- in an experiment
19 into my report.
20    My report contains references to Egli, it
21 contains references to Ventor, and those authors
22 actually published on migration. And those papers
23 are in my report.
24    Having Dr. Ness suggest a proposal that
25 migration exists is not something that belongs in my

Page 239

1 report as scientific evidence of migration.
2    MS. GARBER: Objection. Move to strike
3 as nonresponsive.
4 BY MS. GARBER:
5    Q    Doctor, are you aware that the female
6 genital tract has a mechanism by which retrograde
7 transport of particulate can move up the female
8 genital tract?
9    MS. CURRY: Object to the form.
10    THE WITNESS: From where to where?
11 BY MS. GARBER:
12    Q    Well, let's say from the vaginal vault up
13 to the fallopian tubes.
14    A    I'm aware of some studies that have been
15 conducted that have demonstrated the migration of
16 particulate matter from the posterior vaginal vault
17 in a slurry to the fallopian tubes under certain
18 scientific experimental conditions.
19    Q    And those are limited to the studies that
20 you've cited in your report; correct?
21    A    Correct.
22    Q    Have you heard of a peristaltic pump with
23 regard to the female genital tract?
24    A    I've heard that phrase used; yes.
25    Q    Do you know what that is?

Page 240

1    A    It's the actual contraction mechanism of
2 the uterus. That's, in fact, triggered by oxytocin.
3    Q    And do you have any knowledge that
4 oxytocin can stimulate both antegrade contractions
5 as well as retrograde contractions of the female
6 genital tract?
7    MS. CURRY: Object to the form.
8    THE WITNESS: The directionality of flow
9 can be either way.
10 BY MS. GARBER:
11    Q    That is a biologically plausible
12 mechanism by which particulate can move up the
13 female genital tract; right?
14    MS. CURRY: Object to the form.
15    THE WITNESS: From the posterior vagina
16 as a slurry.
17 BY MS. GARBER:
18    Q    What happens to talc when it mixed with
19 the vaginal fluids. Doesn't it act like a slurry?
20    MS. CURRY: Object to the form.
21    THE WITNESS: I don't know. I haven't
22 seen any studies on talc mixing with vaginal fluids.
23 BY MS. GARBER:
24    Q    Don't the authors indicate -- the study
25 authors indicate that those studies are applicable

Page 241

1 to talc?
2    A    Which study authors?
3    MS. CURRY: Object to the form.
4 BY MS. GARBER:
5    Q    The published studies that cite to that
6 there's a biologically plausible mechanism, that
7 cite Egli and Ventor and some of the studies that
8 you have cited, that it's biologically plausible
9 that talc can migrate from the genitals to the
10 ovaries.
11    A    So --
12    MS. CURRY: Object to the form.
13    THE WITNESS: -- the authors don't
14 actually make that leap. They do say those studies
15 support the migration, but they're misquoting Egli
16 and Ventor because Egli and Ventor actually have the
17 slurry start in the posterior vagina, not on the
18 peritoneum.
19 BY MS. GARBER:
20    Q    If I were to put any study in front of
21 you that said talc can migrate and it was a study
22 author that studied genital talc in ovarian cancer,
23 any study author who was peer reviewed and published
24 who said that is a biologically plausible mechanism,
25 you would say they're wrong?

Cheryl Saenz, M.D.

Page 242

1    MS. CURRY:  Object to the form.
2    THE WITNESS:  I would say to you, show me
3  the science, show me the experiment that they are
4  making this statement from.  That's what I would say
5  to you.
6  BY MS. GARBER:
7    Q    Have you acknowledged in your expert
8  report any of the published authors' statements with
9  regard to the biologically plausible mechanisms for
10  talcum powder products' carcinogenicity and chronic
11  inflammation?
12    MS. CURRY:  Object to the form.
13    THE WITNESS:  So I don't exactly know
14  what you're referencing to.  I have done an analysis
15  in my report as to whether or not there's evidence
16  of chronic inflammation with talc being found in the
17  ovaries.
18    I've also done an analysis in my report
19  as to whether or not we see evidence of foreign body
20  granulomas in ovarian cancer.
21    (C. Saenz Exhibit 18 was marked for
22    identification.)
23    MS. GARBER:  Doctor, I'm going to mark as
24  Exhibit 18, a document again, that I created.  It is
25  titled "Biologic Plausibility Chronic Inflammation."

Page 243

1    Doctor, I will represent to you that
2  these are a listing of peer-reviewed study
3  publications that address the issue of talc's
4  ability to induce chronic inflammation.  I'll
5  represent that to you.
6    MS. CURRY:  I have the same objection to
7  Exhibit 18 as I do to Exhibit 11.
8    MS. GARBER:  You may, Ms. Curry.
9  BY MS. GARBER:
10    Q    Doctor, nowhere in the four corners of
11  your report have you attempted to settle or respond
12  to these statements with regard to peer-reviewed,
13  published study authors' statements with regard to
14  talc's induction of chronic inflammation, have you?
15    MS. CURRY:  Object to the form.  If you
16  need to review this document in full, please do so
17  before responding, as well as other underlying
18  documents.
19    THE WITNESS:  Well, ma'am, first I'm
20  going to disagree with you, because not all of these
21  are peer reviewed or published.
22    Secondly, I'm going to disagree with you
23  because I believe that what you've done here is
24  cherry-picked comments that each of the authors have
25  made from these publications and may not necessarily

Page 244

1  even correspond to the methods, the data collection,
2  and what the results were of these studies.
3    I do believe that many of these comments
4  most likely came from the discussion sections of
5  these papers, and that's not scientific proof of
6  that hypothesis.
7  BY MS. GARBER:
8    Q    Doctor, it's your opinion that talc does
9  not induce chronic inflammation; correct?
10    MS. CURRY:  Object to the form.
11    THE WITNESS:  In what venue?
12  BY MS. GARBER:
13    Q    With regard to the initiation of ovarian
14  cancer as a possible mechanism.
15    A    That's correct.
16    Q    There are a number of peer-reviewed
17  publications that indicate otherwise; correct?
18    MS. CURRY:  Object to the form.
19    THE WITNESS:  No, ma'am.  All of these
20  are hypotheses.  They're not indicating that ovarian
21  cancer is caused by chronic inflammation or talc.
22  They all say, basically -- I mean, right here,
23  ma'am, your own reference that you cherry-picked,
24  one, two, three, four, five, six, seven down.  This
25  is the Wu paper, "with previous findings and are

Page 245

1  compatible with the hypothesis."
2    So these are not statements of fact.
3  They are hypotheses.
4  BY MS. GARBER:
5    Q    You understand the biologic plausibility
6  for the mechanism does not require proof.  It's only
7  a plausible mechanism; correct?
8    MS. CURRY:  Object to the form.
9  BY MS. GARBER:
10    Q    You understand that, don't you?
11    A    For which you need to have a scientific
12  basis and not a single one of these statements is
13  the scientific basis.
14    Q    Provide for me the support of that
15  statement.
16    A    Provide for you the support?
17    Q    Yeah.
18    A    You can't just say something is so and
19  have it be so.  A hypothesis has to actually be
20  based in scientific proof of some sort.  There's no
21  mechanistic study that shows that talc leads to
22  ovarian carcinogenesis via chronic inflammation.
23    Q    Doctor, you understand that in a
24  causation analysis, there is no necessity to prove
25  mechanism of carcinogenicity; right?  You understand

Cheryl Saenz, M.D.

Page 246

1 that?

2     MS. CURRY:  Object to the form.

3     THE WITNESS:  Ma'am, I disagree with you.
4 Biologic plausibility means that you actually have
5 to have some scientific proof that that mechanism
6 exists or makes sense.  And there is no scientific
7 proof that talc leads to chronic inflammation in the
8 ovaries.

9     There's also no scientific proof that
10 chronic inflammation leads to ovarian
11 carcinogenesis.

12 BY MS. GARBER:

13   Q    Provide for me the citation that supports
14 that definition of biologically plausibility.

15   A    Ma'am, I can't provide for you something
16 that is saying, you can just say a hypothesis and it
17 is so.  That's not what an analysis is about.
18 Biologic plausibility can be an extension whereby
19 you say, if we have seen X, Y, or Z in A, B, C, then
20 by extension, it's biologically plausible that it
21 also exists in X, Y, and Z.  You can't just say we
22 have this hypothesis and so, therefore, it's so.

23     (C. Saenz Exhibit 19 was marked for
24     identification.)

25     MS. GARBER:  Let's mark as Exhibit 19 a

Page 247

1 draft screening assessment from Health Canada.

2     MS. CURRY:  Do you guys need to see
3 copies of these exhibits because I may have extra
4 copies of some of them if you need them.

5     MR. ANDERTON:  If you have them, that
6 would be great.  And I guess going forward, I would
7 tend to agree, that we're going to be at these depos
8 and in the interest of checking them --

9     MS. GARBER:  Well, then you guys are
10 going to need to let us know how many of you are
11 going to attend so that we know that --

12     MR. ANDERTON:  We're here as a party, so
13 at least one for each party would be appropriate in
14 my mind.

15     MS. GARBER:  Thank you.

16     MS. SHARKO:  You can assume fairly that
17 you need four copies of every exhibit.  That is what
18 we did.

19 BY MS. GARBER:

20   Q    Doctor, if you could turn to page 18 of
21 this paper.  With regard to -- or sorry, turning to
22 the middle of the document under the title, "Mode of
23 Action," it's right after the Keskin citation.

24     Do you see where I am?

25   A    Yes.

Page 248

1   Q    It indicates, "There is support for an
2 association of inflammation and increased risk of
3 ovarian cancer," and it cites to the National
4 Academy of Sciences and Engineering, 2016, and that
5 Rasmussen paper.

6     Do you disagree with that statement?

7   A    So I've not read the N-A-S [sic] paper,
8 so I don't actually know if the authors are quoting
9 it correctly or not.

10     And which of the Rasmussen -- oh, it's
11 only the published one.  I actually have read the
12 Rasmussen paper.  And the only positive finding in
13 that study for an inflammatory process which would
14 be pelvic inflammatory disease was found with an
15 association of borderline tumors, and that was only
16 after, I believe, the second episode of pelvic
17 inflammatory disease.

18     So I can't comment on the reference of
19 the N-A-S paper and I think that the statement that
20 there is support for an association of inflammation
21 and increased risk of ovarian cancer is really kind
22 of an overbroad generalization because it really
23 only did pertain to borderline tumors.

24   Q    That's a long way of saying no?

25     MS. CURRY:  Object to the form.

Page 249

1     THE WITNESS:  Ma'am, I'm sorry.  I'm just
2 trying to be complete for you so you understand why
3 I say what I'm saying.

4 BY MS. GARBER:

5   Q    Did you read the Trabert paper, 2014,
6 titled "Pre-diagnostic Serum Levels of Inflammation
7 Markers and the Risk of Ovarian Cancer in the
8 Prostate, Lung, Colorectal, and Ovarian Cancer,
9 P-L-C-O, Screening Trial"?

10   A    I don't think it's in my report, but I
11 might have read it somewhere around the course of my
12 career.

13   Q    I didn't see it in your citations.

14   A    But I do think that -- I know I've read
15 various publications from the P-L-C-O trial --
16 sorry, the P-L-C-O clinical trials.  So I don't know
17 if I've, off the top of my head, read that
18 particular one.  I'd be happy to take a look at it
19 for you.

20     But the --

21   Q    I --

22   A    -- P-L-C-O trials are something that the
23 GYN oncology community has paid attention to.

24   Q    So I just want to read for you a
25 statement.  It says "Research Highlights" at page

Page 250

1 13. It says, "Our study provides additional
2 evidence that" --
3        MS. CURRY:  I'm sorry, do you have a copy
4 of that?
5        MS. GARBER:  I don't.
6 BY MS. GARBER:
7    Q    "Our study provides additional evidence
8 that inflammation plays an important role in ovarian
9 carcinogenesis."  If that's what it says, do you
10 disagree with that?
11   A    Why don't we just --
12       MS. CURRY:  Object to the form.  Do you a
13 copy so we can look at it?
14       MS. GARBER:  You don't have a copy?
15       MS. CURRY:  No, can we take a look at
16 what you're quoting?
17 BY MS. GARBER:
18   Q    If that's what it says, do you disagree
19 with that?
20   A    I can't comment on that one way or
21 another because I don't know what they're referring
22 to as inflammation.  If it's something such as an
23 elevated CA 125 versus looking at the actually
24 ovaries.
25       So without looking at the study, I can't

Page 251

1 comment on that statement.
2    Q    What is Interleukin 8?
3    A    Interleukin 8, it's an inflammatory
4 marker.
5    Q    Is it -- so it's associated with
6 inflammation?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  It can be.
9 BY MS. GARBER:
10   Q    Has it been tied to risk of ovarian
11 cancer or a pathway of developing ovarian cancer?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  I'm sure there are some
14 publications that have shown Interleukin 8 levels
15 are elevated, but where along the pathway of
16 carcinogenesis, off the top of my head, I don't
17 really know how that would relate.
18 BY MS. GARBER:
19   Q    You reference the Gates 2018 study in
20 your reference list.
21   A    No, ma'am, there's no Gates 2018 study.
22   Q    I'm sorry, 2008; correct?
23   A    Yes, ma'am.
24       ///
25       ///

Page 252

1        MS. GARBER:  I'll mark that study as
2 Exhibit 20.
3        (C. Saenz Exhibit 20 was marked for
4        identification.)
5 BY MS. GARBER:
6    Q    Doctor, if I could call your attention to
7 page eight, the first full paragraph about halfway
8 down, the sentence begins, "Talc particles."
9        Do you see that?
10   A    I'm sorry, which paragraph?
11   Q    The first full paragraph.
12   A    Oh.  Halfway down.  Okay.
13   Q    Could you read what those two sentences
14 until you reach the note -- I'm sorry, the citation
15 11.
16   A    "Talc particles can induce an
17 inflammatory response in vivo, which may be
18 important in ovarian cancer."
19   Q    Keep going.  One more sentence.
20   A    Hold on one second.  "Normal ovarian
21 cells treated with talc are more likely to undergo
22 self-proliferation and neoplastic trans -- whoops,
23 neoplastic transformation and cellular generation of
24 reactive oxygen species increasing with increasing
25 exposure to talc."

Page 253

1    Q    Do you disagree with those sentences?
2    A    No.
3    Q    Okay.  You also cited to the Mills 2008,
4 study; correct?
5        MS. CURRY:  Object to the form.
6        I don't believe --
7        MS. GARBER:  I'm sorry, 2004.  That's
8 what I do when I get tired.  I get my numbers all
9 mixed up.  You also -- I'll start over.
10 BY MS. GARBER:
11   Q    You also reference the Mills 2004 study
12 in your expert report references; correct?
13   A    Yes.
14       (C. Saenz Exhibit 21 was marked for
15       identification.)
16 BY MS. GARBER:
17   Q    If you could turn to page 458 of this
18 paper.
19   A    That's the first page.
20   Q    Okay.  This is a peer-reviewed
21 publication; correct?
22   A    Yes.
23   Q    This concerned perineal talc exposure and
24 epithelial ovarian cancer risk; correct?
25   A    Yes.

Cheryl Saenz, M.D.

Page 254

1    Q    And with regard to the issue of migration
2  in the first full paragraph, it reads:  "In animal
3  studies, talc and other substances have been
4  demonstrated to migrate from the vagina through the
5  peritoneal cavity to the ovaries."
6         Did I read that correctly?
7    A    Yes.
8    Q    And this is in your -- another
9  peer-reviewed paper where the authors have stated
10 that; correct?
11   A    Ma'am, that's the --
12        MS. CURRY:  Object to the form.
13        THE WITNESS:  -- introduction.  That's
14 not anything that they're proving in this paper.
15 BY MS. GARBER:
16   Q    And with regard to the issue of
17 inflammation, the authors state, and it has been
18 peer reviewed, "Collectively, these studies point to
19 a possible etiologic role of talc in ovarian cancer,
20 via inflammation process at the site of the ovarian
21 epithelium."
22        Did I read that correctly?
23        MS. CURRY:  Inflammatory process.
24 BY MS. GARBER:
25   Q    I'm sorry.  "Collectively, these studies

Page 255

1  point to a possible etiologic role of talc in
2  ovarian cancer via an inflammatory process at the
3  site of the ovarian epithelium."
4         Did I now read that correctly?
5    A    You read it correctly, but the paper that
6  they're citing there and referencing is the Ness
7  2000 paper, which actually was about hypotheses of
8  ovarian cancer in mutagenesis and was not a
9  mechanistic paper.
10        So it's not describing actually the
11 inflammation.  It's theorizing.
12        And, again, this is the introduction.
13 It's not anything that's being proven in this paper.
14   Q    This has been peer reviewed and
15 published, so it's undergone a peer-review process
16 that your opinions have not; true?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  Ma'am, the introduction is
19 not the result of the study.  And a statement that
20 the author makes doesn't make it so, particularly if
21 it's in the introduction or the discussion section.
22        There's nothing in the results of this
23 paper that supports that, and in fact, the paper
24 that they cite for that statement is Ness 2000,
25 which actually doesn't look at inflammation per se.

Page 256

1  It's talking about hypotheses.
2  BY MS. GARBER:
3    Q    Doctor, at page 20 of your expert report,
4  you indicate that "There is no data to support that
5  inflammation is the underlying -- "There is no data
6  to support that inflammation is underlying the" --
7    A    I'm sorry, ma'am, where are we?
8    Q    Under the summary.
9    A    Okay.
10   Q    I'll start again.  In your expert report
11 at page 20, you indicate, "There is no data to
12 support inflammation is the underlying" -- "is
13 underlying the" --
14   A    Wait, I'm sorry.  I don't see where you
15 are.
16        MS. CURRY:  I don't either.
17 BY MS. GARBER:
18   Q    Doctor, under "Summary" --
19   A    Yes, ma'am.
20   Q    -- at the very end, do you see where I
21 am?
22        MS. CURRY:  You're reading the last half
23 of the sentence.
24        THE WITNESS:  You're starting in the
25 middle of a sentence.

Page 257

1  BY MS. GARBER:
2    Q    Okay.  All right.  I'll read the whole
3  sentence.  "The clinical and epidemiologic data" --
4  so we'll start there.
5         What does "clinical data" mean?
6    A    Patients, ovaries themselves, looking for
7  foreign body granulomas, associations of pelvic
8  inflammatory disease with the development of ovarian
9  cancer.
10   Q    What you've seen with your eyes?
11   A    What I've seen with my eyes, but also the
12 literature on PID that we discussed earlier, the
13 Rasmussen study.
14   Q    Okay.  So the clinical an epidemiological
15 data, and there you mean the data that we've been
16 going through, the published, peer-reviewed
17 epidemiological data with regard to genital talc and
18 risk of ovarian cancer, correct?
19   A    Yes, ma'am.
20   Q    You indicate, "do not support the
21 hypothesis that talc causes ovarian cancer through
22 induction of chronic inflammatory process, primarily
23 because there's no data to support that inflammation
24 is underlying the malignant transformation of the
25 ovarian epithelium at all."

Cheryl Saenz, M.D.

Page 258

1    Did I read that correctly?
2    A    Yes.
3    Q    And you have made that statement without
4    reviewing the totality of the literature with regard
5    to mechanisms of carcinogenicity; correct?
6         MS. CURRY:  Object to the form.
7         THE WITNESS:  No, ma'am.  I've reviewed
8    the date on mechanisms of carcinogenicity and
9    ovarian cancer and I've also reviewed the clinical
10   data, which we talked about, and I've also reviewed
11   the pathologic data and the epidemiologic data.
12   BY MS. GARBER:
13   Q    Which pathologic data did you review?
14   A    Whenever we operate on patients, we don't
15   see evidence of foreign body granulomas.  We don't
16   see evidence of chronic inflammation.  From a
17   pathologic standpoint, there's no evidence of
18   inflammation underlying the development of ovarian
19   cancer.
20   Q    Okay.  And I'm going to get to that.  I
21   just wondered if you had seen some patient-level
22   data in this case or something you were referencing.
23        MS. CURRY:  Object to the form.
24        THE WITNESS:  I don't know what you mean,
25   patient --

Page 259

1         MS. GARBER:  Never mind.  I'll withdraw.
2    BY MS. GARBER:
3    Q    But when you claim no epidemiologic or
4    biologic data, as we have established over and over,
5    you have not seen the Buz'Zard or Shukla paper;
6    correct?
7    A    Correct.  But those don't demonstrate
8    cancer.
9    Q    They demonstrate mechanism, don't they?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  No, they demonstrate
12   inflammatory processes.  They don't demonstrate
13   cancer.
14   BY MS. GARBER:
15   Q    Okay.  What is the purpose of a cellular
16   study with regard to, let's say, applying talc to a
17   given cell to assess what happens at the cellular
18   level?  What would be the purpose of doing such a
19   study?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  It all depends on what your
22   hypothesis is.
23   BY MS. GARBER:
24   Q    What if your hypothesis is that talc can
25   induce epithelium ovarian cancer and you're looking

Page 260

1    for a plausible mechanism of how that happens?  What
2    would such a study do?
3         MS. CURRY:  Object to the form.
4         THE WITNESS:  It would look for malignant
5    transformation from a normal cell.
6    BY MS. GARBER:
7    Q    Would it also look for inflammatory
8    factors and mechanistic data by which malignant
9    transformation could happen?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  Only if you believed that
12   chronic inflammation might be involved in the
13   process of malignant transformation.
14   BY MS. GARBER:
15   Q    Are you aware of data that chronic
16   inflammation is associated with malignant
17   transformation in any context?
18   A    In other tumors, yes, about not in
19   ovarian cancer.
20   Q    Okay.  Now, you also indicate in your
21   report -- and I think we were just talking about the
22   pathologic data.  And you talk about when you've
23   performed surgery on patients and what you've seen
24   macroscopically; right, with your naked eye.
25   A    Also microscopically.

Page 261

1    Q    I'm going to get there.  I'm breaking it
2    down.  So you're describing what you see with your
3    eyes, macroscopically, when you operate, and you
4    remove their, let's say, ovaries; correct?
5    A    Their cancer?
6    Q    Uh-huh.
7    A    Yes.
8    Q    You also review their pathological --
9    their pathology slides of the tissue that you've
10   removed; correct?
11   A    Yes.
12   Q    And you use that as support for your
13   opinion that talc can't induce chronic inflammation
14   that leads to cancer, because when you look with
15   your eyes and look under the microscope, you don't
16   see evidence of that in the tumor?
17   A    That's some of what --
18        MS. CURRY:  Object to the form.
19   BY MS. GARBER:
20   Q    Is that fair?
21   A    That's some of what I use to support it,
22   I've not seen evidence of foreign body granulomas,
23   other things that would suggest that foreign bodies
24   are actually causing it.  Yes.
25   Q    Isn't it true, though, Doctor, by the

Cheryl Saenz, M.D.

Page 262

1 time you see the cancer, the inflammatory process
2 has already been overtaken by the tumor?  You're not
3 going to see at time of diagnosis what happened
4 years earlier, way before the latency period as
5 there was transformation of those normal cells into
6 cancer cells, are you?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  I have no reason to believe
9 that that's accurate.  I think that if there was
10 evidence of foreign body granulomas, they would
11 still be there in the pathology that we're
12 reviewing.
13 BY MS. GARBER:
14    Q    Is it a true statement that today, when
15 you're looking at, let's say, ovarian tissue, you
16 have no way of seeing cancerous transformation when
17 it occurred years earlier?
18         MS. CURRY:  Object to the form.
19 BY MS. GARBER:
20    Q    You can't see cancer evolving in ovarian
21 cancer, can you?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  I don't actually think
24 that's true.  I think there's some new and emerging
25 literature that in particular, for high-grade serous

Page 263

1 carcinomas, is giving us a glimpse into the
2 evolution from a pre-neoplastic process to ovarian
3 cancer.
4         That's in particular with what we've been
5 able to glean from a lot of the BRCA one and two
6 patients who have prophylactic surgery and we've
7 been able to identify precursor lesions in those
8 patients.
9         So I think that might have been true five
10 years ago.  I don't think that's necessarily true
11 now.
12 BY MS. GARBER:
13    Q    Was it true on February 25th, 2019?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  That we didn't know what it
16 looks like?  I think we don't know what it looks
17 like for all cases of ovarian cancer.  I think with
18 respect to high-grade serous carcinomas, we're
19 starting to learn.
20 BY MS. GARBER:
21    Q    If you could turn to page three of your
22 expert report, Doctor.
23    A    Sure.
24    Q    As to what cancer looks like as it's
25 developing, don't you indicate at the bottom of

Page 264

1 page three, quote, "As we really don't know what
2 ovarian cancer looks like as it's developing, unlike
3 cancers of the colon, breast, and cervix."
4         Isn't that what you said on February
5 25th, 2019?
6    A    Yeah, I think it's an evolving process,
7 because I think the different histologic subtypes
8 are starting to provide us with clues, but we don't
9 really know what it looks like.  This is --
10    Q    So when you look at an ovarian tumor when
11 you remove it from a woman, it in no way indicates
12 what was happening years earlier during cancer
13 transformation, does it?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  I don't --
16 MS. GARBER:
17    Q    Because you can't see that.  You can't
18 see the transformation of those cells years earlier,
19 can you?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  I could still see hallmarks
22 of foreign bodies if they were actually there.  We
23 see in pathology in women that have had surgery
24 years before evidence of suture granulomas for
25 somebody that might have had surgery before.

Page 265

1         Somebody that might have had a unilateral
2 salpingo-oophorectomy and had staples in order to
3 operate on her, we see evidence of that even years
4 later when they have cancer.  So those markers of
5 inflammation and responses to foreign bodies don't
6 go away just because the patient has cancer.
7 BY MS. GARBER:
8    Q    You can't look at a cancerous tumor and
9 say what induced that cancer by looking at it today,
10 cellularly, can you?
11         MS. CURRY:  Object to the form.
12         THE WITNESS:  I agree with that.  I
13 don't -- I don't know what induced that particular
14 cancer.  I agree with that.
15         MS. GARBER:  Thank you.
16         THE WITNESS:  Can we take a break?
17         MS. GARBER:  Sure.
18         THE VIDEOGRAPHER:  The time is now 3:48.
19 Going off the record.
20       (Break in the deposition taken at 3:49 p.m.)
21                  0o0
22       (The deposition resumed at 4:10 p.m.)
23                  0o0
24         THE VIDEOGRAPHER:  Time is now 4:09.
25 Back on the record.

Cheryl Saenz, M.D.

Page 266

BY MS. GARBER:
2  Q    Doctor, at page 20 of your report, in the
3  first full paragraph near the top, you indicate that
4  "If talc induces ovarian cancer by causing chronic
5  inflammation, then studies examining the use of
6  anti-inflammatory agents such as NSAIDS and aspirin
7  should show a decreased risk of developing ovarian
8  cancer with regular use of these agents."
9      Did I read that correctly?
10  A    Yes.
11  Q    Did you cite in your expert report
12  references to any data looking at NSAIDS and aspirin
13  by way of risk of ovarian cancer?
14  A    Yes.
15  Q    Okay.  And which studies did you cite?
16  Are those 13, 15, and 91?
17  A    Yes, along with reference two.
18  Q    Doctor, in your references, I could not
19  find where you had cited a 2018 paper by the author
20  Qiao, Q-I-A-O; is that correct?  You did not cite
21  that paper?
22  A    I did not.
23  Q    Did you perform a comprehensive review of
24  the literature looking at NSAIDS and aspirin and the
25  potential reduction for risk of ovarian cancer?

Page 267

1      MS. CURRY:  Object to the form.
2      THE WITNESS:  Yes.
3  BY MS. GARBER:
4  Q    Tell me about that comprehensive review
5  of the literature.  What did you do?
6  A    I went to search engines and typed in
7  ovarian cancer and NSAIDS.
8  Q    Did you type in ovarian cancer and
9  aspirin?
10  A    Yes.  Aspirin is an NSAID.
11  Q    But they seem to break it out in the
12  literature.
13  A    Not always.
14  Q    Okay.  Did you do any other search terms
15  with regard to ovarian cancer and NSAIDS?
16  A    Well, I didn't just type NSAIDS because I
17  was concerned that if that acronym wasn't in there,
18  that it might not come up.  So I also typed in
19  Tylenol, acetaminophen, ibuprofen, and what else did
20  I type in.  I think I even looked to see if Celebrex
21  was in there, yeah.
22  ////
23  ////
24  ////
25  ////

Page 268

1  Q    So with regard to the Qiao paper, I
2  will -- I don't know how to pronounce it.  I'm
3  guessing it's Qiao.  I'm going to mark that as
4  Exhibit 22.
5      (C. Saenz Exhibit 22 was marked for
6      identification.)
7  BY MS. GARBER:
8  Q    Doctor, I know you haven't read this
9  paper.  But in the abstract in the conclusions, are
10  the conclusions that as cited by these study
11  authors, these findings suggest that aspirin use is
12  associated with a reduced risk of gastric,
13  esophageal, colorectal, pancreatic, ovarian,
14  endometrial, breast and prostate cancers and small
15  intestine, neuroendocrine tumors?
16  A    That's the conclusion that the authors
17  put there; yes.
18  Q    So this study, does this look like this
19  was a meta-analysis study?
20  A    That's what it says in the title.
21  Q    So this was published in 2018, and it is
22  a meta-analysis of the association between aspirin
23  use and risk of certain cancers when included
24  ovarian cancer; correct?
25  A    Yes, that's one of the things they

Page 269

1  examined.
2  Q    What was the finding by way of reduction
3  of risk with regard to ovarian cancer?
4  A    The authors report that the risk of
5  ovarian cancer decreased by 11 percent.
6  Q    It was statistically significant, wasn't
7  it?
8  A    They reported that that finding was
9  statistically significant; correct.
10      MS. GARBER:  Let's look at another paper.
11  This I'll mark as Exhibit 24.  And this paper, the
12  lead author is Trabert, T-R-A-B-E-R-T, et al.,
13  titled "Aspirin, Nonsteroidal, Nonaspirin,
14  Nonsteroidal Anti-Inflammatory Drug and
15  Acetaminophen Use and the Risk of Invasive
16  Epithelial Ovarian Cancer, a Pooled Analysis in the
17  Ovarian Cancer Association Consortium."
18  BY MS. GARBER:
19  Q    Did I read that correctly?
20  A    Yes.
21      MS. CURRY:  Did we skip Exhibit 23?
22      MS. GARBER:  Did I miss one?
23      THE WITNESS:  Yes.
24      MS. GARBER:  Oh, I did.  Let's replace.
25      MS. SHARKO:  So Trabert is now 23?

Cheryl Saenz, M.D.

Page 270

1    MS. GARBER:  Trabert 2013 is now Exhibit
2    23.
3        MS. CURRY:  I think this is a 2014 --
4        MS. GARBER:  You're right.  It's at the
5    top.  All right.  So Trabert 2014, part of the
6    title, "Aspirin, Nonaspirin, Nonsteroidal
7    Anti-Inflammatory Drug," is now Exhibit 23.
8        (C. Saenz Exhibit 23 was marked for
9        identification.)
10   BY MS. GARBER:
11       Q    Doctor, I don't see that this paper is on
12   your reference list either; is that correct?
13       A    Correct.
14       Q    And nonsteroidal anti-inflammatory drug
15   is the long name for the acronym, NSAIDS; correct?
16       A    Correct.
17       Q    So your literature search should have
18   turned up this paper because NSAID was in the title;
19   correct?
20       A    It depends.  It's not always that simple.
21   I understand that it's there in the title, but if
22   you type in NSAIDS, it doesn't always come up.
23   Sometimes different permutations of your search will
24   yield different results.
25       Q    In the authors' conclusions, in the

Page 271

1    manuscript, it indicates "Aspirin use was associated
2    with a reduced risk of ovarian cancer especially
3    among daily users of low-dose aspirin.  These
4    findings suggest that same aspirin regimen proven to
5    protect against cardiovascular events and several
6    cancers could reduce the risk of ovarian cancer, 20
7    to 34 percent, depending upon" -- "depending on
8    frequency and dose of use."
9        Did I read that correctly?
10       A    That's their conclusion.  The result
11   section is what actually has that data.  The
12   conclusion section doesn't comment on the NSAIDS.
13       Q    And, Doctor, on the first page of this
14   paper, in the second paragraph, does it indicate
15   multiple lines of evidence suggest that ovarian
16   cancer maybe related to chronic inflammation?
17       A    So again, that's a statement from the
18   introduction section and they're referencing to that
19   same Ness paper that actually didn't evaluate
20   chronic inflammation but just commented on different
21   hypotheses as to carcinogenesis of ovarian cancer.
22   This paper is actually very similar in findings, I
23   think, to the Barnard paper, which I did reference
24   to in my report.
25       Q    This paper, if you look at page two on

Page 272

1    the left-hand column, indicates that it included
2    more than 7500 ovarian cancer cases from 12
3    population based case control studies; correct?
4        A    I'm sorry, where are we?
5        Q    On page two.
6        A    Yeah.
7        Q    Left-hand column at the top.
8        A    Oh, left-hand column.
9        Q    "We concluded."
10       A    We conducted?
11       Q    Yeah.  It indicates that the study
12   included more than 7500 ovarian cancer cases from 12
13   population based case control studies; right?
14       A    Right.
15       Q    At the last page, nine of 11, it
16   indicates, "In summary, this pooled analysis
17   supports the hypothesis that regular aspirin use
18   reduces ovarian cancer risk.  Specifically we report
19   a statistically significant decreased risk of
20   ovarian cancer with daily use of aspirin.  Further
21   biological and pharmaceutical" -- sorry,
22   pharmacological research is necessary to understand
23   the mechanisms of ovarian cancer risk reduction by
24   aspirin."
25       Did I read that correctly?

Page 273

1        A    You read that statement correctly, but
2    that wasn't the only finding in this study, just
3    like it wasn't the only finding in the Barnard
4    study, which is why in my report, I talked about the
5    literature on NSAIDS being inconsistent.
6        Sometimes it looks like it reduces the
7    risk.  Sometimes it looks like there is no effect.
8    Sometimes it looks like there actually was an
9    increased risk of developing ovarian cancer.  So the
10   literature on NSAID use in development of ovarian
11   cancer is inconsistent.
12       Q    How many studies did you review that
13   indicated that NSAIDS increased the risk of ovarian
14   cancer?
15       A    Two.
16       Q    How many studies did you review that
17   indicated NSAIDS, including aspirin, reduced the
18   risk of ovarian cancer?
19       A    So the issue is a little bit more complex
20   than that because some of the studies don't
21   necessarily break out which ones they were talking
22   about.  I believe the Barnard study looked at
23   low-dose aspirin use, daily aspirin use, and then
24   NSAIDS, and the results for each of those agents was
25   different.

Cheryl Saenz, M.D.

Page 274

1      So in total, I reference, I believe -- is
2  it three or four studies -- four studies in my
3  review that looked at the use of NSAIDS and the
4  development of ovarian cancer.  And the literature
5  was inconsistent.
6      Q   Do you rely on the studies that show that
7  NSAIDS and aspirin do not reduce the risk to support
8  your opinions that talc does not induce chronic
9  inflammation that leads to ovarian cancer?
10     A   No, I rely on the fact that the
11 literature is inconsistent to formulate my opinion
12 that chronic inflammation is the mechanism by which
13 talc would increase the risk of developing ovarian
14 cancer is not true.
15     Q   You do admit, though, that is there is
16 peer reviewed, published literature that NSAIDS,
17 including aspirin, have been shown to reduce the
18 risk of ovarian cancer, because they're
19 anti-inflammatories; right?
20     MS. CURRY:  Object to the form.
21 BY MS. GARBER:
22     Q   It's the mechanism?
23     A   Well, but just within this paper that you
24 just produced as evidence, there's also within the
25 exact same paper showing evidence that NSAIDS don't

Page 275

1  review -- sorry, don't reduce the risk of ovarian
2  cancer.
3      So what's what I mean by inconsistent, is
4  that some components of a study, depending on the
5  agent, show a reduction in risk.  Others don't show
6  a reduction in risk, even within the same study, and
7  other studies have shown an increase in risk.
8      So that's actually what I mean by
9  inconsistent.
10 BY MS. GARBER:
11     Q   But you nevertheless conclude based on
12 the data with regard to NSAIDS and aspirin and risk
13 of ovarian cancer, that there is not a mechanism of
14 carcinogenicity by chronic inflammation, don't you?
15     MS. CURRY:  Object to the form.
16     THE WITNESS:  What I conclude is that the
17 literature on NSAIDS and ovarian cancer does not
18 support the hypothesis of chronic inflammation as
19 the mechanism.
20     If all the literature on NSAIDS
21 consistently showed a reduction in risk across the
22 board in the development of ovarian cancer with
23 regular NSAID use, then I think that would actually
24 go to potentially the biologic plausibility of
25 chronic inflammation as a mechanism.  But it does

Page 276

1  not.
2      The fact that the NSAID literature
3  doesn't consistently show a reduction in risk speaks
4  to it likely being some other reason that the
5  literature is showing that, that it's not simply the
6  prevention of chronic inflammation.
7  BY MS. GARBER:
8      Q   Could it be the design of the study?
9      MS. CURRY:  Object to the form.
10     THE WITNESS:  I think any time we're
11 talking about case control studies, which is what
12 this study, this meta-analysis looks like, this one
13 that you just handed me, Exhibit 23, is a
14 compilation of -- what did we say, 12
15 population-based case control studies.  I think
16 there's always the possibility that you've got a
17 confound in that study.  That is the reason that you
18 have the findings that you have.
19     But the Barnard study was actually a
20 cohort study.  It was prospective.  So I don't
21 necessarily think that you're subject to the same
22 compound and recall biases that you might be in a
23 case control study such as Exhibit 23.
24 BY MS. GARBER:
25     Q   So you put more weight on the Barnard

Page 277

1  cohort study than you did the meta-analyses of the
2  data; is that fair, with regard to NSAIDS?
3      A   Well, with respect to the studies you
4  just showed me?
5      Q   Okay.
6      A   I've not had a chance to read these two
7  studies through, so I can't really give you an
8  analysis on that.  If we're talking about in a
9  general principle, I do think that a cohort study is
10 more scientifically credible than a case controlled
11 study.
12     Q   You've rendered an opinion about what the
13 literature shows by way of consistency with regard
14 to NSAIDS and aspirin without reviewing all of the
15 literature, do you agree?
16     MS. CURRY:  Object to the form.
17     THE WITNESS:  I believe that I've
18 reviewed a sufficient amount of the literature to
19 render the opinion that I've rendered which is that
20 the literature is inconsistent and, in fact, the two
21 references that you just showed me are consistent
22 with my opinion that the literature on NSAIDS is
23 inconsistent.
24 BY MS. GARBER:
25     Q   Doctor, do you think it's possible to

Page 278

1 render an accurate opinion without reviewing the
2 totality of the literature on a given topic?
3         MS. CURRY:  Object to the form.
4         THE WITNESS:  I think that you can review
5 a sufficient amount of literature to render an
6 opinion as long as the literature that you're
7 reviewing encompasses the breath and depth of the
8 science that is out there.
9 BY MS. GARBER:
10    Q    Do you remember in the Echeverria report
11 what your opinions were with regard to the risk of
12 obesity and serous ovarian cancer?
13    A    So I'm not entirely sure what I said in
14 that report.  I'd be happy to look at it.  I'm not
15 entirely sure I commented specifically on serous
16 ovarian cancer in the Echeverria report.
17    Q    In this report, do you have an opinion as
18 to the risk of obesity as it pertains to serous
19 ovarian cancer?
20    A    So I think the literature on obesity
21 actually does -- well, I think it's inconsistent.  I
22 think that it's somewhat weak.  I think that the
23 strength of the association is still in the range of
24 roughly 1.2 to 1.3.  And I believe the histologic
25 subtypes that are most often associated with obesity

Page 279

1 do not include serous.
2         MS. GARBER:  I'm going to mark as
3 Exhibit 24 your expert report from the Echeverria
4 matter.
5         (C. Saenz Exhibit 24 was marked for
6         identification.)
7 BY MS. GARBER:
8    Q    If you could turn to -- you didn't number
9 your pages, but it's about fourth page in.
10        MS. SHARKO:  Is that protected
11 information in it?
12        MS. GARBER:  Not in this section -- you
13 know, that's a good point.  Thank you very much,
14 Ms. Sharko.  You know what we'll do is, I will
15 take --
16        MS. SHARKO:  Maybe give the witness the
17 whole report, question her, and then only mark pages
18 of it.
19        MS. GARBER:  Thank you.  Well, I don't
20 have pages.  You know what, let's do, Dr. Saenz,
21 let's put a number, just if you could do this,
22 put a number one on the first page at the bottom.
23        THE WITNESS:  On the first page?  I'm
24 sorry.  Okay.
25 ///

Page 280

1 BY MS. GARBER:
2    Q    Let's put a number two on the second
3 page.
4    A    Okay.
5    Q    Then let's put a page three.  And
6 page four.
7    A    Okay.
8    Q    That's all I'm going to mark as from the
9 report of Cheryl Saenz, MD, with regard to the
10 Echeverria report.  We will just mark the first four
11 pages; okay?
12    A    Ma'am, there's patient identifier
13 information on page two.
14    Q    Okay.  We will then just mark page four
15 of the Echeverria report.
16    A    Okay.  I just --
17    Q    Thank you for saying that.  Okay.
18        With regard to your obesity opinion, in
19 this expert report, do you indicate that the data
20 shows an increased risk for high-grade serous?
21    A    In this report?
22    Q    In the Echeverria report, which we've
23 marked as Exhibit 24.
24    A    No.  I don't comment on it increasing the
25 development of high-grade serous.  I comment on it

Page 281

1 portending a worse prognosis in terms of mortality
2 for high-grade serous.
3    Q    Was it your opinion that obesity
4 increases high-grade serous in that case?
5    A    In terms of that incidence or the
6 mortality from?
7    Q    The incidence.
8    A    Not the incidence.  The mortality from.
9    Q    Is it your opinion in the MDL report that
10 obesity increases the risk for high-grade serous, or
11 serous ovarian cancer?
12    A    The incidence?
13    Q    Yes.
14    A    No.
15    Q    Is it your opinion that obesity increases
16 the mortality for high-grade serous?
17    A    It's my opinion that obesity increases
18 the mortality for basically all of the ovarian
19 cancers.
20    Q    Do you say that in your expert report?
21    A    I do.
22    Q    Okay.
23    A    Ma'am, may I ask, what should I do with
24 this then?
25    Q    Thank you.  Moving on.  Okay.  Let's talk

Cheryl Saenz, M.D.

Page 282

1  about a different topic for awhile.
2      Is it your opinion that the data do not
3  support a dose response with regard to talcum
4  powder, genital talcum powder exposure and risk of
5  ovarian cancer?
6      A   Yes, that's correct.
7      Q   You reviewed the Berge study in
8  connection with your expert report; correct?
9      A   The meta-analysis?
10     Q   Yes.
11     A   Yes.
12         MS. GARBER:  I will mark the Berge paper
13  as Exhibit 25.
14         (C. Saenz Exhibit 25 was marked for
15         identification.)
16  BY MS. GARBER:
17     Q   Doctor, the title of this paper is
18  "Genital Use of Talc and Risk of Ovarian Cancer, a
19  Meta-Analysis"; correct?
20     A   Correct.
21     Q   If you turn to page -- let's just look at
22  the first page.  In the abstract, the study authors
23  indicate, "This meta-analysis resulted" --
24     A   I'm sorry, ma'am.  On the first page,
25  where are we?  In the second column?

Page 283

1      Q   At the top, in the abstract.
2      A   Okay.
3      Q   Right-hand column, it indicates, "This
4  meta-analysis."  Do you see that?
5      A   Yes, thank you.
6      Q   "This meta-analysis resulted in weak but
7  statistically significant association between
8  genital use of talc in ovarian cancer, which appears
9  to be a limited to serous" -- sorry.
10     A   No worries.
11     Q   I gave you the wrong version.
12     A   Give you this back?
13     Q   No.  Let's just hang on.
14         Your references indicate the Berge paper
15  that was published in the European Journal of Cancer
16  Prevention in 2018; correct?  It's at page 32.
17     A   Yes.
18     Q   The citation there is Volume 27(3),
19  May 2018, pages 248 to 257; correct?
20     A   Correct.
21     Q   So you have read that publication of the
22  Berge study; correct?
23     A   Correct.
24     Q   So, Doctor, I will represent to you that
25  at the bottom of the abstract, the study says, "This

Page 284

1  meta-analysis resulted in a weak but statistically
2  significant association between genital talc use in
3  ovarian cancer, which appears to be limited to
4  serous carcinoma with suggestion of a dose
5  response."
6      If it says that, do you disagree with the
7  study authors?
8      MS. CURRY:  Do you have a copy of that
9  version?
10     MS. GARBER:  No, I just said that I
11  don't.
12     MS. CURRY:  You don't have it.
13     MS. GARBER:  She had it on her reference
14  list, and I don't.  I put it in hypothetical.
15  BY MS. GARBER:
16     Q   If the study authors say that, do you
17  disagree with that?
18     A   So I have to look at the paper to see
19  exactly what we're looking at and to see where
20  they're saying the suggestion.  Because the paper
21  you've just put in front of me, by the same group,
22  with the same title, actually says that the
23  heterogeneity of results by study design and the
24  lack of a trend for duration and frequency of use
25  detract from a causal interpretation of the

Page 285

1  association.
2      MS. GARBER:  Would you object if I give
3  her a highlighted version that she can look at for
4  purposes of this question?
5      MS. CURRY:  No objection.
6      MS. GARBER:  I can make a clean copy of
7  it so that doesn't show up.
8      MS. CURRY:  Okay.
9  BY MS. GARBER:
10     Q   Doctor, do you see in the abstract where
11  I read from, at the bottom, where it says "This
12  meta-analysis"?
13     A   "This meta-analysis resulted in a weak
14  but statistically significant association between
15  genital use of talc and ovarian cancer, which
16  appears to be limited to serous carcinoma with
17  suggestion of a dose response."
18     Q   Do you disagree with the study authors,
19  the study provided a suggestion of a dose response?
20     MS. CURRY:  Object to the form.
21     THE WITNESS:  So I don't disagree with
22  the suggestion.  I don't think that demonstrates a
23  dose response, because the authors also go on to
24  say, "The heterogeneity of results by study design,
25  however, detracts from a causal interpretation of

Cheryl Saenz, M.D.

Page 286

1 this association."
2        MS. GARBER:  Motion to strike as
3 nonresponsive.
4 BY MS. GARBER:
5        Q    Doctor, if you could now turn to about
6 halfway through the paper.
7        A    Which paper, ma'am, the one that I just
8 got handed or the one before?
9        Q    The one that you just got handed --
10       A    Okay.
11       Q    -- which we will mark as Exhibit -- we
12 will change and we will make that Exhibit 25.
13       MS. CURRY:  I think there's been
14 testimony on Exhibit 25.  Do you want to change --
15 do you want to mark this 26?
16       MS. GARBER:  Let's make that -- let's
17 just make that, yeah, 26.
18       (C. Saenz Exhibit 26 was marked for
19       identification.)
20 BY MS. GARBER:
21       Q    So Doctor, Exhibit 26 is now the Berge
22 paper which is published in the European journal of
23 Cancer Prevention, Volume 273, May 2018; correct?
24       A    Yes, ma'am.
25       Q    That's the same one that's listed on your

Page 287

1 reference list in your expert report?
2        A    Yes, ma'am.
3        Q    All right.  Now, if I could have you turn
4 to table three of that study.
5        A    I don't see a table three.  Am I missing
6 something?
7        Q    Go back one page.
8        A    Sorry; yes.
9        Q    That table three is titled "Duration and
10 Frequency of Use of Genital Talc, Results of the
11 Meta-Analysis."  Do you see that?
12       A    No.  Oh, sorry, "Duration and Frequency
13 of Use of Genital Talc Results in Meta-Analysis."
14 Yes.
15       Q    For the duration of ten years, the
16 relative risk was 1.16 and statistically
17 significant; correct?
18       A    Yes.
19       Q    And the frequency of use defined as one
20 time per week, showed a relative risk of 1.05, also
21 statistically significant; correct?
22       A    Yes.
23       Q    So these data support a suggestion of
24 dose response, don't they?
25       MS. CURRY:  Object to the form.

Page 288

1        THE WITNESS:  I don't necessarily know
2 that, because I don't know what it's being compared
3 against.  If it's being compared against never use
4 versus another time period, my answer would be
5 different.
6 BY MS. GARBER:
7        Q    Okay.  Can you go back to the Schildkraut
8 paper that we marked as Exhibit 7, please.  If you
9 turn --
10       A    Give me a second, ma'am.
11       Q    Sure.
12       A    Okay.
13       Q    If you turn to page 1416 of that
14 publication --
15       A    Yes, ma'am.
16       Q    -- on the left-hand column, about just a
17 little below halfway down, it begins with "The
18 results."  Do you see where I am?
19       A    No.
20       Q    It's about three-quarters of the way down
21 the results.
22       A    Oh.
23       Q    See that?
24       A    Oh, sorry, yes.  The beginning of the
25 paragraph -- yes.

Page 289

1        Q    Yes.  The study authors indicate here,
2 "The results of the current study show that genital
3 powder use was associated with ovarian cancer risk
4 in African-American women and are consistent with
5 localized chronic inflammation in the ovary due to
6 particulates that travel through a direct
7 transvaginal route."  Did I read that correctly?
8        A    You read that component of the discussion
9 section; yes.
10       Q    The authors also say, "The dose response
11 observed for duration of genital powder use provides
12 further evidence for the relationship between
13 genital powder and overall epithelial ovarian cancer
14 risk."
15       Did I read that correctly?
16       A    That is what the author said, but what
17 their data actually shows, their analysis for their
18 dose response curve was not done correctly.  And so
19 I don't agree that this paper actually shows a dose
20 response.
21       Q    Here again, you agree -- you disagree
22 with study authors who actually conducted the study?
23       A    I do, ma'am, because this study looked at
24 applications without pulling out the never-users.
25 So the weight of having a statistically significant

Cheryl Saenz, M.D.

Page 290

1  finding with more use is influenced by the never-use
2  population remaining in the analysis.
3      Q    Let's look at Cramer 2016.  That was
4  another study you cited in your reference list;
5  correct?
6      A    Yes, ma'am.
7          (C. Saenz Exhibit 27 was marked for
8          identification.)
9  BY MS. GARBER:
10     Q    Dr. Cramer was one of the --
11     A    This is 27.
12     Q    Thank you.  Exhibit 27 is the Cramer 2016
13  paper titled "The Association Between Talc Use in
14  Ovarian Cancer Retrospective Case Control Study in
15  Two US States"; right?
16     A    Yes.
17     Q    Dr. Cramer was the first study author in
18  1982 to find a statistically significant associated
19  risk between genital talc use and ovarian cancer;
20  right?
21     A    I believe that he's the first person to
22  publish that, yes, ma'am.
23     Q    He has since published a number of
24  studies about the issues surrounding talc and
25  ovarian cancer, including this study in 2016;

Page 291

1  correct?
2          MS. CURRY:  Object to the form.
3          THE WITNESS:  He -- he has published a
4  number of studies, yes.  And -- yes, this study was
5  publish in yeah, 2016.
6  BY MS. GARBER:
7      Q    Do you have any reason to doubt the
8  reliability of this particular study?
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  I think there are problems
11  with this study, particularly with respect to the
12  reporting of a dose-response curve as we were just
13  discussing.
14  BY MS. GARBER:
15     Q    Can you name any positive study that
16  supports an association between genital talc use and
17  ovarian cancer that you don't think has a problem?
18     A    So I actually think the Terry pooled
19  analysis --
20     Q    Is that in your eyes?
21     A    Yeah.  I can just sit back a little.
22         MS. CURRY:  Are you okay on the video?
23         THE VIDEOGRAPHER:  Yeah, they're all
24  down.  Tried to pull them down more.  They're not
25  blocking.

Page 292

1          THE WITNESS:  The Terry pooled analysis,
2  I think, from a standpoint of the way that that
3  study was conducted, I think it was scientifically
4  sound.
5  BY MS. GARBER:
6      Q    Any others?  There's about 30 of them;
7  right?
8          MS. CURRY:  Object to the form.
9          THE WITNESS:  The case control studies, I
10  don't have criticisms of all of them.  It's just
11  when I'm reviewing them, I review the data in its
12  entirety, particularly looking for consistencies
13  within the study, if it's reporting on things that
14  are claimed in the conclusions.
15  BY MS. GARBER:
16     Q    Do you have any criticisms of any of the
17  data that didn't find a statistically significant
18  increased risk between genital talc and epithelial
19  ovarian cancer?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  I'm sure I --
22         MS. GARBER:  Or are your criticisms just
23  limited to the positive data?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  No, my criticisms are not

Page 293

1  just limited to the positive data.
2  BY MS. GARBER:
3      Q    Let's look at the Terry 2016 study.
4          MS. CURRY:  Do you mean Cramer?
5          THE WITNESS:  We're looking at Terry 2013
6  or Cramer 2016?
7          MS. GARBER:  Let's look at the Cramer
8  2016 study.
9          THE WITNESS:  Okay.
10         MS. SHARKO:  Are you okay with the sun?
11         THE WITNESS:  I'm okay.  If I need to --
12  I can back up.  Right now, I'm okay.
13         THE VIDEOGRAPHER:  Doctor, try to move a
14  little way this way.  That's fine.
15         THE WITNESS:  Move this way?  Yeah,
16  that's -- I'm going to sit back here.
17         THE VIDEOGRAPHER:  That's better
18  actually.
19         THE WITNESS:  You got the right side?
20         MS. GARBER:  That's all off the record.
21         THE REPORTER:  Unfortunately, it is on.
22  BY MS. GARBER:
23     Q    Doctor, if you can turn to page 337 of
24  this study.
25     A    Yes, ma'am.

Cheryl Saenz, M.D.

Page 294

1    Q    Start with page 335 to get the full
2 sentence.  The very last sentence on 335 indicates,
3 "An odds ratio of 1.49 with a confidence interval of
4 1.06 to 2.10 was associated with more than 20 talc
5 years (greater than 7200 applications) and a dose
6 response."
7    A    That's what they wrote.
8    Q    Do you disagree with the study authors in
9 this case that the results supported a dose
10 response?
11    A    So I don't disagree with the finding,
12 that that's the odds ratio.  But I do disagree with
13 the statement that this analysis, which is in the
14 top part of the table one, looking at total genital
15 applications among only those who reported months
16 per year per use, that analysis, that grouping, does
17 not support a dose response with each of those
18 intervals of applications.
19         The only -- there are two, actually, that
20 report statistical significance.  The one of the 361
21 to 1800 applications, and the greater than 7200 that
22 you just reported.  But the interval in between
23 those two does not achieve statistical significance
24 and, in fact, has an odds ratio even lower than less
25 application.

Page 295

1         So I don't believe that this grouping,
2 the analysis of the total applications actually
3 supports a dose response.
4    Q    You make that assumption, because you
5 assume that the dose response needs to be linear,
6 don't you?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  No, that's actually not
9 true.  I'm drawing that opinion from the fact that a
10 lower number of applications was reported as a
11 statistically significant finding, and then the
12 intermediate number of applications actually wasn't
13 statistically significant and had a lower odds
14 ratio.  And then the higher number of applications
15 had statistical significance.
16         So it's not a matter of threshold
17 response per se.  It's a matter of the fact that the
18 statistically significant findings are interrupted
19 by nonstatistically significant findings of an
20 actually lower odds ratio.
21 BY MS. GARBER:
22    Q    Are you aware of any toxicology
23 principles that would support that you don't have to
24 have a linear increase.  It can be in the shape of
25 go up, go down, then go back up?

Page 296

1         MS. CURRY:  Object to the form.
2         THE WITNESS:  Not with respect to talc
3 and not with respect to having a lesser exposure
4 cause a cancer as we're looking at in this
5 circumstance, an intermediate exposure not causing
6 cancer and then the higher exposure causing the
7 cancer.  It -- I'm not aware of anything that would
8 say an intermediate exposure of a carcinogenic agent
9 is safe when a lower exposure is not.
10 BY MS. GARBER:
11    Q    You're not a toxicologist, though; right?
12    A    No, ma'am.
13    Q    If you turn to page 345, there is a
14 summary, that says, "In summary, the study on talc
15 in epithelial ovarian" --
16    A    I'm sorry, can you slow down and let me
17 get there.
18    Q    Sure.
19    A    Thank you.
20    Q    345, left-hand column.  It reads, "In
21 summary, this study on talc and epithelial ovarian
22 cancer has contributed to the following perspectives
23 with some new regarding this association."
24         And the first one reads, "Overall, there
25 is an association between genital talc use an EOC

Page 297

1 and a significant trend with increasing talc years
2 of use."
3         Did you disagree with that?
4    A    I don't believe this paper supports that
5 contention.
6    Q    So yet again here, you're disagreeing
7 with a study author that has actually conducted a
8 study with regard to genital talc use in ovarian
9 cancer?
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  I disagree with the
12 statement in the conclusion section, because the
13 table that is presented actually as the data does
14 not support that statement.
15         MS. GARBER:  Let's mark the Terry paper
16 as 28.
17         (C. Saenz Exhibit 28 was marked for
18         identification.)
19 BY MS. GARBER:
20    Q    Doctor, you looked at this study;
21 correct?
22    A    I read this study, yes.
23    Q    The title is "Genital Powder Use in the
24 Risk of Ovarian Cancer, a Pooled Analysis, of
25 8525 Cases and 9859 Controls."

Cheryl Saenz, M.D.

Page 298

1    A    Correct.
2    Q    With regard to dose response at page six,
3  the authors address -- I'm sorry, under discussion.
4  Under discussion that begins "The biologic
5  plausibility."
6         Do you see where I am?
7    A    Yes.
8    Q    The authors here address some of the
9  issues that I was just raising with regard to it may
10  not be a linear dose response, don't they?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  You would need to point out
13  for me exactly what you're referring to.
14        MS. GARBER:  Okay.
15  BY MS. GARBER:
16    Q    The Terry authors indicate "The biologic
17  plausibility for the observed association between
18  genital talc use and ovarian cancer risk has been
19  challenged because evidence for a dose response has
20  been inconsistent."
21        Gives some citation.  It says "The lack
22  of significant dose response may reflect the
23  difficulty inherent in accurate recollection of
24  specific details of frequency and duration of
25  genital powder use."

Page 299

1         They go on to say "Also, because not all
2  powder products contain talc, various products may
3  differ in their potential cardiogenic effects."
4         MS. CURRY:  Carcinogenic effects.
5         MS. GARBER:  "Carcinogenic effects.
6  Alternatively, the association between genital
7  powder exposure and ovarian cancer risk may not be
8  linear, and modest exposure maybe sufficient to
9  increase cancer risk."
10  BY MS. GARBER:
11    Q    Did I read that correctly with counsel's
12  help?
13    A    That, and earlier I think you missed a
14  word.  It wasn't genital talc use.  It was genital
15  powder use in the first sentence, but otherwise;
16  yes.
17    Q    Okay.  Do you agree with the authors that
18  the dose response results that are seen in the
19  literature and the inconsistency of those may
20  reflect that there's not a linear response, but yet
21  there can still be carcinogenicity?
22        MS. CURRY:  Object to the form.
23        THE WITNESS:  So I believe that the lack
24  of a linear response may be true, and it may be that
25  a threshold dose is the mechanism by which something

Page 300

1  is carcinogenic.  But the literature on talc and
2  developing ovarian cancer, that's not my criticisms
3  of the studies that lack a dose response curve.
4         My criticisms of the studies that lack a
5  dose response curve are either one, they fail to
6  pool the never-users out of the analysis, so the
7  weight of seeing a dose response is actually
8  influenced by the fact that the never-users still
9  remain in the analysis.
10        And two, there are studies such as Cramer
11  2016 that we just talked about, that a lower dose
12  seems to have an association between ovarian cancer,
13  but an intermediate dose does not.  And then a
14  higher dose does have that statistical significant
15  finding so I believe what Terry is saying, is that
16  may be not linear.  It may be threshold.  But that
17  doesn't alter the findings in Cramer.  It doesn't
18  alter the way that Schildkraut did the analysis.
19        So those are my criticisms.  I don't
20  think it's entirely explained by what Terry is
21  offering here in the discussion section.
22  BY MS. GARBER:
23    Q    Do you agree that the literature -- there
24  are literature that support a dose response?
25    A    I do not believe that there's any

Page 301

1  literature that actually has shown a dose response
2  where the dose response calculations have been done
3  correctly.
4    Q    You believe the failure to pull the
5  never-users out of the equation operates to increase
6  the odds ratio?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  I believe that the failure
9  to pull the never-users out of the calculation of a
10  dose response analysis does influence that analysis
11  towards showing a higher odds ratio for increased
12  applications or longer duration or increased
13  frequency.
14  BY MS. GARBER:
15    Q    Why is that if they've never used talc?
16    A    Because the dose, if you're looking at
17  just two applications, let's say that you're looking
18  at less than 5,000 applications or more than 5,000
19  applications, the lower odds ratio that's calculated
20  with less than 5,000 applications is influenced by
21  the never-users still being in there.
22        The higher odds ratio that you see when
23  you calculate the odds ratio for more than 5,000
24  applications is being compared against that
25  population that still had no applications in it.

Cheryl Saenz, M.D.

Page 302

1  So that odds ratio for that first dosing
2  is influenced by the never-users still being
3  contained in that grouping.
4  Q   You're speculating, aren't you, that
5  those odds ratios are influenced by the never-users?
6  MS. CURRY:  Object to the form.
7  THE WITNESS:  No --
8  BY MS. GARBER:
9  Q   You have no data to suggest that that has
10  positively influenced the data, do you?
11  MS. CURRY:  Object to the form.
12  THE WITNESS:  I absolutely do.  That's
13  actually how Terry calculated their dose response.
14  They pulled the never-users out, and they commented
15  that this is the only way to actually go look for a
16  dose response.  Your never-users are not going to
17  have a statistically significant increased risk
18  because they have no applications.
19  So their referent number is one.  That's
20  a lower number by the fact that they're never-users.
21  Terry pulled those patients out, the never-users,
22  when Terry went about doing the dose calculations.
23  And Terry did not find a statistically significant
24  dose response curve.
25  ///

Page 303

1  BY MS. GARBER:
2  Q   Are there other data that support that
3  failure to pull out the never-users inflated the
4  odds ratio?
5  MS. CURRY:  Object to the form.
6  THE WITNESS:  No, every other study left
7  them in.  That's not the proper way to do that
8  analysis, because you're weighting your lower
9  applications by the never-users.  They don't belong
10  in the dose response calculations, because they
11  don't have applications.
12  BY MS. GARBER:
13  Q   But you don't know the way that you just
14  cited in Terry in the other studies that the
15  never-users affected the results, do you?
16  MS. CURRY:  Object to the form.
17  THE WITNESS:  No, I do, because they have
18  an odds ratio, a referent value of one.  So that is
19  the referent value because they have no exposures.
20  That's influencing the lower dose applications.
21  BY MS. GARBER:
22  Q   Do you have any data to indicate that the
23  study subjects that reported no use did, in fact,
24  have no use?
25  A   So I think what you're getting at is

Page 304

1  actually the entire issue of recall bias.  Any case
2  control studies is up and open to recall bias.  I
3  have no reason to believe that somebody would report
4  they never used talc if they never used it.  But I
5  don't have actual data on that.
6  Q   Do you have an opinion that recall bias
7  accounts for the positive association in the case
8  control studies?
9  MS. CURRY:  Object to the form.
10  THE WITNESS:  I think it has the
11  potential to contribute to it.
12  BY MS. GARBER:
13  Q   But that's not my question.  Do you think
14  that the positive results, the statistically
15  significant association in the case control studies
16  are attributable to recall bias?
17  MS. CURRY:  Object to the form.
18  THE WITNESS:  Not exclusively, but I
19  think there is the potential that recall bias is
20  influencing the odds ratios in the case control
21  studies along with other factors that case control
22  studies are subject to.
23  BY MS. GARBER:
24  Q   So I'm here to get your opinion.  So
25  there's potential, but it is not your opinion that

Page 305

1  those studies are, in fact, influenced by recall
2  bias; correct?
3  A   I do --
4  MS. CURRY:  Object to the form.
5  THE WITNESS:  I do believe that
6  Schildkraut demonstrated that recall bias
7  contributes to the odds ratio because when
8  Schildkraut analyzed the data pre-2014 and
9  post-2014, the odds ratio changed.  So I do believe
10  that as a piece of data, the Schildkraut study does
11  show the influence of recall bias in case control
12  studies -- sorry, in her study.
13  BY MS. GARBER:
14  Q   Do you know when there was the first
15  widespread coverage or media coverage of the talcum
16  powder litigation?
17  MS. CURRY:  Object to the form.
18  THE WITNESS:  No, I do not.
19  BY MS. GARBER:
20  Q   Did you read any studies that talked
21  about that?
22  A   About the recall bias?
23  Q   Uh-huh.
24  A   Or the litigation?
25  Q   Uh-huh.

Cheryl Saenz, M.D.

Page 306

1    A    Other than Schildkraut?
2    Q    Uh-huh.
3    A    Penninkilampi talks about it.
4    Q    We'll get to some of that in a minute.
5  Do you have an opinion about whether the
6  epidemiological data provides consistent increased
7  risk of ovarian cancer?
8         MS. CURRY: Object to the form.
9         THE WITNESS: I'm sorry, you're going to
10  have to rephrase that. That's really broad. The
11  epidemiologic literature shows increased risk of
12  ovarian cancer?
13         MS. GARBER: Yes.
14         THE WITNESS: That's very broad. I
15  don't -- can you please rephrase that?
16  BY MS. GARBER:
17    Q    What are your opinions about whether or
18  not the epidemiological data is -- provides
19  consistency or inconsistency? Don't you have
20  opinions about that in your report?
21         MS. CURRY: Object to the form.
22         THE WITNESS: With respect to what and
23  what?
24  BY MS. GARBER:
25    Q    With respect to genital talc use and risk

Page 307

1  of ovarian cancer.
2    A    I think the epidemiologic literature on
3  the risk of -- the possible risk of perineal
4  application of talc and the development of ovarian
5  cancer is inconsistent.
6    Q    You're aware of study data that
7  indicate -- strike that.
8         You're aware of study authors in
9  epidemiological studies that indicate that the
10  literature is consistent, not inconsistent; correct?
11         MS. CURRY: Object to the form.
12         THE WITNESS: No, you'd have to point me
13  to what exactly you're referencing.
14         MS. GARBER: Let's go back to Health
15  Canada, which is Exhibit 20.
16         THE WITNESS: Okay.
17         MS. CURRY: Exhibit 19?
18         MS. GARBER: Is it 19?
19         THE WITNESS: Yes.
20         MS. GARBER: Thank you. I misspoke. So
21  Exhibit 19, that draft screening assessment of
22  Health Canada.
23  BY MS. GARBER:
24    Q    Could you please turn to page -- it's not
25  three, but it's Roman three. It's three pages in.

Page 308

1  Do you see where I am?
2    A    So the -- is this the synopsis section?
3    Q    Yes. Do you see at the bottom of -- the
4  third page in, under the synopsis, the second to the
5  last paragraph?
6    A    Yes.
7    Q    It reads, "The meta-analyses of the
8  available human studies and peer-reviewed literature
9  indicate a consistent and statistically significant
10  positive association between perineal exposure to
11  talc in ovarian cancer."
12         Do you disagree with that statement of
13  these authors who drafted this for Health Canada?
14    A    Yes, the literature is not consistent.
15  In fact, Berge talks about that. There's
16  heterogeneity between case control studies and the
17  cohort studies.
18    Q    So here, again, you're disagreeing with
19  authors who have actually performed an analysis of
20  the data.
21         MS. CURRY: Object to the form.
22         THE WITNESS: These authors didn't
23  perform an analysis. This is a draft screening
24  assessment, and in fact, I'm very consistent with
25  what Berge puts forth, which is that there's

Page 309

1  heterogeneity, meaning inconsistency, between the
2  cohort studies and the case control studies.
3         MS. GARBER: Let's mark the Taher study.
4         THE REPORTER: Which study?
5         MS. GARBER: T-A-H-E-R, 2018. I'm going
6  to mark as Exhibit 29 the Taher 2018 meta-analysis.
7         (C. Saenz Exhibit 29 was marked for
8  identification.)
9         THE WITNESS: Thank you.
10  BY MS. GARBER:
11    Q    Could you please turn to page 49 of the
12  study. Under the conclusion section, beginning with
13  "consistent," the authors conclude "Consistent with
14  previous evaluations, the IARC and subsequent
15  evaluations by individual investigators, the present
16  comprehensive evaluation of all currently available
17  relevant data indicates that perineal exposure to
18  talcum powder is a possible cause of ovarian cancer
19  in humans."
20         I'm assuming that you disagree with that
21  conclusion.
22    A    I disagree with that. I mean, they are
23  basically saying what IARC said, and I disagree with
24  that.
25    Q    You disagree that the literature is

Cheryl Saenz, M.D.

Page 310

1  consistent?
2     A   I disagree that the literature is
3  consistent, because again the cohort studies do not
4  show an increased risk.
5     Q   And you disagree that the perineal
6  exposure to talc is a possible cause of ovarian
7  cancer in humans?
8     A   Yes.
9     Q   Turning back to the Terry 2013 paper.  If
10  you turn to page six of that study where it
11  indicates "Based on the consistency," do you see
12  that?
13     A   I'm sorry, where are we?
14     Q   If you could hand that to me, because I
15  can't find mine.  Thanks.
16     A   No problem.
17     Q   Thank you.  Page six, under the
18  discussion.  Do you see where it begins, "Based on
19  the consistency"?
20     A   Yes.
21     Q   It reads, "Based on the consistency of
22  the epidemiologic literature on talc-based body
23  powder and ovarian cancer risk, the IARC classified
24  talc-based body powder as a 2(b) carcinogen,
25  possibly carcinogenic in human beings."

Page 311

1       So there the Terry papers are citing to
2  IARC, where IARC was saying the data are consistent;
3  correct?
4     A   So Terry is citing IARC, which is a 2010
5  publication, and that's before the cohort studies
6  such as when the talc initiative study was
7  published.  So IARC didn't actually analyze those
8  studies, and I do believe that here, Terry is simply
9  quoting what IARC has to say.
10     Q   Okay.  Did you consider the -- did you
11  consider the issue of recall bias in formulating
12  your opinions in this case?
13       MS. CURRY:  Object to the form.
14       THE WITNESS:  With respect to what?
15  BY MS. GARBER:
16     Q   With regard to the sufficiency of the
17  literature and what it showed.
18       MS. CURRY:  Object to the form.
19       THE WITNESS:  I think recall bias is
20  always an issue.  Whenever there's a case control
21  study, I don't think that that's something that you
22  can necessarily eliminate.  You can try and control
23  for it, but as we discussed earlier and as evidenced
24  by the Schildkraut study, there's certainly an
25  influence of, on the odds ratios, of recall bias.

Page 312

1  BY MS. GARBER:
2     Q   In your report at page eight, under the
3  heading, "Genital Application of Talc," you
4  indicate, "The majority of the published studies" --
5     A   I'm sorry.  Give me a second.  I see
6  where you are, yes.
7     Q   "The majority of the published studies
8  consist of small, retrospective case control studies
9  with inherent selection and recall bias."
10     A   Biases.
11     Q   Biases.
12     A   Yes.
13     Q   That's your opinion?
14     A   Yes.
15     Q   The majority of them?
16     A   Yes.
17     Q   Okay.  Are you aware of study author
18  statements that have indicated that those data are
19  not subject to recall bias?
20       MS. CURRY:  Object to the form.
21       THE WITNESS:  No, you would have to show
22  me that, and I don't believe that you can entirely
23  eliminate recall bias from a case control study.
24  And selection bias is always going to be a component
25  of a case control study because you will have people

Page 313

1  that don't participate in terms of who your cases
2  are.  And what is the reason for them to not
3  participate and the people that do participate, to
4  participate, you can't sort out.  You don't know
5  what those influences are.
6  BY MS. GARBER:
7     Q   At Exhibit 19, page 28.
8     A   What document are we on now, ma'am?
9     A   Sorry, the Health Canada.
10     A   Health Canada.
11     Q   Health Canada, page 28.
12     A   Okay.
13     Q   Under the heading, "Uncertainties in the
14  Evaluation of Risk in Human Health," third paragraph
15  down, beginning with the sentence, "However."
16       Do you see where I am?
17     A   Yes.
18     Q   The next sentence down, it begins, "The
19  studies where the exposure is simple, e.g., never
20  versus ever use, recall bias is unlikely to be an
21  important source of bias."
22       Then it cites to Narod 2016.  "The
23  positive association is strongest for serous
24  histologic type."  Then he cites to Berge 2018.
25  Taher, 2018.  "The findings that the association may

Cheryl Saenz, M.D.

Page 314

1  vary by histologic type detracts from the hypothesis
2  of report bias, as this type of bias would likely
3  operate in all histologic types."
4         Then he cites to the Berge 2018 paper.
5         Correct?
6    A   That's what it says there, but that's
7  just not true.
8    Q   So let's talk about that for a minute.
9  If recall bias were at play, then it wouldn't
10 operate in some histologies and not others, would
11 it?
12   A   So the studies that have shown the
13 association with the serous subtype was the Gertig
14 2000 study, which in the follow-up study with Gates
15 in 2010, did not show the association with the
16 serous subtype.
17   Q   Were there other studies that you saw
18 where serous subtype was more highly associated with
19 risk of ovarian cancer than the other subtypes?
20   A   So across the different literature that
21 has been published at various times, there has been
22 association with the serous type, but there have
23 also been associations with the endometrial type.
24 So the literature has varied, according to what
25 subtypes were found.

Page 315

1         I also think, again, I would cite back to
2  Schildkraut, which demonstrated the influence of
3  recall bias, regardless.  And I just don't think
4  that you can completely eliminate recall bias.
5         You're talking about patients with
6  ovarian cancer that are searching for answers as to
7  why they got their disease.  They want to know why
8  they're in this unfortunately circumstance, and we
9  don't really know how the people that were doing the
10 questions were asking them the questions and how
11 that might influence them as well.
12   Q   Can you pull the Langseth paper from
13 2008.
14         MS. CURRY:  Which exhibit number was
15 that?
16         MS. GARBER:  I think it was seven.
17         MS. THOMPSON:  It's 12.
18         MS. GARBER:  It was not.  It was 12.
19         THE WITNESS:  Almost there.
20 BY MS. GARBER:
21   Q   If you turn to page 358.
22   A   Is that the first page?
23   Q   Yeah.  On the right-hand column, the
24 paragraph that begins with "Methodological factors,"
25 do you see that?

Page 316

1    A   Yes.
2    Q   It reads:  "Methodological factors such
3  as recall bias could always be considered in case
4  control studies."
5         MS. CURRY:  Should always be considered.
6         MS. GARBER:  "It could have been a
7  problem had there been widespread publicity about
8  the possible association between use of body powder
9  and cancer.  The International Agency For Research
10 on Cancer, IARC, working group, considers that there
11 has not been widespread public concern about this
12 issue, and therefore, considers it unlikely that
13 such bias could play -- could explain the consistent
14 findings."
15 BY MS. GARBER:
16   Q   Did I read that correctly?
17   A   Yes, and it goes on, "Another source of
18 recall bias could result from the fact that women
19 with cancer tend to remember or overreport their use
20 of body powder," which is exactly what I was saying
21 before.
22   Q   Isn't it true, Doctor, that habitual use
23 eliminates or reduces the risk of recall bias?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  It can reduce recall bias,

Page 317

1  but you can't eliminate it.  And even as the authors
2  say in this paper that you were just reading from,
3  the influence of this type of recall bias cannot be
4  ruled out.  So habitual use doesn't even rule out
5  the possibility that the women with cancer tend to
6  overreport or remember more so their use of body
7  powder.
8  BY MS. GARBER:
9    Q   Would you read the Narod 2016 publication
10 with regard to talc in ovarian cancer.  I didn't see
11 it cited on your reference list.
12   A   I think in the course of being a GYN
13 oncologist, I probably read it, but I don't know
14 that I read it specifically for the purposes of
15 generating my report.
16         MS. GARBER:  So I've marked that as
17 Exhibit 30.
18         (C. Saenz Exhibit 30 was marked for
19         identification.)
20 BY MS. GARBER:
21   Q   Doctor, this was published in Gynecologic
22 Oncology, so this is something that you probably
23 would have read?
24   A   Quite possibly; yes.
25   Q   Doctor, here, Dr. Narod discusses that

Cheryl Saenz, M.D.

Page 318

1  case control studies to date are consistent on the
2  right-hand column, doesn't he?
3      A   He writes, "The case control studies to
4  date are consistent," yes.
5      Q   If you turn --
6      A   He goes on to say, "Given the small
7  effect size, it is not surprising that some are
8  positive and some are negative."
9      Q   Does he also discuss the cohort studies,
10  if you turn the page over in the left-hand column,
11  about halfway down, beginning with the word
12  "neither"?
13      MS. CURRY:  I don't see where you are.
14      THE WITNESS:  I don't either.
15      MS. GARBER:  Second page in.
16      THE WITNESS:  Yes, ma'am.
17      MS. GARBER:  Left-hand column.
18      THE WITNESS:  Yes, ma'am.
19      MS. GARBER:  About halfway down the
20  paragraph, right after the odds ratio that ends with
21  the competence interval of 1.15.
22      THE WITNESS:  I'm sorry, say that number
23  again.
24      MS. GARBER:  Let me show you, where it
25  says "neither."

Page 319

1      THE WITNESS:  Thank you; okay.
2  BY MS. GARBER:
3      Q   It indicates:  "Neither prospective study
4  confirmed the association of talc use in ovarian
5  cancer raised by the case control studies, but
6  neither study was powered to detect the risk of 1.2
7  and, therefore, we cannot exclude the possibility."
8      He goes on to say, "Only two women in a
9  thousand will develop ovarian cancer in ten-year
10  follow-up period.  If we study 10,000 women over ten
11  years, we can expect 20 cancers to occur.  If the
12  true odds ratio is 1.2, we will expect 20 cancers in
13  the unexposed group of 100,000."
14      MS. CURRY:  10,000.
15      THE WITNESS:  10,000.
16  BY MS. GARBER:
17      Q   And so on.  He goes on to say, "In order
18  to achieve statistical significance in the
19  prospective study, we would need a much larger
20  cohort, e.g., we would need a study upwards of
21  200,000 women for ten years?"
22      Did I read that correctly?
23      A   So, one, he does say that.  Two, I don't
24  know what his -- the bases for his calculations and,
25  three, we actually do have that data.  Berge in the

Page 320

1  meta-analysis, when Berge looked at the cohort
2  studies and put them together, Berge did a
3  mathematical calculation to look at the power of the
4  cohort studies to be able to detect a relative risk
5  of 1.25.
6      And what Berge found was that when you
7  put the cohort studies together, you actually do
8  achieve the statistical significance to detect a
9  relative risk of 1.25 to the 99th percentile.
10      So the power is actually there within the
11  cohort studies, particularly when you do a
12  meta-analysis with them.
13      So I disagree that that data is not
14  available.  I think that this is why Berge came to
15  the conclusion that you cannot say the heterogeneity
16  between the case control studies and the cohort
17  studies is due to the cohort studies lacking power.
18  BY MS. GARBER:
19      Q   None of the cohort studies have a study
20  population of 200,000 women, do they?
21      MS. CURRY:  Object to the form.
22      THE WITNESS:  No, they don't, but the
23  pool of them does.  And the pool of them did not
24  detect a statistically significant difference in the
25  risk of developing ovarian cancer with the use of

Page 321

1  perineal talc.
2  BY MS. GARBER:
3      Q   What did the Penninkilampi data find with
4  regard to the cohort studies?
5      MS. CURRY:  Object to the form.
6      THE WITNESS:  So the Penninkilampi study
7  only looked --
8      MS. GARBER:  Go ahead, I'm sorry.
9      THE WITNESS:  That's okay.
10  BY MS. GARBER:
11      Q   The Penninkilampi study only looked at
12  the Gertig data.  It didn't look at the Gates data.
13      Do you take issue with that?
14      A   I do.
15      Q   Why?
16      A   Because I would think that study authors
17  that are trying to conduct a meta-analysis would
18  always want to look at the most mature data,
19  particularly in cohort study.  So I understand that
20  the authors didn't --
21      Q   I'm listening.  I promise you, I'm
22  listening.  I'm sorry.  We're just short on time.  I
23  can do two things at once.  I'm a woman.
24      A   Understood.  I understand that
25  Penninkilampi didn't want to have duplicate data.

Cheryl Saenz, M.D.

Page 322

1    Q   Okay; yes.
2    A   I understand that Penninkilampi didn't
3  want to have duplicate data, so they said they
4  didn't want to reanalyze the same patient study
5  population.  But I still -- can you move that water
6  bottle?  Sorry.  This one.  The light is reflecting
7  off of it.  Thank you so much.
8        But that means that they should have
9  favored an analysis of the Gates data over the
10 Gertig data and they did not.
11   Q   Do you know what the metric of exposure
12 was for the Penninkilampi meta-analysis?
13       MS. CURRY:  Object to the form.
14       THE WITNESS:  You mean what did they
15 calculate their odds ratio off of?
16 BY MS. GARBER:
17   Q   How did they select the exposure for
18 purposes of their meta-analysis that was conducted?
19   A   I'd have to go look at the original study
20 again.  I can't recall off the top of my head.
21       MS. GARBER:  Let's mark Exhibit 31 the
22 Penninkilampi study.
23       (C. Saenz Exhibit 31 was marked for
24       identification.)
25 ///

Page 323

1  BY MS. GARBER:
2    Q   Doctor, if you look at table two, sorry.
3  If you look at figure two at page 46.  Do you see
4  for figure 2(a), the metric is ever-talc use or
5  any-talc use?
6    A   I'm sorry, where are you?
7    Q   Under figure two.
8    A   Are we reading the legend?
9    Q   Yes.
10   A   Thank you.
11   Q   Figure 2(a), it indicates, "Any perineal
12 talc use is associated with an increased risk";
13 right?
14   A   Yes.
15   Q   Figure 2(a), the metric, is ever-use of
16 talc; correct?
17   A   Well, it says "Any perineal talc use";
18 yes.
19   Q   Ever-use; right?
20   A   I don't see where it says "ever."
21   Q   Well, any, ever, those are used
22 interchangeably, aren't they?
23   A   Fair enough.
24   Q   So now if we go -- you take issue because
25 the Penninkilampi authors included the Gertig 2000

Page 324

1  data; correct?
2    A   Well, they didn't include the Gates data.
3  It's not that they included the Gertig data that I
4  take issue with.  It's that they didn't include the
5  Gates data.
6        MS. GARBER:  Now, if I mark Gertig, as
7  Exhibit 32.
8        (C. Saenz Exhibit 32 was marked for
9        identification.)
10 BY MS. GARBER:
11   Q   Doctor, if we turn to the Gertig data
12 that the Penninkilampi authors included, was an odds
13 ratio of 1.09, with a confidence interval of .86 to
14 1.38; is that correct?
15   A   I'm looking at the Penninkilampi table.
16 Do you want to reference me where to look in the
17 Gertig paper?
18   Q   I do.  So let's do this together.  So in
19 the Penninkilampi publication, under --
20   A   Table A, yes.
21   Q   -- figure 2(a) --
22   A   Right.
23   Q   -- the Gertig data that's reported, is an
24 odds ratio of 1.09, .86 to 1.38; correct?
25   A   Yes.

Page 325

1    Q   We've already established that this is
2  for ever-use of talc; right?
3    A   That's what the legend says.
4    Q   Now, if we go over to table two in the
5  Gertig paper and we see ever-use of talc, we see
6  that that's where the Penninkilampi authors got
7  their data; correct?
8    A   So the adjusted odds ratio is 1.09 with
9  0.86 to 1.37; correct.
10   Q   Okay.  So --
11   A   So that's not exactly the same.
12   Q   Well, it's off by --
13   A   By .01.
14   Q   Close enough?
15   A   I guess for government work.  But it's
16 not exactly the same.
17   Q   For epidemiologic work.  Now, if we go to
18 the Gates paper, I'll mark that as Exhibit 33.
19       (C. Saenz Exhibit 33 was marked for
20       identification.)
21 BY MS. GARBER:
22   Q   And we turn to table one at the Gates
23 2010 paper, the authors reported that genital talc
24 use by way of frequency; correct, not ever-never?
25   A   Correct.

Page 326

1    Q    So it would have been incorrect of the
2  Penninkilampi authors to include the Gates data,
3  because between the Gertig data, looking at
4  ever-never, the Gates data presented only a
5  frequency of use, so that would be comparing apples
6  to oranges by way of exposure, wouldn't it, Doctor?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  By that analysis, then,
9  Penninkilampi also should not have included Wu 2015.
10 Because Wu 2015 included in its analysis as
11 never-users anybody that reported use of less than
12 one year.
13       So it wasn't pure, and yet, they included
14 Wu 2015 in the analysis for the same rationale that
15 you've just pointed out Gates.
16       So Wu 2015 is in figure 2(a).  So if the
17 authors are really trying to pull out and only
18 report on ever-never users, then Wu 2015 should not
19 have been included in the analysis either.
20 BY MS. GARBER:
21   Q    Well, Wu -- did Wu 2009 provide
22 ever-never?
23   A    That's --
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  -- not the issue.  The

Page 327

1  issue is, you're trying to explain that Gertig was
2  included and Gates wasn't, because it was an
3  ever-never use reporting.  And what I'm saying is,
4  in figure 2(a), the fourth study down, Wu 2015 are
5  was not an ever-never use reporting.
6        So if the reason Gates was left out is
7  because frequency of use of, what was it, less than
8  one time per week was the report, then Wu 2015
9  should have been left out as well.  Because Wu 2015
10 grouped women that used talc, but reported less than
11 one year of use, in with the never-users.
12 BY MS. GARBER:
13   Q    Do you think in your experience, which
14 doesn't include a degree in epidemiology, that it
15 was improper for the Penninkilampi authors to
16 analyze the Gertig 2000 data rather than the Gates
17 2010 data?
18       MS. CURRY:  Object to the form.
19       THE WITNESS:  Yes, I do.  And if the
20 rash -- especially in the rationale that you're
21 trying to propose is because they're trying to be
22 pure in the reporting of ever-never data, then they
23 weren't.  Wu 2015 does not belong in that analysis
24 if the rationale that you're proposing is actually
25 what they did.

Page 328

1  BY MS. GARBER:
2    Q    Have you analyzed the Berge data to see
3  if the consistency of the exposures are consistent
4  throughout the meta-analysis study?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  Berge 2015 didn't make an
7  exclusion based on that.  What I'm saying is that I
8  think you would always want to report on a study
9  that has longer latency to -- especially when you're
10 looking at development of a cancer.  And Gates has a
11 longer latency than Gertig.
12       Within Wu 2015, there were patients that
13 had exposure that were grouped in never-users.  So I
14 don't think that that's a reason to eliminate the
15 Gates study.
16 BY MS. GARBER:
17   Q    Do you -- and I don't know why the
18 authors relied on the Gates -- on the Gertig versus
19 the Gates, because it's not in the paper.  Do you?
20   A    No, that's true.  I tried to figure that
21 out as well by thoroughly reading that paper.  What
22 I do know is that they said they -- within their
23 methodology section, that they didn't include
24 studies that had patients that were previously
25 reported on.

Page 329

1    Q    Let's talk about some of the cohorts
2  quickly, and then we'll move on to a final area --
3    A    Sure.
4    Q    -- before my time expires.  So in the
5  three cohort studies that you looked at, the Nurses
6  Health Study, the W-H-I and the sister study, did
7  those support your opinion that there's no credible
8  scientific evidence that talc increases risk for
9  developing ovarian cancer?
10       MS. CURRY:  Object to the form.
11       THE WITNESS:  They helped form my
12 opinion.
13 BY MS. GARBER:
14   Q    So where the other studies were not
15 credible, these studies were?
16       MS. CURRY:  Object to the form.
17       THE WITNESS:  No, that's not what I said.
18 I've read everything that's there and analyzed
19 everything that I've read and every single study
20 that I've read has helped to influence my opinion.
21       I've come to the conclusions that I've
22 come to, because I've read all of these studies.  So
23 just because they didn't have a statistically
24 significant finding or just because the data was
25 inconsistent doesn't mean I discounted that

Cheryl Saenz, M.D.

Page 330

1  literature.  I actually evaluated that in terms of
2  generating my opinion.
3  BY MS. GARBER:
4      Q    Doctor, you make reference at page 30 of
5  your report to junk science.  Which of the
6  peer-reviewed public -- published data is junk
7  science that you're referencing?
8          MS. CURRY:  Object to the form.
9          THE WITNESS:  I'm not referencing any one
10  particular manuscript or article.  I'm just saying
11  the supposition that talc causes ovarian cancer is
12  junk science.
13  BY MS. GARBER:
14      Q    So the literature which supports that
15  talc is associated with a statistically significant
16  increased risk of epithelial ovarian cancer is junk
17  science?
18          MS. CURRY:  Object to the form.
19          THE WITNESS:  The hypothesis is.  It's
20  not supported by the science.
21  BY MS. GARBER:
22      Q    With regard to the cohort studies, let's
23  turn to the Gates 2010 study.  That was a follow-up
24  of the Gertig 2000 study; correct?
25          MS. CURRY:  Do you have another copy?

Page 331

1  This is the wrong publication.
2          THE WITNESS:  It's this one.
3          MS. CURRY:  I know, that's what I'm
4  looking for.
5          MS. GARBER:  It's just a different --
6  it's the same publication.
7          MS. CURRY:  No, no, it's not.  This is a
8  different article.
9          THE WITNESS:  This is the 2008.  This is
10  the 2010.
11          MS. GARBER:  They got merged again.
12  Sorry.  Maybe she can pull one out.
13  BY MS. GARBER:
14      Q    So does the Gates article, it's follow-up
15  to the Gertig 2000 paper; correct?
16      A    I mean, with respect to the NHS-1 study;
17  yes.
18      Q    And you indicate that the case control
19  studies were reliable based on a couple of factors,
20  one, that the women were the right study population;
21  correct?
22          MS. CURRY:  Object to the form.
23          THE WITNESS:  You just said "case control
24  studies."  No, that's actually not true.
25  ///

Page 332

1  BY MS. GARBER:
2      Q    The cohort studies were reliable based on
3  a couple of factors, one of the which is that the
4  women were the right age.
5          MS. CURRY:  Object to the form.
6  BY MS. GARBER:
7      Q    Is that correct?
8      A    Can you direct me to the page in my
9  report that we're discussing?
10      Q    Page 13.  Let's turn specifically to the
11  Gates study.  The age of the women in the Gates
12  study were 25 to 42; correct?
13      A    Not at enrollment.
14      Q    In the Gates study, the study did not ask
15  the question about talc.  Instead, it just carried
16  forward the data from the Gertig, one time, 1982
17  questionnaire; is that correct?
18      A    So at enrollment, so the Gates study had
19  two components.  The NHS-1 Group of patients that
20  were actually originally enrolled and asked about
21  talc in 1982.  And the women in that analysis
22  were -- I'm trying to find the information on age at
23  the time of enrollment.
24      Q    Doctor, in the Gertig study, the women at
25  the time of enrollment were age 30 to 55.

Page 333

1      A    Right.  So that's not the number that you
2  just quoted me.  So at the time of enrollment in the
3  Gertig study, they were 30 to 55; correct.
4      Q    They were followed for 14 years; correct?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  That's how old they were
7  when they enrolled in 1976.  They were asked the
8  question about talc in 1982.  So they actually would
9  be six years older when they were asked about talc
10  and then they were followed for 14 years.
11  BY MS. GARBER:
12      Q    When you say at page 14 that based on the
13  use of, that the average use is greater than
14  20 years, based on the Wu 2015 data, you're
15  speculating --
16      A    Where --
17      Q    -- as to when it stopped.  In your expert
18  report.
19      A    Page 14?
20      Q    You indicate a criticism is often made of
21  the two studies, that they were only -- that they
22  only ascertained information on talc usage at one
23  point.  But we know from Wu 2015, however, the women
24  who are ever users of talc in perineal area, the
25  mean duration of use is 20 years.

Cheryl Saenz, M.D.

Page 334

1     So you're speculating about the years of
2  talc use, based on the Wu data; correct?
3          MS. CURRY:  Object to the form.
4  BY MS. GARBER:
5     Q    You don't know that, you don't have any
6  firsthand knowledge, do you?
7          MS. CURRY:  Object to the form.
8          THE WITNESS:  Well, of course, I don't
9  have firsthand knowledge, but I'm building upon what
10  Wu published.  And what Wu published is that the
11  average of duration of use of women that are talc
12  users is more than 20 years.
13  BY MS. GARBER:
14     Q    But you're speculating --
15     A    I have no reason to believe that the
16  population in either Gertig or Gates is not typical
17  of the same population that Wu studied.
18     Q    But you don't have any reason to know
19  that it was.  This is an entire different study,
20  cohort, than the Wu data, wasn't it?
21          MS. CURRY:  Object to form.
22          THE WITNESS:  It's a different study, but
23  the women are talc users and there's every reason to
24  believe that a talc user is a talc user and the
25  duration of use is going to be more than 20 years.

Page 335

1  BY MS. GARBER:
2     Q    The study does not give that information,
3  does it?
4     A    The study doesn't include that
5  information.
6     Q    Also, the Houghton study does not give
7  that information, does it?
8          MS. CURRY:  Object to the form.
9          THE WITNESS:  That's actually not true.
10  The Houghton study actually did study women who
11  reported on more than 20 years of usage.  Houghton
12  looked at duration.
13  BY MS. GARBER:
14     Q    The Gonzalez sister study did not
15  indicate the years of use, did it?
16     A    That's correct.
17     Q    There again, like Gates, you relied on
18  extrapolation from the Cramer study to give you that
19  data; correct?
20     A    I relied on the data as reported by
21  Dr. Cramer as to the age at which women start using,
22  but I also relied on IARC, even though I don't quote
23  it there, because IARC talks about women that are
24  talc users usually starting by their mid 20s.
25     Q    These cohort studies were not long enough

Page 336

1  to capture a 30- or 40-year latency for ovarian
2  cancer, were they?
3          MS. CURRY:  Objection to form.
4          THE WITNESS:  I disagree with that.  I
5  think that in particular, with Gates and Gertig
6  study, the length of study time in that study was
7  24 years.  The length of study in that study for
8  follow-up was 24 years, and if we then look at as
9  reported by Wu and as reported by Dr. Cramer, these
10  women most likely started by their mid 20s and had
11  used for more than 30 years then -- I'm sorry, more
12  than 20 years, then we actually are in the range of
13  30 plus years of latency.
14  BY MS. GARBER:
15     Q    But, Doctor, to make that statement,
16  you're speculating.  You don't have any information
17  from the studies that support the length of use, do
18  you?
19     A    That's actually not true.  The women's
20  health initiative study reported on women that had
21  used talc for more than 20 years.  It then followed
22  women for 12.4 years.  That puts us at 32.4 years.
23          So if you ask me whether or not the
24  latency ever got to 30 years, absolutely it did.  At
25  a minimum for the women that reported more than

Page 337

1  20 years of use in the Houghton study.
2     Q    Doctor, what was the metric for exposure
3  in the Gertig and Gates study?
4          MS. CURRY:  Objection to form.
5          THE WITNESS:  Gertig and Gates looked at
6  frequency of use.  Gertig looked at it with a little
7  bit more specificity than Gates did.
8  BY MS. GARBER:
9     Q    And what was the metric in the Houghton
10  study?
11     A    Duration.
12          MS. CURRY:  Object to the form.
13          THE WITNESS:  Duration of use.
14  BY MS. GARBER:
15     Q    What was the metric in the sister study
16  or the Gonzalez study?
17          MS. CURRY:  Object to the form.
18          THE WITNESS:  Whether or not the subject
19  had used talc in the preceding 12 months.
20  BY MS. GARBER:
21     Q    Didn't you testify in the Echeverria case
22  that without looking at cumulative use, in other
23  words, if you just look at one side of the equation,
24  either frequency or duration, but not frequency
25  times duration, you only see half the story?

Cheryl Saenz, M.D.

Page 338

1      MS. CURRY:  Objection.
2      THE WITNESS:  I don't believe that that
3  is actually what my testimony was.
4      MS. CURRY:  To form.
5  BY MS. GARBER:
6   Q    Your testimony was that it would be more
7  accurate, and it would give a better picture of the
8  true risk to see duration times frequency in a
9  cohort study.
10     Wasn't that your testimony, Doctor?
11     MS. CURRY:  Objection to form.
12     THE WITNESS:  Then I don't know that
13 you're --
14     MS. CURRY:  Do you have a copy of the
15 testimony?
16     THE WITNESS:  -- I don't know that you're
17 quoting me exactly.  I would agree with you that had
18 there been information on frequency and duration, it
19 would be more informative.  But I don't think that
20 any of the cohort studies, simply because they
21 looked at one metric, i.e., frequency or, i.e.,
22 duration, is not informative.
23     It would always be nice to have more
24 information, but it doesn't discount the fact that
25 there is information in these studies which

Page 339

1  demonstrates that there is not an increased risk of
2  developing ovarian cancer with perineal application
3  of talc.
4  BY MS. GARBER:
5   Q    Amongst the cohorts, the longest
6  follow-up was what period of time?
7   A    Follow-up of the study period itself?
8   Q    Yes.
9   A    24, almost 25 years.
10  Q    What about the other studies?
11  A    The follow-up itself, in Houghton, was
12 12.4 years.  But again, that is -- needs to be
13 clarified by the fact that women were asked about
14 years of use and there were women in the study that
15 already had reported more than 20 years of use.
16  Q    And what about the Gonzales study, what
17 was the period of follow-up in those studies?
18  A    I believe that was 6.4 years.  But I'd
19 have to look at the study to know that I have the
20 decimal right.
21  Q    In the meta-analyses that you looked at,
22 how many meta-analyses are there with regard to
23 talcum powder, genital talcum powder exposure and
24 risk of ovarian cancer?
25  A    Are we talking --

Page 340

1      MS. CURRY:  Object to the form.
2      THE WITNESS:  Are we talking about the
3  published ones, peer-reviewed, published?
4      MS. GARBER:  We can start there.
5      THE WITNESS:  I'm aware of at least
6  eight.
7  BY MS. GARBER:
8   Q    There's nine if we count the Taher paper;
9  correct?
10  A    Which has not been published.
11  Q    Can we agree that each of nine
12 meta-analyses, whether published or not, each showed
13 a statistically significant increased risk in
14 genital talc and risk of ovarian cancer?
15     MS. CURRY:  Object to the form.
16     THE WITNESS:  Each of them did report a
17 statistically significant odds ratio; yes, but the
18 meta-analyses all are different in that some of them
19 included the cohort data, but then pulled it out of
20 the analysis and this influenced the odds ratio.
21 And many of the meta-analyses have simply built upon
22 the earlier meta-analyses, so they're reanalyzing
23 the same data.
24 BY MS. GARBER:
25  Q    So you think they're just rehashing the

Page 341

1  same old data, so you discount them?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  I don't discount them.  I
4  absolutely reviewed them and I considered them in my
5  opinion, but I don't think that their findings are
6  anything unique or different.  I don't think that,
7  for example, to hear added anything to the
8  information in the field, I think Penninkilampi is
9  incomplete.
10     I think that the fact that they all
11 report similar odds ratio is not at all surprising,
12 because they're using the same data.
13 BY MS. GARBER:
14  Q    Do you know what was said about the
15 Penninkilampi article by ACOG --
16     MS. CURRY:  Object to the form.
17     MS. GARBER:  -- when it was published.
18     THE WITNESS:  You'll have to show me what
19 you're referring to.
20     ///
21     ///
22     ///
23     ///
24     ///
25     ///

Cheryl Saenz, M.D.

Page 342

1      MS. GARBER: I'm going to mark as
2  Exhibit 34 a document that the title indicates
3  "What's New in Ovarian Cancer, Best Articles From
4  the Past Year." And there are four articles that
5  are included and the Penninkilampi article was
6  listed as number two.
7      (C. Saenz Exhibit 34 was marked for
8      identification.)
9  BY MS. GARBER:
10     Q    Did you consider that in your expert
11 opinions with regard to Penninkilampi?
12     A    So I've actually read the Penninkilampi
13 article, and I stand by my opinions on this. This
14 is not the opinion of ACOG. This is the opinion of
15 Jason Wright.
16     Q    Do you know who Jason Wright is?
17     A    I do.
18     Q    Do you respect him?
19         MS. CURRY: Object to the form.
20         THE WITNESS: On some issues. I've
21 actually taken issue with some of his other
22 publications in the past. This is not something
23 that is peer reviewed. This is something that he
24 submitted.
25 ///

Page 343

1  BY MS. GARBER:
2      Q    The range of odds ratios for the
3  meta-analyses were from 1.22 to 1.4 across those
4  nine studies; correct?
5      A    I would have to see exactly, but I will
6  concede with you that I believe you are in the
7  correct range.
8      Q    The Health Canada considered the
9  collective meta-analyses in coming to their causal
10 opinion about genital talcum risk of ovarian cancer,
11 didn't they?
12         MS. CURRY: Object to the form.
13         THE WITNESS: They included them in their
14 reference list.
15 BY MS. GARBER:
16     Q    IARC considered 2010 -- considered the
17 meta-analyses that were then available at the time
18 of their analysis -- analysis in coming to their
19 opinions regarding genital talc and carcinogenicity.
20         MS. CURRY: Object to the form.
21         THE WITNESS: I don't know that IARC
22 considered the meta-analyses. I think that IARC
23 considered published literature, but I don't
24 actually know that IARC considered the metas.
25 ///

Page 344

1  BY MS. GARBER:
2      Q    Do you have any opinions about
3  hospital-based versus population-based studies?
4         MS. CURRY: Object to the form.
5         THE WITNESS: With respect to what?
6  BY MS. GARBER:
7      Q    Do you think one group is more reliable
8  than another?
9      A    So I think --
10         MS. CURRY: Object to the form.
11         THE WITNESS: -- in general, with respect
12 to epidemiologic analysis, you want to match your
13 subjects as closely as you can to -- you want to
14 match your subjects in your controls, your cases in
15 your controls as closely as you can.
16         So when we're talking about ovarian
17 cancer patients, the hospital-based studies, I
18 think, in these circumstances are going to be a more
19 appropriate match for ovarian cancer patients
20 because they're sick patients. So you're comparing
21 like to like.
22         With the population-based studies in
23 ovarian cancer, I don't really have a -- I don't
24 agree that a general population control person that
25 doesn't have an illness per se such as somebody with

Page 345

1  ovarian cancer is necessarily an appropriate match
2  control.
3         So I think that's why you see, for
4  example, something like in the Langseth paper, where
5  there's a difference in the studies that find
6  statistically significant odds ratios in the
7  population-based studies versus the hospital-based
8  studies.
9  BY MS. GARBER:
10     Q    Doctor, you reviewed the IARC 2012
11 analysis, didn't you?
12         MS. CURRY: Object to the form.
13         THE WITNESS: You mean the monograph?
14         MS. GARBER: Yes, thank you.
15         THE WITNESS: Yes. On asbestos?
16         MS. GARBER: Yes.
17 BY MS. GARBER:
18     Q    Did that formulate your opinions about
19 asbestos in this case?
20     A    No.
21         MS. CURRY: Object to the form.
22         THE WITNESS: No.
23         MS. SHARKO: So we have about 20 minutes
24 left on the record.
25         MS. GARBER: Let's mark as Exhibit 35.

Page 346

1    Was I supposed to bring a bunch of these?  I knew
2    you'd have one.
3         MS. CURRY:  According to the CMR, I
4    believe so.  I do have my own copy this time.
5         MS. GARBER:  All right, I'm glad to see
6    you have your own.
7         (C. Saenz Exhibit 35 was marked for
8         identification.)
9    BY MS. GARBER:
10   Q    Doctor, did you read the entirety of this
11   IARC Monograph Volume 100C?
12   A    No.
13   Q    Which portions did you read?
14   A    The portions that pertained to ovarian
15   cancer.
16   Q    And the topic of asbestos?
17   A    Yes, ma'am.
18   Q    You didn't read this IARC Monograph with
19   regard to heavy metals like chromium or nickel, did
20   you?
21   A    No, I did not.
22   Q    If I could have you turn to page 219.
23   A    I'm sorry, say that again.
24   Q    Page 219.
25   A    Sure.

Page 347

1    Q    You've testified in the past, haven't
2    you, that you're not an expert in asbestos; right?
3    A    That's correct.
4    Q    Under the heading, "Identification of the
5    Agent," the monograph indicates, midway through the
6    paragraph, "The conclusion reached by this monograph
7    about asbestos" --
8    A    In this monograph.
9    Q    I'll start again.  The monograph
10   indicates:  "The conclusions reached in this
11   monograph about asbestos and it's carcinogenic risk
12   applied to the six types of fibers, wherever they
13   are found, and that includes talc containing
14   asbestiform fibers."
15        Did I read that correctly?
16   A    Yes, ma'am.
17   Q    When it indicates the six types of
18   fibers, those are the six type of asbestos fibers
19   listed above; correct?
20   A    I believe it's --
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  I believe it's the six
23   types of fibers that are listed in the title of this
24   section on page 219, yes.
25   ///

Page 348

1    BY MS. GARBER:
2    Q    This monograph pertains to asbestos and
3    talc containing asbestiform fibers; right?
4    A    That's what it says.
5    Q    Are you aware that the IARC Monograph
6    states that the general population can be exposed to
7    asbestos through perineal powder use?
8         MS. CURRY:  I'm sorry, where are you
9    reading?
10        THE WITNESS:  Where is this in the
11   monograph?
12        MS. GARBER:  Turn to 232.  Sorry, I was
13   on the wrong page.  If you turn to page 232, where
14   it says "Human Exposure."
15        THE WITNESS:  Yes.
16        MS. GARBER:  Subheading, "Exposure in the
17   General Population."  It indicates:  "Consumer
18   products, e.g. cosmetics, pharmaceuticals are the
19   primary sources of exposure to talc for the general
20   population.  Inhalation and dermal contact, i.e.,
21   through a perineal application of talcum powders are
22   the primary routes of exposure."
23   BY MS. GARBER:
24   Q    Did I read that correctly?
25   A    Yes.

Page 349

1    Q    You read the Heller 1996 paper, correct?
2         MS. CURRY:  Object to the form.  There
3    are multiple Heller 1996 papers.  I'm not sure which
4    one you're referring to.
5         MS. GARBER:  Heller 1996 that related to
6    asbestos.
7         THE WITNESS:  I don't know.  Let me see.
8    I believe that it's on my additional materials
9    reviewed by list, yes.  Number 11.
10   BY MS. GARBER:
11   Q    Do you --
12   A    Oh, I take that back.  That's malignant
13   mesotheliomas.  Are we talking about the correlation
14   of asbestos fiber burdens and fallopian tubes and
15   ovarian tissue?
16   Q    Yes.  Did you read that paper?
17   A    Yes.
18   Q    Do you believe that paper provides
19   support that asbestos can reach the ovarian tissue?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  So I don't know how the
22   asbestos that's reported in the Heller paper got
23   there.  I don't know if it's inhalation, ingestion.
24   I don't know if it's contamination.  I have no way
25   of knowing.

Cheryl Saenz, M.D.

Page 350

BY MS. GARBER:

2    Q    Okay.

3    A    And I'm sorry, I think we -- that you
4 misquoted.  I think that this is Heller 1999.  Not
5 1996.

6    Q    On your --

7    A    Unless I have a typo.

8    Q    On your reference list, you cite -- you
9 cite Heller 1996, asbestos exposure and ovarian
10 fiber burden.  Did I read that correctly?

11    A    Oh, I apologize, ma'am.  Yes.  I was
12 looking in the additional materials reviewed, so my
13 bad.

14        MS. GARBER:  I'm going to mark the
15 "Heller 1996 Asbestos Exposure and Ovarian Fiber
16 Burden" as Exhibit 36.

17        (C. Saenz Exhibit 36 was marked for
18        identification.)

19 BY MS. GARBER:

20    Q    Doctor, if you could turn to page 438,
21 left-hand column.

22        Doctor, if you're going to read it, we'll
23 go off the record.  We're short on time.  I didn't
24 ask you to read it.  I asked you to --

25    A    I understand that, but I want to --

Page 351

there's --

2        MS. GARBER:  Let's go off the record.

3        THE WITNESS:  -- four Heller papers.

4        MS. GARBER:  Let's go off the record.

5        THE VIDEOGRAPHER:  Time is now 6:05.
6 Going off the record.

7    (Break in the deposition taken at 6:06 p.m.)

8                 0o0

9    (The deposition resumed at 6:07 p.m.)

10                 0o0

11        THE VIDEOGRAPHER:  Time is now 6:06.
12 Back on the record.

13 BY MS. GARBER:

14    Q    At page 438, left-hand column.  Beginning
15 in the first paragraph, where it begins, "Asbestos,"
16 it indicates, "Asbestos causes" --

17    A    438, beginning in the left-hand column.
18 First paragraph or second paragraph?

19    Q    I said the first paragraph.

20    A    First paragraph.  Okay.  I'm right there
21 with you.

22    Q    "Asbestos causes malignant mesothelioma
23 and there is evidence to support it as an etiology
24 in ovarian carcinoma as well."  And some citations.

25        Did you consider that in formulating your

Page 352

opinions?

2    A    Right, so I believe that many of those
3 citations are the same ones that are reported in the
4 IARC Monograph that talks about heavy occupational
5 exposure.

6        So I did read those and consider those,
7 but again, I don't necessarily agree with IARC.  I
8 think there are problems in this.

9    Q    Is it your opinion that asbestos is
10 associated with ovarian cancer and heavy
11 occupational users?

12        MS. CURRY:  Object to the form.

13        THE WITNESS:  So I don't necessarily
14 agree with IARC's conclusions on that, because I
15 think as we've discussed earlier, I believe, that
16 there are problems with the five studies that IARC
17 looked at, including problems of misclassification,
18 problems of using death certificates, and not
19 necessarily -- I -- actually identifying whether or
20 not these women had peritoneal mesothelioma versus
21 ovarian cancer.

22 BY MS. GARBER:

23    Q    Doctor, have you testified that asbestos
24 can cause ovarian cancer with heavy occupation
25 allege exposure?

Page 353

MS. CURRY:  Object to the form.

2        THE WITNESS:  I'd have to look at my
3 testimony to know if that's exactly what I said.

4 BY MS. GARBER:

5    Q    Well, if it's the truth, wouldn't you
6 remember it, Doctor?

7        MS. CURRY:  Object to the form.

8 BY MS. GARBER:

9    Q    Do you have to see your old testimony to
10 see what your opinions are?

11        MS. CURRY:  Object to the form.

12        THE WITNESS:  Ma'am, I gave you my
13 opinion today.  I don't know that you're reading
14 accurately from what that transcript is and that
15 transcript was from, I believe, if that's the trial
16 transcript, July of 2017.  If it was the deposition,
17 it's almost three years ago now so -- or two years
18 ago.  So I would need to see it to know --

19 BY MS. GARBER:

20    Q    Has your opinion changed?

21    A    I don't know that you're reading my
22 testimony accurately.  And I would ask to be able to
23 see my testimony to see if that's actually true.  I
24 gave you my opinion today.  I'm simply asking to see
25 if I can look at what you're reading to see if

Cheryl Saenz, M.D.

Page 354

1  you're reading it accurately.
2      Q     It was formerly your opinion prior to the
3  MDL report and today's testimony that asbestos could
4  cause ovarian cancer in heavy occupational use, was
5  it not?
6          MS. CURRY:  Object to the form.
7          THE WITNESS:  Ma'am, I'm not going to
8  comment on that unless you actually let me see the
9  testimony and see what I said.
10         MS. GARBER:  I will read it to you first.
11         THE WITNESS:  Ma'am, that's not going to
12 be good enough.
13 BY MS. GARBER:
14     Q  "But my question is simple."
15         I'm going to read it, and then I'll show
16 it to you.
17         "But my question simple.  Answer it,
18         please.  So we'll know which side of the
19         equation you're on.  Does asbestos cause
20         ovarian cancer, Dr. Saenz?"
21         Your answer is:  "Answer:  Yes, with
22         heavy occupational exposure.  Yes, if
23         exposed enough, that's what I said."
24         "Well, ma'am, you're not an asbestos
25         specialist, are you?"

Page 355

1          "No, I am not."
2          MS. CURRY:  What transcript are you
3  reading from?
4          MS. GARBER:  I'm reading from the Ingham
5  testimony at trial.
6          MS. CURRY:  If you need to see additional
7  pages, please let Counsel know.
8  BY MS. GARBER:
9      Q   Is that your testimony?  Did I read it
10 correctly?
11     A   No, ma'am, you're not reading this
12 accurately, because earlier in this transcript, I'm
13 asked about what I think of the IARC monograph.  And
14 that's actually very consistent with what I'm saying
15 here today.
16         In this transcript, I said, I read the
17 IARC Monograph.  I've read the studies in the
18 monograph and I know the conclusion that IARC came
19 to.  And I think there are some problems with the
20 studies that they used to come to that conclusion,
21 but that is their conclusion.  I understand that,
22 but that was limited to heavy occupational exposure.
23         So in the context --
24 BY MS. GARBER:
25     Q   But you've said -- you've said in the

Page 356

1  trial, Doctor --
2      A   Ma'am, I'm not done.
3      Q   Okay.
4      A   In the context of being asked about what
5  I thought about IARC's report and whether or not
6  IARC showed that in the context, did IARC report
7  that asbestos causes ovarian cancer with heavy
8  occupational exposure.  I recorded that.  But it was
9  with the qualifications that I had problems with the
10 studies in the IARC Monograph.
11     Q   I understand that.
12     A   That's exactly what I've said here today.
13     Q   Is your --
14     A   I have not changed my opinion.
15     Q   I understand that.  Is your opinion --
16 no, I don't understand that.  Is your opinion today
17 that asbestos causes ovarian cancer?
18         MS. CURRY:  Object to the form.
19         THE WITNESS:  My opinion today is that I
20 don't think the IARC Monograph conclusions are
21 correct.  I believe that there are problems with
22 those studies.  And my opinion, as I stated then in
23 the Ingham trial, is that there are problems with
24 those studies.
25         And so IARC makes that conclusion,

Page 357

1  but I don't necessarily agree with that conclusion.
2  BY MS. GARBER:
3      Q   But Dr. Saenz, the record speaks for
4  itself.
5      A   Ma'am, you can't cherry-pick one line.
6  The context of which --
7      Q   No, now you're interrupting me.  I'm
8  trying to ask you a question, I'm short on time and
9  you know it.  The IARC -- you testified in the
10 Ingham trial, and you admitted to Mr. Lenear, that
11 heavy occupational use of asbestos was associated
12 with ovarian cancer.
13         Now you're here today saying something
14 differently, that it doesn't, correct?
15         MS. CURRY:  Object to the form, misstates
16 the testimony.
17         THE WITNESS:  I'm not saying anything any
18 different than I said in my testimony --
19         MS. GARBER:  I just need to know what
20 your opinion is --
21         MS. SHARKO:  Don't interrupt the witness,
22 come on.
23 BY MS. GARBER:
24     Q   When you show up at any hearing or trial,
25 are you going to tell the court and jury that

Cheryl Saenz, M.D.

Page 358

1  asbestos does or doesn't cause ovarian cancer?
2  That's all I need to know, and we're pretty much
3  done.
4       MS. CURRY: Object to the form.
5       THE WITNESS: My testimony today is
6  consistent with what I said in testimony at trial at
7  the Ingham trial. I take issue with the conclusions
8  that IARC has drawn. But the conclusions that IARC
9  has drawn is that ovarian cancer can be caused by
10  asbestos, but it's limited to heavy occupational
11  exposure. I don't agree with those conclusions.
12  BY MS. GARBER:
13    Q   You have stated at trial, haven't you,
14  asbestos can cause inflammation at the cellular
15  level?
16       MS. CURRY: Object to the form. May we
17  see the testimony?
18       THE WITNESS: I don't know that I said
19  that.
20  BY MS. GARBER:
21    Q   Have you said asbestos generates R-O-S
22  and N-O-S?
23       MS. CURRY: Object to the form.
24  BY MS. GARBER:
25    Q   Have you testified to that?

Page 359

1       MS. CURRY: Object to the form. Can we
2  see the testimony?
3       THE WITNESS: I can't recall saying that
4  specifically. I would be happy to review it for
5  you.
6  BY MS. GARBER:
7    Q   Have you testified that asbestos is
8  genotoxic?
9       MS. CURRY: Object to the form.
10       THE WITNESS: I cannot verify for you
11  that I have testified to that. I'd be happy to
12  review the testimony for you.
13  BY MS. GARBER:
14    Q   Have you testified that asbestos can
15  cause epigenetic alterations?
16       MS. CURRY: Object to the form.
17       THE WITNESS: I don't know that I have
18  said that phrase exactly, ma'am. I'd be happy to
19  look at the testimony.
20  BY MS. GARBER:
21    Q   Asbestos can alter signaling pathways
22  which is an established mechanistic event for some
23  cancers, including ovarian cancer. You agreed to
24  that, didn't you?
25       MS. CURRY: Object to the form.

Page 360

1       THE WITNESS: Again, ma'am, I'd like to
2  see the testimony to know the exact context in which
3  you're pulling that from.
4       MS. SHARKO: Aren't we now at seven
5  hours?
6       MS. GARBER: You've testified that
7  asbestos can cause resistance to apoptosis, which is
8  an established mechanistic event for the development
9  of ovarian cancer, haven't you?
10       MS. CURRY: Object to the form.
11       THE WITNESS: You would have to show me
12  that testimony, ma'am.
13  BY MS. GARBER:
14    Q   Do you ever tell your patients that
15  asbestos is a risk factor for ovarian cancer?
16    A   No, I do not.
17    Q   Are you -- if a patient asks you, Doctor,
18  is there asbestos in the Johnson & Johnson products
19  that I'm using on my genitals, how would you reply?
20    A   I would reply to them that I do not know
21  what the actual makeup of the baby powder products
22  are, but that the literature that I have reviewed as
23  a paid expert for Johnson & Johnson does not show
24  any consistency that using baby powder products in
25  the perineal region increases the risk of developing

Page 361

1  ovarian cancer.
2    Q   And I want you -- I'm going to ask you a
3  final hypothetical. I want you to assume that there
4  is asbestos in Johnson & Johnson baby powder
5  products or Johnson & Johnson talcum powder
6  products. And if a patient asked you, Doctor, is it
7  safe for me to use that product on my genitals, what
8  would be your reply?
9       MS. CURRY: Object to the form.
10       THE WITNESS: My reply would be, to my
11  patient, ma'am, I've done a thorough review of the
12  literature, the case control studies, the biologic
13  plausibility, the cohort studies, it is my review
14  and my opinion that there is no increased risk of
15  you developing ovarian cancer from the use of
16  Johnson & Johnson baby powder products and I would
17  disclose that I am a paid expert in this litigation
18  testimony.
19  BY MS. GARBER:
20    Q   You would counsel your patient to put a
21  product that has asbestos in it on her genitals?
22       MS. CURRY: Object to the form, misstates
23  the testimony.
24       THE WITNESS: I don't believe that there
25  is any -- any increased risk of developing ovarian

Page 362

1  cancer with the use of Johnson & Johnson baby powder
2  products.  And if asbestos is in the baby powder and
3  the baby powder is the vehicle by which the asbestos
4  is being delivered there, then the baby powder
5  literature should show an increased risk of
6  developing ovarian cancer.  And it does not.
7  BY MS. GARBER:
8      Q   Doctor, based on the IARC assessment of
9  asbestos and risk of ovarian cancer, and I want you
10  now to assume that there is asbestos in Johnson &
11  Johnson talcum powder products.  It is your
12  testimony that you would counsel your patient that
13  it is safe, based on your review of the literature,
14  to put that product containing asbestos on her
15  genitals, that's your testimony?
16      MS. CURRY:  Object to the form.
17      THE WITNESS:  Yes.
18      MS. GARBER:  Okay.  Thank you.  I'm
19  finished for now.
20      THE VIDEOGRAPHER:  The time is now 6:17.
21  Going off the record.
22  (Break in the deposition taken at 6:18 p.m.)
23              0o0
24  (The deposition resumed at 6:18 p.m.)
25              0o0

Page 363

1      THE VIDEOGRAPHER:  The time is now 6:17.
2  Back on the record.
3          EXAMINATION
4          -o0o-
5  BY MS. CURRY:
6      Q   Dr. Saenz, I just have one final question
7  for you, and that is, having heard and seen
8  everything presented to you today by plaintiffs'
9  counsel, do you stand by all of your opinions in
10  your expert report in this case?
11      A   I stand by everything that is in my
12  expert report.  I stand by everything that I have
13  expressed as an opinion today.
14      MS. CURRY:  Thank you.  No further
15  questions.
16      MS. GARBER:  No further questions.
17      THE VIDEOGRAPHER:  The time is now 6:18.
18  This concludes the deposition.  Going off the
19  record.
20  (The deposition was concluded at 6:19 p.m.)
21              0o0
22
23
24
25

Page 364

1      I, CHERYL SAENZ, M.D., do hereby declare
2  under penalty of perjury that I have read the
3  foregoing transcript; that I have made any
4  corrections as noted in ink, initialed by me; that
5  my testimony as contained herein, as corrected, is
6  true and correct.
7
8      EXECUTED this _____ day of
9  _____, 20____, at _____,
                                    (City)
10  _____.
      (State)
11
12
13
                    _____
14                  CHERYL SAENZ, M.D.
15
16
17
18
19
20
21
22
23
24
25

Page 365

1      REPORTER'S CERTIFICATE
2      I, Valerie C. Rodriguez, a Certified
3  Shorthand Reporter for the State of California, do
4  hereby certify:
5      That prior to being examined, CHERYL
6  SAENZ, M.D., the witness named in the foregoing
7  deposition, was by me duly sworn;
8      That said deposition was taken before me
9  at the time and place set forth herein and was
10  stenographically reported by me in shorthand and
11  thereafter transcribed into typewriting using
12  computer-aided transcription, and I hereby certify
13  that said deposition is a full, true, and correct
14  transcript; that the dismantling, unsealing, or
15  unbinding of the original transcript will render the
16  reporter's certificate null and void.
17      I further certify that I am neither
18  counsel for, nor related to any party to said
19  action, nor in any way interested in the outcome
20  thereof. IN WITNESS WHEREOF, I have subscribed my
21  name this 15th day of March, 2019.
22
23
24                  _____
                    VALERIE C. RODRIGUEZ
25                  CSR No. 12871 (orig. 6980)

Page 366

1   DEPOSITION ERRATA SHEET
2   Case Name: IN RE JOHNSON & JOHNSON
3   Name of Witness:  CHERYL SAENZ, M.D.
4   Date of Deposition: MARCH 13, 2019, 2019
5   Job No.: 210344
6   Reason Codes:  1. To clarify the record.
7                         2. To conform to the facts.
8                         3. To correct transcription errors.
9
10  Page _____ Line _____ Reason _____

    From _____ to
11  _____
12  Page _____ Line _____ Reason _____
13  From _____ to
    _____
14
    Page _____ Line _____ Reason _____
15
    From _____ to
16  _____
17  Page _____ Line _____ Reason _____
18  From _____ to
    _____
19
    Page _____ Line _____ Reason _____
20
21  _____  Subject to the above changes, I certify
    that the transcript is true and correct.
22
    _____  No changes have been made. I certify that
23  the transcript is true and correct.
24          _____
25                CHERYL SAENZ, M.D.