# Exhibit C

Kevin Holcomb, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &        :
JOHNSON TALCUM POWDER  :
PRODUCTS MARKETING,      :
SALES PRACTICES, AND   :  NO. 16-2738
PRODUCTS LIABILITY     :  (FLW) (LHG)
LITIGATION             :
                       :
THIS DOCUMENT RELATES  :
TO ALL CASES           :

- - -

March 27, 2019

- - -

Videotaped deposition of
KEVIN HOLCOMB, M.D., taken pursuant to
notice, was held at Weil Gotshal &
Manges, LLP, 767 Fifth Avenue, New York,
New York, beginning at 9:53 a.m., on the
above date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Kevin Holcomb, M.D.

<table>
<tr><td>

Page 2

```
 1   APPEARANCES:
 2
 3   ROBINSON CALCAGNIE, INC.
     BY:  CYNTHIA L. GARBER, ESQ.
 4   19 Corporate Plaza Drive
     Newport Beach, California 92660
 5   (949) 720-1288
     cgarber@robinsonfirm.com
 6
          - and -
 7
     BLOOD HURST & O'REARDON, LLP
 8   BY:  PAULA R. BROWN, ESQ.
     501 West Broadway
 9   Suite 1490
     San Diego, California 92101
10   (619) 338-1100
     Pbrown@bholaw.com
11
          - and -
12
     BEASLEY ALLEN, P.C.
13   BY:  MARGARET M. THOMPSON, M.D., ESQ.
     BY:  P. LEIGH O'DELL, ESQ.
14   218 Commerce Street
     Montgomery, Alabama 36104
15   (334) 269-2343
     Margaret.thompson@beasleyallen.com
16   leigh.odell@beasleyallen.com
     Representing the Plaintiffs
17
18
19
20
21
22
23
24
```
</td><td>

Page 4

```
 1   APPEARANCES:  (Cont'd.)
 2
     TUCKER ELLIS, LLP
 3   BY:  JAMES W. MIZGALA, ESQ.
     233 South Wacker Drive
 4   Suite 6950
     Chicago, Illinois 60606
 5   (312) 624-6307
     james.mizgala@tuckerellis.com
 6   Representing the Defendant, PTI
     Royston LLC and PTI Union LLC
 7
 8   ALSO PRESENT:
 9
     VIDEOTAPE TECHNICIAN:
10     Henry Marte
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```
</td></tr>
<tr><td>

Page 3

```
 1   APPEARANCES:  (Cont'd.)
 2
 3   NUTTER McCLENNEN & FISH, LLP
     BY:  DAWN M. CURRY, ESQ.
 4   155 Seaport Boulevard
     Boston, Massachusetts 02210
 5   (617) 439-2286
     Dcurry@nutter.com
 6
          - and -
 7
     DRINKER, BIDDLE & REATH, LLP
 8   BY:  SUSAN M. SHARKO, ESQ.
     600 Campus Drive
 9   Florham Park, New Jersey 07932
     (973) 549-7000
10   susan.sharko@dbr.com
11        - and -
12   WEIL GOTSHAL & MANGES, LLP
     BY:  RICHARD M. HEASLIP, ESQ.
13   17 Hulfish Street, Suite 201
     Princeton, New Jersey 08542
14   (609) 986-1118
     richard.heaslip@weil.com
15   Representing the Defendants, Johnson
     & Johnson entities
16
17   SEYFARTH SHAW, LLP
     BY:  RENÉE B. APPEL, ESQ.
18   975 F Street, NW
     Washington, D.C. 20004
19   (202) 463-2400
     rappel@seyfarth.com
20   Representing the Defendant, PCPC
21
22
23
24
```
</td><td>

Page 5

```
 1        - - -
 2      I N D E X
 3        - - -
 4
     Testimony of:    KEVIN HOLCOMB, M.D.
 5
       By Ms. Garber          12
 6
 7
 8
 9        - - -
10      E X H I B I T S
11        - - -
12
13   NO.      DESCRIPTION      PAGE
14   Holcomb-1   Excerpt from the    40
               Transcript of Kevin
15             Holcomb, MD, 5/7/18
               Page 56
16
     Holcomb-2   Excerpt from the    45
17             Transcript of Kevin
               Holcomb, MD, 5/7/18
18             Page 57
19   Holcomb-3   Excerpt from the    64
               Transcript of Kevin
20             Holcomb, MD, 5/7/18
               Page 103
21
     Holcomb-4   IARC Monographs    71
22             Arsenic, Metals, Fibres
               And Dusts
23             (Volume 100 C)
24
```
</td></tr>
</table>

2 (Pages 2 to 5)

Kevin Holcomb, M.D.

Page 6

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.      DESCRIPTION      PAGE
 6   Holcomb-5  Notice of Oral and  102
            Videotaped Deposition
 7
        Holcomb-6  Supplemental     110
 8          Materials Received
            And Reviewed
 9          & Invoice
10   Holcomb-7  Expert Report of   114
            Kevin Holcomb, M.D.
11          For General Causation
            Daubert Hearing
12          2/25/19
13   Holcomb-8  Talc & Ovarian     180
            Cancer
14          (Narod)
15   Holcomb-9  Table 1            186
            Study Type, Year
16          Author Journal
17   Holcomb-10  Retire Statistical  199
            Significance
18          (Amrhein)
19   Holcomb-11  Draft Screening    220
            Assessment
20          December 2018
21   Holcomb-12  Systemic Review    224
            and Meta-Analysis
22          Of the Association
            Between Perineal
23          Use of Talc and Risk
            Of Ovarian Cancer
24          (Taher)
```

Page 8

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.      DESCRIPTION      PAGE
 6   Holcomb-19  Reports,           344
            Prospective Study of
 7          Talc Use and Ovarian
            Cancer
 8          (Gertig)
 9   Holcomb-20  Risk Factors for   363
            Epithelial Ovarian
10          Cancer by
            Histologic Subtype
11          (Gates)
12   Holcomb-21  Perineal Powder Use  377
            And Risk of Ovarian
13          Cancer
            (Houghton)
14
        Holcomb-22  Douching, Talc Use  403
15          And Risk of Ovarian
            Cancer
16          (Gonzalez)
17   Holcomb-23  Perineal Talc Use   406
            and Ovarian Cancer
18          A Systematic Review
            And Metal-Analysis
19          (Penninkilampi)
20   Holcomb-24  Demonstrative      407
            TPP and Ovarian
21          And TPP Serous Cancer
            Meta-Analyses
22
23
24
```

Page 7

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.      DESCRIPTION      PAGE
 6   Holcomb-13  Perineal Talc      255
            Exposure and Epithelial
 7          Ovarian Cancer Risk in
            the Central Valley of
 8          California
            (Mills)
 9
        Holcomb-14  Perineal Use of  271
10          Talc and Risk of
            Ovarian Cancer
11          (Langseth)
12   Holcomb-15  Association Between  273
            Body Powder Use and
13          Ovarian Cancer:
            The African American
14          Cancer Epidemiology Study
            (AACES)
15          (Schildkraut)
16   Holcomb-16  Six Persistent     281
            Research
17          Misconceptions
            (Rothman)
18
        Holcomb-17  Weill Cornell    292
19          Medicine, Evidence-
            Based Medicine, EBM
20          Defined
            (Straus)
21
        Holcomb-18  Ovulation and Risk  302
22          Of Epithelial Ovarian
            Cancer
23          (Purdie)
24
```

Page 9

```
 1              - - -
 2      E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.      DESCRIPTION      PAGE
 6   Holcomb-25  FDA Letter, 4/1/14  424
            To Epstein from Musser
 7          RE, Docket Numbers
            JNJ 000489048-54
 8
        Holcomb-26  American Journal of  468
 9          Respiratory and
            Critical Care Medicine
10          Talc Should Not Be Used
            For Pleurodeses in
11          Patients with Nonmalignant
            Pleural Effusions
12          (Ghio)
13   Holcomb-27  Genital Use of Talc  471
            And Risk of Ovarian
14          Cancer:  A Meta-Analysis
            (Berge)
15
        Holcomb-28  Epithelial Ovarian  486
16          Cancer
            (Lheureux)
17
        Holcomb-29  What is New in    488
18          Ovarian Cancer?
            (Wright)
19
        Holcomb-30  FDA Advises Consumers 496
20          To Stop Using Certain
            Claire's Cosmetic
21          Products
22   Holcomb-31  Ingredients Talc    503
            (FDA Website)
23
24
```

Golkow Litigation Services - 877.370.DEPS

Kevin Holcomb, M.D.

Page 10

1           - - -
2       DEPOSITION SUPPORT INDEX
3           - - -
4
5    Direction to Witness Not to Answer
6    PAGE  LINE
     None.
7
8    Request for Production of Documents
9    PAGE  LINE
     None.
10
11   Stipulations
12   PAGE  LINE
     None.
13
14   Questions Marked
15   PAGE  LINE
     None.
16
17
18
19
20
21
22
23
24

Page 11

1           - - -
2        THE VIDEOGRAPHER:  We are
3    now on the record.  My name is
4    Henry Marte.  I am a videographer
5    with Golkow Litigation Services.
6        Today's date is March 27,
7    2019, and the time is 9:53 a.m.
8        This videotaped deposition
9    is being held at 767 Fifth Avenue,
10   New York, New York in the matter
11   of Talcum Powder Litigation.
12       The deponent today is
13   Dr. Kevin Holcomb.
14       All appearances are noted on
15   the stenographic record.
16       Will the court reporter
17   please administer the oath.
18           - - -
19       ... KEVIN HOLCOMB, M.D.,
20   having been first duly sworn, was
21   examined and testified as follows:
22           - - -
23       EXAMINATION
24           - - -

Page 12

1    BY MS. GARBER:
2        Q.   Good morning, Doctor.
3        A.   Good morning.
4        Q.   Would you please state your
5    name for the record?
6        A.   Yes.  My name is Kevin
7    Holcomb.
8        Q.   And you're a medical doctor?
9        A.   Yes, I am.
10       Q.   Are you a gynecologic
11   oncologist?
12       A.   I am.
13       Q.   And are you a practicing
14   gynecologic oncologist?
15       A.   I am.
16       Q.   Where do you practice?
17       A.   I practice at Weill Cornell
18   Medical Center.
19       Q.   Thank you.  Are you here
20   today as a litigation expert for the
21   defendant, Johnson & Johnson?
22       A.   I am.
23       Q.   And this is not the first
24   time you've testified for the defendant

Page 13

1    Johnson & Johnson regarding their talcum
2    powder products and risk of ovarian
3    cancer; is that true?
4        A.   That's true.
5        Q.   You testified in deposition
6    and at trial in the Ingham matter; is
7    that correct?
8        A.   That's correct.
9        Q.   Have you ever testified in
10   deposition or trial in any other talcum
11   powder ovarian cancer cases?
12       A.   No, I haven't.
13       Q.   Doctor, have you been sued
14   in connection with your own medical care
15   and treatment?
16       A.   Yes, I have.
17       Q.   How many times?
18       A.   Probably about three.
19       Q.   Doctor, if you testified in
20   a prior matter that it was four times,
21   does that refresh your recollection?
22       A.   It's possible.
23       Q.   Are all of the matters
24   wherein you were sued as a medical

4 (Pages 10 to 13)

Kevin Holcomb, M.D.

Page 14

1    defendant resolved in one way or another?
2        A.   I believe there's still one
3    outstanding.
4        Q.   What is the name of that
5    matter?
6        A.   I'm trying to remember the
7    patient's last name. I'm sorry. I don't
8    remember the last name of the patient,
9    sorry.
10       Q.   Where was that case venued?
11       A.   In New York.
12       Q.   And is it accurate, Doctor,
13   that none of those matters concern
14   diagnosis and/or treatment of ovarian
15   cancer?
16       A.   That's true.
17       Q.   Is the nature of the matter
18   that's still open in connection with
19   performance of robotic surgery?
20       A.   Yes.
21       Q.   Thank you. So I don't know
22   the last time that you've been deposed.
23   Has it been since the Ingham matter?
24       A.   That was the last time.

Page 15

1        Q.   All right. I'll go through
2    the admonitions that typically accompany
3    the deposition process so we've reviewed
4    the most important ones. Okay?
5        A.   Okay.
6        Q.   All right. You've taken an
7    oath to tell the truth under penalty of
8    perjury. And, Doctor, you understand
9    that that oath carries the same force and
10   effect as if you were testifying in a
11   court of law even though you are in an
12   informal setting of this conference room.
13   Do you understand that?
14       A.   I do.
15       Q.   And you've given depositions
16   so you know that the court reporter is
17   going to be taking down what's said, and
18   we want to avoid talking over one
19   another.
20            You're doing a good job of
21   waiting for my question. And I'll try to
22   do the same, wait for your answer, so we
23   get a clear record. Okay?
24       A.   Okay.

Page 16

1        Q.   If you don't understand one
2    of my questions, I'm bound to be unartful
3    at times, and I don't want you to guess
4    at what you think I'm asking you. Just
5    please ask me to clarify. Because if you
6    don't I'm going to assume that you
7    understood my question. Is that fair?
8        A.   That's fair.
9        Q.   All right. I just want to
10   kind of clear up a few definitions so
11   we're on the same page. Okay?
12            When I refer to talcum
13   powder products today, will you
14   understand that that includes Johnson &
15   Johnson's Baby Powder and Shower to
16   Shower products?
17       A.   Yes.
18       Q.   And in your report you use
19   the word talc. Is that fair to assume
20   that you are including Johnson &
21   Johnson's Baby Powder and Shower to
22   Shower products?
23            MS. CURRY: Objection to
24   form.

Page 17

1            THE WITNESS: That's true.
2    BY MS. GARBER:
3        Q.   What is a carcinogen?
4        A.   A carcinogen is something
5    that causes cancer.
6        Q.   What does it mean to be
7    carcinogenic?
8        A.   To have the ability to cause
9    cancer.
10       Q.   What is a risk factor in the
11   context of ovarian cancer?
12            MS. CURRY: Objection to
13   form.
14            THE WITNESS: A risk factor
15       is something that's associated
16       with a higher likelihood of
17       developing a cancer.
18   BY MS. GARBER:
19       Q.   How do you define higher
20   likelihood?
21       A.   More likely than if you
22   hadn't been exposed.
23       Q.   To a medical degree of
24   certainty?

Kevin Holcomb, M.D.

Page 18

1    MS. CURRY:  Objection to
2  form.
3    THE WITNESS:  Typically that
4  is something that I would relate
5  to statistical analysis from
6  studies.  So there would be
7  statistical definitions.
8  BY MS. GARBER:
9    Q.  Rather than a medical degree
10  of certainty, correct?
11    MS. CURRY:  Objection to
12  form.
13    THE WITNESS:  My medical
14  degree of certainty is often based
15  on the statistical results of
16  tests.
17  BY MS. GARBER:
18    Q.  How do you define a causal
19  factor in the context of ovarian cancer?
20    A.  A causal factor would be
21  something that you know caused the
22  cancer.
23    Q.  How do you know if it caused
24  cancer?

Page 19

1    MS. CURRY:  Objection to
2  form.
3    THE WITNESS:  Well, in the
4  context of any individual patient,
5  I can't say what caused their
6  cancer.  So I think it's
7  impossible to say on an individual
8  level that you've seen that.
9  Outside of the individual, if you
10  have a substance that can
11  transform cells into a malignant
12  phenotype in a cell culture for
13  example, that would be evidence of
14  a carcinogen.
15  BY MS. GARBER:
16    Q.  What is your definition of
17  the phrase latency period in the context
18  of ovarian cancer?
19    MS. CURRY:  Objection to
20  form.
21    THE WITNESS:  In the context
22  of ovarian cancer -- well, the
23  latency period in any cancer is
24  the time between the initial

Page 20

1  exposure to a known carcinogen and
2  the development of the cancer that
3  it's associated with, that it
4  causes.
5  BY MS. GARBER:
6    Q.  You used the phrase "known
7  carcinogen."  How do you know if it's a
8  known carcinogen?
9    A.  Well, if it's not a
10  carcinogen, you can't really have a
11  latency period.
12    Q.  In the performance of a
13  study assessing whether or not it's a
14  carcinogen, you can nevertheless still
15  have a latency period for purposes of
16  determining follow-up and things of that
17  nature, correct?
18    A.  No, I don't think --
19    MS. CURRY:  Objection to
20  form.
21    THE WITNESS:  I don't agree
22  with that.
23  BY MS. GARBER:
24    Q.  You don't?

Page 21

1    A.  No.
2    Q.  All right.  Do you have an
3  opinion as to the latency period for
4  ovarian cancer?
5    A.  In general, I think to
6  define the latency period, you have to,
7  one, start with a carcinogen, and then
8  have data showing that you have an idea
9  from the time of first exposure to that
10  carcinogen to the development of the
11  disease in question.
12    So latency periods are going
13  to be specific to whichever carcinogen
14  you're speaking about.
15    Q.  Okay.  Fair enough.  Is
16  serous ovarian cancer included under the
17  umbrella of epithelial ovarian cancer?
18    A.  It is.
19    Q.  So in other words, serous
20  ovarian cancer is ovarian cancer, right?
21    A.  It's a type of ovarian
22  cancer, yes.
23    Q.  Let's talk about some of
24  your qualifications, okay.  Is it

6 (Pages 18 to 21)

Kevin Holcomb, M.D.

Page 22

```
 1    accurate, Doctor, that you've never
 2    conducted research experiments regarding
 3    the effects of talcum powder products and
 4    its carcinogenicity?
 5         A.   That's true.
 6         Q.   And in your CV it shows that
 7    you've never published regarding talcum
 8    powder products and ovarian cancer,
 9    right?
10         A.   That's true.
11         Q.   Is it also true that you've
12    never published regarding talcum powder
13    products, asbestos, and ovarian cancer?
14         A.   That's true.
15         Q.   You don't have any
16    publications about asbestos at all,
17    correct?
18         A.   That's true.
19         Q.   And you don't have any
20    publications with regard to talcum powder
21    products at all, correct?
22         A.   That's true.
23         Q.   Have you ever created or
24    written any presentations regarding
```

Page 23

```
 1    talcum powder products and ovarian
 2    cancer?
 3         A.   No.  I've created materials
 4    on ovarian cancer and its risk factors
 5    and general educational information for
 6    the students -- medical students,
 7    residents and fellows.  But not
 8    particularly with regard to talc.
 9         Q.   Did any of -- were those in
10    regard to risk factors and ovarian cancer
11    risk?
12         A.   Yes.
13         Q.   And did any of those
14    materials address the issue of talc one
15    way or another?
16         A.   No.
17         Q.   So let me clarify my
18    question.  Is it accurate, Doctor, that
19    in those presentations that you've
20    created with regard to risk factors for
21    ovarian cancer, you've never made an
22    affirmative statement in any of those
23    that talc is not a risk factor; is that
24    true?
```

Page 24

```
 1         MS. CURRY:  Object to the
 2    form.
 3         THE WITNESS:  I'm a little
 4    confused by the question.  Because
 5    if you are giving a lecture and
 6    you're listing what you consider
 7    risk factors, anything that's not
 8    on that list you are not
 9    mentioning as a risk factor, so
10    you're -- you're asking me have I
11    formed a negative?
12    BY MS. GARBER:
13         Q.   Yeah, well, and I appreciate
14    you asking for clarification, because I
15    don't think my question was a good one,
16    so thank you.
17         I just want to be sure I
18    understand the -- the nature of your
19    presentation.
20         In your presentation you've
21    never actually used the word talc in any
22    of your presentations with regard to risk
23    factors and ovarian cancer; is that true?
24         A.   No.
```

Page 25

```
 1         Q.   What percentage of your
 2    current patients have been diagnosed with
 3    female reproductive cancer including
 4    ovarian cancer?
 5         A.   I'd say about 70 percent of
 6    my patients have malignant.
 7         Q.   Can you break that down by
 8    way of ovarian cancer?
 9         A.   Out of that 70 percent,
10    probably 30 percent are ovarian.
11         Q.   For the 30 or so percent
12    that have not been diagnosed with a
13    malignancy, do you counsel them with
14    regard to risk factors?
15         MS. CURRY:  Objection to
16    form.
17         MS. GARBER:  I wasn't done
18    yet.  I'll start again.
19    BY MS. GARBER:
20         Q.   With regard to the
21    30 percent of your patients that have not
22    been diagnosed with malignancy, is it
23    your custom and practice to counsel them
24    with regard to risk factors for cancer in
```

7 (Pages 22 to 25)

Kevin Holcomb, M.D.

Page 26

1    general?
2         MS. CURRY:  Objection to
3    form.
4         THE WITNESS:  I take a
5    formal history and a complete
6    history, and I will address any
7    issues that I may bring up.  But
8    giving a general lecture to each
9    patient on the risk factors for
10   cancers, it would only come up in
11   questions.
12   BY MS. GARBER:
13       Q.   When you take a history,
14   Doctor, do you ask for a patient's
15   exposure to asbestos?
16       A.   When I'm taking a history I
17   do question patients about their
18   occupations.  And that would be the only
19   thing I can think of where an asbestos
20   exposure would likely be revealed.
21       Q.   Do you know how long it
22   takes to conduct an asbestos history?
23       MS. CURRY:  Object to form.
24   BY MS. GARBER:

Page 27

1         Q.   A thorough asbestos history
2    of a patient?
3         MS. CURRY:  Same objection.
4         THE WITNESS:  No, I don't.
5    BY MS. GARBER:
6         Q.   When you take a history, do
7    you ask patients about their exposure to
8    talcum powder products?
9         A.   No.
10        Q.   Why do you ask them about
11   their occupation and put that in the
12   context of asbestos?
13        MS. CURRY:  Object to the
14   form.
15        THE WITNESS:  That's not why
16   I'm asking them about the
17   occupational history.  I was
18   thinking, was there any chance of
19   asbestos exposure coming up in my
20   routine questioning, and I thought
21   that would be the only area that I
22   could think of it coming up.
23   BY MS. GARBER:
24        Q.   And do you relate that to

Page 28

1    any certain risk of any certain type of
2    cancer?
3         MS. CURRY:  Object to the
4    form.
5         THE WITNESS:  Well, I'm
6    aware that heavy occupational
7    exposure to asbestos has been
8    determined by at least some to be
9    a cause of ovarian cancer.  So I
10   guess if -- if it came out through
11   a history that a patient had
12   engaged in any of those type of
13   practices, it would -- it would
14   catch my attention.
15   BY MS. GARBER:
16        Q.   Thank you.
17        How many publications do you
18   have to your credit about the causes of
19   ovarian cancer over your career?
20        A.   I don't believe any of my
21   publications are addressing the causes of
22   ovarian cancer.
23        Q.   Women place talcum powder
24   products on their genitals to stay fresh

Page 29

1    and clean, right?
2         MS. CURRY:  Object to the
3    form.
4         THE WITNESS:  I'm not sure
5    why every individual uses talcum
6    powder.
7    BY MS. GARBER:
8         Q.   Do you understand that women
9    place talcum powder products on their
10   genitals?
11        A.   Yes, I do.
12        Q.   And do you understand that
13   women place talcum powder products on
14   their body?
15        A.   Yes, I do.
16        Q.   And of course, you
17   understand that women in the United
18   States were likely diapered with talcum
19   powder products, correct?
20        MS. CURRY:  Object to the
21   form.
22        THE WITNESS:  I'm not sure
23   of the frequency of using it for
24   diaper.

8 (Pages 26 to 29)

Kevin Holcomb, M.D.

Page 30

BY MS. GARBER:
1
2    Q.   But you understand that at
3    least some portion of the population in
4    the United States was diapered with
5    talcum powder products, right?
6    A.   I do understand that.
7    Q.   Are you aware of data that
8    indicates that there are women now with
9    ovarian cancer who use talc on their
10   genitals in the 1950s, '60s, and early
11   1970s?
12   A.   Could you repeat the
13   question.
14   Q.   Sure.  Are you aware of data
15   that indicates that there are women now
16   with ovarian cancer who used talc on
17   their genitals in the 1950s, '60s, and
18   early 1970s?
19        MR. MIZGALA:  Object to
20   form.
21        MS. GARBER:  Are we --
22   sorry.  Are we going to have one
23   person objecting for the group?  I
24   thought that was CMO 11.

Page 31

1        MS. SHARKO:  No that's not
2    the in the CMO.  He doesn't
3    represent J&J.
4        MS. GARBER:  I thought I
5    read one objection was for all.
6        MS. SHARKO:  Sometimes we do
7    that.
8    BY MS. GARBER:
9    Q.   Go ahead, Doctor.  I forgot
10   my question.  Do you remember it?
11   A.   If you would repeat it, I'd
12   appreciate it.
13   Q.   Sure.  Let me see if you
14   answered it.  So my question is, are you
15   aware of data that indicates women now
16   with ovarian cancer who used talcum
17   powder products on their genitals in the
18   early 1950s, '60s, and 1970s?
19   A.   I think your question was am
20   I aware of any studies that suggest this.
21   And I'd have to say, I'd have to look
22   through each specific study to see do
23   they mention that in particular.
24   Q.   Sure.  That wasn't my

Page 32

1    question.  So I'll ask it again.
2        Doctor, are you aware of
3    data that indicates that there are women
4    now with ovarian cancer who used talc on
5    their genitals in the 1950s, '60s, and
6    '70s, any data?
7        MR. MIZGALA:  Objection.
8        THE WITNESS:  I'm not aware
9    of any specific data, no.
10   BY MS. GARBER:
11   Q.   Do you agree generally,
12   Doctor, that there are women now in the
13   United States with ovarian cancer who
14   were diapered with Johnson & Johnson Baby
15   Powder in the 1950s, '60s, and early
16   1970s?
17        MS. CURRY:  Object to the
18   form.
19        THE WITNESS:  I don't have
20   any specific data on people being
21   diapered in the '50s and '60s.  So
22   no, I'd have to say no.
23   BY MS. GARBER:
24   Q.   Okay.  Johnson & Johnson

Page 33

1    talcum powder products are cosmetic
2    products, not medications, right?
3    A.   That's true.
4    Q.   There's no medical benefits
5    for women to use defendant's talcum
6    powder products on their genitals, right?
7        MS. CURRY:  Objection to
8    form.
9        THE WITNESS:  No, I would
10   disagree with that.
11   BY MS. GARBER:
12   Q.   There's medical benefits?
13        MS. CURRY:  Object to the
14   form.
15        THE WITNESS:  I think you're
16   using a term "medical benefit."
17   I'm not sure if you can first
18   clarify what you mean by medical
19   benefit.
20   BY MS. GARBER:
21   Q.   Sure.  You've done a
22   risk/benefit assessment of, say, a drug
23   or a medication, right?  You know what
24   that means, don't you?

9 (Pages 30 to 33)

Kevin Holcomb, M.D.

Page 34

1    A.  I do.
2    Q.  All right.  And what do you
3  think that means, when I say a
4  risk/benefit in the context of a
5  medication?
6    A.  A risk/benefit would be an
7  analysis of the reason why the person is
8  using the drug versus the risk of using
9  the drug.
10    Q.  Right.  And so the benefit
11  is the reason they are using the drug,
12  right?
13    A.  Right.
14    Q.  It has to have some sort of
15  efficacy or benefit, right?
16    A.  Right.
17    MS. CURRY:  Object to the
18  form.
19  BY MS. GARBER:
20    Q.  So my question is now take
21  that to talc and talcum powder products.
22    There's no medical benefit
23  in that context, is there?
24    MS. CURRY:  Object to the

Page 35

1  form.
2    THE WITNESS:  I'm assuming a
3    practice that has endured for this
4    long of time, there must be a
5    perception on the people who are
6    using it that they are benefiting
7    from it in some form or fashion.
8  BY MS. GARBER:
9    Q.  Sure.  My question is a
10  little different.
11    Is -- is there a medical
12  benefit to using talcum powder products
13  in the same context as, say, a
14  medication, drug, something like that?
15    MS. CURRY:  Object to the
16  form.
17    THE WITNESS:  Yeah, I would
18    say there is.
19  BY MS. GARBER:
20    Q.  There isn't or --
21    A.  There is, I would say.
22    Q.  There is?  So you would tell
23  a patient to use talcum powder products
24  for a medical benefit?

Page 36

1    MS. CURRY:  Object to the
2  form.
3    THE WITNESS:  That wasn't --
4    no, I wouldn't.  But I believe
5    your question was, is there a
6    medical benefit.  And that's in
7    the eye of the patient who's using
8    it.  And I would have to ask her
9    why she's using it.
10    For example, if someone says
11    I'm diabetic, I get yeast
12    infections when I'm moist, and I
13    find that talcum keeps me dry and
14    I have less yeast infections, I
15    would say that's probably a
16    medical benefit to that
17    individual.
18  BY MS. GARBER:
19    Q.  But talcum powder products
20  do not fall under the rubric of a
21  medication for purposes of regulatory;
22  isn't that true?
23    A.  That's true.  But things
24  that fall under the rubric of medications

Page 37

1  that we prescribe pretty regularly that
2  are just quality of life issues are
3  considered medications.  I mean there are
4  medications that prevent hot flashes.  I
5  don't believe anybody can point to a
6  specific medical benefit of stopping hot
7  flashes, but there's still medications
8  for that use.
9    Q.  Doctor, you've been
10  designated as an expert by Johnson &
11  Johnson in the talcum powder litigation
12  in the multi-district litigation; is that
13  right?
14    A.  That's true.
15    Q.  And you understand that
16  we're here today to take your deposition
17  to get all your opinions and the bases of
18  those opinions so we can prepare for
19  briefings, hearings, and trial.
20    Do you understand that?
21    A.  Yes.
22    Q.  When were you first retained
23  in the talcum powder ovarian cancer
24  litigation generally, not in the MDL,

10  (Pages 34 to 37)

Kevin Holcomb, M.D.

Page 38

1    just in general?
2          A.   The Ingham case was my only
3    other involvement.  And I believe that.
4    That interaction began late.  Probably
5    November -- let me think.  I guess that
6    would be November of 2017 then.
7          No, I'm sorry, more like
8    January.  I think it was more like
9    January of 2018 then.
10          Q.   Were there any documents
11    that would refresh your recollection in
12    that regard?
13          A.   Not that I can think of.
14          Q.   You are not an asbestos
15    expert, are you?
16          A.   No.
17          Q.   Before you were hired by
18    Johnson & Johnson regarding talcum powder
19    products, is it fair to say that your
20    understanding of asbestos was pretty
21    limited?
22          MS. CURRY:  Object to the
23    form.
24          THE WITNESS:  I'm not sure

Page 39

1          what you mean by limited.
2    BY MS. GARBER:
3          Q.   Did you testify that it was
4    pretty limited in a prior case?
5          MS. CURRY:  Object to the
6          form.
7          THE WITNESS:  When I -- if I
8          had used the term limited, I guess
9          I was referring to its role in
10          gynecologic oncology.
11          I'm not an expert in
12          asbestos in any way.  But I
13          probably have the same amount of
14          knowledge as anyone else.
15    BY MS. GARBER:
16          Q.   Doctor, let's look at your
17    prior testimony, if we can.
18          I'm going to mark as
19    Exhibit 1 -- no, I'm not going to mark it
20    for now.
21          Doctor, let me pass you
22    over --
23          MS. CURRY:  Do you have a
24    copy of the full transcript?

Page 40

1          MS. GARBER:  I do.
2    BY MS. GARBER:
3          Q.   Doctor, if I could call your
4    attention to --
5          MS. GARBER:  You know what,
6    I am going to mark this as
7    Exhibit 1.
8          Can I have that back,
9    Doctor?
10          THE WITNESS:  Sure.
11          MS. GARBER:  Sorry.
12          (Document marked for
13    identification as Exhibit
14    Holcomb-1.)
15    BY MS. GARBER:
16          Q.   I don't mean to throw these
17    at you.
18          A.   I didn't take offense.
19          Q.   I apologize.
20          So the front page of
21    Exhibit 1 indicates that this is a
22    deposition transcript on May 7th, 2018,
23    in the Ingham case; is that correct?
24          A.   That's correct.

Page 41

1          Q.   And on the front page it
2    indicates that you are the deponent,
3    correct?
4          A.   That I am the?
5          Q.   Person who was being
6    deposed.
7          Does your name --
8          A.   Yes.
9          Q.   Yes, it is.
10          And then, Doctor, if you
11    turn to Page 56 of the transcript, lines
12    2 through 8, I will read it.
13          "Question:  In fact, is it
14    fair to say that, B, until you began
15    consulting for Johnson & Johnson, your
16    understanding of the different fibers of
17    asbestos that exist was -- was pretty
18    limited?
19          And then question:  "Is that
20    fair to say?"
21          And the answer was:  "That's
22    fair to say."
23          So, Doctor, you agree that
24    your understanding of asbestos was pretty

11 (Pages 38 to 41)

Kevin Holcomb, M.D.

Page 42

1    limited before you were hired by J&J,
2    correct?
3            MS. CURRY: Object to the
4    form.
5            THE WITNESS: Your prior
6    question just asked me about my
7    understanding of -- of asbestos
8    and was proceeded by my admitting
9    that I'm not an asbestos
10   specialist.
11           This testimony has to do
12   with my understanding of the
13   different fiber types of asbestos.
14   So I think there's a little bit of
15   a difference in what I was
16   testifying about here and your
17   question.  But I don't see the
18   inconsistency.
19   BY MS. GARBER:
20       Q.   Okay.  Fair enough.
21           As to the fibers, before you
22   were hired by J&J and consulting for
23   them, you weren't even aware what an
24   amphibole was, right?

Page 43

1        A.   No.
2        Q.   All right.  When were you
3    first retained in the MDL talc
4    litigation?
5        A.   That, I believe, was around
6    November of 2018.
7        Q.   And what was your
8    understanding of your assignment when you
9    were hired in the MDL?
10       A.   My understanding with that,
11   that I was -- I was being asked for
12   my opinion based on my assessment of the
13   existing body of literature in the area
14   of whether talc causes ovarian cancers.
15       Q.   We're going to get to the
16   body of literature in a moment.  But were
17   you asked to do anything else?  Or
18   what -- strike that.
19           What was your understanding
20   of your assignment?  Did it -- did it
21   entail anything else?
22           MS. CURRY: Object to the
23   form.
24           THE WITNESS: I believe it

Page 44

1            entailed what I thought was
2    necessary to offer an opinion on
3    the question of whether talc use
4    causes ovarian cancer.
5    BY MS. GARBER:
6        Q.   At the time that you were
7    hired by Johnson & Johnson to do work in
8    the MDL, you already harbored -- harbored
9    causation opinions based on the work that
10   you did attendant to the Ingham cases,
11   correct?
12       A.   That's correct.
13       Q.   Isn't it true that in the
14   Ingham case you formed your opinion that
15   talcum powder products do not cause
16   ovarian cancer based on review of 61
17   published studies provided to you by
18   counsel for Johnson & Johnson?
19           MS. CURRY: Object to the
20   form.
21           THE WITNESS: That's --
22   that's not true.  My opinion that
23   talc did not cause ovarian cancer
24   preceded my involvement with

Page 45

1    Ingham.
2            But, yes, that reliance list
3    helped further confirm that
4    feeling.
5            (Document marked for
6    identification as Exhibit
7    Holcomb-2.)
8    BY MS. GARBER:
9        Q.   Doctor, I'm going to mark as
10   Exhibit 2 another deposition transcript.
11           Doctor, this is -- Exhibit 2
12   is the same front transcript, the Ingham
13   matter, and on your deposition taken on
14   May 7, 2018, right?
15       A.   Yes.
16       Q.   And at Page 57, Lines 10
17   through 14, question reads:
18           "Are the 61 reliance
19   materials cited in Exhibit 4 the complete
20   universe of the materials that you relied
21   upon in order to form your opinions in
22   that case?
23           "Answer:  Yes."
24           Is your testimony different

Kevin Holcomb, M.D.

Page 46

1    today, Doctor?
2            MS. CURRY:  Object to the
3    form.
4            THE WITNESS:  No, it's not
5    any different.  The -- I can't
6    think of anything that was outside
7    of this data that I reviewed for
8    this case that I had not seen
9    prior.
10           My testimony today is that
11   my opinion about the causal
12   relationship of talc and ovarian
13   cancer preceded my involvement in
14   Ingham.  And your question asked
15   me, or you stated in your question
16   that my opinion was developed
17   during Ingham, or that was my
18   understanding of your question.
19   And that's all I was trying to
20   clarify.
21   BY MS. GARBER:
22       Q.   Your universe of the data
23   that you relied on in the Ingham matter
24   consisted of 61 published studies

Page 47

1    provided to you by counsel for J&J.
2            MS. CURRY:  Object to the
3    form.
4    BY MS. GARBER:
5        Q.   Right?
6        A.   To be honest, some of the
7    materials I found on my own.  Some of it
8    was provided by J&J.
9            And again, I -- I don't know
10   if you mean to be doing this, but I just
11   want to clarify.  If I read some of this
12   material years ago and had come to an
13   independent opinion about this, and then
14   I read it again, I don't -- I just want
15   to clarify, that my opinion is not being
16   made during that case.
17       Q.   The 61 studies that were
18   reflected on a reference list were the
19   universe of studies that formed your
20   opinion in the Ingham case, correct?
21       A.   Yes.
22       Q.   Thank you.
23           You testified that the key
24   literature that formed the basis of your

Page 48

1    opinion in the Ingham case were the
2    cohort studies which included gate --
3    Gertig, Gates 2010, Houghton, and
4    Gonzalez, Heller 1996, and IARC 2010 and
5    IARC 2012.
6        Is that correct?
7            MS. CURRY:  Object to form.
8            THE WITNESS:  No.  You're --
9    you're piquing my memory of
10   this -- of this -- because I
11   realize I only have two pages of
12   it.
13           But repeatedly the counsel
14   who was taking my deposition
15   attempted to limit, as you are
16   defining them, as key pieces of
17   information.  My -- my opinion was
18   based on the totality of all the
19   data.
20           That -- that answer just did
21   not seem acceptable at the time,
22   and there was this attempt to
23   constantly drill down to me
24   identifying a few studies that I

Page 49

1    could say were important, but I
2    repeatedly said then and I imagine
3    I'll maybe have to do that again
4    today, that it is the totality of
5    the data that led me to my
6    opinion.
7            The universe, I believe, as
8    you like to call it.
9    BY MS. GARBER:
10       Q.   The totality of the evidence
11   that formulated the opinions in this
12   matter are listed in the reference list
13   of -- lists of your expert report, which
14   is dated February 25, 2019, and the
15   supplemental reference list.
16       Is that a true statement?
17           MS. CURRY:  Object to the
18   form.
19           THE WITNESS:  That's a true
20   statement, but there -- I -- I did
21   also read the expert reports of
22   others involved in the case.  And
23   they referenced other papers that
24   are not in my reference list.

13 (Pages 46 to 49)

Kevin Holcomb, M.D.

Page 50

```
 1          So I -- I'd have to say I
 2     came across more than -- than just
 3     what was in my reference list in
 4     my preparation.
 5  BY MS. GARBER:
 6     Q.   And in regard to what you
 7  just said, reading other experts' reports
 8  that were involved in the case, is it
 9  true that you read the experts' report,
10  but did not read the underlying studies
11  that were referenced in that given expert
12  report?
13     A.   No.
14          MS. CURRY:  Object to the
15     form.
16          THE WITNESS:  That's exactly
17     the opposite of what I'm saying.
18     I'm saying at times I would read
19     something in an expert report that
20     piqued my interest, and I would go
21     back and pull that paper and read
22     the paper.
23  BY MS. GARBER:
24     Q.   And then you didn't list it
```

Page 51

```
 1  on your reference list?
 2          MS. CURRY:  Object to the
 3     form.
 4          THE WITNESS:  It was not
 5     part of my expert report.  My
 6     expert report had already been
 7     completed.
 8  BY MS. GARBER:
 9     Q.   Did you know that a
10  supplemental reference list was just
11  produced in this matter?
12     A.   Yes.
13     Q.   Are you telling me that you
14  have reviewed other materials that do not
15  appear on any of the reference lists that
16  are attached to your expert report or the
17  supplemental materials that were just
18  produced on the 25th?
19          MS. CURRY:  Object to the
20     form.
21          THE WITNESS:  I believe that
22     it -- I don't know exactly the
23     list that you have of everything I
24     reviewed.  But if it's not clear
```

Page 52

```
 1     that I reviewed the other experts'
 2     reports and the literature that
 3     they were basing their opinions
 4     on, I did in some cases.
 5  BY MS. GARBER:
 6     Q.   Doctor, you understand that
 7  I am entitled to know the materials that
 8  you read, reviewed and relied upon in
 9  formulating your opinions.  You
10  understand that, right?
11     A.   Yes.
12          MS. CURRY:  I can possibly
13     clarify --
14          MS. GARBER:  I don't --
15          MS. CURRY:  -- the issue if
16     it's helpful.
17          MS. GARBER:  Let me -- let
18     me just finish this line of
19     questioning, Ms. Curry.  Thank you
20     very much.
21  BY MS. GARBER:
22     Q.   And, Doctor, is it your
23  testimony that aside from the reference
24  lists that are attached to your expert
```

Page 53

```
 1  report and the supplemental materials,
 2  that there are papers that you have
 3  reviewed that are not listed there?
 4          MS. CURRY:  Object to the
 5     form.
 6          THE WITNESS:  I would have
 7     to review my reference list and
 8     see what's on there.  Or all the
 9     information that was handed over
10     to you as far as what I reviewed.
11          But, again, I did look
12     through other experts' reports.
13     If they referenced a study, in
14     most cases, I did not go back and
15     review the study.  I just read
16     what they were saying.
17  BY MS. GARBER:
18     Q.   Can you think of a given
19  study that you were reading an expert
20  report and it piqued your interest, to
21  use your words, and you went and pulled
22  it and read it?
23     A.   No, I can't think of any
24  specific papers.
```

14 (Pages 50 to 53)

Kevin Holcomb, M.D.

Page 54

1    MS. GARBER: Go ahead,
2    Ms. Curry. Maybe you can clarify.
3         MS. CURRY: Just to clarify,
4    we have on the supplemental list,
5    in addition to the expert reports,
6    the deposition transcripts and
7    exhibits to the depositions, and
8    so I believe that the additional
9    articles that would have been
10   reviewed by Dr. Holcomb are
11   included in those exhibits.
12        MS. GARBER: I see. So what
13   I'm supposed to do is I'm supposed
14   to go pull the deposition, and
15   pull the exhibits and then move
16   those forward to the reference
17   list to understand his library?
18        MS. CURRY: It's the
19   deposition that you actually took
20   of Dr. Saenz, the exhibits that
21   you presented to her in its
22   totality were provided to
23   Dr. Holcomb after that deposition.
24

Page 55

1    BY MS. GARBER:
2         Q.   And which of those papers,
3    after reading Dr. Saenz's deposition,
4    which of those -- strike that.
5         Which of those exhibits
6    after reading Dr. Saenz's deposition did
7    you pull and read, if any?
8         A.   I didn't have to pull any of
9    them of them. The paper was in the -- in
10   the exhibit. And I don't remember which
11   one. I believe there were about 30
12   exhibits. So if you show me the list I
13   can show you which ones I read.
14        Q.   Did you read every single
15   one of them?
16        A.   No.
17        Q.   Do any come to mind?
18        A.   I just said no.
19        Q.   Are some of them included in
20   the supplemental reference list that was
21   just produced a couple days ago?
22        MS. CURRY: Object to the
23   form.
24        THE WITNESS: I don't know.

Page 56

1    BY MS. GARBER:
2         Q.   Did you prepare the
3    supplemental reference list?
4         A.   Yes. I don't remember if
5    there's any overlap I'm saying.
6         Q.   Did you type it up yourself?
7         A.   No.
8         Q.   How was it that that was
9    prepared?
10        A.   How was what?
11        MS. CURRY: Object to the
12   form.
13   BY MS. GARBER:
14        Q.   The supplemental reference
15   list.
16        A.   The lawyers asked me, was
17   there anything else that I had reviewed,
18   and I just gave them a list of which
19   papers I had reviewed.
20        Q.   Thank you. What did you do
21   to prepare for today's deposition?
22        A.   I reviewed the epidemiologic
23   papers on talc, and in some cases just
24   powder use and ovarian cancer.

Page 57

1         I looked at the basic
2    science papers, some that addressed
3    mechanistic questions.
4         I looked at some of the
5    basic science papers on theories of
6    carcinogenesis.
7         I reviewed -- that's pretty
8    much it. I pretty much went through that
9    body of literature, so...
10        Q.   The epidemiological
11   literature that you looked at appear on
12   the reference lists that are attached to
13   your expert report and the supplemental
14   reference list that was just produced?
15        A.   Yes.
16        Q.   And when you say the basic
17   science on mechanism of carcinogenicity,
18   what data are those?
19        MS. CURRY: Object to the
20   form.
21        MS. SHARKO: Can you keep
22   your voice a little louder,
23   please?
24        MS. GARBER: Sure.

15 (Pages 54 to 57)

Kevin Holcomb, M.D.

Page 58

1     MS. SHARKO:  Thank you.
2     THE WITNESS:  Could you
3  repeat the question as well.
4  BY MS. GARBER:
5     Q.   The basic science with
6  regard to mechanism of carcinogenicity,
7  what specific studies are those?
8     MS. CURRY:  Object to the
9  form.
10     THE WITNESS:  I don't
11  remember the specific studies
12  because most of that came from
13  reviewing other experts' expert
14  reports.
15  BY MS. GARBER:
16     Q.   Do those studies that you
17  reviewed in connection with preparation
18  for your deposition appear on the
19  reference lists that you have produced?
20     A.   Again, in those cases I
21  wasn't pulling the whole paper.  I was
22  just reading expert reports.  So no, it's
23  not.
24     Q.   When you say science with

Page 59

1  regard to basic science with regard to
2  carcinogens, the theories of carcinogens,
3  that would be your same answer as the
4  prior one; it was in the context of
5  reading expert reports?
6     A.   That's true.
7     Q.   How many hours did you
8  prepare for today's deposition?
9     A.   Do you mean from the
10  beginning of my engagement in the MDL or?
11     Q.   Specifically in connection
12  with just getting ready for today.  I'm
13  going to get to that, Doctor.  And thanks
14  for the clarification.
15     But just with regard to
16  preparing for today's deposition.
17     A.   I'm not sure -- I asked you
18  if there was a difference.  But I guess
19  in essence there really isn't.  I've been
20  preparing for this deposition from the
21  beginning of my engagement.
22     So I would say probably
23  about 90 hours.
24     Q.   So is it your testimony that

Page 60

1  from the time that you were retained by
2  Johnson & Johnson in the MDL through
3  today's deposition, you prepared about
4  90 hours?
5     MS. CURRY:  Object to the
6  form.
7     THE WITNESS:  That's true.
8  BY MS. GARBER:
9     Q.   And your pay rate is $850 an
10  hour?
11     A.   That's true.
12     Q.   Doctor, in the Ingham case,
13  it was your opinion that occupational
14  exposure to asbestos couldn't cause
15  ovarian cancer; is that correct?
16     MS. CURRY:  Object to the
17  form.
18     THE WITNESS:  Yes.
19  BY MS. GARBER:
20     Q.   And is that still your
21  opinion today?
22     A.   As with my deposition at the
23  time of Ingham, I was quoting IARC's
24  monograph on the topic.  And also offered

Page 61

1  some critiques of that finding, which
2  included concerns about
3  misclassification, concerns about whether
4  environmental exposures really supported
5  the findings or not.  And so, you know, I
6  spent quite a bit of time in the Ingham
7  deposition going through this.  But I
8  accepted IARC's findings.
9     Q.   So my question is a little
10  narrower.
11     A.   Mm-hmm.
12     Q.   Is it your opinion today
13  that occupational exposure to asbestos
14  can cause ovarian cancer?
15     A.   In my -- it's my opinion
16  that based on the five heavy occupational
17  exposure papers cited in that IARC
18  monograph, that in those specific
19  situations, yes, those exposures did
20  contribute to ovarian cancer.
21     Q.   Doctor, did you testify in
22  Ingham that occupational exposure to
23  asbestos can cause ovarian cancer?
24     MS. CURRY:  Object to the

16 (Pages 58 to 61)

Kevin Holcomb, M.D.

Page 62

1    form.
2         THE WITNESS: Again, if I
3    did, it's to the degree of -- I --
4    I don't have any opinion outside
5    of the literature that I read on
6    the topic. And the only
7    literature I've read on the topic
8    are those five papers cited in the
9    monograph. So if I said it during
10   Ingham, it's based on the same
11   data that I'd be saying it based
12   on today.
13   BY MS. GARBER:
14        Q.   Was it your testimony that
15   occupational exposure to asbestos can
16   cause ovarian cancer?
17        MS. CURRY: Object to the
18   form.
19        THE WITNESS: I believe so.
20   BY MS. GARBER:
21        Q.   And is it your opinion today
22   that occupational exposure to asbestos
23   can cause ovarian cancer?
24        MS. CURRY: Object to the

Page 63

1    form.
2         THE WITNESS: Once again,
3    it's my opinion that occupational
4    exposure in those settings as
5    described in the IARC monograph,
6    which would be, you know, the --
7    the women who participated in gas
8    mask productions, or cement
9    factories in pre-World War II
10   Italy, and in those specific
11   situations, yes, I think that
12   there's enough evidence to deduce
13   that -- that exposure increased
14   the risk of ovarian cancer.
15   BY MS. GARBER:
16        Q.   So if I asked you in any
17   hearing, Doctor, can occupational
18   exposure to asbestos cause ovarian
19   cancer, and I asked you for a yes or no
20   question, would the answer be yes?
21        MS. CURRY: Object to the
22   form.
23        THE WITNESS: I don't think
24   you can ask a yes or no question

Page 64

1    in that situation, because the
2    question is so broad to say in an
3    occupational setting. And I only
4    have data on a few different
5    settings where it was shown. And
6    so I'm going to restrict my
7    opinion to the data I've read, and
8    the data I've read on those
9    specific occupational settings.
10   BY MS. GARBER:
11        Q.   So, Doctor, I'm going to
12   mark as Exhibit 3 --
13        (Document marked for
14        identification as Exhibit
15        Holcomb-3.)
16   BY MS. GARBER:
17        Q.   -- prior deposition
18   testimony in the Ingham matter.
19        Doctor, this was deposition
20   testimony from May 7, 2018, right?
21        A.   Yes.
22        Q.   And if you turn to Page 103,
23   Lines 7 through 19, it reads:
24        "Question: Do you believe

Page 65

1    that asbestos exposure can cause ovarian
2    cancer?"
3         And your answer is: "Yes.
4    We did go over this before and I do
5    believe that occupational exposure to
6    asbestos can cause ovarian cancer."
7         And it goes on to say: "Is
8    that because you believe that asbestos
9    fibers in the ovaries increases the risk
10   of developing ovarian cancer?"
11        And your answer was: "I
12   have no idea of the mechanism by which it
13   could occur."
14        Is that still your testimony
15   today?
16        MS. CURRY: Object to the
17   form. And to showing one page of
18   the deposition transcript.
19        MS. GARBER: I don't think
20   we're going to have any speaking
21   objections here today, Ms. Curry.
22   I --
23        MS. CURRY: It's just --
24   you're -- he's referring back to

17 (Pages 62 to 65)

Kevin Holcomb, M.D.

Page 66

1    testimony and you're not showing
2    him the prior testimony.
3         MS. GARBER:  As you well
4    know, Ms. Curry, the proper
5    objection is, "Objection to form."
6         MS. SHARKO:  I think she's
7    doing fine.
8         MS. GARBER:  I'm sure you
9    do.
10   BY MS. GARBER:
11        Q.   Go ahead, Doctor.
12        A.   So, in my answer I said yes,
13   we did go over this before, which sort of
14   supports the conversation I was saying
15   without all the things I said before, you
16   don't know how to interpret that.
17            But I know what -- how to
18   interpret that.  It's what I'm just
19   saying, we had gone over this multiple
20   times being asked the same question,
21   similar to what's happening now.  And I
22   kept restricting it to not stepping
23   outside of -- and -- and this is a common
24   theme that I think we're going to revisit

Page 67

1    over and over today.
2            This idea of making comments
3    and conclusions that go outside of the
4    specific findings of your studies, and
5    purists and careful clinicians and
6    scientists don't do that.  And so if you
7    ask me does any occupational exposure
8    increase your risk of asbestos, how would
9    I know?  I only have a body of literature
10   that looks at specific situations.  And
11   that's the only situation that I'm going
12   to speak to -- speak about.
13            So when I said yes, we did
14   go over this before, that's because this
15   was about who knows how many times I had
16   been asked the same question with the
17   same answer.
18        MS. GARBER:  Objection.
19   Motion to strike as nonresponsive.
20   BY MS. GARBER:
21        Q.   Doctor, you answered to the
22   question, do you believe that asbestos
23   exposure can cause ovarian cancer, yes.
24   We did go over this.  And I do believe

Page 68

1    that occupational exposure to asbestos
2    can cause cancer.
3         A.   Are you --
4         Q.   That's your --
5            MS. CURRY:  Same objections.
6    BY MS. GARBER:
7         Q.   That's your answer, right?
8         A.   My answer has a piece of it
9    that you can't, or don't, or you're not
10   interested in.  And I think it's just as
11   important as the part that you're
12   focusing on that says yes, we did go over
13   this before.
14            I'd be happy to go through
15   the entire transcript of this area.  I
16   think you'll find what I'm referring to
17   as being consistent, that I was trying to
18   say that my opinions about exposure in
19   the occupational setting was restricted
20   to the few occupational settings that
21   were defined in the IARC monograph.  And
22   that is what I'm trying to tell you now.
23            Because I said we've gone
24   through this before, I'm referring to

Page 69

1    those qualifications.
2         Q.   I'm just trying to get your
3    opinions here today.  You understand
4    that, right?
5         A.   I don't.  I don't.  I don't
6    think so.  Because my opinion on this is
7    so clear that I believe that if you're
8    making gas masks in a World War II, or
9    pre-World War II or during World War II
10   factory, or if you're mixing cement in
11   Italy around the same time, that I'd be
12   concerned about your risk of ovarian
13   cancer.
14            Outside of those specific
15   situations, I don't have an opinion.
16        Q.   You've read the IARC
17   monograph from 2012 with regard to
18   asbestos, right?
19        A.   Yes.
20        Q.   And, in fact, it's on your
21   reference list in this matter?
22        A.   Yes.
23        Q.   And, Doctor, do you think
24   that the IARC 2002 monograph limits risk

18  (Pages 66 to 69)

Kevin Holcomb, M.D.

Page 70

1    of ovarian cancer to occupational
2    exposure?
3            MS. CURRY: I believe you
4        mean IARC 2012. And objection to
5        form.
6            MS. GARBER: Thank you.
7    BY MS. GARBER:
8        Q.   So I'll redo that question.
9        Doctor, do you think the
10   IARC monograph of 2012 limits risk of
11   ovarian cancer to occupational exposure?
12           MS. CURRY: Object to the
13       form.
14           THE WITNESS: I'm telling
15       you my -- my opinion, which is
16       what I think you're trying to get
17       at, is that the only data on
18       occupational exposure that showed
19       an increased risk of ovarian
20       cancer were those same specific
21       settings that I am mentioning to
22       you. And so my personal opinion
23       is that I can only speak towards
24       the relationship of asbestos

Page 71

1        exposure in an occupational
2        setting and ovarian cancer with
3        regard to those specific settings.
4            (Document marked for
5        identification as Exhibit
6        Holcomb-4.)
7    BY MS. GARBER:
8        Q.   I'm going to mark as
9    Exhibit 4 the IARC monograph of 2012
10   Volume 100-C, titled "Arsenic, Metals,
11   Fibres, and Dust: A Review of Human
12   Carcinogens."
13           And I apologize. I don't
14   have a full copy of this with me.
15       A.   Sure. Thank you.
16           MS. SHARKO: Do you have a
17       copy for us?
18           MS. GARBER: That's what I
19       just said, Ms. Sharko. I
20       apologize. I don't have a full
21       copy. I have a page that I'm
22       going to question him from, but
23       not all the pages.
24           It's based on testimony that

Page 72

1        I just got. So I apologize.
2    BY MS. GARBER:
3        Q.   Doctor, if you could turn to
4    Page 219 of the monograph. And, Doctor,
5    you can look up here. It will go quicker
6    this way if you just --
7        A.   I'd rather look at it, if
8    that's okay.
9            You said 219. Oh.
10       Q.   Yeah. Why don't you just
11   look up here. I'm just going to read
12   something.
13           219, it says, exposure data,
14   identification of the agent.
15       A.   219 -- but what I saw at the
16   back.
17       Q.   Doctor, if you can just look
18   up here.
19           MS. CURRY: I'm sorry. The
20       exhibit that you just handed him
21       does not have a Page 219, is the
22       problem.
23           THE WITNESS: So I just -- I
24       just want to make sure that what

Page 73

1        you've given me is what you're
2        reading.
3            MS. GARBER: Yeah, that's
4        fine.
5    BY MS. GARBER:
6        Q.   Why don't you just look up
7    here at the Elmo.
8        A.   Are we looking at the same
9    thing?
10       Q.   Yes. Yes. I will cure it
11   on the break.
12           MS. SHARKO: If the doctor
13       wants a paper copy, number one
14       he's allowed to have it, and
15       number two --
16           MS. GARBER: Well, you --
17       you have one.
18           MS. SHARKO: -- I'm three
19       seats closer to the screen, and I
20       can't even read that.
21           MS. GARBER: You have one,
22       right?
23           MS. SHARKO: So I don't know
24       how he can.

19 (Pages 70 to 73)

Kevin Holcomb, M.D.

Page 74

1        MS. CURRY: This is the one
2   page. I have the full.
3        THE WITNESS: Okay. So --
4   BY MS. GARBER:
5        Q.   So at Page 219, Doctor, do
6   you see that it says asbestos, and then
7   it lists the different fibers, correct?
8   The different types of asbestos?
9        A.   I don't know -- can you
10  please --
11       Q.   The title. The title.
12       A.   Yes.
13       Q.   The top.
14       A.   The -- correct.
15       Q.   All right. And then under
16  exposure data, Number 1, it says,
17  "Identification of the agent."
18       Do you see that?
19       A.   Yes.
20       Q.   And then about halfway
21  through the paragraph, it says, "The
22  conclusions reached in this monograph
23  about asbestos and its carcinogenic
24  risk" --

Page 75

1        A.   I'm sorry. I'm still just
2   getting up to where you are.
3        Q.   Just look -- just look up at
4   here, Doctor.
5        A.   Ma'am, if it's okay with
6   you, we went through the trouble to get
7   this because it's easier for me to see.
8   I'm going to use this if you just bear
9   with me.
10       Q.   Okay. Well, then you can
11  look up here to see where I'm reading.
12       A.   I've got you.
13       Q.   Okay. "The conclusions
14  reached in this monograph about asbestos
15  and its carcinogenic risks apply to these
16  six types of fibers wherever they are
17  found, and that includes talc containing
18  asbestiform fibers."
19       Correct? Is that what it
20  says?
21       A.   That's what it says.
22       Q.   Doctor, that's my only
23  question. Is that what it says?
24       A.   "The conclusions reached in

Page 76

1   this monograph about asbestos and its
2   carcinogenic risks apply to these six
3   types of fibers wherever they are found."
4   And I'm going to assume that the
5   conclusions are going to be based on the
6   studies that they cite.
7        Q.   Doctor, we don't want to
8   make conclusions. My question is, does
9   that what the monograph say?
10       A.   That's what the monograph --
11       Q.   Did I read that correctly?
12       A.   You read the monograph
13  correctly.
14       Q.   And I have no further
15  question for you.
16       MS. GARBER: Motion to
17  strike everything besides saying
18  yes, that's what it says.
19       MS. SHARKO: Does that mean
20  that we're done for today?
21  BY MS. GARBER:
22       Q.   Doctor, is that what the
23  monograph says on Page 219?
24       A.   That's what the monograph

Page 77

1   says. I disagree with that. Yes.
2        Q.   Okay. What part do you
3   disagree with?
4        MS. CURRY: Object to the
5   form.
6        THE WITNESS: I think -- I
7   was getting at this before, and I
8   think that a lot of what we're
9   going to get into today makes that
10  same mistake. You can't make
11  conclusions about things that you
12  haven't studied. And if you only
13  study a certain setting, and
14  you're able to show that in this
15  setting it causes ovarian cancer,
16  how can you reliably expand that
17  finding to situations that you've
18  never even looked at?
19       And I don't care if IARC
20  puts it in writing and says they
21  are going to do that. The
22  question is, do I accept it? Do
23  I accept that if you show me that
24  it causes cancer if you're making

Golkow Litigation Services - 877.370.DEPS

Kevin Holcomb, M.D.

Page 78

1  gas masks, that means it causes
2  cancer in any other situation.
3      I think that's -- clearly is
4  what IARC said they did.  I think
5  that's a problem.  And I already
6  explained to you some of the other
7  issues that I have with IARC.  I
8  mean, we all can make mistakes.
9  There's other issues with IARC.  I
10 mean, the studies, even in the
11 ones that I accept, there's
12 misclassification issues.
13     In fact, if you look at the
14 studies where they do pathologic
15 confirmation, the increased risk
16 is attenuated to the baseline.
17     And so, you know, part of my
18 being able to give my opinion here
19 is my years of practice.  And I've
20 had the experience of debulking
21 somebody who I thought had ovarian
22 cancer who ended up having
23 mesothelioma.
24     So I know the difficulties

Page 79

1  in being able to tell the
2  difference between the two.
3  BY MS. GARBER:
4      Q.  Doctor, I'm going to get to
5  your report.
6      MS. CURRY:  Were you
7  finished with your response?
8      THE WITNESS:  No.
9      And I'm also aware that, you
10 know, there was not even a
11 diagnosis code for malignant
12 mesothelioma at a time that -- an
13 international diagnosis code, an
14 ICD-9 code for mesothelioma during
15 this time.
16     And I'm sure that the
17 immunohistochemical test that
18 helped to distinguish between
19 ovarian cancer and primary
20 peritoneal cancer and malignant
21 mesothelioma were not developed at
22 that time.
23     So, yes, I take IARC at what
24 they're saying.  But even in the

Page 80

1  settings where they found that
2  it's associated with, there are
3  weaknesses in their findings.  To
4  extend that definition outside to
5  any occupational exposure that
6  they haven't examined, I think is
7  problematic.
8  BY MS. GARBER:
9      Q.  Doctor, what was my
10 question?
11     A.  Did IARC make that
12 statement, and I said yes.
13     Q.  Thank you.
14     MS. GARBER:  Motion to
15 strike everything besides that.
16     MS. SHARKO:  Well, that
17 wasn't the question you asked.
18 BY MS. GARBER:
19     Q.  Doctor, you disagree --
20     MS. CURRY:  He answered your
21 question.
22     MS. O'DELL:  All right,
23 Susan.  We went over this
24 earlier -- I think -- not earlier

Page 81

1  this week, last week.  I think
2  Dawn is doing the objections.
3  There's no need for you to add the
4  commentary.
5      MS. SHARKO:  Well, why --
6  why are you talking if it's one
7  lawyer per side?  You should have
8  been there yesterday when you had
9  three people on your side talking
10 at us.
11     MS. O'DELL:  Well, I
12 can't -- can't speak to yesterday.
13 But we've had this discussion, you
14 and I, and --
15     MS. CURRY:  As the person
16 making objections, I do want to
17 put on the record that the
18 question that was asked was what
19 part of -- of IARC do you disagree
20 with, and so Dr. Holcomb's
21 response was directly responsive
22 to that question.
23     Thank you.
24

21 (Pages 78 to 81)

Kevin Holcomb, M.D.

Page 82

1  BY MS. GARBER:
2      Q.   Doctor, we will get to your
3  report and what you say about asbestos.
4          My question was simply,
5  Number 1, at Page 219 where I read: "Is
6  that what the monograph says?"
7          And I think your testimony
8  was, yes, that's what the monograph says,
9  correct?
10     A.   That's what the monograph
11 says.
12     Q.   All right.  And then I
13 wanted to show you next at Page 232 with
14 regard to your testimony about the
15 populations?
16     A.   I'm sorry.
17     Q.   232 --
18     A.   232, right.
19     Q.   -- under human exposure.
20     A.   This is the --
21     Q.   Are you there?
22     A.   I'm just a little confused,
23 because this is talking about talc.  And
24 we were talking about asbestos.

Page 83

1          Are we in the same --
2      Q.   Are you --
3      A.   I think I'm in a
4  different --
5      Q.   -- are you on Page 232?
6      A.   Yes, but I don't know if I'm
7  reading the same thing you are.  You are
8  talking about the monograph on --
9      Q.   On asbestos.
10     A.   Right.  I think I'm in the
11 wrong --
12     Q.   No, that is -- that is --
13     A.   This is the right one?  Oh,
14 2012.  So this is the one.
15     Q.   Okay.  Doctor, under 1.6.5,
16 it says, "Human Exposure"?
17     A.   Yeah.
18     Q.   And then it indicates
19 "Exposure of the General Population."
20         Is that the heading?
21     A.   Exposure of the general
22 population.  And it's -- yeah, exposure
23 to talc for the general population.
24     Q.   Okay.  Well, let's read what

Page 84

1  it says.
2          It says, "Consumer products,
3  e.g., cosmetic, pharmaceuticals, are the
4  primary sources of exposure to talc for
5  the general population.  Inhalation and
6  dermal contact through" -- "i.e., through
7  perineal application of talcum powders,
8  are the primary routes of exposure."
9          Did I read that correctly?
10     A.   Yes.
11     Q.   So that is indicating that
12 talcum powder products and exposure in
13 the general population, correct?
14         MS. CURRY:  Object to form.
15 BY MS. GARBER:
16     Q.   That's on Page 232?
17     A.   I -- I just want to -- I
18 know we're only picking out this one page
19 to read, but it's a little confusing to
20 me since we had started reading a
21 monograph on asbestos and this seems to
22 be dealing with talc.
23         So I turn one page back.
24 This is a section on talc containing

Page 85

1  asbestiform fibers.
2          So this area that we are
3  talking about -- I -- I don't know if
4  they are talking about -- what -- I'm a
5  little unclear of what they are talking
6  about here, with the general -- are they
7  talking about asbestiform fibers?  Are
8  they talking about -- I'm not sure.
9      Q.   Let me see if I can help
10 you.
11     A.   Thank you.
12     Q.   So turning back to 219.
13     A.   Yes.
14     Q.   Where the monograph says,
15 "The conclusions reached by the monograph
16 about asbestos and its carcinogenic risks
17 apply to these six types of fibers
18 wherever they are found -- thereby
19 meaning asbestos -- and that includes
20 talc containing asbestiform fibers."
21         So this monograph applies to
22 both talc containing asbestiform fibers,
23 and asbestos.
24         You understand that,

22 (Pages 82 to 85)

Kevin Holcomb, M.D.

Page 86

1    correct?
2        A.   This goes to the question of
3    what I disagree with, because what you're
4    saying is that if they study asbestos in
5    these heavy occupational exposures, that
6    means you should then extend these
7    findings to other clinical settings
8    outside of that.  And -- so yes, I get
9    what you're saying and that's exactly
10   what I was saying I disagreed with.
11       Q.   Do you -- I guess I don't
12   know what your -- what your opinion is,
13   so I'll ask it.
14            You understand that this
15   monograph from 2012 applies to asbestos
16   and asbestiform talc, you understand
17   that, right?
18       A.   Yes.
19       Q.   Thank you.
20            Doctor, in your expert
21   report and just a minute ago, you were
22   talking about the misdiagnosis of ovarian
23   cancer and peritoneal mesothelioma.  Do
24   you recall that?

Page 87

1        A.   I said misclassification.
2        Q.   Okay.  And, we'll turn to
3    that part of your expert report in a bit.
4    But since you brought it up, if you could
5    turn to Page 356 of the monograph.
6        A.   Sand and gravel?
7        Q.   It's -- did I say three?
8        A.   You said 356, sand and
9    gravel.
10       Q.   256.  I apologize.
11       A.   Okay.
12       Q.   Okay.  If you look at the
13   right-hand column.  We'll -- we'll start
14   with the first full paragraph which reads
15   the working group -- are we together?
16       A.   Yes.
17       Q.   Okay.  "The working group
18   noted that a causal association between
19   exposure to asbestos and cancer of the
20   ovary was clearly established based on
21   five strongly positive cohort mortality
22   studies of women with heavy occupational
23   exposure."
24            That's what you were

Page 88

1    testifying a bit ago, right?
2        A.   That's true.
3        Q.   All right.  But it goes on,
4    doesn't it, Doctor?  It says, "The
5    conclusion received" -- "the conclusion
6    received additional support from studies
7    showing that women and girls with
8    environmental, but not occupational
9    exposure to asbestos," right?
10       A.   This is what I was --
11   maybe -- maybe it wasn't clear what I was
12   referring to when you asked me earlier
13   what I disagreed with.
14            And I talked about the
15   limitations of the IARC monograph.  I
16   mentioned this issue, that they'll make
17   these statements and then they give you a
18   couple of papers to go look at; Ferante,
19   et al., and Reid, et al.
20            When you go back and you
21   look at those studies, they actually come
22   to the exact opposite conclusion, that
23   women in those settings did not have an
24   increased risk of ovarian cancer.  And

Page 89

1    yet the IARC authors say that their
2    findings were supported.  So they have
3    five strong studies showing an increased
4    risk of ovarian cancer.  Two studies
5    in -- in environmental settings that show
6    no increases of ovarian cancer come to
7    the conclusion that that is not a
8    discrepancy, it's actually in support of.
9            And I am supposed to read
10   this and agree with that.
11       Q.   You disagree with IARC and
12   their findings with regard --
13       A.   No, and if they regard --
14       Q.   Hold on, Doctor.
15       A.   Yes.  Okay.
16       Q.   You disagree with IARC and
17   their findings with regard to asbestos
18   and asbestiform talc and its
19   carcinogenicity as it relates to the
20   ovary, correct?
21            MS. CURRY:  Object to the
22   form.
23            THE WITNESS:  My opinion
24   about this is that I restrict my

Kevin Holcomb, M.D.

Page 90

1  opinions about the carcinogenicity
2  of asbestos with ovarian cancer to
3  the settings where it was shown to
4  increase ovarian cancer.
5      If you ask me about settings
6  where the studies explicitly show
7  it did not increase ovarian
8  cancer, I don't accept that it
9  increases ovarian cancer in those
10  situations.
11      I don't understand how a
12  reasonable person could. If you
13  read a study that says it did not
14  increase risk of ovarian cancer in
15  a situation, why would you then
16  conclude that it does?
17  BY MS. GARBER:
18      Q.  Have you done a thorough and
19  comprehensive assessment of the
20  literature as it pertains to asbestos and
21  ovarian cancer?
22      MS. CURRY: Object to the
23  form.
24      THE WITNESS: To be honest,

Page 91

1  I'm hoping that IARC would have
2  done an extensive study of the
3  literature. So my only -- as I've
4  already admitted, I'm not an
5  asbestos specialist, so my
6  understanding of asbestos and
7  ovarian cancer is limited to IARC.
8      And if they've done an
9  extensive review to reach their
10  conclusions, then I would have to
11  say that I have as well, because I
12  reviewed the papers they've
13  reviewed. And I've already
14  repeatedly told you the problems
15  that I have with saying you're
16  supported by studies that find the
17  exact opposite findings of the
18  studies that hold your original
19  opinion.
20  BY MS. GARBER:
21      Q.  Is the answer to my question
22  no, I have not conducted a full
23  comprehensive review of the literature?
24      MS. CURRY: Object to the

Page 92

1  form.
2      THE WITNESS: I believe I
3  have. I'm disagreeing with you.
4  BY MS. GARBER:
5      Q.  Because --
6      A.  I'm saying --
7      Q.  Because you --
8      A.  -- because I reviewed
9  IARC --
10      MS. CURRY: Sorry. You
11  can't talk over one another.
12      Do you want to finish your
13  response?
14      THE WITNESS: My
15  understanding is that IARC,
16  because so many other groups rely
17  on their findings to inform their
18  opinions, that they are tasked
19  with doing a comprehensive review
20  of the literature on the topic.
21  And so yes, I feel like if I
22  reviewed what they reviewed, I've
23  done a comprehensive review as
24  well.

Page 93

1  BY MS. GARBER:
2      Q.  With regard to the
3  misclassification issue that you
4  testified about, Doctor, if you could
5  look back at Page 256.
6      A.  Yes.
7      Q.  It indicates, "The working
8  group carefully considered the
9  possibility that cases of peritoneal
10  mesothelioma may have been misdiagnosed
11  as ovarian cancer and that these
12  contributed to the observed excesses.
13  Contravening that possibility is the
14  finding that three of the studies cited
15  here specifically examined the
16  possibility, and there were misdiagnosed
17  cases of peritoneal mesothelioma, and all
18  failed to find sufficient numbers of
19  misclassified cases."
20      Doctor, do you agree with
21  that statement?
22      A.  I agree with the statement
23  that they did not find what they
24  considered enough cases of misclassified

24 (Pages 90 to 93)

Kevin Holcomb, M.D.

Page 94

1    cases. But I'm aware that they actually
2    did not go back and do a histologic
3    evaluation of every case.
4           What I'm also aware of is
5    that specific cases that do
6    systematically go back and have
7    pathologic confirmation somehow come to a
8    different conclusion than the studies
9    that don't do that. And so I'm still
10   left wondering, if you do a systematic
11   pathology review and classify them, you
12   don't find an increased risk. If you
13   don't do a systematic pathology
14   confirmation, you find an increased risk.
15          I'm like IARC, I'm not
16   convinced that misclassification has been
17   totally ruled out because I can't
18   understand why these two different types
19   of studies are coming -- you see, you're
20   losing consistency then.
21      Q.    IARC found otherwise.
22      A.    I just admitted that I have
23   a different opinion.
24      Q.    So your review as to the

Page 95

1    issue of asbestos and asbestiform talc
2    and carcinogenicity is limited to IARC
3    2012, correct?
4           MS. CURRY: Object to the
5    form.
6           THE WITNESS: Again, I'm
7    trying to -- trying to state this
8    as clearly as possible so we can
9    move on.
10          My opinion of asbestos and
11   its ability to cause cancer of the
12   ovary are restricted to the
13   studies of heavy occupational
14   exposure in which they actually
15   found an increased risk of ovarian
16   cancer.
17   BY MS. GARBER:
18      Q.    And your review to come to
19   your opinions is limited to IARC 2012?
20          MS. CURRY: Object to form.
21          THE WITNESS: As far as
22   asbestos?
23   BY MS. GARBER:
24      Q.    Yes.

Page 96

1      A.    Yes.
2      Q.    And asbestiform talc?
3      A.    Yes.
4      Q.    Thank you.
5           Do you agree, Doctor, that
6    asbestos and asbestiform talc are Group 1
7    carcinogens under IARC 2012?
8      A.    I agree.
9      Q.    Doctor, if talcum powder
10   products contain asbestos, talcum powder
11   products contain a Group 1 carcinogen?
12          MS. CURRY: Object to the
13   form.
14          THE WITNESS: Excuse me?
15   BY MS. GARBER:
16      Q.    You just testified that
17   asbestos is a Group 1 carcinogen, right?
18      A.    Yes.
19      Q.    And --
20      A.    According to IARC, yes.
21      Q.    Okay. And if, it's a
22   hypothetical, talcum powder products
23   contain asbestos, then those talcum
24   powder products contain a Group 1

Page 97

1    carcinogen, right?
2      A.    That would be IARC's
3    opinion, yes.
4      Q.    Is it your opinion? It's a
5    Group 1 carcinogen.
6      A.    You asked, you asked what --
7    in the beginning whether -- what's my
8    definition of a carcinogen. And I said
9    it's a substance that can cause cancer.
10          So on one hand you're asking
11   if it contains this substance that IARC
12   has deemed a Level 1 carcinogen, would it
13   contain that carcinogen? By definition,
14   yes. You said if I take that
15   supposition.
16          I would just say I'm looking
17   at, and I was asked to review the
18   literature on talc. And you asked me
19   what do I consider talc, and I said
20   Johnson & Johnson and Shower to Shower.
21   Is that a carcinogen?
22          And now that goes back to my
23   definition of carcinogen. Can that
24   powder cause cancer? And my review, as

25 (Pages 94 to 97)

Kevin Holcomb, M.D.

Page 98

1    you know you've already asked, would be
2    no.
3        Q.   Well, so I'll go back to my
4    question.
5            Assume that talcum powder
6    products contain asbestos, then they
7    contain a Group 1 carcinogen, right?
8            MS. CURRY:  Object to form.
9            THE WITNESS:  You know,
10   we're sort of tying all these
11   things together.  I already
12   explained that I disagreed with
13   IARC's definition of at least its
14   role of -- outside of those heavy
15   occupational exposures, which are
16   the only studies that they cite
17   which shows an increased risk of
18   ovarian cancer.
19           So you're saying would IARC
20   consider that in talc as a
21   carcinogen, the asbestos, and I'm
22   saying yes, they considered -- in
23   your supposition, would
24   asbestiform talc be considered a

Page 99

1    Group 1.  I would say according to
2    IARC, yes.
3            I'm just clarifying to say
4    that the whole point of me being
5    here is to give an opinion whether
6    that supposition that you just
7    said, if there is asbestos in Baby
8    Powder, Johnson & Johnson's
9    product, is that a carcinogen?
10           And my answer would be no,
11   because I don't see convincing --
12   and we're going to go through I'm
13   sure all the reasons that I don't
14   believe that.  But I don't believe
15   that it proves that it's a
16   carcinogen.
17   BY MS. GARBER:
18       Q.   So then, you disagree with
19   IARC that asbestos is not a Group 1
20   carcinogen?
21           MS. CURRY:  Object to form.
22           THE WITNESS:  No.  You're
23   oversimplifying my statement.  And
24   I can't believe it's to really

Page 100

1    clarify my opinion, because my
2    opinion is really, I think,
3    clearly what I'm stating.
4            I'm saying that asbestos and
5    its relationship to ovarian cancer
6    has been clearly shown in a few
7    very unlikely situations ever to
8    happen again.  And those are those
9    prospective cohort studies.
10           I'm saying that IARC,
11   extending that outside of those
12   situations that they have not
13   studied, that's when I'm going to
14   go to what are people actually
15   using in that bottle.
16           And if that's asbestos in
17   that bottle, I'm closing this
18   book, and I'm opening the talc
19   monograph, because that -- all the
20   studies that they discuss in that
21   talc monograph are these products,
22   the Johnson & Johnson products.
23           I would be going to the
24   case-control studies in my report.

Page 101

1    I'd be going to the prospective
2    trials in my report.
3            I don't understand why we
4    would use such an indirect
5    comparison, finding something in
6    this book to help us figure out
7    does that product cause cancer
8    when there's been so much research
9    using what's in that bottle that
10   have results.
11   BY MS. GARBER:
12       Q.   Doctor, my question was just
13   way more broad than what -- what you're
14   answering.
15           Do you agree with IARC that
16   asbestos is a Group I carcinogen?  I
17   didn't mention ovarian cancer.  I said do
18   you agree with IARC that asbestos is a
19   Group I carcinogen?
20           MS. CURRY:  Object to the
21   form.
22           THE WITNESS:  Yes.  In
23   certain settings.
24   BY MS. GARBER:

26 (Pages 98 to 101)

Kevin Holcomb, M.D.

Page 102

1          Q.   And so now if we put a
2     Group I carcinogen in a bottle of talc,
3     then the corollary is that the bottle of
4     talc contains a Group I carcinogen,
5     right?
6          A.   That would be true.
7              MS. CURRY:  Object to the
8         form.
9     BY MS. GARBER:
10         Q.   Thank you.
11             So let's mark your notice of
12     deposition as Exhibit 5.
13             (Document marked for
14             identification as Exhibit
15             Holcomb-5.)
16     BY MS. GARBER:
17         Q.   Doctor, we've marked as
18     Exhibit 5 your notice of deposition for
19     today's proceeding.  Did you review this
20     before today?
21         A.   At some point I did.
22         Q.   When did you review it?
23         A.   When?
24         Q.   Mm-hmm.

Page 103

1          A.   When it was first produced.
2          Q.   And did you review the
3     documents --
4              MS. GARBER:  And I
5     understand you've made objections,
6     Ms. Curry.
7     BY MS. GARBER:
8          Q.   But did you review the
9     documents that we asked you to produce?
10         A.   Yes.
11         Q.   And did you endeavor to
12     comply with that and provide those
13     documents?
14         A.   Yes.
15         Q.   And have you brought with
16     you Item 3, a copy of your complete files
17     as they relate to the work done
18     concerning talcum powder litigation?
19             MS. CURRY:  Object to the
20         form.
21             THE WITNESS:  Yes.
22     BY MS. GARBER:
23         Q.   And where is that file?
24         A.   In my report.

Page 104

1          Q.   Your file for this matter is
2     your report?
3          A.   Yes.
4          Q.   Does it consist of anything
5     else?
6          A.   Does my report consist of
7     anything else?
8          Q.   No.
9              Is it your testimony,
10     Doctor, that your file in this matter in
11     the MDL consists of your expert report,
12     which is dated February 25, 2019?
13             MS. CURRY:  Object to the
14         form.
15             THE WITNESS:  Yes.
16     BY MS. GARBER:
17         Q.   You don't have any other
18     documents?
19         A.   No.
20         Q.   And do you have any
21     document -- any scientific literature
22     that consists of your file?
23             MS. CURRY:  Object to the
24         form.

Page 105

1              THE WITNESS:  I don't
2         understand your question.
3     BY MS. GARBER:
4          Q.   You've reviewed a number of
5     studies that appear on the reference
6     lists attached to your expert report,
7     correct?
8          A.   Correct.
9          Q.   Where physically are those
10     literature?
11         A.   When you say where
12     physically?
13         Q.   Mm-hmm.
14         A.   The -- I -- I did most of
15     my -- almost all of it electronically.
16         Q.   You didn't receive hard
17     copies of any documents?
18         A.   The expert reports I
19     received as a hardcopy.
20         Q.   What about with regard to
21     published literature.  Did you review
22     any -- did you receive any hard copies of
23     those?
24         A.   Not for the MDL.

Kevin Holcomb, M.D.

Page 106

1          Q.   You did receive hard copies
2    from the Ingham matter, correct?
3          A.   I did.  And I quickly asked
4    for electronic copies.
5          Q.   And did you make any notes
6    on those 61 studies that you received in
7    connection with Ingham?
8               MS. CURRY:  Object to the
9    form.
10              THE WITNESS:  No.
11   BY MS. GARBER:
12         Q.   With regard to the
13   literature that you reviewed in
14   connection with this matter, did you make
15   any notes electronically on the data?
16         A.   No.
17         Q.   Do you have the data saved
18   in a certain file in your computer?
19         A.   Yes.  I imagine it's
20   probably somewhere in my download list,
21   in my download area.
22         Q.   Like a DropBox?
23         A.   No.  I'm saying like if it
24   was sent electronically, when I

Page 107

1    downloaded it, I would imagine it must be
2    in the download part of my computer.
3          Q.   Have you -- I don't
4    understand when you say download of a
5    computer, where that would be?
6          A.   If you get a ZIP file, and
7    you open it, it's actually downloading
8    stuff to your computer.
9          Q.   I understand.  Okay.
10              Have you produced all
11   documents that relate to your
12   compensation for expert work in this
13   matter?
14         A.   Yes.
15              MS. CURRY:  Subject to the
16   objections.
17   BY MS. GARBER:
18         Q.   And have you produced all
19   references that identify facts, or data
20   that Johnson & Johnson lawyers provided
21   you and you considered in formulating
22   your opinions?
23         A.   Yes.
24         Q.   Are there any assumptions

Page 108

1    that Johnson & Johnson provided you that
2    you relied upon in forming your opinions?
3          A.   No.
4          Q.   Relating to your opinions as
5    set forth in your February 25, 2019,
6    litigation report, have you made any
7    assumptions?
8          A.   Please repeat that?
9          Q.   Sure.  Relating to your
10   opinions in your expert report in this
11   matter, have you made any assumptions?
12              MS. CURRY:  Object to the
13   form.
14              THE WITNESS:  No.
15   BY MS. GARBER:
16         Q.   Do you assume, in coming to
17   your causation opinions regarding talcum
18   powder products, that they are free of
19   asbestos?
20         A.   I don't have an opinion on
21   it.
22         Q.   Do you have an opinion as to
23   whether Johnson & Johnson products,
24   talcum powder products, are free of

Page 109

1    fibrous talc?
2          A.   No, I don't have an opinion.
3          Q.   Do you have an opinion if
4    Johnson & Johnson talcum powder products
5    contain heavy metals like nickel,
6    chromium, cobalt and the like?
7               MS. CURRY:  Object to the
8    form.
9               THE WITNESS:  I don't have
10   an opinion.
11   BY MS. GARBER:
12         Q.   Do you have an opinion
13   whether Johnson & Johnson talcum powder
14   products contain carcinogenic fragrances?
15              MS. CURRY:  Object to the
16   form.
17              THE WITNESS:  No, I don't
18   have an opinion.
19   BY MS. GARBER:
20         Q.   In the Ingham matter, you
21   had no opinion whether Johnson &
22   Johnson's talcum powder products
23   contained asbestos at any point, right?
24         A.   I didn't have an opinion,

28 (Pages 106 to 109)

Kevin Holcomb, M.D.

Page 110

1   no.
2       Q.   Is that still the case?
3       A.   Still the case.
4           (Document marked for
5       identification as Exhibit
6       Holcomb-6.)
7   BY MS. GARBER:
8       Q.   I'll mark as Exhibit 6 the
9   production that was made, I think, the
10  25th.
11          Doctor, this is a single
12  document that is printed on both sides,
13  and we'll start with the side that is
14  titled "Expert Report of Kevin Holcomb
15  For General Or Causation Daubert Hearing,
16  Supplemental Materials Received and
17  Reviewed By Dr. Kevin Holcomb."
18          Doctor, is this the
19  supplemental materials that you reviewed
20  after you issued your expert report?
21      A.   Yes.
22      Q.   Do you need to add any
23  further documents to this list to make it
24  accurate?

Page 111

1       A.   No.
2       Q.   And when did you review the
3   scientific studies that are listed there?
4       A.   When you say scientific?
5       Q.   Aside from the depositions
6   and expert reports, when did you review
7   each of those papers that are listed
8   there, specifically Items 1, 2, 8, 9 and
9   10?
10      A.   That came after reading
11  Dr. Saenz's deposition. So I don't know.
12  Maybe about a week, week and a half ago.
13      Q.   Okay. And then if we turn
14  the document over, does this reflect an
15  invoice issued by you on March 25th,
16  2019, to Johnson & Johnson for expert
17  services?
18      A.   Yes, it does.
19      Q.   And it indicates as to the
20  description for literature review,
21  drafting of expert report, and
22  preparation for deposition; is that
23  correct?
24      A.   That's true.

Page 112

1       Q.   And it lists 95 hours of
2   expert work?
3       A.   Yes, it does.
4       Q.   And at a rate of $850?
5       A.   Yes.
6       Q.   And so you've invoiced
7   Johnson & Johnson for $80,750, right?
8       A.   That's correct.
9       Q.   Have you been paid?
10      A.   No.
11      Q.   And are there any other
12  hours that you intend to invoice Johnson
13  & Johnson for?
14      A.   Yes.
15          MS. CURRY: Object to the
16      form.
17  BY MS. GARBER:
18      Q.   And how many hours would
19  that entail?
20      A.   Depends on how long we go
21  today and the few hours yesterday.
22      Q.   How many hours yesterday?
23      A.   Maybe about four.
24      Q.   And do you intend to bill

Page 113

1   Johnson & Johnson for any work in
2   preparation of today's deposition before
3   the deposition started today?
4       A.   No.
5       Q.   Do you have a different rate
6   for your deposition --
7       A.   No.
8       Q.   -- as opposed to other work
9   that you do?
10      A.   No.
11      Q.   How much money were you paid
12  with regard to your work in the Ingham
13  case?
14      A.   In total, it was $100,300.
15      Q.   And so in connection with
16  your work today for Johnson & Johnson in
17  connection with talcum powder products,
18  ovarian cancer litigation, you have thus
19  at least invoiced and/or been paid for
20  roughly 183 -- almost $184,000; is that
21  fair?
22          MS. CURRY: Object to the
23      form.
24          THE WITNESS: No.

29 (Pages 110 to 113)

Kevin Holcomb, M.D.

Page 114

1  BY MS. GARBER:
2      Q.   How much?
3      A.   You said invoiced and been
4  paid?
5      Q.   Yeah, so, so you have to
6  date earned $103,000, correct?
7      A.   Correct.
8      Q.   And then you've invoiced
9  Johnson & Johnson for $80,750, correct?
10     A.   Correct.
11     Q.   Plus the hours that you just
12 mentioned?
13     A.   Correct.
14     Q.   Is that the totality of the
15 compensation that you have received, or
16 will receive up through today's
17 deposition?
18     A.   That is.
19     Q.   Thank you.
20          (Document marked for
21          identification as Exhibit
22          Holcomb-7.)
23 BY MS. GARBER:
24     Q.   I'm going to mark your

Page 115

1  expert report in the MDL as Exhibit 7.
2          You signed this document on
3  February 25, 2019, correct?
4      A.   Correct.
5      Q.   And this is your litigation
6  report attendant to the MDL talcum powder
7  products litigation, correct?
8      A.   Correct.
9      Q.   Have you endeavored to have
10 this litigation report published in any
11 scientific journal?
12     A.   No.
13     Q.   Can you describe the process
14 you used in developing the opinions
15 contained in this report?
16     A.   Yes.  I started, again, by
17 reviewing epidemiologic data.  I reviewed
18 both case-control and cohort studies.  I
19 looked at -- well, I guess my methodology
20 would really be following Bradford Hill's
21 methodology, because in reviewing that
22 data I looked at the strengths of
23 associations.
24          I tried to rate the studies

Page 116

1  with some degree of how strong I thought
2  the studies were, how subject they might
3  be to spurious results.
4          I looked to see if there was
5  consistency.  I looked to see if there
6  was a biologic plausibility that involved
7  mainly looking at migration issues.  And
8  then in a totality came up with my
9  opinion about the ability of talc to
10 cause ovarian cancer.
11     Q.   If we turn to your
12 references which appear beginning at Page
13 25 through 33.  And in addition the
14 supplemental references, there are more
15 than the 61 references that you had in
16 connection with the Ingham trial,
17 correct?
18     A.   Yes.
19     Q.   Did you request any other
20 documents or literature from counsel?
21          MS. CURRY:  Object to the
22          form.
23          THE WITNESS:  No.
24 BY MS. GARBER:

Page 117

1      Q.   And is it accurate that all
2  of the documents that are listed on your
3  reference lists, which include what's
4  attached to your report and the
5  supplemental, were all provided to you by
6  counsel?
7          MS. CURRY:  Object to the
8          form.
9          THE WITNESS:  No.  Some of
10 these I came up with on my own.  I
11 don't remember exactly which ones.
12 But it's not all provided by
13 counsel.
14 BY MS. GARBER:
15     Q.   Is there anything you
16 reviewed but did not rely upon in forming
17 your opinions?
18     A.   No.
19     Q.   Are there any materials that
20 you relied upon in forming your opinions
21 that are not listed in your reference
22 lists that we've reviewed?
23          MS. CURRY:  Object to the
24          form.

30 (Pages 114 to 117)

Kevin Holcomb, M.D.

Page 118

1      THE WITNESS:  Other than
2  what I've already told you that I
3  came across in expert reports.
4  BY MS. GARBER:
5      Q.   And in drafting your expert
6  report, you have not made any notes; is
7  that correct?
8      A.   If you mean written, no.  I
9  would -- as the manuscript was being
10  produced, I would make points.  But it
11  all became incorporated in the end into a
12  final product.
13      Q.   What was the process by
14  which you developed your report?  Did you
15  read a study and then make some notes or
16  mental notes, or write?  Tell me the
17  process by which you --
18      MS. CURRY:  Object to the
19  form.
20      THE WITNESS:  I typically
21  worked with two monitors.  And one
22  I'm writing the manuscript.  The
23  other one, I'm bringing up papers.
24  BY MS. GARBER:

Page 119

1      Q.   Okay.  So there's no notes
2  that you made before you started to sit
3  down and write your expert report; is
4  that correct?
5      MS. CURRY:  Object to the
6  form.
7      THE WITNESS:  No.
8  BY MS. GARBER:
9      Q.   It's not correct?
10      A.   There are no notes.
11      Q.   There are -- thank you.
12      Did you read every word of
13  the documents listed in your reference
14  list?
15      A.   Yes.
16      Q.   Did you -- when you said you
17  obtained some of the references, is that
18  limited to reviewing exhibits from expert
19  reports or depositions?
20      A.   No.
21      Q.   Did you conduct any
22  searches, say, Medline searches or PubMed
23  searches?
24      A.   I did.

Page 120

1      Q.   What were your -- what was
2  your search engine?
3      A.   PubMed as you mentioned.
4  Sometimes Google.
5      Q.   And what were your search
6  terms?
7      A.   Ovarian cancer, talc,
8  perineal talc and ovarian cancer, body
9  powder and ovarian cancer.  It depended
10  what I was looking for.
11      There was some points I'm
12  making in my expert report where I'm
13  using analogies.  And so I was looking at
14  HPV and cervical cancer or herpes simplex
15  virus and cervical cancer.  And so it --
16  it depended on what I was -- what I was
17  looking at at the moment.
18      Q.   What did you do, Google
19  searches?
20      A.   I'm guilty of using Google
21  from now and then to start a search.
22  It's sometimes faster.  It will bring up
23  PubMed articles.
24      Q.   Did -- have you read, since

Page 121

1  the production of your supplemental
2  reference list, have you read any other
3  expert reports or depositions or other
4  studies?
5      A.   Since?
6      Q.   Since the production of your
7  supplemental expert report which was
8  marked as Exhibit 6.
9      MS. CURRY:  Object to the
10  form.  You mean supplemental
11  materials received list?
12      MS. GARBER:  Yes.
13      THE WITNESS:  Only -- let's
14  see.  Yes, there's one other --
15  one other paper, and that was a
16  migration paper.  But I believe it
17  just came out.  It was --
18  BY MS. GARBER:
19      Q.   What's the title?
20      A.   I don't remember.
21      Q.   Or the author?
22      A.   It was -- I don't know who
23  is the first author.  I know --
24      Q.   Can you give me any authors?

31 (Pages 118 to 121)

Kevin Holcomb, M.D.

Page 122

1      A.   Cramer was -- was involved.
2   I don't remember the first author though.
3      Q.   What was the nature of that
4   paper?
5      A.   It was --
6          MS. CURRY:  Object to the
7   form.
8          THE WITNESS:  It was a paper
9       looking at an attempt to try to
10      differentiate contamination from
11      actual migration of talc
12      particles.
13  BY MS. GARBER:
14     Q.   What did you glean from that
15  paper, Doctor?
16         MS. CURRY:  Object to the
17  form.
18         THE WITNESS:  The biggest
19      thing that I gleaned was that
20      contamination is -- it's probably
21      even more widespread than I
22      realized.  And I appreciated the
23      effort to try to distinguish
24      between the two, but I wasn't

Page 123

1       convinced that you can
2       necessarily.
3   BY MS. GARBER:
4      Q.   Did the authors there
5   attempt to distinguish surface
6   contamination from talc that was deeply
7   embedded in the tissue?
8      A.   Well, they were only looking
9   at lymph nodes from my memory.  So they
10  were trying to distinguish between
11  particles on the surface and particles
12  that are in, deeper inside the lymph node
13  itself, yes.
14     Q.   Does that paper provide a
15  basis for any of your expert opinions
16  today?
17     A.   No.
18     Q.   You did not rely upon -- you
19  do not rely upon the Cramer -- we'll call
20  it Cramer contamination paper -- for
21  purposes of your expert opinions; is that
22  fair?
23     A.   That's fair.
24     Q.   Did you read any other

Page 124

1   expert reports or depositions after the
2   supplemental reference list?
3      A.   No.
4      Q.   And it is accurate that
5   prior to signing your expert report on
6   February 25, 2019, you had not read the
7   recent Saed 2019 paper with regard to a
8   molecular basis supporting the
9   association of talcum powder use with
10  increased risk of ovarian cancer, right?
11         MS. CURRY:  Object to the
12      form.
13         THE WITNESS:  I'm sorry, can
14      you repeat the question again?
15      Prior to --
16  BY MS. GARBER:
17     Q.   Sure.
18         Prior to signing your expert
19  report on February 25, 2019, you had not
20  read Dr. Saed's 2019 publication,
21  correct?
22     A.   That's true.
23         MS. CURRY:  Same objection.
24      Sorry.

Page 125

1   BY MS. GARBER:
2      Q.   Prior to signing your expert
3   report on February 25, 2019, likewise you
4   had not read Dr. Saed's abstract with
5   regard to talc and ROS induction,
6   correct?
7      A.   That's true.
8      Q.   You indicate at Page 20 --
9          MS. CURRY:  Do you need a
10      break?
11         THE WITNESS:  Well, I wasn't
12      sure if I -- it looks like we're
13      going to be close to lunch so...
14         We'll be planning on
15      breaking around 12 or --
16         MS. CURRY:  Sorry.  I
17      thought he had a message from the
18      hospital, so I wanted to make sure
19      if he needs to take a break.
20      We've been going over an hour,
21      Susan, so whenever is a good time
22      for you.
23         MS. GARBER:  You want to
24      take a break?  Whenever you

32 (Pages 122 to 125)

Kevin Holcomb, M.D.

Page 126

1  guys --
2      THE WITNESS:  I'm fine for a
3  break.
4      MS. GARBER:  You want to
5  take a break?
6      THE WITNESS:  Yeah, I'd
7  appreciate it.
8      MS. GARBER:  Okay.
9      THE VIDEOGRAPHER:  Please
10 remove your microphones.  The time
11 is 11:28 a.m.  Going off the
12 record.
13     (Short break.)
14     THE VIDEOGRAPHER:  Okay.  We
15 are back on the record.  The time
16 is 11:42 a.m.
17 BY MS. GARBER:
18     Q.  Doctor, you state at Page 22
19 of your report that plaintiffs' expert
20 gynecologic oncologist conducted a
21 selective review of the study on biologic
22 mechanism.
23     What studies do you
24 contend --

Page 127

1      A.  Could you -- could you
2  point -- I'm not sure where you're
3  reading from.
4      Q.  From Page 22 of your expert
5  report.
6      A.  Right, where -- I'm just
7  looking where on the page it says this.
8      Q.  At the first full paragraph.
9      MS. CURRY:  I'm not seeing
10 it there either.
11     THE WITNESS:  I see where
12 you're saying.
13     You're saying, "Such
14 selective review of studies is
15 clearly conclusion driven."
16     Q.  Yeah, okay.  So what -- what
17 studies do you believe were omitted from
18 the expert -- from the plaintiffs'
19 experts?
20     MS. CURRY:  Object to the
21 form.
22     THE WITNESS:  There's animal
23 studies showing no ascension of --
24 of particles and -- and they --

Page 128

1  they do acknowledge that, but they
2  don't -- they don't describe it.
3  They just say considered limited
4  evidence to the contrary and find
5  it non-persuasive.
6      My review of the literature
7  on this topic, I was looking for
8  some studies showing that you
9  could dust the human vulva with
10 talc and show that those particles
11 can make it to the ovary, and I
12 couldn't find a single study in
13 that situation.
14     You could place particles in
15 the vagina.  You can give a
16 patient oxytocin.  You can do
17 some -- you know, different --
18 different than the majority of the
19 use of these products.
20     And so I -- I came to the
21 conclusion that their -- their
22 approach was conclusion driven,
23 just because it seemed to me, if
24 you've never seen a study that

Page 129

1  shows it's possible, and then you
2  just say well, the -- the studies
3  that I did say that it doesn't
4  happen in an animal model, I
5  don't -- I'm not persuaded by
6  that.
7  BY MS. GARBER:
8      Q.  What animal studies did you
9  review with regard to migration?
10     A.  Yeah, I'd have to look back
11 and see was -- whether it was the -- the
12 rat model or the pig model.  But there
13 were definitely animal model studies.
14     Let me just show you.  It's
15 in the -- in the talc monograph, if you
16 want me to, I can go back through and --
17 and find the citations of --
18     Q.  That's okay, Doctor.
19     I want to know what animal
20 studies you think plaintiffs' experts
21 should have looked at in connection with
22 migration.
23     A.  Well, it's exactly my point.
24 What I'm saying is the study they should

Kevin Holcomb, M.D.

Page 130

1  look at would be the study where someone
2  dusted the human perineum with talc and
3  showed that it was able to reach the
4  ovary, and that doesn't exist.  So that
5  would be the best thing to look at.
6         The studies that I mentioned
7  to you, which I can go back to the talc
8  monograph and find, I don't remember if
9  it was Sprague rats or if it was actually
10 pigs or guinea pigs.  There was a couple
11 of animal models where they were not able
12 to show migration from the vagina, not --
13 much less the perineum.
14     Q.   It's your testimony that
15 plaintiffs' experts didn't look at a
16 human study that dusted the perineum with
17 talc and it was shown to migrate to the
18 ovaries, and you're critical of that even
19 though such a study does not exist?
20         MS. CURRY:  Object to the
21     form.
22         THE WITNESS:  You know, I
23     guess what you can be critical of,
24     and I'd have to admit to that is,

Page 132

1         THE WITNESS:  I'm not sure
2  what you mean by comprehensive.  I
3  will tell you that the studies
4  that I do cite, for example a
5  study like Heller, where there's
6  no correlation between the
7  presence of talc in someone's
8  ovaries and the reported use of
9  talc, which I'm sure the
10 plaintiffs' experts have seen,
11 should give them reason to pause
12 if they've never been able to show
13 it in a human model that it can
14 happen.
15         And then you see studies
16 like that that say there's no
17 correlation between reported
18 history and the presence of talc
19 in the ovaries, that it should
20 make you -- it should make you
21 wonder.
22         And I wouldn't be so
23 dismissive of the studies that are
24 to the contrary.  I mean, they're

Page 131

1  I'm saying such selective
2  review -- and I guess that's not
3  what's being selective here.
4  What's being selective is what you
5  consider persuasive or not.
6         It's not the review.  It's
7  the absence of such a study.  And
8  then not finding the studies on
9  animal models that don't show
10 ascension as not being persuasive.
11 BY MS. GARBER:
12     Q.   Doctor, I reviewed your
13 reference list, and I can find about
14 three studies with regard to the issue of
15 migration.  And my question to you is,
16 did you do a comprehensive review of the
17 literature with regard to the ability of
18 talc to migrate from the genitals to the
19 perineum --
20         MS. CURRY:  Objection.
21 BY MS. GARBER:
22     Q.   -- or to the ovaries?
23         MS. CURRY:  Object to the
24     form.

Page 133

1  mentioning, "Reviewed the small
2  body of literature suggesting
3  migration of particles does not
4  occur."  So they're admitting that
5  there is a body of literature that
6  shows that it doesn't occur.
7  BY MS. GARBER:
8      Q.   Doctor --
9      A.   You can go --
10     Q.   Doctor, if you can --
11         MS. CURRY:  Are you finished
12 with your response?
13         THE WITNESS:  Yeah.
14 BY MS. GARBER:
15     Q.   Can you turn to Page --
16     A.   Can I finish my answer?
17 So --
18     Q.   You can finish.
19     A.   Thank you.
20         So the statement that says,
21 "I've reviewed the small body of
22 literature suggesting that migration of
23 particles does not occur," they're
24 describing that body of literature as

34 (Pages 130 to 133)

Kevin Holcomb, M.D.

Page 134

1  small.  And I'm saying that there is no
2  body of literature showing that perineal
3  dusting of talc gets to the ovaries.
4       So you're comparing small to
5  none, but you find the small
6  non-persuasive.
7       Q.   Doctor, if you can turn to
8  Page 16 of your expert report.  There is
9  a section on Page 16 titled "Migration of
10  Talc Particles," correct?
11       A.   Yes.
12       Q.   And you mention the Wehner
13  paper, correct?
14       A.   Yes.
15       Q.   And do you know what -- was
16  that an animal study or human study?
17       A.   That was animals.
18       Q.   All right.  And then you
19  mentioned the Heller study.  Was that a
20  talc migration study?  In other words,
21  was talc placed at the genitals and
22  looked to see if it travels?
23       A.   No.
24       Q.   Okay.  And then you also

Page 135

1  mentioned the Cramer study, right, the
2  2007 study?
3       A.   Yes.
4       2007, you said?
5       Q.   Yes.
6       A.   Oh, yes, yes.
7       Q.   And then if we turn the page
8  over, you also mention the Gertig study;
9  is that right?
10       A.   Yes.
11       Q.   And then you mention the
12  Terry study?
13       A.   Right.
14       Q.   Doctor, did you look at any
15  of the human studies where particulate
16  was placed at the genitals or in the
17  genitals and the ability to migrate?
18       A.   What particular particulate
19  are you talking about?
20       Q.   Any particulate.
21       A.   Yes.  And I saw in expert --
22  for example, in Dr. Birrer's report, I
23  believe he discusses a study of carbon.
24  But I think it's really important if

Page 136

1  you're going to develop a model to say --
2       Q.   Doctor, sorry, I'm just
3  going to cut you off.
4       A.   Sure.
5       Q.   My question was did you --
6  it was just a really simple question.
7  Did you look at any other human studies.
8  And the answer was yes?
9       A.   Yes.
10       Q.   And then you mentioned one
11  study; is that right?  Were there any
12  other studies?
13       MS. CURRY:  Object to the
14  form.
15       THE WITNESS:  I would have
16  to go back and remind myself of
17  how many, but it was more than
18  one.
19  BY MS. GARBER:
20       Q.   Do you have any other
21  criticisms of plaintiffs' gynecologic
22  oncologists and the claim that they
23  selectively reviewed studies?  Any other
24  criticisms as to the body of literature?

Page 137

1       A.   I do.
2       MS. CURRY:  Object to the
3  form.
4       THE WITNESS:  I do.  I
5  looked at the literature in
6  totality.  So if you just restrict
7  to the epidemiologic data, I
8  looked at the case-control
9  studies.  I spent a fair amount of
10  time going through those, looking
11  for consistency and things like
12  that.
13       And then I looked at the
14  cohort studies, which as you see
15  in my report I explain why they
16  may -- they are generally
17  considered to be less prone to
18  bias.
19       And then I read
20  Dr. Clarke-Pearson's report where
21  he almost -- I don't even think he
22  mentioned the cohort studies,
23  which to me was an important thing
24  that you'd have to explain away if

Kevin Holcomb, M.D.

Page 138

1  you really believe that talc
2  causes ovarian cancer.
3      I did -- as I mention, I
4  think they take as a given that
5  talc can migrate.  And they're not
6  alone in this.  I don't -- I don't
7  think that they're alone in doing
8  that.  I read a number of papers
9  that in the introduction will make
10  statements like, "We all know talc
11  can get to the ovaries," and then
12  offer no citation for it.
13      And so I take issue with
14  that as well.
15  BY MS. GARBER:
16      Q.  Doctor, I didn't ask you for
17  a full list of your opinions.
18      A.  I thought you did.
19      Q.  I asked you --
20      A.  You asked me what areas do I
21  disagree with them.
22      Q.  Okay.  And you mentioned --
23      MS. CURRY:  Please let him
24  finish his response.  You've cut

Page 139

1  him off twice now.
2      MS. GARBER:  That's because
3  he's talking in very large
4  paragraphs, and we're never going
5  to get anywhere if I don't.
6      MS. CURRY:  If you ask these
7  broad, open-ended questions, he's
8  entitled to respond to it.
9      MS. GARBER:  All right.
10  I'll ask a different question.
11  BY MS. GARBER:
12      Q.  Doctor, did you review the
13  Buz'Zard 2007, Shukla 2009 papers?
14      A.  Only with regard to the
15  expert reports.
16      Q.  They're not on your
17  reference list, are they?
18      A.  No.
19      Q.  And you did not review the
20  Saed 2019 prior to signing your expert
21  report.  We've already established that,
22  right?
23      MS. CURRY:  Object to the
24  form.

Page 140

1      THE WITNESS:  That's
2  correct.
3  BY MS. GARBER:
4      Q.  And those papers relied on
5  plaintiffs' experts in support of their
6  biologically plausible mechanism of
7  carcinogenicity, true?
8      A.  Yes, that's true.
9      Q.  And in Page 23 of your
10  report you state, "I understand that
11  there are a number of irregularities in
12  Dr. Saed's work and his lab notes."
13      What is your source of that
14  statement?
15      A.  Dr. Birrer's expert report.
16      Q.  When did you read
17  Dr. Birrer's expert report?
18      A.  I'm trying to think.
19  Probably about maybe two weeks ago.
20      Can you tell me what you're
21  referring to though?
22      Your -- your statement.  You
23  said you -- I made a -- a referral to
24  something about Dr. Saed, but you didn't

Page 141

1  tell me where to find it.
2      Q.  I just asked you generally,
3  Doctor.
4      You -- you made mention
5  that -- that his work and lab notes --
6      A.  I'm just asking where you're
7  reading from, if you can --
8      Q.  At Page 23, Doctor.
9      A.  23.  Thank you.
10      Q.  So what's your source of
11  that statement?
12      A.  Hold on one second.
13      Q.  If you don't know, we'll
14  move on.
15      MS. CURRY:  Just give him a
16  second to look at where you're
17  reading from.
18      THE WITNESS:  I just want to
19  get to -- yeah.
20  BY MS. GARBER:
21      Q.  It's at the top of 23.
22      A.  I don't remember exactly.
23      Q.  All right.  Did you -- I --
24  I noted that his lab notebooks were not

36 (Pages 138 to 141)

Kevin Holcomb, M.D.

Page 142

1    on his reference list.  You didn't look
2    at those, did you?
3         MS. CURRY:  Object to the
4         form.
5         THE WITNESS:  No.
6    BY MS. GARBER:
7         Q.   You haven't looked at all of
8    his work relating to talc and mechanism
9    of carcinogenicity, right?
10        A.   No.
11        Q.   And with regard to your
12   reference list, you haven't reviewed
13   Health Canada's draft screening
14   assessment with regard to talc dated
15   December of 2018, correct?
16        MS. CURRY:  Object to the
17        form.
18        THE WITNESS:  I did.
19   BY MS. GARBER:
20        Q.   Sorry?
21        A.   I did.
22        Q.   You did review it?
23        A.   It's one of Dr. Saenz's
24   exhibits.

Page 143

1         Q.   Okay.  And it's not listed
2    on your reference list, correct?
3         MS. CURRY:  Object to the
4         form.
5         THE WITNESS:  I'd have to
6         look through the reference list --
7         no, it was something that I
8         reviewed as part of Dr. Saenz's
9         exhibits.
10   BY MS. GARBER:
11        Q.   So you have reviewed Health
12   Canada's December 2018 draft report?
13        A.   It's part of Dr. -- it's
14   part of Dr. Saenz's exhibits and I have
15   reviewed it.
16        Q.   When did you review that?
17        A.   Maybe about a week ago.
18        Q.   Okay.  Have you read any
19   comment letters or reports issued in
20   response to the Health Canada DSAR?
21        A.   No.
22        Q.   Have you been asked to
23   provide any comment to Health Canada?
24        A.   No.

Page 144

1         Q.   Are you planning to provide
2    any comment?
3         A.   What I reviewed was a draft.
4    So I'm not sure what Health Canada is
5    going to finally decide to publish.  So
6    no, I didn't -- I didn't --
7         Q.   Do --
8         MS. GARBER:  Motion to
9         strike as nonresponsive.
10   BY MS. GARBER:
11        Q.   Doctor, I asked you, are you
12   planning to provide any comment to Health
13   Canada?
14        A.   I'm saying perhaps I would
15   if I saw a final product that I thought
16   was really egregious, but I've only
17   reviewed a draft and so I -- I can't say
18   whether I would or not.
19        Q.   Doctor, do you understand
20   that Health Canada has asked for public
21   comment?
22        A.   I didn't -- no, I wasn't
23   aware of the process.
24        Q.   Okay.  Have you ever been

Page 145

1    asked to testify at any United States or
2    state government proceedings with regard
3    to talcum powder products?
4         A.   No.
5         Q.   And you are not conducting
6    any research, experimental research in
7    any capacity concerning talcum powder
8    products and ovarian cancer, right?
9         A.   No.
10        Q.   Are you planning to?
11        A.   No.
12        Q.   Have you ever applied for a
13   grant or monies to conduct a research on
14   talcum powder products and ovarian
15   cancer?
16        A.   No.
17        Q.   Have you read the Taher 2018
18   meta-analysis?
19        A.   I have.
20        Q.   Yes?
21        A.   Yes.
22        Q.   When did you read that?
23        A.   Same day I read the Health
24   Canada assessment.

37 (Pages 142 to 145)

Kevin Holcomb, M.D.

Page 146

1          Q.   And that was not on any of
2     your -- the Taher 2018 meta-analysis was
3     not listed on any of your reference
4     lists, correct?
5          A.   It is --
6             MS. CURRY:  Object to the
7     form.
8             THE WITNESS:  It's also part
9     of the exhibits for Dr. Saenz.
10    BY MS. GARBER:
11         Q.   Could you go back to
12    Exhibit 6, please.
13            Doctor, you understand that
14    your reference lists provide me an
15    opportunity to know what literature you
16    have reviewed and relied on attendant to
17    your expert opinions, correct?
18         A.   That's correct.
19         Q.   And if you look at Item 5 of
20    Exhibit 6 which is your supplemental
21    materials?
22         A.   Yes.
23         Q.   Could you read Number 5 for
24    me, please?

Page 147

1          A.   It says, "Expert report of
2     Cheryl Saenz, M.D., February 25, 2019."
3          Q.   It doesn't say exhibits,
4     does it?
5             MS. CURRY:  Object to the
6     form.  Number 3 discusses the
7     deposition.
8     BY MS. GARBER:
9          Q.   Is that what it says,
10    Doctor?  Does it say exhibits there, sir?
11            MS. CURRY:  Object to the
12    form.
13            THE WITNESS:  It clearly
14    doesn't say exhibits.  Number 3 is
15    where it says exhibits, so I'm not
16    sure why you're having me read all
17    of 5, when it clearly says on
18    Number 3, "Deposition of Cheryl
19    Saenz, M.D., and exhibits,
20    March 13, 2019."
21    BY MS. GARBER:
22         Q.   Okay.  Doctor, have you
23    spoken with any of the Taher study
24    authors?

Page 148

1          A.   No, I have not.
2          Q.   And your expert report
3     contains Table 1, correct?
4          A.   Yes.
5          Q.   And what is the nature of
6     Table 1?
7          A.   Table 1 --
8             MS. CURRY:  Table 1 in the
9     copy that you marked is actually
10    cut off.
11            Do you have a full version
12    of it?
13            MS. GARBER:  I do.  It's --
14    it's buried.  But I'm going to
15    mark it, so...
16    BY MS. GARBER:
17         Q.   Are you able to tell me what
18    Table 1 contains?
19         A.   Yes.
20         Q.   And what it is?
21         A.   Table 1 is a list of
22    case-control studies that I reviewed in
23    regard to this matter.
24         Q.   Why did you create this

Page 149

1     list?
2          A.   One, I wanted to show that I
3     performed a comprehensive review.  But I
4     guess largely what I saw mentions over
5     and over again by plaintiffs' experts and
6     sometimes in other papers, the statement
7     that the epidemiologic data consistently
8     shows an increased risk of -- of ovarian
9     cancer with talc exposure.  And I think
10    most people already know that that's only
11    with case-control studies and none of the
12    cohort studies if you include Gates and
13    then update to Gertig.
14            So then I wanted to look at
15    the case-control studies.  And to see
16    could somebody use that term
17    consistently, maybe loosely, and what I
18    consider consistent and they consider
19    consistent different.
20            And so I looked through this
21    list of case-control studies.  I looked
22    at those that showed a positive
23    association and had a 95 percent
24    confidence interval that would suggest it

38 (Pages 146 to 149)

Kevin Holcomb, M.D.

Page 150

1    was statistically significant.  And I
2    wanted to see what percentage of them,
3    that were not duplicates of the same
4    dataset actually showed this association.
5         And so my -- my review of
6    of this list of case-control studies was
7    that -- I don't -- it came out to be
8    about 50/50 with a positive association.
9    Because I wanted to find out, would --
10   would anybody call, you know, a 50/50
11   chance consistent.
12        Q.   So you created Table 1 to
13   show or to support your claim that the
14   case-control studies were inconsistent
15   based on statistical significance.
16        Is that fair, Doctor?
17        MS. CURRY:  Object to the
18   form.
19        THE WITNESS:  That's fair.
20   BY MS. GARBER:
21        Q.   Okay.  Exhibit A at the back
22   of your expert report is your CV, right?
23        A.   Yes.
24        Q.   When did you last update it?

Page 151

1         A.   I believe this is the most
2    recent copy.  Let's see.
3         Let's see.  This last paper
4    is from January 2019, probably like
5    February or maybe early March.
6         Q.   Do you need to make any
7    amendments to make it accurate today?
8         A.   I have a few more accepted
9    publications, but they are not up on
10   PubMed, so I don't think so.
11        Q.   Do they concern ovarian
12   cancer?
13        A.   No.  Oh, hold on.  I'm
14   sorry.
15        Yes.
16        Q.   In what capacity?
17        A.   There's one study, which
18   deals with early detection of ovarian
19   cancer where we looked at vaginal fluid
20   as a potential biomarker for women who
21   have an adnexa mass to pick up whether
22   they have ovarian cancer.  And we looked
23   at a chemical called LPA,
24   lysophosphatidic acid, and showed that

Page 152

1    its levels were higher in women who
2    specifically had clear cell carcinoma.
3         Q.   Do any of the publications
4    that do not appear on your reference list
5    concern any of the issues that you deem
6    relevant in this case?
7         MS. CURRY:  Object to the
8    form.
9         THE WITNESS:  Please repeat
10   that.
11   BY MS. GARBER:
12        Q.   Do any of the publications
13   that do not appear on your CV,
14   bibliography, do any -- are any of those
15   relevant as you deem them to the issues
16   in this case?
17        A.   I just wanted to clarify.
18   You're asking if any of the papers that
19   I'm a co-author or author on relevant to
20   this topic?
21        Q.   That do not appear on your
22   CV?
23        A.   That do not appear on my CV?
24        Q.   Yes.  The ones that you say

Page 153

1    that are not published yet.
2         A.   Oh, no.
3         Q.   No, they do not concern --
4         A.   No, they do not concern talc
5    and ovarian cancer.
6         Q.   Do you consider yourself a
7    research cancer biologist?
8         MS. CURRY:  Object to the
9    form.
10        THE WITNESS:  No, I would
11   consider someone who does mainly
12   basic science research a
13   biologist.
14   BY MS. GARBER:
15        Q.   You don't conduct in vitro
16   studies as part of your practice, right?
17        A.   If you see my CV, you'll see
18   some studies that involve in vitro
19   studies.  So I collaborate with Ph.Ds.
20   So I'm part of a research team that does
21   perform --
22        Q.   But you don't do the bench
23   work, do you?
24        A.   I'm not doing the bench

39 (Pages 150 to 153)

Kevin Holcomb, M.D.

Page 154

1    work, no.
2        Q.   All right.  And you don't
3    have any degrees in epidemiology, right?
4        A.   No.
5        Q.   Did you review any internal
6    documents of defendants in this case that
7    were produced attendant to this
8    litigation?
9        A.   No, I have not.
10       Q.   And do you understand that
11   United States Senate seeking internal
12   company documents relevant to their
13   investigation as to whether Johnson &
14   Johnson has misrepresented the truth
15   about asbestos content in their talcum
16   powder products?
17       A.   I am aware.
18       Q.   You understand that the
19   public, which includes scientists, are
20   not normally allowed to review internal
21   company documents because manufacturers
22   like Johnson & Johnson mark them
23   confidential and disclosure can result in
24   violation of a protective order?  Do you

Page 155

1    understand that?
2        MS. CURRY:  Object to the
3    form.
4        THE WITNESS:  No, I --
5    BY MS. GARBER:
6        Q.   Do you understand how that
7    works?
8        A.   No, I didn't know that.
9        Q.   You do?
10       A.   I don't know that.
11       Q.   Okay.  Do I now have a full
12   list of the documents that you considered
13   in formulating your opinions as
14   referenced in your expert report and
15   supplemental materials?
16       A.   Yes.
17       Q.   Do you understand, Doctor,
18   that I'm entitled to know the literature
19   that you considered and the foundation
20   for your opinions?
21       A.   Yes.
22       Q.   And while you don't agree
23   with plaintiffs' causation opinions that
24   you reviewed, you do acknowledge that

Page 156

1    their opinions were based on informed
2    scientific medical judgment?
3        MS. CURRY:  Object to the
4    form.
5        THE WITNESS:  No.
6    BY MS. GARBER:
7        Q.   You disagree with that?
8        A.   No.
9        Q.   Pardon?
10       A.   I disagree with it.
11       Q.   Which experts -- and I don't
12   need to know why.  Which experts do you
13   think of uninformed scientific opinions?
14       MS. CURRY:  Object to the
15   form.
16       THE WITNESS:  I would say
17   Dr. Clarke-Pearson, Dr. Judith
18   Wolf, Ellen Blair Smith.
19   BY MS. GARBER:
20       Q.   Any others?
21       A.   No, I would restrict it to
22   that.
23       Q.   Okay.  And your criticisms
24   of those particular doctors as referenced

Page 157

1    in your expert report, does that consist
2    of -- strike that.
3        The opinions with regard to
4    plaintiffs' experts, Dr. Clarke-Pearson,
5    Wolf, and Blair Smith, your criticisms of
6    those experts are contained within your
7    expert report; is that fair?
8        A.   That's fair.
9        Q.   Do you agree that experts
10   must use scientific judgment when
11   assessing the literature for causality?
12       A.   Yes, I do.
13       Q.   And in assessing the
14   literature, one person's scientific
15   judgment may be different than another
16   person's scientific judgment?
17       MS. CURRY:  Object to the
18   form.
19       THE WITNESS:  I believe
20   scientific judgment has a role,
21   but I believe that there are
22   things that are right and wrong as
23   well.  And I gave you an example
24   of one of them, which was it's

Golkow Litigation Services - 877.370.DEPS

Kevin Holcomb, M.D.

Page 158

1    wrong to say that something is
2    consistently shown to be
3    associated with something if it's
4    not consistently shown.
5         And -- and I think for
6    statements like that, you can rely
7    on what the general population
8    would consider consistency, or
9    just any reasonable person.  So if
10   someone says something is a
11   hallmark of a disease, and there's
12   no good evidence that it is even a
13   part of the disease, then, you
14   know, that's not a judgment call
15   at that point.  That's the
16   difference between a misstatement
17   and a -- it's just a misstatement.
18   BY MS. GARBER:
19        Q.   We will get to the issue of
20   consistency, Doctor.
21             In addressing -- or in
22   assessing -- strike that.
23             Do you agree that experts
24   can reasonably weigh factors differently?

Page 160

1    that informs the reader of the
2    methodology that you employed to render
3    your opinions.
4         A.   I would have to point to my
5    description of the Bradford Hill
6    criteria.
7         Q.   Where does that appear?
8         A.   I'll find it for you.
9    Page 19.
10        Q.   Doctor, is that a
11   methodology section?  I asked you
12   specifically if you could point me to
13   the methodology section.
14        A.   No.  That does -- that is
15   not a methodology section.
16        Q.   And, in fact, you don't have
17   a methodology section in your report, do
18   you?
19        A.   I don't have a --
20             MS. CURRY:  Object to the
21   form.
22             THE WITNESS:  I don't have a
23   specific section labeled
24   methodology, no.

Page 159

1             MS. CURRY:  Object to the
2    form.
3             THE WITNESS:  What I was
4    trying to get at, and I was hoping
5    that we would be able to cover
6    this quickly, but probably not.
7         That --
8    BY MS. GARBER:
9         Q.   Doctor, just yes or no.  And
10   you're --
11        A.   I need -- no --
12        Q.   -- going to have an
13   opportunity for your lawyer to ask you
14   questions.
15        A.   But ma'am, if you ask a
16   question --
17             MS. GARBER:  Object to form.
18   BY MS. GARBER:
19        Q.   I will withdraw the
20   question.
21        A.   Okay.
22        Q.   Doctor, with regard to
23   methodology, will you please point me to
24   the methodology section in your report

Page 161

1    BY MS. GARBER:
2         Q.   And, in fact, in the four
3    corners of your report you do not state
4    anywhere the methodology that you
5    employed in coming to your opinions.  Is
6    that also a true statement?
7             MS. CURRY:  Object to the
8    form.
9             THE WITNESS:  Throughout my
10   report, within the four corners
11   one could see the methodology I'm
12   using.  And then I go onto explain
13   where I got that methodology with
14   Bradford Hill.
15   BY MS. GARBER:
16        Q.   Doctor, you understand the
17   methodology is important so that opinions
18   can be replicated, right?
19             When you're reviewing a
20   study, there's a methods section, so that
21   the evaluation can be replicated.  You
22   understand that, right?
23        A.   Yes.
24             MS. CURRY:  Object to the

Kevin Holcomb, M.D.

Page 162

1    form.
2    BY MS. GARBER:
3        Q.   You don't have a methodology
4    section in your report where --
5        A.   I do not.
6        Q.   Thank you.
7             Doctor, if we could move
8    onto your statements about plaintiffs'
9    criticism of not reviewing the totality
10   of the literature.
11            I want to ask some questions
12   of you.
13            You did not review the
14   totality of the literature relating to
15   biologic plausibility, because you did
16   not review the Shukla, Buz'Zard, Saed
17   references before rendering your expert
18   opinion in the case?
19            MS. CURRY:  Object to the
20   form.
21   BY MS. GARBER:
22        Q.   In -- in this case.  Do you
23   agree with that?
24            MS. CURRY:  Object to the

Page 163

1    form.
2             THE WITNESS:  I believe that
3    even though it's -- I didn't have
4    a methodology section, I did
5    approach this in a method --
6    methodical way --
7    BY MS. GARBER:
8        Q.   Doctor, I didn't ask you
9    about your methodology.
10       A.   If I -- if I can finish my
11   answer, please.
12            MS. CURRY:  Please stop
13   cutting him off.
14            THE WITNESS:  So --
15            MS. GARBER:  Motion to
16   strike.
17   BY MS. GARBER:
18       Q.   My question was about
19   Shukla, Buz'Zard and Saez --
20            MS. SHARKO:  You have to let
21   him finish his answer.  You are
22   not allowed to interrupt.  Now be
23   polite please.
24            THE WITNESS:  With regard to

Page 164

1    the studies that you're referring
2    to, I did not specifically mention
3    those studies at the time that I
4    presented my opinion, because my
5    view of the Bradford Hill criteria
6    was that there's a reason why the
7    first one is strength of
8    association and the second is
9    consistency.  And that I felt that
10   my reasoning showing the
11   inconsistencies there, that
12   it's -- it's an interesting
13   question to look at biological
14   plausibility and -- and -- but
15   when you have such weakness in the
16   epidemiologic data, I did not
17   spend as much time going through
18   the biologic plausibility other
19   than to the degree that I did,
20   because I think -- and it's full
21   of weaknesses there as well.
22            But no, my opinion, just
23   even based on the epidemiology
24   is -- is that there isn't a

Page 165

1    consistent finding of an
2    association with talc use and
3    ovarian cancer.
4    BY MS. GARBER:
5        Q.   Doctor, is it your testimony
6    that if you look at the epidemiological
7    literature and you find it weak, you
8    don't then need to go on and review the
9    biologic plausibility to render a
10   causation opinion?
11            MS. CURRY:  Object to the
12   form.
13   BY MS. GARBER:
14       Q.   Is that your -- is that your
15   opinion?
16       A.   That is not my opinion.
17       Q.   Okay.
18       A.   And that's not what I'm
19   saying.
20       Q.   So -- and, Doctor, you did
21   not review studies that looked at the
22   biologic plausibility for talc and
23   ovarian cancer which included Shukla,
24   Buz'Zard, and Saed before signing your

42 (Pages 162 to 165)

Kevin Holcomb, M.D.

Page 166

1    report, correct?
2          MS. CURRY:  Object to the
3    form.
4          THE WITNESS:  I would argue
5    that Buz'Zard is not --
6    BY MS. GARBER:
7       Q.   Doctor, yes or no, did you
8    review those or not?
9          MS. CURRY:  Object to the
10   form.
11         THE WITNESS:  I don't --
12         MS. CURRY:  Please let him
13   finish his response.
14         THE WITNESS:  You're --
15   you're looking for yes or no
16   simple answers and you keep --
17   BY MS. GARBER:
18      Q.   I'm not looking for
19   paragraphs, Doctor.
20      A.   -- but -- but you keep
21   telling me that you're here to clarify my
22   answers.  But whenever I get started with
23   an answer you cut me off, which makes me
24   wonder are you really here to clarify my

Page 167

1    answers.  Because I can explain to you.
2    Buz'Zard --
3       Q.   I didn't ask you for an
4    explanation.  I asked you, were they
5    listed, yes or no.  And your answer was
6    no --
7       A.   Can you go back to your last
8    question?  Can you go back to the
9    question?
10      Q.   Doctor, you understand I'm
11   here to ask questions and you're here to
12   answer them.
13      A.   I'm asking you to repeat
14   your question.
15         MS. CURRY:  Ms. Garber,
16   you're not letting him answer the
17   question.  And please, you can't
18   keep talking over each other.
19         MS. O'DELL:  That's really
20   not fair.  If she's -- if she's
21   asking whether the doctor has
22   reviewed a study, that's a yes or
23   no question.
24         She's not cutting you off.

Page 168

1    She's asking him to respond to the
2    question.
3          And if Dr. Holcomb continues
4    not to answer a question, it's an
5    appropriate issue to take to
6    Judge Pisano and that's what we're
7    going to do.  So -- so --
8          MR. MIZGALA:  I want to
9    insert here.  Because you're
10   not -- she's not just asking him
11   yes or no about the studies.
12   She's characterizing the studies
13   in a specific manner and he
14   disagrees with that.  I think he
15   should be able to explain that.
16         THE WITNESS:  That's exactly
17   my feeling about it.  It's, the
18   question is did I review the
19   study --
20   BY MS. GARBER:
21      Q.   Doctor, there's no question
22   pending.
23         Did you --
24         MS. SHARKO:  All right.  So

Page 169

1    all prior questions are withdrawn.
2          MS. GARBER:  No --
3          MS. SHARKO:  She will now
4    ask a question and hopefully
5    she'll be polite and let you
6    answer it.  If we have to go to
7    the judge about the constant
8    interrupting that we've had over
9    the last few days, then we will.
10         MS. O'DELL:  We're here for
11   the day.  Not for the last few
12   days.  And the questions aren't
13   withdrawn.  You're welcome to pose
14   a new question.
15         And -- and I wanted to say
16   for the record the suggestion that
17   Ms. Garber is not being polite is
18   incorrect, Ms. Sharko.
19         MS. SHARKO:  I disagree.
20   But let's go on.
21         There's a lot of silence.
22   Are you going to ask a question,
23   or are you waiting for the doctor
24   to answer the --

43 (Pages 166 to 169)

Kevin Holcomb, M.D.

Page 170

1          MS. GARBER: I'm going to --
2     I'm going to ask a question.
3          MS. SHARKO: Great. Thank
4     you.
5     BY MS. GARBER:
6          Q.   Doctor, you did not review
7     Dr. Longo's testing of talcum powder
8     products for the presence of asbestos,
9     fibrous talc, heavy metals and the like,
10    correct?
11         A.   That's correct.
12         Q.   And you did not present or
13    discuss the study design limitations with
14    the cohort studies.  Do you agree with
15    that, yes or no?
16         MS. CURRY: Object to the
17    form.
18         THE WITNESS: Please repeat.
19    BY MS. GARBER:
20         Q.   Did you -- you did not
21    present and discuss the study design
22    limitations of the cohort studies, yes or
23    no?
24         A.   I'd have to read through the

Page 171

1     report again.  I don't remember.
2          Q.   You can't answer that
3     question?
4          A.   I can't.
5          Q.   Okay.  Is it true, Doctor
6     that you did not provide a word of
7     analysis in your report regarding the
8     contrary data to your causation opinion
9     specifically with regard to
10    Penninkilampi, Health Canada or the Taher
11    paper?
12         MS. CURRY: Object to the
13    form.
14    BY MS. GARBER:
15         Q.   Is that true?
16         A.   Please repeat one more time.
17         Q.   Your report does not provide
18    a word of analysis regarding the contrary
19    data to your causation opinion,
20    specifically the Penninkilampi, Health
21    Canada or Taher analysis of causation,
22    correct?
23         A.   No, I -- I mentioned
24    Penninkilampi.

Page 172

1          MS. CURRY: Object to the
2     form.
3     BY MS. GARBER:
4          Q.   Do you mention her
5     reference -- his references with regard
6     to causation?
7          MS. CURRY: Object to the
8     form.
9          THE WITNESS: No.  I
10    reference his study, not his
11    discussion section.
12    BY MS. GARBER:
13         Q.   Okay.  In your critique of
14    plaintiffs' experts' opinions, you do not
15    state the methodology used in coming to
16    those opinions, correct?
17         MS. CURRY: Object to the
18    form.
19         THE WITNESS: I do discuss
20    the methodology that I used.  I
21    don't have a methodology section
22    that you discussed.
23    BY MS. GARBER:
24         Q.   You don't discuss the

Page 173

1     methodology that you employed in
2     rendering critiques of plaintiffs'
3     experts' opinions, correct?
4          MS. CURRY: Object to the
5     form.
6          THE WITNESS: I just discuss
7     and describe my critiques, yes.
8     BY MS. GARBER:
9          Q.   Wouldn't you agree, Doctor,
10    that there's medical consensus that the
11    female genital tract is an open system to
12    facilitate the passage of menses and
13    promote retrograde movement of sperm?
14         MS. CURRY: Object to the
15    form.
16         THE WITNESS: Yes.
17    BY MS. GARBER:
18         Q.   Let's talk about your
19    opinions and be sure that I understand
20    what they are.
21         These should be yes or no
22    questions, not why.
23         Okay.  Is it your opinion
24    that the literature does not provide a

44 (Pages 170 to 173)

Kevin Holcomb, M.D.

Page 174

1    biologically plausible mechanism whereby
2    talcum powder products can migrate from a
3    woman's genitals to her ovaries?
4         MS. CURRY: Object to the
5    form.
6         THE WITNESS: Is it my
7    opinion that it does not provide?
8    BY MS. GARBER:
9         Q.   Correct.
10        A.   The answer would be yes.
11        Q.   Is it your opinion that the
12   literature does not provide a
13   biologically plausible mechanism whereby
14   talcum powder products can induce chronic
15   inflammation, resulting in ovarian
16   cancer?
17        A.   I believe that it proves
18   that it can cause chronic inflammation.
19   I don't believe that it's been proven
20   that that causes ovarian cancer.
21        Q.   Is it your opinion that
22   talcum powder products do not increase
23   the risk of developing ovarian cancer?
24        A.   Yes.

Page 175

1         Q.   And if talcum powder
2    products contain asbestos, does that
3    opinion change?
4         A.   No.
5         Q.   Is it your opinion that
6    talcum powder products do not cause
7    ovarian cancer?
8         A.   I don't have an opinion.
9    I'm sorry. Talcum powder is -- did you
10   ask the same question twice?
11        Q.   No. One was risk, one was
12   cause.
13        A.   Oh.
14        Q.   Is it your opinion that
15   talcum powder products do not cause
16   ovarian cancer?
17        A.   That's my opinion.
18        Q.   Is it your opinion that
19   there is no evidence that talc is
20   associated with ovarian cancer?
21        MS. CURRY: Object to the
22   form.
23        THE WITNESS: No, that's not
24   my opinion.

Page 176

1    BY MS. GARBER:
2         Q.   Is your opinion limited to
3    there's no credible evidence --
4         MS. CURRY: Object to the
5    form.
6    BY MS. GARBER:
7         Q.   -- that talc is associated
8    with ovarian cancer?
9         MS. CURRY: Object to the
10   form.
11        THE WITNESS: This is going
12   to be tough for yes or no. I
13   can't answer that with a yes or
14   no.
15   BY MS. GARBER:
16        Q.   Okay. As a gynecologic
17   oncologist, you're a member of the
18   Society For Gynecologic Oncology, right?
19        A.   Correct.
20        Q.   And you've served as a
21   reviewer for the publications submitted
22   to the Journal of Gynecologic Oncology,
23   right?
24        A.   Correct.

Page 177

1         Q.   And I assume that you
2    believe the journal -- the journal is a
3    reliable source for study data generally?
4         MS. CURRY: Object to the
5    form.
6         THE WITNESS: What's your
7    definition of reliable?
8    BY MS. GARBER:
9         Q.   What do you think it means?
10        A.   I don't use that term
11   reliable. So I wouldn't use that term.
12        Q.   Do you read the journal?
13        A.   Yes, I do.
14        Q.   And the data that's
15   contained therein generally, do you deem
16   it reliable for what it provides or do
17   you think it's not credible?
18        MS. CURRY: Object to the
19   form.
20        THE WITNESS: Again, if
21   you're saying I believe it's
22   reliable, do I assume that
23   everybody is honestly reporting
24   what they found, that is a general

45 (Pages 174 to 177)

Kevin Holcomb, M.D.

Page 178

1    assumption that we hold in
2    academic medicine.  And, yes, I
3    make that assumption for
4    gynecologic oncology.
5          There's no way for a
6    reviewer or someone else to know
7    if someone is giving you false
8    information.  We assume it's all
9    valid and that they've not lied
10   about anything.  So is that what
11   you mean by reliable?
12   BY MS. GARBER:
13       Q.   Have you had an experience
14   as a reviewer for Gynecologic Oncology
15   where authors submitted false data?
16       A.   What I'm saying is we don't
17   ask for raw data.  I've never -- let me
18   say I.  I have never asked a submitting
19   scientist for their raw data so that I
20   could look for irregularities.  There is
21   a general understanding that you are
22   trusting the person is giving you their
23   findings, and you're reviewing them with
24   that understanding.

Page 179

1        Q.   And based on the fact that
2    you're a reviewer for Gynecologic
3    Oncology, do you tend to trust the data
4    presented in that journal?
5          MS. CURRY:  Object to the
6          form.
7          THE WITNESS:  When you
8          say -- unfortunately, when you say
9          "trust" --
10   BY MS. GARBER:
11       Q.   That was your word, Doctor.
12       A.   You may disagree with the
13   findings, but the word -- when I use the
14   word "trust," that's why I keep on coming
15   back to believing that what the person is
16   giving you is valid, this is actually
17   what they did, that they're not
18   falsifying results.  To that degree, I
19   trust those results just as much as any
20   other journal.
21          Whether I find the findings
22   of every study valid, no.  Just because
23   it's in GYN Oncology does not mean that I
24   take it as a valid study.

Page 180

1        Q.   Okay.  I'm going to show you
2    a paper, Doctor.  I don't believe it was
3    cited in your expert report.
4          (Document marked for
5          identification as Exhibit
6          Holcomb-8.)
7    BY MS. GARBER:
8        Q.   I'm going to mark as
9    Exhibit 8 -- oh, sorry.
10         Doctor, this is a paper that
11   is published in Gynecologic Oncology
12   titled "Talc and Ovarian Cancer" by
13   Steven Narod, the date of this study is
14   2016.
15         Have you read this paper
16   before?
17       A.   I've seen it before, yes.
18       Q.   And when did you see it?
19       A.   When it came out.
20       Q.   Okay.  Did you review it as
21   a reviewer for --
22       A.   No.
23       Q.   Thank you.  Let me -- let me
24   get that clear.

Page 181

1          Did you review this paper
2    prior to its publication attendant to
3    your reviewer role from time to time with
4    Gynecologic Oncology?
5        A.   I did not review this paper
6    before publication.
7        Q.   Okay.  Let's look at some of
8    the statements that are therein.
9          If you look at, Doctor, the
10   bottom of Page 2.  The very last sentence
11   at the bottom of Page 2.
12         And, Doctor, it reads:  "In
13   any case, given the number of hazard
14   ratios reported in the literature" --
15       A.   I'm -- I'm sorry, I'm
16   looking for you.  Bottom of 2.
17       Q.   Doctor, you can look up here
18   at the Elmo.
19       A.   Yes.
20       Q.   And see where I am.  I'm at
21   the bottom of 2, Page 2.  Left-hand
22   column.
23       A.   Okay.  Left-hand column.
24   That helps.  Okay.

46 (Pages 178 to 181)

Kevin Holcomb, M.D.

Page 182

1    Q.   And -- and it says, "This
2  article about talc and ovarian cancer
3  indicates in any case given the number of
4  hazard ratios reported in the literature
5  between 1.1 and 1.4 in both case-control
6  and cohort studies, it would be
7  disingenuous to state that there is no
8  evidence that talc is associated with
9  ovarian cancer."
10       Did I read that correctly?
11   A.   Yes, you read it correctly.
12   Q.   Yes or no, do you agree with
13  that statement?
14   A.   It's actually a question you
15  already asked me and I agreed.
16   Q.   Let's look at some of the
17  other statements in this paper and see if
18  you agree with them.
19       If you go over to the first
20  page, Doctor, right-hand column.
21       As to the issue of
22  consistency, it indicates, "The
23  case-control studies to date are
24  consistent.  Given the small effect size

Page 183

1  it is not surprising that some are
2  positive, i.e., show a consistent" --
3  "show a significant increase in risk and
4  some are negative, i.e., show a
5  nonconsistent increased risk."
6       MS. CURRY:  You keep saying
7  consistent, but the word is
8  significant.
9       MS. GARBER:  Significant.
10  BY MS. GARBER:
11   Q.   Let me start again.
12       "The case-control studies to
13  date are consistent.  Given the small
14  effect size it is not surprising that
15  some are positive, i.e., show a
16  significant increased risk and some are
17  negative, i.e., show a nonsignificant
18  increase in risk or no risk difference."
19       Did I read that correctly?
20   A.   Yes.
21   Q.   Do you disagree with that?
22   A.   It's interesting.  He says
23  the case-control studies are consistent,
24  and then goes on to describe

Page 184

1  inconsistency.  Some are positive and
2  some are negative.
3       So you read it correctly.  I
4  think it's a contradictory statement.
5  He's saying they are consistent, and then
6  says some are positive, some are
7  negative.  That's not my definition of
8  consistency.
9    Q.   Doctor, this study author
10  is -- in a peer-reviewed paper said that
11  the data are consistent.  Do you agree
12  with that?
13   A.   And then himself says some
14  are positive and some are negative.  And
15  I'm asking, my definition of consistency
16  means that they say the same thing.
17   Q.   I didn't ask you for what --
18  why.  I said did this study author in a
19  peer-reviewed journal call the data
20  consistent, yes or no?
21   A.   Yes.  Yes.
22   Q.   Thank you.  You didn't
23  present that in your expert report that
24  there are peer-reviewed published authors

Page 185

1  who say the data are consistent, did you?
2       MS. CURRY:  Object to the
3  form.
4       THE WITNESS:  I would like
5  to say that this is a -- this --
6  there's a difference between a
7  paper and a news -- a story in a
8  newspaper that a reporter wrote
9  and an op Ed.
10       This is the medical version
11  of an op Ed.  I'm not going to be
12  citing op Eds.  I'm going to be
13  citing the literature that's based
14  on.
15       And -- and you find the
16  difficulty with what Dr. Narod is
17  saying here in his own statement.
18  It's contradictory.  He could --
19  it would have made more sense if
20  he said I can explain away the
21  inconsistency.  Because the effect
22  size is low you can expect to see
23  inconsistent data.  But you can't
24  say it's consistent, some are

47 (Pages 182 to 185)

Kevin Holcomb, M.D.

Page 186

1     positive, some are negative.
2     BY MS. GARBER:
3         Q.   Doctor, let's -- let's turn
4     to Table 1 of your expert report.  And
5     I'll mark that as Exhibit 9.
6         (Document marked for
7         identification as Exhibit
8         Holcomb-9.)
9     BY MS. GARBER:
10        Q.   And this appears in your
11    expert report, correct?
12        A.   Correct.
13        Q.   And it is separated by --
14    I -- I've produced a color copy, right?
15        A.   Yes.
16        Q.   Yeah.  And it is -- there
17    appears to be shaded studies that appear
18    to be in a -- in a blue color; is that
19    right?
20        A.   Correct.
21        Q.   And then those that are not
22    shaded, right?
23        A.   That's correct.
24        Q.   And then you have shaded

Page 187

1     the -- some of the studies in blue and
2     why are those studies shaded in blue?
3         A.   They are shaded in blue,
4     because they have 95 -- 95 percent
5     confidence intervals that cross one.  And
6     that is not a statistically significant
7     finding whether it's showing an increase
8     or a decrease.
9         Q.   Did you create this table?
10        A.   Yes, I did.
11        Q.   On your computer?
12        A.   Yes.
13        Q.   And you put all the data
14    into this table and -- and color-coded
15    it?
16        A.   Yes.
17        Q.   In your expert report at
18    Page 10, you indicate that the -- with
19    regard to the case-control studies, the
20    risk estimates range between 1.2 and 1.6,
21    suggesting a 20 to 60 percent increased
22    risk; is that right?
23        A.   Yes.
24        Q.   And so, you believe that the

Page 188

1     case-control data are unreliable because
2     they are inconsistent based on some
3     studies lack statistical significance?
4         MS. CURRY:  Object to the
5         form.
6     BY MS. GARBER:
7         Q.   Is that your opinion?
8         A.   I'm -- no.  Please repeat
9     that again.
10        Q.   Sure.
11             Is it your opinion that the
12    case-control data are unreliable because
13    they are inconsistent based on some
14    studies lack statistical significance?
15        A.   No.  It's my opinion that
16    it's not reliable because those studies
17    that lack statistical significance are
18    actually showing no increased risk, no --
19    no -- we -- we use statistical
20    significance to say that that increased
21    risk was more than just by chance.  So
22    the lack of statistical significance is
23    what leads to the inconsistency.
24        Q.   Okay.  So you believe that

Page 189

1     the case-control studies are inconsistent
2     because some of the studies don't show
3     statistical significance because the
4     confidence interval crosses one; is that
5     fair?
6         A.   In the materials and
7     methods, like you asked me to have a
8     methods section, they will say before
9     they look at the data, and this is what
10    you do, so you're not biased, you say
11    we're going to consider this significant
12    at this level.  We're going to consider
13    this a positive study at this level, and
14    then you go and you do your analysis.
15    And when it doesn't reach that level,
16    whether it's above or below, you don't
17    come out of that study saying there's
18    a -- there's a significant risk of
19    ovarian cancer associated with talc.
20             So everything that's shaded
21    in blue, those things are negative
22    studies.
23        Q.   Doctor, do you remember my
24    question?

48 (Pages 186 to 189)

Kevin Holcomb, M.D.

Page 190

1      A.   I felt the need to clarify
2   why I think this is inconsistent.  It's
3   not just -- it's because yes, they
4   don't -- they -- they --
5      Q.   Doctor, excuse me.
6      A.   Yes.
7      Q.   I'm going to interrupt you
8   there, because --
9           MS. SHARKO:  You can't do
10  that.
11  BY MS. GARBER:
12     Q.   I -- you -- you understood
13  my question, yet you felt the need to
14  clarify.
15          That isn't what I've asked
16  you to do.  I've asked you a very simple
17  question:  What's the nature of this
18  Table 1, and then you launched into what
19  the study authors do.
20     A.   I -- I think I might be
21  mistaken about the purpose of this --
22          MS. CURRY:  Ms. Garber --
23  hold on.  Can I just state an
24  objection on the record, please?

Page 191

1           THE WITNESS:  Okay.
2           MS. SHARKO:  The question,
3       if he can't answer it without
4       clarifying, then he's entitled to
5       clarify the question.
6           And the question was broader
7       than what you just stated.  It
8       was, because it asked specifically
9       whether or not the case-control
10      studies are inconsistent because
11      it doesn't show statistical
12      significance.
13  BY MS. GARBER:
14     Q.   Doctor, is it your opinion
15  that the studies that do not show
16  statistical significance are unreliable
17  and attributable to chance?
18     A.   Yes.
19     Q.   And is it your opinion that
20  the case-control studies that do not
21  show -- strike that.
22          Is it your opinion that the
23  studies do not -- that do not show
24  statistical significance are unreliable

Page 192

1   because they're inconsistent with those
2   that do show statistical significance?
3           MS. CURRY:  Object to the
4       form.
5           THE WITNESS:  Because they
6       are inconsistent with -- no.
7   BY MS. GARBER:
8      Q.   Okay.  Doctor, if we look at
9   Table 1, with the exception of, I think,
10  two studies, every one of those relative
11  risks are all to the right of one, are
12  they not?
13     A.   Yes.
14     Q.   And you have odds ratio,
15  relative risk.  Which is it for the
16  case-control studies?
17          MS. CURRY:  Object to the
18      form.
19  BY MS. GARBER:
20     Q.   Which would be proper?
21     A.   An odds ratio.
22     Q.   Okay.  And so --
23     A.   I'm sorry.  Hold on.  I'm
24  sorry.  One second.  I'm sorry.  It's the

Page 193

1   other way around.  Case-control would be
2   relative risk.
3      Q.   Are you sure?
4      A.   Yeah.
5      Q.   And all of those studies are
6   to the right of one except two, right?
7      A.   Right.
8      Q.   And so all of those are
9   positive because they're to the right of
10  one, correct?
11     A.   No, that's --
12          MS. CURRY:  Object to the
13      form.
14          THE WITNESS:  That's a
15  misunderstanding of statistics.
16  They are not positive because
17  they're to the right of one.  It's
18  defined in the study what they
19  were going to consider a positive
20  study.  It had to be above one and
21  have a 95 percent chance that the
22  true risk estimate was within the
23  range of the 95 percent confidence
24  interval.  So once it drops below

49 (Pages 190 to 193)

Kevin Holcomb, M.D.

Page 194

1    one, you're saying the author
2    themselves, by doing the
3    statistics, by putting that in the
4    materials and methods, they're
5    saying I don't consider this a
6    positive study unless I achieve a
7    positive direction above one and
8    the 95 percent confidence interval
9    does not cross one, otherwise why
10   bother doing that?
11   BY MS. GARBER:
12       Q.   Can you give me any article,
13   treatise, authority, that supports that
14   claim that for a study to be positive, it
15   needs to be greater than one and reach
16   statistical significance?
17       A.   Any treatise?
18       Q.   Any -- any authority to
19   support that claim?
20       A.   Again, I think for each
21   individual paper, I could go through the
22   materials and methods, and the author who
23   wrote that paper will describe, before
24   they started collecting data, their

Page 195

1    methodology.  And what they were going to
2    consider significant.
3        Q.   Do you understand that to be
4    authority?
5            MS. CURRY:  Object to the
6        form.
7            THE WITNESS:  I'm saying for
8        each individual person that's
9        doing the study, that is their
10       definition of what they considered
11       a positive study.
12   BY MS. GARBER:
13       Q.   I understand that.  I'm
14   asking you for an authoritative paper
15   that indicates your definition of a
16   positive study meaning greater than one
17   that reached statistical significance
18   constitutes a positive study.  Can you
19   please give me an authority for that
20   statement?
21       A.   I'm sure if you gave me the
22   time I could find it.  But I don't have
23   one that I can quote you now.
24       Q.   You can't come up with one

Page 196

1    off the top of your head?
2        A.   No.  It's such -- you're
3    asking something that is so widely
4    accepted, that it would be like finding
5    an authority that says water is H2O.  I
6    mean, it's -- I could find a nice review
7    article that explains, and this all comes
8    down to the quality of the study, and in
9    the study design how much risk is there
10   for a spurious value, for a confounder or
11   for a recall bias to play a role.
12           And that's why you have -- I
13   think of 95 confidence intervals as your
14   bumpers, your safety bumpers that keep
15   you from making a mistake.
16       Q.   Is the point estimate the
17   best estimate of risk?
18           MS. CURRY:  Object to the
19       form.
20           THE WITNESS:  The point
21       estimate has to be taken into
22       account with the 95 percent
23       confidence intervals.
24   BY MS. GARBER:

Page 197

1        Q.   That wasn't my question.  Is
2    the point estimate the best estimate of
3    risk?
4            MS. CURRY:  Object to the
5        form.
6            THE WITNESS:  I don't
7        understand your question.  As
8        opposed to what?
9    BY MS. GARBER:
10       Q.   In looking at the data, in
11   looking --
12       A.   As opposed to what though?
13   All you get is the point estimate and the
14   95 percent confidence interval.  So
15   you're saying it's better than what?
16       Q.   You've never seen that
17   statement that the point estimate is the
18   best estimate of risk?
19       A.   Have you heard the term
20   "compared to what"?
21       Q.   Okay.  Doctor, what is your
22   definition of a negative study?
23       A.   A negative study is a study
24   that doesn't reach your predefined

Kevin Holcomb, M.D.

Page 198

1    definition of a positive study.  Anything
2    that doesn't reach your definition of a
3    positive study -- there's no in between.
4    It's either positive or negative.
5         Q.   So your definition of
6    negative is a study which can be to the
7    right of one or greater than one, but
8    doesn't reach statistical significance?
9    That's how --
10        A.   Say this once again.
11        Q.   That's how you define a
12   negative study?
13             MS. CURRY:  Object to the
14   form.
15             THE WITNESS:  I do.  And the
16   reason being is because when you
17   think about the problems with
18   case-control studies, and it's
19   every -- all the experts on both
20   sides talk about this risk of
21   recall bias.  Recall bias never
22   sends your numbers below zero.
23   BY MS. GARBER:
24        Q.   Doctor, did I ask you about

Page 199

1    recall bias?
2         A.   And I'm explaining why I
3    have this opinion.
4         Q.   I didn't ask you why you
5    have your opinion.
6         A.   Then I'll withdraw my
7    statement.
8         Q.   Your lawyer will be able to
9    ask you questions.  Thank you, Doctor.
10        Doctor, have you cited any
11   authority to support your claims that
12   studies that don't show statistical
13   significance are attributable to chance
14   and bias?
15        A.   No.  That's not -- that's
16   not my claim, first of all.
17        Q.   Okay.  Doctor, do you know
18   who Sander Greenland is?
19        A.   No.
20        Q.   Do you know who Kenneth
21   Rothman is?
22        A.   No.
23             (Document marked for
24   identification as Exhibit

Page 200

1         Holcomb-10.)
2    BY MS. GARBER:
3         Q.   I'm going to mark as
4    Exhibit 10 a paper that was just
5    published.  Doctor, in just looking at
6    this paper -- this paper was just
7    published on March 21st, here at the
8    bottom.  March 21, 2019, in Nature.
9         Do you -- do you know that
10   journal?
11        A.   Yes.
12        Q.   And what's your opinion of
13   that journal?
14        A.   Nature?
15        Q.   Mm-hmm.
16        A.   It's a highly respected
17   journal.
18        Q.   Thank you.
19        And do you see that the
20   title of this article is "Retire
21   Statistical Significance"?
22        A.   Yes.  And this is a comment
23   in the highly respected journal.  Again,
24   this is an op Ed piece, not -- this is

Page 201

1    not a study.
2         Q.   Doctor, do you see who the
3    study authors are?
4         A.   Yes.
5         Q.   And do you see that Sander
6    Greenland is one of the study authors?
7         A.   Yes.
8         Q.   And do you see that it goes
9    on to say, "And more than 800 signatories
10   call for an end to the hyped claim and
11   dismissal of possibly crucial effects."
12        Do you see that?  That's
13   the --
14        A.   Yes, I do see that.
15        Q.   All right.  And let's look
16   at this paper, if we could, together.
17        It begins by stating, "When
18   was the last time you heard a seminar
19   speaker claim that there was no
20   difference between two groups because the
21   difference was statistically
22   nonsignificant?"
23        Did I read that correctly?
24        A.   You read that correctly.

Kevin Holcomb, M.D.

Page 202

1      Q.   So this is a paper, just
2   from the introduction at least, looking
3   like it's going to talk about statistical
4   versus non-statistical data using the
5   95 percent confidence interval, right?
6      A.   Right.
7          MS. CURRY:  Object to the
8      form.
9   BY MS. GARBER:
10     Q.   Is that fair?
11         And then if you go to the
12  section which indicates the pervasive
13  problem.  It says, "Let's be clear about
14  what must stop.  We should never conclude
15  that there is no difference or no
16  association just because a P-value is
17  larger than a threshold such as 2
18  point" -- "such as 0.05."
19         And then we turn to the next
20  page, "or equivocally because a
21  confidence interval includes zero."
22         MS. CURRY:  Take the time to
23     look it through.
24  BY MS. GARBER:

Page 203

1      Q.   "Neither should we include
2   that two studies conflict because one has
3   a statistically significant result and
4   the other did not.  These errors waste
5   research efforts and misinform policy
6   decisions."
7          Did I read that correctly,
8   Doctor?
9      A.   Yes, you read that
10  correctly.
11     Q.   That's the opinion of these
12  authors and 800 signatories, correct?
13         MS. CURRY:  Object to the
14     form.
15         THE WITNESS:  I haven't read
16     the full paper, but that's what
17     the title says, yes.
18  BY MS. GARBER:
19     Q.   All right.  Let's go on to
20  read further down where it indicates, "It
21  is ludicrous to conclude that the
22  statistically nonsignificant results
23  showed no association when the interval
24  estimate included serious risk increases.

Page 204

1   It is equally absurd to claim that these
2   results were in contrast with earlier
3   results showing an identical observed
4   result, yet these common practices show
5   how reliance on thresholds of statistical
6   significance can" -- "can mislead us (See
7   'Beware false conclusions')."
8          Did I read that correctly?
9      A.   You did.
10     Q.   And -- and that's, in fact,
11  what you've done in Table 1, haven't you?
12         MS. CURRY:  Object to the
13     form.
14  BY MS. GARBER:
15     Q.   You've tried to separate
16  them by statistically significant and
17  nonstatistically significant, correct?
18     A.   As -- as much -- I did
19  divide them by significance and
20  nonsignificance.
21         Based on these doctors --
22  I'm not familiar with them.  But they are
23  clearly worried about missing significant
24  effects that are small, and I'm not

Page 205

1   saying I'm not interested in small effect
2   sizes.  But I'm saying that because of
3   the risk of -- of confounders and other
4   biases, that you need to find -- if
5   you're going to have a small effect size,
6   you're going to need to find consistency
7   along -- the -- the onus is going to be
8   even stronger to prove that you're not
9   making a spurious conclusion.  Because I
10  would imagine, being Nature contributors,
11  these are likely basic science
12  researchers.  And I can show you example
13  after example in clinical medicine where
14  nonsignificant findings led to wrong
15  results.  Whether -- and I give some
16  examples in my report with, you know,
17  what causes cervix cancer, the effect of
18  estrogen replacement therapy.  These
19  things that we did not use the safety
20  bumpers of 95 percent confidence
21  intervals.  It just -- it doesn't mean
22  that the studies should stop.  It just
23  means -- and that you have a definitive
24  answer.  It means that that should raise

Kevin Holcomb, M.D.

Page 206

1   questions for you and that should make
2   you think that there may be something
3   else going on.
4         MS. GARBER:  Objection.
5         Motion to strike as nonresponsive.
6   BY MS. GARBER:
7         Q.   Doctor, what we're talking
8   about here is ovarian cancer, correct?
9         A.   Correct.
10        Q.   We're talking about a risk
11  of a deadly disease, correct?
12        A.   I treat ovarian cancer,
13  ma'am.  We don't have to go through the
14  fact it's deadly.
15        Q.   Right.  And -- and so here
16  there is a body of literature over
17  40 years that's looked at the topic,
18  right?
19        A.   Right.
20        Q.   And that body of literature
21  has consistent odds ratios throughout
22  case-control, cohort and -- and
23  meta-analyses?
24        A.   Cohort, no --

Page 207

1         MS. CURRY:  Object to the
2   form.
3         THE WITNESS:  I disagree
4   with that.
5   BY MS. GARBER:
6         Q.   You do?
7         A.   Yeah.
8         Q.   Okay.  The cohort studies
9   are showing, aside from the Gonzalez
10  study, they are all showing numbers that
11  are to the right of one, aren't they?
12        MS. CURRY:  Object to the
13  form.
14  BY MS. GARBER:
15        Q.   For every use?
16        A.   For example, Gates is 1.06.
17        Q.   Mm-hmm.  That's to the right
18  of one, isn't it?
19        A.   Yes, ma'am.  Just right to
20  the right of one.
21        Q.   Okay.  Let's -- let's carry
22  on with this paper.
23        MS. SHARKO:  Why doesn't --
24  why doesn't Dr. Greenland disclose

Page 208

1   that he is a plaintiffs' expert
2   here?  I'm just curious.
3         MS. GARBER:  Let's -- let's
4   go on.
5   BY MS. GARBER:
6         Q.   Doctor --
7         MS. O'DELL:  Susan, that's
8   totally inappropriate.  Stop
9   coaching the witness.
10        MS. SHARKO:  I'm not.  I'm
11  not coaching him.  I'm asking you.
12        MS. O'DELL:  He's not my
13  expert.  I don't know what you're
14  talking about.
15        MS. SHARKO:  You identified
16  him as an plaintiffs' expert.
17        MS. O'DELL:  I did not.
18        MS. SHARKO:  Yeah, you did.
19  Look at your disclosures.
20        All right.  We'll send --
21  we'll send you a letter on this,
22  because I'm concerned about that.
23        MS. GARBER:  So I -- I would
24  just like to say I would

Page 209

1   appreciate it, Ms. Sharko, if you
2   could stop coaching.  I understand
3   your need to, you know, speak up,
4   but Ms. Curry is completely
5   capable of defending the doctor.
6   And your coaching only frustrates
7   the process.
8         And -- and I will go to the
9   Court if we need to, because it's
10  not fair.  And you know it.
11        MS. SHARKO:  Right.  There's
12  no coaching.  I asked you --
13        MS. GARBER:  There is
14  coaching, Ms. Sharko.  You -- you
15  have just coached him about
16  Dr. Greenland, so --
17        MS. SHARKO:  You are
18  interrupting me.  You are
19  interrupting me.
20        MS. GARBER:  Because, you
21  know what, we're on the record.
22  So we'll have this topic off the
23  record later if we like.
24        MS. SHARKO:  Are you going

53 (Pages 206 to 209)

Kevin Holcomb, M.D.

Page 210

1    to interrupt me off the record?
2         There's no question pending.
3    It's a question for the plaintiffs
4    and we'll pursue it.  We'll pursue
5    it off the record.
6    BY MS. GARBER:
7         Q.   Doctor, could you look at
8    the bottom of this document.  And it
9    indicates: "Beware of false conclusions.
10   Studies currently dubbed statistically
11   significant and statistically
12   nonsignificant need not be contradictory,
13   and as such, designations might cause
14   genuine effects to be dismissed."
15        Do you see that?
16        A.   Yes.
17        Q.   The study authors are very
18   concerned about risk of disease being
19   dismissed because a body of literature
20   shows statistical significance and
21   another one showing near statistical
22   significance, but experts like you,
23   dismissing that risk, they are concerned
24   about that, aren't they?

Page 211

1         A.   Because I'm -- I'm
2    concerned --
3              MR. MIZGALA:  Object to the
4    form.
5              MS. CURRY:  Object to the
6    form.
7              THE WITNESS:  What I'm
8    concerned about is if you have a
9    group of studies that are all the
10   same design that are subject --
11   BY MS. GARBER:
12        Q.   Doctor, I didn't ask you
13   that.  I asked you yes or no, is that the
14   author's conclusions in your opinion?
15             MR. MIZGALA:  Object to the
16   form.
17             THE WITNESS:  The author is
18   not here speaking in front of the
19   camera.  I'm here because you
20   asked me my opinions.  And if you
21   want me to just read their
22   opinions, you don't need me here.
23   BY MS. GARBER:
24        Q.   I don't want that.  I --

Page 212

1         A.   So I'm here to give you my
2    opinions --
3         Q.   I don't --
4         A.   -- but you're not -- you're
5    not really interested in my opinions --
6         Q.   What I --
7         A.   -- because every time I try
8    to offer it to you, you cut me off and
9    you want me to tell you, are you reading
10   his opinions correctly.
11        Q.   No, Doctor, I'm asking for
12   yours.
13        A.   I believe you can read it.
14        Q.   Do you agree with that?
15   That was my question.  Do you agree with
16   these study authors?
17        A.   Can you repeat the
18   statement?
19        Q.   Okay.  Do you agree with
20   these -- strike that.
21             These study authors are
22   concerned about dismissing genuine
23   effects.
24        A.   Do I agree that they're

Page 213

1    concerned?
2         Q.   Yes.
3              MR. MIZGALA:  Object to the
4    form.
5              MS. CURRY:  Object to the
6    form.
7              THE WITNESS:  They're
8    obviously concerned.  They wrote
9    the paper.
10   BY MS. GARBER:
11        Q.   Okay.  That was my first
12   question --
13        A.   Right.
14        Q.   -- you didn't answer.  Now
15   my second question is --
16             MS. SHARKO:  Objection.
17             MS. GARBER:  Strike my
18   second question.  Let's move on.
19             MS. SHARKO:  Thank you.
20             MS. GARBER:  You know what?
21   I just -- I don't think I've ever
22   had another lawyer treat me as
23   disrespectfully as you,
24   Ms. Sharko.  I just can't believe

54 (Pages 210 to 213)

Kevin Holcomb, M.D.

Page 214

1   it. Okay.
2       MS. SHARKO: I have great
3   respect for you, Ms. Garber. It's
4   not my intention to make you feel
5   disrespected.
6       MS. GARBER: When you laugh
7   and you make snide comments, it's
8   hard to see that you have great
9   respect for me.
10      MS. SHARKO: I haven't
11  laughed or made snide comments,
12  but let's move on.
13  BY MS. GARBER:
14      Q.   Okay. If we move on to the
15  middle of the column. The authors say,
16  "We agree on the call for the entire
17  concept of statistical significance to be
18  abandoned. We are far from alone." And
19  it goes onto describe, 250 people signed
20  on in the first 24 hours and another 800
21  experts.
22          Do you see that?
23      A.   Yes.
24      Q.   And so it's not just these

Page 215

1   study authors. It's -- it's other
2   experts in the field, right?
3       MS. CURRY: Object to the
4   form.
5   BY MS. GARBER:
6       Q.   Do you understand that from
7   reading this or do you need to read the
8   whole paper?
9       MS. CURRY: Object to the
10  form.
11      THE WITNESS: I agree that
12  you read the segment correctly.
13  BY MS. GARBER:
14      Q.   Okay. And then, Doctor,
15  finally, under -- at the right-hand side
16  under the heading "Quit Categorizing,"
17  the authors write, "The trouble is human
18  and cognitive more than statistical.
19  Bucketing results into statistical
20  significance and statistical
21  non-significance makes people think that
22  the items assigned in the way" -- "in
23  that way are categorically different."
24          Do you see that?

Page 216

1       A.   I do.
2       Q.   And you're drawing
3   categorical differences in the data
4   between statistically significant and
5   non-statistically significant, correct?
6       MS. CURRY: Object to the
7   form.
8       THE WITNESS: Will I be able
9   to explain for my reasons doing
10  so? Or are just going to see if I
11  agree with everything that they
12  say?
13  BY MS. GARBER:
14      Q.   You know what? Your lawyer
15  can ask you questions --
16      A.   Okay.
17      Q.   -- that you want asked of
18  you --
19      A.   Okay.
20      Q.   -- Doctor. But this is my
21  opportunity to ask you questions that I
22  want to ask you.
23      A.   Sure.
24      Q.   And finally, turning over to

Page 217

1   the next page. The -- under the heading
2   of "Wrong Interpretations," it reads, "An
3   analysis of 791 articles across five
4   journals found that around half
5   mistakenly assume non-significance means
6   no effect."
7           Did I read that correctly?
8       A.   Yes.
9       Q.   And so, finally, turning
10  over to page -- to the right-hand column,
11  the authors conclude, "But eradicating
12  categorization will help to halt
13  overconfident claims, unwarranted
14  declarations of no difference, and absurd
15  statements about replication failure when
16  the results from the original and
17  replication studies are highly
18  compatible.
19          "The misuse of statistical
20  significance has done much harm to the
21  science community and those who rely on
22  scientific evidence. P-values, intervals
23  and other statistical measures all have
24  their place, but it's time for

55 (Pages 214 to 217)

Kevin Holcomb, M.D.

Page 218

1    statistical significance to go."
2         And I assume that you
3    disagree with these 800-some authors?
4         MS. CURRY:  Object to the
5    form.
6         THE WITNESS:  If you say
7    P-value has its place, what is its
8    place if not to determine
9    significance?  That's all a
10   P-values is.  So I would want to
11   know from the authors, if P-values
12   have their place and it's not in
13   determining significance, what
14   exactly is the place for a
15   P-value?  It's only used for one
16   thing, determining significance.
17   BY MS. GARBER:
18        Q.   What was my question,
19   Doctor?
20        A.   I'm sorry.
21        Q.   What was my question?
22        A.   I don't remember.
23        Q.   Okay.  My question was, I
24   assume you disagree with those authors;

Page 219

1    is that correct?
2         A.   Yes.
3         Q.   So in accord with the study
4    authors of the paper we just reviewed,
5    the case-control data as presented in
6    your Table 1 should not be deemed
7    different or inconsistent based on the
8    confidence interval under the authority
9    of the paper we just reviewed, correct?
10        MS. CURRY:  Object to the
11   form.
12        THE WITNESS:  Under my
13   authority, I would say they should
14   be considered different.
15   BY MS. GARBER:
16        Q.   Under the authority of the
17   paper that we just reviewed --
18        A.   Oh, these doctors want to
19   get rid of statistics altogether.  So we
20   wouldn't even -- yeah, they would say
21   don't bother doing them.
22        Q.   Where do you see that these
23   doctors want to get rid of statistics?
24        A.   Statistical significance,

Page 220

1    sorry.  They want to get rid of
2    statistical significance altogether.
3         Q.   You read Health Canada?
4         A.   Yes.
5         Q.   Let's look at what Health
6    Canada said about the consistency of the
7    study data.  Okay?
8         A.   Are you going to provide
9    something?
10        Q.   I'm going to mark the Health
11   Canada draft screening assessment dated
12   December 2010 as Exhibit 11.
13        A.   Thank you.
14        (Document marked for
15        identification as Exhibit
16        Holcomb-11.)
17   BY MS. GARBER:
18        Q.   There, Doctor, the study
19   authors indicated that, "The
20   meta-analyses of the available human
21   studies in the peer-reviewed literature
22   indicate a consistent and statistically
23   significant positive association between
24   perineal exposure to talc and ovarian

Page 221

1    cancer."
2         Do you agree with that, that
3    that's what the meta-analyses show?
4         A.   Yes.
5         Q.   You disagree?
6         MS. CURRY:  Object to the
7    form.
8    BY MS. GARBER:
9         Q.   You think --
10        A.   No.  They're talking about
11   the meta-analyses?
12        Q.   Yes.  Do you agree with
13   that?
14        A.   I believe they take a bunch
15   of studies, put them together.  Yes,
16   that's true.
17        Q.   So you believe that they are
18   consistent?
19        A.   The meta-analyses?
20        Q.   Yes.
21        MS. CURRY:  Object to the
22   form.
23        THE WITNESS:  The
24   meta-analyses -- if -- if I -- I

56 (Pages 218 to 221)

Kevin Holcomb, M.D.

Page 222

1    want to make sure it's okay for me
2    to expound on this.
3         The meta-analyses combine
4    both case-control and cohort
5    studies and come to the conclusion
6    that the case-control studies that
7    they are including, find a
8    difference, and usually typically
9    described as moderate -- a -- a
10   weak difference.  And cohort
11   studies which show no difference.
12   And they combine them together.
13        The few that have kept them
14   separate and look separately have
15   shown no difference in the cohort
16   studies they've put together and a
17   difference in the case-control
18   studies.
19   BY MS. GARBER:
20        Q.  Doctor, the authors here in
21   the Health Canada have concluded that the
22   meta-analyses are consistent.  Do you
23   agree with that?
24        A.  Yes.  That's what they are

Page 223

1    concluding.
2         Q.  Do you agree with the study
3    authors?
4              MS. CURRY:  Object to the
5         form.
6              THE WITNESS:  Again --
7    BY MS. GARBER:
8         Q.  Do you think they're -- do
9    you think they are consistent or
10   inconsistent?
11        A.  No.  Meta-analyses are
12   consistent.
13        Q.  Thank you.
14             You reviewed the Taher
15   paper?
16        A.  The what?
17        Q.  The Taher, T-A-H-E-R.
18        A.  Taher --
19        Q.  Yes.
20        A.  -- yes.  Mm-hmm.
21             MS. CURRY:  Ms. Garber,
22        whenever it's appropriate to take
23        a lunch break?
24             MS. GARBER:  Okay.  Let me

Page 224

1    just get into this.  I'm half into
2    it.
3         I'll mark the Taher 2018
4    meta-analyses as Exhibit 12.
5         (Document marked for
6    identification as Exhibit
7    Holcomb-12.)
8    BY MS. GARBER:
9         Q.  And turning -- as to the
10   topic of consistency, turning over to
11   Page 49, under the conclusion, it
12   reads --
13        A.  Page 49, I'm sorry.
14        Q.  -- "Consistent with previous
15   evaluations, the IARC in 2010 and
16   subsequent evaluations by individual
17   investigators, the present comprehensive
18   evaluation of all currently available
19   relevant data indicates that perineal
20   exposure to talcum powder is a possible
21   cause of ovarian cancer in humans."
22        First, did I read that
23   correctly?
24        A.  You did read it correctly.

Page 225

1         Q.  And this indicates that the
2    data are consistent --
3              MS. CURRY:  Object to the
4         form.
5    BY MS. GARBER:
6         Q.  -- correct?
7         A.  It's consistent with IARC,
8    yes.
9         Q.  Does it limit it to IARC,
10   that statement?
11        A.  IARC is basically using the
12   subsequent evaluations and so consistency
13   would not be surprising when you're
14   rechurning the same data over and over.
15        So when you say that the --
16   the individual investigators are
17   consistent with IARC, but IARC uses
18   individual investigators.  When you have
19   individual investigator's data then put
20   together into a pooled analysis, you
21   would expect consistency.  When you --
22   when you do meta-analysis that then take
23   those same individual studies and put all
24   the patients together, you would expect

57 (Pages 222 to 225)

Kevin Holcomb, M.D.

Page 226

1    consistency.
2           The consistency in that
3    sense, you know, really doesn't surprise
4    me.  If you take a bunch of studies that
5    have the same risk of bias -- and even if
6    the level of bias is the same, for
7    example, if you're doing a case-control
8    study in Boston, I wouldn't expect women
9    in Massachusetts to be more prone or less
10   prone to recall bias than a group of
11   women in California.
12          So I wouldn't be surprised
13   to see, especially since they are so
14   small, similar risk.  And that's why I
15   have a problem with the commenters in
16   Nature to say you don't need these, these
17   safe ways, because as long as they keep
18   going in the same direction, we should be
19   assuming it's real.
20          But what if all the studies
21   have the same problem, and that problem
22   takes your risk estimate in the same
23   direction?  And that's the problem I have
24   with just getting away with intervals,

Page 227

1    then, in any case.
2           So yes, IARC reviewed the
3    individual investigator's data and came
4    to this conclusion, and they are coming
5    to the same conclusion, largely looking
6    at the same data.
7           Taher's meta-analysis is
8    basically Berge's, it's basically
9    Penninkilampi.  There's no new data in
10   there.  It's rechurning the same data.
11          So to say that this is
12   consistent with this and this is
13   consistent with this, and you're all
14   looking at the same studies, to do the
15   same thing over and over and expect a
16   different outcome is insanity.
17          Q.   Are you done?
18          A.   Yes.
19          Q.   What was my question?
20          A.   Did I agree with this?
21          Q.   Okay.  That wasn't my
22   question.
23          The subsequent evaluations
24   by individual investigators, are -- are

Page 228

1    those contained within IARC's or are
2    those new studies?
3           A.   Well, interesting, IARC came
4    to the conclusion that it's a possible
5    carcinogen --
6           Q.   Doctor, what was my
7    question?
8           A.   I'm going to answer.  And
9    this time, you asked me a question, I'm
10   going to give you an answer.  And --
11          Q.   Are you going to give me an
12   answer that's --
13          A.   I'm going to give you a very
14   direct answer to the question you
15   asked --
16          Q.   That would be great.
17          A.    -- and if you would give me
18   a chance, you would have found out that
19   it would have been that case.
20          So IARC 2010 looks at talc.
21   They have one prospective trial included
22   in that.
23          In the coming years, you
24   asked, are there subsequent data that was

Page 229

1    added to it.  Well, IARC comes to this
2    conclusion, in the subsequent years
3    there's three more prospective studies
4    that are not included in IARC that come
5    to the conclusion that there is no
6    association.
7           And there are a number of
8    pooled analysis, and -- and meta-analysis
9    that keeps rechurning the same old data
10   that's in IARC.
11          So there's a number of
12   studies that have come out since IARC.  I
13   would say the balance of which have been
14   stronger design studies that have shown
15   no increased risk.  And I'll be curious
16   to see what IARC thinks the next time
17   they sit down and pool all this together.
18          Q.   Doctor, Endnote 3 and 5 and
19   69 do not cite to IARC.  Are you aware of
20   that?
21          A.   3, 5 and 69 in IARC?
22          Q.   Yeah.  I'll represent to you
23   they're Berge, Penninkilampi and --
24          A.   Right, so what are Berge and

58 (Pages 226 to 229)

Kevin Holcomb, M.D.

Page 230

1  Penninkilampi, what are the studies in
2  those?
3      Q.    Those are just rechurning in
4  your opinion.  Those are just --
5      A.    I'm saying --
6      Q.    -- those studies are
7  invaluable because they are just
8  rechurning the prior meta-analyses.
9      Is that your opinion?
10     MS. CURRY:  Object to the
11 form.
12     THE WITNESS:  I'm saying
13 that there's very little
14 difference between Taher's
15 meta-analysis and Penninkilampi's
16 meta-analysis, and Berge's
17 meta-analysis.
18     The overlap in those studies
19 is great.  There's very -- that's
20 not much difference between those.
21 They have very similar number of
22 studies.  And so yes, it is a
23 rechurning of the same data.
24 BY MS. GARBER:

Page 231

1      Q.    That doesn't provide you
2  with support that those data are robust?
3      A.    If you --
4      MS. CURRY:  Object to the
5  form.
6      THE WITNESS:  No.  If you --
7  if you --
8  BY MS. GARBER:
9      Q.    Different authors doing --
10 picking basically different studies --
11     A.    Different studies?  That's
12 what I'm saying, they are not different
13 studies.
14     Q.    Okay.
15     A.    They're talking the same
16 studies.
17     Q.    I'm talking about the body
18 of meta-analyses.
19     A.    I'm telling you that
20 Penninkilampi, and Berge, and Taher, if
21 you look at the overlap in the studies
22 that they are putting together, if you
23 look at my case-control list, and it may
24 look like there's so many studies, but in

Page 232

1  fact, you'll see that Purdie and Green,
2  same dataset.  You'll see that Wu 2015
3  includes Wu 2009.  You'll see that Cramer
4  2016 includes Cramer 2009.
5      So is it surprising that
6  2009 Cramer and 2015 Cramer looks the
7  same when the -- half of 2016 is 2009?
8      Q.    Shall we throw out --
9      A.    It is rechurning --
10     Q.    Shall we throw out the
11 meta-analysis because they are
12 rechurning?
13     A.    I'm saying all -- no.  I'm
14 saying that meta --
15     MS. CURRY:  Object to the
16 form.
17     We have to do this in -- in
18 question and answer or you're
19 going to drive the court reporter
20 crazy.
21     THE WITNESS:  I apologize.
22     MS. CURRY:  Let her get her
23 full question out, give me a
24 second if I need to make an

Page 233

1      objection, and then please let him
2      finish his answer.
3  BY MS. GARBER:
4      Q.    Doctor, should we throw out
5  the meta-analyses because the subsequent
6  meta-analyses are just rechurning of
7  prior meta-analyses?
8      A.    No, what I'm saying is don't
9  say Penninkilampi, Berge, and the --
10 don't count three -- in the same way that
11 in my list of case-control studies, you
12 shouldn't consider Purdie and Green
13 different studies.  Even though I have a
14 list there just to show that I was being
15 comprehensive.  It's the same dataset.
16     So my point is, if you're
17 look -- if there's a lot of overlap, you
18 shouldn't then look and say, well, this
19 is consistent, because what Bradford Hill
20 meant by consistency was different
21 populations in different places at
22 different times.  That's not the spirit
23 of taking the same patients from the same
24 times in the same places and looking at

59 (Pages 230 to 233)

Kevin Holcomb, M.D.

Page 234

1    them over and over again.
2        Q.   There's not 100 percent
3    overlap in any of the studies, is there?
4        A.   Not 100 percent.  But the
5    majority of them.  The majority of Berge
6    is in Taher, and the majority of
7    Penninkilampi is in Taher.
8             You do the math and tell me
9    what percentage is not there.  It's the
10   same.  It's -- the majority, it's the
11   same studies.
12       Q.   In the case-control studies
13   is the majority -- are the majority of
14   those studies overlap of the prior
15   studies?
16            MS. CURRY:  Object to the
17   form.
18            THE WITNESS:  I don't
19   understand what you mean.
20   BY MS. GARBER:
21       Q.   Well, you seem to take issue
22   with -- that there's overlap?  So
23   let's --
24       A.   There's some.

Page 235

1        Q.   Let's talk about the
2    case-control studies.
3        A.   Sure.
4        Q.   Do the body of case-control
5    studies provide 100 percent overlap of
6    data?
7             MS. CURRY:  Object to the
8    form.
9             THE WITNESS:  No.
10   BY MS. GARBER:
11       Q.   And what's the percentage of
12   overlap in your opinion?
13            MS. CURRY:  Object to the
14   form.
15            THE WITNESS:  I just
16   mentioned the studies on my list
17   that were overlap.
18   BY MS. GARBER:
19       Q.   Okay.  And it's limited to
20   those studies, correct?
21       A.   And you have -- irrespective
22   of what the doctors say about throwing
23   away confidence intervals, which is not
24   the majority of people in medicine, I

Page 236

1    will say that, yes, when you don't have
2    overlap you get a 50/50.  You get a 50/50
3    significance, 50/50 non-significance.
4             If you keep churning the
5    same data over, you would be surprised to
6    see it drop out of significance.  And in
7    fact, when you look at Berge, which is
8    really the only meta-analysis I -- I
9    wouldn't say it's the only meta-analysis
10   that I respect.
11            But one of the rules of
12   meta-analysis is that you have to do a
13   test for heterogeneity before you just
14   decide to throw these studies together
15   and it's valid to do so.
16            And I look at Penninkilampi.
17   And Penninkilampi says, well, I did a
18   study for heterogeneity.  And I looked
19   at, make sure they use condoms and
20   diaphragms and perineal dusting.  And
21   that's what he's looking for
22   heterogeneity.
23            But the biggest form of
24   heterogeneity, the one thing that they

Page 237

1    don't mention, is the first thing Berge
2    did.  What if you looked at the
3    case-control studies and the cohort
4    studies?  Should these things even be
5    mixed together.
6             And Berge says, they
7    shouldn't.  There's too much
8    heterogeneity.  But they go ahead and do
9    it anyway.
10       Q.   The Penninkilampi authors
11   looked at the issue of heterogeneity and
12   found --
13       A.   Through case-control -- I'm
14   sorry.
15            MS. CURRY:  You have to let
16   her finish her question.
17            THE WITNESS:  I'm sorry.
18   BY MS. GARBER:
19       Q.   The Penninkilampi authors
20   looked at the issue of heterogeneity and
21   concluded that there was not
22   heterogeneity with regard to talc
23   exposure, true?
24            MS. CURRY:  Object to the

60 (Pages 234 to 237)

Kevin Holcomb, M.D.

Page 238

1    form.
2          THE WITNESS:  Looking at a
3    very similar group of studies as
4    Berge, and somehow Berge came up
5    with heterogeneity and mentions
6    the heterogeneity between study
7    design, and Penninkilampi, if you
8    look at what they looked at as far
9    as heterogeneity, they never say
10   that they saw a lack of
11   heterogeneity between cohort
12   studies and case-control studies.
13         And how could you not find
14   heterogeneity when you have none
15   of the cohort studies showing a
16   significant impact?
17   BY MS. GARBER:
18         Q.   Are you an advocate for the
19   defense?
20         MS. CURRY:  Object to the
21   form.
22         THE WITNESS:  I'm an
23   advocate for the truth.  But I'm
24   the biggest advocate for my

Page 239

1    patients.  But that's a whole
2    other story.
3    BY MS. GARBER:
4          Q.   You are an advocate for your
5    patients?
6          A.   I am.
7          Q.   Do you advise them that it's
8    safe to put asbestos on their genitals?
9          A.   No, I don't.
10         MS. CURRY:  Is it a good
11   time -- good breaking point for
12   you?
13         MS. GARBER:  Sure.
14         THE VIDEOGRAPHER:  Off the
15   record, right?  The time is
16   1:07 p.m.  Off the record.
17         (Lunch break.)
18         THE VIDEOGRAPHER:  We are
19   back on the record.  The time is
20   2:04 p.m.
21   BY MS. GARBER:
22         Q.   Good afternoon, Doctor.  Did
23   you have a good lunch?
24         A.   Yes, I did.  Thank you.

Page 240

1          Q.   Very well.
2          In the case-control studies
3    that are here published in Table 1, do
4    those studies involve study participants
5    of different ethnicities?
6          A.   Yes.
7          Q.   And do those studies involve
8    case-control studies that have occurred
9    over decades, in other words from 1982 to
10   recently?
11         A.   Yes.
12         Q.   Okay.  And while some of
13   them are in the United States, some are
14   in foreign countries?
15         A.   Majority in the United
16   States.
17         Q.   But some are in foreign
18   countries?
19         A.   A few.
20         Q.   Yeah.  And --
21         MR. MIZGALA:  Could you
22   raise your voice just a little
23   bit?
24         MS. GARBER:  Yeah.

Page 241

1          MR. MIZGALA:  Thank you.
2    BY MS. GARBER:
3          Q.   And with regard to the
4    case-control cohorts and meta-analyses,
5    the published literature with regard to
6    talc and ovarian cancer contained
7    different study designs, can we agree
8    with that?
9          A.   Yes.
10         Q.   And even within the
11   case-control studies, those involve
12   different study designs generally?
13         MS. CURRY:  Object to the
14   form.
15         THE WITNESS:  No.  The
16   case-control is a study design.
17   BY MS. GARBER:
18         Q.   Okay.  I'll just strike
19   that.
20         All right.  Is it your
21   opinion that unless a given study is
22   statistically significant and with an
23   odds ratio greater or equal to 2.0, that
24   the findings are attributable to random

61 (Pages 238 to 241)

Kevin Holcomb, M.D.

Page 242

1    chance?
2         MS. CURRY:  Object to the
3    form.
4         THE WITNESS:  No.
5    BY MS. GARBER:
6    Q.   That's not your opinion?
7    A.   No.
8    Q.   Who is Melissa Frey?
9    A.   She is one of my partners at
10   Cornell.  She is a GYN oncologist.
11   Q.   Do you respect her as a
12   clinician?
13        MS. CURRY:  Object to the
14   form.
15        THE WITNESS:  Yes, I do.
16   BY MS. GARBER:
17   Q.   Do you respect her
18   professional judgment?
19   A.   Yes.
20   Q.   You indicate in your expert
21   report that use of hormone replacement
22   therapy, or can we call that HRT?
23   A.   It depends what you're
24   talking about.  If you're talking about a

Page 243

1    combination single -- I -- I assume we're
2    going to specify what you're referring
3    to.
4    Q.   Okay.  For purposes of your
5    expert report with regard to risk factors
6    and HRT, what are you referencing?
7    A.   Most of the studies that
8    show a significant increased risk is with
9    estrogen replacement alone.
10   Q.   Okay.  And you believe that
11   HRT is a risk factor for ovarian cancer,
12   or do you limit that to estrogen alone?
13   A.   I would limit it to estrogen
14   alone.
15   Q.   Okay.  In caring for women
16   who use HRT in connection with menopause,
17   have you had the occasion to prescribe or
18   care for a woman using HRT Prempro?
19   A.   Yes.
20   Q.   Did you ever prescribe it?
21   A.   Yes, I have.
22   Q.   Are you aware that the --
23   what the odds ratio or the risks are
24   associated with that drug for cancer?

Page 244

1         MS. CURRY:  Object to the
2    form.
3         THE WITNESS:  Which type of
4    cancer are you referring to?
5    BY MS. GARBER:
6    Q.   We'll start with breast
7    cancer.
8    A.   I don't know the odds ratio
9    exactly, no.
10   Q.   Doctor, if I represent to
11   you that the odds ratio for Prempro and
12   breast cancer is a 1.24, you don't have
13   any reason to dispute that, do you?
14        MS. CURRY:  Object to the
15   form.
16        THE WITNESS:  I -- I don't
17   know the odds ratio.
18   BY MS. GARBER:
19   Q.   Do you know, Doctor, or are
20   you aware that Prempro carries a black
21   box warning for a risk of breast cancer
22   based on an odds ratio of 1.24?
23   A.   For all patients?
24   Q.   Yes.

Page 245

1    A.   No, I wasn't aware of that.
2    Q.   No -- for menopausal women.
3    Are you aware of that?
4    A.   No.
5    Q.   Do you believe that the risk
6    associated with talc and ovarian cancer
7    is generally 1.3 to 1.4?
8         MS. CURRY:  Object to the
9    form.
10        THE WITNESS:  I believe in
11   my report I say it's between 1.2
12   and 1.6.  So I'll stick with that.
13   BY MS. GARBER:
14   Q.   Okay.  And so that would be
15   a 20 to 60 percent increased risk of
16   ovarian cancer associated with talcum
17   powder products, right?
18   A.   In the studies that show a
19   risk increase at all, yes.
20   Q.   And you believe that that
21   odds ratio or relative risk is low?
22        MS. CURRY:  Object to the
23   form.
24        THE WITNESS:  Yes.

62 (Pages 242 to 245)

Kevin Holcomb, M.D.

Page 246

1  BY MS. GARBER:
2      Q.   And do you, therefore, feel
3  that it does not meet sufficiency of a
4  magnitude of a risk to be reliable under
5  the Bradford Hill factors?
6      A.   No --
7          MS. CURRY:  Object to the
8  form.
9          THE WITNESS:  -- that's not
10 my opinion.
11 BY MS. GARBER:
12     Q.   Okay.  Do you have any
13 opinion as to the magnitude of the risk
14 or strength of the association between
15 the talc literature and ovarian cancer?
16     A.   Please repeat the question.
17     Q.   Sure.  Do you have an
18 opinion as to the strength of the
19 association or magnitude of the risk as
20 it pertains to the talc ovarian cancer
21 literature?
22         MS. CURRY:  Object to the
23 form.
24         THE WITNESS:  It's generally

Page 247

1  referred to -- it's generally
2  referred to as modest.  In some
3  cases weak.  And I would -- I
4  would agree with that.
5  BY MS. GARBER:
6      Q.   You are aware of
7  peer-reviewed and published studies that
8  hold the opposite opinion to yours,
9  right, that -- that the magnitude of
10 risk -- magnitude of the risk is
11 sufficient to meet with the Bradford Hill
12 criteria as to that issue?
13     A.   I agree with the statement
14 that -- I don't agree with the statement
15 that I've seen literature that described
16 the association as anything but modest
17 even in the -- by the authors who hold a
18 different opinion.
19     Q.   Do you know what IARC says
20 as to the magnitude of the risk in the
21 2010 monograph?
22     A.   I'd have to review it again
23 to say specifically.
24     Q.   Do you know what the

Page 248

1  prevalence is in the United States for
2  use of talcum powder products?
3          MS. CURRY:  Object to the
4  form.
5          THE WITNESS:  The different
6  studies that I reviewed had
7  different -- different prevalence
8  of use.  And I think it's somewhat
9  related to the ethnic group.  For
10 example, the group that has
11 probably one of the lowest rates
12 of ovarian cancer is African
13 Americans, and historically they
14 have one of the highest uses of
15 talc.
16         But for example, in Gertig
17 at the -- at that time of that
18 study I believe it was about
19 42 percent of women reported using
20 it with about 14 percent using it
21 daily.
22 BY MS. GARBER:
23     Q.   You've seen literature that
24 cites it as high as 50 percent in the

Page 249

1  United States, right?
2      A.   Yes.
3      Q.   Do you agree with the Narod
4  author in 2016 that it's right to be
5  concerned over carcinogenicity of talc
6  even if a risk ratio is below 50 percent?
7          MS. CURRY:  Object to the
8  form.
9          THE WITNESS:  No.  I think
10 that statement taken in isolation,
11 I would not agree with that.
12 BY MS. GARBER:
13     Q.   You agree that his opinion
14 has been published in Gynecologic
15 Oncology, correct?
16     A.   I agree, yes.
17     Q.   Do you have an opinion as to
18 when subgroup analysis for epithelial
19 ovarian cancer histology type is
20 performed in the studies that serous has
21 the strongest association?
22         MS. CURRY:  Object to the
23 form.
24         THE WITNESS:  I do.  It's

63 (Pages 246 to 249)

Kevin Holcomb, M.D.

Page 250

1      not surprising, because it's the
2      most predominate cell type.
3   BY MS. GARBER:
4      Q.   Do you agree if women tend
5   to use talc daily, as you indicate in
6   your report, that the use becomes
7   habitual rather than memorable?
8      A.   Habitual rather than
9   memorable?
10     Q.   Mm-hmm.
11         MS. CURRY:  Object to the
12     form.
13  BY MS. GARBER:
14     Q.   Do you understand the nature
15  of my question?
16     A.   No, I guess I have to think
17  about that.
18     Q.   Let me see if I can help.
19  So if, let's say, I have grown up
20  brushing my teeth every single day twice
21  a day with Crest toothpaste, and somebody
22  wants to know what I've done over my
23  lifetime, I don't have to think about,
24  oh, did I use Crest every single day,

Page 251

1   twice a day?  It's habitual because I've
2   done it my whole life, rather than if I
3   used one product one day and another
4   product the other day and, you know, it
5   was not something that was part of my
6   ADLs.  You understand what ADLs are, of
7   course.
8      A.   I do.
9      Q.   Yeah.  Activities of daily
10  living.  So if it was not part of an
11  activity of daily living, it might be
12  more memorable.
13         Do you understand now?
14         MS. CURRY:  Object to the
15     form.
16         THE WITNESS:  I -- honestly,
17     I think my understanding of this
18     isn't that certain things are
19     memorable and certain things are
20     habitual.  It's that activities
21     can be impacted by alterations in
22     your recall of those things by a
23     number of factors, which I
24     outlined in my report, one

Page 252

1      including the desirability of the
2      exposure.
3         But -- so I think all
4      behaviors are subject to changes
5      in recall based on the specifics.
6   BY MS. GARBER:
7      Q.   Do you believe that the
8   case-control studies are unreliable for
9   assessment of risk for talcum powder
10  exposure in ovarian cancer based on
11  recall bias?
12         MS. CURRY:  Object to the
13     form.
14         THE WITNESS:  I think all
15     case-control studies have a risk
16     of recall bias, not just limited
17     to ovarian cancer studies.
18  BY MS. GARBER:
19     Q.   I understand they're at risk
20  for that.  Is it your opinion that the
21  case-control studies have had recall bias
22  at play to explain that increase in risk?
23     A.   I think that's one of the
24  possible explanations, yes.

Page 253

1      Q.   Possible, not probable?
2         MS. CURRY:  Object to the
3     form.
4         THE WITNESS:  I would argue
5     probable.
6   BY MS. GARBER:
7      Q.   Okay.  I got you to change
8   it to a probable?
9      A.   Yes.
10     Q.   Are you aware of literature
11  that says it's not likely at play to
12  explain the increased odds ratios or
13  relative risks?
14     A.   I have read opinions about
15  it, but literature, no.
16     Q.   Okay.  Are you aware of
17  authors that have studied the topic of
18  talcum powder products and risk of
19  ovarian cancer who have concluded that
20  recall bias is not at play?
21         MS. CURRY:  Object to the
22     form.
23         THE WITNESS:  Please repeat
24     the question again.

64 (Pages 250 to 253)

Kevin Holcomb, M.D.

Page 254

```
 1    BY MS. GARBER:
 2        Q.   Sure.  Have you -- have you
 3    read peer-reviewed published studies
 4    where the authors were studying talcum
 5    powder products and the risk of ovarian
 6    cancer and have concluded that recall
 7    bias was not at play as increasing the
 8    risk for ovarian cancer?
 9        MS. CURRY:  Object to the
10    form.
11        THE WITNESS:  No.  In fact,
12    the only time I remember a study
13    really getting into this where
14    they had proof was Schildkraut
15    2016, where there was a pretty
16    significant increase and people
17    remembering being exposed to talc
18    after 2014 compared to before
19    2014.
20        And I can't think of any
21    other explanation for that
22    difference other than recall bias.
23    BY MS. GARBER:
24        Q.   Well, we'll get to that
```

Page 255

```
 1    paper.  And I appreciate that.  But you
 2    just used a term, "proof."  What do you
 3    mean by that?
 4        A.   I don't know exactly what I
 5    said.  Can you repeat my statement?
 6        Q.   You said, "I remember a
 7    study really getting into this where they
 8    had proof, was Schildkraut 2016, where
 9    there were pretty significant" --
10        A.   Let me change the word from
11    "proof" to "evidence."
12        Q.   Okay.  Let's look at some
13    studies.
14        (Document marked for
15        identification as Exhibit
16        Holcomb-13.)
17    BY MS. GARBER:
18        Q.   I'm going to mark as
19    Exhibit 13 a paper by Mills, et al.  This
20    is one that you reviewed, right?
21        A.   Yes.
22        MS. GARBER: Sorry.  I
23        didn't -- I didn't make enough
24        copies for you guys.  I apologize.
```

Page 256

```
 1        Here's a screen.  The doctor has a
 2    screen.
 3    BY MS. GARBER:
 4        Q.   Doctor, at Page 464 of this
 5    paper, if you can turn to that, the last
 6    page of the study.  And on the left-hand
 7    column, about halfway down the paragraph,
 8    it begins "recall."
 9        Do you see where I am?  If
10    you look -- if you look here, Doctor.
11    See?
12        A.   Yeah.
13        Q.   Okay.  It reads, "Recall
14    bias has also been implicated as a
15    limitation in studies of talc and ovarian
16    cancer.  However, findings in a
17    prospective" -- "in a prospective study,
18    the Nurses' Health Study, in which
19    exposure data were collected prior to
20    diagnosis and hence free of recall bias
21    were similar to the present finding for
22    our talc use and serous invasive ovarian
23    cancer.
24        "It has also been suggested
```

Page 257

```
 1    that use of talc is habitual versus
 2    memorable and not likely to be subject to
 3    recall bias."
 4        So, Doctor, my question is,
 5    this is a peer-reviewed study author who
 6    is suggesting that the studies are
 7    similar between case-control and a cohort
 8    and suggesting that recall bias is not at
 9    play because the use is habitual versus
10    memorable.
11        Do you agree?
12        MS. CURRY:  Object to the
13        form.
14        THE WITNESS:  No.  Can I
15    explain why?
16    BY MS. GARBER:
17        Q.   I don't -- I don't mean
18    agree with the author.  Do you agree with
19    my assessment of what the authors are
20    saying?
21        MS. CURRY:  Object to the
22        form.
23        THE WITNESS:  That's true
24    what the authors are saying.
```

65 (Pages 254 to 257)

Kevin Holcomb, M.D.

Page 258

1    BY MS. GARBER:
2        Q.   Okay.  And you disagree that
3    recall bias is not at play because the
4    use is habitual rather than memorable?
5        A.   No.
6        Q.   You don't agree with that?
7        A.   If I can explain my
8    reasoning, or should I leave this at yes
9    or no?
10       Q.   Just I don't need to know
11   why.
12       A.   You don't need to know why.
13       Q.   No, I want to ask you a few
14   more questions and then I'll circle back
15   to that --
16       A.   Sure.
17       Q.   -- because there are a few
18   other papers that I want to get to before
19   we understand that.
20           Doctor, if you can go back
21   to the Health Canada, which we marked as
22   Exhibit 11.  And if you could turn to
23   Page 28.  Under -- do you see where I am?
24   Under the 6.4, third paragraph down.

Page 259

1            Do you see where I am?  It
2    says, "In studies?"
3        A.   28.  Yes.  Yes.  Okay.
4        Q.   It says, "In studies where
5    the exposure is simple, e.g., never
6    versus ever use, recall bias is unlikely
7    to be an important source of bias."  And
8    then it cites to Narod 2016.
9            "The positive association is
10   strongest for serous histologic type,"
11   and then it cites to Berge 2018 and Taher
12   2018.  "Findings that the association may
13   vary by histologic type detracts from the
14   hypothesis of report bias as this type of
15   bias would likely operate for all
16   histologic types."
17           Did I read that correctly?
18       A.   You did.
19       Q.   And so what the authors
20   there are saying is if recall bias was at
21   play here, you would expect to see an
22   increase in all of the histologic types,
23   not just certain ones, correct?
24           MS. CURRY:  Object to the

Page 260

1    form.
2            THE WITNESS:  One, the first
3    statement, "The recall bias is
4    unlikely to be an important source
5    of bias," is now referring to an
6    opinion of Narod.  Narod's 2016, I
7    told you was that not -- that
8    wasn't based on data.  So there's
9    an echo chamber thing.
10           And then the positive
11   association is strongest for
12   serous histologic type, if you
13   have a higher prevalence of a
14   type, you would expect recall bias
15   to be more commonly seen with
16   that, because when you have rarer,
17   smaller numbers, you may not reach
18   an association high enough to show
19   the increased risk there.
20           So it's not surprising to me
21   if there was going to be a
22   consistent cell type that you saw
23   this increased risk with, it would
24   be with serous, because it is the

Page 261

1    predominate cell type.
2    BY MS. GARBER:
3        Q.   You disagree with the study
4    authors of Health Canada wherein they are
5    stating at Page 28, that recall bias is
6    not likely at play --
7        A.   They are -- yeah, I'm sorry.
8        Q.   -- not likely at play for
9    the increased risk amongst the studies,
10   correct?
11       A.   I do because if they would
12   cite a study where they can show it
13   wasn't at play.  See, I can cite a study
14   where I believe it was at play when I
15   cite Schildkraut.
16           When they cite a study that
17   shows it's not at play, they cite an
18   opinion piece by Narod.  There's a
19   difference.
20       Q.   Well, and they also cite the
21   Berge and Taher papers, don't they?
22       A.   For a different period --
23   for a different point.
24       Q.   Is there any metric,

66 (Pages 258 to 261)

Page 262

1  objective metric to measure recall bias
2  in a given study?  In other words, for
3  those who don't typically read
4  epidemiological literature, there --
5  there is not an objective measurement
6  that can be --
7      A.   I can think of one.
8         MS. CURRY:  Object to the
9  form.
10        THE WITNESS:  If you have a
11  situation where there is a -- an
12  increase in familiarity with a
13  topic that happens after a certain
14  time point and you look at the
15  association before and after this
16  is widely known and show that
17  there's a difference, I think that
18  that's a fair metric -- it puts
19  the onus to figure out, well, why
20  all of a sudden after the time
21  that it's a well-known entity, why
22  do more people remember using it
23  who have cancer compared to the
24  controls.

Page 263

1      So if the controls have the
2  same memory of using it before
3  it's widely known as after it's
4  widely known, but the cases, all
5  of the sudden after it's widely
6  known, the cases remember using,
7  this habitual practice, all of the
8  sudden goes up, after it's widely
9  known, I take that as a fair
10  metric of recall bias.
11      And I've tried to explain in
12  my mind what other thing could get
13  played to explain that finding,
14  and I can't.
15      So with all due respect to
16  Dr. Narod's opinion, which is not
17  citing a paper, I have seen data
18  where I think -- I can't think of
19  another plausible explanation for
20  what's at play other than recall
21  bias using the metric I just
22  described.
23  BY MS. GARBER:
24      Q.   Widely known is subjective,

Page 264

1  isn't it?  I mean, how does a study
2  author decide what is and what isn't
3  likely known?
4      A.   Well, if you -- I think it's
5  a fair thing to ask.  But if you have a
6  date where there's a big lawsuit, per
7  se -- per se.  And I bet you if you
8  counted how many commercials you see on a
9  topic, a liability topic, I bet you can
10  come up with a clear point where you can
11  say before this time frame there was this
12  amount of activity on TV, and after this
13  time frame, it was that much.  And -- and
14  yeah, that was a crude estimate to do it
15  with what date the -- the first cases are
16  becoming very well known.
17      But I disagree with the
18  point that you can't approximate recall
19  bias.  Because I -- I do think
20  Schildkraut's study was a good example of
21  it.
22      Q.   The Schildkraut separated
23  the -- what was known from what was not
24  known based on a time frame of 2014,

Page 265

1  correct?
2      A.   Right.
3      Q.   And what was known, what was
4  widely known in 2014 in your opinion?
5         MS. CURRY:  Object to the
6  form.
7         THE WITNESS:  Well, I don't
8  think it was as widely known
9  before 2014 of large payments and
10  lawsuits because of talc being
11  associated with -- with ovarian
12  cancer.
13         Because it's my assumption
14  that most lay people don't know of
15  the association because they've
16  been reading Cramer studies, or
17  Merritt or any of these other --
18  I'm -- I'm going to assume that
19  the majority of people out there
20  who are going to be on these
21  studies and answering these
22  questionnaires, how are they going
23  to find out about talc.  It's most
24  likely going to come through the

Kevin Holcomb, M.D.

Page 266

1    lay media.
2        The lay media pipes up more
3    when there is product liability
4    associated with it.
5    BY MS. GARBER:
6        Q.   When --
7        A.   And so --
8        Q.   When was that first time
9    that there was lay media coverage of a
10   talc verdict or litigation?
11       A.   I don't think it's -- I
12   can't give you the exact date where it
13   starts.  I think you'd have to look, and
14   split your studies up into an earlier
15   period and a later period.
16       But, if people who don't
17   have ovarian cancer have the same
18   recollection of talc usage before and
19   after a certain point, but cases have a
20   very different memory of using it before
21   and after, I think that that's a very,
22   very powerful statement, and I would
23   argue that you'd be challenged to come up
24   with another reason why that would

Page 267

1    happen, other than recall bias.
2        Q.   Are you aware of
3    peer-reviewed study authors that state in
4    their papers with regard to talcum powder
5    product use and ovarian cancer, that say
6    reporting bias is not at play with regard
7    to the results?
8        MS. CURRY:  Object to the
9    form.
10       THE WITNESS:  I'm not
11   familiar with, and you -- you
12   posited that there's no good
13   metric.  So I'm not sure, other
14   than me describing examples where
15   I believe it's at play and
16   explaining why, I would be curious
17   to hear the opinion of somebody
18   like Narod who says I don't
19   believe it's at play.
20       And if your only
21   justification for the statement is
22   that I believe it's habitual
23   versus memorable, that is less
24   persuasive than what I'm

Page 268

1    describing.
2        I believe it was at play in
3    Schildkraut.  And I don't believe
4    there is anything special about
5    Schildkraut's study design that
6    would make it at play in that
7    study and not another one.
8    BY MS. GARBER:
9        Q.   Okay.  Your opinion that
10   there's recall bias at play in the
11   case-control studies is based on
12   Schildkraut's study?
13       MS. CURRY:  Object to the
14   form.
15       THE WITNESS:  Not only.
16   BY MS. GARBER:
17       Q.   What -- what other data do
18   you have to support that claim?
19       A.   A trend in the strength of
20   association also increasing over time.
21       Q.   Is that your opinion?
22       A.   Yes.
23       Q.   That there is a trend of
24   increasing --

Page 269

1        A.   To be fair the term
2    "trend" --
3        Q.   -- risk over time?
4        A.   I'm sorry.
5        Q.   Sorry.
6        A.   The term "trend" is a -- is
7    a statistical term.  So I -- I can't say
8    I've subjected this to a statistical
9    test.
10       But in earlier versus later
11   studies, you do see an increase.
12       Q.   And, Doctor, if we look at
13   your Table 1 and we look at the odds
14   ratios -- or sorry, the relative risk,
15   do --
16       A.   Let me go back.
17       Q.   -- does it show an increase
18   over time?
19       A.   Let me go back one second.
20       Q.   It's Exhibit 9.
21       A.   I'd have to take the time to
22   look through all the odds ratios, but one
23   of the reasons why I color-coded it was I
24   can just look at that and -- and see that

Page 270

1  there's more blue which are
2  nonsignificant studies --
3      Q.   Well --
4      A.   -- in the beginning --
5      Q.   Well, Doctor --
6      A.   -- and these -- these are
7  in -- in chronological order.
8      Q.   Let's just look at the -- at
9  the white ones.
10      The odds ratios don't seem
11  to be increasing over time appreciably,
12  do they?
13      A.   Not to my naked eye, no.
14      Q.   Okay.
15      A.   Just the frequency of
16  positive studies.
17      Q.   And we're going to get to
18  the meta-analysis shortly.  But the
19  meta-analyses over time.  How many
20  meta-analyses are there, by the way?
21      A.   There's probably about
22  seven.  Maybe more.
23      Q.   And do you, off the top of
24  your head, do you have a general sense of

Page 271

1  what those odds ratios are?
2      A.   Yes.  I believe they're in
3  the same modest range as the studies that
4  are going into them.  1.24, 1.28, 1.31,
5  in that general region.
6      Q.   Let's look at another paper,
7  the Langseth paper.  You reviewed that as
8  part of your expert opinions, right?
9      A.   Yes.
10      (Document marked for
11      identification as Exhibit
12      Holcomb-14.)
13  BY MS. GARBER:
14      Q.   And if you turn to page --
15  well, it's 358.  It's the front page,
16  Doctor.
17      And if you look at -- if you
18  look at the right-hand column about
19  halfway down -- do you see where I am?
20  Where it says, "Methodological factors"?
21      A.   Yes, I do.
22      Q.   And the paper reads,
23  "Methodological factors such as recall
24  bias should always be considered in

Page 272

1  case-control studies.  It could have been
2  a problem had there been widespread
3  publicity about the possible association
4  between use of body powder and cancer.
5  The IARC" -- shortened that -- "working
6  group considers that there has not been
7  widespread public concern about the issue
8  and, therefore, considers it unlikely
9  that such a bias could explain the
10  consistent findings."
11      Did I read that correctly?
12      A.   You did.  And you're talking
13  about one type of recall bias.  The
14  authors go on to say that's not the only
15  type of recall bias that we have to
16  consider.  And in fact just recall bias
17  in cancer patients remembering exposures
18  at a higher rate cannot be ruled out.
19      Q.   Doctor, you can't say to a
20  medical degree of probability that there
21  is recall bias that explain the
22  statistically significant increased risk
23  in the case-control studies, can you?
24          MS. CURRY:  Object to the

Page 273

1      form.
2          THE WITNESS:  No.
3  BY MS. GARBER:
4      Q.   In your expert report, do
5  you address at all anywhere in the four
6  corners of your report where study
7  authors -- peer-reviewed study authors
8  have indicated that recall bias is not
9  likely at play to explain the increased
10  risk?  Do you address that issue at all?
11      A.   No.
12      Q.   And anywhere in the four
13  corners of your report, do you address
14  that study authors, peer-reviewed study
15  authors, have indicated that the
16  epidemiological data is consistent?
17      A.   Do I present the data in my
18  report showing a 50/50 split and then say
19  that other people called it consistent?
20  No, I didn't.
21      Q.   Let's turn to the
22  Schildkraut paper.
23      (Document marked for
24      identification as Exhibit

Kevin Holcomb, M.D.

Page 274

```
 1          Holcomb-15.)
 2    BY MS. GARBER:
 3        Q.   I'm going to mark it as 15.
 4    Doctor, in your expert report at Page 9,
 5    you indicate that, "Recall bias can lead
 6    to spurious results in case-control
 7    studies in a variety" --
 8        A.   I'm sorry.  Which page were
 9    you reading from?
10        Q.   Page 9.  You indicate that,
11    "Recall bias can lead to spurious results
12    in case-control studies in a variety
13    of" --
14        A.   I'm sorry.  I'm still trying
15    to find out where we are.  I don't
16    think --
17        Q.   I'm just --
18        A.   One second.
19        Q.   I'm just reading.
20        A.   I know.  I just want to read
21    along, if it's okay.
22             Yes, I'm ready for you.
23        Q.   I'll try it again.  You
24    indicate that, "Recall bias can lead to
```

Page 275

```
 1    spurious results in case-control studies
 2    in a variety of clinical scenarios."  And
 3    then you cite to the Schildkraut 2016
 4    paper, correct?
 5        A.   Right.
 6        Q.   All right.  And --
 7        A.   Hold on.  Is that
 8    Schildkraut that I'm -- let me see.  33,
 9    yes.
10        Q.   What you didn't cite to is
11    that the -- is what the authors stated
12    about the class action publicity.  And so
13    if I can have you turn to Page 1416 of
14    the Schildkraut paper.
15             And so if you go to the
16    right-hand column, in the first paragraph
17    about halfway down with the sentence that
18    begins "although."
19             Do you see where I am?
20        A.   Yes.
21        Q.   It says, "Although our
22    findings" --
23        A.   No.  I'm sorry.  Wrong
24    although.  They say "although" more than
```

Page 276

```
 1    once.
 2             MS. CURRY:  Where are you?
 3             MS. GARBER:  Right here.
 4             THE WITNESS:  Yes, I found
 5    it.
 6    BY MS. GARBER:
 7        Q.   "Although our findings
 8    suggest that the publicity of class
 9    action lawsuits may have resulted in
10    increased reporting of body powder use,
11    our data do not support that recall bias
12    alone before 2014 versus" -- "before 2014
13    versus 2014 or later would account for
14    the associations with body powder use and
15    epithelial ovarian cancer."
16             Did I read that correctly?
17        A.   Yes, you did.
18        Q.   So you didn't cite in
19    your expert report, did you?
20        A.   I -- maybe I'm
21    misunderstanding what they are saying
22    here.  But they're saying maybe it's not
23    just not that alone.  They're saying that
24    there could be other things that cause
```

Page 277

```
 1    recall bias.  And they're saying --
 2    they're not discounting that that played
 3    a role.  They're saying there could be
 4    other things, and they are pretty much
 5    saying the same thing that I read before
 6    where they said there's other causes of
 7    recall bias other than just information
 8    out in the media.
 9             Possibly there were multiple
10    things at play that caused recall bias.
11    But that statement, they're not saying
12    there was no recall bias in the study.
13    They're just saying that it may be more
14    than just -- than just the lawsuits.
15        Q.   That's your interpretation
16    of what they are saying?
17        A.   Well, it says --
18             MS. CURRY:  Object to the
19    form.
20             THE WITNESS:  -- it says,
21    "The data do not support the
22    recall bias alone before 2014
23    versus" -- "or later would account
24    for the associations."  They
```

70 (Pages 274 to 277)

Kevin Holcomb, M.D.

Page 278

1    didn't say that it didn't.
2    They're just saying possibly
3    there's other things.
4        Yes, that's my
5    interpretation.
6    BY MS. GARBER:
7        Q.   You don't know what the
8    other things are, do you?
9        A.   They don't either.  They're
10   saying -- they're not discounting recall
11   bias.  They're just saying there may be
12   multiple sources.
13       Q.   There was no widespread
14   publicity about talc and ovarian cancer
15   in the lay media in 2014, was there?
16          MS. CURRY:  Object to the
17   form.
18          THE WITNESS:  Then why did
19   Schildkraut decide to make that
20   analysis?  They made that analysis
21   specifically because of the
22   lawsuits.
23   BY MS. GARBER:
24       Q.   You're making that

Page 279

1    assumption, aren't you?
2          MS. CURRY:  Object to the
3    form.
4          THE WITNESS:  No.  They --
5    they say in the materials and
6    methods, why they split at 2014.
7    BY MS. GARBER:
8        Q.   Do you know --
9        A.   They didn't just routinely
10   pick that up.
11       Q.   I understand that, Doctor.
12       A.   Right.
13       Q.   But authors can make
14   mistakes, can't they?
15       A.   I've been pointing out a lot
16   of them.
17       Q.   Okay.  You didn't point out
18   this one, did you?
19       A.   Which mistake?
20       Q.   Well, do you know if there
21   was widespread publicity about lawsuits
22   in 2014?
23       A.   The authors consider that
24   maybe publicity would make a difference.

Page 280

1    They then design an experiment to see if
2    they could show a difference, and guess
3    what?  The findings show exactly that.
4    That controls have the same level of
5    memory of exposure but the cases all of
6    the sudden jump up after 2014.
7          If you do an experiment
8    because you have a hypothesis, and your
9    experiment then proves the hypothesis,
10   you should reasonably say, this is why I
11   did it.  I found what I found.  I have
12   evidence of recall bias.  That's the
13   whole point why they did this experiment.
14       Q.   Did the Schildkraut authors
15   find a statistically significant finding
16   between genital powder use and epithelial
17   ovarian cancer?
18       A.   Yes.  What I found
19   interesting about --
20       Q.   Doctor, I didn't --
21       A.   I won't editorialize.  I
22   won't -- sorry.
23       Q.   I appreciate that.
24       A.   Sure.

Page 281

1        Q.   At Page 8, Figure 1 of your
2    expert report, if we can turn there.
3          Are you there?
4        A.   I am.
5        Q.   Here you have a diagram
6    regarding the levels of evidence; is that
7    right?
8        A.   Yes.
9        Q.   I'll publish it on the Elmo.
10   This is your diagram for the levels of
11   evidence, correct?
12       A.   It's not my diagram.
13       Q.   In fact, it's the levels of
14   evidence for the Center For
15   Evidence-Based Medicine, or the CEBMA,
16   correct?
17       A.   Management, yes.
18       Q.   And what -- is that a
19   medical site or is that a business site?
20       A.   I'm not sure.
21       Q.   Why did you pick that
22   diagram?
23       A.   I was looking -- I was
24   looking for an example of the -- what I

Kevin Holcomb, M.D.

Page 282

1  believe is a widely held hierarchy on the
2  strengths of different study types based
3  on their ability to be altered by
4  inaccuracies.  And this was the diagram
5  that I found that I thought showed it the
6  best.
7       Q.   Did you just look to find a
8  diagram where cohorts were above
9  case-control studies, is that how you
10  searched?
11          MS. CURRY:  Object -- object
12      to the form.
13          THE WITNESS:  If you search
14      under levels of evidence, you will
15      never find -- well, I may not say
16      never.  Who knows.
17          I -- I don't think you
18      will -- you have to search hard to
19      find a -- a figure that has cohort
20      studies above case-control
21      studies.
22  BY MS. GARBER:
23      Q.   Okay.  So what you said is
24  if you search under levels of evidence,

Page 283

1  you will never find -- I mean -- I mean I
2  may not say never.  Who knows.  You have
3  to search hard to find a figure that has
4  cohorts above case-control studies.
5          Is that your testimony?
6      A.   I'm sorry.  It's below.
7  Sorry.  The other way around.  Thank you.
8      Q.   Thanks for that.
9          Did you attempt to find a
10  medical website or an evidence-based
11  medical website as to the levels of
12  evidence?
13          MS. CURRY:  Object to the
14      form.
15  BY MS. GARBER:
16      Q.   Or did you find this one and
17  stop?
18      A.   I -- I don't -- I don't
19  think that whether -- statistics don't
20  alter from one practice to the other.
21  Weaknesses in a study design are built in
22  and baked in.  And so, I didn't look
23  for a specific medical website, because I
24  thought it would look differently than

Page 284

1  this.
2          This is how I was -- this is
3  how I was trained.  I mean, this -- I'm
4  looking for -- there are some things that
5  I learned in reviewing for the -- for
6  this deposition.  And there are certain
7  beliefs that I've long held because I was
8  trained that way.  I was forced -- well,
9  not forced.  I was happily taking a
10  graduate level statistics course as part
11  of my fellowship.  And I was taught this
12  then too.  And that was part of a medical
13  statistics course.
14          So this is just consistent
15  with what I already knew.
16      Q.   Where do meta-analyses fall
17  on your pyramid?
18      A.   You know, the reason why
19  meta-analyses aren't on these is because
20  meta-analysis is a somewhat controversial
21  practice.  They -- there are some
22  strengths to meta-analysis.  There are
23  some ways that meta-analyses can help.
24  But you have to really, really conduct

Page 285

1  them in a strict format and not break the
2  rules.  So you can have a meta-analysis
3  that's well -- you know, very well
4  controlled, and look for heterogeneity
5  and did all the things that you have to
6  do, that would be a strong study.  But
7  it's so fraught with the ability to make
8  it a poor study.  So it's hard to put it
9  on here.  Because there is no one
10  meta-analysis that's going to be
11  positive.  It's going to be a good study.
12      Q.   What -- what is your basis
13  to say that -- that meta-analyses are
14  controversial?
15      A.   Let me go through.  I -- I
16  thought I had actually given a citation
17  for it when I said -- because I believe I
18  made that statement in here as well.
19          You know, I didn't cite to
20  a -- to an exact paper.
21      Q.   So that's the opinion of
22  Dr. Holcomb --
23      A.   No, I wish I had cited it,
24  because I actually reviewed different

72 (Pages 282 to 285)

Kevin Holcomb, M.D.

Page 286

1    study designs. Not just for this. And
2    that is, if given the -- time, I
3    could find a citation that makes the same
4    statement. It's not just my opinion.
5        Q.    But there's not one in your
6    report?
7        A.    There's not one in my
8    report, no.
9        Q.    You can't think of one
10   either, can you?
11       A.    No, I would have to do a
12   search.
13       Q.    So when you had your
14   statistics class, what was your text, do
15   you remember?
16           MS. CURRY:  Object to the
17       form.
18           THE WITNESS:  I don't.
19   BY MS. GARBER:
20       Q.    And I asked you this before,
21   if you knew who Kenneth Rothman was in
22   the context of epidemiology.  And you did
23   not, correct?
24       A.    That's correct.

Page 287

1        Q.    So I'll represent to you
2    that he is a professor of epidemiology,
3    an author of textbooks and many published
4    articles regarding epidemiology.  Okay?
5           I'll also show you that he
6    is the study author of this widely used
7    text with regard to epidemiology.  You
8    see that Kenneth Rothman is the first
9    author, Sander Greenland is the second.
10   And that goes back to that paper on
11   statistical significance.  That's the
12   author, right?
13           You are not familiar with
14   those authors or this text; is that
15   correct?
16       A.    Or the fact that it's widely
17   used, no.
18       Q.    Okay.  You've never read a
19   book with regard to meta-analyses and the
20   utility of them -- strike that.
21           Can you name a text with
22   regard to meta-analyses and the utility
23   of them?
24           MS. CURRY:  Object to the

Page 288

1    form.
2           THE WITNESS:  No.  As I
3    stated before, I would have to
4    search and find you one.
5    BY MS. GARBER:
6        Q.    Did you know that Kenneth
7    Rothman is known for his work on teaching
8    about epidemiologic research methodology?
9           MS. CURRY:  Object to the
10       form.
11   BY MS. GARBER:
12       Q.    Were you aware of that?
13       A.    Given the fact that I --
14   I've already answered that I wasn't aware
15   who he is, I don't see how I would know
16   that.
17       Q.    Do you ever rely on
18   meta-analyses in your practice to make
19   clinical decisions, do you ever look at
20   epidemiological data and set your care
21   attendant to the results or are they just
22   worthwhile in your opinion?
23           MS. CURRY:  Object to the
24       form.

Page 289

1           THE WITNESS:  No, no,
2       they're worthwhile but they -- we
3       don't -- I've never made any
4       clinical decisions on care based
5       on one study.  It's -- it's --
6       meta-analysis will become part of
7       the totality of what I'm looking
8       at.
9    BY MS. GARBER:
10       Q.    Meta-analysis is looking at
11   a systematic review of a body of
12   literature, correct?
13       A.    Meta-analysis is taking
14   subjects that were in different places
15   and different times and mixing them up as
16   if they were all in the same place at the
17   same time under the same conditions,
18   hence it's fraught with potential issues.
19       Q.    There's utility to them,
20   isn't there?
21           MS. CURRY:  Object to the
22       form.
23           THE WITNESS:  If done
24       correctly, yes.

73 (Pages 286 to 289)

Kevin Holcomb, M.D.

Page 290

1    BY MS. GARBER:
2        Q.   What are -- what is the
3    utility of them?
4        A.   For example, if you had --
5    this question of do you have enough
6    numbers in your cohort studies to
7    approximate an effect size that you see
8    in your case-control studies, well, you
9    might be able to do that in a
10   meta-analysis.  You might be able to put
11   all these things together.
12           And Berge says when we put
13   everything together, we felt we had
14   99 percent chance of finding the effect
15   size in the case-control size when we put
16   all the people together from the three
17   cohort studies that Berge put together.
18           So that's an example where
19   it might be helpful.  If you think you
20   can put together studies that are biased
21   for example, and that if you mix them
22   altogether the bias will be diluted,
23   that's where it's not helpful.
24       Q.   Do you have a source to cite

Page 291

1    that when you put cohort studies
2    together, that the bias will affect the
3    results of a meta-analysis?
4            MS. CURRY:  Object to the
5    form.
6            THE WITNESS:  I didn't --
7    that wasn't my statement.
8    BY MS. GARBER:
9        Q.   Do you have a source for
10   that?
11       A.   I didn't say that.  So why
12   would I have a source?
13       Q.   Do you have a source for
14   what you just said?
15       A.   Please repeat it.
16       Q.   You said, "If you think you
17   can put together studies that are biased,
18   for example, and that if you mix them
19   together, although the bias will be
20   diluted, that's where it's not helpful."
21           What is your source for that
22   statement?
23       A.   The source?  That adding
24   biased studies together doesn't dilute

Page 292

1    the bias?  I don't can't think of a
2    source.  I know it's not -- I know even
3    some of your experts don't -- don't
4    refute that.  Ellen Blair Smith says as
5    much in her -- in her expert report.  She
6    agrees that that's the case.
7        Q.   Does she say there's no
8    utility to the meta-analyses because of
9    bias?
10       A.   I didn't -- I didn't say
11   that.  If you're asking me about the
12   statement, I can tell you that I can find
13   support of that statement by some of the
14   plaintiff experts.
15       Q.   Let's look at a paper by Ken
16   Rothman.
17           (Document marked for
18           identification as Exhibit
19           Holcomb-16.)
20   BY MS. GARBER:
21       Q.   I'm going to mark as
22   Exhibit 16 a paper titled "Six Persistent
23   Research Misconceptions" by Kenneth
24   Rothman.  You've not seen that paper

Page 293

1    before?
2        A.   No.
3        Q.   Doctor, if you look at the
4    left-hand column, do you see here that's
5    illuminated or highlighted?
6            Do you see where I am?
7        A.   Yes, I do.
8        Q.   It reads, "Scientific
9    knowledge changes rapidly, but the
10   concepts and methods of conduct of
11   research change more slowly.  To
12   stimulate discussion of outmoded thinking
13   regarding the conduct of research, I list
14   six misconceptions about research that
15   persist long after their flaws become
16   apparent.
17           "These misconceptions are:
18           "Number one, the
19   hierarchy" -- I'm sorry.
20           "Number one, there is a
21   hierarchy of study designs.  Randomized
22   trials provide the greatest validity
23   followed by cohort studies, with
24   case-control studies being least

74 (Pages 290 to 293)

Kevin Holcomb, M.D.

Page 294

1    reliable."
2         So Dr. Rothman is indicating
3    that there is a misconception that there
4    is a hierarchy which ranks cohort studies
5    above case-control studies.
6         A.   He's admitting --
7         Q.   Do you see that?
8         A.   Yes.  He's admitting that
9    this is the hierarchy.
10        Q.   No.  He's admitting that it
11   is a misconception to say that cohort
12   studies are above case-control studies.
13        A.   He's admitting that this is
14   a common thought, right?  He's saying
15   there's a hierarchy.  The misconceptions
16   are, there's a hierarchy.  So he's saying
17   there is this thought out there that
18   there's a hierarchy, because it's clear
19   that there is and it's a commonly taught
20   thing.
21        So this one doctor is
22   saying, similar to the doctors you
23   brought up earlier, let's throw away
24   convention.  And I would have to read the

Page 295

1    whole paper to understand why.  But I
2    take this as -- the first statement to
3    say that there is -- he doesn't say well
4    recognized.
5         But I believe he took the
6    time to write this paper to try to debunk
7    some of these things, because they are
8    out there and well accepted.
9         Q.   Right.  They're out there,
10   and he is concerned about that, that
11   clinicians like yourself are putting
12   cohort above case-control.  And he's
13   trying to debunk that because he doesn't
14   agree with that; is that fair?
15        MS. CURRY:  Object to the
16   form.
17        MR. MIZGALA:  Object to the
18   form.
19        THE WITNESS:  Can I tell you
20   that there's --
21   BY MS. GARBER:
22        Q.   Doctor --
23        A.   -- not as much difference in
24   what --

Page 296

1         Q.   Is that what he's saying?
2         MS. CURRY:  Object to the
3    form.
4         THE WITNESS:  Yes, yes.
5    BY MS. GARBER:
6         Q.   Okay.  Thank you.  That's
7    the only question that I had.
8         He's also saying, number
9    three, "If a term that denotes the
10   product of two factors is a regression
11   model" -- "is a regression model is not
12   statistically significant, then there is
13   no biologic interaction between those
14   factors."
15        So again, he is attempting
16   to debunk this notion of holding at
17   disparate statistically significant from
18   nonstatistically significant data,
19   correct?
20        MS. CURRY:  Object to the
21   form.
22   BY MS. GARBER:
23        Q.   That's a misconception?
24        THE WITNESS:  I'm just

Page 297

1    curious.  Are you here -- are you
2    more interested in me agreeing
3    that you're reading this correctly
4    or my response to it?  Because I'd
5    love to jump in and tell you about
6    what I think about these
7    statements.  But I feel like I'm
8    not being given an opportunity.
9    And I -- you know, I could have
10   come down and read all the papers
11   that you want to read and read
12   them out loud for you.
13        But I'm assuming that you
14   would like to know if I agree with
15   it, why not if I disagree.
16        But I feel like you keep on
17   asking me, is that -- did I read
18   that correctly, and I said yes,
19   you read very well.  And you say
20   do you agree with it?  And I say
21   no.
22        And then I go to try to
23   explain, and you move on.  And I'm
24   trying to understand what's the

75 (Pages 294 to 297)

Kevin Holcomb, M.D.

Page 298

1    purpose of that?
2    BY MS. GARBER:
3        Q.   Are you done?
4        A.   Yes, I am.
5        Q.   Okay.  You know that I am
6    here to ask you questions, and you're
7    here to answer questions.  You also know
8    that this is in the context of a
9    cross-examination and your counsel has
10   the opportunity to ask you questions too.
11   You understand that, right?
12       A.   I understand.
13       Q.   Thanks.
14           All right.  So Dr. Rothman
15   in his peer-reviewed and published paper
16   indicates that there is a misconception
17   about the hierarchy, which places cohorts
18   above case-control.  And this is a
19   misconception about statistical
20   significance and calling nonstatistically
21   results different from statistical
22   significant results.
23           Can we agree with that?
24           MS. CURRY:  Object to the

Page 299

1    form.
2           THE WITNESS:  No.
3    BY MS. GARBER:
4        Q.   You don't agree with that?
5        A.   Because you started off the
6    statement by saying this is a review article.
7    This is peer-reviewed.  This is a review article.
8    I don't know if it's peer-reviewed.
9        Q.   It's a published article?
10       A.   It's not peer-reviewed
11   necessarily.
12       Q.   But it's a published?
13       A.   You said peer-reviewed.
14       Q.   I know.
15       A.   I'm saying, do you know that
16   it was peer reviewed?
17       Q.   Now I'm saying, it's a
18   published article, right?
19       A.   Simple -- yeah, you can --
20   it's an open access journal that you
21   can -- I mean, just because something is
22   published, you're making it seem like --
23   there's something called vanity
24   publishing.  And I'm not suggesting

Page 300

1    that's what he's doing.  I don't know the
2    author.
3           But to suggest that
4    something's published and ergo it's
5    worthwhile, that's a big misconception.
6        Q.   All right.  And otherwise
7    you agree with what I just said, if we --
8    if we amend my question to say it is a
9    published article --
10       A.   Can you repeat it because I
11   got so stuck on your mentioning that it
12   was peer-reviewed that I didn't --
13       Q.   I'll just move on.
14       A.   -- I stopped listening.
15       Q.   Did you attempt to look at
16   what your institution said about study
17   hierarchies?
18           MS. CURRY:  Object to the
19   form.
20           THE WITNESS:  My
21   institution?  Which institution?
22   BY MS. GARBER:
23       Q.   Where do you work?  Where do
24   you work?

Page 301

1        A.   I work in two -- I'm
2    actually an employee of Weill Cornell
3    Medical Center.  But I --
4        Q.   Okay.  And that's your
5    institution, right?
6        A.   As is New York Presbyterian
7    Hospital, which is separate, so which
8    institution --
9        Q.   You have privileges at both?
10       A.   I don't have privileges in
11   the medical school because that's not our
12   medical school's work.  So, no, I don't
13   have privileges --
14       Q.   You don't have privileges
15   in -- in the hospital associated --
16       A.   The hospital is -- is owned
17   by New York Presbyterian Hospital.
18       Q.   Okay.
19       A.   So I have no privileges at
20   Weill Cornell.
21       Q.   Got it.  I didn't understand
22   the -- the nature of that.
23           So did you look at Weill
24   Cornell's study hierarchy?

Golkow Litigation Services - 877.370.DEPS

Kevin Holcomb, M.D.

Page 302

1    MS. CURRY:  Object to the
2  form.
3    THE WITNESS:  I don't know
4  if -- well, no, I don't know that
5  Weill Cornell has a study
6  hierarchy.
7  BY MS. GARBER:
8    Q.   Okay.
9    (Document marked for
10  identification as Exhibit
11  Holcomb-17.)
12  BY MS. GARBER:
13    Q.   Let's mark as Exhibit 17 a
14  document.
15    And, Doctor, this is a
16  printout of a website from Weill Cornell.
17  And it is titled "Evidence-based
18  Medicine, or EBM, Defined."
19    Did I read that correctly?
20    A.   You did.
21    Q.   Under the definition it
22  reads, "Evidence-based medicine requires
23  the integration of the best research
24  evidence with our clinical expertise, and

Page 303

1  our patients' unique values and
2  circumstances."
3    And then there's a citation
4  to Straus, S-T-R-A-U-S, et al.,
5  Evidence-based Medicine 2015.
6    Did you see this before you
7  put in your expert report the hierarchy
8  that you put from the --
9    A.   No.
10    Q.   -- management website?
11    A.   No.
12    MS. CURRY:  Object to the
13  form.
14  BY MS. GARBER:
15    Q.   Doctor, if we could look at
16  this together.
17    Evidence-based medicine.
18  That is what -- that's a -- that's a
19  medical term, right, evidence-based
20  medicine?
21    A.   Yes.
22    Q.   And it implies what to you?
23    A.   It implies practicing on
24  what's deemed to be accurate findings

Page 304

1  from studies, and then brought into
2  clinical practice.
3    Q.   Okay.  And under that
4  heading in the hierarchy at the top lists
5  Cochrane systematic reviews.  Do you know
6  what those are?
7    A.   Yes.
8    Q.   Have you ever considered
9  them for purposes of your practice?
10    A.   Yes.
11    Q.   You ever considered them for
12  purposes of your opinions?
13    A.   They are part of it --
14    MS. CURRY:  Object to the
15  form.
16    THE WITNESS:  -- yes.
17  BY MS. GARBER:
18    Q.   And next on the top of the
19  hierarchy is what?
20    A.   I'm not sure what SR is --
21  systematic reviews, must be, and
22  meta-analyses.
23    Q.   Mm-hmm.  So up above the
24  cohorts and the case-control are

Page 305

1  systematic reviews and meta-analyses,
2  right, on this evidence-based hierarchy,
3  right?
4    A.   Yes.
5    Q.   All right.  And then there's
6  evidence guidelines and the evidence
7  summaries.  And then one, two, three,
8  four -- fifth down, lists randomized
9  clinical trials, case cohorts, and
10  control studies.  All in the same line,
11  correct?
12    A.   Yes.
13    Q.   And so that's a little
14  different than your hierarchy, right?
15    A.   Yes.
16    MS. CURRY:  Object to the
17  form.
18  BY MS. GARBER:
19    Q.   And this one relates to
20  medicine, not to management and business,
21  right?
22    MS. CURRY:  Object to the
23  form.
24    THE WITNESS:  Yes.  It

Kevin Holcomb, M.D.

Page 306

1    relates to medicine.
2    BY MS. GARBER:
3        Q.   And this is from the web --
4    this is from the -- off the website of
5    where you practice medicine?
6        A.   Yes.
7        Q.   And where you teach?
8        A.   And where I teach.  And I
9    don't necessarily disagree that a
10   well-designed --
11       Q.   Doctor, I didn't ask you if
12   you disagreed or not --
13       A.   Okay.
14       Q.   -- I just asked you --
15       A.   Just to read the website.
16       MS. CURRY:  Let him finish
17   his response, please.
18   BY MS. GARBER:
19       Q.   Are you aware that the link
20   between smoking and lung cancer was
21   initially discovered in the case-control
22   studies carried out in the 1950s, are you
23   aware of that?
24       A.   Yes.

Page 307

1        Q.   As a physician you do
2    consider meta-analyses in your practice?
3        A.   Yes.
4        Q.   And as to the cohort studies
5    in this case, do you rely primarily on
6    them in support of your opinions?
7        MS. CURRY:  Object to the
8    form.
9        THE WITNESS:  No.  As I
10   stated in the beginning, it's the
11   totality of their reviews.
12       So the cohort studies which,
13   you know, I will still say as a
14   design are less prone to bias than
15   case-control studies regardless of
16   how this is, I don't think any --
17   anybody questions that.
18       I will look at the whole
19   picture which is what I did with
20   the talc literature.  So it was
21   the inconsistency in case-control
22   results.  It was the low level of
23   strength of association that I
24   found plus the lack of findings in

Page 308

1    the cohort study.  And then the
2    weaknesses and biologic
3    plausibility that led me to the
4    opinion that I offered in the
5    beginning.
6    BY MS. GARBER:
7        Q.   Do you believe that the
8    case-control studies are less reliable
9    than the cohort studies?
10       A.   I believe that all study
11   designs can have weaknesses.  And a
12   poorly designed study can come in the
13   form of any type.
14       You can have a poorly
15   designed cohort study.  You can have a
16   poorly designed case-control study.  You
17   can have a poorly designed meta-analysis.
18       I'm sorry, I forgot your
19   question now.
20       Q.   That's okay.
21       And with regard to the
22   cohort studies, Doctor, I don't see in
23   your expert report where you talk about
24   the design limitations, specifically what

Page 309

1    even the authors talk about as the design
2    limitations.
3        You don't -- you don't talk
4    about those in your expert report, right?
5        A.   I'd have to read through it.
6    I'm not sure.
7        Q.   Okay.
8        A.   I'm not sure if I address
9    that.
10       Q.   I'll represent to you that I
11   couldn't find a single word about you
12   talking about the design limitations.  So
13   you can check me to see if I'm wrong.
14       You do talk about some of
15   the design limitations and the problems
16   with the case-control studies, correct?
17       A.   That is true.
18       Q.   And you do talk about some
19   of the design limitations and problems of
20   the meta-analyses, right?
21       A.   Yes.
22       Q.   And so in your opinion the
23   case-control studies do not support
24   statistically an increased risk of talcum

Kevin Holcomb, M.D.

Page 310

1    powder product exposure and risk of
2    ovarian cancer, right?
3          A.    My feeling is that the
4    case-control studies are not consistent
5    in their results.  That some studies show
6    an association and some studies don't.
7    And that it seems to be as consistent as
8    flipping a coin.
9          Q.    Do they support the opinion
10   that there is an increased risk, yes or
11   no?
12         A.    Some do, and some don't.
13         Q.    Okay.  What about the -- the
14   cohort studies, do they support an
15   increased risk for --
16         A.    No.
17         Q.    Let me finish my sentence.
18         A.    Sorry.
19         Q.    Do the cohort studies
20   support an increased risk for talcum
21   powder exposure and ovarian cancer?
22         A.    The initial Gertig study had
23   found that in a subset of just
24   histologically split out there was an

Page 311

1    increased risk of serous carcinoma.  The
2    reason why we're saying no about cohort
3    studies is because the same group of
4    women, when followed longer in Gates,
5    that significance dropped down.
6          So I would say overall in
7    those populations, the sister study, the
8    WHI, and the Nurses' Health Study, that
9    they did not support an increased risk.
10         Q.    Do the meta-analyses as a
11   whole support an increased risk of talcum
12   powder exposure and ovarian cancer?
13         A.    Not surprisingly, the
14   meta-analyses all say that the
15   case-control studies do and the cohort
16   studies don't, and when you mix the 27
17   case-control studies with the three
18   cohorts and weigh them fairly equally,
19   that you will find an increased risk when
20   you mix them altogether, which is not at
21   all surprising.
22         Q.    Do the odds ratios that are
23   reported for epithelial ovarian cancer
24   and genital talc exposure support an

Page 312

1    increased risk in ovarian cancer?
2          MS. CURRY:  Object to the
3    form.
4          THE WITNESS:  In which
5    study?
6    BY MS. GARBER:
7          Q.    In the meta-analysis as a
8    body?
9          A.    Again, yes.
10         Q.    Okay.  The only group of
11   studies that, in your opinion, don't
12   support an increased risk, you don't have
13   a single criticism of, yet the studies
14   that do, you criticize; is that fair?
15         MS. CURRY:  Object to the
16   form.
17         THE WITNESS:  If you -- that
18   is true.  I'm criticizing all the
19   case-control studies as a design.
20   But that means I'm criticizing the
21   ones that didn't find an
22   association just as much as I'm
23   criticizing the ones that do.
24         I'm saying at the design,

Page 313

1    there are flaws in case-control
2    studies.  And so I'm not just
3    trying to pick on the positive
4    case-control studies.  I'm talking
5    about case-control studies.
6          And that's -- from my look
7    at the literature, I'm saying that
8    about half of them saying there is
9    an association and half of them
10   saying that there's not, I'm
11   criticizing case-control study
12   design altogether.
13   BY MS. GARBER:
14         Q.    You said generally that
15   there can be design problems with
16   cohorts, yet I don't see a single
17   reference to the design limitations of
18   the cohorts that play in this case,
19   right?
20         A.    Well, one of the concerns
21   that you can have with a cohort study is
22   whether or not you follow patients long
23   enough, whether you have sufficient size.
24         And in my read, in my

79 (Pages 310 to 313)

Kevin Holcomb, M.D.

Page 314

1  understanding of the data, I was not
2  concerned -- size I already explained,
3  that I was concerned since it was such a
4  small level of effect in the case-control
5  studies.  It wasn't until I saw Berge,
6  when they put them together, that I
7  realized that you could overcome that
8  size problem.  And so I was not concerned
9  that you would pick up an effect size
10  that small.
11      Q.   Do you remember what my
12  question was?
13      A.   Yes.  You asked me did I
14  bring up criticisms.  And I'm saying my
15  criticisms about cohort studies in
16  general, I was able to put to rest with
17  my reading of those cohort studies,
18  whereas things like recall bias -- and we
19  already went through Schildkraut -- I was
20  able to find examples of why I was
21  concerned, and then find examples of
22  studies where I thought they were at
23  play.
24          So, I'm just explaining to

Page 315

1  you, you're saying, why is there an
2  absence of criticisms on these things.  I
3  didn't find any evidence of those things
4  at play in the cohort studies.
5      Q.   So you didn't find as the
6  expert for Johnson & Johnson in the
7  studies that didn't find an increased
8  risk in your opinion, and you didn't
9  bother to advise the court that there are
10  design limitations in that group of
11  studies, the cohorts, yet you did tell
12  the court about the study limitations of
13  the case-control and the study
14  limitations of the meta-analyses, true?
15      MS. CURRY:  Object to the
16  form.
17  BY MS. GARBER:
18      Q.   I didn't ask why.  I just
19  said true.
20      A.   True.
21      Q.   Thank you.
22          All right.  Let's look at a
23  couple of things.  So in looking at the
24  cohort studies and the limitations, is it

Page 316

1  true, Doctor, that none of the cohort
2  studies were specifically designed to
3  investigate the relationship of talcum
4  powder product use and the risk of
5  ovarian cancer?
6      MS. CURRY:  Object to the
7  form.
8      THE WITNESS:  Specifically
9  no.
10  BY MS. GARBER:
11      Q.   Rather, the cohorts were
12  designed to study a large number of
13  outcomes in a wide variety of exposures,
14  true?
15      A.   True.  When you do a cohort
16  study, because of the time and money
17  invested, you are very rarely going to
18  design a cohort study to answer one
19  question.
20      Q.   Right.  And that's a
21  limitation, right?
22      MS. CURRY:  Object to the
23  form.
24      THE WITNESS:  I'm not

Page 317

1  sure --
2  BY MS. GARBER:
3      Q.   It's okay.
4      A.   -- in what way that was a
5  limitation.
6      Q.   You're not sure?
7      A.   No.
8      Q.   Okay.  With a cohort study
9  looking at a rare cancer like ovarian
10  cancer, the study has to be large enough
11  to detect the true relative risk.
12          Do you agree with that?
13      A.   I agree.
14      Q.   So in fact, that a cohort
15  does not find a significant relative risk
16  can be due to the small study size,
17  correct?
18      MS. CURRY:  Object to the
19  form.
20      THE WITNESS:  Correct.
21  BY MS. GARBER:
22      Q.   The sample sizes and the
23  number of cases of most of the cohort
24  study publications were too small to be

80 (Pages 314 to 317)

Kevin Holcomb, M.D.

Page 318

1    able to accurately detect a relative risk
2    around 1.2 to 1.3.
3         Do you agree with that
4    statement?
5         MS. CURRY:  Object to the
6    form.
7         THE WITNESS:  I'm not sure.
8    I -- I've seen the opinion
9    expressed in the Narod paper that
10   you -- you had produced earlier.
11   And I keep on referring to Berge
12   only because it was the one
13   meta-analysis where they actually
14   addressed that.
15        Narod said you need like
16   200,000 women to see this effect
17   size, and then you look at three
18   studies with 78,000, 61,000,
19   41,000.  You're getting close to
20   that 200,000.  They say, we have
21   99 percent power to detect the
22   effect size in a meta-analysis
23   that is held so highly to see the
24   same effect size in the

Page 319

1    case-control studies.
2    BY MS. GARBER:
3        Q.   Well, you do go to Berge all
4    the time.  But you do that by ignoring
5    Penninkilampi which was a more recent
6    study, right?
7        A.   But the problem --
8         MS. CURRY:  Object to the
9    form.
10        THE WITNESS:  The problem --
11   the problem with Penninkilampi is
12   that Berge says the first thing
13   out the box I'm going to look
14   at heterogeneity and see if these
15   should be mixed.  And one of the
16   problems with putting
17   meta-analyses on the top of your
18   thing is assuming it's well
19   designed.
20        And I think all these
21   studies can have design flaws.
22   But I think meta-analysis is
23   probably the most at risk for
24   making mistakes in the design of

Page 320

1    your study and then coming out
2    with spurious values.
3         And one of the first things
4    that is generally thought to be a
5    no-no, we don't do cross-trial
6    comparisons in general.  If you
7    had a group of women taking this
8    chemotherapy over here and a group
9    of women taking chemotherapy over
10   there, we don't compare those two
11   chemotherapies and say well, this
12   study showed a response rate of
13   this.  This showed this, this,
14   that.
15        So whenever you're going
16   against that rule and you're going
17   to mix these people together, you
18   want to make sure that there's not
19   heterogeneity.  And the reason why
20   I keep on going back to Berge, is
21   because Penninkilampi somehow
22   looked at pretty much the same
23   studies and did not find a problem
24   with heterogeneity, whereas Berge

Page 321

1    says yeah, I found this
2    difference, but I'll caution you,
3    don't take it too seriously
4    because there was too much
5    heterogeneity in these two study
6    designs.
7         And I'm just questioning,
8    how is it that Berge was able to
9    find this heterogeneity issue and
10   yet other -- Taher, Penninkilampi,
11   other people who looked at largely
12   overlap the same study group, with
13   very little difference, somehow
14   didn't come up with this problem.
15   BY MS. GARBER:
16        Q.   So --
17        A.   And so I keep on going back
18   to it because it's the only meta-analysis
19   that says okay, here is the group if we
20   put them altogether.  Maybe we shouldn't
21   be doing it in the first place.  But
22   we're going to do it.
23        We put them altogether, but
24   here is what it looks like if you leave

81 (Pages 318 to 321)

Kevin Holcomb, M.D.

Page 322

1    them separately.
2        Q.   So, Doctor, if you would
3    then look at the Penninkilampi
4    meta-analysis which is later than the
5    Berge meta-analysis, right?
6        A.   Yes.
7        Q.   And the Berge meta-analysis,
8    and you say that those are basically the
9    same studies that the two study groups --
10       A.   There's a lot of overlap.
11       Q.   -- studied, right?
12           And the Penninkilampi says
13   there's no heterogeneity.  And the Berge
14   that says there is.  What is your basis
15   to say Berge is right and Penninkilampi
16   is wrong?
17       A.   Because if you can share --
18       Q.   You don't like the results
19   of Penninkilampi?
20       A.   -- if you can share -- yes.
21   If you can share Penninkilampi, because
22   Berge the -- Berge, Berge, I don't know
23   if I'm pronouncing it correctly, sorry.
24       Q.   However you say it.

Page 323

1        A.   The first thing they do is
2    to talk about heterogeneity in study
3    design.  And I'd like to see in
4    Penninkilampi to say that they considered
5    study design heterogeneity and found
6    none.  Because I don't remember seeing
7    that.  I'd like to see the paper if you
8    have it.  But I don't remember them even
9    addressing it.
10           He goes into act -- other
11   lesser important areas of heterogeneity
12   like the percentage that looked at mode
13   of exposure and things like that.
14           So if one doesn't even
15   mention it, and one mentions it and says
16   we found heterogeneity, I don't assume
17   that the one who didn't even mention it,
18   looked at it, found heterogeneity and
19   just decided not to mention it.  I'm
20   assuming they didn't think about it.
21       Q.   What did the Taher paper say
22   about heterogeneity?  Was there a
23   significant overlap in the Taher paper?
24       A.   I don't remember -- I don't

Page 324

1    remember them splitting out the case
2    controls and the -- they -- they do say
3    all the impact -- the positive effect was
4    in case-control, not in cohort studies.
5    Taher does say that.
6           Although Taher, if you look
7    at the tables, there's a few things that
8    I don't understand.  Like they -- they
9    say, actually in the cohort studies that
10   there is some increased risk of -- of
11   ovarian cancer.
12           And they -- they are
13   actually including Gates in that.  And
14   they say there's possibly an increased
15   risk in -- in Gates.  And then go onto
16   say, "but not mucinous."
17           But in Gates there was no
18   increased risk of any of the types.  In
19   fact, the only one that came the closest
20   to it was mucinous.
21       Q.   We're going to get to that,
22   and we'll go through that data, okay?
23       A.   Sure.
24       Q.   Let's look at Health Canada

Page 325

1    as to the topic of case-control -- or
2    cohort studies.
3        A.   Yes.
4        Q.   Page 20.
5           All right.  On Page 20 in
6    this paragraph here.  Do you see where I
7    am in the -- in the Taher paper?
8        A.   Yes, I see it.
9        Q.   Or, sorry, Health Canada.
10           It indicates -- I'll -- I'll
11   start with the first given.
12           "Given the long latency
13   period of ovarian cancer, the follow-up
14   periods may not have been sufficient to
15   capture all cases for the individual
16   cohort studies.
17           "Also, given the rarity of
18   ovarian cancer, many of the available
19   human studies may not be sufficiently
20   powered to detect a low odds ratio."
21           Do you agree with both of
22   those statements?
23       A.   No.
24       Q.   Which ones do you --

82 (Pages 322 to 325)

Page 326

1    A.   I'll start off.
2    Q.   Do you agree with either
3  one?
4    A.   I -- I'll start off.  The
5  long latency for ovarian cancer suggests
6  we know the latency for ovarian cancer.
7  To determine the latency for a cancer you
8  have to know the time from exposure to a
9  carcinogen to the time it develops.
10       So most people who make
11 statements about ovarian cancer latency
12 will look at things like women who
13 developed ovarian cancer after the
14 dropping of the atomic bomb at Hiroshima.
15 They'll look at the chance of developing
16 ovarian cancer after heavy occupational
17 exposure to asbestos.
18       You have to know the
19 carcinogen first before you can determine
20 the latency.  So they are assuming, well,
21 if there is long latency in these
22 situations it should be the same.  But
23 instead it's taken as a given.
24       Given the long latency of

Page 327

1  ovarian cancer.  Latency to what?
2  Latency from what incident?  There --
3  latency from --
4    Q.   Do you have an opinion of
5  the years?
6    A.   Excuse me?
7    Q.   Do you have an opinion of
8  the years of latency --
9    A.   I -- I'm just letting --
10   Q.   -- of ovarian cancer?
11   A.   I'm saying that you --
12       MS. CURRY:  Object to the
13 form.  And were you done with your
14 prior answer?
15       THE WITNESS:  No.  Because I
16 didn't go through the other part.
17       And then -- but going back
18 to the other one where they say --
19 BY MS. GARBER:
20   Q.   Sorry, Doctor, can I
21 interrupt you?
22       Do you have an opinion --
23   A.   I'd like to finish my first
24 answer.

Page 328

1       MS. CURRY:  I'm sorry.
2  You -- you've asked three
3  questions already that he's trying
4  to respond to.  So we'll still on
5  question Number 1 as to why he
6  disagrees with these two
7  statements.
8  BY MS. GARBER:
9    Q.   I just -- I just now asked
10 you if you have an opinion as to the
11 latency period.
12   A.   I was -- yeah, I'm -- I'm
13 trying to keep my train of thought
14 steady.  And I'm sure you want to keep
15 yours steady as well.
16       So I'm going to finish
17 answering the first thing you asked and
18 then we'll get to that.
19   Q.   Okay.
20   A.   So sample sizes were not
21 large enough to detect the 20 to
22 30 percent increased risk.  And as you
23 said, I keep going back to Berge, because
24 they say yes, there was enough.

Page 329

1       If you add those three
2  cohort studies, you had 99 percent chance
3  of picking up what was in the
4  case-control studies, but yet Taher
5  says -- or, sorry, Health Canada says
6  that there may not have been enough.  But
7  they -- and then they -- they quote Narod
8  as opposed to quoting -- there's no
9  mention of Berge saying that there was
10 enough.  There's just Narod's op Ed
11 opinion in 2016 which was not based on a
12 single study.  So I didn't -- so I didn't
13 agree with either one.
14   Q.   So the Narod paper is
15 talking in the abstract about the design
16 of cohort studies, and that you need a
17 sufficient number to detect a low odds
18 ratio.
19       The Berge study is talking
20 about their study, his study, right?
21   A.   Berge was a meta-analysis.
22   Q.   Yeah.  And -- and they're
23 talking about, for purposes of power,
24 that study.  Narod is talking about in

Kevin Holcomb, M.D.

Page 330

1    general when you look at cohort studies,
2    they have to have sufficient number of --
3    of study participants or you are not
4    going to detect a small risk.
5        A.   In the same way that I
6    wouldn't look at --
7            MS. CURRY:  Object to the
8    form.
9            THE WITNESS:  --
10   occupational exposure to asbestos
11   to answer the question of what
12   talc does when dusted on the
13   perineum, I wouldn't stick on a
14   hypothetical statement by Narod
15   when you actually have data from
16   women in the clinical scenario
17   that you're questioning, do you or
18   do you not have the power to
19   detect the level of -- the low
20   level of effect.
21           They are admitting it's a
22   low level.  They are saying that
23   maybe it wasn't enough.  But I'm
24   saying there's a study out there

Page 331

1    that says it was enough and gives
2    the explanation with the numbers.
3            It's not -- it's not cited
4    here.
5    BY MS. GARBER:
6        Q.   Doctor, you recognize that
7    Health Canada is recognizing that the
8    latency for development of ovarian cancer
9    is an important issue in the cohort
10   designs, right?
11           MS. CURRY:  Object to the
12   form.
13           THE WITNESS:  I'm -- I'm not
14   requesting that.  I'm questioning
15   what is the latency from.  If you
16   assume that talc causes ovarian
17   cancer, what is the latency for
18   talc causing ovarian cancer?
19           No one knows.  So any
20   extrapolation is an extrapolation
21   from another situation like an
22   atomic bomb, like in a heavy
23   occupational exposure.  So there
24   is an assumption, and these

Page 332

1    assumptions get made over and over
2    and over of what the latency
3    period is.  And you asked me then,
4    do I have an opinion on what the
5    latency period is.
6            And I can say that if you
7    had heavy occupational exposure
8    to -- I'll let you finish.
9    BY MS. GARBER:
10       Q.   No.  Carry on.  Carry on.
11       A.   No, I'll let you finish.
12       Q.   I can do two things at once.
13   I can multitask.  I'm listening.  I'm
14   listening.
15       A.   All right.  So if you -- if
16   you're asking me what is the latency
17   period for someone making gas masks in a
18   factory, I would say it's probably
19   somewhere around 20 years, maybe
20   30 years.  Hiroshima, you know, maybe 10
21   to 20 years.  That's the question.
22       Q.   So you have testified in a
23   prior case that ovarian cancer has a long
24   latency; is that true?

Page 333

1            MS. CURRY:  Object to the
2    form.
3            THE WITNESS:  In those
4    situations.
5    BY MS. GARBER:
6        Q.   Yeah.  All right.
7            And you have testified that
8    it can be as long as 20 to 40 years,
9    correct?
10       A.   It's possible, yes.  Based
11   on the extrapolations I just mentioned.
12       Q.   And you're aware of the
13   Purdie study from 2003 that indicated the
14   latency as likely 30 to 40 years,
15   correct?
16       A.   Can you show me Purdie study
17   and I can see what they're relying on --
18       Q.   Sure.
19       A.   -- and see what citation
20   they use, or if it's cited at all.
21           (Document marked for
22   identification as Exhibit
23   Holcomb-18.)
24   BY MS. GARBER:

84 (Pages 330 to 333)

Kevin Holcomb, M.D.

Page 334

1    Q.   Let's mark as Exhibit 18.
2    The Purdie 2003 study.
3         Doctor, if you turn to Page
4    231. Following Footnote 23, it reads,
5    "With regard to the latency" --
6         A.   I'm sorry.  231.
7    Following -- you said --
8         Q.   Here.  Look up here, Doctor.
9         A.   Hold on one second.
10        Q.   The authors state, "It is
11   likely that ovarian cancer has a
12   reasonable" --
13        A.   I'm sorry.  Can you -- I
14   really want to read along with you.  I
15   just don't see where you are.  You said
16   231 is the page we're on?
17        Q.   Yes.
18        A.   Okay.  Left?  Right?
19        Q.   Left-hand column.
20        A.   Okay.  Top of the page,
21   middle of the page, bottom?
22        Q.   Right here.  "It is likely
23   that ovarian cancer has a reasonably long
24   latency period between initiation and

Page 335

1    manifestation of established disease, and
2    this is exacerbated by unusually late
3    clinical detection of the disease."
4         A.   And that --
5         Q.   And you agree -- you
6    disagree with that?
7         MS. CURRY:  Object to the
8    form.  I think you said unusually.
9         The word is usually.
10   BY MS. GARBER:
11        Q.   Do you disagree with that
12   statement?
13        A.   What I -- I was curious to
14   see what the citation was.  I would say
15   that in other situations with a known
16   carcinogen, like the radiation from an
17   atomic bomb or heavy occupational
18   exposure, in those situations there is a
19   long latency.
20        Q.   And so, Doctor --
21        A.   Here there's no citations.
22   So I'm not sure what the statement is
23   based on.
24        Q.   So, Doctor, if you go down a

Page 336

1    bit it says -- couple lines, it says,
2    "Thus, the latency period of more
3    advanced malignant epithelial ovarian
4    cancer could be estimated to be
5    approximately 30 to 40 years."
6         A.   "This time frame is
7    consistent with data from the Hiroshima
8    cohort."
9         Yes.  They're doing what I
10   said.  They're extrapolating from an
11   atomic bomb victim to figure out what the
12   latency would be for somebody putting
13   talcum powder in their underwear.
14        Q.   And, Doctor, do you have any
15   reason or basis -- strike that.
16        Do you have any basis to
17   claim that the latency period would be
18   any different for talcum powder exposure
19   and development of ovarian cancer?
20        A.   In the totality of my review
21   of the literature, I don't see sufficient
22   evidence to consider that talcum powder
23   even causes ovarian cancer.  So I don't
24   have a carcinogen to start off with to

Page 337

1    start estimating latency.
2         What they're saying is, if
3    you extrapolate from the few situations
4    that we know that cause ovarian cancer,
5    they have a long latency.  So the
6    assumption is, well, this must have a
7    long latency period too.
8         They've given no citation
9    why that it is likely.  It's just, well,
10   it happened here; it must be the same
11   here.
12        Q.   So let's talk about this.
13   You're a study designer.  And you really
14   want to find out if talcum powder
15   exposure causes ovarian cancer.  And you
16   know that there's all this data out here
17   that ovarian cancer has a long latency.
18        A.   It's all this data out here?
19        Q.   Yeah.  I'm giving you a
20   hypothetical.  There's data from
21   radiation and other exposures.  Okay?
22        A.   Okay.
23        Q.   And the latency period is
24   about 20 to 40 years.  Are you going to

85 (Pages 334 to 337)

Kevin Holcomb, M.D.

Page 338

1    design a study that is going to follow
2    women 10 or six or 15 years when you know
3    that potentially it could be 20,
4    40 years?  You're not going to detect all
5    the risk, are you?
6         MS. CURRY:  Object to the
7    form.
8         THE WITNESS:  I think
9    there's a misconception between
10   how long you follow a patient and
11   latency.
12        Latency doesn't start when
13   you designed a study and she
14   signed the consent form.  Latency
15   started from exposure to
16   development of a cancer.
17        So if somebody, let's say,
18   on the woman's health initiative,
19   is 55 at the time that she goes
20   on, and you're trying to convince
21   me earlier that this is this
22   habitual thing that she does, that
23   she doesn't even think about it.
24   Cramer 2016 says she likely

Page 339

1    started in her 20s.  She may be
2    decades in by the time that you're
3    following her.
4         So if somebody has been
5    using talc for 20 years and then
6    you follow them for another 12, or
7    in the case of Gates, they were
8    followed for 24 years, and they
9    showed even women who had greater
10   than 20 years' exposure didn't
11   have an increased risk.
12        The other problem with this
13   concept that you're having, like
14   you're missing the latency, you
15   would expect that even in the
16   studies that are showing an
17   effect, that you should be able to
18   show a dose-response curve with
19   duration of use.  And it's an
20   inconsistent thing.  And all the
21   data, it's inconsistent.
22        There's -- one of the
23   struggles of saying that this
24   is -- that talc is a cause of

Page 340

1    ovarian cancer is the biologic
2    plausibility and where it falls
3    apart on dose-response.
4         So I'm saying, just because
5    you followed somebody from
6    12 years, doesn't mean that they
7    started using talc the day before
8    she signed consent.
9         And so no, if you're talking
10   about a behavior that likely
11   starts in the 20s, and you're
12   trying to design a study that's
13   enrolling women who started at 50,
14   yeah, 12 years should be enough.
15   BY MS. GARBER:
16        Q.   Doctor, in the studies
17   themselves, do they indicate when the
18   women started using the talc, the age at
19   which they started using the talc?
20        MS. CURRY:  Object to the
21   form.
22        THE WITNESS:  Again, no.  I
23   am referring to what Dr. Cramer
24   believes.

Page 341

1    BY MS. GARBER:
2         Q.   You're making assumptions
3    based on one given study --
4         MS. CURRY:  Objection.
5    BY MS. GARBER:
6         Q.   -- as to when the women were
7    exposed to talc.  Isn't that true?
8         MS. CURRY:  Object to the
9    form.
10        THE WITNESS:  Honest -- no.
11   Honestly it's -- it's also
12   personal experience with just
13   people in my family who have used
14   talc.  It's been -- it hasn't been
15   my experience.  I -- I don't know
16   anybody --
17   BY MS. GARBER:
18        Q.   That's not scientific,
19   Doctor, is it?
20        A.   It's not.  No.  But you
21   asked me what it's based on.  I'm saying
22   I don't know anybody who starts using
23   talc and never did it before and they
24   started at 50.

86 (Pages 338 to 341)

Kevin Holcomb, M.D.

Page 342

1          Q.   Okay.  And if you were going
2   to take my history if I were one of your
3   patients and you wanted to find out about
4   my risk for developing lung cancer, you
5   wanted to find out about my smoking
6   history, ask me what questions you
7   would -- and tell me what questions you
8   would ask me.
9          A.   I would ask --
10          MS. CURRY:  Object to the
11   form.
12   BY MS. GARBER:
13          Q.   About my exposure?
14          A.   I would ask when you started
15   smoking cigarettes.  How many cigarettes
16   a day do you smoke.
17          Q.   What else?
18          A.   Have you been exposed to
19   asbestos.  I know that's a co-carcinogen.
20   Things like that.
21          Q.   So when I started.
22          A.   Mm-hmm.
23          Q.   And how --
24          A.   Do you still smoke today?

Page 343

1          Q.   -- how frequently I smoke?
2          A.   Mm-hmm.
3          Q.   And so that's a two-sided
4   metric, right, frequency and duration.
5          A.   Right.
6          Q.   Right?  And that's important
7   to determine the true risk?
8          MS. CURRY:  Object to the
9   form.
10   BY MS. GARBER:
11          Q.   Right?
12          MS. CURRY:  Object to the
13   form.
14          THE WITNESS:  That's true.
15          MS. GARBER:  Okay.  Let's
16   take a break.
17          THE VIDEOGRAPHER:  Okay.
18   Stand by, please.  The time is
19   3:28 p.m.  Off the record.
20          (Short break.)
21          THE VIDEOGRAPHER:  Okay.  We
22   are back on the record.  The time
23   is 3:55 p.m.
24   BY MS. GARBER:

Page 344

1          Q.   Doctor, I'm going to mark
2   the Gertig 2000 study --
3          (Document marked for
4   identification as Exhibit
5   Holcomb-19.)
6   BY MS. GARBER:
7          Q.   -- as -- I'm sorry -- as
8   Exhibit 19.
9          Doctor, a study limitation
10   of the Nurses' Health Study is that the
11   authors only captured talcum powder
12   exposure one time in 1982 via
13   questionnaire, right?
14          A.   It's true.
15          Q.   Another limitation is the
16   study's exposure metric only captured
17   frequency of use, and not cumulative use,
18   correct?
19          MS. CURRY:  Object to the
20   form.
21          THE WITNESS:  Yes.
22   BY MS. GARBER:
23          Q.   And Table 2 shows that the
24   talc use in the perineum is never less

Page 345

1   than one week, one to -- one to six --
2   sorry.
3          Less than one time per week,
4   one to six times per week, and daily,
5   correct, is that your understanding?
6          A.   Yes.
7          Q.   And an adequate
8   dose-response cannot be determined by
9   just measuring frequency without the
10   length of use, correct?
11          MS. CURRY:  Object to the
12   form.
13   BY MS. GARBER:
14          Q.   Do you agree with that?
15          A.   No, I don't agree.
16          Q.   Okay.  Because the
17   assessment was only made in 1982, many of
18   the women may have stopped using talcum
19   powder products over the study period.
20   Do you agree with that?
21          A.   Not likely.
22          Q.   Do you agree that there were
23   only 78,630 women who formed the cohort
24   analysis?

87 (Pages 342 to 345)

Kevin Holcomb, M.D.

Page 346

1      A.   Yes.
2      Q.   That's a far cry from the
3  requisite 200 of the Narod study,
4  correct?
5          MS. CURRY:  Object to the
6      form.
7          THE WITNESS:  I've already
8      addressed that in the past.
9  BY MS. GARBER:
10     Q.   All right.  You didn't --
11 and didn't you testify in the Ingham case
12 that we don't know if there was a proper
13 control group because we don't know if
14 the control group was exposed to talcum
15 powder products via diapering?
16         MS. CURRY:  Object to the
17     form.
18         THE WITNESS:  You'd have to
19     show me my --
20 BY MS. GARBER:
21     Q.   You don't recall testifying
22 about that?
23     A.   We talked -- I'd be happy to
24 read through it again.  I don't have an

Page 347

1  independent memory of that.
2      Q.   All right.  The Gertig paper
3  provided a result for ever use of talcum
4  powder products on the perineum for
5  ovarian cancer at Table 2.  Do you recall
6  that?
7      A.   Yes.
8      Q.   And I'll just show you
9  Table 2 here.  Table 2, ever perineal
10 talc use, yes, no.
11         Correct?
12     A.   Correct.
13     Q.   All right.  And the point
14 estimate for ever use of talc, talc
15 powder products and EOC was 1.9 with a
16 confidence interval of 0.86 to 1.37; is
17 that correct?
18     A.   No.  The reference is by
19 Definition 1.
20     Q.   The ever use.
21     A.   I'm sorry.
22     Q.   The ever use --
23     A.   Yes.
24     Q.   -- point estimate was 0.09

Page 348

1  under the multivariant relative risk,
2  right?
3      A.   Yes.  Earlier you had said
4  reference.  So yes.  It's 1.09.
5      Q.   That's an elevated risk,
6  right?
7          THE VIDEOGRAPHER:  Can you
8      give me one second.  Sorry.  Just
9      lost power in my camera for some
10     reason.
11         Stand by.  The time is
12     3:59 p.m.  Off the record.
13         (Brief pause.)
14         THE VIDEOGRAPHER:  Okay.  We
15     are back on the record.  The time
16     is 4:00 p.m.
17 BY MS. GARBER:
18     Q.   And, Doctor, before that
19 break, I was just asking you about ever
20 use of perineal talc -- ever perineal
21 talc use.  And I asked you, is a
22 multivariant relative risk 1.09 with a
23 confidence interval of 0.86 to 1.37.  And
24 you agreed that's what it is,

Page 349

1  correct?
2      A.   Yes.
3      Q.   That's an elevated risk,
4  correct?
5          MS. CURRY:  Object to the
6      form.
7          THE WITNESS:  No.  That's --
8      you can't say for sure whether
9      that's an elevated risk.  Because
10     the true risk estimate is
11     somewhere between having a 14 --
12     yeah, 14 percent reduction in risk
13     to a 37 percent increase in risk.
14     And the true risk is somewhere in
15     there.  Where exactly the true
16     risk estimate I'm not sure.
17 BY MS. GARBER:
18     Q.   The point estimate, the
19 point estimate is elevated at 1.09, true?
20         MS. CURRY:  Object to the
21     form.
22         THE WITNESS:  The point
23     estimate is elevated, yes.
24 BY MS. GARBER:

88 (Pages 346 to 349)

Kevin Holcomb, M.D.

Page 350

1          Q.   And the follow-up study
2    period was just 14 years, correct, here
3    at Table 2, it sets forth a follow-up
4    period.
5              If you look here at the
6    table, you see the study period?
7          A.   Okay --
8          Q.   It's 14 years, right?
9          A.   One second.  I'm just doing
10   the math.  I went to public school.
11         Q.   Okay.  I went to a private
12   school.  But I'm not good at math either.
13         A.   Yes, 14 years.
14         Q.   Okay.  And with regard to
15   that follow-up period at Page 251,
16   Doctor, the authors note the limitation
17   in that they state, "In that regard, in
18   the peer-reviewed paper" --
19             MS. CURRY:  I'm sorry, where
20   are you --
21             THE WITNESS:  I'm sorry, I
22   don't know where you're reading.
23   BY MS. GARBER:
24         Q.   I'm reading at the top of

Page 351

1    251, right-hand column.  The authors
2    state, "Our relatively short follow-up
3    period may be inadequate to detect an
4    association if the latency for
5    development of ovarian cancer is more
6    than 15 years."
7              Did I read that correctly?
8          A.   You read that correctly.
9          Q.   So the authors are noting
10   that study limitation, correct?
11         A.   Yes, they did.
12         Q.   Also, at 251, the authors in
13   the middle column note that there are
14   several important study limitations,
15   correct?
16         A.   That's what it says, yes.
17         Q.   The authors also note that
18   they cannot determine the age at which
19   women began using talc or the duration of
20   their use.  That's what they say under
21   the heading of "Several Important
22   Limitations in Our Study," right?
23         A.   Yes.
24         Q.   Okay.  None of those study

Page 352

1    limitations that I just went through with
2    you are cited or addressed in your expert
3    report; is that true?
4          A.   That's true.  I did not
5    consider that a -- while a potential
6    study limitation, I sort of -- I looked
7    at the literature in totality, and other
8    papers suggested that while they could
9    not account for it, it's very likely that
10   this was a practice that began early in
11   the women's lives.
12             And so for completeness'
13   sake, they are mentioning this as a
14   limitation.  But the follow-up period, as
15   I mentioned earlier, of 14 years would be
16   too short to pick up a latency of
17   15 years if the woman just started using
18   talc the day she signed the consent.  But
19   if she had used talc for just three years
20   before signing the consent, it would not
21   have been a weakness.
22             So I respect them mentioning
23   this for completeness' sake.  But the
24   likelihood of them having not enough time

Page 353

1    for latency -- because latency again is
2    not follow-up time, it's exposure to
3    diagnosis -- I think it's unlikely that
4    they would not have the latency if you
5    extrapolated from an atomic bomb victim.
6          Q.   Did I ask you why those
7    aren't -- those study limitations aren't
8    contained within your expert report?
9          A.   No.  You asked me if it was
10   mentioned.  And I was just explaining why
11   it wasn't.
12         Q.   Try to just answer my
13   questions, if you can, Doctor.  I really
14   appreciate it.
15             The relative risk for ever
16   use of talcum powder products in serous
17   invasive ovarian cancer was elevated at
18   1.4 with a confidence interval of 1.02 to
19   1.91, correct?
20         A.   It depends on what type of
21   use you're talking about.  Because
22   strangely enough, in this study, for some
23   reason, if you use talcum powder on your
24   perineum, but you also used it on

Kevin Holcomb, M.D.

Page 354

1    sanitary napkins, an increased exposure,
2    the point estimates are actually
3    protective, there's .89, of course
4    crossing one, and .90. So --
5        Q.   Doctor, what was my
6    question?
7        A.   You said ever use of what
8    type.
9            MS. CURRY:  Did you complete
10       your thought?
11   BY MS. GARBER:
12       Q.   So, Doctor, you'll get a
13   chance to answer questions that counsel
14   for Johnson & Johnson may want to ask
15   you.
16           My question was, is the odds
17   ratio for serous ovarian cancer 1.4 with
18   a confidence interval of 1.02 to 1.91?
19   Is that what's reported in the study?
20       A.   I'm sorry.  One second,
21   ma'am.  For multivariate, it's 1.4, yes.
22       Q.   Okay.  And serous ovarian
23   cancer, as you testified several hours
24   ago, is a type of ovarian cancer,

Page 355

1    correct?
2        A.   The most predominate type,
3    yes.
4        Q.   Okay.  And so when you say
5    in your expert report that none of the
6    cohort studies showed an increased risk
7    in ovarian cancer, that was an error,
8    right?  Because --
9        A.   No.
10       Q.   -- serous ovarian cancer is
11   a form of ovarian cancer, true?
12           MS. CURRY:  Object to the
13       form.
14           THE WITNESS:  No.  I don't
15       see that as an error, because if I
16       have two studies of the same
17       population, one with 14 years of
18       follow-up, which you seem to take
19       a lot of issue with, and one with
20       24 years follow-up, I was under
21       impression with your criticisms of
22       the study that the one with the
23       longer follow-up would be
24       considered more accurate.

Page 356

1            So if Gates has 24 years of
2    follow-up, I would look at Gates
3    as the answer to this.
4            So that's exactly what
5    happened in this situation.  These
6    same group of women followed years
7    later, closer to covering the
8    latency that you were concerned
9    about, this risk went away.
10           And so I don't think I would
11   report twice on the same cohort of
12   patients.
13           MS. GARBER:  Objection.
14       Motion to strike as nonresponsive.
15   BY MS. GARBER:
16       Q.   Doctor, you didn't cite in
17   the four corners of your expert report
18   that the Gertig study showed an increased
19   risk in serous ovarian cancer, did you?
20           MS. CURRY:  Object to the
21       form.
22           THE WITNESS:  I just
23       explained why I made the general
24       statement --

Page 357

1    BY MS. GARBER:
2        Q.   I didn't ask you why.  My
3    question was very clear and precise.
4            MS. SHARKO:  You can't
5        interrupt him.
6    BY MS. GARBER:
7        Q.   Did you -- did you in the
8    four corners of your report state what
9    the results were for serous ovarian
10   cancer in Gertig, yes or no?
11       A.   Let me take a look and see.
12   Yes, I did mention it.
13       Q.   And, Doctor, do you state at
14   the top of Page 11 that the Gates 2010
15   reversed the finding of the only cohort
16   study reporting the association between
17   genital talc and epithelial ovarian
18   cancer?
19       A.   Yes.
20       Q.   What is your basis for that?
21       A.   Pretty much as I stated in
22   the report, that you said that I didn't
23   state, is that there was a modest
24   increased risk for invasive serous

Kevin Holcomb, M.D.

Page 358

1    ovarian cancer in the Gertig study, which
2    was stated on the bottom of Page 10
3    clearly. And that -- I can read it to
4    you, "In 2010 Gates, et al." --
5         Q.   You don't have to read it,
6    Doctor. I can read it for myself. Let
7    me withdraw that.
8         Doctor, did the Gates
9    authors state that their study reversed
10   the findings of the Gertig 2000 study?
11        MS. CURRY:  Object to the
12   form.
13        THE WITNESS: The results
14   did, yes.
15   BY MS. GARBER:
16        Q.   Did the study authors say
17   our data reversed the findings, used that
18   phrase, "reversed the findings" of the
19   Gertig study?
20        A.   I'd have to read through the
21   study to see if it was mentioned.
22        Q.   Is it epidemiologically
23   sound to say, "My study reversed the
24   findings of a prior study"?

Page 359

1         MS. CURRY:  Object to the
2    form.
3    BY MS. GARBER:
4         Q.   Have you ever heard that
5    done?
6         A.   I use the term. So yes,
7    I've heard it done.
8         Q.   It's your turn -- it's your
9    term?
10        MS. CURRY:  Object to the
11   form.
12        THE WITNESS: I use it in my
13   report, yes.
14   BY MS. GARBER:
15        Q.   Have you seen any other
16   study authors who say, in all of
17   epidemiological literature that you've
18   looked at, that says that the Gates 2010
19   study reversed the findings of the Gertig
20   2000 study?
21        A.   I could not tell you that
22   out of all the epidemiologic studies that
23   I've read whether or not that term was
24   used.

Page 360

1         Q.   In fact, there are
2    epidemiological studies as recent as
3    2018, that use the Gertig study in their
4    meta-analysis, right, the Penninkilampi
5    for one?
6         A.   That is true. And a
7    weakness of the study.
8         Q.   We're going to get to that.
9    I'm sure that's your opinion. But that
10   study relies on the Gertig study, in
11   other words, if they are including it in
12   their meta-analysis, surely those study
13   authors aren't thinking that the results
14   are reversed by Gates, correct?
15        A.   And --
16        MS. CURRY:  Object to the
17   form.
18        THE WITNESS:  -- and by not
19   including Gates, they will come to
20   a spurious result. They will
21   think that maybe a prospective
22   study supports that there's an
23   increased risk. Where if they had
24   done -- and this is what I was

Page 361

1    saying about meta-analysis.
2         Not only do you have to
3    worry about heterogeneity. And we
4    spent enough time talking about
5    that. But selection of the
6    studies that go into your
7    meta-analysis are very, very
8    important. And one -- and
9    selection bias is -- is a very
10   important thing that you have to
11   watch out for as well.
12        So the fact that
13   Penninkilampi, as late as that
14   study just came out, was unable to
15   figure out that that same cohort
16   had been followed for ten years
17   longer, we -- strengthening the
18   study by increasing the follow-up
19   time, all the criticisms you just
20   gave me about Gertig is now
21   strengthened in Gates, and yet you
22   choose to use the number from
23   Gertig. I'd have to ask why would
24   somebody who's seeking the truth

91 (Pages 358 to 361)

Kevin Holcomb, M.D.

Page 362

1    do that.
2    BY MS. GARBER:
3        Q.   I'm going to show you some
4    data and see if we can figure that out
5    together.
6            You don't have any basis to
7    conclude that the Penninkilampi authors
8    didn't know about the Gates 2010 data,
9    did you?
10           MS. CURRY:  Object to the
11       form.
12           THE WITNESS:  I'm saying
13       that I don't see in their
14       definitions, including the studies
15       that they included, the search
16       terms that they included, a reason
17       why they would negate Gates.
18   BY MS. GARBER:
19       Q.   Do you know whether or not
20   the Taher authors included the Gertig or
21   the Gates study?
22       A.   I believe they included
23   both.  But if I can look at it.  Because
24   earlier that was where I was telling you

Page 363

1    that they are saying Gates shows a
2    possible increased risk of cancer in
3    their table, where -- and I'm talking
4    about on the -- the -- can I pull out
5    Taher since you bring it up?
6        Q.   That's okay.  We're going
7    to -- we're going to get there in a
8    minute --
9        A.   Okay.
10       Q.   -- when I'm done with these
11   cohorts, so...
12           All right.  Let's -- let's
13   talk about Gates 2010.
14           (Document marked for
15       identification as Exhibit
16       Holcomb-20.)
17   BY MS. GARBER:
18       Q.   I'll mark as Exhibit 20, the
19   Gates 2010 publication.
20           Doctor, the Gates 2010
21   article was a publication of the
22   follow-up to the Nurses' Health Study I
23   that was published as Gertig in the year
24   2000, correct?

Page 364

1        A.   Correct.
2        Q.   And the age of the women in
3    the Gates 2010 were younger than the
4    study women in the Gertig?
5            MS. CURRY:  Objection to
6        form.
7    BY MS. GARBER:
8        Q.   Is that true?
9        A.   I'm sorry, say the --
10       Q.   Sorry.  The age of the women
11   in Gates 2010 were younger than the
12   Gertig women, correct?
13           MS. CURRY:  Object to form.
14           THE WITNESS:  You mean the
15       same women that were followed
16       in -- in Gertig, by the time they
17       saw them ten years later they were
18       younger?
19   BY MS. GARBER:
20       Q.   Is there a disparity in the
21   age of the two cohorts?
22       A.   Between Gertig and Gates.
23           MS. CURRY:  Not -- I
24   think --

Page 365

1            THE WITNESS:  I'm a -- I'm a
2    little confused by your question.
3    BY MS. GARBER:
4        Q.   Okay.  Do you understand
5    that the women who were included in the
6    Gates study were younger than the women
7    in the Gertig study?
8            MS. CURRY:  Object to the
9        form.
10   BY MS. GARBER:
11       Q.   Maybe I'll show you --
12       A.   Yes.
13       Q.   -- and then you can maybe
14   help me understand.
15       A.   Because I don't need to read
16   through.
17       Q.   Doctor, if you could look
18   right here?
19       A.   Sure.
20       Q.   On the first page.  Do you
21   see where it says, "The Nurses' Health
22   Study was established in 1976 and the
23   Nurses' Health Study II in 1989 amongst
24   121,700 U.S. women" -- "U.S. female

92 (Pages 362 to 365)

Kevin Holcomb, M.D.

Page 366

1  registered nurses aged 30 to 55 and
2  116,430 U.S. female registered nurses
3  aged 25 to 42 respectively."
4          So the two cohorts are
5  different ages, are they not?
6          MS. CURRY:  Object to the
7      form.
8          THE WITNESS:  I'm sorry, I'm
9      just taking my time to read
10     through this again.
11 BY MS. GARBER:
12     Q.   Mm-hmm.  Do you need time to
13 study?  We'll go off the record if you
14 do.
15     A.   No.  That seems to be the
16 case, yes.
17     Q.   Okay.  Okay.  In the Gates
18 study they were not asked questions about
19 it -- about their talc use.  Instead, the
20 data about their talc exposure was
21 carried over from the Gertig one-time
22 1982 questionnaire.  Do you agree with
23 that?
24     A.   It's my understanding that

Page 367

1  the NHSII population was not queried on
2  their use of talc because it was a
3  one-time questionnaire in 1982.
4          So yes, the NHSII
5  population is younger than the NHSI, but
6  the question of the effect of talc on
7  ovarian cancer was in -- only in patients
8  that have been asked about ovarian cancer
9  exposure.
10     Q.   Mm-hmm.  And that's a study
11 limitation, correct?
12     A.   No.
13     Q.   Okay.  In the Gates 2010 the
14 authors provide no results for ever use
15 of talcum powder product on the perineum
16 for ovarian cancer; is that true?
17     A.   No.
18     Q.   It's not true?
19     A.   No.  Hold on one second.
20 Sorry.  I have to go and find.
21     Q.   Doctor, if you turn to
22 Table 4 --
23     A.   Yes.
24     Q.   -- Page 50.  You see that

Page 368

1  the metric is talc use greater than once
2  a week versus less than once a week.
3  It's not ever never, correct?
4      A.   Correct.
5      Q.   That's a different metric
6  from Gertig, right?
7      A.   Different metric, yes.
8      Q.   Thank you.
9      A.   Valid -- valid change
10 though.
11     Q.   Okay.  But different
12 nonetheless, right?
13     A.   Different and valid.
14     Q.   While the Gates 2010 study
15 followed women for ten more years, the
16 follow-up is, in total, 26 years,
17 correct?
18     A.   Correct.
19     Q.   And we don't know when the
20 women were exposed, at what age they
21 began using talc, correct, the study
22 doesn't -- either study doesn't tell us
23 that, correct?
24     A.   No.

Page 369

1      Q.   And assuming the latency for
2  ovarian cancer is 30 to 40 years, that
3  study period would be inadequate to
4  accurately detect all of the women with
5  ovarian cancer.  Would you agree with
6  that?
7          MS. CURRY:  Object to the
8      form.
9          THE WITNESS:  No.  I think
10     if you -- if you can stretch to
11     the assumption that the latency
12     for something that's not even
13     proven carcinogenic is the same as
14     somebody working in a gas mask
15     factory, I think you can
16     equally -- in fact, it takes less
17     of a stretch to believe that the
18     women didn't start talc use four
19     years before they went on the
20     study, because that is not what
21     most people believe, even
22     Dr. Cramer doesn't believe most
23     women start that late in life.
24 BY MS. GARBER:

93 (Pages 366 to 369)

Kevin Holcomb, M.D.

Page 370

1        Q.   But you have no data as to
2  when the women in this study actually
3  started talc use, do you?
4        A.   No.
5        Q.   The Gates relative risk for
6  women who use talc greater than once a
7  week and serous ovarian cancer is 1.06
8  with a confidence interval of 0.84 to
9  1.35.  Do you agree with that?
10       A.   Sorry, one second.  Yes.
11       Q.   And again, under your
12 definition of positive, you do not think
13 that is a positive finding, correct?
14       A.   Positive and not
15 statistically significant, yes.
16       Q.   You do think it's positive,
17 but not statistically significant?
18           MS. CURRY:  Object to the
19     form.
20           THE WITNESS:  If you're
21     asking me about directionality,
22     it's obvious.  Because
23     directionality it's positive.
24           I do not consider it a

Page 371

1  significant or valid finding
2  because I can't say for 90
3  percent, 95 percent accuracy, that
4  the true risk estimate lies above
5  one.
6  BY MS. GARBER:
7        Q.   So, Doctor, earlier today
8  you told me that where relative risk was
9  greater than one, but not statistically
10 significant, that was a negative finding.
11          Are you now changing your
12 definition of positive versus negative?
13       A.   I think you just misstated
14 my statement, because that's not --
15 doesn't make sense what you just said.
16       Q.   Okay.  I thought you told me
17 earlier today when I asked you what a
18 negative study was, it included an odds
19 ratio that could be greater than one but
20 if it wasn't statistically significant,
21 it was a negative study in your opinion?
22       A.   In this term, the question
23 that you just asked me when you were
24 asked positive, I thought you were asking

Page 372

1  directionality.  And that's why I said
2  it's obviously directionality positive.
3           And if you're asking me is
4  it a valid study, one that I would rely
5  on with a degree of medical certainty, I
6  would say no, because I'm one of those
7  old school doctors who still believe that
8  95 percent confidence intervals are
9  important.
10       Q.   If the Court asked you if
11 the Gertig serous ovarian cancer in the
12 Gates study was positive or negative, how
13 would you reply?
14       A.   I would say it's a negative.
15       Q.   Okay.  And I think we
16 already covered this.  But you can't cite
17 me to any authority, can you, that the
18 Gates study reverses the Gertig finding,
19 correct?
20           MS. CURRY:  Object to the
21     form.
22           THE WITNESS:  Well, I'm here
23     giving my testimony.  So I'm going
24     to assume the mantle of an

Page 373

1  authority.  And I would say if
2  this group is followed for ten
3  years longer -- and I'll add the
4  caveat that women who used it for
5  less than one week had the same
6  risk in a study just two years
7  before this, as women who had
8  never used.
9           So if you go to Gates 2008,
10 you will see for this study cohort
11 there's no reason to believe that
12 it's not a valid thing to lump
13 somebody who used it in less than
14 one week with never used, based on
15 the Gates 2008 data.
16          So, yes, I would say this
17 1.4 that was found in Gertig is
18 not -- is no longer here.
19          And so in my estimation,
20 this reverses the findings.  This
21 says in the same population of
22 women followed longer, the
23 increased risk went away.
24 BY MS. GARBER:

Kevin Holcomb, M.D.

Page 374

1          Q.   The study authors, again, do
2    not say that, correct?
3          A.   I'd have to --
4          Q.   They don't say it reverses?
5          A.   I don't remember.  I'd have
6    to read through the whole discussion
7    section for you.
8          Q.   Okay.  And, Doctor, as to
9    the Houghton study, the WHI study, you
10   read that one, right?
11         A.   Yes.
12         Q.   You say in your report, at
13   Page 11 in sort of the middle of the
14   page, that there was no statistically
15   significant association between use of
16   genital talc and the development of
17   ovarian cancer for ever users?
18         A.   I'm sorry.  The page again?
19         Q.   Page 11.
20         A.   Yes.
21         Q.   And to make that statement,
22   there is --
23         A.   I'm still looking for it.
24   One second.

Page 375

1          Q.   It's in the middle of the
2    page.
3          A.   Can you repeat the statement
4    that you said I'm looking for.
5          Q.   In your expert report at
6    Page 11 as to the Houghton study --
7          A.   Yes.
8          Q.   -- you indicate that there
9    was no statistically significant
10   association.
11         A.   I'm looking for the term
12   that you're saying.
13         Q.   That's okay, Doctor.
14         Do you know what the sample
15   size was in the WHI study?
16         A.   I think it was about 61,000.
17         Q.   And based on the relative
18   small size, that's a study limitation of
19   the Houghton study, correct?
20         MS. CURRY:  Object to the
21   form.
22         THE WITNESS:  As taken in a
23   vacuum as an individual study,
24   yes.

Page 376

1    BY MS. GARBER:
2          Q.   And what was the exposure
3    metric in the Houghton study?
4          A.   There was a question at
5    baseline with, "Have you ever used powder
6    on your private parts/genital areas?"
7    And then respondents responding yes, were
8    then asked to identify the duration of
9    use.  It was less than one year, one to
10   four years, five to nine years, and all
11   the way up to greater than 20 years.
12         Q.   And, Doctor, that's --
13   that's a duration of use --
14         A.   Right.
15         Q.   -- assessment, right?
16         A.   Yes.
17         Q.   And that doesn't take into
18   consideration frequency of use, right?
19         A.   No.
20         Q.   All right.  And then the
21   Houghton authors state that the Nurses'
22   Health Study found that there was a
23   40 percent increase in the risk with a
24   confidence interval of 1.02 to 1.91?

Page 377

1          A.   I'm not sure where you're
2    looking.
3          Q.   Okay.  Doctor, if you look
4    at the right-hand -- yeah.  If you look
5    at the first page, the right-hand column.
6          MS. CURRY:  Which study?
7    Sorry.
8          MS. GARBER:  Houghton.
9          THE WITNESS:  Yeah, but we
10   don't --
11         MS. CURRY:  You haven't
12   marked it as an exhibit.
13         MS. GARBER:  Oh, I'm sorry,
14   you guys.
15         (Document marked for
16   identification as Exhibit
17   Holcomb-21.)
18   BY MS. GARBER:
19         Q.   Okay.  Let's mark the
20   Houghton 2014 study.  Doctor, if you look
21   at the right-hand column, here.
22         MS. SHARKO:  What exhibit is
23   this?
24         MS. GARBER:  What?

Kevin Holcomb, M.D.

Page 378

1      MS. CURRY: 21.
2      MS. SHARKO: Oh, 21? Okay.
3 BY MS. GARBER:
4      Q.   Doctor, do you see where I'm
5 marking right here, on the right-hand
6 side?
7      A.   Yes.
8      Q.   The -- the sentence begins,
9 "In the Nurses' Health Study (NHS)
10 cohort, no overall association was found
11 between the use of perineal powder and
12 epithelial ovarian cancer" -- and it
13 cites the risk -- "or serous ovarian
14 cancer," and it cites the odds ratio.  It
15 goes on to say, "However, there was a
16 40 percent with a 95 percent confidence
17 interval of 1.02 to 1.91 increased risk
18 for serous invasive ovarian cancer with
19 ever perineal use, which comprises
20 86 percent of the serous ovarian cancers
21 in the cohort."
22      Did I read that correctly?
23      A.   You read it correctly.
24      Q.   And that cites to the Gertig

Page 379

1 study, right?
2      A.   Yes.  The beginning of that
3 paragraph says, "To date there has only
4 been one prospective study conducted."
5 This is 2013.  And we've already
6 established there was a follow-up to that
7 study in 2010 that wasn't included here.
8      Q.   And that's precisely my
9 point.  So here, the Houghton authors are
10 citing to the Gertig study, not the Gates
11 study, correct?
12      A.   That's correct.  And I would
13 consider it inappropriate not to mention
14 that follow-up information.
15      Q.   The authors don't say that
16 the Gates 2010 reversed the findings of
17 the Gertig study; rather, they cite those
18 data, don't they?
19      A.   They do.
20      MS. CURRY: Object to the
21 form.
22      THE WITNESS: I just think
23 it's a mistake to leave out what
24 clearly -- this statement, "To

Page 380

1 date, there has only been one
2 prospective study conducted the
3 powder use and risk of ovarian
4 cancer," and then only cite
5 Gertig, which in fact to that
6 date, there had been two studies.
7      If you don't want to say one
8 reversed it.  Then you have to at
9 least admit that there was two
10 studies.  It was Gertig and Gates.
11 So the fact that they made that
12 mistake from the beginning of that
13 paragraph and follow it through
14 with only talking about Gertig,
15 yes, you're accurate -- you read
16 perfectly right what they said.
17 But my point is that that's not an
18 accurate statement.  There was
19 more than one.
20 BY MS. GARBER:
21      Q.   So Nurses' Health Study was
22 one study, right, with two publications?
23      A.   No, I think that if you are
24 talking about how many studies,

Page 381

1 there's -- there is two different
2 publications.  You're right, they are
3 only citing one of them.
4      Q.   So the Nurses' Health Study
5 was one study with two publications or it
6 was two studies with two publications?
7      MS. CURRY: Object to the
8 form.
9      THE WITNESS: As you can see
10 with my case-control lists for
11 example, I still counted those as
12 separate studies and you are
13 talking about what percentage are
14 positive, what percentage are
15 negative.  When, in fact, I had
16 studies that were reported on the
17 same populations at later time.  I
18 can -- I considered them two
19 studies.
20      So I'm -- the Nurses' Health
21 Study was one prospective study
22 with -- with two publications.
23 And the fact that they don't cite
24 Gates, I see as a weakness to

Kevin Holcomb, M.D.

Page 382

1    their -- their introduction.
2    BY MS. GARBER:
3        Q.   You think they should have
4    cited the Gates 2010 study?
5        A.   I think that's -- I think
6    that's -- it should make you pause when
7    the only prospective study that you're
8    quoting has this increased risk.  And
9    then the women followed longer, the risk
10   goes away.  It's worth mentioning I would
11   think.
12       Q.   Well, Doctor, the Gates
13   study is peer reviewed and published,
14   right?
15       A.   Yes.
16       Q.   And the Penninkilampi is
17   peer reviewed and published, correct?
18       A.   Yes.
19       Q.   And I know the Taher isn't
20   yet peer reviewed, but it -- it cites to
21   the Gertig study too, doesn't it?
22       A.   Repeated --
23           MS. CURRY:  Object to the
24       form.

Page 383

1           THE WITNESS:  -- mistakes
2       don't make it less of a mistake.
3    BY MS. GARBER:
4        Q.   Okay.  But -- but at least
5    the Gertig and the Penninkilampi are peer
6    reviewed and cite --
7        A.   Some of -- so --
8        Q.   -- to Gertig --
9        A.   Yes.
10       Q.   -- is that true?
11       A.   Yes, yes.
12       Q.   Okay.  Let's talk further
13   about the Houghton study --
14       A.   Yes.
15       Q.   -- the WHI study.  The study
16   enrolled 61,576 postmenopausal women,
17   right?
18       A.   I'm sorry --
19       Q.   It's in the abstract under
20   results?
21       A.   Yes.
22       Q.   Okay.  And you don't -- do
23   you know when the women started using
24   talc, at what age, in this study?

Page 384

1        A.   I have to go back to the
2    materials and methods to see if they
3    asked.  One second.
4           No.
5        Q.   Okay.  And while there is
6    duration of exposure, you don't know how
7    many women were exposed to long-term talc
8    defined by more than 20 years, do you,
9    this study doesn't report that data, does
10   it?
11       A.   How many women had used it
12   for 20 or more years?
13       Q.   Yes.
14       A.   I'd have to go to the
15   results to check for that.  Because it
16   was part of the questions.
17       Q.   All right.  That's all
18   right.  I'll withdraw the question.
19           And turning to Page 4,
20   Table 2.  It shows the number of women in
21   the study who reported using talcum
22   powder products on their genitals, right?
23       A.   Yes.
24       Q.   And how many women used

Page 385

1    it -- let me catch up to you.  How many
2    women were reporting using ten years or
3    more?
4        A.   68.
5        Q.   Not very many, is it?
6           MS. CURRY:  Object to the
7       form.
8           THE WITNESS:  No.
9           This -- you -- let me
10      clarify.  You're asking not how
11      many women used it for longer, but
12      how many women who developed
13      ovarian cancer that had used it.
14   BY MS. GARBER:
15       Q.   Yeah.
16       A.   That's 68.  Yes.
17       Q.   Yeah.  It's not very many
18   women in that study group, is it?
19           MS. CURRY:  Object to the
20      form.
21           THE WITNESS:  Relative to?
22   BY MS. GARBER:
23       Q.   Relative to 200,000?
24       A.   Narod didn't say you need

97 (Pages 382 to 385)

Kevin Holcomb, M.D.

Page 386

1    200,000 women with ovarian cancer. He
2    said you need 200,000 women total.
3         Q.   Okay. Is 68 who developed
4    ovarian cancer a good amount that gives
5    you confidence in these data?
6              MS. CURRY: Object to the
7         form.
8              THE WITNESS: You know, the
9         smaller the number, the wider the
10        confidence interval would be.
11   BY MS. GARBER:
12        Q.   Is this a wide confidence
13   interval? You testified in the Ingham
14   case it was, didn't you?
15        A.   That this is a wide
16   interval?
17        Q.   Mm-hmm.
18        A.   Well, it crosses -- it's
19   wide enough, and it's in the wrong -- you
20   know, it crosses one, so it's not
21   statistically significant.
22             So that apparent reduction
23   in the risk, that 2 percent reduction in
24   the risk, I wouldn't trust it.

Page 387

1         Q.   That's a limitation of the
2    study, right, the wide confidence
3    interval, in that few women -- few number
4    of women participants?
5              MS. CURRY: Object to the
6         form.
7    BY MS. GARBER:
8         Q.   Right?
9         A.   The few number of women
10   participants, it's -- it's actually what,
11   61,000 women participants.
12        Q.   The 68 women participants
13   calls into question the validity of this
14   subgroup analysis, doesn't it, Doctor?
15             MS. CURRY: Object to the
16        form.
17             THE WITNESS: If you're --
18        the only analysis that was broken
19        down, you're saying the number of
20        women with ten or more years is
21        68.
22             And when you say that's low,
23        I'm not sure it's relative to
24        what.

Page 388

1    BY MS. GARBER:
2         Q.   Okay. Another limitation of
3    the study was that one-sided metric of
4    only capturing duration. Do you agree
5    with that?
6              MS. CURRY: Object to the
7         form.
8              THE WITNESS: I think a
9         perfect study would collect --
10        collect both. So yes.
11   BY MS. GARBER:
12        Q.   It would be an optimal study
13   to collect both, wouldn't it?
14             MS. CURRY: Object to the
15        form.
16             THE WITNESS: Unfortunately
17        there is no such thing as an
18        optimal study. I could look at
19        all -- every study I reviewed and
20        pick up things that should have
21        been done differently and better.
22        And hopefully learn with the next
23        study design. But that's true for
24        everything in my reliance list.

Page 389

1    BY MS. GARBER:
2         Q.   Let's see if we can work out
3    how this would work.
4              If you only captured
5    duration of use and you said it was --
6    you used it ten years or more, a given
7    woman could have used it once a year on
8    her anniversary for all you know,
9    correct?
10        A.   Correct.
11             The -- the big problem with
12   this whole body of literature though, is
13   this concept that you have any idea of
14   the dose at the tissue level.
15             I -- if you told me you used
16   it everyday, and I'm a woman and I use it
17   everyday and you take three shakes and I
18   take one, we're really not getting to the
19   heart of dose-response.
20             And this -- this is a
21   difficulty of all this topic. It's --
22   it's -- they are all limited. They are
23   all limited. We have no idea of the dose
24   of talc, if it's even getting to the

98 (Pages 386 to 389)

Kevin Holcomb, M.D.

Page 390

1    ovaries, and if it's getting to the
2    ovaries from that dusting, what amount is
3    getting to the ovaries.  And so we're
4    playing a pseudoscience game with
5    dose-response.
6            This isn't really
7    dose-response.  Dose-response studies
8    have to do with the level of what you're
9    interested in at the tissue level.  So we
10   can go through the stuff and talk about
11   these as weaknesses, but this whole body
12   of literature is weakened by the
13   inability to know.
14           I don't even know for sure
15   that it gets to the ovary from this way.
16   How much each women put into her --
17   dusted with is -- is totally random.
18       Q.   And that's what I want to
19   really get at here because you're aware
20   of data where there is talc found in the
21   ovarian tissue, both tumor and
22   non-diseased, right?
23       A.   In women who report exposure
24   and women who don't report exposure.

Page 391

1        Q.   Okay.  And you're aware
2    of -- from your work in individual cases,
3    that there are women who report talcum
4    powder product exposure who have found
5    asbestos and talc in their ovaries,
6    correct?
7            MS. CURRY:  Object to the
8        form.
9            THE WITNESS:  There are
10       women who report neither of the
11       two who find particles that
12       diagnosed as talc or asbestos in
13       their ovaries.
14           So you're getting to my
15       point, is that the -- it falls
16       apart with the biologic
17       plausibility because of all these
18       weaknesses, because you can't
19       really assess dose at the tissue
20       level, because women who report
21       no -- because there isn't a good
22       correlation between reported
23       history of exposure and finding
24       the particles.

Page 392

1            Because even in the cases of
2    the particles that you find, I
3    have no idea how they got there.
4            There is -- there is a lot
5    of weakness just overall in this
6    whole area.
7            So I would be less bothered
8    by that if you gave me the
9    epidemiology data that showed me a
10   20-fold increase.  Then I'm less
11   reliant or feel like you -- it's
12   less necessary.
13           But in this situation where
14   we've already gone through the
15   epidemiologic data earlier.  And I
16   pointed out all the
17   inconsistencies, as I describe.  I
18   call a 50/50 split inconsistent.
19           And now you get to this, and
20   you can point out all the
21   weaknesses.  But I'm saying
22   there's weaknesses in all these
23   studies going through.
24

Page 393

1    BY MS. GARBER:
2        Q.   Doctor, do you think that
3    the data which shows that there is
4    asbestos and talc in ovarian tissue
5    provides a biologically plausible
6    mechanism of carcinogenicity?
7            MS. CURRY:  Object to the
8        form.
9            THE WITNESS:  Just the
10       presence of it in the --
11   BY MS. GARBER:
12       Q.   Yeah.
13       A.   This is part of the problem
14   with this whole area.  The presence --
15       Q.   Doctor, that wasn't my
16   question.
17       A.   No.  The presence --
18       Q.   Yes or no.
19       A.   No.  The presence of it does
20   not --
21       Q.   You don't think that --
22       A.   Just the mere presence of
23   the particle does not prove a causal
24   relationship.

99 (Pages 390 to 393)

Kevin Holcomb, M.D.

Page 394

1        Q.   And you've seen paper after
2   published paper wherein the study authors
3   who are actually studying talcum powder
4   exposure, talc product exposure and
5   ovarian cancer, are stating that there is
6   a biologically plausible mechanism,
7   correct?
8            MS. CURRY:  Object to the
9        form.
10           THE WITNESS:  The
11       statements of --
12   BY MS. GARBER:
13       Q.   You just disagree with them?
14           MS. CURRY:  Object to the
15       form.
16           THE WITNESS:  But the -- in
17       no situation, in medicine that I
18       can think of would a -- the mere
19       presence of a molecule or particle
20       or whatever in a certain organ be
21       evidence of its carcinogenicity.
22           That's not biologic
23       plausibility.
24           Just its mere presence

Page 395

1        isn't.
2            And the fact -- the fact
3        that so many people are saying
4        that is exactly what I'm talking
5        about when people overstate the
6        findings of their studies, just
7        the -- just the finding it there
8        in no way implies biologic
9        plausibility.
10   BY MS. GARBER:
11       Q.   That's your opinion, right?
12       A.   That's like saying --
13       Q.   There are study authors who
14   disagree with you, correct?
15           MS. CURRY:  Object to the
16       form.
17           THE WITNESS:  Just to give
18       you an example, it was -- it would
19       be like saying because I went to
20       the bank, there's a plausible
21       evidence that I robbed the bank
22       because I was there.  I mean, that
23       doesn't make any sense to me.
24       That's not the way I look at it,

Page 396

1        not just in talc.  I would look at
2        that as a ridiculous situation in
3        any statement.
4            We're here and studying this
5        because people say they -- they
6        describe finding talc there.  But
7        that's -- that's not the burden of
8        proof.
9   BY MS. GARBER:
10       Q.   Okay.  Do you think the
11   burden of proof is absolute proof that
12   the talc got there through perineal
13   dusting?
14       A.   Does it matter how it got
15   there if it's a carcinogen?
16       Q.   If it's a carcinogen, does
17   it matter?
18       A.   It matters maybe for you,
19   because of the nature of this litigation.
20           But if talc caused cancer of
21   the ovary, I could care less how it got
22   there.  I'd want to -- you know, the fact
23   that it's there is an issue.  You'd be
24   able to prove that it's a carcinogen.

Page 397

1            So even the cases, the
2        Heller study, you mentioned it earlier,
3        24 women, 12 reporting a history of
4        exposure, 12 not reporting a history of
5        exposure.  Not only is there not a
6        correlation, if I go back and I read the
7        paper, I think the fiber counts are even
8        higher in the women without a reported
9        history.
10       Q.   We're going to look at that
11   paper in a minute.  But, Doctor, don't
12   the authors suggest why that is, why the
13   unexposed group may have high fiber
14   counts?
15           MS. CURRY:  Object to the
16       form.
17           THE WITNESS:  Do they
18       what -- what it is?  Can you
19       repeat?
20   BY MS. GARBER:
21       Q.   Don't the study authors
22   suggest --
23       A.   See --
24       Q.   -- what may account for that

100 (Pages 394 to 397)

Kevin Holcomb, M.D.

Page 398

1    high fiber burden in the non-exposed
2    group?
3            MS. CURRY:  Object to the
4        form.
5            THE WITNESS:  If you
6        equal -- if you think and suggest
7        and hypothesize are the same, I
8        would agree with you.  You see
9        suggestion in science means
10       there's some evidence to make you
11       think this is the case.
12       Otherwise, you're just -- it's
13       conjecture and it's hypothesis.
14   BY MS. GARBER:
15       Q.   And you read the Cramer
16   paper.  Didn't the Cramer paper suggest
17   that -- address the issues, the
18   shortcomings of the Heller data, that
19   there may be surface contamination that
20   goes in and mixes with the talc or
21   asbestos in the tissue which accounts for
22   the unexposed group?
23           MS. CURRY:  Object to the
24       form.

Page 399

1    BY MS. GARBER:
2        Q.   Don't they suggest that?
3        A.   Yes.  You're saying that one
4    author says it's from one explanation and
5    Cramer says it's from another
6    explanation, so yeah, they're all
7    suggesting these different things.  One
8    person saying it is diapering as a child.
9    The next person is saying it's
10   contamination.  The truth is no one
11   knows.
12       Q.   Did Cramer say it's coming
13   from contamination, or did Cramer say
14   that you need to do polarized light to
15   make sure that you're adequately counting
16   what's really deeply embedded in the
17   tissue and not what's coming in the
18   surface?
19           MS. CURRY:  Object to the
20       form.
21           THE WITNESS:  Because he
22       thinks what's on the surface is
23       contamination.
24   BY MS. GARBER:

Page 400

1        Q.   No, from the paraffin
2    processing, right?
3            MS. CURRY:  Object to the
4        form.
5            THE WITNESS:  Contamination
6        at some point.  I mean, is it
7        contamination during processing?
8        Is it from surgical gloves from
9        past surgeries?  Is it from -- my
10       point is, this is all conjecture
11       because there's all these possible
12       explanations.  And people can
13       suggest what they want in their
14       introduction to their paper.
15           But I'm more interested in
16       the actual science that goes to
17       the heart of trying to figure
18       out -- you know.
19           But again, you're -- we
20       started this conversation by
21       talking about the mere presence of
22       talc particles in the ovary.
23   BY MS. GARBER:
24       Q.   Okay.  So we'll get back to

Page 401

1    the cohorts, and then we'll move onto the
2    biologic plausibility.
3            But you would agree with me,
4    wouldn't you, that there are study --
5    peer-reviewed study authors that set
6    forth that there is a biologically
7    plausible mechanism.  You just disagree
8    with that, correct?
9            MS. CURRY:  Object to the
10       form.
11           THE WITNESS:  The reason
12       that I have to disagree with it
13       is --
14   BY MS. GARBER:
15       Q.   Doctor, my question is yes
16   or no.
17       A.   I disagree with it that
18   there's -- it's conjecture.
19       Q.   That's fine.  I understand
20   your opinion.
21           I just want you to answer my
22   question, which is you agree that there
23   are study authors that say there's
24   biologically plausible mechanism, you

101 (Pages 398 to 401)

Kevin Holcomb, M.D.

Page 402

1　just disagree with that?
2　　　　MS. CURRY: Object to the
3　form.
4　BY MS. GARBER:
5　　　Q. Correct?
6　　　A. I disagree with it. Many
7　people disagree with it.
8　　　Q. Okay. And there's many
9　people who agree with it, right?
10　　　　MS. CURRY: Object to the
11　form.
12　　　　THE WITNESS: Based on
13　pseudoscience.
14　BY MS. GARBER:
15　　　Q. Is the Health Canada
16　pseudoscience?
17　　　A. No, I wouldn't describe
18　Health Canada as pseudoscience in
19　totality. But if you -- if you want to
20　read through it and ask what things I
21　agree with and what things I don't, I
22　think I've already told you that when --
23　when authors make statements in their
24　preambles, in their introductions, that

Page 403

1　aren't based on data but they state it as
2　a fact, watch out for what's coming
3　later.
4　　　Q. Okay. We'll go to --
5　　　A. If somebody starts off like
6　that.
7　　　Q. We'll go to Health Canada
8　and see what they said about biologic
9　plausibility.
10　　　A. You spend a lot of time in
11　Canada.
12　　　Q. You also reviewed the Gertig
13　study, correct?
14　　　A. The same study that we were
15　just going through?
16　　　Q. I'm sorry, I -- I misspoke.
17　The Gonzalez study?
18　　　A. Yes, I did.
19　　　Q. And I'll mark that as
20　Exhibit 22.
21　　　　(Document marked for
22　　　　identification as Exhibit
23　　　　Holcomb-22.)
24　BY MS. GARBER:

Page 404

1　　　Q. Doctor, this study involved
2　only 41,654 women, correct?
3　　　A. 41,000 women, and 600.
4　　　Q. Yeah. And the talc exposure
5　metric was to ask women about the
6　frequency of their talcum powder exposure
7　within -- in their genitals within the
8　prior 12 months, correct?
9　　　A. Let me just confirm that.
10　　　Q. It's under the methods on
11　the abstract, Doctor.
12　　　A. Can you repeat your
13　statement just now?
14　　　Q. Doctor, was one of the
15　limitations that the -- the exposure was
16　talcum powder exposure to the genitals
17　within the prior 12 months. Do you agree
18　with that?
19　　　A. Yes. Along -- along with
20　frequency. I -- I thought you were --
21　yes.
22　　　Q. Okay. And the follow-up
23　there in the abstract was 6.6 years,
24　right?

Page 405

1　　　A. Yes.
2　　　Q. And you don't know when the
3　women started using talc, right?
4　　　A. No.
5　　　Q. Like the others?
6　　　A. As I -- I would anticipate
7　that they were average users.
8　　　Q. Doctor, does douching
9　increase the risk for ovarian cancer?
10　　　A. This study suggests it does.
11　　　Q. Is douching a risk factor
12　for ovarian cancer?
13　　　A. This study suggests it is.
14　　　Q. Do you tell your patients
15　that douching is a risk factor for
16　ovarian cancer?
17　　　A. No. Because it's only one
18　study suggesting it.
19　　　Q. And, Doctor, any of the
20　limitations that we've just gone through
21　with regard to the cohort studies, none
22　of them are listed within the four
23　corners of your expert report; is that
24　correct?

Kevin Holcomb, M.D.

Page 406

1          MS. CURRY: Object to the
2    form.
3          THE WITNESS: The
4    limitations of cohort studies in
5    general?
6    BY MS. GARBER:
7          Q.   That we've gone through
8    here, as we've gone through the cohorts.
9          A.   The --
10         Q.   You have not -- you have not
11   put forth in the four corners of your
12   report any of the study limitations of
13   the cohorts, correct?
14         A.   I'd have to read through
15   the -- through this again.  I -- I don't
16   remember exactly, you know, every word
17   that I said about them.
18         Q.   Doctor, let's talk about the
19   meta-analyses.
20         A.   Sure.
21           (Document marked for
22           identification as Exhibit
23           Holcomb-23.)
24   BY MS. GARBER:

Page 407

1          Q.   I'm going to mark the
2    Penninkilampi paper.  Exhibit 23.
3          Doctor, before we turn to
4    the Penninkilampi paper.  In your expert
5    report, you indicate that the
6    meta-analyses -- the results of the
7    meta-analyses --
8          A.   Can you tell me what page
9    you are reading from?
10         Q.   Page 13.
11         -- are discrepant.  Do you
12   recall using that phrase or that term?
13         It's the very last two words
14   of the first paragraph at Page 13.
15         Do you see that?
16         A.   Yes.
17           (Document marked for
18           identification as Exhibit
19           Holcomb-24.)
20   BY MS. GARBER:
21         Q.   And I'm going to mark as
22   Exhibit 24, a document which I will
23   represent to you I created.  It may have
24   errors on it.  I hope it doesn't.

Page 408

1          MS. CURRY: Do you have
2    copies of that?
3    BY MS. GARBER:
4          Q.   Doctor, what I've attempted
5    to do is to show the results for talcum
6    powder product and ovarian cancer results
7    of the meta-analyses.
8          A.   Mm-hmm.
9          Q.   And I've listed there the
10   meta-analyses and the pooled study.
11   The -- as you see study type, the Berge
12   study indicates it's a pooled study.
13         All of those odds ratios are
14   within the vicinity of 1.22 to 1.35.
15         Do you see that?
16         A.   Yes.
17           MS. CURRY: Object to the
18   form.
19   BY MS. GARBER:
20         Q.   And those are discrepant
21   results?
22         A.   I wasn't speaking about the
23   strength of association.  I think you
24   assumed that.

Page 409

1          I was referring to, there's
2    discrepancies between what tumors were
3    increased and which ones weren't.  For
4    example, Penninkilampi, I believe, found
5    serous and endometrioid but not mucinous
6    or clear cell.  Berge found serous only.
7    Terry found -- I don't even think Terry
8    broke it down by...
9          So there's discrepancies in
10   results.  I wasn't referring to the
11   strength of association.
12         Q.   Okay.
13         A.   We spent a fair amount of
14   time earlier talking about the levels of
15   overlap in some of the meta-analyses.
16         Q.   We're going to give you a
17   chance to talk about those in a second,
18   Doctor.
19         A.   Sure.
20         Q.   With regard to talcum powder
21   products and serous ovarian cancer in the
22   meta-analyses, the Taher paper, the
23   Penninkilampi paper and the Berge paper
24   are all within 1.24 to 1.38.  Do you

103 (Pages 406 to 409)

Kevin Holcomb, M.D.

Page 410

1  agree with that?
2      A.   Can we talk -- we spoke
3  earlier about the overlap in the number,
4  the studies on these three studies --
5      Q.   Doctor, I --
6      A.   -- so it would be strange
7  for the same study design to come out
8  with discrepant results when they are
9  looking at largely the same studies.
10     So yes, the -- the point
11 that these are showing consistency is not
12 going towards proving causality. Because
13 you would just expect that if you
14 subjected the same studies to this study
15 design, you really should come up with
16 very similar results.
17     Q.   So you agree then, Doctor,
18 that the meta-analyses both with
19 epithelial ovarian cancer and serous
20 ovarian cancer are consistent, correct?
21     MS. CURRY:  Object to the
22 form.
23     THE WITNESS:  I believe they
24 are very similar studies.

Page 411

1  BY MS. GARBER:
2      Q.   Is the answer to my question
3  yes?
4      A.   Yes.  I believe that when
5  you examine the same studies you will get
6  very similar answers.
7      Q.   With regard to your
8  criticisms of the Penninkilampi paper,
9  did you write the journal voicing your
10 concerns about this study?
11     A.   No.
12     Q.   Did you attempt to contact
13 the study authors?
14     A.   No.
15     Q.   And you indicate in your
16 expert report that the study authors in
17 Penninkilampi should have included the
18 Gates study instead of the Gertig 2000
19 study; is that correct?
20     A.   Yes.
21     Q.   And there are other study
22 authors that we've seen that have
23 included Gertig rather than Gates 2010,
24 correct?

Page 412

1      A.   It's a mistake then that's
2  not only made by Penninkilampi.
3      Q.   Right.  The -- you have not
4  performed a meta-analysis yourself, have
5  you?
6      A.   No, I have not.
7      Q.   And you certainly do not
8  have any evidence, do you, Dr. Holcomb,
9  that would support your contention that
10 if the study authors had used Gates 2010
11 instead of Gertig, it would have changed
12 the outcome?
13     MS. CURRY:  Object to the
14 form.
15     THE WITNESS:  I'm not so
16 sure about that.
17 BY MS. GARBER:
18     Q.   You would be speculating,
19 wouldn't you, because you haven't done
20 that study, right?
21     MS. CURRY:  Object to the
22 form.
23     THE WITNESS:  But that
24 wasn't your question.  Can you

Page 413

1  repeat your question?
2  BY MS. GARBER:
3      Q.   Sure.  I'll ask it this way.
4      A.   No, I wanted you to repeat,
5  because I -- you're saying speculation,
6  but I believe you asked me to speculate.
7      Q.   Sure.  I'll ask you a better
8  question.
9      You have not performed a
10 meta-analysis using the Gates rather than
11 the Gertig for the ever use with
12 epithelial ovarian cancer, true?
13     A.   As I stated earlier I have
14 not performed any meta-analysis, so that
15 would be true for that specific question
16 as well.
17     Q.   And there are no study
18 authors that have indicated it's a
19 mistake to include Gertig rather than
20 Gates 2010, correct?
21     MS. CURRY:  Object to the
22 form.
23 BY MS. GARBER:
24     Q.   In other words, Health

Kevin Holcomb, M.D.

Page 414

1   Canada didn't say that, did they?
2      A.   Health Canada included
3   Gates, so they didn't make the mistake.
4      Q.   But they didn't say it was a
5   mistake for other study authors to
6   include --
7      A.   The fact that they didn't
8   make the same mistake, I've got to
9   believe that they thought it was
10  worthwhile to include the study.  So yes,
11  they thought it was a mistake not to
12  include it.  They included it.
13     Q.   Well, they didn't say it was
14  a mistake, did they?
15     A.   Because they did it.  Why
16  would they --
17     Q.   Doctor, you are speculating,
18  aren't you?
19         MS. CURRY:  Object to the
20     form.
21  BY MS. GARBER:
22     Q.   As -- as we talked about
23  earlier --
24         MS. SHARKO:  Was that a

Page 415

1      question the doctor should answer?
2   BY MS. GARBER:
3      Q.   Did you answer my question?
4      A.   I'm a little confused if you
5   can repeat.
6      Q.   I'll just withdraw and move
7   on.
8         Doctor, the exposure for
9   Gertig was ever/never, right?
10     A.   Right.
11     Q.   And the exposure for Gates
12  was not ever/never, was it?
13     A.   No.
14     Q.   And so let's look at
15  Penninkilampi, if we could.  Page 46,
16  figure A.
17         Do you see where I am?
18  Figure 2-A.
19     A.   I'm sorry, 2-A?  I'm looking
20  at -- oh, I'm looking at Table 2.  46.
21  Sorry.
22     Q.   It's on Page 46.
23     A.   Yes.
24     Q.   And -- do you see where I

Page 416

1   am?
2      A.   I'm looking at A, yes.
3      Q.   Yeah, okay.  Very good.  And
4   with the legend below, it indicates that
5   2-A is any perineal talc use, right?
6   That's a ever/never metric, right?
7      A.   That's what they say down
8   here, yes.
9      Q.   Right.  And as we see, Gates
10  is not an ever/never, is it?
11     A.   Neither is Wu, et al., 2015
12  and they included that --
13     Q.   I thought you might say
14  that.  Let's look at Wu.  Or let's look
15  at what Penninkilampi says about Wu.
16     A.   Okay.
17     Q.   Let's go to Page 43 of the
18  Penninkilampi paper.  And here in the
19  middle of the paragraph.
20         Do you see where I am?
21     A.   Yes.
22     Q.   It says, "Note that the Wu,
23  et al., 2015 include results from Wu
24  2009.  However, only Wu, et al., 2009,

Page 417

1   reported on non-perineal talc use total
2   lifetime applications and long-term talc
3   use, hence data were extracted from Wu
4   2015 for any perineal use outcome from
5   the Wu, et al., 2009, for the" -- "for
6   the three other outcomes previously
7   mentioned."
8         So the authors in
9   Penninkilampi were trying to keep the
10  data consistent and keep with ever/never
11  exposure, not change the metric, right,
12  Doctor?
13     A.   Give me one -- give me one
14  second just read that.  Note that Wu, et
15  al...
16         MS. CURRY:  Object to the
17     form.  And do you have a copy of
18     Wu 2015?  Do you have a copy of
19     the Wu 2015 paper?
20         MS. GARBER:  I may.  I don't
21     know if I'm going to use it.  You
22     can if you'd like.
23  BY MS. GARBER:
24     Q.   Doctor, should we go off the

105  (Pages 414 to 417)

Kevin Holcomb, M.D.

Page 418

1    record while you read that?
2        A.   Well, I guess I don't -- I'm
3    trying to figure out, is he saying that
4    he only looked at the patients in Wu 2015
5    that were actually included in the Wu
6    2009 for that --
7        Q.   Doctor, if you don't
8    understand what the authors are saying --
9        A.   I don't.
10        Q.   -- we'll just move on.
11        A.   Yeah, I don't understand.
12        Q.   Okay.  All right.  Let's
13    move on.
14        A.   Because it seems to me that
15    he would only include Wu 2009.
16        Q.   Doctor, I don't have a
17    question pending.
18        A.   If Wu 2009 only had the ever
19    use, why have Wu 2015 cited if you only
20    used the patients on 2009?
21            MS. GARBER:  Objection to
22        strike as nonresponsive.
23    BY MS. GARBER:
24        Q.   Doctor, I did not have a

Page 419

1    question pending.
2            Are you aware, Doctor, that
3    the Health Canada considered the
4    collective meta-analyses in coming to
5    their causal opinion regarding genital
6    talc and risk of ovarian cancer?
7        A.   Yes.
8            MS. CURRY:  Object to the
9        form.
10    BY MS. GARBER:
11        Q.   And are you aware that the
12    IARC 2010 considered the meta-analyses
13    that were then available at the time in
14    coming to their findings regarding talc
15    and its carcinogenicity?
16        A.   Yes.
17        Q.   And what was Health Canada's
18    conclusion about talc and risk of ovarian
19    cancer?  Did they come to a causal
20    opinion?
21            MS. CURRY:  Object to the
22        form.
23            THE WITNESS:  My memory was
24        that they said it's possibly --

Page 420

1        they were similar to IARC,
2        possibly a carcinogen.
3    BY MS. GARBER:
4        Q.   Health Canada?
5        A.   Yes.
6        Q.   Okay.  Let's look at Health
7    Canada.
8        A.   Sure.  I have it open.
9        Q.   Doctor, if you can turn to
10    Page 21, and right above 6.2, exposure
11    assessment, it indicates, "The most
12    recent meta-analysis detailed above,
13    Taher 2018, and consistent with the Hill
14    criteria suggest a small but consistent
15    statistically significant positive
16    association between ovarian cancer and
17    perineal talc exposure.  Further
18    available data are indicative of a causal
19    effect."
20            Did I read that correctly?
21        A.   Yes.  Apparently they
22    disagree with IARC.
23        Q.   They looked at more data
24    than IARC looked at, didn't they?

Page 421

1        A.   I'll tell you, I'm not -- I
2    have to tell you that they do say causal
3    effect here.  And yet if I have time to
4    read through this, I can show you where
5    they say it's a possible carcinogen.
6            And I'm not sure how you can
7    say that something is a possible
8    carcinogen and that it is causative of
9    cancer in the same paper.
10            But if you can give -- if
11    you give me the time I can show you where
12    it says it's a possible carcinogen.
13            MS. GARBER:  Let's take a
14        break.
15            THE VIDEOGRAPHER:  Okay.
16        The time -- the time is 5:01 p.m.
17        Off the record.
18            (Short break.)
19            THE VIDEOGRAPHER:  We are
20        back on the record.  The time is
21        5:22 p.m.
22    BY MS. GARBER:
23        Q.   Just so I'm clear, Doctor,
24    it's your opinion that there is no

106 (Pages 418 to 421)

Kevin Holcomb, M.D.

Page 422

1  biologically plausible mechanism by which
2  talc powder products can translocate or
3  migrate from the perineum to the
4  fallopian tubes and ovaries in your
5  opinion?
6      A.  I want to make sure I'm
7  understanding the question.  I -- there
8  is no expelling evidence that I've seen
9  that has the ability to do it.  So I'm
10  not ask -- I'm not sure if you're asking
11  is it just possible or is it -- is any
12  evidence to suggest that it can happen.
13      Because if -- if you're
14  saying is it possible, I'd have to say
15  yes.  If you're saying is there any
16  evidence suggesting it could happen, I
17  would have to say no.
18      Q.  Doctor, is there a
19  biologically plausible mechanism by which
20  talcum powder products can translocate
21  from the perineum to the fallopian tubes
22  and ovaries in your opinion?
23      A.  I would have to say it would
24  be unlikely that -- that the female

Page 423

1  genital tract, while open, for obvious
2  reasons has developed many mechanisms to
3  keep particulate matter and foreign
4  bodies from ascending into the peritoneal
5  cavity.
6      So I would say it's -- it's
7  not plausible to me.
8      Q.  You've seen study data that
9  would indicate that -- strike that.
10      You have seen study authors
11  who have concluded the opposite, that
12  there is a biologically plausible
13  mechanism by which talc can -- talcum
14  powder products can translocate from the
15  perineum to the fallopian tubes and
16  ovaries, right?
17      MS. CURRY:  Object to the
18  form.
19      THE WITNESS:  I'm assuming
20  you -- I'm assuming you struck
21  your original question because
22  they are making the statements
23  with no data.  And so no, I've
24  never seen any data suggesting it

Page 424

1  can happen.
2      But people hypothesizing,
3  yes, I've seen that.
4  BY MS. GARBER:
5      Q.  You've seen study authors
6  who conclude that, right?
7      A.  I have seen study authors
8  who hypothesize it.  You can't conclude
9  it without any studies showing in it.
10      (Document marked for
11  identification as Exhibit
12  Holcomb-25.)
13  BY MS. GARBER:
14      Q.  I'm going to mark as
15  Exhibit 25 a document which I'll
16  represent to you is an FDA letter dated
17  April 1st, 2014.
18      And, Doctor, this document
19  appears on your reference list, doesn't
20  it?
21      A.  Yes.
22      Q.  And if we could turn to
23  Page 5 in the middle of the page where
24  the --

Page 425

1      A.  I'm sorry, give me one
2  second.  5 -- Page 4 -- 5.  Mm-hmm.
3      Q.  Where -- in the middle of
4  the document where the first word is
5  while.
6      Do you see where I am?
7      A.  No.  I'm sorry.  Can -- can
8  we use the --
9      Q.  Right here in the middle,
10  where it says while.
11      A.  Give me one second, ma'am.
12  Give me one second.  Yes.
13      Q.  "While there exists no
14  direct proof of talc and ovarian
15  carcinogenesis, the potential for
16  particulates to migrate from the perineum
17  and vagina to the peritoneal cavity is
18  indisputable."
19      Do you agree with that?
20      A.  No.  This is an example of
21  what I was saying earlier.  Someone
22  making a very, very strong statement.
23  Indisputable, and yet there's no studies
24  showing that perineal talc can make it to

Kevin Holcomb, M.D.

Page 426

1  the ovaries.  And yet Dr. Epstein is
2  saying it's indisputable.
3          So that's not a judgment
4  call.  That's not reasonable doctors
5  having different opinions.  That's just
6  wrong.  It can't be indisputable without
7  a single study showing its ability.
8          Q.   You -- you disagree with FDA
9  on the issue of migration being
10  indisputable, correct?
11         A.   No, I -- I disagree with
12  Dr. Epstein.
13         Q.   And this letter comes from
14  FDA, right?
15         A.   Written by Dr. Epstein,
16  right?
17         Q.   Right.  And --
18         A.   I'm sorry, no, it's written
19  by -- it seems to be written by Steven
20  Musser.
21         Q.   Right.  It's written to
22  Dr. Epstein.
23         A.   It's written to Dr. -- so I
24  guess I'm disagreeing with Steven M.

Page 427

1  Musser, Ph.D., who I -- I don't even know
2  what area of practice he's -- he's the
3  director of operations for Center of Food
4  Safety and Applied Nutrition.
5          I -- I don't know if he
6  knows more about the female genital tract
7  than I do, but my -- my guess is probably
8  not.  And if he's calling it indisputable
9  in the absence of any study showing that
10  it happens, that by definition is just
11  wrong.
12         Q.   Doctor, you would agree,
13  would you not, that in the Health Canada,
14  the study authors, as part of the
15  Bradford Hill have concluded that there
16  is a biologically plausible mechanism by
17  which talcum powder products can migrate
18  from the perineum to the ovaries?
19         MS. CURRY:  Object to the
20  form.
21         THE WITNESS:  I'd have --
22  I'd have to read through it again.
23  Can you point it to me?
24  BY MS. GARBER:

Page 428

1          Q.   You don't recall that?
2          A.   No.  If you can just point
3  it out to me again.
4          Q.   Just so I'm clear, you
5  disagree with the position of the FDA as
6  indicated in the April 1st, 2014, paper
7  on migration, right?
8          A.   I'm -- I'm disagreeing again
9  with a Dr. Steven Musser, Ph.D., who is
10  the deputy director for Scientific
11  Operation Center For Food Safety and
12  Applied Nutrition.  That's who I'm
13  disagreeing with.
14         Q.   So going back to the Health
15  Canada which we've previously marked as
16  Exhibit 11.
17         Do you see starting at
18  Pages 19 through 21, the study authors of
19  the Health Canada assessment are
20  analyzing the scientific evidence in the
21  context of the Bradford Hill criteria?
22         A.   Is there a specific area
23  you'd like me to read or?
24         Q.   No.

Page 429

1          Do you -- do you see that
2  that's what that portion of the document
3  is doing?  It's an analysis of the
4  evidence in the context of the Bradford
5  Hill criteria.
6          Is that true?
7          A.   They are addressing
8  translocation in this section.  I -- I
9  assume that's part of a larger...
10         Q.   Doctor, is -- is strength of
11  the association a criteria of Bradford
12  Hill?
13         A.   Yes.
14         Q.   And consistency is a
15  criteria of Bradford Hill?
16         A.   Yes.  Which makes me think
17  I'm looking at a different page.
18         I'm sorry, which page are
19  you on?
20         Q.   19 through 20.
21         A.   19.
22         Q.   Specificity as an aspect
23  of --
24         A.   Oh, down at the bottom.  I'm

108 (Pages 426 to 429)

Kevin Holcomb, M.D.

Page 430

```
 1        sorry.  I was looking someplace else.
 2            If you can just give me some
 3     idea when we turn the page, if you're
 4     talking top or bottom, I can probably get
 5     there faster.
 6        Q.   Doctor, Pages 19 through 21,
 7     the authors of Health Canada are
 8     analyzing the scientific evidence in the
 9     context of the Bradford Hill aspects or
10     criteria, are they not?
11        A.   Yes.
12        Q.   Thank you.  And if you turn
13     to Page 20 -- sorry, Page 21, under the
14     heading of "Biologic Plausibility."  You
15     agree that that's one of the aspects of
16     Bradford Hill, right?
17        A.   Yes.  And the first line
18     they have is, "Particles of talc are
19     hypothesized to migrate into the pelvis."
20     And that's very different from the
21     statement of the other doctor who said
22     it's indisputable.
23            MS. GARBER:  Motion to
24        strike as nonresponsive.
```

Page 431

```
 1     BY MS. GARBER:
 2        Q.   Doctor, did I ask you a
 3     question?
 4        A.   No.
 5        Q.   Should I get my time back
 6     that you just wasted?
 7        A.   It's a small amount of time.
 8            MS. CURRY:  Object to the
 9        form.
10     BY MS. GARBER:
11        Q.   All day long it's not a
12     small amount of time, is it, Doctor?
13            So let me ask you this,
14     under the biologic plausibility section
15     of the Bradford Hill analysis as
16     conducted by Health Canada, the study
17     authors indicate that, "Particles of talc
18     are hypothesized to migrate into the
19     pelvis and ovarian tissue, causing
20     irritation and inflammation."
21            I read that correctly,
22     right?
23        A.   Yes.
24        Q.   The authors go on to say,
```

Page 432

```
 1     "The presence of talc in the ovaries has
 2     been documented," and they cite to the
 3     Heller 1996 paper, correct?
 4        A.   True.
 5        Q.   And they go on to say, "This
 6     evidence" -- "This evidence of retrograde
 7     transport supports the biologic
 8     plausibility of the association between
 9     perineal talc application and ovarian
10     exposure; however, the specific
11     mechanisms in the cascade of molecular
12     events by which talc cause ovarian cancer
13     have not been identified."  And then they
14     cite to Taher 2018.
15            Did I read that correctly?
16        A.   You read it correctly, yes.
17        Q.   And Doctor, the Saed 2019
18     paper does, in fact, provide the
19     molecular events by which talc can cause
20     ovarian cancer.  Can we agree with that?
21            MS. CURRY:  Object to the
22        form.
23            THE WITNESS:  No.
24     BY MS. GARBER:
```

Page 433

```
 1        Q.   Okay.  You have read the
 2     Saed 2019 paper now?
 3        A.   I have.
 4        Q.   Not at the time of your
 5     report, but you have?
 6            MS. CURRY:  Object to the
 7        form.
 8            THE WITNESS:  I have.
 9     BY MS. GARBER:
10        Q.   Did it provide a molecular
11     basis by which talc can cause ovarian
12     cancer?
13        A.   It proposed a theory without
14     proving it.  So when you say provide, I'm
15     assuming you mean that it proposed a
16     theory and then showed that that -- that
17     molecular change actually transformed
18     cells and causes cancer.
19        Q.   You used the word "prove."
20     So the study provided statistically
21     significant findings of an association in
22     support of the experiment hypothesis,
23     correct?
24        A.   I disagree.
```

109 (Pages 430 to 433)

Kevin Holcomb, M.D.

Page 434

1          MS. CURRY:  Object to the
2     form.
3          THE WITNESS:  I disagree.
4     If the hypothesis is to say that
5     inflammation was the cause of
6     ovarian cancer, and in your study
7     you prove something like CA-125
8     goes up, and you consider that
9     proof of your hypothesis, I'd have
10    to say that's not the case.
11    BY MS. GARBER:
12         Q.   Doctor, was that the only
13    finding of the Saed 2019 paper?
14         A.   I'd be happy to look at the
15    rest of it.
16         Q.   Well, you seem to remember
17    the CA-125 that was a corollary finding,
18    wasn't it?
19         MS. CURRY:  Object to the
20    form.
21         THE WITNESS:  If you have
22    the paper, again, I'd be happy to
23    look at the others.
24    BY MS. GARBER:

Page 435

1          Q.   Can you think of any other
2     molecular findings that were reported?
3          A.   I remember --
4          Q.   For instance ROS or NOS
5     increasing with talc application?
6          MS. CURRY:  Object to the
7     form.
8          THE WITNESS:  I remember --
9     and again, if you have the paper
10    I'd rather look at it again.  But
11    I remember him making a statement
12    that reactive oxygen species
13    actually went up in the presence
14    of talc when in fact they were
15    actually lower than the controls
16    except for one concentration.
17         And then with the next
18    concentration, it actually went
19    back down.  And yet, he concluded
20    that reactive oxygen species was
21    actually going up.
22    BY MS. GARBER:
23         Q.   What was the conclusion of
24    the study authors in that paper, by way

Page 436

1     of --
2          A.   I'd have to look at it
3     again.
4          Q.   Okay.  And we'll do that.
5          So you see at the end of the
6     Bradford Hill analysis and the Health
7     Canada assessment, the authors conclude
8     that the data are indicative of a causal
9     effect, right?
10         A.   That's what they state, yes.
11         Q.   And so the authors have
12    found that there is a biologically
13    plausible mechanism by which talc can
14    migrate and talc can induce inflammation,
15    correct?
16         MS. CURRY:  Object to the
17    form.
18         THE WITNESS:  The authors
19    believe that Heller's findings are
20    evidence of retrograde
21    translocation of talc.
22         And that is a big
23    assumption.  And so I can
24    understand how they would put

Page 437

1     those things together.  But
2     there's no proof in Heller's study
3     where the talc particles came
4     from.
5          And so they're saying this
6     evidence of retrograde transports
7     supports biologic plausibility.
8     They cite a study that doesn't
9     prove retrograde transport and
10    says that is what I'm using to
11    support what I believe is
12    biologically plausible.
13         So yes, these authors are
14    making a statement and then citing
15    to something that never examined
16    retrograde transport.
17    BY MS. GARBER:
18         Q.   Doctor, you have not
19    reviewed the Zervomanolakis or the Kunz
20    paper with regard to genital tract
21    peristalsis, have you?
22         A.   No.
23         Q.   Are you aware that there is
24    retrograde genital tract peristalsis

110 (Pages 434 to 437)

Kevin Holcomb, M.D.

Page 438

1  during the woman's cycle?
2         MS. CURRY:  Object to the
3  form.
4         THE WITNESS:  Yes.  Of
5  course I am.  Does that mean that
6  talc is able to retrograde
7  translocate?  I'm not sure.  This
8  is what often happens.  People
9  cite studies that don't prove what
10 the -- the point that they're
11 trying to make.
12 BY MS. GARBER:
13     Q.   Okay.  There's been data
14 that have shown that particulate in a
15 woman's genital tract can travel
16 retrograde from the vagina to the
17 fallopian tubes and the ovaries, correct?
18 You are aware of this data?
19     A.   If you put her -- if you put
20 her in the lithotomy position and give
21 her a little oxytocin and -- yes, under
22 those very unnatural conditions, there's
23 studies supporting that.
24         What I'm saying is I don't

Page 439

1  see a single study -- and maybe you can
2  quote one for me -- where they dusted the
3  perineum of women and shown that that
4  talc gets to the ovaries.
5      Q.   Based on what we know about
6  talc and its carcinogenicity that would
7  be an unethical study to conduct at this
8  point, wouldn't it?
9         MS. CURRY:  Object to the
10 form.
11        MR. MIZGALA:  Object to the
12 form.
13        THE WITNESS:  Not if -- I
14 would say not for a woman who's
15 currently using talc.
16 BY MS. GARBER:
17     Q.   Doctor, you would agree with
18 me, wouldn't you, that there are study
19 authors, peer-reviewed study authors, and
20 in addition Health Canada, who have
21 concluded that there is a biologically
22 plausible mechanism by which talc can
23 migrate from the genitals to the ovaries,
24 true?

Page 440

1      A.   True.  And I've explained
2  exactly how they make that connection.
3      Q.   Thank you.
4         Let's talk about
5  inflammation.  You are aware that there
6  is study data and peer-reviewed studies
7  that indicate a biologically plausible
8  mechanism by which talc can induce
9  inflammation, correct?
10     A.   Is there a specific --
11        MS. CURRY:  Object to the
12 form.
13        THE WITNESS:  -- study you'd
14 like to review?
15 BY MS. GARBER:
16     Q.   No, I'm just asking you,
17 have you seen peer-reviewed studies that
18 indicate talc can induce inflammation?
19     A.   I have not seen studies that
20 I've read that I've been convinced.  If
21 you have a specific study that you'd like
22 to review, I'm happy to go over --
23     Q.   Have you seen the Ness data?
24 Either '99 or 2000?

Page 441

1      A.   I did -- it's on my reliance
2  list.  If we can pull it out I'd be glad
3  to go through it again with you.
4      Q.   Did the Ness authors
5  conclude that there was a biologically
6  plausible mechanism by which talc can
7  induce inflammation?
8      A.   Again, I'd be happy to read
9  the paper if you have it.
10     Q.   You're not sure?
11        MS. CURRY:  Object to the
12 form.
13        THE WITNESS:  Oh, I don't
14 remember everything off my
15 reliance list off the top of my
16 head, no.
17 BY MS. GARBER:
18     Q.   Doctor, is it your opinion
19 that -- is it your opinion that there is
20 not a biologically plausible mechanism to
21 support talc can migrate from the
22 genitals to the ovaries and tubes because
23 of the tubal ligation data?
24        MS. CURRY:  Object to the

111 (Pages 438 to 441)

Kevin Holcomb, M.D.

Page 442

1    form.
2        THE WITNESS:  Please repeat
3    that again.
4    BY MS. GARBER:
5        Q.   Sure.
6        Do you base your opinion
7    that talcum powder products don't migrate
8    to the ovaries based on tubal ligation
9    and hysterectomy data?
10       MS. CURRY:  Object to the
11   form.
12       THE WITNESS:  No.  I base
13   the fact that I don't have any
14   proof of talc being able to
15   migrate to the ovaries under
16   normal situations.  The tubal
17   ligation data and the
18   inconsistency of its protective
19   impact makes me question even
20   further.
21   BY MS. GARBER:
22       Q.   Doctor, if you could pull
23   out Taher 2018, Page 2.  Do you see under
24   the results there --

Page 443

1        A.   I'm sorry -- Page 2.
2        Q.   -- that the study authors
3    indicate that the most recent
4    meta-analysis found a negative
5    association with tubal ligation.  That's
6    what the authors say, right?
7        A.   This is an unpublished,
8    un-peer-reviewed paper.
9        Q.   That's what the authors say
10   in this paper, true?
11       A.   In this unpublished
12   un-peer-reviewed paper, yes.
13       Q.   That's what the authors say,
14   right?
15       A.   In this unpublished
16   peer-reviewed paper, correct.
17       Q.   Turn to Page 33 please,
18   Doctor.  That the first full -- second
19   full paragraph.  It indicates, "Women
20   with prior ligation of the fallopian
21   tubes showed a significant reduction in
22   risk," and then they cite a statistically
23   significant odds ratio, right, against
24   ovarian cancer?

Page 444

1        A.   I'm assuming this is the
2    results of the meta-analysis that hasn't
3    been published?
4        Q.   Yes.
5        A.   Yes, that's what they say.
6        Q.   All right.  And then a
7    couple lines down it says, "This might be
8    attributed to the fact that tubal
9    ligation is usually performed at an
10   earlier age, thus preventing entry of
11   talc into the reproductive tract earlier
12   and prolonged exposure to talc, compared
13   to hysterectomy that is performed later
14   in life where higher exposure has already
15   taken place."
16       It goes on to say, "In a
17   recent meta-analysis," and then it cites
18   70, "The authors reported a negative
19   association with tubal ligation and
20   hysterectomy with risk of ovarian
21   cancer."
22       Did I read that correctly?
23       A.   Yes, you've read everything
24   very well so far.

Page 445

1        Q.   All right.
2        A.   It's that private schooling.
3        Q.   And -- and the authors go on
4    to say as to the study that the authors
5    there stated a highly plausible mechanism
6    for the association --
7        A.   I'm sorry -- yes.  As
8    suggested by the author.  Suggested.
9        Q.   Right.  "Involving the
10   blocking of ascent of such agents such as
11   talc to the ovaries."
12       Again, you disagree with
13   these study -- with these two study
14   authors that indicate that talc can
15   ascend the female genital tract, right?
16       A.   It is a suggestion by the
17   authors.  It's not a proven point.  These
18   are conjecture and theory by those
19   authors.  And, yes, I would say
20   apparently my bar is a little bit higher.
21   I would like to see a study where they
22   actually put talc on the perineum the way
23   people put talc on the perineum and show
24   that it gets to the ovaries.  So, yes.

112 (Pages 442 to 445)

Kevin Holcomb, M.D.

Page 446

1          And -- and I find, outside
2   of this unpublished meta-analysis, when
3   you get to the individual studies it
4   becomes much less consistent on this
5   protective impact of tubal ligation with
6   regard to talc.
7          MS. GARBER:  Objection.
8      Motion to strike as nonresponsive.
9   BY MS. GARBER:
10     Q.   Doctor, if you could turn
11  back to Health Canada and Page 18.  And
12  I'll just point to where I'm reading,
13  Doctor.  Right here.
14         Do you see where I am?
15         Doctor, it reads:  "There is
16  support for an association of
17  inflammation and increased risk of
18  ovarian cancer."  And it cites to the
19  National Academy of Sciences, Engineering
20  and Medicine in 2016 in the Rasmussen
21  paper.
22         Doctor, that's what these
23  study authors who did an analysis --
24     A.   Can -- can -- I'm sorry,

Page 447

1   I'll let you finish.
2      Q.   -- concluded about the mode
3   of action, correct?
4          MS. CURRY:  Object to the
5      form.
6          THE WITNESS:  Yes, and
7      interestingly, I -- I would be
8      glad to look at the Rasmussen
9      paper.  I believe it was actually
10     a paper that was negative, that
11     there was a paper that didn't show
12     a reduce in the risk of ovarian
13     cancer with -- with
14     antiinflammatories.
15  BY MS. GARBER:
16     Q.   And, Doctor, I'm glad you
17  mentioned antiinflammatories.  Because is
18  the other basis for your opinion that
19  talc, while it increases inflammation,
20  doesn't cause ovarian -- talcum powder --
21  strike that.
22         Another basis for your
23  opinion that talcum powder products do
24  not cause ovarian cancer based on the

Page 448

1   fact that the NSAID data do not support
2   reduction of risk of ovarian cancer?
3          MS. CURRY:  Object to the
4      form.
5          THE WITNESS:  The main
6      reason why I hold that opinion is
7      because I have seen no evidence of
8      chronic inflammation in the
9      genital tract from perineal use of
10     talc.
11         In the Heller study, in the
12     case that they looked for evidence
13     of clinical information, and --
14     and we know what it looks like
15     with talc, because there's years
16     of using it in pleurodesis, it
17     causes granulomas.
18         I -- we -- we present every
19     STIC lesion, a serous tubular
20     intraepithelial carcinoma at
21     Cornell.  We present it as part of
22     our tumor board.  And so I've seen
23     a lot of STIC lesions.  I've seen
24     a lot of p53 signatures.

Page 449

1          I've not ever seen a case
2      with a granuloma or any evidence
3      of granulomatous inflammation or
4      any other sort of inflammation,
5      and so that's the real -- the --
6      the other thing that you're
7      mentioning, the inconsistency of
8      whether antiinflammatories reduce
9      the risk of ovarian cancer just
10     further confirms my -- my belief.
11         But it's really the fact
12     that I've seen the precursor
13     lesion for high grade serous
14     carcinoma, and I've never seen it
15     in conjunction with any evidence
16     of granulomatous inflammation.
17  BY MS. GARBER:
18     Q.   Okay.  Let's take both of
19  those, because I think you mentioned two
20  different things there.
21         As to what you see when you
22  look at the tissue pathology, -- that's
23  what you're referencing, right, what
24  you're seeing microscopically in the path

113 (Pages 446 to 449)

Kevin Holcomb, M.D.

Page 450

1    slides?
2        A.   Yes.
3        Q.   And --
4        A.   I would argue in -- in
5    ovarian cancer cases as well, I don't see
6    granulomas.
7        Q.   You mean macroscopically
8    when you're doing surgery?
9        A.   No, I mean microscopically.
10   I also scrub out and look at all my
11   frozen sections.  And we present every
12   new patient in a multi-disciplinary tumor
13   board where we look at the slides.  So
14   there's not an ovarian cancer patient
15   that I take care of that I haven't seen
16   her histologic slides.
17       Q.   Have you seen testimony
18   where there is -- strike that.
19            Have you seen data that
20   would suggest that you're not seeing
21   evidence of acute inflammation because
22   the talc and its effects have been
23   subsumed by tumor?  In other words,
24   that's a snapshot in time when there's

Page 451

1    carcinogenic transformation, and what
2    you're seeing over here years later
3    you're not going to see the evidence of
4    the chronic inflammation, correct?
5            MS. CURRY:  Object to the
6        form.
7            THE WITNESS:  Maybe you
8        misunderstood my description of
9        what we do.  I said look at every
10       invasive cancer and we present
11       every STIC.
12           And so that's precancer.
13       That is a precursor to high grade
14       serous ovarian cancer.  And now we
15       believe there's a p53 signature
16       that's even earlier.  And I will
17       tell you that I've never seen any
18       evidence of inflammation in any of
19       those lesions, nor have I read of
20       anybody showing granulomatous
21       inflammation in any of those
22       lesions.
23           So you may believe it
24       disappears later.  I'm saying even

Page 452

1    at the time of precancer, I've not
2    seen it.  And if it's not there in
3    the precancerous phase, when was
4    it there?
5    BY MS. GARBER:
6        Q.   Is it your opinion that all
7    epithelial ovarian cancers begin in the
8    fallopian tube?
9        A.   No.
10       Q.   Okay.  Let's talk about the
11   NSAIDs, the NSAID data.
12           You've looked at some
13   studies about NSAIDs and their effect
14   upon the risk of --
15       A.   Yes.
16       Q.   -- ovarian cancer right?
17       A.   Yes, I have.
18       Q.   Would you agree with me that
19   the aspirin data seem to indicate a
20   decreased risk in ovarian cancer?
21           MS. CURRY:  Object to the
22       form.
23           THE WITNESS:  I'm not sure
24       if that's consistent in every --

Page 453

1    in every study.  I just want to
2    get to my report in that area, if
3    that's okay.
4    BY MS. GARBER:
5        Q.   Okay.  Doctor, shall we go
6    off the record?
7        A.   You can.  It's not going to
8    take me long.
9            THE VIDEOGRAPHER:  The time
10   is 5:49.  Going off the record.
11       (Brief pause.)
12           THE VIDEOGRAPHER:  The time
13   is 5:49 p.m.  Back on the record.
14           THE WITNESS:  So Bonovas, et
15   al., is a meta-analysis that
16   showed antiinflammatory drug use
17   did not reduce ovarian cancer.
18       Ni, et al., did a pooled
19   analysis of 13 case-control
20   studies, one clinical trial, three
21   cohort studies.  Also found no
22   efforts of an association between
23   aspirin use and ovarian cancer and
24   did not find strong evidence of an

114 (Pages 450 to 453)

Golkow Litigation Services - 877.370.DEPS

Kevin Holcomb, M.D.

Page 454

1      association between non-aspirin
2      NSAID use and ovarian cancer.
3  BY MS. GARBER:
4      Q.   Doctor, did I have a
5  question pending?
6      A.   You had asked me -- yeah.
7  You did.  That's why we went off.
8  Remember I was looking for the --
9      Q.   Okay.  Have you seen the --
10  I don't know how to pronounce it --
11  Q-I-A-O, 2018, study with regard to --
12  with regard to aspirin and its effects on
13  ovarian cancer?
14      A.   I have not.
15      Q.   Have you seen Trabert 2013
16  study wherein the study authors found
17  that use of antiinflammatory aspirin was
18  associated with a reduction of risk of
19  ovarian cancer?
20      A.   I believe that --
21      MS. CURRY:  Object to the
22  form.
23      THE WITNESS:  I believe
24  that's in my -- my report that's

Page 455

1      saying -- to show the
2  inconsistencies.  I gave you two
3  examples of studies, one including
4  meta-analysis, and showing no
5  reduced ovarian cancer, and the
6  studies that you mentioned that
7  show that there was a reduction.
8  BY MS. GARBER:
9      Q.   Do you agree, Doctor, that
10  there are data on both sides for both
11  aspirin and nonsteroidal
12  antiinflammatories that go both ways?  In
13  other words, there's some data that show
14  a decreased risk of ovarian cancer and
15  some data that do not for both aspirin
16  and NSAIDs?
17      A.   I do believe that if there
18  was powerful enough data to support the
19  use of antiinflammatories to prevent the
20  deadliest GYN malignancy, this would be a
21  common recommendation for patients to
22  use.  We don't tell BRCA mutation
23  patients to take NSAIDs.  We don't tell
24  the women at the highest risk of ovarian

Page 456

1  cancer to take an NSAID, Tylenol -- well,
2  Tylenol really hasn't shown much
3  difference.  But even aspirin.
4      That's different from a
5  woman who has -- or a man who has
6  familial adenomatous polyposis.  There's
7  certain situations where the data is so
8  strong that you can prevent cancer, it's
9  actually recommended to use aspirin to
10  prevent it.  And we don't do that in GYN
11  oncology.
12      And so I'd have to ask you,
13  not only do I not believe this, but why
14  is the GYN oncology not recommending
15  NSAID and aspirin use if it is so proven
16  that it decreases ovarian cancer risk?
17  It would be --
18      MS. GARBER:  Objection.
19  Objection.  Motion to strike as
20  nonresponsive.
21  BY MS. GARBER:
22      Q.   Doctor, you're talking in
23  paragraphs, and you're not answering my
24  question.  I'm going to just ask you to

Page 457

1  indulge me, please.
2      MS. CURRY:  I disagree.
3  BY MS. GARBER:
4      Q.   My question --
5      MS. CURRY:  That was
6  directly responsive to the
7  question.
8  BY MS. GARBER:
9      Q.   My question was, do you
10  agree that there are data for aspirin and
11  NSAIDs that go both ways, they decrease
12  the risk, and other studies do not show
13  that?
14      A.   The reason why for speaking
15  in paragraphs --
16      Q.   I didn't ask you why.
17      A.   -- is because it's still
18  clearly stated in my report --
19      Q.   Doctor, I didn't ask you why
20  you're speaking in paragraphs.
21      A.   But it says so in my report.
22  And I gave you the examples.  And we just
23  went through them one by one.  I gave you
24  two examples where it did, and two

115 (Pages 454 to 457)

Kevin Holcomb, M.D.

Page 458

1    examples it didn't.  And then you follow
2    up a question --
3        Q.   If you're not -- if you're
4    not going to answer my question --
5        A.   Because --
6        Q.   -- I think we're going to
7    have to call the Court because we're
8    nearly done, and you're talking in
9    paragraphs and you're not responding to
10   my question.
11       A.   But you're asking --
12       MS. SHARKO:  The order
13   doesn't allow you to criticize his
14   answer.  So please stop.
15       THE WITNESS:  You're asking
16   questions that --
17       MS. O'DELL:  That's not
18   true, Susan.  Completely not true.
19       THE WITNESS:  -- have clear
20   evidence.  You're saying have I --
21   I cited in my report data that
22   went both ways.  And then you turn
23   around and ask me, do you believe
24   that data goes both ways?  And I

Page 459

1        cited.
2    BY MS. GARBER:
3        Q.   I never said in your report.
4        Do you agree that there are
5    peer-reviewed published studies on the
6    topic of anti-inflammatories, aspirin and
7    NSAIDs -- NSAIDs, that go both ways, some
8    data show a decreased risk and other data
9    do not?
10       MS. CURRY:  Object to the
11   form.
12   BY MS. GARBER:
13       Q.   Do you agree?
14       A.   I do agree.  And that's the
15   reason -- the fact that it's gone both
16   ways is the reason why we do not
17   recommend nonsteroidal use or aspirin use
18   to prevent it.
19       Q.   And Doctor, you don't
20   know -- strike that.
21       You cited on your
22   supplemental report some data that were
23   cited in the Penninkilampi paper about
24   the COX expression in epithelial ovarian

Page 460

1    cancer.
2        Do you recall that data?
3        MS. CURRY:  Object to the
4    form.
5        THE WITNESS:  Yes.
6    BY MS. GARBER:
7        Q.   Why did you cite those data?
8        A.   Couple reasons.
9    Penninkilampi, in trying to explain the
10   way exactly what were you trying to
11   explain, he's saying that I know it's
12   inconsistent, the data on nonsteroidals.
13   He's saying, I know it doesn't look in
14   support of my argument for my biologic
15   plausibility.
16       But maybe -- maybe NSAIDs
17   don't work because they don't -- they
18   only -- they prevent -- they work on COX.
19   And COX expression is low in these cells
20   anyway.  And that's why you don't see a
21   more impressive -- so he's explaining why
22   this data that you're saying is -- is as
23   unimpressive as it is.
24       And so I read in

Page 461

1    Dr. Saenz -- her deposition, she
2    mentioned some basic science research by
3    Dr. Dineo Khabele, who I happened to have
4    been a resident with back at Cornell
5    years ago.
6        And so that piqued my
7    interest.  And I was curious to see what
8    is she doing in her lab, and so I
9    actually went back and I looked at the
10   studies that she was showing to see that
11   Penninkilampi actually had misstated the
12   fact that Type 2 tumors, high grade
13   serous carcinomas, actually expressed
14   COX-1.  And Type 1 expressed COX-2.
15       So this idea that inhibitors
16   of COX, that NSAIDs, that they don't
17   work, or aspirin doesn't work because
18   there's low expression of this thing in
19   the first place, that doesn't make sense.
20   If -- if -- you'd have to explain
21   something else.
22       Maybe it doesn't make a
23   difference because ovarian cancer is not
24   caused by inflammation.

116 (Pages 458 to 461)

Kevin Holcomb, M.D.

Page 462

1      Q.   You didn't read the Wilson
2  2015 paper with regard to COX -- COX
3  expression in epithelial ovarian tissue,
4  did you?
5          MS. CURRY:  Object to the
6  form.
7          THE WITNESS:  Whose -- whose
8  paper?  I'm sorry.
9  BY MS. GARBER:
10      Q.   Wilson, et al.?
11      A.   If you can show it to me I'd
12  let you know.  I don't think so.
13          MS. O'DELL:  Counsel, please
14  don't show something to the
15  witness.
16          MS. CURRY:  I'm just --
17  you're referring to -- you just
18  said Wilson 2000 --
19          MS. O'DELL:  Let me finish.
20  That's the third time --
21          MS. CURRY:  Hang on a minute
22  and let me explain.  It's not the
23  third time.
24          MS. O'DELL:  It's the third

Page 463

1  time I've seen you do it and I
2  haven't said anything.  But that's
3  not appropriate --
4          MS. GARBER:  I've seen you
5  do it as well.
6          MS. CURRY:  Excuse me.
7  Excuse me.  I've pointed out where
8  you were trying to show something
9  on the Elmo, and he's trying to
10  find it, where it is on the
11  document to help speed things
12  along.
13          MS. O'DELL:  Those --
14          MS. CURRY:  What I just
15  referred to him -- excuse me.  Let
16  me finish speaking, please.
17          What I just pointed out was,
18  when you say Wilson 2015, it's --
19  you're not giving any further
20  information about the article.
21          So I'm pointing out that
22  it's the one on his supplemental
23  list of items considered that
24  we've produced to you today.

Page 464

1          That's the only thing I was
2  doing.  That is not inappropriate.
3          MS. O'DELL:  It is
4  inappropriate --
5          MS. CURRY:  I disagree.
6          MS. O'DELL:  -- and the
7  three instances that I've referred
8  to are not occasions when the Elmo
9  was in use, so --
10          MS. CURRY:  Well, I think
11  you are mischaracterizing what has
12  happened today.
13          MS. O'DELL:  That is not
14  true.
15  BY MS. GARBER:
16      Q.   Doctor, is the basis for
17  your opinion that talc does not induce
18  inflammation which leads to ovarian
19  cancer based on pleurodesis data?
20          MS. CURRY:  Object to the
21  form.
22          THE WITNESS:  No.
23  BY MS. GARBER:
24      Q.   Pleurodesis does -- talc

Page 465

1  pleurodesis has been shown to increase
2  inflammation in pleural tissue, correct?
3      A.   But not cancer.  Yes, it
4  increases --
5      Q.   That wasn't my question.
6      A.   It increases inflammation.
7  Does not cause cancer.
8          So the reason why I don't
9  think inflammation --
10      Q.   Doctor, I didn't ask you the
11  reason.  Did I?
12      A.   Oh, I'm sorry.  I thought I
13  was here to clarify my positions.  I'll
14  wait for the questions.
15      Q.   Thank you.  I really
16  appreciate that.  You've got to let me
17  get there.
18      A.   You don't get there.
19      Q.   I will if you don't stop
20  talking in paragraphs.
21          Doctor, did you read the
22  Ghio 2007 study with regard to
23  pleurodesis, talc pleurodesis?
24      A.   Can you produce it for me so

117 (Pages 462 to 465)

Kevin Holcomb, M.D.

Page 466

1    I can let you know?
2        Q.   I will.
3        While she's pulling that,
4    I'll ask you this.  You indicate that
5    talc pleurodesis does not induce cancer,
6    is that fair, what you said?
7        A.   Yes.
8        Q.   And the number one
9    indication for talc pleurodesis is
10   malignant pleural effusions, right?
11       A.   Yes.
12       Q.   And so those patients
13   already have cancer and are likely end
14   stage, right?
15       A.   It had been used for years
16   on patients without malignancy.  The
17   reason why it's used on patients --
18       Q.   Did you say yes?
19       A.   Say this again?
20       Q.   Did you say yes to my -- to
21   my question?
22       MS. CURRY:  Objection.
23       Please don't interrupt him --
24   BY MS. GARBER:

Page 467

1        Q.   Did you say yes to my
2    question?  I didn't ask you for the
3    reason.
4        A.   Your -- your question is?
5        Q.   Did you say yes?
6        A.   Can you ask the question
7    again?  I want to -- just repeat it.
8        Q.   I said: "And those patients
9    have cancer and are likely end stage,
10   right?"
11       And you said: "It has been
12   used for years on patients without
13   malignancy.  The reason --"
14       And then I said: "Did you
15   say yes?"
16       You said?
17       A.   Yes.  In those patients that
18   have malignancy, they are likely end
19   stage.  As opposed to the patients who
20   don't have malignancy for years that has
21   been used.
22       Q.   Doctor, the title of this
23   study is "Talc Should Not Be Used For
24   Pleurodesis in Patients With Nonmalignant

Page 468

1    Pleural Effusions."
2        (Document marked for
3        identification as Exhibit
4        Holcomb-26.)
5    BY MS. GARBER:
6        Q.   Nonmalignant pleural
7    effusions are what for the lay listener?
8        MS. CURRY:  Object to the
9        form.
10       MS. SHARKO:  What exhibit is
11   this now?
12       MS. BROWN:  26.
13       MS. SHARKO:  Pardon me?
14       MS. BROWN:  26.
15   BY MS. GARBER:
16       Q.   What's a nonmalignant
17   pleural effusion?
18       A.   A nonmalignant pleural
19   effusion is one where you have fluid
20   surrounding the lung but it's not from a
21   cancer.
22       Q.   All right.  And -- and this
23   paper is authored by Andrew Ghio and
24   Victor Roggli.

Page 469

1        Do you see that?
2        MS. CURRY:  Object to the
3        form.
4        THE WITNESS:  Yes.
5    BY MS. GARBER:
6        Q.   Okay.  In the first
7    paragraph, it begins, however, it says,
8    "However, there should continue to be
9    concern regarding use of talc for
10   pleurodesis in individuals with
11   nonmalignant pleural effusions and
12   spontaneous pneumothorax.  This dilemma
13   results from a possible increased risk of
14   malignant mesothelioma in those patients
15   treated with talc.  Consequently, an
16   alternative agent should be employed in
17   any individual without malignancy
18   requiring pleurodesis."
19       Did I read that correctly?
20       A.   You read that correctly
21   again.
22       THE VIDEOGRAPHER:  Can
23   you -- your hair is on top of the
24   mic.

118 (Pages 466 to 469)

Kevin Holcomb, M.D.

Page 470

1      MS. GARBER: Sorry.
2      THE VIDEOGRAPHER: Thanks.
3  BY MS. GARBER:
4      Q.   Doctor, do you think that --
5  that peer-reviewed published data
6  indicate that there is a dose-response
7  with regard to talc and risk of ovarian
8  cancer?
9      A.   I believe that that's one of
10 the weaknesses is it's not consistently
11 shown.
12     Q.   But you do agree that there
13 are peer-reviewed studies which show a
14 dose-response, correct?
15     MS. CURRY: Object to the
16 form.
17     THE WITNESS: I've seen
18 studies that are peer reviewed and
19 published that have only two
20 levels of exposure, and one is
21 higher than the other and they
22 call that a dose-response.
23     So what I've seen in the
24 literature, people define

Page 471

1  dose-response in a lot of
2  different ways.  So I'd have to
3  agree with you, yes.
4      Penninkilampi does that.
5  Two dose levels and says there's a
6  dose-response.
7      (Document marked for
8  identification as Exhibit
9  Holcomb-27.)
10 BY MS. GARBER:
11     Q.   I'm going to mark as
12 Exhibit 27 the Berge paper that you've
13 referenced many times today, Doctor.
14     And, Doctor, if you can turn
15 to -- if you can turn to -- well, in this
16 paper, unfortunately there isn't page
17 numbers.
18     And so this table is Table
19 3, and it appears about five, six pages
20 forward from the end of the document.
21 Table 3.
22     A.   Sure.
23     Q.   If you want, we can look at
24 it here.  Do you see Table 3, Doctor?

Page 472

1      A.   Yeah.  I mean, I can't --
2  I'm going to have to watch up here
3  because it's too small.
4      Q.   Are you there --
5      A.   Yeah, I'm going to have to
6  sit it here because --
7      Q.   -- in your version?
8      MS. CURRY: Can I show him
9  my version which is --
10     THE WITNESS: I mean
11 literally, it's this.  That's
12 Table 3.  You want me to read that
13 and give you an opinion?
14     MS. GARBER: Let me see
15 yours, Ms. Curry, if you could.
16     Yes, please show that to
17 him.  Thank you.
18 BY MS. GARBER:
19     Q.   Doctor, in the Berge study
20 it indicates that with the duration of
21 talc use greater than ten years, defined
22 as ten years, there is a statistically
23 significant relative risk, correct?
24     A.   I'm just trying to make sure

Page 473

1  I understand what they're looking at
2  here.
3      Q.   That's what the table says,
4  right?
5      A.   Give me one second, ma'am.
6  I'll be right with you.
7      MS. GARBER: Let's go off
8  the record then.
9      THE VIDEOGRAPHER: All
10 right.  The time is 6:03 p.m.  Off
11 the record.
12     (Brief pause.)
13     MS. SHARKO: For the record,
14 we object to this.  I don't think
15 it's appropriate.  I don't think
16 it's appropriate, but it's late in
17 the day, and I assume that the
18 plaintiffs are almost done in any
19 event.
20     MS. GARBER: You're correct
21 in that regard.
22     THE VIDEOGRAPHER: We are
23 back on the record.  The time is
24 6:04 p.m.

119 (Pages 470 to 473)

Kevin Holcomb, M.D.

Page 474

1    BY MS. GARBER:
2        Q.   Doctor, these data here that
3    are presented in Table 3, they show
4    duration and frequency of talc use,
5    right?
6        A.   Yes.
7        Q.   In the meta-analysis?
8        A.   Yes.
9        Q.   Correct?
10       And for the duration defined
11   as ten years, the relative risk is
12   statistically significant at 1.16, right?
13       A.   The only thing I'm not -- I
14   have to say I'm not sure what's going on
15   here, and I didn't want to hold up more
16   time.  Are they saying if you compare
17   studies in this 12-risk estimate and look
18   at someone who has less than ten years
19   use and more than ten years use, and then
20   say the relative risk between those two
21   is 1.16, and a confidence interval that
22   comes close but doesn't cross one, then
23   you're -- if it's a -- if it's just
24   splitting it in two, and say well ten is

Page 475

1    the split-off and I'm going to look at
2    less than ten and more than ten, that's
3    not a dose-response.  You can't make a
4    dose-response on just two observations.
5        And I think that may be what
6    they're doing on the second one as well.
7    But to be perfectly honest, I'm not sure.
8    I'd have to look at the methods to figure
9    out what they're doing here.  But it
10   seems like a -- like a -- basically
11   just -- what's the term I'm looking for?
12   Just two options, less than ten years,
13   more than ten years.
14       Q.   Doctor, let me ask you this.
15   Does Table 3 --
16       A.   I guess I don't understand
17   exactly what they did here.
18       Q.   Yeah.  Okay.  That's fair.
19       Does Table 3 present
20   duration and frequency of talc use that
21   present statistically significant
22   results?
23       MS. CURRY:  Object to the
24   form.

Page 476

1        THE WITNESS:  Yes.  But not
2    together.  They're saying duration
3    in one and frequency in the other.
4    So they're saying that -- but I
5    think they've just split this in
6    two.
7    BY MS. GARBER:
8        Q.   And, Doctor, if you go back
9    to the abstract, first page of this
10   study.
11       A.   Right.
12       Q.   Okay.  Second-to-last
13   sentence.  It says, "This meta-analysis
14   resulted in a weak but statistically
15   significant association between genital
16   use of talc and ovarian cancer, which
17   appears to be limited to serous carcinoma
18   with a suggestion of a dose-response."
19       Do you see that?
20       A.   Yeah.
21       Q.   Those were the authors'
22   words, right, suggestion of a
23   dose-response?
24       A.   Suggestion, yes.

Page 477

1        Q.   Okay.  And then --
2        A.   And I think they're using
3    suggestion because they just did a
4    dichotomous -- that's the word that I was
5    looking for, dichotomous -- a dichotomous
6    evaluation with just -- and you can't
7    prove a dose-response.  Because if they
8    were doing a test for dose-response, they
9    met statistical significance.  And you
10   know how much I like confidence
11   intervals.  They would say that they
12   found a dose-response.  But they're
13   saying it's a suggestion of a
14   dose-response because they didn't do that
15   sort of analysis.
16       Q.   Doctor, Health Canada
17   concluded there was a dose-response in
18   their Bradford Hill, right, under their
19   biologic gradient assessment?
20       MS. CURRY:  Object to the
21   form.
22       THE WITNESS:  I'd have to
23   look -- have to look back at that.
24   BY MS. GARBER:

120 (Pages 474 to 477)

Kevin Holcomb, M.D.

Page 478

1    Q.   You don't remember?
2    A.   No, I don't.
3    Q.   All right.
4    A.   Can you tell me which page
5  you are talking about?
6    Q.   Can I ask you a few more
7  questions?
8         Were you provided by
9  Johnson & Johnson counsel any testing of
10  talcum powder products by Dr. Longo with
11  regard to historical samples of talcum
12  powder products?
13    A.   No.
14    Q.   Were you provided by Johnson
15  & Johnson with any internal Johnson &
16  Johnson company testing of their talcum
17  powder products for asbestos or fibrous
18  talc?
19    A.   No.
20    Q.   Were you provided with any
21  company witness testimony with regard to
22  testing of talcum powder products?
23    A.   I hadn't requested any of
24  these, and no, I wasn't provided.

Page 479

1    Q.   So, Doctor, let me ask you
2  this.  I want you to assume that talcum
3  powder products contain asbestos, and a
4  patient of yours has asked you, is it
5  safe to use talcum powder products on my
6  genitals.  What would be your response?
7    A.   Well, my first step would be
8  to disclose that I'm involved in this
9  litigation.
10         And then I would tell her,
11  pretty much what I would say without that
12  assumption, that there are some, in my
13  opinion, weaker designed studies showing
14  a weak, as other people agree, increased
15  risk of ovarian cancer.  And other
16  weaker -- other weakly designed studies
17  that show no difference, and it seems to
18  be about a 50/50 thing, and then cohort
19  studies that show no increased risk.
20         And I would tell the patient
21  overall there's not sufficient evidence
22  to suggest that talcum powder causes
23  ovarian cancer.
24    Q.   And, Doctor, if after you

Page 480

1  said all that to her, she said, "I just
2  need to know, Doctor, should I use it?
3  Is it safe?  Yes or no?" what would your
4  response be?
5         MS. CURRY:  Object to the
6  form.
7         THE WITNESS:  I'd want to
8  ask her why she uses it.  I'm
9  going to make another assumption.
10  The fact that she's asking me
11  again after that explanation is
12  that she's concerned.  And I would
13  say, if you're concerned maybe you
14  should find an alternative product
15  because you're concerned, not
16  because I think it causes ovarian
17  cancer.  But I don't see why you
18  would stress yourself out over
19  this.
20  BY MS. GARBER:
21    Q.   And, Doctor, if your patient
22  said, "I just need to know, is using
23  Johnson & Johnson talcum powder products
24  that contain asbestos, is that safe for

Page 481

1  me to use?  Yes or no?"
2         MS. CURRY:  Object to the
3  form.
4         THE WITNESS:  And this is
5  with my assumption that there's
6  asbestos in the product?
7  BY MS. GARBER:
8    Q.   Right.
9    A.   And I'm going to make
10  another assumption that there were
11  asbestos in the products that was studied
12  in this totality of the evidence that I
13  reviewed.  And I would -- I'm not going
14  to repeat it for the sake of time, but I
15  would have the same exact discussion with
16  her.
17    Q.   You would say that it's safe
18  to use?
19    A.   I would say that, given your
20  assumption, there's asbestos in this
21  talcum powder.  The totality of the data
22  using the same product that you say has
23  asbestos in it, does not convince me that
24  it causes ovarian cancer.  So I would --

121 (Pages 478 to 481)

Kevin Holcomb, M.D.

Page 482

1    that's what I would say to her.
2        Q.   Would you say that it was
3    then safe to use?
4        A.   Again, I'm telling you that
5    there is no convincing evidence that this
6    powder causes ovarian cancer.  And that's
7    where I would leave it.
8        Q.   Okay.  Let me turn to
9    another hypothetical.
10           I want you to assume that
11   Johnson & Johnson's talcum powder
12   products are found to contain fibrous
13   talc and your patient asks you the same
14   question, is it safe for me to use
15   Johnson & Johnson's talcum powder
16   products that contain fibrous talc on my
17   genitals, what would your response be?
18           MS. CURRY:  Object to the
19       form.
20           THE WITNESS:  In this
21       hypothetical situation, can I
22       assume that that same Johnson &
23       Johnson that has fibrous talc was
24       the same stuff used in all the

Page 483

1        body of literature that I've or --
2        is that what you'd like me to
3        assume as well?
4    BY MS. GARBER:
5        Q.   What I want you to assume is
6    that one of your patients is asking you
7    is it safe or not.
8        A.   But this is your world.  And
9    this is your hypothetical situation, so I
10   want to make sure I'm doing it right.
11           The patient is asking me,
12   talcum powder products by Johnson &
13   Johnson has fibrous talc as you said.
14   And I'm just asking you, can I assume
15   that the body of literature in its
16   totality that I've reviewed is the same
17   product that you're describing, there is
18   no reason for me to have a different
19   conversation?
20       Q.   My hypothetical did not
21   include the body of literature.
22           My hypothetical was that
23   Johnson & Johnson's products contain
24   fibrous talc and your patient is asking

Page 484

1    you, is it safe to apply this product to
2    my genitals.
3        A.   Okay.  I'm going to assume
4    then that the product that you're
5    describing is the same product that was
6    used in the totality of the data that I
7    reviewed.  And I would tell her the exact
8    same story, that there's some weaker
9    studies suggesting a modest or weak
10   inconsistent positive association, and
11   stronger studies showing no association.
12   And in its totality, I would say there's
13   no compelling evidence that that product
14   that you're describing increases her risk
15   for ovarian cancer.
16       Q.   Do you go to those data
17   because you assume there's asbestos in
18   Johnson & Johnson's products always?
19           MS. CURRY:  Object to the
20       form.
21           THE WITNESS:  Do I go to
22       what data?
23   BY MS. GARBER:
24       Q.   Do you go to the talc data

Page 485

1    because you make an assumption that
2    Johnson & Johnson's products contain
3    asbestos?
4            MS. CURRY:  Object to the
5        form.
6            THE WITNESS:  I'm not sure
7        what would make you say that.
8            How else can I advise a
9        patient on the risk of a substance
10       without going to the epidemiologic
11       data on that substance?  She's
12       asking me about talc.  What other
13       data am I going to review to give
14       her an answer?
15   BY MS. GARBER:
16       Q.   Doctor, you didn't look at
17   the NTP data, did you?
18       A.   No.
19           MS. GARBER:  Okay.  Let's
20       just take a break and let me look
21       at my notes.  But I think I'm
22       finished.
23           MS. CURRY:  Let's go off the
24       record.

122 (Pages 482 to 485)

Kevin Holcomb, M.D.

Page 486

1    THE VIDEOGRAPHER: Okay.
2  The time is 6:13 p.m.  Off the
3  record.
4    (Short break.)
5    THE VIDEOGRAPHER:  We are
6  back on the record.  The time is
7  6:36 p.m.
8  BY MS. GARBER:
9    Q.  Doctor, I'm going to mark an
10  additional paper that appears in the
11  Lancet dated March 23, 2019.
12    (Document marked for
13    identification as Exhibit
14    Holcomb-28.)
15  BY MS. GARBER:
16    Q.  And, Doctor, you have not
17  seen this paper before, have you?
18    A.  No.
19    Q.  All right.  If I could turn
20  your attention to the left-hand column
21  that appears at the bottom if you look up
22  here?
23    A.  Yes.
24    Q.  Okay.  And, Doctor, it

Page 487

1  reads -- the title is "Epithelial Ovarian
2  Cancer" by Stephanie -- oh boy.  Okay.  I
3  have to start with French.
4    A.  Lheureux, I believe.
5    Q.  Lheureux.  All right.
6    And it indicates: "Risk
7  factors for epithelial ovarian cancer
8  include the number of lifetime ovulations
9  (absence of pregnancy, early age of
10  menarche, and late age of menarche)
11  family history of EOC, smoking, benign
12  gynecologic conditions (including
13  endometriosis, polycystic ovarian system,
14  and pelvic inflammatory disease) and
15  potentially the use of talcum powder."
16    Did I read that correctly?
17    A.  Yes, you did.
18    Q.  So here the authors just
19  days ago are indicating the potential of
20  talc as a risk factor for epithelial
21  ovarian cancer, true?
22    MS. CURRY:  Object to the
23    form.
24    THE WITNESS:  Yes.  They for

Page 488

1    some reason separated that one out
2    with a potentially.
3  BY MS. GARBER:
4    Q.  All right.  And the footnote
5  that the authors are citing to is the
6  Penninkilampi data, correct?
7    A.  Yes.
8    Q.  And, Doctor, I'm going to
9  mark another document as Exhibit 29.
10    (Document marked for
11    identification as Exhibit
12    Holcomb-29.)
13  BY MS. GARBER:
14    Q.  And this is a study that
15  appeared in ACOG Obstetrics and
16  Gynecology, and it's titled "What's New
17  in Ovarian Cancer."
18    Do you see that?
19    A.  Yes, I do.
20    Q.  And it says, "Best articles
21  from the past year," correct?
22    A.  Yes.
23    Q.  It's written by Jason D.
24  Wright, M.D., correct?

Page 489

1    A.  Correct.
2    Q.  You respect him?
3    A.  Yes.
4    Q.  And the Penninkilampi
5  article is listed as four of the best
6  articles from the past year, correct?
7    A.  Yes.
8    Q.  Doctor, we --
9    MS. CURRY:  Object to the
10    form of the last question.
11    THE WITNESS:  I don't -- you
12    know, I'm sorry.
13  BY MS. GARBER:
14    Q.  Doctor, I didn't have a
15  question.
16    A.  No, no, I want to go back.
17  Because I said yes.  But you made a few
18  misstatements there.
19    A, you said this was a
20  study.  It's not.  It's another op Ed
21  piece from Jason Wright saying what he
22  felt was the best papers of the year.
23    Two, you said it was an
24  ACOG.  No, it's the journal of

123 (Pages 486 to 489)

Kevin Holcomb, M.D.

Page 490

1    obstetrics -- Obstetrics and Gynecology
2    is the name of the journal this is in.
3         And just to clarify, without
4    speaking to Dr. Wright, I'm not sure why
5    he's calling these specifically the best,
6    whether he's speaking towards the quality
7    of the studies or just what's the most
8    popular or sensational.
9         Q.    Doctor, what's the journal
10   name?
11        A.    Obstetrics and Gynecology.
12        Q.    Does that -- do people refer
13   to that as by a particular color?
14        A.    Green.
15        Q.    And that's a -- that's a
16   journal that you regularly read?
17        A.    Yes.
18        Q.    And you do some review work
19   for them, don't you?
20        A.    Yes.
21        Q.    That is a published document
22   that appears within the Green Journal,
23   right?
24        A.    Yes.  You're telling me this

Page 491

1    is from the Green Journal, so it's --
2         Q.    Doctor, were you aware that
3    IARC is currently evaluating talcum
4    powder products for its carcinogenicity?
5         MS. CURRY:  Object to the
6    form.
7         THE WITNESS:  No.  I was not
8    aware.
9    BY MS. GARBER:
10        Q.    You are not aware of that?
11        Doctor, if -- I want you to
12   assume that IARC reviews the data that
13   exists to date and concludes that talcum
14   powder products are a Group 1 carcinogen.
15   Would your opinions in this case differ
16   with regard to talcum powder products?
17        MS. CURRY:  Object to the
18   form.
19        THE WITNESS:  I'd have to
20   see what additional data happened
21   between 2010 and 2019 that that
22   bumped them from 2-B to 1.  So I'm
23   assuming that there would be some
24   data that I've -- after my

Page 492

1    exhaustive review haven't seen
2    before.
3         And so in that setting, if
4    there was some convincing data
5    that bumped them from 2-B to 1,
6    yes, I would feel differently
7    about it.
8    BY MS. GARBER:
9         Q.    I will state in my
10   hypothetical that the IARC authors or
11   working group look at the data that
12   exists today with regard to the
13   epidemiological data, the meta-analyses
14   that exist, the nine meta-analyses,
15   including Taher, and the other
16   epidemiological data, the Saed data and
17   the other biologically plausible data,
18   and the mechanistic data that was
19   previously contained in IARC 2010, and
20   they concluded that it -- that talcum
21   powder products were a Group 1
22   carcinogen, would your opinions in this
23   matter change?
24        MS. CURRY:  Object to the

Page 493

1    form.
2         THE WITNESS:  I have to be
3    honest.  It's hard for me to
4    imagine that Dr. Saed's paper
5    being quoted in IARC.  So this is
6    a tough one for me to get into
7    your hypothetical situation here.
8         But no, I'm not so sure,
9    because I'm thinking from the last
10   time they published a
11   classification to now, there's
12   going to be three prospective
13   studies, all coming to the
14   conclusion that there is no
15   increased risk.
16        And then there's going to be
17   a number of meta-analysis, as
18   you're saying, which a lot of the
19   data is rechurning what they've
20   already looked at.  So it would be
21   what incremental data have they
22   added to it.
23        So I guess I'm having a hard
24   time in your -- in your scenario,

124 (Pages 490 to 493)

Kevin Holcomb, M.D.

Page 494

1    how IARC is going to get from a
2    2-B to a 1, based on what's been
3    published from the last time that
4    they issued an opinion on this.
5    BY MS. GARBER:
6        Q.   I want you to assume that
7    they get to a 1.  Is your opinion going
8    to change out of your respect for the
9    institution of IARC, a branch of the
10   World Health Organization?
11           MS. CURRY:  Object to the
12       form.
13           THE WITNESS:  If IARC used
14       Penninkilampi, for example --
15       let's say that I was -- I'm going
16       to give you a hypothetical.
17   BY MS. GARBER:
18       Q.   Doctor, you don't give me a
19   hypothetical.
20       A.   If --
21       Q.   I give you one.  You
22   understand that, right?
23       A.   I'm giving you the
24   hypothetical of how I'm considering your

Page 495

1    situation.
2        Q.   I want you to answer my
3    hypothetical.
4        A.   It depends on what brought
5    them from 2-B to 1.  I have respect for
6    IARC because I looked at their
7    methodology.  We've gone through the
8    things that I didn't agree with IARC
9    methodology.  But if you told me IARC's
10   quality dropped to such a standard that
11   they had Dr. Saed's paper as highly
12   credible, and this is moving us from here
13   to here, I'm no longer so impressed with
14   IARC.
15           So, no, my respect level for
16   IARC would drop considerably, and I
17   probably wouldn't follow the
18   recommendations.
19       Q.   Doctor, you're aware, aren't
20   you, of FDA's recent statements with
21   regard to the businesses Justice and
22   Claire and their cosmetic products?
23       A.   That's -- I'm not -- can you
24   repeat that once again.

Page 496

1        Q.   Sure.  Are you aware that
2    the FDA -- are you aware of FDA's
3    statements with regard to certain
4    cosmetic makeup products that are sold at
5    Justice and Claire's with regard to talc
6    and asbestos?
7            MS. CURRY:  Object to the
8        form.
9            THE WITNESS:  No, I'm not
10       aware.
11   BY MS. GARBER:
12       Q.   Did you, before you came
13   here today and in preparation for your
14   deposition, endeavor to look at what FDA
15   is saying about talcum powder products?
16           MS. CURRY:  Object to the
17       form.
18           THE WITNESS:  No.
19           (Document marked for
20       identification as Exhibit
21       Holcomb-30.)
22   BY MS. GARBER:
23       Q.   Let's mark this as
24   Exhibit 30.

Page 497

1            Doctor, this is -- at the
2    bottom, you see this is the FDA's
3    website, right, FDA.gov/cosmetics?
4        A.   Yes.
5        Q.   Do you see that?
6        A.   Yes.
7        Q.   And do you see at the top it
8    indicates recalls and alerts?  "FDA
9    advises consumers to stop using certain
10   Claire's cosmetic products."
11           Do you see that?
12       A.   Yes.
13       Q.   And do you see there in the
14   middle of the document, it indicates,
15   "Product samples test positive for
16   asbestos," and then it lists a number of
17   Claire's products?
18       A.   Yes.
19       Q.   Doctor, if there was such a
20   finding by FDA with regard to J&J's
21   talcum powder products, would your
22   opinions change in this case?
23           MS. CURRY:  Object to the
24       form.

125 (Pages 494 to 497)

Kevin Holcomb, M.D.

Page 498

1        THE WITNESS: I'd have to
2   say the testing of the products
3   that went into this body of
4   knowledge that I have, I'm not
5   sure. I would have to think about
6   it. The reason why I'm hesitating
7   is because I don't know, is that a
8   new problem? Like, for example,
9   this one store, Claire's stores, I
10  think it's easier to call these
11  folks out because you don't know
12  if this is a new contamination.
13       The question would be if all
14  this data is with the same
15  contaminated product, I'd have to
16  assume that a woman is at no more
17  increased risk than -- than --
18  than the stuff in this paper -- in
19  these papers.
20       But I can't see myself going
21  against FDA regulations. I mean,
22  if FDA says stop using something,
23  I'm not going to tell people to
24  use something against FDA's

Page 499

1   regulations.
2   BY MS. GARBER:
3       Q.   And if FDA indicates that
4   the testing that they conducted of
5   Johnson & Johnson's talcum powder
6   products test positive for asbestos,
7   would your causation opinions change?
8        MS. CURRY: Object to the
9   form.
10       THE WITNESS: No. No.
11  BY MS. GARBER:
12      Q.   Would your advice to
13  patients change?
14      A.   Apparently the FDA would
15  likely put out a warning to say stop
16  using it, and, yeah, I would stop using
17  it. I've done that in the past where
18  there's things that -- if the FDA sends
19  out a warning about, and I stop doing it,
20  even though I may think in my hands it's
21  safe.
22       It has a lot to do with
23  medical/legal issues and things like
24  that. But --

Page 500

1       Q.   You would heed the warning?
2        MS. CURRY: Object to the
3   form.
4        THE WITNESS: I would think
5   anyone with common sense would.
6   It doesn't make sense to not to.
7   BY MS. GARBER:
8       Q.   Similarly, if FDA compelled
9   a warning to be placed on Johnson &
10  Johnson's products, would you heed that
11  warning if your patients were asking you
12  if it was safe to use?
13       MS. CURRY: Object to the
14  form.
15       THE WITNESS: Putting a
16  warning on it or pulling it off
17  the market?
18  BY MS. GARBER:
19      Q.   Putting a warning on the
20  bottle.
21       MS. CURRY: Object to the
22  form.
23       THE WITNESS: Would I tell
24  patients to heed the warning.

Page 501

1   BY MS. GARBER:
2       Q.   Sure. If the patient -- if
3   there was a warning about ovarian cancer
4   on the bottle, compelled by -- by FDA and
5   your patient came and said I've been
6   putting this on my genitals, should I
7   stop, what would your answer be?
8        MS. CURRY: Object to the
9   form.
10       THE WITNESS: I have to
11  believe that if the -- if the FDA
12  thought that that product was such
13  a carcinogen and so dangerous
14  there wouldn't be just a warning
15  label, they would pull it off the
16  market. If the FDA is just
17  putting a warning so that patients
18  are aware of it, I think my
19  conversation with her is going to
20  be very similar to the
21  conversation I just told you I
22  would have now.
23  BY MS. GARBER:
24      Q.   But you wouldn't tell her

126 (Pages 498 to 501)

Kevin Holcomb, M.D.

Page 502

1    to -- to stop using it?
2        A.   My guess is the warning
3    would be very similar to the
4    conversations I'm having, there are some
5    weaker data suggesting -- so in your --
6    you know, your hypothetical situation,
7    it's -- I would think that they would
8    possibly recall it or -- not recall it.
9    They would -- they would put an advice to
10   stop using a certain product, like they
11   are doing in this situation.  And a
12   patient came to me and says the FDA has
13   this warning to stop using this product,
14   I would support the FDA.
15       Q.   And, Doctor, I know you are
16   not a regulatory expert, but you do know
17   that at times FDA does not have the power
18   to compel a warning, you understand that,
19   right?
20       A.   I -- I, really -- as you
21   started with your statement, I am not a
22   regulatory expert.  I know very little
23   about regulations and how the FDA works
24   in that regard.

Page 503

1        (Document marked for
2        identification as Exhibit
3        Holcomb-31.)
4    BY MS. GARBER:
5        Q.   I want to mark another
6    document.  And this is Exhibit 31, which
7    is from the FDA website.  And it's titled
8    "Talc."
9        Doctor, do you see -- do you
10   see that the date of the download of this
11   document is March 19, 2019?
12       A.   Yes.
13       Q.   And, Doctor, did you ever
14   endeavor to go to the FDA website and put
15   in "talc" to see what the FDA was saying
16   about talcum powder products?
17       A.   No.
18       Q.   Okay.  I will represent to
19   you what appears that on this website is
20   what's under the heading of "Talc."
21       It says, "Here is a recent
22   FDA action related to talc.  Learn more
23   below."
24       It reads, "The FDA continues

Page 504

1    to investigate and monitor reports of
2    asbestos contamination in certain
3    cosmetic products and will provide
4    additional information as it becomes
5    available.  The agency is and will
6    continue to work with other" -- "other
7    federal partners to share our collective
8    expertise to advance scientific test
9    methods for the assessment of asbestos."
10       Did I read that correctly?
11       A.   So far you've been perfect.
12       Q.   Does it cause you concern
13   that the FDA is interested in looking
14   further into whether talcum powder
15   products contain asbestos?
16       MS. CURRY:  Object to the
17   form.
18       THE WITNESS:  No.  It
19   actually gives me reassurance that
20   the federal agencies that are
21   supposed to be protecting public
22   safety are at work and doing what
23   they are supposed to be doing.
24   BY MS. GARBER:

Page 505

1        Q.   But you are here in this
2    litigation saying talc is safe, even
3    though FDA is looking into whether or not
4    talcum powder products contain asbestos.
5        A.   Right.  So if --
6        MS. CURRY:  Object to the
7    form.
8    BY MS. GARBER:
9        Q.   It doesn't concern you?
10       A.   It would concern me if they
11   told me that they found levels of talc
12   and -- and -- you know, the -- the reason
13   why it would concern me is because I
14   don't know if that's a new contamination
15   or that product is the same as it's
16   always been.
17       If it's the same as it's
18   always been, then you are talking about a
19   level of contamination that doesn't have
20   compelling evidence that it causes
21   cancer.
22       But I don't know how I would
23   know the difference.  I think I would
24   have to assume that it's -- that it's

Kevin Holcomb, M.D.

Page 506

1    different than this.  I think you'd have
2    to either assume it's the same or it's
3    different.  And I think the safer thing
4    to do would be to assume that it's
5    different.
6         If I knew for sure that this
7    level of contamination they find has been
8    in this stuff all this time and all these
9    thousands of patients that we've
10   followed, you know, the large
11   case-control studies, the 70,000, 60,000,
12   40,000 patients on cohort studies, if
13   that's the product that they've been
14   using and it's contaminated all this
15   time, I would have to say no, that
16   wouldn't worry me.  But there's no way
17   that I would be able to tell the
18   difference.
19        Q.   Shouldn't you, as a patient
20   advocate, err on the side of safety?
21             MS. CURRY:  Object to the
22        form.
23             THE WITNESS:  That's what I
24        just said, I would.

Page 507

1    BY MS. GARBER:
2         Q.   You know, Doctor, if -- you
3    are a member of the SGO, right?
4         A.   Yes.
5         Q.   And that stands for Society
6    of Gynecologic Oncology, right?
7         A.   Yes.
8         Q.   That's a professional
9    organization?
10        A.   Yes.
11        Q.   And do you know what --
12   whether they list talc as a risk factor
13   at present?
14        A.   On which site, on the SGO
15   website?
16        Q.   Yeah.
17        A.   No, I'm not -- I'm not sure.
18        Q.   I want you to assume that --
19   that the SGO issues an advisory that talc
20   can cause cancer.  Would you continue to
21   recommend to patients that they use
22   talcum powder products on their genitals?
23             MS. CURRY:  Object to the
24        form.

Page 508

1             THE WITNESS:  You're saying
2        the advisory would just say that
3        there's some evidence suggesting
4        that talc -- what is the -- can
5        you word the -- can you give me
6        the hypothetical wording of what
7        is SGO is saying?
8    BY MS. GARBER:
9         Q.   Sure.  SGO has issued an
10   advisory that says there is evidence that
11   talc can cause cancer, ovarian cancer.
12        A.   Right.  And then --
13        Q.   Would you -- would you
14   continue to advise patients that talcum
15   powder products are safe?
16             MS. CURRY:  Object to the
17        form.
18             THE WITNESS:  Before I made
19        a decision on that I'd have to go
20        and see what is the data that they
21        are basing that on.
22             If they are basing it on the
23        data that I've just reviewed, I
24        would have the same discussion

Page 509

1        with my patients, because I -- I
2        would say them saying that there's
3        evidence to this effect is just
4        telling the truth.
5             If I then have to go and
6        read the body of literature that
7        they're using to make that
8        warning, to decide, well, yes,
9        the -- the studies that they are
10       referring to are the same ones I
11       know, and the ones that don't is
12       the same amount going both ways,
13       my feeling would be the same.
14            So is their advisory based
15       on new data or an assessment of
16       what I've assessed?
17   BY MS. GARBER:
18        Q.   You wouldn't heed the
19   advisory of the SGO, your professional
20   organization, is that your testimony?
21        A.   And stop using talc myself?
22   What -- what would --
23             MS. CURRY:  Object to the
24        form.

128 (Pages 506 to 509)

Kevin Holcomb, M.D.

Page 510

1    BY MS. GARBER:
2        Q.   And advise patients that
3    it's safe to use?
4        A.   You didn't say that SGO is
5    advising to stop using talc.  You said
6    what would I do if the SGO had an
7    advisory just saying that patients should
8    be aware that there's information out
9    there to this effect.
10       Q.   That wasn't my hypothetical,
11   was it, Doctor?
12       A.   Yeah.  Can you go back and
13   read it?
14       Q.   The SGO issues an advisory
15   that talc can cause cancer.  Would that
16   change what you told patients about the
17   safety of talcum powder products?
18           MS. CURRY:  Object to the
19   form.
20           THE WITNESS:  If the SGO
21   jumped up to the same
22   classification as IARC that says
23   there's insufficient evidence but
24   this is potentially a carcinogen,

Page 511

1    I don't see how SGO would be
2    saying anything different than
3    IARC.
4        So that -- that statement
5    that says it can, you'd have to go
6    in and see, well, what's the
7    evidence that you're basing it on.
8        And I'm saying that -- why
9    would I change my feeling about
10   this if somebody else looks at
11   this data, and it's the same data
12   that I've just reviewed, and says
13   we're going to make this
14   statement.
15       And the patient comes to me
16   and asks me, well, how do you feel
17   about that statement?  And if it's
18   based on this same data, I'm not
19   sure how it changes the fact that
20   it's from SGO.  I'm still going to
21   then explain, this is the truth as
22   I see it and the totality of the
23   evidence.
24   BY MS. GARBER:

Page 512

1        Q.   You're not going to heed the
2    advisory of the SGO?
3            MS. CURRY:  Object to the
4    form.
5            THE WITNESS:  You -- the
6    advice --
7    BY MS. GARBER:
8        Q.   Because you know the data
9    better?
10       A.   The advice -- there is no
11   advisory here.  You keep on saying that
12   the SGO is saying that there's evidence
13   that talc can cause cancer.  An advisory
14   is telling you to do something.  In this
15   case, are they saying stop using talc or
16   that patients should just be aware?
17       Q.   Let me give you another
18   hypothetical.  SGO issues an advisory to
19   stop using talcum powder products on your
20   genitals because it contains asbestos.
21   Would you heed that advisory?
22           MS. CURRY:  Object to the
23   form.
24           THE WITNESS:  If the SGO is

Page 513

1    telling patients to stop using
2    talc because of asbestos that's
3    been proven to be there, yes, to
4    be honest, I would probably drop
5    in line, just not to be out of --
6    I'd be fearing medical/legal
7    exposure by not doing it, no
8    matter how I felt about the data.
9    BY MS. GARBER:
10       Q.   More concerned about your
11   neck rather than the patients, Doctor?
12           MS. CURRY:  Object to the
13   form.
14           THE WITNESS:  I have my
15   opinion of this data.  The data --
16   if you're saying my hypothetical
17   that I just gave you is that the
18   data didn't change and SGO makes a
19   statement.  I'm worried about the
20   patients the same amount, because
21   the data is the data.
22       You're saying, well, what if
23   SGO gets behind it and says based
24   on what you read, we want to give

129 (Pages 510 to 513)

Kevin Holcomb, M.D.

Page 514

1  an advisory?
2       The risk level hasn't
3  changed.  It's not based on any
4  new data.  So I don't care about
5  my patients any less.  The risk to
6  them hasn't increased.
7  BY MS. GARBER:
8       Q.  Doctor, is cornstarch a safe
9  alternative to talcum powder products?
10      MS. CURRY:  Object to the
11  form.
12      THE WITNESS:  It's an
13  alternative, yes.
14  BY MS. GARBER:
15      Q.  Is it a safe alternative?
16      MS. CURRY:  Object to the
17  form.
18      THE WITNESS:  I have no
19  reason to think that cornstarch is
20  not safe.
21  BY MS. GARBER:
22      Q.  You haven't done a
23  comprehensive literature review of the
24  cornstarch data, have you?

Page 515

1       A.  No.
2       Q.  Let me ask you about some of
3  the expert work that you've done, just so
4  that I'm clear on your prior testimony.
5       Since the Ingham case, and
6  that verdict, and before you were hired
7  in the MDL, did you continue to do any
8  expert work with regard to talcum powder
9  products and ovarian cancer?
10      A.  No.  You actually asked me
11  that earlier.  Same answer.  No.
12      Q.  Okay.  And are you currently
13  serving as an expert on the talcum powder
14  products in any other litigation aside
15  from the MDL?
16      A.  No.
17      MS. GARBER:  Okay.  Just
18  give me one moment.
19      Okay.  All right.  I have
20  nothing further at this point.
21  Thank you, Doctor.
22      THE WITNESS:  Sure.
23      MS. CURRY:  No questions.
24      MS. GARBER:  Okay.  We're

Page 516

1  finished.
2       THE VIDEOGRAPHER:  Okay.
3  Stand by, please.  This marks the
4  end of today's deposition.  The
5  time is 6:59 p.m.
6       (Excused.)
7       (Deposition concluded at
8  approximately 6:59 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 517

1
2       CERTIFICATE
3
4
5       I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
        It was requested before
8  completion of the deposition that the
   witness, KEVIN HOLCOMB, M.D. have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12  _____
    MICHELLE L. GRAY,
13  A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  March 28, 2019
16
17
18      (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

130  (Pages 514 to 517)

Kevin Holcomb, M.D.

|  | Page 518 |
|---|---|
| 1 | INSTRUCTIONS TO WITNESS |
| 2 | |
| 3 | Please read your deposition |
| 4 | over carefully and make any necessary |
| 5 | corrections.  You should state the reason |
| 6 | in the appropriate space on the errata |
| 7 | sheet for any corrections that are made. |
| 8 | After doing so, please sign |
| 9 | the errata sheet and date it. |
| 10 | You are signing same subject |
| 11 | to the changes you have noted on the |
| 12 | errata sheet, which will be attached to |
| 13 | your deposition. |
| 14 | It is imperative that you |
| 15 | return the original errata sheet to the |
| 16 | deposing attorney within thirty (30) days |
| 17 | of receipt of the deposition transcript |
| 18 | by you.  If you fail to do so, the |
| 19 | deposition transcript may be deemed to be |
| 20 | accurate and may be used in court. |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

**Page 520**

```
 1
 2           ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 521, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   KEVIN HOLCOMB, M.D.          DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24
```

**Page 519**

```
 1          - - - - - -
              E R R A T A
 2          - - - - - -
 3
 4   PAGE LINE CHANGE
 5   ____ ____ _____
 6       REASON: _____
 7   ____ ____ _____
 8       REASON: _____
 9   ____ ____ _____
10       REASON: _____
11   ____ ____ _____
12       REASON: _____
13   ____ ____ _____
14       REASON: _____
15   ____ ____ _____
16       REASON: _____
17   ____ ____ _____
18       REASON: _____
19   ____ ____ _____
20       REASON: _____
21   ____ ____ _____
22       REASON: _____
23   ____ ____ _____
24       REASON: _____
```

**Page 521**

```
 1            LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
```

131 (Pages 518 to 521)

| A | | | | |
|---|---|---|---|---|
| **a.m** 1:15 11:7 126:11,16 | 276:13 277:23 352:9 397:24 | 318:14 346:8 352:2 | 248:12 | 345:14,15,20 345:22 366:22 |
| **AACES** 7:14 | **accounts** 398:21 | **addressing** | **afternoon** 239:22 | 369:5 370:9 |
| **abandoned** 214:18 | **accuracy** 371:3 | 28:21 158:21 | **age** 340:18 | 388:4 398:8 |
| **ability** 17:8 | **accurate** 14:12 | 323:9 429:7 | 351:18 362:2 | 401:3,22 402:9 |
| 95:11 116:9 | 22:1 23:18 | **adenomatous** | 364:10,21 | 402:21 404:17 |
| 131:17 135:17 | 110:24 117:1 | 456:6 | 368:20 383:24 | 410:1,17 |
| 282:3 285:7 | 124:4 151:7 | **adequate** 345:7 | 444:10 487:9 | 425:19 427:12 |
| 422:9 426:7 | 303:24 355:24 | **adequately** | 487:10 | 430:15 432:20 |
| **able** 77:14 78:18 | 380:15,18 | 399:15 | **aged** 366:1,3 | 439:17 452:18 |
| 79:1 130:3,11 | 518:20 | **ADLs** 251:6,6 | **agencies** 504:20 | 455:9 457:10 |
| 132:12 148:17 | **accurately** | **administer** | **agency** 504:5 | 459:4,13,14 |
| 159:5 168:15 | 318:1 369:4 | 11:17 | **agent** 72:14 | 470:12 471:3 |
| 199:8 216:8 | **achieve** 194:6 | **admit** 130:24 | 74:17 469:16 | 479:14 495:8 |
| 290:9,10 | **acid** 151:24 | 380:9 | **agents** 445:10 | **agreed** 182:15 |
| 314:16,20 | **acknowledge** | **admitted** 91:4 | **ages** 366:5 | 348:24 |
| 318:1 321:8 | 128:1 155:24 | 94:22 | **ago** 47:12 55:21 | **agreeing** 297:2 |
| 339:17 396:24 | **ACKNOWLE...** | **admitting** 42:8 | 86:21 88:1 | **agrees** 292:6 |
| 438:6 442:14 | 520:2 | 133:4 294:6,8 | 111:12 140:19 | **ahead** 31:9 54:1 |
| 506:17 | **ACOG** 488:15 | 294:10,13 | 143:17 354:24 | 66:11 237:8 |
| **absence** 131:7 | 489:24 | 330:21 | 461:5 487:19 | **al** 88:19,19 |
| 315:2 427:9 | **act** 323:10 | **admonitions** | **agree** 20:21 | 255:19 303:4 |
| 487:9 | **action** 275:12 | 15:2 | 32:11 41:23 | 358:4 416:11 |
| **absolute** 396:11 | 276:9 447:3 | **adnexa** 151:21 | 89:10 93:20,22 | 416:23,24 |
| **abstract** 125:4 | 503:22 | **advance** 504:8 | 96:5,8 101:15 | 417:5,15 |
| 329:15 383:19 | **activities** 251:9 | **advanced** 336:3 | 101:18 155:22 | 453:15,18 |
| 404:11,23 | 251:20 | **advice** 499:12 | 157:9 158:23 | 462:10 |
| 476:9 | **activity** 251:11 | 502:9 512:6,10 | 162:23 170:14 | **Alabama** 2:14 |
| **absurd** 204:1 | 264:12 | **advise** 239:7 | 173:9 182:12 | **alerts** 497:8 |
| 217:14 | **actual** 122:11 | 315:9 485:8 | 182:18 184:11 | **ALLEN** 2:12 |
| **academic** 178:2 | 400:16 | 508:14 510:2 | 212:14,15,19 | **allow** 458:13 |
| **Academy** | **acute** 450:21 | **advises** 9:19 | 212:24 214:16 | **allowed** 73:14 |
| 446:19 | **add** 81:3 110:22 | 497:9 | 215:11 216:11 | 154:20 163:22 |
| **accept** 77:22,23 | 329:1 373:3 | **advising** 510:5 | 221:2,12 | **alter** 283:20 |
| 78:11 90:8 | **added** 229:1 | **advisory** 507:19 | 222:23 223:2 | **alterations** |
| **acceptable** | 493:22 | 508:2,10 | 227:20 241:7 | 251:21 |
| 48:21 | **adding** 291:23 | 509:14,19 | 247:4,13,14 | **altered** 282:3 |
| **accepted** 61:8 | **addition** 54:5 | 510:7,14 512:2 | 249:3,11,13,16 | **alternative** |
| 151:8 196:4 | 116:13 439:20 | 512:11,13,18 | 250:4 257:11 | 469:16 480:14 |
| 295:8 | **additional** 54:8 | 512:21 514:1 | 257:18,18 | 514:9,13,15 |
| **access** 299:20 | 88:6 486:10 | **advocate** 238:18 | 258:6 295:14 | **altogether** |
| **accompany** 15:2 | 491:20 504:4 | 238:23,24 | 297:14,20 | 219:19 220:2 |
| **accord** 219:3 | **address** 23:14 | 239:4 506:20 | 298:23 299:4 | 290:22 311:20 |
| **account** 196:22 | 26:6 273:5,10 | **affect** 291:2 | 300:7 317:12 | 313:12 321:20 |
| | 273:13 309:8 | **affirmative** | 317:13 318:3 | 321:23 |
| | 398:17 | 23:22 | 325:21 326:2 | **amend** 300:8 |
| | **addressed** 57:2 | **African** 7:13 | 329:13 335:5 | **amendments** |

151:7
American 7:13 9:8
Americans 248:13
amount 39:13 137:9 264:12 386:4 390:2 409:13 431:7 431:12 509:12 513:20
amphibole 42:24
Amrhein 6:18
analogies 120:13
analysis 18:5 34:7 171:7,18 171:21 189:14 217:3 225:20 229:8 249:18 278:20,20 345:24 387:14 387:18 429:3 431:15 436:6 446:23 453:19 477:15
analyzing 428:20 430:8
and/or 14:14 113:19 517:21
Andrew 468:23
animal 127:22 129:4,8,13,19 130:11 131:9 134:16
animals 134:17
anniversary 389:8
answer 10:5 15:22 41:21 45:23 48:20 59:3 63:20 65:3,11 66:12 67:17 68:7,8 91:21 99:10 133:16 136:8

163:11,21
166:23 167:5 167:12,16
168:4 169:6,24 171:2 174:10 176:13 191:3 205:24 213:14 228:8,10,12,14 232:18 233:2 298:7 316:18 327:14,24 330:11 353:12 354:13 356:3 401:21 411:2 415:1,3 458:4 458:14 485:14 495:2 501:7 515:11
answered 31:14 67:21 80:20 288:14
answering 101:14 265:21 328:17 456:23
answers 166:16 166:22 167:1 411:6 520:8
anti-inflamma... 459:6
anticipate 405:6
antiinflammat... 447:14,17 449:8 455:12 455:19
antiinflammat... 453:16 454:17
anybody 37:5 150:10 307:17 341:16,22 451:20
anyway 237:9 460:20
apart 340:3 391:16
apologize 40:19 71:13,20 72:1 87:10 232:21

255:24
apparent 293:16 386:22
apparently 420:21 445:20 499:14
appear 51:15 57:11 58:18 105:5 116:12 152:4,13,21,23 160:7 186:17
appearances 2:1 3:1 4:1 11:14
appeared 488:15
appears 186:10 186:17 424:19 471:19 476:17 486:10,21 490:22 503:19
APPEL 3:17
application 84:7 432:9 435:5
applications 417:2
applied 145:12 427:4 428:12
applies 85:21 86:15
apply 75:15 76:2 85:17 484:1 517:19
appreciably 270:11
appreciate 24:13 31:12 126:7 209:1 255:1 280:23 353:14 465:16
appreciated 122:22
approach 128:22 163:5
appropriate 168:5 223:22 463:3 473:15 473:16 518:6

approximate 264:18 290:7
approximately 336:5 516:8
April 424:17 428:6
area 27:21 43:13 68:15 85:2 106:21 392:6 393:14 427:2 428:22 453:2
areas 138:20 323:11 376:6
argue 166:4 253:4 266:23 450:4
argument 460:14
Arsenic 5:22 71:10
article 182:2 194:12 196:7 200:20 299:7,9 299:18 300:9 363:21 463:20 489:5
articles 54:9 120:23 217:3 287:4 488:20 489:6
asbestiform 75:18 85:1,7 85:20,22 86:16 89:18 95:1 96:2,6 98:24
asbestos 22:13 22:16 26:15,19 26:22 27:1,12 27:19 28:7 38:14,20 39:12 41:17,24 42:7 42:9,13 60:14 61:13,23 62:15 62:22 63:18 65:1,6,8 67:8 67:22 68:1 69:18 70:24

74:6,8,23
75:14 76:1
82:3,24 83:9
84:21 85:16,19
85:23 86:4,15
87:19 88:9
89:17 90:2,20
91:5,6 95:1,10
95:22 96:6,10
96:17,23 98:6
98:21 99:7,19
100:4,16
101:16,18
108:19 109:23
154:15 170:8
175:2 239:8
326:17 330:10
342:19 391:5
391:12 393:4
398:21 478:17
479:3 480:24
481:6,11,20,23
484:17 485:3
496:6 497:16
499:6 504:2,9
504:15 505:4
512:20 513:2
ascend 445:15
ascending 423:4
ascension 127:23 131:10
ascent 445:10
aside 52:23 111:5 207:9 515:14
asked 42:6 43:11,17 46:14 56:16 59:17 63:16,19 66:20 67:16 80:17 81:18 88:12 97:6,6,17,18 98:1 103:9 106:3 138:19 138:20 141:2 143:22 144:11 144:20 145:1

Case 3:16-md-02738-MAS-RLS   Document 9735-7   Filed 05/07/19   Page 135 of 190 PageID: 37010
Kevin Holcomb, M.D.

Page 524

178:18 182:15
189:7 190:15
190:16 191:8
209:12 211:13
211:20 216:17
228:9,15,24
286:20 306:14
314:13 328:2,9
328:17 332:3
341:21 348:21
353:9 366:18
367:8 371:17
371:23,24
372:10 376:8
384:3 413:6
454:6 479:4
515:10
**asking** 16:4
24:10,14 27:16
97:10 141:6
152:18 167:13
167:21 168:1
168:10 184:15
195:14 196:3
208:11 212:11
292:11 297:17
332:16 348:19
370:21 371:24
372:3 385:10
422:10 440:16
458:11,15
480:10 483:6
483:11,14,24
485:12 500:11
**asks** 482:13
511:16
**aspect** 429:22
**aspects** 430:9,15
**aspirin** 452:19
453:23 454:12
454:17 455:11
455:15 456:3,9
456:15 457:10
459:6,17
461:17
**assess** 391:19
**assessed** 509:16

**assessing** 20:13
157:11,13
158:22
**assessment** 6:19
33:22 43:12
90:19 142:14
145:24 220:11
252:9 257:19
345:17 376:15
420:11 428:19
436:7 477:19
504:9 509:15
**assigned** 215:22
**assignment** 43:8
43:20
**associated** 17:15
20:3 80:2
158:3 175:20
176:7 182:8
189:19 243:24
245:6,16
265:11 266:4
301:15 454:18
**association** 6:22
7:12 87:18
124:9 149:23
150:4,8 164:8
165:2 202:16
203:23 220:23
229:6 246:14
246:19 247:16
249:21 259:9
259:12 260:11
260:18 262:15
265:15 268:20
272:3 307:23
310:6 312:22
313:9 351:4
357:16 374:15
375:10 378:10
408:23 409:11
420:16 429:11
432:8 433:21
443:5 444:19
445:6 446:16
453:22 454:1
476:15 484:10

484:11
**associations**
115:23 276:14
277:24
**assume** 16:6,19
76:4 98:5
108:16 177:1
177:22 178:8
217:5 218:2,24
243:1 265:18
323:16 331:16
372:24 429:9
473:17 479:2
482:10,22
483:3,5,14
484:3,17
491:12 494:6
498:16 505:24
506:2,4 507:18
**assumed** 408:24
**assuming** 35:2
226:19 297:13
319:18 323:20
326:20 369:1
423:19,20
433:15 444:1
491:23
**assumption**
178:1,3 265:13
279:1 331:24
337:6 369:11
436:23 479:12
480:9 481:5,10
481:20 485:1
**assumptions**
107:24 108:7
108:11 332:1
341:2
**atomic** 326:14
331:22 335:17
336:11 353:5
**attached** 51:16
52:24 57:12
105:6 117:4
518:12 520:11
**attempt** 48:22
122:9 123:5

283:9 300:15
411:12
**attempted** 48:15
408:4
**attempting**
296:15
**attendant** 44:10
115:6 146:16
154:7 181:2
288:21
**attention** 28:14
40:4 486:20
**attenuated**
78:16
**attorney** 518:16
**attributable**
191:17 199:13
241:24
**attributed** 444:8
**author** 6:16
121:21,23
122:2 152:19
184:9,18 194:1
194:22 211:17
249:4 257:5,18
264:2 287:3,6
287:9,12 300:2
399:4 445:8
**author's** 211:14
**authored** 468:23
**authoritative**
195:14
**authority**
194:13,18
195:4,19 196:5
199:11 219:8
219:13,16
372:17 373:1
**authors** 89:1
121:24 123:4
147:24 178:15
184:24 190:19
201:3,6 203:12
210:17 212:16
212:21 214:15
215:1,17
217:11 218:3

218:11,24
219:4 220:19
222:20 223:3
231:9 237:10
237:19 247:17
253:17 254:4
257:19,24
259:19 261:4
267:3 272:14
273:7,7,14,15
275:11 279:13
279:23 280:14
287:14 309:1
334:10 344:11
350:16 351:1,9
351:12,17
358:9,16
359:16 360:13
362:7,20
367:14 374:1
376:21 379:9
379:15 394:2
395:13 397:12
397:21 401:5
401:23 402:23
411:13,16,22
412:10 413:18
414:5 417:8
418:8 423:10
424:5,7 427:14
428:18 430:7
431:17,24
435:24 436:7
436:11,18
437:13 439:19
439:19 441:4
443:2,6,9,13
444:18 445:3,4
445:14,17,19
446:23 454:16
487:18 488:5
492:10
**authors'** 476:21
**available** 220:20
224:18 325:18
419:13 420:18
504:5

Kevin Holcomb, M.D.

**Avenue** 1:14
11:9
**average** 405:7
**avoid** 15:18
**aware** 28:6 30:7
30:14 31:15,20
32:2,8 42:23
79:9 94:1,4
144:23 154:17
229:19 243:22
244:20 245:1,3
247:6 253:10
253:16 267:2
288:12,14
306:19,23
333:12 390:19
391:1 419:2,11
437:23 438:18
440:5 491:2,8
491:10 495:19
496:1,2,10
501:18 510:8
512:16

**B**

**B** 3:17 5:10 6:2
7:2 8:2 9:2
41:14
**Baby** 16:15,21
32:14 99:7
**back** 40:8 50:21
53:14 65:24
72:16 84:23
85:12 88:20
93:5 94:2,6
97:22 98:3
126:15 129:10
129:16 130:7
136:16 146:11
150:21 167:7,8
179:15 239:19
258:14,20
269:16,19
287:10 320:20
321:17 327:17
328:23 343:22
348:15 384:1

397:6 400:24
421:20 428:14
431:5 435:19
446:11 453:13
461:4,9 473:23
476:8 477:23
486:6 489:16
510:12
**baked** 283:22
**balance** 229:13
**bank** 395:20,21
**bar** 445:20
**base** 442:6,12
**based** 7:19
18:14 43:12
44:9,16 48:18
61:16 62:10,11
71:24 76:5
87:20 150:15
156:1 164:23
179:1 185:13
188:2,13
204:21 219:7
244:22 252:5
252:10 260:8
264:24 268:11
282:2 289:4
329:11 333:10
335:23 341:3
341:21 373:14
375:17 402:12
403:1 439:5
442:8 447:24
464:19 494:2
509:14 511:18
513:23 514:3
**baseline** 78:16
376:5
**bases** 37:17
**basic** 57:1,5,16
58:5 59:1
153:12 205:11
461:2
**basically** 225:11
227:8,8 231:10
322:8 475:10
**basing** 52:3

508:21,22
511:7
**basis** 47:24
123:15 124:8
285:12 322:14
336:15,16
357:20 362:6
433:11 447:18
447:22 464:16
**Beach** 2:4
**bear** 75:8
**BEASLEY** 2:12
**becoming**
264:16
**began** 38:4
41:14 351:19
352:10 368:21
**beginning** 1:15
59:10,21 97:7
116:12 270:4
307:10 308:5
379:2 380:12
**begins** 201:17
256:8 275:18
378:8 469:7
**behavior** 340:10
**behaviors** 252:4
**belief** 449:10
**beliefs** 284:7
**believe** 14:2
28:20 36:4
37:5 38:3 43:5
43:24 49:7
51:21 54:8
55:11 62:19
64:24 65:5,8
67:22,24 69:7
70:3 92:2
99:14,14,24
121:16 127:17
135:23 138:1
151:1 157:19
157:21 163:2
174:17,19
177:2,21 180:2
187:24 188:24
212:13 213:24

221:14,17
243:10 245:5
245:10,20
248:18 252:7
261:14 267:15
267:19,22
268:2,3 271:2
282:1 285:17
295:5 308:7,10
362:22 369:17
369:21,22
372:7 373:11
409:4 410:23
411:4 413:6
414:9 436:19
437:11 447:9
451:15,23
454:20,23
455:17 456:13
458:23 470:9
487:4 501:11
**believes** 340:24
**believing** 179:15
**bench** 153:22,24
**benefit** 33:16,19
34:10,15,22
35:12,24 36:6
36:16 37:6
**benefiting** 35:6
**benefits** 33:4,12
**benign** 487:11
**Berge** 9:14
229:23,24
231:20 233:9
234:5 236:7
237:1,6 238:4
238:4 259:11
261:21 290:12
290:17 314:5
318:11 319:3
319:12 320:20
320:24 321:8
322:5,7,13,15
322:22,22,22
328:23 329:9
329:19,21
408:11 409:6

409:23 471:12
472:19
**Berge's** 227:8
230:16
**best** 130:5
196:17 197:2
197:18 282:6
302:23 488:20
489:5,22 490:5
**bet** 264:7,9
**better** 197:15
388:21 413:7
512:9
**Beware** 204:7
210:9
**bias** 137:18
196:11 198:21
198:21 199:1
199:14 226:5,6
226:10 252:11
252:16,21
253:20 254:7
254:22 256:14
256:20 257:3,8
258:3 259:6,7
259:14,15,20
260:3,5,14
261:5 262:1
263:10,21
264:19 267:1,6
268:10 271:24
272:9,13,15,16
272:21 273:8
274:5,11,24
276:11 277:1,7
277:10,12,22
278:11 280:12
290:22 291:2
291:19 292:1,9
307:14 314:18
361:9
**biased** 189:10
290:20 291:17
291:24
**biases** 205:4
**bibliography**
152:14

Kevin Holcomb, M.D.

**BIDDLE** 3:7
**big** 264:6 300:5
  389:11 436:22
**biggest** 122:18
  236:23 238:24
**bill** 112:24
**biologic** 116:6
  126:21 162:15
  164:18 165:9
  165:22 296:13
  308:2 340:1
  391:16 394:22
  395:8 401:2
  403:8 430:14
  431:14 432:7
  437:7 460:14
  477:19
**biological**
  164:13
**biologically**
  140:6 174:1,13
  393:5 394:6
  401:6,24 422:1
  422:19 423:12
  427:16 436:12
  437:12 439:21
  440:7 441:5,20
  492:17
**biologist** 153:7
  153:13
**biomarker**
  151:20
**Birrer's** 135:22
  140:15,17
**bit** 42:14 61:6
  87:3 88:1
  240:23 336:1
  445:20
**black** 244:20
**Blair** 156:18
  157:5 292:4
**blocking** 445:10
**BLOOD** 2:7
**blue** 186:18
  187:1,2,3
  189:21 270:1
**board** 448:22

450:13
**bodies** 423:4
**body** 7:12 29:14
  43:13,16 57:9
  67:9 120:8
  133:2,5,21,24
  134:2 136:24
  206:16,20
  210:19 231:17
  235:4 272:4
  276:10,14
  289:11 312:8
  389:12 390:11
  483:1,15,21
  498:3 509:6
**bomb** 326:14
  331:22 335:17
  336:11 353:5
**Bonovas** 453:14
**book** 100:18
  101:6 287:19
**Boston** 3:4
  226:8
**bother** 194:10
  219:21 315:9
**bothered** 392:7
**bottle** 100:15,17
  101:9 102:2,3
  500:20 501:4
**bottom** 181:10
  181:11,16,21
  200:8 210:8
  334:21 358:2
  429:24 430:4
  486:21 497:2
**Boulevard** 3:4
**bound** 16:2
**box** 244:21
  319:13
**boy** 487:2
**Bradford**
  115:20 160:5
  161:14 164:5
  233:19 246:5
  247:11 427:15
  428:21 429:4
  429:11,15

430:9,16
431:15 436:6
  477:18
**branch** 494:9
**BRCA** 455:22
**break** 25:7
  73:11 125:10
  125:19,24
  126:3,5,13
  223:23 239:17
  285:1 343:16
  343:20 348:19
  421:14,18
  485:20 486:4
**breaking** 125:15
  239:11
**breast** 244:6,12
  244:21
**Brief** 348:13
  453:11 473:12
**briefings** 37:19
**bring** 26:7
  120:22 314:14
  363:5
**bringing** 118:23
**broad** 64:2
  101:13 139:7
**broader** 191:6
**Broadway** 2:8
**broke** 409:8
**broken** 387:18
**brought** 87:4
  103:15 294:23
  304:1 495:4
**BROWN** 2:8
  468:12,14
**brushing** 250:20
**Bucketing**
  215:19
**built** 283:21
**bumped** 491:22
  492:5
**bumpers** 196:14
  196:14 205:20
**bunch** 221:14
  226:4
**burden** 396:7,11

398:1
**buried** 148:14
**business** 281:19
  305:20
**businesses**
  495:21
**Buz'Zard**
  139:13 162:16
  163:19 165:24
  166:5 167:2

—————————
**C**

**C** 5:23
**CA-125** 434:7
  434:17
**CALCAGNIE**
  2:3
**California** 2:4,9
  7:8 226:11
**call** 40:3 49:8
  123:19 150:10
  158:14 184:19
  201:10 214:16
  242:22 392:18
  426:4 458:7
  470:22 498:10
**called** 151:23
  273:19 299:23
**calling** 298:20
  427:8 490:5
**calls** 387:13
**camera** 211:19
  348:9
**Campus** 3:8
**Canada** 143:20
  143:23 144:4
  144:13,20
  145:24 171:10
  171:21 220:3,6
  220:11 222:21
  258:21 261:4
  324:24 325:9
  329:5 331:7
  402:15,18
  403:7,11 414:1
  414:2 419:3
  420:4,7 427:13

428:15,19
430:7 431:16
436:7 439:20
446:11 477:16
**Canada's**
  142:13 143:12
  419:17
**cancer** 6:13,23
  7:7,10,13,14
  7:22 8:7,10,13
  8:15,17,21
  9:14,16,18
  13:3,11 14:15
  17:5,9,11,17
  18:19,22,24
  19:6,18,22,23
  20:2 21:4,16
  21:17,20,20,22
  22:8,13 23:2,4
  23:10,21 24:23
  25:3,4,8,24
  28:2,9,19,22
  30:9,16 31:16
  32:4,13 37:23
  44:4,16,23
  46:13 56:24
  60:15 61:14,20
  61:23 62:16,23
  63:14,19 65:2
  65:6,10 67:23
  68:2 69:13
  70:1,11,20
  71:2 77:15,24
  78:2,22 79:19
  79:20 86:23
  87:19 88:24
  89:4,6 90:2,4,8
  90:9,14,21
  91:7 93:11
  95:11,16 97:9
  97:24 98:18
  100:5 101:7,17
  113:18 116:10
  120:7,8,9,14
  120:15 124:10
  138:2 145:8,15
  149:9 151:12

Kevin Holcomb, M.D.

151:19,22
153:5,7 165:3
165:23 174:16
174:20,23
175:7,16,20
176:8 180:12
182:2,9 189:19
205:17 206:8
206:12 221:1
224:21 241:6
243:11,24
244:4,7,12,21
245:6,16
246:15,20
248:12 249:19
252:10,17
253:19 254:6,8
256:16,23
262:23 265:12
266:17 267:5
272:4,17
276:15 278:14
280:17 306:20
310:2,21
311:12,23
312:1 316:5
317:9,10
324:11 325:13
325:18 326:5,6
326:7,11,13,16
327:1,10 331:8
331:17,18
332:23 334:11
334:23 336:4
336:19,23
337:4,15,17
338:16 340:1
342:4 347:5
351:5 353:17
354:17,23,24
355:7,10,11
356:19 357:10
357:18 358:1
363:2 367:7,8
367:16 369:2,5
370:7 372:11
374:17 378:12

378:14,18
380:4 385:13
386:1,4 394:5
396:20 405:9
405:12,16
408:6 409:21
410:19,20
413:12 419:6
419:19 420:16
421:9 432:12
432:20 433:12
433:18 434:6
443:24 444:21
446:18 447:13
447:24 448:2
449:9 450:5,14
451:10,14
452:16,20
453:17,23
454:2,13,19
455:5,14 456:1
456:8,16 460:1
461:23 464:19
465:3,7 466:5
466:13 467:9
468:21 470:8
476:16 479:15
479:23 480:17
481:24 482:6
484:15 487:2,7
487:21 488:17
501:3 505:21
507:20 508:11
508:11 510:15
512:13 515:9
**cancers** 26:10
43:14 378:20
452:7
**capable** 209:5
**capacity** 145:7
151:16
**capture** 325:15
**captured** 344:11
344:16 389:4
**capturing** 388:4
**carbon** 135:23
**carcinogen** 17:3

17:4 19:14
20:1,7,8,10,14
21:7,10,13
96:11,17 97:1
97:5,8,12,13
97:21,23 98:7
98:21 99:9,16
99:20 101:16
101:19 102:2,4
228:5 326:9,19
335:16 336:24
396:15,16,24
420:2 421:5,8
421:12 491:14
492:22 501:13
510:24
**carcinogenesis**
57:6 425:15
**carcinogenic**
17:7 74:23
75:15 76:2
85:16 109:14
369:13 451:1
**carcinogenicity**
22:4 57:17
58:6 89:19
90:1 95:2
140:7 142:9
249:5 393:6
394:21 419:15
439:6 491:4
**carcinogens**
59:2,2 71:12
96:7
**carcinoma**
152:2 311:1
448:20 449:14
476:17
**carcinomas**
461:13
**care** 9:9 13:14
77:19 243:18
288:20 289:4
396:21 450:15
514:4
**career** 28:19
**careful** 67:5

**carefully** 93:8
518:4
**caring** 243:15
**carried** 306:22
366:21
**carries** 15:9
244:20
**carry** 207:21
332:10,10
**cascade** 432:11
**case** 14:10 38:2
39:4 40:23
44:14 45:22
46:8 47:16,20
48:1 49:22
50:8 60:12
94:3 110:2,3
113:13 152:6
152:16 154:6
162:18,22
181:13 182:3
227:1 228:19
292:6 305:9
307:5 313:18
324:1 332:23
339:7 346:11
366:16 386:14
398:11 434:10
448:12 449:1
491:15 497:22
512:15 515:5
**case-control**
100:24 115:18
137:8 148:22
149:11,15,21
150:6,14 182:5
182:23 183:12
183:23 187:19
188:1,12 189:1
191:9,20
192:16 193:1
198:18 206:22
219:5 222:4,6
222:17 226:7
231:23 233:11
234:12 235:2,4
237:3,13

238:12 240:2,8
241:4,11,16
252:8,15,21
257:7 268:11
272:1,23 274:6
274:12 275:1
282:9,20 283:4
290:8,15
293:24 294:5
294:12 295:12
298:18 304:24
306:21 307:15
307:21 308:8
308:16 309:16
309:23 310:4
311:15,17
312:19 313:1,4
313:5,11 314:4
315:13 319:1
324:4 325:1
329:4 381:10
453:19 506:11
**cases** 1:8 13:11
44:10 52:4
53:14 56:23
58:20 93:9,17
93:19,24 94:1
94:5 247:3
263:4,6 264:15
266:19 280:5
317:23 325:15
391:2 392:1
397:1 450:5
**catch** 28:14
385:1
**categorical**
216:3
**categorically**
215:23
**categorization**
217:12
**Categorizing**
215:16
**causal** 18:18,20
46:11 87:18
393:23 419:5
419:19 420:18

Kevin Holcomb, M.D.

Page 528

421:2 436:8
causality 157:11
410:12
causation 6:11
44:9 108:17
110:15 155:23
165:10 171:8
171:19,21
172:6 499:7
causative 421:8
cause 17:8 28:9
44:15,23 60:14
61:14,23 62:16
62:23 63:18
65:1,6 67:23
68:2 95:11
97:9,24 101:7
116:10 174:18
175:6,12,15
210:13 224:21
276:24 337:4
339:24 432:12
432:19 433:11
434:5 447:20
447:24 465:7
504:12 507:20
508:11 510:15
512:13
caused 18:21,23
19:5 277:10
396:20 461:24
causes 17:5 20:4
28:18,21 43:14
44:4 77:15,24
78:1 138:2
174:20 205:17
277:6 331:16
336:23 337:15
433:18 448:17
479:22 480:16
481:24 482:6
505:20
causing 331:18
431:19
caution 321:2
caveat 373:4
cavity 423:5

425:17
CEBMA 281:15
cell 19:12 152:2
250:2 260:22
261:1 409:6
cells 19:11
433:18 460:19
cement 63:8
69:10
Center 12:18
281:14 301:3
427:3 428:11
Central 7:7
certain 9:20
28:1,1 77:13
101:23 106:18
251:18,19
259:23 262:13
266:19 284:6
394:20 456:7
496:3 497:9
502:10 504:2
certainly 412:7
certainty 17:24
18:10,14 372:5
CERTIFICA...
517:2
certification
517:18
Certified 1:16
1:16 517:13,14
certify 517:5
520:5
certifying
517:22
cervical 120:14
120:15
cervix 205:17
cgarber@robi...
2:5
challenged
266:23
chamber 260:9
chance 27:18
150:11 188:21
191:17 193:21
199:13 228:18

242:1 290:14
326:15 329:2
354:13 409:17
change 175:3
253:7 255:10
293:11 368:9
417:11 433:17
492:23 494:8
497:22 499:7
499:13 510:16
511:9 513:18
519:4
changed 412:11
514:3
changes 252:4
293:9 511:19
518:11 520:10
changing 371:11
characterizing
168:12
check 309:13
384:15
chemical 151:23
chemotherapies
320:11
chemotherapy
320:8,9
Cheryl 147:2,18
Chicago 4:4
child 399:8
choose 361:22
chromium
109:6
chronic 174:14
174:18 448:8
451:4
chronological
270:7
churning 236:4
cigarettes
342:15,15
circle 258:14
circumstances
303:2
citation 138:12
285:16 286:3
303:3 333:19

335:14 337:8
citations 129:17
335:21
cite 76:6 98:16
132:4 229:19
261:12,13,15
261:16,17,20
275:3,10
276:18 285:19
290:24 356:16
372:16 379:17
380:4 381:23
383:6 432:2,14
437:8 438:9
443:22 460:7
cited 45:19
61:17 62:8
93:14 180:3
199:10 285:23
331:3 333:20
352:2 382:4
418:19 458:21
459:1,21,23
cites 248:24
259:8,11
378:13,14,24
382:20 444:17
446:18
citing 185:12,13
263:17 379:10
381:3 437:14
488:5
claim 136:22
150:13 194:14
194:19 199:16
201:10,19
204:1 268:18
336:17
claims 199:11
217:13
Claire 495:22
Claire's 9:20
496:5 497:10
497:17 498:9
clarification
24:14 59:14
clarify 16:5

23:17 33:18
46:20 47:11,15
52:13 54:2,3
100:1 152:17
166:21,24
190:1,14 191:5
385:10 465:13
490:3
clarifying 99:3
191:4
Clarke-Pearson
156:17 157:4
Clarke-Pears...
137:20
class 275:12
276:8 286:14
classification
493:11 510:22
classify 94:11
clean 29:1
clear 15:23
16:10 51:24
69:7 88:11
152:2 180:24
202:13 264:10
294:18 357:3
409:6 421:23
428:4 458:19
515:4
clearly 78:3
87:20 95:8
100:3,6 127:15
147:13,17
204:23 358:3
379:24 457:18
clinical 86:7
205:13 275:2
288:19 289:4
302:24 304:2
305:9 330:16
335:3 448:13
453:20
clinician 242:12
clinicians 67:5
295:11
close 125:13
318:19 474:22

Case 3:16-md-02738-MAS-RLS   Document 9735-7   Filed 05/07/19   Page 140 of 190 PageID: 37015
Kevin Holcomb, M.D.

Page 529

closer 73:19
  356:7
closest 324:19
closing 100:17
CMO 30:24
  31:2
co-author
  152:19
co-carcinogen
  342:19
coached 209:15
coaching 208:9
  208:11 209:2,6
  209:12,14
cobalt 109:6
Cochrane 304:5
code 79:11,13
  79:14
cognitive 215:18
cohort 48:2
  87:21 100:9
  115:18 137:14
  137:22 149:12
  170:14,22
  182:6 206:22
  206:24 207:8
  222:4,10,15
  237:3 238:11
  238:15 257:7
  282:19 290:6
  290:17 291:1
  293:23 294:4
  294:11 295:12
  307:4,12 308:1
  308:9,15,22
  310:14,19
  311:2,15
  313:21 314:15
  314:17 315:4
  315:24 316:1
  316:15,18
  317:8,14,23
  324:4,9 325:2
  325:16 329:2
  329:16 330:1
  331:9 336:8
  345:23 355:6

356:11 357:15
361:15 373:10
378:10,21
405:21 406:4
453:21 479:18
506:12
cohorts 241:4
  282:8 283:4
  298:17 304:24
  305:9 311:18
  313:16,18
  315:11 316:11
  363:11 364:21
  366:4 401:1
  406:8,13
coin 310:8
collaborate
  153:19
collect 388:9,10
  388:13
collected 256:19
collecting
  194:24
collective 419:4
  504:7
color 186:14,18
  490:13
color-coded
  187:14 269:23
column 87:13
  181:22,23
  182:20 214:15
  217:10 256:7
  271:18 275:16
  293:4 334:19
  351:1,13 377:5
  377:21 486:20
combination
  243:1
combine 222:3
  222:12
come 26:10
  47:12 55:17
  88:21 89:6
  94:7 95:18
  189:17 195:24
  222:5 229:4,12

264:10 265:24
266:23 297:10
308:12 321:14
360:19 410:7
410:15 419:19
comes 196:7
  229:1 426:13
  474:22 511:15
coming 27:19,22
  94:19 108:16
  161:5 172:15
  179:14 227:4
  228:23 320:1
  399:12,17
  403:2 419:4,14
  493:13
comment
  143:19,23
  144:2,12,21
  200:22
commentary
  81:4
commenters
  226:15
comments 67:2
  214:7,11
Commerce 2:14
commercials
  264:8
commission
  520:21
common 66:23
  204:4 294:14
  455:21 500:5
commonly
  260:15 294:19
community
  217:21
company 154:12
  154:21 478:16
  478:21
compare 320:10
  474:16
compared
  197:20 254:18
  262:23 444:12
comparing

134:4
comparison
  101:5
comparisons
  320:6
compatible
  217:18
compel 502:18
compelled 500:8
  501:4
compelling
  484:13 505:20
compensation
  107:12 114:15
complete 26:5
  45:19 103:16
  354:9
completed 51:7
completely
  209:4 458:18
completeness'
  352:12,23
completion
  517:8
comply 103:12
comprehensive
  90:19 91:23
  92:19,23
  131:16 132:2
  149:3 224:17
  233:15 514:23
comprises
  378:19
computer
  106:18 107:2,5
  107:8 187:11
concentration
  435:16,18
concept 214:17
  339:13 389:13
concepts 293:10
concern 14:13
  151:11 152:5
  153:3,4 272:7
  469:9 504:12
  505:9,10,13
concerned 69:12

208:22 210:18
210:23 211:2,8
212:22 213:1,8
249:5 295:10
314:2,3,8,21
356:8 480:12
480:13,15
513:10
concerning
  103:18 145:7
concerns 61:2,3
  313:20 411:10
conclude 90:16
  202:14 203:21
  217:11 362:7
  424:6,8 436:7
  441:5
concluded
  222:21 237:21
  253:19 254:6
  423:11 427:15
  435:19 439:21
  447:2 477:17
  492:20 516:7
concludes
  491:13
concluding
  223:1
conclusion 88:5
  88:5,22 89:7
  94:8 127:15
  128:21,22
  205:9 222:5
  224:11 227:4,5
  228:4 229:2,5
  419:18 435:23
  493:14
conclusions 67:3
  74:22 75:13,24
  76:5,8 77:11
  85:15 91:10
  210:9 211:14
conclusions'
  204:7
conditions
  289:17 438:22
  487:12

Kevin Holcomb, M.D.

Page 530

condoms 236:19
conduct 26:22
    119:21 145:13
    153:15 284:24
    293:10,13
    439:7
conducted 22:2
    91:22 126:20
    379:4 380:2
    431:16 499:4
conducting
    145:5
conference
    15:12
confidence
    149:24 187:5
    189:4 193:23
    194:8 196:13
    196:23 197:14
    202:5,21
    205:20 219:8
    235:23 347:16
    348:23 353:18
    354:18 370:8
    372:8 376:24
    378:16 386:5
    386:10,12
    387:2 474:21
    477:10
confidential
    154:23
confirm 45:3
    404:9
confirmation
    78:15 94:7,14
confirms 449:10
conflict 203:2
confounder
    196:10
confounders
    205:3
confused 24:4
    82:22 365:2
    415:4
confusing 84:19
conjecture
    398:13 400:10

conjunction
    449:15
connection
    13:14 14:18
    58:17 59:11
    106:7,14
    113:15,17
    116:16 129:21
    243:16 440:2
consensus
    173:10
consent 338:14
    340:8 352:18
    352:20
Consequently
    469:15
consider 24:6
    97:19 98:20
    131:5 149:18
    149:18 153:6
    153:11 158:8
    189:11,12
    193:19 194:5
    195:2 233:12
    272:16 279:23
    307:2 336:22
    352:5 370:24
    379:13 434:8
considerably
    495:16
consideration
    376:18
considered 37:3
    93:8,24 98:22
    98:24 107:21
    128:3 137:17
    155:12,19
    195:10 219:14
    271:24 304:8
    304:11 323:4
    355:24 381:18
    419:3,12
    463:23
considering
    494:24
considers 272:6

272:8
consist 104:4,6
    157:1
consisted 46:24
consistency
    94:20 116:5
    137:11 158:8
    158:20 164:9
    182:22 184:8
    184:15 205:6
    220:6 224:10
    225:12,21
    226:1,2 233:20
    410:11 429:14
consistent 68:17
    149:18,19
    150:11 165:1
    182:24 183:2,7
    183:13,23
    184:5,11,20
    185:1,24
    206:21 220:22
    221:18 222:22
    223:9,12
    224:14 225:2,7
    225:17 227:12
    227:13 233:19
    260:22 272:10
    273:16,19
    284:14 310:4,7
    336:7 410:20
    417:10 420:13
    420:14 446:4
    452:24
consistently
    149:7,17 158:2
    158:4 470:10
consists 104:11
    104:22
constant 169:7
constantly 48:23
constitutes
    195:18
consulting 41:15
    42:22
Consumer 84:2
consumers 9:19

497:9
Cont'd 3:1 4:1
    6:2 7:2 8:2 9:2
contact 84:6
    411:12
contain 96:10,11
    96:23,24 97:13
    98:6,7 109:5
    109:14 175:2
    479:3 480:24
    482:12,16
    483:23 485:2
    504:15 505:4
contained
    109:23 115:15
    157:6 177:15
    228:1 241:6
    353:8 492:19
containing
    75:17 84:24
    85:20,22
contains 97:11
    102:4 148:3,18
    512:20
contaminated
    498:15 506:14
contamination
    122:10,20
    123:6,20
    398:19 399:10
    399:13,23
    400:5,7 498:12
    504:2 505:14
    505:19 506:7
contend 126:24
content 154:15
contention
    412:9
context 17:11
    18:19 19:4,17
    19:21 27:12
    34:4,23 35:13
    59:4 286:22
    298:8 428:21
    429:4 430:9
continue 469:8
    504:6 507:20

508:14 515:7
continues 168:3
    503:24
contradictory
    184:4 185:18
    210:12
contrary 128:4
    132:24 171:8
    171:18
contrast 204:2
Contravening
    93:18
contribute
    61:20
contributed
    93:12
contributors
    205:10
control 305:10
    346:13,14
    517:21
controlled 285:4
controls 262:24
    263:1 280:4
    324:2 435:15
controversial
    284:20 285:14
convention
    294:24
conversation
    66:14 400:20
    483:19 501:19
    501:21
conversations
    502:4
convince 338:20
    481:23
convinced 94:16
    123:1 440:20
convincing
    99:11 482:5
    492:4
copies 105:17,22
    106:1,4 255:24
    408:2
copy 39:24
    71:14,17,21

Kevin Holcomb, M.D.

73:13 103:16
148:9 151:2
186:14 417:17
417:18
**Cornell** 7:18
12:17 242:10
301:2,20 302:5
302:16 448:21
461:4
**Cornell's** 301:24
**corners** 161:3
161:10 273:6
273:13 356:17
357:8 405:23
406:11
**cornstarch**
514:8,19,24
**corollary** 102:3
434:17
**Corporate** 2:4
**correct** 13:7,8
18:10 20:17
22:17,21 29:19
40:23,24 41:3
42:2 44:11,12
47:20 48:6
60:15 74:7,14
75:19 82:9
84:13 86:1
89:20 95:3
105:7,8 106:2
111:23 112:8
114:6,7,9,10
114:13 115:3,4
115:7,8 116:17
118:7 119:4,9
124:21 125:6
134:10,13
140:2 142:15
143:2 146:4,17
146:18 148:3
166:1 170:10
170:11 171:22
172:16 173:3
174:9 176:19
176:24 186:11
186:12,20,23

193:10 203:12
204:17 206:8,9
206:11 216:5
219:1,9 225:6
235:20 249:15
259:23 261:10
265:1 275:4
281:11,16
286:23,24
287:15 289:12
296:19 305:11
309:16 317:17
317:20 333:9
333:15 344:18
345:5,10 346:4
347:11,12,17
349:1,4 350:2
351:10,15
353:19 355:1
360:14 363:24
364:1,12
367:11 368:3,4
368:17,18,21
368:23 370:13
372:19 374:2
375:19 379:11
379:12 382:17
389:9,10 391:6
394:7 395:14
401:8 402:5
403:13 404:2,8
405:24 406:13
410:20 411:19
411:24 413:20
426:10 432:3
433:23 436:15
438:17 440:9
443:16 447:3
451:4 465:2
470:14 472:23
473:20 474:9
488:6,21,24
489:1,6 520:7
**corrections**
518:5,7 520:10
**correctly** 76:11
76:13 84:9

182:10,11
183:19 184:3
201:23,24
203:7,10 204:8
212:10 215:12
217:7 224:23
224:24 259:17
272:11 276:16
289:24 297:3
297:18 302:19
322:23 351:7,8
378:22,23
420:20 431:21
432:15,16
444:22 469:19
469:20 487:16
504:10
**correlation**
132:6,17
391:22 397:6
**cosmetic** 9:20
33:1 84:3
495:22 496:4
497:10 504:3
**counsel** 25:13,23
44:18 47:1
48:13 116:20
117:6,13 298:9
354:13 462:13
478:9
**count** 233:10
**counted** 264:8
381:11
**counting** 399:15
**countries**
240:14,18
**counts** 397:7,14
**couple** 55:21
88:18 130:10
315:23 336:1
444:7 460:8
**course** 29:16
251:7 284:10
284:13 354:3
438:5
**court** 1:1 11:16
15:11,16 209:9

232:19 315:9
315:12 372:10
458:7 518:20
**cover** 159:5
**coverage** 266:9
**covered** 372:16
**covering** 356:7
**COX** 459:24
460:18,19
461:16 462:2,2
**COX-1** 461:14
**COX-2** 461:14
**Cramer** 122:1
123:19,20
135:1 232:3,4
232:6,6 265:16
338:24 340:23
369:22 398:15
398:16 399:5
399:12,13
**crazy** 232:20
**create** 148:24
187:9
**created** 22:23
23:3,20 150:12
407:23
**credible** 176:3
177:17 495:12
**credit** 28:18
**Crest** 250:21,24
**criteria** 160:6
164:5 247:12
420:14 428:21
429:5,11,15
430:10
**critical** 9:9
130:18,23
**criticism** 162:9
312:13
**criticisms**
136:21,24
156:23 157:5
314:14,15
315:2 355:21
361:19 411:8
**criticize** 312:14
458:13

**criticizing**
312:18,20,23
313:11
**critique** 172:13
**critiques** 61:1
173:2,7
**cross** 187:5
194:9 474:22
**cross-examina...**
298:9
**cross-trial** 320:5
**crosses** 189:4
386:18,20
**crossing** 354:4
**crucial** 201:11
**crude** 264:14
**cry** 346:2
**culture** 19:12
**cumulative**
344:17
**cure** 73:10
**curious** 208:2
229:15 267:16
297:1 335:13
461:7
**current** 25:2
**currently**
210:10 224:18
439:15 491:3
515:12
**Curry** 3:3 16:23
17:12 18:1,11
19:1,19 20:19
24:1 25:15
26:2,23 27:3
27:13 28:3
29:2,20 32:17
33:7,13 34:17
34:24 35:15
36:1 38:22
39:5,23 42:3
43:22 44:19
46:2 47:2 48:7
49:17 50:14
51:2,19 52:12
52:15,19 53:4
54:2,3,18

Kevin Holcomb, M.D.

55:22 56:11
57:19 58:8
60:5,16 61:24
62:17,24 63:21
65:16,21,23
66:4 68:5 70:3
70:12 72:19
74:1 77:4 79:6
80:20 81:15
84:14 89:21
90:22 91:24
92:10 95:4,20
96:12 98:8
99:21 101:20
102:7 103:6,19
104:13,23
106:8 107:15
108:12 109:7
109:15 112:15
113:22 116:21
117:7,23
118:18 119:5
121:9 122:6,16
124:11,23
125:9,16 127:9
127:20 130:20
131:20,23
133:11 136:13
137:2 138:23
139:6,23
141:15 142:3
142:16 143:3
146:6 147:5,11
148:8 150:17
152:7 153:8
155:2 156:3,14
157:17 159:1
160:20 161:7
161:24 162:19
162:24 163:12
165:11 166:2,9
166:12 167:15
170:16 171:12
172:1,7,17
173:4,14 174:4
175:21 176:4,9
177:4,18 179:5

183:6 185:2
188:4 190:22
192:3,17
193:12 195:5
196:18 197:4
198:13 202:7
202:22 203:13
204:12 207:1
207:12 209:4
211:5 213:5
215:3,9 216:6
218:4 219:10
221:6,21 223:4
223:21 225:3
230:10 231:4
232:15,22
234:16 235:7
235:13 237:15
237:24 238:20
239:10 241:13
242:2,13 244:1
244:14 245:8
245:22 246:7
246:22 248:3
249:7,22
250:11 251:14
252:12 253:2
253:21 254:9
257:12,21
259:24 262:8
265:5 267:8
268:13 272:24
276:2 277:18
278:16 279:2
282:11 283:13
286:16 287:24
288:9,23
289:21 291:4
295:15 296:2
296:20 298:24
300:18 302:1
303:12 304:14
305:16,22
306:16 307:7
312:2,15
315:15 316:6
316:22 317:18

318:5 319:8
327:12 328:1
330:7 331:11
333:1 335:7
338:6 340:20
341:4,8 342:10
343:8,12
344:19 345:11
346:5,16 349:5
349:20 350:19
354:9 355:12
356:20 358:11
359:1,10
360:16 362:10
364:5,13,23
365:8 366:6
369:7 370:18
372:20 375:20
377:6,11 378:1
379:20 381:7
382:23 385:6
385:19 386:6
387:5,15 388:6
388:14 391:7
393:7 394:8,14
395:15 397:15
398:3,23
399:19 400:3
401:9 402:2,10
406:1 408:1,17
410:21 412:13
412:21 413:21
414:19 417:16
419:8,21
423:17 427:19
431:8 432:21
433:6 434:1,19
435:6 436:16
438:2 439:9
440:11 441:11
441:24 442:10
447:4 448:3
451:5 452:21
454:21 457:2,5
459:10 460:3
462:5,16,21
463:6,14 464:5

464:10,20
466:22 468:8
469:2 470:15
472:8,15
475:23 477:20
480:5 481:2
482:18 484:19
485:4,23
487:22 489:9
491:5,17
492:24 494:11
496:7,16
497:23 499:8
500:2,13,21
501:8 504:16
505:6 506:21
507:23 508:16
509:23 510:18
512:3,22
513:12 514:10
514:16 515:23
**curve** 339:18
**custom** 25:23
**cut** 136:3 138:24
    148:10 166:23
    212:8
**cutting** 163:13
    167:24
**CV** 22:6 150:22
    152:13,22,23
    153:17
**cycle** 438:1
**CYNTHIA** 2:3

———————
            **D**
**D** 5:2 488:23
**D.C** 3:18
**daily** 248:21
    250:5 251:9,11
    345:4
**dangerous**
    501:13
**data** 21:8 30:7
    30:14 31:15
    32:3,6,9,20
    46:7,22 48:19
    49:5 57:18

62:11 64:4,7,8
70:17 72:13
74:16 106:15
106:17 107:19
115:17,22
137:7 149:7
164:16 171:8
171:19 177:3
177:14 178:15
178:17,19
179:3 184:11
184:19 185:1
185:23 187:13
188:1,12 189:9
194:24 197:10
202:4 216:3
219:5 220:7
224:19 225:2
225:14,19
227:3,6,9,10
228:24 229:9
230:23 231:2
235:6 236:5
256:19 260:8
263:17 268:17
273:16,17
276:11 277:21
288:20 296:18
314:1 324:22
330:15 336:7
337:16,18,20
339:21 358:17
362:4,8 366:20
370:1 373:15
379:18 384:9
386:5 390:20
392:9,15 393:3
398:18 403:1
417:3,10
420:18,23
423:8,23,24
436:8 438:13
438:18 440:6
440:23 441:23
442:9,17 448:1
450:19 452:11
452:19 455:10

455:13,15,18
456:7 457:10
458:21,24
459:8,8,22
460:2,7,12,22
464:19 470:5
474:2 481:21
484:6,16,22,24
485:11,13,17
488:6 491:12
491:20,24
492:4,11,13,16
492:16,17,18
493:19,21
498:14 502:5
508:20,23
509:15 511:11
511:11,18
512:8 513:8,15
513:15,18,21
513:21 514:4
514:24
**dataset** 150:4
232:2 233:15
**date** 1:15 11:6
114:6 180:13
182:23 183:13
264:6,15
266:12 379:3
380:1,6 491:13
503:10 518:9
520:16
**dated** 49:14
104:12 142:14
220:11 424:16
486:11 517:15
**Daubert** 6:11
110:15
**Dawn** 3:3 81:2
**day** 145:23
169:11 250:20
250:21,24
251:1,3,4
340:7 342:16
352:18 431:11
473:17 520:20
**days** 55:21

169:9,12
487:19 518:16
**Dcurry@nutt...**
3:5
**deadliest** 455:20
**deadly** 206:11
206:14
**dealing** 84:22
**deals** 151:18
**debulking** 78:20
**debunk** 295:6
295:13 296:16
**decades** 240:9
339:2
**December** 6:20
142:15 143:12
220:12
**decide** 144:5
236:14 264:2
278:19 509:8
**decided** 323:19
**decision** 508:19
**decisions** 203:6
288:19 289:4
**declarations**
217:14
**decrease** 187:8
457:11
**decreased**
452:20 455:14
459:8
**decreases**
456:16
**deduce** 63:12
**deem** 152:5,15
177:15
**deemed** 97:12
219:6 303:24
518:19
**deeper** 123:12
**deeply** 123:6
399:16
**defendant** 3:20
4:6 12:21,24
14:1
**defendant's**
33:5

**defendants** 3:15
154:6
**defending** 209:5
**defense** 238:19
**define** 17:19
18:18 21:6
198:11 470:24
**defined** 7:20
68:21 193:18
302:18 384:8
472:21 474:10
**defining** 48:16
**definitely**
129:13
**definition** 19:16
80:4 97:8,13
97:23 98:13
177:7 184:7,15
195:10,15
197:22 198:1,2
198:5 302:21
347:19 370:12
371:12 427:10
**definitions**
16:10 18:7
362:14
**definitive**
205:23
**degree** 17:23
18:9,14 62:3
116:1 164:19
179:18 272:20
372:5
**degrees** 154:3
**Demonstrative**
8:20
**denotes** 296:9
**depended** 120:9
120:16
**depends** 112:20
242:23 353:20
495:4
**deponent** 11:12
41:2 520:2
**deposed** 14:22
41:6
**deposing** 518:16

**deposition** 1:13
6:6 10:2 11:8
13:5,10 15:3
37:16 40:22
45:10,13 48:14
54:6,14,19,23
55:3,6 56:21
58:18 59:8,16
59:20 60:3,22
61:7 64:17,19
65:18 102:12
102:18 111:11
111:22 113:2,3
113:6 114:17
147:7,18 284:6
461:1 496:14
516:4,7 517:6
517:8,9 518:3
518:13,17,19
**depositions**
15:15 54:7
111:5 119:19
121:3 124:1
**deps@golkow...**
1:21
**deputy** 428:10
**dermal** 84:6
**describe** 115:13
128:2 173:7
183:24 194:23
214:19 392:17
396:6 402:17
**described** 63:5
222:9 247:15
263:22
**describing**
133:24 267:14
268:1 483:17
484:5,14
**description** 5:13
6:5 7:5 8:5 9:5
111:20 160:5
451:8
**design** 170:13
170:21 196:9
211:10 229:14
238:7 241:16

**deposition** 1:13
268:5 280:1
283:21 307:14
308:24 309:1
309:12,15,19
312:19,24
313:12,15,17
315:10 316:18
319:21,24
323:3,5 329:15
338:1 340:12
388:23 410:7
410:15
**designated**
37:10
**designations**
210:13
**designed** 308:12
308:15,16,17
316:2,12
319:19 338:13
479:13,16
**designer** 337:13
**designs** 241:7,12
286:1 293:21
308:11 321:6
331:10
**desirability**
252:1
**detailed** 420:12
**detect** 317:11
318:1,21
325:20 328:21
329:17 330:4
330:19 338:4
351:3 369:4
**detection** 151:18
335:3
**determine** 218:8
326:7,19 343:7
351:18
**determined** 28:8
345:8
**determining**
20:16 218:13
218:16
**detracts** 259:13
**develop** 136:1

developed 46:16 79:21 118:14 326:13 385:12 386:3 423:2
developing 17:17 65:10 115:14 174:23 326:15 342:4
development 20:2 21:10 331:8 336:19 338:16 351:5 374:16
develops 326:9
diabetic 36:11
diagnosed 25:2 25:12,22 391:12
diagnosis 14:14 79:11,13 256:20 353:3
diagram 281:5 281:10,12,22 282:4,8
diaper 29:24
diapered 29:18 30:4 32:14,21
diapering 346:15 399:8
diaphragms 236:20
dichotomous 477:4,5,5
Diego 2:9
differ 491:15
difference 42:15 59:18 79:2 158:16 183:18 185:6 201:20 201:21 202:15 217:14 222:8 222:10,11,15 222:17 230:14 230:20 254:22 261:19 262:17 279:24 280:2 295:23 321:2

321:13 456:3 461:23 479:17 505:23 506:18
differences 216:3
different 35:10 41:16 42:13 45:24 46:5 64:4 74:7,8 83:4 94:8,18 94:23 113:5 128:17,18 139:10 149:19 157:15 215:23 219:7,14 227:16 231:9 231:10,11,12 233:13,20,21 233:22 240:5 241:7,12 247:18 248:5,7 248:7 261:22 261:23 266:20 282:2 285:24 289:14,15 298:21 305:14 336:18 366:5 368:5,7,11,13 381:1 399:7 426:5 429:17 430:20 449:20 456:4 471:2 483:18 506:1,3 506:5 511:2
differentiate 122:10
differently 158:24 283:24 388:21 492:6
difficulties 78:24
difficulty 185:16 389:21
dilemma 469:12
dilute 291:24
diluted 290:22 291:20

Dineo 461:3
direct 228:14 425:14 517:21
direction 10:5 194:7 226:18 226:23
directionality 370:21,23 372:1,2
directly 81:21 457:6
director 427:3 428:10
disagree 33:10 77:1,3 80:19 81:19 86:3 89:11,16 99:18 138:21 156:7 156:10 169:19 179:12 183:21 207:3 218:3,24 221:5 258:2 261:3 264:17 297:15 306:9 335:6,11 394:13 395:14 401:7,12,17 402:1,6,7 420:22 426:8 426:11 428:5 433:24 434:3 445:12 457:2 464:5
disagreed 86:10 88:13 98:12 306:12
disagreeing 92:3 426:24 428:8 428:13
disagrees 168:14 328:6
disappears 451:24
disclose 207:24 479:8
disclosure 154:23

disclosures 208:19
discounting 277:2 278:10
discovered 306:21
discrepancies 409:2,9
discrepancy 89:8
discrepant 407:11 408:20 410:8
discuss 100:20 170:13,21 172:19,24 173:6
discussed 172:22
discusses 135:23 147:6
discussion 81:13 172:11 293:12 374:6 481:15 508:24
disease 21:11 158:11,13 206:11 210:18 335:1,3 487:14
disingenuous 182:7
dismissal 201:11
dismissed 210:14,19
dismissing 210:23 212:22
dismissive 132:23
disparate 296:17
disparity 364:20
dispute 244:13
disrespected 214:5
disrespectfully 213:23
distinguish

79:18 122:23 123:5,10
DISTRICT 1:1 1:2
divide 204:19
Docket 9:7
doctor 12:2,8 13:13,19 14:12 15:8 22:1 23:18 26:14 31:9 32:2,12 37:9 39:16,21 40:3,9 41:10 41:23 45:9,11 46:1 52:6,22 59:13 60:12 61:21 63:17 64:11,19 66:11 67:21 69:23 70:9 72:3,4,17 73:12 74:5 75:4,22 76:7 76:22 79:4 80:9,19 82:2 83:15 86:20 88:4 89:14 93:4,20 96:5,9 101:12 102:17 104:10 110:11 110:18 122:15 126:18 129:18 131:12 133:8 133:10 134:7 135:14 136:2 138:16 139:12 141:3,8 144:11 144:19 146:13 147:10,22 150:16 155:17 158:20 159:9 159:22 160:10 161:16 162:7 163:8 165:5,20 166:7,19 167:10,21 168:21 169:23 170:6 171:5

173:9 179:11
180:2,10 181:9
181:12,17
182:20 184:9
186:3 189:23
190:5 191:14
192:8 197:21
198:24 199:9
199:10,17
200:5 201:2
203:8 206:7
208:6 209:5
210:7 211:12
212:11 215:14
216:20 218:19
220:18 222:20
228:6 229:18
233:4 239:22
244:10,19
256:1,4,10
257:4 258:20
269:12 270:5
271:16 272:19
274:4 279:11
280:20 293:3
294:21 295:22
302:15 303:15
306:11 308:22
316:1 322:2
327:20 331:6
334:3,8 335:20
335:24 336:14
340:16 341:19
344:1,9 348:18
350:16 353:13
354:5,12
356:16 357:13
358:6,8 363:20
365:17 367:21
371:7 374:8
375:13 376:12
377:3,20 378:4
382:12 387:14
393:2,15
397:11 401:15
404:1,11,14
405:8,19

406:18 407:3
408:4 409:18
410:5,17
414:17 415:1,8
417:12,24
418:7,16,24
419:2 420:9
421:23 422:18
424:18 427:12
429:10 430:6
430:21 431:2
431:12 432:17
434:12 437:18
439:17 441:18
442:22 443:18
446:10,13,15
446:22 447:16
453:5 454:4
455:9 456:22
457:19 459:19
464:16 465:10
465:21 467:22
470:4 471:13
471:14,24
472:19 474:2
475:14 476:8
477:16 479:1
479:24 480:2
480:21 485:16
486:9,16,24
488:8 489:8,14
490:9 491:2,11
494:18 495:19
497:1,19
502:15 503:9
503:13 507:2
510:11 513:11
514:8 515:21
**doctors** 156:24
204:21 219:18
219:23 235:22
294:22 372:7
426:4
**document** 1:8
40:12 45:5
64:13 71:4
102:13 104:21

110:4,12
111:14 114:20
115:2 180:4
186:6 199:23
210:8 220:14
224:5 255:14
271:10 273:23
292:17 302:9
302:14 333:21
344:3 363:14
377:15 403:21
406:21 407:17
407:22 424:10
424:15,18
425:4 429:2
463:11 468:2
471:7,20
486:12 488:9
488:10 490:21
496:19 497:14
503:1,6,11
**documented**
432:2
**documents** 10:8
38:10 103:3,9
103:13 104:18
105:17 107:11
110:23 116:20
117:2 119:13
154:6,12,21
155:12
**doing** 15:20
47:10 66:7
81:2 92:19
138:7 153:24
194:2,10 195:9
216:9 219:21
226:7 231:9
300:1 321:21
336:9 350:9
429:3 450:8
461:8 464:2
475:6,9 477:8
483:10 499:19
502:11 504:22
504:23 513:7
518:8

**dose** 389:14,23
391:19 471:5
**dose-response**
339:18 340:3
345:8 389:19
390:5,7,7
470:6,14,22
471:1,6 475:3
475:4 476:18
476:23 477:7,8
477:12,14,17
**douching** 8:14
405:8,11,15
**download**
106:20,21
107:2,4 503:10
**downloaded**
107:1
**downloading**
107:7
**Dr** 11:13 54:10
54:20,23 55:3
55:6 81:20
110:17 111:11
124:20 125:4
135:22 137:20
140:12,15,17
140:24 142:23
143:8,13,14
146:9 156:17
156:17 157:4
168:3 170:7
185:16 207:24
209:16 263:16
285:22 294:2
298:14 340:23
369:22 412:8
426:1,12,15,22
426:23 428:9
461:1,3 478:10
490:4 493:4
495:11
**draft** 6:19
142:13 143:12
144:3,17
220:11
**drafting** 111:21

118:5
**drawing** 216:2
**drill** 48:23
**DRINKER** 3:7
**drive** 2:4 3:8 4:3
232:19
**driven** 127:15
128:22
**drop** 236:6
495:16 513:4
**DropBox** 106:22
**dropped** 311:5
495:10
**dropping**
326:14
**drops** 193:24
**drug** 33:22 34:8
34:9,11 35:14
243:24 453:16
**dry** 36:13
**DSAR** 143:20
**dubbed** 210:10
**due** 263:15
317:16
**duly** 11:20 517:5
**duplicates** 150:3
**duration** 339:19
343:4 351:19
376:8,13 384:6
388:4 389:5
472:20 474:4
474:10 475:20
476:2
**dust** 71:11 128:9
**dusted** 130:2,16
330:12 390:17
439:2
**dusting** 134:3
236:20 390:2
396:13
**Dusts** 5:22

---
**E**
---
**E** 5:2,10 6:2 7:2
8:2 9:2 519:1
**e.g** 84:3 259:5
**earlier** 80:24,24

88:12 204:2
266:14 269:10
294:23 318:10
338:21 348:3
352:15 362:24
371:7,17
392:15 397:2
409:14 410:3
413:13 414:23
425:21 444:10
444:11 451:16
515:11
**early** 30:10,18
31:18 32:15
151:5,18
352:10 487:9
**earned** 114:6
**easier** 75:7
498:10
**EASTERN** 1:2
**EBM** 7:19
302:18
**echo** 260:9
**Ed** 185:9,11
200:24 329:10
489:20
**editorialize**
280:21
**Eds** 185:12
**educational**
23:5
**effect** 15:10
182:24 183:14
185:21 205:1,5
205:17 217:6
290:7,14 314:4
314:9 318:16
318:22,24
324:3 330:20
339:17 367:6
420:19 421:3
436:9 452:13
509:3 510:9
**effects** 22:3
201:11 204:24
210:14 212:23
450:22 454:12

**efficacy** 34:15
**effort** 122:23
**efforts** 203:5
453:22
**effusion** 468:17
468:19
**effusions** 9:11
466:10 468:1,7
469:11
**egregious**
144:16
**either** 127:10
198:4 278:9
286:10 326:2
329:13 350:12
368:22 440:24
506:2
**electronic** 106:4
**electronically**
105:15 106:15
106:24
**elevated** 348:5
349:3,9,19,23
353:17
**Ellen** 156:18
292:4
**ELLIS** 4:2
**Elmo** 5:7
181:18 281:9
463:9 464:8
**embedded** 123:7
399:16
**employed** 160:2
161:5 173:1
469:16
**employee** 301:2
**endeavor**
103:11 496:14
503:14
**endeavored**
115:9
**ended** 78:22
**Endnote** 229:18
**endometrioid**
409:5
**endometriosis**
487:13

**endured** 35:3
**engaged** 28:12
**engagement**
59:10,21
**engine** 120:2
**Engineering**
446:19
**enrolled** 383:16
**enrolling** 340:13
**entail** 43:21
112:19
**entailed** 44:1
**entire** 68:15
214:16
**entities** 3:15
**entitled** 52:7
139:8 155:18
191:4
**entity** 262:21
**entry** 444:10
**environmental**
61:4 88:8 89:5
**EOC** 347:15
487:11
**epidemiologic**
56:22 115:17
137:7 149:7
164:16 288:8
359:22 392:15
485:10
**epidemiological**
57:10 165:6
262:4 273:16
288:20 359:17
360:2 492:13
492:16
**epidemiologic...**
358:22
**epidemiology**
7:14 154:3
164:23 286:22
287:2,4,7
392:9
**epithelial** 7:6,22
8:9 9:15 21:17
249:18 276:15
280:16 311:23

336:3 357:17
378:12 410:19
413:12 452:7
459:24 462:3
487:1,7,20
**Epstein** 9:6
426:1,12,15,22
**equal** 241:23
398:6
**equally** 204:1
311:18 369:16
**equivocally**
202:20
**eradicating**
217:11
**ergo** 300:4
**err** 506:20
**errata** 518:6,9
518:12,15
520:12
**error** 355:7,15
**errors** 203:4
407:24
**especially**
226:13
**ESQ** 2:3,8,13,13
3:3,8,12,17 4:3
**essence** 59:19
**established**
87:20 139:21
335:1 365:22
379:6
**estimate** 193:22
196:16,17,21
197:2,2,13,17
197:18 203:24
226:22 264:14
347:14,24
349:10,16,18
349:19,23
371:4 474:17
**estimated** 336:4
**estimates**
187:20 354:2
**estimating**
337:1
**estimation**

373:19
**estrogen** 205:18
243:9,12,13
**et** 88:19,19
255:19 303:4
358:4 416:11
416:23,24
417:5,14
453:14,18
462:10
**ethnic** 248:9
**ethnicities** 240:5
**evaluating**
491:3
**evaluation** 94:3
161:21 224:18
477:6
**evaluations**
224:15,16
225:12 227:23
**event** 473:19
**events** 432:12,19
**ever/never**
415:9,12 416:6
416:10 417:10
**everybody**
177:23
**everyday** 389:16
389:17
**evidence** 19:13
49:10 63:12
128:4 158:12
175:19 176:3
182:8 217:22
255:11 280:12
281:6,11,14
282:14,24
283:12 302:24
305:6,6 315:3
336:22 394:21
395:21 398:10
412:8 422:8,12
422:16 428:20
429:4 430:8
432:6,6 436:20
437:6 448:7,12
449:2,15

Kevin Holcomb, M.D.

450:21 451:3
451:18 453:24
458:20 479:21
481:12 482:5
484:13 505:20
508:3,10 509:3
510:23 511:7
511:23 512:12
**Evidence-** 7:19
**evidence-based**
  281:15 283:10
  302:17,22
  303:5,17,19
  305:2
**exacerbated**
  335:2
**exact** 88:22
  91:17 266:12
  285:20 481:15
  484:7
**exactly** 50:16
  51:22 86:9
  117:11 129:23
  141:22 168:16
  218:14 244:9
  255:4 280:3
  349:15 356:4
  395:4 406:16
  440:2 460:10
  475:17
**EXAMINATI...**
  11:23
**examine** 411:5
**examined** 11:21
  80:6 93:15
  437:15
**example** 19:13
  36:10 132:4
  135:22 157:23
  205:12,13
  207:16 226:7
  248:10,16
  264:20 281:24
  290:4,18,21
  291:18 381:11
  395:18 409:4
  425:20 494:14

498:8
**examples**
  205:16 267:14
  314:20,21
  455:3 457:22
  457:24 458:1
**exception** 192:9
**Excerpt** 5:14,16
  5:19
**excesses** 93:12
**excuse** 96:14
  190:5 327:6
  463:6,7,15
**Excused** 516:6
**exhaustive**
  492:1
**exhibit** 39:19
  40:7,13,21
  45:6,10,11,19
  55:10 64:12,14
  71:5,9 72:20
  102:12,14,18
  110:5,8 114:21
  115:1 121:8
  146:12,20
  150:21 180:5,9
  186:5,7 199:24
  200:4 220:12
  220:15 224:4,6
  255:15,19
  258:22 269:20
  271:11 273:24
  292:18,22
  302:10,13
  333:22 334:1
  344:4,8 363:15
  363:18 377:12
  377:16,22
  403:20,22
  406:22 407:2
  407:18,22
  424:11,15
  428:16 468:3
  468:10 471:8
  471:12 486:13
  488:9,11
  496:20,24

503:2,6
**exhibits** 54:7,11
  54:15,20 55:5
  55:12 119:18
  142:24 143:9
  143:14 146:9
  147:3,10,14,15
  147:19
**exist** 41:17
  130:4,19
  492:14
**existing** 43:13
**exists** 425:13
  491:13 492:12
**expand** 77:16
**expect** 185:22
  225:21,24
  226:8 227:15
  259:21 260:14
  339:15 410:13
**expelling** 422:8
**experience**
  78:20 178:13
  341:12,15
**experiment**
  280:1,7,9,13
  433:22
**experimental**
  145:6
**experiments**
  22:2
**expert** 6:10
  12:20 37:10
  38:15 39:11
  49:13,21 50:11
  50:19 51:5,6
  51:16 52:24
  53:19 54:5
  57:13 58:13,22
  59:5 86:20
  87:3 104:11
  105:6,18
  107:12 108:10
  110:14,20
  111:6,16,21
  112:2 115:1
  118:3,5 119:3

119:18 120:12
121:3,7 123:15
123:21 124:1,5
124:18 125:2
126:19 127:4
127:18 134:8
135:21 139:15
139:20 140:15
140:17 146:17
147:1 148:2
150:22 155:14
157:1,7 162:17
180:3 184:23
186:4,11
187:17 208:1
208:13,16
242:20 243:5
271:8 273:4
274:4 276:19
281:2 292:5
303:7 308:23
309:4 315:6
352:2 353:8
355:5 356:17
375:5 405:23
407:4 411:16
502:16,22
515:3,8,13
**expertise** 302:24
  504:8
**experts** 127:19
  129:20 130:15
  132:10 140:5
  149:5 156:11
  156:12 157:4,6
  157:9 158:23
  198:19 210:22
  214:21 215:2
  292:3,14
**experts'** 50:7,9
  52:1 53:12
  58:13 172:14
  173:3
**expires** 520:21
**explain** 137:15
  137:24 161:12
  167:1 168:15

185:20 216:9
252:22 253:12
257:15 258:7
263:11,13
272:9,21 273:9
297:23 460:9
460:11 461:20
462:22 511:21
**explained** 78:6
  98:12 314:2
  356:23 440:1
**explaining**
  199:2 267:16
  314:24 353:10
  460:21
**explains** 196:7
**explanation**
  167:4 254:21
  263:19 331:2
  399:4,6 480:11
**explanations**
  252:24 400:12
**explicitly** 90:6
**exposed** 17:22
  254:17 341:7
  342:18 346:14
  368:20 384:7
**exposure** 7:6
  20:1 21:9
  26:15,20 27:7
  27:19 28:7
  60:14 61:13,17
  61:22 62:15,22
  63:4,13,18
  65:1,5 67:7,23
  68:1,18 70:2
  70:11,18 71:1
  72:13 74:16
  80:5 82:19
  83:16,19,21,22
  84:4,8,12
  87:19,23 88:9
  95:14 149:9
  220:24 224:20
  237:23 252:2
  252:10 256:19
  259:5 280:5

Kevin Holcomb, M.D.

310:1,21
311:12,24
323:13 326:8
326:17 330:10
331:23 332:7
335:18 336:18
337:15 338:15
339:10 342:13
344:12,16
353:2 354:1
366:20 367:9
376:2 384:6
390:23,24
391:4,23 394:4
394:4 397:4,5
404:4,6,15,16
415:8,11
417:11 420:10
420:17 432:10
444:12,14
470:20 513:7
**exposures** 61:4
61:19 86:5
98:15 272:17
316:13 337:21
**expound** 222:2
**expressed** 318:9
461:13,14
**expression**
459:24 460:19
461:18 462:3
**extend** 80:4 86:6
**extending**
100:11
**extensive** 91:2,9
**extracted** 417:3
**extrapolate**
337:3
**extrapolated**
353:5
**extrapolating**
336:10
**extrapolation**
331:20,20
**extrapolations**
333:11
**eye** 36:7 270:13

**F**

**F** 3:18
**facilitate** 173:12
**fact** 41:13 69:20
78:13 160:16
161:2 179:1
204:10 206:14
232:1 236:7
254:11 272:16
281:13 287:16
288:13 317:14
324:19 360:1
361:12 369:16
380:5,11
381:15,23
395:2,2 396:22
403:2 414:7
432:18 435:14
442:13 444:8
448:1 449:11
459:15 461:12
480:10 511:19
**factor** 17:10,14
18:19,20 23:23
24:9 243:11
405:11,15
487:20 507:12
**factories** 63:9
**factors** 8:9 23:4
23:10,20 24:7
24:23 25:14,24
26:9 158:24
243:5 246:5
251:23 271:20
271:23 296:10
296:14 487:7
**factory** 69:10
332:18 369:15
**facts** 107:19
**fail** 518:18
**failed** 93:18
**failure** 217:15
**fair** 16:7,8,19
21:15 38:19
41:14,20,22
42:20 113:21

123:22,23
137:9 150:16
150:19 157:7,8
167:20 189:5
202:10 209:10
262:18 263:9
264:5 269:1
295:14 312:14
409:13 466:6
475:18
**fairly** 311:18
**fall** 36:20,24
284:16
**fallopian** 422:4
422:21 423:15
438:17 443:20
452:8
**falls** 340:2
391:15
**false** 178:7,15
204:7 210:9
**falsifying**
179:18
**familial** 456:6
**familiar** 204:22
267:11 287:13
**familiarity**
262:12
**family** 341:13
487:11
**far** 53:10 95:21
214:18 238:8
346:2 444:24
504:11
**fashion** 35:7
**faster** 120:22
430:5
**fax** 1:20
**FDA** 9:6,19,22
424:16 426:8
426:14 428:5
496:2,14 497:8
497:20 498:21
498:22 499:3
499:14,18
500:8 501:4,11
501:16 502:12

502:14,17,23
503:7,14,15,22
503:24 504:13
505:3
**FDA's** 495:20
496:2 497:2
498:24
**FDA.gov/cos...**
497:3
**fearing** 513:6
**February** 49:14
104:12 108:5
115:3 124:6,19
125:3 147:2
151:5
**federal** 504:7,20
**feel** 92:21 214:4
246:2 297:7,16
392:11 492:6
511:16
**feeling** 45:4
168:17 310:3
509:13 511:9
**fellows** 23:7
**fellowship**
284:11
**felt** 164:9 190:1
190:13 290:13
489:22 513:8
**female** 25:3
173:11 365:24
366:2 422:24
427:6 445:15
**Ferante** 88:18
**fiber** 42:13
397:7,13 398:1
**fibers** 41:16
42:21 65:9
74:7 75:16,18
76:3 85:1,7,17
85:20,22
**Fibres** 5:22
71:11
**fibrous** 109:1
170:9 478:17
482:12,16,23
483:13,24

**field** 215:2
**fifth** 1:14 11:9
305:8
**figure** 101:6
262:19 281:1
282:19 283:3
336:11 361:15
362:4 400:17
415:16,18
418:3 475:8
**file** 103:23 104:1
104:10,22
106:18 107:6
**files** 103:16
**final** 118:12
144:15
**finally** 144:5
215:15 216:24
217:9
**find** 36:13 68:16
91:16 93:18,23
94:12,14 128:4
128:12 129:17
130:8 131:13
134:5 141:1
150:9 160:8
165:7 179:21
185:15 195:22
196:6 205:4,6
222:7 238:13
265:23 274:15
280:15 282:7
282:15,19
283:1,3,9,16
286:3 288:4
292:12 309:11
311:19 312:21
314:20,21
315:3,5,7
317:15 320:23
321:9 337:14
342:3,5 367:20
391:11 392:2
446:1 453:24
463:10 480:14
506:7
**finding** 61:1

Case 3:16-md-02738-MAS-RLS   Document 9735-7   Filed 05/07/19   Page 150 of 190 PageID: 37025
Kevin Holcomb, M.D.

Page 539

77:17 93:14
101:5 131:8
165:1 187:7
196:4 256:21
263:13 280:15
290:14 357:15
370:13 371:1
371:10 372:18
391:23 395:7
396:6 434:13
434:17 497:20
**findings** 61:5,8
67:4 80:3 86:7
89:2,12,17
91:17 92:17
178:23 179:13
179:21 205:14
241:24 256:16
259:12 272:10
275:22 276:7
280:3 303:24
307:24 358:10
358:17,18,24
359:19 373:20
379:16 395:6
419:14 433:21
435:2 436:19
**fine** 66:7 73:4
126:2 401:19
**finish** 52:18
92:12 133:16
133:18 138:24
163:10,21
166:13 233:2
237:16 306:16
310:17 327:23
328:16 332:8
332:11 447:1
462:19 463:16
**finished** 79:7
133:11 485:22
516:1
**first** 11:20 12:23
21:9 33:17
37:22 43:3
87:14 103:1
121:23 122:2

127:8 164:7
182:19 199:16
213:11 214:20
224:22 237:1
260:2 264:15
266:8 275:16
287:8 295:2
319:12 320:3
321:21 323:1
325:11 326:19
327:23 328:17
365:20 377:5
407:14 425:4
430:17 443:18
461:19 469:6
469:9 479:7
**FISH** 3:3
**five** 61:16 62:8
87:21 89:3
217:3 376:10
471:19
**flashes** 37:4,7
**flaws** 293:15
313:1 319:21
**flipping** 310:8
**Florham** 3:9
**fluid** 151:19
468:19
**FLW** 1:6
**focusing** 68:12
**folks** 498:11
**follow** 313:22
338:1,10 339:6
380:13 458:1
495:17
**follow-up** 20:16
325:13 350:1,3
350:15 351:2
352:14 353:2
355:18,20,23
356:2 361:18
363:22 368:16
379:6,14
404:22
**followed** 293:23
311:4 339:8
340:5 356:6

361:16 364:15
368:15 373:2
373:22 382:9
506:10
**following**
115:20 334:4,7
339:3
**follows** 11:21
**Food** 427:3
428:11
**footnote** 334:4
488:4
**force** 15:9
**forced** 284:8,9
**foregoing**
517:18 520:6
**foreign** 240:14
240:17 423:3
**forgot** 31:9
308:18
**form** 16:24
17:13 18:2,12
19:2,20 20:20
24:2 25:16
26:3,23 27:14
28:4 29:3,21
30:20 32:18
33:8,14 34:18
35:1,7,16 36:2
38:23 39:6
42:4 43:23
44:20 45:21
46:3 47:3 48:7
49:18 50:15
51:3,20 53:5
55:23 56:12
57:20 58:9
60:6,17 62:1
62:18 63:1,22
65:17 66:5
70:5,13 77:5
84:14 89:22
90:23 92:1
95:5,20 96:13
98:8 99:21
101:21 102:8
103:20 104:14

104:24 106:9
108:13 109:8
109:16 112:16
113:23 116:22
117:8,24
118:19 119:6
121:10 122:7
122:17 124:12
127:21 130:21
131:24 136:14
137:3 139:24
142:4,17 143:4
146:7 147:6,12
150:18 152:8
153:9 155:3
156:4,15
157:18 159:2
159:17 160:21
161:8 162:1,20
163:1 165:12
166:3,10
170:17 171:13
172:2,8,18
173:5,15 174:5
175:22 176:5
176:10 177:5
177:19 179:6
185:3 188:5
192:4,18
193:13 195:6
196:19 197:5
198:14 202:8
203:14 204:13
207:2,13 211:4
211:6,16 213:4
213:6 215:4,10
216:7 218:5
219:11 221:7
221:22 223:5
225:4 230:11
231:5 232:16
234:17 235:8
235:14 236:23
238:1,21
241:14 242:3
242:14 244:2
244:15 245:9

245:23 246:8
246:23 248:4
249:8,23
250:12 251:15
252:13 253:3
253:22 254:10
257:13,22
260:1 262:9
265:6 267:9
268:14 273:1
277:19 278:17
279:3 282:12
283:14 286:17
288:1,10,24
289:22 291:5
295:16,18
296:3,21 299:1
300:19 302:2
303:13 304:15
305:17,23
307:8 308:13
312:3,16
315:16 316:7
316:23 317:19
318:6 319:9
327:13 330:8
331:12 333:2
335:8 338:7,14
340:21 341:9
342:11 343:9
343:13 344:20
345:12 346:6
346:17 349:6
349:21 355:11
355:13 356:21
358:12 359:2
359:11 360:17
362:11 364:6
364:13 365:9
366:7 369:8
370:19 372:21
375:21 379:21
381:8 382:24
385:7,20 386:7
387:6,16 388:7
388:15 391:8
393:8 394:9,15

Kevin Holcomb, M.D.

395:16 397:16
398:4,24
399:20 400:4
401:10 402:3
402:11 406:2
408:18 410:22
412:14,22
413:22 414:20
417:17 419:9
419:22 423:18
427:20 431:9
432:22 433:7
434:2,20 435:7
436:17 438:3
439:10,12
440:12 441:12
442:1,11 447:5
448:4 451:6
452:22 454:22
459:11 460:4
462:6 464:21
468:9 469:3
470:16 475:24
477:21 480:6
481:3 482:19
484:20 485:5
487:23 489:10
491:6,18 493:1
494:12 496:8
496:17 497:24
499:9 500:3,14
500:22 501:9
504:17 505:7
506:22 507:24
508:17 509:24
510:19 512:4
512:23 513:13
514:11,17
520:10
**formal** 26:5
**format** 285:1
**formed** 24:11
44:14 47:19,24
345:23
**forming** 108:2
117:16,20
**formulated**

49:11
**formulating**
52:9 107:21
155:13
**forth** 108:5
350:3 401:6
406:11
**forward** 54:16
471:20
**found** 47:7
75:17 76:3
80:1 85:18
94:21 95:15
177:24 217:4
228:18 237:12
276:4 280:11
280:11,18
282:5 307:24
310:23 321:1
323:5,16,18
373:17 376:22
378:10 390:20
391:4 409:4,6
409:7 436:12
443:4 453:21
454:16 477:12
482:12 505:11
**foundation**
155:19

**four** 13:20
112:23 161:2
161:10 273:5
273:12 305:8
356:17 357:8
369:18 376:10
405:22 406:11
489:5
**fragrances**
109:14
**frame** 264:11,13
264:24 336:6
**fraught** 285:7
289:18
**free** 108:18,24
256:20
**French** 487:3
**frequency** 29:23

270:15 343:4
344:17 345:9
376:18 404:6
404:20 474:4
475:20 476:3
**frequently**
343:1
**fresh** 28:24
**Frey** 242:8
**front** 40:20 41:1
45:12 211:18
271:15
**frozen** 450:11
**frustrates** 209:6
**full** 39:24 71:14
71:20 74:2
87:14 91:22
127:8 138:17
148:11 155:11
164:20 203:16
232:23 443:18
443:19
**further** 45:3
76:14 110:23
203:20 383:12
420:17 442:20
449:10 463:19
504:14 515:20

___

**G**

**game** 390:4
**Garber** 2:3 5:5
12:1 17:2,18
18:8,17 19:15
20:5,23 24:12
25:17,19 26:12
26:24 27:5,23
28:15 29:7
30:1,21 31:4,8
32:10,23 33:11
33:20 34:19
35:8,19 36:18
39:2,15 40:1,2
40:5,11,15
42:19 44:5
45:8 46:21
47:4 49:9 50:5

50:23 51:8
52:5,14,17,21
53:17 54:1,12
55:1 56:1,13
57:24 58:4,15
60:8,19 62:13
62:20 63:15
64:10,16 65:19
66:3,8,10
67:18,20 68:6
70:6,7 71:7,18
72:2 73:3,5,16
73:21 74:4
76:16,21 79:3
80:8,14,18
82:1 84:15
90:17 91:20
92:4 93:1
95:17,23 96:15
99:17 101:11
101:24 102:9
102:16 103:4,7
103:22 104:16
105:3 106:11
107:17 108:15
109:11,19
110:7 112:17
114:1,23
116:24 117:14
118:4,24 119:8
121:12,18
122:13 123:3
124:16 125:1
125:23 126:4,8
126:17 129:7
131:11,21
133:7,14
136:19 138:15
139:2,9,11
140:3 141:20
142:6,19
143:10 144:8
144:10 146:10
147:8,21
148:13,16
150:20 152:11
153:14 155:5

156:6,19
158:18 159:8
159:17,18
161:1,15 162:2
162:21 163:7
163:15,17
165:4,13 166:6
166:17 167:15
168:20 169:2
169:17 170:1,5
170:19 171:14
172:3,12,23
173:8,17 174:8
176:1,6,15
177:8 178:12
179:10 180:7
183:9,10 186:2
186:9 188:6
190:11,22
191:13 192:7
192:19 194:11
195:12 196:24
197:9 198:23
200:2 202:9,24
203:18 204:14
206:4,6 207:5
207:14 208:3,5
208:23 209:13
209:20 210:6
211:11,23
213:10,17,20
214:3,6,13
215:5,13
216:13 218:17
219:15 220:17
221:8 222:19
223:7,21,24
224:8 225:5
230:24 231:8
233:3 234:20
235:10,18
237:18 238:17
239:3,13,21
240:24 241:2
241:17 242:5
242:16 244:5
244:18 245:13

Kevin Holcomb, M.D.

| | | | | |
|---|---|---|---|---|
| 246:1,11 247:5 | 377:8,13,18,24 | 483:4 484:23 | 83:19,21,23 | 365:7 366:21 |
| 248:22 249:12 | 378:3 380:20 | 485:15,19 | 84:5,13 85:6 | 368:6 372:11 |
| 250:3,13 252:6 | 382:2 383:3 | 486:8,15 488:3 | 110:15 158:7 | 372:18 373:17 |
| 252:18 253:6 | 385:14,22 | 488:13 489:13 | 177:24 178:21 | 378:24 379:10 |
| 254:1,23 | 386:11 387:7 | 491:9 492:8 | 270:24 271:5 | 379:17 380:5 |
| 255:17,22 | 388:1,11 389:1 | 494:5,17 | 314:16 320:6 | 380:10,14 |
| 256:3 257:16 | 393:1,11 | 496:11,22 | 330:1 356:23 | 382:21 383:5,8 |
| 258:1 261:2 | 394:12 395:10 | 499:2,11 500:7 | 406:5 | 403:12 411:18 |
| 263:23 266:5 | 396:9 397:20 | 500:18 501:1 | **generally** 32:11 | 411:23 412:11 |
| 268:8,16 | 398:14 399:1 | 501:23 503:4 | 37:24 137:16 | 413:11,19 |
| 271:13 273:3 | 399:24 400:23 | 504:24 505:8 | 141:2 177:3,15 | 415:9 |
| 274:2 276:3,6 | 401:14 402:4 | 507:1 508:8 | 241:12 245:7 | **getting** 59:12 |
| 278:6,23 279:7 | 402:14 403:24 | 509:17 510:1 | 246:24 247:1 | 75:2 77:7 |
| 282:22 283:15 | 406:6,24 | 511:24 512:7 | 313:14 320:4 | 226:24 254:13 |
| 286:19 288:5 | 407:20 408:3 | 513:9 514:7,14 | **genital** 9:13 | 255:7 318:19 |
| 288:11 289:9 | 408:19 411:1 | 514:21 515:17 | 173:11 280:16 | 389:18,24 |
| 290:1 291:8 | 412:17 413:2 | 515:24 | 311:24 357:17 | 390:1,3 391:14 |
| 292:20 295:21 | 413:23 414:21 | **gas** 63:7 69:8 | 374:16 419:5 | **Ghio** 9:12 |
| 296:5,22 298:2 | 415:2 417:20 | 78:1 332:17 | 423:1 427:6 | 465:22 468:23 |
| 299:3 300:22 | 417:23 418:21 | 369:14 | 437:20,24 | **girls** 88:7 |
| 302:7,12 | 418:23 419:10 | **gate** 48:2 | 438:15 445:15 | **give** 78:18 88:17 |
| 303:14 304:17 | 420:3 421:13 | **Gates** 8:11 48:3 | 448:9 476:15 | 99:5 121:24 |
| 305:18 306:2 | 421:22 424:4 | 149:12 207:16 | **genitals** 28:24 | 128:15 132:11 |
| 306:18 308:6 | 424:13 427:24 | 311:4 324:13 | 29:10 30:10,17 | 141:15 194:12 |
| 312:6 313:13 | 430:23 431:1 | 324:15,17 | 31:17 32:5 | 195:19 205:15 |
| 315:17 316:10 | 431:10 432:24 | 339:7 356:1,2 | 33:6 131:18 | 212:1 228:10 |
| 317:2,21 319:2 | 433:9 434:11 | 357:14 358:4,8 | 134:21 135:16 | 228:11,13,17 |
| 321:15 327:19 | 434:24 435:22 | 359:18 360:14 | 135:17 174:3 | 232:23 266:12 |
| 328:8 331:5 | 437:17 438:12 | 360:19 361:21 | 239:8 384:22 | 348:8 395:17 |
| 332:9 333:5,24 | 439:16 440:15 | 362:8,17,21 | 404:7,16 | 409:16 417:13 |
| 335:10 340:15 | 441:17 442:4 | 363:1,13,19,20 | 439:23 441:22 | 417:13 421:10 |
| 341:1,5,17 | 442:21 446:7,9 | 364:3,11,22 | 479:6 482:17 | 421:11 425:1 |
| 342:12 343:10 | 447:15 449:17 | 365:6 366:17 | 484:2 501:6 | 425:11,12 |
| 343:15,24 | 452:5 453:4 | 367:13 368:14 | 507:22 512:20 | 430:2 438:20 |
| 344:6,22 | 454:3 455:8 | 370:5 372:12 | **genuine** 210:14 | 472:13 473:5 |
| 345:13 346:9 | 456:18,21 | 372:18 373:9 | 212:22 | 485:13 494:16 |
| 346:20 348:17 | 457:3,8 459:2 | 373:15 379:10 | **Gertig** 8:8 48:3 | 494:18,21 |
| 349:17,24 | 459:12 460:6 | 379:16 380:10 | 135:8 149:13 | 508:5 512:17 |
| 350:23 354:11 | 462:9 463:4 | 381:24 382:4 | 248:16 310:22 | 513:24 515:18 |
| 356:13,15 | 464:15,23 | 382:12 411:18 | 344:2 347:2 | **given** 15:15 |
| 357:1,6 358:15 | 466:24 468:5 | 411:23 412:10 | 356:18 357:10 | 50:11 53:18 |
| 359:3,14 362:2 | 468:15 469:5 | 413:10,20 | 358:1,10,19 | 73:1 138:4 |
| 362:18 363:17 | 470:1,3 471:10 | 414:3 415:11 | 359:19 360:3 | 181:13 182:3 |
| 364:7,19 365:3 | 472:14,18 | 416:9 | 360:10 361:20 | 182:24 183:13 |
| 365:10 366:11 | 473:7,20 474:1 | **general** 6:11 | 361:23 362:20 | 241:21 262:2 |
| 369:24 371:6 | 476:7 477:24 | 21:5 23:5 26:1 | 363:23 364:4 | 285:16 286:2 |
| 373:24 376:1 | 480:20 481:7 | 26:8 38:1 | 364:12,16,22 | 288:13 297:8 |

Golkow Litigation Services - 877.370.DEPS

Kevin Holcomb, M.D.

325:11,12,17
326:23,24
337:8 341:3
389:6 481:19
517:6 520:8
**gives** 331:1
386:4 504:19
**giving** 24:5 26:8
178:7,22
179:16 337:19
372:23 463:19
494:23
**glad** 441:2 447:8
447:16
**glean** 122:14
**gleaned** 122:19
**gloves** 400:8
**go** 15:1 31:9
50:20 53:14
54:1,14 65:4
66:11,13 67:3
67:14,24 68:12
68:14 72:5
88:18,20 94:2
94:6 98:3
99:12 100:14
112:20 129:16
130:7 133:9
136:16 146:11
161:12 165:8
167:7,8 169:6
169:20 182:19
189:14 194:21
202:11 203:19
206:13 208:4
209:8 218:1
237:8 258:20
269:16,19
272:14 275:15
285:15 297:22
319:3 324:15
324:22 327:16
335:24 361:6
366:13 367:20
373:9 384:1,14
390:10 397:6
403:4,7 416:17

417:24 431:24
432:5 440:22
441:3 445:3
453:5 455:12
457:11 459:7
473:7 476:8
484:16,21,24
485:23 489:16
503:14 508:19
509:5 510:12
511:5
**goes** 65:7 86:2
88:3 97:22
183:24 201:8
214:19 263:8
287:10 323:10
338:19 378:15
382:10 398:20
400:16 434:8
444:16 458:24
**going** 15:17 16:6
21:12 30:22
39:18,19 40:6
43:15 45:9
59:13 61:7
64:6,11 65:20
66:24 67:11
71:8,22 72:11
75:8 76:4,5
77:9,21 79:4
99:12 100:13
100:23 101:1
114:24 125:13
125:20 126:11
136:1,3 137:10
139:4 144:5
148:14 159:12
164:17 168:7
169:22 170:1,2
176:11 180:1,8
185:11,12
189:11,12
190:7 193:19
195:1 200:3
202:3 205:5,6
205:7 206:3
209:24 216:10

220:8,10
226:18 228:8
228:10,11,13
232:19 243:2
255:18 260:21
265:18,20,22
265:24 270:17
271:4 274:3
285:10,11
292:21 316:17
319:13 320:15
320:16,20
321:17,22
324:21 327:17
328:16,23
330:4 337:24
338:1,4 342:1
344:1 360:8
362:3 363:6,7
372:23 392:23
397:10 403:15
407:1,21
409:16 410:12
417:21 424:14
428:14 435:21
451:3 453:7,10
456:24 458:4,6
471:11 472:2,5
474:14 475:1
480:9 481:9,13
484:3 485:10
485:13 486:9
488:8 493:12
493:16 494:1,7
494:15 498:20
498:23 501:19
509:12 511:13
511:20 512:1
**Golkow** 1:20
11:5
**Gonzalez** 8:16
48:4 207:9
403:17
**good** 12:2,3
15:20 24:15
125:21 158:12
239:10,11,22

239:23 264:20
267:12 285:11
350:12 386:4
391:21 416:3
**Google** 120:4,18
120:20
**Gotshal** 1:14
3:12
**government**
145:2
**grade** 449:13
451:13 461:12
**gradient** 477:19
**graduate** 284:10
**grant** 145:13
**granuloma**
449:2
**granulomas**
448:17 450:6
**granulomatous**
449:3,16
451:20
**gravel** 87:6,9
**Gray** 1:15
517:12
**great** 170:3
214:2,8 228:16
230:19
**greater** 194:15
195:16 198:7
241:23 339:9
368:1 370:6
371:9,19
376:11 472:21
**greatest** 293:22
**Green** 232:1
233:12 490:14
490:22 491:1
**Greenland**
199:18 201:6
207:24 209:16
287:9
**group** 30:23
87:15,17 93:8
96:6,11,17,24
97:5 98:7 99:1
99:19 101:16

101:19 102:2,4
211:9 226:10
238:3 248:9,10
272:6 311:3
312:10 315:10
320:7,8 321:12
321:19 346:13
346:14 356:6
373:2 385:18
397:13 398:2
398:22 491:14
492:11,21
**groups** 92:16
201:20 322:9
**grown** 250:19
**guess** 16:3 28:10
38:5 39:8
59:18 86:11
115:19 130:23
131:2 149:4
250:16 280:2
418:2 426:24
427:7 475:16
493:23 502:2
**guidelines** 305:6
**guilty** 120:20
**guinea** 130:10
**guys** 126:1
255:24 377:14
**GYN** 179:23
242:10 455:20
456:10,14
**gynecologic**
12:10,14 39:10
126:20 136:21
176:16,18,22
178:4,14 179:2
180:11 181:4
249:14 487:12
507:6
**Gynecology**
488:16 490:1
490:11

---

**H**

**H** 5:10 6:2 7:2
8:2 9:2

Kevin Holcomb, M.D.

Page 543

**H2O** 196:5
**habitual** 250:7,8
  251:1,20 257:1
  257:9 258:4
  263:7 267:22
  338:22
**hair** 469:23
**half** 111:12
  217:4 224:1
  232:7 313:8,9
**halfway** 74:20
  256:7 271:19
  275:17
**hallmark**
  158:11
**halt** 217:12
**hand** 97:10
**handed** 53:9
  72:20
**hands** 499:20
**Hang** 462:21
**happen** 100:8
  129:4 132:14
  267:1 422:12
  422:16 424:1
**happened**
  337:10 356:5
  461:3 464:12
  491:20
**happening**
  66:21
**happens** 262:13
  427:10 438:8
**happily** 284:9
**happy** 68:14
  346:23 434:14
  434:22 440:22
  441:8
**harbored** 44:8,8
**hard** 105:16,22
  106:1 214:8
  282:18 283:3
  285:8 493:3,23
**hardcopy**
  105:19
**harm** 217:20
**hazard** 181:13

182:4
**head** 196:1
  270:24 441:16
**heading** 83:20
  215:16 217:1
  304:4 351:21
  430:14 503:20
**health** 142:13
  143:11,20,23
  144:4,12,20
  145:23 171:10
  171:20 220:3,5
  220:10 222:21
  256:18 258:21
  261:4 311:8
  324:24 325:9
  329:5 331:7
  338:18 344:10
  363:22 365:21
  365:23 376:22
  378:9 380:21
  381:4,20
  402:15,18
  403:7 413:24
  414:2 419:3,17
  420:4,6 427:13
  428:14,19
  430:7 431:16
  436:6 439:20
  446:11 477:16
  494:10
**hear** 267:17
**heard** 197:19
  201:18 359:4,7
**hearing** 6:11
  63:17 110:15
**hearings** 37:19
**heart** 389:19
  400:17
**HEASLIP** 3:12
**heavy** 28:6
  61:16 86:5
  87:22 95:13
  98:14 109:5
  170:9 326:16
  331:22 332:7
  335:17

**heed** 500:1,10
  500:24 509:18
  512:1,21
**held** 1:14 11:9
  282:1 284:7
  318:23
**Heller** 48:4
  132:5 134:19
  397:2 398:18
  432:3 448:11
**Heller's** 436:19
  437:2
**help** 85:9 101:6
  217:12 250:18
  284:23 365:14
  463:11
**helped** 45:3
  79:18
**helpful** 52:16
  290:19,23
  291:20
**helps** 181:24
**Henry** 4:10 11:4
**herpes** 120:14
**hesitating** 498:6
**heterogeneity**
  236:13,18,22
  236:24 237:8
  237:11,20,22
  238:5,6,9,11
  238:14 285:4
  319:14 320:19
  320:24 321:5,9
  322:13 323:2,5
  323:11,16,18
  323:22 361:3
**hierarchies**
  300:17
**hierarchy** 282:1
  293:19,21
  294:4,9,15,16
  294:18 298:17
  301:24 302:6
  303:7 304:4,19
  305:2,14
**high** 248:24
  260:18 397:13

398:1 449:13
  451:13 461:12
**higher** 17:16,19
  152:1 260:13
  272:18 397:8
  444:14 445:20
  470:21
**highest** 248:14
  455:24
**highlighted**
  293:5
**highly** 200:16,23
  217:17 318:23
  445:5 495:11
**Hill** 160:5
  161:14 164:5
  233:19 246:5
  247:11 420:13
  427:15 428:21
  429:5,12,15
  430:9,16
  431:15 436:6
  477:18
**Hill's** 115:20
**hired** 38:17 42:1
  42:22 43:9
  44:7 515:6
**Hiroshima**
  326:14 332:20
  336:7
**histologic** 8:10
  94:2 259:10,13
  259:16,22
  260:12 450:16
**histologically**
  310:24
**histology** 249:19
**historical**
  478:11
**historically**
  248:13
**history** 26:5,6
  26:13,16,22
  27:1,6,17
  28:11 132:18
  342:2,6 391:23
  397:3,4,9

487:11
**Holcomb** 1:13
  5:4,15,17,20
  6:10 11:13,19
  12:7 54:10,23
  110:14,17
  168:3 285:22
  412:8 517:8
  520:16
**Holcomb's**
  81:20
**Holcomb-1** 5:14
  40:14
**Holcomb-10**
  6:17 200:1
**Holcomb-11**
  6:19 220:16
**Holcomb-12**
  6:21 224:7
**Holcomb-13** 7:6
  255:16
**Holcomb-14** 7:9
  271:12
**Holcomb-15**
  7:12 274:1
**Holcomb-16**
  7:16 292:19
**Holcomb-17**
  7:18 302:11
**Holcomb-18**
  7:21 333:23
**Holcomb-19** 8:6
  344:5
**Holcomb-2** 5:16
  45:7
**Holcomb-20** 8:9
  363:16
**Holcomb-21**
  8:12 377:17
**Holcomb-22**
  8:14 403:23
**Holcomb-23**
  8:17 406:23
**Holcomb-24**
  8:20 407:19
**Holcomb-25** 9:6
  424:12

Kevin Holcomb, M.D.

Page 544

Holcomb-26 9:8
468:4
Holcomb-27
9:13 471:9
Holcomb-28
9:15 486:14
Holcomb-29
9:17 488:12
Holcomb-3 5:19
64:15
Holcomb-30
9:19 496:21
Holcomb-31
9:22 503:3
Holcomb-4 5:21
71:6
Holcomb-5 6:6
102:15
Holcomb-6 6:7
110:6
Holcomb-7 6:10
114:22
Holcomb-8 6:13
180:6
Holcomb-9 6:15
186:8
hold 89:14 91:18
141:12 151:13
178:1 190:23
192:23 247:8
247:17 275:7
334:9 367:19
448:6 474:15
holding 296:16
honest 47:6
90:24 341:10
475:7 493:3
513:4
honestly 177:23
251:16 341:11
hope 407:24
hopefully 169:4
388:22
hoping 91:1
159:4
hormone 242:21
hospital 125:18

301:7,15,16,17
hot 37:4,6
Houghton 8:13
48:3 374:9
375:6,19 376:3
376:21 377:8
377:20 379:9
383:13
hour 60:10
125:20
hours 59:7,23
60:4 112:1,12
112:18,21,22
114:11 214:20
354:23
HPV 120:14
HRT 242:22
243:6,11,16,18
Hulfish 3:13
human 71:11
82:19 83:16
128:9 130:2,16
132:13 134:16
135:15 136:7
215:17 220:20
325:19
humans 224:21
HURST 2:7
hyped 201:10
hypothesis
259:14 280:8,9
398:13 433:22
434:4,9
hypothesize
398:7 424:8
hypothesized
430:19 431:18
hypothesizing
424:2
hypothetical
96:22 330:14
337:20 482:9
482:21 483:9
483:20,22
492:10 493:7
494:16,19,24
495:3 502:6

508:6 510:10
512:18 513:16
hysterectomy
442:9 444:13
444:20

_____

**I**

i.e 84:6 183:2,4
183:15,17
IARC 5:21 48:4
48:5 61:17
63:5 68:21
69:16,24 70:4
70:10 71:9
77:19 78:4,7,9
79:23 80:11
81:19 88:15
89:1,11,16
91:1,7 92:9,15
94:15,21 95:2
95:19 96:7,20
97:11 98:19
99:2,19 100:10
101:15,18
224:15 225:7,9
225:11,17,17
227:2 228:3,20
229:1,4,10,12
229:16,19,21
247:19 272:5
419:12 420:1
420:22,24
491:3,12
492:10,19
493:5 494:1,9
494:13 495:6,8
495:14,16
510:22 511:3
IARC's 60:23
61:8 97:2
98:13 228:1
495:9
ICD-9 79:14
idea 21:8 65:12
67:2 389:13,23
392:3 430:3
461:15

identical 204:3
identification
40:13 45:6
64:14 71:5
72:14 74:17
102:14 110:5
114:21 180:5
186:7 199:24
220:15 224:6
255:15 271:11
273:24 292:18
302:10 333:22
344:4 363:15
377:16 403:22
406:22 407:18
424:11 468:3
471:8 486:13
488:11 496:20
503:2
identified
208:15 432:13
identify 107:19
376:8
identifying
48:24
ignoring 319:4
II 63:9 69:8,9,9
365:23
Illinois 4:4
illuminated
293:5
imagine 49:2
106:19 107:1
205:10 493:4
immunohistoc...
79:17
impact 238:16
324:3 442:19
446:5
impacted
251:21
imperative
518:14
implicated
256:14
implies 303:22
303:23 395:8

important 15:4
49:1 68:11
135:24 137:23
161:17 259:7
260:4 323:11
331:9 343:6
351:14,21
361:8,10 372:9
impossible 19:7
impressed
495:13
impression
355:21
impressive
460:21
inability 390:13
inaccuracies
282:4
inadequate
351:3 369:3
inappropriate
208:8 379:13
464:2,4
incident 327:2
include 117:3
149:12 203:1
413:19 414:6
414:10,12
416:23 418:15
483:21 487:8
included 21:16
48:2 54:11
55:19 61:2
165:23 203:24
228:21 229:4
362:15,16,20
362:22 365:5
371:18 379:7
411:17,23
414:2,12
416:12 418:5
includes 16:14
75:17 85:19
154:19 202:21
232:3,4
including 16:20
25:3 222:7

252:1 324:13
360:11,19
362:14 455:3
487:12 492:15
**inconsistencies**
164:11 392:17
455:2
**inconsistency**
42:18 184:1
185:21 188:23
307:21 442:18
449:7
**inconsistent**
150:14 185:23
188:2,13 189:1
190:2 191:10
192:1,6 219:7
223:10 339:20
339:21 392:18
460:12 484:10
**incorporated**
118:11
**incorrect** 169:18
**increase** 67:8
90:4,7,14
174:22 183:3
183:18 187:7
245:19 252:22
254:16 259:22
262:12 269:11
269:17 349:13
376:23 392:10
405:9 465:1
**increased** 63:13
70:19 78:15
88:24 89:3
94:12,14 95:15
98:17 124:10
149:8 183:5,16
187:21 188:18
188:20 229:15
243:8 245:15
253:12 260:19
260:23 261:9
272:22 273:9
276:10 309:24
310:10,15,20

311:1,9,11,19
312:1,12 315:7
324:10,14,18
328:22 339:11
354:1 355:6
356:18 357:24
360:23 363:2
373:23 378:17
382:8 409:3
446:17 469:13
479:14,19
493:15 498:17
514:6
**increases** 65:9
89:6 90:9
203:24 447:19
465:4,6 484:14
**increasing** 254:7
268:20,24
270:11 361:18
435:5
**incremental**
493:21
**independent**
47:13 347:1
**INDEX** 10:2
**indicate** 125:8
187:18 220:22
242:20 250:5
274:5,10,24
340:17 375:8
407:5 411:15
423:9 431:17
440:7,18 443:3
445:14 452:19
466:4 470:6
**indicated**
220:19 273:8
273:15 333:13
413:18 428:6
**indicates** 30:8
30:15 31:15
32:3 40:21
41:2 83:18
93:7 111:19
182:3,22
195:15 202:12

203:20 210:9
224:19 225:1
298:16 325:10
408:12 416:4
420:11 443:19
472:20 487:6
497:8,14 499:3
**indicating** 84:11
294:2 487:19
**indication** 466:9
**indicative**
420:18 436:8
**indirect** 101:4
**indisputable**
425:18,23
426:2,6,10
427:8 430:22
**individual** 19:4
19:7,9 29:5
36:17 194:21
195:8 224:16
225:16,18,19
225:23 227:3
227:24 325:15
375:23 391:2
446:3 469:17
**individuals**
469:10
**induce** 174:14
436:14 440:8
440:18 441:7
464:17 466:5
**induction** 125:5
**indulge** 457:1
**infections** 36:12
36:14
**inflammation**
174:15,18
431:20 434:5
436:14 440:5,9
440:18 441:7
446:17 447:19
448:8 449:3,4
449:16 450:21
451:4,18,21
461:24 464:18
465:2,6,9

**inflammatory**
487:14
**inform** 92:17
**informal** 15:12
**information**
23:5 48:17
53:9 178:8
277:7 379:14
448:13 463:20
504:4 510:8
**informed** 156:1
**informs** 160:1
**Ingham** 13:6
14:23 38:2
40:23 44:10,14
45:1,12 46:14
46:17,23 47:20
48:1 60:12,23
61:6,22 62:10
64:18 106:2,7
109:20 113:12
116:16 346:11
386:13 515:5
**Ingredients** 9:22
**Inhalation** 84:5
**inhibitors**
461:15
**initial** 19:24
310:22
**initially** 306:21
**initiation** 334:24
**initiative** 338:18
**insanity** 227:16
**insert** 168:9
**inside** 123:12
**instance** 435:4
**instances** 464:7
**institution**
300:16,21,21
301:5,8 494:9
**INSTRUCTI...**
518:1
**insufficient**
510:23
**integration**
302:23
**intend** 112:12

112:24
**intention** 214:4
**interaction** 38:4
296:13
**interest** 50:20
53:20 461:7
**interested** 68:10
205:1 212:5
297:2 390:9
400:15 504:13
**interesting**
164:12 183:22
228:3 280:19
**interestingly**
447:7
**internal** 154:5
154:11,20
478:15
**international**
79:13
**interpret** 66:16
66:18
**interpretation**
277:15 278:5
**Interpretations**
217:2
**interrupt**
163:22 190:7
210:1 327:21
357:5 466:23
**interrupting**
169:8 209:18
209:19
**interval** 149:24
189:4 193:24
194:8 197:14
202:5,21
203:23 219:8
347:16 348:23
353:18 354:18
370:8 376:24
378:17 386:10
386:13,16
387:3 474:21
**intervals** 187:5
196:13,23
205:21 217:22

Case 3:16-md-02738-MAS-RLS   Document 9735-7   Filed 05/07/19   Page 157 of 190 PageID: 37032
Kevin Holcomb, M.D.

Page 546

226:24 235:23
372:8 477:11
**intraepithelial**
448:20
**introduction**
138:9 202:2
382:1 400:14
**introductions**
402:24
**invaluable**
230:7
**invasive** 256:22
353:17 357:24
378:18 451:10
**invested** 316:17
**investigate**
316:3 504:1
**investigation**
154:13
**investigator's**
225:19 227:3
**investigators**
224:17 225:16
225:18 227:24
**invoice** 6:9
111:15 112:12
**invoiced** 112:6
113:19 114:3,8
**involve** 153:18
240:4,7 241:11
**involved** 49:22
50:8 116:6
122:1 404:1
479:8
**involvement**
38:3 44:24
46:13
**Involving** 445:9
**irregularities**
140:11 178:20
**irrespective**
235:21
**irritation**
431:20
**isolation** 249:10
**issue** 23:14
52:15 88:16

93:3 95:1
131:14 138:13
158:19 168:5
182:21 234:21
237:11,20
247:12 272:7
273:10 321:9
331:9 355:19
396:23 426:9
**issued** 110:20
111:15 143:19
494:4 508:9
**issues** 26:7 37:2
78:7,9,12
116:7 152:5,15
289:18 398:17
499:23 507:19
510:14 512:18
**Italy** 63:10
69:11
**Item** 103:16
146:19
**items** 111:8
215:22 463:23

---

### J

**J&J** 31:3 42:1
42:22 47:1,8
**J&J's** 497:20
**JAMES** 4:3
**james.mizgala...**
4:5
**January** 38:8,9
151:4
**Jason** 488:23
489:21
**Jersey** 1:2 3:9
3:13
**JNJ** 9:7
**job** 15:20
**Johnson** 1:4,5
3:15,15 12:21
12:21 13:1,1
16:14,20 32:14
32:14,24,24
37:10,11 38:18
38:18 41:15,15

44:7,7,18,18
60:2,2 97:20
97:20 99:8
100:22,22
107:20,20
108:1,1,23,23
109:4,4,13,13
109:21 111:16
111:16 112:7,7
112:12,13
113:1,1,16,16
114:9,9 154:13
154:14,22,22
315:6,6 354:14
354:14 478:9,9
478:14,15,15
478:16 480:23
480:23 482:11
482:15,22,23
483:12,13,23
484:18 485:2
499:5 500:9
**Johnson's** 16:15
16:21 99:8
109:22 482:11
482:15 483:23
484:18 485:2
499:5 500:10
**journal** 6:16 9:8
115:11 176:22
177:2,2,12
179:4,20
184:19 200:10
200:13,17,23
299:20 411:9
489:24 490:2,9
490:16,22
491:1
**journals** 217:4
**judge** 168:6
169:7
**judgment** 156:2
157:10,15,16
157:20 158:14
242:18 426:3
**Judith** 156:17
**jump** 280:6

297:5
**jumped** 510:21
**Justice** 495:21
496:5
**justification**
267:21

---

### K

**keep** 57:21
166:16,20
167:18 179:14
183:6 196:14
226:17 236:4
297:16 318:11
320:20 321:17
328:13,14,23
417:9,10 423:3
512:11
**keeps** 36:13
229:9
**Ken** 292:15
**Kenneth** 199:20
286:21 287:8
288:6 292:23
**kept** 66:22
222:13
**Kevin** 1:13 5:4
5:14,17,19
6:10 11:13,19
12:6 110:14,17
517:8 520:16
**key** 47:23 48:16
**Khabele** 461:3
**kind** 16:10
**knew** 284:15
286:21 506:6
**know** 14:21
15:16 18:21,23
20:7 26:21
33:23 40:5
47:9 51:9,22
52:7 55:24
61:5 63:6 66:4
66:16,17 67:9
73:23 74:9
78:17,24 79:10
83:6 84:18

85:3 86:12
98:1,9 111:11
121:22,23
128:17 129:19
130:22 134:15
138:10 141:13
146:15 149:10
150:10 155:8
155:10,18
156:12 158:14
178:6 199:17
199:20 200:9
205:16 208:13
209:3,10,21
213:20 216:14
218:11 226:3
244:8,17,19
247:19,24
250:22 251:4
255:4 258:10
258:12 265:14
274:20 278:7
279:8,20
284:18 285:3
285:19 288:6
288:15 292:2,2
297:9,14 298:5
298:7 299:8,14
299:15 300:1
302:3,4 304:5
307:13 322:22
326:6,8,18
332:20 337:4
337:16 338:2
341:15,22
342:19 346:12
346:13 350:22
362:8,19
368:19 375:14
382:19 383:23
384:6 386:8,20
389:8 390:13
390:14 396:22
400:18 405:2
406:16 417:21
427:1,5 439:5
448:14 454:10

Kevin Holcomb, M.D.

459:20 460:11
460:13 462:12
466:1 477:10
480:2,22
489:12 498:7
498:11 502:6
502:15,16,22
505:12,14,22
505:23 506:10
507:2,11
509:11 512:8
**knowledge**
39:14 293:9
498:4
**known** 20:1,6,8
262:16 263:3,4
263:6,9,24
264:3,16,23,24
265:3,4,8
288:7 335:15
**knows** 67:15
282:16 283:2
331:19 399:11
427:6
**Kunz** 437:19

———————

**L**

**L** 1:15 2:3
517:12
**lab** 140:12 141:5
141:24 461:8
**label** 501:15
**labeled** 160:23
**lack** 188:3,14,17
188:22 238:10
307:24
**Lancet** 486:11
**Langseth** 7:11
271:7
**large** 139:3
265:9 316:12
317:10 328:21
506:10
**largely** 149:4
227:5 321:11
410:9
**larger** 202:17

429:9
**late** 38:4 335:2
361:13 369:23
473:16 487:10
**latency** 19:17,23
20:11,15 21:3
21:6,12 325:12
326:5,6,7,11
326:20,21,24
327:1,2,3,8
328:11 331:8
331:15,17
332:2,5,16,24
333:14 334:5
334:24 335:19
336:2,12,17
337:1,5,7,17
337:23 338:11
338:12,14
339:14 351:4
352:16 353:1,1
353:4 356:8
369:1,11
**laugh** 214:6
**laughed** 214:11
**launched** 190:18
**law** 15:11
**lawsuit** 264:6
**lawsuits** 265:10
276:9 277:14
278:22 279:21
**lawyer** 81:7
159:13 199:8
213:22 216:14
**LAWYER'S**
521:1
**lawyers** 56:16
107:20
**lay** 265:14 266:1
266:2,9 278:15
468:7
**lead** 274:5,11,24
**leads** 188:23
464:18
**learn** 388:22
503:22
**learned** 284:5

**leave** 258:8
321:24 379:23
482:7
**lecture** 24:5
26:8
**led** 49:5 205:14
308:3
**left** 94:10 334:18
**left-hand** 181:21
181:23 256:6
293:4 334:19
486:20
**legend** 416:4
**LEIGH** 2:13
**leigh.odell@b...**
2:16
**length** 345:10
**lesion** 448:19
449:13
**lesions** 448:23
451:19,22
**lesser** 323:11
**let's** 21:23 39:16
83:24 102:11
121:13 151:2,3
169:20 173:18
181:7 182:16
186:3,3 201:15
202:13 203:19
207:21,21
208:3,3 213:18
214:12 220:5
234:23 235:1
250:19 255:12
270:8 271:6
273:21 292:15
294:23 302:13
315:22 324:24
334:1 337:12
338:17 343:15
363:12,12
377:19 383:12
389:2 406:18
415:14 416:14
416:14,17
418:12 420:6
421:13 440:4

449:18 452:10
473:7 485:19
485:23 494:15
496:23
**letter** 9:6 208:21
424:16 426:13
**letters** 143:19
**letting** 167:16
327:9
**level** 19:8 97:12
189:12,13,15
226:6 280:4
284:10 307:22
314:4 330:19
330:20,22
389:14 390:8,9
391:20 495:15
505:19 506:7
514:2
**levels** 152:1
281:6,10,13
282:14,24
283:11 409:14
470:20 471:5
505:11
**Lheureux** 9:16
487:4,5
**LHG** 1:6
**liability** 1:6
264:9 266:3
**library** 54:17
**lied** 178:9
**lies** 371:4
**life** 37:2 251:2
369:23 444:14
**lifetime** 250:23
417:2 487:8
**ligation** 441:23
442:8,17 443:5
443:20 444:9
444:19 446:5
**light** 399:14
**likelihood** 17:16
17:20 352:24
**likewise** 125:3
**limit** 48:15
225:9 243:12

243:13
**limitation**
256:15 316:21
317:5 344:9,15
350:16 351:10
352:6,14
367:11 375:18
387:1 388:2
**limitations**
88:15 170:13
170:22 308:24
309:2,12,15,19
313:17 315:10
315:12,14,24
351:14,22
352:1 353:7
404:15 405:20
406:4,12
**limited** 38:21
39:1,4,8 41:18
42:1 91:7 95:2
95:19 119:18
128:3 176:2
235:19 252:16
389:22,23
476:17
**limits** 69:24
70:10
**line** 10:6,9,12,15
52:18 305:10
430:17 513:5
519:4 521:2
**lines** 41:11
45:16 64:23
336:1 444:7
**link** 306:19
**list** 24:8 45:2
47:18 49:12,15
49:24 50:3,24
51:1,10,23
53:7 54:4,17
55:12,20 56:3
56:15,18 57:14
69:21 106:20
110:23 119:14
121:2,11 124:2
131:13 138:17

| | | | |
|---|---|---|---|
| 139:17 142:1 | 181:14 182:4 | 338:10 431:11 | 330:1,6 334:8 | 233:24 236:21 |
| 142:12 143:2,6 | 185:13 206:16 | 453:8 | 350:5 356:2 | 238:2 281:23 |
| 148:21 149:1 | 206:20 210:19 | **long-term** 384:7 | 357:11 362:23 | 281:24 284:4 |
| 149:21 150:6 | 220:21 241:5 | 417:2 | 365:17 377:3,4 | 289:7,10 |
| 152:4 155:12 | 246:15,21 | **longer** 311:4 | 377:20 388:18 | 315:23 317:9 |
| 231:23 233:11 | 247:15 248:23 | 355:23 361:17 | 395:24 396:1 | 374:23 375:4 |
| 233:14 235:16 | 253:10,15 | 373:3,18,22 | 397:10 415:14 | 375:11 377:2 |
| 293:13 388:24 | 262:4 289:12 | 382:9 385:11 | 416:14,14 | 410:9 415:19 |
| 424:19 441:2 | 307:20 313:7 | 495:13 | 420:6 434:14 | 415:20 416:2 |
| 441:15 463:23 | 336:21 352:7 | **Longo** 478:10 | 434:23 435:10 | 429:17 430:1 |
| 507:12 | 359:17 389:12 | **Longo's** 170:7 | 436:2 447:8 | 454:8 473:1 |
| **listed** 49:12 53:3 | 390:12 470:24 | **look** 31:21 39:16 | 449:22 450:10 | 475:11 477:5 |
| 111:3,7 117:2 | 483:1,15,21 | 53:11 72:5,7 | 450:13 451:9 | 504:13 505:3 |
| 117:21 119:13 | 509:6 514:23 | 72:11,17 73:6 | 460:13 471:23 | **looks** 67:10 |
| 143:1 146:3 | **lithotomy** | 75:3,3,11 | 474:17 475:1,8 | 125:12 228:20 |
| 167:5 405:22 | 438:20 | 78:13 87:12 | 477:23,23 | 232:6 321:24 |
| 408:9 489:5 | **litigation** 1:7,20 | 88:18,21 93:5 | 485:16,20 | 448:14 511:10 |
| **listener** 468:7 | 11:5,11 12:20 | 129:10 130:1,5 | 486:21 492:11 | **loosely** 149:17 |
| **listening** 300:14 | 37:11,12,24 | 130:15 135:14 | 496:14 | **losing** 94:20 |
| 332:13,14 | 43:4 103:18 | 136:7 141:16 | **looked** 57:1,4,11 | **lost** 348:9 |
| **listing** 24:6 | 108:6 113:18 | 142:1 143:6 | 77:18 115:19 | **lot** 77:8 169:21 |
| **lists** 49:13 51:15 | 115:5,7,10 | 146:19 149:14 | 115:22 116:4,5 | 233:17 279:15 |
| 52:24 57:12 | 154:8 266:10 | 164:13 165:6 | 129:21 134:22 | 322:10 355:19 |
| 58:19 74:7 | 396:19 479:9 | 178:20 181:7,9 | 137:5,8,13 | 392:4 403:10 |
| 105:6 112:1 | 505:2 515:14 | 181:17 182:16 | 142:7 149:20 | 448:23,24 |
| 117:3,22 146:4 | **little** 24:3 35:10 | 189:9 192:8 | 149:21 151:19 | 471:1 493:18 |
| 146:14 304:4 | 42:14 57:22 | 201:15 202:23 | 151:22 165:21 | 499:22 |
| 305:8 381:10 | 61:9 82:22 | 208:19 210:7 | 206:17 236:18 | **loud** 297:12 |
| 497:16 | 84:19 85:5 | 220:5 222:14 | 237:2,11,20 | **louder** 57:22 |
| **literally** 472:11 | 230:13 240:22 | 231:21,23,24 | 238:8 320:22 | **love** 297:5 |
| **literature** 43:13 | 305:13 321:13 | 233:17,18 | 321:11 323:12 | **low** 185:22 |
| 43:16 47:24 | 365:2 415:4 | 236:7,16 238:8 | 323:18 352:6 | 245:21 307:22 |
| 52:2 57:9,11 | 438:21 445:20 | 255:12 256:10 | 359:18 418:4 | 325:20 329:17 |
| 62:5,7 67:9 | 502:22 | 256:10 262:14 | 420:23,24 | 330:19,22 |
| 90:20 91:3,23 | **lives** 352:11 | 266:13 269:12 | 448:12 452:12 | 387:22 460:19 |
| 92:20 97:18 | **living** 251:10,11 | 269:13,22,24 | 461:9 493:20 | 461:18 |
| 104:21 105:10 | **LLC** 4:6,6 | 270:8 271:6,17 | 495:6 | **lower** 435:15 |
| 105:21 106:13 | **LLP** 1:14 2:7 | 271:18 282:7 | **looking** 73:8 | **lowest** 248:11 |
| 111:20 116:20 | 3:3,7,12,17 4:2 | 283:22,24 | 97:16 116:7 | **LPA** 151:23 |
| 128:6 131:17 | **long** 26:21 35:4 | 285:4 288:19 | 120:10,13,17 | **ludicrous** |
| 133:2,5,22,24 | 112:20 226:17 | 292:15 293:3 | 122:9 123:8 | 203:21 |
| 134:2 136:24 | 284:7 293:15 | 300:15 301:23 | 127:7 128:7 | **lump** 373:12 |
| 137:5 146:15 | 313:22 325:12 | 303:15 307:18 | 137:10 166:15 | **lunch** 125:13 |
| 155:18 157:11 | 326:5,21,24 | 313:6 315:22 | 166:18 181:16 | 223:23 239:17 |
| 157:14 162:10 | 332:23 333:8 | 318:17 319:13 | 197:10,11 | 239:23 |
| 162:14 165:7 | 334:23 335:19 | 322:3 324:6,24 | 200:5 202:2 | **lung** 306:20 |
| 173:24 174:12 | 337:5,7,17 | 326:12,15 | 227:5,14 | 342:4 468:20 |

Kevin Holcomb, M.D.

Page 549

lymph 123:9,12
lysophosphati...
151:24

**M**

M 2:13 3:3,8,12
426:24
M.D 1:13 2:13
5:4 6:10 11:19
147:2,19
488:24 517:8
520:16
ma'am 75:5
159:15 206:13
207:19 354:21
425:11 473:5
macroscopically
450:7
magnitude
246:4,13,19
247:9,10,20
main 448:5
majority 128:18
234:5,5,6,10
234:13,13
235:24 240:15
265:19
makeup 496:4
making 67:2
69:8 77:24
81:16 120:12
196:15 205:9
278:24 299:22
319:24 332:17
341:2 423:22
425:22 435:11
437:14
malignancy
25:13,22
455:20 466:16
467:13,18,20
469:17
malignant 19:11
25:6 79:11,20
336:3 466:10
469:14
man 456:5

management
281:17 303:10
305:20
Manges 1:14
3:12
manifestation
335:1
manner 168:13
mantle 372:24
manufacturers
154:21
manuscript
118:9,22
March 1:10 11:6
111:15 147:20
151:5 200:7,8
486:11 503:11
517:15
MARGARET
2:13
Margaret.tho...
2:15
mark 39:18,19
40:6 45:9
64:12 71:8
102:11 110:8
114:24 148:15
154:22 180:8
186:5 200:3
220:10 224:3
255:18 274:3
292:21 302:13
334:1 344:1
363:18 377:19
403:19 407:1
407:21 424:14
471:11 486:9
488:9 496:23
503:5
marked 10:14
40:12 45:5
64:13 71:4
102:13,17
110:4 114:20
121:8 148:9
180:4 186:6
199:23 220:14

224:5 255:14
258:21 271:10
273:23 292:17
302:9 333:21
344:3 363:14
377:12,15
403:21 406:21
407:17 424:10
428:15 468:2
471:7 486:12
488:10 496:19
503:1
market 500:17
501:16
MARKETING
1:5
marking 378:5
marks 516:3
Marte 4:10 11:4
mask 63:8
369:14
masks 69:8 78:1
332:17
mass 151:21
Massachusetts
3:4 226:9
material 47:12
materials 6:8
23:3,14 45:19
45:20 47:7
51:14,17 52:7
53:1 110:16,19
117:19 121:11
146:21 155:15
189:6 194:4,22
279:5 384:2
math 234:8
350:10,12
matter 11:10
13:6,20 14:5
14:17,23 45:13
46:23 49:12
51:11 64:18
69:21 104:1,10
106:2,14
107:13 108:11
109:20 148:23

396:14,17
423:3 492:23
513:8
matters 13:23
14:13 396:18
McCLENNEN
3:3
MD 5:15,17,20
MDL 37:24 43:3
43:9 44:8
59:10 60:2
104:11 105:24
115:1,6 515:7
515:15
mean 17:6 33:18
37:3 39:1
40:16 47:10
59:9 70:4
76:19 78:8,10
118:8 121:10
132:2,24
178:11 179:23
196:6 205:21
234:19 255:3
257:17 264:1
283:1,1 284:3
299:21 340:6
364:14 395:22
400:6 433:15
438:5 450:7,9
472:1,10
498:21
meaning 85:19
195:16
means 33:24
34:3 78:1 86:6
177:9 184:16
205:23,24
217:5 312:20
398:9 517:20
meant 233:20
measure 262:1
measurement
262:5
measures
217:23
measuring

345:9
mechanism
57:17 58:6
65:12 126:22
140:6 142:8
174:1,13 393:6
394:6 401:7,24
422:1,19
423:13 427:16
436:13 439:22
440:8 441:6,20
445:5
mechanisms
423:2 432:11
mechanistic
57:3 492:18
media 266:1,2,9
277:8 278:15
medical 12:8,18
13:14,24 17:23
18:9,13 23:6
33:4,12,16,18
34:22 35:11,24
36:6,16 37:6
156:2 173:10
185:10 272:20
281:19 283:10
283:11,23
284:12 301:3
301:11,12
303:19 372:5
medical/legal
499:23 513:6
medication
33:23 34:5
35:14 36:21
medications
33:2 36:24
37:3,4,7
medicine 7:19
7:19 9:9 178:2
205:13 235:24
281:15 302:18
302:22 303:5
303:17,20
305:20 306:1,5
394:17 446:20

Kevin Holcomb, M.D.

Page 550

Medline 119:22
meet 246:3
    247:11
Melissa 242:8
member 176:17
    507:3
memorable
    250:7,9 251:12
    251:19 257:2
    257:10 258:4
    267:23
memory 48:9
    123:9 263:2
    266:20 280:5
    347:1 419:23
menarche
    487:10,10
menopausal
    245:2
menopause
    243:16
menses 173:12
mental 118:16
mention 31:23
    101:17 134:12
    135:8,11 138:3
    141:4 164:2
    172:4 237:1
    323:15,17,19
    329:9 357:12
    379:13
mentioned
    88:16 114:12
    120:3 130:6
    134:19 135:1
    136:10 137:22
    138:22 171:23
    235:16 333:11
    352:15 353:10
    358:21 397:2
    417:7 447:17
    449:19 455:6
    461:2
mentioning 24:9
    70:21 133:1
    300:11 352:13
    352:22 382:10

449:7
mentions 149:4
    238:5 323:15
mere 393:22
    394:18,24
    400:21
Merritt 265:17
mesothelioma
    78:23 79:12,14
    79:21 86:23
    93:10,17
    469:14
message 125:17
met 477:9
meta 232:14
meta-analyses
    8:21 206:23
    220:20 221:3
    221:11,19,24
    222:3,22
    223:11 224:4
    230:8 231:18
    233:5,6,7
    241:4 270:19
    270:20 284:16
    284:19,23
    285:13 287:19
    287:22 288:18
    292:8 304:22
    305:1 307:2
    309:20 311:10
    311:14 315:14
    319:17 406:19
    407:6,7 408:7
    408:10 409:15
    409:22 410:18
    419:4,12
    492:13,14
meta-analysis
    6:21 9:14
    145:18 146:2
    225:22 227:7
    229:8 230:15
    230:16,17
    232:11 236:8,9
    236:12 270:18
    284:20,22

285:2,10 289:6
    289:10,13
    290:10 291:3
    308:17 312:7
    318:13,22
    319:22 321:18
    322:4,5,7
    329:21 360:4
    360:12 361:1,7
    412:4 413:10
    413:14 420:12
    443:4 444:2,17
    446:2 453:15
    455:4 474:7
    476:13 493:17
Metal-Analysis
    8:18
metals 5:22
    71:10 109:5
    170:9
method 163:5
methodical
    163:6
Methodological
    271:20,23
methodology
    115:19,21
    159:23,24
    160:2,11,13,15
    160:17,24
    161:4,11,13,17
    162:3 163:4,9
    172:15,20,21
    173:1 195:1
    288:8 495:7,9
methods 161:20
    189:7,8 194:4
    194:22 279:6
    293:10 384:2
    404:10 475:8
    504:9
metric 261:24
    262:1,18
    263:10,21
    267:13 343:4
    344:16 368:1,5
    368:7 376:3

388:3 404:5
    416:6 417:11
mic 469:24
Michelle 1:15
    517:12
microphones
    126:10
microscopically
    449:24 450:9
middle 214:15
    334:21 351:13
    374:13 375:1
    416:19 424:23
    425:3,9 497:14
migrate 130:17
    131:18 135:17
    138:5 174:2
    422:3 425:16
    427:17 430:19
    431:18 436:14
    439:23 441:21
    442:7,15
migration 116:7
    121:16 122:11
    129:9,22
    130:12 131:15
    133:3,22 134:9
    134:20 426:9
    428:7
Mills 7:8 255:19
mind 55:17
    263:12
minute 86:21
    363:8 397:11
    462:21
mischaracteri...
    464:11
misclassificati...
    61:3 78:12
    87:1 93:3
    94:16
misclassified
    93:19,24
misconception
    294:3,11
    296:23 298:16
    298:19 300:5

338:9
misconceptions
    7:17 292:23
    293:14,17
    294:15
misdiagnosed
    93:10,16
misdiagnosis
    86:22
misinform
    203:5
mislead 204:6
misrepresented
    154:14
missing 204:23
    339:14
misspoke
    403:16
misstated
    371:13 461:11
misstatement
    158:16,17
misstatements
    489:18
mistake 77:10
    196:15 279:19
    379:23 380:12
    383:2 412:1
    413:19 414:3,5
    414:8,11,14
mistaken 190:21
mistakenly
    217:5
mistakes 78:8
    279:14 319:24
    383:1
misunderstan...
    193:15 276:21
misunderstood
    451:8
misuse 217:19
mix 290:21
    291:18 311:16
    311:20 320:17
mixed 237:5
    319:15
mixes 398:20

**mixing** 69:10 289:15
**MIZGALA** 4:3 30:19 32:7 168:8 211:3,15 213:3 240:21 241:1 295:17 439:11
**Mm-hmm** 61:11 102:24 105:13 200:15 207:17 223:20 250:10 304:23 342:22 343:2 366:12 367:10 386:17 408:8 425:2
**mode** 323:12 447:2
**model** 129:4,12 129:12,13 132:13 136:1 296:11,11
**models** 130:11 131:9
**moderate** 222:9
**modest** 247:2,16 271:3 357:23 484:9
**moist** 36:12
**molecular** 124:8 432:11,19 433:10,17 435:2
**molecule** 394:19
**moment** 43:16 120:17 515:18
**money** 113:11 316:16
**monies** 145:13
**monitor** 504:1
**monitors** 118:21
**monograph** 60:24 61:18 62:9 63:5 68:21 69:17,24 70:10 71:9 72:4 74:22

75:14 76:1,9 76:10,12,23,24 82:6,8,10 83:8 84:21 85:14,15 85:21 86:15 87:5 88:15 100:19,21 129:15 130:8 247:21
**Monographs** 5:21
**Montgomery** 2:14
**months** 404:8,17
**morning** 12:2,3
**mortality** 87:21
**Motion** 67:19 76:16 80:14 144:8 163:15 206:5 356:14 430:23 446:8 456:19
**move** 54:15 95:9 141:14 162:7 213:18 214:12 214:14 297:23 300:13 401:1 415:6 418:10 418:13
**movement** 173:13
**moving** 495:12
**mucinous** 324:16,20 409:5
**multi-discipli...** 450:12
**multi-district** 37:12
**multiple** 66:19 277:9 278:12
**multitask** 332:13
**multivariant** 348:1,22
**multivariate** 354:21

**Musser** 9:6 426:20 427:1 428:9
**mutation** 455:22

———————
**N**
———————
**N** 5:2
**naked** 270:13
**name** 11:3 12:5 12:6 14:4,7,8 41:7 287:21 490:2,10
**napkins** 354:1
**Narod** 6:14 180:13 185:16 249:3 259:8 260:6 261:18 267:18 318:9 318:15 329:7 329:14,24 330:14 346:3 385:24
**Narod's** 260:6 263:16 329:10
**narrower** 61:10
**National** 446:19
**nature** 14:17 20:17 24:18 122:3 148:5 190:17 200:8 200:14 205:10 226:16 250:14 301:22 396:19
**near** 210:21
**nearly** 458:8
**necessarily** 123:2 299:11 306:9
**necessary** 44:2 392:12 518:4
**neck** 513:11
**need** 81:3 110:22 125:9 151:6 156:12 159:11 165:8 190:1,13 205:4 205:6 209:3,9

210:12 211:22 215:7 226:16 232:24 258:10 258:12 318:15 329:16 365:15 366:12 385:24 386:2 399:14 480:2,22
**needs** 125:19 194:15
**negate** 362:17
**negative** 24:11 183:4,17 184:2 184:7,14 186:1 189:21 197:22 197:23 198:4,6 198:12 371:10 371:12,18,21 372:12,14 381:15 443:4 444:18 447:10
**neither** 203:1 391:10 416:11
**Ness** 440:23 441:4
**never** 22:1,7,12 23:21 24:21 77:18 128:24 132:12 139:4 178:17,18 197:16 198:21 202:14 238:9 259:5 282:15 282:16 283:1,2 287:18 289:3 341:23 344:24 368:3 373:8,14 423:24 437:15 449:14 451:17 459:3
**nevertheless** 20:14
**new** 1:2,14,15 3:9,13 9:17 11:10,10 14:11 169:14 227:9 228:2 301:6,17

450:12 488:16 498:8,12 503:19 505:14 509:15 514:4
**Newport** 2:4
**news** 185:7
**newspaper** 185:8
**NHS** 378:9
**NHSI** 367:5
**NHSII** 367:1,4
**Ni** 453:18
**nice** 196:6
**nickel** 109:5
**nine** 376:10 492:14
**no-no** 320:5
**node** 123:12
**nodes** 123:9
**non-aspirin** 454:1
**non-diseased** 390:22
**non-exposed** 398:1
**non-perineal** 417:1
**non-persuasive** 128:5 134:6
**non-significan...** 215:21 217:5 236:3
**non-statistical** 202:4
**non-statistically** 216:5
**nonconsistent** 183:5
**nonmalignant** 9:11 467:24 468:6,16,18 469:11
**nonresponsive** 67:19 144:9 206:5 356:14 418:22 430:24 446:8 456:20

**nonsignificance** 204:20

**nonsignificant** 183:17 201:22 203:22 205:14 210:12 270:2

**nonstatistically** 204:17 296:18 298:20

**nonsteroidal** 455:11 459:17

**nonsteroidals** 460:12

**normal** 442:16

**normally** 154:20

**NOS** 435:4

**Notary** 1:17 517:14 520:23

**note** 350:16 351:13,17 416:22 417:14

**notebooks** 141:24

**noted** 11:14 87:18 141:24 518:11 520:11

**notes** 106:5,15 118:6,15,16 119:1,10 140:12 141:5 485:21 521:1

**notice** 1:14 6:6 102:11,18

**noting** 351:9

**notion** 296:16

**November** 38:5 38:6 43:6

**NSAID** 448:1 452:11 454:2 456:1,15

**NSAIDs** 452:11 452:13 455:16 455:23 457:11 459:7,7 460:16 461:16

**NTP** 485:17

**number** 73:13

73:15 74:16 82:5 105:4 138:8 140:11 146:23 147:6 147:14,18 181:13 182:3 229:7,11 230:21 251:23 293:18,20 296:8 316:12 317:23 328:5 329:17 330:2 361:22 384:20 386:9 387:3,9 387:19 410:3 466:8 487:8 493:17 497:16

**numbers** 9:7 93:18 198:22 207:10 260:17 290:6 331:2 471:17

**nurses** 366:1,2

**Nurses'** 256:18 311:8 344:10 363:22 365:21 365:23 376:21 378:9 380:21 381:4,20

**Nutrition** 427:4 428:12

**NUTTER** 3:3

**NW** 3:18

───────────
**O**
───────────

**O'DELL** 2:13 80:22 81:11 167:19 169:10 208:7,12,17 458:17 462:13 462:19,24 463:13 464:3,6 464:13

**O'REARDON** 2:7

**oath** 11:17 15:7 15:9

**object** 24:1 26:23 27:13 28:3 29:2,20 30:19 32:17 33:13 34:17,24 35:15 36:1 38:22 39:5 42:3 43:22 44:19 46:2 47:2 48:7 49:17 50:14 51:2,19 53:4 55:22 56:11 57:19 58:8 60:5,16 61:24 62:17,24 63:21 65:16 70:12 77:4 84:14 89:21 90:22 91:24 95:4,20 96:12 98:8 99:21 101:20 102:7 103:19 104:13,23 106:8 108:12 109:7,15 112:15 113:22 116:21 117:7 117:23 118:18 119:5 121:9 122:6,16 124:11 127:20 130:20 131:23 136:13 137:2 139:23 142:3 142:16 143:3 146:6 147:5,11 150:17 152:7 153:8 155:2 156:3,14 157:17 159:1 159:17 160:20 161:7,24 162:19,24 165:11 166:2,9 170:16 171:12 172:1,7,17

173:4,14 174:4 175:21 176:4,9 177:4,18 179:5 185:2 188:4 192:3,17 193:12 195:5 196:18 197:4 198:13 202:7 203:13 204:12 207:1,12 211:3 211:5,15 213:3 213:5 215:3,9 216:6 218:4 219:10 221:6 221:21 223:4 225:3 230:10 231:4 232:15 234:16 235:7 235:13 237:24 238:20 241:13 242:2,13 244:1 244:14 245:8 245:22 246:7 246:22 248:3 249:7,22 250:11 251:14 252:12 253:2 253:21 254:9 257:12,21 259:24 262:8 265:5 267:8 268:13 272:24 277:18 278:16 279:2 282:11 282:11 283:13 286:16 287:24 288:9,23 289:21 291:4 295:15,17 296:2,20 298:24 300:18 302:1 303:12 304:14 305:16 305:22 307:7 312:2,15 315:15 316:6 316:22 317:18

318:5 319:8 327:12 330:7 331:11 333:1 335:7 338:6 340:20 341:8 342:10 343:8 343:12 344:19 345:11 346:5 346:16 349:5 349:20 355:12 356:20 358:11 359:1,10 360:16 362:10 364:13 365:8 366:6 369:7 370:18 372:20 375:20 379:20 381:7 382:23 385:6,19 386:6 387:5,15 388:6 388:14 391:7 393:7 394:8,14 395:15 397:15 398:3,23 399:19 400:3 401:9 402:2,10 406:1 408:17 410:21 412:13 412:21 413:21 414:19 417:16 419:8,21 423:17 427:19 431:8 432:21 433:6 434:1,19 435:6 436:16 438:2 439:9,11 440:11 441:11 441:24 442:10 447:4 448:3 451:5 452:21 454:21 459:10 460:3 462:5 464:20 468:8 469:2 470:15 473:14 475:23 477:20 480:5 481:2 482:18

Kevin Holcomb, M.D.

Page 553

| | | | | |
|---|---|---|---|---|
| 484:19 485:4<br>487:22 489:9<br>491:5,17<br>492:24 494:11<br>496:7,16<br>497:23 499:8<br>500:2,13,21<br>501:8 504:16<br>505:6 506:21<br>507:23 508:16<br>509:23 510:18<br>512:3,22<br>513:12 514:10<br>514:16<br>**objecting** 30:23<br>**objection** 16:23<br>17:12 18:1,11<br>19:1,19 20:19<br>25:15 26:2<br>27:3 31:5 32:7<br>33:7 66:5,5<br>67:18 70:4<br>124:23 131:20<br>190:24 206:4<br>213:16 233:1<br>341:4 356:13<br>364:5 418:21<br>446:7 456:18<br>456:19 466:22<br>**objections** 65:21<br>68:5 81:2,16<br>103:5 107:16<br>**objective** 262:1<br>262:5<br>**observations**<br>475:4<br>**observed** 93:12<br>204:3<br>**obstetrics**<br>488:15 490:1,1<br>490:11<br>**obtained** 119:17<br>**obvious** 370:22<br>423:1<br>**obviously** 213:8<br>372:2<br>**occasion** 243:17 | **occasions** 464:8<br>**occupation**<br>27:11<br>**occupational**<br>27:17 28:6<br>60:13 61:13,16<br>61:22 62:15,22<br>63:3,17 64:3,9<br>65:5 67:7 68:1<br>68:19,20 70:1<br>70:11,18 71:1<br>80:5 86:5<br>87:22 88:8<br>95:13 98:15<br>326:16 330:10<br>331:23 332:7<br>335:17<br>**occupations**<br>26:18<br>**occur** 65:13<br>133:4,6,23<br>**occurred** 240:8<br>**odds** 192:14,21<br>206:21 241:23<br>243:23 244:8<br>244:11,17,22<br>245:21 253:12<br>269:13,22<br>270:10 271:1<br>311:22 325:20<br>329:17 354:16<br>371:18 378:14<br>408:13 443:23<br>**offense** 40:18<br>**offer** 44:2<br>138:12 212:8<br>**offered** 60:24<br>308:4<br>**oh** 72:9 83:13<br>135:6 151:13<br>153:2 175:13<br>180:9 219:18<br>250:24 377:13<br>378:2 415:20<br>429:24 441:13<br>465:12 487:2<br>**okay** 15:4,5,23 | 15:24 16:11<br>21:15,24 32:24<br>42:20 72:8<br>74:3 75:5,10<br>75:13 77:2<br>83:15,24 87:2<br>87:11,12,17<br>89:15 96:21<br>107:9 111:13<br>119:1 126:8,14<br>127:16 129:18<br>134:24 138:22<br>143:1,18<br>144:24 147:22<br>150:21 155:11<br>156:23 159:21<br>165:17 171:5<br>172:13 173:23<br>176:16 180:1<br>180:20 181:7<br>181:23,24<br>188:24 191:1<br>192:8,22<br>197:21 199:17<br>207:8,21<br>212:19 213:11<br>214:1,14<br>215:14 216:16<br>216:19 218:23<br>220:7 222:1<br>223:24 227:21<br>231:14 235:19<br>240:12 241:18<br>243:4,10,15<br>245:14 246:12<br>253:7,16<br>255:12 256:13<br>258:2 259:3<br>268:9 270:14<br>274:21 279:17<br>282:23 287:4<br>287:18 296:6<br>298:5 301:4,18<br>302:8 304:3<br>306:13 308:20<br>309:7 310:13<br>312:10 317:3,8 | 321:19 324:22<br>328:19 334:18<br>334:20 337:21<br>337:22 342:1<br>343:15,17,21<br>345:16 348:14<br>350:7,11,14<br>351:24 354:22<br>355:4 363:6,9<br>365:4 366:17<br>366:17 367:13<br>368:11 371:16<br>372:15 374:8<br>375:13 377:3<br>377:19 378:2<br>383:4,12,22<br>384:5 386:3<br>388:2 391:1<br>396:10 400:24<br>402:8 403:4<br>404:22 409:12<br>416:3,16<br>418:12 420:6<br>421:15 433:1<br>436:4 438:13<br>449:18 452:10<br>453:3,5 454:9<br>469:6 475:18<br>476:12 477:1<br>482:8 484:3<br>485:19 486:1<br>486:24 487:2<br>503:18 515:12<br>515:17,19,24<br>516:2<br>**old** 229:9 372:7<br>**omitted** 127:17<br>**once** 63:2<br>193:24 198:10<br>276:1 332:12<br>368:1,2 370:6<br>389:7 495:24<br>**oncologist** 12:11<br>12:14 126:20<br>176:17 242:10<br>**oncologists**<br>136:22 | **oncology** 39:10<br>176:18,22<br>178:4,14 179:3<br>179:23 180:11<br>181:4 249:15<br>456:11,14<br>507:6<br>**one-sided** 388:3<br>**one-time** 366:21<br>367:3<br>**ones** 15:4 55:13<br>78:11 117:11<br>152:24 259:23<br>270:9 312:21<br>312:23 325:24<br>409:3 509:10<br>509:11<br>**onus** 205:7<br>262:19<br>**op** 185:9,11,12<br>200:24 329:10<br>489:20<br>**open** 14:18<br>107:7 173:11<br>299:20 420:8<br>423:1<br>**open-ended**<br>139:7<br>**opening** 100:18<br>**operate** 259:15<br>**Operation**<br>428:11<br>**operations**<br>427:3<br>**opinion** 21:3<br>43:12 44:2,14<br>44:22 46:11,16<br>47:13,15,20<br>48:1,17 49:6<br>60:13,21 61:12<br>61:15 62:4,21<br>63:3 64:7 69:6<br>69:15 70:15,22<br>78:18 86:12<br>89:23 91:19<br>94:23 95:10<br>97:3,4 99:5 |

100:1,2 108:20
108:22 109:2,3
109:10,12,18
109:21,24
116:9 162:18
164:4,22
165:10,15,16
171:8,19
173:23 174:7
174:11,21
175:3,5,8,14
175:17,18,24
176:2 188:7,11
188:15 191:14
191:19,22
199:3,5 200:12
203:11 211:14
230:4,9 235:12
241:21 242:6
246:10,13,18
247:8,18
249:13,17
252:20 260:6
261:18 263:16
265:4 267:17
268:9,21
285:21 286:4
288:22 308:4
309:22 310:9
312:11 315:8
318:8 327:4,7
327:22 328:10
329:11 332:4
360:9 371:21
395:11 401:20
419:5,20
421:24 422:5
422:22 441:18
441:19 442:6
447:18,23
448:6 452:6
464:17 472:13
479:13 494:4,7
513:15
**opinions** 37:17
37:18 44:9
45:21 49:11

52:3,9 68:18
69:3 90:1
92:18 95:19
107:22 108:2,4
108:10,17
115:14 117:17
117:20 123:15
123:21 138:17
146:17 155:13
155:20,23
156:1,13 157:3
160:3 161:5,17
172:14,16
173:3,19
211:20,22
212:2,5,10
253:14 271:8
304:12 307:6
426:5 491:15
492:22 497:22
499:7
**opportunity**
146:15 159:13
216:21 297:8
298:10 517:9
**opposed** 113:8
197:8,12 329:8
467:19
**opposite** 50:17
88:22 91:17
247:8 423:11
**optimal** 388:12
388:18
**options** 475:12
**Oral** 6:6
**order** 45:21
154:24 270:7
458:12
**organ** 394:20
**organization**
494:10 507:9
509:20
**original** 91:18
217:16 423:21
518:15
**outcome** 227:16
412:12 417:4

**outcomes**
316:13 417:6
**outlined** 251:24
**outmoded**
293:12
**outside** 19:9
46:6 62:4
66:23 67:3
69:14 80:4
86:8 98:14
100:11 446:1
**outstanding**
14:3
**ovarian** 6:13,23
7:7,10,13,22
8:7,9,12,15,17
8:20 9:13,15
9:18 13:2,11
14:14 17:11
18:19 19:18,22
21:4,16,17,20
21:20,21 22:8
22:13 23:1,4
23:10,21 24:23
25:4,8,10 28:9
28:19,22 30:9
30:16 31:16
32:4,13 37:23
43:14 44:4,16
44:23 46:12
56:24 60:15
61:14,20,23
62:16,23 63:14
63:18 65:1,6
65:10 67:23
69:12 70:1,11
70:19 71:2
77:15 78:21
79:19 86:22
88:24 89:4,6
90:2,4,7,9,14
90:21 91:7
93:11 95:15
98:18 100:5
101:17 113:18
116:10 120:7,8
120:9 124:10

138:2 145:8,14
149:8 151:11
151:18,22
153:5 165:3,23
174:15,20,23
175:7,16,20
176:8 180:12
182:2,9 189:19
206:8,12
220:24 224:21
241:6 243:11
245:6,16
246:15,20
248:12 249:19
252:10,17
253:19 254:5,8
256:15,22
265:11 266:17
267:5 276:15
278:14 280:17
310:2,21
311:12,23
312:1 316:5
317:9 324:11
325:13,18
326:5,6,11,13
326:16 327:1
327:10 331:8
331:16,18
332:23 334:11
334:23 336:3
336:19,23
337:4,15,17
340:1 347:5
351:5 353:17
354:17,22,24
355:7,10,11
356:19 357:9
357:17 358:1
367:7,8,16
369:2,5 370:7
372:11 374:17
378:12,13,18
378:20 380:3
385:13 386:1,4
390:21 393:4
394:5 405:9,12

405:16 408:6
409:21 410:19
410:20 413:12
419:6,18
420:16 425:14
431:19 432:9
432:12,20
433:1 434:6
443:24 444:20
446:18 447:12
447:20,24
448:2 449:9
450:5,14
451:14 452:7
452:16,20
453:17,23
454:2,13,19
455:5,14,24
456:16 459:24
461:23 462:3
464:18 470:7
476:16 479:15
479:23 480:16
481:24 482:6
484:15 487:1,7
487:13,21
488:17 501:3
508:11 515:9
**ovaries** 65:9
130:18 131:22
132:8,19 134:3
138:11 174:3
390:1,2,3
391:5,13 422:4
422:22 423:16
426:1 427:18
432:1 438:17
439:4,23
441:22 442:8
442:15 445:11
445:24
**ovary** 87:20
89:20 95:12
128:11 130:4
390:15 396:21
400:22
**overall** 311:6

378:10 392:5
479:21
**overcome** 314:7
**overconfident**
217:13
**overlap** 56:5
230:18 231:21
233:17 234:3
234:14,22
235:5,12,17
236:2 321:12
322:10 323:23
409:15 410:3
**oversimplifying**
99:23
**overstate** 395:5
**Ovulation** 7:21
**ovulations** 487:8
**owned** 301:16
**oxygen** 435:12
435:20
**oxytocin** 128:16
438:21

_____
           **P**
**P** 2:13
**P-value** 202:16
218:7,15
**P-values** 217:22
218:10,11
**P.C** 2:12
**p.m** 239:16,20
343:19,23
348:12,16
421:16,21
453:13 473:10
473:24 486:2,7
516:5,8
**p53** 448:24
451:15
**page** 5:13,15,18
5:20 6:5 7:5
8:5 9:5 10:6,9
10:12,15 16:11
40:20 41:1,11
45:16 64:22
65:17 71:21

72:4,21 74:2,5
76:23 82:5,13
83:5 84:16,18
84:23 87:5
93:5 116:12
125:8 126:18
127:4,7 133:15
134:8,9 135:7
140:9 141:8
160:9 181:10
181:11,21
182:20 187:18
202:20 217:1
217:10 224:11
224:13 256:4,6
258:23 261:5
271:14,15
274:4,8,10
275:13 281:1
325:4,5 334:3
334:16,20,21
350:15 357:14
358:2 365:20
367:24 374:13
374:14,18,19
375:2,6 377:5
384:19 407:8
407:10,14
415:15,22
416:17 420:10
424:23,23
425:2 429:17
429:18 430:3
430:13,13
442:23 443:1
443:17 446:11
471:16 476:9
478:4 519:4
521:2
**pages** 48:11
71:23 428:18
430:6 471:19
520:6
**paid** 112:9
113:11,19
114:4
**paper** 50:21,22

55:9 58:21
73:13 121:15
121:16 122:4,8
122:15 123:14
123:20 124:7
134:13 151:3
171:11 180:2
180:10,15
181:1,5 182:17
184:10 185:7
194:21,23
195:14 200:4,6
200:6 201:16
202:1 203:16
207:22 213:9
215:8 219:4,9
219:17 223:15
255:1,19 256:5
263:17 271:6,7
271:22 273:22
275:4,14
285:20 287:10
292:15,22,24
295:1,6 298:15
318:9 323:7,21
323:23 325:7
329:14 347:2
350:18 394:1,2
397:7,11
398:16,16
400:14 407:2,4
409:22,23,23
411:8 416:18
417:19 421:9
428:6 432:3,18
433:2 434:13
434:22 435:9
435:24 437:20
441:9 443:8,10
443:12,16
446:21 447:9
447:10,11
459:23 462:2,8
468:23 471:12
471:16 486:10
486:17 493:4
495:11 498:18

**papers** 49:23
53:2,24 55:2
56:19,23 57:2
57:5 61:17
62:8 88:18
91:12 111:7
118:23 138:8
139:13 140:4
149:6 152:18
258:18 261:21
267:4 297:10
352:8 489:22
498:19
**paraffin** 400:1
**paragraph**
74:21 87:14
127:8 256:7
258:24 275:16
325:6 379:3
380:13 407:14
416:19 443:19
469:7
**paragraphs**
139:4 166:19
456:23 457:15
457:20 458:9
465:20
**Pardon** 156:9
468:13
**Park** 3:9
**part** 51:5 68:11
77:2 78:17
81:19 87:3
107:2 143:8,13
143:14 146:8
153:16,20
158:13 251:5
251:10 271:8
284:10,12
289:6 304:13
327:16 384:16
393:13 427:14
429:9 448:21
**participants**
240:4 330:3
387:4,10,11,12
**participated**

63:7
**particle** 393:23
394:19
**particles** 122:12
123:11,11
127:24 128:10
128:14 133:3
133:23 134:10
391:11,24
392:2 400:22
430:18 431:17
437:3
**particular** 31:23
135:18 156:24
490:13
**particularly**
23:8
**particulate**
135:15,18,20
423:3 438:14
**particulates**
425:16
**partners** 242:9
504:7
**parts/genital**
376:6
**pass** 39:21
**passage** 173:12
**path** 449:24
**pathologic**
78:14 94:7
**pathology** 94:11
94:13 449:22
**patient** 14:8
19:4 26:9 27:2
28:11 35:23
36:7 128:16
338:10 450:12
450:14 479:4
479:20 480:21
482:13 483:11
483:24 485:9
501:2,5 502:12
506:19 511:15
**patient's** 14:7
26:14
**patients** 9:11

Kevin Holcomb, M.D.

25:2,6,21
26:17 27:7
225:24 233:23
239:1,5 244:23
272:17 313:22
342:3 356:12
367:7 405:14
418:4,20
455:21,23
466:12,16,17
467:8,12,17,19
467:24 469:14
483:6 499:13
500:11,24
501:17 506:9
506:12 507:21
508:14 509:1
510:2,7,16
512:16 513:1
513:11,20
514:5
**patients'** 303:1
**PAULA** 2:8
**pause** 132:11
348:13 382:6
453:11 473:12
**pay** 60:9
**payments** 265:9
**Pbrown@bho...**
2:10
**PCPC** 3:20
**peer** 299:16
382:13,17,20
383:5 470:18
**peer-reviewed**
184:10,19,24
220:21 247:7
254:3 257:5
267:3 273:7,14
298:15 299:7,8
299:10,13
300:12 350:18
401:5 439:19
440:6,17
443:16 459:5
470:5,13
**pelvic** 487:14

**pelvis** 430:19
431:19
**penalty** 15:7
**pending** 168:22
210:2 418:17
419:1 454:5
**Penninkilampi**
8:19 171:10,20
171:24 227:9
229:23 230:1
231:20 233:9
234:7 236:16
236:17 237:10
237:19 238:7
319:5,11
320:21 321:10
322:3,12,15,19
322:21 323:4
360:4 361:13
362:7 382:16
383:5 407:2,4
409:4,23 411:8
411:17 412:2
415:15 416:15
416:18 417:9
459:23 460:9
461:11 471:4
488:6 489:4
494:14
**Penninkilamp...**
230:15
**people** 32:20
35:5 81:9
100:14 149:10
214:19 215:21
235:24 254:16
262:22 265:14
265:19 266:16
273:19 290:16
320:17 321:11
326:10 341:13
369:21 395:3,5
396:5 400:12
402:7,9 424:2
438:8 445:23
470:24 479:14
490:12 498:23

**percent** 25:5,9
25:10,11,21
149:23 187:4
187:21 193:21
193:23 194:8
196:22 197:14
202:5 205:20
234:2,4 235:5
245:15 248:19
248:20,24
249:6 290:14
318:21 328:22
329:2 349:12
349:13 371:3,3
372:8 376:23
378:16,16,20
386:23
**percentage** 25:1
150:2 234:9
235:11 323:12
381:13,14
**perception** 35:5
**perfect** 388:9
504:11
**perfectly** 380:16
475:7
**perform** 153:21
**performance**
14:19 20:12
**performed**
149:3 249:20
412:4 413:9,14
444:9,13
**perineal** 6:22
7:6,9 8:12,17
84:7 120:8
134:2 220:24
224:19 236:20
347:9 348:20
348:20 378:11
378:19 396:12
416:5 417:4
420:17 425:24
432:9 448:9
**perineum** 130:2
130:13,16
131:19 330:13

344:24 347:4
353:24 367:15
422:3,21
423:15 425:16
427:18 439:3
445:22,23
**period** 19:17,23
20:11,15 21:3
21:6 261:22
266:15,15
325:13 328:11
332:3,5,17
334:24 336:2
336:17 337:7
337:23 345:19
350:2,4,6,15
351:3 352:14
369:3
**periods** 21:12
325:14
**peristalsis**
437:21,24
**peritoneal** 79:20
86:23 93:9,17
423:4 425:17
**perjury** 15:8
**persist** 293:15
**Persistent** 7:16
292:22
**person** 30:23
34:7 41:5
81:15 90:12
158:9 178:22
179:15 195:8
399:8,9
**person's** 157:14
157:16
**personal** 70:22
341:12
**persuaded**
129:5
**persuasive**
131:5,10
267:24
**pertains** 90:20
246:20
**pervasive**

202:12
**ph** 1:20
**Ph.D** 427:1
428:9
**Ph.Ds** 153:19
**pharmaceutic...**
84:3
**phase** 452:3
**phenotype**
19:12
**phrase** 19:17
20:6 358:18
407:12
**physically** 105:9
105:12
**physician** 307:1
**pick** 151:21
279:10 281:21
313:3 314:9
352:16 388:20
**picking** 84:18
231:10 329:3
**picture** 307:19
**piece** 68:8
200:24 261:18
489:21
**pieces** 48:16
**pig** 129:12
**pigs** 130:10,10
**pipes** 266:2
**piqued** 50:20
53:20 461:6
**piquing** 48:9
**Pisano** 168:6
**place** 28:23 29:9
29:13 128:14
217:24 218:7,8
218:12,14
289:16 321:21
444:15 461:19
**placed** 134:21
135:16 500:9
**places** 233:21,24
289:14 298:17
**plaintiff** 292:14
**plaintiffs** 2:16
210:3 473:18

Kevin Holcomb, M.D.

plaintiffs'
126:19 127:18
129:20 130:15
132:10 136:21
140:5 149:5
155:23 157:4
162:8 172:14
173:2 208:1,16
planning 125:14
144:1,12
145:10
plausibility
116:6 162:15
164:14,18
165:9,22 308:3
340:2 391:17
394:23 395:9
401:2 403:9
430:14 431:14
432:8 437:7
460:15
plausible 140:6
174:1,13
263:19 393:5
394:6 395:20
401:7,24 422:1
422:19 423:7
423:12 427:16
436:13 437:12
439:22 440:7
441:6,20 445:5
492:17
play 196:11
252:22 253:11
253:20 254:7
257:9 258:3
259:21 261:6,8
261:13,14,17
263:20 267:6
267:15,19
268:2,6,10
273:9 277:10
313:18 314:23
315:4
played 263:13
277:2
playing 390:4

Plaza 2:4
please 11:17
12:4 16:5
57:23 74:10
108:8 126:9
138:23 146:12
146:24 152:9
159:23 163:11
163:12,23
166:12 167:17
170:18 171:16
188:8 190:24
195:19 233:1
246:16 253:23
291:15 306:17
343:18 442:2
443:17 457:1
458:14 462:13
463:16 466:23
472:16 516:3
518:3,8
pleural 9:11
465:2 466:10
468:1,6,17,18
469:11
Pleurodeses
9:10
pleurodesis
448:16 464:19
464:24 465:1
465:23,23
466:5,9 467:24
469:10,18
plus 114:11
307:24
pneumothorax
469:12
point 37:5 99:4
102:21 109:23
127:2 129:23
158:15 159:23
160:4,12
196:16,20
197:2,13,17
202:18 233:16
239:11 261:23
262:14 264:10

264:18 266:19
279:17 280:13
347:13,24
349:18,19,22
354:2 379:9
380:17 391:15
392:20 400:6
400:10 410:10
427:23 428:2
438:10 439:8
445:17 446:12
515:20
pointed 392:16
463:7,17
pointing 279:15
463:21
points 118:10
120:11
polarized
399:14
policy 203:5
polite 163:23
169:5,17
polycystic
487:13
polyposis 456:6
pool 229:17
pooled 225:20
229:8 408:10
408:12 453:18
poor 285:8
poorly 308:12
308:14,16,17
popular 490:8
population 30:3
83:19,22,23
84:5,13 158:7
355:17 367:1,5
373:21
populations
82:15 233:21
311:7 381:17
portion 30:3
429:2
pose 169:13
posited 267:12
position 428:5

438:20
positions 465:13
positive 87:21
149:22 150:8
183:2,15 184:1
184:6,14 186:1
189:13 193:9
193:16,19
194:6,7,14
195:11,16,18
198:1,3,4
220:23 259:9
260:10 270:16
285:11 313:3
324:3 370:12
370:13,14,16
370:23 371:12
371:24 372:2
372:12 381:14
420:15 484:10
497:15 499:6
possibility 93:9
93:13,16
possible 13:22
95:8 129:1
224:20 228:4
252:24 253:1
272:3 333:10
363:2 400:11
421:5,7,12
422:11,14
469:13
possibly 52:12
201:11 277:9
278:2 324:14
419:24 420:2
502:8
postmenopausal
383:16
potential 151:20
289:18 352:5
425:15 487:19
potentially
338:3 487:15
488:2 510:24
powder 1:5 7:12
8:12 11:11

13:2,11 16:13
16:15,21 22:3
22:8,12,20
23:1 27:8
28:23 29:6,9
29:13,19 30:5
31:17 32:15
33:1,6 34:21
35:12,23 36:19
37:11,23 38:18
44:15 56:24
84:12 96:9,10
96:22,24 97:24
98:5 99:8
103:18 108:18
108:24 109:4
109:13,22
113:17 115:6
120:9 124:9
145:3,7,14
154:16 170:7
174:2,14,22
175:1,6,9,15
224:20 245:17
248:2 252:9
253:18 254:5
267:4 272:4
276:10,14
280:16 310:1
310:21 311:12
316:4 336:13
336:18,22
337:14 344:11
345:19 346:15
347:4,15
353:16,23
367:15 376:5
378:11 380:3
384:22 391:4
394:3 404:6,16
408:6 409:20
422:2,20
423:14 427:17
442:7 447:20
447:23 478:10
478:12,17,22
479:3,5,22

Kevin Holcomb, M.D.

480:23 481:21 482:6,11,15 483:12 487:15 491:4,14,16 492:21 496:15 497:21 499:5 503:16 504:14 505:4 507:22 508:15 510:17 512:19 514:9 515:8,13
**powders** 84:7
**power** 318:21 329:23 330:18 348:9 502:17
**powered** 325:20
**powerful** 266:22 455:18
**practice** 12:16 12:17 25:23 35:3 78:19 153:16 263:7 283:20 284:21 288:18 304:2,9 306:5 307:2 352:10 427:2
**practices** 1:6 28:13 204:4
**practicing** 12:13 303:23
**pre-World** 63:9 69:9
**preambles** 402:24
**precancer** 451:12 452:1
**precancerous** 452:3
**preceded** 44:24 46:13
**precise** 357:3
**precisely** 379:8
**precursor** 449:12 451:13
**predefined** 197:24
**predominate**

250:2 261:1 355:2
**pregnancy** 487:9
**Prempro** 243:18 244:11,20
**preparation** 50:4 58:17 111:22 113:2 496:13
**prepare** 37:18 56:2,21 59:8
**prepared** 56:9 60:3
**preparing** 59:16 59:20
**Presbyterian** 301:6,17
**prescribe** 37:1 243:17,20
**presence** 132:7 132:18 170:8 393:10,14,17 393:19,22 394:19,24 400:21 432:1 435:13
**present** 4:8 170:12,21 184:23 224:17 256:21 273:17 448:18,21 450:11 451:10 475:19,21 507:13
**presentation** 24:19,20
**presentations** 22:24 23:19 24:22
**presented** 54:21 164:4 179:4 219:5 474:3
**pretty** 37:1 38:20 39:4 41:17,24 57:7 57:8 254:15

255:9 277:4 320:22 357:21 479:11
**prevalence** 248:1,7 260:13
**prevent** 37:4 455:19 456:8 456:10 459:18 460:18
**preventing** 444:10
**previous** 224:14
**previously** 417:6 428:15 492:19
**primarily** 307:5
**primary** 79:19 84:4,8
**Princeton** 3:13
**printed** 110:12
**printout** 302:16
**prior** 13:20 39:4 39:17 42:5 46:9 59:4 64:17 66:2 124:5,15,18 125:2 139:20 169:1 181:2 230:8 233:7 234:14 256:19 327:14 332:23 358:24 404:8 404:17 443:20 515:4
**private** 350:11 376:6 445:2
**privileges** 301:9 301:10,13,14 301:19
**probability** 272:20
**probable** 253:1 253:5,8
**probably** 13:18 25:10 36:15 38:4 39:13 59:22 106:20

122:20 140:19 151:4 159:6 248:11 270:21 319:23 332:18 427:7 430:4 495:17 513:4
**problem** 72:22 78:5 202:13 226:15,21,21 226:23 272:2 314:8 319:7,10 319:11 320:23 321:14 339:12 389:11 393:13 498:8
**problematic** 80:7
**problems** 91:14 198:17 309:15 309:19 313:15 319:16
**proceeded** 42:8
**proceeding** 102:19
**proceedings** 145:2
**process** 15:3 115:13 118:13 118:17 144:23 209:7
**processing** 400:2,7
**produce** 103:9 465:24
**produced** 51:11 51:18 55:21 57:14 58:19 103:1 107:10 107:18 118:10 154:7 186:14 318:10 463:24
**product** 99:9 101:7 118:12 144:15 251:3,4 266:3 267:5 296:10 310:1 316:4 367:15

391:4 394:4 408:6 480:14 481:6,22 483:17 484:1,4 484:5,13 497:15 498:15 501:12 502:10 502:13 505:15 506:13
**production** 10:8 110:9 121:1,6
**productions** 63:8
**products** 1:5,6 9:21 13:2 16:13,16,22 22:3,8,13,21 23:1 27:8 28:24 29:9,13 29:19 30:5 31:17 33:1,2,6 34:21 35:12,23 36:19 38:19 44:15 84:2,12 96:10,11,22,24 98:6 100:21,22 108:18,23,24 109:4,14,22 113:17 115:7 128:19 145:3,8 145:14 154:16 170:8 174:2,14 174:22 175:2,6 175:15 245:17 248:2 253:18 254:5 345:19 346:15 347:4 347:15 353:16 384:22 409:21 422:2,20 423:14 427:17 442:7 447:23 478:10,12,17 478:22 479:3,5 480:23 481:11 482:12,16 483:12,23

Kevin Holcomb, M.D.

484:18 485:2
491:4,14,16
492:21 495:22
496:4,15
497:10,17,21
498:2 499:6
500:10 503:16
504:3,15 505:4
507:22 508:15
510:17 512:19
514:9 515:9,14
**professional**
   1:16 242:18
507:8 509:19
517:13
**professor** 287:2
**prolonged**
   444:12
**promote** 173:13
**prone** 137:17
226:9,10
307:14
**pronounce**
   454:10
**pronouncing**
   322:23
**proof** 254:14
255:2,8,11
396:8,11,11
425:14 434:9
437:2 442:14
**proper** 66:4
192:20 346:12
**proposed**
   433:13,15
**propounded**
   520:9
**prospective** 8:6
100:9 101:1
228:21 229:3
256:17,17
360:21 379:4
380:2 381:21
382:7 493:12
**protecting**
   504:21
**protective**

154:24 354:3
442:18 446:5
**prove** 205:8
393:23 396:24
433:19 434:7
437:9 438:9
477:7
**proven** 174:19
369:13 445:17
456:15 513:3
**proves** 99:15
174:17 280:9
**provide** 103:12
123:14 143:23
144:1,12
146:14 171:6
171:17 173:24
174:7,12 220:8
231:1 235:5
293:22 367:14
432:18 433:10
433:14 504:3
**provided** 44:17
47:1,8 54:22
107:20 108:1
117:5,12 347:3
433:20 478:8
478:14,20,24
**provides** 177:16
393:5
**proving** 410:12
433:14
**pseudoscience**
   390:4 402:13
402:16,18
**PTI** 4:6,6
**public** 1:17
144:20 154:19
272:7 350:10
504:21 517:14
520:23
**publication**
   124:20 181:2,6
363:19,21
**publications**
   22:16,20 28:17
28:21 151:9

152:3,12
176:21 317:24
380:22 381:2,5
381:6,22
**publicity** 272:3
275:12 276:8
278:14 279:21
279:24
**publish** 144:5
281:9
**published** 22:7
22:12 44:17
46:24 105:21
115:10 153:1
180:11 184:24
200:5,7 240:3
241:5 247:7
249:14 254:3
287:3 298:15
299:9,12,18,22
300:4,9 363:23
382:13,17
394:2 444:3
459:5 470:5,19
490:21 493:10
494:3
**publishing**
   299:24
**PubMed** 119:22
120:3,23
151:10
**pull** 50:21 54:14
54:15 55:7,8
363:4 441:2
442:22 501:15
**pulled** 53:21
**pulling** 58:21
466:3 500:16
**Purdie** 7:23
232:1 233:12
333:13,16
334:2
**purists** 67:5
**purpose** 190:21
298:1
**purposes** 20:15
36:21 123:21

243:4 304:9,12
329:23
**pursuant** 1:13
**pursue** 210:4,4
**put** 27:11 81:17
102:1 187:13
221:15 222:16
225:19,23
239:8 285:8
290:10,12,15
290:17,20
291:1,17 303:7
303:8 314:6,16
321:20,23
390:16 406:11
436:24 438:19
438:19 445:22
445:23 499:15
502:9 503:14
**puts** 77:20
262:18
**putting** 194:3
231:22 295:11
319:16 336:12
500:15,19
501:6,17
**pyramid** 284:17

_____

**Q**

**Q-I-A-O** 454:11
**qualifications**
   21:24 69:1
**quality** 37:2
196:8 490:6
495:10
**queried** 367:1
**question** 15:21
16:7 21:11
23:18 24:4,15
26:17 30:13
31:10,14,19
32:1 34:20
35:9 36:5
41:13,19 42:6
42:17 44:3
45:17 46:14,15
46:18 58:3

61:9 63:20,24
64:2,24 66:20
67:16,22 70:8
71:22 75:23
76:8,15 77:22
80:10,17,21
81:18,22 82:4
86:2 91:21
98:4 101:12
105:2 124:14
131:15 136:5,6
139:10 159:16
159:20 163:18
164:13 167:8,9
167:14,17,23
168:2,4,18,21
169:4,14,22
170:2 171:3
175:10 182:14
189:24 190:13
190:17 191:2,5
191:6 197:1,7
210:2,3 212:15
213:12,15,18
218:18,21,23
227:19,22
228:7,9,14
232:18,23
237:16 246:16
250:15 253:24
257:4 290:5
296:7 300:8
308:19 314:12
316:19 328:5
330:11 332:21
354:6,16 357:3
365:2 367:6
371:22 376:4
384:18 387:13
393:16 401:15
401:22 411:2
412:24 413:1,8
413:15 415:1,3
418:17 419:1
422:7 423:21
431:3 442:19
454:5 456:24

Kevin Holcomb, M.D.

457:4,7,9
458:2,4,10
465:5 466:21
467:2,4,6
482:14 489:10
489:15 498:13
**questioning**
27:20 52:19
321:7 330:17
331:14
**questionnaire**
344:13 366:22
367:3
**questionnaires**
265:22
**questions** 10:14
16:2 26:11
57:3 139:7
159:14 162:11
167:11 169:1
169:12 173:22
199:9 206:1
216:15,21
258:14 298:6,7
298:10 307:17
328:3 342:6,7
353:13 354:13
366:18 384:16
458:16 465:14
478:7 515:23
520:8
**quicker** 72:5
**quickly** 106:3
159:6
**Quit** 215:16
**quite** 61:6
**quote** 195:23
329:7 439:2
**quoted** 493:5
**quoting** 60:23
329:8 382:8

— R —

**R** 2:8 519:1,1
**radiation**
335:16 337:21
**raise** 205:24

240:22
**random** 241:24
390:17
**randomized**
293:21 305:8
**range** 187:20
193:23 271:3
**ranks** 294:4
**rapidly** 293:9
**rappel@seyfa...**
3:19
**rare** 317:9
**rarely** 316:17
**rarer** 260:16
**rarity** 325:17
**Rasmussen**
446:20 447:8
**rat** 129:12
**rate** 60:9 112:4
113:5 115:24
272:18 320:12
**rates** 248:11
**ratio** 192:14,21
241:23 243:23
244:8,11,17,22
245:21 249:6
325:20 329:18
354:17 371:19
378:14 443:23
**ratios** 181:14
182:4 206:21
253:12 269:14
269:22 270:10
271:1 311:22
408:13
**rats** 130:9
**raw** 178:17,19
**reach** 91:9 130:3
189:15 194:15
197:24 198:2,8
260:17
**reached** 74:22
75:14,24 85:15
195:17
**reactive** 435:12
435:20
**read** 31:5 41:12

47:11,14 49:21
50:9,10,18,21
52:8 53:15,22
55:7,13,14
62:5,7 64:7,8
69:16 72:11
73:20 76:11,12
82:5 83:24
84:9,19 89:9
90:13 118:15
119:12 120:24
121:2 123:24
124:6,20 125:4
137:19 138:8
140:16 143:18
145:17,22,23
146:23 147:16
170:24 177:12
180:15 182:10
182:11 183:19
184:3 201:23
201:24 203:7,9
203:15,20
204:8 211:21
212:13 215:7
215:12 217:7
220:3 224:22
224:24 253:14
254:3 259:17
262:3 272:11
274:20 276:16
277:5 287:18
294:24 297:10
297:11,11,17
297:19 302:19
306:15 309:5
313:24 334:14
346:24 351:7,8
358:3,5,6,20
359:23 365:15
366:9 374:6,10
378:22,23
380:15 397:6
398:15 402:20
406:14 417:14
418:1 420:20
421:4 427:22

428:23 431:21
432:15,16
433:1 440:20
441:8 444:22
444:23 451:19
460:24 462:1
465:21 469:19
469:20 472:12
487:16 490:16
504:10 509:6
510:13 513:24
517:9 518:3
520:5
**reader** 160:1
**reading** 50:7
53:19 55:3,6
58:22 59:5
73:2 75:11
83:7 84:20
111:10 127:3
141:7,17 212:9
215:7 265:16
274:9,19 297:3
314:17 350:22
350:24 407:9
446:12
**reads** 45:17
64:23 87:14
181:12 217:2
224:12 256:13
271:22 293:8
302:22 334:4
446:15 487:1
503:24
**ready** 59:12
274:22
**real** 226:19
449:5
**realize** 48:11
**realized** 122:22
314:7
**really** 20:10
59:19 61:4
99:24 100:2
115:20 135:24
136:6 138:1
144:16 166:24

167:19 212:5
226:3 236:8
254:13 255:7
284:24,24
334:14 337:13
353:13 389:18
390:6,19
391:19 399:16
410:15 449:11
456:2 465:15
502:20
**Realtime** 1:17
517:14
**reason** 34:7,11
132:11 164:6
198:16 244:13
266:24 284:18
311:2 320:19
336:15 348:10
353:23 362:16
373:11 401:11
448:6 457:14
459:15,16
465:8,11
466:17 467:3
467:13 483:18
488:1 498:6
505:12 514:19
518:5 519:6,8
519:10,12,14
519:16,18,20
519:22,24
**reasonable**
90:12 158:9
334:12 426:4
**reasonably**
158:24 280:10
334:23
**reasoning**
164:10 258:8
**reasons** 99:13
216:9 269:23
423:2 460:8
**reassurance**
504:19
**REATH** 3:7
**recall** 86:24

196:11 198:21
198:21 199:1
226:10 251:22
252:5,11,16,21
253:20 254:6
254:22 256:8
256:13,20
257:3,8 258:3
259:6,20 260:3
260:14 261:5
262:1 263:10
263:20 264:18
267:1 268:10
271:23 272:13
272:15,16,21
273:8 274:5,11
274:24 276:11
277:1,7,10,12
277:22 278:10
280:12 314:18
346:21 347:5
407:12 428:1
460:2 502:8,8
**recalls** 497:8
**receipt** 518:17
**receive** 105:16
105:22 106:1
114:16
**received** 6:8
88:5,6 105:19
106:6 110:16
114:15 121:11
**rechurning**
225:14 227:10
229:9 230:3,8
230:23 232:9
232:12 233:6
493:19
**recognize** 331:6
**recognized**
295:4
**recognizing**
331:7
**recollection**
13:21 38:11
266:18
**recommend**

459:17 507:21
**recommendat...**
455:21
**recommendat...**
495:18
**recommended**
456:9
**recommending**
456:14
**record** 11:3,15
12:5 15:23
81:17 126:12
126:15 169:16
190:24 209:21
209:23 210:1,5
239:15,16,19
343:19,22
348:12,15
366:13 418:1
421:17,20
453:6,10,13
473:8,11,13,23
485:24 486:3,6
517:6
**redo** 70:8
**reduce** 447:12
449:8 453:17
**reduced** 455:5
**reduction**
349:12 386:22
386:23 443:21
448:2 454:18
455:7
**refer** 16:12
490:12
**reference** 47:18
49:12,15,24
50:3 51:1,10
51:15 52:23
53:7 54:16
55:20 56:3,14
57:12,14 58:19
69:21 105:5
117:3,21
119:13 121:2
124:2 131:13
139:17 142:1

142:12 143:2,6
146:3,14 152:4
172:5,10
313:17 347:18
348:4 424:19
**referenced**
49:23 50:11
53:13 155:14
156:24 471:13
**references**
107:19 116:12
116:14,15
119:17 162:17
172:5
**referencing**
243:6 449:23
**referral** 140:23
**referred** 247:1,2
463:15 464:7
**referring** 39:9
65:24 68:16,24
88:12 140:21
164:1 243:2
244:4 260:5
318:11 340:23
409:1,10
462:17 509:10
**reflect** 111:14
**reflected** 47:18
**refresh** 13:21
38:11
**refute** 292:4
**regard** 22:20
23:8,10,20
24:22 25:14,20
25:24 38:12
50:6 58:6 59:1
59:1,15 69:17
71:3 82:14
89:12,13,17
93:2 105:20
106:12 113:12
124:7 125:5
129:9 131:14
131:17 139:14
142:11,14
145:2 148:23

157:3 159:22
163:24 171:9
172:5 187:19
237:22 241:3,5
243:5 267:4,6
287:7,19,22
308:21 334:5
350:14,17
405:21 409:20
411:7 437:20
446:6 454:11
454:12 462:2
465:22 470:7
473:21 478:11
478:21 491:16
492:12 495:21
496:3,5 497:20
502:24 515:8
**regarding** 13:1
22:2,7,12,24
38:18 108:17
171:7,18 281:6
287:4 293:13
419:5,14 469:9
**regardless**
307:15
**region** 271:5
**registered** 1:16
366:1,2 517:13
**regression**
296:10,11
**regularly** 37:1
490:16
**regulations**
498:21 499:1
502:23
**regulatory**
36:21 502:16
502:22
**Reid** 88:19
**relate** 18:4
27:24 103:17
107:11
**related** 248:9
503:22
**relates** 1:8 89:19
305:19 306:1

**relating** 108:4,9
142:8 162:14
**relationship**
46:12 70:24
100:5 316:3
393:24
**relative** 192:10
192:15 193:2
245:21 253:13
269:14 317:11
317:15 318:1
348:1,22
353:15 370:5
371:8 375:17
385:21,23
387:23 472:23
474:11,20
**relatively** 351:2
**relevant** 152:6
152:15,19
154:12 224:19
**reliable** 177:3,7
177:11,16,22
178:11 188:16
246:4 294:1
308:8
**reliably** 77:16
**reliance** 45:2,18
204:5 388:24
441:1,15
**reliant** 392:11
**relied** 45:20
46:23 52:8
108:2 117:20
140:4 146:16
**relies** 360:10
**rely** 92:16
117:16 123:18
123:19 158:6
217:21 288:17
307:5 372:4
**relying** 333:17
**remember** 14:6
14:8 31:10
55:10 56:4
58:11 117:11
121:20 122:2

130:8 141:22
171:1 189:23
218:22 254:12
255:6 262:22
263:6 286:15
314:11 323:6,8
323:24 324:1
374:5 406:16
434:16 435:3,8
435:11 441:14
454:8 478:1
**remembering**
254:17 272:17
**remind** 136:16
**remove** 126:10
**render** 160:2
165:9
**rendering**
162:17 173:2
**RENÉE** 3:17
**repeat** 30:12
31:11 58:3
108:8 124:14
152:9 167:13
170:18 171:16
188:8 212:17
246:16 253:23
255:5 291:15
300:10 375:3
397:19 404:12
413:1,4 415:5
442:2 467:7
481:14 495:24
**Repeated**
382:22
**repeatedly**
48:13 49:2
91:14
**replacement**
205:18 242:21
243:9
**replicated**
161:18,21
**replication**
217:15,17
**reply** 372:13
**report** 6:10

16:18 49:13
50:9,12,19
51:5,6,16 53:1
53:20 57:13
79:5 82:3
86:21 87:3
100:24 101:2
103:24 104:2,6
104:11 105:6
108:6,10
110:14,20
111:21 115:1,6
115:10,15
117:4 118:6,14
119:3 120:12
121:7 124:5,19
125:3 126:19
127:5 134:8
135:22 137:15
137:20 139:21
140:10,15,17
143:12 147:1
148:2 150:22
155:14 157:1,7
159:24 160:17
161:3,10 162:4
166:1 171:1,7
171:17 180:3
184:23 186:4
186:11 187:17
205:16 242:21
243:5 245:11
250:6 251:24
259:14 273:4,6
273:13,18
274:4 276:19
281:2 286:6,8
292:5 303:7
308:23 309:4
352:3 353:8
355:5 356:11
356:17 357:8
357:22 359:13
374:12 375:5
384:9 390:23
390:24 391:3
391:10,20

405:23 406:12
407:5 411:16
433:5 453:2
454:24 457:18
457:21 458:21
459:3,22
**reported** 132:8
132:17 181:14
182:4 248:19
311:23 354:19
381:16 384:21
391:22 397:8
417:1 435:2
444:18
**reporter** 1:16,16
1:17 11:16
15:16 185:8
232:19 517:13
517:14,14,22
**reporting**
177:23 267:6
276:10 357:16
385:2 397:3,4
**reports** 8:6
49:21 50:7
52:2 53:12
54:5 58:14,22
59:5 105:18
111:6 118:3
119:19 121:3
124:1 139:15
143:19 504:1
**represent** 31:3
229:22 244:10
287:1 309:10
407:23 424:16
503:18
**Representing**
2:16 3:15,20
4:6
**reproduction**
517:20
**reproductive**
25:3 444:11
**request** 10:8
116:19
**requested**

478:23 517:7
**requesting**
331:14
**requires** 302:22
**requiring**
469:18
**requisite** 346:3
**research** 7:16
22:2 101:8
145:6,6,13
153:7,12,20
203:5 288:8
292:23 293:11
293:13,14
302:23 461:2
**researchers**
205:12
**resident** 461:4
**residents** 23:7
**resolved** 14:1
**respect** 214:3,9
236:10 242:11
242:17 263:15
352:22 489:2
494:8 495:5,15
**respected**
200:16,23
**respectively**
366:3
**Respiratory** 9:9
**respond** 139:8
168:1 328:4
**respondents**
376:7
**responding**
376:7 458:9
**response** 79:7
81:21 92:13
133:12 138:24
143:20 166:13
297:4 306:17
320:12 479:6
480:4 482:17
**responsive**
81:21 457:6
**rest** 314:16
434:15

**restrict** 64:6
89:24 137:6
156:21
**restricted** 68:19
95:12
**restricting**
66:22
**result** 154:23
203:3 204:4
347:3 360:20
**resulted** 276:9
476:14
**resulting** 174:15
**results** 18:15
101:10 116:3
179:18,19
203:22 204:2,3
205:15 215:19
217:16 267:7
274:6,11 275:1
288:21 291:3
298:21,22
307:22 310:5
322:18 357:9
358:13 360:13
367:14 383:20
384:15 407:6
408:5,6,21
409:10 410:8
410:16 416:23
442:24 444:2
469:13 475:22
**retained** 37:22
43:3 60:1
**Retire** 6:17
200:20
**retrograde**
173:13 432:6
436:20 437:6,9
437:16,24
438:6,16
**return** 518:15
**revealed** 26:20
**reversed** 357:15
358:9,17,18,23
359:19 360:14
379:16 380:8

Kevin Holcomb, M.D.

reverses 372:18
373:20 374:4
review 6:21 8:18
44:16 53:7,15
71:11 91:9,23
92:19,23 94:11
94:24 95:18
97:17,24
102:19,22
103:2,8 105:21
111:2,6,20
126:21 127:14
128:6 129:9
131:2,6,16
139:12,19
142:22 143:16
149:3 150:5
154:5,20
162:13,16
165:8,21 166:8
168:18 170:6
180:20 181:1,5
196:6 247:22
289:11 299:7
336:20 440:14
440:22 485:13
490:18 492:1
514:23
reviewed 6:8
15:3 46:7
51:14,24 52:1
52:8 53:3,10
54:10 56:17,19
56:22 57:7
58:17 91:12,13
92:8,22,22
105:4 106:13
110:17,19
115:17 117:16
117:22 131:12
133:1,21
136:23 142:12
143:8,11,15
144:3,17
146:16 148:22
155:24 167:22
219:4,9,17

223:14 227:2
248:6 255:20
271:7 285:24
299:16 382:13
382:17,20
383:6 388:19
403:12 437:19
470:18 481:13
483:16 484:7
508:23 511:12
reviewer 176:21
178:6,14 179:2
180:21 181:3
reviewing 58:13
115:17,21
119:18 161:19
162:9 178:23
284:5
reviews 304:5
304:21 305:1
307:11 491:12
revisit 66:24
RICHARD 3:12
richard.heasli...
3:14
rid 219:19,23
220:1
ridiculous 396:2
right 15:1,6 16:9
21:2,20 22:9
29:1 30:5 33:2
33:6,23 34:2
34:10,12,13,15
34:16 37:13
42:24 43:2
45:14 47:5
52:10 64:20
68:7 69:4,18
73:22 74:15
80:22 82:12,18
83:10,13 86:17
88:1,3,9 96:17
97:1 98:7
102:5 109:23
112:7 124:10
127:6 134:18
135:1,9,13

136:11 139:9
139:22 141:23
142:9 145:8
150:22 153:16
154:2,3 157:22
161:18,22
168:24 176:18
176:23 186:14
186:19,22
187:22 192:11
193:6,6,7,9,17
198:7 201:15
202:5,6 203:19
206:15,18,19
207:11,17,19
207:20 208:20
209:11 213:13
215:2 229:24
239:15 241:20
245:17 247:9
249:1,4 255:20
265:2 271:8
275:5,6 276:3
279:12 281:7
287:12 294:14
295:9 298:11
298:14 299:18
300:6 301:5
303:19 305:2,3
305:5,14,21
309:4,20 310:2
313:19 315:22
316:20,21
319:6 322:5,11
322:15 325:5
329:20 331:10
332:15 333:6
334:18,22
343:4,5,6,11
344:13 346:10
347:2,13 348:2
348:6 350:8
351:22 355:8
360:4 363:12
365:18 368:6
368:12 374:10
376:14,15,18

376:20 378:5
379:1 380:16
380:22 381:2
382:14 383:17
384:17,18,22
387:2,8 390:22
395:11 400:2
402:9 404:24
405:3 412:3,20
415:9,10 416:5
416:6,9 417:11
418:12 420:10
423:16 424:6
425:9 426:14
426:16,17,21
428:7 430:16
431:22 436:9
443:6,14,23
444:6 445:1,9
445:15 446:13
449:23 452:16
466:10,14
467:10 468:22
473:4,6,10
474:5,12
476:11,22
477:18 478:3
481:8 483:10
486:19 487:5
488:4 490:23
494:22 497:3
502:19 505:5
507:3,6 508:12
515:19
right-hand
87:13 182:20
215:15 217:10
271:18 275:16
351:1 377:4,5
377:21 378:5
risk 6:23 7:7,10
7:21 8:9,12,15
9:13 13:2
17:10,14 23:4
23:10,11,20,23
24:7,9,22
25:14,24 26:9

28:1 34:8
63:14 65:9
67:8 69:12,24
70:10,19 74:24
78:15 88:24
89:4 90:14
94:12,14 95:15
98:17 124:10
149:8 174:23
175:11 183:3,5
183:16,18,18
187:20,22
188:18,21
189:18 192:15
193:2,22 196:9
196:17 197:3
197:18 198:20
203:24 205:3
206:10 210:18
210:23 226:5
226:14,22
229:15 243:5,8
243:11 244:21
245:5,15,19,21
246:4,13,19
247:10,10,20
249:6 252:9,15
252:19,22
253:14 254:5,8
260:19,23
261:9 269:3,14
272:22 273:10
309:24 310:1
310:10,15,20
311:1,9,11,19
312:11,12 315:8
316:4 317:11
317:15 318:1
319:23 324:10
324:15,18
328:22 330:4
338:5 339:11
342:4 343:7
348:1,5,22
349:3,9,10,12
349:13,14,16
353:15 355:6

Kevin Holcomb, M.D.

356:9,19
357:24 360:23
363:2 370:5
371:4,8 373:6
373:23 376:23
378:13,17
380:3 382:8,9
386:23,24
405:9,11,15
419:6,18
443:22 444:20
446:17 447:12
448:2 449:9
452:14,20
454:18 455:14
455:24 456:16
457:12 459:8
469:13 470:7
472:23 474:11
474:20 479:15
479:19 484:14
485:9 487:6,20
493:15 498:17
507:12 514:2,5
**risk/benefit**
33:22 34:4,6
**risks** 75:15 76:2
85:16 192:11
243:23 253:13
**robbed** 395:21
**ROBINSON** 2:3
**robotic** 14:19
**robust** 231:2
**Roggli** 468:24
**role** 39:9 98:14
157:20 181:3
196:11 277:3
**room** 15:12
**ROS** 125:5
435:4
**Rothman** 7:17
199:21 286:21
287:8 288:7
292:16,24
294:2 298:14
**roughly** 113:20
**routes** 84:8

**routine** 27:20
**routinely** 279:9
**Royston** 4:6
**rubric** 36:20,24
**rule** 320:16
**ruled** 94:17
272:18
**rules** 236:11
285:2

---
**S**

**S** 5:10 6:2 7:2
8:2 9:2
**S-T-R-A-U-S**
303:4
**Saed** 124:7
139:20 140:24
162:16 165:24
432:17 433:2
434:13 492:16
**Saed's** 124:20
125:4 140:12
493:4 495:11
**Saenz** 54:20
146:9 147:2,19
461:1
**Saenz's** 55:3,6
111:11 142:23
143:8,14
**Saez** 163:19
**safe** 226:17
239:8 479:5
480:3,24
481:17 482:3
482:14 483:7
484:1 499:21
500:12 505:2
508:15 510:3
514:8,15,20
**safer** 506:3
**safety** 196:14
205:19 427:4
428:11 504:22
506:20 510:17
**sake** 352:13,23
481:14
**SALES** 1:6

**sample** 317:22
328:20 375:14
**samples** 478:11
497:15
**San** 2:9
**sand** 87:6,8
**Sander** 199:18
201:5 287:9
**sanitary** 354:1
**saved** 106:17
**saw** 72:15
135:21 144:15
149:4 238:10
260:22 314:5
364:17
**saying** 50:17,18
53:16 56:5
62:11 66:14,19
76:17 79:24
86:4,9,10
91:15 92:6
98:19,22 100:4
100:10 106:23
127:12,13
129:24 131:1
134:1 144:14
165:19 177:21
178:16 183:6
184:5 185:17
189:17 194:1,5
195:7 197:15
205:1,2 230:5
230:12 231:12
232:13,14
233:8 257:20
257:24 259:20
276:21,22,23
277:1,3,5,11
277:13,16
278:2,10,11
294:14,16,22
296:1,8 299:6
299:15,17
311:2 312:24
313:7,8,10
314:14 315:1
327:11 329:9

330:22,24
337:2 339:23
340:4 341:21
361:1 362:12
363:1 375:12
387:19 392:21
395:3,12,19
399:3,8,9
413:5 418:3,8
422:14,15
425:21 426:2
437:5 438:24
451:24 455:1
458:20 460:11
460:13,22
474:16 476:2,4
477:13 489:21
493:18 496:15
503:15 505:2
508:1,7 509:2
510:7 511:2,8
512:11,12,15
513:16,22
**says** 36:10 68:12
72:13 74:6,16
74:21 75:20,21
75:23 76:18,23
77:1,20 82:6,8
82:11 83:16
84:1,2 85:14
88:4 90:13
127:7 133:20
147:1,9,15,17
158:10 182:1
183:22 184:6
184:13 196:5
202:13 203:17
236:17 237:6
247:19 253:11
259:2,4 267:18
271:20 275:21
277:17,20
290:12 292:4
319:12 321:1
321:19 322:12
322:14 323:15
329:5,5 331:1

336:1,1 338:24
351:16 359:18
365:21 373:21
379:3 399:4,5
416:15,22
421:12 425:10
437:10 444:7
457:21 469:7
471:5 473:3
476:13 488:20
498:22 502:12
503:21 508:10
510:22 511:5
511:12 513:23
**scenario** 330:16
493:24
**scenarios** 275:2
**Schildkraut**
7:15 254:14
255:8 261:15
264:22 268:3
273:22 275:3,8
275:14 278:19
280:14 314:19
**Schildkraut's**
264:20 268:5
268:12
**school** 301:11
350:10,12
372:7
**school's** 301:12
**schooling** 445:2
**science** 57:2,5
57:17 58:5,24
59:1 153:12
205:11 217:21
398:9 400:16
461:2
**Sciences** 446:19
**scientific** 104:21
111:3,4 115:11
156:2,13
157:10,14,16
157:20 217:22
293:8 341:18
428:10,20
430:8 504:8

scientist 178:19
scientists 67:6
  154:19
screen 73:19
  256:1,2
screening 6:19
  142:13 220:11
scrub 450:10
se 264:7,7
Seaport 3:4
search 120:2,5
  120:21 282:13
  282:18,24
  283:3 286:12
  288:4 362:15
searched 282:10
searches 119:22
  119:22,23
  120:19
seats 73:19
second 141:12
  141:16 164:8
  192:24 213:15
  213:18 232:24
  269:19 274:18
  287:9 334:9
  354:20 367:19
  370:10 374:24
  384:3 409:17
  417:14 425:2
  425:11,12
  443:18 473:5
  475:6
Second-to-last
  476:12
section 84:24
  134:9 159:24
  160:11,13,15
  160:17,23
  161:20 162:4
  163:4 172:11
  172:21 189:8
  202:12 374:7
  429:8 431:14
sections 450:11
see 31:13,22

42:17 53:8
54:12 74:6,18
75:7,11 85:9
94:19 99:11
116:4,5 121:14
127:11 129:11
132:15 134:22
137:14 149:15
150:2 151:2,3
153:17,17
161:11 180:18
181:20 182:17
185:22 200:19
201:2,5,8,12
201:14 204:6
210:15 214:8
214:22 215:24
216:10 219:22
226:13 229:16
232:1,2,3
236:6 250:18
256:9,11
258:23 259:1
259:21 261:13
264:8 269:11
269:24 271:19
275:8,19 280:1
287:8 288:15
290:7 293:4,6
294:7 303:6
308:22 309:13
313:16 318:16
318:23 319:14
323:3,7 325:6
325:8 333:17
333:19 334:15
335:14 336:21
350:6 355:15
357:11 358:21
362:4,13
365:21 367:24
373:10 378:4
381:9,24 384:2
389:2 397:23
398:8 403:8
407:15 408:11
408:15 415:17

415:24 416:9
416:20 425:6
428:17 429:1
436:5 439:1
442:23 445:21
446:14 449:21
450:5 451:3
460:20 461:7
461:10 469:1
471:24 472:14
476:19 480:17
488:18 491:20
497:2,5,7,11
497:13 498:20
503:9,10,15
508:20 511:1,6
511:22
seeing 127:9
  323:6 449:24
  450:20 451:2
seeking 154:11
  361:24
seen 19:8 46:8
  128:24 132:10
  180:17 197:16
  247:15 248:23
  260:15 263:17
  292:24 318:8
  359:15 394:1
  411:22 422:8
  423:8,10,24
  424:3,5,7
  440:17,19,23
  448:7,22,23
  449:1,12,14
  450:15,17,19
  451:17 452:2
  454:9,15 463:1
  463:4 470:17
  470:23 486:17
  492:1
segment 215:12
selection 361:5,9
selective 126:21
  127:14 131:1,3
  131:4
selectively

136:23
seminar 201:18
Senate 154:11
send 208:20,21
sends 198:22
  499:18
sensational
  490:8
sense 185:19
  226:3 270:24
  371:15 395:23
  461:19 500:5,6
sent 106:24
sentence 181:10
  275:17 310:17
  378:8 476:13
separate 204:15
  222:14 301:7
  381:12
separated
  186:13 264:22
  488:1
separately
  222:14 322:1
serious 203:24
seriously 321:3
serous 8:21
  21:16,19
  249:20 256:22
  259:10 260:12
  260:24 311:1
  353:16 354:17
  354:22 355:10
  356:19 357:9
  357:24 370:7
  372:11 378:13
  378:18,20
  409:5,6,21
  410:19 448:19
  449:13 451:14
  461:13 476:17
served 176:20
services 1:20
  11:5 111:17
serving 515:13
set 108:5 288:20
  401:5

sets 350:3
setting 15:12
  64:3 68:19
  71:2 77:13,15
  492:3
settings 63:4
  64:5,9 68:20
  70:21 71:3
  80:1 86:7
  88:23 89:5
  90:3,5 101:23
seven 270:22
SEYFARTH
  3:17
SGO 507:3,14
  507:19 508:7,9
  509:19 510:4,6
  510:14,20
  511:1,20 512:2
  512:12,18,24
  513:18,23
shaded 186:17
  186:22,24
  187:2,3 189:20
shakes 389:17
share 322:17,20
  322:21 504:7
Sharko 3:8 31:1
  31:6 57:21
  58:1 66:6
  71:16,19 73:12
  73:18,23 76:19
  80:16 81:5
  163:20 168:24
  169:3,18,19
  170:3 190:9
  191:2 207:23
  208:10,15,18
  209:1,11,14,17
  209:24 213:16
  213:19,24
  214:2,10 357:4
  377:22 378:2
  414:24 458:12
  468:10,13
  473:13
SHAW 3:17

Kevin Holcomb, M.D.

she'll 169:5
sheet 518:7,9,12
   518:15 520:12
short 126:13
   343:20 351:2
   352:16 421:18
   486:4
shortcomings
   398:18
shortened 272:5
Shorthand 1:16
   517:13
shortly 270:18
show 55:12,13
   77:14,23 82:13
   89:5 90:6
   128:10 129:14
   130:12 131:9
   132:12 149:2
   150:13 180:1
   183:2,3,4,15
   183:17 189:2
   191:11,15,21
   191:23 192:2
   199:12 204:4
   205:12 221:3
   222:11 233:14
   243:8 245:18
   260:18 261:12
   262:16 269:17
   280:2,3 287:5
   310:5 333:16
   339:18 346:19
   347:8 362:3
   365:11 408:5
   421:4,11
   445:23 447:11
   455:1,7,13
   457:12 459:8
   462:11,14
   463:8 470:13
   472:8,16 474:3
   479:17,19
showed 70:18
   130:3 149:22
   150:4 151:24
   203:23 282:5

320:12,13
339:9 355:6
356:18 392:9
433:16 443:21
453:16
Shower 16:15
   16:16,21,22
   97:20,20
showing 21:8
   65:17 66:1
   88:7 89:3
   127:23 128:8
   134:2 164:10
   187:7 188:18
   204:3 207:9,10
   210:21 238:15
   273:18 339:16
   410:11 424:9
   425:24 426:7
   427:9 451:20
   455:4 461:10
   479:13 484:11
shown 64:5 90:3
   100:6 130:17
   158:2,4 222:15
   229:14 438:14
   439:3 456:2
   465:1 470:11
shows 22:6
   98:17 129:1
   133:6 149:8
   210:20 261:17
   344:23 363:1
   384:20 393:3
Shukla 139:13
   162:16 163:19
   165:23
side 81:7,9
   110:13 215:15
   378:6 506:20
sides 110:12
   198:20 455:10
sign 517:9 518:8
signatories
   201:9 203:12
signature
   451:15

signatures
   448:24
signed 115:2
   214:19 338:14
   340:8 352:18
significance
   6:17 150:15
   188:3,14,17,20
   188:22 189:3
   191:12,16,24
   192:2 194:16
   195:17 198:8
   199:13 200:21
   204:6,19
   210:20,22
   214:17 215:20
   217:20 218:1,9
   218:13,16
   219:24 220:2
   236:3,6 287:11
   298:20 311:5
   477:9
significant
   150:1 183:3,8
   183:9,16 187:6
   189:11,18
   195:2 203:3
   204:16,17,23
   210:11 216:4,5
   220:23 238:16
   241:22 243:8
   254:16 255:9
   272:22 280:15
   296:12,17,18
   298:22 317:15
   323:23 370:15
   370:17 371:1
   371:10,20
   374:15 375:9
   386:21 420:15
   433:21 443:21
   443:23 472:23
   474:12 475:21
   476:15
signing 124:5,18
   125:2 139:20
   165:24 352:20

518:10
silence 169:21
similar 66:21
   226:14 230:21
   238:3 256:21
   257:7 294:22
   410:16,24
   411:6 420:1
   501:20 502:3
Similarly 500:8
simple 136:6
   166:16 190:16
   259:5 299:19
simplex 120:14
simply 82:4
single 55:14
   110:11 128:12
   243:1 250:20
   250:24 309:11
   312:13 313:16
   329:12 426:7
   439:1
sir 147:10
sister 311:7
sit 119:2 229:17
   472:6
site 281:19,19
   507:14
situation 64:1
   67:11 78:2
   90:15 128:13
   262:11 331:21
   356:5 392:13
   394:17 396:2
   482:21 483:9
   493:7 495:1
   502:6,11
situations 61:19
   63:11 67:10
   69:15 77:17
   90:10 100:7,12
   326:22 333:4
   335:15,18
   337:3 442:16
   456:7
six 7:16 75:16
   76:2 85:17

292:22 293:14
338:2 345:1,4
471:19
size 182:24
   183:14 185:22
   205:5 290:7,15
   290:15 313:23
   314:2,8,9
   317:16 318:17
   318:22,24
   375:15,18
sizes 205:2
   317:22 328:20
slides 450:1,13
   450:16
slowly 293:11
small 133:1,21
   134:1,4,5
   182:24 183:13
   204:24 205:1,5
   226:14 314:4
   314:10 317:16
   317:24 330:4
   375:18 420:14
   431:7,12 472:3
smaller 260:17
   386:9
Smith 156:18
   157:5 292:4
smoke 342:16
   342:24 343:1
smoking 306:20
   342:5,15
   487:11
snapshot 450:24
snide 214:7,11
Society 176:18
   507:5
sold 496:4
somebody 78:21
   149:16 250:21
   267:17 336:12
   338:17 339:4
   340:5 361:24
   369:14 373:13
   403:5 511:10
someone's 132:7

Kevin Holcomb, M.D.

someplace 430:1
something's 300:4
somewhat 248:8 284:20
sorry 14:7,9 30:22 38:7 40:11 72:19 75:1 82:16 92:10 124:13 124:24 125:16 136:2 142:20 151:14 175:9 180:9 181:15 192:23,24,24 218:20 220:1 224:13 237:14 237:17 255:22 261:7 269:4,5 269:14 274:8 274:14 275:23 280:22 283:6,7 293:19 308:18 310:18 322:23 325:9 327:20 328:1 329:5 334:6,13 344:7 345:2 347:21 348:8 350:19 350:21 354:20 364:9,10 366:8 367:20 370:10 374:18 377:7 377:13 383:18 403:16 415:19 415:21 425:1,7 426:18 429:18 430:1,13 443:1 445:7 446:24 462:8 465:12 470:1 489:12
sort 34:14 66:13 98:10 352:6 374:13 449:4 477:15
sound 358:23
source 140:13

141:10 177:3 259:7 260:4 290:24 291:9 291:12,13,21 291:23 292:2
sources 84:4 278:12
South 4:3
space 518:6
speak 67:12,12 70:23 81:12 209:3
speaker 201:19
speaking 21:14 65:20 211:18 408:22 457:14 457:20 463:16 490:4,6
special 268:4
specialist 42:10 91:5
species 435:12 435:20
specific 21:13 31:22 32:9,20 37:6 53:24 58:7,11 61:18 63:10 64:9 67:4,10 69:14 70:20 71:3 94:5 160:23 168:13 283:23 413:15 428:22 432:10 440:10 440:21
specifically 59:11 93:15 111:8 152:2 160:12 164:2 171:9,20 191:8 247:23 278:21 308:24 316:2,8 490:5
Specificity 429:22
specifics 252:5
specify 243:2

speculate 413:6
speculating 412:18 414:17
speculation 413:5
speed 463:11
spend 164:17 403:10
spent 61:6 137:9 361:4 409:13
sperm 173:13
spirit 233:22
split 266:14 273:18 279:6 310:24 392:18 476:5
split-off 475:1
splitting 324:1 474:24
spoke 410:2
spoken 147:23
spontaneous 469:12
Sprague 130:9
spurious 116:3 196:10 205:9 274:6,11 275:1 320:2 360:20
SR 304:20
stage 466:14 467:9,19
Stand 343:18 348:11 516:3
standard 495:10
stands 507:5
start 21:7 25:18 87:13 110:13 120:21 183:11 244:6 325:11 326:1,4 336:24 337:1 338:12 369:18,23 487:3
started 84:20 113:3 115:16 119:2 166:22 194:24 299:5

338:15 339:1 340:7,13,18,19 341:24 342:14 342:21 352:17 370:3 383:23 400:20 405:3 502:21
starting 428:17
starts 266:13 340:11 341:22 403:5
state 12:4 95:7 126:18 140:10 145:2 161:3 172:15 182:7 190:23 267:3 334:10 350:17 351:2 357:8,13 357:23 358:9 376:21 403:1 436:10 492:9 518:5
stated 46:15 191:7 275:11 288:3 307:10 357:21 358:2 413:13 445:5 457:18
statement 23:22 49:16,20 80:12 93:21,22 99:23 133:20 140:14 140:22 141:11 149:6 161:6 182:13 184:4 185:17 195:20 197:17 199:7 212:18 225:10 247:13,14 249:10 255:5 260:3 266:22 267:21 277:11 285:18 286:4 291:7,22 292:12,13 295:2 299:6 318:4 330:14

335:12,22 356:24 371:14 374:21 375:3 379:24 380:18 396:3 404:13 425:22 430:21 435:11 437:14 502:21 511:4 511:14,17 513:19
statements 88:17 138:10 158:6 162:8 181:8 182:17 217:15 297:7 325:22 326:11 328:7 394:11 402:23 423:22 495:20 496:3
States 1:1 29:18 30:4 32:13 145:1 154:11 240:13,16 248:1 249:1
stating 100:3 201:17 261:5 394:5
statistical 6:17 18:5,7,15 150:15 188:3 188:14,17,19 188:22 189:3 191:11,16,24 192:2 194:16 195:17 198:8 199:12 200:21 202:3 204:5 210:20,21 214:17 215:18 215:19,20 217:19,23 218:1 219:24 220:2 269:7,8 287:11 298:19 298:21 477:9
statistically 150:1 187:6

Kevin Holcomb, M.D.

Page 568

201:21 203:3
203:22 204:16
210:10,11
216:4 220:22
241:22 272:22
280:15 296:12
296:17 309:24
370:15,17
371:9,20
374:14 375:9
386:21 420:15
433:20 443:22
472:22 474:12
475:21 476:14
**statistics** 193:15
194:3 219:19
219:23 283:19
284:10,13
286:14
**stay** 28:24
**steady** 328:14
328:15
**stenographic**
11:15
**step** 479:7
**Stephanie** 487:2
**stepping** 66:22
**Steven** 180:13
426:19,24
428:9
**STIC** 448:19,23
451:11
**stick** 245:12
330:13
**stimulate**
293:12
**Stipulations**
10:11
**stop** 9:20 163:12
202:14 205:22
208:8 209:2
283:17 458:14
465:19 497:9
498:22 499:15
499:16,19
501:7 502:1,10
502:13 509:21

510:5 512:15
512:19 513:1
**stopped** 300:14
345:18
**stopping** 37:6
**store** 498:9
**stores** 498:9
**story** 185:7
239:2 484:8
**strange** 410:6
**strangely**
353:22
**Straus** 7:20
303:4
**Street** 2:14 3:13
3:18
**strength** 164:7
246:14,18
268:19 307:23
408:23 409:11
429:10
**strengthened**
361:21
**strengthening**
361:17
**strengths**
115:22 282:2
284:22
**stress** 480:18
**stretch** 369:10
369:17
**strict** 285:1
**strike** 43:18
55:4 67:19
76:17 80:15
144:9 157:2
158:22 163:16
191:21 206:5
212:20 213:17
241:18 287:20
336:15 356:14
418:22 423:9
430:24 446:8
447:21 450:18
456:19 459:20
**strong** 89:3
116:1 285:6

425:22 453:24
456:8
**stronger** 205:8
229:14 484:11
**strongest** 249:21
259:10 260:11
**strongly** 87:21
**struck** 423:20
**struggles** 339:23
**stuck** 300:11
**students** 23:6,6
**studied** 77:12
100:13 253:17
322:11 481:11
**studies** 18:6
31:20 44:17
46:24 47:17,19
48:2,24 50:10
58:7,11,16
67:4 76:6
78:10,14 87:22
88:6,21 89:3,4
90:6 91:16,18
93:14 94:8,19
95:13 98:16
100:9,20,24
105:5 106:6
111:3 115:18
115:24 116:2
121:4 126:23
127:14,17,23
128:8 129:2,8
129:13,20
130:6 131:8,14
132:3,15,23
135:15 136:7
136:12,23
137:9,14,22
148:22 149:11
149:12,15,21
150:6,14
153:16,18,19
164:1,3 165:21
168:11,12
170:14,22
182:6,23
183:12,23

186:17 187:1,2
187:19 188:3
188:14,16
189:1,2,22
191:10,15,20
191:23 192:10
192:16 193:5
198:18 199:12
203:2 205:22
207:8 210:10
211:9 217:17
220:21 221:15
222:5,6,11,16
222:18 225:23
226:4,20
227:14 228:2
229:3,12,14
230:1,6,18,22
231:10,11,13
231:16,21,24
233:11,13
234:3,11,12,14
234:15 235:2,5
235:16,20
236:14 237:3,4
238:3,12,12,15
240:2,4,7,8
241:11 243:7
245:18 247:7
248:6 249:20
252:8,15,17,21
254:3 255:13
256:15 257:6
259:2,4 261:9
265:16,21
266:14 268:11
269:11 270:2
270:16 271:3
272:1,23 274:7
274:12 275:1
282:9,20,21
283:4 290:6,8
290:17,20
291:1,17,24
293:23,24
294:4,5,12,12
304:1 305:10

306:22 307:4
307:12,15
308:8,9,22
309:16,23
310:4,5,6,14
310:19 311:3
311:15,16,17
312:11,13,19
313:2,4,5
314:5,15,17,22
315:4,7,11,24
316:2 318:18
319:1,21
320:23 322:9
324:4,9 325:2
325:16,19
329:2,4,16
330:1 339:16
340:16 355:6
355:16 359:22
360:2 361:6
362:14 380:6
380:10,24
381:6,12,16,19
390:7 392:23
395:6 405:21
406:4 410:4,4
410:9,14,24
411:5 424:9
425:23 438:9
438:23 440:6
440:17,19
446:3 452:13
453:20,21
455:3,6 457:12
459:5 461:10
470:13,18
474:17 479:13
479:16,19
484:9,11 490:7
493:13 506:11
506:12 509:9
**study** 6:15 7:14
8:6 20:13
31:22 53:13,15
53:19 77:13
86:4 90:13

Kevin Holcomb, M.D.

91:2 118:15
126:21 128:12
128:24 129:24
130:1,16,19
131:7 132:5
134:16,16,19
134:20 135:1,2
135:8,12,23
136:11 147:23
151:17 161:20
167:22 168:19
170:13,21
172:10 177:3
179:22,24
180:13 184:9
184:18 189:13
189:17 190:19
193:18,20
194:6,14 195:9
195:11,16,18
196:8,9 197:22
197:23,23
198:1,3,6,12
201:1,3,6
207:10 210:17
212:16,21
215:1 219:3
220:7,18 223:2
226:8 236:18
238:6 240:4
241:7,12,16,21
248:18 254:12
255:7 256:6,17
256:18 257:5
261:3,12,13,16
262:2 264:1,20
267:3 268:5,7
268:12 273:6,7
273:14,14
277:12 282:2
283:21 285:6,8
285:11 286:1
287:6 289:5
293:21 300:16
301:24 302:5
308:1,10,12,15
308:16 310:22

311:7,8 312:5
313:11,21
315:12,13
316:12,16,18
317:8,10,16,24
319:6 320:1,12
321:5,12 322:9
323:2,5 329:12
329:19,20,20
329:24 330:3
330:24 333:13
333:16 334:2
337:13 338:1
338:13 340:12
341:3 344:2,9
344:10 345:19
346:3 350:1,6
351:10,14,22
351:24 352:6
353:7,22
354:19 355:22
356:18 357:16
358:1,9,10,16
358:19,21,23
358:24 359:16
359:19,20
360:3,7,10,10
360:12,22
361:14,18
362:21 363:22
364:4 365:6,7
365:22,23
366:13,18
367:10 368:14
368:21,22
369:3,20 370:2
371:18,21
372:4,12,18
373:6,10 374:1
374:9,9 375:6
375:15,18,19
375:23 376:3
376:22 377:6
377:20 378:9
379:1,4,7,10
379:11,17
380:2,21,22

381:4,5,21,21
382:4,7,13,21
383:13,15,15
383:24 384:9
384:21 385:18
387:2 388:3,9
388:12,18,19
388:23 394:2
395:13 397:2
397:21 401:4,5
401:23 403:13
403:14,17
404:1 405:10
405:13,18
406:12 408:10
408:11,12,12
410:7,14
411:10,13,16
411:18,19,21
412:10,20
413:17 414:5
414:10 423:8
423:10 424:5,7
426:7 427:9,14
428:18 431:16
433:20 434:6
435:24 437:2,8
439:1,7,18,19
440:6,13,21
443:2 445:4,13
445:13,21
446:23 448:11
453:1 454:11
454:16,16
465:22 467:23
472:19 476:10
488:14 489:20
**study's** 344:16
**studying** 254:4
  394:3 396:4
**stuff** 107:8
  390:10 482:24
  498:18 506:8
**subgroup**
  249:18 387:14
**subject** 107:15
  116:2 211:10

252:4 257:2
  518:10
**subjected** 269:8
  410:14
**subjective**
  263:24
**subjects** 289:14
**submitted**
  176:21 178:15
**submitting**
  178:18
**Subscribed**
  520:19
**subsequent**
  224:16 225:12
  227:23 228:24
  229:2 233:5
**subset** 310:23
**substance** 19:10
  97:9,11 485:9
  485:11 520:11
**subsumed**
  450:23
**Subtype** 8:10
**sudden** 262:20
  263:5,8 280:6
**sued** 13:13,24
**sufficiency**
  246:3
**sufficient** 93:18
  247:11 313:23
  325:14 329:17
  330:2 336:21
  479:21
**sufficiently**
  325:19
**suggest** 31:20
  149:24 276:8
  300:3 397:12
  397:22 398:6
  398:16 399:2
  400:13 420:14
  422:12 450:20
  479:22
**suggested**
  256:24 352:8
  445:8,8

**suggesting**
  133:2,22
  187:21 257:6,8
  299:24 399:7
  405:18 422:16
  423:24 484:9
  502:5 508:3
**suggestion**
  169:16 398:9
  445:16 476:18
  476:22,24
  477:3,13
**suggests** 326:5
  405:10,13
**Suite** 2:9 3:13
  4:4
**summaries**
  305:7
**supervision**
  517:22
**supplemental**
  6:7 49:15
  51:10,17 53:1
  54:4 55:20
  56:3,14 57:13
  110:16,19
  116:14 117:5
  121:1,7,10
  124:2 146:20
  155:15 459:22
  463:22
**support** 10:2
  88:6 89:8
  140:5 150:13
  194:19 199:11
  231:2 268:18
  276:11 277:21
  292:13 307:6
  309:23 310:9
  310:14,20
  311:9,11,24
  312:12 412:9
  433:22 437:11
  441:21 446:16
  448:1 455:18
  460:14 502:14
**supported** 61:4

Kevin Holcomb, M.D.

| | | | | |
|---|---|---|---|---|
| 89:2 91:16 | 471:22 472:24 | **T-A-H-E-R** | 342:2 343:16 | 249:5 250:5 |
| **supporting** | 474:14 475:7 | 223:17 | 355:18 357:11 | 254:17 256:15 |
| 124:8 438:23 | 483:10 485:6 | **table** 6:15 148:3 | 376:17 389:17 | 256:22 257:1 |
| **supports** 66:14 | 490:4 493:8 | 148:6,7,8,18 | 389:18 421:13 | 265:10,23 |
| 194:13 360:22 | 496:1 498:5 | 148:21 150:12 | 449:18 450:15 | 266:10,18 |
| 432:7 437:7 | 501:2 506:6 | 186:4 187:9,14 | 453:8 455:23 | 278:14 307:20 |
| **supposed** 54:13 | 507:17 508:9 | 190:18 192:9 | 456:1 485:20 | 311:24 330:12 |
| 54:13 89:9 | 511:19 515:22 | 204:11 219:6 | **taken** 1:13 15:6 | 331:16,18 |
| 504:21,23 | **surely** 360:12 | 240:3 269:13 | 45:13 196:21 | 339:5,24 340:7 |
| **supposition** | **surface** 123:5,11 | 344:23 347:5,9 | 249:10 326:23 | 340:18,19 |
| 97:15 98:23 | 398:19 399:18 | 347:9 350:3,6 | 375:22 444:15 | 341:7,14,23 |
| 99:6 | 399:22 | 363:3 367:22 | **takes** 26:22 | 344:24 347:10 |
| **sure** 24:17 29:4 | **surgeries** 400:9 | 384:20 415:20 | 226:22 369:16 | 347:14,14 |
| 29:22 30:14 | **surgery** 14:19 | 471:18,18,21 | **talc** 6:13,23 7:6 | 348:20,21 |
| 31:13,24 33:17 | 450:8 | 471:24 472:12 | 7:10 8:7,14,17 | 351:19 352:18 |
| 33:21 35:9 | **surgical** 400:8 | 473:3 474:3 | 9:10,13,22 | 352:19 357:17 |
| 38:24 40:10 | **surprise** 226:3 | 475:15,19 | 16:19 23:8,14 | 366:19,20 |
| 57:24 59:17 | **surprised** | **tables** 324:7 | 23:23 24:21 | 367:2,6 368:1 |
| 66:8 71:15 | 226:12 236:5 | **Taher** 6:24 | 30:9,16 32:4 | 368:21 369:18 |
| 72:24 79:16 | **surprising** 183:1 | 145:17 146:2 | 34:21 43:3,14 | 370:3,6 374:16 |
| 85:8 99:13 | 183:14 225:13 | 147:23 171:10 | 44:3,23 46:12 | 383:24 384:7 |
| 108:9 124:17 | 232:5 250:1 | 171:21 223:14 | 56:23 75:17 | 389:24 390:20 |
| 125:12,18 | 260:20 311:21 | 223:17,18 | 82:23 83:23 | 391:5,12 393:4 |
| 127:2 132:1,9 | **surprisingly** | 224:3 231:20 | 84:4,22,24 | 394:4 396:1,6 |
| 136:4 144:4 | 311:13 | 234:6,7 259:11 | 85:20,22 86:16 | 396:12,20 |
| 147:16 173:19 | **surrounding** | 261:21 321:10 | 89:18 95:1 | 398:20 400:22 |
| 188:10 193:3 | 468:20 | 323:21,23 | 96:2,6 97:18 | 404:4 405:3 |
| 195:21 216:23 | **Susan** 3:8 80:23 | 324:5,6 325:7 | 97:19 98:20,24 | 416:5 417:1,2 |
| 222:1 235:3 | 125:21 208:7 | 329:4 362:20 | 100:18,21 | 419:6,14,18 |
| 236:19 239:13 | 458:18 | 363:5 382:19 | 102:2,4 109:1 | 420:17 422:2 |
| 246:17 254:2 | **susan.sharko...** | 409:22 420:13 | 116:9 120:7,8 | 423:13 425:14 |
| 258:16 267:13 | 3:10 | 432:14 442:23 | 122:11 123:6 | 425:24 430:18 |
| 280:24 281:20 | **sworn** 11:20 | 492:15 | 125:5 128:10 | 431:17 432:1,9 |
| 304:20 309:6,8 | 517:5 520:19 | **Taher's** 227:7 | 129:15 130:2,7 | 432:12,19 |
| 317:1,6 318:7 | **system** 173:11 | 230:14 | 130:17 131:18 | 433:11 435:5 |
| 320:18 324:23 | 487:13 | **take** 26:4,13 | 132:7,9,18 | 435:14 436:13 |
| 328:14 333:18 | **systematic** 8:18 | 27:6 34:20 | 134:3,10,20,21 | 436:14,21 |
| 335:22 349:8 | 94:10,13 | 37:16 40:18 | 138:1,5,10 | 437:3 438:6 |
| 349:16 360:9 | 289:11 304:5 | 79:23 97:14 | 142:8,14 149:9 | 439:4,6,15,22 |
| 365:19 377:1 | 304:21 305:1 | 125:19,24 | 153:4 165:2,22 | 440:8,18 441:6 |
| 387:23 390:14 | **systematically** | 126:5 138:4,13 | 170:9 175:19 | 441:21 442:14 |
| 399:15 406:20 | 94:6 | 168:5 179:24 | 176:7 180:12 | 444:11,12 |
| 409:19 412:16 | **Systemic** 6:21 | 202:22 221:14 | 182:2,8 189:19 | 445:11,14,22 |
| 413:3,7 420:8 | | 223:22 225:22 | 220:24 228:20 | 445:23 446:6 |
| 421:6 422:6,10 | **T** | 226:4 234:21 | 237:22 241:6 | 447:19 448:10 |
| 438:7 441:10 | **T** 5:10 6:2 7:2 | 263:9 269:21 | 245:6 246:15 | 448:15 450:22 |
| 442:5 452:23 | 8:2 9:2 519:1 | 295:2 321:3 | 246:20 248:15 | 464:17,24 |

Kevin Holcomb, M.D.

465:23 466:5,9
467:23 469:9
469:15 470:7
472:21 474:4
475:20 476:16
478:18 482:13
482:16,23
483:13,24
484:24 485:12
487:20 496:5
503:8,15,20,22
505:2,11
507:12,19
508:4,11
509:21 510:5
510:15 512:13
512:15 513:2
**talcum** 1:5
11:11 13:1,10
16:12 22:3,7
22:12,20 23:1
27:8 28:23
29:5,9,13,18
30:5 31:16
33:1,5 34:21
35:12,23 36:13
36:19 37:11,23
38:18 44:15
84:7,12 96:9
96:10,22,23
98:5 103:18
108:17,24
109:4,13,22
113:17 115:6
124:9 145:3,7
145:14 154:15
170:7 174:2,14
174:22 175:1,6
175:9,15
224:20 245:16
248:2 252:9
253:18 254:4
267:4 309:24
310:20 311:11
316:3 336:13
336:18,22
337:14 344:11

345:18 346:14
347:3 353:16
353:23 367:15
384:21 391:3
394:3 404:6,16
408:5 409:20
422:20 423:13
427:17 442:7
447:20,23
478:10,11,16
478:22 479:2,5
479:22 480:23
481:21 482:11
482:15 483:12
487:15 491:3
491:13,16
492:20 496:15
497:21 499:5
503:16 504:14
505:4 507:22
508:14 510:17
512:19 514:9
515:8,13
**talk** 21:23 92:11
173:18 198:20
202:3 235:1
308:23 309:1,3
309:14,18
323:2 337:12
363:13 383:12
390:10 406:18
409:17 410:2
440:4 452:10
**talked** 88:14
346:23 414:22
**talking** 15:18
81:6,9 82:23
82:24 83:8
85:3,4,5,7,8
86:22 135:19
139:3 167:18
206:7,10
208:14 221:10
231:15,17
242:24,24
272:12 309:12
313:4 329:15

329:19,23,24
340:9 353:21
361:4 363:3
380:14,24
381:13 395:4
400:21 409:14
430:4 456:22
458:8 465:20
478:5 505:18
**tasked** 92:18
**taught** 284:11
294:19
**teach** 306:7,8
**teaching** 288:7
**team** 153:20
**TECHNICIAN**
4:9
**teeth** 250:20
**tell** 15:7 35:22
68:22 79:1
118:16 132:3
140:20 141:1
148:17 212:9
234:8 292:12
295:19 297:5
315:11 342:7
359:21 368:22
405:14 407:8
421:1,2 451:17
455:22,23
478:4 479:10
479:20 484:7
498:23 500:23
501:24 506:17
**telling** 51:13
70:14 166:21
231:19 362:24
482:4 490:24
509:4 512:14
513:1
**ten** 361:16
364:17 368:15
373:2 385:2
387:20 389:6
472:21,22
474:11,18,19
474:24 475:2,2

475:12,13
**tend** 179:3 250:4
**term** 33:16 39:8
149:16 177:10
177:11 197:19
255:2 269:1,6
269:7 296:9
303:19 359:6,9
359:23 371:22
375:11 407:12
475:11
**terms** 120:6
362:16
**Terry** 135:12
409:7,7
**test** 79:17
236:13 269:9
477:8 497:15
499:6 504:8
**testified** 11:21
12:24 13:5,9
13:19 47:23
93:4 96:16
332:22 333:7
354:23 386:13
**testify** 39:3
61:21 145:1
346:11
**testifying** 15:10
42:16 88:1
346:21
**testimony** 5:4
39:17 42:11
45:24 46:10
52:23 59:24
62:14 64:18,20
65:14 66:1,2
71:24 82:7,14
104:9 130:14
165:5 283:5
372:23 450:17
478:21 509:20
515:4 517:6
**testing** 170:7
478:9,16,22
498:2 499:4
**tests** 18:16

**text** 286:14
287:7,14,21
**textbooks** 287:3
**thank** 12:19
14:21 24:16
28:16 47:22
52:19 56:20
58:1 70:6
71:15 80:13
81:23 85:11
86:19 96:4
102:10 114:19
119:11 133:19
141:9 162:6
170:3 180:23
184:22 199:9
200:18 213:19
220:13 223:13
239:24 241:1
283:7 296:6
315:23 368:8
430:12 440:3
465:15 472:17
515:21
**thanks** 59:13
283:8 298:13
470:2
**theme** 66:24
**theories** 57:5
59:2
**theory** 433:13
433:16 445:18
**therapy** 205:18
242:22
**thing** 26:19 73:9
83:7 122:19
130:5 137:23
184:16 218:16
227:15 236:24
237:1 260:9
263:12 264:5
277:5 294:20
319:12,18
323:1 328:17
338:22 339:20
361:10 373:12
388:17 449:6

Kevin Holcomb, M.D.

Page 572

461:18 464:1
474:13 479:18
506:3
**things** 20:16
36:23 66:15
77:11 98:11
137:11 157:22
189:21 205:19
237:4 251:18
251:19,22
276:24 277:4
277:10 278:3,8
284:4 285:5
290:11 295:7
314:18 315:2,3
315:23 320:3
323:13 324:7
326:12 332:12
342:20 388:20
399:7 402:20
402:21 437:1
449:20 463:11
495:8 499:18
499:23
**think** 16:4 19:6
20:18 21:5
24:15 26:19
27:22 31:19
33:15 34:3
38:5,8,13
42:14 46:6
53:18,23 63:11
63:23 65:19
66:6,24 68:10
68:16 69:6,23
70:9,16 77:6,8
78:3,4 80:6,24
81:1 82:7 83:3
83:10 100:2
110:9 129:20
135:24 137:21
138:4,7 140:18
149:9 151:10
156:13 158:5
164:20 168:14
177:9,17 184:4
190:2,20 192:9

194:20 196:13
198:17 206:2
213:21 215:21
221:9 223:8,9
248:8 249:9
250:16,23
251:17 252:3
252:14,23
254:20 262:7
262:17 263:18
263:18 264:4
264:19 265:8
266:11,13,21
274:16 282:17
283:19 286:9
290:19 291:16
292:1 297:6
307:16 319:20
319:22 323:20
335:8 338:8,23
353:3 356:10
360:21 364:24
369:9,15
370:12,16
371:13 372:15
375:16 379:22
380:23 382:3,5
382:5,11 388:8
393:2,21
394:18 396:10
397:7 398:6,11
402:22 408:23
409:7 429:16
435:1 449:19
458:6 462:12
464:10 465:9
470:4 473:14
473:15 475:5
476:5 477:2
480:16 485:21
498:5,10
499:20 500:4
501:18 502:7
505:23 506:1,3
514:19
**thinking** 27:18
293:12 360:13

493:9
**thinks** 229:16
399:22
**third** 258:24
462:20,23,24
**thirty** 518:16
**THOMPSON**
2:13
**thorough** 27:1
90:18
**thought** 27:20
30:24 31:4
44:1 78:21
116:1 125:17
138:18 144:15
282:5 283:24
285:16 294:14
294:17 314:22
320:4 328:13
354:10 371:16
371:24 404:20
414:9,11
416:13 465:12
501:12
**thousands** 506:9
**three** 13:18
73:18 81:9
87:7 93:14
131:14 229:3
233:10 290:16
296:9 305:7
311:17 318:17
328:2 329:1
352:19 389:17
410:4 417:6
453:20 464:7
493:12
**threshold**
202:17
**thresholds**
204:5
**throw** 40:16
232:8,10 233:4
236:14 294:23
**throwing** 235:22
**time** 11:7 12:24
14:22,24 19:24

21:9 35:4 44:6
48:21 60:1,23
61:6 69:11
79:12,15,22
125:21 126:10
126:15 137:10
164:3,17
171:16 181:3,3
195:22 201:18
202:22 212:7
217:24 228:9
229:16 239:11
239:15,19
248:17 254:12
262:14,20
264:11,13,24
266:8 268:20
269:3,18,21
270:11,19
286:2 289:17
295:6 316:16
319:4 326:8,9
336:6 338:19
339:2 343:18
343:22 344:12
345:3 348:11
348:15 352:24
353:2 361:4,19
364:16 366:9
366:12 381:17
403:10 409:14
419:13 421:3
421:11,16,16
421:20 431:5,7
431:12 433:4
450:24 452:1
453:9,12
462:20,23
463:1 473:10
473:23 474:16
481:14 486:2,6
493:10,24
494:3 506:8,15
516:5
**times** 13:17,20
16:3 50:18
66:20 67:15

233:22,24
289:15 345:4
471:13 502:17
**tissue** 123:7
389:14 390:9
390:21 391:19
393:4 398:21
399:17 431:19
449:22 462:3
465:2
**title** 74:11,11
121:19 200:20
203:17 467:22
487:1
**titled** 71:10
110:14 134:9
180:12 292:22
302:17 488:16
503:7
**today** 11:12
12:20 16:13
37:16 46:1,10
49:4 59:12
60:21 61:12
62:12,21 65:15
65:21 67:1
69:3 76:20
77:9 102:20
112:21 113:3
113:16 123:16
151:7 342:24
371:7,17
463:24 464:12
471:13 492:12
496:13
**today's** 11:6
56:21 59:8,16
60:3 102:19
113:2 114:16
516:4
**told** 91:14 118:2
260:7 371:8,16
389:15 402:22
495:9 501:21
505:11 510:16
**toothpaste**
250:21

Kevin Holcomb, M.D.

top 74:13 141:21
196:1 270:23
304:4,18
319:17 334:20
350:24 357:14
430:4 441:15
469:23 497:7
topic 60:24 62:6
62:7 92:20
128:7 152:20
206:17 209:22
224:10 253:17
262:13 264:9,9
325:1 389:21
459:6
total 113:14
368:16 386:2
417:1
totality 48:18
49:4,10 54:22
114:14 116:8
137:6 162:9,14
289:7 307:11
336:20 352:7
402:19 481:12
481:21 483:16
484:6,12
511:22
totally 94:17
208:8 390:17
tough 176:12
493:6
TPP 8:20,21
Trabert 454:15
tract 173:11
423:1 427:6
437:20,24
438:15 444:11
445:15 448:9
train 328:13
trained 284:3,8
transcript 5:14
5:17,19 39:24
40:22 41:11
45:10,12 65:18
68:15 517:9,19
518:17,19

transcription
520:7
transcripts 54:6
transform 19:11
transformation
451:1
transformed
433:17
translocate
422:2,20
423:14 438:7
translocation
429:8 436:21
transport 432:7
437:9,16
transports
437:6
travel 438:15
travels 134:22
treat 206:12
213:22
treated 469:15
treatise 194:13
194:17
treatment 13:15
14:14
trend 268:19,23
269:2,6
trial 13:6,10
37:19 116:16
228:21 453:20
trials 101:2
293:22 305:9
tried 115:24
204:15 263:11
trouble 75:6
215:17
true 13:3,4
14:16 17:1
22:5,10,11,14
22:18,22 23:24
24:23 33:3
36:22,23 37:14
44:13,22 49:16
49:19 50:9
59:6 60:7,11
88:2 102:6

111:24 124:22
125:7 140:7,8
161:6 171:5,15
193:22 221:16
237:23 257:23
309:17 312:18
315:14,19,20
316:1,14,15
317:11 332:24
341:7 343:7,14
344:14 349:10
349:14,15,19
352:3,4 355:11
360:6 364:8
367:16,18
371:4 383:10
388:23 413:12
413:15 429:6
432:4 439:24
440:1 443:10
458:18,18
464:14 487:21
517:6
trust 179:3,9,14
179:19 386:24
trusting 178:22
truth 15:7
154:14 238:23
361:24 399:10
509:4 511:21
try 15:21 122:9
122:23 212:7
274:23 295:6
297:22 353:12
trying 14:6
46:19 68:17,22
69:2 70:16
95:7,7 123:10
140:18 159:4
274:14 295:13
297:24 313:3
328:3,13
338:20 340:12
400:17 417:9
418:3 438:11
460:9,10 463:8
463:9 472:24

tubal 441:23
442:8,16 443:5
444:8,19 446:5
tube 452:8
tubes 422:4,21
423:15 438:17
441:22 443:21
tubular 448:19
TUCKER 4:2
tumor 390:21
448:22 450:12
450:23
tumors 409:2
461:12
turn 41:11 64:22
72:3 84:23
87:2,5 111:13
116:11 133:15
134:7 135:7
186:3 202:19
256:5 258:22
271:14 273:21
275:13 281:2
334:3 359:8
367:21 407:3
420:9 424:22
430:3,12
443:17 446:10
458:22 471:14
471:15 482:8
486:19
turning 85:12
216:24 217:9
224:9,10
384:19
TV 264:12
twice 139:1
175:10 250:20
251:1 356:11
two 48:11 73:15
79:2 89:4
94:18 118:21
122:24 140:19
192:10 193:6
201:20 203:2
296:10 301:1
305:7 320:10

321:5 322:9
328:6 332:12
355:16 364:21
366:4 373:6
380:6,9,22
381:1,5,6,6,18
381:22 391:11
407:13 445:13
449:19 455:2
457:24,24
470:19 471:5
474:20,24
475:4,12 476:6
489:23
two-sided 343:3
tying 98:10
Tylenol 456:1,2
type 6:15 21:21
28:1,12 56:6
244:3 249:19
250:2 259:10
259:13,14
260:12,14,23
261:1 272:13
272:15 308:13
353:20 354:8
354:24 355:2
408:11 461:12
461:14
types 42:13 74:8
75:16 76:3
85:17 94:18
259:16,22
282:2 324:18
typically 15:2
18:3 118:20
222:8 262:3

U

U.S 365:24,24
366:2
umbrella 21:17
un-peer-revie...
443:8,12
unable 361:14
unartful 16:2
unclear 85:5

Kevin Holcomb, M.D.

underlying 50:10
understand 15:8 15:13 16:1,14 24:18 29:8,12 29:17 30:2,6 37:15,20 52:6 52:10 54:17 69:3 85:24 86:14,16 90:11 94:18 101:3 103:5 105:2 107:4,9 140:10 144:19 146:13 154:10,18 155:1,6,17 161:16,22 167:10 173:19 195:3,13 197:7 209:2 215:6 234:19 250:14 251:6,13 252:19 258:19 279:11 295:1 297:24 298:11 298:12 301:21 324:8 365:4,14 401:19 418:8 418:11 436:24 473:1 475:16 494:22 502:18
understanding 38:20 41:16,24 42:7,12 43:8 43:10,19 46:18 91:6 92:15 178:21,24 251:17 314:1 345:5 366:24 422:7
understood 16:7 190:12
underwear 336:13
unethical 439:7
unexposed 397:13 398:22

unfortunately 179:8 388:16 471:16
unimpressive 460:23
uninformed 156:13
Union 4:6
unique 303:1
United 1:1 29:17 30:4 32:13 145:1 154:11 240:13,15 248:1 249:1
universe 45:20 46:22 47:19 49:7
unnatural 438:22
unpublished 443:7,11,15 446:2
unreliable 188:1 188:12 191:16 191:24 252:8
unusually 335:2 335:8
unwarranted 217:13
update 149:13 150:24
usage 266:18
use 6:23 7:9,12 8:7,12,14,17 9:13 16:18 30:9 33:5 35:23 37:8 44:3 53:21 56:24 75:8 101:4 124:9 128:19 132:8 149:16 157:10 165:2 177:10 177:11 179:13 188:19 205:19 207:15 236:19 242:21 243:16

248:2,8 250:5 250:6,24 256:22 257:1,9 258:4 259:6 267:5 272:4 276:10,14 280:16 316:4 333:20 339:19 344:17,17,24 345:10 347:3 347:10,14,20 347:22 348:20 348:21 351:20 353:16,21,23 354:7 359:6,12 360:3 361:22 366:19 367:2 367:14 368:1 369:18 370:3,6 374:15 376:9 376:13,18 378:11,19 380:3 389:5,16 413:11 416:5 417:1,3,4,21 418:19 425:8 448:9 453:16 453:23 454:2 454:17 455:19 455:22 456:9 456:15 459:17 459:17 464:9 469:9 472:21 474:4,19,19 475:20 476:16 479:5 480:2 481:1,18 482:3 482:14 487:15 498:24 500:12 507:21 510:3
users 374:17 405:7
uses 29:5 225:17 248:14 480:8
usually 222:8 335:9 444:9
utility 287:20,22

289:19 290:3 292:8

vacuum 375:23
vagina 128:15 130:12 425:17 438:16
vaginal 151:19
valid 178:9 179:16,22,24 236:15 368:9,9 368:13 371:1 372:4 373:12
validity 293:22 387:13
Valley 7:7
value 196:10
values 303:1 320:2
vanity 299:23
variety 274:7,12 275:2 316:13
vary 259:13
venued 14:10
verdict 266:10 515:6
version 148:11 185:10 472:7,9
versus 34:8 202:4 257:1,9 259:6 267:23 269:10 276:12 276:13 277:23 368:2 371:12
vicinity 408:14
victim 336:11 353:5
Victor 468:24
videographer 11:2,4 126:9 126:14 239:14 239:18 343:17 343:21 348:7 348:14 421:15 421:19 453:9 453:12 469:22

470:2 473:9,22 486:1,5 516:2
VIDEOTAPE 4:9
videotaped 1:13 6:6 11:8
view 164:5
violation 154:24
virus 120:15
vitro 153:15,18
voice 57:22 240:22
voicing 411:9
Volume 5:23 71:10
vulva 128:9

W 4:3
Wacker 4:3
wait 15:22 465:14
waiting 15:21 169:23
want 15:18 16:3 16:9 24:17 47:11,14 72:24 76:7 81:16 84:17 92:12 125:23 126:4 129:16,19 141:18 162:11 168:8 211:21 211:24 212:9 216:17,22 218:10 219:18 219:23 220:1 222:1 258:13 258:18 274:20 297:11 320:18 328:14 334:14 337:14 354:14 380:7 390:18 396:22 400:13 401:21 402:19 422:6 453:1 467:7 471:23

Kevin Holcomb, M.D.

472:12 474:15
479:2 480:7
482:10 483:5
483:10 489:16
491:11 494:6
495:2 503:5
507:18 513:24
**wanted** 82:13
125:18 149:2
149:14 150:2,9
152:17 169:15
342:3,5 413:4
**wants** 73:13
250:22
**War** 63:9 69:8,9
69:9
**warning** 244:21
499:15,19
500:1,9,11,16
500:19,24
501:3,14,17
502:2,13,18
509:8
**Washington**
3:18
**wasn't** 25:17
31:24 36:3
58:21 80:17
88:11 122:24
125:11 144:22
197:1 227:21
245:1 260:8
261:13 288:14
291:7 314:5
330:23 353:11
371:20 379:7
393:15 408:22
409:10 412:24
434:18 465:5
478:24 510:10
**waste** 203:4
**wasted** 431:6
**watch** 361:11
403:2 472:2
**water** 196:5
**way** 14:1 23:15
25:8 39:12

72:6 101:13
163:6 178:5
193:1 215:22
215:23 233:10
270:20 283:7
284:8 317:4
330:5 376:11
390:15 395:8
395:24 413:3
435:24 445:22
460:10 506:16
**ways** 226:17
284:23 455:12
457:11 458:22
458:24 459:7
459:16 471:2
509:12
**we'll** 87:2,13,13
110:13 123:19
125:14 141:13
208:20,21
209:22 210:4,4
244:6 254:24
324:22 328:4
328:18 366:13
400:24 401:1
403:4,7 418:10
436:4
**we're** 16:11
37:16 43:15
65:20 66:24
76:20 77:8
84:18 98:10
99:12 125:12
139:4 168:6
169:10 189:11
189:12 206:7
206:10 209:21
243:1 270:17
311:2 321:22
324:21 334:16
360:8 363:6,7
389:18 390:3
396:4 397:10
409:16 458:6,7
511:13 515:24
**we've** 15:3 68:23

81:13 102:17
117:22 125:20
139:21 169:8
379:5 392:14
405:20 406:7,8
411:22 428:15
463:24 495:7
506:9
**weak** 165:7
222:10 247:3
476:14 479:14
484:9
**weakened**
390:12
**weaker** 479:13
479:16 484:8
502:5
**weakly** 479:16
**weakness**
164:15 352:21
360:7 381:24
392:5
**weaknesses** 80:3
164:21 283:21
308:2,11
390:11 391:18
392:21,22
470:10
**web** 306:3
**website** 9:22
283:10,11,23
302:16 303:10
306:4,15 497:3
503:7,14,19
507:15
**week** 81:1,1
111:12,12
143:17 345:1,3
345:4 368:2,2
370:7 373:5,14
**weeks** 140:19
**Wehner** 134:12
**weigh** 158:24
311:18
**Weil** 1:14 3:12
**Weill** 7:18 12:17
301:2,20,23

302:5,16
**welcome** 169:13
**well-designed**
306:10
**well-known**
262:21
**went** 53:21 57:8
75:6 80:23
314:19 350:10
350:11 352:1
356:9 369:19
373:23 395:19
435:13,18
454:7 457:23
458:22 461:9
498:3
**weren't** 42:23
409:3
**West** 2:8
**WHI** 311:8
374:9 375:15
383:15
**whichever** 21:13
**white** 270:9
**wide** 316:13
386:12,15,19
387:2
**widely** 196:3
262:16 263:3,4
263:5,8,24
265:4,8 282:1
287:6,16
**wider** 386:9
**widespread**
122:21 272:2,7
278:13 279:21
**Wilson** 462:1,10
462:18 463:18
**wish** 285:23
**withdraw**
159:19 199:6
358:7 384:18
415:6
**withdrawn**
169:1,13
**witness** 10:5
17:1,14 18:3

18:13 19:3,21
20:21 24:3
26:4 27:4,15
28:5 29:4,22
32:8,19 33:9
33:15 35:2,17
36:3 38:24
39:7 40:10
42:5 43:24
44:21 46:4
48:8 49:19
50:16 51:4,21
53:6 55:24
58:2,10 60:7
60:18 62:2,19
63:2,23 70:14
72:23 74:3
77:6 79:8
89:23 90:24
92:2,14 95:6
95:21 96:14
98:9 99:22
101:22 103:21
104:15 105:1
106:10 108:14
109:9,17
113:24 116:23
117:9 118:1,20
119:7 121:13
122:8,18
124:13 125:11
126:2,6 127:11
127:22 130:22
132:1 133:13
136:15 137:4
140:1 141:18
142:5,18 143:5
146:8 147:13
150:19 152:9
153:10 155:4
156:5,16
157:19 159:3
160:22 161:9
163:2,14,24
166:4,11,14
168:16 170:18
172:9,19 173:6

173:16 174:6
175:23 176:11
177:6,20 179:7
185:4 191:1
192:5 193:14
195:7 196:20
197:6 198:15
203:15 207:3
208:9 211:7,17
213:7 215:11
216:8 218:6
219:12 221:23
223:6 230:12
231:6 232:21
234:18 235:9
235:15 237:17
238:2,22
241:15 242:4
242:15 244:3
244:16 245:10
245:24 246:9
246:24 248:5
249:9,24
251:16 252:14
253:4,23
254:11 257:14
257:23 260:2
262:10 265:7
267:10 268:15
273:2 276:4
277:20 278:18
279:4 282:13
286:18 288:2
289:1,23 291:6
295:19 296:4
296:24 299:2
300:20 302:3
304:16 305:24
307:9 312:4,17
316:8,24
317:20 318:7
319:10 327:15
330:9 331:13
333:3 338:8
340:22 341:10
343:14 344:21
346:7,18 349:7

349:22 350:21
355:14 356:22
358:13 359:12
360:18 362:12
364:14 365:1
366:8 369:9
370:20 372:22
375:22 377:9
379:22 381:9
383:1 385:8,21
386:8 387:17
388:8,16 391:9
393:9 394:10
394:16 395:17
397:17 398:5
399:21 400:5
401:11 402:12
406:3 410:23
412:15,23
419:23 423:19
427:21 432:23
433:8 434:3,21
435:8 436:18
438:4 439:13
440:13 441:13
442:2,12 447:6
448:5 451:7
452:23 453:14
454:23 458:15
458:19 460:5
462:7,15
464:22 469:4
470:17 472:10
476:1 477:22
478:21 480:7
481:4 482:20
484:21 485:6
487:24 489:11
491:7,19 493:2
494:13 496:9
496:18 498:1
499:10 500:4
500:15,23
501:10 504:18
506:23 508:1
508:18 510:20
512:5,24

513:14 514:12
514:18 515:22
517:5,6,8
518:1
**Wolf** 156:18
157:5
**woman** 243:18
352:17 389:7
389:16 439:14
456:5 498:16
**woman's** 174:3
338:18 438:1
438:15
**women** 28:23
29:8,13,17
30:8,15 31:15
32:3,12 33:5
63:7 87:22
88:7,23 151:20
152:1 226:8,11
243:15 245:2
248:19 250:4
311:4 318:16
320:7,9 326:12
330:16 338:2
339:9 340:13
340:18 341:6
345:18,23
351:19 356:6
364:2,4,10,12
364:15 365:5,6
365:24 368:15
368:20 369:4
369:18,23
370:2,6 373:4
373:7,22 382:9
383:16,23
384:7,11,20,24
385:2,11,12,18
386:1,2 387:3
387:4,9,11,12
387:20 390:16
390:23,24
391:3,10,20
397:3,8 404:2
404:3,5 405:3
439:3 443:19

455:24
**women's** 352:11
**wonder** 132:21
166:24
**wondering**
94:10
**word** 16:19
24:21 119:12
171:6,18
179:11,13,14
183:7 255:10
309:11 335:9
406:16 425:4
433:19 477:4
508:5
**wording** 508:6
**words** 21:19
53:21 134:20
240:9 262:2
360:11 407:13
413:24 450:23
455:13 476:22
**work** 44:7,9
103:17 107:12
112:2 113:1,8
113:12,16
140:12 141:5
142:8 153:23
154:1 288:7
300:23,24
301:1,12 389:2
389:3 391:2
460:17,18
461:17,17
490:18 504:6
504:22 515:3,8
**worked** 118:21
**working** 87:15
87:17 93:7
272:5 369:14
492:11
**works** 155:7
502:23
**world** 69:8,9
483:8 494:10
**worried** 204:23
513:19

**worry** 361:3
506:16
**worth** 382:10
**worthwhile**
288:22 289:2
300:5 414:10
**wouldn't** 36:4
132:22 173:9
177:11 219:20
226:8,12 236:9
330:6,13
386:24 388:13
401:4 402:17
412:19 439:8
439:18 495:17
501:14,24
506:16 509:18
**Wright** 9:18
488:24 489:21
490:4
**write** 118:16
119:3 215:17
295:6 411:9
**writing** 77:20
118:22
**written** 22:24
118:8 426:15
426:18,19,21
426:23 488:23
**wrong** 83:11
157:22 158:1
205:14 217:2
275:23 309:13
322:16 386:19
426:6 427:11
**wrote** 185:8
194:23 213:8
**Wu** 232:2,3
416:11,14,15
416:22,23,24
417:3,5,14,18
417:19 418:4,5
418:15,18,19

| X |
|---|
| **X** 5:2,10 6:2 7:2 |
| 8:2 9:2 |

Kevin Holcomb, M.D.

**Y**

**yeah** 24:13
35:17 72:10
73:3 83:17,22
114:5 126:6
127:16 129:10
133:13 141:19
186:16 193:4
207:7 208:18
219:20 229:22
240:20,24
251:9 256:12
261:7 264:14
299:19 321:1
328:12 329:22
333:6 337:19
340:14 349:12
377:4,9 385:15
385:17 393:12
399:6 404:4
416:3 418:11
454:6 472:1,5
475:18 476:20
499:16 507:16
510:12
**year** 6:15 363:23
376:9 389:7
488:21 489:6
489:22
**years** 47:12
78:19 206:17
228:23 229:2
327:5,8 332:19
332:20,21
333:8,14 336:5
337:24 338:2,4
339:5,8 340:6
340:14 350:2,8
350:13 351:6
352:15,17,19
355:17,20
356:1,6 361:16
364:17 368:15
368:16 369:2
369:19 373:3,6
376:10,10,11

384:8,12 385:2
387:20 389:6
404:23 448:15
451:2 461:5
466:15 467:12
467:20 472:21
472:22 474:11
474:18,19
475:12,13
**years'** 339:10
**yeast** 36:11,14
**yesterday** 81:8
81:12 112:21
112:22
**York** 1:14,15
11:10,10 14:11
301:6,17
**younger** 364:3
364:11,18
365:6 367:5

**Z**

**zero** 198:22
202:21
**Zervomanola...**
437:19
**ZIP** 107:6

**0**

**0.05** 202:18
**0.09** 347:24
**0.84** 370:8
**0.86** 347:16
348:23
**000489048-54**
9:7
**02210** 3:4
**07932** 3:9
**08542** 3:13

**1**

**1** 6:15 39:19
40:7,21 74:16
82:5 96:6,11
96:17,24 97:5
97:12 98:7
99:1,19 111:8

148:3,6,7,8,18
148:21 150:12
186:4 190:18
192:9 204:11
219:6 240:3
269:13 281:1
328:5 347:19
461:14 491:14
491:22 492:5
492:21 494:2,7
495:5 520:6
**1.02** 353:18
354:18 376:24
378:17
**1.06** 207:16
370:7
**1.09** 348:4,22
349:19
**1.1** 182:5
**1.16** 174:12,21
**1.2** 187:20
245:11 318:2
**1.22** 408:14
**1.24** 244:12,22
271:4 409:24
**1.28** 271:4
**1.3** 245:7 318:2
**1.31** 271:4
**1.35** 370:9
408:14
**1.37** 347:16
348:23
**1.38** 409:24
**1.4** 182:5 245:7
353:18 354:17
354:21 373:17
**1.6** 187:20
245:12
**1.6.5** 83:15
**1.9** 347:15
**1.91** 353:19
354:18 376:24
378:17
**1:07** 239:16
**10** 45:16 111:9
187:18 200:4
332:20 338:2

358:2
**100** 5:23 234:2,4
235:5
**100-C** 71:10
**100,300** 113:14
**102** 6:6
**103** 5:20 64:22
**103,000** 114:6
**11** 30:24 220:12
258:22 357:14
374:13,19
375:6 428:16
**11:28** 126:11
**11:42** 126:16
**110** 6:7
**114** 6:10
**116,430** 366:2
**12** 5:5 125:15
224:4 339:6
340:6,14 397:3
397:4 404:8,17
**12-risk** 474:17
**121,700** 365:24
**13** 147:20
255:19 407:10
407:14 453:19
**14** 45:17 248:20
349:11,12
350:2,8,13
352:15 355:17
**1416** 275:13
**1490** 2:9
**15** 274:3 338:2
351:6 352:17
**155** 3:4
**16** 134:8,9
292:22
**16-2738** 1:6
**17** 3:13 302:13
**18** 334:1 446:11
**180** 6:13
**183** 113:20
**184,000** 113:20
**186** 6:15
**19** 2:4 64:23
160:9 344:8
428:18 429:20

**429:21** 430:6
503:11
**1950s** 30:10,17
31:18 32:5,15
306:22
**1970s** 30:11,18
31:18 32:16
**1976** 365:22
**1982** 240:9
344:12 345:17
366:22 367:3
**1989** 365:23
**199** 6:17
**1996** 48:4 432:3
**1st** 424:17 428:6

**2**

**2** 41:12 45:10,11
111:8 181:10
181:11,16,21
181:21 202:17
344:23 347:5,9
347:9 350:3
384:20 386:23
415:20 442:23
443:1 461:12
**2-A** 415:18,19
416:5
**2-B** 491:22
492:5 494:2
495:5
**2.0** 241:23
**2/25/19** 6:12
**2:04** 239:20
**20** 125:8 187:21
245:15 325:4,5
328:21 332:19
332:21 333:8
337:24 338:3
339:5,10
363:18 376:11
384:8,12
429:20 430:13
520:20
**20-fold** 392:10
**200** 346:3
**200,000** 318:16

Kevin Holcomb, M.D.

318:20 385:23
386:1,2
**2000** 344:2
358:10 359:20
363:24 411:18
440:24 462:18
**20004** 3:18
**2002** 69:24
**2003** 333:13
334:2
**2007** 135:2,4
139:13 465:22
**2008** 373:9,15
**2009** 139:13
232:3,4,6,7
416:24,24
417:5 418:6,15
418:18,20
**201** 3:13
**2010** 48:3,4
220:12 224:15
228:20 247:21
357:14 358:4
359:18 362:8
363:13,19,20
364:3,11
367:13 368:14
379:7,16 382:4
411:23 412:10
413:20 419:12
491:21 492:19
**2012** 48:5 69:17
70:4,10 71:9
83:14 86:15
95:3,19 96:7
**2013** 379:5
454:15
**2014** 254:18,19
264:24 265:4,9
276:12,12,13
277:22 278:15
279:6,22 280:6
377:20 424:17
428:6
**2015** 232:2,6
303:5 416:11
416:23 417:4

417:18,19
418:4,19 462:2
463:18
**2016** 180:14
232:4,7 249:4
254:15 255:8
259:8 260:6
275:3 329:11
338:24 446:20
**2017** 38:6
**2018** 6:20 38:9
40:22 43:6
45:14 64:20
142:15 143:12
145:17 146:2
224:3 259:11
259:12 360:3
420:13 432:14
442:23 454:11
**2019** 1:10 11:7
49:14 104:12
108:5 111:16
115:3 124:6,7
124:19,20
125:3 139:20
147:2,20 151:4
200:8 432:17
433:2 434:13
486:11 491:21
503:11 517:15
**202** 3:19
**20s** 339:1 340:11
**21** 200:8 378:1,2
420:10 428:18
430:6,13
**218** 2:14
**219** 72:4,9,13,15
72:21 74:5
76:23 82:5
85:12
**21st** 200:7
**22** 126:18 127:4
403:20
**220** 6:19
**224** 6:21
**23** 140:9 141:8,9
141:21 334:4

407:2 486:11
**231** 334:4,6,16
**232** 82:13,17,18
83:5 84:16
**233** 4:3
**24** 214:20 339:8
355:20 356:1
397:3 407:22
**25** 49:14 104:12
108:5 115:3
116:13 124:6
124:19 125:3
147:2 366:3
424:15
**250** 214:19
**251** 350:15
351:1,12
**255** 7:6
**256** 87:10 93:5
**25th** 51:18
110:10 111:15
**26** 368:16
468:12,14
**269-2343** 2:15
**27** 1:10 11:6
311:16 471:12
**271** 7:9
**273** 7:12
**28** 258:23 259:3
261:5 517:15
**281** 7:16
**29** 488:9
**292** 7:18

---

**3**

**3** 64:12 103:16
147:6,14,18
229:18,21
471:19,21,24
472:12 474:3
475:15,19
**3:28** 343:19
**3:55** 343:23
**3:59** 348:12
**30** 25:10,11,21
55:11 328:22
332:20 333:14

336:5 366:1
369:2 496:24
518:16
**302** 7:21
**31** 503:6
**312** 4:5
**33** 116:13 275:8
443:17
**334** 2:15
**338-1100** 2:10
**344** 8:6
**356** 87:5,8
**358** 271:15
**36104** 2:14
**363** 8:9
**37** 349:13
**377** 8:12

---

**4**

**4** 45:19 71:9
367:22 384:19
425:2
**4/1/14** 9:6
**4:00** 348:16
**40** 5:14 206:17
333:8,14 336:5
337:24 338:4
369:2 376:23
378:16
**40,000** 506:12
**403** 8:14
**406** 8:17
**407** 8:20
**41,000** 318:19
404:3
**41,654** 404:2
**42** 248:19 366:3
**424** 9:6
**43** 416:17
**439-2286** 3:5
**45** 5:16
**46** 415:15,20,22
**463-2400** 3:19
**464** 256:4
**468** 9:8
**471** 9:13
**486** 9:15

**488** 9:17
**49** 224:11,13
**496** 9:19

---

**5**

**5** 102:12,18
146:19,23
147:17 229:18
229:21 424:23
425:2,2
**5/7/18** 5:15,17
5:20
**5:01** 421:16
**5:22** 421:21
**5:49** 453:10,13
**50** 248:24 249:6
340:13 341:24
367:24
**50/50** 150:8,10
236:2,2,3
273:18 392:18
479:18
**501** 2:8
**503** 9:22
**50s** 32:21
**521** 520:6
**549-7000** 3:9
**55** 338:19 366:1
**56** 5:15 41:11
**57** 5:18 45:16

---

**6**

**6** 110:8 121:8
146:12,20
**6.2** 420:10
**6.4** 258:24
**6.6** 404:23
**6:03** 473:10
**6:04** 473:24
**6:13** 486:2
**6:36** 486:7
**6:59** 516:5,8
**60** 187:21
245:15
**60,000** 506:11
**600** 3:8 404:3
**60606** 4:4

Kevin Holcomb, M.D.

**609** 3:14
**60s** 30:10,17
  31:18 32:5,15
  32:21
**61** 44:16 45:18
  46:24 47:17
  106:6 116:15
**61,000** 318:18
  375:16 387:11
**61,576** 383:16
**617** 3:5
**619** 2:10
**624-6307** 4:5
**64** 5:19
**68** 385:4,16
  386:3 387:12
  387:21
**69** 229:19,21
**6950** 4:4

---
**7**
---

**7** 45:14 64:20,23
  115:1
**70** 25:5,9 444:18
**70,000** 506:11
**70s** 32:6
**71** 5:21
**720-1288** 2:5
**767** 1:14 11:9
**78,000** 318:18
**78,630** 345:23
**791** 217:3
**7th** 40:22

---
**8**
---

**8** 41:12 111:8
  180:9 281:1
**80,750** 112:7
  114:9
**800** 201:9
  203:12 214:20
**800-some** 218:3
**850** 60:9 112:4
**86** 378:20
**877.370.3377**
  1:20
**89** 354:3

---
**9**
---

**9** 111:8 186:5
  269:20 274:4
  274:10
**9:53** 1:15 11:7
**90** 59:23 60:4
  354:4 371:2
**917.591.5672**
  1:20
**92101** 2:9
**92660** 2:4
**949** 2:5
**95** 112:1 149:23
  187:4,4 193:21
  193:23 194:8
  196:13,22
  197:14 202:5
  205:20 371:3
  372:8 378:16
**973** 3:9
**975** 3:18
**986-1118** 3:14
**99** 290:14
  318:21 329:2
  440:24