# Exhibit G

Rebecca Smith-Bindman, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

IN RE:  JOHNSON & JOHNSON TALCUM )
POWDER PRODUCTS MARKETING, SALES )
PRACTICES, AND PRODUCTS LIABILITY )
LITIGATION )
                ) MDL No.
                ) 2738 (FLW)(LHG)
                )
_____)


VIDEOTAPED DEPOSITION OF

REBECCA SMITH-BINDMAN, M.D.

San Francisco, California

Thursday, February 7, 2019

Volume I


Reported by:
MARY J. GOFF
CSR No. 13427

Rebecca Smith-Bindman, M.D.

Page 2

```
 1
 2
 3
 4
 5          Videotaped Deposition of REBECCA
 6   SMITH-BINDMAN, M.D., Volume I, taken on behalf of
 7   Johnson & Johnson, at Levin Simes Abrams LLP,
 8   1700 Montgomery Street, Suite 250, San Francisco,
 9   California 94111, beginning at 9:20 a.m. and ending
10   at 4:01 p.m., on February 7, 2019, before MARY J.
11   GOFF, California Certified Shorthand Reporter No.
12   13427.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiffs
 4      Beasley Allen Law Firm
 5      BY:  P. LEIGH O'DELL
 6         MARGARET M. THOMPSON, MD, JD, MPAff
 7      Attorney at Law
 8      218 Commerce Street
 9      Montgomery, Alabama 36103
10      leigh.odell@beasleyallen.com
11      334-269-2343
12   For Plaintiffs
13      Robinson Calcagnie, Inc.
14      BY:  CYNTHIA L. GARBER
15      Attorney at Law
16      19 Corporate Plaza Drive
17      Newport Beach, California 92660
18      cgarber@robinsonfirm.com
19   For Plaintiffs
20      Wilentz, Goldman & Spitzer P.A.
21      Daniel R. Lapinski
22      Attorney at Law
23      90 Woodbridge Center Drive,
24      Suite 900 Box 10
25      Woodbridge, New Jersey 07095-0958
```

Page 4

```
 1   APPEARANCES (continued):
 2   For Plaintiffs
 3      Restaino Law LLC
 4      BY:  JOHN M. RESTAINO JUNIOR
 5      Attorney at Law
 6      130 Forest Street
 7      Denver, Colorado 80220
 8      jrestaino@restainollc.com
 9      720-891-7921
10
11
12   For Defendant Johnson & Johnson
13      Tucker Ellis LLP
14      BY:  MICHAEL C. ZELLERS
15      Attorney at Law
16      515 South Flower Street
17      42nd Floor
18      Los Angeles, California 90071
19      michael.zellers@tuckerellis.com
20      213-430-3301
21
22
23
24
25
```

Page 5

```
 1   APPEARANCES (continued):
 2   For Defendant Johnson & Johnson
 3      Skadden, Arps, Slate, Meagher & Flom, LLP.
 4      BY:  BENJAMIN HALPERIN
 5      Attorney at Law
 6      4 Times Square
 7      New York, New York 10036
 8      benjamin.halperin@skadden.com
 9      212-735-2453
10
11
12   For Defendant Imerys
13      Dykema
14      BY:  JANE BOCKUS
15      Attorney at Law
16      112 E. Pecan Street
17      Suite 1800
18      San Antonio, Texas 78205
19      jbockus@dykema.com
20      210-554-5549
21
22
23
24
25
```

Rebecca Smith-Bindman, M.D.

Page 6

1    APPEARANCES (continued):
2    For Defendant Imerys
3        Gordon & Rees LLP
4        BY:  JENNIFER A. FOSTER
5        Attorney at Law
6        816 Congress Avenue
7        Suite 1510
8        Austin, Texas 78701
9        jfoster@gordonrees.com
10       512-391-0197
11
12
13   For Defendant PCPC, Personal Care Products Council
14       Seyfarth Shaw, LLP
15       BY:  JAMES R. BILLINGS-KANG
16       Attorney at Law
17       975 F Street, NW
18       Washington, D.C. 20004
19       jbillingskang@seyfarth.com
20       202-828-5356
21
22
23
24
25

Page 7

1    APPEARANCES (continued):
2
3    For Defendants PTI Union, LLC and PTI Royston, LLC
4        Tucker Ellis LLP
5        BY:  CAROLINE M. TINSLEY
6        Attorney at Law
7        100 South 4th Street`
8        Suite 600
9        St. Louis, Missouri, 63102
10       caroline.tinsley@tuckerellis.com
11
12   Videographer:
13       Joseph Morgas
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1                INDEX
2    WITNESS                    EXAMINATION
3    REBECCA SMITH-BINDMAN, M.D.
4    Volume I
5
6        BY MR. ZELLERS            12
7
8    NUMBER        DESCRIPTION        PAGE
9    Exhibit 1  Notice of Oral and Videotaped    24
         Deposition
10
11   Exhibit 2   Rule 26 Expert Report of        25
         Rebecca Smith-Bindman, MD
12
13   Exhibit 3  IMERYS list, Amended Expert Report  30
14
15   (Exhibit 4-11, premarked Hopkins Exhibit 28
16   (Spreadsheet) premarked Pier 47 (Exhibit Number
17   list) and unmarked article "Pycnogenol Reduces
18   Talc-induced Neoplastic Transformation in Human
19   Ovarian Cell Cultures" (Pltf_MISC_00000046) are
20   contained in the blue folder)
21
22   Exhibit 4   Reproductive Sciences            34
23
     Exhibit 5   Safety Assessment article        35
24
25

Page 9

1    EXHIBITS CONTINUED:                    PAGE
2    Exhibit 6  IARC Monographs, Volume 93        35
3
4    Exhibit 7  J&J article by Owen Dyer, BMJ     36
5
6    Exhibit 8  IARC Volumes 1-123               36
7
8    Exhibit 9  "On Talc Translocation from the   36
         Vagina" article
9
10   Exhibit 10  Alterations in Gene Expression   37
         article
11
12   Exhibit 11  Draft Screening Assessment, 12/18  38
13
14   Exhibit 12  (Binder) Talc Articles I         39
15
16   Exhibit 13  (Binder) Talc Articles II        39
         (Exhibit 21 is inside Exhibit 13)
17
18   Exhibit 14  CV of Smith-Bindman, MD          53
19   Exhibit 15  List of articles              54
20   Exhibit 16  9/24/18 e-mail string            76
         forest plots
21
22   Exhibit 17  Rule 26 Expert Report of         90
         Smith-Bindman, MD
23
24   Exhibit 18  The Association Between Talc Use  95
         and Ovarian Cancer article
25

3  (Pages 6 to 9)

Rebecca Smith-Bindman, M.D.

Page 10

EXHIBITS CONTINUED:                              PAGE
1
2   Exhibit 19  NCI, SEER Training Modules         130
                Risk Factors
3
4   Exhibit 20  NCI article, Ovarian, Fallopian    132
                Tube and Primary Peritoneal
5               Cancer Prevention PDQ-Health
                Professional Version
6
7   Exhibit 21  Handwritten notes                  156
                (Inside Binder Exhibit 13)
8
9   Exhibit 22  Genital Talc Exposure and Risk     179
                of Ovarian Cancer article
10
11  Exhibit 23  Genital Powder Exposure article    179
12
13  Exhibit 24  9/29/18 e-mail string              184
14
15  Exhibit 25  Perineal Talc Exposure article     189
16
17  Exhibit 26  Letter to Samuel Epstein, MD       203
18
19  Exhibit 27  IARC Agents Classified by IARC     206
                Monographs, Volumes 1-123
20
21
22
23
24
25

Page 11

1              San Francisco, California
2              February 7, 2019
3              9:20 a.m.
4
5          REBECCA SMITH-BINDMAN, M.D.,
6   being first duly sworn or affirmed to testify to the
7   truth, the whole truth, and nothing but the truth,
8   was examined and testified as follows:
9          THE VIDEOGRAPHER:  We are now on the
10  record.  My name is Joseph morgue.  I'm a
11  videographer for Golkow Litigation Services.
12         Today's date is February 7, 2019.  The
13  time on the video monitor is 9:20 a.m.
14         This video deposition is being held at
15  1700 Montgomery Street, Suite 250, San Francisco,
16  California, in the matter In Re: Johnson & Johnson
17  Talcum Powder Products Marketing, Sales Practices,
18  and Products Liability Litigation, for the United
19  States District Court, for the District of
20  New Jersey.
21         The deponent is Dr. Rebecca Smith-Bindman.
22  Counsel will be noted on the stenographic record.
23  The court reporter is Mary Goff.  She will now
24  administer the oath.
25

Page 12

1          REBECCA SMITH-BINDMAN, M.D., VOLUME I,
2   being first duly sworn or affirmed to testify to the
3   truth, the whole truth, and nothing but the truth,
4   was examined and testified as follows:
5          EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6   BY MR. ZELLERS:
7      Q   State your name.
8      A   Rebecca Smith-Bindman.
9      Q   Dr. Bindman, we are here today to take
10  your deposition in the talcum powder MDL litigation.
11  Are you aware of that?
12     A   I am.
13     Q   Have you been deposed before?
14     A   I have.
15     Q   On how many occasions?
16     A   Three to four times.
17     Q   Have you ever testified at trial?
18     A   I have.
19     Q   On how many occasions?
20     A   One.
21     Q   You are generally familiar with the rules
22  we're going to follow here today?
23     A   I am.
24     Q   If at any time I ask you a question or any
25  counsel asks you a question that you don't

Page 13

1   understand, please don't answer it.  Tell us you
2   don't understand, and we'll rephrase the question or
3   repeat it so it's clear to you.
4          Can you do that?
5      A   I can.
6      Q   If you answer a question, is it fair for
7   us to assume that you understood it?
8      A   It is.
9      Q   Please don't guess or speculate as to any
10  answers.  If you don't know the answer to a question
11  or it would call you to guess or speculate, tell us.
12         Can you do that?
13     A   I can.
14     Q   If at any time you need to take a break as
15  we proceed through the day, please tell us.  And
16  once we finish whatever line of questioning we're
17  involved with, then we will take a break.
18     A   Okay.
19     Q   Tell us the times that you have been
20  deposed.  When is the last time you were deposed?
21     A   I think approximately six years ago.
22     Q   What was the litigation or the matter?
23     A   I have been deposed a few times.  I'm not
24  sure which happened when --
25     Q   That's fine.

Rebecca Smith-Bindman, M.D.

Page 14

1    A  -- but I can tell you in general what they
2  were about.
3    Q    Tell us -- the three to four times that
4  you have been deposed, will you tell us what each of
5  those matters was?
6    A   Yes.  I am in addition to being an
7  epidemiologist, I'm a clinical radiologist.  And
8  each of those cases had to do with diagnosis and
9  communication within medical malpractice cases.
10        One case had to do with a delayed
11  diagnosis of breast cancer and not communicating
12  results.
13        One case had to do with a misdiagnosis of
14  a first trimester pregnancy loss.
15        One case had to do with misdiagnosis of a
16  complication of a twin/twin pregnancy.  I think
17  those are the cases I was deposed in.
18    Q    All of the cases in which you have been
19  deposed previously have been medical malpractice
20  cases?
21    A   Yes.
22    Q   Were those cases in which you had provided
23  treatment to a patient or were they cases in which
24  you were an expert witness independent of that
25  particular plaintiff?

Page 15

1    A   For each of those cases, I was an expert
2  witness.  I had never personally been involved in a
3  medical malpractice cases.
4    Q   Were each of those cases in the
5  San Francisco area or where were they located?
6    A   None of those cases were in the
7  San Francisco area.  One of them was in Huntsville
8  Alabama, one was in Northern California, and one was
9  in Southern California.
10    Q   Do you remember the names of any of those
11  cases?
12    A   I do not.
13    Q   Do you remember the name of the lawyer or
14  lawyers that you worked with in those cases?
15    A   I do not.
16    Q   Did you testify in those cases on behalf
17  of the plaintiff or on behalf of a defendant?
18    A   They were split.  So I have been involved
19  in cases on both slides.
20    Q   Well, my understanding is you have been
21  involved in three prior litigations; is that right
22  --
23        MS. O'DELL:  Object to the form.
24    Q   (BY MR. ZELLERS) -- in which you served as
25  an expert witness and were deposed?

Page 16

1    A   And -- and I was deposed.
2        MS. O'DELL:  Excuse me.
3    Q   (BY MR. ZELLERS) Yes.  So three prior
4  litigations in which you served as an expert and you
5  were deposed; is that right?
6    A   I --
7        MS. O'DELL:  Object to the form.  I think
8  she said four, but --
9        MR. ZELLERS:  Well, she said three to
10  four.  But then when she was telling us about those
11  cases --
12    A   -- so I remember what was fourth case was.
13    Q   (BY MR. ZELLERS) All right.  What was the
14  fourth case?
15    A   There was a case of delay in the diagnosis
16  of an ovarian cancer.
17    Q   Where was that case?
18    A   Somewhere in the middle of the country.
19    Q   When did you testify in that case?
20    A   I -- I only testified in a single case.
21  So it -- do you mean deposed?
22    Q   Yes.  When were you deposed in that case?
23    A   I -- sometime between -- all of the cases
24  were sometime between six and 12 years ago.  I'm
25  not --

Page 17

1    Q   All right.  Did --
2    A   -- sure I remember the years.
3    Q   The case in which you testified as an
4  expert witness in the delay of diagnosis of ovarian
5  cancer, were you testifying for the defense or for
6  the plaintiff?
7    A   I believe that case was for the defense.
8    Q   Do you remember the name of the plaintiff?
9    A   I do not.
10    Q   Do you remember the name of the defendant?
11    A   I do not.
12    Q   Do you remember the name of the attorney
13  who retained you?
14    A   I do not.
15    Q   Do you remember where in the middle of the
16  country that case was pending?
17    A   I do not.
18    Q   You stated that you have testified one
19  time at trial; is that right?
20    A   Yes.
21    Q   Where did you testify at trial?
22    A   That was Huntsville -- the Fayetteville,
23  Alabama case.
24    Q   In that case, did you testify for the
25  plaintiff or the defense?

Rebecca Smith-Bindman, M.D.

Page 18

1  A   For the plaintiff.
2  Q   Do you remember how long ago it was?
3  A   In the ballpark of seven or eight years
4  ago.
5  Q   The Northern California case that you gave
6  deposition testimony in that -- in, was that for the
7  plaintiff or the defense?
8  A   I don't remember.
9  Q   Southern California, that medical
10 malpractice case, did you testify for the plaintiff
11 or the defense?
12 A   Can I go back?  I -- I do remember.
13     So the Northern California case was the
14 plaintiff.  The Southern California case was the
15 defense.
16 Q   Do you remember the attorneys that you
17 worked with in the Northern California case?
18 A   I do not.
19 Q   The Southern California case?
20 A   I do not.
21 Q   Do you remember the name of any of the
22 parties in any of the cases in which you have either
23 given deposition testimony in or trial testimony in?
24 A   I do not.
25 Q   Today I'm going to ask you questions about

Page 19

1  talcum powder or baby powder.  Can we agree that
2  when I refer during the deposition to products, to
3  talc products, talcum powder products, baby powder,
4  or Shower to Shower at issue in this MDL, that I am
5  referring to the baby powder product manufactured by
6  Johnson & Johnson Consumer Products, Inc., and the
7  Shower to Shower product that was formerly
8  manufactured by Johnson & Johnson Consumer Products,
9  Inc.?
10 A   Yes.
11 Q   How would you define the area of expertise
12 in which you were offering opinions in this case,
13 "this case" being the talc MDL?
14 A   I was asked to provide an expert review in
15 the area of epidemiology, ovarian cancer and its
16 causes, the health effects of talc powder products.
17 I think those are the main areas.
18 Q   Are -- are you testifying today as an
19 epidemiologist?
20 A   Yes.
21     MS. O'DELL:  Object to --
22 A   Am --
23     MS. O'DELL:  -- the form.
24 A   -- I bringing expertise to that?
25 Q   (BY MR. ZELLERS) Yes.

Page 20

1  A   Yes.
2  Q   You are not testifying here today as a
3  radiologist; is that right?
4      MS. O'DELL:  Object to the form.
5  A   I think some of my experiences as a
6  radiologist are highly relevant to my expertise, and
7  so there are some questions that I think that that
8  is very relevant.
9  Q   (BY MR. ZELLERS) Are there any areas in
10 which you anticipate providing expert testimony in
11 this litigation, other than in the areas of
12 epidemiology and radiology?
13     MS. O'DELL:  Object to the form.
14 A   I mentioned ovarian cancer.  So risk
15 factors for ovarian cancer falls into epidemiology.
16     The mechanism of ovarian cancer, the
17 pathophysiology, the biological processes are not
18 technically epidemiology.  They're related, and so
19 some of my opinions, I think, would fall into that
20 category.
21 Q   (BY MR. ZELLERS) How would you define that
22 area of expertise for which you are providing expert
23 opinions?
24     MS. O'DELL:  Object to the form.
25 Q   (BY MR. ZELLERS) We have got that you are

Page 21

1  going to provide expert opinions relating to
2  epidemiology.  You're going to provide expert
3  opinions relating to radiology.
4      Are there any other areas that you intend
5  to provide expert opinions in?
6      MS. O'DELL:  Other than what she has just
7  described?
8  Q   (BY MR. ZELLERS) Well, other than
9  epidemiology and radiology.
10     MS. O'DELL:  Object to the form.  She gave
11 another -- a host -- a suite of things she expected
12 to testify on, but --
13     MR. ZELLERS:  And so --
14     MS. O'DELL:  -- I'll object to the form.
15     MR. ZELLERS:  -- yeah, thank you.
16 A   Could you repeat back to me what I have
17 already said?
18 Q   (BY MR. ZELLERS) No.  I'm asking you what
19 you are going to provide expert testimony in, what
20 you consider yourself to be an expert in.
21     I understand epidemiology, and I
22 understand the epidemiology opinions you are going
23 to give, relate to whether or not talcum powder is
24 associated with ovarian cancer, whether or not
25 talcum powder causes ovarian cancer, so I believe

6  (Pages 18 to 21)

Rebecca Smith-Bindman, M.D.

Page 22

1   those are epidemiology-based opinions.
2          I also understand that you have a -- your
3   training and your background is in radiology and
4   that you will provide, to the extent relevant,
5   radiology opinions.
6          But you're not testifying here today as a
7   gynecologic oncologist, are you?
8      A   I am not.
9      Q   You are not testifying here today as an
10   expert in asbestos; is that fair?
11         MS. O'DELL:  Object to the form.
12     A   I am going to provide opinions, if asked,
13   about the health effects of asbestos.
14     Q   (BY MR. ZELLERS) Are you an expert or do
15   you consider yourself to be an expert in asbestos?
16         MS. O'DELL:  Object to the form.
17     A   The question is about asbestos, in
18   general, and I consider myself an expert on the
19   health effects of asbestos.
20     Q   (BY MR. ZELLERS) Does that mean that you
21   are an expert in asbestos or simply looking at
22   studies that have evaluated the epidemiology of
23   asbestos and asbestos exposure to certain
24   conditions?
25         MS. O'DELL:  Object to the form.

Page 23

1      A   I think there are a lot of acts -- aspects
2   of asbestos, so I would absolutely not consider
3   myself an expert on the geology of asbestos or in
4   the mechanism of mining asbestos.
5          But I would consider myself an expert on
6   the changes to the body that can be the result of
7   exposure to asbestos in the context of epidemiology
8   studies, but also in the context of molecular
9   changes, cellular changes like that.
10         And -- and those technically are probably
11   not in the category of epidemiology, but would
12   overlap other areas of my training and experience,
13   such as pathology and...
14     Q   You are not an expert in the testing of
15   asbestos; is that fair?
16     A   I -- I would, yes, agree.
17     Q   You are not an expert in the different
18   forms and types of asbestos --
19     A   I --
20     Q   -- correct?
21     A   -- I -- correct.
22     Q   Okay.
23     A   I'm not an expert in those types of --
24     Q   You are --
25     A   -- asbestos.

Page 24

1      Q   -- not an expert -- well -- and let me
2   withdraw that.
3          You have produced an expert report in this
4   case; is that right?
5      A   I have.
6      Q   Let's mark a couple of things at the
7   outset.
8          Deposition Exhibit 1 is copy of the Notice
9   of Deposition.
10         (Exhibit 1 was marked for identification
11   and is attached to the transcript.)
12         MS. O'DELL:  Thank you.
13     Q   (BY MR. ZELLERS) Have you seen the Notice
14   of Deposition prior to today?
15     A   Yes, I have.
16     Q   Have you either brought with you or
17   through counsel have they brought all of the
18   materials that you believe are responsive to the
19   Deposition Notice?
20         MR. ZELLERS:  And, Ms. O'Dell, I recognize
21   that you have objected to the Deposition Notice and
22   the record will reflect that.
23         MS. O'DELL:  And just so I have a chance
24   to say something, we'll just reassert those
25   objections now.

Page 25

1          Dr. Smith-Bindman has brought with her
2   documents subject to our objections.
3          MR. ZELLERS:  And I would really like
4   Dr. Smith-Bindman to answer the question.
5          MS. O'DELL:  I'm sure she's ready to do
6   that.
7      A   To the best of my knowledge, I have
8   responded or brought or provided all of --
9      Q   (BY MR. ZELLERS) You --
10     A   -- those items.
11     Q   -- you are not aware of items that are
12   called for in the Deposition Notice, what we have
13   marked as Exhibit 1 that has not been produced or
14   not available here today; is that right?
15     A   That's correct.
16     Q   Ms. O'Dell and I spoke earlier about your
17   invoices, and apparently you do have some invoices
18   relating to your work in this matter.  At some point
19   today we'll collect those and we will mark those.
20         (Exhibit 2 was marked for identification
21   and is attached to the transcript.)
22     Q   (BY MR. ZELLERS) Deposition Exhibit 2 is
23   your report in this matter; is that right?
24         MS. O'DELL:  Thank you.
25     A   Okay.  Yes.

Rebecca Smith-Bindman, M.D.

1     Q   (BY MR. ZELLERS) Does your report in this
2   matter, Deposition Exhibit 2, contain all of the
3   opinions that you intend to offer at trial or at any
4   hearing in this matter?
5     A   The report summarizes my opinions.  I have
6   written in the report.  As new information comes
7   available, I may take that into account as well.
8         So when we began, counsel mentioned a few
9   additional papers that I had seen since the time my
10  report was written.  And so those are -- are --
11  won't -- have not changed my views, but those are
12  not necessarily referenced in this report.
13    Q   In terms of your opinions and the opinions
14  that you expect to render in this matter, either at
15  trial or any hearing, those opinions are contained
16  in your report which we marked as Exhibit 2,
17  correct?
18        MS. O'DELL:  Object to the form.
19    A   I have not, since writing my report, seen
20  any documents that have changed my opinions.
21        But as I continue to keep up with the
22  published literature, my opinions may reflect
23  changing documents that I have seen since the time
24  my report was generated.
25

1     Q   (BY MR. ZELLERS) All I can do is ask you
2   questions today.  As of today, does your report
3   contain the opinions that you expect to provide at
4   any trial or hearing in this matter?
5     A   Yes, they do.
6     Q   My understanding from one of your prior
7   answers is that you have reviewed some additional
8   materials since you prepared and signed your report
9   on or about November 15 of 2018; is that right?
10    A   That is correct.
11    Q   Those materials, you believe, support the
12  opinions that you have put in your report, but have
13  not changed your opinions; is --
14    A   It --
15    Q   -- that right?
16    A   -- that's correct.
17    Q   What new or additional materials have you
18  reviewed and considered since preparing your report
19  on November 15, 2018?
20    A   So I have seen a draft of a publication --
21  submitted for publication by Dr. Saed about the
22  cellular and molecular changes to cell lines of
23  being exposed to various talcum powder products,
24  which I think is an important paper that has
25  influenced my views.

1     Q   Okay.  Right now all I want to do is get a
2   list of what you have looked at and considered since
3   you prepared your report.
4     A   I have seen an updated testing report by
5   Mr. Longo.
6         I have seen a report and deposition by
7   Mr. Cooke.  I -- I think those are the...
8     Q   You -- counsel for Plaintiffs, Ms. O'Dell,
9   told me before the deposition that you also have
10  looked at a health assessment from Health Canada or
11  a risk assessment; is -- is that correct?
12    A   Yes, that's correct.
13    Q   All right.  Did you also look at a
14  meta-analysis that was performed or at least the
15  draft of a meta-analysis by the first name, author,
16  Thayer (phonetic)?
17    A   I -- I saw that report briefly.
18    Q   Anything else that you have reviewed
19  and/or considered that is not included in the
20  materials that you reference either in your list of
21  references or in your Materials Considered List?
22    A   There was also a series of reports in --
23  in The New York Times and Reuters and a summary of
24  that in the BMJ, which I have seen since I have
25  issued my report.

1     Q   Are you basing any of your opinions on the
2   Reuters or New York Times articles?
3     A   Those reports support my opinions, but no,
4   I'm not basing my report on -- on those.
5     Q   Ms. O'Dell also provided me with a list
6   materials that she has represented that you have
7   reviewed since you prepared your report.
8         It's a series of Imerys documents.  It's
9   one J&J produced document.  And then the last item
10  listed is an Amended Expert Report of Robert Cooke.
11        Have you reviewed those materials since
12  preparing your report?
13    A   So yes, the -- the Mr. Cooke report, which
14  is one I mentioned.  Yes, I have seen the Imerys
15  report.  And I can't remember what you said, the
16  Johnson & Johnson?
17    Q   Are those additional documents or
18  materials that you have reviewed since preparing
19  your report?
20    A   I'm sorry.  I understand the question.  I
21  don't remember what the Johnson & Johnson material
22  was.
23    Q   I --
24    A   You listed it.  I just don't --
25    Q   -- well, I didn't --

Rebecca Smith-Bindman, M.D.

Page 30

1    A  -- remember that.
2    Q  -- list it.  This was a list that was
3  prepared and provided to me by counsel for
4  Plaintiffs so --
5        MS. O'DELL:  But I don't think he
6  characterized the documented in any way other than
7  the Bates number, so -- so it's a J&J document --
8    Q   What is that item?
9        MS. O'DELL:  -- that's just the Bates
10  number for that particular document.  And it's
11  the -- the test results that you reviewed yesterday.
12    A   Yes.
13        (Exhibit 3 was marked for identification
14  and is attached to the transcript.)
15    Q   (BY MR. ZELLERS) Are all of the documents
16  contained on Exhibit 3, the -- a listing that was
17  put together by counsel for the Plaintiffs,
18  documents that you reviewed yesterday in preparation
19  for your deposition today?
20    A   Yes.
21    Q   Are those documents that were selected by
22  plaintiffs' counsel to show you to help prepare you
23  for the deposition?
24        MS. O'DELL:  Object to the form.
25    A   The document are ones that I asked for to

Page 31

1  see testing results, both positive and negative,
2  from Johnson & Johnson.  So I requested documents
3  that would show that, and I believe that's what each
4  of these were provided for.
5    Q   When did you make that request to
6  plaintiffs' counsel?
7        MS. O'DELL:  And Mr. Zellers is -- he can
8  ask you when you made the request.  In terms of the
9  specifics of the request or conversations with
10  counsel, those would be protected, and I would
11  instruct you not to -- to disclose those.
12    A   To not say when I read the request?
13        MS. O'DELL:  You can say when you gave the
14  request.  But the substance of the request or the
15  substance of the discussions, I would have ask you
16  not to --
17    A   Okay.
18        MS. O'DELL:  -- testify to those.
19    Q   (BY MR. ZELLERS) My question again is:
20  When did you make the request for the documents that
21  are identified on Exhibit 3?
22    A   I believe it was a few weeks ago.
23    Q   You made a request for testing documents
24  of talcum powder used in Johnson & Johnson Consumer,
25  Inc., baby powder or former Shower to Shower powder;

Page 32

1  is that right?
2    A   Yes, I did.
3        MS. O'DELL:  Object to the form.
4    Q   (BY MR. ZELLERS) You asked for documents
5  that were both positive and negative relating that
6  testing; is that right?
7    A   Yes.
8    Q   Do you believe that you have now seen, as
9  part of your review, all documents relating to the
10  testing of Johnson's baby powder and/or Shower to
11  Shower powder?
12    A   I --
13        MS. O'DELL:  Object to the form.
14    A   -- I do not believe I have seen the
15  entirety of the testing results.
16    Q   (BY MR. ZELLERS) Was it your request that
17  you see whatever pertinent documents that were
18  relating to the testing of the baby powder?
19    A   It was not my request.  I wanted to
20  understand, in general, what kind of testing had
21  been done.  I -- I was not planning to delve into
22  the entirety of testing.
23    Q   Any other materials that you have reviewed
24  prior -- strike that -- subsequent to preparing your
25  report, which we marked as Exhibit 2?

Page 33

1    A   None that come to mind.
2    Q   You have brought with you here today
3  several notebooks and it looks like a blue folder;
4  is that right?
5    A   Yes.
6    Q   What is contained in the blue folder that
7  you brought here today?
8    A   Primarily in the blue folder are either
9  additional documents that I have reviewed since I
10  wrote my report, but also a few documents that -- in
11  preparation for the deposition, I went through my
12  report and pulled some articles to look at in
13  greater depth, and so I brought those with --
14    Q   So --
15    A   -- me.
16    Q   -- in the blue folder are materials that
17  you pulled out to have available for the deposition
18  today for your use as needed in responding to
19  questions that were asked?
20    A   Yes, that's correct.
21    Q   Can I see you blue folder, please?  And,
22  Dr. Smith-Bindman, have you taken any medications
23  that impair your ability to answer questions today?
24    A   I have not.
25    Q   All right.  The first document in your

9  (Pages 30 to 33)

Rebecca Smith-Bindman, M.D.

Page 34

1  blue folder is a document, "Reproductive Sciences"
2  at the top, "Molecular basis Supporting the
3  Association of Talcum Powder Use with Increased Risk
4  of Ovarian Cancer."
5      The first named author is Nicole Fletcher.
6      And is this the article by Dr. Saed that
7  you sold me about?
8      A   Yes, it is.
9      Q   There are a number of notes and
10 highlighting that are contained in the document.
11 Are all of those your notes and highlighting?
12     A   They are.
13     Q   We'll mark your copy of Dr. Saed's paper
14 as Exhibit 4.
15         (Exhibit 4 was marked for identification
16 and is attached to the transcript.)
17     Q   (BY MR. ZELLERS) The next paper in your
18 blue folder that you brought here today is a
19 document with the first named author, Fiume,
20 F I U M E. The title is "Safety Assessment of Talc
21 as Used in Cosmetics."
22         It appeared in the International Journal
23 of Toxicology.  Again, there's highlighting in the
24 document and underlying lining.
25         Did you do the highlighting and did you do

Page 35

1  the underlining in this document?
2      A   Yes, I did.
3      Q   We'll mark that document, your copy, as
4  Exhibit 5.
5          (Exhibit 5 was marked for identification
6  and is attached to the transcript.)
7      Q   (BY MR. ZELLERS) I see here that there is
8  the IARC monograph dated 2010 on the evaluation of
9  carcinogenic risk to humans.
10         The bottom part of page 1 is torn off.  Do
11 you know why that is?
12     A   I do not.
13     Q   All right.  So the first page gives a date
14 reference of 2010.  The second page gives -- well,
15 it also lists a 2006 date and a 2010 date.  There is
16 highlighting throughout.
17         Whose highlighting is contained in the
18 document that we'll mark as Exhibit 6?
19     A   That would be mine.
20         (Exhibit 6 was marked for identification
21 and is attached to the transcript.)
22     Q   (BY MR. ZELLERS) We then have a news
23 article from the British Medical Journal that was
24 published December 28 of 2008.  It's just a one-page
25 document with underlining and writing on it.

Page 36

1      Are those your notations?
2      A   Yes, they are.
3      Q   All right.  We'll mark that as Exhibit 7.
4          (Exhibit 7 was marked for identification
5  and is attached to the transcript.)
6          (Exhibit 8 was marked for identification
7  and is attached to the transcript.)
8      Q   (BY MR. ZELLERS) Exhibit 8 are the
9  classifications of the International Agency for
10 Research on Cancer or IARC.
11         Are you generally familiar with the IARC
12 classifications relating to the carcino --
13 carcinogenicity of different agents?
14     A   I am.
15     Q   The next document in your folder that also
16 has some underlining and highlighting is on "Talc
17 Translocation from the Vagina to the Oviducts and
18 Beyond."
19         (Exhibit 9 was marked for identification
20 and is attached to the transcript.)
21     Q   (BY MR. ZELLERS) This is an article that
22 was published in 1985.  The first named author is
23 A.P. Wehner.
24         Is this also a document that you brought
25 here today?

Page 37

1      A   It is.
2      Q   The highlighting in the document, is that
3  your document -- strike that.
4          Is that your highlighting?
5      A   It -- it is.
6      Q   Are all of these documents either on your
7  reference list or on your Materials Considered List,
8  other than what you told us about at the start of
9  the deposition?
10     A   Yes.
11     Q   We have Deposition Exhibit 47 from the
12 Pier deposition.  I will not mark that.
13         We have an article here by Shukla,
14 S H U K L A, "Alterations in Gene Expression in
15 Human Mesothelial Cells Correlate with Mineral
16 Pathogenicity."
17         (Exhibit 10 was marked for identification
18 and is attached to the transcript.)
19     Q   (BY MR. ZELLERS) Is that a document that
20 you brought here today?
21     A   Yes, it is.
22     Q   Are the highlights and writing on that
23 document yours?
24     A   Yes, they are.
25     Q   You have an article by Biz'Zard that was

10  (Pages 34 to 37)

Rebecca Smith-Bindman, M.D.

Page 38

1    published in -- is that -- Phytotherapy Research,
2    2007; is that right?
3        A   Yes.
4        Q   There do not appear to be any handwriting
5    on that document, so I won't mark it.
6            We have got the Hopkins Deposition
7    Exhibit 28.  There's no highlighting on that
8    document.
9            And then we have the "Draft Screening
10   Assessment" from Health Canada dated December 2018.
11           Is the highlighting in that document
12   yours?
13       A   Yes, it is.
14       Q   All right.  We'll mark that as
15   Deposition Exhibit 11.
16           (Exhibit 11 was marked for identification
17   and is attached to the transcript.)
18       Q   (BY MR. ZELLERS) Have we covered all of
19   the documents that you have brought with you today
20   in your blue folder?
21       A   Yes.
22       Q   All right.  Let me see your two notebooks
23   that you also have brought with you today.  One
24   notebook is "Talc Articles I."  The second notebook
25   is "Talc Articles II."

Page 39

1            Are all of the articles that are contained
2    in these two notebooks, articles that are contained
3    either on your reference list or on your reliance
4    materials list?
5        A   Yes, they are.
6        Q   As I go through this quickly, it appears
7    that there is underlining and highlighting of the
8    articles that you have brought here today; is that
9    right?
10       A   Yes, it is.
11       Q   Is all of the highlighting and underlining
12   and marking, are those your highlights and marking?
13       A   Yes, they are.
14       Q   Who prepared the notebooks?  And let's
15   mark Talc Articles I, the entire notebook as
16   Exhibit 12.
17           (Exhibit 12 was marked for identification
18   and is attached to the transcript.)
19       Q   (BY MR. ZELLERS) Talc Articles II, the
20   entire notebook, as Exhibit 13.
21           (Exhibit 13 was marked for identification
22   and is attached to the transcript.)
23       Q   (BY MR. ZELLERS) Who prepared Exhibits 12
24   and 13 for you?
25       A   I did.

Page 40

1        Q   Did you have any staff that helped you in
2    terms of your review of materials and preparation of
3    your report other -- other than Dr. Hall?
4        A   I had a copy editor -- once I had a draft
5    of my report -- review it.
6        Q   Who is your copy editor?
7        A   Her name is Chris Tachibana.
8        Q   And where is she employed?
9        A   She is a freelance medical copy editor.
10       Q   What role did she play in your review and
11   analysis of materials and your -- the preparation of
12   your report?
13       A   So she played no role in the review -- or
14   the drafting of the report, but she reviewed a draft
15   near the end for grammatical issues to remove
16   redundancy.
17           She's someone I work with a great deal for
18   my medical publications, and so --
19       Q   You have worked with her in the past -- I
20   --
21       A   That's right --
22       Q   -- is that right?
23       A   -- yes.
24       Q   Is she here in the San Francisco area?
25       A   She is not.

Page 41

1        Q   Where is she located?
2        A   She splits her time between Seattle,
3    Washington, and Germany.
4        Q   She charges for her services; is that
5    right?
6        A   She does.
7        Q   Are those charges that you paid or that
8    were paid by plaintiffs' counsel?
9        A   They have not yet been paid, but the plan
10   is for her to submit those invoices.  And it will
11   come out of my fees, but will be paid by the
12   counsel.
13       Q   All right.  When you submit invoices,
14   will -- the charges for the copy editor, will those
15   be included in your invoice to plaintiffs' counsel?
16       A   My plan is for it to come out of my fee.
17   So I am paying for it, but it should be literally
18   paid by counsel, since I'm not able to pay and
19   deduct taxes or pay taxes or -- or so -- or...
20       Q   All right.  You will pay it out of your
21   pocket and will not include it on your statement to
22   plaintiffs' counsel; is that right?
23       A   That's correct.
24       Q   Approximately how much have you paid or
25   will you pay to your copy editor?

11  (Pages 38 to 41)

Rebecca Smith-Bindman, M.D.

Page 42

1    A   I believe the total is in the ballpark of
2   about 1,500 or $1,700.
3        Q   How about Dr. hall?  Are her fees being
4   paid by you or are they being paid by plaintiffs'
5   counsel?
6        A   Her fees are being paid by counsel.
7        Q   Dr. Hall either has or will submit her own
8   separate invoice relating to her work on this
9   matter?
10       A   Yes.
11       Q   Has she already done that?
12       A   I believe she has submitted it.  I -- I'm
13  not 100 percent sure.
14       Q   Do you know what Dr. Hall's fees are at
15  least through the present time relating to her work
16  on this matter?
17       A   I believe the amount is in the ballpark of
18  the same 1,500 to $2,000.
19       Q   You believe, though, that Dr. Hall either
20  has or will be submitting invoice -- an invoice
21  separately for her work to plaintiffs' counsel; is
22  that right?
23       A   Yes.
24       Q   You have submitted invoices; is that
25  right?

Page 43

1    A   I have.
2        Q   When were you first retained in this
3   matter -- well, strike that.
4            When were you first contacted with
5   respect to this litigation, the talcum powder MDL?
6        A   My recollection is mid-2017.
7        Q   Who contacted you in mid-2017?
8        A   I was initially contacted by a law firm
9   that i believe was helping the law firms find expert
10  witnesses and asked if I would be willing to speak
11  with them to see if this could be something that I
12  would be interested in doing.
13       Q   What law firm or lawyer contacted you
14  initially in mid-2017?
15       A   I -- I don't remember that initial
16  contact.
17       Q   You don't remember the name of the lawyer
18  or the law firm that initially contacted you in this
19  matter?
20       A   The initial law firm basically asked me if
21  I would be willing to speak to these lawyers, and I
22  do not know the name of that lawyer who originally
23  contacted me.
24       Q   Did you ever speak to that lawyer again?
25       A   No.

Page 44

1    Q   What did that lawyer tell you or ask you
2   about this engagement?
3        A   They told me that there was a -- a case
4   that they would like some epidemiology research on
5   and that they thought I would be a very good fit and
6   would I be willing to speak with them.
7            I don't believe they even told me what the
8   content of -- of the case was about, but rather,
9   that it was a case.  And the role that they were
10  seeking was as an epidemiologist, not as a
11  radiologist or on the medical care.
12       Q   Was this a phone call or an e-mail or how
13  did they contact you?
14       A   I believe it was a short e-mail followed
15  by a short phone call.
16       Q   I mean, do you keep those e-mails?  And if
17  at some point we ask for them to be produced, is
18  that something you could do?
19       A   For the particular e-mail that you are
20  asking about, I cannot find it.  So I don't have
21  that.  I looked.
22       Q   You were contacted by a lawyer or law
23  firm, asked if you would be willing.
24           You said you would be willing without even
25  knowing what the matter related to?

Page 45

1    A   I didn't say I would be willing to be an
2   expert.  I said I would be willing to have a
3   conversation with the lawyers to learn about the
4   case.
5        Q   Were you told at that time that the case
6   related to talcum powder?
7        A   I was not.
8        Q   Were you told at that time that the
9   medical issue in the case related to ovarian cancer?
10       A   I do not believe I was.
11       Q   What is the next contact then that you had
12  with any lawyer relating to this matter?
13       A   So then a phone call was set up between
14  myself and, I believe it was, three lawyers involved
15  in this litigation and told about the -- what the --
16  what the case was about and told what they were
17  looking for to see if I would be interested in
18  speaking with them.
19           And that lead to an in-person meeting
20  where we then discussed what the case was about.
21       Q   When was the phone call with the three
22  attorneys?
23       A   All of this was in mid-2017, June-July
24  time frame.
25       Q   The same question.  When was the in-person

12  (Pages 42 to 45)

Rebecca Smith-Bindman, M.D.

<table>
<tr><td>

Page 46

1  meeting?
2      A   Within that same -- maybe a month later,
3  but same time frame.
4      Q   Was the in-person -- strike that.
5          Where was the in-person meeting?
6      A   It was in my office in San Francisco.
7      Q   Who were the three attorneys that you
8  spoke with initially over the phone and then met
9  with in person?
10     A   So Dr. Thompson was one; John Restaino was
11 one; and a third lawyer whose name is alluding me.
12     Q   Was it a man or a woman?
13     A   A woman.
14     Q   Is it a lawyer that you have had any
15 further contact with or communications with?
16     A   Yes.
17     Q   But you can't remember her name?
18     A   I can't.  But if we give it a minute, I
19 think I will be able to.
20     Q   Well, if you do remember it at some point
21 today, let us know.
22         When you had the phone call with
23 Ms. Thompson and with Mr. Restaino and this third
24 lawyer in the in-person meeting, what did they ask
25 you to do?

</td><td>

Page 48

1      Q   (BY MR. ZELLERS) You understood they
2  represented the Plaintiffs in this litigation --
3      A   Yes.
4      Q   -- is that right?
5      A   Yes.
6      Q   You told them that you would be willing to
7  do the review.  You did not at that point agree to
8  serve as an expert witness for the Plaintiffs; is
9  that fair?
10     A   That's fair.
11     Q   Did you then go and do your review,
12 literature review?
13     A   Yes, I did.
14     Q   You, at least at that point in time, had
15 never previously done any research or review
16 relating to talcum powder or relating to any
17 potential association between talcum powder,
18 perineal talcum powder use, and ovarian concern; is
19 that right?
20     A   That's correct.
21         MS. O'DELL:  Object to the form.
22     Q   (BY MR. ZELLERS) You went out and reviewed
23 the literature; is that right?
24     A   Yes.
25     Q   Did plaintiff's counsel, the two lawyers

</td></tr>
<tr><td>

Page 47

1      A   They asked me if I would be willing to do
2  a comprehensive and unbiased review of the
3  literature around talcum powder products and ovarian
4  cancer.
5      Q   Did they ask you to do anything else?
6      A   Well, they asked if I would be willing to
7  be an expert witness in this case.
8      Q   Anything else?
9      A   Nothing else that I can recall.
10     Q   You said you would do a review of the
11 literature, correct?
12     A   I -- yes --
13     Q   You --
14     A   -- I did.
15     Q   -- you said that you would be willing to
16 serve as an expert for Plaintiffs, correct?
17         MS. O'DELL:  Object to the form.
18     A   I -- I hesitated on the last question
19 because I was very upfront and clear that I was
20 willing to do a review, but that I did not know this
21 field in any great depth and that I would only be
22 interested in doing that if I was permitted to do
23 the review the same as I do in my other scientific
24 work and that I didn't know if my conclusion would
25 support my becoming an expert on their behalf.

</td><td>

Page 49

1  that you met -- well, strike.
2          The three lawyers you met with, did they
3  provide you with some articles to get started with?
4      A   They provided access to a database, a
5  Dropbox, where they had a large number of articles
6  that they made available to me.
7      Q   You reviewed those articles.  Did you then
8  have another meeting or communication with the
9  plaintiffs' lawyers?
10         MS. O'DELL:  Object to the form.
11     A   I had several meetings with the lawyers
12 over the subsequent year.
13     Q   (BY MR. ZELLERS) Eventually were you
14 asked, you know, to render an opinion on a topic or
15 topics?
16         MS. O'DELL:  Object to the form.
17     A   I -- I was asked to draft a report of my
18 review of the -- the literature and the data that
19 were available.
20     Q   (BY MR. ZELLERS) At this time were there
21 any new lawyers that you were meeting on with the
22 plaintiffs' side or was it still the three original
23 lawyers?
24     A   They were -- I -- I believe those would
25 be -- I think there was one additional lawyer

</td></tr>
</table>

13  (Pages 46 to 49)

Rebecca Smith-Bindman, M.D.

Page 50

1  that --
2      Q   Do you remember his or her name?
3      A   Her name.  Breanne was her first name.
4      Q   Do you know Breanne's last name?
5      A   Maybe Cope or something that's similar to
6  Cope.
7      Q   You reviewed the articles.  You were asked
8  then by Plaintiffs to write up something relating to
9  the articles; is that right?
10     A   Yes.
11         MS. O'DELL:  Object to the form.
12     Q   (BY MR. ZELLERS) At some point did either
13  you suggest or the plaintiff lawyers ask you to form
14  certain opinions relating to this matter?
15         MS. O'DELL:  Object to the form.
16     A   I'm not -- I'm not sure what you mean,
17  "form opinions."
18     Q   (BY MR. ZELLERS) You met with the lawyers;
19  is that right, after you had done your literature
20  review?
21     A   Yes.
22     Q   You had not yet agreed to be an expert
23  witness for the Plaintiffs; is that right?
24     A   Yes.
25     Q   After you had done your literature review,

Page 51

1  did the plaintiffs' lawyer say:  Well,
2  Dr. Smith-Bindman, do you have an opinion as to
3  whether or not there's an association between
4  perineal talcum powder use and ovarian cancer?
5      A   I don't remember any such conversation.
6  I -- I think from the very beginning the lawyers
7  were guessing that I was going to feel strongly that
8  there's a strong association.  So I don't remember
9  being retained as an expert after my report came
10  out.
11         At -- at some point I think it became
12  clear to them when I explained my views that they
13  would like to have me be an expert.
14         But I don't remember a particular
15  conversation where they asked me to -- where they
16  linked my being an expert to the finished product of
17  the report.  By the time I drafted the report, they
18  knew that they had wanted me to be an expert in this
19  case.
20     Q   All right.  At -- at some point after you
21  had reviewed the literature and you sat and you
22  talked with plaintiffs' counsel, you became an
23  expert witness for the Plaintiffs; is that right?
24     A   Yes.
25     Q   Are you able to time that for us any

Page 52

1  better than what you have already done?
2      A   No.
3      Q   As part of serving as an expert for
4  Plaintiffs, you did an -- either A -- do you call it
5  a systematic review or a meta-analysis?  What do you
6  call that?
7      A   I call it a systematic review.
8      Q   What's the difference between a systematic
9  review and a meta-analysis?
10     A   I -- I don't think there's any difference.
11  They're -- they're both trying to describe an
12  unbiased, quantitative review of the medical
13  literature.
14     Q   Did -- your systematic review that you
15  did, you did that after you had done this review of
16  the literature, fair?
17         MS. O'DELL:  Object to the form.
18     A   My systematic review grew out of my
19  reading the literature and realizing that there was
20  a real gap, which I thought needed to be filled.
21  And I chose to do that.
22     Q   (BY MR. ZELLERS) I will today, you know,
23  ask you some more detailed questions about that.
24  Let me make sure I have covered by basics here.
25         Your report includes as attachments, a

Page 53

1  list of references; is that right?
2      A   Yes, it does.
3      Q   What is meant to be included in the
4  references that appear and are attached to your
5  report, pages 42 through 47?
6      A   Those are references that I have cited
7  specifically in my report.
8      Q   In addition along with your report, you
9  provided a curriculum vitae; is that right?
10     A   Yes.
11     Q   We'll mark that as Exhibit 14.
12         (Exhibit 14 was marked for identification
13  and is attached to the transcript.)
14         MS. O'DELL:  Thank you.
15     Q   (BY MR. ZELLERS) The curriculum vitae that
16  is attached as -- strike that -- that you provided
17  with your report and that we have marked as
18  Exhibit 14, is that complete and up to date?
19     A   Yes, it is.
20     Q   Any additions or corrections that need to
21  be made to that?
22     A   There are some details of recent
23  publications that are not provided in this, but
24  those are relatively minor changes.
25     Q   Are any of -- the details to publications

14 (Pages 50 to 53)

Rebecca Smith-Bindman, M.D.

Page 54

```
 1   that you would update your curriculum vitae to, do
 2   any of those relate to this matter or to the
 3   opinions you're giving here today?
 4      A   They do not.
 5      Q   Deposition Exhibit 15 is also a document
 6   that was provided along with your report.  It
 7   appears to be a reliance list; is that right?
 8          MS. O'DELL:  Object to the form.  Thank
 9   you.
10          (Exhibit 15 was marked for identification
11   and is attached to the transcript).
12      A   Yes, it is.
13      Q   (BY MR. ZELLERS) What is included on the
14   reliance list which we have marked as a Exhibit 14?
15      A   This is a broad list of --
16          THE COURT REPORTER:  15.
17      Q   (BY MR. ZELLERS) Oh, I'm sorry.  Yes let
18   me ask that question again.
19          What documents are listed and included on
20   the reliance list which we have marked as
21   Exhibit 15?
22      A   That is a broader list of documents.  It
23   includes documents that I may have read, but I
24   didn't believe needed to be cited.
25          It also includes documents that counsel
```

Page 55

```
 1   provided to me that -- that may or may not have been
 2   closely read.
 3          So it includes both articles I know very
 4   many, as well as additional documents I may not have
 5   as deep of a knowledge of.
 6      Q   Was -- Deposition Exhibit 15, was that
 7   prepared by you or was that prepared by counsel?
 8      A   That was prepared by counsel.
 9      Q   Have you reviewed all of the references
10   and materials that are listed out on Deposition
11   Exhibit 15?
12      A   I -- I do not know.  I would have to go
13   through them one at a time to know if I had reviewed
14   all of them.
15      Q   Can you easily tell us which of the
16   materials listed on Exhibit 15, your reliance list,
17   were provided by you and which were provided by
18   counsel?
19          MS. O'DELL:  Objection.  Objection to
20   form.  I think the documents and materials
21   considered -- materials and data considered list.
22          MR. ZELLERS:  Well, there's no caption at
23   the top.  I have tried to be as descriptive as I can
24   with the witness on it.
25          MS. O'DELL:  I think it's referred to in
```

Page 56

```
 1   the report in that manner, but just to clarify.
 2      A   No, I could not easily go through and pick
 3   out which ones were ones that I provided to them or
 4   which ones they provided to me.
 5      Q   (BY MR. ZELLERS) All right.  Are you aware
 6   -- do you know who Dr. Judith Wolf is?
 7      A   No, I do not.  I know the name, but not
 8   the person.
 9      Q   Are you aware that your reliance list or
10   additional Materials Considered List, what we have
11   marked as Exhibit 15, is identical to the Materials
12   Considered List that was attached to Dr. Wolf's
13   report?
14      A   I -- I don't know who Dr. Wolf is, nor do
15   I know her reliance list.
16      Q   All right.  Exhibit 15 is a reliance list
17   or Materials Considered List that was prepared by
18   counsel for Plaintiffs; is that right?
19      A   It was the list provided to me.
20      Q   You may have reviewed some of these
21   documents -- or you have reviewed some of these
22   documents, but potentially not all of these
23   documents --
24          MS. O'DELL:  Object to the form.
25      Q   (BY MR. ZELLERS) -- fair?
```

Page 57

```
 1      A   Yes.
 2      Q   Looking at your report, Deposition
 3   Exhibit 2 -- and let me withdraw that.
 4          Have we covered now all of the documents
 5   that you have either reviewed and relied upon in
 6   preparing your opinions in this matter and your
 7   report, which we marked as Exhibit 2, or that were
 8   made available to you and you may or may not have
 9   looked at them?
10          MS. O'DELL:  Object to the form.
11      A   Yes.
12      Q   (BY MR. ZELLERS) Is your report,
13   Exhibit 2, accurate?
14      A   Yes, it is.
15      Q   Is your report, Exhibit 2, complete, other
16   than perhaps citing to some of the documents that
17   you reviewed after preparing your report that we
18   identified earlier today?
19      A   Yes, it is.
20      Q   There were -- withdraw that.
21          You have a fee schedule.  You're charging
22   a thousand dollars an hour to review materials and
23   talk with the lawyers in this matter and provide
24   opinions; is that right?
25      A   Yes.
```

15  (Pages 54 to 57)

Rebecca Smith-Bindman, M.D.

Page 58

1    Q   I kind of got sidetracked in terms of
2  asking you about the Plaintiff lawyers that you met
3  with.
4         We had gotten up to your meeting with
5  Ms. Thompson, with Mr. Restaino, with a lawyer
6  perhaps with the first name of Breanne; is that
7  correct?
8    A   Yep.
9    Q   Have you remembered the fourth lawyer yet?
10   A   I -- I have not.  Can -- can I call a
11 friend?
12   Q   No.  No, need to call a friend.
13        What other Plaintiff lawyers have you met
14 with relating to your work as a plaintiff expert for
15 the MDL litigation?
16   A   There are no others that I recall.
17   Q   We have other lawyers here today.  You met
18 them --
19   A   I apologize.
20   Q   -- at least in the last day or two?
21   A   Yes.
22   Q   Well, don't apologize to me.  You probably
23 hurt their feelings.
24        Did you meet all of the lawyers who are
25 here today at some point?

Page 59

1    A   Yes, I did.
2    Q   Some of them you have met just in the last
3  couple of days as you prepared for the deposition;
4  is that right?
5    A   That's correct.
6    Q   Other than the lawyers who are present in
7  the room today for Plaintiffs, have you met with any
8  other lawyers or communicated with any other lawyers
9  that you believe represent the Plaintiffs in this
10 litigation?
11   A   I have not.
12   Q   What did you do to prepare for your
13 deposition here today?
14   A   My primary preparation was to review my
15 report and to reaccess references that I included in
16 my report to make sure that I was aware of the
17 details or -- or relevant...
18   Q   What else did you do to prepare for your
19 deposition here today?
20   A   I also met with the lawyers yesterday to
21 review the process of the deposition and so forth.
22   Q   How long did you meet with the lawyers
23 yesterday?
24   A   We met most of the day yesterday.
25   Q   Other than meeting with the lawyers for

Page 60

1  most of the day yesterday, did you have any other
2  meetings or conversations with the lawyers for the
3  Plaintiffs to prepare for your deposition?
4    A   Yes, I did.  So today is Thursday.
5  Wednesday, we met for most of the day.  And I met
6  with Dr. Thompson for an hour or so on Wednesday as
7  well.
8    Q   All right.  Any other --
9        MS. O'DELL:  I think the days may be mixed
10 up.  You said "Wednesday" twice.
11   A   I apologize.  So Tuesday, we met at the
12 end of the day for an hour and then most of the day
13 yesterday, Wednesday, and then today.  Thank you.
14   Q   (BY MR. ZELLERS) Any other meetings or
15 communications with counsel for Plaintiffs to
16 prepare for the deposition here today?
17   A   Any other in-person meetings or --
18   Q   Or phone calls in which there was, you
19 know, discussion about preparing for the deposition.
20   A   I believe over -- well, I had asked to
21 reschedule this deposition.  So there were a couple
22 of e-mails related to that.
23        I also had asked for a couple of
24 additional documents to help ensure that I was
25 seeing all materials that I felt were relevant to

Page 61

1  the case.
2    Q   Are those the materials that were on
3  Exhibit 3 that we talked about at the very
4  beginning?
5    A   Yes, they are.
6    Q   Anything else that you did with the
7  lawyers in terms of preparing for your deposition
8  here today?
9    A   No.
10       MS. O'DELL:  Dr. Smith-Bindman, feel free
11 to testify regarding meetings, when they happened,
12 phone calls, et cetera, but not the substance of
13 those discussions.
14   A   Okay.
15       MS. O'DELL:  Thank you.
16   Q   (BY MR. ZELLERS) Any others?
17   A   None that I can remember.
18   Q   Ms. Thompson -- did you know Ms. Thompson
19 before she initially called you and then came and
20 sat down to meet with you?
21   A   Initially, you --
22   Q   Yes.
23   A   -- mean?  No, I did not.
24   Q   Had you ever worked with Ms. Thompson on
25 any other litigation?

Rebecca Smith-Bindman, M.D.

Page 62

1    A   No.
2    Q   Other than the talcum powder litigation
3    that we're here deposing you in, have you worked on
4    other litigations for either defendants or
5    plaintiffs?
6          MS. O'DELL:  Other than the ones she has
7    testified to?
8    Q   (BY MR. ZELLERS) Well, other than, yes,
9    the cases.
10   A   No, I have not.
11   Q   You have served as an expert witness in
12   other matters in which you did not provide
13   deposition testimony; is that right?
14         MS. O'DELL:  Object to the form.
15   A   There are a small number of additional
16   medical malpractice cases that I was also involved
17   with which would have settled before I was asked to
18   take a deposition.
19   Q   (BY MR. ZELLERS) My question is:  Have you
20   ever testified or consulted with either plaintiffs
21   or defense in -- in a product liability litigation
22   like this?
23   A   I have not.
24   Q   Have you ever provided testimony in a
25   matter relating to a consumer product?

Page 63

1    A   I have not.
2    Q   Have you ever been retained as an expert
3    or provided testimony in a matter relating to
4    asbestos?
5    A   I have not.
6    Q   Mr. Restaino -- had you ever met
7    Mr. Restaino before that initial phone call and
8    meeting back in mid-2017?
9    A   I had not.
10   Q   When I look at your invoices, will they
11   generally outline the times that you had meetings
12   and communications with Plaintiff lawyers?
13   A   Yes, they will.
14   Q   Will they also outline whatever work
15   that -- and I don't mean work, but at least dates as
16   to when you began your systematic review or
17   meta-analysis?
18   A   The work that I did will be itemized.  I'm
19   not sure if I break down writing the report versus
20   doing the systematic review into separate buckets,
21   but it might.
22   Q   The invoices will start with sometime in
23   mid-2017, when you started meeting with the lawyers;
24   is that right?
25   A   Yes.

Page 64

1    Q   Do the invoices go through the time that
2    you prepared your opinions and report as of
3    November 15 of 2018?
4    A   Yes, they will.
5    Q   All right.  Is that where they end?
6    A   They would also include some hours that I
7    have worked reviewing the material since that time.
8    Although, I don't believe I have submitted those
9    reports -- those invoices, but I certainly can.
10   Q   So my question is:  How much time have you
11   spent on this matter since your last invoice?  Can
12   you estimate that for us?
13   A   I would guess in the ballpark of 10 hours,
14   not including the time I met with the lawyers
15   yesterday -- not this week.  Excluding the time this
16   week.
17   Q   How much time did you spend this week in
18   addition to that 10 hours with the lawyers in
19   preparing yourself to provide deposition testimony?
20   A   In the ballpark of another 10 hours.
21   Q   Have you been served or been asked to
22   serve as an expert witness or consultant in any
23   other talcum powder litigation or matters?
24   A   I have not.
25   Q   What percent of your professional time do

Page 65

1    you spend working as a consultant?
2    A   A small amount.  Probably less than
3    5 percent.
4    Q   What percent of your income is from
5    consulting on litigation matters?
6          MS. O'DELL:  For a particular year or time
7    period or average, just --
8    Q   (BY MR. ZELLERS) Well, the last couple of
9    years.
10   A   In the last couple of years, a -- a small
11   amount.  Probably 5 or 10 percent.
12   Q   What is the largest percent of your income
13   that has related to consulting on litigation
14   matters?
15         And what I'm asking you to do is to look
16   back.  And what was the high point in terms of
17   income that you received from consulting on
18   medical/legal matters?
19   A   Probably the 10 percent that I cited.
20   Q   Have you ever attended a convention or a
21   meeting with plaintiff lawyers and other plaintiff
22   experts?
23   A   I have not.
24   Q   Never?
25   A   A meeting of lawyers?

17  (Pages 62 to 65)

Rebecca Smith-Bindman, M.D.

Page 66

```
 1        Q   Yes, a meeting of lawyers --
 2        A   Never.
 3        Q   -- and plaintiff experts.
 4        A   Never.
 5        Q   All right.  Have you --
 6        A   I didn't know there was such a thing.
 7        Q   Do you know any of the experts that have
 8    also been retained by the Plaintiffs in this
 9    litigation?
10        A   I don't know them personally, but I -- I
11    have seen their names.  And their names are the
12    same -- some of the names are names that are
13    familiar to me.
14        Q   Have you communicated with any of the
15    other experts for Plaintiffs?
16        A   I have not.
17        Q   Have you reviewed reports from any of the
18    experts for Plaintiffs?
19        A   I have reviewed a handful of them --
20        Q   What --
21        A   -- yes.
22        Q   -- reports of other plaintiff experts have
23    you reviewed?
24        A   I reviewed Dr. Cooke's report.  I reviewed
25    Mr. Longo's report.  I reviewed an ob --
```

Page 67

```
 1    obstetrician gynecologist report.
 2        Q   Do you remember who?
 3        A   Clarke perhaps or something like Clarke.
 4            MS. O'DELL:  If you need to refer to your
 5    report or your materials, feel free to do that.
 6        A   Okay.  I think Mr. Cralley's (phonetic)
 7    report.
 8        Q   (BY MR. ZELLERS) Do you know any of those
 9    experts personally?
10        A   I do not.
11        Q   All right.  You have never communicated
12    with any of those experts; is that right?
13        A   I have not.
14        Q   You have just reviewed their reports; is
15    that right?
16        A   That's correct.
17        Q   Have you reviewed any deposition testimony
18    or portions of depositions of plaintiff experts in
19    this matter?
20        A   I have reviewed small pieces of several of
21    them.
22        Q   Okay.  What experts have you reviewed a --
23    small pieces of their deposition?
24        A   Dr. Moorman's testimony or deposition, I
25    saw some of.
```

Page 68

```
 1        Q   What others?
 2        A   Mr. Cooke's deposition, I believe.
 3        Q   What others?  Did you put in your report,
 4    the names of other experts that you reviewed their
 5    deposition testimony of?
 6        A   I -- I -- I'm checking if -- if I have.
 7    I...
 8        Q   Well, you have a recollection of reviewing
 9    --
10        A   -- I -- I don't have a recollection of any
11    others that I have looked at.
12        Q   Do you know who David Kessler is?
13        A   I do.
14        Q   How do you know Dr. Kessler?
15        A   I --
16            MS. O'DELL:  Object to the form.
17        A   -- Dr. Kessler is a faculty member at
18    UCSF.
19        Q   (BY MR. ZELLERS) Do you know him
20    personally?
21        A   Not well, but enough to say hello.
22        Q   Been at meetings with him?
23        A   I have.
24        Q   You understand that he's an expert for the
25    Plaintiffs?
```

Page 69

```
 1        A   I -- I have been told that.
 2        Q   Have you had any discussions with
 3    Dr. Kessler at all relating to this matter, the
 4    talcum powder matter?
 5        A   I have not.
 6        Q   Have you participated in any projects --
 7    medical/legal projects with Dr. Kessler --
 8        A   I --
 9        Q   -- in the past?
10        A   -- I have not.
11        Q   Have you heard of a documentary called
12    "The Bleeding Edge"?
13        A   I have.
14        Q   Did you participate in the documentary
15    called "The Bleeding Edge"?
16        A   I did.
17        Q   You understand that Dr. Kessler also
18    participated in that; is that right?
19        A   I -- yes.
20        Q   That is a documentary related to what?
21        A   A medical devices, primarily.
22        Q   Have you served as a consultant or expert
23    in medical device matters?
24        A   I have not.
25        Q   Pharmaceutical matters?
```

18  (Pages 66 to 69)

Rebecca Smith-Bindman, M.D.

Page 70

1    A  I have not.
2    Q  How was it then that you were retained or
3  ended up participating in "The Bleeding Edge"
4  documentary?
5         MS. O'DELL:  Object to the form.
6    A  I -- I'm not sure if you have had a chance
7  to see the documentary or not, but my role in it
8  is -- is pretty off topic.
9         And so at an initial incarnation of that
10  documentary, they had thought about focusing on an
11  issue where I do research, radiation for medical
12  imaging.
13         It no longer fits into their new topic,
14  but somehow they kept a quote of me in that film.
15    Q  Did -- Dr. Kessler, was he the one
16  responsible for putting that documentary together?
17    A  I -- no, I don't -- I don't believe he
18  was.
19    Q  Were you paid for your work in
20  participating in that documentary?
21    A  No I was not.
22    Q  All right.  Jane Hall, she assisted you
23  with your systematic review.  Is -- is that the
24  right way you would characterize it, a systematic
25  review?

Page 71

1    A  Yes, the systematic review -- you asked
2  the difference between a meta-analysis.  It sort of
3  implies a certain scientific review -- rigor when
4  you call it a systematic review, so that's how I
5  like to think about it.
6    Q  You think systematic review implies more
7  scientific rigor than meta-analysis?
8    A  I think it's a subtle distinction, but
9  yes, I do.
10    Q  Well, you communicated and hired Jane hall
11  to assist you; is that right?
12    A  Yes, I did.
13    Q  Have you produced all of your
14  communications and materials with Jane Hall?
15    A  I have.
16    Q  How did you come in contact with Dr. Hall?
17    A  I work closely with an emergency medicine
18  researcher, and I have assisted him in several
19  systematic reviews.
20         And I knew he had a biostatistician who
21  generated the kind of graphics and analysis that I
22  wanted.  And so I reached out to him, and he
23  introduced me to Dr. Hall.
24    Q  You had never worked with Dr. Hall prior
25  to performing your systematic review --

Page 72

1    A  I had --
2    Q  -- in this case --
3    A  -- not.
4    Q  -- is that right?
5    A  That's correct.
6    Q  Have you worked with other
7  biostatisticians in the past?
8    A  I have.
9    Q  Why did you decide you needed to work with
10  a new biostatistician for this litigation?
11    A  The primary work that I needed was to do a
12  few graphs and figures, and so I wanted someone who
13  was both an expert in that and who I thought could
14  respond relatively quickly.
15         I have on my team, several
16  biostatisticians who are part of my research group,
17  but they don't have particularly relevant expertise
18  in generating these graphs.
19         And it would have required them to acquire
20  some skills, and so I wanted someone who focuses
21  specifically on this who could do that.
22    Q  Did you review any work from Dr. Hall
23  before you hired her?
24    A  I have been involved in systematic reviews
25  that she contributed to that I was very impressed

Page 73

1  with.  And so --
2    Q  So what other --
3    A  -- I reached out.
4    Q  -- sorry.  I didn't mean to interrupt you.
5         What other systematic reviews have you
6  been involved with Dr. Hall?
7    A  Actually, two of them.  One of them is on
8  a treatment for kidney stones.  Ralph Wang is the
9  senior author.
10         And the second was a systematic review
11  around the diagnosis of and treatment for pulmonary
12  embolism that also Dr. Wang was the leader on.
13    Q  Did you ever meet with Dr. Hall with
14  respect to this work in person?
15    A  I never met with her related to anything.
16  It was all by electronic communication.
17    Q  Did you ever talk with her over the phone?
18    A  Yes.  We spoke a few times.
19    Q  Did you take notes of your conversations
20  with Dr. Hall?
21    A  Not that I recall.
22    Q  You did have e-mails with Dr. Hall --
23    A  Yes.
24    Q  -- is that right?
25    A  Yes.

19  (Pages 70 to 73)

Rebecca Smith-Bindman, M.D.

Page 74

1    Q   Do you have receipts for the work that
2  Dr. Hall performed for you?
3       MS. O'DELL:  Object to the form.
4    A   Like an invoice receipt?
5    Q   (BY MR. ZELLERS) Yes, an invoice receipt.
6    A   No, I do not.
7    Q   You ended up paying her rush fees so that
8  she would do the work and the analysis more quickly;
9  is that right?
10      MS. O'DELL:  Object to the form.
11   A   I -- I remember telling her I didn't mind
12  her rush fee.  But -- but all of the invoicing was
13  done directly with counsel.
14   Q   (BY MR. ZELLERS) Well, Dr. Hall came to
15  you and said:  You know, it's going to take X amount
16  of time to do a thorough analysis?
17   A   Yes.
18   Q   She did offer to rush the analysis --
19   A   Yes.
20   Q   -- when you told her you needed it?
21   A   Yes.
22   Q   And your recollection is she, you know,
23  did rush the analysis and -- and got it done within
24  a couple of days?
25      MS. O'DELL:  Object to the form.

Page 75

1    A   I believe the analysis actually took a
2  couple of weeks.
3       But I was very open to paying her rush
4  fee.  I thought her fee was extraordinarily
5  reasonable, and so it just made it easier for me to
6  get it done quickly rather than to delay.
7    Q   (BY MR. ZELLERS) You defer to the e-mails
8  and the documents as to the timing of when you
9  requested that she rush the analysis and when she
10  provided it to you; is that right?
11      MS. O'DELL:  Object to the form.
12   A   I believe my documents would be correct
13  about when I asked for stuff and when it was done,
14  yes.
15      MS. O'DELL:  Excuse me, Mike.  We have
16  been going about an hour and 20 minutes.  Is this a
17  good time to take a quick break?
18      MR. ZELLERS:  Absolutely.
19      THE VIDEOGRAPHER:  We are off the record.
20  The time is 10:40 a.m.  This is the end of Disc 1.
21      (A break was taken from 10:40 a.m. to
22  11:10 a.m.)
23      THE VIDEOGRAPHER:  We are back on the
24  record.  This marks the beginning of Disc No. 2 in
25  the deposition of Dr. Rebecca Smith-Bindman.  The

Page 76

1  time is 11:10 a.m.
2    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, I'm
3  handing you Deposition Exhibit 16, which is an
4  e-mail chain.  The very first e-mail, meaning the
5  last e-mail at the top of page 1, is Jane Hall --
6  from Jane Hall, September 24, 2018, at 8:04 a.m. to
7  you.
8       (Exhibit 16 was marked for identification
9  and is attached to the transcript.)
10   Q   (BY MR. ZELLERS) Will you take a look at
11  that and tell us if that is a printout of some of
12  your e-mail exchanges with Dr. Hall?
13   A   Yes.
14   Q   If we go to the very first e-mail in the
15  chain, it appears that you contacted Dr. Hall on
16  Wednesday, September 19, 2018, in the afternoon,
17  3:21 p.m., and told her that you were interested
18  primarily in generating a forest plot with a summary
19  estimate and test for heterogeneity; is that right?
20   A   Yes.
21   Q   That was your initial contact with
22  Dr. Hall; is that right?
23   A   Yes.
24   Q   You contacted your referring person,
25  Ralph, on the e-mail; is that right?

Page 77

1    A   Yes.
2    Q   All right.  You told -- the next day you
3  had some exchanges of e-mails with Dr. Hall.  You
4  told Dr. Hall that because you were doing a review
5  for a legal case, you did not need the detail that
6  you would need for a paper; is that right?
7       MS. O'DELL:  Object to the form.
8    A   Can you tell me where you're reading?
9    Q   (BY MR. ZELLERS) Sure.  I'm reading on
10  page 2 of Exhibit 16, the very last e-mail.  This is
11  from you on September 20 of 2018.
12      You thanked Dr. Hall for her willingness
13  to help.
14      "As Ralph mentioned, I am doing a review
15  for a legal case and don't need quite the detail I
16  would usually need for a paper."
17      Is that what you told Dr. Hall?
18   A   Yes, it is.
19   Q   As of -- well, you communicated with
20  Dr. Hall on Friday, September 21st, in the
21  morning.  This is the very last e-mail on page 1 of
22  Exhibit 16.
23      You asked her to send you whatever she was
24  doing sooner rather than later because you needed to
25  get your report finished ASAP; is that right?

20  (Pages 74 to 77)

Rebecca Smith-Bindman, M.D.

1    MS. O'DELL:  Object to the form.  I think
2  you misstated date on the e-mail but --
3    Q   (BY MR. ZELLERS) Well, I'm sorry.  Let me
4  ask that question again.  On Friday morning,
5  September 21, 2018, you told Dr. Hall that you
6  needed her information as soon as possible because
7  you had to finish your report ASAP; is that right?
8    A   Yes.
9    Q   Dr. Hall got back to you that day and
10  said, you know, I'll do my best.  But if you want, I
11  can rush the work, if you're willing to pay time and
12  a half.
13    You then got back to her on Monday
14  morning, September 24, and said:  Yes, I'll pay the
15  rush fee, and I would like your work as soon as
16  possible.
17    Is that right?
18    MS. O'DELL:  Object to the form.  Object
19  to the form.
20    A   I -- I think you're paraphrasing what it
21  says.  The -- the idea was she said that if I paid
22  the rush, she could have some money to defray
23  childcare cost during --
24    Q   (BY MR. ZELLERS) Right.  And --
25    A   -- that time, and I agreed to do that.

1    Q   Exactly.  And she said back to you:  Okay.
2  By the end of -- so this is on a Monday.  She said
3  you'll have the work product from her Wednesday at
4  the earliest, probably Thursday.
5    "I should have at least two sets of plots
6  today, and I'll send them to you as they are
7  output."
8    Is that right?
9    A   Yes.
10    Q   You have produced all of your e-mails and
11  communications with Dr. Hall in this matter; is that
12  right?
13    A   I have.  You're not showing me all of
14  those communications; is that right?
15    Q   I haven't yet.
16    A   Okay.
17    Q   I'm going to show you some more.
18    A   Yes.
19    Q   But my question to you is:  Included in
20  the production, at least you have included all of
21  your communications --
22    A   Yes.
23    Q   -- with Dr. Hall --
24    A   Yes.
25    Q   -- is that right?

1    A   Yes.
2    Q   Have you communicated about this
3  litigation with anyone other than the plaintiffs'
4  counsel that you have told us about with Dr. Hall?
5  Anyone else?
6    MS. O'DELL:  Object to the form.
7    A   I -- you asked me if I have mentioned this
8  litigation to anyone else?
9    Q   (BY MR. ZELLERS) Well, let's start there.
10  Have you mentioned this litigation to anyone else?
11    A   I have.
12    Q   Who have you mentioned this litigation to?
13    A   I have certainly mentioned it to my
14  husband.
15    Q   Other than your husband?
16    A   And then I have mentioned it to several
17  close friends.
18    Q   Your husband is a physician; is that
19  right?
20    A   He is.
21    Q   Did he provide any professional input to
22  you related to your review of this matter?
23    A   No, he did not.
24    Q   The close friends that you mentioned this
25  to, did they provide any input or assistance or

1  direction to you relating to this matter?
2    A   No.
3    Q   I asked you before if you read any of the
4  depositions of the plaintiff experts.  Have you
5  discussed generally with plaintiffs' counsel, the
6  deposition testimony that's been given by other
7  plaintiff experts in this litigation?
8    MS. O'DELL:  I would instruct you not to
9  answer that question.
10    MR. ZELLERS:  I disagree, but we'll
11  reserve that issue.
12    Q   (BY MR. ZELLERS) Was there anything that
13  you asked plaintiffs' counsel to provide to you in
14  connection with your review or for preparation of
15  your report that you were not provided with?
16    A   So most of the documents that I included
17  in my report, I found by doing an independent search
18  online.
19    There were several items that I didn't
20  find that I wanted to review as well.  And so some
21  of the items that I asked counsel for were items
22  that I couldn't find through scientific research
23  that I asked them to provide.
24    Q   And you have told us about those
25  documents, and those are listed out on Exhibit 3; is

Rebecca Smith-Bindman, M.D.

Page 82

1  that right?
2      A   That's correct.
3      Q   My question was a little bit different.
4          Is there anything that you asked for from
5  plaintiffs' counsel that they were not able or did
6  not provide to you?
7          MS. O'DELL:  Object to the form.
8      A   I -- I can't think of anything that fits
9  into that question.
10     Q   (BY MR. ZELLERS) Take a look at your
11 reliance list, which we have marked as Deposition
12 Exhibit 15.
13         Do you have that in front of you?
14     A   I have my copy of the reliance list.  I
15 don't have your Exhibit 15 in front of me.
16     Q   If you have your copy -- does it start
17 with page 1?
18     A   Yes, it does.
19     Q   At the very top --
20     A   Yes.
21     Q   -- the first item is "A Survey of The
22 Long-Term Effects"?
23     A   Yes.
24     Q   If you turn to pages 11 and 12, there's a
25 series of documents that begin with "IMERYS"

Page 83

1  followed by numbers.
2          Do you see that?
3      A   I do.
4      Q   Do you know whether or not you reviewed
5  some or all of those Imerys-produced documents as
6  part of your review in this matter?
7      A   If those reflect Imerys testing documents
8  then yes, I did review at least some of them.  I
9  can't be sure all of them.
10     Q   Do you know whether or not these documents
11 relate to Imerys testing?
12     A   I have reviewed at least a half dozen
13 Imerys testing documents.
14     Q   In --
15     A   I believe that's what these are, but I --
16 I'm not sure.
17     Q   There are a number of Imerys documents
18 that are listed on Exhibit 3, which you identified
19 as testing documents; is that right?
20     A   Yes.
21     Q   Do you know if you reviewed any Imerys
22 documents other than the documents that are listed
23 out on Exhibit 3?
24         MS. O'DELL:  Can you just make a --
25 Exhibit 3, would you remind --

Page 84

1          MR. ZELLERS:  Sure.  Exhibit 3 is the list
2  you gave me today of -- of the documents that
3  Dr. Smith-Bindman reviewed in addition to whatever
4  else is marked.
5          MS. O'DELL:  -- I see.  I see.
6          MR. ZELLERS:  So there's a -- it's a list
7  of Bates-stamped documents.
8          MS. O'DELL:  Yes.
9          MR. ZELLERS:  There's 10 or 12 Imerys
10 documents.  There's one J&J Bates-stamped document
11 --
12         MS. O'DELL:  Right.
13         MR. ZELLERS:  -- and then there's the, I
14 think, expert report or --
15         MS. O'DELL:  Right.
16         MR. ZELLERS:  -- deposition of Dr. Cooke
17 listed?
18         MS. O'DELL:  Right.  Okay.  I just object
19 to the form of the question.  And -- and --
20     A   Could I --
21         MS. O'DELL:  -- then --
22     A   -- see Exhibit 3?
23         MS. O'DELL:  -- yes.  And then I would --
24 Counsel, permit me -- there was a question related
25 to Exhibit 3.  I thought you were referring to the

Page 85

1  materials list, and so I'm going to assert my
2  objection a little bit late.
3          MR. ZELLERS:  Okay.  I just want to move
4  forward.
5          MS. O'DELL:  I know that you do.
6          MR. ZELLERS:  Yes.
7          MS. O'DELL:  I just want to be clear.
8  Because Exhibit 3 that we provided were additional
9  materials that Dr. Smith-Bindman asked for and
10 reviewed in addition to the Materials Considered.  I
11 don't want the record to be unclear.  So --
12         MR. ZELLERS:  Well --
13         MS. O'DELL:  -- I have noted my objection.
14         MR. ZELLERS:  -- and the record is clear
15 that Dr. Smith-Bindman did not review all of the
16 materials listed in the Materials Considered List,
17 Exhibit 15.  But that testimony will stand as it is.
18         My question just is:  In addition to the
19 documents that I was told about this morning that
20 you believe are testing documents, do you know
21 whether you reviewed any other Imerys-produced
22 documents, and specifically the ones that are
23 itemized on pages 11 and 12 of your Materials
24 Considered List?
25     A   I would need to see those documents to

Rebecca Smith-Bindman, M.D.

1 know if I reviewed them.  The names are awfully
2 nonspecific.
3     Q   With respect to the Imerys documents -- or
4 Imerys-produced documents that are identified in
5 Exhibit 15, which is your Materials Considered List,
6 do you know how those were compiled?
7         MS. O'DELL:  Object to the form.
8     A   You're asking me where this list came
9 from?
10     Q   (BY MR. ZELLERS) I think you have told us
11 the list came from plaintiffs' counsel; is that
12 right?
13     A   Yes.
14     Q   My question then, I guess, is more
15 precise.  Do you know how plaintiffs' counsel
16 compiled this list of Imerys-produced documents or
17 how they selected those documents?
18     A   I know I had a lot of back and forth in
19 generating this list with actually Breanne at the
20 time.  I sent her a lot of documents that I had
21 looked at that I hadn't cited that she added to the
22 list.
23         These were ones that she added to the
24 list, and I don't remember what they were.
25     Q   I'm going to ask my question again.  Do

1 you know how -- these documents, the documents that
2 are on pages 11 and 12 of your Materials Considered
3 List that begin with the "Imerys" name, do you know
4 how they were compiled?
5     A   No.
6     Q   All right.  The same question.  If you
7 look on page 13 of your Materials Considered List,
8 there's a series of documents that have J&J and then
9 a number; is that right?
10     A   Yes.
11     Q   You, as we sit here, do not know what
12 those documents relate to; is that right?
13     A   That's correct.
14         MS. O'DELL:  Object to the form.
15     Q   (BY MR. ZELLERS) You do not know how this
16 listing of J&J documents was compiled; is that
17 right?
18     A   That's correct.
19     Q   These are documents produced by Imerys and
20 by Johnson & Johnson companies as part of this
21 overall list of materials that were available, you
22 know, for you to review; is that right?
23         MS. O'DELL:  Object to the form.
24     A   Yes.
25     Q   (BY MR. ZELLERS) Outside of your work in

1 litigation -- so when you do your research work or
2 when you do your publishing work -- do you rely on
3 documents that are picked by someone else that may
4 not represent the full body of evidence?
5         MS. O'DELL:  Object to the form.
6     A   In my work, I review whatever data are
7 available.  And sometimes those data are identified
8 by me and sometimes they have been given to me by
9 other sources to review.
10     Q   (BY MR. ZELLERS) Is that a -- a yes or a
11 no?  And let me withdraw that.
12         The documents that we have looked at in
13 your reliance list Materials Considered List that
14 begin with Imerys and begin with J&J, your
15 understanding, those are documents that have been
16 produced by the Defendants in this litigation; is
17 that right?
18     A   Yes.
19     Q   Do you know what percentage of the overall
20 documents that have been produced by Johnson &
21 Johnson companies and by Imerys, these documents
22 that are listed in Exhibit 15, represent?
23         MS. O'DELL:  Object to the form.
24     A   Are you asking me if the handful of
25 documents from Johnson & Johnson that are in this

1 list reflect all of the documents ever created at
2 Johnson & Johnson or all relevant documents or --
3     Q   (BY MR. ZELLERS) Do you have any idea?
4     A   No, no idea.
5     Q   This is a handful of documents that have
6 been listed out by plaintiffs' counsel for you; is
7 that right?
8     A   Yes.
9         MS. O'DELL:  Object to the form.
10     A   Yes.
11     Q   (BY MR. ZELLERS) All right.  In your
12 report you cite two exhibits from the depositions of
13 several witnesses.  There's an exhibit from a
14 deposition of John Hopkins.
15         Do you know who John Hopkins is?
16     A   I know what the document is, but I -- I
17 don't know what -- who John Hopkins is.
18     Q   Do you know what company he works for?
19     A   I do not.
20     Q   Do you know what his position or title is?
21         MS. O'DELL:  Object to the form.
22     Q   (BY MR. ZELLERS) You're looking in your
23 materials at the exhibit that you were provided from
24 his deposition; is that right?
25     A   Yes.  I -- I -- I do not --

Rebecca Smith-Bindman, M.D.

Page 90

```
 1        Q   Have --
 2        A   -- see.
 3        Q   -- you read any portion of the deposition
 4   of John Hopkins?
 5        A   I have not.
 6        Q   Have you reviewed any other exhibits from
 7   the deposition of John Hopkins?
 8        A   I have not.
 9        Q   Do you know who Julie Pier is?
10        A   I believe I do.
11        Q   Who is Julie Pier?
12        A   I -- I'm just checking.  I -- I -- I got a
13   few names wrong earlier, so I want to just check
14   if --
15        Q   Well, you're going back now and you are
16   looking at your report?
17        A   Yes.
18        Q   And you have annotated your report, I
19   guess, that you are using here today; is that right?
20        A   Yes.
21        Q   Why don't we -- just so we have a complete
22   record, we'll mark your annotated report as
23   Exhibit 17.
24        A   Yes.
25             (Exhibit 17 was marked for identification
```

Page 91

```
 1   and is attached to the transcript.)
 2        A   And -- and I would like to clarify based
 3   on some of my notes.  But -- so I think Dr. Hopkins
 4   oversaw testing for -- for talc products at J&J.
 5        Q   (BY MR. ZELLERS) Is that a note that you
 6   have on your report?
 7        A   It is.
 8        Q   All right.  That's a note that you put on
 9   your report in preparation for your deposition
10   today?
11             MS. O'DELL:  Object to the form.
12        A   It's a note I put on my report when I was
13   reviewing my report and the documents I'm citing and
14   so forth.
15        Q   (BY MR. ZELLERS) Who is Julie Pier?  Do
16   you know who she is?
17        A   I'm -- what I believe -- although, I don't
18   see that I made a note of it -- is that she was
19   someone who did testing from one of the New York
20   hospitals of -- of the talc powder products.
21        Q   Do you know anything more than that about
22   Julie Pier or who she worked for or what her role
23   with respect to talcum powder was?
24        A   Now that I am remembering where I -- I --
25   no, I don't really know those things.
```

Page 92

```
 1        Q   All right.  You were provided -- just as
 2   you were for the exhibit from the deposition of John
 3   Hopkins, you were provided with the exhibit that you
 4   are reviewing from Julie Pier's deposition; is that
 5   right?
 6             MS. O'DELL:  Object to the form.
 7        A   No, I don't -- well, I -- I don't believe
 8   that's why I know who she is.
 9             I -- I believe The New York Times story
10   and the Reuters story discussed her deposition.  So
11   I don't remember reading her deposition.  But I --
12   if I'm not confusing her with someone else, I think
13   that's where I learned about her testing.
14        Q   (BY MR. ZELLERS) Okay.  You're a couple of
15   questions ahead of me here.  No. 1, the exhibit
16   that's in your blue folder from the deposition of
17   Julie Pier, that was provided to you for review by
18   counsel for Plaintiffs; is that right?
19        A   Thank you for that reminder.  That's the
20   Imerys document.  Yes.  Yes.
21        Q   I'm going to go back to my question.
22        A   Yes.
23        Q   The exhibit from Julie Pier's deposition,
24   that was provided to you for review by plaintiffs'
25   counsel; is that right?
```

Page 93

```
 1        A   Yes.
 2             MS. O'DELL:  Object to the form.
 3        Q   (BY MR. ZELLERS) You have not reviewed the
 4   deposition transcript of Ms. Pier; is that right?
 5        A   Not that I recall.
 6        Q   You have not reviewed any exhibit -- other
 7   exhibits to her deposition; is that right?
 8        A   That is correct.
 9        Q   Are you aware that the two exhibits that
10   you were provided by counsel for Plaintiffs -- one
11   from the deposition of John Hopkins and one from the
12   deposition of Julie Pier -- that those exhibits were
13   prepared by plaintiffs' experts for this litigation?
14             MS. O'DELL:  Object to the form.  I think
15   you referred to plaintiffs' experts.  I think you
16   misspoke.  You said they were prepared by
17   plaintiffs' experts.
18             MR. ZELLERS:  Well -- and I will ask it
19   again then.
20        Q   (BY MR. ZELLERS) Are you aware that the
21   exhibits that were provided to you -- one from
22   Ms. Pier's deposition and one from the Hopkins
23   deposition -- are exhibits that were prepared by
24   Plaintiffs in this litigation?
25             MS. O'DELL:  Object to the form.
```

24  (Pages 90 to 93)

Rebecca Smith-Bindman, M.D.

Page 94

1    A   I was provided these documents from a
2  prior case. I don't know who prepared them or where
3  they came from. I -- they were provided to me by
4  counsel.
5    Q   (BY MR. ZELLERS) Let me ask you just a
6  couple of background questions from your review of
7  the literature in this case. You have reviewed a
8  lot of literature relating to talcum powder and
9  talcum powder use by women in the perineal region;
10  is that right?
11    A   Yes, I have.
12    Q   I think you say in your report that you
13  reviewed upwards of 40 studies in papers relating to
14  that. Does that sound about right?
15    MS. O'DELL:  Object to the form.
16    A   Upward of 40 studies that provided primary
17  new data. There were probably hundreds of papers I
18  reviewed on the topic.
19    Q   (BY MR. ZELLERS) From that review, do you
20  agree that most women who use talcum powder in their
21  perineal region begin that use before age 30?
22    A   I don't know the -- when -- I -- I think a
23  lot of women start use when they're young. I would
24  have to check my report if I have cites as to when
25  they began using talcum powder products.

Page 95

1    Q   (BY MR. ZELLERS) Well, take a look, if you
2  will, at Deposition Exhibit 18, which is a report by
3  Cramer.
4    (Exhibit 18 was marked for identification
5  and is attached to the transcript.)
6    Q   (BY MR. ZELLERS) He's the first named
7  author. This is the 2016 study --
8    MS. O'DELL:  Thank you.
9    Q   (BY MR. ZELLERS) -- report. Are you --
10    MS. O'DELL:  Are we at 18?
11    MR. ZELLERS:  18.
12    Q   (BY MR. ZELLERS) You're familiar with the
13  paper we have marked as Deposition Exhibit 18; is
14  that right?
15    A   Yes, I am.
16    Q   I do want to ask you questions a later
17  about that. But for purposes of this question when
18  do most women who use talcum power -- powder in
19  their perineal region begin, go to page 336 of
20  Exhibit 18 and specifically Table 1.
21    A   Yes.
22    Q   One of the categories that is reported
23  here in Table 1 is "Age First Used Genital Powder";
24  is that right?
25    A   Yes.

Page 96

1    Q   And if we looked at the data for when and
2  the age that women were when they first used genital
3  powder, at least from this study by Dr. Cramer, it
4  appears that the vast majority of women began using
5  talcum powder in their genital area before age 30;
6  is that right?
7    A   In this publication.
8    Q   Do you recall any other publications
9  that -- that you reviewed that provided contrary
10  information?
11    A   The question you're asking me is not one
12  that I spent a lot of time thinking about and so
13  can't recall -- sort of across the hundreds of
14  papers I read and 50 that talked about the
15  association -- what time the age of first use was.
16    I -- I see Dr. Cramer's experience is that
17  women do report beginning use earlier, but I --
18  there's no way for me to know if that's a reflection
19  of his sampling, the place he studied the women, and
20  so forth.
21    Q   At least on that point, you would refer to
22  Dr. Cramer, fair?
23    MS. O'DELL:  Object to the form.
24    A   I -- I would defer to a comprehensive
25  review of the literature to come up with that view.

Page 97

1    My -- my guess would be that Dr. Cramer
2  believes his numbers in his population, but I -- but
3  I don't know that that's the truth in other
4  populations.
5    Q   (BY MR. ZELLERS) Well, let me ask you
6  another question. On average from the studies that
7  you reviewed, do women who use talcum powder in
8  their perineal region continue that use for over
9  20 years?
10    MS. O'DELL:  Object to the form.
11    A   My recollection of the literature is that
12  most publications could not assess or did not ask in
13  detailed enough form of how long women used it.
14    I -- I -- again, it's possibly a question
15  that could be answered from the literature, but I
16  don't recall knowing that answer from my review of
17  the literature.
18    Q   (BY MR. ZELLERS) Did you review the Wu
19  2015 paper?
20    A   I did.
21    Q   Do you have that in one of your notebooks?
22    A   I will have it in here.
23    Q   That makes it easy.
24    A   2009 or --
25    Q   '15. No. The 2015 Wu paper.

25  (Pages 94 to 97)

Rebecca Smith-Bindman, M.D.

Page 98

1    A   Yes, I do.
2    Q   Turn to page 1097, Table 2.
3    A   Could you -- unfortunately, the page --
4    the version I have is a free download, and it
5    doesn't have the same page --
6    Q   How --
7    A   -- numbers.
8    Q   -- about -- can you find Table 2?  It's
9    the a table that's captioned "Prevalence of Risk
10   Factors in Non-Hispanic white, Hispanic, and
11   African-American Control."
12   A   Yes, I have that paper.
13   Q   All right.  So if you look at the
14   controls, at the very bottom of that section, it
15   gives a mean number of years of talc use among
16   users; is that right?
17   A   Yes.
18   Q   And whether we're looking at non-Hispanic
19   whites, Hispanics, or African-Americans, at least
20   the number of years of talc use that's reported is
21   greater than 20 years for each of those groups; is
22   that right?
23   A   In --
24       MS. O'DELL:  Object to the form.
25   A   -- in Dr. Wu's paper, there is reported

Page 99

1    that the mean number of years is greater than 20.
2    Q   (BY MR. ZELLERS) If we look down at the
3    group below, the number of cases, the mean number of
4    years of talc use among users is greater than
5    20 years, also for each of those groups; is that
6    right?
7        MS. O'DELL:  Object to the form.
8    A   Dr. Wu found that the average number of
9    years was greater than 20, yes.
10   Q   (BY MR. ZELLERS) All right.  You have
11   never published on, you know, any topic relating to
12   talcum powder or any association between talcum
13   powder and ovarian cancer; is that right?
14   A   I have not.
15   Q   Your opinion is that women exposed to
16   perineal talcum powder products on a regular basis
17   have about a 50 percent increase in their subsequent
18   risk of developing serous invasive cancer; is that
19   correct?
20   A   Yes, that is my opinion.
21   Q   You also opine in your report that there
22   is a causal association between genital talcum
23   powder use and ovarian cancer generally; is that
24   right?
25       MS. O'DELL:  Object to the form.

Page 100

1    A   Yes.
2    Q   (BY MR. ZELLERS) Are you able to tell us
3    how far before you prepared your report, November 15
4    of 2018, that you formed those conclusions?
5        MS. O'DELL:  Object to the form.
6    A   I spent considerable hours during 2018
7    reviewing the literature.  And over the course of
8    that year, my opinions started to solidify when I
9    saw the evidence that strongly supported that
10   ovarian cancer is caused by talcum powder products.
11   I --
12   Q   (BY MR. ZELLERS) And --
13   A   -- I -- I believe that my final systematic
14   review was for me important to -- to confirm that
15   association.  And that wasn't done -- that wasn't
16   completed until my report was basically -- close to
17   when my report had to be drafted.
18   Q   The systematic review that you did was in
19   and around September and October of 2018; is that
20   right?
21   A   I believe the final statistical analysis
22   was that, but my -- my systematic review went on for
23   many months.
24   Q   Well, your systematic review, at least
25   insofar as Dr. Hall assisted you, was in September

Page 101

1    of 2018; is that right?
2        MS. O'DELL:  Object to the form.
3    A   The systematic review that I described in
4    my report has a lot of components.  So one component
5    is to do a complete comprehensive review of -- of
6    what's been published.
7        And that involved doing the search,
8    according -- obtaining all the papers, and then
9    reviewing the bibliography of all of those papers.
10       Then reviewing all those papers critically
11   and then abstracting data for those papers.  Kind of
12   towards the tail end of that review is to
13   statistically combine the studies.
14       Dr. Hall was involved both in abstracting
15   the data as a second set of eyes and in doing the
16   statistical summary.  But I reached out to her after
17   all of those initial points were completed.  So that
18   went on for many months.
19   Q   (BY MR. ZELLERS) Is it the objective of a
20   systematic review to bring clarity to a research
21   question by combining like-with-like data?
22       MS. O'DELL:  Object to the form.
23   A   The purpose of the systematic review is to
24   take individual papers that may not have enough
25   statistical power to provide by themselves,

26  (Pages 98 to 101)

Rebecca Smith-Bindman, M.D.

Page 102

1  individual results that are meaningful.  And if the
2  methodology is combinable, to pool the sample size
3  to get greater statistical power to come up with a
4  conclusion.
5        But your question about combining like
6  with like is -- is -- is very important.
7        Q   (BY MR. ZELLERS) In order for research to
8  be useful, it must be valid, correct?
9        A   Yes.
10       Q   Inaccurate and incomplete reporting of
11 methods can make research unreasonable and unusable;
12 is that right?
13       MS. O'DELL:  Object to the form.
14       A   I -- I -- I think there are separate
15 phases of research that need happen.  I think the
16 reporting of methodology is so that other people can
17 duplicate your results, understand your results.
18       But in and of themselves, the reporting
19 does not influence the reliability of the -- of the
20 research.
21       Q   (BY MR. ZELLERS) Is reporting of
22 methodology important?
23       A   I -- I think reporting of methodology so
24 that other people can duplicate the results is
25 important.

Page 103

1        So if -- if I move ahead as I'm planning
2  to publish my systematic review, then I would
3  include greater details about the methodology so
4  that other investigators could duplicate my work,
5  should -- should they so choose.
6        Q   At least as of now, other scientists or
7  epidemiologists would not be able to reproduce what
8  you have done based upon your report --
9        MS. O'DELL:  Object --
10       Q   (BY MR. ZELLERS) -- correct?
11       MS. O'DELL:  -- object to the form.
12       A   I am -- I am not sure that that's the
13 case.
14       Q   (BY MR. ZELLERS) Do you think that all of
15 the steps that you followed in terms of preparing
16 your systematic review are set forth in your report?
17       MS. O'DELL:  Object to the form.
18       A   I think the path that I followed in this
19 review and the method that I used is a method that I
20 have used in a number of other published systematic
21 reviews.
22       And so to the degree that people could
23 sort of say:  Well, this is what Dr. Smith-Bindman
24 does in a review -- she focuses on stratified
25 results -- these are the methods that have done --

Page 104

1  been done, I tried, in writing my report, to
2  highlight the details of what would be needed to
3  understand my result.
4        But I have not, for example, included
5  certain details that you would typically put in a
6  journal article.
7        So in a journal article, you would always
8  publish the version of SAS or R that was used for
9  the report.  I -- I would not have included that.
10       And -- and I believe some of the documents
11 I shared with you that Dr. Hall provided to me on
12 the methodology were included in the e-mail to me.
13       And I may not have included it in the
14 report, thinking that the reader would not -- you,
15 for example, would be interested in some of those
16 biostatistical nuances.
17       But when I publish it, I would put those
18 in because the readership might care about them.
19       Q   You talked, I believe, a minute ago about
20 abstracting data; is that right?
21       A   Yes.
22       Q   Is data abstraction one of the most
23 important steps in conducting a meta-analysis or a
24 systematic review?
25       Would you agree with that?

Page 105

1        A   I would agree with that.
2        Q   Would you agree that the accuracy of the
3  data abstraction is very important to the validity
4  of the analysis?
5        A   I think one of the hallmarks of doing a
6  systematic review is, in fact, to have several
7  people abstract the data points so that you can be
8  assured that there are -- that they're done as
9  accurately as possible, with the understanding of a
10 single data abstraction by a single person can never
11 be perfect.
12       And so the more people that abstract and
13 review, the greater the accuracy of the data.
14       Q   Your data abstraction was not perfect,
15 correct?
16       A   It was not.
17       MS. O'DELL:  Object to the form.
18       Q   (BY MR. ZELLERS) The data abstraction that
19 was done by Dr. Hall was not perfect; is that right?
20       MS. O'DELL:  Object to the form.
21       A   That is correct.
22       Q   (BY MR. ZELLERS) If data is misrepresented
23 -- well, strike that.
24       Are you familiar with the
25 term "misrepresentation"?

27 (Pages 102 to 105)

Rebecca Smith-Bindman, M.D.

Page 106

1      MS. O'DELL: Object to the form.
2      A   I -- I will admit I'm not sure what the
3  context is you're asking --
4      Q   (BY MR. ZELLERS) Well --
5      A   -- about.
6      Q   -- let me try to put it in another context
7  or at least ask a question that may get to what I am
8  trying to get to.
9          If data is misrepresented from the
10 original study, the analysis -- the systematic
11 review or the meta-analysis can be comprised,
12 correct?
13     A   Yes, I agree.
14     Q   Inaccuracy and misrepresentation of data
15 are considered violations of generally accepted
16 standards of research; is that right?
17     MS. O'DELL: Object to the form.
18     A   Misrepresentation of data suggests to me
19 that there's some malicious or devious attempt where
20 occasionally there are sometimes simple errors in
21 abstraction when you write down the No. 5 and, in
22 fact, the number really is .5.
23         And often when abstracting data, it's not
24 so much an error of writing down 5 or .5, but it's
25 choosing which number in that manuscript reflects

Page 107

1  what you are really trying to capture and get at.
2          So typically there are more than one way
3  to abstract data.  It's why it's not -- it -- it's
4  why it's not simply having multiple people so they
5  don't make typos or small extraction mistakes, but
6  rather, that they're making similar choices.
7          And so misrepresentation, the way you have
8  asked it, makes it sound like there's some malicious
9  attempt to get it wrong or to -- to manipulate it
10 rather than the wrong number was chosen for either a
11 simple error or because there was a choice and the
12 choice was not made in a way that two people would
13 agree.  And so...
14     Q   (BY MR. ZELLERS) There can be differences
15 in the way different folks go about doing a research
16 project or a meta-analysis or a systematic review;
17 is that right?
18     A   Yes.
19     Q   In order for someone to reproduce or
20 replicate what another epidemiologist or scientist
21 has done, they need to see the steps that the
22 scientist or epidemiologist followed; is that right?
23     A   That is --
24     MS. O'DELL: Object to the --
25     A   -- correct.

Page 108

1      MS. O'DELL: -- form.
2      Q   (BY MR. ZELLERS) Go back to my question.
3  And -- and with the background that you have given
4  and with your qualification, do you agree that
5  inaccuracy and misrepresentation are considered
6  violations of generally accepted standards of
7  research?
8      MS. O'DELL: Object to the form.  If you
9  don't understand the question, you may ask him to
10 rephrase it.  If --
11     A   I --
12     MS. O'DELL: -- you understand --
13     A   -- I --
14     MS. O'DELL: -- the question, feel free to
15 answer it.
16     A   -- I felt like I had answered the question
17 that I understood, so it -- perhaps I'm not
18 understanding your question.
19     Q   (BY MR. ZELLERS) Are you able to answer
20 that question?
21     A   Yes.  I think that misrepresentation of
22 data is not how I would describe an error in
23 abstraction of data or in a difference of opinion
24 about what value reflects the data point you were
25 looking for.  I wouldn't consider that a

Page 109

1  misrepresentation of data.
2      Q   Understood.  Let me ask my question once
3  more.
4      A   Okay.
5      Q   Misrepresentation of data would be a
6  violation of generally accepted standards of
7  research, correct?
8      A   I agree that misrepresentation of data
9  would be a violation of research.
10     Q   A causal analysis cannot be determined
11 based on a single piece of evidence, but requires
12 consideration of the totality of relevant evidence.
13         Do you agree with that?
14     A   I would say in the field of epidemiology,
15 it's unusual to have a single piece of evidence.
16 But I think in some circumstances a single piece of
17 evidence can establish causality.  Not typically in
18 epidemiology work.
19     Q   What do you mean in your report by "causal
20 association"?
21     A   So in my report, I did research as -- sort
22 of as I outlined in my Table of Contents of, you
23 know, number of different areas.
24     Q   Okay.  And I'm going to ask you about
25 those.  Right now my question just --

28 (Pages 106 to 109)

Rebecca Smith-Bindman, M.D.

<table>
<tr><td>

Page 110

```
 1        A   No.
 2        Q   -- is --
 3        A   I understand.  I --
 4        Q   What --
 5        A   -- understand.
 6        Q   -- do you mean when you say "causal
 7   association"?
 8        A   No.  I -- I understand.  I -- I apologize.
 9   I was not getting there quite quickly enough.
10        Q   That's all right.
11        A   So I did research on several topics that I
12   thought were highly relevant to coming up with a
13   causal determination, and I put those different
14   pieces of research and expertise together in terms
15   of the causality by specifically looking at the
16   Bradford Hill criteria.
17        Q   I -- and I'm going to get to eventually, I
18   hope, why you came up with whatever opinion you came
19   up with.
20            Right now I'm just trying to understand
21   what you mean when you use the words "causal
22   association."
23            MS. O'DELL:  Object to the form.  Is there
24   a specific case in her report that --
25        Q   (BY MR. ZELLERS)  Sure.  "Conclusion."
```

</td><td>

Page 112

```
 1        Q   Is that what you mean by "causal
 2   association"?
 3        A   Yes, it is.
 4        Q   What are the other causes of ovarian
 5   cancer?
 6        A   So there's a whole long list of risk
 7   factors for ovarian cancer.
 8        Q   What is the difference between a risk
 9   factor and a cause?
10        A   A risk factor is something that puts you
11   at increased risk, increases the probability that
12   you will get ovarian cancer.  And there are
13   innumerable mechanisms and ways that that can go
14   about.
15            But often -- not entirely, but often, you
16   don't think of risk factors as being things that you
17   can alter.  That's not entirely true.
18            There are some risk factors.  For example,
19   the use of -- well, the -- the most commonly cited
20   risk factor for cancer in general is smoking, and
21   that's clearly something that can be started or
22   ended, that can be changed.
23            But often you think of risk factors as
24   things that can't be changed.  So elevation in age,
25   inherited genetics.
```

</td></tr>
<tr><td>

Page 111

```
 1   Page 41 of the report, In conclusion, substantial
 2   evidence supports a strong, positive, and causal
 3   association between ovarian cancer and genital
 4   exposure to talcum powder products.
 5            I just want to know what you mean when you
 6   say "causal association."
 7            MS. O'DELL:  I think she answered your
 8   question.
 9            But you may answer him, if you understand
10   it.
11        A   I -- I think that the -- the four
12   sentences just above that says that, Summary
13   consideration of causality of talc powder products
14   and ovarian cancer using the Bradford Hill.
15            So I -- I -- I believe, using this
16   framework, the Bradford Hill, the components of the
17   Bradford Hill demonstrate that ovarian cancer is
18   caused by regular talcum powder exposure based on
19   the strength of the association, based on the
20   consistency, the temporality of -- of the components
21   of my analysis.
22        Q   (BY MR. ZELLERS)  Do you believe that
23   perineal use of talcum powder by women on a regular
24   basis causes ovarian cancer?
25        A   Yes, I do.
```

</td><td>

Page 113

```
 1            So those things lead to ovarian cancer,
 2   the risk factors that I describe in my report.  But
 3   most of them are not things that you can influence.
 4   Some of them are, but most of them are not.
 5            Where talcum powder products -- the use of
 6   perineal talcum powder products -- products is
 7   something that can be changed.  That -- that is a
 8   behavior, and so I think that's the distinction that
 9   I would make.
10        Q   A risk factor is something that increases
11   the potential risk of a disease, but cannot be
12   changed, correct?
13            MS. O'DELL:  Object to the form.
14        A   I -- I said that it's often something that
15   can't be changed.  But -- but again, there are risk
16   factors that, by convention, we consider risk
17   factors, but that are modifiable.
18        Q   (BY MR. ZELLERS)  All right.
19        A   And I gave smoking as an example.
20        Q   A cause of a disease is something that can
21   be modified; is -- is that correct?
22        A   It --
23            MS. O'DELL:  Object to the form.
24        A   -- again, it is often used that way.
25        Q   (BY MR. ZELLERS)  What makes a factor cross
```

</td></tr>
</table>

Rebecca Smith-Bindman, M.D.

Page 114

1    the line from being a risk factor to being a cause?
2        A   I -- I think what I was suggesting is it's
3    a blurry distinction.  I think it's by convention
4    things that cannot be modified are typically thought
5    as risk factors.  Things that can be modified are
6    generally thought about as being in the causal
7    family -- pathway.
8        But there's no distinction that you can
9    separate something that increases your risk of
10   something versus something that causes it.  The --
11   the causal pathways could be the exact same causal
12   pathways in both situations.
13       Q   What other causes are there of ovarian
14   cancer?
15       A   So I'm guessing from what I have just said
16   that you are asking about causes and risk factors or
17   would you like them to be --
18       Q   Well, do you use "risk factor" and "cause"
19   interchangeably or are they different?
20       MS. O'DELL:  Object to the form; asked and
21   answered.
22       A   I -- I believe that by convention we
23   typically describe risk factors that are things that
24   cannot be altered.
25       But technically there is no difference

Page 115

1    between factors, covariants that influence your
2    cancer risk that you can change or not.  So I can
3    tell you the list of things that fall into those two
4    categories.
5        Q   (BY MR. ZELLERS) All right.  What I want
6    to know is:  Based upon your review and your
7    research over the past year or so, other than
8    perineal use of talcum powder on a regular basis,
9    what other causes of ovarian cancer are there?
10       A   So in my report on page 11, I write that,
11   Numerous risk factors are identified for ovarian
12   cancer.  Unfortunately, few can be modified by
13   therapies or lifestyle changes.  Risk factors
14   include personal or family history of -- of cancer,
15   inherited mutations, BRC1 and BRC2, advanced age,
16   white, race, education, endometriosis.
17       Other factors that may increase --
18   increase ovarian cancer due to estrogen exposure
19   include having no pregnancies or advanced age at
20   first birth, obesity, post menopausal hormone
21   therapy.
22       Several factors I list are associated with
23   a decreased risk of ovarian cancer such as breast
24   feeding or multiple pregnancies, oral
25   contraceptions, tubal ligation, or hysterectomy.

Page 116

1    Smoking is a possible risk factor.
2        So all of those are in the category of
3    risk factors for ovarian cancer.
4        Q   My question goes to cause.  Based upon
5    your review of the literature over the past year,
6    what other causes of ovarian cancer have you
7    identified, if any?
8        MS. O'DELL:  Objection to form; asked and
9    answered.
10       A   There are other contributors to ovarian
11   cancer like pelvic inflammatory disease, which I
12   think was on the list of what I just noted.
13       There are no other modifiable factors that
14   I would put on the list of things that cause ovarian
15   cancer other than exposure to talc powder products.
16       Q   (BY MR. ZELLERS) Based upon your review of
17   the literature in terms of a cause for ovarian
18   cancer, the only cause that you have identified is
19   the regular perineal use of talcum powder by women,
20   correct?
21       MS. O'DELL:  Object to the form.
22   Misstates her testimony.
23       A   I believe I just said that pelvic
24   inflammatory disease increases the risk of ovarian
25   cancer.

Page 117

1        Q   (BY MR. ZELLERS) Is pelvic in --
2        MS. O'DELL:  Excuse me.  I'm sorry.  Were
3    you finished, Dr. Smith-Bindman?  I mean, if you're
4    not, you -- you may continue.  If so, I apologize --
5        A   I --
6        MS. O'DELL:  -- for interrupting you both.
7        A   -- I was going to add that endometriosis
8    has been noted also as a contributor to --
9        Q   (BY MR. ZELLERS) Is -- are you finished?
10       A   -- I am.
11       Q   Okay.  Is pelvic inflammatory disease a
12   cause of ovarian cancer?
13       A   I -- I -- you -- you keep asking me the
14   same question, and I don't understand the
15   distinction that you are asking me to make between
16   something that causes cancer and something that's a
17   risk factor.
18       In both situation -- situations there is a
19   probability of getting a disease versus not getting
20   a disease.  There's no 100 percent association, and
21   so most people, as an analogy who smoke cigarettes,
22   do not get lung cancer.  It's fewer than 15 percent.
23       Does smoking cause lung cancer?  Yes.  Is
24   it a risk factor for lung cancer?  Yes.  Is it a
25   single pathway that everyone who smokes, gets lung

30 (Pages 114 to 117)

Rebecca Smith-Bindman, M.D.

Page 118

1   cancer?  No.
2        So I -- you're asking me to make a
3   distinction that I don't make in my head, so I'm --
4   I'm not sure -- all of the things I suggested as
5   risk factors in some women will cause them to have
6   cancer.
7        Q   You are opining in this case that the
8   regular perineal use of talcum powder causes ovarian
9   cancer, correct?
10       A   Yes, I am.
11       Q   My question is:  Does pelvic inflammatory
12  disease cause ovarian cancer?
13       A   In some women, pelvic inflammatory disease
14  will cause cancer.
15       Q   You -- you would list a pelvic
16  inflammatory disease as a cause of ovarian cancer;
17  is that your testimony?
18        MS. O'DELL:  Objection, asked and
19  answered.
20       A   I would include pelvic inflammatory
21  disease with all the other ovarian cancer risk
22  factors like BRCA1 and 2 as being one of a large
23  number of contributors and risk factors for ovarian
24  cancer.
25        There -- there is not -- no other

Page 119

1   exposure -- a modifiable exposure that I can think
2   of that leads to getting ovarian cancer or causing
3   ovarian cancer.
4        Q   (BY MR. ZELLERS) In -- in your practice as
5   a radiologist, you do not evaluate what caused an
6   individual patient's ovarian cancer; is that right?
7        MS. O'DELL:  Object to the form.
8        A   As a -- a radiologist, I do not.
9        Q   (BY MR. ZELLERS) You don't diagnose what
10  caused any individual patient's ovarian cancer; is
11  that right, in your practice -- your medical
12  practice.
13        MS. O'DELL:  Objection, asked and
14  answered.
15       A   I -- I -- I do not.  I diagnose ovarian
16  cancer.  I diagnosis pelvic inflammatory disease.
17  But in an individual patient, I wouldn't tell a
18  patient why they got ovarian cancer.
19       Q   (BY MR. ZELLERS) You -- you have not, at
20  least as of this time, published on your theory that
21  there is a causal association between genital talcum
22  powder exposure and ovarian cancer; is that right?
23        MS. O'DELL:  Object to the form.
24       A   I have not published on my conclusion that
25  talcum powder products causes ovarian cancer.

Page 120

1        Q   (BY MR. ZELLERS) Have you done anything to
2   advise the health community about your belief that
3   there is a causal association between talcum powder
4   use and ovarian cancer?
5        A   I have mentioned to you that I have spoken
6   about my review to several individuals, several
7   close mentors of mine in leadership roles within the
8   healthcare community.  So I --
9        Q   Who?
10       A   -- not -- not individuals I am willing to
11  name.
12       Q   You won't tell me who you have talked to
13  about your belief or your theory that there's a
14  causal association between genital talcum powder use
15  and ovarian cancer?
16       A   I would prefer not to share that
17  information.
18       Q   Have you contacted any public health
19  authorities such as the FDA or the National Cancer
20  Institute?
21       A   I have not.
22       Q   Have you written any type of an op-ed or
23  other news article on this topic?
24       A   Not yet.  I have not.
25       Q   You have done that in the past; is that

Page 121

1   right?
2        A   Had -- you're asking if I have written
3   op-eds on areas I have done research?
4        Q   Yes.
5        A   Yes, I have.
6        Q   Back in 2014, you did an op-ed in The New
7   York Times relating to CT scans; is that right?
8        A   Yes, I did.
9        Q   All right.  You concluded or at least put
10  in the op-ed, In 2007, CT scans will cause 29,000
11  excess cancer cases and 14,500 excess deaths; is
12  that right?
13       A   I don't have it in front of me.  But it
14  looks like you do, and so I'm going to guess that
15  that's correct.
16       Q   Well, does that sound right to you?
17       A   It does sound right.
18       Q   You put in that editorial or op-ed that in
19  your opinion, 3 percent to 5 percent of all future
20  cancers may result from exposure to medical imaging
21  such as CT scans; is that right?
22        MS. O'DELL:  And if you have a
23  recollection and -- and you -- and your memory
24  confirms those -- those facts, please feel free to
25  testify to it.  If you need to see the op-ed, then

31 (Pages 118 to 121)

Rebecca Smith-Bindman, M.D.

Page 122

1  I'm sure counsel would be willing to put it in front
2  of you.
3      A   That particular statistic, I don't have to
4  see.  I know that static --
5      Q   (BY MR. ZELLERS) All right.
6      A   -- so yes.
7      Q   You are familiar with the Center for
8  Disease Control, correct?
9      A   Yes, I am.
10      Q   The CDC or Center for Disease Control is a
11  reputable organization; is that right?
12      MS. O'DELL:  Object to the form.
13      A   I think they're a very reputable
14  organization.
15      Q   (BY MR. ZELLERS) You have served on
16  several committees for the CDC in the past; is that
17  right?
18      A   I currently work on several committees
19  with them.
20      Q   Do the doctors and scientists in the CDC
21  work hard to protect women's health, based on your
22  experience?
23      A   Yes, they do.
24      Q   In forming your opinions in this case, did
25  you consider the risk factors that the CDC

Page 123

1  recognizes for ovarian cancer?
2      A   From my report, I read an enormous number
3  of articles, and I spent considerably time
4  considering those articles from a data point of
5  view.
6      And I did not, for the most part, weigh
7  other organization's summaries if they were not
8  quantitative and very explicit in what reviews they
9  did, what literature they included.
10      And sometimes they -- organizations did do
11  that, but did not do nearly as -- a comprehensive
12  job.  So I -- I would not have relied on any
13  professional organization's reviews unless they were
14  quantitative the way -- the way my own were?
15      MR. ZELLERS:  Move to strike as
16  nonresponsive.
17      Q   (BY MR. ZELLERS) Let me ask the question
18  again.  In forming your opinions in this case, did
19  you consider the risk factors that the CDC
20  recognizing for ovarian cancer?
21      MS. O'DELL:  Object to the form.
22      A   I saw documents on their websites that
23  list risk factors, and no individual organization's
24  summaries, either for patients or for clinicians,
25  formed a very large piece of my opinion.  It was one

Page 124

1  of many pieces of information I used.
2      Q   (BY MR. ZELLERS) Are you aware that in
3  their patient-facing websites, as well as their
4  publicly available information about ovarian cancer,
5  the CDC does not identify perineal use of talcum
6  powder as a risk factor for ovarian cancer?
7      A   Yes, I do remember seeing that.
8      Q   You don't have any reason to believe that
9  the folks at the CDC have not kept up to date with
10  talc and ovarian cancer epidemiology, do you?
11      MS. O'DELL:  Object to the form.
12      A   I believe that the comprehensiveness of
13  the review that I did and the amount of time that I
14  put into this review, as I have in -- in many other
15  reviews, requires a very deep dive into the
16  literature.
17      And I do not believe that the CDC has
18  funding or resources to do that kind of deep dive.
19  And so typically what they do is sort of review some
20  things that have been published.  Most things, they
21  don't end up reviewing.
22      And so I have no reason to believe anyone
23  at the CDC deliberately didn't do a comprehensive
24  review of the literature, but -- nor do I have any
25  evidence that they did a comprehensive review of the

Page 125

1  literature.
2      Q   (BY MR. ZELLERS) Do you have any personal
3  knowledge one way or the other as to the extent of
4  the review of the science and literature that the
5  CDC did in compiling its list of risk factors for
6  ovarian cancer?
7      A   I --
8      MS. O'DELL:  Object to the form.
9      A   -- I would have to refresh my memory by
10  looking at their -- their website and documents.  If
11  you provided those, I could.
12      Q   (BY MR. ZELLERS) My question is:  Do you
13  have any personal knowledge one way or the other as
14  to what the CDC has done with respect to a review of
15  the scientific literature in compiling its list of
16  risk factors for ovarian cancer?
17      A   I don't know offhand what they did.  And I
18  don't recall when looking at their website, what
19  references they listed.
20      I think if their reference list included a
21  very short -- small number of references, I would
22  have concluded that they had not done a very
23  comprehensive review.
24      Q   (BY MR. ZELLERS) My question is:  Do you
25  have any personal knowledge as to what the CDC did

32  (Pages 122 to 125)

Rebecca Smith-Bindman, M.D.

Page 126

1    or did not do with respect to its review of the
2    literature?
3        A   Again, I don't know off the top of my
4    head.  But I know I went to their website, and I
5    don't --
6        Q   Other than looking at their website, do
7    you have any personal knowledge?
8        A   No, I do not.
9        Q   All right.  Have you communicated to
10   anyone at the CDC that you disagree with their
11   position?
12       A   I -- I'm laughing at the nature of the
13   question.  There wouldn't be anyone at the CDC to
14   disagree with.
15       Q   There -- there's no one at the CDC that
16   you, as a concerned radiologist, could go to and
17   say:  Hey, I think that you should list perineal
18   talc use as a risk factor for ovarian cancer?
19           MS. O'DELL:  Object to the form.
20       Q   (BY MR. ZELLERS) There's no one you could
21   talk to at the CDC about that?
22       A   I -- I would -- I would have to confirm
23   that that -- I have been -- I -- I study
24   environmental carcinogens.
25           And you pointed out my New York Times

Page 127

1    op-ed that put a message out there that said:  I
2    think this is an environmental carcinogen.
3            And I have spoken about that topic in many
4    forms.  I have testified before Congress several
5    times.  I testified to the FDA.  I have spoken to
6    CMS.
7            All of that took years to get people to
8    hear those messages.  It was not that:  Oh, I see
9    there's a problem here.  Let me just tell the top
10   person to do that.
11           And -- and so I'm -- you're suggesting
12   there's someone at the CDC that I could call and
13   say:  Oh, by the way, I think that's an important
14   topic.  I appreciate your giving me that idea.  I
15   will move forward once I publish a paper on this
16   topic.
17           But -- but that's not nearly as -- as
18   simple as you're suggesting in your question.
19   There's a naiveness there that there's someone at
20   the CDC who would -- who takes responsibility for
21   what they do and -- on all of their websites and you
22   can sort of give them feedback on that.
23       Q   You believe I'm being naive to think that
24   there's a person responsible at the CDC for
25   compiling a list of risk factors for ovarian cancer?

Page 128

1            MS. O'DELL:  Object to the form.
2        A   Naive to suggest that a single person
3    could just call them and say:  I have looked at this
4    topic, and you should change what you are doing.
5        Q   (BY MR. ZELLERS) Are you familiar with the
6    National Institute of Health?
7        A   I am.
8        Q   You have received funding from the
9    National Institute of Health; is that right?
10       A   I have.
11       Q   Do you know that the National Institute of
12   Health does not list talc use as a risk factor for
13   ovarian cancer?
14           MS. O'DELL:  Object to form.
15       A   Again, I -- yeah, I know that the NCI, PDQ
16   that writes reports for patients and clinicians
17   about risk factors for cancer has a report on risk
18   factors for ovarian cancer and that they conclude
19   that there's inadequate evidence for talc.
20       Q   (BY MR. ZELLERS) Inadequate evidence,
21   correct?
22       A   I -- I -- I wasn't finished.
23       Q   Please finish.
24       A   So they don't stand -- just to clarify,
25   for the National Institute of Health.  It's a very

Page 129

1    prestige body.  It's an organization within a small
2    part of the NCI.
3            I know it well, because I served on that
4    committee for many years.  I know the process
5    whereby they review the literature and created a
6    whole a bunch of standards within what they do
7    around that.
8            And I looked and saw that they updated
9    their summary of talc in 2018.  And -- and yet,
10   within that summary, they do list the references
11   that they cite, and they omit a large number of
12   references that are recent.
13           So I do know their conclusion.  I do not
14   agree with their conclusion.  And there were large
15   gaps in their literature.  And that update was very
16   recent.
17           I -- I told you I don't know the
18   leadership at the CDC, and they don't have a
19   process.  But I do know the leadership on this
20   committee and -- and will point out their omissions
21   to this committee.
22       Q   Well, I haven't gotten to the National
23   Cancer Institute yet.
24           My question was:  Do you know that NIH,
25   the National Institute of Health, does not list use

Rebecca Smith-Bindman, M.D.

Page 130

1  of talcum powder as a risk factor for ovarian
2  cancer?
3      A   So I -- I -- I don't know what -- I'm
4  sorry.  I don't know what you're talking about,
5  the --
6      Q   All right.
7      A   -- NIH.
8      Q   Take a look, if you will, at Deposition
9  Exhibit 19, which is captioned NIH steer -- or
10  "SEER, S E E R, Training Modules" and has got "Risk
11  Factors" at the top.
12         (Exhibit 19 was marked for identification
13  and is attached to the transcript.)
14      MS. O'DELL:  Thank you.
15      A   So SEER is also a part of National Cancer
16  Institute.  It's the surveillance epidemiology --
17      MR. LAPINSKI:  Have her wait for a
18  question.
19      MS. O'DELL:  Sorry.  Just wait for his
20  question.  Yeah, thanks, Dan.
21      Q   (BY MR. ZELLERS) You recognize Exhibit 19
22  as a training module from NIH and specifically from
23  the National Cancer Institute; is that right?
24      A   So this says at the top "SEER Training
25  Modules."

Page 131

1         I don't know what this is.  I know SEER
2  quite well.  It's the National Cancer Registries.
3  But I -- I don't -- don't know what this training
4  module is.  But I do see that you are showing me
5  some risk factors.
6      Q   Talc is not listed as a risk factor for
7  ovarian cancer in this document, Exhibit 19, that
8  was updated in June of 2018 from NIH and the
9  National Cancer Institute; is that right?
10      A   I -- I want to sort of explain my
11  confusion.  The SEER, Surveillance, Epidemiology,
12  and End Result, program does not train or educate
13  individuals typically using documents like this.
14         Often this is for cancer abstractors to
15  know what information they're asking their
16  abstractors to collect.
17         I -- I don't know what this is, but it
18  doesn't look to me like something that's identifying
19  risk factors as much as asking medical chart
20  abstractors to write down information that they're
21  collecting as part of their data.
22      Q   My question is very simple.  This is a
23  list that at the top says "Risk Factors."
24         The introductory statement says, The main
25  risk and protective factors for ovarian cancers

Page 132

1  include modifiable and nonmodifiable parameters.
2         Is that right?  And then it lists out
3  nonmodifiable parameters and modifiable parameters;
4  is that right?
5      A   Yes, that's what this --
6      Q   Talcum --
7      A   -- says.
8      Q   -- powder use is not listed, correct?
9      A   Correct.
10      Q   All right.  Take a look, if you will --
11  and this is the document that you were talking about
12  a moment ago -- at Deposition Exhibit 20.
13         (Exhibit 20 was marked for identification
14  and is attached to the transcript.)
15      Q   (BY MR. ZELLERS) This is the "National
16  Cancer Institute Review of Ovarian, Fallopian Tube,
17  and Primary Peritoneal Cancer Prevention PDQ"; is
18  that right?
19      A   Yes, it is.
20      Q   This is the document that you told us a
21  few minutes ago that you disagree with the
22  conclusion; is that right?
23         And specifically if you go to page 5 of 9
24  under "Perineal Talc Exposure," the statement from
25  the National Cancer Institute in this document is

Page 133

1  that the weight of evidence does not support an
2  association between perineal talc exposure and an
3  increased risk of ovarian cancer.  Results from
4  case-control and cohort studies are inconsistent.
5         Is that right?
6      A   That is what they conclude.
7      Q   This was updated, if you looked at the
8  last page, page 9 of 9, on January 4 of 2019; is
9  that right?
10      MS. O'DELL:  Object to the form.
11      A   Can you show me where it's been updated?
12      Q   (BY MR. ZELLERS) Sure.  Look at the very
13  last page.  In bold, "Updated January 4, 2019"; is
14  that right?
15      A   It does say that --
16      Q   All right.
17      A   -- yes.
18      Q   Are there limitations on epidemiological
19  data?
20      A   Yes, there are.
21      Q   Do you agree that epi -- epidemiologic
22  data alone cannot permit a determination regarding
23  causation?
24      A   I'm sorry.  Can you just --
25      Q   Do you need me to say it again or can you

Rebecca Smith-Bindman, M.D.

Page 134

1    read it off the screen?
2         A   I can read it off the screen.  I think
3    epidemiologic data can provide an enormous amount of
4    information about causation.  But there are other
5    considerations that would have to be also taken into
6    account to also support that.
7         Q   Can epidemiologic data alone permit a
8    determination regarding causation?
9         MS. O'DELL:  Object to the form.
10        A   I think epidemiologic data can be used in
11   combination with other data to determine causality,
12   but by itself cannot be used alone to determine
13   causality.
14        Q   (BY MR. ZELLERS) The current epidemiologic
15   data, as it exists, does not enable someone to
16   distinguish between brands of cosmetic talc
17   products; is that right?
18        MS. O'DELL:  Object to the form.
19        A   I would agree.
20        Q   (BY MR. ZELLERS) You can't tell in any of
21   the 40 plus studies that you reviewed, that the
22   women who were involved in those studies used talc
23   products manufactured by Johnson & Johnson
24   Consumer, Inc., or by another company; is that
25   right?

Page 135

1         MS. O'DELL:  Object to the form.
2         A   I -- I would agree that most of the papers
3    that I read did not specify what the source of the
4    baby powder was.
5         Q   (BY MR. ZELLERS) Based on the analysis
6    that you have done, you're not able to draw an
7    opinion specifically about an increased risk of
8    ovarian cancer that is tied to a particular brand of
9    talcum powder, correct?
10        MS. O'DELL:  Object to the form.
11        A   My impression is that a large proportion
12   of the talcum powder products that are available
13   happen to be made by Johnson & Johnson, but I do not
14   know for any given study -- for most of the studies,
15   at least, what kind of talcum powder it was.
16        Q   (BY MR. ZELLERS) Okay.  Is your impression
17   that you just shared with us, you know, based on
18   information you have received from plaintiffs'
19   counsel?
20        MS. O'DELL:  Object to the form.  Don't --
21   don't discuss what's been provided by -- let me say
22   that again.
23        Don't -- don't discuss conversations with
24   plaintiffs' counsel.  Thank you.
25        A   I -- my impression is based on seeing an

Page 136

1    awful lot of Johnson & Johnson baby powder over the
2    last 50 plus years.  And -- and I am --
3         Q   (BY MR. ZELLERS) And --
4         A   -- not sure whether there's lots of other
5    dominant players in the space.  I -- I don't know
6    that.
7         My impression is that Johnson -- baby
8    powder baby is a Johnson & Johnson a product very,
9    very often.
10        Q   But you have not done any type of survey
11   --
12        A   I have --
13        Q   -- or analysis?
14        A   -- I have not.
15        Q   If the biological mechanism by which a
16   talcum powder product can increase the risk of
17   ovarian cancer is because of a particular
18   contaminant or collection of contaminants, but that
19   contaminant or collection of contaminants does not
20   exist in all talcum powder products, will the
21   epidemiologic evidence that exists today allow you
22   to see that distinction?
23        MS. O'DELL:  Object to the form.
24        A   You're asking about contaminants of talcum
25   powder products.  My understanding from what I have

Page 137

1    reviewed is that the components of talcum powder
2    products include asbestos, include fibrous talc,
3    include heavy metals, include fragrances.
4         Let's get rid of the header -- the --
5    the fragrances.  Just the heavy metals, the
6    asbestos, and the fibrous talc.  My understanding is
7    that those are in the same mines as the platy talc,
8    which is the desired part of talc.
9         To the degree that those are all part and
10   parcel of the same product, they're not -- I
11   wouldn't think of them as contaminants.  I would
12   think of them as just part of the product.
13        And so to the degree that that product
14   cannot be separated, I would be concerned that any
15   talcum powder products have all of the above.
16        I separated fragrance, because that's
17   something that's added.  That's not mined directly.
18   But the other items, my understanding is that's part
19   of the talc.
20        Q   You don't know one way or the other
21   whether talcum powder products contain asbestos, do
22   you?
23        MS. O'DELL:  Object to the form.
24        A   You're asking me to opine whether talcum
25   powder products contain asbestos?

35 (Pages 134 to 137)

Rebecca Smith-Bindman, M.D.

Page 138

1    Q   (BY MR. ZELLERS) Yes.
2    A   Yes, I -- I feel very certain that talcum
3  powder products, at least over many years, contained
4  asbestos.
5    Q   Is that part of your opinion in this case?
6    A   Yes, it is.
7    Q   Is it your opinion in this case that
8  talcum powder products contain trace amounts of
9  heavy metals?
10   A   Yes, it is.
11   Q   Is it also part of your opinion in this
12  case that talcum powder products contain different
13  fragrance chemicals?
14   A   Yes, it is.
15   Q   Do you have any opinion as to how many
16  fragrance chemicals are contained in talcum powder
17  manufactured by a Johnson & Johnson company at any
18  time?
19       MS. O'DELL:  Object to the form.  With
20  regard to "opinion."
21   A   I have seen long lists of chemicals and
22  fragrances that are contained.
23       I'm not familiar enough with -- with the
24  testing that was done to understand how that's
25  changed over time in a Johnson & Johnson product

Page 139

1  versus other talcum powder products.
2    Q   (BY MR. ZELLERS) Do you have any opinion
3  or knowledge as to the amount or concentration of
4  particular fragrance chemicals that are contained in
5  talcum powder manufactured by Johnson & Johnson?
6    A   I -- I do not.
7    Q   Do you have any opinion or knowledge as to
8  the amount or concentration of trace chemicals
9  -- strike that -- trace heavy metals that may be
10  contained in talcum powder manufactured by Johnson &
11  Johnson?
12   A   I have seen reports of the amounts that --
13  you know, sort of in the ballpark of hundreds to
14  thousands of parts per million.
15       But I'm not an expert in understanding
16  those numbers in comparison to the concentrations in
17  other things that we're exposed to.  They're much
18  higher.  They're orders of magnitudes higher, but
19  I'm not an expert to understand how those different
20  concentrations might be expected to have an
21  influence on talc.
22   Q   The same question with respect to
23  asbestos.  Do you have any opinion or knowledge as
24  to the amount or concentration of asbestos that you
25  believe is contained in any talcum powder

Page 140

1  manufactured by Johnson & Johnson?
2        MS. O'DELL:  Object to the form. to the
3  form.
4    A   So unlike the question about heavy metals
5  where it sort -- there are traces of heavy metals in
6  other things to which we're exposed regularly, like
7  water.  We don't expect any concentrations of
8  asbestos in products that we're exposed to.
9        And so put in that context, while I'm not
10  an expert in the mineralogy, the numbers that I have
11  seen are tens of thousands to millions of fibers
12  that might be in grams of product seem like an awful
13  lot of units or dose of -- of asbestos or fibrous
14  talc.
15       MR. ZELLERS:  Move to strike as
16  nonresponsive.
17   Q   (BY MR. ZELLERS) You do not have personal
18  knowledge as to any amounts or concentrations of
19  asbestos in talcum powder manufactured by Johnson &
20  Johnson --
21       MS. O'DELL:  Objection.
22   Q   (BY MR. ZELLERS) -- correct?
23       MS. O'DELL:  Objection, asked and
24  answered.
25   A   I have seen several reports of Johnson &

Page 141

1  Johnson products that have been tested for
2  concentrations of asbestos or asbestiform talc that
3  have concentrations shown kind of in ranges of a
4  tenth of a percent or, as I mentioned, tens of
5  thousands or mid -- millions of fibers.
6        And those have been tested by -- by
7  several different people, but coming up with units
8  of dose within Johnson & Johnson talcum powder
9  products.
10   Q   (BY MR. ZELLERS) You're not a geologist,
11  correct?
12   A   I am not a geo --
13   Q   You're --
14   A   -- logist.
15   Q   -- not a mineralogist, correct?
16   A   I am not.
17   Q   You have reviewed some expert reports from
18  Dr. Longo; is that right?
19   A   Among others, yes.
20   Q   You have reviewed some testing reports.
21  Some purportedly show that there is asbestos present
22  in talcum powder and some that show that there's not
23  asbestos in talcum powder; is that right?
24       MS. O'DELL:  Object to the form.
25   A   I have seen a lot of reports that have

36 (Pages 138 to 141)

Rebecca Smith-Bindman, M.D.

Page 142

1   shown the presence of talcum powder containing
2   asbestos and fibrous talc.
3         You listed some of those, the Longo
4   reports, a bunch of publications in the literature
5   such as Blount's.
6         I have seen some testing from Dr. Hopkins,
7   from Imerys, from Cooke.  I have also seen some
8   negative reports.
9      Q    (BY MR. ZELLERS) The answer to my question
10  is:  Yes, you have seen testing that purportedly
11  shows there to be some asbestos in the J&J
12  manufactured talcum powder and you have seen reports
13  that, you know, indicate there's not asbestos in the
14  talcum powder; is that fair?
15     A    The way that you have described it makes
16  it seem like I have seen comprehensive reports that
17  have shown in totality there is asbestos and reports
18  that have shown there's not.  I haven't seen that.
19     Q    All right.
20     A    I have seen reports that have shown in
21  totality there are.  I have seen individual samples
22  that have shown there's not asbestos in those
23  individual samples.
24         But I haven't seen a systematic report
25  that have shown in, for example, a large number of

Page 143

1   specimens, none had asbestos.  I haven't seen that.
2      Q    You have seen, at least in large part, the
3   information that's been provided to you by
4   plaintiffs' attorneys; is that right?
5         MS. O'DELL:  Object to the form. to the
6   form.
7      A    I think some of the public -- published
8   literature was not provided by plaintiff attorneys
9   and some has been, such as the Longo reports.
10        MR. ZELLERS:  All right.
11        MS. O'DELL:  Mike, we have been going
12  about an hour and 30 minutes.  And our lunch is
13  here, so is this a good time.
14        MR. ZELLERS:  Sure --
15        MS. O'DELL:  -- for a break?
16        MR. ZELLERS:  -- of course.
17        THE VIDEOGRAPHER:  This marks the end of
18  Disc 2.  We are off the record at 12:37 p.m.
19        (A break was taken from 12:37 p.m. to
20  1:36 p.m.)
21        THE VIDEOGRAPHER:  We are back on the
22  record.  This marks the beginning of Disc No. 3 in
23  the deposition of Dr. Rebecca Smith-Bindman.  The
24  time is 1:36 p.m.
25        MR. ZELLERS:  Dr. Smith-Bindman, let's go

Page 144

1   off the record for a moment.
2         THE VIDEOGRAPHER:  We're off the record at
3   1:36 p.m.
4         (A break was taken from 1:36 p.m. to
5   1:37 p.m.)
6         THE VIDEOGRAPHER:  We are back on the
7   record.  The time is 1:37 p.m.
8      Q    (BY MR. ZELLERS) Dr. Smith-Bindman, you
9   had recalled, I believe, the name of the fourth
10  plaintiff lawyer that you met with?
11     A    Carmen Scott.
12     Q    I want to ask you some questions about the
13  systematic review that you did.  You have not
14  published that, correct?
15     A    I have not.
16     Q    If at any point you do publish your
17  systematic review, would you disclose that you are a
18  paid expert for the Plaintiffs in the talcum powder
19  litigation?
20     A    Yes, I would.
21     Q    You would expect any expert who is paid to
22  perform a review or who has a study funded by
23  Plaintiffs to make that disclosure, correct?
24        MS. O'DELL:  Object to the form.
25     A    My understanding from my experience is

Page 145

1   that different journals require different
2   disclosures.  So if you're paid by someone, you
3   typically would have to disclose, but the detail
4   would -- would vary by journal.
5      Q    (BY MR. ZELLERS) What methodology or
6   methodologies did you use to arrive at your opinion
7   that regular use of talcum powder increases a
8   woman's risk of developing invasive serous cancer by
9   about 50 percent?
10     A    So I would say there were two parts.  The
11  first part is my systematic review of the published
12  literature.  I think I mentioned earlier that I have
13  published several systematic reviews.
14        And the mechanism of perform -- performing
15  those systematic reviews are both ones that I have
16  personally used and ones that I was involved in
17  developing the methodology as part of my work on the
18  Cochrane collaboration.
19        So it involves doing a very standardized
20  search, creating an approach for abstracting data,
21  abstracting the data.  An approach that I used for
22  summarizing the data, which usually is looking at
23  stratified results, results in sort of specific
24  categories as opposed to broad categories.
25  Statistically summarizing the results and showing

37 (Pages 142 to 145)

Rebecca Smith-Bindman, M.D.

Page 146

1   them.
2         So part of my conclusion was based on my
3   own systematic review.  And then part of my
4   conclusion was based on my review of the published
5   literature on the actual epidemiology data, as well
6   as other considerations that went into consideration
7   of the Bradford Hill criteria such as mechanistic
8   data and any other requirements of Bradford Hill.
9      Q   Tell us step by step how you performed
10  your systematic review or analysis.  And now I'm
11  referring to the meta-analysis or meta-analysis-like
12  review that you did.
13     A   Okay.  So I would just like to do a slight
14  preamble to that, which is that the direction that
15  my review took was partly informed by having read
16  through a number of articles on the topic.  So
17  determining sort of where there was a gap, what was
18  the most important area to focus on.  So that sort
19  of was the background.
20         And then for the review, the literature
21  search is the first step.  So you want to broadly
22  identify all relevant literature, published and
23  unpublished, to include.
24         And that includes searching on several
25  databases -- PubMed was -- Medline were -- Embase,

Page 147

1   Scopus were -- were databases that I started my
2   search.
3         I included in the report some of the
4   keywords I used, keywords including "ovarian cancer,
5   talc, perineal powder, genital powder."
6         So I generated a long list of articles
7   that I retrieved and then reviewed the references
8   for each of those articles, which usually doesn't
9   identify a lot more articles, but usually identifies
10  a few that I may have missed in my search, but that
11  other people have found in their reviews or
12  systematic reviews.  So the first step was to
13  identify the literature.
14     Q   What was the next step?  And again, I'm
15  focused on your methodology for the systematic
16  review or analysis that you did, as reflected in
17  your report?
18     A   So the second step is:  Identified a large
19  number of publications, but some of them may not
20  have been particularly relevant.
21         For example, they may have sounded in the
22  title like they were primary data, but they may have
23  actually only been review data.
24         So Step 2 is to review the abstracts for
25  all of those identified articles and then to go

Page 148

1   through those and to review to make sure that they
2   had primary data.
3         So I was only interested in studies that
4   had primary data, which meant that review articles
5   or editorials or letters to the editors or opinion
6   pieces were dropped from that list.
7         So then I had data that were -- I had
8   studies that had primary data, so that became my
9   list of articles.
10        And -- and then I created a data
11  abstraction form for what variables I wanted to
12  include.  So some variables are the number of cases;
13  the number of controls; the kind of study design
14  whether it was a case-control study or another
15  design.
16        It included -- included the groups that I
17  cared most about.  So you mentioned serous cancer,
18  so I included what kind of histologies they looked
19  at.
20        I included in my initial data form,
21  variables that I ended up not using in my review
22  because I didn't have enough data.
23        So in my initial draft of variables that I
24  might like to abstract was the relationship in pre
25  versus postmenopausal women.

Page 149

1         But when I ended up reviewing articles,
2   there just was not -- not enough data there to make
3   sense of, so I created a data abstraction form.
4         I then went one by one through the
5   articles which I organized and abstracted the data
6   that I had set out to do.
7         And in the course of doing that, I would
8   ensure that the participants that were described in
9   those reports were, in fact, unique subjects.
10        So within this field, just like many
11  fields, people sometimes publish an individual
12  patient in more than one study.  And -- and you
13  don't want to include that, if you can.
14        So as part of my review was to determine
15  how independent the patients were and to make a note
16  if there was overlap.
17        I also didn't mention some of the features
18  that I abstracted.  But it wasn't just the primary
19  result, which was what was the adjusted odds ratio
20  or risk ratio associated with exposure to talcum
21  powder products, but it was also -- what I was most
22  interested in is quantifying that exposure to a
23  degree that had not been present in all the
24  individual reviews that I had previously said.  So I
25  was interested primarily in abstracting data on

38 (Pages 146 to 149)

Rebecca Smith-Bindman, M.D.

Page 150

1  regular exposure to talcum powder.
2        So when I went through the articles, I
3  noted whether -- what the point estimates were, but
4  also whether they had information on all of the
5  things that were in my database.
6        I went through and abstracted data several
7  times.
8     Q   Okay.  Well, that's --
9     A   Oh.
10        MS. O'DELL:  She may not be done but --
11    Q   (BY MR. ZELLERS) Well, I understand.  So
12  I'm just trying to go through your methodology here.
13        So after you abstracted the data and
14  included it or put it on your data abstraction form
15  for each study, what was the next step in your
16  systematic review?
17        MS. O'DELL:  So just continue on, Doctor,
18  what your process was.
19    A   Okay.  Well -- so the next step was to
20  decide which -- which of those papers might have
21  been missing data.
22        So once I abstracted the data, there were
23  gaps almost certainly in the data.  And so I -- I
24  just wanted to emphasize -- I was starting to say
25  this earlier -- that I -- I went back to the papers

Page 151

1  and tried to sort of ensure that I was consistently
2  pulling the data in my database requirement for
3  every study.
4        After I did that, the next step would be
5  to combine the data statistically.  And that would
6  be to pro -- perform steps to figure out how the
7  data can be -- could be combined.
8        And that required looking at issues of
9  consistency across the studies or heterogeneity and
10  then to make sure that the sub analysis that I
11  wanted to do -- the stratified analysis that I
12  wanted to do could be done based on whether I had
13  data for each of those studies in the stratified
14  category.
15        So as an example, I wanted to make sure
16  that I -- I had whatever information was in the
17  paper that could then go to the next step of
18  analysis.
19        And so that's when, actually, I reached
20  out to a biostatistician with -- expert in the
21  biostatistical aspect to do two things:  To both
22  double-check my numbers and ensure that the numbers
23  that -- had been abstracted correctly and then to do
24  the biostatistical analysis and generate the
25  graphical representation of the data.

Page 152

1     Q   That's what Dr. Hall did; is that right?
2     A   That is what Dr. Hall did.  I should have
3  a caveat there.  We -- she absolutely lead that part
4  of the analysis, but I reviewed every step of that
5  very carefully.
6        And there were several places that I --
7  I -- I saw errors in some of the calculations that
8  we went back and forth on to correct those
9  calculation errors.
10    Q   Have you completed your methodology or the
11  different steps in your methodology?
12        MS. O'DELL:  In terms of the
13  meta-analysis?
14    Q   (BY MR. ZELLERS) Yes.  In terms of the
15  systematic review or meta-analysis that you did.
16    A   I believe I have highlighted all the
17  steps.
18    Q   You tried or did correct any errors in
19  calculations or numbers by Dr. Hall; is that right?
20        MS. O'DELL:  Object to the form.
21    A   Yes, I did.
22    Q   (BY MR. ZELLERS) Did anyone else review
23  your calculations and Dr. Hall's calculations?
24    A   No.  Just the two of us.
25        You said something, that I corrected some

Page 153

1  of her numbers.  I -- she also corrected some of my
2  numbers.
3        It was a bi-directional two set of eyes on
4  all of the analysis --
5     Q   I --
6     A   -- and abstractions.
7     Q   -- essentially what you did is you
8  analyzed the studies.  You abstracted data on each
9  of the studies on your Data Abstraction Form,
10  correct?
11    A   Yes.
12    Q   Have you produced your Data Abstraction
13  Forms to us for review?
14    A   I -- I believe I have.
15    Q   All right.  You have them available; is
16  that right?
17    A   Yes.
18    Q   And this would be a form for each of the
19  studies in which you went through and you abstracted
20  data; is that right?
21    A   It's --
22        MS. O'DELL:  Object to the form.  Sorry.
23  Go ahead.
24    A   -- yeah, it's -- it's an electronic
25  database.  It's an Excel file.

Rebecca Smith-Bindman, M.D.

Page 154

1    Q   (BY MR. ZELLERS) But there would be a form
2  or an Excel sheet for each of the studies where you
3  abstracted the data; is that right?
4        MS. O'DELL:  Object to the form.
5    A   There's an Excel sheet with each study
6  listed as a separate line of data and many, many
7  rows -- columns for each -- it's not a physical
8  piece of paper and...
9    Q   (BY MR. ZELLERS) But it's something that
10 could be printed out; is that right?
11   A   Yes.
12   Q   All right.  Did you develop any type of
13 protocol setting forth the different steps that you
14 followed to do your systematic analysis that you
15 have told us about?
16   A   The protocol that I followed for these
17 steps is a very well-established, well-published --
18 including by myself from any prior reviews --
19 protocols.
20   Q   My question is:  Did you write down
21 anywhere, the protocol that you followed for doing
22 this particular systematic review?
23        MS. O'DELL:  Object to the form.
24   A   I did not specifically write down for this
25 review that I would do a literature search or

Page 155

1  abstract data and record points and then do the
2  analysis.
3    Q   (BY MR. ZELLERS) What you have done in
4  your systematic review is a subgroup analysis of
5  those studies that you thought should be included;
6  is that fair?
7    A   I call it a stratified analysis rather
8  than a subgroup analysis.  Usually a subgroup
9  analysis is usually used to describe only limiting
10 to certain groups of patients as opposed to some
11 questions.  So I -- I'm not sure that there's a
12 distinction but...
13   Q   Well, you -- whether we call it a subgroup
14 or whether we call it a stratified analysis, you
15 went through the studies to try to find the studies
16 that would give you information on women who were
17 regular users, as you defined "regular users," and
18 who developed invasive serous ovarian cancer,
19 correct?
20        MS. O'DELL:  Object to the form.
21   A   Yes, that's what I did.
22        When you asked about whether I have a
23 protocol written down, I have written that I was
24 going to abstract information about regular use of
25 talc powder products defined as closely as three

Page 156

1  times week or more as possible and that I would
2  focus on invasive serous cancer wherever possible.
3        And so if that -- if that's what you mean
4  by my "protocol," then yes, that was written down
5  ahead of time.
6    Q   (BY MR. ZELLERS) I'm confused.  Do you
7  define -- well -- and No. 1, did you produce that
8  protocol?
9    A   So I have -- I have my notes and -- which
10 was part of the documents that you saw earlier
11 today.
12   Q   The notes, you would describe as your
13 protocol or an outline of your methodology?
14   A   Yes.
15   Q   All right.  We'll mark your notes, which
16 are your protocol, as Exhibit 21.
17        (Exhibit 21 was marked for identification
18 and is attached to the transcript.)
19   Q   (BY MR. ZELLERS) And it's just the one
20 side sheet; is that right?
21   A   I believe I provided other documents in
22 the datasheet that also has the notes of what group
23 I was focusing on in e-mails that I have sent you.
24   Q   That would be other materials that you
25 have produced; is --

Page 157

1    A   That's --
2    Q   -- the right?
3    A   -- correct.
4    Q   To your knowledge, there's nothing that
5  you have not produced --
6    A   No.
7    Q   -- relating -- hold --
8    A   Okay.
9    Q   -- on.  Let me finish.
10        There's nothing, to your knowledge, that
11 you have not produced relating to your analysis; is
12 that right?
13   A   That's correct.
14   Q   I was confused.  I thought you stated a
15 moment ago that you defined "regular use" as the use
16 of talcum powder three times a week or more.
17        Is that your definition of "regular use"?
18   A   I --
19        MS. O'DELL:  Object to the form.
20   A   -- I describe the definition in my report
21 on page 32.  And --
22   Q   (BY MR. ZELLERS) My question just is:  Is
23 that the correct definition or did you use a
24 different definition of "regular use"?
25        MS. O'DELL:  Object to the form.  You may

40 (Pages 154 to 157)

Rebecca Smith-Bindman, M.D.

Page 158

1  describe your --
2      A  So I -- I --
3          MS. O'DELL:  -- definition.
4      A  -- have listed how I have defined it.  And
5  it's a little bit more -- more nuanced than what you
6  have just asked me to confirm.
7      Q  (BY MR. ZELLERS) What is your definition
8  of "regular use" with respect to the systematic
9  review and analysis that you did?
10     A  So I have written, Regular use was defined
11 ideally as daily or at least more than three uses
12 per week.
13     Q  More than three uses a week; is that
14 right?
15     A  I -- I wasn't finished.  May I finish?
16     Q  Sure.
17     A  "I also accepted studies that defined
18 "use" as regular where the description made it clear
19 that this was regular use.
20         A study that reported regular use, but
21 defined it as less -- as used less frequency --
22 at -- use of less than as -- frequency were not
23 included.
24         Regular use was selected to differentiate
25 occasional use, which may include one-time

Page 159

1  infrequent use or used along a particular time of a
2  woman's menstrual cycle from sustained use.
3          Studies that ask participants a single
4  question about every use of talc without further
5  quantification of exposure were not included for the
6  summary.
7          For example, Perdue reported that 52 to
8  57 percent of women ever using talc without further
9  quantification was not included."
10         THE COURT REPORTER:  Please slow down.
11     Q  (BY MR. ZELLERS) Okay.
12     A  Yes.
13     Q  Doctor, I just wanted to know your
14 definition of "regular use."
15     A  I -- I -- I have spent considerable time
16 both writing my definition and applying it to --
17     Q  What --
18     A  -- the papers.
19     Q  -- what page --
20         MS. O'DELL:  Excuse me, sir.  If you were
21 asking for the page, she can direct you to the page
22 --
23     Q  (BY MR. ZELLERS) What page --
24     A  So --
25         MS. O'DELL:  Doctor --

Page 160

1      A  -- page --
2          MS. O'DELL:  -- go ahead.
3      A  -- 32.
4      Q  (BY MR. ZELLERS) You have defined "regular
5  use" in your report on page 32; is that right?
6      A  Yes.
7      Q  What is Dr. Hall's field of expertise?
8      A  She is a biostatistician who is -- does a
9  lot of summaries of systematic review.
10     Q  You are not a biostatistician; is that
11 right?
12     A  I did a two-year post-graduate fellowship
13 in the Department of Epidemiology and Biostatistics,
14 have taken many courses in biostatistician --
15 biostatistics, and have thought classes in biostatus
16 --
17     Q  Do you con --
18     A  -- statistics.
19     Q  -- do you consider yourself to be an
20 expert biostatistician?
21     A  I consider myself an expert in
22 biostatistics.
23     Q  And Dr. Hall is also an expert in
24 biostatistics; is that right?
25     A  Yes.

Page 161

1      Q  Do you know -- well, did you conduct your
2  systematic review and analysis using the PRISMA
3  standards?
4      A  Yes.
5      Q  And those are the preferred reporting
6  items for systematic reviews and meta-analyses; is
7  that right?
8      A  Yes.
9      Q  What materials did you provide to Dr. Hall
10 to assist you with your review?
11     A  I provided her with the data abstraction
12 table that had information about each of the
13 included studies.
14     Q  The data abstraction table that you
15 prepared; is that right?
16     A  Yes.
17     Q  What specifically did Dr. Hall do to
18 assist you?
19     A  She did two things.  She personally
20 reabstracted data from all of the publications.
21 Most of those publications she found on her own.
22 But for a couple, she was not able to find them, and
23 I provided electronic versions of them.
24         And then she statistically combined and
25 compared the study to assess for heterogeneity to

41 (Pages 158 to 161)

Rebecca Smith-Bindman, M.D.

Page 162

1    calculate forest plots and summary-weighted
2    estimates.
3        Q   What could Dr. Hall do with respect to
4    your analysis that you could not?
5        A   I did not know how to use the software to
6    generate the graphs.  And I thought that by the time
7    I learned how to use that software, it would be a
8    lot more efficient for her to generate them.
9        Q   What did you do to check Dr. Hall's work
10   to make sure it was accurate?
11       A   Dr. Hall sent me back my data abstraction
12   database where she had double-checked all of my
13   numbers and sent -- I think there were several data
14   points where she had questions about either whether
15   I abstracted the right number or put it in the right
16   category.
17           And of all of the items that she had
18   suggestions -- I think it was a small number -- I
19   went back to the original article to -- to confirm
20   or refute whether I agreed with her changes or not.
21   Sort of a way to -- by consensus to decide what the
22   right answer was.  That was part of what I did.  I
23   --
24       Q   How -- did you finish?
25       A   -- no.

Page 163

1        Q   All right.  Well, finish.
2        A   She also generated -- she -- we went back
3    and forth.  She had a bunch of questions.
4            But she also generated summary estimates.
5    And there were a bunch of categories that I asked
6    her to do.  Some of those summary estimates, to me,
7    seemed like they didn't totally make essence.
8            So one analysis used seven studies and one
9    used nine, but it had the same final odds ratio out
10   to three digits.  And it should have been the same
11   result perhaps, but not out to three digits.
12           So I went through those and sort of said:
13   Look, can you redouble-check this to make sure that
14   the weighting was correct?
15           And in one or two cases she came back and
16   said:  No, the weighting was not correct.
17           So I rechecked every graph and every
18   number that she generated.
19       Q   Ultimately, you identified -- let me
20   withdraw that.
21           You reviewed the studies; you did your
22   data abstraction; and you formulated your research
23   question or questions for the systematic review,
24   correct?
25           MS. O'DELL:  Object to the form.

Page 164

1        A   I would not do it in that order.  I -- I
2    generated the research questions first.
3        Q   (BY MR. ZELLERS) You generated the
4    research questions after doing the initial
5    literature review you told us about this morning,
6    correct?
7        A   I --
8            MS. O'DELL:  Object to the form.
9        A   -- yes.
10       Q   (BY MR. ZELLERS) All right.  You
11   identified ten studies that discuss what you define
12   as "regular talc powder product use and risk of
13   ovarian cancer," and those are what you list on a
14   page 33 of your report; is that right?
15       A   That's close to correct.  I would include
16   in that another study, the Terry study, which is a
17   large study that pulls data from a bunch of other
18   component studies -- you can see on the top of
19   page 34 -- whether or not Terry was included or
20   excluded.  The results were basically identical.
21       Q   I'm just looking at your report.  Your
22   report, on page 33, in Figure 2, you identify ten
23   studies that discuss what you define as "regular
24   talc powder product use and risk of ovarian cancer,"
25   correct?

Page 165

1            MS. O'DELL:  Object to the form.
2        A   So that -- that paragraph is continued on
3    page 34, the next page at the top which says, The
4    primary analysis of this excluded Terry, but the
5    results were nearly identical if Terry was included.
6        Q   (BY MR. ZELLERS) You could have included
7    Terry as part of Figure 2, and that would have been
8    an 11th study; is that right?
9        A   Yes, that's correct.
10       Q   Why did you not include Terry in your
11   analysis and -- in Figure 2?
12       A   Terry included, within its -- within her
13   assembled papers, other patients that are already
14   included in Figure 2.
15           And including Terry would have listed --
16   would have weighted some patients more than once.
17       Q   Is there, to your knowledge, any
18   duplication or overlap in the patients for the ten
19   studies that you list in Figure 2 on page 33 of your
20   report?
21       A   To the degree that I could eliminate
22   overlap, I did.
23       Q   Is there overlap in some of the patients
24   and some of the studies?
25       A   I would have to look at it again to remind

Rebecca Smith-Bindman, M.D.

Page 166

1    myself if there is any overlap.  I -- I don't
2    believe there is.
3            And any overlap, I made every effort to
4    get rid of.  I would have to look at those papers a
5    little bit more closely to remember if there was any
6    overlap.
7            I -- I know there was a lot of overlap if
8    I included Terry, which is why that was an important
9    exclusion.
10   Q   How did you identify these ten studies
11   that you list in Figure 2?
12   A   So I -- I did not identify those studies.
13   That was what -- Dr. Hall used the data that I
14   provided -- to identify which studies had the --
15   appropriate data to look at -- look at this.
16   Q   How did Dr. Hall identify these ten
17   studies as being the ones to include in Figure 2?
18   A   These were the studies that had data on
19   daily talc powder -- powder products.
20   Q   You only used subsets of data from these
21   ten studies -- those ten studies listed in
22   Figure 2 -- to reach your conclusions, correct?
23       MS. O'DELL:  Object to the form.
24   A   I don't remember offhand if I used all of
25   the data from these studies or subsets of data from

Page 167

1    these studies to reach my conclusion.
2            There were only data from these ten
3    studies included in this figure, but I'm not sure if
4    I used all of the data from those studies or
5    subsets, as you asked.
6    Q   (BY MR. ZELLERS) Would you agree that only
7    two of the ten studies in Figure 2 demonstrates
8    statistical significance?
9    A   I would agree that taken altogether, these
10   studies show statistical significance.  But I think
11   you're asking if they weren't taken together, if the
12   original studies were used, would those individual
13   studies show statistical significance?  Is that what
14   you are asking?
15   Q   No.  You have listed out ten studies in
16   Figure 2; is that correct?
17   A   Yes.
18   Q   You are not aware whether you used all of
19   data from those studies for your systematic review
20   and analysis or subsets of the data, correct?
21       MS. O'DELL:  Object to the form.
22   A   Yes, that is correct.
23   Q   (BY MR. ZELLERS) Would you agree that only
24   two of the ten studies in Figure 2 demonstrate
25   statistical significance?

Page 168

1    A   I -- I would not -- the individual studies
2    are shown with the confidence interval around those
3    point estimates.
4            One way to establish statistical
5    significance is -- is that statistically different
6    within an individual study than one.
7            But I don't believe that only two of these
8    show statistical significance as a group of studies.
9    So if you're asking if two don't overlap one, then I
10   would agree with you.  If you're asking if these
11   together show statistical --
12   Q   (BY MR. ZELLERS) I'm going to ask you --
13       MS. O'DELL:  Excuse me.  Sorry.  Let her
14   finish.  Sorry.
15   Q   (BY MR. ZELLERS) Did you finish?
16   A   I -- I'm trying to understand if you're
17   asking me if the original studies here show -- or
18   if -- just each line by itself.
19   Q   If we go line by line for these ten
20   studies, only two of these ten studies demonstrate
21   statistical significance; is that right?
22   A   Yes.
23   Q   Yet you conclude by looking at all ten of
24   the studies that there is statistical significance;
25   is that right?

Page 169

1    A   So the way you're asking the question
2    suggests that when you're combining studies in a
3    systematic review, you care about the initial sample
4    size of the question.
5            And so I conclude taken as a group of
6    studies, the individual sample size or power of the
7    individual associations is not sufficient to come up
8    with a narrow confidence interval.
9            And the width of the confidence interval
10   suggests that while the point estimate is greater
11   than one, the confidence interval overlaps one,
12   meaning you can't be sure if it's significantly
13   significant.
14           But the purpose of the systematic review
15   is to combine those studies together.  So combining
16   them together gives a very powerful, positive
17   estimate that's very different than one.
18   Q   Okay.
19       MR. ZELLERS:  Move to strike as
20   nonresponsive.
21   Q   (BY MR. ZELLERS) My question is:  When you
22   looked at the ten studies together, you determined
23   that there was statistical significance; is that
24   right?
25   A   Yes.

43 (Pages 166 to 169)

Rebecca Smith-Bindman, M.D.

1      Q   How did you make that calculation?  How
2  did you calculate statistical significance from
3  those ten studies?
4          MS. O'DELL:  Object to the form.  I
5  believe she has already answered that, but you may
6  describe that again, Doctor.
7      A   So the software that was used, is that
8  what you are asking?
9      Q   (BY MR. ZELLERS) I want to know how it is
10 that you calculated that these ten studies -- eight
11 of which did not demonstrate statistical
12 significance when they were looked at together --
13 were statistically significant?
14     A   So I need to provide you with just a
15 little background on the field of systematic reviews
16 to answer that question.
17     Q   All right.  Well, try to be as direct as
18 you can, because I have only got a certain amount of
19 time.
20         Are you able to answer the question?
21     A   Absolutely.
22     Q   Then please tell us how you calculated
23 statistical significance for the RE model.
24     A   So we looked at adjusted odds ratios of
25 each of the studies.  We weighted them based on the

1  standard errors for each of them and calculated sort
2  of an overlying association when basically the size
3  of each study, the point estimate of each study were
4  taken into consideration.
5          So taking them altogether, it allows the
6  summary estimate, if you look, to have a much
7  narrower confidence interval than the individual
8  study.
9          So you use the weight of all the studies
10 to combine the -- to give you a summary estimate.
11     Q   Where can I see the weighting and the
12 calculation that you did to come up with the
13 statistically significant number?
14     A   So the -- the name of the software we used
15 was in Metafor package in R.  "R" is a program.
16         The data set that I provided to you of the
17 extracted database, if you put those numbers -- if
18 anyone puts those numbers in the Metafor package in
19 R and instructs the software that you want to apply
20 a -- linear mixed models to study that data set, you
21 will get the exact same estimate that I got.
22     Q   And I will be able to see that from the
23 documents that you have produced; is that right?
24     A   Absolutely.
25     Q   How did you calculate the confidence

1  interval around the odds ratio for each of these ten
2  studies?
3          MS. O'DELL:  Object to the form.
4      A   So most of the studies, if not all of
5  those, would have had published adjusted odds ratios
6  in the original calculations.
7          I believe one of the studies, the Gertig,
8  was an adjusted risk ratio, not an odds ratio, which
9  had a bit of back-and-forth discussion with the
10 biostatistician.
11         And we decided they were essentially
12 equivalent.  But the other ones would have been
13 extracted from the initial studies.
14     Q   The confidence intervals for the ten
15 studies on -- in Figure 2, page 33 of your report
16 came from the studies themselves?
17     A   Yes.
18     Q   Were there any other selection criteria
19 that you used to identify these ten studies, other
20 than what you have testified to?
21     A   No.
22     Q   Of the 43 or so studies that had primary
23 data, are these the only studies, other than Terry,
24 that discuss regular use of talc?
25     A   So I am just looking for where my fullest

1  of studies is in the report.  I think it's pages 23
2  and 24.
3          The fullest of studies that I looked at
4  included -- I think there were seven systematic
5  reviews.  So the systematic reviews did not
6  contribute to the -- they were not eligible for --
7  for -- for my own review because they didn't have
8  primary data, and they would overlap.
9          And the same thing with -- well, the
10 Terry, we know about.  So it was only the other
11 studies that were eligible.
12     Q   These ten studies that you list in
13 Figure 2 are the only studies that you reviewed that
14 discuss regular use of talc, and that's why you
15 included them here; is that right?
16         MS. O'DELL:  Object to the form.
17     A   No, that's -- that's not what I said.
18         The systematic reviews I read and had
19 data, many of them, on regular use of talc.
20         But those were not included in my
21 systematic review because that would have had
22 overlap of -- of -- of patients.  So they were not
23 included because it overlapped patients.
24     Q   (BY MR. ZELLERS) Which studies were those
25 seven?

Rebecca Smith-Bindman, M.D.

Page 174

1        A   So they're listed on page 23 as systematic
2    reviews.  So Penninkilampi and Berge and the IARC
3    and Langseth and Huncharek and Gross and Harlow.
4            The reason Terry was pulled out from that
5    to possibly include was because Terry provided new
6    data points that weren't included in the component
7    studies, and so I wanted to make sure not to miss
8    those patients.
9            But these other systematic reviews were
10   all covered in the other primary studies that I
11   included.
12       Q   Why did you not include the Cramer study,
13   1999?
14       A   Cramer was one of the authors that had a
15   lot of patients that kept appearing in subsequent
16   publications.  So he published the same patients
17   more than once, so --
18       Q   What analysis did you do to determine that
19   there was overlap between any of the patients
20   reported on by Cramer in 1999 and any of the ten
21   studies that you did choose to include?
22       A   I went through -- I think there's a
23   separate page in my data fields that's just
24   attributed to the Cramer studies -- and wrote down
25   what years of enrollment the patients were.

Page 175

1            And to the best I could, I identified the
2    cohorts and then pulled them out to only identify
3    all patients once, which -- which is the reason I
4    hesitated to say there was no overlap.
5            But I did my best to only include every
6    patient once.  And --
7        Q   Okay.
8        A   -- Cramer got his own worksheet because it
9    was trickier to figure out.
10       Q   Cramer 1999 you did not include in your
11   systematic review because you analyzed that paper
12   and the other studies and determined that there was
13   overlap; is that right?
14       A   I didn't quite say that.  I'm saying that
15   I was very careful not to include overlap patients.
16   I don't know why Cramer 1999 didn't make it into the
17   review.
18       Q   I --
19       A   I don't know if he didn't have regular use
20   of talc or -- I -- I -- you know, I would have to --
21   to figure out why it wasn't included.
22       Q   Well, take a look at the Cramer 1999
23   paper, which we'll mark as Exhibit 22.
24           (Exhibit 22 was marked for identification
25   and is attached to the transcript.)

Page 176

1        Q   (BY MR. ZELLERS) If you turn to --
2            MS. O'DELL:  I'll take that.
3        Q   (BY MR. ZELLERS) -- turn to Table 2 on
4    page 353, the bottom table -- at the bottom of the
5    table.
6        A   Yes.
7        Q   Do you see data with respect to "frequency
8    of use per month"?
9        A   Yes.
10       Q   That's the type of study and the type of
11   information that you did include in your systematic
12   review; is that right?
13       A   Yes.
14       Q   Is it fair to say that as you sit here
15   today, you just don't remember why you did not
16   include Cramer 1999?
17           MS. O'DELL:  Object to the form.
18       A   In looking at this, you have convinced me
19   it's not because he doesn't have frequency of use,
20   because there is frequency of use in here.  I do not
21   know why it didn't make it into the final database.
22           But I'm looking at my paper from Cramer
23   from 2016, "The Association Between Talc Use and
24   Ovarian Cancer, a Retrospective Case-control Study."
25           He describes -- this is on page 334 of

Page 177

1    that other article -- that data came from three
2    enrollment phases.
3            And my notes on the side say "minus Cramer
4    '99," suggesting -- I don't mind showing you my
5    notes -- showing that there's overlap with Cramer
6    '99 --
7        Q   Okay.
8        A   -- so.
9        Q   You -- do you believe that the reason you
10   did not include Cramer 1999 is because there was
11   overlap with the patients included in Cramer 2016 or
12   you're not sure?
13       A   Yes.
14           MS. O'DELL:  Object to the form.
15       Q   (BY MR. ZELLERS) Which one is it?
16           MS. O'DELL:  Object to the form.
17       A   I -- I do not know why it wasn't included,
18   but I believe there was overlap with 2016, is why it
19   was not included.
20       Q   (BY MR. ZELLERS) You also did not include
21   Rosenblatt 2011 in your systematic review; is that
22   right?
23       A   Rosenblatt was included in the review.
24   But on much -- it looks like it didn't make it into
25   the final graph or the final group of ten.

45 (Pages 174 to 177)

Rebecca Smith-Bindman, M.D.

Page 178

1  Q   Why did it not make it into the final
2  graph or group of ten?
3  A   So I don't -- let me just say I don't
4  remember why Rosenblatt was not included.
5  I specifically asked the biostatistician
6  to do the analysis with and without Rosenblatt, and
7  I believe the reason was -- I believe is that -- the
8  quality of Rosenblatt seems very poor, and I can't
9  remember why.
10  But I asked her to do the analysis with
11  and without Rosenblatt.  I asked her to do, I think,
12  four different analyses with and without Terry, with
13  and without Rosenblatt.
14  My recollection is it had no impact.  But
15  I do not remember why I asked her with the quality
16  issue -- I would have to go back to my database to
17  remember why I asked her to do it both ways.
18  Q   Rosenblatt contained information over --
19  or strike that -- including a lifetime number of
20  applications and included information on more than
21  10,000 lifetime applications, correct?
22  A   Yes.
23  Q   All right.
24  A   Well, I -- I'm -- I'm looking for it.
25  Yeah, I'm guessing that --

Page 179

1  Q   Here is a --
2  MS. O'DELL:  Don't -- don't.  Excuse me --
3  yeah, don't guess.  Just if you know.
4  A   -- I --
5  Q   (BY MR. ZELLERS) Exhibit 23 is Rosenblatt.
6  A   I have got the paper.
7  MS. O'DELL:  Yeah.  Feel free to take a
8  moment.  And if you need your original spreadsheets
9  to answer any of these detailed questions, then we
10  can pull those out for you --
11  A   Okay.
12  MS. O'DELL:  -- if counsel does not have a
13  copy for you.
14  Q   (BY MR. ZELLERS) Just for the record,
15  Exhibit 23 is Rosenblatt.
16  (Exhibit 23 was marked for identification
17  and is attached to the transcript.)
18  Q   (BY MR. ZELLERS) As you sit here, do you
19  know what the difference in results were if
20  Rosenblatt was included in your systematic review or
21  not?
22  A   I -- I do.
23  MS. O'DELL:  Object to the form.
24  Q   (BY MR. ZELLERS) Okay.  What is --
25  A   I do.

Page 180

1  Q   -- the difference in result?
2  A   It -- it had no impact on the overall --
3  Q   Was --
4  A   -- results.
5  Q   -- it exactly the same?
6  A   It was within a decimal fraction of a
7  percent the same.
8  Q   Can you tell us what the result was with
9  Rosenblatt included?
10  A   It was the same with and without
11  Rosenblatt included --
12  Q   Is --
13  A   -- within a hundredth of a percent.
14  Q   Did you produce that calculation for us?
15  A   Within the files that I shared, it is
16  included in the forest plot tables that Dr. Hall
17  generated.
18  Q   Go to Figure 2, if you will, in your
19  report, page 33.  Do you have that?
20  MS. O'DELL:  If you need to see the -- the
21  data that you produced, Doctor, the Excel
22  spreadsheets --
23  A   Oh, that would be great.
24  MS. O'DELL:  -- okay.  And I -- I'm going
25  to hand you my computer.  But it's --

Page 181

1  A   Can I --
2  MS. O'DELL:  -- it's the data --
3  A   -- this is what I shared with you.
4  MS. O'DELL:  -- and that's what she is
5  discussing.
6  Q   (BY MR. ZELLERS) Yeah.  I have a question
7  pending.  If you can answer my -- if you need to
8  look at your counsel's computer to answer my
9  question, you can.
10  But my question is:  Will you look at
11  Figure 2 on page 33 of your report.
12  MS. O'DELL:  Just hang on.  Just -- what
13  I'm showing the doctor is data that -- the tables
14  that she has been discussing, but you have not
15  provided to her, which would be the fair way to
16  examine here on them.
17  But this is the -- the information that
18  was produced to Defendants for purposes of
19  Dr. Smith-Bindman's, you know, deposition.  So if
20  you need that, just -- you may refer to it.
21  Q   (BY MR. ZELLERS) Are you ready,
22  Dr. Smith-Bindman?
23  A   I'm close to ready, but not quite.
24  Q   I -- I'm not sure what you are doing.
25  MS. O'DELL:  Well, she is looking at the

46 (Pages 178 to 181)

Rebecca Smith-Bindman, M.D.

1    calculation that you were just asking her about.
2        Q   (BY MR. ZELLERS) I have finished those
3    questions.  She has answered those questions.  I'm
4    asking a new question.  Or I would like to.
5        A   Okay.  Thank you.
6        MS. O'DELL:  You're welcome.  If you need
7    to see any of the tables --
8        A   Okay.
9        MS. O'DELL:  -- Doctor, I have all that
10   has been produced right here.
11       A   Fantastic.
12       Q   (BY MR. ZELLERS) Okay.
13   Dr. Smith-Bindman -- Bindman, looking at Figure 2,
14   looking at the confidence intervals that you have
15   listed for each of those ten studies, are you aware
16   that not one of those confidence intervals for any
17   of the ten studies are actually listed in or come
18   from the study publications?
19       MS. O'DELL:  Object to the form.
20       A   I am not aware of that.
21       Q   (BY MR. ZELLERS) In fact, did you
22   recalculate the confidence interval for each of
23   these studies?
24       A   The confidence intervals and the point
25   estimate are adjusted confidence intervals and odds

1    ratios, so you -- you can't recalculate them from
2    the data in the paper.
3        Q   My -- my question is:  Who calculated
4    these confidence intervals that appear in Figure 2?
5    Did you calculate those confidence intervals?
6        A   To the best of my knowledge, these
7    confidence intervals came from the primary
8    publications.
9        Q   And -- and I will represent to you that I
10   have looked at all of the primary publications and
11   the confidence intervals that you have listed in
12   Figure 2.  None of those confidence intervals come
13   from the publication.
14       So do you have any idea as to how these
15   confidence intervals were calculated?
16       MS. O'DELL:  If there's --
17       A   You would have to show me --
18       MS. O'DELL:  Yes.
19       A   -- those -- those disagreements for me to
20   --
21       Q   (BY MR. ZELLERS) Well, let's --
22       A   -- to know what we're looking at.
23       Q   -- let's -- I'll get to that in just a
24   second.  Let me show you a couple of documents.
25   Deposition Exhibit 24.

1        (Exhibit 24 was marked for identification
2    and is attached to the transcript.)
3        Q   (BY MR. ZELLERS) Is this another e-mail
4    exchange between you and Dr. Hall?  Is that yes?
5        A   I'm so sorry.  I didn't hear your
6    question.
7        Q   Sure.  My question is:  Is this an e-mail
8    exchange between you and Dr. Hall?
9        A   Yes.
10       Q   If you look at the e-mail at the bottom of
11   the second-to-last page, Dr. Hall writes you on
12   Monday, September 24, 2018, at 11:42, and tells you
13   that she is encountering obstacles; is that right?
14       And I'm sorry.  It's the third-to-last
15   page is where that e-mail starts.
16       A   I see what you are saying.  She has a note
17   at the bottom of the page.
18       Q   She tells you she's encountering
19   obstacles?
20       A   Yes.
21       Q   She asks you a number of questions?
22       A   Yes.
23       Q   No. 1 is that there's missing proportion
24   information and the data is missing.
25       If you go down to 1B, she says, Where the

1    raw numbers are not available, I would do my best to
2    estimate unless you have access to them and can send
3    them to me.
4        How did you respond to that question?
5        A   Can't we see what my answers were?
6        Q   Sure.  Where are you answers?  If you, in
7    any of the documents that have been produced, can
8    show us how you answered these questions, that would
9    be helpful.
10       MS. O'DELL:  Object to the form.
11       A   I would like to just clarify something in
12   her request, which is she is not asking me in this
13   case for an estimate of the odds ratios or the
14   confidence intervals, even although though it seems
15   like she is.
16       What she is asking for is an estimate of
17   the sample size in terms of the N of cases and N of
18   controls that can be used for weighting these
19   studies in generating the summary estimate.
20       So that's where she's trying to fill in
21   the blanks, not for the odds ratios or confidence
22   intervals, but to calculate -- calculate --
23   calculate how -- how much weight it should be in the
24   summary statistic.
25       Q   (BY MR. ZELLERS) How did you respond to

47 (Pages 182 to 185)

Rebecca Smith-Bindman, M.D.

1  her first question where she advised you that there
2  was missing proportion information and her proposal
3  that "where the raw numbers are not available, I'll
4  do my best to estimate, unless you have access to
5  them and can send them to me"?
6      MS. O'DELL:  Object to the form; asked and
7  answered.
8      A  I did not have, other than going to the
9  papers, any additional information to supplement.
10     Q  (BY MR. ZELLERS) Okay.  No. 2 --
11     MS. O'DELL:  Are you finished, Doctor?
12     A  Say it again.
13     MS. O'DELL:  Are you finished?
14     A  No.
15     MS. O'DELL:  Okay.
16     A  And so, again, she's not asking me about
17 the abstraction.  She's asking me if a study
18 reported, for example, that there were a hundred
19 patients with serous carcinoma or if there were
20 150 patients altogether, it reported the odds ratios
21 for serous carcinoma, but may not have specified in
22 the table how many cases of serous carcinoma there
23 were, could she estimate that proportion when we had
24 the point estimate we needed.
25     We had the odds ratio we needed, but she

1      MS. O'DELL:  Object to the form.
2      A  We discussed this at length, and she ended
3  up going with Option 3, using relative risk as an
4  underestimation of the odds ratios, but
5  approximately equal because of the rareness of the
6  disease.
7      Q  (BY MR. ZELLERS) So she adopted, at your
8  suggestion, the option that she states,
9  understanding that relative risk may considerably
10 underestimate odds ratios; is that right?
11     A  Yes, it is.
12     Q  And you advised her -- for No. 3, how did
13 you advise her when she told you that she was unable
14 to calculate the true -- or truly estimate for any
15 talc use and suggested that you consider pooling the
16 results from rarely, monthly, weekly, and daily?
17     MS. O'DELL:  Object to the form.  Are you
18 talking about No. 3?  It's not clear.
19     A  So the option that we did for that choice
20 is actually neither Option 1 or Option 2.
21     The focus of the review that she completed
22 was, in fact, on daily talc use.  It's not different
23 than she suggested.
24     But she used the numbers that were
25 incorrectly categorized as any talc use instead to

1  needed to know how many serous cancers there were to
2  weight it.
3      And I would have told her, when the raw
4  numbers for those missing proportions were not
5  available, to do her best to estimate those.
6      Q  (BY MR. ZELLERS) Did you respond to this
7  e-mail?
8      A  I sent you all of the documents that I had
9  for our correspondence.
10     Q  Okay.
11     A  I certainly could look again to see if I
12 have an answer to this.  Or it could be that we
13 discussed the answers on the telephone.
14     Q  No. 2 --
15     A  Let me just see if we have -- if it says.
16 I think we spoke on the telephone.
17     Q  Do you have any notes of that telephone
18 conversation?
19     A  No, I don't.
20     Q  All right.  No. 2, when she told you that
21 she was unable to calculate the associated
22 95 percent confidence intervals without the
23 variants, which is not reported and she gave you
24 three options, which option did you tell her to
25 follow, if any?

1  represent daily talc use, so that -- that data point
2  was moved for the daily talc use category.
3      Q  Let me show you the Chang paper.  This is
4  one of the papers that you cite both in Figure 2 and
5  again on Figure 3; is that right?
6      A  Yes.
7      Q  All right.  Here's the Chang paper which
8  we have marked as Exhibit 25.
9      A  Oh.
10     (Exhibit 25 was marked for identification
11 and is attached to the transcript.)
12     Q  (BY MR. ZELLERS) Do you have that in front
13 of you?
14     A  I do.
15     Q  Okay.  Show us -- you see in Figure 2,
16 that Chang is listed twice, and it has a confidence
17 interval of .51 to 1.39.
18     Do you see that?
19     A  You said it's listed twice?
20     Q  I'm sorry.  It was -- it's listed in
21 Figure 2 and then you list it again in Figure 3; is
22 that right?
23     A  Yes.
24     Q  All right.  The first question is:  Where
25 in the Chang publication do you get a confidence

Rebecca Smith-Bindman, M.D.

Page 190

1  interval of .51 to 1.39?
2      A  Hum?  So the point estimate that I
3  think -- I need to look at the paper a little more
4  closely.
5          So the number I see in this paper is
6  instead of being .51 to 1.39 is .61 to 1.49 is about
7  ten points higher.
8      Q  All right.  You don't know where, for
9  Figure 2, the confidence interval of .51 to 1.39
10  came from, correct?
11      A  I -- I do not.  It's so close to the
12  publication -- the publication that I'm not sure if
13  it reflects a data abstraction error or if it was --
14  I think that's probably what it -- what it does, but
15  I'm not sure.
16      Q  The Chang paper involved 450 patients with
17  borderline and invasive ovarian carcinoma; is that
18  right?
19      A  Say it one more time for me.
20      Q  Sure.  The Chang paper --
21      A  Yeah.
22      Q  -- Exhibit 25, involved a total of
23  450 patients with borderline and invasive ovarian
24  carcinoma; is that right?
25      A  Yes.

Page 191

1      Q  You used or Dr. Hall used, in your
2  analysis, only 41 of those 450 patients because
3  those are the only ones that had greater than
4  25 times of use per month, correct?
5      A  So I would have to look at my datasheet to
6  know how many made it into the analysis, but I
7  believe you're correct, that there were
8  approximately 10 percent that were frequent users.
9      Q  How did you determine, just looking at the
10  Chang paper, how many of those 41 had invasive
11  serous ovarian cancer?
12          MS. O'DELL:  If you need to look at your
13  datasheets --
14      A  Please.
15          MS. O'DELL:  Which --
16      A  That would be great.
17          MS. O'DELL:  -- which data -- tell -- data
18  summary, is that what --
19      A  Yeah --
20          MS. O'DELL:  -- you are --
21      A  -- that should be it.
22          MS. O'DELL:  Okay.  This is both --
23  both -- both of the spreadsheets are there, so just
24  --
25      A  Okay.  So I don't have all of my detailed

Page 192

1  notes here, but I believe what I did for Chang is
2  that Chang's numbers are included in the Terry
3  report where she used the data that were published,
4  as well as the supplemental data that were provided
5  by Chang.
6          And within the supplemental data, Terry
7  did a stratified analysis that provided additional
8  information on serous cancer that was not actually
9  in the original Chang report.
10          And those are the data that made it into
11  what is under Chang in this systematic review.
12      Q  (BY MR. ZELLERS)  Okay.
13      A  So they're data from Chang's work and
14  following Chang's methods.  They happen not to be
15  published in Chang's original report, but rather
16  included in the Terry report from -- from 2013.
17          And Terry -- the paper that I am talking
18  about for Terry is genital powder use and risk of
19  ovarian cancer, a pooled analysis of 8,500 cases and
20  ninety-eight hundred fifty-nine controls.
21          And then within that describes within the
22  methods, getting extra data for studies describing
23  the regular use and then breaking down the results
24  into whether or not it was invasive borderline,
25  invasive serous, and so forth --

Page 193

1      Q  So --
2      A  -- so that's where those numbers came
3  from.
4      Q  You believe that if I looked at the Terry
5  paper, I would be able to tell of these 41 cases
6  that have greater than 25 uses per month, which of
7  those cases involved invasive serous ovarian cancer,
8  correct?
9          MS. O'DELL:  Object to the form.
10      A  I believe the -- I believe the number of
11  cases is specified in the Terry paper that I would
12  have to look at to find that -- that number.
13      Q  (BY MR. ZELLERS)  All right.  Let me ask
14  you a few questions.
15      A  Yes.
16      Q  In the Chang paper --
17      A  Yes.
18      Q  -- the authors do not define "regular use"
19  as daily, do they?
20      A  What Chang says in the original
21  publication is questions about regular talc use and
22  type of talc use, as well as duration and frequency
23  could be derived or included; dusting or powdering
24  behavior considered improved regular application of
25  talc to the perineum after showering or bathing and

Rebecca Smith-Bindman, M.D.

Page 194

1  dusting.
2        And then that was categorized, I believe
3  by Terry, as regular use when she got supplemental
4  data.
5      Q   Okay.  In the Chang paper, the authors do
6  not define "regular use" as daily use, correct?
7        MS. O'DELL:  Object to the form; asked and
8  answered.
9      A   The Chang paper explicitly says "regular
10  use."  In the original publication, they don't
11  define it.
12     Q   (BY MR. ZELLERS) They do not include
13  information in the Chang paper about how many times
14  per week women used talcum powder, correct?
15        MS. O'DELL:  Object to the form.
16     A   In -- in Table 2 of Chang, they define it
17  as less than ten, ten to 25, or greater than 25
18  times per week.
19     Q   (BY MR. ZELLERS) Where do you see that?
20     A   In Chang?
21     Q   Yes.  I'm looking at the same table, and I
22  think it's per month.
23     A   Per month.
24     Q   Okay.  And that's the only data that's
25  provided with respect to use is the number of

Page 195

1  monthly applications, correct?
2      A   Yes.
3      Q   The authors of Chang did not arrive at a
4  specific odds ratio for serous invasive cancer based
5  on frequency of use, correct?
6      A   The Chang data was used by Terry to
7  calculate frequency of use for serous and invasive
8  by supplementing the original data that they had
9  from additional data from Chang as a participant in
10  the OCAC consortium.
11       So additional data from that study was
12  shared with Terry, which is what we used in our
13  analysis.
14     Q   If we look at Chang in Table 3, they
15  describe a histologic type of invasive; is that
16  right, in Table 3, page 2399?
17     A   Yes.
18     Q   They also describe serous; is that right?
19     A   Yes.
20     Q   In the Chang data, what's the difference
21  between invasive and serous?
22     A   I'm -- I'm sorry.  In lot -- in Table 3
23  you're asking what those different entries mean?
24     Q   Yes.
25     A   "Invasive" presumably includes other types

Page 196

1  of invasive besides just serous.
2      Q   Do you know that?
3      A   I -- I don't think they specify what's
4  included in that.  I have to add up the total to see
5  if they are overlapping or not overlapping.
6        Could you add -- could you add that for
7  me?  Actually, the total should be -- they're
8  overlapping.  360, 460.  Yeah, they're overlapping.
9  Yeah.
10     Q   What do you mean, "they're overlapping"?
11     A   Invasive and borderline should add up to
12  the total.
13       And then serous mucin -- mucinous and
14  endometrioid should add up to the total, except to
15  the degree that they are missing information.
16     Q   Looking at the questions that Dr. Hall
17  asked you --
18     A   Yes.
19     Q   -- in Exhibit 24, you would agree that
20  there were number of assumptions that you and she
21  made in order to complete your systematic review; is
22  that right?
23     A   Absolutely.
24     Q   Is there anywhere that you have written
25  down, you know, what the assumptions were that you

Page 197

1  and Dr. Hall arrived at, at least in part in
2  response to her questions?
3      A   So for some of the issues, it took me
4  quite a bit of remembering to remember that we used
5  some of the extracted data from more than one
6  source.
7        We have notes in our data form of what the
8  source of the data was, so it would say in some of
9  the data I said -- under Chang, it would say "in a
10  column from Terry."
11     Q   My question --
12     A   So that -- that -- so to answer the
13  assumption of where the data came from, it's in my
14  data spreadsheet.  I just -- I just didn't remember
15  that we pulled data.
16     Q   My -- my question is a little different I
17  --
18     A   Okay.
19     Q   -- think.  In terms of all of the
20  questions that Dr. Hall asked you and all of the
21  assumptions that would need to be made so that
22  estimates could be arrived at, do you have either
23  your protocol or a listing of the assumptions that
24  were made by you and by Dr. Hall in -- at least in
25  part in response to the question she raised?

Rebecca Smith-Bindman, M.D.

Page 198

1     MS. O'DELL:  Objection, asked and
2  answered.  Respond.
3     A   I am under the impression that they're
4  documented within our e-mail exchanges, but I do not
5  have a protocol with each of these decisions that
6  are laid out.
7     Q   (BY MR. ZELLERS) I -- my best source would
8  be the e-mail exchanges that you had with Dr. Hall,
9  correct?
10     MS. O'DELL:  Object to the form.
11     Q   (BY MR. ZELLERS) Is that right?
12     A   Yes.
13     Q   Okay.  Once you did your ten studies that
14  are in Figure 2 -- and those were just the --
15  the studies that you chose to include, as you have
16  told us, showing odds of ovarian cancer associated
17  with regular use of talcum powder -- you further
18  refined the studies or narrowed down the studies to
19  four which you state plot or who the odds of ovarian
20  cancer associated with regular use of talcum powder
21  and invasive serous cancer; is that right?
22     MS. O'DELL:  Object to the form.
23     A   With the caveat that when -- when I laid
24  out our stratified analysis on page 32, it says, My
25  review focused on invasive serous cancer where

Page 199

1  possible, but also included all invasive cancer.
2     Q   (BY MR. ZELLERS) What did you do to get
3  from the ten studies that you list in Figure 2 to
4  the four studies that you list in Figure 3?
5     A   Figure 2 is ovarian cancer with regular
6  use, and Figure 3 is invasive serous cancer.
7     If there was not invasive serous but there
8  was just invasive, they also might be in this.  I
9  would have to review these four studies to know if
10  it was invasive or invasive serous.
11     Q   Do you know, as you sit here, what you did
12  to go from the ten studies in Figure 2 to the four
13  studies in Figure 3?
14     MS. O'DELL:  Object to the form.
15     A   In the data set that I sent to you and
16  sent to Dr. Hall, they would -- there were different
17  sets of complete data.  And the Figure 3 had data
18  for invasive or invasive serous cancer; whereas,
19  Figure 2 had -- included invasive and noninvasive.
20     So it would just be where there were data
21  available in the data worksheet.  I -- I was not
22  involved in making the selection to go from one to
23  the other.  It was just where there were data that
24  were abstracted from the papers.
25     Q   (BY MR. ZELLERS) Where did you get the

Page 200

1  confidence interval for the -- let's say the Chang
2  data that you list in Figure 3?
3     A   I'm going to have to look into the exact
4  calculation of the confidence interval.
5     The question that you asked me about Chang
6  for the first table is very close to the one that's
7  published -- so close -- that I'm not sure how it
8  would be different.
9     I don't -- I thought these were abstracted
10  from the paper.  And I would have to go back and
11  talk to Dr. Hall about how they were calculated.
12     I thought they were calculated, but I -- I
13  may be -- I may be wrong.  They may have been in
14  some way reestimated.
15     So again, similar with this, these numbers
16  are close to the ones that are in this paper, but
17  are slightly off, and I'm not sure why.
18     So I would have to go back to the data
19  that I abstracted and then the data that she sent me
20  back for the final tables to see why they were
21  different.
22     Q   Okay.
23     A   But they're -- they're different to a --
24  such a slight degree that -- and I'm not really sure
25  where that difference came from.

Page 201

1     Q   Were there any other analyses that you or
2  Dr. Hall con -- conducted that are not included in
3  your report?
4     A   I had asked Dr. Hall, I believe, to look
5  at -- at several analyses that are all in the data
6  that I shared with you.
7     The sensitivity analysis for Terry and the
8  sensitivity analysis for the Rosen [sic] study are
9  in the data I sent you, but are not summarized in
10  the report.
11     MS. O'DELL:  And by "the data," you're
12  talking about the spreadsheets --
13     A   Yes.
14     MS. O'DELL:  -- that you provided?
15     A   Yes.  There -- there are more analyses
16  that were done that you haven't seen.  But they --
17  they were analysis for four analyses.
18     I just see two here.  So I -- there were
19  two others.  I think it was including Terry and
20  including Rosenblatt, I think, are the other two.
21     But you have all of the -- there were no
22  other analyses except those four that she completed.
23     MS. O'DELL:  Excuse me, Mike.  I'm sorry.
24  We're right at 3:00 p.m.  When you get to a stopping
25  point, can we take a break?

51 (Pages 198 to 201)

Rebecca Smith-Bindman, M.D.

1      MR. ZELLERS:  All right.  Let's stop.
2  We're stopping for the day; is that right?
3      MS. O'DELL:  Let's -- let me speak with
4  Dr. Smith-Bindman on the break and then I'll let you
5  know.
6      MR. ZELLERS:  All right.
7      THE VIDEOGRAPHER:  We're off the record at
8  2:59 p.m.
9      (A break was taken from 2:59 p.m. to
10  3:11 p.m.)
11      THE VIDEOGRAPHER:  We are back on the
12  record.  This marks the beginning of Disc No. 4 in
13  the deposition of Dr. Rebecca Smith-Bindman.  The
14  time is 3:11 p.m.
15      Q   (BY MR. ZELLERS) Dr. Smith-Bindman, what
16  methodology, if anything different, did you use to
17  arrive at your opinion that there was a causal
18  association between genital talcum powder use and
19  ovarian cancer?
20      A   I used the Bradford Hill criteria.
21      Q   Are you familiar with the Bradford Hill
22  criteria?
23      A   I am.  Yes, I am.
24      Q   You're familiar that over time the FDA has
25  gone through and done various analyses with respect

1  to perineal talcum powder use and any association
2  with ovarian cancer; is that right?
3      MS. O'DELL:  Object to the form.
4      A   I -- I have seen some documents by the
5  FDA.
6      Q   (BY MR. ZELLERS) And the FDA, back in
7  2014, did a review and analysis of the epidemiology
8  at that time; is that right?
9      MS. O'DELL:  Object to the form.
10      A   Could you show me that document?
11      Q   (BY MR. ZELLERS) Sure.  This is a document
12  that we'll mark as Exhibit 26.
13      (Exhibit 26 was marked for identification
14  and is attached to the transcript.)
15      Q   (BY MR. ZELLERS) It's a document from the
16  FDA.  It's got a date stamp at the top --
17      MS. O'DELL:  Thank you.
18      Q   (BY MR. ZELLERS) -- April 1 of 2014.
19      Is this one of the documents that you have
20  reviewed in connection with your expert work in this
21  matter?
22      A   Yes, it is.
23      Q   Turn, if you will, to page 4 of that
24  document.  Do you see that?
25      A   Yes.

1      Q   The FDA, in 2014, reviewed the
2  epidemiology and etiology findings relating to
3  ovarian cancer and the genital application of talc;
4  is that right?
5      MS. O'DELL:  Object to the form.
6      A   Yes.
7      Q   (BY MR. ZELLERS) The FDA noted that
8  selection bias and/or uncontrolled confounding
9  result in spurious positive associations between
10  talc use and ovarian cancer; is that right?
11      MS. O'DELL:  Object to the form.
12      A   The FDA concluded that some of the studies
13  had biases.  Yes, they did.
14      Q   (BY MR. ZELLERS) And if we look at No. 2,
15  the FDA states, No single study has considered all
16  the factors that potentially contribute to ovarian
17  cancer, including selection biased and/or
18  uncontrolled confounding that result in spurious
19  positive associations between talc use and ovarian
20  cancer risk.
21      Is that right?
22      A   That is what the FDA concluded.
23      Q   The FDA also noted that there was a lack
24  of consistency in the study results; is that right?
25      A   That is what the FDA concluded.

1      Q   And specifically the FDA concludes,
2  Results of case-control studies do not demonstrate a
3  consistent, positive association across studies; is
4  that right?
5      MS. O'DELL:  I think it says something
6  further than that.
7      A   Can I just add something?  This -- the FDA
8  did some review that I don't know the details of.
9  And this is their summary of that review, which I
10  don't know the details of, yes.
11      Q   (BY MR. ZELLERS) The FDA, at least in this
12  review, stated that dose response evidence is
13  lacking; is that right?
14      And I am looking at the end of Point No. 3
15  on page 4.
16      A   That is what the FDA concluded.
17      Q   And looking at Point No. 4, the FDA found
18  that a cogent biological mechanism was lacking; is
19  that right?
20      A   That is what the FDA concluded.
21      Q   You have reviewed IARC; is that right?
22  And I think in your blue folder here you have
23  included some IARC documents?
24      A   I have included IARC work reflecting
25  analysis through 2006 and then more recently

Rebecca Smith-Bindman, M.D.

1  through -- through 2010, each published a few years
2  after that.
3      Q   IARC has gone through and addressed the
4  Bradford Hill considerations with respect to the
5  classification of genital talc; is that right?
6          MS. O'DELL:  Object to the form.
7      A   Can you remind me which analysis you're
8  referring to?
9      Q   (BY MR. ZELLERS) Well, let's start with
10  the classifications.  Take a look at Exhibit 27, if
11  you will.
12          (Exhibit 27 was marked for identification
13  and is attached to the transcript.)
14      Q   (BY MR. ZELLERS) Are these the IARC
15  classifications for its determination --
16          MS. O'DELL:  Thank you.
17      Q   (BY MR. ZELLERS) -- as to the
18  carcinogenicity -- carcinogenicity of different
19  agents?
20      A   Yes.
21      Q   And you're generally familiar with these
22  classifications; is that right?
23      A   I am.
24      Q   Group 1, these are the agents that IARC
25  has determined are carcinogenic to humans, correct?

1      A   Yes.
2      Q   And that's the only category in which IARC
3  finds sufficient evidence in humans; is that right?
4          MS. O'DELL:  Object to the form.
5      A   That's how they define that category.
6      Q   (BY MR. ZELLERS) IARC puts 82 agents in
7  Group 2A probably carcinogenic to humans; is that
8  right?
9      A   That is correct.
10      Q   So IARC has gone through and has evaluated
11  many, many, many agents and has determined that
12  there are over 200 agents in both the Group 1
13  category and also the Group 2A category, correct?
14      A   Yes.
15      Q   There's only one agent in Group 4,
16  probably not carcinogenic to humans; is that right?
17          MS. O'DELL:  Object to the form.
18      A   Yes, that's correct.
19      Q   (BY MR. ZELLERS) So out of the over a
20  thousand agents that IARC has reviewed, it's only
21  placed one agent in Group 4 probably not
22  carcinogenic; is that right?
23          MS. O'DELL:  Object to the form.
24      A   To be considered by IARC, there has to be
25  data to suggest there's some potential harm.  And to

1  prove that something is safe is -- is next to
2  impossible --
3      Q   (BY MR. ZELLERS) Right.
4      A   -- and so that's why that category is
5  not -- is used.  Category 3 and four can, for the
6  sake of discussion, be considered the same.
7      Q   And that's why there's no Group 5, not
8  carcinogenic; is that right?
9      A   Yes.
10      Q   Correct?  Now, with genital talc, IARC has
11  determined that it is appropriately placed in the
12  "to be" category; is that right?
13          MS. O'DELL:  Object to the form.
14      A   I -- I would take a slight pause to that
15  consideration.  I think that in the first review
16  when they have looked at platy talc, they consider
17  it a "to be" possibly carcinogenic to humans.
18          Whereas, in the report looking at asbestos
19  and fibrous talc, which also counts in the same
20  category as asbestos, the -- that is in the category
21  that's a Group 1 carcinogenic to humans.
22      Q   (BY MR. ZELLERS) IARC has determined that
23  genital talc is a group to be possibly carcinogenic
24  to humans; is that right?
25          MS. O'DELL:  Object to the form.

1  Misstates her testimony.
2      A   So in their initial review -- in their
3  earlier review, they concluded that genital talc is
4  possibly carcinogenic to humans.
5          In the more recent 2012, they discuss that
6  cosmetics are the primary sources of exposure to
7  talc in the general population; that perineal
8  application is the primary route and that fibrous
9  talc, which is part of talc, is actually Group 1
10  carcinogenic.
11      Q   (BY MR. ZELLERS) All right.  Show me the
12  IARC designation of genital talc as a Group 1
13  carcinogenic.
14          MS. O'DELL:  Object to the form.
15      A   Genital talc contains platy talc, as well
16  as fibrous talc, as well as asbestiform contaminated
17  talc, and they consider any fibrous talc to be a
18  Group 1 carcinogen.
19      Q   (BY MR. ZELLERS) Show me where the
20  perineal application of genital talc has been
21  determined by IARC to be a Group 1 carcinogen.
22          MS. O'DELL:  Object to the form.  Would
23  you like to see the IARC?
24      A   Can you show me the IARC report?
25      Q   (BY MR. ZELLERS) No.  I would like you --

Rebecca Smith-Bindman, M.D.

Page 210

1  you're the one who is testifying.
2      A   I just don't have the document in front of
3  me.  How would you like me to show it to you?
4      Q   I -- I would like you to show me where
5  genital talc has been found by IARC to be a Group 1
6  carcinogen.
7          MS. O'DELL:  Object to the form.  So was
8  that not -- excuse me, Doctor.  Is that not
9  something you're going to put in front of her?
10     Q   (BY MR. ZELLERS) I -- I have my
11 information.  And my IARC review says that they have
12 classified genital talc as a group to be possibly
13 carcinogenic to humans.
14     A   Do you have the 2012 --
15         MS. O'DELL:  Yes.  Let me just get it for
16 you, Doctor.  Give me a moment to see what number it
17 is in your references.
18     Q   (BY MR. ZELLERS) As your counsel is
19 looking for that document, can we agree that the "to
20 be" designation with IARC is based on limited
21 evidence in humans, which means IARC cannot rule out
22 chance, bias, or confounding with reasonable
23 confidence?
24     A   In their original assessment of talc in
25 2010 where they classified it as to be, the "to be"

Page 211

1  designation means that it's possibly carcinogenic,
2  which is a very high bar for them to put them in
3  that category, but could also be due to chance.
4      Q   Okay.  Also, in class "to be" as possibly
5  carcinogenic is ginkgo biloba; is that right?
6      A   I -- I have no idea.
7      Q   Occupational carpentry and joinery; is
8  that right?
9      A   I -- I -- I have no idea.
10     Q   Pickled --
11     A   I --
12     Q   -- vegetables?
13     A   I think pickled vegetables are pretty
14 carcinogenic, but I -- I don't know what IARC thinks
15 of them.
16     Q   Do you believe that the standard for
17 prove -- proving causation in the scientific
18 literature is the same as the one that applies in
19 litigation?
20     A   Yes, I do.
21     Q   Do you want to show me what your counsel
22 has provided you?
23     A   Yes.
24     Q   And I am looking for the finding that IARC
25 that genital talc use is a Group 1 carcinogen.

Page 212

1      A   So this is the monograph -- the
2  monograph -- the IARC monograph on the evaluation of
3  carcinogenic risks -- arsenic metals, fibrous and
4  dust, volume 100C.  So --
5      Q   I'm looking for perineal talc.
6      A   No.  No.  I know.  I understand.
7      Q   Okay.
8      A   I'm just telling you where I'm -- I'm
9  going to be pulling this from.  And I'm looking at
10 the section under "Asbestos."  And under the Pier --
11 the -- the section under "Asbestos, it talks, under
12 1.C --
13     Q   What page?
14     A   -- 230.  And I will read several sections
15 of it.  This section says, Talc particles are
16 normally plate-like.  These particles are viewed on
17 edge under the microscope.
18         THE COURT REPORTER:  I have to have you
19 slow down when you read.
20     A   I'm so sorry.  May appear to be fibers.
21 Talc may also form true mineral fibers that are
22 asbestiform in habit.
23         In some talc deposits, tremolite,
24 anthophyllite, and actinolite may occur.  Talc
25 containing asbestiform fibers is a term that has

Page 213

1  been used inconsistently.
2          I'm -- I'm just seeing where the --
3      Q   (BY MR. ZELLERS) That's okay.  And I am
4  looking for the statement or the finding that
5  genital talc -- cosmetic genital talc has been
6  determined by IARC to be a Group 1 carcinogen.
7      A   So I'm in the section --
8          MS. O'DELL:  Object to the form.
9      A   -- on the talc and asbestiform talc.  And
10 under 1.65, "Human Exposure," under "A," it says,
11 Exposure of the general population:  Consumer
12 products, cosmetics, pharmaceuticals are the primary
13 source of exposure to talc for the general
14 population.  Inhalation and dermal contact through
15 perineal application are the primary routes of
16 exposure.
17     Q   (BY MR. ZELLERS) Where does IARC conclude
18 that perineal talc use, cosmetic talc, is a Group 1
19 carcinogen?
20         MS. O'DELL:  Object to the form.
21     A   As late as 1973, talc products contained
22 detectable levels of chrysotile asbestos, tremolite,
23 or anthophyllite role.  And it's possible they
24 remained on the market in some places for some time
25 after that.  And these are asbestiform in habit.

Rebecca Smith-Bindman, M.D.

1      It goes on to cite a whole lot of other
2   places, Blount and so forth.
3      And then in this same document they
4   categorize the asbestos and asbestiform fibers as
5   being a Group 1 carcinogen.
6      Q   (BY MR. ZELLERS) I'm going to ask you
7   about asbestos and I'm going to ask you about
8   asbestiform fibers.
9      What I want to know is:  Where does IARC,
10  in the publication you're looking at, categorize
11  cosmetic talc applied perineal -- to the perineal
12  region as a Group 1 carcinogen?
13     MS. O'DELL:  Object to the form.
14     A   They're telling us in this document that
15  asbestos and asbestiform talc are Group 1
16  carcinogens.
17     They're telling us at the cite -- the --
18  the most common exposure is consumer products.  And
19  inhalation and dermal contact with perineal
20  application of talc powders are the primary routes
21  of exposure.
22     Q   (BY MR. ZELLERS) Where does IARC state
23  that perineal use of cosmetic talc is a Group 1
24  carcinogen?
25     MS. O'DELL:  Object to the form.

1      A   So IARC is telling us which compounds are
2   Group 1 carcinogens.
3      Q   (BY MR. ZELLERS) Where does it state that
4   the perineal use of cosmetic talc is a Group 1
5   carcinogen?
6      MS. O'DELL:  Object to the form.  She has
7   already stated that three times.
8      MR. ZELLERS:  Well, I haven't heard it
9   yet --
10     MS. O'DELL:  Yes.
11     MR. ZELLERS:  -- Counsel.
12     MS. O'DELL:  Yes, you -- she has described
13  it to you three times or four times maybe.  And so
14  she has --
15     MR. ZELLERS:  Counsel --
16     MS. O'DELL:  -- answered your question.
17     MR. ZELLERS:  -- please don't coach the
18  witness.  Just --
19     MS. O'DELL:  -- I'm not -- I'm not --
20     MR. ZELLERS:  -- object to form, if you
21  want to object to form.
22     MS. O'DELL:  -- well, don't harass the
23  witness, which -- that's what I am --
24     MR. ZELLERS:  I'm not harassing the
25  witness.

1      MS. O'DELL:  As I'm not coaching the
2   witness.  So you can ask the questions, but you
3   can't raise your voice and -- and continue --
4      MR. ZELLERS:  We have a video record.
5      MS. O'DELL:  -- yes, we do.
6      MR. ZELLERS:  No one here would say that
7   I'm raising my voice to the witness or behaving in
8   any way other than professionally.
9      A   I'm looking for the executive summary.
10  It's just taking a while in this very large document
11  to -- I see the problem.
12     The copy of this document, I'm missing my
13  first few pages.
14     Q   (BY MR. ZELLERS) Okay.
15     A   It starts at 30 -- 31.
16     THE COURT REPORTER:  Did you say "few" or
17  "first three"?
18     A   I think I'm missing the first 30 pages.
19     Q   (BY MR. ZELLERS) All right.  Let --
20     A   So --
21     Q   -- me move on then.
22     A   -- okay.
23     Q   Strength of association is a Bradford Hill
24  criteria -- is that -- criterion; is that right?
25     A   Yes, it is.

1      Q   You -- one of the studies you reviewed was
2   Langseth; is that right?
3      A   Yes, it is.
4      Q   Langseth reviewed the overall pooled odds
5   of cancer and found that there was an odds ratio of
6   1.35 across the studies; is that right?
7      A   I'm going to look for it, but --
8      Q   Okay.  I --
9      A   -- it sounds about right.
10     Q   -- I will hand you Langseth.
11     A   I have it.
12     Q   If you take a look at page 359,
13  Figure 1 -- do you see that -- do you know Langseth?
14     A   I do.
15     Q   Langseth looks at the case-control
16  studies, both the population-based and the
17  hospital-based; is that right?
18     A   He looked at the studies that had a -- he
19  had available when this was established a decade
20  ago, yes.
21     Q   And -- and he lists out 20 case-control
22  studies, correct?
23     A   14?
24     Q   I'm looking at the chart above Figure 1.
25  And you think there's only 14 studies there?

Rebecca Smith-Bindman, M.D.

Page 218

1      A   Oh, I apologize.  I thought you were
2  talking about the population-based studies.
3          No.  You're absolutely right.  20 studies.
4      Q   And of those 20 studies, only ten have
5  statistical significance; is that right?
6      A   The original studies with the sample size
7  they had, ten seemed to have difference than one.
8      Q   Of the 20 studies -- the 20 case-control
9  studies that were available and were studied by
10  Langseth, only ten had statistically significant
11  results; is that right?
12          MS. O'DELL:  Object to the form.
13      A   Again, he is combining them together.  But
14  in the original form when they were not combined,
15  there are ten in their original form that had
16  statistical differences than one.  They could
17  exclude one.
18      Q   (BY MR. ZELLERS) Half of the studies did
19  not have statistically significant results; is that
20  right?
21      A   The original studies had wide confidence
22  intervals.  And the original studies, before they
23  were combined, many of them overlapped one.
24      Q   Is the answer yes to my question?
25          MS. O'DELL:  She has answered your

Page 219

1  question.
2          MR. ZELLERS:  Well, I -- I don't know.  I
3  haven't heard an answer.
4          MS. O'DELL:  You have heard a complete
5  answer.
6      A   You're asking me to look at the results in
7  Figure 1 --
8      Q   (BY MR. ZELLERS) Yes.
9      A   -- which are meant to combine results.
10  But they also had the individual original study
11  sample size and show that about half of them overlap
12  one.
13      Q   Half is no better than a coin toss,
14  correct?
15          MS. O'DELL:  Object to the form.
16      A   It's an interesting question.  But if
17  you're looking for something, is there an
18  association with an exposure with cancer, a random
19  selection of that, you would expect to find very few
20  positive associations.
21          To find half is an enormous association to
22  find from random studies if there was no
23  association.
24      Q   (BY MR. ZELLERS) Do you believe that based
25  upon the Langseth paper and analysis, that there is

Page 220

1  a causal association between perineal use of talc
2  and ovarian cancer?
3          MS. O'DELL:  Objection to form.
4      A   The Langseth study is one review.  And as
5  I describe in my report, it seems like a well-done
6  review, although it does not provide the kind of
7  details that I would hope it would provide given
8  sort of the stature of some of the people who were
9  involved in writing the report.
10          That being said, this systematic review
11  suggests that there's an association between
12  perineal talc exposure and ovarian cancer.
13      Q   You --
14      A   By itself, I don't think it provides
15  enough data to have causality, but it provides good
16  evidence that there's an association.
17      Q   You understand that your interpretation of
18  this study is different and broader than the
19  authors' interpretation of the data, correct?
20          MS. O'DELL:  Object to the form.
21      A   One of the author's conclusion that I
22  found quite compelling was in -- on page 358 in the
23  second paragraph -- in the second column --
24      Q   (BY MR. ZELLERS) Can you answer my
25  question?

Page 221

1          MS. O'DELL:  She has answered your
2  question.  Don't --
3          MR. ZELLERS:  Well, I don't think she is
4  answering my question.
5      A   I think you are asking me about what the
6  authors conclude.
7      Q   (BY MR. ZELLERS) I asked if your
8  conclusion was broader than the authors' --
9          MS. O'DELL:  And she is telling you what
10  the authors' conclusions are.  You may finish,
11  Doctor.
12      A   What -- what Langseth says is that, Eight
13  of the population-based case-control studies were
14  identified by the Arforthinger (phonetic) as being
15  the most informative in terms of the size of the
16  studies, whether the studies were population-based
17  participation rates and adjustment for confounding
18  variables.  These selected studies -- among these
19  eight studies, the prevalence of use of talc was 16
20  to --
21          THE COURT REPORTER:  I can't hear.
22      A   -- sorry.  The selected studies included
23  at least 188 cases and had participation rates
24  ranging up to 75 percent.  Among these eight
25  studies, the prevalence of peritoneal use of

56 (Pages 218 to 221)

Rebecca Smith-Bindman, M.D.

Page 222

1   talc-based body powder among controls ranged from 16
2   to 52 percent.
3          The relative risk of ovarian cancer among
4   body powder users were homogeneous across the set of
5   eight studies, each of which indicated a 30 to
6   60 percent increase in risk.
7          Among the other 12 case-control studies,
8   most also reported relative risk of this magnitude
9   or higher.
10          So I think the authors of this concluded
11   that the better studies showed a very strong
12   association.  And -- and I -- I'm not sure what
13   conclusion of the authors you're asking me to
14   disagree with.
15      Q   (BY MR. ZELLERS) Okay.  Doctor, take a
16   look at "Proposal to Research Community" on the
17   right-hand side of page 359.
18          Do you see that?
19      A   I do.
20      Q   I'm going to read this, and you tell me if
21   I read it correctly.
22          "The current body of experimental and
23   epidemiological evidence is insufficient to
24   establish a causal association between perineal use
25   of talc and ovarian cancer risk.

Page 223

1          Experimental research is needed to better
2   characterize deposition, retention, and clearance of
3   talc to evaluate the ovarian carcinogenicity of
4   talc."
5          Did I read that correctly?
6      A   Not only did you read that correctly, I
7   would agree with that based on data available in
8   2008.
9          So you asked me if I thought this study by
10   itself evaluated causality.
11          And this study did not discuss the
12   deposition, the retention, or clearance.  And I
13   think those factors are crucial to understanding the
14   causality.
15      Q   Okay.
16      A   And that's new since --
17          MR. ZELLERS:  Move --
18      A   -- 2008.
19          MR. ZELLERS:  -- to strike as not --
20          MS. O'DELL:  She is --
21          MR. ZELLERS:  -- she finished.
22          MS. O'DELL:  -- she did not finish.
23          MR. ZELLERS:  Did you finish?
24      A   I was close enough.
25          MR. ZELLERS:  All right.  Move to strike

Page 224

1   as nonresponsive.
2          My question was:  Did I read that
3   correctly?
4      A   You read that text correctly.
5      Q   All right.  You conclude in your report
6   with respect to strength of association that because
7   a very large number of ovarian cancers are caused by
8   talcum powder and talcum powder provides no
9   better -- no medical benefit, the Hill criterion of
10   strength of association is important and met.
11          Is that right?
12      A   I don't think that's exactly right.  I --
13   I think all of the things I believe are in there
14   somewhere, but that's not quite what I would be --
15      Q   I --
16      A   -- report.
17      Q   -- I'm just reading from page 38 of your
18   report.  Do you believe that because a very large
19   number of ovarian cancers are caused by talcum
20   powder and talcum powder provides no medical
21   benefit, the Hill criterion of strength of
22   association is important and is met?
23          MS. O'DELL:  Object to the form.  I don't
24   think you read that --
25      A   I --

Page 225

1          MS. O'DELL:  -- the report correctly.  But
2   if you were intending to read from her report
3   verbatim, I don't believe that was correct.
4          MR. ZELLERS:  Counsel, please, just object
5   to form, if you do have an objection.
6          MS. O'DELL:  I have an objection.
7      A   Could you -- again, you -- the -- what I
8   believe has been -- within your statement, but
9   that's not the reason I believe that the Bradford
10   Hill criteria are met.
11      Q   (BY MR. ZELLERS) Well, let me ask you a
12   question.
13      A   Yes.
14      Q   In your discussion of the Bradford Hill
15   criterion of strength of association, you include
16   Table 7, which is entitled "An Estimate of the
17   Number of Ovarian Cancers and Invasive Serous
18   Cancers Caused by Regular Use of Perineal Talc
19   Powder Products"; is that right?
20      A   Yes.
21      Q   Is that a calculation that you did to try
22   to determine whether or not there is strength of
23   association?
24      A   No, but that's not why I included that.
25      Q   Well, is it included in your "Strength of

57 (Pages 222 to 225)

Rebecca Smith-Bindman, M.D.

1  Association" section?
2      A   It is included in the strength of
3  association to demonstrate how -- an odds ratio of
4  1.5, how many patients could be impacted on that.
5      So one of the questions is:  Is there a
6  strong association?  And the second, which is really
7  quite a different question, is:  What's the
8  magnitude of that association?
9      And sometimes the magnitude of the
10  association is mistakenly used as an approximation
11  of the strength of the association.
12      And I was trying to disentangle the
13  strength of the association.  How truly do we know
14  they're associated with -- if it is associated, how
15  big of an impact would it have?
16      And so the purpose of Table 7 is not in
17  any way to demonstrate the strengths of the
18  association, which is a requirement to assess for
19  Bradford Hill --
20      Q   Would your --
21          MR. LAPINSKI:  She's not finished --
22      A   -- but how many --
23          MR. LAPINSKI:  -- Counsel.
24      A   -- but --
25          MR. ZELLERS:  Okay.  Counsel, one lawyer

1  can object.  Okay.  I don't want all of you
2  objecting.
3          MR. LAPINSKI:  Don't -- don't raise your
4  voice to me.
5          MR. ZELLERS:  No.  I don't want all of you
6  objecting.
7          MR. LAPINSKI:  Counsel, if you want to
8  make a statement --
9          MR. ZELLERS:  Yeah --
10          MR. LAPINSKI:  -- make a statement.
11          MR. ZELLERS:  -- I'm making a statement
12  that I do not want --
13          MR. LAPINSKI:  That's --
14          MR. ZELLERS:  -- the whole group of
15  lawyers --
16          MR. LAPINSKI:  -- and you --
17          MR. ZELLERS:  -- on the Plaintiffs' side
18  objecting.
19          MR. LAPINSKI:  -- I'm sitting directly
20  across the table from you.  And I can hear you, and
21  I have heard you all day.
22          MR. ZELLERS:  Okay.
23          MR. LAPINSKI:  I have heard you carry on
24  the way you have carried on all day.  There's no
25  reason to raise your voice to me.  I can hear you

1  fine.
2          MR. ZELLERS:  Please don't interrupt
3  the --
4          MS. O'DELL:  That's --
5          MR. ZELLERS:  -- deposition.
6          MR. LAPINSKI:  -- better.  Thank you.
7          MR. ZELLERS:  Ms. O'Dell is doing a
8  fabulous job of making objections --
9          MR. LAPINSKI:  Yes, she is.
10          MR. ZELLERS:  -- for all of you.
11      Q   (BY MR. ZELLERS)  Okay.  Doctor.  You were
12  trying --
13          MS. O'DELL:  Excuse me.  I don't -- still
14  don't think she was finished.
15          MR. ZELLERS:  Okay.
16          MS. O'DELL:  So you may continue, Doctor.
17  If you were finished, great.  If you weren't, you
18  may finish your answer.
19      A   I -- I'm going to have to say I -- I -- so
20  the -- the -- Table 7 is an illustration of the
21  number of women who would be impacted.
22          And the point was to explain that the
23  strength of the association is separate from the
24  number of women impacted.  But indeed, it
25  illustrates how important the number of women

1  impacted is.
2      Q   Let's go through your math.
3      A   Yes.
4      Q   So the table, Table 7, includes several
5  assumptions; is that right?
6      A   A great number of assumptions.
7      Q   You ran the data, assuming that 10 percent
8  of the female population in the United States used
9  talcum powder products regularly, as you define
10  "regularly"; is that right?
11      A   Just to clarify, I -- I demonstrated what
12  the impact would be if we estimated the number of
13  women at 10 percent.
14      Q   You did the same calculation for
15  20 percent and 30 percent; is that right?
16      A   Yes, I did.
17      Q   You don't actually know what percentage of
18  women use talcum powder products regularly --
19      A   I --
20      Q   -- correct?
21      A   -- I do not.
22      Q   All right.  The calculation -- or your
23  conclusion is that .14 percent of women exposed to
24  talcum powder products have invasive serous cancer.
25  And I am looking at your 10 percent assumption that

Rebecca Smith-Bindman, M.D.

Page 230

1   you make.
2         Did you mean .14 or did you mean for that
3   to be 14 percent?
4         A   So I -- I take your correction as a -- as
5   correct.
6         Q   Okay.
7         A   I do mean 14 percent, but -- but it's not
8   the way you have interpreted it.
9         The -- the -- the calculation -- the
10  columns are the percent of invasive cancer that is
11  attributable to talcum powder, not the proportion of
12  cancer -- the proportion of women exposed who will
13  develop cancer.  Those are very different.
14        Q   I'm not sure I understand.  Your column
15  here says, The percent of invasive serous cancer in
16  women exposed to talcum powder products; is that
17  right?
18        A   That is correct.
19        Q   Okay.  The universe of talcum powder
20  products, which you're estimating here -- and I
21  understand it's an estimation -- is 10 percent of
22  the population; is that right?
23        MS. O'DELL:  Object to the form.
24        A   I -- I -- I -- I'm estimating in this
25  table that 10 percent of women use talcum powder --

Page 231

1         Q   (BY MR. ZELLERS) Right.
2         A   -- products in the U.S.
3         Q   There are approximately -- what do you say
4   -- 30 --
5         A   311 million.
6         Q   -- all right.  So 311 million.  And you
7   are estimating for purposes of this exercise that
8   31,100,000 are regular users; is that right?
9         A   Yes.
10        Q   And what you are trying to determine is of
11  those 31,100,000, what percent of regular talc users
12  will have invasive serous cancer, correct?
13        A   Yes.
14        Q   And you have calculated 14 percent; is
15  that right?
16        A   No.
17        Q   It's wrong, right?
18        A   The way you are describing it is wrong.
19  But I can give you an example to help you understand
20  that table.
21        Q   Well --
22        A   The number of cancers, we're talking about
23  31 million women or women who were exposed to
24  cancers.
25        I'm not saying 13 -- 14 percent of those

Page 232

1   women get ovarian cancer.  That would be five
2   million women.
3         I'm saying if we look at the world of
4   invasive serous cancers in the United States, there
5   will be in the ballpark of 11,000 serous cancers
6   every year in the United States.
7         Of those, 14 percent of those will occur
8   in regular users of talc powders.  86 percent will
9   occur in nonregular talc users.
10        So you're interpreting what is listed as a
11  column percent.  It says, Percent of invasive serous
12  cancer in women exposed to talc products.
13        You're interpreting that as if I'm saying
14  that the women exposed, that 15 percent of them will
15  get ovarian cancer.
16        Q   And in fact, if -- if your caption is
17  right, if we really are looking at the percent of
18  invasive serous cancer in women exposed to talcum
19  powder products, it would be less than .01 percent,
20  right?
21        A   Um --
22        MS. O'DELL:  Object to the form.
23        A   -- you -- you're asking me how many women
24  with exposure will end up getting?
25        Q   (BY MR. ZELLERS) Yes.

Page 233

1         A   So that's a -- a good number.  It's not
2   one I presented, but certainly one I can estimate,
3   which is -- if we're talking about 31 million women
4   who have regular exposure and of those who will
5   get -- I'm scribbling on my exhibit.  I hope that's
6   okay.  Is that okay?  One, two, three -- one, two,
7   three.  One -- one out of -- one out of 3,000 women
8   will get --
9         Q   So --
10        A   -- ovarian cancer.
11        Q   -- approximately .01 percent, correct?
12        A   That sounds pretty good, actually.
13        Q   All right.  Dose response.  A significant
14  number of the talcum powder studies that you looked
15  at do not show a dose response or fail to account
16  for dose response altogether; is that right?
17        A   In my summary of dose response on page 39,
18  I note that Penninkilampi, one of the large
19  meta-analyses, which I think is the most
20  comprehensive review, talks about dose response.
21        I didn't cite here -- and it was an
22  oversight -- Berge, another large comprehensive
23  meta-analysis, also shows dose response.
24        So the two systematic reviews showed dose
25  response.  I also list Terry as showing dose

Rebecca Smith-Bindman, M.D.

1   response.  That's the pool data of a large number of
2   studies.  Those are, you know, both quite -- I -- I
3   have covered most of the publications, so those show
4   dose response.
5         There are a few others that I show.  There
6   are definitely a bunch that do not address the issue
7   of dose response, but -- but I wouldn't characterize
8   it as most do not.
9         Q   Well, you state on page 40 of your report
10  with respect to dose response, The results are
11  inconsistent and more importantly are not considered
12  or assessed in most of the published studies.
13        That was your conclusion with respect to
14  dose response; is that right?
15        A   You are going to have to tell me where
16  you're reading.  What I'm reading says, In summary,
17  most, but not all, studies of talcum powder products
18  in ovarian cancer show a dose response.
19        THE COURT REPORTER:  Slow down when you
20  read, please.
21        A   I'm so sorry.
22        In summary, most, but not all, studies of
23  talcum powder products in ovarian cancer show a dose
24  response.  Most do.
25        But the results are inconsistent and more

1   importantly are not considered assessed in most --
2   that -- that should not say "most."  It should say
3   "in many of the published studies."
4         Q   (BY MR. ZELLERS) All right.  So you would
5   amend your report from "most" to "many; is that
6   right?
7         A   I -- I used "most" twice in the same
8   sentence as meaning different things.  So yes, I --
9         Q   Go --
10        A   -- it was an error.
11        Q   -- Gertig 2000 study found that there was
12  no increase in risk of ovarian cancer with
13  increasing frequency of use; is that right?
14        A   I would have to check that, but I'm happy
15  to do so.  I believe that's correct.
16        Q   Hunchcharek 2003 found that the data
17  showed a lack of clear dose response relationship,
18  making the relative risk of questionable validity;
19  is that right?
20        A   Which -- which one?
21        Q   Sure.  Huncharek 2003, page 19 of 55.
22        A   Wait.  This one is 2011.  I don't -- I
23  don't think I have that one.
24        Q   All right.  Consistency.  Consistency is
25  another factor that you looked at; is that right?

1         A   Yes.
2         Q   Would you agree that generally when you
3   looked at the published studies, that they showed an
4   association of around 1.3 between perineal talc use
5   and ovarian cancer?
6         A   I think many of the studies showed an
7   association of about 1.3 of any talc use.  Not
8   quantifying the amount of exposure.
9         Q   But would you agree that an -- that
10  epidemiologists generally consider a 1.3 odds ratio
11  in a case-control study to be a weak or modest
12  association?
13        MS. O'DELL:  Object to the form.
14        A   I am -- I am unaware what -- of what most
15  epidemiologists think.
16        Q   (BY MR. ZELLERS) Have you seen any peer
17  reviewed literature on talc and ovarian cancer that
18  states that 1.3 is a strong association?
19        A   I mean, Penninkilampi concludes there's a
20  consistent association between perineal talc -- talc
21  use and ovarian cancer.
22        And I'm just looking for how he quantifies
23  that.  He concludes the results indicate that
24  perineal talc use is associated with a 24 to
25  39 percent increased risk of ovarian cancer.

1         He doesn't quantify it as weak or strong,
2   but there's a suggestion that a 39 percent increase
3   is important.  But he -- he doesn't quantify it.  So
4   I would have to look through the authors'
5   conclusions.
6         Q   Do you know who Penninkilampi is?
7         A   I do not.
8         Q   Do you know that he is a medical student?
9         A   I'm very impressed.  He did a beautiful
10  review.
11        Q   Do you know who Guy Eslick is, the other
12  author on that paper?
13        A   I do not.
14        Q   Do you know if he's an expert for the
15  Plaintiffs in the talc litigation?
16        A   I -- I do not.
17        MS. O'DELL:  Object to the form.
18        Q   (BY MR. ZELLERS) Does Mr. Eslick disclose
19  or identify that he is working for or has worked for
20  Plaintiffs in the talc litigation?
21        A   I might -- I don't know the answer to
22  that.
23        Q   You would expect that if that was true,
24  that there would be a disclosure of that; is that
25  right?

Rebecca Smith-Bindman, M.D.

Page 238

```
1        A   I --
2            MS. O'DELL: Object to the form.
3        A   -- it's published in a very high-impact,
4   high-quality medical journal, and I would suspect
5   that that would be required of that journal.
6            But -- but I -- I -- I -- I don't -- I --
7   I don't know that journal's requirements, but I
8   would suspect that they would require reporting
9   funding.
10       Q   You --
11       A   It says -- I'm sorry. It says, The
12  authors report no conflicts of interest and have not
13  reported funding.
14           And typically when you have to reporting
15  conflicts of interest in the same area, you also
16  report funding, and I don't see any of that.
17       Q   The cohort studies. There are four cohort
18  studies; is that right?
19       A   Yes.
20       Q   All right. You rely only on the Gertig
21  study, the 2000 study; is that right --
22           MS. O'DELL: Object to the form.
23       Q   (BY MR. ZELLERS) -- of those four?
24           MS. O'DELL: Excuse me. Object to the
25  form.
```

Page 239

```
1        A   My report summarizes all four of them, and
2   that all went into the weight of my report.
3            In terms of being included in any
4   systematic review, only one of them was included in
5   the systematic review.
6        Q   (BY MR. ZELLERS) If you looked just at the
7   cohort studies --
8        A   Yes.
9        Q   -- you would not find a statistically
10  significant association between perineal talc use
11  and ovarian cancer, correct?
12           MS. O'DELL: Object to the form.
13       A   I --
14           MS. O'DELL: Excuse me. When -- when you
15  get to a good stopping point, it would be good to
16  take a break --
17           MR. ZELLERS: Okay.
18           MS. O'DELL: -- but whenever you're -- if
19  you have a few more minutes, that's fine, but
20  whenever you get to a good point.
21       A   -- so I summarize my view of the cohort
22  studies, which are not exactly what you -- what you
23  just summarized -- the way you just summarized them
24  on page 21.
25           So I think that often the cohort studies
```

Page 240

```
1   are summarized the way you summarized them. And I
2   think if you look at them a little more closely, I
3   would not make that conclusion. So --
4        Q   For the reasons set forth in your report?
5        A   It's in my report.
6            MR. ZELLERS: All right. Let's take a
7   break.
8            THE VIDEOGRAPHER: We're off the record.
9   The time is 3:58 p.m.
10           (A break was taken from 3:58 p.m. to
11  3:58 p.m.)
12           (Next portion not on video record.)
13           MR. ZELLERS: So we are back on the
14  written record, but not the video record. My
15  understanding is that, you know, we are taking a
16  break as an accommodation to the witness, and that
17  that's fine, but that, you know, you are not going
18  to use this time to further meet and prepare the
19  witness based upon the questions I asked today.
20           MS. O'DELL: Correct. There's --
21  there's -- Dr. Smith-Bindman is taking this break
22  because she is still recovering from her concussion.
23           There will be no meeting with
24  Dr. Smith-Bindman. I do want to point out counsel
25  for J&J seems to have dictated this requirement in
```

Page 241

```
1   order to accommodate the witness's situation.
2            But I would just note the deposition
3   protocol has no such restriction, and -- and so
4   that -- to that degree, I would say we have no
5   intent to prepare the witness any further.
6            But we're not restricted from talking to
7   the witness, and I don't want the record to suggest
8   otherwise.
9            MR. ZELLERS: We will see you tomorrow.
10           MS. O'DELL: Thank you.
11           THE VIDEOGRAPHER: We are back on the
12  record at 4:01 p.m, and this is the end of Disc
13  No. 4 in today's testimony of Dr. Rebecca
14  Smith-Bindman. The time is 4:01 p.m.
15
16           (TIME NOTED: 4:01 p.m.)
17
18
19
20
21
22
23
24
25
```

61  (Pages 238 to 241)

Rebecca Smith-Bindman, M.D.

## Page 242

```
 1
 2
 3
 4        I, REBECCA SMITH-BINDMAN, M.D., VOLUME I, do
 5   hereby declare under penalty of perjury that I have
 6   read the foregoing transcript; that I have made any
 7   corrections as appear noted, in ink, initialed by
 8   me, or attached hereto; that my testimony as
 9   contained herein, as corrected, is true and correct.
10        EXECUTED this_____ day of_____,
11   20_____, at_____, _____.
                (City)          (State)
12
13
14             _____
           REBECCA SMITH-BINDMAN, M.D.
15                VOLUME I
16
17
18
19
20
21
22
23
24
25
```

## Page 244

```
 1               ERRATA SHEET
 2            Golkow Litigation Services
 3        1650 Market Street, One Liberty Plaza, 51st Floor
 4            Philadelphia, Pennsylvania 19103
 5                 877-370-3377
 6          CASE:  Talcum Powder Litigation
 7   PAGE LINE  FROM              TO
 8   ____|____|_____|_____
 9   ____|____|_____|_____
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17   ____|____|_____|_____
18   ____|____|_____|_____
19   ____|____|_____|_____
20        _____
21       REBECCA SMITH-BINDMAN, M.D., VOLUME I
22   Subscribed and sworn to before me
23   this _____ day of _____, 2019.
24        _____
25            Notary Public
```

## Page 243

```
 1        I, MARY J. GOFF, CSR No. 13427, Certified
 2   Shorthand Reporter of the State of California,
 3   certify;
 4        That the foregoing proceedings were taken
 5   before me at the time and place herein set forth, at
 6   which time the witness declared under penalty of
 7   perjury; that the testimony of the witness and all
 8   objections made at the time of the examination were
 9   recorded stenographically by me and were thereafter
10   transcribed under my direction and supervision; that
11   the foregoing is a full, true, and correct
12   transcript of my shorthand notes so taken and of the
13   testimony so given;
14        That before completion of the deposition,
15   review of the transcript ( ) was (XX) was not
16   requested:  ( ) that the witness has failed or
17   refused to approve the transcript.
18        I further certify that I am not financially
19   interested in the action, and I am not a relative or
20   employee of any attorney of the parties, nor of any
21   of the parties.
22        I declare under penalty of perjury under the
23   laws of California that the foregoing is true and
24   correct, dated this   day of      , 2019.
25             MARY J. GOFF
```

62  (Pages 242 to 244)