**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Civil Action No. 3:16-md-2738-FLW-LHG<br><br>MDL No. 2738 |

*THIS DOCUMENT RELATES TO ALL CASES*

---

**THE PLAINTIFFS' STEERING COMMITTEE'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO EXCLUDE THE OPINIONS OF
DEFENDANTS' EPIDEMIOLOGY EXPERTS KARLA BALLMAN
PH.D., CHRISTIAN MERLO, M.D., MPH, GREGORY DIETTE, M.D.,
MHS, AND JONATHAN BORAK, M.D., DABT**

---

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................1

II.   DEFENDANTS' EPIDEMIOLOGY EXPERTS ............................................3

III.  LEGAL STANDARD ..................................................................................7

IV.   ARGUMENT...............................................................................................7

A.   J&J'S EPIDEMIOLOGY EXPERTS APPLIED A FLAWED AND
     UNRELIABLE METHODOLOGY TO ADDRESS THE
     "CONSISTENCY OF ASSOCIATION" ASPECT OF THE BRADFORD
     HILL ANALYSIS ........................................................................................7

1.   The Dozens of Published and Unpublished Observational Studies
     and Meta-Analyses Demonstrate a "Consistency of Association"
     between Talcum Powder Products and Ovarian Cancer ......................7

2.   In the Face of Strong Epidemiology Spanning Four Decades, J&J's
     Experts Employ a Two-Step Methodology to Conclude That There Is
     No Evidence of an Association Between Talcum Powder Products,
     Much Less A Consistent One...........................................................13

3.   J&J's Epidemiologists' First Step, Significance Testing, Has Been
     Described in the Statistical and Epidemiologic Community as an
     "Error…which Must Stop," an "Evaluation that is Completely
     Fallacious" and a "Misconception" that Results in a "Regrettable and
     Avoidable Misinterpretation of Data that Results in a Confusing
     Fog" ...............................................................................................17

a.   J&J's Experts Performed "Significance Testing" ..........................17

b.   The Statistical Community Has Rejected the Flawed
     "Significance Testing" Methodology Used by J&J's Experts to
     Assess Consistency of Association ...............................................21

c.   The Epidemiology Community Has Rejected the Flawed
     "Significance Testing" Methodology Used by J&J's Experts.......25

4.   J&J's Experts' Second Step, Sorting by a Hierarchy of Evidence to
     Assess Consistency of Association, is Unreliable and a
     Misconception ................................................................................29

i

      a.   J&J's Experts Sorted Using a "Hierarchy of Evidence" by Generic Study Type.......................................................................29

      b.   "Hierarchy of Evidence" Sorting by Generic Study Type is an Improper Methodology and a Misconception................................34

    5.   The Mechanical Two-Step Process of Applying "Significance Testing" to the Talc-Ovarian Cancer Studies after Sorting Studies in a "Hierarchy" Employed by J&J's Experts is Demonstrably Unsound and Unreliable ....................................................................................38

      a.   J&J's Experts Applied the Flawed Two-Step Process to Analyze the Talcum Powder and Ovarian Cancer Observational Studies to Analyze Consistency of Association.............................................38

      b.   Even the Authors of the Talc Studies Relied on by J&J's Experts to Support Their Two-Step Consistency Analysis Do Not Support Their Claims ..................................................................................41

      c.   The Proper Methodology for Determining Consistency of Association Requires an Individual Study Analysis Using Sound Judgment, a Methodology that J&J's Experts Did Not Perform ...44

B.   J&J'S EXPERTS' CAUSATION ANALYSIS IS FURTHER FLAWED BECAUSE THEY APPLIED INCORRECT AND UNSUPPORTED STANDARDS FOR SEVERAL BRADFORD HILL ASPECTS...............48

    1.   J&J's Experts Misstate and Misapply the Biologic Gradient (Dose Response) Aspect of Bradford Hill Making Their Opinions Inadmissible Under the Reliability and Fit Prongs of Daubert...........50

    2.   J&J's Experts Ballman and Diette Misstate and Misapply the Biologic Plausibility Aspect of Bradford Hill Making Their Opinions Inadmissible Under the  Reliability and Fit Prongs of Daubert..........57

C.   NEITHER DR. BORAK NOR DR. MERLO PEFRFORMED A CAUSATION ANAYLYSIS TO SUBSTANTIATE THEIR CAUSATION OPINIONS .........................................................................62

    1.   Dr. Borak Did Not Perform a Causation Analysis at All...................62

    2.   Dr. Merlo Did Not Perform a Complete Causation Analysis .............65

D.   J&J'S EXPERTS' CRITICISMS OF THE PSC' EXPERTS' METHODOLOGIES ARE NOT RELIABLE BECAUSE THEY ARE

BASED CHERRY-PICKED STATEMENTS FROM THE PSC'S
EXPERTS OPINIONS ................................................................................66

V.     CONCLUSION..............................................................................................72

# TABLE OF AUTHORITIES

## Cases

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
  509 U.S. 579 (1993) ............................................................................... passim

*DeLuca v. Merrell Dow Pharm., Inc.,*
  911 F.2d 941 (3d Cir. 1990) ............................................................................ 2

*Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc.,*
  2009 WL 5206280 (D.N.J. Dec. 22, 2009) ................................................... 19

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ............................. 19

*Hamilton v. Emerson Electric Co.,*
  133 F. Supp.2d 360 (M.D. Pa. 2001) ........................................................... 19

*Holman Ent. v. Fidelity & Guaranty Ins. Co.,*
  563 F.Supp.2d 467 (D.N.J. 2008)................................................................. 19

*In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.,*
  No. 2007-MD-1871, 2011 WL 13576 (E.D. Pa. Jan. 4, 2011) ............................51, 52

*In re Fosamax Prods. Liab. Litig.,*
  2013 WL 1558697 (D.N.J. April 10, 2013) ................................................... 60

*In re Gabapentin Patent Litig.,*
  No. CIV.A. 00-2931, 2011 WL 12516763 (D.N.J. Apr. 8, 2011) .............................. 19

*In re Gadolinium Based Contrast Agents Prods. Liab. Litig.,*
  2010 U.S. Dist. LEXIS 43444 (N.D. Ohio May 4, 2010) ......................................... 49

*In re Stand 'N Seal Prods. Liab. Litig.,*
  623 F.Supp.2d 1355 (N.D. Ga. 2009) ........................................................... 51

*In re Tylenol Prods. Liab. Litig.,*
  No. 2:12-cv-07263; MDL No. 2436, 2016 WL 3997046 (E.D. Pa. July 26, 2016) 51

*In re Zoloft Prods. Liab. Litig.,*
  26 F. Supp. 3d 466 (E.D. Pa. 2014)............................................................... 59

*In re Zoloft Prods. Liab. Litig.,*

iv

858 F.3d 787 (3d Cir. 2017) ........................................................................28

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003) ....................................................................67

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002) .............................................................19

*Montgomery Cty. v. Microvote Corp.*,
320 F.3d 440 (3d Cir. 2003) .......................................................................19

*Nartoli v. Novartis Pharm.,*
2014 WL 1515870 (M.D. Pa. Apr. 17, 2014) ............................................59

*Oddi v. Ford Motor Co.,*
234 F.3d 136 (3d Cir. 2000) .......................................................................19

*Rowland v. Novartis Pharms. Corp.*,
9 F.Supp.3d 553 (W.D. Pa. 2014)...............................................................54

*Trigon Ins. Co. v. United States*,
204 F.R.D. 277 (E.D. Va. 2001) .................................................................67

*Zeller v. J.C. Penney Co*.,
2008 WL 906350 (D.N.J. Mar. 31, 2008) ..................................................19

## Other Authorities

Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965) ........................................................ passim

Black's Law Dictionary (6th Ed. 1990) ...............................................................20

Kenneth Rothman, et al., *Modern Epidemiology* (3rd ed. 2008) ................................ passim

Leon Gordis, *Epidemiology* (5th ed. 2013) ..........................................40, 48, 54, 56

*Reference Manual on Scientific Evidence* (3d ed. 2011)................................. passim

Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70 The American Statistician 129 (2016).......................26, 27

William A. Oleckno, *Epidemiology: Concepts and Methods* (2008)................29, 52, 54, 62

**Rules**

Fed. R. Evid. 104(a) ................................................................................................................ 1

Fed. R. Evid. 403 .................................................................................................................... 1

Fed. R. Evid. 702 .................................................................................................................... 1

Fed. R. Evid. 703 .................................................................................................................... 1

The Plaintiffs' Steering Committee ("PSC") submits this motion and memorandum of law, pursuant to Fed. R. Evid. 104(a), 702, 703 and 403, to exclude the testimony of Defendants' Johnson & Johnson, Johnson & Johnson Consumer Inc., (collectively "J&J") and Personal Care Products Council's (PCPC) epidemiology experts, Karla Ballman, Ph.D., Jonathan Borak, M.D., DABT, Gregory Diette, M.D., MHS, and Christian Merlo, M.D., Ph.D. (collectively "Defendants' experts").

## I.     __INTRODUCTION__

Each of Defendants' experts purport to address the question of whether the perineal use of talcum powder products is capable of causing ovarian cancer. The PSC challenges the proposed testimony of these witnesses, not for the conclusions they reach, but for the flawed methodologies they employ in their analyses of the general causation question. In addressing the general causation question, and in criticizing the PSC's epidemiology experts' methodologies, Defendants' experts make five (5) serious—and demonstrable—methodologic errors that render their opinions and criticisms unreliable:

*First*, three of Defendants' expert witnesses (Drs. Ballman, Diette, & Merlo) (collectively "J&J's experts" or "J&J's epidemiology experts") purport to consider the consistency-of-association aspect of the Bradford Hill methodology for assessing causation.  In doing so, however, they employed a methodologically flawed two-step

1

"significance testing" and "hierarchy of evidence" analysis, a process which has been called a serious "misconception" that should "never" be done.[1]

*Second,* these same three defense experts purport to analyze the dose-response aspect of the Hill causation analysis. However, they do so using a definition of dose response that was rejected by Hill himself, the epidemiology community, and the case law interpreting it.

*Third,* Drs. Ballman and Diette purport to analyze Hill's biologic-plausibility aspect of the Hill causation analysis. However, they do so using a definition of biologic plausibility that requires not that the causal inference *make biologic sense* as Hill envisioned, but that the causal inference be *proven* with the existing biologic evidence.

---

[1] Kenneth J. Rothman, *Six Persistent Research Misconceptions*, 29 J. Gen. Internal Med. 1060 (2014), attached as **Exhibit 1**. *See also* Amrhein, Greenland, & McShane, *Retire Statistical Significance*, 567 Nature 305 (2019), attached as **Exhibit 2**. Dr. Rothman and Greenland are the authors of the widely used epidemiology textbooks *Modern Epidemiology,* and *Epidemiology, an Introduction*, which have been cited with approval by the 3rd Circuit. *DeLuca v. Merrell Dow Pharm., Inc.,* 911 F.2d 941, 945, 947 (3d Cir. 1990). Both Drs. Rothman and Greenland are widely cited in the *Reference Manual on Scientific Evidence*, particularly in the *Reference Guide on Epidemiology,* and their textbooks are among the relatively small handful of "References on Epidemiology" cited in that epidemiology chapter. Federal Judicial Center, *Reference Manual on Scientific Evidence* at 549-632 (3d ed. 2011) ("*Reference Manual*").

*Fourth*, neither Dr. Borak nor Dr. Merlo even perform a full causal analysis. Dr. Borak admittedly did not consider the Hill framework (or any discernable causation methodology) at all. Dr. Merlo did not address the biologic plausibility, specificity, or analogy factors of Bradford Hill.

*Fifth*, none of the criticisms of the PSC's experts' methodologies by Defendants' experts are reliable because they cherry-picked and distorted sound-bites from the PSC's epidemiology experts' opinions to fit Defendants' legal arguments.

Any one of these serious methodological errors render these experts' opinions unreliable and inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993). Collectively, however, they call into serious question the qualifications of these experts. The PSC does not concede that these experts are qualified and their application of improper methodology strongly suggests that they are not.

## II.   DEFENDANTS' EPIDEMIOLOGY EXPERTS

Defendants have claimed that Drs. Ballman, Borak, Diette, and Merlo are sufficiently qualified to testify to the central question in this case: *Can talcum powder products cause ovarian cancer?* Indeed, J&J's counsel recently described

3

these experts as part of a "Blue Ribbon Panel of highly qualified experts" that can address that general causation question in this MDL.[2]

Defendants' experts hardly qualify as a "Blue Ribbon Panel" to address this question. Unlike the PSC's experts who have collectively published and spoken on topics related to the general causation questions in this MDL (including to Congress, the International Agency for Research on Cancer (IARC)), or at least spoken to their colleagues of their conclusions, not a single one of Defendants' epidemiology experts have done so.  It is telling that, despite the "Blue Ribbon" claim, neither J&J nor PCPC have *ever* sought or consulted with their experts on the causation question outside of litigation—even as of today.  Not one has published on *any* aspect of this questions and, indeed, Defendants' experts admit to only having first become familiar with the issue of talcum powder and ovarian cancer after being contacted by the Defendants' legal teams. Some of them only became aware of the question in the past few months.

Despite having the advantage of knowing the identities of the PSC's likely epidemiology experts for well-over a year, J&J has identified epidemiology "experts" whose qualifications are, at best, seriously lacking:

> ▪ **Karla V. Ballman, Ph.D.:** Despite her title as Chief of the Division of Biostatistics and Epidemiology, Dr. Ballman

---

[2] Status Conf. Hr'g Tr. at 2, April 29, 2019.

identifies herself professionally only as a statistician.[3]  Dr. Ballman does not have any degree in epidemiology and has never taught a course on epidemiology.[4] In the 40 years that the general causation question has been in the literature, J&J never contacted her to provide her expertise on any causation question, much less the one at issue here. In fact, the first time she was contacted by J&J's legal team was 6 months ago. Prior to writing her defense report in February 2019, she did not have any opinion on talcum powder products.[5]

- **Christian Merlo, MD, MPH**: Dr. Merlo is an Associate Professor at the Johns Hopkins University School of Medicine, Division of Pulmonary and Critical Care Medicine.[6] His primary research focus is on cystic fibrosis, lung transplantation and other pulmonary diseases, *not cancer and certainly not gynecologic cancers*. Though he holds an appointment as an Assistant Professor at the Johns Hopkins School of Public Health, Dr. Merlo does not even have an office there.[7] Though there are professors in the department at Johns Hopkins who have studied and published on the risk of ovarian cancer, Dr. Merlo is not one of them.[8] In the 40 years that the talc-ovarian cancer general causation question has been in the literature, J&J never contacted Dr. Merlo to seek his opinions on that question, Even as of today when those issues are before regulatory bodies here and abroad,

---

[3] Expert Report of Karla V. Ballman, Ph.D. at 1, Feb. 25, 2019 ("Ballman Report"), attached as **Exhibit 3**; Deposition of Karla Ballman, Ph.D. at 44:10-14, 46:9-18, 244:17-21, Mar. 22, 2019 ("Ballman Dep."), attached as **Exhibit 4**; Ballman Dep. Ex. 10-C (invoice in which she identifies herself as a "Statistician and Consultant"), attached as **Exhibit 5**.

[4] Ballman Dep. at 40:14-18, 41:22-42:3, 260:6-18.

[5] *Id.* at 40:14-18, 41:22-42:3, 43:16-22; 44:10-14, 46:9-18, 248:22-249:5.

[6] Expert Report of Christian Merlo at 1, Feb. 25, 2019 ("Merlo Report"), attached as **Exhibit 6**.

[7] Deposition of Christian Merlo, M.D. MPH at 64:6-9, Apr. 18, 2019 ("Merlo Dep."), attached as **Exhibit 7**.

[8] *Id.* at 359:5-21.

J&J has never contacted Dr. Merlo for his expertise.[9] He was not even contacted by J&J's legal team until late 2018. He did not form an opinion on talcum powder and ovarian cancer until February 2019.[10]

- **Gregory Diette, M.D., MHS:** Dr. Diette is a professor at the Johns Hopkins University School of Medicine.[11] Though he holds a joint position at the Johns Hopkins School of Public Health, the primary focus of Dr. Diette' s research is *pulmonary* diseases like Chronic Obstructive Pulmonary Disease (COPD) and asthma, *not cancer or gynecologic cancer*. Like his colleague Dr. Merlo, he has not published or lectured about the talcum powder-ovarian cancer question outside of litigation and has never been contacted by anyone outside of litigation— *including Defendants themselves*—to give an opinion on talcum powder and ovarian cancer.[12]

- **Jonathan Borak, M.D., DABT**: Dr. Borak is a Clinical Professor of Medicine at Yale University and is board certified in internal medicine and toxicology.[13] He does not have any degree in epidemiology, has never taught a course on epidemiology in his career, and is not a member of any epidemiological associations.[14]

---

[9] *Id.* at 100:15-101:1.

[10] *Id.* at 107:10-109:8.

[11] Expert Report of Gregory Diette, M.D., MHS at 2, Feb. 25, 2019 ("Diette Report"), attached as **Exhibit 8**.

[12] Deposition of Gregory B. Diette, M.D. at 56:12-57:18, Apr. 9, 2019 ("Diette Dep."), attached as **Exhibit 9**.

[13] Expert Report of Jonathan Borak, M.D., DABT at 1, Feb. 25, 2019 ("Borak Report"), attached as **Exhibit 10**.

[14] Deposition of Jonathan Borak at 50:14-51:12, 46:7-47:2, 48:1-10, 178:3-181:18, Apr. 11, 2019 ("Borak Dep."), attached as **Exhibit 11**.

## III.   LEGAL STANDARD

The PSC incorporates as if set forth in its entirety the legal standard set forth in the *Plaintiffs' Steering Committee's Omnibus Memorandum of Law Regarding Daubert Legal Standard and Scientific Principles for Assessing General Causation* ("*Omnibus Brief*") as supplemented herein.

## IV.   ARGUMENT

### A.   J&J'S EPIDEMIOLOGY EXPERTS APPLIED A FLAWED AND UNRELIABLE METHODOLOGY TO ADDRESS THE "CONSISTENCY OF ASSOCIATION" ASPECT OF THE BRADFORD HILL ANALYSIS

#### 1.   The Dozens of Published and Unpublished Observational Studies and Meta-Analyses Demonstrate a "Consistency of Association" between Talcum Powder Products and Ovarian Cancer

Collectively, the J&J epidemiologists—Drs. Ballman, Merlo, and Diette—purport to analyze the general causation question using the framework outlined by Sir Bradford Hill in his seminal 1965 lecture on the topic.[15] One of the aspects of causation that Hill discussed was "consistency of association." As Professor Hill stated in his 1965 address, a causal inference is more reasonable if the observed

---

[15] Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295, 296 (1965), attached as **Exhibit 12**.

7

association is made "by different persons, in different places, circumstances and times."[16]

To address this "consistency" aspect, both the PSC and Defendants' experts analyzed the dozens of published observational studies of different designs. Since the first study published by researchers at Harvard in 1982 reported a statistically significant association between talcum powder products and the development of ovarian cancer,[17] there have been numerous studies of different designs conducted over the last four decades by multiple researchers in different countries.

The basic epidemiologic facts relevant to the consistency of association between talcum powder products and ovarian cancer are as follows:

---

[16] *Id.* at 296.

[17] Daniel W. Cramer, et al., *Ovarian Cancer and Talc: A Case-Control Study*, 50 Cancer 372 (1982), attached as **Exhibit 13**.

- There are 35 observational studies of talc and ovarian cancer: 31 case-control studies (7 hospital cases and 24 population based),[18] 1 pooled case-control study,[19] and 3 cohort studies.[20]

---

[18] Cramer, et al. (1982); Patricia Hartge, et al., *Talc and Ovarian Cancer*, 250 JAMA 1844 (1983), attached as **Exhibit 14**; Alice S. Whittemore, et al., *Personal and Environmental Characteristics Related to Epithelial Ovarian Cancer*, 128 Am. J. Epidemiology (1988), attached as **Exhibit 15**; Bernard L. Harlow & Noel S. Weiss, *A Case –Control Study of Borderline Ovarian Tumors: the Influence of Perineal Exposure to Talc*, 130 Am. J. Epidemiology 390 (1989), attached as **Exhibit 16**; M. Booth, *Risk Factors for Ovarian Cancer: a Case-Control Study*, 60 Brit. J. Cancer 592 (1989), attached as **Exhibit 17**; Bernard L. Harlow, et al., *Perineal Exposure to Talc and Ovarian Cancer Risk*, 80 Obstetrics & Gynecology 19 (1992), attached as **Exhibit 18**; Patricia Hartge & Patricia Stewart, *Occupation and Ovarian Cancer: A Case-Control Study in the Washington, DC, Metropolitan Area, 1978-1981*, J. Occupational Med. 924 (1994), attached as **Exhibit 19**; Karin A. Rosenblatt, et al., *Mineral Fiber Exposure and the Development of Ovarian Cancer* 45 Gynecologic Oncology 20 (1992), attached as **Exhibit 20**; Yong Chen, et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, 21 Int'l J. Epidemiology 23 (1992), attached as **Exhibit 21**; Anastasia Tzonou, et al., *Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer*, 55 Int'l J. Cancer 408 (1993), attached as **Exhibit 22**; David Purdie, et al., *Reproductive and Other Factors and Risk of Epithelial Ovarian Cancer: an Australian Case-Control Study*, 62 Int'l J. Cancer 678 (1995), attached as **Exhibit 23**; Asher Shushan, et al., *Human Menopausal Gonadotropin and the Risk of Epithelial Ovarian Cancer,* 65 Fertility & Sterility 13 (1996), attached as **Exhibit 24**; Adele Green, et al., *Tubal Sterilisation, Hysterectomy and Decreased Risk of Ovarian Cancer*,71 Int'l J. Cancer 948 (1997), attached as **Exhibit 25**; Stella Chang & Harvey A. Risch, *Perineal Talc Exposure and Risk of Ovarian Carcinoma*, 79 Cancer 2396 (1997), attached as **Exhibit 26**; Linda S. Cook, et al., *Perineal Powder Exposure and the Risk of Ovarian Cancer*, 145 Am. J. Epidemiology 459 (1997), attached as **Exhibit 27**; Beatrice Godard, et al., *Risk Factors for Familial and Sporadic Ovarian Cancer Among French Canadians: a Case-Control Study*, 179 Am. J. Obstetrics & Gynecology 403 (1998), attached as **Exhibit 28**; Daniel W. Cramer, et al., *Genital Talc Exposure and Risk of Ovarian Cancer*, 81 Int'l J. Cancer 351 (1999), attached as **Exhibit 29;** Cheung Wong, et al., *Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: a Case-Control Study*, 93 Obstetrics & Gynecology 372 (1999), attached as **Exhibit 30**; Roberta B. Ness, *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11

Epidemiology 111 (2000), attached as **Exhibit 31**; Paul K Mills, et al., *Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California*, 112 Int'l J. Cancer 458 (2004), attached as **Exhibit 32**; Malcolm C. Pike, et al., *Hormonal Factors and the Risk of Invasive Ovarian Cancer: a Population-Based Case-Control Study*, 82 Fertility & Sterility 186 (2004), attached as **Exhibit 33**; Susan J. Jordan, et al., *Risk Factors for Benign Serous and Mucinous Epithelial Ovarian Tumors*, 109 Obstetrics & Gynecology 647 (2007), attached as **Exhibit 34**; Melissa A. Merritt, et al., *Talcum Powder, Chronic Pelvic Inflammation and NSAIDs in Relation to Risk of Epithelial Ovarian Cancer*, 122 Int'l J. Cancer 170 (2008), attached as **Exhibit 35**; Margaret A. Gates, et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 Cancer Epidemiology Biomarkers Prev. 2436 (2008), attached as **Exhibit 36**; Patricia G. Moorman, et al., *Ovarian Cancer Risk Factors in African-American and White Women*, 170 Am. J. Epidemiology 598 (2009), attached as **Exhibit 37**; Anna H. Wu, *Markers of Inflammation and Risk of Ovarian Cancer in Los Angeles County*, 124 Int'l J. Cancer 1409 (2009), attached as **Exhibit 38**; Karin A. Rosenblatt, et al., *Genital Powder Exposure and the Risk of Epithelial Ovarian Cancer*, 22 Cancer Causes Control 737 (2011), attached as **Exhibit 39**; Michelle L. Kurta, et al., *Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a U.S.-Based Case-Control Study*, 21 Cancer Epidemiology Biomarkers Prev. 1282 (2012), attached as **Exhibit 40**; Anna H. Wu, *African-Americans and Hispanics Remain at Lower Risk of Ovarian Cancer than Non-Hispanic Whites After Considering Non-Genetic Risk Factors and Oophorectomy Rates*, 24 Cancer Epidemiology Biomarkers Prev. 1094 (2015), attached as **Exhibit 41**; Daniel W. Cramer, et al., *The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States*, 27 Epidemiology 334 (2016), attached as **Exhibit 42**; Joellen M. Schildkraut, et al., *Association Between Body Powder Use and Ovarian Cancer: The African American Epidemiology Study (AACES)*, 25 Cancer Epidemiology Biomarkers Prev. 1411(2016), attached as **Exhibit 43**.

[19] Kathryn L. Terry, et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 85, 25 Cases and 9,859 Controls*, 6 Cancer Prev. Research 811 (2013), attached as **Exhibit 44**.

[20] Presented in five published papers. Dorota M. Gertig, et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. Nat'l Cancer Inst. 249 (2000), attached as **Exhibit 45**; Margaret A. Gates, et al., *Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype*, 171 Am. J. Epidemiology 45 (2010), attached as **Exhibit 46**; Serena C. Houghton, et al., *Perineal Powder Use and Risk of Ovarian Cancer*, 106 J. Nat'l Cancer Inst. (2014), attached as **Exhibit 47**; NL Gonzalez, et al., *Douching,*

- The overwhelming majority (n=34) of these studies, irrespective of study design, found a positive association (i.e., a hazard ratio > 1), with most showing an association in the range of 1.1-1.7, representing a 10-70% increased risk of ovarian cancer with talcum powder use.

- In a majority of the published studies (n=19), the positive association reported was, in fact, statistically significant to a p=0.05.

- Even in the published studies that showed a positive association that was not statistically significant, the vast majority had confidence intervals which overlapped 1.2-1.25, consistent with a 20-25% increased risk of ovarian cancer seen in the studies which did find a statistically significant association.

- In addition, there are numerous published and unpublished meta-analyses of the observational studies.[21] *All* show a consistent and statistically significant 25-45% increased risk of ovarian cancer.

---

*Talc Use, and Risk of Ovarian Cancer*, 27 Epidemiology 797 (2016), attached as **Exhibit 48**.

[21] Harlow (1992); Alan Gross & Paul Berg, *A Meta-Analytical Approach Examining the Potential Relationship Between Talc Exposure and Ovarian Cancer*, 5 J. Exposure Analysis & Envtl. Epidemiology 181 (1995), attached as **Exhibit 49**; Michael Huncharek, et al., *Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: a Meta-Analysis of 11, 933 Subjects from Sixteen Observational Studies*, 23 Anticancer Research 1955 (2003), attached as **Exhibit 50**; Michael Huncharek, et al., *Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: a Meta-Analysis of Nine Observational Studies*, 16 Eur. J. Cancer Prev. 422 (2007), attached as **Exhibit 51**; Hilde Langseth, et al., *Perineal Use of Talc and Risk of Ovarian Cancer*, 62 J. Epidemiology Comm. Health 358 (2008), attached as **Exhibit 52**; Wera Berge, et al., *Genital Use of Talc and Risk of Ovarian cancer: a Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018), attached as **Exhibit 53**; Ross Penninkilampi & Guy Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29 Epidemiology 41 (2018), attached as **Exhibit 54**; Expert Report of Jack Siemiatycki, MSc, PhD , Nov. 16, 2018 (Unpublished), ("Siemiatycki Report"), attached as **Exhibit 55**; Expert Report of Rebecca Smith-Bindman, M.D., Nov. 16, 2018 (Unpublished), attached as **Exhibit 56**; Taher, et al, *Systematic Review and Meta-*

11

■ The 25-35% increased risk of talcum powder and ovarian cancer is similar to many other well-known causal relationships including the causal relationships between asbestos and lung cancer and second-hand smoke and lung cancer. [22]

Against the backdrop of these straightforward facts, independent scientists outside litigation have acknowledged that the consistency of association aspect of Bradford Hill is present. Indeed, the contrary position taken by J&J's experts has been called "disingenuous" by one of the most respected breast and ovarian cancer researchers in the world:

> [G]iven the number of hazard ratios reported in the literature between 1.1 and 1.4 in both case control and cohort studies, **it is disingenuous to state that there is no evidence that talc is associated with ovarian cancer.**[23]

Though the association—and its consistency—has been observed outside of litigation, J&J's experts challenge these observations in their litigation reports. As set forth below, they do so by using a flawed two-step methodology.

---

*Analysis of the Association Between perineal Use of talc and Risk of Ovarian Cancer* (Unpublished Manuscript 2018), attached as **Exhibit 57**.

[22] *E.g.,* trichloroethylene and kidney cancer (RR 1.32), domestic radon gas and lung cancer (RR 1.29), and diesel engine emission and lung cancer (RR 1.42). Siemiatycki Report at 87.

[23] S.A. Narod, *Talc and Ovarian Cancer*, 141 Gynecologic Oncology 410, 411 (2016) (emphasis added), attached as **Exhibit 58**.

2. **In the Face of Strong Epidemiology Spanning Four Decades, J&J's' Experts Employ a Two-Step Methodology to Conclude That There Is No Evidence of an Association Between Talcum Powder Products, Much Less A Consistent One**

Despite this *consistent* association between the perineal use of talcum powder products and ovarian cancer observed over multiple decades and by different authors, J&J's experts insist that there is absolutely no evidence of an association, much less a consistent one. To reach this conclusion, J&J's experts uniformly rely on a methodologically flawed two-step process for consistency of association.

J&J experts' two-step methodology involves the erroneous combination of two methodologic "principles" to analyze the observational studies for consistency. They claim, largely without citation or support, that these steps or principles are "generally accepted" and "fundamental principles of epidemiology."[24] These "steps" or "principles" are as follows:

*First,* Defendants' experts uniformly assert that it is generally accepted that epidemiologists perform "statistical significance testing" (hereinafter "significance testing") on observational studies to determine both proof of association in an individual study *and* consistency of association across observational studies.[25] Applying statistical significance as the benchmark of consistency, Defendant's

---

[24] *See, e.g.*, Merlo Report at 46; Merlo Dep. at 115:7-20; 351:1-354:16.

[25] *Id.* at 351:1-354:1.

experts next opine that *statistically significant* positive ovarian cancer associations seen in a majority of studies are, by definition, *inconsistent* with studies that report positive but *statistically not significant* ovarian cancer associations.[26]

*Second,* Defendants' experts then uniformly assert it is a "generally accepted" rule that epidemiologists adhere to a "hierarchy" or "pyramid" of evidence based on generic study design. Under this so-called "hierarchy," cohort studies generally and,

---

[26] *See, e.g.*, Merlo Report at 31 ("there is a lack of consistency in finding a *statistically significant* association between talc use and ovarian cancer") (emphasis added); *see also id.* at 45 ([To find] a causal relationship, there must be a consistency in statistically significant results.") (emphasis in original); Ballman Report at 17 ("results across studies are consistent if the risk ratios are numerically close to one another and the results are statically significant in most studies."); *Id.* at 26 ( "There is a clear inconsistency between the different study types, with case-control studies yielding *a statistically significant* association ranging from 1.26 and 1.35, and cohort studies yielding a *non-significant association* ranging from 1.02 to 1.06." (emphasis added); *Id.* at 49 (the *statistically significant* association between perineal/genital talcum powder use and ovarian cancer seen across case-control studies is 1.25 or higher, whereas the cohort studies have values less than 1.10, which were *not statistically significant*." (emphasis added); Diette Report at 8 ("the prospective epidemiological studies (cohort studies) *do not show* a *statistically significant* association between genital talc use and ovarian cancer, while a subset of the population-based case-control studies do show weak *statistically significant* associations"); *Id.* at 12 (emphasis added) ("The fact that these [cohort] studies have shown uniformly [statistically non-significant] results indicates no association between talc use and ovarian cancer."]; *Id.* at 14 ("11 of the 25 population-based case-control studies do not show a statistically significant association, and none of the hospital-based studies does."); *Id.* at 24 (the prospective epidemiologic studies (cohort studies) do not show a *statistically significant association*, while only a subset of the population-based case-control studies does. This disparity reflects inconsistent results…") (emphasis added).

to a lesser extent, hospital-based case control studies generally are, by definition, of higher evidentiary value than population-based case-control studies.[27]

This methodology of sorting by statistical significance and study hierarchy is the bedrock of each of the J&J's experts' causation analysis as demonstrated in the following testimony by Dr. Merlo:

> Q.   What do [the studies] show here that makes them inconsistent?
>
> .   .   .
>
> A.   Well, if we're specifically talking about the potential causal association between talcum powder and ovarian cancer, there are hospital-based case-control studies that are all not statistically significant. There is population-based case-control studies; some are statistically significant, some are not. There are cohort studies, four of them, all not statistically significant.
>
> And so, when you break down this association in trying to look at causality, when you break down things -- when you break down this by study design, there's a difference. There's an inconsistency between cohort studies and cases controls. There's

_____

[27] Merlo Report at 35 ("The hierarchy of evidence is well-established within the scientific community."; ". . . plaintiffs' epidemiologists ignore the well-established hierarchy of evidence in their reviews of the relevant human studies."); Ballman Report at 2 ("Figure 1 illustrates the level of evidence within each trial design with increasing evidence moving up the pyramid."); *Id.* at 17 (When the results across study designs are not consistent, i.e., case-control studies report a statistically significant association and cohort studies do not, the study with the accepted higher level of evidence is the cohort study…."); Diette Report at 5 ("Epidemiologists recognize that there is a hierarchy of evidence with respect to human studies.").

an inconsistency between population-based case controls and hospital-based case controls.[28]

J&J's experts not only rely on this two-step methodology to "prove" inconsistency, but they forcefully and derisively accuse the PSC's epidemiologists and other scientists outside of litigation who have opined on the matter of serious scientific misconduct for *not* using it. Dr. Diette, for example, called the PSC's experts' analyses of the weaknesses of some studies "appalling" and "unprecedented."[29] Dr. Merlo, similarly accused them of using a litigation-driven methodology[30] by "disregarding" these well-established rules embodied in his two step analyses.[31] According to Dr. Merlo, the PSC's experts "fabricate[d] consistency"[32] and their analyses were "result-driven."[33] Dr. Diette went even further—accusing scientists *not* involved in litigation, who independently employed the same methodology as the PSC's experts, of using a "word salad exercise" to

---

[28] *Id.* at 188:4-189:15; *see also* Merlo Report at 34-35 (tables of studies); Merlo Dep. at 191:23-192:1 ("if you're not showing consistent statistical significance then that association becomes very difficult to prove causality.").

[29] Diette Dep. at 461:19-462:7.

[30] Merlo Report at 46.

[31] *Id.* at 3.

[32] *Id.* at 44.

[33] *Id.* at 40.

analyze the data; a methodology that was "crazy[,]" "absurd[,]" and "kind of a mess."[34]

As set forth more fully below, Defendants' experts' causation opinions—and their *ad hominem* criticisms of any scientists (retained for litigation or independent of litigation)—are themselves methodologically flawed.  Specifically, their two-step process relies on "rules" that have, in fact, been soundly *rejected* by the epidemiologic and statistical community.

> **3.    J&J's Epidemiologists' First Step, Significance Testing, Has Been Described in the Statistical and Epidemiologic Community as an "Error…which Must Stop," an "Evaluation that is Completely Fallacious" and a "Misconception" that Results in a "Regrettable and Avoidable Misinterpretation of Data that Results in a <u>Confusing Fog</u>"**

> **a.    <u>J&J's Experts Performed "Significance Testing"</u>**

As a first step in their analysis, Defendants' experts uniformly (and, as will be shown, erroneously) employed a "significance testing" methodology to measure consistency of association. Applying this methodology to the studies on talcum powder products and ovarian cancer, they simply listed the (almost all positive) risk ratios in a table, noted which were statistically significant and then compared them

---

[34] This is how Dr. Diette described the December 2019 Bradford Hill analysis independently conducted by scientists at Heath Canada, the Canadian equivalent of the FDA.  *See* Diette Dep. at 267:5-271:5; *see also* Health Canada, *Draft Screening Assessment*, *Talc* (December 2018), attached as **Exhibit 59**.

to those were not."[35] Using this "significance testing" methodology, and having *ignored* the overall positive association shown by the talcum powder data in virtually every study, Defendants' experts noted that some were significant and, unsurprisingly, others were not. On that basis, they found what they were looking for: inconsistency.

This "significance testing" methodology was perhaps best captured by Dr. Merlo who, in his expert report, stated his rule and chided the PSC's epidemiologists for failing to adopt it:

> [I]t is important to remember (contrary to the suggestion of several of plaintiffs' experts) that for this [consistency] criterion to weigh in favor of finding a causal relationship, there must be a consistency in ***statistically significant*** associations.[36]

As set forth below, the flawed "significance testing" methodology described by J&J epidemiologists is wholly *unreliable* and has been universally *condemned* in both the epidemiologic and statistical communities, *including by Professor Hill himself.*

Before demonstrating that this "significance testing" methodology is unreliable to assess consistency of association, however, it is notable that *none* of

---

[35] *See, e.g.,* Merlo Report at 35; *see also* Diette Report at 8-14. This chart was used as a separate exhibit to both the Ballman and Merlo depositions. ("11 of the 25 population-based case-control studies do not show a statistically significant association, and none of the hospital-based studies does.").

[36] Merlo Report at 45 (emphasis in original).  *See also* Diette Report at 2.

J&J's experts even attempt to support it with *any* citation or reference of any kind to any published (or even unpublished) articles or studies. When questioned about this obvious omission, they simply make the unsupported *ipse dixit* or "say so" assertion that their methodology is "generally accepted."[37,38] Dr. Merlo for example, acknowledged that the "significance testing" methodology cited above was unsupported by any authority in his expert report, but nonetheless insisted that it was "a generally accepted principle in epidemiology."[39] Dr. Ballman even made the

---

[37] Merlo Dep. at 354:6-16.

[38] *Oddi v. Ford Motor Co.,* 234 F.3d 136, 158 (3d Cir. 2000) (holding that an expert's *ipse dixit* does not withstand *Daubert's* scrutiny); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (D.N.J. 2002) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")); *Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (citing *Joiner,* 522 U.S. at 146); *In re Gabapentin Patent Litig.*, No. CIV.A. 00-2931, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011); *Hamilton v. Emerson Electric Co.*, 133 F. Supp.2d 360, 370 (M.D. Pa. 2001) ("*ipse dixit* is defined in Black's Law Dictionary as 'a bare assertion resting on the authority of an individual.' Black's Law Dictionary 828 (6th Ed. 1990)."); *Holman Ent. v. Fidelity & Guaranty Ins. Co.*, 563 F.Supp.2d 467, 470 (D.N.J. 2008); *see Zeller v. J.C. Penney Co.*, 2008 WL 906350, at *7 n. 13 (D.N.J. Mar. 31, 2008) (noting that "an expert's bare conclusions are not admissible."); *see also Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc*., 2009 WL 5206280, at *2 (D.N.J. Dec. 22, 2009) (holding that "the expert must have good grounds for his or her belief" and that courts "need not admit bare conclusions or mere assumptions proffered under the guise of expert opinions").

[39] Merlo Report at 45; Merlo Dep. at 352:1-354:16.

spurious claim that "there's no citations for many things that are general sort of principles of epidemiology or facts."[40]

Contrary to Defendants' experts' unsupported *ipse dixit* assertions, "significance testing" is *not* generally accepted as a measure of consistency. Indeed, as set forth below, it has been uniformly found to be an unreliable methodology to assess both association and consistency of association. In fact, it has been specifically and unambiguously rejected by both the statistics and epidemiology communities—and they have done so for decades. In no uncertain terms, the statistical and epidemiology community has described this "significance testing" methodology as an "error…which must stop," an "evaluation that is completely fallacious" and a "[m]isconception" that results in a "regrettable and avoidable misinterpretation of data that results from the confusing fog. . . ."[41]

---

[40] Ballman Dep. at 296:7-10. And although Dr. Ballman searched her report, she could not find any support for her significance testing methodology.

[41] Rothman (2014) at 1063.

**b.    The Statistical Community Has Rejected the Flawed "Significance Testing" Methodology Used by J&J's Experts to Assess Consistency of Association**

With respect to the statistical community, the American Statistical Association (ASA)[42] has *rejected* the use of "significance testing." This rejection is both unambiguous and complete.

Just two months ago, in March 2019, the ASA devoted an *entire* supplemental volume of its journal *The American Statistician* to the persistent misuse of statistical significance. Indeed, the volume of *The American Statistician* was entitled "Statistical Significance in the 21st Century; A World Beyond P<0.05."[43] This journal contained no less than 43 articles on the subject. Accompanying the 43 original articles were an editorial and a comment, which appeared jointly in the journal *Nature.* Collectively, these 43 articles and the editorial and comment highlight the error of "significance testing" of the very type used by Defendants' experts to analyze the talcum powder-ovarian cancer data.

---

[42] The ASA is "the world's largest community of statisticians, the "Big Tent for Statistics."   https://www.amstat.org/ASA/about/home.aspx?hkey=6a706b5c-e60b-496b-b0c6-195c953ffdbc. Dr. Ballman, who is a statistician and not an epidemiologist, is a member and former officer of the ASA. *See Curriculum Vitae* of Karla Ballman, Ph.D at 14, attached as **Exhibit 60**.

[43] 73 The American Statistician 1 (Supp. 1 2019), available at https://www.tandfonline.com/toc/utas20/current.

The important *Nature* comment article was co-authored by Sander Greenland, Ph.D.[44] In it, Dr. Greenland succinctly described and summarized the ASA's disapproval of the very unsupported methodology employed by the J&J's experts in this case. Critically, this editorial was widespread in its acceptance attracting *over 800 signatories in just 24 hours*. These signatories include scientists from Defendants' experts' institutions (Weill Cornell, Yale, and Johns Hopkins). In his review of the issue of "significance testing," Dr. Greenland and the over 800 scientist-signatories described the "significance" methodology embraced by J&J's experts as a "PERVASIVE PROBLEM" riddled with "errors" that "must stop":

> **PERVASIVE PROBLEM**:
>
> Let's be clear about what must stop: We should never conclude that there is 'no difference' or no association' just because a p value is larger than a threshold of .05 or equivalently because a confidence interval includes zero. **Neither should we conclude that two studies conflict because one has a statistically significant result and another did not. These errors waste research efforts and misinform policy decisions.**[45]

---

[44] Amrhein, et al., *Retire Statistical Significance* (2019). Dr. Greenland has been cited as an authority in the *Reference Manual on Scientific Evidence* and the textbook he-co-authored with Dr. Rothman, *Modern Epidemiology*, is cited as an authoritative text. *See supra*. n. 1.

[45] *Id.* at 305-6 (emphasis added).

In the other, much longer, ASA editorial by Wasserstein, et al.,[46] the ASA authors further summarized the 43 ASA articles and stated that it has been known "for decades" that scientific conclusions about association should *not* be based on "solely whether an association or effect was found to be 'statistically significant' (i.e. the p value passed some arbitrary threshold such as p<.05)." This reminder by the ASA *not* to do precisely what Defendants' experts have done to assess the talcum powder-ovarian cancer question was so important that the Johns Hopkins Institute for Clinical & Translational Research—of which Dr. Diette is a member of—posted it for reference by Johns Hopkins scientists.[47]

Faced with the definitive ASA consensus statement (published in March 2019, *after* all the experts had submitted their reports in this MDL), Dr. Diette in particular sought to marginalize it as interesting, aspirational, and something that might happen in the future.[48] However, his half-hearted explanation for his use of a flawed "significance testing" methodology is itself inaccurate. Contrary to Dr. Diette's supposition, the admonition against "significance testing" has been longstanding in

---

[46] Ronald L. Wasserstein, et al., *Moving to a World Beyond "p<.05"*, 73 The American Statistician 1 (Supp. 1 2019), attached as **Exhibit 61**.

[47] Diette Dep. at 310:24-311:8; Diette Dep. Ex. 19, attached as **Exhibit 62**.

[48] Diette Dep. at 313:17-20; 315:7-19.

the statistical community and is also longstanding in the epidemiologic community.[49]

For example, in 2016, long before the Defendants' experts' reports were produced and before the recent ASA publications, the ASA took the unprecedented step of reminding scientists not to do "significance testing" for association by issuing a consensus editorial, "*Statement on Statistical Significance and P Values.*"[50] Notably, the ASA deemed its unprecedented consensus statement on statistical methodology necessary because of the widespread and continued *misuse* of statistical significance by experts like Drs. Ballman (who was, herself, a member and prior officer of ASA but never actually read this editorial), Merlo, and Diette.[51] The ASA made clear that its consensus statement was designed to "shed light on an aspect of our field that is too often misunderstood and misused by the broader research community . . . ."[52]

---

[49] *See* discussion *infra* at Section (A)(3)(c).

[50] Ronald L. Wassertein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70 The American Statistician 129 (2016), attached as **Exhibit 63**.   This 2016 ASA statement was cited in numerous reports by plaintiffs' experts against significance testing.

[51] *Id.* at 129.

[52] *Id.* at 1.

In that 2016 ASA consensus statement, the ASA discussed statistical significance testing and specifically warned of errors that could be derived from its misuse:

> Practices that reduce data analysis or scientific inferences to a mechanical bright line (such as p <.05) for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. A conclusion does not immediately become 'true' on one side of the divide and 'false' on the other.[53]

Moreover, it cited longstanding literature against its use.[54]

### c. The Epidemiology Community Has Rejected the Flawed "Significance Testing" Methodology Used by J&J's Experts

These admonitions against "significance testing" are not isolated to the statistical community. In fact, the admonition against this unreliable methodology as roundly and explicitly rejected by the epidemiology community appears in basic epidemiology textbooks and reviews going back to even the time that Professor Hill published his causation methodology.

Indeed, in 1965—more than 50 years ago—Professor Hill himself, in the very article that Defendant's experts claim to have read and applied, noted that: **"No formal tests of significance can answer these questions...they contribute**

---

[53] *Id.* at 131.

[54] *Id.* at 132 (providing "a brief p-value and statistical significance reference list").

**nothing to the 'proof' of our hypothesis."**[55] Professor Hill further lamented in 1965 that some epidemiologists continued to erroneously apply significance testing, as J&J's experts do here.[56]

The admonition against "significance testing" is taught to even beginning epidemiology students.  For example, in the textbook *Modern Epidemiology*, which has been relied upon by the Third Circuit and in the *Reference Manual for Scientific Evidence*, the authors (Drs. Rothman, Lash, and Greenland)[57] address this error head-on. They characterize this methodology in no uncertain terms as "fallacious" and a "mistake":

> One mistake in implementing the consistency criterion is so common that it serves special mention.  It is sometimes claimed that a set of literature is inconsistent simply because some results were "statically significant" and some are not. **This sort of evaluation is completely fallacious even if one accepts the use of significance testing methods.**[58]

Moreover, other standard textbooks agree that the methodology is both misleading and unreliable.[59]

---

[55] Hill (1965) at 299.

[56] *Id.*

[57] *See supra* n. 1.

[58] Kenneth Rothman, et al., *Modern Epidemiology* (Chapter 2: Causation and Causal Inference) at 25 (3d ed., 2008), attached as **Exhibit 64** (emphasis added).

[59] For example, in the textbook *Epidemiology: Concepts and Methods*, the author states that "epidemiologists prefer using confidence intervals over statistical

The errors described above were so pervasive among part-time purported epidemiologists (like Drs. Ballman, Merlo and Diette), that Dr. Rothman followed his 2008 textbook with a review article called "Six Persistent Research Misconceptions."[60] In his widely-cited review, Dr. Rothman described several methodologic errors that have persisted "long after their flaws have become apparent."[61]

Importantly, Dr. Rothman identified "significance testing" as "misconception" in his review stating that it has "led to far more misunderstanding and misinterpretation than clarity in interpreting study results."[62] He warned that a reflexive reference to "statistical significance" represents a "substitute for a more thoughtful and difficult tasks."[63]  As he noted:

---

significance testing when it comes to assessing random error." William A. Oleckno, *Epidemiology: Concepts and Methods* at 222, 173, 221-24 (2008) attached as **Exhibit 65**. Similarly, in the textbook, *Introduction to Meta-Analysis*, Dr. Borenstein noted that it is wrong to "count[] the number of significant and nonsignificant p-values and pick[] the winner." Michael Borenstein, et al., *Introduction to Meta-Analysis* at 251 (2009), attached as **Exhibit 66**.  The textbook aptly explains the fallacy of Defendants' experts approach as follows: "The logic of vote counting says that significant finding is evidence that an effect exists, while the nonsignificant finding is evidence that an effect is absent.  While the first statement is true, the second is not." *Id.* at 252 (emphasis added).

[60] Rothman (2014) at 1060.

[61] *Id.*

[62] *Id.*

[63] *Id.*

> It is easy to declare that a result is not statically significant, falsely implying that there is no indication of an association, rather than to consider quantitatively the range of associations that the data actually support. These misconceptions involve taking the low road, but when the low road is crowded with others taking the same path, there may be little need to question that path.[64]

Far from being "generally accepted" as asserted by J&J's experts, "significance testing"—the first of their flawed two-step process for analyzing the ovarian cancer observational studies for consistency—is unreliable and misleading.

This fundamental error alone necessitates the exclusion J&J's experts under the Federal Rules of Evidence and *Daubert*.[65]

---

[64] *Id.* at 1064.

[65] This is not to say that statistical significance is irrelevant to the question of association or consistency of association. It is relevant. While relevant, however, significance is not the *test* of either association or consistency of association. *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 793 (3d Cir. 2017). ("Central to this case is whether statistical significance is necessary to prove causality.  We decline to state a bright line rule…A causal connection may exist despite lack of significant findings, due to issues such as random misclassification or insufficient power."). Unlike in this case where a majority of observational studies and published meta-analyses show statistical significance for the talcum powder-ovarian cancer association, there were none in *Zoloft*. The point here is that it is important to look at *both* the statistically significant associations and the non-significant ones and that these are *not* inconsistent simply by virtue of significance or non-significance.

4. **J&J's Experts' Second Step, Sorting by a Hierarchy of Evidence to Assess Consistency of Association, is Unreliable and a Misconception**

a. **J&J's Experts Sorted Using a "Hierarchy of Evidence" by Generic Study Type**

The second step in J&J's experts' two-step consistency of association methodology is applying what they describe as the "hierarchy of evidence" principle. Specifically, after employing the flawed "significance testing" of individual talc studies, they sort those studies together by study design. Once that sorting is done, they looked at which generic study designs sit atop the hierarchy and whether they were "statistically significant," ignoring the strengths and weaknesses of each individual and specific study irrespective of generic study design.

Under this "hierarchy of evidence" principle, J&Js' experts assert that cohort studies *generally* are inherently more reliable than case-control studies, and that hospital-based case-control studies are *generally* more reliable than population-based case-control studies. Like their erroneous assertions about the general acceptance of the "significance testing" methodology, Drs. Ballman, Merlo, and Diette provide scant support for this rigid "hierarchy of evidence" principle.

Retreating to their common refrain, they offer only conclusory statements that this "hierarchy" is "generally accepted" in the epidemiologic community."[66]

By applying the so-called "hierarchy of evidence" principle to assess the talc studies by *generic* design or category of study, Defendants' experts took an unreliable shortcut to reach their litigation opinions and avoided the necessary but harder task of actually assessing the strengths and weakness of each individual talc study, irrespective of design. Notably, Defendants' experts did *not* analyze the strengths, weaknesses and biases of each of the 37 individual studies preferring to criticize the studies by generic study design. Nor did they weigh them *individually* as the PSC's epidemiology experts did. Instead, they simply grouped the studies together by generic study design, discussed design weaknesses generally and then

---

[66] *See* Merlo Dep.at 115:7-28. Dr. Merlo attempted to support this so called "well-established" hierarchy without referring to a textbook but rather to an Australian "white paper" that he found on the internet. Merlo Report at 35, n. 78 (citing Nat. Health & Medical Res. Council, *NHMRC Levels of Evidence and Grades for Recommendations for Developers of Guidelines* (2009), attached as **Exhibit 67**. When questioned as to the Australian white paper, Dr. Merlo did not know about the origins of the document, the Australian organization that wrote it, and could not vouch for its authority. Merlo Dep. at 251:13-254:17. In a similarly feeble attempt to document this allegedly well-established and basic principle of epidemiology that "it is scientifically justified to place more weight on prospective cohort studies[,]" Dr. Ballman cited one plastic surgery paper that describes several different "hierarchies" not in connection with cancer epidemiology but in connection with "implications for the field of plastic surgery as well as the everyday practice of plastic surgery." Ballman Report at 15, n. 29 (citing Burns, PB, et al, *The levels of Evidence and their role in Evidence-Based Medicine*, Plastic Reconstruction Surg. 2011:128(1) 305-10, attached as **Exhibit 68**.

looked at the overall results grouped by design.  Defendants' experts accepted the results of what they contended are the more reliable cohort studies and, secondarily, hospital-based case-control studies and concluded there is no statistically significant association in those studies at the top of the pyramid or hierarchy.

In his deposition, Dr. Diette agreed that this was the method he used:

> Q.    Okay. Dr. Diette, what I'm trying to get at here is, the underbelly, I guess, of your opinions seem to be from your report that cohort studies are inconsistent with the case-control studies, which they themselves are inconsistent because population-based studies and hospital-based studies, some were statistically significant and some were not. Correct?
>
> A.    Exactly, yes.[67]

Dr. Merlo parroted the same ideas in his deposition:

> And so, when you break down this association in trying to look at causality, when you break down things -- when you break down this by study design, there's a difference. There's an inconsistency between cohort studies and cases controls. There's an inconsistency between population-based case controls and hospital-based case controls.[68]

---

[67] Diette Dep. at 360:2-10.

[68] Merlo Dep. at 189:7-15; s*ee also* Merlo Report at 30.

Dr. Merlo further asserted that not only were the studies not consistent, but that there was not even enough evidence of a "clear cut" association to even conduct a full Bradford Hill analysis.[69]

Dr. Ballman took a similar *ipse dixit* sorting approach. She simply stated that: "[w]hen the results across study designs are not consistent, i.e., case-control studies report a statistically significant association and cohort studies do not, **the study with the accepted higher level of evidence is the cohort study....**"[70]

Not only do J&J's experts boldly apply this thinly supported "hierarchy of evidence" approach to justify their own flawed opinions, they excoriate the PSC's experts for not doing so stating that the PSC's experts "ignored" this hierarchy

---

[69] This conclusion is at odds with the published literature that has been published outside of litigation. For example, in the article *Talc and Ovarian Cancer,* the author stated that:

> It is unlikely that the association between talc and ovarian cancer is due to confounding, and so it is fair to say that if there's a statistically robust relationship between talc and ovarian cancer, it is likely to be causal, albeit with intermediate factors, such as inflammation. **In any case, given the number of hazard ratios in the literature between 1.1 and 1.4 in both case-control and cohort studies, it's disingenuous to state there is no evidence that talc is associated with ovarian cancer.**

Narod at 411 (emphasis added); *see also* Heath Canada at 28 ("several meta-analyses conducted over the past 15 years calculated similar ORs and resulted in similar conclusions: that there is a small yet *consistent and statistically significant increased risk of ovarian cancer with perineal talc use*.") (emphasis added).

[70] Ballman Report at 9.

implying that they did so for litigation.[71] Dr. Merlo goes so far as to say that the PSC's experts "fabricated" consistency because they did not apply "significance testing" in the context of a "hierarchy of evidence" framework.[72]

Dr. Diette similarly committed to a misconceived hierarchy of evidence approach, admitted that he could have looked at the various study designs and analyzed important study data available in each individual study (including sample size, demographics, age, adjusted variables, and participant cancer types) as Plaintiffs' experts did, but he simply did not care to do so.[73] Indeed, he thought it was "appalling" for the PSC's epidemiologists to have done such a searching examination of each study and weigh each depending on their own strengths and weaknesses:

> What I -- what I did was I tried to actually not denigrate any of the study designs. I thought that was appalling. You know, when you talk about where this came from, you know, to sort of single out the cohort studies repeatedly by the -- by the plaintiffs' expert and say, you know, [t]his is a terrible design, or this is terrible for whatever reason, it's extraordinary, and it's -- to me it's unprecedented for – for epidemiologists or other healthcare professionals to sort of look at cohort studies and find that those are so awful, and that case-control studies are suddenly so sturdy. It doesn't make any sense.[74]

---

[71] Merlo Report at 46.

[72] *Id.* at 44-45.

[73] Diette Dep. at 249:2-251:23.

[74] *Id.* at 461:19-462: 7. Similarly. Dr. Merlo also did *not* consider, for example, whether the individual talcum powder cohort studies were particularly vulnerable to

As set forth below, the "hierarchy of evidence" approach is flawed and has been rejected by the scientific community.

> **b.    "Hierarchy of Evidence" Sorting by Generic Study Type is an Improper Methodology and a <u>Misconception</u>**

Defendants' experts' unsupported *ipse dixit* "hierarchy of evidence" sorting methodology is as unreliable as their "significance testing" methodology.  Indeed, what is "appalling" is not the PSC's experts searching analysis as Dr. Diette described, but J&J's experts' simplistic and incomplete analysis, which ignores the totality of the evidence.   In fact, methodology like that employed by J&J's experts has been derided as a "substitute for more thoughtful and difficult tasks" of evaluating the strengths and weaknesses of individual studies.[75]

In Dr. Rothman's paper, "*Six Persistent Research Misconceptions*," he also addresses the so-called "hierarchy of evidence" approach used by J&J's experts.  In this paper, Dr. Rothman listed J&J's experts' "hierarchy of evidence" as the very first research misconception, which he describes as follows: "[t]here is a hierarchy

---

"misclassification bias" because study participants were only asked one time in sometimes decades about talc use, and he did not address the issue with respect to any of the individual talc cohort studies and could not recall whether the study authors identified this bias as a weakness of those studies.  *See* Merlo Dep. at 286:1-305:11; 366.

[75] Rothman, *Six Persistent Research Misconceptions* at 1066.

of study designs: randomized trials provide the greatest validity, followed by cohort studies, with case-control studies being least reliable."[76]

According to this review, J&J's experts' superficial methodology of simply ranking studies generically by general study design -- is flawed and leads to error. As Dr. Rothman explained: "[D]iscrepancies between cohort studies and case control studies should *not* be explained away superficially by a presumed advantage of cohort studies over case-control studies."[77] Indeed, he stated that "both cohort and case-control studies will yield valid results when properly designed and carried out."[78] He further stated that it is wrong to "disparage" case-control studies and that "study design should not be taken as a guide to a study's validity."[79]

The concept of elevating cohort studies over case-control studies is also rejected in the textbook *Modern Epidemiology*.[80] In fact, many epidemiologists have criticized the "hierarchy" or "pyramid of evidence" approach as too simplistic at

---

[76] *Id.* at 1061.

[77] *Id.* at 1061.

[78] *Id.* at 1060.

[79] *Id.* at 1061.

[80] Rothman (2008) at 111 ("Conventional wisdom about case-control studies is that they do not yield estimates of effect that are as valid as measures from cohort studies.").

times and emphasized the importance of leaving room for argument and counter-argument for the methodological merit of different designs.[81]

Importantly, these Defendants *in particular* should know that the superficial methodology used by their experts is flawed since they previously hired Dr. Rothman who told them so.[82] In 2000, Defendants commissioned Dr. Rothman to do a causation analysis on talc powder-ovarian cancer for the National Toxicology Program (NTP).  In that analysis on behalf of the talc industry, Dr. Rothman made clear that epidemiologists outside the courtroom reject the very study design "hierarchy" that J&J's experts present as "generally accepted" in this litigation. While his analysis of the talc evidence itself is significantly dated, and it does not include the past 19 years' worth of additional observational evidence on the talcum powder and ovarian cancer relationship, his general view about Defendants experts' so-called "hierarchy of evidence" sorting principle is not:

> **It is commonly believed that the validity of case-control studies is worse than cohort studies, but this view is mistaken.  The validity of a study depends on the specifics of the study design, the nature of the data, and the nature of the hypothesis that the study addresses.** For example, a cohort study that examines the long-term risk of cancer among coffee drinkers after a one-time

---

[81] Vandenbroucke, JP, *Observational research and evidence-based medicine: what should we teach young physicians?*,  51 J. Clinical Epidemiology 467–72 (1998), attached as **Exhibit 69**.

[82] Kenneth J. Rothman, at al. *Interpretation of Epidemiologic Studies on Talc and Ovarian Cancer* at 3 (Nov. 28, 2000), IMERYS 209695, attached as **Exhibit 70**.

dietary assessment of coffee consumption would suffer from weak exposure assessment. Although the exposure information may have been accurate for the time it was collected, the exposure status of cohort members will change with time and the initial measure might be only poorly correlated with a more meaningful measure of coffee consumption.  The effect of having a poor measure of coffee consumption will be considerable nondifferential misclassification, a type of error that introduce bias into study results that tends to drive effect estimates towards the null condition of no effect. In contrast, it may be possible to get more detailed exposure information from study subjects in a case-control study, which might avoid some of the bias that would result from a cohort study.[83]

This same observation was noted in the textbook *Epidemiology*, written by Leon Gordis, MD, professor of epidemiology at Johns Hopkins and an editor of the *Reference Manual for Scientific Evidence*.[84] In *Epidemiology*, Dr. Gordis categorized both cohort and case-control studies as having the *same* level of reliability.[85]

---

[83] *Id.*

[84] Leon Gordis, *Epidemiology* (5th ed. 2013), attached as **Exhibit 71**.

[85] *Id.* at 245, 257.

5. **The Mechanical Two-Step Process of Applying "Significance Testing" to the Talc-Ovarian Cancer Studies after Sorting Studies in a "Hierarchy" Employed by J&J's Experts is <u>Demonstrably Unsound and Unreliable</u>**

    a.     **J&J's Experts Applied the Flawed Two-Step Process to Analyze the Talcum Powder and Ovarian Cancer Observational Studies to Analyze Consistency of <u>Association</u>**

J&Js' experts' mechanical two-step methodology is best visually illustrated by the studies table in Dr. Merlo's expert report.[86] In this Table, Dr. Merlo simply lists the studies and identifies the risk ratio to a p=.05 and the confidence interval. Importantly for his analysis, he adds rows grouped by study design (*e.*g. hospital-based case-control studies, etc.) and he adds a final column entitled: "Statistically Significant Association?" This Table clearly represents the two-step approach and is reprinted below:

[TABLE ON NEXT PAGE]

---

[86] Merlo Report at 38-39.

| Author | Odds Ratio/Relative Risk/Hazard Ratio | 95% CI | Statistically Significant Association? |
|---|---|---|---|
| **Hospital-based case-control studies** | | | |
| Hartge et al. (1983) | 0.70 | 0.04-1.10 | No |
| Whittemore et al. (1988) | 1.45 | 0.81-2.60 | No |
| Booth et al. (1989) | 1.30 | 0.80-1.90 | No |
| Rosenblatt et al. (1992) | 1.70 | 0.70-3.90 | No |
| Tzonou et al. (1993) | 1.05 | 0.28-3.98 | No |
| Hartge and Stewart (1994) | 0.30 (5-9 years of talc exposure) 0.50 (10+ years) | 0.10-1.40 0.20-1.50 | No |
| Wong et al. (1999) | 1.13 | 0.88-1.44 | No |
| **Population-based case-control studies** | | | |
| Cramer et al. (1982) | 1.92 | 1.27-2.89 | Weak |
| Harlow and Weiss. (1989) | 1.10 | 0.70-2.10 | No |
| Harlow et al. (1992) | 1.50 | 1.00-2.10 | Weak |
| Chen et al. (1992) | 3.90 | 0.90-10.6 | No |
| Cramer and Xu (1995) | 1.60 | 1.20-2.10 | Weak |
| Purdie et al. (1995) | 1.27 | 1.04-1.54 | Weak |
| Green et al. (1997) | 1.30 | 1.10-1.60 | Weak |
| Shushan et al. (1996) | 1.97 | 1.06-3.66 | Weak |
| Chang and Risch (1997) | 1.42 | 1.08-1.86 | Weak |
| Cook et al. (1997) | 1.60 | 0.90-2.80 | No |
| Godard et al. (1998) | 2.49 | 0.94-6.58 | No |
| Cramer et al. (1999) | 1.60 | 1.18-2.15 | Weak |
| Ness et al. (2000) | 1.50 | 1.10-2.00 | Weak |
| Mills et al. (2004) | 1.37 | 1.02-1.85 | Weak |
| Pike et al. (2004) | 1.60 | 1.18-2.18 | Weak |
| Jordan et al. (2007) | 1.00 | 0.40-2.10 | No |
| Gates et al. (2008) | 1.36 | 1.14-1.63 | Weak |
| Merritt et al. (2008) | 1.17 | 1.01-1.36 | Weak |
| Moorman et al. (2009) | Afr. Am.: 1.19 Caucasian: 1.04 | Afr. Am: 0.68-2.09 Caucasian: 0.82-1.33 | No |
| Wu et al. (2009) | 1.53 | 1.13-2.09 | Weak |
| Rosenblatt. (2011) | 1.27 | 0.97-1.66 | No |
| Kurta et al. (2012) | 1.40 | 1.16-1.69 | Weak |
| Wu et al. (2015) | 1.46 | 1.27-1.69 | Weak |
| Schildkraut et al. (2016) | 1.44 | 1.11-1.86 | Weak |
| **Pooled case-control studies** | | | |
| Terry et al. (2013) | 1.24 | 1.15-1.33 | Weak |

39

| Cramer et al. (2016) | 1.33 | 1.16-1.52 | Weak |
|---|---|---|---|
| **Cohort studies** | | | |
| Gertig et al. (2000) | 1.09 | 0.86-1.37 | No |
| Gates et al. (2010) | 1.06 | 0.89-1.28 | No |
| Houghton et al. (2014) | 1.12 | 0.92-1.36 | No |
| Gonzalez et al. (2016) | 0.73 | 0.44-1.20 | No |

Having generated this Table sorted by significance and design, Dr. Merlo's analysis is simple. *First,* he performs "significance testing" by determining which studies reached statistical significance and which did not.  The ones that did not are identified simply, and without further analysis, as "No."[87]  *Second,* he sorts the study by design-type so he can see the pattern of "No's" on his "hierarchy of evidence."

Having performed this seemingly simple and allegedly objective two-step test, he observes that the "inconsistency" in the studies and between study designs and called these "striking":

> As set forth in the table [], there are seven hospital-based case-control studies that consistently demonstrate no statistically significant association between exposure to talc and risk of ovarian cancer. There are four cohort studies that also consistently demonstrate no statistically significant association between exposure to talc and risk of ovarian cancer. There are 26 population-based case-control studies that demonstrate inconsistent results, with some studies demonstrating a statistically significant association between exposure to talc and risk of ovarian cancer, while others demonstrate no statistically significant association between exposure to talc and risk of ovarian cancer. This lack of consistency in finding a

[87] Dr. Merlo characterizes the statistically significant results as "weak."  However, that is his subjective view of the "strength" aspect of Bradford Hill and there are numerous examples of causal associations being in the same range as the talcum powder-ovarian cancer relationship.  *See infra* n. 151, Siemiatycki Report Table 11.

statistically significant association between talc use and risk of ovarian cancer likely arises from several factors.[88]

Drs. Merlo, Ballman, and Diette's two-step process of commingling what has been deemed two "misconceptions" – "significance testing" and "hierarchy of evidence" - is demonstrably unreliable and misleading. It is therefore inadmissible under the Federal Rules of Evidence and *Daubert*.

> **b.** **Even the Authors of the Talc Studies Relied on by J&J's Experts to Support Their Two-Step Consistency Analysis Do Not Support Their Claims**

To illustrate the unreliability of J&J's experts two-step methodology to assess consistency, one need look no further than Rosenblatt (1992), a hospital-based case-control observational study conducted at Drs. Merlo and Diette's own institution, the Johns Hopkins University and cited by the defense expert epidemiologists.

In Rosenblatt (1992), the association between talcum powder use and ovarian cancer was positive with a odds ratio (OR) of 1.7 (CI = 0.7-3.9).[89] According to Dr. Merlo's (and the other experts') methodology as expressed in the table of his litigation report above, the results were not statistically significant, because the confidence interval (CI) crossed 1.0. As a result, Dr. Merlo included Rosenblatt (1992) with other statistically not significant hospital-based case-control studies in

---

[88] Merlo Report at 31.

[89] Rosenblatt (1992) at 23.

the same level of the "hierarchy" as Hartge (1983),[90] Whittemore (1988), and Booth (1989). According to Dr. Merlo's flawed litigation methodology then, these four hospital-based case-control studies (Rosenblatt, Hartge, Whittemore and Booth) were consistent in showing no statistically significant association. According to Dr. Merlo, Rosenblatt and the other three hospital-based studies were ***"strikingly consistent"*** with each other and ***"strikingly inconsistent"*** with population-based case control studies available at the time, including Cramer (1982) which did show a statistically significant result. Dr. Ballman and Dr. Diette performed a similar analysis.[91]

The ***"striking inconsistency"*** is ***not*** between the Rosenblatt and other hospital studies and population studies. Instead, the "inconsistency" is between Dr. Merlo's litigation analysis and the peer-reviewed analysis by the Rosenblatt authors at Johns Hopkins. In Rosenblatt (1992), the authors specially address—and reject—Dr. Merlo's "consistency" argument based on "statistical significance testing" and

---

[90] The results for Hartge (1983) were incorrectly reported by Dr. Merlo as 0.7 (.4-1.0). In fact, the results were 2.5 for genital use, 95% CI (.7-10). While Dr. Merlo and Dr. Diette claimed to work wholly independently from each other, it is significant that the same exact "mistake" can be found in Dr. Diette's report table of hospital-based studies on page 14 of his report suggesting that they were using a common set of data provided by J&J's lawyers. When questioned about this, Dr. Diette claimed that maybe the 2.2 RR is what should have been extracted but he chose the 0.7 RR. *See*, Diette Dep. at 332-336.

[91] *See, e.g.*, Diette Report at 12-14 (Tables).

"hierarchy of evidence." Indeed, Rosenblatt (1992) found "consistency" between significant and nonsignificant results and found further consistency between the hospital-based and population-based talc-ovarian cancer studies:

> We found an increased relative risk (4.8) for talc use on sanitary napkins with a smaller effect for genital bath talc exposure (RR = 1.7). **This is in accordance with the original finding of a significant increased risk for perineal talc exposure (RR = 1.19, 95% CI - 1.1-2.9) by Cramer** *et al.* Preliminary findings from a Chinese study [Chen] also suggest that perineal application of talc-containing dusting powder increased the risk of epithelial ovarian cancer (RR = 3.9), 95% CI = 1.1-13.8). A nonsignificant effect for genital talc exposure (on genitals, sanitary napkins, or underwear) was detected in the study of Hartge *et al.* (RR = 2.5, 95% CI = 0.7-10.0). Whittemore *et al*. detected an increased risk (RR = 1.4, P = .06) for perineal exposure. In a study of borderline ovarian cancer [Boothe], an increased risk was also observed with talc exposure from use on sanitary napkins (RR = 1.9, 95% CI – 0.9-6.9, 8).
>
> .   .   .
>
> The results of our study and others suggest that genital fiber exposure may be associated with an adverse effect [ovarian cancer] . . . . .[92]

This example from Rosenblatt is illustrative and just one of many that demonstrate that Defendant's simplistic two-step methodology using "significance

---

[92] Rosenblatt (1992) at 22.

testing" against a "hierarchy of evidence" principle to assess consistency of association is unreliable.[93]

> c. **The Proper Methodology for Determining Consistency of Association Requires an Individual Study Analysis Using Sound Judgment, a Methodology that J&J's Experts Did Not Perform**

According to virtually every epidemiology commentator and the *Reference Manual on Scientific Evidence*,[94] there are no mechanical tests for causation. As another prominent Epidemiologist, Leon Gordis, MD, from Johns Hopkins[95] wrote

---

[93] Another example is Tzonou (1993), another hospital-based case-control study. This early study found a positive, but statistically not significant association between the use of talc and ovarian cancer (RR 1.05, CI 0.28-3.32). Despite that non-significant finding, the authors were clear that their results were *not* inconsistent with population-based study (Cramer 1982) that did show a significant association. Tzonou (1993) at 409 ("given the overlapping range of the confidence intervals, *they are not incompatible with [association]*") (emphasis added).

[94] *See, e.g., Reference Manual* at 600 "[T]he drawing of causal inferences is informed by scientific expertise, [] not a determination that is made my using an objective or algorithmic methodology.""; Tao, et al., *Weight of Evidence: General Principles and Current Applications at Health Canada*, Health Canada at 5, attached as **Exhibit 72** ("..the overall conclusion can be performed in a single step, qualitative process, using best professional judgment."); Centers for Disease Control and Prevention, Lesson 1: Introduction to Epidemiology, ("epidemiology is . . . the basic science of public health . . . [and] a method of causal reasoning"), attached as **Exhibit 73**; Jack Siemiatycki, *Risk factors for Cancer In The Workplace* (Chapter 7: Interpretation of Findings) at 298 (1991) ("The evaluation of causality between a putative risk factor and a disease is a complex and subjective process."), attached as **Exhibit 74**.

[95] Dr. Gordis is one of the authors of the Reference Guide on Epidemiology in in the *Reference Manual on Scientific Evidence*.

in his textbook, *all* studies and indeed *all* evidence is to be evaluated with "reasoned judgment about the entire body of evidence in making reasoned decisions about causation."[96] Nonetheless, J&J's experts profess to have no knowledge of the term "epidemiologic judgment" and state that epidemiologic conclusions are derived from numbers which "can be very objective and not subjective."[97] Departing from generally accepted principles, they employed the rigid two-step "objective" process described above.

The analysis of consistency of association requires a far more nuanced, thoughtful *and scientific* methodology than the simplistic and mechanical two-step *unscientific* process employed by J&J's experts. Consistency requires consideration of the *specific* strengths and *specific* weaknesses of each *individual* study irrespective of design. For example, there are serious issues of "misclassification bias" in the non-talc-specific cohort studies as the participants in these studies were questioned only once regarding their use of talc, a behavior that could have changed

---

[96] Gordis at 260.

[97] Merlo Dep. at 110:23-111:12; 196:9-197:13; Dr. Ballman could not and would not answer the question about the role of "professional judgment" in epidemiology—and could not and would not without intervention of multiple J&J counsel—answer whether scientist disagree causal questions. Ballman Dep. at 117:9-122:15. For his part, Dr. Diette calls it "absurd" that experts outside litigation would use their judgment to weigh the studies and called it "unprecedented" and "appalling" for plaintiffs to have looked into the specific designs of the specific talcum powder *studies* as opposed to looking at design generally. Diette Dep. at 270; 459-462.

over the years they were in the study.  "Misclassification bias" dismissed by J&J's witnesses (and not a bias in retrospective case-control studies), is a bias noted by the commentators who reviewed the talcum powder-ovarian cancer cohort studies.[98] Similarly, the analysis should consider whether the confidence intervals overlap among the various study designs.[99]

---

[98] Others have noted that the cohort studies are not of higher quality because of their design stating that the differences between cohort studies could be "due to issues relating to latency, study power or exposure misclassification," all limitations noted by the cohort study authors.  *See* Taher at 43-44 ("[The] Gertig and Gonzales [cohort study authors] noted that one of their studies main limitations was the relatively short follow up periods…"; "it is possible that women who were not exposed to perineal talc at the time of cohort entry began using talc at a later time, and vice versa, possibly introducing non-differential misclassification exposure which could bias the risk estimate towards the null value of unity").

[99] The question then becomes: If statistical significance testing is not a proper methodology assessing consistency, what is the proper methodology for determining consistency of association? As the references above make clear that it is appropriate to use confidence intervals (CI) or the interval estimates to see the range of risks that are reported. *The Reference Manual for Scientific Evidence* agrees, noting that "Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study." *Reference Manual* at 579 (emphasis added).

With respect to the talcum powder-ovarian cancer studies, confidence interval testing demonstrates consistency.  In most studies, the risk ratios are positive (i.e. > 1.0) *and* the CI's overlap at 1.2 and 1.25 (consistent with a 20-25% increased risk of ovarian cancer in the published meta-analyses).

Using Dr. Merlo's studies table which reported the risk ratio for each study and the confidence intervals, both Drs. Ballman and Merlo did not dispute that virtually every talc study, regardless of design, had a **positive** risk ratio in the 1.2-1.7 range (10-70%) and had overlapping CI's at 20-35% increased risk of ovarian cancer with talcum powder use. *See* Ballman Dep. at 454:21-24; 432:6-9; 438:10-16; 507:12-

Unlike J&J's experts, the PSC's epidemiology experts performed individual assessments of the strengths, weaknesses, and biases of the talc studies. That is the "more thoughtful and difficult task" described herein by Dr. Rothman and stands in stark contrast with the mechanical but unscientific one performed by J&J's epidemiologists.[100] While Dr. Merlo called this "fabrication" "results driven" and "appalling" and "unprecedented," such a searching analysis is **exactly** what is called for by standard epidemiological principles. By reducing their own analyses to an unreliable and mechanical two-step process, Drs. Merlo, Ballman and Diette violated these generally accepted epidemiologic and statistical principles.

J&J's experts' misconceived methodology which assesses consistency of association based on a presumed "hierarchy of evidence" approach based solely on generic study design category is unreliable, misleading, and warrants exclusion.

---

508:2; Ballman Dep. Ex. 26, see attached as **Exhibit 75**; Merlo Dep. at 394:21-396:8; Merlo Dep. Ex. 37, see attached as **Exhibit 76**.

Alternatively, rather than simply "counting studies" or "vote counting" studies a meta-analysis could be performed.  In this case there have been 7 meta-analyses of talcum powder studies all of which showed a 25-40% increased risk of ovarian cancer and Talcum Powder use. *See supra* n. 17.  As Heath Canada noted, the talcum powder meta-analyses demonstrated consistency and, taken together with other evidence, is "indicative of a causal effect." *See* Heath Canada at iii, 23, 28.

[100] *See* Rothman (2014) at 1064.

**B.      J&J'S EXPERTS' CAUSATION ANALYSIS IS FURTHER FLAWED BECAUSE THEY APPLIED INCORRECT AND UNSUPPORTED STANDARDS FOR SEVERAL BRADFORD HILL ASPECTS**

J&Js' experts' analysis of dose response and biologic plausibility fare no better than the improper methodology they used to assess consistency of association. They are equally as flawed, but for a different reason.

Unlike their analyses of consistency, their methodological error in analyzing dose response and biologic plausibility flow from something more fundamental than their use of flawed methodologic tools as they did in their consistency analysis. To put it simply, they have defined both "dose response" and "biologic plausibility" in a way that neither Bradford Hill nor the law requires. In so doing, their testimony is not only methodologically flawed, but they also violate the "fit" requirement of *Daubert*.

In their reports, J&J's experts invent their own standards and definitions for dose-response and biologic plausibility. Contrary to their suggestion, these concocted standards are *not* supported with any reference to scientific literature and have never been applied by them outside of litigation. Having redefined these concepts in a manner designed to support Defendants' theories in this litigation, it is no surprise that they have concluded that the talcum powder evidence fails to meet their re-imagined and unsupported definitions. Defendants' experts' have engaged in a flawed exercise of creating straw men and then knocking them down.

As set forth below, Bradford Hill's actual "dose response" inquiry asks *only* whether there is *evidence* of dose response that can be sought.[101] It does *not* ask whether dose response can be "demonstrated consistently across the available studies" that are both "statistically significant and consistent."[102] With respect to "biologic plausibility," Bradford Hill *only* asks whether "the association makes biological sense[.]"[103] It does *not* require biologic proof that the agent causes disease.

An expert's application of the wrong standard to the facts of the case renders an expert opinion unreliable under *Daubert* and requires exclusion. *See In re Gadolinium Based Contrast Agents Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 43444, *112 (N.D. Ohio May 4, 2010) (where expert testifies to the wrong standard the "probable testimony is at best misleading" and is subject to exclusion under Rule 702). Since J&J's experts have collectively applied the same incorrect definition of the evidence of both dose response and biologic plausibility their opinions on these topics are unreliable and should be excluded as violating both the "reliability" and "fit" prongs of *Daubert*.

---

[101] Hill (1965) at 298.

[102] Ballman Report at 19, 29.

[103] Oleckno, *Epidemiology: Concepts and Methods* at 189.

1.     **J&J's Experts Misstate and Misapply the Biologic Gradient (Dose Response) Aspect of Bradford Hill Making Their Opinions Inadmissible Under the Reliability and Fit Prongs of _Daubert_**

When considering the Bradford Hill biologic gradient (dose response) aspect—and to discern whether J&J's experts applied a correct and reliable standard to their own causation analyses to the talc studies—it is important to consider what Sir Bradford Hill _actually_ said about this aspect:

> Biologic Gradient_:_ Fifthly, if the association is one which can reveal a biologic gradient, or dose response curve, then we should look most carefully for such evidence… [With respect to dust], [t]he dustier the environment the greater the incidence of disease we would expect to see.  **Often the difficulty is to secure satisfactory quantitative measure of the environment which will permit us to explore this dose response.  But we should invariably seek it.**[104]

As with each of Hill's considerations, finding dose response evidence is not a _sine qua non_ for a reliable causal inference supported by other Bradford Hill criteria.[105] _See In re Avandia Mktg., Sales Practices and Prods. Liab. Litig._, No.

---

[104] Hill at 298 (emphasis added).

[105] Gordis, _Epidemiology_ at 251 ("absence of a dose-response relationship does not necessarily rule out a causal relationship"); Rothman, et al., _Modern Epidemiology_ at 28 (". . . the existence of a monotonic relationship is neither necessary nor sufficient for a causal relationship."); Oleckno, _Epidemiology: Concepts and Method_s at 189 ("The absence of a dose response relationship does not necessarily mean that the association is non-causal however. …Once again, several guidelines should be considered in assessing causation.").

2007-MD-1871, 2011 WL 13576, *14 (E.D. Pa. Jan. 4, 2011) (opining against the defendants' contention that the plaintiff's expert failed to perform a reliable Bradford Hill analysis where the expert "could not assess" "a dose response."); *see also in re Stand 'N Seal Prods. Liab. Litig.*, 623 F.Supp.2d 1355, 1372-73 (N.D. Ga. 2009) (determining that an expert's testimony was reliable where the expert relied on "all of the [Bradford Hill] factors except for the dose-response relationship."). Though not a necessary element, *any* evidence of *any* kind should be looked for and considered.  This evidence can come from *any* source and need not be from either a clinical trial or an epidemiologic study showing statistical significance.  *See, e.g., In re Tylenol Prods. Liab. Litig.*, No. 2:12-cv-07263; MDL No. 2436, 2016 WL 3997046, *5-6 (E.D. Pa. July 26, 2016) (rejecting defendants' reliability arguments and admitting plaintiff's expert's testimony, inferring that acetaminophen caused liver failure at or near 4 grams, where the expert relied on case reports and not on epidemiological or statistically-significant data).

From Hill's own description of this dose response consideration of his causal analysis framework to the case law interpreting it, the simple question is:  Is there *any* evidence of *any* kind which would support a dose-response relationship?  If so, that evidence would support a causal inference under the "biologic gradient" aspect of Hill's Framework. *See Tylenol, supra*. If not, other Hill aspects should be considered since "the absence of a dose response relationship does not necessarily

51

rule out a causal relationship." [106] *See In re Avandia*, 2011 WL 13576 at *14 (determining expert's Bradford Hill analysis was reliable despite the expert being unable to assess a dose response).

J&J's experts would convert Hill's own description of the dose response aspect from **unnecessary** to **required**.  More importantly for this case, they would convert Hill's aspect from any evidence of dose response of any type to specific evidence of a specific type.

While each of J&J's epidemiologists do this, the most egregious example of this is perhaps the report of J&J's statistician, Dr. Ballman.  Despite not having any experience in theoretical epidemiology or being able to recall whether she has ever referenced the Bradford Hill aspects in her publications,[107] she nevertheless invented a novel and different definition of Hill's dose response. Dr. Ballman's initial attempt at redefining and raising the bar for Bradford Hill's dose response to her own liking appears in her expert report:

> Regardless of the nature of the dose-response relationship, it needs to be demonstrated **consistently** across the available studies. Specifically, the same type of dose-response relationship needs to be exhibited in the **different studies**. If a threshold relationship is hypothesized, it would **require** evidence of the threshold value as well, and the value is similar across the studies. **If**

---

[106] Gordis, *Epidemiology* at 251.

[107] Ballman Dep. at 183:15-184:2.

**only a few studies exhibit a dose-response rather than all, this criterion would not be convincingly met.**[108]

As with many of Dr. Ballman's unsupported assertions, there is no citation whatsoever for this statement. Not content with that initial re-definition, Dr. Ballman raised the bar even higher in her discussion of dose response later in her Report:

> To establish a dose-response relationship [to evaluate the talc ovarian cancer relationship], the **necessary evidence** is increasing risk with increasing dose, **statistical significance** and **consistency**. Consistency in this context includes **repeated demonstration of the result across different studies, including different study designs, and different measures of dose**.[109]

Neither Dr. Ballman nor any of J&J's experts provided *any* support whatsoever for this newly-minted and narrow re-definition of dose response.[110] The reason they did not is there is no such support for this position. They made it up out of whole cloth to justify their *ipse dixit* litigation opinions. Indeed, Dr. Merlo conceded that the definitions and standards he intended to apply had *not* changed

---

[108] Ballman Report at 19 (emphasis added).

[109] *Id*. at 29.

[110] Like Dr. Ballman, Defendants' other experts would require consistency and statistical significance in different studies designs. *See* Merlo Report at 32 ("the vast majority of both case-control and cohort studies demonstrate no statistically significant dose-response relationship between talc use and risk of ovarian cancer"); Diette Report at 51 ("Moreover, the case-control studies do not show any consistent evidence of a dose-response relationship, and there is a complete lack of evidence for dose-response in the cohort studies.")

since 1965.[111] Specifically, there is *no* support that Bradford Hill (who specifically argued that-dose response "evidence" was both unnecessary and "difficult to secure") intended his guidelines to support Dr. Ballman's (and others') re-definition of this aspect as one that must be "convincingly met" as "demonstrated across available studies" and "statistically significant" to forming a reliable causal inference. *See Rowland v. Novartis Pharms. Corp.*, 9 F.Supp.3d 553, 564 (W.D. Pa. 2014) (rejecting the defendant's argument that the plaintiff's expert opinion was unreliable regarding dose response because the expert relied upon "a single study and an article" to support his theory). Nor is there *any* support for the proposition that in analyzing the talcum powder-ovarian cancer question specifically, the dose response data must be "necessary," "statistically significant," "consistent across different studies, including different study designs," and "with different measures of dose."[112]

Nor did J & J's experts even attempt to provide support for their position that Bradford Hill really did not mean what he actually said.  In fact, Dr. Ballman freely admitted that her self-serving redraft of the Bradford Hill dose response aspect for her litigation report was her own unsupported *ipse dixit* opinion, which she claimed

---

[111] Merlo Dep. at 48:1-9.

[112] Ballman Report at 29.

to be based on her own "common sense" and speculated to which "most reasonable people would agree."[113]

It is easy to see why Defendants' litigation experts would seek to improperly heighten Hill's dose response aspect.  It is also easy to understand that they would seek to incorrectly require not just *evidence* of a dose response as Hill *actually* said, but would require "convincing[,]" "statistically significant[,]" and "consistent" evidence before it can even be considered in the context of a Bradford Hill analysis of the talcum powder-ovarian cancer question.

However, reasonable epidemiologists have, in fact, opined outside of litigation that there *is* evidence of a dose response in available studies.  For example:

- "This meta-analysis resulted in a weak but statistically significant association between genital use of talc and ovarian cancer . . . with suggestion of dose-response."[114]

- "The dose-response observed for duration of genital powder use provides further evidence for the relationship between genital powder and overall [epithelial ovarian cancer] risk."[115]

- "An OR of 1.49 (95% CI = 1.06, 2.10) was associated with more than 20 talc-years (>7,200 applications) and a dose-response.)[116]

---

[113] Ballman Dep. at 521:17-522:3; 530:14-531:12; 531:19-536:2.

[114] Berge (2018) at 1.

[115] Schildkraut (2016) at 1416.

[116] Cramer (2016) at 337.

- "Overall, there is an association between genital talc use and [epithelial ovarian cancer] and a significant trend with increasing 'talc-years' of use."[117]

- "Alternatively, the association between genital-powder exposure and ovarian cancer risk may not be linear and modest exposure may be sufficient to increase cancer risk."[118]

- "Our results show a significant trend with increasing number of total applications."[119]

- "A relative risk estimate of borderline significance was seen for exposure above the median length of time (37.4 years, RR = 2.4, 95% CI = 1.0, 5.8)."[120]

- "About half the epidemiologic studies assessed only one level of talc use (ever vs. never usage). Of the 12 studies reporting a positive association, six (6) studies found significant exposure trend, particularly with high frequency usage groups. Regarding duration of use/exposure to talc. Several studies reported the greatest risk in 20+ years of use exposure group. Followed by 10-20 years group, then the < 10 years group."[121]

The evidence of dose response from the talc studies was not found by J&J's experts because they applied a heightened—and incorrect—definition for this Hill aspect.   As a result, their testimony is not only methodologically flawed, it doesn't

---

[117] *Id*. at 345.

[118] Terry (2013) at 6.

[119] Wu (2009) at 1414.

[120] Rosenblatt (1992) at 22.

[121] Taher, et al. (Unpublished Manuscript 2018). This paper was supported by Health Canada and, based on the statement in the footer of the paper, submitted to a journal for peer review and publication. Despite its current status as unpublished, it is probative of the fact that "reasonable people" can and do find evidence of dose response in the studies.

"fit" the facts of this case where evidence of dose response satisfies Hill's dose-response aspect.

### 2. J&J's Experts Ballman and Diette Misstate and Misapply the Biologic Plausibility Aspect of Bradford Hill Making Their Opinions Inadmissible Under the Reliability and Fit Prongs of *Daubert*

Only two of J&J's experts—Drs. Ballman and Diette—even considered the complete Bradford Hill framework when analyzing the question of whether talcum powder products can cause ovarian cancer. The framework includes "biologic plausibility."[122] Similar to their consideration of the dose response aspect, Drs. Ballman and Diette applied the **incorrect** standard to assess the biologically available evidence for the talcum powder-ovarian cancer question. Moreover, they did not consider whether or not the product contained potential carcinogens like asbestos or fibrous talc and what impact that would have on biologic plausibility.

In analyzing whether Drs. Ballman and Diette applied the correct Bradford Hill standard of biologic plausibility, it is important to start with what Professor Hill actually said about this aspect. In his 1965 article, he stated that:

> It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced that we cannot

---

[122] After performing an "association analysis" based on flawed methodology, Dr. Merlo stopped his analysis as he did not deem it necessary to continue. His failure to perform a complete causation analysis renders his opinion unreliable. The same is true with Dr. Borak. "Q. Okay. And just to be clear, in this case here today, you did not do a Bradford Hill analysis, correct? A. Yes. I did not do a Bradford Hill analysis." Borak Dep. at 103:3-8.

demand.   What is biologically plausible depends upon the biological knowledge of the day.[123]

The biologic-plausibility concept is well-described in a textbook relied on by Dr. Merlo: *Epidemiology: Concepts and Methods*.  In the chapter entitled "Association and Causation in Epidemiology," Professor Oleckno writes:

> **Biological Plausibility:** The basic question here is, does the association make biological sense?  Is the association credible based on our understanding of the natural history of the disease or possible pathogenic mechanisms?[124]

Professor Rothman made the same point in *Modern Epidemiology*: "In asking whether [an association] is causal or not, one of the considerations to take into account is its plausibility . . . [n]evertheless, no approach can transform plausibility into an objective causal criterion."[125]

The application of biologic plausibility outside litigation underscores the fact that what is known about the biology of an association should be considered in answering the causal question, **but should not be conflated with biologic proof**. The question is *only* whether the association seen "makes sense" biologically. In reviewing the Bradford Hill aspects as applied to the relationship between chronic aluminum exposure and Alzheimer's disease, for example, researchers explaining

---

[123] Hill (1965) at 298.

[124] Oleckno (2008) at 189.

[125] Rothman (2008) at 28-29.

plausibility noted that "there is a greater likelihood of a causative relationship being present if it makes biological sense that A causes B."[126] And, it is this "mak[ing] biological sense" by which academics interpret and define "biologically plausible."[127]

In the context of Bradford Hill then, biological plausibility does *not* require that proof of mechanism be known before a causal conclusion is reached. All that need be considered is whether the association is biologically plausible, *i.e.* that it makes "biological sense" based upon what (if anything) is known about the mechanism. In *Nartoli v. Novartis Pharm.,* 2014 WL 1515870 (M.D. Pa. Apr. 17, 2014) the court noted that "where a hypothesis has been deemed plausible and credible in the relevant medical literature…it is reasonable to admit that hypothesis." *Id.*; *see also In re Zoloft Prods. Liab. Litig.*, 26 F. Supp. 3d 466, 469-70 (E.D. Pa. 2014) (stating that there was a plausible mechanism of action existed by which the subject agent, Zoloft, "may" produce the adverse outcomes.) *In re Fosamax Prods.*

---

[126] J.R. Walton, *Chronic Aluminum Intake Causes Alzheimer's Disease: Applying Sir Austin Bradford Hill's Causality Criteria*, 40 J. of Alzheimer's Disease, 765 (2014) (citing R. van Reekum, et al., *Applying Bradford Hill's criteria for causation to neuropsychiatry: Challenges and opportunities*, J. Neuropsychiatry Clin. Neurosci. 13, 318-325 (2001)), attached as **Exhibit 77**.

[127] *Reference Manual* at 604-05 (defining biological plausibility as a judgment about whether an agent plausibly could cause a disease, based on existing knowledge about human biology and disease pathology).

59

*Liab. Litig.*, 2013 WL 1558697, *3 (D.N.J. April 10, 2013) (defining biological plausibility as "coherence with existing knowledge").

Despite the fact that the basic question for biologic plausibility is whether the association makes *biologic sense* and *not* whether it had been *biologically proven*, Drs. Ballman and Diette (and other defense toxicologists and gynecologists) would attempt to erroneously transform this aspect into just that, placing on the PSC a heightened burden Dr. Ballman wrongly states that: "Plausibility requires support from biologic or mechanistic studies. It cannot be something that sounds reasonable."[128] Likewise, Dr. Diette incorrectly implies we would have to "understand any purported mechanism by which talc-based cosmetic powders could cause ovarian cancer."[129]

In this case, there is published literature that answers the fundamental question posed by Professor Oleckno in his textbook: *"Does the association between Talcum Powder products make sense?"* The answer is "yes." There is literature to support the following:

- That talcum powder products, including its constituents, can migrate through the female genital tract and imbed in the ovarian tissue;[130]

---

[128] Ballman Report at 19.

[129] Diette Report at 26.

[130] *See, e.g.*, W. J. Henderson, et al., *Talc and Carcinoma of the Ovary and Cervix*, 78 Br. J. Obstetrics Gynecology 266 (1971), attached as **Exhibit 78**; Debra S. Heller, et al., *The Relationship Between Perineal Cosmetic Talc Usage and Ovarian Talc*

- ▪ That talcum powder contains numerous known and potential carcinogens, including platy talc, asbestos, fibrous talc, heavy metals (nickel, chromium, and cobalt) and fragrance chemicals;[131] and

- ▪ That talc is capable of and does in fact incite inflammation and promote reactive oxygen species.[132]

Indeed, neither Dr. Ballman nor Diette even *considered* whether a causal association between talcum powder products and ovarian cancer "makes sense" if they contained asbestos.[133]   The fact that there may be gaps in what is known about these elements or that the mechanism of cause may not be fully known biologically does not, as Hill clearly stated, detract from considering "plausibility" of the causal inference.

---

*Particle Burden*, Am. J. Obstetrics Gynecology 1508 (1996), attached as **Exhibit 79**.

[131] *See, e.g.,* Ronald E. Gordon, et al., *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women*, 20 Int'l J. Occupational Environ. Health 318 (2014), attached as **Exhibit 80**; Ghana Rehman, et al., *Determination of Toxic Heavy Metals in Different Brands of Talcum Powder*, 2 Int'l J. Applied Natural Sciences 45 (2013), attached as **Exhibit 81**.

[132] Nicole M. Fletcher, et al., *Molecular Basis Supporting the Association of Talcum Powder Use with Increased Risk of Ovarian Cancer*, 20 Reproductive Sciences 1 (2019), attached as **Exhibit 82**.

[133] Ballman Dep. at 132:7-21; Diette Dep. at 77:8-18.

### C.    NEITHER DR. BORAK NOR DR. MERLO PEFRFORMED A CAUSATION ANAYLYSIS TO SUBSTANTIATE THEIR CAUSATION OPINIONS

Two of the Defendants' experts—Drs. Borak (PCPC) and Merlo (J&J)—did not perform a comprehensive or discernable analysis of the causation question. Indeed, Dr. Borak admitted that he did *not* perform a causation analysis at all. As for Dr. Merlo, he claims to have stopped his causation analysis after addressing the issue of consistency and dose response, which were unreliable as discussed above  and therefore *admits* that he never considered the other Hill causation factors, including biologic plausibility, coherence, specificity, and analogy.

Because neither Drs. Borak nor Merlo performed complete causation analyses, both opinions are unreliable and should be excluded.

### 1.    Dr. Borak Did Not Perform a Causation Analysis at All

Although he claims to have been retained by PCPC as an epidemiologist, Dr, Borak's Report is bereft of any discussion of the causation question.[134] Rather, he was retained to apparently "evaluate whether, when and by whom it had been determined that the use of talc containing powder causes ovarian cancer."[135] Based on his "analysis," he is prepared to opine that "science" has not "established" that it

---

[134] *See generally* Borak Report at 1-13.

[135] *Id*. at 2.

does.[136] However, to opine on whether or not talcum containing powder causes ovarian cancer, or whether science has established that it does (or does not) he has to review the evidence and employ some discernable methodology. He did neither.

PCPC apparently expects to have Dr. Borak be a mouthpiece to testify about these opinions without having him personally perform any independent analysis of the causation question himself. Dr. Borak is nothing more than a vessel for lawyer's argument. This was made clear in deposition:

> I was asked—just to be clear, so we don't have any doubts, I was asked to review the literature from a chronological perspective to evaluate whether, when and by whom it had been determined that perineal use of talcum-containing powder causes ovarian cancer. **I was not asked to review the literature on weight of evidence.**[137]

Even as a "historian," however, Dr. Borak's analysis was inadequate. He did not address studies that, for some inexplicable reason, did not "strike [him] as being significant, although [he saw] them cited a lot."[138] Even then he often looked at the conclusions as reported on websites, he did not look at the underlying data and simply stated that "[he] didn't touch those data."[139]

---

[136] *Id.* at 13.

[137] Borak Dep. at 271:19-272:6 (emphasis added).

[138] *Id.* at 297:23-298:2.

[139] *Id.* at 292:8-294:21.

Nor did he perform a causation analysis or reach any independent causation conclusions of whether talcum powder products can cause ovarian cancer:

> Q.    And just to be clear, in this case that brings us here today, you did not do a Bradford Hill analysis, correct?
>
> A.    **Yes, I did not do a Bradford Hill Analysis**.
>
> Q.    And you weren't asked to do a Bradford Hill analysis?
>
> A.    That's correct.
>
> Q.    ---While you commented on, my words, the state of the science, you were not asked nor did you give an opinion on whether or not talc can cause ovarian cancer?
>
> A.    **I did not—I was not asked to render such an opinion**.[140]

Indeed, he emphasized the point that he did no analysis whatsoever and employed no methodology: "**I was not asked the question for the—of inferring causation from epidemiologic evidence.  I was not asked to infer causation.  And so, I did not use Bradford Hill**."[141]

Clearly, Dr. Borak applied no methodology on any question he was asked to address. As a so-called historian, his recitation is incomplete and hollow, never recounting anything beyond the authors' conclusions. Further, he did not conduct any independent analysis of the data of his own and, even if he did, he ascribed no

---

[140] *Id.* at 103:3-21.

[141] *Id.* at 113:21-115:14;  *See also id.* at 221:23-222:23.

discernable methodology to support his analysis. Because Dr. Borak did not employ any methodology in reaching his ultimate opinions, his testimony is both unreliable and irrelevant and should be precluded

### 2.     Dr. Merlo Did Not Perform a Complete Causation Analysis

As set forth above, Dr. Merlo analyzed the epidemiologic evidence for consistency of association using a flawed two-step "significance testing" and "hierarchy of evidence" methodology that has been strongly rejected in the epidemiologic and statistical community as discussed earlier. He then compounded the error by using an incorrect framework for analyzing the dose response data.

As if that were not enough, Dr. Merlo committed serious methodological errors by not considering the remainder of considerations under the Bradford Hill analysis.  Specifically, he did not address biologic plausibility at all in his Report, including whether the presence of asbestos as a constituent could be a biologically plausible explanation for the increased risks (statistically significant and not significant) seen in virtually every study on the question.[142] Nor did he address whether the specificity aspect supported a causal inference since the epidemiology was specific to ovarian, but not other cancers and, even more specifically epithelial ovarian cancer.[143] He further did not consider the "coherence" or "analogy" aspects.

---

[142] Merlo Dep. at 174:8-12.

[143] *Id.* at 182:3-8.

He attempted to explain this methodology by claiming that he did not need to go further since, in his view, there was no association, much less a consistent one. However, as set forth above, it is clear that there is an association and Dr. Merlo should have reviewed the totality of evidence before reaching his conclusion, particularly since this was not a subject that he had ever studied until the past couple months after being hired by defense counsel for this litigation. Dr. Merlo's failure to perform a full causation analysis under Bradford Hill is flawed and his opinions should be excluded.

**D.    J&J's EXPERTS' CRITICISMS OF THE PSC' EXPERTS' METHODOLOGIES ARE NOT RELIABLE BECAUSE THEY ARE BASED CHERRY-PICKED STATEMENTS FROM THE PSC'S EXPERTS OPINIONS**

In their reports, J&J's witnesses (Ballman, Diette, and Merlo) spend an inordinate amount of time criticizing the opinions of the PSC's epidemiology experts.  In a transparent attempt to support what is expected to be J&J's misplaced *legal* challenges under *Daubert*, these witnesses attempt to transform a difference of *scientific* opinion into a "methodologic" flaw.[144]

In promoting and parroting J&J's *legal* theories in terms that are fit for a legal brief rather than objective scientific discourse, and by disingenuously cherry-picking "sound bites" from the PSC's experts, J&J's experts have exposed their own flawed

---

[144] *See, e.g.,* Merlo Report at 35-46; Ballman Report at 22-50; Diette Report at 15-35.

scientific methodology and that they are advocates not objective scientists.[145] This overreach is no more apparent than in J&J's experts' discussion on the "strength of association" aspect of the Bradford Hill considerations, and their abject misrepresentation of the PSC's experts' treatment of it. Strength of association is not, as Defendants and their experts would imply, a **quantitative** assessment that falls neatly into categories like "weak," "moderate," and "strong." Rather, strength of association is a **qualitative** statement that looks at the risk in relationship to other Bradford Hill factors. As noted by Rothman in *Modern Epidemiology*: "[A] strong association is neither necessary nor sufficient for causality, and [] weakness is neither necessary nor sufficient for absence of causality" using as example the "smoking and cardiovascular disease or between environmental tobacco smoke and lung cancer [which are] accepted by most as causal even though the associations are considered weak."[146] As J&J's experts concede, there is no universal "numeric definition" or "hard threshold" for strength and there is "no cut off value for the magnitude of an association between exposure required or the relationship to be

---

[145] *See Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 290 (E.D. Va. 2001) (". . . it is specifically not an expert's position to advocate for a party, lest the witness ceases to be an expert whose testimony is valuable because he or she is not an advocate and becomes, instead, just another legal practitioner for the client."); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003)("An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate.")

[146] Rothman, et al., *Modern Epidemiology* at 26.

causal."[147] Dr. Diette agreed that "there is no absolute cutoff to define a large verses small relative risk..." and the "size of the risk does not, in itself, determine causation."[148]

Indeed, The National Cancer Institute (NCI) has characterized the relative risks of obesity and ovarian cancer (RR 1.1) and Hormone Replacement Therapy and ovarian cancer (RR 1.2-1.8) as "moderate," though J&J and their experts would characterize a relative risk of that magnitude as "weak."[149] This demonstrates that it is the risk estimates themselves that matter, not some arbitrary description of them as "strong," "moderate" or "weak"

Because there are not any established definitions of strength of association such as "strong," "moderate," or "weak," the PSC's experts did **not** describe the "strength" of the talcum powder-ovarian cancer relationship as "strong," "moderate" or "weak." Instead, they described the strength of the association with relationship to other exposures that are also causal.  For example, Dr. Moorman wrote:

> The overall associations see in the talc-ovarian cancer meta-analyses as well as in many of the individual studies are statistically significant, indicating an increased risk of approximately 25-30%.  While not as high as other relationships like smoking and lung cancer, these relative risks are in line with

---

[147] Ballman Report at 22; Merlo Report at 43.

[148] Diette report at 7.

[149] National Cancer Institute, *Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)-Health Professional Version,* at 3, attached as **Exhibit 83**; Merlo Report at 45.

other generally accepted causal relationships (e.g. second hand smoke and lung cancer).  I consider the strength of association seen in the talc–ovarian cancer epidemiologic studies, to be an important factor in favor of a causal relationship between talc and ovarian cancer, particularly when considered along with the consistency of association seen across these studies.[150]

Similarly, Dr. Siemiatycki wrote:

[t]he best estimate from the epidemiologic literature is that women who regularly used talcum powder in the genital area had a 28% higher risk of ovarian cancer thea women who did not use such powders.  As I illustrate in table 11[151] with a few examples, this RR is in line with many well-recognized risk factors for cancer and other diseases...Such a high and significant meta-RR could not have occurred by chance.  This is a very important factor in how I view the evidence of causality and it supports causality. [152]

---

[150] Expert Report of Patricia G. Moorman, MSPH, Ph.D. at 15, Nov. 16, 2018 ("Moorman Report"), attached as **Exhibit 84**.

[151] A copy of Dr. Siemiatycki's Table 11 entitled "selected examples of some of the recognized causal association that have RR less than 2.0 is reprinted from page 87 of his report, without references, below:

| Agent | Disease | Approximate RR |
|---|---|---|
| Urban air pollution | Lung cancer | 1.091 |
| Trichloroethylene | Kidney cancer | 1.322 |
| Diesel engine emissions | Lung cancer | 1.423 |
| Benzene | Leukemia | 1.724 |
| Domestic radon gas | Lung cancer | 1.295 |
| Second hand cigarette smoke | Lung cancer | 1.64 |
| Intermittent intense sun exposure | Melanoma of the skin | 1.616 |
| Estrogen-progestin menopausal therapy | Breast cancer | 1.597 |

[152] Siemiatycki Report at 62.

Apparently frustrated with the PSC's experts' nuanced and scientific approach to the strength of association prong of Bradford Hill, J&J's legal team attempted to obtain sound-bites from them to use in their *Daubert* challenges. They refused. As Dr. Moorman testified when pressed on the subject:

> Q.   And I think you are conflating—or you are misunderstanding my question, because you are answering the question about whether the association is real of not real, and, my question for you is whether the association is weak, modest or strong. How would you characterize it?

> A.   And I would—as I have said, there is no absolute terminology that would say what is a weak association, what is modest, and what is strong. So I think its accurate to describe it as it is, a 20-30 percent increased risk of ovarian cancer.[153]

Dr. Siemiatycki was also pressed but refused to use the J&J lawyer's definition stating that:

> The terminology around strength of association -- weak, modest, strong, very strong, medium, et cetera – it doesn't have -- there are no regulations. There's no epidemiologic handbook that says if a relative risk is in this range, you call it weak or moderate and so forth. So the term "moderate" -- actually, the terminology around strength of associations was probably most influenced by the smoking and lung cancer situation in the '50s and '60s where there were relative risks of ten approximately, ten times as high of risk for smokers as for nonsmokers of getting lung cancer, and that was considered a benchmark for strong associations. . . . It has subsequently turned out that the

---

[153] Deposition of Patricia G. Moorman, at 249:3-14, Jan. 25, 2019 ("Moorman Dep."), attached as **Exhibit 85**.

> level of relative risk for smoking and lung cancer is exceptional among known carcinogens, and that this -- there are not many that have such high relative risks. I'm just giving you a bit of background because the terminology is controversial, and I know it plays into the case of how we -- how we characterize the associations around talc and ovarian cancer . . . . So where you draw the line between strong, moderate, weak, and so on, is a kind of -- is a vague notion.[154]

Apparently frustrated that the PSC's experts did <u>not</u> provide the J&J lawyers with the sound bites that they hoped would allow them to attack plaintiffs' experts in the *Daubert* motions that they expected to file, J&Js experts were apparently conscripted to step-up and fill the void. Perhaps the best example is Dr. Merlo who, unlike Drs. Moorman and Siemiatycki, has never published or in any way communicated his views on the risk of talcum powder and ovarian cancer outside of litigation felt free to criticize them. He not only ignored what those PSC's experts *actually* testified to, but he cherry-picked the record for sound bites like "strong" or "high," and then attacked the PSC's experts for testimony they *never gave*.

In one striking example that sounds more like prose from the pen of a J&J brief-writer than an unbiased scientific expert, Dr. Merlo stated that*:* "Plaintiffs' expert's insistence that a 1.28 relative risk is 'high' raises the concern that they are pursuing a results-driven analysis to their causation analysis instead of a proper

---

[154] Deposition of Jack Siemiatycki, MSc, PhD at 147:2-148:19, Jan. 31, 2019 ("Siemiatycki Dep."), attached as **Exhibit 86**.

scientific methodology."[155] Obviously, Dr. Merlo's *ad hominem* attack and unfair description is *not* what the PSC's experts testified to.  Drs. Ballman and Diette made similar, although not quite as caustic, criticisms.[156]

The above illustration makes clear that it is J&J's experts who have revealed themselves in the fashion originally characterized by Dr. Merlo—as "results-driven."  They have crossed the line from being **unbiased** scientific experts (albeit ones with no training or experience in the area of talcum powder-ovarian cancer) to become **biased** advocates. Their methodology of searching through the PSC's experts' reports and depositions for sound-bites to support a legal argument is **not** a scientific methodology, but a legal one. If J&J wishes to explore the PSC's expert's opinions, they must do so though cross-examination not through mischaracterization by their litigation experts.

The J&J's experts' methodology of criticizing the PSC's experts through selective quoting is unreliable and should be excluded.

## V.   <u>CONCLUSION</u>

For these reasons, the PSC requests that the Court exclude the opinions and testimony of Defendants' epidemiology experts in their entirety. Specifically, that Drs. Merlo, Ballman and Diette should be excluded for employing a discredited

---

[155] Merlo Report at 45.

[156] *See generally* Ballman Report and Diette Report.

methodology for assessing "consistency of association" and applying the wrong standard for the "dose response" and "biologic plausibility" elements of the Bradford Hill causation analysis. Similarly, Drs. Merlo and Borak should be excluded for failing to perform a causation analysis. Finally, J&J's experts should be excluded from testifying about plaintiffs' experts' methodology since they did nothing more than "cherry-pick" sound bites from their reports and depositions.

Respectfully submitted,

/s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-783-6400
Fax: 202-416-6392
mparfitt@ashcraftlaw.com

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
Leigh.odell@beasleyallen.com

**Plaintiffs' Co-Lead Counsel**

/s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ 07701

73

Tel: 732-747-9003
Fax: 732-747-9004
cplacitella@cprlaw.com
***Plaintiffs' Liaison Counsel***

## PLAINTIFFS' EXECUTIVE COMMITTEE:

Warren T. Burns
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Tel: 469-904-4551
Fax: 469-444-5002
wburns@burnscharest.com

Richard Golomb
GOLOMB & HONIK, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
rgolomb@golombhonik.com

Richard H. Meadow
THE LANIER LAW FIRM PC
6810 FM 1960 West
Houston, TX 77069
Tel: 713-659-5200
Fax: 713-659-2204
richard.meadow@lanierlawfirm.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11thFloor
New York, NY 10017
Tel: 212-397-1000
hunter@napolilaw.com

## PLAINTIFFS' STEERING COMMITTEE:

Laurence S. Berman
Michael M. Weinkowitz
LEVIN, SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-592-4663
lberman@lfsblaw.com

Timothy G. Blood
BLOOD, HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101
tblood@bholaw.com

Sindhu S. Daniel
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, #1100
Dallas, TX 75219
Tel: 214-521-3605

Jeff S. Gibson
WAGNER REESE, LLP
11939 N. Meridian St.
Carmel, IN 46032
Tel: (317) 569-0000

Fax: 214-520-1181
sdaniel@baronbudd.com

Kristie M. Hightower
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Tel: 337-439-0707
Fax: 337-439-1029
khightower@lundylawllp.com

Victoria Maniatis
SANDERS PHILLIPS GROSSMAN, LLC
100 Garden City Plaza, Suite 500
Garden City, NJ 11530
Tel: 516-640-3913
Fax: 516-741-0128
vmaniatis@thesandersfirm.com

Eric H. Weinberg
THE WEINBERG LAW FIRM
149 Livingston Avenue
New Brunswick, NJ 08901
Tel: 732-246-7080
Fax: 732-246-1981
ehw@erichweinberg.com

Christopher V. Tisi
LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
ctisi@levinlaw.com

Fax: (317) 569-8088
jgibson@wagnerreese.com

Daniel R. Lapinski
MOTLEY RICE LLC
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Tel: 856-667-0500
Fax: 856-667-5133
dlapinski@motleyrice.com

Carmen S. Scott
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: 843-216-9162
Fax: 843-216-9450
cscott@motleyrice.com

Richard L. Root
MORRIS BART, LLC
Pan America Life Center
601 Poydras St., 24th Fl.
New Orleans, LA 70130
Tel. 504-525-8000
Fax: 504-599-3392
rroot@morrisbart.com