# Exhibit 4

Karla Ballman, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &         :
JOHNSON TALCUM POWDER      :
PRODUCTS MARKETING,        :
SALES PRACTICES, AND       :  NO. 16-2738
PRODUCTS LIABILITY         :  (FLW) (LHG)
LITIGATION                 :
                           :
THIS DOCUMENT RELATES      :
TO ALL CASES               :

- - -

March 22, 2019

- - -

Videotaped deposition of
KARLA BALLMAN, Ph.D., taken pursuant to
notice, was held at Skadden Arps, Four
Times Square, New York, New York,
beginning at 9:04 a.m., on the above
date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

Karla Ballman, Ph.D.

| Page 2 | Page 4 |
|---|---|
| 1  APPEARANCES:<br>2<br>   LEVIN PAPANTONIO THOMAS<br>3  MITCHELL RAFFERTY & PROCTOR, PA<br>   BY:  CHRISTOPHER V. TISI, ESQ.<br>4  316 South Baylen Street,<br>   Suite 600<br>5  Pensacola, Florida 32502<br>   (888) 435-7001<br>6  Ctisi@levinlaw.com<br>7    - and -<br>8  LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>   BY:  RUDIE R. SOILEAU, JR., ESQ.<br>9  501 Broad Street<br>   Lake Charles, Louisiana 70601<br>10 (337) 439-0707<br>   Rudiesoileau@gmail.com<br>11<br>    - and -<br>12<br>   RESTAINO LAW, LLC<br>13 BY: JOHN M. RESTAINO, JR., DPM, ESQ.<br>   130 Forest Street<br>14 Denver, Colorado 80220<br>   (303) 839-8000<br>15 Jrestaino@restainollc.com<br>   Representing the Plaintiffs<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 | 1  APPEARANCES:  (Cont'd.)<br>2<br>   SEYFARTH SHAW, LLP<br>3  BY:  THOMAS T. LOCKE, ESQ.<br>   975 F Street, NW<br>4  Washington, D.C. 20004<br>   (202) 463-2400<br>5  tlocke@seyfarth.com<br>   Representing the Defendant, PCPC<br>6<br>7  TELEPHONIC APPEARANCES:<br>8<br>   ASHCRAFT & GEREL, LLP<br>9  BY:  MICHELLE A. PARFITT, ESQ.<br>   4900 Seminary Road, Suite 650<br>10 Alexandria, Virginia 22311<br>   (703) 931-5500<br>11 mparf@aol.com<br>   Representing the Plaintiffs<br>12<br>   ALSO PRESENT:<br>13<br>   VIDEOTAPE TECHNICIAN:<br>14   Henry Marte<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 |

| Page 3 | Page 5 |
|---|---|
| 1  APPEARANCES:  (Cont'd.)<br>2<br>   SKADDEN ARPS, LLP<br>3  BY:  JESSICA D. MILLER, ESQ.<br>   1440 New York Avenue, N.W.<br>4  Washington, D.C. 20005<br>   (202) 371-7850<br>5  Jessica.miller@skadden.com<br>6    - and -<br>7  DRINKER, BIDDLE & REATH, LLP<br>   BY:  SUSAN M. SHARKO, ESQ.<br>8  600 Campus Drive<br>   Florham Park, New Jersey 07932<br>9  (973) 549-7000<br>   susan.sharko@dbr.com<br>10<br>    - and -<br>11<br>   DRINKER BIDDLE & REATH, LLP<br>12 BY:  KATHERINE McBETH, ESQ.<br>   One Logan Square,<br>13 Suite 2000<br>   Philadelphia, Pennsylvania 19103<br>14 (215) 988-2706<br>   katherine.mcbeth@dbr.com<br>15 Representing the Defendants, Johnson<br>   & Johnson entities<br>16<br>17 TUCKER ELLIS, LLP<br>   BY:  MICHAEL ANDERTON, ESQ.<br>18 950 Main Avenue, Suite 1100<br>   Cleveland, Ohio 44113<br>19 (216) 696-4835<br>   Michael.anderton@tuckerellis.com<br>20 Representing the Defendant, PTI<br>   Royston LLC and PTI Union LLC<br>21<br>22<br>23<br>24 | 1      - - -<br>2    I N D E X<br>3      - - -<br>4<br>   Testimony of:<br>5<br>   KARLA BALLMAN, Ph.D.<br>6<br>   By Mr. Tisi            13, 566<br>7<br>   By Ms. Miller            564<br>8<br>9<br>10     - - -<br>11   E X H I B I T S<br>12     - - -<br>13<br>14 NO.    DESCRIPTION       PAGE<br>15 Ballman-1   Expert Report      13<br>        Karla Ballman, Ph.D.<br>16        2/25/19<br>        P1.0200<br>17<br>   Ballman-2   Demonstrative      48<br>18        Ballman Conclusion<br>        Page 53, Excerpt<br>19        P1.0201<br>20 Ballman-3   Ovarian Cancer     55<br>        And Talc<br>21        (Cramer)<br>22 Ballman-4   Draft Screening     87<br>        Assessment Talc<br>23        12/2018<br>        P1.0198<br>24 |

Karla Ballman, Ph.D.

Page 6

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.     DESCRIPTION      PAGE
 6  Ballman-5  Demonstrative    104
             Health Canada
 7           Conclusion
             Page 28 Excerpt
 8           P1.0202
 9  Ballman-6  The Environment and  145
             Disease:  Association
10           Or Causation
             (Bradford Hill)
11           P2.0056
12  Ballman-7  Talc and Ovarian  155
             Cancer
13           (Narod)
             P2.0052
14
15  Ballman-8  Demonstrative   161
             Narod Conclusion
             Page 2
16           P1.0203
17  Ballman-9  Older Version   180
             Curriculum Vitae
18           (Withdrawn)
19  Ballman-10  Notice of Deposition  187
20  Ballman-10-A Supplemental List of  189
             Materials Reviewed
21           And Considered by
             Karla Ballman, Ph.D.
22
    Ballman-10-B Addendum to List  189
23           Of Materials Reviewed
             And Considered
24
```

Page 7

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.     DESCRIPTION      PAGE
 6  Ballman-10-C Invoice dated 3/7/19  189
 7  Ballman-10-D E-mail Thread    189
             3/21/19
 8           Subject, Additional
             Disclosure
 9
    Ballman-10-E Lectures/Workshops  199
10           Re Epidemiology/
             Biostatistics (Last 2
11           Years)
12  Ballman-11  Weill Cornell Profile 232
             Biostatistics and
13           Epidemiology
             Karla Ballman
14           P1.0204
15  Ballman-12  Anesthesiology and  243
             Respiratory Therapy
16           Devices Panel
             6/14/18
17           P1.0205
18  Ballman-13  Profile of Karla  245
             Ballman, Ph.D. SARC
19           Statistician
             P1.0206
20
    Ballman-14  ASA: Promoting the  247
21           Practice and Profession
             Of Statistics
22           P1.0207
23
24
```

Page 8

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.     DESCRIPTION      PAGE
 6  Ballman-15  ASA Listing of   250
             Fellows/Nominations
 7           Printout
             (No Bates)
 8
 9  Ballman-16  Weill Cornell    257
             Biostatistics and
             Epidemiology Courses
10           P1.0208
11  Ballman-17  Efficacy of Adjuvant  277
             Trastuzumab for
12           Patients with Human
             Epidermal Growth Factor
13           (O'Sullivan)
             P2.0057
14
15  Ballman-18  Expert Report of  306
             Karla Ballman
             (Viagra)
16           P1.0211
17  Ballman-19  Case-Control Studies 313
             (Rothman)
18           P2.0067
19  Ballman-20  Six Persistent   320
             Research Misconceptions
20           (Rothman)
21  Ballman-21  Interpretation of  337
             Epidemiologic Studies
22           On Talc and Ovarian
             Cancer
23           (Rothman, 11/28/00)
             P1.0125
24
```

Page 9

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.     DESCRIPTION      PAGE
 6  Ballman-22  Systematic Review and 375
             Meta-Analysis of the
 7           Association Between
             Perineal Use of Talc
 8           And Risk of Ovarian
             Cancer
 9           (Taher)
             P2.0034
10
    Ballman-23  Epidemiology Faces  390
11           Its Limites
             Special News Report
12
    Ballman-24  Science, Letters,  394
13           The Discipline of
             Epidemiology
14           P2.0062
15  Ballman-25  National Cancer  401
             Institute
16           Ovarian, Fallopian Tube
             And Primary Peritoneal
17           Cancer Prevention
             P2.0060
18
    Ballman-26  Expert Report Excerpt 425
19           Christian Merlo, MD
             2/25/19
20           P1.0215
21  Ballman-27  Modern Epidemiology  440
             Chapter 2
22           (Rothman)
             Causation and Causal
23           Inference
             P2.0061
24
```

Karla Ballman, Ph.D.

```
1              - - -
2        E X H I B I T S (Cont'd.)
3              - - -
4
5  NO.        DESCRIPTION        PAGE
6  Ballman-28  The American        483
              Statistician
7              The ASA's Statement
              On P-Values:  Context
8              Process, and Purpose
              (Wasserstein)
9              P2.0063.1
10  Ballman-29  Comment, Retire      487
              Statistical Significance
11              (Valentin)
12  Ballman-30  Demonstrative        519
              Quote from Ballman
13              Expert Report
              P1.0213
14
    Ballman-31  Demonstrative        532
15              Quote from Ballman
              Expert Report
16              P1.0214
17  Ballman-32  Introduction to      548
              Meta-Analysis
18              (Borenstein)
19
20
21
22
23
24
```

```
1              - - -
2        DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  PAGE  LINE
    None.
7
8  Request for Production of Documents
9  PAGE  LINE
    None.
10
11  Stipulations
12  PAGE  LINE
    None.
13
14  Questions Marked
15  PAGE  LINE
    None.
16
17
18
19
20
21
22
23
24
```

```
1              - - -
2              THE VIDEOGRAPHER:  We're now
3  on the record.  My name is Henry
4  Marte.  I am a videographer with
5  Golkow Litigation Services.
6        Today's date is March 22nd,
7  2019, and the time is 9:04 a.m.
8        This videotaped deposition
9  is being held at Four Times Square
10  in New York, New York, in the
11  matter of Talcum Powder
12  Litigation.
13        The deponent today is
14  Dr. Karla Ballman.
15        Counsel are all introduced
16  for the record, for the
17  stenographic record.
18        Will the court reporter
19  please administer the oath to the
20  witness.
21              - - -
22        ... KARLA BALLMAN, Ph.D.,
23  having been first duly sworn, was
24  examined and testified as follows:
```

```
1              - - -
2              EXAMINATION
3              - - -
4  BY MR. TISI:
5      Q.  Good morning?
6      A.  Good morning.
7      Q.  Would you please state your
8  name.
9      A.  Karla Ballman.
10      Q.  And it's Karla Ballman,
11  Ph.D.?
12      A.  Well, that's my degree, is a
13  Ph.D.
14      Q.  Correct.  You know that
15  you've been identified by Johnson &
16  Johnson lawyers as an expert in the
17  talcum powder litigation?
18      A.  Yes.  I've been retained by
19  Johnson & Johnson as an expert.
20      Q.  Okay.  At the request of
21  Johnson & Johnson's lawyers, did you
22  prepare an expert report on behalf of
23  Johnson & Johnson?
24      A.  I did prepare an expert
```

Karla Ballman, Ph.D.

Page 14

1    report.
2        Q.   Okay.  And I'd like to have
3    that marked as Exhibit Number 1.
4            (Document marked for
5            identification as Exhibit
6            Ballman-1.)
7    BY MR. TISI:
8        Q.   Now Dr. Ballman, does
9    this -- does this report that you issued
10   address the epidemiologic question about
11   whether talcum powder products are
12   capable of causing ovarian cancer?
13       A.   Yes.  I had been asked to
14   look at all the evidence and totality and
15   come to -- to determine whether or not
16   ovarian cancer -- I mean talcum powder
17   causes ovarian cancer.
18       Q.   Okay.  And you reached that
19   to a reasonable degree of medical
20   certainty?
21       A.   My -- my expertise is in
22   epidemiology and statistics, and so I
23   reached it to a reasonable degree of
24   certainty coming from it, from an

Page 15

1    epidemiology standpoint.  I'm not sure
2    what you mean by medicine.  I'm not an
3    M.D.
4        Q.   Okay.  What does reasonable
5    degree of certainty mean to you?
6        A.   It means that I don't see
7    any evidence that supports that
8    hypothesis.
9        Q.   Okay.  No evidence?
10       A.   Credible evidence.
11       Q.   The report that you issued
12   is your epidemiologic assessment of that
13   general causation question about whether
14   talcum powder products is capable of
15   causing ovarian cancer, true?
16       A.   What do you mean by general
17   causation?  I know that lawyers use
18   different words than I use.  And
19   they place a lot of emphasis on the words
20   they use, like I do on the numbers.  So
21   I'm not quite sure what you mean by
22   general causation.
23       Q.   Whether or not -- let's take
24   the word general causation out.

Page 16

1            This question -- this report
2    addresses the question about whether or
3    not, in your opinion, to a reasonable
4    degree of certainty, that talcum powder
5    products cause or does not cause ovarian
6    cancer.
7        A.   Yeah.  So this report
8    describes the -- what I went through to
9    look at the data in totality with respect
10   to the question as to whether there is
11   evidence to support the hypothesis that
12   talcum powder applied to the perineum
13   causes ovarian cancer.
14       Q.   And in fact, the cover page
15   which you signed says "Expert Report of
16   Karla Ballman Ph.D. for General Causation
17   Daubert Hearing."
18           Do you see that?
19       A.   Okay.  I see that.  So I
20   didn't know what the legal terms were.
21   So I did do this report, yes.
22       Q.   And this report is your
23   assessment of both the epidemiologic and
24   non-epidemiologic evidence through a

Page 17

1    framework that we will be talking about
2    today called the Bradford Hill framework,
3    correct?
4        A.   What do you mean by
5    non-epidemiologic?
6        Q.   I think I used -- those were
7    the words that you used in the report.
8        A.   Did I?  Can you point me to
9    the page where I used those words?
10       Q.   I'm not going to waste my
11   time to do it.  But you -- I think you
12   talked about that you were looking at
13   both the observational studies and the
14   non-observational evidence?
15           MS. MILLER:  Objection.
16           THE WITNESS:  So as -- as an
17       expert in epidemiology and
18       statistics, and I do this like day
19       in and day out, as part of my
20       life, I look at the totality of
21       the evidence.
22           So some of the evidence
23       involved human.  And some of the
24       evidence may involve some animal

Karla Ballman, Ph.D.

Page 18

1      experiments, and some evidence I
2      look at might involve some cell
3      line experiments.
4    BY MR. TISI:
5          Q.   Okay.  And we'll talk about
6    that.  We'll talk about that for sure.
7            In collecting that evidence
8    did you organize your evidence
9    considering what I think the record will
10   reflect is the Bradford Hill framework?
11         A.   Within my report I do have
12   sections that go through the Bradford
13   Hill framework.
14         Q.   Okay.  And you know what the
15   Bradford Hill framework is, correct?
16         A.   I do.
17         Q.   And after collecting the
18   evidence, did you then weigh the
19   evidence?
20         A.   So weigh it in what respect?
21         Q.   I'm asking you, how did
22   you -- how did you -- well, we'll come
23   back to this.
24           But you looked at the

Page 19

1    evidence and you decided which evidence,
2    if any, was credible or not, correct?
3          A.   I looked at the evidence in
4    totality.  And what I -- and I think I
5    lay out in my report, you know, there --
6    there is sort of a general hierarchy of
7    epidemiologic evidence that goes from,
8    like, lowest -- it's like a pyramid.  I
9    think it's Figure 2 in my report -- up to
10   the highest evidence.  And that's the
11   type of weight I put on it.
12           So, for instance, I place
13   sort of evidence coming out of -- bless
14   you -- cohort studies higher than
15   evidence coming out of case-control
16   studies.
17         Q.   Okay.  And your -- and we'll
18   talk about this.  But your opinion is
19   that cohort studies are stronger
20   evidence, more reliable evidence than
21   case -- case-control studies?
22         A.   I believe epidemiology,
23   that's a fairly well established
24   principle.

Page 20

1          Q.   Okay.  And that's your
2    opinion?
3          A.   I just work with -- I don't
4    think that's my opinion.  I think it's
5    the basis of what all epidemiologists put
6    together as --
7          Q.   And so it's your opinion
8    that all epidemiologists agree that
9    cohort studies are better than
10   case-control studies?
11         MS. MILLER:  Objection.
12         THE WITNESS:  Again, it
13     depends.  Are you saying cohort
14     studies in general --
15   BY MR. TISI:
16         Q.   Yes.  Prospective --
17         A.   -- or are you talking
18   about --
19         Q.   Prospective cohort studies
20   are better than case-control studies on
21   your hierarchy of evidence.
22         MS. MILLER:  Objection.
23         THE WITNESS:  You know,
24     again, it depends.  That's a

Page 21

1      pretty general thing.  I'm just
2      saying that if you -- you look in
3      epidemiology textbooks, if you
4      look in any other places where
5      this is discussed, cohort studies
6      as a whole in general are placed
7      higher than the evidence coming
8      out of case-control studies.
9    BY MR. TISI:
10         Q.   And we'll talk about that.
11   But that's one of the guiding foundations
12   of your expert opinion, correct?
13         MS. MILLER:  Objection.
14         THE WITNESS:  It's again
15     established in the epidemiology
16     literature, and I just applied
17     that to the evidence that I
18     assessed.
19   BY MR. TISI:
20         Q.   Okay.  Actually my question
21   is different, Doctor.
22           That's one of the guiding
23   principles of your expert report that --
24         MS. MILLER:  Object --

6 (Pages 18 to 21)

Karla Ballman, Ph.D.

Page 22

1  BY MR. TISI:
2      Q.   -- you have weighed --
3          MR. TISI:  Wait.
4          MS. MILLER:  Sorry.
5  BY MR. TISI:
6      Q.   -- that you have weighed
7  cohort studies as a whole higher than
8  case-control studies as a whole.
9          MS. MILLER:  Objection.
10      She's asked -- she's answered this
11      question like four times.
12          THE WITNESS:  And with all
13      the interruptions, again, can --
14  BY MR. TISI:
15      Q.   I'll rephrase the question.
16      Okay.  You asked what other
17  epidemiologists do, and I'm asking you
18  what you did.
19          For the purposes of your
20  report, did you -- the framework in which
21  you looked at the different studies, you
22  placed cohort studies higher than
23  case-control studies?
24          MS. MILLER:  Same objection.

Page 23

1          Just make sure you give me
2      time to object.
3          THE WITNESS:  Thank you.
4          So again, I looked at the
5      evidence in totality and saw what
6      it looked like.  I applied
7      established epidemiology
8      principles that say cohort studies
9      have higher degree of evidence for
10      causality above case-control
11      studies.
12  BY MR. TISI:
13      Q.   And you relied, and we'll
14  talk about this, the hierarchy, you
15  referred to that as levels of evidence
16  throughout your report, correct?
17      A.   I believe I do.
18      Q.   Okay.  And you also found,
19  and we'll talk about this, that the
20  statistically significant results in the
21  case-control studies were inconsistent
22  and -- and contrary to the
23  nonstatistically significant results of
24  the non-case-control studies, correct?

Page 24

1      A.   What I found is in the
2  case-control studies, about 50 percent of
3  the studies had a statistically
4  significant result with regard to the
5  association between talcum powder use and
6  ovarian cancer.  And I found within the
7  cohort studies none of them had a
8  statistically significant association
9  between the use of perineal talcum powder
10  and ovarian cancer.
11      Q.   And it was your opinion that
12  the nonstatistically significant results
13  were inconsistent with the statistically
14  significant results?
15      A.   So if -- if some -- one
16  thing is statistically significant and
17  another thing is not statistically
18  significant, those are two different
19  things.
20      Q.   Okay.  They may be two
21  different things, but is it your opinion
22  that they are contrary to each other?
23  They are inconsistent?
24      A.   So when -- when I looked at

Page 25

1  the cohort studies, I believe --
2  case-control studies, I want to make
3  sure -- I believe that the range of -- of
4  the risk ratios that -- that were shown
5  went about -- were about fourfold and
6  were higher than the cohort studies of
7  which their range was maybe about
8  1.75-fold, so much tighter and lower.
9      Q.   Okay.  But my question is
10  different.  I'm focusing on statistical
11  significance now.
12          Is it your opinion that the
13  nonstatistically significant results were
14  contrary to the statistically significant
15  results in the studies irrespective of
16  study design?
17          MS. MILLER:  Objection.
18          THE WITNESS:  So I'm not
19  sure what you mean as contrary.
20  And what statisticians, how
21  statisticians and epidemiologists
22  approach problems is you assume
23  the null hypothesis is true, which
24  would mean no association, and

Karla Ballman, Ph.D.

Page 26

```
 1        then you look to see if there's
 2     evidence of an association.
 3           So the cohort studies found
 4     no evidence of an association and
 5     about half of the -- in a
 6     statistically significant sense,
 7     and about half of the case-control
 8     studies found a statistically
 9     significant association.
10  BY MR. TISI:
11        Q.   And so because of your --
12     your opinion that statistically
13     significant results, insignificant
14     results prove the null, and -- and
15     statistically significant results suggest
16     an association, those two conflict with
17     each other and, therefore, we have
18     inconsistency?
19           MS. MILLER:  Objection.
20        That mischaracterizes her
21        testimony.
22           THE WITNESS:  So first of
23        all, you can't prove the null.
24  BY MR. TISI:
```

Page 27

```
 1        Q.   Okay.
 2        A.   Okay.  And so, again, you
 3     assume until -- it's sort of like law.
 4     You assume innocence until proven guilty.
 5        Q.   Okay.
 6        A.   And so you assume no
 7     association, and you have to see whether
 8     or not there is evidence of an
 9     association.
10        Q.   Okay.  So changing that a
11     little bit --
12           MS. MILLER:  Were you done?
13        Were you done answering?
14           THE WITNESS:  Well, I'll --
15        I was going to repeat again is
16        that in the cohort studies they
17        consistently found no association,
18        whereas in the case-control
19        studies, even among themselves,
20        some found an association and some
21        did not.
22  BY MR. TISI:
23        Q.   Okay.  And so your -- your
24     view was that statistically significant
```

Page 28

```
 1     results are inconsistent with the
 2     statistically insignificant results?
 3           MS. MILLER:  Objection.
 4        We've now asked and answered this
 5        I think ten times.
 6           MR. TISI:  Well, she hasn't
 7        answered it.
 8  BY MR. TISI:
 9        Q.   Go ahead.
10           MS. MILLER:  I disagree.
11  BY MR. TISI:
12        Q.   Are they -- are they
13     inconsistent in your opinion?
14        A.   I believe, as I said, the
15     cohort studies find no association.
16        Q.   Right.
17        A.   And the case-control
18     studies, some of them find an
19     association, some do not.
20        Q.   And so those are
21     inconsistent?
22           MS. MILLER:  Objection.
23           THE WITNESS:  Those are
24        clearly different.
```

Page 29

```
 1  BY MR. TISI:
 2        Q.   And so are they
 3     inconsistent?
 4           MS. MILLER:  Objection.
 5           THE WITNESS:  Those -- those
 6        again are clearly different.  And
 7        so if -- if -- I think it would be
 8        a different situation if -- if,
 9        you know, every single study found
10        an association which was not the
11        case here.
12  BY MR. TISI:
13        Q.   Okay.  But consistency is
14     one of the elements of the Bradford Hill
15     criteria, right?
16        A.   That is correct.
17        Q.   Okay.  So I'm using a term
18     of art, okay.
19           Is it your opinion that --
20     that the -- the statistically significant
21     results are inconsistent with the
22     statistically not significant results?
23        A.   I think what I said and what
24     Bradford Hill said, that there -- there
```

8 (Pages 26 to 29)

Karla Ballman, Ph.D.

Page 30

1   are two ways of looking at consistency.
2        The first level is whether
3   or not they are coming up with
4   statistical significance or not.  So
5   the -- the case-control studies were
6   mixed with that.  And the cohort studies
7   all came up with an -- a nonsignificant
8   result.
9        Q.    Okay.  So those are
10  inconsistent -- in your opinion.  I
11  just -- I really want to focus on my --
12  my question.
13       Is it your opinion that the
14  nonstatistically significant results that
15  you described of the cohort and some of
16  the case-control studies are inconsistent
17  with the case-controlled studies that
18  showed a statistically significant
19  result?
20       A.    And again, I -- I don't know
21  how to answer other than to say that
22  there is a difference between something
23  that's statistically significant and
24  something that's not.

Page 31

1        If that's your definition of
2   inconsistency, then in that regard, they
3   are inconsistent.
4        Q.    Doctor, I -- you applied the
5   Bradford Hill criteria which is
6   consistency is an element.  And I'm
7   asking you, using that framework, are
8   statistically significant results that
9   you have described inconsistent with the
10  statistically significant results?
11       A.    So give me a minute here.  I
12  want to make -- I'm thinking perhaps I
13  stated it more clearly in here.
14       So it's my opinion that the
15  consistency of the association criteria
16  has not been demonstrated.
17       Q.    And is that because there
18  are statistically significant results on
19  one hand and statistically insignificant
20  results on the other hand?
21       MS. MILLER:  Objection.  I
22  think she's now asked and answered
23  this 20 times.
24       MR. TISI:  She hasn't.

Page 32

1        She's been dancing around the
2   question.
3        THE WITNESS:  So the
4   case-control studies generally
5   report risk ratios greater than
6   one.  A little over half are
7   statistically significant.  And
8   the range of the magnitude of the
9   estimate is quite large.  There's
10  no consistency between the --
11       MS. SHARKO:  You've got to
12  read much slower.
13       MR. TISI:  We're going to
14  have one or two.  We're going to
15  back to what you said -- what you
16  said to me yesterday, that we only
17  have one person.
18       MS. MILLER:  All she said
19  was that she should read more
20  slowly.
21       MR. TISI:  I understand.
22       MS. MILLER:  I can tell her
23  that.
24       MR. LOCKE:  If you would

Page 33

1   encourage that, that was something
2   that you did in breach.
3   BY MR. TISI:
4        Q.    Go ahead.
5        MS. MILLER:  If you read too
6   quickly, the court reporter can't
7   take it down.
8        THE WITNESS:  Sorry about
9   that.
10       So "Although the
11  case-control studies generally
12  report risk ratios greater than
13  one, and a little over half of the
14  studies had statistically
15  significant results, the range of
16  the magnitude is quite large."
17       And then I do say, "More
18  importantly there is no
19  consistency between the
20  case-control studies and the
21  cohort studies."
22  BY MR. TISI:
23       Q.    And is that in part because
24  of the statistical significance?

9 (Pages 30 to 33)

Karla Ballman, Ph.D.

Page 34

1      MS. MILLER: Objection.
2      THE WITNESS: I think I
3  just -- I just stated that there.
4  BY MR. TISI:
5      Q.   Okay.  Then that's -- then
6  that's the answer.  I appreciate that.
7      Okay.  Could you turn to
8  Page 53 of your -- first of all, after
9  weighing the evidence, did you reach a
10  conclusion about the causation question?
11      MS. MILLER: Objection.
12  Vague.
13      THE WITNESS:  Yeah.  What --
14      MR. TISI:  Okay.  Let me ask
15  the question.
16  BY MR. TISI:
17      Q.   After weighing all the
18  evidence that you collected, did you
19  reach a conclusion about whether, in your
20  opinion, to a reasonable degree of
21  certainty, that talcum powder does or
22  does not cause ovarian cancer?
23      A.   So it is my professional
24  opinion that there is no evidence of a

Page 35

1  causal relationship between talcum powder
2  exposure and ovarian cancer.
3      Q.   And you used your
4  professional judgment based upon your
5  experience and training to reach that
6  conclusion?
7      A.   It's based on my extensive
8  and rigorous review of the epidemiology
9  studies, and to some extent my review of
10  the scientific literature and my
11  experience and expertise in assessing
12  studies for level of evidence of the
13  data.
14      Q.   Okay.  And did you use your
15  professional judgment in reaching that
16  conclusion?
17      A.   I don't know what you mean
18  by professional judgment.
19      Q.   Did you -- did you use your
20  judgment in looking at the data?
21      A.   I --
22      MS. MILLER: Objection.
23      THE WITNESS:  I'm sorry.
24      I applied epidemiological

Page 36

1  principles in reaching that
2  conclusion.
3  BY MR. TISI:
4      Q.   Okay.  And in applying those
5  principles in your judgment, there is no
6  evidence of causation, true?
7      MS. MILLER:  Objection.
8  That mischaracterizes the
9  testimony again.
10      MR. TISI:  I'm asking the
11  question. I'm asking --
12      MS. MILLER:  Yeah, but
13  you're mischaracterized her
14  testimony.
15      MR. TISI:  I'm asking her a
16  question, Counsel.  You are --
17      MS. MILLER:
18  Mischaracterizing her testimony.
19      MR. TISI:  Fine, object.
20      MS. MILLER:  I am.
21      MR. TISI:  Good.
22      THE WITNESS:  May you repeat
23  that, please.
24  BY MR. TISI:

Page 37

1      Q.   Yes, in your judgment based
2  upon your analysis of the evidence, the
3  epidemiologic and non-epidemiologic
4  evidence, you have concluded that there
5  is no risk of ovarian cancer with talcum
6  powder products?
7      MS. MILLER:  Objection.
8  Same objection.
9      THE WITNESS:  I'm sorry.  I
10  keep not --
11      I believe I said that I
12  applied established
13  epidemiological principles in
14  evaluating the data in totality
15  and came to the conclusion that
16  the evidence does not support a
17  causal relationship between talcum
18  powder exposure and ovarian
19  cancer.
20  BY MR. TISI:
21      Q.   Now, if you look on Page 53,
22  of your report you have a conclusion.
23      A.   Yes.
24      Q.   And on the conclusion, you

10 (Pages 34 to 37)

Karla Ballman, Ph.D.

| Page 38 | Page 40 |
|---|---|
| 1  state the following.  You state, "In my | 1      A.   I am not a gynecologist. |
| 2  professional opinion, there is no | 2      Q.   You are not an oncologist? |
| 3  evidence of a causal relationship between | 3      A.   I am not an oncologist. |
| 4  perineal genital talcum powder exposure | 4      Q.   You are not now nor have you |
| 5  and ovarian cancer.  This is based on my | 5  ever been licensed to practice medicine |
| 6  extensive and rigorous review of the | 6  in any jurisdiction? |
| 7  epidemiology studies, and to a lesser | 7      A.   That is correct. |
| 8  extent my review of the scientific | 8      Q.   You're not a toxicologist? |
| 9  literature, and my experience and | 9      A.   That is correct. |
| 10  expertise in assessing studies for the | 10      Q.   You're not a mineralogist? |
| 11  level of evidence in the data." | 11      A.   That is correct. |
| 12      Did I read that correctly? | 12      Q.   You're not a geologist? |
| 13      A.   You did read that correctly. | 13      A.   That is correct. |
| 14      Q.   And that is your opinion? | 14      Q.   In fact, you do not have a |
| 15      A.   It's what I wrote there. | 15  formal degree from any university in |
| 16      Q.   Okay.  I'm going to mark, | 16  epidemiology, do you? |
| 17  just so we don't have to read the whole | 17      A.   My degree is in operations |
| 18  report and come back to that. | 18  research.  And it might be of interest |
| 19      (Document marked for | 19  that Bradford Hill's degree actually was |
| 20  identification as Exhibit | 20  in economics.  And I feel we followed |
| 21  Ballman-2.) | 21  sort of the same career path in that our |
| 22      MR. TISI:  This is your | 22  jobs that we took subsequently, first of |
| 23  opinion.  I'm going to mark this | 23  all, we had the basis, the quantitative |
| 24  as Exhibit Number 2, which is the | 24  basis.  I had some statistics courses as |

| Page 39 | Page 41 |
|---|---|
| 1      statement that I just read. | 1  part of my degree.  I also took some -- I |
| 2  BY MR. TISI: | 2  don't know if it was for credit or not -- |
| 3      Q.   And you can keep that and | 3  a seminar that was looking at sort of |
| 4  put that aside for a moment.  We're going | 4  confounding and biases in published |
| 5  to come back to that. | 5  literature.  And so that sort of sparked |
| 6      Are the bases for this | 6  my interest in statistics.  And since |
| 7  Ballman causation conclusion all | 7  statistics was one of the tools in the |
| 8  described in your epidemiology report | 8  toolbox of operations research, my career |
| 9  which we've marked as Exhibit Number 1? | 9  started going the direction of |
| 10      A.   I'm sorry.  Could you repeat | 10  statistics. |
| 11  the question? | 11      MR. TISI:  Okay.  I'm going |
| 12      Q.   Yes.  Are the bases for your | 12  to move to strike. |
| 13  conclusion that is in Exhibit Number 2 | 13  BY MR. TISI: |
| 14  all described in your report which is | 14      Q.   My question was:  Do you |
| 15  Exhibit Number 1? | 15  have a formal degree from any university |
| 16      A.   I believe that is the case. | 16  in epidemiology? |
| 17  I go through and support and describe the | 17      A.   Again, I have no formal |
| 18  methods that I used and the reasons why I | 18  degree, but I have extensive experience |
| 19  came to various conclusions. | 19  in epidemiology and statistics through my |
| 20      Q.   Okay.  We discuss this in | 20  20 years of work.  I mean, that's what I |
| 21  more detail, but let me just back up for | 21  do day in and day out. |
| 22  a minute. | 22      Q.   So the record is clear, you |
| 23      You're not a gynecologist, | 23  do not have a Ph.D. in epidemiology, |
| 24  true? | 24  correct? |

11 (Pages 38 to 41)

Karla Ballman, Ph.D.

Page 42

1    MS. MILLER:  Objection.
2         THE WITNESS:  My Ph.D. is in
3    operations research.  But what I'm
4    saying is I have --
5    BY MR. TISI:
6         Q.  I understand what you're
7    saying.  I need to --
8         MS. MILLER:  Please don't
9    interrupt the witness.
10        MR. TISI:  No, we're going
11   to -- we're going to --
12        MS. MILLER:  No.  No, you're
13   not going to interrupt her.
14        MR. TISI:  We will call --
15   no.  We're going to call the
16   judge.  I asked her a very
17   simple --
18        MS. MILLER:  That's fine.
19        MR. TISI:  -- question.
20        MR. MILLER:  That's fine if
21   you're going to call the judge --
22   BY MR. TISI:
23        Q.  Are you --
24        MR. MILLER:  -- and I'll

Page 43

1    tell the judge that you are interrupting
2    the witness.
3    BY MR. TISI:
4         Q.  Are you -- are you -- do you
5    hold a Ph.D. in -- in epidemiology?
6         MS. MILLER:  Objection.
7    Asked and answered twice.
8         THE WITNESS:  I do not have
9    a Ph.D. in epidemiology, but I was
10   explaining that I do have
11   extensive experience in statistics
12   and epidemiology.  That's all I've
13   been doing, living and breathing
14   for the last 20 years.
15   BY MR. TISI:
16        Q.  Do you have a masters degree
17   in epidemiology?
18        A.  My masters degree is in
19   operations research which contains,
20   again, some statistical training and some
21   training in epidemiology.  But the formal
22   degree is operations research.
23        Q.  In fact, when you introduce
24   yourself to your professional colleagues,

Page 44

1    you do introduce yourself as a
2    statistician, correct?
3         MS. MILLER:  Objection.
4         THE WITNESS:  So it depends
5    what colleagues I'm introducing
6    myself to.  I mean, sometimes I
7    introduce myself as a clinical
8    researcher.
9    BY MR. TISI:
10        Q.  Okay.  Do -- when you speak
11   to the FDA, do you introduce yourself as
12   a statistician?
13        A.  When I speak to the FDA, I
14   do introduce myself as a statistician,
15   because usually, you know, it just again
16   depends upon what skills the individuals,
17   you know, are -- are in need at that
18   time.
19        But I have to say that there
20   is incredible overlap between
21   biostatistics and epidemiology.  If you
22   look at any first textbook you will see
23   basically the same topics in -- whether
24   the book says epidemiology on it or

Page 45

1    whether the book says statistics on it.
2    And, in fact, many departments and
3    divisions across the country, like my
4    own, are departments and divisions of
5    biostatistics and epidemiology, just due
6    to the amount of overlap when it comes to
7    medical research.
8         Q.  Doctor, I'm going to -- I'm
9    really going to stop and we're going to
10   call the judge.
11        I am asking you a very
12   simple, straightforward question.
13        When you introduce yourself
14   to the FDA, do you list yourself as a
15   statistician, yes or no?
16        MS. MILLER:  Objection.
17   Objection.  If she doesn't feel
18   like yes or no is a proper answer,
19   she needs to give you the full
20   context.
21        MR. TISI:  Well, she -- I
22   will ask her -- if she needs to
23   give me full context, she can tell
24   me that and I will then ask a

12 (Pages 42 to 45)

Karla Ballman, Ph.D.

1    follow-up.
2           MS. MILLER:  Please don't --
3    BY MR. TISI:
4        Q.   Are you -- when you
5    introduce yourself to the FDA --
6           MS. MILLER:  Please don't
7           argue with me.
8    BY MR. TISI:
9        Q.   -- do you introduce yourself
10   as a statistician?
11       A.   When we go around the room
12   and say -- I -- I say I -- when I
13   introduce myself around the room, when we
14   have to introduce ourselves at FDA
15   meetings, I say, usually, "I'm Karla
16   Ballman, the division chief of
17   biostatistics and epidemiology.  I am a
18   statistician."
19       Q.   Okay.  When you apply for
20   grants for research, do you describe
21   yourself as a statistician?
22       A.   I don't know if I state
23   anywhere in a grant for research as to if
24   I'm a statistician or not.  It's usually

1    investigator or co-investigator.
2        Q.   Okay.  Let's move to another
3    topic.
4           You know I represent women
5    who claim their use of Johnson &
6    Johnson's talcum powder products caused
7    ovarian cancer, true?
8        A.   I -- I don't know what you
9    do.
10       Q.   Okay.  When we were first --
11   when were you first contacted by J&J's
12   lawyers to consult on the question that
13   you have given your report on regarding
14   the link between ovarian cancer and
15   talcum powder products, or the lack of a
16   link?
17          MS. MILLER:  Objection.
18          THE WITNESS:  I was
19          contacted by Johnson & Johnson
20          lawyers, I was contacted by
21          Ms. Sharko in November of 2018.
22   BY MR. TISI:
23       Q.   Okay.  Prior to being
24   retained by lawyers at J&J, have you ever

1    researched the causation question that
2    you are here to testify about today?
3        A.   I had read some literature.
4        Q.   Okay.
5        A.   Did not perform formal
6    research.
7        Q.   Okay.  Had you ever reached
8    a conclusion about whether or not talcum
9    powder products cause ovarian cancer
10   before being retained by Ms. Sharko?
11       A.   No.
12       Q.   Prior to being retained by
13   Johnson & Johnson lawyers to defend them
14   in lawsuits, have you ever expressed an
15   opinion one way or the other as to
16   whether or not talcum powder products are
17   capable of causing ovarian cancer?
18          MS. MILLER:  Objection.  She
19          wasn't retained to defend us.
20          MR. TISI:  Okay.  Then let
21          me rephrase the question.
22          MS. MILLER:  But we're the
23          lawyers.  Not -- not she.
24   BY MR. TISI:

1        Q.   Where -- before being
2    contacted by the lawyers to be a
3    potential expert in litigation involving
4    women who claim that they may die as a
5    result of ovarian cancer caused by talcum
6    powder products, did you ever express an
7    opinion about whether or not talcum
8    powder products cause ovarian cancer?
9           MS. MILLER:  Objection.
10          Your restated question was as
11          objectionable as your first
12          question.
13          THE WITNESS:  And I'm sorry.
14          That was a very long question.  So
15          I don't know when I answer it
16          what -- what I'm agreeing to and
17          what I'm not agreeing to, so could
18          you --
19   BY MR. TISI:
20       Q.   Prior to -- then let me
21   rephrase the question.
22          Prior to November of 2018
23   have you ever expressed an opinion as to
24   whether or not talcum powder products

13 (Pages 46 to 49)

Karla Ballman, Ph.D.

1  cause ovarian cancer?
2      A.   Not in any sort of formal
3  sense. I don't know if in casual
4  conversation someone may have said what
5  do you think.  But no, I didn't read a
6  form -- a formal opinion.
7      Q.   Okay.  Is it fair to say
8  that the opinions that you have on the
9  subject about whether or not talcum
10  powder products cause ovarian cancer
11  occurred after you've spoke to the
12  lawyers for the first time in November of
13  2018?
14          MS. MILLER:  Objection.
15          THE WITNESS:  So my opinion
16      as to whether or not there is
17      evidence that talcum powder causes
18      ovarian cancer, is based upon the
19      research that I had done.
20          I -- I did not reach a
21      formal opinion until I had done
22      the research and looked at the
23      data in totality.
24  BY MR. TISI:

1      Q.   And that was after November
2  of 2018?
3      A.   Well, I -- I -- that's when
4  I started the research --
5      Q.   Right.
6      A.   -- on -- on the issue.
7      Q.   So the answer to my question
8  is, the first time you ever reached a
9  conclusion based upon your evaluation of
10  the data did not occur until after you
11  first met with Ms. Sharko in 2018 --
12          MS. MILLER:  Object.
13  BY MR. TISI:
14      Q.   -- November?
15          MS. MILLER:  Objection.
16          THE WITNESS:  So -- so how I
17      would say it is I did not start
18      doing research on the issue until
19      after November of 2018.  And as a
20      result of that research, I reached
21      a conclusion which obviously,
22      since I didn't start the research
23      until November, I didn't reach the
24      conclusion until after November.

1  BY MR. TISI:
2      Q.   And that would have been
3  after you met with the lawyers for
4  Johnson & Johnson, correct?
5      A.   I was --
6          MS. MILLER:  Objection.
7          Please remember to give me
8      time to object.
9          THE WITNESS:  I did not
10      start the research until after
11      November 2018.
12  BY MR. TISI:
13      Q.   When you first met the
14  Johnson & Johnson lawyers?
15          MS. MILLER:  Objection.
16          THE WITNESS:  Again, I had
17      no reason to do any research
18      before that, and so I started the
19      research after I was retained to
20      do -- to render an opinion.
21  BY MR. TISI:
22      Q.   Now, is it fair to say that
23  you never published on the subject of
24  talcum powder and ovarian cancer?

1      A.   That is correct.  There are
2  no publications with my name on it.
3      Q.   And though you have by my
4  count over 200 publications in the
5  literature, you didn't cite any of your
6  own literature for -- or any of your
7  published work in your report, correct?
8      A.   I again just used the
9  research tools that I use when I do any
10  sort of research.  And, you know, there
11  are many publications, as you see, that I
12  have there where I cite none of my own
13  work.  I just use what's relevant to
14  doing the research for the question at
15  hand.
16      Q.   And your work was not
17  relevant to your report, correct?
18          MS. MILLER:  Objection.
19  BY MR. TISI:
20      Q.   Or you would have cited it?
21          MS. MILLER:  Objection.
22          THE WITNESS:  So my
23      experience is extremely relevant
24      to my opinion, and my work is my

Karla Ballman, Ph.D.

Page 54

1    experience.  And so --
2    BY MR. TISI:
3        Q.   Okay.  But your published
4    research, you did not rely on any of your
5    published research in crafting your
6    report because it's not -- it's not in
7    the bibliography or the -- anything
8    relied on that was given to us, so I'll
9    represent to you that I looked through
10   all -- all of your citations, and there's
11   not a single reference to any of your
12   published work.  Is that accurate?
13           MS. MILLER:  Objection.
14           THE WITNESS:  So there are
15       no references --
16   BY MR. TISI:
17       Q.   Okay.
18       A.   -- to my own published work.
19   But that wasn't necessary -- in my --
20   that -- because it was based upon my
21   experience and I used what were the
22   relevant pieces of the epidemiology and
23   actually, you know, the reports that I
24   read, and that is in my report.

Page 55

1        Q.   Okay.  And you know that the
2    first epidemiologic study that described
3    the potential association between talcum
4    powder products and ovarian cancer was
5    published by researchers out of Harvard
6    University in 1982, correct?
7            MS. MILLER:  Objection.
8            THE WITNESS:  So it -- I
9        don't know with complete
10       confidence, but I do know that the
11       first publication that I reviewed
12       that had an association in it, I
13       believe was in 1982 by Cramer.
14   BY MR. TISI:
15       Q.   Okay.  I'm just going to,
16   for purposes of the record, I will attach
17   the Cramer article as Exhibit Number 3.
18           (Document marked for
19       identification as Exhibit
20       Ballman-3.)
21   BY MR. TISI:
22       Q.   Is that the same -- Exhibit
23   Number 3 the Cramer article that you
24   referenced?

Page 56

1        A.   Yes.  I do reference this
2    article.
3        Q.   Okay.  Since 1982, you would
4    agree with me that there are over 30
5    epidemiologic studies that have been
6    published?
7        A.   Since this time, I believe
8    the studies that I have in my report and
9    I reviewed included a total of about 30
10   that were case-control studies or cohort
11   studies, and meta-analyses.
12       Q.   Right.  So between 1982 and
13   the time that we sit here today in 2019,
14   there are over 30 studies, and these
15   include population-based case-control
16   studies, correct?
17       A.   There are population-based
18   case-control studies.
19       Q.   They include hospital-based
20   case-control studies, right?
21       A.   There are hospital-based
22   case-control studies.
23       Q.   Cohort studies, which you
24   mentioned.

Page 57

1        A.   There are cohort studies.
2        Q.   Meta-analyses of the
3    epidemiologic studies?
4        A.   There are meta-analyses of
5    the observational studies.
6        Q.   A pooled analysis?
7        A.   There is a pooled analysis.
8        Q.   And there are biologic
9    studies, which you also refer to?
10       A.   There are -- there are some
11   biological studies.
12       Q.   Okay.  And of all those
13   studies in the past 40 years, you have
14   not been involved in any of them, your
15   name doesn't appear in any of those
16   studies, correct?
17       A.   I am not an author on any of
18   those studies that you cited.
19       Q.   Well, you were not involved
20   in any way in any of those studies,
21   correct, because your involvement in
22   this -- this issue didn't really happen
23   until after November of 2018, correct?
24       A.   So involvement, I'm not sure

15 (Pages 54 to 57)

Karla Ballman, Ph.D.

Page 58

1  how to quite interpret that.  I mean, I
2  have vast amount of experience of
3  analyzing data that are in these types of
4  studies --
5          MS. MILLER:  Please don't
6      interrupt her.
7          THE WITNESS:  -- in terms of
8      coming to a conclusion.
9  BY MR. TISI:
10      Q.   Doctor, I'm not asking you
11  what your background is now.   I'm asking
12  you prior to November of 2018, had you
13  ever been involved in any study,
14  observational or otherwise, in any
15  capacity involving talcum and ovarian
16  cancer?
17      A.   I have no publications in
18  talc and ovarian cancer.
19      Q.   I'm not limiting it to
20  publications.  I'm asking you, had you
21  had any involvement in any fashion with
22  any study involving ovarian cancer and
23  talc?
24      A.   So again, I'm not sure what

Page 59

1  you mean by the term "involvement."  I
2  mean --
3      Q.   Did anyone -- then I'll
4  rephrase it.  Okay.
5          Did anyone ever call you and
6  say, "You know, we're doing a study,
7  Dr. Ballman.  Can you give us your
8  informal advice on how to design it,"
9  involving ovarian cancer --
10          MS. MILLER:  Objection.
11  BY MR. TISI:
12      Q.   -- and talcum powder
13  products?
14          MS. MILLER:  Objection.
15          THE WITNESS:  I have not
16      received such a phone call.
17  BY MR. TISI:
18      Q.   Okay.  And would you agree
19  with me that there are literally dozens
20  of scientists that have been involved in
21  this issue over 40 years, involved in the
22  epidemiology studies, toxicologists,
23  pharmacologists, mineralogist, have been
24  involved in the ovarian cancer talc issue

Page 60

1  for over 40 years.  You've seen -- you've
2  seen articles across the spectrum,
3  correct?
4          MR. LOCKE:  Objection.
5          MS. MILLER:  Objection.
6      That's like seven different
7      questions all in one.
8          MR. TISI:  Yes.
9  BY MR. TISI:
10      Q.   There are multiple
11  scientists -- let me rephrase the
12  question.
13          There are multiple
14  scientists from multiple disciplines that
15  have looked at the questions related to
16  ovarian cancer and talc for over
17  40 years, true?
18          MS. MILLER:  Objection.
19          THE WITNESS:  So I don't
20      know what you mean by "multiple."
21      But when there's any sort of topic
22      that's researched, it involves,
23      you know, many different people.
24      It's never -- I mean, it's not

Page 61

1      valuable research if it's just one
2      person.  So I don't think talcum
3      powder and ovarian cancer is any
4      different from any other research
5      field that you had mentioned.
6  BY MR. TISI:
7      Q.   Right.  And so the answer to
8  the question is there are literally
9  dozens of scientists across the spectrum
10  that have been looking at these issues
11  and publishing in this area for 40 years,
12  true?
13          MS. MILLER:  Objection.
14          THE WITNESS:  I can't answer
15      that with certainty.  I don't know
16      how many scientists.  I don't know
17      how long it's been --
18  BY MR. TISI:
19      Q.   There are many.  How about
20  many?
21      A.   Just like any other research
22  topic, it's -- it's what one would
23  expect, yes.
24      Q.   Okay.  Have any of them been

16  (Pages 58 to 61)

Karla Ballman, Ph.D.

1    you?
2            MS. MILLER:  Objection.
3    We've been through this.
4            THE WITNESS:  You know, I --
5    I have not done myself a study in
6    ovarian cancer, a published study
7    in ovarian cancer and talc.  I
8    have done research on this topic
9    as we talked about after
10   November 2018 --
11   BY MR. TISI:
12       Q.   Okay.
13       A.   -- using all the expertise I
14   have in similar types of studies that
15   I've been involved in, but just didn't
16   have the topic ovarian cancer and talcum
17   powder.
18       Q.   Now, I can represent to you
19   that Johnson & Johnson has produced, as
20   they tell me all the time, millions of
21   pages of documents in connection with
22   this litigation.  And I'll represent that
23   to you.  And that covers the time span
24   since the 1960s and perhaps even before.

1            Would it surprise you that
2    your name, Karla Ballman, isn't mentioned
3    as having been contacted even once by
4    Johnson & Johnson on the issue of ovarian
5    cancer and talcum powder products in that
6    whole time?
7            MS. MILLER:  Objection.
8            THE WITNESS:  I wouldn't --
9    I'm -- don't even know how to
10   answer that.
11           I -- I wouldn't know why a
12   company would contact me or have
13   my name in any sort of documents
14   that -- that they generated if I
15   hadn't been working with the
16   company.  I just don't know how to
17   answer that.
18   BY MR. TISI:
19       Q.   Would it surprise you that
20   there's no -- nobody ever mentioned we
21   need to contact Karla Ballman and obtain
22   her expertise about whether or not talcum
23   powder product caused ovarian cancer in
24   that 40-year period?

1            MS. MILLER:  Objection.
2    Asked and answered.
3            THE WITNESS:  Yeah, again, I
4    just don't know why -- why a
5    company -- I -- I don't know how
6    companies operate.  I don't know
7    if they engage experts to do
8    research for them necessarily.
9            I mean, some companies may
10   and some companies may not, I just
11   don't know.
12   BY MR. TISI:
13       Q.   Johnson & Johnson never
14   contacted you in 40 years to ever perform
15   a study or advise them in any fashion
16   about either how to design a study to
17   look at the question of ovarian cancer,
18   did they?
19       A.   I --
20           MS. MILLER:  Objection.
21   Please give me ten seconds.
22           THE WITNESS:  I know it.
23   I'm so sorry.
24           MS. MILLER:  That's all it

1    takes.
2            THE WITNESS:  Again, I'm
3    just at a loss.  I don't know why
4    they would.
5    BY MR. TISI:
6        Q.   Okay.  Well --
7        A.   Because again, I don't know
8    if they do research.  I don't know if
9    they contact people to do research from
10   them for them, so I -- I just don't --
11       Q.   Well, I'll represent to you
12   that they have.  Okay.
13           Among other people they've
14   contacted, do you know who Ken Rothman
15   is?
16       A.   No.
17       Q.   You don't know -- you
18   testified in your Viagra litigation that
19   you knew who Ken Rothman was.  He's an
20   epidemiologist who published a textbook
21   on epidemiology.
22       A.   Oh, yeah.
23       Q.   Do you remember that?
24       A.   Yeah, yeah, yeah, yeah,

17 (Pages 62 to 65)

Karla Ballman, Ph.D.

Page 66

1    yeah.  I don't know him personally.
2         Q.   Right.  But he is a -- he is
3    a well-established epidemiologist,
4    correct?
5              MS. MILLER:  Objection.
6              THE WITNESS:  He is an
7         epidemiologist and I've heard his
8         name.
9    BY MR. TISI:
10        Q.   Right.  And you also --
11   and -- contacted Drs. Huncharek and
12   Muscat.  You've seen those names,
13   correct?
14        A.   I have seen those names.
15        Q.   Okay.  And I'm going to tell
16   you, over the course of 40 years, they
17   have contacted people from various
18   disciplines to -- for various questions
19   related to talc and ovarian cancer.  I
20   want to ask you to assume that that is
21   true.  And I will --
22             MS. MILLER:  Objection.
23             MR. TISI:  I haven't even
24        asked the question, counsel.

Page 67

1              MS. MILLER:  I didn't even
2         know.  I can't tell what's a
3         question and what's a lecture.
4              MR. TISI:  Well, then
5         wait -- wait till the end.
6    BY MR. TISI:
7         Q.   At no time did any scientist
8    or regulatory person from Johnson &
9    Johnson ever contact Dr. Ballman to ask
10   her opinions until the lawyers contacted
11   you in November of 2018, would that be a
12   true statement?
13             MS. MILLER:  Objection.
14             THE WITNESS:  Again, as I
15        said, I -- I just don't know how
16        companies operate.  You tell me
17        they've had -- they hire experts
18        and I have no evidence one way or
19        another if they do.
20             But I had not been contacted
21        by Johnson & Johnson, but I don't
22        know if that's unusual.  I just --
23   BY MR. TISI:
24        Q.   I'm not asking you whether

Page 68

1    it's unusual.  I'm just asking you the
2    simple question.  They never -- none of
3    the lawyers -- excuse me.
4              None of the scientists at
5    Johnson & Johnson ever contacted you over
6    the past 40 years to seek your advice,
7    true?
8         A.   I have not been --
9              MS. MILLER:  Objection.
10             THE WITNESS:  Oh, sorry.
11   BY MR. TISI:
12        Q.   You may answer.
13        A.   Yeah.
14        Q.   She is going to object to
15   everything, so just --
16        A.   I'll wait, I need to wait.
17             MS. MILLER:  I'm not going
18        to object if you don't ask
19        objectionable questions.
20             MR. TISI:  Okay.
21             MS. MILLER:  It's a simple
22        solution.
23             THE WITNESS:  I have not
24        been contacted by anyone in

Page 69

1    Johnson & Johnson.
2    BY MR. TISI:
3         Q.   Related to the issue of
4    talcum powder products and ovarian
5    cancer, true?
6         A.   If you don't count the
7    lawyers, and I'm not sure what that
8    relationship means, I -- I have not.
9         Q.   Okay.  Would it surprise you
10   that when we looked in the Johnson -- in
11   the millions of pages of documents that
12   Johnson & Johnson sent to us, that not a
13   single article of research that you have
14   ever done has appeared in -- in any
15   bibliography for any issue related to
16   ovarian cancer, would that surprise you?
17             MS. MILLER:  Objection.
18             THE WITNESS:  You know,
19        again, I don't know what documents
20        or what's in those million pages.
21        So I don't know if that would
22        surprise me or not.
23   BY MR. TISI:
24        Q.   Well, can you think of any

18 (Pages 66 to 69)

Karla Ballman, Ph.D.

Page 70

1    article that you've ever written that
2    would be relevant to the question of
3    whether or not ovarian cancer is caused
4    by talcum powder products?
5           MS. MILLER: Objection.
6           THE WITNESS: Well, I have
7       expertise in other -- in -- in
8       just sort of this type of thing in
9       general. But if -- if it's
10      related to ovarian cancer and
11      talcum powder as we discussed,
12      there would not be any
13      publications with my name on it
14      that -- that address ovarian
15      cancer and talcum powder.
16   BY MR. TISI:
17      Q.   Now, even as of today, we're
18   now in March of 2019, since Ms. Sharko
19   found you as an expert witness in this
20   litigation, have you ever been in contact
21   with any J&J scientist that -- where they
22   said well, now that we found you,
23   Dr. Ballman, maybe you can help us design
24   a study or give us your advice on

Page 71

1    causation or any -- anything related to
2    talcum powder products and ovarian
3    cancer, have you spoken to any scientist
4    at J&J since November of 2018?
5       A.   I have not spoke --
6           MS. MILLER: You've got to
7       let me object. There was like,
8       seven questions in there. You've
9       got to give me time to object.
10      That was objectionable.
11          THE WITNESS: Can you
12      rephrase? Not rephrase. Just
13      repeat.
14   BY MR. TISI:
15      Q.   Since you've been found as
16   an expert witness in November of 2018,
17   has any scientist at Johnson & Johnson
18   reached out to you to ask your opinion on
19   talcum powder products and ovarian
20   cancer?
21      A.   Since I have been retained
22   by the lawyer -- by Johnson & Johnson in
23   2018 for this case, I have not been
24   contacted by anyone in Johnson & Johnson.

Page 72

1       Q.   Okay. And that would be for
2    research, correct?
3       A.   I haven't been contacted by
4    anyone in Johnson & Johnson.
5       Q.   And that would be to help
6    them in any regulatory issue, correct?
7       A.   I have not been contacted by
8    anyone in Johnson & Johnson.
9       Q.   Okay. So it's the
10   company -- and I'm distinction the
11   company from the lawyers.
12          The company has not spent
13   any time and effort trying to understand
14   your opinions or the basis of it, just
15   the lawyers, true?
16          MS. MILLER: Objection.
17          THE WITNESS: Again, I'm not
18      sure how to answer that because I
19      was retained in terms of the
20      litigation. I don't know if
21      there's any rules that surround
22      that or whatever. I have no idea.
23   BY MR. TISI:
24      Q.   But the answer would be no,

Page 73

1    you've not been retained and spoken to
2    anybody at Johnson & Johnson in
3    connection with any scientific question
4    outside of the legal arena, correct?
5       A.   As I mentioned, I have not,
6    as far as I know, talked to anyone from
7    Johnson & Johnson.
8       Q.   In fact, Johnson & Johnson
9    makes hundreds of products for
10   pharmaceuticals, medical devices and
11   cosmetics. You know that to be true,
12   correct?
13          MS. MILLER: Objection.
14          THE WITNESS: I know they
15      make lots of products. I don't
16      know how many. I don't know what
17      the span is of the different
18      areas.
19   BY MR. TISI:
20      Q.   Has any Johnson & Johnson
21   scientist ever reached out to you to help
22   them understand any scientific question
23   for any reason?
24          MS. MILLER: Objection.

19 (Pages 70 to 73)

Karla Ballman, Ph.D.

Page 74

```
 1          THE WITNESS:  Again, I don't
 2     know how companies operate.  I
 3     don't know -- I mean I presume
 4     they have their own scientists.
 5     I'm not sure if they are reaching
 6     out.  I just --
 7 BY MR. TISI:
 8     Q.   I'm asking you what they did
 9 for you.  And I am not asking you to get
10 in their mind and figure out what their
11 policies are or anything like that.
12          Has Johnson & Johnson, any
13 Johnson & Johnson scientist ever reached
14 out to Dr. Karla Ballman to ask her help
15 in understanding any scientific question
16 for any reason?
17     A.   Again, I have not talked to
18 anyone in an official capacity from
19 Johnson & Johnson.
20     Q.   And you have a career
21 spanning how many decades now?
22     A.   Oh, easily about two to
23 three decades.
24     Q.   Okay.  And in that two or
```

Page 75

```
 1 three decades, no one from Johnson &
 2 Johnson ever reached out to you and asked
 3 you, "Hey, you know, we got this problem
 4 here.  Can you help us design a study or
 5 analyze data, perform a causation
 6 analysis," anything scientist related?
 7          MS. MILLER:  Objection.
 8          THE WITNESS:  So I am in
 9     academia.  So, you know, I don't
10     know why they would necessarily
11     reach out to me in particular.  No
12     other companies do either.
13 BY MR. TISI:
14     Q.   You've never done studies
15 for any company?
16     A.   I didn't say that.
17     Q.   Okay.  You've done studies
18 for companies, true?  You've done studies
19 that have been sponsored by companies,
20 correct?
21     A.   So now you'll have to
22 define --
23     Q.   Have you received funding
24 from companies to do studies?
```

Page 76

```
 1     A.   I believe -- myself, or just
 2 the institution I work for?
 3     Q.   Your team.  You and your --
 4 anybody that you may collaborate with?
 5     A.   There might have been one or
 6 two occasions.
 7     Q.   Okay.  But they've not been
 8 Johnson & Johnson?
 9     A.   That is correct.
10     Q.   Johnson & Johnson never
11 asked you to represent them on any issue
12 before the FDA related to talcum powder
13 products, have they?
14          MS. MILLER:  Objection.
15          THE WITNESS:  I have not
16     been before the FDA on behalf of
17     Johnson & Johnson.
18 BY MR. TISI:
19     Q.   For any reason including --
20     A.   For any reason.
21     Q.   Okay.  You know that IARC
22 looked at the question of ovarian cancer
23 and talcum powder products in 2006
24 correct?
```

Page 77

```
 1     A.   I read a report from IRAC
 2 (sic) who -- that looked at that
 3 question.
 4     Q.   And were you asked by
 5 anybody in the talc industry to help them
 6 understand that talc-ovarian-cancer
 7 connection in connection with the IARC
 8 proceedings in 2006?
 9     A.   I was not part of the IRAC
10 (sic) committee that looked at that
11 question.
12     Q.   You say IRAC.  Is it IRAC
13 or --
14     A.   I'm sorry.  IARC.  I know.
15 I did that -- I do that often.
16     Q.   That's okay.  I do it too.
17     A.   It's IARC.
18     Q.   Okay.  And what does IARC
19 stand for?
20     A.   International Agency -- I
21 don't remember the title.  I can get it.
22     Q.   Did J&J scientists --
23          MS. MILLER:  Wait.  She's
24     looking for the answer.
```

Karla Ballman, Ph.D.

Page 78

1      MR. TISI:  Actually, that's
2  fine.
3      MS. MILLER:  Are you
4  striking the question?
5      MR. TISI:  No, I just --
6  it's fine.
7      MS. MILLER:  If you're not
8  striking the question --
9      MR. TISI:  She didn't
10  know -- she didn't know the
11  answer.
12      MS. MILLER:  Well, she's
13  checking her report and she'd like
14  to finish answering.
15  BY MR. TISI:
16      Q.  Do you know without looking
17  in your report, Doctor?
18      A.  I am not very good at all
19  acronyms and stuff.
20      Q.  Okay.
21      A.  And as you see I don't even
22  pronounce them correctly because I get
23  the letters mixed up.  So I want to be
24  correct when I say what the title is

Page 79

1  of -- of that agency.
2      And it's right here
3  somewhere.  International Agency For
4  Research on Cancer.
5      Q.  Have you ever been asked by
6  can IARC to participate in any
7  deliberation about whether or not a
8  substance causes cancer?
9      A.  I have not been on any IARC
10  committee.
11      Q.  Has IARC a well respected
12  scientific organization?
13      MS. MILLER:  Objection.
14      THE WITNESS:  I believe IARC
15  gets experts in the areas that
16  they need to adjust -- to address
17  the questions that come before
18  them or that they deem of
19  interest.
20  BY MR. TISI:
21      Q.  Do you --
22      A.  That's all I know.
23      Q.  Do you consider them a well
24  respected scientific organization?  Are

Page 80

1  they someone that you come in contact
2  with through the literature and your
3  understanding of the -- of cancer and
4  cancer research?
5      MS. MILLER:  Objection.
6  That was two questions.
7      THE WITNESS:  Again, as I
8  said, I mean, IARC is an
9  established committee that people
10  know do research on cancer to
11  determine whether or not there is
12  carcinogenic risk to humans and
13  people refer to them, as I do
14  myself.
15  BY MR. TISI:
16      Q.  And are they -- when you say
17  refer to them, they rely on them,
18  correct?
19      MS. MILLER:  Objection.
20      THE WITNESS:  I'm not sure
21  what you mean rely on them.
22  BY MR. TISI:
23      Q.  You go --
24      A.  I mean, they go -- I go -- I

Page 81

1  look at them to see what -- what their
2  evidence is and what their conclusions
3  are.
4      Q.  Okay.  Are they considered
5  to be a respectable scientific
6  organization?
7      MS. MILLER:  Objection.
8      THE WITNESS:  They -- again,
9  they are an organization.  I mean,
10  it depends upon what you mean by
11  respectable.  I mean, as I said
12  they're well established.  I use
13  them as a reference.  Many other
14  people use them as references.
15  BY MR. TISI:
16      Q.  Okay.  Now, this IARC report
17  that you refer to in your report was
18  issued in 2010.  But you do understand
19  that IARC looked at evidence before 2006,
20  correct?  It was published in 2010, but
21  the conclusions were reached as of 2006.
22  Do you understand that to be true?
23      MS. MILLER:  Objection.
24      THE WITNESS:  I -- I believe

21 (Pages 78 to 81)

Karla Ballman, Ph.D.

Page 82

1    I'd have to look at the dates to
2    make sure. But I -- I do agree
3    that the actual monograph came out
4    after they had done analyses and
5    the data that they use for that
6    analyses.
7  BY MR. TISI:
8        Q.    Now, you do know that in
9  December 2018, two months before you
10  issued your litigation report for J&J's
11  lawyers, Health Canada looked at the
12  question as to whether or not, in your
13  words, the epidemiology studies and
14  scientific literature supported a causal
15  relationship between talcum powder
16  products and ovarian cancer.
17        Do you -- do you know that
18  to be true?
19        MS. MILLER: Objection.
20        THE WITNESS: So are you
21    asking me if I'm aware that Health
22    Canada has issued a -- could --
23    could you rephrase that?
24  BY MR. TISI:

Page 83

1        Q.    Yes. Yes. Do you know that
2  in December 2018 they issued a, call it a
3  draft report, about assessing the various
4  lines of evidence using the Bradford Hill
5  criteria on the question about whether or
6  not talcum powder products is capable of
7  causing ovarian cancer?
8        A.    I know that Health Canada
9  has issued -- did issue a draft report
10  late last year.
11        Q.    Okay. And you know that
12  they looked at the evidence through the
13  Bradford Hill criteria, correct?
14        MS. MILLER: Objection.
15        THE WITNESS: I -- can
16    you -- can I see the report,
17    please? I can't --
18  BY MR. TISI:
19        Q.    I will give it -- I will
20  give it to you. But you -- it was
21  provided to you. I saw it on your
22  supplemental reliance list that was
23  turned over to us last night.
24        Did you have that at the

Page 84

1  time that you wrote your report?
2        A.    I -- I actually looked it up
3  before -- as I was writing my report,
4  before it was finalized.
5        Q.    Okay. So you were familiar
6  with it, but didn't list it in your
7  report as something that you had
8  considered in connection with your
9  opinions?
10        A.    I did not reference it.
11  And -- and actually, I may have
12  misspoken. I -- it's been such a blur
13  these last two year -- months -- I
14  don't -- even years, it feels like years.
15        I -- I'm not sure exactly
16  when I looked at what, so -- but I do
17  believe I did see it before I finalized
18  my report, because I do reference the
19  Taher meta-analysis.
20        Q.    Right. Well, you know the
21  Taher meta-analysis was commissioned by
22  Health Canada and then used in the Health
23  Canada report, you know that they are two
24  separate reports?

Page 85

1        A.    They are two separate
2  reports.
3        Q.    Okay. Now, Health Canada,
4  just for the record, is the Canadian
5  equivalent to the U.S. FDA?
6        A.    That --
7        MS. MILLER: Objection.
8        THE WITNESS: That's what
9    I've been told. I -- I don't
10    know. I didn't know one way or
11    the other.
12  BY MR. TISI:
13        Q.    And other than for
14  litigation purposes, and I mean on both
15  sides, plaintiffs' experts and
16  defendants' experts, are you aware of any
17  more recent analysis of the causation
18  question through a Bradford Hill
19  framework than the one conducted by
20  Health Canada outside of litigation, are
21  you aware of anything else?
22        A.    That's a long question. Do
23  you want to do -- I mean, I don't know --
24        Q.    Let me -- let me --

22 (Pages 82 to 85)

Karla Ballman, Ph.D.

Page 86

1    A.   -- because you're putting
2  Bradford Hill in there and --
3    Q.   Let me rephrase the question
4  then.
5        Do you know of any authors,
6  published or unpublished, apart from
7  litigation, which has done a causation
8  analysis of the question of ovarian
9  cancer and talc more recently than Health
10  Canada in December of 2018?
11    A.   So the Health Canada report,
12  you mean, unpublished report, draft
13  report?
14    Q.   Correct.
15    A.   Has there been another
16  published study?
17    Q.   Has there been any other
18  published or unpublished analysis of the
19  question of about whether ovarian cancer
20  and talcum powder products are linked,
21  is -- is that the most recent, outside of
22  litigation, that you can think of?
23    A.   Oh, out --
24        MS. MILLER:  Objection.

Page 87

1        THE WITNESS:  Outside of
2        litigation?  I -- I don't know off
3        the top of my head.  I'd have to
4        go through and look at all the
5        reports.
6  BY MR. TISI:
7    Q.   Okay.  Okay.  I'm going to
8  have marked as Exhibit 4 a document which
9  is the draft screening assessment from
10  Health Canada.
11        Now, this is on the
12  supplemental reliance list that was
13  served on us last night, correct?
14    A.   I --
15        MS. MILLER:  I don't think
16        she knows when it was served.
17  BY MR. TISI:
18    Q.   Okay.  Well -- all right.
19  You've seen this, correct?
20    A.   I have seen this, correct.
21    Q.   Okay.
22        (Document marked for
23        identification as Exhibit
24        Ballman-4.)

Page 88

1  BY MR. TISI:
2    Q.   And in your -- in your
3  practice of -- in your professional
4  practice outside of litigation, is it
5  important for you to consider the
6  opinions and views of other scientists
7  who look at the same or similar questions
8  that you were asked to look at?
9    A.   That's a really broad
10  question.
11    Q.   Do you consider the views of
12  other scientists?
13        MS. MILLER:  Objection.
14        THE WITNESS:  When I do
15        research, I -- I look at
16        publications.  So I believe those
17        probably are views of -- of other
18        scientists.  I mean, to do
19        research, you -- you need to look
20        at the literature.
21  BY MR. TISI:
22    Q.   Do you speak -- do you speak
23  to colleagues and get their opinions?
24    A.   If we're doing research in

Page 89

1  the same area, I may speak to a colleague
2  with respect to a research question I'm
3  working on.
4    Q.   Do you go to meetings where
5  information is presented orally or on
6  posters?
7    A.   I go to many meetings, and
8  so often there are information presented
9  orally and on posters.
10    Q.   And on -- on the whole, the
11  views of other scientists is information
12  that you integrate into your knowledge
13  base when you look at scientific
14  questions, true?
15        MS. MILLER:  Objection.
16        THE WITNESS:  So it all
17        depends.  It depends upon the
18        quality of -- of the data.  I look
19        at the data.  I -- I -- you know,
20        determine whether or not the
21        conclusions that they reach is --
22        is justified by the data that they
23        have and their study design.  And
24        so, I -- I -- you know, just

23  (Pages 86 to 89)

Karla Ballman, Ph.D.

Page 90

1    because it's another scientist
2    doesn't necessarily mean...
3  BY MR. TISI:
4      Q.   Now --
5          MS. MILLER:  We've been
6  going about an hour.  Is this a
7  good time for a break or?
8          MR. TISI:  Actually let me
9  finish this -- this area here.
10 BY MR. TISI:
11     Q.   In -- the other report, I'm
12 going to talk about, you were involved in
13 the Viagra/Cialis litigation?
14     A.   Yes.
15     Q.   Okay.  And you issued a
16 report in that litigation as well?
17     A.   I did.
18     Q.   You had a section in that
19 report dealing with regulatory issues and
20 the regulatory views of various European
21 and -- and U.S. agencies.  Do you recall
22 that?
23     A.   Can I see it, please?
24     Q.   I don't have it with me,

Page 91

1  but -- but do you recall that, I'm asking
2  whether you recall --
3          MS. MILLER:  Objection.
4          THE WITNESS:  No, I -- I
5  don't recall any specifics.
6  BY MR. TISI:
7      Q.   Okay.
8          MS. MILLER:  Give me time to
9  object, please.
10         Objection.
11         THE WITNESS:  So, sorry.
12 BY MR. TISI:
13     Q.   Let me ask you this.  Go to
14 Page 16 --
15         MS. MILLER:  Of what?
16         MR. TISI:  Of Exhibit 4.
17 BY MR. TISI:
18     Q.   There's a Table 6.1.  Do you
19 see that?
20     A.   I do see the table.
21     Q.   And it's a study entitled
22 "Available human epidemiologic studies
23 investigating the association of perineal
24 talc use and ovarian cancer."

Page 92

1          Do you see that?
2          MS. MILLER:  Objection.
3  It's not a study.  It's a table.
4  BY MR. TISI:
5      Q.   Do you see that?
6      A.   I see a table that's titled
7  "Available Human Epidemiological Studies
8  Investigating the Association of Perineal
9  Talc and Ovarian Cancer."
10     Q.   And as you glance through
11 these, the studies that are listed here,
12 these are studies that are familiar to
13 you, correct?
14     A.   These look like they include
15 some of the case-control studies and
16 cohort studies that have been used in
17 other meta-analyses.
18     Q.   Okay.  They cover -- for
19 example, I see the Cramer study from 1982
20 that we marked?
21     A.   I see that.
22     Q.   Okay.  And they cover
23 case-control studies, population-based
24 and hospital-based studies.

Page 93

1          Do you see that?
2      A.   I see that study type is
3  listed.  I don't know which are hospital
4  based and which are population based.
5      Q.   And if -- if you look on
6  Page 18, it includes the cohort studies.
7  Do you see that?
8      A.   Yes.  I see page 18 lists
9  cohort studies.
10     Q.   And they considered the
11 meta-analyses that you also looked at.
12 If you look at Page 16 under human
13 studies.  It has the sentence, "Several
14 meta-analyses are available of the
15 epidemiologic data have been published,
16 some very recently.  (Huncharek, 2003;
17 Langseth, 2008; Terry, 2018; Berge, 2018,
18 Penninkilampi and Eslick, 2018; Taher,
19 2018)."
20         Do you see that those?
21     A.   I see that.  I didn't
22 realize that Taher has been published.
23     Q.   It's -- it's not been
24 published yet.

24  (Pages 90 to 93)

Karla Ballman, Ph.D.

Page 94

1    A.    But it says published.
2    Q.    Okay.  So let me ask you
3  this.  These are all studies that you're
4  familiar with, correct?  You've seen
5  those?
6    A.    I have seen those studies.
7    Q.    All right.  And so does it
8  appear from looking at the studies, they
9  considered pretty much -- they considered
10 the same studies that you considered?
11   A.    I -- I -- I mean, I'd have
12 to go through and look and compare
13 whether or not every single study here is
14 what every single study that I looked at.
15 But I do -- it appears that, you know, I
16 recognize the names of many of these
17 studies here.  I don't know if it's a
18 complete match.
19   Q.    Okay.  Now, can you turn to
20 Page 19 through 21.  On the very bottom
21 of the page on 19 it has a section called
22 "Strength"?
23   A.    Yes, I see that.
24   Q.    That's one of the Bradford

Page 95

1  Hill criteria, correct?
2    A.    Mm-hmm.
3    Q.    And if you look on the next
4  page?
5    A.    Wait.  I'm sorry.  I don't
6  know if this is actually referring to the
7  Bradford Hill criteria.  It just says
8  "Strength."
9    Q.    Well, if you look at the
10 sentence above, it says Hill criteria,
11 1965, the paragraph directly above?
12   A.    Okay.
13   Q.    Okay.  So if you look at the
14 next page, Page 20, it talks --
15     MS. MILLER:  You're positing
16   that strength means strength of
17   association?  Is that --
18     MR. TISI:  Yes, correct.
19 BY MR. TISI:
20   Q.    Okay.  Next -- next page it
21 has consistency.  That's also a Bradford
22 Hill criteria?
23   A.    I see where it says
24 consistency.

Page 96

1    Q.    Next page -- next paragraph
2  says "Specificity."  That's also a
3  Bradford Hill aspect?
4    A.    I see where it says
5  "specificity."
6    Q.    "Temporality" is also a
7  Bradford Hill aspect?
8    A.    I see where it says --
9    Q.    Biologic gradient is also a
10 Bradford Hill aspect?
11   A.    I see that.
12   Q.    Biologic plausibility?
13   A.    I see that section.
14   Q.    Coherence, they have that,
15 correct?
16   A.    I see that section.
17   Q.    Okay.  And all of those are
18 the same -- that's the same framework
19 that you used in your report, correct?
20 You considered all those factors?
21   A.    I applied the Bradford Hill
22 criteria when I looked at the totality of
23 the data.
24   Q.    And those are the -- you

Page 97

1  applied those same factors from Bradford
2  Hill that I just described, you looked
3  at -- looked at -- you looked at
4  strength, consistency, specificity,
5  temporality, biologic gradient, biologic
6  plausibility, and coherence.  You looked
7  at all of those things, correct?
8    A.    When I evaluate the totality
9  of the data, I did look at all the
10 criteria of the Bradford Hill --
11   Q.    Okay.  Now --
12   A.    -- framework.
13   Q.    If you go to Page 19 of 21
14 of the report?
15     MS. MILLER:  Of her report
16   or of the draft analysis?
17     MR. TISI:  Of the draft --
18     MS. MILLER:  Draft screening
19   assessment?
20     MR. TISI:  Of Exhibit Number
21   4.
22 BY MR. TISI:
23   Q.    On Page 28 at the very
24 top --

25 (Pages 94 to 97)

Karla Ballman, Ph.D.

| Page 98 |
| --- |

1    A.   So we're not on 21?
2         MS. MILLER: You said 19 to
3    21.
4         MR. TISI: I'm actually
5    moving through. 28 at the very
6    top.
7    BY MR. TISI:
8    Q.   You would agree with me that
9    after discussing the Bradford Hill
10   criteria or Bradford Hill analysis that
11   we just talked about before, they say the
12   following: "The meta-analyses of the
13   available human studies in the
14   peer-reviewed literature indicate a
15   consistent and statistically significant
16   positive association between perineal
17   exposure to talc and ovarian cancer.
18   Further available data are indicative of
19   a causal effect."
20        Do you see that?
21        MS. MILLER: Objection. You
22   said after the Bradford Hill?
23   I'm confused.
24        THE WITNESS: It's on 28.

| Page 99 |
| --- |

1         MR. TISI: You don't need to
2    be.
3         Yes.
4    BY MR. TISI:
5    Q.   So after having looked at
6    the Bradford Hill criteria, or Bradford
7    Hill aspects, they say the following:
8    "The meta-analyses of available human
9    studies in the peer-reviewed literature
10   indicate a consistent and statistically
11   significant positive association between
12   perineal exposure to talc and ovarian
13   cancer. Further available data are
14   indicative of a casal effect."
15        Do you see that?
16        MS. MILLER: Objection.
17   That's a dishonest question.
18   BY MR. TISI:
19   Q.   You can --
20   A.   That's what's written on the
21   page there. They do say that.
22   Q.   Okay. And they say it
23   again. Actually, if you go back. Since
24   counsel was saying that I was being

| Page 100 |
| --- |

1    dishonest, let's go back. They say it
2    again, exactly after -- on Page 21, after
3    the discussion of coherence. They say
4    the most -- do you see where it says,
5    "The most recent meta-analyses detailed
6    above (Taher, 2018) and consistent with
7    the Hill criteria, suggest a small but
8    consistent statistically significant
9    positive association between ovarian
10   cancer and perineal exposure to talc.
11   Further available data are indicative of
12   a causal effect."
13        Do you see that?
14   A.   I see the words on that
15   page. But I'd like to point out that --
16   Q.   No. There's no question
17   pending.
18        MS. MILLER: Excuse me. I
19   think she should be allowed to
20   finish her statement.
21        MR. TISI: I'd like to point
22   out. No. I asked her if those
23   were the words -- did I read that
24   correctly. There's nothing more

| Page 101 |
| --- |

1    to say, Counsel.
2         MS. MILLER: I think we're
3    ready for a break. I asked for a
4    break five minutes ago.
5         MR. TISI: I am just -- I'm
6    just going to mark an exhibit, and
7    then we'll move on.
8         I'm going to attach the --
9         MS. MILLER: Why don't we
10   just mark it after the break?
11        MR. TISI: No, I'm going to
12   mark it right now.
13        THE WITNESS: I would really
14   like a break soon.
15        MR. TISI: We're going to
16   take it as soon as I mark it.
17        I'm going to mark the Health
18   Canada conclusion that I read into
19   the record on Page 28, and I'm
20   going to mark that as Exhibit 5.
21        MS. MILLER: I'm going to
22   object to that.
23        THE WITNESS: The Health
24   Canada draft conclusion.

26 (Pages 98 to 101)

Karla Ballman, Ph.D.

Page 102

1    BY MR. TISI:
2        Q.   Yes.
3        A.   And I don't see draft there.
4        Q.   Okay.  We can -- it says --
5            MS. MILLER:  Also, where
6    does it say "conclusion" in the
7    document?
8    BY MR. TISI:
9        Q.   -- it actually says -- it
10   says draft screening assessment.
11           MS. MILLER:  Actually,
12   conclusion would be this
13   (indicating).  The conclusion is
14   what's on Page 29.  So I object --
15           MR. TISI:  That's not -- you
16   could -- you could say what you --
17           MS. MILLER:  I object to
18   this --
19           MR. TISI:  You can object.
20   Object.
21           MS. MILLER:  Okay.  Let me
22   finish.
23           MR. TISI:  Object.  Fine.
24           MS. MILLER:  You are not

Page 103

1    letting me finish my sentence,
2    sir.
3            MR. TISI:  I don't need --
4    object is fine.
5            MS. MILLER:  No, it's not
6    fine.
7            I object to this exhibit,
8    because the Health Canada
9    conclusion is actually on Page 29
10   where it says conclusion --
11           MR. TISI:  That's the
12   regulatory -- that's the
13   regulatory conclusion.
14           MS. MILLER:  This is not a
15   conclusion.
16           MR. TISI:  Okay.
17           MS. MILLER:  So that's a
18   false statement there.  Health
19   Canada conclusion.
20           MR. TISI:  That's fine.  You
21   can --
22           MS. MILLER:  Okay.  I think
23   we're ready for a break?
24           MR. TISI:  That's an

Page 104

1    exhibit.  Here you go.
2            (Document marked for
3    identification as Exhibit
4    Ballman-5.)
5            THE VIDEOGRAPHER:  Off the
6    record?  Remove your microphone
7    please.  The time is 10:10 a.m.
8            (Short break.)
9            THE VIDEOGRAPHER:  We are
10   back on the record.  The time is
11   10:25 a.m.
12   BY MR. TISI:
13       Q.   Doctor, going back to
14   Exhibit Number 5, the Health Canada
15   statement.  We'll call it a statement.
16           The -- they use the word
17   consistent.
18           Do you see that?
19       A.   So when I read this
20   statement -- and it's also referring to
21   meta-analyses.  And so it appears that
22   it's not just one meta-analysis.  So --
23   so they are saying that the meta-analyses
24   are consistent.

Page 105

1        Q.   Okay.  And the meta-analyses
2    are made up of all of the -- of all of
3    the observational studies, correct?
4        A.   But the meta-analyses are
5    all analyzing essentially the same data.
6    They are reworking the same data.  So it
7    would be strange if they would come up
8    with quite different results.
9        Q.   So -- and they are all
10   consistent, correct?
11       A.   But as I said, they are --
12   they are analyzing exact same data in
13   essentially the same way.  And so it
14   would be very strange if they didn't come
15   up with similar numbers.
16       Q.   But you -- you think there
17   is no consistency, correct, your opinion
18   is there is no consistency in the
19   observational studies, correct, or is
20   there consistency?
21           MS. MILLER:  Objection.
22           THE WITNESS:  When I applied
23   the Bradford Hill, I state that I
24   feel that the consistency criteria

27 (Pages 102 to 105)

Karla Ballman, Ph.D.

Page 106

1    was not met.
2  BY MR. TISI:
3      Q.   Okay.  And they say that
4  there was consistency shown when they
5  looked at the meta-analyses, correct?
6      A.   Well, they are saying
7  meta-analyses are consistent.  But as I
8  said, they keep -- meta-analyses, these
9  meta-analyses are essentially all
10 analyzing the same data.  So reworking
11 the same data is like doing a
12 replication.  So one would expect that
13 the numbers are similar.
14     Q.   Well, the meta-analyses,
15 depending upon their time frame, did not
16 all use the same studies, did they?
17     A.   They -- the earlier ones
18 used a subset of the studies used in the
19 later ones, because there were additional
20 studies done since when the earlier ones
21 were done.
22     Q.   So they -- so they were not
23 all the same, correct?
24     A.   Essentially though, I mean

Page 107

1  in -- in statistics and in epidemiology,
2  you know, reworking data that are not
3  completely independent of each other, we
4  would expect similar results and
5  correlation.
6      Q.   And they say, "Further
7  available data are indicative of a causal
8  effect."
9          Do you see that?
10     A.   I -- I see what's stated
11 there.  I -- I have no idea what that is
12 based upon.  That -- I do see that
13 statement.
14     Q.   And you disagree with that,
15 correct?
16     A.   I -- I don't know if I agree
17 or disagree with it.
18     Q.   So --
19     A.   I mean I -- I -- that's what
20 they wrote.  I do agree with that.
21     Q.   Okay.  Do you agree that the
22 available data is indicative of a causal
23 effect or you disagree with the
24 Canadian -- the Canadian assessment here?

Page 108

1          MS. MILLER:  Objection.
2          THE WITNESS:  So I'm not
3  sure what available data they are
4  referring to, and being indicative
5  of a causal effect, this is -- is
6  taken out of context.  I would
7  have to go back and -- and read
8  through the entire document.  I
9  mean, I don't know what basis.  I
10 don't know what data that that's
11 like being based upon.
12 BY MR. TISI:
13     Q.   Well, we went through that,
14 Doctor.  We went through and that's why I
15 took the time and showed you all the
16 studies that they looked at.  And I -- I
17 showed you the Bradford Hill aspects that
18 they analyzed and they went through all
19 of that.
20          And based upon what they
21 looked at, okay, they concluded that the
22 totality of the evidence was indicative
23 of a causal effect, correct?
24          MS. MILLER:  Objection.

Page 109

1          THE WITNESS:  I think you
2  just -- that's a slightly
3  different question.
4  BY MR. TISI:
5      Q.   Okay.
6      A.   But we didn't look at all
7  the studies that they looked at in terms
8  of, we just went through and -- and I
9  quickly glanced and saw that they had a
10 category that said strength, they had a
11 category that said -- I didn't look
12 through carefully to see what exact
13 studies they looked at.
14     Q.   Did you -- didn't you do
15 that when you were preparing for your
16 deposition today, didn't -- weren't you
17 interested to see how they reached this
18 conclusion which was different than
19 yours?
20     A.   I -- you know, I glanced and
21 I read through the document as you noted.
22 I did not cite it in my report.
23     Q.   Mm-hmm.
24     A.   I -- it's just a draft.  So

28 (Pages 106 to 109)

Karla Ballman, Ph.D.

Page 110

1   it could change.  And I didn't want --
2   all my report is essentially based upon
3   published literature.  I didn't want to
4   incorporate a draft of something that
5   might change, and we don't know which way
6   they may change due to all the comments
7   they get.  The -- I believe it's out for
8   comment right now, so...
9        Q.   Well, that was -- that's
10  going to be my question too.
11            First of all, Health Canada
12  is not involved in this litigation to
13  your knowledge, is it?
14       A.   I have no idea one way or
15  the other.
16       Q.   But you are, you are a paid
17  witness, correct?
18       A.   I'm --
19            MS. MILLER:  Objection.
20  BY MR. TISI:
21       Q.   You're a paid -- you've been
22  paid for your -- the work you did on your
23  report, correct?
24       A.   I am an expert witness for

Page 111

1   Johnson & Johnson.  I really haven't been
2   paid yet.  I'm still waiting for --
3   sorry.
4        Q.   Okay.  You are going to --
5   well, I am sure -- I am sure Susan is
6   good for her -- good for her word on
7   that.  I'm sure she will pay you
8   imminently.
9        A.   Yes.
10       Q.   But -- but you have been
11  paid anywhere between, up and through, I
12  saw your bill, up and through -- it's
13  $56,000.  But I assume you've billed
14  since then.
15            How much have you --
16            MS. MILLER:  Objection.  She
17       just said she hasn't been paid,
18       and you just said you have been
19       paid.
20            MR. TISI:  Fine.  I'm not --
21       I'm not quibbling with you.
22            MS. MILLER:  Well, I mean,
23       but just --
24            MR. TISI:  You know -- you

Page 112

1   know what I mean.
2            THE WITNESS:  I billed for
3   $56,000.
4   BY MR. TISI:
5        Q.   And -- and that will --
6        A.   And I anticipate I will be
7   paid.
8        Q.   Right.  And -- and you have
9   incurred additional time from the time of
10  your last billing until today, correct?
11       A.   Yes, I have.
12       Q.   Okay.  About how much time?
13       A.   Probably on the order, 20,
14  30 hours.
15       Q.   Okay.  And so would it be
16  fair to say that as of today, you will
17  ultimately bill anywhere between 75 and
18  $100,000?
19       A.   If the math works out.
20       Q.   Okay.  And so you are a paid
21  expert in this case, true?
22            MS. MILLER:  Objection.
23            THE WITNESS:  I am being
24       paid for my expert opinion.

Page 113

1   BY MR. TISI:
2        Q.   Okay.  Now, would you agree
3   with me -- let me put it this way.  You
4   would not write this -- you do not agree
5   based upon your analysis of the evidence,
6   with the statement in Exhibit Number 5
7   from Health Canada.  You would disagree
8   with that, true?
9            MS. MILLER:  Objection.
10       Asked and answered twice.
11            MR. LOCKE:  And I just want
12       to assert an objection.  I don't
13       believe -- I believe there are
14       words italicized here that are not
15       italicized in the original.
16            MR. TISI:  And that's fine.
17       You're exactly right, Tom.
18  BY MR. TISI:
19       Q.   So I will make a
20  representation I -- that I italicized
21  those because I was going to ask you
22  questions about those.  But the record
23  will reflect that those are not
24  italicized in the original.

29 (Pages 110 to 113)

Karla Ballman, Ph.D.

Page 114

1    That being the case, you
2  would not write the statement that Health
3  Canada did because you do not believe
4  that the data as a whole that you looked
5  at was indicative of a causal effect?
6    MS. MILLER:  Objection.
7    THE WITNESS:  Again, you
8    know, this is taken out of their
9    report at some section, and as we
10   discussed I believe it's not even
11   in their conclusions.  And I -- I
12   don't know -- I mean, I wrote in
13   my expert report what I wrote.  So
14   I don't have a statement in my
15   expert report that says this.
16 BY MR. TISI:
17   Q.   And you would disagree with
18 that -- those statements, correct?
19   A.   I just --
20     MS. MILLER:  Objection.
21     THE WITNESS:  I just looked
22     at the data as a whole and did my
23     analyses and came up with the
24     conclusion that I came up with.

Page 115

1    Again, this is a draft.  I
2  mean, I -- yeah.
3  BY MR. TISI:
4    Q.   So your conclusion --
5    A.   I don't agree or disagree.
6  I'm just saying that --
7    Q.   So you don't disagree with
8  this?
9    A.   I said I don't agree or
10 disagree.  And I'm saying that when I
11 look at the science and I did my
12 analyses, I have put forward my
13 conclusion.
14     I obviously -- you know,
15 even if I believed what they did, I would
16 probably not have the exact same words.
17 That would be plagiarism.
18   Q.   But you would just -- okay.
19 Let me ask you this statement.  Let me
20 ask you the question directly.
21     Do you believe that the data
22 are indicative of a causal effect,
23 irrespective of this statement?  Do you
24 believe that the data as a whole that you

Page 116

1  looked at are indicative of a causal
2  effect?
3    A.   So it is my professional
4  opinion that there's no evidence of a
5  causal relationship between perineal or
6  genital talcum powder exposure and
7  ovarian cancer.
8    Q.   So you do not think there's
9  a causal effect?
10   A.   That is my opinion.
11   Q.   Okay.  So -- and Health
12 Canada, at least as of today, has a
13 contrary view, true, subject to your view
14 that they may change?  But as of today,
15 they have a different view based upon
16 their analysis of the Bradford Hill
17 criteria, true?
18     MR. LOCKE:  Objection.
19     MS. MILLER:  Objection.
20     THE WITNESS:  Yeah, I --
21     I -- I would have to again read
22     through this carefully.
23 BY MR. TISI:
24   Q.   Okay.

Page 117

1    A.   I would agree that they did
2  not write a sentence exactly the way I
3  wrote a sentence there.
4    You know, again, I'd have to
5  read through this carefully to make sure
6  that this -- this -- this excerpt here
7  reflects the entirety of their analyses
8  and their opinions.
9    Q.   Well, it's not unusual,
10 Doctor, for experts in epidemiology to
11 disagree on issues of causation when they
12 do their analysis, true?
13   A.   It depends.
14   Q.   Okay.  Well, in many -- you
15 know, there are experts -- in fact, you
16 mention it in your report that some
17 experts believe that ovarian cancer --
18 some people believe that ovarian cancer
19 can be caused by talcum powder; other
20 people don't.  That's not unusual; is
21 that true?
22   A.   So when I did my analyses
23 and looked at the data, I don't think
24 there's any scientific basis for any

Karla Ballman, Ph.D.

Page 118

1    other opinion that there is no evidence,
2    credible evidence, of a causal
3    relationship between --
4         Q.    That is not my question.
5    You know, honestly, at some point I
6    really am going to have to call the
7    judge.
8         My question to you is, it is
9    not unusual for experts in epidemiology
10   to look at the same data and come to
11   different conclusions, true?
12        MS. MILLER:  Please let her
13   finish her answer without --
14        MR. TISI:  Well, I'm not --
15   I'm not going to sit --
16        MS. MILLER:  She was in the
17   middle of a sentence.
18        MR. TISI:  I'm not -- I am
19   not going to sit here and listen
20   to her filibuster.  I'm not going
21   to do it.
22        MS. MILLER:  She's not
23   filibustering.  She's answering
24   the question.  You're trying to

Page 119

1    put words in her mouth.
2         MR. TISI:  I am not -- I'm
3    allowed --
4         MS. MILLER:  You're trying
5    to put words -- can you let me
6    finish my sentence?
7         MR. TISI:  No, actually
8    yours --
9         MS. MILLER:  You're not
10   going to let me finish my
11   sentence?
12        MR. TISI:  You're limited to
13   "objection."  That's what you're
14   limited to in this deposition.
15        MS. MILLER:  I think that if
16   you're not allowing --
17        MS. SHARKO:  I don't think
18   that's true.
19        MS. MILLER:  -- the witness
20   to finish her sentences.  I am
21   allowed to speak.  And if you want
22   to call the judge, I am happy to.
23        MR. TISI:  If your -- if
24   your witness is going to sit here

Page 120

1    and filibuster --
2         MS. MILLER:  She's not
3    filibustering.  You're trying to
4    put words in her mouth.  She is
5    trying to answer as an
6    epidemiologist from her scientific
7    experience, and you're trying to
8    put words in her mouth for sound
9    bytes you want.  And you're
10   frustrated because she's trying to
11   give you honest, complete answers
12   as an epidemiologist.
13        MR. TISI:  Oh, that's so
14   good of you.  I'm so -- I'm so
15   glad that you said that.
16   BY MR. TISI:
17        Q.    So, Doctor, in epidemiology,
18   cancer, cancer with cigarettes, for a
19   long time there was a debate in the
20   scientific community about whether
21   cigarettes cause cancer, true?
22        A.    I haven't looked at that
23   literature in depth.  I mean, possibly.
24   I mean, I'd have to --

Page 121

1         Q.    Okay.  It's not unusual in
2    the field of epidemiology for experts in
3    epidemiology to look at data and reach
4    different conclusions in their
5    professional judgment, true?
6         MS. MILLER:  Objection.
7         THE WITNESS:  So again, I --
8    all I can say is I looked at the
9    data in its totality.  I did the
10   analyses and wrote the report with
11   all sort of my methodology and how
12   I arrived at the opinions.  And I
13   do not believe there's scientific
14   credible evidence that there is a
15   causal relationship between
16   talcum -- perineal talcum powder
17   exposure and ovarian cancer.  To
18   me, that's the --
19   BY MR. TISI:
20        Q.    So, all right.
21        That wasn't my question.
22   And my question was a general question.
23        Having -- I'm going to take
24   talcum powder products out of -- out of

Karla Ballman, Ph.D.

Page 122

1  the equation now.  So you don't have to
2  answer me the question about what you did
3  in talc.  Okay.
4          Is it not a true statement
5  that in general, epidemiologists when
6  looking at a causation question, can look
7  at the same data and reach different
8  conclusions?  Does that not happen?
9          MS. MILLER:  Objection.
10         THE WITNESS:  I think it has
11         to depend upon what the question
12         is of interest and what level of
13         data are available.  I mean, I
14         cannot answer that question
15         without knowing more specifics.
16 BY MR. TISI:
17     Q.   Have you responded -- you
18 said there's a comment period.  The
19 comment period was from December 6th
20 through February 6th.
21         Did you respond to
22 comment -- do you feel -- I gather you
23 feel strongly about your opinions,
24 correct?

Page 123

1      A.   I don't know if I feel
2  strongly or not.  I would say that I -- I
3  believe my opinions are based upon the
4  science.
5      Q.   Well, you would agree with
6  me that ovarian cancer is a serious
7  disease?
8      A.   It kills women.  It's a
9  serious disease.
10     Q.   Okay.  And you would agree
11 with me that the mortality involved in
12 ovarian cancer is very, very high?
13     A.   I -- I know that there are
14 different subtypes of ovarian cancer and
15 I -- the high grade serous has -- has --
16 is not a very good prognosis.  I agree a
17 lot of people die from it.
18     Q.   And would you agree that
19 whether or not, irrespective of your view
20 of the evidence, whether or not talcum
21 powder products can cause ovarian cancer,
22 would be an important public health
23 issue?
24     A.   What -- could you ask that

Page 124

1  again?
2      Q.   Would you agree with me that
3  whether or not talcum powder products
4  cause ovarian cancer, the question you're
5  here to answer for us today, is an
6  important public health issue?
7      A.   I believe what's an
8  important public health issue is -- is
9  trying to reduce the mortality from
10 ovarian cancer.
11     Q.   Okay.  And the question --
12 you understand that there's been a debate
13 in the medical and scientific community
14 for decades on the question of whether or
15 not talcum powder products cause ovarian
16 cancer, correct?
17         MS. MILLER:  Objection.
18 BY MR. TISI:
19     Q.   IARC addressed it.  FDA
20 addressed it.  Health Canada addressed
21 it.  It's been in the published
22 literature.  You would agree with me on
23 that, right?
24         MS. MILLER:  Are you asking

Page 125

1      the last question that I objected
2      to or have you changed your
3      question?
4  BY MR. TISI:
5      Q.   I'm asking you the question
6  I asked.  You --
7          MS. MILLER:  Which?
8  BY MR. TISI:
9      Q.   You understand that various
10 agencies have looked at this question,
11 that there has been a debate in the
12 medical and scientific community as to
13 the meaning of the science on ovarian
14 cancer and talc, true or not true?
15         MS. MILLER:  Objection.
16         THE WITNESS:  There is
17         different parts in there.  What
18         I -- I would say is IARC looked at
19         the question.  I'm not sure how
20         deeply the FDA has looked at it.
21         And I know that there's a draft
22         Health Canada document at this
23         point.  So those agencies have
24         done something with respect to

32 (Pages 122 to 125)

Karla Ballman, Ph.D.

Page 126

1    this.
2  BY MR. TISI:
3      Q.   And you agree that the --
4  the questions that they are wrestling
5  with is an important one?
6          MS. MILLER:  Objection.
7          THE WITNESS:  Important in
8      what sense?
9  BY MR. TISI:
10     Q.   Important public health
11 question.  They are addressing an
12 important public health question.
13     A.   If -- if there were evidence
14 that there was a causal relationship
15 between perineal and genital talcum
16 exposure and ovarian cancer, if there was
17 evidence that that is the case, then it
18 would translate into a public -- probably
19 a considerable public health.
20     Q.   Okay.  And you feel strongly
21 about your opinion that there is no such
22 evidence, true?
23     A.   Again, my -- I don't -- I
24 don't know how to use that word strongly.

Page 127

1          I believe that my evidence
2  is -- my statement is based upon my
3  scientific analyses of the data in
4  total --
5      Q.   Have you shared --
6      A.   -- and is supported.
7      Q.   I apologize.
8          Were you -- did you share
9  that -- your opinions with Health Canada?
10     A.   I did not.
11     Q.   Okay.  Did you -- have you
12 tried to contact the FDA?
13     A.   I have not done that.
14     Q.   Have you contacted the
15 National Cancer Institute to tell them
16 there's no problem?
17         MS. MILLER:  Objection.
18         THE WITNESS:  I -- I
19     wouldn't know who to contact.  I
20     don't even know if there's such a
21     mechanism to do so.
22 BY MR. TISI:
23     Q.   Okay.  Well, you know last
24 week the United States House of

Page 128

1  Representatives held hearings on talc and
2  causation.  Do you know that?
3      A.   I did not know that.
4      Q.   Do you know that one of the
5  epidemiologists, Dr. McTiernan, you know
6  her?
7      A.   I know the name.
8      Q.   Okay.  You know she appeared
9  at that hearing.  Do you know anything
10 about that?
11     A.   Again, I -- I wasn't aware
12 of the hearing so I do not know.  I -- so
13 I wouldn't know that she appeared.
14     Q.   Did J&J ask you, say, you
15 know, Dr. Ballman, you're an expert in
16 the field of analyzing causation from an
17 epidemiology standpoint, would you
18 represent us before the House of
19 Representatives on this important
20 question?
21         MS. MILLER:  Objection.
22         THE WITNESS:  I was not
23     contacted by J&J to appear in a
24     congressional.

Page 129

1  BY MR. TISI:
2      Q.   Have you presented your
3  opinions on the subject to your medical
4  and scientific colleagues at Weill
5  Cornell?
6          MS. MILLER:  Objection.
7          THE WITNESS:  I have not
8      discussed this with my colleagues
9      at Weill Cornell.
10 BY MR. TISI:
11     Q.   I mean, there are -- you
12 have an oncology division, and a
13 gynecology division at Weill Cornell I
14 assume?
15     A.   I'm not sure what their
16 terms are.  But there is a group that
17 works on gynecology -- gynecology
18 issues -- gynecology, and there is a
19 hem/onc.  And I don't know if they are
20 divisions or departments, that sort of
21 thing.
22     Q.   Have you reached out to them
23 and said to -- to any of them, gee, you
24 know, I have done this causation

Karla Ballman, Ph.D.

1    analysis, and, you know, you really could
2    tell women they can use talcum powder
3    products everyday for the next 40 years
4    and it be not be a problem in terms of
5    increasing their risk for ovarian cancer.
6          MS. MILLER: Objection.
7    BY MR. TISI:
8        Q.   Have you done that?
9          MS. MILLER: Objection.
10         THE WITNESS: I -- I have
11    not contacted any -- I have not
12    discussed this with -- with any
13    one of my colleagues.
14    BY MR. TISI:
15       Q.   If -- if one of your
16    colleagues at Weill Cornell, your
17    oncology colleagues, came up to you and
18    said look, I heard you were involved in
19    the -- looking at talcum powder products
20    and ovarian cancer for the -- in the
21    litigation involving Johnson & Johnson,
22    you've done your analysis, do you think
23    it's okay if I tell my patients that they
24    can dust everyday for the next 30 years

1    and it won't increase the risk?
2          MS. MILLER: Objection.
3          THE WITNESS: I -- I would
4    say it's my professional opinion
5    that there's no evidence of a
6    causal relationship between
7    perineum-talcum powder exposure
8    and ovarian cancer.
9          I'm not a gynecologist. So
10    I would not presume to tell a
11    gynecologist what they should tell
12    their patients with -- with
13    respect to anything.
14    BY MR. TISI:
15       Q.   Now, you do understand that
16    in this case there is an allegation that,
17    among other things, that talcum powder
18    products used by -- manufactured and sold
19    by J&J contained asbestos. Have you seen
20    that?
21         MS. MILLER: Objection.
22         THE WITNESS: I think I saw
23    somewhere in the media, it might
24    have been a tweet or something,

1    that -- that that -- that that
2    issue has been raised, that --
3    that -- I don't know who is saying
4    that there may be asbestos in
5    talcum powder.
6    BY MR. TISI:
7        Q.   So you have not reviewed
8    evidence in this case that asbestos may
9    or may not be in the talcum powder
10    products that Johnson & Johnson sold?
11         MS. MILLER: Objection.
12         THE WITNESS: So I believe
13    my opinion -- my -- not believe.
14         But my opinion is based upon
15    talcum powder, whatever it's
16    composed of. So I don't know
17    what's in it. But talcum powder,
18    whatever it's composed of, I don't
19    find any evidence -- or credible
20    evidence that there's a causal
21    relationship.
22    BY MR. TISI:
23       Q.   Well, if there was asbestos
24    in talcum powder products, would you, if

1    that same oncologist at Weill Cornell
2    came up to you and said Dr. --
3    Dr. Ballman, I know that you are involved
4    in litigation. You've looked at the
5    causation question. If there is asbestos
6    in the talcum powder that my patients
7    use, is that okay for her to dust every
8    day? What would you tell them?
9          MS. MILLER: Objection.
10         THE WITNESS: I would say
11    the same thing I answered to the
12    talcum powder question, because I
13    analyze whether or not there's
14    evidence of a causal relationship
15    between talcum powder -- whatever
16    is in it -- I have no idea what's
17    in it -- causes ovarian cancer.
18         And so I would say that
19    that's my opinion. And again I
20    would not presume to tell a
21    gynecologist what they should tell
22    their patients one way or another,
23    because I am not an M.D.
24    BY MR. TISI:

34 (Pages 130 to 133)

Karla Ballman, Ph.D.

Page 134

1    Q.   Well, one of the -- one of
2  the aspects of Bradford Hill -- and we're
3  going to talk about this -- is the issue
4  of biologic plausibility, correct?
5    A.   That is one of the criteria
6  within the Bradford Hill framework.
7    Q.   If -- I'm going to ask you
8  to assume for the purposes of my question
9  that talcum powder products -- you would
10  agree with me that asbestos is a
11  carcinogen, correct?
12    MS. MILLER:  Objection.
13    THE WITNESS:  I have not
14    looked into the talcum powder data
15    and literature.  So I only know
16    that there seems to be a strong
17    association that increases the
18    risk of mesothelioma, so a risk
19    factor for sure, between asbestos
20    exposure and mesothelioma.
21  BY MR. TISI:
22    Q.   And looking at the issue of
23  whether or not there's a biologically
24  plausible explanation for the

Page 135

1  increased -- an association, would the
2  presence of a carcinogen be important to
3  look at?
4    A.   So looking at biological
5  plausibility, what would be important is
6  that in the biological experiments that
7  are done, that they use talcum powder,
8  the same type of talcum powder that women
9  use, to see if that talcum powder leads
10  to transformation in animals, let's say,
11  to ovarian cancer.
12    Q.   But if one of the components
13  was a known carcinogen, wouldn't that be
14  a plausible explanation for the
15  association seen in the meta-analyses?
16    MS. MILLER:  Objection.
17    THE WITNESS:  Again, I mean,
18    the question isn't asbestos.  The
19    question is whether talcum powder,
20    however it's composed --
21  BY MR. TISI:
22    Q.   And if it's composed
23  partially of asbestos, if it's composed
24  partially of asbestos -- let me -- let

Page 136

1  me -- let me ask you this way.  Let me
2  give you a hypothetical.  Let me withdraw
3  the question.
4    Okay.  If we had a bottle,
5  and the bottle was full of asbestos and
6  nothing else.  Would you tell -- would
7  you tell a woman that she could use it to
8  dust her perineal -- her perineum?
9    MS. MILLER:  Objection.  I
10    think she said --
11    MR. TISI:  I don't -- I
12    don't care what you think she
13    said.  Objection.
14    MS. MILLER:  You've asked
15    this question 100 times.
16    MR. TISI:  I'm asking -- I'm
17    asking --
18    MS. MILLER:  She said she
19    doesn't give advice.
20    MR. TISI:  She's not.  I'm
21    asking -- I'm asking you a
22    hypothetical.
23  BY MR. TISI:
24    Q.   If -- if I had a bottle of

Page 137

1  pure asbestos, would that be a
2  biologically -- let me -- let me give you
3  a different hypothetical.
4    MS. MILLER:  Are you
5    striking the question?
6    MR. TISI:  Yes, I am,
7    Counsel.
8  BY MR. TISI:
9    Q.   If I had five epidemiology
10  studies all showed an increased risk of
11  ovarian cancer and asbestos, and I had a
12  bottle of asbestos, would you say that
13  that would be okay to dust on the
14  perineum?
15    MS. MILLER:  Objection.
16    THE WITNESS:  So that's
17    difficult.  First of all, I would
18    want to know what the five
19    epidemiology studies are, if there
20    are, you know, observational
21    studies.  I mean, I don't know.
22    I would need to know the
23    dose.  The dose makes the poison.
24    I don't know.  I did not do any

35 (Pages 134 to 137)

Karla Ballman, Ph.D.

Page 138

1    study on asbestos, so I wouldn't
2    render an opinion to a woman what
3    she should or should not use in
4    general either.
5    BY MR. TISI:
6        Q.   Would you tell a family --
7    would you tell a family member it's okay
8    to dust with asbestos?
9            MS. MILLER:  Please stop
10           interrupting her answers, please.
11   BY MR. TISI:
12       Q.   Would you tell a family
13   member that it's okay to dust with
14   asbestos?
15       A.   Yeah, again, this is a
16   hypothetical.
17       Q.   Absolutely.
18       A.   I mean, you know, I -- I
19   wouldn't say -- I -- I wouldn't say one
20   way or the other.  I would have to look
21   at the literature and see sort of whether
22   or not that that would be -- I don't know
23   asbestos.  And so that's why I'm having a
24   hard time answering this question.

Page 140

1    I can't imagine why anyone would dust
2    with asbestos.  So my question -- my
3    second question would be, if the bottle
4    was half asbestos and half talc, would
5    you say that that would be okay?
6            MS. MILLER:  Objection.
7            THE WITNESS:  So my -- what
8    I was going to try to finish in
9    the last one is, it would be like
10           if it were something -- if it were
11           full of cinnamon and someone came
12           to me and said, can I dust with
13           cinnamon?  I mean, why would you
14           want to dust with cinnamon.  I --
15           I mean, that's a weird question to
16           me.
17   BY MR. TISI:
18       Q.   And so the question -- why
19   would you want to dust with asbestos,
20   right?
21       A.   Well, I -- you know, I'm not
22   seeing a purpose for doing it.
23       Q.   I'm asking you from a
24   safety -- from a safety perspective.

Page 139

1        Q.   Okay.  So just the record is
2    clear, if I had a bottle of asbestos and
3    you were advising a family member and a
4    family member came to you and said,
5    "Dr. Ballman, do you think it's okay if I
6    dust with asbestos," you wouldn't know
7    what answer to give?  You'd say I have to
8    take out the literature and look at it?
9            MS. MILLER:  Objection.
10           Maybe -- you don't need to have
11           those facial expression.
12           THE WITNESS:  I mean, that's
13           a real hypothetical, because I
14           couldn't imagine anyone coming to
15           me and saying can they dust with
16           asbestos.  So that's why I'm
17           having a hard time answering this
18           question.  I just don't see any --
19           any -- what would be the purpose
20           of dusting with asbestos?  What
21           would be the -- I just don't --
22   BY MR. TISI:
23       Q.   Honestly I can't imagine
24   either.  So let me ask you the question.

Page 141

1    Let's assume there was a purpose -- I'm
2    going to add to my hypothetical.
3            Let's assume there was a
4    purpose to do it, and somebody came up to
5    you and said, "I think it's -- I think
6    I'd like to dust with asbestos."
7            Would you say that that
8    would be okay?
9            MS. MILLER:  Objection.
10           THE WITNESS:  I just can't
11           imagine that situation.
12   BY MR. TISI:
13       Q.   Okay.
14       A.   So it's very -- I can't
15   answer that.
16       Q.   I'm asking -- bear with me
17   in the hypothetical.  We're allowed to do
18   that in a deposition.
19           If -- if -- if there were a
20   reason and somebody came up to you and
21   asked you for advice.  Would you say to
22   them, sure, dust with asbestos?
23           MS. MILLER:  Objection.
24           THE WITNESS:  So, what I

36 (Pages 138 to 141)

Karla Ballman, Ph.D.

Page 142

```
 1      feel comfortable in saying, and
 2      this is what I addressed, is if
 3      that cup were full of talcum
 4      powder and someone really would
 5      have asked my opinion as to
 6      whether or not they should use it,
 7      I would just say it's my
 8      professional opinion that, you
 9      know, whatever is in there, you
10      know, that's no causal
11      relationship between dusting on
12      the perineum and ovarian cancer.
13   BY MR. TISI:
14      Q.   Okay.  And that would
15   include, whatever in there, if there is
16   asbestos in there?
17      A.   Well, whatever talcum
18   powder, that's the literature I looked
19   at, whatever that talcum powder is
20   composed of, there is no evidence that
21   it -- credible evidence that it causes
22   ovarian cancer.
23      Q.   Let me switch topics again.
24      Go to Exhibit Number 1,
```

Page 143

```
 1   which is the report you were going to --
 2   you gave.
 3      A.   Yes, I'm there.
 4      Q.   Okay.  Front page says --
 5   I'm sorry, let me -- let me just -- you
 6   signed that page, correct?
 7      A.   Yes.
 8      Q.   Was every talc-specific
 9   opinion contained in this report reached
10   after meeting with the J&J lawyers?
11      MS. MILLER:  Objection.
12      This has been addressed already
13      before.
14   BY MR. TISI:
15      Q.   Yeah, okay.
16      A.   This -- this entire report
17   and all the research done for this report
18   was done after I started working on
19   this -- well, I did it as part of
20   generating this report which happened
21   after November 2018.
22      Q.   Does the report give all the
23   opinions you're prepared to give in this
24   case?
```

Page 144

```
 1      A.   Unless new information comes
 2   to light.
 3      Q.   Okay.  Does it fully
 4   describe the methodology that you use to
 5   reach your opinions?
 6      A.   I -- I don't know what you
 7   mean by fully.  But I do explain the
 8   methodology that I used and -- and
 9   provide bases for why I come to
10   conclusions.
11      Q.   Did you grade the evidence
12   giving numerical values?  Did you say,
13   well, this is a four on a scale of five,
14   this is a two on a scale of five, you
15   didn't do that, right?
16      A.   Grade what evidence?
17      Q.   Any of the evidence you
18   used.  Did you provide -- in weighing the
19   evidence, did you grade them?
20      MS. MILLER:  Objection.
21   BY MR. TISI:
22      Q.   Did you provide any
23   numerical values?
24      A.   I'm -- I'm confused by the
```

Page 145

```
 1   question.  I mean, when one does
 2   research, it's not common to grade every
 3   piece of data that's on hand in any --
 4   any way.  So I'm not sure.  So I -- I
 5   think I don't understand your question.
 6      Q.   Thank you.  I appreciate
 7   that.
 8      Now, we discussed this
 9   before, but you employed what are called
10   the Bradford Hill analysis, correct?
11      A.   Something along those terms.
12      Q.   Okay.
13      MR. TISI:  And for the
14      record, I want to attach as
15      Exhibit Number 6 Dr. Hill's
16      article.
17      (Document marked for
18      identification as Exhibit
19      Ballman-6.)
20   BY MR. TISI:
21      Q.   Is this the article, 1965
22   article that you were referring to in
23   your report?
24      A.   Yes.
```

37 (Pages 142 to 145)

Karla Ballman, Ph.D.

Page 146

1    Q.   Thank you.
2         Is this a -- is it fair to
3  say that in the field of epidemiology, as
4  you understand it, this is a seminal --
5  seminal analysis of how to do a causation
6  analysis?
7    A.   I would say it -- it
8  provides the framework for how
9  epidemiologists go about in determining
10 whether there is a causal relationship.
11   Q.   And while there are a lot of
12 published articles out there, you would
13 consider this to be a fairly important
14 piece of -- this would be, you know, kind
15 of a different category in terms of its
16 impact on how we look at causation
17 questions?
18   A.   Again, I think I -- I would
19 say it sort of frames today how -- how
20 people evaluate causation questions.
21 It's -- it's the first basis of it.
22   Q.   When is -- prior to meeting
23 with the lawyers in this case, had you
24 ever seen the Hill criteria -- had you

Page 147

1  ever seen the Hill article?
2    A.   Yes.
3    Q.   Okay.  And is the Hill
4  criteria applied any differently
5  depending upon where you live?
6         In other words, do -- do
7  people in France apply the Hill criteria
8  the same way they apply it in the United
9  States?
10        MS. MILLER:  Objection.
11 BY MR. TISI:
12   Q.   People in England apply it
13 the same way they apply it in Canada?
14        MS. MILLER:  Is that -- is
15        that --
16 BY MR. TISI:
17   Q.   I'm -- I'm asking you
18 geographically.  Is there -- if anyone
19 were to stand up in court and say well,
20 you know, this is an English scientist
21 and, therefore, they apply it differently
22 in England than they apply it in the
23 United States.
24        MS. MILLER:  I think you

Page 148

1  keep piling question -- objection.
2  I'd like to say something.
3         You keep piling question
4  upon question upon question so --
5         MR. TISI:  Objection is --
6         MS. MILLER:  Okay.
7         MR. TISI:  Objection is
8  fine, Counsel.
9         MS. MILLER:  And I think
10 it -- it's impossible for her to
11 know which question to answer.  I
12 don't think it's fair.
13        MR. TISI:  How about the
14 last one?
15        Well, when she looks at
16 me --
17        THE WITNESS:  Can you repeat
18 the last one, please?
19        MR. TISI:  Yes.
20        MS. MILLER:  Can you just
21 try to ask one question at a time.
22 That's all I ask.
23 BY MR. TISI:
24   Q.   Is -- is there -- is there

Page 149

1  any --
2         MS. MILLER:  I'll object
3         less that way.
4  BY MR. TISI:
5    Q.   Is there any difference
6  between how scientists approach a
7  causation question depending upon where
8  they happen to live and practice?
9    A.   I believe that
10 epidemiologists apply this criteria.  I
11 have no evidence that it would be
12 dependent upon geographic location of --
13 of the epidemiologist.
14   Q.   Okay.  And so for example,
15 we use the issue, we -- we looked at the
16 Health Canada report before.  You have no
17 reason to believe that they apply the --
18 the Bradford Hill criteria different in
19 Canada than they do in the United States?
20   A.   I -- I think any good
21 epidemiologist would -- would apply
22 scientifically based methods to -- to
23 come up with their conclusions.
24   Q.   Okay.  And certainly the

38 (Pages 146 to 149)

Karla Ballman, Ph.D.

| Page 150 | Page 152 |
|---|---|
| 1  Hill framework is a scientifically based<br>2  framework for looking at causation?<br>3      A.   It provides a framework in<br>4  which people can look at -- at the issue<br>5  of causation.<br>6      Q.   Okay.  Did you write your<br>7  general causation report Exhibit 1?<br>8      A.   I wrote everything in it<br>9  except for -- title.  Except for the<br>10  materials reviewed and considered piece.<br>11     Q.   Okay.  And are all the words<br>12  and sentences in the report yours?<br>13     A.   I -- I wrote the entire<br>14  report.<br>15     Q.   Did the lawyers for J&J<br>16  write any of the words and sentences<br>17  contained in your report?<br>18     A.   I -- I wrote the entire<br>19  report.<br>20     Q.   When did you actually start<br>21  to write the report?<br>22     A.   From the beginning,<br>23  essentially.  Because as I was reviewing<br>24  the literature, I -- I put sections into | 1  expert witness?  Have you told anybody<br>2  that?<br>3          MS. MILLER:  Objection.<br>4          THE WITNESS:  Have I told<br>5      someone that it --<br>6  BY MR. TISI:<br>7      Q.   Have you ever told anybody,<br>8  you know, being an expert witness I can<br>9  make a little extra money, or words to<br>10  that effect?<br>11         MS. MILLER:  Objection.<br>12         THE WITNESS:  Not that I<br>13     recall.<br>14  BY MR. TISI:<br>15     Q.   If you go to Page 21 of your<br>16  report -- actually, let me change it.<br>17         You rely on the -- you look<br>18  at the observational studies and<br>19  evidence, correct?<br>20     A.   I -- I -- I looked at<br>21  observational studies as part of my<br>22  analyses.<br>23     Q.   And in addition you looked<br>24  at the biologic evidence and that's on |

| Page 151 | Page 153 |
|---|---|
| 1  a document that was the basis of my<br>2  report.<br>3      Q.   When did you first start<br>4  becoming an expert witness?  I know you<br>5  were involved in the Viagra case and I --<br>6          When did you -- when did you<br>7  first make yourself available as an<br>8  expert witness in litigation?<br>9          MS. MILLER:  Objection.<br>10         THE WITNESS:  I never made<br>11     myself available as an expert<br>12     witness.  I was contacted first by<br>13     Sidley Austin with respect to a<br>14     patent case.  But they contacted<br>15     me.  I didn't even know how that<br>16     came about.<br>17  BY MR. TISI:<br>18     Q.   Okay.  And when would that<br>19  have been?<br>20     A.   You are stretching my memory<br>21  now.  2016.<br>22     Q.   Have you ever told anybody<br>23  that you think it would be a good way to<br>24  make additional money to be a -- to be an | 1  Page 48 and 49 of your report?<br>2      A.   48 and 49?<br>3      Q.   Mm-hmm.  I'm sorry.  I must<br>4  have mistyped it.  I apologize.  Maybe<br>5  it's 38 and 39.<br>6          MS. MILLER:  There's a table<br>7      of contents.<br>8  BY MR. TISI:<br>9      Q.   Yeah, that may have it.  On<br>10  Page 36.<br>11     A.   Yes, I'm there.<br>12     Q.   And that contains your<br>13  analysis of the non-epidemiologic<br>14  evidence, correct?<br>15     A.   I don't think I would call<br>16  it non-epidemiologic evidence.  I mean,<br>17  biological plausibility is part of the<br>18  Bradford Hill criteria.  And that's what<br>19  epidemiologists use to --<br>20     Q.   Okay.  Now, going back to<br>21  your conclusion, you say there was no<br>22  evidence of a causal relationship between<br>23  perineal and genital talcum powder<br>24  exposure and ovarian cancer, correct? |

39 (Pages 150 to 153)

Karla Ballman, Ph.D.

Page 154

1     A.   That's what I state.
2     Q.   And that's -- those are your
3 words?
4     A.   Those are my words.
5     Q.   And isn't it true that
6 outside of litigation -- now, this is a
7 litigation report.  This was paid for by
8 Johnson & Johnson for the work that you
9 did, correct?
10        MS. MILLER:  Objection.
11        There's two questions.
12 BY MR. TISI:
13    Q.   The report -- the generation
14 of this report was paid for by Johnson &
15 Johnson?
16        MS. MILLER:  Objection.
17        THE WITNESS:  I did this
18        report as part of my expert
19        witness activities on the behalf
20        of Johnson & Johnson.
21 BY MR. TISI:
22    Q.   For which you are paid?
23    A.   For which I am paid.
24    Q.   Okay.  And isn't it true

Page 155

1 that experts outside of litigation have
2 published the opinion that you expressed
3 here as disingenuous?
4     A.   Can you show me?
5     Q.   I'm going to.  Have you
6 ever -- have you ever seen a description
7 of -- of that opinion as being
8 disingenuous?
9        MS. MILLER:  Objection.
10 BY MR. TISI:
11    Q.   In the published literature?
12    A.   Not to my knowledge.  Can I
13 see --
14    Q.   Sure.
15    A.   -- what you're referring
16 to -- what you're referring to?
17    Q.   Do you know of a -- do you
18 know of a publication by a Steven Narod,
19 M.D.?
20    A.   Which publication?  I'm sure
21 he has many.
22        (Document marked for
23        identification as Exhibit
24        Ballman-7.)

Page 156

1 BY MR. TISI:
2     Q.   Well, I'm going to show you
3 one.  Do you know who Dr. Narod is?
4     A.   Not personally.
5     Q.   Do you know him
6 professionally by reputation?
7     A.   I know that I read an
8 article that he had published.
9     Q.   Okay.  And this article is
10 in Gynecologic Oncology.  It's in your
11 report.
12    A.   Yes.  It's published in
13 Gynecologic Oncology.
14    Q.   And it's an article entitled
15 "Talc and Ovarian Cancer"?
16    A.   Yes.
17    Q.   And it's an -- is this a
18 respected peer-reviewed journal?
19    A.   I don't know what the impact
20 factor is of this journal.  It is a
21 peer-reviewed journal.
22    Q.   Does impact factor always
23 reflect the quality of the journal, the
24 actual academic quality of the journal?

Page 157

1     A.   It depends upon who you talk
2 to.  So journals that have high impact
3 factors tend to think it does.  Probably
4 more than journals with low impact
5 factor.  But in general, I think the
6 higher the impact factor there is a
7 correlation with the quality of the
8 journal.
9     Q.   Have you published in
10 relatively low impact journals?
11    A.   I have.
12    Q.   So you don't have a
13 criticism of anybody who publishes in
14 a -- in a low impact journal, do you?
15    A.   I don't know.  That's a
16 broad question.
17    Q.   Well we had some testimony
18 the other day from a witness who said,
19 "Well, only if it's a high impact" --
20 paraphrasing, and I am paraphrasing, that
21 low impact journals are not as
22 significant as high impact journals in
23 terms of their scholarly -- scholarly
24 importance.

40 (Pages 154 to 157)

Karla Ballman, Ph.D.

Page 158

1          MS. MILLER: Objection.
2          THE WITNESS: That's just
3     really broad. I mean, I think my
4     take on it is that high impact
5     journals have definitely probably
6     more of a rigorous peer review
7     process than do some lower impact
8     journals. But that -- that is not
9     an absolute.
10    BY MR. TISI:
11        Q.   Because you publish --
12        A.   But I'm sure there's --
13        Q.   Because you publish in --
14        A.   -- exceptions.
15        Q.   -- low impact journals,
16    right?
17          MS. MILLER: Objection.
18          Please stop interrupting
19     her.
20    BY MR. TISI:
21        Q.   You publish in low impact
22    journals, correct?
23        A.   I have. I don't -- I'm sure
24    there are some of the publications on my

Page 159

1     list that are in lower impact journals
2     than others.
3          Q.   Okay. Now, if I go to the
4     Narod article which is on your reference
5     list or on one of the lists. I forget
6     which one it is.
7          On the bottom of the
8     left-hand column, on the bottom, it
9     says -- I'm reading --
10          MS. MILLER: What page are
11     you on?
12    BY MR. TISI:
13        Q.   From about --
14          MR. TISI: The second page.
15    BY MR. TISI:
16        Q.   Left-hand column, about
17    60 percent of the way down.
18          Okay. It says the
19    following: And I'm going to read it, and
20    you tell me whether I read it correctly.
21          It is unlikely that the
22    association between talc and ovarian
23    cancer --
24        A.   Wait, wait. Can I find

Page 160

1     exactly where you're reading?
2          Q.   Sure. I'll show you mine.
3          A.   Oh, there, thank you. Thank
4     you.
5          MS. SHARKO: Can I see it?
6          MR. TISI: You have it right
7     there.
8          MS. SHARKO: Thank you.
9     BY MR. TISI:
10        Q.   It is unlikely that the
11    association between talc and ovarian
12    cancer is due to confounding, and so it
13    is fair to say that if there's a
14    statistically -- a statistically robust
15    relationship between talc and ovarian
16    cancer, it is likely to be causal, albeit
17    with intermediate factors, such as
18    inflammation. In any case, given the
19    number of hazard ratios in the literature
20    between 1.1 and 1.4 in both case-control
21    and cohort studies, it's disingenuous to
22    state there is no evidence that talc is
23    associated with ovarian cancer.
24          Do you see that?

Page 161

1          A.   I do see that. You did read
2     that correctly.
3          Q.   Okay. I'm going to have
4     that statement of Dr. Narod --
5          MS. MILLER: I was just
6     going to say you left one word out
7     in your reading --
8          MS. SHARKO: I think he
9     says --
10          THE WITNESS: Oh, you didn't
11     read that correct.
12          MR. TISI: I thought you
13     said you did read -- did I --
14          THE WITNESS: I'm sorry.
15    BY MR. TISI:
16        Q.   I'll read it again. Let me
17    put it in front of you.
18          (Document marked for
19     identification as Exhibit
20     Ballman-8.)
21    BY MR. TISI:
22        Q.   This is Exhibit Number 8.
23    And I've highlighted --
24          MS. MILLER: Again, this is

41 (Pages 158 to 161)

Karla Ballman, Ph.D.

Page 162

1    called a conclusion but it comes
2    in the middle of the document.  I
3    have --
4          MR. LOCKE:  This is
5    definitely -- I'm going to object.
6    This is definitely not the
7    conclusion.  Read the last
8    paragraph.
9          MS. MILLER:  I have an
10   objection to the mislabeling of so
11   far each of these exhibits.
12         MR. TISI:  Let me tell you
13   what.  I'm going to take out --
14   you can block out the conclusion
15   if you want, if that will make you
16   happy, Counsel.
17         MS. MILLER:  Thank you for
18   that offer.
19         MR. TISI:  Okay.  So you
20   won't do it.
21   BY MR. TISI:
22   Q.    So, I'm -- Doctor, did I
23   read the statement correctly, that it is
24   unlikely that the association between

Page 164

1    the -- the statement will be -- the
2    record will be --
3          A.    Yeah.
4          Q.    -- from the article.
5          Do you see where it says,
6    "It's disingenuous to state that there is
7    no evidence that talc is associated with
8    ovarian cancer"?
9          A.    Talc is --
10         MR. TISI:  Counsel, please.
11         MS. MILLER:  I --
12         THE WITNESS:  "It is
13   disingenuous to state that there
14   is no evidence that talc is
15   associated with ovarian cancer."
16   BY MR. TISI:
17   Q.    That's what he writes in his
18   non-litigation report, do you see it?
19   A.    I -- I do see that.
20   Q.    Okay.  And you would
21   disagree with that statement, correct?
22   A.    Well, I mean, it depends
23   upon how you parse things out.  So you
24   know, it's disingenuous to state that

Page 163

1    talc and ovarian cancer is due to
2    confounding, and so it is fair to say
3    that if there's a statistically robust
4    relationship between talc and ovarian
5    cancer is likely to be causal, albeit
6    with intermediate factors such as
7    inflammation.
8          Did I read that correctly?
9          MS. SHARKO:  No, you didn't.
10         Is the word use missing here
11   too?  He misread that.
12         MS. MILLER:  That word "use"
13   is missing again.
14         MR. TISI:  "Talc use and
15   ovarian cancer is likely to be
16   causal."
17         Did I not say that?
18         MS. MILLER:  "Talc use".
19   BY MR. TISI:
20   Q.    Do you see that statement?
21   A.    Yeah, I see that statement.
22   And I'll take your word you read it
23   correctly.
24   Q.    The statement will be what

Page 165

1    there is no evidence that talc is
2    associated with ovarian cancer.  So if
3    you mean that there are no studies that
4    have a statistically significant
5    association, that would be correct.
6    Q.    Okay.
7    A.    He is not stating there that
8    there is no evidence that talc is -- that
9    talc is -- that there's a causal
10   relationship between talc and ovarian
11   cancer.
12   Q.    What -- he also says that
13   there -- that the association between
14   talc and ovarian cancer is unlikely due
15   to confounding, do you see that in the
16   first sentence?
17   A.    Yes.
18   Q.    And you disagree with that,
19   true?
20   A.    Now, which sentence, can you
21   read --
22   Q.    The first sentence.  "It is
23   unlikely that the association between
24   talc and ovarian cancer" --

42 (Pages 162 to 165)

Karla Ballman, Ph.D.

Page 166

1    A.   Oh, that one.
2    Q.   -- "is due to confounding."
3        Do you disagree with that?
4        MR. LOCKE:  Objection to the
5    term, "the first sentence."
6        THE WITNESS:  Yeah.
7        MR. TISI:  The first --
8    okay.
9        THE WITNESS:  It's of that
10   document.
11   BY MR. TISI:
12   Q.   Correct.  Of -- of exhibit
13   that --
14   A.   This one.
15   Q.   Correct.
16   A.   8?
17   Q.   Yes.
18   A.   I -- I don't see any
19   references there's -- references to
20   support that statement.
21   Q.   So you would disagree with
22   the statement?
23   A.   Well, I -- I don't see any
24   references to support that.

Page 167

1    Q.   So you disagree with the
2    statement?
3        MS. MILLER:  Objection.
4        THE WITNESS:  I'm just
5    saying I don't see any
6        references --
7    BY MR. TISI:
8    Q.   I understand.  I'm not
9    asking you whether you see references.
10   I'm asking you whether you disagree with
11   the statement.
12   A.   I believe in any sort of
13   observational study it is not possible to
14   conclude that there is no confounding.
15   Q.   Okay.  That's not what he
16   said, did he?
17       He said, "It is unlikely
18   that the association between talc and
19   ovarian cancer is due to confounding."
20       Do you see that?
21   A.   I see he says unlikely.  But
22   again, I -- there's -- there's no
23   references to support that.
24   Q.   Okay.  So my question is, is

Page 168

1    his conclusion wrong?
2        A.   I -- I would have to see the
3    references upon which he's making that
4    conclusion in order to assess that.
5        The data I looked at in
6    totality, I do see evidence of
7    confounding.  In fact, we can go to the
8    Schildkraut study, and -- and there is a
9    pretty resounding evidence there that
10   there is recall bias, which is --
11   Q.   After 2014, correct?
12   A.   Well, there's recall bias --
13   no, there's recall bias even before that.
14       But it shows sort of how
15   much magnitude recall bias can have just
16   due to tweaking one little thing.
17       But I did not say that
18   there's no recall bias before 2014.
19   Q.   So would you defer to the
20   authors of that study as to what the
21   meaning of that data meant?
22   A.   No.  Scientists don't do
23   that.  Scientists look at publications.
24   They look at -- they looked at the

Page 169

1    methods.  The methods of to be published.
2    They look at the analyses that were done
3    and the results that were done.  And --
4    and they evaluate whether or not they --
5    they believe to the strength that the
6    authors do, that the authors' conclusions
7    are supported by all that.
8    Q.   Now, Dr. Narod published his
9    opinions, correct?
10   A.   Are these opinions?  Yeah?
11   Q.   Okay.  I'm going to -- I'll
12   characterize them as opinion.  Okay.
13       He published these
14   statements, correct?
15   A.   Yes.  This is statements
16   made in a paper that was published.
17   Q.   Okay.  And so he submitted
18   his -- his views to the scientific and
19   medical community, correct?
20   A.   Yeah.  I mean, the -- all
21   the views that's in this entire article,
22   I mean, so, you know, there's more words
23   than this than just the -- the two
24   sentences that were pulled out.

43 (Pages 166 to 169)

Karla Ballman, Ph.D.

Page 170

1     Q.   I agree, I agree.  But he
2  submitted his -- his views to the
3  scientific and medical community for what
4  that's worth, correct?
5     A.   This paper has been
6  published.
7     Q.   Okay.  The Health Canada
8  paper, even in its draft form, was put on
9  the internet.  That's where you found it,
10  correct?
11     A.   The Health Canada draft is
12  available for people to review.
13     Q.   Okay.  And comment on, which
14  you have not done, right?
15     A.   I have not commented on the
16  Health Canada.
17     Q.   Have you published your
18  opinions about talc?
19     A.   I did research on this.  And
20  I wrote an expert report.  I have not
21  published my expert report.
22     Q.   Have you submitted your
23  report to peer review?
24     A.   That's sort of -- that would

Page 171

1  be sort of odd.  This -- this expert
2  report is written for a specific purpose.
3  If I'm going to do a peer-reviewed
4  article, it -- it would look a little
5  different from -- from this expert
6  report.
7     Q.   So what specific purpose was
8  this article -- was this report written
9  for?
10     MS. MILLER:  Objection.
11     THE WITNESS:  So this report
12     was written to look at the
13     totality of the evidence that's
14     been published to determine
15     whether there is an association
16     between talc and ovarian cancer, a
17     causal relationship between talc
18     and ovarian cancer.
19  BY MR. TISI:
20     Q.   Now, did you -- so would
21  you -- have you decided -- now that
22  you've done this review, are you going to
23  write a paper that would put out, just
24  like Dr. Narod did, just like Health

Page 172

1  Canada did, just like any of the other
2  authors of the studies that you've
3  reviewed, what your views on the level of
4  evidence there is for the general
5  causation question.
6     Are you -- do you intend to
7  publish?
8     MS. MILLER:  Objection.
9     Again, that was two questions.
10     The first one was the
11     objectionable one.
12     THE WITNESS:  So --
13     MR. TISI:  Let me rephrase
14     the question.
15  BY MR. TISI:
16     Q.   Do you intend to publish on
17  the question about whether or not ovarian
18  cancer is caused by talcum powder
19  products?
20     A.   I do not plan to publish.
21     Q.   Now, in addition to offering
22  your own professional opinion on the
23  sufficiency of the evidence on talc and
24  ovarian cancer, I understand you may

Page 173

1  offer criticisms of plaintiffs'
2  epidemiology experts in this case; is
3  that true?
4     A.   So, in my report, I point
5  out some -- I point out things that --
6  other experts had said that -- that I
7  believe have limitations or that I don't
8  agree with.
9     Q.   Well, for the record the
10  experts that you referred to in your
11  report are Jack Siemiatycki?
12     A.   He's one expert.
13     Q.   Do you know who Jack
14  Siemiatycki is?
15     A.   I know who -- I know who he
16  is.  But I've not met him.
17     Q.   You understand that he's
18  well published in the field of cancer
19  epidemiology?
20     MS. MILLER:  Objection.
21     THE WITNESS:  I did not look
22     at his publication records.  So I
23     don't know if he's well published
24     or not.

44 (Pages 170 to 173)

Karla Ballman, Ph.D.

Page 174

1    BY MR. TISI:
2        Q.   You know that he was the
3    chair of the IARC panel that dealt with
4    the issue of ovarian cancer and talc?
5        A.   I believe when I read the
6    IARC -- I believe when I read his expert
7    report, that is what he stated.
8        Q.   Do you have any reason to
9    believe that he's unqualified to offer
10   his opinions in this case on the general
11   question?  Whether you disagree with his
12   conclusions, put that aside for a moment.
13           I'm asking you do you have
14   any qualms with his qualifications to
15   offer an opinion on the issue of general
16   causation?
17           MS. MILLER:  Objection.
18           THE WITNESS:  I don't think
19       it's my place to decide whether or
20       not someone has the qualifications
21       to offer an opinion.
22   BY MR. TISI:
23       Q.   Well, we had a witness the
24   other day who said that he thought

Page 175

1    another one of plaintiffs' witnesses was
2    unqualified.  I'm asking you, are you --
3    do you think that this witness -- that
4    Dr. Siemiatycki is unqualified?
5        A.   I believe he has -- he has
6    credentials in this area, and he's
7    done -- he was, as you said, the chair of
8    the IARC committee, and may even have
9    published in this area.
10           So, you know, when people
11   publish, yeah -- I don't know what the
12   word "qualified" means, but I think, you
13   know, he is a scientist.
14       Q.   What about Anne McTiernan?
15   Do you have any qualms about her
16   qualifications to render an opinion on
17   the question of whether or not talc
18   causes ovarian cancer?
19           MS. MILLER:  Objection.
20           THE WITNESS:  I can't speak
21       to the qualifications.
22   BY MR. TISI:
23       Q.   Okay.
24       A.   I know that she's an

Page 176

1    epidemiologist and has -- I can't
2    remember if she's published in the area.
3    I presume she has.  And, you know, one
4    can look at her publications.
5        Q.   So I guess what I'm
6    hearing -- so let --
7            THE VIDEOGRAPHER:  Sorry.
8        You're covering your microphone.
9    BY MR. TISI:
10       Q.   Let me summarize it.  Do
11   you -- of any of plaintiffs' experts in
12   this case, do you intend to offer any
13   opinions that any of them are unqualified
14   to render an opinion on the general
15   causation question?
16           MS. MILLER:  Objection.
17           THE WITNESS:  I -- it's -- I
18       don't -- I was not asked to render
19       an opinion if I think that any of
20       the experts are unqualified or
21       not.  And so I haven't seen
22       thought about that.
23   BY MR. TISI:
24       Q.   And that's fine.  Are all of

Page 177

1    your opinions of these experts contained
2    in your expert report, Exhibit 1?
3            MS. MILLER:  Objection.  She
4        just said she has no opinions.
5            THE WITNESS:  Are my
6        opinions of the actual experts?
7    BY MR. TISI:
8        Q.   Yes.  Of the actual experts,
9    of their conclusions, of their
10   methodology, are all of those opinions
11   contained in your expert report, Exhibit
12   Number 1?
13           MS. MILLER:  Objection.  I
14       don't understand that question.
15           MR. TISI:  You don't have
16       to.  As long as she understand it.
17           THE WITNESS:  Yeah, I'm
18       confused too.
19           MS. MILLER:  What?
20           THE WITNESS:  Because I
21       thought I heard my opinions of the
22       experts --
23   BY MR. TISI:
24       Q.   I said --

45 (Pages 174 to 177)

Karla Ballman, Ph.D.

Page 178

1        A.   -- and I don't know why I
2    would have --
3        Q.   Are your criticisms of
4    your -- are all of the criticisms that
5    you have on plaintiffs' experts contained
6    in your expert report?
7            MS. MILLER:  Her criticisms
8        of the experts' opinions?
9            MR. TISI:  Yes.
10           MS. MILLER:  Okay.  That's
11       not what you said.
12           THE WITNESS:  No, no, you
13       said experts.  And so I'm still
14       confused.
15   BY MR. TISI:
16       Q.   Okay.  Are all of the
17   opinions related to plaintiffs' experts
18   contained in your expert report?
19       A.   Are all my opinions related
20   to plaintiffs' experts?
21       Q.   Mm-hmm.
22       A.   Themselves?
23       Q.   Mm-hmm.  Of their opinions,
24   their methodology, any aspect --

Page 179

1        A.   Okay.  That's a little
2    different.  Again, I heard, are my
3    opinions of the qualifications, or
4    whatever -- of the experts.
5        Q.   I said -- I'm reading
6    verbatim.  Are all of the opinions
7    related to plaintiffs' experts that you
8    have contained in your expert report?
9        A.   See, that says are my
10   opinions of all the plaintiff experts.
11   To me, that's like my opinions on the
12   experts themselves, which I did not
13   address.
14       Q.   Okay.  I said related to the
15   expert.  Okay.  Let me -- let me rephrase
16   the question.
17           Are all of your criticisms
18   about the opinions that plaintiffs'
19   experts will offer in this case contained
20   in your report?
21       A.   I mean, the ones I thought
22   were -- the most important are in here.
23   I can -- you know, I didn't go through
24   and say, okay, I disagree with this

Page 180

1    number here.  I disagree with that number
2    there, or I disagree -- so I guess I have
3    to say it's not complete.
4        Q.   Okay.  Are there any
5    opinions that you have as you sit here
6    today about any of the opinions that they
7    gave that are not in your report?
8        A.   Without going through their
9    reports and going through my report to
10   make sure that every single criticism I
11   might have has been made, I can't answer
12   that with any sort of certainty.
13       Q.   Okay.  I'm going to have it
14   marked as Exhibit Number 9, your
15   curriculum vitae.
16           (Document marked for
17       identification as Exhibit
18       Ballman-9.)
19   BY MR. TISI:
20       Q.   This is the one that was
21   provided with your expert report.  Is
22   this your most recent curriculum vitae?
23       A.   No.
24       Q.   Is there one subsequent to

Page 181

1    that?
2        A.   This says June 5th on it.
3        Q.   Okay.  Is the expert
4    report --
5            MS. MILLER:  She's looking.
6            THE WITNESS:  The thing
7        that's attached as Exhibit A on my
8        expert report says February 22nd.
9    BY MR. TISI:
10       Q.   Okay.  So let's --
11       A.   So --
12       Q.   That's an old one.  I have
13   it says February 22nd there.  Am I wrong?
14           MS. MILLER:  The one that
15       you gave us says June 5th.
16           MR. TISI:  Okay.  My office
17       must have printed it out wrong.
18   BY MR. TISI:
19       Q.   Okay.  So is Exhibit A to
20   your expert report your most recent
21   curriculum vitae?
22       A.   It's the most --
23           MS. MILLER:  Shall we just
24       all refer back to Exhibit 1 for

Karla Ballman, Ph.D.

Page 182

1    this portion of the questioning?
2         MR. TISI:  Yes, correct.
3    Exhibit A.
4         MS. MILLER:  Of your
5    Exhibit 1?
6         MR. TISI:  Exhibit 1.
7         MS. MILLER:  Exhibit A to
8    Exhibit 1.
9         MR. TISI:  Correct.
10        MS. MILLER:  Just so we're
11   all on the same page.
12        MR. TISI:  Thank you.
13        THE WITNESS:  It's the
14   latest one that I updated.
15   BY MR. TISI:
16        Q.   Okay.  Does this CV
17   accurately summarize the experience that
18   you believe qualifies you to render an
19   epidemiologic opinion on the causation
20   question in this case?
21        A.   That -- that's a broad
22   question.  I mean, I don't know if you
23   can capture 20 years of -- of experience,
24   you know, in one document, but it

Page 183

1    captures, you know, some highlights, yes.
2         Q.   Well, is there anything that
3    you can think of in your experience,
4    beyond what is in your expert report as
5    you sit here right now, that would
6    qualify you to testify on the issue of
7    whether or not ovarian cancer is caused
8    by talcum powder products?
9         A.   Well, in the -- in the
10   addition to what is written here is my
11   day in and day out daily activities
12   when -- that I do as part of my job.
13   That -- that has built up the experience
14   over the years.
15        Q.   When is the last time -- do
16   any of your publications anywhere refer
17   to the Bradford Hill criteria?
18        A.   I have no idea.  Nothing
19   comes to the top of my head, but I can't
20   say with certainty.
21        Q.   Okay.
22        A.   As you mentioned, there's
23   like 200 some.
24        Q.   But none you can think of,

Page 184

1    correct?
2         A.   Not off the top of my head.
3         Q.   Okay.  One more plaintiffs'
4    epidemiology referred to in your expert
5    report is April Zambelli-Wiener-Weiner.
6    Do you remember?  She looked at the
7    Huncharek and Muscat publications in 2003
8    and 2000 -- 2007, and then the 2011
9    publication of the -- of their report to
10   the FDA.  Do you remember reading that?
11        A.   I remember reading her
12   expert report.  Can I -- can I see it?  I
13   don't remember if those were the actual
14   studies that she -- I thought 2003 was --
15   and I don't remember a 2011.  So --
16        Q.   Okay.  Let --
17        A.   -- but I did read her expert
18   report.
19        Q.   Let's put aside 2011 for a
20   moment.  The diaphragm study, which was
21   2007 and 2003 meta-analysis, you did read
22   her report on those, correct?
23        A.   I read her expert report.
24        Q.   Okay.  And you agree that

Page 185

1    those reports contain -- those studies
2    contain errors, correct?
3         A.   Yeah.  Can I see her expert
4    report, please?
5         Q.   I don't have it with me.
6         Do you -- do you have any
7    opinions as to whether -- did you look --
8    when you were preparing your report, did
9    you look at her report and try to confirm
10   or not the errors that she identified
11   with respect to those studies?
12        MS. MILLER:  Objection.
13   BY MR. TISI:
14        Q.   Was that part of what you
15   were asked to do?
16        MS. MILLER:  Objection.  I
17   am sorry, objection after the
18   first question.  I didn't realize
19   there would be two.
20        THE WITNESS:  So --
21   BY MR. TISI:
22        Q.   Was it part of your -- in --
23   in connection with preparing your expert
24   report, did you look at whether or not

47 (Pages 182 to 185)

Karla Ballman, Ph.D.

Page 186

1  there were substantive flaws in the
2  analyses conducted by Drs. Huncharek and
3  Muscat that Dr. Zambelli-Wiener-Weiner
4  had identified?
5      A.   So you're asking me to
6  remember, just off the top of my head
7  what's in her report.  I would very much
8  like to see that report --
9      Q.   I'm asking you what you --
10 I'm asking you what you did.  Okay.
11         Did you --
12     A.   I did look at her report and
13 I did read through it.
14     Q.   Did you do any analysis of
15 the Huncharek and Muscat articles?
16     A.   Oh, did I -- that's a
17 different question.  Did I do any
18 analyses of their articles?  I read
19 through her report.  I do remember that.
20 I do remember her finding some error --
21 or what she called errors, numbers that
22 she couldn't match that they had reported
23 in their report that came from other
24 case-control studies and so forth.

Page 187

1         And I -- I remember her
2  doing various different analyses that if
3  they really used the studies that they
4  claimed they used, what would the
5  dose-response relationship, say, look
6  like.  And I remember it didn't matter,
7  because there still was no dose-response
8  relationship even when she did the
9  analyses in the way she thought it should
10 have been done.
11     Q.   So other than that, do you
12 have any criticisms of her?
13     A.   I would have to go through
14 my -- my report here and -- and see if
15 I -- I actually sort of mention anything
16 with respect to her actual report.  I
17 don't remember off of the top of my head.
18     Q.   Now, Exhibit Number 10 is
19 the -- I'm going to ask --
20         (Document marked for
21         identification as Exhibit
22         Ballman-10.)
23 BY MR. TISI:
24     Q.   I'm going to mark the notice

Page 188

1  of deposition --
2         MS. MILLER:  If you want
3         Dr. Zambelli-Wiener-Weiner's
4         report, we can have it brought in
5         here.
6         MR. TISI:  I don't need to.
7  BY MR. TISI:
8      Q.   This is the notice of
9  deposition that we filed in this case.
10 Have you seen that before?
11     A.   I have seen this document.
12     Q.   Okay.  And you -- your
13 counsel provided documents last night.
14 And I'm not going to mark all of them.
15 But because they will go out of order
16 here, I'm going to mark them as 10, A, B,
17 C, D, because they are in response to
18 this notice of deposition.
19         A supplemental list of
20 materials, I'm going to have this marked
21 as Exhibit Number 10A.
22         (Document marked for
23         identification as Exhibit
24         Ballman-10.)

Page 189

1         (Document marked for
2         identification as Exhibit
3         Ballman-10-A.)
4  BY MR. TISI:
5      Q.   And this one, Number 2, is
6  the Health Canada document that we marked
7  previously.
8      A.   It has it on it here, yes.
9      Q.   Okay.
10         (Document marked for
11         identification as Exhibit
12         Ballman-10-B.)
13         (Document marked for
14         identification as Exhibit
15         Ballman-10-C.)
16         (Document marked for
17         identification as Exhibit
18         Ballman-10-D.)
19 BY MR. TISI:
20     Q.   The next is an addendum to
21 list of materials reviewed and considered
22 by Karla Ballman.  And I'm going to have
23 this marked as Exhibit Number 10-B.
24         10-C is your invoice dated

48 (Pages 186 to 189)

Karla Ballman, Ph.D.

Page 190

1  3/7/2019, the one that Ms. Sharko has not
2  paid.
3          MS. MILLER:  It's Skadden.
4      I think it's me who hasn't paid.
5          MR. TISI:  Okay.
6          MS. MILLER:  I'm the bad guy
7      here.
8  BY MR. TISI:
9      Q.   Next one is an e-mail I'm
10 going to ask you in a moment about, from
11 Dr. Karla Ballman to Sandra Oquendo at
12 the FDA.
13         Can you tell me what that's
14 about?
15         MS. MILLER:  Is that a
16     question now?
17         MR. TISI:  Yes.
18         MS. MILLER:  Are you done
19     marking them?
20         MR. TISI:  No, I'm not done
21     marking them.  I'm just going to
22     stop right there.
23         MS. MILLER:  Oh, okay.
24 BY MR. TISI:

Page 191

1      Q.   That's an e-mail that you
2  drafted on March 21, 2019, which would
3  have been -- I don't know what today's
4  date is.  That may have been yesterday.
5      A.   Yeah, I've been getting my
6  dates mixed up this week.
7      Q.   This is an e-mail disclosing
8  to the FDA that you are an expert for
9  Johnson & Johnson in the talc litigation?
10     A.   So the first e-mail I -- is
11 sending an updated disclosure form to the
12 FDA.
13     Q.   Right.
14     A.   The second e-mail is a
15 response from them asking for
16 clarification or answers to some specific
17 questions.
18         And then the last e-mail is
19 my saying here are my responses.
20     Q.   Okay.  But -- but is it fair
21 to say that you initially provided a
22 disclosure form to -- for the FDA that
23 did not disclose you were an expert for
24 Johnson & Johnson and that this e-mail

Page 192

1  exchange back and forth was to clarify
2  that you were?
3          MS. MILLER:  Objection.
4          THE WITNESS:  So can I see
5      the disclosure form?
6  BY MR. TISI:
7      Q.   I don't -- I didn't print --
8  it came too late last night for me to
9  print at the hotel.
10         But you --
11         MS. MILLER:  You printed the
12     e-mail but you didn't print the
13     disclosure it related to?
14         MR. TISI:  Excuse me,
15     Counsel.  I did not.
16         MS. MILLER:  Okay.  I --
17         MR. TISI:  Okay.  If you
18     have a copy, you can feel free to
19     show it to her.
20         MS. MILLER:  Can I get a
21     copy?
22         MR. TISI:  But -- but --
23     well, we'll go off the record and
24     you can get a copy.

Page 193

1          MS. MILLER:  Okay.  Let's go
2      off the record and I'll get a
3      copy.
4          THE VIDEOGRAPHER:  Remove
5      your microphones.  The time is
6      11:33 a.m.  Off the record.
7          (Short break.)
8          THE VIDEOGRAPHER:  Okay.  We
9      are back on the record.  The time
10     is 11:48 a.m.
11 BY MR. TISI:
12     Q.   Doctor, we took a quick
13 break so that you could look at some
14 documents.  Could you tell us why you
15 amended your FDA form yesterday to
16 indicate that you had done some
17 consulting on the talc litigation with
18 J&J?
19     A.   So this is for an FDA panel
20 and they wanted a disclosure.  And so the
21 first time that I submitted my disclosure
22 I believe it was January 23rd.  I listed
23 Johnson & Johnson and $12,000.  So I
24 looked at the box, it says, "Expert

Karla Ballman, Ph.D.

Page 194

1  witness, last 12 months."  I saw last
2  12 months.  "I appeared for or against
3  the following listed firms/issues."
4        And then I saw amount
5  received.
6        So when I saw that, I was
7  like okay, what they want is in the last
8  12 months any money I got from -- that I
9  actually physically got in the last
10  12 months from doing expert work.  And so
11  this was the amount that I had received
12  in the last 12 months.
13        So as part of the, what is
14  this notice called?  As part of
15  document -- Exhibit 10, the request was
16  for all disclosures made to the FDA, so I
17  was looking through and trying to find
18  all disclosures.  And I -- I am learning
19  through my experience here that I need to
20  understand and look at words much more
21  carefully.  And so I re-read this again.
22        And then I saw -- and I am
23  sure I read it the first time.  But it
24  just didn't register to me.  It says "or

Page 195

1  under negotiation."
2        And so I started thinking
3  about that, and I thought, well, you
4  know, they probably don't really mean
5  just under negotiation, that probably
6  encompasses ongoing work.
7        So I felt it was prudent to
8  amend my disclosure to the FDA to let
9  them know about the ongoing work for
10  which I had not received any money in the
11  last 12 months.  And that is the document
12  that is -- is dated incorrectly.  I sent
13  the document on the 20th.  3/21/2019.  I
14  had my dates mixed up.
15        In there I went through and
16  another thing I had missed is it said
17  firm/issue.  So I -- I thought, well, I
18  better also put the issue -- I -- I
19  missed that too the first time.
20        So you now see it says,
21  "Johnson & Johnson/Zytiga patent
22  (prostate cancer)," the amount received.
23  That did not change.
24        And then I added this

Page 196

1  ongoing work that I'm doing, Johnson &
2  Johnson talc powder litigation -- that's
3  the issue -- and the amount that I
4  billed.
5        Q.    And now I notice that these
6  do not contain -- it's supposed to go
7  back 12 months?
8        A.    Yes.
9        Q.    They did not contain the
10  Viagra work that you've done?
11        A.    There was another
12  confidential document that accompanied
13  this, that I believe the decision was
14  made -- I don't know what the legal terms
15  are.  And there was a list of all the
16  companies that they wanted just that
17  information on, if I had any sort of
18  engagement with the companies on that
19  list.
20        Q.    Who is they?  The FDA?
21        A.    The FDA.  There was another
22  document that accompanied this that
23  explains sort of, you know, the
24  confidentiality disclosure.  It says

Page 197

1  confidential on top.  And that's why it
2  wasn't shared.
3        And Johnson & Johnson was
4  the only firm that I've done any work
5  with that was on that list.
6        Q.    Okay.  And so you didn't
7  feel that you needed to indicate that you
8  were an expert witness for the
9  manufacturers in Viagra/Cialis, based
10  upon Number F -- Letter F on this form,
11  that says, "Expert witness last 12 months
12  or negotiation, I appeared for or against
13  the following firms/issues."
14        MR. LOCKE:  Objection to
15  form.
16        THE WITNESS:  Yes,
17  because --
18  BY MR. TISI:
19        Q.    It doesn't -- it doesn't
20  limit to it on the attached list.  It
21  simply says --
22        A.    No, but in the confidential
23  document that wasn't, it said, "Please
24  disclose any" -- "Please disclose for the

50 (Pages 194 to 197)

Karla Ballman, Ph.D.

Page 198

1  firms listed on this list."
2         MS. MILLER:  There's a cover
3  memo.  I can explain.  There's a
4  cover memo.  And it said do not
5  disclose.  Because it said do not
6  disclose and it wasn't the actual
7  conflicts, we did not produce it.
8  BY MR. TISI:
9     Q.   Okay.  But can we agree the
10  form doesn't -- the form itself -- the
11  disclosure form doesn't limit -- I mean,
12  I can't test this -- your -- because I
13  can't see the document.
14         But what I'm asking you is,
15  the form itself that's filed doesn't list
16  Viagra/Cialis litigation, does it?
17     A.   I mean, as you see on the
18  form there, it is not listed, because
19  again, in the cover letter that went with
20  this, the confidential cover letter that
21  says, "Please disclose any engagement
22  with these specific companies," Lilly was
23  not on that.
24     Q.   Okay.  Let me ask you -- I'm

Page 199

1  going to mark this as 10-E.
2         (Document marked for
3         identification as Exhibit
4         Ballman-10-E.)
5  BY MR. TISI:
6     Q.   This is the lectures and
7  workshops on epidemiology.  And you wrote
8  epidemiology biostatistics.  Is it fair
9  to say that all of these -- all of these
10  have to do with trial designs,
11  statistical methods, or biostatistics?
12     A.   So you would say that
13  meta-analyses is not epidemiology?  You
14  would say trial design is most
15  epidemiology?  I think most
16  epidemiologists would disagree with that.
17     Q.   I'm asking you -- there's a
18  difference between trial design and trial
19  analysis and causation analysis, is there
20  not?
21         MS. MILLER:  Objection.
22  BY MR. TISI:
23     Q.   I mean, doing a study and
24  doing a review of the medical literature

Page 200

1  is a different -- two different things,
2  correct?
3     A.   Now I'm confused.  I mean --
4     Q.   Okay.  Let me -- because I
5  don't want to get -- I don't want to get
6  bogged down.
7         Would you agree with me that
8  these three -- these courses that you
9  taught deal primarily with trial design,
10  statistical methods or biostatistics
11  review?
12         MS. MILLER:  Objection.
13  BY MR. TISI:
14     Q.   We can argue about whether
15  it's epidemiology or not later.  Would
16  you agree that that is the focus?
17         MS. MILLER:  Objection.
18  Really try to stick to one
19  question.  I'm really pleading
20  with you.
21         MR. TISI:  She's looking at
22  me like I've lost my mind.
23         THE WITNESS:  Well, no,
24  because, I mean -- I mean -- I

Page 201

1  mean, clinical trials is
2  epidemiology.  It's study design.
3  Biomarker development, that had
4  epidemiology in it because it's
5  very dependent upon study design
6  and what you can say and what you
7  can't say.
8         The trial -- the value of
9  trials, we were talking about
10  meta-analyses.  So that -- that,
11  that lecture involved
12  meta-analyses and what a
13  meta-analysis is so forth.  As you
14  see in most -- you know, this
15  litigation involves many
16  meta-analyses, and we're calling
17  it epidemiology.
18  BY MR. TISI:
19     Q.   I didn't ask you whether --
20  I simply asked you -- and, you know,
21  forgive me if I think you're being
22  defensive here.
23         MS. MILLER:  Objection.
24  BY MR. TISI:

51 (Pages 198 to 201)

Karla Ballman, Ph.D.

Page 202

1       Q.   Okay.  Okay.  Because I've
2   simply asked are these primarily focused
3   on trial design, statistical methods, and
4   biostatistics review.
5            MS. MILLER:  Objection.
6            THE WITNESS:  I don't know
7       how to answer that because, I
8       mean, that's what the titles say.
9   BY MR. TISI:
10      Q.   Thank you.
11      A.   But it does not say sort of
12  what the content is of --
13      Q.   I'm going to ask you that
14  question.  You really need to -- you
15  really need to answer my question, and
16  then I will ask the follow-up questions.
17           So are these -- the next
18  question that I'm going to ask, do any of
19  these in any of these courses or
20  lectures, did you teach students how to
21  do a Bradford Hill analysis?
22           MS. MILLER:  Objection.  Is
23      this about courses?  I thought it
24      was just lectures.

Page 203

1            MR. TISI:  Lectures.  In any
2       of these lectures.
3            MS. MILLER:  You said
4       courses.
5            THE WITNESS:  I don't
6       believe Bradford Hill was
7       mentioned in -- in these
8       particular lectures, no.
9   BY MR. TISI:
10      Q.   Okay.  Okay.  Now before we
11  discuss any further, let me just go back
12  and -- and ask you.
13           The front page of your
14  report talks about general causation
15  Daubert hearings, the page that you
16  signed, correct, on Exhibit 1?
17      A.   That's what it says.
18      Q.   Okay.  And has -- has it
19  been explained to you or do you have any
20  understanding -- let me rephrase the
21  question.
22           Do you have any
23  understanding as to what Daubert hearings
24  are?

Page 204

1       A.   Just, just a very vague.
2       Q.   What is your understanding?
3            MS. MILLER:  Objection.
4       That's a legal question.  I don't
5       think that's a question for an
6       expert.  That's a question for a
7       lawyer.
8   BY MR. TISI:
9       Q.   What is your --
10           MR. TISI:  I understand.
11  BY MR. TISI:
12      Q.   What is your understanding?
13           MS. MILLER:  She's not an
14      expert on the law --
15           MR. TISI:  I'm asking her
16      what her understanding is.
17           THE WITNESS:  I --
18           MS. MILLER:  I understand,
19      but I don't think that's an
20      appropriate question.
21           MR. TISI:  Okay.  Fine.
22           THE WITNESS:  Yeah, I don't
23      even know if I -- I even want to
24      hazard what my understanding is,

Page 205

1       because that's outside the scope
2       of my expertise.
3            And I -- I've been learning,
4       as I have mentioned, I've been
5       learning through these processes
6       that the words I use are very
7       important.  And so I am just not
8       even going to hazard.
9   BY MR. TISI:
10      Q.   Whether you -- do you know
11  whether or not in these hearings the
12  question is going to be whether or not
13  the witnesses are qualified?
14           MS. MILLER:  Objection.
15  BY MR. TISI:
16      Q.   Do you have any
17  understanding of that?
18           MS. MILLER:  Objection.
19      Again, that was two questions.  I
20      think it's really hard when you
21      ask two questions.  I'm sorry to
22      keep repeating this.
23  BY MR. TISI:
24      Q.   Do you have -- do you have

52 (Pages 202 to 205)

Karla Ballman, Ph.D.

Page 206

1    any understanding as to one in the issues
2    in the Daubert hearings is whether the
3    witness is qualified to give an opinion
4    on which they are proffered to give an
5    opinion on?
6        A.   I -- I -- my understanding
7    is, is experts should be experts in -- in
8    the area that they were retained for.
9        Q.   And use a proper
10   methodology, correct?
11       A.   Well, if they were experts,
12   I would presume that -- that they use --
13   they are experts in their area so they
14   know what to do.
15       Q.   Do you have any --
16       MS. MILLER:  Objection.
17   BY MR. TISI:
18       Q.   And that -- so, you agree
19   with me that being qualified experts in
20   the field, that the plaintiffs' experts
21   as your -- have used a proper
22   methodology, they all looked at Bradford
23   Hill, correct?
24       MS. MILLER:  Objection.

Page 207

1        THE WITNESS:  Yeah, that's
2    starting to go beyond my -- my
3    understanding of law.  I mean I
4    know that the -- both sides have
5    experts and they -- both sides'
6    experts say what they're experts
7    in, are -- were retained on the
8    basis of what their expertise is,
9    but that -- that's basically all I
10   know.
11   BY MR. TISI:
12       Q.   Do you have any reason to
13   believe, based upon -- you may disagree
14   with some of the weights or -- and I
15   think you're pretty clear in your report
16   of some of the criticisms that you have
17   about the way in which certain evidence
18   was looked at by some plaintiffs'
19   experts.  Putting aside Smith-Bindman's
20   meta-analysis for a moment.
21       Isn't it fair to say that
22   they applied the same general methodology
23   that you did?
24       MS. MILLER:  Objection.

Page 208

1        THE WITNESS:  I mean,
2    that -- that's a very vague
3    question.  So I -- I can say what
4    I did.  I looked at the totality
5    of the evidence using established
6    epidemiology framework, and I came
7    to the conclusion that there is no
8    credible evidence --
9    BY MR. TISI:
10       Q.   Okay.
11       A.   -- of a causal association
12   between talc and --
13       Q.   I understand that you --
14       MR. TISI:  Again, she's not
15   answering my question --
16       MS. MILLER:  She still has
17   to --
18       MR. TISI:  No, I understand,
19   but she can't filibuster.
20   BY MR. TISI:
21       Q.   I'm -- I didn't ask you what
22   you did.
23       I'm asking you, did the
24   experts when you read their reports on

Page 209

1    the plaintiffs' side, whether you agreed
2    or disagreed with their conclusions, did
3    they use the same framework that you did?
4        MS. MILLER:  Objection.
5        THE WITNESS:  I -- I can't
6        say that.
7    BY MR. TISI:
8        Q.   Okay.
9        A.   I mean, I -- I don't know --
10       Q.   And that's fine then.  Just
11   answer it that way.
12       A.   Okay.  I -- I can't say that
13   with certainty.
14       Q.   That's fine.
15       Is there any methodologic
16   flaw, apart from you that you gave
17   different -- different weights to the
18   evidence and you looked at the evidence
19   differently, is there any methodologic
20   flaw that you have identified in any of
21   the plaintiffs' experts' reports?
22       MS. MILLER:  Objection.  Is
23       there a specific expert you're
24       referring to?

53 (Pages 206 to 209)

Karla Ballman, Ph.D.

Page 210

```
1        MR. TISI:  I'm -- if she
2    says yes, I will then go through
3    them.
4  BY MR. TISI:
5        Q.   Apart from Smith-Bindman.
6  And I know you have a whole section on
7  Smith-Bindman.
8        A.   Well, I -- I also have sort
9  of -- I -- I address other opinions that
10 experts have made and -- and say why I --
11 I don't believe that the scientific
12 evidence supports what they -- they came
13 to.
14       So obviously, I mean that --
15 that's -- that I think is part and parcel
16 as to --
17       Q.   But that's a conclusion
18 question, right?  So -- so --
19       MS. SHARKO:  You can't
20 interrupt the witness.
21       MR. TISI:  You know, she --
22       MS. MILLER:  This is crazy.
23       MR. TISI:  All right.  You
24 know --
```

Page 211

```
1        MS. MILLER:  You've
2    interrupted every sentence that
3    she's given you since we came back
4    from the break and that's just not
5    fair.
6        MR. TISI:  I must tell you,
7    you are not going to do this.
8        MS. MILLER:  I'm not going
9    to do what?
10       MR. TISI:  So -- so -- let
11   me -- let me --
12       MS. SHARKO:  You're not
13   going to do this.
14       MR. TISI:  Are we doing one
15   or two now?
16       MS. SHARKO:  Mr. Tisi, you
17   can't interrupt the witness.
18       MR. TISI:  Okay.
19       MS. SHARKO:  You know that,
20   so behave yourself.
21       MR. TISI:  We have -- so why
22   don't you switch seats -- you can
23   switch seats and we can go --
24   we -- we can have one at a time.
```

Page 212

```
1        I assume your learned
2    counsel here knows how to defend a
3    deposition.  Can I assume that?
4        MS. SHARKO:  Are we going to
5    take my deposition now?
6        MR. TISI:  Well, I mean,
7    unless -- if you want to go under
8    oath I'm happy to ask you
9    questions.
10       MS. SHARKO:  Is that a --
11       MR. TISI:  Otherwise --
12   otherwise, I would appreciate it
13   if you would simply observe.
14  BY MR. TISI:
15       Q.   So, Dr. Ballman, have you
16  identified any methodologic -- apart from
17  disagreeing about some of the weights
18  that Dr. Siemiatycki ascribed to certain
19  studies, do you have any criticism of the
20  methodology he used?
21       A.   Of what he used in his
22  meta-analyses?
23       Q.   In hi -- in any -- in his
24  report, entirely.
```

Page 213

```
1        A.   So, I mean, overall, you
2    know, I -- I think that there are flaws
3    in the methodology of all the experts.
4        Q.   Okay.  Tell me what -- tell
5    me what they are.
6        A.   Well, we can go through my
7    report.
8        Q.   No, I want you -- you can go
9    through your report.  But I -- just give
10   me a general understanding about what
11   your criticism with Dr. Siemiatycki is.
12       MS. MILLER:  If you need to
13   look at your report --
14       THE WITNESS:  Yeah, I
15   can't --
16       MS. MILLER:  -- don't let
17   him prevent you from looking at
18   your report.
19       THE WITNESS:  Yeah, and I
20   need to -- I need to look at
21   his -- the expert report of
22   Dr. Siemiatycki in order to make
23   sure that --
24  BY MR. TISI:
```

54 (Pages 210 to 213)

Karla Ballman, Ph.D.

Page 214

1    Q.   As you sit here right now
2  without looking at his report, do you
3  have any criticisms of Dr. Siemiatycki
4  that you can -- that you can articulate
5  for me?
6         MS. MILLER:  Objection.
7     That's not fair.  The witness said
8     she needs to look at her report.
9     She needs to look at his report.
10    This is not a memory test, is it?
11        MR. TISI:  I'm here to take
12    her deposition.
13  BY MR. TISI:
14    Q.   So I'd like to know, as you
15  sit here -- I assume you spent time with
16  counsel preparing, correct?
17    A.   I would like to see the
18  reports, please, because I don't want to
19  misstate something just because my memory
20  is -- is not well -- doing well right
21  now.
22    Q.   So you cannot -- you
23  cannot -- is it fair to say that you
24  cannot offer an opinion as to the

Page 215

1  methodologic flaws of Jack Siemiatycki
2  without sitting here and going through
3  his report?
4         MS. MILLER:  Objection.
5  BY MR. TISI:
6    Q.   Because I assumed you would
7  have done that before today.
8         MS. MILLER:  Objection.
9         THE WITNESS:  I think it's
10    fair to say that I have reviewed
11    many expert reports.  I wrote my
12    report.  And everything is
13    becoming a jumble.  And I just
14    want to make sure that I -- I can
15    refresh my memory in order to
16    render the opinions you're looking
17    for.
18  BY MR. TISI:
19    Q.   Do you understand that in a
20  Daubert hearing that you too will be
21  questioned about your -- both your
22  qualifications and your methodology?  Do
23  you understand that?
24    A.   I -- I -- I'm not a lawyer,

Page 216

1  so I don't know exactly what I'm going to
2  be questioned on.
3    Q.   Okay.  Now, you offered an
4  opinion in the Viagra Cialis product
5  liability litigation?
6    A.   I did.
7    Q.   Like in this case, you were
8  asked by a pharmaceutical company lawyer
9  to testify on issues about whether or not
10  a product causes a disease, correct?
11        MR. LOCKE:  Objection.
12        THE WITNESS:  In Viagra, I
13    was asked to evaluate the totality
14    of the evidence that exists as to
15    whether or not exposure to Cialis,
16    in particular, I think, because
17    Lilly, I think, is Cialis and not
18    Viagra.
19        Whether or not it causes
20    melanoma.
21  BY MR. TISI:
22    Q.   Okay.  So the answer to my
23  question is you were asked to look at a
24  general causation question as to whether

Page 217

1  or not a product causes a disease?
2         MS. MILLER:  Objection.
3         THE WITNESS:  I don't
4    know --
5         MS. MILLER:  Please.
6         THE WITNESS:  -- that the --
7    I'm sorry.
8    Can I answer?
9  BY MR. TISI:
10    Q.   Please.
11        MS. MILLER:  Of course.
12    Just give me time.  That's all I'm
13    asking.
14        THE WITNESS:  So, I don't
15    know what general causation means.
16  BY MR. TISI:
17    Q.   I didn't ask you general
18  causation.
19    A.   I thought you did.
20    Q.   If I did -- the question was
21  to whether --
22        MS. MILLER:  "So the answer
23    to my question is you were asked
24    to look at a general causation

55 (Pages 214 to 217)

Karla Ballman, Ph.D.

Page 218

```
 1        question." You did say --
 2            MR. TISI:  Well, I wasn't
 3        talking general causation.
 4   BY MR. TISI:
 5        Q.   A general question about
 6   whether or not a product causes a
 7   disease.
 8            MS. MILLER:  Objection.
 9            THE WITNESS:  Again, I told
10        you what I was asked to look for
11        there.  I was -- and I am giving
12        specifics rather than
13        generalities.  I was asked to look
14        at the totality of the
15        epidemiology literature as to
16        whether or not there is evidence
17        that use of Cialis or a PDE5
18        inhibitor more generally causes
19        melanoma.
20   BY MR. TISI:
21        Q.   Okay.  And so you were
22   looking about a causation question?
23            MS. MILLER:  Objection.
24            THE WITNESS:  Again, I told
```

Page 219

```
 1        you what I was -- I don't know
 2        why --
 3   BY MR. TISI:
 4        Q.   You can't tell me whether or
 5   not you were looking at a causation
 6   question in Viagra/Cialis?
 7        A.   I think I answered that.  I
 8   want to be very specific at what I looked
 9   at.
10        Q.   And I'm being very -- and
11   I'm trying to ask you a question.
12            Let me ask you.  Let me
13        change it.
14            Did your talc general
15        causation report lay out your
16        qualifications -- let me rephrase the
17        question.
18            Your Viagra/Cialis report
19        was issued last year in mid-2018,
20        correct?
21        A.   I believe that's about
22   the -- or October maybe.  I'm not -- I
23   don't know.
24        Q.   That was your deposition.
```

Page 220

```
 1   That was your deposition.
 2        A.   Oh, okay.  Okay.
 3        Q.   Okay.  Your --
 4        A.   Yeah, the report was
 5   probably midyear.
 6        Q.   Was the causation --
 7   causation methodology that you employed
 8   to look at the question about whether or
 9   not Cialis was capable of causing
10   melanoma the same methodology you used in
11   this case?
12        A.   My general approach was
13   similar.  I review the data.  I -- or the
14   literature.  I -- I, you know, determine,
15   you know, whether or not there appears to
16   be evidence of causation using
17   established epidemiology principles and I
18   come to a conclusion.
19        Q.   Is there any -- did you
20   change your methodology at all between
21   Viagra/Cialis and this case.  In other
22   words, did you use a different -- a
23   different standard to evaluate evidence
24   or the same standard?
```

Page 221

```
 1            MS. MILLER:  Objection.
 2   BY MR. TISI:
 3        Q.   In that case as you did
 4   here?
 5            MS. MILLER:  Sorry.  I
 6        thought you were done.  Objection.
 7            THE WITNESS:  I don't know
 8        what you mean different standard
 9        versus the same standard.
10            Are you talking about did I
11        use different words in my report?
12        Did I use different --
13   BY MR. TISI:
14        Q.   No.  I'm asking whether you
15   used the same general framework.  For
16   example, did you use the Bradford Hill
17   framework with respect to Viagra Cialis
18   that you used here?
19        A.   I used established
20   epidemiology principles for looking at
21   causation, which are based in the
22   Bradford Hill criteria.
23        Q.   Okay.  And is there anything
24   that you can think of that would be
```

56 (Pages 218 to 221)

Karla Ballman, Ph.D.

Page 222

```
 1    different -- in other words, if I looked
 2    at your Viagra Cialis deposition and your
 3    expert report, would it reflect the same
 4    methodology that you used here?
 5        A.    I -- I don't know how you
 6    would --
 7        Q.    Putting aside the evidence.
 8            MS. MILLER:  She was in the
 9    middle of --
10            MR. TISI:  Well, I -- I --
11            MS. MILLER:  She was
12    literally in the middle of the
13    sentence.  I don't think --
14            MR. TISI:  I am going to
15    withdraw the question, Counsel.
16            MS. MILLER:  Okay.
17    BY MR. TISI:
18        Q.    Okay.  Putting aside the
19    fact that the evidence is different -- I
20    mean, obviously it's a different product,
21    different disease here.  Putting that
22    issue aside.
23            If the same -- did you apply
24    the same general framework and approach
```

Page 223

```
 1    in looking at the causation question in
 2    Viagra/Cialis as you did here?
 3            MS. MILLER:  Same
 4    objections.
 5            THE WITNESS:  So, as I
 6    explained, I -- I -- and I don't
 7    know how to explain it any
 8    differently.
 9            So I -- I looked at all the
10    available evidence that was in the
11    literature.  I used the Bradford
12    Hill criteria as the basis for
13    looking at whether or not there
14    was causation, and then I -- I
15    rendered sort of what I -- what my
16    opinion was.
17    BY MR. TISI:
18        Q.    And that is the -- that is
19    the standard epidemiologic methodology,
20    true?
21            MS. MILLER:  Objection.
22            THE WITNESS:  I think it's
23    an accepted epidemiological -- or
24    epidemiologic methodology.
```

Page 224

```
 1    BY MR. TISI:
 2        Q.    Okay.  And is there any
 3    difference that you can think of in the
 4    approach that you made in Viagra-Cialis
 5    than you did here?
 6        A.    I -- I'm not sure what
 7    you're looking for.  I have my --
 8        Q.    I'm not looking for
 9    anything.  I'm just looking to say, if
10    you were giving a lecture to -- to
11    students and say, you know, in both of
12    these I use the same -- you know, this is
13    how you do it.  For example, in
14    Viagra-Cialis I did it the same way I did
15    it in the talc litigation.
16            MS. MILLER:  Objection.
17    BY MR. TISI:
18        Q.    Did you do it the same?
19        A.    Again, I said I reviewed the
20    literature, I applied Bradford Hill
21    criteria as the basis as to determining
22    whether or not there is causality, and I
23    rendered an opinion.
24        Q.    Was the description of the
```

Page 225

```
 1    methodology you used in Viagra-Cialis
 2    truthful?
 3            MS. MILLER:  Objection.  Do
 4    you want to put in front of her --
 5            MR. TISI:  No, I don't.
 6            MS. MILLER:  But that's not
 7    fair.
 8            MR. TISI:  I asked her --
 9            MS. MILLER:  You are turning
10    this deposition into a memory
11    test.
12            MR. TISI:  Counsel.
13    Counsel, this is not a memory
14    test.
15            MS. MILLER:  Okay.
16    BY MR. TISI:
17        Q.    Did you -- is there
18    anything -- have you re-read your
19    deposition in Viagra-Cialis?
20        A.    My deposition?
21        Q.    Mm-hmm.
22        A.    No.
23        Q.    Do you know that there's --
24        A.    Well, the deposition?
```

57 (Pages 222 to 225)

Karla Ballman, Ph.D.

Page 226

1    Q.   Mm-hmm.
2    A.   In Viagra-Cialis?
3    Q.   Mm-hmm.
4    A.   I've read parts of it, yes.
5    Q.   Okay.  Do you know that
6  there's a Daubert challenge to you in
7  Viagra-Cialis?
8    A.   Yes, I am aware of that.
9    Q.   Okay.  And you know that the
10 hearing is in June, correct?
11   A.   No, I didn't know that.
12   Q.   Okay.  Have you not been
13 told that there's a hearing set?
14   A.   No, I have not been told
15 that.
16   Q.   And is there anything about
17 your approach in Viagra-Cialis as a
18 result of re-reading your testimony that
19 you would change about your approach that
20 you did it here?
21   A.   No.
22       MS. MILLER:  Objection.
23 BY MR. TISI:
24   Q.   Okay.  So that --

Page 227

1        MS. MILLER:  Please try to
2  remember to leave me time to
3  object, please.
4  BY MR. TISI:
5    Q.   Would you --
6        MS. MILLER:  You two are
7  talking over each other and I'm
8  not having an opportunity to
9  object properly.
10       I want the record to show my
11 objection before your answer.
12       MR. TISI:  How about if I
13 just agree that you object to
14 every question and we can move on?
15       MS. MILLER:  How about we
16 just agree that you start asking
17 unobjectionable questions?  It
18 would be so much smoother --
19       MR. TISI:  I am so happy --
20       MS. MILLER:  -- and the depo
21 would go so much quicker.
22       MR. TISI:  -- I will submit
23 every question I have to the
24 court.

Page 228

1        MS. MILLER:  Okay.  Go
2  ahead.
3  BY MR. TISI:
4    Q.   Would you agree that --
5  you've testified to this before, sort of
6  about epidemiology and biostatistics.
7  While there's some overlap obviously
8  between biostatistics and epidemiology,
9  you've pointed that out.  And these are
10 related fields, that they are two
11 distinct scientific disciplines?
12   A.   I think, as I mentioned,
13 that at the basic level, the overlap is
14 almost complete between epidemiology and
15 biostatistics.
16   Q.   Okay.
17   A.   So Epi 101 and Biostats 101
18 are -- are very, very similar.  If you
19 would look at table of contents of books
20 they would have similar concepts being --
21 being taught.
22       I would also say that within
23 clinical research the overlap between
24 epidemiology and biostatistics is very

Page 229

1  complete.
2        I would also say that
3  epidemiology as a field has other areas
4  that aren't so overlapped with
5  biostatistics, such as public health.
6  That -- that is a pure epi sort of topic.
7        Within biostats, there are
8  areas in biostats that are not that
9  overlapping with epidemiology.  It's the
10 area where people want to develop new
11 mathematical techniques and so that's
12 almost more overlapping with mathematics
13 because of the theory beneath it.
14       And so I, as a clinical
15 research in my career over the last
16 20-some years, sits right in that really
17 overlapped area.  And so that's what --
18 what I do.
19   Q.   Okay.  Let me -- let me move
20 to strike the answer because it wasn't --
21 that wasn't my question.
22       My question was, would you
23 agree -- let me -- me give you a
24 different question.

58 (Pages 226 to 229)

Karla Ballman, Ph.D.

Page 230

1          Would you agree that being
2    an epidemiologist does not automatically
3    qualify a professional as a statistician
4    or biostatistician?
5          MS. MILLER: Objection.
6          THE WITNESS: I -- I'm not
7     sure what exactly you're -- you're
8     asking there.
9    BY MR. TISI:
10         Q.   Has every -- can every
11   epidemiologist do what you do?
12         A.   I -- I would have to see
13   what the particular epidemiologist --
14         Q.   I'm not asking that --
15         A.   -- the experience and
16   training is in order to --
17         Q.   Because -- because they are
18   distinct fields, true?
19         There is overlap, just like
20   cardiology and cardiac surgery, overlap,
21   right?
22         MS. MILLER: Objection.
23   She's --
24   BY MR. TISI:

Page 231

1          Q.   Epidemiology and
2    biostatistics overlap, true?
3          MS. MILLER: That's three
4     questions. I'm looking at the --
5    BY MR. TISI:
6          Q.   I'm asking you the question:
7    Do epidemiology and biostatistics
8    overlap?
9          A.   They overlap considerably in
10   some areas.
11         Medicine and epidemiology
12   overlap. There are medical doctors that
13   do epidemiology. But medicine is very
14   different and distinct discipline from
15   epidemiology.
16         Q.   Is epidemiology concerned
17   with the distribution causation and
18   control of disease across time and space
19   and human populations?
20         A.   I believe that's one
21   definition that one could use.
22         Q.   In fact, that's the
23   definition on your website, is it not?
24         A.   It may well be.

Page 232

1          MS. MILLER: Objection.
2     What do you mean by her website?
3          MR. TISI: Can we have the
4     next exhibit, please. Exhibit 11.
5          (Document marked for
6          identification as Exhibit
7          Ballman-11.)
8    BY MR. TISI:
9          Q.   This is your website from
10   Weill Cornell?
11         A.   I -- I don't know if it's my
12   website. I believe it's the division's
13   website of biostatistics and
14   epidemiology.
15         Q.   It has your picture on it?
16         A.   Well, it has my picture on
17   it, but it says biostatistics and
18   epidemiology. It doesn't say Karla
19   Ballman at the top.
20         Q.   Actually it says, "Weill
21   Cornell Medical Center Biostatistics and
22   Epidemiology," correct?
23         A.   Way at the top, yes.
24         Q.   Right. And underneath your

Page 233

1    picture it says Dr. Karla Ballman?
2          A.   Yes, that's correct.
3          Q.   And underneath that it has
4    two separate definitions, one for
5    biostatistics and one for epidemiology,
6    correct?
7          A.   Yeah, that's what's there.
8          Q.   "Epidemiology says it's
9    concerned with the distribution,
10   causation, and control of disease across
11   time and space in human population."
12         Do you see that?
13         A.   Yes, that's what's written
14   there, yes.
15         Q.   Okay. And underneath --
16   above that is a section that says,
17   "Biostatistics is the application of
18   statistical techniques to scientific
19   research in health-related fields
20   including medicine, biology, and public
21   health in the development of novel
22   methodologies that could improve the
23   application. Since the beginning of the
24   Twentieth Century, the field of

59 (Pages 230 to 233)

Karla Ballman, Ph.D.

Page 234

1    biostatistics has become an in
2    dispensable tool in improving health and
3    reducing illness."
4            Correct?
5        A.   What you read there is what
6    it states.  I mean, I'll point out that's
7    this is a biostatistics --
8        Q.   That's all I asked.
9        A.   -- and epidemiology
10   department --
11       Q.   All I asked is whether I
12   read it correctly.
13       A.   You did read it correctly.
14       Q.   Thank you.  This is your
15   website for your department, correct?
16       A.   So I don't think you're
17   letting me sort of address what you're
18   trying to imply.
19       Q.   I'm not trying to imply
20   anything.
21           MS. MILLER:  Please, let her
22   answer.
23           MR. TISI:  No, the problem
24   is -- I think her answer really

Page 235

1           illustrates the problems here.
2           She's anticipating where she
3           thinks that I'm going.  I'm asking
4           her very straightforward
5           questions.
6    BY MR. TISI:
7        Q.   The question is, is this
8    your department's web page?
9        A.   Yes.
10           MS. MILLER:  I think you
11           know the answer to that.  So
12           that's --
13           MR. TISI:  Okay.  Well, I
14           have to put it on the record,
15           Counsel.
16   BY MR. TISI:
17       Q.   Is it your department's web
18   page?
19       A.   I believe it is.  I haven't
20   been out at that web page in -- I don't
21   know when.  So if you say this is what
22   you got from our -- as our division's web
23   page, I will take that as your word.
24       Q.   And it has two separate

Page 236

1    definitions, one for biostatistics and
2    one for epidemiology, correct?
3            MS. MILLER:  Objection.
4            THE WITNESS:  It has -- it
5    has two statements there.  One for
6    biostatistics and one for
7    epidemiology.  And then it has,
8    "The mission of the division of
9    biostatistics and epidemiology."
10   And that's not -- that's the
11   mission of our division --
12           MR. TISI:  Counsel --
13           THE WITNESS:  -- which is to
14   develop epidemiologic studies in
15   the fields of hypertension,
16   women's health, perioperative --
17           MR. TISI:  -- honestly can
18   you just ask your witness to
19   answer the question.
20           THE WITNESS:  -- outcomes and
21   anesthesiology.  And that is
22   actually quite outdated because we
23   do more than that.
24           MR. TISI:  Okay.  Okay.

Page 237

1            Counsel, I'm really going to ask
2            you, maybe we can take a break and
3            you can ask your witness to answer
4            the question.
5    BY MR. TISI:
6        Q.   I'm simply asking, are there
7    two separate definitions on this page?
8            MS. MILLER:  You've asked
9            that three times.
10           MR. TISI:  Well, but I'm not
11           getting an answer.  She wants to
12           go and read the rest of the
13           document.
14           MS. MILLER:  You said it
15           has -- she did answer.  "It has
16           two separate definitions" --
17           MR. TISI:  And she goes on.
18           MS. MILLER:  -- "one for
19           biostatistics and one for
20           epidemiology, correct?"  And she
21           says, "It has two statements
22           there, one for biostatistics and
23           one for epidemiology.  And then it
24           has the mission of division of

60 (Pages 234 to 237)

Karla Ballman, Ph.D.

Page 238

1    biostatistics" --
2        MR. TISI: Did I ask her
3    that? Did I ask her about the
4    mission?
5        MS. MILLER: Did she not
6    answer your question, sir?
7        MR. TISI: Yes, but then she
8    goes on a speech.
9        MS. MILLER: You are pulling
10   statements out of context --
11       MR. TISI: I'm not pulling
12   it out of context.
13       MS. MILLER: -- and she's
14   providing some context. She's
15   providing the context --
16       MR. TISI: Counsel.
17   Counsel.
18       MS. MILLER: Why are you
19   yelling at me?
20       MR. TISI: Because I think
21   this is bizarre.
22       MS. MILLER: Really? I
23   think you're --
24       MR. TISI: I simply asked

Page 239

1    are there two definitions on the
2    page, one for epidemiology. I did
3    not ask anything about the mission
4    of the department, did I?
5        MS. MILLER: She answered
6    your question.
7        THE WITNESS: Actually, can
8    I -- can I. You said two
9    definitions. And I said -- I
10   think I said two statements. It
11   nowhere here says these are
12   definitions.
13   BY MR. TISI:
14       Q.   Okay.
15       A.   These are just descriptions,
16   and it's not a definition. And -- okay.
17       Q.   I'll let -- I'll let -- I'll
18   let the judge and jury decide whether or
19   not these are definitions when it says
20   "biostatistics is" and "epidemiology is."
21   We'll let them decide that.
22       MS. MILLER: What jury are
23       you talking about?
24   BY MR. TISI:

Page 240

1        Q.   These are two separate --
2    these are two separate statements by
3    biostatistics and epidemiology, true?
4        MS. MILLER: Objection.
5        Asked and answered four times or
6        five.
7    BY MR. TISI:
8        Q.   Are they separate
9    statements?
10       A.   They are separate
11   statements.
12       Q.   Thank you.
13       A.   Because --
14       MS. MILLER: Finish your
15       sentence if you'd like to.
16       THE WITNESS: Well, they are
17       separate statements, because it
18       says biostatistics and
19       epidemiology on top. So, I mean,
20       why wouldn't you have sort of two
21       separate, you know --
22   BY MR. TISI:
23       Q.   I am not asking why you
24   would. I'm just asking whether you do.

Page 241

1        A.   Yeah, there are two
2    separate --
3        Q.   Perfect.
4        A.   -- descriptions.
5        Q.   Perfect. Now, the next
6    question is, there are people within your
7    department who actually do have degrees
8    in epidemiology, true?
9        A.   I know of one. Can you name
10   several more?
11       Q.   Dr. Drusin. He's a medical
12   doctor with a degree in epidemiology?
13       A.   He is adjunct -- he is in my
14   department -- my division I think. But
15   it's unclear as to whether he belongs
16   there, because we had a whole -- had a
17   whole restructure of our department a
18   while ago. And there were other
19   divisions, and he belonged to a different
20   division and got put into my --
21       Q.   Does Dr. Gerber have a Ph.D.
22   in epidemiology?
23       A.   She does have a Ph.D. in
24   epidemiology and does -- and we talked

61 (Pages 238 to 241)

Karla Ballman, Ph.D.

Page 242

1  about her work --
2      Q.   I just asked you whether she
3  had it.  That's all.  Simple question.
4      A.   Okay.  I'm just trying to
5  say that she feels she's more of a
6  biostatistician.
7      Q.   I'm not asking what she
8  feels, Doctor.  I really am asking you,
9  does she have a degree in epidemiology.
10     A.   She has a degree in
11  epidemiology.
12     Q.   Does Dr. -- does Professor
13  Christos have a master's in epidemiology?
14     A.   I don't know.  I believe
15  it's in public health.
16     Q.   Okay.
17     A.   Which is different from
18  epidemiology --
19     Q.   Now --
20     A.   -- in the same way as
21  statistics -- a lot of overlap, like with
22  biostatistics.
23     Q.   Doctor, I'm going to show
24  you what's marked as Exhibit Number 12.

Page 243

1          This will be very quick.
2          (Document marked for
3          identification as Exhibit
4          Ballman-12.)
5  BY MR. TISI:
6      Q.   This is a portion of a
7  transcript from the Center For Devices
8  and Radiologic Health Medical Advisory
9  Committee that you sat on in June of
10  2018.
11         Do you see that?
12     A.   Well, I -- I see the
13  document that you handed me, yes.
14     Q.   And in the -- on Page 7 it
15  says, from Dr. Nathan, it says -- fourth
16  paragraph down, "Before we begin, I'd
17  like to ask our distinguished panel
18  members and FDA staff seated at this
19  table to introduce themselves.  Please
20  state your name, your area of expertise,
21  your position, and your affiliation.
22  We'll go counterclockwise and start with
23  Ms. Barnes."
24         Do you see that?

Page 244

1      A.   You read that correctly.
2      Q.   Would you please go to the
3  next page and look down the page, and
4  when you were asked that question, what
5  did you say?
6      A.   So -- and I believe I
7  answered this before.
8      Q.   I'm just asking what you
9  said.  Would you read into the record
10  what you said.
11     A.   I will.  I will.
12     Q.   Thank you.
13     A.   And again, I'm just
14  reiterating that this is --
15     Q.   You don't need to reiterate.
16  I'm just simply asking you what you said.
17     A.   So it says, "I'm Karla
18  Ballman.  I'm the division chief of
19  biostatistics and epidemiology at Weill
20  Cornell Medicine in New York City, and
21  obviously I'm a statistician."
22     Q.   Thank you.
23     A.   Let me point out that there
24  are others here who also have MPH

Page 245

1  degrees, and they identify themselves as
2  doctors.
3          So again it depends upon
4  what role you play within these
5  committees.
6      Q.   Doctor, you are a member of
7  SARC, what is SARC?
8      A.   SARC is the -- is a
9  nonprofit organization that does research
10  in sarcoma.
11     Q.   Okay.  And there's a web
12  page for you on SARC.
13         (Document marked for
14         identification as Exhibit
15         Ballman-13.)
16  BY MR. TISI:
17     Q.   Exhibit Number 13.
18         Does it identify you as
19  statistician at the top?
20     A.   It does say statistician at
21  the top.  But it says I'm professor of
22  biostatistics in the division of Weill
23  Cornell biostatistics and epidemiology.
24  "She is a recognized expert in cancer

62  (Pages 242 to 245)

Karla Ballman, Ph.D.

Page 246

1  research study design and analyses for
2  clinical trials."
3           There's that overlap again
4  with epidemiology.
5      Q.   Does it say anything about
6  causation there?
7           MS. MILLER:  Objection.
8  BY MR. TISI:
9      Q.   To say I'm an expert in
10  analyzing whether or not substances cause
11  disease?
12           MS. MILLER:  Objection.
13           THE WITNESS:  That -- that's
14      very specific.
15           Let me say that if you --
16  BY MR. TISI:
17      Q.   Does it say that there?
18           MS. MILLER:  Objection.
19           THE WITNESS:  Well, it
20      doesn't say that there, but --
21  BY MR. TISI:
22      Q.   Thank you.
23      A.   -- it doesn't say many
24  things that -- that I do.

Page 247

1      Q.   Are you a member of the --
2  what's known as the American Statistical
3  Association?
4      A.   I am.
5      Q.   What is the American
6  Statistical Association?
7      A.   It's the American
8  Statistical Association.
9      Q.   Is it a reputable
10  organization of statisticians?
11           MS. MILLER:  Objection.
12           THE WITNESS:  And
13      epidemiologists.
14  BY MR. TISI:
15      Q.   Okay.  And -- and
16  epidemiologists.  Okay.
17           And the American Statistical
18  organization, is -- and I'm going to have
19  this marked as exhibit -- what is this,
20  Exhibit 14?
21           (Document marked for
22      identification as Exhibit
23      Ballman-14.)
24  BY MR. TISI:

Page 248

1      Q.   This is the website of the
2  American Statistical Association.  And it
3  says the -- it says, "The American
4  Statistical Association is the world's
5  largest community of statisticians.  The
6  Big 10 for statistics."
7           Do you see that?
8      A.   Yeah.  I -- I just don't
9  know.  This is -- I -- I don't know where
10  you pulled this off from the ASA.  So I
11  mean, that's what it says on this
12  particular page.
13      Q.   And it has a directory, if
14  you go to the last page, and you are
15  listed as a consultant.
16           Do you see that?
17      A.   Yes, I see that.
18      Q.   It has your phone number and
19  your e-mail address and all the
20  information?
21      A.   Yeah, mm-hmm.
22      Q.   Okay.  Could you read --
23  read for the record what you identified
24  to your colleagues as your areas of

Page 249

1  expertise?
2      A.   Biometrics, and
3  biostatistics, and -- and data collection
4  procedures, operations research, and
5  statistical training.
6      Q.   Anything else?
7      A.   Well, I just want to point
8  out that again data collection procedures
9  is -- is an area of epidemiology, and
10  biometrics and biostatistics, as I said,
11  also have considerable overlap with
12  epidemiology.
13      Q.   By the way, the American --
14  you were an officer in the American
15  Statistical Association, I think you
16  said?
17      A.   Did I say that?
18      Q.   I think it's in your -- I
19  think it's in your CV, your CV.
20      A.   I'll have to look at my CV.
21  But I -- I did play some roles in there
22  at some point.
23      Q.   They were volunteer roles,
24  right?

63  (Pages 246 to 249)

Karla Ballman, Ph.D.

Page 250

1    A.   They were volunteer roles.
2    Q.   Have you ever -- do you know
3  what it takes to be a fellow at the
4  American Statistical Association?
5    A.   No, I do not.
6    Q.   Okay.  Do you know that they
7  have a fellow program where colleagues
8  have -- can nominate people with
9  distinguished careers in statistics for
10  membership in their organization?
11    A.   I --
12        MS. MILLER:  She just said
13  she doesn't know what it is.
14        MR. TISI:  Then let's mark
15  it.
16        THE WITNESS:  Well, I -- I
17  don't know the specifics of it.
18  But I -- I believe that's the
19  purpose of -- and most fellowships
20  in any profession have that.
21        (Document marked for
22        identification as Exhibit
23        Ballman-15.)
24  BY MR. TISI:

Page 251

1    Q.   I'm going to -- yeah.
2  Other than my -- and I -- I
3  sent this to my e-mail address, and I
4  apologize.
5        But other than that, this is
6  a list from the website from the ASA.
7    A.   Mm-hmm.
8        MR. TISI:  I only have one
9  copy I printed out this morning,
10  I'm sorry, Counsel, if you would
11  share it.
12  BY MR. TISI:
13    Q.   It says, "A designation of
14  an ASA fellow has been a significant
15  honor for nearly 100 years.  People
16  can" --
17        MS. MILLER:  Actually isn't
18  every page the same?
19        THE WITNESS:  Oh yeah.
20        MR. TISI:  Maybe it is.  I
21  apologize.
22        MS. MILLER:  Wait, this is
23  confusing.  I just want to state
24  for the record that this is a

Page 252

1  three-page exhibit.  But the first
2  two pages are Page 1 of 2 and the
3  last one is Page 2 of 2.
4        Do you want me to pull out
5  this so that it's an accurate
6  exhibit?
7        MR. TISI:  That's fine.
8  Thank you.
9        MS. MILLER:  So here we go.
10  I've pulled out the middle page,
11  and now we have Page 1 of 2 and
12  Page 2 of 2.
13  BY MR. TISI:
14    Q.   Okay.  Have you ever been
15  nominated as an ASA fellow, do you know?
16    A.   I have no idea.
17    Q.   Okay.  Have you -- are --
18  you are not an ASA fellow, are you?
19    A.   I am not an ASA fellow.
20    Q.   Okay.  And to be clear, an
21  ASA fellow would be somebody whose
22  contribution to the advancement of
23  statistical science and places due weight
24  on public works, positions held with

Page 253

1  employer, ASA activities, membership and
2  accomplishments in societies, and
3  professional activities.
4        And you are not -- you
5  have -- you are not a fellow, correct?
6        MS. MILLER:  Objection.
7        THE WITNESS:  I am not.
8        MS. MILLER:  Please.
9        THE WITNESS:  You read that
10  correctly.  I am not a fellow.
11  BY MR. TISI:
12    Q.   In applying for funds --
13  actually let me stop for a second.
14        You know, from time to time
15  the ASA issues statements about
16  statistical issues?
17    A.   I'm vaguely aware that they
18  issue statements from time to time.
19    Q.   Okay.  In your CV you
20  identify past or present current grants.
21  Have you -- do you know if whether you
22  have ever asked for a -- identified
23  yourself as an epidemiologist by title,
24  as an epidemiologist, not as part of your

64 (Pages 250 to 253)

Karla Ballman, Ph.D.

Page 254

1  department?
2      MS. MILLER: Objection.
3  BY MR. TISI:
4      Q.  As you are describing
5  yourself, in a -- in a grant that you
6  have ever given for any purpose?
7      MS. MILLER: You just kicked
8      me. Objection.
9      MR. TISI: I apologize.
10     THE WITNESS: I -- I have
11     been on so many grant and grant
12     applications that I cannot off the
13     top of my head tell you whether or
14     not I have ever said I am an
15     epidemiologist.
16  BY MR. TISI:
17     Q.  Have you ever to your
18  knowledge ever stood up in a public
19  meeting and said, "I, Karla Ballman, is
20  an -- I am an epidemiologist"?
21     MS. MILLER: Objection.
22  BY MR. TISI:
23     Q.  Like you did before, and
24  say, "I'm a statistician"?

Page 255

1      MS. MILLER: Objection.
2  BY MR. TISI:
3      Q.  Have you ever told your
4  colleagues, "I am an epidemiologist"?
5      MS. MILLER: It's really
6      hard, because I don't know when
7      your question ends. Because you
8      ask a question, and then I object,
9      and then you keep going.
10     MR. TISI: Okay. Fine. I'm
11     sorry.
12     MS. MILLER: It's a very
13     complicated --
14     MR. TISI: I'm sorry it's
15     hard.
16     MS. MILLER: -- record. But
17     it's not fair to the witness,
18     because I don't -- do you know
19     what question --
20     THE WITNESS: I'll --
21  BY MR. TISI:
22     Q.  Have you ever stood up in a
23  public professional meeting and said, "I,
24  Karla Ballman, an epidemiologist"?

Page 256

1      A.  I have been to many
2  professional and public meetings, I don't
3  know if I've ever stood up and said with
4  certainty -- I cannot answer if I've ever
5  stood up and said that.
6      I do have to say that when
7  people hear biostatistics and clinical
8  research, they intertwine epidemiology
9  and biostatistics, so --
10     Q.  But you have never
11  represented to your colleagues
12  affirmatively, "I, Karla Ballman, an
13  epidemiologist"?
14     MS. MILLER: Objection.
15     THE WITNESS: Again, in
16     situations and studies I'm in, by
17     saying a biostatistics and knowing
18     that I do cancer research, they
19     know what that means and they know
20     it involves study design. As you
21     can look in my CV, I have many
22     case-control -- I've done
23     case-control studies. I've done
24     cohort studies. I've done --

Page 257

1  BY MR. TISI:
2      Q.  Okay. Your department, your
3  department offers a two-month review
4  course in epidemiology, taught by
5  Dr. Christos. Do you know that? In
6  October/November of every year?
7      A.  Is it called a review
8  course?
9      Q.  Yes.
10     A.  I'm just having some -- and
11  can I see where you are getting at and
12  what it is?
13     Q.  Exhibit 16.
14     A.  I just want to see what
15  program it's a part of. I'm not
16  disputing that.
17     (Document marked for
18     identification as Exhibit
19     Ballman-16.)
20     THE WITNESS: Is it part of
21     the CTSC program?
22     MR. TISI: Honestly, I've
23     got to -- I thought it was here.
24  BY MR. TISI:

65 (Pages 254 to 257)

Karla Ballman, Ph.D.

Page 258

1    Q.   This is Exhibit Number 17,
2  which is the list of courses that I got
3  from the Weill Cornell website.
4    A.   I see, okay.
5    Q.   Do you see where I'm
6  referring to?
7    A.   Are you -- go ahead.  Ask
8  your question.  I'll let you say it.
9    MS. MILLER:  This is 17.
10  Catherine saying she says that she
11  doesn't believe there's a 16, that
12  you went from 15 to 17.  Is that
13  correct?
14    MR. SOILEAU:  He referenced
15  a 16, but then essentially
16  withdrew it and moved to a new
17  document and marked it as 17.
18    MR. TISI:  So why don't we
19  mark it as 16.
20    MS. MILLER:  Why don't we
21  mark it 16 for clarity going
22  forward.  Thank you, Catherine.
23  BY MR. TISI:
24    Q.   So to be clear, this is the

Page 259

1  list of courses that are offered by the
2  Weill Cornell Medical Center in
3  biostatistics and epidemiology?
4    A.   I don't know.  Because Madhu
5  Mazumdar who is listed there, that was
6  the individual I replaced.  So I don't
7  know where -- I mean, his is not
8  reflective of anything we're --
9    Q.   You see the date on top is
10  three -- March 2019.  I mean, it's off
11  the website.  I don't know what to tell
12  you, other than that's where I got it.
13    A.   Yeah, I agree.  I don't know
14  what to tell you either.  But that just
15  shows us that we don't keep our website
16  up to date.  But Madhu Mazumdar has not
17  been at Weill Cornell for almost four
18  years, if not more than four years so.
19    Q.   Let me ask you this.  Have
20  you ever taught a course with the word
21  "epidemiology" in it?
22    MS. MILLER:  Objection.  In
23  the course or in the course --
24  BY MR. TISI:

Page 260

1    Q.   I'm asking with -- the title
2  of the course.  I'm not asking the
3  content now.  So you made that very
4  clear, that it overlaps, and the record
5  is clear on that.
6    I'm asking you have you ever
7  taught a course with the word
8  "epidemiology" in it?
9    A.   I do not believe I've taught
10  a course with epidemiology in it.  Most
11  of those courses would be intro courses,
12  and when I teach intro courses, I come at
13  it and teach it from the biostats side.
14  That includes epidemiology as a part of
15  it.  But I have not taught an
16  epidemiology 101 course.  No, I've not
17  had a course with epidemiology in the
18  title.
19    Q.   In fact -- in fact, the only
20  two courses that you taught at Cornell
21  Weill are introduction to biostatistics
22  and biostatistics 1?
23    A.   I'm trying to remember the
24  titles.  And, again, I don't know where

Page 261

1  you're getting that information from.  So
2  I want to make sure the titles are
3  correct.
4    MS. MILLER:  Is that in your
5  CV?
6    MR. TISI:  It is.
7    THE WITNESS:  Okay.  If it's
8  in my CV.  Thank you.  And if -- I
9  have only taught two courses.  I
10  am not quibbling about that.
11  BY MR. TISI:
12    Q.   Thank you.
13    A.   I'm just trying to see, you
14  know, if it says intro to biostats or --
15  okay.  Yeah one is part of the executive
16  MBA/MS program.  And the other is part of
17  our biostatistics and data science
18  program.  Those are two courses that I
19  have taught at Weill Cornell.
20    Q.   Does Weill Cornell offer a
21  Ph.D. or an MPH in epidemiology?
22    A.   Weill Cornell itself?
23    Q.   Mm-hmm.
24    A.   No, it does not.

66 (Pages 258 to 261)

Karla Ballman, Ph.D.

Page 262

1    Q.   Does -- and Cornell only
2  offers epidemiology as a minor, correct?
3    A.   I -- I couldn't comment on
4  that.  I don't know what the main campus
5  offers.
6        MS. MILLER:  Were you asking
7    Cornell, as in not Weill Cornell
8    but undergraduate?  You said -- as
9    in undergraduate courses?
10       MR. TISI:  I said in
11   Cornell, regular Cornell, the
12   Cornell upstate in Ithaca.
13 BY MR. TISI:
14   Q.   To be clear, you have no
15 publications on ovarian cancer, correct?
16       MS. MILLER:  Objection.
17   Asked and answered.
18       THE WITNESS:  I have no
19   publications that have -- I
20   believe, that are on ovarian
21   cancer.
22 BY MR. TISI:
23   Q.   Any publications on the risk
24 factors for ovarian cancer?

Page 263

1        MS. MILLER:  Objection.
2        THE WITNESS:  Again, I just
3    said I have no publications in
4    ovarian cancer.  I have
5    publications on -- that evaluate
6    risk factors for many other
7    cancers.
8  BY MR. TISI:
9    Q.   But not ovarian?
10   A.   Not ovarian, per se, but
11 ovarian cancer is not any different from
12 other cancers in terms of how one would
13 evaluate risk factors.
14   Q.   That's not what Dr. Neel
15 told us the other day.  So we'll have to
16 see whether he's right or you're right.
17   A.   Can you show me that
18 statement?  I believe he was talking
19 about that there's issues about different
20 subtypes of ovarian cancer.  I didn't see
21 that -- and that -- I don't think he said
22 that --
23   Q.   He was very clear that risk
24 factors are different between the two.

Page 264

1    A.   But the --
2    Q.   But let's let --
3        MS. MILLER:  That's not what
4  he said.
5        THE WITNESS:  He didn't say
6    the methodology differed.
7        MR. TISI:  Let's -- let's
8    move on.
9        THE WITNESS:  He said the
10   individual risk factors differed
11   is my understanding.
12       MS. MILLER:  She said in
13   terms of how one would evaluate
14   factors.  You're mischaracterizing
15   her testimony.
16 BY MR. TISI:
17   Q.   Are there any publications
18 on your CV related to talc?
19   A.   No, there are not.
20   Q.   Any publications even
21 mention talc and cancer in the same
22 article?
23       MS. MILLER:  Objection.
24   We've been through this.

Page 265

1        THE WITNESS:  I cannot say
2    that with certainty.
3        I -- you know, it's
4    definitely not in the title, but I
5    can't say for sure if -- if there
6    was talc somewhere mentioned in
7    all 200 publications.  I don't
8    know with certainty.
9  BY MR. TISI:
10   Q.   Any publications about
11 asbestos?
12   A.   No.
13   Q.   Any publications about
14 asbestos and ovarian cancer?
15   A.   Again, there are no
16 publications in ovarian cancer.  So no.
17   Q.   Any publications where you
18 reviewed evidence regarding causation for
19 any disease through a Bradford Hill
20 guideline?
21   A.   So that is a little harder
22 to -- to -- I'll have to go through and
23 look through all the things.  I mean,
24 I -- I don't know for certain whether or

67 (Pages 262 to 265)

Karla Ballman, Ph.D.

Page 266

1 not I discuss -- any of the publications
2 discuss causation.
3        I know I have publications
4 that establish associations with things.
5 And we just don't go any further, because
6 association is not causation and there
7 was no reason to establish whether it was
8 causal or not.
9        Q.   Right.  So my question is,
10 have you ever done an article where you
11 did what you did here, which is look at
12 all the evidence, try to synthesize it
13 and determine whether or not there's
14 cause and effect that you can think of?
15        MS. MILLER:  Objection.
16        THE WITNESS:  So I would
17        have to say that I believe there
18        are articles here that we have
19        established association and we
20        realize that it -- it didn't merit
21        going through Bradford Hill
22        because it was -- because of the
23        methodology we did, that, you
24        know, we weren't -- we didn't

Page 267

1        think there -- it was sufficient
2        to, like perhaps the odds -- the
3        risk ratio was like 1.3 or
4        something, pretty small.
5 BY MR. TISI:
6        Q.   Okay.  And so the answer to
7 my question is, because of the results
8 that you got in your studies, you have
9 never done in your published literature a
10 full-blown Bradford Hill causation
11 analysis because you didn't get that far?
12        MS. MILLER:  Objection.
13        That mischaracterizes the
14        testimony.
15 BY MR. TISI:
16        Q.   If it is, correct me,
17 please.
18        A.   No.  In order to establish
19 causation, you have to start with that.
20 And if it doesn't show that there's
21 causation, why would you write in sort of
22 a whole article, you know, we did
23 Bradford Hill criteria?  I mean, I'm
24 saying that the same methodology is used

Page 268

1 in publication, in some of my
2 publications, as I used in this analysis.
3        Q.   Do you think that if I went
4 through each and every article there
5 would be any mention of Bradford Hill?
6        A.   I'm not sure with
7 100 percent certainty.  But that may well
8 be the case.  Just again, because it
9 doesn't say Bradford Hill does not mean
10 that the underlying methodology that was
11 used was not based on the Bradford Hill
12 framework.
13        Q.   Isn't it true that your
14 contribution to the vast majority of your
15 200-plus articles is statistical design
16 and statistical evaluation and to the
17 statistical methods you used in the paper
18 and that you are not either the first
19 author or the last author?
20        MS. MILLER:  Objection.
21        That's like very, very, very
22        compound.
23        THE WITNESS:  I don't quite
24        understand the question.  I mean,

Page 269

1        I can point out to numerous
2        publications, for clinical
3        trials.  Typically, the first
4        author is the chair of the
5        clinical trial.  The second author
6        is the -- the statistician that is
7        on the clinical trial, to
8        recognize their role in the design
9        of the study, as well as the
10        interpretation of the data.
11 BY MR. TISI:
12        Q.   My question is --
13        MS. MILLER:  She's answering
14        your question.
15        MR. TISI:  You're not
16        answering my question, Doctor,
17        honestly.
18        MS. MILLER:  She's doing her
19        best.
20        MR. TISI:  She's not.
21 BY MR. TISI:
22        Q.   I said in, how many -- very
23 few of these articles -- in fact, I think
24 I counted eight.  I have to go back and

68 (Pages 266 to 269)

Karla Ballman, Ph.D.

Page 270

1  check, it's certainly under ten, where
2  you were either the first or last author.
3  Would that be about accurate?
4          MS. MILLER: Objection.
5          THE WITNESS: Yeah, I -- I
6      don't know. I mean, if you say
7      you counted it, I can go through
8      and count. But I'm just not sure.
9      I'm trying to answer sort of what
10     my role is in these studies.
11 BY MR. TISI:
12     Q.   It would --
13     A.   And again, you don't know
14 this field, but in clinical trials, I
15 would never be the first and last author
16 because I am not the study chair.
17         The role -- what shows the
18 contribution of me is the second
19 position, and there are many where I am
20 the second position. And in fact, on
21 things that have changed practice.
22     Q.   You have criticized
23 Dr. Smith-Bindman and her meta-analysis,
24 correct?

Page 271

1      A.   I -- I show where I think
2  there are some limitations in her
3  analyses, yes.
4      Q.   Well, you said that they
5  were flawed. I think that's -- you used
6  the word flawed.
7      A.   I may have used the word
8  "flawed."
9      Q.   Do you know that
10 Dr. Smith-Bindman, unlike yourself, is
11 actually submitting her analysis to peer
12 review. Does that surprise you?
13     A.   I did not know that.
14         MS. MILLER: When you're
15     ready, they sometimes take away
16     the food away by 1:00. So we
17     should probably wrap up and take a
18     break.
19         MR. TISI: I'm almost done
20     with this section here.
21         MS. MILLER: Okay.
22 BY MR. TISI:
23     Q.   So you've published. You've
24 been on articles where -- three

Page 272

1  meta-analyses that I can count. She has
2  six published in JAMA. JAMA is a high
3  impact journal, would you agree?
4      A.   Yes, JAMA is a high impact
5  journal.
6      Q.   Right. She has two
7  meta-analyses in high impact journals.
8  Can you tell me whether or not you've
9  ever published a meta-analysis in any
10 high impact journal?
11     A.   Can you show me those
12 references to the meta-analyses that she
13 published?
14     Q.   47 -- 47 -- she or you?
15     A.   Not me. Hers.
16     Q.   I'm asking about yours.
17         MS. MILLER: But you asked
18     about --
19         THE WITNESS: No, you asked
20     about her.
21         MS. MILLER: You said she
22     has six published in JAMA. Would
23     you agree?
24         MR. TISI: No, I said two.

Page 273

1  BY MR. TISI:
2      Q.   No, I didn't ask -- I said I
3  will represent to you that she has two
4  published in JAMA. She has six
5  meta-analyses published total.
6          MS. MILLER: I'm looking at
7      the realtime. It says, "You have
8      published -- you've been on
9      articles or three meta-analyses
10     that I can count. She has six
11     published in JAMA. JAMA is a high
12     impact journal. Would you agree?"
13 BY MR. TISI:
14     Q.   Okay. Well, let me rephrase
15 the question. She has six meta-analyses,
16 two published in JAMA. You would agree
17 that JAMA is a high impact journal?
18     A.   Well, I just want to see --
19 I want to see those citations --
20     Q.   I'm not asking you --
21     A.   -- because you're saying
22 she. I mean, does it -- where is she in
23 the author list. I don't know even what
24 you're --

69 (Pages 270 to 273)

Karla Ballman, Ph.D.

Page 274

1      Q.   Is that important?
2      A.   I don't know.  I just want
3   to see what the titles are of the --
4      Q.   Then let's talk about you.
5      A.   -- articles.
6      Q.   Let's talk about you.  In
7   your three published meta-analyses,
8   Number 47, 68, and 142 on your CV, were
9   you the lead designer of the study?
10     A.   I was --
11          MS. MILLER:  Do you want to
12   see?
13   BY MR. TISI:
14     Q.   47, 68, and 142.
15     A.   Thank you.  Yeah, yeah,
16   yeah.
17          MS. MILLER:  Would it be on
18   this list?  I found the 47.
19          THE WITNESS:  No, it's not
20   that list.
21          MS. MILLER:  There's so many
22   lists.
23          THE WITNESS:  It would be my
24   CV maybe?  Is that what you're

Page 275

1   talking about my CV?
2          MR. TISI:  Let me see it.
3          MS. MILLER:  Is this the
4   document?  It's 47, Witt, Ballman.
5          THE WITNESS:  That's one.
6          MS. MILLER:  So then I think
7   this is maybe the right list.
8          THE WITNESS:  Yeah, I see
9   it.
10          MS. MILLER:  Okay.  Great.
11          THE WITNESS:  Again, you see
12   I'm second.  So that means I
13   played a very integral role in
14   this --
15   BY MR. TISI:
16     Q.   That's Number 47?
17     A.   Yep.
18     Q.   And what's that one called?
19     A.   "The Incidence of Stroke
20   After Myocardial Infarction:  A
21   Meta-Analysis."
22          MS. MILLER:  Again, I just
23   want to suggest that we break for
24   lunch soon because --

Page 276

1          MR. TISI:  I understand.
2   I'm almost done.  The food is
3   not --
4          MS. MILLER:  I think we've
5   just been going an hour.  It's a
6   good time to break.
7          MR. TISI:  I understand.
8   I'm just at the end of the --
9          MS. MILLER:  Okay.  Great.
10          MS. SHARKO:  Did you miss
11   me?
12   BY MR. TISI:
13     Q.   The next one is which one,
14   68?
15     A.   And I see that one.
16     Q.   And that's -- which one is
17   that one?  Is that O'Sullivan, or is that
18   142?
19     A.   No, 68 is Witt, Gami,
20   Ballman, Brown.
21     Q.   And the other one is -- 142
22   is O'Sullivan.
23     A.   Yes.
24          (Document marked for

Page 277

1       identification as Exhibit
2       Ballman-17.)
3   BY MR. TISI:
4     Q.   I'm going to hand you
5   O'Sullivan.  Did you play a substantial
6   role in the meta-analysis which is 142,
7   the O'Sullivan meta-analysis?
8     A.   What do you mean by a
9   substantial role?
10     Q.   Did you design it?
11     A.   I was part of the group, so
12   this is actually a pooled analyses.
13     Q.   It says meta-analysis in the
14   title.
15     A.   Yeah.  So you can't get
16   everything out of titles, right?  So a
17   pooled analysis is a type of
18   meta-analysis.  It's a much stronger
19   meta-analysis in the sense that what
20   happens is you get individual patient
21   level data.
22          So this is pooling data
23   from, like, the largest clinical trials
24   that were done in adjuvant trastuzumab,

70 (Pages 274 to 277)

Karla Ballman, Ph.D.

Page 278

1  and that's Herceptin for women that have
2  HER2 positive breast cancer. I control
3  the data for one of the big trials in
4  trastuzumab.
5         And so I was part of this
6  group that just came together and said,
7  wow, we should use all this data, pool it
8  together to address a rare type of
9  situation, which was done here.
10      Q.   Did you do any of the
11  writing of this?
12      A.   I -- I did not do the first
13  draft, but I did go through and make
14  revisions and comments.
15      Q.   Isn't it true that you were
16  identified as primarily the collection
17  and assembly of data?
18      A.   That was probably the
19  biggest role that I played in this study.
20  But I did -- yeah.
21      Q.   Isn't that kind of what
22  you -- isn't that kind of what you've
23  done in the meta-analysis that you've
24  done, you're primarily the collection of

Page 279

1  data?
2      A.   No, that's not true.
3      Q.   Okay. So the other two
4  would be ones that you did more than
5  that, 47 and 58?
6      A.   Well, you know --
7      Q.   47 and 68. Excuse me.
8      A.   Yes, I mean I -- I -- I --
9  it's sort of -- it's a whole
10  collaborative thing. It's not like, you
11  know, this is a service that you're
12  trying to imply. It's a scientific
13  endeavor that's done as a collaborative
14  experience among various different
15  scientists with different expertise.
16      Q.   Do you think you're as --
17  just have one -- do you think you have
18  the same qualifications or better than
19  Dr. Smith-Bindman in doing a
20  meta-analysis?
21           MS. MILLER: Objection. I
22  think she testified that she
23  wasn't testifying about other
24  witnesses' qualifications three

Page 280

1  times.
2  BY MR. TISI:
3      Q.   I'm asking you -- I'm asking
4  you whether or not you, by training and
5  experience, you think you have better
6  qualifications than Dr. Smith-Bindman?
7      A.   I can't answer that. I
8  mean, I don't know. I mean, I would have
9  to go through and look at all -- at all
10  the stuff she's done. My only exposure
11  to her was the study that she's done, and
12  I don't think it was done particularly
13  well.
14      Q.   The one she's submitting for
15  peer review?
16      A.   Has she submitted it? Has
17  it been published? I wonder if it will
18  be published actually.
19      Q.   Well, we'll have to see how
20  that goes.
21           MR. TISI: I am -- this is
22  a -- this is a good time for
23  lunch.
24           THE VIDEOGRAPHER: The time

Page 281

1  is 12:49 p.m. Off the record.
2           - - -
3           (Lunch break.)
4           - - -
5     A F T E R N O O N   S E S S I O N
6           - - -
7           THE VIDEOGRAPHER: We are
8  back on the record. The time is
9  1:27 p.m.
10          - - -
11          EXAMINATION (Cont'd.)
12          - - -
13  BY MR. TISI:
14      Q.   Doctor, before lunch -- I
15  want to finish up talking about your
16  qualifications. I want to move onto a
17  new topic here.
18           I want to ask you about two
19  questions, two or three questions I think
20  about Bradford Hill, and then we're going
21  to move on to your analysis.
22      A.   Okay.
23      Q.   Okay. Just so we know,
24  we'll talk about case -- case-control and

71 (Pages 278 to 281)

Karla Ballman, Ph.D.

Page 282

1    cohort studies, just to kind of give you
2    a little bit of roadmap of where I'm
3    going.  All right?
4           Bradford Hill, we can both
5    agree, we've used the word criteria, but
6    we both agree that these are -- this
7    is -- these are guidelines, correct?
8           A.   I call it a framework.
9           Q.   Okay.  And just to be clear,
10   you use the word criteria.  And I've
11   actually used it in my -- in my
12   questions.
13          When you use the word
14   criteria, we really are talking about,
15   these are different considerations that
16   should be looked at when you're looking
17   at the question of causation generally.
18          A.   Yeah.  So Bradford Hill has
19   nine different considerations that one
20   should consider with -- within the
21   framework of doing a Bradford Hill
22   analysis.
23          Q.   Right.  And just -- just to
24   be clear for the record, this isn't like

Page 283

1    a cookbook or a mathematical formula.
2    Bradford Hill is -- is a balancing of the
3    evidence using that -- that framework as
4    a guideline?
5           MS. MILLER:  Objection.
6           THE WITNESS:  So I mean,
7       research is not a cookbook.  But,
8       you know, one can apply Bradford
9       Hill -- I mean I think there's
10      incorrect ways of applying
11      Bradford Hill.
12   BY MR. TISI:
13          Q.   Okay.  And one of them,
14   you -- you -- and this leads into my next
15   question is, you believe that there are
16   levels of evidence that trump other
17   levels of evidence, generally speaking?
18          MS. MILLER:  Objection.
19          THE WITNESS:  In the
20      epidemiology literature, it's
21      pretty much I think agreed upon
22      that there are -- there are
23      different levels of evidence based
24      upon what type of study design is

Page 284

1       being used.
2    BY MR. TISI:
3           Q.   And that's a -- that's a
4    methodologic flaw that you identified
5    that you think the plaintiffs' experts
6    didn't adequately consider the -- that --
7    that cohort studies are higher on the
8    evidentiary ladder than case-control
9    studies, true?
10          A.   I -- I believe that some of
11   plaintiffs' experts just sort of, just
12   flat out say that case-controlled studies
13   have the higher evidence than the cohort
14   studies.
15          Q.   Let's talk about that for a
16   moment.  On Page 3, on your -- your --
17   excuse me.  On your conclusion, we -- it
18   talks about the levels of evidence.  Do
19   you remember, you -- we -- we talked
20   about that, that's Exhibit Number 2.  You
21   actually mention it in your conclusion,
22   right?
23          A.   So I'm sorry, where --
24   where --

Page 285

1           Q.   It's the second sentence, it
2    says, "In assessing studies for the level
3    of evidence in the data."
4           A.   Okay.
5           Q.   And we agreed --
6           A.   Yeah.  So I used that word.
7    Yeah, I used that word.
8           Q.   And we agreed before that
9    the level of evidence you were talking
10   about was prospective case-controlled --
11   prospective cohort studies versus case
12   controls?
13          A.   No, no, no.  That's not
14   correct here.
15          Q.   Okay.
16          A.   This here, as I'm looking at
17   the evidence in totality across
18   everything I looked at.
19          Q.   Okay.  But below in the --
20   on Page 53 you say, "Cohort studies
21   provide stronger evidence than do
22   case-control studies."
23          It's near the -- like five
24   lines --

72 (Pages 282 to 285)

Karla Ballman, Ph.D.

Page 286

1    A.   "Cohort studies provide
2    stronger evidence do" -- "than do
3    case-control studies."
4         That's stated there, yes.
5         Q.   Okay.  And you think that's
6    a general epidemiologic principle,
7    correct?
8         A.   I do.
9         Q.   And you repeat that
10   repeatedly throughout your report,
11   correct?
12        A.   I -- I may state it several
13   times.
14        Q.   Okay.  Let's -- let's look
15   at them.
16        First of all, if you go to
17   Page 4 of your report, you talk about the
18   levels of evidence with increasing
19   reliability.  It says, on -- "Figure 1
20   illustrates the level of evidence with
21   each trial design with increasing
22   evidence moving up the pyramid."
23        Do you see that?
24        A.   I do see that.

Page 287

1         Q.   And then you have a pyramid?
2         A.   I do.
3         Q.   Okay.  And what is the
4    purpose of this illustration that you
5    included in your report on Page 4?
6         A.   Just -- just to -- to give a
7    visual for how the different study
8    designs compared to each other in terms
9    of -- of the level of evidence that
10   epidemiologists believe are -- are
11   conveyed in each of the different types
12   of studies.
13        Q.   And below randomized
14   controlled trial -- there's randomized
15   and there's meta-analysis, and by that
16   you mean meta-analysis of controlled
17   trials, correct?
18        A.   Yes.
19        Q.   Okay.  And then underneath
20   are RCTs?
21        A.   Mm-hmm.
22        Q.   Okay.  And under that are
23   cohort studies?
24        A.   Yes.

Page 288

1         Q.   And under that are
2    case-control studies?
3         A.   Yes.
4         Q.   And under that are case
5    reports and case series?
6         A.   Yes.
7         Q.   Okay.  And you have kind of
8    bright lines between the two, to really
9    differentiate for the reader, that there
10   is -- these are established principles,
11   correct --
12        MS. MILLER:  Objection.
13   BY MR. TISI:
14        Q.   -- that -- that cohort
15   studies are -- are better than
16   case-control studies, are better than
17   case reports and case series, et cetera?
18        MS. MILLER:  Objection.
19        THE WITNESS:  I -- I don't
20        think I said better.  And I think
21        the lines are there just -- just
22        so there has -- there doesn't have
23        to be lines there.
24        And what it's trying to show

Page 289

1        is the level of evidence contained
2        in those.  I don't -- I mean, I
3        don't know what you mean by
4        better.
5    BY MR. TISI:
6         Q.   Well, okay.  Cohort studies,
7    according to your chart, are more
8    reliable than case-controlled studies?
9         A.   Again, they -- they have a
10   higher level of evidence.  I don't -- I
11   don't know if I would say reliable is the
12   same as level of evidence.
13        Q.   Okay.  Now, you don't have
14   any citation for this, for this chart, do
15   you?
16        Did you create this or is
17   this from some other place?
18        A.   I -- I have seen this in
19   numerous, numerous different places, but
20   I made this particular figure by myself.
21        Q.   Okay.  So there's no
22   citation for this?
23        A.   Not in this document, but
24   there is in the epidemiology literature.

73 (Pages 286 to 289)

Karla Ballman, Ph.D.

Page 290

1      Q.    Okay.  Well, there's no
2  citation for this, correct?
3              MS. MILLER:  Objection.
4          Asked and answered.
5  BY MR. TISI:
6      Q.    Because what I'm going to
7  ask -- I'm going to ask you questions
8  about that, but you did not provide a
9  citation for Figure 1 --
10             MS. MILLER:  Objection.
11 BY MR. TISI:
12     Q.    -- where you got that
13 statement from?
14             MS. MILLER:  I'm sorry, I
15         just always think you're done with
16         your question so I object, and
17         then you keep going.  That's now
18         three questions and it's one
19         question.  We're having the same
20         ongoing issue that we had before.
21             Objection to all three parts
22         of that question.
23 BY MR. TISI:
24     Q.    Okay.  Doctor --

Page 291

1              MS. MILLER:  So which
2         question is --
3  BY MR. TISI:
4      Q.    Doctor, do you have a
5  citation to this chart?
6      A.    I made the chart up myself.
7  And -- and it is just an underlying
8  epidemiological principle, so it -- it
9  doesn't have a citation.  It would be
10 like cite -- citing what a T test is.
11     Q.    Okay.4?
12     A.    It's sort known through the
13 literature as to this is...
14     Q.    Okay.  So your -- so your --
15 your view if it's a general principle,
16 you don't have to cite something to
17 support it?
18             MS. MILLER:  Objection.
19             THE WITNESS:  You know,
20         again, it's -- it's a general
21         principle and, you know, and when
22         one is talking about odds ratios
23         or P-values and things like that,
24         we, you know, we're not citing,

Page 292

1          you know, how the P-values were --
2          were calculated because it's --
3          it's sort of a given --
4  BY MR. TISI:
5      Q.    Okay.
6      A.    -- knowledge.
7      Q.    On Page 7 of your report.
8  And I'm just going to read a couple
9  places where you make this point.
10             On Page 7, 3.3, you say,
11 "Generally in my experience, prospective
12 cohort studies yield a higher level of
13 evidence than case-control studies."
14             That's the first sentence
15 in --
16     A.    That is what it says there.
17     Q.    Okay.  Could you just put a
18 line next to that so we can -- we may
19 come back to that.  Could you just put
20 a --
21     A.    May I write?
22     Q.    Yeah, you can write on that.
23             MS. MILLER:  I think she
24         can --

Page 293

1  BY MR. TISI:
2      Q.    Yeah, would you, please?
3  Yes, it's an exhibit.  Thank you.
4              MS. MILLER:  Why don't we
5          just use a sticky?
6              MR. TISI:  No, because I'm
7          going to -- I want a record of
8          what we did.
9  BY MR. TISI:
10     Q.    So on page -- and there's no
11 citation --
12             MS. MILLER:  She is not
13         creating an exhibit here.
14             MR. TISI:  Yeah, she is.
15             MS. MILLER:  No.
16             MR. TISI:  Yeah, she is.
17             MS. MILLER:  Well, I am
18         objecting to that.
19             MR. TISI:  You can object to
20         it.
21             MS. MILLER:  If you want
22         stickies she can put stickies.
23             MR. TISI:  You can object to
24         it.  You can object to it, and

74 (Pages 290 to 293)

Karla Ballman, Ph.D.

Page 294

1  we'll ask the -- we can take a
2  break and call the judge if you
3  want to do that.
4          MS. MILLER:  Any time you
5  want.  You seem to be threatening
6  that a lot.
7          MR. TISI:  Do you want to do
8  that?
9          MS. MILLER:  It's up to you.
10          MR. TISI:  Do you want to do
11  that?  Because I'm happy to --
12  because I would like to draw on
13  that exhibit there where she --
14          MS. MILLER:  Well, she's
15  already drawn it.  I will see what
16  else you ask of her.
17  BY MR. TISI:
18      Q.   On Page 17, second full
19  paragraph.
20      A.   Yes.
21      Q.   Does it say -- does it say,
22  "When the results across study designs
23  are not consistent, i.e., case-control
24  study reports a statistically significant

Page 295

1  association, but cohort studies do not,
2  the study with the accepted higher level
3  of evidence is the cohort study because
4  it eliminates bias such as recall bias"?
5      A.   That's what it states.
6      Q.   Okay.  Can you put a little
7  star next to that, please?
8          MS. MILLER:  A star.
9  BY MR. TISI:
10      Q.   Or a whatever.  So -- I want
11  to be able to come back to it.  Could you
12  do that, ma'am?
13      A.   I'll remember where it is.
14      Q.   No, could you just put a --
15  please, would you do what I've asked,
16  please?
17          MS. MILLER:  I have a
18  standing objection to this.  I
19  think this is improper.
20          MR. TISI:  You can object.
21  BY MR. TISI:
22      Q.   On Page 26 -- and of course
23  you do not have a cite to that?
24      A.   As I mentioned, this is

Page 296

1  going off of Figure 1, which is a
2  generally accepted principle in
3  epidemiology.
4      Q.   Okay.  But the answer there
5  is there's no citation there, right?
6          MS. MILLER:  Objection.
7          THE WITNESS:  There's no
8  citations for many things that are
9  general sort of principles of
10  epidemiology or other facts.
11  BY MR. TISI:
12      Q.   Please go to Page 26,
13  please.
14      A.   There's no citation there.
15  I take it back.  But I do have citations
16  in -- and if you give me a minute to
17  look, I can --
18      Q.   No, I want to see --
19      A.   -- find citations where
20  there's a higher level of evidence --
21      Q.   I'm going through every
22  place where you've said it.  And I want
23  to put this, Doctor.  First, follow me.
24          MS. MILLER:  Chris, excuse

Page 297

1  me.
2          MR. TISI:  I ask -- I'm
3  asking the questions.
4  BY MR. TISI:
5      Q.   Is there a citation after
6  that statement?  The answer is no.
7          The next one, on Page 26, do
8  you see that it says, "It is well
9  established as discussed above that there
10  are more potential or confounding
11  case-control studies compared to
12  prospective cohort studies since the
13  prospective cohort studies are not prone
14  to participant selection, recall bias
15  with respect to exposure, which is why
16  they're considered to yield stronger
17  level of evidence than case-control
18  studies."
19          Do you see that?
20      A.   On Page 26?  No, I --
21      Q.   Second sentence of the first
22  full paragraph.  "It is well
23  established" --
24      A.   Which it says, "As discussed

Karla Ballman, Ph.D.

Page 298

1    above." So I'm going to go and look at
2    the "as discussed above" for the
3    citations.
4              So I have a citation to a
5    book called case-control studies. And
6    actually my references are transposed
7    there.
8              That discusses sort of the
9    level of evidence.
10        Q.   Okay. So you think that's
11   the citation. What is the name of that?
12   What is the name of that one?
13        A.   So it's listed as six. But
14   it should be seven there, "Case-Control
15   Studies: Design, Conduct and Analyses."
16        Q.   Okay. I'll look that up.
17             Let's go to page --
18        A.   And also -- I also think I
19   have more. Oh, it's in the meta-analyses
20   that we were talking about. And so
21   there's a Citation 23. And I say, "So
22   this is because, due to the effects of
23   confounding and bias, observational
24   studies may produce estimates that

Page 299

1    deviate from a true causal."
2              That's -- that's
3    observational studies in general.
4         Q.   But nothing saying that it's
5    a higher level of evidence? I'm looking
6    for a citation that says cohort studies
7    are a higher level of evidence as a
8    general rule than case-control studies.
9         A.   So again, I think -- it is
10   implied throughout.
11        Q.   It's implied, but it's not
12   cited. And I'm looking for a citation to
13   that. It's not only implied. Actually,
14   you come right out and say it several
15   times.
16        A.   Yes.
17        Q.   Okay. So let's go to Page
18   28, last paragraph, last sentence.
19        A.   Yes.
20        Q.   It says, "Cohort studies
21   yield a higher level of evidence." No
22   citation for that either?
23        A.   I'm sorry. Last sentence?
24        Q.   Cohort studies. Page 28.

Page 300

1         A.   "Cohort studies yield a
2    higher level of evidence. Hill observed,
3    'I would put myself at a good deal of
4    weight upon similar results reached in
5    quite different ways, i.e., prospectively
6    and retrospectively."
7         Q.   But they're not -- you can
8    have prospective case-control studies and
9    you can have retrospective case-control
10   studies. You could have prospective --
11        A.   How can you have prospective
12   case-control studies?
13        Q.   Actually, you're right. You
14   can have prospective and retrospective
15   cohort studies, correct?
16        A.   It depends upon how you
17   define it.
18        Q.   He didn't talk about
19   case-controls and cohorts, did he?
20        A.   I don't know. I'll have to
21   look up Bradford Hill.
22        Q.   Okay. But you do say,
23   without citation, "Cohort studies yield a
24   higher level of evidence," correct, on

Page 301

1    Page 28?
2         A.   There's no explicit citation
3    on -- for the sentence that you read.
4         Q.   Let's go to Page 35. Third
5    paragraph, last sentence. "Now, the
6    cohort studies observed a dose-response
7    relationship. Cohort studies provide a
8    higher level of evidence than do
9    case-control studies."
10             (Brief teleconference
11   interruption.)
12             THE WITNESS: Yes, there's
13   no citation after that particular
14   sentence, I agree.
15   BY MR. TISI:
16        Q.   Okay. So in this one
17   there's no citation to cohort studies
18   providing a higher level of evidence than
19   do case-control studies, true?
20        A.   There's no citation after
21   that particular sentence. You are
22   correct.
23        Q.   Okay. And you have a
24   statement in the conclusion that cohorts

76 (Pages 298 to 301)

Karla Ballman, Ph.D.

Page 302

1    are better than case-control, and that
2    also doesn't have a citation, correct?
3        A.   What conclusion?
4        Q.   On the conclusion on Page
5    53.
6        A.   I do not have a citation
7    after that sentence.
8        Q.   Now, on Page 45, in your
9    criticism of Dr. Smith-Bindman, you say,
10   in the middle of the page, "As I said
11   above there is evidence in the literature
12   that cohort studies provide less biased
13   information than case-control studies,
14   and I have not found instance where
15   the -- instances where the opposite is
16   argued."
17           Do you see that?
18       A.   Mm-hmm.
19       Q.   Okay.  And there's no
20   citation to that as well, right?
21       A.   Well, if I didn't find any
22   instances where that has been showing,
23   there wouldn't be citations.
24       Q.   Did you look?

Page 303

1        A.   I did.
2        Q.   You did?
3        A.   Yeah.  I have not seen a
4    study that has said there is a higher
5    level of evidence in case-control studies
6    than there is in cohort studies as a
7    whole.
8        Q.   Actually, I didn't --
9    actually, I didn't say higher level.  I
10   said that cohort studies are as a whole
11   better than case-control studies.
12       A.   No.  Can -- what -- was that
13   the question?
14       Q.   The statement is, "I have
15   not found the opposite to be true."
16       A.   Exactly.  And I don't have a
17   citation for "I have not found the
18   opposite to be true," because -- because
19   there is no literature that says the
20   opposite is true.
21       Q.   Okay.  The truth is that
22   your methodology, your opinions -- and
23   we've gone through several places in your
24   report -- rely very heavily on, and your

Page 304

1    conclusion, rely very heavily on the
2    concept that, as a general rule, cohort
3    studies are better than case --
4    case-control studies; is that true?
5            MS. MILLER:  Objection.
6            THE WITNESS:  It's not a
7        concept.  It is a generally
8        accepted and well accepted
9        principle of epidemiology that
10       there is more evidence in cohort
11       studies than there is in
12       case-control studies because they
13       eliminate confounding.
14           And I'm just -- I need to
15       look, and I'm sure there are some
16       citations here.
17   BY MR. TISI:
18       Q.   Well, the only cite you
19   mention is -- are -- it's Number 7 in
20   your report, the case-control studies --
21       A.   Right, but buried within
22   some of these other studies there are
23   statements such as, you know, it was
24   thought that oral contraceptives, you

Page 305

1    know, cause breast cancer based on
2    case-control studies, but then when
3    cohort studies were done, the opposite
4    was found due to the fact that they are a
5    lower level of evidence and biases and
6    confounding --
7        Q.   Are there other --
8        A.   -- in case-control studies.
9        Q.   I apologize.
10           Are there other instances
11   where case-control studies have found the
12   real cause that cohorts haven't?
13       A.   I don't know off of the top
14   of my head.
15       Q.   But you know full well that
16   the current view in epidemiology is that
17   evidentiary period does not provide a
18   bright line between -- between
19   case-control and cohorts, don't you?
20           MS. MILLER:  Objection.
21           THE WITNESS:  Can you show
22       me where -- where getting you're
23       that information and why I should
24       know full well?

77 (Pages 302 to 305)

Karla Ballman, Ph.D.

Page 306

1    BY MR. TISI:
2        Q.   Let's start with your own
3    statement in the Viagra litigation.
4    Okay.
5            Let's -- let me show you
6    what I have marked as Exhibit Number 21.
7            (Document marked for
8            identification as Exhibit
9            Ballman-18.)
10   BY MR. TISI:
11       Q.   Do you remember -- do you
12   remember --
13           MR. SOILEAU:  This is not
14       going to be 21 in this deposition.
15           MR. TISI:  I'm sorry.  For
16       the record, this is 18.
17   BY MR. TISI:
18       Q.   And you have a -- do you
19   recall having a section in your Viagra
20   report which talks about levels of
21   evidence?
22       A.   Not off of the top of my
23   head.  I need to see it.
24           MS. MILLER:  Is this the

Page 307

1    whole report or just a portion of
2    the report?
3            MR. TISI:  It's a portion of
4    the report.
5            MS. MILLER:  Yeah, I don't
6    think that's right.  I think that
7    you need to give her the whole
8    report.
9            MR. TISI:  You can object --
10   you know, you haven't even looked
11   at it.
12           MS. MILLER:  Would you like
13   a whole report?
14           THE WITNESS:  I would like
15   the whole report.
16           MR. TISI:  Okay.  Let me --
17   you may like it.  You can use your
18   time to do that.
19   BY MR. TISI:
20       Q.   Doctor, I'm -- there's a
21   section in here, full paragraph on levels
22   of evidence.  Do you see that?
23       A.   Yes.  There is a -- yes.
24       Q.   Okay.  Would you please read

Page 308

1    for the record what you wrote in Viagra?
2        A.   Yeah, this is -- this is
3    very abbreviated.  Because I see I have a
4    section on randomized clinical trials
5    right here --
6        Q.   I'm asking you what you
7    read -- can you read -- can you read what
8    you wrote in Viagra?
9            MS. MILLER:  Objection.
10           THE WITNESS:  Read what?
11   BY MR. TISI:
12       Q.   Read where it says levels of
13   evidence.  Section B.  There's a full
14   paragraph under levels of evidence.
15           Could you read what it says?
16       A.   Sure.  "Cancer epidemiology
17   attempts to identify risk factors that
18   are causative agents of cancer.  Knowing
19   what causes a cancer may lead to
20   therapies that benefit patients and/or
21   strategies to minimize the exposure to a
22   risk.  There are different levels of
23   evidence for determining whether a factor
24   is causal based on the underlying study

Page 309

1    design.  A recognized ranking of common
2    study designs from the greatest level of
3    evidence to lowest is, one, randomized
4    clinical trials, two, cohort and
5    case-control studies, and three, case
6    reports and case series."
7            Then I go on and --
8        Q.   And just -- just --
9        A.   -- I list Number 1 --
10       Q.   I just asked you -- I simply
11   just --
12       A.   I -- I'm not finished.
13   Please, can you let me finish.  Please.
14       Q.   No.  I asked you to read in
15   the record.  Your lawyer if they want to
16   can do that.  Okay?  And I'm going to --
17           MS. SHARKO:  No, she has the
18       right to finish her answer,
19       Mr. Tisi, and you know that --
20           MR. TISI:  Who is -- who
21       is -- she has a right.  I asked
22       her to read the paragraph.
23           MS. SHARKO:  You know that.
24           MR. TISI:  That is -- to my

78 (Pages 306 to 309)

Karla Ballman, Ph.D.

Page 310

```
 1      knowledge --
 2          MS. SHARKO:  What kind of
 3      question is that?  A reading test?
 4          MR. TISI:  I asked -- yes.
 5      That's what I asked her to do, and
 6      she read it.  Thank you.
 7          THE WITNESS:  But this
 8      misrepresents what this --
 9          MS. SHARKO:  No, but she has
10      the right --
11          THE WITNESS:  -- this
12      paragraph is saying, because it's
13      incomplete and taken out of
14      context.
15  BY MR. TISI:
16      Q.   I'm going to --
17      A.   And I see that you've
18  provided -- it says Number 1, randomized
19  clinical trials, and then -- and then it
20  goes over on the next page.  And then it
21  stops because I'm sure I have a section
22  on -- on case-control studies and a
23  section on cohort studies, and it's
24  consistent with what I say here.
```

Page 311

```
 1      Q.   But you lump them --
 2      A.   They are lumped together --
 3      Q.   But you -- Doctor, this
 4  isn't -- this really isn't an argument.
 5  I'm asking you whether for the purposes
 6  of your Viagra case, where you describe
 7  the level of evidence, instead of five
 8  levels, you describe three.
 9      A.   I think that is a
10  mischaracterization --
11      Q.   Okay.
12      A.   -- because this is not
13  complete.
14      Q.   All right.
15      A.   That they are put together
16  because they are both observational
17  studies, and then I'm sure I have a
18  separate section that talks about the
19  different aspects of clinical -- of
20  case-control studies and cohort studies,
21  and say essentially the same thing
22  because it's an accepted underlying
23  epidemiology principle.
24      Q.   So let me ask you this.
```

Page 312

```
 1      Have you looked in textbooks to see
 2  whether that is true?
 3      A.   Yes.
 4      Q.   Okay.  I'm going to show you
 5  Dr. Rothman's textbook -- textbook on --
 6  on epidemiology.
 7      A.   The whole textbook?
 8      Q.   I'm showing you the entire
 9  chapter.  The entire chapter.
10      A.   And the table of contents?
11          MR. TISI:  I can give --
12      actually, I can give you the whole
13      book.  Let's do this.
14  BY MR. TISI:
15      Q.   And if you feel like you
16  need to look at the book, I'm happy to do
17  it.
18          MS. MILLER:  I don't think
19      there's any reason to take that
20      tone with the witness --
21          MR. TISI:  I mean, you know,
22      honestly --
23          MS. MILLER:  We've been very
24      polite in these depositions.  This
```

Page 313

```
 1      is the first deposition that I'm
 2      aware where the -- where the
 3      lawyer has been so rude to the
 4      witness.
 5          MR. TISI:  I don't think I'm
 6      being rude at all.  I don't think
 7      I'm being rude at all.
 8      Okay.
 9          MS. SHARKO:  Maybe not by
10      your standards.
11          MR. TISI:  Certainly not by
12      your standards.
13          MS. SHARKO:  I would
14      disagree with that.
15  BY MR. TISI:
16      Q.   Okay.  Chapter -- I have the
17  book.  I'll give you the book.
18      For the record, I'm going to
19  have this marked as Exhibit Number 19.
20          (Document marked for
21      identification as Exhibit
22      Ballman-19.)
23  BY MR. TISI:
24      Q.   I'm looking at Chapter 8.
```

79 (Pages 310 to 313)

Karla Ballman, Ph.D.

Page 314

1  And I'm going to give you the exhibit
2  right in front of you.  And you can look
3  at the book if you'd like.
4        Doctor?
5     A.   Yes, I'm -- I'm --
6     Q.   I have -- I'd like you to
7  look at the exhibit.  You can look at the
8  book if you need to --
9     A.   I'm sorry, did -- did you
10 hand it to me?
11       Thank you.
12    Q.   Now, this is Chapter 8.
13 It's called "Case-Control Studies."
14       Do you see that?
15    A.   It does say case-control
16 studies.
17    Q.   And the first
18 paragraph introduces the concept.  It
19 says, "In this chapter, we will review
20 case-control designs and contrast their
21 advantages and disadvantages with cohort
22 designs."
23       Do you see that?
24    A.   I'm sorry.  Which page?

Page 315

1     Q.   First page.  The first
2  paragraph just introduces the topic.
3     A.   Yes.
4     Q.   Last sentence says, "In this
5  chapter we will review case-control to
6  study designs and contrast their
7  advantages and disadvantages to cohort
8  designs."
9        Do you see that?
10    A.   I see that.
11    Q.   Okay.  The next sentence in
12 the first paragraph.  "Conventional
13 wisdom about case-control studies is that
14 they do not yield estimates of effect
15 that are as valid a measure obtained from
16 cohort studies.  This thinking may
17 reflect a common misunderstanding in
18 conceptualizing case-control studies
19 which will be clarified later."
20       Do you see that?
21    A.   I -- I see that, you read
22 that correctly.
23    Q.   Okay.  And then he
24 describes, so if you want to go down to

Page 316

1  the next paragraph.  It says, "Cohort
2  studies are not immune from problems
3  often thought to be particular with
4  case-control studies.  For example, while
5  a cohort study may gather information on
6  exposure for an entire source population
7  at the outset of the study, it still
8  requires tracing subjects to ascertain
9  exposure variation and outcomes."
10       Do you see that?
11    A.   So I'm sorry.  I'm trying to
12 take in a lot of information.  I'm sorry.
13 I'm going to have to ask you to rephrase.
14    Q.   Okay.  Does he not say,
15 "Cohort studies are not immune from
16 problems often thought to be particular
17 to case-control studies"?
18    A.   That's what that sentence
19 says.
20    Q.   Next sentence, he gives an
21 example.  "For example, while cohort
22 studies may gather information on
23 exposure for the entire source
24 population, at the outset of the study it

Page 317

1  still requires tracing of subjects to
2  ascertain exposure variation and
3  outcomes."
4        Do you see that?
5     A.   Yes, it does say that.
6        MS. MILLER:  Do you want to
7  give her the time to actually read
8  this, instead of plucking out
9  sentences from it?
10       THE WITNESS:  Yeah, I
11 mean --
12       MS. MILLER:  You are
13 plucking out one sentence from a
14 paragraph.
15 BY MR. TISI:
16    Q.   I'm happy to do -- I'm just
17 asking whether -- where it says -- do you
18 agree with that statement?
19       MS. MILLER:  But she has to
20 read the whole thing.
21       THE WITNESS:  But I don't
22 know.
23       MR. TISI:  No, she doesn't.
24 I'm asking her whether she agrees

Karla Ballman, Ph.D.

Page 318

1    with that statement.
2  BY MR. TISI:
3      Q.  Do you agree that, "Cohort
4  studies may gather information on
5  exposure for an entire source population
6  at the outset of the study and still
7  requires tracing of subjects to ascertain
8  exposure variations and outcome.  If the
9  success of this tracing is related to the
10  exposure and the outcome, the resulting
11  selection bias will behave analogously to
12  the often raised concern of case-control
13  studies."
14      Do you agree with that or
15  disagree with that?
16      MR. LOCKE:  Objection.
17      THE WITNESS:  I cannot say
18      just off the fly like this because
19      I have to see where they're going
20      with this, if they are just sort
21      of setting up, you know, why are
22      people doing case-control studies
23      in the first place, because they
24      have, like, lower level of

Page 319

1      evidence than cohort studies.  I
2      just -- I can't really comment if
3      I agree or disagree with that.
4  BY MR. TISI:
5      Q.  Okay.  You can't agree or
6  disagree with that statement.
7      A.  Well, with the limited
8  information -- I'm given a couple
9  sentences that I'm asked to look at out
10  of an entire chapter that comes out of an
11  entire book, I do not feel that I can
12  give a complete and truthful answer.
13      Q.  Let's see if this helps.
14  Okay.  I'm going to show you an article
15  that Dr. Rothman wrote on this very
16  topic.
17      MS. MILLER:  Are we done
18      with this exhibit?
19      MR. TISI:  For now.  You
20      can put it to aside.  You can
21      leave the book there if you like
22      to.  You can refer to it if you
23      need to.
24      (Document marked for

Page 320

1      identification as Exhibit
2      Ballman-20.)
3  BY MR. TISI:
4      Q.  It's entitled "Six
5  Persistent Research Misconception."
6      Do you see that?
7      A.  Yes, I do see that.
8      Q.  Have you seen this article
9  before?
10      A.  You know, I think in my
11  career I have seen this article before.
12      Q.  Okay.  And again,
13  Dr. Rothman you would agree, he's the
14  founder of the Journal of Epidemiology.
15  You understand that, correct?
16      MS. MILLER:  Objection.
17      THE WITNESS:  I have no idea
18      if he's the founder of the Journal
19      of Epidemiology.
20  BY MR. TISI:
21      Q.  This is a fairly well known
22  article, correct?
23      A.  I don't know that either.
24      Q.  Okay.  Well, let's look at

Page 321

1  Misconception Number 1, because actually
2  as opposed to reading the whole article,
3  which I'm more than happy to have you
4  take a look at if you'd like to, but
5  Misconception Number 1, would you read
6  that?  He puts a bullet point there.
7  Would you please tell the judge and the
8  jury what he says is Misconception Number
9  1.  Read that, please.
10      A.  I'll read what he says.  He
11  says, "The misconceptions are, number
12  one, there is a hierarchy of study
13  designs, randomized trials provide the
14  greatest validity" -- and he's talking
15  validity there -- "followed by cohort
16  studies, with case-control studies being
17  the least reliable."
18      Q.  Okay.  He calls that a
19  misconception, does he not?
20      A.  You know, I don't know what
21  he means by validity, and I don't know
22  what he means by least reliable.  I'm
23  talking about levels of evidence.  So I
24  don't know if those terms mean exactly

81 (Pages 318 to 321)

Karla Ballman, Ph.D.

Page 322

1  the same thing.
2      Q.   Okay.  Let's see what he
3  actually says.  Does he say -- in the
4  first paragraph he talks about RCT, first
5  two paragraphs.  Let's talk about the
6  next paragraph.
7          It says, "Both cohort and
8  case-control studies will yield valid
9  results when properly designed and
10  carried out."
11         Do you see that?
12     A.   Where it is again?  Again,
13  you're making me come -- you know, go
14  through a whole lot of information and
15  so --
16     Q.   Well, you know, I'm going to
17  tell you, if you feel like you need to
18  take a look at this entire misconception,
19  feel free to do it.
20     A.   So, I mean, I'm surprised --
21  I just want to point out a couple things
22  and --
23     Q.   No, I don't -- there's no
24  question pending.  You said you wanted to

Page 323

1  take a look at it.  Feel free to take a
2  look at it, and I'll ask you questions
3  about it.
4      A.   Okay.
5      Q.   I want to be fair.
6      A.   All right.  Go ahead.
7      Q.   Does he not say, in the
8  second paragraph, "Both cohort studies
9  and case-control studies will yield a
10  valid result when properly designed and
11  carried out"?
12     A.   That's what he says.
13     Q.   Okay.  Now, I'm going to
14  read -- he says, "Similarly" -- on the
15  next page, second-to-last paragraph,
16  "Similarly, discrepancies between cohort
17  studies and case-control studies should
18  not be explained away superficially by a
19  presumed validity advantage for cohort
20  studies over case-control studies."
21         True?
22     A.   I'm sorry.  Where are you
23  reading from again?
24     Q.   The next -- the

Page 324

1  second-to-last paragraph on the first
2  column.
3      A.   Okay.  Thank you.
4      Q.   It says, "Discrepancies
5  between cohort studies and case-control
6  studies should not be explained away
7  superficially by a presumed validity
8  advantage for cohort studies over
9  case-control studies."
10         Does he not say that?
11     A.   That's what is written
12  there.
13     Q.   Okay.  And if you go --
14     A.   And I want to point out --
15  and he goes on and says, "Properly
16  designed case-control studies will
17  produce the same results as properly
18  designed cohort studies."
19         So what that means is the
20  studies need to not have recall bias and
21  they need not to have selection bias,
22  which is almost theoretically impossible
23  to do.
24         Also, this is the only

Page 325

1  author out there that has written on
2  this, is one textbook, same author, one
3  paper, same author.  And the author goes
4  on to, say, "These misconceptions have
5  been perpetuated in journals, classrooms
6  and textbooks."
7          And so I could do the same
8  thing and find a vast majority more
9  papers and textbooks and so forth that
10  would dispute that.
11     Q.   But you didn't, Doctor.  You
12  didn't even cite it for any -- for any of
13  the times.  We went through your report,
14  and you didn't cite one instance.  You
15  said one article that was in a different
16  place, case-control -- case-control
17  textbook.  And I'm going to look that up.
18         Okay.  But other than that,
19  you had no citations whatsoever, true?
20         MS. MILLER:  Objection.
21         THE WITNESS:  I disagree
22  with that, because if we go back
23  to -- to my report, I have -- I
24  have like real evidence in the

82 (Pages 322 to 325)

Karla Ballman, Ph.D.

Page 326

1    literature that shows that
2    case-control studies do, and
3    cohort studies do not -- when you
4    do -- have the opportunity to do a
5    randomized trial, it comes up with
6    a completely different conclusion.
7         And I have several
8    references that show that. And
9    that's real life data. That's not
10   purporting, you know, evidence
11   against what's a generally
12   accepted epidemiology principle.
13   BY MR. TISI:
14        Q.   Let's look at the last
15   sentence in this section. It says, "When
16   properly designed" --
17        A.   And, you know, this says
18   it's a review too. It doesn't say it's a
19   research article. This is, like, I think
20   someone's opinion. I mean --
21        Q.   Like your report. Like your
22   report. Your report is your opinion.
23        MS. SHARKO:  Don't interrupt
24   the witness.

Page 327

1    BY MR. TISI:
2         Q.   Your report is your opinion,
3    right?
4         MS. MILLER:  Objection.
5         THE WITNESS:  Those are two
6    different things.
7    BY MR. TISI:
8         Q.   One is for litigation, and
9    one isn't?
10        MS. MILLER:  Objection.
11   BY MR. TISI:
12        Q.   Dr. Ballman, you know,
13   you're offering a lot of commentary of
14   things that I haven't asked. Okay?
15        I'm asking you, first of
16   all, this is published in the peer
17   reviewed literature, correct?
18        MS. MILLER:  Objection.
19        MR. LOCKE:  Objection.
20        THE WITNESS:  So I think I'm
21   trying to give a complete and
22   truthful answer which I swore to
23   at the beginning of the
24   deposition, and I don't feel like

Page 328

1         I'm allowed to -- to give the
2    complete truth.
3    BY MR. TISI:
4         Q.   Okay.
5         A.   I feel like we're doing half
6    truths here.
7         Q.   Okay. I'm perfectly happy
8    to stand on this article.
9         Let me -- let me look at the
10   last sentence. "When properly designed
11   case-control studies can achieve" -- "can
12   achieve the same excellent validity as
13   properly designed cohort studies, whereas
14   poorly designed trial can be unreliable.
15   The type of study should be not taken as
16   a guide to the study's validity."
17        Does he not say that?
18        A.   He does say that there.
19        Q.   Okay. Thank you. Do you
20   agree or disagree?
21        A.   I disagree with his -- his
22   entire thing. I think for individual
23   studies there could be an individual
24   case-control study that might be better

Page 329

1    designed than an individual cohort study.
2         But I think as a body of
3    evidence as a whole, it is accepted as a
4    principle in epidemiology literature,
5    that what comes out of case-control
6    studies in total and what comes out of
7    cohort studies in total, are both under
8    randomized trials, and cohort studies
9    have less biases in terms of selection
10   biases and recall biases than do
11   case-control studies, which is why they
12   have a higher level of evidence.
13        Q.   It has other biases too.
14   For example, if you only ask the
15   patient -- if the cohort study is not
16   designed to -- to look at a particular
17   question, and you only ask a person once
18   in 25 years whether they use talcum
19   powder, that can change over time,
20   correct?
21        A.   So -- so what's the
22   question?
23        Q.   The question is:  That's a
24   bias as well, that would bias towards the

Karla Ballman, Ph.D.

Page 330

1  null?
2       MS. MILLER: Objection.
3  BY MR. TISI:
4       Q.   If a patient, in a
5  hypothetical cohort study, that was not
6  designed specifically to look at whether
7  talc causes ovarian cancer, and that
8  patient -- and it's a 20-year study, and
9  upon enrollment they are asked one time
10 about their exposure to talc, is it
11 possible that over two decades, the
12 patient could change their behavior?
13      MS. MILLER: Objection.
14  There were three questions in
15  there.  I objected to the first.
16      MR. TISI: There's not --
17  that's fine.  You can object --
18  you can object to the question.
19      MS. MILLER: Okay.  I don't
20  know what the question is.
21      MR. TISI: That's fine.
22      THE WITNESS: Can you ask
23  one by one what -- what the --
24  BY MR. TISI:

Page 331

1       Q.   You understand that there
2  are biases that are also inherent in
3  cohort studies as well?
4       A.   I -- I think I'm pretty --
5  pretty clear that I think all
6  observational studies have some sort of
7  biases in them.
8       Q.   Right.  And you have to
9  consider all of them, correct?
10      A.   All of what?
11      Q.   All the biases and all the
12  different kinds of studies.
13      A.   You have to consider -- I --
14  I looked -- I don't know what that means.
15      Q.   You don't dismiss biases in
16  cohort studies because they happen to be
17  cohort studies, right?
18      A.   Again, it depends upon what
19  the individual studies are and the
20  question that is being addressed with the
21  cohort study so that we can see what the
22  individual biases are --
23      Q.   Right.
24      A.   -- and then, you know, one

Page 332

1  could -- could make comment on them.
2       Q.   In all the cohort studies
3  regarding talc, the patients were asked
4  on only one occasion whether they used
5  talc early on in the study, correct?
6       A.   So the cohort --
7       MR. LOCKE: Objection.
8       THE WITNESS: So the cohort
9  studies in talc were done in -- in
10  cohorts of women that tended to be
11  older.  And -- and I can go
12  through the different cohorts.
13 BY MR. TISI:
14      Q.   I'm asking -- I didn't ask
15  you to -- to recite it.  I'm asking you,
16  in each of those studies, the women
17  enrolled in those studies were asked
18  about talc exposure on one occasion,
19  true?
20      MR. LOCKE: Objection.
21      THE WITNESS: So I was
22  trying -- and your previous
23  question I think was a little bit
24  different and I was trying to

Page 333

1  answer that before you interrupted
2  me with -- with the second
3  question, and so --
4  BY MR. TISI:
5       Q.   Okay.  Then let me withdraw
6  the question.
7       I'm going to ask you, can
8  you name for me a cohort study --
9       MS. MILLER: You just
10  interrupted her again.  She was
11  like literally -- when she says
12  "and so," you start talking.  Let
13  her finish her sentences.
14      MR. TISI: I'm going to
15  ask -- I'm going to ask -- I
16  withdrew the question.
17 BY MR. TISI:
18      Q.   My question is this --
19      MS. MILLER: You can't just
20  withdraw a question in the middle
21  of an answer.
22 BY MR. TISI:
23      Q.   Doctor, can you name me one
24  cohort study involved in the talc science

84 (Pages 330 to 333)

Karla Ballman, Ph.D.

Page 334

1  where the patients were asked more than
2  once about their talc exposure?
3       A.   I cannot, but I'm not -- I'm
4  trying to say why that's not really a
5  relevant question.
6       Q.   Okay.  I just want to know
7  if they were asked more than once in any
8  of these studies.
9       A.   They weren't asked more than
10 once in the case-control studies either.
11      Q.   Well, that was only because
12 they were retrospective, right?
13      A.   Well, there are reasons why
14 that asking only once in the cohort study
15 also is not entirely relevant.
16           Having to do with at the age
17 that women generally start using talc,
18 which is early adulthood, and the fact
19 that it's a habitual use and it's very
20 unlikely that a woman age, say 55, who
21 hadn't been using talc would all of the
22 sudden start using talc.
23      Q.   Are you -- do you think that
24 you're a better qualified epidemiologist

Page 335

1  than Ken Rothman is?
2           MR. LOCKE:  Objection.
3           MS. MILLER:  Objection.
4  What's with these questions?
5           THE WITNESS:  I'm not
6  speaking on -- I'm not speaking on
7  qualifications or not.
8           I'm speaking on the fact
9  that there -- this is probably one
10 of the only papers that -- that
11 takes this stance that the general
12 accepted principles of
13 epidemiology are wrong.
14 BY MR. TISI:
15      Q.   Do you know -- do you know
16 that Dr. Rothman was actually -- unlike
17 you, Dr. Rothman was actually asked by
18 the talc industry, including Johnson &
19 Johnson, to consult for them on the
20 talc-ovarian cancer association, did you
21 know that?
22           MR. LOCKE:  Objection.
23           MS. MILLER:  Objection.
24           THE WITNESS:  I -- I have no

Page 336

1       idea and I don't know what the
2       relevance is in terms of -- of me
3       having issues -- or the
4       limitations of this particular
5       study.
6  BY MR. TISI:
7       Q.   Well -- well, then let me --
8  let me --
9           MR. SOILEAU:  Let me do this
10 and fix this, because we may have
11 gotten off.  I don't think --
12           MS. SHARKO:  I thought only
13 one person --
14           MR. SOILEAU:  I'm doing
15 exhibits.  I'm not asking
16 questions.
17           MR. TISI:  It's an exhibit
18 issue.
19           MS. SHARKO:  But I'm happy
20 to have you talk.  That's okay.
21           MR. SOILEAU:  I'm just going
22 to -- I think we agreed that we
23 had 18 as the Viagra report, 19 as
24 Chapter 8 of the Rothman text.

Page 337

1           And I do not believe in the
2  record that the "Six Persistent
3  Research Misconceptions" that has
4  been discussed over the last pages
5  with the witness was actually
6  identified by number.
7           It has a sticker on it
8  that's wrong.  It should be
9  Exhibit 20.
10          MS. MILLER:  It says 19.  Do
11 you want to make it 20?
12          MR. SOILEAU:  Yeah, here's a
13 sticker.  You can just stick it
14 over the top of it.
15          MS. MILLER:  I wrote 20
16 right over it.
17          MR. SOILEAU:  Okay.  Very
18 good.  And I apologize for
19 interrupting.
20          (Document marked for
21 identification as Exhibit
22 Ballman-21.)
23          MR. TISI:  I'd like to show
24 you Exhibit Number 24.

85 (Pages 334 to 337)

Karla Ballman, Ph.D.

Page 338

1    MS. MILLER:  Wait.  21?
2    MR. TISI:  21.  I'm sorry.
3  21.
4    MS. MILLER:  You just
5  skipped 21, 22, 23.
6    MR. TISI:  I'm sorry.
7  You're right.
8  BY MR. TISI:
9    Q.   I'm going to represent to
10  you, Doctor, that Dr. Rothman and his
11  colleagues were asked to draft a report
12  for the national toxicology program in
13  2000 related to talc and ovarian cancer.
14    Have you seen this before?
15    A.   Now is this published
16  somewhere?
17    Q.   It was for the talc industry
18  including Johnson & Johnson.  They
19  actually contributed to paying for it.
20    MR. LOCKE:  Objection.
21    THE WITNESS:  Sort of like
22  an expert report is in litigation?
23  BY MR. TISI:
24    Q.   Sort of like -- absolutely

Page 339

1  absolutely.  Sort of like that.  Like
2  in --
3    A.   Like I've been asked to do?
4    Q.   Like in real time, when the
5  issues were -- but the difference is,
6  see, they were asked by scientists at
7  Johnson & Johnson that they contacted
8  Dr. Rothman.  It's the lawyers who
9  contacted you.
10    MS. MILLER:  Objection.  Was
11  that a question or are you just
12  giving speeches now?
13    MR. TISI:  Well, no, she's
14  giving me a speech.
15    MS. MILLER:  She's -- she's
16  sitting --
17    MS. SHARKO:  The witness --
18  you know, it's really rude to call
19  a woman "she."
20    MR. TISI:  Okay.
21    MS. SHARKO:  Her name is
22  Dr. Ballman, and I would ask you
23  to treat the witness with respect.
24    MR. TISI:  Okay.

Page 340

1  BY MR. TISI:
2    Q.   Dr. Ballman --
3    A.   Yes.
4    Q.   Unlike you, the scientists
5  at Johnson & Johnson, reached out to
6  Dr. Rothman in 2000 to draft a report
7  related to talc.  Do you see that?
8    MR. LOCKE:  Objection.
9    THE WITNESS:  I -- can you
10  show me where this was
11  commissioned by Johnson & Johnson?
12  BY MR. TISI:
13    Q.   I'm going to ask you to --
14  I'm going to ask you to assume that,
15  because that's what the record will show.
16  This was a report submitted to the
17  National Toxicology Program on the part
18  of J&J?
19    MR. LOCKE:  Objection.
20  BY MR. TISI:
21    Q.   So let me -- let me show
22  you.
23    A.   But where does it say that?
24  Where does it say the National

Page 341

1  Toxicology --
2    Q.   I'm asking you to assume it.
3  I'm allowed -- I'm allowed to ask you to
4  assume it.  And counsel will correct me
5  later if I'm wrong.
6    A.   Okay.
7    Q.   The judge will strike me.
8    A.   Okay.
9    Q.   Okay?
10    MS. MILLER:  I don't know if
11  the judge will actually strike
12  you.
13  BY MR. TISI:
14    Q.   So on Page 3 -- on Page 3,
15  Dr. Rothman and his two colleagues --
16  this wasn't just written by him, right?
17    A.   But again, Dr. Rothman, it's
18  not independent of Dr. Rothman.
19    Q.   Okay.  That's fine.  He
20  writes, "Exposure misclassification."
21    Do you see that section?
22    A.   Yes.
23    Q.   Okay.  He says this:
24  "Nearly all the studies were case-control

86 (Pages 338 to 341)

Karla Ballman, Ph.D.

Page 342

1  studies.  It is commonly believed that
2  the validity of case-control studies is
3  worse than cohort studies, but this view
4  is mistaken."
5          Do you see that?
6      A.   Yes, I do.
7      Q.   Okay.  And you disagree with
8  that?
9      A.   Again, it's the same opinion
10  by the same individual and -- and I have
11  stated that the general principles of
12  epidemiology just does not support that.
13      Q.   Okay.  And the next
14  sentence, "The validity of a study design
15  depends on the specifics of the study
16  design.  The nature of the data and the
17  nature of the hypothesis that the study
18  addresses."
19          Do you agree with that?
20      A.   So now he's getting into
21  specifics.  And I said I do agree that
22  one case-control study when compared to
23  one cohort study could be the case that
24  the case-control study is done a little

Page 343

1  better than the one cohort study.  But
2  I'm arguing that -- I'm not arguing.  I'm
3  sorry.
4          I'm just stating what the
5  general epidemiology principle is, is
6  that cohort studies, as a whole, have a
7  higher level of evidence for causality
8  than do case-control studies.
9      Q.   He makes the point, if you
10  go next sentence -- he gives an example.
11  Next sentences says, "Although the
12  exposure information might be accurate at
13  the time that it was collected, the
14  exposure status of cohort members will
15  change with time and the initial measure
16  might only be poorly correlated with a
17  more meaningful measure."
18          Do you see that?
19      A.   And -- but this has to do in
20  particular with coffee drinkers and a
21  one-time dietary assessment.  So drinking
22  coffee or not is different from whether
23  one uses talcum powder or not --
24      Q.   Why?

Page 344

1      A.   -- in terms of the habits.
2          I don't know, I haven't
3  looked at this literature.  So I'd have
4  to look to see.  Do most coffee drinkers
5  start when they're in their early
6  adulthood?  Do most -- versus starting at
7  age 55.  You know, it all depends on the
8  specifics of the study.
9      Q.   The last two sentences here,
10  state what I think his -- his rule is.
11  "The effect of having a poor measure of
12  exposure will be considerable
13  nondifferential misclassification.  A
14  type of error that introduces bias into
15  study results that tends to drive effect
16  estimates towards the null condition of
17  no effect.
18          "In contrast, it may be
19  possible to get more detailed information
20  from a study subject in a case-control
21  study which might avoid some of the
22  biases that would result in the cohort
23  study."
24          Do you see that?

Page 345

1          MR. LOCKE:  Objection to
2  form and to the reference to the
3  last two sentences.
4          MS. MILLER:  I'm sorry.  I
5  can't hear you.
6          MR. LOCKE:  Objection to
7  form and the reference to the last
8  two sentences.
9  BY MR. TISI:
10      Q.   Read it to yourself.  Do you
11  agree or disagree with those last two
12  sentences?
13      A.   It's just a very general
14  statement.  I'm not sure what to agree
15  with or not to agree with.  Again, I
16  think it depends very much on what the
17  question that's under consideration or
18  the study under consideration.  And I
19  have to point out that says, "Which might
20  thus avoid some of the biases that would
21  result in a cohort study."
22          It doesn't say will.  It
23  doesn't say anything definitive.  It says
24  might.

87 (Pages 342 to 345)

Karla Ballman, Ph.D.

Page 346

1    Q.   But that's the point,
2  Doctor.  And I'm really trying to back up
3  a little bit.
4         The point really here is,
5  what you really have to do is look at the
6  data and look at the studies, the cohort
7  and the case-control studies like you
8  said in your Viagra report.  You look at
9  them together, and you decide which one
10 is better and which one is worse, true?
11        MS. MILLER:  Objection.
12       That -- where did she say that in
13       the Viagra report that you should
14       look at them together?  Can you
15       show that us?  Because you showed
16       us part of the report.  It didn't
17       say that.  You're misrepresenting
18       her testimony.
19       MR. TISI:  Counsel, please
20       stop.
21       MS. MILLER:  You're
22       misrepresenting her report.  This
23       is crazy.
24       MR. TISI:  Stop.  It is

Page 347

1     crazy.  What is crazy is your
2     speaking/coaching objections.
3     That's crazy.
4  BY MR. TISI:
5     Q.   Doctor, in your case -- in
6  your Viagra report you put case-control
7  and cohort studies in the same level of
8  evidence, did you not?
9     A.   I do not believe I do.
10    Q.   Okay.
11    A.   I was just given one case
12 where -- where I -- no, I do not believe
13 I do.
14    Q.   Okay.  Now, isn't it true
15 that you're really, instead of just
16 blindly saying cohort is better than
17 case-control, you have to look at the
18 studies, how they're designed, what they
19 ask, and what the data shows; isn't that
20 true?
21    A.   And that's what I did, and I
22 applied underlying epidemiological
23 principles.  And so there were three
24 cohort studies, not just one.  All three

Page 348

1  did not show a statistically significant
2  result, whereas in the case-control
3  studies, some did, some didn't.  And by
4  levels of -- as I say throughout my
5  report, as levels of evidence, one needs
6  to go with the cohort studies because
7  they have a higher level of evidence.
8  I'm not comparing one individual cohort
9  study to one individual case-control
10 study, where it might be the case that in
11 that particular comparison of two
12 different studies, maybe case-control was
13 done a little better than cohort.
14    Q.   So -- okay.  So we'd talked
15 about statistical significance in a short
16 while.
17       So but -- so what you're
18 saying is where there is a -- if you have
19 some studies that are cohort studies that
20 are not statistically significant and
21 some studies that are case-controls that
22 are statistically significant, the cohort
23 studies win?
24       MS. MILLER:  Objection.

Page 349

1        THE WITNESS:  I am -- not in
2  general.  I am saying -- no, I did
3  not say that in general.  I said
4  in the data and the analyses I
5  looked at, that was one component
6  of the whole totality of the
7  analyses.
8  BY MR. TISI:
9     Q.   Okay.  And statistical
10 significance was very important to you in
11 that way, in other words you kind of
12 put -- you saw whether there's a pattern.
13 You put together the statistically
14 significant results, the statistically
15 nonsignificant results, and you felt that
16 the statistically nonsignificant results
17 had the better reliability?
18    A.   Again, I don't -- what I did
19 was I looked at the totality of the data.
20 I saw in the case-control studies, there
21 were some statistically significant and
22 some not statistically significant.
23       I did not group those with
24 the cohort studies which also were not

88 (Pages 346 to 349)

Karla Ballman, Ph.D.

Page 350

1  statistically significant.  So I do not
2  believe that I just sort of put all the
3  nonstatistically significant studies
4  together and the statistically
5  significant studies together.  I do not
6  believe that's what I did.
7       Q.   Do you think statistical
8  significance is the issue that is the --
9  defines your opinion?  In other words --
10 in other words, where you feel that there
11 is inconsistency between the
12 observational data, because some studies
13 were not statistically significant and
14 others were.
15      MS. MILLER:  Objection.
16 BY MR. TISI:
17      Q.   True?
18      MS. MILLER:  Objection.
19      THE WITNESS:  I don't
20 believe that's what I stated.  And
21 I believe I stated all along that
22 I did the Bradford Hill analyses.
23 You know, I looked at strength of
24 association.  I looked at

Page 351

1  consistency.  And I made a note in
2  terms of consistency that there
3  was no consistency on many -- a
4  lack of consistency on many
5  different levels.
6  BY MR. TISI:
7       Q.   Okay.  Are you done?
8       MS. MILLER:  Are you -- are
9  you still talking?
10      THE WITNESS:  So this
11 factor -- so consistency is that,
12 you know, it needs to be multiple
13 studies across different locations
14 and populations, and study designs
15 have to show a similar association
16 between the exposure and outcome.
17      I would also note within the
18 case-control studies --
19 BY MR. TISI:
20      Q.   Can I -- can I ask you --
21      A.   -- the hospital-based --
22      Q.   -- a question here?  Can I
23 ask you --
24      A.   I'm not finished, please.

Page 352

1  The hospital-based controls, none of them
2  were statistically significant.  And
3  those were case-control studies.  You
4  know, so you look at the different study
5  designs, and you're getting different
6  sort of results, and that's an
7  inconsistency.
8       Q.   Okay.  And so they're
9  inconsistent in that some are
10 statistically significant and others
11 aren't?
12      MS. MILLER:  Objection.
13      THE WITNESS:  Again, taken
14 as a whole -- and I also talk
15 about the fact that if you look at
16 the magnitude of the estimates --
17 BY MR. TISI:
18      Q.   We'll talk about that.
19      A.   -- that were produced --
20 well, that has to do with consistency
21 too.
22      Q.   I'm going to talk about -- I
23 need to --
24      A.   Well, no, you asked me if my

Page 353

1  consistency is just on the basis if --
2       Q.   I didn't.
3       A.   -- there's statistical
4  significance or not.
5       Q.   Doctor, you know, when I
6  ask -- when I ask a question, it involves
7  different variables, I get accused of
8  asking a compound question.  So I'm
9  asking you one question at a time.
10      Is statistical significance,
11 when you looked at these studies overall,
12 did you find that the statistically
13 significant results were counter-balanced
14 by the statistically insignificant
15 results?
16      MS. MILLER:  Objection.
17      THE WITNESS:  I do not --
18 I'm sorry.
19      I do not know what you mean
20 by counterbalance.
21 BY MR. TISI:
22      Q.   In other words, did they
23 negate them?
24      MS. MILLER:  Objection.

89 (Pages 350 to 353)

Karla Ballman, Ph.D.

Page 354

1      THE WITNESS:  That's not
2   what I said.
3   BY MR. TISI:
4      Q.   Are they inconsistent with
5   them?  Is it inconsistent that some
6   studies are statistically significant and
7   others aren't?
8      A.   Again, consistency requires
9   that multiple studies across different
10   locations, populations, and study designs
11   show similar association between the
12   exposure and the outcome.
13      So I looked at case-control
14   studies, which is one design.  And within
15   case-control studies you have
16   population-based case-control studies,
17   which is a design.  You have
18   hospital-based control studies, which is
19   a design.
20      You also have cohort
21   studies, which is another different
22   design.
23      And when you look across
24   that, you do not come up with the same

Page 355

1   association.
2      Q.   Isn't that why you do a
3   meta-analysis?
4      A.   No.
5      Q.   Okay.  Well --
6      A.   Meta-analysis -- let me
7   answer -- finish that.
8      Meta-analyses are not meant
9   that if results differ from each other
10   you throw them all together to get a
11   result that you want.  And in fact if
12   results are different from each other,
13   you shouldn't do a meta-analyses.  That's
14   heterogeneity --
15      Q.   So you think --
16      A.   -- and that's going to lead
17   to an incorrect conclusion.
18      Q.   So you think nobody --
19      MS. MILLER:  Are you done?
20      THE WITNESS:  I'm done.
21   BY MR. TISI:
22      Q.   So you think that -- there
23   are five or six meta-analyses.  Do you
24   think those shouldn't have been done?

Page 356

1      A.   I didn't say that they
2   shouldn't be done.  But to be done
3   correctly and how to look at them
4   correctly, and -- is to do a separate
5   case -- meta-analyses of the case-control
6   studies, and a separate of the cohort
7   studies, and not just do one case -- or
8   one meta-analysis that combine both
9   together.
10      And a lot of the
11   meta-analysis, they do report out
12   separately for the case-control studies
13   and the cohort studies.
14      Q.   But they do a meta-analysis
15   combining all the studies, every single
16   one of them combine all the studies?
17      MS. MILLER:  Objection.
18      THE WITNESS:  Yes.  And I
19   have -- I do know that I have
20   citations in here somewhere that
21   shows that that is a problem with
22   meta-analysis.  Because it lumps
23   over -- you won't be able to see
24   consistency or not, but you -- you

Page 357

1   just have one result.  So you
2   can't see where the results
3   differ.
4   BY MR. TISI:
5      Q.   Now, in criticize --
6      MS. MILLER:  Is this a good
7   time for a break?
8      MR. TISI:  No.  Unless you
9   need it.  Do you need it?
10      MS. MILLER:  Do you need it?
11      THE WITNESS:  I need it.
12      MS. MILLER:  It's not about
13   me.  It's about her.
14      MR. TISI:  Absolutely.  If
15   she needs it, she can always ask
16   for it.
17      THE WITNESS:  Yeah, I'm
18   sorry.  I was trying to be polite.
19   Thank you.
20      MS. MILLER:  Yeah, she's
21   very polite.  She's not going to
22   ask.
23      THE VIDEOGRAPHER:  Stand by,
24   please.  The time is 2:23 p.m.

90 (Pages 354 to 357)

Karla Ballman, Ph.D.

Page 358

1  Off the record.
2  (Short break.)
3  THE VIDEOGRAPHER: Okay. We
4  are back on the record. The time
5  is 2:34 p.m.
6  BY MR. TISI:
7  Q.  In your report -- Doctor,
8  we're talking about the talc studies
9  now -- you have some criticisms of the
10  plaintiffs' experts in how they addressed
11  the biases in the cohort studies and you
12  give your opinions about them, and it's
13  pretty clear in your report. You know
14  that section, correct?
15  MS. MILLER: Is that a
16  question?
17  MR. TISI: Yes.
18  THE WITNESS: Can you point
19  me to the section, please?
20  BY MR. TISI:
21  Q.  Sure. I'm happy to do that.
22  On Page 28. Do you see you're addressing
23  the issues that the plaintiffs' experts
24  raise about the cohort studies and you

Page 359

1  address them and your opinions about them
2  are pretty clear.
3  A.  So you're talking about the
4  paragraph that says, "The final argument
5  made by plaintiffs' experts"?
6  Q.  Yeah. Actually and it
7  starts -- you talk about all of the --
8  you address all of the issues that -- I
9  mean, this is not a trick question.
10  A.  Yeah.
11  Q.  You are addressing all of
12  the issues that the plaintiffs' experts
13  raise about the cohort studies here, and
14  you don't think that they're valid, and
15  you give the reasons for that, correct?
16  MS. MILLER: Objection.
17  Objection.
18  THE WITNESS: So yeah, you
19  know, as it says here, I -- I say
20  plaintiffs cite certain things,
21  and I point out why I disagree
22  with their methodology.
23  BY MR. TISI:
24  Q.  Okay. In your opinion?

Page 360

1  A.  It's why I disagree with the
2  methodology.
3  Q.  Okay. And for the record,
4  the cohort studies are what? Gertig,
5  Gates, Houghton and Gonzales?
6  A.  Yeah, it depends on how you
7  count cohort studies. But those are
8  publications on the cohort studies.
9  Q.  And so it's not that the
10  plaintiffs' experts don't consider the
11  cohort studies, they just think that on
12  balance they're not as reliable as --
13  MR. TISI: What are you
14  shaking your head for?
15  MS. MILLER: Because
16  you're -- okay, I'll wait. I'll
17  object at the end. I didn't mean
18  to be shaking my head.
19  MR. TISI: You've been doing
20  it the whole time.
21  MS. MILLER: There's a video
22  that will --
23  MR. TISI: It will.
24  BY MR. TISI:

Page 361

1  Q.  So the question is not --
2  your contention is not that the
3  plaintiffs' experts don't address the
4  cohort studies. You just disagree about
5  the interpretation that they give to the
6  cohort studies; is that fair?
7  MS. MILLER: Objection.
8  Objection.
9  THE WITNESS: My concern is
10  the methodology used by the
11  plaintiffs in doing their -- their
12  whole analyses of the data in
13  total.
14  BY MR. TISI:
15  Q.  And what methodology do you
16  think that they used wrong with respect
17  to the cohort studies?
18  A.  I -- well, again, I think
19  that they -- in terms of the methodology,
20  I was talking about methodology, sort of
21  in general. I don't think that they're
22  applying the Bradford Hill criteria in a
23  methodologically correct manner.
24  And so for the cohort

91 (Pages 358 to 361)

Karla Ballman, Ph.D.

Page 362

1    studies, I point out, you know, what they
2    say as to why, you know, they say that,
3    well, the cohort studies, you know,
4    really have no play in terms of
5    determining consistency.
6         Q.   Is that what you think they
7    say?
8         A.   I'm paraphrasing.  I do
9    not -- I do not see -- I don't know
10   offhand, and I'll have to read through
11   carefully.  But it's seem to remember
12   that none of the plaintiffs' experts said
13   that -- that they gave cohort studies
14   more weight than they did the
15   case-control studies.
16        Q.   And you think that they
17   should have said cohort studies should be
18   given more weight than case-control
19   studies?
20        A.   I'm --
21             MS. MILLER:  Objection.
22             THE WITNESS:  I'm saying --
23             MS. MILLER:  Please give me
24        time to object.  I know everybody

Page 363

1        is tired this afternoon.
2    BY MR. TISI:
3         Q.   I mean, I'm reading what
4    you.  You said, "I don't know offhand but
5    I'll have to read through carefully, but
6    it seemed -- I seem to remember that none
7    of plaintiffs' experts said that they
8    gave cohort studies more weight than they
9    did case-control studies."
10             And you think that's a
11   methodologic flaw?
12        A.   I -- I -- in the end I may
13   be misremembering exactly what they said.
14   But I do believe some of them said I
15   weighted the case-control studies more
16   because here are flaws in the cohort
17   studies and that sort of makes them
18   invalid.
19             And due to the generally
20   accepted principle in epidemiology that
21   cohort studies have higher evidence than
22   do case-control studies, I don't think
23   that's correct.
24        Q.   But the biases that the

Page 364

1    plaintiffs' experts, there's several of
2    them.  There's misclassification bias
3    that they identified.  You know what that
4    is, right?
5         A.   Can you point in particular
6    where they identified a mis --
7         Q.   Well, I'm asking you.  You
8    identified it in your report.  You said
9    that one of the issues that were raised
10   was that they did not -- the issue that
11   Dr. Rothman raised --
12             MS. MILLER:  Do you want to
13        tell us what page you are reading?
14             MR. TISI:  Page 28.
15             MS. MILLER:  That would help
16        a lot.
17             MR. TISI:  I'm on Page 28.
18        I told you before.
19             THE WITNESS:  Yeah, yeah,
20        but I don't know from there where
21        you're reading.
22   BY MR. TISI:
23        Q.   Okay.  Let me ask you this.
24   Did they identify misclassification bias?

Page 365

1         A.   I don't know.  I mean, can
2    you --
3         Q.   I'm asking you.  You're the
4    expert.  I'm just a lawyer.  Did they
5    identify misclassification bias?
6         A.   I'll have to go through all
7    the expert reports and see which ones.
8         Q.   I'm asking, in your
9    report -- in your report, do you identify
10   that she would -- that the witness's
11   plaintiff were concerned about
12   misclassification bias?
13        A.   I'll have to go through my
14   report.
15             MR. LOCKE:  Objection to
16        form.  Maybe it's just the
17        pronouns.  But are you talking
18        about a specific witness?
19             MR. TISI:  No.  She's
20        lumping them altogether.
21             MS. MILLER:  Where is she
22        lumping them altogether?
23   BY MR. TISI:
24        Q.   Plaintiffs' experts.  It

92 (Pages 362 to 365)

Karla Ballman, Ph.D.

Page 366

1  says the final argument made by
2  plaintiffs' experts.
3     A.  Yes.  And I cite two of
4  them, so what is 15 and 73?
5         So one is, as I -- we've
6  been talking about, is that the level of
7  evidence in cohort studies is weaker than
8  that in case-control studies.
9         And number 15 and 73 are --
10 so that would be McTiernan and Moorman.
11    Q.  Okay.  So now let me ask you
12 this.  Do the witnesses -- do as a whole,
13 do the plaintiffs' experts, one, or all
14 of them, talk about the issue of
15 misclassification bias?
16        MS. MILLER:  Objection.
17        THE WITNESS:  I can't
18    remember off the top of my head.
19 BY MR. TISI:
20    Q.  But you know what
21 misclassification bias is, right?
22    A.  Yes, I do.
23    Q.  What is it?
24    A.  It's when you put a case

Page 367

1  into the control group or you put a
2  control into the case group.
3     Q.  Okay.  And that is a
4  recognized bias and that's what
5  Dr. Rothman was talking about -- is a
6  recognized bias within -- within cohort
7  studies, correct?
8     A.  It doesn't have to be just
9  cohort studies you can have
10 misclassification biases in case-control
11 studies.
12    Q.  Okay.  But that is a
13 recognized concern about cohort studies,
14 right?
15    A.  It's something one needs to
16 be aware of when they are looking at
17 cohort studies.  It doesn't mean that
18 every cohort study has misclassification
19 bias.
20    Q.  Isn't it also another
21 concern that the studies -- that cohort
22 studies are difficult to design if
23 they're studying a rare disease?
24        MS. MILLER:  Objection.

Page 368

1        THE WITNESS:  That's more of
2    a feasibility question and a
3    resource question.  I don't see
4    how that creates any biases or
5    confounding or issues like that.
6  BY MR. TISI:
7     Q.  One of the things that you
8  raised is that Narod had mentioned that
9  there should be 200,000 patients.  Do you
10 remember that?
11    A.  Yes, I do.  We can look at
12 it here.
13    Q.  Let me ask you.  Did you
14 ever -- did you -- did you do any power
15 calculation to determine how big a cohort
16 study would have to be in order to
17 identify a risk of ovarian cancer?
18        MR. LOCKE:  Objection.
19 BY MR. TISI:
20    Q.  If you disagree -- if you
21 disagree with Dr. Narod?
22        MS. MILLER:  Objection.
23        Is the question the first
24    one or is the second question?

Page 369

1        Is, "Do you disagree with
2    Dr. Narod a question?"  Or is it
3    editorial content?  What is that?
4        Objection.
5        MR. TISI:  Thank you.
6    That's -- that's all you have to
7    say.
8        MS. MILLER:  Well, I need to
9    know.
10        MR. TISI:  You don't.
11        MS. MILLER:  The witness
12    needs to know.
13        MR. TISI:  She's doing just
14    fine.
15        MS. MILLER:  Do you know
16    what the question is?
17        THE WITNESS:  I'm not sure.
18 BY MR. TISI:
19    Q.  Doctor --
20    A.  But I heard that I --
21    Q.  Because you were queued by
22 your lawyer, let me ask you this --
23        MS. MILLER:  It doesn't take
24    a queue to know.

93 (Pages 366 to 369)

Karla Ballman, Ph.D.

Page 370

BY MR. TISI:
1    Q.   You recall -- you recall --
2         MR. TISI:  Counsel, please.
3
4    BY MR. TISI:
5    Q.   You recall that you -- that
6    Dr. Narod said that you would have to
7    have 200,000 patients in a cohort study
8    in order to detect -- detect ovarian
9    cancer, do you remember that?
10   A.   We can go to the Narod
11   study.  I just want to make sure exactly
12   what he said, but...
13        MS. MILLER:  Is there a
14   specific part of her report that
15   you're referring to?
16        MR. TISI:  I'll find it for
17   you.  Honestly, she remembers it,
18   so you don't have to keep doing
19   that.
20   BY MR. TISI:
21   Q.   Do you see in the middle of
22   Page 26 where it says, on your report,
23   "Across two different prospective
24   studies, there were approximately 1,400

Page 371

1    women diagnosed with ovarian cancer and
2    more than 200,000 women who were not
3    diagnosed with ovarian cancer."
4         Do you see that?
5    A.   Yes.  I see that.
6    Q.   Okay.  So now my question
7    is, did you do any power calculations to
8    determine how big the cohort studies
9    would have to be to detect ovarian
10   cancer, or are you relying on Narod?
11   A.   I think if you go down.  It
12   says the power to detect a hazard ratio
13   of 1.2 or larger is over 90 percent with
14   a two-sided level of confidence of 0.05.
15   Clearly this is sufficient power for an
16   association of 1.26 that is observed in
17   the case-control studies to be found
18   statistically significant.
19        So that -- so that is a
20   power statement.
21   Q.   Okay.  I'm asking you how
22   many patients would have to be enrolled
23   in a study.  So what would that turn out
24   to be?

Page 372

1    A.   I'm saying on the basis of
2    what we have here, I mean, if you read
3    that whole thing, it says, "Across the
4    three prospective studies there's 1,400
5    women with ovarian cancer, over 200,000
6    without."  So if you take those numbers,
7    the power to detect a hazard ratio of 1.2
8    or larger is over 90 percent with a
9    two-sided level of significance of .05.
10   Q.   Do you know whether or not
11   other people outside of litigation have
12   actually looked at the concerns about the
13   cohort studies that the plaintiffs'
14   experts have identified?
15   A.   I'm not sure what the
16   question is.
17   Q.   Well, I'll read it again.
18   A.   I mean, is there a
19   publication that looked at the cohort --
20   Q.   Do you know whether or not
21   people -- people, scientists outside of
22   litigation, have looked at the issues
23   related to the talc cohort studies and
24   agreed with the plaintiffs?

Page 373

1         MS. MILLER:  Objection.
2         THE WITNESS:  I'm -- I mean,
3    the meta-analyses obviously looked
4    at the cohort studies, and I do
5    not remember --
6    BY MR. TISI:
7    Q.   Did you read the Taher?
8    A.   The unpublished study that
9    hasn't been through peer review yet?
10   Q.   Actually -- it's actually
11   been through peer review.  But it's not
12   been published yet.  You're correct.
13   But let me ask you --
14   A.   So there's a notification of
15   publication?
16   Q.   Doctor, just I'm not
17   under -- I'm not under oath here.
18   A.   Sorry.
19   Q.   I'm asking you -- I'm asking
20   you this question?
21   A.   Yeah.
22        MR. TISI:  Are we laughing?
23   Is that part of -- part of
24   deposition protocol?

94 (Pages 370 to 373)

Karla Ballman, Ph.D.

Page 374

1        MS. SHARKO:  Well, you
2    represented that it was
3    peer-reviewed.
4        MR. TISI:  I'm
5    representing --
6        MS. SHARKO:  And then you say
7    you're not under oath.  Can we see
8    the peer review?  Are you guys
9    part of that?
10   BY MR. TISI:
11       Q.   Doctor -- Doctor --
12       MR. TISI:  I'm not part of
13   it, Counsel.  You know I'm not
14   part of it.
15       MS. SHARKO:  No, I don't.
16   BY MR. TISI:
17       Q.   Do you know whether or not
18   the Taher authors have identified the
19   same weaknesses with the cohort study as
20   the plaintiffs' experts did?
21       A.   I don't remember off the top
22   of my head --
23       Q.   Let's look at it.
24       A.   -- but I would have sort of

Page 375

1    the same...
2        MR. TISI:  Yes, hers has the
3    tab.
4        MS. MILLER:  Do you want
5    this tab?
6    BY MR. TISI:
7        Q.   You read the -- you read
8    the --
9        MR. TISI:  Yes, I did that
10   to make her life easy.
11       (Document marked for
12   identification as Exhibit
13   Ballman-22.)
14       THE WITNESS:  So this looks
15   like a draft.
16   BY MR. TISI:
17       Q.   Yes, correct.
18       A.   So whether it's been
19   peer-reviewed.
20       Q.   I'm asking you -- I'm asking
21   you whether they identified --
22       MS. MILLER:  You just
23   interrupted her.
24       MR. TISI:  Okay.  I -- there

Page 376

1    was no question pending, Counsel.
2    BY MR. TISI:
3        Q.   Okay.  If you go to Page 43.
4    It says at the top, Although the reasons
5    are unclear, the difference potentially
6    due to issues related to latency, study
7    power or exposure misclassification.
8        And they're talking about
9    the difference between cohort and case
10   controls.
11       Do you see that?
12       A.   I'm sorry, where were you
13   reading again?  Was it starting
14   "although"?
15       Q.   And the very top, "The
16   effect estimates of the meta-analysis
17   reported on 24-case-control studies" --
18       A.   Yes.
19       Q.   -- "and three cohort studies
20   and refer to ever versus never use of
21   perineal talc.  And it talks about the
22   fact that there's a difference between
23   the case-control and the cohort studies.
24       Do you see that?

Page 377

1        A.   Yes, I do.
2        Q.   Okay.  And "Although the
3    reasons for this are unclear, the
4    difference could potentially be due to
5    issues related to latency, study power or
6    exposure misclassification," correct?
7        A.   You know, that's what he
8    says there.  And I think it's really
9    striking that he doesn't talk about what
10   most people talk about in terms of the
11   limitations of the case-control studies.
12   So most people would say well, the reason
13   is, is because there's recall bias.  And
14   we do have evidence of how recall bias
15   can affect these results from
16   Schildkraut.  And so -- and so there it
17   can be kicked around --
18       Q.   There's no question --
19   there's no question pending.
20       A.   Well, you asked me --
21       Q.   I didn't ask you.  I asked
22   you whether I read that right.
23       MS. MILLER:  Please stop
24   interrupting her.

95 (Pages 374 to 377)

Karla Ballman, Ph.D.

1    MR. TISI: I asked you --
2    MS. MILLER: She wants to
3 give full, accurate answers.
4    MR. TISI: But there was no
5 question pending.
6    MS. MILLER: And you're
7 trying to stonewall her.
8    MR. TISI: No, she's trying
9 to stonewall me.
10 BY MR. TISI:
11    Q. I'm asking you this. I said
12 their reason they identify three reasons
13 why there could be a difference between
14 the case-control and the cohort studies,
15 did they not? And the answer is either a
16 yes or no.
17    MS. MILLER: Sometimes in
18 life an answer isn't yes or no.
19 And if the witness feels like she
20 needs to give a complete answer,
21 please allow her to give a
22 complete answer.
23 BY MR. TISI:
24    Q. Doctor, did I read the

1 following statement correct:
2    "Although the reasons for
3 this are unclear, the difference could
4 potentially be due to issues related to
5 latency, study power, or study
6 misclassification."
7    A. You read that sentence
8 correct. But you were saying that --
9 that there are experts outside of
10 litigation that have the same objections
11 as do the plaintiffs' experts. And so I
12 was -- and you're citing this.
13    Q. Okay.
14    A. And I'm trying to be
15 completely, you know, truthful. And I'm
16 saying this is surprising to me, because
17 first of all, it hasn't been put through
18 peer review. So I don't know if this
19 will stand. The reviewers may say --
20 well, you can say this the other way,
21 which most people would, is the issue is,
22 is that the case-control studies have
23 recall bias and selection bias.
24    Q. Have those not been

1 addressed in this paper?
2    A. I don't know.
3    Q. Okay.
4    A. And let me just point --
5    Q. So now, let's talk about the
6 cohort studies, which is what we were
7 talking about.
8    MS. MILLER: She was in the
9 middle of a sentence.
10 BY MR. TISI:
11    Q. The next paragraph talks
12 about latency. It says, "Although cohort
13 designs are efficient in examining
14 diseases with long latency periods, it is
15 essential that the period between talc
16 exposures and cancer's diagnosis be
17 specific" -- "sufficiently long.
18 Gonzales suggested that the latency
19 period for ovarian cancer is between 15
20 and 20 years.
21    "In the cohort studies
22 included in this review, Houghton
23 reported a mean follow-up of 12.4 years
24 while Gates followed a cohort of women

1 for 24 years. Gertig and Gonzales
2 noticed that" -- "noted that one of their
3 studies' main limitations one was the
4 relatively short follow-up period that
5 may not accurately detect a potential
6 association between talc exposure and
7 ovarian cancer."
8    Do you see that?
9    MR. LOCKE: Objection.
10    THE WITNESS: I do see that.
11 BY MR. TISI:
12    Q. Okay. And that is the very
13 same thing that the plaintiffs' experts
14 identify, correct?
15    MS. MILLER: Objection.
16 BY MR. TISI:
17    Q. You disagree with it, but
18 they identified it?
19    MS. MILLER: Objection.
20    THE WITNESS: And I'm saying
21 that the methodology and -- and
22 sort of what's being stated here
23 is -- is not a true representation
24 of what's going on.

96 (Pages 378 to 381)

Karla Ballman, Ph.D.

Page 382

BY MR. TISI:
1
2      Q.   Okay.  So they're wrong?
3          MS. MILLER:  Objection.
4          THE WITNESS:  I'm saying
5      that I -- I think that the
6      methodology applied has not -- has
7      some flaws in it.
8  BY MR. TISI:
9      Q.   Okay.  So the methodology of
10  these folks outside of litigation are
11  wrong --
12      A.   But these --
13      Q.   -- but yours is right?
14      A.   Sorry.
15      Q.   Correct?
16          MS. MILLER:  Objection.
17          THE WITNESS:  I'm saying
18      that I followed the general
19      principles of evaluating causation
20      on the basis of epidemiology good
21      practice.
22          And this has not even been
23      peer-reviewed yet, so...
24  BY MR. TISI:

Page 383

1      Q.   So the next -- nor has your
2  report, right?
3          MS. MILLER:  Objection.
4  BY MR. TISI:
5      Q.   Your report hasn't been
6  peer-reviewed, right?
7          MS. MILLER:  Objection.
8          THE WITNESS:  So I'm not
9      using anything outside of
10      litigation that hasn't been
11      peer-reviewed to say, look, you
12      know, this --
13  BY MR. TISI:
14      Q.   But your --
15      A.   -- is in support of that.
16  And so that's --
17      Q.   But your report --
18      A.   -- what I'm saying.
19      Q.   -- has not been
20  peer-reviewed, correct?
21      A.   But that wasn't the relevant
22  thing.
23      Q.   Okay.
24      A.   You were pointing to

Page 384

1      something outside of litigation that
2      hasn't been published to say, look, this
3      is in support of our experts' opinion.
4      So I don't know how that has much weight.
5          Q.   The next statement is --
6      deals with the power issue.  In addition
7      cohort studies included -- may have
8      underpowered -- may have been
9      underpowered to detect an odds ratio of
10      1.3 from the case-control studies.  This
11      was noted by Narod who suggested a cohort
12      of at least 200,000 women would be needed
13      to reach statistical significance if the
14      true odds ratio is 1.3.  The cohort
15      studies included in this review included
16      much smaller cohort studies, ranging
17      between 41,000 and 78,000 women.
18          Do you see that?
19      A.   I see where it's stated
20      there.
21          MS. MILLER:  You didn't read
22      that exactly.
23          MR. TISI:  I didn't read it
24      exactly.  You're right.

Page 385

1          MS. MILLER:  No, you didn't.
2  BY MR. TISI:
3      Q.   My question is --
4          MS. MILLER:  So --
5  BY MR. TISI:
6      Q.   -- were any -- were any of
7      the cohort studies above 80,000 women?
8      A.   I'm saying that if you look
9      at the meta-analyses of the cohort
10      studies, there -- it meets, as I said in
11      my report, meets the 200,000, and there
12      is sufficient power there.  And The
13      meta-analyses of the cohort studies did
14      not find a statistically significant
15      result.
16      Q.   Where was the meta-analysis
17      for the cohort studies?  Where was that?
18      A.   Oh, let's look at -- I think
19      Berge has meta-analysis of the cohort.
20      Penninkilampi also has a meta-analysis.
21      Those are the two most recent ones.  And
22      those are published.
23      Q.   The next -- the next thing
24      deals with the misclassification bias.

97 (Pages 382 to 385)

Karla Ballman, Ph.D.

Page 386

1        MR. TISI:  God bless you.
2    BY MR. TISI:
3        Q.    On the next page, it says,
4    Finally, in cohort studies talc exposure
5    was assessed at cohort entry and was used
6    to measure -- as a measure of chronic
7    talc use during follow-up.
8            It is possible women who
9    were not exposed to perineal talc at the
10   time of cohort entry began using talc
11   later time and vice versa, possibly
12   introducing nondifferential
13   misclassification of exposure, which
14   could have biased the risk estimate
15   towards the null value of unity.
16           MS. MILLER:  I just want to
17   say object.  That was paraphrased.
18   It wasn't read exactly.
19   BY MR. TISI:
20       Q.    Do you read that?
21       A.    I see where you're reading
22   from.
23       Q.    And that's the same
24   misclassification bias that Dr. Rothman

Page 387

1    mentioned and plaintiffs' experts also --
2    experts also mentioned as well.
3        A.    Yeah.  And that's just a
4    statement there, but it doesn't go into
5    sort of how this applies to talc in
6    general.  It's just a general statement.
7            So for instance, it doesn't
8    acknowledge that most women begin talc
9    use in their early adulthood.  It doesn't
10   acknowledge that -- so that means that
11   most women by the time they're 55,
12   probably wouldn't start using talc at
13   that point.
14           And even if they did, there
15   probably wouldn't be sufficient follow-up
16   time at that point for ovarian cancer to
17   develop.
18           So these are much more
19   subtle than just sort of stating a
20   platitude that, oh, yeah, this is a thing
21   you have to look out for in cohort
22   studies and, therefore, it's true.
23           It is something that you
24   have to look out for.  But you have to

Page 388

1    sort of take a deeper dive and see if
2    there's any evidence for or against that.
3        Q.    Let's talk about strength of
4    association.
5            You -- I'm going to do this
6    pretty quickly I think.  On Page 22 of
7    your report you talk about that, correct?
8        A.    I have a section that says
9    strength of association.
10       Q.    And the first two sentences,
11   you say, "The criterion does not have a
12   hard threshold.  There is no cut-off
13   value for the magnitude of an association
14   between an exposure required for a
15   relationship to be causal."
16           And you agree with that,
17   correct?
18       A.    There's no hard threshold.
19   I mean, there is no hard number that, you
20   know, people would say, oh, it's 1.31.
21   No, it's 1.32.
22       Q.    Okay.  On Page 22, again,
23   you say, "Most epidemiologists regard the
24   relative risk odds ratio or risk ratios

Page 389

1    are less than 1.5 to be weak
2    relationships."
3            Do you see that?
4        A.    Yes.  And I have citations
5    there.
6        Q.    Okay.  And then you go on to
7    say, "Although there are instances where
8    ratios under 1.5 are established to be
9    causal based upon observational data,
10   there are more instances where they are
11   spurious due to confounding or bias."
12           Do you see that?
13       A.    Yep.  With the citation.
14       Q.    Okay.  That citation is to
15   an article by Taubes?
16       A.    Mm-hmm.
17       Q.    Okay.  Who is Gary Taubes?
18       A.    I don't know offhand who he
19   is.
20       Q.    Gary Taubes, is he a doctor?
21       A.    I -- I don't know offhand.
22   If I could see the article.  I could see
23   if he has a Ph.D. or M.D. behind his
24   name.

98 (Pages 386 to 389)

Karla Ballman, Ph.D.

Page 390

1           MR. TISI:  Exhibit 30,
2      please.
3           MS. MILLER:  So that would
4      be 23.
5           MR. SOILEAU:  Yes, that
6      would be 23.
7           MS. MILLER:  I can't figure
8      out your code.  But you're always
9      off by a always a different
10     number.
11          MR. TISI:  Yes, it is,
12     because I'm off my --
13          MS. MILLER:  It's not like I
14     can even add or subtract.
15          (Document marked for
16     identification as Exhibit
17     Ballman-23.)
18     BY MR. TISI:
19     Q.   I don't have the whole
20     thing.  But I'm going to give you mine.
21     This is an article by Dr. Taubes.  And it
22     has my highlighting on it, which of
23     course I will be glad to substitute one.
24          MS. SHARKO:  We don't mind

Page 391

1      your highlighting.
2           MR. TISI:  That's okay.  I'm
3      happy to have you show it to the
4      jury.
5           MS. MILLER:  There's no jury
6      here.  This is a Daubert
7      proceeding.  We've established
8      that like 16 times.  So I don't
9      know which jury you're talking
10     about.
11          MS. SHARKO:  There's never
12     going to be a jury.  We're going
13     to be done after Daubert.
14          MR. TISI:  There have been
15     plenty of juries.  They've all
16     said the same thing.
17     BY MR. TISI:
18     Q.   Is that the article that
19     you've referred to?
20     A.   Yes, it is.
21     Q.   Okay.  Can you tell me
22     whether Dr. Taubes -- first of all, it's
23     a news article, isn't it?
24     A.   In -- in Science, which is a

Page 392

1      really well respected journal.
2           Q.   Do you know, Doctor, that
3      Taubes is a journalist and not a doctor?
4           A.   Oh, I did not realize that.
5      But he's quoting many individuals in here
6      who are famous epidemiologists, Norman
7      Breslow.
8           Q.   Doctor, do you see a nice,
9      big picture of --
10          A.   I see Ken Rothman in there.
11          Q.   Yeah.
12          A.   Who you say is -- so he --
13     he may be reporting.  But it's -- Sander
14     Greenland.
15          Q.   That's the other guy who, if
16     you look at the book there, they both
17     co-authored the book on epidemiology?
18          A.   Right.
19          Q.   All right.  And first of
20     all, is this a peer-reviewed article?
21          A.   Since it says "Special news
22     report," I don't know if it was
23     peer-reviewed or not.
24          Q.   Did you look and see whether

Page 393

1      or not the people who were quoted in this
2      news article, first of all, do you
3      typically cite news articles in your
4      published -- published papers?
5           MS. MILLER:  Objection.
6           THE WITNESS:  Well, if they
7      interview epidemiologists -- so
8      the epidemiologist interviewed by
9      Science, so I believe that
10     journalist would sort of report
11     correctly what the epidemiologist
12     said that they interviewed.
13     BY MR. TISI:
14     Q.   So you don't -- you don't
15     buy fake news, huh?
16          MS. MILLER:  Objection.
17     BY MR. TISI:
18     Q.   Let me ask you this, Doctor.
19          MS. MILLER:  Was that a
20     question that you actually want
21     her --
22          MR. TISI:  Yeah.  I withdraw
23     it.  I was making a joke, Counsel.
24          MS. MILLER:  It's hard to

99 (Pages 390 to 393)

Karla Ballman, Ph.D.

1    tell.
2    BY MR. TISI:
3        Q.   Did you see -- did you see
4    whether or not the people who were quoted
5    wrote a rebuttal to this report?
6        A.   No, I did not look.
7            (Document marked for
8            identification as Exhibit
9            Ballman-24.)
10   BY MR. TISI:
11       Q.   In the same article, and you
12   use the same rigor in doing -- in
13   drafting your report that you would do in
14   any publication, right?
15           MS. MILLER:  Objection.
16   BY MR. TISI:
17       Q.   In drafting your expert
18   report, you use the same scientific rigor
19   that would you use in every publication
20   that you -- that you'd use?
21           MS. MILLER:  Objection.
22           THE WITNESS:  I applied
23       scientific rigor in doing my
24       analyses and writing my report.

1    BY MR. TISI:
2        Q.   So in the same journal of
3    Science, Drs. -- if you look at the next
4    page, Drs. Willett, Greenland, MacMahon
5    Rothman, Thomas, Thun and Weiss wrote a
6    letter.
7            Do you see that?
8        A.   Yes, I see that.
9        Q.   Okay.  And the first
10   sentence says, "In the special news
11   report, "Epidemiology Faces Its Limits,"
12   Gary Taubes assembles a series of
13   quotations from ourselves and others
14   about potential methodologic pitfalls in
15   epidemiologic studies that might leave
16   readers with the misimpression that
17   evidence-based epidemiologic findings are
18   not usually credible."
19           Did I read that right?
20       A.   Yeah, you read that right.
21   Does -- are we talking about -- is this
22   all in relation to threshold?
23       Q.   This is all in relationship
24   to the study that you relied on to

1    support your -- your statement, yes.
2            MS. MILLER:  Objection.
3        That's --
4    BY MR. TISI:
5        Q.   The next sentence, he says,
6    A problem does -- A problem does not
7    exist with general medical reports about
8    single scientific studies.
9            Correct?
10           MS. MILLER:  Objection.
11           MR. LOCKE:  Objection.  You
12       added a "not".
13   BY MR. TISI:
14       Q.   "A problem does exist with
15   general media reports about single
16   scientific studies."
17           Correct?
18       A.   Yes, that's what it says
19   there.
20       Q.   And most of the examples
21   that are cited in the Taubes articles had
22   one observational study, correct?
23       A.   Yeah.  That might be the
24   case.

1        Q.   Okay.  Now, talc has, we
2    established earlier, over 30, correct?
3        A.   Well, again, it depends upon
4    how you measure studies.  I don't know if
5    they are 30 independent with different
6    datasets.
7        Q.   Certainly over one?
8        A.   That's correct.
9        Q.   Okay.  It says, "Taubes
10   seems to perpetuate this confusion by
11   listing several media reports of
12   published findings and telling the
13   reader, 'You should be the judge.'"
14           Do you see that?
15       A.   I see where you're reading
16   from.
17       Q.   Okay.  It goes on to say,
18   "In any scientific field, findings of
19   individual studies are not usually
20   considered seriously until confirmed by
21   others.  Also, in epidemiology, as in
22   another scientific fields, more powerful
23   studies need to be conducted to evaluate
24   smaller fixed."

Karla Ballman, Ph.D.

Page 398

1      Do you see that?
2           MR. LOCKE:  Objection.
3           THE WITNESS:  Yep.
4    BY MR. TISI:
5      Q.   Okay.  So you cited the
6    Taubes article but you didn't really
7    consider the quotations, the
8    epidemiologist who thought differently,
9    correct?
10          MS. MILLER:  Objection.
11          THE WITNESS:  But I think
12          there are other quotations, such
13          as, "Often doing so will require
14          large and long-term prospective
15          studies."
16          And it also states that,
17          "Taubes writes that, I have
18          expressed the view that a fourfold
19          risk should be taken seriously.
20          This is correct, but only when the
21          finding stands in the biological
22          vacuum" --
23   BY MR. TISI:
24     Q.   Right.

Page 399

1      A.   -- "and has no" -- "or no
2    biomedical credibility."
3      Q.   Okay.
4      A.   "We all take seriously small
5    relative risk when there are credible
6    hypothesis in the background."
7      Q.   And you don't think the
8    hypothesis that talc could cause ovarian
9    cancer is credible?
10     A.   After doing my complete
11   scientific review, I -- I again come to
12   the conclusion that there's no evidence
13   of a causal relationship between
14   peritoneal talcum powder exposure and
15   ovarian cancer.
16     Q.   Okay.  You mentioned that
17   you think that the -- most
18   epidemiologists would categorize the
19   risks seen in these studies as weak?
20     A.   I -- yes.
21     Q.   Okay.  Who is the National
22   Cancer Institute?
23     A.   What is it?
24     Q.   Do you know who the National

Page 400

1    Cancer Institute is?
2      A.   You mean what is it?
3      Q.   Yes.
4      A.   I thought you said who.  Is
5    it who or what?
6      Q.   What is the National Cancer
7    Institute?
8      A.   So it's -- it's a government
9    agency that funds cancer research.
10     Q.   Okay.  Would it surprise you
11   that the National Cancer Institute
12   characterized risks as low as 1.2 as a
13   moderate risk and not a weak risk?
14          MR. LOCKE:  Objection.
15          THE WITNESS:  Can I see what
16          you're citing that from, please?
17          MR. TISI:  Sure.
18   BY MR. TISI:
19     Q.   National Cancer Institute,
20   PDQ on the NI -- from "Ovarian Fallopian
21   Tube and Primary Peritoneal Cancer:
22   Peritoneal Cancer Prevention."
23          (Document marked for
24          identification as Exhibit

Page 401

1    Ballman-25.)
2    BY MR. TISI:
3      Q.   Do you see that?
4      A.   Yes, I see that.  That's the
5    title of the article.  Yes.
6      Q.   And if you go to Page 3.  It
7    identifies factors with adequate evidence
8    of increased risk of ovarian, fallopian
9    tube and primary peritoneal cancer.
10          Do you see that?
11     A.   Yes, I do.
12     Q.   Okay.  And it talks about
13   for each one of them, the magnitude of
14   the effect?
15     A.   Yes, I see that.
16     Q.   Okay.  The magnitude of
17   effect for endometriosis is modest with
18   an observed relative risk rate of 1.8 to
19   2.4?
20     A.   Yes.
21     Q.   Magnitude of the effect for
22   hormone replacement therapy is modest
23   with a relative risk of 1.2 to 1.8?
24     A.   Yes.

101 (Pages 398 to 401)

Karla Ballman, Ph.D.

Page 402

1    Q.   And obesity and height talks
2  about, "Based on fair evidence, obesity
3  and height are associated with a modest
4  increase of ovarian cancer," which they
5  describe down below as a 1.1.
6    A.   Yes.  I see that.
7        MS. MILLER:  Can you --
8  BY MR. TISI:
9    Q.   Are there -- so would you --
10 would you agree with me that at least in
11 this document, that there are people who
12 define magnitude of risk of 1.1 to 1.2 as
13 a modest risk?
14       MS. MILLER:  Objection.  Are
15 we talking about relative risks?
16 Or are we talking --
17       MR. TISI:  You can clarify,
18 Counsel.  She's looking at it.
19       MS. MILLER:  That's an
20 objectionable question.
21       MR. TISI:  Of course.  Every
22 one of my questions is.
23       MS. SHARKO:  Exactly.
24       MS. MILLER:  Fix that.

Page 403

1        THE WITNESS:  So this has
2  nothing to do with --
3        MS. MILLER:  You have the
4  power to change that.
5        MR. TISI:  Every one of my
6  questions is.  You've made that
7  clear.
8        THE WITNESS:  This has
9  nothing to do with trying to
10 identify what the strength of an
11 association is within the context
12 of a Bradford Hill.
13 BY MR. TISI:
14    Q.   So is the Bradford --
15    A.   This is more, I think, for
16 lay people.  I mean, it says, "Who's at
17 risk?"  I don't think this is for
18 scientists.
19       And so, you know, so I don't
20 know what their reference basis is.  And
21 I note that --
22    Q.   I have -- no question is
23 pending.
24    A.   Let me go through, but I

Page 404

1  don't think talc is listed here.
2    Q.   I understand.  Counsel --
3  counsel can ask you this question.  This
4  is not your opportunity to pontificate.
5        MR. LOCKE:  Objection.
6        MS. MILLER:  Objection.
7  BY MR. TISI:
8    Q.   Let's talk about consistency
9  and statistical significance now, because
10 this is a big part of your report.
11       Please pull out Exhibit 6,
12 which is the Bradford Hill article.
13    A.   Yes, I have.
14    Q.   On Page 8 it talks about
15 consistency.  It says, "Next to my list."
16    A.   Yes.
17    Q.   Okay.  It does not say
18 different designs, does it?  Can you read
19 it for the record, please?
20    A.   Yes.  It says, "Has it been
21 repeatedly observed by different persons
22 in different places, circumstances, and
23 times?"
24    Q.   Okay.  It doesn't talk about

Page 405

1  study design, does it?
2    A.   I don't know.  Circumstances
3  could fall under -- I mean, study design
4  could fall under circumstances.
5    Q.   It doesn't say anything
6  about statistical significance, does it?
7    A.   You know, I read -- where
8  did I read --
9        So it's going to take me a
10 while to go through where he talks
11 about -- yeah, so the lesson here is
12 that, "Broadly the same answer has been
13 reached in quite a wide variety of
14 situations and techniques."
15       So I would consider study
16 design a technique.  In other words, it's
17 not due to some constant error or fallacy
18 that permeates every inquiry.
19    Q.   Okay.  So now the next thing
20 if I go to Page 17 of your report under
21 consistency, the second sentence.
22    A.   Under consistency.
23    Q.   Right.  It says -- I'll read
24 it into the record.  "Results across

102 (Pages 402 to 405)

Karla Ballman, Ph.D.

Page 406

1  studies are consistent if the risk ratios
2  are numerically close to one another and
3  the results are statistically significant
4  in most studies."
5       A.   Yes.
6       Q.   Let's take each part.
7  Numerically close to one another.  First
8  of all, there's no citation to that
9  whatsoever, is there?
10      A.   Again, I mean, it's like
11 what does consistency mean.  Well, I
12 mean, it means that you have numbers that
13 are close to each other.  A number
14 wouldn't be consistent if one is one and
15 another is 100.  I think that's common
16 sense.
17      Q.   Okay.  Well -- okay.
18      A.   And as well as, you know,
19 results are statistically significant in
20 most studies.  Again, I think that's how
21 most people -- most epidemiologists would
22 interpret consistency.
23      Q.   Well, on Page 26 of the
24 report, if you go there, you criticize

Page 407

1  the plaintiffs' experts in another
2  context.  You say, "Arguments have been
3  made by plaintiffs' experts that the
4  results are consistent.  Some experts
5  emphasize what they see is a relative
6  stability of the estimates across time,
7  diverse population, and across diverse
8  study designs.  Unfortunately, they do
9  not indicate what is meant by relative
10 stability."
11      Do you see that?
12      A.   I'm sorry, no.  I haven't
13 gotten there.
14      Q.   It's the last paragraph.
15      A.   Yes.  I see that.
16      Q.   And you're critical of the
17 plaintiffs' experts for in the defining
18 the terms, right?
19      A.   But if you go on --
20      Q.   I'm asking you a question.
21 You're critical of plaintiffs' experts
22 for not defining their terms, correct?
23      A.   Can I finish?
24      Q.   No, I'm asking you -- I'm

Page 408

1  asking you one question at a time,
2  Doctor.
3       A.   I don't think it's a yes or
4  no answer.
5       Q.   Are you not criticizing
6  them -- "Unfortunately, they do not
7  indicate what is meant by relative
8  stability.  They did not provide a
9  definition."
10      Do you see that?
11      A.   I did not say that they did
12 not provide a cross --
13      Q.   You say, "Unfortunately,
14 they do not indicate what is meant by
15 relative stability."
16      A.   Right.  I did not say
17 definition.
18      Q.   Okay.  Do you indicate what
19 you mean by numerically close to one
20 another --
21      A.   So --
22      Q.   -- on Page 17?
23      MS. MILLER:  Objection.
24      THE WITNESS:  I -- I --

Page 409

1  that's where I was going.  It's
2  transfer -- I do have sort of
3  criteria -- where was it, Page 17?
4       So when I apply the
5  criteria, I say how I apply it.
6  And so I'm trying to look for that
7  right now.
8  BY MR. TISI:
9       Q.   No, I'm asking you the
10 general principles, Doctor.  What is --
11 how do you define numerically close?
12 What is your definition and your
13 authority for that?
14      A.   Common sense.  And I'm going
15 to where I applied it, as the plaintiffs
16 did not give this a definition in their
17 sort of how to do consistency and their
18 general setup of consistency, what I'm
19 saying is when they reported their
20 results on consistency, they just make a
21 statement that it's relatively stable,
22 but they don't even give an indication of
23 what they mean by relatively stable.
24      Q.   And you don't think the --

103 (Pages 406 to 409)

Karla Ballman, Ph.D.

Page 410

1    A.   So in my --
2         MS. MILLER:  She's still
3    talking.
4         THE WITNESS:  In my general
5    setup, I do not indicate.  But I
6    do when I go through sort of the
7    consistency evaluation, I do give
8    magnitudes of the ranges that were
9    reported in the case-control
10   studies that are almost fourfold
11   different.
12   BY MR. TISI:
13        Q.   I understand.
14        A.   Versus -- well, that's
15   what -- you asked me about consistency.
16        Q.   No.  But I'm asking you
17   where you -- no, but I'm asking --
18        A.   And that's how I --
19        Q.   You're not answering my
20   question.
21        MS. MILLER:  Stop talking
22   over each other.  Let her finish
23   her sentence.
24   BY MR. TISI:

Page 411

1         Q.   You are really not answering
2    my question.
3         Doctor, with all due
4    respect, and I -- because I think it's
5    important here.  I want to know what your
6    definition is of numerically close, and I
7    want to know where you get it from.
8         A.   So I think this is a bit
9    unfair.  You're asking me for a
10   definition of numerically close.  And
11   when I just sort of give a general
12   gestalt of what's meant by consistency.
13        And then you're saying but
14   you criticize the other plaintiffs'
15   experts because they don't say what
16   relatively stable is.  And their
17   statements are in terms of when they
18   looked at consistency, not a definition
19   of consistency.
20        So I'm saying let's look and
21   I'll show you why I say they're not
22   consistent.  And when I invoke --
23        Q.   But you're not answering.
24        MS. MILLER:  Let her finish.

Page 412

1         THE WITNESS:  -- the
2    analysis -- I'm answering.
3    BY MR. TISI:
4         Q.   You are not --
5         MS. MILLER:  Let her finish
6    her sentence.
7    BY MR. TISI:
8         Q.   You are not answering my
9    question with all due respect.
10        MS. SHARKO:  You haven't
11   heard her whole answer.
12        MR. TISI:  This is --
13        MS. MILLER:  Maybe -- maybe
14   she was about to give you the
15   answer you wanted.
16        MR. TISI:  This is --
17        MS. MILLER:  You have to let
18   her finish talking.
19   BY MR. TISI:
20        Q.   This is -- you provide --
21        MS. MILLER:  You don't let
22   me talk either.
23   BY MR. TISI:
24        Q.   You provide a statement,

Page 413

1    okay, here about consistency.  This is in
2    your general section, 5.1.2, correct?
3    Without regard to talc.
4         A.   I -- I say -- I provide a
5    general statement there.
6         Q.   Okay.  And your general
7    statement is that numerically close --
8         A.   Yes.
9         Q.   Okay.  You use numerically
10   close.  And I want to know where -- other
11   than you said common sense and gestalt,
12   okay, those are your two things, kind of
13   like the sniff test that you used in
14   Viagra, right?
15        MR. LOCKE:  Objection.
16   BY MR. TISI:
17        Q.   I want to know where your --
18   where your --
19        MS. MILLER:  He wasn't done
20   with the question.  I was going to
21   object.  Don't worry.
22   BY MR. TISI:
23        Q.   Okay.  Then let me back up.
24   You remember the sniff test that you used

104 (Pages 410 to 413)

Karla Ballman, Ph.D.

Page 414

1  in Viagra, right?
2       MS. MILLER:  Objection.
3       THE WITNESS:  I don't
4  remember exactly how I used it.  I
5  do remember using those terms.
6  BY MR. TISI:
7       Q.   Right.  So this is the
8  gestalt test or the common sense test
9  that you used.
10      MS. MILLER:  Objection.
11 BY MR. TISI:
12      Q.   I want to know exactly where
13 you get your cut-off for what is
14 numerically close for the consistency
15 prong of Bradford Hill?
16      MR. LOCKE:  Objection.
17      THE WITNESS:  You know what,
18 again, it all depends upon the
19 situation.  And that's why there's
20 no solid number within the
21 definition for the general thing.
22      You also then brought up --
23 and that's what I'm trying to get
24 the whole truth out there, is I

Page 415

1  criticize the plaintiffs' experts
2  by saying relatively stable
3  without giving any sort of
4  indication.
5       But their relatively stable
6  was just in their conclusion that
7  they're consistent, whereas when I
8  look at the consistency analyses,
9  I give more numbers and ranges as
10 to why I believe those numbers are
11 not consistent.
12 BY MR. TISI:
13      Q.   Right.  But that's your
14 opinion.  You don't give any basis for
15 it.  You don't give any citation.  You
16 don't give any published peer-reviewed
17 literature which would -- against which
18 we could measure your opinion, do you?
19      MS. MILLER:  Objection.
20      THE WITNESS:  There wouldn't
21 be any published peer-reviewed
22 literature that would say that.
23 But I am -- I'm giving my criteria
24 and metrics and how I came to my

Page 416

1       conclusion, versus the plaintiffs'
2       experts, which just say they're
3       relatively stable.
4  BY MR. TISI:
5       Q.   Okay.  Let me do the next
6  one.  Last paragraph in the consistency
7  section, last -- I'm going to read it
8  into the record.  It's the first
9  paragraph.
10      "However" --
11      MS. MILLER:  You said last
12 paragraph.  Then you said first
13 paragraph.
14 BY MR. TISI:
15      Q.   First paragraph, last couple
16 sentences.
17      Tell me where you are.  Are
18 you with me, Doctor?  Right here.
19 Consistency.  Page 17.
20      A.   No, I was on 24.  Yes.
21      Q.   Okay.  You say -- I'll read
22 it into the record.  "However, if
23 adequately powered studies do not achieve
24 statistical significance, this is

Page 417

1  evidence of inconsistency."
2       Do you stand by that
3  statement, first of all?
4       A.   However if adequately
5  powered studies do not achieve
6  statistical significance... Yes.
7       Q.   Okay.  Next thing.  "Another
8  way an inconsistency can rise is if
9  95 percent confidence intervals for the
10 risk ratio estimates have no to little
11 overlap with one another for adequately
12 powered studies.  If one study has a
13 statistically significant result and the
14 other does not, it means that the
15 magnitude of the relative risk differs
16 considerably, which is an inconsistency
17 between the size of the estimated risk.
18      Do you see that?
19      A.   I do see that.
20      Q.   Okay.  Can you tell me
21 what -- how you define no to little
22 overlap?  What's the -- what's the
23 criteria for that and where do you get it
24 from?

105  (Pages 414 to 417)

Karla Ballman, Ph.D.

Page 418

1      First of all, there's no
2  citation for any of this, is there?
3      MS. MILLER:  Objection.
4      First of all, so what is --
5      MR. TISI:  I was --
6      MS. MILLER:  You can't ask a
7  question that way.
8      MR. TISI:  Counsel, I said
9  first of all, there is --
10      MS. MILLER:  Is the first
11  question stricken?
12      MR. TISI:  Yes.
13      MS. MILLER:  Okay.
14  BY MR. TISI:
15      Q.   First of all, in the second
16  part of the paragraph you do not provide
17  a single citation, correct?
18      A.   I do not provide a citation
19  there.
20      Q.   Okay.  Secondly -- okay, can
21  you tell me what you mean by no to little
22  overlap?  What is the criteria and where
23  do you get it from?
24      A.   That's was what I was trying

Page 419

1  to answer.  I'm trying to see if I have
2  that citation here.  And if I don't, I
3  can provide a citation.  No, I don't
4  provide a citation there.  But in the
5  literature, there are articles that state
6  how much -- in fact, confidence intervals
7  can overlap and the results still are
8  statistically significantly different.
9      Q.   In fact, Doctor -- and we're
10  going to talk about this.  Aren't you
11  aware that even this week, the American
12  Statistical Association published a
13  whole -- a whole volume of 43 articles
14  with an editorial recommending that they
15  get rid of the issue of statistical
16  significance and look at confidence
17  intervals?
18      A.   Well, that's what I'm citing
19  there, that one can look at confidence
20  intervals and see if they overlap or not.
21      Q.   Perfect.  And we're going to
22  talk about that.  Okay?
23      But you do understand that
24  the American Statistical Association in

Page 420

1  2016 and again just this week have
2  indicated that statistical significance
3  should not even be -- should not even be
4  mentioned when we are talking about
5  analyses like these, true?
6      MR. LOCKE:  Objection.
7      MS. MILLER:  Objection.
8      THE WITNESS:  I have no idea
9  what it's referring to.  But let
10  me -- let me sort of explain to
11  you the relationship between
12  statistical significance and
13  confidence intervals.
14      If one has a confidence
15  interval, one can infer whether or
16  not a result is statistically
17  significant at a certain level.
18      So one can sort of infer if
19  the P-value is going to be less
20  than or greater than .05 if you're
21  using a 95 percent confidence
22  interval.
23      So the reason they're saying
24  this, and I tell this people all

Page 421

1  the time when I teach, I never
2  just want to see a P-value, I want
3  the magnitude of the difference.
4      I want to know what is the
5  size of the difference and a
6  confidence interval on that, and I
7  would agree.  I don't need the
8  P-value.
9  BY MR. TISI:
10      Q.   And --
11      A.   And I could infer
12  statistical significance just based upon
13  the confidence interval.
14      So they are not saying don't
15  worry about statistical significance.
16  They are saying don't place so much
17  emphasis on the P-value itself.
18      Q.   But also -- we're going to
19  talk about this for a moment.  You would
20  agree that almost all of these studies
21  with a handful of exceptions, regardless
22  of study design, their confidence
23  intervals overlap at 1.2?
24      A.   I have no idea.

106 (Pages 418 to 421)

Karla Ballman, Ph.D.

Page 422

1    Q.   We'll talk about that.
2         MS. MILLER:  Do you need a
3    break?
4         THE WITNESS:  No, I'm good.
5    BY MR. TISI:
6    Q.   On Page 26, you say the
7    following with respect to the talc
8    evidence:  "There is clear
9    inconsistency" -- Page 26?
10   A.   Yeah, I'm there.  I'm not
11   seeing where that statement -- or where
12   that --
13   Q.   The last sentence of the
14   paragraph in the middle?
15   A.   Okay.  I'm with you.
16   Q.   There is clear inconsistency
17   between different study types with
18   case-control studies yielding a
19   statistically significant association
20   ranging from 1.26 to 1.35 and cohort
21   studies yielding a nonstatistically
22   significant association ranging from 1.02
23   to 1.06, hence no evidence of a causal
24   relationship because the results are

Page 423

1    inconsistent."
2         Do you say that?
3    A.   I do.
4    Q.   Okay.  And so you think that
5    because these two sets of results are --
6    one is statistically significant and one
7    is not statistically significant, they
8    are inconsistent?
9         MS. MILLER:  Objection.
10        THE WITNESS:  I'm saying
11        that one set of results is
12        establishing an association that's
13        statistically significant.  And
14        I'm saying another one is saying
15        there is no association because
16        this is no statistical
17        significance.
18   BY MR. TISI:
19   Q.   Okay.  Now, you didn't put a
20   Forest plot of the studies in your
21   report, did you?
22   A.   I believe there is no Forest
23   plot.
24   Q.   Okay.  Have you reviewed the

Page 424

1    expert reports of any of the other
2    defense experts in this case?
3    A.   Other defense experts?
4    Q.   Have you read Christian
5    Merlo's?
6    A.   Yes, I have.
7    Q.   Did you have any problems
8    with his report?
9    A.   Problems?  What do you mean
10   by problems.
11   Q.   Anything that you thought
12   was wrong?
13   A.   I wasn't evaluating whether
14   or not I agree or disagree with his
15   report.
16   Q.   I'm going to show you a
17   chart that he put in his report because
18   you don't have one in yours.  And I will
19   stipulate that it is accurate to the
20   extent that it is --
21   A.   Comes from his report?
22   Q.   I'm going to ask you to
23   assume that it comes from his report and
24   I'm going to use his numbers.

Page 425

1         MS. MILLER:  I'll check my
2    laptop to make sure that's true.
3         (Document marked for
4         identification as Exhibit
5         Ballman-26.)
6    BY MR. TISI:
7    Q.   Do you remember seeing this
8    chart?
9    A.   I was expecting a Forest
10   plot.  Yes, I see this chart here.  I've
11   seen so many charts that if this comes
12   from his study, yes, I believe --
13   Q.   And I'm using his because
14   I'm sure the defense would object to me
15   using anything else but their evidence.
16   I'm using your evidence, and I'm putting
17   it in front of you.  Okay?
18        MS. MILLER:  Objection.
19   BY MR. TISI:
20   Q.   And I'm asking you to assume
21   it's true.
22        MS. MILLER:  If there's a
23        statement there, I'm objecting.
24        If there's a question there, I'm

Karla Ballman, Ph.D.

Page 426

```
 1        objecting.  If there's a statement
 2        there, I don't know what the point
 3        of it was.
 4   BY MR. TISI:
 5        Q.   There are 30 observational
 6   studies here.  And he identified them as
 7   hospital-based case-control,
 8   population-based case-controls, pooled
 9   case-control studies, and cohort studies,
10   correct?
11        A.   Yes, that's --
12        MR. LOCKE:  Objection.
13   Before you answer that question, I
14   don't have a copy of what you're
15   looking at.
16        MR. TISI:  Oh, I'm sorry.
17        MS. MILLER:  Wait.  I'm
18   sorry.  Did you just read us a
19   sentence?
20        THE WITNESS:  No, he was --
21        MR. TISI:  They're
22   categorized.  No, it's not.
23   They're categorized.  One,
24   hospital based case-control
```

Page 427

```
 1   studies, population based
 2   case-control studies --
 3        MS. MILLER:  You talked so
 4   fast, I thought you were reading
 5   something that I didn't have.
 6        I didn't realize you were --
 7        MR. TISI:  I am reading it.
 8   BY MR. TISI:
 9        Q.   Okay.  There are four
10   categories of studies in this chart,
11   correct?
12        A.   Yes, he lists four
13   categories of studies in the chart.
14        Q.   And these four categories
15   are -- these studies are studies you
16   recognize, correct?
17        A.   Yes.  I recognize studies
18   that I reviewed.  I don't know if they
19   are all there or if any extra or there.
20   But yes, in general.
21        Q.   Okay.  Now, would you agree
22   that irrespective of -- and I'm going to
23   put this aside for a minute.  I'm going
24   to say it.  Irrespective of the
```

Page 428

```
 1   statistically -- statistical significance
 2   issue, you would agree with me for the
 3   hospital case-control studies with the
 4   exception of the two Hartge papers, all
 5   show a risk ratio greater than one?
 6        A.   The two Hartge pages?
 7        Q.   Yes.
 8        A.   Yes.  That's what it's
 9   showing here.
10        Q.   Okay.  You would also agree
11   with me that the population based
12   case-control studies, every single one of
13   them, whether they were statistically
14   significant or not, had a risk ratio of
15   greater than one.
16        MS. MILLER:  Objection.
17        THE WITNESS:  In this chart
18   that is true.
19   BY MR. TISI:
20        Q.   Okay.  The pooled
21   case-control study, Terry had a risk
22   ratio great]er than one?
23        A.   That's true.  That's what
24   this --
```

Page 429

```
 1        Q.   As was -- as is Cramer on
 2   the next page?
 3        A.   Yes.
 4        Q.   And the cohort studies all
 5   had risk ratios greater than one with the
 6   exception of Gonzalez, correct?
 7        A.   Yes, that's correct.
 8        Q.   And would you agree with me,
 9   risk ratio, the RR, is the same thing as
10   the point estimate, correct?
11        A.   Yeah.  Either it's an odds
12   ratio or it's a relative risk.  But they
13   are point estimates.
14        Q.   And the point estimate, just
15   for anybody going to read this, is the
16   most likely place where the risk resides?
17        A.   It's more subtle than that.
18        Q.   Okay.  But just -- well, how
19   would you describe it?
20        A.   I would say that what a
21   confidence interval shows, and this is
22   why people hate statistics, is that --
23        (Brief telephone
24   interruption.)
```

108 (Pages 426 to 429)

Karla Ballman, Ph.D.

Page 430

1    MS. SHARKO:  That's someone
2  who loves statistics.
3    MR. TISI:  Troy Rafferty was
4  calling to you.
5    MS. SHARKO:  I'm happy to
6  talk with Troy.
7    THE WITNESS:  Sorry.  I was
8  trying to concentrate.
9    MS. MILLER:  Yeah, that's
10  not fair to Dr. Ballman.  Should
11  we -- the banter has confused her.
12  Should we go back and hear the
13  question again.
14  BY MR. TISI:
15    Q.  Yeah.  My question -- my
16  question is, what is your definition of a
17  point estimate.
18    Actually, let me -- let
19  me -- actually, that was not the
20  question.  The question was, the point
21  estimate is the place within the
22  confidence interval that it's most likely
23  to be the true risk?
24    A.  No, that's not correct.

Page 431

1    Q.  Okay.  Well, what is it?
2    A.  So it's just the point
3  estimate that comes on based on the
4  actual data that you have on hand and
5  that you calculated.  And it's for that
6  data.
7    And a confidence interval is
8  the interval such that if you would redo
9  the study with a different random set,
10  selected exactly the same way, many, many
11  times 95 percent of those intervals would
12  contain the real risk ratio.
13    Q.  And is the number that is
14  reported, the risk ratio, more likely or
15  less likely than the number that's at the
16  tails?
17    A.  I don't know how you would
18  measure that necessarily.  Because you
19  have no idea what truth is.  So you have
20  no idea within a given confidence
21  interval where the real estimate lies.
22    Q.  But you would agree with me
23  that -- that all of these studies with
24  the exceptions that we talked about

Page 432

1  before, Gonzalez, the -- cohort study,
2  and the two Hartge studies, that all of
3  the risk ratios here show a positive risk
4  ratio greater than one?
5    MS. MILLER:  Objection.
6    THE WITNESS:  As we
7  mentioned, most of the numbers
8  here are bigger than one.
9  BY MR. TISI:
10    Q.  Okay.  And that's what we
11  call a positive association, a positive
12  risk ratio?
13    MS. MILLER:  Objection.
14    THE WITNESS:  Well, I think
15  that --
16  BY MR. TISI:
17    Q.  Putting statistical
18  significance aside for a moment.  I'll
19  talk about statistical significance.
20    A.  Yeah, but I think it's
21  important.  I think one would not say
22  there's a positive association if it's
23  not statistically significant.  I mean,
24  it depends upon the context in which he

Page 433

1  was saying, so that might be misleading.
2  I mean, you know, a lot of people might
3  say, oh, they said there's a positive
4  association, and they would assume that
5  it was statistically significant.
6    Q.  I understand.  And we're
7  going to talk about statistical
8  significance in a moment.  But I'm asking
9  you, all of these numbers with the
10  exception of the ones that I mentioned,
11  the two Houghton studies and the Gonzalez
12  cohort study, show a positive risk ratio?
13    MS. MILLER:  Objection.
14    THE WITNESS:  I mean, that's
15  one thing, yes, here in the study.
16  BY MR. TISI:
17    Q.  Okay.
18    A.  Risk ratios that are -- you
19  know, rated as weak, or no risk -- no
20  significant association.
21    Q.  Okay.  Now, I'm going to ask
22  you a hypothetical.  If every one of
23  these studies was statistically
24  significant instead of some of them yes,

Karla Ballman, Ph.D.

Page 434

1  some of them no, would you find
2  consistency?
3       MS. MILLER: Objection.
4       THE WITNESS: If every what?
5  BY MR. TISI:
6    Q.   If every one --
7    A.   That that's not -- but
8  that's not the case.
9    Q.   I understand. This is a
10 hypothetical. And I'm allowed to ask
11 hypotheticals.
12      If this chart were that
13 every one of these results were
14 statistically significant, would that --
15 would those be consistent in your
16 opinion?
17      MS. MILLER: Objection.
18      THE WITNESS: Again, I mean,
19 I would have to look at the
20 ranges. They said it's just
21 magnitude. And then even
22 furthermore, you know, the next
23 step then would be consistent
24 what, and consistently biased,

Page 435

1  because these are all population
2  studies, and hence that's probably
3  why --
4  BY MR. TISI:
5    Q.   Well, no. There are cohort
6  studies in there. There's
7  hospital-based. If all of these studies,
8  regardless of design, was statistically
9  significant and the risk ratios were the
10 same, would they be consistent in your
11 opinion?
12   A.   You know, again, I would
13 have to see what the actual numbers
14 were --
15   Q.   These are the numbers.
16   A.   -- and so forth.
17   Q.   These are the numbers.
18   A.   But -- yeah, but you're
19 asking me to hypothesize something on
20 numbers that did not yield statistically
21 significant results.
22   Q.   I understand. I'm
23 allowed -- I'm allowed to do that. I
24 really -- and your lawyers will tell you

Page 436

1  that. I'm allowed to ask you
2  hypotheticals.
3       Okay. So my hypothetical is
4  that this chart -- this chart is exactly
5  as it is, except in the right-hand
6  column, there would be -- let's say --
7  let's call them all weak associations.
8  Let's call them all weak but they would
9  all be statistically significant.
10      If that were to change,
11 would those, in your opinion, be
12 consistent?
13      MS. MILLER: Objection.
14      THE WITNESS: I think it
15      depends. And I think there
16      wouldn't be agreement in terms of
17      what the actual association is,
18      which would be quite weird. And
19      the fact that, you know, in
20      general, the cohort studies have
21      much lower estimates than do the
22      case-control studies.
23 BY MR. TISI:
24   Q.   So is your answer they would

Page 437

1  be inconsistent?
2    A.   I am saying it depends in
3  this hypothetical situation. I mean, I
4  would have to look at it more carefully
5  and do an analysis to see --
6    Q.   Would you --
7    A.   -- because that wasn't the
8  analyses that I did. I did the analyses
9  on -- on these observed results.
10   Q.   Okay. Would you agree that
11 most of these risk ratios are between
12 approximately 1.1, some higher, some
13 lower, and 1.5?
14   A.   No. There are some that's
15 3.9, I see.
16   Q.   Well, so my next point --
17   A.   You know that's for
18 concerning. 2.49.
19   Q.   Right.
20   A.   I see a .7. I see a .3.
21   Q.   I said most of them. Most
22 of -- most of them are in the range of
23 1.1 to 1.5. Not all of them. I
24 wasn't -- I was clear about that.

Karla Ballman, Ph.D.

Page 438

1  A.  Well, you're right.
2       MS. MILLER:  Objection.
3  Wait, is that a question?
4       MR. TISI:  Yes.
5  BY MR. TISI:
6  Q.  I'm asking you --
7       MS. MILLER:  Or just a
8  statement?  That's a statement.
9  BY MR. TISI:
10  Q.  I'm asking you, were -- are
11  most -- most of these results are between
12  1.1 and 1.5, true?
13  A.  So I would say that the
14  statement you made, however you define
15  most, I'm not quite sure, look like that
16  could be true, yes.
17       MS. MILLER:  Is this a good
18  time for a break?
19       MR. TISI:  Let me just --
20       THE WITNESS:  Yeah.
21       MS. MILLER:  My head is
22  pounding.
23       THE WITNESS:  So is mine,
24  actually.

Page 439

1       MS. MILLER:  Soon as the
2  statistics started my head started
3  hurting.
4       MR. TISI:  Let me just --
5  let me just finish this, like, one
6  or two sentences, if you don't
7  mind.
8       MS. MILLER:  Sure.
9  BY MR. TISI:
10  Q.  Now, you said before on Page
11  17 -- on Page 17, "However, adequately
12  powered studies do not achieve
13  statistical significance, that is
14  evidence of inconsistency."
15  A.  That is correct.
16  Q.  So you are relying on the
17  statistically significant metric as part
18  of your analysis of consistency, true?
19  A.  I am, or you could put it
20  another way and say that all of the
21  adequately powered studies would have to
22  have as their lower bound above 1.0.
23       MR. TISI:  Okay.  That's
24  fine.  Let's take a break.

Page 440

1       THE VIDEOGRAPHER:  All
2  right.  The time is 3:35 p.m. off
3  the record.
4       (Short break.)
5       THE VIDEOGRAPHER:  We are
6  back on the record.  The time is
7  3:51 p.m.
8  BY MR. TISI:
9  Q.  Doctor, we were talking
10  before the break about role of
11  statistical significance and the issue of
12  consistency.  Do you remember that?
13  A.  I know that we were talking
14  about consistency and statistical
15  significance, yes.
16  Q.  Okay.  I'm going to hand you
17  another chapter from Rothman's textbook.
18       I'll have that marked as the
19  next exhibit.
20       MR. SOILEAU:  Which will be
21  27.
22       (Document marked for
23  identification as Exhibit
24  Ballman-27.)

Page 441

1  BY MR. TISI:
2  Q.  Give that to your counsel.
3  Now, there is a section here on
4  consistency in the Bradford Hill
5  criteria, and it starts on Page 25 of 30.
6       Do you see that?
7  A.  So causal criteria is on
8  this page, and strength.
9  Q.  Correct.  That's the section
10  that talks about Bradford Hill.  Do you
11  see that?  He refers to Bradford Hill, a
12  commonly used set of criteria was based
13  on a list of considerations or viewpoints
14  composed by Sir Bradford Hill.  That's
15  the second paragraph there.
16       Do you see that?
17  A.  Yes, I do.
18  Q.  Okay.  And he then goes
19  through the nine aspects.  I'm just
20  orienting you here.  There's a section on
21  consistency.
22       Do you see that?
23  A.  Yes.
24  Q.  Okay.  Feel free to look at

111  (Pages 438 to 441)

Karla Ballman, Ph.D.

Page 442

1  it if you want.  It's only two
2  paragraphs.  But I'm going to focus on
3  the second paragraph.  First of all,
4  consistency is not a necessary criteria
5  according to Dr. Rothman, right?
6          MS. MILLER:  Have you read
7  this?
8          THE WITNESS:  No, I'm still
9  reading.  Okay, I've read it.
10  BY MR. TISI:
11      Q.   Okay.  Does he not say, in
12  the second paragraph, "One mistake in
13  implementing the consistency criterion is
14  so common it deserves special attention.
15  It is sometimes claimed that a literature
16  or set of results is inconsistent simply
17  because some results are statistically
18  significant and some are not.
19          "This sort of evaluation is
20  completely fallacious, even if one
21  accepts the use of significance testing
22  methods."
23          Did I read that correctly,
24  first of all?

Page 443

1      A.   That is what it says.
2      Q.   Okay.  Do you agree with
3  that?
4      A.   So it also says that --
5      Q.   I'm asking whether you agree
6  with that statement.  Okay.  Do you agree
7  with it?
8      A.   Well, I do not agree with
9  it.  And I'm going to explain why.
10      Q.   Okay.
11      A.   It goes on to -- well, it
12  says that -- I agree with it in some
13  sense.  In the sense that the results --
14  effect estimates from a set of studies
15  could all be identical even if they --
16  many were -- many were significant and
17  many were not, the difference in
18  significance arising solely because of
19  differences in the standard error or
20  sizes of the study.
21          And if you recall, I said
22  adequately powered studies, which is what
23  he made this statement here.
24      Q.   Did you analyze each of the

Page 444

1  studies for power in the talc litigation?
2      A.   I did not.
3      Q.   You did not.  So you don't
4  know whether they were adequately powered
5  or not, do you?
6      A.   I -- I did not go through
7  and do a powered calculation for the
8  studies.
9      Q.   So you can't determine
10  whether or not you applied that rule
11  correctly because you don't know whether
12  or not these were adequately powered
13  studies or not, do you?
14      A.   I don't know if it was a
15  rule.  I'm just saying that this is one
16  aspect of consistency.  That's what I
17  said.
18      Q.   Okay.  So do you agree with
19  Dr. -- Dr. Rothman that just because some
20  studies are not statistically significant
21  and others are, it does not make them
22  inconsistent?
23      A.   So what is adequately
24  powered is if one does a meta-analyses of

Page 445

1  all the case-control studies and one does
2  a meta-analyses of all the cohort
3  studies.
4      Q.   I didn't ask you that
5  question, respectfully.  Okay.  My
6  question was --
7          MS. MILLER:  Try not to
8  interrupt her.
9  BY MR. TISI:
10      Q.   Do you agree --
11          MS. MILLER:  It's so tiring.
12          MR. TISI:  No, it is to --
13  listening to her speechify is
14  really disrupting.
15          MS. MILLER:  That's the pot
16  calling the kettle black.
17  BY MR. TISI:
18      Q.   Do you agree with
19  Dr. Rothman that because some studies are
20  not statistically significant and others
21  are, it does not make them inconsistent?
22  Do you agree with that statement as a
23  general proposition?
24          MR. LOCKE:  Objection.

112 (Pages 442 to 445)

Karla Ballman, Ph.D.

Page 446

1    THE WITNESS: It depends.
2 BY MR. TISI:
3    Q.   Okay.  And it depends upon
4 the power, correct?
5    A.   No.  It depends upon the
6 situation, as I was trying to explain and
7 you wouldn't let me finish.
8    Q.   Okay.  Does it depend upon
9 the power of the study to detect an
10 association?
11    A.   You mean a statistically
12 significant association?
13    Q.   Yes.
14    A.   That is what power is about.
15    Q.   Correct.  Okay.  The study,
16 each study has to be powered to find the
17 association, correct, adequately powered?
18    A.   No.  Just because a study is
19 adequately powered, it could not find an
20 association because there really is no
21 real relationship there.
22    Q.   Let's go to Exhibit Number
23 23.  Again, this was Dr. Rothman's six
24 misconceptions.

Page 447

1    A.   Yes.  20.
2    Q.   Exhibit 20.  I'm sorry.  Go
3 to Misconception Number 6.  Can you read
4 what it is?
5    A.   Okay.
6    Q.   Could you read -- could you
7 read it for the record, Misconception
8 Number 6?
9    A.   Oh, read it out loud?
10    Q.   Yes.
11    A.   Just that piece?
12    Q.   Just what the misconception
13 is, and we can talk about what he says.
14    A.   Okay.  It says,
15 "Misconception 6.  Significance testing
16 is useful and important for the
17 interpretation of data."
18    Q.   Okay.  Is that what -- isn't
19 that what you've done here, is you've
20 looked at, you've looked at which studies
21 are statistically significant and which
22 ones aren't, and you've said that they
23 were inconsistent and, therefore, you did
24 not find inconsistency?

Page 448

1    A.   No.  That's not what I'd
2 done.  I would like some time please to
3 read the rest of this.
4    Q.   Sure.
5    A.   He does say, "Focusing on
6 the magnitude" --
7    Q.   Just -- I thought you were
8 going to read the whole -- I thought you
9 were going to read the whole thing.
10 Let's read the whole thing and we can
11 talk about it.  Thank you.
12    A.   Okay.
13    MS. MILLER:  It would be
14 really nice if you would not talk
15 over the witness.
16    MR. TISI:  It would be
17 really nice if she'd --
18    MS. MILLER:  It's especially
19 offensive for the way you are
20 talking to her.
21    MR. TISI:  Okay.  You know,
22 I find it offensive that a witness
23 would come in here, and I ask her
24 whether or not this pen is red and

Page 449

1 she talks about all the reasons
2 why the blue pen down the table is
3 blue.  Okay.  I find that
4 offensive.  That's not the way
5 this works.
6    MR. LOCKE:  Objection.
7    MS. SHARKO:  That's not what
8 happened.  That's not what just
9 happened.
10    MS. MILLER:  You just kicked
11 me again.  I hope you're not doing
12 that on purpose.
13    MR. TISI:  I'm definitely
14 not doing it on purpose.  I would
15 not do that.  And you kicked me
16 before, and I said nothing about
17 it.
18    MS. MILLER:  I don't think
19 my legs are long enough.
20    MR. TISI:  Well, if they
21 aren't long enough, how did I --
22    THE WITNESS:  Okay.  Is
23 there a question?
24 BY MR. TISI:

113 (Pages 446 to 449)

Karla Ballman, Ph.D.

Page 450

1      Q.   Yes.  So my question is,
2  Doctor, didn't you -- wasn't the issue of
3  which studies were statistically
4  significant and which ones weren't,
5  wasn't that an important factor in your
6  discussion of the talc studies in the
7  context of the consistency aspect of
8  Bradford Hill?
9          MR. LOCKE:  Objection.
10         THE WITNESS:  So when I
11     looked at the analyses for
12     consistency, just for sake of
13     argument, to go through this
14     quickly, let's -- I look at the --
15     the meta-analyses of the
16     case-control studies, which is
17     statistically significant.
18         I looked at the
19     meta-analyses of the cohort
20     studies, which show no significant
21     association.  And that is an
22     inconsistency.
23 BY MR. TISI:
24     Q.   Okay.  So the determining

Page 451

1  factor, because even the cohort studies
2  had a positive risk ratio, correct?
3      A.   I don't know why that plays
4  into anything.
5      Q.   Well, okay.  They both
6  showed a positive -- they were in your
7  report on Page 26.  It was 1.02 to 1.06,
8  whereas the statistically significant
9  results from the case-control studies
10 were 1.26 to 1.35.
11         MS. MILLER:  When you say
12     "they both," what are you
13     referring to?
14 BY MR. TISI:
15     Q.   Okay.  On Page 26 of your
16 report, you say, "There is clear
17 inconsistency between different study
18 designs with the case-control studies
19 yielding a statistically significant
20 association ranging from 1.26 to 1.35,
21 and cohort studies yielding a
22 nonstatistically significant association
23 ranging from 1.02 to 1.06, correct?
24     A.   That is what it says there.

Page 452

1      Q.   All right.  Both of those if
2  you're just looking at the risk ratios
3  are positive, correct?
4          MR. LOCKE:  Objection.
5  BY MR. TISI:
6      Q.   1.02 to 1.06 is a positive
7  risk ratio, correct?
8          MS. MILLER:  Objection.
9          THE WITNESS:  But -- but --
10     they are positive.  But again, I
11     don't see where this is playing
12     into --
13 BY MR. TISI:
14     Q.   I'm asking you the question.
15 Okay.  The difference is one is
16 statistically significant result and the
17 other one is not.  And you make a point
18 of that in this sentence, correct?
19     A.   And that follows the point I
20 made above, which also plays into my
21 consistency is that Berge found there was
22 a statistically different
23 association for the perineal talc
24 powder -- or perineal/genital talc powder

Page 453

1  exposure and ovarian cancer between the
2  case-control studies and the cohort
3  studies.
4      Q.   And he's looking at
5  P-values, right.  P-.07?
6      A.   Yeah.  He is looking at
7  P-values, and that is what most of
8  medical literature does and bases their
9  evidence on.
10         And I looked -- and then I
11 look at the magnitude of the differences
12 between the two, and I do see that they
13 are different.
14     Q.   Did you look to see whether
15 the confidence intervals overlapped?
16     A.   What confidence intervals?
17     Q.   Well, if you go above.  The
18 same results here, if you go above in
19 your paragraph, it says 1.26, 95 percent
20 confidence interval 1.17 to 1.35.
21         Do you see that?  You're
22 basically talking about the same dataset.
23     A.   What do you mean the same
24 dataset?

114 (Pages 450 to 453)

Karla Ballman, Ph.D.

Page 454

1    Q.   If you go above, you said
2  1.26 to 1.35.  But above, you're
3  including the confidence intervals,
4  correct?
5    A.   Yes.
6    Q.   Okay.  The confidence
7  intervals for all of those results cross
8  1.2, for each and every one of them,
9  don't they?
10   A.   I don't know how that's
11 relevant.
12   Q.   I know you don't.  I'm
13 asking you do they all cross 1.2?  Do all
14 the confidence intervals for every one of
15 these risk ratios have 1.2 in the
16 confidence interval?
17   A.   Well, I don't know what you
18 mean by in.  The one from 1.02 goes from
19 .85 to 1.2.  I suppose you could call
20 that in it.
21   **But, yeah, if you look at**
22 **ranges, other than the one that it's on**
23 **the actual point, the ranges would**
24 **contain 1.2.**

Page 455

1    Q.   Okay.  So all of these
2  reports are consistent in that the
3  confidence intervals include 1.2, would
4  you agree with that?
5    MR. LOCKE:  Objection.
6    THE WITNESS:  No I would not
7    agree with that whatsoever.
8  BY MR. TISI:
9    Q.   Okay.  So let me go back to
10 Dr. Rothman's statement in -- in the
11 conclusion that he says -- in the
12 conclusionary statement of his six
13 misconceptions, persistent research
14 misconceptions.
15   He says, "It's easy to
16 declare a result is not statistically
17 significant, falsely implying that there
18 is no indication of an association" --
19   A.   I -- I'm sorry.  I'm just
20 stopping you because I really don't know
21 where you're reading from.
22   Q.   It's the last of the
23 conclusion sentence.
24   A.   Conclusion section on what

Page 456

1  page of --
2    Q.   At the -- page -- on the
3  last page.
4    A.   In the conclusions?
5    Q.   Yeah, 102 -- 10 --
6    A.   Okay.  I'm sorry.  I didn't
7  understand.
8    Q.   No, that's fine.  I should
9  have oriented you.  I apologize.
10   A.   So the last sentence in the
11 conclusion?
12   Q.   Right.  And I'll read it.
13   A.   Okay.
14   Q.   "Why do such important
15 misconceptions about research" --
16   A.   Wait, wait, the last
17 sentence in the conclusion?  Mine says
18 to the extent --
19   Q.   I'm on the conclusions.  I'm
20 on the conclusions.  The very --
21   A.   Oh, the first sentence.
22 Yes.
23   Q.   "Why do such important
24 misconceptions about research persist?

Page 457

1  To a large extent these misconceptions
2  represent substitutes for more thoughtful
3  and difficult tasks.  It's simpler to
4  resolve a discrepancy between a trial and
5  a non-experimental study in favor of a
6  trial without undertaking a laborious
7  analysis that Herman, et al., did.  It's
8  easier to declare that a result is not
9  statistically significant, falsely
10 implying that there is no indication of
11 an association, rather than consider
12 quantitatively the range of associations
13 that the data actually support."
14   Do you see that?
15   A.   I -- that those are what --
16 those are the words.
17   Q.   Okay.  And the range of
18 associations for the data is represented
19 by the confidence intervals, correct?
20   A.   Now, where are you reading
21 that?
22   Q.   I'm asking you that
23 question.  The range of associations in
24 any reported study is the numbers that

115 (Pages 454 to 457)

Karla Ballman, Ph.D.

Page 458

```
 1   are between the confidence intervals?
 2        MS. MILLER:  Objection.
 3        THE WITNESS:  That's not
 4   necessarily true.  In the
 5   meta-analyses, we have the range
 6   of associations of the point
 7   estimates.  Those are not
 8   confidence intervals.
 9        MADAM COURT REPORTER:
10   Chris, can we go off the record
11   for a second, just briefly?
12        THE VIDEOGRAPHER:  The time
13   is 4:07 p.m.  Off the record.
14        (Brief pause.)
15        THE VIDEOGRAPHER:  We are
16   back on the record.  The time is
17   4:12 p.m.
18   BY MR. TISI:
19     Q.   Doctor, isn't it true, that
20   the statistical -- the statistics
21   community has abandoned the looking only
22   at -- looking at statistical significance
23   in favor of looking at where the
24   confidence intervals are on studies in
```

Page 459

```
 1   terms of making decisions about things
 2   like causation?
 3        MR. LOCKE:  Objection.
 4        THE WITNESS:  So there's two
 5   different questions there.  The
 6   first I heard, isn't it true that
 7   the statistical community
 8   abandoned using P-values for
 9   statistical significance.
10        And I -- I don't think I --
11   I'm not sure what you mean by the
12   statistical community.  But I know
13   in the medical literature and all
14   studies that I've worked on and
15   all studies that I published, we
16   had P-values in them.
17        So I don't know who you mean
18   by the statistical community
19   abandoning P-values.
20   BY MR. TISI:
21     Q.   Well, what about the
22   American Statistical Association?
23     A.   Well, you told me that there
24   was a statement that was just out this
```

Page 460

```
 1   week.  I have not read that.
 2        So did you give me that
 3   statement so I can --
 4     Q.   I haven't yet.  I'm going to
 5   do it.  But it's not just this week.  Did
 6   you know in 2016 the American Statistical
 7   Association was so concerned about the
 8   misuse of statistical significance in
 9   P-values that it took the extraordinary
10   step, never before taken before, and
11   never before taken since, to issue a
12   statement about the misuse of P-values
13   and statistical significance?
14     A.   If you say that's true, I
15   would have to see what that statement was
16   at that time.
17     Q.   Had you ever -- had you ever
18   heard of that?
19     A.   I --
20        MS. MILLER:  Objection.
21        THE WITNESS:  I heard
22   that -- I may have heard there was
23   a P-value statement.  But again, I
24   didn't read it.
```

Page 461

```
 1   BY MR. TISI:
 2     Q.   You didn't know that?
 3   Somebody as accomplished as you in the
 4   scientific and statistical community, you
 5   don't know when the American Statistical
 6   Association position, as a member, what
 7   the position is on P-values and
 8   statistical significance?
 9        MR. LOCKE:  Objection.
10        THE WITNESS:  I said I
11   haven't read the statement.
12   BY MR. TISI:
13     Q.   Did you not know that it
14   even existed before I brought it up to
15   you?
16     A.   Again, I didn't know what
17   type of statement it is and the way you
18   characterized it.  As I said, I think I
19   heard there was some things on
20   P-values --
21     Q.   Did you bother to look it
22   up?
23     A.   I'm on Listservs.
24        No, I did not look it up.
```

116 (Pages 458 to 461)

Karla Ballman, Ph.D.

Page 462

1          MS. MILLER:  Objection.
2    BY MR. TISI:
3          Q.   So having heard there was a
4    statement about statistical significance
5    and P-values by the American Statistical
6    Association, it wasn't important for you
7    to look it up and see, well, what do my
8    colleagues say about this?
9          A.   I don't think it's a matter
10   of importance.  I think it's a matter of
11   time.  And you know, I -- when that came
12   out, I may have thought, oh, that's
13   something worth looking at.  But, you
14   know, my time got consumed by more
15   pressing matters, and I never got to it.
16         Q.   This came out in 2016.  This
17   is 2019.  You mean you had no time in the
18   past three years to look at a
19   two-three-page statement about the misuse
20   of P-values and statistical significance?
21         MS. MILLER:  Objection.
22         THE WITNESS:  That's not
23   what I said or meant.  What I
24   meant is that at the time it came

Page 463

1    out, I likely thought, oh, if I
2    ever have a spare minute, this
3    would be something interesting to
4    look at.  But I don't think I came
5    out with -- I -- the spare minute
6    probably may have happened later.
7    But by that point, I had forgotten
8    about it.
9    BY MR. TISI:
10         Q.   Well, in the interim you had
11   written two reports, one in
12   Viagra/Cialis -- Cialis outside of your
13   work and one here for 56 hours or
14   whatever it happened to be.
15         And you mentioned
16   statistical significance a lot in your
17   report.
18         Could you have taken one of
19   those hours to look up what the American
20   Statistical Association says about
21   statistical significance?
22         MS. MILLER:  Objection.
23         THE WITNESS:  I'm not sure
24   how that would be relevant,

Page 464

1    because all the studies I looked
2    at were talking about statistical
3    significance.  So it would be odd
4    if I didn't talk about statistical
5    significance.
6          Can you show me a report
7    where there wasn't a P-value in
8    the studies I reviewed.
9    BY MR. TISI:
10         Q.   I'm asking you the
11   questions.  I'm asking you the questions.
12   And the question that I'm asking you is,
13   since you were doing a whole causation
14   analysis, looking at the totality of the
15   evidence, 30-some odd studies and dealing
16   with an issue of consistency, and relying
17   on statistical significance, not for one
18   study, but looking across studies,
19   looking across design, did you not think
20   it important to say, you know, I remember
21   that the American Association for --
22   American Statistical Association came out
23   with this really unique statement.  Maybe
24   I ought to pick it up and take a look at

Page 465

1    it?
2          MR. LOCKE:  Objection.
3          THE WITNESS:  Again, I don't
4    see how that's relevant, because
5    to do the analyses I've done, I
6    rely upon how the papers report
7    their results and so forth.  And I
8    can't impose sort of a different
9    way for them to analyze their
10   data.
11   BY MR. TISI:
12         Q.   They didn't do -- they
13   didn't do Bradford Hill tests, did they?
14   You did.  You did in this litigation.
15   All the studies, very -- none of these
16   studies did a Bradford Hill -- Bradford
17   Hill analysis, but you did, true?
18         MS. MILLER:  Objection.
19         THE WITNESS:  I don't know
20   how P-values are relevant just to
21   Bradford Hill.  I don't get that.
22   BY MR. TISI:
23         Q.   You applied your own
24   independent -- independent expertise as a

117 (Pages 462 to 465)

Karla Ballman, Ph.D.

Page 466

1  statistician at a medical university and
2  you are unaware what the American
3  Statistical Association says about
4  P-values?
5          MS. MILLER: Objection.
6          THE WITNESS: Again, I
7      looked at all the literature that
8      exists. And I -- I used the
9      Bradford Hill criteria to
10     determine whether or not there is
11     a causal relationship between
12     perineal talc exposure and ovarian
13     cancer.
14         And the methodology that I
15     used is the methodology that all
16     others use. And so I don't see
17     the relevance of having to look
18     up -- or I don't see the relevance
19     of looking up a statement on
20     P-values to do that analyses.
21 BY MR. TISI:
22     Q.   You know that looking at the
23 plaintiffs' experts reports they -- you
24 clearly were critical of the plaintiffs'

Page 467

1  experts for looking at the point
2  estimates and not considering the --
3  whether a study was statistically
4  significant or not, true?
5      A.   Can you point me to --
6      Q.   I'm asking whether that's
7  true. We can go through it. I'm asking
8  you, was that -- or is that one of your
9  criticisms?
10     A.   Well, you told me that was a
11 criticism.
12     Q.   Is it a criticism?
13     A.   I'm asking you show me in my
14 report where that --
15     Q.   Is that a criticism?
16     A.   I can't --
17         MS. MILLER: Please don't
18     talk over the witness.
19 BY MR. TISI:
20     Q.   Is that -- is that a
21 criticism of yours --
22         MS. MILLER: How many times
23     do I have to say it?
24 BY MR. TISI:

Page 468

1      Q.   Is that a criticism --
2          MS. MILLER: And also talk
3      over me.
4          MR. TISI: I'm going to talk
5      because --
6          MS. MILLER: Do you just
7      talk over all women?
8          MR. TISI: Oh, please don't
9      do that to me. I have no problem
10     with you -- with you objecting.
11         But your constant speaking
12     objections are -- are really
13     overboard.
14 BY MR. TISI:
15     Q.   Doctor --
16         MS. SHARKO: I don't think
17     the record will demonstrate that.
18         MR. TISI: I think the
19     record will demonstrate that.
20 BY MR. TISI:
21     Q.   Doctor, did you -- isn't one
22 of your criticisms of the plaintiffs'
23 experts, one of them, is that they --
24 they were looking at the point estimate

Page 469

1  and not the -- of these studies for
2  consistency, and not considering whether
3  or not they were statistically
4  significant or not? I'm asking you, is
5  that -- as you sit here today, is that
6  one of your criticisms?
7      A.   I'm asking you to point that
8  out to me, because you --
9      Q.   I'm asking you -- I'm asking
10 you, is that one of your criticisms?
11     A.   I -- I'll have to read
12 through all my criticisms. I'm happy to
13 do so.
14     Q.   I thought you would have
15 done that in preparation for today.
16     A.   Yeah, and I'm tired. And
17 it's a long day, and I don't -- I did not
18 memorize my, you know, 40-some-page
19 report. So I will --
20     Q.   When's the last time you --
21     A.   I will take the time and go
22 through and --
23     Q.   When was the last time that
24 you read it before today?

118 (Pages 466 to 469)

Karla Ballman, Ph.D.

Page 470

```
 1          MS. MILLER:  She's in the
 2   middle of a sentence again.
 3   BY MR. TISI:
 4      Q.   When's the last time you
 5   read it before today?
 6          MR. TISI:  This is a
 7   filibuster, and you know it.
 8          THE WITNESS:  I'm trying to
 9   answer your question.  And you're
10   asking me if I made that
11   criticism.  And I'm saying that I
12   can't remember off the top of my
13   head.
14   BY MR. TISI:
15      Q.   Okay.
16      A.   And if you know where it is
17   in here, that I made that criticism, I
18   ask for the help.  You said no, I'm not
19   going to do that.  You need to remember
20   that.  And --
21      Q.   I didn't say that.
22      A.   Well, that's how I
23   interpreted it.
24      Q.   Okay.
```

Page 471

```
 1      A.   And then I said, well, okay,
 2   then I'll have to go through and read to
 3   see if I made that criticism.
 4      Q.   Okay.  As you sit here
 5   today, okay, because honestly, I don't
 6   have the time to go through this.  But I
 7   know it's in there.
 8      A.   Well, then please show it to
 9   me.
10      Q.   I said I know it's in there,
11   and I don't have the time to go through
12   it.  But I'm asking you, as you sit here
13   today, do you have an opinion to a
14   reasonable degree of scientific certainty
15   that the plaintiffs' experts were wrong
16   and used an improper methodology if they
17   looked at the point estimates and did not
18   consider statistical significance?  If
19   that were shown to be true, would that be
20   wrong?
21          MS. MILLER:  Objection.  If
22   what was shown to be true?
23          MR. TISI:  Read the
24   question, Counsel.
```

Page 472

```
 1          MS. MILLER:  Would you like
 2   me to re-read?
 3          MR. TISI:  No.  She's not
 4   asking to re-read.  You are.
 5          THE WITNESS:  Well, I am.  I
 6   am.  I'm confused.  What is the
 7   question?
 8   BY MR. TISI:
 9      Q.   Doctor -- doctor -- okay.
10   Do you have an opinion to a reasonable
11   degree of scientific certainty that the
12   plaintiffs' experts were wrong and used
13   an improper methodology if they looked at
14   the point estimates for consistency and
15   did not consider statistical
16   significance?  If that was shown to be
17   true, would that be wrong?
18      A.   I think if someone only
19   looked at point estimates and did not
20   look at statistical significance, that
21   would be incorrect.
22      Q.   Okay.  What if they looked
23   at the point estimate and the confidence
24   interval, irrespective of statistical
```

Page 473

```
 1   significance?
 2      A.   Again, I'd have to see the
 3   analyses.  The analyses that I looked at
 4   in terms of consistency was
 5   methodologically flawed.
 6      Q.   Okay.  Let's look at the ASA
 7   statement on P-values.  If you go to the
 8   "ASA statement on P-values:  Context and
 9   purpose, the editorial."
10          Do you see that?  Second
11   page.
12      A.   I don't have that document.
13      Q.   It's right in front of you,
14   I believe.
15      A.   28?
16      Q.   Mm-hmm.
17      A.   Second page?
18      Q.   Yep.  It says, "ASA
19   statement on P-values:  Context, process,
20   and purpose."
21      A.   Okay.
22      Q.   And if you go down -- and
23   I'm just going to ask you one question
24   here, so I don't think it's necessary for
```

119 (Pages 470 to 473)

Karla Ballman, Ph.D.

Page 474

1   you to read the whole thing.
2         It says, "When the ASA board
3   decided to take up" -- at the very last
4   paragraph at the bottom of the left
5   column. "When the ASA board decided to
6   take up the challenge of developing
7   policy statements on P-values and
8   statistical significance, it did so
9   recognizing this was not a lightly taken
10  step. The ASA has not previously taken
11  positions on specific matters of
12  statistical practice."
13        Is that true? I mean, is
14  that -- did I read that correctly?
15        A.   You read the words, yes.
16        Q.   Okay. Have you ever seen
17  the ASA do -- issue a statement other
18  than what I've just presented you here,
19  about statistical practice?
20        A.   Well, they state that they
21  previously -- have not previously taken
22  positions. So if what they are saying is
23  true, there would be nothing to see.
24        Q.   Okay. And if you look at

Page 475

1   the next page, some of the people who
2   were involved in this are, among other
3   people, Sander Greenland, and Kenneth
4   Rothman. You see their names there?
5         A.   I'm sorry. Where are you?
6         Q.   Next page. Do you see the
7   bullet points on the right?
8         A.   Yeah. There's a list of
9   individuals. Yes, I see that.
10        Q.   Among them Sander Greenland,
11  Kenneth Rothman, the two people that
12  we've been talking about all day,
13  correct?
14        A.   So, again, can you point
15  me -- you mean these bullets?
16        Q.   Yeah.
17        A.   Well, these are references.
18        Q.   Okay. All right. If you go
19  to the next page, the ASA statements on
20  statistical significance.
21        A.   On what page? Could you
22  just --
23        Q.   Next page.
24        A.   -- say the page number,

Page 476

1   please?
2         Q.   Page 131. We are at the
3   bottom, 63.4.
4         A.   Okay. Yes, I'm there.
5         Q.   Do you see Number 2 where it
6   says, "P-values" -- and let me ask you if
7   this is a true statement or not.
8   "P-values do not measure the probability
9   that a study hypothesis is true or the
10  probability that the data was produced by
11  random chance alone."
12        Do you see that?
13        A.   Yes, I do.
14        Q.   Okay. It says, "Researchers
15  often wish to turn P-values into a
16  statement the truth of a null hypothesis
17  or about the probability that random
18  chance produced the overall data. The
19  P-value is neither. It is a statement
20  about the data in relation to a specified
21  hypothetical explanation and it is not a
22  statement about the explanation itself."
23        Is that true?
24        A.   Yeah, I -- I'll have to

Page 477

1   parse it in different ways.
2         So it is true that the
3   P-value is not the truth about a
4   hypothesis. To calculate a P-value, you
5   need to assume the hypothesis is true.
6         Therefore, it can't be the
7   probability that the hypothesis is true
8   because you assumed it was true. So,
9   yes, I agree with that.
10        Q.   But it also says --
11        THE VIDEOGRAPHER:  Chris,
12        watch your -- watch your
13        microphone. Sorry.
14  BY MR. TISI:
15        Q.   But it also says it is not a
16  statement of the truth of the null
17  hypothesis.
18        A.   That's what I mean. You're
19  assume the null hypothesis is true in
20  order to calculate a P-value. So
21  therefore the P-value cannot be the
22  probability the null hypothesis is true
23  because that was the assumption to get
24  the P-value.

120 (Pages 474 to 477)

Karla Ballman, Ph.D.

Page 478

1    Q.   The next statement is
2   "Scientific conclusions and business
3   policy decisions should not be based only
4   on whether a P-value passes a specific
5   threshold.  Practices that reduce data
6   analysis to scientific inferences to
7   mechanical bright-line rules, i.e.,
8   P-value .05 for justifying scientific
9   claims and conclusions, can lead to
10  enormous beliefs and poor decisionmaking.
11       "A conclusion does not
12  immediately become true on one side of
13  the divide and false on the other."
14       Do you agree with that?
15   A.   I agree that you read the
16  sentence.  And I go on, and what makes
17  me -- this true is researchers should
18  bring many contextual factors into play
19  to derive scientific inferences,
20  including the design of a study, the
21  quality of the measurements, the external
22  elements for the phenomenon under study,
23  and the validity of the assumptions that
24  underlie the data analysis.  And to me,

Page 479

1   this sort of encompasses what the
2   Bradford Hill framework is doing.
3    Q.   And let's read the rest of
4   it.  It goes on to say, "Pragmatic
5   considerations often require binary yes
6   and no decisions, but does not mean that
7   the P-value alone can ensure that a
8   decision is correct or incorrect.  The
9   widespread use of statistical
10  significance, generally interpreted as a
11  P-value less than or equal to .05, is a
12  license for making a claim of a
13  scientific finding or implied truth,
14  leads to considerable distortion of the
15  scientific process."
16       Is that true or not?
17   A.   That is true in the context
18  of what they mean in that you cannot use
19  a single study to say this study was
20  statistically significant, therefore, I
21  have proven something scientifically, a
22  single study.
23   Q.   Okay.  At the very end of
24  it, on conclusion, it says -- at the last

Page 480

1   sentence says --
2    A.   No, no, no.  Very end of
3   what?
4    Q.   The very end of the
5   conclusion section.
6    A.   On a different page now?
7    Q.   On a different -- next page.
8   The next sentence says, "No single index
9   should substitute for scientific
10  reasoning."
11       Do you agree with that?
12   A.   I haven't -- again, that's
13  taken out of context.  I agree with the
14  whole thing that's, "Good statistical
15  practice is an essential component of
16  good scientific practice, emphasizes
17  principles of good study design and
18  conduct, a variety of numerical and
19  graphical summaries of data,
20  understanding the phenomenon under study,
21  and interpretation of results in context,
22  complete reporting and proper and logical
23  quantitative understanding of what the
24  data summaries mean."

Page 481

1    Q.   And then the next sentence
2   says?
3    A.   "No single index" -- I don't
4   know what they're referring to there.  It
5   doesn't say the P-value alone -- "should
6   substitute for scientific reasoning."  It
7   says no single index.  It could be any
8   index, the mean.
9    Q.   Now, do you know that the
10  American Statistical -- and you were not
11  asked to be on this panel, I assume,
12  since you didn't even know that -- you
13  hadn't even read it.  So you were not on
14  this panel.  You were not asked by your
15  colleagues to participate in this,
16  correct?
17       MS. MILLER:  Objection.
18       Please let me object.
19       THE WITNESS:  Could you show
20  me who was on the panel?
21  BY MR. TISI:
22   Q.   I'm just asking you, were
23  you asked to be on this panel?
24   A.   I -- I -- yeah, I don't know

121 (Pages 478 to 481)

Karla Ballman, Ph.D.

Page 482

1  how -- who is on the panel and how many
2  people are on the panel.
3      Q.   I didn't ask you that.
4      A.   But I have a feeling that
5  there are many people that weren't on the
6  panel.
7      Q.   I didn't ask that.  I asked
8  whether you were asked to be on the
9  panel.
10      A.   No, I was not asked to be on
11  the panel.
12      Q.   That was the answer to the
13  question.  Thank you.
14          Next question is -- now, I
15  represented to you that this week the
16  American -- you know, -- do you get the
17  journal, the American Statistician?
18      A.   Yes.
19      Q.   It's probably the most
20  important journal in the statistical --
21  in the field of statistics.  Would you
22  agree?
23          MS. MILLER:  Objection.
24  BY MR. TISI:

Page 483

1      Q.   It's a high-impact journal
2  within that field?
3          MS. MILLER:  Objection.
4          THE WITNESS:  Wait, what's
5      the journal again?
6          (Document marked for
7      identification as Exhibit
8      Ballman-28.)
9  BY MR. TISI:
10      Q.   The American -- the
11  American -- what's the journal of the
12  American Statistical Society?
13      A.   What is the journal?  The
14  journal -- JASA.
15      Q.   Yeah.  Actually, just give
16  me the -- I'm sorry.  I apologize.
17      A.   JASA, I believe, is the
18  Journal of ASA.  The Journal of the
19  American Statistical --
20      Q.   It's the American
21  Statistician.  The American Statistician.
22      A.   Yeah, that's sort of a -- I
23  get that journal.  I don't know if people
24  would characterize it as the most

Page 484

1  important statistics journal that there
2  is.  I think it depends upon -- no.  I --
3      Q.   Did you know just this week,
4  as I indicated, that the journal devoted
5  its entire volume to the issue of
6  statistical significance?
7      A.   So this week's journal?
8      Q.   Mm-hmm.
9      A.   And, you know, I don't even
10  know if I had been in my office to get
11  it.  So I am not aware of that.
12      Q.   You weren't aware that it
13  was coming out, were you?
14      A.   I don't know why I would be
15  aware that it's coming out.
16      Q.   Sometimes if something big
17  is happening in the world of statistics,
18  kind of a lot of people involved, it gets
19  out that they are putting together a
20  volume devoted to a specific topic.
21          You didn't -- you were
22  unaware of it?
23      A.   I -- well, I -- I don't know
24  if that statement is true or not.  I

Page 485

1  mean, I know in JCO, we put out very --
2  we put out special issues.  And I don't
3  think all of oncology is aware it's
4  coming out.
5      Q.   So I'm going to show you in
6  the -- is the journal Science a good
7  journal?  Sorry.  Nature.  I'm sorry.
8      A.   Yes.  Nature is a very good
9  journal.
10      Q.   The entire ASA journal was
11  devoted to 43 studies, 43 papers on this
12  topic.
13          MS. MILLER:  What's ASA?
14          MR. TISI:  The American
15      Statistical Association.
16          MS. MILLER:  That's not a
17      journal.  That's an association.
18      You said --
19          MR. TISI:  You're
20      interrupting me now.
21          MS. MILLER:  Fine.
22          MR. TISI:  Their journal is
23      the American Statistician.
24          MS. MILLER:  I think she

122 (Pages 482 to 485)

Karla Ballman, Ph.D.

Page 486

1    said that's not their journal.
2         THE WITNESS: No, I didn't
3    say that.
4         MS. MILLER: Oh, I
5    misunderstood.
6         THE WITNESS: I said I don't
7    believe it's the most important.
8         Could -- I don't know if
9    there's 40-some articles.
10   BY MR. TISI:
11        Q.   I'm going to represent to
12   you that it is.
13        And I'm -- you know, you can
14   either believe me or not.  My guess is at
15   some point this week, you may go home and
16   take a look at it.  But I didn't bring
17   all 43 articles.  And you'd want to read
18   them all anyway.  So we don't have the
19   time to do that.
20        A.   But I'd at least like to
21   look at the titles.
22        MR. TISI: Okay.  Well, John
23   can you pull up the titles of the
24   43?  If you can get them on your

Page 487

1    computer, please.
2    BY MR. TISI:
3         Q.   But in the meantime, a
4    commentary related to this, this
5    publication was published in Nature by
6    Drs. Greenland, Blake McShane and
7    Valentin Amrhein.
8         (Document marked for
9         identification as Exhibit
10        Ballman-29.)
11   BY MR. TISI:
12        Q.   Okay.  Let me show you that.
13   Now, the title of this is "Retire
14   Statistical Significance."
15        Do you see that, Doctor?
16        A.   It says "Retire Statistical
17   Significance."
18        Q.   Okay.  And actually,
19   underneath it says, Valentin Amrhein,
20   Sander Greenland, and Blake McShane, and
21   more 800 signatories, call for an end to
22   hyped up claims and dismissal --
23   dismissal of possibly crucial effects.
24        Do you see that?

Page 488

1         MS. MILLER: Objection.
2    That was not read correctly.
3    BY MR. TISI:
4         Q.   These three authors and more
5    than 800 signatories call for an end to
6    hyped claims and the dismissal of
7    possibly crucial effects.
8         Do you see that?
9         A.   I see how that's stated
10   there.
11        Q.   Okay.  And I'm happy to give
12   you an opportunity to read it.  And since
13   you haven't read it, and this will take a
14   moment, I'm happy to do it, but I am
15   going to focus your attention to certain
16   things.
17        Do you want to glance
18   through it, I'm more than happy to have
19   you glance through it, but we can do it
20   off the record.
21        MR. TISI: Go off the
22   record, please.
23        MR. LOCKE: No, no.
24        MR. TISI: That's what we've

Page 489

1    done -- if it's a long --
2         MR. LOCKE: No, we have not.
3         MR. TISI: Yes, we have.
4         MR. LOCKE: No, we have
5    not--
6         MR. TISI: Yes, we have.
7    Yes, we have.
8         MS. MILLER: I thought we go
9    off the record if it's something
10   the witness --
11        MR. TISI: Hadn't seen,
12   yeah.
13        MS. MILLER: No, if it was
14   something the witness had cited
15   and a reference.  But if it's
16   something the witness had never
17   seen before, I don't think we'd go
18   off --
19        MR. TISI: No, that's what
20   we -- that's what we've been
21   doing.
22        MR. LOCKE: That's not what
23   we've been doing.
24        MR. TISI: That's exactly

123 (Pages 486 to 489)

Karla Ballman, Ph.D.

Page 490

1      what we've been doing.
2           Anyway, she's looking at it.
3    BY MR. TISI:
4      Q.   Let's go through.  I'm going
5    to ask you to read down to the bottom of
6    the left-hand column.  I'll ask you some
7    questions about that.
8      A.   How far do you want me to
9    read?
10     Q.   Just to the bottom of the
11   left-hand column?
12     A.   Second page?
13     Q.   Second page, correct.
14     A.   Okay.  Just the bottom of
15   that first column.
16     Q.   Correct.
17     A.   I have read that.
18     Q.   Actually, and you can
19   continue to the next -- the first
20   paragraph on the next page.
21         MS. MILLER:  The first
22         paragraph on the next column or
23         the --
24         MR. TISI:  Next column.

Page 491

1    BY MR. TISI:
2      Q.   Actually, you can read the
3    whole -- read the whole column up until
4    the next category.
5      A.   Yes.  I read it.
6      Q.   So, Doctor, under the
7    section that says -- first of all, these
8    are all -- these authors are all people
9    that you know in your field, correct?
10     A.   I've heard of their names.
11     Q.   Okay.  These are all widely
12   respected statisticians and
13   epidemiologists, correct?
14         MS. MILLER:  Objection.
15         MR. LOCKE:  Objection.
16         THE WITNESS:  I -- I -- I
17         can't speak to what respect they
18         do or they do not have.  I know
19         their names.
20   BY MR. TISI:
21     Q.   And do you have respect for
22   them?
23         MS. MILLER:  Objection.
24         THE WITNESS:  The only name

Page 492

1      that I actually know is Sander
2      Greenland.  I do not know who
3      Blake McShane is, nor Valentin
4      Amrhein.
5    BY MR. TISI:
6      Q.   Do you know -- do you have
7    respect for Sander Greenland?
8         MS. MILLER:  Objection.
9         THE WITNESS:  Again, I know
10        his name.  I know he's done -- you
11        know, he's authored some books and
12        so forth.
13   BY MR. TISI:
14     Q.   So what they say here -- and
15   of course, I'm reading in the second
16   page.  It says, "We agree" -- "We are far
17   from alone.  We invited others to read
18   this draft" -- "read a draft of this
19   comment and sign their names if they
20   concurred with our message.  250 did so
21   within 24 hours.  A week later, we had
22   more than 800 signatories, all checked
23   for academic affiliation or other
24   indication of present or past work in a

Page 493

1    field that depends on statistical
2    modeling."
3         Do you see that?
4      A.   That's what it says there.
5      Q.   Okay.  So this has been
6    endorsed by 800 of your colleagues?
7         MR. LOCKE:  Objection.
8    BY MR. TISI:
9      Q.   Correct?
10     A.   I don't know who the 800
11   people are.
12     Q.   Okay.  And they say, "The
13   pervasive problem" -- here on Page 1,
14   says, "Let's be clear about what must
15   stop.  We should never conclude that
16   there is no difference or no association
17   just because a P-value is larger than a
18   threshold of .05, or equivalently because
19   a confidence interval includes zero.
20        "Neither should we conclude
21   that two studies conflict because one had
22   a statistically significant result and
23   the other did not.  These errors waste
24   much research efforts and misinform

124 (Pages 490 to 493)

Karla Ballman, Ph.D.

Page 494

1  policy decisions."
2        Do you see that?
3     A.  That's what they say.
4     Q.  Do you agree?
5     A.  I -- I -- I don't know if I
6  agree or not.  I mean, I have to read
7  this more through more carefully.  There
8  are some aspects that I agree.  I agree
9  that, you know, it's wrong to conclude
10 that two studies conflict because one has
11 statistically significant results or not.
12       So I agree with the example
13 that they give, null or one has a risk
14 ratio of 1.2, that it is statistically --
15 that is statistically
16 significant, or just is not statistically
17 significant by the .05 level if P-value
18 of .091.
19       Another one also has a risk
20 ratio of 1.2, so similar risk ratios.
21 And its P-value is statistically
22 significant.  So I agree that I would not
23 conclude that those two studies conflict.
24    Q.  And they result -- and they

Page 495

1  talk about the American Statistical
2  Association in the statement that we just
3  read from 2016, right?  The associated
4  statement in the American Statistician,
5  warning against the misuse of statistical
6  significance.  And that was what we just
7  talked about as Exhibit Number --
8     A.  28.
9     Q.  -- 28, correct?
10    A.  They cite that statement,
11 yes.
12    Q.  And it says, "Eradicating
13 categorization will help halt" --
14    A.  Now where do you -- where
15 are you now?
16    Q.  In the middle.  In the blue.
17    A.  Okay.
18    Q.  "Eradicating categorization,
19 will help halt overconfident claims,
20 warranted claims of no different and
21 absurd statements about replication
22 failure."
23       Do you agree with that?
24    A.  Again, I think it depends.

Page 496

1     Q.  Okay.  But their statement
2  is definitive.  They're not hedging at
3  all?  They're saying don't do this.
4        MS. MILLER:  Objection.
5        THE WITNESS:  They are
6  hypothesizing.
7  BY MR. TISI:
8     Q.  They are not hypothesizing.
9  They're saying let's be clear about what
10 must stop.
11    A.  That, they're clear about.
12 But again, if I could -- you asked me if
13 I agree with this statement.  And you cut
14 me off when I said that they are
15 hypothesizing.  So may I finish that?
16    Q.  Sure.
17    A.  So they are hypothesizing by
18 saying eradicating -- and I'm surprised
19 statisticians are doing this.
20 "Eradicating categorization will help to
21 halt overconfident claims, unwarranted
22 declarations of no difference, and absurd
23 statements about replication failure.
24       I don't see any evidence.

Page 497

1  This is a hypothesis, that doing this is
2  going to stop this.  I don't see any
3  evidence here, unless it's in here, which
4  I haven't been able to read in detail,
5  that there's evidence doing so is going
6  to prevent these things.
7     Q.  Let's go to the next page.
8  And there's a paragraph that I want you
9  to read.  I'm going to ask you to read it
10 in entirety because it deals with an
11 issue that we talked about before.
12       Go to the next page.  It
13 says under the term second on the
14 left-hand side.  And it says -- and I'll
15 read it into the record.
16       "Second, not all values
17 inside" -- they're talking about inside
18 the confidence interval -- are equally
19 compatible with the data, given the
20 assumptions.
21       "The point estimate is the
22 most compatible, and the values near it
23 or more compatible than those at the
24 outer" -- "near the limits.  That is why

125 (Pages 494 to 497)

Karla Ballman, Ph.D.

Page 498

1  we urge authors to discuss the point
2  estimate, even when we have large
3  P-values or a wide interval, as well as
4  discussing the limits of that interval.
5      "For example, authors above
6  could have written, "Like a previous
7  study our results suggest a 20 percent
8  increased risk on new onset atrial
9  fibrillation in patients given
10 antiinflammatory drugs.  Nonetheless, the
11 risk difference ranging from a 3 percent
12 decrease, a small negative association,
13 to a 48 percent increase, a substantial
14 positive association, is also reasonably
15 compatible with our data.
16      "Interpreting the point
17 estimate while acknowledging its
18 uncertainty will keep you from making
19 false declarations of no difference and
20 then making overconfident claims."
21      Do you see that?
22      A.   I -- that's what it says
23 there.
24      Q.   Okay.  Now, let's go back to

Page 499

1  talk about talc.  First of all, do you
2  agree with that?
3      A.   Again, I -- I would need to
4  read.  I don't know what study they are
5  talking about above.  I mean, I think
6  I --
7      Q.   Well, they're talking about
8  the one we read on the prior page, the
9  example that we read on the prior page
10 with the example that we talked about --
11 that was talked about, that I asked you
12 to read before.
13      A.   So I'm not comfortable
14 agreeing or disagreeing with something
15 that I was just handed and told, okay,
16 you have a few minutes to read through
17 this, you know, quickly and not have time
18 to think about it.  So I'm just not
19 comfortable saying whether I agree or
20 not.
21      Q.   Well, let's go to
22 Dr. Merlo's chart if we could, back to
23 that.
24      MS. MILLER:  Do you remember

Page 500

1      the number?
2      THE WITNESS:  And after
3  that, and I'm willing to do this.
4  But I do need a bathroom break.
5  That water I drank.
6      Yes, I have it.
7      MR. SOILEAU:  It's 26.
8      MS. MILLER:  I got it.
9      THE WITNESS:  We have it.
10 BY MR. TISI:
11     Q.   First, we talked about --
12 the comment that we talked about before
13 if you look at the -- the most likely, do
14 you agree with the statement in this,
15 "The point estimate is the most
16 compatible with" -- "and the values near
17 it are more compatible than those near
18 the limits in terms of the true risk."
19     A.   Yeah, so can I place
20 something -- it says compatible with the
21 data.  It doesn't say compatible with the
22 truth.  We don't know the truth.
23     So compatible with the data,
24 I agree.  Compatible with the truth, I do

Page 501

1  not agree because we don't know the
2  truth.  And we're just trying to estimate
3  it with the data.  But it could be
4  drastically wrong, like if there are
5  recall biases and selection biases.
6      Q.   But one of the things that
7  statisticians do is they say, look at the
8  whole confidence interval, right?  They
9  say, here, the real thing that you really
10 need to do is look at the range
11 represented by the confidence interval.
12     A.   I think -- yeah, they're
13 just saying one should look at the
14 uncertainty in the estimate by looking at
15 the confidence interval.
16     Q.   Okay.  And the example they
17 give is, if the confidence interval goes
18 from a negative, and like a .97 all the
19 way up to a 1.48, that you should talk
20 about the fact that, yes, it crosses
21 zero.  And you might have some risk that
22 is negative.  But most of the risk lies
23 in the positive area.
24     A.   Yeah, I don't know where you

126 (Pages 498 to 501)

Karla Ballman, Ph.D.

Page 502

1  are getting that confidence interval. I
2  don't see a .97.
3      Q.   It says here, "Nonetheless,
4  the risk difference ranging from a 3
5  percent decrease" --
6      A.   Oh, I see.
7      Q.   -- "a small negative
8  association" --
9      A.   Okay.
10     Q.   -- "to a 48 percent" -- "a
11 substantial" --
12     A.   I see.  So you took one
13 minus 3 percent.  I got it.  I'm with
14 you.
15     Q.   Okay.  Okay.  And so what
16 they're saying is you look at the
17 entirety of the confidence interval and
18 use your judgment.  And you don't rely on
19 a snap decision of saying statistically
20 significant or not, true?
21     A.   Say -- ask the question
22 again.
23     Q.   They're saying you don't
24 just flip a switch on statistical

Page 503

1  significance.  They say you look at the
2  entirety of the confidence interval in
3  the context of everything, correct?
4      A.   Yeah.  They're saying one --
5  one can report the confidence interval so
6  that you know the uncertainty that's
7  associated with the point estimate.
8      MS. MILLER:  Okay.  I think
9  she asked for a break.
10     MR. TISI:  Sure.  Although
11 we're in the -- yeah, if you need
12 to do a break, we'll do that.
13     THE WITNESS:  It can only be
14 like two minutes.
15     THE VIDEOGRAPHER:  All
16 right.  Stand by, please.  Remove
17 your microphones.  The time is
18 4:48 p.m. Off the record.
19     (Short break.)
20     THE VIDEOGRAPHER:  We are
21 back on the record.  The time is
22 4:54 p.m.
23 BY MR. TISI:
24     Q.   Doctor, if you can go back

Page 504

1  to the exhibit with Dr. Merlo's exhibit
2  there.  Would you please take for me, if
3  you could -- I'm going to give you this
4  pen.  And would you please highlight for
5  me every single risk ratio that's above
6  one?
7      MS. MILLER:  Objection.
8      THE WITNESS:  The risk ratio
9  itself?
10 BY MR. TISI:
11     Q.   Yes.
12     A.   I'm sorry.  I goofed.
13     MS. MILLER:  Can you give a
14 new one?  She made a mistake.
15     THE WITNESS:  Can I color it
16 in green or something so --
17 BY MR. TISI:
18     Q.   Yeah, color it -- well, why
19 don't we put an X by it.  This way we'll
20 know.  Which one did you do it wrong?
21     A.   The last one.
22     Q.   Okay.  That's Gonzalez.  For
23 the record, Gonzalez is not greater than
24 one, correct?

Page 505

1      MS. MILLER:  Objection.
2      THE WITNESS:  Yes, that's
3  correct.
4  BY MR. TISI:
5      Q.   So now --
6      A.   The risk ratio.
7      Q.   Now, the next thing that
8  Dr. Greenland and his colleagues point
9  out here is that we look at the
10 confidence interval, correct?
11     A.   What do you mean by the next
12 thing?
13     Q.   Well, one of the things he
14 says, you need to look not at statistical
15 significance so much as the confidence
16 interval, correct?
17     A.   Where is that statement?
18     Q.   Well, he says here, he says,
19 "The point estimate is the most
20 compatible value and the values near the
21 most compatible" -- "comparable than
22 those near the limits.  That's why you
23 urge authors to discuss the point
24 estimate even when you have a large

Karla Ballman, Ph.D.

Page 506

1   P-value or wide interval."
2          Okay.  And then he talks
3   below about where the confidence interval
4   rates go, correct?
5          A.   Well, you didn't quite
6   complete that sentence.  So when they
7   have a large P-value or wide interval as
8   well as discussing the limits of the
9   interval.
10         Q.   Okay.  So let's discuss the
11  limits of the interval for a moment.
12         A.   Okay.
13         Q.   Okay.  I'm going to ask you,
14  if you wouldn't mind, to circle every
15  P-value on -- every confidence interval
16  that includes 1.2 -- actually, let me use
17  a black pen, use that -- that includes
18  1.2 either as -- within the upper or
19  lower bounds.
20         A.   Every confidence interval?
21         Q.   Yeah, where 1.2 is within
22  the confidence interval.  I'll ask you to
23  do one other thing.  This is the last
24  thing I'll asked you to do with art.

Page 507

1          Take this blue pen, and
2   would ask you to put a mark by the side
3   of anything that in any of those studies
4   that include within the confidence
5   interval of 1.25?
6          MS. MILLER:  Objection.
7   BY MR. TISI:
8          Q.   Or maybe you can highlight
9   the inside of the -- however you want to
10  do it.  It's up to you.
11         A.   (Witness complies.)
12         Q.   Doctor, when you were
13  looking at this, you had an opportunity
14  to take a look at this, and you've done a
15  little bit of art here on this.
16              Irrespective of the
17  statistically -- statistical
18  significance, would you agree that,
19  irrespective of design, every one of
20  these studies that -- the vast majority
21  of them, have a point estimate greater
22  than one?
23         MS. MILLER:  Objection.
24         THE WITNESS:  I mean, the

Page 508

1   numbers on the page, for most of
2   these, are greater than one.
3   BY MR. TISI:
4          Q.   Okay.  Would you also agree
5   that irrespective of design, every one of
6   these -- every one of these studies that
7   you highlighted in yellow, the vast
8   majority of -- excuse me, highlighted in
9   red --
10         A.   Pink.
11         Q.   -- pink are consistent with
12  a 20 percent increased risk of ovarian
13  cancer?
14         MS. MILLER:  Objection.
15         THE WITNESS:  That I
16  disagree with.
17  BY MR. TISI:
18         Q.   Okay.  Why would you say
19  that?
20         A.   Because we know that
21  population-based case-control studies --
22  or, sorry, case-control studies and --
23  well, and to some degree the cohort
24  studies have confounding and bias in

Page 509

1   these.
2          And so, therefore, it's hard
3   to know what the true risk ratio is,
4   because if you're consistently
5   overestimating something, just because
6   every study that has the same design that
7   consistently overestimates something,
8   doesn't make the truth.  That's something
9   that is estimated.
10         Q.   Let me put it this way.
11  Would you agree with me with respect to
12  the cohort studies and the case-control
13  studies, that the vast majority of them
14  have in common a 20 percent -- have
15  20 percent in their confidence interval?
16         MS. MILLER:  Objection.
17         THE WITNESS:  I don't know
18  why that would be relevant,
19  because as what you were just
20  having me read before, it says
21  look at the risk ratios and see
22  sort of if they're the same.  Like
23  the example they gave, they had
24  two risk ratios which were exactly

128  (Pages 506 to 509)

Karla Ballman, Ph.D.

Page 510

```
 1   the same.  One was statistically
 2   significant, one was not.
 3          And as I pointed out in my
 4   report, the risk ratios across the
 5   case-control studies differ by as
 6   much as four times.  And so --
 7   BY MR. TISI:
 8      Q.   Do you really expect in any
 9   set of studies in anything that you've
10   ever done, that the risk ratios be
11   exactly the same?
12      A.   To be exactly the same?
13   Again, it depends upon the studies that
14   I'm comparing.
15      Q.   In fact, wouldn't you be
16   suspicious of a set of studies of any
17   design which had exactly the same risk
18   ratio?
19          MS. MILLER:  Objection.
20          THE WITNESS:  Again, I would
21      have to see -- it depends on what
22      the studies are that I'm looking
23      at and so forth.
24   BY MR. TISI:
```

Page 512

```
 1   this.  Because I want to get kind of --
 2   isn't the decision -- the vast majority
 3   of these studies have a risk ratio
 4   between 1.1 -- irrespective of design,
 5   1.1 and 1.5.  Would you agree with that?
 6   There is some outliers on the low end and
 7   outliers on the high end.  But the vast
 8   majority of them.
 9      A.   But your -- so your --
10   your -- your --
11      Q.   Go ahead.
12      A.   So when I look at numbers, I
13   can say that those numbers fall in that
14   range.
15          As to whether or not the
16   true risk ratio is in that range, I have
17   no idea, because I know of the biases
18   that exist, especially in the
19   case-control studies.
20      Q.   Now, didn't Dr. -- have you
21   calculated a confounding -- how big a
22   confounder would have to be in order to
23   create a risk ratio of 1.3?
24      A.   I think it depends.  It
```

Page 511

```
 1      Q.   Have you ever seen that
 2   happen, a group of five studies where
 3   they all have exact same risk ratio?
 4          MS. MILLER:  Objection.
 5          THE WITNESS:  The exact
 6      same -- I mean, to how many
 7      decimal places?  I've seen studies
 8      that -- yeah.
 9   BY MR. TISI:
10      Q.   Where five studies done in
11   different populations, have the exact
12   same risk ratio.
13          MS. MILLER:  Objection.
14   BY MR. TISI:
15      Q.   You've seen that happen?
16      A.   Again, I -- I don't know.  I
17   mean, I -- it depends upon what level you
18   are measuring at, is the same.  If one
19   would say, oh, look, you know, all these
20   have a risk ratio of one because someone
21   rounded 1.2 down to one, 1.1 down to one,
22   then, yes, that study could have all the
23   same.
24      Q.   So, Doctor, let me ask you
```

Page 513

```
 1   depends upon many factors.
 2      Q.   Well, how big would it have
 3   to be?
 4      A.   I can't answer that because
 5   I need to know many things in order to
 6   calculate that.
 7      Q.   If you go back to Dr.
 8   Rothman's Exhibit Number -- this one, the
 9   one that looks like this.
10          MR. SOILEAU:  It should be
11      21.
12   BY MR. TISI:
13      Q.   21.
14      A.   Yes, I have it.
15      Q.   Okay.  Here's a section in
16   here, a paragraph on confounding in
17   case-control studies, on Page 5.
18          Do you see that?
19      A.   Yes, I see that paragraph.
20      Q.   Okay.  Can you read that
21   paragraph?  You can read it to yourself.
22      A.   You know, I see that --
23      Q.   I just asked you to read it.
24   There's no question pending.
```

129 (Pages 510 to 513)

Karla Ballman, Ph.D.

Page 514

1     A.   Okay.  Okay, sorry.  Yes, I
2  read that.
3     Q.   Okay.  Does he not say that,
4  "Family history, ethnicity, obesity and
5  some reproductive risk factors are
6  positively associated with the risk of
7  ovarian cancer"?
8     A.   Yes.
9     Q.   He says, even if you combine
10  all of those together, they would not
11  explain increased risk?
12     A.   You know, he states that
13  there, but I would need to see the
14  calculation.  I don't see any
15  calculation.  So I don't know if that
16  statement is correct or not.
17     Q.   Well, have you done the
18  calculations that would say that -- how
19  big the confounding would have to be in
20  order to explain the consistent risks
21  seen across all these case-control
22  studies?
23           MS. MILLER:  Objection.
24           THE WITNESS:  I have not

Page 515

1        done that calculation, but I don't
2        see a calculation here either.
3  BY MR. TISI:
4     Q.   I'm not asking you.  He's --
5  he made his assertion.  You're here, I'm
6  getting to ask you questions.  You've
7  made a big deal about confounding in your
8  report.  A big deal.
9           I'm asking you, have you
10  made any calculation as to how big the
11  confounder would have to be to explain
12  what the meta-analysis show as
13  approximately 1.3 risk associated with
14  ovarian cancer and talc?
15           MS. MILLER:  Objection.
16           THE WITNESS:  Again, I -- I
17        have not made such a calculation,
18        but -- can I see -- is it the
19        Gonzalez study?
20  BY MR. TISI:
21     Q.   Did you bring it with you?
22           MS. MILLER:  I've got all
23        the studies in the next room.  Do
24        you want to go off the record and

Page 516

1  get it?
2           THE WITNESS:  That would be
3        great.  That's the one with the
4        douching?
5           MS. MILLER:  Sure.  Let's go
6        off the record, and I'll get it.
7           THE VIDEOGRAPHER:  The time
8        is 5:09 p.m.  Off the record.
9           (Brief pause.)
10           THE VIDEOGRAPHER:  The time
11        is 5:11 p.m.  Back on the record.
12  BY MR. TISI:
13     Q.   Okay.  So let me turn to
14  dose-response, which is another area you
15  spend a lot of time on.  And I'm going to
16  spend rest of my time on dose-response,
17  which is another of Hill's criteria.
18           First of all, do you agree
19  with me that Bradford Hill said himself
20  that dose-response was not a required
21  finding in order to make a causation
22  assessment, correct?
23     A.   I believe Bradford Hill
24  indicates that none of these are -- are a

Page 517

1  requirement to establish causation, and I
2  agree with that.
3     Q.   Okay.  The next -- the next
4  statement on page -- turn to Page 19 of
5  your report.  On Page 19, you say -- and
6  it's your general discussion of
7  dose-response.
8           Do you see that?
9     A.   Under biological --
10     Q.   No.  Above -- above
11  plausible -- yes, under -- above
12  plausibility.
13     A.   Oh, so we're on 19.
14     Q.   Yes.
15     A.   Okay.
16     Q.   You talk about biologic
17  gradient.  You start out by saying it's
18  not necessary.  And the next -- the
19  next paragraph is what I'm going to ask
20  you about.
21     A.   I dent see where I say it's
22  not necessary.
23     Q.   Okay.
24     A.   I see that I see if

130 (Pages 514 to 517)

Karla Ballman, Ph.D.

Page 518

1  dose-response is seen, it's more likely
2  the association is causal.
3      Q.  Okay.  So let's go to the
4  next paragraph.  It says, "Regardless of
5  the nature of the dose-response
6  relationship, it needs to be demonstrated
7  consistently across available studies.
8  Specifically the same type of
9  dose-response relationship needs to be
10  exhibited in the different studies.  If a
11  threshold relationship is hypothesized,
12  it would require evidence of a threshold
13  value as well, and the value is similar
14  across studies.
15          "If only a few studies
16  exhibit a dose-response rather than all,
17  this criterion" -- "criterion would not
18  be convincingly met."
19          I'm going to have that
20  marked as Exhibit Number 36 (sic).  I
21  just pulled that paragraph out.
22          (Document marked for
23          identification as Exhibit
24          Ballman-30.)

Page 519

BY MR. TISI:
1
2      Q.  First of all, you would
3  agree with me -- would you agree with me
4  that you have not cited a single
5  reference for any of those statements?
6      A.  I just think it's common
7  knowledge in terms of the general
8  principles of epidemiology for
9  establishing a dose-response.
10      Q.  So where is your -- I'm
11  going to hand you Exhibit Number 30.  I'm
12  going ask you about the highlighted ones.
13          Where is your authority
14  for -- in fact, you had indicated that
15  dose-response wasn't even necessary
16  according to Bradford Hill, right?  You
17  agreed with that?
18      A.  Qualified.  I would say --
19  and I state throughout my report, that if
20  the initial association that's
21  established is weak then it's important
22  that other criteria be met.
23      Q.  And where is your basis for
24  that?

Page 520

1      A.  I give citations for that.
2  So you're going to have to bear with me.
3  And I will find --
4          So 30 and 31.  "Hence,
5  observational studies that yield small to
6  modest levels of association require a
7  higher level of supporting evidence to
8  reach a conclusion of causality than do
9  studies with strong levels of
10  association."
11      Q.  Okay.  So if I look at 30
12  and 31, references to those will be in
13  there?
14      A.  That will support that
15  statement.  Mm-hmm.
16      Q.  Okay.  I'll look them up.
17          So now let's go -- let's go
18  to the next -- let's go to exhibit
19  number -- the exhibit that I just gave
20  you, the pull-out of your report.
21          We agreed that, okay --
22  where is your statement that
23  dose-response needs to be demonstrated
24  consistently across the available

Page 521

1  studies?
2      A.  Well, I think I'm sort of
3  explaining what I mean by consistently.
4  I mean, if one study out of 40 had a
5  dose-response, that likely is just due to
6  the fact of multiple comparisons.  So
7  that would not establish a dose-response.
8          So dose-response is very
9  similar to establishing whether -- I
10  mean, consistency is sort of implied in
11  terms of dose-response.  You can't have
12  one study showing a dose-response out of
13  many and conclude there is a
14  dose-response.
15      Q.  Okay.  Actually -- I'm
16  actually asking you this.
17          Regardless of the nature of
18  the dose-response, it needs to be
19  demonstrated consistently across the
20  available studies.  Where is your support
21  for that statement that it needs to be
22  consistent across all -- across available
23  studies?
24      A.  So just -- just common sense

131  (Pages 518 to 521)

Karla Ballman, Ph.D.

Page 522

1  off the top of my head, but I can go
2  through and try to find references if
3  you'd like.
4         But if something is causal,
5  it would be quite odd that it would only
6  have a dose-response in, say, one out of
7  40 studies.  And again, I think I
8  explained that in my previous answer.
9         Q.   The next sentence says,
10  "Specifically, the same type of
11  dose-response relationship needs to be
12  exhibited in the different studies."
13         Could you -- you have no
14  citation for that, right?
15         A.   Again, if something is
16  causal, it would be odd that in one
17  study, it's a threshold effect, and in
18  another study it's a sign effect, and yet
19  in another study it's a decreasing
20  effect, and in another study it's an
21  increasing effect.  What would you
22  conclude?  How could you conclude it to
23  be causal?
24         Q.   Well, it depends on what you

Page 523

1  measure, correct?  It depends on the
2  power of the study.  It depends upon a
3  lot of things, right?
4         A.   Dose-response looks for
5  patterns.  I'm not even talking
6  statistically significant here.  So
7  things that you just mentioned are
8  talking about statistical significance,
9  which you say people are going to
10  abandoned in the future.
11         I'm talking about looking
12  for evidence that supports a
13  dose-response.  And if you have one study
14  that it shows it's going up and down,
15  another study that it's going down,
16  another study that even if it's not
17  statistically significant, that would
18  raise red flags.
19         Q.   What study, what study
20  showed that it was going down?  Would
21  that be the Huncharek study?
22         A.   I can tell you in a minute.
23  Wong?  So -- well, here's one that's up
24  and down.  So Wong, one point -- one to

Page 524

1  nine years .9.  Ten to 19 is 1.4.
2  Greater than 20, it's .9.
3         So that's going up and down.
4         Q.   Can I stop and ask you that
5  question?  Do you know how many people
6  were in the last category?
7         A.   No.  I have no idea how many
8  people were in the last category.  But
9  the width of the confidence intervals
10  there look like it's relatively close to
11  perhaps what's in the previous
12  categories.
13         Q.   Okay.  Let me ask you
14  another question here.  On the next
15  sentence?
16         A.   Wait -- I can show you one
17  where -- Whittemore, it goes down.  It's
18  1.9, it's 1.6, and greater than ten years
19  it's 1.1.
20         Q.   Is that -- is that
21  never/ever?  What is that?
22         A.   That's duration.
23         Q.   Okay.  So wouldn't the best
24  measurement be frequency?

Page 525

1         MS. MILLER:  Objection.
2  BY MR. TISI:
3         Q.   Or total number -- total
4  number of applications?
5         MS. MILLER:  I assume my
6  objection applies to the second
7  question.
8         MR. TISI:  Yes, it would.
9  BY MR. TISI:
10         Q.   Wouldn't the total --
11         MS. MILLER:  That was the
12  second question.
13  BY MR. TISI:
14         Q.   Wouldn't --
15         MS. MILLER:  Those are two
16  different things.
17         MR. TISI:  I got it.  I got
18  it.
19  BY MR. TISI:
20         Q.   Wouldn't the total --
21  wouldn't the best measure be the total
22  number of applications?
23         A.   Well, if we're getting into
24  measurements, first of all, there's no

Karla Ballman, Ph.D.

Page 526

1   valid instrument as to how to best
2   measure talc exposure.  So having no
3   valid instrument in the first place, I
4   don't think one can say what's the best
5   measure for a dose-response.  If
6   something is truly causal and you are
7   measuring increasing dose with some
8   metric that has increasing, so duration
9   would be increasing, that, you know, the
10  longer you use, the more likely you would
11  get ovarian cancer.
12       Frequency would be also a
13  measure of dose-response because using it
14  once a week is, you know, much less than
15  using it every day.  And so they are all
16  some measures of dose-response.
17       So if there's a true causal
18  relationship, one would expect seeing
19  consistent sort of dose-responses across
20  any of those measures.
21       Q.   And the Terry study did show
22  that, didn't it, when you combine
23  frequency and duration, correct?
24       A.   Well, that -- it -- it looks

Page 527

1   like -- do we have the Terry study?
2       Q.   I'm just asking -- you have
3   the results in your -- in your Table 3.
4       A.   Oh, in Table 3.  Thank you.
5       Q.   Mm-hmm.
6       A.   Yeah, I see it now.  Thanks.
7   I thought it was here.  You know, I --
8   I -- I actually gave it the benefit of
9   the doubt because there's a couple issues
10  here.  One needs to -- so the test for
11  trend is not statistically significant.
12       And if you look at this, you
13  see that it goes from 1.14 to 1.23 down
14  to 1.22 and then up to 1.32.  So I don't
15  know if I'd call that a --
16       Q.   So you're kind of quibbling
17  with the Q3 going down from 1.23 to 1.22,
18  as showing, oops, it dropped a tenth of
19  the point?
20       A.   Well, I'm quibbling that --
21  actually if you look at, you know, the
22  last three values there, you know, it
23  well may be the case that there are
24  really -- as you were pointing out, that

Page 528

1   if you do five studies would you expect
2   the same relative risk.
3       And, you know, these all
4   could be sort of the same underlying
5   relative risk and just come up with the
6   variations, because the numbers don't
7   differ that much.  So it's sort of a flat
8   relationship.
9       Q.   This is -- this is a
10  meta-analysis, isn't it?  This is looking
11  at all studies together?
12       A.   Yeah, I don't know if that
13  makes it any stronger or not because,
14  again, there's no valid measure that was
15  used.  So combining a bunch of studies
16  that use a bunch of different measures
17  together and no valid measure of talc
18  exposure in general, and then no, you
19  know, valid measure as to what the total
20  applications were or consistent
21  standardized measure, you know, it's hard
22  to interpret --
23       Q.   And Penninkilampi --
24       A.   -- the pooled --

Page 529

1       Q.   I'm sorry.  I didn't mean to
2   interrupt you.
3       A.   Sorry.  It's just hard to
4   interpret a pooled study.
5       Q.   And Penninkilampi also
6   looked at less than 3,600 applications
7   and more than 3,600 applications, and
8   there was a difference there as well,
9   right?
10       A.   And, again, if a test for a
11  trend were done the correct way where you
12  do not have the never category in, it's
13  likely that that would not be a
14  statistically significant difference.
15  But that aside, looking at these point
16  estimates, those again could probably
17  happen -- it doesn't indicate sort of a
18  clear difference between those two
19  numbers --
20       Q.   How about Schildkraut?
21       A.   -- and those point
22  estimates.
23       Q.   In your study -- in your
24  chart, on the prior page, on Table 1,

133 (Pages 526 to 529)

Karla Ballman, Ph.D.

Page 530

1  Schildkraut shows less than 3,600, had a
2  1.16, and at greater than 3,600 had a
3  1.67, to a P-value of .01.
4      A.   That's not really -- that's
5  not really a test for dose-response
6  because there's only two levels.  So it's
7  sort of like just comparing two levels to
8  each other.  You don't know for certain.
9      Q.   So -- so let me go back to
10  your statement.  It says Exhibit
11  Number -- exhibit right there, what
12  number -- what exhibit?
13      A.   30.
14      Q.   Exhibit 30.  Last sentence
15  says, "If only a few studies exhibit
16  dose-response rather than all, the
17  criterion would not be convincingly met."
18          First of all, you have no
19  citation for that either, do you?
20          MS. MILLER:  Objection.
21          THE WITNESS:  Other than
22  what we discussed before, because
23  if there's true causality, it
24  would be quite odd that only,

Page 531

1  like, two studies show any sort of
2  dose-response relationship and the
3  rest do not.
4          And you know, we can do the
5  counting exercise and go through
6  and see of all these, these
7  different measures of
8  dose-response, how many of them
9  actually are potentially.  And I
10  don't even know if I would call
11  the highlighted ones showing a
12  dose-response relationship.
13  BY MR. TISI:
14      Q.   Let's go to the next -- Page
15  29 of your report.  You say -- on Page
16  29, you say, "Given" -- sorry.  Let me
17  see where I find it.  Where is the word
18  "given"?  Hold on.
19          Oh, okay.  On the first
20  paragraph you say -- second sentence, you
21  say, "Given that available data are from
22  observational data and the association is
23  weak, additional evidence is required to
24  rule out a spurious association making

Page 532

1  this criterion more important.
2          And you say that those
3  two -- there's no citation here.  But you
4  gave me the citation to that concept
5  earlier, right?
6      A.   I did.
7      Q.   Okay.  The next paragraph
8  says, "To establish a dose-response
9  relationship, the necessary evidence is
10  increasing risk with increasing dose,
11  statistical significance, and
12  consistency.  Consistency in this context
13  includes repeated demonstration of the
14  result across different studies,
15  including different study designs and
16  different measures of dose."
17          Do you see that?
18      A.   Mm-hmm.
19      Q.   And I have that pulled out
20  here as well as Exhibit Number --
21          (Document marked for
22  identification as Exhibit
23  Ballman-31.)
24  BY MR. TISI:

Page 533

1      Q.   As with the prior statement,
2  you don't have a single citation for that
3  do you?
4      A.   I think we discussed all
5  this before in Exhibit 30 about why
6  consistency is important.  And why the
7  same type of dose-response needs to be
8  important.  I think I --
9      Q.   But you didn't cite it
10  there, and you don't cite it here?
11          MS. MILLER:  Objection.
12  BY MR. TISI:
13      Q.   You didn't cite it in the
14  prior exhibit, and you don't cite
15  anything here.
16          MS. MILLER:  Sorry.  I
17  thought the last thing was a
18  question, so I objected to that.
19  But this is a new question.  I
20  object to this one as well.
21  BY MR. TISI:
22      Q.   Yeah.  Okay.  We looked at
23  two --
24      A.   Yeah, yeah, yeah, yeah.

134 (Pages 530 to 533)

Karla Ballman, Ph.D.

Page 534

1        Q.   -- Exhibit Number 30, and
2    Exhibit Number 31.  They're both the same
3    statement about consistency, and you
4    don't have a citation for either one of
5    those?
6        A.   And I explained why there is
7    no citation is, again, that if there is a
8    causal relationship that is in fact true,
9    one would expect to see the same type of
10   relationship because if it goes up in one
11   study, down in another, up and down, or
12   stays flat, it's hard to understand how
13   something that truly has a causal effect
14   would come up with these different sort
15   of dose-responses.
16        And again, consistency is,
17   again, that you don't have these
18   different patterns going on in the data.
19        Q.   But you have no citation for
20   that whatsoever, and the meta-analyses
21   that were done, the two of them that
22   looked at it, whether it be Terry -- or
23   you pointed out.  I'm blanking on the
24   other one.  Both showed evident of a

Page 535

1    dose-response -- Terry and
2    Penninkilampi -- that looked at total
3    number of -- those are the only two that
4    looked at the total number of
5    applications, and they both showed
6    increasing dose -- increasing risk with
7    increasing number of applications, true?
8        A.   That is -- again, there's no
9    evidence that that's the right metric
10   because there's no validated instrument
11   for measuring talc in the first place.
12   And so it's sort of cherry-picking to
13   say, oh, okay, that one shows it but a
14   measure of frequency doesn't show it, a
15   measure of duration doesn't show it, even
16   within the same studies.
17        And so I think most
18   reasonable people would say, if there
19   really is a dose-response, why does it
20   have to be sort of the total lifetime
21   applications, but I'm not seeing it in
22   the total of years, which goes into that
23   calculation, nor the frequency, which
24   goes into that calculation.  And I don't

Page 536

1    even know if there's any valid measure of
2    that.
3        Q.   But you would agree with me
4    that both of these are peer-reviewed
5    studies, and when you looked at the total
6    number of applications, which is a
7    measure of dose, we saw an increased
8    risk.  Whether you think it's the right
9    inference or not is fine, but you agree
10   with that -- that that's what they
11   showed, both Penninkilampi and Terry.
12   And that's on Page 34 of your report.
13        A.   I don't think I said that.
14   I think I said Penninkilampi, you can't
15   even infer dose-response because there's
16   only two doses.  It's only two lines.  So
17   you can't -- I mean, only like -- you
18   know, dichotomous things.
19        So one can't really infer a
20   dose-response, and it's not even clear
21   that those two numbers in reality differ
22   from each other because we had this
23   discussion about, you know, point
24   estimates, you know, not having -- that

Page 537

1    they don't have to be the same, and if
2    they are pretty close to each other, who
3    knows.
4        So that's the same with the
5    Terry study too.  So I do not agree.
6        Q.   Okay.  But different -- you
7    know that in those studies, that both of
8    them, they noted an evidence of
9    dose-response, correct?
10        MS. MILLER:  Objection.
11        THE WITNESS:  I would have
12   to see the studies and see exactly
13   how they stated their conclusions.
14   Can you --
15   BY MR. TISI:
16        Q.   I'm just -- I'm just asking
17   you, do you recall that that was the
18   case?
19        A.   Off the --
20        MS. MILLER:  Objection.
21        MR. LOCKE:  Objection.
22   BY MR. TISI:
23        Q.   I'm asking you, do you
24   recall or not?  If you don't recall,

Karla Ballman, Ph.D.

Page 538

1    that's fine.
2        A.    Off the top of my head, I do
3    not recall.
4        Q.    Okay.  I want to ask you a
5    couple questions about meta-analysis and
6    kind of move on from there.
7            First of all, not all
8    dose-responses are monotonic, are they?
9        MS. MILLER:  Objection.
10           THE WITNESS:  I believe --
11   there can be different type of
12   dose-responses.
13   BY MR. TISI:
14       Q.    Okay.  Have you considered
15   that?
16       A.    In what sense?
17       Q.    Have you considered it at
18   all?
19       MS. MILLER:  Objection.
20           THE WITNESS:  I think I --
21   just in -- I mean, in what sense?
22   BY MR. TISI:
23       Q.    In connection with
24   dose-response?

Page 539

1        A.    Well, in cancer it would be
2    very rare -- in a non-monotonic, one
3    would be that the higher the dose, the
4    less the risk.  It could be concave.  I
5    mean, that would be quite --
6        Q.    Could it --
7        A.    -- bizarre different from
8    any other cancers I've seen.
9        Q.    Have you ever heard
10   depletion of the susceptibles?
11       A.    No, I have not.
12       Q.    Okay.  That as people die,
13   they're not going to be showing a --
14   anyway.  I'll move on.
15           What about a trend test
16   when -- when the trend test was used in
17   non-users, did they show a dose-response?
18       MS. MILLER:  Objection.
19   BY MR. TISI:
20       Q.    When a trend test was used,
21   did it show a dose-response?
22       MS. MILLER:  Well, where?
23       THE WITNESS:  Trend test
24   used where, meaning what?

Page 540

1    BY MR. TISI:
2        Q.    In any of the studies.
3        A.    Well, I know it looks like
4    Terry did a test for trend that does not
5    include the never/none category.  And
6    it's P-value is .17.  So -- and that is a
7    flat relationship.
8            Checking to see.
9            So Cramer 1999 did the
10   correct test.  He did a trend test.  And
11   his P-value of .48 and .16, that's a
12   trend test that does not include the
13   never category.
14       Q.    Right, but when he looked at
15   the total number of applications, you saw
16   an increase that went from 1.1 to 1.38,
17   went down to 1.36, and up to 1.49.
18       A.    I think we're talking about
19   the different Cramer.  Sorry.
20       Q.    Cramer 2016?
21       A.    No.  I was looking -- I said
22   Cramer 1999.  I'm sorry.
23       Q.    I'm looking --
24       A.    I misspoke that.

Page 541

1            You asked me which ones did
2    the correct trend test.  And I'm saying
3    Cramer 1999.
4        Q.    What about Cramer 2016?
5        MS. MILLER:  You didn't
6    misspeak.  You said 1999.
7    BY MR. TISI:
8        Q.    What about Cramer 2016?
9        A.    That one does -- that test
10   for trend includes the never versus none
11   category.
12       Q.    All right.  Okay.  Let me
13   ask you a couple questions about -- about
14   meta-analyses.
15           We've been talking about the
16   individual studies.  Is it your view
17   that -- you know, you mentioned several
18   times.
19       MR. TISI:  I'm sorry.  I'm
20   sorry.  You reached over.  You
21   reached over that time.
22       MS. MILLER:  I'm moving
23   back.
24       MR. TISI:  You reached over

136 (Pages 538 to 541)

Karla Ballman, Ph.D.

Page 542

1  that time.
2       MS. MILLER:  I'm so sorry.
3       MR. TISI:  And you kicked
4  me.
5       MS. MILLER:  I'm so sorry.
6       MR. TISI:  And I don't take
7  it personally.
8       MS. SHARKO:  Can I do that
9  too.
10       MS. MILLER:  I had to
11  stretch my legs.  It's been a very
12  long day.  I can only stretch that
13  far.
14  BY MR. TISI:
15       Q.   Doctor, you mentioned
16  several times that a certain number of
17  case-control studies found a
18  statistically significant result, and a
19  certain found -- didn't.  And then a
20  certain number of case -- cohort studies
21  did not find a statistically significant
22  result.
23       Do you remember that kind of
24  general testimony?

Page 543

1       MS. MILLER:  Objection.
2  BY MR. TISI:
3       Q.   Yeah, I mean.  Yes?
4       A.   What's your question?
5       Q.   My question is do you
6  remember that testimony.  I'm kind of
7  referring you.  Remember you listed,
8  well, you know, you kind of looked at
9  them together.  And some were
10  statistically significant, some weren't.
11  Some were in case-control, some were in
12  cohort.  Do you remember that testimony?
13       MS. MILLER:  Objection.
14       MR. TISI:  You can object.
15       THE WITNESS:  So what I --
16  what I -- I recall sort of when
17  looking at the evidence in
18  totality is that you know, the --
19  the hospital-based controls did
20  not find statistical significance.
21       The population-based
22  controlled studies -- case-control
23  studies, some found a statistical
24  significant association, some did

Page 544

1  not.
2       Looking at the cohort
3  studies, none of them found a
4  statistically significant
5  association.
6       And the magnitude of the
7  risk ratios for these groups of
8  studies also vary.
9  BY MR. TISI:
10       Q.   Would you agree with me that
11  it is wrong to simply count the number
12  of -- count the number of studies and
13  kind of do it like a democracy.  There
14  are a certain number of studies that say
15  X that's not statistically significant.
16  Certain number that say Y, they are, and
17  the non-statistical numbers win?
18       A.   It depends.
19       Q.   Okay.  Do you ever do that?
20       A.   It depends.  I mean, again,
21  I -- it depends upon many things.
22       You know, if I have, like,
23  you know, randomized controlled trials,
24  you know, and, you know, all of them show

Page 545

1  an effect, and then or none of them show
2  an effect, let's say.  So I have
3  randomized control trials --
4       Q.   But that's not what we're
5  talking about.  We're not talking about
6  randomized controlled.
7       Let's just talk about, for
8  example, in the case-control studies.
9       A.   You asked me if there are
10  any situations, and I was trying to
11  answer that.
12       Q.   And we're not talking about
13  that.  And I apologize, because we're
14  talking about in the context of this
15  case.  There are no randomized control
16  trials because it would be unethical to
17  do so, correct?
18       MS. MILLER:  Objection.
19       THE WITNESS:  Again, I
20  talked about reasons why, you
21  know, randomized control studies
22  are not done and, you know --
23  yeah, so anyway.
24  BY MR. TISI:

137 (Pages 542 to 545)

Karla Ballman, Ph.D.

Page 546

1     Q.   They could not be done here
2  because you can't test somebody --
3  assuming you can even design such a
4  study, you couldn't -- with the
5  hypothesis being, let's expose people to
6  something and see whether it causes
7  cancer?
8         MS. MILLER:  Objection.
9  BY MR. TISI:
10     Q.   It would be unethical to do
11 that, right?
12     A.   Yeah.  I mean, just in
13 general, one would not do a clinical
14 trial and say, okay, we're going to
15 expose people to something that there's
16 evidence for that it's harmful, but I
17 don't know if it applies in this case.
18        It's been purported that the
19 use of talc is harmful.  But I don't know
20 if there is --
21     Q.   Would you ever participate
22 in a study that would test the hypothesis
23 that talc would cause ovarian cancer?
24        MS. MILLER:  Objection.

Page 547

1  BY MR. TISI:
2     Q.   A clinical trial?
3         MS. MILLER:  Objection.
4         THE WITNESS:  Again, I don't
5     think people would do such a
6     clinical trial --
7  BY MR. TISI:
8     Q.   And you wouldn't --
9     A.   -- with that question.
10        I mean, I would participate
11 in one if it says talc would prevent sort
12 of this from happening because I would
13 see a benefit.  I wouldn't participate in
14 a trial where there's no benefit being
15 hypothesized.
16     Q.   So now the question is, why
17 do we do meta-analysis?  Why do we do
18 meta-analysis?
19        MS. MILLER:  Objection.
20        THE WITNESS:  Well,
21     meta-analysis, and the history of
22     meta-analysis are that they were
23     first used for randomized
24     controlled trials.  And they were

Page 548

1     done, and the intent for
2     meta-analyses is that the
3     randomized controlled trials, back
4     when trials were starting to
5     become popular, were too small on
6     their own to have statistical
7     significance.
8         So the idea was there were
9     several trials done in the same
10    disease, essentially, of the same
11    treatments, and so to get the
12    necessary power in order to make a
13    definitive statement,
14    meta-analyses were used.
15        MR. TISI:  Okay.
16        (Document marked for
17    identification as Exhibit
18    Ballman-32.)
19 BY MR. TISI:
20     Q.   Let me show you a textbook,
21 a chapter of a textbook called
22 "Introduction to Meta-Analyses" by
23 Borenstein.  Is that something that
24 you've ever seen before?

Page 549

1     A.   I haven't seen this
2  particular textbook.
3     Q.   I'm marking it as Exhibit
4  Number 32?  And I pulled out --
5         MS. MILLER:  Is this Xerox
6     on cardboard?
7         MR. TISI:  I know.  The
8     machine, it was weird.  It was the
9     FedEx office.
10 BY MR. TISI:
11     Q.   Chapter 28 is called "Vote
12 Counting, a New Name For an Old Problem."
13        Do you see that?
14     A.   I'm sorry.  What page are we
15 on?
16     Q.   It's chapter 28.  If you go
17 in, there's the chapter there?
18     A.   Oh, I see.  It says "Vote
19 Counting, a New Name For an Old Problem."
20 Yes.
21     Q.   So just -- you would agree
22 with me just looking at the number of
23 studies that show statistically
24 significant results and the numbers that

138 (Pages 546 to 549)

Karla Ballman, Ph.D.

Page 550

1    don't is not a good scientific
2    methodology, correct?
3        A.   Again, it depends.
4        Q.   Well, at the very end of in
5    statement -- and I guess that was a
6    pretty non-controversial thing, at least
7    I thought it was.  At the very end,
8    there's a box that says "Summary Points"
9    on Page 255.
10            I'm going to ask you if this
11   is true.  "Vote counting" -- and by vote
12   counting, I mean counting the number of
13   positive and negative studies.  "Vote
14   counting is the process of counting the
15   number of studies that are not (sic)
16   statistically significant and comparing
17   those with the number that are not
18   statistically significant."
19            Do you see that?
20       A.   Yes, I see what you read.
21       Q.   And it says, "Vote counting
22   treats a nonsignificant P-value as
23   evidence that an effect is absent.  In
24   fact, though small, moderate, and even

Page 551

1    large effects may yield nonsignificant
2    P-values due to inadequate statistical
3    power.  Therefore, vote counting is never
4    a valid approach."
5        A.   Yes, I see that -- that
6    stated there.
7        Q.   Do you agree that vote
8    counting -- in other words, counting the
9    number of studies that are not
10   statistically significant and comparing
11   them with the numbers that are, is never
12   a valid approach?
13       A.   Again, I said it depends.
14   So if all the studies were of the same
15   sample size done in the same population
16   using the same treatment, and all of them
17   were adequately powered, and, like, two
18   only found a statistically significant
19   result, and the rest did not, I think
20   that's evidence right there that there
21   really is no effect.
22       Q.   And that -- that's why we do
23   meta-analyses, correct?
24       A.   We do meta-analyses when the

Page 552

1    studies being combined -- again, as I
2    mentioned the intent of a meta-analyses
3    was for randomized clinical trials.  And
4    it was to combine small, underpowered
5    studies together in order to get
6    sufficient power.
7        Q.   Do you agree that it is
8    appropriate to use meta-analysis to
9    combine observational studies, even
10   observational studies of different
11   design?
12       A.   No.  I think it is incorrect
13   to do a meta-analyses to combine
14   observational studies, especially
15   observational studies of different
16   designs.
17       Q.   Yet in the talc area, you
18   know of at least four, five or six
19   meta-analyses that have been done that
20   have done exactly that, that have passed
21   peer review, correct?
22       A.   Yeah, and I hope ASA comes
23   out with a statement on that, because the
24   intent of meta-analyses was not to

Page 553

1    combine observational studies.  And
2    that's why in the meta-analyses, in that
3    chart of increasing evidence that I --
4    I -- we had discussed previously in my
5    report, the meta-analyses at the top are
6    meta-analyses of randomized trials.  I've
7    never seen any pyramid of evidence of
8    that that puts in meta-analyses of
9    observational studies anywhere in that
10   pyramid because it's unknown.
11       Q.   But I'm -- let me just get
12   it down.  There are six meta-analyses in
13   this -- in this litigation, five which
14   have been published, one of which is
15   being submitted to peer review, right,
16   the Taher study.
17       A.   Yes, correct.
18       Q.   And there's -- there's six
19   altogether, five of which are
20   published --
21       A.   Oh, wait?  Six altogether.
22   No, I'm sorry.  Go through the numbers
23   again.  My count is seven published.
24       Q.   Okay.  Fine.

Karla Ballman, Ph.D.

Page 554

1    A.   And -- okay.
2    Q.   Fine.  Whatever the number
3  happens to be, it happens to be.  I'm
4  doing it off the top of my head.
5        Are you saying that because
6  all of those studies combined
7  observational studies -- let's just deal
8  with that issue -- that that was
9  unscientific, and they should not have
10  passed peer review?
11    A.   I am saying that they're
12  good for hypothesis generating, and
13  that's about it.  They are not good for
14  making definitive statements with respect
15  to things such as causality or whether
16  there truly is an association.
17    Q.   Do you think that those
18  should have passed peer review.  If you
19  were peer reviewers on any of the
20  meta-analyses that are in this case,
21  would you have given a green light to
22  allow those to be published?
23        MS. MILLER:  Objection.
24        THE WITNESS:  Again, they

Page 555

1  are good for hypothesis
2  generating.  And I didn't say that
3  hypothesis generating is not --
4  not good -- or is not -- I'm
5  getting tired.  I'm searching for
6  words here.
7        I did not say that
8  hypothesis generating should not
9  be published.
10  BY MR. TISI:
11    Q.   You would agree with me that
12  people disagree with you on the value of
13  meta-analyses, correct?
14        MS. MILLER:  Objection.
15        THE WITNESS:  Well, I -- I
16  don't know.  All I know is JCO,
17  the journal I'm deputy editor for,
18  which has quite a high impact
19  factor, we would never, ever
20  publish a meta-analyses -- well, I
21  shouldn't say that.  That's too
22  strong.
23        It would be very rare that
24  we ever would publish a

Page 556

1  meta-analyses of observational
2  data.
3  BY MR. TISI:
4    Q.   Okay.  And you think it
5  would be inappropriate to rely on that
6  data for consideration in the -- of the
7  Bradford Hill criteria for causation in
8  talc and ovarian cancer?
9        MS. MILLER:  Objection.
10        THE WITNESS:  As I said,
11  meta-analyses are good for
12  hypothesis generating, but they
13  are not sufficient evidence to --
14  to make a definitive statement
15  about causation.
16  BY MR. TISI:
17    Q.   I didn't ask about
18  definitive statements.  I'm asking, are
19  they even appropriate to consider in a
20  Bradford Hill analysis, or is that a
21  methodologic flaw if anybody were to
22  consider a meta-analysis in the context
23  of doing a Bradford Hill test or analysis
24  for ovarian cancer and talc?

Page 557

1        MS. MILLER:  Objection.
2        THE WITNESS:  As I -- I do
3  cite one of the articles here that
4  says -- I don't -- within Bradford
5  Hill, it says look at the totality
6  of the data.  But it's more
7  important to look at the
8  individual studies and see what
9  the conclusion comes from there,
10  rather than a meta-analyses.
11        So I'm not sure how a
12  meta-analyses sort of plays into
13  the Bradford Hill except coming up
14  with some summary values.
15  BY MR. TISI:
16    Q.   But you do know that most
17  people looking at this question have
18  looked at -- at the meta-analyses,
19  correct, in connection -- I mean, Health
20  Canada did, correct?  Are they wrong for
21  having done so?
22        MS. MILLER:  Objection.
23        THE WITNESS:  I didn't say
24  that.  I mean, I said even I've

140 (Pages 554 to 557)

Karla Ballman, Ph.D.

Page 558

```
 1        looked at the meta-analyses
 2     because that's the totality of the
 3     data, to see if there's any sort
 4     of additional information that it
 5     brings forward.
 6  BY MR. TISI:
 7        Q.   But do you remember the
 8  statement -- and I pulled it out there.
 9  I think it was Exhibit Number 5.  That
10  statement says that they found a
11  consistent result across meta-analyses
12  and additional evidence is consistent
13  with causation.
14           MS. MILLER:  Who is "they"?
15           MR. TISI:  Health Canada.
16           THE WITNESS:  I'm trying to
17     find Exhibit 5.
18           MR. LOCKE:  Can I ask for a
19     time check?
20           MR. TISI:  We've got about
21     four minutes.
22           THE WITNESS:  I'm looking
23     for Exhibit 5.  Do you have it
24     handy?  Oh, I got it.  I got it.
```

Page 560

```
 1           MS. MILLER:  Objection.
 2           THE WITNESS:  And I said
 3     that when one is doing a proper
 4     sort of causal analyses that's
 5     based upon, you know, established
 6     epidemiology principles, one looks
 7     at all studies, including
 8     meta-analyses.
 9  BY MR. TISI:
10        Q.   Are they wrong for having
11  relied on them?  Having looked at them,
12  can they rely on them?
13           MS. MILLER:  Objection.
14           THE WITNESS:  I'm not sure
15     if they relied on them from this
16     statement here.  I can't tell that
17     they relied just on meta-analyses
18     or not.
19  BY MR. TISI:
20        Q.   What is the journal JCO?
21        A.   The Journal of Clinical
22  Oncology.
23        Q.   One final question.  You
24  made a comment in the Taher study that
```

Page 559

```
 1        I got it.  Okay.
 2  BY MR. TISI:
 3        Q.   Were they wrong -- were
 4  Health Canada wrong in Exhibit 5 for
 5  relying on that?
 6        A.   So I think I said that
 7  meta-analyses, it's not surprising that
 8  they are consistent because they are
 9  analyzing the same set of data, and so
10  one would expect --
11        Q.   I didn't ask you that.  I
12  didn't ask you about consistency.  I'm
13  asking were they wrong for even
14  considering them?
15        A.   But that's a different
16  question --
17        Q.   It is a different question.
18        A.   -- than what you just asked
19  me there.
20        Q.   I'm asking you, are they
21  wrong for having considered them in the
22  context of looking at the causal
23  inference for talcum powder and ovarian
24  cancer?
```

Page 561

```
 1  they indicated that they thought it was a
 2  possible association.  And you said that
 3  you thought that as a peer reviewer, they
 4  would take that out?
 5        A.   No.  They said a possible
 6  causal --
 7        Q.   Causal association.
 8        A.   -- association.
 9        Q.   And you would take -- you
10  thought that that was something that
11  would be taken out by peer reviewers,
12  correct?
13        A.   Of -- of high quality
14  journals, yes.
15        Q.   And you -- but that's pure
16  speculation on your part, right?
17        A.   No, I do not believe so.
18  Through all my experience in the numerous
19  papers that I've reviewed and -- both for
20  JCO and as a reviewer of other things,
21  that's pushing the data, because one
22  assumes no causal relationship, and you
23  need evidence for it before you can state
24  causality.
```

141 (Pages 558 to 561)

Karla Ballman, Ph.D.

Page 562

1    Q.   Would it surprise you to
2  know that we have meta-analyses in JCO,
3  correct?  Would that surprise you?  You
4  mentioned that you've never published
5  meta-analyses or rarely.  Would that
6  surprise you?
7    A.   There are meta-analyses --
8    MS. MILLER:  Objection.  She
9  said meta-analyses -- objection.
10    THE WITNESS:  There are
11  meta-analyses in JCO of randomized
12  clinical trials.  And in fact, one
13  of the studies you showed me today
14  was a meta-analysis.  It was a
15  pooled analysis, of individual
16  patient-level data.
17  BY MR. TISI:
18    Q.   Okay.  So is it your
19  statement that JCO would not publish a
20  meta-analyses -- meta-analysis of
21  observational data?
22    MS. MILLER:  Objection.
23  Misstates --
24    THE WITNESS:  I said it

Page 563

1  was --
2    MS. MILLER:
3  Mischaracterizes her testimony.
4  Please let me finish my
5  objection, even though you're
6  eager to talk.
7  BY MR. TISI:
8    Q.   You can answer the question.
9    A.   Okay.  So I said that it
10  would very rarely happen.  I had
11  corrected.  I had said never, but I said,
12  no, wait a minute, it would very rarely
13  happen.
14    Q.   Okay.  So -- so you would
15  agree with me that there have been
16  observational meta-analyses in JCO?
17    A.   I have no idea if there have
18  been or not.  I cannot say that off the
19  top of my head.
20    MR. TISI:  I don't think I
21  have any questions.  I think I'm
22  down to the --
23    MS. MILLER:  You have one
24  minute.  Go crazy with your last

Page 564

1  minute.
2    MR. TISI:  I'm totally okay.
3  I'll give you -- I'll give you my
4  minute.
5    Thank you very much.  I have
6  no further questions.
7    MS. MILLER:  I just have a
8  few questions for you, Dr.
9  Ballman.
10    - - -
11    EXAMINATION
12    - - -
13  BY MS. MILLER:
14    Q.   Can you please turn back to
15  Exhibit Number 25.
16    MR. TISI:  Which is what?
17    THE WITNESS:  The National
18  Cancer Institute one.  This one?
19  BY MS. MILLER:
20    Q.   Can you tell me what the
21  title of that exhibit is?
22    A.   The title is "Ovarian,
23  Fallopian Tube, and Primary Peritoneal
24  Cancer" -- I don't know if there's

Page 565

1  anything under the sticker --
2  "Prevention, Health Professional
3  Version."
4    Q.   And what is this document?
5    A.   It's a document that was
6  published by the National Cancer
7  Institute that's talking about who's at
8  risk for ovarian cancer and established
9  risk factors of ovarian cancer, I
10  believe, as best I can tell.
11    Q.   Please turn to Page 11.
12    A.   Yes, I'm there.
13    Q.   Do you see the subheading
14  titled "Perineal Talc Exposure"?
15    A.   Oh, yes, I see "Perineal
16  Talc Exposure."  Yes.
17    Q.   Can you please read the
18  sentence under that?
19    A.   "The weight" --
20    Q.   You did a lot of reading
21  today.  I thought we should you read,
22  too.
23    A.   "The weight of evidence does
24  not support an association between

Karla Ballman, Ph.D.

Page 566

1  perineal talc exposure and an increased
2  risk of ovarian cancer."
3      Q.   Did Mr. Tisi read this
4  sentence to you?
5      A.   No.  And it goes on to say
6  that the result from case-control and
7  cohort studies are inconsistent.
8          MS. MILLER:  I have no
9  further questions.
10         MR. TISI:  I have a
11  question.  I'll use my minute and
12  add a couple minutes to yours.
13         MS. MILLER:  Wait.  I used
14  30 seconds.  So you have a minute
15  and 30 seconds.
16         MR. TISI:  Okay.  Well don't
17  waste my 30 seconds.  I don't
18  think I'll use 30 seconds.
19             - - -
20          EXAMINATION
21             - - -
22  BY MR. TISI:
23      Q.   In that section, it
24  refers -- there are four footnotes under

Page 567

1  the perineal talc section.
2          Do you see that?
3      A.   Yeah, I'm sorry.  I thought
4  I was done.
5      Q.   On -- on Page 12.  Footnote
6  43 through footnote 46.
7          Do you see that?
8      A.   I see -- I see Reference 42
9  and I see a reference 43.  I don't see
10  where you see -- oh, there's 44.  Yeah, I
11  see -- I see a bunch of --
12      Q.   And 46?
13      A.   44, 45, 46.
14      Q.   Right.  So there are five
15  references in this paragraph, correct?
16      A.   Yes.
17      Q.   Okay.  And so we can assume,
18  can we not, that those are the references
19  they looked at?
20          MS. MILLER:  Objection.
21  Calls for speculation.
22          THE WITNESS:  I don't know
23  if it's all the references that
24  they looked at.  I think they are

Page 568

1  references for the values that
2  they're reporting before the
3  reference --
4  BY MR. TISI:
5      Q.   So if you go to the back --
6      A.   -- such as, "However, a
7  dose-response relationship was not
8  found," which is reference 42.
9      Q.   Can you look at Page 16 of
10  18.
11          MS. SHARKO:  I really think
12  your time is up at this point.
13          MS. MILLER:  Yeah, your time
14  is way up.
15          THE WITNESS:  I'm there.
16          MS. MILLER:  You've just
17  gone over two more minutes.
18          MR. TISI:  Counsel, you've
19  been wasting my time.  I'm going
20  to ask this question.  And if you
21  want to -- you want to walk out,
22  that's fine.  I'll ask the judge
23  for the time.
24  BY MR. TISI:

Page 569

1      Q.   How many -- how many
2  references -- of all these references,
3  there are five references.  Do you have
4  any -- any suggestion that the NCI
5  actually did a causation analysis like
6  you or Health Canada or the plaintiffs'
7  experts or anybody else did?
8          MS. MILLER:  Objection.
9          THE WITNESS:  I don't know.
10  I don't know what they did.
11          MR. TISI:  Thank you very
12  much.
13          THE VIDEOGRAPHER:  Stand by,
14  please.  Remove your microphones.
15  The time is 5:54 p.m.  This
16  completes today's deposition.
17          (Excused.)
18          (Deposition concluded at
19  approximately 5:54 p.m.)
20
21
22
23
24

143 (Pages 566 to 569)

Karla Ballman, Ph.D.

Page 570

```
1
2              CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
         It was requested before
8  completion of the deposition that the
   witness, KARLA BALLMAN, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12  _____
    MICHELLE L. GRAY,
13  A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  March 24, 2019
16
17
18        (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24
```

Page 571

```
1         INSTRUCTIONS TO WITNESS
2
3            Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8            After doing so, please sign
9   the errata sheet and date it.
10           You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14           It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24
```

Page 572

```
1         - - - - - -
              E R R A T A
2         - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____ ____ _____
6       REASON: _____
7  ____ ____ _____
8       REASON: _____
9  ____ ____ _____
10      REASON: _____
11 ____ ____ _____
12      REASON: _____
13 ____ ____ _____
14      REASON: _____
15 ____ ____ _____
16      REASON: _____
17 ____ ____ _____
18      REASON: _____
19 ____ ____ _____
20      REASON: _____
21 ____ ____ _____
22      REASON: _____
23 ____ ____ _____
24      REASON: _____
```

Page 573

```
1         ACKNOWLEDGMENT OF DEPONENT
2
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 574, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  KARLA BALLMAN, Ph.D.          DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
    _____
23  Notary Public
24
```

144 (Pages 570 to 573)

Karla Ballman, Ph.D.

Page 574

1          LAWYER'S NOTES
2    PAGE LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____

Golkow Litigation Services - 1.877.370.DEPS

## A

**abandoned**
458:21 459:8
523:10
**abandoning**
459:19
**abbreviated**
308:3
**able**
295:11 356:23
497:4
**absent**
550:23
**absolute**
158:9
**absolutely**
138:17 338:24
339:1 357:14
**absurd**
495:21 496:22
**academia**
75:9
**academic**
156:24 492:23
**accepted**
223:23 295:2 296:2
304:8,8 311:22
326:12 329:3
335:12 363:20
**accepts**
442:21
**accompanied**
196:12,22
**accomplished**
461:3
**accomplishments**
253:2
**accurate**
54:12 252:5 270:3
343:12 378:3
424:19 571:20
**accurately**
182:17 381:5
**accused**
353:7
**achieve**

328:11,12 416:23
417:5 439:12
**acknowledge**
387:8,10
**acknowledging**
498:17
**ACKNOWLED...**
573:2
**acronyms**
78:19
**activities**
154:19 183:11
253:1,3
**actual**
82:3 156:24 177:6
177:8 184:13
187:16 198:6
431:4 435:13
436:17 454:23
**add**
141:2 390:14
566:12
**added**
195:24 396:12
**addendum**
6:22 189:20
**addition**
152:23 172:21
183:10 384:6
**additional**
7:8 106:19 112:9
151:24 531:23
558:4,12
**address**
14:10 70:14 79:16
179:13 210:9
234:17 248:19
251:3 278:8 359:1
359:8 361:3
**addressed**
124:19,20,20 142:2
143:12 331:20
358:10 380:1
**addresses**
16:2 342:18
**addressing**

126:11 358:22
359:11
**adequate**
401:7
**adequately**
284:6 416:23 417:4
417:11 439:11,21
443:22 444:4,12
444:23 446:17,19
551:17
**adjunct**
241:13
**adjust**
79:16
**adjuvant**
8:11 277:24
**administer**
12:19
**adulthood**
334:18 344:6 387:9
**advancement**
252:22
**advantage**
323:19 324:8
**advantages**
314:21 315:7
**advice**
59:8 68:6 70:24
136:19 141:21
**advise**
64:15
**advising**
139:3
**Advisory**
243:8
**affect**
377:15
**affiliation**
243:21 492:23
**affirmatively**
256:12
**afternoon**
363:1
**age**
334:16,20 344:7
**agencies**

90:21 125:10,23
**agency**
77:20 79:1,3 400:9
**agents**
308:18
**ago**
101:4 241:18
**agree**
20:8 56:4 59:18
82:2 98:8 107:16
107:20,21 113:2,4
115:5,9 117:1
123:5,10,16,18
124:2,22 126:3
134:10 170:1,1
173:8 184:24
198:9 200:7,16
206:18 227:13,16
228:4 229:23
230:1 259:13
272:3,23 273:12
273:16 282:5,6
301:14 317:18
318:3,14 319:3,5
320:13 328:20
342:19,21 345:11
345:14,15 388:16
402:10 421:7,20
424:14 427:21
428:2,10 429:8
431:22 437:10
443:2,5,6,8,12
444:18 445:10,18
445:22 455:4,7
477:9 478:14,15
480:11,13 482:22
492:16 494:4,6,8
494:8,12,22
495:23 496:13
499:2,19 500:14
500:24 501:1
507:18 508:4
509:11 512:5
516:18 517:2
519:3,3 536:3,9
537:5 544:10

549:21 551:7
552:7 555:11
563:15
**agreed**
209:1 283:21 285:5
285:8 336:22
372:24 519:17
520:21
**agreeing**
49:16,17 499:14
**agreement**
436:16
**agrees**
317:24
**ahead**
28:9 33:4 228:2
258:7 323:6
512:11
**al**
457:7
**albeit**
160:16 163:5
**Alexandria**
4:10
**allegation**
131:16
**allow**
378:21 554:22
**allowed**
100:19 119:3,21
141:17 328:1
341:3,3 434:10
435:23,23 436:1
**allowing**
119:16
**altogether**
365:20,22 553:19
553:21
**amend**
195:8
**amended**
193:15
**American**
10:6 247:2,5,7,17
248:2,3 249:13,14
250:4 419:11,24

Karla Ballman, Ph.D.

459:22 460:6
461:5 462:5
463:19 464:21,22
466:2 481:10
482:16,17 483:10
483:11,12,19,20
483:21 485:14,23
495:1,4
**amount**
45:6 58:2 194:4,11
195:22 196:3
**Amrhein**
487:7,19 492:4
**analogously**
318:11
**analyses**
82:4,6 114:23
115:12 117:7,22
121:10 127:3
152:22 169:2
186:2,18 187:2,9
246:1 271:3
277:12 298:15
349:4,7 350:22
361:12 394:24
415:8 420:5 437:8
437:8 450:11
465:5 466:20
473:3,3 560:4
**analysis**
37:2 57:6,7 75:6
85:17 86:8,18
97:16 98:10 113:5
116:16 117:12
130:1,22 145:10
146:5,6 153:13
186:14 199:19,19
202:21 267:11
268:2 271:11
277:17 281:21
282:22 412:2
437:5 439:18
457:7 464:14
465:17 478:6,24
556:20,23 562:15
569:5

**analyze**
75:5 133:13 443:24
465:9
**analyzed**
108:18
**analyzing**
58:3 105:5,12
106:10 128:16
246:10 559:9
**ANDERTON**
3:17
**and/or**
308:20 570:21
**anesthesiology**
7:15 236:21
**animal**
17:24
**animals**
135:10
**Anne**
175:14
**answer**
11:5 30:21 34:6
45:18 49:15 51:7
61:7,14 63:10,17
68:12 72:18,24
77:24 78:11
118:13 120:5
122:2,14 124:5
139:7 141:15
148:11 180:11
202:7,15 209:11
216:22 217:8,22
227:11 229:20
234:22,24 235:11
236:19 237:3,11
237:15 238:6
256:4 267:6 270:9
280:7 296:4 297:6
309:18 319:12
327:22 333:1,21
355:7 378:15,18
378:20,22 405:12
408:4 412:11,15
419:1 426:13
436:24 470:9

482:12 513:4
522:8 545:11
563:8
**answered**
22:10 28:4,7 31:22
43:7 64:2 113:10
133:11 219:7
239:5 240:5 244:7
262:17 290:4
**answering**
27:13 78:14 118:23
138:24 139:17
208:15 269:13,16
410:19 411:1,23
412:2,8
**answers**
120:11 138:10
191:16 378:3
573:8
**anticipate**
112:6
**anticipating**
235:2
**antiinflammatory**
498:10
**anybody**
73:2 76:4 77:5
151:22 152:1,7
157:13 429:15
556:21 569:7
**anyway**
486:18 490:2
539:14 545:23
**apart**
86:6 209:16 210:5
212:16
**apologize**
127:7 153:4 251:4
251:21 254:9
305:9 337:18
456:9 483:16
545:13
**appear**
57:15 94:8 128:23
**APPEARANCES**
2:1 3:1 4:1,7

**appeared**
69:14 128:8,13
194:2 197:12
**appears**
94:15 104:21
220:15
**application**
233:17,23
**applications**
254:12 525:4,22
528:20 529:6,7
535:5,7,21 536:6
540:15
**applied**
16:12 21:16 23:6
31:4 35:24 37:12
96:21 97:1 105:22
147:4 207:22
224:20 347:22
382:6 394:22
409:15 444:10
465:23
**applies**
387:5 525:6 546:17
**apply**
46:19 147:7,8,12
147:13,21,22
149:10,17,21
222:23 283:8
409:4,5 570:19
**applying**
36:4 253:12 283:10
361:22
**appreciate**
34:6 145:6 212:12
**approach**
25:22 149:6 220:12
222:24 224:4
226:17,19 551:4
551:12
**appropriate**
204:20 552:8
556:19 571:6
**approximately**
370:24 437:12
515:13 569:19

**April**
184:5
**area**
61:11 89:1 90:9
175:6,9 176:2
206:8,13 229:10
229:17 243:20
249:9 501:23
516:14 552:17
**areas**
73:18 79:15 229:3
229:8 231:10
248:24
**arena**
73:4
**argue**
46:7 200:14
**argued**
302:16
**arguing**
343:2,2
**argument**
311:4 359:4 366:1
450:13
**Arguments**
407:2
**arising**
443:18
**Arps**
1:14 3:2
**arrived**
121:12
**art**
29:18 506:24
507:15
**article**
55:17,23 56:2
69:13 70:1 145:16
145:21,22 147:1
156:8,9,14 159:4
164:4 169:21
171:4,8 266:22
266:10 267:22
268:4 319:14
320:8,11,22 321:2
325:15 326:19

328:8 389:15,22
390:21 391:18,23
392:20 393:2
394:11 398:6
401:5 404:12
**articles**
60:2 146:12 186:15
186:18 266:18
268:15 269:23
271:24 273:9
274:5 393:3
396:21 419:5,13
486:9,17 557:3
**articulate**
214:4
**ASA**
7:20 8:6 248:10
251:6,14 252:15
252:18,19,21
253:1,15 473:6,8
473:18 474:2,5,10
474:17 475:19
483:18 485:10,13
552:22
**ASA's**
10:7
**asbestos**
131:19 132:4,8,23
133:5 134:10,19
135:18,23,24
136:5 137:1,11,12
138:1,8,14,23
139:2,6,16,20
140:2,4,19 141:6
141:22 142:16
265:11,14
**ascertain**
316:8 317:2 318:7
**ascribed**
212:18
**ASHCRAFT**
4:8
**aside**
39:4 174:12 184:19
207:19 222:7,18
222:22 319:20

427:23 432:18
529:15
**asked**
14:13 22:10,16
28:4 31:22 42:16
43:7 64:2 66:24
75:2 76:11 77:4
79:5 88:8 100:22
101:3 113:10
125:6 136:14
141:21 142:5
176:18 185:15
201:20 202:2
216:8,13,23
217:23 218:10,13
225:8 234:8,11
237:8 238:24
240:5 242:2 244:4
253:22 262:17
272:17,19 290:4
295:15 309:10,14
309:21 310:4,5
319:9 327:14
330:9 332:3,17
334:1,7,9 335:17
338:11 339:3,6
352:24 377:20,21
378:1 410:15
481:11,14,23
482:7,8,10 496:12
499:11 503:9
506:24 513:23
541:1 545:9
559:18
**asking**
18:21 22:17 31:7
36:10,11,15 45:11
58:10,11,20 67:24
68:1 74:8,9 82:21
91:1 124:24 125:5
136:16,17,21,21
140:23 141:16
147:17 167:9,10
174:13 175:2
186:5,9,10 191:15
198:14 199:17

204:15 208:23
217:13 221:14
227:16 230:8,14
231:6 235:3 237:6
240:23,24 242:7,8
244:8,16 260:1,2
260:6 262:6
272:16 273:20
280:3,3 297:3
308:6 311:5
317:17,24 327:15
332:14,15 334:14
336:15 341:2
353:8,9 364:7
365:3,8 371:21
373:19,19 375:20
375:20 378:11
407:20,24 408:1
409:9 410:16,17
411:9 425:20
433:8 435:19
438:6,10 443:5
452:14 454:13
457:22 464:10,11
464:12 467:6,7,13
469:4,7,9,9
470:10 471:12
472:4 481:22
515:4,9 521:16
527:2 537:16,23
556:18 559:13,20
**aspect**
96:3,7,10 178:24
444:16 450:7
**aspects**
99:7 108:17 134:2
311:19 441:19
494:8
**assembles**
395:12
**assembly**
278:17
**assert**
113:12
**assertion**
515:5

**assess**
168:4
**assessed**
21:18 386:5
**assessing**
35:11 38:10 83:3
285:2
**assessment**
5:22 15:12 16:23
87:9 97:19 102:10
107:24 343:21
516:22
**associated**
160:23 164:7,15
165:2 402:3 495:3
503:7 514:6
515:13
**association**
6:9 9:7 24:5,8
25:24 26:2,4,9,16
27:7,9,17,20
28:15,19 29:10
31:15 55:3,12
91:23 92:8 95:17
98:16 99:11 100:9
134:17 135:1,15
159:22 160:11
162:24 165:5,13
165:23 167:18
171:15 208:11
247:3,6,8 248:2,4
249:15 250:4
266:6,19 295:1
335:20 350:24
351:15 354:11
355:1 371:16
381:6 388:4,9,13
403:11 419:12,24
422:19,22 423:12
423:15 432:11,22
433:4,20 436:17
446:10,12,17,20
450:21 451:20,22
452:23 455:18
457:11 459:22
460:7 461:6 462:6

463:20 464:21,22
466:3 485:15,17
493:16 495:2
498:12,14 502:8
518:2 519:20
520:6,10 531:22
531:24 543:24
544:5 554:16
561:2,7,8 565:24
**associations**
266:4 436:7 457:12
457:18,23 458:6
**assume**
25:22 27:3,4,6
66:20 111:13
129:14 134:8
141:1,3 212:1,3
214:15 340:14
341:2,4 424:23
425:20 433:4
477:5,19 481:11
525:5 567:17
**assumed**
215:6 477:8
**assumes**
561:22
**assuming**
546:3
**assumption**
477:23
**assumptions**
478:23 497:20
**atrial**
498:8
**attach**
55:16 101:8 145:14
**attached**
181:7 197:20
571:12 573:11
**attempts**
308:17
**attention**
442:14 488:15
**attorney**
571:16
**Austin**

151:13
**author**
57:17 268:19,19
269:4,5 270:2,15
273:23 325:1,2,3
325:3
**authored**
492:11
**authority**
409:13 519:13
**authors**
86:5 168:20 169:6
169:6 172:2
374:18 488:4
491:8 498:1,5
505:23
**automatically**
230:2
**available**
91:22 92:7 93:14
98:13,19 99:8,13
100:11 107:7,22
108:3 122:13
151:7,11 170:12
223:10 518:7
520:24 521:20,22
531:21
**Avenue**
3:3,18
**avoid**
344:21 345:20
**aware**
82:21 85:16,21
128:11 226:8
253:17 313:2
367:16 419:11
484:11,12,15
485:3
**a.m**
1:15 12:7 104:7,11
193:6,10

——————
**B**
**B**
5:11 6:2 7:2 8:2 9:2
10:2 188:16

**back**
18:23 32:15 38:18
39:5,21 99:23
100:1 104:10,13
108:7 153:20
181:24 192:1
193:9 196:7
203:11 211:3
269:24 281:8
292:19 295:11
296:15 325:22
346:2 358:4
413:23 430:12
440:6 455:9
458:16 498:24
499:22 503:21,24
513:7 516:11
530:9 541:23
548:3 564:14
568:5
**background**
58:11 399:6
**bad**
190:6
**balance**
360:12
**balancing**
283:2
**Ballman**
1:13 5:5,15,18 6:21
7:13,18 8:15
10:12,15 12:14,22
13:9,10 14:8
16:16 39:7 46:16
59:7 63:2,21 67:9
70:23 74:14
128:15 133:3
139:5 189:22
190:11 212:15
232:19 233:1
244:18 254:19
255:24 256:12
275:4 276:20
327:12 339:22
340:2 430:10

564:9 570:8
573:16
**Ballman-1**
5:15 14:6
**Ballman-10**
6:19 187:22 188:24
**Ballman-10-A**
6:20 189:3
**Ballman-10-B**
6:22 189:12
**Ballman-10-C**
7:6 189:15
**Ballman-10-D**
7:7 189:18
**Ballman-10-E**
7:9 199:4
**Ballman-11**
7:12 232:7
**Ballman-12**
7:15 243:4
**Ballman-13**
7:18 245:15
**Ballman-14**
7:20 247:23
**Ballman-15**
8:6 250:23
**Ballman-16**
8:8 257:19
**Ballman-17**
8:11 277:2
**Ballman-18**
8:14 306:9
**Ballman-19**
8:17 313:22
**Ballman-2**
5:17 38:21
**Ballman-20**
8:19 320:2
**Ballman-21**
8:21 337:22
**Ballman-22**
9:6 375:13
**Ballman-23**
9:10 390:17
**Ballman-24**
9:12 394:9

**Ballman-25**
9:15 401:1
**Ballman-26**
9:18 425:5
**Ballman-27**
9:21 440:24
**Ballman-28**
10:6 483:8
**Ballman-29**
10:10 487:10
**Ballman-3**
5:20 55:20
**Ballman-30**
10:12 518:24
**Ballman-31**
10:14 532:23
**Ballman-32**
10:17 548:18
**Ballman-4**
5:22 87:24
**Ballman-5**
6:6 104:4
**Ballman-6**
6:9 145:19
**Ballman-7**
6:12 155:24
**Ballman-8**
6:14 161:20
**Ballman-9**
6:17 180:18
**banter**
430:11
**Barnes**
243:23
**base**
89:13
**based**
35:4,7 37:1 38:5
50:18 51:9 54:20
93:4,4 107:12
108:11,20 110:2
113:5 116:15
123:3 127:2
132:14 149:22
150:1 197:9
207:13 221:21

268:11 283:23
305:1 308:24
389:9 402:2
421:12 426:24
427:1 428:11
431:3 441:12
478:3 560:5
**bases**
39:6,12 144:9
453:8
**basic**
228:13
**basically**
44:23 207:9 453:22
**basis**
20:5 40:23,24
72:14 108:9
117:24 146:21
151:1 207:8
223:12 224:21
353:1 372:1
382:20 403:20
415:14 519:23
**Bates**
8:7
**bathroom**
500:4
**Baylen**
2:4
**bear**
141:16 520:2
**becoming**
151:4 215:13
**began**
386:10
**beginning**
1:15 150:22 233:23
327:23
**behalf**
13:22 76:16 154:19
**behave**
211:20 318:11
**behavior**
330:12
**beliefs**
478:10

Karla Ballman, Ph.D.

**believe**
19:22 23:17 25:1,3
28:14 37:11 39:16
55:13 56:7 76:1
79:14 81:24 84:17
88:16 110:7
113:13,13 114:3
114:10 115:21,24
117:17,18 121:13
123:3 124:7 127:1
132:12,13 149:9
149:17 167:12
169:5 173:7 174:5
174:6,9 175:5
182:18 193:22
196:13 203:6
207:13 210:11
219:21 231:20
232:12 235:19
242:14 244:6
250:18 258:11
260:9 262:20
263:18 266:17
283:15 284:10
287:10 337:1
347:9,12 350:2,6
350:20,21 363:14
393:9 415:10
423:22 425:12
473:14 483:17
486:7,14 516:23
538:10 561:17
565:10
**believed**
115:15 342:1
**belonged**
241:19
**belongs**
241:15
**beneath**
229:13
**benefit**
308:20 527:8
547:13,14
**Berge**
93:17 385:19

452:21
**best**
269:19 524:23
525:21 526:1,4
565:10
**better**
20:9,20 195:18
279:18 280:5
288:15,16,20
289:4 302:1
303:11 304:3
328:24 334:24
343:1 346:10
347:16 348:13
349:17
**beyond**
183:4 207:2
**bias**
168:10,12,13,15,18
295:4,4 297:14
298:23 318:11
324:20,21 329:24
329:24 344:14
364:2,24 365:5,12
366:15,21 367:4,6
367:19 377:13,14
379:23,23 385:24
386:24 389:11
508:24
**biased**
302:12 386:14
434:24
**biases**
41:4 305:5 329:9
329:10,10,13
331:2,7,11,15,22
344:22 345:20
358:11 363:24
367:10 368:4
501:5,5 512:17
**bibliography**
54:7 69:15
**BIDDLE**
3:7,11
**big**
248:6 278:3 368:15

371:8 392:9
404:10 484:16
512:21 513:2
514:19 515:7,8,10
**bigger**
432:8
**biggest**
278:19
**bill**
111:12 112:17
**billed**
111:13 112:2 196:4
**billing**
112:10
**binary**
479:5
**biologic**
57:8 96:9,12 97:5,5
134:4 152:24
517:16
**biological**
57:11 135:4,6
153:17 398:21
517:9
**biologically**
134:23 137:2
**biology**
233:20
**Biomarker**
201:3
**biomedical**
399:2
**biometrics**
249:2,10
**biostatistician**
230:4 242:6
**biostatistics**
7:10,12 8:9 44:21
45:5 46:17 199:8
199:11 200:10
202:4 228:6,8,15
228:24 229:5
231:2,7 232:13,17
232:21 233:5,17
234:1,7 236:1,6,9
237:19,22 238:1

239:20 240:3,18
242:22 244:19
245:22,23 249:3
249:10 256:7,9,17
259:3 260:21,22
261:17
**biostats**
228:17 229:7,8
260:13 261:14
**bit**
27:11 282:2 332:23
346:3 411:8
507:15
**bizarre**
238:21 539:7
**black**
445:16 506:17
**Blake**
487:6,20 492:3
**blanking**
534:23
**bless**
19:13 386:1
**blindly**
347:16
**block**
162:14
**blue**
449:2,3 495:16
507:1
**blur**
84:12
**board**
474:2,5
**body**
329:2
**bogged**
200:6
**book**
44:24 45:1 298:5
312:13,16 313:17
313:17 314:3,8
319:11,21 392:16
392:17
**books**
228:19 492:11

**Borenstein**
10:18 548:23
**bother**
461:21
**bottle**
136:4,5,24 137:12
139:2 140:3
**bottom**
94:20 159:7,8
474:4 476:3 490:5
490:10,14
**bound**
439:22
**bounds**
506:19
**box**
193:24 550:8
**Bradford**
6:10 17:2 18:10,12
18:15 29:14,24
31:5 40:19 83:4
83:13 85:18 86:2
94:24 95:7,21
96:3,7,10,21 97:1
97:10 98:9,10,22
99:6,6 105:23
108:17 116:16
134:2,6 145:10
149:18 153:18
183:17 202:21
203:6 206:22
221:16,22 223:11
224:20 265:19
266:21 267:10,23
268:5,9,11 281:20
282:4,18,21 283:2
283:8,11 300:21
350:22 361:22
403:12,14 404:12
414:15 441:4,10
441:11,14 450:8
465:13,16,16,21
466:9 479:2
516:19,23 519:16
556:7,20,23 557:4
557:13

**breach**
33:2
**break**
90:7 101:3,4,10,14
103:23 104:8
193:7,13 211:4
237:2 271:18
275:23 276:6
281:3 294:2 357:7
358:2 422:3
438:18 439:24
440:4,10 500:4
503:9,12,19
**breast**
278:2 305:1
**breathing**
43:13
**Breslow**
392:7
**Brief**
301:10 429:23
458:14 516:9
**briefly**
458:11
**bright**
288:8 305:18
**bright-line**
478:7
**bring**
478:18 486:16
515:21
**brings**
558:5
**broad**
2:9 88:9 157:16
158:3 182:21
**Broadly**
405:12
**brought**
188:4 414:22
461:14
**Brown**
276:20
**built**
183:13
**bullet**

321:6 475:7
**bullets**
475:15
**bunch**
528:15,16 567:11
**buried**
304:21
**business**
478:2
**buy**
393:15
**bytes**
120:9

---

**C**

**C**
188:17
**calculate**
477:4,20 513:6
**calculated**
292:2 431:5 512:21
**calculation**
368:15 444:7
514:14,15 515:1,2
515:10,17 535:23
535:24
**calculations**
371:7 514:18
**call**
42:14,15,21 45:10
59:5,16 83:2
104:15 118:6
119:22 153:15
282:8 294:2
339:18 432:11
436:7,8 454:19
487:21 488:5
527:15 531:10
**called**
17:2 94:21 145:9
162:1 186:21
194:14 257:7
275:18 298:5
314:13 548:21
549:11
**calling**

201:16 430:4
445:16
**calls**
321:18 567:21
**campus**
3:8 262:4
**Canada**
6:6 82:11,22 83:8
84:22,23 85:3,20
86:10,11 87:10
101:18,24 103:8
103:19 104:14
110:11 113:7
114:3 116:12
124:20 125:22
127:9 147:13
149:16,19 170:7
170:11,16 172:1
189:6 557:20
558:15 559:4
569:6
**Canadian**
85:4 107:24,24
**cancer**
5:20 6:12 8:22 9:8
9:15,17 14:12,16
14:17 15:15 16:6
16:13 24:6,10
34:22 35:2 37:5
37:19 38:5 47:7
47:14 48:9,17
49:5,8 50:1,10,18
52:24 55:4 58:16
58:18,22 59:9,24
60:16 61:3 62:6,7
62:16 63:5,23
64:17 66:19 69:5
69:16 70:3,10,15
71:3,20 76:22
79:4,8 80:3,4,10
82:16 83:7 86:9
86:19 91:24 92:9
98:17 99:13
100:10 116:7
117:17,18 120:18
120:18,21 121:17

123:6,12,14,21
124:4,10,16
125:14 126:16
127:15 130:5,20
131:8 133:17
135:11 137:11
142:12,22 153:24
156:15 159:23
160:12,16,23
163:1,5,15 164:8
164:15 165:2,11
165:14,24 167:19
171:16,18 172:18
172:24 173:18
174:4 175:18
183:7 195:22
245:24 256:18
262:15,21,24
263:4,11,20
264:21 265:14,16
278:2 305:1
308:16,18,19
330:7 335:20
338:13 368:17
370:9 371:1,3,10
372:5 380:19
381:7 387:16
399:9,15,22 400:1
400:6,9,11,19,21
400:22 401:9
402:4 453:1
466:13 508:13
514:7 515:14
526:11 539:1
546:7,23 556:8,24
559:24 564:18,24
565:6,8,9 566:2
**cancers**
263:7,12 539:8
**cancer's**
380:16
**capable**
14:12 15:14 48:17
83:6 220:9
**capacity**
58:15 74:18

**capture**
182:23
**captures**
183:1
**carcinogen**
134:11 135:2,13
**carcinogenic**
80:12
**cardboard**
549:6
**cardiac**
230:20
**cardiology**
230:20
**care**
136:12
**career**
40:21 41:8 74:20
229:15 320:11
**careers**
250:9
**carefully**
109:12 116:22
117:5 194:21
362:11 363:5
437:4 494:7 571:4
**carried**
322:10 323:11
**casal**
99:14
**case**
19:21 29:11 39:16
71:23 112:21
114:1 126:17
131:16 132:8
143:24 146:23
151:5,14 160:18
173:2 174:10
176:12 179:19
182:20 188:9
216:7 220:11,21
221:3 268:8
281:24 285:11
288:4,5,17,17
304:3 309:5,6
311:6 342:23

347:5,11 348:10
356:5,7 366:24
367:2 376:9
396:24 424:2
434:8 527:23
537:18 542:20
545:15 546:17
554:20
**CASES**
1:8
**case-control**
8:17 19:15,21
20:10,20 21:8
22:8,23 23:10,21
24:2 25:2 26:7
27:18 28:17 30:5
30:16 32:4 33:11
33:20 56:10,15,18
56:20,22 92:15,23
160:20 186:24
256:22,23 281:24
284:8 285:22
286:3 288:2,16
292:13 294:23
297:11,17 298:5
298:14 299:8
300:8,9,12 301:9
301:19 302:1,13
303:5,11 304:4,12
304:20 305:2,8,11
305:19 309:5
310:22 311:20
314:13,15,20
315:5,13,18 316:4
316:17 318:12,22
321:16 322:8
323:9,17,20 324:5
324:9,16 325:16
325:16 326:2
328:11,24 329:5
329:11 334:10
341:24 342:2,22
342:24 343:8
344:20 346:7
347:6,17 348:2,9
348:12 349:20

351:18 352:3
354:13,15,16
356:5,12 362:15
362:18 363:9,15
363:22 366:8
367:10 371:17
376:23 377:11
378:14 379:22
384:10 410:9
422:18 426:7,9,24
427:2 428:3,12,21
436:22 445:1
450:16 451:9,18
453:2 508:21,22
509:12 510:5
512:19 513:17
514:21 542:17
543:11,22 545:8
566:6
**case-controlled**
30:17 284:12
285:10 289:8
**case-controls**
300:19 348:21
426:8
**casual**
50:3
**categories**
427:10,13,14
524:12
**categorization**
495:13,18 496:20
**categorize**
399:18
**categorized**
426:22,23
**category**
109:10,11 146:15
491:4 524:6,8
529:12 540:5,13
541:11
**Catherine**
258:10,22
**causal**
9:22 35:1 37:17
38:3 82:14 98:19

100:12 107:7,22
108:5,23 114:5
115:22 116:1,5,9
118:2 121:15
126:14 131:6
132:20 133:14
142:10 146:10
153:22 160:16
163:5,16 165:9
171:17 208:11
266:8 299:1
308:24 388:15
389:9 399:13
422:23 441:7
466:11 518:2
522:4,16,23 526:6
526:17 534:8,13
559:22 560:4
561:6,7,22
**causality**
23:10 224:22 343:7
520:8 530:23
554:15 561:24
**causation**
6:10 9:22 15:13,17
15:22,24 16:16
34:10 36:6 39:7
48:1 71:1 75:5
85:17 86:7 117:11
122:6 128:2,16
129:24 133:5
146:5,16,20 149:7
150:2,5,7 172:5
174:16 176:15
182:19 199:19
203:14 216:24
217:15,18,24
218:3,22 219:5,15
220:6,7,16 221:21
223:1,14 231:17
233:10 246:6
265:18 266:2,6
267:10,19,21
282:17 382:19
459:2 464:13
516:21 517:1

556:7,15 558:13
569:5
**causative**
308:18
**cause**
16:5,5 34:22 48:9
49:8 50:1,10
120:21 123:21
124:4,15 246:10
266:14 305:1,12
399:8 546:23
**caused**
47:6 49:5 63:23
70:3 117:19
172:18 183:7
**causes**
14:17 16:13 50:17
79:8 133:17
142:21 175:18
216:10,19 217:1
218:6,18 308:19
330:7 546:6
**causing**
14:12 15:15 48:17
83:7 220:9
**cell**
18:2
**Center**
232:21 243:7 259:2
**Century**
233:24
**certain**
207:17 212:18
265:24 359:20
420:17 488:15
530:8 542:16,19
542:20 544:14,16
**certainly**
149:24 270:1
313:11 397:7
**certainty**
14:20,24 15:5 16:4
34:21 61:15
180:12 183:20
209:13 256:4
265:2,8 268:7

471:14 472:11
**CERTIFICATE**
570:2
**certification**
570:18
**Certified**
1:16,16 570:13,14
**certify**
570:5 573:5
**certifying**
570:22
**cetera**
288:17
**chair**
174:3 175:7 269:4
270:16
**challenge**
226:6 474:6
**chance**
476:11,18
**change**
110:1,5,6 116:14
152:16 195:23
219:13 220:20
226:19 329:19
330:12 343:15
403:4 436:10
572:4
**changed**
125:2 270:21
**changes**
571:11 573:10
**changing**
27:10
**chapter**
9:21 312:9,9
313:16,24 314:12
314:19 315:5
319:10 336:24
440:17 548:21
549:11,16,17
**characterize**
169:12 483:24
**characterized**
400:12 461:18
**Charles**

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 154 of 463 PageID: 38391
Karla Ballman, Ph.D.

Page 582

2:9
**chart**
289:7,14 291:5,6
424:17 425:8,10
427:10,13 428:17
434:12 436:4,4
499:22 529:24
553:3
**charts**
425:11
**check**
270:1 425:1 558:19
**checked**
492:22
**checking**
78:13 540:8
**cherry-picking**
535:12
**chief**
46:16 244:18
**Chris**
296:24 458:10
477:11
**Christian**
9:19 424:4
**CHRISTOPHER**
2:3
**Christos**
242:13 257:5
**chronic**
386:6
**Cialis**
216:4,15,17 218:17
220:9 221:17
222:2 463:12
**cigarettes**
120:18,21
**cinnamon**
140:11,13,14
**circle**
506:14
**circumstances**
404:22 405:2,4
**citation**
289:14,22 290:2,9
291:5,9 293:11

296:5,14 297:5
298:4,11,21 299:6
299:12,22 300:23
301:2,13,17,20
302:2,6,20 303:17
389:13,14 406:8
415:15 418:2,17
418:18 419:2,3,4
522:14 530:19
532:3,4 533:2
534:4,7,19
**citations**
54:10 273:19 296:8
296:15,19 298:3
302:23 304:16
325:19 356:20
389:4 520:1
**cite**
53:5,12 109:22
291:10,16 295:23
304:18 325:12,14
359:20 366:3
393:3 495:10
533:9,10,13,14
557:3
**cited**
53:20 57:18 299:12
396:21 398:5
489:14 519:4
**citing**
291:10,24 379:12
400:16 419:18
**City**
244:20
**claim**
47:5 49:4 479:12
**claimed**
187:4 442:15
**claims**
478:9 487:22 488:6
495:19,20 496:21
498:20
**clarification**
191:16
**clarified**
315:19

**clarify**
192:1 402:17
**clarity**
258:21
**classrooms**
325:5
**clear**
41:22 139:2 207:15
252:20 258:24
260:4,5 262:14
263:23 282:9,24
331:5 358:13
359:2 403:7 422:8
422:16 437:24
451:16 493:14
496:9,11 529:18
536:20
**clearly**
28:24 29:6 31:13
371:15 466:24
**Cleveland**
3:18
**clinical**
44:7 201:1 228:23
229:14 246:2
256:7 269:2,5,7
270:14 277:23
308:4 309:4
310:19 311:19
546:13 547:2,6
552:3 560:21
562:12
**close**
406:2,7,13 408:19
409:11 411:6,10
413:7,10 414:14
524:10 537:2
**code**
390:8
**coffee**
343:20,22 344:4
**coherence**
96:14 97:6 100:3
**cohort**
19:14,19 20:9,13
20:19 21:5 22:7

22:22 23:8 24:7
25:1,6 26:3 27:16
28:15 30:6,15
33:21 56:10,23
57:1 92:16 93:6,9
160:21 256:24
282:1 284:7,13
285:11,20 286:1
287:23 288:14
289:6 292:12
295:1,3 297:12,13
299:6,20,24 300:1
300:15,23 301:6,7
301:17 302:12
303:6,10 304:2,10
305:3 309:4
310:23 311:20
314:21 315:7,16
316:1,5,15,21
318:3 319:1
321:15 322:7
323:8,16,19 324:5
324:8,18 326:3
328:13 329:1,7,8
329:15 330:5
331:3,16,17,21
332:2,6,8 333:8
333:24 334:14
342:3,23 343:1,6
343:14 344:22
345:21 346:6
347:7,16,24 348:6
348:8,13,19,22
349:24 354:20
356:6,13 358:11
358:24 359:13
360:4,7,8,11
361:4,6,17,24
362:3,13,17 363:8
363:16,21 366:7
367:6,9,13,17,18
367:21 368:15
370:7 371:8
372:13,19,23
373:4 374:19
376:9,19,23

378:14 380:6,12
380:21,24 384:7
384:11,14,16
385:7,9,13,17,19
386:4,5,10 387:21
422:20 426:9
429:4 432:1
433:12 435:5
436:20 445:2
450:19 451:1,21
453:2 508:23
509:12 542:20
543:12 544:2
566:7
**cohorts**
300:19 301:24
305:12,19 332:10
332:12
**collaborate**
76:4
**collaborative**
279:10,13
**colleague**
89:1
**colleagues**
43:24 44:5 88:23
129:4,8 130:13,16
130:17 248:24
250:7 255:4
256:11 338:11
341:15 462:8
481:15 493:6
505:8
**collected**
34:18 343:13
**collecting**
18:7,17
**collection**
249:3,8 278:16,24
**color**
504:15,18
**Colorado**
2:14
**column**
159:8,16 324:2
436:6 474:5 490:6

490:11,15,22,24
491:3
**combine**
356:8,16 514:9
526:22 552:4,9,13
553:1
**combined**
552:1 554:6
**combining**
356:15 528:15
**come**
14:15 18:22 38:18
39:5 79:17 80:1
105:7,14 118:10
144:9 149:23
220:18 260:12
292:19 295:11
299:14 322:13
354:24 399:11
448:23 528:5
534:14
**comes**
45:6 144:1 162:1
183:19 319:10
326:5 329:5,6
424:21,23 425:11
431:3 552:22
557:9
**comfortable**
142:1 499:13,19
**coming**
14:24 19:13,15
21:7 30:3 58:8
139:14 484:13,15
485:4 557:13
**comment**
10:10 110:8 122:18
122:19,22 170:13
262:3 319:2 332:1
492:19 500:12
560:24
**commentary**
327:13 487:4
**commented**
170:15
**comments**

110:6 278:14
**commission**
573:21
**commissioned**
84:21 340:11
**committee**
77:10 79:10 80:9
175:8 243:9
**committees**
245:5
**common**
145:2 309:1 315:17
406:15 409:14
413:11 414:8
442:14 509:14
519:6 521:24
**commonly**
342:1 441:12
**community**
120:20 124:13
125:12 169:19
170:3 248:5
458:21 459:7,12
459:18 461:4
**companies**
64:6,9,10 67:16
74:2 75:12,18,19
75:24 196:16,18
198:22
**company**
63:12,16 64:5
72:10,11,12 75:15
216:8
**comparable**
505:21,21
**compare**
94:12
**compared**
287:8 297:11
342:22
**comparing**
348:8 510:14 530:7
550:16 551:10
**comparison**
348:11
**comparisons**

521:6
**compatible**
497:19,22,23
498:15 500:16,17
500:20,21,23,24
505:20
**complete**
55:9 94:18 120:11
180:3 228:14
229:1 311:13
319:12 327:21
328:2 378:20,22
399:10 480:22
506:6
**completely**
107:3 326:6 379:15
442:20
**completes**
569:16
**completion**
570:8
**complicated**
255:13
**complies**
507:11
**component**
349:5 480:15
**components**
135:12
**composed**
132:16,18 135:20
135:22,23 142:20
441:14
**compound**
268:22 353:8
**computer**
487:1
**concave**
539:4
**concentrate**
430:8
**concept**
304:2,7 314:18
532:4
**concepts**
228:20

**conceptualizing**
315:18
**concern**
318:12 361:9
367:13,21
**concerned**
231:16 233:9
365:11 460:7
**concerning**
437:18
**concerns**
372:12
**conclude**
167:14 493:15,20
494:9,23 521:13
522:22,22
**concluded**
37:4 108:21 569:18
**conclusion**
5:18 6:7,15 34:10
34:19 35:6,16
36:2 37:15,22,24
39:7,13 48:8 51:9
51:21,24 58:8
101:18,24 102:6
102:12,13 103:9
103:10,13,15,19
109:18 114:24
115:4,13 153:21
162:1,7,14 168:1
168:4 208:7
210:17 220:18
284:17,21 301:24
302:3,4 304:1
326:6 355:17
399:12 415:6
416:1 455:11,23
455:24 456:11,17
478:11 479:24
480:5 520:8 557:9
**conclusionary**
455:12
**conclusions**
39:19 81:2,21
89:21 114:11
118:11 121:4

122:8 144:10
149:23 169:6
174:12 177:9
209:2 456:4,19,20
478:2,9 537:13
**concurred**
492:20
**condition**
344:16
**conduct**
298:15 480:18
**conducted**
85:19 186:2 397:23
**confidence**
55:10 371:14 417:9
419:6,16,19
420:13,14,21
421:6,13,22
429:21 430:22
431:7,20 453:15
453:16,20 454:3,6
454:14,16 455:3
457:19 458:1,8,24
472:23 493:19
497:18 501:8,11
501:15,17 502:1
502:17 503:2,5
505:10,15 506:3
506:15,20,22
507:4 509:15
524:9
**confidential**
196:12 197:1,22
198:20
**confidentiality**
196:24
**confirm**
185:9
**confirmed**
397:20
**conflict**
26:16 493:21
494:10,23
**conflicts**
198:7
**confounder**

512:22 515:11
**confounding**
41:4 160:12 163:2
165:15 166:2
167:14,19 168:7
297:10 298:23
304:13 305:6
368:5 389:11
508:24 512:21
513:16 514:19
515:7
**confused**
98:23 144:24
177:18 178:14
200:3 430:11
472:6
**confusing**
251:23
**confusion**
397:10
**congressional**
128:24
**connection**
62:21 73:3 77:7,7
84:8 185:23
538:23 557:19
**consider**
79:23 88:5,11
146:13 282:20
284:6 331:9,13
360:10 398:7
405:15 457:11
471:18 472:15
556:19,22
**considerable**
126:19 249:11
344:12 479:14
**considerably**
231:9 417:16
**consideration**
345:17,18 556:6
**considerations**
282:15,19 441:13
479:5
**considered**
6:21,23 81:4 84:8

93:10 94:9,9,10
96:20 150:10
189:21 297:16
397:20 538:14,17
559:21
**considering**
18:9 467:2 469:2
559:14
**consistency**
29:13 30:1 31:6,15
32:10 33:19 95:21
95:24 97:4 105:17
105:18,20,24
106:4 351:1,2,3,4
351:11 352:20
353:1 354:8
356:24 362:5
404:8,15 405:21
405:22 406:11,22
409:17,18,20
410:7,15 411:12
411:18,19 413:1
414:14 415:8
416:6,19 434:2
439:18 440:12,14
441:4,21 442:4,13
444:16 450:7,12
452:21 464:16
469:2 472:14
473:4 521:10
532:12,12 533:6
534:3,16 559:12
**consistent**
98:15 99:10 100:6
100:8 104:17,24
105:10 106:7
294:23 310:24
406:1,14 407:4
411:22 415:7,11
434:15,23 435:10
436:12 455:2
508:11 514:20
521:22 526:19
528:20 558:11,12
559:8
**consistently**

27:17 434:24 509:4
509:7 518:7
520:24 521:3,19
**constant**
405:17 468:11
**consult**
47:12 335:19
**consultant**
248:15
**consulting**
193:17
**consumed**
462:14
**contact**
63:12,21 65:9 67:9
70:20 80:1 127:12
127:19
**contacted**
47:11,19,20 49:2
63:3 64:14 65:14
66:11,17 67:10,20
68:5,24 71:24
72:3,7 127:14
128:23 130:11
151:12,14 339:7,9
**contain**
185:1,2 196:6,9
431:12 454:24
**contained**
131:19 143:9
150:17 177:1,11
178:5,18 179:8,19
289:1
**contains**
43:19 153:12
**content**
202:12 260:3 369:3
**contention**
361:2
**contents**
153:7 228:19
312:10
**context**
10:7 45:20,23
108:6 238:10,12
238:14,15 310:14

403:11 407:2
432:24 450:7
473:8,19 479:17
480:13,21 503:3
532:12 545:14
556:22 559:22
**contextual**
478:18
**continue**
490:19
**contraceptives**
304:24
**contrary**
23:22 24:22 25:14
25:19 116:13
**contrast**
314:20 315:6
344:18
**contributed**
338:19
**contribution**
252:22 268:14
270:18
**control**
231:18 233:10
278:2 354:18
367:1,2 545:3,15
545:21 570:21
**controlled**
287:14,16 543:22
544:23 545:6
547:24 548:3
**controls**
285:12 352:1
376:10 543:19
**Cont'd**
3:1 4:1 6:2 7:2 8:2
9:2 10:2 281:11
**Conventional**
315:12
**conversation**
50:4
**conveyed**
287:11
**convincingly**
518:18 530:17

**cookbook**
283:1,7
**copy**
192:18,21,24 193:3
251:9 426:14
**Cornell**
7:12 8:8 129:5,9,13
130:16 133:1
232:10,21 244:20
245:23 258:3
259:2,17 260:20
261:19,20,22
262:1,7,7,11,11
262:12
**correct**
13:14 17:3 18:15
19:2 21:12 23:16
23:24 29:16 40:7
40:9,11,13 41:24
44:2 52:4 53:1,7
53:17 55:6 56:16
57:16,21,23 60:3
66:4,13 72:2,6
73:4,12 75:20
76:9,24 78:24
80:18 81:20 83:13
86:14 87:13,19,20
92:13 94:4 95:1
95:18 96:15,19
97:7 105:3,10,17
105:19 106:5,23
107:15 108:23
110:17,23 112:10
114:18 122:24
124:16 134:4,11
143:6 145:10
152:19 153:14,24
154:9 158:22
161:11 164:21
165:5 166:12,15
168:11 169:9,14
169:19 170:4,10
182:2,9 184:1,22
185:2 200:2
203:16 206:10,23
214:16 216:10

219:20 226:10
232:22 233:2,6
234:4,15 236:2
237:20 253:5
258:13 261:3
262:2,15 267:16
270:24 282:7
285:14 286:7,11
287:17 288:11
290:2 300:15,24
301:22 302:2
320:15,22 327:17
329:20 331:9
332:5 341:4
358:14 359:15
361:23 363:23
367:7 373:12
375:17 377:6
379:1,8 381:14
382:15 383:20
388:7,17 396:9,17
396:22 397:2,8
398:9,20 407:22
413:2 418:17
426:10 427:11,16
429:6,7,10 430:24
439:15 441:9
446:4,15,17 451:2
451:23 452:3,7,18
454:4 457:19
475:13 479:8
481:16 490:13,16
491:9,13 493:9
495:9 503:3
504:24 505:3,10
505:16 506:4
514:16 516:22
523:1 526:23
529:11 537:9
540:10 541:2
545:17 550:2
551:23 552:21
553:17 555:13
557:19,20 561:12
562:3 567:15
573:7

**corrected**
563:11
**corrections**
571:5,7 573:10
**correctly**
38:12,13 78:22
  100:24 159:20
  161:2 162:23
  163:8,23 234:12
  234:13 244:1
  253:10 315:22
  356:3,4 393:11
  442:23 444:11
  474:14 488:2
**correlated**
343:16
**correlation**
107:5 157:7
**cosmetics**
73:11
**counsel**
12:15 36:16 66:24
  99:24 101:1 137:7
  148:8 162:16
  164:10 188:13
  192:15 212:2
  214:16 222:15
  225:12,13 235:15
  236:12 237:1
  238:16,17 251:10
  341:4 346:19
  370:3 374:13
  376:1 393:23
  402:18 404:2,3
  418:8 441:2
  471:24 568:18
**count**
53:4 69:6 270:8
  272:1 273:10
  360:7 544:11,12
  553:23
**counted**
269:24 270:7
**counterbalance**
353:20
**counterclockwise**

243:22
**counter-balanced**
353:13
**counting**
531:5 549:12,19
  550:11,12,12,14
  550:14,21 551:3,8
  551:8
**country**
45:3
**couple**
292:8 319:8 322:21
  416:15 527:9
  538:5 541:13
  566:12
**course**
66:16 217:11 257:4
  257:8 259:20,23
  259:23 260:2,7,10
  260:16,17 295:22
  390:23 402:21
  492:15
**courses**
8:9 40:24 200:8
  202:19,23 203:4
  258:2 259:1
  260:11,11,12,20
  261:9,18 262:9
**court**
1:1 12:18 33:6
  147:19 227:24
  458:9 571:20
**cover**
16:14 92:18,22
  198:2,4,19,20
**covering**
176:8
**covers**
62:23
**co-authored**
392:17
**co-investigator**
47:1
**crafting**
54:5
**Cramer**

5:21 55:13,17,23
  92:19 429:1 540:9
  540:19,20,22
  541:3,4,8
**crazy**
210:22 346:23
  347:1,1,3 563:24
**create**
289:16 512:23
**creates**
368:4
**creating**
293:13
**credentials**
175:6
**credibility**
399:2
**credible**
15:10 19:2 118:2
  121:14 132:19
  142:21 208:8
  395:18 399:5,9
**credit**
41:2
**criteria**
29:15 31:5,15 83:5
  83:13 95:1,7,10
  95:22 96:22 97:10
  98:10 99:6 100:7
  105:24 116:17
  134:5 146:24
  147:4,7 149:10,18
  153:18 183:17
  221:22 223:12
  224:21 267:23
  282:5,10,14
  361:22 409:3,5
  415:23 417:23
  418:22 441:5,7,12
  442:4 466:9
  516:17 519:22
  556:7
**criterion**
388:11 442:13
  518:17,17 530:17
  532:1

**critical**
407:16,21 466:24
**criticism**
157:13 180:10
  212:19 213:11
  302:9 467:11,12
  467:15,21 468:1
  470:11,17 471:3
**criticisms**
173:1 178:3,4,7
  179:17 187:12
  207:16 214:3
  358:9 467:9
  468:22 469:6,10
  469:12
**criticize**
357:5 406:24
  411:14 415:1
**criticized**
270:22
**criticizing**
408:5
**cross**
408:12 454:7,13
**crosses**
501:20
**crucial**
487:23 488:7
**Ctisi@levinlaw.c...**
2:6
**CTSC**
257:21
**cup**
142:3
**current**
253:20 305:16
**curriculum**
6:17 180:15,22
  181:21
**cut**
496:13
**cut-off**
388:12 414:13
**CV**
182:16 249:19,19
  249:20 253:19

Karla Ballman, Ph.D.

256:21 261:5,8
264:18 274:8,24
275:1

**D**

**D**
3:3 5:2 188:17
**daily**
183:11
**dancing**
32:1
**data**
16:9 35:13,20
37:14 38:11 50:23
51:10 58:3 75:5
82:5 89:18,19,22
93:15 96:23 97:9
98:18 99:13
100:11 105:5,6,12
106:10,11 107:2,7
107:22 108:3,10
114:4,22 115:21
115:24 117:23
118:10 121:3,9
122:7,13 127:3
134:14 145:3
168:5,21 220:13
249:3,8 261:17
269:10 277:21,22
278:3,7,17 279:1
285:3 326:9
342:16 346:6
347:19 349:4,19
350:12 361:12
389:9 431:4,6
447:17 457:13,18
465:10 476:10,18
476:20 478:5,24
480:19,24 497:19
498:15 500:21,23
501:3 531:21,22
534:18 556:2,6
557:6 558:3 559:9
561:21 562:16,21
**dataset**
453:22,24

**datasets**
397:6
**date**
1:15 12:6 191:4
259:9,16 571:9
573:16
**dated**
7:6 189:24 195:12
570:15
**dates**
82:1 191:6 195:14
**Daubert**
16:17 203:15,23
206:2 215:20
226:6 391:6,13
**day**
17:18,19 41:21,21
133:8 157:18
174:24 183:11,11
263:15 469:17
475:12 526:15
542:12 573:20
**days**
571:16
**deal**
200:9 300:3 515:7
515:8 554:7
**dealing**
90:19 464:15
**deals**
384:6 385:24
497:10
**dealt**
174:3
**debate**
120:19 124:12
125:11
**decades**
74:21,23 75:1
124:14 330:11
**December**
82:9 83:2 86:10
122:19
**decide**
174:19 239:18,21
346:9

**decided**
19:1 171:21 474:3
474:5
**decimal**
511:7
**decision**
196:13 479:8
502:19 512:2
**decisionmaking**
478:10
**decisions**
459:1 478:3 479:6
494:1
**declarations**
496:22 498:19
**declare**
455:16 457:8
**decrease**
498:12 502:5
**decreasing**
522:19
**deem**
79:18
**deemed**
571:19
**deeper**
388:1
**deeply**
125:20
**defend**
48:13,19 212:2
**Defendant**
3:20 4:5
**defendants**
3:15 85:16
**defense**
424:2,3 425:14
**defensive**
201:22
**defer**
168:19
**define**
75:22 300:17
402:12 409:11
417:21 438:14
**defines**

350:9
**defining**
407:17,22
**definitely**
158:5 162:5,6
265:4 449:13
**definition**
31:1 231:21,23
239:16 408:9,17
409:12,16 411:6
411:10,18 414:21
430:16
**definitions**
233:4 236:1 237:7
237:16 239:1,9,12
239:19
**definitive**
345:23 496:2
548:13 554:14
556:14,18
**degree**
13:12 14:19,23
15:5 16:4 23:9
34:20 40:15,17,19
41:1,15,18 43:16
43:18,22 241:12
242:9,10 471:14
472:11 508:23
**degrees**
241:7 245:1
**deliberation**
79:7
**democracy**
544:13
**demonstrate**
468:17,19
**demonstrated**
31:16 518:6 520:23
521:19
**demonstration**
532:13
**Demonstrative**
5:17 6:6,14 10:12
10:14
**dent**
517:21

**Denver**
2:14
**department**
234:10,15 239:4
241:7,14,17 254:1
257:2,3
**departments**
45:2,4 129:20
**department's**
235:8,17
**depend**
122:11 446:8
**dependent**
149:12 201:5
**depending**
106:15 147:5 149:7
**depends**
20:13,24 44:4,16
81:10 89:17,17
117:13 157:1
164:22 245:3
300:16 331:18
342:15 344:7
345:16 360:6
397:3 414:18
432:24 436:15
437:2 446:1,3,5
484:2 493:1
495:24 510:13,21
511:17 512:24
513:1 522:24
523:1,2 544:18,20
544:21 550:3
551:13
**depletion**
539:10
**depo**
227:20
**deponent**
12:13 573:2
**deposing**
571:16
**deposition**
1:13 6:19 11:2 12:8
109:16 119:14
141:18 188:1,9,18

212:3,5 214:12
219:24 220:1
222:2 225:10,19
225:20,24 306:14
313:1 327:24
373:24 569:16,18
570:6,8,9 571:3
571:13,17,19
**depositions**
312:24
**deps@golkow.com**
1:21
**depth**
120:23
**deputy**
555:17
**derive**
478:19
**describe**
39:17 46:20 144:4
311:6,8 402:5
429:19
**described**
30:15 31:9 39:8,14
55:2 97:2
**describes**
16:8 315:24
**describing**
254:4
**description**
5:14 6:5 7:5 8:5 9:5
10:5 155:6 224:24
**descriptions**
239:15 241:4
**deserves**
442:14
**design**
25:16 59:8 64:16
70:23 75:4 89:23
199:14,18 200:9
201:2,5 202:3
246:1 256:20
268:15 269:8
277:10 283:24
286:21 298:15
309:1 342:14,16

354:14,17,19,22
367:22 405:1,3,16
421:22 435:8
464:19 478:20
480:17 507:19
508:5 509:6
510:17 512:4
546:3 552:11
**designation**
251:13
**designed**
322:9 323:10
324:16,18 326:16
328:10,13,14
329:1,16 330:6
347:18
**designer**
274:9
**designs**
199:10 287:8
294:22 309:2
314:20,22 315:6,8
321:13 351:14
352:5 354:10
380:13 404:18
407:8 451:18
532:15 552:16
**detail**
39:21 497:4
**detailed**
100:5 344:19
**detect**
370:8,8 371:9,12
372:7 381:5 384:9
446:9
**determine**
14:15 80:11 89:20
171:14 220:14
266:13 368:15
371:8 444:9
466:10
**determining**
146:9 224:21
308:23 362:5
450:24
**develop**

229:10 236:14
387:17
**developing**
474:6
**development**
201:3 233:21
**deviate**
299:1
**devices**
7:16 73:10 243:7
**devoted**
484:4,20 485:11
**diagnosed**
371:1,3
**diagnosis**
380:16
**diaphragm**
184:20
**dichotomous**
536:18
**die**
49:4 123:17 539:12
**dietary**
343:21
**differ**
355:9 357:3 510:5
528:7 536:21
**differed**
264:6,10
**difference**
30:22 149:5 199:18
224:3 339:5 376:5
376:9,22 377:4
378:13 379:3
421:3,5 443:17
452:15 493:16
496:22 498:11,19
502:4 529:8,14,18
**differences**
443:19 453:11
**different**
15:18 21:21 22:21
24:18,21 25:10
28:24 29:6,8 60:6
60:23 61:4 73:17
105:8 109:3,18

116:15 118:11
121:4 122:7
123:14 125:17
137:3 146:15
149:18 171:5
179:2 186:17
187:2 200:1,1
209:17,17 220:22
220:23 221:8,11
221:12 222:1,19
222:20,21 229:24
231:14 241:19
242:17 263:11,19
263:24 279:14,15
282:15,19 283:23
287:7,11 289:19
300:5 308:22
311:19 325:15
326:6 327:6
331:12 332:12,24
343:22 348:12
351:5,13 352:4,5
353:7 354:9,21
355:12 370:23
390:9 397:5
404:18,21,22
410:11 419:8
422:17 431:9
451:17 452:22
453:13 459:5
465:8 477:1 480:6
480:7 495:20
511:11 518:10
522:12 525:16
528:16 531:7
532:14,15,16
534:14,18 537:6
538:11 539:7
540:19 552:10,15
559:15,17
**differentiate**
288:9
**differently**
147:4,21 209:19
223:8 398:8
**differs**

417:15
**difficult**
137:17 367:22
457:3
**direct**
570:21
**direction**
11:5 41:9
**directly**
95:11 115:20
**directory**
248:13
**disadvantages**
314:21 315:7
**disagree**
28:10 107:14,17,23
113:7 114:17
115:5,7,10 117:11
164:21 165:18
166:3,21 167:1,10
174:11 179:24
180:1,2 199:16
207:13 313:14
318:15 319:3,6
325:21 328:20,21
342:7 345:11
359:21 360:1
361:4 368:20,21
369:1 381:17
424:14 508:16
555:12
**disagreed**
209:2
**disagreeing**
212:17 499:14
**discipline**
9:13 231:14
**disciplines**
60:14 66:18 228:11
**disclose**
191:23 197:24,24
198:5,6,21
**disclosing**
191:7
**disclosure**
7:8 191:11,22

192:5,13 193:20
193:21 195:8
196:24 198:11
**disclosures**
194:16,18
**discrepancies**
323:16 324:4
**discrepancy**
457:4
**discuss**
39:20 203:11 266:1
266:2 498:1
505:23 506:10
**discussed**
21:5 70:11 114:10
129:8 130:12
145:8 297:9,24
298:2 337:4
530:22 533:4
553:4
**discusses**
298:8
**discussing**
98:9 498:4 506:8
**discussion**
100:3 450:6 517:6
536:23
**disease**
6:9 123:7,9 216:10
217:1 218:7
222:21 231:18
233:10 246:11
265:19 367:23
548:10
**diseases**
380:14
**dishonest**
99:17 100:1
**disingenuous**
155:3,8 160:21
164:6,13,24
**dismiss**
331:15
**dismissal**
487:22,23 488:6
**dispensable**

234:2
**dispute**
325:10
**disputing**
257:16
**disrupting**
445:14
**distinct**
228:11 230:18
231:14
**distinction**
72:10
**distinguished**
243:17 250:9
**distortion**
479:14
**distribution**
231:17 233:9
**DISTRICT**
1:1,2
**dive**
388:1
**diverse**
407:7,7
**divide**
478:13
**division**
46:16 129:12,13
236:8,11 237:24
241:14,20 244:18
245:22
**divisions**
45:3,4 129:20
241:19
**division's**
232:12 235:22
**doctor**
21:21 31:4 45:8
58:10 78:17
104:13 108:14
117:10 120:17
162:22 193:12
241:12 242:8,23
245:6 269:16
281:14 290:24
291:4 296:23

307:20 311:3
314:4 325:11
333:23 338:10
346:2 347:5 353:5
358:7 369:19
373:16 374:11,11
378:24 389:20
392:2,3,8 393:18
408:2 409:10
411:3 416:18
419:7 440:9 450:2
458:19 468:15,21
472:9,9 487:15
491:6 503:24
507:12 511:24
542:15
**doctors**
231:12 245:2
**document**
1:8 14:4 38:19
55:18 87:8,22
102:7 104:2 108:8
109:21 125:22
145:17 151:1
155:22 161:18
162:2 166:10
180:16 182:24
187:20 188:11,22
189:1,6,10,13,16
194:15 195:11,13
196:12,22 197:23
198:13 199:2
232:5 237:13
243:2,13 245:13
247:21 250:21
257:17 258:17
275:4 276:24
289:23 306:7
313:20 319:24
337:20 375:11
390:15 394:7
400:23 402:11
425:3 440:22
473:12 483:6
487:8 518:22
532:21 548:16

565:4,5
**documents**
11:8 62:21 63:13
69:11,19 188:13
193:14
**doing**
43:13 51:18 53:14
59:6 88:24 106:11
140:22 187:2
194:10 196:1
199:23,24 211:14
214:20 269:18
279:19 282:21
318:22 328:5
336:14 360:19
361:11 369:13
370:18 394:12,23
398:13 399:10
449:11,14 464:13
479:2 489:21,23
490:1 496:19
497:1,5 554:4
556:23 560:3
571:8
**dose**
137:23,23 526:7
532:10,16 535:6
536:7 539:3
**doses**
536:16
**dose-response**
187:5,7 301:6
516:14,16,20
517:7 518:1,5,9
518:16 519:9,15
520:23 521:5,7,8
521:11,12,14,18
522:6,11 523:4,13
526:5,13,16 530:5
530:16 531:2,8,12
532:8 533:7 535:1
535:19 536:15,20
537:9 538:24
539:17,21 568:7
**dose-responses**
526:19 534:15

538:8,12
**doubt**
527:9
**douching**
516:4
**dozens**
59:19 61:9
**DPM**
2:13
**Dr**
12:14 14:8 59:7
67:9 70:23 74:14
128:5,15 133:2,3
139:5 145:15
156:3 161:4 169:8
171:24 175:4
186:3 188:3
190:11 212:15,18
213:11,22 214:3
233:1 241:11,21
242:12 243:15
257:5 263:14
270:23 271:10
279:19 280:6
302:9 312:5
319:15 320:13
327:12 335:16,17
338:10 339:8,22
340:2,6 341:15,17
341:18 364:11
367:5 368:21
369:2 370:6
386:24 390:21
391:22 430:10
442:5 444:19,19
445:19 446:23
455:10 499:22
504:1 505:8
512:20 513:7
564:8
**draft**
5:22 83:3,9 86:12
87:9 97:16,17,18
101:24 102:3,10
109:24 110:4
115:1 125:21

170:8,11 278:13
338:11 340:6
375:15 492:18,18
**drafted**
191:2
**drafting**
394:13,17
**drank**
500:5
**drastically**
501:4
**draw**
294:12
**drawn**
294:15
**DRINKER**
3:7,11
**drinkers**
343:20 344:4
**drinking**
343:21
**drive**
3:8 344:15
**dropped**
527:18
**Drs**
66:11 186:2 395:3
395:4 487:6
**drugs**
498:10
**Drusin**
241:11
**due**
45:5 110:6 160:12
163:1 165:14
166:2 167:19
168:16 252:23
298:22 305:4
363:19 376:6
377:4 379:4
389:11 405:17
411:3 412:9 521:5
551:2
**duly**
12:23 570:5
**duration**

524:22 526:8,23
535:15
**dust**
130:24 133:7 136:8
137:13 138:8,13
139:6,15 140:1,12
140:14,19 141:6
141:22
**dusting**
139:20 142:11
**D.C**
3:4 4:4

**E**

**E**
5:2,11 6:2 7:2 8:2
9:2 10:2 281:5,5
572:1
**eager**
563:6
**earlier**
106:17,20 397:2
532:5
**early**
332:5 334:18 344:5
387:9
**easier**
457:8
**easily**
74:22
**EASTERN**
1:2
**easy**
375:10 455:15
**economics**
40:20
**editor**
555:17
**editorial**
369:3 419:14 473:9
**effect**
98:19 99:14 100:12
107:8,23 108:5,23
114:5 115:22
116:2,9 152:10
266:14 315:14

344:11,15,17
376:16 401:14,17
401:21 443:14
522:17,18,20,21
534:13 545:1,2
550:23 551:21
**effects**
298:22 487:23
488:7 551:1
**Efficacy**
8:11
**efficient**
380:13
**effort**
72:13
**efforts**
493:24
**eight**
269:24
**either**
64:16 75:12 138:4
139:24 259:14
268:18 270:2
299:22 320:23
334:10 378:15
412:22 429:11
486:14 506:18
515:2 530:19
534:4
**element**
31:6
**elements**
29:14 478:22
**eliminate**
304:13
**eliminates**
295:4
**ELLIS**
3:17
**emphasis**
15:19 421:17
**emphasize**
407:5
**emphasizes**
480:16
**employed**

145:9 220:7
**employer**
253:1
**encompasses**
195:6 479:1
**encourage**
33:1
**endeavor**
279:13
**endometriosis**
401:17
**endorsed**
493:6
**ends**
255:7
**engage**
64:7
**engagement**
196:18 198:21
**England**
147:12,22
**English**
147:20
**enormous**
478:10
**enrolled**
332:17 371:22
**enrollment**
330:9
**ensure**
479:7
**entire**
108:8 143:16
150:13,18 169:21
312:8,9 316:6,23
318:5 319:10,11
322:18 328:22
484:5 485:10
**entirely**
212:24 334:15
**entirety**
117:7 497:10
502:17 503:2
**entities**
3:15
**entitled**

91:21 156:14 320:4
**entry**
386:5,10
**Environment**
6:9
**epi**
228:17 229:6
**epidemiologic**
8:21 14:10 15:12
16:23 19:7 37:3
55:2 56:5 57:3
91:22 93:15
182:19 223:19,24
236:14 286:6
395:15,17
**epidemiological**
35:24 37:13 92:7
223:23 291:8
347:22
**epidemiologist**
65:20 66:3,7 120:6
120:12 149:13,21
176:1 230:2,11,13
253:23,24 254:15
254:20 255:4,24
256:13 334:24
393:8,11 398:8
**epidemiologists**
20:5,8 22:17 25:21
122:5 128:5 146:9
149:10 153:19
199:16 247:13,16
287:10 388:23
392:6 393:7
399:18 406:21
491:13
**epidemiology**
7:10,13 8:9 9:10,13
9:21 14:22 15:1
17:17 19:22 21:3
21:15 23:7 35:8
38:7 39:8 40:16
41:16,19,23 43:5
43:9,12,17,21
44:21,24 45:5
46:17 54:22 59:22

65:21 82:13 107:1
117:10 118:9
120:17 121:2,3
128:17 137:9,19
146:3 173:2,19
184:4 199:7,8,13
199:15 200:15
201:2,4,17 208:6
218:15 220:17
221:20 228:6,8,14
228:24 229:3,9
231:1,7,11,13,15
231:16 232:14,18
232:22 233:5,8
234:9 236:2,7,9
237:20,23 239:2
239:20 240:3,19
241:8,12,22,24
242:9,11,13,18
244:19 245:23
246:4 249:9,12
256:8 257:4 259:3
259:21 260:8,10
260:14,16,17
261:21 262:2
283:20 289:24
296:3,10 304:9
305:16 308:16
311:23 312:6
320:14,19 326:12
329:4 335:13
342:12 343:5
363:20 382:20
392:17 395:11
397:21 519:8
560:6
**Epidermal**
8:12
**equal**
479:11
**equally**
497:18
**equation**
122:1
**equivalent**
85:5

**equivalently**
493:18
**eradicating**
495:12,18 496:18
496:20
**errata**
571:6,9,12,15
573:12
**error**
186:20 344:14
405:17 443:19
**errors**
185:2,10 186:21
493:23
**Eslick**
93:18
**especially**
448:18 512:18
552:14
**ESQ**
2:3,8,13 3:3,7,12
3:17 4:3,9
**essential**
380:15 480:15
**essentially**
105:5,13 106:9,24
110:2 150:23
258:15 311:21
548:10
**establish**
266:4,7 267:18
517:1 521:7 532:8
**established**
19:23 21:15 23:7
37:12 80:9 81:12
208:5 220:17
221:19 266:19
288:10 297:9,23
389:8 391:7 397:2
519:21 560:5
565:8
**establishing**
423:12 519:9 521:9
**estimate**
32:9 386:14 429:10
429:14 430:17,21

431:3,21 468:24
472:23 497:21
498:2,17 500:15
501:2,14 503:7
505:19,24 507:21
**estimated**
417:17 509:9
**estimates**
298:24 315:14
344:16 352:16
376:16 407:6
417:10 429:13
436:21 443:14
458:7 467:2
471:17 472:14,19
529:16,22 536:24
**et**
288:17 457:7
**ethnicity**
514:4
**European**
90:20
**evaluate**
97:8 146:20 169:4
216:13 220:23
263:5,13 264:13
397:23
**evaluating**
37:14 382:19
424:13
**evaluation**
51:9 268:16 410:7
442:19
**everybody**
362:24
**everyday**
130:3,24
**evidence**
14:14 15:7,9,10
16:11,24 17:14,21
17:22,24 18:1,7,8
18:18,19 19:1,1,3
19:7,10,13,15,20
19:20 20:21 21:7
21:17 23:5,9,15
26:2,4 27:8 34:9

34:18,24 35:12
36:6 37:2,4,16
38:3,11 50:17
67:18 81:2,19
83:4,12 108:22
113:5 116:4 118:1
118:2 121:14
123:20 126:13,17
126:22 127:1
131:5 132:8,19,20
133:14 142:20,21
144:11,16,17,19
149:11 152:19,24
153:14,16,22
160:22 164:7,14
165:1,8 168:6,9
171:13 172:4,23
207:17 208:5,8
209:18,18 210:12
216:14 218:16
220:16,23 222:7
222:19 223:10
265:18 266:12
283:3,16,17,23
284:13,18 285:3,9
285:17,21 286:2
286:18,20,22
287:9 289:1,10,12
292:13 295:3
296:20 297:17
298:9 299:5,7,21
300:2,24 301:8,18
302:11 303:5
304:10 305:5
306:21 307:22
308:13,14,23
309:3 311:7 319:1
321:23 325:24
326:10 329:3,12
343:7 347:8 348:5
348:7 363:21
366:7 377:14
388:2 399:12
401:7 402:2 417:1
422:8,23 425:15
425:16 439:14

453:9 464:15
496:24 497:3,5
518:12 520:7
523:12 531:23
532:9 535:9 537:8
543:17 546:16
550:23 551:20
553:3,7 556:13
558:12 561:23
565:23
**evidence-based**
395:17
**evident**
534:24
**evidentiary**
284:8 305:17
**exact**
105:12 109:12
115:16 511:3,5,11
**exactly**
84:15 100:2 113:17
117:2 160:1 216:1
230:7 303:16
321:24 363:13
370:11 384:22,24
386:18 402:23
414:4,12 431:10
436:4 489:24
509:24 510:11,12
510:17 537:12
552:20
**EXAMINATION**
13:2 281:11 564:11
566:20
**examined**
12:24
**examining**
380:13
**example**
92:19 149:14
221:16 224:13
316:4,21,21
329:14 343:10
494:12 498:5
499:9,10 501:16
509:23 545:8

**examples**
396:20
**excellent**
328:12
**exception**
428:4 429:6 433:10
**exceptions**
158:14 421:21
431:24
**excerpt**
5:18 6:7 9:18 117:6
**exchange**
192:1
**excuse**
68:3 100:18 192:14
279:7 284:17
296:24 508:8
**Excused**
569:17
**executive**
261:15
**exercise**
531:5
**exhibit**
14:3,5 38:20,24
39:9,13,15 55:17
55:19,22 87:8,23
91:16 97:20 101:6
101:20 103:7
104:1,3,14 113:6
142:24 145:15,18
150:7 155:23
161:19,22 166:12
177:2,11 180:14
180:17 181:7,19
181:24 182:3,5,6
182:7,8 187:18,21
188:21,23 189:2
189:11,14,17,23
194:15 199:3
203:16 232:4,4,6
242:24 243:3
245:14,17 247:19
247:20,22 250:22
252:1,6 257:13,18
258:1 277:1

284:20 293:3,13
294:13 306:6,8
313:19,21 314:1,7
319:18 320:1
336:17 337:9,21
337:24 375:12
390:1,16 394:8
400:24 404:11
425:4 440:19,23
446:22 447:2
483:7 487:9 495:7
504:1,1 513:8
518:16,20,23
519:11 520:18,19
530:10,11,12,14
530:15 532:20,22
533:5,14 534:1,2
548:17 549:3
558:9,17,23 559:4
564:15,21
**exhibited**
518:10 522:12
**exhibits**
162:11 336:15
**exist**
396:7,14 512:18
**existed**
461:14
**exists**
216:14 466:8
**expect**
61:23 106:12 107:4
510:8 526:18
528:1 534:9
559:10
**expecting**
425:9
**experience**
35:5,11 38:9 41:18
43:11 53:23 54:1
54:21 58:2 120:7
182:17,23 183:3
183:13 194:19
230:15 279:14
280:5 292:11
561:18

**experiments**
18:1,3 135:6
**expert**
5:15 8:14 9:18
10:13,15 13:16,19
13:22,24 16:15
17:17 21:12,23
49:3 70:19 71:16
110:24 112:21,24
114:13,15 128:15
151:4,8,11 152:1
152:8 154:18
170:20,21 171:1,5
173:12 174:6
177:2,11 178:6,18
179:8,15 180:21
181:3,8,20 183:4
184:4,12,17,23
185:3,23 191:8,23
193:24 194:10
197:8,11 204:6,14
209:23 213:21
215:11 222:3
245:24 246:9
338:22 365:4,7
394:17 424:1
**expertise**
14:21 35:11 38:10
62:13 63:22 70:7
205:2 207:8
243:20 249:1
279:15 465:24
**experts**
64:7 67:17 79:15
85:15,16 117:10
117:15,17 118:9
121:2 155:1 173:2
173:6,10 176:11
176:20 177:1,6,8
177:22 178:5,8,13
178:17,20 179:4,7
179:10,12,19
206:7,7,11,13,19
206:20 207:5,6,6
207:19 208:24
209:21 210:10

213:3 284:5,11
358:10,23 359:5
359:12 360:10
361:3 362:12
363:7 364:1
365:24 366:2,13
372:14 374:20
379:9,11 381:13
384:3 387:1,2
407:1,3,4,17,21
411:15 415:1
416:2 424:2,3
466:23 467:1
468:23 471:15
472:12 569:7
**expires**
573:21
**explain**
144:7 198:3 223:7
420:10 443:9
446:6 514:11,20
515:11
**explained**
203:19 223:6
323:18 324:6
522:8 534:6
**explaining**
43:10 521:3
**explains**
196:23
**explanation**
134:24 135:14
476:21,22
**explicit**
301:2
**expose**
546:5,15
**exposed**
386:9
**exposure**
35:2 37:18 38:4
98:17 99:12
100:10 116:6
121:17 126:16
131:7 134:20
153:24 216:15

280:10 297:15
308:21 316:6,9,23
317:2 318:5,8,10
330:10 332:18
334:2 341:20
343:12,14 344:12
351:16 354:12
376:7 377:6 381:6
386:4,13 388:14
399:14 453:1
466:12 526:2
528:18 565:14,16
566:1
**exposures**
380:16
**express**
49:6
**expressed**
48:14 49:23 155:2
398:18
**expression**
139:11
**extensive**
35:7 38:6 41:18
43:11
**extent**
35:9 38:8 424:20
456:18 457:1
**external**
478:21
**extra**
152:9 427:19
**extraordinary**
460:9
**extremely**
53:23
**e-mail**
7:7 190:9 191:1,7
191:10,14,18,24
192:12 248:19
251:3

---
**F**
**F**
4:3 197:10,10
281:5

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 164 of 463 PageID: 38401
Karla Ballman, Ph.D.

Page 592

**Faces**
9:10 395:11
**facial**
139:11
**fact**
16:14 40:14 43:23
45:2 73:8 117:15
168:7 222:19
231:22 260:19,19
269:23 270:20
305:4 334:18
335:8 352:15
355:11 376:22
419:6,9 436:19
501:20 510:15
519:14 521:6
534:8 550:24
562:12
**factor**
8:12 134:19 156:20
156:22 157:5,6
308:23 351:11
450:5 451:1
555:19
**factors**
96:20 97:1 157:3
160:17 163:6
262:24 263:6,13
263:24 264:10,14
308:17 401:7
478:18 513:1
514:5 565:9
**facts**
296:10
**fail**
571:18
**failure**
495:22 496:23
**fair**
50:7 52:22 112:16
146:2 148:12
160:13 163:2
191:20 199:8
207:21 211:5
214:7,23 215:10
225:7 255:17

323:5 361:6 402:2
430:10
**fairly**
19:23 146:13
320:21
**fake**
393:15
**fall**
405:3,4 512:13
**fallacious**
442:20
**fallacy**
405:17
**fallopian**
9:16 400:20 401:8
564:23
**false**
103:18 478:13
498:19
**falsely**
455:17 457:9
**familiar**
84:5 92:12 94:4
**family**
138:6,7,12 139:3,4
514:4
**famous**
392:6
**far**
73:6 162:11 267:11
490:8 492:16
542:13
**fashion**
58:21 64:15
**fast**
427:4
**favor**
457:5 458:23
**FDA**
44:11,13 45:14
46:5,14 76:12,16
85:5 124:19
125:20 127:12
184:10 190:12
191:8,12,22
193:15,19 194:16

195:8 196:20,21
243:18
**feasibility**
368:2
**February**
122:20 181:8,13
**FedEx**
549:9
**feel**
40:20 45:17 105:24
122:22,23 123:1
126:20 142:1
192:18 197:7
312:15 319:11
322:17,19 323:1
327:24 328:5
350:10 441:24
**feeling**
482:4
**feels**
84:14 242:5,8
378:19
**fellow**
250:3,7 251:14
252:15,18,19,21
253:5,10
**fellowships**
250:19
**Fellows/Nominat...**
8:6
**felt**
195:7 349:15
**fibrillation**
498:9
**field**
61:5 121:2 128:16
146:3 173:18
206:20 229:3
233:24 270:14
397:18 482:21
483:2 491:9 493:1
**fields**
228:10 230:18
233:19 236:15
397:22
**figure**

19:9 74:10 286:19
289:20 290:9
296:1 390:7
**filed**
188:9 198:15
**filibuster**
118:20 120:1
208:19 470:7
**filibustering**
118:23 120:3
**final**
359:4 366:1 560:23
**finalized**
84:4,17
**Finally**
386:4
**find**
28:15,18 132:19
159:24 194:17
296:19 302:21
325:8 353:12
370:16 385:14
434:1 446:16,19
447:24 448:22
449:3 520:3 522:2
531:17 542:21
543:20 558:17
**finding**
186:20 398:21
479:13 516:21
**findings**
395:17 397:12,18
**fine**
36:19 42:18,20
78:2,6 102:23
103:4,6,20 111:20
113:16 148:8
176:24 204:21
209:10,14 252:7
255:10 330:17,21
341:19 369:14
439:24 456:8
485:21 536:9
538:1 553:24
554:2 568:22
**finish**

78:14 90:9 100:20
102:22 103:1
118:13 119:6,10
119:20 140:8
240:14 281:15
309:13,18 333:13
355:7 407:23
410:22 411:24
412:5,18 439:5
446:7 496:15
563:4
**finished**
309:12 351:24
**firm**
197:4
**firms**
198:1
**firms/issues**
194:3 197:13
**firm/issue**
195:17
**first**
12:23 26:22 30:2
34:8 40:22 44:22
47:10,11 49:11
50:12 51:8,11
52:13 55:2,11
110:11 137:17
146:21 151:3,7,12
165:16,22 166:5,7
172:10 185:18
191:10 193:21
194:23 195:19
252:1 268:18
269:3 270:2,15
278:12 286:16
292:14 296:23
297:21 313:1
314:17 315:1,1,12
318:23 322:4,4
324:1 327:15
330:15 368:23
379:17 388:10
391:22 392:19
393:2 395:9 406:7
416:8,12,15 417:3

418:1,4,9,10,15
442:3,24 456:21
459:6 490:15,19
490:21 491:7
499:1 500:11
516:18 519:2
525:24 526:3
530:18 531:19
535:11 538:7
547:23
**five**
101:4 137:9,18
144:13,14 240:6
285:23 311:7
355:23 511:2,10
528:1 552:18
553:13,19 567:14
569:3
**fix**
336:10 402:24
**fixed**
397:24
**flags**
523:18
**flat**
284:12 528:7
534:12 540:7
**flaw**
209:16,20 284:4
363:11 556:21
**flawed**
271:5,6,8 473:5
**flaws**
186:1 213:2 215:1
363:16 382:7
**flip**
502:24
**Florham**
3:8
**Florida**
2:5
**FLW**
1:6
**fly**
318:18
**focus**

30:11 200:16 442:2
488:15
**focused**
202:2
**focusing**
25:10 448:5
**folks**
382:10
**follow**
296:23
**followed**
40:20 321:15
380:24 382:18
**following**
38:1 98:12 99:7
159:19 194:3
197:13 379:1
422:7
**follows**
12:24 452:19
**follow-up**
46:1 202:16 380:23
381:4 386:7
387:15
**food**
271:16 276:2
**footnote**
567:5,6
**footnotes**
566:24
**foregoing**
570:18 573:6
**Forest**
2:13 423:20,22
425:9
**forget**
159:5
**forgive**
201:21
**forgotten**
463:7
**form**
50:6 170:8 191:11
191:22 192:5
193:15 197:10,15
198:10,10,11,15

198:18 345:2,7
365:16 573:10
**formal**
40:15 41:15,17
43:21 48:5 50:2,6
50:21
**formula**
283:1
**forth**
186:24 192:1
201:13 325:9
435:16 465:7
492:12 510:23
**forward**
115:12 258:22
558:5
**found**
23:18 24:1,6 26:3,8
27:17,20 29:9
70:19,22 71:15
170:9 274:18
302:14 303:15,17
305:4,11 371:17
452:21 542:17,19
543:23 544:3
551:18 558:10
568:8
**foundations**
21:11
**founder**
320:14,18
**four**
1:14 12:9 22:11
144:13 240:5
259:17,18 427:9
427:12,14 510:6
552:18 558:21
566:24
**fourfold**
25:5 398:18 410:10
**fourth**
243:15
**frame**
106:15
**frames**
146:19

**framework**
17:1,2 18:10,13,15
22:20 31:7 85:19
96:18 97:12 134:6
146:8 150:1,2,3
208:6 209:3
221:15,17 222:24
268:12 282:8,21
283:3 479:2
**France**
147:7
**free**
192:18 322:19
323:1 441:24
**frequency**
524:24 526:12,23
535:14,23
**front**
143:4 161:17
203:13 225:4
314:2 425:17
473:13
**frustrated**
120:10
**full**
45:19,23 136:5
140:11 142:3
294:18 297:22
305:15,24 307:21
308:13 378:3
**fully**
144:3,7
**full-blown**
267:10
**funding**
75:23
**funds**
253:12 400:9
**further**
98:18 99:13 100:11
107:6 203:11
266:5 564:6 566:9
**furthermore**
434:22
**future**
523:10

**G**

**Gami**
276:19
**Gary**
389:17,20 395:12
**Gates**
360:5 380:24
**gather**
122:22 316:5,22
318:4
**gee**
129:23
**general**
15:13,16,22,24
16:16 19:6 20:14
21:1,6 70:9
121:22 122:5
138:4 150:7 157:5
172:4 174:10,15
176:14 203:14
207:22 213:10
216:24 217:15,17
217:24 218:3,5
219:14 220:12
221:15 222:24
286:6 291:15,20
296:9 299:3,8
304:2 335:11
342:11 343:5
345:13 349:2,3
361:21 382:18
387:6,6 396:7,15
409:10,18 410:4
411:11 413:2,5,6
414:21 427:20
436:20 445:23
517:6 519:7
528:18 542:24
546:13
**generalities**
218:13
**generally**
32:4 33:11 218:18
282:17 283:17
292:11 296:2
304:7 326:11

334:17 363:19
479:10
**generated**
63:14
**generating**
143:20 554:12
555:2,3,8 556:12
**generation**
154:13
**genital**
38:4 116:6 126:15
153:23
**geographic**
149:12
**geographically**
147:18
**geologist**
40:12
**Gerber**
241:21
**GEREL**
4:8
**Gertig**
360:4 381:1
**gestalt**
411:12 413:11
414:8
**getting**
191:5 237:11
257:11 261:1
305:22 342:20
352:5 502:1 515:6
525:23 555:5
**give**
23:1 31:11 45:19
45:23 52:7 59:7
64:21 70:24 71:9
83:19,20 91:8
120:11 136:2,19
137:2 139:7
143:22,23 206:3,4
213:9 217:12
229:23 282:1
287:6 296:16
307:7 312:11,12
313:17 314:1

317:7 319:12
327:21 328:1
358:12 359:15
361:5 362:23
378:3,20,21
390:20 409:16,22
410:7 411:11
412:14 415:9,14
415:15,16 441:2
460:2 483:15
488:11 494:13
501:17 504:3,13
520:1 564:3,3
**given**
47:13 54:8 160:18
211:3 254:6 292:3
319:8 347:11
362:18 431:20
497:19 498:9
531:16,18,21
554:21 570:6
573:8
**gives**
316:20 343:10
**giving**
144:12 218:11
224:10 339:12,14
415:3,23
**glad**
120:15 390:23
**glance**
92:10 488:17,19
**glanced**
109:9,20
**go**
18:12 28:9 33:4
39:17 46:11 80:23
80:24,24 87:4
89:4,7 91:13
94:12 97:13 99:23
100:1 104:1 108:7
142:24 146:9
152:15 159:3
168:7 179:23
187:13 188:15
192:23 193:1

196:6 203:11
207:2 210:2
211:23 212:7
213:6,8 227:21
228:1 237:12
243:22 244:2
248:14 252:9
258:7 265:22
266:5 269:24
270:7 278:13
280:9 286:16
296:12 298:1,17
299:17 301:4
309:7 315:24
322:13 323:6
324:13 325:22
332:11 343:10
348:6 365:6,13
370:10 371:11
376:3 387:4 389:6
401:6 403:24
405:10,20 406:24
407:19 410:6
430:12 444:6
446:22 447:2
450:13 453:17,18
454:1 455:9
458:10 467:7
469:21 471:2,6,11
473:7,22 475:18
478:16 486:15
488:21 489:8,17
490:4 497:7,12
498:24 499:21
503:24 506:4
512:11 513:7
515:24 516:5
518:3 520:17,17
520:18 522:1
530:9 531:5,14
549:16 553:22
563:24 568:5
**God**
386:1
**goes**
19:7 237:17 238:8

280:20 310:20
324:15 325:3
397:17 441:18
443:11 454:18
479:4 501:17
524:17 527:13
534:10 535:22,24
566:5
**going**
17:10 27:15 32:13
32:14 38:16,23
39:4 41:9,11
42:10,11,13,15,21
45:8,9,9 55:15
66:15 68:14,17
87:7 90:6,12
101:6,8,11,15,17
101:20,21 104:13
110:10 111:4
113:21 118:6,15
118:19,20 119:10
119:24 121:23
134:3,7 140:8
141:2 143:1
153:20 155:5
156:2 159:19
161:3,6 162:5,13
169:11 171:3,22
180:8,9,13 187:19
187:24 188:14,16
188:20 189:22
190:10,21 199:1
202:13,18 205:8
205:12 211:7,8,13
212:4 215:2 216:1
222:14 235:3
237:1 242:23
247:18 251:1
255:9 258:21
266:21 276:5
277:4 281:20
282:3 290:6,7,17
292:8 293:7 296:1
296:21 298:1
306:14 309:16
310:16 312:4

313:18 314:1
316:13 318:19
319:14 322:16
323:13 325:17
333:7,14,15
336:21 338:9
340:13,14 352:22
355:16 357:21
381:24 388:5
390:20 391:12,12
405:9 409:1,14
413:20 416:7
419:10,21 420:19
421:18 424:16,22
424:24 427:22,23
429:15 433:7,21
440:16 442:2
443:9 448:8,9
460:4 468:4
470:19 473:23
485:5 486:11
488:15 490:4
497:2,5,9 504:3
506:13 516:15
517:19 518:19
519:11,12 520:2
523:9,14,15,20
524:3 527:17
534:18 539:13
546:14 550:10
568:19
**Golkow**
1:20 12:5
**Gonzales**
360:5 380:18 381:1
**Gonzalez**
429:6 432:1 433:11
504:22,23 515:19
**good**
13:5,6 36:21 78:18
90:7 111:6,6
120:14 123:16
149:20 151:23
276:6 280:22
300:3 337:18
357:6 382:20

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 167 of 463 PageID: 38404
Karla Ballman, Ph.D.

Page 595

422:4 438:17
480:14,16,17
485:6,8 550:1
554:12,13 555:1,4
556:11
**goofed**
504:12
**gotten**
336:11 407:13
**government**
400:8
**grade**
123:15 144:11,16
144:19 145:2
**gradient**
96:9 97:5 517:17
**grant**
46:23 254:5,11,11
**grants**
46:20 253:20
**graphical**
480:19
**Gray**
1:15 570:12
**great**
275:10 276:9 516:3
**greater**
32:5 33:12 420:20
428:5,15 429:5
432:4 504:23
507:21 508:2
524:2,18 530:2
**greatest**
309:2 321:14
**great]er**
428:22
**green**
504:16 554:21
**Greenland**
392:14 395:4 475:3
475:10 487:6,20
492:2,7 505:8
**group**
129:16 277:11
278:6 349:23
367:1,2 511:2

**groups**
544:7
**Growth**
8:12
**guess**
176:5 180:2 486:14
550:5
**guide**
328:16
**guideline**
265:20 283:4
**guidelines**
282:7
**guiding**
21:11,22
**guilty**
27:4
**guy**
190:6 392:15
**guys**
374:8
**Gynecologic**
156:10,13
**gynecologist**
39:23 40:1 131:9
131:11 133:21
**gynecology**
129:13,17,17,18

───────────
**H**
───────────
**H**
5:11 6:2 7:2 8:2 9:2
10:2
**habits**
344:1
**habitual**
334:19
**half**
26:5,7 32:6 33:13
140:4,4 328:5
**halt**
495:13,19 496:21
**hand**
31:19,20 53:15
145:3 277:4
314:10 431:4

440:16 519:11
**handed**
243:13 499:15
**handful**
421:21
**handy**
558:24
**happen**
57:22 122:8 149:8
331:16 511:2,15
529:17 563:10,13
**happened**
143:20 449:8,9
463:6,14
**happening**
484:17 547:12
**happens**
277:20 554:3,3
**happy**
119:22 162:16
212:8 227:19
294:11 312:16
317:16 321:3
328:7 336:19
358:21 391:3
430:5 469:12
488:11,14,18
**hard**
138:24 139:17
205:20 255:6,15
388:12,18,19
393:24 509:2
528:21 529:3
534:12
**harder**
265:21
**harmful**
546:16,19
**Hartge**
428:4,6 432:2
**Harvard**
55:5
**hate**
429:22
**hazard**
160:19 204:24

205:8 371:12
372:7
**head**
87:3 183:19 184:2
186:6 187:17
254:13 305:14
306:23 360:14,18
366:18 374:22
438:21 439:2
470:13 522:1
538:2 554:4
563:19
**health**
6:6 82:11,21 83:8
84:22,22 85:3,20
86:9,11 87:10
101:17,23 103:8
103:18 104:14
110:11 113:7
114:2 116:11
123:22 124:6,8,20
125:22 126:10,12
126:19 127:9
149:16 170:7,11
170:16 171:24
189:6 229:5
233:21 234:2
236:16 242:15
243:8 557:19
558:15 559:4
565:2 569:6
**health-related**
233:19
**hear**
256:7 345:5 430:12
**heard**
66:7 130:18 177:21
179:2 369:20
412:11 459:6
460:18,21,22
461:19 462:3
491:10 539:9
**hearing**
16:17 128:9,12
176:6 215:20
226:10,13

**hearings**
128:1 203:15,23
205:11 206:2
**heavily**
303:24 304:1
**hedging**
496:2
**height**
402:1,3
**held**
1:14 12:9 128:1
252:24
**help**
70:23 72:5 73:21
74:14 75:4 77:5
364:15 470:18
495:13,19 496:20
**helps**
319:13
**hem/onc**
129:19
**Henry**
4:14 12:3
**Herceptin**
278:1
**Herman**
457:7
**HER2**
278:2
**heterogeneity**
355:14
**Hey**
75:3
**hi**
212:23
**hierarchy**
19:6 20:21 23:14
321:12
**high**
123:12,15 157:2,19
157:22 158:4
272:2,4,7,10
273:11,17 512:7
555:18 561:13
**higher**
19:14 21:7 22:7,22

23:9 25:6 157:6
284:7,13 289:10
292:12 295:2
296:20 299:5,7,21
300:2,24 301:8,18
303:4,9 329:12
343:7 348:7
363:21 437:12
520:7 539:3
**highest**
19:10
**highlight**
504:4 507:8
**highlighted**
161:23 508:7,8
519:12 531:11
**highlighting**
390:22 391:1
**highlights**
183:1
**high-impact**
483:1
**Hill**
6:10 17:2 18:10,13
18:15 29:14,24
31:5 83:4,13
85:18 86:2 95:1,7
95:10,22 96:3,7
96:10,21 97:2,10
98:9,10,22 99:6,7
100:7 105:23
108:17 116:16
134:2,6 145:10
146:24 147:1,3,7
149:18 150:1
153:18 183:17
202:21 203:6
206:23 221:16,22
223:12 224:20
265:19 266:21
267:10,23 268:5,9
268:11 281:20
282:4,18,21 283:2
283:9,11 300:2,21
350:22 361:22
403:12 404:12

414:15 441:4,10
441:11,14 450:8
465:13,16,17,21
466:9 479:2
516:19,23 519:16
556:7,20,23 557:5
557:13
**Hill's**
40:19 145:15
516:17
**hire**
67:17
**history**
514:4 547:21
**hold**
43:5 531:18
**home**
486:15
**honest**
120:11
**honestly**
118:5 139:23
236:17 257:22
269:17 312:22
370:17 471:5
**honor**
251:15
**hope**
449:11 552:22
**hormone**
401:22
**hospital**
93:3 426:24 428:3
**hospital-based**
56:19,21 92:24
351:21 352:1
354:18 426:7
435:7 543:19
**hotel**
192:9
**Houghton**
360:5 380:22
433:11
**hour**
90:6 276:5
**hours**

112:14 463:13,19
492:21
**House**
127:24 128:18
**huh**
393:15
**human**
8:12 17:23 91:22
92:7 93:12 98:13
99:8 231:19
233:11
**humans**
80:12
**Huncharek**
66:11 93:16 184:7
186:2,15 523:21
**hundreds**
73:9
**hurting**
439:3
**hyped**
487:22 488:6
**hypertension**
236:15
**hypothesis**
15:8 16:11 25:23
342:17 399:6,8
476:9,16 477:4,5
477:7,17,19,22
497:1 546:5,22
554:12 555:1,3,8
556:12
**hypothesize**
435:19
**hypothesized**
518:11 547:15
**hypothesizing**
496:6,8,15,17
**hypothetical**
136:2,22 137:3
138:16 139:13
141:2,17 330:5
433:22 434:10
436:3 437:3
476:21
**hypotheticals**

434:11 436:2

---

**I**

**IARC**
76:21 77:7,14,17
77:18 79:6,9,11
79:14 80:8 81:16
81:19 124:19
125:18 174:3,6
175:8
**idea**
72:22 107:11
110:14 133:16
183:18 252:16
320:17 336:1
420:8 421:24
431:19,20 512:17
524:7 548:8
563:17
**identical**
443:15
**identification**
14:5 38:20 55:19
87:23 104:3
145:18 155:23
161:19 180:17
187:21 188:23
189:2,11,14,17
199:3 232:6 243:3
245:14 247:22
250:22 257:18
277:1 306:8
313:21 320:1
337:21 375:12
390:16 394:8
400:24 425:4
440:23 483:7
487:9 518:23
532:22 548:17
**identified**
13:15 185:10 186:4
209:20 212:16
248:23 253:22
278:16 284:4
337:6 364:3,6,8
372:14 374:18

375:21 381:18
426:6
**identifies**
401:7
**identify**
245:1,18 253:20
308:17 364:24
365:5,9 368:17
378:12 381:14
403:10
**illness**
234:3
**illustrates**
235:1 286:20
**illustration**
287:4
**imagine**
139:14,23 140:1
141:11
**immediately**
478:12
**imminently**
111:8
**immune**
316:2,15
**impact**
146:16 156:19,22
157:2,4,6,10,14
157:19,21,22
158:4,7,15,21
159:1 272:3,4,7
272:10 273:12,17
555:18
**imperative**
571:14
**implementing**
442:13
**implied**
299:10,11,13
479:13 521:10
**imply**
234:18,19 279:12
**implying**
455:17 457:10
**importance**
157:24 462:10

**important**
88:5 123:22 124:6
124:8 126:5,7,10
126:12 128:19
135:2,5 146:13
179:22 205:7
274:1 349:10
411:5 432:21
447:16 450:5
456:14,23 462:6
464:20 482:20
484:1 486:7
519:21 532:1
533:6,8 557:7
**importantly**
33:18
**impose**
465:8
**impossible**
148:10 324:22
**improper**
295:19 471:16
472:13
**improve**
233:22
**improving**
234:2
**inadequate**
551:2
**inappropriate**
556:5
**Incidence**
275:19
**include**
56:15,19 92:14
142:15 455:3
507:4 540:5,12
**included**
56:9 287:5 380:22
384:7,15,15
**includes**
93:6 260:14 493:19
506:16,17 532:13
541:10
**including**
76:19 233:20

335:18 338:18
454:3 478:20
532:15 560:7
**incomplete**
310:13
**inconsistency**
26:18 31:2 350:11
352:7 417:1,8,16
422:9,16 439:14
447:24 450:22
451:17
**inconsistent**
23:21 24:13,23
28:1,13,21 29:3
29:21 30:10,16
31:3,9 352:9
354:4,5 423:1,8
437:1 442:16
444:22 445:21
447:23 566:7
**incorporate**
110:4
**incorrect**
283:10 355:17
472:21 479:8
552:12
**incorrectly**
195:12
**increase**
131:1 402:4 498:13
540:16
**increased**
135:1 137:10 401:8
498:8 508:12
514:11 536:7
566:1
**increases**
134:17
**increasing**
130:5 286:18,21
522:21 526:7,8,9
532:10,10 535:6,6
535:7 553:3
**incredible**
44:20
**incurred**

112:9
**independent**
107:3 341:18 397:5
465:24,24
**index**
11:2 480:8 481:3,7
481:8
**indicate**
98:14 99:10 193:16
197:7 407:9 408:7
408:14,18 410:5
529:17
**indicated**
420:2 484:4 519:14
561:1
**indicates**
516:24
**indicating**
102:13
**indication**
409:22 415:4
455:18 457:10
492:24
**indicative**
98:18 99:14 100:11
107:7,22 108:4,22
114:5 115:22
116:1
**individual**
259:6 264:10
277:20 328:22,23
329:1 331:19,22
342:10 348:8,9
397:19 541:16
557:8 562:15
**individuals**
44:16 392:5 475:9
**industry**
77:5 335:18 338:17
**Infarction**
275:20
**infer**
420:15,18 421:11
536:15,19
**inference**
9:23 536:9 559:23

**inferences**
478:6,19
**inflammation**
160:18 163:7
**informal**
59:8
**information**
89:5,8,11 144:1
196:17 248:20
261:1 302:13
305:23 316:5,12
316:22 318:4
319:8 322:14
343:12 344:19
558:4
**inherent**
331:2
**inhibitor**
218:18
**initial**
343:15 519:20
**initially**
191:21
**innocence**
27:4
**inquiry**
405:18
**inside**
497:17,17 507:9
**insignificant**
26:13 28:2 31:19
353:14
**instance**
19:12 302:14
325:14 387:7
**instances**
302:15,22 305:10
389:7,10
**Institute**
9:15 127:15 399:22
400:1,7,11,19
564:18 565:7
**institution**
76:2
**INSTRUCTIONS**
571:1

**instrument**
526:1,3 535:10
**integral**
275:13
**integrate**
89:12
**intend**
172:6,16 176:12
**intent**
548:1 552:2,24
**interest**
40:18 41:6 79:19
122:12
**interested**
109:17
**interesting**
463:3
**interim**
463:10
**intermediate**
160:17 163:6
**International**
77:20 79:3
**internet**
170:9
**interpret**
58:1 406:22 528:22
529:4
**interpretation**
8:21 269:10 361:5
447:17 480:21
**interpreted**
470:23 479:10
**Interpreting**
498:16
**interrupt**
42:9,13 58:6
210:20 211:17
326:23 445:8
529:2
**interrupted**
211:2 333:1,10
375:23
**interrupting**
43:1 138:10 158:18
337:19 377:24

485:20
**interruption**
301:11 429:24
**interruptions**
22:13
**intertwine**
256:8
**interval**
420:15,22 421:6,13
429:21 430:22
431:7,8,21 453:20
454:16 472:24
493:19 497:18
498:3,4 501:8,11
501:15,17 502:1
502:17 503:2,5
505:10,16 506:1,3
506:7,9,11,15,20
506:22 507:5
509:15
**intervals**
417:9 419:6,17,20
420:13 421:23
431:11 453:15,16
454:3,7,14 455:3
457:19 458:1,8,24
524:9
**interview**
393:7
**interviewed**
393:8,12
**intro**
260:11,12 261:14
**introduce**
43:23 44:1,7,11,14
45:13 46:5,9,13
46:14 243:19
**introduced**
12:15
**introduces**
314:18 315:2
344:14
**introducing**
44:5 386:12
**introduction**
10:17 260:21

548:22
**invalid**
363:18
**investigating**
91:23 92:8
**investigator**
47:1
**invited**
492:17
**invoice**
7:6 189:24
**invoke**
411:22
**involve**
17:24 18:2
**involved**
17:23 57:14,19
58:13 59:20,21,24
62:15 90:12
110:12 123:11
130:18 133:3
151:5 201:11
333:24 475:2
484:18
**involvement**
57:21,24 58:21
59:1
**involves**
60:22 201:15
256:20 353:6
**involving**
49:3 58:15,22 59:9
130:21
**IRAC**
77:1,9,12,12
**irrespective**
25:15 115:23
123:19 427:22,24
472:24 507:16,19
508:5 512:4
**issue**
51:6,18 57:22
59:21,24 63:4
69:3,15 72:6
76:11 83:9 123:23
124:6,8 132:2

134:3,22 149:15
150:4 174:4,15
183:6 195:18
196:3 222:22
253:18 290:20
336:18 350:8
364:10 366:14
379:21 384:6
419:15 428:2
440:11 450:2
460:11 464:16
474:17 484:5
497:11 554:8
**issued**
14:9 15:11 81:18
82:10,22 83:2,9
90:15 219:19
**issues**
61:10 90:19 117:11
129:18 206:1
216:9 253:15,16
263:19 336:3
339:5 358:23
359:8,12 364:9
368:5 372:22
376:6 377:5 379:4
485:2 527:9
**italicized**
113:14,15,20,24
**Ithaca**
262:12
**i.e**
294:23 300:5 478:7

_____

**J**

_____

**Jack**
173:11,13 215:1
**JAMA**
272:2,2,4,22 273:4
273:11,11,16,17
**January**
193:22
**JASA**
483:14,17
**JCO**
485:1 555:16

560:20 561:20
562:2,11,19
563:16
**Jersey**
1:2 3:8
**JESSICA**
3:3
Jessica.miller@s...
3:5
**job**
183:12
**jobs**
40:22
**John**
2:13 486:22
**Johnson**
1:4,5 3:15,15 13:15
13:16,19,19,21,23
13:23 47:5,19,19
48:13,13 52:4,4
52:14,14 62:19,19
63:4,4 64:13,13
67:8,9,21,21 68:5
68:5 69:1,1,10,12
69:12 71:17,17,22
71:22,24,24 72:4
72:4,8,8 73:2,2,7
73:7,8,8,20,20
74:12,12,13,13,19
74:19 75:1,2 76:8
76:8,10,10,17,17
111:1,1 130:21,21
132:10,10 154:8,8
154:14,15,20,20
191:9,9,24,24
193:23,23 195:21
196:1,2 197:3,3
335:18,19 338:18
338:18 339:7,7
340:5,5,11,11
**Johnson's**
13:21 47:6
**Johnson/Zytiga**
195:21
**joke**
393:23

**journal**
156:18,20,21,23,24
157:8,14 272:3,5
272:10 273:12,17
320:14,18 392:1
395:2 482:17,20
483:1,5,11,13,14
483:18,18,23
484:1,4,7 485:6,7
485:9,10,17,22
486:1 555:17
560:20,21
**journalist**
392:3 393:10
**journals**
157:2,4,10,21,22
158:5,8,15,22
159:1 272:7 325:5
561:14
**JR**
2:8,13
**Jrestaino@restai...**
2:15
**judge**
42:16,21 43:1
45:10 118:7
119:22 239:18
294:2 321:7 341:7
341:11 397:13
568:22
**judgment**
35:4,15,18,20 36:5
37:1 121:5 502:18
**jumble**
215:13
**June**
181:2,15 226:10
243:9
**juries**
391:15
**jurisdiction**
40:6
**jury**
239:18,22 321:8
391:4,5,9,12
**justified**

89:22
justifying
478:8
J&J
47:24 70:21 71:4
77:22 128:14,23
131:19 143:10
150:15 193:18
340:18
J&J's
47:11 82:10

**K**
Karla
1:13 5:5,15 6:21
7:13,18 8:15
12:14,22 13:9,10
16:16 46:15 63:2
63:21 74:14
189:22 190:11
232:18 233:1
244:17 254:19
255:24 256:12
570:8 573:16
KATHERINE
3:12
katherine.mcbet...
3:14
keep
37:10 39:3 106:8
148:1,3 205:22
255:9 259:15
290:17 370:18
498:18
Ken
65:14,19 335:1
392:10
Kenneth
475:3,11
kettle
445:16
kicked
254:7 377:17
449:10,15 542:3
kills
123:8

kind
146:14 278:21,22
282:1 288:7 310:2
349:11 413:12
484:18 512:1
527:16 538:6
542:23 543:6,8
544:13
kinds
331:12
knew
65:19
know
13:14 15:17 16:20
18:14 19:5 20:23
29:9 30:20 35:17
41:2 44:15,17
46:22 47:4,8
49:15 50:3 53:10
54:23 55:1,9,10
59:6 60:20,23
61:15,16 62:4
63:9,11,16 64:4,5
64:6,11,22 65:3,7
65:8,14,17 66:1
67:2,15,22 69:18
69:19,21 72:20
73:6,11,14,16,16
74:2,3 75:3,9,10
76:21 77:14 78:10
78:10,16 79:22
80:10 82:8,17
83:1,8,11 84:20
84:23 85:10,10,23
86:5 87:2 89:19
89:24 93:3 94:15
94:17 95:6 107:2
107:16 108:9,10
109:20 110:5
111:24 112:1
114:8,12 115:14
117:4,15 118:5
123:1,13 125:21
126:24 127:19,20
127:23 128:2,3,4
128:5,7,8,9,12,13

128:15 129:19,24
130:1 132:3,16
133:3 134:15
137:18,20,21,22
137:24 138:18,22
139:6 140:21
142:9,10 144:6
146:14 147:20
148:11 151:4,15
152:8 155:17,18
156:3,5,7,19
157:15 164:24
169:22 173:13,15
173:15,23 174:2
175:10,11,13,24
176:3 178:1
179:23 182:22,24
183:1 191:3 195:4
195:9 196:14,23
201:14,20 202:6
204:23 205:10
206:14 207:4,10
209:9 210:6,21,24
211:19 213:2
214:14 216:1
217:4,15 219:1,23
220:14,15 221:7
222:5 223:7
224:11,12 225:23
226:5,9,11 232:11
235:11,21 240:21
241:9 242:14
248:9,9 250:2,6
250:13,17 252:15
253:14,21 255:6
255:18 256:3,19
256:19 257:5
259:4,7,11,13
260:24 261:14
262:4 265:3,8,24
266:3,24 267:22
270:6,13 271:9,13
273:23 274:2
279:6,11 280:8
281:23 283:8
289:3,11 291:19

291:21,24 292:1
300:20 304:23
305:1,13,15,24
307:10 309:19,23
312:21 317:22
318:21 320:10,23
321:20,20,21,24
322:13,16 326:10
326:17 327:12
330:20 331:14,24
334:6 335:15,15
335:21 336:1
339:18 341:10
344:2,7 350:23
351:12 352:4
353:5,19 356:19
358:13 359:19
362:1,2,3,9,24
363:4 364:3,20
365:1 366:20
369:9,12,15,24
372:10,20 374:13
374:17 377:7
379:15,18 380:2
383:12 384:4
388:20 389:18,21
391:9 392:2,22
397:4 399:24
403:19,20 405:2,7
406:18 411:5,7
413:10,17 414:12
414:17 421:4
426:2 427:18
431:17 433:2,19
434:22 435:12
436:19 437:17
440:13 444:4,11
444:14 448:21
451:3 454:10,12
454:17 455:20
459:12,17 460:6
461:2,5,13,16
462:11,14 464:20
465:19 466:22
469:18 470:7,16
471:7,10 481:4,9

481:12,24 482:16
483:23 484:3,9,10
484:14,23 485:1
486:8,13 491:9,18
492:1,2,6,9,10,11
493:10 494:5,9
499:4,17 500:22
501:1,24 503:6
504:20 508:20
509:3,17 511:16
511:19 512:17
513:5,22 514:12
514:15 524:5
526:9,14 527:7,15
527:21,22 528:3
528:12,19,21
530:8 531:4,10
536:1,18,23,24
537:7 540:3
541:17 543:8,18
544:22,23,24,24
545:21,22 546:17
546:19 549:7
552:18 555:16,16
557:16 560:5
562:2 564:24
567:22 569:9,10
knowing
122:15 256:17
308:18
knowledge
89:12 110:13
155:12 254:18
292:6 310:1 519:7
known
135:13 247:2
291:12 320:21
knows
87:16 212:2 537:3

**L**
L
1:15 570:12
laborious
457:6
lack

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 172 of 463 PageID: 38409
Karla Ballman, Ph.D.

Page 600

47:15 351:4
**ladder**
284:8
**Lake**
2:9
**Langseth**
93:17
**laptop**
425:2
**large**
32:9 33:16 398:14
457:1 498:2
505:24 506:7
551:1
**larger**
371:13 372:8
493:17
**largest**
248:5 277:23
**late**
83:10 192:8
**latency**
376:6 377:5 379:5
380:12,14,18
**latest**
182:14
**laughing**
373:22
**law**
2:12 27:3 204:14
207:3
**lawsuits**
48:14
**lawyer**
71:22 204:7 215:24
216:8 309:15
313:3 365:4
369:22
**lawyers**
13:16,21 15:17
47:12,20,24 48:13
48:23 49:2 50:12
52:3,14 67:10
68:3 69:7 72:11
72:15 82:11
143:10 146:23

150:15 339:8
435:24
**LAWYER'S**
574:1
**lay**
19:5 219:15 403:16
**lead**
274:9 308:19
355:16 478:9
**leads**
135:9 283:14
479:14
**learned**
212:1
**learning**
194:18 205:3,5
**leave**
227:2 319:21
395:15
**lecture**
67:3 201:11 224:10
**lectures**
199:6 202:20,24
203:1,2,8
**Lectures/Works...**
7:9
**left**
161:6 474:4
**left-hand**
159:8,16 490:6,11
497:14
**legal**
16:20 73:4 196:14
204:4
**legs**
449:19 542:11
**lesser**
38:7
**lesson**
405:11
**letter**
197:10 198:19,20
395:6
**letters**
9:12 78:23
**letting**

103:1 234:17
**let's**
15:23 47:2 100:1
135:10 141:1,3
181:10 184:19
193:1 250:14
264:2,7,7 274:4,6
284:15 286:14,14
298:17 299:17
301:4 306:2,5
312:13 319:13
320:24 322:2,5
326:14 374:23
380:5 385:18
388:3 404:8 406:6
411:20 436:6,7,8
439:24 446:22
448:10 450:14
473:6 479:3 490:4
493:14 496:9
497:7 498:24
499:21 506:10
516:5 518:3
520:17,17,18
531:14 545:2,7
546:5 554:7
**level**
30:2 35:12 38:11
122:12 172:3
228:13 277:21
285:2,9 286:20
287:9 289:1,10,12
292:12 295:2
296:20 297:17
298:9 299:5,7,21
300:2,24 301:8,18
303:5,9 305:5
309:2 311:7
318:24 329:12
343:7 347:7 348:7
366:6 371:14
372:9 420:17
494:17 511:17
520:7
**levels**
23:15 283:16,17,23

284:18 286:18
306:20 307:21
308:12,14,22
311:8 321:23
348:4,5 351:5
520:6,9 530:6,7
**LEVIN**
2:2
**LHG**
1:6
**liability**
1:6 216:5
**license**
479:12
**licensed**
40:5
**lies**
431:21 501:22
**life**
17:20 326:9 375:10
378:18
**lifetime**
535:20
**light**
144:2 554:21
**lightly**
474:9
**Lilly**
198:22 216:17
**limit**
197:20 198:11
**limitations**
173:7 271:2 336:4
377:11 381:3
**limited**
119:12,14 319:7
**Limites**
9:11
**limiting**
58:19
**limits**
395:11 497:24
498:4 500:18
505:22 506:8,11
**line**
11:6,9,12,15 18:3

292:18 305:18
572:4 574:2
**lines**
83:4 285:24 288:8
288:21,23 536:16
**link**
47:14,16
**linked**
86:20
**list**
6:20,22 45:14
83:22 84:6 87:12
159:1,5 188:19
189:21 196:15,19
197:5,20 198:1,15
251:6 258:2 259:1
273:23 274:18,20
275:7 309:9
404:15 441:13
475:8
**listed**
92:11 93:3 193:22
194:3 198:1,18
248:15 259:5
298:13 404:1
543:7
**listen**
118:19
**listening**
445:13
**listing**
8:6 397:11
**lists**
93:8 159:5 274:22
427:12
**Listservs**
461:23
**literally**
59:19 61:8 222:12
333:11
**literature**
21:16 35:10 38:9
41:5 48:3 53:5,6
80:2 82:14 88:20
98:14 99:9 110:3
120:23 124:22

Karla Ballman, Ph.D.

134:15 138:21
139:8 142:18
150:24 155:11
160:19 199:24
218:15 220:14
223:11 224:20
267:9 283:20
289:24 291:13
302:11 303:19
326:1 327:17
329:4 344:3
415:17,22 419:5
442:15 453:8
459:13 466:7
**litigation**
1:7,20 12:5,12
13:17 49:3 62:22
65:18 70:20 72:20
82:10 85:14,20
86:7,22 87:2 88:4
90:13,16 110:12
130:21 133:4
151:8 154:6,7
155:1 191:9
193:17 196:2
198:16 201:15
216:5 224:15
306:3 327:8
338:22 372:11,22
379:10 382:10
383:10 384:1
444:1 465:14
553:13
**little**
27:11 32:6 33:13
152:9 168:16
171:4 179:1
265:21 282:2
295:6 332:23
342:24 346:3
348:13 417:10,21
418:21 507:15
**live**
147:5 149:8
**living**
43:13

**LLC**
2:12 3:20,20
**LLP**
2:8 3:2,7,11,17 4:2
  4:8
**location**
149:12
**locations**
351:13 354:10
**LOCKE**
4:3 32:24 60:4
  113:11 116:18
  162:4 166:4
  197:14 216:11
  318:16 327:19
  332:7,20 335:2,22
  338:20 340:8,19
  345:1,6 365:15
  368:18 381:9
  396:11 398:2
  400:14 404:5
  413:15 414:16
  420:6 426:12
  445:24 449:6
  450:9 452:4 455:5
  459:3 461:9 465:2
  488:23 489:2,4,22
  491:15 493:7
  537:21 558:18
**Logan**
3:12
**logical**
480:22
**long**
49:14 61:17 85:22
  120:19 177:16
  380:14,17 449:19
  449:21 469:17
  489:1 542:12
**longer**
526:10
**long-term**
398:14
**look**
14:14 16:9 17:20
  18:2 21:2,4 26:1

37:21 44:22 64:17
81:1 82:1 87:4
88:7,8,15,19
89:13,18 92:14
93:5,12 94:12
95:3,9,13 97:9
109:6,11 115:11
118:10 121:3
122:6 130:18
135:3 138:20
139:8 146:16
150:4 152:17
168:23,24 169:2
171:4,12 173:21
176:4 185:7,9,24
186:12 187:5
193:13 194:20
213:13,20 214:8,9
216:23 217:24
218:10,13 220:8
228:19 244:3
249:20 256:21
265:23 266:11
280:9 286:14
296:17 298:1,16
300:21 302:24
304:15 312:16
314:2,7,7 319:9
320:24 321:4
322:18 323:1,2
325:17 326:14
328:9 329:16
330:6 344:4 346:5
346:6,8,14 347:17
352:4,15 354:23
356:3 368:11
374:23 383:11
384:2 385:8,18
387:21,24 392:16
392:24 394:6
395:3 409:6
411:20 415:8
419:16,19 434:19
437:4 438:15
441:24 450:14
453:11,14 454:21

461:21,24 462:7
462:18 463:4,19
464:24 466:17
472:20 473:6
474:24 486:16,21
500:13 501:7,10
501:13 502:16
503:1 505:9,14
507:14 509:21
511:19 512:12
520:11,16 524:10
527:12,21 557:5,7
568:9
**looked**
18:24 19:3 22:21
23:4,6 24:24
50:22 54:9 60:15
69:10 76:22 77:2
77:10 81:19 82:11
83:12 84:2,16
93:11 94:14 96:22
97:2,3,3,6 99:5
106:5 108:16,21
109:7,13 114:4,21
116:1 117:23
120:22 121:8
125:10,18,20
133:4 134:14
142:18 149:15
152:20,23 168:5
168:24 184:6
193:24 206:22
207:18 208:4
209:18 219:8
222:1 223:9
282:16 285:18
307:10 312:1
331:14 344:3
349:5,19 350:23
350:24 353:11
354:13 372:12,19
372:22 373:3
411:18 447:20,20
450:11,18 453:10
464:1 466:7
471:17 472:13,19

472:22 473:3
529:6 533:22
534:22 535:2,4
536:5 540:14
543:8 557:18
558:1 560:11
567:19,24
**looking**
17:12 30:1 35:20
41:3 61:10 77:24
78:16 94:8 122:6
130:19 134:22
135:4 150:2 181:5
194:17 200:21
213:17 214:2
215:16 218:22
219:5 221:20
223:1,13 224:7,8
224:9 231:4 273:6
282:16 285:16
299:5,12 313:24
367:16 402:18
426:15 452:2
453:4,6 458:21,22
458:23 462:13
464:14,18,19
466:19,22 467:1
468:24 490:2
501:14 507:13
510:22 523:11
528:10 529:15
540:21,23 543:17
544:2 549:22
557:17 558:22
559:22
**looks**
148:15 375:14
513:9 523:4
526:24 540:3
560:6
**loss**
65:3
**lost**
200:22
**lot**
15:19 123:17

Karla Ballman, Ph.D.

146:11 242:21
294:6 316:12
322:14 327:13
356:10 364:16
433:2 463:16
484:18 516:15
523:3 565:20
**lots**
73:15
**loud**
447:9
**Louisiana**
2:9
**loves**
430:2
**low**
157:4,10,14,21
158:15,21 400:12
512:6
**lower**
25:8 158:7 159:1
305:5 318:24
436:21 437:13
439:22 506:19
**lowest**
19:8 309:3
**lump**
311:1
**lumped**
311:2
**lumping**
365:20,22
**lumps**
356:22
**lunch**
275:24 280:23
281:3,14
**LUNDY**
2:8,8

**M**

**M**
2:13 3:7
**machine**
549:8
**MacMahon**

395:4
**MADAM**
458:9
**Madhu**
259:4,16
**magnitude**
32:8 33:16 168:15
352:16 388:13
401:13,16,21
402:12 417:15
421:3 434:21
448:6 453:11
544:6
**magnitudes**
410:8
**main**
3:18 262:4 381:3
**majority**
268:14 325:8
507:20 508:8
509:13 512:2,8
**making**
168:3 322:13
393:23 459:1
479:12 498:18,20
531:24 554:14
**manner**
361:23
**manufactured**
131:18
**manufacturers**
197:9
**March**
1:10 12:6 70:18
191:2 259:10
570:15
**mark**
38:16,23 101:6,10
101:12,16,17,20
187:24 188:14,16
199:1 250:14
258:19,21 507:2
**marked**
11:14 14:3,4 38:19
39:9 55:18 87:8
87:22 92:20 104:2

145:17 155:22
161:18 180:14,16
187:20 188:20,22
189:1,6,10,13,16
189:23 199:2
232:5 242:24
243:2 245:13
247:19,21 250:21
257:17 258:17
276:24 306:6,7
313:19,20 319:24
337:20 375:11
390:15 394:7
400:23 425:3
440:18,22 483:6
487:8 518:20,22
532:21 548:16
**MARKETING**
1:5
**marking**
190:19,21 549:3
**Marte**
4:14 12:4
**masters**
43:16,18
**master's**
242:13
**match**
94:18 186:22
**materials**
6:20,23 150:10
188:20 189:21
**math**
112:19
**mathematical**
229:11 283:1
**mathematics**
229:12
**matter**
12:11 187:6 462:9
462:10
**matters**
462:15 474:11
**Mazumdar**
259:5,16
**ma'am**

295:12
**MBA/MS**
261:16
**McBETH**
3:12
**McShane**
487:6,20 492:3
**McTiernan**
128:5 175:14
366:10
**MD**
9:19
**mean**
14:16 15:2,5,16,21
17:4 25:19,24
35:17 41:20 44:6
58:1 59:1,2 60:20
60:24 64:9 74:3
80:8,21,24 81:9
81:10,11 85:14,23
86:12 88:18 90:2
94:11 106:24
107:19 108:9
111:22 112:1
114:12 115:2
120:23,24 122:13
129:11 135:17
137:21 138:18
139:12 140:13,15
144:7 145:1
153:16 158:3
164:22 165:3
169:20,22 179:21
182:22 195:4
198:11,17 199:23
200:3,24,24 201:1
202:8 207:3 208:1
209:9 210:14
212:6 213:1 221:8
222:20 232:2
234:6 240:19
248:11 259:7,10
265:23 267:23
268:9,24 270:6
273:22 277:8
279:8 280:8,8

283:6,9 287:16
289:2,3 312:21
317:11 321:24
322:20 326:20
353:19 359:9
360:17 363:3
365:1 367:17
372:2,18 373:2
380:23 388:19
400:2 403:16
405:3 406:10,11
406:12 408:19
409:23 418:21
424:9 432:23
433:2,14 434:18
437:3 446:11
453:23 454:18
459:11,17 462:17
474:13 475:15
477:18 479:6,18
480:24 481:8
485:1 494:6 499:5
505:11 507:24
511:6,17 521:3,4
521:10 529:1
536:17 538:21
539:5 543:3
544:20 546:12
547:10 550:12
557:19,24
**meaning**
125:13 168:21
539:24
**meaningful**
343:17
**means**
15:6 69:8 95:16
175:12 217:15
256:19 275:12
321:21,22 324:19
331:14 387:10
406:12 417:14
570:20
**meant**
168:21 355:8 407:9
408:7,14 411:12

462:23,24
**measure**
315:15 343:15,17
    344:11 386:6,6
    397:4 415:18
    431:18 476:8
    523:1 525:21
    526:2,5,13 528:14
    528:17,19,21
    535:14,15 536:1,7
**measurement**
524:24
**measurements**
478:21 525:24
**measures**
526:16,20 528:16
    531:7 532:16
**measuring**
511:18 526:7
    535:11
**mechanical**
478:7
**mechanism**
127:21
**media**
131:23 396:15
    397:11
**medical**
14:19 45:7 73:10
    124:13 125:12
    129:3 169:19
    170:3 199:24
    231:12 232:21
    241:11 243:8
    259:2 396:7 453:8
    459:13 466:1
**medicine**
15:2 40:5 231:11
    231:13 233:20
    244:20
**meeting**
143:10 146:22
    254:19 255:23
**meetings**
46:15 89:4,7 256:2
**meets**

385:10,11
**melanoma**
216:20 218:19
    220:10
**member**
138:7,13 139:3,4
    245:6 247:1 461:6
**members**
243:18 343:14
**membership**
250:10 253:1
**memo**
198:3,4
**memorize**
469:18
**memory**
151:20 214:10,19
    215:15 225:10,13
**mention**
117:16 187:15
    264:21 268:5
    284:21 304:19
**mentioned**
56:24 61:5 63:2,20
    73:5 183:22 203:7
    205:4 228:12
    265:6 295:24
    368:8 387:1,2
    399:16 420:4
    432:7 433:10
    463:15 523:7
    541:17 542:15
    552:2 562:4
**merit**
266:20
**Merlo**
9:19
**Merlo's**
424:5 499:22 504:1
**mesothelioma**
134:18,20
**message**
492:20
**met**
51:11 52:3,13
    106:1 173:16

518:18 519:22
    530:17
**meta-analyses**
56:11 57:2,4 92:17
    93:11,14 98:12
    99:8 100:5 104:21
    104:23 105:1,4
    106:5,7,8,9,14
    135:15 199:13
    201:10,12,16
    212:22 272:1,7,12
    273:5,9,15 274:7
    298:19 355:8,13
    355:23 356:5
    373:3 385:9,13
    444:24 445:2
    450:15,19 458:5
    534:20 541:14
    548:2,14,22
    551:23,24 552:2
    552:13,19,24
    553:2,5,6,8,12
    554:20 555:13,20
    556:1,11 557:10
    557:12,18 558:1
    558:11 559:7
    560:8,17 562:2,5
    562:7,9,11,20
    563:16
**meta-analysis**
9:6 10:17 84:19,21
    104:22 184:21
    201:13 207:20
    270:23 272:9
    275:21 277:6,7,13
    277:18,19 278:23
    279:20 287:15,16
    355:3,6 356:8,11
    356:14,22 376:16
    385:16,19,20
    515:12 528:10
    538:5 547:17,18
    547:21,22 552:8
    556:22 562:14,20
**methodologic**
209:15,19 212:16

215:1 284:4
    363:11 395:14
    556:21
**methodologically**
361:23 473:5
**methodologies**
233:22
**methodology**
121:11 144:4,8
    177:10 178:24
    206:10,22 207:22
    212:20 213:3
    215:22 220:7,10
    220:20 222:4
    223:19,24 225:1
    264:6 266:23
    267:24 268:10
    303:22 359:22
    360:2 361:10,15
    361:19,20 381:21
    382:6,9 466:14,15
    471:16 472:13
    550:2
**methods**
39:18 149:22 169:1
    169:1 199:11
    200:10 202:3
    268:17 442:22
**metric**
439:17 526:8 535:9
**metrics**
415:24
**MICHAEL**
3:17
**Michael.anderto...**
3:19
**Michelle**
1:15 4:9 570:12
**microphone**
104:6 176:8 477:13
**microphones**
193:5 503:17
    569:14
**middle**
118:17 162:2 222:9
    222:12 252:10

302:10 333:20
    370:21 380:9
    422:14 470:2
    495:16
**midyear**
220:5
**mid-2018**
219:19
**Miller**
3:3 5:7 17:15 20:11
    20:22 21:13,24
    22:4,9,24 25:17
    26:19 27:12 28:3
    28:10,22 29:4
    31:21 32:18,22
    33:5 34:1,11
    35:22 36:7,12,17
    36:20 37:7 42:1,8
    42:12,18,20,24
    43:6 44:3 45:16
    46:2,6 47:17
    48:18,22 49:9
    50:14 51:12,15
    52:6,15 53:18,21
    54:13 55:7 58:5
    59:10,14 60:5,18
    61:13 62:2 63:7
    64:1,20,24 66:5
    66:22 67:1,13
    68:9,17,21 69:17
    70:5 71:6 72:16
    73:13,24 75:7
    76:14 77:23 78:3
    78:7,12 79:13
    80:5,19 81:7,23
    82:19 83:14 85:7
    86:24 87:15 88:13
    89:15 90:5 91:3,8
    91:15 92:2 95:15
    97:15,18 98:2,21
    99:16 100:18
    101:2,9,21 102:5
    102:11,17,21,24
    103:5,14,17,22
    105:21 108:1,24
    110:19 111:16,22

Karla Ballman, Ph.D.

| | | | | |
|---|---|---|---|---|
| 112:22 113:9 | 223:21 224:16 | 351:8 352:12 | 488:1 489:8,13 | 427:23 463:2,5 |
| 114:6,20 116:19 | 225:3,6,9,15 | 353:16,24 355:19 | 490:21 491:14,23 | 523:22 563:12,24 |
| 118:12,16,22 | 226:22 227:1,6,15 | 356:17 357:6,10 | 492:8 496:4 | 564:1,4 566:11,14 |
| 119:4,9,15,19 | 227:20 228:1 | 357:12,20 358:15 | 499:24 500:8 | **minutes** |
| 120:2 121:6 122:9 | 230:5,22 231:3 | 359:16 360:15,21 | 503:8 504:7,13 | 101:4 499:16 |
| 124:17,24 125:7 | 232:1 234:21 | 361:7 362:21,23 | 505:1 507:6,23 | 503:14 558:21 |
| 125:15 126:6 | 235:10 236:3 | 364:12,15 365:21 | 508:14 509:16 | 566:12 568:17 |
| 127:17 128:21 | 237:8,14,18 238:5 | 366:16 367:24 | 510:19 511:4,13 | **mis** |
| 129:6 130:6,9 | 238:9,13,18,22 | 368:22 369:8,11 | 514:23 515:15,22 | 364:6 |
| 131:2,21 132:11 | 239:5,22 240:4,14 | 369:15,23 370:13 | 516:5 525:1,5,11 | **mischaracterizat...** |
| 133:9 134:12 | 246:7,12,18 | 373:1 375:4,22 | 525:15 530:20 | 311:10 |
| 135:16 136:9,14 | 247:11 250:12 | 377:23 378:2,6,17 | 533:11,16 537:10 | **mischaracterized** |
| 136:18 137:4,15 | 251:17,22 252:9 | 380:8 381:15,19 | 537:20 538:9,19 | 36:13 |
| 138:9 139:9 140:6 | 253:6,8 254:2,7 | 382:3,16 383:3,7 | 539:18,22 541:5 | **mischaracterizes** |
| 141:9,23 143:11 | 254:21 255:1,5,12 | 384:21 385:1,4 | 541:22 542:2,5,10 | 26:20 36:8 267:13 |
| 144:20 147:10,14 | 255:16 256:14 | 386:16 390:3,7,13 | 543:1,13 545:18 | 563:3 |
| 147:24 148:6,9,20 | 258:9,20 259:22 | 391:5 393:5,16,19 | 546:8,24 547:3,19 | **mischaracterizing** |
| 149:2 151:9 152:3 | 261:4 262:6,16 | 393:24 394:15,21 | 549:5 554:23 | 36:18 264:14 |
| 152:11 153:6 | 263:1 264:3,12,23 | 396:2,10 398:10 | 555:14 556:9 | **misclassification** |
| 154:10,16 155:9 | 266:15 267:12 | 402:7,14,19,24 | 557:1,22 558:14 | 341:20 344:13 |
| 158:1,17 159:10 | 268:20 269:13,18 | 403:3 404:6 | 560:1,13 562:8,22 | 364:2,24 365:5,12 |
| 161:5,24 162:9,17 | 270:4 271:14,21 | 408:23 410:2,21 | 563:2,23 564:7,13 | 366:15,21 367:10 |
| 163:12,18 164:11 | 272:17,21 273:6 | 411:24 412:5,13 | 564:19 566:8,13 | 367:18 376:7 |
| 167:3 171:10 | 274:11,17,21 | 412:17,21 413:19 | 567:20 568:13,16 | 377:6 379:6 |
| 172:8 173:20 | 275:3,6,10,22 | 414:2,10 415:19 | 569:8 | 385:24 386:13,24 |
| 174:17 175:19 | 276:4,9 279:21 | 416:11 418:3,6,10 | **million** | **misconception** |
| 176:16 177:3,13 | 283:5,18 288:12 | 418:13 420:7 | 69:20 | 320:5 321:1,5,8,19 |
| 177:19 178:7,10 | 288:18 290:3,10 | 422:2 423:9 425:1 | **millions** | 322:18 447:3,7,12 |
| 181:5,14,23 182:4 | 290:14 291:1,18 | 425:18,22 426:17 | 62:20 69:11 | 447:15 |
| 182:7,10 185:12 | 292:23 293:4,12 | 427:3 428:16 | **mind** | **misconceptions** |
| 185:16 188:2 | 293:15,17,21 | 430:9 432:5,13 | 74:10 200:22 | 8:19 321:11 325:4 |
| 190:3,6,15,18,23 | 294:4,9,14 295:8 | 433:13 434:3,17 | 390:24 439:7 | 337:3 446:24 |
| 192:3,11,16,20 | 295:17 296:6,24 | 436:13 438:2,7,17 | 506:14 | 455:13,14 456:15 |
| 193:1 198:2 | 304:5 305:20 | 438:21 439:1,8 | **mine** | 456:24 457:1 |
| 199:21 200:12,17 | 306:24 307:5,12 | 442:6 445:7,11,15 | 160:2 390:20 | **misimpression** |
| 201:23 202:5,22 | 308:9 312:18,23 | 448:13,18 449:10 | 438:23 456:17 | 395:16 |
| 203:3 204:3,13,18 | 317:6,12,19 | 449:18 451:11 | **mineralogist** | **misinform** |
| 205:14,18 206:16 | 319:17 320:16 | 452:8 458:2 | 40:10 59:23 | 493:24 |
| 206:24 207:24 | 325:20 327:4,10 | 460:20 462:1,21 | **minimize** | **mislabeling** |
| 208:16 209:4,22 | 327:18 330:2,13 | 463:22 465:18 | 308:21 | 162:10 |
| 210:22 211:1,8 | 330:19 333:9,19 | 466:5 467:17,22 | **minor** | **misleading** |
| 213:12,16 214:6 | 335:3,23 337:10 | 468:2,6 470:1 | 262:2 | 433:1 |
| 215:4,8 217:2,5 | 337:15 338:1,4 | 471:21 472:1 | **minus** | **misread** |
| 217:11,22 218:8 | 339:10,15 341:10 | 481:17 482:23 | 502:13 | 163:11 |
| 218:23 221:1,5 | 345:4 346:11,21 | 483:3 485:13,16 | **minute** | **misremembering** |
| 222:8,11,16 223:3 | 348:24 350:15,18 | 485:21,24 486:4 | 31:11 39:22 296:16 | 363:13 |

Karla Ballman, Ph.D.

misrepresenting
346:17,22
misrepresents
310:8
missed
195:16,19
missing
163:10,13
mission
236:8,11 237:24
 238:4 239:3
misspeak
541:6
misspoke
540:24
misspoken
84:12
misstate
214:19
Misstates
562:23
mistake
442:12 504:14
mistaken
342:4
mistyped
153:4
misunderstanding
315:17
misunderstood
486:5
misuse
460:8,12 462:19
 495:5
MITCHELL
2:3
mixed
30:6 78:23 191:6
 195:14
mm-hmm
95:2 109:23 153:3
 178:21,23 225:21
 226:1,3 248:21
 251:7 261:23
 287:21 302:18
 389:16 473:16

484:8 520:15
 527:5 532:18
modeling
493:2
moderate
400:13 550:24
Modern
9:21
modest
401:17,22 402:3,13
 520:6
moment
39:4 174:12 184:20
 190:10 207:20
 284:16 421:19
 432:18 433:8
 488:14 506:11
money
151:24 152:9 194:8
 195:10
monograph
82:3
monotonic
538:8
months
82:9 84:13 194:1,2
 194:8,10,12
 195:11 196:7
 197:11
Moorman
366:10
morning
13:5,6 251:9
mortality
123:11 124:9
mouth
119:1 120:4,8
move
41:12 47:2 101:7
 227:14 229:19
 264:8 281:16,21
 538:6 539:14
moved
258:16
moving
98:5 286:22 541:22

mparf@aol.com
4:11
MPH
244:24 261:21
multiple
60:10,13,14,20
 351:12 354:9
 521:6
Muscat
66:12 184:7 186:3
 186:15
Myocardial
275:20
M.D
15:3 133:23 155:19
 389:23

——————————
N

N
5:2 281:5,5,5
name
12:3 13:8 53:2
 57:15 63:2,13
 66:8 70:13 128:7
 241:9 243:20
 298:11,12 333:8
 333:23 339:21
 389:24 491:24
 492:10 549:12,19
names
66:12,14 94:16
 475:4 491:10,19
 492:19
Narod
6:13,15 155:18
 156:3 159:4 161:4
 169:8 171:24
 368:8,21 369:2
 370:6,10 371:10
 384:11
Nathan
243:15
national
9:15 127:15 338:12
 340:17,24 399:21
 399:24 400:6,11

400:19 564:17
 565:6
nature
342:16,17 485:7,8
 487:5 518:5
 521:17
NCI
569:4
near
285:23 497:22,24
 500:16,17 505:20
 505:22
nearly
251:15 341:24
necessarily
64:8 75:10 90:2
 431:18 458:4
necessary
54:19 442:4 473:24
 517:18,22 519:15
 532:9 548:12
 571:4
need
42:7 44:17 63:21
 68:16 79:16 88:19
 99:1 103:3 137:22
 139:10 188:6
 194:19 202:14,15
 213:12,20,20
 244:15 304:14
 306:23 307:7
 312:16 314:8
 319:23 322:17
 324:20,21 352:23
 357:9,9,10,11
 369:8 397:23
 421:7 422:2
 470:19 477:5
 499:3 500:4
 501:10 503:11
 505:14 513:5
 514:13 561:23
needed
197:7 384:12
needs
45:19,22 214:8,9

348:5 351:12
 357:15 367:15
 369:12 378:20
 518:6,9 520:23
 521:18,21 522:11
 527:10 533:7
Neel
263:14
negate
353:23
negative
498:12 501:18,22
 502:7 550:13
negotiation
195:1,5 197:12
neither
476:19 493:20
never
52:23 60:24 64:13
 68:2 75:14 76:10
 151:10 256:10
 267:9 270:15
 376:20 391:11
 421:1 460:10,11
 462:15 489:16
 493:15 529:12
 540:13 541:10
 551:3,11 553:7
 555:19 562:4
 563:11
never/ever
524:21
never/none
540:5
new
1:2,14,14 3:3,8
 12:10,10 144:1
 229:10 244:20
 258:16 281:17
 498:8 504:14
 533:19 549:12,19
news
9:11 391:23 392:21
 393:2,3,15 395:10
NI
400:20

nice
392:8 448:14,17
night
83:23 87:13 188:13
192:8
nine
282:19 441:19
524:1
nominate
250:8
nominated
252:15
nondifferential
344:13 386:12
nonprofit
245:9
nonsignificant
30:7 349:15,16
550:22 551:1
nonstatistically
23:23 24:12 25:13
30:14 350:3
422:21 451:22
non-case-control
23:24
non-controversial
550:6
non-epidemiologic
16:24 17:5 37:3
153:13,16
non-experimental
457:5
non-litigation
164:18
non-monotonic
539:2
non-observational
17:14
non-statistical
544:17
non-users
539:17
Norman
392:6
Notary
1:17 570:14 573:23

note
351:1,17 403:21
noted
109:21 381:2
384:11 537:8
571:11 573:11
NOTES
574:1
notice
1:14 6:19 187:24
188:8,18 194:14
196:5
noticed
381:2
notification
373:14
novel
233:21
November
47:21 49:22 50:12
51:1,14,19,23,24
52:11 57:23 58:12
62:10 67:11 71:4
71:16 143:21
null
25:23 26:14,23
330:1 344:16
386:15 476:16
477:16,19,22
494:13
number
14:3 38:24 39:9,13
39:15 55:17,23
97:20 104:14
113:6 142:24
145:15 160:19
161:22 177:12
180:1,1,14 187:18
188:21 189:5,23
197:10 242:24
245:17 248:18
258:1 274:8
275:16 284:20
304:19 306:6
309:9 310:18
313:19 321:1,5,8

321:11 337:6,24
366:9 388:19
390:10 406:13
414:20 431:13,15
446:22 447:3,8
475:24 476:5
495:7 500:1 513:8
518:20 519:11
520:19 525:3,4,22
530:11,12 532:20
534:1,2 535:3,4,7
536:6 540:15
542:16,20 544:11
544:12,14,16
549:4,22 550:12
550:15,17 551:9
554:2 558:9
564:15
numbers
15:20 105:15
106:13 186:21
372:6 406:12
415:9,10 424:24
432:7 433:9
435:13,15,17,20
457:24 508:1
512:12,13 528:6
529:19 536:21
544:17 549:24
551:11 553:22
numerical
144:12,23 480:18
numerically
406:2,7 408:19
409:11 411:6,10
413:7,9 414:14
numerous
269:1 289:19,19
561:18
NW
4:3
N.W
3:3
_____
O
_____
O

281:5,5,5
oath
12:19 212:8 373:17
374:7
obesity
402:1,2 514:4
object
21:24 23:2 36:19
51:12 52:8 68:14
68:18 71:7,9 91:9
101:22 102:14,17
102:19,20,23
103:4,7 149:2
162:5 227:3,9,13
255:8 290:16
293:19,23,24
295:20 307:9
330:17,18 360:17
362:24 386:17
413:21 425:14
481:18 533:20
543:14
objected
125:1 330:15
533:18
objecting
293:18 425:23
426:1 468:10
objection
17:15 20:11,22
21:13 22:9,24
25:17 26:19 28:3
28:22 29:4 31:21
34:1,11 35:22
36:7 37:7,8 42:1
43:6 44:3 45:16
45:17 47:17 48:18
49:9 50:14 51:15
52:6,15 53:18,21
54:13 55:7 59:10
59:14 60:4,5,18
61:13 62:2 63:7
64:1,20 66:5,22
67:13 68:9 69:17
70:5 72:16 73:13
73:24 75:7 76:14

79:13 80:5,19
81:7,23 82:19
83:14 85:7 86:24
88:13 89:15 91:3
91:10 92:2 98:21
99:16 105:21
108:1,24 110:19
111:16 112:22
113:9,12 114:6,20
116:18,19 119:13
121:6 122:9
124:17 125:15
126:6 127:17
128:21 129:6
130:6,9 131:2,21
132:11 133:9
134:12 135:16
136:9,13 137:15
139:9 140:6 141:9
141:23 143:11
144:20 147:10
148:1,5,7 151:9
152:3,11 154:10
154:16 155:9
158:1,17 162:10
166:4 167:3
171:10 172:8
173:20 174:17
175:19 176:16
177:3,13 185:12
185:16,17 192:3
197:14 199:21
200:12,17 201:23
202:5,22 204:3
205:14,18 206:16
206:24 207:24
209:4,22 214:6
215:4,8 216:11
217:2 218:8,23
221:1,6 223:21
224:16 225:3
226:22 227:11
230:5,22 232:1
236:3 240:4 246:7
246:12,18 247:11
253:6 254:2,8,21

255:1 256:14
259:22 262:16
263:1 264:23
266:15 267:12
268:20 270:4
279:21 283:5,18
288:12,18 290:3
290:10,21 291:18
295:18 296:6
304:5 305:20
308:9 318:16
320:16 325:20
327:4,10,18,19
330:2,13 332:7,20
335:2,3,22,23
338:20 339:10
340:8,19 345:1,6
346:11 348:24
350:15,18 352:12
353:16,24 356:17
359:16,17 361:7,8
362:21 365:15
366:16 367:24
368:18,22 369:4
373:1 381:9,15,19
382:3,16 383:3,7
393:5,16 394:15
394:21 396:2,10
396:11 398:2,10
400:14 402:14
404:5,6 408:23
413:15 414:2,10
414:16 415:19
418:3 420:6,7
423:9 425:18
426:12 428:16
432:5,13 433:13
434:3,17 436:13
438:2 445:24
449:6 450:9 452:4
452:8 455:5 458:2
459:3 460:20
461:9 462:1,21
463:22 465:2,18
466:5 471:21
481:17 482:23

483:3 488:1
491:14,15,23
492:8 493:7 496:4
504:7 505:1 507:6
507:23 508:14
509:16 510:19
511:4,13 514:23
515:15 525:1,6
530:20 533:11
537:10,20,21
538:9,19 539:18
543:1,13 545:18
546:8,24 547:3,19
554:23 555:14
556:9 557:1,22
560:1,13 562:8,9
562:22 563:5
567:20 569:8
**objectionable**
49:11 68:19 71:10
172:11 402:20
**objections**
223:4 347:2 379:10
468:12
**observational**
17:13 57:5 58:14
105:3,19 137:20
152:18,21 167:13
298:23 299:3
311:16 331:6
350:12 389:9
396:22 426:5
520:5 531:22
552:9,10,14,15
553:1,9 554:7
556:1 562:21
563:16
**observe**
212:13
**observed**
300:2 301:6 371:16
401:18 404:21
437:9
**obtain**
63:21
**obtained**

315:15
**obviously**
51:21 115:14
  210:14 222:20
  228:7 244:21
  373:3
**occasion**
332:4,18
**occasions**
76:6
**occur**
51:10
**occurred**
50:11
**October**
219:22
**October/Novemb...**
257:6
**odd**
171:1 464:3,15
  522:5,16 530:24
**odds**
267:2 291:22 384:9
  384:14 388:24
  429:11
**offensive**
448:19,22 449:4
**offer**
162:18 173:1 174:9
  174:15,21 176:12
  179:19 214:24
  261:20
**offered**
216:3 259:1
**offering**
172:21 327:13
**offers**
257:3 262:2,5
**offhand**
362:10 363:4
  389:18,21
**office**
181:16 484:10
  549:9
**officer**
249:14

**official**
74:18
**oh**
65:22 68:10 74:22
  86:23 120:13
  160:3 161:10
  166:1 186:16
  190:23 220:2
  251:19 298:19
  385:18 387:20
  388:20 392:4
  426:16 433:3
  447:9 456:21
  462:12 463:1
  468:8 486:4 502:6
  511:19 517:13
  527:4 531:19
  535:13 549:18
  553:21 558:24
  565:15 567:10
**Ohio**
3:18
**okay**
13:20 14:2,18 15:4
  15:9 16:19 18:5
  18:14 19:17 20:1
  21:20 22:16 23:18
  24:20 25:9 27:1,2
  27:5,10,23 29:13
  29:17,18 30:9
  34:5,7,14 35:14
  36:4 38:16 39:20
  41:11 44:10 46:19
  47:2,10,23 48:4,7
  48:20 50:7 54:3
  54:17 55:1,15
  56:3 57:12 59:4
  59:18 61:24 62:12
  65:6,12 66:15
  68:20 69:9 72:1,9
  74:24 75:17 76:7
  76:21 77:16,18
  78:20 81:4,16
  83:11 84:5 85:3
  87:7,7,18,21
  90:15 91:7 92:18

92:22 94:2,19
95:12,13,20 96:17
97:11 99:22 102:4
102:21 103:16,22
105:1 106:3
107:21 108:21
109:5 111:4
112:12,15,20
113:2 115:18
116:11,24 117:14
121:1 122:3
123:10 124:11
126:20 127:11,23
128:8 130:23
133:7 136:4
137:13 138:7,13
139:1,5 140:5
141:8,13 142:14
143:4,15 144:3
145:12 147:3
148:6 149:14,24
150:6,11 151:18
153:20 154:24
156:9 159:3,18
161:3 162:19
164:20 165:6
166:8 167:15,24
169:11,12,17
170:7,13 175:23
178:10,16 179:1
179:14,15,24
180:4,13 181:3,10
181:16,19 182:16
183:21 184:3,16
184:24 186:10
188:12 189:9
190:5,23 191:20
192:16,17 193:1,8
194:7 197:6 198:9
198:24 200:4
202:1,1 203:10,10
203:18 204:21
208:10 209:8,12
211:18 213:4
216:3,22 218:21
220:2,2,3 221:23

222:16,18 224:2
225:15 226:5,9,12
226:24 228:1,16
229:19 233:15
235:13 236:24,24
239:14,16 242:4
242:16 245:11
247:15,16 248:22
250:6 252:14,17
252:20 253:19
255:10 257:2
258:4 261:7,15
267:6 271:21
273:14 275:10
276:9 279:3
281:22,23 282:9
283:13 285:4,15
285:19 286:5,14
287:3,19,22 288:7
289:6,13,21 290:1
290:24 291:14
292:5,17 295:6
296:4 298:10,16
299:17 300:22
301:16,23 302:19
303:21 306:4
307:16,24 309:16
311:11 312:4
313:8,16 315:11
315:23 316:14
319:5,14 320:12
320:24 321:18
322:2 323:4,13
324:3,13 325:18
327:14 328:4,7,19
330:19 333:5
334:6 336:20
337:17 339:20,24
341:6,8,9,19,23
342:7,13 347:10
347:14 348:14
349:9 351:7 352:8
355:5 358:3
359:24 360:3,16
364:23 366:11
367:3,12 371:6,21

375:24 376:3
377:2 379:13
380:3 381:12
382:2,9 383:23
388:22 389:6,14
389:17 391:2,21
395:9 397:1,9,17
398:5 399:3,16,21
400:10 401:12,16
404:17,24 405:19
406:17,17 408:18
413:1,6,9,12,23
416:5,21 417:7,20
418:13,20,20
419:22 422:15
423:4,19,24
425:17 427:9,21
428:10,20 429:18
431:1 432:10
433:17,21 436:3
437:10 439:23
440:16 441:18,24
442:9,11 443:2,6
443:10 444:18
445:5 446:3,8,15
447:5,14,18
448:12,21 449:3
449:22 450:24
451:5,15 452:15
454:6 455:1,9
456:6,13 457:17
470:15,24 471:1,4
471:5 472:9,22
473:6,21 474:16
474:24 475:18
476:4,14 479:23
486:22 487:12,18
488:11 490:14
491:11 493:5,12
495:17 496:1
498:24 499:15
501:16 502:9,15
502:15 503:8
504:22 506:2,10
506:12,13 508:4
508:18 513:15,20

514:1,1,3 516:13
517:3,15,23 518:3
520:11,16,21
521:15 524:13,23
531:19 532:7
533:22 535:13
537:6 538:4,14
539:12 541:12
544:19 546:14
548:15 553:24
554:1 556:4 559:1
562:18 563:9,14
564:2 566:16
567:17
**Okay.4**
291:11
**old**
181:12 549:12,19
**older**
6:17 332:11
**once**
63:3 329:17 334:2
334:7,10,14
526:14
**oncologist**
40:2,3 133:1
**oncology**
129:12 130:17
156:10,13 485:3
560:22
**ones**
106:17,19,20
179:21 279:4
365:7 385:21
433:10 447:22
450:4 519:12
531:11 541:1
**one-time**
343:21
**ongoing**
195:6,9 196:1
290:20
**onset**
498:8
**oops**
527:18

**operate**
64:6 67:16 74:2
**operations**
40:17 41:8 42:3
43:19,22 249:4
**opinion**
16:3 19:18 20:2,4,7
21:12 24:11,21
25:12 26:12 28:13
29:19 30:10,13
31:14 34:20,24
38:2,14,23 48:15
49:7,23 50:6,15
50:21 52:20 53:24
71:18 105:17
112:24 116:4,10
118:1 126:21
131:4 132:13,14
133:19 138:2
142:5,8 143:9
155:2,7 169:12
172:22 174:15,21
175:16 176:14,19
182:19 206:3,5
214:24 216:4
223:16 224:23
326:20,22 327:2
342:9 350:9
359:24 384:3
415:14,18 434:16
435:11 436:11
471:13 472:10
**opinions**
50:8 67:10 72:14
84:9 88:6,23
117:8 121:12
122:23 123:3
127:9 129:3
143:23 144:5
169:9,10 170:18
174:10 176:13
177:1,4,6,10,21
178:8,17,19,23
179:3,6,10,11,18
180:5,6 185:7
210:9 215:16

303:22 358:12
359:1
**opportunity**
227:8 326:4 404:4
488:12 507:13
570:9
**opposed**
321:2
**opposite**
302:15 303:15,18
303:20 305:3
**Oquendo**
190:11
**oral**
304:24
**orally**
89:5,9
**order**
112:13 168:4
188:15 213:22
215:15 230:16
267:18 368:16
370:8 477:20
512:22 513:5
514:20 516:21
548:12 552:5
**organization**
79:12,24 81:6,9
245:9 247:10,18
250:10
**organize**
18:8
**oriented**
456:9
**orienting**
441:20
**original**
113:15,24 571:15
**ought**
464:24
**outcome**
318:8,10 351:16
354:12
**outcomes**
236:20 316:9 317:3
**outdated**

Karla Ballman, Ph.D.

236:22
**outer**
497:24
**outliers**
512:6,7
**outset**
316:7,24 318:6
**outside**
73:4 85:20 86:21
87:1 88:4 154:6
155:1 205:1
372:11,21 379:9
382:10 383:9
384:1 463:12
**ovarian**
5:20 6:12 8:22 9:8
9:16 14:12,16,17
15:15 16:5,13
24:6,10 34:22
35:2 37:5,18 38:5
47:7,14 48:9,17
49:5,8 50:1,10,18
52:24 55:4 58:15
58:18,22 59:9,24
60:16 61:3 62:6,7
62:16 63:4,23
64:17 66:19 69:4
69:16 70:3,10,14
71:2,19 76:22
82:16 83:7 86:8
86:19 91:24 92:9
98:17 99:12 100:9
116:7 117:17,18
121:17 123:6,12
123:14,21 124:4
124:10,15 125:13
126:16 130:5,20
131:8 133:17
135:11 137:11
142:12,22 153:24
156:15 159:22
160:11,15,23
163:1,4,15 164:8
164:15 165:2,10
165:14,24 167:19
171:16,18 172:17

172:24 174:4
175:18 183:7
262:15,20,24
263:4,9,10,11,20
265:14,16 330:7
338:13 368:17
370:8 371:1,3,9
372:5 380:19
381:7 387:16
399:8,15 400:20
401:8 402:4 453:1
466:12 508:12
514:7 515:14
526:11 546:23
556:8,24 559:23
564:22 565:8,9
566:2
**overall**
213:1 353:11
476:18
**overboard**
468:13
**overconfident**
495:19 496:21
498:20
**overestimates**
509:7
**overestimating**
509:5
**overlap**
44:20 45:6 228:7
228:13,23 230:19
230:20 231:2,8,9
231:12 242:21
246:3 249:11
417:11,22 418:22
419:7,20 421:23
**overlapped**
229:4,17 453:15
**overlapping**
229:9,12
**overlaps**
260:4
**O'Sullivan**
8:13 276:17,22
277:5,7

                **P**
**P**
453:5
**PA**
2:3
**page**
5:14,18 6:5,7,15
7:5 8:5 9:5 10:5
11:6,9,12,15
16:14 17:9 34:8
37:21 91:14 93:6
93:8,12 94:20,21
95:4,14,14,20
96:1 97:13,23
99:21 100:2,15
101:19 102:14
103:9 143:4,6
152:15 153:1,10
159:10,14 182:11
203:13,15 235:8
235:18,20,23
237:7 239:2
243:14 244:3,3
245:12 248:12,14
251:18 252:2,3,10
252:11,12 284:16
285:20 286:17
287:5 292:7,10
293:10 294:18
295:22 296:12
297:7,20 298:17
299:17,24 301:1,4
302:4,8,10 310:20
314:24 315:1
323:15 341:14,14
358:22 364:13,14
364:17 370:22
376:3 386:3 388:6
388:22 395:4
401:6 404:14
405:20 406:23
408:22 409:3
416:19 422:6,9
429:2 439:10,11
441:5,8 451:7,15
456:1,2,3 473:11

473:17 475:1,6,19
475:21,23,24
476:2 480:6,7
490:12,13,20
492:16 493:13
497:7,12 499:8,9
508:1 513:17
517:4,4,5 529:24
531:14,15 536:12
549:14 550:9
565:11 567:5
568:9 572:4 574:2
**pages**
62:21 69:11,20
252:2 337:4 428:6
573:6
**paid**
110:16,21,22 111:2
111:11,17,19
112:7,20,24 154:7
154:14,22,23
190:2,4
**panel**
7:16 174:3 193:19
243:17 481:11,14
481:20,23 482:1,2
482:6,9,11
**PAPANTONIO**
2:2
**paper**
169:16 170:5,8
171:23 268:17
325:3 380:1
**papers**
325:9 335:10 393:4
428:4 465:6
485:11 561:19
**paragraph**
95:11 96:1 162:8
243:16 294:19
297:22 299:18
301:5 307:21
308:14 309:22
310:12 314:18
315:2,12 316:1
317:14 322:4,6

323:8,15 324:1
359:4 380:11
407:14 416:6,9,12
416:13,15 418:16
422:14 441:15
442:3,12 453:19
474:4 490:20,22
497:8 513:16,19
513:21 517:19
518:4,21 531:20
532:7 567:15
**paragraphs**
322:5 442:2
**paraphrased**
386:17
**paraphrasing**
157:20,20 362:8
**parcel**
210:15
**PARFITT**
4:9
**Park**
3:8
**parse**
164:23 477:1
**part**
17:19 33:23 41:1
77:9 143:19
152:21 153:17
154:18 183:12
185:14,22 194:13
194:14 210:15
253:24 257:15,20
260:14 261:15,16
277:11 278:5
340:17 346:16
370:14 373:23,23
374:9,12,14
404:10 406:6
418:16 439:17
561:16
**partially**
135:23,24
**participant**
297:14
**participate**

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 182 of 463 PageID: 38419
Karla Ballman, Ph.D.

Page 610

79:6 481:15
546:21 547:10,13
**particular**
75:11 203:8 216:16
230:13 248:12
289:20 301:13,21
316:3,16 329:16
336:4 343:20
348:11 364:5
549:2
**particularly**
280:12
**parts**
125:17 226:4
290:21
**passed**
552:20 554:10,18
**passes**
478:4
**patent**
151:14 195:21
**path**
40:21
**patient**
277:20 329:15
330:4,8,12
**patients**
8:12 130:23 131:12
133:6,22 308:20
332:3 334:1 368:9
370:7 371:22
498:9
**patient-level**
562:16
**pattern**
349:12
**patterns**
523:5 534:18
**pause**
458:14 516:9
**pay**
111:7
**paying**
338:19
**PCPC**
4:5

**PDE5**
218:17
**PDQ**
400:20
**peer**
158:6 170:23
271:11 280:15
327:16 373:9,11
374:8 379:18
552:21 553:15
554:10,18,19
561:3,11
**peer-reviewed**
98:14 99:9 156:18
156:21 171:3
374:3 375:19
382:23 383:6,11
383:20 392:20,23
415:16,21 536:4
**pen**
448:24 449:2 504:4
506:17 507:1
**pending**
100:17 322:24
376:1 377:19
378:5 403:23
513:24
**Penninkilampi**
93:18 385:20
528:23 529:5
535:2 536:11,14
**Pennsylvania**
3:13
**Pensacola**
2:5
**people**
60:23 65:9,13
66:17 80:9,13
81:14 117:18,20
123:17 146:20
147:7,12 150:4
170:12 175:10
229:10 241:6
250:8 251:15
256:7 318:22
372:11,21,21

377:10,12 379:21
388:20 393:1
394:4 402:11
403:16 406:21
420:24 429:22
433:2 475:1,3,11
482:2,5 483:23
484:18 491:8
493:11 523:9
524:5,8 535:18
539:12 546:5,15
547:5 555:12
557:17
**percent**
24:2 159:17 268:7
371:13 372:8
417:9 420:21
431:11 453:19
498:7,11,13 502:5
502:10,13 508:12
509:14,15
**Perfect**
241:3,5 419:21
**perfectly**
328:7
**perform**
48:5 64:14 75:5
**perineal**
9:7 24:9 38:4 91:23
92:8 98:16 99:12
100:10 116:5
121:16 126:15
136:8 153:23
376:21 386:9
452:23 466:12
565:14,15 566:1
567:1
**perineal/genital**
452:24
**perineum**
16:12 136:8 137:14
142:12
**perineum-talcum**
131:7
**period**
63:24 122:18,19

305:17 380:15,19
381:4
**periods**
380:14
**perioperative**
236:16
**peritoneal**
9:16 399:14 400:21
400:22 401:9
564:23
**permeates**
405:18
**perpetuate**
397:10
**perpetuated**
325:5
**persist**
456:24
**persistent**
8:19 320:5 337:2
455:13
**person**
32:17 61:2 67:8
329:17 336:13
**personally**
66:1 156:4 542:7
**persons**
404:21
**perspective**
140:24
**pervasive**
493:13
**ph**
1:20
**pharmaceutical**
216:8
**pharmaceuticals**
73:10
**pharmacologists**
59:23
**phenomenon**
478:22 480:20
**Philadelphia**
3:13
**phone**
59:16 248:18

**physically**
194:9
**Ph.D**
1:13 5:5,15 6:21
7:18 12:22 13:11
13:13 16:16 41:23
42:2 43:5,9
241:21,23 261:21
389:23 570:8
573:16
**pick**
464:24
**picture**
232:15,16 233:1
392:9
**piece**
145:3 146:14
150:10 447:11
**pieces**
54:22
**piling**
148:1,3
**pink**
508:10,11
**pitfalls**
395:14
**place**
15:19 19:12 174:19
289:17 296:22
318:23 325:16
421:16 429:16
430:21 500:19
526:3 535:11
**placed**
21:6 22:22
**places**
21:4 252:23 289:19
292:9 303:23
404:22 511:7
**plagiarism**
115:17
**plaintiff**
179:10 365:11
**plaintiffs**
2:15 4:11 85:15
173:1 175:1

173:1 175:1
176:11 178:5,17
178:20 179:7,18
184:3 206:20
207:18 209:1,21
284:5,11 358:10
358:23 359:5,12
359:20 360:10
361:3,11 362:12
363:7 364:1
365:24 366:2,13
372:13,24 374:20
379:11 381:13
387:1 407:1,3,17
407:21 409:15
411:14 415:1
416:1 466:23,24
468:22 471:15
472:12 569:6
**plan**
172:20
**platitude**
387:20
**plausibility**
96:12 97:6 134:4
135:5 153:17
517:12
**plausible**
134:24 135:14
517:11
**play**
245:4 249:21 277:5
362:4 478:18
**played**
275:13 278:19
**playing**
452:11
**plays**
451:3 452:20
557:12
**pleading**
200:19
**please**
12:19 13:7 36:23
42:8 46:2,6 52:7
58:5 64:21 83:17

90:23 91:9 104:7
118:12 138:9,10
148:18 158:18
164:10 185:4
197:23,24 198:21
214:18 217:5,10
227:1,3 232:4
234:21 243:19
244:2 253:8
267:17 293:2
295:7,15,16
296:12,13 307:24
309:13,13 321:7,9
346:19 351:24
357:24 358:19
362:23 370:3
377:23 378:21
390:2 400:16
404:11,19 448:2
467:17 468:8
471:8 476:1
481:18 487:1
488:22 503:16
504:2,4 563:4
564:14 565:11,17
569:14 571:3,8
**plenty**
391:15
**plot**
423:20,23 425:10
**plucking**
317:8,13
**point**
17:8 100:15,21
118:5 125:23
173:4,5 234:6
244:23 249:7,22
269:1 292:9 321:6
322:21 324:14
343:9 345:19
346:1,4 358:18
359:21 362:11
364:5 380:4
387:13,16 426:2
429:10,13,14
430:17,20 431:2

437:16 452:17,19
454:23 458:6
463:7 467:1,5
468:24 469:7
471:17 472:14,19
472:23 475:14
486:15 497:21
498:1,16 500:15
503:7 505:8,19,23
507:21 523:24
527:19 529:15,21
536:23 568:12
**pointed**
228:9 510:3 534:23
**pointing**
383:24 527:24
**points**
475:7 550:8
**poison**
137:23
**policies**
74:11
**policy**
474:7 478:3 494:1
**polite**
312:24 357:18,21
**pontificate**
404:4
**pool**
278:7
**pooled**
57:6,7 277:12,17
426:8 428:20
528:24 529:4
562:15
**pooling**
277:22
**poor**
344:11 478:10
**poorly**
328:14 343:16
**popular**
548:5
**population**
93:4 233:11 316:6
316:24 318:5

407:7 427:1
428:11 435:1
551:15
**populations**
231:19 351:14
354:10 511:11
**population-based**
56:15,17 92:23
354:16 426:8
508:21 543:21
**portion**
182:1 243:6 307:1
307:3
**positing**
95:15
**position**
243:21 270:19,20
461:6,7
**positions**
252:24 474:11,22
**positive**
98:16 99:11 100:9
278:2 432:3,11,11
432:22 433:3,12
451:2,6 452:3,6
452:10 498:14
501:23 550:13
**positively**
514:6
**possible**
167:13 330:11
344:19 386:8
561:2,5
**possibly**
120:23 386:11
487:23 488:7
**posters**
89:6,9
**pot**
445:15
**potential**
49:3 55:3 297:10
381:5 395:14
**potentially**
376:5 377:4 379:4
531:9

**pounding**
438:22
**powder**
1:5 12:11 13:17
14:11,16 15:14
16:4,12 24:5,9
34:21 35:1 37:6
37:18 38:4 47:6
47:15 48:9,16
49:6,8,24 50:10
50:17 52:24 55:4
59:12 61:3 62:17
63:5,23 69:4 70:4
70:11,15 71:2,19
76:12,23 82:15
83:6 86:20 116:6
117:19 121:16,24
123:21 124:3,15
130:2,19 131:7,17
132:5,9,15,17,24
133:6,12,15 134:9
134:14 135:7,8,9
135:19 142:4,18
142:19 153:23
172:18 183:8
196:2 329:19
343:23 399:14
452:24,24 559:23
**power**
368:14 371:7,12,15
371:20 372:7
376:7 377:5 379:5
384:6 385:12
403:4 444:1 446:4
446:9,14 523:2
548:12 551:3
552:6
**powered**
416:23 417:5,12
439:12,21 443:22
444:4,7,12,24
446:16,17,19
551:17
**powerful**
397:22
**practice**

7:21 40:5 88:3,4
149:8 270:21
382:21 474:12,19
480:15,16
**Practices**
1:6 478:5
**Pragmatic**
479:4
**preparation**
469:15
**prepare**
13:22,24
**prepared**
143:23
**preparing**
109:15 185:8,23
214:16
**presence**
135:2
**present**
4:12 253:20 492:24
**presented**
89:5,8 129:2
474:18
**pressing**
462:15
**presume**
74:3 131:10 133:20
176:3 206:12
**presumed**
323:19 324:7
**pretty**
21:1 94:9 168:9
207:15 267:4
283:21 331:4,5
358:13 359:2
388:6 537:2 550:6
**prevent**
213:17 497:6
547:11
**Prevention**
9:17 400:22 565:2
**previous**
332:22 498:6 522:8
524:11
**previously**

189:7 474:10,21,21
553:4
**primarily**
200:9 202:2 278:16
278:24
**primary**
9:16 400:21 401:9
564:23
**principle**
19:24 286:6 291:8
291:15,21 296:2
304:9 311:23
326:12 329:4
343:5 363:20
**principles**
21:23 23:8 36:1,5
37:13 220:17
221:20 288:10
296:9 335:12
342:11 347:23
382:19 409:10
480:17 519:8
560:6
**print**
192:7,9,12
**printed**
181:17 192:11
251:9
**Printout**
8:7
**prior**
47:23 48:12 49:20
49:22 58:12
146:22 499:8,9
529:24 533:1,14
**probability**
476:8,10,17 477:7
477:22
**probably**
88:17 112:13
115:16 126:18
157:3 158:5 195:4
195:5 220:5
271:17 278:18
335:9 387:12,15
435:2 463:6

482:19 529:16
**problem**
75:3 127:16 130:4
234:23 356:21
396:6,6,14 468:9
493:13 549:12,19
**problems**
25:22 235:1 316:2
316:16 424:7,9,10
**procedures**
249:4,8
**proceeding**
391:7
**proceedings**
77:8
**process**
10:8 158:7 473:19
479:15 550:14
**processes**
205:5
**PROCTOR**
2:3
**produce**
198:7 298:24
324:17
**produced**
62:19 352:19
476:10,18
**product**
63:23 216:4,10
217:1 218:6
222:20
**Production**
11:8
**products**
1:5,6 14:11 15:14
16:5 37:6 47:6,15
48:9,16 49:6,8,24
50:10 55:4 59:13
63:5 69:4 70:4
71:2,19 73:9,15
76:13,23 82:16
83:6 86:20 121:24
123:21 124:3,15
130:3,19 131:18
132:10,24 134:9

172:19 183:8
**profession**
7:21 250:20
**professional**
1:16 34:23 35:4,15
35:18 38:2 43:24
88:3 116:3 121:5
131:4 142:8
172:22 230:3
253:3 255:23
256:2 565:2
570:13
**professionally**
156:6
**professor**
242:12 245:21
**proffered**
206:4
**Profile**
7:12,18
**prognosis**
123:16
**program**
250:7 257:15,21
261:16,18 338:12
340:17
**Promoting**
7:20
**prone**
297:13
**prong**
414:15
**pronounce**
78:22
**pronouns**
365:17
**proper**
45:18 206:9,21
480:22 560:3
**properly**
227:9 322:9 323:10
324:15,17 326:16
328:10,13
**proposition**
445:23
**propounded**

573:9
**prospective**
20:16,19 285:10,11
292:11 297:12,13
300:8,10,11,14
370:23 372:4
398:14
**prospectively**
300:5
**prostate**
195:22
**protocol**
373:24
**prove**
26:14,23
**proven**
27:4 479:21
**provide**
144:9,18,22 285:21
286:1 290:8 301:7
302:12 305:17
321:13 408:8,12
412:20,24 413:4
418:16,18 419:3,4
**provided**
83:21 180:21
188:13 191:21
310:18
**provides**
146:8 150:3
**providing**
238:14,15 301:18
**prudent**
195:7
**PTI**
3:20,20
**public**
1:17 123:22 124:6
124:8 126:10,12
126:18,19 229:5
233:20 242:15
252:24 254:18
255:23 256:2
570:14 573:23
**publication**
55:11 155:18,20

Karla Ballman, Ph.D.

173:22 184:9
268:1 372:19
373:15 394:14,19
487:5
**publications**
53:2,4,11 58:17,20
70:13 88:16
158:24 168:23
176:4 183:16
184:7 262:15,19
262:23 263:3,5
264:17,20 265:7
265:10,13,16,17
266:1,3 268:2
269:2 360:8
**publish**
158:11,13,21 172:7
172:16,20 175:11
555:20,24 562:19
**published**
41:4 52:23 53:7
54:3,5,12,18 55:5
56:6 62:6 65:20
81:20 86:6,16,18
93:15,22,24 94:1
110:3 124:21
146:12 155:2,11
156:8,12 157:9
169:1,8,13,16
170:6,17,21
171:14 173:18,23
175:9 176:2 267:9
271:23 272:2,9,13
272:22 273:4,5,8
273:11,16 274:7
280:17,18 327:16
338:15 373:12
384:2 385:22
393:4,4 397:12
415:16,21 419:12
459:15 487:5
553:14,20,23
554:22 555:9
562:4 565:6
**publishes**
157:13

**publishing**
61:11
**pull**
252:4 404:11
486:23
**pulled**
169:24 248:10
252:10 518:21
532:19 549:4
558:8
**pulling**
238:9,11
**pull-out**
520:20
**pure**
137:1 229:6 561:15
**purported**
546:18
**purporting**
326:10
**purpose**
10:8 139:19 140:22
141:1,4 171:2,7
250:19 254:6
287:4 449:12,14
473:9,20
**purposes**
22:19 55:16 85:14
134:8 311:5
**pursuant**
1:13
**pushing**
561:21
**put**
19:11 20:5 39:4
113:3 115:12
119:1,5 120:4,8
150:24 161:17
170:8 171:23
174:12 184:19
195:18 225:4
235:14 241:20
292:17,19 293:22
295:6,14 296:23
300:3 311:15
319:20 347:6

349:12,13 350:2
366:24 367:1
379:17 423:19
424:17 427:23
439:19 485:1,2
504:19 507:2
509:10
**puts**
321:6 553:8
**putting**
86:1 207:19 222:7
222:18,21 425:16
432:17 484:19
**pyramid**
19:8 286:22 287:1
553:7,10
**P-value**
420:19 421:2,8,17
460:23 464:7
476:19 477:3,4,20
477:21,24 478:4,8
479:7,11 481:5
493:17 494:17,21
506:1,7,15 530:3
540:6,11 550:22
**P-Values**
10:7 291:23 292:1
453:5,7 459:8,16
459:19 460:9,12
461:7,20 462:5,20
465:20 466:4,20
473:7,8,19 474:7
476:6,8,15 498:3
551:2
**p.m**
281:1,9 357:24
358:5 440:2,7
458:13,17 503:18
503:22 516:8,11
569:15,19
**P1.0125**
8:23
**P1.0198**
5:23
**P1.0200**
5:16

**P1.0201**
5:19
**P1.0202**
6:8
**P1.0203**
6:16
**P1.0204**
7:14
**P1.0205**
7:17
**P1.0206**
7:19
**P1.0207**
7:22
**P1.0208**
8:10
**P1.0211**
8:16
**P1.0213**
10:13
**P1.0214**
10:16
**P1.0215**
9:20
**P2.0034**
9:9
**P2.0052**
6:13
**P2.0056**
6:11
**P2.0057**
8:13
**P2.0060**
9:17
**P2.0061**
9:23
**P2.0062**
9:14
**P2.0063.1**
10:9
**P2.0067**
8:18

## Q

**qualifications**
174:14,20 175:16

175:21 179:3
215:22 219:16
279:18,24 280:6
281:16 335:7
**qualified**
175:12 205:13
206:3,19 334:24
519:18
**qualifies**
182:18
**qualify**
183:6 230:3
**quality**
89:18 156:23,24
157:7 478:21
561:13
**qualms**
174:14 175:15
**quantitative**
40:23 480:23
**quantitatively**
457:12
**question**
14:10 15:13 16:1,2
16:10 21:20 22:11
22:15 25:9 30:12
32:2 34:10,15
36:11,16 39:11
41:14 42:19 45:12
47:12 48:1,21
49:10,12,14,21
51:7 53:14 60:12
61:8 64:17 66:24
67:3 68:2 70:2
73:3,22 74:15
76:22 77:3,11
78:4,8 82:12 83:5
85:18,22 86:3,8
86:19 88:10 89:2
99:17 100:16
109:3 110:10
115:20 118:4,8,24
121:21,22,22
122:2,6,11,14
124:4,11,14 125:1
125:3,5,10,19

Karla Ballman, Ph.D.

126:11,12 128:20
133:5,12 134:8
135:18,19 136:3
136:15 137:5
138:24 139:18,24
140:2,3,15,18
145:1,5 148:1,3,4
148:4,11,21 149:7
157:16 167:24
172:5,14,17
174:11 175:17
176:15 177:14
179:16 182:20,22
185:18 186:17
190:16 200:19
202:14,15,18
203:21 204:4,5,6
204:20 205:12
208:3,15 210:18
216:23,24 217:20
217:23 218:1,5,22
219:6,11,17 220:8
222:15 223:1
227:14,23 229:21
229:22,24 231:6
235:7 236:19
237:4 238:6 239:6
241:6 242:3 244:4
255:7,8,19 258:8
266:9 267:7
268:24 269:12,14
269:16 273:15
282:17 283:15
290:16,19,22
291:2 303:13
310:3 322:24
329:17,22,23
330:18,20 331:20
332:23 333:3,6,16
333:18,20 334:5
339:11 345:17
351:22 353:6,8,9
358:16 359:9
361:1 368:2,3,23
368:24 369:2,16
371:6 372:16

373:20 376:1
377:18,19 378:5
385:3 393:20
402:20 403:22
404:3 407:20
408:1 410:20
411:2 412:9
413:20 418:7,11
425:24 426:13
430:13,15,16,20
430:20 438:3
445:5,6 449:23
450:1 452:14
457:23 464:12
470:9 471:24
472:7 473:23
482:13,14 502:21
513:24 524:5,14
525:7,12 533:18
533:19 543:4,5
547:9,16 557:17
559:16,17 560:23
563:8 566:11
568:20
**questioned**
215:21 216:2
**questioning**
182:1
**questions**
11:14 60:7,15
66:18 68:19 71:8
79:17 80:6 88:7
89:14 113:22
126:4 146:17,20
154:11 172:9
191:17 202:16
205:19,21 212:9
227:17 231:4
235:5 281:19,19
282:12 290:7,18
297:3 323:2
330:14 335:4
336:16 402:22
403:6 459:5
464:11,11 490:7
515:6 538:5

541:13 563:21
564:6,8 566:9
573:8
**queue**
369:24
**queued**
369:21
**quibbling**
111:21 261:10
527:16,20
**quick**
193:12 243:1
**quicker**
227:21
**quickly**
33:6 109:9 388:6
450:14 499:17
**quite**
15:21 32:9 33:16
58:1 105:8 236:22
268:23 300:5
405:13 436:18
438:15 506:5
522:5 530:24
539:5 555:18
**quotations**
395:13 398:7,12
**Quote**
10:12,15
**quoted**
393:1 394:4
**quoting**
392:5
**Q3**
527:17

_____

### R

**R**
2:8 281:5 572:1,1
**Radiologic**
243:8
**Rafferty**
2:3 430:3
**raise**
358:24 359:13
523:18

**raised**
132:2 318:12 364:9
364:11 368:8
**random**
431:9 476:11,17
**randomized**
287:13,14 308:4
309:3 310:18
321:13 326:5
329:8 544:23
545:3,6,15,21
547:23 548:3
552:3 553:6
562:11
**range**
25:3,7 32:8 33:15
437:22 457:12,17
457:23 458:5
501:10 512:14,16
**ranges**
410:8 415:9 434:20
454:22,23
**ranging**
384:16 422:20,22
451:20,23 498:11
502:4
**ranking**
309:1
**rare**
278:8 367:23 539:2
555:23
**rarely**
562:5 563:10,12
**rate**
401:18
**rated**
433:19
**rates**
506:4
**ratio**
267:3 371:12 372:7
384:9,14 388:24
417:10 428:5,14
428:22 429:9,12
431:12,14 432:4
432:12 433:12

451:2 452:7
494:14,20 504:5,8
505:6 509:3
510:18 511:3,12
511:20 512:3,16
512:23
**ratios**
25:4 32:5 33:12
160:19 291:22
388:24 389:8
406:1 429:5 432:3
433:18 435:9
437:11 452:2
454:15 494:20
509:21,24 510:4
510:10 544:7
**RCT**
322:4
**RCTs**
287:20
**reach**
34:9,19 35:5 50:20
51:23 75:11 89:21
121:3 122:7 144:5
384:13 520:8
**reached**
14:18,23 48:7 51:8
51:20 71:18 73:21
74:13 75:2 81:21
109:17 129:22
143:9 300:4 340:5
405:13 541:20,21
541:24
**reaching**
35:15 36:1 74:5
**read**
32:12,19 33:5
38:12,13,17 39:1
48:3 50:5 54:24
77:1 100:23
101:18 104:19
108:7 109:21
116:21 117:5
156:7 159:19,20
161:1,11,13,16
162:7,23 163:8,22

165:21 174:5,6
184:17,21,23
186:13,18 194:23
208:24 226:4
234:5,12,13
237:12 244:1,9
248:22,23 253:9
292:8 301:3
307:24 308:7,7,7
308:10,12,15
309:14,22 310:6
315:21 317:7,20
321:5,9,10 323:14
345:10 362:10
363:5 372:2,17
373:7 375:7,7
377:22 378:24
379:7 384:21,23
386:18,20 395:19
395:20 404:18
405:7,8,23 416:7
416:21 424:4
426:18 429:15
442:6,9,23 447:3
447:6,7,9 448:3,8
448:9,10 456:12
460:1,24 461:11
469:11,24 470:5
471:2,23 474:1,14
474:15 478:15
479:3 481:13
486:17 488:2,12
488:13 490:5,9,17
491:2,3,5 492:17
492:18 494:6
495:3 497:4,9,9
497:15 499:4,8,9
499:12,16 509:20
513:20,21,23
514:2 550:20
565:17,21 566:3
570:9 571:3 573:5
**reader**
288:9 397:13
**readers**
395:16

**reading**
159:9 160:1 161:7
179:5 184:10,11
310:3 321:2
323:23 363:3
364:13,21 376:13
386:21 397:15
427:4,7 442:9
455:21 457:20
492:15 565:20
**ready**
101:3 103:23
271:15
**real**
139:13 305:12
325:24 326:9
339:4 431:12,21
446:21 501:9
**reality**
536:21
**realize**
93:22 185:18
266:20 392:4
427:6
**really**
30:11 45:9 57:22
88:9 101:13 111:1
118:6 130:1 142:4
158:3 187:3 195:4
200:18,19 202:14
202:15 205:20
229:16 234:24
237:1 238:22
242:8 255:5
282:14 288:8
311:4 319:2 334:4
339:18 346:2,4,5
347:15 362:4
377:8 392:1 398:6
411:1 435:24
445:14 446:20
448:14,17 455:20
464:23 468:12
501:9 510:8
527:24 530:4,5
535:19 536:19

551:21 568:11
**realtime**
1:17 273:7 570:14
**reason**
52:17 73:23 74:16
76:19,20 141:20
149:17 174:8
207:12 266:7
312:19 377:12
378:12 420:23
571:5 572:6,8,10
572:12,14,16,18
572:20,22,24
**reasonable**
14:19,23 15:4 16:3
34:20 471:14
472:10 535:18
**reasonably**
498:14
**reasoning**
480:10 481:6
**reasons**
39:18 334:13
359:15 376:4
377:3 378:12
379:2 449:1
545:20
**REATH**
3:7,11
**rebuttal**
394:5
**recall**
90:21 91:1,2,5
152:13 168:10,12
168:13,15,18
295:4 297:14
306:19 324:20
329:10 370:2,2,5
377:13,14 379:23
443:21 501:5
537:17,24,24
538:3 543:16
**receipt**
571:17
**received**
59:16 75:23 194:5

194:11 195:10,22
**recite**
332:15
**recognize**
94:16 269:8 427:16
427:17
**recognized**
245:24 309:1 367:4
367:6,13
**recognizing**
474:9
**recommending**
419:14
**record**
12:3,16,17 18:9
41:22 55:16 85:4
101:19 104:6,10
113:22 139:1
145:14 164:2
173:9 192:23
193:2,6,9 227:10
235:14 244:9
248:23 251:24
255:16 260:4
281:1,8 282:24
293:7 306:16
308:1 309:15
313:18 337:2
340:15 358:1,4
360:3 404:19
405:24 416:8,22
440:3,6 447:7
458:10,13,16
468:17,19 488:20
488:22 489:9
497:15 503:18,21
504:23 515:24
516:6,8,11 570:6
**records**
173:22
**red**
448:24 508:9
523:18
**redo**
431:8
**reduce**

124:9 478:5
**reducing**
234:3
**refer**
57:9 80:13,17
81:17 181:24
183:16 319:22
376:20
**reference**
54:11 56:1 81:13
84:10,18 159:4
345:2,7 403:20
489:15 519:5
567:8,9 568:3,8
**referenced**
55:24 258:14
**references**
54:15 81:14 166:19
166:19,24 167:6,9
167:23 168:3
272:12 298:6
326:8 475:17
520:12 522:2
567:15,18,23
568:1 569:2,2,3
**referred**
23:15 173:10 184:4
391:19
**referring**
95:6 104:20 108:4
145:22 155:15,16
209:24 258:6
370:15 420:9
451:13 481:4
543:7
**refers**
441:11 566:24
**reflect**
18:10 113:23
156:23 222:3
315:17
**reflective**
259:8
**reflects**
117:7
**refresh**

Case 3:16-md-02738-MAS-RLS  Document 9737-7  Filed 05/07/19  Page 188 of 463 PageID: 38425
Karla Ballman, Ph.D.

Page 616

215:15
**regard**
24:4 31:2 388:23
413:3
**regarding**
47:13 265:18 332:3
**regardless**
421:21 435:8 518:4
521:17
**register**
194:24
**Registered**
1:16 570:13
**regular**
262:11
**regulatory**
67:8 72:6 90:19,20
103:12,13
**reiterate**
244:15
**reiterating**
244:14
**related**
60:15 66:19 69:3
69:15 70:10 71:1
75:6 76:12 178:17
178:19 179:7,14
192:13 228:10
264:18 318:9
338:13 340:7
372:23 376:6
377:5 379:4 487:4
**RELATES**
1:8
**relation**
395:22 476:20
**relationship**
35:1 37:17 38:3
69:8 82:15 116:5
118:3 121:15
126:14 131:6
132:21 133:14
142:11 146:10
153:22 160:15
163:4 165:10
171:17 187:5,8

301:7 388:15
395:23 399:13
420:11 422:24
446:21 466:11
518:6,9,11 522:11
526:18 528:8
531:2,12 532:9
534:8,10 540:7
561:22 568:7
**relationships**
389:2
**relative**
388:24 399:5
401:18,23 402:15
407:5,9 408:7,15
417:15 429:12
528:2,5
**relatively**
157:10 381:4
409:21,23 411:16
415:2,5 416:3
524:10
**relevance**
336:2 466:17,18
**relevant**
53:13,17,23 54:22
70:2 334:5,15
383:21 454:11
463:24 465:4,20
509:18
**reliability**
286:19 349:17
**reliable**
19:20 289:8,11
321:17,22 360:12
**reliance**
83:22 87:12
**relied**
23:13 54:8 395:24
560:11,15,17
**rely**
54:4 80:17,21
152:17 303:24
304:1 465:6
502:18 556:5
560:12

**relying**
371:10 439:16
464:16 559:5
**remember**
52:7 65:23 77:21
176:2 184:6,10,11
184:13,15 186:6
186:19,20 187:1,6
187:17 227:2
260:23 284:19
295:13 306:11,12
362:11 363:6
366:18 368:10
370:9 373:5
374:21 413:24
414:4,5 425:7
440:12 464:20
470:12,19 499:24
542:23 543:6,7,12
558:7
**remembers**
370:17
**Remove**
104:6 193:4 503:16
569:14
**render**
52:20 138:2 175:16
176:14,18 182:18
215:16
**rendered**
223:15 224:23
**repeat**
27:15 36:22 39:10
71:13 148:17
286:9
**repeated**
532:13
**repeatedly**
286:10 404:21
**repeating**
205:22
**rephrase**
22:15 48:21 49:21
59:4 60:11 71:12
71:12 82:23 86:3
172:13 179:15

203:20 219:16
273:14 316:13
**replaced**
259:6
**replacement**
401:22
**replication**
106:12 495:21
496:23
**report**
5:15 8:14 9:11,18
10:13,15 13:22
14:1,9 15:11 16:1
16:7,15,21,22
17:7 18:11 19:5,9
21:23 22:20 23:16
32:5 33:12 37:22
38:18 39:8,14
47:13 53:7,17
54:6,24 56:8 77:1
78:13,17 81:16,17
82:10 83:3,9,16
84:1,3,7,18,23
86:11,12,13 90:11
90:16,19 96:19
97:14,15 109:22
110:2,23 114:9,13
114:15 117:16
121:10 143:1,9,16
143:17,20,22
145:23 149:16
150:7,12,14,17,19
150:21 151:2
152:16 153:1
154:7,13,14,18
156:11 164:18
170:20,21,23
171:2,6,8,11
173:4,11 174:7
177:2,11 178:6,18
179:8,20 180:7,9
180:21 181:4,8,20
183:4 184:5,9,12
184:18,22,23
185:4,8,9,24
186:7,8,12,19,23

187:14,16 188:4
203:14 207:15
212:24 213:7,9,13
213:18,21 214:2,8
214:9 215:3,12
219:15,18 220:4
221:11 222:3
286:10,17 287:5
292:7 303:24
304:20 306:20
307:1,2,4,8,13,15
325:13,23 326:21
326:22,22 327:2
336:23 338:11,22
340:6,16 346:8,13
346:16,22 347:6
348:5 356:11
358:7,13 364:8
365:9,9,14 370:14
370:22 383:2,5,17
385:11 388:7
392:22 393:10
394:5,13,18,24
395:11 404:10
405:20 406:24
423:21 424:8,15
424:17,21,23
451:7,16 463:17
464:6 465:6
467:14 469:19
503:5 510:4 515:8
517:5 519:19
520:20 531:15
536:12 553:5
**reported**
186:22 376:17
380:23 409:19
410:9 431:14
457:24
**reporter**
1:16,16,17 12:18
33:6 458:9 570:13
570:14,14,22
**reporting**
392:13 480:22
568:2

Karla Ballman, Ph.D.

**reports**
54:23 84:24 85:2
87:5 180:9 185:1
208:24 209:21
214:18 215:11
288:5,17 294:24
309:6 365:7 396:7
396:15 397:11
424:1 455:2
463:11 466:23
**represent**
47:4 54:9 62:18,22
65:11 76:11
128:18 273:3
338:9 457:2
486:11
**representation**
113:20 381:23
**Representatives**
128:1,19
**represented**
256:11 374:2
457:18 482:15
501:11
**representing**
2:15 3:15,20 4:5,11
374:5
**reproduction**
570:20
**reproductive**
514:5
**reputable**
247:9
**reputation**
156:6
**request**
11:8 13:20 194:15
**requested**
570:7
**require**
398:13 479:5
518:12 520:6
**required**
388:14 516:20
531:23
**requirement**

517:1
**requires**
316:8 317:1 318:7
354:8
**research**
8:19 40:18 41:8
42:3 43:19,22
45:7 46:20,23
48:6 50:19,22
51:4,18,20,22
52:10,17,19 53:9
53:10,14 54:4,5
61:1,4,21 62:8
64:8 65:8,9 69:13
72:2 79:4 80:4,10
88:15,19,24 89:2
143:17 145:2
170:19 228:23
229:15 233:19
245:9 246:1 249:4
256:8,18 283:7
320:5 326:19
337:3 400:9
455:13 456:15,24
493:24
**researched**
48:1 60:22
**researcher**
44:8
**researchers**
55:5 476:14 478:17
**resides**
429:16
**resolve**
457:4
**resounding**
168:9
**resource**
368:3
**respect**
16:9 18:20 89:2
125:24 131:13
151:13 185:11
187:16 221:17
297:15 339:23
361:16 411:4

412:9 422:7
491:17,21 492:7
509:11 554:14
**respectable**
81:5,11
**respected**
79:11,24 156:18
392:1 491:12
**respectfully**
445:5
**Respiratory**
7:15
**respond**
122:21
**responded**
122:17
**response**
188:17 191:15
**responses**
191:19
**rest**
237:12 448:3 479:3
516:16 531:3
551:19
**RESTAINO**
2:12,13
**restated**
49:10
**restructure**
241:17
**result**
24:4 30:8,19 49:5
51:20 226:18
323:10 344:22
345:21 348:2
355:11 357:1
385:15 417:13
420:16 452:16
455:16 457:8
493:22 494:24
532:14 542:18,22
551:19 558:11
566:6
**resulting**
318:10
**results**

23:20,23 24:12,14
25:13,15 26:13,14
26:15 28:1,2
29:21,22 30:14
31:8,10,18,20
33:15 105:8 107:4
169:3 267:7
294:22 300:4
322:9 324:17
344:15 349:14,15
349:16 352:6
353:13,15 355:9
355:12 357:2
377:15 405:24
406:3,19 407:4
409:20 419:7
422:24 423:5,11
434:13 435:21
437:9 438:11
442:16,17 443:13
451:9 453:18
454:7 465:7
480:21 494:11
498:7 527:3
549:24
**retained**
13:18 47:24 48:10
48:12,19 52:19
71:21 72:19 73:1
206:8 207:7
**Retire**
10:10 487:13,16
**retrospective**
300:9,14 334:12
**retrospectively**
300:6
**return**
571:15
**review**
9:6 35:8,9 38:6,8
158:6 170:12,23
171:22 199:24
200:11 202:4
220:13 257:3,7
271:12 280:15
314:19 315:5

326:18 373:9,11
374:8 379:18
380:22 384:15
399:11 552:21
553:15 554:10,18
**reviewed**
6:20,23 55:11 56:9
132:7 150:10
172:3 189:21
215:10 224:19
265:18 327:17
423:24 427:18
464:8 561:19
**reviewer**
561:3,20
**reviewers**
379:19 554:19
561:11
**reviewing**
150:23
**revisions**
278:14
**reworking**
105:6 106:10 107:2
**re-read**
194:21 225:18
472:2,4
**re-reading**
226:18
**rid**
419:15
**right**
28:16 29:15 51:5
56:12,20 61:7
66:2,10 79:2
84:20 87:18 94:7
101:12 110:8
112:8 113:17
121:20 124:23
140:20 144:15
158:16 160:6
170:14 183:5
190:22 191:13
210:18,23 214:1
214:20 229:16
230:21 232:24

Karla Ballman, Ph.D.

249:24 263:16,16
266:9 272:6 275:7
277:16 282:3,23
284:22 296:5
299:14 300:13
302:20 304:21
307:6 308:5
309:18,21 310:10
311:14 314:2
323:6 327:3 331:8
331:17,23 334:12
337:16 338:7
341:16 364:4
366:21 367:14
377:22 382:13
383:2,6 384:24
392:18,19 394:14
395:19,20 398:24
405:23 407:18
408:16 409:7
413:14 414:1,7
415:13 416:18
437:19 438:1
440:2 442:5 452:1
453:5 456:12
473:13 475:7,18
495:3 501:8
503:16 519:16
522:14 523:3
529:9 530:11
532:5 535:9 536:8
540:14 541:12
546:11 551:20
553:15 561:16
567:14

**right-hand**
436:5
**rigor**
394:12,18,23
**rigorous**
35:8 38:6 158:6
**rise**
417:8
**risk**
9:8 25:4 32:5 33:12
37:5 80:12 130:5

131:1 134:18,18
137:10 262:23
263:6,13,23
264:10 267:3
308:17,22 368:17
386:14 388:24,24
398:19 399:5
400:13,13 401:8
401:18,23 402:12
402:13 403:17
406:1 417:10,15
417:17 428:5,14
428:21 429:5,9,12
429:16 430:23
431:12,14 432:3,3
432:12 433:12,18
433:19 435:9
437:11 451:2
452:2,7 454:15
494:13,19,20
498:8,11 500:18
501:21,22 502:4
504:5,8 505:6
508:12 509:3,21
509:24 510:4,10
510:17 511:3,12
511:20 512:3,16
512:23 514:5,6,11
515:13 528:2,5
532:10 535:6
536:8 539:4 544:7
565:8,9 566:2
**risks**
399:19 400:12
402:15 514:20
**Road**
4:9
**roadmap**
282:2
**robust**
160:14 163:3
**role**
245:4 269:8 270:10
270:17 275:13
277:6,9 278:19
440:10

**roles**
249:21,23 250:1
**room**
46:11,13 515:23
**Rothman**
8:17,20,23 9:22
65:14,19 319:15
320:13 335:1,16
335:17 336:24
338:10 339:8
340:6 341:15,17
341:18 364:11
367:5 386:24
392:10 395:5
442:5 444:19
445:19 475:4,11
**Rothman's**
312:5 440:17
446:23 455:10
513:8
**rounded**
511:21
**Royston**
3:20
**RR**
429:9
**rude**
313:3,6,7 339:18
**RUDIE**
2:8
**Rudiesoileau@g...**
2:10
**rule**
299:8 304:2 344:10
444:10,15 531:24
**rules**
72:21 478:7

────────────
S
────────────
**S**
5:11 6:2 7:2 8:2 9:2
10:2 281:5,5,5
**safety**
140:24,24
**sake**
450:12

**SALES**
1:6
**sample**
551:15
**Sander**
392:13 475:3,10
487:20 492:1,7
**Sandra**
190:11
**SARC**
7:18 245:7,7,8,12
**sarcoma**
245:10
**sat**
243:9
**saw**
23:5 83:21 109:9
111:12 131:22
194:1,4,6,22
349:12,20 536:7
540:15
**saying**
20:13 21:2 42:4,7
99:24 104:23
106:6 115:6,10
132:3 139:15
142:1 167:5
191:19 256:17
258:10 267:24
273:21 299:4
310:12 347:16
348:18 349:2
362:22 372:1
379:8,16 381:20
382:4,17 383:18
385:8 409:19
411:13,20 415:2
420:23 421:14,16
423:10,14,14
433:1 437:2
444:15 470:11
474:22 496:3,9,18
499:19 501:13
502:16,19,23
503:4 517:17
541:2 554:5,11

**says**
16:15 44:24 45:1
94:1 95:7,10,23
96:2,4,8 100:4
102:4,9,10 103:10
114:15 143:4
159:9,18 161:9
164:5 165:12
167:21 179:9
181:2,8,13,15
193:24 194:24
195:20 196:24
197:11,21 198:21
203:17 210:2
232:17,20 233:1,8
233:16 237:21
239:11,19 240:18
243:15,15 244:17
245:21 248:3,3,11
251:13 258:10
261:14 273:7
277:13 285:2
286:19 292:16
297:8,24 299:6,20
303:19 308:12,15
310:18 314:19
315:4 316:1,19
317:17 321:8,10
321:11 322:3,7
323:12,14 324:4
324:15 326:15,17
333:11 337:10
341:23 343:11
345:19,23 359:4
359:19 366:1
370:22 371:12
372:3 376:4 377:8
380:12 386:3
388:8 392:21
395:10 396:5,18
397:9 403:16
404:15,20 405:23
443:1,4,12 447:13
447:14 451:24
453:19 455:11,15
456:17 463:20

466:3 473:18
474:2 476:6,14
477:10,15 479:24
480:1,8 481:2,7
487:16,19 491:7
492:16 493:4,14
495:12 497:13,14
498:22 500:20
502:3 505:14,18
505:18 509:20
514:9 518:4 522:9
530:10,15 532:8
547:11 549:18
550:8,21 557:4,5
558:10
**scale**
144:13,14
**Schildkraut**
168:8 377:16
529:20 530:1
**scholarly**
157:23,23
**science**
9:12 115:11 123:4
125:13 252:23
261:17 333:24
391:24 393:9
395:3 485:6
**scientific**
35:10 38:8 73:3,22
74:15 79:12,24
81:5 82:14 89:13
117:24 120:6,20
121:13 124:13
125:12 127:3
129:4 169:18
170:3 210:11
228:11 233:18
279:12 394:18,23
396:8,16 397:18
397:22 399:11
461:4 471:14
472:11 478:2,6,8
478:19 479:13,15
480:9,16 481:6
550:1

**scientifically**
149:22 150:1
479:21
**scientist**
67:7 70:21 71:3,17
73:21 74:13 75:6
90:1 147:20
175:13
**scientists**
59:20 60:11,14
61:9,16 68:4 74:4
77:22 88:6,12,18
89:11 149:6
168:22,23 279:15
339:6 340:4
372:21 403:18
**scope**
205:1
**screening**
5:22 87:9 97:18
102:10
**se**
263:10
**searching**
555:5
**seated**
243:18
**seats**
211:22,23
**second**
140:3 159:14
191:14 253:13
269:5 270:18,20
275:12 285:1
294:18 297:21
323:8 333:2
368:24 405:21
418:15 441:15
442:3,12 458:11
473:10,17 490:12
490:13 492:15
497:13,16 525:6
525:12 531:20
**Secondly**
418:20
**seconds**

64:21 566:14,15,17
566:18
**second-to-last**
323:15 324:1
**section**
90:18 94:21 96:13
96:16 114:9 210:6
233:16 271:20
306:19 307:21
308:4,13 310:21
310:23 311:18
326:15 341:21
358:14,19 388:8
413:2 416:7 441:3
441:9,20 455:24
480:5 491:7
513:15 566:23
567:1
**sections**
18:12 150:24
**see**
15:6 16:18,19 26:1
27:7 44:22 53:11
78:21 81:1 83:16
84:17 90:23 91:19
91:20 92:1,5,6,19
92:21 93:1,2,7,8
93:20,21 94:23
95:23 96:4,8,11
96:13,16 98:20
99:15 100:4,13,14
102:3 104:18
107:9,10,12
109:12,17 135:9
138:21 139:18
155:13 160:5,24
161:1 163:20,21
164:5,18,19
165:15 166:18,23
167:5,9,20,21
168:2,6 179:9
184:12 185:3
186:8 187:14
192:4 195:20
198:13,17 201:14
214:17 230:12

233:12 243:11,12
243:24 248:7,16
248:17 257:11,14
258:4,5 259:9
261:13 263:16,20
273:18,19 274:3
274:12 275:2,8,11
276:15 280:19
286:23,24 294:15
296:18 297:8,19
302:17 306:23
307:22 308:3
310:17 312:1
314:14,23 315:9
315:10,20,21
316:10 317:4
318:19 319:13
320:6,7 322:2,11
331:21 339:6
340:7 341:21
342:5 343:18
344:4,24 356:23
357:2 358:22
362:9 365:7 368:3
370:21 371:4,5
374:7 376:11,24
381:8,10 384:18
384:19 386:21
388:1 389:3,12,22
389:22 392:8,10
392:24 394:3,3
395:7,8 397:14,15
398:1 400:15
401:3,4,10,15
402:6 407:5,11,15
408:10 417:18,19
419:1,20 421:2
425:10 435:13
437:5,15,20,20
441:6,11,16,22
452:11 453:12,14
453:21 457:14
460:15 462:7
465:4 466:16,18
471:3 473:2,10
474:23 475:4,6,9

476:5,12 487:15
487:24 488:8,9
493:3 494:2
496:24 497:2
498:21 502:2,6,12
509:21 510:21
513:18,19,22
514:13,14 515:2
515:18 517:8,21
517:24,24 527:6
527:13 531:6,17
532:17 534:9
537:12,12 540:8
546:6 547:13
549:13,18 550:19
550:20 551:5
557:8 558:3
565:13,15 567:2,7
567:8,8,9,9,10,11
567:11
**seeing**
140:22 422:11
425:7 526:18
535:21
**seek**
68:6
**seen**
60:1,2 66:12,14
87:19,20 94:4,6
131:19 135:15
146:24 147:1
155:6 176:21
188:10,11 289:18
303:3 320:8,11
338:14 399:19
425:11 474:16
489:11,17 511:1,7
511:15 514:21
518:1 539:8
548:24 549:1
553:7
**selected**
431:10
**selection**
297:14 318:11
324:21 329:9

379:23 501:5
**seminal**
146:4,5
**seminar**
41:3
**Seminary**
4:9
**sending**
191:11
**sense**
26:6 50:3 126:8
277:19 406:16
409:14 413:11
414:8 443:13,13
521:24 538:16,21
**sent**
69:12 195:12 251:3
**sentence**
93:13 95:10 103:1
117:2,3 118:17
119:6,11 165:16
165:20,22 166:5
211:2 222:13
240:15 285:1
292:14 297:21
299:18,23 301:3,5
301:14,21 302:7
315:4,11 316:18
316:20 317:13
326:15 328:10
342:14 343:10
379:7 380:9
395:10 396:5
405:21 410:23
412:6 422:13
426:19 452:18
455:23 456:10,17
456:21 470:2
478:16 480:1,8
481:1 506:6 522:9
524:15 530:14
531:20 565:18
566:4
**sentences**
119:20 150:12,16
169:24 317:9

319:9 333:13
343:11 344:9
345:3,8,12 388:10
416:16 439:6
**separate**
84:24 85:1 233:4
235:24 237:7,16
240:1,2,8,10,17
240:21 241:2
311:18 356:4,6
**separately**
356:12
**series**
288:5,17 309:6
395:12
**serious**
123:6,9
**seriously**
397:20 398:19
399:4
**serous**
123:15
**served**
87:13,16
**service**
279:11
**Services**
1:20 12:5
**set**
226:13 423:11
431:9 441:12
442:16 443:14
510:9,16 559:9
**sets**
423:5
**setting**
318:21
**setup**
409:18 410:5
**seven**
60:6 71:8 298:14
553:23
**SEYFARTH**
4:2
**shaking**
360:14,18

**share**
127:8 251:11
**shared**
127:5 197:2
**Sharko**
3:7 32:11 47:21
48:10 51:11 70:18
119:17 160:5,8
161:8 163:9 190:1
210:19 211:12,16
211:19 212:4,10
276:10 309:17,23
310:2,9 313:9,13
326:23 336:12,19
339:17,21 374:1,6
374:15 390:24
391:11 402:23
412:10 430:1,5
449:7 468:16
542:8 568:11
**SHAW**
4:2
**sheet**
571:7,9,12,15
573:12
**she'd**
78:13 448:17
**short**
104:8 193:7 348:15
358:2 381:4 440:4
503:19
**Shorthand**
1:16 570:13
**show**
155:4 156:2 160:2
192:19 227:10
242:23 263:17
267:20 271:1
272:11 288:24
305:21 306:5
312:4 319:14
326:8 337:23
340:10,15,21
346:15 348:1
351:15 354:11
391:3 411:21

424:16 428:5
432:3 433:12
450:20 464:6
467:13 471:8
481:19 485:5
487:12 515:12
524:16 526:21
531:1 535:14,15
539:17,21 544:24
545:1 548:20
549:23
**showed**
30:18 108:15,17
137:10 346:15
451:6 523:20
534:24 535:5
536:11 562:13
**showing**
302:22 312:8 428:9
521:12 527:18
531:11 539:13
**shown**
25:4 106:4 471:19
471:22 472:16
**shows**
168:14 259:15
270:17 326:1
347:19 356:21
429:21 523:14
530:1 535:13
**sic**
77:2,10 518:20
550:15
**side**
209:1 260:13
478:12 497:14
507:2
**sides**
85:15 207:4,5
**Sidley**
151:13
**Siemiatycki**
173:11,14 175:4
212:18 213:11,22
214:3 215:1
**sign**

492:19 522:18
570:9 571:8
**signatories**
487:21 488:5
492:22
**signed**
16:15 143:6 203:16
**significance**
10:10 25:11 30:4
33:24 348:15
349:10 350:8
353:4,10 372:9
384:13 404:9
405:6 416:24
417:6 419:16
420:2,12 421:12
421:15 423:17
428:1 432:18,19
433:8 439:13
440:11,15 442:21
443:18 447:15
458:22 459:9
460:8,13 461:8
462:4,20 463:16
463:21 464:3,5,17
471:18 472:16,20
473:1 474:8
475:20 479:10
484:6 487:14,17
495:6 503:1
505:15 507:18
523:8 532:11
543:20 548:7
**significant**
23:20,23 24:4,8,12
24:14,16,18 25:13
25:14 26:6,9,13
26:15 27:24 29:20
29:22 30:14,18,23
31:8,10,18 32:7
33:15 98:15 99:11
100:8 157:22
165:4 251:14
294:24 348:1,20
348:22 349:14,21
349:22 350:1,3,5

350:13 352:2,10
353:13 354:6
371:18 385:14
406:3,19 417:13
420:17 422:19,22
423:6,7,13 428:14
432:23 433:5,20
433:24 434:14
435:9,21 436:9
439:17 442:18
443:16 444:20
445:20 446:12
447:21 450:4,17
450:20 451:8,19
451:22 452:16,22
455:17 457:9
467:4 469:4
479:20 493:22
494:11,16,17,22
502:20 510:2
523:6,17 527:11
529:14 542:18,21
543:10,24 544:4
544:15 549:24
550:16,18 551:10
551:18

**significantly**
419:8

**signing**
571:10

**similar**
62:14 88:7 105:15
106:13 107:4
220:13 228:18,20
300:4 351:15
354:11 494:20
518:13 521:9

**Similarly**
323:14,16

**simple**
42:17 45:12 68:2
68:21 242:3

**simpler**
457:3

**simply**
197:21 201:20

202:2 212:13
237:6 238:24
244:16 309:10
442:16 544:11

**single**
29:9 54:11 69:13
94:13,14 180:10
356:15 396:8,15
418:17 428:12
479:19,22 480:8
481:3,7 504:5
519:4 533:2

**sir**
103:2 238:6 441:14

**sit**
56:13 118:15,19
119:24 180:5
183:5 214:1,15
469:5 471:4,12

**sits**
229:16

**sitting**
215:2 339:16

**situation**
29:8 141:11 278:9
414:19 437:3
446:6

**situations**
256:16 405:14
545:10

**six**
8:19 272:2,22
273:4,10,15
298:13 320:4
337:2 355:23
446:23 455:12
552:18 553:12,18
553:21

**size**
417:17 421:5
551:15

**sizes**
443:20

**Skadden**
1:14 3:2 190:3

**skills**

44:16

**skipped**
338:5

**slightly**
109:2

**slower**
32:12

**slowly**
32:20

**small**
100:7 267:4 399:4
498:12 502:7
520:5 548:5
550:24 552:4

**smaller**
384:16 397:24

**Smith-Bindman**
210:5,7 270:23
271:10 279:19
280:6 302:9

**Smith-Bindman's**
207:19

**smoother**
227:18

**snap**
502:19

**sniff**
413:13,24

**societies**
253:2

**Society**
483:12

**SOILEAU**
2:8,8 258:14
306:13 336:9,14
336:21 337:12,17
390:5 440:20
500:7 513:10

**sold**
131:18 132:10

**solely**
443:18

**solid**
414:20

**solution**
68:22

**somebody**
141:4,20 252:21
461:3 546:2

**someone's**
326:20

**soon**
101:14,16 275:24
439:1

**sorry**
22:4 33:8 35:23
37:9 39:10 49:13
64:23 68:10 77:14
91:11 95:5 111:3
143:5 153:3
161:14 176:7
185:17 205:21
217:7 221:5
251:10 255:11,14
284:23 290:14
299:23 306:15
314:9,24 316:11
316:12 323:22
338:2,6 343:3
345:4 353:18
357:18 373:18
376:12 382:14
407:12 426:16,18
430:7 447:2
455:19 456:6
475:5 477:13
483:16 485:7,7
504:12 508:22
514:1 529:1,3
531:16 533:16
540:19,22 541:19
541:20 542:2,5
549:14 553:22
567:3

**sort**
19:6,13 27:3 40:21
41:3,5 50:2 53:10
60:21 63:13 70:8
121:11 129:20
138:21 146:19
167:12 168:14
170:24 171:1

180:12 187:15
196:17,23 202:11
210:8 223:15
228:5 229:6
234:17 240:20
267:21 270:9
279:9 284:11
291:12 292:3
296:9 298:8
318:20 331:6
338:21,24 339:1
350:2 352:6
361:20 363:17
374:24 381:22
387:5,19 388:1
393:10 409:2,17
410:6 411:11
415:3 420:10,18
442:19 465:8
479:1 483:22
509:22 521:2,10
526:19 528:4,7
529:17 530:7
531:1 534:14
535:12,20 543:16
547:11 557:12
558:3 560:4

**sound**
120:8

**source**
316:6,23 318:5

**South**
2:4,8

**space**
231:18 233:11
571:6

**span**
62:23 73:17

**spanning**
74:21

**spare**
463:2,5

**sparked**
41:5

**speak**
44:10,13 88:22,22

Karla Ballman, Ph.D.

89:1 119:21
175:20 491:17
**speaking**
283:17 335:6,6,8
468:11
**speaking/coaching**
347:2
**special**
9:11 392:21 395:10
442:14 485:2
**specific**
171:2,7 191:16
198:22 209:23
219:8 246:14
365:18 370:14
380:17 474:11
478:4 480:20
**specifically**
330:6 518:8 522:10
**specificity**
96:2,5 97:4
**specifics**
91:5 122:15 218:12
250:17 342:15,21
344:8
**specified**
476:20
**spectrum**
60:2 61:9
**speculation**
561:16 567:21
**speech**
238:8 339:14
**speeches**
339:12
**speechify**
445:13
**spend**
516:15,16
**spent**
72:12 214:15
**spoke**
50:11 71:5
**spoken**
71:3 73:1
**sponsored**

75:19
**spurious**
389:11 531:24
**Square**
1:14 3:12 12:9
**stability**
407:6,10 408:8,15
**stable**
409:21,23 411:16
415:2,5 416:3
**staff**
243:18
**stance**
335:11
**stand**
77:19 147:19 328:8
357:23 379:19
417:2 503:16
569:13
**standard**
220:23,24 221:8,9
223:19 443:19
**standardized**
528:21
**standards**
313:10,12
**standing**
295:18
**standpoint**
15:1 128:17
**stands**
398:21
**star**
295:7,8
**start**
51:17,22 52:10
150:20 151:3
227:16 243:22
267:19 306:2
333:12 334:17,22
344:5 387:12
517:17
**started**
41:9 51:4 52:18
143:18 195:2
439:2,2

**starting**
207:2 344:6 376:13
548:4
**starts**
359:7 441:5
**state**
13:7 38:1,1 46:22
105:23 154:1
160:22 164:6,13
164:24 243:20
251:23 286:12
344:10 419:5
474:20 519:19
561:23 571:5
**stated**
31:13 34:3 107:10
174:7 286:4
342:11 350:20,21
381:22 384:19
488:9 537:13
551:6
**statement**
10:7 39:1 67:12
100:20 103:18
104:15,15,20
107:13 113:6
114:2,14 115:19
115:23 122:4
127:2 161:4
162:23 163:20,21
163:24 164:1,21
166:20,22 167:2
167:11 263:18
290:13 297:6
301:24 303:14
306:3 317:18
318:1 319:6
345:14 371:20
379:1 384:5 387:4
387:6 396:1
409:21 412:24
413:5,7 417:3
422:11 425:23
426:1 438:8,8,14
443:6,23 445:22
455:10,12 459:24

460:3,12,15,23
461:11,17 462:4
462:19 464:23
466:19 473:7,8,19
474:17 476:7,16
476:19,22 477:16
478:1 484:24
495:2,4,10 496:1
496:13 500:14
505:17 514:16
517:4 520:15,22
521:21 530:10
533:1 534:3
548:13 550:5
552:23 556:14
558:8,10 560:16
562:19
**statements**
114:18 169:14,15
236:5 237:21
238:10 239:10
240:2,9,11,17
253:15,18 304:23
411:17 474:7
475:19 495:21
496:23 519:5
554:14 556:18
**states**
1:1 127:24 147:9
147:23 149:19
234:6 295:5
398:16 514:12
**stating**
165:7 343:4 387:19
**statistical**
10:10 25:10 30:4
33:24 43:20
199:11 200:10
202:3 233:18
247:2,6,8,17
248:2,4 249:5,15
250:4 252:23
253:16 268:15,16
268:17 348:15
349:9 350:7 353:3
353:10 384:13

404:9 405:6
416:24 417:6
419:12,15,24
420:2,12 421:12
421:15 423:16
428:1 432:17,19
433:7 439:13
440:11,14 458:20
458:22 459:7,9,12
459:18,22 460:6,8
460:13 461:4,5,8
462:4,5,20 463:16
463:20,21 464:2,4
464:17,22 466:3
471:18 472:15,20
472:24 474:8,12
474:19 475:20
479:9 480:14
481:10 482:20
483:12,19 484:6
485:15 487:14,16
493:1 495:1,5
502:24 505:14
507:17 523:8
532:11 543:20,23
548:6 551:2
**statistically**
23:20 24:3,8,13,16
24:17 25:14 26:6
26:8,12,15 27:24
28:2 29:20,22
30:18,23 31:8,10
31:18,19 32:7
33:14 98:15 99:10
100:8 160:14,14
163:3 165:4
294:24 348:1,20
348:22 349:13,14
349:16,21,22
350:1,4,13 352:2
352:10 353:12,14
354:6 371:18
385:14 406:3,19
417:13 419:8
420:16 422:19
423:6,7,13 428:1

428:13 432:23
433:5,23 434:14
435:8,20 436:9
439:17 442:17
444:20 445:20
446:11 447:21
450:3,17 451:8,19
452:16,22 455:16
457:9 467:3 469:3
479:20 493:22
494:11,14,15,16
494:21 502:19
507:17 510:1
523:6,17 527:11
529:14 542:18,21
543:10 544:4,15
549:23 550:16,18
551:10,18
**statistician**
7:19 10:6 44:2,12
44:14 45:15 46:10
46:18,21,24 230:3
244:21 245:19,20
254:24 269:6
466:1 482:17
483:21,21 485:23
495:4
**statisticians**
25:20,21 247:10
248:5 491:12
496:19 501:7
**statistics**
7:21 14:22 17:18
40:24 41:6,7,10
41:19 43:11 45:1
107:1 242:21
248:6 250:9
429:22 430:2
439:2 458:20
482:21 484:1,17
**status**
343:14
**stays**
534:12
**stenographic**
12:17

**step**
434:23 460:10
474:10
**Steven**
155:18
**stick**
200:18 337:13
**sticker**
337:7,13 565:1
**stickies**
293:22,22
**sticky**
293:5
**stipulate**
424:19
**Stipulations**
11:11
**stonewall**
378:7,9
**stood**
254:18 255:22
256:3,5
**stop**
45:9 138:9 158:18
190:22 253:13
346:20,24 377:23
410:21 493:15
496:10 497:2
524:4
**stopping**
455:20
**stops**
310:21
**straightforward**
45:12 235:4
**strange**
105:7,14
**strategies**
308:21
**Street**
2:4,9,13 4:3
**strength**
94:22 95:8,16,16
97:4 109:10 169:5
350:23 388:3,9
403:10 441:8

**stretch**
542:11,12
**stretching**
151:20
**stricken**
418:11
**strike**
41:12 229:20 341:7
341:11
**striking**
78:4,8 137:5 377:9
**Stroke**
275:19
**strong**
134:16 520:9
555:22
**stronger**
19:19 277:18
285:21 286:2
297:16 528:13
**strongly**
122:23 123:2
126:20,24
**students**
202:20 224:11
**studies**
8:17,21 17:13
19:14,16,19,21
20:9,10,14,19,20
21:5,8 22:7,8,21
22:22,23 23:8,11
23:21,24 24:2,3,7
25:1,2,6,15 26:3,8
27:16,19 28:15,18
30:5,6,16,17 32:4
33:11,14,20,21
35:9,12 38:7,10
56:5,8,10,11,14
56:16,18,20,22,23
57:1,3,5,9,11,13
57:16,18,20 58:4
59:22 62:14 75:14
75:17,18,24 82:13
91:22 92:7,11,12
92:15,16,23,24
93:6,9,13 94:3,6,8

94:10,17 98:13
99:9 105:3,19
106:16,18,20
108:16 109:7,13
137:10,19,21
152:18,21 160:21
165:3 172:2
184:14 185:1,11
186:24 187:3
212:19 236:14
256:16,23,24
267:8 270:10
282:1 284:7,9,12
284:14 285:2,11
285:20,22 286:1,3
287:12,23 288:2
288:15,16 289:6,8
292:12,13 295:1
297:11,12,13,18
298:5,15,24 299:3
299:6,8,20,24
300:1,8,10,12,15
300:23 301:6,7,9
301:17,19 302:12
302:13 303:5,6,10
303:11 304:3,4,11
304:12,20,22
305:2,3,8,11
309:5 310:22,23
311:17,20,20
314:13,16 315:13
315:16,18 316:2,4
316:15,17,22
318:4,13,22 319:1
321:16,16 322:8
323:8,9,17,17,20
323:20 324:5,6,8
324:9,16,18,20
326:2,3 328:11,13
328:23 329:6,7,8
329:11 331:3,6,12
331:16,17,19
332:2,9,16,17
334:8,10 341:24
342:1,2,3 343:6,8
346:6,7 347:7,18

347:24 348:3,6,12
348:19,19,21,23
349:20,24 350:3,5
350:12 351:13,18
352:3 353:11
354:6,9,14,15,16
354:18,21 356:6,7
356:12,13,15,16
358:8,11,24
359:13 360:4,7,8
360:11 361:4,6,17
362:1,3,13,15,17
362:19 363:8,9,15
363:17,21,22
366:7,8 367:7,9
367:11,13,17,21
367:22 370:24
371:8,17 372:4,13
372:23 373:4
376:17,19,23
377:11 378:14
379:22 380:6,21
381:3 384:7,10,15
384:16 385:7,10
385:13,17 386:4
387:22 395:15
396:8,16 397:4,19
397:23 398:15
399:19 406:1,4,20
410:10 416:23
417:5,12 421:20
422:18,21 423:20
426:6,9,9 427:1,2
427:10,13,15,15
427:17 428:3,12
429:4 431:23
432:2 433:11,23
435:2,6,7 436:20
436:22 439:12,21
443:14,22 444:1,8
444:13,20 445:1,3
445:19 447:20
450:3,6,16,20
451:1,9,18,21
453:2,3 458:24
459:14,15 464:1,8

464:15,18 465:15
465:16 469:1
485:11 493:21
494:10,23 507:3
507:20 508:6,21
508:22,24 509:12
509:13 510:5,9,13
510:16,22 511:2,7
511:10 512:3,19
513:17 514:22
515:23 518:7,10
518:14,15 520:5,9
521:1,20,23 522:7
522:12 528:1,11
528:15 530:15
531:1 532:14
535:16 536:5
537:7,12 540:2
541:16 542:17,20
543:22,23 544:3,8
544:12,14 545:8
545:21 549:23
550:13,15 551:9
551:14 552:1,5,9
552:10,14,15
553:1,9 554:6,7
557:8 560:7
562:13 566:7

**study**
25:16 29:9 55:2
58:13,22 59:6
62:5,6 64:15,16
70:24 75:4 86:16
89:23 91:21 92:3
92:19 93:2 94:13
94:14 138:1
167:13 168:8,20
184:20 199:23
201:2,5 246:1
256:20 269:9
270:16 274:9
278:19 280:11
283:24 287:7
294:22,24 295:2,3
303:4 308:24
309:2 315:6 316:5

316:7,24 318:6
321:12 328:15,24
329:1,15 330:5,8
331:21 332:5
333:8,24 334:14
336:5 342:14,15
342:17,22,23,24
343:1 344:8,15,20
344:21,23 345:18
345:21 348:9,10
351:14 352:4
354:10 367:18
368:16 370:7,11
371:23 373:8
374:19 376:6
377:5 379:5,5
395:24 396:22
405:1,3,15 407:8
417:12 421:22
422:17 425:12
428:21 431:9
432:1 433:12,15
443:20 446:9,15
446:16,18 451:17
457:5,24 464:18
467:3 476:9
478:20,22 479:19
479:19,22 480:17
480:20 498:7
499:4 509:6
511:22 515:19
521:4,12 522:17
522:18,19,20
523:2,13,15,16,19
523:19,21 526:21
527:1 529:4,23
532:15 534:11
537:5 546:4,22
553:16 560:24

**studying**
367:23

**study's**
328:16

**stuff**
78:19 280:10

**subheading**

565:13

**subject**
7:8 50:9 52:23
116:13 129:3
344:20 571:10

**subjects**
316:8 317:1 318:7

**submit**
227:22

**submitted**
169:17 170:2,22
193:21 280:16
340:16 553:15

**submitting**
271:11 280:14

**Subscribed**
573:19

**subsequent**
180:24

**subsequently**
40:22

**subset**
106:18

**substance**
79:8 573:11

**substances**
246:10

**substantial**
277:5,9 498:13
502:11

**substantive**
186:1

**substitute**
390:23 480:9 481:6

**substitutes**
457:2

**subtle**
387:19 429:17

**subtract**
390:14

**subtypes**
123:14 263:20

**success**
318:9

**sudden**
334:22

**sufficiency**
172:23

**sufficient**
267:1 371:15
385:12 387:15
552:6 556:13

**sufficiently**
380:17

**suggest**
26:15 100:7 275:23
498:7

**suggested**
380:18 384:11

**suggestion**
569:4

**Suite**
2:4 3:13,18 4:9

**summaries**
480:19,24

**summarize**
176:10 182:17

**summary**
550:8 557:14

**superficially**
323:18 324:7

**supervision**
570:22

**supplemental**
6:20 83:22 87:12
188:19

**support**
11:2 16:11 37:16
39:17 166:20,24
167:23 291:17
342:12 383:15
384:3 396:1
457:13 520:14
521:20 565:24

**supported**
82:14 127:6 169:7

**supporting**
520:7

**supports**
15:7 210:12 523:12

**suppose**
454:19

**supposed**
196:6

**sure**
15:1,21 18:6 23:1
25:3,19 57:24
58:24 69:7 72:18
74:5 80:20 82:2
84:15 108:3 111:5
111:5,7 117:5
125:19 129:15
134:19 141:22
145:4 155:14,20
158:12,23 160:2
180:10 194:23
213:23 215:14
224:6 230:7 261:2
265:5 268:6 270:8
304:15 308:16
310:21 311:17
345:14 358:21
369:17 370:11
372:15 400:17
425:2,14 438:15
439:8 448:4
459:11 463:23
496:16 503:10
516:5 557:11
560:14

**surgery**
230:20

**surprise**
63:1,19 69:9,16,22
271:12 400:10
562:1,3,6

**surprised**
322:20 496:18

**surprising**
379:16 559:7

**surround**
72:21

**Susan**
3:7 111:5

**susan.sharko@d...**
3:9

**susceptibles**
539:10

**suspicious**
510:16
**switch**
142:23 211:22,23
502:24
**swore**
327:22
**sworn**
12:23 570:5 573:19
**synthesize**
266:12
**Systematic**
9:6

---

**T**

**T**
4:3 5:11 6:2 7:2 8:2
9:2 10:2 281:5
291:10 572:1
**tab**
375:3,5
**table**
91:18,20 92:3,6
153:6 228:19
243:19 312:10
449:2 527:3,4
529:24
**Taher**
9:9 84:19,21 93:18
93:22 100:6 373:7
374:18 553:16
560:24
**tails**
431:16
**take**
15:23 33:7 101:16
121:23 139:8
158:4 162:13
163:22 212:5
214:11 235:23
237:2 271:15,17
294:1 296:15
312:19 316:12
321:4 322:18
323:1,1 369:23
372:6 388:1 399:4

405:9 406:6
439:24 464:24
469:21 474:3,6
486:16 488:13
504:2 507:1,14
542:6 561:4,9
**taken**
1:13 108:6 114:8
310:13 328:15
352:13 398:19
460:10,11 463:18
474:9,10,21
480:13 561:11
**takes**
65:1 250:3 335:11
**talc**
5:20,22 6:12 8:22
9:7 58:18,23
59:24 60:16 62:7
66:19 77:5 86:9
91:24 92:9 98:17
99:12 100:10
122:3 125:14
128:1 140:4
156:15 159:22
160:11,15,22
163:1,4,14,18
164:7,9,14 165:1
165:8,9,10,14,24
167:18 170:18
171:16,17 172:23
174:4 175:17
191:9 193:17
196:2 208:12
219:14 224:15
264:18,21 265:6
330:7,10 332:3,5
332:9,18 333:24
334:2,17,21,22
335:18 338:13,17
340:7 358:8
372:23 376:21
380:15 381:6
386:4,7,9,10
387:5,8,12 397:1
398:8 404:1 413:3

422:7 444:1 450:6
452:23,24 466:12
499:1 515:14
526:2 528:17
535:11 546:19,23
547:11 552:17
556:8,24 565:14
565:16 566:1
567:1
**talcum**
1:5 12:11 13:17
14:11,16 15:14
16:4,12 24:5,9
34:21 35:1 37:5
37:17 38:4 47:6
47:15 48:8,16
49:5,7,24 50:9,17
52:24 55:3 58:15
59:12 61:2 62:16
63:5,22 69:4 70:4
70:11,15 71:2,19
76:12,23 82:15
83:6 86:20 116:6
117:19 121:16,16
121:24 123:20
124:3,15 126:15
130:2,19 131:17
132:5,9,15,17,24
133:6,12,15 134:9
134:14 135:7,8,9
135:19 142:3,17
142:19 153:23
172:18 183:8
329:18 343:23
399:14 559:23
**talc-ovarian**
335:20
**talc-ovarian-can...**
77:6
**talc-specific**
143:8
**talk**
18:5,6 19:18 21:10
23:14,19 90:12
134:3 157:1 274:4
274:6 281:24

284:15 286:17
300:18 322:5
336:20 352:14,18
352:22 359:7
366:14 377:9,10
380:5 388:3,7
404:8,24 412:22
419:10,22 421:19
422:1 430:6
432:19 433:7
447:13 448:11,14
464:4 467:18
468:2,4,7 495:1
499:1 501:19
517:16 545:7
563:6
**talked**
17:12 62:9 73:6
74:17 98:11
241:24 284:19
348:14 427:3
431:24 495:7
497:11 499:10,11
500:11,12 545:20
**talking**
17:1 20:17 201:9
218:3 221:10
227:7 239:23
263:18 275:1
281:15 282:14
285:9 291:22
298:20 321:14,23
333:12 351:9
358:8 359:3
361:20 365:17
366:6 367:5 376:8
380:7 391:9
395:21 402:15,16
410:3,21 412:18
420:4 440:9,13
448:20 453:22
464:2 475:12
497:17 499:5,7
523:5,8,11 540:18
541:15 545:5,5,12
545:14 565:7

**talks**
95:14 203:14
284:18 306:20
311:18 322:4
376:21 380:11
401:12 402:1
404:14 405:10
441:10 449:1
506:2
**tasks**
457:3
**Taubes**
389:15,17,20
390:21 391:22
392:3 395:12
396:21 397:9
398:6,17
**taught**
200:9 228:21 257:4
259:20 260:7,9,15
260:20 261:9,19
**teach**
202:10 260:12,13
421:1
**team**
76:3
**TECHNICIAN**
4:14
**technique**
405:16
**techniques**
229:11 233:18
405:14
**teleconference**
301:10
**telephone**
429:23
**TELEPHONIC**
4:7
**tell**
32:22 43:1 45:23
62:20 66:15 67:2
67:16 127:15
130:2,23 131:10
131:11 133:8,20
133:21 136:6,7

138:6,7,12 159:20
162:12 190:13
193:14 211:6
213:4,4 219:4
254:13 259:11,14
272:8 321:7
322:17 364:13
391:21 394:1
416:17 417:20
418:21 420:24
435:24 523:22
560:16 564:20
565:10
**telling**
397:12
**temporality**
96:6 97:5
**ten**
28:5 64:21 270:1
524:1,18
**tend**
157:3
**tended**
332:10
**tends**
344:15
**tenth**
527:18
**term**
29:17 59:1 166:5
497:13
**terms**
16:20 58:7 72:19
109:7 129:16
130:4 145:11
146:15 157:23
196:14 263:12
264:13 287:8
321:24 329:9
336:2 344:1 351:2
361:19 362:4
377:10 407:18,22
411:17 414:5
436:16 459:1
473:4 500:18
519:7 521:11

**Terry**
93:17 428:21
526:21 527:1
534:22 535:1
536:11 537:5
540:4
**test**
198:12 214:10
225:11,14 291:10
310:3 413:13,24
414:8,8 527:10
529:10 530:5
539:15,16,20,23
540:4,10,10,12
541:2,9 546:2,22
556:23
**testified**
12:24 65:18 228:5
279:22
**testify**
48:2 183:6 216:9
**testifying**
279:23
**testimony**
5:4 26:21 36:9,14
36:18 157:17
226:18 264:15
267:14 346:18
542:24 543:6,12
563:3 570:6
**testing**
442:21 447:15
**tests**
465:13
**text**
336:24
**textbook**
44:22 65:20 312:5
312:5,7 325:2,17
440:17 548:20,21
549:2
**textbooks**
21:3 312:1 325:6,9
**thank**
23:3 145:6 146:1
160:3,3,8 162:17

182:12 202:10
234:14 240:12
244:12,22 246:22
252:8 258:22
261:8,12 274:15
293:3 310:6
314:11 324:3
328:19 357:19
369:5 448:11
482:13 527:4
564:5 569:11
**Thanks**
527:6
**theoretically**
324:22
**theory**
229:13
**therapies**
308:20
**therapy**
7:15 401:22
**thing**
21:1 24:16,17 70:8
129:21 133:11
168:16 181:6
195:16 279:10
311:21 317:20
322:1 325:8
328:22 372:3
381:13 383:22
385:23 387:20
390:20 391:16
405:19 414:21
417:7 429:9
433:15 448:9,10
474:1 480:14
501:9 505:7,12
506:23,24 533:17
550:6
**things**
24:19,21 97:7
131:17 164:23
173:5 200:1
246:24 265:23
266:4 270:21
291:23 296:8

322:21 327:6,14
359:20 368:7
413:12 459:1
461:19 488:16
497:6 501:6
505:13 513:5
523:3,7 525:16
536:18 544:21
554:15 561:20
**think**
17:6,11 18:9 19:4,9
20:4,4 28:5 29:7
29:23 31:22 34:2
50:5 61:2 69:24
86:22 87:15
100:19 101:2
103:22 105:16
109:1 116:8
117:23 119:15,17
122:10 130:22
131:22 136:10,12
139:5 141:5,5
145:5 146:18
147:24 148:9,12
149:20 151:23
153:15 157:3,5
158:3 161:8
174:18 175:3,12
176:19 183:3,24
190:4 199:15
201:21 204:5,19
205:20 207:15
210:15 213:2
215:9 216:16,17
219:7 221:24
222:13 223:22
224:3 228:12
234:16,24 235:10
238:20,23 239:10
241:14 249:15,18
249:19 263:21
266:14 267:1
268:3 269:23
271:1,5 275:6
276:4 279:16,17
279:22 280:5,12

281:19 283:9,21
284:5 286:5
288:20,20 290:15
292:23 295:19
298:10,18 299:9
307:6,6 311:9
312:18 313:5,6
320:10 326:19
327:20 328:22
329:2 331:4,5
332:23 334:23
336:11,22 344:10
345:16 350:7
355:15,18,22,24
359:14 360:11
361:16,18,21
362:6,16 363:10
363:22 371:11
377:8 382:5
385:18 388:6
398:11 399:7,17
403:15,17 404:1
406:15,20 408:3
409:24 411:4,8
423:4 432:14,20
432:21 436:14,15
449:18 459:10
461:18 462:9,10
463:4 464:19
468:16,18 472:18
473:24 484:2
485:3,24 489:17
495:24 499:5,18
501:12 503:8
512:24 519:6
521:2 522:7 526:4
533:4,8 535:17
536:8,13,14
538:20 540:18
547:5 551:19
552:12 554:17
556:4 558:9 559:6
563:20,21 566:18
567:24 568:11
**thinking**
31:12 195:2 315:16

| | | | | |
|---|---|---|---|---|
| **thinks** | 478:5 493:18 | 558:19 568:12,13 | 88:1,21 90:3,8,10 | 181:18 182:2,6,9 |
| 235:3 | 518:11,12 522:17 | 568:19,23 569:15 | 91:6,12,16,17 | 182:12,15 185:13 |
| **Third** | **throw** | **times** | 92:4 95:18,19 | 185:21 187:23 |
| 301:4 | 355:10 | 1:14 12:9 22:11 | 97:17,20,22 98:4 | 188:6,7 189:4,19 |
| **thirty** | **Thun** | 28:5 31:23 136:15 | 98:7 99:1,4,18 | 190:5,8,17,20,24 |
| 571:16 | 395:5 | 237:9 240:5 280:1 | 100:21 101:5,11 | 192:6,14,17,22 |
| **Thomas** | **tighter** | 286:13 299:15 | 101:15 102:1,8,15 | 193:11 197:18 |
| 2:2 4:3 395:5 | 25:8 | 325:13 391:8 | 102:19,23 103:3 | 198:8 199:5,22 |
| **thought** | **till** | 404:23 431:11 | 103:11,16,20,24 | 200:13,21 201:18 |
| 161:12 174:24 | 67:5 | 467:22 510:6 | 104:12 106:2 | 201:24 202:9 |
| 176:22 177:21 | **time** | 541:18 542:16 | 108:12 109:4 | 203:1,9 204:8,10 |
| 179:21 184:14 | 12:7 17:11 23:2 | **tired** | 110:20 111:20,24 | 204:11,15,21 |
| 187:9 195:3,17 | 44:18 50:12 51:8 | 363:1 469:16 555:5 | 112:4 113:1,16,18 | 205:9,15,23 |
| 202:23 217:19 | 52:8 56:7,13 | **tiring** | 114:16 115:3 | 206:17 207:11 |
| 221:6 257:23 | 62:20,23 63:6 | 445:11 | 116:23 118:14,18 | 208:9,14,18,20 |
| 304:24 316:3,16 | 67:7 71:9 72:13 | **Tisi** | 119:2,7,12,23 | 209:7 210:1,4,21 |
| 336:12 398:8 | 84:1 90:7 91:8 | 2:3 5:6 13:4 14:7 | 120:13,16 121:19 | 210:23 211:6,10 |
| 400:4 424:11 | 104:7,10 106:15 | 18:4 20:15 21:9 | 122:16 124:18 | 211:14,16,18,21 |
| 427:4 448:7,8 | 108:15 112:9,9,12 | 21:19 22:1,3,5,14 | 125:4,8 126:2,9 | 212:6,11,14 |
| 462:12 463:1 | 120:19 138:24 | 23:12 26:10,24 | 127:22 129:1,10 | 213:24 214:11,13 |
| 469:14 489:8 | 139:17 148:21 | 27:22 28:6,8,11 | 130:7,14 131:14 | 215:5,18 216:21 |
| 527:7 533:17 | 183:15 193:5,9,21 | 29:1,12 31:24 | 132:6,22 133:24 | 217:9,16 218:2,4 |
| 550:7 561:1,3,10 | 194:23 195:19 | 32:13,21 33:3,22 | 134:21 135:21 | 218:20 219:3 |
| 565:21 567:3 | 211:24 214:15 | 34:4,14,16 36:3 | 136:11,16,20,23 | 221:2,13 222:10 |
| **thoughtful** | 217:12 227:2 | 36:10,15,19,21,24 | 137:6,8 138:5,11 | 222:14,17 223:17 |
| 457:2 | 231:18 233:11 | 37:20 38:22 39:2 | 139:22 140:17 | 224:1,17 225:5,8 |
| **Thread** | 253:14,14,18,18 | 41:11,13 42:5,10 | 141:12 142:13 | 225:12,16 226:23 |
| 7:7 | 276:6 280:22,24 | 42:14,19,22 43:3 | 143:14 144:21 | 227:4,12,19,22 |
| **threatening** | 281:8 294:4 | 43:15 44:9 45:21 | 145:13,20 147:11 | 228:3 230:9,24 |
| 294:5 | 307:18 317:7 | 46:3,8 47:22 | 147:16 148:5,7,13 | 231:5 232:3,8 |
| **three** | 329:19 330:9 | 48:20,24 49:19 | 148:19,23 149:4 | 234:23 235:6,13 |
| 74:23 75:1 200:8 | 339:4 343:13,15 | 50:24 51:13 52:1 | 151:17 152:6,14 | 235:16 236:12,17 |
| 231:3 237:9 | 353:9 357:7,24 | 52:12,21 53:19 | 153:8 154:12,21 | 236:24 237:5,10 |
| 259:10 271:24 | 358:4 360:20 | 54:2,16 55:14,21 | 155:10 156:1 | 237:17 238:2,7,11 |
| 273:9 274:7 | 362:24 386:10,11 | 58:9 59:11,17 | 158:10,20 159:12 | 238:16,20,24 |
| 279:24 281:19 | 387:11,16 407:6 | 60:8,9 61:6,18 | 159:14,15 160:6,9 | 239:13,24 240:7 |
| 290:18,21 309:5 | 408:1 421:1 | 62:11 63:18 64:12 | 161:12,15,21 | 240:22 243:5 |
| 311:8 330:14 | 438:18 440:2,6 | 65:5 66:9,23 67:4 | 162:12,19,21 | 245:16 246:8,16 |
| 347:23,24 372:4 | 448:2 458:12,16 | 67:6,23 68:11,20 | 163:14,19 164:10 | 246:21 247:14,24 |
| 376:19 378:12 | 460:16 462:11,14 | 69:2,23 70:16 | 164:16 166:7,11 | 250:14,24 251:8 |
| 462:18 488:4 | 462:17,24 469:20 | 71:14 72:23 73:19 | 167:7 171:19 | 251:12,20 252:7 |
| 527:22 | 469:21,23 470:4 | 74:7 75:13 76:18 | 172:13,15 174:1 | 252:13 253:11 |
| **three-page** | 471:6,11 486:19 | 78:1,5,9,15 79:20 | 174:22 175:22 | 254:3,9,16,22 |
| 252:1 | 499:17 503:17,21 | 80:15,22 81:15 | 176:9,23 177:7,15 | 255:2,10,14,21 |
| **threshold** | 516:7,10,15,16 | 82:7,24 83:18 | 177:23 178:9,15 | 257:1,22,24 |
| 388:12,18 395:22 | 541:21 542:1 | 85:12 87:6,17 | 180:19 181:9,16 | 258:18,23 259:24 |

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 200 of 463 PageID: 38437
Karla Ballman, Ph.D.

Page 628

| | | | | |
|---|---|---|---|---|
| 261:6,11 262:10 | 365:19,23 366:19 | 468:14,18,20 | 274:3 277:16 | 47:3 60:21 61:22 |
| 262:13,22 263:8 | 368:6,19 369:5,10 | 470:3,6,14 471:23 | 486:21,23 | 62:8,16 229:6 |
| 264:7,16 265:9 | 369:13,18 370:1,3 | 472:3,8 477:14 | tlocke@seyfarth.... | 281:17 315:2 |
| 267:5,15 269:11 | 370:4,16,20 373:6 | 481:21 482:24 | 4:5 | 319:16 484:20 |
| 269:15,20,21 | 373:22 374:4,10 | 483:9 485:14,19 | today | 485:12 |
| 270:11 271:19,22 | 374:12,16 375:2,6 | 485:22 486:10,22 | 12:13 17:2 48:2 | topics |
| 272:24 273:1,13 | 375:9,16,24 376:2 | 487:2,11 488:3,21 | 56:13 70:17 | 44:23 142:23 |
| 274:13 275:2,15 | 378:1,4,8,10,23 | 488:24 489:3,6,11 | 109:16 112:10,16 | total |
| 276:1,7,12 277:3 | 380:10 381:11,16 | 489:19,24 490:3 | 116:12,14 124:5 | 56:9 127:4 273:5 |
| 280:2,21 281:13 | 382:1,8,24 383:4 | 490:24 491:1,20 | 146:19 180:6 | 329:6,7 361:13 |
| 283:12 284:2 | 383:13 384:23 | 492:5,13 493:8 | 215:7 469:5,15,24 | 525:3,3,10,20,21 |
| 288:13 289:5 | 385:2,5 386:1,2 | 496:7 500:10 | 470:5 471:5,13 | 528:19 535:2,4,20 |
| 290:5,11,23 291:3 | 386:19 390:1,11 | 503:10,23 504:10 | 562:13 565:21 | 535:22 536:5 |
| 292:4 293:1,6,9 | 390:18 391:2,14 | 504:17 505:4 | today's | 540:15 |
| 293:14,16,19,23 | 391:17 393:13,17 | 507:7 508:3,17 | 12:6 191:3 569:16 | totality |
| 294:7,10,17 295:9 | 393:22 394:2,10 | 510:7,24 511:9,14 | told | 14:14 16:9 17:20 |
| 295:20,21 296:11 | 394:16 395:1 | 513:12 515:3,20 | 85:9 151:22 152:1 | 19:4 23:5 37:14 |
| 297:2,4 301:15 | 396:4,13 398:4,23 | 516:12 519:1 | 152:4,7 218:9,24 | 50:23 96:22 97:8 |
| 304:17 306:1,10 | 400:17,18 401:2 | 525:2,8,9,13,17 | 226:13,14 255:3 | 108:22 121:9 |
| 306:15,17 307:3,9 | 402:8,17,21 403:5 | 525:19 531:13 | 263:15 364:18 | 168:6 171:13 |
| 307:16,19 308:11 | 403:13 404:7 | 532:24 533:12,21 | 459:23 467:10 | 208:4 216:13 |
| 309:19,20,24 | 409:8 410:12,24 | 537:15,22 538:13 | 499:15 | 218:14 285:17 |
| 310:4,15 312:11 | 412:3,7,12,16,19 | 538:22 539:19 | Tom | 349:6,19 464:14 |
| 312:14,21 313:5 | 412:23 413:16,22 | 540:1 541:7,19,24 | 113:17 | 543:18 557:5 |
| 313:11,15,23 | 414:6,11 415:12 | 542:3,6,14 543:2 | tone | 558:2 |
| 317:15,23 318:2 | 416:4,14 418:5,8 | 543:14 544:9 | 312:20 | totally |
| 319:4,19 320:3,20 | 418:12,14 421:9 | 545:24 546:9 | tool | 564:2 |
| 326:13 327:1,7,11 | 422:5 423:18 | 547:1,7 548:15,19 | 234:2 | toxicologist |
| 328:3 330:3,16,21 | 425:6,19 426:4,16 | 549:7,10 555:10 | toolbox | 40:8 |
| 330:24 332:13 | 426:21 427:7,8 | 556:3,16 557:15 | 41:8 | toxicologists |
| 333:4,14,17,22 | 428:19 430:3,14 | 558:6,15,20 559:2 | tools | 59:22 |
| 335:14 336:6,17 | 432:9,16 433:16 | 560:9,19 562:17 | 41:7 53:9 | toxicology |
| 337:23 338:2,6,8 | 434:5 435:4 | 563:7,20 564:2,16 | top | 338:12 340:17 |
| 338:23 339:13,20 | 436:23 438:4,5,9 | 566:3,10,16,22 | 87:3 97:24 98:6 | 341:1 |
| 339:24 340:1,12 | 438:19 439:4,9,23 | 568:4,18,24 | 183:19 184:2 | tracing |
| 340:20 341:13 | 440:8 441:1 | 569:11 | 186:6 187:17 | 316:8 317:1 318:7 |
| 345:9 346:19,24 | 442:10 445:9,12 | title | 197:1 232:19,23 | 318:9 |
| 347:4 349:8 | 445:17 446:2 | 77:21 78:24 150:9 | 240:19 245:19,21 | training |
| 350:16 351:6,19 | 448:16,21 449:13 | 253:23 260:1,18 | 254:13 259:9 | 35:5 43:20,21 |
| 352:17 353:21 | 449:20,24 450:23 | 265:4 277:14 | 305:13 306:22 | 230:16 249:5 |
| 354:3 355:21 | 451:14 452:5,13 | 401:5 487:13 | 337:14 366:18 | 280:4 |
| 357:4,8,14 358:6 | 455:8 458:18 | 564:21,22 | 374:21 376:4,15 | transcript |
| 358:17,20 359:23 | 459:20 461:1,12 | titled | 470:12 522:1 | 243:7 570:9,19 |
| 360:13,19,23,24 | 462:2 463:9 464:9 | 92:6 565:14 | 538:2 553:5 554:4 | 571:17,19 |
| 361:14 363:2 | 465:11,22 466:21 | titles | 563:19 | transcription |
| 364:14,17,22 | 467:19,24 468:4,8 | 202:8 260:24 261:2 | topic | 573:7 |

transfer
409:2
transformation
135:10
translate
126:18
transposed
298:6
trastuzumab
8:11 277:24 278:4
treat
339:23
treatment
551:16
treatments
548:11
treats
550:22
trend
527:11 529:11
539:15,16,20,23
540:4,10,12 541:2
541:10
trial
199:10,14,18,18
200:9 201:8 202:3
269:5,7 286:21
287:14 326:5
328:14 457:4,6
546:14 547:2,6,14
trials
201:1,9 246:2
269:3 270:14
277:23 278:3
287:17 308:4
309:4 310:19
321:13 329:8
544:23 545:3,16
547:24 548:3,4,9
552:3 553:6
562:12
trick
359:9
tried
127:12
Troy

430:3,6
true
15:15 25:23 36:6
39:24 47:7 60:17
61:12 66:21 67:12
68:7 69:5 72:15
73:11 75:18 81:22
82:18 89:14
112:21 113:8
116:13,17 117:12
117:21 118:11
119:18 120:21
121:5 122:4
125:14,14 126:22
154:5,24 165:19
173:3 223:20
230:18 231:2
240:3 241:8
268:13 278:15
279:2 284:9 299:1
301:19 303:15,18
303:20 304:4
312:2 323:21
325:19 332:19
346:10 347:14,20
350:17 381:23
384:14 387:22
420:5 425:2,21
428:18,23 430:23
438:12,16 439:18
458:4,19 459:6
460:14 465:17
467:4,7 471:19,22
472:17 474:13,23
476:7,9,23 477:2
477:5,7,8,19,22
478:12,17 479:16
479:17 484:24
500:18 502:20
509:3 512:16
526:17 530:23
534:8 535:7
550:11 570:6
truly
526:6 534:13
554:16

trump
283:16
truth
303:21 328:2
414:24 431:19
476:16 477:3,16
479:13 500:22,22
500:24 501:2
509:8
truthful
225:2 319:12
327:22 379:15
truths
328:6
try
140:8 148:21 185:9
200:18 227:1
266:12 445:7
522:2
trying
72:13 118:24 119:4
120:3,5,7,10
124:9 194:17
219:11 234:18,19
242:4 260:23
261:13 270:9
279:12 288:24
316:11 327:21
332:22,24 334:4
346:2 357:18
378:7,8 379:14
403:9 409:6
414:23 418:24
419:1 430:8 446:6
470:8 501:2
545:10 558:16
tube
9:16 400:21 401:9
564:23
TUCKER
3:17
turn
34:7 94:19 371:23
476:15 516:13
517:4 564:14
565:11

turned
83:23
turning
225:9
tweaking
168:16
tweet
131:24
Twentieth
233:24
twice
43:7 113:10
two
24:18,20 26:16
30:1 32:14 74:22
74:24 76:6 80:6
82:9 84:13,23
85:1 144:14
154:11 169:23
172:9 185:19
200:1 205:19,21
211:15 227:6
228:10 233:4
235:24 236:5
237:7,16,21 239:1
239:8,10 240:1,2
240:20 241:1
252:2 260:20
261:9,18 263:24
272:6,24 273:3,16
279:3 281:18,19
288:8 309:4 322:5
327:5 330:11
341:15 344:9
345:3,8,11 348:11
366:3 370:23
385:21 388:10
413:12 423:5
428:4,6 432:2
433:11 439:6
442:1 453:12
459:4 463:11
475:11 493:21
494:10,23 503:14
509:24 525:15
529:18 530:6,7

531:1 532:3
533:23 534:21
535:3 536:16,16
536:21 551:17
568:17
two-month
257:3
two-sided
371:14 372:9
two-three-page
462:19
type
19:11 70:8 93:2
135:8 277:17
278:8 283:24
328:15 344:14
461:17 518:8
522:10 533:7
534:9 538:11
types
58:3 62:14 287:11
422:17
typically
269:3 393:3

U

ultimately
112:17
unaware
466:2 484:22
uncertainty
498:18 501:14
503:6
unclear
241:15 376:5 377:3
379:3
undergraduate
262:8,9
underlie
478:24
underlying
268:10 291:7
308:24 311:22
347:22 528:4
underneath
232:24 233:3,15

287:19 487:19
**underpowered**
384:8,9 552:4
**understand**
32:21 42:6 72:13
73:22 77:6 81:18
81:22 124:12
125:9 131:15
145:5 146:4 167:8
172:24 173:17
177:14,16 194:20
204:10,18 208:13
208:18 215:19,23
268:24 276:1,7
320:15 331:1
404:2 410:13
419:23 433:6
434:9 435:22
456:7 534:12
**understanding**
74:15 80:3 203:20
203:23 204:2,12
204:16,24 205:17
206:1,6 207:3
213:10 264:11
480:20,23
**undertaking**
457:6
**unethical**
545:16 546:10
**unfair**
411:9
**Unfortunately**
407:8 408:6,13
**Union**
3:20
**unique**
464:23
**United**
1:1 127:24 147:8
147:23 149:19
**unity**
386:15
**university**
40:15 41:15 55:6
466:1

**unknown**
553:10
**unobjectionable**
227:17
**unpublished**
86:6,12,18 373:8
**unqualified**
174:9 175:2,4
176:13,20
**unreliable**
328:14
**unscientific**
554:9
**unusual**
67:22 68:1 117:9
117:20 118:9
121:1
**unwarranted**
496:21
**updated**
182:14 191:11
**upper**
506:18
**upstate**
262:12
**urge**
498:1 505:23
**use**
9:7 15:17,18,20
24:5,9 35:14,19
47:5 53:9,13
81:12,14 82:5
91:24 104:16
106:16 126:24
130:2 133:7 135:7
135:9 136:7 138:3
142:6 144:4
149:15 153:19
163:10,12,14,18
205:6 206:9,12
209:3 218:17
220:22 221:11,12
221:16 224:12
231:21 278:7
282:10,13 293:5
307:17 329:18

334:19 376:20
386:7 387:9
394:12,18,19,20
413:9 424:24
442:21 466:16
479:9,18 502:18
506:16,17 526:10
528:16 546:19
552:8 566:11,18
**useful**
447:16
**uses**
343:23
**usually**
44:15 46:15,24
395:18 397:19
**U.S**
85:5 90:21

——————————————
**V**
——————————————
**V**
2:3
**vacuum**
398:22
**vague**
34:12 204:1 208:2
**vaguely**
253:17
**Valentin**
10:11 487:7,19
492:3
**valid**
315:15 322:8
323:10 359:14
526:1,3 528:14,17
528:19 536:1
551:4,12
**validated**
535:10
**validity**
321:14,15,21
323:19 324:7
328:12,16 342:2
342:14 478:23
**valuable**
61:1

**value**
201:8 386:15
388:13 505:20
518:13,13 555:12
**values**
144:12,23 497:16
497:22 500:16
505:20 527:22
557:14 568:1
**variables**
353:7
**variation**
316:9 317:2
**variations**
318:8 528:6
**variety**
405:13 480:18
**various**
39:19 66:17,18
83:3 90:20 125:9
187:2 279:14
**vary**
544:8
**vast**
58:2 268:14 325:8
507:20 508:7
509:13 512:2,7
**verbatim**
179:6
**versa**
386:11
**Version**
6:17 565:3
**versus**
221:9 285:11 344:6
376:20 410:14
416:1 541:10
**Viagra**
8:15 65:18 151:5
196:10 216:4,12
216:18 221:17
222:2 306:3,19
308:1,8 311:6
336:23 346:8,13
347:6 413:14
414:1

**Viagra-Cialis**
224:4,14 225:1,19
226:2,7,17
**Viagra/Cialis**
90:15 197:9 198:16
219:6,18 220:21
223:2 463:12
**vice**
386:11
**video**
360:21
**videographer**
12:2,4 104:5,9
176:7 193:4,8
280:24 281:7
357:23 358:3
440:1,5 458:12,15
477:11 503:15,20
516:7,10 569:13
**VIDEOTAPE**
4:14
**videotaped**
1:13 12:8
**view**
27:24 116:13,13,15
123:19 291:15
305:16 342:3
398:18 541:16
**viewpoints**
441:13
**views**
88:6,11,17 89:11
90:20 169:18,21
170:2 172:3
**Virginia**
4:10
**visual**
287:7
**vitae**
6:17 180:15,22
181:21
**volume**
419:13 484:5,20
**volunteer**
249:23 250:1
**vote**

549:11,18 550:11
550:11,13,21
551:3,7

**W**

**wait**
22:3 67:5,5 68:16
68:16 77:23 95:5
159:24,24 251:22
338:1 360:16
426:17 438:3
456:16,16 483:4
524:16 553:21
563:12 566:13
**waiting**
111:2
**walk**
568:21
**want**
25:2 30:11 31:12
66:20 78:23 85:23
110:1,3 113:11
119:21 120:9
137:18 140:14,19
145:14 162:15
188:2 194:7 200:5
200:5 204:23
212:7 213:8
214:18 215:14
219:8 225:4
227:10 229:10
249:7 251:23
252:4 257:14
261:2 273:18,19
274:2,11 275:23
281:15,16,18
293:7,21 294:3,5
294:7,10 295:10
296:18,22 309:15
315:24 317:6
322:21 323:5
324:14 334:6
337:11 355:11
364:12 370:11
375:4 386:16
393:20 411:5,7

413:10,17 414:12
421:2,2,4 442:1
486:17 488:17
490:8 497:8 507:9
512:1 515:24
538:4 568:21,21
**wanted**
193:20 196:16
322:24 412:15
**wants**
237:11 378:2
**warning**
495:5
**warranted**
495:20
**Washington**
3:4 4:4
**wasn't**
48:19 54:19 121:21
128:11 197:2,23
198:6 218:2
229:20,21 279:23
341:16 383:21
386:18 413:19
424:13 437:7,24
450:2,5 462:6
464:7 519:15
**Wasserstein**
10:8
**waste**
17:10 493:23
566:17
**wasting**
568:19
**watch**
477:12,12
**water**
500:5
**way**
48:15 57:20 67:18
85:10 105:13
110:5,14 113:3
117:2 133:22
136:1 138:20
145:4 147:8,13
149:3 151:23

159:17 187:9
207:17 209:11
224:14 232:23
242:20 249:13
349:11 379:20
417:8 418:7
431:10 439:20
448:19 449:4
461:17 465:9
501:19 504:19
509:10 529:11
568:14
**ways**
30:1 283:10 300:5
477:1
**weak**
389:1 399:19
400:13 433:19
436:7,8 519:21
531:23
**weaker**
366:7
**weaknesses**
374:19
**web**
235:8,17,20,22
245:11
**website**
231:23 232:2,9,12
232:13 234:15
248:1 251:6 258:3
259:11,15
**week**
127:24 191:6
419:11 420:1
460:1,5 482:15
484:3 486:15
492:21 526:14
**week's**
484:7
**weigh**
18:18,20
**weighed**
22:2,6
**weighing**
34:9,17 144:18

**weight**
19:11 252:23 300:4
362:14,18 363:8
384:4 565:19,23
**weighted**
363:15
**weights**
207:14 209:17
212:17
**Weill**
7:12 8:8 129:4,9,13
130:16 133:1
232:10,20 244:19
245:22 258:3
259:2,17 260:21
261:19,20,22
262:7
**weird**
140:15 436:18
549:8
**Weiss**
395:5
**well-established**
66:3
**went**
16:8 25:5 108:13
108:14,18 109:8
195:15 198:19
258:12 268:3
325:13 540:16,17
**weren't**
109:16 266:24
334:9 450:4 482:5
484:12 543:10
**we'll**
18:5,6,22 19:17
21:10 23:13,19
101:7 104:15
192:23 239:21
243:22 263:15
280:19 281:24
294:1 352:18
422:1 503:12
504:19
**we're**
12:2 32:13,14 39:4

42:10,11,15 45:9
48:22 59:6 70:17
88:24 98:1 101:2
101:15 103:23
134:2 141:17
182:10 201:16
259:8 281:20
290:19 291:24
328:5 358:8
391:12 419:9,21
421:18 433:6
501:2 503:11
517:13 525:23
540:18 545:4,5,12
545:13 546:14
**we've**
28:4 39:9 62:3 90:5
264:24 276:4
282:5 303:23
312:23 366:5
391:7 475:12
488:24 489:20,23
490:1 541:15
558:20
**whatsoever**
325:19 406:9 455:7
534:20
**When's**
469:20 470:4
**Whittemore**
524:17
**wide**
405:13 498:3 506:1
506:7
**widely**
491:11
**widespread**
479:9
**width**
524:9
**Willett**
395:4
**willing**
500:3
**win**
348:23 544:17

Karla Ballman, Ph.D.

| | | | | |
|---|---|---|---|---|
| **wisdom** | 139:12 140:7 | 326:24 327:5,20 | 530:21 537:11 | 82:13 100:14,23 |
| 315:13 | 141:10,24 148:17 | 330:22 332:8,21 | 538:10,20 539:23 | 113:14 115:16 |
| **wish** | 151:4,8,10,12 | 335:5,24 337:5 | 543:15 545:19 | 119:1,5 120:4,8 |
| 476:15 | 152:1,4,8,12 | 338:21 339:17,23 | 547:4,20 554:24 | 147:6 150:11,16 |
| **withdraw** | 154:17,19 157:18 | 340:9 349:1 | 555:15 556:10 | 152:9 154:3,4 |
| 136:2 222:15 333:5 | 158:2 161:10,14 | 350:19 351:10 | 557:2,23 558:16 | 169:22 194:20 |
| 333:20 393:22 | 164:12 166:6,9 | 352:13 353:17 | 558:22 560:2,14 | 205:6 220:22 |
| **Withdrawn** | 167:4 171:11 | 354:1 355:20 | 562:10,24 564:17 | 221:11 222:1 |
| 6:18 | 172:12 173:21 | 356:18 357:11,17 | 567:22 568:15 | 349:11 350:9,10 |
| **withdrew** | 174:18,23 175:3 | 358:18 359:18 | 569:9 570:5,6,8 | 353:22 405:16 |
| 258:16 333:16 | 175:20 176:17 | 361:9 362:22 | 571:1 | 457:16 474:15 |
| **witness** | 177:5,17,20 | 364:19 365:18 | **witnesses** | 551:8 555:6 |
| 11:5 12:20 17:16 | 178:12 181:6 | 366:17 368:1 | 175:1 205:13 | **work** |
| 20:12,23 21:14 | 182:13 185:20 | 369:11,17 373:2 | 279:24 366:12 | 20:3 41:20 53:7,13 |
| 22:12 23:3 25:18 | 192:4 194:1 197:8 | 375:14 378:19 | **witness's** | 53:16,24 54:12,18 |
| 26:22 27:14 28:23 | 197:11,16 200:23 | 381:10,20 382:4 | 365:10 | 76:2 110:22 154:8 |
| 29:5 32:3 33:8 | 202:6 203:5 | 382:17 383:8 | **Witt** | 194:10 195:6,9 |
| 34:2,13 35:23 | 204:17,22 206:3 | 393:6 394:22 | 275:4 276:19 | 196:1,10 197:4 |
| 36:22 37:9 42:2,9 | 207:1 208:1 209:5 | 398:3,11 400:15 | **woman** | 242:1 463:13 |
| 43:2,8 44:4 47:18 | 210:20 211:17 | 403:1,8 408:24 | 136:7 138:2 334:20 | 492:24 |
| 49:13 50:15 51:16 | 213:14,19 214:7 | 410:4 412:1 414:3 | 339:19 | **worked** |
| 52:9,16 53:22 | 215:9 216:12 | 414:17 415:20 | **women** | 459:14 |
| 54:14 55:8 58:7 | 217:3,6,14 218:9 | 420:8 422:4 | 47:4 49:4 123:8 | **working** |
| 59:15 60:19 61:14 | 218:24 221:7 | 423:10 426:20 | 130:2 135:8 278:1 | 63:15 89:3 143:18 |
| 62:4 63:8 64:3,22 | 223:5,22 230:6 | 428:17 430:7 | 332:10,16 334:17 | **works** |
| 65:2 66:6 67:14 | 236:4,13,18,20 | 432:6,14 433:14 | 371:1,2 372:5 | 112:19 129:17 |
| 68:10,23 69:18 | 237:3 239:7 | 434:4,18 436:14 | 380:24 384:12,17 | 252:24 449:5 |
| 70:6,19 71:11,16 | 240:16 246:13,19 | 438:20,23 442:8 | 385:7 386:8 387:8 | **workshops** |
| 72:17 73:14 74:1 | 247:12 250:16 | 446:1 448:15,22 | 387:11 468:7 | 199:7 |
| 75:8 76:15 79:14 | 251:19 253:7,9 | 449:22 450:10 | **women's** | **world** |
| 80:7,20 81:8,24 | 254:10 255:17,20 | 452:9 455:6 458:3 | 236:16 | 484:17 |
| 82:20 83:15 85:8 | 256:15 257:20 | 459:4 460:21 | **wonder** | **world's** |
| 87:1 88:14 89:16 | 261:7 262:18 | 461:10 462:22 | 280:17 | 248:4 |
| 91:4,11 98:24 | 263:2 264:5,9 | 463:23 465:3,19 | **Wong** | **worry** |
| 101:13,23 105:22 | 265:1 266:16 | 466:6 467:18 | 523:23,24 | 413:21 421:15 |
| 108:2 109:1 | 268:23 270:5 | 470:8 472:5 | **word** | **worse** |
| 110:17,24 112:2 | 272:19 274:19,23 | 481:19 483:4 | 15:24 104:16 111:6 | 342:3 346:10 |
| 112:23 114:7,21 | 275:5,8,11 283:6 | 486:2,6 489:10,14 | 126:24 161:6 | **worth** |
| 116:20 119:19,24 | 283:19 288:19 | 489:16 491:16,24 | 163:10,12,22 | 170:4 462:13 |
| 121:7 122:10 | 291:19 296:7 | 492:9 496:5 500:2 | 175:12 235:23 | **wouldn't** |
| 125:16 126:7 | 301:12 304:6 | 500:9 503:13 | 259:20 260:7 | 63:8,11 127:19 |
| 127:18 128:22 | 305:21 307:14 | 504:8,15 505:2 | 271:6,7 282:5,10 | 128:13 135:13 |
| 129:7 130:10 | 308:10 310:7,11 | 507:11,24 508:15 | 282:13 285:6,7 | 138:1,19,19 139:6 |
| 131:3,22 132:12 | 312:20 313:4 | 509:17 510:20 | 531:17 | 240:20 302:23 |
| 133:10 134:13 | 317:10,21 318:17 | 511:5 514:24 | **words** | 387:12,15 406:14 |
| 135:17 137:16 | 320:17 325:21 | 515:16 516:2 | 15:18,19 17:7,9 | 415:20 436:16 |

Case 3:16-md-02738-MAS-RLS   Document 9737-7   Filed 05/07/19   Page 205 of 463 PageID: 38442
Karla Ballman, Ph.D.

Page 633

446:7 506:14
510:15 524:23
525:10,14,20,21
547:8,13
**wow**
278:7
**wrap**
271:17
**wrestling**
126:4
**write**
113:4 114:2 117:2
150:6,16,21
171:23 267:21
292:21,22
**writes**
164:17 341:20
398:17
**writing**
84:3 278:11 394:24
**written**
70:1 99:20 171:2,8
171:12 183:10
233:13 324:11
325:1 341:16
463:11 498:6
**wrong**
168:1 181:13,17
335:13 337:8
341:5 361:16
382:2,11 424:12
471:15,20 472:12
472:17 494:9
501:4 504:20
544:11 557:20
559:3,4,13,21
560:10
**wrote**
38:15 84:1 107:20
114:12,13 117:3
121:10 150:8,13
150:18 170:20
199:7 215:11
308:1,8 319:15
337:15 394:5
395:5

**X**

**X**
5:2,11 6:2 7:2 8:2
9:2 10:2 504:19
544:15
**Xerox**
549:5

**Y**

**Y**
544:16
**yeah**
16:7 34:13 36:12
64:3 65:22,24,24
65:24,24 66:1
68:13 115:2
116:20 138:15
143:15 153:9
163:21 164:3
166:6 169:10,20
175:11 177:17
185:3 191:5
204:22 207:1
213:14,19 220:4
233:7 241:1 248:8
248:21 251:1,19
259:13 261:15
270:5 274:15,15
274:16 275:8
277:15 278:20
282:18 285:6,7
292:22 293:2,14
293:16 303:3
307:5 308:2
317:10 337:12
357:17,20 359:6
359:10,18 360:6
364:19,19 373:21
387:3,20 392:11
393:22 395:20
396:23 405:11
422:10 429:11
430:9,15 432:20
435:18 438:20
453:6 454:21
456:5 469:16

475:8,16 476:24
481:24 483:15,22
489:12 500:19
501:12,24 503:4
503:11 504:18
506:21 511:8
527:6 528:12
533:22,24,24,24
533:24 543:3
545:23 546:12
552:22 567:3,10
568:13
**year**
83:10 84:13 219:19
257:6
**years**
7:11 41:20 43:14
57:13 59:21 60:1
60:17 61:11 64:14
66:16 68:6 84:14
84:14 130:3,24
182:23 183:14
229:16 251:15
259:18,18 329:18
380:20,23 381:1
462:18 524:1,18
535:22
**yelling**
238:19
**yellow**
508:7
**Yep**
275:17 389:13
398:3 473:18
**yesterday**
32:16 191:4 193:15
**yield**
292:12 297:16
299:21 300:1,23
315:14 322:8
323:9 435:20
520:5 551:1
**yielding**
422:18,21 451:19
451:21
**York**

1:14,14 3:3 12:10
12:10 244:20

**Z**

**Zambelli-Wiener...**
184:5 186:3
**Zambelli-Wiener...**
188:3
**zero**
493:19 501:21

**$**

**$100,000**
112:18
**$12,000**
193:23
**$56,000**
111:13 112:3

**0**

**0.05**
371:14
**01**
530:3
**05**
372:9 420:20 478:8
479:11 493:18
494:17
**07**
453:5
**07932**
3:8
**091**
494:18

**1**

**1**
14:3 39:9,15
142:24 150:7
177:2,12 181:24
182:5,6,8 203:16
252:2,11 260:22
286:19 290:9
296:1 309:9
310:18 321:1,5,9
493:13 529:24
573:6

**1,400**
370:24 372:4
**1.0**
439:22
**1.02**
422:22 451:7,23
452:6 454:18
**1.06**
422:23 451:7,23
452:6
**1.1**
160:20 402:5,12
437:12,23 438:12
511:21 512:4,5
524:19 540:16
**1.14**
527:13
**1.16**
530:2
**1.17**
453:20
**1.2**
371:13 372:7
400:12 401:23
402:12 421:23
454:8,13,15,19,24
455:3 494:14,20
506:16,18,21
511:21
**1.22**
527:14,17
**1.23**
527:13,17
**1.25**
507:5
**1.26**
371:16 422:20
451:10,20 453:19
454:2
**1.3**
267:3 384:10,14
512:23 515:13
**1.31**
388:20
**1.32**
388:21 527:14

**1.35**
422:20 451:10,20
  453:20 454:2
**1.36**
540:17
**1.38**
540:16
**1.4**
160:20 524:1
**1.48**
501:19
**1.49**
540:17
**1.5**
389:1,8 437:13,23
  438:12 512:5
**1.6**
524:18
**1.67**
530:3
**1.75-fold**
25:8
**1.8**
401:18,23
**1.9**
524:18
**1:00**
271:16
**1:27**
281:9
**10**
187:18 188:16
  194:15 248:6
  456:5
**10A**
188:21
**10-B**
189:23
**10-C**
189:24
**10-E**
199:1
**10:10**
104:7
**10:25**
104:11

**100**
136:15 251:15
  268:7 406:15
**101**
228:17,17 260:16
**102**
456:5
**104**
6:6
**11**
232:4 565:11
**11/28/00**
8:23
**11:33**
193:6
**11:48**
193:10
**1100**
3:18
**12**
194:1,2,8,10,12
  195:11 196:7
  197:11 242:24
  567:5
**12.4**
380:23
**12/2018**
5:23
**12:49**
281:1
**13**
5:6,15 245:17
**130**
2:13
**131**
476:2
**14**
247:20
**142**
274:8,14 276:18,21
  277:6
**1440**
3:3
**145**
6:9
**15**

**258:12 366:4,9**
  380:19
**155**
6:12
**16**
91:14 93:12 257:13
  258:11,15,19,21
  391:8 540:11
  568:9
**16-2738**
1:6
**161**
6:14
**17**
258:1,9,12,17
  294:18 405:20
  408:22 409:3
  416:19 439:11,11
  540:6
**18**
93:6,8 306:16
  336:23 568:10
**180**
6:17
**187**
6:19
**189**
6:20,22 7:6,7
**19**
94:20,21 97:13
  98:2 313:19
  336:23 337:10
  517:4,5,13 524:1
**19103**
3:13
**1960s**
62:24
**1965**
95:11 145:21
**1982**
55:6,13 56:3,12
  92:19
**199**
7:9
**1999**
540:9,22 541:3,6

**2**

**2**
6:15 7:10 9:21 19:9
  38:24 39:13 189:5
  252:2,3,3,11,12
  252:12 284:20
  476:5
**2.4**
401:19
**2.49**
437:18
**2/25/19**
5:16 9:19
**2:23**
357:24
**2:34**
358:5
**20**
31:23 41:20 43:14
  95:14 112:13
  182:23 337:9,11
  337:15 380:20
  447:1,2 498:7
  508:12 509:14,15
  524:2 573:20
**20th**
195:13
**20-some**
229:16
**20-year**
330:8
**200**
53:4 183:23 265:7
**200,000**
368:9 370:7 371:2
  372:5 384:12
  385:11
**200-plus**
268:15
**2000**
3:13 184:8 338:13
  340:6
**20004**
4:4
**20005**
3:4

**2003**
93:16 184:7,14,21
**2006**
76:23 77:8 81:19
  81:21
**2007**
184:8,21
**2008**
93:17
**2010**
81:18,20
**2011**
184:8,15,19
**2014**
168:11,18
**2016**
151:21 420:1 460:6
  462:16 495:3
  540:20 541:4,8
**2018**
47:21 49:22 50:13
  51:2,11,19 52:11
  57:23 58:12 62:10
  67:11 71:4,16,23
  82:9 83:2 86:10
  93:17,17,18,19
  100:6 143:21
  243:10
**2019**
1:10 12:7 56:13
  70:18 191:2
  259:10 462:17
  570:15
**202**
3:4 4:4
**21**
94:20 97:13 98:1,3
  100:2 152:15
  191:2 306:6,14
  338:1,2,3,5
  513:11,13
**215**
3:14
**216**
3:19
**22**

1:10 338:5 388:6
388:22
**22nd**
12:6 181:8,13
**22311**
4:10
**23**
298:21 338:5 390:4
390:6 446:23
**23rd**
193:22
**232**
7:12
**24**
337:24 381:1
416:20 492:21
570:15
**24-case-control**
376:17
**243**
7:15
**245**
7:18
**247**
7:20
**25**
329:18 441:5
564:15
**250**
8:6 492:20
**255**
550:9
**257**
8:8
**26**
295:22 296:12
297:7,20 370:22
406:23 422:6,9
451:7,15 500:7
**27**
440:21
**277**
8:11
**28**
6:7 97:23 98:5,24
101:19 299:18,24

301:1 358:22
364:14,17 473:15
495:8,9 549:11,16
**29**
102:14 103:9
531:15,16

─────── **3** ───────

**3**
55:17,23 284:16
341:14,14 401:6
437:20 498:11
502:4,13 527:3,4
**3,600**
529:6,7 530:1,2
**3.3**
292:10
**3.9**
437:15
**3/21/19**
7:7
**3/21/2019**
195:13
**3/7/19**
7:6
**3/7/2019**
190:1
**3:35**
440:2
**3:51**
440:7
**30**
56:4,9,14 112:14
130:24 390:1
397:2,5 426:5
441:5 519:11
520:4,11 530:13
530:14 533:5
534:1 566:14,15
566:17,18 571:16
**30-some**
464:15
**303**
2:14
**306**
8:14

**31**
520:4,12 534:2
**313**
8:17
**316**
2:4
**32**
549:4
**320**
8:19
**32502**
2:5
**337**
2:10 8:21
**34**
536:12
**35**
301:4
**36**
153:10 518:20
**371-7850**
3:4
**375**
9:6
**38**
153:5
**39**
153:5
**390**
9:10
**394**
9:12

─────── **4** ───────

**4**
87:8 91:16 97:21
286:17 287:5
**4:07**
458:13
**4:12**
458:17
**4:48**
503:18
**4:54**
503:22
**40**

57:13 59:21 60:1
60:17 61:11 64:14
66:16 68:6 130:3
521:4 522:7
**40-some**
486:9
**40-some-page**
469:18
**40-year**
63:24
**401**
9:15
**41,000**
384:17
**42**
567:8 568:8
**425**
9:18
**43**
376:3 419:13
485:11,11 486:17
486:24 567:6,9
**435-7001**
2:5
**439-0707**
2:10
**44**
567:10,13
**440**
9:21
**44113**
3:18
**45**
302:8 567:13
**46**
567:6,12,13
**463-2400**
4:4
**47**
272:14,14 274:8,14
274:18 275:4,16
279:5,7
**48**
5:17 153:1,2
498:13 502:10
540:11

**483**
10:6
**487**
10:10
**49**
153:1,2
**4900**
4:9

─────── **5** ───────

**5**
101:20 104:14
113:6 513:17
558:9,17,23 559:4
**5th**
181:2,15
**5.1.2**
413:2
**5:09**
516:8
**5:11**
516:11
**5:54**
569:15,19
**50**
24:2
**501**
2:9
**519**
10:12
**53**
5:18 34:8 37:21
285:20 302:5
**532**
10:14
**548**
10:17
**549-7000**
3:9
**55**
5:20 334:20 344:7
387:11
**56**
463:13
**564**
5:7

**566**
5:6
**574**
573:6
**58**
279:5

---
**6**

**6**
145:15 404:11
447:3,8,15
**6th**
122:19,20
**6.1**
91:18
**6/14/18**
7:16
**60**
159:17
**600**
2:4 3:8
**63.4**
476:3
**650**
4:9
**68**
274:8,14 276:14,19
279:7
**696-4835**
3:19

---
**7**

**7**
243:14 292:7,10
304:19 437:20
**703**
4:10
**70601**
2:9
**73**
366:4,9
**75**
112:17
**78,000**
384:17

---
**8**

**8**
161:22 166:16
313:24 314:12
336:24 404:14
**80,000**
385:7
**800**
487:21 488:5
492:22 493:6,10
**80220**
2:14
**839-8000**
2:14
**85**
454:19
**87**
5:22
**877.370.3377**
1:20
**888**
2:5

---
**9**

**9**
180:14 524:1,2
**9:04**
1:15 12:7
**90**
371:13 372:8
**917.591.5672**
1:20
**931-5500**
4:10
**95**
417:9 420:21
431:11 453:19
**950**
3:18
**97**
501:18 502:2
**973**
3:9
**975**
4:3
**988-2706**
3:14

Exhibit 5

## Invoice

Dr. Karla Ballman
Statistician and Consultant
430 East 63rd Street, Apt. 12G
New York, NY 10065
507-301-3013
kab2053@med.cornell.edu

Please remit payment to Karla Ballman at the address above.

Invoice Date: 03/07/2019

Consulting Services for Johnson and Johnson Talcum Power and ovarian cancer litigation: 11/12/2018-03/07/2019

Consulting Services/Fees

| Description | Hours |
|---|---|
| ██████████████████ | 5 |
| ██████████████████ | 55 |
| ██████████████████ | 80 |
| | **140** |

Consulting rate: $400 per hour

**Invoice Total**          **$56,000**



Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION**<br><br>***THIS DOCUMENT RELATES TO ALL CASES*** | **MDL NO. 16-2738 (FLW) (LHG)** |

**EXPERT REPORT OF CHRISTIAN MERLO, MD, MPH**
**FOR GENERAL CAUSATION *DAUBERT* HEARING**

Date: February 25, 2019

_____
Christian Merlo, M.D., M.P.H.

## I.      SCOPE OF REPORT

I was asked to address fundamental tenets of epidemiology, to review the epidemiology related to the potential association between perineal talc use and ovarian cancer, to review plaintiffs' epidemiology experts' reports, and to offer my opinions on their methodologies.

All of the opinions in this report are stated to a reasonable degree of scientific certainty.

I am being compensated at a rate of $530 per hour for record review and drafting my report and $720 per hour for testimony.

My curriculum vitae, a list of literature that I have reviewed, and a list of testimony I have provided in the last four years may be found in Appendices A, B and C.

## II.     PROFESSIONAL QUALIFICATIONS

My name is Christian Merlo.  I am a licensed physician in the state of Maryland and am board certified in internal medicine, pulmonary medicine and critical care medicine.  I am an attending physician at the Johns Hopkins Hospital and the Johns Hopkins Bayview Medical Center and care for patients both in the hospital and in our outpatient centers.  I am Associate Professor of Medicine in the Division of Pulmonary and Critical Care Medicine at the Johns Hopkins University School of Medicine, and in addition, I am Associate Professor of Epidemiology in the Department of Epidemiology at the Johns Hopkins Bloomberg School of Public Health.  I am also a member of the *Alpha Omega Alpha* honor society for medicine.

I have provided patient care and consultation as a clinical physician and have taught medicine in the fields of general medicine, pulmonary medicine and critical care medicine for more than 18 years.

I received my doctorate in medicine at Georgetown University School of Medicine and completed my residency in internal medicine at Georgetown University Medical Center, where I also served as Chief Resident.  I completed a four-year fellowship in Pulmonary and Critical Care Medicine at the Johns Hopkins Hospital, and during this period in time, I also received a master's degree in public health from the Johns Hopkins Bloomberg School of Public Health.

I was offered a faculty position in 2004 as Instructor in Medicine at the Johns Hopkins University School of Medicine, and was promoted to Assistant Professor of Medicine in 2006.  In 2009, I was awarded a joint faculty appointment as Assistant Professor of Epidemiology at the Johns Hopkins Bloomberg School of Public Health, and in 2015, I was promoted to Associate Professor of Medicine and Epidemiology.

I am the Associate Program Director of the Adult Cystic Fibrosis Program at the Johns Hopkins Cystic Fibrosis Center, one of the largest cystic fibrosis centers in the country, and in addition, I am the Director of Research for both the Adult Cystic Fibrosis Program and the Lung Transplant Program at the Johns Hopkins Hospital.  I am also an Associate Program Director for Research and Scholarship for the Osler Medical Residency

P1.02018.2

program.  I have specific expertise in the clinical care of patients with cystic fibrosis and those who undergo lung transplantation, as well as in the care of patients with other pulmonary diseases or those that require critical care therapies.  My research involves the design of clinical studies investigating the impact of environmental and infectious exposures on outcomes for patients with cystic fibrosis and those who undergo lung transplantation.

I am currently principal investigator or co-investigator on many NIH-funded and pharmaceutical industry-sponsored clinical trials.  I have authored or co-authored more than 70 manuscripts, book chapters and commentaries on topics involving cystic fibrosis and lung transplantation, as well as on topics in general pulmonary medicine and critical care medicine.  As a clinical investigator, I have had rigorous training and have expertise in clinical epidemiology, with specific training in clinical trial design, conduct and analysis.  My ties with the School of Public Health have provided ongoing collaboration to help research the epidemiologic nature of the exposure/outcome causal pathway in diseases involving internal medicine, pulmonary medicine and critical care medicine.

I am also an expert in the methodologic approach to the study of disease and have more than 15 years of experience teaching coursework on study design and analysis, as well as conducting research on the epidemiologic nature of the exposure/outcome relationship with a strong command of the strengths and limitations of epidemiologic investigation.

## III.   FUNDAMENTAL PRINCIPLES OF EPIDEMIOLOGY

Although there are many definitions of epidemiology, a widely accepted definition describes epidemiology as:

> *the study of the distribution and determinants of health-related states or events in specified populations, and the application of this study to the control of health problems.*[1]

Epidemiology is a scientific discipline that relies heavily on an unbiased approach to the collection, analysis and interpretation of data.  Epidemiology places an emphasis on the frequency and rate of health events as well as how personal characteristics such as demographics, socioeconomic status, behaviors and environmental exposures play a role in health-related events.  Epidemiology is a science, and epidemiologic studies, when designed, conducted, analyzed and interpreted appropriately, can be powerful tools in the critical examination of the causal pathway between exposure and outcome.

### A.   *Fundamentals Of Epidemiologic Study Design*

Researchers often have to choose a study design based on the research question, as not all study designs are appropriate for all questions.  Many research questions are suitable to be answered using a classic experimental design such as the randomized controlled trial.  For instance, it may be appropriate to use a randomized controlled trial design to investigate

---

[1]      *See, e.g.*, Centers for Disease Control & Prevention, Principles of Epidemiology in Public Health Practice, Third Edition, An Introduction to Applied Epidemiology and Biostatistics, Lesson 1: Introduction to Epidemiology, https://www.cdc.gov/ophss/csels/dsepd/ss1978/lesson1/section1.html (footnote omitted).

**P1.02018.3**

the effect of a new cholesterol lowering agent on mortality in patients with heart disease. An example of this is the Scandinavian Simvastatin Survival Study,[2] in which researchers studied 4,444 patients with heart disease who were either treated with simvastatin or placebo. The investigators found a significant reduction in the risk of death from heart disease in the simvastatin group compared to placebo.

Other research questions are not suitable for an experimental design in humans because of the potential for harm, lack of equipoise or ethical concerns. One such example is the effect of cigarette smoking on risk of death and risk of death from lung cancer. In order to attempt to answer this, researchers would not be able to use an experimental design, and more likely would have to use an observational study design. Doll and Hill[3] sent out a short but detailed questionnaire asking more than 59,000 British physicians about smoking habits and obtained follow-up information regarding mortality and lung cancer risk. In this very large observation cohort, Doll and Hill were able to demonstrate a significant increase in all-cause mortality as well as deaths due to lung cancer among cigarette smokers when compared to non-smokers.

Sometimes, the experimental study design is appropriate, and other times, an observational study design is necessary, but it is only with careful and detailed attention to the study design (study type, study size, exposure assessment, attempt to limit bias and confounding), conduct and analysis that the cause of disease can possibly be determined.

### B. Limitations Of Epidemiologic Study Design

All epidemiologic studies have the advantage and limitation of studying humans rather than experimental animals. Each epidemiologic study design (detailed in the **STUDY DESIGN CONSIDERATIONS** section), however, not only has its strengths, but also weaknesses.

For example, consider the design of an epidemiologic study to evaluate the question:

*"Does regular aerobic exercise decrease the risk of heart disease?"*

A randomized controlled trial, one might think, would be the most rigorous approach and the method most similar to a laboratory scientist working in a highly controlled environment with experimental animals. Suppose researchers choose a group of subjects who don't exercise regularly, divide the group randomly into an intervention group, who are instructed to perform aerobic exercise for 30 minutes three times a week, and a control group, who are instructed to continue with a low exercise lifestyle. The investigators will follow both groups looking for signs of heart disease, and if they are correct, subjects who exercise will get less heart disease. With this study design there may be a problem with controlling how much the subjects exercise. In the laboratory, a scientist can control exactly how much an experimental animal exercises, but in the real world this

---

[2]    The Scandinavian Simvastatin Survival Study Group, *Design and baseline results of the Scandinavian Simvastatin Survival Study of patients with stable angina and/or previous myocardial infarction.* (1993) 71 Am J Cardiol 393.

[3]    Doll & Hill, *The mortality of doctors in relation to their smoking habits.* (1954) 328 (7455) BMJ. 1529 .

may be difficult to control.  The intervention group may become lazy and not exercise, while the control group might have concern about heart disease and increase exercise, which would affect the study results.

The researchers might attempt a cohort study and follow a large group of people without heart disease over a period of time and ask them detailed questions about exercise and then after several years compare the rate of heart disease among those who exercise regularly to those who do not.  Again, if the researchers are correct, patients who exercise regularly will develop less heart disease.  One potential problem with this design is that people who exercise regularly may differ in other ways from people who do not exercise regularly.  For example, the people who exercise regularly might be more likely to eat healthier and less likely to smoke and have a reduced risk of heart disease that is unrelated to exercise.

The researchers might also choose to perform a case-control study and identify a group of people with heart disease from the hospital coronary care unit as well as a comparable group from the hospital without heart disease.  The investigators would then question both groups about their exercise over the past several years and classify each as either exercising regularly or not exercising regularly.  Once again, if the researchers are correct, the patients with heart disease will report less exercise than controls.  One potential problem with this approach is that people may not be able to remember their exercise patterns, or those with heart disease might feel self-conscious about reporting true exercise patterns and the information obtained about the exposure may not be reliable.

## IV.    EVALUATING THE ACCURACY OF EPIDEMIOLOGIC STUDIES

### A.  *Accuracy Of An Epidemiologic Study*

In an ideal setting, all epidemiologic studies would be designed, conducted, analyzed, and interpreted in a fashion that eliminated sources of error.  One of the major goals for epidemiologists is to minimize error as much as possible.  Similarly, it is important for those who read and use the epidemiologic literature to be cautious in how the information is interpreted.  As such, it is important to understand the factors that can influence the accuracy of epidemiologic study as errors can arise from three main sources – bias, confounding and random error.

Accuracy requires both validity and precision.  Bias and confounding affect the validity of a study, while random error affects the precision of a study.

### B.  *Validity*

Validity of epidemiologic studies is defined as the "degree to which inferences are warranted given the methods and study population chosen."[4]  There are two major types of validity – internal validity and external validity.  Internal validity represents how well the study findings, aside from random error, represent the truth in the population being studied.  The internal validity of an epidemiologic study can be challenged by systematic error caused by either or both of bias and confounding.  This systematic error in the study design, conduct, analysis or interpretation can lead to either artificial elevation or artificial

---

[4]        Oleckno, *Epidemiology: Concepts & Methods* (2008).

reduction in the measures of association between exposure and outcome. External validity, sometimes referred to as generalizability, is the extent to which the results of the study can be applied to populations other than the population under investigation. It is often felt that internal validity is more important than external validity because if a study is not valid, then why would one generalize a non-internally-valid study to another population. The above-mentioned Scandinavian Simvastatin Survival Study[5] results were believed to be internally valid, and it was also felt to be reasonable to apply these results to other populations.[6]

### C. Bias

Bias is a type of systematic non-random error in the design and/or conduct of an epidemiologic study. Bias can have a dramatic effect on the internal validity of a study and because of this, can affect the accuracy of the study. In general, bias can be broken down into two main categories, known as selection bias and information bias. Both of these types of bias can lead to either an overestimation or underestimation of risk in epidemiologic studies. Although bias can be present in all types of studies, bias can be a particularly significant concern in observational studies, especially in those studies that are poorly designed.

Selection bias refers to a systematic error due to the way in which subjects are selected for the study. This type of bias can occur when the subjects in the study population differ from the subjects in the source population. This can occur in a cross-sectional or case-control study when the frequency of the exposure or outcome differs systematically between the study population and the source population. Because of this, selection bias can sometimes lead to an association when one does not actually exist. For instance, an investigator interested in researching whether coffee drinking is associated with a specific type of cancer designs a case-control study and obtains cases from an oncology clinic. The investigator obtains controls from a nearby heartburn clinic. The study is performed, and the investigator finds that coffee drinkers are 1.5 times more likely to develop a specific type of cancer. Since controls are recruited from a different clinic than the cases, it is possible that controls may be systematically different from cases in a way that may affect the study results. In fact, since controls were recruited from a nearby heartburn clinic where patients are routinely instructed to reduce or stop coffee drinking, controls are less likely to be coffee drinkers than all people who would be eligible controls and lead to an overestimate of risk due to selection bias.

Information bias refers to a systematic error due to measurement errors that leads to misclassification of study subjects with regards to either exposure or outcome. Information bias tends to occur during the data collection portion of an epidemiologic study. This misclassification of either exposure or outcome can be characterized as either differential or nondifferential. Differential misclassification can occur when the likelihood of misclassification is different between the study and comparison groups. Differential misclassification may lead to either overestimation or underestimation of the true value of the measure of association. If the cases in a case-control study are more likely to be

---

[5]     The Scandinavian Simvastatin Survival Study Group. *Design and baseline results of the Scandinavian Simvastatin Survival Study of patients with stable angina and/or previous myocardial infarction.* (1993) 71 Am J Cardiol 393.

[6]     *Id.*

misclassified as exposed than the controls, then the study will tend to overestimate the true estimate of risk (odds ratio).

For example, suppose an investigator is interested in studying whether high blood pressure is associated with drinking sugary drinks. A case-control study is designed, and the investigator finds 200 cases with high blood pressure and 200 controls with normal blood pressure. The investigator then asks questions about sugary drink habits during the previous five years. The responses are collected and analyzed (table a), and there is a statistically significant increase in risk of high blood pressure with drinking sugary drinks (OR: 3.67; p<0.001), suggesting sugary drinks are associated with high blood pressure. If cases are systematically more likely to report sugary drink usage than controls (differential misclassification because of the belief that sugary drinks may cause high blood pressure), then this will lead to an overestimation of the true estimate of risk. In reality, if there was no increase (table b) in reporting sugary drink consumption among cases (no misclassification), there would be a non-statistically significant estimate of risk (OR: 1.35; p=0.13).

a.

|  | Study | | | |
|---|---|---|---|---|
|  | High BP | No high BP |  |  |
| Sugary drinks | 150 | 90 | OR=3.67 | P<0.001 |
| No sugary drinks | 50 | 110 |  |  |
|  | 200 | 200 |  |  |

b.

|  | Truth | | | |
|---|---|---|---|---|
|  | High BP | No high BP |  |  |
| Sugary drinks | 105 | 90 | OR=1.35 | P=0.13 |
| No sugary drinks | 95 | 110 |  |  |
|  | 200 | 200 |  |  |

Nondifferential misclassification can occur when there is likely an equal proportion of misclassification of exposure status among those with and without an outcome or of outcome status among those with and without an exposure. This type of misclassification typically results in a dilution of the effect of exposure on outcome and is more likely to result in no association when an association between exposure and outcome actually exists.

One specific type of bias that leads to misclassification and that is common in case-control studies is known as recall bias. It often results from the fact that cases tend to remember past exposures more than controls. It may also arise if cases are more likely than controls to investigate whether certain risk factors increase the risk of developing a certain disease. Recall bias is often less likely to occur when both cases and controls are patients, for example, in hospitalized patients,[7] where the degree of thinking about a possible exposure or outcome is likely to be at similar levels. Consider again the above example of the investigator who is trying to determine if there is a relationship between sugary drinks and high blood pressure. If the cases tend to recall and report more sugary drink consumption simply because they have reflected more on their past experiences, recall bias

---

[7]      Schultz & Grimes, *Case-control studies: research in reverse*. (2002) 359(9304) Lancet 431; Schlesselman, *Case-control studies: design, conduct, analysis* (1982).

could result in an overestimation of the measure of risk between the sugary drinks and high blood pressure.

As particularly pertinent here, in one case-control study involving the potential association between perineal talc use and ovarian cancer,[8] the investigators examined whether cases and controls reported talc use more frequently if they were interviewed after 2014, which is the year when two widely publicized lawsuits concerning talc use were filed, as opposed to before that year. For those interviewed prior to 2014, approximately the same percentage of cases and controls reported genital talc use (36.5% for cases, 34.0% for controls). For those interviewed after 2014, cases reported talc use 51.5% of the time, while the percentage of controls reporting talc use remained about the same (34.4%). This is a clear demonstration of the effect of recall bias in case-control studies. Critically, that study found a statistically significant risk of ovarian cancer for those who were interviewed after 2014 at 2.91 (95% CI: 1.70-4.97). For those interviewed prior to 2014, no statistically significant association was found.[9] As discussed in Section VIII.B below, such concerns of recall bias could have affected pre-2014 studies as well.

Selection and information bias can best be controlled and prevented during the design and conduct of a study. This means that investigators must recognize the potential sources of bias and take precautions to minimize this bias. Methods have been developed to prevent or minimize bias in epidemiologic studies. Some of these include attempts to standardize data collection, pilot test data collection instruments, use objective methods to measure exposure and outcome status, verify subject response from other sources and obtain multiple measurements of exposure and outcome status.

### D. Confounding

In epidemiology, confounding is a misrepresentation of the true effect of an exposure on an outcome due to an association between the exposure and another factor. This factor is often referred to as a confounder, and like bias, confounding is a systematic, non-random error that can affect the internal validity of a study. Confounding can result in an overestimation or underestimation of the true effect of an exposure on an outcome. In general, for another factor to confound the effect of an exposure on the outcome, three conditions must be met: (1) the factor must be associated with the exposure; (2) the factor must be associated with the outcome; and (3) the factor must not represent a step in the causal pathway between exposure and outcome. Many times, epidemiologists do not know what extra factors will confound an actual effect of an exposure on an outcome, but it is important for suspected factors to be considered as potential confounders. Experienced epidemiologists are usually able to anticipate suspected confounders given previous experience in similar studies or based on previous studies looking at a similar exposure outcome relationship.

The Sister Study, which I discuss in more detail below, is one example of potential confounding affecting the measurement of the effect of genital talc exposure.[10] In that

---

[8]     Schildkraut et al., *Association between Body Powder Use and Ovarian Cancer: The African American Caner Epidemiology Study (AACES)*. (2016) 25(10) Cancer Epidemiol Biomarkers Prev. 1411.

[9]     *Id.*

[10]     Gonzalez et al., *Douching, Talc Use, and Risk of Ovarian Cancer*. (2016) 27 Epidemiology 797.

study, in addition to talc use, participants were also asked about their douching habits.  Of the 50,884 women who completed questionnaires, 154 women developed ovarian cancer.  Ever douching during the 12 months prior to the study was associated with a statistically significant risk of ovarian cancer (HR: 1.8; 95% CI: 1.2-2.8) when compared with never douching after adjusting for confounders.[11]  In contrast, there was no statistically significant increase risk of ovarian cancer (HR: 0.73; 95% CI: 0.44-1.2) with ever talc use during the 12 months prior to the study when compared with never talc use after adjusting for confounders.[12]  There was no change in the estimated effect of talc use after adjustment for douching, and similarly, there was no change in the estimated effect of douching after adjusting for talc use. If those who use talc are more likely to douche, as is demonstrated in this and other studies,[13] and douching has a significant effect on the risk of ovarian cancer in this study, prior studies that have revealed a significant effect of talc on ovarian cancer may have been confounded by douching.

Although the amount of confounding is the degree to which the measure of association is affected, it is not appropriate to evaluate confounding using statistical tests of significance.  In order to ensure the validity of an epidemiologic study, all attempts should be made to control confounding.  While bias usually occurs in the study design and data collection phases of an epidemiologic study, confounding usually occurs during the design and analysis phases.  Epidemiologists can work to control confounding in the design phase by restricting subjects to only certain characteristics, matching to attempt to create study and comparison groups that are similar with respect to potential confounders, and randomization to decrease confounding by increasing the likelihood that the study group is similar to the comparison group with regard to known factors, as well as unknown potential confounders.

### E.  Precision

Precision is a measure of the amount of nonsystematic or random error that is present in the study.  Random error is variability in a measure that is simply due to chance, and it represents unexplained error in a study.  In epidemiologic studies, a precise result would be very easily replicated.  Random errors tend to cause inconsistency between different studies and may make it less likely that investigators will find an association between exposure and outcome.

### F.  Random Error

Random error affects the precision (and thus, the accuracy) of an epidemiologic study.  Measurement error and sampling variation are the two main components of random error.  Measurement error occurs because of an error in the measuring of the value of a variable.  This may be the result of inaccurate measuring devices or due to the subjective type of some exposures or outcomes.  Measurement error can be minimized by taking multiple measurements for a certain exposure or outcome.  For instance, assume the above case-control study designed to investigate the effect of sugary drinks on blood pressure.

---

[11]     *Id.*

[12]     *Id.*

[13]     Rosenblatt et al., *Characteristics of women who use perineal powders*. (1998) 92(5) Obstet Gynecol 753.

8

Investigators might consider taking several measures of blood pressure and using the average to minimize measurement error. A second form of random error, sampling variation, can occur because samples used in an epidemiologic study are only estimates of the desired population of interest to study. Consider again the above case-control study in which investigators report the odds ratio of 1.35 as the risk estimate of the effect of sugary drinks on high blood pressure. Suppose the investigators replicated the study using a new sample of the same size and found that the odds ratio was now 1.8. Assuming systematic errors were controlled for in study design, data collection and analysis, this difference can be explained by random error/sampling variation. A third sample might reveal an odds ratio of 1.1 or 2.5, which demonstrates that sampling variation is both unpredictable and not reproducible. In general, epidemiologists try to reduce sampling variation by increasing sample size. The stronger the relationship between the exposure and outcome, the smaller the group of patients that need to be studied for this relationship to be apparent. If the group being studied is too small, then the causal relationship may be missed, or spurious results may show up by sampling variation and random error.

## V.     STUDY DESIGN CONSIDERATIONS

The purpose of epidemiology is to establish associations between exposures and outcomes that may uncover clues to causation. Epidemiologists can explore the relationship between exposure and outcome in humans in real-world situations by observing (observational study designs) or intervening to a limited extent (experimental study designs), as opposed to controlling all aspects of an experiment in the laboratory. Epidemiologists may also gather data from many studies, either observational or experimental (meta-analysis study designs) and summarize the information in an attempt to demonstrate associations between exposure and outcome. As such, there are many different study designs in epidemiologic research in humans, each with strengths and weaknesses.

### A.   Case Reports And Case Series

Individual level observations can be documented in a case report, a particular clinical situation involving one unique patient, or in a case series, a description of a group of patients with similar clinical findings or conditions. Case reports and case series are helpful tools in generating hypotheses about associations between exposures and outcomes. However, the lack of a comparison group and the likely presence of bias and confounding limit validity, and therefore limit the ability of these types of epidemiologic descriptions to establish causal associations between exposure and outcome.

### B.   Cross-Sectional Studies

A common epidemiologic study design used in the initial attempts to evaluate associations between exposures and outcomes is the cross-sectional study. In this type of study, both the exposure and outcome are evaluated simultaneously in each study participant. This approach is sometimes referred to as a prevalence study, as cases of disease or outcome identified are prevalent cases of the outcome being investigated. It is impossible to determine the temporality between exposure and outcome with this epidemiologic study design because of the temporal bias that may exist if the disease causes the exposure. For instance, prevalent cases of asthma may be less likely to own a cat than those without asthma. As patients with asthma may have been instructed to not own a cat,

this relationship might lead investigators to conclude that cat ownership is protective against asthma, leading to a phenomenon known as reverse causality. In addition to temporal bias, selection bias due to survivorship may also be present in cross-sectional studies. This may result if exposure in cases leads to shortened survival than those cases who are unexposed. Similar to case-reports and case-series, cross-sectional studies are often used to generate hypotheses about potential causal associations between exposure and outcome.

### C. Case-Control Studies

Another common study design used to evaluate the effect of an exposure on an outcome is known as a case-control study. In this type of epidemiologic study, cases are defined as those with a particular outcome and non-cases or controls are defined as those without a certain outcome. Exposure is then retrospectively evaluated and compared between the cases and controls. Thus, in a case-control study, the prevalence of the exposure of interest should be higher among those with the outcome (cases) than those without the outcome (controls). In general, case-control studies provide more information on the temporal relationship between exposure and outcome than cross-sectional studies. However, case-control studies remain susceptible to other forms of bias. Selection bias can occur in a case-control study when the relationship between exposure and outcome differs systematically between the study population and the source population. Because of this, selection bias can sometimes lead to an association when one does not actually exist. Recall bias is common in case-control studies and results from the cases or subjects with disease having a tendency to remember past exposures more than controls. As mentioned above, it may also arise if cases are more likely to investigate possible factors that may increase the risk of developing a certain disease. Recall bias is often less likely to occur when both cases and controls are patients, for example, in hospitalized patients[14] as compared to population-based case-control studies where the degree of thinking about a possible exposure or outcome is likely to be at similar levels.

### D. Cohort Studies

A cohort design assigns an individual as either exposed or unexposed and then that individual is followed over time to see if a particular outcome of interest develops. In general, there are two main types of cohort studies – prospective and retrospective. A prospective cohort design establishes exposure status in the beginning of a study and potentially repeatedly during the study, and then the outcome status for each individual is determined during a follow-up period that extends into the future. In a retrospective cohort design, the exposure and outcome have already occurred (as in the use of administrative or registry data), and the exposure status of each individual is determined from a time period that existed in the past with the outcome then being determined during a time period after exposure that may extend to the present. Temporality is established whether a cohort study is prospective or retrospective in design because the exposure status is always determined prior to evaluating outcome status. In general, cohort studies provide more evidence for a causal relationship between exposure and outcome, and can often study many exposure-outcome relationships with less chance for bias and confounding than case-control studies if

---

[14]       Oleckno (2008) at 207; Infante-Rivard, *Hospital or Population Controls for Case-Control Studies of Sever Childhood Diseases?* (2003) 157(2) Am J Epidemiol 176.

the design, conduct, data collection and analysis are properly performed.  However, cohort study designs also remain susceptible to certain types of bias and confounding, are often very expensive, take a long time to conduct and may be difficult to perform, especially if the outcome of interest is rare.

### E.  Experimental Studies

Unlike an observational study, where exposure is not under the control of the investigator, an experimental study is one in which the exposure (intervention) is controlled directly by the investigator.  One such experimental study design – the randomized-controlled clinical trial – is a planned epidemiologic experiment where subjects are randomly assigned to an exposure (intervention) or control group to evaluate the effect of the exposure on outcome.  Randomized controlled clinical trials are considered the gold standard of epidemiologic studies.  Although there are many advantages to an experimental study design, experimental studies are still subject to the effects of bias and confounding if not designed and conducted properly, and there are instances when this design is not suitable to evaluate the causal association between exposure and outcome because of potential for harm, lack of equipoise or ethical concerns.

### F.  Meta-Analysis

Epidemiologists may use multiple studies that address the same research question to provide an overall statistical summary of the results.  This process is known as meta-analysis and is useful when individual studies tend to be inconclusive because of small sample size.  A meta-analysis can provide a precise estimate of the effect of an exposure on an outcome of interest by combining the results of relevant studies by using a systematic approach and analysis.  Meta-analyses can also help to provide consensus about the effectiveness of interventions, as well as insight or explanation for differences in individual trial results.  Meta-analysis is a type of systematic review that utilizes a comprehensive, rigorous and standardized approach to selecting, assessing and synthesizing all relevant studies on a given topic.  Systematic reviews that summarize studies without combining the results statistically are often called qualitative systematic reviews, while those that also combine study results statistically to produce an overall summary effect are referred to as quantitative systematic reviews, and are synonymous with meta-analyses.  There are fundamental steps that must be followed to ensure the quality of a meta-analysis.  These include (a) defining the research question, (b) defining the criteria for study selection, (c) structuring a review of the literature for all eligible studies, (d) structuring data abstraction, (e) reviewing the methods and results of each study critically, (f) summarizing the results of each study using a standard format, (g) using proper statistical tests to provide a summary effect, (h) assessing variation (heterogeneity) between studies and (i) reviewing, interpreting and reporting the findings.[15]

The idea of a meta-analysis is to combine the results of individual studies so that a summary point estimate can be reached that describes the strength of association between exposure and outcome.  There are different approaches to modelling data between studies, and it is important to understand that these approaches may produce different results.  Fixed-effects models assume that the effect of exposure on outcome is equal in all studies

---

[15]        Oleckno (2008).

**P1.02018.12**

included in the meta-analysis, while random-effects models assume that the effect of exposure on outcome varies between each included study due to both actual differences in effect and random error.  In general, when the findings of the included studies are similar, both models yield similar summary estimates, but when the findings of the included studies vary appreciably, the models may produce conflicting results.  A statistical test of heterogeneity is oftentimes performed to evaluate whether differing results from the included studies are due to chance alone.  If unlikely due to chance, then a random effects model may be more appropriate.

It is also important to understand that in addition to the great deal of preparation and structured organization that is involved in conducting a meta-analysis, it is of utmost importance to vigilantly examine the accuracy of the included individual studies when relying on meta-analyses.  Many of plaintiffs' epidemiologists, for instance, premise their causation opinions in large part on the various meta-analyses assessing the effect of exposure to talc on ovarian cancer.[16]  But, when it comes to concerns over bias and confounding, a pooled analysis or a meta-analysis will only be as good as the included studies.  And while some of plaintiffs' experts have performed their own meta-analyses, the underlying limitations of the included studies are not lessened or removed simply by performing additional meta-analyses using the same studies with different groupings.

## VI.   EPIDEMIOLOGIC STUDIES OF TALC POWDER AND OVARIAN CANCER

In order to understand the relationship between talc exposure and ovarian cancer, I have performed a search of the peer-reviewed literature.  I identified 44 individual studies investigating the exposure/outcome relationship between talcum powder use and ovarian cancer.  The individual studies were evaluated with attention to study design, accuracy, exposure assessment, analysis and validity, while noting both strengths and weaknesses.

### A.   Summary Of Article Study Designs

Due to the exposure (talc powder) and outcome (ovarian cancer) being studied, there were no experimental studies, as this study design would not be suitable to evaluate this relationship.  The studies identified can be separated into three categories: (1) case-control studies, (2) cohort studies, and (3) meta-analyses.  I reviewed 33 case-control studies (two of which pooled data from different studies), four cohort studies, and seven meta-analyses published between 1982 and 2018.[17]

The 33 case-control studies ranged in size from 123 to 4,092 participants.  There were seven hospital-based case-control studies and 26 population-based case-control studies that I reviewed.  The assessment of exposure varied extensively in the case-control studies and was obtained from responses to questionnaires on the use of talc, diaphragm with talc, diaphragm storage only, all over body talc, genital talc, legs only talc, not genital talc, talcum powder in the perineum, talcum powder on sanitary pads, talcum powder on

---

[16]      Clarke-Pearson Rep. 7; McTiernan Report 8, 63; Moorman Rep. 10.

[17]      I also briefly reviewed the unpublished Taher meta-analysis cited by several of plaintiffs' experts, and it does not affect my analysis.  The association it reports is not materially higher than prior studies, and it agrees with IARC's assessment that a causal relationship is merely "possible" in light of current evidence.

diaphragms, after bathing only, baby powder only, deodorizing powder, dusting powder to the perineum, any dusting powder, talc around the abdomen/ perineum, perineal dusting, genital powder application, genital/rectal talc, powder to genitals, powder to diaphragm, or powder to sanitary napkins.  All studies included pathologically confirmed cases or cancer registry cases of ovarian cancer.  Analyses varied widely among the case-control studies from no adjustment for potential confounders to adjusting for varying degrees of confounding, including age at first birth, age at last birth, age at menarche, age at menopause, tumor behavior, breast feeding, community-based case-control study, diaphragm use, duration of use, exercise, education, frequency of use, family history of breast and ovarian cancer, histologic type, hospital-based case-control study, hair dye use, hormone replacement therapy, hysterectomy, income, use of medications, menopausal status, sanitary napkin use, number of pregnancies, oral contraceptive use, parity, socioeconomic status, timing of use and tubal ligation.

The four cohort studies I reviewed utilized data from the US Nurses' Health Study (NHS), US Nurses' Health Study II, the Women's Health Initiative Observational Study, and the Sister Study and ranged in size from 41,654 to 108,870 participants.  The assessment of exposure was obtained from responses to questionnaires on talc use, talc on the perineum or napkin, powder on the genitals, powder on diaphragm, powder on napkin or talc use in the past 12 months.  Analyses varied across the different cohort studies with varying degrees of adjustment for potential confounding, including age, age at last birth, menopause status, age at menopause, race, parity, BMI, activity level, breast feeding, oral contraceptive use, duration of oral contraceptive use, estrogen use, postmenopausal hormone use, duration of hormone replacement therapy, tubal ligation, smoking status and family history of breast or ovarian cancer.

### B.  Case-Control Studies: Hospital-Based

I identified seven hospital-based case-control studies that have evaluated the potential causative association between talc and ovarian cancer, yielding similar non-statistically significant estimates of risk of ovarian cancer and talc usage.

In 1983, Hartge et al.[18] conducted a hospital-based case-control study of pathologically identified ovarian cancer and frequency matched controls of women in the same hospitals in Washington, DC.  Interviews were performed and exposures were categorized as "any" use of talc and "genital" exposure to talc.  Among women exposed to "any" talc, the odds ratio of ovarian cancer was not statistically significant at 0.7 (95% CI: 0.4-1.1).  Among those who reported talc use on genitals, sanitary napkin or underwear, the odds ratio was not statistically significant at 2.5 (95% CI: 0.7-10.0).  The study is limited by small sample size and lack of adjustment for potential confounders.

In 1988, Whittemore et al.[19] similarly completed a hospital-based case-control study of histologically confirmed ovarian cancer cases in pre-menopausal and postmenopausal women between the ages of 18 and 74 with primary epithelial ovarian cancer in Santa Clara County hospitals or at the University of California, San Francisco Medical Center and

---

[18]    Hartge et al., *Talc and Ovarian Cancer*, (1983) 250 J. Am. Med. Ass'n 1844.

[19]    Whittemore et. al., *Personal And Environmental Characteristics Related To Epithelial Ovarian Cancer*, (1988) 128 Am J. Epidemiol 1228.

13

**P1.02018.14**

hospitalized controls.  In-person interviews were performed, and to evaluate exposure, subjects were asked about whether they had used talcum powder products on the perineum, sanitary pads and/or diaphragms.  Participants who responded were asked about frequency and duration of use.  Among women who reported perineum only talc use, the odds ratio was not statistically significant at 1.45 (95% CI: 0.81-2.60) after adjustment for parity and oral contraceptive use.  There was no trend in increasing duration of treatment, and the risk of ovarian cancer was not statistically significant with increasing frequency of use.

Booth et al.[20] in 1989 performed a hospital-based case-control study of pathologically identified ovarian cancer in women under 65 years of age from 13 hospitals in London and two in Oxford and hospitalized controls.  Subjects were interviewed and exposure was obtained through a questionnaire and frequency of talc use was reported as never, rarely, monthly, weekly or daily talc use.  There was no statistically significant increase in risk of ovarian cancer between never and daily reported talc use (OR: 1.3; 95% CI: 0.8-1.9) after adjusting for age and social class.  There was no trend of increased risk of ovarian cancer with increased frequency of reported talc use, as those participants who reported weekly use had a higher risk estimate (OR: 2.0; 95% CI: 1.3-3.4) than those who reported daily talc use, and no dose-response relationship with frequency of reported talc use was found among those exposed compared to those unexposed after adjusting for age and social class.

Rosenblatt et al.[21] in 1992 reported a hospital-based case-control study evaluating "fiber exposure" generally (with "fiber" defined as asbestos, talc or fiberglass), including "genital fiber use" specifically, which included an assessment of "method of application" in pathologically confirmed cases of ovarian cancer and hospitalized controls between 1981 and 1985 at the Johns Hopkins Hospital.  A questionnaire was administered to participants, both by telephone and in the hospital, which was used to obtain reported exposure to talc and presence and length of applying talcum powder to the genital area.  There was no statistically significant increase in risk of ovarian cancer with "genital fiber use" (OR: 1.0; 95% CI: 0.2-4.0) after adjustment for parity, or for exposures from diaphragm use with powder (OR: 3.0; 95% CI: 0.8-10.8) after adjustment for parity and education, or genital bath talc exposure (OR: 1.7; 95% CI: 0.7-3.9) in unadjusted analysis.  There was also no statistically significant increase in the risk of ovarian cancer with length of exposure ($^3$ 37.4 years vs. <37.4 years) to "genital fiber use" (OR: 2.4; 95% CI: 1.0-5.8) after adjustment for religion.

Tzonou et al.[22] in 1993 conducted a case-control study among hospitalized patients from two hospitals in Athens, Greece with histologically confirmed ovarian cancer and hospital visitor controls.  In-hospital questionnaires were administered and exposure was obtained as reported use of talc in the perineal region.  Even though the prevalence of talc usage was low, there was no statistically significant association between reported exposure of talc to the perineum and risk of ovarian cancer (OR: 1.05; 95% CI: 0.28-3.98). The

---

[20]  Booth et al., Risk factors for ovarian cancer: a case-control study. (1989) 60(4) *Br J Cancer.* 592.

[21]  Rosenblatt et al., *Mineral Fiber Exposure and the Development of Ovarian Cancer*, (1992) 45 Gynecologic Oncology 20.

[22]  Tzonou et al., *Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer*. (1993) 55(3) Int J Cancer. 408.

14

authors adjusted for age, years of schooling, weight before onset of the disease, age at menarche, menopausal status, age at menopause, parity, age at first birth, tobacco smoking, consumption of alcoholic beverages, consumption of coffee, hair dyeing and analgesics-tranquilizers/hypnotics.

Hartge and Stewart[23] in 1994 reported a case-control study of women diagnosed with pathologically confirmed ovarian cancer in the Washington, DC area between 1978 and 1981.  This study analyzed occupational history in women who were diagnosed with ovarian cancer and hospital-based controls.  Trained interviewers used a standardized questionnaire that included lifetime job history and exposure to talc on the job.  An industrial hygienist conducted an industrial hygiene exposure assessment evaluating each job/industry combination for potential exposure to talc, as well as other potential exposures.  The risk of ovarian cancer was not significantly increased for any exposure to talc, regardless of the duration of exposure:  <5 years (OR: 0.5; 95% CI: 0.1-1.4), 5-9 years (OR: 0.3; 95% CI: 0.1-1.4), 10+ years (OR: 0.5; 95% CI: 0.2-1.5).

Wong et al.[24] in 1999 reported the results of a hospital-based case-control study in patients with ovarian cancer as determined by the Roswell Park Tumor Registry and hospital-based controls.  Exposure was evaluated using a self-administered questionnaire regarding medical history and personal hygiene.  There was no statistically significant increased risk of ovarian cancer among participants who ever used talc (OR: 1.13; 95% CI: 0.88-1.44)[25] or among those who used talc on both a sanitary napkin and on the genital or thigh area (OR: 1.1; 95% CI: 0.7-1.7).  There was a haphazard non-statistically-significant relationship with duration of talc use over time and risk of ovarian cancer: 1-9 years (OR: 0.9; 95% CI: 0.6-1.5), 10-19 years (OR: 1.4; 95% CI: 0.9-2.2), and ³ 20 years (OR: 0.9; 95% CI: 0.6-1.2) after adjustment for parity, oral contraceptive use, smoking history, family history of epithelial ovarian cancer, age at menarche, menopausal status, income, education, geographic location and history of tubal ligation or hysterectomy.

### C. Case-Control Studies: Population-Based

I identified 26 population-based case-control studies (two from pooled data) that assessed the potential causative association between talc and ovarian cancer, yielding conflicting results.

Cramer et al.[26] in 1982 reported the first epidemiologic case-control study of genital talc use and risk of ovarian cancer.  Cases were women diagnosed with ovarian cancer in the Greater Boston area between 1978 and 1981 and identified through pathology logs or tumor boards and confirmed pathologically.  Controls were identified through annual

---

[23]     Hartge & Stewart., *Occupation and ovarian cancer: a case-control study in the Washington, DC, metropolitan area, 1978-1981*. (1994) 36(8) J Occup Med. 924.

[24]     Wong et al. *Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study*. (1999) 93 Obstet Gynecol 372.

[25]     The Wong paper does not report an odds ratio for ever versus never talc use, but the text of the article contains the information necessary to calculate it.  Specifically, the text reports that 221 cases out of 421 total had ever used talc and 311 controls out of 693 total had ever used talc.  The calculated odds ratio is 1.13 with a 95% CI of 0.88-1.44 (STATA SE 15.1, StataCorp, College Station, TX).

[26]     Cramer et al., *Ovarian cancer and talc: a case-control study*. (1982) 50(2) Cancer 372.

15

listings of Massachusetts residents and were matched by residence, race and age.  Subjects were interviewed in person to evaluate potential exposure to talc through contraceptives, hygiene or surgery.  After adjustment for parity and menopausal status, a statistically significant association was found between "any perineal exposure" of talc and risk of ovarian cancer (OR: 1.92; 95% CI: 1.27-2.89).

Harlow and Weiss[27] in 1989 conducted a study of perineal use of powder and the risk of borderline ovarian cancer.  Caucasian women aged 20-79 from three counties in Washington State diagnosed as having serous or mucinous borderline ovarian tumor were identified using the Seattle-Puget Sound Cancer Surveillance System during the years 1980 to 1985.  Independent pathologic review was performed on 73% of cases.  A control group was identified through random digit dialing.  Reproductive, sexual and medical history, as well as information on talc exposure, was obtained during an in-person interview.  There was no statistically significant increase in risk of borderline ovarian tumors with any perineal exposure to powder (OR: 1.1; 95% CI: 0.7-2.1), baby powder use (OR: 0.8; 95% CI: 0.4-1.9), or unspecified talc use (OR: 1.0; 95% CI: 0.4-2.4) after adjusting for age, parity and use of oral contraceptives.  Use of deodorizing powder alone (OR: 3.5; 95% CI: 1.2-28.7) and use of deodorant powder alone or in combined use with another powder (OR: 2.8; 95% CI: 1.1-11.7) were both associated with a statistically significant increase in risk of borderline ovarian tumors after adjusting for age, parity and use of oral contraceptives.

Harlow et al.[28] in 1992 reported a case-control study among women 18 to 76 years of age diagnosed with borderline or malignant epithelial ovarian cancer confirmed pathologically from 10 hospitals in the Boston metropolitan area.  Controls were selected from the Massachusetts Town Books.  An in-person interview was performed to obtain demographic, occupational and medical history, as well as hygienic practices.  Exposure was reported as any genital talc, type of application (sanitary napkin, underwear, partner or application to diaphragm, or dusting powder to the perineum) and brand of application (brand or generic baby powder or deodorizing or other scented powders).  Application via dusting to the perineum was associated with a statistically significant risk of ovarian cancer (OR: 1.7; 95% CI: 1.1-2.7) after adjusting for parity, education, marital status, religion, use of sanitary napkins, douching, age and weight.  Use of any genital talc was not associated with a statically significant increase in risk of ovarian cancer (OR: 1.5; 95% CI: 1.0-2.1) after adjusting for the same potential confounders.  Although there was no statistically significant increase in risk of ovarian cancer with increasing lifetime total applications of talc-containing powders after adjusting for the same potential confounders, there was a statistically significant increase in the risk of ovarian cancer with more than 10,000 total lifetime perineal applications of talc-containing powders in participants with hysterectomy, tubal ligation and use during nonovulatory months (OR: 2.8; 95% CI: 1.4-5.4).

Chen et al.[29] in 1992 conducted a case-control study in China in women with pathologically confirmed cases of epithelial ovarian cancer.  Controls were identified from

---

[27]     Harlow & Weiss, *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*. (1989) 130(2) Am J Epidemiol. 390.

[28]     Harlow et al., *Perineal exposure to talc and ovarian cancer risk*. (1992) 80(1) Obstet Gynecol. 19.

[29]     Chen et al., *Risk factors for epithelial ovarian cancer in Beijing, China*. (1992) 21(1) Int J Epidemiol. 23.

16

**P1.02018.17**

the community using a random selection from a neighborhood committee or village.  A questionnaire was developed and administered through face-to-face interviews by trained interviewers.  There was no statistically significant association with using dusting powder to the lower abdomen and perineum and risk of ovarian cancer (OR: 3.9; 95% CI: 0.9-10.6) after adjusting for education and parity.

Cramer and Xu[30] in 1995 reported on a case-control study of women in the Greater Boston area diagnosed with ovarian cancer.  The study combined women diagnosed with ovarian cancer from area hospitals between 1984 and 1987 and confirmed pathologically with a previous study of women diagnosed between 1978 and 1981.  Controls were selected from the general population and matched by age and residence.  In an unadjusted analysis, talc use was associated with an increase in risk of ovarian cancer (OR: 1.6; 95% CI: 1.2-2.1).

In 1995, Purdie et al.[31] conducted a case-control study in three Australian states of women diagnosed with ovarian cancer that was confirmed pathologically.  Controls were drawn at random from the electoral roll and stratified by age and geographic region.  Trained interviewers administered a questionnaire in a face-to-face interview, which included questions about marital status, education, ethnicity, height, weight, smoking history, occupation, medical history and history of talc use.  Talc use around the abdomen/perineum was associated with an increased risk of ovarian cancer (OR 1.27; 95% CI: 1.04-1.54) after adjusting for parity.

Green et al.[32] in 1997 performed a case-control study using the study population from the Purdie study.  Methods for case and control identification were similar to the Purdie study.  Ever douching was associated with a non-significant 60% increase in risk of ovarian cancer.  Use of talc in the perineal region was associated with an increased risk of ovarian cancer (OR: 1.3; 95% CI: 1.1-1.6) after adjustment for parity, oral contraceptive use, age, education, body mass index, smoking and family history of ovarian cancer.  Even though there was a reported 60% increase in risk of ovarian cancer for those who ever-douched, there were no adjustments in multivariable analyses for douching as a potential confounder.

Shushan et al.[33] in 1996 conducted a case-control study of women aged 36 to 64 years with histologically diagnosed primary invasive or borderline epithelial ovarian cancer.  Cases were identified through the Israel Cancer Registry.  Controls were identified by telephoning randomly selected numbers within the same area codes as the cases.  Cases and controls were interviewed using a questionnaire containing details on medical history and exposures.  Exposure to talc was recorded as never-seldom and moderate-a lot talc use.  A

---

[30]     Cramer & Xu, *Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer*. (1995) 5 Ann Epidemiol. 310.

[31]     Purdie et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study*. Survey of Women's Health Study Group. (1995) 62(6) Int J Cancer. 678.

[32]     Green et al., *Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer*. Survey of Women's Health Study Group. (1997) 71(6) Int J Cancer. 948.

[33]     Shushan et al., *Human menopausal gonadotropin and the risk of epithelial ovarian cancer\**. (1996) 65(1) Fertil Steril. 13.

17

larger proportion of cases reported moderate-a lot of talc use when compared with controls (10.5% vs. 5.6%; p=0.04) without adjusting for potential confounders.

Chang and Risch[34] in 1997 reported a case-control study among women diagnosed with histologically confirmed borderline and invasive ovarian cancers in Toronto and southern Ontario.  Controls were identified through the Ontario Ministry of Finance and random selection based on geographic residence.  A questionnaire was developed and administered in-person, in-home.  Exposure to talc was evaluated by reported regular talc use, use of talc/cornstarch combination, talc use with a sanitary napkin, talc use after bathing as well as after bath uses per month, and years of after bath use.  Although there was a significant increase in risk of ovarian cancer with any talc exposure (OR: 1.42; 95% CI: 1.08-1.86), there was no dose-response, and in fact there was a non-statistically significant inverse trend for after bath uses per month:  <10 (OR: 1.84; 95% CI: 1.24-2.73), 10-25 (OR: 1.13; 95% CI: 0.74-1.72), >25 (OR: 0.95; 95% CI: 0.61-1.49) and for years of after bath use: : <30 (OR: 1.7; 95% CI: 1.09-2.64), 30-40 (OR: 1.44; 95% CI: 0.96-2.15), >40 (OR: 0.87; 95% CI: 0.54-1.38)) after adjusting for age at time of interview, years of oral contraceptive use, number of full-term pregnancies, average duration of breastfeeding per pregnancy, the occurrence of a tubal ligation or hysterectomy, and having a mother/sister with ovarian or breast carcinoma.

Cook et al.[35] in 1997 conducted a case-control study of women diagnosed with invasive or borderline epithelial ovarian cancer from records of the Cancer Surveillance System of western Washington State from 1986 through 1988.  Controls were identified by random digit dialing of a larger control pool for other studies of cancer in women.  Information regarding genital powder exposure was collected by in-person interviews.  The occurrence of lifetime genital powder application and the exclusive use of types of genital powder application, including perineal dusting, diaphragm storage in powder, powder on sanitary napkins and genital deodorant spray, were collected.  Reported exposure also included cumulative lifetime days of use for perineal dusting, cumulative lifetime months for diaphragm storage in powder, cumulative lifetime months for powder on sanitary napkins and cumulative lifetime months for genital deodorant spray. The use of different types of powder, including talcum powder, baby powder, cornstarch, deodorizing powder, bath or body powder and unspecified powder, was also reported.  Although there was an increase in risk of ovarian cancer in women who dusted their perineal areas with powder after bathing (OR: 1.8; 95% CI: 1.2-2.9), there was no statically significant increase in risk of ovarian cancer with increasing cumulative lifetime days of any perineal dusting.  There was also no statistically significant increase in risk of ovarian cancer with exclusive use of talcum powder (OR: 1.2; 95% CI: 0.6-2.5) or with the use of any talcum powder (OR: 1.6; 95% CI: 0.9-2.8) after adjusting for age.

Godard et al.[36] in 1998 reported a case-control study of women with histologic diagnosis of ovarian cancer through the gynecologic oncology clinics of two large teaching

---

[34]     Chang & Risch, *Perineal talc exposure and risk of ovarian carcinoma*. (1997) 79(12) Cancer. 2396.

[35]     Cook et al., *Perineal powder exposure and the risk of ovarian cancer*. (1997) 145(5) Am J Epidemiol. 459.

[36]     Godard et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study*. (1998) 179(2) Am J Obstet Gynecol. 403.

hospitals in Montreal in 1995 and 1996.  Controls were obtained through random digit dialing.  A questionnaire was developed and administered either in-person or on the phone to obtain medical history and reported exposure to talc on perineum.  Talc on the perineum was not statistically associated with an increase in ovarian cancer (OR: 2.49; 95% CI: 0.94-6.58) after adjusting for age at diagnosis, age at last childbirth, age at menarche, age at last oral contraceptive use, tubal ligation or hysterectomy and alcohol use.

Cramer et al.[37] in 1999 conducted a case-control study of women with newly diagnosed ovarian cancer in eastern Massachusetts or New Hampshire identified through tumor boards and statewide cancer registries with review of pathology reports.  Controls were identified through random digit dialing.  Participants were interviewed in-person using a standardized questionnaire and asked if they regularly used talc, baby powder, or deodorant powder dusted or sprayed on "feet, arms, or other non-genital areas, to the genital or rectal area, on sanitary napkins, or on underwear" as well as a husband's use of powder in his genital area.  "[T]ypes of powder(s) used, applications per month and total years of use were assessed in talc users."  Any reported personal genital exposure was associated with increased risk of ovarian cancer (1.60; 95% CI: 1.18-2.15) after adjusting for age, study center, tubal ligation, BMI, parity, oral contraceptive use, or primary relative with breast or ovarian cancer.  Risk of ovarian cancer increased and then fell (inverse relationship) with increasing years of talc use and with increasing total applications, although these estimates were not statistically significant.

Ness et al.[38] in 2000 reported a case-control study of women diagnosed with ovarian cancer who were identified from 39 hospitals in the Delaware Valley region.  Controls were identified through random digit dialing.  Statistically significant associations were observed for the use of talc on the feet, etc. (OR: 1.4; 95% CI: 1.1-1.6), the genital/rectal area (OR: 1.5; 95% CI: 1.1-2.0), sanitary napkins (OR: 1.6; 95% CI: 1.1-2.3) and underwear (OR: 1.7; 95% CI: 1.2-2.4) after adjusting for age, number of pregnancies, family history of ovarian cancer, race, oral contraceptive use, tubal ligation, hysterectomy and breast-feeding.  Risk of ovarian cancer increased and then fell (inverse relationship) with increasing years of talc use and with increasing total applications, although these estimates were not statistically significant.

Mills et al.[39] in 2004 reported a case-control study of epithelial ovarian cancer in 22 counties of Central California and identified cases through two regional cancer registries as women diagnosed with pathologically confirmed epithelial ovarian cancer from 2000 through 2001.  Controls were women 18 years or older selected by random digit dialing. All cases and controls were interviewed by telephone to obtain information on history of adult use of talcum powder in the genital area, calendar year(s) of use, frequency of use, and total duration of use.  Although there was a statistically significant increase in risk of ovarian cancer with ever talc use (OR: 1.37; 95% CI: 1.02-1.85) after adjusting for age, race/ethnicity, duration of oral contraceptive use and breast feeding, there was no clear

[37]       Cramer et al., *Genital talc exposure and risk of ovarian cancer*. (1999) 81(3) Int J Cancer. 351.

[38]       Ness et al., *Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer.* (2000) 11(2) Epidemiology 111.

[39]       Mills et al., *Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California*. (2004) 112 Int'l J. Cancer 458.

19

dose-response with relation to frequency and duration of talc use and risk of ovarian cancer after adjusting for the same potential confounders.  There was a haphazard relationship between reported frequency of use and risk of ovarian cancer, with estimates increasing with rare to several time a month use, then decreasing with 1-3 times per week, and finally increasing with 4-7 times per week.  Similarly, there was a haphazard relationship between duration of use and risk of ovarian cancer, as estimates increased at 4-12 years, then decreased at 13-30 years and decreased further at >30 years reported exposure.

Pike et al.[40] in 2004 conducted a case-control study of women in Los Angeles County with histologically confirmed ovarian cancer or borderline tumors identified by the Cancer Surveillance Program between 18 and 74 years of age from 1992 to 1998.  Controls were identified using a systematic algorithm based on the address of the patient.  Participants were interviewed in person using a questionnaire covering medical and personal lifestyle history.  Genital area talc usage was associated with a statistically significant increase in risk of ovarian cancer (OR: 1.60; 95% CI: 1.18-2.18) after adjustment for ethnicity, age, education, family history of ovarian cancer, tubal ligation, BMI, parity, age at last childbirth, number of births, number of incomplete pregnancies, oral contraceptive use, menopausal status, age at menopause and estrogen-progesterone therapy.

Jordan et al.[41] in 2007 reported a case-control study of women aged 18-79 years with histologically confirmed invasive and borderline ovarian cancer in Australia identified by the Australian Ovarian Cancer Study and state-based cancer registries between 2002 and 2005.  Women with benign mucinous tumors were also identified by the Australian Ovarian Cancer Study and through records from three major pathology laboratories.  Controls were randomly selected from the Australian Electoral Roll after stratifying for age and state.  Participants were asked to complete and return a health and lifestyle questionnaire.  Neither moderate talc use in the perineal region (OR: 0.4; 95% CI: 0.1-2.0) nor substantial talc use in the perineal region (OR: 1.0; 95% CI: 0.4-2.1) was associated with a statistically significant increase in risk of invasive mucinous ovarian cancer after adjustment for age, education level, parity, use of oral contraceptives, hysterectomy, tubal ligation and smoking status.

Gates et al.[42] in 2008 reported a nested case-control study of talc use, variants in the GSTM1, GSTT1 and NAT2 genes, and the risk of ovarian cancer using cases from the New England Case-Control Study (NECC) and the Nurses' Health Study (NHS).  The "NECC questionnaires included multiple questions about regular use of talcum, baby or deodorizing powder as an adult.  Specific questions were asked about type of use (as a dusting powder to the genital area, sanitary napkins, underwear or non-genital areas), frequency of use, age at first use, number of years used and brand of powder used.  The 1982 NHS questionnaire requested information on whether the participant had ever commonly applied talcum, baby

---

[40]     Pike et al., *Hormonal factors and the risk of invasive ovarian cancer: a population-based case-control study*. (2004) 82(1) Fertil Steril. 186.

[41]     Jordan SJ, Green AC, Whiteman DC, Webb PM, Australian Ovarian Cancer Study Group. *Risk factors for benign, borderline and invasive mucinous ovarian tumors: epidemiological evidence of a neoplastic continuum*? (2007) 107(2) Gynecol Oncol 223.

[42]     Gates et al., *Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer*. (2008) 17(9) Cancer Epidemiol Biomarkers 2436.

P1.02018.21

or deodorizing powder to the perineal area (no, <once/week, 1-6 times/week or daily) or to sanitary napkins (yes/no)." There was a statistically significant increase in the risk of ovarian cancer with regular genital talc use in participants from the NECC study (OR: 1.62: 95% CI: 1.26-2.09) but no statistically significant increase in risk of ovarian cancer with regular talc use in the NHS (OR: 1.48; 95% CI: 0.82-2.68). Similarly, there was a statistically significant increase in the risk of ovarian cancer with daily genital talc use in participants from the NECC study (OR: 1.61: 95% CI: 1.18-2.2) but no statistically significant increase in risk of ovarian cancer with regular talc use in the NHS (OR: 1.34; 95% CI: 0.65-2.76). Regular genital talc use was associated with a statistically significant increase in risk of ovarian cancer using the combined study population (OR: 1.36; 95% CI: 1.14-1.63) after adjustment for duration of oral contraceptive use, parity, tubal ligation, BMI and duration of hormone replacement therapy. There was no clear dose-response with regard to frequency of genital talc use, with estimates falling with less than once a week usage and then rising with 1-6 times a week and daily usage.

Merritt et al.[43] in 2008 reported the Australian Ovarian Cancer Study, which was an Australia-wide case-control study of epithelial ovarian cancer. Cases were women diagnosed with invasive or low malignant potential ovarian cancer aged 18 to 79 years between 2002 and 2005. Controls were selected from the Australia Electoral Roll. Study participants filled out a comprehensive health and lifestyle questionnaire. "To determine use of talcum powder in the perineal region, participants were asked whether they had ever used powder or talc in the genital area or on underwear or sanitary pads/diaphragm. They were asked their age at first use and years of talc use in these areas." Ever perineal use of talcum powder was associated with a statistically significant increase in risk of ovarian cancer (OR: 1.17: 95% CI: 1.01-1.36) after adjusting for age, education, parity and oral contraceptive use. However, there was no clear dose-response relationship, with a random shape of the exposure-response curve between perineal use of talcum powder and risk of ovarian cancer as well as the risk of cancer subtypes.

Moorman et al.[44] in 2009 reported a case-control study of epithelial ovarian cancer conducted in a 48-county region of North Carolina between 1999 and 2008. Cases were identified through the North Carolina Cancer Registry and were confirmed histopathologically. Controls were obtained from the same geographic region through random digit dialing. In-person questionnaires were administered, which included questions on medical history and lifestyle factors, including talc ever use. There was no statistically significant increase in risk of ovarian cancer with ever talc use among both white women (OR: 1.04: 95% CI: 0.82-1.33) and African Americans (OR: 1.19: 95% CI: 0.68-2.09) after adjusting for age.

In 2009, Wu et al.[45] conducted a case-control study of residents of Los Angeles County between the ages of 18 and 74 who had histologically confirmed invasive or

---

[43]     Merritt et al., *Talcum Powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*. (2008) 122 Int'l J. Cancer 170.

[44]     Moorman et al., *Ovarian Cancer Risk Factors in African-American and White Women*. (2009) 170(5) Am J Epidemiol 598.

[45]     Wu et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*. (2009) 124 Int'l J. Cancer 1409.

P1.02018.22

borderline ovarian cancer diagnosed from 1998 through 2002. Cases were identified by the Cancer Surveillance Program. Controls were identified using a neighborhood recruitment algorithm. Participants were interviewed using a questionnaire that covered medical, gynecological, reproductive and lifestyle history. To determine use of talcum powder, subjects were asked if they ever used talc at least once per month for six months or more. If the response was positive, participants were asked if "they had ever used talc in nonperineal areas (feet, arms, chest or back), perineal areas, or on underwear or sanitary pads/diaphragm," as well "frequency of use (times per month) and years of talc use." Ever talc use was associated with a statistically significant risk of ovarian cancer (OR: 1.48; 95% CI: 1.15-1.91) as was talc applied to the perineal area (OR: 1.53; 95% CI: 1.13-2.09) after adjusting for race/ethnicity, age, education, tubal ligation, family history of breast/ovarian cancer, menopausal status, use of oral contraceptives and parity. A statistically significant increase in risk of ovarian cancer was also seen in those who used talc for more than 20 years and more than 30 times per month (OR: 2.08; 95% CI: 1.34-3.23) and in those who had more than 52,000 talc uses (OR: 1.99; 95% CI: 1.34-2.96).

Rosenblatt et al.[46] in 2011 reported a case-control study of women from a 13-county area of Washington State who were 35 to 74 years old and who were diagnosed with invasive or borderline epithelial ovarian tumor between 2002 and 2005. Cases were identified through the Cancer Surveillance System and controls were selected by random digit dialing. In-person interviews were performed, and obtained information on demographic and lifestyle characteristics, medical history and obstetrical history. For powder use on sanitary napkins and deodorant spray, investigators recorded the total number of months of use. For the use of powder on the perineum after bathing, only intervals of at least one year when powder was usually used was recorded. Women were also asked to report the "types of powder(s) used after bathing, including talcum, baby, cornstarch, deodorant, body/bath, and other or unknown. The extent of exposure to perineal powder after bathing was assessed as lifetime duration of use . . . and as the estimated lifetime number of applications." There was no statistically significant increase in the risk of ovarian cancer for using powder after bathing (OR: 1.27; 95% CI: 0.97-1.66) after adjusting for age, calendar year of diagnosis/reference date, county of residence, number of full-term births and duration of hormonal contraception.

Kurta et al.[47] in 2012 conducted a case-control study using data from the Hormones and Ovarian Cancer Prediction (HOPE) study. Cases were residents of Western Pennsylvania, Eastern Ohio and Western New York State and had histologically confirmed ovarian, peritoneal or fallopian tube cancers diagnosed between 2003 and 2008. Controls were frequency matched and identified through random digit dialing. Trained interviewers collected questionnaire data that included medical history and information about lifestyle. "Perineal talc use was defined as ever using dusting powder or deodorizing spray on the genital or rectal areas, on sanitary napkins, on underwear, or on diaphragms or cervical caps." Perineal talc use was associated with a statistically significant increase in risk of ovarian cancer (OR: 1.40; 95% CI: 1.16-1.69) after adjusting for age and education.

---

[46]     Rosenblatt et al., *Genital powder exposure and the risk of epithelial ovarian cancer*. (2011) 22 Cancer Causes Control 737.

[47]     Kurta et al., *Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a U.S.-Based Case-Control Study*. (2012) 21(8) Cancer Epidemiol Biomarkers Prev. 1282.

22

**P1.02018.23**

Terry et al.[48] in 2013 reported on a pooled analysis of case-control studies using data from the Ovarian Cancer Association Consortium.  Investigators used data from eight case-control studies and included 8,525 cases of ovarian, fallopian tube or peritoneal cancer and 9,859 controls.  Genital powder use was defined as "any type of powder (talc, baby, deodorizing, cornstarch, or unspecified/unknown) applied directly or indirectly (by application to sanitary pads, tampons, or underwear) to the genital, perineal, or rectal area."  Criteria for regular use varied between studies from "ever use" to "one year or longer."  "Women who reported both genital and non-genital powder use were classified as genital users."  Genital use of powder was associated with a statistically significant increase in risk of ovarian cancer when compared with no powder use (OR: 1.24; 95% CI: 1.15-1.33) after adjusting for age, oral contraceptive use, parity, tubal ligation history, BMI and race/ethnicity.

Wu et al.[49] in 2015 reported a case-control study of women with newly diagnosed histologically confirmed invasive epithelial ovarian cancer identified through the Cancer Surveillance Program.  Cases were non-Hispanic white, Hispanic, or African American women aged 18 to 74 diagnosed between 2003 and 2008.  In-person interviews were conducted using questionnaires, which included questions on demographics, lifestyle, medical history, family history and genital talc use.  Results are based on pooling of four case-control studies in Los Angeles County investigating invasive epithelial ovarian cancer.  Genital talc use was associated with a statistically significant increase in risk for invasive ovarian cancer in all study participants (OR: 1.46; 95% CI: 1.27-1.69); non-Hispanic whites (OR: 1.41; 95% CI: 1.21-1.67) and Hispanics (OR: 1.77; 95% CI: 1.20-2.62), but not in African Americans (OR: 1.56; 95% CI: 0.80-3.04).  Every five years of talc use was also associated with a statistically significant increase in risk for invasive ovarian cancer in non-Hispanic whites (OR: 1.14; 95% CI: 1.08-1.21) and Hispanics (OR: 1.18; 95% CI: 1.02-1.36), but not in African Americans (OR: 1.15; 95% CI: 0.90-1.47).  Estimates were adjusted for menopausal status, age at menarche, hormone therapy use, BMI, income, education, parity, oral contraceptive use, tubal ligation, endometriosis and family history of ovarian cancer.

Schildkraut et al.[50] in 2016 reported a case-control study of women enrolled in the African American Cancer Epidemiology Study from 11 locations in the United States.  Cases included African American women aged 20 to 79 with newly diagnosed ovarian cancer.  Controls were African American women who were identified through random digit dialing.  Participants completed a baseline telephone interview, which includes questions on demographics, medical history and information on lifestyle.  "[P]articipants were asked whether they had ever regularly used talc, cornstarch, baby, or deodorizing powders.  Participants were considered 'regular users' if they reported using any of these powders at least one time per month for at least six months, and 'never users' if they did not.  Regular users were asked about their frequency and duration of use, age at first use, and whether

---

[48]     Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls.* (2013) 6(8) Cancer Prev Res 811.

[49]     Wu et al., *African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates.* (2015) 24(7) Cancer Epidemiol Biomarkers Prev. 1094 ("Wu 2015").

[50]     Schildkraut (2016).

23

they applied powders to genital areas (including on underwear or sanitary napkins, or on birth control devices like diaphragms) and/or nongenital areas." There was a statistically significant increase in the risk of ovarian cancer with any genital use of powder (OR: 1.44; 95% CI: 1.11-1.86) after adjusting for age at diagnosis/interview, study site, education, tubal ligation, parity, BMI, duration of oral contraceptive use, first-degree family history of breast or ovarian cancer and interview year. In addition, as discussed above, when investigators stratified by the interview date, there was no statistically significant association between ovarian cancer and any genital use of body powder if the interview date was before 2014 (OR: 1.19; 95% CI: 0.87-1.63), but if the interview date was after 2014, there was a statistically significant increase in risk of ovarian cancer with any genital use of body powder (OR: 2.91; 95% CI: 1.70-4.97), after adjusting for the same potential confounders.

Cramer et al.[51] in 2016 reported a pooled analysis of case-control studies of women residing in Eastern Massachusetts and New Hampshire diagnosed with ovarian cancer between the ages of 18 and 80 using data from the NHS and several sites from the Ovarian Cancer Association Consortium. Controls were identified through random digit dialing. Participants "were asked whether they 'regularly' or 'at least monthly' applied powder to the genital or rectal area, sanitary napkins or tampons, underwear, or areas other than the genital-rectal area. Additional details included type of powder, age begun, years used, and applications per month. Lifetime exposure was estimated by multiplying frequency of application per month by months used." This was divided by 360 to yield talc-years, which were divided into separate quartiles for dose-response analysis. Any genital powder use was associated with a statistically significant increase in the risk of ovarian cancer (OR: 1.33; 95% CI: 1.16-1.52) after adjusting for reference age, study center and study phase. There was no clear pattern suggesting a dose-response effect, with a random sine wave pattern with increasing risk, then decreasing risk, then increasing risk with total genital talc applications.

### D. Cohort Studies

Gertig et al.[52] reported the relationship between perineal talc use and ovarian cancer using participants from the NHS. This is a prospective study of 121,700 registered nurses in the United States who were ages 30-55 years at enrollment in 1976. Talc exposure was not evaluated when the study began, but questions regarding talc exposure were added in 1982. 78,630 women completed the questions regarding talc at baseline and formed the cohort for analysis and were followed for 14 years (1982-1996). There were 307 women who were subsequently diagnosed with ovarian cancer. After adjusting for confounders, no statistically significant association was found with ever talc use, with a relative risk for ovarian cancer of 1.09 (95% CI: 0.86-1.37) when compared to never talc use. Similarly, no statistically significant association was found with daily talc use, with a relative risk of 1.12 (95% CI: 0.82-1.55) when compared with never talc after adjusting for age, parity, duration of oral contraceptive use, BMI, tubal ligation, smoking status and postmenopausal hormone use. There was an increase in risk of invasive serous ovarian cancer, with a relative risk of

---

[51]    Cramer et al., *The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States*. (2016) 27(3) Epidemiology 334.

[52]    Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*. (2000) 92 J. Nat. Cancer Inst. 249.

**P1.02018.25**

1.40 (95% CI: 1.02-1.91) among ever talc users when compared to never talc users after adjusting for the same potential confounders.

Gates et al.[53] examined the association between ovarian cancer risk factors and ovarian cancer by histological subtype in the NHS and Nurses' Health Study II (NHSII). This prospective study included 221,866 women who completed baseline and biennial follow-up providing information on lifestyle factors and disease diagnoses. Follow-up was longer than the Gertig study and was 24 years in the NHS (1982-2006) and six years in the NHSII. There were 924 women who subsequently developed ovarian cancer and 721 cases with the histologies of interest (496 serous invasive, 139 endometrioid, 86 mucinous). Information on regular talc use was collected in 1982 and available for NHS participants only (108,870 women). No statistically significant increases in risk were found between talc used greater than once weekly with all epithelial (RR: 1.06; 95% CI: 0.89-1.28), serous invasive (RR: 1.06; 95% CI: 0.84-1.35), endometrioid (RR: 1.06; 95% CI: 0.66-1.69), or mucinous (RR: 1.5; 95%CI: 0.84-2.66) ovarian cancer when compared with less than once weekly talc use after adjusting for age, BMI, activity level, parity, breastfeeding, oral contraceptive use, tubal ligation, age at menopause, estrogen use, menopause status, smoking status and family history of breast or ovarian cancer.

Houghton et al.[54] assessed the perineal powder use and the risk of ovarian cancer prospectively in the Women's Health Initiative observational cohort, which enrolled postmenopausal women aged 50-79 from 40 clinical centers across the United States from 1993 to 1998 through 2012. Participants completed annual questionnaires to obtain information on risk factors and outcomes, including ovarian cancer. Perineal powder was assessed via self-report at baseline by asking participants if they had ever used powder on their private parts (genital areas). Those who answered yes were asked questions regarding duration of use. Participants were also asked about use with diaphragms and sanitary napkins or pads. There were 61,576 women who completed baseline questionnaires and followed for a mean 12.4 years. There were 429 women who subsequently developed ovarian cancer. No statistically significant increase in risk of ovarian cancer between ever powder use on genitals (HR: 1.12; 95% CI: 0.92-1.36) and never powder use on genitals was found after adjusting for age, race, duration of oral contraceptive use, duration of hormone replacement therapy, family history, age at last birth, BMI, smoking status, tubal ligation and parity. There was also no statistically significant increase in risk from duration of use between talc use greater than 10 years (RR: 0.98; 95% CI: 0.75-1.29) or greater than 20 years (RR: 1.10; 95% CI: 0.82-1.48) when compared with never talc use after adjusting for the same potential confounders. Similarly, no statistically significant increase in risk was found for all serous (RR: 1.16; 95% CI: 0.88-1.53), serous invasive (RR: 1.13; 95% CI: 0.84-1.51), mucinous (RR: 1.03; 95% CI: 0.47-2.27), or endometrioid (RR: 1.29; 95% CI: 0.64-2.61) ovarian cancer between ever talc use and never talc use after adjusting for the same potential confounders.

---

[53]      Gates et al., *Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype.* (2010) 171 Am. J. Epidemiology 45.

[54]      Houghton et al., *Perineal Powder Use and Risk of Ovarian Cancer.* (2014) 106(9) J Nat. Cancer Inst.

Gonzalez et al.[55] evaluated the effect of douching and talc use on the risk of ovarian cancer prospectively in the Sister Study, which enrolled women aged 35 to 74 who had never had breast cancer and who had a sister or half-sister diagnosed with breast cancer in the United States and Puerto Rico from 2003 to 2009 through 2014.  Participants completed computer-assisted telephone interviews, which included questions about lifestyle factors and health conditions.  Participants also completed a self-administered questionnaire about personal products used in the 12 months prior to enrollment, which included questions about frequency of douching as well as talc use, method of talc use, and frequency of talc use.  There were 50,884 women who completed questionnaires and, after excluding participants who had bilateral oophorectomies or ovarian cancer before enrollment or who had no follow-up information, 41,654 women were followed for a median of 6.6 years.  There was no statistically significant increased risk of ovarian cancer (HR: 0.73; 95% CI: 0.44-1.2) with ever talc use during the 12 months prior to the study when compared with never talc use after adjusting for race, BMI, parity, duration of oral contraceptive use, baseline menopausal status and tubal ligation.  There was, however, a statistically significant increase in risk of ovarian cancer (HR: 1.9: 95% CI: 1.2-2.9) with douching/no talc use when compared with neither use as well as an increased risk of ovarian cancer with douching in the past 12 months (HR: 1.8: 95% CI: 1.2-2.8) when compared with never douching after adjustment for the same potential confounders.  This study highlights the potential for douching to be a confounder in previous investigations, and all but one study failed to control for the potential confounding effect of douching and risk of ovarian cancer.

### E.  Summary Of Observational Studies

Evaluating the association between talc use and ovarian cancer in case-control studies poses several challenges that require attention.  The assessment of exposure is difficult because it is solely based on self-report.  Talc purchasing and use are not documented in the medical records or available in pharmacy records.  As there is no reliable method of confirming talc usage, the accuracy and validity of these studies even under perfect circumstances can be dramatically affected by reporting bias.  Additionally, the quantification of talc exposure is very difficult and may be impossible to verify accurately. Powders have varying amounts of talc and can be applied by various methods, leading to more or less exposure.  There is no standardized dose/amount that is used, and there is no standard quantification method with verification that has been universally employed among the studies in the medical literature.  Various studies collected information on the reported use of talc, diaphragm with talc, diaphragm storage only, all over body talc, genital talc, legs only talc, not genital talc, talcum powder in the perineum, talcum powder on sanitary pads, talcum powder on diaphragms, after bathing only, baby powder only, deodorizing powder, dusting powder to the perineum, any dusting powder, talc around the abdomen/ perineum, perineal dusting, genital powder application, genital/rectal talc, powder to genitals, powder to diaphragm, or powder to sanitary napkins.  As such, there are no case-control or cohort epidemiologic studies or meta-analyses that have investigated the effect of a standardized amount of talc usage or a standardized method of use to ensure consistency of the assessment of exposure.  In addition, only a few epidemiologic studies have found any dose-response relationship between genital talc use and ovarian cancer.

---

[55]        Gonzalez (2016).

Furthermore, as in all case-control studies, recall bias is also of great concern. This arises from the phenomenon that cases are more likely than controls to think about and remember past exposures. Recall bias leads to differential misclassification of exposure and a falsely elevated estimate of risk between talc exposure and ovarian cancer. This is especially important if an exposure such as talc appeared in the news or was discussed in the public arena as having a possible causative association with ovarian cancer. There is evidence to suggest that hospital-based case-control studies are less likely to be subject to recall bias than population-based case-control studies because the degree to which study subjects think about possible past exposure is more similar (given that both cases and controls are being hospitalized).[56]

In general, cohort studies provide more evidence for a causal relationship between exposure and outcome and can often study many exposure-outcome relationships with less chance for bias and confounding than case-control studies if the design, conduct, data collection and analysis are proper. However, cohort study designs also remain susceptible to certain types of bias and confounding, and cohort studies are often very expensive, take a long time to conduct, and may be difficult to perform, especially if the outcome of interest is rare.

Plaintiffs' epidemiologists repeatedly downplay the results of the four relevant cohort studies. Dr. McTiernan, for example, has the opinion that there are a number of "serious limitations" in the cohort studies, including that they were not specifically designed to investigate the relationship between talc use and ovarian cancer, but rather examined a number of different outcomes.[57] This point is irrelevant as cohort studies are designed specifically to have the ability to investigate many exposure-outcome relationships, even if the cohort study was not specifically designed to look at the exposure-outcome relationship of interest. Dr. McTiernan also criticizes the cohort studies on other grounds – that they did not obtain detailed lifetime histories of talcum powder use and therefore could not measure dose-response; that the sample sizes were too small to detect a relative risk like 1.24; and that the latency period of ovarian cancer makes these studies "not likely reflective of risk from exposure to talcum powder products."[58] But as just explained, no type of study in this context can provide an accurate measure of dose-response due to the problems inherent in relying on study participants' subjective assessments regarding the amount of talcum powder they use, and as I elaborate in part VIII.A below, Dr. McTiernan's criticisms with respect to latency and sample size are speculative and wrong. All of this suggests that Dr. McTiernan's criticisms reflect her own bias. While cohort studies also have their own limitations like any other study design, the focused criticism of cohort studies by plaintiffs' epidemiologists, even though they are generally considered more reliable than case-control studies, suggests a biased approach to their analyses.

---

[56]   Oleckno, *Epidemiology: Concepts and Methods*. (2008) at 207; Infante-Rivard, *Hospital or Population Controls for Case-Control Studies of Sever Childhood Diseases?* (2003) 157(2) Am J Epidemiol 176.

[57]   McTiernan Report 46.

[58]   *Id.* at 46-47.

27

### F. Meta-Analysis

Gross et al.[59] in 1995 reviewed nine case-control studies (all previously described above) and one cohort study to evaluate the association between talc and ovarian cancer. The authors combined the results of seven studies and found an increase in risk of ovarian cancer (RR: 1.20; 95% CI: 1.01-1.44) with any talc exposure, and combined the results of five studies and, after adjustment, found an increase in risk of ovarian cancer (RR: 1.29; 95% CI: 1.02-1.63). Unfortunately, there is little detail provided regarding the methods used to identify, evaluate and analyze the studies, making the interpretation of this investigation challenging and problematic. In addition, all of the limitations described above with respect to the included case-control studies remain inherent within this investigation.

Huncharek et al.[60] in 2003 evaluated 15 case-control studies (all previously described above) and one cohort study using a predefined technique for literature search, study inclusion and analysis. The study included data from 11,933 subjects and pooling all subjects demonstrated a summary OR of 1.33 (95% CI: 1.16-1.45) for ovarian cancer with being exposed to never versus ever talc, none versus any talc and never versus any talc. Seven studies analyzed together yielded an inverse relationship between duration of exposure and ovarian cancer, with low-exposure groups having a higher risk and high-exposure groups having a lower risk, demonstrating a lack of clear dose-response. Hospital-based case-control studies demonstrated no significant relationship between talc use and risk of ovarian cancer (RR: 1.19; 95% CI: 0.99-1.41), while population-based case-control studies showed an increased risk of ovarian cancer with talc use (RR: 1.38; 95% CI: 1.25-1.52). As mentioned above, the limitations of the previously described case-control studies remain inherent within this review. Furthermore, differences in recall bias between hospital-based and population-based case-control studies provide one possible explanation for differences found between the two different study designs.

Huncharek et al.[61] in 2007 evaluated nine case-control studies (all previously described above) investigating the association between talc via dusting of contraceptive diaphragms and ovarian cancer in 2,281 cases of ovarian cancer and 3,608 controls using a predefined technique for literature search, study inclusion and analysis. Pooling all subjects demonstrated no significant risk of ovarian cancer with being exposed to talc via dusting of contraceptive diaphragms (OR 1.03; 95% CI: 0.80-1.37). One included case-control study did not explicitly provide data on talc use via contraceptive diaphragms, and without data from this study, the resultant OR was 1.12 (95% CI: 0.84-1.48).[62]

---

[59]   Gross & Berg, *A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer*. (1995) 5(2) J Expo Anal Environ Epidemiol. 181.

[60]   Huncharek et al., *Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-analysis of 11,933 Subjects from Sixteen Observational Studies*. (2003) 23 Anticancer Res. 1955.

[61]   Huncharek et al., *Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies*. (2007) 18 Eur J Cancer Prev 422.

[62]   Dr. Zambelli-Weiner has criticized the Huncharek studies and did indeed find some errors in them. However, her analysis did not show that any errors materially affected the conclusions of these studies.

Langseth et al.[63] in 2008 reported on a meta-analysis of 20 case-control studies and make reference to one cohort study. Results were separated into 14 population-based case-control studies and six hospital-based case-control studies.  The investigators state that the cohort study showed "no association between cosmetic talc use and risk of all subtypes of ovarian cancer combined," although the results were not shown. The hospital-based case-control studies reported a pooled odds ratio of 1.12 (95% CI: 0.92-1.36) and the population-based case-control studies reported a pooled odds ratio of 1.40 (95% CI: 1.29-1.52). The combined OR from all case-control studies using a fixed effects model was 1.35 (95% CI: 1.26-1.46).  This meta-analysis reflects some methodological weaknesses, including the fact that there is no report of a literature search strategy and no structured review of the literature for eligible studies.

Berge et al.[64] in 2018 reported on a meta-analysis of 27 studies, which included 24 case-control studies and three cohort studies.  The authors reported a "small increased risk" with a summary relative risk of 1.22 (95% CI: 1.13-1.30) for ever talc use and ovarian cancer, but found that the cohort studies did not show an association (RR 1.02 (95% CI: 0.85-1.20)).  The investigators demonstrated that given the total number of exposed and unexposed cases of ovarian cancer, the statistical power of the cohort studies to detect a relative risk difference of 1.25 was 0.99, which matched that of the case-control studies, and thus rejected inadequate power as an explanation for the lack of an association between talc exposure and ovarian cancer in the cohort studies and the heterogeneity between study designs.  The study found a "weak trend in RR with duration and frequency of genital talc use," but cautioned that this analysis was based on few studies and that the "modest association between both duration and frequency of use of talc may reflect a true relationship, or recall bias or confounding."  The authors noted that several aspects of their analysis, including heterogeneity between case-control and cohort studies, did "not support a causal interpretation of the association."

Penninkilampi et al.[65] in 2018 reported on a meta-analysis of 24 case-control studies and three cohort studies.  The study reported a summary odds ratio of 1.31 (95% CI: 1.24, 1.39) for any talc use and ovarian cancer, but this association was not present in cohort studies (OR 1.06 (95% CI: 0.90-1.25)).  Although the study reported a statistically significant association in the cohort studies for serous invasive ovarian cancer (OR 1.25 (95% CI: 1.01, 1.55)), it excluded the 2010 Gates study from its analysis.  The study further found that more than 3,600 lifetime talc applications "were slightly more associated with ovarian cancer than" fewer than 3,600 lifetime applications (odds ratios of 1.42 and 1.32, respectively), but noted that these data came from case-control studies and were therefore "prone to recall bias" (which the study observed could be particularly problematic due to recent media coverage of talc lawsuits). It also observed that the "mechanism by which perineal talc use may increase the risk of ovarian cancer is uncertain," and in particular that use of NSAIDs "is not inversely associated with the incidence of ovarian cancer, as may be

---

[63]     Langseth et al., *Perineal use of talc and risk of ovarian cancer*. (2008) 62 J Epidemiol Community Health 358.

[64]     Berge et al., *Genital use of talc and risk of ovarian cancer: a meta-analysis*. (2018) 27 Eur J Cancer Prev 248.

[65]     Penninkilampi and Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*. (2018) 29(1) Epidemiology 41.

expected if the etiology was related to chronic inflammation." The authors cited the "substantial need for further research on a potential mechanism" as one reason why a causal relationship could not be established with any certainty.

In summary, the published meta-analyses have been of varying quality and in general observed a weak association (odds ratio roughly 1.3) between talc use and ovarian cancer. However, as the meta-analyses have noted, the observed increased risk is restricted entirely to case-control studies and may be a result of bias and/or confounding. Although different studies employ different techniques to attempt to adjust for these issues, meta-analyses are only as good as their underlying studies, and the fact that the meta-analyses themselves combine studies that used different adjustment approaches can exacerbate issues regarding overall reliability.

## VII.    ANALYSIS OF STUDIES

It is my opinion that there is insufficient evidence to support a causal association between exposure to talc and risk of ovarian cancer based on the body of available epidemiologic observational studies that have been performed and reported in the literature. While there is no single method for undertaking a causal assessment based on epidemiology, the criteria formulated by Austin Bradford Hill are often used and are considered the gold standard for evaluating causation once an association has been identified. These include: strength of association, consistency, specificity, temporality, biologic gradient, plausibility, coherence, experimentation and analogy.[66] While Bradford Hill suggests nine different viewpoints to consider in a careful examination of the association between exposure and outcome before concluding that a causal relationship exists, it is important to understand that none of his concepts provide unquestionable evidence for or against a causative relationship and none is required as essential or absolutely necessary. They can simply help to provide a framework to guide epidemiologists to decide whether or not there is another more likely way of explaining the association, including non-causal explanations for the results of individual studies. These other explanations can come from bias, confounding and/or random error (as discussed above), can lead to risk estimates that are falsely higher or lower than actual risk and can even lead to conclusions that an exposure causes disease when it does not.

Even before starting such an analysis, however, one should examine whether the epidemiologic literature establishes a true association – the fundamental predicate of a Bradford Hill analysis. As Hill noted in his seminal article setting forth his epidemiologic approach, before evaluating causation, studies must "reveal an association between two variables, *perfectly clear-cut and beyond what we would care to attribute to the play of chance*."[67] As I discuss further below, this requirement is likely not satisfied here because we are not presented with a "clear cut" association.

A number of the Hill factors further weigh decidedly against a causal finding in this instance. In particular, and as detailed in this section, lack of consistent results among studies, lack of reliable assessment of exposure to talc, lack of a dose-response relationship

---

[66]    Hill, *Environment and disease: association or causation?* (1965) 58 Proc Royal Soc Med. 295.

[67]    *Id.*

and lack of strength of association all contribute to my opinion that there is a lack of reliable evidence to conclude that exposure to talc increases the risk of ovarian cancer.

### A. Lack Of Consistency Between Studies

One of the most striking aspects of the studies is their inconsistency.

Some studies demonstrate an association between talc use and ovarian cancer, while others do not. As set forth in the table below, there are seven hospital-based case-control studies that consistently demonstrate no statistically significant association between exposure to talc and risk of ovarian cancer. There are four cohort studies that also consistently demonstrate no statistically significant association between exposure to talc and risk of ovarian cancer. There are 26 population-based case-control studies that demonstrate inconsistent results, with some studies demonstrating a statistically significant association between exposure to talc and risk of ovarian cancer, while others demonstrate no statistically significant association between exposure to talc and risk of ovarian cancer. This lack of consistency in finding a statistically significant association between talc use and risk of ovarian cancer likely arises from several factors. The studies use varying questionnaires, describe varying self-reported assessments of talc exposure and varying self-reported assessments of frequency and duration of talc use, and apply no adjustment or varying levels of adjustment for potential confounders. Finally, each one of these observational studies has limitations (recall bias and confounding in case-control studies; lack of repeated measure of exposure in cohort studies). The consistency of effect between hospital-based case-control studies and the cohort studies is somewhat assuring and the heterogeneity among population-based case-control studies weigh against finding a causal relationship between exposure and outcome. In addition, even though the methods for at least two of the reported meta-analyses were relatively robust, the studies that were used in all of the meta-analyses were of limited quality.

### B. Lack Of Reliable Assessment Of Talc Exposure

In all of the studies investigating the possible causal association between talc and ovarian cancer, assessment of talc exposure relies on self-report. Talc use is not documented in a medical record or in a pharmacy record in order to confirm, or at least verify, self-reported use. This has a substantial potential to lead to recall and reporting bias, in particular in case-control studies, although this type of bias may also be present in cohort studies. Furthermore, self-reported exposures were obtained from responses to questionnaires on the use of talc or talc products, including: use of talc, diaphragm with talc, diaphragm storage only, all over body talc, genital talc, legs only talc, non-genital talc, talcum powder in the perineum, talcum powder on sanitary pads, talcum powder on diaphragms, "genital fiber use", after bathing only, baby powder only, deodorizing powder, dusting powder to the perineum, any dusting powder, talc around the abdomen/ perineum, perineal dusting, genital powder application, genital/rectal talc, powder to genitals, powder to diaphragm, or powder to sanitary napkins. Varying amounts of talc exist within different powders, varied methods can be used to apply talc either by spray or by powder, varying amounts may be applied on diaphragms, and the amount applied may be very different depending on the method of application and the person applying it. Questions arise, such as: How much talc is used in dusting? How much talc is used in the perineum? How much

31

talc is used after bathing only, etc.?  In addition, there are no observational studies or meta-analyses that have investigated the effect of a standardized amount of talc usage or a standardized method of use to ensure consistency of the assessment of exposure.  As an epidemiologist, I find this lack of ability to quantify a dose to be a gaping hole in the exposure-outcome relationship and a tremendous limitation in all of the epidemiologic studies evaluating talc and risk of ovarian cancer.

### C.  Lack Of A Dose-Response To Talc Exposure

There have been very few case-control studies and no cohort studies that have reported a dose-response relationship between talc exposure and risk of ovarian cancer; and measures of dose-response generally have varied widely among studies.

Dose-response curves may increase with increasing exposure (i.e., increased risk of heart disease with increasing level of cholesterol) and decrease with increasing exposure (i.e., decreased risk of heart disease with increased doses of cholesterol lowering agent).  Typically, a dose-response curve that depicts an increased risk would demonstrate increasing risk with increasing quantity of exposure, increasing frequency of exposure, increasing duration of exposure or a combination.  When the curve is concave, convex or has a haphazard random shape, that is a red flag to epidemiologists.  Studies that have evaluated the potential for dose-response have found:  (1) random or "sine wave" (up and down) risk[68]; (2) convex (up then down) risk[69]; (3) concave (down then up) risk[70]; and (4) even decreasing risk[71] with either increasing frequency or duration of talc use.  Studies by Wu[72] and Cramer[73] demonstrated increasing risk of ovarian cancer with increasing frequency and duration of reported talc use, but not all cut-offs were statistically significant.  Only one study[74]  demonstrated a statistically significant association between duration of reported talc use (per five years of reported genital talc use) and risk of ovarian cancer in Hispanics (OR: 1.18; 95% CI: 1.02-1.36) and non-Hispanic whites (OR: 1.14; 95% CI: 1.08-1.21).

In sum, the vast majority of both case-control and cohort studies demonstrate no statistically significant dose-response relationship between talc use and risk of ovarian cancer.

### D.  Lack Of Strength Of Association

Another indicator of causality is strength of association.

---

[68]    Booth (1989); Wong (1999); Cook (1997); Mills (2004); Merritt (2008); Gertig (2000).

[69]    Cramer (1999); Chang (1997); Cramer (2016); Rosenblatt (2011); Houghton (2014).

[70]    Whittemore (1988); Gates (2008).

[71]    Hartge (1983).

[72]    Wu (2009).

[73]    Cramer (2016).

[74]    Wu (2015).

32

Relative risk and odds ratios are two measures of strength of association. The higher the relative risk or odds ratio, the greater the likelihood that the relationship is causal. For instance, the International Primary Pulmonary Hypertension Study was a case-control study where cases were defined as patients with pulmonary hypertension without a known reason.[75] Controls were randomly selected from lists of consecutive patients seen by the same general practitioner. Each participant went through a face-to-face interview and was asked about demographics, medical and surgical history as well as medication history. Use of appetite suppressants was associated with a statistically significant increase in risk of pulmonary hypertension (OR: 6.3; 95% CI: 3.0-13.2) after adjusting for systemic hypertension, use of cocaine or intravenous drugs, smoking status, BMI, weight loss behavior, use of thyroid extracts and possible exposure to anorexic agents. The odds ratio in this study was found to be 6.3, and with a relative risk this high it is unlikely that any other factor could be the cause of the association.

The higher the relative risk or odds ratio, the less likely other factors can explain the association. Similarly, for relative risks or odds ratios that are lower, it is important to understand that there may be factors other than the exposure of interest that can explain the association. Rosenblatt (1998)[76] found a statistically significant association between women who had ever douched and those who used powder in the perineal area (OR: 2.9: 95% CI: 1.6-5.1). Gonzalez et al.[77] as described above evaluated the effect of douching and talc use on the risk of ovarian cancer prospectively in the Sister Study. Results demonstrated no statistically significant increased risk of ovarian cancer (HR: 0.73; 95% CI: 0.44-1.2) with ever talc use when compared with never talc use after adjusting for confounders. However, there was a statistically significant increase in risk of ovarian cancer (HR: 1.9: 95% CI: 1.2-2.9) with douching/no talc use when compared with neither use as well as a statistically significant increase in risk of ovarian cancer with douching in the past 12 months (HR: 1.84: 95% CI: 1.2-2.8) when compared with never douching. As previous studies (except for Harlow et al. (1992)) did not account for douching, the relatively weak statistically significant associations could potentially be explained by confounding. One explanation could be that since talc users are more likely to douche and douching appears to increase risk of ovarian cancer, previous studies may not have captured the correct exposure (douching) in the causal pathway and mistakenly concluded talc to be the exposure that increased risk of ovarian cancer instead of douching. Similarly, it is also possible that the relatively weak yet statistically significant associations seen in some of the case-control studies could be explained by other potential confounders that were only considered in some of the studies or that have not yet even been identified.

In summary, based on evidence in the literature and the lack of consistency across studies, the lack of a reliable assessment of actual talc exposure, the lack of a significant dose-response to talc exposure, and a weak strength of association between a poorly characterized exposure to talc and risk of ovarian cancer, it is impossible to conclude that talc exposure increases the risk of ovarian cancer.

---

[75]     Abenhaim et al., *Appetite-Suppressant Drugs and the Risk of Primary Pulmonary Hypertension.* (1996) 335(9) N Engl J Med 609.

[76]     Rosenblatt (1998).

[77]     Gonzalez (2016).

33

| Author | Odds Ratio/Relative Risk/Hazard Ratio | 95% CI | Statistically Significant Association? |
|---|---|---|---|
| **Hospital-based case-control studies** | | | |
| Hartge et al. (1983) | 0.70 | 0.04-1.10 | No |
| Whittemore et al. (1988) | 1.45 | 0.81-2.60 | No |
| Booth et al. (1989) | 1.30 | 0.80-1.90 | No |
| Rosenblatt et al. (1992) | 1.70 | 0.70-3.90 | No |
| Tzonou et al. (1993) | 1.05 | 0.28-3.98 | No |
| Hartge and Stewart (1994) | 0.30 (5-9 years of talc exposure) 0.50 (10+ years) | 0.10-1.40 0.20-1.50 | No |
| Wong et al. (1999) | 1.13 | 0.88-1.44 | No |
| **Population-based case-control studies** | | | |
| Cramer et al. (1982) | 1.92 | 1.27-2.89 | Weak |
| Harlow and Weiss. (1989) | 1.10 | 0.70-2.10 | No |
| Harlow et al. (1992) | 1.50 | 1.00-2.10 | Weak |
| Chen et al. (1992) | 3.90 | 0.90-10.6 | No |
| Cramer and Xu (1995) | 1.60 | 1.20-2.10 | Weak |
| Purdie et al. (1995) | 1.27 | 1.04-1.54 | Weak |
| Green et al. (1997) | 1.30 | 1.10-1.60 | Weak |
| Shushan et al. (1996) | 1.97 | 1.06-3.66 | Weak |
| Chang and Risch (1997) | 1.42 | 1.08-1.86 | Weak |
| Cook et al. (1997) | 1.60 | 0.90-2.80 | No |
| Godard et al. (1998) | 2.49 | 0.94-6.58 | No |
| Cramer et al. (1999) | 1.60 | 1.18-2.15 | Weak |
| Ness et al. (2000) | 1.50 | 1.10-2.00 | Weak |
| Mills et al. (2004) | 1.37 | 1.02-1.85 | Weak |
| Pike et al. (2004) | 1.60 | 1.18-2.18 | Weak |
| Jordan et al. (2007) | 1.00 | 0.40-2.10 | No |
| Gates et al. (2008) | 1.36 | 1.14-1.63 | Weak |
| Merritt et al. (2008) | 1.17 | 1.01-1.36 | Weak |
| Moorman et al. (2009) | Afr. Am.: 1.19 Caucasian: 1.04 | Afr. Am: 0.68-2.09 Caucasian: 0.82-1.33 | No |
| Wu et al. (2009) | 1.53 | 1.13-2.09 | Weak |
| Rosenblatt. (2011) | 1.27 | 0.97-1.66 | No |
| Kurta et al. (2012) | 1.40 | 1.16-1.69 | Weak |
| Wu et al. (2015) | 1.46 | 1.27-1.69 | Weak |
| Schildkraut et al. (2016) | 1.44 | 1.11-1.86 | Weak |
| **Pooled case-control studies** | | | |
| Terry et al. (2013) | 1.24 | 1.15-1.33 | Weak |

34

**P1.02018.35**

| Author | Odds Ratio/Relative Risk/Hazard Ratio | 95% CI | Statistically Significant Association? |
|---|---|---|---|
| Cramer et al. (2016) | 1.33 | 1.16-1.52 | Weak |
| **Cohort studies** | | | |
| Gertig et al. (2000) | 1.09 | 0.86-1.37 | No |
| Gates et al. (2010) | 1.06 | 0.89-1.28 | No |
| Houghton et al. (2014) | 1.12 | 0.92-1.36 | No |
| Gonzalez et al. (2016) | 0.73 | 0.44-1.20 | No |

## VIII.   METHODOLOGICAL FLAWS IN PLAINTIFFS' EXPERTS' EPIDEMIOLOGY-BASED OPINIONS

I was asked to address whether the causation analyses set forth in the expert reports of plaintiffs' epidemiology experts were conducted in a scientifically reliable manner.  As set forth below, I have concluded that there are several significant methodological flaws that are prevalent in multiple plaintiffs' experts' reports, rendering their analyses unreliable.

### A.   Disregard For The Hierarchy Of Evidence

The hierarchy of evidence is well-established within the scientific community.[78] Consistent with that hierarchy, epidemiologists consider meta-analyses of multiple randomized clinical trials, followed by individual randomized clinical trials, as the strongest evidence to support a causal relationship between an exposure and an outcome.  These are followed by the observational designs, with cohort studies, case-control studies, and cross-sectional studies in descending order also providing potential evidence for a causal association between exposure and outcome.  The lowest quality of evidence comes from case reports, case series and other descriptive studies.  As a general rule, lower-quality studies provide less information on whether a causal relationship exists than studies of higher quality.

Although this hierarchy should not be indiscriminately applied to all research questions and studies, an epidemiologist should provide sound scientific justifications for departing from these well-established norms.  For example, a poorly designed and conducted meta-analysis or randomized clinical trial may provide less evidence than a well-designed and conducted cohort or case-control study.

A number of plaintiffs' epidemiologists ignore the well-established hierarchy of evidence in their reviews of the relevant human studies, either by treating all studies equally or, even more troublingly, placing an inappropriate amount of weight on case-control studies that they claim demonstrate a weak association between talc use and ovarian cancer, while ignoring stronger, better designed cohort studies that do not show any association and also better capture the temporal nature that must exist to demonstrate a causal relationship

---

[78]       Nat. Health & Medical Res. Council, *NHMRC Levels of Evidence and Grades for Recommendations for Developers of Clinical Practice Guidelines* (2009).

**P1.02018.36**

between exposure and outcome.  For example, Dr. Moorman states the following in her report:

> As I evaluated individual epidemiologic studies (case-control and cohort studies) that described the risk for ovarian cancer associated with talc use, I did not weight one design more heavily than the other because there are advantages and disadvantages to each design for evaluating talc as a cause of ovarian cancer.[79]

Likewise, Dr. McTiernan states in her report that "all" studies provide evidence of causal effect.[80]  When asked at her deposition about the hierarchy of scientific evidence, Dr. McTiernan testified that she was "not sure what hierarchy" the questioner was referring to and that, in any event, "depending on the question, one type of study could be preferable to another, but in general all of the studies provide information, and we look at the totality of evidence."[81]  When I teach students about study design in epidemiology, this is exactly what I tell them *not* to do.  When evaluating whether causality can be demonstrated from a particular study or series of studies, it is essential to evaluate the strengths and potential weaknesses of each individual study.  Because case-control studies are more easily subject to biases and confounding factors and can often not fully capture the temporal relationship between exposure and outcome, as discussed in detail below, they are often less reliable than cohort studies.

Even more problematic than treating all studies the same is plaintiffs' experts' tendency to place *more* emphasis on case-control studies than higher-quality cohort studies, despite their limitations.  For example, despite her disclaimer of adherence to any hierarchy of evidence, Dr. McTiernan does apply a hierarchy of her own, suggesting that case-control studies are preferable in situations where an exposure is "very difficult to measure and which can change over time."[82]  While I agree with her that case-control studies are often "easier" when an exposure may be "difficult to measure,"[83] a poor-quality case-control study does not provide higher quality data due to limitations in design.  Furthermore, case-control studies, as mentioned above, can be subject to bias and confounding, even when they are well designed.  Even though case-control studies sometimes may be "easier" to conduct, the temporal relationship between exposure and outcome is often more difficult to establish because ascertainment of the exposure is done after the outcome.  Finally, it is often extremely difficult for a case-control study design to accurately investigate an exposure that changes over time and a cohort design will more likely be able to investigate time varying exposures than a case-control study design.  Dr. McTiernan's suggestion therefore is illogical, and in my opinion, is not supported by any science.

---

[79]     Moorman Report 10.

[80]     McTiernan Report 18.

[81]     McTiernan Deposition 118.

[82]     McTiernan Deposition 117.

[83]     *Id.*

**P1.02018.37**

Dr. McTiernan has also criticized the multiple cohort studies finding no association between talc use and ovarian cancer on the ground that those studies involved an "insufficient number of cases . . . to find a statistically significant result."[84]  Dr. McTiernan's criticism seems to be that, because ovarian cancer has a low incidence rate – and so few study participants developed the disease in both the study and control populations – the studies cannot rule out the possibility of a link between talc use and ovarian cancer.  This position is incorrect.

The first problem with Dr. McTiernan's criticism is that her focus on the low overall incidence of ovarian cancer in the population is misplaced.  Incidence rates reported by the National Cancer Institute's Surveillance, Epidemiology, and End Results (SEER) Program are estimated rates for *all* women.  These rates may change from year to year, and rates may be different for different age groups and races as reported by SEER.[85]  Observational studies do not study the population at large, but rather a subset of the population (i.e., study participants).  And the incidence of ovarian cancer in the population enrolled in the cohort studies, including Gonzalez (2016) (41,654 women),[86] Houghton (2014) (61,576 women),[87] and Gates (2010)/Gertig (2000) (108,870 women),[88] was higher than in the general population, with 429 cases among 68,435 participants who reported exposure to talc, and 943 cases among 141,345 participants who reported no exposure to talc.  It is not surprising that the incidence rates of ovarian cancer in the cohort studies are much higher than the reported rates for all females by the SEER Program because the cohort studies may include women who are in general at higher risk of developing ovarian cancer (i.e., older age, family history of cancer etc.).

A higher incidence of disease in the study population means that the number of participants needed to detect true risk is decreased – i.e., smaller sample sizes can detect the same amount of risk.  Thus, because the cohort studies involve women who likely have a higher risk of ovarian cancer than the general population as reported by SEER, the study sample sizes needed to detect a given difference in risk between groups will be smaller.  (This is why epidemiologists study higher-risk groups for less-common disease.)  Specifically, using the Berge study's meta-analysis of cohort studies,[89] which concluded that combined cohort studies yielded no increased risk of ovarian cancer when comparing participants exposed to talc to participants not exposed to talc (RR: 1.02; 95% CI: 0.85-1.20), I calculated that the incidence of ovarian cancer and the overall number of study participants was sufficient to detect a true risk of ovarian cancer of 1.25 with a power of .99.[90]  In other words, there would be a 1% chance of being incorrect and concluding that there is no difference in risk of ovarian cancer between participants exposed and unexposed to talc if there was a true increase in risk of ovarian cancer with talc exposure.

---

[84]     McTiernan Deposition 124.

[85]     https://seer.cancer.gov/statfacts/html/ovary.html.

[86]     Gonzalez (2016).

[87]     Houghton (2014).

[88]     Gates (2010); Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*. (2000) 92 J. Nat. Cancer Inst. 249.

[89]     Berge 2018.

[90]     Calculations performed with STATA SE 15.1, StataCorp, College Station, TX.

Dr. Moorman's power-based criticisms are similarly flawed. She relies on commentary by Narod,[91] who states that "the lack of a significant overall association between ever use of talc and ovarian cancer in the cohort studies may be due to the fact that despite the large size of the cohorts, the studies were not adequately powered to detect a relative risk of approximately 1.2." But this commentary rests on sample size calculations with certain assumptions regarding risk of ovarian cancer, including the same incidence rate issue that undermines Dr. McTiernan's critique. When the actual incidence rate of ovarian cancer in the cohort studies is taken into account, it decreases the study sample size needed to the sample sizes reported in the relevant cohort studies.

Relatedly, the fact that so few participants in Gonzalez (2016),[92] Houghton (2014),[93] and Gates (2010)/Gertig (2000),[94] developed ovarian cancer regardless of their talc exposure does not undermine the validity of these studies. To the contrary, it demonstrates that the risk of developing ovarian cancer is small among the higher-risk populations that were studied, and that talc exposure simply does not increase that risk to a statistically significant degree.

Other plaintiffs' experts have criticized cohort studies on the grounds that they do not sufficiently account for the latency period of ovarian cancer. For example, Dr. Siemiatycki has stated that the "short follow-up periods in cohort studies would be a source of bias."[95] According to Dr. Siemiatycki, because cohort study researchers "collect information about exposure, and then follow [patients] for two years to find out how many of them got cancer, and whether there is a difference between the people who were exposed and the people who are not exposed, well, that would be pretty hopeless because it takes more than two years for cancers to develop and be diagnosed."[96] But this supposed limitation on cohort studies is greatly exaggerated. Houghton (2014) asked about talcum powder use in study participants who had been followed for up to 18 years and found no statistically significant increased risk in ovarian cancer.[97] Gates (2010) added to the Gertig (2000) cohort and followed study participants for up to 24 years and found no statistically significant elevations in risk for talc use for all epithelial ovarian cancers.[98] Similarly, Gonzalez (2016) followed participants with a sister or half-sister with a history of breast cancer for a median 6.5 years and found no association between the use of talc and ovarian cancer.[99] In any event, the women followed in all of these studies presumably did not start

---

[91]    Narod, *Talc and ovarian cancer*. (2016) 141 Gynecol. Oncol. 410. Plaintiffs' experts Drs. Ellen Blair Smith and Judith Wolf place similar reliance on Narod's commentary on the power of cohort studies to detect risk. (Blair Smith Rep. at 20; Wolf Rep. at 6.)

[92]    Gonzalez (2016).

[93]    Houghton (2014).

[94]    Gates (2010); Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*. (2000) 92 J. Nat. Cancer Inst. 249.

[95]    Siemiatycki Deposition 171.

[96]    *Id*.

[97]    Houghton (2014).

[98]    Gates (2010); Gertig (2000).

[99]    Gonzalez (2016).

using talc for the first time the day the studies began and therefore would have had longer durations of use than the time period of the study – in most cases many years more.

### B. Ignoring Or Minimizing The Effects Of Recall Bias And Other Biases In Case-Control Studies

Recall bias is of particular concern in retrospective case-control studies because, as compared to controls, cases "tend to search their memories to identify what might have caused their disease; healthy controls have no such motivation."[100]  This, in turn, tends to artificially increase the supposed effect of the exposure.  As Vetter and Mascha point out, a number of factors can affect recall bias.[101]  Study participants with a particular disease tend to "search their memories to identify what might have caused their disease," whereas "healthy controls have no such motivation."[102]  Cases tend to remember past exposures more than controls, and cases are often more likely than controls to investigate whether certain risk factors increase the risk of developing a certain disease.  In addition, individuals with a disease may have greater awareness of potential risk factors for their condition or may have become sensitized by repeated physician interviews.  Consider again the previous example of the investigator who is trying to determine if there is a relationship between sugary drinks and high blood pressure.  If the cases tend to recall and report more sugary drink consumption simply because they have reflected more on their past experiences, recall bias could result in differential misclassification and a false overestimation of the measure of risk between the sugary drinks and high blood pressure.  Because cases and controls have different incentives to recall past exposures, recall bias can lead to finding associations between exposures and diseases that do not exist. As I explained earlier, the Schildkraut case-control study demonstrates an excellent example of the effect of recall bias in assessing the effects of genital talc use before and after the year 2014.
Dr. Singh attempts to minimize this finding because "there was a statistically significant increased risk both before and after 2014."[103]  This is incorrect, as there is only a statistically significant association between any genital body powder use and ovarian cancer in interviews conducted after 2014, providing an exceptional real-world example of the possibility of recall bias in a case-control epidemiologic study.  Likewise, Dr. McTiernan asserts that recall bias is "unlikely" to be an issue because the studies for which data collection pre-dated news reports of this association showed similar effects to those for which data were collected afterward.[104]  However, there is no reason to believe that recall bias did not affect cases reporting perineal talc use before 2014, since there were reports of an association in the medical literature (and presumably, the media) prior to that time – and the tendency in a case-control study for cases to remember past exposures more than controls is an issue that affects case-control studies regardless of date.

---

[100]     Grimes & Schultz, *Bias and causal associations in observational research*. (2002) 259(9302) Lancet 248.

[101]     Vetter & Mascha, *Bias, Confounding, and Interaction: Lions and Tigers, and Bears, Oh My!*. (2017) 125(3) Anesth Analg 1042.

[102]     Grimes & Schultz (2002).

[103]     Singh Report 45-46.

[104]     McTiernan Report 24.

P1.02018.40

Dr. Siemiatycki also states that if recall bias were present, "we would systematically see elevated RRs from case-control studies for all manner of variables in all kinds of studies."[105]  This makes little epidemiologic sense, as recall bias is a known particular concern in retrospective studies that use a case-control design to investigate the association between exposure and outcome.[106]

### C.   Jumping To Causation Without Sufficiently Determining Association

Epidemiologists and other researchers are often asked to determine whether an exposure can cause an illness.  As noted above, the Bradford Hill factors supply the commonly used framework for undertaking such an analysis.  But as also noted above, the existence of a clear-cut, statistically significant association is a prerequisite to such an analysis.  One needs to find an association between exposure and outcome first, and it is not acceptable epidemiologic methodology to apply the Bradford Hill criteria in the absence of an established association.

Plaintiffs' experts have the opinion that "most" or the "vast majority" of the epidemiological studies show an increased relative risk of ovarian cancer for genital talc users.  For example:

·    Dr. Moorman states that, "among the more than two dozen studies that have reported on the association between talc use and ovarian cancer, the vast majority of them reported relative risks or odds ratios greater than one[.]"[107]

·    Dr. Singh concludes that "[m]ost case control studies demonstrate an increased risk factor of ovarian cancer associated with talc use with an OR between 1.3 and 1.6, even after adjusting for various risk factors."[108]

·    Dr. Smith-Bindman pronounces that her "review of case-control studies on talcum powder use and ovarian cancer risk were consistent and indicate a 50% increase in risk of serous invasive cancer related to routine talcum powder exposure compared to no exposure."[109]

The table in Section VII demonstrates that none of the hospital-based case-control studies, none of the cohort studies, and nearly half of the population-based case-control studies found no statistically significant association.  Given that the association found in the literature is far from "perfectly clear-cut," it is not clear to me that a Bradford Hill analysis is even appropriate in this situation.

---

[105]    Siemiatycki Report 54.

[106]    Schultz & Grimes (2002).

[107]    Moorman Report 15.

[108]    Singh Report 53.

[109]    Smith-Bindman Report 34 (emphasis omitted).

40

### D.  Methodological Problems With Dr. Smith-Bindman's Meta-Analysis

One of plaintiffs' epidemiologists, Dr. Smith-Bindman, conducted her own, new meta-analysis of a portion of the talc literature for purposes of this litigation.  There are significant problems with her approach that render it unreliable.  The first is that the rationale for a new non-peer-reviewed meta-analysis – in an area that has already been subject to repeated meta-analyses on substantially the same body of literature – is not clearly stated.  "Although this subject has hardly been studied, repeating or updating rarely (9%) leads to changes in the pooled results of meta-analyses."[110]  Therefore, while repeated meta-analyses should not be "discouraged a priori," an "important question" is the "rationale for repeating the analysis" and, where the results differ from prior studies, another important question is "how [the] authors defend their conclusions in relation to prior studies."[111]  Dr. Smith-Bindman does not adequately do this; nor does she subject this new meta-analysis to any form of peer review – one of the cornerstones of the body of evidence contained in the medical literature.  Under a section of her report that is supposed to set forth a "rationale" for her new meta-analysis, she fails to explain the methodological shortcomings of prior meta-analyses.[112]  Instead, she asserts that she believes that "the most important research question to answer in this review is whether regular exposure to talcum powder is associated with ovarian cancer" – and serous cancer particularly – and thus that her review should be limited to those studies that supply data for "as close to approximately daily" use of talcum powder as possible.[113]  But she does not explain why daily use is the right metric.  Nor, in any event, does she actually limit her review to daily use, which, as she acknowledges, is not specifically examined in all of the studies she included in her review; and at the same time, she also excluded studies that did address daily use based on her own (unexplained) assessment that their "research methods were poorly defined."[114]

Dr. Smith-Bindman reports an odds ratio of 1.43 for all ovarian cancers that is somewhat higher than prior meta-analyses,[115] and ultimately that the association is indicative of a causal relationship.[116]  She does not explain why these results might be more valid and defensible in relation to prior meta-analyses, which report somewhat lower odds ratios and reach the opposite conclusion on causation.  The sum total of her discussion on this is that "[t]he existing systematic reviews (in particular Penninkilampi and Berge) also concluded a significant increase in ovarian cancer risk following talcum powder exposure,"[117] but she fails to acknowledge that the odds ratios were lower and that neither study embraced a causal conclusion in its review of the overall scientific literature.  This omission is critical.  Scientists do not practice in a vacuum; they must take into account the

---

[110]      Vavken & Dorotka, *A Systematic Review of Conflicting Meta-Analyses in Orthopaedic Surgery.* (2009) 467(10) Clin Orthop Relat Res. 2723.

[111]      *Id.*

[112]      Smith-Bindman Report 30.

[113]      *Id.* at 31.

[114]      *Id.* at 32.

[115]      *Id.* at 33.

[116]      *Id.* at 41.

[117]      *Id.* at 34.

entire existing body of scientific evidence. Dr. Smith-Bindman's failure to do so in any meaningful sense, as well as her failure to state the fact that there are no studies that investigated a standardized dose of talc, a standardized method of exposure to talc, or a validated assessment of the frequency and duration of talc usage, makes this a pointless exercise. Because of these fundamental flaws in her study, there is no valid basis to accept her unique perspective over the body of work of many other investigators over several decades that has reached the opposite conclusion.

A second problem with Dr. Smith-Bindman's approach concerns her treatment of serous ovarian cancer specifically. Dr. Smith-Bindman claims to have found data concerning serous ovarian cancer specifically from four studies.[118] But such post-hoc analyses are often speculative because identifying subgroups after the fact can be subject to problems associated with confounding. Therefore, while these analyses may be hypothesis-generating, caution is advised in interpreting the results. For instance, if weight, socioeconomic status, race or douching each were causally related to the risk of serous ovarian cancer and also related to the use of talc but were not investigated in the post-hoc analysis because the study was not designed to look at these factors, then investigators may conclude there is an association when one does not in reality exist between talc use and serous ovarian cancer.

Identifying subgroups after the fact is also inherently prone to bias because of the investigator's impressions of the results of the study.[119] Essentially, it allows the researcher to start with a conclusion and work backwards, which is exactly the opposite of the scientific method. And even setting aside the bias concerns in such a backwards endeavor, findings from post-hoc analyses may also be spurious because the study was not designed to address questions that are developed post-hoc, and thus, for example, no effort would have been made to match cases and controls within the subgroup.

Dr. Smith-Bindman's meta-analysis has other methodological flaws as well. For instance, Dr. Smith-Bindman stated that she alone performed "the search, according – obtaining all the papers, and then reviewing the bibliography of all those papers."[120] Most meta-analyses of higher quality involve more than one investigator to perform the search to decide what studies to include and what studies not to include in order to avoid bias. This was not done.[121] She also states that Dr. Hall helped her with "abstracting the data as a second set of eyes and in doing the statistical summary."[122] Based on her deposition, there also appear to be discrepancies between the numbers reported in Dr. Smith-Bindman's meta-analysis and those from the published literature, and she testified that she "was struggling to understand why the numbers and the figures were not exactly the same as the ones . . . in the published manuscript."[123] Dr. Smith-Bindman, as she stated in her

---

[118]   *Id.*

[119]   Wang et al., *Statistics in Medicine – Reporting of Subgroup Analyses in Clinical Trials.* (2007) 357(21) N Engl J Med 2189.

[120]   Smith-Bindman Deposition (Vol. I) 101.

[121]   *Id.*

[122]   *Id.*

[123]   Smith-Bindman Deposition (Vol. II) 255-56.

deposition, called Dr. Hall in between the first and second part of her deposition to ask Dr. Hall "to clarify how she did the calculations of the numbers that are shown in the figures."[124]  These irregularities further call her meta-analysis into question.

### E.   Methodological Errors In Plaintiffs' Epidemiologists' Bradford Hill Analyses

Once an association has been established, Bradford Hill set forth a framework to help assess whether a causal relationship exists:  strength of association, consistency, specificity, temporality, biologic gradient, plausibility, coherence, experimentation, and analogy.  To the extent a Bradford Hill analysis is even called for, plaintiffs' experts took an irregular approach that seems to be results-driven.  In my discussion below, I focus on three criteria – strength of association, consistency of association and biologic gradient – that are the most relevant to my opinions and experience as an epidemiologist.

#### 1.   Plaintiffs' epidemiologists find a "strong" association where there is none.

Strength of association measures the level of increased risk of developing a particular disease as a result of exposure to a particular substance.  Strength of association is typically measured by calculating an odds ratio or relative risk – i.e., the ratio of the risk of disease in the population exposed to the risk of disease in those unexposed.  A relative risk of 1.0 would indicate that there is no difference in disease risk between individuals exposed and those who are not.  When the risk is low, epidemiologists typically require other strong evidence of causation.

Although there is no universal numeric definition of a "strong" association between exposure and outcome in terms of risk, it is generally accepted that ratios of risk measures between 1.1 and 2.0 represent a weak association between exposure and outcome in part because other factors (bias, confounding and random error) have the potential to explain away an apparent association of that level. [125]  One after another, plaintiffs' epidemiologists mischaracterize the – at best – weak association between talc use and ovarian cancer as one that is strong.  For example:

- Dr. Siemiatycki states that "*[such] a high and significant* [relative risk] could not have occurred by chance."[126]

- Dr. Singh writes that he "place[s] significant weight on the fact that studies demonstrate *a strong association* between talcum powder use and ovarian cancer[.]"[127]

- Dr. Moorman concludes that, "[t]aken as a whole, the *overwhelming statistical strength of these studies*, whose results are replicated over decades across a wide

---

[124]   *Id.* 255.

[125]   Wynder et al., *Radford Conference Report: Weak associations in epidemiology and their interpretation (3rd ed.).* (1982) 11 Prev. Med. 464.

[126]   Siemiatycki Report 63 (emphasis added).

[127]   Singh Report 63 (emphasis added).

43

variety of populations and investigators, further supported by consistent meta-analysis, weighs very heavily in favor of a causal inference."[128]

In his own non-peer-reviewed meta-analysis, Dr. Siemiatycki calculated the relative risk as 1.28. While I agree with Dr. Siemiatycki that a summary relative risk of 1.28, in general, represents that an exposed group has a 28% increased risk of an outcome, a relative risk in this range is weak, and may well result from bias, confounding, and/or random error rather than a true causal relationship. There is simply no disagreement about this within the scientific community. Plaintiffs' experts' insistence that a 1.28 relative risk is "high" raises the concern that they are pursuing a results-driven approach to their causation analysis instead of proper scientific methodology.

Furthermore, Dr. Siemiatycki states that "the statistical significance of individual studies is irrelevant to the consideration of causality; it is the totality of evidence embodied in the meta-analysis that counts."[129] This might be something to consider in an ideal setting where multiple studies exist to evaluate the effect of a certain exposure that had the same design, the same conduct and the same analysis. But in this instance, in evaluating the effect of talc exposure on the risk of ovarian cancer, one cannot simply ignore the results of individual studies by lumping them together, especially when the individual studies were very different in terms of design, conduct, and analysis.

### 2.   *Plaintiffs' experts fabricate consistency by ignoring inconsistent studies.*

Plaintiffs' experts uniformly assert that the consistency criterion has been satisfied. Dr. Singh states, for example, that "the direction and strength of association of talc and ovarian cancer is generally consistent across studies."[130] Dr. McTiernan likewise concludes that "the association between use of talcum powder products and risk of ovarian cancer was highly consistent."[131] I would agree with plaintiffs' experts that there are some consistencies among the studies, but those consistencies are among hospital-based case-control studies and among large cohort studies showing no statistically significant association between talc exposure and ovarian cancer. By contrast, there are inconsistencies between hospital-based and population-based case-control studies and within population-based case-control studies. As mentioned above, there are seven hospital-based case-control studies that demonstrate no statistically significant association between talc exposure and risk of ovarian cancer, while there are 26 population-based case-control studies that show inconsistent results, with some studies demonstrating a significant effect of talc exposure on risk of ovarian cancer and others showing no significant effect of talc exposure on risk of ovarian cancer. In addition, there are four cohort studies that also demonstrate no statistically significant association between talc exposure and risk of ovarian cancer. This lack of consistency both within and between study designs suggests that any association may result from bias, confounding, and/or random error, and therefore weighs against a causal relationship.

---

[128]   Moorman Report 29 (emphasis added).

[129]   Siemiatycki Report 63.

[130]   Singh Report 63.

[131]   McTiernan Report 64.

Moreover, it is important to remember (contrary to the suggestion of several of plaintiffs' experts) that for this criterion to weigh in favor of finding a causal relationship, there must be a consistency in *statistically significant* associations. Consistency in relative risks that are not statistically significant is not meaningful because that sort of consistency does not provide any degree of confidence that the claim of association made by the study is more than random chance.

### 3. Plaintiffs' experts claim there is a dose-response where none exists.

A causal association is far more likely if there is demonstrated biological gradient – i.e., a dose-response such that a greater dose leads to a greater risk of disease incidence rate. Almost every epidemiological study has failed to show any dose-response relationship between genital talc use and ovarian cancer as described above.[132] Indeed, plaintiffs' own expert Dr. Siemiatycki acknowledged in 2008 that "[t]he main epidemiological evidence against the association [between talc use and ovarian cancer] is the absence of clear exposure-response associations in most studies[.]"[133]

In responding to this scientific consensus, plaintiffs' epidemiologists insist that the literature supports a finding of a dose-response relationship. For example, Dr. Siemiatycki has the opinion that "there is a clear indication of increasing risk with increasing cumulative exposure" in the Terry 2013 and Schildkraut 2016 studies.[134] But the Terry study – which Dr. Siemiatycki calls "the most important piece of evidence we have on dose-response"[135] – "observed no significant trend . . . in risk with increasing number of lifetime applications."[136] A significant trend was found in that study only when non-users were included in the analysis. Including individuals who are not exposed to a substance in calculating a dose-response trend is inappropriate, however, because it renders this criterion redundant of the strength-of-association inquiry. Dr. Siemiatycki dismissed the fact that the p-value for the trend is not statistically significant by suggesting that "the absence of statistical significance of the trend among the four exposed subsets is not equivalent to the demonstration of an absence of dose-response."[137] That is pure speculation; if the trend line cannot be shown to be statistically significant, then there is no way to tell whether an actual relationship exists. The Schildkraut study likewise only included findings on the difference in risk between, in essence, never-users and ever-users of talc, and its analysis is therefore not relevant to a dose-response relationship.

Indeed, determining the dose of talc exposure is problematic. As Dr. Moorman acknowledges, the relevant dose of talc is not the amount applied but the amount, if any,

---

[132]    Nat. Cancer Inst., *Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ) – Health Professional Version*, https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#link/_220_toc (last updated Jan. 4, 2019); Gonzalez (2016); Houghton (2014); Gates (2010).

[133]    Langseth (2008).

[134]    Siemiatycki Report 63.

[135]    *Id.* at 45.

[136]    Terry (2013).

[137]    Siemiatycki Report 44.

that actually reaches the ovaries.[138]  However, there is no validated method of evaluating the amount applied, let alone how much (if any) reaches the ovaries.  As previously discussed, asking a woman how much talc she powdered on to the underwear is not something that can be objectively measured.  Instead, it is inherently subjective and prone to inaccurate estimation.  As also discussed above, this creates the potential for recall, reporting, and measurement bias, all of which can lead to false conclusions based on the results.  For all of these reasons, the potential for inaccurate classification of exposure leads to tremendous limitations in the entire body of relevant literature, limiting the ability to conclude that there is a causal relationship between talc exposure and ovarian cancer.

## IX.     SUMMARY AND CONCLUSIONS ASSESSING CAUSALITY

In designing an epidemiological study, the goal of a scientist is to derive findings that represent the truth in the population being studied.  In this respect, choosing a study design that minimizes or eliminates the effects of bias and confounding is very important.  In the context of assessing whether epidemiological studies indicate an association between genital talc use and ovarian cancer, recall bias is of particular concern among case-control studies and has demonstrably affected findings of association.

The methodologies used by plaintiffs' experts ignore fundamental principles of epidemiology.  In particular, plaintiffs' experts ignore the hierarchy of evidence in evaluating studies and rely on study designs that are inherently susceptible to bias.  Specifically, plaintiffs' experts pay particular attention to criticizing cohort studies, with little acknowledgment of the limitations in the case-control studies that find weak associations.

Plaintiffs' experts generally agree that even the studies that do show an association between talc use and ovarian cancer have found a relative risk in the range of 1.2-1.6.  This, by definition, is a weak association.  Plaintiffs' epidemiologists nonetheless characterize the association as "strong."  Likewise, plaintiffs' epidemiologists try to demonstrate a dose-response relationship by relying on methodologically flawed studies and statistically insignificant trend lines.  They also see consistency where the studies are inherently inconsistent.

As a professor of medicine and of public health, I have focused my career on using the science of epidemiology as a scientific tool to help improve our understanding of health and disease.  The distortion of epidemiological science for purposes of litigation does not achieve those goals.  Instead, it undermines scientific efforts to better understand the etiology of disease.

When analyzed in a methodological manner, the body of medical literature simply does not support the conclusion that perineal exposure to talc causes ovarian cancer.

---

[138]     Moorman Report 30.

46

**P1.02018.47**

# APPENDIX A

Curriculum Vitae for Academic Promotion
The Johns Hopkins University School of Medicine

Christian A. Merlo, M.D., M.P.H.                    February 22, 2019

**DEMOGRAPHIC AND PERSONAL INFORMATION**

**Current Appointments**

| | |
|---|---|
| 2006-2015 | Assistant Professor of Medicine, Johns Hopkins University School of Medicine |
| 2009-2015 | Assistant Professor of Epidemiology, Johns Hopkins University Bloomberg School of Public Health |
| 2010-present | Associate Program Director for Scholarship, Osler House Staff Program, Johns Hopkins University School of Medicine |
| 2014-present | Director of Outpatient Services, Johns Hopkins Division of Pulmonary and Critical Care Medicine |
| 2015-present | Associate Program Director, Adult Cystic Fibrosis Center, Johns Hopkins Cystic Fibrosis Center |
| 2015-present | Associate Professor of Medicine, Johns Hopkins University School of Medicine |
| 2015-present | Associate Professor of Epidemiology, Johns Hopkins University Bloomberg School of Public Health |

**Personal Data**

Division of Pulmonary and Critical Care Medicine
Department of Medicine
1830 E. Monument Street, 5th Floor
Baltimore, MD 21205
Phone:  (410) 502-7044
Fax:     (410) 502-7048
e-mail:  cmerlo@jhmi.edu

**Education and Training**

Undergraduate
1992          A.B., Biology/Visual Arts, The College of The Holy Cross, Worcester, MA, *cum laude*

Doctoral/graduate
1996          M.D., Georgetown University School of Medicine, Washington, DC

2003          M.P.H., Johns Hopkins University Bloomberg School of Public Health, Baltimore, MD

Postdoctoral

| | |
|---|---|
| 1996-1997 | Intern, Internal Medicine, Georgetown University School of Medicine, Washington, DC |
| 1997-1999 | Resident, Internal Medicine, Georgetown University School of Medicine, Washington, DC |
| 1999-2000 | Chief Resident, Internal Medicine, Georgetown University School of Medicine, Washington, DC |
| 2000-2001 | Clinical Fellow, Division of Pulmonary & Critical Care Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2001-2004 | Research Fellow, Division of Pulmonary & Critical Care Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |

**Professional Experience:**

1999-2000          Instructor, Georgetown University School of Medicine, Washington, DC

1

**P1.02018.49**

| | |
|---|---|
| 2003-2004 | Intensivist, Virginia Hospital Center, Arlington, VA |
| 2004-2006 | Instructor, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2006-2015 | Assistant Professor, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2009-2015 | Assistant Professor of Epidemiology, Department of Epidemiology, JHSPH |
| 2015-present | Associate Professor, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2015-present | Associate Professor of Epidemiology, Department of Epidemiology, JHSPH |

**RESEARCH ACTIVITIES**

**Peer Reviewed Original Science Publications**

1. Lechtzin N, John M, Irizarry R, **Merlo C**, Diette GB, Boyle MP. Outcomes of adults with cystic fibrosis infected with antibiotic-resistant Pseudomonas aeruginosa. Respiration 2006; 73: 27-33.
2. Wright JM, **Merlo CA**, Reynolds JB, Zeitlin PL, Garcia JG, Guggino WB, Boyle MP. Respiratory epithelial gene expression in patients with mild and severe cystic fibrosis lung disease. Am J Respir Cell Mol Biol 2006; 35: 327-336.
3. Buranawuti K, Boyle MP, Cheng S, Steiner LL, McDougal K, Fallin MD, **Merlo C**, Zeitlin PL, Rosenstein BJ, Mogayzel PJ,Jr, Wang X, Cutting GR. Variants in mannose-binding lectin and tumour necrosis factor alpha affect survival in cystic fibrosis. J Med Genet 2007; 44: 209-214.
4. Hsu SC, Groman JD, **Merlo CA**, Naughton K, Zeitlin PL, Germain-Lee EL, Boyle MP, Cutting GR. Patients with mutations in Gsalpha have reduced activation of a downstream target in epithelial tissues due to haploinsufficiency. J Clin Endocrinol Metab 2007; 92: 3941-3948.
5. Kirk GD, **Merlo C**, O'Driscoll P, Mehta SH, Galai N, Vlahov D, Samet J, Engels EA. HIV infection is associated with an increased risk for lung cancer, independent of smoking. Clin Infect Dis 2007; 45: 103-110.
6. **Merlo CA**, Boyle MP, Diener-West M, Marshall BC, Goss CH, Lechtzin N. Incidence and risk factors for multiple antibiotic-resistant Pseudomonas aeruginosa in cystic fibrosis. Chest 2007; 132: 562-568.
7. Dasenbrook EC, **Merlo CA**, Diener-West M, Lechtzin N, Boyle MP. Persistent methicillin-resistant Staphylococcus aureus and rate of FEV1 decline in cystic fibrosis. Am J Respir Crit Care Med 2008; 178: 814-821.
8. Allen JG, Weiss ES, **Merlo CA**, Baumgartner WA, Conte JV, Shah AS. Impact of donor-recipient race matching on survival after lung transplantation: analysis of over 11,000 patients. J Heart Lung Transplant 2009; 28: 1063-1071.
9. **Merlo CA**, Weiss ES, Orens JB, Borja MC, Diener-West M, Conte JV, Shah AS. Impact of U.S. Lung Allocation Score on survival after lung transplantation. J Heart Lung Transplant 2009; 28: 769-775.
10. Weiss ES, Allen JG, Meguid RA, Patel ND, **Merlo CA**, Orens JB, Baumgartner WA, Conte JV, Shah AS. The impact of center volume on survival in lung transplantation: an analysis of more than 10,000 cases. Ann Thorac Surg 2009; 88: 1062-1070.
11. Weiss ES, Allen JG, **Merlo CA**, Conte JV, Shah AS. Lung allocation score predicts survival in lung transplantation patients with pulmonary fibrosis. Ann Thorac Surg 2009; 88: 1757-1764.
12. Weiss ES, Allen JG, **Merlo CA**, Conte JV, Shah AS. Survival after single versus bilateral lung transplantation for high-risk patients with pulmonary fibrosis. Ann Thorac Surg 2009; 88: 1616-25; discussion 1625-6.
13. Weiss ES, Allen JG, Modi MN, **Merlo CA**, Conte JV, Shah AS. Lung transplantation in older patients with cystic fibrosis: analysis of UNOS data. J Heart Lung Transplant 2009; 28: 135-140.
14. Weiss ES, **Merlo CA**, Shah AS. Impact of advanced age in lung transplantation: an analysis of United Network for Organ Sharing data. J Am Coll Surg 2009; 208: 400-409.
15. Allen JG, Arnaoutakis GJ, Weiss ES, **Merlo CA**, Conte JV, Shah AS. The impact of recipient body mass index on survival after lung transplantation. J Heart Lung Transplant 2010; 29: 1026-1033.
16. Arnaoutakis GJ, Allen JG, **Merlo CA**, Baumgartner WA, Conte JV, Shah AS. Low potassium dextran is superior to University of Wisconsin solution in high-risk lung transplant recipients. J Heart Lung Transplant 2010; 29: 1380-1387.
17. Dasenbrook EC, Checkley W, **Merlo CA**, Konstan MW, Lechtzin N, Boyle MP. Association between respiratory tract methicillin-resistant Staphylococcus aureus and survival in cystic fibrosis. JAMA 2010; 303: 2386-2392.
18. Drummond MB, Kirk GD, McCormack MC, Marshall MM, Ricketts EP, Mehta SH, Wise RA, **Merlo CA**. HIV and COPD: impact of risk behaviors and diseases on quality of life. Qual Life Res 2010; 19: 1295-1302.
19. Drummond MB, Kirk GD, Ricketts EP, McCormack MC, Hague JC, McDyer JF, Mehta SH, Engels EA, Wise RA, **Merlo CA**. Cross sectional analysis of respiratory symptoms in an injection drug user cohort: the impact of obstructive lung disease and HIV. BMC Pulm Med 2010; 10: 27-2466-10-27.
20. Hoag JB, Terry P, Mitchell S, Reh D, **Merlo CA**. An epistaxis severity score for hereditary hemorrhagic

telangiectasia. Laryngoscope 2010; 120: 838-843.

21. Weiss ES, Allen JG, **Merlo CA**, Conte JV, Shah AS. Factors indicative of long-term survival after lung transplantation: a review of 836 10-year survivors. J Heart Lung Transplant 2010; 29: 240-246.

22. Allen JG, Arnaoutakis GJ, Orens JB, McDyer J, Conte JV, Shah AS, **Merlo CA**. Insurance status is an independent predictor of long-term survival after lung transplantation in the United States. J Heart Lung Transplant 2011; 30: 45-53.

23. Arnaoutakis GJ, Allen JG, **Merlo CA**, Sullivan BE, Baumgartner WA, Conte JV, Shah AS. Impact of the lung allocation score on resource utilization after lung transplantation in the United States. J Heart Lung Transplant 2011; 30: 14-21.

24. Arnaoutakis GJ, George TJ, Alejo DE, **Merlo CA**, Baumgartner WA, Cameron DE, Shah AS. Society of Thoracic Surgeons Risk Score predicts hospital charges and resource use after aortic valve replacement. J Thorac Cardiovasc Surg 2011; 142: 650-655.

25. Arnaoutakis GJ, George TJ, Robinson CW, Gibbs KW, Orens JB, **Merlo CA**, Shah AS. Severe acute kidney injury according to the RIFLE (risk, injury, failure, loss, end stage) criteria affects mortality in lung transplantation. J Heart Lung Transplant 2011; 30: 1161-1168.

26. Drummond MB, Kirk GD, Astemborski J, McCormack MC, Marshall MM, Mehta SH, Wise RA, **Merlo CA**. Prevalence and risk factors for unrecognized obstructive lung disease among urban drug users. Int J Chron Obstruct Pulmon Dis 2011; 6: 89-95.

27. George TJ, Arnaoutakis GJ, **Merlo CA**, Kemp CD, Baumgartner WA, Conte JV, Shah AS. Association of operative time of day with outcomes after thoracic organ transplant. JAMA 2011; 305: 2193-2199.

28. Marshall MM, Kirk GD, Caporaso NE, McCormack MC, **Merlo CA**, Hague JC, Mehta SH, Engels EA. Tobacco use and nicotine dependence among HIV-infected and uninfected injection drug users. Addict Behav 2011; 36: 61- 67.

29. Sheridan MB, Hefferon TW, Wang N, **Merlo C**, Milla C, Borowitz D, Green ED, Mogayzel PJ,Jr, Cutting GR. CFTR transcription defects in pancreatic sufficient cystic fibrosis patients with only one mutation in the coding region of CFTR. J Med Genet 2011; 48: 235-241.

30. Tam V, Arnaoutakis GJ, George TJ, Russell SD, **Merlo CA**, Conte JV, Baumgartner WA, Shah AS. Marital status improves survival after orthotopic heart transplantation. J Heart Lung Transplant 2011; 30: 1389-1394.

31. West NE, Lechtzin N, **Merlo CA**, Turowski JB, Davis ME, Ramsay MZ, Watts SL, Stenner SP, Boyle MP. Appropriate goal level for 25-hydroxyvitamin D in cystic fibrosis. Chest 2011; 140: 469-474.

32. Drummond MB, Kirk GD, Astemborski J, Marshall MM, Mehta SH, McDyer JF, Brown RH, Wise RA, **Merlo CA**. Association between obstructive lung disease and markers of HIV infection in a high-risk cohort. Thorax 2012; 67: 309-314.

33. Eberlein M, Arnaoutakis GJ, Yarmus L, Feller-Kopman D, Dezube R, Chahla MF, Bolukbas S, Reed RM, Klesney-Tait J, Parekh KR, **Merlo CA**, Shah AS, Orens JB, Brower RG. The effect of lung size mismatch on complications and resource utilization after bilateral lung transplantation. J Heart Lung Transplant 2012; 31: 492-500.

34. George TJ, Arnaoutakis GJ, Beaty CA, Pipeling MR, **Merlo CA**, Conte JV, Shah AS. Acute kidney injury increases mortality after lung transplantation. Ann Thorac Surg 2012; 94: 185-192.

35. George TJ, Beaty CA, Kilic A, Shah PD, **Merlo CA**, Shah AS. Outcomes and temporal trends among high-risk patients after lung transplantation in the United States. J Heart Lung Transplant 2012; 31: 1182-1191.

36. Kilic A, George TJ, Beaty CA, **Merlo CA**, Conte JV, Shah AS. The effect of center volume on the incidence of postoperative complications and their impact on survival after lung transplantation. J Thorac Cardiovasc Surg 2012; 144: 1502-8; discussion 1508-9.

37. Kilic A, **Merlo CA**, Conte JV, Shah AS. Lung transplantation in patients 70 years old or older: have outcomes changed after implementation of the lung allocation score? J Thorac Cardiovasc Surg 2012; 144: 1133-1138.

38. Drummond MB, **Merlo CA**, Astemborski J, Kalmin MM, Kisalu A, Mcdyer JF, Mehta SH, Brown RH, Wise RA, Kirk GD. The effect of HIV infection on longitudinal lung function decline among IDUs: a prospective cohort. AIDS 2013; 27: 1303-1311.

39. Eberlein M, Diehl E, Bolukbas S, **Merlo CA**, Reed RM. An oversized allograft is associated with improved survival after lung transplantation for idiopathic pulmonary arterial hypertension. J Heart Lung Transplant 2013; 32: 1172-1178.

40. Eberlein M, Reed RM, Bolukbas S, Parekh KR, Arnaoutakis GJ, Orens JB, Brower RG, Shah AS, Hunsicker L, **Merlo CA**. Lung size mismatch and survival after single and bilateral lung transplantation. Ann Thorac Surg 2013; 96: 457-463.

41. Eberlein M, Reed RM, Maidaa M, Bolukbas S, Arnaoutakis GJ, Orens JB, Brower RG, **Merlo CA**, Hunsicker LG.

**P1.02018.51**

Donor-recipient size matching and survival after lung transplantation. A cohort study. Ann Am Thorac Soc 2013; 10: 418-425.

42.    Kilic A, Beaty CA, **Merlo CA**, Conte JV, Shah AS. Functional status is highly predictive of outcomes after redo lung transplantation: an analysis of 390 cases in the modern era. Ann Thorac Surg 2013; 96: 1804-11; discussion 1811.

43.    Kilic A, Shah AS, **Merlo CA**, Gourin CG, Lidor AO. Early outcomes of antireflux surgery for United States lung transplant recipients. Surg Endosc 2013; 27: 1754-1760.

44.    Reh DD, Hur K, **Merlo CA**. Efficacy of a topical sesame/rose geranium oil compound in patients with hereditary hemorrhagic telangiectasia associated epistaxis. Laryngoscope 2013; 123: 820-822.

45.    Yarmus L, Akulian J, Gilbert C, Illei P, Shah P, **Merlo C**, Orens J, Feller-Kopman D. Cryoprobe transbronchial lung biopsy in patients after lung transplantation: a pilot safety study. Chest 2013; 143: 621-626.

46.    Drummond MB, Astemborski J, Lambert AA, Goldberg S, Stitzer ML, **Merlo CA**, Rand CS, Wise RA, Kirk GD. A randomized study of contingency management and spirometric lung age for motivating smoking cessation among injection drug users. BMC Public Health 2014; 14: 761-2458-14-761.

47.    Fischer WA, Drummond MB, **Merlo CA**, Thomas DL, Brown R, Mehta SH, Wise RA, Kirk GD. Hepatitis C virus infection is not an independent risk factor for obstructive lung disease. COPD 2014; 11: 10-16.

48.    Gashouta MA, **Merlo CA**, Pipeling MR, McDyer JF, Hayanga JW, Orens JB, Girgis RE. Serial monitoring of exhaled nitric oxide in lung transplant recipients. J Heart Lung Transplant 2014.

49.    Hulbert A, Hooker CM, Keruly JC, Brown T, Horton K, Fishman E, Rodgers K, Lee B, Sam C, Tsai S, Weihe E, Pridham G, Drummond B, **Merlo C**, Geronimo M, Porter M, Cox S, Li D, Harline M, Teran M, Wrangle J, Mudge B, Taylor G, Kirk GD, Herman JG, Moore RD, Brown RH, Brock MV. Prospective CT screening for lung cancer in a high-risk population: HIV-positive smokers. J Thorac Oncol 2014; 9: 752-759.

50.    Kilic A, Conte JV, Baumgartner WA, Russell SD, **Merlo CA**, Shah AS. Does recipient age impact functional outcomes of orthotopic heart transplantation? Ann Thorac Surg 2014; 97: 1636-1642.

51.    **Merlo CA**, Yin LX, Hoag JB, Mitchell SE, Reh DD. The effects of epistaxis on health-related quality of life in patients with hereditary hemorrhagic telangiectasia. Int Forum Allergy Rhinol 2014; 4: 921-925.

52.    Popescu I, Drummond MB, Gama L, Coon T, **Merlo CA**, Wise RA, Clements JE, Kirk GD, McDyer JF. Activation- induced cell death drives profound lung CD4(+) T-cell depletion in HIV-associated chronic obstructive pulmonary disease. Am J Respir Crit Care Med 2014; 190: 744-755.

53.    Reh DD, Yin LX, Laaeq K, **Merlo CA**. A new endoscopic staging system for hereditary hemorrhagic telangiectasia. Int Forum Allergy Rhinol 2014; 4: 635-639.

54.    Grimm JC, Valero V,3rd, Kilic A, Crawford TC, Conte JV, **Merlo CA**, Shah PD, Shah AS. Preoperative performance status impacts perioperative morbidity and mortality after lung transplantation. Ann Thorac Surg 2015; 99: 482-489.

55.    **Merlo CA**, Clark SC, Arnaoutakis GJ, Yonan N, Thomas D, Simon A, Thompson R, Thomas H, Orens JB, Shah AS. National health care delivery systems influence lung transplant outcomes for cystic fibrosis. American Journal of Transplantation 2015; Epub March 24.

56.    Braun AT, Dasenbrook EC, Shah AS, Orens JB, **Merlo CA**. Impact of lung allocation score on survival in cystic fibrosis lung transplant recipients. J Heart Lung Transplant. 2015; Epub Jun 11.

57.    Grimm JC, Valero V 3rd, Kilic A, Magruder JT, **Merlo CA**, Shah PD, Shah AS. Association Between Prolonged Graft Ischemia and Primary Graft Failure or Survival Following Lung Transplantation. JAMA Surg. 2015 Jun;150(6):547-53. doi: 10.1001/jamasurg.2015.12. PubMed PMID: 25874575.

58.    Yin LX, Reh DD, Hoag JB, Mitchell SE, Mathai SC, Robinson GM, **Merlo CA**. The minimal important difference of the epistaxis severity score in hereditary hemorrhagic telangiectasia. Laryngoscope. 2015; Epub Sep 22.

59.    Grimm JC, Valero V 3rd, Magruder JT, Kilic A, Dungan SP, Silhan LL, Shah PD, Kim BS, **Merlo CA**, Sciortino CM, Shah AS. A novel risk score that incorporates recipient and donor variables to predict 1-year mortality in the current era of lung transplantation.J Heart Lung Transplant. 2015 Nov;34(11):1449-54. doi: 10.1016/j.healun.2015.07.001. Epub 2015 Jul 22. PubMed PMID: 26275639.

60.    Walker-Sperling VE, **Merlo CA**, Buckheit RW 3rd, Lambert A, Tarwater P, Kirk GD, Drummond MB, Blankson JN. HIV Controller T Cells Effectively Inhibit Viral Replication in Alveolar Macrophages. AIDS Res Hum Retroviruses. 2016 Aug 2. [Epub ahead of print] PubMed PMID: 27353255.

61.    Mock JR, Kolb TM, Illei PB, Yang SC, Lederman HM, **Merlo CA**. Bronchus-associated Lymphoid Tissue in Kabuki Syndrome with Associated Hyper-IgM Syndrome/Common Variable Immunodeficiency. Am J Respir Crit Care Med. 2016 Aug 15;194(4):514-5. doi: 10.1164/rccm.201511-2305IM. PubMed PMID: 27275756.

62.    Popescu I, Drummond MB, Gama L, Lambert A, Hoji A, Coon T, **Merlo CA**, Wise RA, Keruly J, Clements JE,

P1.02018.52

Kirk GD, McDyer JF. HIV Suppression Restores the Lung Mucosal CD4+ T-Cell Viral Immune Response and Resolves CD8+ T-Cell Alveolitis in Patients at Risk for HIV-Associated Chronic Obstructive Pulmonary Disease. J Infect Dis. 2016 Nov 15;214(10):1520-1530. Epub 2016 Sep 9. PubMed PMID: 27613775; PubMed Central PMCID: PMC5091376.

63.     Walker-Sperling VE, **Merlo CA**, Buckheit RW 3rd, Lambert A, Tarwater P, Kirk GD, Drummond MB, Blankson JN. Short Communication: HIV Controller T Cells Effectively Inhibit Viral Replication in Alveolar Macrophages. AIDS Res Hum Retroviruses. 2016 Oct/Nov;32(10-11):1097-1099. Epub 2016 Aug 2. PubMed PMID: 27353255; PubMed Central PMCID: PMC5067835.

64.     Whitehead KJ, Sautter NB, McWilliams JP, Chakinala MM, **Merlo CA**, Johnson MH, James M, Everett EM, Clancy MS, Faughnan ME, Oh SP, Olitsky SE, Pyeritz RE, Gossage JR. Effect of Topical Intranasal Therapy on Epistaxis Frequency in Patients With Hereditary Hemorrhagic Telangiectasia: A Randomized Clinical Trial. JAMA. 2016 Sep 6;316(9):943-51. doi: 10.1001/jama.2016.11724. PubMed PMID: 27599329.

65.     Magruder JT, Crawford TC, Grimm JC, Kim B, Shah AS, Bush EL, Higgins RS, **Merlo CA**. Risk Factors for De Novo Malignancy Following Lung Transplantation. Am J Transplant. 2017 Jan;17(1):227-238. doi: 10.1111/ajt.13925. Epub 2016 Aug 25. PubMed PMID: 27321167.

66.     Magruder JT, Shah AS, Crawford TC, Grimm JC, Kim B, Orens JB, Bush EL, Higgins RS, **Merlo CA**. Simulated Regionalization of Heart and Lung Transplantation in the United States. Am J Transplant. 2017 Feb;17(2):485-495. doi: 10.1111/ajt.13967. Epub 2016 Sep 12. PubMed PMID: 27618731.

67.     Drummond MB, Lambert AA, Hussien AF, Lin CT, **Merlo CA**, Wise RA, Kirk GD, Brown RH. HIV Infection Is Independently Associated with Increased CT Scan Lung Density. Acad Radiol. 2017 Feb;24(2):137-145. doi: 10.1016/j.acra.2016.09.019. Epub 2016 Nov 18. PubMed PMID: 27876271; PubMed Central PMCID: PMC5237394.

68.     Jennings MT, Dezube R, Paranjape S, West NE, Hong G, Braun A, Grant J, **Merlo CA**, Lechtzin N. An Observational Study of Outcomes and Tolerances in Patients with Cystic Fibrosis Initiated on Lumacaftor/Ivacaftor. Ann Am Thorac Soc. 2017 Apr 13. doi: 10.1513/AnnalsATS.201701-058OC. [Epub ahead of print] PubMed PMID: 28406713.

69.     Jennings MT, Dasenbrook EC, Lechtzin N, Boyle MP, **Merlo CA**. Risk factors for persistent methicillin-resistant Staphylococcus aureus infection in cystic fibrosis. J Cyst Fibros. 2017 Apr 23. pii: S1569-1993(17)30106-6. doi: 10.1016/j.jcf.2017.04.010. [Epub ahead of print] PubMed PMID: 28446387.

70.     Crawford TC, Grimm JC, Magruder JT, Ha J, Sciortino CM, Kim BS, Bush EL, Conte JV, Higgins RS, Shah AS, **Merlo CA**. Lung Transplant Mortality Is Improving in Recipients With a Lung Allocation Score in the Upper Quartile. Ann Thorac Surg. 2017 May;103(5):1607-1613. doi: 10.1016/j.athoracsur.2016.11.057. Epub 2017 Feb 21. PubMed PMID: 28223052.

71.     Crawford TC, Magruder JT, Grimm JC, Suarez-Pierre A, Zhou X, Ha JS, Higgins RS, Broderick SR, Orens JB, Shah P, **Merlo CA**, Kim BS, Bush EL. Impaired Renal Function Should Not Be a Barrier to Transplantation in Patients With Cystic Fibrosis. Ann Thorac Surg. 2017 Aug 16. pii: S0003-4975(17)30707-5. doi: 10.1016/j.athoracsur.2017.05.032. [Epub ahead of print] PubMed PMID: 28822537.

72.     Reed RM, Cabral HJ, Dransfield MT, Eberlein M, Merlo CA, Mulligan MJ, Netzer G, Sanchez PG, Scharf SM, Sin DD, Celli BR. Survival of Lung Transplant Candidates With COPD: BODE Score Reconsidered. Chest. 2018 Mar;153(3):697-701.

73.     Orens JB, Merlo CA. Selection of Candidates for Lung Transplantation and Controversial Issues. Semin Respir Crit Care Med. 2018 Apr;39(2):117-125.

74.     Crawford TC, Lui C, Magruder JT, Ha JS, Higgins RS, Merlo CA, Kim BS, Bush EL. Five-year mortality hazard is reduced in chronic obstructive pulmonary disease patients receiving double- versus single-lung transplants. J Surg Res. 2018 Jun 2.

75.     Hong G, Psoter KJ, Jennings MT, Merlo CA, Boyle MP, Hadjiliadis D, Kawut SM, Lechtzin N. Risk factors for persistent Aspergillus respiratory isolation in cystic fibrosis. J Cyst Fibros. 2018 Sep;17(5):624-630.

76.     Crawford TC, Lui C, Magruder JT, Suarez-Pierre A, Ha JS, Higgins RS, Broderick SR, Merlo CA, Kim BS, Bush EL. Traumatically Brain-Injured Donors and the Impact on Lung Transplantation Survival. Ann Thorac Surg. 2018 Sep;106(3):842-847.

77.     Hsu J, Krishnan A, Lin CT, Shah PD, Broderick SR, Higgins RSD, Merlo CA, Bush EL.Sarcopenia of the Psoas Muscles is Associated with Poor Outcomes Following Lung Transplantation. Ann Thorac Surg. 2018 Nov 14;.

78.     Sharma N, Evans TA, Pellicore MJ, Davis E, Aksit MA, McCague AF, Joynt AT, Lu Z, Han ST, Anzmann AF, Lam AN, Thaxton A, West N, Merlo C, Gottschalk LB, Raraigh KS, Sonsay PR, Cotton CU, Cutting GR. Capitalizing on the heterogeneous effects of CFTR nonsense and frameshift variants to inform therapeutic strategy for cystic fibrosis.PLoS Genet. 2018 Nov;14(11):e1007723.

5

79.     Fraser CD 3rd, Zhou X, Grimm JC, Suarez-Pierre A, Crawford TC, Lui C, Bush EL, Hibino N, Jacobs ML, Vricella LA, Merlo C. Size Mismatching Increases Mortality Following Lung Transplantation in Pre-Adolescent Patients. Ann Thorac Surg. 2019 Feb 11;.

**Invited Reviews**
1.     **Merlo CA**, Boyle MP. Modifier genes in cystic fibrosis lung disease. J Lab Clin Med 2003;141:237-41.
2.     **Merlo CA**, Orens JB. Candidate selection, overall results, and choosing the right operation. Semin Respir Crit Care Med 2010;31:99-107.
3.     Braun AT, **Merlo CA**. Cystic fibrosis lung transplantation. Curr Opin Pulm Med 2011;17:467-72.
4.     Kirk GD, **Merlo CA**, For the Lung HIV Study Group. HIV infection in the etiology of lung cancer: confounding, causality, and consequences. Proc Am Thorac Soc 2011;8:326-32.
5.     Lambert AA, **Merlo CA**, Kirk GD. Human immunodeficiency virus-associated lung malignancies. Clin Chest Med 2013;34:255-72.

**Inventions, Patents, Copyrights**
2010     **Merlo CA**, Reh DR, Hoag JB. Method and severity scale for measuring epistaxis among patients with hereditary hemorrhagic telangiectasia (HHT). Used worldwide as a primary outcome in HHT interventional clinical trials.

**Extramural Sponsorship (current, pending, previous)**

**Current Grants**

| | |
|---|---|
| 09/26/13 – 07/31/18 | Immune Mechanisms of HIV-associated COPD |
| | U01HL121814 |
| | NIH |
| | $505,539 |
| | PI: Gregory Kirk, MD PhD (Johns Hopkins School of Public Health) |
| | Role: Co-I |
| | 0.60 calendar months |
| | This proposal directly addresses critical gaps in our understanding of the clinical spectrum and consequences of HIV-associated COPD and will identify key biologic mechanisms contributing to the disease. Findings will inform the clinical management and development of interventions targeting HIV associated COPD, and may also inform broader strategies for COPD in non-HIV infected populations. |
| 07/01/14 – 06/30/19 | Clinical Risk Factors for Primary Graft Dysfunction |
| | R01HL087115 |
| | NIH subaward |
| | $19,984 |
| | PI: Jason Christie, MD (University of Pennsylvania) |
| | Role: Co-I |
| | 0.12 calendar months |
| | The major goal of this multicenter study is to define risk factors for the development of primary graft dysfunction following lung transplantation. |
| 09/01/14 – 08/31/18 | Predictors, consequences and mechanisms of accelerated lung aging in HIV |
| | R01HL126549 |
| | NIH |
| | $499,997 |
| | PI: Gregory Kirk, MD PhD (Johns Hopkins School of Public Health) |
| | Role: Co-I |
| | 0.60 calendar months |
| | The goal of this program is to establish risk factors, associated co-morbidities, and immunologic and inflammatory biomarkers associated with accelerated decline in lung function in the SHIELD cohort of HIV-positive inner-city intravenous drug users. |
| 07/01/15 – 06/30/18 | Transition of Care for Patients with Cystic Fibrosis who Undergo Lung Transplantation |
| | Spruance Foundation II Discovery Fund |

**P1.02018.54**

$300,000
PI: Christian Merlo, MD MPH
2.4 calendar months
The major goal of this proposal is to identify factors which may help to improve the process of lung transplantation for patients with cystic fibrosis.

**Previous**

| | |
|---|---|
| 07/01/03 – 06/30/04 | Gene Expression Analysis of Nasal Respiratory Epithelial Cells in ΔF508/ΔF508 Individuals with Mild and Severe Cystic Fibrosis Lung Disease<br>Bauernschmidt Fellowship in Pulmonary Disease<br>Eudowood Foundation<br>$35000<br>Role: PI<br>The goal of this study was to evaluate differences in gene expression between patients with cystic fibrosis with mild and severe lung disease. |
| 07/01/04 – 06/30/07 | The Effect of Multiple Antibiotic Resistant *Pseudomonas aeruginosa* on Outcomes in Cystic Fibrosis<br>The Harry Shwachman Clinical Investigator Award<br>Cystic Fibrosis Foundation<br>$270000<br>Role: PI<br>6.0 calendar months<br>The goal of this study was to evaluate the impact of multiple antibiotic resistant *Pseudomonas aeruginosa* (MARPA) on outcomes among patients with cystic fibrosis. |
| 07/01/06 – 06/30/07 | Emphysema and HIV infection within the ALIVE cohort in Baltimore<br>Thomas and Carol McCann Innovative research Fund for Asthma and Respiratory Disease<br>$35000<br>Role: Co-PI<br>The main goal of this study was to evaluate the association between emphysema and HIV infection among the ALIVE cohort in Baltimore. |
| 01/01/08 – 12/30/12 | The Study of HIV Infection in the Etiology of Lung Disease (SHIELD)<br>RFAHL07008<br>NIH<br>$549,598<br>PI: Gregory Kirk, MD PhD (Johns Hopkins School of Public Health)<br>Role: Co-PI<br>0.60 calendar months |
| 06/01/11 – 02/28/15 | North American Study of Epistaxis in HHT (NOSE)<br>Hereditary Hemorrhagic Telangiectasia Foundation<br>$11,126<br>Role: site PI<br>0.12 calendar months<br>This was a multicenter randomized placebo-controlled trial comparing bevacizumab, estrogen, tranexamic acid, and placebo in patients with HHT-related epistaxis. |
| 09/06/12 – 06/30/14 | Using mHealth to Respond Early to Acute Exacerbations of COPD in HIV mREACH<br>R34HL117349<br>NIH<br>$376,291<br>PI: Gregory Kirk, MD PhD (Johns Hopkins School of Public Health)<br>Role: Co-I<br>0.60 calendar months |

7

**P1.02018.55**

This clinical trial planning grant evaluated the feasibility, acceptability and defined optimal trial elements for an m-Health intervention to identify early exacerbations in HIV-COPD to improve management and clinical outcomes.

**Research Program Building / Leadership:**

2010-present     Associate Program Director for Scholarship, Osler Residency Program, Johns Hopkins University School of Medicine.  In my capacity, I am responsible for the research experience for the Osler House Staff thoughout residency training.  This involves one on one meetings to discuss research interests and goals, an online lecture series providing an introduction to research, pairing with faculty mentors, mentorship in the presentation of research projects at local and national meetings, collecting data highlighting scholarly activity, and reporting these data to the Director for internal use as well as for ACGME purposes.

2010-present     Director of Research, The Johns Hopkins Lung Transplant Program.  In my capacity, I am responsible for coordination of research efforts within the lung transplant program.  This involves multidisciplinary projects spanning across many disciplines (Medicine, Surgery, Rehabilitation, Psychology, Epidemiology) as well as across different levels of training from faculty, fellows, residents, and medical students.

2010-2018        Director, Hereditary Hemorrhagic Telangiectasia Center of Excellence.  In my capacity, I am responsible for the coordination of multicenter clinical trials as well as local investigations among patients with HHT.  Our center was responsible for creation of an epistaxis severity score (HHT-ESS), the first objective measure of epistaxis severity, now used worldwide clinically as well as an outcome measure in HHT clinical investigations.

2016-present     Associate Director, The Johns Hopkins Adult Cystic Fibrosis Program.  In my capacity, I am responsible for the coordination of aspects of clinical and research coordination for our cystic fibrosis program.

2016-present     Director of Research, The Johns Hopkins Adult Cystic Fibrosis Program.  In my capacity, I am responsible for coordination of research efforts within the Adult CF program.  This involves multidisciplinary projects spanning across many disciplines (Medicine, Surgery, Psychology, Epidemiology) as well as across different levels of training from faculty, fellows, residents, and medical students.

## EDUCATIONAL ACTIVITIES

**Educational Publications**

**Peer-reviewed, original, educational publications –** None

**Review Articles –** None

**Editorials –** None

**Case Reports**

1.   **Merlo CA**, Studer SM, Conte JV, Yang SC, Sonnett J, Orens JB. The course of neurofibromatosis type 1 on immunosuppression after lung transplantation: report of 2 cases. J Heart Lung Transplant 2004; 23: 774-776.
2.   Houston B, Reiss KA, **Merlo C**. Healthy, but comatose. Am J Med 2011; 124: 303-305.

**Book and Book Chapters**
1.   **Merlo CA**, Boyle MP.  "Adult Cystic Fibrosis".  In The Osler Medical Handbook.  Mosby.  Philadelphia: 60, 899-911, 2003.
2.   **Merlo CA**, Terry PB.  Concise Review: Diagnosis and management of pulmonary arteriovenous malformations.  In Harrison's Online.  2002.  http://www.harrisonsonline.com.
3.   **Merlo CA**, Hansel N.  "Have a working knowledge of EMTALA laws as they apply to the ICU. How to be a good referring and accepting ICU physician".  In Avoiding Common ICU Errors.  Lippincott. 2008.
4.   **Merlo CA**.  Critical Care Medicine.  In First Aid for the Internal Medicine Boards.  McGraw-Hill.  New York: 16, 123-132, 2010.

**P1.02018.56**

5.     **Merlo CA**. Pulmonary Medicine. In First Aid for the Internal Medicine Boards. McGraw-Hill. New York: 4, 553-580, 2010.

6.     Dasenbrook EC, **Merlo CA**. "Cystic Fibrosis and Bronchiectasis". In Lung Transplantation. Informa. 2010.

7.     Hayes M, **Merlo CA**. "Hemoptysis". The Principles and Practice of Hospital Medicine, 1st Edition, Sylvia C. McKean, Editor-in-Chief, McGraw-Hill publishers.

8.     **Merlo CA**. "Diffuse Parenchymal Lung Disease." In Current Therapy in Thoracic and Cardiovascular Surgery. Mosby 2013.

9.     **Merlo CA**, Terry PB. "Chest X-Ray Review". In The Johns Hopkins Internal Medical Board Review. Mosby. 2015

**Letters, correspondence** - None

**Other Media -** None

**Teaching**

**Classroom instruction**

| | |
|---|---|
| 2003-2010 | Pulmonary physiology small group facilitator, Johns Hopkins University School of Medicine, Baltimore, MD. |
| 2003-2010 | Pulmonary pathophysiology small group facilitator, Johns Hopkins University School of Medicine, Baltimore, MD. |
| 2004-2010 | Good Samaritan Internal Medicine Program Guest Lectures – Cystic Fibrosis, Pulmonary Function Testing, Baltimore, MD. |
| 2004-present | Lecturer, Carol Johns Service (Inpatient Pulmonary Service) – Lecture monthly about Cystic Fibrosis and Lung Transplantation to medical students, residents, and fellows as part of the core curriculum on the inpatient pulmonary service, Johns Hopkins University School of Medicine, Baltimore, MD. |
| 2004-present | Lecturer, Pulmonary and Critical Care Medicine Fellow's Core Conference – Cystic Fibrosis, Lung Transplantation, Hereditary Hemorrhagic Telangiectasia, and Noninfectious Pulmonary Complications of HIV, Johns Hopkins University School of Medicine, Baltimore, MD. |
| 2006-2014 | Chest Radiography Conference Director – Lecture weekly for 10-15 Pulmonary and Critical Care Medicine fellows regarding the reading of chest radiographs and computed tomography, Johns Hopkins University School of Medicine, Baltimore, MD. |

**Clinical Instruction**

| | |
|---|---|
| 2004-present | Medical Intensive Care Unit. Attending physician 4 to 6 weeks per year, Johns Hopkins. |
| 2004-present | Pulmonary Consultation Service. Attending physician four weeks per year, Johns Hopkins. |
| 2004-present | Lung Transplantation and Pulmonary Hypertension Service. Attending physician 8 weeks per year, Johns Hopkins. |
| 2004-present | Pulmonary Physiology Service. Attending physician four weeks per year, Johns Hopkins. |
| 2005-present | Janeway Firm Faculty. Teaching Attending 4 weeks per year, Johns Hopkins. |

**CME Instruction**

| | |
|---|---|
| 5/06 | PFT interpretation, Topics/Tumulty Rounds, Johns Hopkins, Baltimore, MD. |
| 4/06 | Challenging infections among adults with cystic fibrosis. Medical Grand Rounds. Johns Hopkins, Baltimore, MD |
| 8/07 | Update in Pulmonary and Critical Care Medicine, Johns Hopkins, Williamsburg VA. |
| 1/07 | Cough for the Allergist, Allergy Symposium, Bayview Medical Center, Baltimore, MD. |
| 7/08 | Update in Pulmonary and Critical Care Medicine, Johns Hopkins, Bar Harbor ME. |
| 2/09 | Hereditary Hemorrhagic Telangiectasia- A Fresh Start to an Old Disease. Medical Grand Rounds. Johns Hopkins, Baltimore, MD. |
| 7/09 | Update in Pulmonary and Critical Care Medicine, Johns Hopkins, Washington DC. |
| 1/10 | An update in Cystic Fibrosis, Allergy Lecture Series, Johns Hopkins, Baltimore, MD. |
| 4/12 | Nutritional Considerations after Lung Transplantation in Cystic Fibrosis. Nutrition Grand Rounds. Johns Hopkins, Baltimore, MD. |
| 9/12 | Hereditary Hemorrhagic Telangiectasia. Medical Grand Rounds. Johns Hopkins Bayview. Baltimore, MD. |
| 5/14 | A Curious Case of Hypoxemia, Topics/Tumulty Rounds, Johns Hopkins, Baltimore, MD. |

9

9/14            Creating a Common Language in Cystic Fibrosis to Improve Adherence, Lecturer, Med-IQ.  www.med-iq.com/a796

**Workshops/ Seminars**

5/08            Invited Lecturer, Observational Studies, Short Course in Epidemiology. American Thoracic Society, Toronto, ON.

10/09           Symposium Chairperson, Infectious Complications in Cystic Fibrosis.  North American Cystic Fibrosis Conference, Minneapolis MN.

10/10           Symposium Chairperson, End Stage Lung Disease in CF: From Lung transplantation to Paliative Care, North American Cystic Fibrosis Conference, Baltimore, MD.

10/10           Invited Lecturer.  Rise and Shine Workshop Management of Hemoptysis and Pneumothorax in Cystic Fibrosis.  North American Cystic Fibrosis Conference, Baltimore, MD.

**Mentoring**

Advisees

2006-2010       Elliott Dasenbrook, MD MHS, Post-doctoral Fellow, Pulmonary and Critical Care Medicine Johns Hopkins University, currently Assistant Professor of Medicine at Case Western Reserve, Cleveland, OH.

2006-2010       Jeffrey Hoag, MD, Post-doctoral Fellow, Pulmonary and Critical Care Medicine, Johns Hopkins University, currently Assistant Professor of Medicine at Drexel University, Philadelphia, PA.

2008-2011       Brad Drummond, MD MHS, Post-doctoral Fellow, Pulmonary and Critical Care Medicine, Johns Hopkins University, currently Assistant Professor of Medicine, Johns Hopkins University, Baltimore MD.

2008-2012       Natalie West, MD MHS, Post-doctoral Fellow, Pulmonary and Critical Care Medicine, Johns Hopkins University, currently Assistant Professor of Medicine at Johns Hopkins University, Baltimore, MD.

2009-2011       Eric Weiss, MD MPH, Master's of Public Health student at Johns Hopkins Bloomberg School of Public Health, currently Assistant Professor of Surgery (adjunct) at Columbia College of Physicians and Surgeons, New York, NY.

2010-2012       Jeremiah Allen, MD, Resident, Johns Hopkins University, currently Attending Cardiac Surgeon, Kaiser Permanente, San Francisco, CA.

2010-present    Andrew Braun, MD MHS, Post-doctoral Fellow, Pulmonary and Critical Care Medicine, Johns Hopkins University, currently Instructor of Medicine, Johns Hopkins University, Baltimore, MD.

2011-2013       Timothy George, MD, Resident, Johns Hopkins University, currently Resident Surgeon at Johns Hopkins University, Baltimore, MD.

2011-2014       Arman Kilic, MD, Resident, Johns Hopkins University, currently Resident Surgeon, Johns Hopkins University, Baltimore, MD.

2011-present    Mark Jennings, MD, Post-doctoral Fellow, Pulmonary and Critical Care Medicine, Johns Hopkins University, currently Instructor of Medicine, Johns Hopkins University, Baltimore, MD.

2012-2016       Allison Lambert, MD MHS, Post-doctoral Fellow, Pulmonary and Critical Care Medicine, Johns Hopkins University, currently Instructor of Medicine, Johns Hopkins University, Baltimore, MD.

2012-2016       George Arnaoutakis, MD, Resident, Johns Hopkins Universeity, currently Cardiac Surgery Fellow, University of Pennsylvania, Philadelphia, PA.

2014-present    Joshua Grimm, MD, Resident, Johns Hopkins University, currently Resident Surgeon, Johns Hopkins University, Baltimore, MD.

2014-present    Linda Yin, Medical student, Johns Hopkins University, currently a medical student at Johns Hopkins University, Baltimore, MD.

2015-present    Todd Crawford, MD, Resident, Johns Hopkins University, currently Resident Surgeon, Johns Hopkins University, Baltimore, MD.

2015-present    Trent Magruder, MD, Resident, Johns Hopkins University, currently Resident Surgeon, Johns Hopkins University, Baltimore, MD.

**Educational Program Building/ Leadership**

2006-present    Course Director, Design of Clinical Studies, Johns Hopkins Bloomberg School of Public Health.  This is an ongoing course available in the 2nd term each year through the Department of Epidemiology in the School of Public Health.  It is part of a series of courses known formally together as the Science of

10

Clinical Investigation series.  Together these courses convey the fundamentals of clinical research.  In my capacity as director, I am responsible each year for the syllabus, lectures, homework assignments, and follow-up questions which arise during the 12-week class.  The course has expanded over the years starting with a class size of about 6-8 to know over 40 per term and now includes physicians, nurses, administrators, and research coordinators.

2012-present    Course Director, Distance Education Design of Clinical Studies, Johns Hopkins Bloomberg School of Public Health.  This is a fully online version of the above course available through the Office of Distance Education in the 3rd term.  Lectures, assignments, and quizzes are all available online.  Live sessions accompany the online media.  This course has also expanded from just a few to over 30 students per session.

**Educational Extramural Funding (Current, Pending, Previous) -** None

**CLINICAL ACTIVITIES**

**Certification**

Medical
| 1998 | Medical License, Commonwealth of Virginia | 0101057430 | Inactive |
| 1999 | Medical License, District of Columbia | MD31720 | Inactive |
| 2004-present | Medical License, Maryland | D0061725 | Active |

Boards
| 2000 | Diplomate, Internal Medicine, American Board of Internal Medicine |
| 2003 | Diplomate, Pulmonary Disease, American Board of Internal Medicine |
| 2005 | Diplomate, Critical Care Medicine, American Board of Internal Medicine |

**Clinical Responsibilities**
| 2004-present | Medical Intensive Care Unit.  Attending physician 4 to 6 weeks per year, JHH. |
| 2004-present | Pulmonary Consultation Service.  Attending physician four weeks per year, JHH. |
| 2004-present | Lung Transplantation and Pulmonary Hypertension Service.  Attending physician 8 weeks per year, JHH. |
| 2004-present | Pulmonary Physiology Service. Attending physician four weeks per year, JHH. |
| 2004-present | Attend in the Adult Cystic Fibrosis Clinic.  One half day per week |
| 2009-present | Attend in HHT Clinic.  One half day per month |
| 2011-present | Attend in the Lung Transplantation Clinic.  One half day per week |

**Clinical Program Building/Leadership**
2010-2018    Director, Johns Hopkins Hereditary Hemorrhagic Telangiectasia Center of Excellence.  In my capacity, I am responsible for the coordination of multidisciplinary care for the patients with HHT that we care for at Johns Hopkins.  Working in partnership with Sally Mitchell, MD, we created the Johns Hopkins HHT Center of Excellence in 2010, one of 17 such centers in the United States.  The center now includes over 35 specialists from 15 Hopkins Departments and Divisions and has increased exponentially in size to include over 400 patients and family members.  The team at Hopkins now consists of a nurse coordinator as well as specialists from nearly every division and department within the Hopkins system.

2015-present    Associate Program Director, Johns Hopkins Adult Cystic Fibrosis Center.  In my capacity, I assist the Program and Center Director in the coordination of care guidelines and the delivery of clinical care in both the inpatient and outpatient settings, assist with coordination of clinical trials, and provide education to medical students, physicians, nurses, respiratory and physical therapists, nutritionists, social workers, patients, and family members regarding the multidisciplinary subspecialty care needed for patients with CF.

**Clinical Extramural Funding (Current, Pending, Previous) -** None

**SYSTEM INNOVATION AND QUALITY IMPROVEMENT ACTIVITIES -** None

11

## ORGANIZATIONAL ACTIVITIES

**Institutional Administrative Appointments**

| | |
|---|---|
| 2003-2005 | Educational Committee, Division of Pulmonary and Critical Care Medicine |
| 2005-present | Faculty Recruitment Committee, Division of Pulmonary and Critical Care |
| 2014-present | Assistant Director of Outpatient Services, Johns Hopkins Division of Pulmonary and Critical Care Medicine |
| 2015-present | Associate Program Director, Adult Cystic Fibrosis Center, Johns Hopkins Cystic Fibrosis Center |

**Editorial Activities -** Not Applicable

**Journal Reviewer**

| | |
|---|---|
| 2009-present | Chest |
| 2009-present | Journal of Heart and Lung Transplant |
| 2009-present | Journal of Cystic Fibrosis |
| 2009-present | European Respiratory Journal |
| 2009-present | American Journal of Transplantation |

**Advisory Committees, Review Groups/Study Sections**

| | |
|---|---|
| 2012-present | Member, Cystic Fibrosis Foundation Grant review Committee |

**Professional Societies**

| | |
|---|---|
| 2004-present | Member, American Thoracic Society |
| 2004-present | Member, American College of Chest Physicians |
| 2010-present | Member, International Society for Heart and Lung Transplant |

**Conference Organizer, Session Chair -** Not Applicable

**Consultantships -** Not Applicable

## RECOGNITION

**Awards, Honors**

| | |
|---|---|
| 1999 | Clinical Pearls Student Teaching Appreciation Award |
| 1999 | The William P. Argy Memorial House Staff Award |
| 2000 | Alpha Omega Alpha, Georgetown University |
| 2003 | DC Thoracic Society Annual Conference Award |
| 2003 | NIH Loan Repayment Program Award for Clinical Research |
| 2005 | Janeway Firm Faculty |
| 2005 | CHEST Foundation's Young Investigator Award |
| 2005 | NIH Loan Repayment Program Award for Clinical Research |
| 2010 | Fellows Teaching Award, Johns Hopkins |

**Invited Talks**

Local/National/International

| | |
|---|---|
| 2005 | Speaker, Medical Grand Rounds. Virginia Hospital Center. "The Care of Adults with Cystic Fibrosis". Arlington, VA |
| 2005 | Speaker, Pulmonary Grand Rounds.  The University of Pittsburgh.  "The influence of environmental and genetic factors on outcomes in cystic fibrosis".  Pittsburgh, PA. |
| 2007 | Plenary Speaker, International Society for Heart and Lung Transplant.  "The effect of the Lung Allocation Score (LAS) on survival after lung transplantation".  San Francisco, CA. |
| 2008 | Speaker, North American Cystic Fibrosis Conference.  "The Impact of the LAS on Outcomes in CF".  Orlando, FL. |
| 2008 | Speaker, Mid Atlantic Thoracic Society Conference.  "Adult Cystic Fibrosis". Richmond, VA. |
| 2009 | Speaker, Hereditary Hemorrhagic Telangiectasia International Scientific Conference.  "Quality of Life among Patients with Hereditary Hemorrhagic Telangiectasia".  Santander, Spain. |
| 2010 | Speaker/ Session Chair, Society for General Internal Medicine.  "Research During Residency- Striking the Balance at Hopkins".  Minneapolis, MN. |

12

**P1.02018.60**

| 2010 | Speaker/ Session Chair, North American Cystic Fibrosis Conference. "Lung Transplantation and Cystic Fibrosis". Baltimore, MD. |
| 2010 | Speaker, Pulmonary Grand Rounds. Brown University. "Hereditary Hemorrhagic Telangiectasia". Providence, RI. |
| 2010 | Speaker, 8th International Congress on Lung Transplantation. "Understanding and Dissecting the Lung Allocation Scoring System". Paris, France. |
| 2012 | Speaker, Medical Grand Rounds. Georgetown University Hospital. "Adult Cystic Fibrosis". Washington, DC. |
| 2012 | Speaker, 16th Annual HHT Patient and Family Day, HHT Foundation, "Understanding Screening for HHT." Orlando, FL. |
| 2013 | Speaker, American Thoracic Society. "Understanding and Dissecting the Lung Allocation Scoring System". Philadelphia, PA. |
| 2013 | Speaker, Cystic Fibrosis Conference Mexico. "Outcomes in Adults with Cystic Fibrosis". Mexico City, Mexico. |
| 2013 | Speaker, Hereditary Hemorrhagic Telangiectasia International Scientific Conference. "Minimal Clinical Important Difference in Epistaxis Severity Score in HHT". Cork, Ireland. |
| 2014 | Speaker, Medical Grand Rounds. Virginia Hospital Center. "Adult Cystic Fibrosis". Arlington, VA. |

**OTHER PROFESSIONAL ACCOMPLISHMENTS**

| 2013 | Washington Post. When should you start worrying about that lingering cough? Give it time. http://www.washingtonpost.com/national/health-science/when-should-you-start-worrying-about-that-lingering-cough-give-it-time/2013/12/20/1e615e9c-665d-11e3-ae56-22de072140a2_story.html |
| 2013 | Hopkins Medicine. For Lung Transplant, Researchers Surprised to Learn Bigger Appears to Be Better. http://www.hopkinsmedicine.org/news/media/releases/for_lung_transplant_researchers_surprised_to_learn_bigger_appears_to_be_better_ |
| 2014 | Cover photograph entitled "A View of the Dome". Annals of the American Thoracic Society, Volume 11, Issue 5. http://www.atsjournals.org/toc/annalsats/11/5 |
| 2014 | Johns Hopkins Health. Calming that cough. http://www.hopkinsmedicine.org/news/publications/johns_hopkins_health/fall_2014/calming_that_cough |
| 2015 | EurekAlert! Lung transplant patients in the UK fare better than publicly insured Americans. http://www.eurekalert.org/pub_releases/2015-03/jhm-ltp031915.php |

13

**P1.02018.61**

# APPENDIX B

## APPENDIX B

List of Literature Review and Materials Considered by Dr. Christian Merlo

1. Abenhaim et al., *Appetite-Suppressant Drugs and the Risk of Primary Pulmonary Hypertension.* (1996) 335(9) N Engl J Med 609
2. Berge et al., *Genital use of talc and risk of ovarian cancer: a meta-analysis.* (2018) 27 Eur J Cancer Prev 248
3. Booth et al., *Risk factors for ovarian cancer: a case-control study.* (1989) 60(4) Br J Cancer. 592
4. Centers for Disease Control & Prevention, Principles of Epidemiology in Public Health Practice, Third Edition, An Introduction to Applied Epidemiology and Biostatistics, Lesson 1: Introduction to Epidemiology, https://www.cdc.gov/ophss/csels/dsepd/ss1978/lesson1/section1.html
5. Chang & Risch,. *Perineal talc exposure and risk of ovarian carcinoma.* (1997) 79(12) Cancer. 2396
6. Chen et al., *Risk factors for epithelial ovarian cancer in Beijing, China.* (1992) 21(1) Int J Epidemiol. 23
7. Cook et al., *Perineal powder exposure and the risk of ovarian cancer.* (1997) 145(5) Am J Epidemiol. 459
8. Cramer & Xu, *Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer.* (1995) 5 Ann Epidemiol. 310
9. Cramer et al., *Ovarian cancer and talc: a case-control study.* (1982) 50(2) Cancer 372
10. Cramer et al., *The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States.* (2016) 27(3) Epidemiology 334
11. Cramer et al., *Genital talc exposure and risk of ovarian cancer.* (1999) 81(3) Int J Cancer. 351
12. Deposition of Anne McTiernan, M.D., Ph.D., Jan. 28, 2019 (MDL No. 2738)
13. Deposition of April Zambelli-Weiner, Ph.D., Jan. 11, 2019 (MDL No. 2738)
14. Deposition of April Zambelli-Weiner, Ph.D., Feb. 7, 2019 (MDL No. 2738)
15. Deposition of Ghassan Saed, Ph.D., Jan. 23, 2019 (MDL No. 2738)
16. Deposition of Ghassan Saed, Ph.D., Feb. 14, 2019 (MDL No. 2738)
17. Deposition of Jack Siemiatycki, Jan. 31, 2019 (MDL No. 2738)
18. Deposition of Rebecca Smith-Bindman, M.D., Feb. 7, 2019 (MDL No. 2738)
19. Deposition of Rebecca Smith-Bindman, M.D., Feb. 8, 2019 (MDL No. 2738)
20. Deposition of Patricia Moorman, M.S.P.H., Ph.D., Jan. 25, 2019 (MDL No. 2738)
21. Deposition of Sonal Singh, M.D., M.P.H., Jan. 16, 2019 (MDL No. 2738)
22. Doll & Hill, *The mortality of doctors in relation to their smoking habits.* (1954) 328 (7455) BMJ 1529
23. Expert Report of Anne McTiernan, M.D., Ph.D., Nov. 16, 2018 (MDL No. 2738)
24. Expert Report of April Zambelli-Weiner, Ph.D., M.P.H., Nov. 16, 2018 (MDL No. 2738)
25. Expert Report of Ghassan Saed, Ph.D., Nov. 16, 2018 (MDL No. 2738)
26. Expert Report of Jack Siemiatycki, M.Sc., Ph.D., Nov. 16, 2018 (MDL No. 2738)
27. Expert Report of Patricia Moorman, M.S.P.H., Ph.D., Nov. 16, 2018 (MDL No. 2738)
28. Expert Report of Rebecca Smith-Bindman, M.D., Nov. 15, 2019 (MDL No. 2738)
29. Expert Report of Sonal Singh, M.D., M.P.H., Nov. 16, 2018 (MDL No. 2738)

1

30. Gates et al., *Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype.* (2010) 171 Am. J. Epidemiology 45

31. Gates et al., *Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer.* (2008) 17(9) Cancer Epidemiol Biomarkers 2436

32. Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer.* (2000) 92 J. Nat. Cancer Inst. 249

33. Godard et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study.* (1998) 179(2) Am J Obstet Gynecol. 403

34. Gonzalez et al., *Douching, Talc Use, and Risk of Ovarian Cancer.* (2016) 27 Epidemiology 797

35. Green A, Purdie D, Bain C, et al., *Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group.* (1997) 71(6) Int J Cancer. 948

36. Grimes & Schultz, *Bias and causal associations in observational research.* (2002) 259(9302) Lancet 248

37. Gross & Berg, *A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer.* (1995) 5(2) J Expo Anal Environ Epidemiol. 181

38. Harlow & Weiss, *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc.* (1989) 130(2) Am J Epidemiol. 390

39. Harlow et al., *Perineal exposure to talc and ovarian cancer risk.* (1992) 80(1) Obstet Gynecol. 19

40. Hartge & Stewart., *Occupation and ovarian cancer: a case-control study in the Washington, DC, metropolitan area, 1978-1981.* (1994) 36(8) J Occup Med. 924

41. Hartge et al., *Talc and Ovarian Cancer,* (1983) 250 J. Am. Med. Ass'n 1844

42. Hill, *Environment and disease: association or causation?* (1965) 58 Proc Royal Soc Med. 295

43. Houghton et al., *Perineal Powder Use and Risk of Ovarian Cancer.* (2014) 106(9) J Nat. Cancer Inst

44. Huncharek et al., *Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-analysis of 11,933 Subjects from Sixteen Observational Studies.* (2003) 23 Anticancer Res. 1955

45. Huncharek et al., *Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies.* (2007) 18 Eur J Cancer Prev 422

46. Infante-Rivard, *Hospital or Population Controls for Case-Control Studies of Sever Childhood Diseases?* (2003) 157(2) Am J Epidemiol 176

47. Jordan et al., *Risk factors for benign, borderline and invasive mucinous ovarian tumors: Epidemiological evidence of a neoplastic continuum?* (2007) 107 Gynecol. Oncol. 223

48. Jordan et al., *Risk factors for benign serous and mucinous epithelial ovarian tumors.* (2007) 109(3) Obstet Gynecol. 647

49. Kurta et al., *Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a U.S.-Based Case-Control Study.* (2012) 21(8) Cancer Epidemiol Biomarkers Prev. 1282

50. Langseth et al., *Perineal use of talc and risk of ovarian cancer.* (2008) 62 J Epidemiol Community Health 358

51. Malmberg et al., *Serous tubal intraepithelial carcinoma, chronic fallopian tube injury, and serous carcinoma development.* (2016) 468(6) Virchows Arch. 707-13

52. Merritt et al., *Talcum Powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer.* (2008) 122 Int'l J. Cancer 170

2

53. Mills et al., *Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California.* (2004) 112 Int'l J. Cancer 458

54. Moorman et al., *Ovarian Cancer Risk Factors in African-American and White Women.* (2009) 170(5) Am J Epidemiol 598

55. Narod, *Talc and ovarian cancer.* (2016) 141 Gynecol. Oncol. 410

56. Nat. Cancer Inst., *Cancer Stat Facts: Ovarian Cancer,* https://seer.cancer.gov/statfacts/html/ovary.html

57. Nat. Cancer Inst., *Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ) – Health Professional Version,* https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#link/_220_toc (last updated Jan. 4, 2019)

58. Nat. Health & Medical Res. Council, *NHMRC Levels of Evidence and Grades for Recommendations for Developers of Clinical Practice Guidelines* (2009)

59. Ness et al., *Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer.* (2000) 11(2) Epidemiology 111

60. Oleckno, *Epidemiology: Concepts and Methods.* (2008)

61. Penninkilampi and Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis.* (2018) 29(1) Epidemiology 41

62. Pike et al., *Hormonal factors and the risk of invasive ovarian cancer: a population-based case-control study.* (2004) 82(1) Fertil Steril. 186

63. Purdie et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study.* Survey of Women's Health Study Group. (1995) 62(6) Int J Cancer. 678

64. Rosenblatt et al., *Genital powder exposure and the risk of epithelial ovarian cancer.* (2011) 22 Cancer Causes Control 737

65. Rosenblatt et al., *Mineral Fiber Exposure and the Development of Ovarian Cancer,* (1992) 45 Gynecologic Oncology 20

66. Rosenblatt et al., *Characteristics of women who use perineal powders.* (1998) 92(5) Obstet Gynecol 753

67. Schildkraut et al., *Association between Body Powder Use and Ovarian Cancer: The African American Caner Epidemiology Study (AACES).* (2016) 25(10) Cancer Epidemiol Biomarkers Prev. 1411

68. Schlesselman, *Case-control studies: design, conduct, analysis* (1982)

69. Schultz & Grimes, *Case-control studies: research in reverse.* (2002) 359(9304) Lancet 431

70. Shushan et al., *Human menopausal gonadotropin and the risk of epithelial ovarian cancer\*.* (1996) 65(1) Fertil Steril. 13

71. Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls.* (2013) 6(8) Cancer Prev Res 811

72. The Scandinavian Simvastatin Survival Study Group. *Design and baseline results of the Scandinavian Simvastatin Survival Study of patients with stable angina and/or previous myocardial infarction.* (1993) 71 Am J Cardiol 393

73. Tzonou et al., *Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer.* (1993) 55(3) Int J Cancer. 408

74. Vavken & Dorotka, *A Systematic Review of Conflicting Meta-Analyses in Orthopaedic Surgery.* (2009) 467(10) Clin Orthop Relat Res. 2723

3

**P1.02018.65**

75. Vetter & Mascha, *Bias, Confounding, and Interaction: Lions and Tigers, and Bears, Oh My!,* (2017) 125(3) Anesth Analg 1042

76. Wang et al., *Statistics in Medicine – Reporting of Subgroup Analyses in Clinical Trials.* (2007) 357(21) N Engl J Med 2189

77. Whittemore et. al., *Personal And Environmental Characteristics Related To Epithelial Ovarian Cancer,* (1988) 128 Am J. Epidemiol 1228

78. Wong et al. *Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study.* (1999) 93 Obstet Gynecol 372

79. Wu et al., *African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates.* (2015) 24(7) Cancer Epidemiol Biomarkers Prev. 1094

80. Wu et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County.* (2009) 124 Int'l J. Cancer 1409

81. Wynder et al., *Radford Conference Report: Weak associations in epidemiology and their interpretation  (3rd ed.).* (1982) 11 Prev. Med

P1.02018.66

# APPENDIX C

**Fed. R. Civ. P. 26(a)(2)(B)(v) Disclosure for Christian Merlo, M.D., M.P.H.**

| Year | Parties | State | Caption |
|------|---------|-------|---------|
| 2015 | Blevins v. Pyron | Missouri | Blevins v. Pyron<br>Lawrence County Circuit Court<br>14LW-CC00108 |
| 2015 | Grove v. UMMS | Maryland | Grove v. UMMS<br>USDC Maryland<br>12-cv-2950 |
| 2015 | Dutton v. UMMS | Maryland | Dutton v. UMMS<br>Baltimore City Circuit Court<br>24-C-14-003848 |
| 2015 | Hawkins v. Mercy Kansas | Missouri | Hawkins v. Mercy Kansas<br>St. Louis City Circuit Court<br>1422-CC09810 |
| 2015 | Whitehead v. CVS | Florida | Whitehead v. CVS<br>Miami-Dade County Circuit Court<br>14-25980CA01 |
| 2016 | Evans v. Livingston Health Care | Montana | Evans v. Livingston Health Care<br>Gallatin County District Court<br>DV-11-990B |
| 2016 | Moore v. Mercy | Maryland | Moore v. Mercy<br>Baltimore City Circuit Court<br>24-C-16-004483 |
| 2016 | Quintanilla v. Narayanan | Maryland | Quintanilla v Narayanan<br>Montgomery County Circuit Court<br>397252V |
| 2017 | Burns v. Bowser | Virginia | Burns v. Bowser<br>Virginia 13th Judicial Circuit<br>CL14005484-00 |
| 2017 | Monroe v. Franklin Square | Maryland | Monroe v. Franklin Square<br>Baltimore County Circuit Court<br>03-C-16-001886 |
| 2017 | Weisman v. Maryland General | Maryland | Weisman v. Maryland General<br>Baltimore City Circuit Court<br>24-C-16-004199 |
| 2017 | Almquist v. Kinsey | Maryland | Almquist v. Kinsey<br>USDC Maryland<br>1:15cv292 |
| 2017 | Sullivan v. Holy Cross | Maryland | Sullivan v. Holy Cross<br>Montgomery County Circuit Court<br>423516v |
| 2018 | Flores v. Kaiser | Maryland | Flores v. Kaiser<br>Montgomery County Circuit Court<br>427661v |
| 2018 | Hamlin-Lewis v. Guckes | Maryland | Hamlin-Lewis v. Guckes<br>USDC Maryland<br>1:16cv3357 |
| 2018 | Hirschenson v. Cleveland Clinic | Florida | Hirschenson v. Cleveland Clinic<br>Broward County Circuit Court<br>CACE13001180 |
| 2018 | Knoerlein v. Express Primary Care | Maryland | Knoerlein v. Express Primary Care<br>Baltimore County Circuit Court<br>03-C-17-001137 |
| 2018 | McRae v. Dimensions Health | Maryland | McRae v. Dimensions Health<br>Prince George's County Circuit Court<br>CAL1702184 |
| 2018 | Fluoroquinolone Liability Litigation | New Jersey | |
| 2019 | Jones v. Agrawal | Maryland | Jones vs Bon Secours Hospital Baltimore, Inc, et al ("Jones v. Agrawal")<br>Baltimore County Circuit Court<br>24C18000398 |

Exhibit 7

Christian Merlo, M.D., MPH

Page 1

            UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY


    IN RE: JOHNSON &        )
    JOHNSON TALCUM POWDER   )
    PRODUCTS MARKETING      )
    SALES PRACTICES AND     )   MDL 16-2738
    PRODUCT LIABILITY       )   (FLW)(LHG)
    LITIGATION              )
    _____ )
    THIS DOCUMENT           )
    PERTAINS TO ALL CASES   )


            THURSDAY, APRIL 18, 2019


                    - - -


            Videotaped deposition of Christian
    Merlo, M.D., MPH, held at the offices of
    VENABLE LLP, 750 East Pratt Street, Suite
    900, Baltimore, Maryland, commencing at 9:06
    a.m., on the above date, before Carrie A.
    Campbell, Registered Diplomate Reporter
    and Certified Realtime Reporter.




                    - - -


            GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com

Christian Merlo, M.D., MPH

Page 2

1
2       A P P E A R A N C E S :

3       LEVIN, PAPANTONIO, THOMAS, MITCHELL,
        RAFFERTY & PROCTOR, P.A.
3       BY:  CHRISTOPHER V. TISI
4           ctisi@levinlaw.com
        316 South Baylen Street, Suite 600
5       Pensacola, Florida  32502
        (850) 435-7000

6
7
        RESTAINO LAW LLC
8       BY:  JOHN M. RESTAINO, JR., DPM, JD, MPH
            JRestaino@RestainoLLC.com
9       130 Forest Street
        Denver, Colorado  80220
10      (303) 839-8000

11
        ASHCRAFT & GEREL, LLP
12      BY:  MICHELLE A. PARFITT
13          mparfitt@ashcraftlaw.com
        4900 Seminary Road, Suite 650
14      Alexandria, Virginia  22311
        (703) 931-5500

15
16
        ROBINSON CALCAGNIE, INC.
17      BY:  CYNTHIA L. GARBER
            cgarber@robinsonfirm.com
18      19 Corporate Plaza Drive
        Newport Beach, California  92660
19      (949) 720-1288

20
21      WAGNER REESE LLP
        BY:  JEFF S. GIBSON
22          JGibson@WagnerReese.com
        11939 North Meridian Street
23      Carmel, Indiana  46032
        Counsel for Plaintiffs

24
25

Page 3

1       DRINKER BIDDLE & REATH LLP
        BY:  SUSAN M. SHARKO
2           Susan.Sharko@dbr.com
        600 Campus Drive
3       Florham Park, New Jersey 07932-1047
        (973) 549-7000
4
5       DRINKER BIDDLE & REATH LLP
        BY:  KATHERINE MCBETH
6           katherine.mcbeth@dbr.com
        One Logan Square, Suite 2000
7       Philadelphia, Pennsylvania 19103
        (215) 988-2700
8
        and
9
        SKADDEN ARPS SLATE MEAGHER & FLOM LLP
10      BY:  JESSICA D. MILLER
            jessica.miller@skadden.com
11      1440 New York Avenue N.W.
        Washington, DC  20005
12      (202) 371-7000
        Counsel for Defendant Johnson &
13      Johnson
14
15      SEYFARTH SHAW LLP
        BY:  THOMAS T. LOCKE
16          tlocke@seyfarth.com
        975 F Street, N.W.
17      Washington, DC 20004
        (202) 463-2400
18      Counsel for Defendant Personal Care
        Products Council
19
20
21      TUCKER ELLIS, LLP
        BY:  MICHAEL ANDERTON
            michael.anderton@tuckerellis.com
22      950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113
23      (216) 592-5000
        Counsel for PTI Union, LLC and PTI
24      Royston, LLC
25

Page 4

1       V I D E O G R A P H E R :
            DANIEL HOLMSTOCK, Golkow Litigation
2       Services
3               – – –
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1               INDEX
2                           PAGE
3       APPEARANCES..................................  2
4       EXAMINATIONS
5       BY MR. TISI.............................  11
6       BY MS. MILLER............................  479
7       BY MR. TISI.............................  483
8
9               EXHIBITS
10      No.    Description            Page
11      Merlo 1   Curriculum Vitae of Christian A.   11
            Merlo, MD, MPH
12
        Merlo 2   Pulmonary & Critical Care   13
13          Medicine printout
14      Merlo 3   Expert Report of Christian   32
            Merlo, MD, MPH, for General
15          Causation Daubert Hearing
16      Merlo 3A   Expert Report of Christian   33
            Merlo, MD, MPH, Supplemental
17          Materials Reviewed and
            Considered
18
        Merlo 3B   March 13, 2019 letter from Susan   78
19          Sharko to Michelle Parfitt
20      Merlo 4   Christian Merlo, MD, MPH   54
            biography printout from Johns
21          Hopkins website
22      Merlo 5   Johns Hopkins web page printout   57
            of Christian Merlo, MD, MPH,
23          Adult Clinic for the Cystic
            Fibrosis Center
24
25

2  (Pages 2 to 5)

Page 6

1   Merlo 6   Faculty directory printout of   65
2   the epidemiology department at
    Johns Hopkins Bloomberg School
    of Public Health
3
4   Merlo 7   Printout of the web page from   70
    the Johns Hopkins department of
5   epidemiology
6   Merlo 8   VeraMedica Institute invoices   83
7   Merlo 9   Excerpt from Expert Report Of   110
    Christian Merlo, MD, MPH; Page
    46
8
9   Merlo 10   "Merlo Allegations of Plaintiffs   118
    Experts Methodologic Flaws"
10  Merlo 12   "Ovarian Cancer and Talc,"   151
    Cramer, et al.
11
12  Merlo 13   Draft Screening Assessment Talc,   165
    Chemical Abstracts Service
13  Registry Number 14807-96-6,
    Environment and Climate Change
    Canada, Health Canada, December
14  2018
15  Merlo 14   "The Environment and Disease:   170
    Association of Causation?" Sir
16  Bradford Hill
17  Merlo 21   "Perineal Talc Use and Ovarian   418
    Cancer A Systematic Review and
18  Meta-Analysis," Penninkilampi,
    et al.
19
20  Merlo 22   "Epidemiology, Concepts and   200
    Methods," Oleckno
21  Merlo 23   Chapter 14: "From Association   206
    to Causation: Deriving
22  Inferences from Epidemiologic
    Studies"
23
24  Merlo 24   CDC Lesson 1:   Introduction to   217
    Epidemiology
25

Page 7

1   Merlo 25   "Appetite-Suppressant Drugs and   232
    The Risk of Primary Pulmonary
2   Hypertension," Abenhaim, et al.
3   Merlo 26   NHMRC levels of evidence and   251
    grades for recommendations for
4   developers of guidelines,
    December 2009
5
    Merlo 27   Chapter 8: Case-Control   268
6   Studies, Rothman, et al.
7   Merlo 28   "Six Persistent Research   270
    Misconceptions," Rothman
8
    Merlo 29   Interpretation of Epidemiologic   272
9   Studies on Talc and Ovarian
    Cancer by Kenneth Rothman, et
10  al.,
    IMERYS 209695 - IMERYS 209705
11
12  Merlo 30   Systematic Review and   438
    Meta-Analysis of the Association
13  between Perineal Use of Talc and
    Risk of Ovarian Cancer, Taher,
14  et al.
15  Merlo 31   "Ovarian, Fallopian Tube, and   309
    Primary Peritoneal Cancer
16  Prevention (PDQ)- Health
    Professional Version," NIH
17  Merlo 32   Modern Epidemiology, Kenneth   314
    Rothman, et al.
18
19  Merlo 33   Rule 26 Expert Report of Jack   324
    Siemiatycki, MSc, PhD
20  Merlo 34   Excerpts from Jack Siemiatycki,   330
    PhD, deposition
21
22  Merlo 35   Rule 26 Expert Report of   331
    Patricia G. Moorman, MSPH, PhD
23  Merlo 36   Excerpts from Patricia G.   334
    Moorman, MSPH, PhD, deposition
24  on January 25, 2019
25

Page 8

1   Merlo 37   Excerpt From Expert Report of   344
    Christian Merlo, MD, MPH, for
2   General Causation Daubert
    Hearing
3
4   Merlo 38   Statement from Christian Merlo   351
    Expert Report, February 25,
    2019, Page 44-55
5
6   Merlo 39   Statement from Christian Merlo   353
    Expert Report, February 25,
    2019, Page 45
7
8   Merlo 40   "Mineral Fiber Exposure and the   359
    Development of Ovarian Cancer,"
    Rosenblatt, et al.
9
10  Merlo 41   "Hair Dyes, Analgesics,   374
    Tranquilizers and Perineal Talc
11  Application as Risk Factors for
    Ovarian Cancer," Tzonou, et al.
12  Merlo 42   Excerpt From Expert Report of   396
    Christian Merlo, MD, MPH, for
13  General Causation Daubert
    Hearing
14
    Merlo 43   Epidemiology Concepts and   404
15  Methods, William A. Oleckno
16  Merlo 44   "Scientists rise up against   410
    statistical significance,"
17  Amrhein
18  Merlo 46   Exhibit of a compilation of   446
    studies titled "Dose Response"
19
    Merlo 47   Pro Publica Christian Merlo   88
20  printout
21  Merlo 48   "Genital use of talc and risk of   378
    ovarian cancer: A
22  meta-analysis," Berge, et al.
23  (Exhibits attached to the deposition.)
24
25

Page 9

1   CERTIFICATE................................487
2   ACKNOWLEDGMENT OF DEPONENT..................489
3   ERRATA......................................490
4   LAWYER'S NOTES.............................491
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Christian Merlo, M.D., MPH

Page 10

1        VIDEOGRAPHER:  We are now on
2   the record.
3        My name is Daniel Holmstock.
4   I'm the videographer for Golkow
5   Litigation Services.
6        Today's date is April 18, 2019,
7   and the time on the video screen is
8   9:06 a.m.
9        This deposition is being held
10  at the law offices of Venable LLP, 750
11  East Pratt Street, Suite 900,
12  Baltimore, Maryland, for the matter of
13  In Re: Johnson & Johnson Talcum Powder
14  Products Marketing, Sales Practices
15  and Products Liability Litigation, MDL
16  Number 2738, pending before the United
17  States District Court for the Eastern
18  District of New Jersey.
19       Our deponent today is
20  Dr. Christian Merlo.
21       Counsel for the record will be
22  noted on the stenographic record for
23  appearances.
24       Our court reporter is Carrie
25  Campbell, who will now administer the

Page 11

1   oath to the witness.
2
3        CHRISTIAN MERLO, M.D., MPH,
4   of lawful age, having been first duly sworn
5   to tell the truth, the whole truth and
6   nothing but the truth, deposes and says on
7   behalf of the Plaintiffs, as follows:
8
9        (Merlo Exhibit 1 marked for
10  identification.)
11
12       DIRECT EXAMINATION
13  QUESTIONS BY MR. TISI:
14       Q.    Please state your name.
15       A.    My name is Christian Merlo.
16       Q.    And I've placed before you,
17  Dr. Merlo, a copy of your CV as Exhibit 1.
18  Do you see that?
19       A.    I do.
20       Q.    Is this your current CV?
21       This was produced to us in
22  connection with this litigation.
23       A.    Seems about right.
24       Q.    Okay.  Is there anything that
25  needs to be added to it since February of

Page 12

1   this year that would make it more current?
2        A.    There are probably a couple of
3   articles that I need to put in there.
4        Q.    Do any of them deal with
5   ovarian cancer?
6        A.    They do not.
7        Q.    Do any of them deal with talc?
8        A.    They do not.
9        Q.    Okay.  Get back to your CV in a
10  moment.
11       You're a medical doctor?
12       A.    I am.
13       Q.    And you're board certified in
14  internal medicine?
15       A.    Internal medicine, pulmonary
16  medicine and critical care medicine.
17       Q.    Okay.  And you are also an
18  associate professor of medicine in the
19  Department of Pulmonary and Critical Care
20  Medicine at Johns Hopkins University?
21       A.    In the department of medicine
22  and also in the department of epidemiology at
23  the School of Public Health.
24       Q.    I'll ask you about the second
25  later, but my specific question is that you

Page 13

1   are associate professor of medicine in the
2   Department of Pulmonary and Critical Care
3   Medicine at Johns Hopkins University?
4        A.    But my official title is an
5   associate professor of medicine in
6   epidemiology.
7        (Merlo Exhibit 2 marked for
8   identification.)
9   QUESTIONS BY MR. TISI:
10       Q.    Okay.  I would like you show
11  you what I would like to have marked as
12  Exhibit Number 2.
13       This is the --
14       MR. TISI:  I'm sorry, did you
15  put an exhibit sticker on it?
16  QUESTIONS BY MR. TISI:
17       Q.    This is the web page to the
18  Johns Hopkins Division of Pulmonary and
19  Critical Care Medicine.
20       Do you see that?
21       A.    I see the exhibit, yes.
22       Q.    Okay.  And who is Nadia Hansel?
23       A.    Nadia Hansel is our current
24  division director of the pulmonary and
25  critical care division.

4 (Pages 10 to 13)

Christian Merlo, M.D., MPH

Page 14

```
 1        Q.    She basically runs your
 2   division?
 3        A.    Well, she's part of the crew
 4   that runs the division, but she's our
 5   division director.
 6        Q.    Okay.  And did you see where it
 7   describes -- on the second paragraph it
 8   describes the scope of conditions treated in
 9   the department, Division of Pulmonary and
10   Critical Care Medicine?
11        A.    I see that paragraph, yes.
12        Q.    Let me read it for the record.
13             It says, "We hold clinical and
14   research expertise in a broad range of
15   diseases, including asthma, COPD, critical
16   care, cystic fibrosis, interstitial lung
17   disease, lung cancer, lung transplantation,
18   neuromuscular disease, pulmonary
19   hypertension, sarcoidosis and sleep
20   medicine."
21             Do you see that?
22        A.    I do.
23        Q.    Does the Johns Hopkins Division
24   of Pulmonary and Critical Care Medicine
25   provide primary care treatment for
```

Page 15

```
 1   gynecologic cancers?
 2        A.    I think you'd have to define
 3   primary care treatment.
 4        Q.    Yes.
 5        A.    We do have an oncologic center
 6   where we take care of many patients who are
 7   very, very sick with cancers, and some of
 8   those involve gynecologic cancers, and we are
 9   the primary caregiver in our onc ICU.
10        Q.    Okay.  But is that in the
11   Division of Pulmonary and Critical Care --
12        A.    Yes.
13        Q.    -- Medicine?
14             Okay.  But the treatment of
15   people who actually are diagnosed, until the
16   very end of their treatment, is not in your
17   division; is that correct?
18        A.    Again, I think you'd have to
19   define what the treatment is --
20        Q.    Okay.
21        A.    -- because sometimes the
22   treatment involved in gynecologic cancers
23   involves therapies that give side effects,
24   and those side effects land those patients in
25   some intensive care units where we do take
```

Page 16

```
 1   care of patients like that.
 2        Q.    Okay.  So -- I'm sorry.  I
 3   didn't mean to interrupt you.
 4             So other than treating the side
 5   effects that perhaps might occur in the
 6   context of a patient who has gynecologic
 7   cancers, people with ovarian cancer typically
 8   are treated by oncologists; is that true?
 9   Primarily?
10        A.    Again, if we're talking about
11   oncologic therapy, yes, they would be
12   traditionally treated by oncologists.
13        Q.    You're what's called an
14   associate professor?
15        A.    I am an associate professor.
16        Q.    Okay.  And just to follow up on
17   the last question, you're not board certified
18   in oncology, are you?
19        A.    I'm not.
20        Q.    Do you have tenure?
21        A.    Tenure is a tricky thing at
22   Hopkins.  There's not really a full
23   definition of it.
24             The usual definition is if
25   you're asked to stay after an instructor, the
```

Page 17

```
 1   institution is committed to keeping you here.
 2        Q.    Okay.
 3        A.    But there's no contract that
 4   one signs or that one gets saying "you can
 5   stay here forever."
 6        Q.    You're not a full professor?
 7        A.    I am not a full professor.
 8        Q.    And your expertise is critical
 9   care -- is in the care -- critical care --
10   I'm sorry.
11             Your expertise has been
12   described as in critical care and cystic
13   fibrosis, and those with lung transplants as
14   well as patients who have other lung
15   diseases, as well as those who require
16   critical care therapy.
17             Is that true?
18             MS. MILLER:  Objection.
19             Are you looking at this?
20             MR. TISI:  I'm not -- you can
21   object.
22             THE WITNESS:  No, you'd have to
23   show me where you're getting that.  I
24   mean, I have lots of expertise.  I
25   have expertise in internal medicine
```

5 (Pages 14 to 17)

Christian Merlo, M.D., MPH

Page 18

1    and a broad range of pulmonary
2    medicine, a broad range of critical
3    care medicine as well as lung
4    transplantation.
5        So I'm not sure where you got
6    that from, but if you show me
7    something I can --
8    QUESTIONS BY MR. TISI:
9        Q.    We'll do that.
10       I think you mentioned you don't
11   hold yourself out as an expert in oncology,
12   correct?
13       MS. MILLER:  Objection.
14       THE WITNESS:  I think what I
15   said before is I do have a broad range
16   of experience in taking care of
17   oncologic patients in our oncology
18   ICU, so I do consider myself an expert
19   in the intensive care unit care for
20   patients with oncologic disease.
21   QUESTIONS BY MR. TISI:
22       Q.    Okay.  Different question,
23   however.
24       Do you hold yourself out to
25   your colleagues as an expert -- as a cancer

Page 19

1    expert?
2        MS. MILLER:  Objection.
3        THE WITNESS:  I'm going to have
4    to say the same thing, because part of
5    cancer does deal with patients who get
6    very, very, very sick.  And as a
7    group, we have several in our group
8    who attend in our oncology ICU, and
9    I'm one of them, and I do have
10   specific expertise in that aspect of
11   oncology.
12   QUESTIONS BY MR. TISI:
13       Q.    And you are not board certified
14   in oncology, however?
15       A.    I believe I said I wasn't.
16       Q.    And you're not a gynecologist?
17       A.    I'm not a gynecologist.
18       Q.    You're not a toxicologist?
19       A.    I am not a toxicologist.
20       Q.    You're not a mineralogist?
21       A.    I'm not a mineralogist.
22       Q.    Turning back to your CV,
23   Exhibit 1, page 2, you have a section
24   entitled "Peer Review, Original Science
25   Publications."

Page 20

1        Do you see that?
2        A.    I do.
3        Q.    And you identify, if I'm
4    reading correctly, 79 peer-reviewed papers?
5        A.    Seems about right.
6        Q.    Do any of your peer-reviewed
7    papers deal with gynecologic cancers?
8        A.    There's one paper where we look
9    at the risk of malignancy after lung
10   transplantation, and I believe we looked at
11   certain -- I have to go back and look at the
12   paper, but I believe we looked at all sorts
13   of cancers, and gynecologic cancers may have
14   been in there as well.
15       Q.    But the focus of the paper was
16   the consequences of lung transplantation,
17   correct?
18       A.    The risk of malignancy after
19   lung transplantation.
20       Q.    Do any of them deal
21   specifically with ovarian cancer and its
22   causes?
23       A.    No.
24       Q.    Do any of them deal with talcum
25   powder products?

Page 21

1        A.    Excuse me.  No.
2        Q.    Do any of them deal with
3    asbestos?
4        A.    No.
5        Q.    In fact, you understand in this
6    case that there is a claim that there is
7    asbestos contamination or asbestos included
8    in talcum powder products, correct?
9        MS. MILLER:  Objection.
10       THE WITNESS:  I wasn't asked to
11   give an opinion on asbestos in this
12   case.
13   QUESTIONS BY MR. TISI:
14       Q.    Okay.  And I understand that,
15   and that was going to be my question.  So I'm
16   going to ask you that you -- so we don't run
17   into problems here, I'm going to ask that you
18   listen to my question.  Okay?
19       Do you understand that there is
20   an allegation in this case -- and if you
21   don't have an understanding, that's fine --
22   that there is asbestos in talc -- Johnson &
23   Johnson's talcum powder products?
24       MS. MILLER:  Objection.
25       MR. LOCKE:  Objection.

6 (Pages 18 to 21)

Christian Merlo, M.D., MPH

Page 22

1    THE WITNESS:  Again, I wasn't
2  asked to give an opinion about
3  asbestos.
4  QUESTIONS BY MR. TISI:
5    Q.   I didn't ask whether you were
6  asked to give opinions.
7    Do you have any understanding
8  if that's part of the record in this case?
9    MS. MILLER:  Same objections.
10    MR. LOCKE:  Objection.
11  QUESTIONS BY MR. TISI:
12    Q.   Okay.  That's fine.
13    So again, I'm going to ask you
14  to listen to my question.
15    So you're not offering an
16  opinion as to whether or not talc -- the
17  presence or -- the presence of asbestos
18  provides a biologically plausible mechanism
19  for talcum powder product causing ovarian
20  cancer?
21    A.   So I have not reviewed the
22  literature specifically about asbestos.  I
23  was not asked to provide an opinion about
24  asbestos.
25    Q.   Okay.

Page 23

1    A.   However, if asbestos was
2  present at all in a sufficient dose within
3  talcum powder products, that would have come
4  out in the epidemiologic literature, which it
5  didn't.
6    Q.   Okay.
7    A.   Because the epidemiology shows
8  that there is not a causal association
9  between talcum powder and ovarian cancer.
10    MR. TISI:  I'm going to move to
11  strike the answer as nonresponsive.
12  QUESTIONS BY MR. TISI:
13    Q.   My question was:  Were you
14  asked to offer a -- by the way, I'm not
15  getting any -- I said -- my question was:
16  Did you -- were you asked whether or not the
17  presence of asbestos would provide a
18  biologically plausible mechanism for talcum
19  powder products causing ovarian cancer?
20    The question is either yes or
21  no.
22    MR. LOCKE:  Objection.
23    THE WITNESS:  Can you ask that
24  question again?
25

Page 24

1  QUESTIONS BY MR. TISI:
2    Q.   Yes.
3    Were you asked to provide an
4  opinion as to whether or not the presence of
5  asbestos in talcum powder products is a
6  biologically plausible mechanism for causing
7  ovarian cancer?
8    MS. MILLER:  Objection.
9    MR. LOCKE:  Objection.
10    THE WITNESS:  I was asked to
11  provide an opinion on talcum powder
12  products.  And my opinion, based on
13  the epidemiologic literature, is that
14  there is no causal association.
15    So whatever is in talcum powder
16  products would have come out in the
17  literature.
18  QUESTIONS BY MR. TISI:
19    Q.   Okay.  Would it be fair to say
20  you've never published any commentary or
21  review of the literature on ovarian cancer
22  and its causes generally?  I apologize.
23    A.   I have never published a review
24  on ovarian cancer.
25    Q.   Have you published a review on

Page 25

1  any cancer?
2    A.   We have a review in press --
3  sorry, in submission on malignancies after
4  lung transplantation.
5    Q.   Does it focus on whether or not
6  talcum powder products is a risk factor for
7  ovarian cancer?
8    A.   It does not.
9    Q.   Have you ever published a
10  commentary or review on the causes of ovarian
11  cancer?
12    A.   I have not.
13    Q.   Have you published a commentary
14  or review on talcum powder products and its
15  safety?
16    A.   I have not.
17    Q.   Have you published any
18  commentary or review that deal with lifestyle
19  or environmental cause of disease?
20    MS. MILLER:  Objection.
21    THE WITNESS:  That's a pretty
22  broad question.
23  QUESTIONS BY MR. TISI:
24    Q.   It is.
25    A.   I mean, you have my CV here,

7 (Pages 22 to 25)

Christian Merlo, M.D., MPH

Page 26

1     and my clinical and research experience has
2     dealt with epidemiology.  And the
3     epidemiology -- epidemiology usually is the
4     study of an exposure and how it relates to an
5     outcome, and most of my papers and research
6     has focused on exposures and how they lead to
7     outcomes.
8         Q.    So what exposures,
9     environmental or lifestyle exposures, have
10    you investigated as related to what diseases?
11        MS. MILLER: Objection.
12        THE WITNESS:  Well, you'd have
13    to get a little more specific about
14    what diseases we're talking about.
15    QUESTIONS BY MR. TISI:
16        Q.    So my question was a broad one,
17    because I don't see anything in your
18    published literature that falls in this
19    category, but it may just be that I missed
20    it.
21        Do you have any articles which
22    deal with the relationship between lifestyle
23    and environmental factors and any kind of
24    cancer?
25        A.    That's a different question.

Page 27

1         Q.    Okay.  So the answer would be?
2         A.    Well, I would have to say that
3     the risk of malignancy after lung
4     transplantation does deal with that.
5         Q.    Is lung transplantation an
6     environmental or lifestyle?
7         MS. MILLER: Objection.
8         THE WITNESS:  So again, that's
9     a pretty broad question.  It can be --
10    QUESTIONS BY MR. TISI:
11        Q.    Okay.
12        A.    -- and it depends, because a
13    lung transplant could be done for someone who
14    is born with a disease, say like cystic
15    fibrosis, a genetic disease, or a lung
16    transplantation could be performed because
17    someone has emphysema because they smoked all
18    their life.
19        And so the environmental
20    exposure and the personal health exposure is
21    very, very different in those two
22    populations.
23        Someone who's smoking may
24    smoke -- continue to smoke after their lung
25    transplant.  It's not advised, but they may

Page 28

1     continue.  So that environmental exposure can
2     lead to an outcome over time.
3         Q.    But did you study the
4     relationship between the exposure and the
5     outcome, or was it primarily focused on lung
6     transplant?
7         A.    Well, I --
8         MS. MILLER: Objection.
9     QUESTIONS BY MR. TISI:
10        Q.    Let me rephrase the question.
11    Let me withdraw and rephrase the question.
12        Did you do any causation
13    analysis, including applying the Bradford
14    Hill factors, to any exposure and any cancer
15    in any of your publications?
16        A.    So in general, when a study is
17    performed, we try to do either a Bradford
18    Hill or different aspects of Bradford Hill to
19    look at strength of associations or look at
20    specificity, to look at consistency, to look
21    at dose response.  Sometimes it's available;
22    sometimes it's not.
23        I think it's a -- it's a --
24    it's a framework that is often used in these
25    papers and in these studies, but it's not

Page 29

1     necessarily the only thing that's done in
2     them.
3         Q.    I understand.
4         But if I looked at -- and I
5     appreciate that.  These may touch on aspects
6     of Brad Hill -- the Bradford Hill guidelines.
7         My question is:  Did you ever,
8     in any of these papers, synthesize all of the
9     medical and scientific information available
10    in order to do a Bradford Hill, complete
11    Bradford Hill, analysis of the relationship
12    between an exposure and a disease?
13        MS. MILLER: Objection.
14        THE WITNESS:  Well, that's a
15    very, very, very broad question.
16    QUESTIONS BY MR. TISI:
17        Q.    Uh-huh.
18        A.    I think that there are certain
19    papers in my CV that -- studies that we've
20    done.  It's the only study available that we
21    did.
22        Q.    Okay.
23        A.    So, you know, it's impossible
24    to synthesize everything that's in the
25    medical literature if it's the only study

8 (Pages 26 to 29)

Christian Merlo, M.D., MPH

Page 30

1    that's done.
2        Q.    Okay.  So if I -- it wouldn't
3    be surprising if I looked at all these papers
4    and the word "Bradford Hill" does not appear
5    in any of them?
6        A.    That wouldn't be something that
7    would appear --
8        Q.    Okay.
9        A.    -- normally in a paper like
10   this.
11       Q.    Do any of these 78, 79 papers
12   purport to provide any guidance or discussion
13   of the definition or how to apply the
14   Bradford Hill criteria, a theoretic paper,
15   for example?
16           MS. MILLER:  Objection.
17           THE WITNESS:  I don't have any
18       theoretical papers describing a
19       Bradford Hill analysis.
20   QUESTIONS BY MR. TISI:
21       Q.    Okay.  So just -- this is a
22   slightly different question than before.
23           Have you ever published
24   research aimed at elucidating a possible
25   causation between a putative risk factor and

Page 31

1    disease?
2        A.    Well, I think that -- can you
3    ask that again?
4        Q.    Yes.
5            Have you ever published
6    research aimed at elucidating a possible
7    causation between a putative risk factor and
8    a disease?
9            MS. MILLER:  I'm objecting.
10       Objection.
11           THE WITNESS:  So it's not -- we
12       don't really approach epidemiologic
13       studies trying to show causation with
14       risk factors.
15           Sometimes there are studies
16       that are -- that we do just to
17       identify risk factors.  And then once
18       risk factors are identified, then we
19       could do follow-up studies to see if
20       they are actual factors or exposures
21       that lead to a certain outcome.
22           Sometimes that takes multiple
23       studies to do that.
24   QUESTIONS BY MR. TISI:
25       Q.    Can you identify an article

Page 32

1    where you identified a risk factor for a
2    disease?
3        A.    I can.
4            I mean, one of the first
5    studies that we did was to look at the risk
6    factors for developing resistant bacteria in
7    patients with cystic fibrosis.
8        Q.    Okay.  In that context, did you
9    apply the Bradford Hill guidelines?
10           MS. MILLER:  Objection.
11           THE WITNESS:  Again, that's not
12       really something that would have been
13       done in that study.
14   QUESTIONS BY MR. TISI:
15       Q.    Okay.
16       A.    There's a -- there's a large
17   epidemiologic data set that the Cystic
18   Fibrosis Foundation has, and we utilized that
19   to identify factors that we thought might be
20   important in seeing if those factors led to
21   this resistant organism in that population.
22           (Merlo Exhibit 3 marked for
23       identification.)
24   QUESTIONS BY MR. TISI:
25       Q.    I'm going to mark your report

Page 33

1    in this case.
2            You issued a report in the
3    talcum powder products litigation?
4        A.    I wrote a report.
5        Q.    Yes.
6        A.    Yes, I did.
7        Q.    Marked as Exhibit Number 3.
8        A.    Thank you.
9        Q.    Uh-huh.
10           I think we've also been
11   provided a supplemental materials reviewed
12   and considered paper which I'll mark as 3A,
13   which I assume is a supplement to your
14   report.
15           (Merlo Exhibit 3A marked for
16       identification.)
17   QUESTIONS BY MR. TISI:
18       Q.    Is this your report in this
19   case, and are these the supplemental
20   materials you reviewed as of today?
21       A.    This looks about correct.
22       Q.    Okay.  Does this contain all
23   the opinions you're prepared to offer in this
24   case?
25           MS. MILLER:  Objection.

9 (Pages 30 to 33)

Christian Merlo, M.D., MPH

Page 34

1      THE WITNESS:  From the -- from
2   the items that I've reviewed thus far.
3   There may be other things that come up
4   in the literature, there may be other
5   reports that are out, and I would like
6   to review those and...
7   QUESTIONS BY MR. TISI:
8      Q.   But as of today, as of today,
9   this is -- these are your opinions and these
10  are the bases of your opinions, correct?
11     A.   They are.
12     Q.   Okay.  Go to page 30 of your
13  report, if you would.  The second sentence of
14  your report says, "While there is no single
15  method for undertaking a causal assessment
16  based on epidemiology, the criteria
17  formulated by Austin Bradford Hill are often
18  used and are considered the gold standard for
19  evaluating causation once an association has
20  been identified."
21     Do you see that?
22     A.   I do.
23     Q.   Can you point to any articles
24  on your CV where you applied the gold
25  standard articulated on page 30 of your

Page 35

1   report?
2      MS. MILLER:  Objection.
3      THE WITNESS:  Well, again, most
4   of these articles are epidemiologic
5   studies looking at an exposure and an
6   outcome.
7      Sometimes there are Bradford
8   Hill considerations that are
9   available, and sometimes there are
10  not.
11  QUESTIONS BY MR. TISI:
12     Q.   But whether they are -- I'm
13  sorry, go ahead.
14     A.   And in every study, we apply
15  what we can --
16     Q.   Right.
17     A.   -- based on these suggestions
18  put forth by Bradford Hill.
19     Q.   Is there any study in which you
20  say, "We are undertaking" -- and I'm not
21  using these words specifically.
22     "We are, in this article,
23  undertaking a causal assessment of putative
24  factor X and disease Y, and here is my
25  analysis"?

Page 36

1      MS. MILLER:  Objection.
2      THE WITNESS:  I wouldn't say it
3   that way.
4   QUESTIONS BY MR. TISI:
5      Q.   I understand you wouldn't say
6   it that way, but in concept.
7      A.   In concept.
8      That's the concept of all of
9   those articles, or at least the majority of
10  them, that we're looking for -- we're looking
11  at an outcome, and we're looking for an
12  exposure to see if that exposure leads to an
13  outcome.
14     And there are considerations
15  that we consciously or subconsciously -- "we"
16  meaning my research team and myself
17  consciously and subconsciously --
18  considerations that Bradford Hill put forth
19  that we apply in there.
20     Now, is it stated?  No, but it
21  wouldn't be stated in the papers.  The
22  medical literature is not written that like
23  that.
24     Q.   Okay.  You mentioned -- and you
25  give an example in your report; we're going

Page 37

1   to talk about it later -- primary pulmonary
2   hypertension and anorexigens.
3      Do you remember the IPPHS
4   study?
5      A.   I do.
6      Q.   Does, in your opinion, exposure
7   to anorexigens cause pulmonary hypertension,
8   primary pulmonary hypertension?
9      A.   The opinion of the medical
10  community -- and part of that is that a
11  significant exposure over a significant
12  amount of time with certain specific
13  anorexigens is associated with pulmonary
14  hypertension.
15     Q.   That's a different -- that's a
16  different question than I'm asking, Doctor.
17     So I asked you -- I asked you
18  whether or not in your opinion exposure to
19  anorexigens, in particular dexfenfluramine
20  and fenfluramine, cause pulmonary
21  hypertension?
22     MS. MILLER:  Objection.
23     THE WITNESS:  So I'm going to
24  answer it very similarly, because
25  you --

10 (Pages 34 to 37)

Christian Merlo, M.D., MPH

Page 38

QUESTIONS BY MR. TISI:
1
2    Q.    But I'm using the word "cause,"
3  so --
4    A.    And based on the medical
5  literature and based on clinical experience,
6  if we're talking about those two anorexigens,
7  the opinion of the medical community is that
8  those cause primary pulmonary hypertension.
9    Q.    Okay.  Is that your opinion?
10    A.    Yes.
11    Q.    Okay.  And we'll talk about it
12  again, but there was only one study,
13  epidemiologic study, the IPPHS study,
14  correct?
15    A.    You'd have to show me what
16  you're referring to so we can look at it.
17    Q.    Yeah, it's the study by
18  Abenhaim.  I believe it's footnote 77 of your
19  report.
20        You know that study, don't you?
21    A.    I referenced it, but if you'd
22  like to discuss it --
23    Q.    I'm not going to discuss --
24    A.    -- I'd like to see it in front
25  of me to discuss it.

Page 39

1    Q.    I will discuss it later and
2  I'll -- I will discuss it later, but I'm
3  asking you:  Do you know that there was only
4  one study, epidemiologic study, performed?
5        MS. MILLER:  Objection.
6        THE WITNESS:  I'm not aware of
7    that, but if we're going to talk about
8    studies, then I would have like to
9    have that in front of me.
10  QUESTIONS BY MR. TISI:
11    Q.    I'm going to give it to you.
12        I'm asking you whether there
13  are any other studies, epidemiologic studies,
14  that you're aware of other than that study,
15  which I will give you.
16        MR. LOCKE:  Objection.
17        MS. MILLER:  Objection.
18        THE WITNESS:  You know, I'm not
19    really here to give my opinion on
20    whether or not there was one or ten
21    epidemiologic studies looking at
22    anorexigens in pulmonary hypertension.
23  QUESTIONS BY MR. TISI:
24    Q.    I understand.
25    A.    I'm not a pulmonary

Page 40

1  hypertension expert, so if you'd like to
2  discuss that, I would need to review the
3  medical literature.
4    Q.    Okay.
5    A.    I can't agree or disagree with
6  you.
7    Q.    Well, you're not an ovarian
8  cancer expert, are you?
9        MR. LOCKE:  Objection.
10        THE WITNESS:  I think I
11    answered that before.
12  QUESTIONS BY MR. TISI:
13    Q.    If you're not a primary
14  pulmonary hypertension expert, and that's a
15  lung disease, are you a -- do you consider
16  yourself an ovarian cancer expert?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  And what I said
19    before is that there are certain
20    aspects of cancer that I do consider
21    myself an expert, and that is the care
22    of patients who have cancer in the
23    intensive care unit.
24  QUESTIONS BY MR. TISI:
25    Q.    Okay.  Do you hold yourself out

Page 41

1  to your colleagues as an expert in ovarian
2  cancer?
3        MS. MILLER:  Objection.
4        MR. LOCKE:  Objection.
5        THE WITNESS:  I'm going to have
6    to answer that very similarly because
7    there are certain aspects of
8    malignancies where I have taken care
9    of patients with ovarian cancer in the
10    intensive care unit, who are very,
11    very sick, who have been given
12    specific therapies for their ovarian
13    cancer, that I do consider myself an
14    expert in taking care of.
15  QUESTIONS BY MR. TISI:
16    Q.    I understand that.
17        But ovarian cancer is a -- let
18  me just -- if I was, you know, a doctor at
19  Hopkins, and we're not sitting here in a
20  deposition, and I came to you and said,
21  "Doctor, what is your area of expertise?"
22  would you say "ovarian cancer"?
23        MS. MILLER:  Objection.
24        MR. LOCKE:  Objection.  Asked
25    and answered four times.

11 (Pages 38 to 41)

Christian Merlo, M.D., MPH

Page 42

1      THE WITNESS: I would say
2  internal medicine. I would say
3  pulmonary medicine. I would say
4  critical care medicine. And all of
5  those -- well, maybe -- no, actually
6  all of them encompass taking care of
7  patients who can become or do become
8  very, very sick with ovarian cancer
9  and with specific -- and having
10  specific expertise in taking care of
11  some of the medicines that they get
12  that give them very, very specific
13  side effects.
14  QUESTIONS BY MR. TISI:
15      Q.  Have you also cared for
16  patients with primary pulmonary hypertension?
17      A.  I have.
18      Q.  Okay. So does that also make
19  you an expert in the area of primary
20  pulmonary hypertension?
21      A.  So there are certain aspects of
22  primary pulmonary hypertension that I do
23  consider myself an expert in. I do take care
24  of patients in the hospital who have primary
25  pulmonary hypertension and also secondary

Page 43

1  pulmonary hypertension.
2      But -- I'll just stop there.
3      Q.  Do you put -- when you're
4  taking care of a patient with primary
5  pulmonary hypertension and they're exposed to
6  anorexigens, or they're exposed to
7  fenfluramine, dexfenfluramine, although those
8  are off the market, and would you note that
9  on the list of potential differential causes
10  of the pulmonary hypertension?
11      MS. MILLER: Objection.
12      THE WITNESS: Can you ask that
13  again?
14  QUESTIONS BY MR. TISI:
15      Q.  Yes.
16      If you have a patient who has
17  primary pulmonary hypertension with a history
18  of use of the anorexigens fenfluramine and
19  dexfenfluramine, do you put them on the list
20  of potential causes in your -- do you make
21  note of that in your record?
22      MS. MILLER: Objection.
23      MR. LOCKE: Objection.
24      THE WITNESS: Well, you're
25  right, these medicines have been off

Page 44

1  the market for quite some time, so it
2  would be very rare to see somebody who
3  had a new diagnosis of pulmonary
4  hypertension and an exposure to one of
5  those medicines.
6      When I'm evaluating someone
7  with pulmonary hypertension, I
8  typically do ask them about the
9  potential exposures to anorexigens.
10  It's just on the list of things to do.
11  QUESTIONS BY MR. TISI:
12      Q.  Okay.
13      A.  And it should be part of the
14  differential diagnosis.
15      Q.  So you're treating -- is it
16  fair to say that with ovarian cancer you're
17  treating the sequela of the disease, not
18  making the diagnosis of the disease?
19      A.  No, I mean, I've probably made
20  the diagnosis of disease one or two times in
21  my career.
22      Q.  Okay. And how long -- when you
23  say your career, how long is that?
24      A.  I graduated medical school in
25  1996, so that's when I became a doctor.

Page 45

1      Q.  Okay. So can you -- you list
2  the factors on page 30 of your report, the
3  Bradford Hill factors: strength of
4  association, consistency, specificity,
5  temporality, biologic gradient, plausibility,
6  coherence, experimentation, analogy.
7      You list them all, correct?
8      A.  One, two, three, four, five,
9  six, seven, eight, nine. Yes, correct.
10      Q.  Okay. From the time that
11  Bradford Hill, Sir Bradford Hill, wrote his
12  article -- and you agree that's a seminal
13  paper on the topic of how you evaluate cause?
14      A.  It's an article, and it's an
15  important article historically. We learn
16  about it in epidemiology classes. I teach
17  about it.
18      Seminal article, I mean, there
19  are lots of articles that are written about
20  causation. This is an article that I've
21  learned about in class and I've taught about
22  in class.
23      Q.  Well, I think you used the word
24  "seminal" in your report, didn't you?
25      A.  I may have.

12 (Pages 42 to 45)

Christian Merlo, M.D., MPH

Page 46

```
1        Q.   Okay.
2        A.   If you can show me that, I --
3        Q.   So, well, do you agree that
4   it's --
5        A.   I don't know where.
6        Q.   -- it's a seminal article on
7   the issue?
8        A.   But can you show me where I
9   said that?
10        Q.   I'm asking what your opinion
11   is as to whether or not you agree that's the
12   seminal article -- that's a seminal article
13   on causation.
14        A.   But you said I --
15        Q.   I'm not asking you whether you
16   said it in the report.
17        A.   You said you did.
18             MS. MILLER:  Objection.
19   QUESTIONS BY MR. TISI:
20        Q.   I'm asking you -- I'm asking
21   you whether it is a seminal article.
22        A.   And I'll say, it's -- it is an
23   article about -- written about causation.
24        Q.   Okay.  Has the medical
25   community, over the past 60 years, changed
```

Page 47

```
1   the definitions of any of the Bradford Hill
2   factors as described by Bradford Hill in his
3   1965 article?
4             MS. MILLER:  Objection.
5             THE WITNESS:  That is a very
6        general question, and I would have to
7        say that it depends.  It depends on
8        who you're defining as the medical
9        community, who you're defining as --
10        yeah, I mean, that's a -- too general
11        a question to answer.
12   QUESTIONS BY MR. TISI:
13        Q.   Well, are there different --
14   do -- does the medical community define these
15   factors differently depending upon who's
16   applying them?
17             MS. MILLER:  Objection.
18             THE WITNESS:  Again, I don't
19        know who you're referring to as far as
20        the medical community.  You'd have to
21        be much more specific about that.
22   QUESTIONS BY MR. TISI:
23        Q.   Well, you used the term,
24   Doctor.  I'm just kind of jumping off of what
25   you said.
```

Page 48

```
1             I'm asking you:  In your
2   view -- let me -- in terms of you, Dr. Merlo,
3   do you apply the same -- is your definitions
4   of the Bradford Hill factors the same in 2019
5   as described by Bradford Hill in 1965?
6        A.   I would say that it's very
7   similar --
8        Q.   Okay.
9        A.   -- to what's described.
10        Q.   Is there any that are different
11   in your view?
12             Can you look at it and say, for
13   example, "My view of the coherence factor is
14   different than as described by Dr. -- by
15   Bradford Hill"?
16             MS. MILLER:  Objection.
17             For the record, I'll just state
18   that the -- Dr. Merlo brought Bradford
19   Hill with him.
20             MR. TISI:  I'm going to mark it
21   as well.
22             MS. MILLER:  Do you want to
23   mark this one?
24             MR. TISI:  I will not.  I'll
25   mark them when I get --
```

Page 49

```
1             MS. MILLER:  But he's looking
2        at it now.
3             MR. TISI:  He can look at it.
4   I think you're limited to "objection,"
5   and if we start with this, we're going
6   to go to the judge.
7             MS. SHARKO:  Mr. Tisi --
8             MR. TISI:  And that's another
9   thing.  We're only having one
10   objection.
11             MS. SHARKO:  You don't need to
12   point your finger.
13             MR. TISI:  I pointed up.  I
14   pointed up, Counsel, and the record
15   will reflect that I did.  There's a
16   camera right on me, as you assured me.
17             And you're laughing, let the
18   record reflect that, as you do in
19   every deposition.
20             MS. SHARKO:  Please, behave
21   yourself.
22             MR. TISI:  Agreed.
23             THE WITNESS:  So did you have a
24   specific question about coherence?
25
```

13  (Pages 46 to 49)

Christian Merlo, M.D., MPH

Page 50

1    QUESTIONS BY MR. TISI:
2        Q.    No.
3            My question is -- I want to be
4    able to say -- I want to know whether or not
5    your 2009 {sic} definitions of the Bradford
6    Hill factors -- no, let me phrase it a
7    different way.
8            Do you take any issue with any
9    of the factors as described in the 1965
10   articles and say, you know, "This concept is
11   outdated, I would define it differently," or
12   can we look at the 1965 factors as being the
13   ones you actually apply, the definitions you
14   use?
15       A.    So I usually look at them as
16   considerations and not factors.
17       Q.    Okay.
18       A.    And in general, the way it's
19   written is how I interpret and move through
20   when I evaluate evidence.
21       Q.    Okay.  Now, almost every one of
22   your 79 peer-reviewed papers going back to
23   your CV have to do with lung disease of one
24   kind or another, correct?
25       A.    There are a few that deal with

Page 51

1    certain conditions that may not involve lung
2    disease.
3        Q.    The vast majority are, correct?
4        A.    I mean, I haven't tallied up.
5    I don't know percentages, but there are
6    articles in there that involve other disease
7    states.
8        Q.    The vast -- would you agree
9    that the vast majority of your published
10   literature deals with lung disease of one
11   kind or another, whether it be transplants,
12   cystic fibrosis, COPD, et cetera?
13           MS. MILLER:  Objection.  Asked
14   and answered.
15           THE WITNESS:  I didn't tally it
16   up, and I don't have the percentages,
17   but I do know that there are many
18   articles in there that are written
19   about diseases that may not involve
20   the lungs.
21   QUESTIONS BY MR. TISI:
22       Q.    I don't think you have to tally
23   them up to look at them and see that the vast
24   majority of them deal with lung diseases,
25   true?

Page 52

1            MS. MILLER:  Objection.
2            MR. LOCKE:  Objection.
3            MS. MILLER:  Asked and answered
4    again.
5            THE WITNESS:  I mean, I don't
6    even know what vast majority means,
7    but --
8    QUESTIONS BY MR. TISI:
9        Q.    I would say -- let's say more
10   than 50 percent.
11           MS. MILLER:  Objection to the
12   definition of "vast majority" as more
13   than 50 percent.
14           THE WITNESS:  So, again, I
15   don't know the numbers.  We can go
16   through them if you'd like --
17   QUESTIONS BY MR. TISI:
18       Q.    Okay.
19       A.    -- and get a percentage, but --
20       Q.    I think -- I think -- fine.
21           On your CV at the bottom of
22   page 8 you've written several book chapters,
23   correct?
24       A.    Book chapters, sure.
25       Q.    Do any deal with cancer?

Page 53

1        A.    I don't specifically recall,
2    but in this First Aid for Internal Medicine
3    Boards there may have been -- there may have
4    been some -- some cancer topics in there.
5        Q.    Do any deal with the
6    methodology for assessing causation?
7        A.    Book chapters on the
8    methodology assessing causation?  Not that
9    I'm aware of.
10       Q.    Any deal with talcum powder or
11   ovarian cancer?
12       A.    You know, other than the
13   potential for there being talk about
14   malignancies or cancer in First Aid for
15   Internal Medicine Boards, which I don't
16   specifically recall.
17       Q.    Do you think that that
18   references talcum powder?
19       A.    Do I think that what references
20   talcum powder?
21       Q.    That first chapter.
22       A.    Which one?  I'm --
23           MS. MILLER:  Objection.
24   QUESTIONS BY MR. TISI:
25       Q.    The one you just mentioned.

14 (Pages 50 to 53)

Christian Merlo, M.D., MPH

Page 54

```
 1           Do any of your book chapters
 2   deal in any way with talcum powder?
 3       A.   No, they don't.
 4       Q.   Okay.  Prior to finalizing your
 5   report in February of 2019, two months ago,
 6   had you ever publicly expressed your opinion
 7   about talcum powder and ovarian cancer?
 8       A.   No.
 9       Q.   Now, we talked about the fact
10   that you were an associate professor at Johns
11   Hopkins critical care.
12           You've been associate professor
13   for how many years?
14       A.   I'd have to look back at my CV.
15   It looks like I was promoted to associate
16   professor in 2015.
17       Q.   So you've been associate
18   professor for four years?
19       A.   That's correct.
20           (Merlo Exhibit 4 marked for
21   identification.)
22   QUESTIONS BY MR. TISI:
23       Q.   Okay.  I want to show you
24   Exhibit Number 4, which is the -- your bio on
25   your web page for the critical care division
```

Page 55

```
 1   of Hopkins.
 2           That's your picture, correct?
 3       A.   That is my picture.
 4       Q.   Does it list your expertise as
 5   cystic fibrosis, lung transplant, pulmonary
 6   and critical care medicine?
 7       A.   Are you referring to up top --
 8       Q.   Yes.
 9       A.   -- to the right?
10           Expertise:  cystic fibrosis,
11   lung transplant, pulmonary and critical care
12   medicine --
13       Q.   Yes.
14       A.   -- pulmonary?
15       Q.   Yeah.
16       A.   That's what it says.
17       Q.   Does it also say your research
18   interests are HIV-related pulmonary disease,
19   outcomes after lung transplantation, clinics
20   and -- clinical cystic fibrosis?
21       A.   That's what it says.
22       Q.   Okay.  Any mention of ovarian
23   cancer?
24       A.   There is no mention of ovarian
25   cancer.
```

Page 56

```
 1       Q.   Any mention of cancer of any
 2   kind?
 3       A.   There is not.
 4       Q.   Okay.  Now, your CV also
 5   mentions that you currently run the adult
 6   clinic for a cystic fibrosis center for the
 7   past four years, since 2015?
 8       A.   So I'm the associate program
 9   director for our adult cystic fibrosis
10   program at Johns Hopkins.
11       Q.   I'm sorry, I promoted you.
12       A.   Thank you.  It's very difficult
13   to get promoted at Hopkins, so --
14       Q.   Maybe someday.
15           You've held that position since
16   2015?
17       A.   Where are you referring --
18   where are we looking now?
19       Q.   Page 2.
20       A.   Page 2.
21       Q.   I'm sorry, the first page.
22       A.   First page.
23       Q.   It says, "2015 to present,
24   associate program director, Adult Cystic
25   Fibrosis Center."
```

Page 57

```
 1       A.   2015, yes, that's correct.
 2       Q.   So for four years you've been
 3   an associate professor.  For four years
 4   you've been an associate program director for
 5   the Cystic Fibrosis Clinic.
 6           What is cystic fibrosis?
 7       A.   Cystic fibrosis is a genetic
 8   disease that -- some people are born with it,
 9   and it leads to an abnormal chloride channel
10   in epithelial-lined cells -- in
11   epithelial-lined organs in the body.  In the
12   lungs it leads to a buildup of secretions and
13   progressive lung disease that oftentimes
14   leads to death or lung transplantation.
15           It leads to sinus disease.  It
16   leads to liver disease.  It leads to problems
17   in the gastrointestinal tract.  It leads to
18   infertility in men.  It leads to women
19   oftentimes having difficulties getting
20   pregnant.
21           And, unfortunately, there is no
22   cure for it.
23       Q.   Is it cancer?
24       A.   No.
25           (Merlo Exhibit 5 marked for
```

15 (Pages 54 to 57)

Christian Merlo, M.D., MPH

Page 58

1      identification.)
2      QUESTIONS BY MR. TISI:
3          Q.    Okay.  If I could show you
4      Exhibit Number 5, which is the web page from
5      the Adult Clinic for the Cystic Fibrosis
6      Center.
7          A.    I look much younger there.
8          Q.    We all look younger, Doctor, at
9      different times.
10          This is your web page from the
11     Johns Hopkins Adult Clinic for Cystic
12     Fibrosis?
13         A.    It's a web page from Hopkins.
14     I don't know whose web page it is.  I didn't
15     make it.
16         Q.    And it lists you and it -- an
17     associate professor of medicine and
18     epidemiology, correct?  Right under your
19     name?
20         A.    Where are you referring to?
21         Q.    Right under your name.
22         A.    I see.
23          Associate professor of medicine
24     and epidemiology, yes.
25         Q.    And I will talk about the

Page 59

1      epidemiology portion of it, but right now let
2      me ask you this:  The research interests
3      listed here are outcomes of adults with
4      cystic fibrosis infected with multiple
5      antibiotic-resistant pneumonias -- and I
6      don't even know how to pronounce that last
7      word.
8          Could you tell me?
9          A.    Pseudomonas aeruginosa.
10         Q.    Okay.  Diagnosis of management
11     of pulmonary arterial venous malformations,
12     correct?
13         A.    I do see that.
14         Q.    Are there areas of your
15     research interests?
16         A.    Those are things that I've been
17     interested in in research, among other
18     things.  I don't know who put this together
19     or where they got those things, so -- but
20     that's part of my research interests, sure.
21         Q.    Your clinical interests, at
22     least as described by your colleagues at
23     Johns Hopkins, are cystic fibrosis and lung
24     transplantation, correct?
25          MS. MILLER:  Objection.

Page 60

1          THE WITNESS:  On this website,
2      it's listed that my clinical interests
3      are cystic fibrosis and lung
4      transplantation.
5          But again, I have no idea who
6      put this together.  I don't know if
7      they were my colleagues or they're --
8      some random person at Hopkins did
9      this.
10     QUESTIONS BY MR. TISI:
11         Q.    Okay.  Did you ever ask to take
12     it down?
13         A.    No.
14         Q.    Okay.  Would you ever tell
15     somebody, "let's put in my clinical interests
16     here treatment of ovarian cancer"?
17          MS. MILLER:  Objection.
18          THE WITNESS:  You know, there
19     are lots of websites out there, and if
20     I spent my time just looking at
21     websites, I wouldn't be able to get
22     anything done.
23          So Hopkins has a lot of web
24     presence, and we oftentimes don't know
25     what goes up there.

Page 61

1      QUESTIONS BY MR. TISI:
2          Q.    I'll just start:  Now that
3      you've seen it, would you go back to your
4      colleagues and say, "You know something, I'm
5      an expert in ovarian cancer; you need to list
6      that"?
7          MS. MILLER:  Objection.
8          MR. LOCKE:  Objection.
9          THE WITNESS:  No.
10     QUESTIONS BY MR. TISI:
11         Q.    Okay.
12         A.    Not on a website.
13         Q.    Now let's talk a bit about your
14     appointment as associate professor of
15     medicine and epidemiology at the Johns
16     Hopkins School of Public Health.
17          You held that position as well,
18     right?
19         A.    Can you say that one more time?
20         Q.    Yeah.
21          Do you hold -- are you -- have
22     you been appointed as associate professor of
23     medicine and epidemiology at the Johns
24     Hopkins School of Public Health?
25         A.    So I'm appointed an associate

16 (Pages 58 to 61)

Christian Merlo, M.D., MPH

Page 62

1    professor of epidemiology at the Johns
2    Hopkins Bloomberg School of Public Health.
3        Q.    Now, would you agree that your
4    primary appointment, in terms of the time you
5    spend, is in the pulmonary and critical care
6    area as opposed to the School of Public
7    Health?
8            MS. MILLER:  Objection.
9            THE WITNESS:  So it depends.
10   It depends on the time of year.  It
11   depends on year to year.  There may be
12   more -- there may be some years where
13   I spend much more time over at the
14   School of Public Health in
15   collaborating with the epidemiologists
16   over there.  There may be years or
17   months where I spend more time in the
18   hospital.  There's no way for me to
19   really parse it out.
20   QUESTIONS BY MR. TISI:
21       Q.    If you were to -- if you were
22   to -- let's take a year, but we could take
23   four years you've been associate professor.
24   Let's do the big picture first.
25            Over the four years you have

Page 63

1    been at Hopkins, and you had to give me an
2    estimate of the time you spend over at the
3    Bloomberg School of Public Health as opposed
4    to at the pulmonary and critical care
5    medicine or the cystic fibrosis clinic,
6    basically the Bloomberg School of Public
7    Health and everything else, how would you
8    divide the time over the past four years?
9            MR. LOCKE:  Objection.
10           THE WITNESS:  I think it's
11   impossible to divide it because I may
12   go to clinic on, say, Wednesday --
13   Thursday and see transplant patients
14   and see cystic fibrosis patients, but
15   then Friday I'll spend working on a
16   research project with one of my
17   fellows where we have some of the
18   epidemiologists and analysts helping
19   us with our analysis and study
20   designs.
21           There may be times when I'm
22   seeing a patient in clinic, and then I
23   call one of my colleagues over at the
24   School of Public Health because I'm
25   going to say I'm going to get a sample

Page 64

1    for you, this and that.
2            So there's no way for me to
3    parse out whether it's 20/80, 80/20,
4    50/50.  It's all related.
5    QUESTIONS BY MR. TISI:
6        Q.    Do you have an office over at
7    the School of Public Health?
8        A.    I don't have a physical space
9    over at the School of Public Health.
10       Q.    Okay.
11       A.    I do have -- I do have lab
12   meetings that are located over at the School
13   of Public Health or in other epidemiologic
14   areas that are outside the School of
15   Medicine.
16       Q.    Now, there are professors and
17   assistant professors who work only in the
18   Bloomberg School of Public Health, correct?
19       A.    There are faculty that are only
20   appointed -- their only appointment is within
21   the School of Public Health, that is correct.
22       Q.    And they spend all their
23   professional time in that school -- in the
24   School of Public Health?
25       A.    Not necessarily.

Page 65

1        Q.    Okay.
2        A.    Because Hopkins is a very
3    collaborative place, and even though a
4    faculty member may not have a primary
5    appointment within a school, that doesn't
6    necessarily mean that that person would spend
7    his or her time only in one specific
8    building.
9        Q.    Now --
10       A.    It's a very fluid place.
11       Q.    Okay.  But there are full
12   professors at the Bloomberg School of Public
13   Health, correct?
14       A.    There are full professors at
15   the Johns Hopkins Bloomberg School of Public
16   Health.
17       Q.    And there are full associate
18   professors at -- full-time associate
19   professors at the Bloomberg School of Public
20   Health?
21       A.    There are full-time associate
22   professors at the Bloomberg School of Public
23   Health.
24           (Merlo Exhibit 6 marked for
25   identification.)

17  (Pages 62 to 65)

Christian Merlo, M.D., MPH

Page 66

```
 1   QUESTIONS BY MR. TISI:
 2        Q.   I'm going to provide you as
 3   Exhibit Number 6 the faculty directory at the
 4   Bloomberg School of -- the epidemiology
 5   department at the Bloomberg School of Public
 6   Health.
 7            MS. MILLER:  Are you providing
 8   it to the rest of us or just to him?
 9            MR. TISI:  I apologize,
10   Counsel.  I didn't do it quick enough
11   for you.
12            MS. MILLER:  Thank you.
13            MR. TISI:  Actually, may I have
14   one copy back?
15            MS. MILLER:  Totally.
16            MR. TISI:  Thank you.
17            MS. MILLER:  Susan and I can
18   share.
19   QUESTIONS BY MR. TISI:
20        Q.   I'll represent to you, Doctor,
21   that this is the faculty directory of the
22   epidemiology department, Bloomberg School of
23   Public Health.  It was taken off the website
24   before your deposition was moved last week,
25   so April 3rd of 2019.
```

Page 67

```
 1            Do you see that?
 2        A.   I do.
 3            MR. LOCKE:  Objection.
 4   QUESTIONS BY MR. TISI:
 5        Q.   And it lists full-time faculty.
 6            Do you see that?
 7        A.   I don't --
 8        Q.   See on the top -- top right
 9   here, full time?
10        A.   I do see that.
11        Q.   And if you look through here --
12   first of all, actually on the front page is a
13   gentleman by the name of Leon Gordis.
14            Who is Dr. Gordis?
15        A.   Leon Gordis was an
16   epidemiologist who -- when I took
17   Epidemiology I at the School of Public
18   Health, he taught the course.
19        Q.   And he is -- he wrote a
20   textbook on epidemiology, correct?
21            MS. MILLER:  Objection.
22            THE WITNESS:  I know of a
23   textbook that he wrote.  He may have
24   written multiple, but I know of one.
25
```

Page 68

```
 1   QUESTIONS BY MR. TISI:
 2        Q.   And it's used at Hopkins,
 3   right?
 4        A.   Dr. Gordis' textbook, when I
 5   took the course, was used at Hopkins.
 6            I'm not sure what textbook is
 7   used for that specific class today.
 8        Q.   And do you know a Dr. -- and I
 9   can't pronounce his name -- Moyses Szklo?
10        A.   Yeah, and I -- I'm not sure how
11   to pronounce his last -- his last name
12   either.
13        Q.   He's a full professor -- he's a
14   full professor of epidemiology, correct?
15        A.   Moyses Szklo.
16            Do I know him?  No.  I know of
17   him.
18        Q.   Do you know that he took over
19   the editing of the book when -- on
20   epidemiology when Dr. Gordis passed?
21        A.   I don't know that.
22        Q.   Okay.  Both of those
23   epidemiologists I mentioned, Dr. Szklo and
24   Dr. Gordis, were full-time professors at
25   the -- or in Dr. Szklo's case still is a
```

Page 69

```
 1   full-time professor at the Bloomberg School
 2   of Public Health, correct?
 3        A.   It says right here that he's a
 4   full-time professor.
 5        Q.   Have you spoke to Dr. Szklo?
 6            MS. MILLER:  Objection.
 7            THE WITNESS:  This Dr. Szklo?
 8   Yeah.
 9   QUESTIONS BY MR. TISI:
10        Q.   Szklo, is that how you
11   pronounce it?
12        A.   I think so.
13        Q.   Okay.
14        A.   I'm not sure.  Again, I know of
15   him, and I don't think I've ever met him.
16            Hopkins is a big place.
17        Q.   Now, I've -- it's also
18   collaborative, right?
19        A.   It is.
20        Q.   You told me it's very
21   collaborative.
22        A.   It is.  But it's a very big
23   place.
24        Q.   Understood.
25            But that's a department that
```

Christian Merlo, M.D., MPH

Page 70

1  you've -- I mean, is there anything that
2  would prevent you from speaking to Dr. Szklo?
3       MS. MILLER: Objection.
4       THE WITNESS: If I had a reason
5  to. But there are many people on here
6  that I actually have collaborated
7  with, so --
8  QUESTIONS BY MR. TISI:
9       Q.   Okay.
10      A.   In particular, Dr. Kirk right
11  here, I think he's on many of my articles.
12  So, you know, it just depends.
13      If there was something specific
14  that I thought that we could work on or I had
15  a question, I'd just e-mail or call him right
16  up and go over there.
17      Q.   Good to know. We'll talk about
18  that.
19      (Merlo Exhibit 7 marked for
20  identification.)
21  QUESTIONS BY MR. TISI:
22      Q.   I showed you Exhibit 4, which
23  was your personal web page from Johns Hopkins
24  pulmonary critical care department.
25      Now let me show you the web

Page 71

1  page from the Johns Hopkins department of
2  epidemiology, which I'd like to have marked
3  as Exhibit Number 7.
4       Do you see that?
5       A.   I see a faculty directory for
6  Johns Hopkins Bloomberg School of Public
7  Health.
8       Q.   All right. And underneath it
9  says, "department affiliation." It says,
10  "school of medicine, primary" and
11  "epidemiology, joint."
12      Do you see that?
13      A.   I do.
14      Q.   What does it mean to be
15  primary, and what does it mean to be joint?
16      A.   I actually have no idea. I
17  know that my first appointment at Johns
18  Hopkins was with the School of Medicine, and
19  then because I was teaching courses over at
20  the School of Public Health and collaborating
21  with some of the investigators over there, we
22  talked about another appointment, which I
23  guess would be called a joint appointment.
24      Q.   Okay. It says here, "View
25  current courses."

Page 72

1       Do you see that?
2       A.   I do.
3       Q.   And if you click on that, on
4  the computer, you get the second page of this
5  document, which is a course catalog.
6       Do you see that?
7       A.   I do.
8       Q.   And it says, "No results."
9       A.   Okay.
10      Q.   Okay. Do you teach any courses
11  in epidemiology?
12      A.   I do. I teach two.
13      Q.   Which ones do you teach?
14      A.   I teach a course called the
15  Science of Clinical Investigation and --
16      Q.   And what is -- I'm sorry.
17      A.   And that -- and the specific
18  aspect of that is the design of clinical
19  studies. We have both an in-person class and
20  an online course.
21      Q.   Okay. And is any part of that
22  course the discussion of the application of
23  the Bradford Hill framework to answering a
24  question of causation?
25      MS. MILLER: Objection.

Page 73

1       THE WITNESS: I don't know that
2  I have a specific slide that would say
3  Bradford -- there may be. I'd have to
4  look back. But we certainly do talk
5  about causality.
6  QUESTIONS BY MR. TISI:
7       Q.   And one of the things -- do you
8  have slides that you use in that course?
9       A.   I have slides, and other
10  instructors have slides.
11      Q.   Do you have any objection to
12  producing it to us?
13      MS. MILLER: I don't think
14  that's his decision whether to object
15  or not. I think that would be our
16  objection.
17      MR. TISI: I'm asking whether
18  he has any objection.
19      MS. MILLER: That's not an
20  appropriate question for the witness.
21      MR. TISI: I understand.
22  Objection.
23      MS. MILLER: But if it is
24  appropriate or not --
25      MR. TISI: Objection.

19 (Pages 70 to 73)

Christian Merlo, M.D., MPH

Page 74

1    Objection.
2         MS. MILLER:  No, I'm going to
3    speak.
4         MR. TISI:  No, you're not.
5         MS. MILLER:  You're talking --
6    Yes, I am.
7         MR. TISI:  No, you're not.
8         MS. MILLER:  Really?  You want
9    to watch?
10        MR. TISI:  Let's call the
11   judge.  Let's go off the record and
12   call the judge.
13        MS. MILLER:  We're going to off
14   the record and call the judge and tell
15   her that you asked the witness if he
16   has any objection to producing a
17   document --
18        MR. TISI:  Yes, does he have
19   personal --
20        MS. MILLER:  -- and won't let
21   me talk about the objection.  That is
22   not an appropriate question.
23        MR. TISI:  Does he have -- does
24   he have any -- do you have any
25   objection --

Page 75

1         MS. MILLER:  That is not an
2    appropriate question.  I'm instructing
3    you not to answer.
4         THE WITNESS:  You can take the
5    course.
6    QUESTIONS BY MR. TISI:
7         Q.    I'd love to take the course,
8    Doctor.
9         A.    Great.
10        Q.    I'd love to learn about the
11   levels of evidence.  But let's --
12        MS. SHARKO:  Should we agree?
13        MS. MILLER:  Yeah.
14   QUESTIONS BY MR. TISI:
15        Q.    Let's -- we're going -- on a
16   break, we're going to call the judge on that
17   question.
18             You said you taught a second
19   course.  What is the second course?
20        A.    So there's an online version
21   and there's an in-person version, and
22   sometimes they're a little bit different;
23   sometimes they're the same.
24        Q.    Okay.  In any of these courses
25   have you ever discussed your opinions on

Page 76

1    talcum powder?
2         A.    No, although I think it would
3    be a very fun exercise during that class.
4         Q.    Okay.  When is the next time
5    you give the class?
6         A.    We give the in-person version
7    in the fall, and we give the online version
8    usually in the wintertime.
9         Q.    Have you ever taught strategies
10   for investigating the causes of cancer?
11        A.    Can you ask that again?
12        MS. MILLER:  Objection.
13   QUESTIONS BY MR. TISI:
14        Q.    Yes.
15             Have you ever taught any
16   strategies for investigating the causes of
17   cancer?
18        MS. MILLER:  Same objection.
19        THE WITNESS:  So I would have
20   to say that in certain -- now, for
21   instance, in this -- in this
22   investigation looking at malignancies
23   after a transplant that we did, yeah,
24   certainly we talked about aspects of
25   how to evaluate the potential

Page 77

1    exposure/outcome relationship.
2    QUESTIONS BY MR. TISI:
3         Q.    What article is that, so I can
4    look it up?
5         A.    I'm trying to find the number
6    here.  65.
7         Q.    Thank you.
8             What is the title of the
9    article?  I'm sorry.
10        A.    "Risk Factors for De Novo
11   Malignancy Following Lung Transplantation."
12        Q.    Okay.  Do you know whether or
13   not ovarian cancer -- there's an association
14   between lung transplantation and ovarian
15   cancer?
16        MS. MILLER:  Objection.
17        MS. SHARKO:  Could you keep
18   your voice up, please, Mr. Tisi?
19        MR. TISI:  Sure.  You know, I'd
20   have to -- that's the first time I've
21   ever heard you say that.
22        MS. SHARKO:  I know.  I'm --
23        MR. TISI:  Well, this witness
24   is actually pretty good in answering
25   questions, so I appreciate that so

20 (Pages 74 to 77)

Christian Merlo, M.D., MPH

Page 78

1      far.
2           THE WITNESS:  I would have to
3      specifically look back at that
4      article.  I don't specifically recall.
5      QUESTIONS BY MR. TISI:
6           Q.    Okay.  Now, could you go to
7      Appendice C of your report?  Your report
8      which I believe is Exhibit Number 3.
9           It's the list of cases that you
10     have testified to over the past four years.
11          A.    Okay.
12          Q.    And that's exhibit -- and
13     that's Exhibit 3 -- and that's Exhibit 3,
14     correct?
15          A.    Yes, correct.
16          Q.    I want to have -- I believe
17     counsel provided us with a supplemental
18     exhibit to that.  I'll make it 3B because I
19     think we have a 3.
20          (Merlo Exhibit 3B marked for
21     identification.)
22          MS. MILLER:  You're talking
23     about the fact that we didn't know
24     what court one of the cases was in or
25     something.

Page 79

1           MR. TISI:  Honestly, I don't
2      know.  I don't have any idea.
3           MS. MILLER:  He's talking about
4      this.
5           MR. TISI:  Okay.  This is just
6      a clerical thing, Doctor.
7           Here's -- provided to us.  It
8      was a supplement.  I'm not even going
9      to spend any time with it.  It's just
10     a housekeeping thing.
11          MS. MILLER:  Yeah, I don't
12     think Dr. Merlo was involved in that.
13          MR. TISI:  Okay.
14     QUESTIONS BY MR. TISI:
15          Q.    Okay.  So you've given
16     testimony in the past four years 20 times?
17          A.    That seems about -- I mean, I
18     don't know if it's exactly 20, but --
19     whatever --
20          Q.    Well, I've counted them up.
21     Five times in 2015; three times in 2016; five
22     times in 2017, six times in 2018.
23          Does that -- does that look
24     about right to you?
25          A.    It looks about right.

Page 80

1           Q.    Okay.  Are there times that
2      you've consulted on legal cases but not been
3      an expert?
4           MS. MILLER:  Objection.
5           THE WITNESS:  Well, being asked
6      to consult on a case, I've been
7      considered an expert.  There have been
8      cases that I've turned down because I
9      felt like my opinion -- or I felt like
10     there wasn't -- there wasn't something
11     that I could support or there wasn't
12     something that was -- something that I
13     could provide an opinion about.
14     QUESTIONS BY MR. TISI:
15          Q.    Could you give me an estimate,
16     if you would -- I'll talk about your work on
17     behalf of Johnson & Johnson in this case, but
18     putting that aside for a moment, on the legal
19     matters in which you have been either
20     identified as an expert or consulted,
21     approximately how much have you made the past
22     year, money?
23          A.    Well, first off, I would like
24     to clarify that I'm not working on behalf of
25     Johnson & Johnson.

Page 81

1           And I would have to look at my
2      tax statement because I don't recall.
3           Q.    Was it more than $10,000?
4           A.    Probably.
5           Q.    More than 20?
6           A.    Probably.
7           Q.    More than 30?
8           A.    Probably was more than 30.
9           Q.    More than 40?
10          A.    Probably.
11          Q.    More than 50?
12          A.    Probably.
13          Q.    More than 60?
14          A.    In the last year, probably,
15     yes.
16          Q.    More than 70?
17          A.    Maybe.
18          Q.    Okay.  What about the year
19     prior?
20          A.    I don't recall.
21          Q.    Okay.  The prior -- last year
22     you had six times in 2018.  2017 you had five
23     times.
24          Would it be approximately the
25     same?

21 (Pages 78 to 81)

Christian Merlo, M.D., MPH

Page 82

1          MS. MILLER: Objection. He
2     said he doesn't remember.
3          MR. TISI: I can -- I can ask
4     these questions.
5          THE WITNESS: Again, I'd
6     probably have to look at my tax
7     records. I'd be just guessing.
8     QUESTIONS BY MR. TISI:
9          Q.   Would it be more than 10?
10         A.   I'd be guessing.
11         Q.   Okay. Over the past four
12    years, have you been provided -- have you
13    provided expert work in litigation fairly
14    consistently? Is that something that you do?
15         MS. MILLER: Objection.
16         THE WITNESS: It's not
17    something I keep track of. I have
18    been -- I have offered opinions as an
19    expert witness, but I don't keep track
20    of how much or how little.
21    QUESTIONS BY MR. TISI:
22         Q.   Now in this case, in 2019, have
23    you -- in 2019, have you given any
24    depositions -- we're now in April. Have you
25    been identified as an expert or given any

Page 83

1     opinions in 2019 other than in this case?
2          A.   I'd have to look back through
3     my records. I don't remember.
4          Q.   You don't remember giving any
5     depositions or signing any reports over the
6     past three, four months?
7          A.   Again, I'd have to look at my
8     records.
9          Q.   Okay. In this case we have
10    your records, which I'll mark in a minute.
11    Actually, I'll do it right now. Exhibit
12    Number 8, which are the records of --
13    provided to us.
14         (Merlo Exhibit 8 marked for
15         identification.)
16    QUESTIONS BY MR. TISI:
17         Q.   And it shows that you have made
18    in the Johnson & Johnson litigation about
19    $150,000 so far this year?
20         A.   This looks like a bill or an
21    invoice.
22         Q.   One is dated -- one is dated
23    March 1, 2019, and it's -- first date is
24    December 3, 2018, through March 17th, and
25    it's for $116,000?

Page 84

1          A.   I see that, yes.
2          Q.   Is that accurate?
3          A.   This is an invoice. I haven't
4     seen it yet, but --
5          Q.   Did you do any work for
6     Johnson & Johnson before December of 2018?
7          A.   Again, I just would like to
8     clarify. I'm not working for Johnson &
9     Johnson.
10         Q.   Okay. Have you been paid by
11    Johnson & Johnson for your time prior to
12    December of 2018?
13         A.   Not that I recall.
14         Q.   Okay.
15         MS. MILLER: Let us know when
16    it's a good time for a break.
17    QUESTIONS BY MR. TISI:
18         Q.   The next document is an invoice
19    showing that you made an additional $28,995
20    through April 7, 2019; is that correct?
21         MS. MILLER: I'm sorry?
22         THE WITNESS: I'm sorry, could
23    you ask that one more time?
24         MR. TISI: I'm sorry. I'm
25    sorry.

Page 85

1     QUESTIONS BY MR. TISI:
2          Q.   It shows just $5 short of 30 --
3     $29,000 as of March 7, 2019?
4          A.   That's what the invoice shows,
5     yes.
6          Q.   It has a company or LLC here
7     called VeraMedica.
8               What is VeraMedica?
9          A.   VeraMedica is an organization.
10    I'm not sure about the -- any of the
11    specifics there, but it's an organization
12    that I used for administrative purposes to
13    put binders together, to make photocopies, to
14    make -- to schedule meetings, those sort of
15    things.
16         Q.   Are they a scientific
17    consulting company?
18         A.   I have no idea.
19         Q.   Do they provide -- did they
20    provide you any support for the reports that
21    you prepare -- the report you prepared in
22    this case?
23         A.   Other than making a photocopy
24    or scheduling meetings or helping to give me
25    kind of an office away from an office, that's

22 (Pages 82 to 85)

Christian Merlo, M.D., MPH

Page 86

1    the support that they give me.
2         Q.    And if you give me about five,
3    ten minutes, I think we can finish this.
4         MR. TISI:  Is that okay with
5    you, Counsel?
6         MS. MILLER:  Sure.
7         MR. TISI:  Okay.
8    QUESTIONS BY MR. TISI:
9         Q.    Your expert work you charge
10   $530 an hour, and $720 an hour for your
11   testimony?
12        A.    That's correct.
13        Q.    Okay.  Those are -- those are
14   numbers that are -- is there anything built
15   into that number?
16             We had Dr. Diette the other day
17   where a certain portion of his bill went to
18   somebody other than himself, so I'm asking
19   you that question.
20        A.    You know, and I'd have -- I
21   don't actually know, but I'd have to look
22   back or I'd have to talk -- the
23   administrative services for -- that were
24   supported to me by VeraMedica may be built
25   into that.

Page 87

1             MS. MILLER:  I would note that
2    the -- it says 540 on the --
3             MR. TISI:  Okay.
4             MS. MILLER:  -- on here and it
5    says 530 on here, so...
6             THE WITNESS:  And again, I'm
7    not sure of the specifics.
8    QUESTIONS BY MR. TISI:
9         Q.    Okay.  Now, in addition to
10   consulting for litigation purposes like you
11   are here, have you also worked directly for
12   pharmaceutical companies over the past four,
13   five years?
14        A.    I have not worked directly for
15   pharmaceutical companies --
16        Q.    Well, I'm sorry.
17        A.    -- over the past four or five
18   years.
19        Q.    That's a bad question.
20             Have you been provided funding
21   by pharmaceuticals companies like Novartis,
22   for example?
23        A.    So it depends.  And that's a
24   very general question, so you'd have to be
25   very -- even more specific about that.

Page 88

1         Q.    Well, let me show you -- and
2    I'm taking this out of order a little bit.
3    There's a website that I go to sometimes to
4    find this information out.
5             It identifies -- and I'm going
6    to show you...
7             MS. MILLER:  We're up to what
8    number exhibit?
9             MR. TISI:  This is 47.  It's
10   taken out of order because everything
11   is marked.
12             (Merlo Exhibit 47 marked for
13   identification.)
14   QUESTIONS BY MR. TISI:
15        Q.    It lists payments made by
16   pharmaceutical companies to doctors, and I'm
17   just curious as to whether this is accurate
18   or not.
19             Were you paid approximately
20   $44,000 in 2016 --
21             MS. MILLER:  Objection.
22   QUESTIONS BY MR. TISI:
23        Q.    -- by --
24             MS. MILLER:  Sorry, I thought
25   you were done.

Page 89

1    QUESTIONS BY MR. TISI:
2         Q.    -- by, among others, Novartis?
3             MS. MILLER:  Objection.
4             THE WITNESS:  So I'm not really
5    sure what this website is.
6             I do -- I have been involved in
7    think tanks for -- involving other
8    doctors and folks to talk about
9    aspects of disease, and there have
10   been honorariums involved with that.
11             I also give speeches to groups,
12   mainly groups of doctors and nurses
13   and teams that take care of patients
14   with cystic fibrosis.  And those
15   speeches are sometimes sponsored by
16   pharmaceutical companies, so -- and
17   I'm provided an honorarium to give
18   that.
19             So this doesn't surprise me.
20   QUESTIONS BY MR. TISI:
21        Q.    Okay.  So -- and that's what
22   I'm trying to get at here, Doctor.
23             You can call them honorarium.
24   You can call them whatever you want.  You
25   get -- you get a check from the

23 (Pages 86 to 89)

Page 90

1    pharmaceutical companies for outside -- work
2    outside of your official duties at Johns
3    Hopkins.
4              And this goes from 2013 to
5    2016, correct?
6              MR. LOCKE:  Objection.
7              THE WITNESS:  And I am going to
8         say that they're honorarium because
9         that's what they're called.
10   QUESTIONS BY MR. TISI:
11        Q.   Okay.
12        A.   And I'm asked by sometimes
13   other centers to come, and that -- and
14   that -- to give a speech or a talk to the
15   group, and that talk or speech might be
16   sponsored by a pharmaceutical industry, and
17   that's what this reflects.
18        Q.   Okay.  And so without getting
19   down to the minutiae, this has 44,000,
20   approximately, in 2016, 31,000 in 2015,
21   79,000 in 2014, and 42,000, approximately,
22   more or less, in 2013.
23             Is that about -- is that
24   accurate or in that ballpark?
25        A.   I mean, I'd have to look

Page 91

1    through my records, but that's what the
2    website says.
3         Q.   Okay.  And is that money that
4    you get as an honorarium yours?
5         A.   It is mine, yes.
6         Q.   And did you do it in 2017,
7    2018, and continue into 2019?
8              MS. MILLER:  Objection.  Vague.
9              THE WITNESS:  I'd have to look
10        through my records.  I have done --
11        I've given much less talks in the last
12        few years.
13   QUESTIONS BY MR. TISI:
14        Q.   And on all the products that
15   you speak about or all the companies that
16   you -- they -- would it be fair to say that
17   they are all focused in the pulmonary area;
18   in other words, either involved treatments
19   for pulmonary disease or descriptions of
20   pulmonary disease?  Correct?
21        A.   So there's a lot to that
22   question because you mentioned products, you
23   mentioned descriptions, and I probably should
24   break it down a little bit.
25             The talks are usually given to

Page 92

1    a group that's taking care of patients with
2    advanced lung disease due to cystic fibrosis.
3              And most times the talks are a
4    description about the disease, either to
5    educate the teams or describe how the process
6    of when a kid grows up to be an adult with
7    cystic fibrosis, how do you take care of the
8    transition process.
9              Most of them don't involve a
10   specific therapy for cystic fibrosis.
11   Oftentimes specific therapies are talked
12   about after the talk with the group, but most
13   times it's done for education purposes.
14        Q.   But most of the companies that
15   pay these honorariums actually do produce
16   products used to treat cystic fibrosis and
17   pulmonary disease, correct?
18        A.   Which companies are you
19   referring to?
20        Q.   Gilead, Novartis.
21        A.   Gilead, Novartis do have --
22   well, Novartis not anymore, but --
23        Q.   They did at the time?
24        A.   -- Gilead and Novartis did have
25   products that were used to treat patients

Page 93

1    with cystic fibrosis.
2         Q.   Okay.  So just to wrap this up,
3    and I -- we'll move on to the next topic and
4    take our break.
5              MS. MILLER:  Take our break.
6    QUESTIONS BY MR. TISI:
7         Q.   You have done work in
8    litigation, which we've talked about earlier,
9    and you did speeches and talks for which you
10   received honorarium from pharmaceutical
11   companies.
12             Do you also -- have you also
13   provided consulting services to
14   pharmaceutical companies or the like that are
15   not giving speeches and all that?
16        A.   I mean, I've helped design some
17   of these talks, put together the slides for
18   them, and I have been provided honorariums
19   for that as well.
20             MR. TISI:  Let's take our
21        break.
22             VIDEOGRAPHER:  The time is
23        10:23 a.m., and we're going off the
24        record.
25        (Off the record at 10:23 a.m.)

24 (Pages 90 to 93)

Christian Merlo, M.D., MPH

Page 94

1           VIDEOGRAPHER:  The time is
2     10:42 a.m., and we are back on the
3     record.
4     QUESTIONS BY MR. TISI:
5          Q.    Just a couple of questions real
6     briefly before I move on to your report.
7                You received your master's in
8     public health from Johns Hopkins School of
9     Public Health in 2003?
10         A.    Yes, I believe so.
11         Q.    And who was your advisor?
12         A.    My advisor in the School of
13    Public Health, or the School of Medicine at
14    that time?
15         Q.    School of Public Health.
16         A.    I believe my advisor may have
17    been Marie Diener Smith, but I don't
18    specifically recall.
19         Q.    Did you do a Capstone?
20         A.    At the time the Capstone
21    project was not part of the master's in
22    public health.
23         Q.    Okay.  Did you have to do any
24    kind of final project to get your MPH?
25         A.    We had a final project

Page 95

1     assignment with Biostatistics IV where we had
2     to design a clinical study, do the analysis
3     and write up a manuscript, which was
4     eventually published, but that was my final
5     project.
6          Q.    And was it a pulmonary study?
7          A.    It was a study looking at risk
8     factors for resistant organisms in cystic
9     fibrosis.
10         Q.    Okay.  So it was a pulmonary
11    cystic fibrosis study?
12         A.    It was a cystic fibrosis study.
13         Q.    Okay.
14         A.    An epidemiologic cystic
15    fibrosis study.
16         Q.    Are you a Capstone advisor for
17    any students in the School of Public Health?
18         A.    I have been in the past.  I'm
19    not this year.
20         Q.    Okay.  How does the School of
21    Public Health assign students to advisors for
22    their Capstone project?
23                I mean, do they look at
24    qualifications, et cetera, areas of interest,
25    research?

Page 96

1          A.    I don't know specifically.  I
2     don't know if advisors are assigned or
3     advisors are recommended and then the student
4     decides.  I just don't know.
5          Q.    Have you ever had a student who
6     did a Capstone project with you that was not
7     pulmonary in nature?
8          A.    I've had students who have
9     worked with me that have been outside of
10    pulmonary and critical care medicine.
11         Q.    Okay.
12         A.    Two have been surgeons who have
13    worked on -- that we wound up working on many
14    projects together.
15         Q.    Okay.  All right.  So when was
16    the first time you met with -- who was your
17    primary contact for the ovarian cancer report
18    that we've marked as Exhibit 3?  Which of the
19    lawyers?
20                Who first contacted you for
21    this project?
22         A.    Ms. Miller.
23         Q.    Okay.  And when was that done?
24    When was the first contact you had with
25    Ms. Miller?

Page 97

1          A.    2018.
2          Q.    Okay.  When?
3          A.    Late 2018.  I don't
4     specifically recall.
5          Q.    The first billing record that
6     we had when we looked at that exhibit, I
7     think Exhibit 8, had a December 2018 date.
8                Is that about right?
9          A.    It would have been before that.
10         Q.    Okay.  Was December 2018 the
11    first actual work you did on the project?
12         A.    What do you mean by "work"?
13         Q.    It's the first time you billed,
14    so why would that be the -- I mean, did you
15    do work for which you did not bill?
16         A.    It -- just if you could be a
17    little bit more specific about what you mean
18    by "work."
19         Q.    I can't go by anything any --
20    for more than what you billed.
21                How long between the first
22    contact and the first work you did on the
23    case that would start the process of
24    resulting in the report that was issued in
25    February?

25  (Pages 94 to 97)

Christian Merlo, M.D., MPH

Page 98

1     MS. MILLER: Objection.
2         THE WITNESS: I don't
3     specifically recall.
4     QUESTIONS BY MR. TISI:
5         Q.   Okay.
6         MS. MILLER: Don't forget to
7     give me ten seconds before you answer.
8         THE WITNESS: I'm sorry.
9     QUESTIONS BY MR. TISI:
10        Q.   Prior to -- now, we had
11    indicated that you did some litigation work.
12    You did some consulting work for which you
13    received honoraria.
14        Had you ever worked -- had you
15    ever had -- done litigation work for
16    Johnson & Johnson previously?
17        A.   Well, again, I'd have to
18    clarify. I'm not doing litigation work for
19    Johnson & Johnson.
20        Q.   How would you -- so we don't
21    have to dance around that issue, how would
22    you --
23        A.   But you keep asking it, so --
24        MR. LOCKE: Objection.
25

Page 99

1     QUESTIONS BY MR. TISI:
2         Q.   Well, okay. So you tell me --
3     you tell me how I would phrase it so we don't
4     have to keep going back and forth on that.
5         MS. MILLER: Objection.
6     QUESTIONS BY MR. TISI:
7         Q.   What makes you more
8     comfortable?
9         Have you ever done consulting
10    work for Johnson & Johnson in a litigation
11    context before?
12        A.   Again, the premise there is
13    that I'm doing something for someone, and I'm
14    not doing something for anyone.
15        Q.   Are you being paid by them?
16        A.   I don't know who I'm being paid
17    by.
18        Q.   You don't know who -- you don't
19    know that the lawyers here are paying you for
20    your time here today?
21        A.   Again, I don't know who is
22    paying me. I know I'm getting paid, but I
23    don't know who is paying me.
24        Q.   Okay. You're being paid in
25    this litigation. You're not being paid by

Page 100

1     me, right?
2         So you're being paid by the
3     folks sitting next to you, and where it comes
4     from, we'll leave that -- we'll leave that to
5     other people to decide.
6         The question is: You are being
7     paid to be here today?
8         A.   I will submit a bill, and I
9     will be paid for being here today.
10        Q.   Have you ever had any similar
11    circumstances in cases involving Johnson &
12    Johnson before?
13        A.   I don't believe that I have --
14    I don't believe so.
15        Q.   Okay. Has Johnson & Johnson,
16    putting litigation aside, ever hired you or
17    paid you honoraria to actually speak on a
18    topic?
19        A.   I've never been paid an
20    honorarium or have been hired by Johnson &
21    Johnson.
22        Q.   Okay. Have they ever consulted
23    you in any way for any scientific reason
24    outside of litigation?
25        A.   Johnson & Johnson has not

Page 101

1     consulted me outside of this litigation.
2         Q.   Now, Merlo -- you know that
3     this report was filed in the context of
4     litigation, correct, Exhibit 3? It's got a
5     legal caption on it.
6         A.   Exhibit 3, yes.
7         Q.   Okay. And it was requested as
8     a result -- it was -- I'm sorry, it was
9     generated as a result of a request from the
10    lawyers for J&J?
11        A.   I was asked -- I'll just read
12    this right here. I was asked to address
13    fundamental tenets of epidemiology, to review
14    epidemiology related to the potential
15    association between perineal talc use and
16    ovarian cancer, to review plaintiffs'
17    epidemiologic expert reports, and to offer my
18    opinions on their methodologies.
19        Q.   Who asked you to do that?
20        A.   I was asked by Ms. Miller.
21        Q.   Okay. And when you drafted --
22    when you did that, you understood that your
23    report was being submitted in the context of
24    this litigation, correct?
25        A.   I understood that I would put

26 (Pages 98 to 101)

Christian Merlo, M.D., MPH

Page 102

 1  together a report and that would likely be
 2  submitted.
 3      Q.   In litigation?
 4      A.   In litigation.
 5      Q.   Okay.  So this report that you
 6  have in front of you, Exhibit Number 6, was
 7  not generated in your normal course of your
 8  professional work as a professor or -- excuse
 9  me, as an assistant professor at Johns
10  Hopkins, either in the School of Public
11  Health or the department of medicine?
12          MS. MILLER:  Objection.
13          THE WITNESS:  Can you ask that
14      again?
15  QUESTIONS BY MR. TISI:
16      Q.   Yes.
17          So the report that you have in
18  front of you, Exhibit Number 3, was
19  generated -- was not generated in the normal
20  course of your professional work as a
21  professor or researcher at either the School
22  of Medicine or the School of Public Health at
23  Johns Hopkins?
24          MS. MILLER:  Objection.
25          THE WITNESS:  So I'd say it

Page 103

 1  depends.  Because if we look at it as
 2  a report in itself and how I approach
 3  this subject, that would be very
 4  similar to how I approach a lot of
 5  things in my -- in my career.  So --
 6  and in my professional duties within
 7  the School of Medicine and
 8  epidemiology.
 9          So is this any different?  No.
10  QUESTIONS BY MR. TISI:
11      Q.   I didn't ask you that question,
12  Doctor.  With all due respect, I think you
13  need to listen to my question.
14          My question is:  Was this
15  particular report on talcum powder product
16  and ovarian cancer done in connection with
17  your duties and responsibilities at Johns
18  Hopkins?
19          MS. MILLER:  That wasn't your
20      question.
21          MR. LOCKE:  Objection.
22          MS. MILLER:  That's a different
23      question.  I just want to make that
24      clear.  And I'm objecting to this
25      question as well.

Page 104

 1          THE WITNESS:  Can you ask that
 2      again?
 3  QUESTIONS BY MR. TISI:
 4      Q.   Yes.
 5          Would you have done this report
 6  had Ms. Miller not asked you to do it?
 7      A.   I would not have specifically
 8  put this together.
 9      Q.   Okay.
10      A.   Had not been asked to provide
11  my opinions on this topic.
12      Q.   Right.
13          And before Ms. Miller reached
14  out to you in December of 2018, some five
15  months ago, you had never expressed an
16  opinion one way or another about the risk of
17  ovarian cancer associated with talcum powder
18  products, have you?
19          MR. LOCKE:  Objection.
20          MS. MILLER:  Objection.
21          THE WITNESS:  Can you ask that
22      one more time?
23  QUESTIONS BY MR. TISI:
24      Q.   Yes.
25      A.   I'm sorry, I'm just getting --

Page 105

 1  when I hear objections, I just --
 2      Q.   Yeah, they're intended to be
 3  that way.
 4      A.   No, but it's -- so I need to
 5  think about the question.
 6          MS. MILLER:  They're not
 7      intended to be that way.  That was not
 8      a necessary comment.
 9  QUESTIONS BY MR. TISI:
10      Q.   Let me ask you this question.
11          Before your report in February,
12  Exhibit Number 3, had you ever expressed the
13  opinion on page 46 of your report that says,
14  "When analyzed in a methodologic manner, the
15  body of medical literature simply does not
16  support the conclusion that perineal exposure
17  to talc causes ovarian cancer"?
18          Have you ever said that
19  statement or any statement similar to that
20  prior to your report being filed on
21  February 25, 2019?
22      A.   I had not said that prior to
23  this because I had not reviewed all of this
24  literature prior to that.
25      Q.   Okay.  So all the literature

Christian Merlo, M.D., MPH

Page 106

1   review that you did in this case was as a
2   result of being retained in this case?
3        A.   The literature review that I
4   did in this case was because I was asked to
5   provide an opinion on that.
6        Q.   Prior to Ms. Miller contacting
7   you, had you ever read any of the articles
8   that you read in connection with this report
9   on talc and ovarian cancer?
10       A.   Likely no.
11       Q.   Okay.  Now, you mentioned, if
12   you go to page 1 of your report, the scope of
13   your report -- as I count it, you have -- you
14   did three things.
15            You were asked to address
16   fundamental tenets of epidemiology, correct?
17       A.   Address fundamental tenets of
18   epidemiology.
19       Q.   Okay.  Number 2, review the
20   epidemiology of the potential association
21   between perineal talc use and ovarian cancer,
22   correct?
23       A.   To review the epidemiology
24   related to the potential association between
25   perineal talc use and ovarian cancer,

Page 107

1   correct.
2        Q.   And the third assignment was to
3   review plaintiffs' epidemiology reports and
4   offer your opinion on their methodologies?
5        A.   So those are two different
6   things.  To review plaintiffs' epidemiology
7   expert reports and then to offer my opinions
8   on their methodologies would be a separate
9   thing.
10       Q.   Okay.  All right.  And to be
11   clear, the scope -- the things that you did
12   for this report as indicated on page 1, the
13   four items we've talked about, are things you
14   never did before December of 2019 {sic}?
15            MS. MILLER:  Objection.
16   QUESTIONS BY MR. TISI:
17       Q.   2018?
18            MS. MILLER:  Objection.
19            THE WITNESS:  Well, not
20   necessarily.
21   I think if we --
22   QUESTIONS BY MR. TISI:
23       Q.   Actually, let me rephrase the
24   question.
25            You have --

Page 108

1            MS. MILLER:  I think if you let
2   him finish --
3            MR. TISI:  I said I'm
4   withdrawing the question.  Okay?
5   QUESTIONS BY MR. TISI:
6        Q.   I assume that you have reviewed
7   fundamental tenets of epidemiology prior to
8   December of 2018?
9            MS. MILLER:  Objection.
10            THE WITNESS:  I have reviewed
11   and I teach fundamental tenets of
12   epidemiology.
13   QUESTIONS BY MR. TISI:
14       Q.   Okay.  Putting that aside,
15   prior to December of 2018, have you ever
16   reviewed the epidemiology related to the
17   potential exposure between perineal talc use
18   and ovarian cancer?
19       A.   The potential exposure?
20       Q.   Association.
21       A.   I had not reviewed epidemiology
22   related to the potential association between
23   perineal talc and ovarian cancer.
24       Q.   Before December of 2018?
25       A.   Specifically, it may have been

Page 109

1   November.  I don't remember when we first
2   talked, but --
3        Q.   Let's say the last quarter.
4        A.   -- late 2018.
5        Q.   Okay.  So within the past eight
6   or nine months?
7        A.   Before late 2018?  No, I did --
8   had not reviewed the epidemiology --
9        Q.   Okay.
10       A.   -- related to the potential
11   association between perineal talc exposure
12   and ovarian cancer.
13       Q.   Okay.  And if you go to
14   page 46 -- and we touched on this.  You said
15   your opinion on Issue Number 2, which would
16   be the results of your analysis of the
17   epidemiology related to the potential
18   association between perineal use and ovarian
19   cancer, your opinion was:  When analyzed in a
20   methodologic manner, the body of medical
21   literature simply does not support the
22   conclusion that perineal talc exposure causes
23   ovarian cancer.
24       A.   And we're referring to page 46
25   of --

28  (Pages 106 to 109)

Christian Merlo, M.D., MPH

Page 110

1    Q.    Correct.
2    A.    -- this report?
3          And which line was that?
4    Q.    The last paragraph.
5    A.    "When analyzed in a
6    methodologic manner, the body of medical
7    literature simply does not support the
8    conclusion that perineal exposure to talc
9    causes ovarian cancer," yes.
10         (Merlo Exhibit 9 marked for
11   identification.)
12   QUESTIONS BY MR. TISI:
13   Q.    And I have that conclusion
14   marked as Exhibit Number 9.  Read it and tell
15   me if it's correct.
16   A.    That's correct.
17   Q.    And that's your professional
18   opinion on the issue of causation, correct?
19   A.    That is my professional and
20   epidemiologic opinion on causation.
21   Q.    Okay.
22   A.    Correct.
23   Q.    Did you -- in addition to
24   providing basic epidemiologic principles, did
25   you apply your professional and epidemiologic

Page 111

1    judgment to answer that question?
2    A.    I don't know what you mean by
3    "epidemiologic judgment. "
4    Q.    Well, this -- epidemiology
5    isn't the kind science where you just plug
6    numbers in and you come out with an answer,
7    right?
8          MS. MILLER:  Objection.
9          THE WITNESS:  Well,
10   epidemiology can be very objective and
11   not subjective, and oftentimes there
12   are numbers involved in epidemiology.
13   QUESTIONS BY MR. TISI:
14   Q.    Clearly there are numbers --
15   clearly there are numbers involved.
16         But an expert in epidemiology
17   also has to use their professional judgment
18   interpreting the numbers, correct?
19         MS. MILLER:  Objection.
20         THE WITNESS:  I don't know what
21   you mean by "interpreting the
22   numbers."
23   QUESTIONS BY MR. TISI:
24   Q.    Well, oftentimes experts
25   disagree about what an epidemiology study or

Page 112

1    a group of epidemiology studies mean, true?
2    A.    Can you say that again?
3    Q.    Yeah.
4          Oftentimes experts in
5    epidemiology disagree about what an
6    epidemiology study actually means or a group
7    of epidemiology studies actually means?
8    A.    There may be instances where
9    epidemiologists may disagree on methodologies
10   and how a study was performed.
11         The interpretation of results
12   is usually something that is not disagreed
13   upon.  It's usually the methodology that
14   leads to the disagreement.
15   Q.    Well, for an individual study,
16   the results are what the results are, true?
17   A.    For an individual study, the
18   results are usually what the results are
19   based on -- but those are -- with the caveat
20   that there are a lot of aspects that go into
21   those results:  the study design, the study
22   type, whether or not bias and confounding was
23   accounted for before or after the analysis,
24   was the analysis appropriate.
25         So those results can't just be

Page 113

1    taken out of context without looking at all
2    the other aspects of the study.
3    Q.    Okay.  And when -- now, putting
4    aside looking at the results of an individual
5    study, when you're looking at a body of
6    literature, all right, multiple epidemiology
7    studies, multiple biologic studies, and
8    trying to interpret a body of literature, do
9    you use professional judgment?
10         MS. MILLER:  Objection.
11         THE WITNESS:  Again, I don't --
12   I don't know what "professional
13   judgment" means.  I don't understand
14   what you mean by that, so --
15   QUESTIONS BY MR. TISI:
16   Q.    Do you know if that's a phrase
17   that's used in textbooks that are used at
18   Johns Hopkins, that you teach students?
19         MS. MILLER:  Objection.
20         THE WITNESS:  I mean, I have no
21   idea.  There's lots of textbooks.  You
22   would have to point me to one that
23   you're referring to.
24   QUESTIONS BY MR. TISI:
25   Q.    We will do that.

Christian Merlo, M.D., MPH

Page 114

```
 1            Now, apart from your own
 2   causation opinion, which we've marked as
 3   Exhibit Number 9, I think, right there -- is
 4   that number 9?
 5       A.    That's number 9.
 6       Q.    You also, as part of your
 7   assignment, offered opinions on the
 8   plaintiffs' experts' reports, true?
 9       A.    That's correct.
10       Q.    Okay.  And in fact, if you go
11   to page 46 of your report, you devoted the
12   vast majority of your conclusion paragraphs
13   to discussing the methodologies that are used
14   by plaintiffs' experts in reaching their
15   conclusions.
16            Do you see that?
17       A.    Yes.
18       Q.    Okay.  For example, you say in
19   paragraph 2, "The methodologies used by
20   plaintiffs' experts ignore fundamental
21   principles of epidemiology.  In particular,
22   plaintiffs' experts ignore the hierarchy of
23   evidence evaluating studies and rely on study
24   designs that are inherently susceptible to
25   bias.  Specifically plaintiffs' experts pay
```

Page 115

```
 1   particular attention to criticizing cohort
 2   studies, with little acknowledgement to the
 3   limitations of case-control studies that find
 4   weak associations."
 5            Did I read that correctly?
 6       A.    That's correct.
 7       Q.    Okay.  So you think that there
 8   is a hierarchy of evidence that is generally
 9   accepted?
10            MS. MILLER:  Objection.
11            THE WITNESS:  It's not what I
12   think.  There is a general hierarchy
13   of evidence --
14   QUESTIONS BY MR. TISI:
15       Q.    Okay.
16       A.    -- in the epidemiologic
17   community --
18       Q.    Okay.
19       A.    -- and so there are different
20   levels of evidence based on a study design.
21       Q.    Okay.  And on that -- under
22   that design hierarchy, cohort studies are
23   more reliable than case-control studies, as a
24   general matter?
25            MS. MILLER:  Objection.
```

Page 116

```
 1            THE WITNESS:  So in --
 2            MS. MILLER:  Ten seconds.
 3            THE WITNESS:  So in general,
 4   the hierarchy of evidence does put
 5   certain study designs above others.
 6   Meta-analyses are usually put above
 7   randomized controlled trials.
 8   Randomized controlled trials are
 9   usually put above cohort studies.
10   Cohort studies are usually put above
11   case-control studies.  Case-control
12   studies are usually put above case
13   series or cross-sectional studies.
14            But it depends.  It depends on
15   many, many -- it depends on many, many
16   factors, and you can't just take that
17   in itself.
18            A poorly designed randomized
19   controlled trial may be much less
20   informative than a very, very good
21   cohort study.
22   QUESTIONS BY MR. TISI:
23       Q.    Okay.  Then you say -- a
24   separate criticism.  You say, "Plaintiffs'
25   experts generally agree that even if the
```

Page 117

```
 1   studies do show an association between talc
 2   use and ovarian cancer, have found a relative
 3   risk in the range of 1.2 to 1.6, this, by
 4   definition, is a weak association."
 5            Do you see that?
 6       A.    I do, yes.
 7       Q.    Okay.  And you're critical of
 8   their description of the strength of the
 9   association?
10       A.    Relative risk in the range of
11   1.2 to 1.6 is, by definition, a weak
12   association.
13       Q.    Whose definition?
14       A.    I think I have a reference in
15   here.
16       Q.    Yeah, you have a reference to
17   an Australian white paper.
18       A.    And in the epidemiology --
19   epidemiologic community, a relative risk or
20   an odds ratio of less than 2 would be
21   considered a weak association --
22       Q.    Okay.
23       A.    -- and very, very easy --
24   easily -- with the susceptibility to be
25   easily explained away by bias or confounding,
```

Christian Merlo, M.D., MPH

Page 118

1  and that's why it's considered a weak
2  association.
3       Q.    The next thing you say is,
4  "Likewise, plaintiffs' experts demonstrate a
5  dose-response relationship in relying on
6  methodologically flawed studies and
7  statistically insignificant trend lines."
8       A.    That's correct.
9       Q.    Okay.  And then another thing
10  is you say, "They see consistency where the
11  studies are inherently inconsistent."
12       A.    That's correct.
13       Q.    Okay.  So those are the four
14  main criticisms that you have?
15            MS. MILLER:  Objection.
16            THE WITNESS:  That's what it
17  says here, yeah.
18            (Merlo Exhibit 10 marked for
19  identification.)
20  QUESTIONS BY MR. TISI:
21       Q.    Okay.  So I have pulled
22  together -- so it will help us frame our
23  discussion today, I pulled those four, put
24  them on a slide, and I'm going to ask you to
25  look at it and tell me whether you agree that

Page 119

1  those -- I'm sorry.  Can I have that one
2  back?  That's my copy.
3            MS. MILLER:  Yeah.
4            I'm going to object to this
5  exhibit.  I think this pulls four
6  sentences out of a 46-page report.  It
7  says "Merlo allegations," and Merlo's
8  not making allegations.  He's --
9            MR. TISI:  Oh, he's making
10  plenty of allegations, and your
11  expert --
12            MS. SHARKO:  Don't interrupt.
13            MS. MILLER:  Excuse me.
14            MR. TISI:  I'm going to tell
15  you the -- Jessica, we're not going to
16  get into this.  You've been --
17            MS. MILLER:  I'm going to
18  object to this exhibit --
19            MR. TISI:  So just say
20  "objection."
21            MS. MILLER:  -- and I'm going
22  to explain -- no.
23            MR. TISI:  No.  You're not
24  going to.  Objection.
25            MS. MILLER:  I'm going to

Page 120

1  explain on the record my objections to
2  this exhibit.
3            MR. TISI:  Objection to form is
4  the question {sic}.
5            MS. MILLER:  That's -- you
6  can't object to the form of an
7  exhibit.
8            MR. TISI:  Fine.  Objection.
9            MS. MILLER:  Excuse me.  Please
10  let me finish --
11            MR. TISI:  Objection.
12            MS. MILLER:  -- my sentence.
13  You're being really rude to me.
14            MR. TISI:  I'm being -- you
15  know, honestly, you have been so
16  unprofessional with every one of these
17  witnesses, and I have today pulled
18  together all of your objections over
19  the past couple of depositions, I've
20  put them on a spreadsheet, and I will
21  send them to judge -- to Judge Pisano
22  and have him look at whether or not
23  your objections comply with the CMO.
24            MS. SHARKO:  Calm down.
25            MR. TISI:  Okay.  So if we're

Page 121

1  going to -- if we're going to go down
2  this today as we did in the Shih
3  deposition, the Ballman deposition and
4  every other deposition in this case,
5  I'm going to pull them, I'm going to
6  send them to Judge Pisano, and we're
7  going to have a hearing.
8            MS. MILLER:  I'm not going to
9  be intimidated by your threats.
10            MR. TISI:  So let's just --
11  let's just comply with the CMO and say
12  "objection."
13            MS. MILLER:  This is an
14  inappropriate exhibit.
15            MR. TISI:  Fine.  Objection.
16            MR. LOCKE:  I object as well.
17  QUESTIONS BY MR. TISI:
18       Q.    Doctor, are those four
19  criticisms --
20            MS. MILLER:  Excuse me.  Do you
21  have something to say?
22            MR. LOCKE:  Yeah, I object as
23  well for the same bases.
24            MR. TISI:  Okay.
25            MR. LOCKE:  It doesn't even

31 (Pages 118 to 121)

Christian Merlo, M.D., MPH

Page 122

1    quote --
2         MR. TISI: Tom --
3         MR. LOCKE: -- what's there.
4         MR. TISI: Tom, I'm asking
5    him -- I haven't asked a question yet.
6         MS. MILLER: It doesn't matter
7    whether you've asked the question.
8    We're objecting to the exhibit itself.
9         MR. TISI: Fine.
10        MS. MILLER: It's an
11   inappropriate exhibit.
12        MR. TISI: So just say
13   objection.
14        MS. SHARKO: I don't think we
15   have to do that. If you're concerned
16   about the witness hearing what we're
17   saying, he can leave the room.
18        MR. TISI: I'm happy to leave
19   the room --
20        MS. SHARKO: This is totally
21   inappropriate, Mr. Tisi, and you know
22   it.
23        MR. TISI: I can provide him
24   with a plate of spaghetti and ask him
25   questions about it if I want to.

Page 123

1    Okay? It's not inappropriate.
2         MR. LOCKE: And it would be a
3    complete waste of time.
4    QUESTIONS BY MR. TISI:
5         Q.   Doctor, let me ask you: Are
6    these four criticisms that are on that
7    exhibit criticisms that you have of
8    plaintiffs' experts?
9         MS. MILLER: Objection.
10        MR. LOCKE: Objection.
11        MR. TISI: Can I have the
12   spreadsheet that you made copies of
13   today? Because I'm going to mark that
14   as an exhibit.
15        THE WITNESS: I didn't say
16   these things.
17   QUESTIONS BY MR. TISI:
18        Q.   Okay. So you disagree.
19        Is there anything that I would
20   need to make those things -- to make them
21   accurate?
22        A.   It's all in my report.
23        Q.   Okay. So let's do this. You
24   make serious charges against plaintiffs'
25   experts in your report, do you not?

Page 124

1         MR. LOCKE: Objection.
2         MS. MILLER: Objection.
3         THE WITNESS: I don't know what
4    you mean by "serious charges."
5    QUESTIONS BY MR. TISI:
6         Q.   Well, you say that each of
7    plaintiffs' experts used Bradford Hill in a
8    manner that was irregular and suggest
9    results-driven approach.
10        Do you remember that?
11        MS. MILLER: Objection.
12        THE WITNESS: Where are you
13   referring to?
14   QUESTIONS BY MR. TISI:
15        Q.   Well, go to page 40, if you
16   could, of your report.
17        On your report, you use the
18   phrase that "they jumped to causation without
19   sufficiently determining association."
20        That's a word that you use. That's
21   the -- that's Section C.
22        Do you see that?
23        A.   It says, "Jumping to causation
24   without sufficiently determining
25   association."

Page 125

1         Q.   Okay. So they jumped to
2    causation.
3         Is that a word that you used or
4    is it a word that was provided to you by
5    defense lawyers in this case?
6         MS. MILLER: Objection.
7         MR. LOCKE: Objection.
8         THE WITNESS: Again, I didn't
9    say "they." It just says, "C, jumping
10   to causation without sufficiently
11   determining association."
12   QUESTIONS BY MR. TISI:
13        Q.   And then you describe what the
14   plaintiffs' experts allegedly did, correct?
15        A.   It's all -- it's all in my
16   report.
17        Q.   Okay. And on page 35 of your
18   report, you say that they "ignored and
19   disregarded well-established hierarchy."
20        A.   Which page? I'm sorry.
21        Q.   Page 35.
22        And this is under the title of
23   Methodologic Flaws in Plaintiffs' Experts'
24   Epidemiology-Based Opinions, correct?
25        A.   Where are you referring to?

32 (Pages 122 to 125)

Christian Merlo, M.D., MPH

Page 126

1    Q.    Right there.
2    A.    I know, but what -- I see that,
3  Methodologic Flaws in Plaintiffs' Experts.
4    Q.    Right.
5        And Section A is, "disregard
6  for the hierarchy of evidence."
7    A.    Section A does say "disregard
8  for the hierarchy of evidence."
9    Q.    And the third paragraph starts
10  with, "A number of plaintiffs'
11  epidemiologists ignore well-established
12  hierarchy of evidence," correct?
13    A.    In my report it says, "A number
14  of plaintiffs' epidemiologists ignore the
15  well-established hierarchy of evidence."
16    Q.    And under the section that says
17  Methodologic Flaws of Plaintiffs' Experts'
18  Epidemiology-Based Opinions, you also say
19  that they "fabricated consistency by ignoring
20  studies that did not support their
21  conclusion" on page 44, correct?
22    A.    And where is that on page 44?
23    Q.    Well, Section 2 says,
24  "Plaintiffs' experts fabricate consistency by
25  ignoring inconsistent studies."

Page 127

1    A.    It says Section 2, "Plaintiffs'
2  experts fabricate consistency by ignoring
3  inconsistent studies."
4    Q.    That is a very -- to charge
5  another scientist with fabrication is a
6  pretty serious charge, is it not?
7        MR. LOCKE:  Objection.
8        MS. MILLER:  Objection.
9  QUESTIONS BY MR. TISI:
10    Q.    It's not one that scientists
11  make lightly, is it?
12    A.    I'm not fabri -- I'm not -- I'm
13  not charging anyone with anything.
14    Q.    Well, you're saying that that's
15  what they did, correct?
16        You're saying that "plaintiffs'
17  experts fabricated consistency by ignoring
18  inconsistent results."
19    A.    The studies were inconsistent.
20    Q.    Okay.
21    A.    So to say that they're
22  consistent is --
23    Q.    A fabrication?
24    A.    -- inconsistent.
25    Q.    And you're saying that's a

Page 128

1  fabrication?
2        MS. MILLER:  Objection.
3        THE WITNESS:  It says,
4    "Plaintiffs' experts fabricate
5    consistency by ignoring inconsistent
6    studies."
7  QUESTIONS BY MR. TISI:
8    Q.    And that is a pretty serious
9  thing to say about another scientist, is it
10  not?
11        MS. MILLER:  Objection.
12        THE WITNESS:  Not if it's not
13    true.
14  QUESTIONS BY MR. TISI:
15    Q.    Okay.  And so your opinion is
16  that these experts fabricated opinions?
17    A.    What this is saying is that
18  plaintiffs' expert fabricate consistency, not
19  fabricating an opinion; fabricate consistency
20  when consistency does not exist.
21    Q.    Well, one of their opinions is
22  that there is consistency, correct?
23        MS. MILLER:  Objection.
24        THE WITNESS:  There is
25    opinions -- well, you'd have to show

Page 129

1    me who you're talking about and --
2  QUESTIONS BY MR. TISI:
3    Q.    Well, you wrote this, Doctor.
4  You wrote this, Doctor.  You wrote this,
5  Doctor.  Okay?
6        You said that "plaintiffs'
7  experts fabricate consistency by ignoring
8  inconsistent studies."
9        That was your words, correct?
10    A.    That's correct.
11    Q.    All right.  Now, my question to
12  you is:  You are -- you know that plaintiffs'
13  experts, using your words here, said that the
14  studies were consistent.
15    A.    We'd have to go through each
16  expert and look --
17    Q.    You've done that before today,
18  right?
19    A.    But we'd have to do it today.
20    Q.    You've done that in preparation
21  of this report?
22    A.    I've read all the reports.
23    Q.    Okay.  And so you wouldn't say
24  that "plaintiffs' experts fabricated
25  consistency by ignoring inconsistent results"

33 (Pages 126 to 129)

Christian Merlo, M.D., MPH

Page 130

1 had you not actually done the work to make
2 that conclusion, correct?
3     A.   I have read the expert --
4     Q.   Okay.
5     A.   -- reports, but for the purpose
6 of today, we would have to --
7     Q.   I'm going to ask you that. I'm
8 going to ask you that, Doctor.
9          My question is: That's a
10 pretty serious thing for one scientist to say
11 about another.
12         MS. MILLER: Objection.
13 QUESTIONS BY MR. TISI:
14    Q.   How would you -- how would you
15 react if somebody said you -- that you
16 fabricated your opinion in this case?
17        MS. MILLER: Objection.
18        THE WITNESS: I didn't say that
19    there's fabrication of opinion. I
20    said that's fabricating consistency,
21    and that's a very different thing.
22 QUESTIONS BY MR. TISI:
23    Q.   Okay. And you don't think that
24 the experts in this case testified that they
25 thought the studies were consistent?

Page 131

1     A.   We'd have to look at each
2 expert and go through. It's a very general
3 question.
4     Q.   So you didn't do that before
5 today?
6         MS. MILLER: Objection.
7 QUESTIONS BY MR. TISI:
8     Q.   You actually cite Moorman's
9 report, Siemiatycki's report, Singh's report,
10 McTiernan's report. You cited all these --
11 all these here. And we can go through them,
12 and I'm happy to go through them.
13        But I'm asking you about your
14 report. And this report says that it is --
15 that it is your review -- they said it was
16 consistent; you said that was fabricated.
17 Right?
18        MS. MILLER: Objection.
19        THE WITNESS: What I say is,
20    "plaintiffs' experts fabricate
21    consistency by ignoring inconsistent
22    studies."
23 QUESTIONS BY MR. TISI:
24    Q.   Okay.
25    A.   And when we look at the body of

Page 132

1 medical evidence and the literature, there's
2 tremendous inconsistency between study
3 designs, cohort studies and case controls,
4 and even within study designs.
5     Q.   Okay. And then --
6     A.   In looking at the difference
7 between hospital-based case controls and
8 population-based controls, there's
9 inconsistency.
10    Q.   Okay. And we're going to talk
11 about that. Okay. I promise you we're going
12 to talk about that.
13        But the question is: When you
14 use a word like "fabrication," you would
15 agree that that is a word that is -- has a
16 particular understanding in science as being
17 a very bad thing?
18        MS. MILLER: Objection.
19        THE WITNESS: I would neither
20    agree nor disagree with that. I don't
21    know even what you mean by "that's a
22    very bad thing."
23 QUESTIONS BY MR. TISI:
24    Q.   So if somebody said to you,
25 "Doctor, your report contains fabricated

Page 133

1 conclusions or fabricated methodologies,"
2 would you not take that seriously?
3         MS. MILLER: Objection.
4         THE WITNESS: I don't know what
5    a fabricated conclusion is or a
6    fabricated methodology, sir.
7 QUESTIONS BY MR. TISI:
8     Q.   You don't know what that is.
9         But you used the word -- what
10 did you mean by "fabrication"? The word
11 "fabrication."
12        What does the word
13 "fabrication" mean to you?
14    A.   What I mean is plaintiffs'
15 experts are making a case for consistency
16 when consistency does not exist.
17    Q.   Okay. Well, you go on to say,
18 Doctor, at the very last page, you say -- or
19 the paragraph says, "As a professor of
20 medicine and public health, I have focused my
21 career using science of epidemiology as a
22 scientific tool to help improve the
23 understanding of health and disease. The
24 distortion of epidemiologic science for
25 purposes of litigation does not achieve those

34 (Pages 130 to 133)

Christian Merlo, M.D., MPH

Page 134

1  goals; instead, it undermines scientific
2  efforts to better understand the etiology of
3  disease."
4           Is it your opinion that
5  plaintiffs' experts distorted the
6  epidemiologic science for purposes of
7  litigation?
8           MR. LOCKE: Objection.
9           THE WITNESS: That's what I
10  wrote in my report.
11  QUESTIONS BY MR. TISI:
12      Q.   Did you mean to refer to
13  plaintiffs' experts here?
14      A.    In any epidemiologic study --
15      Q.    I'm asking you this question.
16           MS. MILLER: Please let him
17  answer.
18           THE WITNESS: In any
19  epidemiologic study, if science is
20  distorted for the purpose of
21  litigation, it goes against --
22  QUESTIONS BY MR. TISI:
23      Q.   Right.
24      A.   -- what I've done in my --
25      Q.   And you're claiming that's what

Page 135

1  defendants -- that that's what plaintiffs'
2  experts did in this case.
3      A.   Can you say that again?
4      Q.   Yes.
5           You say you don't do that,
6  right?
7           You don't distort the
8  scientific evidence for the purposes of
9  litigation, right?
10          MS. MILLER: Objection.
11          THE WITNESS: Can you ask that
12  question --
13  QUESTIONS BY MR. TISI:
14      Q.   Yes.
15      A.   -- just a little slower?
16  You're speaking very fast.
17      Q.   You say that -- you say, as a
18  professor of medicine in public health, it's
19  a bad thing to distort the epidemiologic
20  evidence for litigation, true?
21      A.   What I say is, "As a professor
22  of medicine in public health, I have focused
23  my career on using the science of
24  epidemiology as a scientific tool to help
25  improve our understanding of health and

Page 136

1  disease."
2      Q.   Right.
3      A.   "The distortion of
4  epidemiologic science for purposes of
5  litigation does not achieve this goal."
6      Q.   Okay.
7      A.   "Instead, it undermines
8  scientific efforts to better understand the
9  etiology of disease."
10     Q.   We read that. Now I'm asking
11  you a question about that.
12          My question is: Is it your
13  opinion that that's what the plaintiffs'
14  experts did in this case?
15          MS. MILLER: Objection.
16          THE WITNESS: I don't know what
17  the experts did in this case as far as
18  with regards to that.
19          What I can say is that the
20  distortion of epidemiologic science
21  for purposes of litigation does not
22  achieve those goals.
23  QUESTIONS BY MR. TISI:
24     Q.   Okay. I'm asking you this
25  question. You have to answer this question.

Page 137

1  Okay?
2           Is it your opinion, to a
3  reasonable degree of medical and scientific
4  certainty, that plaintiffs' experts distorted
5  the epidemiologic science for the purposes of
6  litigation?
7           MR. LOCKE: Objection.
8           THE WITNESS: So I believe I
9  answered that already.
10          I -- the methodology that was
11  performed by plaintiffs' experts is
12  flawed, and, therefore, my opinions in
13  relation to the potential causal
14  association between talcum powder and
15  ovarian cancer -- when I think of --
16  when I -- based on the body of medical
17  evidence, there is no causal
18  association between perineal talc
19  usage and ovarian cancer.
20          And the critique I have against
21  plaintiffs' opinions relate to their
22  methodology.
23  QUESTIONS BY MR. TISI:
24     Q.   Right.
25          And is it your opinion -- I

35 (Pages 134 to 137)

Christian Merlo, M.D., MPH

Page 138

1    understand you have a difference of opinion
2    on their methodology.  But you take it one
3    step further, right?
4            You say it was their
5    methodology -- at least the implication is,
6    and I'm asking you the question:  Are you
7    suggesting that they fabricated in a
8    methodology for the purposes of litigation?
9            MR. LOCKE:  Objection.
10           MS. MILLER:  Objection.  Asked,
11   answered, mischaracterizes his
12   opinions and his testimony.
13           THE WITNESS:  I believe I
14   answered that.
15   QUESTIONS BY MR. TISI:
16       Q.   Okay.  I want to hear about
17   your litigation -- I want to hear about what
18   your opinion is as the motivation for doing
19   what they did.
20           Is it your opinion that their
21   motive in drafting their reports and using
22   the methodology that they use was to assist
23   in litigation?
24           MS. MILLER:  Objection.
25           THE WITNESS:  I have no idea

Page 139

1    what their motivation was.
2    QUESTIONS BY MR. TISI:
3        Q.   So then why is it in here?  Why
4    is anything about litigation even in your
5    report, Doctor?
6            MR. LOCKE:  Objection.
7            MS. MILLER:  Objection.
8            THE WITNESS:  Because if
9       epidemiologic science is distorted for
10      the purposes of litigation, it does
11      not achieve those goals.
12   QUESTIONS BY MR. TISI:
13       Q.   And do you think that that's
14   what they did?
15           MS. MILLER:  Objection.
16           THE WITNESS:  I have no idea
17      what they did.
18   QUESTIONS BY MR. TISI:
19       Q.   Okay.  So you'd take that out
20   of this report?
21           MR. LOCKE:  Objection.
22           MS. MILLER:  Objection.
23           THE WITNESS:  My report is my
24      report.  It stands.
25

Page 140

1    QUESTIONS BY MR. TISI:
2        Q.   So you have no idea what the
3    motive and intent of plaintiffs' experts were
4    in drafting their opinions, right?
5        A.   I have no idea.
6        Q.   Okay.  Are you saying that the
7    methodology that they used was fraudulent?
8            MS. MILLER:  Objection.
9            THE WITNESS:  I don't think
10      that there's -- are you referring to
11      any part of my report that says
12      fraudulent?
13   QUESTIONS BY MR. TISI:
14       Q.   I'm asking you your opinion --
15   I'm asking your opinion right now, under
16   oath.
17           Are you saying that the
18   opinions that they offered was fraudulent?
19           MS. MILLER:  Objection.
20   QUESTIONS BY MR. TISI:
21       Q.   The methodology they used was
22   fraudulent?
23       A.   Probably have to be a little
24   bit more specific.
25       Q.   Tell me what your views are on

Page 141

1    that.
2        A.   Which expert are we talking
3    about?  Which part of the methodology?
4    Which --
5        Q.   Okay.  Do you think that
6    Dr. Siemiatycki applied a fraud -- a
7    professor of epidemiology applied -- who has
8    sat on IARC and looked at cancer and exposure
9    to disease applied a fraudulent methodology?
10           MR. LOCKE:  Objection.
11           MS. MILLER:  Objection.
12           THE WITNESS:  No.  I don't even
13      know what a fraudulent methodology is.
14   QUESTIONS BY MR. TISI:
15       Q.   Okay.  Do you think he applied
16   a litigation or results-driven methodology?
17       A.   I don't -- I don't know what a
18   litigation -- I don't know what a litigation
19   methodology would be.
20       Q.   Well, it says -- do you believe
21   that he distorted the epidemiologic
22   sciences -- science for the purpose of
23   litigation?
24       A.   I never said that
25   Dr. Siemiatycki distorted epidemiologic

36 (Pages 138 to 141)

Christian Merlo, M.D., MPH

Page 142

1     science.
2         Q.    Okay.  Do you think that
3     Dr. McTiernan did?
4             MS. MILLER:  Objection.
5             THE WITNESS:  Can you ask that
6     one more time?
7     QUESTIONS BY MR. TISI:
8         Q.    Yes.
9             Do you think that Dr. McTiernan
10    distorted epidemiologic science?
11            MS. MILLER:  Objection.
12            THE WITNESS:  I have no idea.
13    QUESTIONS BY MR. TISI:
14        Q.    Okay.  Do you think that
15    Dr. Smith-Bindman distorted science?
16            MS. MILLER:  Objection.
17            THE WITNESS:  I don't know.
18    QUESTIONS BY MR. TISI:
19        Q.    Do you think that Dr. Singh
20    distorted science?
21        A.    The same answer stands.
22        Q.    Dr. Moorman, do you think she
23    distorted science?
24            MS. MILLER:  Objection.
25            THE WITNESS:  I think -- I

Page 143

1     can't -- I can't speak to the
2     motivations of someone else.
3     QUESTIONS BY MR. TISI:
4         Q.    Do you believe that the same
5     standards you would apply to plaintiffs'
6     experts should apply to your opinions:  You
7     shouldn't fabricate; you shouldn't distort;
8     you shouldn't ignore?
9             MS. MILLER:  Objection.
10    That's --
11            MR. TISI:  Let the record
12    reflect you're once again laughing.
13            MS. MILLER:  -- four questions.
14            MS. SHARKO:  I'm smiling.
15            MR. TISI:  You're laughing.
16            MS. SHARKO:  No.  I think --
17            MR. TISI:  I don't ask -- I'm
18    not asking her anything.  The record
19    will reflect is you were laughing.
20            MS. SHARKO:  The record will
21    reflect that you are not asking him a
22    single question like you're supposed
23    to.
24            You're barking things.  You're
25    raising your voice.  Your hands are

Page 144

1     shaking --
2             MR. TISI:  Okay.  That's fine.
3             MS. SHARKO:  -- and I ask that
4     you calm down.
5             MR. TISI:  I think it's -- I
6     think -- you can ask if I'd calm down,
7     but when this gentleman comes in here
8     and says our experts fabricated,
9     ignored, I take it personally.
10    QUESTIONS BY MR. TISI:
11        Q.    I want to hear -- I want to
12    ask -- I want to ask you this question,
13    Doctor.
14            MS. SHARKO:  Well, I think
15    you're misrepresenting his report, and
16    he's told that you.
17            MR. TISI:  Well, if you are,
18    then maybe -- maybe he ought to back
19    down on some of the adjectives he
20    uses.
21    QUESTIONS BY MR. TISI:
22        Q.    Doctor, do you believe --
23            MS. SHARKO:  Do you need a
24    break, Mr. Tisi?
25            MR. TISI:  No, I don't, Susan,

Page 145

1     but maybe you do.
2     QUESTIONS BY MR. TISI:
3         Q.    Let me ask you this question,
4     Doctor.
5             Do you believe that the same
6     standards that you apply to reviewing
7     plaintiffs' experts in this report should
8     apply to your report as well?
9             MS. MILLER:  Objection.
10            THE WITNESS:  I believe that my
11    opinion is made based on the body of
12    medical evidence.  And for someone to
13    say that there is consistency when
14    consistency doesn't exist, or strength
15    of association when strength of
16    association doesn't exist, or there is
17    a dose response when dose response
18    doesn't exist, that's ignoring the
19    body of evidence.
20    QUESTIONS BY MR. TISI:
21        Q.    Okay.  And you would take issue
22    if you ignored evidence of the strength of
23    association, correct?
24            MS. MILLER:  Objection.
25

37 (Pages 142 to 145)

Christian Merlo, M.D., MPH

Page 146

1    QUESTIONS BY MR. TISI:
2         Q.    If you ignored evidence of
3    consistency, if you ignored evidence of dose
4    response, you would be subject to the same
5    criticism. You would hold yourself up to no
6    different scrutiny than you would imply --
7    you would impose on plaintiffs' experts,
8    agreed?
9              MS. MILLER: Objection. There
10   was a question, and before he could
11   answer it, you asked another question.
12             MR. LOCKE: Objection.
13   QUESTIONS BY MR. TISI:
14        Q.    Would you agree that you should
15   not fabricate inconsistency when there is
16   consistency?
17             MS. MILLER: Objection.
18             THE WITNESS: If we just go
19   back to the medical evidence in this
20   specific case, the fact that there is
21   no strength of association or --
22   QUESTIONS BY MR. TISI:
23        Q.    I'm not asking you that
24   question. Doctor, I'm going to move to
25   strike it. And honestly, we're going to

Page 147

1    need -- we may need to take a break on this
2    because you need to listen to my question.
3              My question is: Would you hold
4    yourself to the same standards that you have
5    criticized the plaintiffs' experts for?
6              I'm not asking about the
7    evidence in this case.
8              Scientifically, would you agree
9    that you should not -- you should not ignore
10   consistency when it exists?
11             MS. MILLER: Objection.
12             THE WITNESS: Can you ask that
13   one more time?
14   QUESTIONS BY MR. TISI:
15        Q.    Yes.
16             Do you agree that you should
17   not fabricate an opinion?
18             MS. MILLER: Objection.
19             THE WITNESS: I don't know what
20   that means.
21   QUESTIONS BY MR. TISI:
22        Q.    You don't know -- well, you
23   used the word "fabrication." It's your word.
24        A.    Well, fabricate an opinion.
25        Q.    Yes.

Page 148

1         A.    I don't know what that means.
2         Q.    Okay. Do you think you should
3    not fabricate a methodology for the purposes
4    of litigation?
5              MS. MILLER: Objection.
6              THE WITNESS: I never said
7    fabricating methodology.
8    QUESTIONS BY MR. TISI:
9         Q.    Okay. Do you think that you
10   should not -- you should not ignore evidence
11   and well-established principles?
12             MS. MILLER: Objection.
13             THE WITNESS: Can you ask that
14   one more time?
15             MR. TISI: Yeah.
16             THE WITNESS: I'm not sure I
17   understood what that --
18   QUESTIONS BY MR. TISI:
19        Q.    Do you think you should not
20   ignore evidence?
21             Should you ignore evidence?
22             MS. MILLER: Objection.
23             THE WITNESS: I mean, in
24   looking at the causal association
25   between exposure and outcome, we try

Page 149

1    to look at all the evidence.
2    QUESTIONS BY MR. TISI:
3         Q.    Do you know Sonal Singh?
4         A.    No.
5         Q.    He previously worked at
6    Hopkins.
7              Did he distort science?
8              MS. MILLER: Objection.
9              THE WITNESS: I have no idea.
10   QUESTIONS BY MR. TISI:
11        Q.    Okay. Now, let me see if I
12   can...
13             As you know, I represent women
14   who claim to have developed ovarian cancer as
15   a result of using talcum powder products.
16             You understand that, correct?
17             MR. LOCKE: Objection.
18             THE WITNESS: If you're telling
19   me that, that's fine.
20   QUESTIONS BY MR. TISI:
21        Q.    Okay. You were first consulted
22   in this case in December of 2019 {sic},
23   correct?
24             MS. MILLER: Objection. Asked
25   and answered multiple times.

38 (Pages 146 to 149)

Page 150

1    THE WITNESS:  Somewhere around
2    there.  I don't remember the specific
3    time.
4    MS. MILLER:  Please let me
5    finish my objections.
6    QUESTIONS BY MR. TISI:
7    Q.   Prior to being contacted by the
8    lawyers --
9    MS. SHARKO:  I assume you mean
10   December 2018.
11   MR. TISI:  2018.
12   QUESTIONS BY MR. TISI:
13   Q.   Prior to being contacted by the
14   lawyers representing Johnson & Johnson to
15   defend them in lawsuits, you had never
16   expressed the causation opinions, any of the
17   information in Exhibit Number 3, correct,
18   other than the general principles of
19   epidemiology?  Any -- let me rephrase the
20   question.
21   Prior to December of 2018, you
22   had never expressed opinions about talc and
23   ovarian cancer, true?
24   A.   That's about right.
25   Q.   Okay.  And you do know that the

Page 151

1    epidemiologic -- the first epidemiologic
2    study was published by researchers at Harvard
3    University in 1982, correct?
4    MS. MILLER:  Objection.
5    THE WITNESS:  I would have to
6    look back through the -- through my
7    report and see where those researchers
8    are from.
9    (Merlo Exhibit 12 marked for
10   identification.)
11   QUESTIONS BY MR. TISI:
12   Q.   Well, let me provide you with a
13   copy of an article by Cramer, et al.
14   You've seen this study before,
15   correct?
16   A.   Cramer, yes, 1982.
17   Q.   Okay.  And you were just
18   looking at your chart on page 34 and 35 of
19   the various studies, correct?
20   A.   That's correct.
21   Q.   Okay.  There are over 30
22   studies that you identified here,
23   hospital-based, population-based,
24   case-control studies, pooled case-control
25   studies and cohort studies, correct?

Page 152

1    A.   There are hospital-based
2    case-control studies.  There are
3    population-based case-control studies, pool
4    case-control studies, cohort studies.
5    Q.   They go from the 1980s, 1990s,
6    2000s and 2010s.  Four decades, correct?
7    A.   Spanning 1982 through 2016 for
8    these studies that we're talking about right
9    here.
10   Q.   Were you involved in any of
11   these studies in any way even peripherally?
12   A.   I was not.
13   Q.   Okay.  Had anybody in this
14   period of time ever contacted you and said,
15   "You know, we have this issue out there about
16   whether or not talcum powder products are
17   associated with ovarian cancer; could you
18   consult with us on that question?"
19   MS. MILLER:  Objection.
20   THE WITNESS:  What period of
21   time are we talking about?
22   QUESTIONS BY MR. TISI:
23   Q.   1982 till today.
24   Other than the lawyers.
25   A.   Can you ask me that question

Page 153

1    again then?
2    Q.   Yeah.
3    From 1982 until today, has
4    anybody, other than the lawyers for Johnson &
5    Johnson, ever asked you your opinions about
6    ovarian cancer and talcum powder products?
7    MS. MILLER:  Objection.
8    THE WITNESS:  Well, I believe I
9    answered that already, because I told
10   you when I was first approached to see
11   if I could offer an opinion.
12   QUESTIONS BY MR. TISI:
13   Q.   That's a different question.
14   My question is:  Outside of
15   lawyers, outside of lawyers in litigation,
16   has any scientist ever come up to you and
17   said, "Dr. Merlo, you are a epidemiologist
18   and a pulmonary and critical care professor
19   at Johns Hopkins.  I'd like for you to give me
20   your thoughts on the relationship between
21   ovarian cancer and talcum powder products."
22   MS. MILLER:  Objection.
23   THE WITNESS:  No one has asked
24   me to give an opinion in that time
25   period from 1982 to 2016.

39 (Pages 150 to 153)

Christian Merlo, M.D., MPH

Page 154

1  QUESTIONS BY MR. TISI:
2      Q.   Has anyone ever consulted you
3  and said, "What do you think about these
4  studies?"
5      A.   No.
6      Q.   Has anyone ever said to you,
7  "Doctor, you know, the evidence is really
8  unclear; can you help us design a study?"
9          MS. MILLER: Objection.
10         THE WITNESS: No.
11 QUESTIONS BY MR. TISI:
12     Q.   Has anybody ever come to you
13 from Johnson & Johnson and say, "You know, we
14 have these different regulatory bodies
15 looking at the issue, NTP, the National
16 Toxicology Project, IARC, the FDA, Health
17 Canada, looking at this issue; would you come
18 help us explain to these various regulatory
19 bodies what the science is about talc and
20 ovarian cancer?"
21         MS. MILLER: Objection.
22         THE WITNESS: No, but I would
23     have been excited to do it.
24 QUESTIONS BY MR. TISI:
25     Q.   You know that Congress just

Page 155

1  held a hearing on the issue of ovarian cancer
2  and talcum powder products, correct?
3      A.   I have no idea.
4      Q.   You know Dr. McTiernan appeared
5  before -- appeared before the House of
6  Representatives to express her opinions in a
7  public forum, correct?
8          MS. MILLER: Objection.
9          THE WITNESS: Again, I have no
10     idea.
11 QUESTIONS BY MR. TISI:
12     Q.   Do you know that -- did Johnson
13 & Johnson ever ask you, "You know, Dr. Merlo,
14 we need somebody to present our point of view
15 on what the science says. Would you go
16 testify before Congress?"
17         Did they tell you that?
18         MS. MILLER: Objection.
19         THE WITNESS: Did they tell me
20     what?
21 QUESTIONS BY MR. TISI:
22     Q.   Did they ask you to do that?
23         MS. MILLER: Objection. Vague.
24 QUESTIONS BY MR. TISI:
25     Q.   Did Johnson & Johnson ask you

Page 156

1  to express your opinions to the United States
2  Congress about the relationship between
3  ovarian cancer and talcum powder products?
4          MS. MILLER: Objection.
5          THE WITNESS: No. No. But
6      again, I would have been excited to do
7      something like that.
8  QUESTIONS BY MR. TISI:
9      Q.   Did any scientist at Johnson &
10 Johnson ever come to you and say, "You know,
11 we have" -- you understand Health Canada has
12 reviewed the evidence, correct?
13     A.   I don't have -- I don't know
14 anything about Health Canada.
15     Q.   Okay. Health Canada, you know,
16 is the Canadian equivalent to the United
17 States FDA?
18         MR. LOCKE: Objection.
19         MS. MILLER: Objection.
20         THE WITNESS: I have no idea
21     what Health Canada is.
22 QUESTIONS BY MR. TISI:
23     Q.   Okay. And have you ever been
24 asked by the scientists, as opposed to the
25 lawyers at Johnson & Johnson, to express your

Page 157

1  opinion before any regulatory or professional
2  body on the relationship between ovarian
3  cancer and talcum powder products?
4          MS. MILLER: Objection.
5          THE WITNESS: No, and I believe
6      I've answered this before, but I would
7      have been -- having reviewed the
8      literature, I would be really excited
9      to do that.
10 QUESTIONS BY MR. TISI:
11     Q.   Uh-huh. Let me ask you this,
12 Doctor -- maybe Ms. Sharko will you do to
13 it after this deposition. We'll find out.
14         Has Johnson & Johnson ever come
15 to you and asked you, we have -- to do a
16 causation analysis on any issue, on any
17 product it markets?
18     A.   They have not.
19     Q.   And you know Johnson &
20 Johnson's a big company. They produce --
21 they produce pharmaceutical drugs. They
22 produce cosmetics. They produce
23 over-the-counter drugs. They produce all
24 kinds of drugs, right?
25         MS. MILLER: Objection.

40 (Pages 154 to 157)

Christian Merlo, M.D., MPH

Page 158

1      THE WITNESS: I have no idea.
2  I mean, I know of Johnson & Johnson,
3  but I don't have an opinion on what
4  they do or have really any knowledge
5  on what they do.
6  QUESTIONS BY MR. TISI:
7      Q.   And other than the litigation,
8  they never came to you to ask your advice on
9  anything, true?
10     MS. MILLER: Objection.
11     THE WITNESS: I think we've
12  talked about that. They didn't ask me
13  to do anything.
14 QUESTIONS BY MR. TISI:
15     Q.   Now, in this case, literally
16 millions of documents have been produced --
17 millions of pages of documents have been
18 produced to us.
19     Would it surprise you that the
20 name Christian Merlo doesn't appear in any of
21 them?
22     MS. MILLER: Objection.
23     THE WITNESS: I don't know what
24  you're referring to.
25

Page 159

1  QUESTIONS BY MR. TISI:
2      Q.   Millions of pages of documents
3  relating to research and marketing and
4  evidence and -- about ovarian cancer and its
5  relationship to talcum powder products, the
6  composition of talcum powder, all kinds of
7  issues, have been produced to us in this
8  case.
9      Would it surprise you that your
10 name doesn't appear even once over the past
11 40 or 50 years of documents that we've
12 received?
13     MR. LOCKE: Objection.
14     THE WITNESS: No, it wouldn't
15  surprise me, but my opinion on this
16  and the potential association --
17  potential causal association between
18  talcum powder and ovarian cancer is
19  based on the medical literature.
20 QUESTIONS BY MR. TISI:
21     Q.   Okay. Have the scientists at
22 Johnson & Johnson ever reached out to you and
23 said -- even as of today, even as of the day
24 you wrote this report criticizing the various
25 studies that have been done in this case,

Page 160

1  done on this issue, have you ever either been
2  approached or approached Johnson & Johnson
3  and said, "You know something, I'm an expert
4  in design of studies. Let me help you design
5  a study that would -- that would answer this
6  question once and for all"?
7      MS. MILLER: Objection.
8  QUESTIONS BY MR. TISI:
9      Q.   Has that ever happened?
10     MS. MILLER: Objection.
11     THE WITNESS: Excuse me. That
12  has not happened.
13 QUESTIONS BY MR. TISI:
14     Q.   Okay.
15     A.   However, I would gladly like to
16 be involved in something like that.
17     Q.   Okay.
18     A.   I think the key issue here in
19 designing a clinical study like that is there
20 are a lot of difficulties.
21     Q.   Well, you can't do a clinical
22 trial on this issue, can you?
23     A.   Well, it depends what you mean
24 by a clinical trial, because clinical trials
25 can be cohort studies; they can be

Page 161

1  case-control studies.
2      Q.   Understood.
3      You cannot randomize patients
4  to receiving talcum powder products, and it
5  would be unethical and unfeasible to study
6  this question using a randomized, controlled,
7  placebo-controlled trial?
8      A.   It would be very difficult to
9  perform a randomized controlled trial.
10     Q.   It would also be -- it would
11 not only be difficult, it would be unethical
12 if the hypothesis was to assess whether or
13 not talcum powder products cause ovarian
14 cancer?
15     A.   Usually when randomized
16 controlled trials are designed, by
17 definition, if there is a -- if you're
18 testing a hypothesis that something is
19 causing something, usually you wouldn't
20 perform a randomized controlled trial.
21     Q.   It would be unethical. There
22 are rules against that, correct?
23     MS. MILLER: Objection.
24     THE WITNESS: There are rules
25  against randomized controlled trials

41 (Pages 158 to 161)

Christian Merlo, M.D., MPH

Page 162

1     when the hypothesis is that you're
2     going to cause -- there is the
3     potential to cause harm.
4  QUESTIONS BY MR. TISI:
5     Q.   Right.
6        So it's not -- it's not -- you
7  would not expect to see clinical trials in a
8  setting like this?
9     A.   Again, these are -- there are
10 clinical trials that have been done, but we
11 wouldn't expect to see a randomized
12 controlled trial performed here.
13    Q.   Okay.  And you would agree with
14 me that in circumstances like this, what
15 typically experts have are epidemiology
16 studies, observational studies.
17        MS. MILLER:  Can you just ask
18        that again?
19 QUESTIONS BY MR. TISI:
20    Q.   You want me to answer {sic}
21 again?
22    A.   If you could ask me again, yes,
23 please.
24    Q.   Do you -- where the question is
25 whether or not an environmental factor or a

Page 163

1  substance causes harm, what science typically
2  relies on are observational studies and
3  biologic studies because you can't do
4  controlled trials?
5        MS. MILLER:  Objection.
6        THE WITNESS:  Okay.  Again, we
7  have to just separate clinical trials.
8  That involves everything.
9  QUESTIONS BY MR. TISI:
10    Q.   Right.
11    A.   So if we're talking about an
12 observational study, for instance, if I'm
13 looking at a -- how a certain infectious
14 agent might affect an outcome in a patient
15 with cystic fibrosis, I wouldn't necessarily
16 do a randomized control trial where I give
17 someone an infection and I don't give
18 somebody else -- give another group an
19 infection and I look at an outcome
20 afterwards.
21    Q.   Right.
22    A.   So when there is a potential
23 for harm, a randomized control trial is
24 usually not done, so we rely on observational
25 studies, cohort and case-control studies, to

Page 164

1  provide us with potential evidence when
2  looking at the association between exposure
3  and outcome.
4     Q.   Okay.  Has the FDA ever reached
5  out to you and asked your opinions on the
6  question of whether or not talc causes
7  ovarian cancer?
8     A.   The FDA has not.
9     Q.   Okay.  You know IARC?
10    A.   I know what IARC stands for,
11 but I don't know IARC.
12    Q.   Okay.  Do you -- have you --
13 has the International Agency for Research on
14 Cancer, IARC, ever contacted you for any
15 reason to ask you to be involved in any
16 assessment of any exposure and cancer?
17    A.   They have not.
18    Q.   Have you written Health Canada
19 to express your opinions that you've given in
20 your report?
21        MS. MILLER:  Objection.
22        THE WITNESS:  Again, I don't
23 really know who Health Canada is.
24 QUESTIONS BY MR. TISI:
25    Q.   Have you been provided with

Page 165

1  Health Canada's draft report on talcum powder
2  and ovarian cancer?
3        MS. MILLER:  Objection.  I
4  don't know what that means.
5        MR. TISI:  You don't have to,
6  Counsel.
7        THE WITNESS:  Is there
8  something that you want to show me?
9  QUESTIONS BY MR. TISI:
10    Q.   Yeah.  Sure.
11    A.   We can look at it.
12        (Merlo Exhibit 13 marked for
13 identification.)
14 QUESTIONS BY MR. TISI:
15    Q.   Showing you what I have marked
16 as Exhibit Number 13.
17        Have you seen this document
18 before?
19    A.   I don't know.
20    Q.   Is it of interest to you --
21        MS. MILLER:  Do you need some
22 time to flip through it?
23        THE WITNESS:  I think so.
24        MR. TISI:  No, I'm not -- I'm
25 not asking -- I'm asking if he ever

42 (Pages 162 to 165)

Christian Merlo, M.D., MPH

Page 166

1    saw it -- Counsel, you know, honestly,
2    you really need to stop.  You are
3    among the most unprofessional people I
4    have ever seen objecting in a case.
5    You inject yourself into almost every
6    question.
7          MR. LOCKE:  Objection.
8          MS. SHARKO:  Your ad hominem
9    and personal attacks --
10         MR. TISI:  Counsel, I was
11   called at the last deposition --
12         MS. SHARKO:  -- and venomous
13   comments, Mr. Tisi, are inappropriate.
14         MR. TISI:  I was called --
15         MS. SHARKO:  Stop it
16   immediately.
17         MR. TISI:  I was called at the
18   last deposition I was kicking her
19   under the table.  I was called that I
20   speak to her as a -- you know, that I
21   speak to women this way.
22         Please don't talk to me about
23   ad hominem attacks.
24         MS. SHARKO:  Well, those other
25   things you said are true.  You were

Page 167

1    kicking her.
2          MR. TISI:  Oh, okay.  I was not
3    kicking her under the table, and you
4    know that that's true -- not true.
5          MR. LOCKE:  The witness is
6    entitled to read --
7          MR. TISI:  I'm not asking him a
8    question about the document.  I'm
9    asking whether he ever saw the
10   document.
11         MS. MILLER:  He needs to review
12   it to know if he ever saw it.
13         MR. TISI:  No.  I'm asking him
14   the questions.
15         MS. MILLER:  Okay.
16         THE WITNESS:  I'm looking to
17   see if I've seen this before.
18   I don't know.
19   QUESTIONS BY MR. TISI:
20         Q.   Okay.  Is it of interest to you
21   how other people outside of litigation, other
22   scientists, have evaluated the question of
23   whether or not talcum powder products cause
24   ovarian cancer?
25         MS. MILLER:  Objection.

Page 168

1          THE WITNESS:  Can you ask that
2    one more time?
3    QUESTIONS BY MR. TISI:
4          Q.   Yeah.
5          Is it of interest to you what
6    other scientists and regulators have said
7    about the question you were asked to address
8    outside of litigation?
9          A.   I'm curious about what others
10   say; however, in my review of the body of
11   medical literature that is out there today in
12   the published, peer-review literature, my
13   opinions are based on that.
14         Q.   Okay.
15         A.   I'm curious about other things,
16   but my opinions are based on what is peer
17   reviewed and published.
18         Q.   Have you looked to see what
19   others have said about the body of evidence?
20         A.   I don't know what you mean by
21   "others."
22         Q.   Other scientists?  Other
23   regulatory bodies?
24         A.   You'd have to be more specific.
25         Q.   Example, Health Canada?

Page 169

1          A.   Health Canada?  And again, I
2    have no idea who Health Canada is, whether or
3    not -- who is involved in Health Canada,
4    whether or not there are scientists involved,
5    whether or not -- who's there.  I have no
6    idea.
7          Q.   How about IARC?  Did you review
8    the IARC 2010 report?
9          You were reviewing evidence
10   through 2006.  Did you look at that?
11         A.   Can you say that again?  You
12   said two dates.
13         Q.   Yes.
14         There was a 2010 report looking
15   at evidence up to 2006.
16         Did you look at that report?
17         A.   I believe I did review that.
18         Q.   And did you look any other
19   place to see what other scientists and
20   doctors have said about the issue?
21         A.   Again, my job is not to have
22   opinions about other doctors or scientists.
23   My job is to give an opinion based on the
24   body of medical evidence, and that's what I
25   did.

43 (Pages 166 to 169)

Christian Merlo, M.D., MPH

Page 170

1    Q.    Did you seek epidemio -- input
2   from your epidemiologic colleagues at Johns
3   Hopkins?
4    A.    I seek -- I seek help from
5   epidemiologists all the time.
6    Q.    For this report?
7    A.    No.
8    Q.    Okay.  Did you speak to
9   Dr. Diette about your opinions in this case?
10    A.    No.
11    Q.    Did you speak to Dr. Szklo?  Is
12   that his name?
13    A.    Yeah.  No.
14    Q.    Did you speak to him?
15    A.    No.  No.
16    Q.    Did you get permission of
17   approval from Johns Hopkins to participate in
18   this litigation?
19        MS. MILLER:  Objection.
20        THE WITNESS:  That's not
21    something that I would need approval
22    through Johns Hopkins for.
23        (Merlo Exhibit 14 marked for
24    identification.)
25

Page 171

1   QUESTIONS BY MR. TISI:
2    Q.    Going back to your opinions
3   about talc, I'd like to attach as Exhibit 14
4   the Bradford Hill article I think you had in
5   front of you, but I'm going to attach it as
6   Exhibit Number 14.
7    A.    Thank you.
8    Q.    Is this the Bradford Hill
9   article that you have been referring to?
10    A.    This is one of many of Bradford
11   Hill's articles.
12    Q.    Okay.
13    A.    This is his discussion of
14   the -- what we call nowadays the Bradford
15   Hill analysis.
16    Q.    This is what you called the
17   seminal article, right?
18        MR. LOCKE:  Objection.
19        MS. MILLER:  Objection.
20        THE WITNESS:  Did I say that?
21   QUESTIONS BY MR. TISI:
22    Q.    Yes, you did.
23        I don't know why that's a hard
24   question to answer, Doctor.  Either you agree
25   to that or you don't, but it is in your

Page 172

1   report.
2    A.    I see it there on page 30.
3    Q.    Yeah.  So now can we agree it's
4   a seminal article?
5        MS. MILLER:  Objection.
6        THE WITNESS:  Well, it says,
7    "As Hill noted his seminal article."
8   QUESTIONS BY MR. TISI:
9    Q.    So why was that such a hard
10   question to ask when -- answer when I asked
11   you what your opinion was?
12        MR. LOCKE:  Objection.
13        MS. MILLER:  Objection.
14   QUESTIONS BY MR. TISI:
15    Q.    Did you need to see it in your
16   report in order to say what it says?
17        MS. MILLER:  Objection.
18        THE WITNESS:  I didn't
19    specifically remember saying that.
20   QUESTIONS BY MR. TISI:
21    Q.    Okay.  It doesn't matter
22   because my question was, is it a seminal
23   article?  I didn't ask you whether you said
24   it in your report.
25        Why is it so hard to answer a

Page 173

1   simple question as whether or not this is a
2   seminal article?
3        MS. MILLER:  Objection.
4        Is that actually a question
5    you're asking?
6        MR. TISI:  Yes.  Absolutely.
7   QUESTIONS BY MR. TISI:
8    Q.    Why is it so hard to answer
9   that question?
10        MS. MILLER:  Objection.
11        MR. LOCKE:  Objection.
12   QUESTIONS BY MR. TISI:
13    Q.    Without seeing it in your
14   report?
15        MS. MILLER:  Objection.
16        Now that the question has been
17    amended, still objection.
18        THE WITNESS:  I thought you had
19    asked me if I said it, and I couldn't
20    remember --
21   QUESTIONS BY MR. TISI:
22    Q.    No.
23    A.    -- if I actually said it.
24    Q.    Actually, I asked you about ten
25   times:  Is this a seminal article?

44 (Pages 170 to 173)

Christian Merlo, M.D., MPH

Page 174

1      And why is that such a hard
2  question to answer?
3          MS. MILLER:  Objection.
4          MR. LOCKE:  Objection.
5          THE WITNESS:  It's probably one
6  of his seminal articles.
7  QUESTIONS BY MR. TISI:
8      Q.    Okay.  You didn't address the
9  question of biologic plausibility in your
10 report, did you?
11     A.    So I did not speak about
12 biologic plausibility in my report.
13     Q.    Okay.  Did you -- I'm sorry.
14     A.    And -- you can go ahead.
15     Q.    Did you address the question of
16 specificity?
17     A.    There are several aspects of
18 the Bradford Hill considerations that are
19 inherently irrelevant in the analysis.
20         And the reason for that is if
21 we -- if we just back up a little bit, first
22 of all, Bradford Hill said that you need to
23 have a clearcut association before even going
24 into that and --
25     Q.    Aren't there plenty of examples

Page 175

1  of cases where a exposure -- there is no
2  epidemiology studies where there is a
3  clearcut association?
4          I'll give you an example:
5  Acetaminophen and liver disease, do you know
6  of any epidemiology study which establishes
7  that risk?
8          MS. MILLER:  Objection.
9          THE WITNESS:  I'm not here to
10 give an opinion on --
11 QUESTIONS BY MR. TISI:
12     Q.    I know.  But I want to know --
13     A.    -- acetaminophen and liver
14 disease.  I'd have to review the literature.
15     Q.    Well, where is your assessment?
16         Where is the statement that
17 before you apply the Bradford Hill factors
18 that there must be a clearcut association?
19         MS. MILLER:  Objection.
20         THE WITNESS:  It's actually
21 said right in his article.
22 QUESTIONS BY MR. TISI:
23     Q.    Actually, let's talk about that
24 because you quoted part of the sentence
25 there.  You didn't quote the whole thing, did

Page 176

1  you?
2          It's the second paragraph.
3      A.    I see that.
4      Q.    Right.
5          What does the first paragraph
6  say?
7      A.    We can read it if you'd like.
8      Q.    Why don't you.
9      A.    "I have no wish, nor the skill,
10 to embark upon a philosophical discussion of
11 the meaning of causation.  The cause of
12 illness may be immediate, indirect, it may be
13 remote and indirect, underlying the observed
14 association, but with the aims of
15 occupational and almost synonymously
16 preventive medicine in mind, the decisive
17 question is whether the frequency of the
18 undesirable event, B, will be influenced by a
19 change in the environmental factor, A.  How
20 such a change exerts that influence may call
21 for a great deal of research.  However,
22 before deducing causation and taking action,
23 we shall not have invariably have to sit
24 around awaiting the results of that research.
25 The whole chain may have to be unraveled or a

Page 177

1  few links may suffice.  It will depend on
2  circumstances."
3      Q.    Okay.  So and circumstances
4  are, there are sometimes we have a lot of
5  evidence on one factor and a lot of evidence
6  on another factor, right?
7          MS. MILLER:  Objection.
8  QUESTIONS BY MR. TISI:
9      Q.    These are considerations.  No
10 one is more important than the other.  And
11 that was Dr. -- Sir Bradford Hill's point,
12 right?  These are considerations?
13         MS. MILLER:  Objection.
14         THE WITNESS:  Once there is a
15 clearcut association.  And without
16 that clearcut association, one could
17 make the case of not even performing a
18 Bradford Hill analysis.
19 QUESTIONS BY MR. TISI:
20     Q.    Okay.  One can make the case;
21 is that what he says?
22     A.    What he says is that in -- "in
23 looking at causation, our observations reveal
24 an association between two variables,
25 perfectly clearcut and beyond what we would

45 (Pages 174 to 177)

Christian Merlo, M.D., MPH

Page 178

1  care to attribute the play of chance."
2      Q.   Now, before we discuss your
3  experience any further, I want to ask you to
4  go back to the front page of your report.
5          The front page of your report,
6  Exhibit 3, says -- actually, let me just go
7  back and ask this question.
8          On the Bradford Hill, you said
9  you didn't discuss the biologic evidence with
10  respect to talc and ovarian cancer, and it's
11  not in your report, correct?
12         MS. MILLER:  Objection.
13         THE WITNESS:  I did not.
14  QUESTIONS BY MR. TISI:
15     Q.   Okay.  Did you -- I'm sorry, I
16  thought you were finished.
17     A.   No, I did not discuss biologic
18  plausibility, and the reason is -- I said
19  before one could make the case of not even
20  performing a Bradford Hill analysis, but for
21  the sake of what other experts did, I went
22  through strength of association, consistency
23  and dose response.
24         And with a lack of strength of
25  association, with a lack of consistency

Page 179

1  between studies and with a lack of dose
2  response, biologic plausibility doesn't
3  matter because there's no causal association
4  between talcum powder and ovarian cancer
5  based on the medical literature.
6      Q.   So let me ask you this:  Is the
7  issue of specificity important?
8          For example, wouldn't it be
9  important to consider whether or not the
10  studies that did show an association were
11  specific to a particular type of cancer and
12  not others?  Because that would -- that
13  question would argue against the issue of
14  recall bias, for example.
15     A.   You asked several questions
16  there, so if you could just break that down,
17  it would be helpful.
18     Q.   I'll break it down.
19         Wouldn't it be important to
20  consider the issue of specificity?
21         You know that many of these
22  studies broke down their analysis -- tried to
23  break down their analysis by subtype of
24  ovarian cancer, correct?
25     A.   There were several

Page 180

1  epidemiologic studies that looked at
2  different subtypes.
3      Q.   And serous cancers were more
4  associated at a higher rate than other
5  ovarian cancers, correct?
6      A.   It depends on which study we're
7  looking at.  We'd have to go through all of
8  them.
9      Q.   Okay.  But would it -- you
10  didn't do that for the purposes of -- you
11  didn't look at whether or not the evidence --
12  there was evidence of specificity to -- for
13  example, epithelial ovarian cancer as opposed
14  to other kinds of cancers?
15     A.   That's not --
16         MS. MILLER:  Objection.
17         THE WITNESS:  That's not
18     exactly what Bradford Hill is talking
19     about when talking about specificity.
20  QUESTIONS BY MR. TISI:
21     Q.   Okay.
22     A.   The term "specificity" is
23  referred -- the term "specificity" is talking
24  about a specific exposure causing a certain
25  disease, and there are certain diseases that

Page 181

1  have lots of things that can cause them.
2          But if there is one disease
3  that only one exposure causes, then that's
4  what specificity means.  Not specificity in
5  the different type of ovarian cancer.
6      Q.   So you don't think it's
7  relevant to look at whether or not a
8  association is correlated more specifically
9  with the type of ovarian cancer as opposed to
10  ovarian cancer generally for the purposes of
11  trying to figure out whether or not there
12  really was bias in these studies?
13         MS. MILLER:  Objection.
14         THE WITNESS:  I don't even
15     understand what you just asked me.
16  QUESTIONS BY MR. TISI:
17     Q.   Okay.  You didn't look at --
18  you didn't look at analogy, did you?
19         MS. MILLER:  Objection.
20         THE WITNESS:  Analogy, again,
21     is -- you'd have to look at something
22     exactly similar to talc, and there's
23     nothing analogous there that --
24  QUESTIONS BY MR. TISI:
25     Q.   But you didn't address it in

46 (Pages 178 to 181)

Christian Merlo, M.D., MPH

Page 182

1      your report is my question.
2          A.    I did not address it.
3          Q.    And you didn't address the
4      specificity factor, correct?
5          A.    Again, specificity in this
6      case, as in cases of other diseases where
7      there are a number of potential risk factors,
8      it's not appropriate to look at specificity.
9          Q.    Doctor, my question is:  You
10     didn't address it in your report at all?
11             MS. MILLER:  Please don't
12     interrupt him.
13             THE WITNESS:  It's inherent in
14     there.
15     QUESTIONS BY MR. TISI:
16         Q.    Okay.  It's not addressed
17     specifically in your report, is it?
18             MS. MILLER:  Objection.
19     QUESTIONS BY MR. TISI:
20         Q.    You didn't say, "I address the
21     specificity factor, and it doesn't apply or
22     it does apply" for the following reasons?
23             MS. MILLER:  Objection.
24             THE WITNESS:  Again, there is
25     not a line item that says specificity,

Page 183

1      and because of -- and the reason for
2      that is because there's no strength of
3      association, there's no consistency
4      within studies, and there's no dose
5      response to -- within the studies.
6          And so without those things --
7      QUESTIONS BY MR. TISI:
8          Q.    Okay.
9          A.    Without those things, the other
10     considerations are -- are -- you can't get
11     there.
12         Q.    Okay.  Let me go to page 30 of
13     your report.  There's a paragraph here that
14     deals with the issue -- it's the seminal --
15     the seminal article paragraph.
16         A.    Sure.
17         Q.    All right?  It says, "Before
18     evaluating causation, study must reveal an
19     association between two variables, preferably
20     clearcut and beyond that -- beyond what we
21     would care to attribute the play of chance.
22     As I discuss further below, the requirement
23     is likely not satisfied here because we are
24     not presented with a clearcut association."
25             How do you define clearcut?

Page 184

1          A.    So, first of all, it says
2      "perfectly clearcut."
3          Q.    I understand you quoted him,
4      and I'm asking you -- I'm not asking you what
5      he meant because I think it's -- article is
6      pretty clear when he meant.
7              I'm asking you:  In the next
8      sentence where you pulled out the word
9      "clearcut," what do you mean?
10             MS. MILLER:  Objection.
11             THE WITNESS:  One that is
12     beyond that we would attribute to the
13     play of chance.
14             And based on the body of
15     medical evidence and the inconsistency
16     within certain study designs and
17     between certain study designs, the
18     association is not clearcut.
19     QUESTIONS BY MR. TISI:
20         Q.    How do you define "clearcut"?
21             In other words, when you say
22     "play of chance," that's a statistical
23     concept.
24             Chance is defined typically by
25     P value, correct, of .05?

Page 185

1          A.    Chance is defined as a -- about
2      a 1 and 20 chance.
3          Q.    Right.  A .05 P value, right?
4          A.    Statistically, yes.
5          Q.    Okay.  And so is that what you
6      mean when you say "a clearcut association"?
7              You're talking a statistically
8      significant association, correct?
9          A.    I'm not.  No, I'm not.
10             MS. MILLER:  Objection.
11     QUESTIONS BY MR. TISI:
12         Q.    Okay.  So what do you mean
13     by -- when you say --
14         A.    I wasn't finished.
15         Q.    Okay.
16         A.    Well, I'm trying to get at what
17     you mean by clearcut association.
18             MS. MILLER:  Okay.  Objection.
19     Asked and answered.
20             THE WITNESS:  One where there
21     is consistency between -- and in this
22     instance, in this specific instance,
23     one where there's consistency between
24     different types of studies and
25     different types of --

Christian Merlo, M.D., MPH

Page 186

1  QUESTIONS BY MR. TISI:
2      Q.   I'm not asking you in this
3  case.
4          I'm asking you, generally
5  speaking, when you say the requirement is not
6  satisfied here -- okay, because it's not
7  presented with a clearcut association.
8          I'm asking you, generally
9  speaking, if you're -- if I'm a student at
10  Johns Hopkins and I see this sentence and I
11  ask you -- raise my hand and say, "Doctor,
12  can you tell me what is meant by a clearcut
13  association?  What is meant by that?" how
14  would you -- what would you tell me?
15          Without reference to any
16  specific case, what is meant by clearcut
17  association?
18          MS. MILLER:  Objection.
19          THE WITNESS:  I would say it
20  depends.  It depends on what we're
21  looking at, what exposure and outcome
22  relationship we're looking at.  It
23  depends what's available in the
24  medical evidence.  It depends on how
25  the study or the initial work was set

Page 187

1  up.  It depends on whether or not bias
2  and confounding were taken care of.
3          It depends on so many factors
4  that it makes it impossible to even
5  answer that question.
6  QUESTIONS BY MR. TISI:
7      Q.   Would it matter whether or not
8  the study was replicated, in other words,
9  that there was more than one study?
10      A.   So sometimes replication can
11  help with --
12      Q.   Is it necessary?
13      A.   So I was -- wasn't done.
14      Q.   Okay.
15      A.   So sometimes replication can be
16  helpful.
17          Is it necessary?  Not
18  necessarily, because you could have one very,
19  very, very good initial study where you've
20  taken care of lots of things like bias and
21  confounding and random error and the analysis
22  is fine, and so you do come up with, "Hey, we
23  think this association is real.  Let's do
24  further studies."
25          But when you look at different

Page 188

1  study types over a period of time that
2  show -- some show something and some show
3  another, that's inconsistent, and that --
4      Q.   What do they show here that
5  makes them inconsistent?
6          MS. MILLER:  Objection.  He's
7  really -- please let him finish his
8  sentences.
9          THE WITNESS:  Can you be more
10  specific?
11  QUESTIONS BY MR. TISI:
12      Q.   Yeah.  You just made --
13          MS. MILLER:  You were in the
14  middle of a sentence.
15  QUESTIONS BY MR. TISI:
16      Q.   You just made the statement,
17  "Some show something and some show another,
18  that's inconsistent."
19          My question is, what:  Here --
20  what is the "something" you're referring to?
21      A.   Well, if we're specifically
22  talking about the potential causal
23  association between talcum powder and ovarian
24  cancer, there are hospital-based case-control
25  studies that are all not statistically

Page 189

1  significant.
2          There are population-based
3  case-control studies; some are statistically
4  significant, some are not.
5          There are cohort studies, four
6  of them, all not statistically significant.
7          And so when you break down this
8  association in trying to look at causality,
9  when you break down things -- when you break
10  down this by study design, there's a
11  difference.  There's an inconsistency between
12  cohort studies and cases controls.  There's
13  an inconsistency between population-based
14  case controls and hospital-based case
15  controls.
16      Q.   Okay.  So if I understand you
17  correctly --
18      A.   And so the association is not
19  clearcut.
20      Q.   Okay.  So if I can go to
21  page 45 of your report -- I was going to
22  discuss this later, but this seems to be a
23  perfect time.
24          On page 45 you state, "It is
25  important to remember, contrary to the

48 (Pages 186 to 189)

Christian Merlo, M.D., MPH

Page 190

1    suggestion of plaintiffs' experts, in
2    parentheses, that this criterion" -- and the
3    criterion we're talking about is
4    consistency -- "to weigh in favor finding
5    causal association must be consistency in
6    statistically significant associations."
7        And you have that in bold,
8    correct?
9        A.   Are we reading the first
10   sentence?
11       Q.   Correct.
12       A.   Okay.  Can I read it?
13       Q.   Sure.
14       A.   You want me to read it out
15   loud?
16       Q.   No, I just read it.
17       A.   I was flipping through, trying
18   to --
19       Q.   That's okay.  Let me read it
20   again.
21       You state, "It is important to
22   remember, contrary to the suggestion of
23   several of plaintiffs' experts, that for this
24   criterion to weigh in favor of finding a
25   causal relationship, there must be

Page 191

1    consistency in statistically significant
2    associations."
3        And you have that in bold,
4    correct?
5        A.   That's correct.
6        Q.   Okay.  And the report that you
7    cite there is -- I'm sorry, you don't cite
8    anything for that.
9        Can you tell me your basis for
10   that --
11       MS. MILLER:  Objection.
12   QUESTIONS BY MR. TISI:
13       Q.   -- statement?
14       MS. MILLER:  Objection.
15       THE WITNESS:  As an
16   epidemiologist, if we are -- if I'm
17   asked to weigh the body of evidence
18   and there is inconsistency in
19   statistical significance, it makes it
20   impossible to conclude a causal
21   relationship between exposure and
22   outcome.
23       Because if you're not showing
24   consistent statistical significance,
25   then that association becomes very

Page 192

1    difficult to prove causality.
2    QUESTIONS BY MR. TISI:
3        Q.   So is an underlying
4    principle -- you say it's important to
5    remember here -- that a statistically
6    significant result is inconsistent with a
7    statistically insignificant result?
8        MR. LOCKE:  Objection.
9        MS. MILLER:  Objection.
10       THE WITNESS:  Can you say that
11   again?
12   QUESTIONS BY MR. TISI:
13       Q.   Yes.
14       If one study shows a
15   statistically significant result and one a
16   statistically insignificant result, are they
17   by definition inconsistent?
18       MS. MILLER:  Objection.
19       THE WITNESS:  I think it
20   depends.  If you get 20 studies, and
21   10 of them are statistically
22   significant and 10 are not
23   statistically significant, that's
24   inconsistent.
25

Page 193

1    QUESTIONS BY MR. TISI:
2        Q.   Okay.  Have you done a
3    meta-analysis?
4        A.   I have.
5        Q.   Okay.  Have you ever published
6    a meta-analysis?
7        A.   I have not.
8        Q.   Are you a biostatistician?
9        A.   I've taken courses in
10   biostatistics.  I don't consider myself a
11   biostatistician, but oftentimes there is a
12   link between epidemiology and biostatistics.
13   So I do a lot of my statistical analysis
14   myself.  I don't consider myself a
15   biostatistician, though.
16       Q.   Okay.  Do you hold yourself out
17   to colleagues as a biostatistician or a
18   statistician?
19       MS. MILLER:  Objection.  Asked
20   and answered.
21       THE WITNESS:  Again, I consider
22   myself an epidemiologist, and we do
23   have training in biostatistics, and
24   they're not -- they're oftentimes
25   very, very linked.  I don't call

Page 194

1      myself a biostatistician.
2      QUESTIONS BY MR. TISI:
3          Q.   Okay.  By virtue of being --
4      would you agree with me that though there is
5      overlap between the two professions -- you
6      guys need each other, right? -- it is not
7      necessarily the case that a biostatistician
8      is an epidemiologist and an epidemiologist is
9      a biostatistician?
10             MS. MILLER:  Objection.
11             MR. LOCKE:  Objection.
12             THE WITNESS:  That's pretty
13     general.  I mean, there are probably
14     people out there that are both.
15     QUESTIONS BY MR. TISI:
16         Q.   And there are some that are one
17     and not the other, correct?
18         A.   I have no idea.  It's not
19     something I think about.
20         Q.   Okay.  What is the latency of
21     ovarian cancer between something that may
22     cause it and something that -- and the onset
23     of disease?
24             MS. MILLER:  Objection.
25             THE WITNESS:  I don't think

Page 195

1      anybody knows the latency of ovarian
2      cancer and -- first of all, you'd have
3      to not just say something you'd have
4      to say what risk factor you're talking
5      about.  Is it risk factor X, and do we
6      know that, has that been studied?
7          So talking about the latency of
8      ovarian cancer with such generalities,
9      I don't think anybody can answer that.
10     QUESTIONS BY MR. TISI:
11         Q.   Well, is that important to
12     consider when looking at cohort studies and
13     to see whether or not they're long enough?
14             MS. MILLER:  Objection.
15             THE WITNESS:  So that depends.
16     It depends on whether -- certainly it
17     does depend on how long you follow
18     someone in a cohort study, yeah, but
19     also depends on when potentially the
20     exposure could have started.
21         For instance, in cohort studies
22     that I have performed in patients with
23     cystic fibrosis who have had lung
24     transplants, some are born with
25     conditions.  Some are -- some acquire

Page 196

1      an infection at age 1, and we follow
2      them for 20 years.
3          Sometimes we ask about things
4      and we follow people for an
5      appropriate amount of time, but they
6      may have been exposed to that prior to
7      that.  So it really depends.
8      QUESTIONS BY MR. TISI:
9          Q.   Now, I asked you a couple of
10     questions before about the role of
11     professional judgment in looking at the
12     Bradford Hill guidelines.
13         Do you remember those
14     questions?
15         A.   Not specifically, no.
16         Q.   Okay.  Well, I'm going to turn
17     to that question now.  I told you I'd come
18     back to it, and I'm going to come back to it
19     now.
20         Did you use -- when looking at
21     all of this evidence that you looked at, did
22     you use any degree of professional judgment
23     in analyzing the question of whether or not
24     talcum powder products cause ovarian cancer?
25         A.   I don't know what you mean by

Page 197

1      "professional judgment."
2          What I did is I reviewed the
3      literature.  I read the articles.  I looked
4      at how the studies were designed, whether or
5      not they controlled for bias or adjusted for
6      potential confounding, sample size in
7      studies, the differences in population
8      between the case-control studies, the number
9      of people in cohort studies, how long people
10     were followed.
11         So I don't know what you mean
12     by professional judgment, but that's what I
13     did.
14         Q.   Well, I mean, you provided a
15     list of people -- you provided a list of
16     things that you did.
17         Is there anything on that list
18     that you think that any of plaintiffs'
19     experts did not do?
20         A.   You'd have to get way more
21     specific about that.
22         Q.   I'm asking you.  Did you -- you
23     reviewed their reports.
24         Is there anything -- any part
25     of you -- did they look at bias, study

Christian Merlo, M.D., MPH

Page 198

1  design, number of patients enrolled, all
2  those things that you just mentioned?  You
3  listed a bunch of them.
4          Can you think of any gap in
5  their report where they didn't consider the
6  things you considered?
7          MS. MILLER:  Objection.
8          THE WITNESS:  You'd have to
9      show where what we're -- what you're
10     asking me about.
11  QUESTIONS BY MR. TISI:
12     Q.    No, I'm not going to do that,
13  Doctor.
14          I'm asking can you think of any
15  as you sit here right now?
16         MS. MILLER:  Objection.  Asked
17  and answered.
18         THE WITNESS:  Without us going
19     through the specifics, I can't answer
20     that general question.
21  QUESTIONS BY MR. TISI:
22     Q.    So do you agree that it is
23  well-understood that Hill's postulates are
24  ones in which experts will always apply
25  professional judgment?

Page 199

1      A.    I don't -- what are you
2  referring to?
3      Q.    Well, let me ask you this:  In
4  your report you refer oftentimes to a
5  textbook by William Oleckno.
6          Do you know that --
7      A.    The textbook?
8      Q.    Yeah.
9      A.    I do know that textbook.
10     Q.    Okay.
11         MS. MILLER:  If we're going to
12     move on to a new subject, lunch has
13     been waiting for a while, so maybe --
14         MR. TISI:  Well, I just opened
15     up a can of worms here, so I'm going
16     to just -- give me about five, ten
17     minutes, and we'll get done with this
18     section.
19  QUESTIONS BY MR. TISI:
20     Q.    You cited it several times
21  because you find that that is an
22  authoritative textbook in the area of
23  epidemiology?
24         MS. MILLER:  Objection.
25         THE WITNESS:  I cited it

Page 200

1  because it's one of my textbooks.  I'm
2  not here to provide opinions on
3  whether or not I think a textbook is
4  authoritative.  I'm here to give you
5  my opinion on the medical evidence.
6          (Merlo Exhibit 22 marked for
7      identification.)
8  QUESTIONS BY MR. TISI:
9      Q.    Well, you cited a textbook --
10  okay.  Let me ask you this.  Let me look at
11  Exhibit 22.
12          Here is a -- it's called
13  Epidemiology, Concepts and Methods.
14          Do you see that, Doctor?  I
15  just included the cover page.
16          MS. MILLER:  I'm going to
17      object to this exhibit.  It is two
18      pages pulled from a book, and the
19      second page ends in the middle of a
20      sentence.
21          MR. TISI:  I'm not asking that
22      question.  Why don't you --
23          MS. MILLER:  I just don't think
24      it's a proper exhibit.
25          MR. TISI:  I know you don't

Page 201

1  think so.  You don't think anything is
2  proper.
3          But I'm going to ask -- why
4  don't you wait until I ask my
5  question, and then we can figure out
6  whether or not I'm doing something
7  improper or not.
8          MS. MILLER:  I'm objecting to
9      the exhibit, not to the question.
10          MR. TISI:  Okay.  That's fine.
11  I'm objecting to your objections
12  because I think they're ridiculous.
13          MS. SHARKO:  Please be
14  professional.
15          MR. TISI:  Oh, I'm very
16  professional, Counsel, except when
17  somebody is an intrusive as Ms. Miller
18  has been in any deposition I've been
19  involved with.
20          MS. SHARKO:  That's so
21  inappropriate.
22          MR. TISI:  I know you think it
23  is inappropriate.
24          MR. LOCKE:  Objection.  I'm
25  objecting to the exhibit as well.

Christian Merlo, M.D., MPH

Page 202

1    QUESTIONS BY MR. TISI:
2        Q.    So there is a paragraph here on
3    page 188, and I'm going to ask you whether
4    you agree with it or not, and I'm going to
5    ask you to read it.
6        It says --
7        A.    So what am I looking at here?
8        Q.    On page 188, Chapter 7.
9        A.    No, what is this exhibit?
10       Q.    It is a -- it is a -- it is a
11   page of Chapter 7, Association, Causation in
12   Epidemiology.
13       There's a chapter from
14   Dr. Oleckno's book.
15       A.    Okay.  So I see a photocopy of
16   what appears to be the cover of the book.
17       Q.    The first chapter -- the first
18   page of the chapter.
19       A.    Of Chapter 7.
20       Q.    And there's a paragraph on
21   Bradford Hill.  Okay?
22       And I'm going to ask you about
23   the paragraph that he writes on Bradford
24   Hill.  It's the only paragraph that he talks
25   about Bradford Hill.

Page 203

1        MS. MILLER:  Objection.  We --
2        MR. TISI:  That's fine.
3    QUESTIONS BY MR. TISI:
4        Q.    "On 1965, Sir Bradford Hill,
5    professor emeritus at the medical statistics
6    with the University of London, delivered a
7    landmark address where he outlined nine
8    criteria that could be used to determine if
9    statistical associations were likely to
10   represent causal associations.  His reasoning
11   built on the earlier work of others such as
12   John Stuart Mill, who in 1856 had defined
13   several canons from which causal
14   relationships could be deduced.  Over the
15   years, many authors have articulated or
16   modified Hill's basic criteria which have
17   become known as Hill's postulates.  Using
18   these as a focal point, the following six
19   guidelines should be helpful in deciding
20   whether or not statistical associations are
21   likely to represent causal associations.  In
22   the end, the process of determining causation
23   is largely subjective except for the first
24   guideline, which is actually a requirement."
25       And that's temporal

Page 204

1    association, correct?  Temporal sequence,
2    temporality?
3        A.    We're talking about that last
4    sentence there?
5        Q.    Yes, correct.
6        A.    "In the end, the process of
7    determining causation is largely subjective
8    except for the first guideline, which is
9    actually a requirement."
10       Q.    And the first guideline is
11   correct temporal sequence?
12       A.    I'm not sure what it's
13   referring to, but I see "correct temporal
14   sequence" right below that.
15       Q.    All right.  Do you disagree
16   that the determination of causation is
17   largely subjective, if using Hill's
18   postulates?
19       A.    Can you ask that again?
20       Q.    Yeah.
21       Do you believe that the
22   ultimate decision on causation requires -- is
23   a subjective look at the evidence?
24       MS. MILLER:  Objection.
25       THE WITNESS:  I'm not -- I'm

Page 205

1    sorry, I'm just not understanding what
2    you're asking.
3    QUESTIONS BY MR. TISI:
4        Q.    Okay.  Do you agree with the
5    sentence that -- the last sentence.  "In the
6    end, the process of determining causation is
7    largely subjective except for the first
8    guideline, which is actually a requirement"?
9        MS. MILLER:  Objection.
10       THE WITNESS:  I see that
11   sentence there, and I see that it
12   says, "In the end, the process of
13   determining causation is largely
14   subjective except for the first
15   guideline, which is actually a
16   requirement."
17       What is the question?
18   QUESTIONS BY MR. TISI:
19       Q.    My question:  Do you agree with
20   that sentence?
21       A.    It's written there.
22       Q.    Do you agree with it?
23       A.    I think it depends.  I think
24   it -- it depends on what we're looking at.
25   It depends on the exposure outcome

52 (Pages 202 to 205)

Christian Merlo, M.D., MPH

Page 206

1  relationship.  It's a very, very general
2  question --
3       Q.  Okay.
4       A.   -- and a photocopy of one page
5  in a textbook that I don't have memorized.
6            (Merlo Exhibit 23 marked for
7       identification.)
8  QUESTIONS BY MR. TISI:
9       Q.   Well, let's look at exhibit
10  number -- let's look at Exhibit Number 23,
11  which is the textbook by Dr. Gordis.  And I
12  do have the whole chapter here, so feel free
13  to thumb through it.
14            MS. MILLER:  Is this a good
15       time for lunch?  You said it was just
16       five minutes.  It's been five minutes.
17            MR. TISI:  Okay.
18            MS. MILLER:  Do you want to do
19       that after lunch?
20            MR. TISI:  I would prefer to
21       finish it now, but if you feel like
22       you're -- you absolutely need to have
23       lunch right now, if the witness does,
24       I'm absolutely okay with that.
25            MS. MILLER:  We've been going

Page 207

1       an hour and 40 minutes.  That's a long
2       time.
3            What do you think, Susan?
4            MS. SHARKO:  Yeah.
5            MR. TISI:  It's up to you.  I
6       said I'm okay with it.
7            MS. SHARKO:  Thank you.
8            VIDEOGRAPHER:  All right.  The
9       time is 12:18 p.m.  We're going off
10       the record.
11           (Off the record at 12:17 p.m.)
12           VIDEOGRAPHER:  The time is
13       12:57 p.m., and we're back on the
14       record.
15  QUESTIONS BY MR. TISI:
16       Q.   Doctor, before the break I was
17  about to hand you Exhibit Number 23.  And
18  these are -- just for the record, I had these
19  kind of preorganized, so we're going to skip
20  exhibits.  So you may see me bouncing around
21  a little bit.  There's not necessarily a
22  rhyme or reason to that.
23            So this is Exhibit Number 23.
24  This is Chapter 14 from the Gordis textbook.
25       A.   Sure.

Page 208

1       Q.   And Dr. Gordis, again, is
2  the -- was the head of the department for
3  epidemiology at Johns Hopkins, correct?
4       A.   You know, I don't remember.  I
5  know he taught one of my courses.
6       Q.   He's a big deal, isn't he?
7       A.   I can't remember if he was the
8  head of the department of epidemiology.
9       Q.   He's a big deal.  He was well
10  known, a well-known epidemiologist?
11       A.   I took his course, I mean, but
12  I don't know what you mean by "big deal."  I
13  don't --
14       Q.   You don't think he's -- okay.
15  Do you -- you don't understand what his
16  reputation was in the community?
17       A.   Again --
18            MR. LOCKE:  Objection.
19            MS. MILLER:  Objection.
20  QUESTIONS BY MR. TISI:
21       Q.   Let me ask you -- what you
22  think you're here for, candidly, is not as
23  important to me as you answering my
24  questions.  Because what I may think
25  important or you may think important and what

Page 209

1  Ms. Miller may think important are different.
2            So I'm going to ask this
3  question:  Do you have an understanding of
4  the reputation of Dr. Gordis?
5            MS. MILLER:  Objection.
6            MR. LOCKE:  Objection.
7            THE WITNESS:  And I'll state
8       that I took a course by Dr. Gordis in
9       epidemiology.  It was Epidemiology I.
10           And I will state again that I'm
11       not here to give an opinion on whether
12       or not I think Dr. Gordis or anyone
13       has a reputation or a good reputation
14       or a great reputation or whatever.
15  QUESTIONS BY MR. TISI:
16       Q.   So you have -- you're agnostic
17  to who Dr. -- Dr. Gordis' qualifications?
18       A.   What I can say --
19            MS. MILLER:  Objection.
20            THE WITNESS:  I didn't say
21       that.
22  QUESTIONS BY MR. TISI:
23       Q.   Okay.  So what is your
24  assessment?
25            MS. MILLER:  Objection.

Christian Merlo, M.D., MPH

QUESTIONS BY MR. TISI:

1  Q.   What is your assessment then?
2       MS. MILLER:  Same objection.
3       THE WITNESS:  What I can say --
4  what I can say is that he was a
5  professor of mine.  I learned a great
6  deal from the class that I took that
7  he taught, and he was a member of the
8  faculty at Johns Hopkins Bloomberg
9  School of Public Health.
10      But as far as reputation and
11 those things, that's -- I don't have
12 an opinion about it.
13 QUESTIONS BY MR. TISI:
14      Q.   Do you consider him an
15 authority?
16      MS. MILLER:  Objection.
17 QUESTIONS BY MR. TISI:
18      Q.   You personally consider him an
19 authority?
20      MS. MILLER:  Objection.
21      THE WITNESS:  I consider
22 Dr. Gordis a professor of mine.
23 QUESTIONS BY MR. TISI:
24      Q.   Well, he was a professor of

*(lines 1–24 numbering continues as in transcript)*

1  yours, and so I'm asking you:  Do you
2  consider him to be an authority in the field
3  of epidemiology?
4       MS. MILLER:  Objection.
5       THE WITNESS:  Dr. Gordis was an
6  epidemiologist.  He's since passed.
7  And he taught a course that I took,
8  and that's that.
9  QUESTIONS BY MR. TISI:
10      Q.   So you don't have any feelings
11 about his qualifications one way or the
12 other?
13      A.   It's not something I consider.
14 It's not something that I -- he taught me a
15 class, and I learned a lot from it.
16      Now, whether or not he's an
17 authority is -- that's -- I don't have an
18 opinion -- I'm not here to give an opinion
19 about --
20      Q.   I didn't ask you whether you
21 think you're here to give an opinion about
22 that.  I'm here to ask you questions, and I'm
23 entitled to ask you questions.  Okay?
24      And so if you -- if you don't
25 have an opinion, that's one thing.  But if

1  you have an opinion, I'm entitled to ask it.
2  Unless counsel tells you that you can't
3  answer it, you have to answer it.
4       So my question is:  Do you have
5  an opinion as to whether or not Dr. -- from
6  your perspective, he is an authority in the
7  field of epidemiology?
8       MS. MILLER:  Objection.
9       MR. LOCKE:  Objection.
10      MS. MILLER:  I'm going to
11 object on multiple grounds, one of
12 which is asked and answered.
13      THE WITNESS:  He was a
14 professor of mine who taught a course
15 in Epidemiology I, we used his
16 textbook as one of the references
17 during the class, and I had good
18 interactions with him during the
19 class.  That's what I have to say
20 about Dr. Gordis.
21 QUESTIONS BY MR. TISI:
22      Q.   So let's look at Chapter 14,
23 Association to Causation:  Deriving
24 Inferences From Epidemiologic Studies.
25      That's what we're doing here

1  today, right?  We're deriving -- we're seeing
2  whether or not there's an inference from the
3  epidemiologic studies.
4       MS. MILLER:  Objection.
5       THE WITNESS:  Can you ask me
6  that question.
7  QUESTIONS BY MR. TISI:
8       Q.   Actually, I don't even need to.
9  Let's move on.
10      Can you look at the page --
11 it's 260, please.  Actually, go to page 251.
12      A.   251.  Got it.
13      Q.   Do you see on page 251 -- and
14 I'm not going to ask you to read it.
15 Actually, if you go to page 250 --
16      MS. MILLER:  I'm sorry, Chris,
17 I don't think we got a copy.
18      MR. TISI:  Oh, I'm sorry.
19 That's my bad.  Here you go.
20      MS. MILLER:  Thank you so much.
21 QUESTIONS BY MR. TISI:
22      Q.   There's a section called
23 Evidence for Causal Relationship, and then it
24 has guidelines for judging whether an
25 observed association is causal.  On page 250.

Christian Merlo, M.D., MPH

Page 214

1    A.    250 now.
2    Q.    Yeah.
3    A.    250.  Okay.  I got it.
4    Q.    And see Table 14.1 in those
5  lists, the five aspects -- excuse me -- the
6  nine aspects of Bradford Hill?
7    A.    Yeah, let me just look at them
8  because there are nine there.  I just want to
9  make sure that those are the nine Bradford
10  Hill criteria.
11        MR. LOCKE:  Objection to the
12    use of this exhibit.
13        THE WITNESS:  So I see these
14    nine -- I see Table 14.1 stating
15    "guidelines for judging whether an
16    observed association is causal," and I
17    see nine lines there.
18        But there are some lines that
19    are not necessarily those that are --
20    those that Bradford Hill spoke about
21    in his article.
22  QUESTIONS BY MR. TISI:
23    Q.    Okay.  So if you go to the
24  last -- after discussing the nine that he
25  discusses, at the very end it has a

Page 215

1  conclusion.
2    A.    Who are you referring to,
3  Dr. Gordis or --
4    Q.    Dr. Gordis.
5    A.    -- Bradford Hill?
6    Q.    Dr. Gordis.  At the conclusion
7  on page 260.
8    A.    So we're going to 260 now?
9    Q.    Uh-huh.
10    A.    Okay.  260.
11    Q.    Right.
12        There's a conclusion there,
13  right?
14    A.    I see "conclusion," the word,
15  yes.
16    Q.    Okay.  And I'm going to read
17  it -- the paragraph in the conclusion and see
18  whether you agree with it.
19        "Although causal guidelines
20  discussed in this chapter are often referred
21  to as criteria, the term does not seem
22  entirely appropriate.  Although it may be a
23  desirable goal to place causal inferences on
24  a firm quantitative and structural
25  foundation, at present we do not have all the

Page 216

1  information needed for doing so.  The
2  preceding list should therefore be
3  considered -- should therefore be considered
4  to be only guidelines that can be of most
5  value when coupled with reasoned judgment
6  about the entire body of available evidence
7  in making decisions about causation."
8        Did I read that correctly?
9    A.    Yes, you did.
10    Q.    Okay.  Do you agree with that
11  statement?
12        MS. MILLER:  Objection.
13        MR. LOCKE:  Objection.
14        THE WITNESS:  I mean, there are
15    so many statements in there, you'd
16    have to ask me specifically if I agree
17    or disagree with --
18  QUESTIONS BY MR. TISI:
19    Q.    Well, do you agree with the
20  statement that reasoned judgment is important
21  when interpreting epidemiologic evidence?
22        MS. MILLER:  Objection.
23        THE WITNESS:  I didn't write
24    this, and I don't know exactly what
25    the definition of reasoned judgment

Page 217

1  in -- that's a very vague term.
2  QUESTIONS BY MR. TISI:
3    Q.    Okay.
4    A.    And it's going to be impossible
5  to answer that, because I don't know what the
6  definition of reasoned judgment is.
7        (Merlo Exhibit 24 marked for
8    identification.)
9  QUESTIONS BY MR. TISI:
10    Q.    Okay.  That's fine.
11        Go to page -- we'll discuss
12  this real quickly.
13        Oh.  On page 2 of your report,
14  footnote 1, you refer to a lesson from the
15  CDC publication.  I'd like to mark that as
16  Exhibit Number 24.
17    A.    Where are we now?
18    Q.    Page 2 of your report, footnote
19  1.
20    A.    Correct.  Yes.  I have it.
21    Q.    It refers to a CDC publication?
22    A.    That's correct.
23    Q.    Okay?  I marked that as Exhibit
24  Number 24.
25        I assume that this is something

55 (Pages 214 to 217)

Christian Merlo, M.D., MPH

| Page 218 |
| --- |

1 that you read before you cited it in your
2 report?
3 　　　　MR. LOCKE: Objection.
4 　　　　THE WITNESS: So this --
5 this --
6 QUESTIONS BY MR. TISI:
7 　　Q.　Actually, it's a very simple
8 question: I assume you read it before citing
9 it?
10 　　A.　I did look at this website from
11 the CDC. This definition actually comes out
12 of several textbooks, and the reference from
13 those --
14 　　Q.　Doctor, I didn't ask you that
15 question. I asked you whether you --
16 　　A.　I'm giving you an answer.
17 　　Q.　I just asked you whether you
18 read it.
19 　　A.　And so I'm giving you an
20 answer.
21 　　　　Where I found this definition
22 was in several textbooks. When I looked back
23 to the reference, it referenced this lesson.
24 　　　　Did I read this entire thing?
25 I don't recall. I know that I did look this

| Page 219 |
| --- |

1 up on the CD's website -- CDC's website and
2 did take this definition from one or the
3 entirety of those -- of those references, and
4 I don't specifically remember where.
5 　　Q.　Okay. You cited it, and so
6 let's go through it. Okay?
7 　　　　On page 1 it says,
8 "Epidemiology is just -- is not just a
9 research activity but an integral component
10 of public health providing the foundation for
11 directing practical and appropriate public
12 health action based upon this science and
13 causal reasoning."
14 　　　　MS. MILLER: Do you know where
15 he is?
16 　　　　THE WITNESS: I'm sorry, where
17 are you?
18 QUESTIONS BY MR. TISI:
19 　　Q.　The last sentence on the first
20 page.
21 　　　　I'll read it again.
22 "Epidemiology is not just a research activity
23 but an integral component of public health
24 providing the foundation for directing
25 practical and appropriate public health

| Page 220 |
| --- |

1 action based on this science and causal
2 reasoning."
3 　　　　Do you see that?
4 　　A.　I do see that.
5 　　Q.　Okay.
6 　　A.　And that's why I put this
7 definition in --
8 　　Q.　Okay.
9 　　A.　-- when I was defining
10 epidemiology, because I said that it's "the
11 study of the distribution and determinants of
12 health-related states or events in specific
13 populations and the application of this study
14 to control health problems."
15 　　Q.　Right.
16 　　A.　And that's what I was looking
17 for, is a definition --
18 　　Q.　And it also -- and it also uses
19 the word "causal reasoning."
20 　　A.　If I could just finish --
21 　　Q.　Well, I understand, but --
22 　　A.　-- because I'm giving you an
23 answer.
24 　　Q.　You're not -- I asked you about
25 a particular sentence. Okay? I didn't ask

| Page 221 |
| --- |

1 you why you used it. I didn't ask you -- you
2 need to -- I'm perfectly happy to let you
3 answer the question, but I'm also -- it's
4 also important that you listen to my
5 question. Okay?
6 　　　　My question is: Do you agree
7 with the statement that I just read?
8 　　　　I didn't ask you why. I didn't
9 ask how. I didn't ask you what you did to do
10 get there. I simply asked you whether you
11 agree with it.
12 　　　　MR. LOCKE: Objection.
13 　　　　MS. MILLER: Objection.
14 　　　　Assuming that was a question
15 and not a speech. I'm --
16 　　　　MR. TISI: It was a speech,
17 actually.
18 　　　　MS. MILLER: Oh. I'm objecting
19 to it as a speech.
20 　　　　MR. TISI: Fine.
21 QUESTIONS BY MR. TISI:
22 　　Q.　So now I'm going to ask you the
23 question.
24 　　　　Do you agree with the sentence
25 that is in the article that you cited?

56 (Pages 218 to 221)

Christian Merlo, M.D., MPH

Page 222

1      MS. MILLER: Objection.
2      THE WITNESS: I would like to
3   preface this by saying I am listening
4   to your questions.
5   QUESTIONS BY MR. TISI:
6      Q.   Okay. So I'm going to ask you
7   to listen closer because the answers are not
8   answering my question.
9      So now let me ask you this
10  question --
11     MR. LOCKE: Objection.
12  QUESTIONS BY MR. TISI:
13     Q.   -- again, and it's a very
14  simple one.
15     Do you agree with the following
16  statement, quote, "Epidemiology is not just a
17  research activity but an integral component
18  of public health, providing the foundation
19  for directing practical and appropriate
20  public health action based on this science
21  and causal reasoning, close quote."
22     Do you agree with that?
23     A.   It's a statement that's in
24  this -- off the website.
25     Q.   And do you agree with it?

Page 223

1      A.   I mean, there's so many aspects
2   to that statement --
3      Q.   I understand.
4      A.   -- that make it difficult to
5   agree or disagree with. It depends. It --
6      Q.   Okay.
7      A.   I didn't write it, so I --
8      Q.   Now let's go to the end where
9   it says, "Application" on the last page
10  before the summary.
11     Application. Do you see the
12  paragraph? Let's see if we can read it
13  together.
14     "Epidemiology is not just the
15  study of," in quotes, "public health in a
16  population. It also involves applying the
17  knowledge gained by the studies to
18  community-based practice. Like the practice
19  of medicine, the practice of epidemiology is
20  both a science and an art. To make a proper
21  diagnosis and to prescribe appropriate
22  treatment for a patient, the clinician
23  combines medical, scientific knowledge with
24  experience, clinical judgment and
25  understanding of the patient. Similarly, the

Page 224

1   epidemiologist uses the scientific methods of
2   descriptive and analytic epidemiology as well
3   as experience, epidemiologic judgment and
4   understanding of local conditions in
5   diagnosing the health of a community and
6   proposing appropriate practical and
7   acceptable public health interventions to
8   control and prevent disease in a community."
9      First of all, did I read that
10  right?
11     A.   You did read that correctly off
12  the page.
13     Q.   Does it use the word -- does it
14  make the statement that it -- that
15  epidemiologists use scientific methods of
16  descriptive and analytic epidemiology as well
17  as experience and epidemiologic judgment?
18     Does it not say that?
19     MS. MILLER: Objection.
20     THE WITNESS: It says,
21  "Similarly, the epidemiologist uses
22  the scientific methods of descriptive
23  and analytic epidemiology as well as
24  experience, epidemiologic judgment and
25  understanding of local conditions in

Page 225

1   diagnosing the health of a community
2   and proposing appropriate practical
3   and acceptable public health
4   interventions to control and prevent
5   disease in the community."
6   QUESTIONS BY MR. TISI:
7      Q.   Do you agree with it?
8      A.   I mean, in general, that seems
9   like a statement that -- that's why we use
10  epidemiology.
11     Q.   Okay.
12     A.   I didn't write this. There's
13  no reference there. There's -- this is a
14  very, very general statement.
15     Q.   Okay. I agree.
16     But you cited this particular
17  document in your report, and I'm asking you
18  about it.
19     In fact, you make a lot of
20  statements in your report that aren't cited
21  either, right?
22     MS. MILLER: Objection.
23     THE WITNESS: You asked several
24  questions there.
25

Christian Merlo, M.D., MPH

Page 226

1    QUESTIONS BY MR. TISI:
2        Q.   Well, okay.  You make a lot of
3    statements in your report that aren't cited
4    either, don't you?
5        We just talked about the
6    statistical significance paragraph, the one
7    that's important to note.  There was not a
8    citation there either, right?
9            MR. LOCKE:  Objection.
10           MS. MILLER:  Objection.
11           THE WITNESS:  In that instance
12       there was not a citation.
13   QUESTIONS BY MR. TISI:
14       Q.   Okay.  So the fact that there's
15   no citation, does that make your -- the
16   opinion you express in your report invalid?
17       A.   Not necessarily.
18       Q.   Okay.  So --
19       A.   But --
20       Q.   I want to ask you about this
21   statement.
22       A.   I --
23       Q.   Well, I want to ask you about
24   this statement.  You answered my question,
25   saying that there's no --

Page 227

1        A.   No, I didn't.  No, I didn't.  I
2    didn't finish.  And --
3        Q.   Doctor --
4        A.   And --
5        Q.   Do you agree or disagree --
6            MS. MILLER:  He's literally in
7        the middle of a word --
8            THE WITNESS:  And I would
9        appreciate it if you would stop
10       interrupting.  Just let me finish.
11       It's fine.
12   QUESTIONS BY MR. TISI:
13       Q.   Fine.  I would appreciate if
14   you answer my question.
15       Do you agree or disagree with
16   the application paragraph in this document?
17           MR. LOCKE:  Objection.
18           THE WITNESS:  It's not
19       something to agree or disagree with.
20       It's from a website that is online.
21       I cited this to give a
22       definition of what epidemiology is.
23       It doesn't mean I agree or disagree
24       with the entire thing.  I used this as
25       a way to get a definition for

Page 228

1    epidemiology.
2    QUESTIONS BY MR. TISI:
3        Q.   Understood.  I get it.  I get
4    it.
5        Now I'm asking you:  In the
6    document that you cited is another statement.
7    Do you agree with it or not agree with it?
8            MS. MILLER:  Objection.
9    QUESTIONS BY MR. TISI:
10       Q.   And if you don't agree with it,
11   I want to know why.  And if you do agree with
12   it, I'm fine with it.
13           MS. MILLER:  Okay.  So what's
14       the question?  Because I --
15   QUESTIONS BY MR. TISI:
16       Q.   Do you agree with it, or do you
17   don't agree with it?
18           MS. MILLER:  Objection.  Asked
19       and answered.
20           THE WITNESS:  I think in
21       general -- it's such a general
22       statement that it depends.  It depends
23       on what we're talking about.  It
24       depends on what the study is doing.
25       It's so general that there's no

Page 229

1    way to agree or disagree with it.
2    QUESTIONS BY MR. TISI:
3        Q.   Okay.  Well, I guess the CDC
4    would be happy to know that.
5            MR. LOCKE:  Objection.
6    QUESTIONS BY MR. TISI:
7        Q.   Let's move on to the discussion
8    on paragraph -- page 33, footnote 75.  And we
9    talked about this very briefly, the IPPHS
10   study on the primary pulmonary hypertension?
11       A.   Are you referring to my report?
12       Q.   Yes.
13       A.   Okay.
14       Q.   Page 33?
15       A.   33.
16       Q.   Footnote 75.
17       In the footnote you cite a
18   study by Abenhaim, appetite suppressants and
19   the risk of primary pulmonary hypertension in
20   1996, for the proposition for -- where you're
21   discussing strength of association, correct?
22       A.   That's correct.
23       Q.   All right.  And I thought that
24   was an interesting example that you took, and
25   I want to ask you some questions about that.

58 (Pages 226 to 229)

Christian Merlo, M.D., MPH

Page 230

1        You mentioned before that you
2   believe that anorexigens, fenfluramine and
3   dexfenfluramine, can cause primary pulmonary
4   hypertension, correct?
5        You remember that testimony?
6        MR. LOCKE:  Objection.
7        MS. MILLER:  Objection.  I
8   don't think that characterizes his
9   testimony accurately.
10       THE WITNESS:  As a clinician,
11   when I see patients who have been
12   diagnosed with pulmonary hypertension,
13   asking about anorexigens is part of my
14   clinical evaluation because of studies
15   that have looked into the association.
16  QUESTIONS BY MR. TISI:
17       Q.    Okay.  So and I think you
18   testified before, and the record will reflect
19   what you testified to, but I think you did
20   testify before that you believed on balance
21   that there is cause and effect there.  But
22   the record will be what the record is.
23       Let me ask you this:  Are you
24   aware -- first of all, this is a case-control
25   study, correct?

Page 231

1        A.    It is a case-control study.
2        Q.    Subject to all the same biases
3   that you discussed with respect to the
4   case-control studies in this case, correct?
5        MS. MILLER:  Objection.
6        THE WITNESS:  So some of the
7   biases.  But we have to remember that
8   this is a medication study, and so the
9   medications can be looked at in the
10   record, they can be looked as whether
11   or not someone's been prescribed them.
12       So it is a little bit different
13   there in that this is not just
14   recalling back, this is -- you can
15   look to see whether or not people were
16   on medications.
17  QUESTIONS BY MR. TISI:
18       Q.    Do you know whether they did
19   that?
20       A.    I'd have to read the article
21   again.
22       Q.    Okay.  Well, you're just
23   speculating right now as you're talking?
24       MR. LOCKE:  Objection.
25       MS. MILLER:  Objection.

Page 232

1        THE WITNESS:  No, we'd have to
2   look back through the records.
3        (Merlo Exhibit 25 marked for
4   identification.)
5   QUESTIONS BY MR. TISI:
6        Q.    My question to you is this:
7   Did you do the same kind of rigorous analysis
8   of this study that you did of the studies
9   involving talc?
10       MS. MILLER:  Objection.
11       THE WITNESS:  My -- the reason
12   that I included this study in my
13   report was because -- was to -- was to
14   highlight a strength of association.
15  QUESTIONS BY MR. TISI:
16       Q.    I understand.
17       A.    And an odds ratio of 6.3 that
18   actually increases to -- well, I could look
19   here -- to 23.1 when the drugs were used for
20   more than three months is a high strength of
21   association.
22       Q.    Okay.
23       A.    So the reason that I included
24   it was to make the point that it is very,
25   very, very difficult, almost impossible, to

Page 233

1   explain away an odds ratio of 23.1 by some
2   other factor, bias or confounding.
3        Q.    It's funny because I was
4   involved in the litigation involving that,
5   and that's exactly what experts like you
6   said.
7        But we'll go back -- let me go
8   back and ask you this question, Doctor.
9        MS. MILLER:  Objection.
10       MR. LOCKE:  Objection.
11  QUESTIONS BY MR. TISI:
12       Q.    Do you know --
13       MS. MILLER:  Enough with the
14   speeches.  "Experts like you"?  What
15   does that even mean?
16       MR. TISI:  Experts like you,
17   hired by the companies.  Experts like
18   you.
19  QUESTIONS BY MR. TISI:
20       Q.    Let me ask you --
21       MR. LOCKE:  Objection.
22  QUESTIONS BY MR. TISI:
23       Q.    Let me ask you --
24       MS. SHARKO:  Please behave the
25   way you would in court.

59 (Pages 230 to 233)

Christian Merlo, M.D., MPH

Page 234

1      THE WITNESS: So I've never
2   been hired by a company --
3   QUESTIONS BY MR. TISI:
4      Q.   Okay.
5      A.   -- to evaluate primary
6   pulmonary hypertension drugs.  So I would
7   appreciate you not labeling me as something
8   that I am not.
9      Q.   Okay.  So let me ask you this,
10  Doctor:  Are you aware that there was no --
11  first of all, are you aware there's no cohort
12  studies involving primary pulmonary
13  hypertension anorexigen use?
14     A.   So I'm aware of cohort studies
15  that have followed patients with pulmonary
16  hypertension, but I'm not aware that they
17  looked at exposures over time in cohort
18  studies.
19     Q.   Were you aware that there are
20  no other case-control studies; in fact, this
21  is the only one?
22        MR. LOCKE:  Objection.
23        THE WITNESS:  Again, I would
24     have to review the medical literature
25     to --

Page 235

1   QUESTIONS BY MR. TISI:
2      Q.   Would it surprise you?
3      A.   I'm sorry?
4      Q.   Would it surprise you to know
5   that this is not the -- that this is the only
6   one?
7        MS. MILLER:  Objection.
8        THE WITNESS:  Not necessarily,
9     and I'll tell you why.  Because if you
10    have a study that suggests -- that has
11    an odds ratio of 6.3 that goes up to
12    23, as a researcher, I'm not sure
13    another study would need to be done.
14  QUESTIONS BY MR. TISI:
15     Q.   Okay.  At what point -- what
16  would the odds ratio have to be before you
17  say, we don't need to do a second one?
18        MS. MILLER:  Objection.
19        THE WITNESS:  It depends.  It
20    depends on the study design.  It
21    depends on the --
22  QUESTIONS BY MR. TISI:
23     Q.   Say a case-control study, what
24  level would a case-control study have to be
25  in terms of a statistically significant odds

Page 236

1   ratio for you, Dr. Merlo, to say you don't
2   need a second one, it's enough?
3        MS. MILLER:  Objection.
4        MR. LOCKE:  Objection.
5        THE WITNESS:  So, again, I'm
6     going to say it depends.  It depends
7     on not only the study design, but I
8     was going to finish with how the study
9     was conducted.  But what plans were
10    taken to try to limit bias, what plans
11    were taken in the analysis to try to
12    adjust for potential confounding, and
13    what was done in the analysis.  And
14    that -- it depends.  It depends on all
15    those things.
16  QUESTIONS BY MR. TISI:
17     Q.   Let's go to your report at the
18  end -- the summary paragraph, and we'll go
19  elsewhere.  I want to address your opinions
20  about the so-called hierarchy of evidence.
21     A.   Sure.
22     Q.   On page 46.
23     A.   46, I got it.
24        MS. MILLER:  I'm going to
25     object to that speech.

Page 237

1   QUESTIONS BY MR. TISI:
2      Q.   You say --
3        MR. TISI:  No speech.
4
5   QUESTIONS BY MR. TISI:
6      Q.   You call it the hierarchy of
7   evidence, right?
8      A.   What are you referring to?
9      Q.   Okay.  "In particular,
10  plaintiffs' experts ignored the hierarchy of
11  evidence in evaluating studies."
12        Do you see that?
13     A.   I do see that sentence.
14     Q.   Okay.
15     A.   Or that partial sentence.
16     Q.   I want to talk about that.
17        I take it that you believe that
18  there is a recognized hierarchy of evidence
19  with cohort studies having higher evidentiary
20  values and reliability than case-control
21  studies?
22        MS. MILLER:  Objection.  Asked
23     and answered before lunch.
24        THE WITNESS:  So that's not my
25     belief.  It's a belief in epidemiology

60 (Pages 234 to 237)

Christian Merlo, M.D., MPH

Page 238

1    that there is a hierarchy of evidence.
2    QUESTIONS BY MR. TISI:
3        Q.   Okay.  And you also believe
4    that within case-control studies that
5    hospital-based studies are more reliable than
6    population-control studies?
7            MS. MILLER:  Objection.
8            THE WITNESS:  What are you
9    referring to?
10   QUESTIONS BY MR. TISI:
11       Q.   I'm asking -- you say here --
12           MS. MILLER:  Can you tell us
13   what page you're on?
14           MR. TISI:  46.
15           MS. MILLER:  Thanks.
16           Do you have your report?
17   QUESTIONS BY MR. TISI:
18       Q.   In your report you talk about
19   the merits of hospital-based studies
20   versus -- which in your view showed no
21   association, and the case-control studies,
22   some of which showed an association, the
23   population-based ones?
24           MS. MILLER:  Is that a
25   question?

Page 239

1            MR. TISI:  Yes.
2            MS. MILLER:  Objection.
3            THE WITNESS:  Can you -- can
4    you ask that again?  Because I didn't
5    understand that was a question.
6    QUESTIONS BY MR. TISI:
7        Q.   Let me ask you directly.
8            In terms of reliability, do you
9    think that hospital-based studies are more
10   reliable than population-based case-control
11   studies?
12           MS. MILLER:  Objection.
13           THE WITNESS:  I don't know if
14   more reliable -- I don't know if
15   "reliable" is the right term.  It's
16   not a term we use in evaluating the
17   literature.
18           But there is some suggestion
19   that hospital-based case-control
20   studies might be less susceptible to
21   recall bias, and recall bias is a
22   tremendous limitation in case-control
23   studies of all kinds.
24   QUESTIONS BY MR. TISI:
25       Q.   Okay.

Page 240

1        A.   And the reason for that is that
2    there's thought that when a hospital-based
3    case-control study is done, cases and
4    controls think about the past in the same
5    amount; whereas when we have population-based
6    case-control studies, there may be
7    difference -- differences in recall between
8    cases and controls.  And that's the
9    definition of recall bias.
10           MR. TISI:  Okay.  I'm going to
11   move to strike.
12   QUESTIONS BY MR. TISI:
13       Q.   My question was in terms of
14   evidentiary value.  Do you place
15   hospital-based studies having more -- give
16   them more weight as a study design than
17   population-based case-control study designs?
18           MR. LOCKE:  Objection.
19   QUESTIONS BY MR. TISI:
20       Q.   For whatever reason.  I don't
21   care what the reason is now.
22           MS. MILLER:  Objection.
23           THE WITNESS:  So I'll say it
24   depends.
25   QUESTIONS BY MR. TISI:

Page 241

1        Q.   Okay.
2        A.   And it depends on the -- how
3    the study is put together.  It depends on
4    what the study investigators used to tried to
5    limit bias and what the study investigators
6    tried to use to limit confounding.
7            If -- a poorly designed
8    hospital-based study may not be as good as a
9    very well-designed population-based study and
10   vice versa.
11       Q.   In terms of -- I'm sorry.
12       A.   But if we're talking about
13   serious limitations in case-control studies,
14   recall bias is one of them.
15           And it's an accepted thought
16   that recall bias is less in hospital-based
17   case-control studies when compared to
18   population-based studies.
19       Q.   What's your citation for that?
20       A.   I would have to look through.
21   I know I talked about it in my report, but I
22   have to -- if you give me a couple seconds,
23   I'll look through that.
24           MS. MILLER:  Do you know what
25   page it's on, Counsel?

61 (Pages 238 to 241)

Christian Merlo, M.D., MPH

Page 242

1      MR. TISI: Nope.
2      MS. MILLER: I do.
3      MR. TISI: Good for you.
4      MS. MILLER: May I say that to
5  cut to the chase?
6      MR. TISI: No, I don't want --
7      MS. MILLER: You want him to
8  read through every page? Okay.
9      MR. TISI: I don't want him to
10  read every page, but I don't want you
11  to coach your witness. Because I
12  noticed before that you were circling
13  things while he was looking at it, so
14  I don't want to do it anymore.
15      MR. LOCKE: Objection.
16      MS. SHARKO: That's really
17  inappropriate.
18      MR. TISI: I understand it's --
19      MS. SHARKO: -- Mr. Tisi, and
20  it's not true.
21      MR. TISI: The video will
22  demonstrate that it is true.
23      MR. LOCKE: It's false. She
24  was circling something on the left
25  side away from the witness.

Page 243

1      MR. TISI: Okay.
2      MS. MILLER: To show to Susan.
3      MS. SHARKO: With her computer
4  open between Ms. Miller and the
5  witness.
6      MR. TISI: Well, I was accused
7  before of kicking under the table,
8  which I thought was absolutely
9  inappropriate.
10      MS. SHARKO: We understand
11  that.
12      MR. TISI: And incorrect.
13      MS. SHARKO: You've mentioned
14  that a number of times.
15      MR. TISI: And incorrect. And
16  incorrect and wrong and
17  unprofessional. We're sitting at a
18  conference table.
19      MS. SHARKO: All right. So
20  let's have a truce on the personal
21  attacks and just take your deposition.
22      MR. TISI: Perfect. Perfect.
23      THE WITNESS: So on page 6, the
24  last paragraph I say, "Recall bias is
25  often less likely to occur when both

Page 244

1  cases and controls are patients, for
2  example, in hospitalized patients."
3  QUESTIONS BY MR. TISI:
4      Q.  Is there a citation to it?
5      A.  There is, Schultz and Grimes.
6      Q.  Okay.
7      A.  "Where the degree of thinking
8  about a possible exposure outcome is likely
9  to be at similar levels."
10      Q.  Okay. All right. So going
11  back to the hierarchy of evidence concept --
12  because you mentioned that several times
13  throughout your report, true?
14      A.  You've asked me several times
15  about it, and I have talked about the
16  hierarchy evidence in my report.
17      Q.  Okay. Well, let's talk about
18  the places where you do talk about it.
19      You mentioned it in your
20  conclusion. We talked about that.
21      Can you go to page 27 of your
22  report?
23      A.  Sure.
24      Q.  At the very bottom of the page
25  it says, "While cohort studies have their own

Page 245

1  limitations like any other study design, the
2  focused criticism of cohort studies by
3  plaintiffs' epidemiologists, even though they
4  generally are considered more reliable than
5  case-control studies, suggesting a biased
6  approach to their analysis."
7      Do you see that?
8      A.  I do.
9      Q.  Okay. First of all, that's
10  another example where you accused our experts
11  of being biased, correct?
12      MR. LOCKE: Objection.
13      MS. MILLER: Objection.
14      THE WITNESS: I didn't accuse
15  anything. I'm suggesting.
16  QUESTIONS BY MR. TISI:
17      Q.  Okay. You're suggesting.
18      Do you believe that they used a
19  biased methodology?
20      A.  I'm sorry.
21      Q.  Did you believe that they used
22  a biased methodology?
23      MS. MILLER: Objection.
24      THE WITNESS: What I say here
25  is "even though they're generally

62 (Pages 242 to 245)

Christian Merlo, M.D., MPH

Page 246

1    considered more reliable than
2    case-control studies suggests a biased
3    approach to their analysis."
4    QUESTIONS BY MR. TISI:
5        Q.   Do you believe that they did?
6            MS. MILLER:  Objection.
7            THE WITNESS:  I'm just going to
8    read what I said.
9            MS. MILLER:  Asked and
10   answered.
11   QUESTIONS BY MR. TISI:
12       Q.   I understand you read what you
13   said.  This is my opportunity to ask you
14   questions about what you wrote.  I can read
15   what you said, too.
16           Okay.  So my question to you
17   is:  Do you believe that they used a biased
18   approach --
19           MS. MILLER:  Objection.
20   QUESTIONS BY MR. TISI:
21       Q.   -- to their analysis?
22       A.   What I'm saying is that --
23       Q.   I'm not asking what you said.
24   I'm asking what your opinion is now, Doctor.
25           Is your opinion, if I close

Page 247

1    this book and we don't read what you said,
2    I'm asking you, do you think that they used a
3    biased approach in looking at the
4    case-control studies and the cohort studies?
5            MS. MILLER:  He was in the
6            middle of answering, and you
7            interrupted him to ask the question --
8            MR. TISI:  No, he was about to
9            read me what -- this is what I said.
10   QUESTIONS BY MR. TISI:
11       Q.   I'm asking you what your
12   opinion is.
13       A.   And my opinion is what I said.
14       Q.   Okay.
15       A.   And I'll say again.
16       Q.   No, you don't need read it
17   again.  If your opinion is limited to what it
18   says here, then that's fine.
19           Do you believe -- do you have
20   any reason to know that they used -- well,
21   strike that.  Strike that.  We'll let it
22   stand.
23           Before you discussed the state
24   of mind of our experts and their sloppiness,
25   their bias approach, you state, "It is

Page 248

1    generally accepted that they are more
2    reliable than case-control studies," meaning
3    cohort studies, true?
4            MR. LOCKE:  Objection.
5            THE WITNESS:  Can you state
6    that as a question?
7    QUESTIONS BY MR. TISI:
8        Q.   Yes.
9            Do you state that cohort
10   studies here are more reliable than
11   case-control studies?
12           MS. MILLER:  Objection.
13           THE WITNESS:  So it depends.
14   In general, cohort studies, as I
15   talked about earlier, when performed
16   appropriate -- when designed
17   appropriately, when performed
18   appropriately, when analyzed
19   appropriately, do fall higher up on
20   the hierarchy of evidence when
21   compared to case-control studies.
22   QUESTIONS BY MR. TISI:
23       Q.   On page 35, you have a whole
24   section about the disregard of hierarchy of
25   evidence.

Page 249

1            Do you see that?
2        A.   I do see the disregard for
3    hierarchy of evidence.
4        Q.   And you're referring, again, to
5    the methodologic flaw of plaintiffs' experts,
6    which is the main Section 8 above, correct?
7        A.   Can you show me what you're
8    referring to?
9        Q.   Yeah.
10           Roman Numeral VIII is
11   Methodologic Flaws of Plaintiffs' Experts'
12   Epidemiology-Based Opinions.  That's the
13   title of this section?
14       A.   That's correct.
15       Q.   And the first criticism you
16   have here is disregard for hierarchy of
17   evidence, correct?
18       A.   I see that, disregard for
19   hierarchy of evidence.
20       Q.   Are you saying that the
21   plaintiffs' experts disregarded the hierarchy
22   of evidence?
23           MS. MILLER:  Objection.
24           THE WITNESS:  In general, in
25   comparing cohort studies to

63 (Pages 246 to 249)

Christian Merlo, M.D., MPH

Page 250

1    case-control studies, they're just not
2    equal.  I mean, cohort studies are
3    following subjects --
4    QUESTIONS BY MR. TISI:
5        Q.   Wasn't what I asked.  So,
6    Doctor, sorry.  I wasn't asking your opinion
7    about case control and cohort.
8         I'm asking you:  Did the
9    plaintiffs' experts -- not what your views
10   are.  Did, in your opinion, plaintiffs'
11   experts disregard the hierarchy of evidence?
12       MR. LOCKE:  Objection.
13       MS. MILLER:  Objection.
14       THE WITNESS:  So -- and I'll
15   say that in general the hierarchy of
16   evidence does place cohort studies
17   above the case-control studies.  And
18   to treat those studies equally in
19   looking at the body of evidence would
20   be disregarding the hierarchy of
21   evidence.
22   QUESTIONS BY MR. TISI:
23       Q.   Okay.  And you say, "The
24   hierarchy of evidence is well-established in
25   the scientific community."  And that's where

Page 251

1    you cite the National Health and Research
2    Council.
3         And that's that Australian
4    white paper that we talked about before,
5    right?
6        MS. MILLER:  Objection.
7        THE WITNESS:  I'd have to look
8    at it.
9        (Merlo Exhibit 26 marked for
10   identification.)
11   QUESTIONS BY MR. TISI:
12       Q.   Okay.  We'll find it.
13   I'll attach this as Exhibit
14   Number 26.  This is the paper to which you
15   were referring.
16       A.   Yeah, I don't have this
17   memorized, the entirety.
18       Q.   I'm not asking you about it.
19   I'm just asking if this is the document you
20   referenced to in your footnote.
21       A.   This looks like it.
22       Q.   Okay.  Before when I asked you
23   about Health Canada, you said you didn't even
24   know who they were.
25         Do you know who the Australian

Page 252

1    National Health Medical Research Council is?
2        MR. LOCKE:  Objection.
3        THE WITNESS:  I do not know who
4    the National Health and Medical
5    Research Council are.
6    QUESTIONS BY MR. TISI:
7        Q.   Did you get this document from
8    the defense lawyers or did you find it on
9    your own?
10       A.   I found this myself.
11       Q.   Okay.  Without -- but you don't
12   know who these people are?
13       A.   I don't know who a lot of
14   people are that publish things.
15       Q.   Well, you don't know what this
16   organization is, do you?
17       A.   No, I don't.
18       Q.   Okay.  So -- but you say
19   here -- the only thing you cite for that is
20   this Australian document.
21         Can you tell me why you didn't
22   go to any of the textbooks that you use at
23   Hopkins to cite this well-established
24   principle?
25       A.   No.

Page 253

1        MR. LOCKE:  Objection.
2        THE WITNESS:  I mean, I could
3    have gone to textbooks, but I didn't.
4    QUESTIONS BY MR. TISI:
5        Q.   Well, we will.
6        A.   I looked things up.
7        Q.   You call this a fundamental
8    principle of epidemiology, if you go to
9    page 46.  First sentence, second paragraph of
10   your conclusions.
11       A.   The first sentence of the
12   second paragraph?
13       Q.   Uh-huh.
14       A.   And what was the question?
15       Q.   You call it a fundamental
16   principle of epidemiology, right?
17       A.   The first sentence of the
18   second paragraph says, "The methodologies
19   used by plaintiffs' experts ignore
20   fundamental principles of epidemiology."
21       Q.   In particular, plaintiffs'
22   experts ignore the hierarchy of evidence.
23       A.   Yes.
24       Q.   That's what you're referring
25   to?

Christian Merlo, M.D., MPH

Page 254

1      A.   Yes.
2      Q.   Okay.  So in your whole report,
3  the only thing you cited was this Australian
4  document, which we've marked as Exhibit
5  Number 26, on this fundamental principle,
6  right?
7          MR. LOCKE:  Objection.
8          MS. MILLER:  Objection.
9  QUESTIONS BY MR. TISI:
10      Q.   Because I don't see any other
11  citation in any other place other than this
12  Australian document from the organization you
13  know who they are.
14      A.   That's the citation I used.  I
15  teach about this in class.  I've been taught
16  about it in class.
17      Q.   Okay.
18      A.   You're welcome to take my class
19  and see the slides.
20      Q.   I think I'm gonna.
21          Putting aside your concern
22  about how the experts weighed the talc
23  studies, you believe that the cohort design
24  is the best for measuring ovarian cancer?
25          MS. MILLER:  Objection.

Page 255

1          THE WITNESS:  Again, it
2  depends.  It depends on the -- how the
3  study is set up.  It depends on
4  what -- it depends on how long someone
5  is followed.  It depends on the study
6  population being looked at.  It
7  depends on what potential bias was --
8  tried to -- it depends on the
9  investigators planning to try to limit
10  bias.  It depends on the plan to
11  adjust for potential confounders.
12          So it depends.  It's too
13  general to answer.
14  QUESTIONS BY MR. TISI:
15      Q.   Do you know whether or not any
16  of the cohort studies had, as one of its
17  primary focuses at the initiation of this
18  study, assessing whether or not talc causes
19  ovarian cancer?
20      A.   Can you ask that again?
21      Q.   Yes.
22          Do you know whether or not one
23  of the hypotheses that was considered at the
24  inception of any of these cohort studies was
25  that talc could cause ovarian cancer?

Page 256

1      A.   So I wasn't -- I wasn't
2  involved in any of the design of the cohort
3  studies, but one of the beauties of a cohort
4  study is you actually don't need that.
5      Q.   Okay.
6      A.   And what you do is you follow
7  patients over time, and sometimes things come
8  up.  And you might add a questionnaire in and
9  then follow because you have a large group of
10  people that you're following over time.  You
11  have a time zero with some measurement, and
12  then an outcome that develops.  And that's --
13  that's the purpose of a cohort study --
14      Q.   How long --
15      A.   -- that you don't need to have
16  one hypothesis.
17      Q.   How large would a study -- have
18  you done any power calculations to determine
19  how large a study would have to be in order
20  to accurately collect information that would
21  be useful in determining where there's
22  association?
23          MR. LOCKE:  Objection.
24          THE WITNESS:  I don't
25  understand your question.  It doesn't

Page 257

1  make sense.
2  QUESTIONS BY MR. TISI:
3      Q.   How large?  How large would a
4  study have to be?
5          How many patients would have to
6  be enrolled in a cohort study in order to get
7  good information about whether or not talc is
8  associated with ovarian cancer?
9          MR. LOCKE:  Objection.
10          THE WITNESS:  So it depends.
11  It depends on the study.  It depends
12  on the study population.
13          If you're looking at younger
14  women, it may take -- there may be --
15  you may need a larger study
16  population.  If you're looking at
17  women, say, in their 50s, you need a
18  smaller population.
19          It's all going to depend on
20  the -- on the incidence of disease in
21  the study population.
22  QUESTIONS BY MR. TISI:
23      Q.   Did you look at that?
24      A.   I did.
25      Q.   Okay.  How long would the study

65 (Pages 254 to 257)

Christian Merlo, M.D., MPH

Page 258

1  have to be?
2      A.    It depends.  It depends on
3  the -- it depends on the population.  It
4  depends on what the incidence of disease in
5  that population is.
6      Q.    And how long -- how long do you
7  think it would have to be for a cohort study
8  to detect ovarian cancer in women?
9          MS. MILLER:  Objection.
10         THE WITNESS:  Well, then I'm
11     going to have to say it depends.
12     Because in all women, that will --
13     you'd need a very different number
14     than in looking at, say, women who are
15     55 to 65, because the incidence of
16     disease is very different among
17     different age populations.
18  QUESTIONS BY MR. TISI:
19     Q.    Okay.  So in women 55 to 65,
20  did you independently assess how large a
21  study would have to be?
22         MS. MILLER:  Objection.
23         THE WITNESS:  I looked at power
24     and sample size calculation under
25     various assumptions, and those

Page 259

1     assumptions utilized the incidence of
2     disease and the time to follow someone
3     with varying times and varying
4     incidence of disease.
5  QUESTIONS BY MR. TISI:
6     Q.    So how large would a study have
7  to be in women age 50 to 55 to detect an
8  association between talc and ovarian cancer?
9      A.    So I used 55 to 65 as an
10  example just talking right here.  I don't
11  specifically remember right now the incidence
12  of ovarian cancer in someone who is 55 to 60.
13         I know that there are ranges,
14  and those ranges are available on the
15  Internet to look at incidence of disease
16  based on age, and I used some of those ranges
17  and some of those incidences.
18     Q.    Did you do calculations?
19     A.    I did calculations.
20     Q.    Where are they?
21     A.    They're in my report.
22     Q.    Where are they?
23         MR. LOCKE:  Objection.
24         THE WITNESS:  Give me a couple
25     of seconds to find it.

Page 260

1  QUESTIONS BY MR. TISI:
2      Q.    I'm not saying anything.
3          What page are you looking at,
4  Doctor?
5      A.    Well, this might not be -- 38.
6  So 38, page 38, paragraph 1, where it says,
7  "She relies on commentary by Narod, who
8  states that the lack of significant overall
9  association between ever talc use and ovarian
10 cancer in the cohort studies may be due to
11 the fact that despite the large size of the
12 cohorts, the studies were not adequately
13 powered to detect a relative risk of
14 approximately 1.2."
15     Q.    Right.
16     A.    "But this commentary rests on
17 sample size calculations with certain
18 assumptions regarding the risk of ovarian
19 cancer, including the same incidence rate
20 issue that undermines Dr. McTiernan's
21 critique.  When the actual incidence rate of
22 ovarian cancer in the cohort studies is taken
23 into account, it decreases the study sample
24 size needed to the sample size reported in
25 the relevant cohort studies."

Page 261

1      Q.    I understood.  I read that.
2          Where is your calculation for
3  that?
4          Did you -- it says when -- the
5  last sentence says, "When the actual
6  incidence rates of ovarian cancer in the
7  cohort studies is taken into account, it
8  decreases the study sample size."
9          You did the calculation to make
10 that conclusion, and I don't see it in your
11 report.
12         Can you tell me where it is?
13     A.    I did it on a computer, and it
14 gave me a sample size that was similar to
15 what was reported in the relevant cohort
16 studies when you use an incidence of ovarian
17 cancer that's similar to the incidence rates
18 of the population that was being studied.
19     Q.    You did it on a computer?  It's
20 not in your report.
21         MS. MILLER:  Yes, it is.
22 QUESTIONS BY MR. TISI:
23     Q.    Well, tell me where it is.
24         MR. TISI:  I'm not asking
25     counsel; I'm asking the witness.

66 (Pages 258 to 261)

Christian Merlo, M.D., MPH

Page 262

1          MS. MILLER:  Well, we can sit
2     and he can look for it, or I can tell
3     you where it is.
4          MR. TISI:  It's funny how that
5     happens.  When I ask him about a
6     specific sentence, you want him to
7     read the whole report.
8          MS. MILLER:  No, that's not --
9     no, that's exactly the opposite of
10    what I was saying.  I said if you want
11    him to read the whole report, you can.
12    I also know where it is.
13         MR. TISI:  No, that's -- it
14    depends on the question.
15         MS. SHARKO:  Well, being nice
16    doesn't work, unfortunately.
17         MS. MILLER:  Yeah, I'm trying
18    to be nice.  That's the irony.
19         MR. TISI:  You don't -- fine.
20         MS. MILLER:  Do you want to
21    finish that sentence?
22         MR. TISI:  Yes.
23         MS. MILLER:  Go ahead.
24         MR. TISI:  Your conduct during
25    the course of these depositions has

Page 263

1     been anything but nice.
2          MR. LOCKE:  Objection.
3          MR. TISI:  If you really want
4     it to be put on the record, that's
5     what I was going to say.
6          To honor Susan's request, I was
7     going to forebear from that, but you
8     asked.
9          MS. SHARKO:  Mr. Tisi, really.
10         THE WITNESS:  So just give me a
11    couple seconds.  I'll find it.
12         Okay.  So I think I found
13    another instance where I described
14    that sample size would be adequate.
15    QUESTIONS BY MR. TISI:
16    Q.    Okay.  Where is that?
17    A.    It's at page 37.
18    Q.    Which paragraph?
19    A.    Third paragraph.
20    Q.    Okay.
21    A.    And then halfway down that
22    paragraph it says, "Specifically using the
23    Berge study meta-analysis of cohort studies,
24    which concluded that combined cohort studies
25    yielded no risk of ovarian cancer when

Page 264

1     comparing participants exposed to talc to
2     participants not exposed to talc, I
3     calculated that the incidence of ovarian
4     cancer in the overall number of study
5     participants was sufficient to detect the
6     true risk of ovarian cancer of 1.25 with a
7     power of 99, 99 percent."
8          Q.    So what would the number have
9     to be in order to be -- what was your number?
10    That's what I wanted to know.
11         A.    I would have to look at my
12    computer again.  I just know it's sufficient.
13         Q.    Okay.  But you didn't put in
14    your report what the number would have to be
15    to -- so I can't ask you that question, and
16    you don't know it here right now, do you?
17         MR. LOCKE:  Objection.
18         THE WITNESS:  The number is
19    over the number of participants
20    included in those studies.
21    QUESTIONS BY MR. TISI:
22    Q.    Okay.
23    A.    And that means that there's
24    only a 1 percent chance of being incorrect --
25    Q.    Okay.

Page 265

1          A.    -- if, in fact, there is no
2     difference in folks who haven't been
3     exposed -- or unexposed to talcum powder.
4          Q.    Now, getting back to the --
5     this fundamental principle of epidemiology
6     that there's this hierarchy of evidence, you
7     know that the current view in epidemiology,
8     in fact, a view that's been for a while, has
9     been that case control and epidemiologic case
10    control and cohort studies are looked at
11    together --
12         MR. LOCKE:  Objection.
13    QUESTIONS BY MR. TISI:
14    Q.    -- if they exist together,
15    right?
16         MS. MILLER:  Objection.
17         THE WITNESS:  I don't
18    understand the question.  You have to
19    ask it again.
20    QUESTIONS BY MR. TISI:
21    Q.    Well, let's look at the Gordis
22    textbook again.  Exhibit Number 23.
23         Can you look at Exhibit 23
24    again, Doctor?
25         MS. MILLER:  Is that the

67 (Pages 262 to 265)

Christian Merlo, M.D., MPH

Page 266

1    Chapter 14?
2         MR. TISI:  Yeah.
3    QUESTIONS BY MR. TISI:
4         Q.   Can you go to page 256?  You
5    use it as an example -- 255, excuse me.  Oh,
6    I'm sorry.  257, please.
7              He uses as an exam -- and feel
8    free to look at if you wish.  He uses an
9    example, the process for using evidence in
10   developing recommendations, effectiveness of
11   prenatal interventions.  He's giving a
12   causation approach here.
13             The top here is categorizing
14   the evidence by quality and source, and
15   stage 2 is using the guidelines of evidence
16   of causal relationship, and those would be
17   the Bradford Hill criteria.
18             Do you see that?
19        A.   I see this table and I see a --
20   something that says, stage 1, categorizing
21   the evidence by the quality of its source.
22             I see stage 2, guidelines with
23   some -- what Dr. Gordis calls criteria, some
24   of which are some Bradford Hill
25   considerations.

Page 267

1         Q.   Okay.  Now, let's look at the
2    quality of evidence, because that's what
3    we're talking about here, right?
4              Number 1 is trials, and we
5    talked about those before.  Those would be
6    kind of the human experimental trials, the
7    placebo-control kind of trials, right?
8         A.   Usually trials are either
9    randomized, double-blinded, placebo-control
10   trials, or randomized, not blinded, or
11   nonrandomized but clinical trials where an
12   intervention is done.
13        Q.   Okay.  And the second category
14   he has here is cohort or case-control
15   studies.
16             Do you see that?
17        A.   I do see that line that says
18   "cohort or case-control studies."
19        Q.   He doesn't say cohort and then
20   case-control studies, does he?
21        A.   He doesn't.
22        Q.   Okay.
23        A.   They're both observational
24   studies.
25        Q.   Do you know who Kenneth Rothman

Page 268

1    is?
2         A.   No.
3         Q.   You don't know who he is?
4         A.   I have no idea.
5         Q.   Okay.  Do you know he's written
6    a textbook on epidemiology?
7         A.   I don't know his textbook, no.
8              (Merlo Exhibit 27 marked for
9    identification.)
10   QUESTIONS BY MR. TISI:
11        Q.   Okay.  So I'm going to show you
12   and ask whether you agree with it.  It's a
13   textbook on case-control studies.
14             Chapter 8.  Did you read -- by
15   the way, did you read Dr. Ballman's
16   testimony?
17        A.   I did.
18        Q.   You did.
19             So you saw a discussion of
20   Dr. Rothman, right?
21        A.   Yes, but I don't know who
22   Dr. Rothman is.
23        Q.   Okay.  Spent a lot of time
24   talking about Dr. Rothman.
25             Let me ask you this --

Page 269

1              MS. MILLER:  I'm sorry,
2    Mr. Tisi, can we have copies as well?
3              MR. TISI:  Oh, I'm sorry.  That
4    was an error.  Here you go.
5              MS. MILLER:  Thank you so much.
6              MR. TISI:  You're welcome.
7    QUESTIONS BY MR. TISI:
8         Q.   Second sentence in the
9    textbook -- second paragraph.  It's on --
10   this is on -- this chapter is entitled
11   "Case-Control Studies," right?
12        A.   This chapter, Chapter 8, called
13   "Case-Control Studies."
14        Q.   The second paragraph begins
15   with the sentence, "Conventional wisdom about
16   case-control studies is that they do not
17   yield estimates of effect that are valid
18   measures obtained from cohort studies.  This
19   thinking may reflect common misunderstandings
20   in the conceptualizing of case-control
21   studies, which will be clarified later."
22             Do you see that?
23        A.   I do see that.
24        Q.   Do you agree with that?
25             MS. MILLER:  Objection.

68 (Pages 266 to 269)

Christian Merlo, M.D., MPH

Page 270

1          THE WITNESS:  This is a very,
2    very, very vague statement.
3    QUESTIONS BY MR. TISI:
4          Q.    Okay.
5          A.    And I'm going to have to say it
6    depends.  It depends on who's thinking about
7    it.  It depends on the quality of the
8    case-control study.  It depends on the
9    quality of the cohort study.  It depends on
10   so many things that I can't even agree nor
11   disagree with it.
12         (Merlo Exhibit 28 marked for
13   identification.)
14   QUESTIONS BY MR. TISI:
15         Q.    Okay.  Let me show you another
16   article by Dr. Rothman, Exhibit Number 28.
17         This is a review article
18   entitled "Six Persistent Misconceptions."
19         Do you see that?
20         A.    I do.
21         Q.    Have you seen this before?
22         A.    Yes.
23         Q.    Okay.  Can you read
24   misconception number 1?
25         MS. MILLER:  Objection.

Page 271

1          THE WITNESS:  Misconception 1,
2    "There is a hierarchy of study
3    designs.  Randomized trials provide
4    the greatest validity, followed by
5    cohort studies, with case-control
6    studies being least reliable."
7    QUESTIONS BY MR. TISI:
8          Q.    You are -- studying for your
9    support of this general -- this general
10   proposition, you're citing that Australian --
11   that Australian white paper, right?
12         MR. LOCKE:  Objection.
13   QUESTIONS BY MR. TISI:
14         Q.    You didn't study any published
15   literature.  You didn't cite textbooks,
16   published literature, nothing?
17         MR. LOCKE:  Objection.
18         MS. MILLER:  Objection.
19         THE WITNESS:  I'm citing -- I'm
20   citing that article, but I'm also
21   referencing my experience in
22   epidemiology as well as the general
23   sense among epidemiologists today.
24   QUESTIONS BY MR. TISI:
25         Q.    The general -- how do I check

Page 272

1    that, Doctor?  I mean, honestly, I'm pulling
2    up book chapters, published articles.  You
3    pulled up a white paper from Australia.
4          How do I check and ask you,
5    other than your say-so, as to what the
6    general acceptance is in the -- in the
7    epidemiologic community, other than you just
8    saying it?
9          MS. MILLER:  Objection.
10         MR. LOCKE:  Objection.
11         THE WITNESS:  You can take a
12   class in epidemiology.
13   QUESTIONS BY MR. TISI:
14         Q.    I don't think I'm going to take
15   your class.
16         A.    Well, I didn't say my class.
17   You can take any class.
18         Q.    I'm reading the textbooks, and
19   they don't say what you say.
20         MS. MILLER:  Objection.
21         MR. LOCKE:  Objection.
22         (Merlo Exhibit 29 marked for
23   identification.)
24   QUESTIONS BY MR. TISI:
25         Q.    I'm going to show you another

Page 273

1    one.  This is Dr. Rothman who actually was,
2    unlike you, consulted to look at the talc
3    question back in 2000.
4          Almost 20 years ago, right?
5          I'm going to show you that
6    Exhibit Number 29.
7          MS. SHARKO:  Can we please just
8    have questions instead of accusatory
9    speeches?
10         MR. TISI:  I thought there was
11   only one objector here.
12   QUESTIONS BY MR. TISI:
13         Q.    Doctor, I show you Exhibit
14   Number 28, which is entitled "Interpretation
15   of Epidemiologic Studies on Talc and Ovarian
16   Cancer."
17         Have you seen this before?
18         A.    Yes.
19         Q.    Okay.  Have you been shown or
20   have you seen the section on exposure
21   misclassification on page 3?
22         A.    I see the -- I see the
23   paragraph underneath exposure
24   misclassification.
25         Q.    Now, just to put things in

69 (Pages 270 to 273)

Christian Merlo, M.D., MPH

Page 274

1    context, this is November of 2000, this date
2    of this report, correct?
3        A.    That's correct.
4        Q.    Okay.  This is some -- this is
5    like halfway, if that, in the timeline of all
6    the studies that have been conducted in this
7    case from 1982 to 2016?
8            MR. LOCKE:  Objection.
9            MS. MILLER:  Objection.
10           THE WITNESS:  It's November
11    of 2000 --
12    QUESTIONS BY MR. TISI:
13       Q.    Right.
14       A.    -- and that's when it was
15    published.
16       Q.    So what he's saying here, and
17    I'm going to read it for the record, not all
18    the study -- "nearly all the studies were
19    case-control studies.  It is commonly
20    believed that the validity of case-control
21    studies is worse than cohort studies, but
22    this view is mistaken.  The validity of the
23    study depends on the specifics of the study
24    design, the nature of the data and the nature
25    of the hypothesis that the study addresses."

Page 275

1            Do you see that?
2        A.    I do see that.
3        Q.    Do you agree with it or not?
4        A.    Well, I think I said earlier,
5    and I've said it in my report, that the
6    hierarchy of evidence is in general.  And I
7    said that a poorly designed or a poorly
8    executed or a poorly analyzed cohort study
9    may be less evident than a very, very
10    well-designed case control.
11       Q.    So when -- I'm sorry.
12       A.    And the same thing for
13    randomized control trials.
14           But when looking at the
15    different study designs, if properly
16    designed, if properly conducted, if properly
17    analyzed and if properly interpreted, a
18    randomized control trial gives you higher
19    evidence than a cohort, which gives you
20    higher evidence than a case-control, which
21    gives you higher evidence than a case series.
22       Q.    And you --
23       A.    In general.
24       Q.    And you saw that plaintiffs'
25    experts, each one of them, talked about study

Page 276

1    design, talked about the methodology used in
2    the studies and the conclusions reached in
3    the study, right?  They went through every
4    one of them.
5            MS. MILLER:  Objection.
6            MR. LOCKE:  Objection.
7            MR. TISI:  True?
8            MS. MILLER:  Objection.
9            THE WITNESS:  You'd have to be
10    more specific --
11    QUESTIONS BY MR. TISI:
12       Q.    Well, you reviewed them and you
13    made the criticisms.
14           So can you tell me one expert
15    who -- both plaintiffs' experts who did not
16    look at the study design for the
17    case-controls and cohorts, who did not look
18    at the methodology and who did not look at
19    the results?
20           MS. MILLER:  Objection.
21           MR. LOCKE:  Objection.
22           THE WITNESS:  You'd have to be
23    more specific.  If we look at the --
24    QUESTIONS BY MR. TISI:
25       Q.    No, you'll have to be more

Page 277

1    specific because you made some bald
2    accusations here, and I really need you to be
3    specific.  I need you to tell me:  Did
4    plaintiffs' experts -- did plaintiffs'
5    experts -- did they do or not do an analysis
6    of each study?
7            MS. MILLER:  Objection.
8            MR. LOCKE:  Objection.
9            THE WITNESS:  There were
10    summaries of studies, but we'd have to
11    go through each expert and go through
12    the reports of each one of them to get
13    specific about it.
14    QUESTIONS BY MR. TISI:
15       Q.    Okay.  You disagree with the
16    way in which they characterize them, but they
17    just didn't simply list the studies, did
18    they?
19           MS. MILLER:  Objection.
20           MR. LOCKE:  Objection.
21           THE WITNESS:  I never said I
22    disagreed.
23    QUESTIONS BY MR. TISI:
24       Q.    Okay.
25       A.    With whatever you're saying.

70 (Pages 274 to 277)

Christian Merlo, M.D., MPH

Page 278

1    Q.    Okay.  All four studies --
2         MS. MILLER:  Do you want a
3    break?
4         MR. TISI:  If -- he can tell me
5    if he wants a break.
6         THE WITNESS:  I'm okay.
7         MR. TISI:  He just said he's
8    okay.
9         MS. MILLER:  Do we have a new
10   rule in depositions where lawyers
11   can't ask for a break?
12        MR. TISI:  If you want to ask
13   for a break, that's fine.  If he's --
14   you asked him whether he wants a
15   break.
16        MS. MILLER:  This is just
17   getting surreal, Susan.
18        MR. TISI:  It is totally
19   getting surreal.  You asked him
20   whether he wants a break.
21        Can you read that back?  Can
22   you read that back?
23        MS. SHARKO:  I thought -- are
24   we really going to have this kind of
25   meltdown over a break, Mr. Tisi?

Page 279

1         MR. TISI:  I am totally okay
2    with her taking a break if she says "I
3    would like to take a break."  But
4    don't ask the witness whether he wants
5    to take a break, because that suggests
6    that he should take a break.
7         MS. SHARKO:  Seriously?
8         MR. TISI:  That's coaching.
9         MS. SHARKO:  That's not
10   coaching, Mr. Tisi.
11        MS. MILLER:  Was there a
12   question?  Was there a question
13   pending?
14        MR. TISI:  It's totally
15   coaching.
16        Did you need to take a break,
17   or do you want to go forward?
18        Do you want to take a break?
19        MS. MILLER:  I would like to
20   take a break.
21        MS. SHARKO:  I want to take a
22   break.
23        MR. TISI:  Perfect.  All you
24   have to do is ask.
25        VIDEOGRAPHER:  The time is

Page 280

1    2:00 p.m.  We're going off the record.
2         (Off the record at 2:00 p.m.)
3         VIDEOGRAPHER:  Okay.  The time
4    is 2:11 p.m., and we're back on the
5    record.
6    QUESTIONS BY MR. TISI:
7         Q.    Was the talc/ovarian cancer
8    hypothesis prespecified in any of the cohort
9    studies?
10        MS. MILLER:  Objection.
11        THE WITNESS:  I don't know.
12   The cohort studies involving the
13   Nurses' Health Study, for instance,
14   added a questionnaire in 1982.
15        And so if one added a
16   questionnaire in 1982 asking about
17   talc, at that point in the cohort
18   study there may have been a hypothesis
19   about that.  That's why they added
20   that -- that's why one might think
21   that they added a questionnaire.
22   QUESTIONS BY MR. TISI:
23        Q.    You don't know that because the
24   study doesn't say that, does it?
25        MS. MILLER:  Objection.

Page 281

1         THE WITNESS:  I'd have to
2    review the study back -- to look at
3    it.  I don't have it memorized.
4    QUESTIONS BY MR. TISI:
5         Q.    How many times in each of these
6    cohort studies -- what is the concept of
7    exposure classification?
8         A.    Can you be more specific?
9         Q.    Yeah.
10        What is exposure mis -- is that
11   a term of art in epidemiology?
12        A.    Well, misclassification is a
13   term.  And you can have misclassification in
14   both exposure and both in outcome if --
15        Q.    I'm asking you about exposure
16   misclassification.  Actually, I'm using the
17   term that Dr. Rothman used.
18        By the way, you know, Doctor,
19   the journal American Epidemiologists?
20        A.    I don't.
21        Q.    Okay.  Do you know -- have you
22   ever heard of the Ken Rothman Award in
23   epidemiology?
24        A.    I've never heard of that.
25        Q.    Okay.  All right.  So

71 (Pages 278 to 281)

Christian Merlo, M.D., MPH

Page 282

```
 1      Dr. Rothman and his colleagues talk about
 2    exposure misclassification in Exhibit
 3    Number 29.
 4            Do you know what that concept
 5    is?
 6      A.    And what page is that on again?
 7      Q.    I'm just asking you what it is.
 8    I mean, it's in Exhibit 29 he uses the term.
 9            Do you know what it is?
10      A.    Well, you're referring to this.
11    I haven't read this paragraph yet, but I do
12    know what exposure misclassification is.
13      Q.    Then that's what I want.  What
14    is exposure misclassification?
15      A.    Misclassification involving an
16    exposure is when either a study subject is
17    classified as being exposed when they're not
18    exposed or being classified as not exposed
19    when they're exposed.
20      Q.    And exposure misclassification,
21    generally speaking, will bias the results
22    towards the null, correct?
23      A.    Not necessarily.
24      Q.    I didn't say necessarily.  I
25    said generally speaking.
```

Page 283

```
 1            Wouldn't that be the case?
 2      A.    No, absolutely not.
 3      Q.    Okay.
 4      A.    And I'll tell you why.
 5      Q.    Please.
 6      A.    Because there are two different
 7    types of misclassification.  One is
 8    traditionally referred to as differential
 9    misclassification, and one is traditionally
10    referred to as nondifferential
11    misclassification.
12            Nondifferential
13    misclassification can bias the study results
14    to the null.  Differential misclassification,
15    such as that occurs with recall bias, can
16    actually bias the result away from the
17    null --
18      Q.    Okay.
19      A.    -- and give you an overinflated
20    estimate of risk.
21      Q.    Is recall bias an aspect of
22    exposure misclassification; do you think?
23      A.    Absolutely.
24      Q.    Okay.  So exposure
25    misclassification that is differential -- I
```

Page 284

```
 1    think you said it's the one that biases
 2    toward the null -- is that a problem with
 3    cohort studies?
 4      A.    Nondifferential --
 5      Q.    Nondifferential?
 6      A.    -- misclassification --
 7      Q.    Yes.
 8      A.    -- biases toward the null.
 9      Q.    Right.
10            Is that a recognized concern
11    with cohort studies?
12      A.    So it depends.  It depends if
13    there's some reason to believe that those who
14    are exposed actually are unexposed, and those
15    that are unexposed are being labeled as
16    exposed.
17      Q.    And in the cohort studies on
18    talc, would it -- isn't it generally true
19    across the cohort studies that women were
20    asked about that talc exposure only once?
21      A.    I would have to review the
22    articles again.  I don't know that I
23    specifically have that memorized.
24      Q.    Okay.  If that were true, would
25    there be a danger of exposure
```

Page 285

```
 1    misclassification?
 2      A.    Again, I think it depends.  It
 3    depends on -- it depends on the
 4    questionnaire.  It depends on the time
 5    between questionnaire and measurement of
 6    outcome.  It depends on whether or not
 7    there's any aspect of asking about potential
 8    exposure in the past, and it depends a lot --
 9    it depends on a lot of things.
10      Q.    Did you review the Taher draft
11    article meta-analysis?
12      A.    I did review Taher.
13      Q.    Do you know whether or not
14    exposure misclassification was identified as
15    a shortcoming in the cohort studies dealing
16    with talc?
17      A.    I would have to look at the
18    draft and see what you're referring to.
19      Q.    No, I'm not asking about the
20    draft.  I'm asking in the cohort studies
21    themselves.
22      A.    I'm sorry?
23      Q.    Didn't the authors of the
24    cohort studies identify weaknesses in their
25    studies?
```

Page 286

1          MS. MILLER:  Objection.
2          THE WITNESS:  You'd have to be
3    more specific and see which -- what
4    study are we talking about?
5    QUESTIONS BY MR. TISI:
6          Q.    Did they identify a concern
7    about a limitation being that there might be
8    recall -- excuse me, might be exposure
9    misclassification, nondifferential
10   misclassification?
11         MS. MILLER:  Objection.
12         THE WITNESS:  You'd have to
13   point me to the specific article that
14   you're referring to.
15   QUESTIONS BY MR. TISI:
16         Q.    You don't know whether or not
17   the authors in any of those studies discussed
18   it?
19         A.    There are so many articles
20   here, so many reports, a lot of paper, I
21   don't have things memorized.
22         Q.    You --
23         A.    If there's certain -- something
24   that you want to ask me about the cohort
25   studies --

Page 287

1          Q.    You put them in your report.
2          Did you address -- did you
3    address in your report, in your discussion of
4    the cohort studies, the concern about a
5    nondifferential misclassification of
6    exposure?
7          A.    Can you ask that again?
8          Q.    Yes.
9          In your report on your
10   discussion of the -- what you call the four
11   cohort studies, did you discuss the issue of
12   nondifferential misclassification of
13   exposure?
14         MS. MILLER:  Objection.
15         THE WITNESS:  I would have to
16   look through my report because I don't
17   have that memorized as well.
18   QUESTIONS BY MR. TISI:
19         Q.    Well, your discussion of the
20   individual studies are on --
21         A.    Be happy to look at that.
22         Q.    Yeah.  On Houghton page 24 and
23   25.
24         I mean, I assume you read this
25   before you came in here today, right?

Page 288

1          MS. MILLER:  Objection.
2          MR. LOCKE:  Objection.
3          THE WITNESS:  I'm sorry?
4    QUESTIONS BY MR. TISI:
5          Q.    When's the last time you read
6    your report before you came in here today?
7          A.    I read it last night.
8          Q.    Okay.
9          A.    But again, there's a lot of
10   information here, and I don't have things
11   memorized.
12         Q.    I agree.  I agree.
13         So on page 24 and 25 you
14   discuss -- and 26 you discuss Gates,
15   Houghton, Gonzales and Gertig.  I don't see
16   any discussion about the concern of
17   nondifferential misclassification bias.
18         A.    Okay.
19         Q.    Do you agree?
20         A.    Do I agree with what?
21         Q.    Did you discuss nondifferential
22   misclassification bias in your discussion of
23   the four cohort studies?
24         A.    I discussed the potential for
25   nondifferential misclassification in

Page 289

1    observational studies in my report.
2          Q.    Did you discuss them in the
3    context of the talc studies?
4          A.    I didn't.
5          Q.    You know that that's a concern
6    that the plaintiffs' experts had when they
7    looked at the case -- excuse me, the cohort
8    studies, that women were asked only one time
9    whether they were exposed to talc and that
10   there was a potential for nondifferential
11   misclassification bias?
12         MR. LOCKE:  Objection.
13         MS. MILLER:  Objection.
14   QUESTIONS BY MR. TISI:
15         Q.    Do you remember that?
16         A.    You'd have to show me
17   specifically what you're referring to.
18         Q.    You don't remember that that
19   was -- that was a primary focus of each one
20   of these experts?
21         MR. LOCKE:  Objection.
22         MS. MILLER:  Objection.
23         THE WITNESS:  Again, you'd have
24   to show me the specifics because --

Christian Merlo, M.D., MPH

Page 290

1    QUESTIONS BY MR. TISI:
2        Q.    Okay.  But you don't address
3    that in your report?
4            MS. MILLER:  Objection.
5            THE WITNESS:  I'm sorry?
6    QUESTIONS BY MR. TISI:
7        Q.    You don't address that in your
8    report with respect to the individual case --
9    the individual cohort studies, do you?
10           MR. LOCKE:  Objection.
11           THE WITNESS:  Nondifferential
12       misclassification is a potential
13       limitation of any observational study.
14   QUESTIONS BY MR. TISI:
15       Q.    Okay.  I asked you whether you
16   discussed it in the context of the cohort
17   studies.
18           MS. MILLER:  Objection.
19   QUESTIONS BY MR. TISI:
20       Q.    The four cohort studies on
21   talc, did you discuss -- did you even discuss
22   that bias?
23           I mean, you're sitting here
24   telling our -- telling -- under oath telling
25   our -- saying that our experts were, you

Page 291

1    know, litigation-driven opinions, that they
2    did all kinds of -- did all kinds of things
3    that in your view were inappropriate for the
4    purposes of litigation.
5            I'm asking you:  Did you look
6    at the issue of recall -- excuse me, of
7    nondifferential exposure misclassification
8    with respect to the four cohort studies?
9            MS. MILLER:  Objection.
10           MR. LOCKE:  Objection.
11           THE WITNESS:  So I don't know
12       what the first part of what you said
13       was, whether or not that was a
14       question.
15   QUESTIONS BY MR. TISI:
16       Q.    Well, you are sitting here
17   saying that they applied -- you are sitting
18   here, and you've been -- made some very --
19   used some very strong words in your report
20   about the conduct of the plaintiffs' experts.
21   Agreed?
22           MS. MILLER:  Objection.
23           THE WITNESS:  I mean, that's a
24       general -- a very general statement,
25       the conduct --

Page 292

1    QUESTIONS BY MR. TISI:
2        Q.    It is a general statement, and
3    I suspect that -- I suspect that the judge
4    might look at some of the words used in here
5    and agree with me here.
6            Pretty strong terms to say that
7    somebody was using a -- conducting an
8    analysis for the purpose of litigation and
9    all the things that you've said.  So -- but
10   let's put that aside.
11           MS. MILLER:  Objection.
12   QUESTIONS BY MR. TISI:
13       Q.    Let's put it aside.  Put it
14   aside.
15           MS. MILLER:  If that's a
16       speech, I'm objecting to it.  It
17       mischaracterizes --
18           MR. TISI:  Put it aside.
19           MS. MILLER:  It
20       mischaracterizes his report.  If
21       you're going to say it, then you're
22       going to have to let me object to it.
23       If you didn't want to say it --
24           MR. TISI:  Put it aside.
25           MS. MILLER:  -- then you

Page 293

1    shouldn't have said it.
2            MR. TISI:  Put it aside.
3    QUESTIONS BY MR. TISI:
4        Q.    You didn't discuss -- one of
5    your real criticisms is they did not
6    account -- our experts did not account for
7    recall bias in each of the case-control
8    studies, true?
9        A.    I'm not saying that it wasn't
10   accounted for.  It's just a known limitation
11   of case-control studies, absolutely.
12       Q.    Okay.  Did our experts consider
13   recall bias as part of looking at the
14   talc-related case-control studies?  Did they
15   address the issue?
16           MS. MILLER:  Objection.
17           THE WITNESS:  Again, I think
18       we'd have to look at each specific --
19       each specific expert, and if there's a
20       part in the expert report that you'd
21       like to discuss, I'd like to have it
22       in front of me.  I don't have these --
23       I don't have these --
24           MR. TISI:  You --
25           THE WITNESS:  I don't have

74 (Pages 290 to 293)

Christian Merlo, M.D., MPH

Page 294

1    these memorized.
2    QUESTIONS BY MR. TISI:
3        Q.   Okay.  You had an opportunity
4    to write your report.  There was no page
5    limit on it.  You could have written a
6    thousand-page report if you'd wanted to.
7            My question here is:  You don't
8    really -- you have criticisms of plaintiffs'
9    experts generally, but you don't really
10   address what they said about each individual
11   study, do you?
12           MR. LOCKE:  Objection.
13           MS. MILLER:  Objection.
14           THE WITNESS:  Again, we'd have
15       to go through each report --
16   QUESTIONS BY MR. TISI:
17       Q.   You don't address.  I'm not
18   asking what they did.  I'm asking:  In your
19   report, you do not address what each expert
20   of the plaintiff said about each study, do
21   you?
22           MS. MILLER:  Objection.
23           MR. LOCKE:  Objection.
24           THE WITNESS:  I'm not sure what
25       you're asking me.

Page 295

1    QUESTIONS BY MR. TISI:
2        Q.   Okay.  Did each of the
3    plaintiffs' experts address the issue of
4    recall bias?  Was that issue discussed in
5    each and every one of their reports?
6            MS. MILLER:  Objection.
7            THE WITNESS:  Again, I'd have
8        to go through them and --
9    QUESTIONS BY MR. TISI:
10       Q.   Well, I assume you did that
11   before today.
12       A.   And I don't have them
13   memorized.
14       Q.   Okay.
15       A.   So if you'd like to go through
16   them, I'm happy to sit here and we can go
17   through each of them.
18       Q.   You know that's impossible,
19   don't you?  In seven hours, you know that's
20   impossible, which is exactly why you're
21   saying that.
22           MR. LOCKE:  Objection.
23   QUESTIONS BY MR. TISI:
24       Q.   Let me ask you this, Doctor:
25   You are going -- you are asking -- you are --

Page 296

1    exposure misclassification.  You identified
2    it as a potential weakness generally.
3            Did you discuss that issue in
4    connection with any one of the four cohort
5    studies for talc?
6            MS. MILLER:  Objection.
7            THE WITNESS:  Misclassification
8        is inherently a limitation in any
9        study --
10   QUESTIONS BY MR. TISI:
11       Q.   And did you --
12       A.   -- case control or cohort
13   studies.  There are limitations inherent in
14   the case-control studies that are in the
15   literature.  There are inherent limitations
16   in the cohort studies that are out there.
17       Q.   Right.
18           And just testified before that
19   because of these things, you have to look at
20   the design of each study individually, right?
21           A better -- I think you said a
22   well-designed cohort study is better than a
23   well-designed case-control study, right?
24           And a poorly-designed cohort
25   study may be less valuable than a

Page 297

1    well-designed case-control study, right?
2            MR. LOCKE:  Objection.
3            MS. MILLER:  Objection.
4            THE WITNESS:  It depends.
5        Potentially.
6    QUESTIONS BY MR. TISI:
7        Q.   Of course it depends.
8            So the question is:  Having
9    been dependent upon that, it's incumbent upon
10   you as a scientist to look at each study for
11   the purpose of design, to see whether one is
12   well-designed and one isn't, right?
13           MS. MILLER:  Objection.
14           THE WITNESS:  Can you ask that
15       again?
16   QUESTIONS BY MR. TISI:
17       Q.   Yes.
18           Since epidemiology -- we went
19   through the different examples -- requires
20   you to not strictly adhere to a hierarchy but
21   look at the particular designs of the
22   studies, did you do that with respect to each
23   one of these studies?
24       A.   I did.
25       Q.   Okay.  So with regard to the

75 (Pages 294 to 297)

Christian Merlo, M.D., MPH

Page 298

1    cohort studies, okay, did you look at
2    individually whether there was a particular
3    concern with these studies on
4    misclassification bias?
5        A.    There's always a concern for
6    misclassification.
7        Q.    Understood.  Theoretically
8    that's true with every one of these cohort
9    studies.
10           But you know each of these
11   studies only asked these women in decades,
12   most cases decades -- I think the Nurses'
13   Health Study was six and a half years -- but
14   one -- only once about talc usage at the
15   beginning -- at or near the beginning of the
16   study, right?
17       MR. LOCKE:  Objection.
18       THE WITNESS:  We'd have to
19   break -- that's a very generalized
20   question.
21   QUESTIONS BY MR. TISI:
22       Q.    Where is it in your report?
23   Where is it in your report?
24       A.    I'm sorry.
25       MS. MILLER:  Objection.

Page 299

1    QUESTIONS BY MR. TISI:
2        Q.    Where is your discussion in the
3    report about when they were asked about their
4    talc usage in the cohort studies?
5        A.    Well, we can go through my
6    report if you'd like to.
7        Q.    You just did that, Doctor, and
8    you said it wasn't here.
9            On page 24 and 25, you have a
10   discussion, the Gertig, Gates, Houghton and
11   Gonzalez studies.  There is no discussion in
12   here about when they were asked about the
13   talc and how often they were asked.
14       MR. LOCKE:  Objection.
15       THE WITNESS:  I would have to
16   look back through my report because I
17   do know that in the Gertig study and
18   the Gates study, the questionnaire
19   that asked women about talc exposure
20   was in 1982.
21   QUESTIONS BY MR. TISI:
22       Q.    Correct.
23       A.    And so that is when they were
24   asked.
25       Q.    And when was the analysis done?

Page 300

1        A.    The analysis was done during
2    the follow-up period.
3        Q.    Which was when?
4            How many decades after they
5    were initially asked?
6        A.    Well, it depends on when the
7    patient -- when the study subject was
8    enrolled.
9            I can say that the Gertig
10   study, it was assessed -- the exposure
11   questionnaire was added in 1982, and they
12   were followed for 14 years on average.
13       Q.    Right.
14           And in 14 years, isn't it
15   conceivable that somebody could have started
16   using talc, or somebody that who said they
17   were using talc stopped using talc?
18       A.    That's certainly possible, but
19   for four studies to show the same
20   nondifferential misclassification, that would
21   be very, very unlikely.
22       Q.    Right.
23           And four studies which asked --
24   asked the question once at the beginning of
25   the study, right?

Page 301

1        MS. MILLER:  Objection.
2    QUESTIONS BY MR. TISI:
3        Q.    They all had the same flaw.
4    You had four flawed studies, didn't you?
5        MS. MILLER:  Can we stick with
6    one question at a time?
7    QUESTIONS BY MR. TISI:
8        Q.    You had four flawed studies
9    with respect to misclassification bias.  They
10   all asked one time at the beginning of the
11   study; true or not true?
12       MR. LOCKE:  Objection.
13       MS. MILLER:  Objection.
14       THE WITNESS:  The Gates and
15   Gertig study did ask women questions
16   about talc in 1982.  That was the only
17   time that they were asked about talc
18   usage in those two studies.
19   QUESTIONS BY MR. TISI:
20       Q.    What about Houghton?
21       A.    In Gertig -- sorry, in -- let
22   me just do Gonzalez first.
23           Gonzalez were asked if they
24   used talc within 12 months prior to
25   enrollment into the study, and so that's

Christian Merlo, M.D., MPH

Page 302

1    going to depend on when they enrolled in the
2    study in between 2003 to 2009.  And they were
3    followed for six years afterwards.
4        Q.    And they were never -- just
5    while we're talking about that, were they
6    ever asked after enrollment, again, whether
7    or not they switched to using talc, or people
8    who said they were using talc stopped?
9        MS. MILLER:  Objection.
10       THE WITNESS:  They were not
11   asked again.
12   QUESTIONS BY MR. TISI:
13       Q.    Okay.  Houghton?
14       A.    In Houghton, participants
15   were -- completed an annual questionnaire at
16   enrollment.  And I don't know if I have the
17   specific year that the questionnaire was
18   asked, because study subject enrolled from
19   1993 to 1998 and then were followed --
20       Q.    How many years?
21       A.    An average of 12 years.
22       Q.    Okay.  Were they ever asked in
23   that 12 years whether some who had been on
24   talc went off, or some who were off talc went
25   on in those 12 years?

Page 303

1        A.    They weren't.
2        Q.    Okay.  So those were
3    limitations on the cohort studies, correct?
4        A.    They're potential limitations
5    of a cohort study.
6        Q.    And you don't address those in
7    your report, do you?
8        A.    Again, it's inherent in a
9    cohort study that there are potential --
10   there's potential exposure misclassification.
11       Q.    I understand.
12       Did you address those -- well,
13   in cohort studies they can be asked every
14   year about their exposures, right?  Some do
15   that.
16       A.    And there's still potential for
17   misclassification.
18       Q.    Understood.
19       But these particular studies
20   were particularly vulnerable to that bias
21   because they asked only once at the beginning
22   of the studies, true?
23       A.    Not necessarily, no.
24       Q.    Okay.  But you don't address it
25   at all in the context of each individual

Page 304

1    study, do you?
2        MS. MILLER:  Objection.  Asked
3    and answered like ten times.
4        THE WITNESS:  I addressed it in
5    the context of my report, and inherent
6    in any observational study is the
7    potential for misclassification.
8    QUESTIONS BY MR. TISI:
9        Q.    You didn't analyze in your
10   report whether the cohort studies in talc
11   were flawed or limited in reliability by
12   misclassification studies, did you?
13       MS. MILLER:  Objection.
14       THE WITNESS:  Can you ask that
15   again?
16   QUESTIONS BY MR. TISI:
17       Q.    Yes.
18       Other than making the general
19   observation, did you analyze in your report
20   whether the cohort talc studies were flawed
21   or limited in reliability by
22   misclassification bias?
23       A.    So other than saying what I
24   said before, that inherent in all
25   observational studies, which I talked about

Page 305

1    in my report, misclassification, other than
2    that -- that's what I talked about in my
3    report.
4        Q.    Other than that, the answer is
5    no, you didn't discuss them in the context of
6    the individual studies?
7        MS. MILLER:  Objection.
8        MR. LOCKE:  Objection.
9        THE WITNESS:  But I discussed
10   it within my report, which is within
11   the context of the individual studies.
12   QUESTIONS BY MR. TISI:
13       Q.    Let's talk about strength of
14   the association.  We talked about methodology
15   generally.  Let's talk about strength.
16       On page 32 of your report, you
17   say -- you have a section called "Lack of
18   Strength of Associations."
19       Page 32, bottom, Section D.
20       A.    Lack of Strength of
21   Association.
22       Q.    Do you see that?
23       A.    Yes.
24       Q.    On page 33, you say, "The
25   heart -- the higher the relative risk, the

Christian Merlo, M.D., MPH

Page 306

```
 1   greater the likelihood that the relationship
 2   is causal."
 3        A.   I see that.
 4        Q.   You use the term "weak" or
 5   "relatively weak" association seen in the
 6   talc and ovarian cancer relationship,
 7   correct?  You call them weak.
 8        A.   Where are you?
 9        Q.   For example, the very -- the
10   very last -- the second full paragraph, last
11   three lines up you say, "Relatively weak
12   associations."
13        A.   I'm not seeing where you're
14   referring to.
15        Q.   Right there.
16        MS. MILLER:  It's hard to see
17   upside down.
18        MR. TISI:  Well, I can't do it
19   any other way unless you want me to
20   reach over and point at the witness.
21        I said three sentences up from
22   the second paragraph.
23        MS. MILLER:  Three second up --
24   from the bottom of the second
25   paragraph?
```

Page 307

```
 1        MR. TISI:  Yeah.
 2        MS. MILLER:  Oh, okay.  I see
 3   it now.  I misunderstood you.
 4        THE WITNESS:  I see that.
 5   QUESTIONS BY MR. TISI:
 6        Q.   And on page 42, you say, "It is
 7   generally accepted that risk ratios -- that
 8   ratios of risk measures between 1.1 and 2.0
 9   represent a weak association between exposure
10   and outcome."
11        A.   What page is that on?
12        Q.   42.
13        A.   And where is that?
14        Q.   I'm sorry.  I'm sorry, page 43,
15   second paragraph.  "Although there is no
16   universe numeric definition of a strong
17   association between exposure and risk, it is
18   generally accepted that risk -- that ratios
19   of risk measures between 1.1 and 2.0
20   represent a weak association between exposure
21   and outcome."
22        Is that right?
23        Did you say that?
24        A.   Did I --
25        Q.   Yes.
```

Page 308

```
 1        A.   I wrote that in my report.
 2        Q.   Okay.  And you cite a 1982
 3   article by Widner.
 4        A.   That's correct.
 5        Q.   And on page 46, you state that
 6   "Risk ratios between 1.2 and 1.6 are by
 7   definition weak associations."
 8        That's your conclusion
 9   sentence.  First sentence, third paragraph
10   down.
11        "This is by definition a weak
12   association."
13        A.   That's correct.
14        Q.   Okay.  Where is that definition
15   written?
16        MS. MILLER:  Objection.
17        THE WITNESS:  Well, I would
18   have to go back and look at the
19   article that I referenced.
20   QUESTIONS BY MR. TISI:
21        Q.   Is that the only -- is that the
22   only article that you can think of?
23        A.   It's the only article that
24   comes to mind that I could find, but it's a
25   generally accepted -- generally accepted in
```

Page 309

```
 1   the epidemiologic community that anything
 2   less than 2 is a weak association.
 3        Q.   Anything less than 2 is weak?
 4        A.   So, again, it depends, because
 5   there are certain studies that may show, that
 6   have been designed properly, that bias and
 7   confounding aren't a problem, that analysis
 8   is great and interpretation is fine where
 9   that association, that relative risk, even
10   though it's less than 2 considered weak, that
11   may be -- that may point towards causality
12   between an exposure and an outcome.
13        However, when bias and
14   confounding are potential to be present --
15   for instance, if we're going to talk about
16   confounding, which I think I should --
17        Q.   I'm asking you about the
18   definition, where, by definition, something
19   less than 2.0 is weak.
20        A.   It's a generally accepted --
21        Q.   Generally accepted?
22        A.   It's generally accepted in the
23   epidemiology community.
24        (Merlo Exhibit 31 marked for
25   identification.)
```

Page 310

1    QUESTIONS BY MR. TISI:
2        Q.   I'm going to show you
3    Exhibit Number 31, which is the National
4    Cancer Institute statements on ovarian
5    cancer.
6             Have you seen this before?
7        A.   No.
8             MR. LOCKE:  Objection.
9    QUESTIONS BY MR. TISI:
10       Q.   Okay.  If you look at the
11   second page, it talks about factors within --
12   "with adequate evidence of increased risk of
13   ovarian, fallopian tube and primary
14   peritoneal cancers."
15            Do you see that?
16       A.   I see that.
17       Q.   You see they talk about
18   endometriosis.
19            MS. MILLER:  Can you point me
20   to that?
21            MR. TISI:  Yeah.  You see where
22   endometriosis is?
23            MS. MILLER:  No, that's why I'm
24   asking you to point --
25            MR. TISI:  It's on page 3 of

Page 311

1        18.
2             MS. MILLER:  Oh, sorry, I was
3    on page 4.  I thought you said
4    factors.
5    QUESTIONS BY MR. TISI:
6        Q.   See endometriosis?
7             Do you see that?
8        A.   I do see that.
9        Q.   See it talks about this is an
10   established risk of ovarian cancer?  The
11   magnitude of the effect is described as
12   modest with 1.8 to 2.4.
13            MS. MILLER:  Objection.
14   Mischaracterizes the document.
15   QUESTIONS BY MR. TISI:
16       Q.   Do you see that?
17       A.   I see a statement that says,
18   magnitude of effect --
19       Q.   Okay.
20       A.   -- modest with observed
21   relative risks of 1.8 to 2.4.
22       Q.   Do you see magnitude of effect
23   for hormone replacement therapy, modest with
24   observed relative risk, 1.20 to 1.8?
25       A.   I do see the statement

Page 312

1    magnitude of effect modest with observed
2    relative risks of 1.2 to 1.8.
3        Q.   Do you think the National
4    Cancer Institute doesn't understand the --
5    doesn't understand the concept of strength of
6    association and this generally accepted
7    principle that anything under 2.0 is weak?
8             MS. MILLER:  Objection.
9             MR. LOCKE:  Objection.
10            THE WITNESS:  So again, I'm not
11   here to give an opinion about the
12   National Cancer Institute.  I don't
13   know who put this document together,
14   and I did say that it depends.  It
15   depends on the study.
16   QUESTIONS BY MR. TISI:
17       Q.   Okay.
18       A.   But in general, a relative risk
19   of -- or an odds ratio of less than 2 is a
20   weak association.
21       Q.   What about obesity and height,
22   the next one?  It says, based on fair
23   evidence -- not even great evidence but fair
24   evidence -- obesity and height are associated
25   with a modest increased risk of ovarian

Page 313

1    cancer, and they defined it as a 1.1.
2             Do you see that?
3        A.   I see, based on fair evidence,
4    increases in height and body mass indexes are
5    associated with a modest increase in risk of
6    ovarian cancer.
7             And then where are you seeing
8    the 1.1?
9        Q.   The next paragraph.
10       A.   I do see that.
11       Q.   So the National Cancer
12   Institute, at least with respect to ovarian
13   cancer, has classified modest increases from
14   anywhere between 1.1 all the way up to 2.0 as
15   modest, correct?
16            MS. MILLER:  Objection.
17            MR. LOCKE:  Objection.
18            THE WITNESS:  Again, I'm not
19   sure who put this all together, but if
20   I were to give a presentation and
21   say -- in a classroom or in a lecture
22   or in my research progress and said
23   that a risk ratio of 1.1 was modest,
24   I'd get laughed out of the room.
25   QUESTIONS BY MR. TISI:

79 (Pages 310 to 313)

Christian Merlo, M.D., MPH

Page 314

1    Q.    So this is a laughable
2  document, huh?
3          MR. LOCKE:  Objection.
4          THE WITNESS:  I'm not saying
5  I'm laughing at this, but I'm just
6  telling you that if Dr. Gordis came
7  into the room and I tried to explain
8  to him that a relative risk of 1.1 is
9  modest, he'd laugh me out of the room.
10 QUESTIONS BY MR. TISI:
11   Q.    Now he's an expert?
12   A.    I'm not saying he's an expert.
13   Q.    Okay.
14   A.    He was my teacher.
15   Q.    Okay.
16   A.    And I wouldn't do that in front
17 of him.
18        (Merlo Exhibit 32 marked for
19        identification.)
20 QUESTIONS BY MR. TISI:
21   Q.    Okay.  Let's look at Exhibit
22 Number 32, which is another chapter out of
23 the textbook Modern Epidemiology by
24 Dr. Rothman, which I have marked as Exhibit
25 Number 32.  And on page 25 of 30, it talks

Page 315

1  about the strength criteria.
2          He says -- and I want to ask
3  you whether you agree with it or not -- under
4  the strength of association, second -- two
5  sentences from the bottom of the first
6  paragraph, "Of special importance, Cornfield,
7  et al., acknowledged that having only a weak
8  association does not rule out causal
9  association.  Today, some associations, such
10 as those between smoking and cardiovascular
11 disease or between environmental tobacco
12 smoke and lung cancer are accepted by most as
13 causal, even though the associations are
14 considered weak."
15        Do you agree with that?
16   A.    So I'm going to -- if you just
17 give me a second to read it over again.
18   Q.    Uh-huh.
19   A.    Because I'm seeing this for the
20 first time.
21        So again, we're talking about
22 generalizations here, and there are -- there
23 may be instances where a relative risk or an
24 odds ratio is less than 2, and it's
25 considered a weak association.

Page 316

1          But because of other factors,
2  maybe factors, considerations that Bradford
3  Hill has, such as consistency or dose
4  response, do lead one to conclude that
5  there's a causal association between exposure
6  and outcome.
7          And if we're talking about
8  environmental tobacco smoke and lung cancer,
9  studies are consistent, and there's a
10 consistent dose response.
11   Q.    They all show -- they all
12 show -- they all show statistically
13 significant associations.  Every cohort and
14 case-control study shows consistent
15 association in secondhand smoke; is that what
16 you're testifying to?
17        MS. MILLER:  Objection.
18        MR. LOCKE:  Objection.
19        THE WITNESS:  I didn't say
20        that.
21 QUESTIONS BY MR. TISI:
22   Q.    Okay.
23   A.    I said that there's
24 consistency.  And there's consistency in the
25 literature that secondhand smoke in

Page 317

1  sufficient dose over sufficient time -- so a
2  dose response plus consistency -- can lead
3  one to conclude that there is a causal
4  association between secondhand smoke and,
5  say, lung cancer.
6    Q.    So where is the statement that
7  you have to -- in the absence of a high risk
8  ratio or in the presence of a weak risk ratio
9  that you need to have dose response and
10 consistency?
11   A.    Because --
12   Q.    Or is that -- is that your
13 postulate?
14   A.    No, that is not my postulate.
15 That's -- those things oftentimes go
16 hand in hand.  And the reason I say this, if
17 there's a relative risk of 200, it's going to
18 be very difficult to explain that away.
19        Say we used the pulmonary
20 hypertension example.  The odds ratio is 23
21 for patients that use that medication for
22 more than three months.  So -- and that gets
23 at the dose response and gets at the factors
24 that may -- the other considerations that
25 Bradford Hill brought out, namely, namely,

Christian Merlo, M.D., MPH

| Page 318 | Page 320 |
|---|---|
| 1   the dose response. | 1   objection that this is an excerpt that |
| 2       So secondhand smoke over a | 2   was cut off at the end, and it's not a |
| 3   sufficient amount of time, given a sufficient | 3   complete chapter or a complete |
| 4   amount of exposure, even though there may be | 4   anything. |
| 5   a weak relative risk, that potentially could | 5       MR. TISI:  Okay.  Well, it's a |
| 6   be a causal -- could -- one could conclude | 6   complete paragraph that talks about |
| 7   causality because of the other considerations | 7   the strength of association, so |
| 8   that are present. | 8   let's... |
| 9       Q.   On the next page -- I'm going | 9       MR. LOCKE:  Objection. |
| 10   to ask you about secondhand smoke.  Before I | 10       THE WITNESS:  I'm sorry, I just |
| 11   do, let's go to the next page.  It says, | 11   need a little bit of time to find it. |
| 12   "These examples remind us that a strong | 12   QUESTIONS BY MR. TISI: |
| 13   association is neither necessary nor | 13       Q.   That's fine. |
| 14   sufficient for causality and that weakness | 14       A.   Okay.  So I have three pages |
| 15   isn't even necessary nor sufficient for the | 15   photocopied here. |
| 16   absence of causality." | 16       Q.   Correct. |
| 17       Do you see that? | 17       So if you go to the last page, |
| 18       A.   Is that the second sentence on | 18   it has a paragraph with a bullet point that |
| 19   the top? | 19   says, "Strength of Association." |
| 20       Q.   Yes.  "These examples remind us | 20       Do you see that? |
| 21   that a strong association is neither | 21       And if you read it and tell me |
| 22   necessary nor sufficient for causality and | 22   where Dr. Oleckno talks about strong, |
| 23   that weakness is neither necessary nor | 23   moderate and weak associations. |
| 24   sufficient for absence of causality." | 24       MS. MILLER:  Objection. |
| 25       Do you agree with that? | 25       MR. LOCKE:  Objection. |

| Page 319 | Page 321 |
|---|---|
| 1       A.   So I think that this is one of | 1       THE WITNESS:  I think the |
| 2   the -- one of the things that Bradford Hill | 2   Oleckno textbook says in general, the |
| 3   in his article said, that these are | 3   stronger an association between a |
| 4   considerations, and that if there is a risk | 4   given exposure and outcome, the more |
| 5   ratio, whether it's a relative risk or a odds | 5   likely association is causal. |
| 6   ratio of 200, it's difficult to explain that | 6       It's also referencing a table, |
| 7   away. | 7   6.3, which is not here, so I'm not |
| 8       Could it be explained away? | 8   sure how I can even answer that. |
| 9   Sure, if we didn't measure some factor that | 9   QUESTIONS BY MR. TISI: |
| 10   is associated with the exposure and the | 10       Q.   Yeah, but you said -- but, |
| 11   outcome and is not in between the causal | 11   Doctor, you said here -- you said here at the |
| 12   pathway.  But it -- it's a reason to use | 12   end "by definition."  You use the phrase "by |
| 13   these as considerations. | 13   definition," "a 1.2 to 1.6 by definition is |
| 14       And further, if we're talking | 14   weak." |
| 15   about a weak association, say a weak relative | 15       And I don't see that |
| 16   risk or odds ratio, that less than 2, if | 16   definition, so you need to tell me where that |
| 17   there are other considerations that add to | 17   definition is. |
| 18   it, say dose response or consistency among | 18       A.   It's an accepted definition in |
| 19   studies, then that supports causality. | 19   epidemiology. |
| 20       Q.   Let me go to the Oleckno | 20       MS. MILLER:  Objection. |
| 21   article -- the Oleckno textbook again, and | 21   QUESTIONS BY MR. TISI: |
| 22   let me ask you this.  He also -- it's the | 22       Q.   By whom? |
| 23   same one we talked about before.  So we can | 23       A.   Epidemiologists. |
| 24   go to Exhibit Number 22. | 24       Q.   Where? |
| 25       MS. MILLER:  I have the same | 25       I've gone through every |

Christian Merlo, M.D., MPH

Page 322

1    textbook and I've never seen a definition,
2    and you don't provide it.  So I want to know
3    where you find it --
4         MR. LOCKE:  Objection.
5         MS. MILLER:  Objection.
6    QUESTIONS BY MR. TISI:
7         Q.    -- other than the Australian
8    thing that we talked about before.  Where?
9         MS. MILLER:  Objection.
10        MR. LOCKE:  Objection.
11        THE WITNESS:  It's in my
12    reference.  We can pull that and look
13    at it, if you'd like.
14   QUESTIONS BY MR. TISI:
15        Q.    Okay.  I'm going to find it in
16   your references?
17        A.    It's that reference.
18        Q.    Okay.  That Australian white
19   paper?
20        MS. MILLER:  Objection.
21        THE WITNESS:  Let me look
22    through.  I'll look through my report
23    again.
24   QUESTIONS BY MR. TISI:
25        Q.    Actually, Doctor, I think

Page 323

1    that's where it is.  I'm not going to ask you
2    to move on.
3         But you criticize plaintiffs'
4    experts because they say -- they call this
5    strong, this 1.2 to 1.6 as strong.
6         Do you see that?  Page 43 of
7    your report?
8         A.    I do see that.  Plaintiffs'
9    epidemiologists find a strong association.
10        Q.    Did you actually read their
11   reports?
12        A.    I did.
13        MR. LOCKE:  Objection.
14   QUESTIONS BY MR. TISI:
15        Q.    Did you read their depositions?
16        A.    I did.
17        Q.    Did you read -- did you read
18   where they explained what they were talking
19   about in terms of strength of association?
20        MS. MILLER:  Objection.
21        THE WITNESS:  So you would have
22    to --
23   QUESTIONS BY MR. TISI:
24        Q.    I mean, you're cherry-picking
25   what they said, aren't you?

Page 324

1         MR. LOCKE:  Objection.
2         MS. MILLER:  Objection.
3    QUESTIONS BY MR. TISI:
4         Q.    You're cherry-picking.
5         I'm going to show you what
6    Dr. Siemiatycki says.  Actually, let me just
7    choose actually -- I'm going to choose
8    Dr. Siemiatycki.  Here's his report.  I'm
9    going to attach it as Exhibit Number 33, his
10   discussion of that issue.
11        (Merlo Exhibit 33 marked for
12    identification.)
13   QUESTIONS BY MR. TISI:
14        Q.    He's one of the people you
15   criticize, right?
16        A.    I critiqued plaintiffs'
17   reports.
18        Q.    Right.
19        And you say, "Dr. Siemiatycki
20   states," and you have a quote, which indeed I
21   will tell you appears in the report, but it's
22   not the whole thing of what he says.  Does
23   it -- would you agree?
24        MS. MILLER:  Objection.
25        THE WITNESS:  Can you ask that

Page 325

1    again?  I'm not sure what you're
2    asking me.
3    QUESTIONS BY MR. TISI:
4         Q.    Yes.  I'm going to read his
5    section that talks about strength of
6    association.
7         MS. MILLER:  I'm going to
8    object to this --
9         MR. TISI:  Of course you're
10    going to object because it's --
11        MS. MILLER:  -- specific
12    because it's page 19 and then it's
13    page 62, 63, 87, 88, 82.
14        MR. TISI:  Yes.  These are the
15    two -- this is every place in his
16    report where he talks about strength
17    of association.  Absolutely.
18        MS. MILLER:  Well, I don't have
19    a need to know that.
20        MR. TISI:  Including --
21    actually, it has -- it has the -- it
22    has the very quote that this doctor
23    put in his report, and I'll put it
24    there.  It's page 63.  "Such a high
25    and significant meta-analysis research

82 (Pages 322 to 325)

Christian Merlo, M.D., MPH

Page 326

1     risk ratio could not have occurred by
2     chance."
3     QUESTIONS BY MR. TISI:
4         Q.    Do you see that?
5         MR. LOCKE:  Objection.
6     QUESTIONS BY MR. TISI:
7         Q.    It's on page 63, and that's the
8     quote you had.
9         MS. MILLER:  You objected to
10    cherry-picking.  These are seven
11    cherry-picked pages from an expert
12    report.
13        MR. TISI:  They're not
14    cherry-picked pages.  Every part that
15    talks about --
16        MS. MILLER:  I don't know what
17    cherry-picked means to you, but --
18        MR. TISI:  Well, Counsel, then
19    keep your objections to yourself.
20        MR. LOCKE:  Objection.
21        MR. TISI:  "Objection, form,"
22    is fine.
23    QUESTIONS BY MR. TISI:
24        Q.    Doctor, this is the paragraph
25    that you quote in your report, correct?  It's

Page 327

1     the last sentence of a full paragraph.
2         A.    I'd have to look at his full
3     report to know if that's the one I'm quoting.
4     Said that again somewhere.
5         Q.    Okay.  Doctor, it says, "Such a
6     high" -- you look at your report on page 43.
7     It says, "Such a high and significant," in
8     parentheses, "relative risk could not have
9     occurred by chance."  And that's the sentence
10    on page 63.
11        A.    So we're looking at page 63
12    of --
13        Q.    Correct.
14        A.    -- Dr. Siemiatycki's report.
15        Q.    Right.
16        And that's at the end of a
17    paragraph, right?
18        A.    That's at the end of a
19    paragraph.
20        Q.    Okay.  So let's look at what he
21    says before that.
22        "Strength of association.  This
23    can embody both the magnitude of the relative
24    risk and its statistical significance.  The
25    meta-analysis risk ratio estimate is 1.28.

Page 328

1     That means the best estimate from an ep --
2     from the epidemiologic literature is that
3     women who regularly used talcum powder
4     products in the genital area had a 28 percent
5     higher risk of ovarian cancer than a woman
6     who did not use such powder.  As I illustrate
7     in Table 11, which I attach" -- because it
8     refers to there, if you take a look on
9     page -- at the -- on page 87, it has a
10    Table 11.  He lists numerous kinds of --
11    urban air pollution, trichloroethylene,
12    diesel engine emissions, benzene, domestic
13    radon gas, secondhand cigarette smoke,
14    intermittent, intense sun exposure, et
15    cetera.  He lists a lot of them, all within a
16    relative risk of 1.09, with the highest being
17    1.64.
18        Do you see that table?
19        A.    I do.
20        Q.    "As I illustrate in Table 11
21    with a few examples, this relative risk is in
22    line with well-recognized risk factors for
23    cancer and other diseases.  For example, it
24    is well-accepted now that people living in an
25    urban neighborhood in which there is -- in

Page 329

1     which the air is highly polluted with
2     particulate matter have a 5 to 10 percent
3     excess risk of lung cancer compared to people
4     living in a less polluted urban neighborhood.
5     Also is well-accepted that workers exposed to
6     a solvent called trichloroethylene had about
7     a 40 percent higher chance of kidney cancer
8     compared to workers not exposed to
9     trichloroethylene.  Thus, the 28 percent
10    increase in ovarian cancer for women who used
11    talcum powder products is in line with many
12    risk factors.  This increased risk is
13    manifested by a meta research -- meta risk
14    ratio that is statistically significant."
15    And then it has the sentence you quoted.
16        He's very clear about the range
17    of relative risks and compares it to a number
18    of other well-accepted carcinogens, does he
19    not?
20        MS. MILLER:  Objection.
21        MR. LOCKE:  Objection.
22        THE WITNESS:  I see that there
23    is a comparison to other agents and
24    potential risk for disease in those
25    agents.

83  (Pages 326 to 329)

Christian Merlo, M.D., MPH

Page 330

1    QUESTIONS BY MR. TISI:
2        Q.    And you --
3        A.    However, this says nothing
4    about the strength of association.  It just
5    says that there's an association between
6    these agents and this disease with this
7    relative risk.
8            These are all under 2.  That
9    doesn't -- that says nothing about the
10   strength.  It's a weak association of all of
11   them.
12       Q.    Okay.  Then he goes on and he's
13   asked about that in his deposition, and I'm
14   going to attach that.  And I'm not going to
15   spend a lot of time on it, but for the
16   record, that will be on the record, Exhibit
17   Number 34.
18           (Merlo Exhibit 34 marked for
19           identification.)
20   QUESTIONS BY MR. TISI:
21       Q.    And did you cite anything from
22   his deposition?
23           MS. MILLER:  Objection.
24           THE WITNESS:  I'd have to look
25   through my report.

Page 331

1    QUESTIONS BY MR. TISI:
2        Q.    Let me show you another
3    example: Dr. Moorman.  Dr. Moorman, who you
4    also criticize as saying, "Taken as a whole,
5    the overwhelming statistical strength of
6    these studies" -- sorry, "by the strength of
7    the studies, whose results are replicated
8    over decades and over a wide variety of
9    populations and investigators, further
10   supported by consistent meta-analysis, weigh
11   heavily in favor of a causal inference."
12           That was what you said that
13   Dr. Moorman said, correct?
14       A.    You'd have to refer to me where
15   I said that.
16       Q.    On page 43 and 44 of your
17   report.
18       A.    And I apologize.  I don't have
19   these -- this memorized.  So, you know,
20   you're reading stuff --
21       Q.    Well, I do, and I didn't write
22   it.  Here you go.
23           MS. MILLER:  Objection.
24           (Merlo Exhibit 35 marked for
25           identification.)

Page 332

1            MS. MILLER:  Again, I'm going
2    to have to have the same objection.  I
3    don't know why you didn't just provide
4    the entire expert report.
5            This is pages 11, 12, 13, 14,
6    15, 16.  We don't have pages 1 to 10.
7    We don't have --
8            MR. TISI:  Counsel, I got your --
9    objection.  I got your --
10           MS. MILLER:  -- pages after 16,
11   and page 16 ends in the middle of a
12   sentence.
13           MR. TISI:  I got your -- I got
14   your objection, Counsel.
15           MR. LOCKE:  Same objection.
16   QUESTIONS BY MR. TISI:
17       Q.    Doctor, can you turn to page 15
18   of Dr. Moorman's report, which I have put
19   here, which I will represent to you is a
20   whole section on strength of association.
21           She has a paragraph, "The
22   overall association seen in talc/ovarian
23   cancer meta-analyses, as well as many other
24   individual studies, are statistically
25   significant, indicating an increased risk of

Page 333

1    approximately 25 to 30 percent.  While not as
2    high as other relationship, like smoking and
3    lung cancer, these relative risks are in line
4    with other generally accepted causal
5    relationships.  Example, secondhand smoke and
6    lung cancer:  I consider the strength of
7    association as seen in the ovarian cancer
8    epidemiologic studies to be an important
9    factor in favor of a causal relationship
10   between talc and ovarian cancer, particularly
11   when considered along with the consistency
12   and association seen across these studies."
13           Dr. Moorman is not -- has
14   characterized what the studies show.  The
15   numbers are the numbers, correct?
16           MS. MILLER:  Objection.
17           MR. LOCKE:  Objection.
18           THE WITNESS:  You'd have to
19   show me what you're referring to.  The
20   numbers are the numbers.
21   QUESTIONS BY MR. TISI:
22       Q.    All right.  Well, let's do
23   that.  Dr. Moorman --
24           MS. MILLER:  This is only part
25   of her report, and it's not the part

84 (Pages 330 to 333)

Golkow Litigation Services - 877.370.DEPS

Christian Merlo, M.D., MPH

Page 334

1    of her report that he cites.  Is that
2    correct?
3         (Merlo Exhibit 36 marked for
4    identification.)
5    QUESTIONS BY MR. TISI:
6         Q.    Here's your -- here's Exhibit
7    Number 36, please.
8         She's asked the questions on
9    page 249 of her report -- of her deposition.
10   "I think you're conflating or
11   misunderstanding my question."  This is the
12   Johnson & Johnson lawyer asking the question.
13        "I think you're conflating or
14   you're misunderstanding my question because
15   you're answering the question" --
16        A.    I'm sorry, where are we?
17        Q.    Page 249, starting on line 3.
18        Okay?  "And I think you're
19   conflating or you're misunderstanding my
20   question because you're answering the
21   question about whether the association is
22   real or not real, and my question for you is
23   whether the association is weak, modest or
24   strong.  How would you characterize it?" to
25   Dr. Moorman.

Page 335

1         Her answer:  "Answer, as I
2    would -- as I have said, there is no absolute
3    terminology that would say what is a weak
4    association, what is modest and what is
5    strong.  So I think it is more accurate just
6    to describe it as it is, a 25 to 30 percent
7    increased risk of ovarian cancer."
8         Do you see that?
9         A.    I see that.
10        Q.    Okay.  She didn't characterize
11   it as strong, did she?
12        MS. MILLER:  Objection.
13        MR. LOCKE:  Objection.
14   QUESTIONS BY MR. TISI:
15        Q.    She characterized it by the
16   number, correct?
17        MS. MILLER:  Objection.
18        MR. LOCKE:  Objection.
19        MS. MILLER:  Are you asking
20   ever or here or --
21        MR. TISI:  I'm asking -- I'm
22   asking when she was asked the question
23   at deposition.
24        MR. LOCKE:  Objection.
25        THE WITNESS:  Dr. Moorman is

Page 336

1    saying that I think it's more accurate
2    just to describe it as it is, a 25 to
3    30 percent increase of risk of ovarian
4    cancer, but I don't know what she's
5    referring to there --
6    QUESTIONS BY MR. TISI:
7         Q.    Okay.
8         A.    -- whether that's one study,
9    all studies, a meta-analysis, anything.
10        Q.    Okay.
11        A.    One could also say that a
12   relative risk of 1.25 or 1.30 is a weak
13   association.
14        Q.    Okay.  But you are
15   characterizing what they testified to, and
16   you were cherry-picking statements from their
17   report, were you not?
18        MS. MILLER:  Objection.
19        MR. LOCKE:  Objection.
20        THE WITNESS:  I don't know what
21   you mean by "cherry-picking."
22   QUESTIONS BY MR. TISI:
23        Q.    Meaning taking --
24        A.    I read their depositions --
25   sorry, I read their reports and I critiqued

Page 337

1    their reports.  And by saying that a relative
2    risk of 1.2 is a strong association is so far
3    out of line of the epidemiologic community
4    that that is my critique.
5         MR. TISI:  Okay.  We're about
6    ready to go into a new area, so if you
7    want to take a break, this is a good
8    time unless you want me to just plow
9    forward.
10        MS. MILLER:  How long is the
11   next area?
12        MR. TISI:  I have no idea.  It
13   depends on whether he says "it
14   depends" all the time.
15        MR. LOCKE:  Objection.
16        THE WITNESS:  I can take a
17   break.
18        MR. TISI:  Perfect.
19        THE WITNESS:  Get some coffee.
20        MR. TISI:  Perfect.
21        VIDEOGRAPHER:  The time is
22   3:01 p.m.  We're going off the record.
23        (Off the record at 3:01 p.m.)
24        VIDEOGRAPHER:  The time is
25   3:16 p.m., and we're back on the

85 (Pages 334 to 337)

Christian Merlo, M.D., MPH

Page 338

1    record.
2    QUESTIONS BY MR. TISI:
3        Q.   Doctor, could you go to page 31
4    of your report?  I'm going to talk about
5    consistency and statistical significance.
6        A.   Sure.
7        Q.   We've spent a lot of time
8    talking about consistency and your opinion
9    that there is no consistency, so I think
10   we'll be able to go through this pretty
11   quickly.
12           But if you go to page 31, you
13   criticize plaintiffs' experts -- well, you
14   say, "Lack of consistency between studies.
15   One of the most striking aspects of their
16   studies is their inconsistency."
17           Do you see that?
18       A.   No.
19           Where am I saying that?
20       Q.   First sentence of your
21   Section A on page 31.
22       A.   Okay.
23       Q.   Okay.  And you note, and I'm
24   summarizing here, that there are seven
25   hospital-based studies, four cohort studies

Page 339

1    and some population studies that have
2    statistically insignificant results.
3            And we talked about that
4    before; do you recall?
5        A.   We talked about cohort studies.
6    We talked about hospital-based studies.  We
7    talked about population-based studies.  We
8    talked about statistical significance in
9    population-based studies as well as
10   statistical insignificance in
11   population-based studies as well as
12   statistical insignificance in hospital-based
13   and statistical insignificance within cohort
14   studies.
15       Q.   Right.
16           And on page 34 of your report,
17   you have a chart that you put in summarizing
18   the studies, correct?
19       A.   Page 34 is a chart that
20   summarizes case-control studies as well as
21   cohort studies, and the case controls are
22   broken down into hospital-based and
23   population-based.
24       Q.   And the first column is
25   actually the study name.  The second column

Page 340

1    are the risk ratios, correct?
2        A.   Yes, the first column's the
3    study authors and the dates.  The second
4    column is either the odds ratio, relative
5    risk or hazard ratio.
6        Q.   Can we call them risk ratios
7    generally?
8            Can we call them -- is there a
9    general -- I thought we could call them risk
10   ratios, but --
11       A.   Sure.  It's just that in an --
12   an odds ratio is something that's determined
13   in a case-control study and a relative risk,
14   which in a hazard ratio deal with time, and
15   those are involved in cohort studies.
16       Q.   I understand.  I understand.
17           But the second column are the
18   risk ratios generally?
19       A.   Estimates of risk, yes.
20       Q.   Estimates of risk.
21           And the third column are the
22   confidence interval.
23           And tell me what a confidence
24   interval is.
25       A.   A confidence interval is when

Page 341

1    you do an analysis and you get a -- some
2    estimate of risk, some point estimate, which
3    would be that second column.  Then you're
4    given -- then you obtain what's called a
5    95 percent confidence interval, which is sort
6    of the range within statistical significance
7    where that point estimate might fall.
8        Q.   Right.
9        A.   And in general, when the
10   95 percent confidence interval overlies 1,
11   that signifies a nonstatistically significant
12   point -- estimate of risk.
13       Q.   But the confidence interval
14   encompasses the range of likely -- where the
15   likely results are likely to be to a
16   95 percent certainty?
17       A.   The -- I don't know that I
18   would say certainty.  I think it's the --
19   it's the range of the -- it's the range of
20   the point estimate above which or below which
21   there would be a 2.5 percent chance of that
22   point estimate falling.
23       Q.   Okay.
24       A.   And the confidence interval can
25   either be wide or narrow.  The wider it is,

Christian Merlo, M.D., MPH

Page 342

1    that usually relates to heterogeneity within
2    the study, a small study population, problems
3    in collecting appropriate information.
4            If the confidence interval is
5    narrow, usually that reflects a larger study
6    population.
7        Q.   And the last column is your
8    assessment of the strength of the
9    association, if there is one, right?
10           You say, "Is it a statistically
11   significant association?"
12           And that's your interpretations
13   here, correct?
14       A.   It says, "If there's a
15   statistically significant association."
16   That's what's reported in the journal.
17       Q.   Okay.  And then the "no" in the
18   last column stands for not statistically
19   significant?
20       A.   The "no" stands for not
21   statistically significant, that's correct.
22       Q.   And the "weak" stands for
23   statistically significant and with your
24   characterization of the strength of the
25   association?

Page 343

1        A.   The "weak" stands for a weak
2    statistically significant association.
3        Q.   But that's your
4    characterization; that's not the authors'?
5        A.   That is what is -- they're all
6    below 2, statistically significant --
7        Q.   Okay.
8        A.   Which -- suggests a weak
9    association, yes.
10       Q.   Okay.  And just to be clear,
11   you can't point to me any textbook in
12   epidemiology where it is universally accepted
13   that a risk ratio of 1.17, which is one of
14   the things -- to 1.92 is weak.  That's just
15   your view of what the scientific community
16   says?
17           MS. MILLER:  Objection.
18           MR. LOCKE:  Objection.
19           THE WITNESS:  It's not my view
20       of what the scientific community says.
21       It's what the scientific community
22       says.
23   QUESTIONS BY MR. TISI:
24       Q.   Okay.  And you -- okay.  I'd
25   like to make this chart a separate chart -- a

Page 344

1    separate exhibit.
2            (Merlo Exhibit 37 marked for
3        identification.)
4    QUESTIONS BY MR. TISI:
5        Q.   And I'm going to do it Exhibit
6    Number 37.
7        A.   Thank you.
8        Q.   I'm going to come back to it,
9    and I don't want to keep flipping back and
10   forth to the pages.
11       A.   Okay.
12       Q.   And this is your -- this chart
13   summarizes the -- the last column here
14   summarizes your view of the inconsistency of
15   these studies.  The now are inconsistence
16   with the weaks?
17           MS. MILLER:  Objection.
18           THE WITNESS:  So what -- not
19       only that, I mean, what this does
20       summarize, inconsistency within
21       population-based case-control studies
22       where some studies show a weak
23       statistically significant association
24       while some studies do not show any
25       statistically significant association.

Page 345

1            But there's also differences
2    in -- within study -- the same study
3    design.  Say, within case controls,
4    hospital-based case controls, there
5    are seven of them, and none of them
6    have a statistically significant
7    association, and therefore case con --
8    sorry, four cohort studies which do
9    not show any statistically
10   significant.
11           So it's not just summarizing
12   the differences in that column, it's
13   summarizing the differences between
14   study types and the differences within
15   a similar study.
16   QUESTIONS BY MR. TISI:
17       Q.   Understood.  And I hear you.
18           And what I'm trying to say is,
19   it's your view that a weak statistically
20   significant result is inconsistent with a
21   non -- and I think you agreed to this before,
22   but I want to make sure.
23           MS. MILLER:  No.
24   QUESTIONS BY MR. TISI:
25       Q.   That a weak statistically

87 (Pages 342 to 345)

Christian Merlo, M.D., MPH

Page 346

1   significant result is inconsistent with a --
2   for example, let's go back down here. Let's
3   take -- see the Rosenblatt study, which was
4   one that was done at your institution. That
5   has -- was nonstatistically significant, in
6   your view, and that is inconsistent with
7   Cramer, which is -- shows a weak -- a weak
8   statistically significant results.
9           MS. MILLER: Objection. That
10          mischaracterizes either his report or
11          his testimony, whichever it is that
12          you're characterizing.
13  QUESTIONS BY MR. TISI:
14      Q.   Doctor, is it your view that,
15  using the example I just took, Cramer is
16  inconsistent with Rosenblatt?
17      A.   Which Cramer?
18      Q.   Cramer 1982 and Rosenblatt
19  1992.
20      A.   So Cramer 1982 shows a point
21  estimate of 1.92, and the 95 percent
22  confidence interval is 1.27 to 2.89.
23          Rosenblatt, 1.27 --
24      Q.   No, Rosenblatt -- Rosenblatt
25  1992, which is a hospital-based study.

Page 347

1       A.   Rosenblatt '92. Okay.
2       Q.   A hospital-based study.
3       A.   So that's a 1.7, with the
4   95 percent confidence interval .7 to 3.9.
5           Now, Cramer 1982 is
6   statistically significant. Rosenblatt '92 --
7   Cramer '82, statistically significant;
8   Rosenblatt '92, not statistically
9   significance.
10      Q.   And are those inconsistent?
11          MS. MILLER: Objection.
12          THE WITNESS: One is
13          statistically significant, and one is
14          not statistically significant. They
15          are inconsistent with each other.
16  QUESTIONS BY MR. TISI:
17      Q.   Okay. So and on page 44 and 45
18  of your report, you criticize plaintiffs'
19  experts. You say, "I would agree" -- you
20  see, this is the part where you accuse them
21  of fabrication. Page 44. "Plaintiffs'
22  experts fabricate consistency by ignoring
23  inconsistent studies," that heading.
24          Do you see that?
25          MS. MILLER: Objection. That

Page 348

1   was such a loaded question.
2           MR. TISI: Oh, it is. It's a
3   loaded -- it's a loaded headnote.
4           THE WITNESS: So I'm not
5           accusing anybody of anything.
6           MS. MILLER: Objection.
7           THE WITNESS: I'm just
8           reporting what the medical evidence
9           shows. And the medical evidence shows
10          that there is inconsistency among
11          similar study designs, inconsistency
12          between hospital-based and
13          population-based case controls,
14          inconsistency among population
15          case-controls, and inconsistency
16          between cohort studies and case
17          controls, all leading to
18          inconsistency.
19          I'm not accusing anyone of
20          anything. I'm just reporting what's
21          in the medical literature.
22  QUESTIONS BY MR. TISI:
23      Q.   Okay. So but you didn't just
24  say they're inconsistent result. You say
25  plaintiffs' experts fabricate consistency

Page 349

1   when there is none. Right?
2           So that's -- I mean, maybe I'm
3   splitting hairs, but that's a little bit more
4   inflammatory than just simply saying, I find
5   the studies inconsistent. Right?
6           MS. MILLER: Objection.
7           MR. LOCKE: Objection.
8           THE WITNESS: I don't know. I
9           don't know what your definition of
10          inflammatory is.
11  QUESTIONS BY MR. TISI:
12      Q.   Okay. I think if somebody
13  accused you of fabrication, you might be
14  thinking that that might be inflammatory, but
15  we'll see.
16          MR. LOCKE: Objection.
17  QUESTIONS BY MR. TISI:
18      Q.   Let's move on.
19          You say plaintiffs' experts
20  uniformly assert -- I'm sorry, uniformly
21  assert consistent criterion has been
22  satisfied, and then you go on to say, "I
23  would agree with plaintiffs' experts that
24  there's some consistencies among the study,
25  but those consistencies are among the

88 (Pages 346 to 349)

Christian Merlo, M.D., MPH

---

Page 350

1    hospital-based case-control studies and among
2    the large cohort studies showing no
3    statistically significant inconsistencies" --
4    I'm sorry, "showing no association between
5    talc exposure and ovarian cancer.  By
6    contrast, the inconsistencies between
7    hospital-based and population-based
8    case-control and within population-based
9    case-control studies."
10            Did I read that right?
11            Actually, let me -- I didn't
12   read it right.  Let me read it again.
13            "I would agree with plaintiffs'
14   experts that there are some consistencies
15   between studies, but those consistencies are
16   among hospital-based case-control studies and
17   among large cohort studies showing no
18   statistically significant association between
19   talc exposure and ovarian cancer.  By
20   contrast, there are inconsistencies between
21   hospital-based and population-based
22   case-control studies and within
23   population-based case-control studies."
24            Did I read that right?
25       A.   Yes, sir.

---

Page 351

1        Q.   Okay.  And then you go on to
2    say -- and this is the statement that we
3    talked about before, the kind of the general
4    rule that you set out.  It says, "It is
5    important to remember, contrary to the
6    suggestion of several of plaintiffs' experts
7    on page 45, that for this criteria to weigh
8    in favor of finding a causal relationship,
9    there must be consistency and statistically
10   significant associations.  Consistency is --
11   in relative risks that are not statistically
12   significant is not meaningful because that
13   sort of consistency does not provide any
14   degree of confidence that the claim of
15   association made by the study is more than
16   random chance."
17            Did I read that right?
18       A.   That's correct.
19            (Merlo Exhibit 38 marked for
20   identification.)
21   QUESTIONS BY MR. TISI:
22       Q.   Okay.  Now, I'm going to have
23   that statement marked here as Exhibit
24   Number 38.  But I'm going to do this, Doctor,
25   because I have to say that I made a mistake

---

Page 352

1    here on -- in retyping this.
2            I did not highlight
3    statistically significant.  So if you would
4    just do me a favor and take this pen and
5    circle "statistically significant" in the
6    middle of that paragraph, I'd appreciate
7    that.
8            MS. MILLER:  Objection.
9    QUESTIONS BY MR. TISI:
10       Q.   Go ahead, if you don't mind.
11       A.   What do you want me to do?
12       Q.   Just take statistically in --
13   because in your document, you actually
14   highlight and italicize "statistically
15   significant" in your -- correct?
16            MS. MILLER:  Huh?
17   QUESTIONS BY MR. TISI:
18       Q.   In your -- on page 45, top
19   paragraph.
20       A.   But that's not -- that's not
21   from page 45.  This is page 44 from that
22   paragraph.
23       Q.   Let me see.  Maybe I gave you
24   the wrong one.
25            MS. MILLER:  This is the

---

Page 353

1    paragraph --
2            MR. TISI:  I apologize.  I'm
3    sorry, you're correct.  It's
4    Exhibit 39.
5            (Merlo Exhibit 39 marked for
6    identification.)
7            MS. MILLER:  So are we done
8    with this one?
9            MR. TISI:  I'm just mark it.
10   It's the early part.  We'll leave it
11   there.
12   QUESTIONS BY MR. TISI:
13       Q.   This is 39.  I'm sorry, Doctor.
14       A.   That's okay.
15       Q.   This is the paragraph on the
16   top of page 45.  And I did not emphasize what
17   you emphasized, and I apologize for that.
18            You emphasized statistically
19   significant, and I didn't when I retyped
20   this.  So if you would do me a favor and just
21   circle the words "statistically significant,"
22   I'd appreciate it.
23            MS. MILLER:  I'm going to
24   object to that.  I think you should
25   circle it if you want it circled.

---

89 (Pages 350 to 353)

Christian Merlo, M.D., MPH

Page 354

1    THE WITNESS:  It's mentioned
2  twice, so --
3  QUESTIONS BY MR. TISI:
4    Q.    Well, the one that you
5  highlighted in your report.
6    A.    Looks like -- consistency and
7  statistically significant.  This and this.
8    Q.    And this is your rule that you
9  set out.  It says, "Important to remember,"
10  and this is a -- we talked about this earlier
11  in your deposition.  Although there is no
12  citation for this, you agree that this is
13  your -- you believe that this is a generally
14  accepted principle in epidemiology?
15    A.    It's a generally accepted
16  principle in epidemiology.
17    Q.    Okay.  Doctor, have you seen
18  references to the fact that statistical
19  significance is not the test of consistency?
20    A.    You'd have to show me a
21  reference.
22    Q.    Okay, let's do that.  Could you
23  go -- can you pull out Exhibit 23, which is
24  the "From Association to Causation" chapter
25  that Johns Hopkins uses in courses there?

Page 355

1  It's the Gordis text.
2    Do you see that?
3    Do you have it in front of you?
4    A.    I have Chapter 14, yes,
5  Exhibit 23.
6    Q.    Can you go to page 251.  On
7  page -- it talks about Replications of
8  Findings, which is the consistency issue,
9  right?
10    MS. MILLER:  Objection.
11    THE WITNESS:  I see where it
12  says "Replication of Findings."
13  QUESTIONS BY MR. TISI:
14    Q.    And it says, "If the
15  relationship is causal, we would expect to
16  find consistency in different studies and in
17  different populations.  Replication of
18  findings is particularly important in
19  epidemiology.  If an association as observed,
20  we can also -- we would also expect it to be
21  seen consistently within subgroups of the
22  population and in different populations and
23  unless there is a clear reason to expect
24  different results."
25    Do you see that?

Page 356

1    A.    I do see that.
2    Q.    Is there any mention of
3  statistical significance in this?
4    MS. MILLER:  Objection.
5    THE WITNESS:  There is not.
6  QUESTIONS BY MR. TISI:
7    Q.    Okay.
8    A.    But there's not a reference
9  saying that -- that if it's not there, the
10  opposite.
11    Q.    Okay.  Does it also talk about
12  there needs to be consistency among study
13  designs?
14    MS. MILLER:  Objection.
15  QUESTIONS BY MR. TISI:
16    Q.    This talks about among studies
17  but not study design, does it?
18    MS. MILLER:  Objection.
19    THE WITNESS:  It says, "If an
20  association observed, we would expect
21  it to be seen consistently within
22  subgroups of the population and in
23  different populations," which may
24  involve different studies and
25  different study designs.

Page 357

1  QUESTIONS BY MR. TISI:
2    Q.    But it doesn't say study
3  designs, does it?
4    MS. MILLER:  Objection.
5    THE WITNESS:  I don't think it
6  has to.  That's inherent in the
7  statement.
8  QUESTIONS BY MR. TISI:
9    Q.    Okay.  Now, I previously asked
10  you whether you had done any independent
11  research on studies of talc and ovarian
12  cancer, and you said you had not.
13    Do you recall that?
14    MS. MILLER:  Objection.
15  QUESTIONS BY MR. TISI:
16    Q.    That was very early in the day.
17    MS. MILLER:  Objection.
18    THE WITNESS:  I don't recall.
19  I'm going to have to see it.
20  QUESTIONS BY MR. TISI:
21    Q.    Okay.  Have you done any
22  studies in talc and ovarian cancer?
23    A.    What do you mean by "studies"?
24    Q.    Have you done any observational
25  studies on talc and ovarian cancer?

90  (Pages 354 to 357)

Christian Merlo, M.D., MPH

Page 358

1    A.    I've reviewed the literature --
2    Q.    Have you done any studies?
3    A.    -- on the potential causal
4  association between talcum powder and ovarian
5  cancer.  I've reviewed the literature.
6    Q.    Have you authored any studies
7  on talc and ovarian cancer or designed any
8  studies on talc and ovarian cancer?
9    A.    And I believe I told you no
10 earlier on.
11   Q.    That was my question.
12         Now, you mentioned in your
13 report that there are seven hospital-based
14 case-control studies examining the
15 association between talc and ovarian cancer.
16   A.    Where did I say that?
17   Q.    It's in your chart, and you
18 mentioned it several times today.
19         MS. MILLER:  You just said,
20 this is in your report.
21         THE WITNESS:  You just said I
22 wrote it in my report, so I just
23 wanted to see where I said it.
24 QUESTIONS BY MR. TISI:
25   Q.    Are there not seven

Page 359

1  observational -- seven hospital-based
2  studies, Doctor?
3    A.    I have a chart here that has
4  seven hospital-based case-control studies.
5    Q.    Okay.  And one of them we just
6  talked about, it was Rosenblatt, and it was
7  done here at Johns Hopkins, was it not?
8    A.    I don't specifically recall.
9    Q.    Well, actually, you mention
10 that on page 14 of your report.  Go to
11 page 14 of your report.
12         You say, "Rosenblatt is a 1992
13 reported hospital-based study evaluating
14 fiber exposure generally with fiber defined
15 as asbestos talc or fiberglass, et cetera,
16 done in Johns Hopkins Hospital."
17         Do you see that?
18   A.    A little bit before my time,
19 1981 to 1985 --
20   Q.    Right.
21   A.    -- at Johns Hopkins.
22         (Merlo Exhibit 40 marked for
23 identification.)
24 QUESTIONS BY MR. TISI:
25   Q.    All right.  I'm like to attach

Page 360

1  the Rosenblatt study, Exhibit Number 40.
2         Did you actually read this
3  study?
4    A.    I did.
5    Q.    Good.
6         Let's go, so we don't have to
7  spend a lot of time rereading it.
8    A.    I haven't memorized it, though.
9    Q.    Okay.  One of the authors of
10 this study, if you'll notice, is a guy we
11 mentioned a couple times today, Dr. Szklo.
12 He's the second author.
13   A.    Szklo, yes.
14   Q.    Szklo.
15         He's at the school.  He's a
16 full professor there.
17         Have you ever said, you know,
18 "Doctor, there's a study done at our school.
19 What do you think about this relationship?
20 You've published on it."
21         Have you gone and talked to
22 him?
23   A.    I have not.
24         MS. MILLER:  Objection.
25         MR. LOCKE:  Objection.

Page 361

1         MS. MILLER:  Give us time to
2  object, Doctor.
3         THE WITNESS:  Okay.  Sorry.
4         I did my own independent
5  search, and I evaluated the body of
6  medical evidence.
7  QUESTIONS BY MR. TISI:
8    Q.    Now, if you go to -- I'm sorry.
9    A.    I did read this article, and I
10 did see that -- recall now that I did see his
11 name on there, but it did not interfere or
12 cause me reflection to go talk to him about
13 it because I was going to perform my own
14 independent review.
15   Q.    Right.
16         So you had on the chart -- on
17 your chart, exhibit number -- do you have
18 your chart in front of you?  Exhibit 37?
19   A.    I have Exhibit 37, yes.
20   Q.    And I asked you before whether
21 or not Rosenblatt was inconsistent with
22 Cramer.
23         Do you remember that?
24         And you said yes?
25   A.    So if we're still -- which

Christian Merlo, M.D., MPH

Page 362

1    Rosenblatt, again, are we talking about?
2    Because there are two Rosenblatts.
3        Q.    1992.
4        A.    Rosenblatt '92.  I got it.
5        Q.    And Cramer 1982.
6        A.    Got it.
7        Q.    And I asked you the question,
8    and you said that they were inconsistent.
9            Well, let's see what Dr. Szklo
10   says about this.
11           Now, just to be clear,
12   Rosenblatt is a hospital-based case-control
13   study?
14       A.    Rosenblatt was a hospital-based
15   case-control study, yes, that's correct.
16       Q.    And Cramer was a
17   population-based case-control study?
18       A.    Cramer 1982 was a
19   population-based case-control study.
20       Q.    Now, first, if you go to the
21   study itself, if you go to the third page,
22   page 22.
23       A.    Page 22, yes.
24       Q.    It says -- actually, the second
25   column it says, "We found an increased

Page 363

1    relative risk, 4.8, for talc use on sanitary
2    napkins, with a smaller effect on genital
3    bath talc exposure, relative risk 1.7."
4            Do you see that?
5        A.    I do see that.
6        Q.    Can you tell me why it is you
7    didn't refer to the talc on sanitary napkins'
8    relative risk of 4.8, which was statistically
9    significant?
10       A.    The point estimate that I took
11   out of that was for genital talc exposure,
12   which is a relative risk of 1.70.
13       Q.    All right.  But genital talc
14   exposure was defined as asbestos --
15   asbestos -- I'm sorry, it was actually fiber
16   exposure.
17           In your report on page 15, you
18   talk about it as being -- it's defined --
19       A.    Well, if you actually look at
20   Table 3, the genital fiber use, yes/no, has
21   an odds ratio of 1.0, and the 95 percent
22   confidence interval is 0.2 to 4.0.
23           So if we're just talking about
24   genital fiber use, there's --
25       Q.    Okay.

Page 364

1        A.    -- an odds ratio of 1 --
2        Q.    Okay.
3        A.    -- which is null.
4        Q.    And when you have talc, it's
5    1.7, and when you have it directly applied to
6    sanitary napkins, it was 4.8 -- do you see
7    that? -- which was statistically significant.
8        A.    Statistically significant with
9    a confidence interval of 1.3 to 17.8, a very,
10   very wide range, and with also a proportion
11   of missing -- of cases and controls with
12   missing exposure.
13       Q.    But then he says something that
14   addresses your point directly.  It says,
15   "This is" -- and I'm going to read the whole
16   paragraph.
17           MS. MILLER:  Tell us where you
18   are.
19           MR. TISI:  Yeah.  Second
20   column.  It's beginning with "we
21   found" on page 22.
22   QUESTIONS BY MR. TISI:
23       Q.    "We found an increased relative
24   risk, 4.8 for talc use on sanitary napkins,
25   with a smaller effect for genital bath

Page 365

1    exposure, 1.7."
2            And that 1.7 was not
3    statistically significant, correct?
4        A.    The 1.7 was not statistically
5    significant.
6        Q.    Okay.  He then says, "This is
7    in accordance with the original finding of a
8    significant increased risk for perineal talc
9    exposure, relative risk 1.9, 95 percent
10   confidence interval, 1.3 to 2.9, by Cramer,
11   et al."
12           And that's the Cramer article
13   from 1982, correct?
14       A.    That's what it says.
15       Q.    Okay.  And so he's saying his
16   results are actually consistent with what
17   Cramer found.
18       A.    But they're not.
19       Q.    Okay.  But Dr. Szklo says that
20   they are?
21           MR. LOCKE:  Objection.
22           THE WITNESS:  If we're talking
23   about consistency here between two
24   studies and talking about statistical
25   significance and consistency within

Christian Merlo, M.D., MPH

Page 366

1    statistical significance, they're not
2    consistent.
3    QUESTIONS BY MR. TISI:
4        Q.   Okay.  Because statistical
5    significance is never the test for
6    consistency, is it, Doctor?
7            And everybody from the
8    epidemiology textbooks to the American
9    Statistical Association says, don't do what
10   you did in this report, true?
11           MS. MILLER:  Objection.
12           MR. LOCKE:  Objection.
13           THE WITNESS:  I don't even know
14   what that means, and I --
15   QUESTIONS BY MR. TISI:
16       Q.   Okay.
17       A.   -- don't know what you mean by
18   everyone and --
19       Q.   Well, we're going to talk --
20       A.   -- who those different groups
21   are, so you'd have be very specific.
22       Q.   We're going to be --
23       A.   It's a very big generalization.
24       Q.   Well, you made a lot of
25   generalizations about what the epidemiology

Page 367

1    community thinks.
2            MR. LOCKE:  Objection.
3    QUESTIONS BY MR. TISI:
4        Q.   So I'm talking to you about
5    epidemiology textbooks.  The American
6    Statistical Association says, you don't do
7    what you did here.
8            MS. MILLER:  Objection.
9            MR. LOCKE:  Objection.
10   QUESTIONS BY MR. TISI:
11       Q.   Let me ask you this.  He says
12   below, "The results of our study suggest that
13   genital talc fiber exposure may be associated
14   with an adverse event, but further study is
15   needed to determine if this relationship is
16   causal in nature from 1990 -- this 1992
17   study."
18           Correct?
19       A.   Where are you reading that?
20       Q.   The paragraph below.  It says,
21   "The results of our study."  Two paragraphs
22   down.
23       A.   Okay.
24       Q.   Okay.  It says, "The results of
25   our study and others suggest that genital

Page 368

1    talc fiber exposure may be associated with an
2    adverse event, but further study is needed."
3            Do you see that?
4        A.   I do, and that's a very, very
5    general statement.  There's a "suggest,"
6    there's a "may," there's an "associated,"
7    there's an "adverse effect."  I don't even
8    know what that means.
9        Q.   He never said it was
10   inconsistent, did he?  He said, in fact, his
11   study -- this study is in accordance with the
12   original study.
13           MS. MILLER:  Objection.
14           THE WITNESS:  This statement
15   right here is not talking about -- is
16   not talking about consistency, this
17   results of our study.  I don't know
18   why that has anything to do with
19   consistency.
20   QUESTIONS BY MR. TISI:
21       Q.   Okay.  Well, let's go to the
22   paragraph that does.
23           It says above, "We found an
24   increased, 4.8 for talc use on sanitary
25   napkins, with a smaller effect for genital

Page 369

1    bath talc exposure, relative risk, 1.7.  This
2    is in accordance with the original finding of
3    a significant increased risk for perineal
4    talc exposure by Cramer, et al.  Preliminary
5    findings from a Chinese talc study also
6    suggest the application of talc-containing
7    dusting powder and the risk of epithelial
8    ovarian cancer relative risk to be 1.9, with
9    a confidence interval of 1.1 to 13.8," which
10   is the Chen study on your list.  "A
11   nonsignificant effect for genital talc
12   exposure on genital sanitary napkins or
13   underwear was detected in a study by Hartge,
14   relative risk 2.5, which was not
15   statistically significant.  Whittemore, et
16   al., detected an increased relative risk 1.4,
17   P value greater than .05, for perineal
18   exposure.  In a study of borderline ovarian
19   tumors, the increased risk was also observed
20   with talc exposure use on sanitary napkins,
21   relative risk 1.9 with a confidence interval
22   of .9 to 6.9."
23           This paragraph says all these
24   studies show an increased risk, true?
25   Including the last one that says an increased

93 (Pages 366 to 369)

Christian Merlo, M.D., MPH

Page 370

1   risk was observed in a nonstatistically
2   significant study.
3                MS. MILLER:  Objection.
4                MR. LOCKE:  Objection.
5                THE WITNESS:  This paragraph
6        does not say that there's an increased
7        risk in all these studies.
8                This paragraph says -- this
9        paragraph highlights that some studies
10       are statistically significant and
11       others are nonstatistically
12       significant.  And that is not
13       consistent.
14  QUESTIONS BY MR. TISI:
15       Q.    They say these are -- these
16   studies are in accordance, and you're saying
17   that that's inconsistent?
18                MS. MILLER:  Objection.
19                THE WITNESS:  That's not what
20       it says.
21  QUESTIONS BY MR. TISI:
22       Q.    It says this study is in
23   accordance with the original finding of a
24   significant -- a significant increased risk
25   for perineal talc exposure, true?  Does it

Page 371

1   not say that?
2        A.    And what that sentence is
3   referring to is the sentence before that,
4   which is talking about an increased relative
5   risk for talc use on sanitary napkins, and
6   that's it.  It's not in accordance --
7        Q.    No, that's not true.
8        A.    It is.
9        Q.    It says with a smaller effect
10   for genital bath talc exposure, relative risk
11   1.7.  It includes both, does it not?
12       A.    That relative risk is not
13   statistically significant.  If they're
14   talking about the point estimate being over
15   1, that may be true, but this paragraph does
16   not say anything about consistency within
17   these studies.  In fact, this highlights
18   inconsistency between all of these studies.
19       Q.    Okay.  Well, and so
20   Dr. Moyses -- Dr. Szklo is wrong when he says
21   this:  "The results of our study and others
22   suggest that genital fiber exposure may be
23   associated with an adverse effect."
24                He's wrong when he says that?
25       A.    That is such a general

Page 372

1   statement.  It says "suggests," "may,"
2   "associated adverse effect."  I don't even
3   know what the adverse effect he's talking
4   about is.
5        Q.    Well, how about the last --
6   let's talk about the last paragraph.
7                "In summary" --
8                MS. MILLER:  The last paragraph
9        of what --
10                MR. TISI:  Of the study.
11                MS. MILLER:  Oh, okay.
12  QUESTIONS BY MR. TISI:
13       Q.    "In summary, our study shows
14   that the development of ovarian cancer may
15   be -- may be associated with genital fiber
16   exposure, especially talc on sanitary
17   napkins."
18                Do you see that?
19       A.    I do.
20                And then it says, "Given its
21   small sample size and the potential selection
22   bias stemming from including patients in only
23   one hospital, further research needs to be
24   performed in order to confirm our findings."
25                And that is the importance of

Page 373

1   consistency.  And that first paragraph that
2   you highlighted demonstrates the lack of
3   consistency.
4        Q.    Doctor, he's saying that this
5   study is further support of the hypothesis,
6   additional study needs to be done, but that
7   this shows that the development of ovarian
8   cancer may be associated with genital fiber
9   exposure.  That's what he says.  I'm reading
10   directly from the report.
11                MR. LOCKE:  Objection.
12                THE WITNESS:  And where are you
13       reading that?
14  QUESTIONS BY MR. TISI:
15       Q.    "In summary, our study shows
16   that the development of ovarian cancer may be
17   associated with genital fiber exposure,
18   especially talc on sanitary napkins and
19   exposure to fibers in relatives."
20                He does say that, correct?
21                MS. MILLER:  Objection.
22                THE WITNESS:  He says, "Our
23       study shows that the development of
24       ovarian cancer may be associated."
25       "May be associated."

94 (Pages 370 to 373)

Christian Merlo, M.D., MPH

Page 374

1      And then he also says -- and
2   I'll say this again -- "Given its
3      small sample size and the potential
4      for selection bias" --
5   QUESTIONS BY MR. TISI:
6      Q.   And he doesn't say this is
7   inconsistent, does he?  He doesn't say, our
8   studies are opposite to.  He doesn't say, our
9   studies are inconsistent with, does he?
10      MR. LOCKE:  Objection.
11      MS. MILLER:  Objection.
12      THE WITNESS:  He doesn't say
13      they're inconsistent.  He doesn't say
14      either.  But they are inconsistent
15      with each other, because some are
16      showing a statistical significance and
17      some are not.
18      (Merlo Exhibit 41 marked for
19      identification.)
20   QUESTIONS BY MR. TISI:
21      Q.   Let's go to another one.
22      A.   They're inconsistent.
23      Q.   Let's go to another one.
24   There's another one that you refer to.  It's
25   the Tzonou study from Greece, the Tzonou

Page 375

1   study.  I'm going to show you this one.  This
2   is one you also read.
3      And this is another
4   hospital-based study, correct?
5      And this is the one on your
6      chart --
7      MS. MILLER:  I'm sorry, I took
8      yours.
9      MR. TISI:  I'm sorry.
10   QUESTIONS BY MR. TISI:
11      Q.   This is the one on your chart
12   that has a 1.05 with a confidence interval of
13   .28 to 3.98.
14      Do you see that?
15      A.   I see on my chart 1.05, with a
16   95 confidence interval of .28 to 3.98.
17      Q.   Let's look at what these
18   doctors say about this relationship.  If you
19   go to page 409, second column, it says, "The
20   results of the present study do not support
21   an association between talc and ovarian
22   cancer but given the overlapping range in the
23   confidence intervals, they are not
24   incompatible with it."
25      True?

Page 376

1      A.   Can you just show me?  I'm
2   sorry, I just didn't know where that was.
3      Okay.
4      Q.   Does it not say, "The result of
5   the present study do not support the
6   association between talc and ovarian cancer
7   but given the overlapping range of the
8   confidence intervals, they are not
9   incompatible"?
10      MR. LOCKE:  Objection.
11      THE WITNESS:  I do see that
12      sentence, but I'm just trying to
13      figure out where that -- that that is
14      reference to.
15   QUESTIONS BY MR. TISI:
16      Q.   Okay.  Was it important to you
17   to figure out what that doctor meant by that?
18   The overlapping confidence intervals is
19   consistency, is it not?
20      MR. LOCKE:  Objection.
21      THE WITNESS:  I don't know what
22      you mean by overlapping confidence
23      intervals.
24   QUESTIONS BY MR. TISI:
25      Q.   If confidence intervals overlap

Page 377

1   between studies and -- let's say at 1.2,
2   those are consistent.  The confidence
3   intervals are consistent, correct?
4      MS. MILLER:  Objection.
5      THE WITNESS:  It depends.  It
6      depends if you have three, eight,
7      ten studies that show 1.2, 1.3, their
8      confidence intervals overlap and those
9      are all statistically significant,
10      then those would be consistent.
11      However, if you have a point
12      estimate -- if you have several
13      studies that have point estimates of
14      1.2, 1.3, those are statistically
15      significant, and you have several
16      studies that have similar point
17      estimates but they're not
18      statistically significant, no, they
19      would be inconsistent with each other.
20   QUESTIONS BY MR. TISI:
21      Q.   Even though the confidence
22   intervals overlap?
23      A.   That's not really how you
24   approach consistency, in just looking at the
25   confidence intervals and seeing if they

95 (Pages 374 to 377)

Christian Merlo, M.D., MPH

Page 378

1    overlap.
2         Because the two studies, if
3    we're talking about a consistent set, the
4    studies would be statistically significant,
5    and that would point towards consistency.
6         Q.   I'm going to like to show
7    you -- have you seen a meta-analysis of the
8    hospital-based studies at all?
9         A.   I did review some
10   meta-analyses.
11        Q.   Did you review the
12   meta-analyses of the hospital-based studies?
13        A.   I would have to look back at my
14   report and see --
15        Q.   Let me see if I can show you
16   the Berge study.
17        A.   -- which -- which had the
18   hospital-based studies.
19        Q.   Let me show you the Berge
20   study, which you've actually seen, correct?
21        MS. MILLER:  Can you show us,
22   too?
23        THE WITNESS:  Okay.
24        (Merlo Exhibit 48 marked for
25   identification.)

Page 379

1    QUESTIONS BY MR. TISI:
2         Q.   If you go to the table on
3    page 6 of 15.
4         Do you see they have
5    case-control studies and they have
6    hospital-based control studies?
7         Do you see that?
8         A.   I do see that.
9         Q.   Okay.  See the relative risk of
10   1.34?
11        A.   I do see 1.34.
12        Q.   See the confidence interval
13   greater than 1, 1.16 to 1.51?
14        A.   I see 1.16 to 1.51.
15        Q.   What does that tell you,
16   Doctor?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  Well, it tells me
19   that looking at these six case-control
20   studies, the relative risk in however
21   they lump these together was a 1.34,
22   with a 95 percent confidence interval
23   of 1.16 to 1.5 -- sorry, 1.51.
24   QUESTIONS BY MR. TISI:
25        Q.   And that's statistically

Page 380

1    significant for the hospital-based studies,
2    correct?
3         A.   For -- that's what that
4    suggests for those six studies.
5         Q.   Now, Doctor, just while we're
6    at it here, and we're going to talk about
7    the -- by the way, you didn't reference that
8    in your report, did you, that there was a
9    meta-analysis of the hospital-based studies
10   that showed a statistically significant
11   increased risk?
12        MR. LOCKE:  Objection.
13        THE WITNESS:  Can you ask that
14   one more time?
15   QUESTIONS BY MR. TISI:
16        Q.   Yes.
17        You didn't note that there was
18   a meta-analysis of the hospital-based studies
19   in the Berge study that showed a
20   statistically significant increased risk, did
21   you?
22        MR. LOCKE:  Objection.
23        THE WITNESS:  In the
24   meta-analysis done by Berge, I did not
25   reference that hospital-based

Page 381

1    case-control study table right there.
2    QUESTIONS BY MR. TISI:
3         Q.   And that showed an increased
4    risk?
5         A.   I would have to go through and
6    look at the papers that were pulled for that
7    because I have seven on my list, and there's
8    six there.
9         Q.   Okay.  But, of course, this
10   study was published and yours wasn't.  Your
11   report has not been?
12        MR. LOCKE:  Objection.
13        MS. MILLER:  Objection.
14        THE WITNESS:  I didn't do a
15   meta-analysis.  I just gave a summary
16   statement of the available
17   hospital-based case controls, and
18   they're all not statistically
19   significant.
20   QUESTIONS BY MR. TISI:
21        Q.   Right.
22        And -- but when you combine
23   them, because they were not powered to do it,
24   they were small studies, because the
25   confidence intervals were large -- you

Christian Merlo, M.D., MPH

Page 382

1    indicated that before.  When you combine
2    them, you increase the power, right?
3         MR. LOCKE:  Objection.
4         MS. MILLER:  Objection.
5         THE WITNESS:  You can --
6    QUESTIONS BY MR. TISI:
7         Q.    Okay.
8         A.    -- if the studies looked at the
9    same thing.
10        Q.    Right.
11        A.    If they looked at the same
12   measure of exposure.
13        Q.    So when they combine them, it
14   increased the power.  They show a
15   statistically significant results in the
16   Berge study, correct?
17        MS. MILLER:  Objection.  He
18   specifically said something different.
19        MR. TISI:  You get to cross.
20        THE WITNESS:  If, in fact, the
21   studies are measuring the same aspect
22   of the exposure, which there are
23   varying measures of exposure with --
24   in all of the case-control studies, if
25   they're measuring the same thing, then

Page 383

1    it does add -- it does add more study
2    subjects, which increases -- it does
3    add more study subjects.
4    QUESTIONS BY MR. TISI:
5         Q.    And it does increase the power?
6         MR. LOCKE:  Objection.
7    QUESTIONS BY MR. TISI:
8         Q.    To detect an association,
9    correct?
10        MR. LOCKE:  Objection.
11        MS. MILLER:  Objection.
12        THE WITNESS:  That's not really
13   what power is for.  Power is to say
14   that if you don't detect a certain
15   association, that you're not wrong
16   about that.  That's what power's for.
17   QUESTIONS BY MR. TISI:
18        Q.    Well, the original studies did
19   not detect a statistically significant
20   result, but when you combine them, they did,
21   true?
22        MS. MILLER:  Objection.
23        MR. LOCKE:  Objection.
24        MS. MILLER:  No, that's not
25   what he said.

Page 384

1         THE WITNESS:  And I would have
2    to go through and see why there's only
3    six there and see what the measure of
4    risk was and whether or not that was
5    appropriate to even combine those.
6    QUESTIONS BY MR. TISI:
7         Q.    Okay.  But you didn't do that,
8    and you didn't address this in your report?
9         MR. LOCKE:  Objection.
10        THE WITNESS:  So in looking at
11   this table now, I'm looking at the
12   hospital-based case-control studies,
13   and there's six of them, and the
14   relative risk is as you say.  But
15   there is significant heterogeneity
16   within the studies, and so it may not
17   be appropriate to lump all of those
18   together.
19        And I believe that the authors
20   concluded that because of
21   heterogeneity, it did not support a
22   causal interpretation of the
23   association.
24   QUESTIONS BY MR. TISI:
25        Q.    Doctor, let me ask you this:

Page 385

1    It also says at the top -- and if you look at
2    the abstract -- actually, the -- and I'll
3    represent to you that this study was actually
4    amended.  The original study was amended a
5    year later, so this is the amended study.
6         It says, "This meta-analysis
7    resulted in a weak" -- second to the last
8    sentence -- "weak but statistically
9    significant association between genital talc
10   use and ovarian cancer, which appears to be
11   limited to serous carcinoma with the
12   suggestion of a dose response."
13        Do you see that?
14        MR. LOCKE:  Objection.
15        THE WITNESS:  That's in the
16   abstract?
17   QUESTIONS BY MR. TISI:
18        Q.    Yes.
19        A.    Can you read that again?
20        Q.    Yeah.
21        Second to the last sentence.
22   It says, "The meta-analysis results in a weak
23   but statistically significant association
24   between genital talc -- genital use of talc
25   and ovarian cancer, which appears to be

Christian Merlo, M.D., MPH

Page 386

1    limited to serous carcinoma and suggests --
2    with the suggestion of dose response."
3          Did I read that correctly?
4          A.    You read that correctly.
5          Q.    You don't note that in your
6    report, do you?
7                MR. LOCKE: Objection.
8                THE WITNESS: But the authors
9          also say in their concluding sentence,
10         "Several aspects of our study,
11         including heterogeneity of results
12         between case-control and cohort
13         studies, however, do not support a
14         causal interpretation of the
15         association."
16   QUESTIONS BY MR. TISI:
17         Q.    I understand, Doctor.
18               I asked you whether I read the
19   prior sentence correctly about a dose
20   response, and you didn't address that in your
21   report, did you not?
22               MR. LOCKE: Objection.
23               MS. MILLER: Objection.
24               THE WITNESS: Well, let's look
25         at dose response then.

Page 387

1    QUESTIONS BY MR. TISI:
2          Q.    Let's look at -- yeah. You
3    didn't address it. I looked for it. I
4    didn't find it.
5          A.    The only reason I'm looking at
6    this is because I did address dose response,
7    and I looked at all of the dose response
8    within all of the studies available. And in
9    order for Berge to talk about dose response,
10   the studies that involve a dose response have
11   to go in there.
12               And aside from one study, which
13   is Wu 2015, there is no dose response.
14   There's random curves, there's convex curves,
15   convey curves, in Booth, Wong, Cook, Mills,
16   Merritt, Gertig, Cramer, in all of those. So
17   actually I did.
18         Q.    Okay. My question is --
19         A.    And there's no dose response.
20         Q.    Did you address Berge's
21   analysis of that issue?
22               MS. MILLER: Objection.
23               THE WITNESS: There's no need
24         to because --
25

Page 388

1    QUESTIONS BY MR. TISI:
2          Q.    The question is whether you did
3    or you didn't.
4                MS. MILLER: Please don't
5          interrupt the witness.
6                MR. TISI: No, he needs to
7          answer my questions.
8                MS. MILLER: He's answering
9          your questions as fully as he can --
10               MR. TISI: My question is, I
11         know you --
12               MS. MILLER: And now you're
13         interrupting me.
14               MR. TISI: I know you -- well,
15         because you're coaching.
16   QUESTIONS BY MR. TISI:
17         Q.    Doctor, I know you discussed
18   the --
19               MR. TISI: Your laughing is
20         really, really overwhelming.
21               MS. MILLER: You just accused
22         me of coaching the witness for saying
23         "please don't interrupt him."
24               MR. TISI: You are totally
25         coaching the witness. Don't interrupt

Page 389

1    him. He was saying X, Y and Z. It's
2    coaching.
3                MS. MILLER: Excuse me? I
4          said, "Please don't interrupt the
5          witness."
6                Where did I say he was saying
7          X, Y and Z?
8    QUESTIONS BY MR. TISI:
9          Q.    Doctor --
10               MS. MILLER: What are you even
11         talking about?
12   QUESTIONS BY MR. TISI:
13         Q.    Doctor, did you address the
14   analysis done by Berge on the dose response
15   issue in your report?
16               You may have done the
17   underlying studies, but did you discuss
18   Berge's?
19               MR. LOCKE: Objection.
20               THE WITNESS: I actually am
21         trying to find where the -- where the
22         dose response is even discussed in
23         Berge.
24   QUESTIONS BY MR. TISI:
25         Q.    Okay. I can help you with

98 (Pages 386 to 389)

Christian Merlo, M.D., MPH

Page 390

1    that.
2            Have you actually seen this?
3    This -- because there are two Berge
4    publications.  There was the original and
5    there was an amended one.  This is the
6    amended one.
7            Did counsel provide you with
8    the amended one?
9        A.   Counsel didn't provide me with
10   any articles.
11       Q.   Okay.
12       A.   I looked them up myself.
13       Q.   Did you find this one?
14       A.   Again, I don't have these
15   memorized, so I don't know which is the first
16   one or which is the second one.
17       Q.   This is the second one.
18           MS. MILLER:  Is there a
19   question pending?  I'm so sorry, I
20   lost it.
21           MR. TISI:  Yes.
22   QUESTIONS BY MR. TISI:
23       Q.   Did you see this -- have you --
24   will you see the second -- the second Berge
25   study?

Page 391

1        A.   I may have had the second one
2    or the first one.  I don't know.
3        Q.   Okay.
4        A.   Because it's not --
5            MS. MILLER:  Can we check his
6    references?
7            MR. TISI:  Well, no, I think
8    the record will be -- the record will
9    be that he didn't, so we'll just go
10   on.
11           THE WITNESS:  No, I'm not
12   saying that, because I --
13           MR. TISI:  No, I think the
14   record will be that the study that you
15   looked at was the original Berge study
16   but not the amended one.
17           THE WITNESS:  Why do you say
18   that?
19           MR. TISI:  Because you have a
20   citation to it with a year and the
21   publication.
22           MS. MILLER:  And the citation
23   is to 2018, and this year is this?
24           THE WITNESS:  And this is 2018.
25           MR. TISI:  Okay.  It'll be what

Page 392

1    it'll be.
2            THE WITNESS:  I don't know how
3    you can say that this -- that I
4    didn't -- that I looked at this one or
5    the other one.
6            MR. TISI:  It'll be what it'll
7    be.  I will compare the citation, and
8    it'll either be the one you looked at
9    or not.  Let's move on.
10           THE WITNESS:  Well, we can
11   compare it right now.
12   QUESTIONS BY MR. TISI:
13       Q.   I want to go -- Doctor --
14       A.   I'm going to look to compare it
15   right now.
16       Q.   Well, then you can do it off
17   the record.  I'm not doing it on the record.
18       A.   Well, then you can't say
19   that -- that you can just assume that --
20       Q.   I'm not --
21       A.   -- I saw the first one and
22   didn't see the second one.
23       Q.   Doctor, I'll look it up.  You
24   have the citation in the back of your
25   references.  I'll just look it up.

Page 393

1            If you go to your chart here,
2    exhibit -- that we marked as Exhibit
3    Number 37 -- it's right in front of you,
4    sir -- would you agree with me that of all
5    the studies of whatever design, other than
6    Hartge 1983, Hartge and Stewart 1994, and
7    Gonzalez 2016, all -- every single one of
8    these risk ratios or relative risks or hazard
9    ratios is greater than 1?
10           MS. MILLER:  Objection.
11           THE WITNESS:  The point
12   estimates in this -- in this chart,
13   Hartge 1983, Hartge Stewart '94, and
14   Gonzales are all below 1.  The others
15   are -- the point estimates are above
16   1.
17   QUESTIONS BY MR. TISI:
18       Q.   Okay.  And so of the
19   30-some-odd studies, all of them have -- all
20   of these studies, 30 of 33 or whatever the
21   number happens to be, other than three have a
22   risk ratio, relative risk or hazard ratio,
23   greater than 1?
24       A.   A point estimate greater than
25   1.

99 (Pages 390 to 393)

Christian Merlo, M.D., MPH

Page 394

```
 1        Q.    Greater than 1.
 2            Would you look at the
 3   confidence interval of the ones that have a
 4   greater -- a point estimate greater than 1?
 5            Would you agree that the
 6   confidence intervals overlap for every one of
 7   those studies at 1.2?
 8        MS. MILLER:  Objection.
 9        THE WITNESS:  I would have to
10   use a calculator to do that.
11   QUESTIONS BY MR. TISI:
12        Q.    Well, all you have to do is
13   look at the -- all you have to look at is the
14   confidence interval, right?  The confidence
15   interval?  If it overlaps 1.2, then it's --
16   then they're overlapping, right?
17        A.    It's not how we use a
18   confidence interval, but if that's what -- if
19   that's the number that you want to say, but
20   that's not how --
21        Q.    They're all -- every single one
22   of these confidence intervals, with the
23   exception of the three that I just talked
24   about, overlap at 1.2.
25        A.    For the purpose of this
```

Page 395

```
 1   exercise, looking down that column,
 2   95 percent confidence interval, and you want
 3   me to say whether or not there's overlap at
 4   1.2?
 5        Q.    Uh-huh.
 6        A.    And what was the other
 7   qualification?
 8        Q.    None.
 9            The vast majority of these
10   confidence intervals overlap at 1.2, true?
11        A.    1.2 is included in many of
12   these.
13        Q.    The vast majority -- in fact
14   every one, with the exception of three that I
15   just mentioned?
16        A.    Well, Cramer 1982 is 1.27.  Wu
17   2015 is 1.27.
18        Q.    Right.
19        A.    That doesn't include 1.2.
20        Q.    Okay.  Okay.  1.2 or above.
21        A.    Okay.
22        Q.    Is that true?
23        A.    That is true for that column.
24        Q.    Okay.  And in fact, most of
25   them have -- overlap at 1.25, correct?  Not
```

Page 396

```
 1   every one, but they -- most of them do.
 2            In fact, even if you look at
 3   the cohort studies, with the exception of
 4   Gonzalez, they include 1.25.
 5        A.    Okay.
 6        Q.    Is that true?
 7        A.    It looks like it, based on this
 8   chart.
 9        Q.    Now, I provided Dr. Ballman --
10   have you seen Dr. Ballman's exhibits?
11        A.    Yes.
12        Q.    Okay.  I provided her with a
13   copy of your chart, which I will have marked
14   as Exhibit 42.  Since you had time to look at
15   it, I'm going to ask you whether you agree
16   with her or not.
17            (Merlo Exhibit 42 marked for
18            identification.)
19   QUESTIONS BY MR. TISI:
20        Q.    I asked her to highlight, to
21   circle, every -- I asked her to highlight
22   every -- in red, in pink, every result that
23   was greater than 1.0, and she did.
24            Do you see that?
25        MS. MILLER:  Objection.
```

Page 397

```
 1        MR. LOCKE:  Objection.
 2        THE WITNESS:  What -- you're --
 3   what did she highlight?
 4   QUESTIONS BY MR. TISI:
 5        Q.    Every result that had a risk
 6   ratio greater than 1.0, and she highlighted
 7   that in pink.
 8        A.    And you're talking about the
 9   point estimate?
10        Q.    The point estimate, correct.
11        MR. LOCKE:  I'm going to object
12   for the same reasons we did during her
13   deposition.
14        MR. TISI:  Okay.
15   QUESTIONS BY MR. TISI:
16        Q.    Do you see that?
17        A.    That's what it looks like.
18        Q.    Okay.  And she circled every
19   point estimate -- she circled every
20   confidence interval that included 1.2, which
21   is a 20 percent increase, correct?
22        MR. LOCKE:  Same objection.
23        MS. MILLER:  Objection.
24   QUESTIONS BY MR. TISI:
25        Q.    Do you see that, and do you
```

Christian Merlo, M.D., MPH

Page 398

1 disagree with that?
2 MS. MILLER: I'm going to
3 object. I don't understand how you
4 disagree with circling, and also --
5 QUESTIONS BY MR. TISI:
6 Q. Do you --
7 MS. MILLER: -- this is kind of
8 illegible.
9 QUESTIONS BY MR. TISI:
10 Q. Do you agree --
11 MR. TISI: It's very legible to
12 me, Counsel, but you can coach your
13 witness if you'd like. I can read it
14 very carefully. Very well.
15 THE WITNESS: I see circles in
16 the 95 percent confidence interval,
17 and if you're asking if those circles
18 include a range that includes 1.2 in
19 that 95 percent confidence interval,
20 that's what it appears to show.
21 QUESTIONS BY MR. TISI:
22 Q. And then I asked her to
23 highlight in blue those that included 1.25,
24 and she did that as well.
25 Do you see that?

Page 399

1 MR. LOCKE: Objection.
2 MS. MILLER: Objection.
3 THE WITNESS: The blue is a
4 little bit difficult to make out.
5 There's purple.
6 QUESTIONS BY MR. TISI:
7 Q. Well, purple is the -- it's
8 blue and red. We didn't use a purple marker.
9 A. And so what was the question?
10 Q. Those were the ones that
11 included 1.25 in the confidence interval.
12 A. So it looks like this exercise
13 does have a blue mark to those values that
14 would include a 1.25 within the confidence
15 interval.
16 Q. And so in terms of we can
17 disagree with the significance of that, you
18 agree that with the interpretation that she
19 had about risk ratios greater than 1, the
20 ones that are greater than 1.2 -- or they
21 included 1.2 and the ones that included 1.25?
22 MS. MILLER: Objection.
23 MR. LOCKE: Objection.
24 THE WITNESS: For the purposes
25 of you asking her what to highlight,

Page 400

1 she appears to have done what you've
2 asked her to do --
3 QUESTIONS BY MR. TISI:
4 Q. Okay.
5 A. -- and circled.
6 Q. And if asked to do the same
7 thing, you would have done the same circling
8 and the same highlighting?
9 MR. LOCKE: Objection.
10 THE WITNESS: If you asked me
11 the same questions, it appears that
12 she followed your directions
13 appropriately.
14 QUESTIONS BY MR. TISI:
15 Q. Okay. Now, I'm going to show
16 you what -- a textbook. It's already been
17 marked as Exhibit Number 32.
18 Can you pull that out, please?
19 That's the Rothman textbook.
20 A. 32?
21 Q. Uh-huh. I have another copy in
22 case anybody wants it because I don't really
23 need paper. You can have it if you'd like.
24 MS. MILLER: Okay. Instead of
25 making us go through our pile.

Page 401

1 Thanks.
2 MR. TISI: Yeah.
3 QUESTIONS BY MR. TISI:
4 Q. Do you have it in front of you?
5 A. I have Modern Epidemiology.
6 Q. Okay. If you look at the
7 consistency prong -- we've looked at the
8 strength prong before -- and it's on page 26
9 of 30.
10 A. Okay.
11 Q. Okay. And I'm going to read
12 the paragraph and see whether you agree with
13 it or not.
14 In this textbook Dr. Rothman
15 says --
16 A. I'm sorry, where are you
17 reading from?
18 Q. The second paragraph under
19 Consistency. This is the consistency prong.
20 "One mistake in implementing
21 the consistency" --
22 A. But where is this in the paper?
23 I'm not seeing it. I see the second
24 paragraph.
25 Q. "One mistake." It says -- it

101 (Pages 398 to 401)

Christian Merlo, M.D., MPH

Page 402

1    starts with "one mistake."
2        Do you see it?
3    A.    I see it now.
4    Q.    Okay.  "One mistake in
5    implementing the consistency criterion is so
6    common it deserves special mention.  It is
7    sometimes claimed that a literature or set of
8    results is inconsistent simply because some
9    results are statistically significant and
10   some are not.  This sort of evaluation is
11   completely fallacious, even if one accepts
12   the use of statistical -- the use of
13   significance testing methods."
14       Did I read that correctly?
15       MR. LOCKE:  Objection.
16       MS. MILLER:  Objection.
17       MR. LOCKE:  And to the
18       characterization of this as a
19       textbook.
20       THE WITNESS:  I see that
21       statement on this page.
22   QUESTIONS BY MR. TISI:
23   Q.    You can pull the textbook out
24   so I don't have to, like, deal with that kind
25   of objection.

Page 403

1        MR. LOCKE:  Well, it's a
2        portion of a book.
3        MR. TISI:  Okay.  Okay, Tom.
4    QUESTIONS BY MR. TISI:
5    Q.    The chapter in a textbook.
6    That's exactly what you did, right?
7    A.    I'm sorry?
8    Q.    Do you agree with that
9    statement?
10   A.    Do I agree with the statement?
11   Q.    "One mistake in implementing
12   the consistency criterion is so common that
13   it deserves special attention.  It is
14   sometimes claimed that a literature or set of
15   results is inconsistent simply because some
16   results are statistically significant and
17   some are not.  That sort of evaluation is
18   completely fallacious, even if one accepts
19   the use of significance testing methods."
20       Did I read that correctly?
21   A.    Yes, you did.
22   Q.    Do you agree with that?
23   A.    I would say it depends, and
24   I'll tell you why.  Because it's a very
25   general statement.  And if we're talking in

Page 404

1    this instance where there are several
2    different kinds of study designs -- there's
3    consistency within study results.  There's
4    consistency within hospital-based
5    case-controls.  There's consistency in
6    nonsignificant -- nonsignificant results.
7        There's inconsistency in
8    population-based case-control studies where
9    some showed statistical significance, some
10   don't.  There's also consistency within
11   cohort studies where there's a consistent
12   nonstatistically significance.
13       So there's consistency and
14   there's inconsistency.  And just to divide it
15   up simply the way that Dr. Rothman says here
16   is too general because there are very
17   specific instances that need to be considered
18   before just agreeing or disagreeing to that
19   statement.
20       (Merlo Exhibit 43 marked for
21       identification.)
22   QUESTIONS BY MR. TISI:
23   Q.    Okay.  Let me look at Dr. --
24   what Dr. Oleckno says about it.  Here's
25   Exhibit Number 43, which is also from the

Page 405

1    Oleckno textbook that you referred to in your
2    report.
3        And in the chapter --
4        MS. MILLER:  This appears to be
5    pages 131, 173 and 174 --
6        MR. TISI:  Correct.
7        MS. MILLER:  -- so I'm going to
8    have the same objection.
9        MR. TISI:  Fine.
10       MS. MILLER:  This just pulls
11   things out of context rather than
12   including an inherent thing.  I don't
13   know --
14       MR. TISI:  I know you don't
15   know.
16       MS. MILLER:  -- what's between
17   pages 131 --
18       MR. TISI:  I know you don't
19   know, Counsel.
20       MS. MILLER:  -- and 173 --
21       MR. TISI:  Objection.
22       MS. MILLER:  -- and what occurs
23   after page 175.
24       MR. TISI:  "Objection" is fine.
25       THE WITNESS:  Can I take a

Christian Merlo, M.D., MPH

Page 406

1    favor?
2            MR. TISI: Yeah.
3            THE WITNESS: Can we take a
4    little -- I just need to use the
5    restroom.
6            MR. TISI: Absolutely.
7            THE WITNESS: Would that be
8    okay?
9            MR. TISI: Absolutely.
10           THE WITNESS: All right.
11   Thanks.
12           VIDEOGRAPHER: The time is
13   4:20 p.m., and we're going off the
14   record.
15    (Off the record at 4:20 p.m.)
16           VIDEOGRAPHER: The time is
17   4:32 p.m., and we are back on the
18   record.
19   QUESTIONS BY MR. TISI:
20       Q.   If you go to page 174 of
21   Exhibit 43, the Oleckno textbook, there's a
22   bullet point talking about statistical
23   significance. I gave it to you as the last
24   document we gave you.
25       A.   Sorry, it was not in front of

Page 407

1    me. I got it.
2        Q.   Okay. Go to page 174.
3        A.   This is a four-page summary of
4    the textbook?
5        Q.   No, it's not a four-page
6    summary of the textbook, Doctor. It is a
7    page out of the textbook where he bullet
8    points, and this is the point where he talks
9    about statistical significance and
10   significance testing.
11           It says here, "Measures of
12   association may be tested for statistical
13   significance, i.e., if they significantly
14   different {sic} from 1.0 for measures based
15   on relative comparisons or significantly
16   different from .0 for measures based on
17   absolute comparisons. Statistical
18   significance is rooted in hypothesis testing
19   and is measured by the P value. Generally, P
20   .05 indicates that an observed measure of
21   association is unlikely to be due to chance
22   alone based upon the assumption that there is
23   no real association. Thus, it is considered
24   statistically significant."
25           You with me so far?

Page 408

1        A.   I do see where that's said.
2        Q.   And that's correct, right?
3        A.   That's correct.
4        Q.   All right. "Conversely, P
5    greater than .05 indicates that the observed
6    measure of association is probably due to
7    chance alone and hence not statistically
8    significant."
9            Correct? Do you see that?
10       A.   I do see that, correct.
11       Q.   Okay. "Statistical
12   significance does not indicate the strength
13   of an association, nor does it reveal its
14   practical significance. For a number of
15   reasons, most epidemiologists prefer to use
16   confidence intervals rather than
17   significant -- significance testing. For one
18   thing, these provide more information than
19   significance testing."
20           Do you see that?
21       A.   I do.
22       Q.   And do you agree with that?
23       A.   So there's a lot of statements
24   there.
25       Q.   The last sentence, the last two

Page 409

1    sentences I'm talking about.
2        A.   "For a number of reasons, most
3    epidemiologists prefer to use confidence
4    intervals rather than significance testing.
5    For one thing, these provide more information
6    than statistic -- significance testing."
7            So it's an -- that's an
8    important thing to consider, and I think we
9    have to remember that statistical
10   significance, a P value of less than .05,
11   will give a confidence interval that does
12   not -- that -- so if you have a statistically
13   significant result, meaning that the P value
14   is less than .05, then if you're looking at a
15   measure of risk, then your confidence
16   interval will not include 1.
17           So they're not saying the
18   same -- they're not saying different things.
19   If your -- if your confidence interval does
20   not include 1, then you're going to have a
21   statistically significant result.
22           The reason for looking at the
23   confidence interval is because that gives you
24   more information about the study. If the
25   confidence interval is really, really tight,

103 (Pages 406 to 409)

Christian Merlo, M.D., MPH

Page 410

1    that means your measurement is really good or
2    your study sample is really, really big.
3            But you're not going to have a
4    statistically significant result if the
5    confidence interval crosses 1.  It will be
6    statistically insignificant.
7            So dividing these things up is
8    not how this is meant to mean.  What this
9    means is that the confidence interval just
10   gives you a little bit more information, but
11   they're not any different than each other.
12   It's the same thing.
13           (Merlo Exhibit 44 marked for
14           identification.)
15   QUESTIONS BY MR. TISI:
16       Q.   All right.  Doctor, I'm going
17   to show you what the American Statistical
18   Association says about this issue.  I'm
19   attaching this as Exhibit Number 44.
20       I assume you've seen if you
21   read Dr. Ballman's testimony, because I think
22   it came out a couple of days before her
23   testimony.
24       A.   Okay.
25       Q.   I assume you've read this, sir?

Page 411

1        A.   I have looked this over, yes.
2        Q.   It says -- under the section it
3    says, "Retire Statistical Significance."
4    That's the title of the -- of the article.
5            Retire?
6        A.   I don't have that, actually.  I
7    have "Sciences Rise Up Against Statistical
8    Significance."
9        Q.   All right.  Well, okay.  I have
10   a different version.
11           MS. MILLER:  Retire is nature.
12           THE WITNESS:  And then I have
13   "Comment."  So this is a comment.
14   QUESTIONS BY MR. TISI:
15       Q.   Right.  Correct.
16       A.   Not a study.
17       Q.   Right.  I understand.
18           Your report is a comment,
19   right?
20           MR. LOCKE:  Objection.
21           MS. MILLER:  Objection.
22           THE WITNESS:  My report is a
23   conglomeration of my opinions based on
24   the medical evidence.
25

Page 412

1    QUESTIONS BY MR. TISI:
2        Q.   So underneath -- on page 2, it
3    says, "Pervasive problem."  And you
4    understand the American Statistical
5    Association published 42 articles in one
6    journal relating to this issue?
7        A.   I have no idea what the
8    American association -- what was it called?
9        Q.   Statistical association?
10       A.   The American Statistical
11   Association, that's not something I follow,
12   so it's not -- I would have no idea whether
13   they published 42 articles or --
14       Q.   That's a good point.
15           What epidemiology journals do
16   you actually get?  You mentioned the American
17   Epidemiology -- the American Epidemiology.
18           Any others that you get?
19       A.   So I don't subscribe to
20   journals because we all -- we get them
21   through our Welch Library.  We have access to
22   pretty much every journal available.  And so
23   there are a number of epidemiologic journals
24   within the Welch Library that I have access
25   to.

Page 413

1        Q.   Which ones do you get?  Which
2    one do you look at?
3        A.   It would depend on the
4    situation.  It would depend on the
5    investigation that I'm undertaking.
6        Q.   Okay.  Do you know who Sander
7    Greenland is?
8        A.   I do not.
9        Q.   Okay.  So on page 2 of this
10   document, it says, "Let's be clear about what
11   must stop.  We should never conclude that
12   there is no difference or no association just
13   because a P value is larger than the
14   threshold, such as P .05 or equivalent,
15   because confidence interval includes zero.
16   Neither should we conclude that two studies
17   conflict because one had a statistically
18   significant result and the other did not.
19   These errors waste research efforts and
20   misinform policy decisions."
21           Do you see that?
22       A.   I do.
23       Q.   Okay.  I assume you disagree
24   with that given what you said before?
25       A.   Again, I think it's going to

104 (Pages 410 to 413)

Christian Merlo, M.D., MPH

Page 414

1   depend, and the reason why I say it's going
2   to depend is because two studies may be
3   inherently different. One study may have a
4   very good study design and one study may have
5   a poor design. One study may adjust for bias
6   and confounding; one study may not.
7        And this is a very, very
8   generalized statement that can either be
9   agreed or disagreed with because of those.
10       Q.   Okay. Doctor, I'm going to
11  show you a -- can you please take out the
12  article about misconceptions again, the
13  Rothman review which I -- you -- Exhibit
14  Number 28?
15       A.   Exhibit 28?
16       Q.   Uh-huh.
17       A.   Okay. I have it.
18       Q.   Misconception number 6, 1063.
19  Can you read it for the record, please?
20       A.   Misconception -- which one?
21       Q.   6.
22       A.   6. Okay.
23       "Misconception 6. Significant
24  testing is useful and important for the
25  interpretation of data."

Page 415

1        Q.   And does it also say that -- on
2   the second column, second paragraph,
3   "Significant tests are a poor classification
4   scheme for study results. Strong effects may
5   be incorrectly interpreted as null findings
6   because the author" --
7        A.   I'm sorry to interrupt. Where
8   are you?
9        Q.   Second paragraph.
10       A.   Thank you.
11       Q.   On the right-hand side.
12       A.   I see it.
13       Q.   "Significant tests are a poor
14  classification scheme for study results.
15  Strong effects may be incorrectly interpreted
16  as null findings because the authors
17  fallaciously interpret lack of statistical
18  significance or imply lack of effect or weak
19  effects may be incorrectly interpreted as
20  important because they are statistically
21  significant."
22       Do you see that?
23       A.   I do see that.
24       Q.   Do you agree with that?
25       A.   So again, I'm just going to say

Page 416

1   it depends, because it depends on the study
2   design. It depends on whether the
3   researchers decided to set up their study
4   well and properly control for bias, properly
5   adjust for potential for confounding, analyze
6   the results correctly. So all of those
7   factors have to -- have to come into balance.
8        And the interesting thing about
9   this paper is it's published in the Journal
10  of General Internal Medicine. And if he's an
11  epidemiologist and has these very important
12  misconceptions that he's trying to bring
13  forward in the epidemiology community, I'm
14  not sure why this wasn't published in an
15  epidemiology journal.
16       Q.   Actually, in all fairness,
17  Doctor, I could have chosen dozens of
18  articles where Dr. Rothman makes the same,
19  including in his textbook. He has been very
20  adamant about this. So, I mean, you may not
21  understand it, but he has written about this
22  a lot.
23       So let me -- you made a
24  comment --
25       MS. MILLER: We're going to

Page 417

1   have to object to that speech and move
2   to strike that speech for the record.
3   QUESTIONS BY MR. TISI:
4        Q.   You made a comment, and I
5   really have to push back on it.
6        Let's go to the conclusion --
7        A.   Are you asking me if I don't
8   understand it?
9        Q.   Do you not -- do you not -- do
10  you understand it?
11       A.   Understand what?
12       MS. MILLER: Objection.
13  QUESTIONS BY MR. TISI:
14       Q.   I don't understand what your
15  question is.
16       MS. SHARKO: You don't have to
17  respond to the speeches, Doctor.
18       MS. MILLER: Yeah, just let it
19  go.
20  QUESTIONS BY MR. TISI:
21       Q.   Doctor, if you go to the
22  conclusion in this thing, he says -- he makes
23  the following statement: "It is easy to
24  declare that the result is not statistically
25  significant, falsely implying that there is

105 (Pages 414 to 417)

Christian Merlo, M.D., MPH

Page 418

1    no indication of an association, rather than
2    considering it the quantitative --
3    quantitatively the range of associations that
4    the data actually support."
5         Q.   Do you see that?
6         A.   I do see that sentence.
7         Q.   Okay.  And what he's talking
8    about, the range of associations, is
9    expressed by the confidence interval; is that
10   correct?
11        A.   I don't know what he's
12   referring to there.
13        Q.   Okay.
14        A.   But if he's talking about a
15   nonstatistically significant result, then the
16   confidence interval will include 1.
17             (Merlo Exhibit 21 marked for
18        identification.)
19   QUESTIONS BY MR. TISI:
20        Q.   Okay.  Doctor, I want to go
21   back for a moment to the -- we were talking
22   about the hospital-based studies and the
23   heterogeneity, and we talked about Berge, and
24   I want to talk about Penninkilampi for a
25   moment.

Page 419

1             I'll show the Penninkilampi
2    study which you reviewed in your report.
3         A.   Thank you.
4         Q.   And that's exhibit number --
5    Exhibit Number 21.
6             You've seen this study before?
7         A.   Yes, I have.
8         Q.   First of all, I'm going like
9    you to go to page 200 -- to page 44, please.
10   It's the one with the table on it.
11        A.   44, yes.
12        Q.   Now, I showed -- on the
13   Table 1 it shows serous invasive and serous
14   borderline tumors having a statistically
15   significant elevated risk of 1.32 and 1.39
16   respectively, correct?
17        A.   Serous invasive, serous
18   borderline, 1.32, 1.39.
19        Q.   Okay.  And this is a
20   meta-analysis, true?
21        A.   This is a meta-analysis.
22        Q.   Okay.  Now it does not show the
23   same for mucinous, mucinous invasive, et
24   cetera, right?  It shows that they're not
25   statistically significant?

Page 420

1         A.   Mucinous.  Which ones?
2    Mucinous, invasive mucinous, borderline?
3         Q.   Uh-huh.
4         A.   Yeah, with much -- a much lower
5    number of studies that looked at that.
6         Q.   Would any bias or recall bias
7    or confounding have -- what would that --
8    what would explain that there would be a
9    difference between serous tumors and
10   nonserous tumors?
11             Because I assume there would be
12   no reason for a woman to recall exposure to
13   one and not the other.
14             MS. MILLER:  Objection.
15        Mischaracterizes this table, among
16        other problems.
17             THE WITNESS:  I'm not sure what
18        you're asking.
19   QUESTIONS BY MR. TISI:
20        Q.   Okay.  Let's go on.
21             On the qualitative data
22   synthesis on page -- on the right-hand
23   column, at the bottom of the second paragraph
24   it says, "The only outcome" -- it talks about
25   the three cohort studies.

Page 421

1             "The only outcome reported in
2    all three studies was any perineal talc use,
3    hence the available data from prospective
4    studies was limited."
5         Q.   Do you see that?
6         A.   Can you point me to where
7    you're reading?
8         Q.   (Indicating.)
9             MS. MILLER:  So it's the third
10        to the last paragraph, the last
11        sentence?  Is that where you are?
12             MR. TISI:  It's the second
13        paragraph on the right-hand side.
14             THE WITNESS:  The last sentence
15        of the second paragraph?
16   QUESTIONS BY MR. TISI:
17        Q.   The last sentence.
18             "The only outcome reported in
19   all three core studies was any perineal talc
20   use."  And that would be irrespective of
21   duration, frequency, et cetera, right?
22        A.   That would refer to any
23   perineal talc use if they're combined
24   together.
25        Q.   Right.

Christian Merlo, M.D., MPH

Page 422

1    And there -- so he indicated
2  that the available data from the prospective
3  studies, meaning the cohort studies, was
4  limited, true?  It's what he says?
5    A.    In combining them it's limited,
6  because the cohort studies may have not
7  collected the same data about talc exposure.
8    Q.    Okay.  It also says, "A
9  subgroup analysis related to study population
10  setting, i.e., hospitals or general
11  population, was performed for any perineal
12  use application."
13    Do you see that?
14    A.    Yes, I do.
15    Q.    And the conclusion was, "There
16  was no difference between the pooled results
17  for hospital-based and population studies,
18  OR, 1.22 versus 1.33 respectively."
19    Do you see that?
20    A.    I do see that sentence, but I
21  need see what that's referring to, what table
22  and where that's coming from.
23    Q.    Well, have you reviewed this
24  before?
25    A.    I have.  I just haven't

Page 423

1  memorized it.  There's a lot of papers out
2  there.
3    Q.    Okay.
4    A.    And I don't know what that
5  sentence is referring to.
6    Q.    Okay.  Then it goes on to say,
7  "There was heterogeneity in the analysis for
8  non-perineal applications of talc.  There was
9  no heterogeneity for any other outcome
10  measures in either the meta-analysis for all
11  available studies or subgroup analysis."
12    Do you see that?
13    A.    I do see that.
14    Q.    Okay.  Do you agree with that?
15    MS. MILLER:  Objection.
16    THE WITNESS:  I would just need
17    to see the table where it says that.
18  QUESTIONS BY MR. TISI:
19    Q.    Well, haven't you seen it
20  before?
21    A.    I have.  I just haven't
22  memorized it.
23    Q.    Okay.  Well, if you go to
24  Table 2, it talks about the type of cancers.
25  Serous invasive has a 1.25 with a confidence

Page 424

1  interval of 1.01 to 1.55, heterogeneity, .33.
2    Do you see that?
3    A.    Which line is that?
4    Q.    Under Types of Ovarian Cancer,
5  Doctor.  Right here.
6    A.    I see that.
7    Q.    Let's read what he says in
8  conclusion.  The conclusion that
9  Dr. Penninkilampi reaches when he did his
10  meta-analysis says -- and this is
11  January 2018.  "The results of this review
12  indicate that perineal talc is associated
13  with a 24 to 39 percent increased risk of
14  ovarian cancer.  While the case-control
15  studies are prone to recall bias, especially
16  with intense media attention following the
17  commencement of a litigation in 2014, the
18  confirmation of an association in cohort
19  studies between perineal talc use and serous
20  ovarian cancer is suggestive of a causal
21  association."
22    Do you see that?
23    A.    I do see that; however,
24  Penninkilampi --
25    Q.    I didn't ask you a question.  I

Page 425

1  just asked --
2    A.    Well, I need to qualify this
3  because Penninkilampi left out the -- left
4  out Gates, and in Gates there was no
5  association between serous.
6    Q.    I just asked you if you saw it.
7  I'm going to ask you a follow-up question.
8  Okay?
9    Did you see it?
10    Did I read it correctly?
11    A.    You read it correctly.
12    Q.    I assume you disagree with it.
13    MS. MILLER:  Objection.
14    MR. LOCKE:  Objection.
15    THE WITNESS:  I neither
16  disagree -- I'm not disagreeing with
17  it.  It's just the -- what I do have
18  an issue with is the methodology, and
19  the methodology in this -- in this
20  meta-analysis did not include the
21  Gates study.  And the Gates study is
22  one that was a follow-up to Gertig
23  using the same cohort, and that
24  association was not in the Gates study
25  when found in Gertig with bigger

Christian Merlo, M.D., MPH

Page 426

1    numbers.
2         So I'm not agreeing or
3    disagreeing with the statement.  I'm
4    disagreeing with the methodology that
5    led to that statement.
6    QUESTIONS BY MR. TISI:
7         Q.   Now, you would agree with me
8    that this article was peer-reviewed and
9    published, right?
10        A.   I don't know.  I don't know --
11   I'm not -- I don't serve on the review
12   committee for Epidemiology.  I don't know
13   what their practices are.  I can only speak
14   to the journals that I review for and whether
15   or not those are peer-reviewed.
16        Q.   Doctor, isn't it true that
17   every meta-analysis done in this case shows
18   between a 25 and 40 percent increased --
19   statistically significant increased risk of
20   ovarian cancer?
21        MS. MILLER:  Objection.
22   QUESTIONS BY MR. TISI:
23        Q.   Every published and even
24   unpublished meta-analysis shows that risk?
25        MR. LOCKE:  Objection.

Page 427

1         MS. MILLER:  Objection.
2         THE WITNESS:  We'd have to go
3    through each specific one if you want
4    me to --
5    QUESTIONS BY MR. TISI:
6         Q.   Can you think of one that
7    doesn't have a statistically significant
8    increased risk?
9         MS. MILLER:  Objection.
10        THE WITNESS:  Again, we'd have
11   to go through each -- each one
12   individually.
13   QUESTIONS BY MR. TISI:
14        Q.   I'm not asking -- I'm not
15   asking you that.
16        I'm asking, can you think of
17   any meta-analysis that was published or not
18   published that shows a nonstatistically
19   significant result?
20        A.   Well --
21        MS. MILLER:  That's a different
22   question.
23        MR. TISI:  I'm changing the
24   question.
25        MS. MILLER:  Okay.  Great.  I

Page 428

1    just wanted to make sure we were on
2    the same page.
3         MR. TISI:  I don't know why you
4    need to confirm that, but, okay, fine,
5    I changed the question.
6         THE WITNESS:  So there are six
7    meta-analyses that I reviewed, and
8    again, it depends on what we're
9    looking at here.
10        There's a meta-analysis from
11   1995 which -- done by Gross which may
12   not have the same quality that
13   meta-analyses done later because we
14   learned how to do meta-analyses over
15   time.
16        But also have to remember that
17   some of these meta-analyses broke
18   things down by type of study, design,
19   case-control versus cohort study, and
20   even broke it down even further,
21   breaking down the case-control studies
22   into hospital-based versus
23   population-based.
24        And it's inappropriate to lump
25   them all together, because they're

Page 429

1    different study designs.
2    QUESTIONS BY MR. TISI:
3         Q.   But, Doctor, every one of these
4    passed peer review, every single one, right?
5         MS. MILLER:  Objection.
6         MR. LOCKE:  Objection.
7         THE WITNESS:  And when you
8    break things down further, for
9    instance --
10   QUESTIONS BY MR. TISI:
11        Q.   Well, my --
12        A.   -- in the Penninkilampi --
13        Q.   But that wasn't my question,
14   Doctor, honestly.
15        Every one of these studies
16   passed peer review, did they not?
17        A.   Again, I'm not a -- I'm not a
18   reviewer for these -- for these articles.
19        Q.   I didn't ask you whether you're
20   a reviewer.  I didn't ask you whether you
21   reviewed them.  I didn't ask whether you knew
22   the process of review.  I didn't ask whether
23   you reviewed the reviewer comments.  I didn't
24   ask you anything.
25        I asked you:  They were all

108 (Pages 426 to 429)

Christian Merlo, M.D., MPH

Page 430

1    published in peer-reviewed journals, right?
2        MR. LOCKE:  Objection.
3        THE WITNESS:  I don't know.
4
5    QUESTIONS BY MR. TISI:
6        Q.    You don't know --
7        A.    I don't know if these are all
8    peer-reviewed journals.
9        Q.    All right.  Let's talk about
10   dose response.  That's the -- one of the Hill
11   aspects, and you spent some time talking
12   about that.  And you discuss it on page 32 of
13   your report.
14       Do you see that, sir?
15       A.    I do see where I talk about
16   dose response in my report.
17       Q.    And you claim on page 45 when
18   you're criticizing plaintiffs' experts that
19   plaintiffs' experts claim there was dose
20   response when none exists, right?
21       MR. LOCKE:  Objection.
22   QUESTIONS BY MR. TISI:
23       Q.    It's on page 45.
24       A.    I thought we were on page 32.
25       Q.    I said, you talk about your

Page 431

1    opinions on lack of dose response, and you
2    criticize plaintiffs' experts who claim there
3    is dose response when none exist.
4        A.    So on page 32, they're not my
5    opinions; that's what's found in the medical
6    literature.
7        Q.    I got it.  I hear you, Doctor.
8        I'm saying your two parts of
9    your discussion, you point out dose response
10   on page 32, and that's your interpretation of
11   the studies, and your criticisms of the
12   plaintiffs' experts appear on page 45.
13       MS. MILLER:  Objection.
14       THE WITNESS:  On page 45, I
15   talk about where there is no dose
16   response, and that would be my
17   opinion.
18   QUESTIONS BY MR. TISI:
19       Q.    Right.  And that plaintiffs are
20   just flat out wrong, plaintiffs' experts?
21       MR. LOCKE:  Objection.
22       THE WITNESS:  I didn't say --
23   I'm not saying plain out, flat out
24   wrong.  What I'm saying is, my
25   opinion, based on the medical

Page 432

1    literature out there and based on the
2    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,
3    13, 14, 15, 16, 17 articles that may
4    have -- sorry -- yeah, about that.  I
5    mean, I haven't tallied them up, but a
6    bunch have attempted to look at dose
7    response, and that dose response is
8    just not there.
9    QUESTIONS BY MR. TISI:
10       Q.    First of all, is dose response
11   required for Bradford Hill?
12       MS. MILLER:  Objection.
13       THE WITNESS:  Again, if we --
14   if we go back to Bradford Hill,
15   Bradford Hill has considerations, and
16   those nine considerations oftentimes
17   run into each other.
18       Does one or another outweigh
19   the other?  They're usually used in
20   combination.
21   QUESTIONS BY MR. TISI:
22       Q.    Okay.
23       A.    Is one of them required and an
24   absolute?  They're considerations that in --
25   used in combination can help provide

Page 433

1    information on the causal pathway.
2        Q.    And it is often true with
3    exposures as opposed to drugs that it is
4    difficult to measure exposure, true?
5        We talked about smoking.  We
6    talked about asbestos.  We've talked about
7    pollution.  We've talked about benzene.
8    We've talked about all different kinds of
9    exposure.
10       It is often difficult to know
11   exactly how much a person gets, true?
12       MS. MILLER:  Objection.
13       THE WITNESS:  It depends.  I
14   mean, that's a very general statement.
15   I think if we're -- if you have an
16   accurate way of measuring something,
17   then it's easier.  If you don't,
18   then --
19   QUESTIONS BY MR. TISI:
20       Q.    Let's take cigarettes.
21       A.    -- it's more difficult.
22       Q.    Let's take cigarettes.  We use
23   pack years, right?
24       A.    Cigarettes?  Pack years would
25   be one estimate of the frequency and

109 (Pages 430 to 433)

Christian Merlo, M.D., MPH

Page 434

1    duration --
2        Q.    But you don't know how much --
3        A.    -- of exposure.
4        Q.    You don't know how much a
5    person actually gets, how much they actually
6    take into their lungs, whether they complete
7    the whole cigarette, whether they go halfway
8    and then put it out, whether they just puff
9    on it.  You don't really know how much they
10   actually get, right?
11           MS. MILLER:  Objection.
12           MR. LOCKE:  Objection.
13           THE WITNESS:  Actually, I
14       haven't reviewed the literature on
15       this, and there may be studies out
16       there that I'm just not aware of.  And
17       there may be studies that have looked
18       at how much deposition goes into the
19       lungs.
20           We have studies looking at
21       inhalational antibiotics, and we've
22       studied actually how much gets into
23       the lungs.  I'd have to read
24       literature on --
25

Page 435

1    QUESTIONS BY MR. TISI:
2        Q.    Well, those would be clinical
3    trials, would they not be?  Because you could
4    measure that because you're in a controlled
5    environment, right?
6        A.    I'm not sure what you're
7    asking.
8        Q.    What I'm saying is, when you're
9    doing an occupational exposure like this, it
10   is oftentimes difficult to measure dose --
11           MS. MILLER:  Objection.
12   QUESTIONS BY MR. TISI:
13       Q.    -- as a general matter?
14           MS. MILLER:  Objection.
15   QUESTIONS BY MR. TISI:
16       Q.    I mean, I think it's a point
17   Dr. Diette made.  We sat with Dr. Diette last
18   week.  He said it's very difficult to measure
19   dose.
20           MS. MILLER:  Objection.
21           MR. LOCKE:  Objection.
22           THE WITNESS:  Can you ask me
23       that question again?
24   QUESTIONS BY MR. TISI:
25       Q.    Yes.

Page 436

1            Is it difficult to measure dose
2    with exposures like this that are not drugs,
3    for example?
4            MS. MILLER:  Objection.
5            THE WITNESS:  And I'll say it
6        depends.  If there is a reliable
7        measure of -- if there's a reliable
8        method of measuring something --
9        because we're talking in generalities.
10       If there's a reliable measure, then
11       it's easier.
12   QUESTIONS BY MR. TISI:
13       Q.    What's the best way to measure
14   talc exposure?
15           MS. MILLER:  Objection.
16           THE WITNESS:  Measuring talc
17       exposure is -- would be very difficult
18       to measure because of many, many
19       factors.
20   QUESTIONS BY MR. TISI:
21       Q.    Okay.  And have you seen where
22   articles attempted to figure out a way to do
23   that?
24           MS. MILLER:  Objection.
25           THE WITNESS:  What kind of

Page 437

1    articles are you referring to?
2    QUESTIONS BY MR. TISI:
3        Q.    The epidemiology studies, never
4    versus ever, breaking it down by weeks, days,
5    months, years, et cetera.
6            Have you seen those kinds of --
7    those kinds of attempts?
8            MR. LOCKE:  Objection.
9            THE WITNESS:  So there are --
10       there have been articles that have
11       attempted to look at frequency of
12       duration and those sorts of things,
13       but I think we need to step back a
14       little bit because what I'm talking
15       about is it's -- it's not a
16       medication.  There are no pharmacy
17       records.  There's no dosing.  I have
18       no idea -- and I don't think anyone
19       can tell what -- how much comes out if
20       someone's pouring talc on a sanitary
21       napkin or underwear or placing talc in
22       the perineal area.  There's no way to
23       know.  And there's no article in the
24       medical literature that looks at that
25       as a measure of exposure.

110 (Pages 434 to 437)

Christian Merlo, M.D., MPH

Page 438

1    And that's actually more
2 important than frequency and duration
3 because we have no idea what even goes
4 into that frequency and duration.
5    (Merlo Exhibit 30 marked for
6 identification.)
7 QUESTIONS BY MR. TISI:
8    Q.   I'm going to show you what I
9 have marked as Exhibit Number 30, which is an
10 meta-analysis by Taher.  It's not been
11 published yet, but it is the draft that we
12 have that's been commissioned by Health
13 Canada.
14    You've seen this before, right?
15    A.   I've seen Taher.  I'm not aware
16 that it's commissioned by Health Canada.
17    Q.   I'll represent to you that it
18 is.
19    When did you see this study for
20 the first time?
21    A.   I don't recall.  Sometime after
22 December.
23    Q.   So if you look at -- if you
24 look at the conclusion on the one that says
25 page 49 on the bottom, P2.00344.9, it says,

Page 439

1 source of funding.  "This work was supported
2 by Health Canada."
3    Do you see that?
4    A.   I do.  "This work was supported
5 by Health Canada."
6    Q.   Do you think Health Canada is
7 involved with this litigation?
8    MR. LOCKE:  Objection.
9    THE WITNESS:  Again, I told you
10 I don't know anything about Health
11 Canada.
12 QUESTIONS BY MR. TISI:
13    Q.   Do you think that this --
14    MR. TISI:  You want to talk
15 about inappropriate, that was totally
16 inappropriate, that laughter.
17    MS. SHARKO:  Given this --
18 given the way your experts are having
19 this big ex parte communication with
20 Health Canada, I don't think so,
21 Mr. Tisi.
22    MR. TISI:  Given the way --
23 given the way -- given the way -- wait
24 a second.
25    MS. PARFITT:  Chris, let's go

Page 440

1 off the record for this.
2    MR. TISI:  Given the way your
3 experts have filed things with Health
4 Canada, with Dr. Nicholson, not
5 identifying who she was when she was
6 writing for the Cosmetic Association
7 of Canada, I don't think you get to
8 talk.
9    MS. SHARKO:  I think your
10 comments are totally off base.  You
11 asked me why we laughed.
12    MR. TISI:  It's not even
13 appropriate to laugh.  Even if you
14 thought it was funny, it's not
15 appropriate.
16 QUESTIONS BY MR. TISI:
17    Q.   Doctor --
18    MS. SHARKO:  Well, then don't
19 make the obnoxious comments.
20    MR. TISI:  You don't think
21 laughing is obnoxious?
22 QUESTIONS BY MR. TISI:
23    Q.   On page 26, the summary of
24 evidence on biologic gradient exposure
25 response.

Page 441

1    A.   26?
2    Q.   There's a chart.
3    A.   I see it.
4    Q.   Okay?  It discusses -- it
5 summarizes the evidence on biologic gradient.
6 It says, "About half of the epidemiologic
7 studies assessed only one level of talc
8 exposure, ever versus never usage."
9    Is that correct?
10    MR. LOCKE:  Objection.
11    MS. MILLER:  Objection.
12    Are you asking --
13    MR. TISI:  I'm asking what I'm
14 asking.
15    MS. MILLER:  -- whether you
16 read it correctly?
17    MR. TISI:  No.  I'm asking is
18 that correct.
19 QUESTIONS BY MR. TISI:
20    Q.   "About half of the epidemiology
21 studies assessed only one level of talc
22 usage, ever versus never."
23    MR. LOCKE:  Objection.
24    THE WITNESS:  You know, I would
25 have -- I don't have these things

111 (Pages 438 to 441)

Christian Merlo, M.D., MPH

Page 442

1    memorized. I'm going to have to go
2    back to each individual article and
3    look to see if it's about half.
4    That's not something that I have
5    memorized.
6          I know that I did look into the
7    different exposure categories or the
8    different levels of exposure in each
9    study, but I didn't lump those into
10   that kind of broad category.
11   QUESTIONS BY MR. TISI:
12       Q.   The next one says, "Of the 12
13   studies reporting a positive association, six
14   studies found a significant exposure response
15   trend, particularly with medium and high
16   frequency usage groups. Regarding duration
17   of use, exposure to talc, several studies
18   reported the greatest risk in 20-plus years
19   of exposure group followed by 10 to 20 years
20   group, then less than 10 years group."
21          Do you see that?
22       A.   I do see that statement.
23       Q.   Now, Bradford Hill doesn't
24   require proof of dose response. It just says
25   if there is evidence of it, that's supportive

Page 443

1    of causation, correct?
2          MR. LOCKE:  Objection.
3          THE WITNESS:  Well, I'm going
4    to have to --
5    QUESTIONS BY MR. TISI:
6       Q.   Let's get it.
7       A.    -- refer back to Bradford Hill
8    and see what he says.
9       Q.   Let's see what he says.
10   Exhibit Number 14.
11          It's on page 10.
12       A.   Okay.
13       Q.   It says, "If" -- "Fifthly, if
14   the association is one which can reveal a
15   biologic gradient or a dose-response curve,
16   then we should look most carefully for such
17   evidence."
18          Do you see that?
19       A.   I do see that.
20       Q.   It doesn't say statistically
21   significant evidence, it doesn't say studies
22   which demonstrate it, does it?
23          MR. LOCKE:  Objection.
24          THE WITNESS:  It says that if
25   the association is one that can reveal

Page 444

1    a biologic gradient, then we should
2    look for it.
3    QUESTIONS BY MR. TISI:
4       Q.   Right.
5          And should look for evidence of
6    it?
7       A.   Look for such evidence.
8       Q.   Right.
9          And it goes -- down at the
10   bottom it says, "Often the difficulty is to
11   secure some satisfactory quantitative measure
12   of environment which will permit us to
13   explore dose response, but we should
14   invariably seek it."
15          Do you agree with that?
16          MS. MILLER:  Objection.
17          THE WITNESS:  Can you ask me
18   that again? I'm sorry.
19   QUESTIONS BY MR. TISI:
20       Q.   Yes.
21          It says, "Often the difficulty
22   in to secure some satisfactory quantitative
23   measure of environment which would permit us
24   to explore this dose response, but we should
25   invariably seek it."

Page 445

1       A.   That's correct.
2       Q.   All right. And so in trying to
3    seek the evidence, these authors, not
4    involved in litigation, found that there was
5    at least evidence of a dose response,
6    correct?
7          MR. LOCKE:  Objection.
8          THE WITNESS:  I'm going to have
9    to turn back to that page again and
10   look at it because I don't know the
11   exact words.
12          What page is that on again?
13   26?
14   QUESTIONS BY MR. TISI:
15       Q.   Yes. And I'll read it again,
16   Doctor.
17          "Of the 12 studies reporting a
18   positive association, six studies found
19   significant exposure response trends,
20   particularly with medium and high frequency
21   usage groups. Regarding duration of use,
22   exposure to talc, several studies reported
23   the greatest risk in the 20-plus years of
24   exposure group, followed by 10 to 20, then
25   less than 10 years."

Christian Merlo, M.D., MPH

Page 446

1      A.   So...
2           MR. LOCKE:  Is there a
3      question?
4           MR. TISI:  Yes.  That's the
5      section I was referring to.
6      QUESTIONS BY MR. TISI:
7      Q.   Isn't that what they found?
8      A.   That's what they say.
9           (Merlo Exhibit 46 marked for
10     identification.)
11     QUESTIONS BY MR. TISI:
12     Q.   Okay.  Let me show you Exhibit
13     Number 46, which is a compilation exhibit
14     that I pulled together, and I tabbed it for
15     you with the actual articles.  And you can
16     check my quotations from it.
17          MS. MILLER:  I'm going to
18     object to this exhibit, of course.
19          MR. TISI:  Of course you are.
20          MS. MILLER:  Because you once
21     again just pulled random sentences out
22     of studies --
23          MR. TISI:  Okay.
24          MS. MILLER:  -- that do not
25     account for the entire body of

Page 447

1      statements within the studies.
2           MR. TISI:  Okay.
3      QUESTIONS BY MR. TISI:
4      Q.   Now, Doctor, if you look, I
5      have the Berge studies we talked about
6      before.  And you saw the statement, "The
7      meta-analysis results in a weak but
8      statistically significant association between
9      genital use of talc and ovarian cancer which
10     appears to be limited to serous with a
11     suggestion of dose response."
12          Is that correct?
13          MR. LOCKE:  Objection.
14     QUESTIONS BY MR. TISI:
15     Q.   Is that there in?  Can you
16     confirm that that's there?
17          MS. MILLER:  You just said --
18          MR. LOCKE:  Objection.
19          MS. MILLER:  That was so fast.
20          THE WITNESS:  Confirm where
21     what is where?
22     QUESTIONS BY MR. TISI:
23     Q.   Okay.  Number one says, "The
24     meta-analysis resulted in a weak but
25     statistically significant association between

Page 448

1      genital talc use and ovarian cancer, which
2      appears to be limited to serous carcinoma
3      with suggestion of dose response."
4           Is that --
5           MS. MILLER:  So you've got the
6      ellipses leaving out the "which
7      appears to be limited to serous
8      carcinoma"?
9           MR. TISI:  I'm reading it from
10     the study, Doctor.
11     QUESTIONS BY MR. TISI:
12     Q.   Am I reading that correctly, if
13     you look at it?
14          MR. LOCKE:  Objection.  Asked
15     and answered.
16          THE WITNESS:  You're reading
17     the abstract.
18     QUESTIONS BY MR. TISI:
19     Q.   Yes.  Is that correct.
20          I'm just asking you, Doctor,
21     whether it says that.
22     A.   And I said that's what it says
23     in the abstract, and I'm looking for where
24     that is actually represented in the -- in the
25     article.

Page 449

1      Q.   And in number 2 it says -- on
2      the Schildkraut study it has a quote, and
3      let's turn to the Schildkraut study.  And
4      that's number 2.  And if you go to page --
5      A.   But if I could just say,
6      because I did find this Table 3 right now,
7      looks at duration and frequency.
8      Q.   Uh-huh.
9      A.   And the number of risk
10     estimates are 12 and the relative risk 1.16,
11     with a 95 percent confidence interval, 1.07
12     to 1.26.  This is just dichotomized duration,
13     ten years.  This isn't -- that's not a dose
14     response.  That's yes or no.
15     Q.   Okay.
16     A.   Less than ten years or more
17     than ten years.
18     Q.   Okay.  Now --
19     A.   Frequency, one time a week.
20     That's not -- that's not a frequency.
21     That's -- that's a yes/no, and that's a
22     dichotomized -- so that's not a dose
23     response.
24     Q.   Okay.  Doctor, in the
25     Schildkraut study on number 2, does the

113 (Pages 446 to 449)

Christian Merlo, M.D., MPH

Page 450

1    Schildkraut author say on page -- and then if
2    you look at number 2, which is the second
3    article attached on page 1416, the second --
4    left-hand side, second to last paragraph,
5    second sentence, it says, "The dose response
6    observed for duration of genital powder use
7    provides further evidence of the relationship
8    between genital powder and overall EOC risk."
9           Do you see that?
10          MR. LOCKE:  Objection.
11   QUESTIONS BY MR. TISI:
12       Q.   I highlighted it for you to
13   make it easy.
14       A.   That's what is said in the --
15   in the paper; however, when you look at
16   Table 2, duration of use, again, it's
17   dichotomized into less than 20 years or
18   greater than 20 years.  So there's no full --
19   never use and genital use.
20          And then it's looked at
21   lifetime body powder applications.  Again,
22   dichotomized in above median, 3,600, or
23   below -- or above 3,600.
24          That's not a dose response.  A
25   dose response is multiple categories.  This

Page 451

1    is a dichotomy.  This is a yes or no.  Is it
2    more or less.  That's not a dose response.
3        Q.   Okay.  Doctor, that's what the
4    authors say that's in the published
5    peer-reviewed literature, correct?
6           MR. LOCKE:  Objection.
7           MS. MILLER:  Objection.
8           THE WITNESS:  I said that
9    that's what it said, but that's not
10   what dose --
11   QUESTIONS BY MR. TISI:
12       Q.   Okay.  So why are you going any
13   further than what I asked you?
14          MR. LOCKE:  Objection.
15          THE WITNESS:  Because that's
16   not what a dose response represents.
17   QUESTIONS BY MR. TISI:
18       Q.   All right.  Let's go to the
19   next one.  Let's go to the Cramer study,
20   which is number 3 and 4.  There's two
21   statements here.  One is on page 335, and
22   I've highlighted it.
23          Does it say an odds ratio of
24   1.49 was associated with more than 20 talc
25   years, greater than 7,200 applications, in a

Page 452

1    dose response?
2           Do you see that?
3           MR. LOCKE:  Objection.
4    QUESTIONS BY MR. TISI:
5        Q.   Does it not say that, Doctor?
6           Do you see where I'm at,
7    Doctor?
8        A.   I do.
9        Q.   Okay.  Does in not say that?
10       A.   It says, "An odds ratio of 1.49
11   was associated with more" -- and I'm sorry, I
12   had to skip a couple pages -- "than 20 talc
13   years, greater than 7,200 applications" --
14       Q.   And --
15       A.   -- "in a dose response."
16       Q.   And if you go to page --
17       A.   However, I would like to just
18   look at --
19       Q.   Your lawyer can ask you
20   questions.  I asked whether that's in the
21   published article.
22          The next is on page 345, in
23   summary.
24          Do you see that?
25          It says, "Overall, there's an

Page 453

1    association between genital talc use and EOC
2    in a significant trend with increasing talc
3    years' use."
4           MR. LOCKE:  Is there a
5    question?
6           MR. TISI:  Yes.  I said, is
7    that correct?
8           MS. MILLER:  Is what correct?
9           MR. LOCKE:  Objection.
10   QUESTIONS BY MR. TISI:
11       Q.   I said do you see it.  On
12   page 345, number 1 in the Cramer study, the
13   authors report in the peer-review literature:
14   "Overall, there is an association between
15   genital talc use and epithelial ovarian
16   cancer in a significant trend with increasing
17   talc years' of use."
18          Did I read that right?
19       A.   I see that written there.
20       Q.   And does it appear in the
21   peer-reviewed literature?
22          MS. MILLER:  Objection.
23          THE WITNESS:  Again, this is --
24   it's in the literature.
25

Christian Merlo, M.D., MPH

Page 454

1    QUESTIONS BY MR. TISI:
2        Q.    Okay.
3        A.    I can't comment on whether it
4    was peer-reviewed or not.
5        Q.    Okay.  And the next study,
6    which is the Terry study -- you've seen that
7    study before as well, Doctor?  That's
8    number 5?
9        A.    I have.
10       Q.    Okay.  All right.  Do you see
11   where -- the statement where it says -- I
12   highlighted it for you.  "The association
13   between genital powder exposure and ovarian
14   cancer may not be linear, and a modest
15   exposure may be sufficient to increase the
16   cancer risk."
17            Do you see that?
18       A.    I do see that.
19       Q.    Okay.  Next one is Wu.  That's
20   the one where I think you agree there was
21   evidence of dose response, correct?
22       A.    Well, the statement in the
23   Terry where it just says, "Alternatively, the
24   associate" -- that's not saying that there's
25   a dose response.  That's just stating

Page 455

1    something.
2        Q.    Okay.
3        A.    It says nothing about dose
4    response.
5        Q.    Next one is Wu, number 5.  I'm
6    sorry, number 6.
7        A.    Number 6.
8        Q.    Okay.  In the abstract, does it
9    not say, "Risk of ovarian cancer increased
10   significantly with increasing frequency and
11   duration of talc use"?
12       A.    So in Wu -- just trying to flip
13   through these.
14            Where'd you read that?
15       Q.    In the abstract.  It's
16   highlighted for you, Doctor.
17       A.    There's a lot going on here
18   really quickly, so I'm just trying my hardest
19   to read everything.
20            So in the abstract it says,
21   "Risk of ovarian cancer increased
22   significantly with increasing frequency and
23   duration of talc use."
24       Q.    And does it also say -- and I
25   highlighted it for you as well in the back --

Page 456

1    "However, only about half the studies
2    examined exposure response relationships, and
3    the evidence for this is less consistent.
4    Our study adds to the small group of studies
5    that have investigated a combination of
6    frequency and duration of use of ovarian
7    cancer -- on ovarian cancer."
8        A.    So I think -- I think in my
9    report I actually said that Wu, there's a
10   suggestion of a dose response, as well as
11   Cramer 2016, there is a suggestion of dose
12   response.
13            But all the cutoffs were not
14   statistically significant, so, you know --
15       Q.    But, of course -- but, of
16   course, we just agreed that Bradford Hill
17   doesn't require a statistically significant
18   result on dose response.  Just says it's good
19   if you have evidence of it.
20            MS. MILLER:  Objection.
21            MR. LOCKE:  Objection.
22            THE WITNESS:  I didn't agree to
23   that.  I think that I have to take
24   what this table tells me, and if there
25   is evidence of a dose response based

Page 457

1    on what the numbers look like and is
2    there a consistent increase in risk
3    with increasing duration and
4    frequency, and those numbers are
5    statistically significant, then that
6    would suggest a dose response.
7            However, if we look at the risk
8    estimates in Wu here, looking at
9    Table 2, looking at total number of
10   times, yeah, there is a -- there is a
11   suggestion that there is an increase
12   in risk estimate with increasing
13   number of talc uses, but those numbers
14   are not statistically significant.  So
15   they could all be the same or be
16   solely due to chance.
17            MR. TISI:  I'm going to take --
18            THE WITNESS:  So it depends.
19            MR. TISI:  Okay.  I want to
20   take a break.
21            VIDEOGRAPHER:  The time is
22   5:22 p.m.  We're going off the record.
23   (Off the record at 5:22 p.m.)
24            VIDEOGRAPHER:  The time is
25   5:36 p.m.  We're back on the record.

115 (Pages 454 to 457)

Christian Merlo, M.D., MPH

Page 458

1    QUESTIONS BY MR. TISI:
2        Q.    Doctor, can you go back to
3    Exhibit 32, which was the -- Chapter 2 out of
4    the Rothman textbook.
5        A.    I have it here.
6        Q.    If you can go to the section on
7    biologic gradient.
8            MS. MILLER:  Can you point us
9    to a page?
10           MR. TISI:  Yeah.  It's 28.
11           THE WITNESS:  28.
12           MS. MILLER:  Like where it says
13    out of 30?
14           MR. TISI:  You know, I don't
15    have my copy right there.  I'm just
16    using the book.
17           MS. MILLER:  Sorry.  There's
18    like different page numbers.
19           MR. TISI:  Yeah, if you just
20    give me -- it's the one that -- maybe
21    I will look at yours.  Thank you.
22           MS. MILLER:  Sure.
23    QUESTIONS BY MR. TISI:
24        Q.    It's page -- it's page 27 out
25    of 30.

Page 459

1        A.    I see it.
2        Q.    Okay.  Do you agree that not
3    all bio -- all dose-response relationships
4    are linear?
5            MS. MILLER:  Objection.
6            THE WITNESS:  There may be
7        dose-response relationships that could
8        be linear, there may be dose-response
9        relationships that may be exponential,
10        but in general, a dose response has an
11        increasing risk with increasing dose.
12    QUESTIONS BY MR. TISI:
13        Q.    Right.
14           But they could be like U-shaped
15    curves; they can be J-shaped curves; they
16    could be monotonic associations; they could
17    be all kinds of associations, right?
18           MS. MILLER:  Objection.
19           THE WITNESS:  So if we're
20        talking about curves, a curve can look
21        like anything.  It can be a straight
22        line.  It can be something that -- J
23        goes like a J shape, like you're
24        saying.  There could be a convex
25        curve.  There could be a concave

Page 460

1    curve.  But that -- but that's just
2    describing the curve.
3    QUESTIONS BY MR. TISI:
4        Q.    The last sentence of this says,
5    "The issues imply the -- existence of a
6    monotonic association is neither necessary
7    nor sufficient for causal relation."
8            Is that true or not true?
9        A.    And I would just have to look
10    up to see what monotonic is being defined as.
11        Q.    So you don't have any
12    understanding what the word "monotonic"
13    means?
14           MS. MILLER:  Objection.
15           THE WITNESS:  Well, I have an
16        understanding, but I need to know what
17        monotonic is being referred to as
18        here.
19    QUESTIONS BY MR. TISI:
20        Q.    Well, what do you -- how do you
21    define monotonic?
22           MS. MILLER:  Objection.
23           THE WITNESS:  Usually monotonic
24        means that there is an increasing risk
25        with increasing dose, or a decreasing

Page 461

1    risk with decreasing dose.
2    QUESTIONS BY MR. TISI:
3        Q.    Okay.  Let's just use your
4    definition.
5            Is the monotonic association
6    either necessary or sufficient for causal
7    relationship?
8        A.    Can you ask that again?
9        Q.    Yeah.
10           I'm referring to the sentence
11    that -- and Dr. Rothman says, "These issues
12    imply that the existence of a monotonic
13    association is neither necessary nor
14    sufficient for causal relation."
15           Is that true or not true using
16    your definition of monotonic?
17        A.    Well, if we go back to the
18    original Bradford Hill considerations,
19    biologic gradient is only one of the
20    considerations.  And if we're talking about a
21    causal relationship, we need to consider the
22    other considerations as well.
23        Q.    But, Doctor, that's not my
24    question.  Okay?
25           So my question is -- I'm

116  (Pages 458 to 461)

Christian Merlo, M.D., MPH

Page 462

1   focused now on biologic gradient or dose
2   response.
3            Would you agree with
4   Dr. Rothman that a monotonic association,
5   meaning increasing dose with increasing
6   duration -- with increasing risk, is neither
7   necessary nor sufficient for causal relation?
8            MS. MILLER: Objection.
9            THE WITNESS: And again, I'm
10   going to have to go back to what I
11   just said because I'm not sure what
12   Dr. Rothman is referring to here.
13            Is it just specifically for
14   biologic gradient --
15   QUESTIONS BY MR. TISI:
16       Q.   Yeah.
17       A.   -- or is it -- well --
18       Q.   Let's assume that's what he's
19   saying, because I want to know if, on its
20   own, a -- on its own, is it necessary to have
21   a increasing risk with increasing dose --
22            MS. MILLER: Objection.
23   QUESTIONS BY MR. TISI:
24       Q.   -- to show causation?
25            MS. MILLER: Objection.

Page 463

1            THE WITNESS: Again, I will go
2   back to the Bradford Hill
3   considerations, and that of the nine
4   considerations, none of them or all of
5   them could support causation.
6   QUESTIONS BY MR. TISI:
7       Q.   Okay.
8       A.   I'm not going to say none of
9   them, but all of them could support
10   causation.
11            Does one factor -- does one
12   factor weigh in more than another factor?
13   Not necessarily.
14            And this sentence can't be
15   taken out of context in the -- from the
16   Bradford Hill considerations.
17       Q.   I hear you, Doctor, but I'm
18   going to ask you to listen to my question.
19            Is it necessary to have a dose
20   response to find causation?
21            You said before that it was
22   necessary to have a consistent association, I
23   think a clear association -- that was your
24   testimony before -- to even get to Bradford
25   Hill.

Page 464

1            Remember that?
2            MR. LOCKE: Objection.
3            THE WITNESS: We would have to
4   refer back to what -- what I said.
5   QUESTIONS BY MR. TISI:
6       Q.   Okay.
7       A.   I don't recall specifically my
8   language.
9       Q.   Is it necessary to have a
10   dose-response relationship in order to show
11   causation? Is that a required element?
12       A.   I think what I said earlier is
13   that of the nine Bradford Hill
14   considerations, none of them are required.
15       Q.   Okay.
16       A.   They're helpful in making an --
17   in making -- in putting together an
18   evaluation looking at causality.
19       Q.   Is Dr. Rothman's statement here
20   wrong?
21            MS. MILLER: Objection.
22   QUESTIONS BY MR. TISI:
23       Q.   Is the existence of a monotonic
24   association -- he says, "The existence of a
25   monotonic association is neither necessary

Page 465

1   nor sufficient for causal relations."
2            Is that wrong?
3            MS. MILLER: Objection.
4            THE WITNESS: I'm going to say
5   it depends. If you have nine other --
6   or eight other factors that suggest
7   causation and there's -- and a
8   biologic gradient doesn't exist
9   because you haven't tested for it or
10   it's just isn't showing that, you have
11   to consider the other factors.
12            If biologic gradient is the
13   only thing, and we're not seeing
14   strength of association and
15   consistency, then it becomes difficult
16   to rely on that -- just the biologic
17   gradient. So I'm just going to say it
18   depends.
19   QUESTIONS BY MR. TISI:
20       Q.   Okay. So if you go to the
21   Penninkilampi study back -- I forget which
22   exhibit it was. But if you can pull that out
23   if you can find it, sir.
24       A.   Sure.
25            MR. TISI: Do you know what

117 (Pages 462 to 465)

Christian Merlo, M.D., MPH

Page 466

1    exhibit it was?
2    QUESTIONS BY MR. TISI:
3        Q.   21, please.
4        A.   21.  Got it.
5        Q.   You were critical of that study
6    because Penninkilampi included Gertig but not
7    Gates.
8            Do you recall that?
9            MS. MILLER:  Objection.
10           THE WITNESS:  I did make
11       reference that Gertig was included in
12       this meta-analysis and Gates was not,
13       which is a more recent publication
14       with greater numbers.
15   QUESTIONS BY MR. TISI:
16       Q.   Which Gates did you mean?
17   Which Gates study did you mean should have
18   been included that wasn't?
19       A.   I'll just need to look up the
20   specific one in my report.  Gates 2010.
21       Q.   Okay.  What was the talc
22   exposure metric in Gates 2010?
23       A.   If I could see the article, I
24   could...
25       Q.   Is it in your report?

Page 467

1        A.   I could point to it.
2        Q.   Is it in your report?
3        A.   No, but I know that it was --
4    but I would have to see the article because I
5    don't specifically remember what the
6    actual -- I don't want to be mistaken right
7    now.
8        Q.   Well, Penninkilampi used an
9    ever use of talc, correct, as its metric?
10       A.   I mean, Table 1 in
11   Penninkilampi summarizes the different
12   outcomes in the methods of talc use.
13       Q.   Right.
14       A.   There's any perineal, there's
15   non-perineal, there's diaphragm, and there's
16   sanitary napkins.
17       Q.   Well, if you look at
18   Penninkilampi under Figure 2 -- on the study
19   name.  Under Figure 2 it says "any perineal
20   talc use."
21           Do you see?
22       A.   I do see that.
23       Q.   Okay.  Do you know what the
24   metric was in Gates?
25           MS. MILLER:  I believe you

Page 468

1    asked that question.
2    QUESTIONS BY MR. TISI:
3        Q.   Could that have been --
4            MR. TISI:  Counsel, I'm not
5    even done, okay?
6            MS. MILLER:  It sounded like a
7    question.
8            MR. TISI:  I'm not done.
9            MS. MILLER:  Apologies.
10   QUESTIONS BY MR. TISI:
11       Q.   In the Gates -- in the Gates
12   study, do you know that talc use metric was
13   great or equal to one week versus less --
14   versus less than one time a week?
15           MS. MILLER:  Objection.
16           THE WITNESS:  I'd love to look
17       at it.
18   QUESTIONS BY MR. TISI:
19       Q.   I'm happy to show it.  I'm
20   happy to show it to you.  It's my copy, so
21   you can't have it.  But it's in Table 4, and
22   this is Gates 2010.
23       A.   So Table 4 says, talc use,
24   greater than once a week versus less than
25   once a week.

Page 469

1        Q.   Right.
2            So it's a different metric, is
3    it not?
4        A.   It may or may not be a
5    different metric because there is a previous
6    publication where the authors felt that this
7    was a more reliable measure of exposure of
8    ever versus never.
9        Q.   The point is, Doctor, you were
10   critical of Penninkilampi as to why they
11   didn't include Gates 2010.  And I'm asking
12   you:  Would that be good reason not to
13   include Gates 2010, because it used a
14   different metric of exposure?
15           MS. MILLER:  Objection.  Calls
16       for speculation.
17           THE WITNESS:  No, not
18       necessarily, because the authors felt
19       that this -- that this metric was
20       actually a more reliable metric of
21       ever versus never.
22   QUESTIONS BY MR. TISI:
23       Q.   Okay.  In the Gertig study,
24   they use ever versus ever talc use.  You
25           MS. MILLER:  Objection.  You

118 (Pages 466 to 469)

Christian Merlo, M.D., MPH

Page 470

1     said ever versus ever.
2     QUESTIONS BY MR. TISI:
3         Q.    They used ever use.
4             Gates -- Gertig used ever
5     versus never, correct?
6         A.    Gertig?  Again, I don't have
7     these memorized, so I'm going to have to look
8     at it to see what we're referring to.
9         Q.    But the big question is you
10    don't -- you can't sit here today and tell me
11    why it is that Penninkilampi did not use
12    Gates 2010, can you?
13            It's not in your report, and
14    you can't tell me this case?
15            MS. MILLER:  Objection.  Asked
16    and answered.
17            THE WITNESS:  The description
18    of the -- of the pulling of articles
19    for the meta-analysis is described.
20    The replication of that would have to
21    be performed to answer that question.
22    QUESTIONS BY MR. TISI:
23        Q.    And you didn't do that, did
24    you?
25        A.    For me to -- for me to perform

Page 471

1     my own meta-analysis by myself would be out
2     of the scope of even performing an analysis
3     per -- a meta-analysis correctly.
4         Q.    Doctor --
5         A.    I'm going to need a team to do
6     that.
7         Q.    Okay.  We started our day today
8     talking about publication and, you know,
9     opinions inside and outside litigation and
10    all those questions.
11            Let me ask you this:  You spent
12    seven hours with me today.  You wrote your
13    report.  You've been through this process.
14            Do you intend to publish your
15    views on ovarian cancer and talc?
16        A.    I have no idea what I'm going
17    to do in the future.  I -- I am a -- I have
18    an active research career in cystic fibrosis
19    and lung transplantation.
20            If the opportunity arose where
21    there was something to publish and seemed
22    interesting, fine, but I can't predict that.
23        Q.    Well, you're also pretty busy
24    in litigation.  You do four, five cases a
25    year.  You do speakers bureaus.  You do all

Page 472

1     kinds of stuff.  You find time for those.
2             My question to you is:  Would
3     you find time do this, to submit your point
4     of view to peer review?
5             MS. MILLER:  Objection.
6             THE WITNESS:  Again, I'm going
7     to have to answer it the same -- the
8     same way, that if an opportunity arose
9     and it seemed like an interesting
10    investigation --
11    QUESTIONS BY MR. TISI:
12        Q.    Is it an interesting
13    investigation to you, or is this just
14    something you did for this case?
15            MS. MILLER:  Objection.
16            THE WITNESS:  This has -- this
17    has been a very interesting exercise
18    in evaluating epidemiology.
19    QUESTIONS BY MR. TISI:
20        Q.    And so now having been through
21    the process, do you intend to subject your
22    opinions, particularly the ones where you
23    were very strong in your criticism of those
24    who have published and have put themselves
25    out there, subject your opinions to peer

Page 473

1     review?
2             MR. LOCKE:  Objection.
3             THE WITNESS:  Well --
4     QUESTIONS BY MR. TISI:
5         Q.    Dr. Siemiatycki has put himself
6     out there and submitted himself --
7             MS. MILLER:  He started
8     answering the question --
9     QUESTIONS BY MR. TISI:
10        Q.    Well, let me ask you this.
11            MS. MILLER:  -- and you
12    interrupted him.  Can we just end the
13    day with question, answer, question,
14    answer?
15    QUESTIONS BY MR. TISI:
16        Q.    Okay.  Dr. Siemiatycki
17    published in this, correct?
18            MS. MILLER:  Objection.
19            THE WITNESS:  I'm going to have
20    to look through what's been published
21    by Dr. Siemiatycki.
22    QUESTIONS BY MR. TISI:
23        Q.    Okay.  Dr. McTiernan went
24    before Congress and gave her testimony,
25    correct?

Christian Merlo, M.D., MPH

Page 474

1      MR. LOCKE:  Objection.
2      THE WITNESS:  Again, I told you
3   I didn't know about that.
4   QUESTIONS BY MR. TISI:
5      Q.   Dr. Smith-Bindman said she's
6   going to submit her meta-analysis to
7   publication.
8      Do you remember seeing that?
9      A.   You'd have to show me where she
10  said that.
11     Q.   Dr. Moorman was a coauthor on
12  the Schildkraut study, correct?
13     A.   I'd have to look back through
14  the list of authors to confirm or not
15  confirm.
16     Q.   Some of them wrote Health
17  Canada, as counsel pointed out, to express
18  their point of views on this in the comment
19  period, correct?
20     A.   I have no idea.
21     Q.   Do you have any intention, now
22  having been through this process, as you sit
23  here today, to submit your criticisms and
24  your opinions to the criticisms of your
25  fellow peers?

Page 475

1      MS. MILLER:  Objection.
2      THE WITNESS:  Submit where?
3   QUESTIONS BY MR. TISI:
4      Q.   Anywhere.  Congress, medical
5   meetings, regulatory authorities,
6   publications, peer review, your colleagues,
7   anywhere.
8      MS. MILLER:  Objection.
9      THE WITNESS:  And I'll just
10  have to say I have no idea.
11  QUESTIONS BY MR. TISI:
12     Q.   Okay.
13     A.   There's a possibility that
14  something may arise in the future and I may
15  take up that opportunity.  And I don't know
16  today.
17     Q.   Have you gone -- have you gone
18  to your oncology department here -- you have
19  an oncology department here at -- or a
20  gynecology department here at Hopkins?
21     A.   We do have a --
22     Q.   Gynecology?
23     A.   -- a gynecology department.
24     Q.   Okay.  If a gynecology
25  department asked you, do you think we should

Page 476

1   tell our patients to stop using talcum
2   powder, what would you tell them?
3      MS. MILLER:  Objection.
4      THE WITNESS:  Again, I -- I'd
5   say it depends.  If you're talking
6   about based on the medical evidence
7   out there, there's no evidence to
8   suggest that -- and if we're
9   specifically talking about risk of
10  ovarian cancer --
11  QUESTIONS BY MR. TISI:
12     Q.   Yes.
13     A.   -- there's no evidence to
14  suggest a causal relationship between talcum
15  powder and ovarian cancer.
16     Q.   No evidence whatsoever?
17     A.   Based on the body of medical
18  literature, no, there is not evidence --
19     Q.   And so you would --
20     A.   -- but there is a --
21     Q.   You would tell them --
22     MS. MILLER:  He's in a middle
23  of a sentence.
24     THE WITNESS:  So what I said is
25  it would depend.  If we're talking

Page 477

1   about the medical literature, that
2   would be my response, that -- that
3   that causal relationship does not
4   exist based on the evidence.
5      But if a doctor is asking -- if
6   a gynecologist is asking me whether or
7   not talcum powder should be used for a
8   specific patient, it's going to be
9   dependent on that specific patient.
10  There might be a wound in there.
11  There might be some other reason --
12  QUESTIONS BY MR. TISI:
13     Q.   I'm not asking that.
14     A.   Well, that's --
15     Q.   I'm not asking that.  I'm
16  asking --
17     A.   But that's what I'm saying.
18  You asked me if I would recommend, and so
19  I'll telling you that it depends.  It
20  depends.
21     Q.   If a gynecologist came to you
22  and said, "Doctor, you're an epidemiologist,
23  I have women who are asking me whether or not
24  I should -- they hear what's on the radio,
25  they hear what's on television.  They're

Page 478

1    aware of a potential link that's been
2    discussed out there.  Should I tell my women
3    to stop or should I tell them to continue
4    using it?" what would you tell them?
5    Continue using it?
6            MS. MILLER:  Objection, vague,
7        and objection, asked and answered.
8            THE WITNESS:  So I would ask
9        why, and it would be dependent on the
10       answer to why.
11   QUESTIONS BY MR. TISI:
12       Q.   If they said because there's a
13   concern that they might put myself at
14   increased risk of ovarian cancer?
15           MS. MILLER:  Objection.  This
16       was asked and answered.
17   QUESTIONS BY MR. TISI:
18       Q.   If they said -- if they said
19   that was the reason why, what would you
20   answer -- would you respond to them?
21       A.   I would say, based on the body
22   of medical evidence, there is no causal
23   association between talcum powder and ovarian
24   cancer.
25       Q.   Okay.  So you'd tell them, keep

Page 479

1    dusting?
2            MS. MILLER:  Objection.
3            THE WITNESS:  I didn't say
4        that.  I said based on the body of
5        medical evidence, there is no
6        association, causal association,
7        between talcum powder and ovarian
8        cancer.
9            There may be other reasons that
10       that gynecologist would or would not
11       recommend using talcum powder.
12           MR. TISI:  Doctor, I appreciate
13       your time today.  I have no further
14       questions.
15           Anything else?  Do you have any
16       questions?
17           MS. MILLER:  We're discussing
18       it.  I just have two questions.
19           CROSS-EXAMINATION
20   QUESTIONS BY MS. MILLER:
21       Q.   Can you go back to Exhibit 31?
22       A.   31.
23       Q.   Okay.  Can you turn to --
24           MR. TISI:  Can you wait until I
25       get my copy, Counsel?

Page 480

1            MS. MILLER:  Of course.
2            MR. TISI:  Can you find --
3        would you pull them over...
4    QUESTIONS BY MS. MILLER:
5        Q.   We're going to be looking at
6    page 11.
7            MR. TISI:  I'm sorry, he just
8        started putting them away.
9            MS. MILLER:  It's
10       understandable.  I think everybody
11       wants to get home for the weekend.
12   QUESTIONS BY MS. MILLER:
13       Q.   I'm looking at the bottom of
14   page -- of page 11 in Exhibit 31.
15           Do you recall Exhibit 31 was
16   shown to you earlier today?
17       A.   I do.
18       Q.   And this is a document from the
19   National Cancer Institute; is that correct?
20       A.   That's what it appears to be.
21       Q.   The title is "Ovarian,
22   Fallopian Tube and Primary Peritoneal Cancer
23   Prevention," correct?
24       A.   Correct.
25       Q.   There's a section on page 11

Page 481

1    titled "Perineal Talc Exposure."
2            Do you see that?
3            MR. TISI:  It's on page 11?  I
4        don't see it on page 11.
5            MS. MILLER:  Page 11 of 17.
6    QUESTIONS BY MS. MILLER:
7        Q.   Do you see that section?
8            MR. TISI:  No, I don't,
9        actually.  Can you show me?
10           THE WITNESS:  I do.
11           MR. TISI:  I see oophorectomy
12       on page 11.
13           MS. MILLER:  You've got --
14       you've got a different version than
15       the one you used as an exhibit.  It's
16       on page 11 of the one you used as an
17       exhibit.
18           MR. TISI:  Okay.  I'll have to
19       argue this when we're done.
20   QUESTIONS BY MS. MILLER:
21       Q.   Did counsel direct you to this
22   section of the exhibit when he was
23   questioning you about it?
24           MR. TISI:  Objection to form.
25           THE WITNESS:  Not that I

Christian Merlo, M.D., MPH

Page 482

1    recall.
2    QUESTIONS BY MS. MILLER:
3        Q.   Did you see this section when
4    you were asked questions about this document?
5            MR. TISI:  Objection to form.
6            THE WITNESS:  Not that I
7    recall.
8    QUESTIONS BY MS. MILLER:
9        Q.   Can you read the first sentence
10   under Perineal Talc Exposure?
11       A.   Sure.
12           "The weight of evidence does
13   not support an association between perineal
14   talc exposure and an increased risk of
15   ovarian cancer."
16       Q.   Can you read the second
17   sentence?
18       A.   "Results from case control and
19   cohort studies are inconsistent."
20           MS. MILLER:  I have no further
21   questions at this time.
22           MR. TISI:  May have it, please?
23           MS. MILLER:  Well, don't take
24   his because --
25           MR. TISI:  Well, okay, can I

Page 483

1    have -- may I have yours then?
2            MS. MILLER:  Well, mine is
3    marked.
4            MR. TISI:  Okay.  Well, I --
5            MS. MILLER:  You don't have it?
6            MR. TISI:  I don't.  I have the
7    different copy.
8            MS. MILLER:  If you give it to
9    me, I'll show you what page it is.
10           REDIRECT EXAMINATION
11   QUESTIONS BY MR. TISI:
12       Q.   All right.  So, Doctor, first
13   of all, you testified earlier you don't even
14   know who these authors are who did this,
15   correct?
16           MR. LOCKE:  Objection.
17   QUESTIONS BY MR. TISI:
18       Q.   Earlier?
19           MS. MILLER:  Objection.
20           THE WITNESS:  It looks like
21   this is from the National Cancer
22   Institute, but I don't know who put
23   this all together.
24   QUESTIONS BY MR. TISI:
25       Q.   So now in the perineal talc

Page 484

1    exposure it has footnotes 43, 44, 45 and 46.
2        Do you see that?
3        A.   Okay.
4        Q.   Do you see that?
5        A.   Yeah, I see 42 through 45, yes.
6        Q.   And if you go to the back of
7    the thing where they -- the back of this --
8    they only looked at four studies.
9            Do you see that?
10       A.   What are you referring to?
11       Q.   Well, the footnotes, they look
12   at 43, 44, 45 and 46.  They have four
13   references:  Huncharek, Terry, Gertig and
14   Houghton.
15           One is the Huncharek study
16   which in your footnote in your report you
17   indicated you agree that there are mistakes
18   in those, right?
19           MS. MILLER:  Objection.
20   QUESTIONS BY MR. TISI:
21       Q.   You looked at the report of
22   April Zambelli-Weiner, correct?
23       A.   I did look at that, yes.
24       Q.   Okay.  And you agree that there
25   were mistakes in that?

Page 485

1            MS. MILLER:  Objection.
2            THE WITNESS:  The numbers may
3    have been off, but the general gist of
4    the trend was still the same, meaning
5    the numbers didn't affect statistical
6    significance, as I recall.
7    QUESTIONS BY MR. TISI:
8        Q.   And this is not -- this
9    study -- studies four -- it has four
10   references.  You have some 30 --
11           MS. MILLER:  We're out of time.
12   QUESTIONS BY MR. TISI:
13       Q.   You have some 30 references.
14           Are you going to tell me that
15   they did a full causation analysis that you
16   did?
17           MS. MILLER:  Objection.  And
18   we're out of time.
19           MR. TISI:  You're not going to
20   let him answer that question?
21           MS. SHARKO:  He can answer that
22   one question.
23           MR. TISI:  Thank you.
24           THE WITNESS:  I don't know what
25   they did here.

122 (Pages 482 to 485)

Christian Merlo, M.D., MPH

Page 486

1          MR. TISI:  Thank you very much.
2     I appreciate it.
3          VIDEOGRAPHER:  Okay.  That's
4     it.
5          MS. MILLER:  Thank you.
6          VIDEOGRAPHER:  The time is
7     6:01 p.m., April 18, 2019.  Going off
8     the record, completing the videotaped
9     deposition.
10     (Deposition concluded at 6:01 p.m.)
11          – – – – – – –
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 488

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4     carefully and make any necessary corrections.
5     You should state the reason in the
6     appropriate space on the errata sheet for any
7     corrections that are made.
8          After doing so, please sign the
9     errata sheet and date it.  You are signing
10     same subject to the changes you have noted on
11     the errata sheet, which will be attached to
12     your deposition.
13          It is imperative that you return
14     the original errata sheet to the deposing
15     attorney within thirty (30) days of receipt
16     of the deposition transcript by you.  If you
17     fail to do so, the deposition transcript may
18     be deemed to be accurate and may be used in
19     court.
20
21
22
23
24
25

Page 487

1               CERTIFICATE
2
3          I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
4     Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
5     of the examination, Christian Merlo, MD, MPH
     was duly sworn by me to testify to the truth,
6     the whole truth and nothing but the truth.
7          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
8     testimony as taken stenographically by and
     before me at the time, place and on the date
9     hereinbefore set forth, to the best of my
     ability.
10
          I DO FURTHER CERTIFY that I am
11     neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12     action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13     that I am not financially interested in the
     action.
14
15
16
     _____
17     CARRIE A. CAMPBELL,
     NCRA Registered Diplomate Reporter
18     Certified Realtime Reporter
     Notary Public
19     Dated:  April 19, 2019
20
21
22
23
24
25

Page 489

1          ACKNOWLEDGMENT OF DEPONENT
2
3
4          I,_____, do
5     hereby certify that I have read the foregoing
     pages and that the same is a correct
6     transcription of the answers given by me to
     the questions therein propounded, except for
7     the corrections or changes in form or
     substance, if any, noted in the attached
8     Errata Sheet.
9
10
11
12     _____
     Christian Merlo, M.D., MPH          DATE
13
14
15     Subscribed and sworn to before me this
16     _____ day of _____, 20 _____.
17     My commission expires: _____
18
19     Notary Public
20
21
22
23
24
25

Christian Merlo, M.D., MPH

Page 490

```
1                _____
                  ERRATA
2                _____
3      PAGE   LINE  CHANGE/REASON
4      ____   ___  _____
5      ____   ___  _____
6      ____   ___  _____
7      ____   ___  _____
8      ____   ___  _____
9      ____   ___  _____
10     ____   ___  _____
11     ____   ___  _____
12     ____   ___  _____
13     ____   ___  _____
14     ____   ___  _____
15     ____   ___  _____
16     ____   ___  _____
17     ____   ___  _____
18     ____   ___  _____
19     ____   ___  _____
20     ____   ___  _____
21     ____   ___  _____
22     ____   ___  _____
23     ____   ___  _____
24     ____   ___  _____
25
```

Page 491

```
1                _____
               LAWYER'S NOTES
2                _____
3      PAGE   LINE
4      ____   ___  _____
5      ____   ___  _____
6      ____   ___  _____
7      ____   ___  _____
8      ____   ___  _____
9      ____   ___  _____
10     ____   ___  _____
11     ____   ___  _____
12     ____   ___  _____
13     ____   ___  _____
14     ____   ___  _____
15     ____   ___  _____
16     ____   ___  _____
17     ____   ___  _____
18     ____   ___  _____
19     ____   ___  _____
20     ____   ___  _____
21     ____   ___  _____
22     ____   ___  _____
23     ____   ___  _____
24     ____   ___  _____
25
```

Christian Merlo, M.D., MPH

Page 492

| | | | | |
|---|---|---|---|---|
| **A** | 123:21 335:5 | **addition** 87:9 | **advisor** 94:11,12 | 403:8,10,22 |
| **a.m** 1:16 10:8 | 336:1 433:16 | 110:23 | 94:16 95:16 | 408:22 415:24 |
| 93:23,25 94:2 | 488:18 | **additional** 84:19 | **advisors** 95:21 | 423:14 426:7 |
| **Abenhaim** 7:2 | **accurately** | 373:6 | 96:2,3 | 444:15 454:20 |
| 38:18 229:18 | 230:9 256:20 | **address** 101:12 | **aeruginosa** 59:9 | 456:22 459:2 |
| **ability** 487:9 | **accusations** | 106:15,17 | **affect** 163:14 | 462:3 484:17 |
| **able** 50:4 60:21 | 277:2 | 168:7 174:8,15 | 485:5 | 484:24 |
| 338:10 | **accusatory** | 181:25 182:2,3 | **affiliation** 71:9 | **agreed** 49:22 |
| **abnormal** 57:9 | 273:8 | 182:10,20 | **age** 11:4 196:1 | 146:8 291:21 |
| **absence** 317:7 | **accuse** 245:14 | 203:7 236:19 | 258:17 259:7 | 345:21 414:9 |
| 318:16,24 | 347:20 | 287:2,3 290:2 | 259:16 | 456:16 |
| **absolute** 335:2 | **accused** 243:6 | 290:7 293:15 | **Agency** 164:13 | **agreeing** 404:18 |
| 407:17 432:24 | 245:10 349:13 | 294:10,17,19 | **agent** 163:14 | 426:2 |
| **absolutely** 173:6 | 388:21 | 295:3 303:6,12 | **agents** 329:23 | **ahead** 35:13 |
| 206:22,24 | **accusing** 348:5 | 303:24 384:8 | 329:25 330:6 | 174:14 262:23 |
| 243:8 283:2,23 | 348:19 | 386:20 387:3,6 | **agnostic** 209:16 | 352:10 |
| 293:11 325:17 | **acetaminophen** | 387:20 389:13 | **ago** 54:5 104:15 | **Aid** 53:2,14 |
| 406:6,9 | 175:5,13 | **addressed** | 273:4 | **aimed** 30:24 |
| **abstract** 385:2 | **achieve** 133:25 | 182:16 304:4 | **agree** 40:5 45:12 | 31:6 |
| 385:16 448:17 | 136:5,22 | **addresses** | 46:3,11 51:8 | **aims** 176:14 |
| 448:23 455:8 | 139:11 | 274:25 364:14 | 62:3 75:12 | **air** 328:11 329:1 |
| 455:15,20 | **acknowledged** | **adds** 456:4 | 116:25 118:25 | **al** 6:10,18 7:2,6 |
| **Abstracts** 6:12 | 315:7 | **adequate** 263:14 | 132:15,20 | 7:10,13,17 8:8 |
| **acceptable** | **acknowledge...** | 310:12 | 146:14 147:8 | 8:11,22 151:13 |
| 224:7 225:3 | 115:2 | **adequately** | 147:16 162:13 | 315:7 365:11 |
| **acceptance** | **ACKNOWLE...** | 260:12 | 171:24 172:3 | 369:4,16 |
| 272:6 | 9:2 489:1 | **adhere** 297:20 | 194:4 198:22 | **Alexandria** 2:14 |
| **accepted** 115:9 | **acquire** 195:25 | **adjectives** | 202:4 205:4,19 | **allegation** 21:20 |
| 241:15 248:1 | **action** 176:22 | 144:19 | 205:22 215:18 | **allegations** 6:8 |
| 307:7,18 | 219:12 220:1 | **adjust** 236:12 | 216:10,16,19 | 119:7,8,10 |
| 308:25,25 | 222:20 487:12 | 255:11 414:5 | 221:6,11,24 | **allegedly** 125:14 |
| 309:20,21,22 | 487:13 | 416:5 | 222:15,22,25 | **Alternatively** |
| 312:6 315:12 | **active** 471:18 | **adjusted** 197:5 | 223:5 225:7,15 | 454:23 |
| 321:18 333:4 | **activity** 219:9,22 | **administer** | 227:5,15,19,23 | **amended** 173:17 |
| 343:12 354:14 | 222:17 | 10:25 | 228:7,7,10,11 | 385:4,4,5 |
| 354:15 | **actual** 31:20 | **administrative** | 228:16,17 | 390:5,6,8 |
| **accepts** 402:11 | 97:11 260:21 | 85:12 86:23 | 229:1 268:12 | 391:16 |
| 403:18 | 261:5 446:15 | **adult** 5:23 56:5 | 269:24 270:10 | **American** |
| **access** 412:21,24 | 467:6 | 56:9,24 58:5 | 275:3 288:12 | 281:19 366:8 |
| **account** 260:23 | **ad** 166:8,23 | 58:11 92:6 | 288:12,19,20 | 367:5 410:17 |
| 261:7 293:6,6 | **adamant** 416:20 | **adults** 59:3 | 292:5 315:3,15 | 412:4,8,10,16 |
| 446:25 | **add** 256:8 | **advanced** 92:2 | 318:25 324:23 | 412:17 |
| **accounted** | 319:17 383:1,1 | **adverse** 367:14 | 347:19 349:23 | **amount** 37:12 |
| 112:23 293:10 | 383:3 | 368:2,7 371:23 | 350:13 354:12 | 196:5 240:5 |
| **accurate** 84:2 | **added** 11:25 | 372:2,3 | 393:4 394:5 | 318:3,4 |
| 88:17 90:24 | 280:14,15,19 | **advice** 158:8 | 396:15 398:10 | **Amrhein** 8:17 |
| | 280:21 300:11 | **advised** 27:25 | 399:18 401:12 | **Analgesics** 8:9 |

analogous 181:23
analogy 45:6 181:18,20
analysis 28:13 29:11 30:19 35:25 63:19 95:2 109:16 112:23,24 157:16 171:15 174:19 177:18 178:20 179:22 179:23 187:21 193:13 232:7 236:11,13 245:6 246:3,21 277:5 292:8 299:25 300:1 309:7 341:1 387:21 389:14 422:9 423:7,11 471:2 485:15
analysts 63:18
analytic 224:2 224:16,23
analyze 304:9 304:19 416:5
analyzed 105:14 109:19 110:5 248:18 275:8 275:17
analyzing 196:23
ANDERTON 3:21
annual 302:15
anorexigen 234:13
anorexigens 37:2,7,13,19 38:6 39:22 43:6,18 44:9 230:2,13
answer 23:11 27:1 37:24 41:6 47:11 75:3 98:7

111:1,6 134:17 136:25 142:21 146:11 160:5 162:20 171:24 172:10,25 173:8 174:2 187:5 195:9 198:19 212:3,3 217:5 218:16 218:20 220:23 221:3 227:14 255:13 305:4 321:8 335:1,1 388:7 470:21 472:7 473:13 473:14 478:10 478:20 485:20 485:21
answered 40:11 41:25 51:14 52:3 137:9 138:11,14 149:25 153:9 157:6 185:19 193:20 198:17 212:12 226:24 228:19 237:23 246:10 304:3 448:15 470:16 478:7,16
answering 72:23 77:24 208:23 222:8 247:6 334:15,20 388:8 473:8
answers 222:7 489:5
antibiotic-resi... 59:5
antibiotics 434:21
anybody 152:13 153:4 154:12 195:1,9 348:5 400:22
anymore 92:22 242:14

apart 114:1
Apologies 468:9
apologize 24:22 66:9 331:18 353:2,17
appear 30:4,7 158:20 159:10 431:12 453:20
appearances 5:3 10:23
appeared 155:4 155:5
appears 202:16 324:21 385:10 385:25 398:20 400:1,11 405:4 447:10 448:2,7 480:20
Appendice 78:7
appetite 229:18
Appetite-Sup... 7:1
application 8:10 72:22 220:13 223:9,11 227:16 369:6 422:12
applications 423:8 450:21 451:25 452:13
applied 34:24 141:6,7,9,15 291:17 364:5
apply 30:13 32:9 35:14 36:19 48:3 50:13 110:25 143:5,6 145:6,8 175:17 182:21,22 198:24
applying 28:13 47:16 223:16
appointed 61:22 61:25 64:20
appointment 61:14 62:4 64:20 65:5

71:17,22,23
appreciate 29:5 77:25 227:9,13 234:7 352:6 353:22 479:12 486:2
approach 31:12 103:2,4 124:9 245:6 246:3,18 247:3,25 266:12 377:24
approached 153:10 160:2,2
appropriate 73:20,24 74:22 75:2 112:24 182:8 196:5 215:22 219:11 219:25 222:19 223:21 224:6 225:2 248:16 342:3 384:5,17 440:13,15 488:6
appropriately 248:17,18,19 400:13
approval 170:17 170:21
approximately 80:21 81:24 88:19 90:20,21 260:14 333:1
April 1:8 10:6 66:25 82:24 84:20 484:22 486:7 487:19
area 41:21 42:19 62:6 91:17 199:22 328:4 337:6,11 437:22
areas 59:14 64:14 95:24
argue 179:13 481:19
arose 471:20

472:8
ARPS 3:9
art 223:20 281:11
arterial 59:11
article 31:25 35:22 45:12,14 45:15,18,20 46:6,12,12,21 46:23 47:3 77:3,9 78:4 151:13 171:4,9 171:17 172:4,7 172:23 173:2 173:25 175:21 183:15 184:5 214:21 221:25 231:20 270:16 270:17 271:20 285:11 286:13 308:3,19,22,23 319:3,21 361:9 365:12 411:4 414:12 426:8 437:23 442:2 448:25 450:3 452:21 466:23 467:4
articles 12:3 26:21 34:23 35:4 36:9 45:19 50:10 51:6,18 70:11 106:7 171:11 174:6 197:3 272:2 284:22 286:19 390:10 412:5,13 416:18 429:18 432:3 436:22 437:1,10 446:15 470:18
articulated 34:25 203:15
asbestos 21:3,7 21:7,11,22 22:3,17,22,24

23:1,17 24:5
359:15 363:14
363:15 433:6
**ASHCRAFT**
2:12
**aside** 80:18
100:16 108:14
113:4 254:21
292:10,13,14
292:18,24
293:2 387:12
**asked** 16:25
21:10 22:2,6
22:23 23:14,16
24:3,10 37:17
37:17 41:24
51:13 52:3
74:15 80:5
90:12 101:11
101:12,19,20
104:6,10 106:4
106:15 122:5,7
138:10 146:11
149:24 153:5
153:23 156:24
157:15 164:5
168:7 172:10
173:19,24
179:15 181:15
185:19 191:17
193:19 196:9
198:16 212:12
218:15,17
220:24 221:10
225:23 228:18
237:22 244:14
246:9 250:5
251:22 263:8
278:14,19
284:20 289:8
290:15 298:11
299:3,12,13,19
299:24 300:5
300:23,24
301:10,17,23
302:6,11,18,22
303:13,21

304:2 330:13
334:8 335:22
357:9 361:20
362:7 386:18
396:20,21
398:22 400:2,6
400:10 425:1,6
429:25 440:11
448:14 451:13
452:20 468:1
470:15 475:25
477:18 478:7
478:16 482:4
**asking** 37:16
39:3,12 46:10
46:15,20,20
48:1 73:17
86:18 98:23
122:4 131:13
134:15 136:10
136:24 138:6
140:14,15
143:18,21
146:23 147:6
165:25,25
167:7,9,13
173:5 184:4,4
184:7 186:2,4
186:8 197:22
198:10,14
200:21 205:2
211:1 225:17
228:5 230:13
238:11 246:23
246:24 247:2
247:11 250:6,8
251:18,19
261:24,25
280:16 281:15
282:7 285:7,19
285:20 291:5
294:18,18,25
295:25 309:17
310:24 325:2
334:12 335:19
335:21,22
398:17 399:25

417:7 420:18
427:14,15,16
435:7 441:12
441:13,14,17
448:20 469:11
477:5,6,13,15
477:16,23
**aspect** 19:10
72:18 283:21
285:7 382:21
**aspects** 28:18
29:5 40:20
41:7 42:21
76:24 89:9
112:20 113:2
174:17 214:5,6
223:1 338:15
386:10 430:11
**assert** 349:20,21
**assess** 161:12
258:20
**assessed** 300:10
441:7,21
**assessing** 53:6,8
255:18
**assessment** 6:11
34:15 35:23
164:16 175:15
209:24 210:2
342:8
**assign** 95:21
**assigned** 96:2
**assignment** 95:1
107:2 114:7
**assist** 138:22
**assistant** 64:17
102:9
**associate** 12:18
13:1,5 16:14
16:15 54:10,12
54:15,17 56:8
56:24 57:3,4
58:17,23 61:14
61:22,25 62:23
65:17,18,21
454:24
**associated** 37:13

104:17 152:17
180:4 257:8
312:24 313:5
319:10 367:13
368:1,6 371:23
372:2,15 373:8
373:17,24,25
424:12 451:24
452:11
**association** 6:15
6:21 7:12 23:8
24:14 34:19
45:4 77:13
101:15 106:20
106:24 108:20
108:22 109:11
109:18 117:1,4
117:9,12,21
118:2 124:19
124:25 125:11
137:14,18
145:15,16,23
146:21 148:24
159:16,17
164:2 174:23
175:3,18
176:14 177:15
177:16,24
178:22,25
179:3,10 181:8
183:3,19,24
184:18 185:6,8
185:17 186:7
186:13,17
187:23 188:23
189:8,18 190:5
191:25 202:11
204:1 212:23
213:25 214:16
229:21 230:15
232:14,21
238:21,22
256:22 259:8
260:9 305:14
305:21 306:5
307:9,17,20
308:12 309:2,9

312:6,20 315:4
315:8,9,25
316:5,15 317:4
318:13,21
319:15 320:7
320:19 321:3,5
323:9,19 325:6
325:17 327:22
330:4,5,10
332:20,22
333:7,12
334:21,23
335:4 336:13
337:2 342:9,11
342:15,25
343:2,9 344:23
344:25 345:7
350:4,18
351:15 354:24
355:19 356:20
358:4,15 366:9
367:6 375:21
376:6 383:8,15
384:23 385:9
385:23 386:15
407:12,21,23
408:6,13
410:18 412:5,8
412:9,11
413:12 418:1
424:18,21
425:5,24 440:6
442:13 443:14
443:25 445:18
447:8,25 453:1
453:14 454:12
460:6 461:5,13
462:4 463:22
463:23 464:24
464:25 465:14
478:23 479:6,6
482:13
**associations**
28:19 115:4
190:6 191:2
203:9,10,20,21
305:18 306:12

Christian Merlo, M.D., MPH

308:7 315:9,13
316:13 320:23
351:10 418:3,8
459:16,17
**assume** 33:13
108:6 150:9
217:25 218:8
287:24 295:10
392:19 410:20
410:25 413:23
420:11 425:12
462:18
**Assuming**
221:14
**assumption**
407:22
**assumptions**
258:25 259:1
260:18
**assured** 49:16
**asthma** 14:15
**attach** 171:3,5
251:13 324:9
328:7 330:14
359:25
**attached** 8:23
450:3 488:11
489:7
**attaching**
410:19
**attacks** 166:9,23
243:21
**attempted** 432:6
436:22 437:11
**attempts** 437:7
**attend** 19:8
**attention** 115:1
403:13 424:16
**attorney** 487:11
487:12 488:15
**attribute** 178:1
183:21 184:12
**Austin** 34:17
**Australia** 272:3
**Australian**
117:17 251:3
251:25 252:20

254:3,12
271:10,11
322:7,18
**author** 360:12
415:6 450:1
**authored** 358:6
**authoritative**
199:22 200:4
**authorities**
475:5
**authority**
210:16,20
211:2,17 212:6
**authors** 203:15
285:23 286:17
340:3 360:9
384:19 386:8
415:16 445:3
451:4 453:13
469:6,18
474:14 483:14
**authors'** 343:4
**available** 28:21
29:9,20 35:9
186:23 216:6
259:14 381:16
387:8 412:22
421:3 422:2
423:11
**Avenue** 3:11,22
**average** 300:12
302:21
**awaiting** 176:24
**Award** 281:22
**aware** 39:6,14
53:9 230:24
234:10,11,14
234:16,19
434:16 438:15
478:1

———————
**B**
———————
**B** 176:18
**back** 12:9 19:22
20:11 50:22
54:14 61:3
66:14 73:4

78:3 83:2
86:22 94:2
99:4 119:2
144:18 146:19
151:6 171:2
174:21 178:4,7
196:18,18
207:13 218:22
231:14 232:2
233:7,8 244:11
265:4 273:3
278:21,22
280:4 281:2
299:16 308:18
337:25 344:8,9
346:2 378:13
392:24 406:17
417:5 418:21
432:14 437:13
442:2 443:7
445:9 455:25
457:25 458:2
461:17 462:10
463:2 464:4
465:21 474:13
479:21 484:6,7
**bacteria** 32:6
**bad** 87:19
132:17,22
135:19 213:19
**balance** 230:20
416:7
**bald** 277:1
**Ballman** 121:3
396:9
**Ballman's**
268:15 396:10
410:21
**ballpark** 90:24
**Baltimore** 1:15
10:12
**barking** 143:24
**base** 440:10
**based** 24:12
34:16 35:17
38:4,5 112:19
115:20 137:16

145:11 159:19
168:13,16
169:23 179:5
184:14 219:12
220:1 222:20
259:16 312:22
313:3 396:7
407:14,16,22
411:23 431:25
432:1 456:25
476:6,17 477:4
478:21 479:4
**bases** 34:10
121:23
**basic** 110:24
203:16
**basically** 14:1
63:6
**basis** 191:9
**bath** 363:3
364:25 369:1
371:10
**Baylen** 2:4
**Beach** 2:18
**beauties** 256:3
**beginning**
298:15,15
300:24 301:10
303:21 364:20
**begins** 269:14
**behalf** 11:7
80:17,24
**behave** 49:20
233:24
**belief** 237:25,25
**believe** 19:15
20:10,12 38:18
78:8,16 94:10
94:16 100:13
100:14 137:8
138:13 141:20
143:4 144:22
145:5,10 153:8
157:5 169:17
204:21 230:2
237:17 238:3
245:18,21

246:5,17
247:19 254:23
284:13 354:13
358:9 384:19
467:25
**believed** 230:20
274:20
**benzene** 328:12
433:7
**Berge** 8:22
263:23 378:16
378:19 380:19
380:24 382:16
387:9 389:14
389:23 390:3
390:24 391:15
418:23 447:5
**Berge's** 387:20
389:18
**best** 254:24
328:1 436:13
487:9
**better** 134:2
136:8 296:21
296:22
**beyond** 177:25
183:20,20
184:12
**bias** 112:22
114:25 117:25
179:14 181:12
187:1,20 197:5
197:25 233:2
236:10 239:21
239:21 240:9
241:5,14,16
243:24 247:25
255:7,10
282:21 283:13
283:15,16,21
288:17,22
289:11 290:22
293:7,13 295:4
298:4 301:9
303:20 304:22
309:6,13
372:22 374:4

Christian Merlo, M.D., MPH

Page 496

414:5 416:4
420:6,6 424:15
**biased** 245:5,11
245:19,22
246:2,17 247:3
**biases** 231:2,7
284:1,8
**BIDDLE** 3:1,5
**big** 62:24 69:16
69:22 157:20
208:6,9,12
366:23 410:2
439:19 470:9
**bigger** 425:25
**bill** 83:20 86:17
97:15 100:8
**billed** 97:13,20
**billing** 97:5
**binders** 85:13
**bio** 54:24 459:3
**biography** 5:20
**biologic** 45:5
113:7 163:3
174:9,12 178:9
178:17 179:2
440:24 441:5
443:15 444:1
458:7 461:19
462:1,14 465:8
465:12,16
**biologically**
22:18 23:18
24:6
**biostatistician**
193:8,11,15,17
194:1,7,9
**biostatistics**
95:1 193:10,12
193:23
**bit** 61:13 75:22
88:2 91:24
97:17 140:24
174:21 207:21
231:12 320:11
349:3 359:18
399:4 410:10
437:14

**blinded** 267:10
**Bloomberg** 6:2
62:2 63:3,6
64:18 65:12,15
65:19,22 66:4
66:5,22 69:1
71:6 210:9
**blue** 398:23
399:3,8,13
**board** 12:13
16:17 19:13
**Boards** 53:3,15
**bodies** 154:14
154:19 168:23
**body** 57:11
105:15 109:20
110:6 113:5,8
131:25 137:16
145:11,19
157:2 168:10
168:19 169:24
184:14 191:17
216:6 250:19
313:4 361:5
446:25 450:21
476:17 478:21
479:4
**bold** 190:7 191:3
**book** 52:22,24
53:7 54:1
68:19 200:18
202:14,16
247:1 272:2
403:2 458:16
**Booth** 387:15
**borderline**
369:18 419:14
419:18 420:2
**born** 27:14 57:8
195:24
**bottom** 52:21
244:24 305:19
306:24 315:5
420:23 438:25
444:10 480:13
**bouncing**
207:20

**Brad** 29:6
**Bradford** 6:16
28:13,17,18
29:6,10,11
30:4,14,19
32:9 34:17
35:7,18 36:18
45:3,11,11
47:1,2 48:4,5
48:15,18 50:5
72:23 73:3
124:7 171:4,8
171:10,14
174:18,22
175:17 177:11
177:18 178:8
178:20 180:18
196:12 202:21
202:23,25
203:4 214:6,9
214:20 215:5
266:17,24
316:2 317:25
319:2 432:11
432:14,15
442:23 443:7
456:16 461:18
463:2,16,24
464:13
**break** 75:16
84:16 91:24
93:4,5,21
144:24 147:1
179:16,18,23
189:7,9,9
207:16 278:3,5
278:11,13,15
278:20,25
279:2,3,5,6,16
279:18,20,22
298:19 337:7
337:17 429:8
457:20
**breaking** 428:21
437:4
**briefly** 94:6
229:9

**bring** 416:12
**broad** 14:14
18:1,2,15
25:22 26:16
27:9 29:15
442:10
**broke** 179:22
428:17,20
**broken** 339:22
**brought** 48:18
317:25
**building** 65:8
**buildup** 57:12
**built** 86:14,24
203:11
**bullet** 320:18
406:22 407:7
**bunch** 198:3
432:6
**bureaus** 471:25
**busy** 471:23

───────────
**C**

**C** 2:1 78:7
124:21 125:9
**CALCAGNIE**
2:16
**calculated** 264:3
**calculation**
258:24 261:2,9
**calculations**
256:18 259:18
259:19 260:17
**calculator**
394:10
**California** 2:18
**call** 63:23 70:15
74:10,12,14
75:16 89:23,24
171:14 176:20
193:25 237:6
253:7,15
287:10 306:7
323:4 340:6,8
340:9
**called** 16:13
71:23 72:14

85:7 90:9
166:11,14,17
166:19 171:16
200:12 213:22
269:12 305:17
329:6 341:4
412:8
**calls** 266:23
469:15
**calm** 120:24
144:4,6
**camera** 49:16
**Campbell** 1:17
10:25 487:3,17
**Campus** 3:2
**Canada** 6:13,15
154:17 156:11
156:14,15,21
164:18,23
168:25 169:1,2
169:3 251:23
438:13,16
439:2,5,6,11
439:20 440:4,7
474:17
**Canada's** 165:1
**Canadian**
156:16
**cancer** 6:10,17
7:9,13,15 8:8
8:11,21 12:5
14:17 16:7
18:25 19:5
20:21 22:20
23:9,19 24:7
24:21,24 25:1
25:7,11 26:24
28:14 40:8,16
40:20,22 41:2
41:9,13,17,22
42:8 44:16
52:25 53:4,11
53:14 54:7
55:23,25 56:1
57:23 60:16
61:5 76:10,17
77:13,15 96:17

Christian Merlo, M.D., MPH

101:16 103:16
104:17 105:17
106:9,21,25
108:18,23
109:12,19,23
110:9 117:2
137:15,19
141:8 149:14
150:23 152:17
153:6,21
154:20 155:1
156:3 157:3
159:4,18
161:14 164:7
164:14,16
165:2 167:24
178:10 179:4
179:11,24
180:13 181:5,9
181:10 188:24
194:21 195:2,8
196:24 254:24
255:19,25
257:8 258:8
259:8,12
260:10,19,22
261:6,17
263:25 264:4,6
273:16 280:7
306:6 310:4,5
311:10 312:4
312:12 313:1,6
313:11,13
315:12 316:8
317:5 328:5,23
329:3,7,10
332:23 333:3,6
333:7,10 335:7
336:4 350:5,19
357:12,22,25
358:5,7,8,15
369:8 372:14
373:8,16,24
375:22 376:6
385:10,25
424:4,14,20
426:20 447:9

448:1 453:16
454:14,16
455:9,21 456:7
456:7 471:15
476:10,15
478:14,24
479:8 480:19
480:22 482:15
483:21
**cancers** 15:1,7,8
15:22 16:7
20:7,13,13
180:3,5,14
310:14 423:24
**candidly** 208:22
**canons** 203:13
**Capstone** 94:19
94:20 95:16,22
96:6
**caption** 101:5
**carcinogens**
329:18
**carcinoma**
385:11 386:1
448:2,8
**cardiovascular**
315:10
**care** 3:18 5:12
12:16,19 13:2
13:19,25 14:10
14:16,24,25
15:3,6,11,25
16:1 17:9,9,9
17:12,16 18:3
18:16,19,19
40:21,23 41:8
41:10,14 42:4
42:6,10,23
43:4 54:11,25
55:6,11 62:5
63:4 70:24
89:13 92:1,7
96:10 153:18
178:1 183:21
187:2,20
240:21
**cared** 42:15

**career** 44:21,23
103:5 133:21
135:23 471:18
**carefully** 398:14
443:16 488:4
**caregiver** 15:9
**Carmel** 2:23
**Carrie** 1:16
10:24 487:3,17
**case** 21:6,12,20
22:8 33:1,19
33:24 68:25
80:6,17 82:22
83:1,9 85:22
97:23 106:1,2
106:4 116:12
121:4 125:5
130:16,24
132:3,7 133:15
135:2 136:14
136:17 146:20
147:7 149:22
158:15 159:8
159:25 166:4
170:9 177:17
177:20 178:19
182:6 186:3,16
189:14,14
194:7 231:4
250:7 265:9,9
274:7 275:10
275:21 283:1
289:7 290:8
296:12 339:21
345:3,4,7
348:13,16
381:17 400:22
426:17 472:14
482:18
**case-control** 7:5
115:3,23
116:11,11
151:24,24
152:2,3,4
161:1 163:25
188:24 189:3
197:8 230:24

231:1,4 234:20
235:23,24
237:20 238:4
238:21 239:10
239:19,22
240:3,6,17
241:13,17
245:5 246:2
247:4 248:2,11
248:21 250:1
250:17 267:14
267:18,20
268:13 269:11
269:13,16,20
270:8 271:5
274:19,20
275:20 293:7
293:11,14
296:14,23
297:1 316:14
339:20 340:13
344:21 350:1,8
350:9,16,22,23
358:14 359:4
362:12,15,17
362:19 379:5
379:19 381:1
382:24 384:12
386:12 404:8
424:14 428:19
428:21
**case-controls**
276:17 348:15
404:5
**cases** 1:7 78:9
78:24 80:2,8
100:11 175:1
182:6 189:12
240:3,8 244:1
298:12 364:11
471:24
**catalog** 72:5
**categories** 442:7
450:25
**categorizing**
266:13,20
**category** 26:19

267:13 442:10
**causal** 23:8
24:14 34:15
35:23 137:13
137:17 148:24
159:17 179:3
188:22 190:5
190:25 191:20
203:10,13,21
213:23,25
214:16 215:19
215:23 219:13
220:1,19
222:21 266:16
306:2 315:8,13
316:5 317:3
318:6 319:11
321:5 331:11
333:4,9 351:8
355:15 358:3
367:16 384:22
386:14 424:20
433:1 460:7
461:6,14,21
462:7 465:1
476:14 477:3
478:22 479:6
**causality** 73:5
189:8 192:1
309:11 318:7
318:14,16,22
318:24 319:19
464:18
**causation** 5:15
6:15,21 8:2,13
28:12 30:25
31:7,13 34:19
45:20 46:13,23
53:6,8 72:24
110:18,20
114:2 124:18
124:23 125:2
125:10 150:16
157:16 176:11
176:22 177:23
183:18 202:11
203:22 204:7

204:16,22
205:6,13
212:23 216:7
266:12 354:24
443:1 462:24
463:5,10,20
464:11 465:7
485:15
**cause** 25:19 37:7
37:20 38:2,8
45:13 161:13
162:2,3 167:23
176:11 181:1
194:22 196:24
230:3,21
255:25 361:12
**causes** 20:22
24:22 25:10
43:9,20 76:10
76:16 105:17
109:22 110:9
163:1 164:6
181:3 255:18
**causing** 22:19
23:19 24:6
161:19 180:24
**caveat** 112:19
**CD's** 219:1
**CDC** 6:23
217:15,21
218:11 229:3
**CDC's** 219:1
**cells** 57:10
**center** 5:23 15:5
56:6,25 58:6
**centers** 90:13
**certain** 20:11
29:18 31:21
37:12 40:19
41:7 42:21
51:1 76:20
86:17 116:5
163:13 180:24
180:25 184:16
184:17 260:17
286:23 309:5
383:14

**certainly** 73:4
76:24 195:16
300:18
**certainty** 137:4
341:16,18
**CERTIFICA...**
9:1 487:1
**certified** 1:18
12:13 16:17
19:13 487:3,4
487:18
**certify** 487:4,7
487:10 489:4
**cetera** 51:12
95:24 328:15
359:15 419:24
421:21 437:5
**cgarber@robi...**
2:17
**chain** 176:25
**chance** 178:1
183:21 184:13
184:22,24
185:1,2 264:24
326:2 327:9
329:7 341:21
351:16 407:21
408:7 457:16
**change** 6:13
176:19,20
**CHANGE/RE...**
490:3
**changed** 46:25
428:5
**changes** 488:10
489:6
**changing** 427:23
**channel** 57:9
**chapter** 6:21 7:5
53:21 202:8,11
202:13,17,18
202:19 206:12
207:24 212:22
215:20 266:1
268:14 269:10
269:12,12
314:22 320:3

354:24 355:4
403:5 405:3
458:3
**chapters** 52:22
52:24 53:7
54:1 272:2
**characterizati...**
342:24 343:4
402:18
**characterize**
277:16 334:24
335:10
**characterized**
333:14 335:15
**characterizes**
230:8
**characterizing**
336:15 346:12
**charge** 86:9
127:4,6
**charges** 123:24
124:4
**charging** 127:13
**chart** 151:18
339:17,19
343:25,25
344:12 358:17
359:3 361:16
361:17,18
375:6,11,15
393:1,12 396:8
396:13 441:2
**chase** 242:5
**check** 89:25
271:25 272:4
391:5 446:16
**Chemical** 6:12
**Chen** 369:10
**cherry-picked**
326:11,14,17
**cherry-picking**
323:24 324:4
326:10 336:16
336:21
**Chinese** 369:5
**chloride** 57:9
**choose** 324:7,7

**chosen** 416:17
**Chris** 213:16
439:25
**Christian** 1:12
5:11,14,16,20
5:22 6:7 8:1,3
8:5,12,19
10:20 11:3,15
158:20 487:5
489:12
**CHRISTOPH...**
2:3
**cigarette** 328:13
434:7
**cigarettes**
433:20,22,24
**circle** 352:5
353:21,25
396:21
**circled** 353:25
397:18,19
400:5
**circles** 398:15
398:17
**circling** 242:12
242:24 398:4
400:7
**circumstances**
100:11 162:14
177:2,3
**citation** 226:8
226:12,15
241:19 244:4
254:11,14
354:12 391:20
391:22 392:7
392:24
**cite** 131:8 191:7
191:7 229:17
251:1 252:19
252:23 271:15
308:2 330:21
**cited** 131:10
199:20,25
200:9 218:1
219:5 221:25
225:16,20

226:3 227:21
228:6 254:3
**cites** 334:1
**citing** 218:8
271:10,19,20
**claim** 21:6
149:14 351:14
430:17,19
431:2
**claimed** 402:7
403:14
**claiming** 134:25
**clarified** 269:21
**clarify** 80:24
84:8 98:18
**class** 45:21,22
68:7 72:19
76:3,5 210:7
211:15 212:17
212:19 254:15
254:16,18
272:12,15,16
272:17
**classes** 45:16
**classification**
281:7 415:3,14
**classified** 282:17
282:18 313:13
**classroom**
313:21
**clear** 103:24
107:11 184:6
329:16 343:10
355:23 362:11
413:10 463:23
**clearcut** 174:23
175:3,18
177:15,16,25
183:20,24,25
184:2,9,18,20
185:6,17 186:7
186:12,16
189:19
**clearly** 111:14
111:15
**clerical** 79:6
**Cleveland** 3:22

Christian Merlo, M.D., MPH

click 72:3
Climate 6:13
clinic 5:23 56:6
  57:5 58:5,11
  63:5,12,22
clinical 14:13
  26:1 38:5
  55:20 59:21
  60:2,15 72:15
  72:18 95:2
  160:19,21,24
  160:24 162:7
  162:10 163:7
  223:24 230:14
  267:11 435:2
clinician 223:22
  230:10
clinics 55:19
close 222:21
  246:25
closer 222:7
CMO 120:23
  121:11
coach 242:11
  398:12
coaching 279:8
  279:10,15
  388:15,22,25
  389:2
coauthor 474:11
coffee 337:19
coherence 45:6
  48:13 49:24
cohort 115:1,22
  116:9,10,21
  132:3 151:25
  152:4 160:25
  163:25 189:5
  189:12 195:12
  195:18,21
  197:9 234:11
  234:14,17
  237:19 244:25
  245:2 247:4
  248:3,9,14
  249:25 250:2,7
  250:16 254:23

255:16,24
256:2,3,13
257:6 258:7
260:10,22,25
261:7,15
263:23,24
265:10 267:14
267:18,19
269:18 270:9
271:5 274:21
275:8,19 280:8
280:12,17
281:6 284:3,11
284:17,19
285:15,20,24
286:24 287:4
287:11 288:23
289:7 290:9,16
290:20 291:8
296:4,12,16,22
296:24 298:1,8
299:4 303:3,5
303:9,13
304:10,20
316:13 338:25
339:5,13,21
340:15 345:8
348:16 350:2
350:17 386:12
396:3 404:11
420:25 422:3,6
424:18 425:23
428:19 482:19
cohorts 260:12
  276:17
collaborated
  70:6
collaborating
  62:15 71:20
collaborative
  65:3 69:18,21
colleagues 18:25
  41:1 59:22
  60:7 61:4
  63:23 170:2
  193:17 282:1
  475:6

collect 256:20
collected 422:7
collecting 342:3
Colorado 2:9
column 339:24
  339:25 340:4
  340:17,21
  341:3 342:7,18
  344:13 345:12
  362:25 364:20
  375:19 395:1
  395:23 415:2
  420:23
column's 340:2
combination
  432:20,25
  456:5
combine 381:22
  382:1,13
  383:20 384:5
combined
  263:24 421:23
combines
  223:23
combining
  422:5
come 23:3 24:16
  34:3 90:13
  111:6 153:16
  154:12,17
  156:10 157:14
  187:22 196:17
  196:18 256:7
  344:8 416:7
comes 100:3
  144:7 218:11
  308:24 437:19
comfortable
  99:8
coming 422:22
commencement
  424:17 487:4
commencing
  1:15
comment 105:8
  411:13,13,18
  416:24 417:4

454:3 474:18
commentary
  24:20 25:10,13
  25:18 260:7,16
comments
  166:13 429:23
  440:10,19
commission
  489:17
commissioned
  438:12,16
committed 17:1
committee
  426:12
common 269:19
  402:6 403:12
commonly
  274:19
communication
  439:19
community
  37:10 38:7
  46:25 47:9,14
  47:20 115:17
  117:19 208:16
  224:5,8 225:1
  225:5 250:25
  272:7 309:1,23
  337:3 343:15
  343:20,21
  367:1 416:13
community-b...
  223:18
companies
  87:12,15,21
  88:16 89:16
  90:1 91:15
  92:14,18 93:11
  93:14 233:17
company 85:6
  85:17 157:20
  234:2
compare 392:7
  392:11,14
compared
  241:17 248:21
  329:3,8

compares
  329:17
comparing
  249:25 264:1
comparison
  329:23
comparisons
  407:15,17
compilation
  8:18 446:13
complete 29:10
  123:3 320:3,3
  320:6 434:6
completed
  302:15
completely
  402:11 403:18
completing
  486:8
comply 120:23
  121:11
component
  219:9,23
  222:17
composition
  159:6
computer 72:4
  243:3 261:13
  261:19 264:12
con 345:7
concave 459:25
conceivable
  300:15
concept 36:6,7,8
  50:10 184:23
  244:11 281:6
  282:4 312:5
Concepts 6:19
  8:14 200:13
conceptualizing
  269:20
concern 254:21
  284:10 286:6
  287:4 288:16
  289:5 298:3,5
  478:13
concerned

Christian Merlo, M.D., MPH

122:15
conclude 191:20
316:4 317:3
318:6 413:11
413:16
concluded
263:24 384:20
486:10
concluding
386:9
conclusion
105:16 109:22
110:8,13
114:12 126:21
130:2 133:5
215:1,6,12,14
215:17 244:20
261:10 308:8
417:6,22
422:15 424:8,8
438:24
conclusions
114:15 133:1
253:10 276:2
conditions 14:8
51:1 195:25
224:4,25
conduct 262:24
291:20,25
conducted 236:9
274:6 275:16
conducting
292:7
conference
243:18
confidence
340:22,23,25
341:5,10,13,24
342:4 346:22
347:4 351:14
363:22 364:9
365:10 369:9
369:21 375:12
375:16,23
376:8,18,22,25
377:2,8,21,25
379:12,22

381:25 394:3,6
394:14,14,18
394:22 395:2
395:10 397:20
398:16,19
399:11,14
408:16 409:3
409:11,15,19
409:23,25
410:5,9 413:15
418:9,16
423:25 449:11
confirm 372:24
428:4 447:16
447:20 474:14
474:15
confirmation
424:18
conflating
334:10,13,19
conflict 413:17
confounders
255:11
confounding
112:22 117:25
187:2,21 197:6
233:2 236:12
241:6 309:7,14
309:16 414:6
416:5 420:7
conglomeration
411:23
Congress
154:25 155:16
156:2 473:24
475:4
connection
11:22 103:16
106:8 296:4
consciously
36:15,17
consequences
20:16
consider 18:18
40:15,20 41:13
42:23 179:9,20
193:10,14,21

195:12 198:5
210:15,19,22
211:2,13
293:12 333:6
409:8 461:21
465:11
considerations
35:8 36:14,18
50:16 174:18
177:9,12
183:10 266:25
316:2 317:24
318:7 319:4,13
319:17 432:15
432:16,24
461:18,20,22
463:3,4,16
464:14
considered 5:17
33:12 34:18
80:7 117:21
118:1 198:6
216:3,3 245:4
246:1 255:23
309:10 315:14
315:25 333:11
404:17 407:23
considering
418:2
consistencies
349:24,25
350:14,15
consistency
28:20 45:4
118:10 126:19
126:24 127:2
127:17 128:5
128:18,19,20
128:22 129:7
129:25 130:20
131:21 133:15
133:16 145:13
145:14 146:3
146:16 147:10
178:22,25
183:3 185:21
185:23 190:4,5

191:1 316:3,24
316:24 317:2
317:10 319:18
333:11 338:5,8
338:9,14
347:22 348:25
351:9,10,13
354:6,19 355:8
355:16 356:12
365:23,25
366:6 368:16
368:19 371:16
373:1,3 376:19
377:24 378:5
401:7,19,19,21
402:5 403:12
404:3,4,5,10
404:13 465:15
consistent
127:22 129:14
130:25 131:16
191:24 316:9
316:10,14
331:10 349:21
365:16 366:2
370:13 377:2,3
377:10 378:3
404:11 456:3
457:2 463:22
consistently
82:14 355:21
356:21
consult 80:6
152:18
consulted 80:2
80:20 100:22
101:1 149:21
154:2 273:2
consulting 85:17
87:10 93:13
98:12 99:9
contact 96:17,24
97:22
contacted 96:20
150:7,13
152:14 164:14
contacting

106:6
contain 33:22
contains 132:25
contamination
21:7
context 16:6
32:8 99:11
101:3,23 113:1
274:1 289:3
290:16 303:25
304:5 305:5,11
405:11 463:15
continue 27:24
28:1 91:7
478:3,5
contract 17:3
contrary 189:25
190:22 351:5
contrast 350:6
350:20
control 163:16
163:23 220:14
224:8 225:4
250:7 265:9,10
275:10,13,18
296:12 379:6
416:4 482:18
controlled 116:7
116:8,19 161:6
161:9,16,20,25
162:12 163:4
197:5 435:4
controls 132:3,7
132:8 189:12
189:14,15
240:4,8 244:1
339:21 345:3,4
348:13,17
364:11 381:17
Conventional
269:15
Conversely
408:4
convex 387:14
459:24
convey 387:15
Cook 387:15

Christian Merlo, M.D., MPH

51:12
copies 123:12
269:2
copy 11:17
66:14 119:2
151:13 213:17
396:13 400:21
458:15 468:20
479:25 483:7
core 421:19
Cornfield 315:6
Corporate 2:18
correct 15:17
18:12 20:17
21:8 33:21
34:10 38:14
45:7,9 50:24
51:3 52:23
54:19 55:2
57:1 58:18
59:12,24 64:18
64:21 65:13
67:20 68:14
69:2 78:14,15
84:20 86:12
90:5 91:20
92:17 101:4,24
106:16,22
107:1 110:1,15
110:16,18,22
111:18 114:9
115:6 118:8,12
125:14,24
126:12,21
127:15 128:22
129:9,10 130:2
145:23 149:16
149:23 150:17
151:3,15,19,20
151:25 152:6
155:2,7 156:12
161:22 178:11
179:24 180:5
182:4 184:25
185:8 190:8,11
191:4,5 194:17
204:1,5,11,13

208:3 217:20
217:22 229:21
229:22 230:4
230:25 231:4
245:11 249:6
249:14,17
274:2,3 282:22
299:22 303:3
306:7 308:4,13
313:15 320:16
326:25 327:13
331:13 333:15
334:2 335:16
339:18 340:1
342:13,21
351:18 352:15
353:3 362:15
365:3,13
367:18 373:20
375:4 377:3
378:20 380:2
382:16 383:9
395:25 397:10
397:21 405:6
408:2,3,9,10
411:15 418:10
419:16 441:9
441:18 443:1
445:1,6 447:12
448:19 451:5
453:7,8 454:21
467:9 470:5
473:17,25
474:12,19
480:19,23,24
483:15 484:22
489:5
corrections
488:4,7 489:6
correctly 20:4
115:5 189:17
216:8 224:11
386:3,4,19
402:14 403:20
416:6 425:10
425:11 441:16
448:12 471:3

correlated 181:8
Cosmetic 440:6
cosmetics
157:22
Council 3:18
251:2 252:1,5
counsel 2:23
3:12,18,23
10:21 49:14
66:10 78:17
86:5 165:6
166:1,10
201:16 212:2
241:25 261:25
326:18 332:8
332:14 390:7,9
398:12 405:19
468:4 474:17
479:25 481:21
487:11,12
count 106:13
counted 79:20
couple 12:2 94:5
120:19 196:9
241:22 259:24
263:11 360:11
410:22 452:12
coupled 216:5
course 67:18
68:5 72:5,14
72:20,22 73:8
75:5,7,19,19
102:7,20
208:11 209:8
211:7 212:14
262:25 297:7
325:9 381:9
446:18,19
456:15,16
480:1
courses 71:19,25
72:10 75:24
193:9 208:5
354:25
court 1:1 10:17
10:24 78:24
233:25 488:19

cover 200:15
202:16
Cramer 6:10
151:13,16
346:7,15,17,18
346:20 347:5,7
361:22 362:5
362:16,18
365:10,12,17
369:4 387:16
395:16 451:19
453:12 456:11
crew 14:3
criteria 30:14
34:16 203:8,16
214:10 215:21
266:17,23
315:1 351:7
criterion 190:2
190:3,24
349:21 402:5
403:12
critical 5:12
12:16,19 13:2
13:19,25 14:10
14:15,24 15:11
17:8,9,12,16
18:2 42:4
54:11,25 55:6
55:11 62:5
63:4 70:24
96:10 117:7
153:18 466:5
469:10
criticism 116:24
146:5 245:2
249:15 472:23
criticisms
118:14 121:19
123:6,7 276:13
293:5 294:8
431:11 474:23
474:24
criticize 323:3
324:15 331:4
338:13 347:18
431:2

criticized 147:5
criticizing 115:1
159:24 430:18
critique 137:20
260:21 337:4
critiqued 324:16
336:25
cross 382:19
CROSS-EXA...
479:19
cross-sectional
116:13
crosses 410:5
ctisi@levinla...
2:4
cure 57:22
curious 88:17
168:9,15
current 11:20
12:1 13:23
71:25 265:7
currently 56:5
Curriculum
5:11
curve 443:15
459:20,25
460:1,2
curves 387:14
387:14,15
459:15,15,20
cut 242:5 320:2
cutoffs 456:13
CV 11:17,20
12:9 19:22
25:25 29:19
34:24 50:23
52:21 54:14
56:4
CYNTHIA 2:17
cystic 5:23 14:16
17:12 27:14
32:7,17 51:12
55:5,10,20
56:6,9,24 57:5
57:6,7 58:5,11
59:4,23 60:3
63:5,14 89:14

92:2,7,10,16
93:1 95:8,11
95:12,14
163:15 195:23
471:18

**D**

**D** 3:10 4:1
305:19
**dance** 98:21
**danger** 284:25
**Daniel** 4:1 10:3
**data** 32:17
274:24 414:25
418:4 420:21
421:3 422:2,7
**date** 1:16 10:6
83:23 97:7
274:1 487:8
488:9 489:12
**dated** 83:22,22
487:19
**dates** 169:12
340:3
**Daubert** 5:15
8:2,13
**day** 86:16
159:23 357:16
471:7 473:13
489:16
**days** 410:22
437:4 488:15
**DC** 3:11,17
**De** 77:10
**deal** 12:4,7 19:5
20:7,20,24
21:2 25:18
26:22 27:4
50:25 51:24
52:25 53:5,10
54:2 176:21
208:6,9,12
210:7 340:14
402:24
**dealing** 285:15
**deals** 51:10
183:14

**dealt** 26:2
**death** 57:14
**decades** 152:6
298:11,12
300:4 331:8
**December** 6:13
7:4 83:24 84:6
84:12 97:7,10
104:14 107:14
108:8,15,24
149:22 150:10
150:21 438:22
**decide** 100:5
**decided** 416:3
**decides** 96:4
**deciding** 203:19
**decision** 73:14
204:22
**decisions** 216:7
413:20
**decisive** 176:16
**declare** 417:24
**decreases**
260:23 261:8
**decreasing**
460:25 461:1
**deduced** 203:14
**deducing** 176:22
**deemed** 488:18
**defend** 150:15
**Defendant** 3:12
3:18
**defendants**
135:1
**defense** 125:5
252:8
**define** 15:2,19
47:14 50:11
183:25 184:20
460:21
**defined** 184:24
185:1 203:12
313:1 359:14
363:14,18
460:10
**defining** 47:8,9
220:9

**definition** 16:23
16:24 30:13
52:12 117:4,11
117:13 161:17
192:17 216:25
217:6 218:11
218:21 219:2
220:7,17
227:22,25
240:9 307:16
308:7,11,14
309:18,18
321:12,13,13
321:16,17,18
322:1 349:9
461:4,16
**definitions** 47:1
48:3 50:5,13
**degree** 137:3
196:22 244:7
351:14
**delivered** 203:6
**demonstrate**
118:4 242:22
443:22
**demonstrates**
373:2
**Denver** 2:9
**department** 6:1
6:4 12:19,21
12:22 13:2
14:9 66:5,22
69:25 70:24
71:1,9 102:11
208:2,8 475:18
475:19,20,23
475:25
**depend** 177:1
195:17 257:19
302:1 413:3,4
414:1,2 476:25
**dependent**
297:9 477:9
478:9
**depending**
47:15
**depends** 27:12

47:7,7 62:9,10
62:11 70:12
87:23 103:1
116:14,14,15
160:23 180:6
186:20,20,23
186:24 187:1,3
192:20 195:15
195:16,19
196:7 205:23
205:24,25
223:5 228:22
228:22,24
235:19,20,21
236:6,6,14,14
240:24 241:2,3
248:13 255:2,2
255:3,4,5,7,8
255:10,12
257:10,11,11
258:2,2,3,4,11
262:14 270:6,6
270:7,8,9
274:23 284:12
284:12 285:2,3
285:3,4,6,8,9
297:4,7 300:6
309:4 312:14
312:15 337:13
337:14 377:5,6
403:23 416:1,1
416:2 428:8
433:13 436:6
457:18 465:5
465:18 476:5
477:19,20
**deponent** 9:2
10:19 489:1
**deposes** 11:6
**deposing** 488:14
**deposition** 1:12
7:20,23 8:23
10:9 41:20
49:19 66:24
121:3,3,4
157:13 166:11
166:18 201:18

243:21 330:13
330:22 334:9
335:23 354:11
397:13 434:18
486:9,10 488:3
488:12,16,17
**depositions**
82:24 83:5
120:19 262:25
278:10 323:15
336:24
**deps@golkow...**
1:24
**deriving** 6:21
212:23 213:1
**describe** 92:5
125:13 335:6
336:2
**described** 17:12
47:2 48:5,9,14
50:9 59:22
263:13 311:11
470:19
**describes** 14:7,8
**describing**
30:18 460:2
**description** 5:10
92:4 117:8
470:17
**descriptions**
91:19,23
**descriptive**
224:2,16,22
**deserves** 402:6
403:13
**design** 72:18
93:16 95:2
112:21 115:20
115:22 154:8
160:4,4 189:10
198:1 235:20
236:7 240:16
245:1 254:23
256:2 274:24
276:1,16
296:20 297:11
345:3 356:17

Christian Merlo, M.D., MPH

Page 503

393:5 414:4,5
416:2 428:18
**designed** 116:18
161:16 197:4
241:7 248:16
275:7,16 309:6
358:7
**designing**
160:19
**designs** 63:20
114:24 116:5
132:3,4 184:16
184:17 240:17
271:3 275:15
297:21 348:11
356:13,25
357:3 404:2
429:1
**desirable** 215:23
**despite** 260:11
**detect** 258:8
259:7 260:13
264:5 383:8,14
383:19
**detected** 369:13
369:16
**determinants**
220:11
**determination**
204:16
**determine** 203:8
256:18 367:15
**determined**
340:12
**determining**
124:19,24
125:11 203:22
204:7 205:6,13
256:21
**developed**
149:14
**developers** 7:4
**developing** 32:6
266:10
**development**
8:8 372:14
373:7,16,23

**develops** 256:12
**devoted** 114:11
**dexfenflurami...**
37:19 43:7,19
230:3
**diagnosed** 15:15
230:12
**diagnosing**
224:5 225:1
**diagnosis** 44:3
44:14,18,20
59:10 223:21
**diaphragm**
467:15
**dichotomized**
449:12,22
450:17,22
**dichotomy**
451:1
**Diener** 94:17
**diesel** 328:12
**Diette** 86:16
170:9 435:17
435:17
**difference** 132:6
138:1 189:11
240:7 265:2
413:12 420:9
422:16
**differences**
197:7 240:7
345:1,12,13,14
**different** 18:22
26:25 27:21
28:18 30:22
37:15,16 47:13
48:10,14 50:7
58:9 75:22
103:9,22 107:5
115:19 130:21
146:6 153:13
154:14 180:2
181:5 185:24
185:25 187:25
209:1 231:12
258:13,16,17
275:15 283:6

297:19 355:16
355:17,22,24
356:23,24,25
366:20 382:18
404:2 407:14
407:16 409:18
410:11 411:10
414:3 427:21
429:1 433:8
442:7,8 458:18
467:11 469:2,5
469:14 481:14
483:7
**differential** 43:9
44:14 283:8,14
283:25
**differently**
47:15 50:11
**difficult** 56:12
161:8,11 192:1
223:4 232:25
317:18 319:6
399:4 433:4,10
433:21 435:10
435:18 436:1
436:17 465:15
**difficulties**
57:19 160:20
**difficulty** 444:10
444:21
**Diplomate** 1:17
487:3,17
**direct** 11:12
481:21
**directing** 219:11
219:24 222:19
**directions**
400:12
**directly** 87:11
87:14 239:7
364:5,14
373:10
**director** 13:24
14:5 56:9,24
57:4
**directory** 6:1
66:3,21 71:5

**disagree** 40:5
111:25 112:5,9
123:18 132:20
204:15 216:17
223:5 227:5,15
227:19,23
229:1 270:11
277:15 398:1,4
399:17 413:23
425:12,16
**disagreed**
112:12 277:22
414:9
**disagreeing**
404:18 425:16
426:3,4
**disagreement**
112:14
**discuss** 38:22,23
38:25 39:1,2
40:2 178:2,9
178:17 183:22
189:22 217:11
287:11 288:14
288:14,21
289:2 290:21
290:21 293:4
293:21 296:3
305:5 389:17
430:12
**discussed** 75:25
215:20 231:3
247:23 286:17
288:24 290:16
295:4 305:9
388:17 389:22
478:2
**discusses** 214:25
441:4
**discussing**
114:13 214:24
229:21 479:17
**discussion** 30:12
72:22 118:23
171:13 176:10
229:7 268:19
287:3,10,19

288:16,22
299:2,10,11
324:10 431:9
**disease** 6:15
14:17,18 18:20
25:19 27:14,15
29:12 31:1,8
32:2 35:24
40:15 44:17,18
44:20 50:23
51:2,6,10
55:18 57:8,13
57:15,16 89:9
91:19,20 92:2
92:4,17 133:23
134:3 136:1,9
141:9 175:5,14
180:25 181:2
194:23 224:8
225:5 257:20
258:4,16 259:2
259:4,15
315:11 329:24
330:6
**diseases** 14:15
17:15 26:10,14
51:19,24
180:25 182:6
328:23
**disregard** 126:5
126:7 248:24
249:2,16,18
250:11
**disregarded**
125:19 249:21
**disregarding**
250:20
**distort** 135:7,19
143:7 149:7
**distorted** 134:5
134:20 137:4
139:9 141:21
141:25 142:10
142:15,20,23
**distortion**
133:24 136:3
136:20

**distribution**
220:11
**District** 1:1,1
10:17,18
**divide** 63:8,11
404:14
**dividing** 410:7
**division** 13:18
13:24,25 14:2
14:4,5,9,23
15:11,17 54:25
**doctor** 12:11
37:16 41:18,21
44:25 47:24
58:8 66:20
75:8 79:6
89:22 103:12
121:18 123:5
129:3,4,5
130:8 132:25
133:18 139:5
144:13,22
145:4 146:24
154:7 157:12
171:24 182:9
186:11 198:13
200:14 207:16
218:14 227:3
233:8 234:10
246:24 250:6
260:4 265:24
272:1 273:13
281:18 295:24
299:7 321:11
322:25 325:22
326:24 327:5
332:17 338:3
346:14 351:24
353:13 354:17
359:2 360:18
361:2 366:6
373:4 376:17
379:16 380:5
384:25 386:17
388:17 389:9
389:13 392:13
392:23 407:6

410:16 414:10
416:17 417:17
417:21 418:20
424:5 426:16
429:3,14 431:7
440:17 445:16
447:4 448:10
448:20 449:24
451:3 452:5,7
454:7 455:16
458:2 461:23
463:17 469:9
471:4 477:5,22
479:12 483:12
**doctors** 88:16
89:8,12 169:20
169:22 375:18
**document** 1:6
72:5 74:17
84:18 165:17
167:8,10
225:17 227:16
228:6 251:19
252:7,20 254:4
254:12 311:14
312:13 314:2
352:13 406:24
413:10 480:18
482:4
**documents**
158:16,17
159:2,11
**doing** 98:18
99:13,14
138:18 201:6
212:25 216:1
228:24 392:17
435:9 488:8
**domestic** 328:12
**dose** 8:18 23:2
28:21 145:17
145:17 146:3
178:23 179:1
183:4 316:3,10
317:1,2,9,23
318:1 319:18
385:12 386:2

386:19,25
387:6,7,9,10
387:13,19
389:14,22
430:10,16,19
431:1,3,9,15
432:6,7,10
435:10,19
436:1 442:24
444:13,24
445:5 447:11
448:3 449:13
449:22 450:5
450:24,25
451:2,10,16
452:1,15
454:21,25
455:3 456:10
456:11,18,25
457:6 459:10
459:11 460:25
461:1 462:1,5
462:21 463:19
**dose-response**
118:5 443:15
459:3,7,8
464:10
**dosing** 437:17
**double-blinded**
267:9
**dozens** 416:17
**DPM** 2:8
**Dr** 10:20 11:17
48:2,14,18
67:14 68:4,8
68:20,23,24,25
69:5,7 70:2,10
79:12 86:16
141:6,25 142:3
142:9,15,19,22
153:17 155:4
155:13 170:9
170:11 177:11
202:14 206:11
208:1 209:4,8
209:12,17,17
210:23 211:5

212:5,20 215:3
215:4,6 236:1
260:20 266:23
268:15,20,22
268:24 270:16
273:1 281:17
282:1 314:6,24
320:22 324:6,8
324:19 327:14
331:3,3,13
332:18 333:13
333:23 334:25
335:25 360:11
362:9 365:19
371:20,20
396:9,10
401:14 404:15
404:23,24
410:21 416:18
424:9 435:17
435:17 440:4
461:11 462:4
462:12 464:19
473:5,16,21,23
474:5,11
**draft** 6:11 165:1
285:10,18,20
438:11
**drafted** 101:21
**drafting** 138:21
140:4
**DRINKER** 3:1
3:5
**Drive** 2:18 3:2
**drugs** 7:1
157:21,23,24
232:19 234:6
433:3 436:2
**due** 92:2 103:12
260:10 407:21
408:6 457:16
**duly** 11:4 487:5
**duration** 421:21
434:1 437:12
438:2,4 442:16
445:21 449:7
449:12 450:6

450:16 455:11
455:23 456:6
457:3 462:6
**dusting** 369:7
479:1
**duties** 90:2
103:6,17
**Dyes** 8:9

**E**

**E** 2:1,1 4:1,1
**e-mail** 70:15
**earlier** 93:8
203:11 248:15
275:4 354:10
358:10 464:12
480:16 483:13
483:18
**early** 353:10
357:16
**easier** 433:17
436:11
**easily** 117:24,25
**East** 1:14 10:11
**Eastern** 10:17
**easy** 117:23
417:23 450:13
**editing** 68:19
**educate** 92:5
**education** 92:13
**effect** 230:21
269:17 311:11
311:18,22
312:1 363:2
364:25 368:7
368:25 369:11
371:9,23 372:2
372:3 415:18
**effectiveness**
266:10
**effects** 15:23,24
16:5 42:13
415:4,15,19
**efforts** 134:2
136:8 413:19
**eight** 45:9 109:5
377:6 465:6

either 23:20
28:17 68:12
80:19 91:18
92:4 102:10,21
160:1 171:24
225:21 226:4,8
267:8 282:16
340:4 341:25
346:10 374:14
392:8 414:8
423:10 461:6
element 464:11
elevated 419:15
ellipses 448:6
ELLIS 3:20
elucidating
30:24 31:6
embark 176:10
embody 327:23
emeritus 203:5
emissions
328:12
emphasize
353:16
emphasized
353:17,18
emphysema
27:17
employee
487:11,12
encompass 42:6
encompasses
341:14
endometriosis
310:18,22
311:6
ends 200:19
332:11
engine 328:12
enrolled 198:1
257:6 300:8
302:1,18
enrollment
301:25 302:6
302:16
entire 216:6
218:24 227:24

332:4 446:25
entirely 215:22
entirety 219:3
251:17
entitled 19:24
167:6 211:23
212:1 269:10
270:18 273:14
environment
6:13,15 435:5
444:12,23
environmental
25:19 26:9,23
27:6,19 28:1
162:25 176:19
315:11 316:8
EOC 450:8
453:1
ep 328:1
epidemio 170:1
epidemiologic
6:22 7:8 23:4
24:13 31:12
32:17 35:4
38:13 39:4,13
39:21 64:13
95:14 101:17
110:20,24,25
111:3 115:16
117:19 133:24
134:6,14,19
135:19 136:4
136:20 137:5
139:9 141:21
141:25 142:10
151:1,1 170:2
180:1 212:24
213:3 216:21
224:3,17,24
265:9 272:7
273:15 309:1
328:2 333:8
337:3 412:23
441:6
epidemiologist
67:16 153:17
191:16 193:22

194:8,8 208:10
211:6 224:1,21
416:11 477:22
epidemiologists
62:15 63:18
68:23 112:9
126:11,14
170:5 224:15
245:3 271:23
281:19 321:23
323:9 408:15
409:3
epidemiology
6:1,4,19,24
7:17 8:14
12:22 13:6
23:7 26:2,3,3
34:16 45:16
58:18,24 59:1
61:15,23 62:1
66:4,22 67:17
67:20 68:14,20
71:2,11 72:11
101:13,14
103:8 106:16
106:18,20,23
107:3,6 108:7
108:12,16,21
109:8,17 111:4
111:10,12,16
111:25 112:1,5
112:6,7 113:6
114:21 117:18
133:21 135:24
141:7 150:19
162:15 175:2,6
193:12 199:23
200:13 202:12
208:3,8 209:9
209:9 211:3
212:7,15 219:8
219:22 220:10
222:16 223:14
223:19 224:2
224:16,23
225:10 227:22
228:1 237:25

253:8,16,20
265:5,7 268:6
271:22 272:12
281:11,23
297:18 309:23
314:23 321:19
343:12 354:14
354:16 355:19
366:8,25 367:5
401:5 412:15
412:17,17
416:13,15
426:12 437:3
441:20 472:18
Epidemiology...
125:24 126:18
249:12
epithelial
180:13 369:7
453:15
epithelial-lined
57:10,11
equal 250:2
468:13
equally 250:18
equivalent
156:16 413:14
errata 9:3 488:6
488:9,11,14
489:7 490:1
error 187:21
269:4
errors 413:19
especially
372:16 373:18
424:15
established
311:10
establishes
175:6
estimate 63:2
80:15 283:20
327:25 328:1
341:2,2,7,12
341:20,22
346:21 363:10
371:14 377:12

393:24 394:4
397:9,10,19
433:25 457:12
estimates
269:17 340:19
340:20 377:13
377:17 393:12
393:15 449:10
457:8
et 6:10,18 7:2,6
7:9,13,17 8:8
8:11,22 51:12
95:24 151:13
315:7 328:14
359:15 365:11
369:4,15
419:23 421:21
437:5
etiology 134:2
136:9
evaluate 45:13
50:20 76:25
234:5
evaluated
167:22 361:5
evaluating
34:19 44:6
114:23 183:18
237:11 239:16
359:13 472:18
evaluation
230:14 402:10
403:17 464:18
event 176:18
367:14 368:2
events 220:12
eventually 95:4
everybody
366:7 480:10
evidence 7:3
50:20 75:11
114:23 115:8
115:13,20
116:4 126:6,8
126:12,15
132:1 135:8,20
137:17 145:12

145:19,22
146:2,3,19
147:7 148:10
148:20,21
149:1 154:7
156:12 159:4
164:1 168:19
169:9,15,24
177:5,5 178:9
180:11,12
184:15 186:24
191:17 196:21
200:5 204:23
213:23 216:6
216:21 236:20
237:7,11,18
238:1 244:11
244:16 248:20
248:25 249:3
249:17,19,22
250:11,16,19
250:21,24
253:22 265:6
266:9,14,15,21
267:2 275:6,19
275:20,21
310:12 312:23
312:23,24
313:3 348:8,9
361:6 411:24
440:24 441:5
442:25 443:17
443:21 444:5,7
445:3,5 450:7
454:21 456:3
456:19,25
476:6,7,13,16
476:18 477:4
478:22 479:5
482:12
**evident** 275:9
**evidentiary**
237:19 240:14
**ex** 439:19
**exact** 445:11
**exactly** 79:18
180:18 181:22

216:24 233:5
262:9 295:20
403:6 433:11
**exam** 266:7
**examination**
11:12 483:10
487:5
**EXAMINATI...**
5:4
**examined** 456:2
**examining**
358:14
**example** 30:15
36:25 48:13
87:22 114:18
168:25 175:4
179:8,14
180:13 229:24
244:2 245:10
259:10 266:5,9
306:9 317:20
328:23 331:3
333:5 346:2,15
436:3
**examples**
174:25 297:19
318:12,20
328:21
**exception**
394:23 395:14
396:3
**excerpt** 6:6 8:1
8:12 320:1
**Excerpts** 7:20
7:23
**excess** 329:3
**excited** 154:23
156:6 157:8
**excuse** 21:1
102:8 119:13
120:9 121:20
160:11 214:5
266:5 286:8
289:7 291:6
389:3
**executed** 275:8
**exercise** 76:3

395:1 399:12
472:17
**exerts** 176:20
**exhibit** 8:18
11:9,17 13:7
13:12,15,21
19:23 32:22
33:7,15 54:20
54:24 57:25
58:4 65:24
66:3 70:19,22
71:3 78:8,12
78:13,13,18,20
83:11,14 88:8
88:12 96:18
97:6,7 101:4,6
102:6,18
105:12 110:10
110:14 114:3
118:18 119:5
119:18 120:2,7
121:14 122:8
122:11 123:7
123:14 150:17
151:9 165:12
165:16 170:23
171:3,6 178:6
200:6,11,17,24
201:9,25 202:9
206:6,9,10
207:17,23
214:12 217:7
217:16,23
232:3 251:9,13
254:4 265:22
265:23 268:8
270:12,16
272:22 273:6
273:13 282:2,8
309:24 310:3
314:18,21,24
319:24 324:9
324:11 330:16
330:18 331:24
334:3,6 344:1
344:2,5 351:19
351:23 353:4,5

354:23 355:5
359:22 360:1
361:17,18,19
374:18 378:24
393:2,2 396:14
396:17 400:17
404:20,25
406:21 410:13
410:19 414:13
414:15 418:17
419:4,5 438:5
438:9 443:10
446:9,12,13,18
458:3 465:22
466:1 479:21
480:14,15
481:15,17,22
**exhibits** 5:9 8:23
207:20 396:10
**exist** 128:20
133:16 145:14
145:16,18
265:14 431:3
465:8 477:4
**existence** 460:5
461:12 464:23
464:24
**exists** 147:10
430:20
**expect** 162:7,11
355:15,20,23
356:20
**experience**
18:16 26:1
38:5 178:3
223:24 224:3
224:17,24
271:21
**experimental**
267:6
**experimentati...**
45:6
**expert** 5:14,16
6:6 7:18,21 8:1
8:4,6,12 18:11
18:18,25 19:1
40:1,8,14,16

40:21 41:1,14
42:19,23 61:5
80:3,7,20
82:13,19,25
86:9 101:17
107:7 111:16
119:11 128:18
129:16 130:3
131:2 141:2
160:3 276:14
277:11 293:19
293:20 294:19
314:11,12
326:11 332:4
**expertise** 14:14
17:8,11,24,25
19:10 41:21
42:10 55:4,10
**experts** 6:9
111:24 112:4
114:14,20,22
114:25 116:25
118:4 123:8,25
124:7 125:14
126:3,24 127:2
127:17 128:4
128:16 129:7
129:13,24
130:24 131:20
133:15 134:5
134:13 135:2
136:14,17
137:4,11 140:3
143:6 144:8
145:7 146:7
147:5 162:15
178:21 190:1
190:23 197:19
198:24 233:5
233:14,16,17
237:10 245:10
247:24 249:5
249:21 250:9
250:11 253:19
253:22 254:22
275:25 276:15
277:4,5 289:6

Christian Merlo, M.D., MPH

289:20 290:25 291:20 293:6 293:12 294:9 295:3 323:4 338:13 347:19 347:22 348:25 349:19,23 350:14 351:6 430:18,19 431:2,12,20 439:18 440:3
**experts'** 114:8 125:23 126:17 249:11
**expires** 489:17
**explain** 119:22 120:1 154:18 233:1 314:7 317:18 319:6 420:8
**explained** 117:25 319:8 323:18
**explore** 444:13 444:24
**exponential** 459:9
**exposed** 43:5,6 196:6 264:1,2 265:3 282:17 282:18,18,19 284:14,16 289:9 329:5,8
**exposure** 8:7 26:4 27:20,20 28:1,4,14 29:12 35:5 36:12,12 37:6 37:11,18 44:4 105:16 108:17 108:19 109:11 109:22 110:8 141:8 148:25 164:2,16 175:1 180:24 181:3 186:21 191:21 195:20 205:25

244:8 273:20 273:23 281:7 281:10,14,15 282:2,12,14,16 282:20 283:22 283:24 284:20 284:25 285:8 285:14 286:8 287:6,13 291:7 296:1 299:19 300:10 303:10 307:9,17,20 309:12 316:5 318:4 319:10 321:4 328:14 350:5,19 359:14 363:3 363:11,14,16 364:12 365:1,9 367:13 368:1 369:1,4,12,18 369:20 370:25 371:10,22 372:16 373:9 373:17,19 382:12,22,23 420:12 422:7 433:4,9 434:3 435:9 436:14 436:17 437:25 440:24 441:8 442:7,8,14,17 442:19 445:19 445:22,24 454:13,15 456:2 466:22 469:7,14 481:1 482:10,14 484:1
**exposure/outc...** 77:1
**exposures** 26:6 26:8,9 31:20 44:9 234:17 303:14 433:3 436:2
**express** 155:6

156:1,25 164:19 226:16 474:17
**expressed** 54:6 104:15 105:12 150:16,22 418:9

***

## F

**F** 3:16
**fabri** 127:12
**fabricate** 126:24 127:2 128:4,18 128:19 129:7 131:20 143:7 146:15 147:17 147:24 148:3 347:22 348:25
**fabricated** 126:19 127:17 128:16 129:24 130:16 131:16 132:25 133:1,5 133:6 138:7 144:8
**fabricating** 128:19 130:20 148:7
**fabrication** 127:5,23 128:1 130:19 132:14 133:10,11,13 147:23 347:21 349:13
**fact** 21:5 54:9 78:23 114:10 146:20 225:19 226:14 234:20 260:11 265:1,8 354:18 368:10 371:17 382:20 395:13,24 396:2
**factor** 25:6 30:25 31:7 32:1 35:24 48:13 162:25

176:19 177:5,6 182:4,21 195:4 195:5 233:2 319:9 333:9 463:11,12,12
**factors** 8:10 26:23 28:14 31:14,17,18,20 32:6,19,20 45:2,3 47:2,15 48:4 50:6,9,12 50:16 77:10 95:8 116:16 175:17 182:7 187:3 310:11 311:4 316:1,2 317:23 328:22 329:12 416:7 436:19 465:6 465:11
**faculty** 6:1 64:19 65:4 66:3,21 67:5 71:5 210:9
**fail** 488:17
**fair** 24:19 44:16 91:16 312:22 312:23 313:3
**fairly** 82:13
**fairness** 416:16
**fall** 76:7 248:19 341:7
**fallacious** 402:11 403:18
**fallaciously** 415:17
**falling** 341:22
**fallopian** 7:14 310:13 480:22
**falls** 26:18
**false** 242:23
**falsely** 417:25
**far** 34:2 47:19 78:1 83:19 136:17 210:11 337:2 407:25
**fast** 135:16

447:19
**favor** 190:4,24 331:11 333:9 351:8 352:4 353:20 406:1
**fax** 1:24
**FDA** 154:16 156:17 164:4,8
**February** 8:4,6 11:25 54:5 97:25 105:11 105:21
**feel** 206:12,21 266:7
**feelings** 211:10
**fellow** 474:25
**fellows** 63:17
**felt** 80:9,9 469:6 469:18
**fenfluramine** 37:20 43:7,18 230:2
**fiber** 8:7 359:14 359:14 363:15 363:20,24 367:13 368:1 371:22 372:15 373:8,17
**fiberglass** 359:15
**fibers** 373:19
**fibrosis** 5:23 14:16 17:13 27:15 32:7,18 51:12 55:5,10 55:20 56:6,9 56:25 57:5,6,7 58:5,12 59:4 59:23 60:3 63:5,14 89:14 92:2,7,10,16 93:1 95:9,11 95:12,15 163:15 195:23 471:18
**field** 211:2 212:7
**Fifthly** 443:13

Christian Merlo, M.D., MPH

figure 181:11
201:5 376:13
376:17 436:22
467:18,19
filed 101:3
105:20 440:3
final 94:24,25
95:4
finalizing 54:4
financially
487:13
find 77:5 88:4
115:3 157:13
199:21 251:12
252:8 259:25
263:11 308:24
320:11 322:3
322:15 323:9
349:4 355:16
387:4 389:21
390:13 449:6
463:20 465:23
472:1,3 480:2
finding 190:4,24
351:8 365:7
369:2 370:23
findings 355:8
355:12,18
369:5 372:24
415:5,16
fine 21:21 22:12
52:20 120:8
121:15 122:9
144:2 149:19
187:22 201:10
203:2 217:10
221:20 227:11
227:13 228:12
247:18 262:19
278:13 309:8
320:13 326:22
405:9,24 428:4
471:22
finger 49:12
finish 86:3 108:2
120:10 150:5
188:7 206:21

220:20 227:2
227:10 236:8
262:21
finished 178:16
185:14
firm 215:24
first 11:4 32:4
53:2,14,21
56:21,22 62:24
67:12 71:17
77:20 80:23
83:23 96:16,20
96:24 97:5,11
97:13,21,22
109:1 149:21
151:1 153:10
174:21 176:5
184:1 190:9
195:2 202:17
202:17 203:23
204:8,10 205:7
205:14 219:19
224:9 230:24
234:11 245:9
249:15 253:9
253:11,17
291:12 301:22
308:9 315:5,20
338:20 339:24
340:2 362:20
373:1 390:15
391:2 392:21
419:8 432:10
438:20 482:9
483:12
five 45:8 79:21
79:21 81:22
86:2 87:13,17
104:14 199:16
206:16,16
214:5 471:24
flat 431:20,23
flaw 249:5 301:3
flawed 118:6
137:12 301:4,8
304:11,20
Flaws 6:9

125:23 126:3
126:17 249:11
flip 165:22
455:12
flipping 190:17
344:9
FLOM 3:9
Florham 3:3
Florida 2:5
fluid 65:10
FLW 1:5
focal 203:18
focus 20:15 25:5
289:19
focused 26:6
28:5 91:17
133:20 135:22
245:2 462:1
focuses 255:17
folks 89:8 100:3
265:2
follow 16:16
195:17 196:1,4
256:6,9 259:2
412:11
follow-up 31:19
300:2 425:7,22
followed 197:10
234:15 255:5
271:4 300:12
302:3,19
400:12 442:19
445:24
following 77:11
182:22 203:18
222:15 250:3
256:10 417:23
424:16
follows 11:7
footnote 38:18
217:14,18
229:8,16,17
251:20 484:16
footnotes 484:1
484:11
forebear 263:7
foregoing 487:7

489:4
Forest 2:9
forever 17:5
forget 98:6
465:21
form 120:3,6
326:21 481:24
482:5 489:6
formulated
34:17
forth 35:18
36:18 99:4
344:10 487:9
forum 155:7
forward 279:17
337:9 416:13
found 117:2
218:21 252:10
263:12 362:25
364:21,23
365:17 368:23
425:25 431:5
442:14 445:4
445:18 446:7
foundation
32:18 215:25
219:10,24
222:18
four 41:25 45:8
54:18 56:7
57:2,3 62:23
62:25 63:8
78:10 79:16
82:11 83:6
87:12,17
107:13 118:13
118:23 119:5
121:18 123:6
143:13 152:6
189:5 278:1
287:10 288:23
290:20 291:8
296:4 300:19
300:23 301:4,8
338:25 345:8
471:24 484:8
484:12 485:9,9

four-page 407:3
407:5
frame 118:22
framework
28:24 72:23
fraud 141:6
fraudulent
140:7,12,18,22
141:9,13
free 206:12
266:8
frequency
176:17 421:21
433:25 437:11
438:2,4 442:16
445:20 449:7
449:19,20
455:10,22
456:6 457:4
Friday 63:15
front 38:24 39:9
67:12 102:6,18
171:5 178:4,5
293:22 314:16
355:3 361:18
393:3 401:4
406:25
full 16:22 17:6,7
65:11,14,17
67:9 68:13,14
306:10 327:1,2
360:16 450:18
485:15
full-time 65:18
65:21 67:5
68:24 69:1,4
fully 388:9
fun 76:3
fundamental
101:13 106:16
106:17 108:7
108:11 114:20
253:7,15,20
254:5 265:5
funding 87:20
439:1
funny 233:3

262:4 440:14
**further** 138:3
178:3 183:22
187:24 319:14
331:9 367:14
368:2 372:23
373:5 428:20
429:8 450:7
451:13 479:13
482:20 487:7
487:10
**future** 471:17
475:14

## G

**G** 4:1 7:22,23
**gained** 223:17
**gap** 198:4
**GARBER** 2:17
**gas** 328:13
**gastrointestinal**
57:17
**Gates** 288:14
299:10,18
301:14 425:4,4
425:21,21,24
466:7,12,16,17
466:20,22
467:24 468:11
468:11,22
469:11,13
470:4,12
**general** 5:14 8:2
8:13 28:16
47:6,10 50:18
87:24 115:12
115:24 116:3
131:2 150:18
194:13 198:20
206:1 225:8,14
228:21,21,25
248:14 249:24
250:15 255:13
271:9,9,22,25
272:6 275:6,23
291:24,24
292:2 304:18

312:18 321:2
340:9 341:9
351:3 368:5
371:25 403:25
404:16 416:10
422:10 433:14
435:13 459:10
485:3
**generalities**
195:8 436:9
**generalization**
366:23
**generalizations**
315:22 366:25
**generalized**
298:19 414:8
**generally** 24:22
115:8 116:25
181:10 186:4,8
245:4,25 248:1
282:21,25
284:18 294:9
296:2 305:15
307:7,18
308:25,25
309:20,21,22
312:6 333:4
340:7,18
354:13,15
359:14 407:19
**generated** 101:9
102:7,19,19
**genetic** 27:15
57:7
**genital** 8:21
328:4 363:2,11
363:13,20,24
364:25 367:13
367:25 368:25
369:11,12
371:10,22
372:15 373:8
373:17 385:9
385:24,24
447:9 448:1
450:6,8,19
453:1,15

454:13
**gentleman**
67:13 144:7
**GEREL** 2:12
**Gertig** 288:15
299:10,17
300:9 301:15
301:21 387:16
425:22,25
466:6,11
469:23 470:4,6
484:13
**getting** 17:23
23:15 57:19
90:18 99:22
104:25 265:4
278:17,19
**GIBSON** 2:21
**Gilead** 92:20,21
92:24
**gist** 485:3
**give** 15:23 21:11
22:2,6 36:25
39:11,15,19
42:12 63:1
76:5,6,7 80:15
85:24 86:1,2
89:11,17 90:14
98:7 153:19,24
163:16,17,18
169:23 175:4
175:10 199:16
200:4 209:11
211:18,21
227:21 240:15
241:22 259:24
263:10 283:19
312:11 313:20
315:17 361:1
409:11 458:20
483:8
**given** 41:11
79:15 82:23,25
91:11,25
164:19 318:3
321:4 341:4
372:20 374:2

375:22 376:7
413:24 439:17
439:18,22,23
439:23 440:2
489:5
**gives** 275:18,19
275:21 409:23
410:10
**giving** 83:4
93:15 218:16
218:19 220:22
266:11
**gladly** 160:15
**go** 20:11 34:12
35:13 49:6
52:15 61:3
63:12 70:16
74:11 78:6
88:3 97:19
106:12 109:13
112:20 114:10
121:1 124:15
129:15 131:2
131:11,12
133:17 146:18
152:5 155:15
174:14 178:4,6
180:7 183:12
189:20 213:11
213:15,19
214:23 217:11
219:6 223:8
233:7,7 236:17
236:18 244:21
252:22 253:8
262:23 266:4
269:4 277:11
277:11 279:17
294:15 295:8
295:15,16
299:5 308:18
317:15 318:11
319:20,24
320:17 331:22
337:6 338:3,10
338:12 346:2
349:22 351:1

352:10 354:23
355:6 359:10
360:6 361:8,12
362:20,21
368:21 374:21
374:23 375:19
379:2 381:5
384:2 387:11
391:9 392:13
393:1 400:25
406:20 407:2
417:6,19,21
418:20 419:9
420:20 423:23
427:2,11
432:14 434:7
439:25 442:1
449:4 451:18
451:19 452:16
458:2,6 461:17
462:10 463:1
465:20 479:21
484:6
**goal** 136:5
215:23
**goals** 134:1
136:22 139:11
**goes** 60:25 90:4
134:21 235:11
330:12 423:6
434:18 438:3
444:9 459:23
**going** 19:3 21:15
21:16,17 22:13
23:10 32:25
36:25 37:23
38:23 39:7,11
41:5 48:20
49:5 50:22
63:25,25 66:2
74:2,13 75:15
75:16 79:8
88:5 90:7
93:23 99:4
118:24 119:4
119:14,15,17
119:21,24,25

Christian Merlo, M.D., MPH

121:1,1,5,5,7,8
123:13 130:7,8
132:10,11
146:24,25
162:2 171:2,5
174:23 189:21
196:16,18
198:12,18
199:11,15
200:16 201:3
202:3,4,22
206:25 207:9
207:19 209:2
212:10 213:14
215:8,16 217:4
221:22 222:6
236:6,8,24
240:10 244:10
246:7 257:19
258:11 263:5,7
268:11 270:5
272:14,25
273:5 274:17
278:24 280:1
292:21,22
295:25 302:1
309:15 310:2
315:16 317:17
318:9 322:15
323:1 324:5,7
324:9 325:4,7
325:10 330:14
330:14 332:1
337:22 338:4
344:5,8 351:22
351:24 353:23
357:19 361:13
364:15 366:19
366:22 375:1
378:6 380:6
392:14 396:15
397:11 398:2
400:15 401:11
405:7 406:13
409:20 410:3
410:16 413:25
414:1,10

415:25 416:25
419:8 425:7
438:8 442:1
443:3 445:8
446:17 451:12
455:17 457:17
457:22 462:10
463:8,18 465:4
465:17 470:7
471:5,16 472:6
473:19 474:6
477:8 480:5
485:14,19
486:7
**gold** 34:18,24
**Golkow** 1:23 4:1
    10:4
**gonna** 254:20
**Gonzales** 288:15
    393:14
**Gonzalez** 299:11
    301:22,23
    393:7 396:4
**good** 70:17
    77:24 84:16
    116:20 187:19
    206:14 209:13
    212:17 241:8
    242:3 257:7
    337:7 360:5
    410:1 412:14
    414:4 456:18
    469:12
**Gordis** 67:13,14
    67:15 68:20,24
    206:11 207:24
    208:1 209:4,8
    209:12 210:23
    211:5 212:20
    215:3,4,6
    265:21 266:23
    314:6 355:1
**Gordis'** 68:4
    209:17
**grades** 7:3
**gradient** 45:5
    440:24 441:5

443:15 444:1
458:7 461:19
462:1,14 465:8
465:12,17
**graduated** 44:24
**great** 75:9
    176:21 209:14
    210:6 309:8
    312:23 427:25
    468:13
**greater** 306:1
    369:17 379:13
    393:9,23,24
    394:1,4,4
    396:23 397:6
    399:19,20
    408:5 450:18
    451:25 452:13
    466:14 468:24
**greatest** 271:4
    442:18 445:23
**Greece** 374:25
**Greenland**
    413:7
**Grimes** 244:5
**Gross** 428:11
**grounds** 212:11
**group** 19:7,7
    90:15 92:1,12
    112:1,6 163:18
    256:9 442:19
    442:20,20
    445:24 456:4
**groups** 89:11,12
    366:20 442:16
    445:21
**grows** 92:6
**guess** 71:23
    229:3
**guessing** 82:7,10
**guidance** 30:12
**guideline** 203:24
    204:8,10 205:8
    205:15
**guidelines** 7:4
    29:6 32:9
    196:12 203:19

213:24 214:15
215:19 216:4
266:15,22
**guy** 360:10
**guys** 194:6
**gynecologic**
    15:1,8,22 16:6
    20:7,13
**gynecologist**
    19:16,17 477:6
    477:21 479:10
**gynecology**
    475:20,22,23
    475:24

────────────
**H**

**H** 4:1
**Hair** 8:9
**hairs** 349:3
**half** 298:13
    441:6,20 442:3
    456:1
**halfway** 263:21
    274:5 434:7
**hand** 186:11
    207:17 317:16
    317:16
**hands** 143:25
**Hansel** 13:22,23
**happened** 160:9
    160:12
**happens** 262:5
    393:21
**happy** 122:18
    131:12 221:2
    229:4 287:21
    295:16 468:19
    468:20
**hard** 171:23
    172:9,25 173:8
    174:1 306:16
**hardest** 455:18
**harm** 162:3
    163:1,23
**Hartge** 369:13
    393:6,6,13,13
**Harvard** 151:2

**hazard** 340:5,14
    393:8,22
**head** 208:2,8
**heading** 347:23
**headnote** 348:3
**health** 6:2,13
    7:15 12:23
    27:20 61:16,24
    62:2,7,14 63:3
    63:7,24 64:7,9
    64:13,18,21,24
    65:13,16,20,23
    66:6,23 67:18
    69:2 71:7,20
    94:8,9,13,15
    94:22 95:17,21
    102:11,22
    133:20,23
    135:18,22,25
    154:16 156:11
    156:14,15,21
    164:18,23
    165:1 168:25
    169:1,2,3
    210:10 219:10
    219:12,23,25
    220:14 222:18
    222:20 223:15
    224:5,7 225:1
    225:3 251:1,23
    252:1,4 280:13
    298:13 438:12
    438:16 439:2,5
    439:6,10,20
    440:3 474:16
**health-related**
    220:12
**hear** 105:1
    138:16,17
    144:11 345:17
    431:7 463:17
    477:24,25
**heard** 77:21
    281:22,24
**hearing** 5:15 8:2
    8:13 121:7
    122:16 155:1

Christian Merlo, M.D., MPH

Page 511

**heart** 305:25
**heavily** 331:11
**height** 312:21,24
  313:4
**held** 1:13 10:9
  56:15 61:17
  155:1
**help** 118:22
  133:22 135:24
  154:8,18 160:4
  170:4 187:11
  389:25 432:25
**helped** 93:16
**helpful** 179:17
  187:16 203:19
  464:16
**helping** 63:18
  85:24
**hereinbefore**
  487:9
**heterogeneity**
  342:1 384:15
  384:21 386:11
  418:23 423:7,9
  424:1
**Hey** 187:22
**hierarchy**
  114:22 115:8
  115:12,22
  116:4 125:19
  126:6,8,12,15
  236:20 237:6
  237:10,18
  238:1 244:11
  244:16 248:20
  248:24 249:3
  249:16,19,21
  250:11,15,20
  250:24 253:22
  265:6 271:2
  275:6 297:20
**high** 232:20
  317:7 325:24
  327:6,7 333:2
  442:15 445:20
**higher** 180:4
  237:19 248:19

275:18,20,21
305:25 328:5
329:7
**highest** 328:16
**highlight** 232:14
  352:2,14
  396:20,21
  397:3 398:23
  399:25
**highlighted**
  354:5 373:2
  397:6 450:12
  451:22 454:12
  455:16,25
**highlighting**
  400:8
**highlights** 370:9
  371:17
**highly** 329:1
**Hill** 6:16 28:14
  28:18,18 29:6
  29:6,10,11
  30:4,14,19
  32:9 34:17
  35:8,18 36:18
  45:3,11,11
  47:1,2 48:4,5
  48:15,19 50:6
  72:23 124:7
  171:4,8,15
  172:7 174:18
  174:22 175:17
  177:18 178:8
  178:20 180:18
  196:12 202:21
  202:24,25
  203:4 214:6,10
  214:20 215:5
  266:17,24
  316:3 317:25
  319:2 430:10
  432:11,14,15
  442:23 443:7
  456:16 461:18
  463:2,16,25
  464:13
**Hill's** 171:11

177:11 198:23
203:16,17
204:17
**hired** 100:16,20
  233:17 234:2
**historically**
  45:15
**history** 43:17
**HIV-related**
  55:18
**hold** 14:13 18:11
  18:24 40:25
  61:21 146:5
  147:3 193:16
**Holmstock** 4:1
  10:3
**home** 480:11
**hominem** 166:8
  166:23
**honestly** 79:1
  120:15 146:25
  166:1 272:1
  429:14
**honor** 263:6
**honoraria** 98:13
  100:17
**honorarium**
  89:17,23 90:8
  91:4 93:10
  100:20
**honorariums**
  89:10 92:15
  93:18
**Hopkins** 5:21,22
  6:2,4 12:20
  13:3,18 14:23
  16:22 41:19
  54:11 55:1
  56:10,13 58:11
  58:13 59:23
  60:8,23 61:16
  61:24 62:2
  63:1 65:2,15
  68:2,5 69:16
  70:23 71:1,6
  71:18 90:3
  94:8 102:10,23

103:18 113:18
149:6 153:19
170:3,17,22
186:10 208:3
210:9 252:23
354:25 359:7
359:16,21
475:20
**hormone** 311:23
**hospital** 42:24
  62:18 359:16
  372:23
**hospital-based**
  132:7 151:23
  152:1 188:24
  189:14 238:5
  238:19 239:9
  239:19 240:2
  240:15 241:8
  241:16 338:25
  339:6,12,22
  345:4 346:25
  347:2 348:12
  350:1,7,16,21
  358:13 359:1,4
  359:13 362:12
  362:14 375:4
  378:8,12,18
  379:6 380:1,9
  380:18,25
  381:17 384:12
  404:4 418:22
  422:17 428:22
**hospitalized**
  244:2
**hospitals** 422:10
**Houghton**
  287:22 288:15
  299:10 301:20
  302:13,14
  484:14
**hour** 86:10,10
  207:1
**hours** 295:19
  471:12
**House** 155:5
**housekeeping**

79:10
**huh** 314:2
  352:16
**human** 267:6
**Huncharek**
  484:13,15
**hypertension**
  7:2 14:19 37:2
  37:7,8,14,21
  38:8 39:22
  40:1,14 42:16
  42:20,22,25
  43:1,5,10,17
  44:4,7 229:10
  229:19 230:4
  230:12 234:6
  234:13,16
  317:20
**hypotheses**
  255:23
**hypothesis**
  161:12,18
  162:1 256:16
  274:25 280:8
  280:18 373:5
  407:18

**I**

**i.e** 407:13
  422:10
**IARC** 141:8
  154:16 164:9
  164:10,11,14
  169:7,8
**ICU** 15:9 18:18
  19:8
**idea** 60:5 71:16
  79:2 85:18
  113:21 138:25
  139:16 140:2,5
  142:12 149:9
  155:3,10
  156:20 158:1
  169:2,6 194:18
  268:4 337:12
  412:7,12
  437:18 438:3

Christian Merlo, M.D., MPH

471:16 474:20
475:10
**identification**
11:10 13:8
32:23 33:16
54:21 58:1
65:25 70:20
78:21 83:15
88:13 110:11
118:19 151:10
165:13 170:24
200:7 206:7
217:8 232:4
251:10 268:9
270:13 272:23
309:25 314:19
324:12 330:19
331:25 334:4
344:3 351:20
353:6 359:23
374:19 378:25
396:18 404:21
410:14 418:18
438:6 446:10
**identified** 31:18
32:1 34:20
80:20 82:25
151:22 285:14
296:1
**identifies** 88:5
**identify** 20:3
31:17,25 32:19
285:24 286:6
**identifying**
440:5
**ignore** 114:20
114:22 126:11
126:14 143:8
147:9 148:10
148:20,21
253:19,22
**ignored** 125:18
144:9 145:22
146:2,3 237:10
**ignoring** 126:19
126:25 127:2
127:17 128:5

129:7,25
131:21 145:18
347:22
**illegible** 398:8
**illness** 176:12
**illustrate** 328:6
328:20
**IMERYS** 7:10
7:10
**immediate**
176:12
**immediately**
166:16
**imperative**
488:13
**implementing**
401:20 402:5
403:11
**implication**
138:5
**imply** 146:6
415:18 460:5
461:12
**implying** 417:25
**importance**
315:6 372:25
**important** 32:20
45:15 177:10
179:7,9,19
189:25 190:21
192:4 195:11
208:23,25,25
209:1 216:20
221:4 226:7
333:8 351:5
354:9 355:18
376:16 409:8
414:24 415:20
416:11 438:2
**impose** 146:7
**impossible**
29:23 63:11
187:4 191:20
217:4 232:25
295:18,20
**improper** 201:7
**improve** 133:22

135:25
**in-person** 72:19
75:21 76:6
**inappropriate**
121:14 122:11
122:21 123:1
166:13 201:21
201:23 242:17
243:9 291:3
428:24 439:15
439:16
**inception**
255:24
**incidence**
257:20 258:4
258:15 259:1,4
259:11,15
260:19,21
261:6,16,17
264:3
**incidences**
259:17
**include** 395:19
396:4 398:18
399:14 409:16
409:20 418:16
425:20 469:11
469:13
**included** 21:7
200:15 232:12
232:23 264:20
395:11 397:20
398:23 399:11
399:21,21
466:6,11,18
**includes** 371:11
398:18 413:15
**including** 14:15
28:13 260:19
325:20 369:25
372:22 386:11
405:12 416:19
**incompatible**
375:24 376:9
**inconsistence**
344:15
**inconsistencies**

350:3,6,20
**inconsistency**
132:2,9 146:15
184:15 189:11
189:13 191:18
338:16 344:14
344:20 348:10
348:11,14,15
348:18 371:18
404:7,14
**inconsistent**
118:11 126:25
127:3,18,19,24
128:5 129:8,25
131:21 188:3,5
188:18 192:6
192:17,24
345:20 346:1,6
346:16 347:10
347:15,23
348:24 349:5
361:21 362:8
368:10 370:17
374:7,9,13,14
374:22 377:19
402:8 403:15
482:19
**incorrect** 243:12
243:15,16
264:24
**incorrectly**
415:5,15,19
**increase** 313:5
329:10 336:3
382:2 383:5
397:21 454:15
457:2,11
**increased**
310:12 312:25
329:12 332:25
335:7 362:25
364:23 365:8
368:24 369:3
369:16,19,24
369:25 370:6
370:24 371:4
380:11,20

381:3 382:14
424:13 426:18
426:19 427:8
455:9,21
478:14 482:14
**increases** 232:18
313:4,13 383:2
**increasing** 453:2
453:16 455:10
455:22 457:3
457:12 459:11
459:11 460:24
460:25 462:5,5
462:6,21,21
**incumbent**
297:9
**independent**
357:10 361:4
361:14
**independently**
258:20
**INDEX** 5:1
**indexes** 313:4
**Indiana** 2:23
**indicate** 408:12
424:12
**indicated** 98:11
107:12 382:1
422:1 484:17
**indicates** 407:20
408:5
**indicating**
332:25 421:8
**indication** 418:1
**indirect** 176:12
176:13
**individual**
112:15,17
113:4 287:20
290:8,9 294:10
303:25 305:6
305:11 332:24
442:2
**individually**
296:20 298:2
427:12
**industry** 90:16

Christian Merlo, M.D., MPH

**infected** 59:4
**infection** 163:17
  163:19 196:1
**infectious**
  163:13
**inference** 213:2
  331:11
**inferences** 6:22
  212:24 215:23
**infertility** 57:18
**inflammatory**
  349:4,10,14
**influence** 176:20
**influenced**
  176:18
**information**
  29:9 88:4
  150:17 216:1
  256:20 257:7
  288:10 342:3
  408:18 409:5
  409:24 410:10
  433:1
**informative**
  116:20
**inhalational**
  434:21
**inherent** 182:13
  296:13,15
  303:8 304:5,24
  357:6 405:12
**inherently**
  114:24 118:11
  174:19 296:8
  414:3
**initial** 186:25
  187:19
**initially** 300:5
**initiation** 255:17
**inject** 166:5
**input** 170:1
**inside** 471:9
**insignificance**
  339:10,12,13
**insignificant**
  118:7 192:7,16
  339:2 410:6

**instance** 76:21
  163:12 185:22
  185:22 195:21
  226:11 263:13
  280:13 309:15
  404:1 429:9
**instances** 112:8
  315:23 404:17
**Institute** 6:5
  310:4 312:4,12
  313:12 480:19
  483:22
**institution** 17:1
  346:4
**instructing** 75:2
**INSTRUCTI...**
  488:1
**instructor** 16:25
**instructors**
  73:10
**integral** 219:9
  219:23 222:17
**intend** 471:14
  472:21
**intended** 105:2
  105:7
**intense** 328:14
  424:16
**intensive** 15:25
  18:19 40:23
  41:10
**intent** 140:3
**intention** 474:21
**interactions**
  212:18
**interest** 95:24
  165:20 167:20
  168:5
**interested** 59:17
  487:13
**interesting**
  229:24 416:8
  471:22 472:9
  472:12,17
**interests** 55:18
  59:2,15,20,21
  60:2,15

**interfere** 361:11
**intermittent**
  328:14
**internal** 12:14
  12:15 17:25
  42:2 53:2,15
  416:10
**International**
  164:13
**Internet** 259:15
**interpret** 50:19
  113:8 415:17
**interpretation**
  7:8 112:11
  273:14 309:8
  384:22 386:14
  399:18 414:25
  431:10
**interpretations**
  342:12
**interpreted**
  275:17 415:5
  415:15,19
**interpreting**
  111:18,21
  216:21
**interrupt** 16:3
  119:12 182:12
  388:5,23,25
  389:4 415:7
**interrupted**
  247:7 473:12
**interrupting**
  227:10 388:13
**interstitial**
  14:16
**interval** 340:22
  340:24,25
  341:5,10,13,24
  342:4 346:22
  347:4 363:22
  364:9 365:10
  369:9,21
  375:12,16
  379:12,22
  394:3,14,15,18
  395:2 397:20

398:16,19
  399:11,15
  409:11,16,19
  409:23,25
  410:5,9 413:15
  418:9,16 424:1
  449:11
**intervals** 375:23
  376:8,18,23,25
  377:3,8,22,25
  381:25 394:6
  394:22 395:10
  408:16 409:4
**intervention**
  267:12
**interventions**
  224:7 225:4
  266:11
**intimidated**
  121:9
**Introduction**
  6:23
**intrusive** 201:17
**invalid** 226:16
**invariably**
  176:23 444:14
  444:25
**invasive** 419:13
  419:17,23
  420:2 423:25
**investigated**
  26:10 456:5
**investigating**
  76:10,16
**investigation**
  72:15 76:22
  413:5 472:10
  472:13
**investigators**
  71:21 241:4,5
  255:9 331:9
**invoice** 83:21
  84:3,18 85:4
**invoices** 6:5
**involve** 15:8
  51:1,6,19 92:9
  356:24 387:10

**involved** 15:22
  79:12 89:6,10
  91:18 111:12
  111:15 152:10
  160:16 164:15
  169:3,4 201:19
  233:4 256:2
  340:15 439:7
  445:4
**involves** 15:23
  163:8 223:16
**involving** 89:7
  100:11 232:9
  233:4 234:12
  280:12 282:15
**IPPHS** 37:3
  38:13 229:9
**irony** 262:18
**irregular** 124:8
**irrelevant**
  174:19
**irrespective**
  421:20
**issue** 46:7 50:8
  98:21 109:15
  110:18 145:21
  152:15 154:15
  154:17 155:1
  157:16 160:1
  160:18,22
  169:20 179:7
  179:13,20
  183:14 260:20
  287:11 291:6
  293:15 295:3,4
  296:3 324:10
  355:8 387:21
  389:15 410:18
  412:6 425:18
**issued** 33:2
  97:24
**issues** 159:7
  460:5 461:11
**it'll** 391:25
  392:1,6,6,8
**italicize** 352:14
**item** 182:25

**items** 34:2
107:13
**IV** 95:1

**J**

**J** 459:22,23
**J-shaped** 459:15
**J&J** 101:10
**Jack** 7:18,20
**January** 7:24
424:11
**JD** 2:8
**JEFF** 2:21
**Jersey** 1:1 3:3
10:18
**Jessica** 3:10
119:15
**jessica.miller...**
3:10
**JGibson@Wa...**
2:22
**job** 169:21,23
**John** 2:8 203:12
**Johns** 5:20,22
6:2,4 12:20
13:3,18 14:23
54:10 56:10
58:11 59:23
61:15,23 62:1
65:15 70:23
71:1,6,17 90:2
94:8 102:9,23
103:17 113:18
153:19 170:2
170:17,22
186:10 208:3
210:9 354:25
359:7,16,21
**Johnson** 1:3,3
3:12,13 10:13
10:13 21:22
80:17,17,25,25
83:18,18 84:6
84:6,8,9,11,11
98:16,16,19,19
99:10,10
100:11,12,15

100:15,20,21
100:25,25
150:14,14
153:4,5 154:13
154:13 155:12
155:13,25,25
156:9,10,25,25
157:14,14,19
158:2,2 159:22
159:22 160:2,2
334:12,12
**Johnson's** 21:23
157:20
**joint** 71:11,15
71:23
**journal** 281:19
342:16 412:6
412:22 416:9
416:15
**journals** 412:15
412:20,23
426:14 430:1,8
**JR** 2:8
**JRestaino@R...**
2:8
**judge** 49:6 74:11
74:12,14 75:16
120:21,21
121:6 292:3
**judging** 213:24
214:15
**judgment** 111:1
111:3,17 113:9
113:13 196:11
196:22 197:1
197:12 198:25
216:5,20,25
217:6 223:24
224:3,17,24
**jumped** 124:18
125:1
**jumping** 47:24
124:23 125:9

**K**

**KATHERINE**
3:5

**katherine.mc...**
3:6
**keep** 77:17
82:17,19 98:23
99:4 326:19
344:9 478:25
**keeping** 17:1
**Ken** 281:22
**Kenneth** 7:9,17
267:25
**key** 160:18
**kicking** 166:18
167:1,3 243:7
**kid** 92:6
**kidney** 329:7
**kind** 26:23
47:24 50:24
51:11 56:2
85:25 94:24
111:5 207:19
232:7 267:6,7
278:24 351:3
398:7 402:24
436:25 442:10
**kinds** 157:24
159:6 180:14
239:23 291:2,2
328:10 404:2
433:8 437:6,7
459:17 472:1
**Kirk** 70:10
**knew** 429:21
**know** 29:23
38:20 39:3,18
41:18 46:5
47:19 50:4,10
51:5,17 52:6
52:15 53:12
58:14 59:6,18
60:6,18,24
61:4 67:22,24
68:8,16,16,18
68:21 69:14
70:12,17 71:17
73:1 77:12,19
77:22 78:23
79:2,18 84:15

86:20,21 96:1
96:2,4 99:16
99:18,19,21,22
99:23 101:2
111:2,20
113:12,16
120:15 122:21
124:3 126:2
129:12 132:21
133:4,8 136:16
141:13,17,18
142:17 147:19
147:22 148:1
149:3,13
150:25 152:15
154:7,13,25
155:4,12,13
156:10,13,15
157:19 158:2
158:23 160:3
164:9,10,11,23
165:4,19 166:1
166:20 167:4
167:12,18
168:20 171:23
175:5,12,12
179:21 195:6
196:25 197:11
199:6,9 200:25
201:22 208:4,5
208:12 216:24
217:5 218:25
219:14 228:11
229:4 231:18
233:12 235:4
239:13,14
241:21,24
247:20 251:24
251:25 252:3
252:12,13,15
254:13 255:15
255:22 259:13
262:12 264:10
264:12,16
265:7 267:25
268:3,5,7,21
280:11,23

281:18,21
282:4,9,12
284:22 285:13
286:16 289:5
291:1,11
295:18,19
298:10 299:17
302:16 312:13
322:2 325:19
326:16 327:3
331:19 332:3
336:4,20
341:17 349:8,9
360:17 366:13
366:17 368:8
368:17 372:3
376:2,21
388:11,14,17
390:15 391:2
392:2 405:13
405:14,15,18
405:19 413:6
418:11 423:4
428:3 430:3,6
430:7 433:10
434:2,4,9
437:23 439:10
441:24 442:6
445:10 456:14
458:14 460:16
462:19 465:25
467:3,23
468:12 471:8
474:3 475:15
483:14,22
485:24
**knowledge**
158:4 223:17
223:23
**known** 203:17
208:10 293:10
**knows** 195:1

**L**

**L** 2:17
**lab** 64:11

Christian Merlo, M.D., MPH

Page 515

labeled 284:15
labeling 234:7
lack 178:24,25
  179:1 260:8
  305:17,20
  338:14 373:2
  415:17,18
  431:1
land 15:24
landmark 203:7
language 464:8
large 32:16
  256:9,17,19
  257:3,3 258:20
  259:6 260:11
  350:2,17
  381:25
largely 203:23
  204:7,17 205:7
  205:13
larger 257:15
  342:5 413:13
late 97:3 109:4,7
latency 194:20
  195:1,7
laugh 314:9
  440:13
laughable 314:1
laughed 313:24
  440:11
laughing 49:17
  143:12,15,19
  314:5 388:19
  440:21
laughter 439:16
law 2:7 10:10
lawful 11:4
lawsuits 150:15
lawyer 334:12
  452:19
LAWYER'S 9:4
  491:1
lawyers 96:19
  99:19 101:10
  125:5 150:8,14
  152:24 153:4
  153:15,15

156:25 252:8
  278:10
lead 26:6 28:2
  31:21 316:4
  317:2
leading 348:17
leads 36:12 57:9
  57:12,14,15,16
  57:16,17,18
  112:14
learn 45:15
  75:10
learned 45:21
  210:6 211:15
  428:14
leave 100:4,4
  122:17,18
  353:10
leaving 448:6
lecture 313:21
led 32:20 426:5
left 242:24 425:3
  425:3
left-hand 450:4
legal 80:2,18
  101:5
legible 398:11
Leon 67:13,15
lesson 6:23
  217:14 218:23
let's 52:9 60:15
  61:13 62:22,24
  74:10,11 75:11
  75:15 93:20
  109:3 121:10
  121:11 123:23
  175:23 187:23
  206:9,10
  212:22 213:9
  219:6 223:8,12
  229:7 236:17
  243:20 244:17
  265:21 267:1
  292:10,13
  305:13,15
  314:21 318:11
  320:8 327:20

333:22 346:2,2
  349:18 354:22
  360:6 362:9
  368:21 372:6
  374:21,23
  375:17 377:1
  386:24 387:2
  392:9 413:10
  417:6 420:20
  424:7 430:9
  433:20,22
  439:25 443:6,9
  449:3 451:18
  451:19 461:3
  462:18
letter 5:18
level 235:24
  441:7,21
levels 7:3 75:11
  115:20 244:9
  442:8
LEVIN 2:2
LHG 1:5
Liability 1:5
  10:15
Library 412:21
  412:24
life 27:18
lifestyle 25:18
  26:9,22 27:6
lifetime 450:21
lightly 127:11
likelihood 306:1
Likewise 118:4
limit 236:10
  241:5,6 255:9
  294:5
limitation
  239:22 286:7
  290:13 293:10
  296:8
limitations
  115:3 241:13
  245:1 296:13
  296:15 303:3,4
limited 49:4
  247:17 304:11

304:21 385:11
  386:1 421:4
  422:4,5 447:10
  448:2,7
line 110:3
  182:25 267:17
  328:22 329:11
  333:3 334:17
  337:3 424:3
  459:22 490:3
  491:3
linear 454:14
  459:4,8
lines 118:7
  214:17,18
  306:11
link 193:12
  478:1
linked 193:25
links 177:1
  216:2 277:17
  369:10 381:7
  474:14
listed 59:3 60:2
  198:3
listen 21:18
  22:14 103:13
  147:2 221:4
  222:7 463:18
listening 222:3
lists 58:16 67:5
  88:15 214:5
  328:10,15
literally 158:15
  227:6
literature 22:22
  23:4 24:13,17
  24:21 26:18
  29:25 34:4
  36:22 38:5
  40:3 51:10
  105:15,24,25
  106:3 109:21

110:7 113:6,8
  132:1 157:8
  159:19 168:11
  168:12 175:14
  179:5 197:3
  234:24 239:17
  271:15,16
  296:15 316:25
  328:2 348:21
  358:1,5 402:7
  403:14 431:6
  432:1 434:14
  434:24 437:24
  451:5 453:13
  453:21,24
  476:18 477:1
litigation 1:5,23
  4:1 10:5,15
  11:22 33:3
  82:13 83:18
  87:10 93:8
  98:11,15,18
  99:10,25
  100:16,24
  101:1,4,24
  102:3,4 133:25
  134:7,21 135:9
  135:20 136:5
  136:21 137:6
  138:8,17,23
  139:4,10
  141:16,18,18
  141:23 148:4
  153:15 158:7
  167:21 168:8
  170:18 233:4
  291:4 292:8
  424:17 439:7
  445:4 471:9,24
litigation-driv...
  291:1
little 26:13
  75:22 82:20
  88:2 91:24
  97:17 115:2
  135:15 140:23
  174:21 207:21

Christian Merlo, M.D., MPH

231:12 320:11
349:3 359:18
399:4 406:4
410:10 437:14
**liver** 57:16
175:5,13
**living** 328:24
329:4
**LLC** 2:7 3:23,24
85:6
**LLP** 1:14 2:12
2:21 3:1,5,9,15
3:20 10:10
**loaded** 348:1,3,3
**local** 224:4,25
**located** 64:12
**LOCKE** 3:15
21:25 22:10
23:22 24:9
39:16 40:9,17
41:4,24 43:23
52:2 61:8 63:9
67:3 90:6
98:24 103:21
104:19 121:16
121:22,25
122:3 123:2,10
124:1 125:7
127:7 134:8
137:7 138:9
139:6,21
141:10 146:12
149:17 156:18
159:13 166:7
167:5 171:18
172:12 173:11
174:4 192:8
194:11 201:24
208:18 209:6
212:9 214:11
216:13 218:3
221:12 222:11
226:9 227:17
229:5 230:6
231:24 233:10
233:21 234:22
236:4 240:18

242:15,23
245:12 248:4
250:12 252:2
253:1 254:7
256:23 257:9
259:23 263:2
264:17 265:12
271:12,17
272:10,21
274:8 276:6,21
277:8,20 288:2
289:12,21
290:10 291:10
294:12,23
295:22 297:2
298:17 299:14
301:12 305:8
310:8 312:9
313:17 314:3
316:18 320:9
320:25 322:4
322:10 323:13
324:1 326:5,20
329:21 332:15
333:17 335:13
335:18,24
336:19 337:15
343:18 349:7
349:16 360:25
365:21 366:12
367:2,9 370:4
373:11 374:10
376:10,20
379:17 380:12
380:22 381:12
382:3 383:6,10
383:23 384:9
385:14 386:7
386:22 389:19
397:1,11,22
399:1,23 400:9
402:15,17
403:1 411:20
425:14 426:25
429:6 430:2,21
431:21 434:12
435:21 437:8

439:8 441:10
441:23 443:2
443:23 445:7
446:2 447:13
447:18 448:14
450:10 451:6
451:14 452:3
453:4,9 456:21
464:2 473:2
474:1 483:16
**Logan** 3:6
**London** 203:6
**long** 44:22,23
97:21 195:13
195:17 197:9
207:1 255:4
256:14 257:25
258:6,6 337:10
**look** 20:8,11
28:19,19,20,20
32:5 38:16
48:12 49:3
50:12,15 51:23
54:14 58:7,8
67:11 73:4
77:4 78:3
79:23 81:1
82:6 83:2,7
86:21 90:25
91:9 95:23
103:1 118:25
120:22 129:16
131:1,25 149:1
151:6 163:19
165:11 169:10
169:16,18
180:11 181:7
181:17,18,21
182:8 187:25
189:8 197:25
200:10 204:23
206:9,10
212:22 213:10
214:7 218:10
218:25 231:15
232:2,18
241:20,23

251:7 257:23
259:15 262:2
264:11 265:21
265:23 266:8
267:1 273:2
276:16,17,18
276:23 281:2
285:17 287:16
287:21 291:5
292:4 293:18
296:19 297:10
297:21 298:1
299:16 308:18
310:10 314:21
322:12,21,22
327:2,6,20
328:8 330:24
363:19 375:17
378:13 381:6
385:1 386:24
387:2 392:14
392:23,25
394:2,13,13
396:2,14 401:6
404:23 413:2
432:6 437:11
438:23,24
442:3,6 443:16
444:2,5,7
445:10 447:4
448:13 450:2
450:15 452:18
457:1,7 458:21
459:20 460:9
466:19 467:17
468:16 470:7
473:20 474:13
484:11,23
**looked** 20:10,12
29:4 30:3 97:6
141:8 168:18
180:1 196:21
197:3 218:22
230:15 231:9
231:10 234:17
253:6 255:6
258:23 265:10

289:7 382:8,11
387:3,7 390:12
391:15 392:4,8
401:7 411:1
420:5 434:17
450:20 484:8
484:21
**looking** 17:19
35:5 36:10,10
36:11 39:21
49:1 56:18
60:20 76:22
95:7 113:1,4,5
132:6 148:24
151:18 154:15
154:17 163:13
164:2 167:16
169:14 177:23
180:7 186:21
186:22 195:12
196:11,20
202:7 205:24
220:16 242:13
247:3 250:19
257:13,16
258:14 260:3
275:14 293:13
327:11 377:24
379:19 384:10
384:11 387:5
395:1 409:14
409:22 428:9
434:20 448:23
457:8,9 464:18
480:5,13
**looks** 33:21
54:15 79:25
83:20 251:21
354:6 396:7
397:17 399:12
437:24 449:7
483:20
**lost** 390:20
**lot** 60:23 91:21
103:4 112:20
160:20 177:4,5
193:13 211:15

Christian Merlo, M.D., MPH

225:19 226:2
252:13 268:23
285:8,9 286:20
288:9 328:15
330:15 338:7
360:7 366:24
408:23 416:22
423:1 455:17
**lots** 17:24 45:19
60:19 113:21
181:1 187:20
**loud** 190:15
**love** 75:7,10
468:16
**lower** 420:4
**lump** 379:21
384:17 428:24
442:9
**lunch** 199:12
206:15,19,23
237:23
**lung** 14:16,17,17
17:13,14 18:3
20:9,16,19
25:4 27:3,5,13
27:15,24 28:5
40:15 50:23
51:1,10,24
55:5,11,19
57:13,14 59:23
60:3 77:11,14
92:2 195:23
315:12 316:8
317:5 329:3
333:3,6 471:19
**lungs** 51:20
57:12 434:6,19
434:23

———————
**M**
**M** 2:8 3:1
**M.D** 1:13 11:3
489:12
**magnitude**
311:11,18,22
312:1 327:23
**main** 3:22

118:14 249:6
**majority** 36:9
51:3,9,24 52:6
52:12 114:12
395:9,13
**making** 44:18
85:23 119:8,9
133:15 216:7
304:18 400:25
464:16,17
**malformations**
59:11
**malignancies**
25:3 41:8
53:14 76:22
**malignancy**
20:9,18 27:3
77:11
**management**
59:10
**manifested**
329:13
**manner** 105:14
109:20 110:6
124:8
**manuscript** 95:3
**March** 5:18
83:23,24 85:3
**Marie** 94:17
**mark** 32:25
33:12 48:20,23
48:25 83:10
123:13 217:15
353:9 399:13
**marked** 11:9
13:7,11 32:22
33:7,15 54:20
57:25 65:24
70:19 71:2
78:20 83:14
88:11,12 96:18
110:10,14
114:2 118:18
151:9 165:12
165:15 170:23
200:6 206:6
217:7,23 232:3

251:9 254:4
268:8 270:12
272:22 309:24
314:18,24
324:11 330:18
331:24 334:3
344:2 351:19
351:23 353:5
359:22 374:18
378:24 393:2
396:13,17
400:17 404:20
410:13 418:17
438:5,9 446:9
483:3
**marker** 399:8
**market** 43:8
44:1
**marketing** 1:4
10:14 159:3
**markets** 157:17
**Maryland** 1:15
10:12
**mass** 313:4
**master's** 94:7,21
**materials** 5:17
33:11,20
**matter** 10:12
115:24 122:6
172:21 179:3
187:7 329:2
435:13
**matters** 80:19
**MCBETH** 3:5
**McTiernan**
142:3,9 155:4
473:23
**McTiernan's**
131:10 260:20
**MD** 5:11,14,16
5:20,22 6:7 8:1
8:12 487:5
**MDL** 1:4 10:15
**MEAGHER** 3:9
**mean** 16:3 17:24
25:25 32:4
44:19 45:18

47:10 51:4
52:5 65:6 70:1
71:14,15 79:17
90:25 93:16
95:23 97:12,14
97:17 111:2,21
112:1 113:14
113:20 124:4
132:21 133:10
133:13,14
134:12 148:23
150:9 158:2
160:23 168:20
184:9 185:6,12
185:17 194:13
196:25 197:11
197:14 208:11
208:12 216:14
223:1 225:8
227:23 233:15
250:2 253:2
272:1 282:8
287:24 290:23
291:23 323:24
336:21 344:19
349:2 357:23
366:17 376:22
410:8 416:20
432:5 433:14
435:16 466:16
466:17 467:10
**meaning** 36:16
176:11 248:2
336:23 409:13
422:3 462:5
485:4
**meaningful**
351:12
**means** 52:6
112:6,7 113:13
147:20 148:1
165:4 181:4
264:23 326:17
328:1 366:14
368:8 410:1,9
460:13,24
**meant** 184:5,6

186:12,13,16
376:17 410:8
**measure** 319:9
382:12 384:3
407:20 408:6
409:15 433:4
435:4,10,18
436:1,7,10,13
436:18 437:25
444:11,23
469:7
**measured**
407:19
**measurement**
256:11 285:5
410:1
**measures**
269:18 307:8
307:19 382:23
407:11,14,16
423:10
**measuring**
254:24 382:21
382:25 433:16
436:8,16
**mechanism**
22:18 23:18
24:6
**media** 424:16
**median** 450:22
**medical** 12:11
29:9,25 36:22
37:9 38:4,7
40:3 44:24
46:24 47:8,14
47:20 105:15
109:20 110:6
132:1 137:3,16
145:12 146:19
159:19 168:11
169:24 179:5
184:15 186:24
200:5 203:5
223:23 234:24
252:1,4 348:8
348:9,21 361:6
411:24 431:5

431:25 437:24
475:4 476:6,17
477:1 478:22
479:5
**medication**
231:8 317:21
437:16
**medications**
231:9,16
**medicine** 5:13
12:14,15,16,16
12:18,20,21
13:1,3,5,19
14:10,20,24
15:13 17:25
18:2,3,7 42:2,3,4
53:2,15 55:6
55:12 58:17,23
61:15,23 63:5
64:15 71:10,18
94:13 96:10
102:11,22
103:7 133:20
135:18,22
176:16 223:19
416:10
**medicines** 42:11
43:25 44:5
**medium** 442:15
445:20
**meetings** 64:12
85:14,24 475:5
**meltdown**
278:25
**member** 65:4
210:8
**memorized**
206:5 251:17
281:3 284:23
286:21 287:17
288:11 294:1
295:13 331:19
360:8 390:15
423:1,22 442:1
442:5 470:7
**men** 57:18
**mention** 55:22

55:24 56:1
356:2 359:9
402:6
**mentioned**
18:10 36:24
53:25 68:23
91:22,23
106:11 198:2
230:1 243:13
244:12,19
354:1 358:12
358:18 360:11
395:15 412:16
**mentions** 56:5
**Meridian** 2:22
**merits** 238:19
**Merlo** 1:13 5:11
5:11,12,14,14
5:16,16,18,20
5:20,22,22 6:1
6:3,5,6,7,8,8
6:10,11,15,17
6:19,21,23 7:1
7:3,5,7,8,11,14
7:17,18,20,21
7:23 8:1,1,3,3
8:5,5,7,9,12,12
8:14,16,18,19
8:19,21 10:20
11:3,9,15,17
13:7 32:22
33:15 48:2,18
54:20 57:25
65:24 70:19
78:20 79:12
83:14 88:12
101:2 110:10
118:18 119:7
151:9 153:17
155:13 158:20
165:12 170:23
200:6 206:6
217:7 232:3
236:1 251:9
268:8 270:12
272:22 309:24
314:18 324:11

330:18 331:24
334:3 344:2
351:19 353:5
359:22 374:18
378:24 396:17
404:20 410:13
418:17 438:5
446:9 487:5
489:12
**Merlo's** 119:7
**Merritt** 387:16
**met** 69:15 96:16
**meta** 329:13,13
**meta-analyses**
116:6 332:23
378:10,12
428:7,13,14,17
**meta-analysis**
6:18 7:12 8:22
193:3,6 263:23
285:11 325:25
327:25 331:10
336:9 378:7
380:9,18,24
381:15 385:6
385:22 419:20
419:21 423:10
424:10 425:20
426:17,24
427:17 428:10
438:10 447:7
447:24 466:12
470:19 471:1,3
474:6
**method** 34:15
436:8
**methodologic**
6:9 105:14
109:20 110:6
125:23 126:3
126:17 249:5
249:11
**methodologic...**
118:6
**methodologies**
101:18 107:4,8
112:9 114:13

114:19 133:1
253:18
**methodology**
53:6,8 112:13
133:6 137:10
137:22 138:2,5
138:8,22 140:7
140:21 141:3,9
141:13,16,19
148:3,7 245:19
245:22 276:1
276:18 305:14
425:18,19
426:4
**methods** 6:20
8:15 200:13
224:1,15,22
402:13 403:19
467:12
**metric** 466:22
467:9,24
468:12 469:2,5
469:14,19,20
**MICHAEL** 3:21
**michael.ander...**
3:21
**Michelle** 2:12
5:19
**middle** 188:14
200:19 227:7
247:6 332:11
352:6 476:22
**Mill** 203:12
**Miller** 3:10 5:6
17:18 18:13
19:2 21:9,24
22:9 24:8
25:20 26:11
27:7 28:8
29:13 30:16
31:9 32:10
33:25 35:2
36:1 37:22
39:5,17 41:3
41:23 43:11,22
46:18 47:4,17
48:16,22 49:1

51:13 52:1,3
52:11 53:23
59:25 60:17
61:7 62:8 66:7
66:12,15,17
67:21 69:6
70:3 72:25
73:13,19,23
74:2,5,8,13,20
75:1,13 76:12
76:18 77:16
78:22 79:3,11
80:4 82:1,15
84:15,21 86:6
87:1,4 88:7,21
88:24 89:3
91:8 93:5
96:22,25 98:1
98:6 99:5
101:20 102:12
102:24 103:19
103:22 104:6
104:13,20
105:6 106:6
107:15,18
108:1,9 111:8
111:19 113:10
113:19 115:10
115:25 116:2
118:15 119:3
119:13,17,21
119:25 120:5,9
120:12 121:8
121:13,20
122:6,10 123:9
124:2,11 125:6
127:8 128:2,11
128:23 130:12
130:17 131:6
131:18 132:18
133:3 134:16
135:10 136:15
138:10,24
139:7,15,22
140:8,19
141:11 142:4
142:11,16,24

Christian Merlo, M.D., MPH

143:9,13 145:9
145:24 146:9
146:17 147:11
147:18 148:5
148:12,22
149:8,24 150:4
151:4 152:19
153:7,22 154:9
154:21 155:8
155:18,23
156:4,19 157:4
157:25 158:10
158:22 160:7
160:10 161:23
162:17 163:5
164:21 165:3
165:21 167:11
167:15,25
170:19 171:19
172:5,13,17
173:3,10,15
174:3 175:8,19
177:7,13
178:12 180:16
181:13,19
182:11,18,23
184:10 185:10
185:18 186:18
188:6,13
191:11,14
192:9,18
193:19 194:10
194:24 195:14
198:7,16
199:11,24
200:16,23
201:8,17 203:1
204:24 205:9
206:14,18,25
208:19 209:1,5
209:19,25
210:3,17,21
211:4 212:8,10
213:4,16,20
216:12,22
219:14 221:13
221:18 222:1

224:19 225:22
226:10 227:6
228:8,13,18
230:7 231:5,25
232:10 233:9
233:13 235:7
235:18 236:3
236:24 237:22
238:7,12,15,24
239:2,12
240:22 241:24
242:2,4,7
243:2,4 245:13
245:23 246:6,9
246:19 247:5
248:12 249:23
250:13 251:6
254:8,25 258:9
258:22 261:21
262:1,8,17,20
262:23 265:16
265:25 269:1,5
269:25 270:25
271:18 272:9
272:20 274:9
276:5,8,20
277:7,19 278:2
278:9,16
279:11,19
280:10,25
286:1,11
287:14 288:1
289:13,22
290:4,18 291:9
291:22 292:11
292:15,19,25
293:16 294:13
294:22 295:6
296:6 297:3,13
298:25 301:1,5
301:13 302:9
304:2,13 305:7
306:16,23
307:2 308:16
310:19,23
311:2,13 312:8
313:16 316:17

319:25 320:24
321:20 322:5,9
322:20 323:20
324:2,24 325:7
325:11,18
326:9,16
329:20 330:23
331:23 332:1
332:10 333:16
333:24 335:12
335:17,19
336:18 337:10
343:17 344:17
345:23 346:9
347:11,25
348:6 349:6
352:8,16,25
353:7,23
355:10 356:4
356:14,18
357:4,14,17
358:19 360:24
361:1 364:17
366:11 367:8
368:13 370:3
370:18 372:8
372:11 373:21
374:11 375:7
377:4 378:21
381:13 382:4
382:17 383:11
383:22,24
386:23 387:22
388:4,8,12,21
389:3,10
390:18 391:5
391:22 393:10
394:8 396:25
397:23 398:2,7
399:2,22
400:24 402:16
405:4,7,10,16
405:20,22
411:11,21
416:25 417:12
417:18 420:14
421:9 423:15

425:13 426:21
427:1,9,21,25
429:5 431:13
432:12 433:12
434:11 435:11
435:14,20
436:4,15,24
441:11,15
444:16 446:17
446:20,24
447:17,19
448:5 451:7
453:8,22
456:20 458:8
458:12,17,22
459:5,18
460:14,22
462:8,22,25
464:21 465:3
466:9 467:25
468:6,9,15
469:15,25
470:15 472:5
472:15 473:7
473:11,18
475:1,8 476:3
476:22 478:6
478:15 479:2
479:17,20
480:1,4,9,12
481:5,6,13,20
482:2,8,20,23
483:2,5,8,19
484:19 485:1
485:11,17
486:5
**millions** 158:16
  158:17 159:2
**Mills** 387:15
**mind** 176:16
  247:24 308:24
  352:10
**mine** 91:5 210:6
  210:23 212:14
  483:2
**Mineral** 8:7
**mineralogist**

19:20,21
**minute** 83:10
**minutes** 86:3
  199:17 206:16
  206:16 207:1
**minutiae** 90:19
**mis** 281:10
**mischaracteri...**
  138:11 292:17
  292:20 311:14
  346:10 420:15
**misclassificati...**
  273:21,24
  281:12,13,16
  282:2,12,14,15
  282:20 283:7,9
  283:11,13,14
  283:22,25
  284:6 285:1,14
  286:9,10 287:5
  287:12 288:17
  288:22,25
  289:11 290:12
  291:7 296:1,7
  298:4,6 300:20
  301:9 303:10
  303:17 304:7
  304:12,22
  305:1
**misconception**
  270:24 271:1
  414:18,20,23
**misconceptions**
  7:7 270:18
  414:12 416:12
**misinform**
  413:20
**misrepresenting**
  144:15
**missed** 26:19
**missing** 364:11
  364:12
**mistake** 351:25
  401:20,25
  402:1,4 403:11
**mistaken** 274:22
  467:6

mistakes 484:17
484:25
misunderstan...
334:11,14,19
misunderstan...
269:19
misunderstood
307:3
MITCHELL
2:2
moderate
320:23
Modern 7:17
314:23 401:5
modest 311:12
311:20,23
312:1,25 313:5
313:13,15,23
314:9 334:23
335:4 454:14
modified 203:16
moment 12:10
80:18 418:21
418:25
money 80:22
91:3
monotonic
459:16 460:6
460:10,12,17
460:21,23
461:5,12,16
462:4 464:23
464:25
months 54:5
62:17 83:6
104:15 109:6
232:20 301:24
317:22 437:5
Moorman 7:22
7:23 142:22
331:3,3,13
333:13,23
334:25 335:25
474:11
Moorman's
131:8 332:18
motivation

138:18 139:1
motivations
143:2
motive 138:21
140:3
move 23:10
50:19 93:3
94:6 146:24
199:12 213:9
229:7 240:11
323:2 349:18
392:9 417:1
moved 66:24
Moyses 68:9,15
371:20
mparfitt@ash...
2:13
MPH 1:13 2:8
5:11,14,16,20
5:22 6:7 8:1,12
11:3 94:24
487:5 489:12
MSc 7:19
MSPH 7:22,23
mucinous
419:23,23
420:1,2,2
multiple 31:22
59:4 67:24
113:6,7 149:25
212:11 450:25

―――― N ――――

N 2:1
N.W 3:11,16
Nadia 13:22,23
name 10:3 11:14
11:15 58:19,21
67:13 68:9,11
158:20 159:10
170:12 339:25
361:11 467:19
napkin 437:21
napkins 363:2
364:6,24
368:25 369:12
369:20 371:5

372:17 373:18
467:16
napkins' 363:7
Narod 260:7
narrow 341:25
342:5
National 154:15
251:1 252:1,4
310:3 312:3,12
313:11 480:19
483:21
nature 96:7
274:24,24
367:16 411:11
NCRA 487:17
near 298:15
nearly 274:18
necessarily 29:1
64:25 65:6
107:20 163:15
187:18 194:7
207:21 214:19
226:17 235:8
282:23,24
303:23 463:13
469:18
necessary 105:8
187:12,17
318:13,15,22
318:23 460:6
461:6,13 462:7
462:20 463:19
463:22 464:9
464:25 488:4
need 12:3 40:2
49:11 61:5
103:13 105:4
123:20 144:23
147:1,1,2
155:14 165:21
166:2 170:21
172:15 174:22
194:6 206:22
213:8 221:2
235:13,17
236:2 247:16
256:4,15

257:15,17
258:13 277:2,3
279:16 317:9
320:11 321:16
325:19 387:23
400:23 404:17
406:4 422:21
423:16 425:2
428:4 437:13
460:16 461:21
466:19 471:5
needed 216:1
260:24 367:15
368:2
needs 11:25
167:11 356:12
372:23 373:6
388:6
neighborhood
328:25 329:4
neither 132:19
318:13,21,23
413:16 425:15
460:6 461:13
462:6 464:25
487:11,12
neuromuscular
14:18
never 24:20,23
100:19 104:15
107:14 141:24
148:6 150:15
150:22 158:8
234:1 277:21
281:24 302:4
322:1 366:5
368:9 413:11
437:3 441:8,22
450:19 469:8
469:21 470:5
new 1:1 3:3,11
10:18 44:3
199:12 278:9
337:6
Newport 2:18
NHMRC 7:3
nice 262:15,18

263:1
Nicholson 440:4
night 288:7
NIH 7:16
nine 45:9 109:6
203:7 214:6,8
214:9,14,17,24
432:16 463:3
464:13 465:5
non 345:21
non-perineal
423:8 467:15
nondifferential
283:10,12
284:4,5 286:9
287:5,12
288:17,21,25
289:10 290:11
291:7 300:20
nonrandomized
267:11
nonresponsive
23:11
nonserous
420:10
nonsignificant
369:11 404:6,6
nonstatistically
341:11 346:5
370:1,11
404:12 418:15
427:18
Nope 242:1
normal 102:7,19
normally 30:9
North 2:22
Notary 487:18
489:19
note 43:8,21
87:1 226:7
338:23 380:17
386:5
noted 10:22
172:7 488:10
489:7
NOTES 9:4
491:1

Christian Merlo, M.D., MPH

| | | | | |
|---|---|---|---|---|
| **notice** 360:10 | 400:17 404:25 | 166:4 201:8,11 | 128:2,11,23 | 204:24 205:9 |
| **noticed** 242:12 | 408:14 409:2 | 201:25 221:18 | 130:12,17 | 208:18,19 |
| **Novartis** 87:21 | 410:19 412:23 | 292:16 | 131:6,18 | 209:5,6,19,25 |
| 89:2 92:20,21 | 414:14,18 | **objection** 17:18 | 132:18 133:3 | 210:3,17,21 |
| 92:22,24 | 419:4,5 420:5 | 18:13 19:2 | 134:8 135:10 | 211:4 212:8,9 |
| **November** | 438:9 443:10 | 21:9,24,25 | 136:15 137:7 | 213:4 214:11 |
| 109:1 274:1,10 | 446:13 447:23 | 22:10 23:22 | 138:9,10,24 | 216:12,13,22 |
| **Novo** 77:10 | 449:1,4,9,25 | 24:8,9 25:20 | 139:6,7,15,21 | 218:3 221:12 |
| **nowadays** | 450:2 451:20 | 26:11 27:7 | 139:22 140:8 | 221:13 222:1 |
| 171:14 | 453:12 454:8 | 28:8 29:13 | 140:19 141:10 | 222:11 224:19 |
| **NTP** 154:15 | 455:5,6,7 | 30:16 31:10 | 141:11 142:4 | 225:22 226:9 |
| **null** 282:22 | 457:9,13 | 32:10 33:25 | 142:11,16,24 | 226:10 227:17 |
| 283:14,17 | **numbers** 52:15 | 35:2 36:1 | 143:9 145:9,24 | 228:8,18 229:5 |
| 284:2,8 364:3 | 86:14 111:6,12 | 37:22 39:5,16 | 146:9,12,17 | 230:6,7 231:5 |
| 415:5,16 | 111:14,15,18 | 39:17 40:9,17 | 147:11,18 | 231:24,25 |
| **number** 6:12 | 111:22 333:15 | 41:3,4,23,24 | 148:5,12,22 | 232:10 233:9 |
| 10:16 13:12 | 333:15,20,20 | 43:11,22,23 | 149:8,17,24 | 233:10,21 |
| 33:7 54:24 | 426:1 457:1,4 | 46:18 47:4,17 | 151:4 152:19 | 234:22 235:7 |
| 58:4 66:3 71:3 | 457:13 458:18 | 48:16 49:4,10 | 153:7,22 154:9 | 235:18 236:3,4 |
| 77:5 78:8 | 466:14 485:2,5 | 51:13 52:1,2 | 154:21 155:8 | 237:22 238:7 |
| 83:12 86:15 | **Numeral** 249:10 | 52:11 53:23 | 155:18,23 | 239:2,12 |
| 88:8 102:6,18 | **numeric** 307:16 | 59:25 60:17 | 156:4,18,19 | 240:18,22 |
| 105:12 106:19 | **numerous** | 61:7,8 62:8 | 157:4,25 | 242:15 245:12 |
| 109:15 110:14 | 328:10 | 63:9 67:3,21 | 158:10,22 | 245:13,23 |
| 114:3,4,5 | **nurses** 89:12 | 69:6 70:3 | 159:13 160:7 | 246:6,19 248:4 |
| 126:10,13 | **Nurses'** 280:13 | 72:25 73:11,16 | 160:10 161:23 | 248:12 249:23 |
| 150:17 165:16 | 298:12 | 73:18,22,25 | 163:5 164:21 | 250:12,13 |
| 171:6 182:7 | | 74:1,16,21,25 | 165:3 166:7 | 251:6 252:2 |
| 197:8 198:1 | **O** | 76:12,18 77:16 | 167:25 170:19 | 253:1 254:7,8 |
| 206:10,10 | **O** 4:1 | 80:4 82:1,15 | 171:18,19 | 254:25 256:23 |
| 207:17,23 | **oath** 11:1 140:16 | 88:21 89:3 | 172:5,12,13,17 | 257:9 258:9,22 |
| 217:16,24 | 290:24 | 90:6 91:8 98:1 | 173:3,10,11,15 | 259:23 263:2 |
| 243:14 251:14 | **obesity** 312:21 | 98:24 99:5 | 173:17 174:3,4 | 264:17 265:12 |
| 254:5 258:13 | 312:24 | 102:12,24 | 175:8,19 177:7 | 265:16 269:25 |
| 264:4,8,9,14 | **object** 17:21 | 103:21 104:19 | 177:13 178:12 | 270:25 271:12 |
| 264:18,19 | 73:14 119:4,18 | 104:20 107:15 | 180:16 181:13 | 271:17,18 |
| 265:22 267:4 | 120:6 121:16 | 107:18 108:9 | 181:19 182:18 | 272:9,10,20,21 |
| 270:16,24 | 121:22 200:17 | 111:8,19 | 182:23 184:10 | 274:8,9 276:5 |
| 273:6,14 282:3 | 212:11 236:25 | 113:10,19 | 185:10,18 | 276:6,8,20,21 |
| 310:3 314:22 | 292:22 325:8 | 115:10,25 | 186:18 188:6 | 277:7,8,19,20 |
| 314:25 319:24 | 325:10 353:24 | 118:15 119:20 | 191:11,14 | 280:10,25 |
| 324:9 329:17 | 361:2 397:11 | 119:24 120:3,8 | 192:8,9,18 | 286:1,11 |
| 330:17 334:7 | 398:3 417:1 | 120:11 121:12 | 193:19 194:10 | 287:14 288:1,2 |
| 335:16 344:6 | 446:18 | 121:15 122:13 | 194:11,24 | 289:12,13,21 |
| 351:24 360:1 | **objected** 326:9 | 123:9,10 124:1 | 195:14 198:7 | 289:22 290:4 |
| 361:17 393:3 | **objecting** 31:9 | 124:2,11 125:6 | 198:16 199:24 | 290:10,18 |
| 393:21 394:19 | 103:24 122:8 | 125:7 127:7,8 | 201:24 203:1 | 291:9,10,22 |

292:11 293:16
294:12,13,22
294:23 295:6
295:22 296:6
297:2,3,13
298:17,25
299:14 301:1
301:12,13
302:9 304:2,13
305:7,8 308:16
310:8 311:13
312:8,9 313:16
313:17 314:3
316:17,18
320:1,9,24,25
321:20 322:4,5
322:9,10,20
323:13,20
324:1,2,24
326:5,20,21
329:20,21
330:23 331:23
332:2,9,14,15
333:16,17
335:12,13,17
335:18,24
336:18,19
337:15 343:17
343:18 344:17
346:9 347:11
347:25 348:6
349:6,7,16
352:8 355:10
356:4,14,18
357:4,14,17
360:24,25
365:21 366:11
366:12 367:2,8
367:9 368:13
370:3,4,18
373:11,21
374:10,11
376:10,20
377:4 379:17
380:12,22
381:12,13
382:3,4,17

383:6,10,11,22
383:23 384:9
385:14 386:7
386:22,23
387:22 389:19
393:10 394:8
396:25 397:1
397:22,23
399:1,2,22,23
400:9 402:15
402:16,25
405:8,21,24
411:20,21
417:12 420:14
423:15 425:13
425:14 426:21
426:25 427:1,9
429:5,6 430:2
430:21 431:13
431:21 432:12
433:12 434:11
434:12 435:11
435:14,20,21
436:4,15,24
437:8 439:8
441:10,11,23
443:2,23
444:16 445:7
447:13,18
448:14 450:10
451:6,7,14
452:3 453:9,22
456:20,21
459:5,18
460:14,22
462:8,22,25
464:2,21 465:3
466:9 468:15
469:15,25
470:15 472:5
472:15 473:2
473:18 474:1
475:1,8 476:3
478:6,7,15
479:2 481:24
482:5 483:16
483:19 484:19

485:1,17
**objections** 22:9
  105:1 120:1,18
  120:23 150:5
  201:11 326:19
**objective** 111:10
**objector** 273:11
**obnoxious**
  440:19,21
**observation**
  304:19
**observational**
  162:16 163:2
  163:12,24
  267:23 289:1
  290:13 304:6
  304:25 357:24
  359:1
**observations**
  177:23
**observed** 176:13
  213:25 214:16
  311:20,24
  312:1 355:19
  356:20 369:19
  370:1 407:20
  408:5 450:6
**obtain** 341:4
**obtained** 269:18
**occupational**
  176:15 435:9
**occur** 16:5
  243:25
**occurred** 326:1
  327:9
**occurs** 283:15
  405:22
**odds** 117:20
  232:17 233:1
  235:11,16,25
  312:19 315:24
  317:20 319:5
  319:16 340:4
  340:12 363:21
  364:1 451:23
  452:10
**offer** 23:14

33:23 101:17
  107:4,7 153:11
**offered** 82:18
  114:7 140:18
**offering** 22:15
**office** 64:6 85:25
  85:25
**offices** 1:13
  10:10
**official** 13:4
  90:2
**oftentimes**
  57:13,19 60:24
  92:11 111:11
  111:24 112:4
  193:11,24
  199:4 317:15
  432:16 435:10
**Oh** 119:9 167:2
  201:15 213:18
  217:13 221:18
  266:5 269:3
  307:2 311:2
  348:2 372:11
**Ohio** 3:22
**okay** 11:24 12:9
  12:17 13:10,22
  14:6 15:10,14
  15:20 16:2,16
  17:2 18:22
  21:14,18 22:12
  22:25 23:6
  24:19 27:1,11
  29:22 30:2,8
  30:21 32:8,15
  33:22 34:12
  36:24 38:9,11
  40:4,25 42:18
  44:12,22 45:1
  45:10 46:1,24
  48:8 50:17,21
  52:18 54:4,23
  55:22 56:4
  58:3 59:10
  60:11,14 61:11
  64:10 65:1,11
  68:22 69:13

70:9 71:24
  72:9,10,21
  75:24 76:4
  77:12 78:6,11
  79:5,13,15
  80:1 81:18,21
  82:11 83:9
  84:10,14 86:4
  86:7,13 87:3,9
  89:21 90:11,18
  91:3 93:2
  94:23 95:10,13
  95:20 96:11,15
  96:23 97:2,10
  98:5 99:2,24
  100:15,22
  101:7,21 102:5
  104:9 105:25
  106:11,19
  107:10 108:4
  108:14 109:5,9
  109:13 110:21
  113:3 114:10
  114:18 115:7
  115:15,18,21
  116:23 117:7
  117:22 118:9
  118:13,21
  120:25 121:24
  123:1,18,23
  125:1,17
  127:20 128:15
  129:5,23 130:4
  130:23 131:24
  132:5,10,11
  133:17 136:6
  136:24 137:1
  138:16 139:19
  140:6 141:5,15
  142:2,14 144:2
  145:21 148:2,9
  149:11,21
  150:25 151:17
  151:21 152:13
  156:15,23
  159:21 160:14
  160:17 162:13

Christian Merlo, M.D., MPH

| | | | | |
|---|---|---|---|---|
| 163:6 164:4,9 | 263:12,16,20 | 379:9 381:9 | 406:21 | 137:2,25 138:1 |
| 164:12 167:2 | 264:13,22,25 | 382:7 384:7 | **Oleckno's** | 138:18,20 |
| 167:15,20 | 267:1,13,22 | 387:18 389:25 | 202:14 | 140:14,15 |
| 168:14 170:8 | 268:5,11,23 | 390:11 391:3 | onc 15:9 | 145:11 147:17 |
| 171:12 172:21 | 270:4,15,23 | 391:25 393:18 | **once** 31:17 | 147:24 153:11 |
| 174:8,13 177:3 | 273:19 274:4 | 395:20,20,21 | 34:19 143:12 | 153:24 157:1 |
| 177:20 178:15 | 277:15,24 | 395:24 396:5 | 159:10 160:6 | 158:3 159:15 |
| 180:9,21 | 278:1,6,8 | 396:12 397:14 | 177:14 284:20 | 169:23 172:11 |
| 181:17 182:16 | 279:1 280:3 | 397:18 400:4 | 298:14 300:24 | 175:10 200:5 |
| 183:8,12 185:5 | 281:21,25 | 400:15,24 | 303:21 446:20 | 209:11 210:13 |
| 185:12,15,18 | 283:3,18,24 | 401:6,10,11 | 468:24,25 | 211:18,18,21 |
| 186:6 187:14 | 284:24 288:8 | 402:4 403:3,3 | **oncologic** 15:5 | 211:25 212:1,5 |
| 189:16,20 | 288:18 290:2 | 404:23 406:8 | 16:11 18:17,20 | 226:16 246:24 |
| 190:12,19 | 290:15 293:12 | 407:2 408:11 | **oncologists** 16:8 | 246:25 247:12 |
| 191:6 193:2,5 | 294:3 295:2,14 | 410:24 411:9 | 16:12 | 247:13,17 |
| 193:16 194:3 | 297:25 298:1 | 413:6,9,23 | **oncology** 16:18 | 250:6,10 |
| 194:20 196:16 | 302:13,22 | 414:10,17,22 | 18:11,17 19:8 | 312:11 338:8 |
| 199:10 200:10 | 303:2,24 307:2 | 418:7,13,20 | 19:11,14 | 431:17,25 |
| 201:10 202:15 | 308:2,14 | 419:19,22 | 475:18,19 | **opinions** 22:6 |
| 202:21 205:4 | 310:10 311:19 | 420:20 422:8 | **ones** 50:11 72:13 | 33:23 34:9,10 |
| 206:3,17,24 | 312:17 314:13 | 423:3,6,14,23 | 198:24 238:23 | 75:25 82:18 |
| 207:6 208:14 | 314:15,21 | 425:8 427:25 | 394:3 399:10 | 83:1 101:18 |
| 209:23 211:23 | 316:22 320:5 | 428:4 432:22 | 399:20,21 | 104:11 107:7 |
| 214:3,23 | 320:14 322:15 | 436:21 441:4 | 413:1 420:1 | 114:7 125:24 |
| 215:10,16 | 322:18 327:5 | 443:12 446:12 | 472:22 | 126:18 128:16 |
| 216:10 217:3 | 327:20 330:12 | 446:23 447:2 | **online** 72:20 | 128:21,25 |
| 217:10,23 | 334:18 335:10 | 447:23 449:15 | 75:20 76:7 | 137:12,21 |
| 219:5,6 220:5 | 336:7,10,14 | 449:18,24 | 227:20 | 138:12 140:4 |
| 220:8,25 221:5 | 337:5 338:22 | 451:3,12 452:9 | **onset** 194:22 | 140:18 143:6 |
| 222:6 223:6 | 338:23 341:23 | 454:2,5,10,19 | **oophorectomy** | 150:16,22 |
| 225:11,15 | 342:17 343:7 | 455:2,8 457:19 | 481:11 | 153:5 155:6 |
| 226:2,14,18 | 343:10,24,24 | 459:2 461:3,24 | **open** 243:4 | 156:1 164:5,19 |
| 228:13 229:3 | 344:11 347:1 | 463:7 464:6,15 | **opened** 199:14 | 168:13,16 |
| 229:13 230:17 | 347:17 348:23 | 465:20 466:21 | **opinion** 21:11 | 169:22 170:9 |
| 231:22 232:22 | 349:12 351:1 | 467:23 468:5 | 22:2,16,23 | 171:2 200:2 |
| 234:4,9 235:15 | 351:22 353:14 | 469:23 471:7 | 24:4,11,12 | 236:19 249:12 |
| 237:9,14 238:3 | 354:17,22 | 473:16,23 | 37:6,9,18 38:7 | 291:1 411:23 |
| 239:25 240:10 | 356:7,11 357:9 | 475:12,24 | 38:9 39:19 | 431:1,5 471:9 |
| 241:1 242:8 | 357:21 359:5 | 478:25 479:23 | 46:10 54:6 | 472:22,25 |
| 243:1 244:6,10 | 360:9 361:3 | 481:18 482:25 | 80:9,13 104:16 | 474:24 |
| 244:17 245:9 | 363:25 364:2 | 483:4 484:3,24 | 105:13 106:5 | **opportunity** |
| 245:17 246:16 | 365:6,15,19 | 486:3 | 107:4 109:15 | 246:13 294:3 |
| 247:14 250:23 | 366:4,16 | **Oleckno** 6:20 | 109:19 110:18 | 471:20 472:8 |
| 251:12,22 | 367:23,24 | 8:15 199:5 | 110:20 114:2 | 475:15 |
| 252:11,18 | 368:21 371:19 | 319:20,21 | 128:15,19 | **opposed** 62:6 |
| 254:2,17 256:5 | 372:11 376:3 | 320:22 321:2 | 130:16,19 | 63:3 156:24 |
| 257:25 258:19 | 376:16 378:23 | 404:24 405:1 | 134:4 136:13 | 180:13 181:9 |

433:3
**opposite** 262:9
356:10 374:8
**order** 29:10 88:2
88:10 172:16
256:19 257:6
264:9 372:24
387:9 464:10
**organism** 32:21
**organisms** 95:8
**organization**
85:9,11 252:16
254:12
**organs** 57:11
**original** 19:24
365:7 368:12
369:2 370:23
383:18 385:4
390:4 391:15
461:18 488:14
**ought** 144:18
**outcome** 26:5
28:2,5 31:21
35:6 36:11,13
148:25 163:14
163:19 164:3
186:21 191:22
205:25 244:8
256:12 281:14
285:6 307:10
307:21 309:12
316:6 319:11
321:4 420:24
421:1,18 423:9
**outcomes** 26:7
55:19 59:3
467:12
**outdated** 50:11
**outlined** 203:7
**outside** 64:14
90:1,2 96:9
100:24 101:1
153:14,15
167:21 168:8
471:9
**outweigh** 432:18
**ovarian** 6:10,17

7:9,13,14 8:8
8:11,21 12:5
16:7 20:21
22:19 23:9,19
24:7,21,24
25:7,10 40:7
40:16 41:1,9
41:12,17,22
42:8 44:16
53:11 54:7
55:22,24 60:16
61:5 77:13,14
96:17 101:16
103:16 104:17
105:17 106:9
106:21,25
108:18,23
109:12,18,23
110:9 117:2
137:15,19
149:14 150:23
152:17 153:6
153:21 154:20
155:1 156:3
157:2 159:4,18
161:13 164:7
165:2 167:24
178:10 179:4
179:24 180:5
180:13 181:5,9
181:10 188:23
194:21 195:1,8
196:24 254:24
255:19,25
257:8 258:8
259:8,12 260:9
260:18,22
261:6,16
263:25 264:3,6
273:15 306:6
310:4,13
311:10 312:25
313:6,12 328:5
329:10 333:7
333:10 335:7
336:3 350:5,19
357:11,22,25

358:4,7,8,15
369:8,18
372:14 373:7
373:16,24
375:21 376:6
385:10,25
424:4,14,20
426:20 447:9
448:1 453:15
454:13 455:9
455:21 456:6,7
471:15 476:10
476:15 478:14
478:23 479:7
480:21 482:15
**over-the-coun...**
157:23
**overall** 260:8
264:4 332:22
450:8 452:25
453:14
**overinflated**
283:19
**overlap** 194:5
376:25 377:8
377:22 378:1
394:6,24 395:3
395:10,25
**overlapping**
375:22 376:7
376:18,22
394:16
**overlaps** 394:15
**overlies** 341:10
**overwhelming**
331:5 388:20

———————
**P**
**P** 2:1,1 4:1
184:25 185:3
369:17 407:19
407:19 408:4
409:10,13
413:13,14
**P.A** 2:3
**p.m** 207:9,11,13
280:1,2,4

337:22,23,25
406:13,15,17
457:22,23,25
486:7,10
**P2.00**344.9
438:25
**pack** 433:23,24
**page** 5:2,10,22
6:3,7 8:4,6
13:17 19:23
34:12,25 45:2
52:22 54:25
56:19,20,21,22
58:4,10,13,14
67:12 70:23
71:1 72:4
105:13 106:12
107:12 109:14
109:24 114:11
124:15 125:17
125:20,21
126:21,22
133:18 151:18
172:2 178:4,5
183:12 189:21
189:24 200:15
200:19 202:3,8
202:11,18
206:4 213:10
213:11,13,15
213:25 215:7
217:11,13,18
219:7,20 223:9
224:12 229:8
229:14 236:22
238:13 241:25
242:8,10
243:23 244:21
244:24 248:23
253:9 260:3,6
263:17 266:4
273:21 282:6
287:22 288:13
294:4 299:9
305:16,19,24
307:6,11,14
308:5 310:11

310:25 311:3
314:25 318:9
318:11 320:17
323:6 325:12
325:13,24
326:7 327:6,10
327:11 328:9,9
331:16 332:11
332:17 334:9
334:17 338:3
338:12,21
339:16,19
347:17,21
351:7 352:18
352:21,21
353:16 355:6,7
359:10,11
362:21,22,23
363:17 364:21
375:19 379:3
401:8 402:21
405:23 406:20
407:2,7 412:2
413:9 419:9,9
420:22 428:2
430:12,17,23
430:24 431:4
431:10,12,14
438:25 440:23
443:11 445:9
445:12 449:4
450:1,3 451:21
452:16,22
453:12 458:9
458:18,24,24
480:6,14,14,25
481:3,4,5,12
481:16 483:9
490:3 491:3
**pages** 158:17
159:2 200:18
320:14 326:11
326:14 332:5,6
332:10 344:10
405:5,17
452:12 489:5
**paid** 84:10 88:19

Christian Merlo, M.D., MPH

99:15,16,22,24
99:25 100:2,7
100:9,17,19
**PAPANTONIO**
2:2
**paper** 20:8,12
20:15 30:9,14
33:12 45:13
117:17 251:4
251:14 271:11
272:3 286:20
322:19 400:23
401:22 416:9
450:15
**papers** 20:4,7
26:5 28:25
29:8,19 30:3
30:11,18 36:21
50:22 381:6
423:1
**paragraph** 14:7
14:11 110:4
114:19 126:9
133:19 176:2,5
183:13,15
202:2,20,23,24
215:17 223:12
226:6 227:16
229:8 236:18
243:24 253:9
253:12,18
260:6 263:18
263:19,22
269:9,14
273:23 282:11
306:10,22,25
307:15 308:9
313:9 315:6
320:6,18
326:24 327:1
327:17,19
332:21 352:6
352:19,22
353:1,15
364:16 367:20
368:22 369:23
370:5,8,9

371:15 372:6,8
373:1 401:12
401:18,24
415:2,9 420:23
421:10,13,15
450:4
**paragraphs**
114:12 367:21
**parentheses**
190:2 327:8
**Parfitt** 2:12 5:19
439:25
**Park** 3:3
**parse** 62:19 64:3
**part** 14:3 19:4
22:8 37:10
44:13 59:20
72:21 94:21
114:6 140:11
141:3 175:24
197:24 230:13
291:12 293:13
293:20 326:14
333:24,25
347:20 353:10
**parte** 439:19
**partial** 237:15
**participants**
264:1,2,5,19
302:14
**participate**
170:17
**particular** 37:19
70:10 103:15
114:21 115:1
132:16 179:11
220:25 225:16
237:9 253:21
297:21 298:2
303:19
**particularly**
303:20 333:10
355:18 442:15
445:20 472:22
**particulate**
329:2
**parties** 487:11

**parts** 431:8
**passed** 68:20
211:6 429:4,16
**pathway** 319:12
433:1
**patient** 16:6
43:4,16 63:22
163:14 223:22
223:25 300:7
477:8,9
**patients** 15:6,24
16:1 17:14
18:17,20 19:5
32:7 40:22
41:9 42:7,16
42:24 63:13,14
89:13 92:1,25
161:3 195:22
198:1 230:11
234:15 244:1,2
256:7 257:5
317:21 372:22
476:1
**Patricia** 7:22,23
**pay** 92:15
114:25
**paying** 99:19,22
99:23
**payments** 88:15
**PDQ)-** 7:15
**peer** 19:24
168:16 429:4
429:16 472:4
472:25 475:6
**peer-review**
168:12 453:13
**peer-reviewed**
20:4,6 50:22
426:8,15 430:1
430:8 451:5
453:21 454:4
**peers** 474:25
**pen** 352:4
**pending** 10:16
279:13 390:19
**Penninkilampi**
6:18 418:24

419:1 424:9,24
425:3 429:12
465:21 466:6
467:8,11,18
469:10 470:11
**Pennsylvania**
3:7
**Pensacola** 2:5
**people** 15:15
16:7 57:8 70:5
100:5 166:3
167:21 194:14
196:4 197:9,9
197:15 231:15
252:12,14
256:10 302:7
324:14 328:24
329:3
**percent** 52:10
52:13 264:7,24
328:4 329:2,7
329:9 333:1
335:6 336:3
341:5,10,16,21
346:21 347:4
363:21 365:9
379:22 395:2
397:21 398:16
398:19 424:13
426:18 449:11
**percentage**
52:19
**percentages**
51:5,16
**perfect** 189:23
243:22,22
279:23 337:18
337:20
**perfectly** 177:25
184:2 221:2
**perform** 161:9
161:20 361:13
470:25
**performed**
27:16 28:17
39:4 112:10
137:11 162:12

195:22 248:15
248:17 372:24
422:11 470:21
**performing**
177:17 178:20
471:2
**perineal** 6:17
7:12 8:10
101:15 105:16
106:21,25
108:17,23
109:11,18,22
110:8 137:18
365:8 369:3,17
370:25 421:2
421:19,23
422:11 424:12
424:19 437:22
467:14,19
481:1 482:10
482:13 483:25
**period** 152:14
152:20 153:25
188:1 300:2
474:19
**peripherally**
152:11
**peritoneal** 7:15
310:14 480:22
**permission**
170:16
**permit** 444:12
444:23
**Persistent** 7:7
270:18
**person** 60:8 65:6
433:11 434:5
**personal** 3:18
27:20 70:23
74:19 166:9
243:20
**personally**
144:9 210:19
**perspective**
212:6
**PERTAINS** 1:7
**Pervasive** 412:3

Christian Merlo, M.D., MPH

ph 1:24
pharmaceutical
87:12,15 88:16
89:16 90:1,16
93:10,14
157:21
pharmaceutic...
87:21
pharmacy
437:16
PhD 7:19,20,22
7:23
Philadelphia 3:7
philosophical
176:10
photocopied
320:15
photocopies
85:13
photocopy
85:23 202:15
206:4
phrase 50:6 99:3
113:16 124:18
321:12
physical 64:8
picture 55:2,3
62:24
pile 400:25
pink 396:22
397:7
Pisano 120:21
121:6
place 65:3,10
69:16,23
169:19 215:23
240:14 250:16
254:11 325:15
487:8
placebo-control
267:7,9
placebo-contr...
161:7
placed 11:16
places 244:18
placing 437:21
plain 431:23

plaintiff 294:20
plaintiffs 2:23
6:8 11:7
431:19
plaintiffs'
101:16 107:3,6
114:8,14,20,22
114:25 116:24
118:4 123:8,24
124:7 125:14
125:23 126:3
126:10,14,17
126:24 127:1
127:16 128:4
128:18 129:6
129:12,24
131:20 133:14
134:5,13 135:1
136:13 137:4
137:11,21
140:3 143:5
145:7 146:7
147:5 190:1,23
197:18 237:10
245:3 249:5,11
249:21 250:9
250:10 253:19
253:21 275:24
276:15 277:4,4
289:6 291:20
294:8 295:3
323:3,8 324:16
338:13 347:18
347:21 348:25
349:19,23
350:13 351:6
430:18,19
431:2,12,20
plan 255:10
planning 255:9
plans 236:9,10
plate 122:24
plausibility 45:5
174:9,12
178:18 179:2
plausible 22:18
23:18 24:6

play 178:1
183:21 184:13
184:22
Plaza 2:18
please 11:14
49:20 77:18
120:9 134:16
150:4 162:23
166:22 182:11
188:7 201:13
213:11 233:24
266:6 273:7
283:5 334:7
388:4,23 389:4
400:18 414:11
414:19 419:9
466:3 482:22
488:3,8
plenty 119:10
174:25
plow 337:8
plug 111:5
plus 317:2
pneumonias
59:5
point 34:23
49:12 113:22
155:14 177:11
203:18 232:24
235:15 280:17
286:13 306:20
309:11 310:19
310:24 320:18
341:2,7,12,20
341:22 343:11
346:20 363:10
364:14 371:14
377:11,13,16
378:5 393:11
393:15,24
394:4 397:9,10
397:19 406:22
407:8 412:14
421:6 431:9
435:16 458:8
467:1 469:9
472:3 474:18

pointed 49:13
49:14 474:17
points 407:8
policy 413:20
polluted 329:1,4
pollution 328:11
433:7
pool 152:3
pooled 151:24
422:16
poor 414:5
415:3,13
poorly 116:18
241:7 275:7,7
275:8
poorly-designed
296:24
population
32:21 197:7
223:16 255:6
257:12,16,18
257:21 258:3,5
261:18 339:1
342:2,6 348:14
355:22 356:22
422:9,11,17
population-ba...
132:8 151:23
152:3 189:2,13
238:23 239:10
240:5,17 241:9
241:18 339:7,9
339:11,23
344:21 348:13
350:7,8,21,23
362:17,19
404:8 428:23
population-co...
238:6
populations
27:22 220:13
258:17 331:9
355:17,22
356:23
portion 59:1
86:17 403:2
position 56:15

61:17
positive 442:13
445:18
possibility
475:13
possible 30:24
31:6 244:8
300:18
postulate 317:13
317:14
postulates
198:23 203:17
204:18
potential 43:9
43:20 44:9
53:13 76:25
101:14 106:20
106:24 108:17
108:19,22
109:10,17
137:13 159:16
159:17 162:3
163:22 164:1
182:7 188:22
197:6 236:12
255:7,11 285:7
288:24 289:10
290:12 296:2
303:4,9,10,16
304:7 309:14
329:24 358:3
372:21 374:3
416:5 478:1
potentially
195:19 297:5
318:5
pouring 437:20
powder 1:3
10:13 20:25
21:8,23 22:19
23:3,9,19 24:5
24:11,15 25:6
25:14 33:3
53:10,18,20
54:2,7 76:1
103:15 104:17
137:14 149:15

Christian Merlo, M.D., MPH

152:16 153:6
153:21 155:2
156:3 157:3
159:5,6,18
161:4,13 165:1
167:23 179:4
188:23 196:24
265:3 328:3,6
329:11 358:4
369:7 450:6,8
450:21 454:13
476:2,15 477:7
478:23 479:7
479:11
**power** 256:18
258:23 264:7
382:2,14 383:5
383:13,13
**power's** 383:16
**powered** 260:13
381:23
**practical** 219:11
219:25 222:19
224:6 225:2
408:14
**practice** 223:18
223:18,19
**practices** 1:4
10:14 426:13
**Pratt** 1:14 10:11
**preceding** 216:2
**predict** 471:22
**preface** 222:3
**prefer** 206:20
408:15 409:3
**preferably**
183:19
**pregnant** 57:20
**Preliminary**
369:4
**premise** 99:12
**prenatal** 266:11
**preorganized**
207:19
**preparation**
129:20
**prepare** 85:21

**prepared** 33:23
85:21
**prescribe**
223:21
**prescribed**
231:11
**presence** 22:17
22:17 23:17
24:4 60:24
317:8
**present** 23:2
56:23 155:14
215:25 309:14
318:8 375:20
376:5
**presentation**
313:20
**presented**
183:24 186:7
**prespecified**
280:8
**press** 25:2
**pretty** 25:21
27:9 77:24
127:6 128:8
130:10 184:6
194:12 292:6
338:10 412:22
471:23
**prevent** 70:2
224:8 225:4
**Prevention** 7:15
480:23
**preventive**
176:16
**previous** 469:5
**previously**
98:16 149:5
357:9
**primarily** 16:9
28:5
**primary** 7:1,15
14:25 15:3,9
37:1,8 38:8
40:13 42:16,19
42:22,24 43:4
43:17 62:4

65:4 71:10,15
96:17 229:10
229:19 230:3
234:5,12
255:17 289:19
310:13 480:22
**principle** 192:4
252:24 253:8
253:16 254:5
265:5 312:7
354:14,16
**principles**
110:24 114:21
148:11 150:18
253:20
**printout** 5:13,20
5:22 6:1,3 8:20
**prior** 54:4 81:19
81:21 84:11
98:10 105:20
105:22,24
106:6 108:7,15
150:7,13,21
196:6 301:24
386:19 487:4
**Pro** 8:19
**probably** 12:2
44:19 81:4,6,8
81:10,12,14
82:6 91:23
140:23 174:5
194:13 408:6
**problem** 284:2
309:7 412:3
**problems** 21:17
57:16 220:14
342:2 420:16
**process** 92:5,8
97:23 203:22
204:6 205:6,12
266:9 429:22
471:13 472:21
474:22
**PROCTOR** 2:3
**produce** 92:15
157:20,21,22
157:22,23

**produced** 11:21
158:16,18
159:7
**producing** 73:12
74:16
**product** 1:5
22:19 103:15
157:17
**products** 1:4
3:18 10:14,15
20:25 21:8,23
23:3,19 24:5
24:12,16 25:6
25:14 33:3
91:14,22 92:16
92:25 104:18
149:15 152:16
153:6,21 155:2
156:3 157:3
159:5 161:4,13
167:23 196:24
328:4 329:11
**professional**
7:16 64:23
102:8,20 103:6
110:17,19,25
111:17 113:9
113:12 157:1
196:11,22
197:1,12
198:25 201:14
201:16
**professions**
194:5
**professor** 12:18
13:1,5 16:14
16:15 17:6,7
54:10,12,16,18
57:3 58:17,23
61:14,22 62:1
62:23 68:13,14
69:1,4 102:8,9
102:21 133:19
135:18,21
141:7 153:18
203:5 210:6,23
210:25 212:14

360:16
**professors** 64:16
64:17 65:12,14
65:18,19,22
68:24
**program** 56:8
56:10,24 57:4
**progress** 313:22
**progressive**
57:13
**project** 63:16
94:21,24,25
95:5,22 96:6
96:21 97:11
154:16
**projects** 96:14
**promise** 132:11
**promoted** 54:15
56:11,13
**prone** 424:15
**prong** 401:7,8
401:19
**pronounce** 59:6
68:9,11 69:11
**proof** 442:24
**proper** 200:24
201:2 223:20
**properly** 275:15
275:16,16,17
309:6 416:4,4
**proportion**
364:10
**proposing** 224:6
225:2
**proposition**
229:20 271:10
**propounded**
489:6
**prospective**
421:3 422:2
**prove** 192:1
**provide** 14:25
22:23 23:17
24:3,11 30:12
66:2 80:13
85:19,20
104:10 106:5

122:23 151:12
164:1 200:2
271:3 322:2
332:3 351:13
390:7,9 408:18
409:5 432:25
**provided** 33:11
78:17 79:7
82:12,13 83:13
87:20 89:17
93:13,18 125:4
164:25 197:14
197:15 396:9
396:12
**provides** 22:18
450:7
**providing** 66:7
110:24 219:10
219:24 222:18
**Pseudomonas**
59:9
**PTI** 3:23,23
**public** 6:2 12:23
61:16,24 62:2
62:6,14 63:3,6
63:24 64:7,9
64:13,18,21,24
65:12,15,19,22
66:5,23 67:17
69:2 71:6,20
94:8,9,13,15
94:22 95:17,21
102:10,22
133:20 135:18
135:22 155:7
210:10 219:10
219:11,23,25
222:18,20
223:15 224:7
225:3 487:18
489:19
**Publica** 8:19
**publication**
217:15,21
391:21 466:13
469:6 471:8
474:7

**publications**
19:25 28:15
390:4 475:6
**publicly** 54:6
**publish** 252:14
471:14,21
**published** 24:20
24:23,25 25:9
25:13,17 26:18
30:23 31:5
51:9 95:4
151:2 168:12
168:17 193:5
271:14,16
272:2 274:15
360:20 381:10
412:5,13 416:9
416:14 426:9
426:23 427:17
427:18 430:1
438:11 451:4
452:21 472:24
473:17,20
**puff** 434:8
**pull** 121:5
322:12 354:23
400:18 402:23
465:22 480:3
**pulled** 118:21,23
120:17 184:8
200:18 272:3
381:6 446:14
446:21
**pulling** 272:1
470:18
**pulls** 119:5
405:10
**pulmonary** 5:12
7:1 12:15,19
13:2,18,24
14:9,18,24
15:11 18:1
37:1,7,8,13,20
38:8 39:22,25
40:14 42:3,16
42:20,22,25
43:1,5,10,17

44:3,7 55:5,11
55:14,18 59:11
62:5 63:4
70:24 91:17,19
91:20 92:17
95:6,10 96:7
96:10 153:18
229:10,19
230:3,12 234:6
234:12,15
317:19
**purple** 399:5,7,8
**purport** 30:12
**purpose** 130:5
134:20 141:22
256:13 292:8
297:11 394:25
**purposes** 85:12
87:10 92:13
133:25 134:6
135:8 136:4,21
137:5 138:8
139:10 148:3
180:10 181:10
291:4 399:24
**push** 417:5
**put** 12:3 13:15
35:18 36:18
43:3,19 59:18
60:6,15 85:13
93:17 101:25
104:8 116:4,6
116:9,10,12
118:23 120:20
220:6 241:3
263:4 264:13
273:25 287:1
292:10,13,13
292:18,24
293:2 312:13
313:19 325:23
325:23 332:18
339:17 434:8
472:24 473:5
478:13 483:22
**putative** 30:25
31:7 35:23

**putting** 80:18
100:16 108:14
113:3 254:21
464:17 480:8

_____
**Q**

**qualification**
395:7
**qualifications**
95:24 209:17
211:11
**qualify** 425:2
**qualitative**
420:21
**quality** 266:14
266:21 267:2
270:7,9 428:12
**quantitative**
215:24 418:2
444:11,22
**quantitatively**
418:3
**quarter** 109:3
**question** 12:25
16:17 18:22
21:15,18 22:14
23:13,15,20,24
25:22 26:16,25
27:9 28:10,11
29:7,15 30:22
37:16 47:6,11
49:24 50:3
70:15 72:24
73:20 74:22
75:2,17 86:19
87:19,24 91:22
100:6 103:11
103:13,14,20
103:23,25
105:5,10
107:24 108:4
111:1 120:4
122:5,7 129:11
130:9 131:3
132:13 134:15
135:12 136:11
136:12,25,25

138:6 143:22
144:12 145:3
146:10,11,24
147:2,3 150:20
152:18,25
153:13,14
160:6 161:6
162:24 164:6
166:6 167:8,22
168:7 171:24
172:10,22
173:1,4,9,16
174:2,9,15
176:17 178:7
179:13 182:1,9
187:5 188:19
196:17,23
198:20 200:22
201:5,9 205:17
205:19 206:2
209:3 212:4
213:6 218:8,15
221:3,5,6,14
221:23 222:8
222:10 226:24
227:14 228:14
232:6 233:8
238:25 239:5
240:13 246:16
247:7 248:6
253:14 256:25
262:14 264:15
265:18 273:3
279:12,12
291:14 294:7
297:8 298:20
300:24 301:6
334:11,12,14
334:15,20,21
334:22 335:22
348:1 358:11
362:7 387:18
388:2,10
390:19 399:9
417:15 424:25
425:7 427:22
427:24 428:5

Christian Merlo, M.D., MPH

| | | | | |
|---|---|---|---|---|
| 429:13 435:23 | 94:4,5 98:4,9 | 172:14,20 | 248:22 250:4 | 343:23 344:4 |
| 446:3 453:5 | 99:1,6 102:15 | 173:7,12,21 | 250:22 251:11 | 345:16,24 |
| 461:24,25 | 103:10 104:3 | 174:7 175:11 | 252:6 253:4 | 346:13 347:16 |
| 463:18 468:1,7 | 104:23 105:9 | 175:22 177:8 | 254:9 255:14 | 348:22 349:11 |
| 470:9,21 472:2 | 107:16,22 | 177:19 178:14 | 257:2,22 | 349:17 351:21 |
| 473:8,13,13 | 108:5,13 | 179:15 180:20 | 258:18 259:5 | 352:9,17 |
| 485:20,22 | 110:12 111:13 | 181:16,24 | 260:1 261:22 | 353:12 354:3 |
| **questioning** | 111:23 113:15 | 182:15,19 | 263:15 264:21 | 355:13 356:6 |
| 481:23 | 113:24 115:14 | 183:7 184:19 | 265:13,20 | 356:15 357:1,8 |
| **questionnaire** | 116:22 118:20 | 185:11 186:1 | 266:3 268:10 | 357:15,20 |
| 256:8 280:14 | 121:17 122:25 | 187:6 188:11 | 269:7 270:3,14 | 358:24 359:24 |
| 280:16,21 | 123:4,17 124:5 | 188:15 191:12 | 271:7,13,24 | 361:7 364:22 |
| 285:4,5 299:18 | 124:14 125:12 | 192:2,12 193:1 | 272:13,24 | 366:3,15 367:3 |
| 300:11 302:15 | 127:9 128:7,14 | 194:2,15 | 273:8,12 | 367:10 368:20 |
| 302:17 | 129:2 130:13 | 195:10 196:8 | 274:12 276:11 | 370:14,21 |
| **questions** 11:13 | 130:22 131:7 | 196:10,14 | 276:24 277:14 | 372:12 373:14 |
| 13:9,16 18:8 | 131:23 132:23 | 198:11,21 | 277:23 280:6 | 374:5,20 |
| 18:21 19:12 | 133:7 134:11 | 199:19 200:8 | 280:22 281:4 | 375:10 376:15 |
| 21:13 22:4,11 | 134:22 135:13 | 202:1 203:3 | 286:5,15 | 376:24 377:20 |
| 23:12 24:1,18 | 136:23 137:23 | 205:3,18 206:8 | 287:18 288:4 | 380:15 381:2 |
| 25:23 26:15 | 138:15 139:2 | 207:15 208:20 | 289:14 290:1,6 | 381:20 382:6 |
| 27:10 28:9 | 139:12,18 | 208:24 209:15 | 290:14,19 | 383:4,7,17 |
| 29:16 30:20 | 140:1,13,20 | 209:22 210:1 | 291:15 292:1 | 384:6,24 |
| 31:24 32:14,24 | 141:14 142:7 | 210:14,18,24 | 292:12 293:3 | 385:17 386:16 |
| 33:17 34:7 | 142:13,18 | 211:9,22,23 | 294:2,16 295:1 | 387:1 388:1,7 |
| 35:11 36:4 | 143:3,13 | 212:21 213:7 | 295:9,23 | 388:9,16 389:8 |
| 38:1 39:10,23 | 144:10,21 | 213:21 214:22 | 296:10 297:6 | 389:12,24 |
| 40:12,24 41:15 | 145:2,20 146:1 | 216:18 217:2,9 | 297:16 298:21 | 390:22 392:12 |
| 42:14 43:14 | 146:13,22 | 218:6 219:18 | 299:1,21 301:2 | 393:17 394:11 |
| 44:11 46:19 | 147:14,21 | 221:21 222:4,5 | 301:7,15,19 | 396:19 397:4 |
| 47:12,22 50:1 | 148:8,18 149:2 | 222:12 225:6 | 302:12 304:8 | 397:15,24 |
| 51:21 52:8,17 | 149:10,20 | 225:24 226:1 | 304:16 305:12 | 398:5,9,21 |
| 53:24 54:22 | 150:6,12 | 226:13 227:12 | 307:5 308:20 | 399:6 400:3,11 |
| 58:2 60:10 | 151:11 152:22 | 228:2,9,15 | 310:1,9 311:5 | 400:14 401:3 |
| 61:1,10 62:20 | 153:12 154:1 | 229:2,6,25 | 311:15 312:16 | 402:22 403:4 |
| 64:5 66:1,19 | 154:11,24 | 230:16 231:17 | 313:25 314:10 | 404:22 406:19 |
| 67:4 68:1 69:9 | 155:11,21,24 | 232:5,15 | 314:20 316:21 | 410:15 411:14 |
| 70:8,21 73:6 | 156:8,22 | 233:11,19,22 | 320:12 321:9 | 412:1 417:3,13 |
| 75:6,14 76:13 | 157:10 158:6 | 234:3 235:1,14 | 321:21 322:6 | 417:20 418:19 |
| 77:2,25 78:5 | 158:14 159:1 | 235:22 236:16 | 322:14,24 | 420:19 421:16 |
| 79:14 80:14 | 159:20 160:8 | 237:1,5 238:2 | 323:14,23 | 423:18 426:6 |
| 82:4,8,21 | 160:13 162:4 | 238:10,17 | 324:3,13 325:3 | 426:22 427:5 |
| 83:16 84:17 | 162:19 163:9 | 239:6,24 | 326:3,6,23 | 427:13 429:2 |
| 85:1 86:8 87:8 | 164:24 165:9 | 240:12,19,25 | 330:1,20 331:1 | 429:10 430:5 |
| 88:14,22 89:1 | 165:14 167:14 | 244:3 245:16 | 332:16 333:21 | 430:22 431:18 |
| 89:20 90:10 | 167:19 168:3 | 246:4,11,14,20 | 334:5,8 335:14 | 432:9,21 |
| 91:13 93:6 | 171:1,21 172:8 | 247:10 248:7 | 336:6,22 338:2 | |

433:19 435:1
435:12,15,24
436:12,20
437:2 438:7
439:12 440:16
440:22 441:19
442:11 443:5
444:3,19
445:14 446:6
446:11 447:3
447:14,22
448:11,18
450:11 451:11
451:17 452:4
452:20 453:10
454:1 458:1,23
459:12 460:3
460:19 461:2
462:15,23
463:6 464:5,22
465:19 466:2
466:15 468:2
468:10,18
469:22 470:2
470:22 471:10
472:11,19
473:4,9,15,22
474:4 475:3,11
476:11 477:12
478:11,17
479:14,16,18
479:20 480:4
480:12 481:6
481:20 482:2,4
482:8,21
483:11,17,24
484:20 485:7
485:12 489:6
**quick** 66:10
**quickly** 217:12
338:11 455:18
**quite** 44:1
**quotations**
446:16
**quote** 122:1
175:25 222:16
222:21 324:20

325:22 326:8
326:25 449:2
**quoted** 175:24
184:3 329:15
**quotes** 223:15
**quoting** 327:3

**R**

**R** 2:1 4:1,1
**radio** 477:24
**radon** 328:13
**RAFFERTY** 2:3
**raise** 186:11
**raising** 143:25
**random** 60:8
187:21 351:16
387:14 446:21
**randomize**
161:3
**randomized**
116:7,8,18
161:6,9,15,20
161:25 162:11
163:16,23
267:9,10 271:3
275:13,18
**range** 14:14
18:1,2,15
117:3,10
329:16 341:6
341:14,19,19
364:10 375:22
376:7 398:18
418:3,8
**ranges** 259:13
259:14,16
**rare** 44:2
**rate** 180:4
260:19,21
**rates** 261:6,17
**ratio** 117:20
232:17 233:1
235:11,16
236:1 312:19
313:23 315:24
317:8,8,20
319:5,6,16

326:1 327:25
329:14 340:4,5
340:12,14
343:13 363:21
364:1 393:22
393:22 397:6
451:23 452:10
**ratios** 307:7,8
307:18 308:6
340:1,6,10,18
393:8,9 399:19
**reach** 306:20
**reached** 104:13
159:22 164:4
276:2
**reaches** 424:9
**reaching** 114:14
**react** 130:15
**read** 14:12
101:11 106:7,8
110:14 115:5
129:22 130:3
136:10 167:6
176:7 190:12
190:14,16,19
197:3 202:5
213:14 215:16
216:8 218:1,8
218:18,24
219:21 221:7
223:12 224:9
224:11 231:20
242:8,10 246:8
246:12,14
247:1,9,16
261:1 262:7,11
268:14,15
270:23 274:17
278:21,22
282:11 287:24
288:5,7 315:17
320:21 323:10
323:15,17,17
325:4 336:24
336:25 350:10
350:12,12,24
351:17 360:2

361:9 364:15
375:2 385:19
386:3,4,18
398:13 401:11
402:14 403:20
410:21,25
414:19 424:7
425:10,11
434:23 441:16
445:15 453:18
455:14,19
482:9,16 488:3
489:4
**reading** 20:4
190:9 272:18
331:20 367:19
373:9,13
401:17 421:7
448:9,12,16
**ready** 337:6
**real** 94:5 187:23
217:12 293:5
334:22,22
407:23
**really** 16:22
31:12 32:12
39:19 62:19
74:8 89:4
120:13 154:7
157:8 158:4
164:23 166:2
181:12 188:7
196:7 242:16
263:3,9 277:2
278:24 294:8,9
377:23 383:12
388:20,20
400:22 409:25
409:25 410:1,2
410:2 417:5
434:9 455:18
**Realtime** 1:18
487:3,18
**reason** 70:4
100:23 164:15
174:20 178:18
183:1 207:22

232:11,23
240:1,20,21
247:20 284:13
317:16 319:12
355:23 387:5
409:22 414:1
420:12 469:12
477:11 478:19
488:5
**reasonable**
137:3
**reasoned** 216:5
216:20,25
217:6
**reasoning**
203:10 219:13
220:2,19
222:21
**reasons** 182:22
397:12 408:15
409:2 479:9
**REATH** 3:1,5
**recall** 53:1,16
78:4 81:2,20
84:13 94:18
97:4 98:3
179:14 218:25
239:21,21
240:7,9 241:14
241:16 243:24
283:15,21
286:8 291:6
293:7,13 295:4
339:4 357:13
357:18 359:8
361:10 420:6
420:12 424:15
438:21 464:7
466:8 480:15
482:1,7 485:6
**recalling** 231:14
**receipt** 488:15
**received** 93:10
94:7 98:13
159:12
**receiving** 161:4
**recognized**

Christian Merlo, M.D., MPH

237:18 284:10
**recommend**
477:18 479:11
**recommendat...**
7:3 266:10
**recommended**
96:3
**record** 10:2,21
10:22 14:12
22:8 43:21
48:17 49:14,18
74:11,14 93:24
93:25 94:3
97:5 120:1
143:11,18,20
207:10,11,14
207:18 230:18
230:22,22
231:10 263:4
274:17 280:1,2
280:5 330:16
330:16 337:22
337:23 338:1
391:8,8,14
392:17,17
406:14,15,18
414:19 417:2
440:1 457:22
457:23,25
486:8
**records** 82:7
83:3,8,10,12
91:1,10 232:2
437:17
**red** 396:22
399:8
**REDIRECT**
483:10
**REESE** 2:21
**refer** 134:12
199:4 217:14
331:14 363:7
374:24 421:22
443:7 464:4
**reference**
117:14,16
186:15 218:12

218:23 225:13
322:12,17
354:21 356:8
376:14 380:7
380:25 466:11
**referenced**
38:21 218:23
251:20 308:19
**references** 53:18
53:19 212:16
219:3 322:16
354:18 391:6
392:25 484:13
485:10,13
**referencing**
271:21 321:6
**referred** 180:23
215:20 283:8
283:10 405:1
460:17
**referring** 38:16
47:19 55:7
56:17 58:20
92:19 109:24
113:23 124:13
125:25 140:10
158:24 171:9
188:20 199:2
204:13 215:2
229:11 237:8
238:9 249:4,8
251:15 253:24
282:10 285:18
286:14 289:17
306:14 333:19
336:5 371:3
418:12 422:21
423:5 437:1
446:5 461:10
462:12 470:8
484:10
**refers** 217:21
328:8
**reflect** 49:15,18
143:12,19,21
230:18 269:19
**reflection**

361:12
**reflects** 90:17
342:5
**regard** 297:25
**regarding**
260:18 442:16
445:21
**regards** 136:18
**Registered** 1:17
487:3,17
**Registry** 6:12
**regularly** 328:3
**regulators** 168:6
**regulatory**
154:14,18
157:1 168:23
475:5
**relate** 137:21
**related** 26:10
64:4 101:14
106:24 108:16
108:22 109:10
109:17 422:9
**relates** 26:4
342:1
**relating** 159:3
412:6
**relation** 137:13
460:7 461:14
462:7
**relations** 465:1
**relationship**
26:22 28:4
29:11 77:1
118:5 153:20
156:2 157:2
159:5 186:22
190:25 191:21
206:1 213:23
266:16 306:1,6
333:2,9 351:8
355:15 360:19
367:15 375:18
450:7 461:7,21
464:10 476:14
477:3
**relationships**

203:14 333:5
456:2 459:3,7
459:9
**relative** 117:2
117:10,19
260:13 261:15
305:25 309:9
311:21,24
312:2,18 314:8
315:23 317:17
318:5 319:5,15
327:8,23
328:16,21
329:17 330:7
333:3 336:12
337:1 340:4,13
351:11 363:1,3
363:8,12
364:23 365:9
369:1,8,14,16
369:21 371:4
371:10,12
379:9,20
384:14 393:8
393:22 407:15
449:10 487:11
487:12
**relatively** 306:5
306:11
**relatives** 373:19
**relevant** 181:7
260:25
**reliability**
237:20 239:8
304:11,21
**reliable** 115:23
238:5 239:10
239:14,15
245:4 246:1
248:2,10 271:6
436:6,7,10
469:7,20
**relies** 163:2
260:7
**rely** 114:23
163:24 465:16
**relying** 118:5

**remember** 37:3
82:2 83:3,4
109:1 124:10
150:2 172:19
173:20 189:25
190:22 192:5
196:13 208:4,7
219:4 230:5
231:7 259:11
289:15,18
351:5 354:9
361:23 409:9
428:16 464:1
467:5 474:8
**remind** 318:12
318:20
**remote** 176:13
**rephrase** 28:10
28:11 107:23
150:19
**replacement**
311:23
**replicated** 187:8
331:7
**replication**
187:10,15
355:12,17
470:20
**Replications**
355:7
**report** 5:14,16
6:6 7:18,21 8:1
8:4,6,12 32:25
33:2,4,14,18
34:13,14 35:1
36:25 38:19
45:2,24 46:16
54:5 78:7,7
85:21 94:6
96:17 97:24
101:3,23 102:1
102:5,17 103:2
103:15 104:5
105:11,13,20
106:8,12,13
107:12 110:2
114:11 119:6

| | | | | |
|---|---|---|---|---|
| 124:16,17 | 330:25 331:17 | **represented** | 290:8 291:8 | 346:1 348:24 |
| 125:16,18 | 332:4,18 | 448:24 | 297:22 301:9 | 376:4 383:20 |
| 126:13 129:21 | 333:25 334:1,9 | **representing** | 313:12 | 396:22 397:5 |
| 131:9,9,9,10 | 336:17 338:4 | 150:14 | **respectively** | 409:13,21 |
| 131:14,14 | 339:16 346:10 | **represents** | 419:16 422:18 | 410:4 413:18 |
| 132:25 134:10 | 347:18 354:5 | 451:16 | **respond** 417:17 | 417:24 418:15 |
| 139:5,20,23,24 | 358:13,20,22 | **reputation** | 478:20 | 427:19 456:18 |
| 140:11 144:15 | 359:10,11 | 208:16 209:4 | **response** 8:18 | **resulted** 385:7 |
| 145:7,8 151:7 | 363:17 366:10 | 209:13,13,14 | 28:21 145:17 | 447:24 |
| 159:24 164:20 | 373:10 378:14 | 210:11 | 145:17 146:4 | **resulting** 97:24 |
| 165:1 169:8,14 | 380:8 381:11 | **request** 101:9 | 178:23 179:2 | **results** 72:8 |
| 169:16 170:6 | 384:8 386:6,21 | 263:6 | 183:5 316:4,10 | 109:16 112:11 |
| 172:1,16,24 | 389:15 405:2 | **requested** 101:7 | 317:2,9,23 | 112:16,16,18 |
| 173:14 174:10 | 411:18,22 | **require** 17:15 | 318:1 319:18 | 112:18,21,25 |
| 174:12 178:4,5 | 419:2 430:13 | 442:24 456:17 | 385:12 386:2 | 113:4 127:18 |
| 178:11 182:1 | 430:16 453:13 | **required** 432:11 | 386:20,25 | 129:25 176:24 |
| 182:10,17 | 456:9 466:20 | 432:23 464:11 | 387:6,7,9,10 | 276:19 282:21 |
| 183:13 189:21 | 466:25 467:2 | 464:14 | 387:13,19 | 283:13 331:7 |
| 191:6 198:5 | 470:13 471:13 | **requirement** | 389:14,22 | 339:2 341:15 |
| 199:4 217:13 | 484:16,21 | 183:22 186:5 | 430:10,16,20 | 346:8 355:24 |
| 217:18 218:2 | **reported** 260:24 | 203:24 204:9 | 431:1,3,9,16 | 365:16 367:12 |
| 225:17,20 | 261:15 342:16 | 205:8,16 | 432:7,7,10 | 367:21,24 |
| 226:3,16 | 359:13 421:1 | **requires** 204:22 | 440:25 442:14 | 368:17 371:21 |
| 229:11 232:13 | 421:18 442:18 | 297:19 | 442:24 444:13 | 375:20 382:15 |
| 236:17 238:16 | 445:22 | **rereading** 360:7 | 444:24 445:5 | 385:22 386:11 |
| 238:18 241:21 | **reporter** 1:17,18 | **research** 7:7 | 445:19 447:11 | 402:8,9 403:15 |
| 244:13,16,22 | 10:24 487:3,4 | 14:14 26:1,5 | 448:3 449:14 | 403:16 404:3,6 |
| 254:2 259:21 | 487:4,17,18 | 30:24 31:6 | 449:23 450:5 | 415:4,14 416:6 |
| 261:11,20 | **reporting** 348:8 | 36:16 55:17 | 450:24,25 | 422:16 424:11 |
| 262:7,11 | 348:20 442:13 | 59:2,15,17,20 | 451:2,16 452:1 | 447:7 482:18 |
| 264:14 274:2 | 445:17 | 63:16 95:25 | 452:15 454:21 | **results-driven** |
| 275:5 287:1,3 | **reports** 34:5 | 159:3 164:13 | 454:25 455:4 | 124:9 141:16 |
| 287:9,16 288:6 | 83:5 85:20 | 176:21,24 | 456:2,10,12,18 | **retained** 106:2 |
| 289:1 290:3,8 | 101:17 107:3,7 | 219:9,22 | 456:25 457:6 | **Retire** 411:3,5 |
| 291:19 292:20 | 114:8 129:22 | 222:17 251:1 | 459:10 462:2 | 411:11 |
| 293:20 294:4,6 | 130:5 138:21 | 252:1,5 313:22 | 463:20 477:2 | **return** 488:13 |
| 294:15,19 | 197:23 277:12 | 325:25 329:13 | **responsibilities** | **retyped** 353:19 |
| 298:22,23 | 286:20 295:5 | 357:11 372:23 | 103:17 | **retyping** 352:1 |
| 299:3,6,16 | 323:11 324:17 | 413:19 471:18 | **rest** 66:8 | **reveal** 177:23 |
| 303:7 304:5,10 | 336:25 337:1 | **researcher** | **RESTAINO** 2:7 | 183:18 408:13 |
| 304:19 305:1,3 | **represent** 66:20 | 102:21 235:12 | 2:8 | 443:14,25 |
| 305:10,16 | 149:13 203:10 | **researchers** | **restroom** 406:5 | **review** 6:17 7:11 |
| 308:1 322:22 | 203:21 307:9 | 151:2,7 416:3 | **rests** 260:16 | 19:24 24:21,23 |
| 323:7 324:8,21 | 307:20 332:19 | **resistant** 32:6,21 | **result** 101:8,9 | 24:25 25:2,10 |
| 325:16,23 | 385:3 438:17 | 95:8 | 106:2 149:15 | 25:14,18 34:6 |
| 326:12,25 | **Representatives** | **respect** 103:12 | 192:6,7,15,16 | 40:2 101:13,16 |
| 327:3,6,14 | 155:6 | 178:10 231:3 | 283:16 345:20 | 106:1,3,19,23 |

107:3,6 131:15
167:11 168:10
169:7,17
175:14 234:24
270:17 281:2
284:21 285:10
285:12 361:14
378:9,11
414:13 424:11
426:11,14
429:4,16,22
472:4 473:1
475:6
**reviewed** 5:17
22:21 33:11,20
34:2 105:2,3
108:6,10,16,21
109:8 156:12
157:7 168:17
197:2,23
276:12 358:1,5
419:2 422:23
428:7 429:21
429:23 434:14
**reviewer** 429:18
429:20,23
**reviewing** 145:6
169:9
**rhyme** 207:22
**ridiculous**
201:12
**right** 11:23 20:5
35:16 43:25
49:16 55:9
58:18,21 59:1
61:18 67:8
68:3 69:3,18
70:10,15 71:8
79:24,25 83:11
96:15 97:8
100:1 101:12
104:12 107:10
111:7 113:6
114:3 126:1,4
129:11,18
131:17 134:23
135:6,9 136:2

137:24 138:3
140:4,15
150:24 152:8
157:24 162:5
163:10,21
171:17 175:21
176:4 177:6,12
183:17 185:3,3
194:6 198:15
204:14,15
206:23 207:8
213:1 215:11
215:13 220:15
224:10 225:21
226:8 229:23
231:23 237:7
239:15 243:19
244:10 251:5
253:16 254:6
259:10,11
260:15 264:16
265:15 267:3,7
268:20 269:11
271:11 273:4
274:13 276:3
281:25 284:9
287:25 296:17
296:20,23
297:1,12
298:16 300:13
300:22,25
303:14 306:15
307:22 324:15
324:18 327:15
327:17 333:22
339:15 341:8
342:9 349:1,5
350:10,12,24
351:17 355:9
359:20,25
361:15 363:13
368:15 381:1
381:21 382:2
382:10 392:11
392:15 393:3
394:14,16
395:18 403:6

406:10 408:2,4
410:16 411:9
411:15,17,19
419:24 421:21
421:25 424:5
426:9 429:4
430:1,9,20
431:19 433:23
434:10 435:5
438:14 444:4,8
445:2 449:6
451:18 453:18
454:10 458:15
459:13,17
467:6,13 469:1
483:12 484:18
**right-hand**
415:11 420:22
421:13
**rigorous** 232:7
**rise** 8:16 411:7
**risk** 7:1,13 8:10
8:21 20:9,18
25:6 27:3
30:25 31:7,14
31:17,18 32:1
32:5 77:10
95:7 104:16
117:3,10,19
175:7 182:7
195:4,5 229:19
260:13,18
263:25 264:6
283:20 305:25
307:7,8,17,18
307:19 308:6
309:9 310:12
311:10,24
312:18,25
313:5,23 314:8
315:23 317:7,8
317:17 318:5
319:4,5,16
326:1 327:8,24
327:25 328:5
328:16,21,22
329:3,12,12,13

329:24 330:7
332:25 335:7
336:3,12 337:2
340:1,5,6,9,13
340:18,19,20
341:2,12
343:13 363:1,3
363:8,12
364:24 365:8,9
369:1,3,7,8,14
369:16,19,21
369:24 370:1,7
370:24 371:5
371:10,12
379:9,20
380:11,20
381:4 384:4,14
393:8,22,22
397:5 399:19
409:15 419:15
424:13 426:19
426:24 427:8
442:18 445:23
449:9,10 450:8
454:16 455:9
455:21 457:2,7
457:12 459:11
460:24 461:1
462:6,21 476:9
478:14 482:14
**risks** 311:21
312:2 329:17
333:3 351:11
393:8
**Road** 2:13
**ROBINSON**
2:16
**role** 196:10
**Roman** 249:10
**room** 122:17,19
313:24 314:7,9
**rooted** 407:18
**Rosenblatt** 8:8
346:3,16,18,23
346:24,24
347:1,6,8
359:6,12 360:1

361:21 362:1,4
362:12,14
**Rosenblatts**
362:2
**Rothman** 7:6,7
7:9,17 267:25
268:20,22,24
270:16 273:1
281:17,22
282:1 314:24
400:19 401:14
404:15 414:13
416:18 458:4
461:11 462:4
462:12
**Rothman's**
464:19
**Royston** 3:24
**rude** 120:13
**rule** 7:18,21
278:10 315:8
351:4 354:8
**rules** 161:22,24
**run** 12:16 56:5
432:17
**runs** 14:1,4

---
**S**

**S** 2:1,21
**safety** 25:15
**sake** 178:21
**Sales** 1:4 10:14
**sample** 63:25
197:6 258:24
260:17,23,24
261:8,14
263:14 372:21
374:3 410:2
**Sander** 413:6
**sanitary** 363:1,7
364:6,24
368:24 369:12
369:20 371:5
372:16 373:18
437:20 467:16
**sarcoidosis**
14:19

Christian Merlo, M.D., MPH

sat 141:8 435:17
satisfactory 444:11,22
satisfied 183:23 186:6 349:22
saw 166:1 167:9 167:12 268:19 275:24 392:21 425:6 447:6
say-so 272:5
saying 17:4 122:17 127:14 127:16,25 128:17 140:6 140:17 172:19 222:3 226:25 246:22 249:20 260:2 262:10 272:8 274:16 277:25 290:25 291:17 293:9 295:21 304:23 314:4,12 331:4 336:1 337:1 338:19 349:4 356:9 365:15 370:16 373:4 388:22 389:1,6 391:12 409:17 409:18 431:8 431:23,24 435:8 454:24 459:24 462:19 477:17
says 11:6 14:13 34:14 55:16,21 56:23 69:3 71:9,9,24 72:8 87:2,5 91:2 105:13 118:17 119:7 124:23 125:9 126:13 126:16,23 127:1 128:3 131:14 133:19 140:11 141:20 144:8 155:15

172:6,16
177:21,22
178:6 182:25
183:17 184:1
202:6 205:12
219:7 223:9
224:20 244:25
247:18 253:18
260:6 261:4,5
263:22 266:20
267:17 279:2
311:17 312:22
315:2 318:11
320:19 321:2
324:6,22 327:5
327:7,21 330:3
330:5,9 337:13
342:14 343:16
343:20,22
351:4 354:9
355:12,14
356:19 362:10
362:24,25
364:13,14
365:6,14,19
366:9 367:6,11
367:20,24
368:23 369:23
369:25 370:8
370:20,22
371:9,20,24
372:1,20 373:9
373:22 374:1
375:19 385:1,6
385:22 401:15
401:25 404:15
404:24 407:11
410:18 411:2,3
412:3 413:10
417:22 420:24
422:4,8 423:17
424:7,10
438:24,25
441:6 442:12
442:24 443:8,9
443:13,24
444:10,21

447:23 448:21
448:22 449:1
450:5 452:10
452:25 454:11
454:23 455:3
455:20 456:18
458:12 460:4
461:11 464:24
467:19 468:23
schedule 85:14
scheduling 85:24
scheme 415:4,14
Schildkraut 449:2,3,25 450:1 474:12
school 6:2 12:23 44:24 61:16,24 62:2,6,14 63:3 63:6,24 64:7,9 64:12,14,18,21 64:23,24 65:5 65:12,15,19,22 66:4,5,22 67:17 69:1 71:6,10,18,20 94:8,12,13,15 95:17,20 102:10,21,22 103:7 210:10 360:15,18
Schultz 244:5
science 19:24 72:15 111:5 132:16 133:21 133:24 134:6 134:19 135:23 136:4,20 137:5 139:9 141:22 142:1,10,15,20 142:23 149:7 154:19 155:15 163:1 219:12 220:1 222:20 223:20
sciences 141:22 411:7

scientific 29:9 85:16 100:23 133:22 134:1 135:8,24 136:8 137:3 223:23 224:1,15,22 250:25 343:15 343:20,21
Scientifically 147:8
scientist 127:5 128:9 130:10 153:16 156:9 297:10
scientists 8:16 127:10 156:24 159:21 167:22 168:6,22 169:4 169:19,22
scope 14:8 106:12 107:11 471:2
screen 10:7
Screening 6:11
scrutiny 146:6
search 361:5
second 12:24 14:7 34:13 72:4 75:18,19 176:2 200:19 235:17 236:2 253:9,12,18 267:13 269:8,9 269:14 306:10 306:22,23,24 307:15 310:11 315:4,17 318:18 339:25 340:3,17 341:3 360:12 362:24 364:19 375:19 385:7,21 390:16,17,24 390:24 391:1 392:22 401:18 401:23 415:2,2 415:9 420:23

421:12,15
439:24 450:2,3
450:4,5 482:16
secondary 42:25
secondhand 316:15,25 317:4 318:2,10 328:13 333:5
seconds 98:7 116:2 241:22 259:25 263:11
secretions 57:12
section 19:23 124:21 126:5,7 126:16,23 127:1 199:18 213:22 248:24 249:6,13 273:20 305:17 305:19 325:5 332:20 338:21 411:2 446:5 458:6 480:25 481:7,22 482:3
secure 444:11 444:22
see 11:18 13:20 13:21 14:6,11 14:21 20:1 26:17 31:19 34:21 36:12 38:24 44:2 51:23 58:22 59:13 63:13,14 67:1,6,8,10 71:4,5,12 72:1 72:6 84:1 114:16 117:5 118:10 124:22 126:2 149:11 151:7 153:10 162:7,11 167:17 168:18 169:19 172:2 172:15 176:3 186:10 195:13 200:14 202:15

Christian Merlo, M.D., MPH

204:13 205:10
205:11 207:20
213:13 214:4
214:13,14,17
215:14,17
220:3,4 223:11
223:12 230:11
231:15 237:12
237:13 245:7
249:1,2,18
254:10,19
261:10 266:18
266:19,19,22
267:16,17
269:22,23
270:19 273:22
273:22 275:1,2
285:18 286:3
288:15 297:11
305:22 306:3
306:16 307:2,4
310:15,16,17
310:21 311:6,7
311:8,9,16,17
311:22,25
313:2,3,10
318:17 320:20
321:15 323:6,8
326:4 328:18
329:22 335:8,9
338:17 346:3
347:20,24
349:15 352:23
355:2,11,25
356:1 357:19
358:23 359:17
361:10,10
362:9 363:4,5
364:6 368:3
372:18 375:14
375:15 376:11
378:14,15
379:4,7,8,9,11
379:12,14
384:2,3 385:13
390:23,24
392:22 396:24

397:16,25
398:15,25
401:12,23
402:2,3,20
408:1,9,10,20
413:21 415:12
415:22,23
418:5,6 421:5
422:13,19,20
422:21 423:12
423:13,17
424:2,6,22,23
425:9 430:14
430:15 438:19
439:3 441:3
442:3,21,22
443:8,9,18,19
450:9 452:2,6
452:24 453:11
453:19 454:10
454:17,18
459:1 460:10
466:23 467:4
467:21,22
470:8 481:2,4
481:7,11 482:3
484:2,4,5,9
**seeing** 32:20
63:22 173:13
213:1 306:13
313:7 315:19
377:25 401:23
465:13 474:8
**seek** 170:1,4,4
444:14,25
445:3
**seen** 61:3 84:4
151:14 165:17
166:4 167:17
270:21 273:17
273:20 306:5
310:6 322:1
332:22 333:7
333:12 354:17
355:21 356:21
378:7,20 390:2
396:10 410:20

419:6 423:19
436:21 437:6
438:14,15
454:6
**selection** 372:21
374:4
**seminal** 45:12
45:18,24 46:6
46:12,12,21
171:17 172:4,7
172:22 173:2
173:25 174:6
183:14,15
**Seminary** 2:13
**send** 120:21
121:6
**sense** 257:1
271:23
**sentence** 34:13
120:12 175:24
184:8 186:10
188:14 190:10
200:20 204:4
205:5,5,11,20
219:19 220:25
221:24 237:13
237:15 253:9
253:11,17
261:5 262:6,21
269:8,15 308:9
308:9 318:18
327:1,9 329:15
332:12 338:20
371:2,3 376:12
385:8,21 386:9
386:19 408:25
418:6 421:11
421:14,17
422:20 423:5
450:5 460:4
461:10 463:14
476:23 482:9
482:17
**sentences** 119:6
188:8 306:21
315:5 409:1
446:21

**separate** 107:8
116:24 163:7
343:25 344:1
**sequela** 44:11
**sequence** 204:1
204:11,14
**series** 116:13
275:21
**serious** 123:24
124:4 127:6
128:8 130:10
241:13
**seriously** 133:2
279:7
**serous** 180:3
385:11 386:1
419:13,13,17
419:17 420:9
423:25 424:19
425:5 447:10
448:2,7
**serve** 426:11
**Service** 6:12
**services** 1:23 4:2
10:5 86:23
93:13
**set** 32:17 186:25
255:3 351:4
354:9 378:3
402:7 403:14
416:3 487:9
**setting** 162:8
422:10
**seven** 45:9
295:19 326:10
338:24 345:5
358:13,25
359:1,4 381:7
471:12
**SEYFARTH**
3:15
**shaking** 144:1
**shape** 459:23
**share** 66:18
**Sharko** 3:1 5:19
49:7,11,20
75:12 77:17,22

119:12 120:24
122:14,20
143:14,16,20
144:3,14,23
150:9 157:12
166:8,12,15,24
201:13,20
207:4,7 233:24
242:16,19
243:3,10,13,19
262:15 263:9
273:7 278:23
279:7,9,21
417:16 439:17
440:9,18
485:21
**SHAW** 3:15
**sheet** 488:6,9,11
488:14 489:7
**Shih** 121:2
**short** 85:2
**shortcoming**
285:15
**Shorthand**
487:4
**show** 13:10
17:23 18:6
31:13 38:15
46:2,8 54:23
58:3 70:25
88:1,6 117:1
128:25 165:8
179:10 188:2,2
188:2,4,17,17
198:9 243:2
249:7 268:11
270:15 272:25
273:5,13
289:16,24
300:19 309:5
310:2 316:11
316:12,12
324:5 331:2
333:14,19
344:22,24
345:9 354:20
369:24 375:1

Christian Merlo, M.D., MPH

376:1 377:7
378:6,15,19,21
382:14 398:20
400:15 410:17
414:11 419:1
419:22 438:8
446:12 462:24
464:10 468:19
468:20 474:9
481:9 483:9
**showed** 70:22
238:20,22
380:10,19
381:3 404:9
419:12
**showing** 84:19
165:15 191:23
350:2,4,17
374:16 465:10
**shown** 273:19
480:16
**shows** 23:7
83:17 85:2,4
192:14 316:14
346:7,20 348:9
348:9 372:13
373:7,15,23
419:13,24
426:17,24
427:18
**sic** 50:5 107:14
120:4 149:22
162:20 407:14
**sick** 15:7 19:6
41:11 42:8
**side** 15:23,24
16:4 42:13
242:25 415:11
421:13 450:4
**Siemiatycki**
7:19,20 141:6
141:25 324:6,8
324:19 473:5
473:16,21
**Siemiatycki's**
131:9 327:14
**sign** 488:8

**significance**
8:16 191:19,24
226:6 327:24
338:5 339:8
341:6 347:9
354:19 356:3
365:25 366:1,5
374:16 399:17
402:13 403:19
404:9,12
406:23 407:9
407:10,13,18
408:12,14,17
408:19 409:4
409:10 411:3,8
415:18 485:6
**significant**
37:11,11 185:8
189:1,4,6
190:6 191:1
192:6,15,22,23
235:25 260:8
316:13 325:25
327:7 329:14
332:25 341:11
342:11,15,19
342:21,23
343:2,6 344:23
344:25 345:6
345:10,20
346:1,5,8
347:6,7,13,14
350:3,18
351:10,12
352:3,5,15
353:19,21
354:7 363:9
364:7,8 365:3
365:5,8 369:3
369:15 370:2
370:10,12,24
370:24 371:13
377:9,15,18
378:4 380:1,10
380:20 381:19
382:15 383:19
384:15 385:9

385:23 402:9
403:16 407:24
408:8,17 409:6
409:13,21
410:4 413:18
414:23 415:3
415:13,21
417:25 418:15
419:15,25
426:19 427:7
427:19 442:14
443:21 445:19
447:8,25 453:2
453:16 456:14
456:17 457:5
457:14
**significantly**
407:13,15
455:10,22
**signifies** 341:11
**signing** 83:5
488:9
**signs** 17:4
**similar** 48:7
100:10 103:4
105:19 181:22
244:9 261:14
261:17 345:15
348:11 377:16
**similarly** 37:24
41:6 223:25
224:21
**simple** 173:1
218:7 222:14
**simply** 105:15
109:21 110:7
221:10 277:17
349:4 402:8
403:15 404:15
**Singh** 142:19
149:3
**Singh's** 131:9
**single** 34:14
143:22 393:7
394:21 429:4
**sinus** 57:15
**sir** 6:15 45:11

133:6 177:11
203:4 350:25
393:4 410:25
430:14 465:23
**sit** 176:23
198:15 262:1
295:16 470:10
474:22
**sitting** 41:19
100:3 243:17
290:23 291:16
291:17
**situation** 413:4
**six** 7:7 45:9
79:22 81:22
203:18 270:18
298:13 302:3
379:19 380:4
381:8 384:3,13
428:6 442:13
445:18
**size** 197:6
258:24 260:11
260:17,24,24
261:8,14
263:14 372:21
374:3
**SKADDEN** 3:9
**skill** 176:9
**skip** 207:19
452:12
**SLATE** 3:9
**sleep** 14:19
**slide** 73:2
118:24
**slides** 73:8,9,10
93:17 254:19
**slightly** 30:22
**sloppiness**
247:24
**slower** 135:15
**small** 342:2
372:21 374:3
381:24 456:4
**smaller** 257:18
363:2 364:25
368:25 371:9

**smiling** 143:14
**Smith** 94:17
**Smith-Bindman**
142:15 474:5
**smoke** 27:24,24
315:12 316:8
316:15,25
317:4 318:2,10
328:13 333:5
**smoked** 27:17
**smoking** 27:23
315:10 333:2
433:5
**so-called** 236:20
**solely** 457:16
**solvent** 329:6
**somebody** 44:2
60:15 86:18
130:15 132:24
155:14 163:18
201:17 292:7
300:15,16
349:12
**someday** 56:14
**someone's**
231:11 437:20
**Sonal** 149:3
**sorry** 13:14 16:2
17:10 25:3
35:13 56:11,21
72:16 77:9
84:21,22,24,25
87:16 88:24
98:8 101:8
104:25 119:1
125:20 174:13
178:15 191:7
205:1 213:16
213:18 219:16
235:3 241:11
245:20 250:6
266:6 269:1,3
275:11 285:22
288:3 290:5
298:24 301:21
307:14,14
311:2 320:10

Christian Merlo, M.D., MPH

331:6 334:16
336:25 345:8
349:20 350:4
353:3,13 361:3
361:8 363:15
375:7,9 376:2
379:23 390:19
401:16 403:7
406:25 415:7
432:4 444:18
452:11 455:6
458:17 480:7
**sort** 85:14 341:5
351:13 402:10
403:17
**sorts** 20:12
437:12
**sounded** 468:6
**source** 266:14
266:21 439:1
**South** 2:4
**space** 64:8 488:6
**spaghetti** 122:24
**Spanning** 152:7
**speak** 74:3
91:15 100:17
143:1 166:20
166:21 170:8
170:11,14
174:11 426:13
**speakers** 471:25
**speaking** 70:2
135:16 186:5,9
282:21,25
**special** 315:6
402:6 403:13
**specific** 12:25
19:10 26:13
37:12 41:12
42:9,10,12
47:21 49:24
65:7 68:7
70:13 72:17
73:2 87:25
92:10,11 97:17
140:24 146:20
150:2 168:24

179:11 180:24
185:22 186:16
188:10 197:21
220:12 262:6
276:10,23
277:1,3,13
281:8 286:3,13
293:18,19
302:17 325:11
366:21 404:17
427:3 466:20
477:8,9
**specifically**
20:21 22:22
35:21 53:1,16
78:3,4 94:18
96:1 97:4 98:3
104:7 108:25
114:25 172:19
181:8 182:17
188:21 196:15
216:16 219:4
259:11 263:22
284:23 289:17
359:8 382:18
462:13 464:7
467:5 476:9
**specificity** 28:20
45:4 174:16
179:7,20
180:12,19,22
180:23 181:4,4
182:4,5,8,21
182:25
**specifics** 85:11
87:7 198:19
274:23 289:24
**speculating**
231:23
**speculation**
469:16
**speech** 90:14,15
221:15,16,19
236:25 237:3
292:16 417:1,2
**speeches** 89:11
89:15 93:9,15

233:14 273:9
417:17
**spend** 62:5,13
62:17 63:2,15
64:22 65:6
79:9 330:15
360:7
**spent** 60:20
268:23 338:7
430:11 471:11
**splitting** 349:3
**spoke** 69:5
214:20
**sponsored** 89:15
90:16
**spreadsheet**
120:20 123:12
**Square** 3:6
**stage** 266:15,20
266:22
**stand** 247:22
**standard** 34:18
34:25
**standards** 143:5
145:6 147:4
**stands** 139:24
142:21 164:10
342:18,20,22
343:1
**start** 49:5 61:2
97:23
**started** 195:20
300:15 471:7
473:7 480:8
**starting** 334:17
**starts** 126:9
402:1
**state** 11:14
48:17 189:24
190:21 209:7
209:10 247:23
247:25 248:5,9
308:5 488:5
**stated** 36:20,21
**statement** 8:3,5
81:2 105:19,19
175:16 188:16

191:13 216:11
216:20 221:7
222:16,23
223:2 224:14
225:9,14
226:21,24
228:6,22 270:2
291:24 292:2
311:17,25
317:6 351:2,23
357:7 368:5,14
372:1 381:16
402:21 403:9
403:10,25
404:19 414:8
417:23 426:3,5
433:14 442:22
447:6 454:11
454:22 464:19
**statements**
216:15 225:20
226:3 310:4
336:16 408:23
447:1 451:21
**states** 1:1 10:17
51:7 156:1,17
220:12 260:8
324:20
**stating** 214:14
454:25
**statistic** 409:6
**statistical** 8:16
184:22 191:19
191:24 193:13
203:9,20 226:6
327:24 331:5
338:5 339:8,10
339:12,13
341:6 354:18
356:3 365:24
366:1,4,9
367:6 374:16
402:12 404:9
406:22 407:9
407:12,17
408:11 409:9
410:17 411:3,7

412:4,9,10
415:17 485:5
**statistically**
118:7 185:4,7
188:25 189:3,6
190:6 191:1
192:5,7,15,16
192:21,23
235:25 316:12
329:14 332:24
339:2 342:10
342:15,18,21
342:23 343:2,6
344:23,25
345:6,9,19,25
346:8 347:6,7
347:8,13,14
350:3,18 351:9
351:11 352:3,5
352:12,14
353:18,21
354:7 363:8
364:7,8 365:3
365:4 369:15
370:10 371:13
377:9,14,18
378:4 379:25
380:10,20
381:18 382:15
383:19 385:8
385:23 402:9
403:16 407:24
408:7 409:12
409:21 410:4,6
413:17 415:20
417:24 419:14
419:25 426:19
427:7 443:20
447:8,25
456:14,17
457:5,14
**statistician**
193:18
**statistics** 203:5
**stay** 16:25 17:5
**stemming**
372:22

Christian Merlo, M.D., MPH

stenographic 10:22
stenographica... 487:8
step 138:3
437:13
Stewart 393:6 393:13
stick 301:5
sticker 13:15
stop 43:2 166:2 166:15 227:9 413:11 476:1 478:3
stopped 300:17 302:8
straight 459:21
strategies 76:9 76:16
Street 1:14 2:4,9 2:22 3:16 10:11
strength 28:19 45:3 117:8 145:14,15,22 146:21 178:22 178:24 183:2 229:21 232:14 232:20 305:13 305:15,18,20 312:5 315:1,4 320:7,19 323:19 325:5 325:16 327:22 330:4,10 331:5 331:6 332:20 333:6 342:8,24 401:8 408:12 465:14
strictly 297:20
strike 23:11 146:25 240:11 247:21,21 417:2
striking 338:15
strong 291:19 292:6 307:16

318:12,21
320:22 323:5,5
323:9 334:24
335:5,11 337:2
415:4,15
472:23
stronger 321:3
structural 215:24
Stuart 203:12
student 96:3,5 186:9
students 95:17 95:21 96:8 113:18
studied 195:6 261:18 434:22
studies 6:22 7:6 7:9 8:18 28:25 29:19 31:13,15 31:19,23 32:5 35:5 39:8,13 39:13,21 72:19 112:1,7 113:7 113:7 114:23 115:2,3,22,23 116:9,10,11,12 116:13 117:1 118:6,11 126:20,25 127:3,19 128:6 129:8,14 130:25 131:22 132:3 151:19 151:22,24,25 151:25 152:2,3 152:4,4,8,11 154:4 159:25 160:4,25 161:1 162:16,16 163:2,3,25,25 175:2 179:1,10 179:22 180:1 181:12 183:4,5 185:24 187:24 188:25 189:3,5 189:12 192:20

195:12,21
197:4,7,8,9
212:24 213:3
223:17 230:14
231:4 232:8
234:12,14,18
234:20 237:11
237:19,21
238:4,5,6,19
238:21 239:9
239:11,20,23
240:6,15
241:13,17,18
244:25 245:2,5
246:2 247:4,4
248:2,3,10,11
248:14,21
249:25 250:1,2
250:16,17,18
254:23 255:16
255:24 256:3
260:10,12,22
260:25 261:7
261:16 263:23
263:24 264:20
265:10 267:15
267:18,20,24
268:13 269:11
269:13,16,18
269:21 271:5,6
273:15 274:6
274:18,19,21
274:21 276:2
277:10,17
278:1 280:9,12
281:6 284:3,11
284:17,19
285:15,20,24
285:25 286:17
286:25 287:4
287:11,20
288:23 289:1,3
289:8 290:9,17
290:20 291:8
293:8,11,14
296:5,13,14,16
297:22,23

298:1,3,9,11
299:4,11
300:19,23
301:4,8,18
303:3,13,19,22
304:10,12,20
304:25 305:6
305:11 309:5
316:9 319:19
331:6,7 332:24
333:8,12,14
336:9 338:14
338:16,25,25
339:1,5,6,7,9
339:11,14,18
339:20,21
340:15 344:15
344:21,22,24
345:8 347:23
348:16 349:5
350:1,2,9,15
350:16,17,22
350:23 355:16
356:16,24
357:11,22,23
357:25 358:2,6
358:8,14 359:2
359:4 365:24
369:24 370:7,9
370:16 371:17
371:18 374:8,9
377:1,7,13,16
378:2,4,8,12
378:18 379:5,6
379:20 380:1,4
380:9,18
381:24 382:8
382:21,24
383:18 384:12
384:16 386:13
387:8,10
389:17 393:5
393:19,20
394:7 396:3
404:8,11
413:16 414:2
418:22 420:5

420:25 421:2,4
421:19 422:3,3
422:6,17
423:11 424:15
424:19 428:21
429:15 431:11
434:15,17,20
437:3 441:7,21
442:13,14,17
443:21 445:17
445:18,22
446:22 447:1,5
456:1,4 482:19
484:8 485:9
study 26:4 28:3 28:16 29:20,25 32:13 35:14,19 37:4 38:12,13 38:13,17,20 39:4,4,14 63:19 95:2,6,7 95:11,12,15 111:25 112:6 112:10,15,17 112:21,21 113:2,5 114:23 115:20 116:5 116:21 132:2,4 134:14,19 151:2,14 154:8 160:5,19 161:5 163:12 175:6 180:6 183:18 184:16,17 186:25 187:8,9 187:19 188:1 189:10 192:14 195:18 197:25 220:11,13 223:15 228:24 229:10,18 230:25 231:1,8 232:8,12 235:10,13,20 235:23,24 236:7,8 240:3 240:16,17

Golkow Litigation Services - 877.370.DEPS

241:3,4,5,8,9
245:1 255:3,5
255:18 256:4
256:13,17,19
257:4,6,11,12
257:15,21,25
258:7,21 259:6
260:23 261:8
263:23 264:4
270:8,9 271:2
271:14 274:18
274:23,23,25
275:8,15,25
276:3,16 277:6
280:13,18,24
281:2 282:16
283:13 286:4
290:13 294:11
294:20 296:9
296:20,22,23
296:25 297:1
297:10 298:13
298:16 299:17
299:18 300:7
300:10,25
301:11,15,25
302:2,18 303:5
303:9 304:1,6
312:15 316:14
336:8 339:25
340:3,13 342:2
342:2,5 345:2
345:2,14,15
346:3,25 347:2
348:11 349:24
351:15 356:12
356:17,25
357:2 359:13
360:1,3,10,18
362:13,15,17
362:19,21
367:12,14,17
367:21,25
368:2,11,11,12
368:17 369:5
369:10,13,18
370:2,22

371:21 372:10
372:13 373:5,6
373:15,23
374:25 375:1,4
375:20 376:5
378:16,20
380:19 381:1
381:10 382:16
383:1,3 385:3
385:4,5 386:10
387:12 390:25
391:14,15
404:2,3 409:24
410:2 411:16
414:3,4,4,5,6
415:4,14 416:1
416:3 419:2,6
422:9 425:21
425:21,24
428:18,19
429:1 438:19
442:9 448:10
449:2,3,25
451:19 453:12
454:5,6,7
456:4 465:21
466:5,17
467:18 468:12
469:23 474:12
484:15 485:9
**studying** 271:8
**stuff** 331:20
472:1
**subconsciously**
36:15,17
**subgroup** 422:9
423:11
**subgroups**
355:21 356:22
**subject** 103:3
146:4 199:12
231:2 282:16
300:7 302:18
472:21,25
488:10
**subjective**
111:11 203:23

204:7,17,23
205:7,14
**subjects** 250:3
383:2,3
**submission** 25:3
**submit** 100:8
472:3 474:6,23
475:2
**submitted**
101:23 102:2
473:6
**subscribe**
412:19
**Subscribed**
489:15
**substance** 163:1
489:7
**subtype** 179:23
**subtypes** 180:2
**suffice** 177:1
**sufficient** 23:2
264:5,12 317:1
317:1 318:3,3
318:14,15,22
318:24 454:15
460:7 461:6,14
462:7 465:1
**sufficiently**
124:19,24
125:10
**suggest** 124:8
367:12,25
368:5 369:6
371:22 457:6
465:6 476:8,14
**suggesting**
138:7 245:5,15
245:17
**suggestion**
190:1,22
239:18 351:6
385:12 386:2
447:11 448:3
456:10,11
457:11
**suggestions**
35:17

**suggestive**
424:20
**suggests** 235:10
246:2 279:5
343:8 372:1
380:4 386:1
**Suite** 1:14 2:4
2:13 3:6,22
10:11
**summaries**
277:10
**summarize**
344:20
**summarizes**
339:20 344:13
344:14 441:5
467:11
**summarizing**
338:24 339:17
345:11,13
**summary**
223:10 236:18
372:7,13
373:15 381:15
407:3,6 440:23
452:23
**sun** 328:14
**supplement**
33:13 79:8
**supplemental**
5:16 33:11,19
78:17
**support** 80:11
85:20 86:1
105:16 109:21
110:7 126:20
271:9 373:5
375:20 376:5
384:21 386:13
418:4 463:5,9
482:13
**supported** 86:24
331:10 439:1,4
**supportive**
442:25
**supports** 319:19
**supposed**

143:22
**suppressants**
229:18
**sure** 18:5 52:24
59:20 68:6,10
69:14 77:19
85:10 86:6
87:7 89:5
148:16 165:10
183:16 190:13
204:12 207:25
214:9 235:12
236:21 244:23
294:24 313:19
319:9 321:8
325:1 338:6
340:11 345:22
416:14 420:17
428:1 435:6
458:22 462:11
465:24 482:11
**surgeons** 96:12
**surprise** 89:19
158:19 159:9
159:15 235:2,4
**surprising** 30:3
**surreal** 278:17
278:19
**Susan** 3:1 5:18
66:17 144:25
207:3 243:2
278:17
**Susan's** 263:6
**Susan.Sharko...**
3:2
**susceptibility**
117:24
**susceptible**
114:24 239:20
**suspect** 292:3,3
**switched** 302:7
**sworn** 11:4
487:5 489:15
**synonymously**
176:15
**synthesis** 420:22
**synthesize** 29:8

29:24
**Systematic** 6:17
7:11
**Szklo** 68:9,15,23
69:5,7,10 70:2
170:11 360:11
360:13,14
362:9 365:19
371:20
**Szklo's** 68:25

**T**

**T** 3:15
**tabbed** 446:14
**table** 166:19
167:3 214:4,14
243:7,18
266:19 321:6
328:7,10,18,20
363:20 379:2
381:1 384:11
419:10,13
420:15 422:21
423:17,24
449:6 450:16
456:24 457:9
467:10 468:21
468:23
**Taher** 7:13
285:10,12
438:10,15
**take** 15:6,25
42:23 50:8
60:11 62:22,22
75:4,7 89:13
92:7 93:4,5,20
116:16 133:2
138:2 139:19
144:9 145:21
147:1 219:2
237:17 243:21
254:18 257:14
272:11,14,17
279:3,5,6,16
279:18,20,21
328:8 337:7,16
346:3 352:4,12

405:25 406:3
414:11 433:20
433:22 434:6
456:23 457:17
457:20 475:15
482:23
**taken** 41:8 66:23
88:10 113:1
187:2,20 193:9
236:10,11
260:22 261:7
331:4 463:15
487:8
**takes** 31:22
**talc** 6:10,11,17
7:9,12 8:10,21
12:7 21:22
22:16 101:15
105:17 106:9
106:21,25
108:17,23
109:11,22
110:8 117:1
137:18 150:22
154:19 164:6
171:3 178:10
181:22 232:9
254:22 255:18
255:25 257:7
259:8 260:9
264:1,2 273:2
273:15 280:17
284:18,20
285:16 289:3,9
290:21 296:5
298:14 299:4
299:13,19
300:16,17,17
301:16,17,24
302:7,8,24,24
304:10,20
306:6 333:10
350:5,19
357:11,22,25
358:7,8,15
359:15 363:1,3
363:7,11,13

364:4,24 365:8
367:13 368:1
368:24 369:1,4
369:5,11,20
370:25 371:5
371:10 372:16
373:18 375:21
376:6 385:9,24
385:24 421:2
421:19,23
422:7 423:8
424:12,19
436:14,16
437:20,21
441:7,21
442:17 445:22
447:9 448:1
451:24 452:12
453:1,2,15,17
455:11,23
457:13 466:21
467:9,12,20
468:12,23
469:24 471:15
481:1 482:10
482:14 483:25
**talc-containing**
369:6
**talc-related**
293:14
**talc/ovarian**
280:7 332:22
**talcum** 1:3
10:13 20:24
21:8,23 22:19
23:3,9,18 24:5
24:11,15 25:6
25:14 33:3
53:10,18,20
54:2,7 76:1
103:15 104:17
137:14 149:15
152:16 153:6
153:21 155:2
156:3 157:3
159:5,6,18
161:4,13 165:1

167:23 179:4
188:23 196:24
265:3 328:3
329:11 358:4
476:1,14 477:7
478:23 479:7
479:11
**talk** 37:1 38:11
39:7 53:13
58:25 61:13
70:17 73:4
74:21 80:16
86:22 89:8
90:14,15 92:12
132:10,12
166:22 175:23
237:16 238:18
244:17,18
282:1 305:13
305:15 309:15
310:17 338:4
356:11 361:12
363:18 366:19
372:6 380:6
387:9 418:24
430:9,15,25
431:15 439:14
440:8
**talked** 54:9
71:22 76:24
92:11 93:8
107:13 109:2
158:12 226:5
229:9 241:21
244:15,20
248:15 251:4
267:5 275:25
276:1 304:25
305:2,14
319:23 322:8
339:3,5,6,7,8
351:3 354:10
359:6 360:21
394:23 418:23
433:5,6,6,7,8
447:5
**talking** 16:10

26:14 38:6
74:5 78:22
79:3 129:1
141:2 152:8,21
163:11 180:18
180:19,23
185:7 188:22
190:3 195:4,7
204:3 228:23
231:23 241:12
259:10 267:3
268:24 286:4
302:5 315:21
316:7 319:14
323:18 338:8
362:1 363:23
365:22,24
367:4 368:15
368:16 371:4
371:14 372:3
378:3 389:11
397:8 403:25
406:22 409:1
418:7,14,21
430:11 436:9
437:14 459:20
461:20 471:8
476:5,9,25
**talks** 91:11,25
92:3 93:9,17
202:24 310:11
311:9 314:25
320:6,22 325:5
325:16 326:15
355:7 356:16
407:8 420:24
423:24
**tallied** 51:4
432:5
**tally** 51:15,22
**tanks** 89:7
**taught** 45:21
67:18 75:18
76:9,15 208:5
210:8 211:7,14
212:14 254:15
**tax** 81:2 82:6

Christian Merlo, M.D., MPH

teach 45:16
72:10,12,13,14
108:11 113:18
254:15
teacher 314:14
teaching 71:19
team 36:16
471:5
teams 89:13
92:5
television
477:25
tell 11:5 59:8
60:14 74:14
99:2,3 110:14
118:25 119:14
140:25 155:17
155:19 186:12
186:14 191:9
235:9 238:12
252:21 261:12
261:23 262:2
276:14 277:3
278:4 283:4
320:21 321:16
324:21 340:23
363:6 364:17
379:15 403:24
437:19 470:10
470:14 476:1,2
476:21 478:2,3
478:4,25
485:14
telling 149:18
290:24,24,24
314:6 477:19
tells 212:2
379:18 456:24
temporal 203:25
204:1,11,13
temporality
45:5 204:2
ten 39:20 86:3
98:7 116:2
173:24 199:16
304:3 377:6
449:13,16,17

tenets 101:13
106:16,17
108:7,11
tenure 16:20,21
term 47:23
180:22,23
215:21 217:1
239:15,16
281:11,13,17
282:8 306:4
terminology
335:3
terms 48:2 62:4
235:25 239:8
240:13 241:11
292:6 323:19
399:16
Terry 454:6,23
484:13
test 354:19
366:5
tested 407:12
465:9
testified 78:10
130:24 230:18
230:19 296:18
336:15 483:13
testify 155:16
230:20 487:5
testifying
316:16
testimony 79:16
86:11 138:12
230:5,9 268:16
346:11 410:21
410:23 463:24
473:24 487:8
testing 161:18
402:13 403:19
407:10,18
408:17,19
409:4,6 414:24
tests 415:3,13
text 355:1
textbook 67:20
67:23 68:4,6
199:5,7,9,22

200:3,9 206:5
206:11 207:24
212:16 265:22
268:6,7,13
269:9 314:23
319:21 321:2
322:1 343:11
400:16,19
401:14 402:19
402:23 403:5
405:1 406:21
407:4,6,7
416:19 458:4
textbooks
113:17,21
200:1 218:12
218:22 252:22
253:3 271:15
272:18 366:8
367:5
Thank 33:8
56:12 66:12,16
77:7 171:7
207:7 213:20
269:5 344:7
415:10 419:3
458:21 485:23
486:1,5
Thanks 238:15
401:1 406:11
theoretic 30:14
theoretical
30:18
Theoretically
298:7
therapies 15:23
41:12 92:11
therapy 16:11
17:16 92:10
311:23
thing 16:21 19:4
29:1 49:9 79:6
79:10 107:9
118:3,9 128:9
130:10,21
132:17,22
135:19 175:25

211:25 218:24
227:24 252:19
254:3 275:12
322:8 324:22
382:9,25 400:7
405:12 408:18
409:5,8 410:12
416:8 417:22
465:13 484:7
things 34:3
44:10 59:16,18
59:19 73:7
85:15 103:5
106:14 107:6
107:11,13
123:16,20
143:24 166:25
168:15 181:1
183:6,9 187:20
189:9 196:3
197:16 198:2,6
210:12 236:15
242:13 252:14
253:6 256:7
270:10 273:25
285:9 286:21
288:10 291:2
292:9 296:19
317:15 319:2
343:14 405:11
409:18 410:7
428:18 429:8
437:12 440:3
441:25
think 15:2,18
18:10,14 28:23
29:18 31:2
33:10 40:10
45:23 49:4
51:22 52:20,20
53:17,19 63:10
69:12,15 70:11
73:13,15 76:2
78:19 79:12
86:3 89:7 97:7
103:12 105:5
107:21 108:1

114:3 115:7,12
117:14 119:5
122:14 130:23
137:15 139:13
140:9 141:5,15
142:2,9,14,19
142:22,25
143:16 144:5,6
144:14 148:2,9
148:19 154:3
158:11 160:18
165:23 171:4
181:6 184:5
187:23 192:19
194:19,25
195:9 197:18
198:4,14 200:3
200:23 201:1,1
201:12,22
205:23,23
207:3 208:14
208:22,24,25
209:1,12
211:21 213:17
228:20 230:8
230:17,19
239:9 240:4
247:2 254:20
258:7 263:12
272:14 275:4
280:20 283:22
284:1 285:2
293:17 296:21
298:12 308:22
309:16 312:3
319:1 321:1
322:25 334:10
334:13,18
335:5 336:1
338:9 341:18
345:21 349:12
353:24 357:5
360:19 391:7
391:13 409:8
410:21 413:25
427:6,16
433:15 435:16

Christian Merlo, M.D., MPH

437:13,18
439:6,13,20
440:7,9,20
454:20 456:8,8
456:23 463:23
464:12 475:25
480:10
**thinking** 244:7
269:19 270:6
349:14
**thinks** 367:1
**third** 107:2
126:9 263:19
308:9 340:21
362:21 421:9
**thirty** 488:15
**THOMAS** 2:2
3:15
**thought** 32:19
70:14 88:24
130:25 173:18
178:16 229:23
240:2 241:15
243:8 273:10
278:23 311:3
340:9 430:24
440:14
**thoughts** 153:20
**thousand-page**
294:6
**threats** 121:9
**three** 45:8 79:21
83:6 106:14
232:20 306:11
306:21,23
317:22 320:14
377:6 393:21
394:23 395:14
420:25 421:2
421:19
**threshold**
413:14
**thumb** 206:13
**Thursday** 1:8
63:13
**tight** 409:25
**till** 152:23

**time** 10:7 28:2
37:12 44:1
45:10 60:20
61:19 62:4,10
62:13,17 63:2
63:8 64:23
65:7 67:9 76:4
77:20 79:9
84:11,16,23
92:23 93:22
94:1,14,20
96:16 97:13
99:20 104:22
123:3 142:6
147:13 148:14
150:3 152:14
152:21 153:24
165:22 168:2
170:5 188:1
189:23 196:5
206:15 207:2,9
207:12 234:17
256:7,10,11
259:2 268:23
279:25 280:3
285:4 288:5
289:8 301:6,10
301:17 315:20
317:1 318:3
320:11 330:15
337:8,14,21,24
338:7 340:14
359:18 360:7
361:1 380:14
396:14 406:12
406:16 428:15
430:11 438:20
449:19 457:21
457:24 468:14
472:1,3 479:13
482:21 485:11
485:18 486:6
487:8
**timeline** 274:5
**times** 41:25
44:20 58:9
63:21 79:16,21

79:21,22,22
80:1 81:22,23
92:3,13 149:25
173:25 199:20
243:14 244:12
244:14 259:3
281:5 304:3
358:18 360:11
457:10
**Tisi** 2:3 5:5,7
11:13 13:9,14
13:16 17:20
18:8,21 19:12
21:13 22:4,11
23:10,12 24:1
24:18 25:23
26:15 27:10
28:9 29:16
30:20 31:24
32:14,24 33:17
34:7 35:11
36:4 38:1
39:10,23 40:12
40:24 41:15
42:14 43:14
44:11 46:19
47:12,22 48:20
48:24 49:3,7,8
49:13,22 50:1
51:21 52:8,17
53:24 54:22
58:2 60:10
61:1,10 62:20
64:5 66:1,9,13
66:16,19 67:4
68:1 69:9 70:8
70:21 73:6,17
73:21,25 74:4
74:7,10,18,23
75:6,14 76:13
77:2,18,19,23
78:5 79:1,5,13
79:14 80:14
82:3,8,21
83:16 84:17,24
85:1 86:4,7,8
87:3,8 88:9,14

88:22 89:1,20
90:10 91:13
93:6,20 94:4
98:4,9 99:1,6
102:15 103:10
104:3,23 105:9
107:16,22
108:3,5,13
110:12 111:13
111:23 113:15
113:24 115:14
116:22 118:20
119:9,14,19,23
120:3,8,11,14
120:25 121:10
121:15,17,24
122:2,4,9,12
122:18,21,23
123:4,11,17
124:5,14
125:12 127:9
128:7,14 129:2
130:13,22
131:7,23
132:23 133:7
134:11,22
135:13 136:23
137:23 138:15
139:2,12,18
140:1,13,20
141:14 142:7
142:13,18
143:3,11,15,17
144:2,5,10,17
144:21,24,25
145:2,20 146:1
146:13,22
147:14,21
148:8,15,18
149:2,10,20
150:6,11,12
151:11 152:22
153:12 154:1
154:11,24
155:11,21,24
156:8,22
157:10 158:6

158:14 159:1
159:20 160:8
160:13 162:4
162:19 163:9
164:24 165:5,9
165:14,24
166:10,13,14
166:17 167:2,7
167:13,19
168:3 171:1,21
172:8,14,20
173:6,7,12,21
174:7 175:11
175:22 177:8
177:19 178:14
180:20 181:16
181:24 182:15
182:19 183:7
184:19 185:11
186:1 187:6
188:11,15
191:12 192:2
192:12 193:1
194:2,15
195:10 196:8
198:11,21
199:14,19
200:8,21,25
201:10,15,22
202:1 203:2,3
205:3,18 206:8
206:17,20
207:5,15
208:20 209:15
209:22 210:1
210:14,18,24
211:9 212:21
213:7,18,21
214:22 216:18
217:2,9 218:6
219:18 221:16
221:20,21
222:5,12 225:6
226:1,13
227:12 228:2,9
228:15 229:2,6
230:16 231:17

Christian Merlo, M.D., MPH

232:5,15
233:11,16,19
233:22 234:3
235:1,14,22
236:16 237:1,3
237:5 238:2,10
238:14,17
239:1,6,24
240:10,12,19
240:25 242:1,3
242:6,9,18,19
242:21 243:1,6
243:12,15,22
244:3 245:16
246:4,11,20
247:8,10 248:7
248:22 250:4
250:22 251:11
252:6 253:4
254:9 255:14
257:2,22
258:18 259:5
260:1 261:22
261:24 262:4
262:13,19,22
262:24 263:3,9
263:15 264:21
265:13,20
266:2,3 268:10
269:2,3,6,7
270:3,14 271:7
271:13,24
272:13,24
273:10,12
274:12 276:7
276:11,24
277:14,23
278:4,7,12,18
278:25 279:1,8
279:10,14,23
280:6,22 281:4
286:5,15
287:18 288:4
289:14 290:1,6
290:14,19
291:15 292:1
292:12,18,24

293:2,3,24
294:2,16 295:1
295:9,23
296:10 297:6
297:16 298:21
299:1,21 301:2
301:7,19
302:12 304:8
304:16 305:12
306:18 307:1,5
308:20 310:1,9
310:21,25
311:5,15
312:16 313:25
314:10,20
316:21 320:5
320:12 321:9
321:21 322:6
322:14,24
323:14,23
324:3,13 325:3
325:9,14,20
326:3,6,13,18
326:21,23
330:1,20 331:1
332:8,13,16
333:21 334:5
335:14,21
336:6,22 337:5
337:12,18,20
338:2 343:23
344:4 345:16
345:24 346:13
347:16 348:2
348:22 349:11
349:17 351:21
352:9,17 353:2
353:9,12 354:3
355:13 356:6
356:15 357:1,8
357:15,20
358:24 359:24
361:7 364:19
364:22 366:3
366:15 367:3
367:10 368:20
370:14,21

372:10,12
373:14 374:5
374:20 375:9
375:10 376:15
376:24 377:20
379:1,24
380:15 381:2
381:20 382:6
382:19 383:4,7
383:17 384:6
384:24 385:17
386:16 387:1
388:1,6,10,14
388:16,19,24
389:8,12,24
390:21,22
391:7,13,19,25
392:6,12
393:17 394:11
396:19 397:4
397:14,15,24
398:5,9,11,21
399:6 400:3,14
401:2,3 402:22
403:3,4 404:22
405:6,9,14,18
405:21,24
406:2,6,9,19
410:15 411:14
412:1 417:3,13
417:20 418:19
420:19 421:12
421:16 423:18
426:6,22 427:5
427:13,23
428:3 429:2,10
430:5,22
431:18 432:9
432:21 433:19
435:1,12,15,24
436:12,20
437:2 438:7
439:12,14,21
439:22 440:2
440:12,16,20
440:22 441:13
441:17,19

442:11 443:5
444:3,19
445:14 446:4,6
446:11,19,23
447:2,3,14,22
448:9,11,18
450:11 451:11
451:17 452:4
453:6,10 454:1
457:17,19
458:1,10,14,19
458:23 459:12
460:3,19 461:2
462:15,23
463:6 464:5,22
465:19,25
466:2,15 468:2
468:4,8,10,18
469:22 470:2
470:22 472:11
472:19 473:4,9
473:15,22
474:4 475:3,11
476:11 477:12
478:11,17
479:12,24
480:2,7 481:3
481:8,11,18,24
482:5,22,25
483:4,6,11,17
483:24 484:20
485:7,12,19,23
486:1
**title** 13:4 77:8
    125:22 249:13
    411:4 480:21
**titled** 8:18 481:1
**tlocke@seyfar...**
    3:16
**tobacco** 315:11
    316:8
**today** 10:19
    33:20 34:8,8
    68:7 99:20
    100:7,9 118:23
    120:17 121:2
    123:13 129:17

129:19 130:6
131:5 152:23
153:3 159:23
168:11 213:1
271:23 287:25
288:6 295:11
315:9 358:18
360:11 470:10
470:14 471:7
471:12 474:23
475:16 479:13
480:16
**Today's** 10:6
**told** 69:20
    144:16 153:9
    196:17 358:9
    439:9 474:2
**Tom** 122:2,4
    403:3
**tool** 133:22
    135:24
**top** 55:7 67:8,8
    266:13 318:19
    352:18 353:16
    385:1
**topic** 45:13 93:3
    100:18 104:11
**topics** 53:4
**total** 457:9
**totally** 66:15
    122:20 278:18
    279:1,14
    388:24 439:15
    440:10
**touch** 29:5
**touched** 109:14
**toxicologist**
    19:18,19
**Toxicology**
    154:16
**track** 82:17,19
**tract** 57:17
**traditionally**
    16:12 283:8,9
**training** 193:23
**Tranquilizers**
    8:10

transcript 487:7
488:16,17
transcription 489:5
transition 92:8
transplant
27:13,25 28:6
55:5,11 63:13
76:23
transplantation
14:17 18:4
20:10,16,19
25:4 27:4,5,16
55:19 57:14
59:24 60:4
77:11,14
471:19
transplants
17:13 51:11
195:24
treat 92:16,25
250:18
treated 14:8
16:8,12
treating 16:4
44:15,17
treatment 14:25
15:3,14,16,19
15:22 60:16
223:22
treatments
91:18
tremendous
132:2 239:22
trend 118:7
442:15 453:2
453:16 485:4
trends 445:19
trial 116:19
160:22,24
161:7,9,20
162:12 163:16
163:23 275:18
trials 116:7,8
160:24 161:16
161:25 162:7
162:10 163:4,7

267:4,6,7,8,10
267:11 271:3
275:13 435:3
trichloroethyl...
328:11 329:6,9
tricky 16:21
tried 179:22
241:4,6 255:8
314:7
truce 243:20
true 16:8 17:17
51:25 112:1,16
114:8 128:13
135:20 150:23
158:9 166:25
167:4,4 242:20
242:22 244:13
248:3 264:6
276:7 284:18
284:24 293:8
298:8 301:11
301:11 303:22
366:10 369:24
370:25 371:7
371:15 375:25
383:21 395:10
395:22,23
396:6 419:20
422:4 426:16
433:2,4,11
460:8,8 461:15
461:15
truth 11:5,5,6
487:5,6,6
try 28:17 148:25
236:10,11
255:9
trying 31:13
77:5 89:22
113:8 181:11
185:16 189:8
190:17 262:17
345:18 376:12
389:21 416:12
445:2 455:12
455:18
tube 7:14 310:13

480:22
TUCKER 3:20
tumors 369:19
419:14 420:9
420:10
turn 196:16
332:17 445:9
449:3 479:23
turned 80:8
Turning 19:22
twice 354:2
two 27:21 38:6
44:20 45:8
54:5 72:12
96:12 107:5
169:12 177:24
183:19 194:5
200:17 283:6
301:18 315:4
325:15 362:2
365:23 367:21
378:2 390:3
408:25 413:16
414:2 431:8
451:20 479:18
type 112:22
179:11 181:5,9
423:24 428:18
types 185:24,25
188:1 283:7
345:14 424:4
typically 16:7
44:8 162:15
163:1 184:24
Tzonou 8:11
374:25,25

───────
U
───────

U-shaped
459:14
Uh-huh 29:17
33:9 157:11
215:9 253:13
315:18 395:5
400:21 414:16
420:3 449:8
ultimate 204:22

unclear 154:8
underlying
176:13 192:3
389:17
undermines
134:1 136:7
260:20
underneath
71:8 273:23
412:2
understand 21:5
21:14,19 29:3
36:5 39:24
41:16 73:21
113:13 134:2
136:8 138:1
149:16 156:11
181:15 184:3
189:16 208:15
220:21 223:3
232:16 239:5
242:18 243:10
246:12 256:25
265:18 303:11
312:4,5 340:16
340:16 386:17
398:3 411:17
412:4 416:21
417:8,10,11,14
understandable
480:10
understanding
21:21 22:7
132:16 133:23
135:25 205:1
209:3 223:25
224:4,25
460:12,16
understood
69:24 101:22
101:25 148:17
161:2 228:3
261:1 298:7
303:18 345:17
undertaking
34:15 35:20,23
413:5

underwear
369:13 437:21
undesirable
176:18
unethical 161:5
161:11,21
unexposed
265:3 284:14
284:15
unfeasible 161:5
unfortunately
57:21 262:16
uniformly
349:20,20
Union 3:23
unit 18:19 40:23
41:10
United 1:1 10:16
156:1,16
units 15:25
universally
343:12
universe 307:16
University
12:20 13:3
151:3 203:6
unprofessional
120:16 166:3
243:17
unpublished
426:24
unraveled
176:25
upside 306:17
urban 328:11,25
329:4
usage 137:19
298:14 299:4
301:18 441:8
441:22 442:16
445:21
use 6:17 7:12
8:21 43:18
50:14 73:8
101:15 106:21
106:25 108:17
109:18 111:17

Christian Merlo, M.D., MPH

113:9 117:2
124:17,20
132:14 138:22
196:20,22
214:12 224:13
224:15 225:9
234:13 239:16
241:6 252:22
260:9 261:16
266:5 306:4
317:21 319:12
321:12 328:6
363:1,20,24
364:24 368:24
369:20 371:5
385:10,24
394:10,17
399:8 402:12
402:12 403:19
406:4 408:15
409:3 421:2,20
421:23 422:12
424:19 433:22
442:17 445:21
447:9 448:1
450:6,16,19,19
453:1,3,15,17
455:11,23
456:6 461:3
467:9,12,20
468:12,23
469:24,24
470:3,11
**useful** 256:21
414:24
**uses** 144:20
220:18 224:1
224:21 266:7,8
282:8 354:25
457:13
**usual** 16:24
**usually** 26:3
50:15 76:8
91:25 112:12
112:13,18
116:6,9,10,12
161:15,19

163:24 267:8
342:1,5 432:19
460:23
**utilized** 32:18
259:1

___

**V**

**V** 2:3 4:1
**vague** 91:8
155:23 217:1
270:2 478:6
**valid** 269:17
**validity** 271:4
274:20,22
**valuable** 296:25
**value** 184:25
185:3 216:5
240:14 369:17
407:19 409:10
409:13 413:13
**values** 237:20
399:13
**variables** 177:24
183:19
**variety** 331:8
**various** 151:19
154:18 159:24
258:25
**varying** 259:3,3
382:23
**vast** 51:3,8,9,23
52:6,12 114:12
395:9,13
**Venable** 1:14
10:10
**venomous**
166:12
**venous** 59:11
**VeraMedica** 6:5
85:7,8,9 86:24
**verbatim** 487:7
**versa** 241:10
**version** 7:16
75:20,21 76:6
76:7 411:10
481:14
**versus** 238:20

422:18 428:19
428:22 437:4
441:8,22
468:13,14,24
469:8,21,24
470:1,5
**vice** 241:10
**video** 10:7
242:21
**videographer**
10:1,4 93:22
94:1 207:8,12
279:25 280:3
337:21,24
406:12,16
457:21,24
486:3,6
**videotaped** 1:12
486:8
**view** 48:2,11,13
71:24 155:14
238:20 265:7,8
274:22 291:3
343:15,19
344:14 345:19
346:6,14 472:4
**views** 140:25
250:9 471:15
474:18
**VIII** 249:10
**Virginia** 2:14
**virtue** 194:3
**Vitae** 5:11
**voice** 77:18
143:25
**vulnerable**
303:20

___

**W**

**WAGNER** 2:21
**wait** 201:4
439:23 479:24
**waiting** 199:13
**want** 48:22 50:3
50:4 54:23
74:8 78:16
89:24 103:23

122:25 138:16
138:17 144:11
144:11,12
162:20 165:8
175:12 178:3
190:14 206:18
214:8 226:20
226:23 228:11
229:25 236:19
237:16 242:6,7
242:9,10,14
262:6,10,20
263:3 278:2,12
279:17,18,21
282:13 286:24
292:23 306:19
315:2 322:2
337:7,8 344:9
345:22 352:11
353:25 392:13
394:19 395:2
418:20,24
427:3 439:14
457:19 462:19
467:6
**wanted** 264:10
294:6 358:23
428:1
**wants** 278:5,14
278:20 279:4
400:22 480:11
**Washington**
3:11,17
**wasn't** 19:15
21:10 22:1
80:10,10,11
103:19 185:14
187:13 250:5,6
256:1,1 293:9
299:8 381:10
416:14 429:13
466:18
**waste** 123:3
413:19
**watch** 74:9
**way** 23:14 36:3
36:6 50:7,18

54:2 62:18
64:2 100:23
104:16 105:3,7
152:11 166:21
197:20 211:11
227:25 229:1
233:25 268:15
277:16 281:18
306:19 313:14
380:7 404:15
433:16 436:13
436:22 437:22
439:18,22,23
439:23 440:2
472:8
**we'll** 18:9 38:11
70:17 93:3
100:4,4 157:13
199:17 217:11
233:7 236:18
247:21 251:12
338:10 349:15
353:10 391:9
**we're** 16:10
26:14 36:10,10
36:11,25 38:6
39:7 41:19
49:5,9 74:13
75:15,16 82:24
88:7 93:23
109:24 119:15
120:25 121:1,6
122:8,16
132:10,11
146:25 152:8
163:11 180:6
186:20,22
188:21 190:3
198:9 199:11
204:3 205:24
207:9,13,19
212:25 213:1,1
215:8 228:23
241:12 243:17
267:3 280:1,4
302:5 309:15
315:21 316:7

Christian Merlo, M.D., MPH

319:14 327:11
337:5,22,25
361:25 363:23
365:22 366:19
366:22 378:3
380:5,6 403:25
406:13 416:25
428:8 433:15
436:9 457:22
457:25 459:19
461:20 465:13
470:8 476:8,25
479:17 480:5
481:19 485:11
485:18
**we've** 29:19
33:10 93:8
96:18 107:13
114:2 158:11
159:11 206:25
254:4 338:7
401:7 433:6,7
433:8 434:21
**weak** 115:4
117:4,11,21
118:1 306:4,5
306:7,11 307:9
307:20 308:7
308:11 309:2,3
309:10,19
312:7,20 315:7
315:14,25
317:8 318:5
319:15,15
320:23 321:14
330:10 334:23
335:3 336:12
342:22 343:1,1
343:8,14
344:22 345:19
345:25 346:7,7
385:7,8,22
415:18 447:7
447:24
**weakness** 296:2
318:14,23
**weaknesses**

285:24
**weaks** 344:16
**web** 5:22 6:3
13:17 54:25
58:4,10,13,14
60:23 70:23,25
**website** 5:21
60:1 61:12
66:23 88:3
89:5 91:2
218:10 219:1,1
222:24 227:20
**websites** 60:19
60:21
**Wednesday**
63:12
**week** 66:24
435:18 449:19
468:13,14,24
468:25
**weekend** 480:11
**weeks** 437:4
**weigh** 190:4,24
191:17 331:10
351:7 463:12
**weighed** 254:22
**weight** 240:16
482:12
**Welch** 412:21
412:24
**welcome** 254:18
269:6
**well-accepted**
328:24 329:5
329:18
**well-designed**
241:9 275:10
296:22,23
297:1,12
**well-established**
125:19 126:11
126:15 148:11
250:24 252:23
**well-known**
208:10
**well-recognized**
328:22

**well-understood**
198:23
**went** 86:17
178:21 276:3
297:18 302:24
302:24 473:23
**weren't** 303:1
**whatsoever**
476:16
**When's** 288:5
**Where'd** 455:14
**whichever**
346:11
**white** 117:17
251:4 271:11
272:3 322:18
**Whittemore**
369:15
**wide** 331:8
341:25 364:10
**wider** 341:25
**Widner** 308:3
**William** 8:15
199:5
**wintertime** 76:8
**wisdom** 269:15
**wish** 176:9
266:8
**withdraw** 28:11
**withdrawing**
108:4
**witness** 11:1
17:22 18:14
19:3 21:10
22:1 23:23
24:10 25:21
26:12 27:8
29:14 30:17
31:11 32:11
34:1 35:3 36:2
37:23 39:6,18
40:10,18 41:5
42:1 43:12,24
47:5,18 49:23
51:15 52:5,14
60:1,18 61:9
62:9 63:10

67:22 69:7
70:4 73:1,20
74:15 75:4
76:19 77:23
78:2 80:5 82:5
82:16,19 84:22
87:6 89:4 90:7
91:9 98:2,8
102:13,25
104:1,21
107:19 108:10
111:9,20
113:11,20
115:11 116:1,3
118:16 122:16
123:15 124:3
124:12 125:8
128:3,12,24
130:18 131:19
132:19 133:4
134:9,18
135:11 136:16
137:8 138:13
138:25 139:8
139:16,23
140:9 141:12
142:5,12,17,25
145:10 146:18
147:12,19
148:6,13,16,23
149:9,18 150:1
151:5 152:20
153:8,23
154:10,22
155:9,19 156:5
156:20 157:5
158:1,11,23
159:14 160:11
161:24 163:6
164:22 165:7
165:23 167:5
167:16 168:1
170:20 171:20
172:6,18
173:18 174:5
175:9,20
177:14 178:13

180:17 181:14
181:20 182:13
182:24 184:11
185:20 186:19
188:9 191:15
192:10,19
193:21 194:12
194:25 195:15
198:8,18
199:25 204:25
205:10 206:23
209:7,20 210:4
210:22 211:5
212:13 213:5
214:13 216:14
216:23 218:4
219:16 222:2
224:20 225:23
226:11 227:8
227:18 228:20
230:10 231:6
232:1,11 234:1
234:23 235:8
235:19 236:5
237:24 238:8
239:3,13
240:23 242:11
242:25 243:5
243:23 245:14
245:24 246:7
248:5,13
249:24 250:14
251:7 252:3
253:2 255:1
256:24 257:10
258:10,23
259:24 261:25
263:10 264:18
265:17 270:1
271:1,19
272:11 274:10
276:9,22 277:9
277:21 278:6
279:4 280:11
281:1 286:2,12
287:15 288:3
289:23 290:5

290:11 291:11
291:23 293:17
293:25 294:14
294:24 295:7
296:7 297:4,14
298:18 299:15
301:14 302:10
304:4,14 305:9
306:20 307:4
308:17 312:10
313:18 314:4
316:19 320:10
321:1 322:11
322:21 323:21
324:25 329:22
330:24 333:18
335:25 336:20
337:16,19
343:19 344:18
347:12 348:4,7
349:8 354:1
355:11 356:5
356:19 357:5
357:18 358:21
361:3 365:22
366:13 368:14
370:5,19
373:12,22
374:12 376:11
376:21 377:5
378:23 379:18
380:13,23
381:14 382:5
382:20 383:12
384:1,10
385:15 386:8
386:24 387:23
388:5,22,25
389:5,20
391:11,17,24
392:2,10
393:11 394:9
397:2 398:13
398:15 399:3
399:24 400:10
402:20 405:25
406:3,7,10

411:12,22
420:17 421:14
423:16 425:15
427:2,10 428:6
429:7 430:3
431:14,22
432:13 433:13
434:13 435:22
436:5,16,25
437:9 439:9
441:24 443:3
443:24 444:17
445:8 447:20
448:16 451:8
451:15 453:23
456:22 457:18
458:11 459:6
459:19 460:15
460:23 462:9
463:1 464:3
465:4 466:10
468:16 469:17
470:17 472:6
472:16 473:3
473:19 474:2
475:2,9 476:4
476:24 478:8
479:3 481:10
481:25 482:6
483:20 485:2
485:24 488:1
**witnesses**
120:17
**woman** 328:5
420:12
**women** 57:18
149:13 166:21
257:14,17
258:8,12,14,19
259:7 284:19
289:8 298:11
299:19 301:15
328:3 329:10
477:23 478:2
**Wong** 387:15
**word** 30:4 38:2
45:23 59:7

124:20 125:3,4
132:14,15
133:9,10,12
147:23,23
184:8 215:14
220:19 224:13
227:7 460:12
**words** 35:21
91:18 129:9,13
184:21 187:8
291:19 292:4
353:21 445:11
**work** 64:17
70:14 80:16
82:13 84:5
86:9 90:1 93:7
97:11,12,15,18
97:22 98:11,12
98:15,18 99:10
102:8,20 130:1
186:25 203:11
262:16 439:1,4
**worked** 87:11
87:14 96:9,13
98:14 149:5
**workers** 329:5,8
**working** 63:15
80:24 84:8
96:13
**worms** 199:15
**worse** 274:21
**wouldn't** 30:2,6
36:2,5,21
60:21 129:23
159:14 161:19
162:11 163:15
179:8,19 283:1
314:16
**wound** 96:13
477:10
**wrap** 93:2
**write** 95:3
216:23 223:7
225:12 294:4
331:21
**writes** 202:23
**writing** 440:6

**written** 36:22
45:19 46:23
50:19 51:18
52:22 67:24
164:18 205:21
268:5 294:5
308:15 416:21
453:19
**wrong** 243:16
352:24 371:20
371:24 383:15
431:20,24
464:20 465:2
**wrote** 33:4
45:11 67:19,23
129:3,4,4
134:10 159:24
246:14 308:1
358:22 471:12
474:16
**Wu** 387:13
395:16 454:19
455:5,12 456:9
457:8

**X**

**X** 35:24 195:5
389:1,7

**Y**

**Y** 35:24 389:1,7
**yeah** 38:17
47:10 55:15
61:20 68:10
69:8 75:13
76:23 79:11
105:2 112:3
117:16 118:17
119:3 121:22
148:15 153:2
165:10 168:4
170:13 172:3
188:12 195:18
199:8 204:20
207:4 214:2,7
249:9 251:16
262:17 266:2

281:9 287:22
307:1 310:21
321:10 364:19
385:20 387:2
401:2 406:2
417:18 420:4
432:4 457:10
458:10,19
461:9 462:16
484:5
**year** 12:1 62:10
62:11,11,22
80:22 81:14,18
81:21 83:19
95:19 302:17
303:14 385:5
391:20,23
471:25
**years** 46:25
54:13,18 56:7
57:2,3 62:12
62:16,23,25
63:8 78:10
79:16 82:12
87:13,18 91:12
159:11 196:2
203:15 273:4
298:13 300:12
300:14 302:3
302:20,21,23
302:25 433:23
433:24 437:5
442:18,19,20
445:23,25
449:13,16,17
450:17,18
451:25 452:13
**years'** 453:3,17
**yes/no** 363:20
449:21
**yield** 269:17
**yielded** 263:25
**York** 3:11
**younger** 58:7,8
257:13

**Z**

Christian Merlo, M.D., MPH

Page 548

**Z** 389:1,7
**Zambelli-Wei...**
  484:22
**zero** 256:11
  413:15

**0**
**0** 407:16
**0.2** 363:22
**05** 184:25 185:3
  369:17 407:20
  408:5 409:10
  409:14 413:14
**07932-1047** 3:3

**1**
**1** 5:11 6:23 11:9
  11:17 19:23
  83:23 106:12
  107:12 185:2
  196:1 217:14
  217:19 219:7
  260:6 264:24
  266:20 267:4
  270:24 271:1
  332:6 341:10
  364:1 371:15
  379:13 393:9
  393:14,16,23
  393:25 394:1,4
  399:19 409:16
  409:20 410:5
  418:16 419:13
  432:2 453:12
  467:10
**1.0** 363:21
  396:23 397:6
  407:14
**1.01** 424:1
**1.05** 375:12,15
**1.07** 449:11
**1.09** 328:16
**1.1** 307:8,19
  313:1,8,14,23
  314:8 369:9
**1.16** 379:13,14
  379:23 449:10

**1.17** 343:13
**1.2** 117:3,11
  260:14 308:6
  312:2 321:13
  323:5 337:2
  377:1,7,14
  394:7,15,24
  395:4,10,11,19
  395:20 397:20
  398:18 399:20
  399:21
**1.20** 311:24
**1.22** 422:18
**1.25** 264:6
  336:12 395:25
  396:4 398:23
  399:11,14,21
  423:25
**1.26** 449:12
**1.27** 346:22,23
  395:16,17
**1.28** 327:25
**1.3** 364:9 365:10
  377:7,14
**1.30** 336:12
**1.32** 419:15,18
**1.33** 422:18
**1.34** 379:10,11
  379:21
**1.39** 419:15,18
**1.4** 369:16
**1.49** 451:24
  452:10
**1.5** 379:23
**1.51** 379:13,14
  379:23
**1.55** 424:1
**1.6** 117:3,11
  308:6 321:13
  323:5
**1.64** 328:17
**1.7** 347:3 363:3
  364:5 365:1,2
  365:4 369:1
  371:11
**1.70** 363:12
**1.8** 311:12,21,24

  312:2
**1.9** 365:9 369:8
  369:21
**1.92** 343:14
  346:21
**10** 6:8 82:9
  118:18 192:21
  192:22 329:2
  332:6 432:2
  442:19,20
  443:11 445:24
  445:25
**10,000** 81:3
**10:23** 93:23,25
**10:42** 94:2
**1063** 414:18
**11** 5:5,11 328:7
  328:10,20
  332:5 432:2
  480:6,14,25
  481:3,4,5,12
  481:16
**110** 6:6
**1100** 3:22
**116,000** 83:25
**118** 6:8
**11939** 2:22
**12** 6:10 151:9
  301:24 302:21
  302:23,25
  332:5 432:2
**12:17** 207:11
**12:18** 207:9
**12:57** 207:13
**13** 5:12,18 6:11
  165:12,16
  332:5 432:3
**13.8** 369:9
**130** 2:9
**131** 405:5,17
**14** 6:15,21
  170:23 171:3,6
  207:24 212:22
  266:1 300:12
  300:14 332:5

  355:4 359:10
  359:11 432:3
  443:10
**14.1** 214:4,14
**1416** 450:3
**1440** 3:11
**14807-96-6** 6:12
**15** 332:6,17
  363:17 379:3
  432:3
**150,000** 83:19
**151** 6:10
**16** 332:6,10,11
  432:3
**16-2738** 1:4
**165** 6:11
**17** 432:3 481:5
**17.8** 364:9
**170** 6:15
**173** 405:5,20
**174** 405:5
  406:20 407:2
**175** 405:23
**17th** 83:24
**18** 1:8 10:6
  311:1 486:7
**1856** 203:12
**188** 202:3,8
**19** 2:18 325:12
  487:19
**19103** 3:7
**1965** 47:3 48:5
  50:9,12 203:4
**1980s** 152:5
**1981** 359:19
**1982** 151:3,16
  152:7,23 153:3
  153:25 274:7
  280:14,16
  299:20 300:11
  301:16 308:2
  346:18,20
  347:5 362:5,18
  365:13 395:16
**1983** 393:6,13
**1985** 359:19
**1990** 367:16

**1990s** 152:5
**1992** 346:19,25
  359:12 362:3
  367:16
**1993** 302:19
**1994** 393:6
**1995** 428:11
**1996** 44:25
  229:20
**1998** 302:19

**2**
**2** 5:3,12 13:7,12
  19:23 56:19,20
  106:19 109:15
  114:19 117:20
  126:23 127:1
  217:13,18
  266:15,22
  309:2,3,10
  312:19 315:24
  319:16 330:8
  343:6 412:2
  413:9 423:24
  432:2 449:1,4
  449:25 450:2
  450:16 457:9
  458:3 467:18
  467:19
**2.0** 307:8,19
  309:19 312:7
  313:14
**2.4** 311:12,21
**2.5** 341:21
  369:14
**2.89** 346:22
**2.9** 365:10
**2:00** 280:1,2
**2:11** 280:4
**20** 79:16,18 81:5
  185:2 192:20
  196:2 273:4
  397:21 442:19
  445:24 450:17
  450:18 451:24
  452:12 489:16
**20-plus** 442:18

Christian Merlo, M.D., MPH

445:23
**20/80** 64:3
**200** 6:19 317:17
319:6 419:9
**2000** 3:6 273:3
274:1,11
**20004** 3:17
**20005** 3:11
**2000s** 152:6
**2003** 94:9 302:2
**2006** 169:10,15
**2009** 7:4 50:5
302:2
**2010** 169:8,14
466:20,22
468:22 469:11
469:13 470:12
**2010s** 152:6
**2013** 90:4,22
**2014** 90:21
424:17
**2015** 54:16 56:7
56:16,23 57:1
79:21 90:20
387:13 395:17
**2016** 79:21
88:20 90:5,20
152:7 153:25
274:7 393:7
456:11
**2017** 79:22
81:22 91:6
**2018** 6:14 79:22
81:22 83:24
84:6,12 91:7
97:1,3,7,10
104:14 107:17
108:8,15,24
109:4,7 150:10
150:11,21
391:23,24
424:11
**2019** 1:8 5:18
7:24 8:4,6 10:6
48:4 54:5
66:25 82:22,23
83:1,23 84:20

85:3 91:7
105:21 107:14
149:22 486:7
487:19
**202** 3:12,17
**206** 6:21
**209695** 7:10
**209705** 7:10
**21** 6:17 418:17
419:5 466:3,4
**215** 3:7
**216** 3:23
**217** 6:23
**22** 6:19 200:6,11
319:24 362:22
362:23 364:21
**22311** 2:14
**23** 6:21 206:6,10
207:17,23
235:12 265:22
265:23 317:20
354:23 355:5
**23.1** 232:19
233:1
**232** 7:1
**24** 6:23 217:7,16
217:24 287:22
288:13 299:9
424:13
**249** 334:9,17
**25** 7:1,24 8:4,6
105:21 232:3
287:23 288:13
299:9 314:25
333:1 335:6
336:2 426:18
**250** 213:15,25
214:1,3
**251** 7:3 213:11
213:12,13
355:6
**255** 266:5
**256** 266:4
**257** 266:6
**26** 7:3,18,21
251:9,14 254:5
288:14 401:8

440:23 441:1
445:13
**260** 213:11
215:7,8,10
**268** 7:5
**27** 7:5 244:21
268:8 458:24
**270** 7:7
**272** 7:8
**2738** 10:16
**28** 7:7 270:12,16
273:14 328:4
329:9 375:13
375:16 414:14
414:15 458:10
458:11
**28,995** 84:19
**29** 7:8 272:22
273:6 282:3,8
**29,000** 85:3

_____

**3**

**3** 5:14 32:22
33:7 78:8,13
78:13,19 83:24
96:18 101:4,6
102:18 105:12
150:17 178:6
273:21 310:25
334:17 363:20
432:2 449:6
451:20
**3,600** 450:22,23
**3.9** 347:4
**3.98** 375:13,16
**3:01** 337:22,23
**3:16** 337:25
**30** 7:11 34:12,25
45:2 81:7,8
85:2 151:21
172:2 183:12
314:25 333:1
335:6 336:3
393:20 401:9
438:5,9 458:13
458:25 485:10
485:13 488:15

**30-some-odd**
393:19
**303** 2:10
**309** 7:14
**31** 7:14 309:24
310:3 338:3,12
338:21 479:21
479:22 480:14
480:15
**31,000** 90:20
**314** 7:17
**316** 2:4
**32** 5:14 7:17
305:16,19
314:18,22,25
400:17,20
430:12,24
431:4,10 458:3
**324** 7:18
**32502** 2:5
**33** 5:16 7:18
229:8,14,15
305:24 324:9
324:11 393:20
424:1
**330** 7:20
**331** 7:21
**334** 7:23
**335** 451:21
**34** 7:20 151:18
330:17,18
339:16,19
**344** 8:1
**345** 452:22
453:12
**35** 7:21 125:17
125:21 151:18
248:23 331:24
**351** 8:3
**353** 8:5
**359** 8:7
**36** 7:23 334:3,7
**37** 8:1 263:17
344:2,6 361:18
361:19 393:3
**371-7000** 3:12
**374** 8:9

**378** 8:21
**38** 8:3 260:5,6,6
351:19,24
**39** 8:5 353:4,5
353:13 424:13
**396** 8:12
**3A** 5:16 33:12
33:15
**3B** 5:18 78:18
78:20
**3rd** 66:25

_____

**4**

**4** 5:20 54:20,24
70:22 311:3
432:2 451:20
468:21,23
**4.0** 363:22
**4.8** 363:1,8
364:6,24
368:24
**4:20** 406:13,15
**4:32** 406:17
**40** 8:7 81:9
124:15 159:11
207:1 329:7
359:22 360:1
426:18
**404** 8:14
**409** 375:19
**41** 8:9 374:18
**410** 8:16
**418** 6:17
**42** 8:12 307:6,12
396:14,17
412:5,13 484:5
**42,000** 90:21
**43** 8:14 307:14
323:6 327:6
331:16 404:20
404:25 406:21
484:1,12
**435-7000** 2:5
**438** 7:11
**44** 8:16 126:21
126:22 331:16
347:17,21

Christian Merlo, M.D., MPH

352:21 410:13
410:19 419:9
419:11 484:1
484:12
**44-55** 8:4
**44,000** 88:20
90:19
**44113** 3:22
**446** 8:18
**45** 8:6 189:21,24
347:17 351:7
352:18,21
353:16 430:17
430:23 431:12
431:14 484:1,5
484:12
**46** 6:7 8:18
105:13 109:14
109:24 114:11
236:22,23
238:14 253:9
308:5 446:9,13
484:1,12
**46-page** 119:6
**46032** 2:23
**463-2400** 3:17
**47** 8:19 88:9,12
**479** 5:6
**48** 8:21 378:24
**483** 5:7
**487** 9:1
**489** 9:2
**49** 438:25
**490** 9:3
**4900** 2:13
**491** 9:4

———————
**5**
**5** 5:22 57:25
58:4 85:2
329:2 432:2
454:8 455:5
**5:22** 457:22,23
**5:36** 457:25
**50** 52:10,13
81:11 159:11
259:7

**50/50** 64:4
**50s** 257:17
**530** 86:10 87:5
**54** 5:20
**540** 87:2
**549-7000** 3:3
**55** 258:15,19
259:7,9,12
**57** 5:22
**592-5000** 3:23

———————
**6**
**6** 6:1 65:24 66:3
102:6 243:23
379:3 414:18
414:21,22,23
432:2 455:6,7
**6.3** 232:17
235:11 321:7
**6.9** 369:22
**6:01** 486:7,10
**60** 46:25 81:13
259:12
**600** 2:4 3:2
**62** 325:13
**63** 325:13,24
326:7 327:10
327:11
**65** 6:1 77:6
258:15,19
259:9
**650** 2:13

———————
**7**
**7** 6:3 70:19 71:3
84:20 85:3
202:8,11,19
347:4 432:2
**7,200** 451:25
452:13
**70** 6:3 81:16
**703** 2:14
**720** 86:10
**720-1288** 2:19
**75** 229:8,16
**750** 1:14 10:10
**77** 38:18

**78** 5:18 30:11
**79** 20:4 30:11
50:22
**79,000** 90:21

———————
**8**
**8** 6:5 7:5 52:22
83:12,14 97:7
249:6 268:14
269:12 432:2
**80/20** 64:3
**80220** 2:9
**82** 325:13 347:7
**83** 6:5
**839-8000** 2:10
**850** 2:5
**87** 325:13 328:9
**877.370.3377**
1:24
**88** 8:19 325:13

———————
**9**
**9** 6:6 110:10,14
114:3,4,5
369:22 432:2
**9:06** 1:15 10:8
**900** 1:15 10:11
**917.591.5672**
1:24
**92** 347:1,6,8
362:4
**92660** 2:18
**931-5500** 2:14
**94** 393:13
**949** 2:19
**95** 341:5,10,16
346:21 347:4
363:21 365:9
375:16 379:22
395:2 398:16
398:19 449:11
**950** 3:22
**973** 3:3
**975** 3:16
**988-2700** 3:7
**99** 264:7,7